# EXHIBIT A.948
## (1 of 8)

[Emblem of the State of Israel]

**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

**Before the Hon. Judge Dalia Ganot**

| | |
|---|---|
| **The Plaintiffs** | 1. **Estate of the Deceased, Amit Amos Mentin** |
| | 2. **Raines [sic] Nitza Mentin** |
| | Represented by Counsel, Adv. Anat [sic] |

v.

| | |
|---|---|
| **The Defendants** | 1. **Bezeq Israeli Telecommunications Co. Ltd.** |
| | 2. **Asher Ben Naim** |
| | 3. **Yekutiel Lavi – Director of the Department for Physical Security** |
| | 4. **Dror Overlander** |
| | 5. **Yehuda Aryeh** |
| | 6. **Lilit Security Ltd.** |
| | 7. **The Palestinian Authority** |
| | 8. **The Palestinian Council** |
| | 9. **Harel Insurance Company Ltd.** |

**Judgment**

1.  I have before me a Statement of Claim that was filed by the Estate of the Deceased, Amos Mentin of blessed memory (hereinafter: the "**Deceased**") and by Ines Nitza Mentin – the mother and the heiress of the Deceased (hereinafter: the "**Mother**") against Bezeq Israeli Telecommunications Co. Ltd., against Asher Ben Naim, against Yekutiel Lavi, against Dror Overlander, against Yehuda Aryeh, against Lilit Security Ltd., against the Palestinian Authority, against the Palestinian Council, and against Harel Insurance Company Ltd.

**The facts relevant to the matter**

2.  On June 26, 2036 [sic], Amit Amos Mentin was murdered, when, in the course of his work as a Bezeq technician in the town of Baqa al-Gharbiyya, he was shot by a terrorist.

    The Deceased was murdered in the course of a terrorist attack, which was carried out by a terrorist, a minor who was 15.5 years old on the date of the event. The terrorist was captured and tried, and is serving his sentence in a prison in Israel.

1 of 90

P1: 886



[Emblem of the State of Israel]

**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

3.   The Plaintiff claims that the Defendants are liable for the murder of her son, and are therefore obligated to compensate her for her damages as a result of the murder of her son.

4.   It should be noted at the outset that Lilit Security Ltd. is a company in liquidation and an order for stay of proceedings against it has been issued. This, however, does not prevent the determination of its liability, should there be such, for failure to prevent the murder of the Deceased.

5.   For the purposes of writing this Judgment, I have decided to view the Defendants Bezeq Israeli Telecommunications Co. Ltd. (hereinafter: "**Bezeq**"), Yekutiel Lavi, Dror Overlander, and Yehuda Aryeh, as a single entity, and accordingly, I shall not consider the personal liability of each of Defendants No. 3 through No. 5, meaning that their liability or the absence thereof shall be determined jointly and severally with Bezeq (hereinafter: the "**Bezeq Group**").

**The murder**

6.   For the purposes of determining liability in torts, it is necessary to determine the facts of the incident, which ended in the tragic death of the Deceased.

On June 26, 2003 a Bezeq technician – the Deceased – and a security guard, Asher Ben Naim (hereinafter: "**Ben Naim**") came to Baqa al-Gharbiyya, for the purpose of doing work for Bezeq, which included the repair of malfunctions in accordance with orders for repairs which had been placed by local residents.

The Deceased and Ben Naim came to Baqa al-Gharbiyya in two cars. The Deceased drove a Citroen Berlingo, which bore the Bezeq logo (hereinafter: the "**Berlingo**"), and Ben Naim came in his own car, which was a Honda Civic.

Ben Naim parked his car on the premises of an automotive accessories business, got into the Deceased's car, and both of them began their work.

As shall be clarified below, Ben Naim's car was left on the premises of an automotive accessories shop named Dana because Ben Naim had agreed with the shop owner, Wa'il Qa'adan (hereinafter: "**Wa'il**"), for the latter to install an amplifier in his car. Thus, as set forth above, after leaving his car, Ben Naim joined the Deceased in the Berlingo and together they began their work in Baqa al-Gharbiyya.

At a certain stage in the course of their work, during the late morning hours, the Deceased and Ben Naim returned to Wa'il's shop. According to Ben Naim's statement, they did so in order to give Wa'il the key to the Honda for the purposes of installing

2 of 90

**Tel-Aviv-Jaffa District Court**

[Emblem of the State of Israel]

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

the amplifier, and so that the latter could take them to his house, because, according to Ben Naim, Wa'il had contacted him the night before and had asked to **expedite** the repair of a Bezeq pole that had fallen next to his house.

Ben Naim left the Berlingo and the Deceased remained seated in the car, with the windows closed, and talked on the telephone while waiting for Ben Naim to return to the Berlingo. While Ben Naim was talking with Wa'il, at a distance of about 5 meters from the Berlingo, standing with his back towards the Berlingo, a youth about 16 years old approached the car, pulled out a pistol and fired five bullets into the head of the Deceased, through the closed window glass. This shooting caused the death of the Deceased.

Upon hearing the shots, Ben Naim turned around, pulled out the pistol which he carried under license as a security guard, and fired in the direction of the terrorist, who began to flee, with Ben Naim pursuing him.

As it transpired, during his flight, the terrorist threw away his weapon, which was seized by Ben Naim. It further emerged that the terrorist was wounded as a result of Ben Naim's shooting at him, which enabled his capture. He was hospitalized in **Hillel Yaffe** Hospital in Hadera for the purposes of medical treatment.

Upon hearing the shots, an additional Bezeq team, which was also engaged in repairs in Baqa al-Gharbiyya on the same day, came to the scene. The security guard, Oni Devir, got into the Berlingo, sat down in the seat next to the driver's seat and attempted to speak to the Deceased, and even to resuscitate him, but his efforts failed because the Deceased had died from his injury.

To complete the picture, it should be noted that an ambulance operated by Wan (an ambulance company in the Palestinian Authority) arrived at the scene of the incident and refused to treat the Deceased, and even removed him from the ambulance after he had already been placed inside it. In the end, a Magen David Adom ambulance arrived at the scene; the Magen David Adom ambulance team pronounced the death of the Deceased and evacuated him from the scene.

## The liability and the tort of negligence

7.   In this Judgment, I intend to review and determine the legal relationship between the Deceased and each of the Defendants, in order to establish or to negate liability, and, should liability be established, I shall consider the question of whether the duty of care vis-à-vis the Deceased was breached, and whether there is a legal causal relationship between the breach of the duty and the damage that occurred.

8.   For purposes of proving liability for the tort of negligence, the existence of three elements must be proved:

3 of 90

**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

    a.    The existence of a duty of care that applies to the tortfeasor vis-à-vis the injured party, both at the level of a conceptual duty of care and at the level of a concrete duty of care.

    b.    A breach of the duty in question.

    c.    Proof of the damage as a result of the breach of the duty.

(Civil Appeal 145/80, **Vaknin v. Bet Shemesh Local Council** *et al.*, *PD* 37 (1) 113 (hereinafter: the "**Vaknin Case**").

9.    Regarding the existence of a conceptual duty of care – the question is whether there is a duty of care between a particular category of tortfeasors and a particular category of injured parties. This question is examined in light of the test of foreseeability – in other words, whether the tortfeasor could have foreseen the occurrence of the event, and whether he should have foreseen it in the normative sense. (Civil Appeal 653/97, **Baruch and Tzippora Center Ltd. v. Municipality of Tel Aviv-Jaffa,** *PD* 53 (5) 817 (hereinafter: the "**Baruch and Tzippora Center Case**").

The final determination regarding the question of normative foreseeability, which constitutes the conceptual duty of care, is a matter of legal policy (see **Baruch and Tzippora Center Case**, *ibid.,* at 825); I shall discuss this question, as it relates to each of the Defendants, below.

**The conceptual duty of care in the relationship between the Deceased and Bezeq, Yekutiel Lavi, Dror Overlander and Yehuda Aryeh (the Bezeq Group)**

10.    Bezeq was the Deceased's employer at the time of his murder; the murder was committed in the course of a working day. It seems to me that there is no need to elaborate regarding the existence of a conceptual duty of care between an employer and his employee. This duty is well recognized within the framework of the legal policy of the court, as it receives consistent expression in its case law. In principle, a reasonable employer should and can foresee the occurrence of bodily harm to his employee (see *e.g.* Civil Appeal 684/76, **Ayal v. Fuxman**, *PD* 31 (3) 349, at 359), as determined, for example, in Civil Appeal 663/88, **Sharizian v. Ashkelon Plywood Ltd.** (*PD* 47(3) 225, at 229 (hereinafter: the "**Sharizian Case**"):

> "It would seem that today it is no longer necessary to examine the very existence of the conceptual duty of care between an employer and his employee. This duty is well recognized in extensive and consistent case law."

See also a statement by the Court in Civil Appeal 417/81, **Hotel Ramada Shalom v. Amsalem**, *PD* 38(1) 72, at 76 (hereinafter: the "**Hotel Ramada Shalom Case**"):

4 of 90

[Emblem of the State of Israel]

## Tel-Aviv-Jaffa District Court

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

> "An employer – as an employer vis-à-vis his employees, there can be no doubt that this duty of care is imposed upon him."

11. All that which has been set forth above indicates that there is no dispute regarding the existence of a conceptual duty of care between the Deceased and the Bezeq Group.

### The conceptual duty of care between the Deceased and Asher Ben Naim and Lilit Security Ltd.

12. Asher Ben Naim – the security guard – was an employee of Lilit Security Ltd. (hereinafter: "**Lilit**") and was engaged by Bezeq as a security guard. At the time of the incident, he was guarding the Deceased; accordingly, by virtue of the definition of his role – the security guard of the Deceased – he was required to keep the Deceased safe and secure. This fact gives rise to a conceptual duty of care in the relationship between Ben Naim and Lilit, on the one hand, and the Deceased, on the other.

### The conceptual duty of care between the Deceased and the Palestinian Authority and the Palestinian Council

13. As shall be clarified further in this Judgment, in the relationship between the Palestinian Authority and the Deceased, there was a clear and unequivocal concrete duty of care, which was breached by the Palestinian Authority.

Given the existence and the breach of this duty, the necessity of giving traditional consideration to the question of the existence of a conceptual duty of care is doubtful.

This position has recently been expressed in case law and the legal literature, as part of a position which holds that there is no need to prove a conceptual duty of care, since – insofar as the question is whether there is an impediment in principle to imposing liability upon a certain category of tortfeasors with respect to a certain category of injured parties – this examination is too generalized, and preference should therefore be given to the approach which holds that, in any event, the conceptual duty of care will only be ruled out in isolated cases, and that it is preferable to address the specific circumstances of the case. In other words, the Court should first examine the question of the existence of negligent conduct; if the answer to that question is affirmative, it should then proceed to examine whether there was a concrete duty of care, while skipping the question of conceptual liability (Civil Appeal 878/06, **Dr. Troyaft** *et al.* **v. Attiah** *et al.*, published in the Nevo database; hereinafter: the "**Troyaft Case**"); Y. Gilad, "**The Elements of the Tort of Negligence**" [Hebrew], *Dinei Mishpat* XIV (5749 – 1989) 319; Y. Gilad, "**Causality in the Israeli Laws of Torts**" [Hebrew], *Mishpatim* XIV (5744-5745 – 1984-1985).

5 of 90

Case 1:04-cv-00397-GBD-RLE [Emblem of the State of Israel] Filed 06/25/14 Page 7 of 26

**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

This is the place to state that there are cases in which there is no difficulty in establishing the existence of a conceptual duty of care before examining the question of the concrete duty of care. However, there are also cases – such as the case which is before me – in which it is difficult to initially consider the question of a conceptual duty of care, which becomes self-evident once the question of the concrete duty of care has been clarified.

In view of the above, I hereby rule at this stage –as shall be clarified below – that there was a conceptual duty of care in the relationship between the Deceased and the Palestinian Authority.

### The concrete duty of care and the breach thereof

14. On this level the question to be examined is "**whether, in the relations between the specific tortfeasor and a specific injured party, under the special circumstances of the case, there is a concrete duty of care with respect to the specific damage that occurred**" (Vaknin Case, *ibid.*, at 125, Civil Appeal 3510/99, **Walles v. Egged – Cooperative Transport Association in Israel**, *PD* 55 (5), 826, at 840).

This question, like the previous question, is examined pursuant to the test of foreseeability. In other words: Could a reasonable person have foreseen the occurrence of the damage at the technical-factual level, and should he have foreseen the occurrence of the damage under its specific circumstances, at the normative level?

Case law holds that the liability of a tortfeasor who owes a duty of care vis-à-vis an injured party does not extend to every case in which the injured party sustains damage as a result of the tortfeasor's actions or omissions. The occurrence of the damage as such does not indicate that the duty of care was breached. The tortfeasor is responsible for taking reasonable precautions vis-à-vis the injured party, and only if he failed to take them, and damage was caused as a result, does the tortfeasor's liability become finalized (see: Civil Appeal 437/87 **Cohen v. Israel Electric Company Ltd.,** *PD* 44 (1) 807, at 809).

The reasonableness of the precautionary measures is determined according to objective criteria, which are summed up in the dictum that the tortfeasor must act in the manner in which a reasonable person would have acted under the circumstances of the case. This level of care is determined according to considerations of legal policy (**Vaknin Case**, at 131).

15. As I noted, the injured party must prove the existence of a factual causal relationship and a legal causal relationship between the breach of the duty of care toward him and the damage that he sustained (Section 64, Torts Ordinance [New Version] (hereinafter: the "**Torts Ordinance**"); **Vaknin Case**; page 144; Civil Appeal 576/81, **Ben Shimon v. Barda,** *PD* 38 (3) 1, at 7 (hereinafter: the "**Barda Case**"); Civil Appeal 610/94, **Buchbinder v. Official Receiver in his Capacity as the Liquidator of the North American Bank,** *PD* 57(4) 289, at 309, 311 (hereinafter: the "**Buchbinder Case**").

6 of 90

[Emblem of the State of Israel]

**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

The purpose of the rules of causation is to determine, whether in terms of the law, there is a sufficient relationship between the fault of the tortfeasor and the damage suffered by the injured party. The existence of this relationship establishes the liability of the tortfeasor or tortfeasors for the damage, and the injured party's right to the remedies which arise from that liability (see: Y. Gilad, "**Causality in the Israeli Laws of Torts – a Renewed Examination**" [Hebrew], *Mishpatim* XIV 15 – 16 (hereinafter: "**Causality in Israeli Law**").

16. The factual causal relationship – the basic requirement is that, on the factual level, the damage must be caused by the tortfeasor's conduct (by way of action or omission). This conduct must be a necessary or sufficient cause for the occurrence of the damage (see Y. Gilad, "**The Elements of the Tort of Negligence in the Israeli Laws of Torts**" [Hebrew], *Iyyun Mishpat* XIV 319, 326.

It is generally said that this test means that the breach of the duty of care constitutes a *causa sine qua non*. In other words, without the breach of the duty, the damage would not have been caused (**Vaknin Case**, 144; **Causality in Israeli Law**, 17). Any cause which was sufficient to cause the damage will be considered as a factual cause of the damage (**Causality in Israeli Law**, 18). In the present context, this means that it is necessary to examine whether the negligence of each of the Defendants before us, on a factual level, constitutes the *causa sine qua non* of the Plaintiff's damage (**Buchbinder Case**, 311). As shall be clarified below, the conduct of each of the Defendants, in my humble opinion, constitutes the *causa sine qua non* for the damage to the Deceased, and if not for the negligent conduct which shall be specified below, the tragic event would not have occurred. Alternatively, even had there been an attempt to shoot the Deceased, he would not have died as a result of that attempt.

17. The legal causal relationship – having established the existence of a factual causal relationship, the question which now arises is whether the causal relationship is not negated by considerations of "**legal causation**".

It has been ruled that the "**predominant cause**" for the occurrence of the damage is determined on the basis of legal criteria, which principally consists of three alternative tests: the test of foreseeability, the test of risk and the test of common sense (**Barda Case**, 7; **Causality in Israeli Law**, 24).

As I noted, these tests are alternative and not cumulative. However, as I shall show below, I am of the opinion that all three of the tests have been proved with respect to the Defendants.

As I noted above, according to another approach cited in the case law, no distinction should be made between the conceptual and the concrete duty of care; rather, the question should be examined as a single unit (see *e.g.* Civil Appeal 10084/04,

7 of 90

Case 1:04-cv-00397-GBD-RLE    Document 547-549    Filed 06/25/14    Page 9 of 26
[Emblem of the State of Israel]
**Tel-Aviv-Jaffa District Court**
Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

**Goder v. Modi'in Local Council**, published in the Nevo database; Civil Appeal 2625/02, **Nachum v. Dornbaum**, *PD* 58 (3) 385, at 408; Civil Appeal 10078/03, **Shatil v. State of Israel**, published in the Nevo database). This approach is reflected in Civil Appeal 915/91, **State of Israel v Levi** (*PD* 48 (3) 45), where it was ruled that the duty of care shall be recognized if two elements exist. The first element is that of "vicinity" or "proximity"; the second is a judicial conclusion according to which it is just, reasonable, and fair to determine a duty of care. In this case, as part of the first element, the relationship between the tortfeasor and the injured party – which may be a legal relationship, a physical relationship, or by force of reliance and the like, all of which create the duty of care – is examined. As part of the second element, various considerations of judicial policy are considered (see **Levi Case**, 66-70; **Dornbaum Case**, 408-409). (Regarding the relationship between the approaches, see an article by Yisrael Gilad, "**Working Assumptions, Judicial Intuition, and Rationality in Determining the Scope of Liability in Negligence**" [Hebrew], *Mishpatim* XXVI 295, at 304, 305 (5756-1996).

Without going into detail on the difference between these approaches, it seems to me that they both involve similar considerations of policy and judgment, in light of which the boundaries of the duty of care should be defined, and that they have the same objective – as was very aptly expressed by the Honorable Justice Rivlin, in the **Dornbaum Case**, where he ruled:

> "**The applicability of the tort of negligence is,** *inter alia***, a result of determining the boundaries of the duty of care. These boundaries may distinguish between the cases in which a person was negligent and in which, in light of policy considerations, liability for his actions should be imposed upon him, and the cases in which the tortfeasor was indeed negligent, but policy considerations bring the Court to the conclusion that it would not be appropriate to impose responsibility upon him**" (**Dornbaum Case**, 408),

This being so, I shall make my best efforts in attempting to combine the two approaches, in order to arrive at the correct and appropriate result.

## The concrete duty of care in the relationship between the Deceased and the Bezeq Group

18.  The conduct of the Bezeq Group should be examined in accordance with the affidavits and the testimony of the Defendants and of additional, relevant witnesses.

I shall immediately state that I do not attribute any evidentiary value to the testimonies of the Plaintiff and the brother of the Deceased, Mr. Ronen Mentin, regarding the manner in which the event which constitutes the object of the Statement of Claim occurred; this is because, in this matter, their testimony constitutes

Case 1:04-cv-00397-GBD-RLE   Document 547-549   Filed 06/25/14   Page 10 of 26

[Emblem of the State of Israel]

**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

hearsay because they were not present at the scene of the incident, at the time of the incident, and, in any case, they are not personally aware of the work procedures at Bezeq.

Defendant No. 2 – Yekutiel Lavi (hereinafter: "**Lavi**") – submitted an affidavit of evidence in chief and even testified before the Court.

Lavi's statements indicate that, at the time of the incident, he headed Bezeq's Security, Safety and Emergency Division (Section 2 of his affidavit).

Lavi claimed in his affidavit that, at the time of the terrorist attack which constitutes the object of the Statement of Claim, the entire State was suffering from "**a harsh reality of acts of terror and destruction, which took the lives of many innocent people**" (Section 7 of the affidavit). These were the days of the Second Intifada, which were undoubtedly very stormy and were characterized by numerous terrorist attacks and attempted attacks all over the country. Accordingly, in Lavi's opinion – and in the opinion of all of the other Bezeq witnesses – in view of the difficult security situation throughout the country, which Bezeq could neither have prevented nor foreseen, no liability should be imposed upon it.

I do not accept this position. Precisely because the security situation was particularly grave, and was known to all those concerned, Bezeq should have made sure that it had updated its security arrangements and had changed its procedures in order to adapt them to the situation which was described by its personnel. This did not happen.

Lavi claimed in his affidavit that, by virtue of his position, "**I know that Bezeq, at the relevant times, had introduced security procedures and rules which were appropriate and reasonable, and even beyond that**" (Section 17 of the affidavit). Accordingly, it would have been appropriate to produce these updated procedures, which had *prima facie* been adapted to the security situation which prevailed within the State of Israel at the relevant times, and especially in the "seam zone" cities and towns adjacent to the border, such as Baqa al-Gharbiyya. However, with the exception of statements, some of which were backed by vague documents and some were not, Bezeq did not take up the burden which was incumbent upon it – proof of the existence of **updated** security procedures, which were adapted to the security situation typical of the Second Intifada.

Lavi directed the attention of the Court to a procedure which was issued in January 1995 (!!), "**in Bezeq's Security Division – of which, as said, I was the head – a procedure for conduct in the Territories and in sensitive areas, and we made sure to disseminate it and publicize it among the Company's employees, the security guards and the technicians, and to supervise its execution and enforcement by them**" (Section 19 of the affidavit). The problem was, however, that these grand statements remained a dead letter on the pages of the affidavit and were not proved. Quite the opposite is true. In my humble opinion, it was positively proved that no new procedures were published as an updated response

9 of 90

[Emblem of the State of Israel]

**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, Estate of the Deceased, Amit Amos Mentin, *et al.* v. Bezeq Israeli Telecommunications Co. Ltd. *et al.*

to the grave security situation that prevailed in Israel at the time of the terrorist attack, and that, in any event, the procedures were not enforced – since, as set forth above, they had not even been published.

In the course of Lavi's examination, it emerged that he began to work for Bezeq in the year 2000 (page 64 of the Court transcript, line 25). Accordingly, the declaration included in Section 19 of his affidavit is not clear, because it transpired that, at the time of the publication of the procedure, in 1995, he was not even a Bezeq employee, and was accordingly not involved in the drafting of those procedures (page 87, lines 7-12). Moreover, these procedures, which were drafted in 1995, were drafted before the outbreak of the Second Intifada, which erupted in September 2000 and continued until October 2005; by their very nature, they were not adapted to the security situation that prevailed in the State of Israel during those years.

In his examination, Lavi claimed that, upon taking his position in Bezeq, he "**went over**" the rules dating from 1995. In response to the question of whether he did not believe they should be updated, he replied, "**We occasionally issued ... we issued instructions; we occasionally issued, I issued instructions … there were temporary instructions that I issued…**" (page 88, lines 19-27). However, when he was asked to present those temporary instructions, or new procedures, he answered, "**They are in the Bezeq files**" (page 89, line 4), but he did not "**remember**" whether there was a document which was more updated than Appendix A to his affidavit, which is nothing more than that same irrelevant, outdated procedure dating from 1995.

This conduct on Bezeq's part – as reflected in Lavi's testimony – is grave, because Lavi testified that, before writing his affidavit, he examined the Bezeq security file. The file in question was not submitted to the Court, and according to Lavi, "**it is not here**" (page 86). He further affirmed that he determined the Bezeq security policy (page 140, lines 1-2). It could therefore have been reasonably assumed that Lavi was quite conversant with the Bezeq security plans and capable of presenting them in detail to the Court. That hope, however, was disappointed.

Lavi testified that he knew that Baqa al-Gharbiyya was located on the border, referred to as the "seam", between the Green Line and the territories under the management of the Palestinian Authority, and especially the adjacent town of Baqa al-Sharqiyya. He also stated that he was aware of how easy it was to go from Baqa al-Sharqiyya to Baqa al-Gharbiyya during the period relevant to the terrorist attack (page 71, lines 14-18; page 72) (there is now a separation fence in that location).

Notwithstanding the proximity of Baqa al-Gharbiyya to the border, and despite the perpetration of a number of terrorist attacks and attempted attacks, including incidents which ended in the deaths of Israelis during the relevant years of the Second Intifada, Bezeq did not keep an incident log, in order to explore the foreseeable risk for its employees in the "seam zone". Moreover, in any event, it did not prove that it attempted to contend with this danger (page 79, lines 18-25; page 80). Lavi repeatedly asserted the existence of security procedures at Bezeq (page 84, lines 15-20) and of work plans (page 106, lines 6-16). However, when asked to present them, he answered, "**They are**

Case 1:04-cv-00397-GBD-RLE   Document 547-549   Filed 06/25/14   Page 12 of 26

[Emblem of the State of Israel]
**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

**in the office"** (page 137). He even went so far as to say that in accordance with the work plans in question, the existence of which was not even proved, employees were even monitored in order to ensure their compliance with them (page 106, lines 6-16; page 110).

In his testimony, Lavi spoke at length about the work procedures and the various guidelines that were given to the employees. However, when he was asked to present them, he said that these guidelines were given "**orally**" (page 127, line 199).

Lavi claimed that in addition to the work procedures and guidelines which were given orally, the existence of which, as set forth above, was not proved, the employees – technicians and security guards – also received security briefings.

When asked whether the briefings were conducted in accordance with an organized work plan, Lavi surprisingly responded that the briefings were given, *inter alia*, "**based on the intuition**" of the Bezeq personnel, who "**felt**" that they should assemble the workers for a briefing (page 101; page 122).

Lavi also claimed that the procedure – dating from 1995 – was distributed among the security guards at the time when they received the briefing (??) (page 139). However, he had no answer to the fact that reading the 1995 procedure shows that it refers to Areas A, B, and C, and actually does not refer to the territory of the State of Israel (page 139). Furthermore, this procedure states that **two** armed employees are to be sent out (page 111). As it transpired, in the case which constitutes the object of the Statement of Claim, Ben Naim, the security guard, was the only one carrying a weapon. In other words: Bezeq did not even comply with the inappropriate and outdated procedure, and did not send **two** armed workers to Baqa al-Gharbiyya.

In Section 15 of his affidavit, Lavi claimed that "**at no stage did the Israel Police or any other authorized security entity give Bezeq any guidelines, prior to the event, on how to act when the Company performs work in an Arab settlement...**". Contrary to this declaration, however, it emerged in the course of his testimony that, according to his own statement, a close working relationship existed between Bezeq and the Israel Police, which included contacts on a daily basis, even though most of them were not recorded.

Appendix E to the Lavi affidavit indicates that, on the morning of the incident, a Bezeq telephone receptionist named Einat had a conversation with the Eiron Police (with a person named Hadar), as she did every morning, as claimed by Bezeq, and she was told that "**there are no restrictions**" (pages 82-83). Further in his testimony, Lavi claimed that work meetings were conducted between Bezeq and the Israel Police, and that the Israel Police had approved the security policy adopted by Bezeq and had even instructed Bezeq (pages 84-85); no documentation of this, however, was submitted. More precisely: this testimony totally and absolutely contradicts the allegations appearing in Section 15 of Lavi's affidavit, where he argued that the Israel Police did not instruct Bezeq – an argument that sounded like a complaint by Bezeq against the Israel Police.

11 of 90

**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

Lavi testified that ongoing meetings were conducted with the Israel Police (pages 95-96), and that, pursuant to those meetings, the Bezeq procedure had *prima facie* been changed. However, he did not produce any documentation of this (page 112).

It would seem reasonable to assume that, in contending with the grave security situation that prevailed in the State during the Second Intifada – a situation of which the Bezeq security personnel, like every other citizen of the State of Israel at that time, were undoubtedly aware – Bezeq would have established strict, updated and upgraded procedures, in anticipation of updating and guidance meetings with the Israel Police. Lavi's testimony, however, indicates that this did not happen (pages 128, 152), and Bezeq apparently continued to be updated by the Israel Police on a random and unplanned basis, although this did not prevent Lavi from continuing to argue that Bezeq did not receive any guidelines from the Israel Police regarding its conduct in Arab localities (page 154).

It subsequently transpired that, in October 2002, a briefing was conducted at Bezeq for security guards and technicians in the Hefer Region, within which Baqa al-Gharbiyya is located. Within the framework of that briefing, the technicians and security guards were updated regarding an increase in the frequency of alerts concerning terrorist attacks in the sector, alerts concerning attempts to steal weapons, and the like – all facts which indicate a specific exacerbation of the security situation in the area. Lavi was asked where Bezeq got the information concerning the exacerbation in question; he admitted that the information came from the Israel Police (pages 90-91). There was, however, no clarification as to how the information in question reached Bezeq, or which person in Bezeq received the information and decided to conduct the briefing, as set forth above, pursuant to the information that he received.

All of that which has been set forth above indicates that there were ongoing contacts between Bezeq and the Israel Police. Nonetheless, in the absence of any documentation, even as much as a single scrap of paper concerning the nature of those contacts, it is impossible to determine whether this discussion was authorized by Bezeq, was initiated by Bezeq, or perhaps was just a chance inquiry by some Bezeq employee or other to the Israel Police. In any event, it is clear that, in the absence of a defined and detailed program regarding work contacts with the Israel Police, it cannot be determined that Bezeq discharged its duty towards its workers in safeguarding their personal security.

Lavi claimed that Bezeq conducted evaluations of the situation (page 95), but no documentation was produced attesting to the performance of the alleged evaluations, or to the conclusions drawn therefrom. Accordingly, there is no escaping the conclusion that it is highly doubtful whether the alleged evaluations of the situation were really conducted, as otherwise Bezeq would have produced some kind of documentation to show that they had taken place.

As I mentioned, Lavi claimed that the employees, and primarily the security guards, were given briefings by Bezeq people – a fact that was not proved. He also claimed that they were given a booklet of sorts to document the security guidelines, and that the employees had confirmed, by way of their signatures, that they had received the booklet (pages 138-139). However, no documentation whatsoever was attached to show

P1: 897

[Emblem of the State of Israel]
**Tel-Aviv-Jaffa District Court**
Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

that the booklet had been given to the Deceased, or to Ben Naim, and, in any event, no documentation of their signature confirming the receipt of the booklet was produced.

The testimony indicates that, shortly before March 4, 2003 – about 3 1/2 months before the murder of the Deceased – Bezeq employees had complained about a sense of poor security in Baqa al-Gharbiyya, and that, pursuant to these complaints, a patrol was conducted in that location by senior Bezeq Security Department personnel.

The summary of the visit (Prosecution Exhibit No. 15) set forth the fact that the patrol was conducted pursuant to the employees' complaints and recorded recommendations for implementation, including a meeting with the Border Police Platoon serving on the site.

In his examination, Lavi referred to this patrol – which was conducted, as set forth above, at the employees' request. It then transpired that patrols such as this were actually intended **to calm the workers down** and, in any event, were not conducted for the purpose of reevaluating the level of security that should be provided for the employees (page 103). In other words: the senior members of the Bezeq security network never intended to implement any conclusions in the area of security as a result of the patrol in question – a fact which I view as particularly serious – because, as it transpired, the purpose of the patrol was to serve as a "tranquilizer" for the Bezeq employees who had complained about feelings of lack of security, and nothing more.

Lavi had no recollection of whether a meeting with the Border Police took place pursuant to the trip, although Overlander claimed that such a meeting was held and that he personally participated in it (page 184). In any event, however, no document which recorded such a meeting or its conclusions was presented to me, and I fear that Lavi's statements are correct, and that, as set forth above, the Bezeq management did not have any intention of changing the security arrangements pursuant to the patrol in question, and that the patrol itself was only intended to put the workers at ease.

This is the place to mention that Bezeq has shrugged off its responsibility for the murder of the Deceased by claiming that the Deceased and Ben Naim broke the rules by entering Baqa al-Gharbiyya in two cars when, according to the procedure, they were supposed to enter in one car only; by maintaining contact with the local population, when such contact was prohibited; and the like. As I have mentioned many times, however, the existence of procedures was not proved and, in any event, the nature of the guidelines which were included in those *prima facie* procedures has not been proved. There is accordingly no escaping the conclusion that it was not proved that it was forbidden for the technicians and the security guards to enter the work areas in two cars, or that it was forbidden for them to have any contact with the local population. More precisely: even were there proof of a prohibition to enter in two cars, in any event, it was not proved that there was a causal relationship between the act of entering with two cars and the terrorist attack in question. Regarding the prohibition against contact with the local population – no such prohibition was proved; rather, there was proof of quite the opposite. The Bezeq security guards who testified in this case (Vadim Simanovitz, Ben Naim, Oni Devir) testified that they usually received assistance from the local residents in finding the addresses of Bezeq clients and

Case 1:04-cv-00397-GBD-RLE  Document 547-549  Filed 06/25/14  Page 15 of 26
[Emblem of the State of Israel]

**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, Estate of the Deceased, Amit Amos Mentin, *et al.* v. Bezeq Israeli Telecommunications Co. Ltd. *et al.*

customarily ate in local restaurants and even did business with the locals (pages 473-474, 497-498), just as Ben Naim did with Wa'il at the time of the murder, and as clarified above, Bezeq was aware of this conduct, saw nothing wrong with it, and, in any event, did nothing to prevent it.

The failure to produce relevant documents to prove Bezeq's claims also continued in the testimony by Dror Overlander – a physical security officer at Bezeq (pages 165-166) who, like his predecessors, made numerous claims in a vague manner, without any basis, and without producing any documents to verify his statements.

Overlander admitted that, despite the exacerbation of the security situation during the relevant period, the safety procedures dating from 1995 had not been changed (pages 170-171). He claimed, however, that it was not his job to issue new procedures.

According to his statement, the duty of issuing new procedures for Bezeq was incumbent upon the Israel Police (??) (page171). However, he admitted that he had not contacted the Israel Police in this matter, although he subsequently claimed that he had contacted them but had not received answers (page 173). Naturally, none of his statements were supported by any documentation whatsoever.

Overlander admitted that Bezeq acted at its own discretion (page 178), but did not specify which considerations constituted the basis the supposed discretion, the existence of which was not proved.

Overlander further claimed that Bezeq "**consulted**" with the Israel Police (page 178) but did not remember "**with whom**" (page 179), although he examined the Bezeq files before signing his affidavit – the very same mysterious files that Bezeq did not produce for the Court. This indeed is the place to recall the axiomatic principles regarding the failure to produce evidence, as set forth by the writer Y. Kedmi in his book *On Evidence* [Hebrew], Part III, page 1649:

> "**At times, the manner in which the litigant conducts his case in the court has evidentiary significance, as though it were circumstantial evidence. Accordingly, it is possible to ascribe evidentiary significance to the failure to produce evidence, the failure to bring a witness to testify, the failure to present questions to a witness, or to the failure to cross-examine someone whose testimony was given in the form of a document in writing submitted by him. Such conduct, in the absence of a credible and reasonable explanation, will be held against the party adopting it, given that it *prima facie* calls for the conclusion that, had the evidence been produced or the witness heard, or had the questions been asked, or had a cross-examination been conducted, they would have supported the version of the rival party.**

14 of 90

[Emblem of the State of Israel]

**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

> **Failure to produce evidence – in the broader sense of the term, as explained above – establishes a factual presumption to the disadvantage of the party who failed to produce it, a presumption rooted in logic and life experience, according to which the law requires the failure to produce evidence to be considered as tantamount to an admission, in the sense that, had the evidence in question been produced, it would have operated to the disadvantage of the party who failed to produce it. In this way, evidentiary significance is attributed, in practical terms, to evidence that was not brought."**

Overlander admitted that the briefing of the technicians (Prosecution Exhibit No. 13), which took place on October 28, 2010, did not give rise to any change in the security procedure (page 180). According to his statement, he had asked the Israel Police to approve a change in the security procedure that had been written by Bezeq in 1995. However, he did not produce any written evidence to that effect (page 181), and he admitted that Bezeq had not seen fit to change and update the outdated safety procedures dating from 1995, in light of the events of the Second Intifada and in view of the rise in the level of alerts and terrorist attacks (page 181).

In excess of that which is required, I shall state that no evidence, pursuant to which Bezeq needed the approval of the Israel Police to change its security procedures, was produced; and that, in any event, no evidence was produced pursuant to which the Israel Police was involved in the drafting of the procedures dating from 1995.

Attached to the affidavit by the Deceased's brother – Ronen Mentin – as Appendix J was a document which bore the title "**List of Settlements – in the Sensitive Areas and Security Measures Required for Movement and Work Within Them**." This document is dated November 7, 2002; it appears to have been issued by Bezeq in the wake of the security situation as a result of the Second Intifada. The document is not signed, and the identity of its author is not clear.

The document indicates that someone at Bezeq felt that Bezeq employees in Baqa al-Gharbiyya should be given a security guard and a car equipped with shielding against the throwing of stones. The problem was, however, that none of the Bezeq witnesses were able to explain exactly why the document was written. Was it preceded by a specific security-related incident? Who were the members of the "think tank" of Bezeq's Security Department which considered the security needs of Bezeq employees in the settlements mentioned in the document? Who did the Bezeq people consult with before writing the document? None of this is known – and yet it is as clear as daylight that the security measures specified in this document were exclusively intended to protect Bezeq employees from stone-throwing, and not from shooting attacks. More precisely: as I mentioned, Baqa al-Gharbiyya is a town within the borders of Israel, is populated by Israeli Arabs, and is situated adjacent to Baqa al-Sharqiyya, an Arab town located within the area controlled by Palestinian Authority, and the attendant risk stems from its close proximity to Baqa al-Sharqiyya, and not specifically from being in Baqa al-Gharbiyya, an Israeli town located within the Green Line.

P1: 900

[Emblem of the State of Israel]

## Tel-Aviv-Jaffa District Court

Civil File 1047-04, Estate of the Deceased, Amit Amos Mentin, *et al.* v. Bezeq Israeli Telecommunications Co. Ltd. *et al.*

The testimony which was given before me indicates that there is a useless obstacle between the two towns, which did not prevent transit from Palestinian Baqa al-Sharqiyya to Israeli Baqa al-Gharbiyya – just as the terrorist himself testified, when he testified about the intolerable ease with which he made the move from Baqa al-Sharqiyya to Baqa al-Gharbiyya.

I was not presented with so much as a single document drawn up by Bezeq, which assessed the security needs of Bezeq employees in Baqa al-Gharbiyya, which is so close to Palestinian Baqa al-Sharqiyya, and set forth the risk resulting from the ease of transit from Palestinian territory to Israeli territory – an ease which "**invites**" an attacker such as the terrorist to equip himself with a weapon, to enter Israeli territory and to carry out a murderous attack.

Did the Bezeq security personnel assess the danger involved in the proximity of Israeli Baqa al-Gharbiyya to Palestinian Baqa al-Sharqiyya? Did they consider the possibility of easy and "convenient" transit from Palestinian territory to Israeli territory, and the immense danger that this posed for Bezeq employees? As set forth above, no documents were presented which attested to the exercise of any discretion at all in this matter, or any attempt to consult with the Israel Police concerning the protection required for Bezeq employees (see testimony by Aryeh Yehuda, page 337). The unfortunate conclusion is that the Bezeq management and the Bezeq Security Division acted in an unprofessional and grossly negligent manner – thereby enabling the terrorist to enter Israeli territory with no difficulty whatsoever and to murder the Deceased.

It should be mentioned that Appendix J (Prosecution Exhibit No. 14), which is the list of settlements in sensitive areas drafted by Bezeq, includes an itemization of additional settlements in which it was determined, for example, that Bezeq employees were to travel in a bullet-proof car with an armed security guard, or with a bullet-proof vest and a helmet. On the other hand, the recommendation with respect to Baqa al-Gharbiyya was for a car equipped with shielding against stones and an escort consisting solely of a security guard.

I read the list of settlements, but I did not understand why, for certain settlements, it was decided to provide the employees with a bullet-proof car, or why specifically with respect to Baqa al-Gharbiyya, which is right on the "seam line", it was decided not to provide the employees with a bullet-proof car. Moreover, none of the Bezeq personnel were able to answer that question. More precisely, there is no doubt that, had the Deceased been sitting in a bullet-proof car when he was shot at, his life would have been saved and he would not have died.

Overlander testified in his examination that he was "**among those**" who drafted Prosecution Exhibit No. 14 (page 182, line 8) but he had difficulty in explaining why it was decided to provide Bezeq employees with bullet-proof cars in certain settlements, but to provide only cars equipped with shielding against stones to employees working in Baqa al-Gharbiyya. He even went so far as to "**remind**" us that there was no difference between Baqa al-Gharbiyya and Hadera (!!), where there had also been

16 of 90

Case 1:04-cv-00397-GBD-RLE    Document 547-549    Filed 06/25/14    Page 18 of 26
[Emblem of the State of Israel]
**Tel-Aviv-Jaffa District Court**
Civil File 1047-04, Estate of the Deceased, Amit Amos Mentin, *et al.* v. Bezeq Israeli Telecommunications Co. Ltd. *et al.*

terrorist attacks. We were thus left with an unanswered question: what was the difference between the settlements in which Bezeq workers "**merited**" bullet-proof cars, and Baqa al-Gharbiyya, which was in the same category as Hadera?? (pages 182-183) – although, by contrast to Hadera, Baqa al-Gharbiyya is right on the border.

The lack of professionalism that characterized the attitude of the Bezeq Security Division personnel to the security and protection needs of Bezeq employees was also reflected in the fact that Overlander was not familiar with Prosecution Exhibit No. 15 – the summary of the patrol which took place in Baqa al-Gharbiyya, following the Bezeq employees' complaints regarding the perceived lack of security in these places. This patrol was conducted just before the date of the murderous terrorist attack which constitutes the object of the Statement of Claim before me, on March 4, 2003. Nonetheless, Overlander was not familiar with the document, nor did he participate in the patrol (page 183), although this fact did not prevent him from claiming that the purpose of the visit was "**to examine what.... the workers were afraid of. It was in the area of Baqa al-Gharbiyya, which is quite near to Baqa al-Sharqiyya, where some kind of work on a junction box was going on**…" (page 184, lines 6-16).

Overlander's response was somewhat puzzling, because he had clarified that he was not familiar with the document, did not remember the employees' complaints, and did not participate in the visit, and the document does not refer to work on a Bezeq junction box. When asked about this, he admitted that "**it's not written; I remember the case**." Is this really so? Let us be precise: this complaint by Bezeq employees, which was raised at a time so close to the date of the murder, attests to the employees' feeling of insecurity. This feeling was given no response whatsoever, other than the actual performance of the patrol – the sole purpose of which, as Lavi testified, was to reassure the worried employees, and not to change any of the existing procedures, to the extent that they existed.

As I clarified, the procedures that were attached are the outdated procedures dating from 1995, which do not address the actual security problems to which the State of Israel was exposed during the years of the Intifada. As proved, the procedures dealt with travel within the Palestinian territories and actually did not deal with travel by Bezeq employees within the territory of the State of Israel in general, and in cities and towns adjacent to the border in particular. What this means is that, at the time of the incident, there were no security procedures that were intended to protect Bezeq employees within the borders of the State of Israel, in cities and towns adjacent to the "seam line" – a fact which is of particular gravity.

Admittedly, the Bezeq witnesses attempted to present the 1995 procedures as applying to travel within Israeli territory as well. This conclusion, however, is not evidenced by the document itself. In any event, it transpired that even Bezeq did not act in accordance with the guidelines set forth in that document. For example, the 1995 procedures state that Bezeq workers should travel in pairs and should be armed. Nonetheless, it was proved beyond all doubt that, in the incident in question, a technician was teamed up with a security guard, but only the security guard was armed. When Overlander was required to address this point in his examination and asked why the Deceased was not

Case 1:04-cv-00397-GBD-RLE   Document 547-549   Filed 06/25/14   Page 19 of 26

[Emblem of the State of Israel]

**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

armed, he replied laconically that "**we changed the travel guidelines**" (page 190, line 9). Naturally, questions continued to arise: Who changed them? Which guidelines were changed? (This was because no guidelines which referred to travel within the territory of the State of Israel had been presented.) Why were they changed? What were the reasons for changing the guidelines? No answers, however, were given (page 190).

Furthermore, Overlander confirmed that, after the events of 2000 (the beginning of the Second Intifada), two security guards were teamed up with each Bezeq technician – "**I believe that this was in Wadi Ara**" (page 189, lines 7-10) (a fact that was confirmed by Erez Golan in his examination; page 304-305). In 2002, however, the number of security guards was reduced, because someone at Bezeq felt that one security guard for each technician would suffice. (Quite oddly, by the way, Aryeh Yehuda "**does not remember**" that there were two security guards before the incident; page 358).

The reduction of the number of security guards gives rise to numerous questions, because – just as with all of the other aspects of Bezeq's conduct – no evidence or minutes of meetings were produced in which the professional echelon discussed the question of the number of security guards necessary for each technician. Furthermore, in any event, there is no specification of the considerations for reducing the number of technicians [sic], including the actual decision to do so.

I consider this matter as particularly grave, in light of the contents of Prosecution Exhibit No. 15, which speaks for itself. That document mentions the fears of employees in 2003 with regard to certain areas, including the area which constitutes the object of the Statement of Claim. Accordingly, it is quite natural for there to be, at least in 2003, a demand for a renewed examination of the procedures for the safeguarding of technicians, including the number of security guards required for each technician in particular locations. Nonetheless, no such discussion took place and no change was made in the manner of protecting Bezeq employees in settlements in "**sensitive areas**".

Bezeq again claimed that the Deceased and Ben Naim had breached the provisions of the procedure by choosing to enter Baqa al-Gharbiyya in two cars, "**in contravention of the procedure**." As I determined, however, the existence of procedures was not proved, and hence it cannot be concluded that the Deceased and Ben Naim breached any kind of procedure by entering Baqa al-Gharbiyya in two cars – a fact that was confirmed by Overlander, who confirmed in his examination that "**there is no procedure. There is no procedure in which it is expressly written that he should travel in one car… no**" (page 192, lines 12-14).

In any event, there was no proof of a causal relationship between the occurrence of the murder and the very fact of entry in two cars. Moreover, the terrorist attack did not occur at the time of their entry in two cars, but rather, a few hours later.

Bezeq further argued that the Deceased and Ben Naim breached an additional procedure, which forbade them to be in contact with the local population. This, however, is an argument that should never have been raised.

[Emblem of the State of Israel]

**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

The reliance on this prohibition derives from the 1995 procedure, which, as set forth above, refers to Areas A, B and C of the Palestinian Authority, and not to the territory of the State of Israel. Is it even conceivable to forbid Bezeq employees to converse or to be in contact with residents of Israel?? Baqa al-Gharbiyya is an Israeli settlement populated by Israeli Arab citizens. After all, according to Overlander, there is no difference between Baqa al-Gharbiyya and, for example, Hadera?!

Moreover, the security guards testified that they often had difficulty in locating the houses of Bezeq clients for the purposes of performing repairs, because there are no clear addresses (street names and house numbers) in Baqa al-Gharbiyya, and because of the tremendous similarity between the residents' names. Accordingly, they regularly received assistance from local residents, who guided them to the required address.

The fact that Bezeq workers were assisted by local residents for the purposes of identifying addresses was well known to Bezeq Security Division personnel. This point arose in the testimony by Lavi (page 126 of the transcript), and also in the testimony by Overlander (page 194) – who, for his own reasons, chose to express reservations with regard to the ostensible prohibition, in the form of an argument that Bezeq employees were permitted to initiate contact with the local population, but only for the purposes of carrying out their duties (??) (page 204, lines 19-20). Once again, the question arises: where is all this written down? Where are the guidelines concerning the prohibition against initiating contact with local residents (Israeli citizens!!!), other than for the purposes of carrying out their duties?? Yehuda Aryeh – the Director of Physical Security in Bezeq – also admitted, in his examination, that he was aware that Bezeq employees were assisted by local residents in locating addresses and that he **"did not remember"** a procedure that prohibited them from talking to the local residents (page 204).

Important testimony concerning the relationships formed between Bezeq employees and local Baqa al-Gharbiyya residents was given by the security guard, Oni Devir, who made a very reliable impression upon me.

In his testimony, Devir stated that Bezeq employees did business with residents of Baqa al-Gharbiyya (pages 473-474), including the owner of the automotive accessories shop (Wa'il), at the entrance to whose premises the murder took place. Devir testified that their supervisor at Bezeq – Eli Levinger – was aware of the Bezeq employees' private activities with local residents (page 497). Furthermore, he claimed that Bezeq employees, himself included, often when privately to Baqa al-Gharbiyya after work hours, in order to perform business transactions with the locals (page 503). More precisely: Levinger was not brought to testify; accordingly, Devir's testimony was never refuted, and I accept it.

By contrast to the other witnesses' testimony, the security guard Vadim Simanovitz claimed that the security guards received updated instructions from Bezeq once or twice a week, and they would confirm receipt of the instructions with their signatures

19 of 90

Case 1:04-cv-00397-GBD-RLE   Document 547-549   Filed 06/25/14   Page 21 of 26
[Emblem of the State of Israel]
**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

and return them to Bezeq (pages 234-235). However, documentation of that which has been set forth above was not attached; moreover, in fact, this was a new version that did not appear in Simanovitz's affidavit (page 235). Further on, Simanovitz claimed that the security guards also received telephone warnings upon entering the settlements (pages 237-238); this version as well, however, is a new one, which was not mentioned in the affidavit, and was not verified in any manner. Moreover, he surprised us with the claim that, at times, the technicians were also armed (page 239) – a version that was not mentioned in his affidavit and was not raised by any of the other witnesses. Needless to say, had they provided the technicians with weapons, there would have been a document to that effect; naturally enough, no such documentation was produced.

In general, Simanovitz's testimony was characterized by "innovations and surprises", which were not set forth in his affidavit, and which, in certain cases, totally contradicted other testimony. For example, Simanovitz remembered that he had kept a **"yellow notebook"** (pages 241-242), which remains in his home to this very day, but which was not filed before the Court. Moreover, it was never clarified whether the notebook had been given to him by Lilit, which hired out his services, or by Bezeq, for which he worked as a security guard.

In Section 6 of his affidavit, Simanovitz claimed that **"I can unequivocally state that all of the employees were well aware of the procedures in the sensitive areas."** In his examination, he clarified that he made this claim on the basis of meetings that were held with the security officers **"once every few months"** (page 243, line 10). Surprisingly, he testified that the employees (technicians and security guards) were given written procedures (page 243, line 22); these procedures, however, were not produced in the course of the trial.

Needless to say, Simanovitz testified that Ben Naim was the shift leader (page 262) and that he had given the weekly alerts to the employees (page 263) – a fact which was not reflected in a single affidavit or testimony. Generally speaking, I do not accept Simanovitz' testimony, most of which was raised for the first time in the courtroom, was not included in his affidavit, and contradicts the other testimony heard in the Court.

Erez Golan of the Bezeq Security Division also relied, in both his affidavit and his testimony, on the existence of procedures. Nonetheless, he too did not attach any procedures to his affidavit, and in his testimony, he admitted that **"the procedures, once again, I don't know if they are written down"** (page 272, line 9). In other words: what we have here, yet again, are mysterious procedures, the contents of which nobody knows – and, even worse, which do not actually exist. It would appear that the giving of security and guarding instructions to the employees was performed orally, if at all, and as an independent initiative by various security officers, as a kind of **"Oral Law"**, which depended on the seriousness, the professionalism, and the work ethic of any particular security officer.

20 of 90

**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

Erez Golan, in his testimony, "recited" procedures, the origin of which he did not know (pages 271-272), and claimed that the procedures were based on the 1995 procedure, which had been modified and updated. He did not, however, produce any documentation of the modification and updating of the outdated procedures (pages 271-272). Furthermore, as set forth above, he admitted that there were no written procedures, as opposed to random guidelines given orally (page 272).

Erez Golan claimed that he briefed the employees in accordance with written work plans, and that the briefings were agreed upon with Overlander and went on for somewhere between half an hour and an hour. No such plans, however, were attached to his affidavit, nor were they presented in the course of the trial.

According to his statement, he had not been asked to present them (page 275). There is no other choice than to conclude that the very existence of the briefings, not to mention the duration, content and frequency thereof, have not been proved.

Golan drew a puzzling distinction between a briefing, which is specific and is given before going out in the field, and an instruction session, which is actually training (page 275). He admitted, however, that there were no regular lesson plans for the instruction of technicians or security guards (page 276), and moreover, no documentation was submitted to prove the existence of briefings or training sessions.

Golan admitted that he did not maintain a personal file which includes a professional opinion that evaluates the performance of the various security guards (page 277), although, according to his statement, a complaint concerning the performance of a security guard was liable to give rise to the termination of his employment.

Golan claimed in his examination that there are reports on covert and overt performance reviews of the security guards. Nonetheless, these reports as well were not attached (page 278). When eyebrows were raised upon hearing this, Golan claimed that, at times, the results of the reviews "**were not reflected in the report**" (page 279, line 8). It has been proved that no such report exists with regard to Ben Naim's activity as a security guard over a period of three years (page 279). Accordingly, the question which must be asked is this: were these reviews actually conducted?

Golan claimed that "**technically there was a barrier**" (page 282, line 31) between Baqa al-Gharbiyya, and Baqa al-Sharqiyya, but admitted that "**it was quite easy to cross it**" (*ibid.*). Golan was asked why he did not initiate the issuing of new updated guidelines in view of the deterioration of the security situation, but claimed that it was not his job, but rather, that of his superiors (page 283).

Speaking of the list of settlements in the sensitive areas and the security measures required for traveling to work in those places (Prosecution Exhibit No. 14), Golan claimed that this list had been transferred to the Israel Police. However, no documentation was presented that could confirm this (page 284-285); moreover, there was no clear statement of the identity of the person or persons at Bezeq who ostensibly

Case 1:04-cv-00397-GBD-RLE Document 547-549 Filed 06/25/14 Page 23 of 26
[Emblem of the State of Israel]

**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

transferred the list to the Israel Police for its approval, the person or persons at the Israel Police who ostensibly received the list, and so forth.

A surprise in Golan's testimony was his claim that he had warned his superiors of the possibility of a terrorist attack on a Bezeq employee. However, when asked whether he had presented his warning in written form, he answered that he did "**not understand the question**" (page 286, lines 12-17). More precisely: Erez Golan was responsible for the security of Bezeq employees in the northern sector, which included Baqa al-Gharbiyya!!!

Golan testified that the bullet-proof car was "**intended to provide security for the travel, the trip**" (page 280, line 27). He could not, however, indicate any decision which had been set forth in writing, as a result of the exercise of someone's discretion, concerning who was entitled to travel in a bullet-proof car (page 288). Furthermore, he admitted that he did not know how the reports on security activities for the benefit of Bezeq employees were issued (page 288). These reports, none of which were filed before the Court, ostensibly included the monitoring of Bezeq employees for purposes of ascertaining compliance with the procedures?? (page 289) – the very existence of which, as set forth above, was not proved.

Reports which were ostensibly drawn up once a month, and from which it is possible to infer that reviews and briefings were conducted for the Bezeq security guards in the areas defined as sensitive, were attached to the Bezeq affidavits.

For example, a report (Prosecution Exhibit No. 13) signed by Erez Golan stated that, on October 28, 2002, a briefing was conducted for security guards and technicians in the Hefer Region, within which Baqa al-Gharbiyya is located. The report states that "**in the course of the briefing, the following emphases emerged: an increase in the levels of warnings of attacks, warnings of the attempted theft of arms; security guards were instructed to increase their level of alertness**" (page 291). It accordingly transpires that, despite the grave alerts, which specify risks that might cost human life, the security guards were instructed to "**increase alertness**", but without any detailed discussion with them as to how the security guards were supposed to "**increase alertness**". Moreover, they did not increase the capacity for security by supplying bullet-proof cars or by arming the technicians. And that is not all: when Golan was asked how he enforced the guideline of increasing alertness, it became clear that this guideline was actually not enforced at all, and there was no surveillance to verify the mysterious "**increased alertness**" (page 291). It further transpired that despite the complaints by employees, who feared for their security in the area of Baqa al-Gharbiyya, Golan did not deem it appropriate to contact the Israel Police, or the Border Police, in order to consult with them concerning the methods for safeguarding the Bezeq employees (page 294). In fact, the conclusion is that despite the clear increase in alerts, the procedures (the existence of which was not proved, as stated) were not modified or refined, and Bezeq's Security Department felt that it had discharged its obligation to protect the personal security of Bezeq employees in sensitive areas during the Second Intifada by assembling the employees and calling for increased alertness. Was this sufficient?? Certainly not. And yet all of that which has been set forth above did not prevent Erez Golan from asserting the existence of a plan

22 of 90

[Emblem of the State of Israel]

**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

for conducting reviews, although no such plan was produced to the Court (page 297), although Golan admitted that, before preparing his affidavit and testifying in Court, he had gone over all of the relevant material located in the binder and in the computer. However, as stated, this material was not filed before the Court, and it is impossible to know whether important materials were concealed from both the parties and the Court (page 298) or whether they simply do not exist.

Golan claimed that the briefings for the Bezeq employees were conducted once every month or month and a half, at a morning meeting before the employees left for their daily work (page 300, lines 8-10). However, he did not produce any reports on these meetings. Golan further confirmed that there was a "**brief**" period before the murder during which two security guards escorted every technician (page 304, line 31), due to the existence of a "**specific alert during that period, the abduction of a technician, and so we increased the security, but we subsequently reduced it again**" (page 305, lines 2-3). Needless to say, the alert itself was not produced, nor were the deliberations concerning the expansion of the security network by reason thereof. In any event, the professional considerations which constituted the basis for the decision to downgrade the security guarding network and to reduce the number of security guards were never produced.

An example of the faulty, unprofessional conduct exhibited by Bezeq in safeguarding its employees is the appointment of Aryeh Yehuda as the Director of Physical Security at Bezeq.

Aryeh Yehuda's testimony reveals that he was appointed to his position without any prior training in matters of security, and only after his appointment did he undergo special-purpose courses at the Israel Police and the Israel Security Agency (page 328-329), that included a three- to four-week course at the Israel Police and a six-week course at the Israel Security Agency (no documentation of the above was submitted).

As a parenthetical note, I shall state that a large and broadly based entity, such as Bezeq, which has many employees who travel throughout the territory of the State of Israel, could have been expected to appoint to this sensitive position a person with a security background and a knowledge of security matters. Moreover, according to his own statement, he was responsible for the security of hundreds of people (page 391), and the choice of a person lacking any knowledge of security- and guarding-related matters is puzzling, to put it mildly, and certainly does not attest to professionalism.

Aryeh confirmed in his testimony that there was no orderly procedure for inquiries and consultations with the Israel Police (page 337). According to his statement, he was involved in the drafting of the 1995 procedures (page 337). Nonetheless, he did not find it appropriate to modify them or to draft updated procedures upon the outbreak of the Second Intifada in 2002. The only things that were done, according to his statement, were to hold meetings with employees and to inform them of the existence of alerts (page 338). Aryeh testified that despite the employees' fears, as reflected in Prosecution Exhibit No. 13, he did not deem it necessary to

**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin**, *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

modify the level of security (pages 338-339). His statements indicate that there is no written explanation, and no written set of considerations, from which it is possible to deduce the considerations that guided Bezeq on the subject of security for employees in general, and in the "seam line" area in particular (pages 339-340).

Despite his position – Director of Physical Security – Aryeh did not remember the patrol which was conducted by the management in the area as a result of the employees' fears (page 340). My impression of what was happening is reflected in the Court transcript, where I said "**If I have correctly understood what you are saying, then everything was done orally; there were no organized procedures. If someone felt that they should speak with the Israel Police – they spoke with them; if someone felt that they should speak with the Border Police – they spoke; everything was according to personal discretion and nothing was in accordance with procedure, and nothing was written down**" (page 340, lines 28-31). This conclusion was actually confirmed by the witness. That set forth above makes it clear that there were no permanent and clear procedures and certainly no enforceable procedures, and that the employees' security depended upon the professional talents, diligence, and initiative of any particular employee.

Aryeh did not remember that he had asked the Israel Police for guidelines, even though he later claimed that he had asked for them "**many times**" (page 350, line 14). Nonetheless, he could not remember "**where it was written**" (*ibid.*).

Aryeh very surprisingly claimed that the Israel Police "**did not give answers, but in oral conversations, they were willing to say 'Do this' – but otherwise, they were not willing**" (page 350, lines 29-30). This fact, in and of itself, is puzzling. The question which arises is this: did the Israel Police refuse to give guidelines to Bezeq, was it perhaps never asked to provide guidelines? It is reasonable to assume that the Israel Police was not asked to give guidelines to Bezeq; in any event, no documentation was produced which could have led to a different conclusion. More precisely: the Israel Police is not a litigant in this file, and none of the litigants, Bezeq included, has asked for it to be added as a litigant. The impression which arises is that its absence from the Statement of Claim has created a convenient platform for Bezeq to attempt to saddle it with the responsibility for Bezeq's omissions, without giving the Israel Police a chance to be heard. Rather, the action has been characterized by an intentional failure to summon the relevant members of the Israel Police to testify, in an attempt to prove Bezeq's claims regarding the Israel Police. This conduct is reprehensible and unacceptable to me.

Aryeh admitted that there is no written documentation for the existence of a procedure and that he almost never participated in briefings (page 357). Surprisingly, despite his position, he "**did not remember**" that there had been a period in which teams were made up of two security guards and a technician (page 358).

Oni Devir defined the procedures as an "**Oral Law**" (pages 470, 472), which consisted primarily of prohibitions, such as the prohibition forbidding security guards to drive and so forth. "... **This is forbidden and that is forbidden; clothing...**

24 of 90

Case 1:04-cv-00397-GBD-RLE   Document 547-549   Filed 06/25/14   Page 26 of 26
[Emblem of the State of Israel]
**Tel-Aviv-Jaffa District Court**
Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

**they spent a lot of time talking with us about clothing, this clothing was appropriate, that was inappropriate; there was no emphasis, no discussion of how professional a security guard should be...**" (page 470, lines 19-23).

As we may recall, Bezeq claimed that each employee was equipped with a booklet that contained security provisions, and a photocopy of the booklet was even attached to the exhibits file. There was no proof, however, that it had been given to the employees in general, and to Ben Naim in particular.

According to Devir, he received the aforementioned booklet as a free handout on the firing range from Bezeq, or from Lilit (page 472), and his testimony indicates that, in fact, there was no supervision of the security guards' work, neither by Bezeq nor by Lilit (page 479).

Devir complained bitterly about what he said were the unsatisfactory training procedures, as well as about the failure to give the security guards powers. He said that the Bezeq security guards are nothing more than armed civilians, and that they have no powers of arrest and no other powers, such as those which are given, for example, to the security guards of the Courts, and accordingly, they have no real ability to protect the technicians.

I cannot rely on these statements within the framework of the considerations underlying the judgment. Had the Plaintiffs felt that the training given to the Bezeq security guards, or their status, was insufficient, they should have produced an opinion by an expert in the field. No such opinion was produced, and in the absence thereof, I have no tools with which to evaluate the professional value of the training provided to the security guards, or their status as such. In excess of that which is required, it should be noted that the testimony indicates that all of the security guards had already been given appropriate training during the period of their military service, and it is clear that no one at Bezeq or Lilit relied exclusively on the knowledge acquired in the five-day course that was given to security guards during their work for Bezeq or Lilit.

As set forth above, regarding the status of security guards as mere guards and not specifically as security guards, I shall not express an opinion on this subject as well, because no opinion, pursuant which the status of the Bezeq security guards was not sufficient and there was a need for their status to be upgraded antiquated with that of the Court security guards, was presented to me.

I assume that there is a legal way to regulate the status of the security guards. Nonetheless, it is clear that no one at Bezeq give any consideration to changing the status of the security guards, nor did anyone take any measures aimed at modifying that status and equating it, for example, with the status of the Court security guards. In fact, no one even claimed to have done so.

In summary, I shall state that the absolute absence of any updated and detailed procedures gave rise to a situation in which every security guard acted in accordance with his own assessment of the situation on the ground, whereby it was not certain whether each bodyguard's personal assessment corresponded to the actual conditions on the ground, and this fact made for a very grave failure.