# EXHIBIT A.948
## (2 of 8)

Case 1:04-cv-00397-GBD-RLE   Document 547-550   Filed 06/25/14   Page 2 of 27
[Emblem of the State of Israel]

**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

19. All of that which has been set forth above indicates that Bezeq had no clear, written and detailed security policy and that Bezeq's systematic failure to produce documents to verify its arguments concerning the *prima facie* existence of procedures, or to someone witnesses to testify in proof of its claims – against the Israel Police, for example – will be held against it.

Even more gravely, there was no review network regarding the enforcement of the guidelines that were occasionally given orally, and it seems to me that I would not be mistaken if I were to state that the absence of procedures gave rise to a situation in which the technicians and security guards were left to their own devices, in a situation of "every person will do as he pleases" – a situation which is intolerable, especially during the period in question.

As a result of these failures, Bezeq missed noticing the fact that its employees were engaged in private activities during the work day – activities which, in the case before me, caused the Deceased to be abandoned by his security guard, who, as shall be explained below, was engaged in his own private matters, and who accordingly refrained from guarding the technician – the Deceased. This fact, *inter alia*, enabled the perpetration of the murder in the sense of a *causa sine qua non*.

In other words, Bezeq's negligence in this case lies in its many security-related failures, which, in the end, made it possible for the Deceased to be without a security guard who would protect him, in a car which was not bullet-proof.

Needless to say, had Bezeq drafted clear and sharp security procedures, and had it maintained a permanent system of briefings, and had it enforced those procedures on its employees, it is almost certain that Ben Naim would never have dared to engage in his own private affairs during working hours and would never have abandoned his post as the security guard of the Deceased. Similarly, it is almost certain that, had Bezeq provided the Deceased with a bullet-proof car, in light of the physical proximity of Baqa al-Gharbiyya to Baqa al-Sharqiyya, it is probable that the tragic murder would have been prevented. In other words it has been proved that there was a factual causal relationship between the omissions of the Bezeq Group and the incident of the murder, and it has been proved that there was a legal causal relationship, insofar as the test of foreseeability, the test of risk, and the test of common sense all required Bezeq to foresee the occurrence of a tragedy as a result of the serious security flaws – as was proved before me. More precisely: there can be no doubt regarding the existence of a risk in a town on the "seam line" during the Second Intifada, and it has been proved that the employees themselves feared working in that location. In my humble opinion, and in view of the grave security situation which affected the State of Israel during the relevant period, common sense would have required the Bezeq management to draft clear procedures, in cooperation with other security entities, such as the Israel Police, or the Border Police, in order to protect the security and lives of its workers, as well as to enforce and ascertain compliance with the procedures.

26 of 90

Case 1:04-cv-00397-GBD-RLE    Document 547-550    Filed 06/25/14    Page 3 of 27
[Emblem of the State of Israel]
**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

Bezeq also failed in the test of common sense, and – as set forth above – the outcome is clear.

20. Before I end this chapter, which addresses the breach of the concrete duty of care by Bezeq, I shall comment on several points which were raised in the Bezeq summation.

In its summation, Bezeq argued that Baqa al-Gharbiyya is actually an Israeli settlement, which is located within the borders of the Green Line, and as such, the law requires it to be deemed as equivalent to any other Israeli town.

There can be no doubt that Baqa al-Gharbiyya is an Israeli town within the confines of the Green Line. Nonetheless, it is a border settlement located on the "seam line", on the other side of which hostile Palestinian settlements are located, and its security situation is particularly grave. The special attitude toward Baqa al-Gharbiyya does not result from the characterization of its residents as Arab residents, but rather, from its close proximity to Palestinian settlements under the control of the Palestinian Authority and the clear risk which arises from that proximity. The fact is that Bezeq also felt that, in certain settlements within the confines of the Green Line, it was necessary to provide its employees with bullet-proof cars. Unfortunately, however, Baqa al-Gharbiyya was not included among those settlements, despite its location adjacent to the Palestinian Baqa al-Sharqiyya and despite the ease of passage between the two settlements.

These circumstances create the difference between Baqa al-Gharbiyya and other settlements within the confines of the Green Line. Moreover, Bezeq's reasons for providing other employees, and other settlements adjacent to the border, with better means of security, such as the use of bullet-proof cars, have remained unclear. Accordingly, those reasons – by contrast to the very fact of the distinction which was made between the various settlements – cannot be subjected to judicial review.

21. In its summation, Bezeq made every effort to drag the Court into a determination, pursuant to which, should liability be imposed upon Bezeq, the outcome of this imposition of liability would necessitate treating the Arab population of Israel, in its entirety, as a population with terrorist potential – which it is not.

I emphatically protest against this vile attempt. More precisely: the Court does not issue political declarations, and the attempt to drag it into doing so is distressing.

**Given that this unfortunate statement was made in the summation of the Bezeq Group, I would like to make the following crystal clear: the Court makes no distinction whatsoever between the Jewish citizens of the State of Israel and its Muslim, Christian or other citizens.**

27 of 90

[Emblem of the State of Israel]

## Tel-Aviv-Jaffa District Court

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin**, *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

This action was filed, *inter alia*, against Bezeq by reason of its grave security failures, which were reflected in this case.

As I have made perfectly clear, the requirement for increased security in the area of Baqa al-Gharbiyya did not result, in any way whatsoever, from the nature of its residents as Arabs. Rather, it resulted exclusively from its closeness and proximity to the Palestinian Baqa al-Sharqiyya, and the risk – which was fulfilled – that a murderous terrorist would pass from Baqa al-Sharqiyya to Baqa al-Gharbiyya, due to the absence of a serious obstacle which would prevent him from doing so.

As set forth above, in the case before me, the risk most unfortunately materialized, and the Deceased was murdered by a terrorist, who exploited the proximity and the ease of transit between the settlements. More precisely: it was not claimed, and, in any event, was not proved, that the terrorist was assisted by local residents in carrying out his plot. On the other hand, it was proved beyond all doubt that the local residents and the Bezeq employees maintained excellent relations, which were reflected in the daily assistance which Bezeq employees received from the local residents, and in the commercial relations between Bezeq employees and the local residents. As set forth above, this Judgment does not contain even the slightest hint of a characterization of the residents of Baqa al-Gharbiyya, as was alluded by the Bezeq Group in its summation – an allusion that should never have been made.

22. In its summation, the Bezeq Group compared the presence of the Bezeq employees in Baqa al-Gharbiyya to the presence of attorneys from the offices of Counsel for Bezeq in the Court in Jerusalem, which is located in the heart of East Jerusalem. And the Bezeq Group wondered whether it was required to assign a security guard to the attorneys on its behalf during their visits to the Court in Jerusalem.

Obviously, this wondering is nothing more than a provocative and superfluous remark.

The security authorities of the State of Israel are charged with the security of the citizens and residents of the State, throughout its entire territory. By the very nature of things, it is not possible to assign a security guard to each and every person. Accordingly, large entities – such as Bezeq – are expected to assist the security forces in providing appropriate security for its employees who work in places which entail a security risk.

Bezeq appears to have been aware of its duty, and it accordingly provided the Deceased with an armed security guard and a car equipped with shielding against the throwing of stones. However, in light of the grave security situation during the relevant period, in light of the proximity of Baqa al-Gharbiyya to the border, and in light of the anticipated fear of the perpetration of a terrorist attack by an attacker coming from the Palestinian Authority, there is no other choice than to conclude that Bezeq did not do enough, and that, in actual fact, there was no proof of all of the existence of a security policy, or of procedures that attest to the taking of real measures with regard to the security of Bezeq employees in sensitive areas.

28 of 90

Case 1:04-cv-00397-GBD-RLE   Document 547-550    Filed 06/25/14   Page 5 of 27
**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

23. The Bezeq Group further argues, in its summation, that the terrorist attack was not foreseeable. As evidence of this, it presented the document which attests to the check of the security situation with the Israel Police on the morning of the incident.

   The fact that the State security authorities did not discover, in a timely manner, the intention to carry out a terrorist attack cannot give rise to the conclusion that this was a surprising and unforeseeable incident. Quite the opposite is true. Actually, the daily conversation of the Bezeq telephone receptionist with the Israel Police each morning provides more than ample testimony of the delicate security situation in the Baqa al-Gharbiyya area. In other words, Bezeq could have foreseen, and actually did foresee, the possibility of a terrorist attack. For its own reasons, however, it believed that it had discharged its duty by means of its daily conversation with the Israel Police – but this is not the case.

24. Bezeq devoted a chapter of its summation to the absence of statutory provisions, or guidelines, or procedures, on behalf of the State or the Israel Defense Forces, with regard to the subject of security in sensitive areas. I, however, do not see the absence of guidelines and procedures on behalf of the State as exempting Bezeq from having to protect its employees. If Bezeq believed that it did not know how to protect its employees in areas that it defined as "sensitive", it should have initiated a request for guidelines to the Israel Police. No such request was made, and certainly no such request was proved; accordingly, there are no grounds for complaint against the State authorities or the Israel Police in this matter.

25. The Bezeq Group referred to the decision in Civil Appeal 491/73, **Gedudei HaHuleh Ltd. v. Ezra Mahruz** (*District Rulings* 29(2) 32, (hereinafter: the **"Gedudei HaHuleh Case"**). However, the facts of the Gedudei HaHuleh Case bear no resemblance to the matter before me.

   In the Gedudei HaHuleh Case, the plaintiff was injured in 1967 – immediately before the outbreak of the Six-Day War – while driving a combine for the performance of harvesting work in an area adjacent to the Syrian border. In that case, the argument that the employer was obligated to provide the plaintiff with an armored car was rejected, because this was not practical in the context of a combine. In that case, it was proved that the relations between the employer and the Israel Defense Forces authorities involved a custom, according to which the employer reported to the Israel Defense Forces authorities when his employees went out to work, the employees' departure for the fields was individually coordinated between the employer and the military authorities, and the Army was the entity which ensured the employees' security.

   In the case before me, there was no similar arrangement with the Israel Defense Forces authorities, or the Border Police, or the Israel Police, and the only proved contact between Bezeq and the Israel Police consisted of a daily conversation in order to receive information on expected alerts.

P1: 914

Case 1:04-cv-00397-GBD-RLE    Document 547-550 Filed 06/25/14    Page 6 of 27
**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* v. Bezeq Israeli Telecommunications Co. Ltd. *et al.*

It was positively proved that Bezeq did not request security advice for its employees from the Israel Police, and, in any event, individual security for the Bezeq employees was not provided by the Israel Police. Furthermore, there can be no doubt that the duty to protect the security and the life of the Deceased was first and foremost incumbent upon his employer, Bezeq, and not upon another entity, which is not a litigant in the case before me, and which was not brought by Bezeq to testify.

26. Bezeq also referred to the decision in Civil Appeal 559/77, **Haim Lampert v. State of Israel** (published in the Nevo database), in which the Court heard an action by an employee of the Ministry of Defense, who was wounded on his way to work by shots fired by terrorists who infiltrated into Israel. In that matter, the Court ruled that "**the degree of care which is required of an employer with respect to the level of safety within his plant and on his premises, which are under his control, cannot be compared to the degree of care which he can adopt with respect to the risks posed to his employee and to any other person who is located in the public domain.**"

    In all humility, I concur with this statement. The problem is that, in the case which is presently at hand, it was proved that Bezeq workers were sent to certain settlements in bullet-proof cars, and no clarification was provided concerning the difference between those settlements and Baqa al-Gharbiyya. In other words, the employer – Bezeq – provided more advanced means of protection, but did not provide them to the Deceased, whereby it was clear that, had he been in a bullet-proof car, he would not have been killed.

    In light of the fact that no explanations were given for this failure to provide the Deceased with a bullet-proof car, although he worked on the "seam line", in proximity to a Palestinian settlement, the result is that the determinations in the **Lampert Case** cannot help Bezeq in the case before me.

27. Bezeq further referred to the decision in Civil Appeal 686/77, **Mekorot Israel Water Company v. Moshe Margi** *et al.* (published in the Nevo database), which held that under the circumstances of a terrorist incident, the regular principles of negligence cannot be applied to an employer.

    I concur, in all modesty, with this ruling as well. The problem, however, is that the case before me concerns a foreseeable terrorist attack, for which it would have been possible to prepare, for example, by providing the Deceased with a bullet-proof car. This failure to prepare by not providing the Deceased with a bullet-proof car, in addition to the many additional security flaws which have been set forth in detail of to this point, can only lead to one conclusion – that Bezeq exhibited negligent conduct, and that, as a result of that negligent conduct, the tragedy which constitutes the object of the action was made possible.

    My conclusion stands even in view of the facts of the decision in Civil File (Tel Aviv) 1051/92, **Abraham Shapir v. Pardess Syndicate** (published in the Nevo database). Moreover, I am of the opinion that, insofar as the acts of terror directed against the citizens of Israel continue and increase, employers are obligated to improve the security measures

30 of 90

Case 1:04-cv-00397-GBD-RLE    Document 547-550    Filed 06/25/14    Page 7 of 27
**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

that they provide for their employees. The mere statement that this is the harsh reality that we live in is not enough. Does this difficulty mean that an employer is permitted to refrain from protecting his employee?? Certainly not – especially as it was proved that, during the relevant period of time, Bezeq owned bullet-proof cars, which, for reasons that were not clarified, were not used for the benefit and the security of the Deceased.

28. Counsel for Bezeq went on to argue that considerations of legal policy "**necessitate the conclusion which negates any foreseeability for the employer with respect to terrorist incidents, which are an integral part of the ordinary risk of life in the State of Israel**" (Section 53 of the Bezeq summation). I, however, do not accept this statement. Quite the opposite is true: within the framework of legal policy, there is a duty to entrench and strengthen the determination of the employer's obligation to ensure the security of his employees, especially when the occurrence of a terrorist attack is to be expected and the fear thereof is well-founded. More precisely: the employer is obviously not capable of foreseeing the occurrence of a specific terrorist attack; nonetheless, he is certainly able and obligated to foresee a security incident, in the general sense, and to do all that he can in order to minimize the risk to which his employees are exposed.

29. I cannot end this chapter without addressing the debriefings conducted by Bezeq and the Israel Police with regard to the terrorist attack which constitutes the object of the Statement of Claim.

   The Bezeq debriefing – the Bezeq debriefing is deficient, because it contains no details with regard to the identity of the interviewees, who provided the information which constitutes the object of the debriefing, or with regard to the identity of the interviewers who conducted the debriefing – and, this being the case, there is a real difficulty in evaluating the seriousness of the debriefing.

   Reading the debriefing indicates that it is not signed. However, the words "**Written by: Yehuda Aryeh**" appear at the bottom of the report, and the question which naturally arises is whether the writer in question actually drew up the debriefing, or perhaps merely "**wrote**" down the determinations and conclusions of others.

   Yehuda Aryeh, the Director of Physical Security at Bezeq, referred to this issue in his examination and said that that he had been asked by the Director of the Division, Yekutiel Lavi, to write the debriefing.

   Aryeh clarified in his testimony that he did not draw up the debriefing by himself, and that he was assisted by Overlander and Erez Golan, as well as by Gal "**and the workers**" (page 341). He was, however, unable to explain why the involvement of others in the preparation of the debriefing was not mentioned in the body of the debriefing (page 342). Later in his testimony, Aryeh again stated that "**I was not the only one who did the debriefing; as I stated, there were additional workers who also participated, and there were – there were conversations with Bezeq employees and with Bezeq security guards and the Israel Police**" (page 344, lines 13-14). He further admitted that he did not participate in all of the alleged debriefings, but rather, "**in most of them**" (page 344, line 229) and "**in those in which I didn't,**

31 of 90

Case 1:04-cv-00397-GBD-RLE    Document 547-550ael] Filed 06/25/14    Page 8 of 27
**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

**they forwarded the material to me**" (page 344 line 24). Aryeh was asked to present the Court with the basic raw material which had *prima facie* been forwarded to him – or so he claimed – by others involved in the investigation of the event on behalf of Bezeq, but he did not remember where the material was: "**It may have been filed. I don't know. I don't remember**" (page 345, line 4). In his own words, "**I summed it up in the debriefing**" (page 344, line 319).

Given that Aryeh claimed that the Bezeq debriefing was based, *inter alia*, on meetings with police personnel, he was asked which particular police personnel he had met, and he answered "**There was one meeting in the Eiron station, the intelligence officer of the Eiron station and another functionary whose name I don't remember, in the position at that time, and they met with them, yes**" (page 345, lines 15-16). However, he did not remember whether there were written records of the meeting (page 345, line 18), and in any event, he was unable to explain why a meeting that *prima facie* took place with police personnel was not reflected in the Bezeq debriefing.

Aryeh further claimed in his testimony that, for the purposes of writing the debriefing, "**we sat**" (page 346, line 119) "**with employees who worked in the Baqa al-Gharbiyya area** ..." (*ibid.*).

He claimed that he and others – whose identity remains a mystery – debriefed the Bezeq employees in Baqa al-Gharbiyya, each one of them separately, and that their statements were recorded (page 346, line 17). When asked why the employees' statements are not reflected in the debriefing, he answered "**Listen, in this report, there does not appear, we did not write down everything pursuant to each statement by this or that employee. The report is general**" (page 346, lines 19-20). Apparently in light of the "generality" of the debriefing, the witness was unable to explain the involvement of "**the media and the Company spokesperson**", who were specified in the debriefing as having been involved in its preparation. He said that "**the truth is that I did not meet with them; Kuti** (Lavi – D.G.) **met them and that was at their request**..." (page 347, line 6), and the very fact that the meeting with them is mentioned was a "**mistake**" (page 347, line 15). These words inevitably lead to the conclusion that this debriefing is of no value at all, and its results may well be biased. Otherwise, it is unclear why it was necessary for Lavi – who is not the signatory of the debriefing – to meet with the media and the company spokesperson, in order to arrive at truthful conclusions regarding the manner in which the incident took place and the identity of those responsible for it, if there were any such persons, at Bezeq – unless the purpose of the meeting was to give guidelines regarding the conclusions of the debriefing, irrespective of the facts?!

Yekutiel Lavi, who served as the Director of the Physical Security Department during the relevant period, confirmed that he had debriefed the incident (page 100, lines 1-3). However, by contrast to the majority of his testimony, which was characterized by an absolute lack of memory regarding the questions he was asked, he claimed that he was "**involved**" (page 123, line 24) in the debriefing. The problem was, however, that he was unable to state the physical location where the debriefings of the various employees had taken place (page 123, line 20), he was unable to provide the location of the statements supposedly taken from the employees who were interrogated

Case 1:04-cv-00397-GBD-RLE    Document 547-560    Filed 06/25/14    Page 9 of 27
**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

(page 1259), and he did not know where the statements were, even though he assumed that **"everything was located in Security, in the Security Division"** (page 125, line 19). However, he definitely "remembered" that statement said been taken from Ben Naim and from Oni Devir (page125) – a fact that was emphatically denied by both Oni Devir (pages 488-489) and Ben Naim (page 443, line 30; page 444, line 1).

The testimony by Overlander – the Bezeq Physical Security Officer – also gives rise to a similar picture regarding the manner in which the Bezeq debriefing was conducted. Overlander insisted that Bezeq had not **"investigated"** the event, but rather, had **"debriefed"** it, emphasizing that **"there is a difference between investigation and ..."** (page 199, lines 25- 29). Overlander was questioned a number of times regarding the identity of the persons who were **"debriefed"** by him. However, he avoided giving an answer for many long minutes, and was finally forced to answer that he did not take down the testimony or statements of any of those involved, **"because the Police interrogated them...**"(page 201, line 22). Moreover, he claimed that the conclusions set forth in the debriefing are **"our joint conclusions, yes"**(page 201, line 31) – in other words, those of Overlander and of Aryeh Yehuda.

All that which has been set forth above indicates that it is highly doubtful whether the document entitled **"Bezeq Debriefing"** is worthy of that title. It is apparently a document which was written at the initiative of the Bezeq management, based on the demands of its media consultants; it is devoid of any evidentiary value; and it certainly cannot serve as a source for learning about Bezeq's share in the failures which enabled the occurrence of the tragedy.

The police debriefing – The police debriefing is based on conversations conducted with Bezeq personnel, whose names are specified in the debriefing. However, the name of the security guard Ben Naim, who was an eye witness to the terrorist attack, is quite conspicuously absent. Also missing is the name of Oni Devir, who arrived on the scene immediately after the attack occurred. The absence of these two from the debriefing casts a heavy shadow over the police debriefing, which is entirely based on the hearsay evidence from Bezeq personnel who did not witness the incident, and who, in any event – as was clarified in their testimony – were interested parties. Their objective was to prevent the determination of Bezeq's liability for the grave incident – a liability which has been clearly established in judgment and which is reflected in both the actions and the omissions of Bezeq.

The Israel Police commends the conduct of Ben Naim, **"for the manner of performance of his pursuit, his efforts to make contact, his determination and his wounding of the terrorist"** – and I wholeheartedly concur with the praises showered upon Ben Naim in relation to his conduct after the perpetration of the shooting attack on the Deceased. All this, however, cannot reduce his share in the liability for the actual occurrence of the incident, as I stated in detail in this Judgment with regard to his conduct before the shooting.

In any event, I rule that the police debriefing was superficial and unsubstantiated, and that it can be of no help in determining the liability of the various entities for the occurrence of the incident which constitutes the object of the Statement of Claim.

33 of 90

Case 1:04-cv-00397-GBD-RLE    Document 547-550 Israel Filed 06/25/14    Page 10 of 27
**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

30. To summarize this chapter, I hereby rule that the Bezeq Group (Defendants No. 1, No. 3, No. 4 and No. 5) breached the duty of care which applied to it in its relationship to which it was subject in its relations with the Deceased, and there can be no doubt that the omissions which have been set forth in this Judgment constitute the *causa sine qua non* for the occurrence of the tragedy, in addition to other causes which shall be set forth in detail in this Judgment below.

**The concrete duty of care and the breach thereof in the relationship between the Deceased and Defendant No. 2 – Asher Ben Naim**

31. At the time of the incident, Ben Naim served as the Deceased's security guard, and worked at Bezeq through Lilit.

   In his affidavit, Ben Naim repeated his claim that he protected the Deceased in accordance with the procedures which were in force at the time at Lilit. However, it was not proved that any procedures were in force at Lilit at the relevant time, and, in any event, no such procedures were produced for the Court file.

   In his affidavit, Ben Naim completely ignored the reason why he and the Deceased arrived at Wa'il's shop, where the Deceased was murdered. Reading the affidavit can give rise to the mistaken impression that the two arrived at Wa'il's shop, and that Ben Naim got out of the car, in accordance with some kind of rules and for work-related purposes – but this is not the case.

   This is the place to state that Ben Naim's failure to protect the Deceased is extremely grave, although his conduct after the murder was very professional, and he was even awarded a commendation for his pursuit of the terrorist following the murder – a pursuit that led to his capture.

32. In the course of his interrogation, Ben Naim raised arguments with regard to the level of his training as a security guard. As I have explained, however, I do not intend to attempt to evaluate the level of his training, inasmuch as no expert opinion was submitted in that regard. In any event, as shall be explained below, not only is there no causal relationship between the possibility of perpetrating the terrorist attack and the level of Ben Naim's training as a security guard; his excellent performance following the murder indicates that he is a professional security guard, who was qualified to serve as a security guard.

33. The central question in the context Ben Naim's involvement concerns the purpose of the his arrival, together with the Deceased, at Wa'il's shop.

   Ben Naim was interrogated by the Israel Police on the day of the incident, on June 26, 2003, and he claimed that Wa'il serviced his car from time to time, **"and that morning he was supposed to install an amplifier in my car."** He further noted that **"Wa'il called me**

34 of 90

Case 1:04-cv-00397-GBD-RLE    Document 547-550   Filed 06/25/14    Page 11 of 27
**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin**, *et al.* v. **Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

**contacted me yesterday evening ... and said that a Bezeq pole had fallen next to his home, and asks that I give priority to handling his matter ...."** (sheet 1, lines 7-11).

Ben Naim's testimony in the courtroom indicated that, on the morning of the incident, he parked his car in a covered parking space at Wa'il's shop (Section 382, line 29), and left it there, as Wa'il had not yet opened his business and was not present when Ben Naim's car was brought to the site for the purpose of installing the amplifier.

After leaving the car on Wa'il's premises, Ben Naim moved to the Bezeq Berlingo, which was driven by the Deceased, and the two began their workday.

According to him, at about 11:00 a.m., they returned to Wa'il's shop – where Ben Naim's car was parked. Ben Naim testified that, when they arrived at the shop, he got out of the Berlingo, searched the area around the Berlingo (page 385), and began to walk towards the shop, but then spotted Wa'il, who was in a car parked "**in front of the car that we had parked**" (page 386, line 6). In his testimony, Ben Naim claimed that the purpose of going to Wa'il's shop at this stage was for him to take them to the site of the problem with the Bezeq pole next to Wa'il's house, so that they could repair it. In any event, Ben Naim admitted in his examination that, while he was talking with Wa'il, he actually had his back to the Berlingo, in which the Deceased was sitting and talking on the phone (page 392), although, according to his statement, "**I glanced over from time to time, looking to the right, looking to the left**..." (page 392, line 14). At this point, the terrorist approached the Berlingo and shot the Deceased in the head through the car window, which was closed.

I shall immediately state that I do not accept Ben Naim's version. In my humble opinion, my impression is that this version is a fabricated one, which was only created in order to justify why Ben Naim and the Deceased went to Wa'il's shop, as I shall explain.

As I noted, on reading Ben Naim's affidavit, it appears that, on the morning of the incident, Ben Naim left his car at Wa'il's shop. His affidavit, however, does not provide any explanation of the reason for leaving the car at the shop, nor of the reason why the two men returned to the shop during the morning hours.

Ben Naim's testimony to the police and his testimony in court give rise to an utterly different picture from the innocent, apparently naïve version which appears in Ben Naim's affidavit.

Ben Naim's testimony indicates that his objective in leaving his car with Wa'il on the morning of the incident was for the purpose of installing an amplifier in his car.

35 of 90

Case 1:04-cv-00397-GBD-RLE    Document 547-550   Filed 06/25/14    Page 12 of 27
**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

Ben Naim claimed that, on the previous evening, Wa'il had called him and had asked him to expedite the repair of a pole which had fallen next to his house.

For reasons known only to Ben Naim, he did not find it necessary to mention those facts in his affidavit; this omission seriously detracts from his credibility and the accuracy of his version.

Ben Naim mentioned the phone conversation which had allegedly taken place on the previous evening between him and Wa'il, who asked him to expedite the repair of the pole next to his house. This version, however, constitutes an uncorroborated statement by an individual litigant, and in light of Ben Naim's lack of credibility, I am of the opinion, as I noted earlier, that it is a fabrication.

In excess of that which is required, it should be noted that Ben Naim could have submitted a printout of his phone calls, in order to prove that the conversation in question took place, but did not do so. No one can dispute that Bezeq did not receive any complaint with regard to a fallen pole near Wa'il's house; in fact, no one knows where Wa'il's house is located. More precisely: had a pole actually fallen next to Wa'il's house, it may be assumed that, at some point after the murder, Bezeq would have fixed that pole. However, no document attesting to the repair of the pole was submitted, and Ben Naim refrained from bringing Wa'il to testify, claiming that Wa'il had demanded money for his testimony. Let us again recall established case law with regard to the failure to bring a witness – especially in light of the fact that Ben Naim was entitled to petition the Court to summon Wa'il to testify, but did not do so.

And that is not all. No one can dispute that Ben Naim served as a security guard, and he did not provide a logical explanation for why Wa'il chose to turn to a security guard, of all people, in order to request the expedited repair of a Bezeq pole – when, after all, that is not his job, as he confirmed in his testimony (page 384). More precisely: as I stated, it has not been proved that Wa'il reported the alleged fallen pole to Bezeq, and in any case, the receipt of such a report by Bezeq was never proved.

This is a material matter, inasmuch as, according to Ben Naim's statement to the police and his testimony in court, he was asked by Wa'il to "expedite" and "give priority to" the repair of the pole – a request that would appear to attest to the existence of a report to Bezeq on the falling of the pole in question. Nonetheless, the existence of such a report was not proved.

Ben Naim admitted, in his examination, that one of the reasons why he and the Deceased arrived at Wa'il's shop was to install an amplifier; however, he insisted that they also went in order to repair the pole (page 383). Nonetheless, given that I have determined that the entire matter of the repair of the pole was a complete fabrication, it is obvious that the sole purpose for which the two went to Wa'il's shop on the date in question was in order to arrange for the installation of the amplifier in Ben Naim's car, and that Ben Naim, for reasons known only to him, had decided to handle a personal matter while he was at work

36 of 90

Case 1:04-cv-00397-GBD-RLE    Document 547-550    Filed 06/25/14    Page 13 of 27
**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin**, *et al.* v. **Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

and in the course of the working day, and not thereafter – despite the fact that, according to Oni Devir (page 506), Ben Naim often went to Baqa al-Gharbiya on personal matters even after working hours.

In the course of his testimony, Ben Naim described the manner in which he exited the Berlingo and the search of the area that he allegedly performed following his exit. However, in light of my lack of faith in Ben Naim's testimony, I do not accept the version which states that he performed a search – which was apparently intended to show that, despite the fact that he was seeing to his own personal matters at the time, he was not derelict in his duties as a security guard, especially as this point is not mentioned in his affidavit. More precisely: no one can dispute that, while Ben Naim was talking to Wa'il, he stood with his back to the Berlingo and to the Deceased, who was sitting at in it (page 392). And after all, can it not be reasonably assumed that a security guard, who gets out of a car and searches the area, should not then stand with his back to the person whom he is protecting and talk to someone else?!

At this point, it should be noted that, in the course of his testimony, Ben Naim submitted a sketch of Wa'il's establishment, including a sketch of the location of the cars that were there (Defense Exhibit No. 3). It appears, however, that this sketch differs in material details from the sketch that Ben Naim made in the course of his police interrogation (Prosecution Exhibit No. 5). The sketch in the police file clearly indicates that Ben Naim's testimony describing the trajectory of his walk, from the moment he got out of the Berlingo until he reached Wa'il, who was bent over servicing another car, is both untruthful and impossible (page 460-461), and I am of the opinion that the purpose for which the two went to Wa'il's shop in the course of the working day was for no other reason than to arrange for the installation of the amplifier in Ben Naim's car, and to give Wa'il the car keys for the purpose of the installation in question (436-437), and that, as set forth above, the entire story about the fallen pole is a fabrication, which never actually happened.

Ben Naim claimed in his testimony that he saw the terrorist attacker before he reached Wa'il's shop, and that he even saw him approach the shop. I do not know if Ben Naim indeed saw the terrorist at those early stages. However, in light of the terrorist's young age (15.5), and the fact that a group of children was also walking nearby, he did not attribute any importance to him, and certainly did not suspect that he was a terrorist, and I accept that fact.

34. In summary: with regard to the question of Ben Naim's involvement in the incident which constitutes the object of the action, there is no avoiding the conclusion that Ben Naim's conduct was also a *causa sine qua non*, which helped to make the perpetration of the terrorist attack possible.

Ben Naim led the Deceased to Wa'il's shop for his personal affairs, got out of the Deceased's car and spoke with Wa'il while his back was to the Deceased, and therefore was incapable of preventing the fatal shots which caused the death of the Deceased.

37 of 90

Case 1:04-cv-00397-GBD-RLE    Document 547-550    Filed 06/25/14    Page 14 of 27
**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

As for the question of whether Ben Naim could have and should have foreseen what was about to occur, the answer is in the affirmative; in fact, that answer is obvious, and has even been proved in practical terms, in light of the description of the search of the area, which Ben Naim allegedly performed when he got out of the Berlingo. In other words: Ben Naim proved, by his own description of his conduct, that he could have and should have foreseen the incident, which occurred very shortly after he left the Berlingo.

As set forth above, I do not accept the description in question. However, the very fact that it was raised indicates Ben Naim's understanding of the situation, and of the need to protect the technician from any incident that might harm him. In that description, Ben Naim demonstrated awareness of his role as a security guard, and attempted to minimize his part in the unfortunate occurrence that followed.

35. I cannot avoid addressing the question of what would have happened, had Ben Naim and the Deceased not arrived at Wa'il's shop, and what would have happened, had Ben Naim not left the car and conversed while standing with his back to the Deceased.

These are hypotheses, and I cannot answer them. The facts are that the Deceased and Ben Naim arrived at Wa'il's shop, at Ben Naim's initiative, and that Ben Naim dealt with his own private matters in the shop, while turning his back to the Deceased.

This conduct gives rise to the conclusion that there was a concrete duty of care between Ben Naim and the Deceased, and that it was breached by Ben Naim.

### The concrete duty of care and the breach thereof in the relationship between Lilit and the Deceased

36. Lilit is a company in liquidation, and a stay of proceedings is in place with regard thereto. My task, however, will not be complete without an evaluation of Lilit's share in the incident, especially as there is an insurance policy which covers Lilit's liability at the time of the incident.

It has been clarified that Ben Naim was employed as a security guard for Bezeq through Lilit, and according to him, he was trained for his job by Lilit.

I am of the opinion that Lilit's role was concluded upon transferring the security guard, who was trained by it, to his job at Bezeq.

P1: 923

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

It was proved that from the moment that the security guard was transferred to Bezeq, the security guard operated in accordance with Bezeq's instructions, and I do not see how the existence of a concrete duty of care can be determined in the relationship between the Deceased and Lilit. More precisely: had it been proved that Lilit had not properly trained Ben Naim, and that his training was deficient, and that, as a result, he did not know how to defend the person whom he was meant to protect at the time of the incident, it would have been possible to determine the existence, and the breach, of a concrete duty of care. The problem is, however, that Ben Naim's training was flawless, and he was even awarded a commendation for his quick response upon hearing the shots. Accordingly, Lilit has no direct or indirect involvement in the incident, and in any case, there is no concrete duty of care between it and the Deceased.

### The concrete duty of care and the breach thereof in the relationship between the Palestinian Authority and the Palestinian Council and the Deceased

37. May 4, 1994 was the date of the signing of the **Agreement on the Gaza Strip and Jericho Area between the Government of the State of Israel and the Palestine Liberation Organization** (hereinafter: the "**PLO**",) **the Representative of the Palestinian People** (hereinafter: the "**Gaza-Jericho Agreement**") (attached as Appendix B to the notice by Counsel for the Plaintiffs regarding the submission of conventions).

    The agreement was published in *Treaties* [Hebrew] 1067, Vol. 32, and includes Article VI, entitled "**Powers and Responsibilities of the Palestinian Authority**". Section C of Article VI clarifies that the Palestinian Authority "**shall have,** *inter alia*, **the powers to formulate policies, supervise their implementation, employ staff, establish departments, authorities and institutions, file legal actions and have legal actions filed against it, and conclude contracts**." In other words, what we have here is an admission by a litigant regarding the legal competence of the Palestinian Authority (hereinafter: the "**Authority**") and of its nature as a legal entity, against which legal actions can be filed and a judgment can be handed down. More precisely: it is not for me to define the nature of the legal entity which is known as the "**Palestinian Authority**", and all that I require is the Certificate by a Public Servant which was filed, pursuant to which the Authority does not enjoy legal immunity.

    Counsel for the Authority invested tremendous efforts in an attempt to drag the Court into the political controversy concerning the nature of the legal entity referred to as the "**Palestinian Authority**", and which he defined as "**a foreign political entity**", which is not subject to Israel law in general, and specifically not to the laws of torts. According to the attorney for the Authority, "**One cannot ignore the international aspect of the fact that the PLO is not only a foreign, non-Israeli entity, which is not subject to Israeli law or Israeli norms, but also holds the status of the foreign law**... " He deduced this, *inter alia*, from the Oslo Agreements, which, according to his interpretation, determined the PLO as the sovereign authority in the Territories. Otherwise, as he put it, "**What would the source be for the Plaintiffs' attribution of negligence to Defendant No. 8** (the PLO – D.G), **for not having prevented terrorist acts against the citizens of the State of Israel, other than by virtue of its nature as the sovereign authority on the ground?**" (Section 3 of the opening passage of the summation by the Authority).

Case 1:04-cv-00397-GBD-RLE    Document 547-550    Filed 06/25/14    Page 16 of 27
**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

Regarding the incident which constitutes the object of the Statement of Claim, it was argued that no direct connection was proved between the Palestinian Authority and incident which constitutes the object of the Statement of Claim. In addition, arguments were raised concerning the illegality of the certificate issued by the Foreign Minister, and there were also arguments of non-justiciability and *forum non conveniens*. With regard to all of these arguments, the Court was requested, in the summation by the Palestinian Authority, not to hand down a ruling within the framework of this case.

38. In the Statement of Claim and in the summation, the Plaintiffs attribute liability for the perpetration of the terrorist attack to the Palestinian Authority. They base the cause of action upon the undertakings which the Palestinian Authority took upon itself, within the framework of the Gaza-Jericho Agreement and the Interim Agreement, as well as upon the provisions of the Torts Ordinance [New Version]. I believe that, in the first place, it is fitting and proper to address these agreements and to clarify their significance in the setting of the present action.

39. The Gaza-Jericho agreement and the Interim Agreement – as I mentioned, this agreement was signed on May 4, 1994 in Cairo, between the "**Government of Israel**" and the Palestine Liberation Organization.

   After the signing of the agreement, the Implementation of the Agreement Regarding the Gaza Strip and Jericho Law (Jurisdiction and Other Provisions) (Legislative Amendments), 5754-1994 was enacted (hereinafter: the "**Implementation of the Gaza-Jericho Agreement Law**").

   On September 28, 1995, the Israel-Palestine Interim Agreement Regarding the West Bank (hereinafter: the "**Interim Agreement**") was signed in Washington. Within the framework of the Interim Agreement, the Palestinian Council was established and founded, as the entity to which the powers which had been conferred upon the Palestinian Authority pursuant to the Gaza-Jericho Agreement (Chapter 1, Article 2 of the Interim Agreement) were to be transferred.

   The Interim Agreement was published in *Treaties* [Hebrew] 1071, Vol. 33, and was followed by the enactment of the Implementation of the Interim Agreement Regarding the West Bank and the Gaza Strip Law (Jurisdiction and Miscellaneous Provisions) (Legislative Amendments), 5756-1996, and of the Amendment and Extension of the Validity of Emergency Regulations Law (Judea and Samaria – Jurisdiction over Offenses and Legal Assistance), 5766-2007, whereby some of the legislative amendments were directly inserted into the Amendment and Extension of the Validity of Emergency Regulations Law (Judea and Samaria and Gaza Strip – Jurisdiction over Offenses and Legal Assistance), 5727-1967. In addition, Proclamation No. 7 Regarding the Implementation of the Interim Agreement (Judea and Samaria) was also published. Within the framework of the Interim Agreement, Israel transferred to the Council the powers and responsibilities as specified in the agreement itself.

40 of 90

Case 1:04-cv-00397-GBD-RLE    Document 547-550 [Israel] Filed 06/25/14    Page 17 of 27
**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

The "Agreement Regarding the Preparatory Transfer of Powers and Responsibilities" was signed in Erez on August 29, 1994 and published in *Treaties* [Hebrew] 1068, Vol. 32, and was followed by the enactment of the Implementation of the Preparatory Transfer of Powers to the Palestinian Authority Law (Legislative Amendments and Miscellaneous Provisions), 5755-1995 (hereinafter: the "**Transfer Agreement**").

40. In Article XVIII of the Gaza-Jericho agreement, both parties (the State of Israel and the Palestinian Authority) undertook to take "**all measures necessary in order to prevent acts of terrorism, crime and hostilities directed against each other, against individuals falling under the other's authority and against their property, and shall take legal measures against offenders. In addition, the Palestinian side shall take all measures necessary to prevent such hostile acts directed against the Settlements, the infrastructure serving them and the Military Installation Area, and the Israeli side shall take all measures necessary to prevent such hostile acts emanating from the Settlements and directed against Palestinians.**"

This undertaking is repeated in Article 15 of the Interim Agreement, under the heading "**Prevention of Hostile Activity**".

As we have seen, there can be no doubt that, contrary to the argument by the Palestinian Authority, the agreements set forth above between the State of Israel and the Palestinian Authority became part of Israeli domestic law, pursuant to the enactment of the laws set forth above, and there is accordingly no impediment, legal or otherwise, to the filing of civil actions in torts based on the undertakings by the Palestinian Authority in those agreements.

Counsel for the Palestinian Authority has argued that the purpose of the aforementioned implementation laws was to adjust the Israeli legislation to the undertakings assumed by the State of Israel in the agreements set forth above, because it is inconceivable that Israeli legislation could anchor undertakings of the Palestinian Authority. In this argument, however, the Palestinian Authority is only partially correct.

There can be no doubt that the purpose of the implementation laws is to anchor Israel's undertakings to the Palestinian Authority within the framework of Israeli law. These undertakings, however, did not originate in a vacuum. They are based on the agreements which were signed by the Palestinian Authority. In other words, the Palestinian Authority as an independent legal entity entered into a contractual undertaking vis-à-vis the State of Israel and its citizens to prevent terrorist acts. This undertaking, which is reflected in both the Gaza-Jericho Agreement and the Interim Agreement, constitutes a direct undertaking to the citizens of the State of Israel; alternatively, it constitutes a contract for the benefit of a third party – the citizens of the State of Israel. In other words: the reliance on the undertakings by the Palestinian Authority in the various agreements is by virtue of the Israeli and Palestinian contractual agreement, to the effect that these are binding agreements and that, in accordance with the laws of contracts, a party which is directly harmed as a result of a breach of these agreements is entitled to file actions and

**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

to claim his damages. More precisely: Section 34 of the Contracts Law (General Part) recognizes the right of a third party, who is extraneous to a contract, to file an action pursuant to the contract, in the capacity of a beneficiary pursuant to that contract (See G. Shalev: *The Laws of Contracts* [Hebrew], 2nd ed., 5755-1995, at 4319.

Counsel for the Palestinian Authority argued that, within the framework of the summation which was filed in Civil Appeal 4060/93, **Palestinian Authority** *et al.* **v. Eliyahu Dayan** *et al.*, Counsel for the Attorney General agreed that the agreements in question do not give rise to causes of action other than to the parties which signed them, **"and people, or private entities, who are not party to them, are not authorized to file actions by virtue thereof, unless expressly otherwise stated in the diplomatic agreements themselves."** The problem is, however, that Counsel for the Palestinian Authority did not attach the cited position of the Attorney General to his summation, and an examination of the Supreme Court ruling reveals that the Supreme Court did not even address the argument, because it had not been raised in the trial forum (Section 7 of the ruling).

On the merits, it should be stated that the Court is not bound by any particular position by the Attorney General, especially given that the Attorney General's statement was not brought to my knowledge and I do not know what his position is.

In my opinion, after reading the agreements, and by virtue of that which arises therefrom, it may be concluded that the intention of the authors thereof was to confer upon the beneficiaries thereof the right to demand the fulfillment of the obligation pursuant to that set forth in the agreements. I derive this, *inter alia*, from the preface to the Gaza-Jericho Agreement, which confirms the right of the parties to the agreement **"to live in peaceful coexistence, mutual dignity, and security…".** Dignity includes the right not to be harmed by terrorist acts and the right to file actions in torts for any such harm. More precisely: the right of the State of Israel to live in peaceful coexistence, mutual dignity, and security, is none other than the right of the residents and citizens of the State of Israel, and in any event, it has not been proved otherwise.

I am aware that the interpretation of the agreements between the State of Israel and the Palestinian Authority was not even mentioned in the Court sessions. Nonetheless, given that Counsel for the Plaintiffs relied upon the existence of the agreements, she is entitled to interpret them as she sees fit. If the Palestinian Authority believed that the agreements should not be relied on, or that they should be interpreted in a certain way, it was entitled to reason argument to that effect, and to bring evidence in support of its arguments – but it did not do so.

Furthermore, in Section C of Article VI of the Gaza-Jericho Agreement, the Palestinian Authority declares its right to file legal actions and to have legal actions filed against it. The Palestinian Authority did not see fit to limit the right to file an action against it, or the type of matter regarding which an action could be so filed; rather, it proclaimed the existence of the right to file an action against it. That set forth above indicates that the right to file an action against the Palestinian Authority applies to the State of Israel and to its individuals who find themselves harmed as a result of the actions by the Authority, especially since the purpose of the agreements is to institutionalize **"peaceful coexistence".** This concept includes

Case 1:04-cv-00397-GBD-RLE  Document 547-550  Filed 06/25/14  Page 19 of 27

**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

both the right of individuals to live in peace and their right to file legal actions if their right to live in peace is infringed. After all, if this is not the case, what is the meaning of "**coexistence**"?

In view of all that which has been set forth above, I am of the opinion that the agreements confer the right to file legal actions, with respect to the breach thereof, upon both the State and its individuals, and that, had either of the parties desired to prevent individuals of the State from having that right of action, it would have stipulated this in the agreements – and this, as set forth above, was not done.

In addition to that which has been set forth above, it should be recalled that the Plaintiffs' cause of action against the Palestinian Authority is a cause in torts, and reliance on the agreements is legitimate reliance within the framework of their attempt to prove that the Palestinian Authority is liable for compensating them for the incident which constitutes the object of the action.

As I mentioned, the Palestinian Authority defined itself, in the agreements, as a legal entity competent to file legal actions and to have legal actions filed against it. Regardless of the fact of this admission by a litigant, to the effect that the Palestinian Authority is a legal entity, we cannot ignore the fact that it is a legal entity which, by its conduct, according to the Plaintiffs' argument, caused the damage which constitutes the object of the Statement of Claim. I believe that, in the matter of liability in torts, the law requires the Palestinian Authority to be considered as equal to any legal entity against which a civil action in torts is filed. Accordingly, it should be clarified that the Plaintiffs' cause of action does not stem from the Palestinian Authority's undertakings as set forth within the framework of the agreements, but rather, from its very nature as a legal entity, which committed a tortious act, and against which, as a result of its having done so, and action for compensation of the injured parties has been filed.

41.  The Plaintiff has [sic] argued that the Palestinian Authority and the Palestinian Council "**not only did not frustrate terrorism, but actually initiated, exercised and financed terrorism, in contravention of the relevant treaties**" (Section 4 of the Plaintiffs' summation). On the other hand, the Palestinian Authority and the Council have argued that they bear no liability for the terrorist's actions and that they are not in the nature of the "**principal**" of the terrorist with regard to the perpetration of the terrorist attack which constitutes the object of the Statement of Claim (page 8 of the summation by Defendants No. 7 and No. 8).

I do not accept the position of the Palestinian Authority, as I shall now clarify.

The terrorist, Shadi Muhamad Hassain Jawada, gave preliminary testimony before the Court on July 12, 2009.

In his police interrogation and in a Court session before me, the terrorist confessed that he had murdered the Deceased.

In his statement (which was taken from him in the hospital on July 2, 2003, Prosecution Exhibit No. 19), the terrorist stated that, about two and one-half months before the attack he had begun taking a "**physical training and weapons training course**" (sheet 2, lines 7-8),

43 of 90

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

and he clarified that he did this in the Palestinian Authority, in Jericho. According to his statement, the course had lasted for 50 days, and had ended about 10 days before the perpetration of the terrorist attack (*ibid.*). In his statement, he described how he had decided to kill a Jew, and how he had carried out his desires; in answer to a question, he answered that he does not belong "**to any organization**" (sheet 5, line 10).

It appears that, after the terrorist's admission that he trained in the Palestinian Authority, there can no longer be any doubt on this point. The problem, however, is that, in his testimony in Court, the terrorist argued for the first time that "**what I said to the police was not correct**" (page 11, line 29), and that, according to his testimony in Court, his training had taken place in Jenin and that "**I was given weapons training in the al-Aqsa Brigades**" (page 14, line 28). Nonetheless, he had no explanation for the change in his version precisely at this time, in total contrast to his original, unsullied version at the time of his interrogation, just after the perpetration of the murder. It accordingly seems reasonable to assume, as suggested by Counsel for the Plaintiffs, that someone in the prison instructed him to change his testimony, so as not to implicate the Palestinian Authority in this case.

In view of his change of version, the terrorist was declared to be a hostile witness (page 12), with no objection by any of the parties, and was cross-examined by the parties.

In its summation, the Palestinian Authority argued that the terrorist's statement to the police that he underwent physical training and weapons training "**in the Palestinian Authority**" in Jericho" does not mean that he was given the training in the Palestinian Authority, but rather, "**within the confines**" of the Palestinian Authority in Jericho, and not on behalf of the Palestinian Authority in Jericho.

I totally and categorically reject this argument. First of all, had Counsel for the Palestinian Authority believed that the content of the terrorist's statement had been wrongly interpreted or wrongly translated, he would have been entitled to bring in an expert in linguistics, who would make the necessary clarification. His failure to do so will be held against the Palestinian Authority.

Furthermore, reading the terrorist's statement indicates that his intention was to clarify that he underwent physical and weapons training in the Palestinian Authority in Jericho, and not "**within the confines**" of the Palestinian Authority in Jericho. This can be inferred from the continuation of the statement, where the terrorist explained "**that I underwent weapons training in Jericho...**" (sheet 2, line 14). In other words: when the terrorist intended to indicate a geographic location only, he used the word "**Jericho**" alone, and the conclusion is that, when he claimed that he underwent physical and weapons training in the Palestinian Authority in Jericho, he meant exactly what he said – that is, that he participated in a training camp on behalf of the Palestinian Authority in Jericho.

44 of 90

Case 1:04-cv-00397-GBD-RLE    Document 547-550    Filed 06/25/14    Page 21 of 27
**Tel-Aviv-Jaffa District Court**
Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

As I mentioned, on the date of the attack, the terrorist was only 15.5 years old, and it seems that he chose to exploit that fact in order to substantiate his change of version, by surprisingly arguing, for the first time, that "**the Palestinian Authority did not allow me to undergo training, and when I went to the Jericho area to volunteer for a military location, and they didn't agree, they refused for only one reason – because of my age**" (page 14, lines 17-18).

As may be seen, there has been a development in the terrorist's version – a development which is intended to distance the Palestinian Authority from liability for the murder that he committed – given that, whereas the terrorist clarified, just a few days after the murder, that he was trained "**in the Palestinian Authority in Jericho**", in the courtroom, six years after the terrorist attack, he knew enough to say that he set out "**for the Jericho area**." The matter speaks for itself.

The terrorist was asked why he had told the police interrogator that he had been trained in the Palestinian Authority, and now he was claiming that he had been trained in Jenin with the al-Aqsa Brigades; his laconic answer was that "**these were things which happened six, seven years ago. I don't remember what I said at all. When I perpetrated the perpetration** [sic], **I belonged to the al-Aqsa Brigades.**" The problem is, however, that when the terrorist was interrogated right after the event, he argued, as we may recall, that he did not belong to any organization at all, and when he was confronted with his statements, he said "**They interrogated me, and I was wounded, tired.**" But this statement is also untrue: reading the police statement indicates that, when the interrogator asked the terrorist how he felt before the beginning of the interrogation, his reply was "**Praise God, I feel good... people are very nice to me here, the doctors and the nurses are all very nice to me**" (sheet 1, lines 14, 16).

As we have seen, there can be no doubt that the terrorist's answers to the police interrogator, within the framework of Prosecution Exhibit No. 1 were actually the true answers, and that, as set forth above, the change in his version stemmed from his attempt to distance the Palestinian Authority from the incident which constitutes the object of the Statement of Claim.

In the terrorist's further testimony, it became clear that he had been fed information that somebody wanted to be brought before the Court. For example, he claimed that "**those in Jenin were not brought into the Authority. They are fighting against Israel, and the Authority is not fighting. Jenin takes people who want to carry out an action... The Authority wants security and peace, but in Jenin, everyone who can do so wants to carry out whatever action they assign to him**" (page 23, lines 6-10).

As a parenthetical note, it should be stated that the terrorist argued, in the courtroom, that he had told the police interrogator that he had been trained by the al-Aqsa Brigades. He had no explanation, however, for the fact that his statement, which bears his signature, indicates that he was trained in the Palestinian Territory. In his testimony before the Court, he attempted to justify his statements to the

45 of 90

**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

interrogator on the basis of his medical condition. Nonetheless, the description which he gave in the courtroom (page 16, lines 14-25) is not consistent with his declaration to the interrogator, to the effect that he felt well at the time when the statement was taken.

Counsel for the Plaintiff's claimed that the change in the terrorist's version in Court, relative to his statements in Prosecution Exhibit No. 1, constitutes "**withheld testimony**" – and she is correct.

### Withheld testimony

42. "Withheld testimony" is testimony given by a witness in Court, which he had previously "withheld" in his heart, despite its relevance and importance to the matter at hand, and which he only revealed at a later stage. The withholding of testimony, in the absence of an adequate explanation, gives rise to doubt regarding its veracity. "**The rule is: withheld testimony is of particularly low value and weight, because a person who 'withholds his testimony' is naturally suspect with respect to the veracity thereof. This is the case provided that he has no convincing explanation of why his testimony was withheld for a long time and why the witness decided to disclose it. If the witness gave a satisfactory explanation for the 'withholding' of the testimony, the Court is entitled to view it as reliable and to attribute to it the evidentiary weight dictated by the circumstances**" (see Y. Kedmi, *On Evidence* [Hebrew], Part I – The Law as Reflected in Case Law, combined and updated edition, 5763-2003, at 441).

The subject has been expressed in established case law as follows:

> "**The rule which applies to withheld to repressed testimony is that its evidentiary value and weight are low, by reason of the natural suspicion that arises with respect to the veracity thereof, provided that the witness has no convincing and satisfactory explanation of the reasons for which he repressed his testimony (see: Criminal Appeal 5396/05, Alhorati v. State of Israel [published in the Nevo database], May 18, 2006; Criminal Appeal 4297/98, Hershtik v. State of Israel, *PD* 50 (4) 673, at 687-688 (2000); Criminal Appeal 3625/91, Or v. State of Israel [published in the Nevo database], June 9, 1993), paragraph 19 of the ruling by Justice Levin; Criminal Appeal 154/85, Avrushmi v. State of Israel, *PD* 41 (1) 387, at 399 (1987)). The duration of time after which testimony will be considered to have been withheld is not determined according to a fixed and rigid criterion; rather, it is determined, in each case, according to the circumstances thereof (Criminal Appeal 4223/07, John Doe v. State of Israel [published in the Nevo database], June 11, 2007); Criminal Appeal 10189/02, John Doe v. State of Israel [published in the Nevo database], September 19, 2005, paragraph 13; Criminal Appeal 5612/92,**

Case 1:04-cv-00397-GBD-RLE   Document 547-550   Filed 06/25/14   Page 23 of 27
**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

> **State of Israel v. Beeri,** *PD* **48 (1) 302, at 363 (1993)
> (hereinafter: the 'Beeri Case').... The focus is not on the
> duration of the silence, but rather, on the reason that
> motivated the witness to withhold the knowledge which
> was in his possession, as well as the change in
> circumstances that prompted him to disclose the
> information"**(see: Section 10 of Criminal Appeal 1645/08,
> **John Doe v. State of Israel,** not yet published).

See also:

> **"In the case before me, the Court is requested to take into
> account testimony which was withheld for a considerable
> period of time. The Court will only reluctantly attribute
> weight to such testimony, especially when the testimony is
> presented as grounds for the holding of a retrial. The
> evidentiary value of withheld testimony is slight, due to the
> natural suspicion which arises with respect to the veracity
> thereof. This suspicion, of course, may be refuted when a
> good reason is given for the withholding of the testimony.
> (In this regard, see and compare: Cohen Case, Section 11
> of the ruling by Justice Arbel; Criminal Appeal 1645/08,
> John Doe v. State of Israel, Section 10 of the ruling and
> references cited [published in the Nevo database],
> September 3, 2009.)"** (see Retrial (Supreme Court Retrial)
> 1178/03, **Hani Hason v. State of Israel,** not yet published,
> Section 11 of the ruling) (see also: Criminal Appeal 2014/94,
> **Salah v. State of Israel,** *PD* 50 (2) 624, at 629; Criminal
> Appeal 5730/96, **Graziani v. State of Israel,** published in the
> Nevo database; Criminal Appeal 235/79, **Ohana v. State of
> Israel,** *PD* 34 (1) 544, at 546; Criminal Appeal 6274/98, **John
> Doe v. State of Israel,** *PD* 55 (2) 293, at 297; Criminal Appeal
> 1258/03, **John Doe v. State of Israel,** *PD* 58 (6) 625, at 638).

It should be clarified that case law concerning a different [sic] witness is identical on
both the criminal and the civil levels. One of the results of the raising of withheld
testimony is the proclamation of the witness as a hostile witness, as in the case before
me. More precisely: a hostile witness is a witness who, in the course of his testimony
before the Court, demonstrates hostility toward the party who summoned him to
testify, or where there is a contradiction between the witness's testimony in Court and
his recorded statements out of court, or in affidavit, or in expert opinions. In the matter
which is presently at hand, there is a clear and absolute contradiction between things
which the terrorist said (and which, on the witness stand, he confirmed having said) in
his statement to the police (Prosecution Exhibit No. 1 1) and his statements in Court. It
should be clarified that – as I have already determined – I have no doubt that the
contradiction between

47 of 90

**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, Estate of the Deceased, Amit Amos Mentin, *et al.* v. Bezeq Israeli Telecommunications Co. Ltd. *et al.*

the terrorist's statements in Prosecution Exhibit No. 1 and his statements in Court were intended to distance the Palestinian Authority from the incident which constitutes the object of the Statement of Claim. This attempt, however, was unsuccessful.

Despite the change in his version, which I have rejected, the chain of events may be clearly outlined as follows:

The terrorist – a 15.5-year-old minor – wanted to be a Palestinian soldier (page 16, line 12). According to his statement to the police, he was given weapons training in Jericho by the Palestinian Authority. He stated that the training lasted for 50 days, and immediately thereafter, about 10 days after the end of the training session, the terrorist appears to have had a burning desire to implement the knowledge which he had acquired in the training camp of the Palestinian Authority. The rest is history.

As I mentioned, I prefer the terrorist's statement to the police. This was an authentic statement, and one which, from the time when it was made and until the terrorist's examination in Court, he did not seek to change. I have no doubt that what appears in the statement is the truth.

The version regarding the training by the al-Aqsa Brigades was first "**born**" in the courtroom, and the terrorist was obviously reciting a version which was not true.

Counsel for the Palestinian Authority attorney argued that the entire case against the Palestinian Authority is based on the terrorist's statement (Prosecution Exhibit No. 1), in accordance with which he was trained by the Palestinian Authority in Jericho, and in his own words "**in the Palestinian Authority in Jericho.**" According to the terrorist, however, this statement is inadmissible and cannot serve as evidence of the veracity of its contents. I, however, do not accept this.

First of all, it should be noted that the terrorist's statement (Prosecution Exhibit No. 1) was filed with his consent and without objection, after the terrorist confirmed his signature on the statement. In fact, he also confirmed the truth of its contents in Court, and testified that he himself was "**clever and understanding**" (page 24, line 13). He even wondered, "**Why is it necessary to ask all the questions? I confessed a long time ago**" (page 24, lines 13- 14). In other words, the terrorist himself referred to his statement (Prosecution Exhibit No. 1) and actually confirmed that it was true.

Furthermore, the terrorist's statement was taken from him immediately after the terrorist attack, and reading the interrogation clearly indicates that the terrorist was asked "**open**" questions, such as "**Can you tell us what exactly happened to you?**" (sheet 2 of Prosecution Exhibit No. 1, line 3). In answer to this question, the terrorist started telling his story, which he himself chose to tell of his own free will; without having been asked any question about his training before the commission of the murder, he chose to tell about having gone through training camp in the Palestinian Authority in Jericho. The manner in which the question was presented and the detailed answer confer extensive evidentiary value upon the statement to the police, and its value increases in view of the terrorist's behavior

## Tel-Aviv-Jaffa District Court

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

and lies when he was examined in court, six years after he had given his voluntary statement (regarding the value of the statement, see Y. Kedmi, *On Evidence* [Hebrew], revised and combined edition, 2009, at 1818). More precisely: Counsel for the Palestinian Authority did not object to the filing of the terrorist's statement as evidence and did not raise any reservations regarding its content, and if he did not do so when the statement was filed, he cannot be permitted to do so at the time of the summation, because, had he raised any objection to the filing thereof as evidence, the objection would have been heard, and ruled on, even with regard to the evidentiary value of the statement. But none of this happened. Furthermore, when the terrorist was declared to be a hostile witness, the Palestinian Authority was entitled to cross-examine him, and thereby to attempt to explain the material change in versions between the statement in Prosecution Exhibit No. 1 regarding the identity of the entity which trained him and the terrorist's testimony in Court. Counsel for the Palestinian Authority waived the examination of the terrorist and chose not to examine him at all. This waiver demands an explanation.

The terrorist's change of version included not only the identity of the entity which trained him, but also the duration of the training. By contrast to the statement in Prosecution Exhibit No. 1, the terrorist claimed in Court that he had been trained in Jenin – and not in Jericho, as clarified in his statement – but for only two days, for an hour each day. In other words, he had been trained for a total of two hours before the murder. I cannot accept this version, either, and I rule that it is untrue. The terrorist was asked why he had stated, in Prosecution Exhibit No. 1, that he had trained for 50 hours, but he chose to avoid giving an answer, saying only that "**I didn't go to training at all, they told me that I didn't have an identity document**" (page 26, lines 10-11). In other words, there was no answer to the question.

As often happens to those who do not speak the truth, the terrorist also became entangled in his statements. On one hand, he again argued that he had spoken truthfully to the police interrogators, including with respect to the question of his organizational affiliation (in Prosecution Exhibit No. 1, he claimed that he did not belong to any organization). Immediately afterward, however, he turned devious and said that he had told the police interrogator that the al-Aqsa organization "**was behind the perpetration of the murder that I committed**." He then immediately added, on his own initiative and without having been asked, "**The interrogator was focused on whether or not I had killed and to whom I belonged**" (page 28, lines 16-18). As set forth above, I have no doubt that the terrorist's statements in Prosecution Exhibit No. 1 are true statements, which were made without any leading or guiding; they were the truthful statements of an unsophisticated 15.5-year-old youth, who most probably is not aware of the implications of his statements for the Palestinian Authority.

There can be no doubt that, during his years in prison, the terrorist "**got wise**" and understood the damage caused to the Palestinian Authority by his statement in Prosecution Exhibit No. 1; that he was guided by other prisoners (page 28); and that he made a tremendous effort to rectify these statements – an effort that was doomed to failure because there is no doubt that this is a case of false testimony, and the truth is that the terrorist was trained by the Palestinian Authority in the training camp in Jericho, just as he claimed at the very beginning.

[Emblem of the State of Israel]

**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

43.  The Palestinian Authority attempted to prove, through the use of witnesses on its behalf, that the terrorist had not undergone a course under its auspices in the relevant period, but this attempt failed.

The first witness on behalf of the Palestinian Authority was Naaman Naim Fanun (hereinafter: "**Fanun**"), who has served as the legal advisor to the Palestinian military intelligence (page 64, line 7) since 2009 (*ibid.*). His statements indicate that, between 2000 and 2006, he served as a prosecutor in the courts of the Palestinian Authority (page 64, line 20) and between 2006 and 2008, he served as a judge in a Palestinian Authority military court (*ibid.*). It further transpired that, during the years in which he served as a military prosecutor, he lived "**between Hebron and Bethlehem**" (page 65, line 2). The question that naturally arises is why this witness was brought to testify, given that, during the relevant years he had no connection to the Palestinian Authority training camps and, in any event, could not give any information on the camps on the basis of his own personal knowledge. The oddity of his testimony only increases when the identity of the Commander of the Palestinian Security Apparatus became clear, along with the fact that this person was alive and capable of providing the most authoritative evidence regarding the existence or non-existence of training camps in Jericho in 2003, as well as details with regard to those who had been trained there (page 65).

As a parenthetical note, it should be stated that this oddity was "**explained**" by Counsel for the Palestinian Authority in his summation (Section 73). In deference to his dignity, I shall not address this "**explanation**" as it appears in his summation.

The witness Fanun, who is an attorney by profession, attempted to explain his having been brought to testify in this case, although he had no personal knowledge of the disputed subject, by explaining: "**It is difficult to find a person who can give information about all of these places (**the training camps that the Palestinian Authority received – D.G.) **and really accurate names**" (of the people who had been trained –D.G.) (page 65, line 25). More precisely: the Court issued a number of orders requiring the Palestinian Authority to disclose details regarding the training camp in Jericho and the names of those who had been trained there at the relevant time, but the Palestinian Authority did not produce the relevant information, without giving any reason for its failure to comply with the provisions of the order. In this way, the Court was prevented from finding out, first-hand, whether the terrorist had participated in these training camps, in Jericho, under the auspices of the Palestinian Authority in 2003 – as he had indeed confessed in Prosecution Exhibit No. 1, or had not participated in those camps, according to his later version, which I have found to be mendacious. Needless to say, this failure works against the Palestinian Authority, and it is almost certain that, had the required information been produced, we would have found the terrorist's name among the names of those who had been trained there, just as he described in Prosecution Exhibit No. 1.

Adv. Fanun even admitted that he did not know who had been responsible for the training camps in Jericho between 2000 and 2006 (page 66, lines 1-2), and it transpired that his argument, to the effect that the terrorist had not participated in the training camp

50 of 90

Case 1:04-cv-00397-GBD-RLE    Document 547-550    Filed 06/25/14    Page 27 of 27
**Tel-Aviv-Jaffa District Court**
Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin**, *et al.* v. **Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

of the P.A. relied on "**we asked... we clarified...**", and he admitted that he had no personal knowledge of whether or not the terrorist had been trained in the Palestinian Authority camp in Jericho (page 66, lines 17-18).

Adv. Fanun further confirmed that he had not personally visited the training camp in Jericho and had not personally examined the Records (page 67, lines 12-13). In his own words: "**I can't examine and go and look over all of the records**" (page 68, line 14).

As to the terrorist's argument, in his examination in the courtroom, pursuant to which he was not accepted to the training camp in Jericho because of his young age, Adv. Fanun admitted that he was not in possession of any confirmation from the Palestinian Security Apparatus, to the effect that people under the age of 18 were not accepted into their ranks (page 69, lines 6-8). In answer to a question by the Court as to where it would have been possible to see a list of the participants in Palestinian Authority training camps in Jericho between April and June 2003, the witness surprisingly stated that, "**in order for you to find this list, we would have to know where he was trained, in which place in Jericho**" (page 70, lines 28-29) – at which point it transpired that the Palestinian Authority ran a number of training camps in Jericho (page 71, lines 1-2).

44. In view of his total unfamiliarity with the subjects under discussion, the Palestinian Authority submitted an additional affidavit, by Juma'a Hassin Freij Hamdallah (hereinafter: "**Hamdallah**"), who is the Head of the Training Authority in the Palestinian Authority.

Although one might have thought that Hamdallah would be the witness who could finally answer the question regarding the terrorist's training, we were disappointed yet again. It transpired that Hamdallah had lived in Gaza from September 1996 "**until 2007 after the Hamas revolution**" (page 520, line 6). In other words, during the relevant period of time – in 2003 – he not only was not the Head of the Training Authority, but resided in Gaza and *ipso facto* could not have reached the Jericho area.

It further emerged form Hamdallah's statements that, until 2007, the Head of the Training Authority in the Palestinian Authority was "**Major General Samih Nasser**" (page 520, line 23). Accordingly, even at this stage, the inevitable conclusion is that the Palestinian Authority's failure to bring the relevant person as a witness is a failure which will be held against it, and that it originates in the Palestinian Authority's desire to conceal the truth from the Court – since the truth is apparently not convenient for the Palestinian Authority.

As a parenthetical note, it should be stated that Hamdallah's examination encountered difficulties due to his systematic refusal to give direct answers to clear questions, and his attempt to avoid giving any response whatsoever (page 522, lines 31-32).

51 of 90