# EXHIBIT A.948
## (3 of 8)

**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

In his examination, Hamdallah admitted that, between 2000 and 2005, the Palestinian Authority's training camps were "**only in Jericho**" (page 525, line 30). However, he claimed that the training camps did not operate between 2002 and 2004 due to the Israeli attacks, including those within the framework of Operation Defensive Shield (page 526, lines 22-25; page 527, lines 16-19). Nonetheless, he was forced to admit, with obvious reluctance, that the Israel Defense Forces did not enter the training camps in the framework of Defensive Shield, "**but they were in close proximity, at the roadblock**" (page 527).

Later in Hamdallah's examination, it transpired that, between 2002 and 2004, he was not even in Judea and Samaria, but in Gaza. Moreover, his testimony indicated that, during those years, which are the relevant years for our purposes, he was in contact with the security apparatuses in Jericho by telephone (page 529, lines 11-12), and he claimed to know that the courses were not conducted during the relevant years, because he was the one who gave approval by telephone for the holding of a course, and during the years in question, he was not asked to approve the holding of a course (page 530).

45. Summing up the testimony by Fanun and Hamdallah, there is no escaping the conclusion that the vast majority of the testimony by both men is hearsay, in terms of the absence of personal knowledge. More precisely: I cannot accept Hamdallah's testimony, according to which no training camps were held in Jericho between 2002 and 2004.

First and foremost, Hamdallah admitted that he was not physically present in Jericho during those years. Accordingly, all of the information in his possession is nothing but hearsay, because, being absent from Jericho, he had no way of really knowing whether or not training camps were held. Furthermore, if a decision had actually been made not to hold training camps or courses between 2002 and 2004, due to the fear of an Israeli attack, there would almost certainly have been documentation to that effect; nonetheless, no documents of this kind were produced. Most importantly, Operation Defensive Shield took place between March and May 2002 (a fact to which Counsel for the Palestinian Authority agreed; see Section 71 of his summation). Accordingly, Hamdallah's statement that people were afraid to travel on the roads during those years, ostensibly because of Operation Defensive Shield, is untrue and devoid of any value whatsoever.

If I add to this the terrorist's authentic testimony in Prosecution Exhibit No. 1, then there can be no doubt that the terrorist participated in a training camp in Jericho on behalf of the Palestinian Authority, and all of the Palestinian Authority's efforts to conceal the existence of the training camp in Jericho at that time, and the terrorist's participation in the camp, have failed. **I therefore rule that the terrorist was trained in the Palestinian Authority in a training camp in Jericho, for 50 days, and I also rule that he completed his training about 10 days before the perpetration of the murder.**

46. This is the place to state that Counsel for the Palestinian Authority made an effort, throughout the entire summation which he filed, to "**explain**" various statements made by his witnesses. These "**explanations**", however, are nothing other than testimony,

Case 1:04-cv-00397-GBD-RLE Document 547-551 Filed 06/25/14 Page 3 of 27
**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, Estate of the Deceased, Amit Amos Mentin, *et al.* v. Bezeq Israeli Telecommunications Co. Ltd. *et al.*

the proper place for which is in affidavits, or during the hearing of evidence, and not as part of the summation by Counsel for the Palestinian Authority (see *e.g.* Sections 71 and 73 of the summation, and other sections as well).

47. Counsel for the Palestinian Authority emphatically rejected the argument by Counsel for the Plaintiff [sic], according to which the Palestinian Authority "**recruited and trained the terrorist who murdered the Deceased**" (Section 53A of the Amended Statement of Claim), and similarly rejected the content of Section 53B of the Amended Statement of Claim, according to which "**the Defendant trained and guided the terrorist to kill Jews, wherever they might be, in cold blood, and according to his statement, the Plaintiffs had not taken up the burden, which was incumbent upon them, of proving that the terrorist was trained to kill Jews in courses or in training camps on behalf of the Palestinian Authority.**"

There can be no doubt that these passages in the Statement of Claim and the summation are somewhat harsh. Nonetheless, if we separate the wheat from the chaff and present the facts as they stand, with no casuistry, there can be no doubt of the existence of a factual and legal causal relationship between the training which was given to the terrorist by the Palestinian Authority and the murder which he committed shortly thereafter, immediately upon the completion of his "**studies**".

48. This case is complex and exceptional from a legal standpoint, and the discussion of whether or not there was a factual and legal causal relationship between the actions or omissions of the Palestinian Authority and the commission of the murder is no ordinary legal deliberation. It involves a complex tissue of facts, the interweaving of which into a complete creation will assist me in resolving the question of the causal relationship.

49. In order to establish iron-clad findings regarding the existence or non-existence of a causal relationship, it is first necessary to review the general public atmosphere among the Palestinian populace during the period which preceded the murder of the Deceased. An understanding of the atmosphere will assist us in our attempt to understand what caused a 15.5-year-old youth to kill a Jew, merely because he was a Jew (see Prosecution Exhibit No. 19), and will also clarify that the statement by Counsel for the Plaintiffs in the Statement of Claim, according to which the PLO "**recruited and trained the terrorist, who murdered the Deceased**", is not only not unfounded, but has actually been proved at the level of probability required in a civil trial.

Regarding the additional statement by Counsel for the Plaintiffs, according to which the Palestinian Authority trained the terrorist to kill Jews – this is a probabilistic conclusion, which, in my humble opinion, has been proved at the level of probability required in a civil trial. I shall clarify this point below.

The conclusions regarding the atmosphere in the Palestinian streets just before the murder can be derived from the testimony by Brigadier General (Res.) Kuperwasser (hereinafter: "**Kuperwasser**") and Dr. Menachem Klein.

53 of 90

Case 1:04-cv-00397-GBD-RLE [Document 547-551] Filed 06/25/14 Page 4 of 27
**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

Before I discuss their testimony, it is necessary to clarify the status of the Certificate by a Public Servant which was filed by Kuperwasser.

Counsel for the Palestinian Authority rightly argued that the document filed by Kuperwasser does not constitute a "**Certificate by a Public Servant**", as this term is defined in Section 23 of the Evidence Ordinance, which states: "**The Certificate by a Public Servant shall be signed by the public servant who made the record or performed the act or received the information recorded, and if he is no longer in the service in question, by the person in charge of the unit in which he was employed.**"

Kuperwasser's testimony indicates that, between July 2001 and June 2006, he served as the Head of the Research Division in the Intelligence Branch of the Israel Defense Forces. In that capacity, he was familiar with and personally read all of the documents which were captured by the Israel Defense Forces in Operation Defensive Shield, and was even involved in writing the surveys that were attached to the Certificate by a Public Servant and supervised the drafting thereof. The problem is that, as of today, he no longer serves as the Head of the Research Division in the Intelligence Branch of the Israel Defense Forces. Admittedly, even today, he serves in a public position, as the Director-General of the Ministry of Strategic Affairs (page 312, line 21). Nonetheless, there can be no doubt that the Certificate by a Public Servant (Prosecution Exhibit No. 9) was not filed by him in his capacity as the Director-General of the Ministry of Strategic Affairs, and as such, pursuant to Section 23 of the Evidence Ordinance, he is not a "**public servant**" who was entitled to file the "**Certificate by a Public Servant**" which was filed by him.

In view of that which has been set forth above, in the course of the hearing, I made it clear that Prosecution Exhibit No. 9 would be treated as an expert opinion, and not as a Certificate by a Public Servant (page 325, line 25), and I also allowed the Palestinian Authority to file an expert opinion in rebuttal, and it filed an expert opinion in rebuttal, written by Dr. Menachem Klein, in response to the opinion by Kuperwasser.

That set forth above indicates that the document which was filed by Kuperwasser is an expert opinion – a fact that was also accepted, as set forth above, by the Palestinian Authority, which filed an expert opinion in rebuttal.

In view of my ruling that Prosecution Exhibit No. 9 is to be treated as an expert opinion, which was filed on behalf of the Plaintiffs, all of the rules of evidence for the examination of expert opinions will apply to Prosecution Exhibit No. 9 and to the testimony by Kuperwasser, who is an expert on behalf of the Plaintiffs, just as Dr. Klein is the opposing expert on behalf of Defendants No. 7 and No. 8.

Furthermore, Counsel for the Palestinian Authority claims that the four surveys that were attached to Prosecution Exhibit No. 9 are nothing other than hearsay, and that they do not attest to the veracity of their contents, as opposed to their existence *per se*. However, I do not accept this position, and I will clarify my position below.

**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

Prosecution Exhibit No. 9 and Kuperwasser's testimony are based on the documents captured by the Israel Defense Forces in Operation Defensive Shield, the authenticity of which is beyond doubt, as even Dr. Klein admitted in his examination (page 702) (and notwithstanding the attempt by Counsel for the Palestinian Authority attorney to dispute it; page 332). The surveys that were attached to Prosecution Exhibit No. 9 are surveys which were written by the staff of the Research Division of the Intelligence Branch during the relevant years; they are based on the contents of the seized documents, which were translated into Hebrew.

There can be no dispute that, during the period in which the documents were seized and translated and the surveys were written on the basis thereof, Kuperwasser was the Head of the Research Division in the Intelligence Branch and was in charge of studying the documents and deriving conclusions therefrom, for both military and diplomatic purposes. More precisely: Kuperwasser clarified in his examination that the surveys attached to Prosecution Exhibit No. 9 were based on both documents which were seized in the course of Operation Defensive Shield and documents **"which were also seized, on other occasions"** (page 313, lines 26-27), the authenticity of which, as set forth above, is not in dispute.

Kuperwasser testified that he is personally familiar with the documents (page 313, lines 28-30) because, following the seizure of the documents, they were physically brought to him and he read them (page 314, lines 2-4). Kuperwasser further testified that he was involved in the writing of the surveys attached to Prosecution Exhibit No. 9, **"not at the level of writing"**, but rather, **"at the level of supervision"** (page 314, lines 16-21). He also confirmed that **"Yes. Everything that goes out of the Research Division is confirmed by me as the Head of the Research Division"** (page 314, line 27) and repeatedly clarified he was personally familiar with the seized documents (page 316, line 14).

Kuperwasser was questioned regarding the issue of the role of the Research Division in the Intelligence Branch and clarified that **"my central role, and the central role of the Research Division, was to warn about and to prevent acts that harm the security of the State of Israel and its citizens**..." (page 317, lines 26-28).

In Kuperwasser's cross-examination by Counsel for the Palestinian Authority, great efforts were made to prove that Kuperwasser had a personal, tendentious position with regard to the interpretation of the seized documents – a point that was also raised in the summation on behalf of the Palestinian Authority.

Kuperwasser testified that, on the basis of the seized documents, **"many additional surveys were written"** (page 321, line 9) in addition to the four surveys attached to Prosecution Exhibit No. 9, and clarified that he was not personally involved in the decision of which surveys should be attached to Prosecution Exhibit No. 9 and which should not.

In his examination, Kuperwasser confirmed that none of the seized documents refers specifically to the incident which constitutes the object of the Statement of Claim (page 322, lines 5-6). He also confirmed that he did not personally translate the documents into Hebrew,

Case 1:04-cv-00397-GBD-RLE    Document 547-551    Filed 06/25/14    Page 6 of 27
**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, Estate of the Deceased, Amit Amos Mentin, *et al.* v. Bezeq Israeli Telecommunications Co. Ltd. *et al.*

and that his involvement in the writing of the surveys was at the supervisory level (page 323), which is clear, because he served, during the relevant times, as the Head of the Research Division in the Intelligence Branch, and he was assisted in his work by a team of additional people.

Counsel for the Palestinian Authority made his very best attempt to prove, in Kuperwasser's examination, that there were differences of opinion between various personnel serving in the Research Division of the Intelligence Branch, with respect to the interpretation of these documents, and that the position presented in the surveys that were attached to Prosecution Exhibit No. 9 is not the official position of the Intelligence Branch. Nonetheless, he failed in those efforts. My impression, based on Kuperwasser's credible testimony, is that the attached surveys represent the official position of the Research Division of the Intelligence Branch, especially as more, Kuperwasser testified unequivocally that the position presented in the surveys was not a minority position that was "**accepted**" (page 325, lines 1-2).

Regarding this matter, it should be clarified that it was not proved that there were conflicting opinions as to the significance which should be attributed to the seized documents; nonetheless, I am certainly prepared to accept the view that there were different opinions. This is as it should be, because the very raising of the different opinions indicates freedom of thought and the existence of a brainstorming process among the persons involved, and this is precisely their job. Indeed, even if the position presented in the surveys was a **"minority opinion that was accepted"** (in the words of Counsel for the Palestinian Authority, page 325, line 1), the conclusion is that this is the final interpretation that was given to the seized documents and this is how they were treated by the officeholders who were required to make decisions and determinations on the basis thereof.

In Dr. Klein's expert opinion and rebuttal, he strongly disputed these statements by Kuperwasser in his examination, and claimed that the surveys attached to Prosecution Exhibit No. 9 were nothing more than "**a subjective, tendentious interpretation, directed by higher authorities or intended for higher authorities, and they are comparable to a person who shoots an arrow and then draws a bull's-eye around it**" (Section 18 of the expert opinion).

Dr. Klein agreed that the position expressed in the surveys attached to Prosecution Exhibit No. 9 is the official position of the Intelligence Branch. Nonetheless, he argued that this position was not based exclusively on the raw material that was placed before the Research Division (the seized documents), and, in any event, was not based on "**the entirety of the raw intelligence material which was in the hands of the Division at that time**" (Section 19 of the expert opinion).

Dr. Klein actually went so far as to determine that "**the Research Division failed when issuing these surveys…. As indicated by the captured documents, these were specific documents that refer to specific operations in a particular time and place, and do not attest to the overall strategic network. The surveys chose to refer to only a few captured documents and not to the remaining documents, which raises the question of whether the remaining**

Case 1:04-cv-00397-GBD-RLE   [Document 547-551] Filed 06/25/14   Page 7 of 27
**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

**captured documents were consistent with the conclusion that the writers of the surveys sought to reach ….**"(Section 21 of the expert opinion).

At first glance, these comments would appear to be resoundingly correct. Actually, however, they are devoid of any real substance, and I shall explain.

Dr. Klein's examination indicates that he served in the Research Division of the Intelligence Branch during the 1990s (page 690), under the commander at that time, Dr. Ephraim Lavi, who, according to the expert opinion, was Dr. Klein's teacher and mentor. Reading Dr. Klein's opinion discloses that it is entirely based on articles written by Dr. Lavi and others. The question which therefore arises is why Dr. Klein's expert opinion was filed, rather than that of Dr. Lavi, whose writings and statements constitute the basis of the statements and determinations by Dr Klein in his expert opinion – which is nothing more than a summary of conversations between Dr. Klein and Dr. Lavi (Section 2 of the expert opinion) and a summary of the articles published on that subject. More precisely: I am not certain as to whether one can treat Dr. Klein's expert opinion as an "**expert opinion**", because it does not contain pertinent determinations derived from his expertise in the subject; rather, it constitutes a collection of statements and opinions by others, and, as such, is devoid of any evidentiary value.

In terms of the substance of the "**expert opinion**": Dr. Klein admitted, in his examination, that he was not an expert on terrorism, but rather, an expert on the Palestinian issue, "**and not on terrorism in its operative sense**" (page 691, line 31).

Dr. Klein explained that his expert opinion contains two sections. The first section is entirely "**hearsay**", "**what I heard from Colonel (Res.) Dr. Ephraim Lavi, and the second section consists of the conclusions which I reached on the basis of my academic research**" (page 696, lines 28-30). He subsequently again confirmed that his entire expert opinion is based on things said by Dr. Lavi (page 700, lines 7-13), and the conclusion is that the opinions which appear in this expert opinion are actually the opinions of Dr. Lavi (who was not brought to testify), which were endorsed in their entirety by Dr. Klein.

Dr. Klein confirmed that his determination in the expert opinion, to the effect that that the Research Division in the Intelligence Branch engaged in a public relations campaign, as part of which the surveys in question were written, with the purpose of adapting them to the public relations campaign of the Government of Israel, was based "**on Dr. Lavi's statements**" (page 703, line 5).

Dr. Klein, in his expert opinion, further argued that the opinions reflected in the surveys which were attached to Prosecution Exhibit No. 9 were not based on all of the captured documents, but only on part thereof. It subsequently transpired, however, that these statements were totally without foundations, in the nature of defamations that were never proved, because Dr. Klein confirmed that his statements

57 of 90

  
Case 1:04-cv-00397-GBD-RLE   Document 547-551   Filed 06/25/14   Page 8 of 27
Tel-Aviv-Jaffa District Court

Civil File 1047-04, Estate of the Deceased, Amit Amos Mentin, *et al.* v. Bezeq Israeli Telecommunications Co. Ltd. *et al.*

were based on Dr. Lavi's statements – and in his own words: "**This was said by Ephraim Lavi and I am quoting from the things he wrote in the Intelligence Corps Journal, in the Operational Intelligence Journal**" (page 704, lines 26-27).

It may reasonably be assumed that, if Dr. Klein had thought that the surveys were based on those captured documents upon which it was "**convenient**" for the Research Division in the Intelligence Branch to rely, then he would have taken the trouble to verify his view – or Dr. Lavi's view – regarding the existence of additional captured documents, which were not mentioned in the surveys, and the contents of which could have changed the conclusions cited in the surveys attached to Prosecution Exhibit No. 9. In the course of Dr. Klein's examination, however, it emerged that he did not see those intelligence documents himself (page 704, lines 28-29), and he clarified, once again, that he was relying on opinions by Dr. Lavi (page 704, lines 30-31), and that "**it could be**" (page 705, lines 16-18) that the surveys that were attached to Prosecution Exhibit No. 9 do not say that there were additional captured documents.

In view of the dispute that Dr. Klein attempted to provoke concerning the existence or non-existence of additional captured documents, "**which were concealed**" at the time when the relevant surveys were written, it would have been only natural for Dr. Klein to ask to see the captured documents himself, and to learn for himself whether there were additional documents. His examination, however, indicates that he made no request to see the captured documents "**because I do not investigate the operative actions and the course of events of the Intifada at the very specific level of campaigns**" (page 705, lines 24-29), and he clarified that he had not found it necessary to personally examine documents because "**I relied on Dr. Lavi's statements and experience**" (page 706, lines 4-6). Moreover, it subsequently transpired that he had also not spoken with any of the other writers mentioned in his expert opinion, and that he had merely quoted from their written work (page 708). Thus, as I mentioned, the expert opinion by Dr. Klein is no more than hearsay based on the opinions of others, who were not brought to testify, and is therefore devoid of any evidentiary value.

As a parenthetical note, I shall state that, in view of Dr. Klein's comments in his expert opinion regarding the underlying concept of the surveys that were attached to Prosecution Exhibit No. 9, and his belief that they reflected the subjective interpretation of the authors of the surveys (Sections 17, 18 of the expert opinion), it would have been only natural for Dr. Klein to interpret the documents in the manner that he felt was correct. Nonetheless, aside from ruling out the interpretation which was given to the captured documents within the framework of the surveys in question, Dr. Klein refrained from enlightening us as to what he felt was the correct interpretation of those documents. Perhaps this was because he never actually bothered to read them, and perhaps because they do not admit of any other interpretation, or for any other reason.

When Dr. Klein was asked, in his examination, why he did not see fit to give another interpretation to the documents in question and whether he felt that this was the correct way of interpreting them, he replied "**At this stage I am not writing another interpretation or expert opinion. I am relating to the documents as they stand. I am not writing my thesis**

58 of 90

[Emblem of the State of Israel]

## Tel-Aviv-Jaffa District Court

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin**, *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

**in rebuttal here**" (page 713, lines 25-26). I believe his comments speak for themselves and do not require any further interpretation.

50.  In view of all the above, I rule that no evidentiary or legal value whatsoever should be attributed to the expert opinion by Dr. Klein, and I endorse the expert opinion and the testimony by Kuperwasser, who impressed me with his knowledge and his professionalism.

51.  The uniqueness of the expert opinion filed by Kuperwasser is due to the fact that it is founded upon the documents attached to it, the captured documents, the veracity and authenticity of which are not in dispute.

The Palestinian Authority failed in its attempt to minimize the conclusions arising from the captured documents. The captured documents indicate that, in the course of the Second Intifada, the various organizations made joint efforts to perpetrate terrorist attacks against Israel and against Israelis, and it was proved beyond all doubt that they did this under the direct command and supervision of the Head of the Palestinian Authority – Yasser Arafat – who guided them and ensured the funding for their activities, including the approval of money for the terrorist attackers and their families, and specified the sums to be given to them.

The depth of Arafat's involvement in the activity of the organizations is clearly evidenced in the documents that were attached and this is clearly attested to by the numerous requests to "**the Brother, the President Abu Amar, may God protect him**", letters concerning the recruiting and funding of activists, including the expression of thanks for the payments of money pursuant to request by organizations – see *e.g.* Document No. 1 (page 17 of Prosecution Exhibit No. 8), in which Arafat is requested to allocate financial assistance to the commander of the Tanzim in Tulkarm, as well as to the "brother" – the terrorist Ziad Muhamad Daas, who, according to this document, planned the "killing operation at the Bat Mitzvah ceremony in Hadera."

As we have seen, and without being overly lengthy on this matter, examination of the documents attached to the surveys, as well as the surveys themselves, leads to one single conclusion: that the activities of the various organizations – including the Tanzim and the al-Aqsa Brigades – were all conducted under the orchestration and with the funding of the Palestinian Authority. This being the case, even were I to accept the terrorist's current version of the terrorist, pursuant to which he had carried out the attack on behalf of the al-Aqsa Brigades, this would not alter the basic liability of the Palestinian Authority, in light of its status as a full partner to what went on in the al-Aqsa Brigades, as evidenced by the captured documents. More precisely: I do not accept that version, and I hereby unequivocally determine that the murderous terrorist was trained in weaponry by the Palestinian Authority.

59 of 90

[Emblem of the State of Israel]

**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin**, *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

52.   Another dispute between the Plaintiffs and the Palestinian Authority concerned the evidentiary value of the report by former Minister Danny Naveh (hereinafter: the "**Naveh Report**").

The Plaintiffs asked to bring Mr. Danny Naveh to testify, so that the Report (Prosecution Exhibit No. 8) could be filed through him. I, however, thought that, inasmuch as this report as well was based on the same authentic captured documents as those attached to Prosecution Exhibit No. 9, there was no need to put him to the trouble. Accordingly, with the consent of Counsel for the Palestinian Authority, the report was submitted and marked as Prosecution Exhibit No. 8, and it was made clear that the parties would be entitled to argue in their summations with regard to its evidentiary value, as opposed to its admissibility.

The arguments advanced by Counsel for the Palestinian Authority, in his summation, according to which the Naveh Report was left in the Court file as an "**exhibit**" (Section 130 of the summation), are not correct. Examination of the Court transcript indicates that the Palestinian Authority attorney did not object to the filing and marking of the Report as evidence, and the Report was in fact filed as evidence and marked as Prosecution Exhibit No. 8.

As to the evidentiary value of the Report – Kuperwasser testifies that this Report was written by "**Danny Naveh's team**" (page 316, line 3). Nonetheless, he confirmed that he had read it and concurred with its contents, which were based on the same captured documents as those that which Kuperwasser himself had referred. This being the case, notwithstanding the fact that Danny Naveh did not testify before me, I hereby rule that, in light of the Naveh Report's reliance on the captured documents, it is valid and highly valuable evidence. Moreover, for the purposes of the matter which is presently at hand, it is of special significance, as shall be clarified below – especially as Counsel for the Palestinian Authority did not point out any contradictions between the contents of the Report and the contents of the captured documents.

53.   We shall now return to the question of the causal relationship, and we will examine it from the perspective of the period during which the terrorist attack was committed.

The terrorist in question – a 15.5-year-old minor – wanted to be a Palestinian soldier (page 16, line 129 [sic]). The question which arises is this: what prompts a 15.5-year-old minor youth to want to be a soldier, and even worse – how did the Palestinian Authority agree to train him, despite his youth?

The terrorist's statement (Prosecution Exhibit No. 19) indicates that he lived in "**a small village called Bir** [sic] **al-Maqsur**" (sheet 1, line 19). Prosecution Exhibit No. 1 further indicates that he apparently dropped out of the school system: in answer to the question "**What do you do?**" he answered, "**I work in agriculture with my father and plant vegetables with my father in Dir al-Maqsur**" (sheet 1, lines 19-20). Prosecution Exhibit No. 1 also shows that the terrorist is a first-born son to a family with seven more children (sheet 1, line 25).

Case 1:04-cv-00397-GBD-RLE  Document 547-551  Filed 06/25/14  Page 11 of 27

[Emblem of the State of Israel]

**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

I have no information concerning the economic situation of the family, which was a large family of ten people. It is clear however that the income from agricultural work in Dir al-Maqsur was not sufficient to support the family because **"my father works as a fruit picker in Kibbutz Ogen"** (sheet 1, lines 25-26).

The picture emerging from the terrorist's statement is one of a teenager who dropped out of school, a first-born son of a family with many children, the financial situation of which was probably not the best. Against this background, his fantasies of being a soldier are quite understandable. In other words, he probably wanted to leave his family and its travails.

As set forth above, this was the period of the Second Intifada, a time at which the leaders of the Palestinian Authority not only refrained from making every effort to prevent attacks, but actually encouraged them, as is clearly indicated by the captured documents and the surveys written in reliance on them (Prosecution Exhibit No. 9). The youth was sucked into this vacuum; in view of his youth, it is not clear how much discretion he exercised, if any – although he may quite possibly have exercised discretion and chose chosen the tempting option of joining the ranks of the Palestinian Authority security apparatus.

As I noted, due to the Palestinian Authority's effort to distance itself from its consent to train a terrorist who is a minor, in a training camp which it ran in Jericho, and pursuant to my unequivocal determination that the terrorist participated in a training camp in Jericho for a period of 50 days, under the tutelage of the Palestinian Authority – just as he admitted in his statement in Prosecution Exhibit No. 1 – the details pertaining to the training which the terrorist received just before he committed the murder, were hidden from the Court.

The Palestinian Authority's agreement to train minors "**in physical and weapons training**" (Prosecution Exhibit No. 19) also clearly emerges from the captured documents. In the past as well, the Palestinian Authority had already used minors for the purposes of carrying out attacks against Israeli targets. After the attacks as indicated by the captured documents, it provided them, or their families, with funds, both in cases where the recruited minors died as a result of their actions, and in cases where they were captured and imprisoned in Israeli prisons.

One example of this was the case of Jamal Hamid, a 16-year-old youth from Bethlehem, who was recruited by Fatah, despite his young age, or perhaps due to his young age, and who blew himself up on March 31, 2002 in the settlement of Efrat. Six Israelis were injured in the terrorist attack in question.

An additional example was the case of the young girl, Shirin Rabua – 15 years old – who was detained for interrogation upon the Israel Defense Forces' entry into Bethlehem. She confessed that her uncle, a local Tanzim activist, had recruited her to carry out a suicide attack in Israeli territory. (More precisely: the captured documents unequivocally show the existence of complete cooperation

61 of 90

Case 1:04-cv-00397-GBD-RLE   Document 547-551   Filed 06/25/14   Page 12 of 27
[Emblem of the State of Israel]
**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin, *et al.* v. Bezeq Israeli Telecommunications Co. Ltd. *et al.***

between the Palestinian Authority headed by Yasser Arafat, and other organizations, including the Tanzim, the al-Aqsa Brigades and others – Survey No. 688/0032, which deals with the institutionalization of the local militias by the PLO leadership, based on the captured documents, and the Danny Naveh Report, Prosecution Exhibit No. 8, page 4, which is likewise based on the captured documents.)

Yet another example was the case of Anwar Hamad, a 17-year-old youth from Rafiah, who was sent to carry out a suicide attack against a convoy of vehicles, which was carrying Israel Defense Forces soldiers in the Gaza Strip. It transpired that the youth had no education whatsoever, was completely illiterate, and, before his recruitment into Fatah, was engaged in the use and trafficking of drugs (see page 42 of Prosecution Exhibit No. 89).

This being the case, it is easy to understand and to endorse Danny Naveh's conclusion, pursuant to which **"it should be noted that the Palestinian Authority does not struggle against this phenomenon and consistently continues to ignore the fact that young Palestinian male and female teenagers have become a 'self-sacrifice' of the entire Palestinian society"** (page 42 of Prosecution Exhibit No. 8).

54.  In the case before me it was not proved that the terrorist was sent to carry out the specific attack by the Palestinian Authority – *inter alia*, because of the difficulty in doing so, in view of the fact that the Palestinian Authority systematically refrain from filing relevant documents. Nevertheless, when the Palestinian Authority expressed its willingness to train a 15.5-year-old adolescent in the use of weapons for a period of 50 days (!!), It becomes obvious that it encouraged him to apply the knowledge that he had acquired during his studies, and in view of the prevailing atmosphere at that time of fomenting hatred and incitement against Israel and against Jews (see Prosecution Exhibit No. 8, page 9), it was natural for the terrorist to feel that he should implement the knowledge of weapons and their operation, which he had acquired in the Palestinian Authority training camp, in the spirit of the period – in other words, by murdering a Jew. More precisely: the captured documents indicate that there can be no doubt that the Palestinian Authority was constantly and actively involved in inculcating the ideology which underlay its strategic concept: that terror is a legitimate means of achieving the Palestinian national objective. And there is no doubt that this ideology was gradually internalized by young people, who viewed the realization of the ideology as a noble and desirable act, especially as the Authority made the effort to give them practical knowledge in the use of weapons as a direct outcome of that ideology.

This conclusion is a necessary conclusion, even from the perspective of common sense. After all, why would the Palestinian Authority agree to train a youth, 15.5 years old, and to provide him with knowledge of the use of weapons, if not to encourage him to use them? Obviously, the Authority did not intend for him to use the weapons against his own people. And if this is the case, what was the purpose of giving the knowledge of the use of weapons to a youth of 15.5? The answer appears to be obvious.

## Tel-Aviv-Jaffa District Court

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

55.  To preclude all doubt, it is hereby clarified that the content which was imparted to the trainees in the Palestinian Authority training camp in Jericho has not been proved. This being the case, I cannot determine with certainty that the terrorist was trained by the Palestinian Authority "**to commit murder in general and to murder Jews in particular**" (Section 91 of the Palestinian Authority summation). However, when the Palestinian Authority decided to train a 15.5-year-old minor and to teach him the secrets of using weapons, in the atmosphere that prevailed in the Palestinian Authority at that time, and taking into account the Intifada on one hand and Operation Defensive Shield on the other hand, it is obvious that, even without making such statements in so many words, the general atmosphere encouraged the trainees at the camp to utilize the knowledge of the use of weapons that they had gained. Given the obvious fact that no one expected this use to be directed against Palestinians, very little imagination is needed to arrive at the necessary conclusion – the use of the weapons against Jews.

Furthermore, the short time which elapsed between the terrorist's completion of "**his studies**" at the training camp and the perpetration of the murder (ten days) only reinforces the conclusion that the Palestinian Authority's willingness to train a 15.5-year-old minor in the use of weapons was for the purpose of a particular objective – an objective which was realized by the terrorist immediately after the completion of his training. In other words: it was proved that there was a factual and legal causal relationship between the terrorist's training in the Palestinian Authority training camp in Jericho and the murder of the Deceased. More precisely: we must not forget that, for obvious reasons, the Palestinian Authority avoided providing any kind of information pertaining to the training camp in question, including with regard to its very existence, or the content of the teaching therein, but merely denied its existence. The problem is that, on one hand, the Palestinian Authority did not provide any explanation for the motives which prompted the terrorist, in his statement (Prosecution Exhibit No. 1) to the police, to say things which are supposedly not true; yet, on the other hand, the Palestinian Authority's systematic failure to bring relevant witnesses to testify and to present documents, which could have supported its a legend position, lead to the conclusion that the terrorist's statements regarding his training by the Palestinian Authority at the training camp in Jericho are true, and that, as a direct result of this training, the murder which constitutes the object of this Statement of Claim was committed.

56.  Counsel for the Palestinian Authority argued, in his summation, that the Plaintiffs "**did not prove**" their arguments with regard to the terrorist's training within the framework of the Palestinian Authority and his incitement to kill Jews.

In my opinion, as set forth above, the Plaintiffs took up the burden which was incumbent upon them. In order to clarify my position, I shall recall the axiomatic principles regarding the tipping of the balance of probabilities in a civil trial. An appropriate statement in this regard was made by the author Y. Kedmi **on page 1548 of his book,** *On Evidence*, **where he clarifies:**

> "**What does 'tipping the balance of probabilities' mean? In terms of case law, this degree of proof means that, in the opinion of the Court, based on its position regarding the credibility of the evidence presented to it, their quantity, their sufficiency and the evidentiary weight to be attributed to them – <u>one version</u>**

[Emblem of the State of Israel]

**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin**, *et al.* v. Bezeq Israeli Telecommunications Co. Ltd. *et al.*

> (regarding a matter which is disputed) <u>is more</u>
> <u>probable and more reasonable than the opposing</u>
> <u>version.</u>
>
> As a figure of speech, it is often said that 'there is only a
> need to take up the burden of proof at the level of more
> than 50%'. This means that for the party bearing the
> burden of proof, if his version convinces the court to the
> degree of 51%, out of the 100% which expresses absolute
> certainty, this will be sufficient to fulfill his obligation. The
> fact that there is another 49% of 'uncertainty' is
> irrelevant." (See Civil Appeal 6283/97, **Alexandrov v. State**
> **of Israel**, *PD* 52 (3) 254; Civil Appeal 1892/95, **Muhammad**
> **Kassam Abu Saada v. Prison Service – State of Israel**, *PD*
> 51 (2) 704.)

Regarding the distinction between the burden of persuasion and the burden of bringing
evidence, the following was ruled:

> "The 'burden of persuasion' is a material, evidentiary
> burden which is part of the laws of evidence. This burden
> is the principal burden which is incumbent upon a litigant,
> who is required to prove the facts upon which his claims
> are based. Failure to take up this burden means the
> dismissal of the arguments of the party which bears the
> burden. The 'burden of bringing evidence' is a procedural
> burden, which is part of the laws of procedure. This is the
> burden which is incumbent upon a litigant, who is
> required to bring evidence, in order to take up the 'burden
> of persuasion', if that burden is incumbent upon him, or in
> order to undermine his rival's arguments and evidence.
> This burden is a secondary one and it exists primarily in
> service of the principal burden." (Leave for Civil Appeal
> 3646/98, **C.V.A. Construction Ltd. v. Director of Value**
> **Added Tax**, 57 (4) 891; at 897; see also Y. Kedmi, *On*
> *Evidence* (5764-2003), at 1505-1508.)

> "The determination of which of the litigants bears the
> burden of persuasion is made on the basis of two
> elementary rules: The first is that 'he who takes from his
> friend bears the burden of evidence'; this may be the
> plaintiff or the defendant, as the case may be. The second
> is that 'the laws of evidence follow material law' –
> regarding both the proof of the evidence of the cause/the
> defense and the refutation of presumptions." (Y. Kedmi,
> *On Evidence* (5764-2003), at 1508.)

64 of 90

[Emblem of the State of Israel]

**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

Regarding the principle "he who takes from his friend bears the burden of evidence", the following was ruled in Civil Appeal 357/72, **Shansi Aziz v. Soraya Betzelzioni,** *District Rulings* 27(1) 741, at 744:

> **"This burden of persuasion stems from the basic principle in the laws of evidence, which is that a litigant in a civil action, who raises that is important for his legal position, bears the burden of persuasion to prove the facts that are required to substantiate his argument."**

> (See also Y. Kedmi, *On Evidence* (5764-2003), at 1508-1515; E. Harnon, *Laws of Evidence* [Hebrew] (Academic Press, Vol. 1, 5730-1970), at 200; Civil Appeal 210/88, **The Israel Fruit Distribution Company Ltd. v. Local Planning and Construction Committee, Kfar Saba,** *PD* 46 (4) 627).

In Civil Appeal 642/61, **Tefer v. Machla** (*PD* 16 1000), Justice Sussman clarified:

**"A plaintiff bringing his case to court seeks to gain an advantage or benefit that was determined in his favor in a particular doctrine of case law, which is part of the case law of material law. This result, the right to which the plaintiff claims that he is entitled, is contingent upon the existence of the facts that give rise to the right in question (the 'cause of action').**

> **The same holds true of a defendant who seeks to clear his name, and who, in order to do so, relies on another doctrine of case law that exempts him from the liability that arose. Whether or not the exempting doctrine applies in the defendant's favor will be contingent upon whether other facts were proved (the 'cause of defense')."**

Regarding the rule according to which "the laws of evidence follow material law", the following was ruled:

> **"Everything depends upon material law, for the laws of evidence follow in its footsteps. Occasionally material law makes the right claimed by the plaintiff contingent upon the non-occurrence of an abrogating fact, and if such a fact occurred, then the burden of proof is incumbent upon the plaintiff, and he must prove that the fact in question did not occur, even if it is an abrogating fact with respect to another right."**

> Civil Appeal 210/88, **The Israel Fruit Distribution Company Ltd. v. Local Planning and Construction Committee, Kfar Saba,** *PD* 46 (4) 643). See also Y. Kedmi, *On Evidence* (5764-2003), at 1516-1537).

65 of 90

**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

And regarding the bearing of, or the failure to bear, the burden of persuasion:

> **"The question of whether a litigant has taken up the burden of persuasion which is incumbent upon him is examined at the end of the hearing. The Court gives its answer to this question in accordance with the entirety of the evidence presented to it – and it makes no difference which litigant brought it – and based on the credibility of this evidence and the determination of its evidentiary weight"** (Y. Kedmi, *On Evidence* (5764-2003), at 1537.)

> **"And needless to say, the particular importance of determining the burden of persuasion lies in this: if, at the end of the trial, the Court considers that the evidence brought by both parties is balanced, then the Court will rule against the party upon which the burden of persuasion is incumbent."**

> Additional Hearing 4/69, **Newman** *et al.* **v. Cohen** *et al.*, *PD* 24 (2) 229; Civil Appeal 8383/09, **Sajur Local Council v. Sonol Israel Ltd.** (published in the Nevo database, on January 24, 2011).

57.   And in the matter which is presently at hand, the Plaintiffs presented more than enough evidence to prove the factual and legal, causal and circumstantial relationship between the conduct of the Palestinian Authority, by way of both action and omission, and the perpetration of the attack by the terrorist. More precisely: I am not determining, as a matter of fact, that it was proved that the Palestinian Authority initiated the specific terrorist attack on a practical level. My determination is that the Palestinian Authority's willingness to teach a 15.5-year-old youth how to use weapons, against the background of the period during which it did so, caused the young terrorist to understand that he was expected to perform an act and to utilize his knowledge of the use of weapons in practical terms. The terrorist translated this understanding into action, and carried out what was expected of him, just as he had learned at the Palestinian Authority training camp. In other words, even if it was not positively proved that the knowledge which the Palestinian Authority imparted to the trainees in its camps included clear instructions to perpetrate attacks against Israeli targets, the very existence of the camps and the involvement of young adolescents in studying the operation of weapons are tantamount to the issuance of actual instructions to carry out terrorist attacks of this kind.

And more precisely: the Palestinian Authority did not discharge the secondary burden imposed upon it, and did not produce documentation or testimony with regard to what went on in its training camps. Even more precisely, it did not produce evidence that would lead to different conclusions.

P1: 951

Case 1:04-cv-00397-GBD-RLE    Document 547-551    Filed 06/25/14    Page 17 of 27
[Emblem of the State of Israel]

**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

In addition, the Palestinian Authority "closed its eyes" to the possibility that the trainee whom it had trained, despite his young age, would apply the knowledge with which the Authority had made the effort to provide him and would perpetrate a terrorist attack against a Jew. And, in general, the Palestinian Authority did not prove, and did not even attempt, to prove what lay behind its agreement to give weapons training to a 15.5-year-old youth, including its intended purpose in imparting this knowledge to a 15.5-year-old youth.

This conduct by the Palestinian Authority leads to the conclusion that, in its decision to train a 15.5-year-old youth and to teach him how to use weapons, it understood the risk involved therein, and as a result, that it agreed to the materialization of the risk, just as it actually transpired.

The Palestinian Authority did not take up the secondary burden which was imposed upon it: to undermine the Plaintiffs' evidence. In terms of the balance of probability, I am convinced that the Plaintiffs' version is **"more probable and more reasonable than the opposing version"** (Kedmi, *ibid.*).

It should be clarified that it has already been ruled (Civil Appeal 10078/03, **Uri Shatil** *et al.* **v. State of Israel** (published in the Nevo database) that there is no fundamental rule in the laws of evidence which establishes or negates liability, and the determination regarding the existence or absence of a concrete duty of care is made on the basis of the concrete circumstances of each case. As I have clarified, in the case before me, under the concrete circumstances of the case, the Palestinian Authority's liability for the perpetration of the terrorist attack has been proved, and its encouragement and support for terrorist acts, by way of both action and omission, has also been proved. **More precisely: there is no escaping the conclusion that the perpetration of the murder by the terrorist, is nothing other than the materialization of the risk which was created by the Palestinian Authority when it trained a 15.5-year-old youth to fire a weapon,** and the Palestinian Authority's responsibility for the tortious event and its consequences is principal and definitive liability, because, had it refrained from training the terrorist in the use of weapons, it is almost certain that the incident would have been avoided.

There can be no doubt that, when the Palestinian Authority chose to train the youth in the use of weapons, it could and should have expected that the event of the damage would occur – in other words, that the youth would make use of his new talents.

58.  As I noted, Counsel for the Palestinian Authority made unrelenting efforts to drag the Court into political statements and to divert the focus of the hearing, which concerned the existence or non-existence of negligence on the part of the Palestinian Authority, to questions concerning a foreign sovereign and a foreign legal entity. Moreover, it continued to do so within the framework of its summation, in which it came to the far-reaching conclusion that, if **"total liability is imposed upon the Defendant for acts of violence that occurred in the course of the Intifada…. it will necessarily be accompanied by a political statement on the part of the State of Israel; such a statement will have a direct and immediate effect on the future of the diplomatic process, and specifically on the relations between the peoples"** (Section 147 of the Defendant's summation).

P1: 952

Case 1:04-cv-00397-GBD-RLE   Document 547-551   Filed 06/25/14   Page 18 of 27
[Emblem of the State of Israel]

**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin, *et al.* v. Bezeq Israeli Telecommunications Co. Ltd. *et al.***

By implication, Counsel for the Palestinian Authority further argues that the terrorist attack originated in "**a dispute between peoples…**" (Section 27 of the summation) – an unfortunate and regrettable statement. Is the training of a 15.5-year-old youth to use weapons a result of a dispute between peoples? Do the terrorist attack and the murder of the Deceased constitute an anticipated result of the dispute between peoples? Does the existence of a dispute between peoples legitimize the perpetration of this kind of murder? Is this the position of the Palestinian Authority? And if so, for what purpose is this Court required to hear evidence regarding the Palestinian Authority's liability for the perpetration of the murder??

Counsel for the Palestinian Authority repeated this claim in Section 148 of his summation, where he said: "**The fact that the event which constitutes the object of the Statement of Claim is an integral part of the dispute between the two peoples – Israeli and Palestinian – represents a policy consideration on the highest level, which should prevent the establishment of a duty of care in this case.**" I read, and I was astonished. If this is not an admission by a litigant, with respect to the Palestinian Authority's liability for the murder, then it is not clear what constitutes an admission by a litigant.

Let this be entirely clear: I am issuing this Judgment as a judge of the Tel-Aviv District Court. This Judgment is handed down following the hearing of evidence and is based in its entirety on law as it is customarily practiced in the State of Israel.

As a judge, I have no interest in meddling in diplomatic matters, and I am not doing so. This Judgment is the legal result of a legal proceeding, which was lawfully conducted before me, no more and no less. The attempt by Counsel for the Palestinian Authority to characterize my rulings as an "**immediate and direct**" blow to "**the future of the diplomatic process in particular, and specifically on the relations between the peoples**" is nothing more than an attempt to intimidate the Court, an attempt to dissuade it from giving a decision against the Palestinian Authority, and I am greatly distressed by this attempt and by these utterances.

59. Before I complete this part of the Judgment, which establishes in practical terms the legally required causal relationship between the conduct of the Palestinian Authority, by way of action and omission, and the perpetration of the murder which constitutes the object of the Statement of Claim, I shall address a number of additional subjects which were raised by Counsel for the Palestinian Authority in his summation.

Regarding the argument of non-justiciability: given that the matter *prima facie* concerns diplomatic matters, I do not attribute any real substance to this argument, and its entire purpose is to drag the Court into discussions of diplomatic matters, which is not its role and does not lie within its competence.

In excess of that which is required, I shall state that, as I have already ruled, the cause of action against the Palestinian Authority is by virtue of the Torts Ordinance, given that the Palestinian Authority is a legal entity, against which legal actions may be filed, in accordance with its own declarations.

[Emblem of the State of Israel]

**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

Regarding the status of military judgments, I am not required to rule on this matter because, in any event, I have not relied on those judgments for the purposes of this Judgment.

Regarding the claim that the surveys (Prosecution Exhibit No. 9) do not refer to the event which constitutes the object of the Statement of Claim – Counsel for the Palestinian Authority is indubitably correct on this point. Nonetheless, the surveys were intended to describe the background, the atmosphere in the prevailing moods in the Palestinian Authority and in the Palestinian street. This background is essential for an understanding of the situation that led to the attack which constitutes the object of this case.

The argument regarding the non-enactment of laws in the Palestinian Authority, pursuant to the agreements which were signed with Israel, is also a justified argument on the part of the Palestinian Authority. However, given that, in this Judgment, I attributed no value whatsoever to the question of their enactment or non-enactment, I do not see fit to address this argument at all.

The argument that no evidence was brought with respect to the distribution of flyers, propaganda broadcasts, and the distribution of books, is correct in part, because the captured documents, which were presented before this Court, included flyers.

Regarding the propaganda broadcasts: no attempt was made in this case to prove their existence.

Regarding the distribution of books, I have no information, and the argument was not proved.

Regarding the breach of a statutory duty with reference to the Prevention and Punishment of the Crime of Genocide Law, 5710-1950 – Section 1 of the Law defines the term "**genocide**" for the purposes of the Law, and it includes five alternatives for the applicability thereof, whereby, for the purposes of the applicability thereof, is necessary to prove that someone performed a particular act "**with intent to destroy, in whole or in part, a national, ethnical, racial or religious group**…" (Section 1 of the Law). Intent must be proved by way of evidence, and this was not done in the case before me.

Furthermore, I do not think that this law was intended for use within the framework of civil law, but rather, in criminal law. I learn this from the use of the term "**crime**" – a definition taken from criminal law, and from the declared purpose of the Law – the punishment of criminals. Civil law is not concerned with punishment; the laws of torts are intended to compensate for damages caused by a tort, and under no circumstances are they intended to punish the tortfeasor.

Vicarious liability – the reference to vicarious liability arose for the first time in the Plaintiffs' summation and was not discussed during the hearing of the evidence.

Case 1:04-cv-00397-GBD-RLE   Document 547-551   Filed 06/25/14   Page 20 of 27
[Emblem of the State of Israel]

**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

In excess of that which is required, I shall state that, even had an argument been raised concerning the vicarious liability of the Palestinian Authority, the argument would have been rejected, because direct liability has been established, in accordance with that set forth in this Judgment.

Another matter which calls for comment is the Defendants' petition to strike the summation in response which was filed by Counsel for the Plaintiffs, on the basis of the grounds set forth in their petitions.

I did not see fit to grant the petition, even though some of the Defendants' arguments are correct, both with regard to the length of the summation in response and with regard to the prohibited expansion of the line of argumentation.

It should be clarified that the Plaintiffs were instructed as to the length of the summation in response, and there can be no doubt that they patently ignored those instructions, with no convincing or satisfactory explanation for having done so. However, the striking of the summation in response would inevitably have given rise to an extension of the duration of the action, which was filed in 2004, and I could not permit this.

As for the alleged expansion of the line of argumentation – this argument is also justified. However, anyone reading the Judgment will have no difficulty realizing that I ignored the arguments raised in the summation in response with respect to the expansion of the line of argumentation.

60. Another matter which calls for comment is the Plaintiffs' argument to the effect that the burden of evidence should be transferred to the Palestinian Authority by virtue of Section 41 of the Torts Ordinance.

Section 41 of the Torts Ordinance sets forth three cumulative conditions for its applicability:

First of all: the plaintiff did not know and could not have known of the actual circumstances which led to the event of the damage.

Secondly: the damage was caused by an asset under the full control of the defendant.

Thirdly: the occurrence of the event is more consistent with the conclusion of negligent conduct on the part of the defendant than with the conclusion that he exercised reasonable care.

As set forth above, these are cumulative conditions, and in my opinion, not all of them were fulfilled in the case before me. What do I mean by this?

[Emblem of the State of Israel]

**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

As set forth in the Judgment, there can be no doubt that the first and third conditions were fulfilled. However, I am not able to determine that, at the time of the attack, the terrorist was under the full control of the Palestinian Authority, unless the "control" also includes the terrorist's state of mind when the act was carried out. I do not, however, believe that the legislature intended to include the state of mind within the test of control, but rather, that it intended to refer to real and effective control. This being the case I reject the argument regarding the applicability of Section 41 of the Torts Ordinance to the case before me.

61. As I have stated in great detail in this Judgment, I am of the opinion that the Plaintiffs took up the burden of proof which was incumbent upon them at the level of probability required in a civil trial, at a rate of over 51%. However, I think that this case is indicative of the inherent difficulty of proving liability in cases such as this, and more precisely, proving the liability of the Palestinian Authority and the Palestinian Council. What do I mean by this? By the very nature of things, the relevant information which can be of assistance in reaching a conclusion concerning the presence or absence of a duty of care, and the breach thereof, is known to the Palestinian Authority, and the Palestinian Authority has systematically and utterly failed to produce any documents or information. Case law holds that this kind of failure is held against the failing party – the Palestinian Authority, because the presumption is that, had it produced all that was required of it, the documents and evidence would have operated to its detriment.

Counsel for the Palestinian Authority repeatedly argued, in his summation, that the Plaintiffs did not prove the argument that the Palestinian Authority had trained the terrorist to kill Jews. As I have explained in this Judgment, the very act of training a 15.5-year-old youth in the use of weapons during the relevant period had no other purpose than to prepare him to use the weapons in accordance with the "**education**" which he received in the Palestinian Authority training camp. There is no need for a clear and explicit statement as to what the youth was supposed to do with the "**education**" which he received in the Palestinian Authority training camp. Taking into account the entire background which has been set forth in this Judgment, and especially the fact that this was the time of the Second Intifada, when grave terrorist attacks were committed against the residents of Israel, and even resulted in numerous deaths, there was no need for explicit statements – although we cannot know whether such clear statements were not, in fact, actually made within the framework of those training camps, given that the Palestinian Authority actually denied that they even took place and that the terrorist had participated in them, and, in any event, did not attach the "**curriculum**" to which the terrorist had been exposed within the framework of his studies at the training camp on behalf of the Palestinian Authority.

Proving the Plaintiffs' arguments is not an easy task in view of the Palestinian Authority's systematic failure to comply with the Court orders, and its concealment of all of the relevant material which could have shed light on what was going on

**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

in those training camps at the relevant period – a failure which, as I stated, must undoubtedly be held against the Palestinian Authority.

To what can this be compared? In criminal cases, it has often been ruled that, when a person carries a knife, the presumption is that he intends to use it. In other words: the act of carrying a knife is a risk, and the use made thereof is the materialization of the risk. The same is true in the case before us. The Palestinian Authority's intention to teach a 15.5-year-old youth the secrets of weapons and their use is a tremendous risk, which the Palestinian Authority took upon itself, and accordingly, it should come as no surprise that the youth in question brought the risk to fruition and used the weapon to murder a Jew.

What is the focus of these comments? It is possible that, in cases of this kind, where there is an inherent evidentiary difficulty of proving the causal relationship between the conduct of Party A – in this case, the Palestinian Authority – and the behavior of Party B – in this case, the terrorist, there are grounds for applying the doctrine of vague causation (or causal vagueness), which is both similar to and different from, *mutatis mutandis,* the doctrine established in Civil Additional Hearing 4693/05, **Carmel Hospital, Haifa v. Eden Malul** (published in the Nevo database). To what does this refer? In the first **Eden Malul Case** (Civil Appeal 7375/02), the court ruled that an exception to liability should be recognized in cases of vague causation. Admittedly, the facts of the **Eden Malul Case** were decidedly different from the facts of the case before me, because it concerned the existence of a causal relationship between medical conduct and damage caused, whereby there was a difficulty of proving the existence of such a connection at the level of a 51% probability.

Within the framework of the additional hearing (Civil Additional Hearing 4693/05), the judgment which had been handed down in Civil Appeal 7375/02 was set aside and the position of Deputy Chief Justice (as his title was then) Justice E. Rivlin was accepted. In my opinion, this position is also the correct one for examining the case before us. Let me explain.

Within the framework of the additional hearing in the **Malul Case**, Justice Rivlin believed that, until that time, case law had contended with the issue of vague causation by establishing the facts in the individual case which was brought before the Court, in an attempt to do individual justice. In Justice Rivlin's view, the rule for deviation from the rule of the balance of probabilities should be replaced by a rule of compensation according to probability, not at the level of the individual case, but rather, on a broader level, by identifying a recurrent tendency. In his opinion, this result represents the lesser evil, due to the deviation from the test of balance of probabilities.

Justice Rivlin requires the fulfillment of four elements in order to deviate from the test of balance of probabilities:

**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

    a.    The existence of a tortfeasor.

    b.    The existence of a group of injured parties.

    c.    A recurrent and common risk.

    d.    A consistent bias in the application of the balance of probabilities rule.

According to Justice Rivlin, in these cases, and in these cases only, there is justification for deviating from the regular rule of the balance of probabilities and requiring a party to pay compensation even if the chance of the damage having been caused as a result of his negligence, by way of action or omission, is rather low.

If I examine the case before me in view of these tests, I find that all of the above-cited components are fulfilled in the case before me. In other words: there is tortfeasor – the Palestinian Authority, who for a period of 50 days trained a 15.5-year-old adolescent in the use of weaponry.

There is a group of injured parties. As I have stated in detail, the period was that of the Second Intifada, which was replete with terrorist attacks and lives lost among Israeli citizens, whereby the captured documents which were presented to me clearly and explicitly indicate the Palestinian Authority's involvement in the financing and execution of the terrorist attacks.

A recurrent and common risk – this was an inherent risk, which resulted from the conduct of the Palestinian Authority as borne out by the captured documents, which leave no doubt regarding the Palestinian Authority's liability for the perpetration of the terrorist attacks, or part thereof.

A consistent bias in the application of the balance of probabilities rule – in my humble opinion, what we have here is a phenomenon – terrorist attacks against Israeli citizens – which gives rise to a **"recurrent bias"** due to the inherent difficulty of proving the liability of the organization, or of the particular entity responsible for the attack and its consequences, in each and every case.

62.    My comments on the possibility of also applying this doctrine to cases such as that which constitutes the object of this Judgment are thoughts which occurred to me, and which were not argued by the litigants. Accordingly, I shall not make a decision with regard thereto. Nonetheless, I think it would be appropriate to consider the application of this doctrine to cases such as the case which constitutes the object of this Judgment. More precisely: invoking the doctrine in this case is also likely to serve the interests of the plaintiffs, who occasionally find it difficult to meet the requirements of the balance of probability, and the needs of the defendants, who will be able to argue in favor of the reduction of compensation, when the proof of their liability is not completely certain, and in the absence of a clear determination regarding their liability for the tortious act, with respect to which compensation is claimed.

Case 1:04-cv-00397-GBD-RLE    Document 547-551    Filed 06/25/14    Page 24 of 27

[Emblem of the State of Israel]

**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

Admittedly, the ruling in the **Malul Case** held that the possibility of relying on the test of recurrent bias is an exception to the rule concerning the duty of proving the action in accordance with the of the balance of probabilities rule, and in any event, it is only applied in cases of an argument of the existence of medical damage. However, as I explained, the application of this test should also be considered in additional cases, such as the one before me. Moreover, the test of recurrent bias is relatively new and has yet to be examined in a systematic manner in the case law handed down by the courts. (For an extensive discussion of the difficulties in the implementation of relative solutions, see Y. Gilad, "**The Doctrine of Evidentiary Damage: Does it Contribute to the Onus of Persuasion?**" [Hebrew], *Mishpatim* XXX 317; Y. Gilad: "**Response: A New Arrangement for the Statute of Limitations Law?** " [Hebrew], *Mishpatim* XXXVI (3) 855.)

As I noted, this is an idea which it would be appropriate to develop and consider. In any event, I have not seen fit to rule on it, or to apply it in the case before me, since, as I determined, the action in the case before me has been proved in accordance with the balance of probabilities rule.

### The action against Harel Insurance Company Ltd.

63. Harel Insurance Company Ltd. (hereinafter: **"Harel"**) issued an insurance policy to Bezeq and Lilit (Appendices A, F to the Garmeiza affidavit).

With regard to the policy issued to Lilit – in light of my ruling that Lilit bears no concrete duty of liability [sic] with regard to the incident which constitutes the object of the Statement of Claim, the action against Harel, with regard to the arguments raised against Lilit, must be denied. Moreover, the policy is not relevant to the case before me, inasmuch as it contains an exclusion concerning terrorist incidents.

As for the policy issued to Bezeq – this is Employers' Liability Policy No. 61000043/02, which was attached as Appendix A to the Garmeiza affidavit (hereinafter: the "**Policy**").

Examination of the policy reveals that it comprises a **"war, civil war and terror exclusion"** *that states*, inter alia: **"Notwithstanding that set forth anywhere else in the policy, or in any writer to the policy, it is hereby agreed and declared that the policy shall not cover the insured for:**

**...2. Any terrorist act"**

**"Terrorist act"** is defined by the policy as: **"an act, including, but not limited to use of force, violence...sabotage, or any use of another means in order to intentionally or unintentionally cause harm of any kind...**

74 of 90

## Tel-Aviv-Jaffa District Court

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

**by a person or one or more groups whether acting alone, or in the name of, or in connection with any organization created for political, religious, ideological or similar purposes..."**

Terrorist incidents are also explicitly excluded on the jackets of the policies (Appendix A – pages 2 and 3 of the list, and Section 3.4 of the jacket; Appendix D – page 9 of the list, and Section 1.3 of the jacket; Appendix F – page 3 of the list, and Section 51.2 of the jacket).

That set forth above shows that the policy explicitly and clearly excludes the incident which constitutes the object of the Statement of Claim, which is, without any doubt, a terrorist incident.

Counsel for the Plaintiffs attempted to show, during the hearing of the evidence, and even argued in her summation, that the exclusion of terrorism in the policy should not be accepted, and Harel should not be exempted from coverage for the incident which constitutes the object of the Statement of Claim, inasmuch as Harel's liability derives from Bezeq's tortious liability for its conduct and its omissions, and not from the terrorist incident. Nonetheless, I cannot accept that interpretation. The policy unequivocally states that it covers any negligent act by Bezeq, as a result of which Bezeq will be required to pay damages to the victims. However, that contractual obligation on the part of Harel, as expressed in the policy, is not absolute, but restricted, and it is clearly stated that it will not apply in a case where the event which constitutes the object of the liability is a terrorist incident.

That set forth above cannot be understood to mean, as Counsel for the Plaintiffs has argued, that, should it transpire that the terrorist incident was made possible, *inter alia*, as a consequence of Bezeq's omissions, the exception will not apply. Quite the opposite is true – the policy clearly and precisely establishes that, if a terrorist incident is involved, the exclusion will apply and Harel will not be obligated to pay, in accordance with its undertakings under the policy.

In this regard, it should be noted that the witness Mr. Yoram Zilberman, who is an insurance agent, was primarily questioned with regard to the Lilit policy, and not specifically with regard to the Bezeq policy, and for good reason.

Lilit is a company in liquidation, and no one appeared in Court on its behalf. This accordingly gave rise to the impression that it would be easier for the Plaintiffs to prove omissions on the part of Harel in issuing the insurance policy to Lilit, in a way which would obligate Harel to bear Lilit's share of the incident which constitutes the object of the Statement of Claim. However, in light of my decision to dismiss the action against Lilit, I do not intend to examine the circumstances of the issuance of the policy to Lilit, and I shall only state that it was not proved, under any circumstances, that the terrorism exclusion was included in the policy against Lilit's will, or as a result of Lilit's misunderstanding the meaning of that exclusion.

[Emblem of the State of Israel]

**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

As for the Bezeq policy – Harel brought Mr. Ilan Garmeiza (hereinafter: "**Garmeiza**"), who is the head of Harel's Claims Department, to testify on its behalf, and he made an excellent impression upon me. Garmeiza submitted two affidavits, one dated March 11, 2009, and the second dated March 23, 2011.

Counsel for the Plaintiffs tirelessly attempted to prove that the policy did not reflect the agreements between Bezeq and Harel with regard to the content of the policy in general, and the existence of the terrorism exclusion in particular, while presenting numerous questions concerning the negotiations between Bezeq and Harel leading up to the issuance of the policy. That examination, however, was entirely superfluous. What does that mean? In insurance policy is a contract like any other contract, which is concluded by the parties thereto, and it reflects all of the agreements reached by the parties to the contract (see: Civil Appeal 4688/02, **Hezi Cohen v. Migdal Insurance Company Ltd.**, published in the Nevo database). In other words: if the policy includes a terrorism exclusion, then that was the intention of the parties. More precisely: in the case which constitutes the object of the Statement of Claim, we are not concerned with a policy issued to a private individual, unschooled in matters of law, who might not understand what is included in it, or the significance of a terrorism exclusion. Needless to say, Bezeq is a large company, which avails itself of legal advisors, and therefore, this is not a case of "sneaking in" an exclusion that went unnoticed by Bezeq's legal advisors.

This is also the necessary conclusion in view of Garmeiza's testimony, in which he explained that **"in the Bezeq policies that were written and attached hereto... these are policies that were written by Bezeq/its advisors and not by Harel. It is a policy that is part of a tender"** (page 641, lines 18-19). This statement, which was not refuted, undermines the Plaintiffs' arguments as to the question of Bezeq's knowledge regarding the application of the terrorism exclusion.

In excess of that which is required, I shall state that, in accordance with established case law, in interpreting an insurance contract, or any contract, one may resort to the rule preferring the interpretation to the detriment of the drafter (see for example, Civil Appeal 5167/06, **Clal Insurance Company Ltd. v. Shimon Asraf**, published in the Nevo database; Civil Appeal 5775/02, **Neve Gan (A.C.) Construction, Development and Investments Ltd.**, *PD* 58 (2) 307; Civil Appeal 779/89, **Shalev v. Sela Insurance Company Ltd.**, *PD* 48(1) 221). Therefore, now that it has become clear that the drafter was, in fact, Bezeq, the aforesaid role of interpretation should be applied against it, and it should be determined that the terrorism exclusion was inserted into the policy with its consent and in accordance with its wishes.

This conclusion is reinforced by Bezeq's conduct after the event. According to Garmeiza's testimony, upon the filing of the action against it in court, Bezeq contacted Harel (page 632, line 11), and, in reply, was sent a letter of denial on the basis of the terrorism exclusion. According to Garmeiza "**... Bezeq, after receiving the letter of claim** (should read: letter of denial – D.G.) **did not raise any objections with regard to the denial, although**

76 of 90

P1: 961

[Emblem of the State of Israel]

**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

**in cases in which we disagree with them in other matters, they know how to raise objections. They have an insurance consultant Uri Orland who represents them, and he is the one who was also responsible for the entire tender and the all the drafting of the policies..."** (page 634, lines 23-27). This testimony was not refuted, and these statements only serve to strengthen the conclusion that the terrorism exclusion was inserted into the policy with Bezeq's consent and in accordance with its wishes.

In her summation, Council for the Plaintiffs refers to the fact that, in the period following the occurrence of the event which constitutes the object of the Statement of Claim, Harel issued a policy to Bezeq that included a rider for terrorism (P/20), and states that this indicates that the change in the policy by way of a rider to cover terrorist events shows that this was Bezeq's intention even at the time of the relevant policy.

I cannot accept this purely speculative argument. Not only was it not proved, but, in fact, the contrary was proved. The fact that, following the incident, Bezeq chose to expand its policy and to cancel the terrorism exclusion shows that Bezeq internalized the lesson learned from the incident which constitutes the object of the Statement of Claim, and agreed to expand the policy and to cancel the terrorism exclusion, no doubt against payment of higher premiums. In any case, this conduct cannot be viewed as proof of the argument advanced by Counsel for the Plaintiffs.

Counsel for the Plaintiffs further argues in her summation (page 24) that Bezeq and Harel colluded against the Plaintiffs **"and it is more than likely that the two came to an agreement that Harel would compensate Bezeq for the damages with which it would be charged in this action"** – an argument that met with the indignation of Counsel for Harel (last paragraph of the introduction to his summation). Once again, this is unproved speculation, which I cannot address.

Counsel for the Plaintiffs also argues that applying the terrorism exclusion in this case effectively renders the policy devoid of any real content. This, however, is a puzzling argument. Reading the policy shows that it covers all cases in which Bezeq will be required to pay damages to a third party for its negligence, with the exception of cases derived from, *inter alia*, terrorist incidents, as in this case. This exclusion does not render the policy devoid of any real content; rather, it merely expresses the agreement of the parties, and nothing to the contrary has been proved.

In light of that which has been set forth above, the action against Harel Insurance Company Ltd. is hereby dismissed.

**Division of the liability**

64. As I have ruled, the concrete duty of care between Defendants No. 1, No. 2, No. 3, No. 4, No. 5, No. 7, No. 8 and the Deceased was breached.