# EXHIBIT A.948
## (4 of 8)

[Emblem of the State of Israel]

**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

In accordance with my findings as to the actions and omissions by the various tortfeasors, which enabled, whether by way of action, silence or omission, enabled the occurrence of the grave incident, in the course of which the Deceased was shot and killed, I hereby divide the liability as follows:

Defendants No. 7 and No. 8 (the Palestinian Authority and the Palestinian Council) bear 70% of the responsibility, jointly and severally, for the occurrence of the incident.

Defendants No. 1, No. 2, No. 3, No. 4 and No. 5bear 30% of the responsibility, jointly and severally, for the occurrence of the incident.

### The damage

65. The Plaintiffs have petitioned for damages for the Deceased's losses **"in the lost years"**, including loss of pension, loss of old-age pension, loss of professional development fund, car, benefits, pain and suffering and shortened life expectancy, loss of the services of a son, third-party help, increased travel, the Plaintiff's loss of income, cost of a monument and the seven-day mourning period, and punitive damages against Defendants No. 7 and No. 8.

66. The Deceased's losses **"in the lost years"** – according to the pay slips submitted to the court (Appendix M to the affidavit by Ronen Mentin), the Deceased's average gross salary came to NIS 5,474, and with the addition of the linkage differentials to this day – the amount of NIS 6,605.

In her summation, Counsel for the Plaintiffs laid out a speculative path for the Deceased's promotion at Bezeq, had he not been murdered. However, I cannot accept her arguments in this regard, as I shall explain.

67. The Deceased, who was 31 years old at the time of his death, had worked as a technician for Bezeq for seven years. He had worked at Bezeq for six of those years through a personnel placement company – Lilit – and during the last year of his employment, he was accepted into Bezeq as a Bezeq employee. At the time of his murder, he had worked at Bezeq as a Bezeq employee for 11 months.

In an attempt to prove the Deceased's path of promotion at Bezeq, the Plaintiff's attorney brought a number of witnesses to testify.

The first witness – Ms. Mali Yosef – Head of the Human Resources Team at Bezeq, explained that the Deceased was employed by Bezeq within the framework of the collective agreement called "Dor 2000", and explained that he had not signed a personal contract.

[Emblem of the State of Israel]

## Tel-Aviv-Jaffa District Court

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

Ms. Yosef explained in her examination that this was a personal collective agreement, and further explained that **"it is important for me to say that the Bezeq company has recently undergone privatization, cutbacks and streamlining, and even good workers were sent home. I cannot guarantee that he would have continued to have been employed, especially since he had been employed for less than a year** (at the time of his murder – D.G.) **...**" (page 73, lines 3-5) – a fact that was verified by the Deceased's mother, who testified that her husband, who had been a Bezeq employee, was dismissed due to cutbacks, although **"he was an excellent worker"** (page 33, line 21). This is the place to clarify that, according to the testimony heard, the Deceased's personal file at Bezeq was not found, and therefore we have no way of knowing if there were any evaluations of the Deceased's professional performance.

There can be no doubt that the loss of the file should be held against Bezeq. Moreover, it seems reasonable to assume that the Deceased was considered a competent worker, as otherwise, Bezeq would not have taken him on as a Bezeq employee in July 2002 after he had worked at Bezeq for some six years through a personnel placement company (Lilit) (page 75, lines 3-4).

The witness explained that, in accordance with the Dor 2000 collective agreement, to which the Deceased was party, it was possible to work for Bezeq as a temporary employee for eight years, and since the Deceased began working at Bezeq as a temporary employee in July 2002, he should have remained in that status for eight years, that is, until 2010 – just as we find in the pay slips that were attached, where it is written that the date for the termination of his employment was meant to be June 30, 2010.

As for the question of whether the Deceased would have been granted permanent employment status at Bezeq, following the period of his temporary employment, the witness replied that **"it really does not guarantee that an employee will get permanent status. Really not. Even if he is a good worker"** (page 76, line 23). However, it was clarified that she did not handle the Deceased's file within the scope of her job, and she had no personal knowledge of him (page 80, lines 25-26; page 81, lines 2-3).

Following Ms. Yosef, Ms. Yvette Ron, who is the Director of Human Resources for the Private Division of Bezeq, testified.

Ms. Ron testified that, within the framework of her job, she is responsible for technicians (page 6). She confirmed that the Deceased worked at Bezeq within the framework of the Dor 2000 collective agreement, and further testified that, in 2006, all of the employees who had worked at Bezeq under Dor 2000 were transferred to a new collective agreement, by the name of Dor 2006 (page 8). The witness's testimony indicated that **"there is no path** (of advancement – D.N. [sic]) **for technicians. There is no structured path..."** (page 13), by contrast to other professions at Bezeq. She further explained that technicians' jobs may be upgraded, in accordance with their skills **"but that requires certification..."** (page 13). In this regard, I would like to clarify that no testimony was given which even hinted that the Deceased would have obtained certifications

79 of 90

[Emblem of the State of Israel]
**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

and would have improved his skills, and just as one may assume that he would have done so, one may also assume that, in view of his alleged in skills, he would have left his work at Bezeq in order to work for a private company, for example (see my comment on page 15 of the transcript).

Further on in the witness's testimony, it transpired that the Dor 2006 collective agreement was later replaced by a new collective agreement in December 2010, and it is reasonable to assume that, had the Deceased been alive, he would have been employed under this new agreement and would have been **"transferred to the status of 'new permanent employee'"**, provided that **"he would remain, and that he was appropriate... the Company would find him appropriate to remain, he probably would have been transferred to that status today"** (page 17), whereas employees who were not transferred to the new, new agreement – were terminated (*ibid.*).

Ms. Ron was asked if she knew which changes had occurred since 2004 with regard to overtime, and she explained that there had been **"a drastic reduction"** (page 18) with regard to overtime, except during periods of work pressure.

A witness for the Plaintiffs, Mr. Ronen Levi, who is Director of the Salary and Benefits Department at Bezeq, testified that, as a rule, a temporary employee – which was the status of the Deceased at the time of his murder – receives permanent status after 96 months (7 years [sic]) (pages 30,31), while there is an interim status between that of temporary employee and that of permanent employee, which is called "new permanent employee" (page 319).

At a certain point in the hearing of evidence, Ms. Yvette Ron was called back to testify.

Counsel for the Plaintiffs tried to obtain confirmation from Ms. Ron as to the existence of various preferences granted to "continuing children" at Bezeq (the Deceased's father had been a Bezeq employee). Ms. Ron, however, explained that there is no preference in granting permanent status to "continuing children" (page 579, lines 26-28). This was also the testimony of Ms. Irit Nagar Mor – Director of the Employee Relations Department – who explained that it is possible that a certain shortening of the periods between promotions may be granted to a "continuing child", but that such a child would be given no preference in the context of getting a particular job (page 598).

Ms. Ron's testimony indicates that the attempt to estimate the question of the Plaintiff's future permanent status is very, very theoretical, as it was made clear that Bezeq did not begin transferring temporary employees to the status of permanent employees until 2011. More precisely: these were employees who began working at Bezeq before the Deceased, in February 2001 (page 584).

The testimony by Ms. Ron and Ms. Nagar Mor clearly indicated that it is not even theoretically possible to attempt to lay out the Deceased's path of promotion at Bezeq, and the attempt by Counsel for the Plaintiffs

Case 1:04-cv-00397-GBD-RLE   Document 547-552   Filed 06/25/14   Page 5 of 27
[Emblem of the State of Israel]
**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

to try to prove the Deceased's losses, including the value of the holiday gifts given to Bezeq employees, has been broken down into impossibly fine resolutions. And note: at the time of his murder, the Deceased had worked for 11 months as a temporary employee of Bezeq, and the attempt of Counsel for the Plaintiffs to prove a certain, sure advancement path is doomed to failure. Moreover, we learned from Ms. Nagar Mor's statement that Bezeq fires workers who break its rules, or who are caught not telling the truth (page 614), and in the matter before me, there is no denying that on the morning of the murder, the Deceased submitted an inaccurate report when he reported to the Bezeq call center that he was entering Baqa al-Gharbiya with the security guard, while hiding the fact that the security guard had entered Baqa al-Gharbiya in his own car, and not in the Bezeq car. On such matters, Ms. Nagar Mor testified **"for false reports, people are sent home"**.

In light of all of the above, and in the absence of the possibility to determine that the Deceased would have remained a Bezeq employee until reaching the age of 67, or that he would have advanced in his job beyond the job of a technician, primarily in consideration of the fact that at the time of his murder the Deceased had been a Bezeq employee for only 11 months, I am of the opinion that his loss of income from the day of his murder to the date of the handing down of the judgment should be calculated according to his proved income in the amount of NIS 6,605, at today's value.

However, in view of the Deceased's abilities and education, as detailed in the affidavit of his brother – Ronen Mentin, I have no doubt that at some point the deceased would have earned at least the average labor-market wage (whether at Bezeq or elsewhere), and therefore, his losses from the date of the judgment until reaching the age of 67, according to the average labor-market wage should be calculated at the amount of NIS 8,837.

As a parenthetical note, I shall state that in most actions in torts, the Court is involved in guesswork and prophecy with regard to the professional future and income level of the injured party. There are cases in which it is easier to estimate the injured party's advancement had he not been injured, and there are cases where it is difficult, or even practically impossible, as in the case before us. And note: the Deceased had worked for Bezeq through Lilit for six years until he was accepted as a Bezeq employee. It was not made clear, and in any case not proved, why he did not become a Bezeq employee at an earlier date, but there is no doubt that we cannot build castles in the sky with regard to the Deceased's professional advancement in Bezeq, and it is appropriate to employ objective, accepted data, which are, no doubt, close to reality, and in any case do not oppress any of the litigants.

Therefore, the Deceased's lost income should be calculated as follows:

A. NIS 6,605 (the Deceased's estimated income as of this date) x 117 months) (from the date of the murder until the date of the judgment) = NIS 772,785, with the addition of interest from the middle of the period in the amount

[Emblem of the State of Israel]

**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

of NIS 66,905, totaling NIS 839,690.

B. From today until the Deceased reaching the age of 67, NIS 8,837 (the average labor-market wage) x 210.8765 (the capitalization coefficient for a period of 25 years) = NIS 1,863,516.

In light of the above, the Deceased's loss of income comes to a total of NIS 2,703,206.

68. Loss of pension – the Plaintiff [sic] made a calculation of this head based upon twice the average labor market wage. As I explained, however, I do not accept the wage calculation set forth in the summation of Counsel for the Plaintiffs.

The Defendants did not respond to this head in their summation, and accordingly, in accordance with the calculation principles presented in the Plaintiffs' summation, we should take into account 70% of the Deceased's expected salary of the Deceased prior to his retirement, and therefore the calculation is to be made as follows:

70% x NIS 8,837 (the Deceased's salary) = 6186 x (capitalization coefficient times 0.47 x 129.0454) = NIS 375,183.

69. Loss of old-age pension – were it not for the unfortunate incident, the Deceased would have been entitled to an old-age pension from the time he reached the age of 70 and until the end of his life expectancy, at the age of 80 according to the Central Bureau of Statistics, that is, for 11 years.

The Defendants did not respond to the Plaintiffs' calculation, and accordingly do not object to the proposed calculation. I therefore accept it and determine the loss for this head of damages at the amount of NIS 62,201.

70. What arises from the above is that the value of all of the Deceased's loss of income comes to the amount of NIS 3,140,590, and in accordance with the principles set forth in Civil Appeal 1400/00, **Estate of the Late Michael Ettinger v. The Company for the Restoration and Development of the Jewish Quarter**, published in the Nevo database (hereinafter: the "**Ettinger rule**"), the Estate is entitled to damages at the rate of 30% of the savings which the Deceased would have accumulated in the course of his life, and the estate is therefore entitled to damages in the amount of NIS 942,177.

## Tel-Aviv-Jaffa District Court

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

71. Pain and suffering and shortening of life expectancy – Ben Naim's testimony indicates that the Deceased did not die immediately as a result of the shooting. In his statement to the police, Ben Naim reported that following the – successful – chase after the terrorist, he returned to the car in which the Deceased was sitting, and according to him, **"I heard that Amos was gurgling"** (Statement No. 2, sheet 8, line 13, Prosecution Exhibit No. 17) – although, according to the testimony by Oni Devir (page 481), it would appear that the Deceased died only a few minutes after he was shot.

As a parenthetical note, I shall state that the conduct of the Wan ambulance team, as expressed in the testimony of Oni Devir (page 482), amounts to disrespect for the sanctity of the Deceased. Wan, however, is not a defendant in this case, and cannot be brought to account for its treatment of the Deceased.

The Deceased, who was 31 years old at the time of his death, died at a young age and under tragic circumstances, and I therefore believe that the estate is entitled to damages in the amount of NIS 1,000,000 for the pain and suffering of the Deceased and the shortening of his life expectancy.

72. Loss of the services of a son – I admit that I am unfamiliar with the head of damages which is known in case law as "loss of the services of a son". Moreover, it would appear that this section was intended to justify the Plaintiff's claim as a dependent. That claim, however, was not proved. More precisely: I have no doubt that, upon being apprised of the murder of the Deceased and the circumstances of his death, his mother's world was destroyed. This is a grave, unfathomable tragedy, which leaves behind it a wake of pain which will never cease. Nonetheless, there is no connection at all between this terrible pain of a mother whose son has died and the conclusion that she is his dependent.

Moreover, I am deeply saddened that I have to evaluate the testimony of the mother – Ms. Inez Nitza Mentin, as, unfortunately, her testimony was very tendentious.

In her affidavit (Section 15), Ms. Mentin claimed that she lives with her husband, **"but we have not gotten along for years, and my son of blessed memory was my savior and confidant."** Ms. Mentin further claimed in her affidavit that the Deceased used to drive her to her errands in the car that Bezeq had made available to him (Section 13), and that he supported her **"financially and saw to all my needs, as my husband did not give me money to live on and/or for anything else throughout the years. My late son even supported his little brother, Talor"** (Section 23).

As to her income, Ms. Mentin claimed in her affidavit that, from 1990 until 2000 she worked as a cleaner in the Mizrahi Bank as an employee of a personnel company, and earned the amount of NIS 1,700 a month, and that after she was dismissed due to the liquidation of the company, she worked as a housekeeper three days a week, for five hours a day,

[Emblem of the State of Israel]

**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

and earned NIS 140 a day. Ms. Mentin further affied that, since the murder she does not work (Section 22 of the affidavit).

On the basis of the affidavit and the probate order, it appears that Ms. Mentin is the sole heir of the Deceased, and that his father waived any claim to the Deceased's inheritance, but no satisfactory explanation was given for this fact.

On the basis of the affidavit and testimony by Ms. Mentin, it appears that she and her husband are the parents of four additional children, born in 1973, 1975, 1978 and 1986, but in her testimony, the witness claimed that her husband never supported her and her children **"since we were married"** (page 33, line 7).

According to her **"he did not participate in all of the expenses of the children, for all kinds of things; he only participated in marginal things like giving them bread and milk"** (*ibid.*).

The witness confirmed that she lives with her husband under one roof to this very day, and that she has been retired for 12 years. Later in her testimony, it transpired that the couple has a joint bank account, into which both the mother's pension and the National Insurance allocation are deposited by the National Insurance Institute, in accordance with the Compensation for Victims of Hostile Acts Law, 5730-1970, and she confirmed that she uses the money from this account to support the members of her family (page 33, lines 17-21).

It further transpired that the couple jointly owns an apartment, which was purchased by means of a mortgage that was taken out and has been repaid by both spouses (page 34, lines 1-12).

Ms. Mentin further confirmed that, when her husband worked for Bezeq, his salary was deposited **"to the joint account"** (page 34, line 28), although she then recanted and claimed that only the pension monies are deposited to the joint account, while the money from his wages went into a separate account, but **"he made me checks that I could sign..."** (page 35, line 4). In light of the above, it is only natural that Ms. Mentin confirmed that, throughout the years of their marriage, the family was supported from both her husband's income and her own income (page 35, line 7), although, in her words, **"he did not support me"** (page 35, line 7), which forced her to work hard and take out loans, because her husband only participated in the household expenses **"for the little things that he paid for, the electricity bill..."** (page 35, lines 7-10), although she confirmed that the family was supported from both her husband's income and her own income (page 35, lines 11-12).

84 of 90

P1: 969

Subsequently, the witness admitted that even today **"he gives me money to put in my account..."** (page 35, lines 16-19), and admitted that her husband pays the water, property tax and electricity bills (page 37, lines 29-30).

His testimony indicates that the attempt to portray the father of the family as not supporting it failed, and that there can be no doubt that the couple lived on their joint incomes during the period prior to the murder and have continued to do so in the period following it. As a parenthetical note, I shall state that the father of the family was not brought to testify, and apparently for good reason.

As for the Deceased's alleged support of his mother – this argument was not proved. The Plaintiff [sic] did not append a printout of a bank statement, from which the existence of such support of her might be learned, and in fact, did not append any document that would support her claim.

Moreover, Ms. Mentin's testimony indicates that the Deceased rented an apartment for himself an apartment [sic], and even funded its costs, such as rent and ongoing expenses. It is accordingly clear that, in light of the proved level of his salary, he could not have supported his mother even if he had wanted to.

Admittedly, according to the mother, the Deceased rented the apartment shortly before his murder, and had lived in the family home until that time. Nonetheless, from her own reasons, she did not append any document to verify her claim as to the date of the rental of the apartment, and so forth, and this fact must be held against her.

Ms. Mentin has asked the Court to deduce the fact of the support provided by her late son from the fact that, after his death, he was found to have only NIS 1500 in his account. According to her, the reason there was such a paltry sum remaining in the account was because most of his income served to support his mother. According to her statement, **"if he hadn't helped me, he would have had piles of money..."** (page 38, line 27). But not only was no document attached which could testify to the balance in the Deceased's account at the time of his death; nothing about the aforesaid amount can serve as evidence for Ms. Mentin's arguments, and as stated, Ms. Mentin's claim to have been her son's dependent was not proved.

In excess of that which is required, I shall state that the Deceased's brother – Ronen Mentin – also testified, *inter alia*, with regard to the financial situation of his parents' home. His testimony, however, absolutely contradicted the principal parts of his mother's testimony, and the tendentious efforts to artificially prove the mother's dependence upon her late son became apparent. Moreover, the mother's testimony indicates that her son Ronen has been married since 1999 (page 46) and does not live with or near his parents; accordingly, he cannot have any personal knowledge of whether the mother was supported by his late brother.

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

I would like to clarify that I have no doubt that the Deceased was a good son, and was very close to his mother, and no doubt helped her with transportation and other matters. I am even willing to assume that he occasionally helped her financially – although no such support was proved. Nonetheless, there can also be no doubt, and, in any event, nothing to the contrary was proved, that the Deceased's support for his mother did not transcend the scope of the normal help that children occasionally provide for their parents. I accordingly reject the argument with regard to the Plaintiff's having depended upon the Deceased.

73. Third-party help – This petition is puzzling. It was not argued, and was certainly not proved, that the Deceased performed the housework in his mother's home, and therefore it is unclear why this claim was raised.

Moreover, it should be recalled that the father of the family did not testify – a fact which acts to the Plaintiffs' detriment, since, had his testimony been presented, it might have been proved that he helps his wife with the housework. In any case, since it was not argued, and, as set forth above, was certainly not proved, that the Deceased helped with the housework in his mother's home, no causal relationship was proved between the Deceased's death and her demand from the Defendants for payment for third-party help.

74. Increased travel – It was not proved that the Plaintiff required increased travel as a result of the death of the Deceased. More precisely: I accept as a fact the argument that the Deceased occasionally transported his mother. At the same time, however, it should not be forgotten that the Deceased worked most of the day, and, in any event, was not present in his mother's home, and therefore could not help his mother in the course of the day, and I accordingly dismiss this petition.

Moreover, the brother, Ronen Mentin, confirmed in his testimony that, after the murder, his parents received a loan from the National Insurance Institute for the purpose of purchasing a car, and that they even purchased a car with that money **"and the one who takes them in that car is my little brother"** (page 115, lines 9-13). In other words, the family owns a car which is driven by the younger son, who transports his parents as needed. More precisely: before the murder, the family did not own a car.

75. Loss of income of Plaintiff No. 2 – The Plaintiff claims that, prior to the death of her son, she worked as a housekeeper three days a week, and that she has stopped working since his death. Nonetheless, she did not prove her income during the period prior to the murder, and in any event, did not take up the burden, which is incumbent upon her, of proving the reason why she stopped working.

Moreover, in accordance with the decision in Leave for Civil Appeal 444/87, **Alsuha v. Estate of the late David Dahan of blessed memory** (*PD* 44 (3) 397) (hereinafter: the "**Alsuha rule**") and the subsequent decisions, the Plaintiff has no independent cause of action for claiming damages for loss of income, especially as it was not argued and was certainly not proved that any psychological handicap was involved.

86 of 90

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

More precisely: as I explained, I have no doubt as to the Plaintiff's profound and terrible suffering as the result of her son's death and the circumstances involved therein. Still, such suffering, grave though it may be, does not entitle the Plaintiff to damages within the framework of an independent cause of action unless it is shown that she suffers significant psychological damage as a result of her son's death, and this was not proved in the case before me.

76. Expenses for a tombstone and the seven-day mourning period – Counsel for Bezeq is correct in arguing that it would have been better not to repeat the claim for damages for the expenses of the seven days of mourning in the summation, given that the Plaintiff admitted under examination that Bezeq paid all of the expenses in the course of the seven days of mourning and for the commemoration of the 30th day after the death of the Deceased, including **"catering the seven days of mourning and the 30th day, for renting chairs and tables... they brought and did everything themselves..."** (page 41, lines 23-26). More precisely: no receipts were presented attesting to additional expenses, and there is therefore no avoiding the conclusion that the argument in Section 78 of the affidavit by the brother, Ronen Mentin, was raised with no reason and no foundation.

As for the tombstone, the Plaintiff testified that the tombstone was paid for **"partly by Bezeq, partly by the National Insurance, and the rest by us"** (page 42, line 3).

From the documents submitted by the Plaintiffs, it appears that the cost of the tombstone was NIS 12,000. However, no clarification was provided as to what part of that sum was paid by the Plaintiff herself.

Nevertheless, and for the sake of caution, I find it appropriate to award the Plaintiffs damages in the amount of NIS 2,000.

77. Punitive damages with regard to Defendants No. 7 and No. 8 – the Plaintiffs are correct in their claim that **"the Deceased was murdered as the result of a heinous, malicious, murderous terrorist act"** (Section 52 of the Plaintiffs' summation). However, the act itself was committed by a terrorist – who is not a party to this suit – and it has not been determined that the acts perpetrated by the terrorist were the acts by the Palestinian Authority, although it was determined that the Plaintiffs proved, at the required level of probability, the causal relationship between the conduct of the Palestinian Authority and the heinous act perpetrated by the terrorist, and I am therefore of the opinion that the Palestinian Authority should not be charged punitive damages.

Case 1:04-cv-00397-GBD-RLE [EDocument 547-552] Filed 06/25/14 Page 12 of 27
**Tel-Aviv-Jaffa District Court**
Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin**, *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

## Pensions from the National Insurance Institute

78. Section 17(b) of the Compensation for Victims of Hostile Acts Law, 5730-1970 (hereinafter: the "**Compensation Law**") states:

> "**(b) a person entitled by a single event to compensation under this Law, and to damages under the Torts Ordinance [New Version], or under the Compensation for Victims of Road Accidents Law, 5735-1975, will be subject, *mutatis mutandis*, to the provisions of Section 36 of the Invalids Law, or Section 21 of the Families of Soldiers Law, as the case may be.**"

The purpose of this arrangement, to which the Compensation Law refers, is to prevent "double compensation", and it sets forth the course that a plaintiff is to follow if he is entitled to compensation under both the Compensation Law and "**another law**", and in the matter which is presently at hand – the Torts Ordinance.

The principles of the arrangement are as follows:

A. A person who is entitled to compensation may institute parallel legal proceedings against the National Insurance Institute and against the tortfeasor, within the framework of a legal action pursuant to the Torts Ordinance, but he may not collect compensation from both.

B. If the entitled person chose to accept compensation from the State, under the Compensation Law, the State is entitled to initiate an action for subrogation against the tortfeasor for the amounts that were paid by it to the injured party.

C. If the injured party was paid damages by the tortfeasor, he is no longer entitled to benefits from the state (in the matter which is presently at hand – under the Compensation for Victims of Hostile Acts Law), and if he received compensation from the State, he must return to it all the compensation he received.

79. Counsel for the Bezeq Group argues that the suit should be dismissed *in limine*, inasmuch as the Plaintiff receives monthly pensions from the State in accordance with the Compensation Law, the capitalized value of which, in the past and future, comes to an amount of NIS 2,200,000. However, he is mistaken, as I shall explain.

Counsel for the Bezeq Group bases his arguments upon the judgment in Civil Appeal 399/81, **Yaffa Timsod v. Levis Catering Meals Industries Ltd.** (*PD* 36 (3) 686) (hereinafter: the "**Timsod Case**"), which states that the consent

Case 1:04-cv-00397-GBD-RLE   Document 547-552   Filed 06/25/14   Page 13 of 27
**Tel-Aviv-Jaffa District Court**

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

of the State (in that case – the consent of the Claims Officer) to the refund of the payments, pensions and benefits that the injured party received from the State is a precondition for regaining the right to file an action in torts, and since no such consent was filed before the Court in the case before me, the Plaintiff does not have the right to file an action in torts.

That was indeed the rule for a number of years, but it was changed within the framework of the judgment which was handed down by an expanded panel of seven judges in Civil Appeal 1162/96, **Hila Weiss** *et al.* **v. Aviad Yosef Mack** *et al.***,** *PD* 53 (2) 79 (hereinafter: the **"Weiss Case"**).

In the Weiss Case, the Supreme Court addressed the intrinsic difficulty inherent to the demand for restitution of payments that the injured party received from the State as a precondition for gaining the right to file an action in torts.

This difficulty stems from the fact that, upon the National Insurance Institute's agreement to the refund of the compensation by the injured party, the payment of compensation to the injured party stops, and in such a case, the injured party is **"without resources to accommodate his damage for the duration of the proceeding in torts"**, in addition to the loss of his future right to receive compensation from the State. That being the case, the injured party's alternative to choose between compensation by the State or damages from the tortfeasor **"usually remains a theoretical matter, not to mention that he does not have the possibility of refunding the amounts he received, whether in cash or in kind**."

In view of the problems set forth above, it was decided, against the background of section 36(a)(1) of the Invalids (Compensation and Rehabilitation) Law [Consolidated Version], 5719-1959, which expressly distinguishes between filing actions and collecting compensation, that the closing passage of Section 36(a)(5) of the Law, which establishes when an invalid may **"file an action under another law"**, should be interpreted as referring to the realization of the claim, which concerns the collecting of the compensation and not the conducting of the proceedings.

The legal outcome is that the status of the invalid injured party, who is initially entitled to file both actions, does not change upon receiving compensation. In other words, the injured party may conduct both actions in parallel, both against the State and against the tortfeasor, and if he first applied for compensation – as in the case before me, he may still institute an action against the tortfeasor and pursue it to completion. If, in the end, he prefers to collect damages from the tortfeasor, he will have to comply with the condition set forth in Section 36(a)(5) of the Invalids Law: to return all the amounts he received from the State, as a condition to the receipt of compensation from the tortfeasor.

P1: 974

Civil File 1047-04, **Estate of the Deceased, Amit Amos Mentin,** *et al.* **v. Bezeq Israeli Telecommunications Co. Ltd.** *et al.*

This solution transforms the alternative which is available to the injured party, who may choose between compensation and damages, from a theoretical alternative into a real alternative, and is consistent with the provisions of Basic Law: Human Dignity and Liberty.

80. In view of that which has been set forth above, there is no problem with the filing of the action before the Court despite having received compensation from the State, so that, at the end of the day, the Plaintiff will have the option of choosing which of the possibilities is preferable from her point of view: continuing to receive the compensation from the State, or returning it and receiving damages from the tortfeasors. Therefore, the argument advanced by the Bezeq Group is hereby dismissed, including the argument with regard to the bad faith attributed to the Plaintiffs (in Section 11 of Bezeq's summation).

81. In conclusion, we hereby grant a judgment in the amount of NIS 1,944,177, plus legal fees at the rate of 20%, experts' fees, and a return of filing fees.

In accordance with what was detailed in the decision, Defendants No. 7 and No. 8 shall jointly and severally bear 70% of the amount of the judgment, while Defendants No. 1 through No. 5 shall jointly and severally bear 30% of the amount of the judgment.

The action against Defendant No. 9 is dismissed.

In view of the tragedy which constitutes the object of the action, and notwithstanding the recommendation that the Plaintiffs should agree to the dismissal of the action against this Defendant in the early stages of the proceeding, I shall not issue an order for costs.

Given this day, 17 Adar 5773, February 26, 2013, in the absence of the parties.

> [Signature]
> Dalia Ganot, Judge

> 90 of 90

P1: 975

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

MARK I. SOKOLOW, *et al.*,

                  Plaintiffs,

                            No. 04 Civ. 00397 (GBD) (RLE)

vs.

THE PALESTINE LIBERATION
ORGANIZATION, *et al.*,

                  Defendants.

## DECLARATION OF RINA NE'EMAN

Rina Ne'eman hereby certifies as follows:

1. The attached translation from Hebrew to English is an accurate representation of the document received by Rina Ne'eman Hebrew Language Services, to the best of my knowledge and belief. The document is designated as P1 886-975.

2. I am a professional translator with a B.A. in International Relations from the Hebrew University of Jerusalem (Israel) and 30 years of translation experience. I am fluent in Hebrew and English, and I am qualified to translate accurately from Hebrew to English.

3. To the best of my knowledge and belief, the accompanying text is a true, full and accurate translation of the Hebrew-language document designated bearing the bates number P1 886-975.

Dated: March 6, 2014

                                   Rina Ne'eman

ss.: New Jersey

On the _6_ day of March, 2014 before me, the undersigned, personally appeared Rina Ne'eman, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is signed to this Declaration and acknowledged to me that he executed the same in his capacity, and that by his signature on this Declaration, the individual executed the Declaration.

Sworn to me this
_6_ day of March, 2014

*Leonor Troyano*
Notary Public

**LEONOR TROYANO**
ID # 2385580
NOTARY PUBLIC OF NEW JERSEY
Commission Expires 5/8/2014



בית המשפט המחוזי בתל אביב - יפו

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

בפני    כב' השופטת דליה גנות

| תובעים | 1.עזבון המנוח מנטין עמית עמוס |
|---|---|
| | 2.ראינס ניצה מנטין |
| | ב"כ עו"ד ענת |
| | נגד |
| נתבעים | 1.בזק החברה הישראלית לתקשורת בע"מ |
| | 2.אשר בן נעים |
| | 3.יקותיאל לביא - מנהל המחלקה לאבטחת פיזית |
| | 4.דרור אוברלנדר |
| | 5.יהודה אריה |
| | 6.לילית אבטחה בע"מ |
| | 7.הרשות הפלשתינית |
| | 8.המועצה הפלשתינית |
| | 9.הראל חברה לביטוח בע"מ |

## פסק דין

1
2
3    1.    בפני כתב תביעה, אשר הוגש על ידי עזבון המנוח מנטין עמוס ז"ל (להלן: "המנוח") וכן על
4         ידי אינס ניצה מנטין – אמו ויורשתו של המנוח (להלן: "האם") כנגד בזק – החברה
5         הישראלית לתקשורת בע"מ, כנגד אשר בן נעים, כנגד יקותיאל לביא, כנגד דרור אוברלנדר,
6         כנגד יהודה אריה, כנגד לילית אבטחה בע"מ – בפירוק, כנגד הרשות הפלשתינית, כנגד
7         המועצה הפלשתינית וכנגד הראל – חברה לביטוח בע"מ.
8
9    העובדות הצריכות לעניין
10
11   2.    בתאריך 26/6/036 נרצח עמית עמוס מנטין ז"ל, כאשר במהלך עבודתו כטכנאי בזק בישוב
12        בקעה אל גרבייה נורה על ידי מחבל.
13
14        המנוח נרצח במהלך ביצוע פיגוע חבלני, שביצע מחבל – קטין בן 15.5 במועד האירוע.
15        המחבל נתפס ונשפט, והוא מרצה את עונשו בבית כלא בישראל.
16



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

<table>
<tr><td>.3</td><td>התובעת טוענת, כי הנתבעים אחראיים לרצח בנה, ועל כן עליהם לפצותה בגין נזיקה<br>כתוצאה מרצח בנה.</td><td>1<br>2<br>3</td></tr>
<tr><td>.4</td><td>ייאמר מיד, כי לילית אבטחה בע"מ הינה חברה בפירוק, וקיים כנגדה צו עיכוב הליכים, דבר<br>שאינו מונע את קביעת חבותה, ככל שקיימת, בגין אי מניעת רצח המנוח.</td><td>4<br>5<br>6</td></tr>
<tr><td>.5</td><td>לצורך כתיבת פסק הדין בחרתי לראות בנתבעים בזק – החברה הישראלית לתקשורת בע"מ<br>(להלן : "בזק"), יקותיאל לביא, דרור אוברלנדר ויהודה אריה כישות אחת, ומשכך לא אדון<br>באחריותו האישית של כל אחד מהנתבעים 3-5, באופן שאחריותם, או חוסר אחריותם<br>ייקבעו ביחד ולחוד עם בזק (להלן: "קבוצת בזק").</td><td>7<br>8<br>9<br>10<br>11</td></tr>
</table>

**הרצח**

<table>
<tr><td>.6</td><td>לצורך קביעת אחריות בנזיקין, יש לקבוע את עובדות המקרה, אשר הסתיים במותו הטראגי<br>של המנוח.</td><td>14<br>15<br>16</td></tr>
</table>

בתאריך 26.6.03 הגיעו טכנאי בזק – המנוח והמאבטח אשר בן נעים (להלן: "בן נעים")
לבקעה אל גרבייה לצורך ביצוע עבודות בזק, שכללו תיקוני תקלות בהתאם להזמנות תיקון
שנמסרו על ידי תושבים מקומיים.

המנוח ובן נעים הגיעו לבקעה אל גרבייה בשתי מכוניות. המנוח נהג ברכב מסוג סיטרואן
ברלינגו, אשר נשא את הלוגו של בזק (להלן: "הברלינגו") ואילו בן נעים הגיע עם רכבו
הפרטי מסוג הונדה סיווויק.

בן נעים החנה את רכבו בעסק לאביזרי רכב, עבר לרכב של המנוח, והשניים החלו בעבודתם.

כפי שיוובהר בהמשך, רכבו של בן נעים הושאר בחנות לאביזרי רכב "דנה" משום שבן נעים
סיכם עם בעל החנות – וואיל קעדאן (להלן: "וואיל"), כי הלה יתקין מגבר ברכבו, וכאמור,
לאחר השארת הרכב הצטרף בן נעים למנוח ברכב הברלינגו והשניים החלו את עבודתם
בבקעה אל גרבייה.

בשלב מסויים במהלך השעות שלפני הצהריים, חזרו המנוח ובן נעים לחנותו של וואיל,
כאשר לטעות בן נעים הם עשו כן, הן כדי לתת לוואיל את מפתח ההונדה לצורך התקנת

P 1: 887



## בית המשפט המחוזי בתל אביב - יפו

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1    המגבר, והן על מנת שהלה יקח אותם לביתו, שכן לדברי בן נעים, ואיל יצר עימו קשר
2    טלפוני ערב קודם לכן וביקש ממנו **לזוז** תיקון עמוד בזק שנפל בסמוך לביתו.
3
4    בן נעים יצא מרכב הברלינגו ואילו המנוח נשאר ישוב ברכב, עם חלונות סגורים ושוחח
5    בטלפון תוך כדי המתנה לשובו של בן נעים לברלינגו. בזמן שבן נעים שוחח עם ואיל,
6    במרחק של כ- 5 מ' מרכב הברלינגו, כשהוא עומד עם גבו לרכב הברלינגו, הגיע לרכב
7    הברלינגו נער כבן 16 שנים, שלף אקדח וירה בראשו של המנוח חמישה כדורים מבעד
8    לשמשה הסגורה. ירי זה גרם למותו של המנוח.
9
10    למשמע היריות הסתובב בן נעים, שלף את האקדח, שנשא ברשיון כמאבטח וירה לכיוון
11    המחבל, שהחל נמלט, כאשר בן נעים רודף אחריו.
12
13    כפי שהתברר, במהלך מנוסתו, השליך המחבל את נשקו, אשר נתפס על ידי בן נעים. עוד
14    התברר, כי המחבל נפצע כתוצאה מהירי של בן נעים לעברו, דבר אשר איפשר את תפיסתו,
15    והוא אושפז בבית החולים **"הלל יפה"** בחדרה לצורך קבלת טיפול.
16
17    למשמע היריות הגיע למקום נוסף של בזק, שעסק גם הוא בתיקונים בבקעה אל
18    גרבייה באותו יום. המאבטח אוני דביר נכנס לרכב הברלינגו, התיישב במושב שליד הנהג
19    וניסה לדבר עם המנוח, ואף להניעו אותו, אולם מאמציו כשלו, שכן המנוח נפטר מפציעתו.
20
21    לצורך השלמת התמונה יצויין, כי למקום האירוע הגיע אמבולנס "וואן" (חברת אמבולנסים
22    ברשות הפלשתינית),אשר סירב לטפל במנוח, ואף הוציאו מהאמבולנס לאחר שהוא כבר
23    הוכנס אליו, ובסופו של דבר הגיע למקום אמבולנס של מד"א, אשר אנשיו קבעו את מותו
24    של המנוח ופינו אותו מהמקום.
25
26    <u>החבות ועוולת הרשלנות</u>
27
28    7.    בפסק הדין הנני מתעתדת לסקור ולקבוע את היחסים המשפטיים שבין המנוח לבין כל אחד
29       מהנתבעים, על מנת לקבוע קיומה או שלילתה של חבות, וכן – במידה שתקבע קיומה של
30       חבות, אדון בשאלה האם הופרה חובת הזהירות כלפי המנוח, והאם קיים קשר סיבתי
31       משפטי בין הפרת החובה לבין הנזק שאירע.
32
33    8.    לצורך הוכחת אחריות בעוולת הרשלנות, יש להוכיח קיומם של שלושה יסודות:
34

3 מתוך 90



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

| | |
|---|---|
| 1 | א.   קיומה של חובת זהירות החלה על המזיק כלפי ניזוק, הן במישור חובת הזהירות |
| 2 | המושגית והן במישור חובת הזהירות הקונקרטית. |
| 3 | ב.   הפרת החובה האמורה. |
| 4 | ג.   הוכחת הנזק כתוצאה מהפרת החובה. |
| 5 | (ע.א. 145/80 **ועקנין נ' המועצה המקומית בית שמש ואח'**, פ"ד לז(1) 113, (להלן: **"פרשת** |
| 6 | **ועקנין"**). |
| 7 | |
| 8 | 9.   <u>באשר לחובת הזהירות המושגית</u> – השאלה היא האם קיימת חובת זהירות בין סוג מסויים |
| 9 | של מזיקים לבין סוג מסויים של ניזוקים, כאשר השאלה נבחנת לאור מבחן הציפיות, |
| 10 | כלומר, האם המזיק יכול היה לצפות את התרחשות האירוע והאם צריך היה לצפותו |
| 11 | מבחינה  נורמטיבית. (ע"א 653/97 חב' **מרכז ברוך וצפורה בע"מ נ' עיריית תל אביב יפו,** |
| 12 | פ"ד נג (5) 817, (להלן: **"פרשת מרכז ברוך וצפורה"**). |
| 13 | |
| 14 | ההכרעה הסופית בשאלת הצפיות הנורמטיבית, המרכיבה את חובת הזהירות המושגית |
| 15 | היא עניין של מדיניות משפטית (ראו: <u>פרשת מרכז ברוך וציפורה,</u> שם בעמ' 825) ובהמשך |
| 16 | אדון בשאלה זו בהתייחס לכל אחד מהנתבעים. |
| 17 | |
| 18 | <u>**חובת זהירות מושגית ביחסים שבין המנוח לבין בזק, יקותיאל לביא, דרור אוברלנדר אריה**</u> |
| 19 | <u>**(קבוצת בזק)**</u> |
| 20 | |
| 21 | 10.   בזק הייתה מעבידתו של המנוח בעת הירצחו, כאשר הרצח אירע במהלך יום העבודה. |
| 22 | דומני, כי אין להכביר מילים באשר לקיומה של חובת זהירות מושגית בין מעביד לבין |
| 23 | עובדו. חובה זו מוכרת היטב במסגרת מדיניותו המשפטית של בית המשפט, כפי שבאה לידי |
| 24 | ביטוי באופן שיטתי בפסיקתו. בעקרון, מעביד סביר צריך ויכול לצפות לצפות התרחשות של נזק |
| 25 | גוף לעובדו (ראו למשל ע"א 684/76 **אייל נ' פוקסמן**, פ"ד לא(3) 349, 359), כפי שנקבע למשל |
| 26 | בע"א 663/88 **שריזיאן נ' לבידי אשקלון בע"מ** (פ"ד מז(3) 225, 229) (להלן: **"פרשת** |
| 27 | **שריזיאן"**) : |
| 28 | |
| 29 | "נראה שהיום, אין עוד צורך לבחינת עצם קיומה של חובת זהירות |
| 30 | מושגית בין מעביד לעובדו. חובה זו מוכרת יפה בפסיקה עניפה |
| 31 | ועקבית". |
| 32 | |
| 33 | וכן דברי בית המשפט בע"א 417/81 **מלון רמדה שלום נ' אמסלם** (פ"ד לח(1) 72, 76 (להלן: |
| 34 | **"פרשת מלון רמדה שלום"**) : |

4 מתוך 90



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1
2    "מעביד – כמעביד כלפי עובדיו, לא יכולה להיות מחלוקת, כי מוטלת
3    עליו חובת זהירות זו".
4
5    .11    מהאמור עולה, כי אין כל מחלוקת באשר לקיומה של חובת זהירות מושגית בין המנוח לבין
6        קבוצת בזק.
7
8    **חובת זהירות מושגית בין המנוח לבין אשר בן נעים ולילית אבטחה בע"מ.**
9
10   .12    אשר בן נעים –המאבטח - היה עובד לילית אבטחה בע"מ  (להלן: "לילית") והועסק
11       כמאבטח בבזק, כאשר במועד האירוע אבטח את המנוח, ועל כן, מתוקף הגדרת תפקידו –
12       מאבטחו של המנוח, היה עליו לשמור על שלומו ובטחונו של המנוח, עובדה המקימה חובת
13       זהירות מושגית ביחסים שבין בן נעים ולילית מחד גיסא לבין המנוח מאידך גיסא.
14
15   **חובת זהירות מושגית בין המנוח לבין הרשות הפלשתינית והמועצה הפלשתינית**
16
17   .13    כפי שיובהר בהמשך פסק הדין, ביחסים שבין הרשות הפלשתינית לבין המנוח קיימת חובת
18       זהירות קונקרטית ברורה וחד משמעית, אשר הופרה על ידה.
19
20       מכח קיומה של חובה זו, והפרתה, ספק אם יש לדון בדרך המסורתית בשאלת קיומה של
21       חובת זהירות מושגית.
22
23       עמדה זו מצאה לאחרונה, לא אחת, את ביטוייה בפסיקה ובספרות המשפטית, במסגרת
24       העמדה, על פיה אין צורך בקביעת חובת זהירות מושגית, שכן, ככל שעסקינן בשאלה האם
25       יש מניעה עקרונית להטיל אחריות על מזיקים מסוג פלוני כלפי ניזוקים מסוג אלמוני,
26       בחינה זו היא כללית מידי, ועל כן יש להעדיף את הגישה הגורסת, כי חובת הזהירות
27       המושגית ממילא תישלל במקרים בודדים בלבד, וכי מוטב להיודרש לנסיבות המקרה
28       הספציפי, קרי: לבחון תחילה את שאלת קיומה של ההתרשלות, ואם התשובה לכך היא
29       חיובית, לעבור ולבחון האם קיימת חובת זהירות קונקרטית, תוך פסיחה על שאלת החובת
30       המושגית (ע"א 878/06 **דר' טרוייהפט ואח' נ' עטיה ואח'**, פורסם בנבו, להלן: **"פרשת**
31       **טרוייהפט"**; י. גלעד **"על יסודותיה של עוולת הרשלנות"**, דיני משפט, כרך יד (תשמ"ט)
32       319; י' גלעד **"הסיבתיות במשפט הנזיקין הישראלי"**, משפטים ידי (תשמ"ד – תשמ"ה).
33

P 1: 890



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1   זה המקום לציין, כי קיימים מקרים שבהם אין כל קושי לקבוע קיומה של חובת זהירות
2   מושגית לפני בחינת חובת הזהירות הקונקרטית, אולם, קיימים מקרים – כמו
3   המקרה אשר בפני – בהם יש קושי לדון תחילה בשאלת חובת הזהירות המושגית, ההופכת
4   לברורה מאליה לאחר ליבון שאלת חובת הזהירות הקונקרטית.
5
6   נוכח האמור, הנני קובעת כבר עתה – כפי שיובהר בהמשך – כי ביחסים שבין המנוח לבין
7   הרשות הפלשתינית קיימת חובת זהירות מושגית.
8
9   <u>חובת זהירות קונקרטית והפרתה</u>
10
11  .14  במישור זה נבחנת השאלה ״**האם בין המזיק הספציפי לבין הניזוק הספציפי, בנסיבותיו**
12  **המיוחדות של המקרה, קיימת חובת זהירות קונקרטית בגין הנזק הספציפי שהתרחש״**
13  (<u>פרשת ועקנין</u>, שם בעמ' 125 ; ע"א 3510/99 **ולעס נ' אגד – אגודה שיתופית לתחבורה**
14  **בישראל,** פ"ד נה(5) 826, 840).
15
16  גם שאלה זו, כקודמתה, נבחנת על פי מבחן הצפיות, קרי: האם האדם הסביר יכול היה
17  לצפות את התרחשות הנזק במישור הטכני – עובדתי, והאם  צריך היה לצפות את
18  התרחשות הנזק בנסיבותיו הספציפיות, במישור הנורמטיבי.
19
20  הלכה היא, כי אחריותו של מזיק החב חובת זהירות כלפי הניזוק איננה משתרעת על כל
21  מקרה בו נגרם נזק לניזוק בשל מעשיו, או מחדליו של המזיק. אין ללמוד מעצם קרות הנזק
22  שחובת הזהירות הופרה. אחריותו של המזיק כלפי הניזוק היא לנקוט אמצעי זהירות
23  סבירים, ורק אם לא נקט בהם, ובשל כך נגרם הנזק, מתגבשת אחריותו של המזיק (ראו :
24  ע"א 437/87 **כהן נ' חברת חשמל לישראל בע"מ,** פ"ד מד(1) 807, 809).
25
26  סבירותם של אמצעי הזהירות נקבעת על פי אמות מידה אובייקטיביות, המגולמות
27  באמירה, כי על המזיק לנהוג כפי שאדם סביר היה נוהג בנסיבות העניין.
28  רמת זהירות זו נקבעת על פי שיקולים של מדיניות משפטית (פרשת ועקנין, עמ' 131) .
29
30  .15  כפי שציינתי, חובה על הניזוק, להוכיח קיומו של קשר סיבתי עובדתי וקשר סיבתי משפטי
31  בין הפרת חובת הזהירות הכלפי, לבין הנזק שנגרם לו (סע' 64 <u>לפקודת הנזיקין</u> [נוסח חדש]
32  (להלן : **״פקודת הנזיקין״**) ; פרשת ועקנין, עמ' 144 ; ע"א 576/81 **בן שמעון נ' ברדה,** פ"ד
33  לח(3) 1, 7 (להלן: **״פרשת ברדה״**), ע"א 610/94 **בוכבינדר נ' כונס הנכסים הרשמי**
34  **בתפקידו כמפרק בנק צפון אמריקה,** פ"ד נו (4) 289, 309, 311 (להלן : **״פרשת בוכבינדר״**).



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

| | |
|---|---|
| 1 | |
| 2 | ייעודם של כללי הסיבתיות הוא לקבוע, אם קיימת מבחינת הדין זיקה מספקת בין אשמו |
| 3 | של המזיק לבין נזק שבסל הניזוק. קיומה של זיקה זו מקים את אחריותם של המזיק, או |
| 4 | של המזיקים לנזק, ואת זכותו של הניזוק לסעדים הנובעים מאחריות זו (ראו: י' גלעד |
| 5 | **"הסיבתיות המשפט הנזיקין הישראלי – בחינה מחודשת,** משפטים יד' 15, 16 (להלן: |
| 6 | **"הסיבתיות במשפט הישראלי").** |
| 7 | |
| 8 | .16 <u>הקשר הסיבתי העובדתי</u> – הדרישה הבסיסית היא, שהנזק ייגרם עובדתית על ידי |
| 9 | ההתנהגות של המזיק (במעשה, או במחדל). התנהגות זו צריכה להיות גורם הכרחי, או גורם |
| 10 | מספיק לקרות הנזק (ראו: י. גלעד **"על יסודותיה של עוולת הרשלנות במשפט הנזיקין** |
| 11 | **הישראלי",** עיון משפט יד 319, 326). |
| 12 | |
| 13 | מקובל לומר, כי משמעות מבחן זה היא, כי הפרתה של חובת הזהירות מהווה גורם, אשר |
| 14 | אין בלעדיו, כלומר, שללא הפרת החובה לא היה נגרם הנזק (<u>פרשת ועקנין</u>, 144 ; <u>הסיבתיות</u> |
| 15 | <u>במשפט הישראלי</u>, עמ' 17). כל גורם, שדי היה בו לגרום לנזק ייחשב כגורם עובדתי לנזק |
| 16 | (<u>הסיבתיות במשפט הישראל</u>, עמ' 18). משמעות הדבר בהקשר דנן הינה, כי יש לבחון האם |
| 17 | התרשלותם של כל אחד מהנתבעים אשר בפני מהווה ברמה העובדתית **"הסיבה בלעדיה** |
| 18 | **אין"** לנזקו של התובע (<u>פרשת בוכבינדר</u>, עמ' 311), וכפי שיובהר בהמשך, התנהלותם של כל |
| 19 | אחד מהנתבעים, הינה לעניות דעתי **"הסיבה בלעדיה אין"** לנזקו של המנוח, ולולא |
| 20 | ההתרשלויות שיפורטו, לא היה מתרחש כלל האירוע הטראגי, ולחילופין, אף אם היה נסיון |
| 21 | לירות במנוח, הוא לא היה מוצא את מותו כתוצאה מניסיון זה. |
| 22 | |
| 23 | .17 <u>הקשר הסיבתי המשפטי</u> – משנקבע קיומו של קשר סיבתי עובדתי, קמה ועולה השאלה, אם |
| 24 | הקשר הסיבתי לא נשלל בשל שיקולים של **"סיבתיות משפטית".** |
| 25 | |
| 26 | נקבע, כי **"הסיבה המכרעת"** לקרות הנזק נקבעת על פי אמות מידה משפטיות, אשר |
| 27 | במרכזם עומדים שלושה מבחנים חלופיים: מבחן הצפיות, מבחן הסיכון ומבחן השכל הישר |
| 28 | (<u>פרשת ברדה</u>, בעמ' 7 ; <u>הסיבתיות במשפט הישראלי</u>, עמ' 24). |
| 29 | |
| 30 | כפי שציינתי, מדובר במבחנים חלופיים – ולא מצטברים – אולם כפי שאראה בהמשך, הנני |
| 31 | בדיעה, כי כל שלושת המבחנים הוכחו לגבי כל הנתבעים. |
| 32 | |
| 33 | כפי שציינתי קודם לכן, לפי גישה אחרת שהובאה בפסיקה, אין להבחין בין חובת זהירות |
| 34 | מושגית וקונקרטית, אלא יש לבחון את השאלה כמקשה אחת (ראו למשל ע"א 10084/04 |



## בית המשפט המחוזי בתל אביב - יפו

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1  **גודר נ' המועצה המקומית מודיעין**, פורסם בנבו; ע"א 2625/02 **נחום נ' דורנבאום**, פ"ד
2  נח(3) 385,408; ע"א 10078/03 **שתיל נ' מדינת ישראל**, פורסם בנבו). גישה זו באה לידי
3  ביטוי בע"א 915/91 **מדינת ישראל נ' לוי** (פ"ד מח(3) 45), שם נקבע, כי חובת הזהירות תוכר
4  בהתקיים שני יסודות: האחד – יסוד של "שכנות" או "קירבה"; השני – מסקנה שיפוטית
5  לפיה צודק, סביר והוגן שתיקבע חובת זהירות. במקרה זה, בגדרו של היסוד הראשון נבחנת
6  הזיקה בין המזיק לניזוק – אשר יכול שתהיה זיקה משפטית, או פיסית, או מכח הסתמכות
7  וכו', היוצרת את חובת הזהירות. בגדר היסוד השני נשקלים שיקולי מדיניות שיפוטית
8  שונים (ראה **עניין לוי** בע"מ 66-70; **עניין דורנבאום** בע"מ 408-409). (אודות היחס שבין
9  הגישות ראה מאמרו של ישראל גלעד "**הנחות עבודה, אינטואיציה שיפוטית ורציונליות**
10  **בקביעת גדרי האחריות ברשלנות**" משפטים כו', 295, 304-305 (התשנ"ו).
11
12  מבלי לדון בפירוט בהבדלי הגישות האמורות, דומני, כי שתיהן משלבות שיקולי מדיניות
13  ושפיטה דומים, אשר לאורם יש לתחום את גבולותיה של חובת הזהירות, ומטרתן היא
14  אחת, כפי שהיטיב לנסח כב' השופט ריבלין **בפרשת דורנבאום** בקובעו:
15
16   "תחולתה של עוולת הרשלנות היא, בין השאר, פועל יוצא של קביעת
17   גדרה של חובת הזהירות. גדרים אלה עשויים לבור את אותם
18   המקרים, בהם התרשל אדם, ואשר לאור שיקולי מדיניות ראוי
19   להטיל עליו אחריות בגין מעשיו, מבין המקרים בהם התרשל אמנם
20   המזיק, אלא ששיקולי המדיניות המביאים את בית המשפט למסקנה
21   כי לא יהא זה ראוי להטיל עליו אחריות" (**עניין דורנבאום**, בע"מ
22   408).
23
24  ומשכך אעשה כמיטב יכולתי לנסות ולשלב בין שתי הגישות האמורות, כדי להגיע לתוצאה
25  הנכונה והראויה.
26
27  <u>חובת זהירות קונקרטית ביחסים שבין המנוח לבין קבוצת בזק</u>
28
29  18.  יש להעריך את התנהלותה של קבוצת בזק בהתאם לתצהיריהם ועדויותיהם של הנתבעים
30       ושל עדים רלבנטיים נוספים.
31
32  אומר מיד, כי אינני מייחסת כל ערך ראייתי לעדויותיהם של התובעת ושל אחי המנוח – מר
33  רונן מנטין, בהתייחס לאופן התרחשות האירוע נשוא כתב התביעה, שכן בנושא זה מהוות

8 מתוך 90



בית המשפט המחוזי בתל אביב - יפו

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1   עדויותיהם עדות שמועה, שהרי לא נכחו במקום האירוע בזמן האירוע, וממילא אינם
2   יודעים מידיעה אישית את נוהלי העבודה בבזק.

3

4   הנתבע 2 – יקותיאל לביא (להלן: **"לביא"**), הגיש תצהיר עדות ראשית ואף העיד בפני בית
5   המשפט.

6

7   מדברי לביא עולה, כי במועד האירוע הוא ניהל את אגף הבטחון, הבטיחות והחירום בבזק
8   (סע' 2 לתצהירו).

9

10   לביא טוען בתצהירו, כי במועד הפיגוע נשוא כתב התביעה סבלה המדינה כולה **"ממציאות**
11   **קשה של מעשי טרור ואירועי חבלה, הגובים קורבנות רבים בנפש, חפים מפשע"** (סע' 7
12   לתצהיר). הימים – ימי האינתיפאדה השנייה, אשר ללא ספק היו סוערים מאוד והתאפיינו
13   בפיגועים ובנסיונות פיגוע רבים בכל רחבי הארץ, ועל כן לדעת לביא – כמו גם לדעת כל עדי
14   בזק – היות ומדובר היה במציאות בטחונית קשה בכלל ארצית, אשר לא היה בידי בזק
15   למונעה, או לצפותה, אין להטיל עליה חבות.

16

17   אינני מקבלת עמדה זו. דווקא משום שמדובר היה במציאות בטחונית קשה ביותר, וידועה
18   לכל הגורמים, היה על בזק על לוודא, כי היא עדכנה את מערך הבטחון שלה ושינתה את נוהליה
19   כדי להתאימם למציאות המתוארת על ידי אנשיה. זאת לא קרה.

20

21   לביא טען בתצהירו, כי בתוקף תפקידו **"אני יודע, כי חברת בזק במועדים הרלבנטיים**
22   **הנהיגה נוהלים וכללי בטחון ראויים וסבירים, ואף מעבר לכך"** (סע' 17 לתצהיר), ועל כן,
23   מן הראוי היה להמציא נוהלים מעודכנים אלו, שהותאמו לכאורה למציאות הבטחונית,
24   שהייתה מנת חלקה של מדינת ישראל במועדים הרלבנטיים, ובמיוחד בישובי התפר
25   הסמוכים לגבול, דוגמת בקעה אל גרבייה, אלא שלמעט אמירות, אשר לעיתים גובו
26   במסמכים סתמיים ולעיתים לא, לא הרימה בזק את הנטל הרובץ עליה להוכיח קיומם של
27   נוהלי בטחון **עדכניים**, המותאמים למציאות הבטחונית נשוא האינתיפאדה השנייה.

28

29   לביא הפנה את בית המשפט לנוהל שהוצא בינואר 1995(!!!),**"באגף הבטחון של חברת בזק,**
30   **שכאמור עמדתי בראשו, נוהל התנהגות בשטחים ובאיזורים רגישים ודאגנו להפיצו**
31   **ולפרסמו בקרב עובדי החברה, המאבטחים והטכנאים ולפקח על ביצועו ואכיפתו על ידם"**
32   (סע' 19 לתצהיר). אלא מאי? אמירה יפה זו נותרה כאות מתה מעל דפי התצהיר, ולא
33   הוכחה. נהפוך הוא, לעניות דעתי הוכח באופן פוזיטיבי, כי לא פורסמו נהלים חדשים כמענה



**בית המשפט המחוזי בתל אביב - יפו**

**ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת בע"מ ואח'**

1  מעודכן למצב הבטחוני הקשה ששרר במועד הפיגוע, וממילא לא נאכפו הנהלים – שכאמור
2  לא פורסמו כלל.
3
4  במהלך חקירתו של לביא התברר, כי הוא החל לעבוד בבזק בשנת 2000 (עמ' 64 לפרוטוקול
5  שורה 25), ועל כן לא ברורה ההצהרה הכלולה בסע' 19 לתצהירו, שכן הובער, כי במועד
6  פרסום הנוהל בשנת 1995, כלל לא עבד בבזק וממילא לא היה שותף לניסוח אותם נהלים
7  (עמ' 87 שורות 7-12). זאת ועוד. נהלים אלו אשר נוסחו בשנת 1995, נוסחו לפני פרוץ
8  האינתיפאדה השניה, שפרצה בספטמבר 2000 ונמשכה עד 10/05, ומטבע הדברים לא
9  הותאמו למצב הבטחוני ששרר במדינת ישראל באותן שנים.
10
11  לביא טען בחקירתו, כי עם כניסתו לתפקידו בבזק, **"עבר"** על הכללים משנת 1995, ובמענה
12  לשאלה, האם הם סבר שיש לעדכנם, ענה **"אנחנו הוצאנו מידי פעם... הוצאנו הוראות, מידי**
13  **פעם הוצאנו, הוצאתי אני הוראות... היו הוראות שעה שהוצאתי..."** (עמ' 88 שורות 19-27),
14  אולם כאשר התבקש להציג את אותן הוראות שעה, או נוהלים חדשים, ענה **"יש אותם**
15  **בתיקים של בזק"** (עמ' 89 שורה 4), אולם לא **"זכר"** האם יש מסמך מעודכן יותר מנספח א'
16  לתצהירו, שאינו אלא נוהל אותו נוהל רלבנטי ובלתי מעודכן משנת 1995.
17
18  התנהלות זו של בזק – כפי שבאה לידי ביטוי בעדותו של לביא – הינה חמורה, שכן לביא
19  העיד, כי לפני כתיבת תצהירו הוא עיין בתיק האבטחה של בזק, תיק אשר לא הוצג בפני בית
20  המשפט, ולדבריו לביא **"זה לא כאן"** (עמ' 86), והוא אף אישר, כי הוא קבע את מדיניות
21  האבטחה של בזק (עמ' 140 שורות 1-2), אם כן – הדעת נותנת, שלביא מעורה היטב
22  בתוכניות האבטחה של בזק, ומסוגל לפרטן באזני בית המשפט, אלא שתקוה זו נכזבה.
23
24  לביא העיד, כי ידע שבקעה אל גרבייה ממוקמת על גבול התפר בין הקו הירוק לבין שטחים
25  הנמצאים בניהול הרשות הפלסטינית, ובמיוחד היישוב הצמוד – בקעה אל שרקייה, ואף
26  היה מודע למעבר הקל מבקעה אל שרקייה לבקעה אל גרבייה בתקופה הרלבנטית לפיגוע
27  (עמ' 71 שורות 14-18, עמ' 72) (כיום קיימת במקום גדר הפרדה).
28
29  למרות צמידותה של בקעה אל גרבייה לגבול, ולמרות ביצועם של מספר פיגועים ונסיונות
30  פיגוע, לרבות אירועים שהסתיימו במות ישראליים בשנים הרלבנטיות לאינתיפאדה השניה,
31  לא ניהלה בזק יומן אירועים, על מנת להתחקות אחר מידת הסכנה הצפויה לעובדיה באיזור
32  קו התפר, וממילא לא הוכיחה, כי ניסתה להתמודד עם סכנה זו (עמ' 79 שורות 18-25, עמ'
33  80). לביא חזר וטען לקיומם של נהלי בטחון ואבטחה בבזק (עמ' 84 שורות 15-20) וכן
34  תוכניות עבודה (עמ' 106 שורות 6-16), אולם כאשר התבקש להציגם, ענה **"יש אותם**

P 1: 895