# EXHIBIT A.948
## (5 of 8)



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1    **במשרד"** (עמ' 137), והוא אף הגדיל לעשות כאשר טען, כי בהתאם לאותן תוכניות עבודה,
2    שקוימו לא הוכח כלל, אף נערכו מעקבים אחר העובדים כדי לוודא התנהלות על פיהם (עמ'
3    106 שורות 16-6, עמ' 110).
4

5    לביא הרבה להתייחס בעדותו לנוהלי עבודה ולהנחיות שניתנו לעובדים, אולם כאשר
6    התבקש להציגן טען, כי מדובר בהנחיות שניתנו **"בעל פה"** (עמ' 127 שורה 199).
7

8    לביא טען, כי בנוסף לנוהלי העבודה וההנחיות שניתנו בעל פה, שכאמור קיומם לא הוכח,
9    עברו העובדים – הטכנאים והמאבטחים – תדרוכי בטחון.
10

11    כאשר נשאל האם נערכו התדרוכים בהתאם לתוכנית עבודה סדורה, ענה לביא במפתיע, כי
12    התדרוכים נעשו, בין היתר **"לפי תחושה"** של אנשי בזק, אשר **"חשו"** כי יש לכנס את
13    העובדים לתדרוך (עמ' 101, עמ' 122).
14

15    עוד טען לביא, כי הנוהל – משנת 1995 – הופץ למאבטחים בזמן שעברו תדרוך (!?) (עמ'
16    139), אולם לא ידע להתייחס לעובדה, שמקריאת הנוהל משנת 1995 עולה, שהוא מתייחס
17    בכלל לשטחים A,B,C ולאו דווקא לשטחי מדינת ישראל (עמ' 139), מה שאך שנוהל זה
18    קובע, שיש לשלוח **שני** עובדים חמושים (עמ' 111), כאשר הובהר, כי במקרה נשוא כתב
19    התביעה רק המאבטח בן נעים נשא נשק, קרי: בזק אף לא פעלה בהתאם לאותו נוהל לא
20    מעודכן ולא מתאים, ולא שלחה לבקעה אל גרבייה **שני** עובדים חמושים.
21

22    לביא טען בסע' 15 לתצהירו, **"כי משטרת ישראל ושום גורם בטחוני מוסמך לא נתן לבזק**
23    **מעולם, לפני האירוע, הנחיות כיצד לנהוג כאשר החברה מבצעת עבודה בישוב ערבי..."**,
24    והנה, בניגוד למוצהר, התברר במהלך עדותו, כי על פי דבריו הוא התקיימו בין בזק לבין
25    משטרת ישראל קשרי עבודה הדוקים ויומיומיים, אם כי מרביתם לא תועדו.
26

27    מנספח ה' לתצהיר לביא עולה, כי בבוקר האירוע שוחחה מוקדנית מבזק בשם עינת עם
28    משטרת עירון (עם הדר) ונמסר לה ש"**אין הגבלות"**, כפי שעשתה , כנטען על ידי בזק, כל
29    בוקר (עמ' 83-82). בהמשך עדותו טען לביא, כי התקיימו ישיבות עבודה בין בזק לבין
30    משטרת ישראל וכי משטרת ישראל אישרה את מדיניותה הבטחון שננקטה על ידי בזק ואף
31    הנחתה את בזק (עמ' 85-84) אולם לא המצאה כל אסמכתא לאמור, ודזק : עדות זו הינה
32    בניגוד גמור ומוחלט לנטען בסע' 15 לתצהירו של לביא, שטען כי משטרת ישראל לא הנחתה
33    את בזק, טענה שנשמעה כתרוניה של בזק כלפי משטרת ישראל.
34



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1 לביא העיד על קיומן של פגישות שוטפות עם משטרת ישראל (עמ' 95-96), אשר בעקבותיהן
2 שונה לכאורה הנוהל של בזק, אולם לא המציא כל אסמכתא לאמור (עמ' 112).
3
4 הדעת נותנת, שבעת התמודדות עם המצב הבטחוני הקשה ששרר במדינה בתקופת
5 האינתיפאדה השנייה, מצב, אשר ללא ספק היה בידיעת אנשי האבטחה של בזק, כפי שהיה
6 בידיעת כל אזרח במדינת ישראל בתקופה ההיא, תקבע בזק נהלים מוקפדים, מעודכנים
7 ומשודרגים לפגישות עדכון והכוונה עם משטרת ישראל, אולם מעדות לביא התברר שהדבר
8 לא נעשה (עמ' 128, 152), ונראה, כי בזק המשיכה להתעדכן על ידי משטרת ישראל באופן
9 רנדומלי ולא מתוכנן, דבר שלא מנע מלביא להמשיך ולטעון, כי בזק לא קיבלה הנחיות
10 ממשטרת ישראל לגבי התנהלות בישובים ערביים (עמ' 154).
11
12 בהמשך התברר, כי באוקטובר 2002 נערך בבזק תדרוך למאבטחים ולטכנאים במרחב חפר
13 – אשר בקעה אל גרבייה נמצאת בתחומו – ובמסגרתו עודכנו הטכנאים והמאבטחים בדבר
14 עלייה ברמת ההתרעות לפיגועים בגזרה זו, התרעות על נסיונות לחטיפת נשק וכד', עובדות
15 המצביעות על החמרה ספציפית במצב הבטחוני באיזור זה. לביא נשאל מהיכן קיבלה בזק
16 את המידע בדבר ההחמרה האמורה, והודה, כי המידע הגיע ממשטרת ישראל (עמ' 90-91),
17 אולם לא הוברר באיזו דרך הגיע המידע האמור לבזק, ומי האישיות בבזק שקיבלה אותו
18 והחליטה על קיום התדריך האמור בעקבות המידע שהתקבל.
19
20 מהאמור עולה, כי היה קשר רציף בין בזק לבין משטרת ישראל, אולם בהיעדר אסמכתא
21 כלשהי, ולו בדל נייר בהתייחס לאופיו של קשר זה, לא ניתן לקבוע האם מדובר בהידברות
22 מתוכננת שנעשתה על דעת בזק, ביוזמת בזק, או שמא מדובר בהתענינויות אקראית של מי
23 מאנשי בזק אצל גורמים במשטרת ישראל. מכל מקום, ברור כי בהיעדר תוכנית מוגדרת ומפורטת של
24 קשרי עבודה עם משטרת ישראל,  לא ניתן לקבוע, כי בזק יצאה ידי חובתה כלפי עובדיה
25 בשמירה על בטחונם האישי.
26
27 לביא טען, כי בזק קיימה הערכות מצב (עמ' 95) אולם לא הומצאה כל אסמכתא המעידה על
28 קיומן של הערכות המצב הנטענות, או מסקנותיהן של הערכות המצב, ועל כן, אין מנוס
29 מהמסקנה, כי ספק גדול מאד האם באמת נערכו הערכות המצב הנטענות, שאם לא כן,
30 הייתה בזק ממציאה אסמכתא כלשהי, המעידה על ביצוען.
31
32 כפי שציינתי, לביא טען, כי העובדים – ובעיקר המאבטחים תודרכו על ידי אנשי בזק, עובדה
33 שלא הוכחה, וכן טען כי נמסר להם איושהו פנקס המפרט את הנחיות הבטחון, והעובדים
34 אף אישרו את קבלת הפנקס בחתימתם (עמ' 138-139),  אולם לא צורפה אסמכתא כלשהיא

P 1: 897



## בית המשפט המחוזי בתל אביב - יפו

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1  המעידה שפנקס כזה נמסר למנוח, או לבן נעים, וממילא לא הומצאה אסמכתא המעידה על
2  חתימתם המאשרת את קבלת הפנקס.
3
4  מהעדויות עולה, כי עובר לתאריך 4.3.03 – כשלושה וחצי חודשים לפני רצח המנוח –
5  התלוננו עובדי בזק על תחושת חוסר בטחון בבקעה אל גרבייה, ובעקבות תלונתם נערך
6  במקום סיור של בכירי מחלקת האבטחה בבזק.
7
8  בסיכום הביקור (ת/15) נרשמה העובדה שהסיור נערך בעקבות תלונות העובדים, וכן נרשמו
9  המלצות ליישום, ובהן פגישה עם פלוגת מג"ב המוצבת במקום.
10
11  לביא נדרש בחקירתו לסיור זה, שנערך כאמור לבקשת העובדים, או אז התברר, שהסיורים
12  דוגמת הסיור האמור, נועדו בעצם **להרגעת העובדים**, וממילא, לא נעשו לצורך הערכה
13  מחודשת של רמת האבטחה שיש לספק לעובדים (עמ' 103). קרי : בכירי מערך האבטחה של
14  בזק לא התכוונו מלכתחילה ליישם לקחים כלשהם בתחום הבטחוני כתוצאה מהסיור
15  האמור, עובדה הנתפסת בעיני כחמורה במיוחד, שכן התברר, שמטרת הסיור הייתה לשמש
16  גלולת הרגעה לעובדי בזק, שהתלוננו על תחושת חוסר הבטחון, ותו לא.
17
18  לביא לא זכר כלל אם נערכה פגישה עם מג"ב בעקבות הסיור האמור – אם כי אוברלנדר טען
19  כי פגישה כזאת התקיימה והוא השתתף בה באופן אישי (עמ' 184), אולם, מכל מקום לא
20  הוצג לעיני מסמך המתעד פגישה מעין זו, או את מסקנותיה, והנני חוששת, שדבריו לביא
21  נכונים, וכאמור, מראש לא הייתה להנהלת בזק כל כוונה לשנות את הסדרי האבטחה
22  בעקבות הסיור האמור, ועצם קיומו של הסיור לא נועד, אלא כדי להרגיע את העובדים.
23
24  זה המקום לציין, כי בזק מתנערת מאחריותה לרצח המנוח בטענה שהמנוח ובן נעים הפרו
25  את הנוהלים, בכך שנכנסו לבקעה אל גרבייה בשני רכבים, כאשר הנוהל חייב כניסה עם רכב
26  אחד, רכב בזק בלבד ; בכך שקיימו מגעים עם האוכלוסיה המקומית, מקום שמגע כזה נאסר
27  עליהם וכד', אלא מאיו כפי שציינתי מספר רב של פעמים, קיומם של הנוהלים לא הוכח,
28  וממילא לא הוכח מה היו ההנחיות הכלליות באותם נוהלים לכאוריים, ועל כן, אין מנוס
29  מהמסקנה, כי לא הוכח שנאסר על הטכנאים והמאבטחים להיכנס לשטחי העבודה בשני
30  רכבים, או שנאסר עליהם לקיים מגע עם האוכלוסיה המקומית. ודוק : גם אם היה מוכח
31  איסור כניסה בשני רכבים, הרי ממילא לא הוכח קשר סיבתי בין עצם הכניסה בשני רכבים
32  לבין הפיגוע האמור. באשר לאיסור מגע עם האוכלוסיה המקומית – איסור זה לא רק שלא
33  הוכח, אלא ההפך הוכח. מאבטחי בזק שהעידו בתיק זה (וואדים סימונוביץ, בן נעים, אוני
34  דביר) העידו, כי נהגו להיעזר בתושבים המקומיים במציאת כתובות של לקוחות בזק, וכן

P 1: 898



## בית המשפט המחוזי בתל אביב - יפו

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1    נהגו לאכול במסעדות במקום ואף עשו עסקים עם המקומיים (עמ' 474-473, 498-497),ממש
2    כפי שעשה בן נעים עם ואיל בעת ביצוע הרצח, וכפי שהובהרה, התנהלות זו הייתה בידיעת
3    בזק, שלא מצאה בה כל פסול וממילא לא הוכח איסורה.
4

5    המחדל שבא המצאת מסמכים רלבנטיים להוכחת טענות בזק נמשך גם בעדותו של דרור
6    אוברלנדר – קצין אבטחה פיסית בבזק (עמ' 165-166), אשר כמו קודמו הירבה לטעון
7    טענות, שנטענו על דרך הסתם, ללא כל ביסוס ומבלי להמציא מסמכים לאימות דבריו.
8

9    אוברלנדר הודה, כי למרות החרפת המצב הבטחוני בתקופה הרלבנטית לא שונו נוהלי
10    הבטחון משנת 1995 ( עמ' 170-171), אולם טען, שלא היה זה מתפקידו להוציא נהלים
11    חדשים.
12

13    לדבריו, החובה להוצאת נהלים חדשים לבזק חלה על משטרת ישראל (?!!)(עמ' 171) אולם
14    הוא הודה, כי לא פנה בעניין זה למשטרת ישראל, אם כי בהמשך טען שפנה, אולם לא קיבל
15    תשובות (עמ' 173) וכמובן שאף אחת מאמירותיו לא לוותה באסמכתא כלשהי.
16

17    אוברלנדר הודה, כי בזק פעלה על פי שיקול דעתה (עמ' 178), אולם לא פירט מה השיקולים
18    שעמדו בבסיס אותו שיקול דעת לכאורי, שקיומו כלל לא הוכח.
19

20    אוברלנדר טען עוד, כי בזק "התייעצה" עם משטרת ישראל (עמ' 178), אולם הוא לא זכר
21    "עם מי" (עמ' 179), למרות שעיין בתיקי בזק לפני שחתם על תצהירו, אותם תיקים עלומים
22    שבזק לא המציאה לבית המשפט, וזה המקום להזכיר מושכלות ראשונים בדבר הימנעות
23    מהמצאת ראיה, כפי שפורט על ידי המחבר י. קדמי בספרו "על הראיות" חלק שלישי, עמ'
24    1649 :
25

26    " יש והדרך שבה מנהל בעל דין את עניינו בבית המשפט הינה בעלת
27    משמעות ראייתית, כאילו הייתה זו ראיה נסיבתית. כך ניתן
28    להעניק משמעות ראייתית" לאי הבאת ראיה, לאי השמעת עד, לאי
29    הצגת שאלות לעד או להימנעות מחקירה נגדית של מי שעדותו
30    הוגשה בתעודה בכתב שהוגשה על ידו. התנהגות כזו, בהיעדר
31    הסבר אמין וסביר, פועלת לחובתו של הנוקט בה; באשר על פניה,
32    מתחייבת ממנה המסקנה שאילו הובאה הראיה או הושמע העד, או
33    הוצגו השאלות או קויימה החקירה הנגדית-היה בכך כדי לתמוך
34    בגירסת היריב.



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

| | |
|---|---|
| 1 | הימנעות מהבאת ראיה – במשמעות הרחבה של המושג כמוסבר |
| 2 | לעיל – מקיימה למעשה לחובתו של הנמנע חזקה שבעובדה, העוצה |
| 3 | בהגיון ובנסיון החיים, לפיה: דין ההימנעות כדין הודאה בכך |
| 4 | שאילו הובאה אותה ראיה, הייתה פועלת לחובת הנמנע. בדרך זו |
| 5 | ניתן למעשה משקל ראייתי לראיה שלא הובאה". |
| 6 | |
| 7 | אובלנדר הודה, כי בעקבות תדרוך הטכנאים (13/ת) בתאריך 28.10.02 לא שונה נוהל |
| 8 | האבטחה (עמ' 180). לדבריו, הוא ביקש את אישור משטרת ישראל לשנות את נוהל |
| 9 | האבטחה שנכתב על ידי בזק בשנת 1995, אולם לא המציא אסמכתא לכך (עמ' 181), והוא |
| 10 | הודה, כי בזק לא מצאה לנכון לשנות ולעדכן את נוהלי האבטחה המיושנים משנת 1995, |
| 11 | נוכח אירועי האינתיפאדה השנייה ונוכח העליה ברמת ההתרעות והפיגועים (עמ' 181). |
| 12 | |
| 13 | מעבר לצורך אציין, כי לא הובאה ראייה כלשהי המחייבת את בזק לקבל את אישור |
| 14 | משטרת ישראל לשינוי נוהלי הבטחון, וממילא לא הובאה ראייה כלשהי על פיה הייתה |
| 15 | משטרת ישראל מעורבת בניסוח הנהלים בשנת 1995. |
| 16 | |
| 17 | לתצהירו של אחי המנוח – רונן מנטין צורף נספח י' הנושא כותרת **"רשימת הישובים –** |
| 18 | **באיזורים הרגישים ואמצעי האבטחה הדרושים לתנועה ועבודה בהם"**. מסמך זה נושא |
| 19 | תאריך 7.11.02 ונראה, כי הופק בבזק עקב מצב הבטחוני הקשה כתוצאה מאירועי |
| 20 | האינתיפאדה השנייה. |
| 21 | המסמך אינו חתום ולא ברור מי כתב אותו. |
| 22 | |
| 23 | מהמסמך עולה, כי מאן דהוא בבזק סבר, שבבקעה אל גרבייה יש לספק לעובדי בזק מאבטח |
| 24 | וכן רכב ממוגן אבנים. אלא מאי? איש מעדי בזק לא ידע לומר מדוע נכתב המסמך? האם |
| 25 | קדם לו אירוע בטחוני מסויים? מי היה צוות החשיבה באגף האבטחה בבזק ששקל את |
| 26 | הצרכים הבטחוניים של עובדי בזק בישובים המוזכרים במסמך? עם מי נועצו אנשי בזק |
| 27 | עובר לכתיבת המסמך? דבר מכל אלה לא ידוע, אולם ברור כשמש, כי אמצעי האבטחה |
| 28 | המפורטים במסמך זה, נועדו להגן על עובדי בזק מידוי אבנים בלבד, ולא מפגיעי ירי. ודוק? |
| 29 | כפי שציינתי, בקעה אל גרבייה הינה ישוב בתחום ישראל, המאוכלס באוכרחים ערבים |
| 30 | ישראליים, והוא שוכן ממש על הגבול בצמידות לבקעה אל שרקייה, שהינו ישוב ערבי |
| 31 | בשליטת הרשות הפלשתינית, והסיכון בעבודה בו נובע מהשכנות הצמודה שלו לבקעה אל |
| 32 | שרקייה, ולא דווקא משהייה בבקעה אל גרבייה, שהינו ישוב ישראלי, המצוי בתוך תחומי |
| 33 | הקו הירוק. |
| 34 | |



## בית המשפט המחוזי בתל אביב - יפו

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1  מהעדויות שהובאו בפני עלה, כי בין שני הישובים היה איושחו מכשול חסר ערך, אשר לא
2  מנע מעבר אנשים מבקעה אל שרקייה הפלשתינית אל בקעה אל גרבייה הישראלית, ממש
3  כפי שהעיד המחבל, שסיפר על הקלות הבלתי נסבלת שבה עבר מבקעה אל שרקייה אל
4  בקעה אל גרבייה.
5
6  לא הוצג בפניי ולו מסמך אחד  שנערך בבזק, השוקל את צרכי הבטחון של עובדי בזק
7  בבקעה אל גרבייה, הסמוכה כל כך לבקעה אל שרקייה הפלשתינית והמפרט את הסיכון
8  הנובע מהמעבר הפשוט והקל מהשטח הפלשתיני לשטח הישראלי, פשטות "המזמינה"
9  מפגע כמו המחבל להצטייד בנשק, להגיע לשטח ישראל ולבצע פיגוע רצחני.
10
11  האם שקלו אנשי האבטחה בבזק את הסיכון הגלום בצמידות של בקעה אל גרבייה
12  הישראלית אל בקעה אל שרקייה הפלשתינית? האם שקלו את אפשרות המעבר הקלה
13  "והנוחה" מהשטח הפלשתיני לשטח הישראלי, ואת הסיכון העצום הגלום בכך לעובדי בזק?
14  כאמור, לא הוצגו מסמכים כלשהם המעידים על הפעלת איזשהו שיקול דעת כזה, או  פנייה
15  למשטרת ישראל על מנת להיוועץ בה  לגבי המינגן הנדרש לעובדי בזק, (ראו עדות אריה
16  יהודה, עמ' 337), והמסקנה המעציבה הינה, שהנהלת בזק ואנף האבטחה בבזק פעלו בחוסר
17  מקצועיות וברשלנות רבתי – דבר אשר אפשר את כניסתו של המחבל לשטח ישראל ללא כל
18  קשיים, ורציחתו של המנוח.
19
20  יצוויין, כי בנספח י' (ת/14), שהינו רשימת הישובים באיזורים הרגישים שנוסח על ידי בזק
21  פורטו ישובים נוספים, שבהם למשל נקבע, כי עובדי בזק ינועו בהם ברכב ממוגן ירי
22  ומאבטח חמוש, או עם אפוד מגן וקסדה, להבדיל מבקעה אל גרבייה, שבה הומלץ על שימוש
23  ברכב ממוגן אבנים וליווי מאבטח בלבד.
24
25  קראתי את רשימת הישובים, אולם לא השכלתי להבין מדוע בישובים מסויימים הוחלט
26  לצייד את העובדים ברכב ממוגן ירי, ודווקא בבקעה אל גרבייה – השכנת ממש על קו
27  התפר, הוחלט שלא לצייד את העובדים ברכב ממוגן ירי, מה עוד שאיש מאנשי בזק לא ידע
28  ליתן מענה לתהייה זו. ודוק: אין כל ספק, שאילו היה המנוח יושב ברכב ממוגן ירי בעת
29  ביצוע הירי לעברו, היו חייו ניצלים והוא לא היה מוצא את מותו.
30
31  אוברלנדר העיד בחקירתו, כי הוא "בין אלו" שערכו את ת/14 (עמ' 182 שורה 8), אולם
32  התקשה להסביר, מדוע הוחלט לצייד את עובדי בזק בישובים מסויימים ברכב ממוגן ירי,
33  ואת העובדים בבקעה אל גרביה הוחלט לצייד רק ברכב ממוגן אבנים, והוא הגדיל לעשות
34  כאשר "הזכיר" לכולנו, שאין הבדל בין בקעה אל גרבייה לבין חדרה(!!!), שגם בה אירעו

16 מתוך 90

P 1: 901



בית המשפט המחוזי בתל אביב - יפו

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1   פיגועים חבלניים, ומשכך נותרנו עם השאלה הבלתי פתורה – מה ההבדל בין הישובים,
2   שבהם "זכו" עובדי בזק לרכבים ממוגני ירי, לבין בקעה אל גרבייה, שדינה כדין חדרה?!
3   (עמ' 182-183), למרות שבשונה מחדרה, ממוקמת בקעה אל גרבייה ממש על קו הגבול.
4
5   חוסר המקצועיות שבה התייחסו אנשי אגף האבטחה בבזק לצרכי האבטחה והמיגון של
6   עובדיהם בא לידי ביטוי גם בעובדה, שאוברלנדר אינו מכיר את המסמך ת/15 – שהינו
7   סיכום סיור שנערך בבקעה אל גרבייה ובברתעה עקב תלונותיהם של עובדי בזק לגבי
8   תחושת חוסר הבטחון שלהם במקומות אלו. סיור זה נערך סמוך מאוד לפיגוע הרצח נשוא
9   התובענה אשר בפניי, בתאריך 4.3.03, אולם אוברלנדר לא הכיר את המסמך ואף לא
10  השתתף בסיור (עמ' 183), דבר שלא מנע מבעדו לטעון, כי מטרת הביקור הייתה "... **על מנת**
11  **לבחון את מה ש... ממה שהעובדים חוששים. מדובר שם באיזור של בקעה אל גרבייה**
12  **בקרבת בקעה אל שרקייה, היה שם איזה עבודות של ארון סעף...**" (עמ' 184 שורות 16-6).
13
14  תשובתו של אוברלנדר הייתה תמוהה משהו, שכן הוא הבהיר, כי אינו מכיר את המסמך,
15  אינו זוכר את תלונות העובדים ואף לא השתתף בביקור, ובמסמך לא מוזכרות עבודות
16  בארון סעף של בזק, וכאשר נדרש לכך הודה, כי **"לא כתוב, אני זוכר את המקרה".** האם
17  אכן?! ודוק: תלונה זו של עובדי בזק, שהועלתה במועד כה סמוך לביצוע הרצח מצביעה על
18  תחושת חוסר הבטחון של העובדים, תחושה שלא זכתה לכל מענה, לבד מעצם ביצוע הסיור,
19  שכפי שהעיד לביא – מטרתו הייתה להרגיע את העובדים המודאגים, ולא לשנות את
20  נוהלים קיימים שהיו, ככל שהיו.
21
22  כפי שהבהרתי, הנוהלים שצורפו הינם נוהלים מיושנים משנת 1995, שאינם מתמודדים עם
23  הבעיות הבטחוניות האקטואליות שאוליהן נחשפה מדינת ישראל במהלך שנות
24  האינתיפאדה, וכפי שהוכח, הם כוונו לתנועה בשטחים הפלשתינים, ולאו דווקא לתנועת
25  עובדי בזק בתוך שטחי מדינת ישראל בכלל, ובישובים הממוקמים על קו הגבול בפרט.
26  היוצא מכך הוא, שבמועד האירוע לא היו קיימים בבזק נוהלי אבטחה המיועדים לשמירה
27  על עובדי בזק בתוך תחומי מדינת ישראל, בישובים הסמוכים לקו התפר, עובדה שהינה
28  חמורה ביותר.
29
30  אמנם, עדי בזק ניסו להציג את הנוהלים משנת 1995, כחלים גם על תנועה בתוך שטח
31  ישראל, אולם מסקנה זו אינה עולה מהמסמך עצמו, וממילא התברר, שבזק אף לא נהגה על
32  פי ההנחיות באותו מסמך. כך למשל נקבע בנוהלים משנת 1995, כי עובדי בזק ינועו בצמדים
33  ויהיו חמושים, והנה הוכח מעבר לכל ספק, כי באירוע הנדון צוות טכנאי למאבטח, כאשר
34  רק המאבטח היה חמוש. כאשר נדרש לכך אוברלנדר בחקירתו, ונשאל מדוע המנוח לא היה

P 1: 902



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1 חמוש, ענה על דרך הסתם "**כי שינינו את הנחיות התנועה**" (עמ' 190 שורה 9), ומטבע
2 הדברים צפו ועלו השאלות: מי שינה? איזה הנחיות שונו (שכן לא הוצגו נוהלים כלשהם
3 המיועדים לתנועה בתוך שטח מדינת ישראל), מדוע שונו? מה היו השיקולים לשינוי
4 ההנחיות? אולם תשובות אַיָן. (עמ' 190).
5
6 זאת ועוד. אוברלנדר אישר, כי לאחר אירועי 2000 (תחילת האינתיפאדה השניה) הוצמדו
7 לכל טכנאי בזק "**נדמה לי בוואדי ערה**" (עמ' 189 שורות 7-10) שני מאבטחים (עובדה
8 שאושרה על ידי ארז גולן בחקירתו, עמ' 304-305), אולם בשנת 2002 הופחתו מספר
9 המאבטחים, שכן מאן דהוא בבזק סבר שדי במאבטח אחד לכל טכנאי. (אגב, באופן תמוה,
10 אריה יהודה "**לא זוכר**" – שהיו שני מאבטחים לפני האירוע, עמ' 358).
11
12 עניין הפחתת מספר המאבטחים מעורר סימני שאלה רבים, שכן, בדומה לכלל ההתנהלות
13 של בזק לא הומצאו ראיות, או פרוטוקולי ישיבות, שבהם דן הדרג המקצועי בשאלת מספר
14 המאבטחים הנדרש לכל טכנאי, וממילא לא פורטו השיקולים להפחתת מספר הטכנאים,
15 לרבות עצם ההחלטה לעשות כן.
16
17 עניין זה נתפס בעיני בחומרה מיוחדת דווקא נוכח תוכנו של ת/15 המדבר בעד עצמו, ומציין
18 את חשששו של העובדים בשנת 2003 באיזורים מסוימיים, ובהם האיזור נשוא כתב התביעה,
19 ועל כן אך טבעי הוא שנדרש, לפחות בשנת 2003, דיון מחודש בנוהלי אבטחת הטכנאים,
20 לרבות מספר המאבטחים הנדרשים לכל טכנאי במקומות מסוימיים, אלא שדיון כזה לא
21 נערך, ואף לא נעשה כל שינוי באופן אבטחת עובדי בזק בישובים "**באיזורים רגישים**".
22
23 בזק חזרה וטענה, כי המנוח ובן נעים הפרו את הוראות הנוהל, כאשר בחרו להיכנס לבקעה
24 אל גרבייה בשני רכבים "**בניגוד לנוהל**". אלא מאי? כפי שקבעתי, לא הוכח קיומם של
25 נוהלים, ועל כן, לא ניתן להגיע למסקנה, כי המנוח ובן נעים הפרו איזשהו נוהל בכניסתם
26 לבקעה אל גרבייה בשני רכבים, עובדה שאושרה על ידי אוברלנדר, אשר אישר בחקירתו
27 "**אין נוהל. אין נוהל שכתוב בפירוש, שהוא נוסע ברכב אחד... לא**" (עמ' 192 שורות 12-14).
28
29 מכל מקום, לא הוכח קשר סיבתי בין אירוע הרצח לבין עצם הכניסה בשני רכבים, מה עוד
30 שהפיגוע לא אירע בעת הכניסה בשני הרכבים, אלא מספר שעות לאחר מכן.
31
32 עוד טוענת בזק, כי המנוח ובן נעים הפרו נוהל נוסף האוסר עליהם להיות במגע עם
33 האוכלוסיה המקומית, אלא שטענה זו מוטב היה לו לא הייתה נטענת, משנטענה.
34

P 1: 903



בית המשפט המחוזי בתל אביב - יפו

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1    ההסתמכות על איסור זה מצויה בנוהל משנת 1995, אשר כזכור מתייחס לשטחי הרשות
2    הפלשתינית, A,B,C ולא לשטחי מדינת ישראל. היעלה על הדעת לאסור על עובדי בזק
3    לשוחח או להיות במגע עם תושבי ישראל?! והרי בקעה אל גרבייה הינה ישוב ישראלי
4    המאוכלס באזרחים ישראליים ערביים, והלא לדעת אוברלנדר, אין כל הבדל בין בקעה אל
5    גרבייה לבין חדרה למשל?!
6
7    לא זאת אף זאת. המאבטחים העידו, כי לעיתים מזומנות התקשו לאתר את בתי לקוחות
8    בזק לצורך ביצוע תיקונים, וזאת משום שבבקעה אל גרבייה אין כתובות ברורות (שמות
9    רחובות ומספרי בתים) ובשל הדמיון הרב בין שמות התושבים, ועל כן, נעזרו באופן קבוע
10    בתושבים מקומיים כדי שינחו אותם להגיע לכתובת הנדרשת.
11
12    עובדת הסתייעותם של עובדי בזק בתושבים מקומיים לצורך איתור כתובות הייתה ידועה
13    היטב לאנשי אגף האבטחה בבזק. כך עולה מדברי לביא (עמ' 126 לפרוטוקול) ואף מדברי
14    אוברלנדר (עמ' 194), אשר מטעמיו הוא בחר לסייג את האיסור הלכאורי בטענה, שמותר
15    לעובדי בזק ליצור מגע עם האוכלוסיה המקומית לצורך ביצוע תפקידם בלבד (!?!)(עמ' 204
16    שורות 20-19), ופעם נוספת נשאלת השאלה, היכן כתובים הדברים? היכן ההנחיות בדבר
17    איסור יצירת מגע עם תושבים מקומיים (אזרחים ישראליים!!!), אלא לצורך ביצוע
18    תפקידם?! גם יהודה אריה – מנהל אבטחה פיסית בבזק הודה בחקירתו, כי היה מודע לכך
19    שעובדי בזק נעזרו במקומיים לצורך איתור כתובות, והוא **"לא זכר"** נוהל, שאסר עליהם
20    לשוחח עם התושבים המקומיים (עמ' 204).
21
22    עדות חשובה לעניין היחסים שנרקמו בין עובדי בזק לבין התושבים המקומיים בבקעה אל
23    גרבייה ניתנה על ידי המאבטחן אוני דביר, שהותירו עליי רושם אמין מאד.
24
25    דביר סיפר בעדותו, כי עובדי בזק עשו עסקים עם תושבי בקעה אל גרביה (עמ' 473-474)
26    לרבות עם בעל התנות לאביזורי רכב – וואיל – שבפתח עסקו התרחש הפיגוע הרצחני. דביר
27    העיד, כי הממונה עליהם מטעם בזק – אלי לוינגר – היה מודע לפעילויות הפרטיות של
28    עובדי בזק עם תושבים מקומיים (עמ' 497), מה עוד, שלדבריו נהגו עובדי בזק – ובהם הוא
29    עצמו – לנסוע לבקעה אל גרבייה באונף פרטי לאחר שעות העבודה ולבצע שם עסקאות עם
30    המקומיים (עמ' 503). ודוק: לוינגר לא הובא לעדות, ועל כן עדותו של דביר לא נסתרה, והיא
31    מקובלת עליי.
32
33    בניגוד לעדויות העדים האחרים, טען המאבטחו ואדים סימונוביץ', כי המאבטחים קיבלו
34    התראות עדכניות מבזק פעם ,או פעמיים בשבוע, והם היו חותמים על קבלתן ומחזירים

19 מתוך 90

P 1: 904



# בית המשפט המחוזי בתל אביב - יפו

ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1    לבזק (עמ' 235-234), אלא שאסמכתאות לאמור לא צורפו, מה עוד שמדובר בגרסה חדשה
2    שזכרה לא בא בתצהירו של סימונוביץ' (עמ' 235). בהמשך טען סימונוביץ, כי המאבטחים
3    קיבלו גם התראות טלפוניות בכניסה לכפרים (עמ' 238-237), אלא שגם כאן מדובר בגרסה
4    חדשה, אשר לא הועלתה בתצהירו, ולא אומתה בכל דרך שהיא, והוא הפתיע בטענה, כי
5    לעיתים גם הטכנאים היו חמושים (עמ' 239), גרסה שלא עלתה בתצהירו, ולא הועלתה על
6    ידי אף אחד מהעדים. למותר לציין, כי אילו היו מצוידים את הטכנאים בנשק, כי אז הייתה
7    אסמכתא על כך, וכמובן שאסמכתא כזו לא צורפה.
8
9    באופן כללי התאפיינה עדותו של סימונוביץ' ב"חידושים והפתעות", שלא פורטו בתצהירו,
10    ובחלק מהמקרים אף עמדו בניגוד גמור ומוחלט לעדויות אחרות. כך למשל, סימונוביץ' זכר
11    שניהל **"פנקס צהוב"** (עמ' 242-241) שנמצא עד היום בביתו, אולם לא הוגX לא הוגא בפני בית
12    המשפט, מה עוד שלא הוברר האם הפנקס ניתן לו על ידי ליליית, ששכרה את שירותיו, או על
13    ידי בזק – שם עבד כמאבטח.
14
15    סימונוביץ' טען בסע' 6 לתצהירו, כי **"אני מציין באופן חד משמעי, כי כל העובדים ידעו**
16    **היטב מהם הנוהלים באיזורים הרגישים"**, ובחקירתו הבהיר, כי הוא טוען זאת על סמך
17    ישיבות שערכו עם קב"יטים **"פעם בכמה חודשים"** (עמ' 243 שורה 10), והפתיע בהעידו, כי
18    נמסרו לעובדים (טכנאים ומאבטחים) נוהלים כתובים (עמ' 243 שורה 22), אלא שנוהלים
19    כאלה לא הוגגו במהלך המשפט.
20
21    למותר לציין, כי סימונוביץ' העיד, שבן נעים היה אחראי משמרת (עמ' 262) והוא זה שמסר
22    לעובדים את ההתראות השבועיות (עמ' 263), עובדה שלא מצאה את ביטוייה באף תצהיר
23    ובשום עדות, ובאופן כללי, אינני מקבלת את עדותו של סימונוביץ, שמרבית הועלתה
24    לראשונה בבית המשפט, היא נעדרת מתצהירו ועומדת בניגוד לעדויות האחרות שנשמעו
25    בבית המשפט.
26
27    גם ארז גולן מאגף האבטחה בבזק, הסתמך בתצהירו ובעדותו על קיומם של נוהלים, אולם
28    גם הוא לא צירף נוהלים כלשהם לתצהירו, ובעדותו הודה **"הנוהלים, עוד פעם, אני לא יודע**
29    **אם זה רשום"** (עמ' 272, שורה 9), קרי: פעם נוספת מדובר בנוהלים עלומים, שאיש אינו
30    יודע את תוכנם, וחמור מכך, למעשה הם אינם קיימים באמת, ונראה, כי מתן הוראות
31    אבטחה ובטחון לעובדים, נעשתה, אם בכלל, בעל פה וביוזמה עצמאית של קצין בטחון כזה,
32    או אחר, בבחינת **"תורה שבעל פה"** התלויה ברצינותו, מקצועיותו ומוסר העבודה של קצין
33    בטחון כזה, או אחר.
34

P 1: 905



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1   ארז גולן "דיקלם" בעדותו נוהלים, שאינו יודע את מקורם (עמ' 271-272), וטען, כי הנוהלים
2   התבססו על הנוהל משנת 1995, ששונה ועודכן, אולם לא המציא אסמכתא כלשהיא לשינוי
3   ועדכון הנוהלים המיושנים (עמ' 271-272), וכאמור הודה, כי אין בנמצא נוהלים כתובים,
4   להבדיל מהנחיות אקראיות הניתנות בעל פה (עמ' 272).
5
6   ארז גולן טען, כי ערך לעובדים תדריכים על פי תוכניות עבודה כתובות, שסוכמו עם
7   אוברלנדר וארכו בין חצי שעה לשעה, אולם תוכניות כאלו אין צורפו לתצהירו ואף לא הוצגו
8   במהלך המשפט.
9   לדבריו, הוא לא התבקש להציגן (עמ' 275), ואין מנוס מהמסקנה, כי עצם קיומם של
10  התדריכים כמו גם משכם, תוכנם ותדירותם כלל לא הוכח.
11
12  גולן ערך הבחנה תמוהה בין תדרוך – שהוא ספציפי ולפני יציאה לשטח, לבין הדרכה –
13  המהווה הכשרה (עמ' 275) אולם הודה, כי לא היו מערכים קבועים של הדרכה לטכנאים,
14  או למאבטחים (עמ' 276), מה עוד שלא הוצגה כל אסמכתא להוכחת קיומם של התדריכים,
15  או ההכשרות.
16
17  גולן הודה, כי לא ניהל תיק אישי הכולל חוות דעת מקצועית המעריכה את תפקודם של
18  המאבטחים השונים (עמ' 277), למרות שלדבריו, תלונה על תפקודו של מאבטח, הייתה
19  עלולה לגרום להפסקת העסקתו.
20
21  גולן טען בחקירתו, כי קיימים דו"חות על ביקורות גלויות וחשויות שנעשו למאבטחים,
22  אולם גם דוחות אלו לא צורפו (עמ' 278), וכאשר הורמה גבה למשמע הדברים, טען גולן, כי
23  לפעמים תוצאות הביקורות "**לא עלו בדו"ח**" (עמ' 279 שורה 8), והוכח, כי אין בנמצא דו"ח
24  כזה לגבי פעילותו של בן נעים כמאבטח במשך 3 שנים (עמ' 279), ונשאלת השאלה, האם אכן
25  נערכו ביקורות?!!
26
27  גולן טען, כי "**טכנית היה מחסום**" (עמ' 282 שורה 31) בין בקעה אל גרביה לבין בקעה אל
28  שרקייה, אולם הודה, "**אבל אפשר היה לעבור בקלות**" (שם). גולן נשאל מדוע לא יזם
29  הוצאת הנחיות חדשות ומעודכנות נוכח ההחמרה במצב הבטחוני, אולם טען, כי אין זה
30  מתפקידו, אלא מתפקידים של הממונים עליו (עמ' 283).
31
32  בהתייחס לרשימת הישובים באיזורים הרגישים ואמצעי האבטחה הדרושים לתנועה
33  לעבודה בהם (ת/14), טען גולן, כי רשימה זו הועברה למשטרת ישראל, אולם לא הוצג כל
34  תיעוד לאישור האמור (עמ' 284-285), מה עוד שלא הובהר מי בבזק העביר לכאורה את

21 מתוך 90

P 1: 906



## בית המשפט המחוזי בתל אביב - יפו

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1  הרשימה לאישורה של משטרת ישראל; מי במשטרת ישראל קיבל לכאורה את הרשימה
2  וכד'.
3
4  גולן הפתיע בעדותו, כאשר טען, כי התריע בפני הממונים עליו על אפשרות של פגיעת מחבל
5  בעובדי בזק, אולם כאשר נשאל האם העלה את התרעתו על הכתב, ענה, כי הוא **"לא מבין**
6  **את השאלה"** (עמ' 286 שורות 12-17), ודוק: ארז גולן היה האחראי על הבטחון של עובדי
7  בזק בגזרת הצפון, בה נכללה גם בקעה אל גרבייה!!!
8
9  גולן העיד, כי הרכב ממוגן הירי **"נועד לאבטח את התנועה, את הנסיעה"** (עמ' 280 שורה
10  27), אולם לא ידע להצביע על החלטה שניתנה בכתב לאחר הפעלת שיקול דעת של מישהו,
11  לגבי מי זכאי להתניע ברכב ממוגן ירי (עמ' 288), והוא הודה, כי איננו יודע איך הופקו
12  הדו"חות באשר לפעולות האבטחתיות של עובדי בזק (עמ' 288), דו"חות שלא הוצגו כלל
13  בפני בית המשפט, וכללו לכאורה מעקב אחר עובדי בזק לצורך וידוא שמירה על נוהלים?!
14  (עמ' 289), שגן קיומם לא הוכח כאמור.
15
16  לתצהירי בזק צורפו דו"חות, שנערכו לכאורה אחת לחודש, ומהם ניתן להסיק קיומן של
17  ביקורות ותדרוכים שנערכו למאבטחי בזק באיזורים שהוגדרו רגישים.
18
19  כך למשל, בדו"ח (ת/13) החתום על ידי ארז גולן נרשם, שבתאריך 28.10.02 נערך תדרוך
20  למאבטחים ולטכנאים במחוז חפר בו מצוי הישוב בקעה אל גרבייה – וכי **"במהלך התדרוך**
21  **עלו ההדגשים הבאים: עלייה ברמות התרעה לפיגועים, התרעות לנסיונות חטיפה של**
22  **נשק, מאבטחים הונחו להגביר עירנות"** (עמ' 291), והנה תתברר, כי למרות ההתחרטות
23  החמורות, המפרטות סיכונים העלולים לעלות בחיי אדם, הונחו המאבטחים באופן כללי
24  **"להגביר עירנות"**, מבלי שדנו עימם בפרטי פרטים, כיצד על המאבטחים **"להגביר עירנות"**,
25  וממילא לא שיכללו את יכולת האבטחה על ידי אספקת רכבים ממוגני ירי, למשל, או ציוד
26  הטכנאים בנשק.  לא זו אף זו. גולן נשאל כיצד אכף את ההנחיה להגביר עירנות, או אז
27  תתברר שהנחייה זו לא נאכפה כלל, ולא נעשה כל מעקב לוודא את אותה **"הגברת עירנות"**
28  עלומה (עמ' 291). עוד הוברר, כי למרות תלונות העובדים, אשר חששו לבטחונם באיזור
29  בקעה אל גרבייה, לא מצא גולן לנכון לפנות למשטרת ישראל, או למג"ב על מנת להיווועץ
30  עימם בנושא דרכי אבטחתם של עובדי בזק (עמ' 294), ולמעשה המסקנה הינה, כי למרות
31  העלייה הברורה בהתרעות, לא שונו, או חודדו הנוהלים (שקיומם לא הוכח כאמור),
32  ומחלקית האבטחה של בזק סברה, שיצאה כדי חובתה בשמירת בטחונם האישי של העובדים
33  באיזורים רגישים בזמן האינתיפאדה השניה, בדרך של כינוס העובדים וקריאה להגברת
34  עירנות. האם די בכך?! ודאי שלא. כל האמור, לא מנע מארז גולן לטעון לקיומה של תוכנית

P 1: 907



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1  לעריכת ביקורות, אלא שתוכנית כזו לא הומצאה לבית המשפט (עמ' 297), למרות שגולן
2  הודה שלקראת עריכת התצהיר ומתן העדות בבית המשפט עבר על החומר הרלבנטי בקלסר
3  ובמחשב, אלא שכאמור, חומר זה לא הוגש לבית המשפט, ואין לדעת האם חומרים
4  רלבנטיים הוסתרו מידיעת הצדדים ומידיעת בית המשפט (עמ' 298), או שמא אינם כלל
5  בנמצא.
6
7  גולן טען שהתתדרוכים לעובדי בזק נערכו אחת לחודש, או חודש וחצי במפגש הבוקר לפני
8  יציאתם לעבודת יומם (עמ' 300 שורות 10-8), אולם לא המציא דיווחים על קיומם. עוד
9  אישר גולן, כי הייתה תקופה **"קצרה"** לפני הרצח, שבממלכה היו מתלווים שני מאבטחים
10  לכל טכנאי (עמ' 304 שורה 31), וזאת בשל קיומה של **"התרעה נקודתית באותה תקופה,
11  חטיפה של טכנאי, הגברנו את האבטחה ואז צמצמנו אותה בחזרה"** (עמ' 305 שורות 3-2)
12  ולמותר לציין, כי התהרותה עצמה לא הומצאה, כמו גם דיונים לגבי תגובר מערך האבטחה
13  בגינה, וממילא לא הומצאו השיקולים המקצועיים שעמדו בבסיס ההחלטה לצמצם את
14  מערך האבטחה ולהפחית את מספר המאבטחים.
15
16  דוגמא להתנהלותה הכושלת והבלתי מקצועית של בזק באבטחת עובדיה, הינה מינויו של
17  אריה יהודה למנהל אבטחה פיסית בבזק.
18
19  מעדותו של אריה עולה, כי הוא מונה לתפקידו ללא כל הכשרה מוקדמת בנושאי אבטחה,
20  ורק לאחר מינויו עבר, לדבריו, קורסים ייעודיים במשטרה ובשב"כ (עמ' 329-328), שכללו
21  קורס בן שלושה – ארבעה שבועות במשטרה, וקורס בן שישה שבועות בשב"כ. (לא הומצאו
22  אסמכתאות לאמור).
23
24  במאמר מוסגר אציין, כי מצופה מגוף גדול ורחב היקף כמו בזק, הכולל עובדים רבים
25  המתניעים בכל שטח מדינת ישראל, למנות לתפקיד רגיש זה אדם בעל עבר בטחוני וידע
26  בנושאי אבטחה, מה עוד, שלדבריו הוא היה אחראי על בטחונם של מאות אנשים (עמ' 391)
27  ובהיותה באדם חסר כל ידע בנושאי בטחון ואבטחה הינה תמוהה, בלשון המעטה ובודאי
28  שאינה מעידה על מקצועיותו.
29
30  אריה אישר בעדותו, כי לא היה נוהל מסודר של פניות והיוועצויות עם משטרת ישראל (עמ'
31  337). לדבריו, הוא היה שותף לניסוח הנוהלים משנת 1995 (עמ' 337), אולם הוא לא מצא
32  לנכון לשנותם, או לנסח נהלים עדכניים עם פרוץ האינתיפאדה השנייה בשנת 2002. כל
33  שנעשה הסתכם לדבריו, בפגישות עם העובדים וידיעתם בדבר קיומן של התרעות (עמ' 338).
34  אריה העיד כי למרות חשבות העובדים, כפי שבאו לידי ביטוי בת/13, הוא לא מצא לנכון

P 1: 908



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1   לשנות את רמת האבטחה (עמ' 338-339), ומדבריו עלה, כי אין בנמצא כל הסבר כתוב, או
2   מערך שיקולים כתוב, שמהם ניתן ללמוד מה היו השיקולים שהינחו את בזק בנושא אבטחת
3   העובדים בכלל, ובישובים על קו התפר בפרט (עמ' 339-340).
4
5   למרות תפקידו – מנהל אבטחה פיסית, לא זכר אריה את סיור ההנהלה בשטח עקב חששות
6   העובדים (עמ' 340), והתרשמותי לגבי אופן התנהלות העניינים באה לידי ביטוי בפרוטוקול,
7   באומרי: **"אם אני מבינה נכון את מה שאתה אומר, אז הכל התנהל בעל פה, לא היו נוהלים**
8   **מסודרים. אם  מישהו חשב שצריך לדבר עם המשטרה – דיברו, אם מישהו חשב שצריך...**
9   **לדבר עם מג"ב – דיברו, הכל היה היה שיקול דעת אישי ושום דבר לא על פי נוהל ולא כתוב"**
10  (עמ' 340 שורות 28-31), מסקנה שאושרה למעשה על ידי העד. מהאמור ברור, כי לא היו
11  נוהלים קבועים וברורים וממילא לא היו נוהלים ברי אכיפה, ואבטחת העובדים הייתה
12  תלוייה בכשריו המקצועיים, חריצותו ויוזמתו של עובד כזה, או אחר.
13
14  אריה לא זכר שביקש הנחיות מממשטרת ישראל, למרות שלאחר מכן טען שביקש **"הרבה**
15  **פעמים"** (עמ' 350 שורה 14), אולם לא זכר **"איפה זה כתוב"** (שם).
16
17  אריה הפתיע מאוד בטענה, כי המשטרה **"הם לא נתנו תשובות, אבל בשיחות בעל פה הם**
18  **היו מוכנים לומר, תעשו כך, או אחרת, הם לא היו מוכנים"** (עמ' 350 שורות 29-30), עובדה
19  תמוהה כשלעצמה. ונשאלת השאלה: האם משטרת ישראל סרבה להנחות את בזק, או שמא
20  לא התבקשה כלל להנחותה. סביר להניח, כי המשטרה לא התבקשה להנחות את בזק, ומכל
21  מקום לא הומצאה אסמכתא שיש בה כדי להגיע למסקנה שונה. ודוק: משטרת ישראל
22  איננה בעלת דין בתיק זה, ואיש מבעלי הדין, לרבות לא בזק לא ביקש את צירופה, ונוצר
23  הרושם שהיעדרה מכתב התביעה יצר לבזק פלטפורמה נוחה לנסות ולהטיל עליה אחריות
24  בגין מחדלי בזק, כפי שהוכח, וזאת לא רק מבלי שקולה של משטרת ישראל יישמע, אלא
25  שהדבר נעשה תוך הימנעות יזומה מזימון אנשי המשטרה הרלבנטיים למתן עדות בנסיון
26  להוכיח את טענותיה של בזק כלפי משטרת ישראל. התנהלות זו הינה פסולה ואיננה
27  מקובלת עלי.
28
29  אריה הודה, כי אין אסמכתאות לקיומו של נוהל, וכי כמעט שלא השתתף בתדרוכים (עמ'
30  357), ובאופן מפתיע, ולמרות תפקידו, **"לא זכר"** שהייתה תקופה בה צוותו שני מאבטחים
31  וטכנאי (עמ' 358).
32
33  אוני דביר, הגדיר את הנוהלים כ"**תורה שבעל פה"** (עמ' 470, 472), שכללה בעיקר איסורים
34  כגון: איסור על המאבטח לנהוג, וכו'. לדבריו "... **זה אסור וזה אסור, הביגוד מאוד**

P 1: 909



## בית המשפט המחוזי בתל אביב - יפו

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1  התעסקנו איתנו עם הביגוד, ביגוד כן מתאים, לא מתאים, שום דגש, שום התייחסות לכמה
2  המקצועיות של המאבטח..." (עמ' 470 שורות 19-23).
3
4  כזכור, בזק טענה, כי כל עובד צוייד בפנקס שכלל הוראות בטחון, אשר צילומו אף צורף
5  לתיק המוצגים, אולם מסירתו לעובדים לא הוכחה בכלל, ולמנוח ולבן נעים בפרט.
6
7  והנה, לדברי דביר, הוא קיבל את הפנקס האמור כמועד חינמי במטווח מבזק, או מלילית
8  (עמ' 472), ומעדותו עולה, כי למעשה לא היה כל פיקוח על עבודת המאבטחים, לא מטעם
9  בזק ולא מטעם לילית (עמ' 479).
10
11  דביר הלין קשות הן על הליכי ההכשרה הבלתי מספיקים לדבריו, והן על אי מתן סמכויות
12  למאבטחים. לדבריו, המאבטחים בבזק אינם אלא אזרחים נושאי נשק, ואין להם סמכויות
13  מעצר או סמכויות אחרות, כפי שיש למשל למאבטחי בתי המשפט, ועל כן, אין באפשרותם
14  באמת ובתמים להגן על הטכנאים.
15
16  אינני יכולה להסתמך על אמירות אלה במסגרת השיקולים העומדים בבסיס פסק הדין. לו
17  סברו התובעים, כי אין די בהדרכה הניתנת למאבטחי בזק, או במעמדם, כי אז היה עליהם
18  להמציא חוות דעת של מומחה בתחום. חוות דעת כזו לא הומצאה, ובהיעדרה אין לי כלים
19  להעריך את ערכה המקצועי של ההדרכה שניתנה למאבטחים, או את מעמדם ככאלה. מעבר
20  לצורך ציוויין, כי מהעדויות עולה, כי כל המאבטחים היו בעלי הכשרה מתאימה עוד
21  מתקופת שירותם הצבאי, וברור שאיש בבזק, או בלילית לא הסתמכו על הידע הנרכש
22  בחמשת ימי הקורס שניתנו למאבטחים בעבודתם בבזק, או בלילית.
23
24  כאמור, באשר למעמדם של המאבטחים כשומרים ולאו דווקא כמאבטחים – גם בנושא זה
25  אינני מביעה כל דעה, שכן לא הוצגה בפני כל חוות דעת, אשר על פיה לא היה די במעמדם
26  של המאבטחים בבזק, והיה צורך לשדרג את מעמדם ולהשוותו למעמד מאבטחי בתי
27  המשפט.
28  הנני מניחה, כי קיימאו דרך חוקית להסדיר את מעמד המאבטחים, אולם ברור, כי איש
29  בבזק לא שקל לשנות את מעמדם של המאבטחים ואף לא פעל כדי לשנות מעמד זה,
30  ולהשוותו, למשל, למעמדם של מאבטחי בתי המשפט, והדבר אף לא נטען.
31
32  לסיכום אציין, כי היעדרם המוחלט של נוהלים מעודכנים ומפורטים, הביאו לכך, שכל
33  מאבטח התנהג בהתאם לאומד דעתו, כאשר לא ברור אם אומד דעתו האישי של כל מאבטח
34  ומאבטח תאם את התנאים בשטח, ועל כן מדובר במחדל חמור מאוד.

P 1: 910



## בית המשפט המחוזי בתל אביב - יפו

ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

19.    מכל האמור עולה, כי לא הייתה בבזק מדיניות אבטחה ברורה, כתובה ומפורטת,
והיממעותה השיטתית של בזק  מהנמצאת מסמכים לאימות טענותיה בדבר קיום הלכאורי
של נוהלים, או מזימון עדים להוכחת טענותיה – כלפי המשטרה למשל – פועלת לחובתה.

חמור מכך, לא היה כל מנגנון ביקורת של אכיפת הנחיות שניתנו מידי פעם בעל פה, ודומני,
כי לא אטעה אם אקבע, כי היעדר הנוהלים גרם למצב בו הושארו הטכנאים והמאבטחים
לנפשם בבחינת "איש הישר בעיניו יעשה", מצב שהינו בלתי נסבל, במיוחד בתקופה בה
מדובר.

כתוצאה ממחדלים אלו, חמקה מעיני בזק העובדה, שעובדיה מבצעים פעילות פרטית
במהלך יום העובדה, פעילות, אשר במקרה אשר בפני גרמה לנטישת המנוח על ידי מאבטחו,
אשר כפי שיבואר בהמשך, עסק בענייניו הפרטיים, ונמצע תוך כדי כך מאבטחת הטכנאי –
המנוח, דבר שגם הוא איפשר, בין היתר את ביצוע הרצח, בבחינת הגורם שאין בלתו.

רוצה לומר, שרשלנותה של בזק במקרה זה, הינה   במחדליה האבטחתיים הרבים, אשר
בסופו של דבר אפשרו את הימצאותו של המנוח ללא מאבטח שיגן עליו, ברכב שאינו ממוגן
ירי.

למותר לציין, כי אילו הייתה בזק מנסחת נוהלי אבטחה ברורים וחדים, ואילו הייתה
מקיימת מערך קבוע של תדריכים, ואילו הייתה אוכפת את אותם נוהלים על עובדיה, קרוב
לוודאי שבן נעים לא היה מעז לעסוק בענייניו הפרטיים במהלך שעות העבודה, ולא היה
נוטש את משמרתו כמאבטחו של המנוח, וכן קרוב לוודאי, שאילו הייתה בזק מספקת
למנוח רכב ממוגן ירי, עקב קרבתה הפיסית של בקעה אל גרבייה אל בקעה אל שרקיית ותכן
שהיה נמנע הרצח הטראגי, קרי הוכח קיומו של קשר סיבתי עובדתי בין מחדליה של קבוצת
בזק לבין אירוע הרצח, וכן הוכח קשר סיבתי משפטי, שכן הן מבחן הצפיות, הן מבחן
הסיכון והן מבחן השכל הישר חייבו שקבוצת בזק תצפה אירוע של אסון עקב מחדלי
האבטחה החמורים, כפי שהוכח בפני ; ודוק : אין כל ספק לגבי קיומו של הסיכון בישעו על
קו התפר בימי האינתיפאדה השנייה, כאשר הוכח שהעובדים עצמם חששו לעבוד במקום ;
ולעניין דעתי ולנוכח המציאות הבטחונית הקשה שהייתה מנת חלקה של מדינת ישראל
בתקופה הרלבנטית, חייב השכל הישר את הנהלת בזק לנסח נוהלים ברורים, בשיתוף עם
גופי בטחון אחרים, כגון משטרת ישראל, או משמר הגבול, על מנת לשמור על בטחונם
וחייהם של עובדיה, כמו גם לאכוף ולוודא ביצוע הנוהלים.

P 1: 911



## בית המשפט המחוזי בתל אביב - יפו

ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת בע"מ ואח'

| | |
|---|---|
| 1 | בזק נכשלה גם במבחן השכל הישר, וכאמור – התוצאה ידועה. |
| 2 | |
| 3 | 20. בטרם אסיים פרק זה של הפרת הזהירות הקונקרטית על ידי בזק, אתייחס למספר |
| 4 | נקודות בסיכומי קבוצת בזק. |
| 5 | |
| 6 | בזק טענה בסיכומיה, כי בקעה אל גרבייה הינה למעשה יישוב ישראלי המצוי בתוך גבולות |
| 7 | הקו הירוק, ועל כן דינה אינו שונה מדינו של כל ישוב ישראלי אחר. |
| 8 | |
| 9 | אין כל ספק, שבקעה אל גרבייה הינה ישוב ישראלי בתוך תחומי הקו הירוק. אלא מאי! |
| 10 | מדובר בישוב ספר המצוי על קו התפר, אשר מעברו השני ישובים פלשתינים עויינים., כאשר |
| 11 | המציאות הבטחונית קשה במיוחד. ההתייחסות המיוחדת לבקעה אל גרבייה איננה נובעת |
| 12 | מאפיון תושביה כתושבים ערביים, אלא מקירבתה הצמודה לישובים פלשתנים בשליטת |
| 13 | הרשות הפלשתינית והסיכון הברור הנובע מקירבה זו. עובדה היא, שגם בזק סברה, כי |
| 14 | בישובים מסויימים בתוך תחומי הקו הירוק, יש צורך לצייד את עובדיה ברכבים ממוגני |
| 15 | ירי, אלא שלרוע המזל – בקעה אל גרבייה לא נכללה בין אותם ישובים, למרות צמידותה |
| 16 | לבקעה אל שרקייה הפלשתינית, ולמרות קלות המעבר בין שני הישובים. |
| 17 | |
| 18 | נסיבות אלו יוצרות את השוני בין בקעה אל גרבייה לבין ישובים אחרים בתוך תחומי הקו |
| 19 | הירוק, מה עוד שסיבותיה של בזק לצייד עובדים אחרים בישובים אחרים הסמוכים לגבול |
| 20 | באמצעי אבטחה טובים יותר, כגון שימוש ברכבים ממוגני ירי – נותרו עלומות, ולפיכך לא |
| 21 | ניתן לבקרן שיפוטית, להבדיל מעצם ההבחנה שנעשתה בין הישובים השונים. |
| 22 | |
| 23 | 21. בזק ניסתה בסיכומיה בכל מאודה, לגרור את בית המשפט לקביעה על פיה באם מוטל |
| 24 | אחריות על בזק, הרי שהתוצאה של הטלת אחריות זו הינה, כי ההתייחסות לאוכלוסיה |
| 25 | הערבית בישראל בכללותה, ככזו, צריכה להיות כאל פוטנציאל טרוריסטי, ולא היא. |
| 26 | |
| 27 | הנני מוחה נמרצות על נסיון נואל זה. ודוק: בית המשפט אינו נותן הצהרות פוליטיות, ויש |
| 28 | להצר על הנסיון לגרירתו לעשות כן. |
| 29 | |
| 30 | **היות ואמירה אומללה זו עלתה בסיכומי קבוצת בזק, הנני להבהיר הבהר היטב: בית** |
| 31 | **המשפט אינו עושה כל אבחנה בין אזרחיה היהודיים של מדינת ישראל לבין אזרחיה** |
| 32 | **המוסלמים, או הנוצרים, או אחרים.** |
| 33 | |

P 1: 912



**בית המשפט המחוזי בתל אביב - יפו**

**ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת בע"מ ואח'**

1　　תביעה זו הוגשה, בין היתר, כנגד בזק בגין מחדלי האבטחה החמורים שלה, שבאו לידי
2　　ביטוי בתיק זה.
3
4　　כפי שהבהרתי הבהר היטב, האבטחה המוגברת בתחומי בקעה אל גרבייה לא נדרשה בשום
5　　פנים ואופן מחמת אפיונם של תושביה כערבים, אלא אך ורק בשל קירבתה וצמידותה
6　　לבקעה אל שרקייה הפלשתינית, והסיכון – שהתממש- במעבר מפגע רצחני מבקעה אל
7　　שרקייה אל בקעה אל גרבייה, נוכח אי קיומו של מכשול רציני, אשר ימנע מעבר זה.
8
9　　כאמור, לצערנו הרב, במקרה אשר בפני התממש הסיכון, והמנוח נרצח בידי מחבל שניצל
10　את הקירבה והעוברות הקלה בין הישובים. ודוק : לא נטען, וממילא לא הוכח, כי המחבל
11　נעזר בתושבים מקומיים לצורך ביצוע מזימתו. לעומת זאת, הוכח מעבר לכל ספק, כי בין
12　התושבים המקומיים לבין עובדי בזק שררו יחסים מצויינים, שבאו לידי ביטוי בסיוע
13　יומיומי שקיבלו עובדי בזק מהתושבים המקומיים וביחסי מסחר בין עובדי בזק לבין
14　התושבים המקומיים, וכאמור, אין בפסק דין זה, ולו רמיזה לאפיון תושבי בקעה אל גרבייה
15　כמרומז על ידי קבועת בזק בסיכומיה, רמיזה אשר מוטב היה שלא להעלותה כלל.
16
17　22.　קבועת בזק משוותה בסיכומיה את נוכחות עובדי בזק  בבקעה אל גרבייה, לנוכחות עורכי דין
18　ממשרד ב"כ בזק בבית המשפט בירושלים, השוכן בלב ליבה של מזרח העיר, והיא תוהה,
19　האם עליה להעמיד מאבטח לעורכי הדין מטעמה בעת ביקורם בבית המשפט בירושלים.
20
21　　כמובן שתהייה זו אינה אלא תהייה פרובוקטיבית ומיותרת.
22
23　　רשויות הבטחון במדינת ישראל אמונות על בטחונם של אזרחיה ותושביה של המדינה בכל
24　שטחה. מטבע הדברים, לא ניתן להצמיד מאבטח לכל אדם ואדם, ועל כך מצופה מגופים
25　גדולים – כגון בזק, לסייע לכוחות הבטחון בהצבת אבטחה מתאימה לעובדיה העובדים
26　במקומות שיש בהם סיכון בטחוני.
27
28　　נראה, כי בזק הייתה מודעת לחובתה, ועל כן, צייידה את המנוח במאבטח חמוש וברכב
29　ממוגן אבנים, אולם, נוכח המצב הבטחוני החמור בתקופה הרלבנטית, נוכח קירבת בקעה
30　אל גרבייה לגבול, נוכח החשש הצפוי לביצוע פיגוע באמצעות מפגע שיגיע מהרשות
31　הפלשתינית, אין מנוס מהמסקנה, כי בזק לא עשתה די, ולמעשה לא הוכיחה כלל מדיניות
32　בטחון וקיומם של נוהלים, שיש בהם כדי להעיד על עשייייה אמיתית בתחום בטחון עובדי
33　בזק באיזורים רגישים.
34



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

23.   עוד טוענת קבוצת בזק בסיכומיה, כי הפגיעה לא היה צפוי, ולראיה הציגה את המסמך
      המעיד על וידוא המצב הבטחוני עם משטרת ישראל בבוקר האירוע.

      אין בעובדה שרשויות הבטחון  במדינה לא גילו את הכוונה לבצע פיגוע מבעוד מועד, כדי
      להביא למסקנה שמדובר באירוע מפתיע ובלתי צפוי. נהפוך הוא, דוקא השיחה היומית
      מידי בוקר של מוקדנית בזק עם משטרת ישראל מעידה יותר מכל על המצב הבטחוני העדין
      באיזור בקעה אל גרבייה, קרי: בזק יכולה הייתה וצפתה בפועל אפשרות של פיגוע, אולם
      מטעמים השמורים עימה סברה, כי היא תצא ידי חובתה, בשיחה יומית עם משטרת ישראל,
      ולא היא.

24.   בזק ייחדה בסיכומיה פרק בדבר היעדר הוראות שבדין, או הנחיות, או נוהלים בנושא
      בטחון באיזורים רגישים – מטעם המדינה/צה"ל, אלא שאינני רואה בהיעדר ההנחיות
      והנוהלים מטעם המדינה, מתן פטור לבזק מהגנה על עובדיה. אם סברה בזק, כי איננה
      יודעת איך להגן על עובדיה באיזורים שהוגדרו על ידה "כרגישים", היה עליה ליזום פניה
      למשטרת ישראל לצורך קבלת הנחיות. פניה כזו לא נעשתה, וממילא לא הוכחה, ואין לבוא
      בטרוניה לרשויות המדינה, או למשטרת ישראל בענין זה.

25.   קבוצת בזק מפנה לפסק הדין בע"א 491/73 **גדודי החולה בע"מ נ' עזרא מחרוז** (פ"מ כט(2)
      32) (להלן: **פרשת גדודי החולה**") אלא, שאין דמיון בין עובדות פרשת גדודי החולה לבין
      העניין אשר בפני.

      בפרשת גדודי החולה, נפגע התובע בשנת 1967 – ערב פרוץ מלחמת ששת הימים – בעת שנהג
      בקומביין במהלך עבודת קציר בשטח סמוך לגבול הסורי. באותו מקרה, נדחתה הטענה, כי
      היה על המעביד לספק לתובע רכב משורריין, שכן הדבר אינו מעשי כאשר מדובר בקומביין.
      באותו מקרה הוכח, כי בין המעביד לבין שלטונות צה"ל קיים היה נוהג, על פיו דיווח
      המעביד לשלטונות צה"ל על צאת עובדיו לעבודה, תוך ביצוע תיאום פרטני בין המעביד לבין
      שלטונות הצבא לגבי יציאת העובדים לשטח, כאשר הצבא הוא זה שדאג לאבטחת
      העובדים.

      במקרה אשר בפני, לא היה כל הסדר דומה עם שלטונות צה"ל, או מג"ב, או משטרת
      ישראל, והקשר המוכח היחיד בין בזק לבין משטרת ישראל, היה בשיחה יומית על מנת
      לקבל אינפורמציה לגבי התרעות צפויות.

P 1: 914



## בית המשפט המחוזי בתל אביב - יפו

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת בע"מ ואח'

1     הוכח באופן פוזיטיבי, כי בזק לא ביקשה ייעוץ אבטחתי לעובדיה מאת משטרת ישראל,
2     וממילא לא אובטחו עובדי בזק באופן פרטני על ידי משטרת ישראל, ואין כל ספק, כי חובת
3     השמירה על בטחונו וחייו של המנוח הייתה מוטלת בראש ובראשונה על מעבידתו בזק, ולאו
4     דווקא על גוף אחר, שאינו בעל דין בתיק שבפני, ואף לא הובא לעדות על ידי בזק.
5

6     בזק מפנה אף לפסק הדין בע"א 559/77 **חיים למפרט נ' מדינת ישראל** (פורסם בנבו), שם   .26
7     עסק בית המשפט בתביעה על עובד משרד הבטחון, שנפגע בדרכו לעבודה מאש מחבלים
8     שחדרו לישראל. באותו עניין קבע בית המשפט, כי **"אין להשוות את מידת הזהירות**
9     **הנדרשת ממעביד לגבי מצב הבטיחות בתוך מפעלו ובחצרו הנתונים לשליטתו ומידת**
10     **הזהירות שהוא יכול לנהוג כלפי סכנות הנשקפות לעובדו כלכל אדם הנמצא ברשות**
11     **הרבים".**
12

13     במלוא הענווה, הנני מסכימה עם אמירה זו. אלא מאי? בעניינינו הוכח, כי בישובים
14     מסוויימים נשלחו עובדי בזק ברכב ממוגן ירי, כאשר לא הובהר השוני בין אותם ישובים
15     לבין בקעה אל ג'רביה. קרי: המעבידה – בזק סיפקה אמצעי מיגון מתקדמים יותר, אולם
16     לא סיפקה אותם דווקא למנוח, כאשר ברור, שאילו היה ברכב ממוגן ירי, לא היה נהרג.
17

18     היות ולא הומצאו כל הסברים למחדל שבאי ציוד המנוח ברכב ממוגן ירי, למרות שעבד על
19     קו התפר בצמידות לישוב פלשתיני, הרי שאין בקביעות בפרשת למפרט כדי לסייע לבזק
20     במקרה אשר בפני.
21

22     עוד הפנתה בזק לפסק הדין בע"א 686/77 **מקורות חב' מים לישראל נ' משה מרג'י ואח'**   .27
23     (פורסם בנבו), שם נקבע, כי בנסיבות של אירוע חבלני, לא ניתן להחיל על מעביד את
24     עקרונות הרשלנות הרגילים.
25

26     גם לקביעה זו הנני מסכימה, עם כל הצניעות. אלא מאי? במקרה אשר בפניי מדובר באירוע
27     חבלני <u>צפוי</u>, אשר ניתן היה להיערך כנגדו, למשל בצידוד של המנוח ברכב ממוגן ירי. אי
28     היערכות זו, והימנעות מציוד המנוח ברכב ממוגן ירי, בנוסף לכשלי האבטחה הרבים
29     והנוספים שפורטו עד כה, איננה יכולה להביא, אלא למסקנה אחת – בזק התרשלה,
30     וכתוצאה מהתרשלות זו התאפשר האסון נשוא התובענה.
31

32     מסקנתי זו עומדת בעינה גם נוכח עובדות פסק הדין בת.א. (ת"א 1051/92 **אברהם שפיר נ'**
33     **פרדס סינדיקט** (פורסם בנבו). לא זאת אף זאת. הנני בדיעה, כי ככל שנמשכים ומתרבים
34     מעשי הטרור המכוונים כלפי אזרחי ישראל, חובה על המעביד לשפר את אמצעי האבטחה

P 1: 915



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

| | |
|---|---|
| 1 | והבטחון שהוא מספק לעובדו. אין די בקביעה, כי מדובר במציאות קשה שאנו חיים בה. |
| 2 | האם בשל הקושי האמור ניתן היתר למעביד שלא להגן על עובדו?! לא ולא, מה עוד שהוכח, |
| 3 | כי בבעלות בזק היו בתקופה הרלבנטית רכבים ממוגני ירי, אשר מסיבות שלא הובהרו, לא |
| 4 | נעשה בהם שימוש לטובת המנוח ולבטחונו. |
| 5 | |
| 6 | .28 ממשיך וטוען ב"כ בזק, כי גם שיקולי מדיניות משפטית **מחייבים הגעה אל המסקנה,** |
| 7 | **אשר שוללת צפיית של המעביד לגבי אירועי טרור, אשר הינם חלק בלתי נפרד מהסיכון** |
| 8 | **הרגיל של החיים במדינת ישראל"** (סע' 53 לסיכומי בזק), אולם אינני מקבלת אמירה זו. |
| 9 | נהפוך הוא – במסגרת שיקולי מדיניות משפטית, חובה לשרש ולחזק את הקביעה בדבר |
| 10 | חובתו של מעביד לדאוג לשלום עובדיו, במיוחד כאשר יש צפי ובסיס לחשש בדבר |
| 11 | התרחשות פיגוע. ודוק: כמובן שאין המעביד מסוגל לצפות קיומו של פיגוע ספציפי, אולם |
| 12 | הוא בהחלט יכול וצריך לצפות אירוע בטחוני, באופן כללי, ולעשות כל שביכולתו על מנת |
| 13 | לחשוף את עובדו למינימום סיכון. |
| 14 | |
| 15 | .29 לא אוכל לסיים פרק זה בלא להתייחס לתחקירי בזק ומשטרת ישראל בהתייחס לפיגוע |
| 16 | נשוא כתב התביעה. |
| 17 | |
| 18 | <u>תחקיר בזק</u> – תחקיר בזק לוקה בחסר, שכן אין כל פירוט לגבי זהות המרואיינים שמסרו |
| 19 | את האינפורמציה נשוא התחקיר, כמו גם זהות המראיינים שעשו את התחקיר, ועל כן, יש |
| 20 | קושי אמיתי בהערכת רצינותו של התחקיר. |
| 21 | |
| 22 | מקריאת התחקיר עולה, כי אינו חתום, אולם בתחתיתו נרשם **"כתב: יהודה אריה",** |
| 23 | ומאליה עולה השאלה, האם אותו כותב ערך את התחקיר, או שמא **"כתב"** קביעות |
| 24 | ומסקנות של אחרים. |
| 25 | |
| 26 | יהודה אריה, שהינו מנהל אבטחה פיסית בבזק נדרש לנושא זה בחקירתו, וסיפר כי התבקש |
| 27 | על ידי מנהל האגף, יקותיאל לביא, לכתוב את התחקיר. |
| 28 | |
| 29 | אריה הבהיר בעדותו, כי לא ערך את התחקיר לבדו, וכי סייעו לו אוברלנדר וארז גולן וכן גל |
| 30 | **"והעובדים"** (עמ' 341), אולם לא ידע להסביר מדוע עובדינ מעורבותם של אחרים בהכנת |
| 31 | התחקיר לא צויינה בגוף התחקיר (עמ' 342). בהמשך חקירתו חזר אריה וסיפר, כי **"זה לא** |
| 32 | **רק אני תחקרתי, כמו שאמרתי השתתפו בו עובדים נוספים והיו, היו שיחות עם עובדי בזק** |
| 33 | **ועם מאבטחים מבזק ומשטרת ישראל"** (עמ' 344 שורות 13-14), והודה, כי לא השתתף בכל |
| 34 | התחקירים הנטענים, אלא **"ברובם"** (עמ' 344 שורה 229) ו**"באלה שלא, העבירו לי את** |

31 מתוך 90



**בית המשפט המחוזי בתל אביב - יפו**

**ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת בע"מ ואח'**

1  **החומר"** (עמ' 344 שורה 24). אריה התבקש להציג בפני בית המשפט את אותו חומר גולמי
2  שהועבר אליו לכאורה, לדבריו, על ידי אחרים שעסקו בחקירת האירוע מטעם בזק, אולם
3  הוא לא זכר היכן החומר **"יכול להיות שתוייק. אני לא יודע. אני לא זוכר"** (עמ' 345 שורה
4  4), ולדבריו **"אני סיכמתי אותו בתחקיר"** (עמ' 344 שורה 319).
5
6  היות ואריה טען, כי תחקיר בזק מבוסס, בין השאר על פגישות עם אנשי משטרה, הוא נשאל
7  עם מי מאנשי המשטרה נפגש, וענה **"הייתה פגישה עם מפקד תחנת עירון, קצין המודיעין**
8  **של תחנת עירון, ועוד איזהושהי פונקציה שאני לא זוכר את שמה, את התפקיד שהיה אז**
9  **ואיתם ישבו, כן"** (עמ' 345 שורות 15-16), אולם הוא לא זכר אם היו רישומים בכתב של
10  הפגישה (עמ' 345 שורה 18), ומכל מקום, הוא לא ידע להסביר מדוע הפגישה שהתקיימה
11  לכאורה עם אנשי משטרה לא מוצאת ביטויייה בתחקיר בזק.
12
13  עוד טען אריה בעדותו, כי לצורך כתיבת התתחקיר **"ישבנו"** (עמ' 346 שורה 119) **"עם עובדים**
14  **שעבדו באיזור בקעה אל גרביה..."** (שם).
15
16  לדבריו הוא ואחרים – שזהותם נותרה עלומה –תחברו את עובדי בזק בבקעה אל גרבייה,
17  כל אחד מהם בנפרד, ואמירותיהם נרשמו (עמ' 346 שורה 17), וכאשר נשאל מדוע אמירות
18  העובדים אינם באים לידי ביטוי בתחקיר, ענה **"תשמעי, בדו"ח הזה לא מופיע, לא רשמנו**
19  **בכל דבר בעקבות אמירה כזאת של עובד כזה, או אחר, הדו"ח הוא כללי"** (עמ' 346 שורות
20  19-20), ונראה, כי נוכח **"כלליותו"** של התחקיר, לא ידע העד להסביר את מערובותם של
21  **"התקשורת ודובר החברה"** שצויינו בתחקיר כמעורבים בעריכתו. לדבריו **"האמת, שאני**
22  **לא נפגשתי איתם, קותי** (לביא – ד.ג.) **נפגש איתם וזה היה לו לבקשתם..."** (עמ' 347 שורה 6),
23  ועצם ציון הפגישה עימם היתה **"בטעות"** (עמ' 347 שורה 15), ולמשמע הדברים, אין מנוס
24  מהמסקנה, כי תחקיר זה הינו חסר כל ערך ויתכן שתוצאותיו מוטות, שאם לא כן לא ברור
25  מדוע נדרשה פגישה של לביא – שאינו חתום התחקיר – עם התקשורת ודובר החברה, על
26  מנת להגיע למסקנות אמת באשר לאופן התרחשות האירוע, והאחראים .לו, אם בכלל,
27  בחברת בזק, אלא אם כן מטרת הפגישה היתה מתן הנחיות באשר למסקנות התחקיר
28  במנותק מהעובדות!!!
29
30  יקותיאל לביא, ששימש בתקופה הרלבנטית כמנהל המחלקה לאבטחה פיסית אישר, כי
31  תיחקר את האירוע (עמ' 100 שורות 1-3), אולם בניגוד למרבית עדותו אשר התאפיינה
32  בחוסר זכרון מוחלט באשר לשאלות שנשאל, הוא טען, כי היה **"מעורב"** (עמ' 123 שורה 24)
33  בביצוע התחקיר. אלא מאי? הוא לא ידע לומר היכן הכין פיסית נערכו התחקירים של העובדים
34  השונים (עמ' 123 שורה 20), לא ידע לומר היכן ההודעות שנגבו כביכול מהעובדים שתושאלו

P 1: 917



## בית המשפט המחוזי בתל אביב - יפו

### ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת בע"מ ואח'

1     (עמ' 1259, ולא ידע לומר היכן מצויות ההודעות, אם כי הניח **"שהכל נמצא בבטחון, באגף**

2     **הבטחון"** (עמ' 125 שורה 19), אולם "זיכרי" בודדות שנגבו הודעות מבן נעים ומאוני דביר

3     (עמ' 125), עובדה שהוכחשה מרצותם הן על ידי אוני דביר (עמד 488 – 489) והן על ידי בן

4     נעים (עמ' 443 שורה 30, עמ' 444 שורה 1).

5

6     גם מעדותו של אוברלנדר – קצין אבטחה פיסית בבזק  - עלתה תמונה דומה באשר לאופן

7     ניהול תחקיר בזק. אוברלנדר התעקש, כי בזק לא "חקרה" את האירוע, אלא **"תחקרה"**

8     אותו, בהדגישו **"שיש הבדל בין חקירה ל..."** (עמ' 199 שורות 25-29). אוברלנדר נשאל

9     מספר פעמים לגבי זהות האנשים **"שתוחקרו"** על ידו, אולם התחמק במשך דקות ארוכות

10     ממתן תשובה, ולבסוף נאלץ להודות, כי לא גבה עדות או הודעה מאיש מהמעורבים **"כי**

11     **המשטרה חקרה אותם..."** (עמ' 201 שורה 22), וטען, כי המסקנות המפורטות בתחקיר בזק

12     הן **"המסקנות שלנו ביחד, כן"** (עמ' 201 שורה 31), דהיינו, של אוברלנדר ושל אריה יהודה.

13

14     מכל האמור עולה, כי ספק רב האם המסמך הנושא כותרת **"תחקיר בזק"** ראוי לכותרת זו.

15     נראה, כי מדובר במסמך אשר נכתב ביוזמת הנהלת בזק, על סמך דרישות יועצי התקשורת

16     שלה, והוא חסר כל ערך ראייתי, ובוודאי שלא ניתן ללמוד ממנו על חלקה של בזק במחדלים

17     שאפשרו את התרחשות האסון.

18

19     תחקיר המשטרה – תחקיר המשטרה מבוסס על שיחות שנערכו עם אנשי בזק, ששמותיהם

20     מפורטים בתחקיר, אולם באופן בולט ביותר נעדר שמו של המאבטח – בן נעים, שהיה עד

21     ראייה לפיגוע, וכן שמו של אוני דביר, שהגיע למקום מיד לאחר התרחשות הפיגוע, והיעדר

22     תחקירים של שניים אלה, מטיל צל מעיב על תחקיר המשטרה, המבוסס כל כולו על עדות

23     שמיעה של אנשי בזק, שלא היו עדי ראיה להתרחשות וממילא – כפי שהוברר בעדותם, הם

24     אינטרסנטיים ומטרתם  למנוע קביעת אחריות של בזק לאירוע החמור, אחריות שנקבעה

25     באופן ברור בפסק דין זה ובאה לידי ביטוי הן במעשים והן במחדלים של בזק.

26

27     משטרת ישראל מציינת לשבח את התנהלותו של בן נעים **"על אופן ביצוע המרדף, החתירה**

28     **למגע, הנחישות והפגיעה במחבל"**, והנני מצטרפת מכל לב לשבחים שהורעפו על בן נעים

29     בהתייחס להתנהלותו לאחר ביצוע הירי על המנוח, אלא, שאין בכך כדי להמעיט מחלקו

30     באחריות לעצם התרחשות האירוע, כפי שפירטתי בפסק דין זה בנוגע להתנהלותו לפני הירי.

31

32     מכל מקום, הנני קובעת, כי תחקיר המשטרה היה שטחי ובלתי מבוסס, ואין בו כדי לסייע

33     בקביעת אחריותם של הגורמים השונים להתרחשות האירוע נשוא כתב התביעה.

34

P 1: 918



בית המשפט המחוזי בתל אביב - יפו

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

| | | |
|---|---|---|
| 1 | .30 | <u>לסיכום פרק זה הנני קובעת, כי קבוצת בזק (נתבעים 1, 3, 4 ו-5) הפרה את חובת הזהירות</u> |
| 2 | | <u>החלה עליה ביחסיה עם המנוח ואין כל ספק, כי המחדלים המפורטים בפסק דין זה מהווים</u> |
| 3 | | <u>את "הגורם בלתו אין" להתרחשות האסון, בנוסף לגורמים אחרים שיפורטו בהמשך פסק</u> |
| 4 | | <u>הדין.</u> |
| 5 | | |
| 6 | | <u>חובת זהירות קונקרטית, והפרתה ביחסים שבין המנוח לבין הנתבע 2 – אשר בן נעים</u> |
| 7 | | |
| 8 | .31 | במועד האירוע שימש בן נעים כמאבטחו של המנוח, ועבד בבזק מטעם לילית. |
| 9 | | |
| 10 | | בתצהירו חזר בן נעים וטען, כי אבטח את המנוח בהתאם לנהלים שהיו נהוגים באותה עת |
| 11 | | לילית, אולם כלל לא הוכח, שבמועד הרלבנטי היו איזשהם נוהלים בלילית, וממילא לא |
| 12 | | הומצאו לתיק בית המשפט. |
| 13 | | |
| 14 | | בתצהירו התעלם בן נעים מחלוקין מהסיבה, אשר בגינה הגיע עם המנוח לחנותו של ואיל, |
| 15 | | שם נרצח המנוח, ולמקרא התצהיר ניתן לחשוב בטעות שהגעתם של השניים לחנותו של |
| 16 | | ואיל ויציאתו של בן נעים מהרכב, נעשתה בהתאם לכללים כלשהם ולצרכי עבודה, ולא |
| 17 | | היא. |
| 18 | | |
| 19 | | זה המקום לציין, כי מחדלו של בן נעים באבטחת המנוח הינו חמור ביותר, למרות |
| 20 | | שהתנהלותו לאחר הרצח הייתה מקצועית מאוד, והוא אף זכה לציון לשבח על המרדף |
| 21 | | שניהל אחרי המחבל לאחר הרצח, מרדף שהביא לתפיסתו. |
| 22 | | |
| 23 | .32 | בחקירתו העלה בן נעים טענות לגבי רמת הכשרתו כמאבטח, אלא שכפי שהבהרתי, אין |
| 24 | | בדעתי לנסות ולהעריך את רמת הכשרתו, שכן לא הומצאה חוות דעת מומחה בעניין, ומכל |
| 25 | | מקום, כפי שיובהר בהמשך, לא רק שאין כל קשר סיבתי בין התאפשרות ביצוע הפיגוע לבין |
| 26 | | רמת הכשרתו של בן נעים כמאבטח, אלא שהתנהלותו המצויינת לאחר הרצח מעידה על |
| 27 | | היותו מאבטח מקצועי, שהיה כשיר לשמש כמאבטח. |
| 28 | | |
| 29 | .33 | השאלה המרכזית הנוגעת למעורבותו של בן נעים, הינה מה הייתה מטרת הגעתו עם המנוח |
| 30 | | לחנותו של ואיל. |
| 31 | | |
| 32 | | בן נעים נחקר במשטרת ישראל ביום האירוע, בתאריך 26.6.03, וטען, כי ואיל מטפל ברכבו |
| 33 | | מידי פעם ו"<b>והבוקר היה צריך להרכיב לי מגבר באוטו</b>" וכן ציין, כי "<b>ואיל התקשר אליי</b> |

P 1: 919



## בית המשפט המחוזי בתל אביב - יפו

### ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת בע"מ ואח'

1    אתמול בשעות הערב... ואמר לי שנפל עמוד בזק על יד ביתו ומבקש שאקדים את הטיפול
2    בעניינו...." (גליון 1 שורות 11-7).

3

4    מעדותו של בן נעים בבית המשפט עלה, כי בבוקר האירוע הוא החנה את רכבו מתחת
5    לסככת בחנותו של וואיל (סע' 382 שורה 29) והותירו שם, שכן וואיל לא פתח עדיין את
6    עסקו ולא נכח במקום בעת הבאת רכבו של בן נעים למקום, לצורך התקנת המגבר.

7

8    לאחר השארת הרכב אצל וואיל, עבר בן נעים לרכב הברלינגו של בזק, שהיה נהוג בידי
9    המנוח, והשניים החלו את יום עבודתם.

10

11   לדבריו, בערך בשעה 11:00 חזרו לחנותו של וואיל – שם חנה רכבו של בן נעים. בן נעים
12   העיד, כי כשהגיע לחנות, הוא ירד מרכב הברלינגו, עשה סריקה סביב רכב הברלינגו (עמ'
13   385) והחל ללכת לעבר החנות, אלא שאז הבחין בוואיל שהיה ברכב שחנה **"לפני הרכב**
14   **שעמדנו"** (עמ' 386 שורה 6). בעדותו טען בן נעים, כי מטרת הגעתם לחנותו של וואיל בשלב
15   זה הייתה כדי שיקח אותם למקום התקלה בעמוד בזק הסמוכה לביתו של וואיל על מנת
16   שיתקנו אותה. מכל מקום, בן נעים הודה בחקירתו, כי בזמן שדיבר עם וואיל היה למעשה
17   עם גבו לרכב הברלינגו, בו ישב המנוח ושוחח בטלפון (עמ' 392), למרות שלדבריו **"עשיתי**
18   **מבט מידי פעם, להסתכל ימינה, להסתכל שמאלה..."** (עמ' 392 שורה 14). בשלב זה
19   התקרב המפגע אל רכב הברלינגו וירה בראשו של המנוח  מבעד לשמשת הרכב שהייתה
20   סגורה.

21

22   אומר מיד, כי אינני מקבלת את גרסתו של בן נעים, וכי לעניות דעתי ולהתרשמותי מדובר
23   בגרסת בדים, שלא באה לעולם, אלא כדי להצדיק את הגעת בן נעים והמנוח לחנותו של
24   וואיל, ואבהיר.

25

26   כפי שציינתי, ממקרא תצהירו של בן נעים עולה, כי בבוקר האירוע השאיר בן נעים את רכבו
27   בחנות של וואיל, אולם הוא מספק בתצהיר כל הסבר לסיבת השארת הרכב בחנות, כמו
28   גם לסיבת חזרת השניים לחנות במהלך הבוקר.

29

30   ממקרא עדותו של בן נעים במשטרה ומעדותו בבית המשפט, עולה תמונה שונה בתכלית
31   השינוי מהמצג התמים והסתמי לכאורה המופיע בתצהיר בן נעים.

32

33   מעדותו של בן נעים עולה, כי מטרת השארת מכוניתו אצל וואיל בבוקר האירוע הייתה
34   לצורך התקנת מגבר ברכבו.

P 1: 920



## בית המשפט המחוזי בתל אביב - יפו

ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

| | |
|---|---|
| 1 | |
| 2 | בן נעים טען, שערב לפני כן טלפן אליו ואיל ובקשו לזרז תיקון עמוד שנפל ליד ביתו. |
| 3 | |
| 4 | מטעמים השמורים עם בן נעים, הוא לא מצא לנכון לציין עובדות אלו בתצהירו, דבר הפוגם |
| 5 | קשות באמינותו ובנכונות גרסתו. |
| 6 | |
| 7 | בן נעים נדרש לשיחת הטלפון הלכאורית שנערכה ערב קודם לכן בינו לבין ואיל, אשר ביקש |
| 8 | ממנו לזרז תיקון העמוד שליד ביתו, אלא שגירסה זו הינה גירסה יחידה של בעל דין, ואין |
| 9 | לה אימות, ונוכח חוסר מהימנותו של בן נעים, הנני בדיעה, כי כפי שציינתי מדובר בגרסת |
| 10 | בדים. |
| 11 | |
| 12 | מעבר לצורך יצויין, כי בן נעים יכול היה להמציא פלט שיחות של הטלפון להוכחת קיומה |
| 13 | של השיחה האמורה, אולם הוא לא עשה כן. אין חולק, כי בבזק לא התקבלה תלונה על |
| 14 | נפילת העמוד בסמוך לביתו של ואיל, ולמעשה, כלל לא ידוע היכן ממוקם ביתו של ואיל. |
| 15 | ודוק : אם אכן נפל עמוד ליד ביתו של ואיל, יש להניח שבשלב כלשהו, לאחר הרצאת, הייתה |
| 16 | בזק מתקנת את אותו עמוד, אלא שלא הובאה כל אסמכתא לתיקונו של העמוד, ובן נעים |
| 17 | אף נמנע מהבאת ואיל לעדות, לטענתו, משום שדרש כסף עבור עדותו, וזה הרגע להפנות |
| 18 | פעם נוספת להלכות הידועות בדבר אי הבאת עד, מה עוד שבן נעים רשאי היה לבקש את |
| 19 | זימונו של ואיל על ידי בית המשפט, דבר שלא עשה. |
| 20 | |
| 21 | זאת ועוד. אין חולק, כי בן נעים שימש כמאבטח, והוא לא המציא הסבר מושכל, הכיצד פנה |
| 22 | לכאורה ואיל  דווקא למאבטח בבקשה לזרז תיקון עמוד בזק, והלא אין זה מתפקידו, כפי |
| 23 | שאישר בעדותו (עמ' 384), ודוק : כפי שציינתי, לא הוכח, כי ואיל דיווח לבזק על נפילתו |
| 24 | הלכאורית של העמוד, וממילא לא הוכח קיומה של פנייה כזו לבזק. |
| 25 | |
| 26 | עניין זה הינו מהותי, שכן לדברי בן נעים במשטרה ובעדותו, הוא התבקש על ידי ואיל |
| 27 | "לזרז" "ולהקדים" את תיקון העמוד, בקשה המעידה לכאורה על קיומו של דיווח בבזק על |
| 28 | נפילתו של העמוד האמור, דיווח שקיומו לא הוכח. |
| 29 | |
| 30 | בן נעים הודה בחקירתו, כי מטרת הגעתו עם המנוח לחנותו של ואיל הייתה גם לצורך |
| 31 | התקנת המגבר, אולם התעקש, כי ההגעה הייתה גם לצורך תיקון העמוד (עמ' 383), אלא |
| 32 | משקבעתי שכל עניין תיקון העמוד לא היה ולא נברא, הרי שברור, שמטרת הגעת השניים |
| 33 | לחנותו של ואיל במועד האמור, הייתה אך ורק לצורך הסדרת התקנת המגבר ברכבו של בן |
| 34 | נעים, אשר מטעמים השמורים עימו מצא לנכון להסדיר את ענייניו הפרטיים תוך כדי |