# EXHIBIT A.948

(6 of 8)



## בית המשפט המחוזי בתל אביב - יפו

**ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת בע"מ ואח'**

ובמהלך יום העבודה, ולא לאחריו, למרות שלפי דברי אוני דביר (עמ' 506), נהג בן נעים להגיע לבקעה אל גרבייה לצורך ענייניו הפרטיים גם לאחר שעות העבודה.

במהלך עדותו, תיאר בן נעים את אופן ירידתו מרכב הברלינגו ואת הסריקה שעשה לכאורה לאחר ירידתו, אולם, נוכח חוסר האמון שלי בעדותו של בן נעים, אינני מקבלת את גרסת ביצוע הסריקה, שמטרתה, כפי הנראה להוכיח, כי למרות שעסק באותה עת בענייניו הפרטיים, לא הזניח את חובותיו כמאבטח, מה עוד שלא בא זכרה בתצהירו. ודוק: אין חולק, כי כאשר שוחח בן נעים עם וואיל, הוא עמד עם גבו לרכב הברלינגו ולמנוח שישב בו. (עמ' 392), והרי הדעת נותנת שמאבטח היורד מהרכב ועושה סריקה, לא יעמוד בגבו אל המאובטח, וישוחח עם אחר!!

זה המקום לציין, כי במהלך עדותו של בן נעים הגיש בן נעים שרטוט של עסקו של וואיל, לרבות ציור מיקום הרכבים שהיו שם (נ/3), אולם התברר, כי שרטוט זה שונה בפרטים מהותיים משרטוט שעשה בן נעים במסגרת חקירתו במשטרה (ת/5), כאשר מהשרטוט המצוי בתיק המשטרה ברור, כי עדותו של בן נעים בתארו את מסלול הליכתו מרגע ירידתו מהברלינגו ועד הגיעו לוואיל שטיפל ברכינה ברכב אחר, היא עדות שאיננה אמת ואיננה אפשרית (עמ' 460 – 461), והנני בדעה ,כי מטרת הגעת השניים לחנותו של וואיל במהלך יום העבודה לא הייתה אלא לצורך הסדרת התקנת המגבר ברכבו של בן נעים ומסירת מפתחות הרכב לוואיל לצורך ביצוע ההתקנה האמורה (436-437), וכאמור, כל סיפור העמוד שנפל הוא סיפר בדים, שלא היה ולא נברא.

בן נעים טען בחקירתו, כי ראה את המחבל המפגע קודם להגעתו לחנותו של וואיל, ואף ראה אותו מתקרב לעבר החנות. אינני יודעת אם אכן ראה בן נעים את המחבל בשלבים מוקדמים אלו, אולם נוכח גילו הצעיר של המחבל (15.5) והעובדה שבקרבת מקום פסעה גם חבורת ילדים, הוא לא ייחס לו חשיבות ובוודאי שלא חשד בו שהוא מחבל, עובדה המקובלת עליי.

34. לסיכום, בשאלת מעורבותו של בן נעים באירוע נשוא כתב התביעה, אין מנוס מהמסקנה, כי התנהלותו של בן נעים הייתה גם היא "**הגורם בלתו אין**", אשר תרמה לאפשרות ביצוע הפיגוע.

בן נעים הוביל את המנוח לחנותו של וואיל לצרכיו הפרטיים, יצא מרכבו של המנוח ושוחח עם וואיל כשהוא בגבו אל המנוח, ועל כן לא יכול היה למנוע את היריות הקטלניות שגרמו למותו של המנוח.



**בית המשפט המחוזי בתל אביב - יפו**

**ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת בע"מ ואח'**

באשר לשאלה האם יכול היה וצריך היה בן נעים לצפות את העומד להתרחש, התשובה היא חיובית ולמעשה היא מתבקשת והוכחה בפועל, נוכח תיאור הסריקה שביצע לכאורה בן נעים ברדתו מרכב הברלינגו, קרי: בן נעים הוכיח בהתנהגותו, כפי שתיאר, שהוא יכול היה וצריך היה לצפות את האירוע, שהתרחש זמן קצר מאד לאחר רדתו מרכב הברלינגו.

כאמור, אינני מקבלת את התיאור האמור, אולם עצם העלאתו מצביע על הבנתו של בן נעים את המצב ואת הצורך להגן על הטכנאי מפני כל אירוע, אשר עלול לפגוע בו. בתיאור זה הפגין בן נעים מודעות לתפקידו כמאבטח, וניסה למזער את חלקו בהתרחשות האומללה שארעה לאחר מכן.

35. אינני יכולה שלא להתייחס לשאלה, מה היה קורה אילו לא היה בן נעים והמנוח מגיעים לחנותו של וואיל, ומה היה קורה אילו לא היה בן נעים יורד מהרכב, ומשוחח בעומדו בגבו למנוח.

מדובר בהיפותיזות, שאינני יכולה להשיב עליהן. העובדות הן שהמנוח ובן נעים הגיעו לחנותו של וואיל ביוזמתו של בן נעים, ובן נעים עסק בחנות בענייניו הפרטיים, תוך הפניית גבו למנוח.

התנהלות זו מביאה למסקנה, כי בין בן נעים למנוח קיימת חובת זהירות קונקרטית, וכי זו הופרה על ידי בן נעים.

<u>**חובת הזהירות הקונקרטית והפרתה, ביחסים שבין לילית לבין המנוח**</u>

36. לילית הינה חברה בפירוק, וקיים לגביה צו עיכוב הליכים, אולם לא אעשה מלאכתי שלמה ללא הערכת חלקה של לילית באירוע, מה עוד שקיימת פוליסה המכסה את חבותה של לילית במועד האירוע.

הובהר, כי בן נעים הועסק כמאבטח בבזק מטעם לילית, ולדבריו הוכשר לתפקידו על ידי לילית.

הנני בדיעה, כי תפקידה של לילית מוצה עם העברת המאבטח, שעבר אצלה הכשרה ,לעבודה בבזק.



**בית המשפט המחוזי בתל אביב - יפו**

**ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת בע"מ ואח'**

הוכח, כי מרגע העברת המאבטח לבזק, פעל המאבטח בהתאם להוראות בזק, ואינני רואה איך ניתן לקבוע קיומה של חובת זהירות קונקרטית ביחסים שבין המנוח לבין לילית. ודוק: אילו היה מוכח, כי לילית לא הכשירה את בן נעים כיאות וכי הכשרתו הייתה לקויה וכתוצאה מכך הוא לא ידע להגן על המאובטח בעת קרות האירוע, כי אז ניתן היה לקבוע קיומה של חובת זהירות קונקרטית והפרתה. אלא מאי? לא נפל כל דופי בהכשרתו של בן נעים, אשר אף זכה לציון לשבח על תגובתו המהירה עם הישמע היריות, ואשר על כן אין ללילית כל מעורבות ישירה, או עקיפה לאירוע, וממילא לא קמה חובת זהירות קונקרטית בינה לבין המנוח.

**<u>חובת זהירות קונקרטית והפרתה ביחסים שבין הרשות הפלשתינית והמועצה הפלשתינית לבין המנוח.</u>**

37. בתאריך 4.5.94, נחתם "**הסכם בדבר רצועת עזה ואיזור יריחו בין ממשלת מדינת ישראל לבין ארגון השחרור הפלשתיני**" (להלן: "**אש"פ**"), **הנציג של העם הפלשתיני** (להלן: "**הסכם עזה-יריחו**") (נספח ב' להודעת ב"כ התובעים בדבר הגשת כתבי אמנה).

ההסכם פורסם בכתבי אמנה 1067, כרך 32 והוא כולל את סעיף VI, שכותרתו "**הכוחות והאחריות של הרשות הפלשתינית**" המבהיר בסע' ג', כי הרשות הפלשתינית "**תהיה, בין היתר, בעלת כח לנסח קווי מדיניות, לפקח על יישומם, להעסיק סגל עובדים, להקים מחלקות, רשויות ומוסדות, לתבוע ולהיתבע ולכרות חוזים...**", קרי: בפנינו הודאת בעל דין בדבר כשרותה המשפטית של הרשות הפלשתינית (להלן: "**הרשות**") ובדבר היותה ישות משפטית, שניתן לתובענה ולקבל כנגדה פסק דין. ודוק: לא לי להגדיר את טיבה של הישות המשפטית המכונה "**הרשות הפלשתינית**", ודי לי בתעודת עובד ציבור שהוגשה, ועל פיה אין הרשות נהנית מחסינות משפטית.

ב"כ הרשות, עשה מאמצים גדולים מאוד לנסות ולגרור את בית המשפט לפולמוס פוליטי בדבר טיבה של הישות המשפטית, המכונה "**הרשות הפלשתינית**", בהגדירו אותה "**ישות מדינית זרה**" וככזו אינה כפופה לדין הישראלי בכלל, ולדיני הנזיקין בפרט. לדברי ב"כ הרשות "**אי אפשר להתעלם מהיסוד הבינלאומי של עובדת היותה של הרש"פ לא רק גוף זר ולא ישראלי, שלא חלים עליו הדין, או הנורמות הישראליים, אלא גם במעמד של הדין זר....**" וזאת הוא מסיק, בין היתר מהסכמי אוסלו, אשר על פי פרשנותו קבעו, כי הרש"פ הינה הריבון בשטחים, שאם לא כן, לדבריו "**מכח מה מייחסים התובעים רשלנות לנתבעת 8** (הרש"פ – ד.ג.) **כאשר לא מנעו פעולות טרור נגד אזרחי מדינת ישראל, אם לא מכח היותה ריבון בשטח?**" (סע' 3 לפתיח לסיכומי הרשות).



**בית המשפט המחוזי בתל אביב - יפו**

**ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת בע"מ ואח'**

לגופו של האירוע נשוא כתב התביעה נטען, כי לא הוכח קשר ישיר בין הרש"פ לבין האירוע נשוא כתב התביעה וכן הועלו טענות בדבר אי חוקיות תעודת שר החוץ, וכן טענות לגבי אי שפיטות ופורום בלתי נאות – טענות בהן התבקש בית המשפט שלא להכריע במסגרת תיק זה במסגרת סיכומי הרשות הפלשתינית.

38. בכתב התביעה ובסיכומים מייחסים התובעים לרש"פ את האחריות לביצוע הפיגוע, והם מבססים את עילת התביעה על ההתחייבויות שנטלה הרש"פ על עצמה במסגרת הסכם עזה-יריחו והסכם הביניים וכן על הוראות פקודת הנזיקין [נוסח חדש]. ודומני, כי ראש וראשונה מן הראוי להתייחס להסכמים אלו ולהבהירם באיצטלת התביעה דנן.

39. <u>הסכם עזה-יריחו והסכם הביניים</u> – כפי שציינתי, נחתם הסכם זה בתאריך 4.5.94 בקהיר, בין "**ממשלת ישראל**" לבין הארגון לשחרור פלשתין.

לאחר החתימה על ההסכם, נחקק <u>חוק יישום ההסכם בדבר רצועת עזה ויריחו (סמכויות שיפוט והוראות אחרות) (תיקוני חקיקה), התשנ"ה – 1944</u> (להלן: "**חוק יישום הסכם עזה-יריחו**").

בתאריך 28.9.95 נחתם בוושינגטון הסכם ביניים ישראלי – פלשתיני בדבר הגדה המערבית ורצועת עזה (להלן: "**הסכם הביניים**"), ובמסגרתו הוקמה ונוסדה המועצה הפלשתינית, אשר אליה אמורות היו להיות מועברות הסמכויות אשר הוקנו לרשות הפלשתינית בהתאם להסכם עזה-יריחו (פרק 1 סעיף 2 להסכם הביניים).

הסכם הביניים פורסם בכתבי אמנה 1071, כרך 33, ובעקבותיו חוקק <u>חוק יישום הסכם הביניים בדבר הגדה המערבית ורצועת עזה (סמכויות שיפוט והוראות שונות (תיקוני חקיקה) התשנ"ו – 1996 וחוק לתיקון ולהארכת תוקפן של תקנות שעת חירום (יהודה ושומרון – שיפוט בעבירות ועזרה משפטית), התשס"ז – 2007</u>, כאשר חלק מתיקוני החקיקה הוכנסו ישירות <u>לחוק הארכת תוקפן של תקנות שעת חירום (יהודה ושומרון וחבל עזה – שיפוט בעבירות ועזרה משפטית) תשכ"ז – 1967</u>, וכן פורסם מנשר מס' 7 בדבר יישום הסכם הביניים (יהודה ושומרון). במסגרת הסכם הביניים, העבירה ישראל למועצה את הסמכות והאחריות כמפורט בהסכם עצמו.



**בית המשפט המחוזי בתל אביב - יפו**

**ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת בע"מ ואח'**

"הסכם בדבר העברה מכינה של סמכויות ואחריות" נחתם בארז בתאריך 29.8.94 ופורסם בכתבי אמנה 1068 כרך 32, ובעקבותיו נחקק <u>חוק יישום הסכם העברה מכינה של סמכויות לרש"פ (תיקוני חקיקה והוראות שונות), התשנ"ה – 1995</u> (להלן: **הסכם ההעברה**").

.40 בסעי 18 (XVIII) להסכם עזה יריחו התחייבו שני הצדדים (הן מדינת ישראל והן הרשות הפלשתינית) לנקוט "**בכל האמצעים הנחוצים כדי למנוע מעשי טרור, פשע ועויינות המכוונים כנגד כל אחד מהם, נגד יחידים המצויים בסמכות הצד האחר ונגד רכושם וינקטו באמצעים משפטיים כנגד עבריינים. נוסף על כך, הצד הפלשתיני ינקוט בכל האמצעים הנחוצים כדי למנוע פעולות עוינות כאלה המכוונות כנגד ישובים, נגד התשתית המשרתת אותם ונגד איזור המתקנים הצבאיים, והצד הישראלי ינקוט בכל האמצעים הנחוצים כדי למנוע פעולות עויינות כאלה, אשר מקורן בישובים והמכוונת כנגד פלשתינים**".

התחייבות זו חוזרת על עצמה בסעי 15 להסכם הביניים, שכותרתו "**מניעת פעולות עוינות**".

הנה כי כן, אין ספק, כי בניגוד לטענת הרש"פ הפכו ההסכמים האמורים בין מדינת ישראל לבין הרש"פ לחלק מהמשפט הפנימי הישראלי, זאת בעקבות חקיקת החוקים האמורים, ואשר על כן אין כל מניעה משפטית, או אחרת להגיש תביעות אזרחיות – נזיקיות על סמך התחייבויותיה של הרש"פ באותם הסכמים.

ב"כ הרש"פ טוען, כי מטרתם של חוקי היישום האמורים הינם להתאים את החקיקה הישראלית להתחייבויות שנטלה על עצמה מדינת ישראל בהסכמים האמורים, והרי לא תתכן חקיקה ישראלית המעגנת את ההתחייבויות הרש"פ, אלא שבטענה זו צודקת הרש"פ באופן חלקי בלבד.

אין ספק, שמטרת חוקי היישום הינה לעגן בחוק הישראלי את ההתחייבויות שנטלה על עצמה מדינת ישראל כלפי הרשות הפלשתינית, אלא מאי? התחייבויות אלו לא באו לעולם בחלל ריק, אלא הן שאובות מהסכמים שהרש"פ חתומה עליהם, קרי: הרש"פ – כישות משפטית עצמאית התחייבה בחוזה כלפי מדינת ישראל ותושביה למנוע פעולות טרור. התחייבות זו, הבאה לידי ביטוי הן בהסכם עזה-יריחו והן בהסכם הביניים מהווה התחייבות ישירה כלפי אזרחי מדינת ישראל, ולחילופין מהווה חוזה לטובת צד ג' – הם אזרחי מדינת ישראל. רוצה לומר: ההסתמכות על ההתחייבות של הרש"פ בהסכמים השונים, הינה מכח ההסכמה החוזית הישראלית והפלשתינית, כי מדובר בהסכמים מחייבים, וכי בהתאם לדיני החוזים, רשאי מי שנפגע כתוצאה מהפרת ההסכמים אלו,

**בית המשפט המחוזי בתל אביב - יפו**

**ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת בע"מ ואח'**

להגיש תביעות ולתבוע את נזקו. ודוק: סעי' 34 לחוק החוזים (חלק כללי) מכיר בזכותו של צד ג', זר לחוזה, לתבוע על פיו, כמי שהינו מוטב על פי אותו חוזה (ראו: ג' שלו "**דיני חוזים**", מהדורה שניה, התשנ"ה, 4319.

ב"כ הרש"פ טוען, כי במסגרת הסיכומים שהוגשו ברע"א 4060/03 **הרשות הפלשתינית ואח' נ' אליהו דיין ואח'** הסכים ב"כ היועץ המשפטי לממשלה, כי ההסכמים האמורים אינם מקימים עילות תביעה, אלא לצדדים החתומים עליהם, "**ואין אנשים, או גופים פרטיים, אשר אינם צד להם, זכאים לתבוע בגינם, אלא אם נאמר במפורש אחרת בהסכמים המדיניים עצמם**" אלא מאי? ב"כ הרש"פ לא צירף את עמדתו האמורה של היועץ המשפטי לממשלה לסיכומיו, ועיון בפסק דינו של בית המשפט העליון מגלה, כי בית המשפט העליון לא דן כלל בטענה, משום שלא הועלתה כלל בפני בית הערכאה המבררת (סעי' 7 לפסק הדין).

לגופם של דברים יובהר, כי בית המשפט אינו כפוף לעמדה כזו, או אחרת של היועץ המשפטי לממשלה, מה עוד שהאמירות לא הובאו לידיעתי, ואינני יודעת מהי עמדתו של היועץ המשפטי.

הנני בדיעה, כי מקריאת ההסכמים, ומכח הדברים העולה מהם, ניתן להגיע למסקנה, כי כוונת מנסחיו הייתה להקנות למוטבים על פיהם את הזכות לדרוש את קיום החיוב בהתאם לאמור בהסכמים וזאת הנני למדה, בין היתר מהמבוא להסכם עזה-יריחו, המאשר את זכותם של הצדדים להסכם "**לחיות בדו קיום של שלום, כבוד הדדי ובטחון...**". כבוד כולל את הזכות שלא להיפגע על ידי מעשי טרור, ואת הזכות לתבוע את בנזיקין בגין פגיעה כזו. ודוק: זכותה של מדינת ישראל לחיות בדו קיום של שלום, כבוד הדדי ובטחון, אינה אלא זכותם של תושביה ואזרחיה של מדינת ישראל, ומכל מקום לא הוכח אחרת.
הנני ערה לעובדה, שפרשנות ההסכמים בין מדינת ישראל לרש"פ לא עלתה כלל בדיוני בית המשפט, אלא משהסתמכה ב"כ התובעים על קיומם של ההסכמים, זכותה לפרשם על פי ראותה, ואם סברה הרש"פ, כי אין להסתמך על ההסכמים, או שיש לפרשם בדרך מסויימת, רשאית הייתה לטעון זאת ולהביא עדויות לאימות טענותיה, וזאת לא עשתה.

זאת ועוד. בסעי' ג' לסעי' 6 להסכם עזה-יריחו, מכריזה הרש"פ על זכותה לתבוע ולהיתבע. הרש"פ לא מצאה לנכון להגביל את זכות התביעה כנגדה, או את סוג העניין שבגינו ניתן לתבוע אותה, אלא הכריזה על קיומה של זכות לתבוע אותה. מהאמור עולה, כי הזכות לתבוע את הרש"פ נתונה הן למדינת ישראל והן ליחידיה המוצאים עצמם נפגעים כתוצאה מפעולת הרשות, מה עוד שמטרת ההסכמים הינה למסד "**דו קיום בשלום**". מושג זה כולל

**בית המשפט המחוזי בתל אביב - יפו**

**ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת בע"מ ואח'**

בחובו הן את זכותם של היחידים לחיות בשלום, והן את זכותם להגיש תביעות אם הופרה זכותם לחיות בשלום, שאם לא תאמר כן, מה משמעו של "**דו הקיום!**".

לנוכח כל האמור, הנני בדיעה, כי ההסכמים מקנים זכות תביעה בגין הפרתם הן למדינה והן ליחידיה, ואילו רצה מי מהצדדים למנוע את זכות התביעה ליחידי המדינה, היה מפרט זאת בהסכמים, דבר שלא נעשה כאמור.

מעבר לאמור, יש לזכור, כי עילת התביעה של התובעים כנגד הרש"פ הינה עילה נזיקית והסתמכותם על ההסכמים הינה הסתמכות לגיטימית במסגרת נסיונם להוכיח את חבותה של הרש"פ לפצותם בגין האירוע נשוא התובענה.

כפי שציינתי, הרש"פ הגדירה את עצמה בהסכמים כישות משפטית הרשאית לתבוע ולהיתבע. ללא קשר לעובדה, שהודאת בעל דין זו בדבר היות הרשות הפלשתינית ישות משפטית, לא ניתן להתעלם מהעובדה, שמדובר בישות משפטית, אשר לטענת התובעים גרמה בהתנהלותה לנזק נשוא כתב התביעה, והנני סבורה, שלעניין האחריות הנזיקית, דינה של הרש"פ זהה לדינה של כל ישות משפטית הנתבעת בגין עוולה אזרחית בתחום הנזיקי, ועל כן יובהר, כי עילת התביעה המצויה בידי התובעים אינה נובעת מהתחייבויות הרש"פ כפי שפורטו במסגרת ההסכמים, כי אם מעצם היותה ישות משפטית, אשר ביצעה עוולה בתחום הנזיקין ומשכך היא נתבעת לפצות את הנפגעים.

.41 התובעת טוענת, כי הרשות הפלשתינית והמועצה הפלשתינית "**לא רק שלא סיכלו טרור, אלא יזמו, הפעילו ומימנו טרור, בניגוד לאמנות הרלבנטיות**" (סע' 4 לסיכומי התובעים), ואילו הרש"פ והמועצה טוענות שאינן נושאות באחריות למעשיו של המחבל ואינן בגדר "**שולחת**" המחבל לביצוע הפיגוע נשוא כתב התביעה (עמ' 8 לסיכומי נתבעים 7,8).

אינני מקבלת את עמדת הרש"פ ואבהר.

המחבל – שאדי מוחמד חסאין גיוואדה – העיד בפני בית המשפט עדות מוקדמת בתאריך 12.7.09.

המחבל הודה הן בחקירתו במשטרה, והן בדיון שבפני, כי רצח את המנוח.

המחבל סיפר בהודעתו (שנלקחה ממנו בבית החולים בתאריך 2.7.03, ת/19), כי כחודשיים וחצי לפני הפיגוע החל ללמוד "**בקורס אימוני גוף ואימונים על נשק**" (גליון 2 שורות 7-8),



## בית המשפט המחוזי בתל אביב - יפו

**ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת בע"מ ואח'**

והבהיר, כי עשה כן ברשות הפלשתינית ביריחו. לדבריו, נמשך הקורס במשך 50 ימים, והסתיים כעשרה ימים לפני ביצוע הפיגוע (שם). המחבל תיאר בהודעתו כיצד החליט לרצוח יהודי, וכיצד מימש את רצונו, ובמענה לשאלה ענה, כי אינו משתייך "**לשום ארגון**" (גליון 5 שורה 10).

דומה, כי לאחר הודאתו של המחבל על פיה התאמן ברשות הפלשתינית, אין עוד ספק בשאלה זו. אלא מאי? בעת מתן עדותו בבית המשפט טען המחבל לראשונה, כי "**מה שאמרתי במשטרה זה לא נכון**" (עמ' 11 שורה 29) ולדבריו בבית המשפט, האימונים שעבר היו בג'נין, וכן "**אני עברתי אימונים על נשק בגדודי אל אקצע**" (עמ' 14 שורה 28), אולם לא היה בפיו כל הסבר לשינוי גרסתו דווקא בעת הזאת, בניגוד גמור לגירסתו הראשונית והבתולית בעת חקירתו בסמוך לאחר ביצוע הרצח, ועל כן יש רגליים לסברה, שהועלתה על ידי ב"כ התובעים ,לפיה מאן דהוא בכלא הינחה את המחבל לשנות את עדותו, כל מנת שלא לסבך את הרש"פ בתיק זה.

נוכח שינוי הגרסה הוכרז המחבל כעד עויין (עמ' 12) בלא שמי מהצדדים התנגד לכך, והוא נחקר בחקירה נגדית על ידי הצדדים.

הרש"פ טוענת בסיכומיה, כי דברי המחבל בהודעתו במשטרה, על פיהם עבר אימוני גוף ונשק "**ברשות הפלשתינית ביריחו**", אין בהם כדי להצביע שהמחבל עבר את האימונים ברשות הפלשתינית, אלא "**בתחומי**" הרשות הפלשתינית ביריחו, ולא מטעם הרשות הפלשתינית ביריחו.

הנני דוחה טענה זו מכל וכל. ראש וראשונה, לו סבר ב"כ הרש"פ, כי האמור בהודעת המחבל פורש, או תורגם בצורה שגוייה, כי אז רשאי היה להביא מומחה לבלשנות, אשר יבהיר את הטעון הבהרה. הימנעותו מלעשות כן פועלת לחובת הרש"פ.

זאת ועוד. מקריאת הודעת המחבל עולה, כי התכוון להבהיר שעבר אימוני גוף ונשק ברשות הפלשתינית ביריחו ולא "**בתחומי**" הרשות הפלשתינית ביריחו. זאת ניתן ללמוד מהמשך ההודעה, בה הסביר המחבל "**כי התאמנתי על נשק ביריחו...**" (גליון 2 שורה 14). קרי: כאשר התכוון המחבל לציין מיקום גיאוגרפי בלבד, הוא השתמש במילה "**יריחו**" בלבד, והמסקנה היא שכאשר טען שעבר אימוני גוף ונשק ברשות הפלשתינית ביריחו, התכוון בדיוק למה שאמר, כלומר, הוא השתתף במחנה אימונים מטעם הרשות הפלשתינית ביריחו.



## בית המשפט המחוזי בתל אביב - יפו

**ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת בע"מ ואח'**

כפי שציינתי, במועד ביצוע הפיגוע היה המחבל בן 15.5 שנים בלבד, ונראה, כי החליט לנצל עובדה זו לצורך ביסוס שינוי גרסתו, שכן לראשונה טען במפתיע, כי "**הרשות הפלשתינית היא לא נתנה לי לעבור אימונים, ואני כאשר יצאתי לאיזור יריחו, על מנת להתנדב למקום צבאי, והם לא הסכימו, סרבו, בגלל סיבה אחת, בגלל הגיל שלי**" (עמ' 14 שורות 17-18).

כפי שניתן לראות, קיימת התפתחות בגירסת המחבל, התפתחות, אשר מטרתה להרחיק את הרשות הפלשתינית מאחריות לרצח שביצע, שכן, בעוד שימים ספורים לאחר ביצוע הרצח הבהיר המחבל, כי התאמן "**ברשות הפלשתינית ביריחו**", הרי שבבית המשפט, כעבור שש שנים מהפיגוע, ידע לומר, כי יצא "**לאיזור יריחו**", והדברים מדברים בעד עצמם.

המחבל נשאל מדוע אמר לחוקר המשטרתי, שהתאמן ברשות הפלשתינית ביריחו, ועתה הוא טוען שהתאמן בג'נין בגדודי אל אקצה, ותשובתו הסתמית הייתה "**זה היו דברים של לפני 6,7 שנים, אני לא זוכר מה דיברתי בכלל. כאשר אני ביצעתי את הביצוע הייתי שייך לגדודי אל אקצה**" אלא מאי? כאשר נחקר המחבל בסמוך לאירוע, טען כזכור, כי אינו שייך לארגון כלשהו, וכאשר עומת עם דבריו, טען "**הם חקרו אותי ואני הייתי פגוע, עייף**" – אמירה שגם היא איננה אמת, שכן מקריאת ההודעה המשטרתית עולה, כי החוקר שאל לשלומו של המחבל לפני תחילת החקירה, ותשובתו הייתה "**השבח לאל אני מרגיש טוב... היחס טוב מאוד כאן, והרופאים והאחים והאחיות מתייחסים אליי בצורה טובה מאוד**" (גליון 1 שורות 14, 16).

הנה כי כן, אין ספק, כי דווקא התשובות שהשיב המחבל לחוקר המשטרה במסגרת ת/1, הן הן תשובות האמת, וכאמור, שינוי גרסתו נובע מרצונו להרחיק את הרש"פ מהאירוע נשוא כתב התביעה.

בהמשך עדותו של המחבל, ניכר היה שהולעט באינפורמציה, שמאן דהוא רצה להביאה בפני בית המשפט. כך למשל טען, כי "**אלה שבג'נין הם לא הכניסו אותם לרשות. אלה הם נלחמים עם ישראל. והרשות היא לא נלחמת. ג'נין לוקחים אנשים שרוצים לבצע פעולה... הרשות היא רוצה בטחון ושלום, אבן בג'נין רוצים כל אחד שהוא יכול לבצע איזה פעולה, שיתנו לו**" (עמ' 23 שורות 6-10).

במאמר מוסגר יצויין, כי המחבל טען בבית המשפט, שסיפר לחוקר המשטרה שאומן על ידי גדודי אל אקצה, אולם לא ידע להסביר את העובדה שמהודעתו, הנושאת את חתימתו, עולה, כי אומן ברשות הפלשתינית, ובבית המשפט הוא ניסה לתלות את אמירותיו בפני



## בית המשפט המחוזי בתל אביב - יפו

**ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת בע"מ ואח'**

החוקר במצבו הרפואי, אלא שהתיאור שנתן בבית המשפט (עמ' 16 שורות 14-25) אינו תואם את הצהרתו בפני החוקר בדבר הרגשתו הטובה במועד גביית ההודעה.

ב"כ התובעים טענה, כי שינוי גרסתו של המחבל בבית המשפט, לעומת דבריו בת/1 מהווים "**עדות כבושה**", והצדק עימה.

<u>**עדות כבושה**</u>

42. עדות כבושה הינה עדות, שהעד המוסר אותה בבית המשפט, "כבש" אותה בליבו על אף שהיא רלוונטית וברת משקל לעניין וגילה אותה בשלב מאוחר. כבישת העדות בהיעדר הסבר נאות, מעוררת חששות באשר לאמיתותה. "**הכלל הוא: עדות כבושה, ערכה ומשקלה מועטים ביותר, משום ש"הכובש עדותו" חשוד, מטבע הדברים, על אמיתותה. זאת, כל עוד אין בפיו הסבר משכנע: על שום מה נכבשה העדות עת רבה; ומדוע החליט העד לחשפה. ניתן הסבר מתקבל על הדעת ל"כבישת" העדות, רשאי בית המשפט ליתן בה אמון ולהעניק לה את המשקל הראייתי המתחייב בנסיבות**" ( ר: י' קדמי **על הראיות** חלק ראשון הדין בראי הפסיקה, מהדורה משולבת מעודכנת תשס"ד- 2003, ע"מ 441).

וכך באו הדברים לכלל ביטוי בהלכה פסוקה:

> **"הכלל החל לעניינה של עדות כבושה הינו כי ערכה ומשקלה הראייתי של זו מועטים בשל החשד המתעורר באופן טבעי באשר לאמיתותה. זאת, כל עוד אין בפי העד הסבר משכנע ומניח את הדעת לטעמים שבעטיים כבש עדותו (ראו: <u>ע"פ 5386/05</u> אלחורטי נ' מדינת ישראל ([פורסם בנבו], 18.5.06); <u>ע"פ 4297/98 הרשטיק נ' מדינת ישראל, פ"ד נד</u>(4) 673, 687 – 688 (2000); <u>ע"פ 3625/91</u> אור נ' מדינת ישראל ([פורסם בנבו], 9.6.93) פסקה 19 לפסק דינו של השופט לוין; <u>ע"פ 154/85 אברושמי נ' מדינת ישראל, פ"ד מא</u>(1) 387, 399 (1987)). משך הזמן שלאחריו תיחשב עדות לכבושה אינו נקבע בהתאם לאמת מידה ברורה ונוקשה, אלא הוא נקבע בכל מקרה בהתאם לנסיבותיו (<u>ע"פ 4223/07</u> פלוני נ' מדינת ישראל ([פורסם בנבו], 29.11.07); <u>ע"פ 1543/06</u> פלוני נ' מדינת ישראל ([פורסם בנבו], 11.6.07); <u>ע"פ 10189/02</u> פלוני נ' מדינת ישראל ([פורסם בנבו], 19.9.05) בפסקה 13; <u>ע"פ 5612/92</u>**



# בית המשפט המחוזי בתל אביב - יפו

**ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת בע"מ ואח'**

> מדינת ישראל נ' בארי, פ"ד מח(1) 302, 363 (1993) (להלן: **פרשת בארי). ... מרכז הכובד אינו מושם על משך השתיקה אלא על הסיבה בגינה בחר העד לצפון המידע שברשותו, כמו-גם על שינוי הנסיבות אשר הניעו לחשוף את המידע".** ( ר: סעיף 10 לע"פ 1645/08 פלוני נ' מ"י, טרם פורסם)

וראה גם:

> **"במקרה שלפניי, מתבקש בית המשפט להתחשב בעדות שנכבשה במשך תקופת זמן לא מבוטלת. לא בנקל יתחשב בית המשפט בעדות שכזו, לא כל שכן כאשר מדובר בעדות עליה נסמכת בקשה לעריכת משפט חוזר. ערכה הראייתי של עדות כבושה הינו מועט, זאת בשל החשד הטבעי המתעורר לגבי אמינותה. חשד זה כמובן יכול להיות מופרך, בהינתן סיבה משכנעת לכבישת העדות. (לעניין זה, ראו והשוו: עניין כהן, סעיף 11 לפסק דינה של השופטת ארבל; ע"פ 1645/08 פלוני נ' מדינת ישראל, סעיף 10 לפסק הדין והאסמכתאות המובאות בו, ([פורסם בנבו], 3.9.2009))."** (ר: מח ( משפט חוזר בימ"ש עליון) 7803/11 **האני חסון נ' מדינת ישראל**, טרם פורסם, סעיף 11 לפסק הדין) (וכן ראו: ע"פ 2014/94 **סאלח נ' מדינת ישראל**, פ"ד נ (2) 624, 629; ע"פ 5730/96 **גרציאני נ' מדינת ישראל**, פורסם בנבו; ע"פ 235/79 **אוחנה נ' מדינת ישראל**, פ"ד לד (1) 544, 546; ע"פ 6274/98 **פלוני נ' מדינת ישראל**, פ"ד נה (2) 293, 297; ע"פ 1258/03 **פלוני נ' מדינת ישראל**, פ"ד נח (6) 625, 638).

ויובהר, ההלכות לעניין עד שונה הן זהות הן במישור הפלילי והן במישור האזרחי.

אחת התוצאות הנובעות מהעלאת עדות כבושה, הינה הכרזתו של העד כעד עויין, כפי שנעשה בעניין אשר בפניי. ודוק: עד עויין הוא עד, אשר במהלך עדותו בבית המשפט מגלה עויינות כלפי הצד שקרא לו לעדות, או שקיימת סתירה בין דברי העד בבית המשפט לבין הרשום מפיו בהודעת חוץ שלו, בתצהיר, או בחוות דעת, ולענייננו – סתירה ברורה ומוחלטת בין אמירות, שאמר המחבל (ואישר על דוכן העדים את אמירתן) בהודעתו בפני המשטרה (ת/1) לאמירותיו בבית המשפט. ויובהר – כפי שקבעתי, אין לי כל ספק, כי הסתירה בין



## בית המשפט המחוזי בתל אביב - יפו

**ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת בע"מ ואח'**

דברי המחבל בת/1 לבין דבריו בבית המשפט נועדה להרחיק את הרש"פ מהאירוע נשוא כתב התביעה, אלא שנסיון זה לא צלח.

למרות שינוי הגרסה – שאינני מקבלת אותה – ניתן לצייר בבהירות את השתלשלות העניינים.
המחבל, קטין בן 15.5 רצה להיות חייל פלשתיני (עמ' 16 שורה 12), ובהתאם להודעתו במשטרה, אומן ביריחו על ידי הרשות הפלשתינית, לשאת נשק. אימון זה ארך לדבריו 50 ימים, ומיד לאחר מכן, עשרה ימים מתום האימון, נראה שבער בעצמותיו של המחבל הצורך להוציא לפועל את הידע שרכש במחנה האימונים של הרשות הפלשתינית, והשאר ידוע.

כפי שציינתי, הנני מעדיפה את הודעתו של המחבל במשטרה. מדובר בהודעה אוטנטית, אשר מאז נתינתה ועד לחקירתו של המחבל בבית המשפט, הוא לא מצא לנכון לשנותה ואין לי כל ספק, כי האמור בהודעה זו הינו האמת לאמיתה.

גרסת האימונים במסגרת גדודי אל אקצה **"נולדה"** לראשונה בבית המשפט, וניכר היה שהמחבל מדקלם גרסה, שאיננה גרסת אמת.

ב"כ הרש"פ טען, כי התביעה כולה כנגד הרש"פ מושתתת על הודעת המחבל, (ת/1) על פיה אומן על ידי הרשות הפלשתינית ביריחו, ובלשונו **"ברשות הפלשתינית ביריחו"**, אולם לדבריו הודעה זו איננה קבילה ואיננה יכולה לשמש ראיה לאמיתות תוכנה, אלא שאינני מקבלת את האמור.

ראש וראשונה יצויין, כי הודעת המחבל (ת/1) הוגשה בהסכמה וללא התנגדות, לאחר שהמחבל אישר את חתימתו על ההודאה, ולמעשה אישר בבית המשפט גם את אמיתות תוכנה, בהעידו על עצמו, שהוא **"פיקח ומבין"** (עמ' 24 שורה 13), ובתהותו **"בשביל מה לשאול את כל השאלות, אני הודיתי מזמן"** (עמ' 24 שורות 13-14), קרי: המחבל עצמו מפנה להודעתו ת/1, ומאשר למעשה את אמיתות תוכנה.

זאת, אף זאת. הודעת המחבל נגבתה ממנו סמוך מאוד לביצוע הפיגוע, ומקריאת החקירה עולה, כי המחבל נשאל שאלות **"פתוחות"**, כגון: **"האם אתה יכול לספר לי מה קרה בדיוק איתך?"** (גליון 2 ת/1 שורה 3), כאשר במענה לשאלה זו החל המחבל מספר את קורותיו, והוא עצמו בחר לספר מרצונו, ומבלי שהוצגה לו שאלה כלשהי בעניין אימוניו קודם לביצוע הרצח, על מחנה האימונים שעבר ברשות הפלשתינית ביריחו. אופן הצגת השאלה והתשובה הספונטנית מקנים להודעה במשטרה ערך ראייתי רב, ערך אשר אך עולה נוכח התנהגותו



## בית המשפט המחוזי בתל אביב - יפו

**ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת בע"מ ואח'**

ושקריו של המחבל בחקירתו בבית המשפט, כשש שנים לאחר מסירת הודעתו הראשונית באופן וולונטרי (לגבי ערכה של ההודעה, ראו: י' קדמי **"על הראיות, מהדורה מעודכנת ומשולבת 2009, 1818**). ודוק: ב"כ הרש"פ לא התנגד להגשת הודעתו של המחבל כראייה, הוא אף לא העלה כל הסתייגות בנוגע לתוכנה, ומשלא עשה כן במועד הגשתה, הוא לא יורשה לעשות כן בשלב הסיכומים, שכן אילו היה מעלה התנגדות להגשת הראיה, הייתה ההתנגדות נדונה ומוכרעת, אף בהתייחס לערכה הראייתי של ההודעה. דבר מאלו לא קרה. לא זו אף זו. משהוכרז המחבל כעד עויין, רשאי היה ב"כ הרש"פ לחקור אותו בחקירה נגדית, ולנסות להבהיר את שינוי הגרסאות המהותי בין ההודעה ת/1 בשאלת מיהות הגוף המאמן, לבין עדות המחבל בבית המשפט. ב"כ הרש"פ ויתר על חקירת המחבל ובחר שלא לחקור אותו כלל. וויתור זה אומר דרשני.

שינוי גרסתו של המחבל לא בא לידי ביטוי רק בשאלת מיהות הגוף המאמן, אלא גם בשאלת משך האימונים. בניגוד להודעה ת/1 טען המחבל בבית המשפט, כי התאמן בג'נין – ולא ביריחו, כפי שהבהיר בהודעתו - במשך יומיים בלבד, כל יום שעה, כלומר, הוא התאמן בסך הכל שעתיים לפני ביצוע הרצח. גם גירסה זו אינני מקבלת, וקובעת שהיא שקרית. המחבל נשאל מדוע סיפר בת/1, כי התאמן במשך 50 ימים, אולם הוא בחר להתחמק ממתן תשובה, באומרו **"אני לא הלכתי לאימונים בכלל, אמרו לי שאין לי תעודת זהות"** (עמ' 26 שורות 10-11), כלומר תשובה לשאלה –אין.

כדרכו של מי שאינו דובר אמת, הסתבך גם המחבל בדבריו. מחד גיסא חזר וטען, כי ענה לחוקר המשטרה תשובות אמת, לרבות בשאלת השתייכותו הארגונית (בת/1 טען שאינו שייך לשום ארגון), אולם מיד התחכם וטען, כי אמר לחוקר המשטרה שארגון אל אקצה **"עומד מאחורי הביצוע של הרצח שעשיתי"** ומיד הוסיף ביוזמתו ומבלי שנשאל **"החוקר היה מרוכז אם הרגתי, או לא ולמי אני שייך"** (עמ' 28 שורות 16-18), וכאמור, אין לי כל ספק שאמירותיו של המחבל בת/1 הינן אמירות אמת שנאמרו ללא כל הדרכה, או הכוונה, אמירות אמת של נער בן 15.5, שאינו מתוחכם, ומן הסתם אינו מעורה בתוצאות אמירותיו בהתייחס לרשות הפלשתינית.

אין ספק שבמהלך שנות כליאתו **"החכים"** המחבל, הבין את הנזק שנגרם לרש"פ בגין הודעתו בת/1, הודרך על ידי אסירים אחרים (עמ' 28), ועשה מאמץ גדול לתקן אמירות אלו, מאמץ שנדון לכשלון, שכן אין ספק כי מדובר בעדות שקר, והאמת היא שהמחבל אומן על ידי הרש"פ במחנה אימונים ביריחו, ממש כפי שטען מלכתחילה.



## בית המשפט המחוזי בתל אביב - יפו

**ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת בע"מ ואח'**

43. הרש"פ ניסתה להוכיח באמצעות עדים מטעמה, כי המחבל לא עבר קורס מטעמה במועד הרלבנטי, אלא שנסיון זה כשל.

ראשון העדים מטעם הרש"פ היה נעמן נעים פאנון (להלן: "**פאנון**"), המשמש כיועץ משפטי במודיעין הצבאי הפלשתיני (עמ' 64 שורה 7) מאז שנת 2009 (שם). מדבריו עלה, כי משנת 2000 עד שנת 2006 שימש כתובע בבתי דין של הרש"פ (עמ' 64 שורה 20) ומשנת 2006 עד שנת 2008 שימש כשופט בבית דין צבאי של הרש"פ (שם). עוד התברר כי בשנים שבהן שימש כתובע צבאי, הוא התגורר "**בין חברון לבית לחם**" (עמ' 65 שורה 2) ומאליה נשאלה השאלה מדוע הובא עד זה לעדות, כאשר בשנים הרלבנטיות לא היה לו כל קשר למחנות האימונים של הרש"פ, וממילא אינו מסוגל ליתן כל אינפורמציה לגביהם מידיעה אישית. התמיהה שבהבאתו לעדות גברה, כאשר התבררה זהותו של מפקד מנגנון הבטחון הפלשתיני, וכן התברר שמדובר באדם שהוא חי וקיים, והוא זה אשר יכול היה ליתן את העדות המוסמכת ביותר בנוגע לקיומם, או אי קיומם של מחנות אימונים של הרש"פ ביריחו בשנת 2003, וכן פרטים לגבי המתאמנים בהם (עמ' 65).

במאמר מוסגר יצויין, כי תמיהה זו "**הוסברה**" על ידי ב"כ הרש"פ בסיכומיו (סע' 73) ומפאת כבודו לא אתייחס "**להסבר**" זה, המופיע בסיכומים.

העד פאנון, שהינו עורך דין במקצועו, ניסה לתרץ את הבאתו לעדות בתיק זה, למרות שאין לו כל ידע בנושא השנוי במחלוקת, בהסבירו כי "**קשה למצוא בן אדם שיתן אינפורמציה על כל המקומות האלה** (מחנות האימונים שקיבלה הרש"פ – ד.ג.) **ושמות ממש מדוייקים**" (של מתאמנים – ד.ג.) (עמ' 65 שורה 25). ודוק: בית המשפט נתן מספר צווים המחייבים את הרש"פ לגלות פרטים בהתייחס למחנה האימונים ביריחו ולשמות המתאמנים במועד הרלבנטי, אולם הרש"פ לא המציאה את האינפורמציה האמורה, מבלי להעלות טעם של ממש להימנעותה מהיענות להוראות הצו, וכך נמנע מבית המשפט ללמוד מכלי ראשון, האם השתתף המחבל במחנה אימונים ביריחו מטעם הרש"פ בשנת 2003 – כפי שהודה בת/1, או שלא השתתף במחנות אלו, בהתאם לגירסתו המאוחרת, שהינה שקרית על פי קביעתי. מיותר לציין, כי הימנעות זו פועלת לחובת הרש"פ, וקרוב לוואי שאילו הייתה מומצאת האינפורמציה המבוקשת, היינו מגלים בין שמות המתאמנים גם את שמו של המחבל, ממש כפי שתיאר בת/1.

עו"ד פאנון אף הודה, כי אינו יודע מי היה אחראי על מחנות האימונים ביריחו בין השנים 2006-2000 (עמ' 66 שורות 1-2), והתברר, כי טענתו על פיה המחבל לא נטל חלק במחנה



**בית המשפט המחוזי בתל אביב - יפו**

**ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת בע"מ ואח'**

אימונים מטעם הרש"פ הסתמכה על "**שאלנו... בררנו...**" והוא הודה, כי אינו יודע מידיעה אישית האם המחבל התאמן במחנה של הרש"פ ביריחו אם לאו (עמ' 66 שורות 17-18).

עוד אישר עו"ד פאנון, כי הוא לא הגיע באופן אישי למחנה האימונים ביריחו ולא בדק את רישומי המחנה באופן אישי (עמ' 67 שורות 12-13), ולדבריו "**אני לא יכול לבדוק וללכת ולעבור על כל הרשימות**" (עמ' 68 שורה 14).

באשר לטענת המחבל בחקירתו בבית המשפט, על פיה לא התקבל למחנה האימונים ביריחו בשל גילו הצעיר, הודה עו"ד פאנון, כי אין ברשותו אישור של מנגנוני הבטחון הפלשתינים, על פיו הם אינם מקבלים לשורותיהם אנשים שגילם פחות מגיל 18 (עמ' 69 שורות 6-8), ובמענה לשאלת בית המשפט היכן ניתן לראות את רשימת המשתתפים במחנות אימונים של הרש"פ ביריחו מאפריל עד יוני 2003, הפתיע העד, באומרו "**על מנת שאת תוכלי להגיע לרשימה הזו, אנחנו צריכים לדעת איפה הוא התאמן, באיזה מקום ביריחו**" (עמ' 70 שורות 28-29) ואז התחוור, כי הרש"פ קיימה ביריחו מספר מחנות אימונים (עמ' 71 שורות 1-2).

44. נוכח חוסר התמצאותו הטוטאלי בנושאים העומדים על הפרק, הגישה הרש"פ תצהיר נוסף מטעמו של ג'ומעה חסין פריג' חמדאללה (להלן: "**חמדאללה**"), שהינו ראש רשות האימונים ברש"פ.

ניתן היה לסבור, כי חמדאללה הוא הוא העד שיוכל ליתן סוף סוף מענה לשאלת אימוניו של המחבל, אלא שפעם נוספת נכונה לנו אכזבה. התברר, כי חמדאללה התגורר בעזה מספטמבר 96 "**עד 2007 אחרי המהפכה של החמאס**" (עמ' 520 שורה 6), כלומר, במועד הרלבנטי, בשנת 2003, לא רק שלא היה ראש רשות האימונים, אלא ששהה בעזה, וממילא לא יכול היה להגיע לאיזור יריחו.

עוד עולה מדברי חמדאללה, כי עד שנת 2007 היה "**אלוף סמיה נאסר**" (עמ' 520 שורה 23) ראש רשות האימונים ברש"פ ועל כן, כבר עתה אין מנוס מהמסקנה, שהימנעותה של הרש"פ מהבאתו לעדות של האדם הרלבנטי, הינה הימנעות הפועלת לחובתה, ומקורה ברצונה של הרש"פ להסתיר את האמת מידיעת בית המשפט, אמת אשר כפי הנראה אינה נוחה לרש"פ.

במאמר מוסגר יצויין, כי חקירתו של חמדאללה נתקלה בקשיים עקב הימנעותו השיטתית ממתן תשובות ישירות לשאלות ברורות, ונסיון התחמקותו ממתן מענה (עמ' 522, שורות 31-32).



**בית המשפט המחוזי בתל אביב - יפו**

**ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת בע"מ ואח'**

בחקירתו הודה חמדאללה, כי בין השנים 2005-2000 היו לרש"פ מחנות אימונים "**רק ביריחו**" (עמ' 525 שורה 30), אולם לדבריו בין השנים 2002 ו- 2004 לא פעלו מחנות האימונים עקב ההתקפות הישראליות, לרבות במסגרת מבצע חומת מגן (עמ' 526 שורות 25-22, עמ' 527 שורות 19-16), אלא שהוא נאלץ להודות באי רצון גלוי, כי צה"ל לא נכנס למחנות האימונים במסגרת מבצע חומת מגן, "**אבל הוא היה בקירבת מקום, במחסום**" (עמ' 527).

בהמשך חקירתו של חמדאללה התברר, כי בין השנים 2004-2002 הוא לא היה כלל באיו"ש, אלא בעזה, ומעדותו עלה, כי בשנים אלו שהן השנים הרלבנטיות לענייננו – הוא היה בקשר טלפוני עם מנגנוני הבטחון ביריחו (עמ' 529 שורות 12-11) ולטענתו הוא יודע שבשנים הרלבנטיות לא התקיימו קורסים, שכן הוא נהג לתת אישור טלפוני לקיומו של הקורס, ובשנים אלו הוא לא התבקש לאשר קיומו של קורס. (עמ' 530).

45. לסיכום עדויותיהם של פאנון וחמדאללה, אין מנוס מהמסקנה, כי מדובר בעדויות שמרביתן המכריע הינו עדות שמועה, בבחינת חוסר ידיעה אישית. וליתר דיוק : אינני יכולה לקבל את טענתו של חמדאללה, לפיה לא התקיימו מחנות אימונים ביריחו בין השנים 2004-2002. ראש וראשונה, חמדאללה הודה, כי הוא לא נכח פיסית ביריחו בשנים האמורות, ועל כן כל מידע שבידו, אינו אלא עדות שמועה, שכן בהיעדרו מיריחו, אינו יכול לדעת באמת ובתמים האם התקיימו מחנות אימונים, אם לאו. לא זאת אף זאת. באם אכן הייתה החלטה שלא לקיים מחנות אימונים, או קורסים בין השנים 2004-2002, מחמת הפחד מתקיפה ישראלית, קרוב לוודאי שהיו מסמכים המאשרים זאת, אלא שמסמכים כאלו לא הומצאו וחשוב מכל, מבצע חומת מגן התקיים בין החודשים 5/02-3/02, (עובדה לה מסכים ב"כ הרש"פ בסעי 71 לסיכומיו) ועל כן דברי חמדאללה, לפיהם היה חשש לנוע בכבישים בשנים האמורות, לכאורה בשל מבצע חומת מגן אינם אמת, והם חסרי כל ערך.

אם אצרף לכך את עדותו האותנטית של המחבל בת/1, הרי שאין כל ספק, שהמחבל השתתף במחנה אימונים ביריחו מטעם הרשות הפלשתינית, וכל מאמציה של הרש"פ להסתיר את עובדת קיומו של מחנה האימונים ביריחו בעת הזאת והשתתפותו של המחבל במחנה, כשלו, **ועל כן הנני קובעת, כי המחבל אומן ברשות הפלשתינית במחנה אימונים ביריחו במשך 50 ימים, וכן הנני קובעת כי הוא סיים את אימוניו כעשרה ימים לפני ביצוע הרצח.**

46. זה המקום לציין, כי ב"כ הרש"פ עשה מאמץ לכל אורך הסיכומים שהוגשו על ידו "**להסביר**" אמירות כאלו ואחרות של עדיו, אלא ש"**הסברים**" אלו אינם, אלא עדות,



## בית המשפט המחוזי בתל אביב - יפו

**ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת בע"מ ואח'**

שמקומם היה בתצהירים, או במהלך שמיעת הראיות, ולא בסיכומים מפי ב"כ הרש"פ (ראו למשל סע' 71, 73 לסיכומים ועוד).

47. ב"כ הרש"פ יצא חוצץ כנגד טענתה של ב"כ התובעת, לפיה הרש"פ "**גייסה ואימנה את המחבל אשר רצח את המנוח**" (סע' 53 א' לכתב התביעה המתוקן), וכן כנגד האמור בסע' 53ב' לכתב התביעה המתוקן, לפיו "**הנתבעת אימנה והדריכה את המחבל לרצוח יהודים, באשר הם, בדם קר, ולדבריו, התובעים לא הרימו את הנטל המוטל עליהם להוכיח, כי המחבל אומן לרצוח יהודים בקורסים, או מחנות אימונים מטעם הרשות הפלשתינית**".

אין ספק, כי האמירות הללו בכתב התביעה ובסיכומים הן בוטות משהו, אולם אם נבור את המוץ מהתבן ונציג את העובדות כפשוטן, ללא כל פלפולים, הרי שלא יתכן ספק באשר לקיומו של קשר סיבתי עובדתי ומשפטי בין האימונים שניתנו למחבל על ידי הרשות הפלשתינית, לבין הרצח שביצע זמן קצר לאחר מכן, מיד בתום "**לימודיו**".

48. תיק זה הינו תיק סבוך ויוצא דופן מבחינה משפטית, והדיון בשאלת קיומו או אי קיומו של קשר סיבתי – עובדתי ומשפטי – בין מעשי, או מחדלי הרש"פ, לבין ביצוע הפיגוע, אינו בגדר דיון משפטי רגיל. מדובר במארג סבוך של עובדות, אשר חיבורם לכלל יצירה שלמה, יסייע בידי לפתור את שאלת הקשר הסיבתי.

49. על מנת לקבוע מסמרות בעניין קיומו, או אי קיומו של קשר סיבתי, יש לסקור ראש וראשונה את הלך הרוח הציבורי בקרב הציבור הפלשתיני בתקופה שקדמה לרצח המנוח. הלך הרוח הזה יסייע בידינו לנסות ולהבין, מה גורם לנער בן 15.5 לרצוח יהודי, רק בשל היותו יהודי (ראה ת/19), וכן יבהיר, כי דברי ב"כ התובעים בכתב התביעה, על פיהם הרש"פ "**גייסה ואימנה את המחבל, אשר רצח את המנוח**", לא רק שאינם מופרכים, אלא שהוכחו ברמת ההסתברות המקובלת במשפט האזרחי.

באשר לאמירה הנוספת של ב"כ התובעים, על פיה הרש"פ אימנה את המחבל לרצוח יהודים – מדובר במסקנה הסתברותית, אשר לעניות דעתי הוכחה גם היא ברמת ההסתברות הנדרשת במשפט האזרחי, ואבהיר.

את המסקנות בדבר הלך הרוח ברחוב הפלשתיני עובר לביצוע הרצח ניתן ללמוד מעדויותיהם של תת אלוף במיל קופרווסר (להלן: "**קופרווסר**") ודר' מנחם קליין.



## בית המשפט המחוזי בתל אביב - יפו

**ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת בע"מ ואח'**

בטרם אדון בעדויות אלו, יש להבהיר את מעמדה של תעודת עובד ציבור שהוגש על ידי קופרווסר.

ב"כ הרש"פ טוען, ובצדק, כי המסמך אשר הוגש על ידי קופרווסר אינו מהווה "**תעודת עובד ציבור**" כהגדרתה בסעי' 23 לפקודת הראיות, הקובעת: "**תעודת עובד הציבור תהא חתומה בידי עובד הציבור שעשה את הרישום, או את המעשה, או קיבל את הידיעה שנרשמה, ואם אין הוא עוד באותו שירות – בידי האחראי על היחידה שבה עבד**".

מדברי קופרווסר עולה, כי מיולי 2001 ועד יוני 2006 שימש כראש חטיבת המחקר באמ"ן, ובמסגרת תפקידו זה הכיר וקרא באופן אישי את כל מסמכי השלל שנתפסו על ידי צה"ל במסגרת מבצע חומת מגן, ואף היה מעורה בכתיבת הסקירות שצורפו לתעודת עובד הציבור, ופיקח על כתיבתן. אלא מאי? כיום אין הוא משמש עוד כראש חטיבת המחקר באמ"ן. אמנם, גם כיום הוא משמש בתפקיד ציבורי כמנהל הכללי של המשרד לנושאים אסטרטגיים (עמ' 312 שורה 21), אולם אין ספק, כי תעודת עובד הציבור (ת/9) לא ניתנה במעמדו כמנכ"ל המשרד לנושאים אסטרטגיים, ועל כן, ובהתאם לסעי' 23 לפקודת הראיות, הוא אינו בגדר "**עובד ציבור**" שרשאי היה להגיש את "**תעודת עובד ציבור**" שהוגשה באמצעותו.

נוכח האמור, הבהרתי במהלך הדיון, כי ההתייחסות לת/9 תהיה כאל חוות דעת ולא כאל תעודת עובד ציבור (עמ' 325 שורה 25), ואף אפשרתי לרש"פ להמציא חוות דעת נגדית, והיא עשתה כן, והגישה חוות דעת נגדית כתובה בידי דר' מנחם קליין, כמענה לחוות דעתו של קופרווסר.

מהאמור עולה, כי המסמך אשר הוגש על ידי קופרווסר הינו חוות דעת, עובדה שאף התקבלה כאמור על דעת הרש"פ, אשר הגישה חוות דעת נגדית.

היות וקבעתי כי ההתייחסות לת/9 תהיה כאל חוות דעת, שהוגשה מטעם התובעים, הרי שכל הכללים הראייתיים לבחינת חוות דעת יחולו על ת/9 ועל עדותו של קופרווסר, שהינו מומחה מטעם התובעים, ממש כפי שדר' קליין הינו המומחה הנגדי מטעם הנתבעים 7 ו- 8.

זאת ועוד, ב"כ הרש"פ טוען, כי ארבע הסקירות שצורפו לת/9 אינן אלא עדות מפי השמועה, ואין בהן כדי להעיד על אמיתות תוכנם, להבדיל מעצם קיומן, אלא שאינני מקבלת עמדה זו, ואבהיר עמדתי בהמשך.



# בית המשפט המחוזי בתל אביב - יפו

**ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת בע"מ ואח'**

ת/9 ועדותו של קופרווסר מבוססים על מסמכי שלל שנתפסו על ידי צה"ל במסגרת מבצע חומת מגן, ואשר אין כל ספק לגבי האותנטיות שלהם, כפי שאף הודה דר' קליין בחקירתו (עמ' 702) (למרות שב"כ הרש"פ ניסה לחלוק על כך, עמ' 322). הסקירות שצורפו לת/9, הן סקירות שנעשו בידי אנשי חטיבת המחקר באמ"ן בשנים הרלבנטיות, והן מבוססות על תוכנם של מסמכי השלל שנתפסו ותורגמו לעברית.

אין חולק, כי בתקופת תפיסת מסמכי השלל, תרגומם וכתיבת הסקירות על סמכם, היה קופרווסר ראש חטיבת מחקר באמ"ן, והיה ממונה על לימוד מסמכי השלל והסקת מסקנות העולות מהן, הן לצרכים צבאיים והן לצרכים מדיניים. ודוק: קופרווסר הבהיר בחקירתו, כי הסקירות שצורפו לת/9 מבוססות הן על מסמכי השלל שנתפסו במהלך מבצע חומת מגן, והן על מסמכים "**שנתפסו גם הם בהזדמנויות אחרות**" (עמ' 313 שורות 26-27), ואשר כפי שציין, אין כל מחלוקת באשר לאוטנטיות שלהם.

קופרווסר העיד, כי הוא מכיר את המסמכים באופן אישי (עמ' 313 שורות 28-30), שכן לאחר תפיסת המסמכים הם הובאו אליו פיסית והוא קרא אותם (עמ' 314 שורות 2-4). עוד העיד קופרווסר, כי היה מעורב בכתיבת הסקירות המצורפות לת/9 "**לא ברמת כותב**", אלא "**ברמת פיקוח**" (עמ' 314 שורות 16-21), וכן אישר, כי "**כן. כל דבר שיוצא מחטיבת המחקר מאושר על ידי ראש חטיבת המחקר**" (עמ' 314 שורה 27), וחזר והבהיר, כי הוא מכיר באופן אישי את מסמכי השלל (עמ' 316 שורה 14).

קופרווסר נחקר בשאלת תפקידה של חטיבת המחקר באמ"ן והבהיר "**תפקידי המרכזי, תפקידה המרכזי של חטיבת המחקר הוא להתריע ולמנוע מעשים הפוגעים בבטחונה של מדינת ישראל ואזרחיה...**" (עמ' 317 שורות 26-28).

בחקירתו הנגדית של קופרווסר על ידי ב"כ הרש"פ, נעשה מאמץ גדול להוכיח קיומה של עמדה אישית מגמתית של קופרווסר בשאלת פרשנות מסמכי השלל, כפי גם נטען בסיכומי הרש"פ.

קופרווסר העיד, כי על סמך מסמכי השלל נכתבו "**הרבה סקירות נוספות**" (עמ' 321 שורה 9) בנוסף לארבע הסקירות שצורפו לת/9, והבהיר, כי לא היה שותף להחלטה אילו סקירות לצרף לת/9 ואילו לא.

קופרווסר אישר בחקירתו, שאף אחד ממסמכי השלל שנתפסו אינו נוגע ספציפית לפיגוע נשוא כתב התביעה (עמ' 322 שורות 5-6), וכן אישר, כי לא תרגם את המסמכים לעברית



## בית המשפט המחוזי בתל אביב - יפו

**ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת בע"מ ואח'**

באופן אישי, ומעורבותו בכתיבת הסקירות הייתה ברמת הפיקוח (עמ' 323), דבר שהינו ברור, שכן הוא שימש במועדים הרלבנטיים כראש חטיבת המחקר באמ"ן והוא נעזר בעבודתו בצוות של אנשים נוספים.

ב"כ הרש"פ ניסה בכל מאודו להוכיח באמצעות חקירתו של קופרווסר, קיומם של חילוקי דעות בין האנשים השונים ששרתו בחטיבת המחקר באמ"ן, לגבי הפרשנות שיש ליתן למסמכים אלו, וכי העמדה המוצגת בסקירות שצורפו לת/9 איננה עמדה רשמית של אמ"ן, אלא שהוא כשל בכך, ועל פי התרשמותי, בהתבסס על עדותו האמינה של קופרווסר, מייצגות הסקירות שצורפו את עמדתה הרשמית של חטיבת המחקר באמ"ן, מה עוד שקופרווסר אישר באופן חד משמעי, כי העמדה המוצגת בסקירות, איננה עמדת המיעוט **"שהתקבלה"** (עמ' 325, שורות 1-2).

בעניין זה יובהר, כי לא הוכח קיומן של דעות סותרות באשר למשמעות שיש ליתן למסמכי השלל, אולם הנני מוכנה בהחלט לקבל את העובדה שהיו דעות שונות, וטוב שכך, שכן עצם העלאת הדעות השונות מצביע על חופש מחשבתי וסיעור מוחות של האנשים, שזהו בדיוק תפקידם. גם אם העמדה המוצגת בסקירות הינה **"עמדת מיעוט שהתקבלה"** (דברי ב"כ הרש"פ, עמ' 325 שורה 1), הרי שהמסקנה הינה, כי זו הפרשנות הסופית שניתנה למסמכי השלל, וכך התייחסו אליהם בעלי התפקידים, שהיו אמורים להגיע להכרעות והחלטות על סמכם.

בחוות דעתו הנגדית של דר' קליין, התרעם דר' קליין על אמירותיו של קופרווסר בחקירתו, וטען כי הסקירות שצורפו לת/9 אינן אלא **"פרשנות סובייקטיבית, אך מגמתית ומכוונת מלמעלה, או כלפי מעלה, והדבר משול לאותו אדם היורה את החץ ולאחר מכן מסמן את המטרה"** (סע' 18 לחוות הדעת).

דר' קליין הסכים, כי העמדה המובאת בסקירות שצורפו לת/9 הינה העמדה הרשמית של אמ"ן, אולם לדבריו, עמדה זו לא התבססה בלעדית על חומר הגלם שעמד בפני חטיבת המחקר (מסמכי השלל), ומכל מקום, אינה מבוססת על **"מלוא חומר הגלם המודיעיני, שהיה בידי החטיבה באותה עת"** (סע' 19 לחוות הדעת).

דר' קליין הרחיק לכת, בקובעו כי **"חטיבת המחקר כשלה בעת שהוציאה סקירות אלו... כפי שעולה ממסמכי השלל, מדובר במסמכים נקודתיים, המתייחסים לפעולות ספציפיות במקום ובזמן נתון והם אינם מעידים על המכלול האסטרטגי. הסקירות בחרו להתייחס למסמכי שלל מסויימים בלבד ולא ליתר המסמכים, דבר המעלה את השאלה, האם יתר**



# בית המשפט המחוזי בתל אביב - יפו

**ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת בע"מ ואח'**

**מסמכי השלל תאמו את המסקנה אליה ביקשו כותבי הסקירות להגיע...."** (סע' 21 לחוות הדעת).

לכאורה, דברים כדורבנות, אולם אין בהם כל ממש, ואבאר.

מחקירתו של דר' קליין עלה, כי הוא שירת בחטיבת מחקר באמ"ן בשנות ה- 90 (עמ' 690) תחת פיקודו של המפקד דאז דר' אפרים לביא, אשר על פי חוות דעתו הינו מורו ורבו של דר' קליין, שכן מקריאת חוות דעתו של דר' קליין עולה, כי כל כולה מבוססת על מאמרים שנכתבו בידי דר' לביא ואח', ונשאלת השאלה, מדוע הוגשה חוות דעתו של דר' קליין דווקא, ולא חוות דעתו של דר' לביא, אשר כתביו ואמירותיו הן היסוד לאמירות והקביעות בחוות דעתו של דר' קליין, שאינה אלא סיכום שיחות שערך דר' קליין עם דר' לביא (סע' 2 לחוות הדעת) וסיכום מאמרים שפורסמו בנושא. ודוק: ספק בעיני האם ניתן להתייחס לחוות דעתו של דר' קליין כאל **"חוות דעת"**, שכן היא איננה כוללת קביעות ענייניות, הנובעות ממומחיותו בנושא, אלא מהווה צֶבֶר סיכומים של אמירות ודעות של אחרים, וככזו, הינה חסרת כל ערך ראייתי.

לגופה של **"חוות הדעת"**, דר' קליין הודה בחקירתו, כי אינו מומחה לטרור, כי אם מומחה לתחום הפלשתיני, **"לא לטרור במובן המבצעי שלו"** (עמ' 691 שורה 31).

דר' קליין הסביר, כי חוות דעתו כוללת שני חלקים. החלק הראשון הינו כל כולו **"עדות שמועה"**, **"מה ששמעתי מאל"מ דר' אפריים לביא, והחלק השני אילו הן המסקנות שאליהן הגעתי במחקרים האקדמיים שלי"** (עמ' 696 שורות 28-30), ובהמשך אישר פעם נוספת, כי חוות דעתו כולה מבוססת על דברי דר' לביא (עמ' 700 שורות 7-13), והמסקנה היא, שהדעות המובאות בחוות דעת זו, הן למעשה דעותיו של דר' לביא (שלא הובא לעדות) שאומצו במלואן על ידי דר' קליין.

דר' קליין אישר, כי קביעתו בחוות דעתו ממנה עולה, כי חטיבת המחקר באמ"ן נרתמה למסע הסברה, שבמסגרתו נכתבו הסקירות האמורות במטרה להתאימן ליעדי ההסברה של ממשלת ישראל, מבוססת **"על הדברים של דר' לביא"** (עמ' 703 שורה 5).

עוד טען דר' קליין בחוות דעתו, כי הדעות הבאות לידי ביטוי בסקירות שצורפו לת/9 אינן מבוססות על כלל מסמכי השלל, אלא על חלקם בלבד, אולם בהמשך התברר, כי מדובר באמירות חסרות כל בסיס, בבחינת השמצות שלא הוכחו, שכן דר' קליין אישר שדבריו



**בית המשפט המחוזי בתל אביב - יפו**

**ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת בע"מ ואח'**

מבוססים על דברי דר' לביא וכלשונו, **"את זה אומר אפריים לביא ואני מצטט מתוך הדברים שהוא כתב בבטאון חיל המודיעין, בבטאון מל"מ"** (עמ' 704 שורות 26-27).

הדעת נותנת, שאם סבר דר' קליין, כי הסקירות מבוססות על אותם מסמכי שלל, אשר "**נוח**" היה לחטיבת המחקר באמ"ן להשען עליהם, הרי שהיה טורח ומאמת את סברתו – או סברתו של דר' לביא – בדבר קיומם של מסמכי שלל נוספים, שלא הוזכרו בסקירות, ואשר תוכנם עשוי היה לשנות את המסקנות המובאות בסקירות שצורפו לת/9, אלא שבמהלך חקירתו של דר' קליין התברר, כי הוא עצמו לא ראה את אותם מסמכים מודיעיניים (עמ' 704 שורות 28-29), והבהיר פעם נוספת, כי הוא מסתמך על דעותיו של דר' לביא (עמ' 704 שורות 30-31), וכי "**יכול להיות**" (עמ' 705 שורות 16-18) שבסקירות, אשר צורפו בת/9 לא כתוב שהיו מסמכי שלל נוספים.

נוכח המחלוקת, שניסה דר' קליין לעורר בדבר קיומם, או אי קיומם של מסמכי שלל נוספים "**שהוסתרו**" בזמן כתיבת הסקירות הרלבנטיות, אך טבעי היה, שדר' קליין יבקש לראות בעצמו את מסמכי השלל, ויווכח בעצמו האם היו מסמכים נוספים אלא, שמחקירתו עלה, כי הוא לא ביקש כלל לראות את מסמכי השלל "**מפני שאני לא חוקר את הפעולות המבצעיות והשתלשלות האינתיפאדה ברמה הפרטנית מאוד של המבצעים**" (עמ' 705 שורות 24-29), והוא הבהיר, כי לא ראה לנכון לעיין במסמכים בעצמו, שכן "**הסתמכתי על דבריו, נסיונו של דר' לביא**" (עמ' 706 שורות 4-6), ובהמשך הוברר, כי הוא לא שוחח גם עם הכותבים הנוספים המצוטטים בחוות דעתו, והסתפק בציטוט הכתוב (עמ' 708), וכפי שציינתי, חוות דעתו של דר' קליין, אינה אלא עדות שמועה המתבססת על דעותיהם של אחרים, שלא הובאו לעדות, והינה חסרת כל ערך ראייתי.

במאמר מוסגר אציין, כי נוכח דברי דר' קליין בחוות דעתו, בדבר הקונספציה, שעמדה בבסיס הסקירות שצורפו לת/9 וכן סברתו, כי מדובר בפרשנות סובייקטיבית של כותבי הסקירות (סע' 17, 18 לחוות הדעת), אך טבעי היה, שדר' קליין יעניק למסמכים האמורים את הפרשנות הנכונה לפי דעתו, אלא שלמעט פסילת הפרשנות שניתנה למסמכי השלל במסגרת הסקירות האמורות, נמנע דר' קליין מלהאיר את עינינו באשר לפרשנות הנכונה לדעתו, שיש ליתן לאותם מסמכים, אולי משום שלא טרח לקרוא אותם מעולם, ואולי משום שלא ניתן ליתן להם פרשנות אחרת, או מכל סיבה אחרת.

כאשר נשאל דר' קליין בחקירתו מדוע לא מצא לנכון לפרש את המסמכים האמורים בצורה שונה, אם סבר שזוהי הדרך הנכונה לפרשם, השיב דר' קליין "**אני לא כותב עכשיו פרשנות אחרת, או חוות דעת, אני מתייחס למסמכים הללו כפי שהם. אני לא כותב את התיזה**



## בית המשפט המחוזי בתל אביב - יפו

**ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת בע"מ ואח'**

**הנגדית שלי כאן"** (עמ' 713 שורות 25-26), ודומני, כי הדברים מדברים בעד עצמם, ואינם זקוקים לפרשנות נוספים.

50. נוכח כל האמור, הנני קובעת, כי אין לייחס ערך ראייתי – משפטי כלשהו לחוות דעתו של דר' קליין, והנני מאמצת את חוות דעתו ועדותו של קופרווסר, אשר הרשים אותי בידענותו ובמקצועיותו.

51. ייחודה של חוות הדעת, שהוגשה על ידי קופרווסר, הינה התבססותה על מסמכים שצורפו אליה, מסמכי השלל, אשר אין כל מחלוקת באשר לאמיתותם והאותנטיות שלהם.

נסיונה של הרש"פ למזער את המסקנות העולות ממסמכי השלל, כשל. ממסמכי השלל עולה, כי במהלך האינתיפאדה השנייה שילבו הארגונים השונים ידיים במאמציהם לבצע פיגועים בישראל וכנגד ישראלים, וכן הוכח למעלה מכל ספק, כי הם עשו כן תחת פיקודו ופיקוחו הישיר של ראש הרש"פ – יאסר ערפאת, אשר הנחה אותם – ודאג לממן את פעולותיהם, לרבות אישור כספים למפגעים ולמשפחותיהם, ונקיבה בסכומים שיש ליתן להם.

עומק מעורבותו של ערפאת בפעילות הארגונים עולה בבירור מהמסמכים שצורפו, ויעידו המסמכים הרבים של הפניות ל**"האח הנשיא אבו עמאר ישמרהו האל"**, פניות הנוגעות לגיוס פעילים ומימונם, לרבות הבעת תודות על תשלום כספים על פי פניות הארגונים, וראו למשל את מסמך מס' 1 (עמ' 17 לת/8), שבו מתבקש ערפאת להקצות סיוע כספי למפקד התנזים בטול כרם וכן "לאח" המחבל זיאד מוחמד דעאס, שתכנן, בהתאם למסמך זה, את "פעולת ההרג בטקס בת המצווה בחדרה".

הנה כי כן, ועל מנת שלא אאריך יתר על המידה, עיון במסמכים שצורפו לסקירות, כמו גם בסקירות עצמם, מביא למסקנה אחת ויחידה, על פיה פעולותיהם של הארגונים השונים, לרבות התנזים וגדודי חללי אל אקצע, נעשו תחת ניצוחה ובמימונה של הרש"פ, ואשר על כן, גם אם הייתי מקבלת את גרסתו העכשווית של המחבל, על פיה ביצע את הפיגוע מטעם ארגון חללי אל אקצע, הרי שאין בכך כדי לשנות את חבותה הבסיסית של הרש"פ, בהיותה שותפה מלאה למתרחש בגדודי חללי אל אקצע, כפי שעולה ממסמכי השלל. ודוק: אינני מקבלת גרסה זו, והנני קובעת באופן שאינו משתמע לשתי פנים, כי המחבל הרוצח אומן בנשק על ידי הרשות הפלשתינית.



# בית המשפט המחוזי בתל אביב - יפו

**ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת בע"מ ואח'**

52. מחלוקת נוספת אשר נפלה בין התובעים לבין הרש"פ הינה בדבר ערכו הראייתי של דו"ח השר לשעבר דני נווה (להלן: **"דו"ח נווה"**).

התובעים ביקשו להביא את מר דני נווה לעדות, על מנת להגיש באמצעותו את הדו"ח (ת/8), אלא שסברתי, שהיות וגם דו"ח זה מבוסס על אותם מסמכי שלל אוטנטיים, שצורפו לת/9, אין מקום להטריחו, וכך, בהסכמת ב"כ הרש"פ הוגש הדו"ח וסומן ת/8, כאשר הובהר, כי הצדדים יהיו רשאים לטעון לגבי ערכו הראייתי – להבדיל מקבילותו – בסיכומיהם.

דברי ב"כ הרש"פ בסיכומיו, על פיהם נותר דו"ח נווה בתיק בית המשפט **"כמוצג"** (סע' 130 לסיכומים) אינם נכונים, ומטעים. עיון בפרוטוקול הדיון (עמ' 47) מלמד, כי ב"כ הרש"פ לא התנגד להגשתו וסימונו של הדו"ח כראייה, ואכן הדו"ח הוגש כאמור כראיה וסומן ת/8.

לגבי ערכו הראייתי של הדו"ח – קופרווסר העיד, כי דו"ח זה נכתב על ידי **"הצוות של דני נווה"** (עמ' 316 שורה 3), אולם הוא אישר, כי קרא אותו ומסכים לתוכנו, באשר הוא מבוסס על אותם מסמכי שלל, אשר אליהם התייחס קופרווסר עצמו, ועל כן, למרות שדני נווה לא העיד בפניי, הנני קובעת, כי נוכח הסתמכות דו"ח נווה על מסמכי השלל, הרי שמדובר בראייה כשרה ובעלת ערך גבוה, ולענייננו – בעלת משמעות מיוחדת, כפי שיבואר בהמשך, מה עוד שב"כ הרש"פ לא הצביע על סתירות הקיימות בין האמור בדו"ח לבין הכתוב במסמכי השלל.

53. ועתה, נחזור לשאלת הקשר הסיבתי, ונבחן אותה בראי התקופה בה נעשה הפיגוע.

מדובר במחבל, קטין בן 15.5 שנים, אשר רצה להיות חייל פלשתיני (עמ' 16 שורה 129. נשאלת השאלה, מה גורם לנער בן 15.5 לרצות להיות חייל, וחמור מכך, הכיצד הסכימה הרש"פ לאמנו, למרות גילו הצעיר.

מהודעת המחבל (ת/19) עולה, כי הוא התגורר ב**"כפר קטן נקרא ביר אלמקסור"** (גליון 1 שורה 19). עוד עולה מת/1, כי כפי הנראה הוא נפלט ממערכת החינוך, שכן במענה לשאלה **"מה אתה עושה"**, ענה **"עובד בחקלאות עם אבי ונוטע ירקות עם אבא שלי בדיר אלמקסור"** (גליון 1 שורות 19-20). עוד עלה מת/1, כי המחבל הינו בן בכור למשפחה המונה עוד שבעה ילדים (גליון 1 שורה 25).

**בית המשפט המחוזי בתל אביב - יפו**

**ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת בע"מ ואח'**

אין לי אינפורמציה לגבי מצבה הכלכלי של המשפחה, שהינה משפחה גדולה המונה עשר נפשות, אולם ברור, כי ההכנסות מהעבודה בחקלאות בדיר אל מקסור לא הספיקה לפרנסת המשפחה, שכן "**אבא שלי עובד בקטיף פירות בקיבוץ עוגן**" (גליון 1 שורות 25-26).

התמונה המצטיירת מדברי המחבל הינה, כי מדובר בנער שנפלט ממסגרת חינוכית, בן בכור למשפחה מרובת ילדים, אשר מצבה הכלכלי אינו מזהיר מן הסתם, ועל רקע זה, נקל להבין את הפנטזיה שלו, להיות חייל ובמילים אחרות, הוא רצה מן הסתם לעזוב את משפחתו ומצוקותיה.

כאמור, התקופה היא תקופת האינתיפאדה השנייה, כאשר קברניטי הרש"פ, לא רק שלא עשו כל מאמץ לסכל פיגועים, אלא עודדו את ביצועם, כפי שעולה בבירור ממסמכי השלל והסקירות שנכתבו בעקבותיהם (ת/9), ולתוך הואקום הזה נשאב הנער, אשר נוכח גילו הצעיר, לא ברורה מידת שיקול הדעת שהפעיל, אם בכלל, ויתכן, כי הפעיל שיקול דעת ובחר באופציה המפתה של השתייכות לשורות מנגנון הבטחון של הרש"פ.

כפי שציינתי, בשל נסיונה של הרש"פ להרחיק עצמה מהסכמתה לאמן את המחבל הקטין במחנה אימונים שקיימה ביריחו, ובהמשך לקביעתי החד משמעית, על פיה השתתף המחבל במחנה אימונים בן 50 ימים ביריחו, מטעם הרשות הפלשתינית, ממש כפי שהודה בהודעתו ת/1, הוסתרו מידיעת בית המשפט הפרטים הנוגעים לאימון המחבל, עובר לביצוע הרצח על ידו.

הסכמתה של הרש"פ לאמן קטינים ב"**אימוני גוף ונשק**" (ת/19) אף עולה בבירור ממסמכי השלל, שהרי בעבר עשתה כבר הרש"פ שימוש בקטינים לצורך הוצאת פיגועים כנגד מטרות ישראליות מהכח אל הפועל, ולאחר מכן, כפי שעולה ממסמכי השלל, היא מימנה אותם, או את משפחותיהם, הן במקרים בהם מצאו המגוייסים הקטינים את מותם כתוצאה ממעשיהם והן במקרים שהם נתפסו ונכלאו בבתי כלא בישראל.

כך למשל מקרהו של ג'מיל חמיד, נער בן 16 מבית לחם, אשר גוייס על ידי הפת"ח, למרות גילו הצעיר, ואולי בשל גילו הצעיר, ופוצץ עצמו בתאריך 31.3.02 בישוב אפרת. בפיגוע זה נפצעו שישה ישראליים.

כך למשל, עניינה של הנערה שירין רבוע, בת 15 שנים, אשר נעצרה לתחקור עם כניסת צה"ל לבית לחם, והודתה, כי גוייסה על ידי דודה, שהיה פעיל תנזים באזור, לצורך ביצוע פיגוע התאבדות בשטח ישראל. (ודוק: ממסמכי השלל עלה באופן חד משמעי קיומו של שיתוף

61 מתוך 90

P 1: 946



## בית המשפט המחוזי בתל אביב - יפו

**ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת בע"מ ואח'**

פעולה מלא בין הרש"פ, בראשותו של ערפאת, לבין ארגונים נוספים לרבות התנזים, גדודי חללי אל אקצה ועוד. (סקירה מס' 688/0032, העוסקת במיסוד המליציות המקומיות על ידי הנהגת אש"פ, על סמך מסמכי השלל, וכן דו"ח דני נווה ת/8, עמ' 4, המבוסס גם הוא על מסמכי השלל).

כך למשל מקרהו של הנער אנואר חמאד, בן 17 שנים מרפיח, אשר נשלח לבצע פיגוע התאבדות כנגד שיירת כלי רכב, אשר הסיעה חיילי צה"ל ברצועת עזה. התברר, כי הנער חסר השכלה ואינו יודע קרוא וכתוב, וטרם גיוסו לפת"ח עסק בשימוש וסחר בסמים. (ראו עמ' 42 לת/89).

משכך, נקל להבין את מסקנתו של דני נווה, על פיה **"יצויין, כי הרשות הפלשתינית איננה נאבקת בתופעה זו וממשיכה בעקביות להעלים עין מכך שהנערים והנערות הפלשתינים היו "לקורבן עצמי" של החברה הפלשתינית כולה"**, (עמ' 42 לת/8) ואף להצטרף אליה.

54. במקרה אשר בפניי לא הוכח, כי המחבל נשלח לביצוע הפיגוע הספציפי על ידי הרש"פ, בין היתר בשל הקושי לעשות כן נוכח התחמקותה השיטתית של הרש"פ מהמצאת מסמכים רלבנטיים. אלא מאי? משהביעה הרש"פ את נכונותה לאמן נער בן 15.5 בשימוש בנשק במשך 50 ימים (!!), הרי שברור שעודדה אותו, ליישם את המידע שצבר במשך לימודיו, ונוכח האווירה ששררה באותם ימים, ליבוי השנאה וההסתה כלפי ישראל וכלפי היהודים (ראו ת/8 עמ' 9), אך טבעי היה בעיני המחבל כי עליו לממש את הידיעות שצבר במחנה האימונים של הרש"פ בהפעלת נשק ברוח התקופה, קרי: בדרך של רצח יהודי. ודוק: ממסמכי השלל עולה, כי אין ספק באשר לעיסוקה המתמיד של הרש"פ בהטמעת האידיאולוגיה שעמדה מאחורי התפיסה האסטרטגית שלה, כי הטרור הוא לגיטימי להשגת היעד הלאומי הפלשתיני, ואין ספק, כי אידיאולוגיה זו חלחלה והוטמעה בקרב הצעירים, אשר ראו במימוש האידיאולוגיה משום מעשה נאצל ורצוי, מה עוד שהרשות טרחה להקנות להם את היידע המעשי בשימוש בנשק, כצעד ישיר כתוצאה מאותה אידיאולוגיה.

מסקנה זו הינה מסקנה מתבקשת, אף בראי מבחן השכל הישר. וכי מדוע הסכימה הרשות הפלשתינית לאמן נער בן 15.5 ולהקנות לו ידע בהפעלת כלי נשק, אם לא כדי לעודדו להשתמש בו? והרי ברור, כי הרשות לא עשתה כן כדי שישתמש בנשק כנגד בני עמו, ואם כך, מי היה מטרת היעד של הקניית הידע בשימוש בנשק לנער בן 15.5? דומה, שהתשובה ברורה מאליה.