# EXHIBIT A.948
## (7 of 8)



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

55. למען הסר ספק יובהר, כי לא הוכחו התכנים שהועברו לחניכים במחנה האימונים של
הרש"פ ביריחו, ועל כן איני יכולה לקבוע בוודאות, כי המחבל אומן על ידי הרש"פ **"לרצוח**
**בכלל ויהודים בפרט"** (סע' 91 לסיכומי הרש"פ), אולם, משהחליטה הרש"פ לאמן קטין בן
15.5 וללמדו את רזי השימוש בנשק, באווירה שהשררה ברש"פ באותה עת, בהתחשב
באינתיפאדה מחד גיסא ובמבצע חומת מגן מאידך גיסא, הרי שברור, שגם אם הדברים לא
נאמרו **"ברחל בתך הקטנה"**, הרי שהאווירה הכללית עודדה את חניכי המחנה לעשות
שימוש בידע שרכשו בתפעול כלי נשק, והיות וברור, כי איש לא ציפה שישימוש זה ייעשה
כנגד הפלשתינים, הרי שנותר מעט מאד דמיון באשר למסקנה המתבקשת – שימוש בנשק
כנגד יהודים.

זאת ועוד. סמיכות הזמנים שבין סיום **"לימודיו"** של המחבל במחנה האימונים לבין ביצוע
הרצח ( עשרה ימים), אך מחזקת את המסקנה, שנכונותה של הרש"פ לאמן בנשק קטין בן
15.5 הייתה לצורך מטרה מסויימת, מטרה שמומשה על ידי המחבל מיד עם סיום הכשרתו,
קרי: הוכח קיומו של קשר סיבתי ומשפטי בין האימונים שעבר המחבל במחנה
האימונים של הרש"פ ביריחו, לבין רצח ממונע. ודוק: אין לשכוח, כי הרש"פ – מטעמים
מובנים – נמנעה ממתן אינפורמציה כלשהי בהתייחס למחנה האימונים האמור, לרבות לא
לגבי עצם קיומו, או תכניו, והסתפקה בהכחשת קיומו. אלא מאי? הרש"פ לא סיפקה הסבר
כלשהו למניעיו של המחבל לומר בהודעתו במשטרה (ת/1) אמירות שלכאורה אינן אמת
מחד גיסא, ומאידך גיסא – הימנעותה השיטתית מהבאת עדים רלבנטיים לעדות ומהמצאת
מסמכים, אשר יכולים היו לתמוך בעמדתה הנטענת, מובילה למסקנה, כי דברי המחבל
בהתייחס לאימונים שעבר מטעם הרשות הפלשתינית במחנה האימונים ביריחו הינם אמת,
ובהמשך ישיר לאימונים אלו – בוצע הרצח נשוא כתב התביעה.

56. ב"כ הרש"פ טען בסיכומיו, כי התובעים **"לא הוכיחו"** את טענותיהם בדבר אימונו של
המחבל במסגרת הרש"פ והסתתו לרצוח יהודים.

כגפי שהבהרתי, הנני בדעה, כי התובעים הרימו את הנטל המוטל עליהם, ועל מנת להבהיר
עמדתי, אחזור למושכלות ראשונים בדבר הטיית מאזן ההסתברות במשפט האזרחי, ויפים
לכך דברי המחבר י' קדמי **"על הראיות" עמ' 1548**, בהבהירו:

> "הטיית מאזן ההסתברות מאי משמע? הלכה למעשה, משמעותה
> של מידת ההוכחה האמורה היא: שלדעת בית המשפט – על בסיס
> העמדה שהוא נוקט באשר למהימנותן של הראיות שבאו בפניו,
> כמותן, דיותן והמשקל הראייתי, שיש להעניק להן – <u>גירסה אחת</u>

P 1: 948



בית המשפט המחוזי בתל אביב - יפו

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

| | |
|---|---|
| 1 | (באשר לעניין השנוי במחלוקת) מסתברת יותר ומתקבלת יותר על |
| 2 | הדעת מן הגרסה שכנגד. |
| 3 | |
| 4 | באורח ציורי, נוהגים לומר 'שדרושה רק הרמת נטל ההוכחה על |
| 5 | למעלה מ- 50% לשון אחר די לנושא בנטל השכנוע, שגרסתו |
| 6 | תשכנע את בית המשפט ב- 51%, מתוך ה- 100% המבטאים ודאות |
| 7 | מוחלטת, על מנת לצאת ידי חובתו; ואין נפקא מינה שנותרים 49% |
| 8 | של "אי ודאות". (ראו ע"א 6283/97 יאניקה אלכסנדרוב נ' מדינת |
| 9 | ישראל, פ"ד נב(3) 254; ע"א 1892/95 מוחמד קאסם אבו סעדה נ' |
| 10 | שירות בתי הסוהר — משטרת ישאל, פ"ד נא(2) 704). |
| 11 | |
| 12 | ובאשר להבחנה בין נטל השכנוע לבין נטל הבאת הראיות, נקבע: |
| 13 | |
| 14 | "'נטל השכנוע' הוא נטל ראייתי מהותי שהוא חלק מדיני הראיות. |
| 15 | נטל זה הוא הנטל העיקרי המוטל על בעל-דין הנדרש להוכיח את |
| 16 | העובדות העומדות ביסוד טענותיו. אי-עמידה בנטל זה משמעותה |
| 17 | דחיית תביעתו של מי שהנטל מוטל עליו. 'נטל הבאת הראיות' הוא |
| 18 | נטל דיוני, הוא חלק מסדרי הדין. נטל זה הוא הנטל המוטל על בעל- |
| 19 | דין להביא את ראיותיו כדי לעמוד ב'נטל השכנוע' אם נטל זה מוטל |
| 20 | עליו, או כדי לשמוט את הבסיס מתחת לכוחן של טענות יריבו |
| 21 | וראיותיו. נטל זה הוא נטל משני, ועיקר קיומו הוא לצורכי הנטל |
| 22 | העיקרי. |
| 23 | רע"א 98 / 3646 כ.ו.ע. לבנין בע"מ נ' מנהל מס ערך מוסף, נז (4) 891, |
| 24 | בעמ' 897. (ראה גם : י. קדמי "על הראיות" (תשס"ד-2003) בעמ' |
| 25 | 1505-1508). |
| 26 | |
| 27 | "הקביעה מי מבעלי הדין נושא בנטל השכנוע נעשית על בסיסם של |
| 28 | שני כללים יסודיים: האחד – 'המוציא מחברו עליו הראיה' ; ויכול |
| 29 | שיהא זה התובע ויכול שיהא זה הנתבע, הכל לפי העניין. והשני – |
| 30 | 'דיני הראיות הולכים אחרי הדין המהותי'; הן לעניין הוכחת יסודות |
| 31 | העילה/ההגנה והן לעניין הפרכתן של חזקות." |
| 32 | י. קדמי "על הראיות" (תשס"ד-2003) בעמ' 1508. |
| 33 | |



## בית המשפט המחוזי בתל אביב - יפו

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

| | |
|---|---|
| 1 | באשר לכלל "המוציא מחברו עליו הראייה", נקבע <u>בע"א 357/72</u>, שנסי עזיז נ' סוראיה בצלציוני, |
| 2 | |
| 3 | (פ"מ כז(1), 741) בעמ' 744 : |
| 4 | |
| 5 | |
| 6 | "חובת שכנוע זו נובעת מהעקרון היסודי בדיני ראיות, לפיו בעל-דין |
| 7 | במשפט אזרחי, הטוען טענה חשובה לעמדתו המשפטית, נושא בנטל |
| 8 | השכנוע להוכחת העובדות הנחוצות לביסוס טענתו" |
| 9 | |
| 10 | (ראה גם : י. קדמי **על הראיות** (תשס"ד-2003) בעמ' 1515- 1508 ; א. |
| 11 | הרנון, **דיני ראיות** (הדפוס האקדמי, כרך א, תש"ל) 200 ; ע"א 88 / |
| 12 | 210 החברה להפצת פרי הארץ בע"מ נ' הוועדה המקומית לתכנון |
| 13 | ולבנייה, כפר-סבא מו (4) 627). |
| 14 | |
| 15 | ו<u>בע"א 642/61</u> **טפר נ' מכלה**, (פ"ד טז 1000) הובהר מפי השופט זוסמן : |
| 16 | |
| 17 | "תובע המביא דברו לפני בית-המשפט מבקש לזכות ביתרון או |
| 18 | בהנאה שנקבעו - לטובתו - בהלכה פלונית מהלכות המשפט |
| 19 | המהותי. תוצאה זו, הזכות שהתובע טוען לה, מותנית בכך שנתקיימו |
| 20 | העובדות המולידות את הזכות האמורה ('עילת התביעה'). |
| 21 | כיוצא בזה הנתבע המבקש לנקות את עצמו ומסתמך לשם כך על |
| 22 | הלכה אחרת הפוטרת אותו מחבות שנולדה. אם תופסת הלכת- |
| 23 | הפטור לטובת הנתבע, תלוי בכך אם נתקיימו עובדות אחרות ('עילת |
| 24 | ההגנה')". |
| 25 | |
| 26 | באשר לכלל על פיו "דיני הראיות הולכים אחרי הדין המהותי" נקבע : |
| 27 | |
| 28 | "הכל תלוי במשפט המהותי, כי דיני הראיות הולכים אחריו. פעמים |
| 29 | יש והמשפט המהותי תולה את הזכות שהתובע טוען לה בכך שלא |
| 30 | אירעה עובדה מפקיעה, ואם עשה כן - נטל השכנוע על התובע, ועליו |
| 31 | להוכיח שלא אירעה העובדה האמורה, אף על-פי - שלעניין זכות |
| 32 | אחרת - עובדה מפקעת היא". |
| 33 | ע"א 88 / 210 החברה להפצת פרי הארץ בע"מ נ' הוועדה המקומית |
| 34 | לתכנון ולבנייה, כפר-סבא מו (4), בעמ' 643. (ראה גם : י. קדמי **על** |
| 35 | **הראיות** (תשס"ד-2003) בעמ' 1516- 1537). |



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

| | |
|---|---|
| 1 | |
| 2 | ובאשר לעמידה, או אי עמידה בנטל השכנוע נקבע: |
| 3 | |
| 4 | "השאלה אם הרים בעל דין את נטל השכנוע המוטל עליו נבחנת |
| 5 | בתום הדיון כולו; ובית המשפט משיב לשאלה זו, על פי כלל הראיות |
| 6 | שבאו בפניו – ואין נפקא מינה מיהו בעל הדין שהביאן – ועל בסיס |
| 7 | הערכת מהימנותן של ראיות אלו וקביעת משקלן הראייתי." |
| 8 | (י. קדמי **על הראיות** (תשס"ד-2003) בעמ' 1537). |
| 9 | |
| 10 | "ואין צריך לומר, שחשיבותה המיוחדת של קביעת נטל השכנוע היא |
| 11 | בכך: שאם בסוף המשפט העריך השופט שההוכחות של הצדדים הן |
| 12 | שקולות ומאוזנות, כי אז יכריע את הדין לרעת הצד הנושא בנטל |
| 13 | השכנוע". |
| 14 | |
| 15 | ד"נ 4/69 **נוימן ואח' נ' כהן ואח'** פ"ד כד(2) 229, ע"א 8383/09 |
| 16 | **המועצה המקומית סאג'ור נ' סונול ישראל בע"מ** (פורסם בנבו |
| 17 | בתאריך 24.1.11). |
| 18 | |
| 19 | 57. ולענייננו – התובעים הביאו די והותר ראיות להוכחת הקשר הסיבתי הנסיבתי, העובדתי |
| 20 | והמשפטי בין התנהלות הרש"פ, הן במעשה והן במחדל, לבין ביצוע הפיגוע על ידי המחבל. |
| 21 | ודוק: אינני קובעת כעניין שבעובדה, כי הוכח שהרש"פ יזמה את הפיגוע הספציפי באופן |
| 22 | מעשי. הקביעה היא שנכונותה של הרש"פ ללמד נער בן 15.5 להשתמש בכלי נשק, על רקע |
| 23 | התקופה בה עשתה כן, יצרה אצל המחבל הצעיר הבנה, כי מצופה ממנו לעשות מעשה |
| 24 | ולממש את ידיעותיו בתחום תפעול כלי נשק. המחבל תרגם הבנה זו למעשה, וביצע את |
| 25 | המצופה ממנו, כפי שלמד במחנה האימונים של הרש"פ. כלומר: גם אם לא הוכח באופן |
| 26 | פוזיטיבי, כי הרשות כללה במסגרת הידע שהנחילה למתאמנים במחנותיה, הנחיות ברורות |
| 27 | לביצוע פיגועים כנגד מטרות ישראליות, הרי שעצם קיום המחנות ושיתוף נערים בלימוד |
| 28 | תיפעול כלי הנשק, כמוה כמתן הנחיות בפועל לביצוע פיגועים כאלו. |
| 29 | |
| 30 | ודוק: הרש"פ לא הרימה את הנטל המשני המונח על כתפיה, ולא המציאה תיעוד, או עדויות |
| 31 | לגבי המתרחש במחנות האימונים שלה, ולייתר דיוק, לא המציאה ראיות, שיש בהן כדי |
| 32 | להוביל למסקנות שונות. |
| 33 | |

P 1: 951



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1    בנוסף, הרש"פ "עצמה עיניה" אל מול האפשרות שהחניך, שאותו אימנה, למרות גילו הצעיר
2    יממש את הידע, שהרשות טרחה לצייד אותו בו, ויבצע פיגוע טרור כנגד יהודי, וככלל,
3    הרש"פ לא הוכיחה, ואף לא ניסתה להוכיח מה עמד ביסוד הסכמתה להעניק לנער בן 15.5
4    אימוני נשק, לרבות המטרה שניסתה להשיג בהקניית ידע זה לנער בן 15.5.
5
6    התנהלות זו של הרש"פ מובילה למסקנה, כי בהחלטתה לאמן נער בן 15.5 וללמדו לאחוז
7    בנשק, היא מבינה את הסיכון הגלום בכך, וכפועל יוצא – היא מסכימה למימוש הסיכון,
8    ממש כפי שקרה בפועל.
9
10    הרש"פ לא עמדה בנטל המשני המוטל עליה לשמוט את הבסיס מתחת לראיות התובעים,
11    ובמאזן ההסתברות שוכנעתי, כי גרסת התובעים **"מסתברת יותר ומתקבלת יותר על הדעת**
12    **מהגרסה שכנגד"** (קדמי, שם).
13
14    ויובהר, כבר נקבע (בע"א 10078/03 **אורי שתיל ואח' נ' מדינת ישראל ואח'**, פורסם בנבו),
15    כי אין בנמצא בדיני הראיות כלל עקרוני השולל, או מקים אחריות, והקביעה בדבר קיומה
16    או אי קיומה של חובת זהירות קונקרטית נעשית על יסוד הנסיבות הקונקרטיות של כל
17    מקרה ומקרה, וכפי שהבהרתי, במקרה אשר בפני, בנסיבותיו הקונקרטיות הוכחה
18    אחריותה של הרש"פ לביצוע הפיגוע, וכן הוכחו עידד את ותמיכתה בביצוע פעולות טרור הן
19    במעשה והן במחדל. **ודוק: אין מנוס מהמסקנה, כי ביצוע הרצח בידי המחבל, אינו אלא**
20    **התממשות של סיכון שיצרה הרש"פ באמנה נער בן 15.5 לירות בנשק**, וכי אחריותה של
21    הרש"פ לאירוע הנזיקי ולתוצאתו הינה אחריות עיקרית ומכרעת, שכן אילו הייתה נמנעת
22    מללמד את המחבל להשתמש בנשק, קרוב לוודאי שהאירוע היה נמנע.
23
24    אין כל ספק, כי כאשר בחרה הרש"פ ללמד את הנער להשתמש בנזק, היא יכולה הייתה
25    וצריכה הייתה לצפות את אירוע הנזק, קרי: השימוש שיבחר הנער לעשות בכישוריו
26    החדשים.
27
28    .58    כפי שציינתי, ב"כ הרש"פ ניסה ללא לאות לגרור את בית המשפט, לאמירות פוליטיות,
29    ולהסיט את מרכז הכובד של הדיון בהתייחס לקיומה, או אי קיומה של רשלנות במעשי
30    הרש"פ לשאלות של ריבון זר ויישומו משפטית זרה, והמשיך לעשות כן אף בסיכומיו, בהגיעו
31    למסקנה מרחיקת הלכת, לפיה, אם **"תוטל על הנתבעת אחריות גורפת למעשי האלימות**
32    **שאראו במהלך האינתיפאדה – תתלווה לכך בהכרח אמירה מדינית המיוחסת למדינת**
33    **ישראל, לאמירה זו תהיה מצידה השלכה ישירה ומיידית על עתידו של התהליך המדיני**
34    **בפרט ועל היחסים בין העמים בפרט"** (סעי' 147 לסיכומי הנתבעת).



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 1047‑04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1
2    עוד טוען ב"כ ברש"פ במשתמע, כי מקורו של הפיגוע הינו **"בסכסוך בין עמים..."** (סע' 27
3    לסיכומים), אמירה אומללה, שיש להצר עליה. האם הכשרת נער בן 15.5 לשימוש בנשק
4    הינה תוצאה של סכסוך בין עמים? האם הפיגוע ורצח המנוח הינם תוצאה צפויה של סכסוך
5    בין עמים? האם קיומו של סכסוך בין העמים מכשיר ביצוע רצח כגון זה? האם זו עמדתה
6    של הרש"פ? ואם כן – לשם מה נדרש בית המשפט לשמוע ראיות באשר לאחריותה של
7    הרש"פ לביצוע הרצח?!
8
9    ב"כ הרש"פ חוזר על הדברים בסע' 148 לסיכומיו, באומרו, כי **"העובדה, כי הארוע נשוא**
10   **כתב התביעה הינו חלק בלתי נפרד מהסכסוך בין שני העמים הישראלי והפלשתיני,**
11   **מהווה שיקול מדיניות ראשון במעלה, שיש בו כדי למנוע קביעה בדבר קיומה של חובת**
12   **זהירות במקרה זה".** קראתי ונדהמתי. אם זו איננה הודאת בעל דין בדבר אחריות הרש"פ
13   לרצח, לא ברור לי מהי הודאת בעל דין.
14
15   ויובהר הבהר היטב. פסק דין זה ניתן על ידי כשופטת בית המשפט המחוזי בתל אביב. פסק
16   הדין ניתן לאחר שמיעת ראיות, ומבוסס כל כולו על הדין הנוהג במדינת ישראל.
17
18   כשופטת אין לי כל ענין להתערב בעניינים מדיניים, ואינני עושה כן. פסק הדין הינו תוצאה
19   משפטית של הליך משפטי שנוהל בפני כדין, לא יותר ולא פחות, ונסיונו של ב"כ הרש"פ
20   לייחס לקביעותי פגיעה **"ישירה ומיידית על עתידו של התהליך המדיני בפרט ועל היחסים**
21   **שבין העמים בפרט"** אינה, אלא נסיון להלך אימים על בית המשפט, ונסיון להניאו מליתן
22   פסק דין לחובת הרשות הפלשתינית, והנני מצרה מאוד על נסיון זה ועל התבטאויות אלו.
23
24   .59    בטרם סיום פרק זה בפסק הדין, הקובע הלכה למעשה את הקשר הסיבתי הנדרש בדין בין
25           התנהלות הרש"פ, במעשה ובמחדל, לבין ביצוע הרצח נשוא כתב התביעה, אדרש למספר
26           נושאים נוספים, אשר הועלו על ידי ב"כ הרש"פ בסיכומיו.
27
28   באשר לטענת אי השפיטות, שכן מדובר לכאורה בעניינים מדיניים – אינני רואה בטענה זו
29   כל ממש, וכל עניינה הוא לגרור את בית המשפט לדיונים בעניינים מדיניים, דבר שאינו
30   מתפקידו, וזו מסמכותו של בית המשפט.
31
32   למעלה מן הצורך אציין, כי כפי שקבעתי, עילת התביעה כנגד הרש"פ הינה מכח פקודת
33   הנזיקין, בהיותה ישות משפטית, שניתן לתבועה, בהתאם להצהרותיה היא.
34

P 1: 953



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת בע"מ ואח'

1  בהתייחס למעמדם של פסקי הדין הצבאיים – איני נדרשת להכרעה בעניין זה שכן ממילא
2  לא הסתמכתי בפסק דין זה על אותם פסקי דין.
3
4  בהתייחס לטענה, כי אין בסקירות (ת/9) התייחסות לאירוע נשוא כתב התביעה – אין כל
5  ספק שהצדק עם ב"כ הרש"פ. אלא מאי? הסקירות נועדו לתאר את הרקע, האווירה והלך
6  הרוח ברש"פ וברחוב הפלשתיני, רקע, שהינו הכרחי להבנת הסיטואציה, שהובילה לפיגוע
7  נשוא תיק זה.
8
9  הטענה בדבר אי חקיקת חוקים ברש"פ עקב ההסכמים שנחתמו עם ישראל – גם היא טענה
10 מוצדקת של הרש"פ, אלא שהיות ולא ייחסתי בפסק הדין כל ערך לשאלת חקיקתם, או אי
11 חקיקתם של החוקים, איני מוצאת לנכון להתייחס אליה כלל.
12
13 הטענה, כי לא הובאו ראיות להפצת כרוזים, שידורי תעמולה והפצת ספרים – טענה זו
14 נכונה בחלקה, שכן במסגרת מסמכי השלל שהוצגו בפני המשפט קיימים כרוזים.
15
16 באשר לשידורי תעמולה – בתיק זה לא נעשה ניסיון להוכיח את קיומם.
17
18 באשר להפצת ספרים אין לי כל מידע, וטענה זו לא הוכחה.
19
20 באשר להפרת חובה חקוקה בהתייחס <u>לחוק בדבר מניעתו וענישתו של הפשע השמדת עם,</u>
21 <u>תשי"ד – 1950</u> – חוק זה מגדיר בסע' 1 מה פירוש "**השמדת עם**" על פי חוק זה, והוא כולל
22 חמש אפשרויות חלופיות להחלתו, כאשר לצורך החלתו, יש להוכיח, כי מאן דהוא עשה
23 מעשה מסוים "**בכוונה להשמיד, השמדה גמורה או חלקית, קיבוץ לאומי, אתני, גזעי, או**
24 **דתי...**" (סע' 1 לחוק) – כוונה זו יש צורך להוכיח באמצעות ראיות, דבר שלא היה בעניין
25 אשר בפני.
26
27 לא זו אף זו, איני סבורה, כי חוק זה נועד לשימוש במסגרת המשפט האזרחי, אלא במסגרת
28 המשפט הפלילי, וזאת למדה אני משימושה במונח "**פשע**" – הגדרה הלקוחה מהמשפט
29 הפלילי, ממטרתו המוצהרת של החוק – ענישת הפושע. המשפט האזרחי אינו עוסק בענישה
30 ודיני הנזיקין – מטרתם לפצות בשל נזקים שנגרמו בעוולה, ובשום פנים ואופן אין מטרתם
31 להעניש את המעוול.
32
33 אחריות שילוחית – ההתייחסות לאחריות שילוחית עלתה לראשונה בסיכומי התובעים ולא
34 נדונה במסגרת שמיעת הראיות.



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1
2   מעבר לצורך אציין, כי גם אילו הייתה מועלית הטענה בדבר קיומה של אחריות שילוחית
3   לרש"פ, הרי שטענה זו הייתה נדחית, באשר נקבע קיומה של אחריות ישירה, בהתאם
4   למפורט בפסק דין זה.
5
6   עניין נוסף הדורש התייחסות הינו בקשת הנתבעים למחוק את סיכומי התשובה שהוגשו על
7   ידי ב"כ התובעים וזאת על סמך הנימוקים שפורטו בבקשות שהוגשו על ידם.
8
9   לא מצאתי לנכון להיעתר למבוקש, למרות שחלק מטענות הנתבעים נכונות. כך בהתייחס
10   לאורכם של סיכומי התשובה וכך בהתייחס לטענות בדבר הרחבת חזית אסורה.
11
12   יובהר, כי התובעים הונחו באשר לאורכם של סיכומי התשובה, וללא ספק התעלמו באופן
13   מהנחייה זו, מבלי שהיה בפיהם הסבר משכנע, או מניח את הדעת להתנהלותם. אלא מאי?
14   מחיקת סיכומי התשובה היה גורם בהכרח להארכת משך ניהול התובענה, שהוגשה בשנת
15   2004, וזאת לא יכולתי להתיר.
16
17   באשר להרחבת החזית הנטענת – גם טענה זו מוצדקת, אולם הקורא את פסק הדין לא
18   יתקשה להבחין בהתעלמותי מהטענות שהועלו בסיכומי התשובה בבחינת הרחבת חזית.
19
20   60.   טענה נוספת הדורשת התייחסות הינה טענת התובעים, לפיה יש להעביר את נטל הראיה
21   לרש"פ, מכח סע' 41 לפקודת הנזיקין.
22
23   סע' 41 לפקודת הנזיקין מונה שלושה תנאים מצטברים להחלתו :
24
25   <u>האחד</u> – לתובע לא הייתה ידיעה, או לא הייתה לו יכולת לדעת מה הן הנסיבות שהביאו
26   לאירוע הנזק.
27
28   <u>השניה</u> – הנזק נגרם על ידי נכס, שהיה בשליטתו המלאה של הנתבע.
29
30   <u>השלישי</u> – אירוע המקרה מתיישב יותר עם המסקנה, שהנתבע התרשל, מאשר עם המסקנה
31   שנקט זהירות סבירה.
32
33   כאמור, מדובר בתנאים מצטברים, ולעניות דעתי, לא כולם התקיימו במקרה אשר בפני.
34   במה דברים אמורים?

70 מתוך 90



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1
2   כמפורט בפסק הדין, אין ספק שהתנאי הראשון והתנאי השלישי התקיימו, אולם אין
3   באפשרותי לקבוע, כי במועד ביצוע הפיגוע היה המחבל בשליטתה המלאה של הרש"פ, אלא
4   אם כן כוללת "שליטה" זו גם הלך רוח שבו היה נתון המחבל במועד ביצוע הפיגוע, אלא
5   שאינני סבורה שכוונות המחוקק הייתה לכלול במבחן השליטה גם הלך רוח, אלא הכוונה
6   היא לשליטה ממשית ואקטיבית, ואשר על כן הנני דוחה את הטענה בדבר חלותו של סע' 41
7   לפקודת הראיות במקרה אשר בפניי.
8
61.   9   כפי שציינתי ופרטתי היטב בפסק הדין, הנני בדעה, כי התובעים הרימו את נטל ההוכחה
10   המוטל עליהם ברמת ההסתברות הנדרשת במשפט האזרחי, בשיעור של למעלה מ- 51%,
11   אולם הנני סבורה, כי מקרה זה מלמד, שיש ליתן את הדעת על הקושי המובנה שבהוכחת
12   חבות במקרים כגון דא, וביתר דיוק, להוכחת החבות של הרשות הפלשתינית והמועצה
13   הפלשתינית. במה דברים אמורים? מטבע ה הדברים, האינפורמציה הרלבנטית, אשר יש בה
14   כדי לסייע בהנעת למסקנות בדבר קיומה, או אי קיומה של חובת זהירות, והפרתה, מצויה
15   בידיעת הרש"פ, אשר נמצאה באופן שיטתי וגורף מהמצאת מסמכים, או אינפורמציה.
16   ההלכה היא, שהימנעות מהמצאת האמור פועלת לחובתו של הנמנע – הרשות הפלשתינית,
17   שכן חזקה היא שאילו היתה ממציאה את כל הנדרש ממנה, היו המסמכים והראיות
18   פועלים לחובתה.
19
20   ב"כ הרש"פ חזר הרבה מאוד פעמים בסיכומיו על הטענה, כי התובעים לא הוכיחו את
21   הטענה, על פיה הרש"פ אימנה את המחבל כדי להרוג יהודים, וכפי שביארתי בפסק דין זה,
22   עצם האימון על נער בן 15.5 להשתמש בנשק, בתקופה הרלבנטית, אינה אלא, לצורך הכנתו
23   של הנער לשימוש בנשק בפועל בהתאם **"להשכלה"** שרכש במחנה של הרשות הפלשתינית.
24   אין צורך באמירה ברורה ומפורשת מה אמור הנער לעשות עם **"ההשכלה"** שרכש במחנה
25   האימונים ברש"פ. בהתחשב בכל הרקע שפורט בפסק דין זה, ובמיוחד בהתחשב בעובדה
26   שהימים הם ימי האינתיפאדה השניה, ופיגועים קשים שבוצעו כנגד תושבי ישראל ואף גבו
27   קורבנות רבים בנפש, אין צורך באמירה ברורה, אם כי, אין לדעת האם לא נאמרו אמירות
28   ברורות במסגרת אותו מחנה אימונים, מקום שהרש"פ הכחישה  הן את עצם קיומו והן את
29   השתתפותו של המחבל במחנה בטענה, וממילא לא צירפה את **"תוכנית הלימודים"**, לה
30   נחשף המחבל במסגרת לימודיו במחנה האימונים מטעם הרש"פ.
31
32   הוכחת טענות התובעים אינה מלאכה קלה נוכח הימנעותה השיטתית של הרש"פ מהיענות
33   לצווי בית המשפט, והסתרת כל החומר הרלבנטי שיכול היה להטיל אור על המתרחש

P 1: 956



**בית המשפט המחוזי בתל אביב - יפו**

**ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת בע"מ ואח'**

1  באותם מחנות אימונים במועד הרלבנטי, הימנעות, אשר כפי שקבעתי, אין כל ספק שיש
2  לזוקפה לחובת הרש"פ.
3
4  ולמה הדבר דומה? לא אחת נקבע בפסקי דין בתחום הפלילי, כי חזקה על מי שנושא סכין,
5  שהוא מתכוון להשתמש בו, קרי: עצם נשיאת הסכין הוא סיכון, והשימוש בו הוא
6  התממשות הסיכון. כך במקרה אשר בפני. כוונת הרש"פ ללמד נער בן 15.5 את רזי הנזק
7  והשימוש בו הינה בגדר סיכון עצום שלקחה הרש"פ על עצמה, ועל כן לא ייפלא, שאותו נער
8  מימש את הסיכון והשתמש בנשק לרצח יהודי.
9
10  למה מכוונים דברי? יתכן, שבמקרים כאלו קיים קושי ראייתי מובנה להוכיח את
11  הקשר הסיבתי בין התנהלות של צד א' – במקרה שלנו, הרש"פ - לבין התנהגותו של צד ב' –
12  במקרה שלנו, המחבל, יש מקום לחשוב על הפעלת הדוקטרינה של סיבתיות עמומה (או
13  עמומות סיבתית) בדומה ובשונה – בשינויים המתבקשים, לדוקטרינה שנקבעה בדנ"א
14  4693/05 **בית החולים "כרמל" חיפה נ' עדן מלול** (פורסם בנבו). במה דברים אמורים?
15  בפרשת עדן מלול הראשונה (ע"א 7375/02) פסק בית המשפט, כי יש להכיר בחריג האחריות
16  היחסית במקרים של סיבתיות עמומה. אמנם פרשת עדן מלול הינה פרשה, אשר עובדותיה
17  שונות בתכלית מעובדות המקרה אשר בפני, שכן היא עוסקת בשאלת קיומו של קשר סיבתי
18  בין התנהלות רפואית לבין נזק שנגרם, כאשר קיים קושי להוכיח ברמת ההסתברות של
19  51% קיומו של קשר כזה.
20
21  במסגרת הדיון הנוסף (דנ"א 4693/05) בוטל פסק הדין שניתן בע"א 7375/02, והתקבלה
22  עמדתו של המשנה לנשיאה (כתוארו דאז) כב' השופט א' ריבלין, והנני בדיעה, כי יתכן
23  שעמדה זו אף נכונה לבחינת המקרה אשר בפני, ואבאר.
24
25  במסגרת הדיון הנוסף בפרשת עדן מלול סבר כב' השופט ריבלין, כי עד לאותו מועד
26  התמודדה הפסיקה עם העמימות הסיבתית, תוך קביעת העובדות במקרה הבודד המובא
27  בפני בית המשפט, ותוך חתירה להשגת צדק פרטני, ולשיטתו של השופט ריבלין, מן ראוי
28  להמיר את מבחן החריגה מכלל מאזן ההסתברויות לכלל של פיצוי לפי הסתברות בדרך
29  שאינה מצויה במישור של המקרה הבודד, כי אם במישור רחב יותר על ידי איתור הטייה
30  נשנית. לדעתו, תוצאה זו הינה הרע במיעוטו, בשל הסטייה ממבחן מאזן ההסתברויות.
31
32  השופט ריבלין דורש התקיימותם של ארבעה יסודות לצורך הפעלת הסטייה ממבחן מאזן
33  ההסתברויות:
34



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת בע"מ ואח'

| | |
|---|---|
| 1 | א. קיומו של מזיק. |
| 2 | ב. קיומה של קבוצת ניזוקים. |
| 3 | ג. סיכון חוזר ומשותף. |
| 4 | ד. הטייה עקבית בהחלת כלל מאזן ההסתברויות. |
| 5 | |
| 6 | לדברי השופט ריבלין, במקרים אלו, ובהם בלבד, ניתן יהיה לשיטתו לחרוג מן הכלל הרגיל |
| 7 | של מאזן ההסתברויות ולחייב בפיצוי גם את מי שהסיכוי לכך שגרם לנזק בהתרשלותו – |
| 8 | במעשה, או במחדל – נמוך למדי. |
| 9 | |
| 10 | אם אבחן את המקרה אשר בפני לאור המבחנים האמורים, אמצא, כי כל המרכיבים |
| 11 | האמורים מתקיימים במקרה אשר בפני. קרי: קיים מזיק – הרשות הפלשתינית, אשר |
| 12 | אימנה במשך 50 ימים נער בן 15.5 להשתמש בנשק. |
| 13 | |
| 14 | קיימת קבוצה של ניזוקים – כפי שפירטתי, הימים ימי האינתיפאדה השניה רוויית |
| 15 | הפיגועים והקורבנות בקרב אזרחי ישראל, כאשר ממסמכי השלל שהוצגו בפני עולה באופן |
| 16 | ברור ומפורש מעורבותה של הרש"פ במימון והוצאה לפועל של הפיגועים. |
| 17 | |
| 18 | סיכון חוזר ומשותף – מדובר בסיכון מובנה כתוצאה מהתנהלות הרש"פ, כפי שעולה |
| 19 | ממסמכי השלל, אשר אינם מותירים ספק באשר לאחריותה של הרש"פ לביצוע הפיגועים, |
| 20 | או חלקם. |
| 21 | |
| 22 | הטייה עקבית בהחלת מאזן ההסתברויות – לעניינו דעתי מדובר בתופעה – פיגועים כלפי |
| 23 | אזרחי ישראל – היוצרת **"הטייה נשנית"** בשל הקושי המובנה להוכיח בכל אחד מהמקרים |
| 24 | את אחריותו של הארגון, או של הגוף שאחראי לפיגוע ולתוצאתו. |
| 25 | |
| 26 | 62.   דברי באשר להיתכנות הפעלת דוקטרינה זו גם במקרים כגון המקרה נשוא פסק הדין, הינם |
| 27 | הגיגים שעלו על דעתי, לא נטענו על ידי בעלי הדין, וממילא אינני מכריעה בהם, אולם |
| 28 | סברתי, כי מן הראוי לשקול דוקטרינה זו במקרים כגון המקרה נשוא פסק הדין. ודוק: |
| 29 | הפעלת הדוקטרינה במקרה כזה עשויה לשרת הן את האינטרסים של התובעים, המוצאים |
| 30 | עצמם לעיתים מתקשים לעמוד ברף מאזן ההסתברויות, והן את האינטרסים של הנתבעים, |
| 31 | שיוכלו לטעון להפחתת הפיצויים  כאשר אין ודאות מלאה בהתייחס להוכחת חבותם, כמו |
| 32 | גם היעדר קביעה מפורשת בדבר אחריותם למעשה הנזיקי, אשר בגינו נתבעים פיצויים. |
| 33 | |



**בית המשפט המחוזי בתל אביב - יפו**

**ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'**

1  אמנם בפרשת עדן מלול נקבע, כי היתכנות ההזקקות למבחן ההטייה הנשנית הינו חריג
2  לכלל בדבר החובה להוכיח את התביעה על פי כלל מאזן ההסתברות, ומכל מקום, הוא
3  מופעל רק במקרים של טענה לקיומו של נזק במישור הרפואי, אולם כפי שהבהרתי, יש
4  לשקול הפעלת מבחן זה גם במקרים נוספים, כגון המקרה אשר בפני, מה עוד שמבחן
5  ההטייה הנשנית הינו חדש יחסית וטרם נבחן הלכה למעשה באופן שיטתי בפסיקת בתי
6  המשפט. (לדיון נרחב בקשיים המתעוררים בישום גורף של פתרונות יחסים, ראו י' גלעד
7  **"דוקטרינת הנזק הראייתי: האם הורם נטל השכנוע?** משפטים ל 317; י' גלעד **"תגובה:**
8  **הסדר חדש לדין ההתיישנות?,** משפטים לו (3) 855).
9
10  כפי שציינתי, מדובר ברעיון, אשר מן הראוי לעבדו ולשקול אותו, ומכל מקום, אינני מוצאת
11  לנכון להכריע בו, או ליישמו במסגרת המקרה אשר בפני, שכן כפי שקבעתי, במקרה אשר
12  בפני הוכחה התובענה בהתאם לכלל מאזן ההסתברות.
13
14  <u>התביעה כנגד הראל חברה לביטוח בע"מ</u>
15
16  .63  הראל חברה לביטוח בע"מ (להלן: **"הראל"**) הוציאה פוליסת ביטוח לחברות **"בזק"**
17  ו**"לילית"** (נספחים א', ו' לתצהיר גרמיזה).
18
19  באשר לפוליסה, שהוצאה ללילית – משקבעתי, כי לא קמה חובת אחריות קונקרטית
20  ללילית בגין האירוע נשוא כתב התביעה, הרי שיש לדחות את התובענה כנגד הראל בגין
21  הטענות שהועלו כנגד **"לילית"**, מה עוד שהפוליסה איננה רלבנטית למקרה אשר בפני,
22  באשר היא כוללת חריג ביחס לאירועי טרור.
23
24  ביחס לפוליסה שהוצאה לחברת בזק – מדובר בפוליסת חבות מעבידים שמספרה
25  61000043/02, אשר צורפה כנספח א' לתצהירו של גרמיזה (להלן: **"הפוליסה"**).
26
27  עיון בתנאי הפוליסה מגלה, כי היא כוללת **"חריג מלחמה, מלחמת אזרחים וטרור"** הקובע,
28  בין היתר: **"בניגוד לאמור בכל מקום אחר בפוליסה, או בכל תוספת לפוליסה,  מוסכם**
29  **ומוצהר בזאת, כי הפוליסה לא תכסה את המבוטח בגין:**
30  **... .2 כל מעשה טרור"**
31
32  **"מעשה טרור"** מוגדר בפוליסה: **"מעשה הכולל, אך לא מוגבל לשימוש בכח, אלימות...**
33  **חבלה, או כל שימוש באמצעי אחר על מנת לגרום במכוון, או שלא במכוון לנזק מכל סוג**



## בית המשפט המחוזי בתל אביב - יפו

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1   שהוא... על ידי אדם, קבוצה/ות בין אם הם פועלים לבדם, או בשם, או בקשר עם כל ארגון
2   שנוצר למטרות פוליטיות, דתיות, אידיאולוגיות, או מטרות דומות..."
3
4   גם בג'קטים של הפוליסות מוחרג באופן מפורש אירוע טרור (נספח א' – עמ' 1 -2 לרשימה,
5   וסע' 3.4 לג'קט; נספח ד' – עמ' 9 לרשימה, וסע' 1.3 לג'קט; נספח ו' – עמ' 3 לרשימה, וסע'
6   51.2 לג'קט.
7
8   מהאמור עולה, כי הפוליסה מחריגה במפורש ובאופן ברור את האירוע נשוא כתב התביעה,
9   שהינו ללא כל ספק אירוע טרור.
10
11   ב"כ התובעים ניסתה להוכיח במהלך שמיעת הראיות ואף טענה בסיכומיה, כי אין לקבל את
12   החרגת הטרור בפוליסה, ואין לפטור את הראל מכיסוי בגין הארוע נשוא כתב התביעה, שכן
13   חבותה של הראל נובעת מאחריותה חוזיקית של בזק בגין בגין התנהלותה ומחדליה, ולא בשל
14   אירוע הטרור, אלא שאיננו יכולה לקבל פרשנות זו. הפוליסה קובעת בלשון שאיננה
15   משתמעת לשתי פנים מכסה כל אירוע רשלני של בזק, אשר כתוצאה ממנו תחוייב
16   בזק בתשלום פיצוי לנפגעים, אלא מאי? התחייבות חוזית זו של הראל, כפי שבאה לידי
17   ביטוי בפוליסה איננה מוחלטת, אלא מסוייגת, ונקבע במפורש, כי היא לא  תחול במקרה
18   שהאירוע נשוא החיוב הוא אירוע טרור.
19
20   אין להבין מהאמור, כפי שמבקשת ב"כ התובעים לטעון, כי באם מתברר שאירוע הטרור
21   התאפשר, בין היתר, כתוצאה ממחדלי בזק, כי אז אין להפעיל את החריג. נהפוך הוא –
22   הפוליסה קובעת בבירור ובחדות, כי אם מדובר באירוע טרור, יחול החריג והראל לא
23   תחוייב לשלם בהתאם להתחייבויותיה בפוליסה.
24
25   בעניין זה יצויין, כי העד מר יורם זילברמן, שהינו סוכן ביטוח, נחקר בעיקר לגבי פוליסת
26   לילית, ולא דווקא בהתייחס לפוליסת בזק, ולא בכדי.
27
28   לילית הינה חברה בפירוק, ואיש מטעמה לא התייצב לדיון, ועל כן נוצר הרושם שיקל על
29   התובעים להוכיח מחדלים של הראל עובר להוצאת פוליסת הביטוח ללילית, באופן שיחייב
30   את הראל לשאת בחלקה של לילית לארוע נשוא כתב התביעה, אלא שנוכח קביעתי באשר
31   לדחיית התובענה כנגד לילית, אין בדעתי להידרש לנסיבות הוצאת פוליסת לילית, ואומר
32   רק, שלא הוכח בשום פנים ואופן שהכללת חריג הטרור בפוליסת לילית היה בניגוד לרצונה,
33   ו/או מתוך חוסר הבנתה של לילית למשמעות חריג זה.
34

P 1: 960



## בית המשפט המחוזי בתל אביב - יפו

### ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת בע"מ ואח'

1  באשר לפוליסת בזק - הראל הביאה לעדות מטעמה את מר אילן גרמיזה (להלן: **"גרמיזה"**)
2  שהינו מנהל מחלקת תביעות בהראל, והותיר עליי רושם מצויין. גרמיזה הגיע לבית המשפט
3  שני תצהירים, האחד – מתאריך 11.11.09, והשני - מתאריך 23.3.11.
4
5  ב"כ התובעים ניסתה ללא לאות להוכיח, כי הפוליסה לא שיקפה את ההסכמות בין בזק
6  והראל בנושא תוכן הפוליסות בכלל, וקיומו של חריג הטרור בפרט, זאת תוך הצגת שאלות
7  רבות באשר למשא ומתן שנערך בין בזק להראל עבור להפקת הפוליסה, אלא שמדובר היה
8  בחקירה מיותרת לחלוטין. במה דברים אמורים? פוליסת ביטוח הינה חוזה ככל חוזה
9  הנכרת בין הצדדים לו, והיא משקפת את כל ההסכמות אליהן הגיעו הצדדים לחוזה (ראו:
10  ע"א 4688/02 **חזי כהן נ' מגדל חברה לביטוח בע"מ**, פורסם בנבו), דהיינו – אם הפוליסה
11  כוללת חריג טרור, הרי שזו הייתה הסכמת הצדדים. ודוק: במקרה נשוא כתב התביעה אין
12  מדובר בפוליסה שהוצאה לאדם פרטי, הדיוט בענייניים משפטיים, אשר יתכן שלא הבין את
13  הכלול בה, או את המשמעות של חריג טרור. מיותר לציין, כי בזק הינה חברה גדולה הנעזרת
14  ביועצים משפטיים, ועל כן, אין מדובר "בהגנבת" חריג, שהיה הנעלם מעיני יועציה
15  המשפטיים של בזק.
16
17  מסקנה זו אף מחוייבת המציאות נוכח דבריו של גרמיזה בעדותו, כאשר הבהיר **"בפוליסות**
18  **של בזק, שנכתבו וצורפו לפה... זה פוליסות שנכתבו על ידי בזק/היועצים שלהם ולא על**
19  **ידי הראל. זה פוליסה שהם חלק ממכרז"** (עמ' 641 שורות 18-19). אמירה זו, אשר לא
20  נסתרה, משמיטה את הקרקע מתחת לטענות התובעים בשאלת ידיעת בזק בדבר החלת
21  חריג הטרור.
22
23  מעבר לצורך אציין, כי בהתאם להלכה הפסוקה, בעת פרשנות של חוזה  ביטוח, או חוזה
24  בכלל ניתן להיעזר בכלל בדבר העדפת פרשנות שהינה כנגד המנסח (ראו למשל **ע"א 5175/06**
25  **כלל חברה לביטוח בע"מ נ' שמעון אסרף**, פורסם בנבו; **ע"א 5775/02 נווה גן (א.כ.) בנייה**
26  **פיתוח והשקעות בע"מ נ' הפניקס הישראלי בע"מ**, פ"ד נח(2) 307; **ע"א 779/89 שלו נ'**
27  **סלע חברה לביטוח בע"מ**, פ"ד מח(1) 221). והנה, משהתברר, כי המנסחת היא למעשה בזק,
28  הרי שיש להפעיל את כלל הפרשנות הנ"ל כנגדה, ולקבוע, כי חריג הטרור הוכנס לפוליסה על
29  דעתה ועל פי רצונה.
30
31  מסקנה זו מקבלת משנה תוקף מהתנהלות בזק לאחר הארוע.  בהתאם לעדותו גרמיזה,
32  פנתה בזק להראל עם הגשת התובענה כנגדה לבית המשפט (עמ' 632 שורה 11) ונענתה
33  במכתב דחיה על סמך חריג הטרור, ולדבריו גרמיזה **"... בזק, אחרי שקיבלו את מכתב**
34  **התביעה** (צריך להיות: מכתב הדחיה – ד.ג.) **לא באו בהשגות כלשהם לגבי הדחיה, למרות**

P 1: 961



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1    שבמקרים שיש לנו איתם חילוקי דעות בעניינים אחרים, הם יודעים לבוא. יש להם יועץ
2    ביטוח אורי אורלנד שמייצג אותם והוא זה, שגם היה אחראי על כל המכרז וכל הניסוח של
3    **הפוליסות...**" (עמ' 634 שורות 23-27). עדות זו לא נסתרה ואמירות אלו רק מחזקות את
4    המסקנה, שחריג הטרור הוכנס לפוליסה על דעתה ועל פי רצונה של בזק.
5
6    ב"כ התובעים מפנה בסיכומיה לעובדה, שבתקופה שלאחר קרות הארוע נשוא כתב התביעה,
7    הוציאה הראל לבזק פוליסה הכוללת הרחבה המתייחסת לטרור (ת/20), וממנה ניתן ללמוד,
8    לדבריה, ששינוי הפוליסה על דרך הרחבתה והכללת אירועי טרור מלמדת, כי זו הייתה
9    כוונת בזק גם בתקופת הפוליסה הרלבנטית.
10
11    אינני יכולה לקבל טענה זו, שאינה אלא ספקולציה, שלא רק שלא הוכחה, אלא שהוכח
12    ההפך. העובדה שלאחר האירוע בחרה בזק להרחיב את הפוליסה ולבטל את חריג הטרור
13    מלמדת שבזק הפנימה את חלקה העולה מאירוע נשוא כתב התביעה, והסכימה להרחבת
14    הפוליסה וביטול חריג הטרור, מן הסתם כנגד הגדלת תשלומי הפרמיה, ובכל מקרה, אין
15    לראות בהתנהלות זו הוכחה לנטען על ידי ב"כ התובעים.
16
17    עוד טוענת ב"כ התובעים בסיכומיה (עמ' 24), כי בזק והראל עשו יד אחת כנגד התובעים
18    **"כאשר יותר מסביר הוא, כי השתיים סיכמו ביניהן, כי הראל תשפה את בזק בגין**
19    **הפיצויים שיושתו עליה בתביעה זו"**, טענה שעוררה תרעומת אצל ב"כ הראל (פסקה
20    אחרונה בפתיח לסיכומיו). פעם נוספת, מדובר בספקולציה שלא הוכחה, ואינני יכולה
21    להתייחס אליה.
22
23    ב"כ התובעים טוענת עוד, כי הפעלת חריג הטרור במקרה זה, מרוקנת למעשה את הפוליסה
24    מכל תוכן, אלא שמדובר בטענה תמוהה. ממקרא הפוליסה עולה, כי היא מכסה את כל
25    המקרים בהם תחוייב בזק לפצות צדדי ג' בשל התרשלותה, למעט מקרים הנובעים, בין
26    היתר, מאירועי טרור, כפי שארע במקרה זה. חריג זה אינו מרוקן את הפוליסה מתוכנה,
27    ואינו אלא ביטוי להסכמות הצדדים, מה עוד שלא הוכח אחרת.
28
29    נוכח האמור, נדחית בזאת התובענה כנגד הראל חברה לביטוח בע"מ.
30
31    <u>חלוקת החבות</u>
32
33    64.    כפי שקבעתי, הופרה חובת הזהירות הקונקרטית בין הנתבעים 1, 2, 3, 4, 5, 7 ו-8 לבין
34    המנוח.



## בית המשפט המחוזי בתל אביב - יפו

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1    בהתאם לקביעותי בדבר מעשיהם ומחדליהם של המעוולים השונים, אשר אפשרו במעשה,
2    בשתיקה, או במחדל את התרחשות הארוע הקשה, אשר במהלכו נורה ונהרג המנוח, הנני
3    מחלקת את החבות כדלקמן :
4
5    נתבעות 7 ו - 8 (הרשות הפלשתינית והמועצה הפלשתינית) נושאות באחריות בשיעור של
6    70% ביחד ולחוד להתרחשות האירוע.
7
8    נתבעים 1,2,3,4,5 נושאים באחריות בשיעור של 30% ביחד ולחוד להתרחשות האירוע.
9
10                                                                      <u>הנזק</u>
11
12 .65    התובעים עותרים לפיצוי בגין הפסדי המנוח **"בשנים האבודות"**, לרבות אובדן פנסיה,
13    אובדן קצבת זקנה, הפסד קרן השתלמות, רכב, הטבות, כאב וסבל וקיצור תוחלת חיים,
14    אובדן שירותי בן, עזרת צד ג', נסיעות מוגברות, אובדן השתכרות התובעת, הוצאות מצבה
15    ושבעה ופיצויים עונשיים כנגד נתבעים 7 ו – 8.
16
17 .66    <u>אובדן הכנסות המנוח **"בשנים אבודות"**</u> – בהתאם לתלושי המשכורת שהוגשו לבית
18    המשפט (נספח יג' לתצהירו של רונן מנטין) עמד שכר הממוצע ברוטו של המנוח על סך של
19    5,474 ₪ ובתוספת הפרשי הצמדה לתאריך היום – סך של 6,605 ₪.
20
21    ב"כ התובעים שירטטה בסיכומיה מסלול התקדמות ספקולטיבי של המנוח בבזק, אילו לא
22    היה נרצח, אולם אינני יכולה לקבל את טענותיה בעניין זה ואבאר.
23
24 .67    המנוח, בן 31 במותו, עבד בבזק 7 שנים כטכנאי, מתוכם עבד בבזק במשך 6 שנים מטעם
25    חברת השמת כח אדם – לילית – ובשנה האחרונה, השנה השביעית להעסקתו, התקבל לבזק
26    כעובד בזק ועובר להירצחו עבד בבזק כעובד בזק במשך 11 חודשים.
27
28    בנסיון להוכיח את מסלול קידומו של המנוח בבזק הביאה ב"כ התובעים לעדות מספר
29    עדים.
30
31    העדה הראשונה – גב' מלי יוסף – ראש צוות משאבי אנוש בבזק, הבהירה כי המנוח הועסק
32    בבזק במסגרת הסכם קיבוצי שנקרא "דור 2000" והיא הבהירה כי הוא לא היה חתום על
33    חוזה אישי.
34

P 1: 963



## בית המשפט המחוזי בתל אביב - יפו

ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1  גב' יוסף הבהירה בחקירתה, כי מדובר בהסכם קיבוצי אישי, וכן הבהירה, כי **"חשוב לי**
2  **לומר, שחברת בזק עברה הפרטה לאחרונה, צמצומים והתייעלות וגם עובדים טובים**
3  **נשלחו הביתה. אני לא יכולה להבטיח שהוא היה ממשיך להיות מועסק, מה גם שהיה**
4  **מועסק פחות משנה** (במועד הרצחו – ד.ג.)..." (עמ' 73 שורות 3-5) – עובדה שאושרה על ידי
5  אם המנוח שהעידה כי בעלה, שהיה ועבד בזק פוטר עקב צמצומים, למרות ש**"הוא היה**
6  **עובד מצויין"** (עמ' 33 שורה 21). זה המקום להבהיר, כי בהתאם לעדויות שנשמעו, לא נמצא
7  תיקו האישי של המנוח בבזק, ועל כן לא ניתן לדעת האם היו בנמצא הערכות לגבי תפקודו
8  המקצועי של המנוח.
9
10  אין ספק שיש לזקוף לחובת בזק את העלמו של התיק, מה עוד שהדעת נותנת, שהמנוח
11  נחשב לעובד מקצועי, שאם לא כן, לא הייתה בזק קולטת אותו ביולי 2002 כעובד בזק לאחר
12  שהועסק בבזק כשש שנים באמצעות חברת להשמת כח אדם (לילית) (עמ' 75 שורות 3-4).
13
14  העדה הסבירה, כי בהתאם להסכם הקיבוצי דור 2000, אליו השתייך המנוח, ניתן היה
15  לעבוד בבזק כעובד ארעי במשך 8 שנים, והיות שהמנוח החל את עבודתו בבזק כעובד ארעי
16  ביולי 2002, הוא אמור היה להישאר במעמד זה למשך 8 שנים, קרי : עד שנת 2010 – ממש
17  כפי שעולה מתלושי המשכורת שצורפו, שם נרשם, כי מועד סיום העסקתו אמור היה להיות
18  בתאריך 30.6.10.
19
20  באשר לשאלה, האם היה המנוח מקבל קביעות בבזק, בתום תקופת העסקתו כעובד ארעי,
21  השיבה העדה כי **"ממש לא מבטיח שעובד יקבל קביעות. ממש לא. גם אם הוא עובד טוב"**
22  (עמ' 76 שורה 23), אם כי הובררו, כי המנוח לא היה בתחום טיפולה ולא הייתה לה כל ידיעה
23  אישית לגביו (עמ' 80 שורות 25-26, עמ' 81 שורות 2-3).
24
25  אחרי גב' יוסף העידה גב' איוׄוט רון, שהינה מנהלת משאבי אנוש של החטיבה הפרטית
26  בבזק.
27
28  גב' רון העידה, כי במסגרת תפקידה היא אחראית על הטכנאים (עמ' 6). היא אישרה, כי
29  המנוח עבד בבזק במסגרת ההסכם הקיבוצי דור 2000, וכן העידה, כי כל העובדים שעבדו
30  בבזק במסגרת הסכם דור 2000 עברו בשנת 2006 להסכם קיבוצי חדש, שנקרא דור 2006
31  (עמ' 8). מדברי העדה עלה, כי **"אין מסלול** (קידום – ד.ג.) **לטכנאים. אין מסלול מובנה...**
32  (עמ' 13) בניגוד למקצועות אחרים בבזק. עוד הבהירה העדה, כי קיימת אפשרות שידרוג
33  בעבודות הטכנאים, בהתאם לכישוריהם **"אבל שדרושות הסמכה..."** (עמ' 13), ולעניין זה
34  אבהיר, כי לא הובאה עדות כלשהי, שהיה בה כדי לרמז על כך שהמנוח היה עובר הסמכות

P 1: 964



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1 ומשפר את כישוריו, ובאותה מידה שניתן לצאת מתוך הנחה שהיה עושה כן, ניתן גם לצאת
2 מתוך הנחה, שנוכח כישוריו הנטענים היה פורש מעובדתו בבזק ועובד במסגרת חברה
3 פרטית למשל (ראו הערתי בעמ' 15 לפרוטוקול).
4
5 בהמשך עדותה של העדה הוברר, שבהמשך הוחלף ההסכם הקיבוצי דור 2006 בהסכם
6 קיבוצי חדש מדצמבר 2010, וסביר להניח, שאילו המנוח היה בחיים היה מוצע במסגרת
7 הסכם חדש זה "**ועובר למעמד שנקרא – עובד קבוע חדש**", זאת בתנאי ש"**הוא היה נשאר,
8 והוא היה ראוי... החברה הייתה מוצאת אותו ראוי להישאר, הוא היה עובר כנראה
9 לסטטוס הזה היום**" (עמ' 17), ואילו עובדים שלא הוברו להסכם החדש החדש – עובדתם
10 הופסקה (שם).
11
12 גבי רון נשאלה, האם היא יודעת אילו שינויים חלו משנת 2004 בשאלת השעות הנוספות,
13 והיא הבהירה שחלה "**ירידה דרסטית**" (עמ' 18) בנושא השעות הנוספות, למעט בתקופות
14 לחוצות.
15
16 עד התביעה, מר רונן לוי, המשמש כמנהל מחלקת שכר והטבות בבזק העיד, כי בדרך כלל
17 עובד ארעי – הוא המעמד של המנוח במועד הרצחו, מקבל קביעות כעבור 96 חודשים (7
18 שנים) (עמ' 30,31), כאשר קיים מעמד מעמד ביניים בין עובד ארעי לבין עובד קבוע, הנקרא - עובד
19 קבוע חדש (עמ' 319.
20
21        בשלב מסויים במהלך שמיעת הראיות הוחזרה גבי איבק רון לעדות.
22 ב"כ התובעים ניסתה לדלות לדלות מגב' רון אישור לקיומן של העדפות שונות שניתנו לבנים
23 ממשיכים בבזק (אבי המנוח היה בזמנו עובד בזק), אולם היא הבהירה, כי אין עדיפות במתן
24 קביעות לבנים ממשיכים (עמ' 579 שורות 28-26), כפי שאף העידה גבי אירית נגר מור –
25 מנהלת מחלקת יחסי עבודה, שהסבירה שיתכן קיצור זמנים מסויים לבן ממשיך, אולם לא
26 ניתנה לו כל עדיפות בקבלת תפקיד מסויים (עמ' 598).
27
28 מעדותה של גב' רון עלה, כי הנסיון להעריך את שאלת קביעותו העתידית של התובע הינו
29 מאוד מאוד תיאורטי, שכן הוברר, כי רק בשנת 2011 החלה בזק להעביר עובדים זמניים
30 למעמד של עובדי קבע, ודוק: מדובר בעובדים שהחלו עובדתם בבזק לפני המנוח, בפברואר
31 2001 (עמ' 584).
32
33 מעדותה של גב' רון וכן מעדותה של גב' נגר מור עלה בבירור, כי אין כל אפשרות, אפילו
34 תיאורטית, לנסות ולשרטט את מסלול קידומו של המנוח בבזק, ונסיונה של ב"כ התובעים

80 מתוך 90



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1  לנסות ולהוכיח את הפסדי המנוח, לרבות את ערכו של המתנות לחג שניתנו לעובדי בזק,
2  הינה ירידה לרזולוציות בלתי אפשריות. ודוק: במועד הרצחו עבד המנוח כעובד ארעי בבזק
3  במשך 11 חודשים בלבד, ונסיונה של ב"כ התובעים להוכיח מסלול קידום וואי ובטוח נדון
4  לכשלון, מה עוד, שמדבריה של גב' נגר מור עלה שבזק מפטרת עובדים אשר מפרים את
5  הוראותיה , או נתפסים באי אמירת אמת (עמ' 614), ובעניין אשר בפניי, אין כל חולק, כי
6  המנוח העביר לבזק בבוקרו של יום הרצח דיווח בלתי מדוייק, כאשר דיווח למוקד בזק על
7  כניסתו לבקעה אל גרבייה עם המאבטח, בהסתירו את העובדה שהמאבטח נכנס לבקעה אל
8  גרבייה ברכבו הפרטי ולא ברכב בזק. על דברים כגון דא העידה גב' נגר מור **"על דיווחים**
9  **כוזבים אנשים הולכים הביתה".**
10
11  נוכח כל האמור, ובשל חוסר האפשרות לקבוע שהמנוח היה נשאר עובד בזק עד הגיעו לגיל
12  67, או שהיה מתקדם בתפקידו מעבר לתפקיד של טכנאי, בעיקר בהתחשב בעובדה שבמועד
13  הרצח היה המנוח עובד בזק במשך 11 חודשים בלבד, הנני בדעה, כי יש לחשב את הפסדי
14  הכנסתו מיום הרצח ועד מועד מתן פסק הדין על פי הכנסתו המוכחת בסך של 6,605 ₪,
15  כערכה לתאריך היום.
16
17  עם זאת, נוכח כישוריו והשכלתו של המנוח, כפי שמפורט בתצהירו של אחיו – רונן מנטין,
18  אין לי כל ספק, שבשלב מסויים היה המנוח משתכר לפחות בגובה השכר הממוצע במשק,
19  (אם בבזק, אם מחוצה לה) ואשר על כן, יש לחשב את הפסדיו מתאריך פסק הדין ועד הגיעו
20  לגיל 67, על פי השכר הממוצע במשק, בסך של 8,837 ₪.
21
22  במאמר מוסגר אציין, כי במרבית התביעות המוגשות בעילה נזיקית עוסק בית המשפט
23  בניחוש ובנבואה בהתייחס לעתידו המקצועי ורמת הכנסתו של הנפגע. ישנם מקרים, בהם
24  קל יותר להעריך את קידומו של הנפגע לולא פגיעתו, וישנם מקרים בהם קשה הדבר, ואף
25  בלתי אפשרי למעשה, כמו המקרה אשר בפניי. ודוק: המנוח עבד בבזק מטעם ליליית במשך
26  שש שנים עד שהתקבל כעובד בזק. לא הובהר, וממילא לא הוכח מדוע לא הפך המנוח לעובד
27  בזק בתאריך מוקדם יותר, אולם אין ספק שלא ניתן לבנות מגדלים באוויר בהתייחס
28  לעתידו המקצועי של המנוח בבזק, ומן הראוי להשתמש בנתונים אוביקטיביים ומקובלים,
29  אשר קרוב לוודאי שהינם קרובים למציאות, וממילא אינם מקפחים איש מבעלי הדין.
30
31  אשר על כן, יש לחשב את הפסדי ההכנסה של המנוח באופן כדלקמן :
32
33  א.  6,605 ₪ (הכנסתו המשוערכת של המנוח לתאריך היום) X 117 חודשים ) (ממועד
34  הרצח ועד לתאריך פסק הדין) = 772,785 ₪, בצירוף ריבית מאמצע התקופה בסך

81 מתוך 90

P 1: 966



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת בע"מ ואח'

| | |
|---|---|
| 1 | של 66,905 ₪, ובסה"כ 839,690 ₪. |
| 2 | |
| 3 | |
| 4 | ב. מתאריך היום עד הגיע המנוח לגיל 67, 8,837 ₪ (השכר הממוצע במשק) X |
| 5 | 210.8765 (מקדם היוון למשך 25 שנים) =סך של 1,863,516 ש"ח. |
| 6 | |
| 7 | נוכח האמור, הפסדי ההשתכרות של המנוח הינם בשיעור 2,703,206 ₪. |
| 8 | |
| 9 | 68. אובדן פנסיה – התובעת ערכה חישוב בראש נזק זה, על פי כפל השכר הממוצע במשק, אלא |
| 10 | שכפי שפרטתי, אינני מקבלת את חישוב השכר שפורט בסיכומיה של ב"כ התובעים. |
| 11 | |
| 12 | הנתבעים לא התייחסו לראש נזק זה בסיכומיהם, ואשר על כן, על פי עקרון החישוב המופיע |
| 13 | בסיכומי התובעים, יש לקחת בחשבון 70% משכרו הצפוי של המנוח עובר לפרישתו, ועל כן |
| 14 | ייערך החשבון באופן הבא : |
| 15 | |
| 16 | 70% X 8,837 ₪ (שכרו של המנוח) =6186 X (מקדם היוון כפול 0.47 X129.0454) = |
| 17 | 375,183 ₪. |
| 18 | |
| 19 | 69. אובדן קיצבת זיקנה – אלמלא האירוע המצער, היה המנוח זכאי לקצבת זקנה החל מהגיעו |
| 20 | לגיל 70 ועד תום תוחלת חייו, בגיל 80 לפי נתוני הלשכה המרכזית לסטטיסטיקה, קרי : |
| 21 | למשך 11 שנים. |
| 22 | |
| 23 | הנתבעים לא התייחסו בסיכומיהם לחישוב התובעים, ומשכך, אינם מתנגדים לחישוב |
| 24 | המוצע, ואשר על כן, הנני מקבלת אותו ומעמידה את ההפסד בגין ראש נזק זה על סך של |
| 25 | 62,201 ₪. |
| 26 | |
| 27 | 70. מהאמור עולה, כי שווי סך כל הפסדי ההכנסה של המנוח הינו בסך של 3,140,590 ₪, |
| 28 | ובהתאם לעקרונות שהותוו בע"א 1400/00 **עזבון המנוח מיכאל אטינגר ז"ל נ' החברה** |
| 29 | **לשיקום ופיתוח הרובע היהודי**, פורסם בנבו, (להלן : **"הלכת אטינגר"**), זכאי העזבון לפיצוי |
| 30 | בשיעור החסכון שהיה צובר המנוח במהלך חייו בשיעור של 30%, ואשר על כן זכאי העזבון |
| 31 | לפיצוי בסך של 942,177 ₪. |
| 32 | |

82 מתוך 90



## בית המשפט המחוזי בתל אביב - יפו

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

71.    <u>כאב וסבל וקיצור תוחלת חיים</u> – מעדותו של בן נעים עולה, כי המנוח לא נפטר באופן מיידי    1
כתוצאה מהירי שספג. בהודעתו במשטרה מסר בן נעים, שבתום המרדף – המוצלח –    2
לאחר המחבל, הוא חזר לרכב בו ישב המנוח, ולדבריו "שמעתי שעמום היה מחרחר".    3
(הודעה מס' 2 גליון מס' 8 שורה 13, ת/17), אם כי על פי עדותו של אוני דביר (עמ' 481) נראה    4
כי המנוח נפטר דקות ספורות מאד לאחר שנורה.    5
6
במאמר מוסגר אציין, כי התנהגות צוות האמבולנס של וואן, כפי שבאה לידי ביטוי בעדותו    7
של אוני דביר (עמ' 482) מגעת לכדי חילול כבודו של המנוח, אולם וואן אינה נתבעת בתיק    8
זה ולא ניתן לבוא עימה  חשבון על התייחסותה למנוח.    9
10
המנוח, בן 31 במותו מצא את מותו בגיל צעיר ובנסיבות טראגיות, ואשר על כן הנני בדעה,    11
כי העזבון זכאי לפיצוי בסך <u>1,000,000 ₪</u> בגין הכאב והסבל ובגין קיצור תוחלת חייו של    12
המנוח.    13
14
72.    <u>אובדן שירותי בן</u> – אודה, כי אינני מכירה ראש נזק הידוע  בפסיקה כאובדן  שירותי בן,    15
ונראה, כי סעיף זה בא להצדיק את תביעת התובעת כתוליה, אלא שתביעה זו לא הוכחה.    16
ודוק : אין לי כל ספק, שעם קבלת ההודעה על הרצחו של המנוח ונסיבות מותו, חרב על אמו    17
עולמה. מדובר באסון כבד ובלתי נתפס, המותיר אחריו שובל של כאב שלעולם לא יפוג, אלא    18
שאין בין כאב נוראי זה של אם על מות בנה, לבין המסקנה בדבר היותה תלויה בו, דבר וחצי    19
דבר.    20
21
זאת ועוד. הנני מצרה מאוד על שהנני נדרשת להעריך את עדותה של האם – גב' אינס ניצה    22
מנטין, שכן עדותה היתה מגמתית מאוד, וחבל.    23
24
בתצהירה (סע' 15) טענה גב' מנטין, כי היא מתגוררת עם בעלה **"אך מזה שנים לא הסתדרנו**    25
**ובני ז"ל היה המושיע שלי, איש סודי"**. גב' מנטין אף טענה בתצהירה, כי המנוח נהג    26
להסיעה לסידורים ברכב שבזק העמידה לרשותו (סע' 13) וכי תמך בה **"כספית ודאג לכל**    27
**מחסורי, היית ועלי לא נתן כסף למחיה ו/או לכל דבר אחר משך כל השנים. בני המנוח**    28
**אף תמך באח הקטן טלאור"** (סע' 23).    29
30
באשר להכנסתה, טענה גב' מנטין בתצהירה, כי משנת 1990 ועד שנת 2000 עבדה כמנקה    31
בבנק מזרחי כעובדת חברת כח אדם והשתכרה סך של 1,700 ₪ לחודש, ולאחר שפוטרה    32
עקב פרוקה של החברה, עבדה בעבודות משק בית שלוש פעמים בשבוע במשך חמש שעות כל    33

P 1: 968



בית המשפט המחוזי בתל אביב - יפו

ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1      פעם, והשתכרה סך 140 ₪ ליום. עוד הצהירה גב' מנטין, כי מאז הרצח איננה עובדת (סע' 22
2      לתצהיר).
3
4      מהתצהיר וממצו הירושה עלה, כי גב' מנטין הינה יורשתו היחידה של המנוח, וכי אביו
5      הסתלק מירושת המנוח, אולם לא ניתן לעובדה זו כל הסבר המניח את הדעת.
6
7      מהתצהיר ומעדותה של גב' מנטין עלה, כי היא ובעלה הינם הורים לארבעה ילדים נוספים
8      ילידי 1973, 1975, 1978 ו- 1986, אולם העדה טענה בחקירתה, כי בעלה מעולל לא תמך בה
9      ובילדיה **"מאז שהתחתנו"** (עמ' 33 שורה 7).
10
11      לדבריה **"הוא לא השתתף בכל ההוצאות של הילדים, של כל מיני דברים, הוא השתתף**
12      **בדברים שוליים כמו לתת לחם וחלב"** (שם).
13
14      העדה אישרה, כי היא חיה עם בעלה תחת קורת גג אחת עד עצם היום הזה, וכי היא
15      בגמלאות מזה 12 שנים.
16
17      בהמשך העדות התברר, כי לבני הזוג חשבון בנק משותף, אליו מועברים גם כספי הפנסיה
18      של האם והן קצבת הביטוח הלאומי מהמוסד לביטוח לאומי, בהתאם <u>לחוק התגמולים</u>
19      <u>לנפגעי פעולות איבה תש"ל -1970</u> וכן היא אישרה כי היא משתמשת בכספים מחשבון זה
20      לצורך מחיית בני המשפחה (עמ' 33 שורות 17-21).
21
22      עוד התברר, כי לבני הזוג דירה משותפת בבעלותם, אשר נרכשה בסיוע כספי משכנתא
23      שנלקחה ושולמה על ידי שני בני הזוג (עמ' 34 שורות 1-12).
24
25      גב' מנטין אישרה, כי גם כאשר בעלה עבד בבזק, נכנסה משכורתו **"לחשבון משותף"** (עמ'
26      34 שורה 28), אם כי חזרה בה וטענה, כי רק כספי הפנסיה נכנסים לחשבון משותף, ואילו
27      כספי משכורתו נכנסו לחשבון נפרד, אולם **"הוא עשה לי שיקים שיכולתי לחתום**
28      **עליהם..."** (עמ' 35 שורה 4). נוכח האמור, אך טבעי הוא שגב' מנטין אישרה שבמהלך כל
29      שנות נישואיהם התקיימה התקיימה המשפחה הן מהכנסת בעלה והן מכנסתה היא (עמ' 35 שורה 7),
30      אם כי לדבריה **"הוא לא תמך בי"** (עמ' 35 שורה 7), דבר שאילץ אותה לעבוד קשה ולקחת
31      הלוואות, וזאת משום שבעלה השתתף בהוצאות משק הבית **"בדברים שוליים ששילם,**
32      **חשמל..."** (עמ' 35 שורות 7-10), למרות שהיא אישרה כי המשפחה התקיימה הן מהכנסת
33      בעלה והן מהכנסתה היא (עמ' 35 שורות 11-12).
34

P 1: 969



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת בע"מ ואח'

| | |
|---|---|
| 1 | בהמשך הודתה העדה, כי גם כיום "**הוא נותן לי כסף שאכניס לחשבון שלי...**" (עמ' 35 |
| 2 | שורות 16-19) וכן הודתה, כי בעלה משלם את חשבונות המים, הארנונה והחשמל, (עמ' 37 |
| 3 | שורות 29-30). |
| 4 | |
| 5 | מעדות זו עולה, כי הנסיון לצייר את אבי המשפחה כמי שאינו תומך בה, כשל, ואין כל ספק |
| 6 | שבני הזוג מתקיימים מהכנסתם המשותפת הן בתקופה שלפני הרצח והן בתקופה שלאחריו. |
| 7 | במאמר מוסגר יצויין, כי אבי המשפחה לא הובא לעדות, ונראה כי לא בכדי. |
| 8 | |
| 9 | באשר לתמיכתו הנטענת של המנוח באמו – טענה זו לא הוכחה. |
| 10 | |
| 11 | התובעת לא צרפה תדפיס מחשבון בנק, אשר ממנו ניתן היה ללמוד על קיומה של תמיכה |
| 12 | בה, ולמעשה לא צרפה כל מסמך התומך בטענתה. |
| 13 | |
| 14 | זאת ועוד. מדברי גב' מנטין עלה, שהמנוח שכר דירה לעצמו דירה, ואף מימן את הוצאותיה, |
| 15 | כגון שכר דירה וחשבונות שוטפים, ועל כן ברור, כי נוכח גובה משכורתו המוכח, לא יכול |
| 16 | היה לתמוך באמו, אף לו רצה לעשות כן. |
| 17 | |
| 18 | אמנם לדברי האם, שכר המנוח את הדירה זמן קצר קודם להרצחו, ועד אז התגורר בבית |
| 19 | המשפחה, אלא שמטעמים השמורים עמה, היא לא צרפה מסמך כלשהו לאמיתות דבריה לגבי |
| 20 | מועד שכירת הדירה, וכו', דבר הפועל לחובתה. |
| 21 | |
| 22 | גב' מנטין מבקשת מבית המשפט להסיק את עובדת תמיכתו של בנה המנוח בה מכך שלאחר |
| 23 | מותו התגלה, כי בחשבון המנוח היו רק 1,500 ₪. לדבריה נשאר בחשבון סכום זה ועם, |
| 24 | שכן מרבית הכנסתו שימשה לעזרה לאמו. לדבריה "**אם לא היה עוזר לי הייתה לו בוחטה** |
| 25 | **של כסף...**" (עמ' 38 שורה 27), אלא שלא רק שלא צורף מסמך המעיד על היתרה בחשבונו |
| 26 | של המנוח בעת פטירתו, אלא שאין בסכום האמור כדי לשמש ראיה לטענותיה של גב' |
| 27 | מנטין, וכאמור, טענתה של גב' מנטין בדבר היותה תלויה בבנה לא הוכחה. |
| 28 | |
| 29 | מעבר לצורך אציין – כ גם אחי המנוח – רונן מנטין – העיד, בין היתר לגבי ההתנהלות |
| 30 | הכספית בבית הוריו, אולם עדותו עמדה בסתירה מוחלטת לעיקרי עדותה של אמו, וניכרו |
| 31 | המאמץ והמגמה להוכיח באופן מלאכותי את תלותה של האם בבנה המנוח, מה עוד, |
| 32 | שמעדות האם עלה רונן נשוי מאז שנת 99 (עמ' 46) ואינו מתגורר עם ההורים, או |
| 33 | בקרבתם, כך  שאינו יכול לדעת מידיעה אישית האם נתמכה אמו על ידי אחיו המנוח. |
| 34 | |



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1    ויובהר: אין לי ספק שהמנוח היה בן טוב וקשור מאוד לאמו, ומן הסתם סייע לה בהסעות

2    או בעניינים אחרים, ואני מוכנה אף לצאת מהנחה שלעיתים אף סייע לה כספית – למרות

3    שטיוע זה לא הוכח – אולם אין גם ספק, וממילא לא הוכח אחרת, שסיועו של המנוח לאמו

4    לא חרג ממסגרת של סיוע רגיל שניתן לעיתים להורים על ידי ילדיהם, ואשר על כן הנני

5    דוחה את הטענה בדבר היות התובעת תלויה במנוח.

6

7    73.    **עזרת צד ג'** - עתירה זו תמוהה. לא נטען, וממילא לא הוכח, כי המנוח ביצע את עבודות

8      הבית בבית אמו, ואשר על כן, לא ברור על סמך מה הועלתה תביעה זו.

9

10    זאת ועוד. יוזכר, כי אבי המשפחה לא העיד, דבר הפועל לחובת התובעים, שכן אילו היה

11      מובא לעדות, יתכן והיה מוכח, כי הוא מסייע לרעייתו בעבודות הבית. מכל מקום, משלא

12      נטען, וכאמור ממילא לא הוכח, כי המנוח סייע בעבודות הבית בבית אמו, הרי שלא הוכח

13      קשר סיבתי בין מות המנוח לבין דרישתה למימון עזרת צד ג' מהנתבעים.

14

15    74.    **נסיעות מוגברות** – לא הוכח, כי התובעת נזקקה לנסיעות מוגברות עקב מות המנוח. ודוק:

16      הנני מקבלת כעובדה את הטענה שלעיתים הסיע המנוח את אמו, אלא מאי? אין לשכוח, כי

17      המנוח עבד במשך מרבית שעות היום וממילא לא היה נוכח בבית אמו, ועל כן לא יכול היה

18      לסייע לאמו במהלך שעות היום, ומשכך הנני דוחה עתירה זו.

19

20    זאת ועוד. האח – רונן מנטין אישר בחקירתו, כי לאחר הרצח קיבלו הוריו הלוואה מהמוסד

21      לביטוח לאומי לצורך רכישת רכב, ואף רכשו בכסף זה רכב **"ומי שלוקח אותם ברכב זה**

22      **אחי הקטן"** (עמ' 115 שורות 9-13). קרי: המשפחה הינה בעלת רכב הנמצא בשימוש הבן

23      הצעיר, אשר מסיע את הוריו על פי הצורך. ודוק: לפני הרצח לא היה בבעלות המשפחה רכב.

24

25    75.    **אובדן השתכרות התובעת 2** – התובעת טוענת, כי עובר למות בנה עבדה במשק בית שלוש

26      פעמים בשבוע, ומאז מותו חדלה לעבוד, אלא שהיא לא הוכיחה הן את הכנסתה בתקופה

27      שלפני הרצח, וממילא לא הרימה את הנטל המוטל עליה להוכחת הסיבה להפסקת עבודתה.

28

29    לא זו אף זו. בהתאם לפסק הדין ברע"א 444/87 **אלסוחה נ' עזבון המנוח דוד דהאן ז"ל,**

30      (פ"ד מד (3) 397) (להלן: **"הילכת אלסוחה"**) ופסקי הדין שבאו בעקבותיו, אין לתובעת עילה

31      עצמאית לתביעת פיצוי בגין אובדן השתכרות, מה עוד שלא נטען, וממילא לא הוכחה קיומה

32      של נכות כלשהי בתחום הנפשי.

33



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1 ודוק: כפי שהבהרתי, אין לי כל ספק בדבר צערה העמוק והקשה של התובעת בגין מות בנה,
2 והסיבתיות הכרוכות במותו, אלא שאין בצער זה, קשה ככל שיהיה כדי לזכות את התובעת
3 בפיצוי במסגרת עילת תביעה עצמאית, אלא אם הוכח, כי היא סובלת מנזק נפשי משמעותי
4 כתוצאה ממות בנה, דבר שלא הוכח כאמור במקרה אשר בפני.
5
6 .76 הוצאות בגין מצבה ושבעה – צודק ב"כ בזק בטענה, כי מן הראוי היה שלא לחזור במסגרת
7 הסיכומים על העתירה לפיצוי בגין הוצאות השבעה, שעה שהתובעת הודתה בחקירתה, כי
8 בזק מימנה את כל ההוצאות במהלך השבעה ורכש ציון 30 למותו של המנוח, לרבות
9 **"קייטרינג של השבעה, של החודש, לגבי השכרת כסאות ושולחנות... הביאו ועשו הכל**
10 **בעצמם..."** (עמ' 41 שורות 23-26). ודוק: לא הוצגו קבלות המעידות על הוצאות נוספות,
11 ומשכך אין מנוס מהמסקנה, כי והטענה בסע' 78 לתצהירו של האח – רונן מנטין הועלתה על
12 דרך הסתם וללא כל ביסוס.
13
14 באשר למצבה, העידה התובעת כי המצבה מומנה **"חלק בזק וחלק ביטוח לאומי והשאר**
15 **אנחנו"** (עמ' 42 שורה 3).
16
17 מהמסמכים שהוגשו על ידי התובעים עולה, כי עלות המצבה הייתה בסך של 12,000 ₪,
18 כאשר לא הוברר כמה מסכום זה שולם על ידי התובעת עצמה.
19
20 עם זאת, ולמען הזהירות, הנני מוצאת לנכון להעניק לתובעים פיצוי בסך 2,000 ₪.
21
22 .77 פיצויים עונשיים בהתייחס לנתבעים 7 ו- 8 – צודקים התובעים בטענתם, כי **"המנוח נרצח**
23 **עקב מעשה טרור נפשע, זדוני ורצחני"** (סע' 52 לסיכומי התובעים, אולם המעשה עצמו
24 בוצע על ידי המחבל – שאינו בעל דין בתובענה זו – ולא נקבע כי מעשי המחבל הינם מעשי
25 הרש"פ, אם כי נקבע, כי התובעים הוכיחו ברמת ההסתברות הנדרשת את הקשר  הסיבתי
26 בין התנהלות הרש"פ לבין מעשהו הנפשע של המחבל, ומשכך, איננו סבורה, כי יש להטיל על
27 הרש"פ פיצויים עונשיים.
28
29
30
31
32
33
34

87 מתוך 90



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח׳ נ׳ בזק החברה הישראלית לתקשורת בע"מ ואח׳

| | |
|---|---|
| 1 | <u>קצבאות המוסד לביטוח לאומי</u> |
| 2 | |
| 3 | 78. סע׳ 17(ב) <u>לחוק התגמולים לנפגעי פעולות איבה, תש"ל -1970</u> (להלן: **"חוק התגמולים"**) |
| 4 | קובע: |
| 5 | |
| 6 | **"(ב) זכאי עקב מאורע אחד לתגמול לפי חוק זה ולפיצויים לפי פקודת** |
| 7 | **הנזיקין [ נוסח חדש], או לפי חוק פיצויים לנפגעי תאונות דרכים,** |
| 8 | **התשל"ה – 1975, יחולו עליו בשינויים המחייבים הוראות סע׳ 36** |
| 9 | **לחוק הנכים, או סעיף 21 לחוק משפחות חיילים, לפי העניין".** |
| 10 | |
| 11 | מטרתו של הסדר זה, אשר אליו מפנה חוק התגמולים היא למנוע "כפל פיצוי", והוא מסדיר |
| 12 | את הדרך בה על התובע לילך במקרה בו הוא זכאי לפיצוי הן לפי חוק התגמולים והן לפי |
| 13 | **"חוק אחר"**, ובענייננו – פקודת הנזיקין. |
| 14 | |
| 15 | עיקריו של ההסדר הם כדלקמן: |
| 16 | |
| 17 | א.  הזכאי לפיצוי רשאי לנקוט בהליכים משפטיים במקביל הן כנגד המוסד לביטוח |
| 18 | לאומי והן כנגד המזיק, במסגרת תביעה משפטית לפי פק׳ הנזיקין, אולם הוא אינו |
| 19 | רשאי לגבות את הפיצוי משניהם. |
| 20 | |
| 21 | ב.  אם בחר הזכאי במסלול של קבלת תגמולים מהמדינה, בהתאם לחוק התגמולים, |
| 22 | זכאית המדינה להגיש תביעת שיבוב כנגד המזיק בגין הסכומים המשולמים על ידה |
| 23 | לניזוק. |
| 24 | |
| 25 | ג.  אם שולמו לניזוק פיצויים מהמזיק, הוא אינו זכאי עוד להטבות מהמדינה (במקרה |
| 26 | שלנו – על פי חוק התגמולים לנפגעי פעולות איבה), ואם קיבל תגמולים מהמדינה, |
| 27 | עליו להחזיר לה את כל התגמולים שקיבל. |
| 28 | |
| 29 | 79.  ב"כ קבוצת בזק טוען, כי יש לדחות את התביעה על הסף, שכן התובעת מקבלת מהמדינה |
| 30 | תגמולים חודשיים על פי חוק התגמולים, אשר ערכם המהוון לעבר ולעתיד הינו בסך של כ- |
| 31 | 2,200,000 ₪, אלא שהוא נתפס לכלל טעות, ואבאר. |
| 32 | |
| 33 | ב"כ קבוצת בזק מסתמך בטיעוניו על פסק הדין ב<u>ע"א  399/81 יפה טימסוד  נ׳ לויס קטרינג</u> |
| 34 | <u>תעשיית ארוחות בע"מ</u> (פ"ד לו (3) 686) (להלן: **"פרשת טימסוד"**) ממנו עולה, כי הסכמתה |