# EXHIBIT B.9

1

```
1            IN THE UNITED STATES DISTRICT COURT

2         FOR THE SOUTHERN DISTRICT OF NEW YORK

3

4    MARK I. SOKOLOW, et al.,         )

5         Plaintiffs,                 )

6    v.                              ) Civil Action No.
                                      ) 04cv397(GBD)(RLE)
7    THE PALESTINE LIBERATION         )
     ORGANIZATION, et al.,
8                                     )
          Defendants.                 )
9    _____    )

10

11

12

13

14            DEPOSITION OF ALON EVIATAR

15               JERUSALEM, ISRAEL

16               OCTOBER 22, 2013

17

18

19

20

21

22

23

24

25    REPORTED BY:  AMY R. KATZ, RPR

             OCTOBER 22, 2013 - ALON EVIATAR
```

2

```
1            Deposition of ALON EVIATAR, taken in the

2    above-entitled cause pending in the United States

3    District Court, for the Southern District of New York,

4    pursuant to notice, before AMY R. KATZ, RPR, at the

5    American Colony Hotel, Executive Room, First Floor,

6    Jerusalem, Israel, on Tuesday, the 22nd day of October,

7    2013, at 9:04 a.m.

8

9

10   APPEARANCES:

11   FOR PLAINTIFFS:

12            ARNOLD & PORTER, LLP
              By:  KENT A. YALOWITZ, ESQ.
13            399 Park Avenue
              New York, New York 10022-4690
14            (212) 715-1000 / Fax (212) 715-1399
              kent.yalowitz@aporter.com
15

16   FOR DEFENDANTS:

17            MILLER & CHEVALIER CHARTERED
              By:  BRIAN A. HILL, ESQ.
18                 MARK J. ROCHON, ESQ.
                   MICHAEL J. SATIN, ESQ.
19            655 Fifteenth Street, NW
              Suite 900
20            Washington, DC 20005-5701
              (202) 626-5800 / Fax (202) 626-5801
21            bhill@milchev.com
              mrochon@milchev.com
22            msatin@milchev.com

23

24

25

             OCTOBER 22, 2013 - ALON EVIATAR
```

3

```
1    APPEARANCES (Continued):

2    ALSO PRESENT:

3         RINA NE'EMAN, Official Hebrew Interpreter

4         SARIT AFRIAT, Check Hebrew Interpreter

5         RACHEL WEISER, Esq.

6         DINA ROVNER, Advocate

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

             OCTOBER 22, 2013 - ALON EVIATAR
```

4

```
1                     I N D E X

2    WITNESS

3    Alon Eviatar

4

5    EXAMINATION                                    PAGE

6    By Mr. Hill                                       8

7

8

9

10       D E F E N D A N T S '   E X H I B I T S

11   NUMBER         DESCRIPTION               MARKED

12   Exhibit 420    Document Entitled "Expert
13                  Report of Alon Eviatar,"
                    Dated June 14, 2013
14                  (No Bates Number)               9

15   Exhibit 421    Copy of Signed Signature
16                  Page, Dated June 14, 2013
                    (No Bates Number)              11

17   Exhibit 422    Document Entitled "Expert
18                  Report of Israel Shrenzel
                    in Sokolow v. Palestinian
19                  Authority, Case No. 04-397
                    (S.D.N.Y.)," Dated April 10,
20                  2013
                    (No Bates Number)             37

21   Exhibit 423    Document Entitled "Expert
22                  Report of Alon Eviatar,"
                    with Red-Lined Text,
                    Dated June 14, 2013
23                  (No Bates Number)             42

24

25

             OCTOBER 22, 2013 - ALON EVIATAR
```

```
 1         D E F E N D A N T S '   E X H I B I T S
 2    NUMBER         DESCRIPTION                    MARKED
 3    Exhibit 424    Article, The Associated
 4                   Press, Entitled "At Least
                     Seven Killed, Many Wounded
 5                   in Bomb Blast at Hebrew
                     University Cafeteria,"
 6                   Dated July 31, 2002
                     (No Bates Number)                63
 7    Exhibit 425    Website Article, Unispal,
                     Entitled "Chronological
 8                   Review of Events Relating
                     to the Question of Palestine,"
 9                   Dated August 31, 2001
                     (No Bates Number)                66
10    Exhibit 426    Document Entitled "Expert
11                   Report of Ronni Shaked,"
                     Dated April 10, 2013
12                   (No Bates Number)                78
13    Exhibit 427    Document Entitled "Expert
14                   Rebuttal Report of Alon
                     Eviatar," Dated September 16,
                     2013
15                   (No Bates Number)               149
16
17
18
19
20
21
22
23
24
25
                OCTOBER 22, 2013 - ALON EVIATAR
```

```
 1         Q U E S T I O N S   I N S T R U C T E D
 2               N O T   T O   A N S W E R
 3                    PAGE        LINE
 4                     43          19
 5                     43          23
 6                     44           2
 7                     44           6
 8                     44          22
 9                     45          15
10                     45          19
11                     47          17
12                     47          20
13                     53          11
14                     55           1
15                     55           9
16                     55          22
17
18
19
20
21
22
23
24
25
                OCTOBER 22, 2013 - ALON EVIATAR
```

```
 1              P R O C E E D I N G S
 2
 3         (The following section of the proceedings
 4    was conducted only in English, unless otherwise
 5    indicated, and until page 8.)
 6
 7         MR. YALOWITZ:  Before we begin, I just want
 8    to reiterate, we've advised the defendants that there's
 9    a section of Mr. Eviatar's expert report that we're
10    withdrawing.  It's the part of the report dealing with
11    the interrogations.
12
13              RINA NE'EMAN,
14         the Official Hebrew Interpreter, was
15         duly affirmed to translate from English
16         to Hebrew and from Hebrew to English.
17
18              ALON EVIATAR,
19         called as a witness, being first duly
20         affirmed, was examined and testified
21         as hereinafter set forth.
22
23         MR. HILL:  The record should reflect that
24    that was not interpreted.
25
                OCTOBER 22, 2013 - ALON EVIATAR
```

```
 1              EXAMINATION
 2    BY MR. HILL:
 3         Q.   Do you speak English?
 4         A.   Yes, I speak English.
 5         Q.   Do you have any difficulty understanding me?
 6         A.   Sometimes.  I prefer in Hebrew.
 7         Q.   Have you been educated in the English
 8    language, sir?
 9         A.   Yes.
10         MR. YALOWITZ:  Let her interpret for you.
11         THE WITNESS:  Okay.
12
13         (The following section of the proceedings was
14    conducted through the Official Hebrew Interpreter,
15    unless otherwise indicated.)
16
17         Q.   BY MR. HILL:  Do you feel like you need an
18    interpreter to understand the questions and answers
19    today?
20         A.   Yes.
21         Q.   Then we will proceed with the interpreter,
22    sir.  If at any point during the course of the day
23    you think there's been a misinterpretation, please
24    do let us know.  Okay?
25         A.   (In English.)  Okay.
                OCTOBER 22, 2013 - ALON EVIATAR
```

9

1    Q.    State your name.
2    A.    Alon Eviatar.
3    Q.    Of what country or countries are you a
4    citizen?
5    A.    Israel.
6    Q.    Have you ever been a citizen of any other
7    country?
8    A.    No.
9    Q.    What's your address?
10   A.    I live in the town of Maccabim, on Nahal
11   Kissufim Street.
12   Q.    Do you live in a settlement?
13   A.    No.
14   Q.    Is your home within the 1948 borders of
15   Israel?
16   A.    I do not know.
17   Q.    Are you familiar with something called the
18   Green Line?
19   A.    I'm familiar with it.
20   Q.    Is your home east or west of the Green Line?
21   A.    To the best of my knowledge, it's to the
22   west of the Green Line.
23        MR. HILL:  Let's mark this as 420.
24        (Defendants' Exhibit 420 marked.)
25   Q.    BY MR. HILL:  Mr. Eviatar, I'm handing you

OCTOBER 22, 2013 - ALON EVIATAR

10

1    what we've marked as Defendants' Exhibit 420.
2         Have you ever seen this document before?
3    A.    (Examining.)  Yes.
4    Q.    Turn to the last page.
5         Is that your name?
6    A.    Yes.
7    Q.    Are you prepared to sign this document
8    under oath and penalty of perjury under the laws
9    of the United States today?
10   A.    Yes.
11   Q.    Is everything in this document true and
12   correct?
13   A.    Yes.
14   Q.    How do you know?
15   A.    I am a full partner in the drafting of
16   this report.  This report is my report, and I stand
17   behind every sentence that's included in this report.
18   Q.    Turn to page 17.  Look at paragraph 1 on
19   page 17.  The first sentence says:
20        "While I have not personally been involved
21   in the interrogation of terrorists, I am familiar
22   with such interrogations from, inter alia, my work
23   at the Israel Security Agency."
24        Do you see that?
25   A.    I see that.

OCTOBER 22, 2013 - ALON EVIATAR

11

1    Q.    That's not a true statement, is it?
2    A.    The intent of that sentence is from my work
3    with the Israel Security Agency.
4    Q.    Okay.  You never worked at the Israel Security
5    Agency, did you?
6    A.    No.
7    Q.    That sentence doesn't say "my work with the
8    Israel Security Agency," does it?
9    A.    Correct.
10   Q.    Are you familiar with the difference between
11   the word "at" and "with" in the English language?
12   A.    Yes.
13        MR. HILL:  Let's mark this as Exhibit 421.
14        (Defendants' Exhibit 421 marked.)
15   Q.    BY MR. HILL:  I'm showing you what we've
16   marked as Exhibit 421.
17        Have you ever seen this before?
18   A.    (Examining.)  Yes.
19   Q.    Is that your signature?
20   A.    Yes.
21   Q.    When did you sign it?
22   A.    On the date that appears there.
23   Q.    You're saying you signed this on June 14th,
24   2013?
25   A.    To the best of my recollection, yes.

OCTOBER 22, 2013 - ALON EVIATAR

12

1    Q.    When did you deliver that signature to the
2    plaintiffs' lawyers in this case?
3    A.    At the moment that my counsel advised me
4    or requested that I do so.
5    Q.    Did you review all of Exhibit 420 before
6    you signed Exhibit 421?
7    A.    Yes.
8    Q.    Did you understand it?
9    A.    Yes.
10   Q.    You did not write Exhibit 420; correct?
11   A.    That is not correct.
12   Q.    Are you saying you wrote Exhibit 420, the
13   report that's in front of me?
14   A.    I wrote part of it.
15   Q.    Somebody else wrote part of it, too; right?
16   A.    Correct.
17   Q.    Who wrote the part that you didn't write?
18   A.    Ronni Shaked.
19   Q.    How do you know that?
20   A.    My counsel told me that.
21   Q.    Have you ever spoken to Mr. Shaked?
22   A.    Yes.
23   Q.    Did you talk to him about this report?
24   A.    Yes.
25   Q.    When?

OCTOBER 22, 2013 - ALON EVIATAR

13

```
1        A.  After I received the report from my counsel.
2        Q.  Did you ever start to write your own report?
3        A.  Yes.
4        Q.  What happened to that document?
5        A.  The report that I wrote was the rebuttal.
6        Q.  So when did you first -- when were you first
7   asked to prepare a report in this case?
8        A.  I was requested to read this report and to
9   make amendments to it.
10       Q.  So no one ever asked you to write a report
11  in May of 2013; correct?
12       A.  Correct.
13       Q.  Who told you to take Ronni Shaked's report
14  and make amendments to it?
15       A.  My attorney.
16       Q.  What was the name of that person?
17       A.  Nitsana Darshan-Leitner.
18       Q.  When did you first speak to Nitsana
19  Darshan-Leitner about being an expert witness in
20  this case?
21       A.  She spoke to me in the month of May.
22       Q.  What date?
23       A.  I do not recall.
24       Q.  Do you have any way of telling me which
25  week in May this was?
```

OCTOBER 22, 2013 - ALON EVIATAR

---

14

```
1        A.  I cannot know that at this time.
2        Q.  Did anyone speak to you about being an
3   expert in this case prior to the conversation in
4   May with Ms. Darshan-Leitner?
5        A.  Somebody spoke to me about this report
6   or about this work.  It was a person by the name
7   of Arieh Spitzen.
8        Q.  When did Mr. Spitzen speak to you about
9   this work?
10       A.  Before Nitsana approached me about it.
11       Q.  Did Mr. Spitzen speak to you in the month
12  of May, or was it before that?
13       A.  I recall that it was in the month of May.
14       Q.  Do you recall which week in the month of
15  May Mr. Spitzen spoke to you about being an expert?
16       A.  No, I do.
17       Q.  Did you know Mr. Spitzen before he spoke
18  to you about this subject in May of this year?
19       A.  Yes.
20       Q.  How long have you known him?
21       A.  Fifteen years.
22       Q.  Is this the first time he's ever talked to
23  you about being a witness in a lawsuit?
24       A.  Yes.
25       Q.  When did you stop working for the IDF?
```

OCTOBER 22, 2013 - ALON EVIATAR

---

15

```
1        A.  In April of this year.
2        Q.  What was your last day as an IDF officer?
3        A.  On the 11th of April.
4        Q.  Did you speak to Mr. Spitzen about being
5   an expert witness prior to leaving the IDF on the
6   11th of April?
7        A.  No, I did not.
8        Q.  Apart from Mr. Spitzen and
9   Ms. Darshan-Leitner, who else have you spoken
10  to about being a witness in this case?
11       A.  Nobody.
12       Q.  Did you speak to Mr. Shaked about that
13  subject?
14       A.  I spoke to Shaked about the report after
15  Nitsana had spoken with me.
16       Q.  So tell me the names of everyone you've
17  ever spoken to about being a witness in this case.
18       A.  Nitsana Darshan-Leitner, Arieh Spitzen,
19  Ronni Shaked, and my wife.
20       Q.  Have you ever spoken to Mr. Yalowitz about
21  this case prior to today?
22       A.  Yes.
23       Q.  When did you first speak to him?
24       A.  In the month of August.
25       Q.  Sir, do you understand that you're under
```

OCTOBER 22, 2013 - ALON EVIATAR

---

16

```
1   an obligation to answer questions fully and truthfully?
2        A.  Definitely.
3        Q.  Are you having any difficulty understanding
4   the Hebrew that's being interpreted?
5        A.  No.
6        Q.  Do you understand that I previously asked
7   you to tell me the names of everyone you had spoken
8   to about being a witness in this case?
9        A.  Now I understand.
10       Q.  Well, just so there's no misunderstanding
11  going forward, whenever I ask you a question, you
12  are under an obligation to give me a full and complete
13  and truthful answer.
14       Do you understand, sir?
15            MR. YALOWITZ:  I object.  You know this
16  witness has been very cooperative.  And for you to
17  insinuate that he's withholding something is an outrage.
18  I won't stand for it.
19            MR. HILL:  All right.  Let's have the question
20  interpreted, and we'll go on.
21            THE WITNESS:  Yes.
22       Q.  BY MR. HILL:  Now, tell me the names of
23  everyone you have spoken to about being a witness
24  in this case.
25            MR. YALOWITZ:  Objection.  Asked and answered.
```

OCTOBER 22, 2013 - ALON EVIATAR

17

1    Q.   BY MR. HILL:  Go ahead and answer.
2    A.   Advocate Yalowitz.  An attorney by the
3  name of Phil, the attorneys named Rachel and Dina,
4  an attorney by the name of Mordechai.  And with my
5  parents in very general terms.
6    Q.   Turn to page 2 of Exhibit 420.  The last
7  sentence on that page says:
8         "In addition, in preparing my report, I
9  reviewed, inter alia, the documents listed below."
10        Do you see that, sir?
11   A.   Yes.
12   Q.   And then there is a list of Bates numbers
13  that continues on to the next page; right?
14   A.   Yes.
15   Q.   Do you understand what Bates numbers are, sir?
16   A.   The number has no significance as far as I
17  am concerned.
18   Q.   Do you understand that these Bates numbers
19  represent pages of documents?
20   A.   That, yes.
21   Q.   Prior to signing Exhibit 421, how many pages
22  of documents did you review in connection with this
23  case?
24   A.   Thousands.
25   Q.   How many thousands.

OCTOBER 22, 2013 - ALON EVIATAR

18

1    A.   I do not know.
2    Q.   How did you review these documents?
3    A.   I read them.
4    Q.   In what form did you read them?
5    A.   In the original.
6    Q.   Did you review them in paper or on computer?
7    A.   Both.
8    Q.   How many pages of paper documents did you
9  review prior to signing Exhibit 421?
10   A.   Hundreds.
11   Q.   Approximately how high was the stack of paper
12  documents you reviewed prior to signing Exhibit 421?
13   A.   There were several piles.
14   Q.   All together, how tall were they?
15   A.   I do not know.
16   Q.   Would they be taller than you?
17   A.   I do not think so.
18   Q.   Would they be taller than your knees?
19   A.   Perhaps.
20   Q.   Taller than your waist?
21   A.   Perhaps.
22   Q.   Were these documents in boxes?
23   A.   No.
24   Q.   How did you get them?
25   A.   By way of the computer, and I also printed

OCTOBER 22, 2013 - ALON EVIATAR

19

1  out a large portion of the documents.
2    Q.   You printed them out on a printer at home?
3    A.   During the course of the preparation, yes.
4    Q.   How many packets of paper did it take to
5  print out the documents you printed out?
6    A.   I did not count them.
7    Q.   Did you have to go to the store and buy a
8  box of paper to print out all these documents?
9    A.   Yes.
10   Q.   How many boxes of paper did you buy?
11   A.   I think two.
12   Q.   And how many pieces of paper were in each
13  box that you bought?
14   A.   I know that every package has 200 sheets.
15   Q.   Approximately how many packages of paper
16  did you need to print out the documents you had?
17   A.   I estimate that it was between five and ten
18  packs.
19   Q.   Did you print out all of the documents that
20  the plaintiffs' lawyers had provided to you?
21   A.   No.
22   Q.   How did you decide which ones to print?
23   A.   There's no real decision behind that.
24   Q.   You just randomly selected pages to print out?
25        Is that what you're saying, sir?

OCTOBER 22, 2013 - ALON EVIATAR

20

1    A.   I didn't select pages.  I just printed what
2  was more convenient for me to work with on hard copy.
3    Q.   And how did you make the decision about what
4  would be more convenient to work with on hard copy?
5    A.   On the basis of the nature of the text.
6    Q.   Tell me what criteria you used to determine
7  which texts you would print out.
8    A.   Where I could see better, and also in terms
9  of the comfort level of the work.
10   Q.   What do you mean by the "comfort level of
11  the work"?
12   A.   For example, whether I want to make notes
13  on the paper.
14   Q.   Did you, in fact, make notes on some of the
15  paper?
16   A.   Yes.
17   Q.   Do you still have these notes today?
18   A.   No.
19   Q.   What did you do with them?
20   A.   The drafts I shredded.
21   Q.   When you say "the drafts," what are you
22  referring to?
23   A.   For example, a document that I printed off
24  the Internet, that could be in part some have the Bates
25  numbers and in part not have Bates numbers; I read it,

OCTOBER 22, 2013 - ALON EVIATAR

21

```
 1    I wrote down, made notes, whatever I wanted to for my
 2    own purposes.  And I did not make any further use of it.
 3        Q.   Did you consider the notes you had made in
 4    preparing your opinions in this case?
 5        A.   Only if they were relevant.
 6        Q.   Did anyone tell you that you needed to save
 7    relevant documents that you considered in preparing your
 8    opinions in the case?
 9        A.   Yes.
10        Q.   And are you saying that you did not save
11    those relevant notes that you made in the course of
12    the case?
13             MR. YALOWITZ:  Objection.
14             THE WITNESS:  All of the documents that are
15    relevant to the case have been retained.
16        Q.   BY MR. HILL:  So you still have some notes
17    today that are relevant to the case?
18        A.   No.
19        Q.   Did you at one time have notes that were
20    relevant to the case?
21        A.   Yes.
22        Q.   And where are those notes today?
23        A.   They are all in binders at Nitsana's office.
24        Q.   Have any of the relevant notes you made been
25    destroyed, to your knowledge?
              OCTOBER 22, 2013 - ALON EVIATAR
```

22

```
 1        A.   No.
 2        Q.   The exhibit which we've marked as 420 has
 3    176 footnotes; right?
 4        A.   Correct.
 5        Q.   And those footnotes were written by
 6    Mr. Shaked; right?
 7        A.   Most of them.
 8        Q.   Which ones did you write?
 9        A.   I don't recall exactly at this moment.
10        Q.   Can you identify a single footnote in
11    Exhibit 420 that you wrote that Mr. Shaked did not?
12        A.   I can.
13        Q.   Which one?
14        A.   For example, footnote 163.
15        Q.   Can you identify any other footnotes in
16    Exhibit 420 that you wrote and Mr. Shaked did not?
17             CHECK INTERPRETER AFRIAT:  Exhibit 420.
18             OFFICIAL INTERPRETER NE'EMAN:  In Exhibit 420.
19    Thank you.
20             THE WITNESS:  Yes.
21        Q.   BY MR. HILL:  Tell me all the footnotes
22    you can identify in Exhibit 420 that you wrote and
23    Mr. Shaked did not.
24        A.   For example, footnote 85.
25        Q.   Apart from footnote 85 and footnote 163,
              OCTOBER 22, 2013 - ALON EVIATAR
```

23

```
 1    can you identify any other footnotes that you wrote
 2    that Mr. Shaked did not?
 3        A.   I will try to recall.
 4        Q.   Please do.
 5        A.   Footnote 86 and footnote 87.
 6        Q.   Any others?
 7        A.   Footnote 100.  I believe that also -- I
 8    think also footnote 118.  I think also the last one,
 9    the next-to-last one, footnote 155.  There were more
10    of them.  I cannot recall at this time.
11        Q.   Have you now told me about all of the
12    footnotes that you can presently recall that you believe
13    that you wrote and Mr. Shaked did not?
14        A.   That's what I remember.
15        Q.   Before you signed Exhibit 421, did you
16    look at all the documents that are referenced in
17    the footnotes of Exhibit 420?
18        A.   Yes.
19        Q.   Where did you get them?
20        A.   Most of them I received via computer.
21        Q.   From whom?
22        A.   From the attorneys and from Ronni Shaked.
23        Q.   Did you consider any documents in your review
24    of Exhibit 420 that are not cited in Exhibit 420?
25        A.   I did not understand the question.
              OCTOBER 22, 2013 - ALON EVIATAR
```

24

```
 1        Q.   In working on Exhibit 420, which you have
 2    in front of you, did you review any documents that
 3    ended up not being cited or referred to in Exhibit 420?
 4        A.   Yes.
 5        Q.   Did you consider the content of those
 6    documents when deciding whether to sign Exhibit 420?
 7        A.   Yes.
 8        Q.   Where are those documents today?
 9        A.   They're still on my computer.
10        Q.   If I was to ask the plaintiffs' lawyers to
11    get those documents for me, where would they have to
12    look?
13        A.   I read hundreds of documents on the Internet,
14    and that's where they are, on the websites themselves.
15        Q.   Did you make a record of the hundreds of
16    documents on the Internet that you considered in
17    reviewing Exhibit 420?
18        A.   The only list is that which is relevant
19    to this document.
20        Q.   Okay.  That's not what I asked you, sir.
21             You said that you reviewed hundreds of
22    documents on the Internet while you were in the
23    process of reviewing Exhibit 420 in order to sign it;
24    correct?
25        A.   Correct.
              OCTOBER 22, 2013 - ALON EVIATAR
```

25

```
1        Q.   Did you make a list of those documents that
2   you reviewed on the Internet that are not cited in
3   Exhibit 420?
4        A.   No.
5        Q.   Did you put copies of those documents
6   that you reviewed on the Internet in connection
7   with Exhibit 420 that aren't cited in the report
8   in a computer file?
9        A.   No.
10       Q.   Did you print out hard copies of those
11  documents you reviewed on the Internet in connection
12  with Exhibit 420 but did not cite in Exhibit 420?
13       A.   Some of them.
14       Q.   Where are those documents today?
15       A.   I don't have them.
16       Q.   You printed them out and then threw them away?
17       A.   Yes.
18       Q.   Would you agree with me, sir, that if
19  I wanted to look at what you looked at on the
20  Internet in connection with preparing Exhibit 420,
21  it's impossible for me to look at the same materials?
22       A.   I don't understand the question exactly.
23       Q.   Mr. Eviatar, if I wanted to look at the
24  same collection of materials that you looked at in
25  connection with Exhibit 420, would you agree that
```

OCTOBER 22, 2013 - ALON EVIATAR

26

```
1   there's no way we can reconstruct that group of
2   materials?
3        A.   I agree.
4        Q.   Did you ever review a translation of
5   Exhibit 420?
6        A.   Yes.
7        Q.   Do you have a copy of the translation you
8   reviewed?
9        A.   No.
10       Q.   Do you know if anyone does?
11       A.   The translation is the report that was
12  written in Hebrew with amendments.
13       Q.   When you made amendments, did you make
14  them in Hebrew or in English?
15       A.   In Hebrew.
16       Q.   Did you sign a Hebrew version of the report?
17       A.   No.
18       Q.   Do you know whether the changes you made
19  in Hebrew are reflected in the English document which
20  is Exhibit 420?
21       A.   Yes.
22       Q.   How do you know?
23       A.   Within the framework of the work that I
24  did together with the attorneys, the amendments that
25  I sent in Hebrew came back translated into English.
```

OCTOBER 22, 2013 - ALON EVIATAR

27

```
1   And I checked them one by one.
2        Q.   Is there a record of the amendments that
3   you made in Hebrew to Mr. Shaked's report?
4        A.   Yes.
5        Q.   Do you have that?
6        A.   Yes.
7        Q.   Where is it?
8        A.   It's on my computer, and the attorneys have
9   it.
10       Q.   In what form did you make these amendments?
11       A.   On the computer.
12       Q.   Were you working in a red line, as we say?
13       A.   Yes.
14       Q.   You understand that term to mean computer
15  "track changes"?
16       A.   Yes.
17       Q.   How many "track changes" in Hebrew do you
18  believe you sent to the lawyers in the case?
19       A.   Many dozens.
20       Q.   Is this the first time you've been involved
21  in the preparation of an English-language document?
22       A.   No.
23       Q.   In what other contexts have you prepared
24  English-language documents?
25       A.   Within the framework of my responsibilities
```

OCTOBER 22, 2013 - ALON EVIATAR

28

```
1   in the military.
2        Q.   Within the framework of your responsibilities
3   in the military, did you ever have to prepare an 80-page
4   English document?
5        A.   No.
6        Q.   What's the longest English-language document
7   you ever prepared within your framework as a military
8   officer in the IDF?
9        A.   Dozens of pages.
10       Q.   Are you being paid for your work in this case?
11       A.   Yes.
12       Q.   Do you have an hourly rate?
13       A.   Yes.
14       Q.   What is it?
15       A.   $100.
16       Q.   Have you submitted any invoices or bills
17  to the plaintiffs' lawyer for your work in this case?
18       A.   Yes.
19       Q.   When did you submit that?
20       A.   Approximately one week ago.
21       Q.   Have you submitted only one invoice?
22       A.   Yes.
23       Q.   Approximately how many hours did you bill
24  the plaintiffs' lawyers for work prior to signing
25  Exhibit 421?
```

OCTOBER 22, 2013 - ALON EVIATAR

29

```
1        A.   I believe it was approximately 180 hours.
2        Q.   And how many hours in total have you billed
3   the plaintiffs for through last week?
4        A.   I don't recall.
5        Q.   Have you been paid?
6        A.   Not yet.
7        Q.   What was the total amount of your bill?
8        A.   I don't recall precisely.
9        Q.   Do you recall generally?
10        A.   Yes.
11        Q.   What's your general recollection of how
12   much you billed?
13        A.   To date, I believe that it's approximately
14   $35,000.
15        Q.   How much money did you make the last year
16   you worked as an IDF officer?
17             MR. YALOWITZ:  Bear with me one second.
18             (Pause in the proceedings.)
19             MR. YALOWITZ:  All right.  Go ahead.
20             THE WITNESS:  Annual or monthly?  I did
21   not understand.
22        Q.   BY MR. HILL:  How about monthly?
23        A.   Close to 40,000 Israeli shekels.
24        Q.   And have you done any other work since you
25   retired in April of this year?
```

OCTOBER 22, 2013 - ALON EVIATAR

30

```
1        A.   I gave one lecture.
2        Q.   Did you get paid for that?
3        A.   Yes.
4        Q.   How much did you get paid for the lecture?
5        A.   1,300 shekel.
6        Q.   Apart from the lecture and your work in
7   this case, do you have another job?
8        A.   I am supposed to start another job.
9        Q.   When are you going to start your new job?
10        A.   In January.
11        Q.   Who will be your employer?
12        A.   A municipality.
13        Q.   And what will your salary be in your new job?
14        A.   1,300 shekels per lecture.
15        Q.   So you're going to be lecturing for a
16   municipality beginning in January?
17        A.   Yes.
18        Q.   Which municipality?
19        A.   Pardes Hanna.
20        Q.   And how frequently do you anticipate
21   lecturing?
22        A.   Once a week.
23        Q.   Will you be teaching a class?
24        A.   I am going to be giving a course.
25        Q.   What course?
```

OCTOBER 22, 2013 - ALON EVIATAR

31

```
1        A.   "The Israeli/Palestinian Conflict."
2        Q.   And who will be the audience for these
3   lectures?
4        A.   Residents of the town.
5        Q.   Will the residents of the town who attend
6   your lectures be getting course credit at any
7   institution?
8        A.   I do not know.
9        Q.   How long is your lecture series anticipated
10   to last?
11        A.   It's currently planned to last until the end
12   of April.
13        Q.   The lecture you've already given, who was
14   that for?
15        A.   The same group.
16        Q.   Prior to being asked to work as an expert
17   in this case, had you ever heard of Shurat HaDin?
18        A.   I heard of it.
19        Q.   When had you first heard of them?
20        A.   Over the course of the past few years.
21        Q.   How did you first hear of Shurat HaDin?
22        A.   In the media.
23        Q.   When was the first time you met anyone
24   associated with Shurat HaDin, as far as you know?
25        A.   What do you mean by "associated with"?
```

OCTOBER 22, 2013 - ALON EVIATAR

32

```
1        Q.   Anybody who works for Shurat HaDin.
2        A.   I know Arieh Spitzen, who works for them.
3        Q.   How long have you known Arieh Spitzen worked
4   for Shurat HaDin?
5        A.   I don't know exactly.
6        Q.   You knew he worked for Shurat HaDin before
7   he approached you about being a witness in the case;
8   right?
9        A.   Yes.
10        Q.   What's your best recollection of when you
11   first learned that Mr. Spitzen worked with Shurat HaDin?
12        A.   I think it was in 2012.
13        Q.   And in what context did he tell you that he
14   was working with Shurat HaDin?
15        A.   He told me, generally speaking, what he was
16   doing.
17        Q.   Did you talk with him in 2012 about being
18   a witness in a Shurat HaDin case?
19        A.   No.
20        Q.   Apart from Mr. Spitzen, when was the next
21   occasion when you met someone associated with Shurat
22   HaDin?
23        A.   When I met with Ronni Shaked.
24        Q.   When was that?
25        A.   I think it was in the month of May.
```

OCTOBER 22, 2013 - ALON EVIATAR

33

```
 1       Q.   Are you aware that Nitsana Darshan-Leitner
 2   has said in the past that, in the early years, Shurat
 3   HaDin took direction from the government of Israel
 4   on which cases to pursue?
 5       A.   No.
 6       Q.   Do you know if this lawsuit is one of
 7   the lawsuits that the government of Israel directed
 8   Shurat HaDin to bring?
 9            MR. YALOWITZ:  Object to the form.
10            Go ahead and answer.
11            THE WITNESS:  No.
12       Q.   BY MR. HILL:  Do you know who within the
13   government of Israel may have directed Shurat HaDin
14   to bring lawsuits?
15            MR. YALOWITZ:  Object to the form.
16            Go ahead and answer.
17            THE WITNESS:  No.
18       Q.   BY MR. HILL:  You're also working with
19   Shurat HaDin on other lawsuits; right?
20       A.   Yes.
21       Q.   How many other cases are you working for
22   Shurat HaDin in connection with?
23       A.   One.
24       Q.   What's the name of that case?
25       A.   Gilmore.
```

                 OCTOBER 22, 2013 - ALON EVIATAR

35

```
 1   scope of 17 hours and is in the amount of $1,700.
 2       Q.   Apart from the work that we've already
 3   discussed that you've done for Shurat HaDin and
 4   Mr. Spitzen, have you done any other work for any
 5   of the people that you've spoken to in connection
 6   with Exhibit 420?
 7       A.   No.
 8       Q.   Have you been asked to do any work for any
 9   of those people, other than what we've already talked
10   about?
11       A.   No.
12       Q.   Do you know someone named Israel Shrenzel?
13       A.   Yes.
14       Q.   How do you know Mr. Shrenzel?
15       A.   I met him within the framework of my work
16   for Shurat HaDin.
17       Q.   So is there anyone else that you've met
18   within the framework of your work for Shurat HaDin
19   that you haven't told me about yet?
20       A.   No.
21       Q.   Did you know Mr. Shrenzel before you met
22   him in the context of your work for Shurat HaDin?
23       A.   No.
24       Q.   Did you speak to him before you signed
25   Exhibit 421?
```

                 OCTOBER 22, 2013 - ALON EVIATAR

34

```
 1       Q.   And have you submitted a bill for your work
 2   in the Gilmore case?
 3       A.   No.
 4       Q.   What rate are you charging for your work
 5   in that case?
 6       A.   $100 per hour.
 7       Q.   And approximately how many hours of work
 8   have you done for Shurat HaDin on the Gilmore case?
 9       A.   Approximately 100 hours.
10       Q.   Has Shurat HaDin asked you to do any work
11   other than work on this case and the Gilmore case?
12       A.   No.
13       Q.   Setting aside whether it was Shurat HaDin,
14   has anyone associated with Shurat HaDin asked you to
15   do any other work?
16       A.   I performed one small project for Arieh
17   Spitzen.
18       Q.   Okay.  And did you get paid for that project?
19       A.   No.
20       Q.   Are you expecting to get paid for that
21   project?
22       A.   Certainly.
23       Q.   How much do you expect to be paid for that
24   project?
25       A.   My request for payment includes work in the
```

                 OCTOBER 22, 2013 - ALON EVIATAR

36

```
 1       A.   I told him "hi."  I said "hello" to him.
 2       Q.   Any other conversations before you signed
 3   Exhibit 421, other than saying "hello"?
 4       A.   No.
 5            MR. YALOWITZ:  I think we've been going
 6   more than an hour, and I suspect some in the group
 7   might appreciate a break.
 8            MR. HILL:  Let me ask about three more
 9   questions on this line, and we'll finish up.
10            MR. YALOWITZ:  I think somebody in the
11   room would appreciate a break.  I think we should
12   take a break.
13       Q.   BY MR. HILL:  Have you spoken to --
14            MR. YALOWITZ:  When your witnesses asked
15   for a break or when you asked for a break, I said
16   "sure."  I didn't say we'll wait more time.  I think
17   you should extend the same courtesy.
18            MR. HILL:  Well, I have like three more
19   questions.  Counsel, if you don't mind, I'll close
20   out this line, and we can move on.
21       Q.   BY MR. HILL:  (Not translated.)  Have you
22   spoken to Mr. Shrenzel after you signed Exhibit 421?
23            (Comment in Hebrew by the witness.)
24            (Court reporter clarification.)
25            MR. ROCHON:  It wasn't translated.
```

                 OCTOBER 22, 2013 - ALON EVIATAR

37

1     MR. HILL:  The question was:  Had you
2  spoken to Mr. Shrenzel after you signed the report?
3  He answered in English "no."  And Mr. Rochon said
4  it wasn't translated.
5     MR. YALOWITZ:  He said "lo."  He didn't say
6  "no."
7     OFFICIAL INTERPRETER NE'EMAN:  Tell me when
8  you're ready for me to interpret.
9     MR. HILL:  I don't think it's necessary.
10     All right.  We'll take a break.
11     (Recess from 10:12 a.m. to 10:25 a.m.)
12    Q.  BY MR. HILL:  Did you speak to Mr. Shrenzel
13  about his report before you signed Exhibit 421?
14    A.  No.
15     MR. HILL:  Mark this as Exhibit 422.
16     (Defendants' Exhibit 422 marked.)
17    Q.  BY MR. HILL:  Mr. Eviatar, I'm showing you
18  what we've marked as Exhibit 422, which is a document
19  entitled:
20     "Expert Report of Israel Shrenzel in Sokolow
21  versus Palestinian Authority, Case No. 04-397."
22     Have you ever seen this before?
23    A.  (Examining.)  No.
24    Q.  Lay Exhibit 422 side by side with Exhibit 420,
25  if you would, please.  If you could, align the pages

OCTOBER 22, 2013 - ALON EVIATAR

38

1  so that the last paragraph of Exhibit 420 is next to
2  the fourth paragraph of Exhibit 422.
3    A.  The last one in 420, next to?
4    Q.  On the first page of each document, align
5  the last paragraph of 420 with the fourth paragraph
6  of 422.
7     Do you have the two documents side by side,
8  sir?
9    A.  Yes.
10    Q.  Look, if you will, at 420, the last paragraph
11  on the first page.  The third sentence of that paragraph
12  says:
13     "In that position, I was responsible (among
14  other things) for supervising the work of IDF research
15  and assessment personnel in various fields relating to
16  Palestinian affairs, drafting and presenting research
17  and policy papers concerning Palestinian affairs, and
18  appearing before and providing briefings to senior
19  governmental and military forums regarding Palestinian
20  affairs."
21     And that's in the exhibit that you eventually
22  signed; right?
23    A.  Yes.
24    Q.  Then look at Exhibit 422 and look at the
25  fourth paragraph on the first page.

OCTOBER 22, 2013 - ALON EVIATAR

39

1     Do you see that the third paragraph, the
2  third sentence of that paragraph, contains exactly
3  the same language I just read to you, except that in
4  420 it says "IDF" and in 422 it says "GSS"?
5    A.  I see that.
6    Q.  Do you see, sir, that the next sentence on
7  420 says:
8     "I supervised approximately 50 people."
9    A.  I see that.
10    Q.  And on Exhibit 422, it says:
11     "I supervised approximately 15 to 20 people."
12     Do you see that?
13    A.  Yes.
14    Q.  And would you agree with me that the last
15  sentence of the paragraph we've been looking at on
16  420 and 422 both say:
17     "I also provided numerous briefings about
18  Palestinian affairs, in Israel, to foreign officials."
19    A.  Yes.
20    Q.  There is a slight difference in that in 422
21  it also says "and abroad"; right?
22    A.  Correct.
23    Q.  The next paragraph in 420 says:
24     "In the course of my services in the IDF,
25  I received and read many thousands of intelligence

OCTOBER 22, 2013 - ALON EVIATAR

40

1  items - including raw intelligence data obtained
2  from electronic and human sources, as well as analyses
3  and summaries compiled from such raw data, many of which
4  my team prepared under my supervision - relating to the
5  activities of the Palestinian Authority (the 'PA'), the
6  Palestine Liberation Organization (the 'PLO'), and the
7  full range of Palestinian groups, organizations,
8  institutions, and personalities."
9     Do you see that, sir?
10    A.  Yes.
11    Q.  And you would agree with me that the exact
12  same language appears in the fifth paragraph on the
13  first page of Exhibit 422, except that in Exhibit 422
14  it says "GSS" instead of "IDF"?
15     Right?
16    A.  I would like to examine that.
17     (Examining.)  Yes.
18    Q.  Do the sentences that we've just read together
19  have the same author?
20    A.  No.
21    Q.  Who wrote the sentences that we've just read
22  in Exhibit 420?
23    A.  I did.
24    Q.  Is it your testimony that no one other than
25  you wrote the sentences we've just read aloud together

OCTOBER 22, 2013 - ALON EVIATAR

41

```
1   in Exhibit 420?
2       A.   Yes.
3       Q.   Can you explain how the sentences that you
4   wrote on Exhibit 420 are so close to the sentences that
5   appear on Exhibit 422?
6       A.   I do not know.
7       Q.   Turn, if you will, to the last page of
8   Exhibit 422.
9            Do you see that that page is dated April 10th,
10  2013?
11      A.   Yes.
12      Q.   Turn to the last page of Exhibit 420.
13           Do you see how that page is dated June 14th,
14  2013?
15      A.   Yes.
16      Q.   Look at Exhibit 421.
17           That's the document that has your signature
18  on it; right?
19      A.   Yes.
20      Q.   And you've previously testified that you
21  signed that document on or about June 14th, 2013; right?
22      A.   Correct.
23      Q.   Do you have any explanation for how
24  Mr. Shrenzel, in a report dated April of this year,
25  could have chosen almost exactly the same language
```

42

```
1   as the language you claim to have written in June
2   of this year?
3       A.   I have no idea.
4            (Defendants' Exhibit 423 marked.)
5       Q.   BY MR. HILL:  Mr. Eviatar, I'm handing you
6   what we've marked as Defendants' Exhibit 423.
7            Have you seen this document before?
8       A.   (Examining.)  Yes.
9       Q.   What is this document?
10      A.   This is my report.
11      Q.   Turn, if you will, to page 17 of Exhibit 423,
12  and lay that page side by side, if you would, to page 17
13  of Exhibit 420.
14           Do you see, sir, that in paragraph 1 on
15  page 17 of Exhibit 423, certain text has been struck
16  through?
17      A.   Yes.
18      Q.   And in particular, the text that has been
19  struck through reads:
20           "From, inter alia, my work at the Israel
21  Security Agency."
22           Correct?
23      A.   Yes.
24      Q.   And we have been told by plaintiffs' counsel
25  that this is a corrected version of your report.
```

43

```
1            Is this, in fact, a corrected version of
2   your report?
3       A.   That is quite correct.
4       Q.   Whose idea was it to strike the text on
5   page 17?
6       A.   Mine.
7       Q.   And you wished to have that information
8   struck because it was not true; correct?
9       A.   Correct.
10      Q.   Was that something you overlooked when you
11  were working on Exhibit 420 in June?
12      A.   I noticed it and I corrected it.  I don't
13  recall when I corrected it.
14      Q.   Now, at the beginning of our time together
15  today, Mr. Yalowitz indicated that the portion of
16  Exhibit 420 that starts under "III," which is called
17  "Part Two," has been withdrawn; correct?
18      A.   Correct.
19      Q.   Why has that been withdrawn?
20           MR. YALOWITZ:  Objection.  Instruction not
21  to answer.  Attorney work product.
22           Don't answer the question.
23      Q.   BY MR. HILL:  Was it your idea to withdraw
24  that section?
25           MR. YALOWITZ:  Objection.  Instruction not
```

44

```
1   to answer.  Attorney work product.
2       Q.   BY MR. HILL:  Why did you wait until yesterday
3   to withdraw that section?
4           MR. YALOWITZ:  Objection.  Instruction not
5   to answer.  Attorney work product.
6       Q.   BY MR. HILL:  When did you first have a
7   conversation with plaintiffs' counsel about whether
8   to withdraw this section?
9           MR. YALOWITZ:  Objection.  Instruction not
10  to answer.  Attorney work product.
11          MR. HILL:   I don't want to debate with you,
12  Counsel, but I don't think the timing of the discussion
13  would be privileged.  Would you reconsider your
14  instruction?
15          MR. YALOWITZ:  I'll reflect on it.  I'll
16  step out.
17          MR. HILL:  You want to take a break?  Sure.
18          (Recess from 10:47 a.m. to 10:48 a.m.)
19          MR. YALOWITZ:  Back on the record.  We've
20  taken a moment to reflect, and on reflection, we're
21  going to stand on the instruction.
22      Q.   BY MR. HILL:  Which lawyers for the plaintiffs
23  did you communicate with about potentially withdrawing
24  "Part Two," regarding terrorist interrogations?
25          MR. YALOWITZ:  Objection.  Instruction not
```

45

```
1   to answer.  Attorney work product.
2       Q.   BY MR. HILL:  Was anyone present other
3   than plaintiffs' counsel when you communicated
4   with them about potentially withdrawing "Part Two,"
5   entitled "Terrorist Interrogations," from Exhibit 420?
6            MR. YALOWITZ:  You can answer.
7            THE WITNESS:  No.
8       Q.   BY MR. HILL:  What were the names of
9   the plaintiffs' counsel that were present at that
10  communication?
11      A.   Mr. Yalowitz and the lawyer named Dina.
12      Q.   Where did that communication with Dina and
13  Mr. Yalowitz take place?
14      A.   On the computer.
15      Q.   When approximately did you have that computer
16  communication with Mr. Yalowitz and Dina?
17           MR. YALOWITZ:  Objection.  Instruction not
18  to answer.  Attorney work product.
19      Q.   BY MR. YALOWITZ:  Did you have a communication
20  with Mr. Yalowitz or Dina about that subject prior to
21  September 16, 2013?
22           MR. YALOWITZ:  Objection.  Instruction not
23  to answer.  Attorney work product.
24           MR. HILL:  Again, I don't want to debate
25  with you, Counsel.  But you're taking the position
```

OCTOBER 22, 2013 - ALON EVIATAR

46

```
1   that the date of the communication is itself covered
2   by the protection?
3            MR. YALOWITZ:  We're standing on the
4   instruction.  We did pause and reflect on it, as
5   you requested.
6            MR. HILL:  Okay.  I disagree, but we'll
7   let the magistrate sort out that issue.
8       Q.   BY MR. HILL:  (Not translated.)  Apart
9   from that computer communication about potentially
10  withdrawing the section which is "III," entitled
11  "Part Two - Terrorist Interrogations," from the
12  report which has been marked as Exhibit 420, have
13  you had any other communications about that subject?
14           MR. YALOWITZ:  I'm sorry.  Can I have the
15  question back?
16           (Pending question read.)
17           MR. YALOWITZ:  Okay.
18           (Pending question translated.)
19           THE WITNESS:  Yes.
20      Q.   BY MR. HILL:  With who else have you had
21  communications about that subject?
22      A.   Nobody else.
23      Q.   On how many occasions have you communicated
24  with Mr. Yalowitz and Dina about that subject?
25      A.   One.
```

OCTOBER 22, 2013 - ALON EVIATAR

47

```
1       Q.   So there have been a total of two
2   communications about this subject over the computer;
3   is that correct?
4       A.   On the computer, one communication.
5       Q.   Has there been an in-person communication
6   about this as well?
7       A.   Yes.
8       Q.   Where did that in-person communication take
9   place?
10      A.   At the offices of Shurat HaDin.
11      Q.   Who was present for this communication?
12      A.   Mr. Yalowitz and the attorney named Dina.
13      Q.   Anyone else?
14      A.   Perhaps the attorney named Phil.
15      Q.   Anyone else?
16      A.   No.
17      Q.   And what date was the in-person communication?
18           MR. YALOWITZ:  Objection.  Instruction not
19  to answer.  Attorney work product.
20      Q.   BY MR. HILL:  Was the in-person communication
21  before or after the computer communication you have
22  described?
23           MR. YALOWITZ:  Objection.  Instruction not
24  to answer.  Attorney work product.
25           MR. HILL:  Mr. Yalowitz, may I correctly
```

OCTOBER 22, 2013 - ALON EVIATAR

48

```
1   assume that, if I pose any further questions on this
2   line, you will be instructing the witness not to answer,
3   as you've already done?
4            MR. YALOWITZ:  I will take it question by
5   question.  But my instructions will be consistent
6   with those that I've given in the past.  You should
7   feel free to ask whatever questions you want to make
8   whatever record you think is appropriate.
9            MR. HILL:  Will you state for the record
10  the basis of your instruction that the date of the
11  communication is itself protected?
12           MR. YALOWITZ:  It reflects our litigation
13  strategy.
14      Q.   BY MR. HILL:  Did any of your work at the
15  Bar Ilan University pertain to the role of the PA or
16  PLO in the Second Intifada?
17      A.   No.
18      Q.   Have you had any further formal education
19  since you obtained your Master's degree?
20      A.   Can you repeat the question?
21      Q.   Since you completed your Master's degree,
22  have you had any further formal education of any kind?
23      A.   No.
24      Q.   Have you conducted any interviews of any
25  persons in connection with Exhibit 420?
```

OCTOBER 22, 2013 - ALON EVIATAR

49

```
1     A.   Are you referring to the report itself?
2     Q.   Yes, sir.
3     A.   I did not perform any interviews.
4     Q.   Prior to your work on Exhibit 420, had you
5   interviewed anyone that you believe is relevant to
6   Exhibit 420?
7     A.   Yes.
8     Q.   Tell me the names of all the people that
9   you interviewed prior to your work on Exhibit 420,
10  the interviews of which you believe are relevant to
11  Exhibit 420.
12          (Pending question partially translated.)
13          MR. YALOWITZ:  I just want to caution the
14  witness not to disclose -- and I assume that the
15  question is limited, that you don't want him to
16  disclose the information that he's not at liberty
17  to disclose because of his prior employment.
18          MR. HILL:  Unless you're instructing him
19  not to answer this question, I'd like him to answer
20  this question.  So let's see what he says.
21          MR. YALOWITZ:  Okay.  So with that caution,
22  if you just ask the question, and then I'll repeat my
23  objection.
24          (Pending question translated.)
25          MR. YALOWITZ:  And I just want to caution
```

OCTOBER 22, 2013 - ALON EVIATAR

50

```
1   the witness that he should not disclose any names
2   that he thinks would be inappropriate to disclose,
3   based on his prior work.
4          THE WITNESS:  May I answer?
5          MR. YALOWITZ:  Yes.
6          THE WITNESS:  All of the people whom I
7   spoke with were within the framework of my work in
8   the military.
9     Q.   BY MR. HILL:  (Not translated.)  So are you
10  saying that, because all of the people you spoke with,
11  the interviews of which you think are pertinent to
12  Exhibit 420, were within the framework of your work
13  for the military, that you are unable to tell me their
14  names?
15          MR. YALOWITZ:  Object to the form of the
16  question.
17          (Pending question translated.)
18          THE WITNESS:  Correct.
19    Q.   BY MR. HILL:  So sitting here today, you
20  cannot tell me the name of a single person who you
21  interviewed, the interview of which is relevant to
22  Exhibit 420; correct?
23          MR. YALOWITZ:  Object.  Object to the form
24  of the question.
25          THE WITNESS:  Correct.
```

OCTOBER 22, 2013 - ALON EVIATAR

51

```
1          MR. HILL:  I don't think I got the answer.
2          OFFICIAL INTERPRETER NE'EMAN:  "Correct."
3     Q.   BY MR. HILL:  And why can't you tell me the
4   names of those people?
5     A.   Because we're talking about sources that
6   served my professional work.
7     Q.   Sir, the sources that you've referred to,
8   did you consider the information you received from
9   them in connection with your work on Exhibit 420?
10          MR. YALOWITZ:  Object to the form of the
11  question.
12          THE WITNESS:  Irrespective of that work,
13  I took it into account within the framework of my
14  responsibilities.
15    Q.   BY MR. HILL:  So you did consider the
16  information you had received from those sources in
17  connection with your work on Exhibit 420; is that
18  correct?
19          MR. YALOWITZ:  Object.  Object to the form
20  of the question.
21          THE WITNESS:  No.  What I intended to say
22  was that the information that I accumulated within
23  the framework of my conversations with those sources,
24  it was formulated and it accumulated in my head within
25  the framework of that work.  I cannot state what the
```

OCTOBER 22, 2013 - ALON EVIATAR

52

```
1   exact use was of information from this interview or
2   that interview.
3     Q.   BY MR. HILL:  Thank you.  I think that helps
4   me understand.
5          You would agree, sir, that when you were
6   working on Exhibit 420, you still had in your mind
7   information from sources that you had learned as a
8   result of your work in the IDF; correct?
9     A.   Definitely.
10    Q.   Okay.  And over the course of your work
11  with the IDF, you have received information from
12  sources that is relevant to Exhibit 420; correct?
13          MR. YALOWITZ:  Object to the form of the
14  question.
15          THE WITNESS:  It's possible.
16    Q.   BY MR. HILL:  It's not just possible.  It's
17  certain, isn't it, sir?
18    A.   I assume that's correct.
19    Q.   And it's also correct that, even if you wanted
20  to, you couldn't tell me any of that information today
21  because it remains classified; right?
22    A.   Correct.
23    Q.   In fact, sir, you may know something from
24  sources in your work in the IDF that's inconsistent
25  with what's written on Exhibit 420; right?
```

OCTOBER 22, 2013 - ALON EVIATAR

53

1    A.   Can you repeat the question?
2    Q.   It's possible, sir, that some of the
3   information you received from sources over your
4   decades in the IDF is inconsistent with what's been
5   written in Exhibit 420; correct?
6    A.   No.
7    Q.   You've never received, in the course of
8   your work in the IDF, any information inconsistent
9   with what's written in Exhibit 420?
10    A.   No.
11    Q.   Tell me about the information that you've
12   received in the course of your work at the IDF that's
13   consistent with what you've written in Exhibit 420.
14          MR. YALOWITZ:  Objection.  Instruction not
15   to answer.
16          MR. HILL:  What's the basis of the
17   instruction?
18          MR. YALOWITZ:  The witness -- it's not
19   relevant.  He didn't rely on it.  And he's not at
20   liberty to disclose it.
21          MR. HILL:  Well, the first two are not a
22   basis.  So you're saying he's prohibited by some law
23   from disclosing the answer?
24          MR. YALOWITZ:  Yes -- well, I don't know that.
25          MR. HILL:  Well, are you instructing him or

OCTOBER 22, 2013 - ALON EVIATAR

54

1   not?
2          MR. YALOWITZ:  I'm protecting the witness.
3   I'm protecting the record.  I'm instructing him.  If
4   you wish to take it up with the court, you know how
5   to do that.
6          MR. HILL:  Well, the court's not in session
7   right now.  But you're not going to change your
8   instruction on this question?
9          MR. YALOWITZ:  That's correct.
10    Q.   BY MR. HILL:  Can you tell me anything about
11   the information you learned while in the IDF that's
12   relevant to Exhibit 420?
13          MR. YALOWITZ:  Object -- well, go ahead.
14          You can answer.
15          THE WITNESS:  All of the sources for this
16   report are open source.  They're accessible by anyone,
17   and they're also relevant to my previous line of work.
18    Q.   BY MR. HILL:  But, sir, you also have
19   information that is not open source, that is relevant
20   to Exhibit 420; right?
21    A.   I don't have in my possession any classified
22   information.
23    Q.   There's classified information in your head,
24   isn't there, sir?
25    A.   Correct.

OCTOBER 22, 2013 - ALON EVIATAR

55

1    Q.   Tell me the classified information that you
2   know that's relevant to Exhibit 420.
3          MR. YALOWITZ:  Objection.  Instruction not
4   to answer.  It also calls for a legal conclusion on
5   what's relevant.
6          I think you're asking him a question that's
7   not appropriate for the lay witness to answer.  You
8   can ask a more specific question if you wish.
9    Q.   BY MR. HILL:  Okay.  Do you have classified
10   information in your head that's relevant to Exhibit 420?
11          MR. YALOWITZ:  Same objection.  Same
12   instruction since it's the same question.
13          MR. HILL:  You're not going to let him answer
14   whether he has it?  The question is:  Does he have it?
15          MR. YALOWITZ:  My objection is to the term
16   "relevant."  That's a legal term.  That's your argument.
17   You're embedding a legal conclusion in your question.
18          MR. HILL:  That's not a basis to instruct
19   him not to answer.  Are you instructing him not to
20   answer this question or not?
21          MR. YALOWITZ:  Yes.
22    Q.   BY MR. HILL:  Sir, do you have any classified
23   information in your head that relates to Exhibit 420?
24          MR. YALOWITZ:  Same objection.  Same
25   instruction.

OCTOBER 22, 2013 - ALON EVIATAR

56

1    Q.   BY MR. HILL:  Sir, do you have any classified
2   information in your head that has anything to do with
3   Exhibit 420?
4    A.   No.
5    Q.   Do you have any classified information in
6   your head that has to do with the Hebrew University
7   attack?
8    A.   No.
9          MR. HILL:  Okay.  Let's take a break.
10          (Recess from 11:08 a.m. to 11:20 a.m.)
11    Q.   BY MR. HILL:  Turn to page 2 of Exhibit 420.
12   Under the heading "Nature and Purpose of Report," I'd
13   like you to look at the second paragraph.  That sentence
14   there says:
15          "My expert opinion herein does not deal with
16   the responsibility of Hamas for the commission of the
17   attack by Hamas."
18          And the attack you're referring to there is
19   the bombing of the cafeteria at the Hebrew University;
20   correct?
21    A.   Correct.
22    Q.   And you agree, though, that that attack was
23   done by Hamas; right?
24    A.   Correct.
25    Q.   Your report does not mention the name of

OCTOBER 22, 2013 - ALON EVIATAR

57

1  the person who placed the bomb in the cafeteria;
2  does it?
3       A.   To the best of my recollection, that is
4  correct.
5       Q.   Your report does not contain any discussion
6  of who may have instructed that person to place the
7  bomb; right?
8       A.   Can you repeat the question?
9       Q.   Your report does not contain a discussion
10 of who may have instructed the person to place the
11 bomb in the cafeteria to do so; correct?
12      A.   Correct.
13      Q.   Your report does not contain any discussion
14 of why the person who placed the bomb in the cafeteria
15 did so; correct?
16           MR. YALOWITZ:  Object to the form.
17           THE WITNESS:  Correct.
18      Q.   BY MR. HILL:  Your report does not contain
19 any discussion of where the person who placed the bomb
20 in the cafeteria got it?
21      A.   Correct.
22      Q.   Your report does not contain any discussion
23 of from whom the person who placed the bomb received
24 the bomb?
25      A.   Not correct.

OCTOBER 22, 2013 - ALON EVIATAR

58

1       Q.   What does your report say about from whom
2  the person who placed the bomb received it?
3       A.   The report states that the person who is
4  responsible for that bomb is Abdullah Barghouti.
5       Q.   I appreciate the answer, sir.  That's not
6  what I asked you.
7       The report does not say from whom the person
8  who placed the bomb got the bomb, does it?
9       A.   Correct.
10      Q.   Your report does not say how the person who
11 placed the bomb hid the bomb in order to take it to
12 Hebrew University; correct?
13      A.   Correct.
14      Q.   Your report does not say how the person who
15 placed the bomb got access to the cafeteria; correct?
16      A.   Correct.
17      Q.   And Exhibit 420 does not explain what
18 connection, if any, the person who placed the bomb
19 had with Abdullah Barghouti; correct?
20      A.   Correct.
21      Q.   In fact, the person who placed the bomb had
22 no connection to the PA at all, did he?
23      A.   To the best of my recollection, that is
24 correct.
25      Q.   Okay.  The person who placed the bomb had

OCTOBER 22, 2013 - ALON EVIATAR

59

1  never received any money from the PA; right?
2       A.   To the best of my recollection, that is
3  correct.
4       Q.   In fact, the person that placed the bomb
5  lived in Israel; right?
6       A.   Correct.
7       Q.   And the Hebrew University is outside of the
8  area controlled by the PA; right?
9       A.   Correct.
10      Q.   The PA has no security responsibility for
11 Hebrew University; right?
12           MR. YALOWITZ:  Object to the form of the
13 question.
14           THE WITNESS:  Correct.
15      Q.   BY MR. HILL:  None of your work at the IDF
16 involved the bombing of the Hebrew University?
17      A.   I did not directly deal with that.
18      Q.   None of your work at the IDF even indirectly
19 dealt with the Hebrew University bombing; right?
20      A.   I heard about the attack when I was in the
21 Army.
22      Q.   Did you hear about it through official
23 channels?
24      A.   From media sources.
25      Q.   Apart from what you heard about in media

OCTOBER 22, 2013 - ALON EVIATAR

60

1  sources, you had nothing to do with the bombing of
2  Hebrew University; correct?
3       A.   I read about it subsequently in the reports.
4       Q.   Okay.  But I want to focus on what happened
5  in July of 2002, sir.
6       At the time the bombing happened in July of
7  2002, you had no job responsibilities related to that
8  bombing; correct?
9       A.   Correct.
10      Q.   All you know about that bombing are things
11 that you've seen in the media or read; right?
12      A.   Correct.
13      Q.   At the time of the bombing, your
14 responsibilities were in Jericho; right?
15      A.   Correct.
16      Q.   And the Hebrew University, for the record,
17 is not in Jericho; right?
18      A.   Correct.
19      Q.   The Hebrew University is in Jerusalem?
20      A.   Correct.
21      Q.   And none of your duties, as a member of the
22 IDF, involved any responsibility for Jerusalem; correct?
23      A.   In my most recent positions, I studied and
24 I investigated -- I investigated or I researched what
25 is happening in Jerusalem as well.

OCTOBER 22, 2013 - ALON EVIATAR

61

1    Q.   Did your research involve the Hebrew
2  University bombing?
3    A.   No.
4    Q.   Turn, if you will, to page 4 of the report.
5  Sir, I'd like to call your attention to "II" of your
6  report, which is entitled:
7          "Part One - Hebrew University."
8          Do you see that, sir?
9    A.   Yes.
10   Q.   And that section begins on page 4 of your
11 report and goes through page 16 of your report; correct?
12   A.   Correct.
13   Q.   All of the information contained on those
14 pages in that section is information that you read
15 somewhere; right?
16   A.   Correct.
17   Q.   You don't have any firsthand knowledge of
18 any of that information; right?
19   A.   I would like to review the pages.
20        (Examining.)  Can you repeat the question,
21 please?
22   Q.   The question is just:  You don't have any
23 firsthand knowledge of the information that appears
24 under heading "II" on pages 4 to 16 of your report;
25 correct?

OCTOBER 22, 2013 - ALON EVIATAR

62

1    A.   That's all correct, with the exception of
2  one or two sections.  The section where I'm talking
3  about the Dawa.
4    Q.   For the record, which page and paragraph
5  is that?
6    A.   I'd like to locate that, please.  Section 2,
7  page 13.
8    Q.   Have you finished your answer?
9    A.   (In English.)  Yes.  Yes, of course, I
10 finished.
11        (Translated.)  I had finished it earlier.
12   Q.   Are you aware of statements by Hamas as
13 to why the attack was made at the Hebrew University
14 in July 2002?
15   A.   Can you repeat the question?
16   Q.   Are you aware of statements made by Hamas
17 as to why the attack was made on the cafeteria in
18 July 2002 at the Hebrew University?
19   A.   Yes.
20   Q.   What do you understand Hamas said was the
21 reason for the attack?
22   A.   The reason is, from the perspective of Hamas,
23 that Palestine must be liberated by means of an armed
24 struggle.
25   Q.   And do any of the sources that you cite in

OCTOBER 22, 2013 - ALON EVIATAR

63

1  Exhibit 420 say that, sir?
2    A.   I believe that footnote number 2 refers to
3  this.
4    Q.   Which source of footnote number 2?
5    A.   A statement from a website of Izz Ad-Din
6  Al-Qassam, a confession -- a confession that Hamas
7  carried out the terrorist attack.
8    Q.   Are you familiar with someone called Sheikh
9  Ahmed Yassin?
10   A.   Yes.
11   Q.   Who was he?
12   A.   He was the leader of Hamas.
13   Q.   Is he alive today?
14   A.   No.
15   Q.   Why not?
16   A.   Because he was assassinated by Israel.
17   Q.   Did you have anything to do with the
18 assassination of Sheikh Yassin?
19   A.   No.
20        MR. HILL:  Let's mark this.
21        (Defendants' Exhibit 424 marked.)
22   Q.   BY MR. HILL:  In fact, Israel has assassinated
23 a number of Hamas leaders; correct?
24   A.   Correct.
25   Q.   One was named Salah Shehadeh; right?

OCTOBER 22, 2013 - ALON EVIATAR

64

1    A.   Correct.
2    Q.   Did you have anything to do with the
3  assassination of Salah Shehadeh?
4    A.   No.
5    Q.   Have you had anything to do with any
6  assassinations conducted by the IDF?
7    A.   No.
8    Q.   Let me show you what we've marked as
9  Exhibit 424.  This is an Associated Press article
10 dated July 31st, 2002; correct?
11   A.   Correct.
12   Q.   Did you look at this document when you were
13 working on Exhibit 420?
14   A.   I have to examine this.
15   Q.   Please do.
16   A.   (Examining.)  Could you please tell me what
17 Bates number that is?
18   Q.   It doesn't have a Bates number, sir.
19   A.   I don't recall whether I have seen this
20 before.
21   Q.   I'd like to draw your attention to the second
22 paragraph on Exhibit 424, which says:
23        "Sheikh Ahmed Yassin, the spiritual leader
24 of the militant Hamas group, linked the bombing to
25 Israel's air strike in Gaza last week that killed

OCTOBER 22, 2013 - ALON EVIATAR

65

```
 1   Hamas military commander Salah Shehadeh and 14
 2   civilians, including nine children."
 3        Do you see that?
 4   A.   Yes.
 5   Q.   Do you recall Sheikh Yassin making statements
 6   to that effect on or around July 31st, 2002?
 7   A.   I don't recall.
 8   Q.   You didn't put that in your report, did you?
 9   A.   Correct.
10   Q.   Look at the second page of Exhibit 424.  The
11   sixth paragraph on that page says:
12        "The Palestinian Authority, led by Yasser
13   Arafat, said in a statement that it 'absolutely
14   condemns the attack against Hebrew University.'"
15        Do you see that, sir?
16   A.   Yes.
17   Q.   Do you recall President Arafat stating words
18   to that effect on or about July 31st, 2002?
19   A.   No.
20   Q.   You didn't put that in your report either,
21   did you?
22   A.   Correct.  I believe that's correct.
23   Q.   Now, it's also true that Israel conducted
24   assassinations of Palestinians who were held in PA
25   custody; right?
```

OCTOBER 22, 2013 - ALON EVIATAR

66

```
 1   A.   Correct.
 2   Q.   And you agree that Palestinian policemen
 3   were sometimes killed when Israelis assassinated
 4   Palestinians who were in PA custody; right?
 5   A.   Could we please examine what is meant by
 6   the words "assassination during detention" or while
 7   being held.
 8   Q.   Will you agree that Israel has fired missiles
 9   or other ordinance at PA detention facilities in order
10   to kill people that were detained inside?
11        Right?
12   A.   Correct.
13   Q.   And you agree that, in some of those
14   instances, Palestinian policemen who were on duty
15   guarding prisoners were killed; right?
16   A.   I assume so, yes.
17   Q.   Now, in your report, you claim that
18   Abdullah Barghouti was released from PA custody
19   on August 27th, 2001; right?
20   A.   I believe that it was the 27th.
21   Q.   And that's based on a document you've read;
22   right?
23   A.   Correct.
24        (Defendants' Exhibit 425 marked.)
25   Q.   BY MR. HILL:  Let me show you a document
```

OCTOBER 22, 2013 - ALON EVIATAR

67

```
 1   which we've marked as Defendants' Exhibit 425, entitled:
 2        "Chronological Review of Events Relating to
 3   the Question of Palestine."
 4        Is this one of the documents you looked at
 5   in connection with your work on Exhibit 420?
 6   A.   (Examining.)  I believe that I have not seen
 7   this.
 8   Q.   Are you familiar with the United Nations?
 9   A.   Yes.
10   Q.   Do you consider them to be a reliable source
11   of information?
12   A.   It depends what information.
13   Q.   Well, turn, if you will, to the third page
14   of Exhibit 425.  And you see in bold there on the
15   left-hand side the number "26."
16   A.   Yes.
17   Q.   And you see on the first page that this
18   refers to August of 2001; right?
19   A.   Correct.
20   Q.   And you see that the bold numbers on the
21   document correspond to dates of the month; right?
22   A.   I can't say whether or not that is true.
23   Q.   Assume for the purposes of our inquiry
24   today that those bold numbers refer to dates of the
25   month.  Okay?
```

OCTOBER 22, 2013 - ALON EVIATAR

68

```
 1   A.   Okay.  Fine.
 2   Q.   The first sentence under 26 on the third
 3   page says:
 4        "Israeli fighter planes and tanks demolished
 5   police buildings in several Palestinian towns."
 6   A.   Correct.
 7   Q.   Do you see that?
 8   A.   Yes.
 9   Q.   Do you recall that happening on or about
10   that day?
11   A.   No.
12   Q.   The next sentence says:
13        "A Palestinian policeman was killed and
14   at least 19 people injured when Israeli F-16s and
15   F-15s attacked Palestinian police HQ in Gaza City,
16   Deir el-Balah in southern Gaza Strip, and the village
17   of Salfit near Nablus."
18        Do you see that?
19   A.   Yes.
20   Q.   Do you also see in the middle of that
21   paragraph where it says:
22        "An Israeli tank shell near Beit Hanoun,
23   northeast of Gaza City, killed a 14-year-old Palestinian
24   boy from the Jabalya refugee camp."
25   A.   No.  Can you show me that again?
```

OCTOBER 22, 2013 - ALON EVIATAR

69

```
1    Q.   Yes.
2    A.   (In English.)  "An Israeli tank"?
3    Q.   Yes.  Do you see the reference to Beit Hanoun?
4    A.   (In English.)  Yes.
5    Q.   And you see the next sentence that says:
6         "Israeli helicopters fired seven missiles at
7  a police station in Tulkarm."
8    A.   Yes.
9    Q.   And if you see, the last sentence in that
10 paragraph says:
11        "One of the nighttime air strikes leveled
12 a four-story building in the Gaza City police HQ."
13        Do you see that?
14   A.   Yes.
15   Q.   Does this refresh your memory that the day
16 before you say Abdullah Barghouti was released, Israeli
17 forces were destroying police buildings in Gaza City,
18 Deir Al-Balah, Salfit, Tulkarm, and Ramallah?
19        MR. YALOWITZ:  Objection.  Objection.
20 Misstates the record.
21        The question was Ramallah and not Salfit,
22 I think.  He said Ramallah; right?
23        Objection, misstates the record.
24   Q.   BY MR. HILL:  You can respond to it.
25   A.   I'm not the one who's claiming that Abdullah
```

OCTOBER 22, 2013 - ALON EVIATAR

70

```
1  Barghouti was released.  He is the one who is saying
2  that.
3    Q.   That's a fair point.
4         You're just repeating what Mr. Barghouti
5  allegedly said in some document; right?
6    A.   He did not allegedly claim that.  He
7  confessed it in the course of his interrogation.
8    Q.   Okay.  But you weren't present when he was
9  interrogated; right?
10   A.   Correct.
11   Q.   You've just read a document that purports
12 to reflect what he told an interrogator; right?
13   A.   The document cites what Barghouti stated
14 during the course of his interrogation.  And Barghouti
15 signed the document and stated that everything is
16 accurate.
17   Q.   What language is this document written in?
18   A.   In Hebrew.
19   Q.   Do you know whether Abdullah Barghouti could
20 read Hebrew as of the date of that document?
21   A.   He is not capable of doing so.
22   Q.   Okay.  So Abdullah Barghouti did not write
23 anything in Hebrew in those documents, did he?
24   A.   He wrote in Arabic, not in Hebrew.
25   Q.   Now, to now to return to the exhibit
```

OCTOBER 22, 2013 - ALON EVIATAR

71

```
1  that's in front of you, sir, does this refresh your
2  recollection that the attacks made by the IDF on
3  Palestinian police facilities that are described in
4  that document occurred on or about August 26th, 2001?
5         MR. YALOWITZ:  I'm sorry.  Can I just have
6  the question back?
7         (Pending question read.)
8         MR. YALOWITZ:  Go ahead and answer.
9         THE WITNESS:  I am reading here that the
10 Israeli attacks took place on those same dates.
11   Q.   BY MR. HILL:  You don't have any reason
12 to doubt the accuracy of this UN report, do you, sir?
13   A.   Correct.
14   Q.   In fact, you have a general recollection
15 that, in this time period of August of 2001, the IDF
16 was attacking PA police facilities; right?
17   A.   Correct.
18   Q.   You didn't mention any of these attacks in
19 your report; right?
20   A.   Correct.
21   Q.   Do you recall the IDF assassinating someone
22 called Abu Ali Mustafa?
23   A.   Yes.
24   Q.   Who was Abu Ali Mustafa?
25   A.   The head of the Popular Front.
```

OCTOBER 22, 2013 - ALON EVIATAR

72

```
1    Q.   That's the Popular Front for the Liberation
2  of Palestine?
3    A.   Yes.
4    Q.   And do you recall that he was assassinated
5  by missiles from a helicopter, in his office in
6  Ramallah?
7    A.   I think so.  Yes.
8    Q.   Turn to the next page of Exhibit 425.  Do
9  you see the first sentence on the top of the page that
10 says:
11        "The Israeli Army killed the secretary general
12 of the Popular Front for the Liberation of Palestine
13 (PFLP), Mustafa Zibri, known has Abu Ali Mustafa, in
14 his office in the West Bank town of Ramallah."
15        Do you see that?
16   A.   Yes.
17   Q.   Does this refresh your recollection that
18 the assassination of Abu Ali Mustafa took place on
19 August 27, 2001?
20   A.   I don't recall the date of the assassination.
21   Q.   Do you have any reason to doubt that the
22 UN report that we're looking at that is Exhibit 425
23 is inaccurate as to the date on which Abu Ali Mustafa
24 was assassinated by the IDF?
25   A.   I have no reason.
```

OCTOBER 22, 2013 - ALON EVIATAR

73

1    Q.    As far as you know, August 27th, 2001, was
2  the date on which Abu Ali Mustafa was assassinated;
3  right?
4    A.    Correct.
5    Q.    And that is the same date on which Exhibit 420
6  says Abdullah Barghouti was released; right?
7    A.    Correct.
8    Q.    You did not mention the assassination of
9  Abu Ali Mustafa in your report; correct?
10   A.    Correct.  To the best of my recollection.
11   Q.    Turn, if you will, to page 7 of Exhibit 420.
12 And I'd like to refer you to footnote number 6.  That
13 references something called an:
14       "ISA Wanted List Delivered to PA - August
15 2001."
16       Is that correct?
17   A.    I see the section that you're talking about.
18   Q.    And it's also referenced in paragraph 6 on
19 that same page; right?
20   A.    Footnote 6?  I don't understand the question.
21   Q.    The same list is referred to both in
22 paragraph 6 in the text and footnote 6 at the bottom
23 of page 7; right?
24   A.    Correct.
25   Q.    In August of 2001, your job responsibilities

OCTOBER 22, 2013 - ALON EVIATAR

74

1  in Jericho didn't have anything to do with this ISA
2  list; right?
3    A.    Correct.
4    Q.    You've never even seen this document, have
5  you?
6    A.    The document containing the list of names?
7    Q.    Yes, sir.
8    A.    I saw it within the framework of the sources
9  for this report.
10   Q.    And you would agree that the version that
11 you saw within the framework of the sources for the
12 report does not contain Abdullah Barghouti's name;
13 correct?
14   A.    The version that I saw did not contain his
15 name, but that was a partial version.
16   Q.    And you've never seen the full version; right?
17   A.    Correct.
18   Q.    You reviewed the police officers' recordation
19 of Mr. Barghouti's interrogation; right?
20       (Pending question partially translated.)
21       OFFICIAL INTERPRETER NE'EMAN:  Did you say
22 "recording"?
23   Q.    BY MR. HILL:  Let me rephrase the question.
24       As part of your work on Exhibit 420, you
25 looked at a document that would have been purportedly

OCTOBER 22, 2013 - ALON EVIATAR

75

1  prepared by a police officer who had interrogated
2  Abdullah Barghouti; right?
3    A.    I examined the report by the police officer.
4    Q.    And that's the same document we were talking
5  about earlier that's written in Hebrew?
6    A.    Correct.
7    Q.    And you would agree that that document
8  indicates that Abdullah Barghouti received a lot
9  of money from Hamas; right?
10   A.    Correct.
11   Q.    And you would agree that no document you
12 have seen indicates how much money Abdullah Barghouti
13 had available to him in July of 2002; right?
14   A.    No, there was another document.
15   Q.    Which document have you seen that indicates
16 how much money Abdullah Barghouti had in July of 2002?
17   A.    The book that Abdullah Barghouti wrote
18 himself.
19   Q.    And does it say what his bank account
20 balance was in July, 2002?
21   A.    I don't recall.
22   Q.    Apart from the book that you found on the
23 Internet that you've referenced, have you seen anything
24 else that indicates how much money Abdullah Barghouti
25 may have had available to him in July of 2002?

OCTOBER 22, 2013 - ALON EVIATAR

76

1    A.    No.
2    Q.    And the book that you're referring to is,
3  in fact, something you found on the Web; right?
4    A.    It's also in the Internet and also within
5  the framework of the sources that were given to me
6  for the purpose of the preparation of the report.
7    Q.    Okay.  The lawyers gave you a document that
8  purports to have been written by Abdullah Barghouti
9  in Arabic; right?
10   A.    It was from the Internet.
11   Q.    Okay.  You don't have any idea who put that
12 document on the Internet, do you?
13   A.    I don't know.
14   Q.    The statement of the police that you reviewed
15 also indicated that there came a time when Abdullah
16 Barghouti claimed to be living in a home in Ramallah;
17 right?
18   A.    Correct.
19   Q.    There did come a time when the IDF invaded
20 or re-occupied Ramallah; right?
21   A.    Correct.
22   Q.    And, in fact, the police statement you
23 reviewed indicated that Abdullah Barghouti claimed
24 to be living in a house in Ramallah with an IDF
25 observation post on top of the house; right?

OCTOBER 22, 2013 - ALON EVIATAR

77

1    A.  I don't recall the issue of the observation
2  post.
3        Q.  You didn't mention the fact that the police
4  statement indicated he'd been in a house that had an
5  IDF observation post on top of it in your report; right?
6        A.  Correct.
7        Q.  You would agree with me, sir, that if the
8  IDF has an observation post on top of a house in
9  Ramallah, that at least that house is under IDF control;
10 right?
11       A.  It would be reasonable to assume that.  Yes.
12       Q.  The IDF would not allow Palestinian forces
13 to secure a building that the IDF had an observation
14 post on, would it, sir?
15       A.  Correct.
16       Q.  Certainly not in the period that we're
17 talking about here; right?
18       A.  In principle, correct.
19       Q.  There's no doubt in your mind that, if
20 there was an IDF observation post on top of the
21 house in which Abdullah Barghouti was living, that
22 that entire house was under the control of the IDF;
23 right?
24       A.  It would be reasonable to assume.  Yes.
25       Q.  Do you recall, from the police statement,

OCTOBER 22, 2013 - ALON EVIATAR

78

1  that Abdullah Barghouti claimed that he had shown
2  IDF soldiers a fake ID?
3        A.  I recall.
4        Q.  And you recall that the IDF soldiers who
5  encountered Mr. Barghouti on that occasion did not
6  take him into custody; correct?
7        A.  Correct.
8        Q.  And you recall that that episode occurred
9  before the bombing at Hebrew University; right?
10       A.  Correct.
11       Q.  And you did not mention that in Exhibit 420;
12 did you, sir?
13       A.  Correct.
14           MR. HILL:  Why don't we take our lunch break
15 here.  Let's go off the record.
16           (Recess from 12:13 p.m. to 1:23 p.m.)
17           (Defendants' Exhibit 426 marked.)
18       Q.  BY MR. HILL:  Mr. Eviatar, you understand
19 that you're still under oath; right?
20       A.  Correct.
21       Q.  Let me hand you what we've marked as
22 Exhibit 426.  This is the report of Ronni Shaked
23 that we discussed this morning; right?
24       A.  (Examining.)  Correct.
25       Q.  And that's the report that the plaintiffs'

OCTOBER 22, 2013 - ALON EVIATAR

79

1  lawyers gave you at the beginning of your work in
2  this matter; right?
3        A.  Correct.
4        Q.  Turn, if you will, to page 19 of Exhibit 420,
5  which is the first document that we handed you today.
6           Do you have page 19 of Exhibit 420 in front
7  of you?
8        A.  Yes.
9        Q.  The section that's on "IV" of Exhibit 420
10 is called:
11           "Part Three - The Connection and Relationship
12 Between the PA, PLO, and Fatah."
13           Correct?
14       A.  Yes.
15       Q.  And that section "IV," which is "Part Three,"
16 begins at the bottom of page 19 and continues through
17 page 25; right?
18       A.  That's right.
19       Q.  This may be obvious, but you've never been
20 part of the PA; right?
21       A.  Correct.
22       Q.  And you've never been part of the PLO?
23       A.  Correct.
24       Q.  You've never been part of Fatah?
25       A.  Correct.

OCTOBER 22, 2013 - ALON EVIATAR

80

1        Q.  You've never been part of something called
2  Tanzim; right?
3        A.  Correct.
4        Q.  You've never been part of something called
5  the Al-Aqsa Martyrs' Brigade; right?
6        A.  Correct.
7        Q.  Your job in Jericho with the IDF did not
8  involve the connection and relationship between the PA,
9  PLO, and Fatah; correct?
10       A.  No.
11       Q.  Do you agree with me?
12       A.  No.
13       Q.  What responsibility did you have in your
14 job in Jericho for the connection and relationship
15 between the PA, PLO, and Fatah?
16       A.  Within the framework of my responsibilities
17 in Jericho, I was responsible for the entire picture
18 of information in my region and the Allenby Bridge.
19       Q.  Anything else about your responsibilities in
20 Jericho that involved the connection and relationship
21 between the PA, PLO, and Fatah?
22       A.  Part of my responsibility is to understand
23 and to be familiar with the various Palestinian entities
24 that I work with or that I learn about.
25       Q.  While you were working in Jericho, did you

OCTOBER 22, 2013 - ALON EVIATAR

81

```
1    have any dealings with the PLO?
2        A.    Yes.
3        Q.    Who from the PLO did you have dealings with
4    while you worked at Jericho?
5        A.    For example, Dr. Saeb Erekat.
6        Q.    Anyone other than Dr. Erekat?
7        A.    For example, Ahmed Qurei, whose nickname --
8    whose alias is Abu Alaa.
9        Q.    Anyone else from the PLO that you dealt
10    with while you worked in Jericho?
11        A.    I don't recall at this moment.
12        Q.    While you were working in Jericho, did you
13    have any dealings with someone -- with anyone from
14    Fatah?
15        A.    Definitely.
16        Q.    Okay.  Tell me the names of the people from
17    Fatah that you dealt with while you were working in
18    Jericho?
19        A.    Jamal Lafi, the mayor of Jericho, the head
20    of the Fatah movement in Jericho, the head of the
21    Preventive Security Services in -- or the security
22    services in Jericho.
23        Q.    Anyone else?
24        A.    Those were the main people.
25        Q.    What was the name of the mayor?
```

82

```
1        A.    I don't recall right now.
2        Q.    How about the head of Fatah, what was his
3    name?
4        A.    I don't recall his name at the moment either.
5        Q.    How about the head of the security services,
6    what was his name?
7        A.    I don't recall precisely.
8        Q.    Other than the people you've already told
9    me about, while you were working in Jericho, did you
10    deal with anyone from the Palestinian Authority?
11        A.    Yes.
12        Q.    Tell me the names of those people.
13        A.    I don't recall names.  I remember the
14    positions that they served in.
15        Q.    Okay.  What positions of the people whose
16    names you can't recall from the PA did you deal with
17    while you were working in Jericho?
18        A.    Various functionary -- officeholders at
19    the municipality, at the district, in the various
20    governmental offices --
21            OFFICIAL INTERPRETER NE'EMAN:  "Offices"
22    or "ministries"?
23            THE WITNESS:  (In English.)  Ministries is up.
24            OFFICIAL INTERPRETER NE'EMAN:  Yes.  Okay.
25            THE WITNESS:  People holding positions at
```

83

```
1    the Allenby Bridge.  Those were the main ones.
2        Q.    BY MR. HILL:  And can you tell me the names
3    of any of those people?
4        A.    I don't recall at the moment.
5        Q.    Have you now told me all of the names or
6    positions of people from the PA, PLO, or Fatah that
7    you dealt with while you were working in Jericho?
8        A.    Most of them, I think.
9        Q.    Can you tell me any more?
10        A.    Officially?
11        Q.    I don't understand what you mean, sir.
12            What do you mean by "officially"?
13        A.    Are you referring to people holding official
14    positions with the Palestinian Authority?
15        Q.    Sir, I mean to refer to anyone associated
16    with the PA, PLO, or Fatah that you personally dealt
17    with when you worked in Jericho.  If you can tell me
18    the names or offices of anyone else that you haven't
19    told me about yet, please do so.
20        A.    People from the office of Saeb Erekat;
21    people from the office of the head of the Palestinian
22    Liaison Office; people from the municipal authorities
23    of the various districts in the Jericho area, including
24    the northern Jordan Valley; people from the Palestinian
25    Tourism Ministry; and all of the other offices that I
```

84

```
1    noted previously.
2        Q.    Anybody else?
3        A.    Not that I currently recall.
4        Q.    So of that group of people that we've been
5    talking about for the last few minutes that you've
6    now described as much as you can recall of, did you
7    ever have a conversation with any of them about the
8    connection and relationship between the PA, PLO, and
9    Fatah?
10        A.    I recall, in general terms, conversations
11    that I conducted with some of them on the issue that
12    you asked about.
13        Q.    Can you tell me the name of any person who
14    you recall having such a conversation with?
15        A.    For example, with Saeb Erekat.
16        Q.    Okay.  We'll come back to Mr. Erekat.
17            Can you tell me the name of anyone, other
18    than Mr. Erekat, that you had a conversation about
19    this subject with while you were working in Jericho?
20        A.    For example, Abu Alaa.  For example, with
21    the head of the Palestinian Liaison Office.  For
22    example, with some of the heads of the Palestinian
23    security forces.
24        Q.    Which heads of the security forces?
25        A.    The head of the national security apparatus,
```

85

1    the head of the preventative security apparatus, the
2    head of the -- the intelligence apparatus, the police
3    apparatus, the head of the military liaison --
4    Palestinian military liaison office.
5        Q.    Any others?
6        A.    I assume that I had conversations with other
7    people primarily at the Allenby Bridge, and I don't
8    recall.
9        Q.    You don't recall any others than that;
10   correct?
11       A.    Not at the moment.
12       Q.    What, if anything, do you recall Saeb Erekat
13   saying to you about the connection and relationship
14   between the PA, PLO, and Fatah?
15       A.    I don't recall precisely sentences that he
16   said to me.  I remember that I had conversations with
17   him about the entities in which he is a member and
18   which he represents.
19       Q.    Can you tell me anything more about
20   conversations you may have had with Saeb Erekat
21   about the connection and relationship between the
22   PA, PLO, and Fatah, other than what you just said?
23       A.    I don't recall further.
24       Q.    Okay.  You mentioned Ahmed Qurei, who is
25   also known as Abu Alaa.

OCTOBER 22, 2013 - ALON EVIATAR

87

1        A.    I don't recall at the moment.
2        Q.    I'll try a question of a group of people and
3    see if it makes things go faster.
4            Can you tell me, to the best of your
5    recollection, the substance of any conversation you
6    may have had with any of the heads of the Palestinian
7    security forces about the subject of the connection
8    and relationship between the PA, PLO, and Fatah?
9        A.    I recall, in general terms, that in the
10   meetings with the heads of the Palestinian security
11   forces, they made sure to represent the positions of
12   the entities that they were members of, which were
13   the Palestinian Authority, the PLO, and the Fatah.
14       Q.    Okay.  Can you provide me any more information
15   about conversations you may have had with the heads
16   of Palestinian security forces on the subject of the
17   connection and relationship between the PA, PLO, and
18   Fatah, beyond what you just told me?
19           (Comment in Hebrew by the witness.)
20           MR. YALOWITZ:  Objection.  Vague.
21       BY MR. HILL:  What's the answer?
22       A.    No, I don't recall.
23       Q.    Can you recall any conversation you may have
24   had with the Palestinian Liaison Office concerning the
25   subject of the connection and relationship between the

OCTOBER 22, 2013 - ALON EVIATAR

86

1            Can you recollect any conversation with
2    Abu Alaa about the connection and relationship between
3    the PA, PLO, and Fatah?
4        A.    I don't recall.
5        Q.    Can you recollect anything the head of the
6    Palestinian Liaison Office may have told you about
7    the connection and relationship between the PA, PLO,
8    and Fatah?
9        A.    I don't recall anything specific.
10       Q.    Do you recall anything generally?
11       A.    Yes.
12       Q.    Tell me the best and fullest recollection you
13   have of a conversation with the head of the Palestinian
14   Liaison Office about the connection and relationship
15   between the PA, PLO, and Fatah.
16       A.    We had many conversations about the situation
17   among various parties, the positions of -- the political
18   positions of the Palestinians, and with respect to
19   Palestinian interests, Palestinian needs.  And that's
20   what I currently recall at this time.
21       Q.    Can you provide me any more information about
22   conversations with the head of the Palestinian Liaison
23   Office concerning the topic of the connection and
24   relationship between the PA, PLO, and Fatah, other
25   than what you just said?

OCTOBER 22, 2013 - ALON EVIATAR

88

1    PA, PLO, and Fatah?
2        A.    I was speaking about them as well when I
3    spoke about the heads of the security forces.
4        Q.    Okay.  Then I'm down to my last one.
5            Can you tell me the substance of any
6    conversation you may have had with anyone connected
7    with the Allenby Bridge about the connection and
8    relationship between the PA, PLO, and Fatah?
9        A.    I don't recall specific content.
10       Q.    Tell me the full recollection of what
11   you recall talking with somebody associated with
12   the Allenby Bridge about the topic of the connection
13   and relationship between the PA, PLO, and Fatah.
14       A.    I'm asking again:  Are you asking me whether
15   I should answer to the best of my recollection?
16       Q.    If you have any recollection at all of
17   a conversation with somebody from the Allenby Bridge
18   on the subject of a connection and relationship between
19   the PA, PLO, and Fatah, please tell me what it is right
20   now.
21       A.    No, don't remember.
22       Q.    Is it fair to say, sir, that none of the
23   material which is in "IV, Part Three," on pages 19 to
24   25 of Exhibit 420, comes from conversations you've had
25   with Palestinians?

OCTOBER 22, 2013 - ALON EVIATAR

89

1    A.    There is nothing in this information that's
2  based -- no section in this --
3         (Brief exchange in Hebrew between Official
4    Interpreter Ne'eman and the witness.)
5         THE WITNESS:  None of the information that's
6  set forth here in the pages that you've mentioned,
7  there is no section or sentence that that's based
8  upon my conversations with the people who I refer to.
9    Q.    BY MR. HILL:  Is there anything in this
10  section, "IV, Part Three," on pages 19 to 25, that's
11  based on a conversation you've had with any Palestinian?
12    A.    Yes.  In the past.
13    Q.    Which information contained in Item 4,
14  which is "Part Three," from pages 19 to 25 of
15  Exhibit 420, is based on a conversation you've
16  had with a Palestinian?
17    A.    I wish to examine the material.
18    Q.    Of course.
19    A.    (Examining.)  Okay.  For example, the fact
20  that we're referring to a single system is based upon
21  all of my conversations with the Palestinians throughout
22  all of the years.
23    Q.    Okay.  Anything else?
24    A.    (In English.)  Yes.
25         (Translated.)  The issue of identity of

OCTOBER 22, 2013 - ALON EVIATAR

90

1  the Fatah, of the Shabiba, of the Tanzim, of the
2  Palestinian Authority, of the PLO, and all of the
3  relationships among those entities is based upon
4  an organized Palestinian philosophy.  All of that
5  information I accumulated over the course of all
6  the years within the framework of hundreds of
7  conversations that I've conducted with Palestinians.
8    Q.    Anything else?
9    A.    No.
10    Q.    Can you tell me the name of a single
11  Palestinian who told you about either of those topics,
12  as you sit here today?
13    A.    I could give an example of the head of
14  Fatah in Bethlehem.  I can give an additional example
15  of a minister in the Palestinian Authority.
16         I can give further examples of people
17  who hold offices -- of officials in the Palestinian
18  Authority, in the PLO, in the Palestinian government,
19  and in the Fatah movement with whom I had professional
20  contacts from the very first day that I have dealt
21  with the Palestinian arena and to date.
22    Q.    I appreciate your answer, sir.
23         Can you give me the name of a single person
24  who spoke to you about these topics?
25    A.    I can give the example of Minister Hussein

OCTOBER 22, 2013 - ALON EVIATAR

91

1  Al-Sheikh.
2    Q.    Anyone else?
3    A.    Kamal Hamid, the head of the Fatah in
4  Bethlehem.
5    Q.    Anyone else?
6    A.    For example, Mohammed Dahlan.
7    Q.    Anything else?
8    A.    No.
9    Q.    What did Hussein Al-Sheikh say to you about
10  these topics?
11    A.    I don't recall particular or specific
12  sentences that Hussein Al-Sheikh stated.  I remember
13  conversations that he had with me with respect to
14  the Palestinian entities which we mentioned.
15    Q.    Can you tell me anything more about the
16  subject of these conversations with Mr. Al-Sheikh,
17  other than what you've just said?
18    A.    I remember, for example, a prominent
19  conversation that Hussein Al-Sheikh had with me
20  on the subject of Shuhada Al-Aqsa.
21    Q.    Anything else?
22    A.    I don't recall at the moment.
23    Q.    Have you now told me everything you can
24  recollect about the conversations with Hussein
25  Al-Sheikh that you referred to?

OCTOBER 22, 2013 - ALON EVIATAR

92

1    A.    Yes.
2    Q.    Tell me the full recollection you have of
3  any conversations with Kamal Hamid about this subject.
4    A.    I don't recall a specific conversation.
5    Q.    Tell me your full recollection of any
6  conversation you had with Kamal Hamid on this topic.
7    A.    I remember that, in the conversations
8  that Kamal and I had together, he would make sure
9  to represent the Palestinian positions of those
10  entities.
11    Q.    Can you tell me anything else about those
12  conversations with Mr. Hamid beyond what you've
13  already said here today?
14    A.    Kamal Hamid would also talk about
15  demonstrations, for example.
16    Q.    Can you recall anything else about your
17  conversations with Kamal Hamid on this subject that
18  you haven't told me about today?
19    A.    The subjects also pertained to issues that
20  related to the relationships between Israelis and
21  Palestinians.
22    Q.    Okay.  Can you tell me anything else about
23  your recollection of conversations with Kamal Hamid
24  on this subject of the connection and relationship
25  between the PA, PLO, and Fatah, other than what you've

OCTOBER 22, 2013 - ALON EVIATAR

93

```
 1   already said?
 2       A.   I do not recall.
 3       Q.   Can you tell me anything about conversations
 4   you may have had with Mohammed Dahlan about the
 5   connection and relationship between the PA, PLO,
 6   and Fatah?
 7       A.   I remember small-talk with Dahlan in Gaza
 8   before the disengagement.
 9       Q.   Apart from what you've just described,
10   can you recollect any other conversations with
11   Mohammed Dahlan about the subject of the connection
12   and relationship between the PA, PLO, and Fatah?
13       A.   No.
14       Q.   Is any of the information contained in
15   "Part Three" of Exhibit 420, which is pages 19 to 25,
16   drawn from written materials other than those that
17   you refer to in those pages?
18       A.   I'd like to review the pages.
19       Q.   Of course.
20       A.   (Examining.)  All of the material that
21   appears here is based upon sources, open sources,
22   that are relevant within the framework of this work.
23   And they are combined with the cumulative knowledge
24   and experience that I have acquired within the
25   framework of my various positions.
```

OCTOBER 22, 2013 - ALON EVIATAR

94

```
 1       Q.   (Not translated.)  Okay.  I appreciate
 2   that answer.  Is every written document that you
 3   have considered in connection with the subject of
 4   the connection and relationship between the PA, PLO,
 5   and Fatah, listed on pages 19 to 25 of Exhibit 420?
 6            MR. YALOWITZ:  Object to the form of the
 7   question.  Overbroad.
 8            You can give him the question.
 9            (Pending question translated.)
10            THE WITNESS:  Yes, it's all here.
11       Q.   BY MR. HILL:  Have you ever received
12   any classified information about the connection
13   and relationship between the PA, PLO, and Fatah?
14       A.   Within the framework of my work in the Army?
15       Q.   At any time.
16       A.   The answer is "yes."
17       Q.   I take it, if I ask you about the classified
18   information you've received about the connection and
19   relationship between the PA, PLO, and Fatah, that you
20   won't tell me what that information is; right?
21       A.   That's correct.
22       Q.   Turn, if you will, to page 25 of Exhibit 420.
23   There is "V," which is "Part Four," and it's entitled:
24            "PLO/PA Payments to Terrorists and Their
25   Families."
```

OCTOBER 22, 2013 - ALON EVIATAR

95

```
 1            Do you see that, sir?
 2       A.   Yes.
 3       Q.   And that section begins on page 25 and
 4   continues to page 27; correct?
 5       A.   Correct.
 6       Q.   Have you had any conversations with
 7   Palestinians about the subject that you discuss
 8   in "Part Four" of Exhibit 420?
 9       A.   I wish to review what's written here.
10       Q.   Please do so.
11       A.   (Examining.)  I don't recall a specific
12   conversation with any Palestinian person with respect
13   to what's written here.
14       Q.   Okay.  Do you recall the name of a Palestinian
15   that you may have had a general conversation with about
16   the subject of "Part Four" of Exhibit 420?
17       A.   I recall one specific conversation.
18       Q.   Tell me the best of your recollection of that
19   conversation you had with someone about the subject of
20   "Part Four" of Exhibit 420.
21            MR. YALOWITZ:  Objection.  Are you limiting
22   it to -- as a follow-up to the prior answer, which
23   was about Palestinians?
24            MR. HILL:  I didn't intend to, but let's see
25   what the witness says.
```

OCTOBER 22, 2013 - ALON EVIATAR

96

```
 1            THE WITNESS:  Can you repeat the question?
 2       Q.   BY MR. HILL:  Yes.  Tell me the best
 3   recollection you have of a conversation with someone
 4   that you had about the subject matter of "V, Part Four,"
 5   of Exhibit 420.
 6       A.   Are you referring only to Palestinians or
 7   to Israelis as well?
 8       Q.   Well, let's start with Palestinians.
 9            Can you recollect a conversation with
10   any Palestinian about the subject of "Part Four" of
11   Exhibit 420, specifically the subject that's on pages
12   25 to 27 of this document?
13       A.   I remember a conversation that I had with
14   the head of the Palestinian prisoners club.
15       Q.   Any other conversations with Palestinians
16   about this subject of "Part Four" of Exhibit 420,
17   other than the one with the head of the prisoners club?
18       A.   I don't recall at the moment.
19       Q.   What was the name of the person that you
20   described as the head of the prisoners club?
21       A.   Qadura Fares.
22       Q.   And can you tell me the fullest recollection
23   you have of the conversation with Qadura Fares about
24   that topic?
25       A.   I remember that we spoke six years ago, in
```

OCTOBER 22, 2013 - ALON EVIATAR

97

1  2007, a conversation that dealt with the organization
2  of demonstrations of support in favor of Marwan
3  Barghouti.  My conversations with Qadura Fares were
4  on this topic.
5      Q.  Have you now told me everything you can
6  recall about those conversations with Mr. Fares?
7      A.  The conversations with him dealt with the
8  Palestinian support for Marwan Barghouti, who was
9  in prison for five years.
10     Q.  Can you tell me anything else about that
11 conversation with Mr. Fares, other than what you've
12 already said here today?
13     A.  I don't recall.
14     Q.  You mentioned you'd had some conversation
15 with Israelis about the subject of "Part Four" of
16 Exhibit 420; is that right?
17     A.  Correct.
18     Q.  And did any of them work for the PA?
19     A.  No.
20     Q.  Did any of them work for the PLO?
21     A.  No.
22     Q.  Who did they work for?
23     A.  They worked in the Israel prison authority.
24     OFFICIAL INTERPRETER NE'EMAN:  "Israel Prison
25 Service."  Sorry.

OCTOBER 22, 2013 - ALON EVIATAR

98

1      Q.  BY MR. HILL:  And do you remember what someone
2  from the Israel Prison Service may have told you about
3  subject "Four" of Exhibit 420, which is PA/PLO payments
4  to terrorists and their families?
5      A.  The information that they gave me, within
6  the framework of the fact that we were professional
7  colleagues, was consistent with what appears here.
8      Q.  Can you tell me anything in particular that
9  this person or persons from the Israeli Prison Service
10 told you about the subject that you recall?
11     A.  I remember details about conversations that
12 dealt with methods and ways in which the Palestinian
13 entities transferred the money to the prisoners and
14 to their families.
15     Q.  Tell me your fullest recollection of those
16 conversations.
17     A.  I don't recall more than what I've just
18 stated.
19     Q.  You agree that, in order for the prisoners
20 of Israeli prisons to receive any money, the Israeli
21 Prison Service has to be involved; right?
22     A.  Correct.
23     Q.  In fact, this is what your colleague was
24 telling you was the mechanism of how the Israeli
25 Prison Service allowed prisoners to receive money;

OCTOBER 22, 2013 - ALON EVIATAR

99

1  right?
2      A.  Just about part of the apparatus or part
3  of the mechanism.
4      Q.  Tell me the part of the mechanism you
5  recall discussing with the person from the Israel
6  Prison Service that you mentioned.
7      A.  The Israel Prison Service is part of the
8  picture only with respect to some of the funds.
9      Q.  Okay.  Tell me everything you can recollect
10 about that conversation with the person from the
11 Israeli Prison Service about this subject.
12     A.  I remember conversations that dealt with
13 money for the canteen, that dealt with money that the
14 Hamas prisoners received.  That's more or less what
15 I remember.
16     Q.  Did the colleague from the Israeli Prison
17 Service say anything about where the Hamas prisoners
18 were getting money?
19     A.  Yes.
20     Q.  Tell me what you recall in that regard.
21     A.  What I remember is the funds that the Hamas
22 prisoners received, as well as other security prisoners,
23 that they receive it from the Palestinian Authority
24 and from Hamas itself.
25     Q.  Okay.  And that's what your colleague at

OCTOBER 22, 2013 - ALON EVIATAR

100

1  the Israeli Prison Service told you; right?
2      A.  Yes.
3      Q.  Your job responsibilities have never involved
4  the transfer of money to Israeli prisoners; right?
5      A.  Correct.
6      Q.  And by "Israeli prisoners," I mean
7  Palestinians imprisoned in Israeli jails.
8      You understand that; right?
9      A.  Correct.
10     Q.  You would agree with me that, if the Israeli
11 prison system wanted to stop prisoners from receiving
12 money from Hamas, the Israeli prison system could do so;
13 right?
14     MR. YALOWITZ:  Objection.  Calls for a legal
15 conclusion.
16     Q.  BY MR. HILL:  Go ahead and answer, sir.
17     A.  Do not agree.
18     Q.  Do you believe Hamas has the ability to give
19 money to people in Israeli prisons if the Israeli Prison
20 Service doesn't want them to?
21     A.  The money goes to the families of the
22 prisoners.  And, therefore, it has nothing to do
23 with the Israel Prison Service.
24     Q.  Okay.  What was the name of this person
25 from the Israel Prison Service that we've been talking

OCTOBER 22, 2013 - ALON EVIATAR

101

1    about?

2        A.    Yuval Biton.

3        Q.    Did you speak to anyone else from the Israeli

4    Prison Service about that subject?

5        A.    Yes.

6        Q.    Who else did you speak to about that subject,

7    sir?

8        A.    From the Israel Prison Service?

9        Q.    Yes, sir.

10       A.    With Gabi Yehuda.

11       Q.    Anyone else?

12       A.    No.

13       Q.    Have you now told me the substance of what

14   you can recall about the conversations with these two

15   individuals from the Israeli Prison Service?

16       A.    Yes.

17       Q.    Are all of the written documents that you

18   considered in connection with "Part Four" of Exhibit

19   420, which is on pages 25 to 27, disclosed in "Part

20   Four" of Exhibit 420?

21            MR. YALOWITZ:  Objection.  Overbroad.

22       Q.    BY MR. HILL:  Go ahead and answer, please.

23       A.    All of the documents are cited here.

24       Q.    Did you ever receive classified information

25   about the subject of "Part Four," which is described

OCTOBER 22, 2013 - ALON EVIATAR

102

1    as PA/PLO payments to terrorists and their families,

2    that's on pages 25 to 27 of Exhibit 420?

3        A.    No.

4        Q.    Look, if you will, at page 27, and I'll refer

5    you to "VI."

6            OFFICIAL INTERPRETER NE'EMAN:  Could I ask

7    for a break?

8            MR. HILL:  Sure.  Let's go off the record.

9            (Recess from 2:22 p.m. to 2:32 p.m.)

10       Q.    BY MR. HILL:  Mr. Eviatar, we were looking

11   at Exhibit 420 before the break.  Calling your attention

12   again to the bottom of page 27, which is "VI," entitled:

13            "Part Five - The Palestinian Ministry of

14   Prisoners and Released Prisoners' Affairs."

15            Do you see that, sir?

16       A.    Yes.

17       Q.    And that section of Exhibit 420 starts on

18   page 27 and continues through page 38; correct?

19       A.    Correct.

20       Q.    And you would agree with me, sir, that

21   not every Palestinian security prisoner who is in

22   an Israeli prison is a terrorist; right?

23       A.    Could you repeat the question?

24       Q.    You would agree with me that not every

25   Palestinian security prisoner who is in an Israeli

OCTOBER 22, 2013 - ALON EVIATAR

103

1    prison is a terrorist; correct?

2        A.    Everyone who is defined as a security

3    prisoner has committed an offense, and that person

4    is defined as a terrorist.

5        Q.    So someone who is a security prisoner because

6    they've engaged in nonviolent protest, are you saying

7    that such a person is a terrorist?

8        A.    The concept of terrorist is not only in

9    the context of terrorism.  Somebody who creates a

10   disturbance, a violent disturbance, to any other form

11   of activity, in Hebrew, he is a terrorist.  He's --

12            OFFICIAL INTERPRETER NE'EMAN:  I'm looking

13   for the right word.

14            "He's obstructing something."

15       Q.    BY MR. HILL:  So, sir, in your view, even

16   someone who is a security prisoner because they've

17   engaged in nonviolent protests is, nonetheless, a

18   terrorist?

19            Is that what you're saying?

20       A.    He's not a terrorist.

21       Q.    Okay.  So you would agree with me, then,

22   that there are some Palestinians who are security

23   prisoners imprisoned by Israel who are not terrorists;

24   right?

25       A.    That's correct, in the pure sense of the word.

OCTOBER 22, 2013 - ALON EVIATAR

104

1        Q.    Would you agree with me, sir, that someone

2    who is a Palestinian security prisoner because they

3    have thrown stones at IDF personnel is not a terrorist?

4        A.    I agree with the definition.

5        Q.    Would you agree with me, sir, that someone

6    who is a Palestinian who is a security prisoner because

7    they are a member of an illegal organization, is not,

8    for that reason alone, a terrorist?

9        A.    I agree.

10       Q.    Okay.  You would agree, sir, that Palestinians

11   have the right, under international law, to resist the

12   occupation by engaging with IDF forces; correct?

13            MR. YALOWITZ:  Objection.  Calls for a legal

14   conclusion.  Beyond the scope.

15       Q.    BY MR. HILL:  Go ahead.

16       A.    That issue is not part of my responsibilities.

17   It's not part of my field.

18       Q.    You don't know anything about whether

19   Palestinians have the right, under international law,

20   to resist IDF forces in occupied territory?

21            Is that what you're saying?

22       A.    I am not proficient in international law.

23       Q.    Did you ever express an opinion on that

24   issue while you worked for the IDF?

25       A.    No.

OCTOBER 22, 2013 - ALON EVIATAR

105

1    Q.   We talked earlier about the basis for the
2    information that's in Exhibit 420; right?
3    A.   Yes.
4    Q.   I need to ask you similar questions about
5    the rest of the report.  I'm going to try and do it
6    as a group, if we can, and maybe we'll get through it
7    faster.  Maybe we can't, but we'll give it a try.  Okay?
8    A.   Please.  Go ahead.
9    Q.   So with respect to "Part Five," which begins
10   on page 27, through "Part Eleven," which continues
11   through page 88, with respect to those sections of
12   the report that we haven't yet discussed, have you
13   had any conversations with Palestinians about those
14   subjects?
15   A.   Are you referring, in your question, to all
16   of the material that appears from page 27 to -- till
17   the end of page 88?
18   Q.   I'm trying to do it as a group, if it's
19   possible.  If it's not, we'll do them one by one.
20   But let's see if we can do it this way.
21        Can you tell me whether, for that material
22   from page 27 to the end of the report, you've had
23   conversations with Palestinians on any of those topics?
24   A.   With your permission, I'd like to review
25   the pages.

OCTOBER 22, 2013 - ALON EVIATAR

106

1    Q.   Of course.  Please do so.
2    A.   (Examining.)  Yes, I remember conversations
3    that I had with Palestinians on these subjects that
4    appear here.
5    Q.   Are any of the subjects that you've just
6    reviewed subjects that you cannot recall having a
7    conversation with a Palestinian about?
8    A.   I'd like to look at the pages again, because
9    now that's a different question.
10   Q.   Please do.
11   A.   (Examining.)  Yes.  For example --
12        MR. YALOWITZ:  I'm sorry.  I need to go off
13   the record for one second.
14        (Recess from 2:45 p.m. to 2:46 p.m.)
15   Q.   BY MR. HILL:  The witness was in the middle
16   of an answer, I think.
17        Please continue your answer, sir.
18   A.   For example, I did not speak with Palestinians
19   about the details of the terrorist attacks that appear
20   here.
21   Q.   Which section are you referring to, sir?
22   A.   I'll look, with your permission.
23   Q.   Of course.
24   A.   For example, the sections of paragraph 7,
25   on page 69, that detail -- that provide detailed

OCTOBER 22, 2013 - ALON EVIATAR

107

1    information about specific terrorist attacks, I did
2    not speak with Palestinians about that.
3    Q.   So just so the record is clear, are you
4    saying that, on page 69, the paragraph that starts
5    as 7 and has letters that continue to page 72, that
6    that paragraph is something that you have not spoken
7    to Palestinians about?
8    A.   Correct.
9    Q.   And your job did not require you to have
10   any responsibilities with respect to the particular
11   attack that's discussed in that paragraph 7, which
12   begins on page 69 and goes to page 72; correct?
13   A.   The attacks -- the specific attacks?
14   Q.   Yes, sir.
15   A.   Correct.
16   Q.   That happened in Jerusalem at a time when
17   you were working in Jericho; right?
18   A.   Correct.
19   Q.   Is it also the case that, to the extent
20   you're relying on documents for the information that's
21   in paragraph 7, which goes from page 69 to page 72,
22   that those documents are disclosed in those pages
23   of Exhibit 420?
24   A.   To the best of my recollection, the
25   information that appears here is taken from documents

OCTOBER 22, 2013 - ALON EVIATAR

108

1    that are relevant to the report.
2    Q.   So what you're doing in paragraph 7, on
3    pages 69 through 72, is summarizing documents that
4    you reviewed?
5        Is that fair to say?
6    A.   You could say that.
7    Q.   And you don't have any personal knowledge
8    of that particular event, do you, sir?
9    A.   Yes, correct.
10   Q.   You agree with me?
11   A.   Yes.
12   Q.   Have you received any classified information
13   about the event that's described in paragraph 7, on
14   pages 69 through 72?
15   A.   I'd like to review the sections once more.
16   Q.   Of course.
17   A.   (Examining.)  No, there's no classified
18   information here.
19   Q.   I just want to make sure the question
20   was clear.  I wasn't asking if there was classified
21   information in Exhibit 420.  I was asking if you have
22   ever received classified information about the event
23   that is described in paragraph 7, on pages 69 to 72.
24   A.   No.
25   Q.   All right.  Apart from that example, are

OCTOBER 22, 2013 - ALON EVIATAR

109

1    there any other portions of the report, from pages 27
2    to the end, where you cannot [sic] recollect having
3    a conversation with a Palestinian about that subject
4    matter?
5        A.   That I had a conversation or that I did not
6    have a conversation?
7        Q.   To return to the big picture, if we can,
8    I'm trying to find out if there are any portions of
9    the report, from page 27 to the end, where, sitting
10   here today, you cannot recollect having a conversation
11   with any Palestinian about that subject matter.
12            You have told me about one.  Are there others?
13       A.   With respect to which I did not have
14   conversations with Palestinians; correct?
15       Q.   Yes, sir.
16       A.   From a fast review of the pages, I don't
17   recognize another significant subject with regard
18   to which I did not have any conversations with
19   Palestinians in that respect.
20       Q.   Well, then, let's return to page 27.  Look
21   at "VI," which is "Part Five," the subject of which is:
22            "The Palestinian Ministry of Prisoners and
23   Released Prisoners' Affairs."
24            Do you see that, sir?
25       A.   Yes.

OCTOBER 22, 2013 - ALON EVIATAR

110

1        Q.   And that section begins on page 27 and goes
2    through page 38; right?
3        A.   Correct.
4        Q.   With respect to that section, can you
5    recollect any conversations with any Palestinians
6    about that subject matter?
7        A.   Another moment, please.  I wish to review
8    the material.
9        Q.   Of course.
10       A.   (Examining.)  I don't recall a specific
11   conversation with a particular Palestinian that
12   dealt with a specific -- with any specific section.
13   I remember conversations that I had with Palestinians,
14   generally speaking, with respect to the issues that
15   appear in the report.
16       Q.   Tell me, sir, to the best of your
17   recollection, everything you can recall about these
18   conversations you've just referenced with Palestinians
19   about the subject matter of "Part Five" of Exhibit 420.
20       A.   I remember a conversation that I had with
21   a terrorist Nasser Aweis in a prison in Israel, who
22   talked about -- talked about the fact that he received
23   support, both material support as well as emotional
24   support, from the Palestinian Authority, from the Fatah,
25   from his family, for everything that he did.

OCTOBER 22, 2013 - ALON EVIATAR

111

1        Q.   Okay.  Have you now told me the full
2    recollection you have of this conversation with
3    Mr. Aweis?
4        A.   The other thing he told me is that he's
5    proud of all the terrorist attacks that he perpetrated
6    and that he would do it again.
7        Q.   Okay.  Have you now told me your full
8    recollection of the conversation with Mr. Aweis?
9        A.   Yes.
10       Q.   Where did you meet Mr. Aweis?
11       A.   In the Hadarim Prison in Israel.
12       Q.   When did you meet Mr. Aweis?
13       A.   Approximately two years ago.
14       Q.   How long did you speak with Mr. Aweis?
15       A.   Fifteen, 20 minutes.
16       Q.   Why did you meet with Mr. Aweis?
17       A.   I was at the prison within the framework of
18   a staff visit, a professional staff visit on behalf of
19   several organizations, and.  We conducted a professional
20   visit to the prison.  We went into his cell, I met him,
21   and I started to speak with him.
22       Q.   What organizations were you acting on behalf
23   of in this instance?
24       A.   It was in the framework of the Office for
25   Coordination of Government Activities in the

OCTOBER 22, 2013 - ALON EVIATAR

112

1    Territories.
2        Q.   Any other organizations you were acting
3    on behalf of in this instance?
4        A.   No.
5        Q.   Was anyone else present when you spoke to
6    Mr. Aweis?
7        A.   There were other people there, certainly.
8        Q.   Do you know their names?
9        A.   (Translated.)  I don't recall who specifically
10   was with me.
11            (In English.)  Sorry.
12            (Translated.)  Excuse me.  Yuval Biton from
13   the Israel Prison Service was there.
14       Q.   Okay.  Can you give me the name of anyone
15   else who was present other than yourself, Mr. Aweis,
16   and Mr. Biton?
17       A.   I don't recall.
18       Q.   Was any record made of this conversation?
19       A.   No.
20       Q.   Have you now told me everything you can
21   remember about this conversation with Mr. Aweis?
22       A.   Definitely.
23       Q.   Did Mr. Aweis say whether the support he
24   referenced was the time after he was imprisoned?
25       A.   Yes.

OCTOBER 22, 2013 - ALON EVIATAR

113

1    Q.  Your recollection is he was referring to
2  support he received after he was in prison; correct?
3    A.  Yes.
4    Q.  Probably the last time I'll ask, but can
5  you think of anything else about this conversation
6  you haven't told me?
7    A.  There's nothing further.
8    Q.  Apart from the conversation with Mr. Aweis,
9  can you recollect any other conversations with
10  Palestinians about the subject matter of "Part Five"
11  of Exhibit 420, which runs from 27 to 38 in the report?
12    A.  Just a moment, please.  I don't recall an
13  additional conversation.
14    Q.  Okay.  To the extent you are relying on
15  documents in "Part Five" of the report, for the material
16  that's contained in "Part Five" of the report, from
17  pages 27 to 38, are those documents disclosed in that
18  section of the report?
19    A.  Can you repeat the question?
20    Q.  To the extent you are referring to documents
21  in "Part Five" of the report, which is from pages 27
22  to 38, are those documents disclosed in "Part Five"
23  of the report?
24    A.  All of the documents that I refer to are
25  cited here.

OCTOBER 22, 2013 - ALON EVIATAR

---

114

1    Q.  Have you ever received any classified
2  information about the subject of "Part Five" of the
3  report concerning the Palestinian Ministry of Prisoners
4  and Released Prisoners' Affairs?
5    A.  No.
6    Q.  Did your job responsibilities in the IDF
7  cause you to have any interaction with the Palestinian
8  Ministry of Prisoners and Released Prisoners' Affairs?
9    A.  My job involved gathering -- the collection
10  of information regarding that ministry.
11    Q.  Tell me what you mean by that.
12    A.  I studied, I researched, investigated.
13  I gathered information.  I analyzed it.  Everything
14  that's related to the activity of the minister and
15  his ministry.
16    Q.  Any other work you did in connection with
17  the Palestinian Ministry of Prisoners and Released
18  Prisoners' Affairs?
19    A.  No.
20    Q.  When did you do this work that you've just
21  described relating to the Palestinian Ministry of
22  Prisoners and Released Prisoners' Affairs?
23    A.  From 1998 until 2013.
24    Q.  Did you produce any writings reflecting
25  the work you have described?

OCTOBER 22, 2013 - ALON EVIATAR

---

115

1    A.  Yes.
2    Q.  Where are those writings today?
3    A.  Those are documents that were distributed
4  within the defense establishment.
5    Q.  Tell me what you wrote in these documents
6  that were distributed within the defense establishment
7  about the Palestinian Ministry of Prisoners and Released
8  Prisoners' Affairs?
9    A.  From what I remember, I and my team wrote
10  about the anti-Israeli activity that the minister
11  and his ministry were engaged in.  For example, lying
12  statements on the part of the minister to the media.
13    I'm trying to recall additional subjects.
14  For example, with respect to the issue of payments
15  to the prisoners and the families, as it was published
16  in the Palestinian media, benefits that were distributed
17  to prisoners, about visits that the minister had in
18  the homes of the families of the terrorists, and other
19  additional subjects that I don't recall at the moment.
20    Q.  Have you now told me about everything you
21  can recall writing about concerning the Palestinian
22  Ministry of Prisoners and Released Prisoners' Affairs,
23  other than Exhibit 420?
24    A.  Yes.
25    Q.  Did that prior writing that you've

OCTOBER 22, 2013 - ALON EVIATAR

---

116

1  described -- I'll start the question again.
2    Did you take into consideration the
3  prior writing you've described in preparing "Part
4  Five" of Exhibit 420?
5    MR. YALOWITZ:  Objection.  Vague.
6    THE WITNESS:  No.
7    Q.  BY MR. HILL:  Do you believe that prior
8  writing and work is relevant to "Part Five" of
9  Exhibit 420?
10    MR. YALOWITZ:  Objection.  Calls for a
11  legal conclusion.
12    Q.  BY MR. HILL:  Go ahead.
13    A.  Part of what I wrote is identical to what
14  is written here.
15    Q.  Did you copy your prior writing and place
16  it into Exhibit 420?
17    A.  Never.
18    Q.  How can it be identical, then?
19    A.  It's identical in terms of the subjects,
20  not in the sense of the words themselves.
21    Q.  If I wanted to obtain your prior writings
22  for the IDF on these subjects, could I do so?
23    A.  Through me?
24    Q.  In any fashion.
25    A.  You could contact any official entity with

OCTOBER 22, 2013 - ALON EVIATAR

1    that request.
2        Q.   Which entity should I contact to get
3    your prior writings on the subject of "Part Five"
4    of Exhibit 420?
5        A.   The entity that I worked for is called COGAT.
6        Q.   Did all of the work you described as relating
7    to the Palestinian Ministry of Prisoners and Released
8    Prisoners' Affairs take place for that entity?
9        A.   Yes.
10       Q.   And for what years were you employed by that
11   entity?
12       A.   From 1998 until 2013.
13       Q.   During what years, in the period between
14   1998 and 2013, did you author documents that
15   you've been describing here as relating to "Part Five"
16   of Exhibit 420?
17           MR. YALOWITZ:  Objection.  Misstates the
18   record.
19           THE WITNESS:  During the -- over the course
20   of all of those years.  I do not recall a specific year.
21       Q.   BY MR. HILL:  Were you preparing documents
22   of this type while you were working in Jericho?
23       A.   I approved documents that my people wrote.
24       Q.   Did you actually write any documents on
25   this subject, sir?

OCTOBER 22, 2013 - ALON EVIATAR

1        Q.   If your name doesn't appear, how would COGAT
2    know that you were the author?
3        A.   I headed a department that wrote all of those
4    papers -- all of the papers.  And on the basis of the
5    various periods of time, everything that that department
6    wrote and distributed, I am responsible for that.
7        Q.   What is the name of the department you're
8    referring to that wrote these documents?
9        A.   Palestinian Consulting.  Consulting on
10   Palestinian Affairs.
11       Q.   Okay.  And for which years were you the
12   head of the Department of Consulting on Palestinian
13   Affairs?
14       A.   It was divided according to years.  From
15   1998 to 2000, I was in charge of that function in
16   Bethlehem and Nablus.  From 2004 to 2006, I was
17   responsible for that department in the Gaza district.
18   From 2006 to 2007, I was responsible for that position
19   in Judea and Samaria.  And from 2007 to 2013, I
20   was responsible for that position in -- at the
21   headquarters of the department in Tel Aviv.
22       Q.   Okay.  And to the best of your recollection,
23   did you author papers on the subject of the Palestinian
24   Ministry of Prisoners and Released Prisoners' Affairs
25   during all of the periods you've just described?

OCTOBER 22, 2013 - ALON EVIATAR

1        A.   Yes.
2        Q.   During which years did you personally write
3    documents on this subject?
4        A.   To the best of my recollection, with the
5    exception of the years in which I was the commander
6    of Jericho, during all of the other years, I wrote
7    papers myself, in addition -- in addition to papers
8    that were written by other people that I approved.
9        Q.   If I wanted to obtain from COGAT the
10   documents you wrote yourself about this subject,
11   what should I ask them to give me?
12       A.   That depends on what he wants to know.
13   I don't know what he's looking for.
14       Q.   I'm looking for everything that you've
15   previously written on the subject of the Palestinian
16   Ministry of Prisoners and Released Prisoners' Affairs.
17           So let's -- let me ask you a different
18   question.
19           If you wanted to get that material, what
20   would you ask them to give you?
21       A.   I would ask them to give me all of the
22   documents that deal with this subject.
23       Q.   Does your name appear on the documents that
24   you wrote regarding this subject?
25       A.   On some of them, yes.

OCTOBER 22, 2013 - ALON EVIATAR

1        A.   To the best of my recollection, yes.
2        Q.   Are the papers you have described available
3    to the public?
4        A.   The documents that I distributed are not
5    available to the public.
6        Q.   So if I were to ask for them, would you
7    expect the IDF would not give them to me?
8        A.   I do not know.
9        Q.   Do you know if the documents you authored
10   are subject to withholding under the Israeli Freedom
11   of Information Act for any reason?
12           MR. YALOWITZ:  Objection.  Calls for a legal
13   conclusion.
14           Go ahead.
15           THE WITNESS:  I do not know.
16       Q.   BY MR. HILL:  Were the documents you've
17   described published in any fashion?
18       A.   I have no idea.
19       Q.   Are they available on an IDF website?
20       A.   I believe that they are not.
21       Q.   Have you now told me everything you can
22   recollect about your prior writing on the subject
23   of the Palestinian Ministry of Prisoners and Released
24   Prisoners' Affairs?
25       A.   Yes.

OCTOBER 22, 2013 - ALON EVIATAR

121

1    Q.  We've been talking about "Part Five" relating
2  to the Palestinian Ministry of Prisoners and Released
3  Prisoners' Affairs.
4         For the preceding parts of your report, did
5  you do any other writing on those subjects for the IDF?
6    A.  Is he referring to the sections up to
7  section "Four"?
8    Q.  Yes, sir.
9    A.  I wish to review the pages.
10   Q.  Please do so.
11   A.  (Examining.)  The answer is "yes."
12   Q.  Okay.  What other prior writing have you
13  done for the IDF pertaining to the prior portions of
14  Exhibit 420?
15   A.  For example, papers, documents were written
16  on the treatment of Palestinian collaborators.
17   Q.  Any other writing you've done for the IDF
18  pertaining to the topics in your report?
19   A.  Yes.  For example, I wrote papers about
20  Marwan Barghouti.
21   Q.  Okay.  Any other writing you've done for
22  the IDF that pertains to the topics in Exhibit 420?
23   A.  All of it?
24   Q.  Yes, sir.
25   A.  Yes.  For example, I wrote papers, documents,

122

1  about the ideological and political concepts of the PLO,
2  of the Palestinian Authority, and the Fatah.
3    Q.  Anything else?
4    A.  May I have another moment, please?
5    Q.  Of course.
6    A.  (Examining.)  Yes.  And I just remembered
7  two other subjects.  One key significant subject is
8  that of the Palestinian incitement as it manifested
9  in the media.  And another subject -- and another
10  subject is the atmosphere, the public opinion and
11  the prevalent thought among the Palestinian public
12  during the course of the years that the report refers
13  to.
14   Q.  Any other writing you've done for the IDF
15  that you believe is relevant to Exhibit 420?
16       MR. YALOWITZ:  Objection.  Misstates the
17  testimony.  Calls for a legal conclusion.
18       THE WITNESS:  That's relevant or that's not
19  relevant?
20   Q.  BY MR. HILL:  That is relevant.
21   A.  I don't recall.
22   Q.  Would you agree with me, sir, that the prior
23  work you've described, performing the writing on these
24  various subjects, is something you had in mind as you
25  worked on Exhibit 420?

123

1    A.  Yes.
2    Q.  And are any of the documents you've described
3  as writing for the IDF that relate to Exhibit 420
4  available to the public?
5    A.  Nothing is available to the public.
6    Q.  All right.  Are any of the documents that
7  you've described as writing for the IDF that relate
8  to Exhibit 420 subject to secrecy or classification
9  rules?
10       MR. YALOWITZ:  Objection.  Misstates the
11  testimony.  Calls for a legal conclusion.
12       THE WITNESS:  All of the documents
13  are classified, and they are within the defense
14  establishment.
15   Q.  BY MR. HILL:  And therefore, sir, you would
16  expect that, if I ask the IDF to give me the materials
17  you've described as writing while you worked for the
18  IDF that relate to Exhibit 420, I would not be able
19  to get them?
20       Is that fair to say?
21       MR. YALOWITZ:  Objection.  Misstates the
22  testimony.
23       THE WITNESS:  I don't know.
24   Q.  BY MR. HILL:  Do you believe, if you asked
25  for these materials, that the IDF would give them to

124

1  you?
2       (Brief exchange in Hebrew between Official
3       Interpreter Ne'eman and the witness.)
4       THE WITNESS:  I assume not, because they're
5  secret.
6    Q.  BY MR. HILL:  Turn, if you will, to page 38
7  of your report.  I'd like to refer you to "VII," which
8  is:
9       "Part Six - The Release of Terrorist Prisoners
10  by the PA - The 'Revolving Door' Policy."
11       Do you see that, sir?
12   A.  Yes.
13   Q.  And that section continues from page 38 to
14  page 43; correct?
15   A.  Correct.
16   Q.  Do you recall having any conversations with
17  Palestinians about the subject of "Part Six" of this
18  report?
19   A.  I had conversations with Palestinians on
20  the subject of the "revolving door," generally speaking.
21   Q.  Can you tell me everything you can presently
22  recall about the conversations you've just described?
23   A.  Yes.  Shall I be specific?
24   Q.  Please do so.
25   A.  I currently remember, when I was the

125

```
1    commander of the Jericho region, I was engaged in the
2    subject of the revolving door in the context of those
3    Palestinian terrorists that were held in detention by
4    the Palestinian Authority in the Jericho region.
5        Q.  Anything else you can recall about those
6    conversations?
7        A.  We, as the Israeli side, we were afraid --
8    we were afraid of the release of terrorists within
9    the framework of what was termed the "revolving door"
10   policy from the detention -- their exit from the
11   detention of the Palestinian Authority in Jericho.
12       Q.  Anything else you can tell me about those
13   conversations?
14       A.  I remember, for example, the sympathetic
15   and the warm treatment that those detainees received
16   in the detention of the Palestinian Authority.
17       Q.  Okay.  Anything else you can tell me about
18   conversations with Palestinians about "Part Six" of
19   Exhibit 420?
20       A.  Not that I recall at the moment.
21       Q.  Can you tell me the name of any Palestinian
22   you spoke to about that subject?
23       A.  I don't recall names.
24       Q.  While you worked for the IDF, did you ever
25   do any writing about the subject of "Part Six" of
```

OCTOBER 22, 2013 - ALON EVIATAR

126

```
1    Exhibit 420?
2        A.  (In English.)  This is --
3            (Translated.)  That's the section that we're
4    currently speaking about?
5        Q.  Yes.  This is "Part Six", that goes from
6    page 38 to page 43.
7        A.  I remember that we wrote, when I was in
8    Jericho, about the subject that I just spoke about.
9        Q.  Apart from the writing in Jericho that
10   you're recollecting, did you do any other writing
11   while you worked for the IDF about the subject that
12   is "Part Six" of Exhibit 420?
13       A.  I don't recall anything at the moment.
14       Q.  The document or documents you recall writing
15   while you were in Jericho about this subject, are those
16   publicly available?
17           MR. YALOWITZ:  Objection.  Vague.
18           THE WITNESS:  No.
19       Q.  BY MR. HILL:  Are the document or documents
20   you wrote, that you've described in Jericho about the
21   subject of "Part Six" of Exhibit 420 classified?
22       A.  Yes.
23       Q.  And as you worked on Exhibit 420, did you
24   have in your mind the prior work you had done in
25   Jericho, as you've described it here today?
```

OCTOBER 22, 2013 - ALON EVIATAR

127

```
1            MR. YALOWITZ:  Objection.  Vague.
2            THE WITNESS:  What do you mean by "work"?
3        Q.  BY MR. HILL:  Well, you've done some writing
4    in Jericho for the IDF about the subject of "Part Six"
5    of Exhibit 420; right?
6        A.  I didn't hear the question well.  Can you
7    repeat it, please?
8            MR. HILL:  Sure.  We'll have her read it
9    back, then.
10           (Pending question read.)
11           THE WITNESS:  No.
12       Q.  BY MR. HILL:  Did you do writing while you
13   were working in Jericho about the "revolving door"
14   policy?
15       A.  Not regarding the policy, but generally
16   speaking.
17       Q.  And that work you've done generally on the
18   subject is something that you have in your mind today;
19   right?
20           MR. YALOWITZ:  Objection.  Vague and
21   ambiguous.
22           THE WITNESS:  Can you repeat the question?
23       Q.  BY MR. HILL:  Yes.  You still have in your
24   mind the work that you did on this subject in Jericho;
25   right?
```

OCTOBER 22, 2013 - ALON EVIATAR

128

```
1            MR. YALOWITZ:  Objection.  Vague.
2            THE WITNESS:  I don't have that specific work
3    in my head.  I have my familiarity and my proficiency
4    in the modes of operation of the Palestinian Authority
5    in that respect over the course of the years.
6        Q.  BY MR. HILL:  That's part of your work
7    experience from your time in Jericho; right?
8        A.  Also.
9        Q.  Did you draw on that experience in working
10   on Exhibit 420?
11       A.  No.
12       Q.  Nothing from your prior work informed what
13   you did on Exhibit 420; correct?
14       A.  Is he talking about the entire exhibit?
15       Q.  "Part Six."
16       A.  As I stated previously, I'm familiar, over
17   the course of the years, with the policy and the modes
18   of operation of the Palestinian Authority on the subject
19   of the revolving door in its entirety.
20       Q.  And that familiarity you utilized in working
21   on Exhibit 420; right?
22       A.  With respect to this section of Exhibit 420,
23   it's based upon the relevant sources that appear in the
24   work.
25       Q.  Okay.  Are you saying that your prior work
```

OCTOBER 22, 2013 - ALON EVIATAR

129

```
1  experience had no effect on what is written in "Part
2  Six" of Exhibit 420?
3       A.   What are you referring to when you say my
4  "work experience"?
5       Q.   Did your prior work experience inform what
6  is written in "Part Six" of Exhibit 420 in any fashion?
7       A.   The professional tools that I acquired
8  over the course of the years, my deep familiarity
9  and proficiency with the various Palestinian entities,
10 methods of analysis and gathering of information,
11 ability to comprehend, all of these things, together
12 with my deep familiarity with the Palestinian media
13 and my understanding of how to approach open sources,
14 all of those things are tools that I've acquired which
15 assist me with this work.
16      Q.   Okay.  You would agree that the prior work
17 you did in Jericho about the "revolving door" policy
18 informed your judgment in working on Exhibit 420?
19           Correct?
20           MR. YALOWITZ:  Objection.  Vague.  Asked and
21 answered.
22           THE WITNESS:  No.
23      Q.   BY MR. HILL:  Your prior work experience on
24 the "revolving door" policy of Jericho did not inform
25 your judgment in working on 420; correct?
```

OCTOBER 22, 2013 - ALON EVIATAR

130

```
1       A.   Correct.
2            MR. HILL:  All right.  Let's take a break.
3            (Recess from 3:50 p.m. to 4:01 p.m.)
4       Q.   BY MR. HILL:  Mr. Eviatar, turn, if you would,
5  to page 43 of Exhibit 420.  I would like to call your
6  attention to what is "VIII," entitled:
7            "Part Seven - Fatah's Terrorist Operations
8  Between 2000 and 2004 Under the Auspices of the PA
9  and PLO."
10           Do you see that, sir?
11      A.   Yes.
12      Q.   And that section begins on page 43 and
13 continues through page 55; correct?
14      A.   Correct.
15      Q.   Are all the documents that you rely on in
16 connection with that section disclosed in that section
17 of Exhibit 420?
18      A.   Again, I'd like to ask the question again.
19      Q.   Are all the documents that you relied on
20 in connection with "Part Seven," on pages 43 to 55,
21 disclosed in those pages of Exhibit 420?
22      A.   Yes.
23           MR. YALOWITZ:  Hold on.  I just want to
24 ask the witness one question.  I'm sorry.  We can go
25 off the record for a moment.
```

OCTOBER 22, 2013 - ALON EVIATAR

131

```
1            MR. HILL:  Is it on a matter of privilege?
2            MR. YALOWITZ:  No.
3            MR. HILL:  Then I don't think it's appropriate
4  to be asking questions during my examination.  I would
5  ask that you refrain from doing so.
6            MR. YALOWITZ:  I hear you.  I just want to
7  ask one thing.
8            MR. HILL:  The record should reflect that
9  the witness and Mr. Yalowitz are stepping out of the
10 room.
11           MR. YALOWITZ:  It will be less than a minute.
12 Bear with us.
13           (Recess from 4:04 p.m. to 4:05 p.m.)
14           MR. YALOWITZ:  Okay.  Thank you for that.
15      Q.   BY MR. HILL:  Mr. Eviatar, before we took
16 the break, Mr. Yalowitz was whispering something in
17 your ear.
18           What did he say?
19      A.   He asked about a document that I had located
20 in the Palestinian media after this report was written,
21 a document that was not cited here.  And it's extremely
22 relevant to the report.
23      Q.   Okay.  And then the two of you stepped outside
24 of the room.
25           What was said outside of the room?
```

OCTOBER 22, 2013 - ALON EVIATAR

132

```
1       A.   Does he mean the conversation just now?
2       Q.   Yes, sir.  Tell me what was said in the
3  conversation just now in the hall.
4       A.   That's exactly what we talked about.
5       Q.   Tell me exactly what you said to each other
6  in the hall just now.
7       A.   The attorney asked me which section of the
8  report the document that I just referred to is relevant.
9  And I told him that I don't recall precisely which part,
10 and if it's possible to discuss it, then I'll discuss
11 it.
12      Q.   Okay.  Anything else that was said outside
13 the room?
14      A.   No.
15      Q.   For the record, you just said "no" in English;
16 right?
17      A.   (In English.)  I said "no" in Hebrew.  It
18 sounds similar.
19      Q.   Go ahead.
20      A.   With his permission --
21           OFFICIAL INTERPRETER NE'EMAN:  Can I just
22 say something?  When you refer to him, you should
23 refer to him as if you're talking to him.
24           THE WITNESS:  Okay.  I'm sorry.
25           With your permission, I remembered with
```

OCTOBER 22, 2013 - ALON EVIATAR

133

1  respect to the previous questions that you asked --
2  you asked whether I remember names of additional
3  Palestinians who had official positions in the
4  Palestinian Authority and the Fatah, whom I spoke
5  with on the subjects that appear in the report.
6          And if he's interested, I can give him the
7  names of those Palestinians -- excuse me -- if you are
8  interested, I can tell you the names of the additional
9  Palestinians with whom I spoke who I remember.
10     Q.   BY MR. HILL:  Okay.  Did you talk with
11  the lawyers about telling me additional names of
12  Palestinians?
13     A.   Yes, I told him that I remember that there
14  are several more.
15     Q.   And who started this conversation about how
16  you could remember more names of Palestinians?
17     A.   I said it.
18     Q.   You said this to Mr. Yalowitz?
19     A.   Yes.
20     Q.   When did you talk with him about this?
21     A.   During the previous break, I believe.
22     Q.   Okay.  Have you had other conversations
23  with the lawyers today about the substance of your
24  testimony while on breaks?
25     A.   No.

                OCTOBER 22, 2013 - ALON EVIATAR

134

1      Q.   How did you come to remember additional names?
2      A.   It's a question of time.
3      Q.   Did you look at any documents?
4      A.   No, not at all.
5      Q.   Did anyone suggest the name to you?
6      A.   No.
7      Q.   So what are the additional names of
8  Palestinians that you now recall speaking to about
9  the subjects of Exhibit 420?
10     A.   I will specify names.  One, Ahmed Hilles,
11  who is the head of the Fatah movement in the Gaza Strip.
12  The second one is Adnan Samara, who served as the head
13  of the Revolutionary Council of the Fatah.  Hisham
14  Abdel-Razek, who was the minister of prisoners in the
15  Palestinian Authority.  Sufian Abu Zaida, who was also
16  a senior figure in the Fatah, and he served as minister
17  of prisoners -- of Palestinian prisoners.  Those are
18  the names that I recall.
19     Q.   Okay.  So now you recall conversations with
20  these four individuals about the subject matter of
21  Exhibit 420?
22     A.   I remember that we spoke generally, speaking
23  about the subjects here.
24     Q.   Tell me what you recollect of having a
25  conversation with Ahmed Hilles about the subjects

                OCTOBER 22, 2013 - ALON EVIATAR

135

1  of Exhibit 420.
2      A.   I recall a conversation that I had with
3  Ahmed Hilles about the status of the Fatah movement
4  in the Gaza Strip prior to the disengagement.
5      Q.   Can you tell me anything else about this
6  conversation with Mr. Hilles, other than what you
7  have already said today?
8      A.   I don't recall any additional details.
9      Q.   Do you recall anything else about that
10  conversation at all?
11     A.   I remember that, as far as I was concerned,
12  it had professional importance.
13     Q.   Okay.  Can you tell me anything else about
14  that conversation with Mr. Hilles, other than what
15  you've already said?
16     A.   I remember that my conversation with him --
17  that I wrote a report about my conversation with him
18  and I sent it to all of the intelligence entities at
19  that time.
20     Q.   Okay.  Can you tell me anything else about
21  your conversation with Mr. Hilles, other than what
22  you've already told me?
23     A.   There's nothing further that I remember.
24     Q.   The report you wrote, is it classified?
25     A.   It's classified.  Yes.

                OCTOBER 22, 2013 - ALON EVIATAR

136

1      Q.   Tell me everything you can recollect about
2  your conversations with Adnan Samara that relate to
3  Exhibit 420.
4      A.   I remember that I conducted several
5  conversations with him with respect to the Fatah
6  movement in Judea and Samaria, with respect to the
7  elections in the Palestinian Authority, with respect
8  to the status of the Palestinian Authority, about him,
9  himself.  Those are the things that I remember.
10     Q.   Okay.  Can you now remember anything else
11  about conversations with Adnan Samara that you haven't
12  told here today?
13     A.   I don't recall anything further.
14     Q.   Did you make a record of that conversation
15  or series of conversations?
16     A.   Yes.
17     Q.   Is that also a classified document?
18          (Brief exchange in Hebrew between Official
19     Interpreter Ne'eman and the witness.)
20          THE WITNESS:  (In English.)  Can you --
21          (Translated.)  Can you repeat the question?
22     Q.   BY MR. HILL:  Is the record of the
23  conversations you had with Adnan Samara also a
24  classified document?
25     A.   Yes.

                OCTOBER 22, 2013 - ALON EVIATAR

137

```
1    Q.  Have you now told me everything you can
2  recollect about conversations with Adnan Samara?
3    A.  Yes.
4    Q.  Tell me everything you can recollect about
5  conversations with Hisham Abdel-Razek?
6    A.  I remember one particularly salient
7  conversation that I called Hisham Abdel-Razek after
8  a Qassam fell on his home, a Qassam rocket fell on
9  his home, and his son had been injured.  And I asked
10  him whether he was in need of any assistance.  And I
11  went to visit his son in the hospital.  I met Hisham
12  after that, and he thanked me for my personal attention,
13  individual attention for his son.
14    Q.  Can you recollect anything else about
15  conversations with Hisham Abdel-Razek?
16    A.  My conversations with him were general about
17  the Palestinian Authority, about the Fatah, and the
18  Gaza Strip, during the period of time that I was in
19  Gaza.
20    Q.  Okay.  Any other information you can remember
21  about conversations with Hisham Abdel-Razek that you
22  haven't told me about today?
23    A.  There's nothing further.
24    Q.  Did you make a record of those conversations
25  with Hisham Abdel-Razek that you've described today?
```

OCTOBER 22, 2013 - ALON EVIATAR

138

```
1    A.  Yes.
2    Q.  Is that record classified?
3    A.  Yes.
4    Q.  Can you remember anything else about
5  conversations with Hisham Abdel-Razek that you haven't
6  told me about today?
7    A.  I don't recall anything further.
8    Q.  Okay.  Tell me everything you know or can
9  recollect about conversations with Sufian Abu Zaida.
10    A.  My conversations with Sufian were primarily
11  when I served -- at the time that I served in Gaza and
12  after he left for Ramallah.  And we talked about the
13  status of the Palestinian Authority, of the Fatah,
14  and the Hamas.
15    Q.  Can you tell me anything else about those
16  conversations with Sufian Abu Zaida, other than what
17  you've just said?
18    A.  I remember that Sufian expressed a desire
19  to make progress in terms of Israeli easements.
20    Q.  Can you remember anything else about
21  conversations with Sufian Abu Zaida, other than
22  what you've told me so far today?
23    A.  I remember that Sufian, both in a lecture
24  that I gave and in conversations with me, said that
25  Israel must release all of the security prisoners,
```

OCTOBER 22, 2013 - ALON EVIATAR

139

```
1  including those from Hamas, from the prisons.
2    Q.  Can you remember anything else about the
3  conversations with Sufian Abu Zaida other than what
4  you've told me about today?
5    A.  I don't recall anything further.
6    Q.  Did you make a record of any of these
7  conversations with Sufian Abu Zaida?
8    A.  Definitely.
9    Q.  Is that record classified?
10    A.  Yes.
11    Q.  Earlier today you mentioned some other
12  conversations you had with Palestinians.
13        Is it fair to say that you made records of
14  all of those conversations?
15    A.  I estimate that between 90 and 100 percent
16  of the conversations that I conducted with the
17  Palestinians during all the years of my service,
18  that I wrote them down in the form of documents.
19    Q.  And am I right in thinking that all of those
20  documents are classified?
21    A.  Yes.
22    Q.  Sitting here today, can you think of any
23  other conversations you've had with Palestinians about
24  the subjects contained in Exhibit 420 that you haven't
25  yet told me about?
```

OCTOBER 22, 2013 - ALON EVIATAR

140

```
1    A.  There are hundreds of Palestinians with whom
2  I've discussed the subjects that appear here during
3  all of the years of my service.  And I don't have
4  anything further to say beyond what I stated.
5    Q.  So just so the record is clear, you cannot
6  tell me the names of any other Palestinians that you
7  recollect speaking to about the subjects in Exhibit 420,
8  other than the ones you've already told me about today;
9  correct?
10    A.  Correct.
11    Q.  And you can't tell me the substance of any
12  of those communications with the Palestinians about
13  the subjects that are in Exhibit 420, other than what
14  you've already told me about today; correct?
15    A.  Correct.
16    Q.  Can you tell me any more writing that you
17  did for the IDF related to the topics of Exhibit 420,
18  other than what you've already told me today?
19        MR. YALOWITZ:  Objection.  It's a very broad
20  question.
21        THE WITNESS:  Is it possible to repeat the
22  question?
23    Q.  BY MR. HILL:  Of course.
24        Sitting here today, can you identify any
25  additional writing that you did when you were working
```

OCTOBER 22, 2013 - ALON EVIATAR

141

```
 1   for the IDF that pertains to the topics contained in
 2   Exhibit 420, other than what you've already told me
 3   about today?
 4          MR. YALOWITZ:  Same objection to the breadth
 5   of the question.
 6          THE WITNESS:  Apart from everything that
 7   I said, I wrote one article that, to the best of
 8   my recollection, is open source.  I wrote it for a
 9   magazine for the College of Command and Headquarters.
10   The article addresses a comparison between the Second
11   Intifada and the Great Arab Rebellion.
12     Q.  BY MR. HILL:  Any other writing you've done
13   that relates to the subjects of Exhibit 420, other
14   than what you've already told me about today?
15     A.  There is nothing further.
16          CHECK INTERPRETER AFRIAT:  If I can just
17   correct, when he spoke before about "Mikhlelet Pikud
18   u'Mateh," I believe in English it's called the IDF
19   School of Command.
20          OFFICIAL INTERPRETER NE'EMAN:  Thank you.
21          CHECK INTERPRETER AFRIAT:  If I recall
22   correctly.
23          MR. HILL:  Rina, do you agree with that
24   correction?
25          OFFICIAL INTERPRETER NE'EMAN:  I don't see
                  OCTOBER 22, 2013 - ALON EVIATAR
```

142

```
 1   any -- it's not a literal translation, but it makes
 2   more sense than the literal translation that I used.
 3   So I don't have a problem with that.  And I thank you
 4   for the correction.
 5     Q.  BY MR. HILL:  Back on Exhibit 420, "Part
 6   Seven" on page 43 -- and that runs through page 55 --
 7   you've now told me about all the prior writing you've
 8   done on this subject; right?
 9     A.  Yes.
10     Q.  And all the prior writing you've done on
11   this subject is classified; correct?
12          MR. YALOWITZ:  Objection.  Misstates the
13   testimony.
14          THE WITNESS:  I don't understand the last
15   sentence.
16     Q.  BY MR. HILL:  You've done prior writing
17   on the subject that is "Part Seven" of Exhibit 420;
18   right?
19     A.  Generally speaking.
20     Q.  Is any of that writing open source?
21     A.  My writing was from open sources.
22     Q.  Okay.  That's not what I'm asking.
23          The prior writing you've done related to
24   the subject of "Part Seven" of Exhibit 420, that prior
25   writing that you did while you worked for the IDF, that
                  OCTOBER 22, 2013 - ALON EVIATAR
```

143

```
 1   writing is classified; right?
 2          (Brief exchange in Hebrew between Official
 3    Interpreter Ne'eman and the witness.)
 4          THE WITNESS:  That it is classified.
 5     Q.  BY MR. HILL:  Okay.  So you would agree with
 6   me, sir, that if I wanted to compare your prior writing
 7   on the subject of "Part Seven" of Exhibit 420 with what
 8   is written in "Part Seven" of 420, that I am unable to
 9   do so because the prior writing is classified; right?
10          MR. YALOWITZ:  Objection.  Calls for a legal
11   conclusion and misstates the record.
12          MR. HILL:  The witness can respond.
13          THE WITNESS:  Can you repeat the question
14   again, please?  I apologize.
15     Q.  BY MR. HILL:  That's quite all right.
16          You would agree with me, if I wanted to
17   compare what you wrote for the IDF about the topic
18   that's in "Part Seven" of Exhibit 420 with what
19   is written in "Part Seven" of Exhibit 420, I would
20   not be able to do so because your prior writing is
21   classified; right?
22          MR. YALOWITZ:  Objection.  Calls for a legal
23   conclusion.  Misstates the record.
24          THE WITNESS:  Correct.
25     Q.  BY MR. HILL:  You would also agree that if,
                  OCTOBER 22, 2013 - ALON EVIATAR
```

144

```
 1   for whatever reason, I disbelieved your testimony
 2   here today and I believed that you did not, in fact,
 3   do prior writing about the topic of "Part Seven" for
 4   the IDF, there is no way I can see if, in fact, you
 5   did so because I can't get those records; right?
 6     A.  I'm requesting that you take the long
 7   question apart and you break it down to different
 8   sections.
 9     Q.  Sure.
10          MR. YALOWITZ:  Objection to the prior
11   question.  Compound.
12     Q.  BY MR. HILL:  Sir, with no disrespect to you,
13   assume that I thought you had not actually done the
14   writing about the topic in "Part Seven" of 420 that
15   you have testified to here today.
16          Can we make that assumption?
17     A.  All right.
18     Q.  You would agree with me that there is no
19   way that I can verify you have done the writing you
20   have testified about today, because I cannot obtain
21   those writings from the IDF, as they are classified?
22          MR. YALOWITZ:  Objection.  Calls for a legal
23   conclusion.
24          Go ahead.
25          THE WITNESS:  Okay.
                  OCTOBER 22, 2013 - ALON EVIATAR
```

145

1    Q.   BY MR. HILL:  Do you agree with me?
2    A.   That it's not possible to obtain the
3  classified documents?
4    Q.   Yes, sir.
5    A.   Correct.
6    Q.   So, therefore, I don't have any way to
7  verify your testimony that you, in fact, wrote the
8  things you have claimed to write -- you have claimed
9  to have written, today; right?
10   A.   I don't agree.
11   Q.   Other than your testimony, how can I verify
12 that you have done writing for the IDF about the subject
13 matter of "Part Seven" of Exhibit 420?
14   A.   I don't know what ways you could approach it.
15   Q.   Can you think of any way that I could verify
16 what you have testified to was your prior writing for
17 the IDF, other than taking your word for it here today?
18   A.   It's possible to check it.
19   Q.   How could I do so?
20   A.   I can hypothesize that contacting the IDF to
21 confirm everything that I have stated with respect to
22 his question, that it's possible that such a possibility
23 could exist.
24   Q.   Who at the IDF should I contact to verify
25 the items that you have testified to today with respect

OCTOBER 22, 2013 - ALON EVIATAR

146

1  to your work for the IDF?
2    A.   All of my commanders over the years.
3    Q.   Okay.  What are their names?
4    A.   My most recent commander was General Eitan
5  Dangot.  Before him was General Amos Gilad.  Before
6  him was General Yusef Mishleb.  Before him was Brigadier
7  General Yoav Mordechai.  Before him was Brigadier
8  General Kamil Abu-Rukun.  Before him was Brigadier
9  General Elan Paz.  Before him was my commander at
10 the IDF School of Command.  His name was Yariv Krieger.
11 Before him, my commander was Lieutenant Colonel Moshe
12 Madar.  And before that, it was Lieutenant Colonel
13 Udi Zerachia.  And the last one was Colonel Arieh
14 Spitzen.
15   Q.   So Colonel Spitzen --
16       MR. YALOWITZ:  Can we go off the record for
17 a moment?
18       MR. HILL:  You want to take a break?
19       MR. YALOWITZ:  I don't want to take a break.
20 I just want to go off the record any place for a moment.
21       MR. HILL:  Sure.
22       (Discussion held off the record.)
23   Q.   BY MR. HILL:  Have you now told me the name
24 of all of your direct commanding officers for the period
25 of time when you were employed by the IDF?

OCTOBER 22, 2013 - ALON EVIATAR

147

1    A.   I forgot one other commander.  His name was
2  Shimshon Arbel.  And to the best of my recollection,
3  those were my commanders over the course of the years.
4    Q.   Would any of those commanders be able to tell
5  me the content of the confidential -- I'm sorry -- the
6  classified documents that you prepared while working
7  at the IDF?
8    A.   Which commanders?  Is that the question?
9    Q.   Would any of the commanders who you've just
10 named be able to tell me the content of the classified
11 material that you created while working for the IDF?
12   A.   All of them.
13   Q.   They can tell me classified information?
14   A.   They know what I wrote about.  Whether they'll
15 tell you or not, I don't know.
16   Q.   Well, are they allowed by Israeli law to tell
17 me, an American lawyer, Israeli classified information?
18       MR. YALOWITZ:  Objection.  Calls for a legal
19 conclusion.  Beyond the scope of the witness' expertise.
20       THE WITNESS:  They are prohibited to do so.
21   Q.   BY MR. HILL:  You mentioned Arieh Spitzen
22 had been one of your commanding officers?
23   A.   Correct.
24   Q.   What year was he your CO?
25   A.   He was my direct commander from 2007 until

OCTOBER 22, 2013 - ALON EVIATAR

148

1  2009.
2    Q.   And this is the same Arieh Spitzen who asked
3  you to be a witness in this case; right?
4    A.   Arieh Spitzen did not request that I be a
5  witness.
6    Q.   This is the same Arieh Spitzen who first
7  spoke to you about being a witness for Shurat HaDin
8  in this case; right?
9    A.   Yes.
10   Q.   There's only one Arieh Spitzen that you know;
11 right?
12   A.   Yes.
13   Q.   Let me try and do this as a group.
14       For the portion of your report that begins
15 on page 43 as "Part Seven" and running through the
16 end of the report, to the extent you have relied on
17 a document, is it fair to say that the document is
18 disclosed in the report?
19   A.   I used documents that are cited in the report.
20   Q.   Right.  Did you use any documents for these
21 last sections that are not cited in the report?
22   A.   I read hundreds of documents on the Internet
23 in order to learn and become familiarized with and to
24 ascertain that what I'm writing is accurate.
25   Q.   So there are hundreds of other documents

OCTOBER 22, 2013 - ALON EVIATAR

149

1 that you considered that are not disclosed in the
2 report; right?
3    A.   Yes.
4    Q.   And you agree with me that I have no way
5 of knowing what those hundreds of other documents are;
6 right?
7         MR. YALOWITZ:  Objection.  Misstates the
8 record.
9         THE WITNESS:  I don't agree.
10    Q.   BY MR. HILL:  How can I know what documents
11 you considered but did not refer to in your report?
12    A.   The documents that I read, all of them are
13 on Palestinian websites and Arab websites and foreign
14 websites on the Internet.  And the documents that I
15 made use of for the purpose of this report, all of
16 them appear here.
17    Q.   Okay.  But the documents that you looked at
18 on the various websites that you just described, you
19 agree there is no way for me to figure out what material
20 on the Internet you looked at, other than what you cited
21 in your report; right?
22         MR. YALOWITZ:  Objection.  Misstates the
23 testimony.
24         THE WITNESS:  Correct.
25         (Defendants' Exhibit 427 marked.)

                OCTOBER 22, 2013 - ALON EVIATAR

150

1    Q.   BY MR. HILL:  Mr. Eviatar, I'm handing you
2 what we've marked as Exhibit 427.
3         Is this a copy of your rebuttal report in
4 this matter?
5    A.   (Examining.)  Yes.
6    Q.   You reference here the report of Professor
7 Glen Robinson.
8         Did you read Professor Robinson's report?
9    A.   Yes.
10    Q.   Did you read any reports of the defendants
11 other than Professor Robinson's?
12    A.   Yes.
13    Q.   Who else's reports did you read?
14    A.   Miller's report, Shahadeh's report, and one
15 more.  There were four all in all.  I don't recall at
16 the moment.
17    Q.   Did you review Laurie Allen's report?
18    A.   Yes, Laurie Allen.
19    Q.   And for whatever reason, you only responded
20 to Professor Robinson's report; right?
21    A.   Yes.
22    Q.   David Miller had written some things about
23 you; right?
24    A.   I assume that he did.  I don't recall at the
25 moment.

                OCTOBER 22, 2013 - ALON EVIATAR

151

1    Q.   Do you remember reading a portion of Professor
2 Miller's report that concerned you?
3    A.   I don't recall at the moment.
4    Q.   Do you recall that Professor Robinson's report
5 also made some comments about you?
6    A.   Yes.
7    Q.   And you didn't respond to those comments by
8 Professor Robinson in your rebuttal report, did you?
9    A.   I did respond to them.
10    Q.   Did you respond to his comments about you?
11    A.   Yes.
12    Q.   Where in your rebuttal report did you respond
13 to Professor Robinson's comments on you?
14    A.   For example, with respect to the issue of
15 the detention and the hosting of Abdullah Barghouti.
16    Q.   I see.
17         Do you recall that Professor Robinson had
18 comments specifically on your qualifications?
19    A.   I recall that.
20    Q.   And you did not respond to Professor
21 Robinson's comments on your qualifications in your
22 rebuttal report; right?
23    A.   Correct.
24    Q.   Have you ever had a conversation with a
25 Palestinian about the subject of your rebuttal report,

                OCTOBER 22, 2013 - ALON EVIATAR

152

1 which is Exhibit 427?
2    A.   With your permission, I'll examine the report.
3    Q.   Of course.
4    A.   (Examining.)  Is it possible to repeat the
5 question?
6    Q.   Yes, sir.  Sitting here today, can you recall
7 having conversations with any Palestinians about any
8 of the subjects addressed in your rebuttal report,
9 which is Exhibit 427?
10    A.   Yes.
11    Q.   Can you recall having any conversations
12 with Palestinians about the subjects addressed in
13 your rebuttal report, other than the conversations
14 that you've already described to me today?
15    A.   No.
16    Q.   Sitting here today, can you recall doing any
17 writing for the IDF on any of the subjects contained
18 in your rebuttal report, which is Exhibit 427?
19         (Brief exchange in Hebrew between Official
20    Interpreter Ne'eman and the witness.)
21         OFFICIAL INTERPRETER NE'EMAN:  "Yes" --
22 I'm sorry.
23         "Is the question whether I can recall
24 documents that I have read?"
25         And I said:  "Yes."

                OCTOBER 22, 2013 - ALON EVIATAR

153

```
 1        And he said:  "The answer is 'yes.'"
 2        MR. HILL:  I'm not sure that was right.
 3   Please read the question back.
 4        (Last question read.)
 5        MR. HILL:  I'll pose a different question.
 6   I think there may have been a miscommunication.  There
 7   may have been a misunderstanding, which often happens
 8   at this time of the day.  So I'll pose the question
 9   again.
10        Q.   BY MR. HILL:  Sitting here today, can you
11   recall writing any documents while you were working
12   at the IDF that pertain to the subjects of your expert
13   rebuttal report, which is Exhibit 427?
14        A.   Yes.
15        Q.   Can you recall any writing that you did while
16   working at the IDF that pertains to the subjects of the
17   expert rebuttal report, which is Exhibit 427, other than
18   the writings you've already told me about today?
19        A.   Yes.
20        Q.   Okay.  Please tell me about those writings.
21        A.   I wrote documents also about the subject of
22   the conclusion of the Second Intifada.
23        Q.   Okay.  Any other documents that you wrote
24   at the IDF about the subjects of the expert rebuttal
25   report, other than the ones you've told me so far?
```

OCTOBER 22, 2013 - ALON EVIATAR

154

```
 1        A.   I don't recall whether I talked about it
 2   before or not.  But I also wrote documents about
 3   Arafat and his policy.
 4        Q.   Any other documents you wrote while you were
 5   at the IDF that pertain to the opinions in your expert
 6   rebuttal report, which is Exhibit 427, other than what
 7   you've already told me about today?
 8        A.   I recall now that there is another document --
 9   that there are other documents -- excuse me -- that
10   I did not write but that I approved, that deal with
11   the Palestinian clans and the Islamic customs that
12   are related to the clans.
13        Q.   Let me finish with one question, and then
14   we'll switch to another one.
15        Sitting here today, can you think of any
16   other documents that you wrote while at the IDF that
17   pertain to the topics of your expert rebuttal report
18   that you haven't yet told me about?
19        A.   No.
20        Q.   Okay.  And I'm correct that all of the
21   documents that we've discussed today that you wrote
22   while at the IDF are classified; right?
23        MR. YALOWITZ:  Objection.  Misstates the
24   testimony with regard to public source documents.
25        MR. HILL:  I appreciate the objection.  I'll
```

OCTOBER 22, 2013 - ALON EVIATAR

155

```
 1   correct it.  Let me rephrase.
 2        Q.   BY MR. HILL:  I'm correct, Mr. Eviatar, that
 3   apart from the one document you wrote that was published
 4   in the IDF Command School magazine, all of the other
 5   writing that you've described today is classified?
 6        Right?
 7        A.   Correct.
 8        Q.   Now, you mentioned that you had also reviewed
 9   a document that dealt with Palestinian clans and Islamic
10   customs; right?
11        A.   Correct.
12        Q.   And that document was prepared by someone
13   else at the IDF?
14        A.   Correct.
15        Q.   And was that document also classified?
16        A.   Yes.
17        Q.   Apart from that document, while you were
18   at the IDF, did you review other documents that
19   pertain to your opinions or that pertain to your
20   rebuttal report, which is Exhibit 427?
21        MR. YALOWITZ:  Objection.  Ambiguous.
22        THE WITNESS:  Is it possible to repeat the
23   question?
24        Q.   BY MR. HILL:  Of course.  Other than the
25   document about clans and Islamic customs that you've
```

OCTOBER 22, 2013 - ALON EVIATAR

156

```
 1   just mentioned, had you reviewed any other documents
 2   while you were working at the IDF that relate to the
 3   subjects of your rebuttal report in this case, which
 4   is Exhibit 427?
 5        A.   I reviewed documents that are related to this
 6   exhibit at the time that I was engaged in military
 7   service.
 8        Q.   And it's also true, sir, that you reviewed
 9   documents related to what we've marked as Exhibit 420
10   while you were in military service; right?
11        A.   Correct.
12        Q.   And many of the documents that you reviewed
13   while you were in military service that relate to the
14   topics that are in Exhibit 420 are classified; right?
15        A.   Correct.
16        Q.   And, similarly, many of the documents that
17   you reviewed while you were in military service that
18   relate to the topics of your rebuttal report, which
19   is 427, are classified; right?
20        A.   Correct.
21        Q.   In your rebuttal report, which is 427, you
22   do reference a number of public source documents; right?
23        A.   Correct.
24        Q.   In connection with your work on Exhibit 427,
25   which is the rebuttal report, did you look at any public
```

OCTOBER 22, 2013 - ALON EVIATAR

157

```
 1   source materials that are not referenced in the rebuttal
 2   report?
 3        A.   It's possible.
 4        Q.   Sitting here today, can you identify for
 5   me any public source documents that you considered
 6   in connection with Exhibit 427, the rebuttal report,
 7   that are not listed or identified in the rebuttal
 8   report?
 9        A.   I recall now -- I remember now that I read
10   sections from the book written by the former chief of
11   staff Moshe Ya'alon.  I didn't use them.  I read them,
12   and they're relevant to this report.
13        Q.   Did you read anything else other than the
14   book you've just described in preparing your rebuttal
15   report, which is Exhibit 427, that's not disclosed in
16   the rebuttal report itself?
17        A.   The answer is "yes."
18        Q.   Can you tell me what any of those additional
19   documents that you reviewed in connection with preparing
20   the rebuttal report but did not disclose in the rebuttal
21   report are?
22        A.   I read from the Internet site, the Fatah
23   website, and on the website of the Palestinian
24   Authority, and the websites of the Palestinian media.
25        Q.   If I wanted to figure out which Web pages
                 OCTOBER 22, 2013 - ALON EVIATAR
```

158

```
 1   in particular you looked at from those websites, is
 2   there any way for me to do that?
 3        A.   At the moment, I recall several websites.
 4        Q.   Okay.  If I wanted to figure out what pages
 5   you looked at on the several websites you're currently
 6   recollecting, am I able to do that?
 7        A.   I don't recall pages.
 8        Q.   You didn't keep a list of the website pages
 9   that you viewed in connection with preparing the
10   rebuttal report; correct?
11        A.   Correct.
12        Q.   You didn't take screen shots of those websites
13   and save them in a computer file or anything like that,
14   did you?
15        A.   Correct.
16        Q.   You would agree with me that there's no way
17   to reconstruct exactly what websites you considered
18   in connection with the rebuttal report that you did
19   not cite in the rebuttal report; right?
20        MR. YALOWITZ:  Objection.  Misstates the
21   testimony.
22        THE WITNESS:  Part of the -- some of the
23   websites I can mention, just as I mentioned them before.
24        Q.   BY MR. HILL:  Okay.  Tell me to the best of
25   your recollection every Web page that you viewed in
                 OCTOBER 22, 2013 - ALON EVIATAR
```

159

```
 1   connection with preparing the rebuttal report, which
 2   is Exhibit 427, other than those that are cited in the
 3   report itself.
 4        A.   Are you referring to names of websites or
 5   to something else?
 6        Q.   Sir, I would like to go and look at all of
 7   the webpages you considered in connection with your work
 8   on the rebuttal report in this case that you did not
 9   cite in the rebuttal report itself.  So, if you can,
10   please tell me, with as much information that you can,
11   every website that you visited in connection with your
12   work on the rebuttal report that's not cited in the
13   rebuttal report itself.
14        A.   I can state and specify websites of the
15   official Palestinian newspapers, additional websites
16   of the Fatah, websites of Palestinian media.  And if
17   I may, I'll take another look through this.  And that's
18   what I recall at the moment.
19        Q.   Can you give me any more information about
20   which websites you considered in connection with the
21   rebuttal report but don't cite in the rebuttal report,
22   beyond what you've told me so far today?
23        A.   I don't recall additional websites at this
24   moment.
25        MR. HILL:  Why don't we take a break.
                 OCTOBER 22, 2013 - ALON EVIATAR
```

160

```
 1        MR. YALOWITZ:  I was going to suggest it,
 2   but I didn't want to disrupt the line.
 3        (Recess from 5:18 p.m. to 5:31 p.m.)
 4        MR. HILL:  Back on the record.
 5        I don't have any further questions for
 6   Mr. Eviatar at this time.
 7        MR. YALOWITZ:  So I calculated 6 hours and
 8   17 minutes.  So can we agree on payment of 6 and a
 9   half hours to Mr. Eviatar?
10        MR. HILL:  I don't have the payment
11   information.  So you'll have to provide that to me.
12   But I'll take care of it.
13        MR. YALOWITZ:  Thank you.
14        MR. HILL:  We're off the record.
15        (The deposition concluded at 5:34 p.m.)
16
17
18
19
20
21
22
23
24
25
                 OCTOBER 22, 2013 - ALON EVIATAR
```

161

```
 1              CERTIFICATE OF REPORTER
 2
 3           I, AMY R. KATZ, RPR, do hereby certify:
 4           That, prior to being examined, the witness
 5   named in the foregoing deposition was duly affirmed by
 6   me to testify the truth, the whole truth, and nothing
 7   but the truth;
 8           That the foregoing deposition was taken before
 9   me at the time and place herein set forth, at which time
10   the aforesaid proceedings were stenographically recorded
11   by me and thereafter transcribed by me;
12           That the foregoing transcript, as typed, is a
13   true record of the said proceedings;
14           And I further certify that I am not interested
15   in the action.
16
17           Dated this 4th day of November, 2013.
18
19           _____
20           AMY R. KATZ, RPR
21
22
23
24
25
          OCTOBER 22, 2013 - ALON EVIATAR
```

163

```
 1                  ERRATA SHEET
 2   Case:    MARK I. SOKOLOW, et al. vs. THE PALESTINE
 3            LIBERATION ORGANIZATION, et al.
 4   Date:    OCTOBER 22, 2013
 5   Witness: ALON EVIATAR
 6
 7   Page ____ Line ____ Change _____
 8   Reason _____
 9   Page ____ Line ____ Change _____
10   Reason _____
11   Page ____ Line ____ Change _____
12   Reason _____
13   Page ____ Line ____ Change _____
14   Reason _____
15   Page ____ Line ____ Change _____
16   Reason _____
17   Page ____ Line ____ Change _____
18   Reason _____
19   Page ____ Line ____ Change _____
20   Reason _____
21   Page ____ Line ____ Change _____
22   Reason _____
23
24   _____      _____
          ALON EVIATAR, Witness          Date
25
          OCTOBER 22, 2013 - ALON EVIATAR
```

162

```
 1          CERTIFICATE OF WITNESS/DEPONENT
 2
 3           I, ALON EVIATAR, witness herein, do
 4   hereby certify and declare the within and foregoing
 5   transcription to be my examination under oath in said
 6   action taken on October 22, 2013, with the exception
 7   of the changes listed on the errata sheet, if any;
 8           That I have read, corrected, and do hereby
 9   affix my signature under penalty of perjury to said
10   examination under oath.
11
12
13
14
15   _____      _____
          ALON EVIATAR, Witness          Date
16
17
18
19
20
21
22
23
24
25
          OCTOBER 22, 2013 - ALON EVIATAR
```