# EXHIBIT B.22

Page 1

1   MARK I. SOKOLOW, et al,   *   IN THE UNITED STATES

2             Plaintiffs,   *   DISTRICT COURT

3   vs.                       *   FOR THE SOUTHERN

4   THE PALESTINE LIBERATION  *   DISTRICT OF NEW

5   ORGANIZATION, et al,      *   CIVIL ACTION NO.:

6             Defendants,   *   04cv397 (GBD) (RLE)

7             *       *       *       *       *

8                     VOLUME I of II

9   DEPOSITION OF:

10                  DR. MATTHEW LEVITT,

11  was held on Tuesday, September 24, 2013,

12  commencing at 9:15 a.m., at Miller & Chevalier,

13  655 15th Street, N.W., Suite 900, Washington,

14  D.C., before Cheryl Jefferies, Certified

15  Shorthand Reporter.

16             *       *       *       *       *

17

18

19

20

21

Page 2

1   APPEARANCES:
2
3   On behalf of the PLAINTIFFS:
4       BRIAN HILL, ESQ.
        KARA SCHMIDT, ESQ.
5       ANDY WISE, ESQ.
        MILLER & CHEVALIER CHARTERED
6       655 15th Street, N.W.
        Suite 900
7       Washing, D.C. 20005
        (202) 626-6014
8       E-mail: Bhill@milchev.com
9
10  On behalf of the DEFENDANTS:
11      PHILIP W. HORTON, ESQ.
        ARNOLD & PORTER, LLP
12      555 Twelfth Street, N.W.
        Washington, D.C. 20004
13      (202) 942-5787
        E-mail: Philip_Horton@aporter.com
14
15
16
17
18
19
20
21

Page 3

                    I-N-D-E-X
            Deposition of Dr. Matthew Levitt
                September 24, 2013

5   EXAMINATION BY:                      PAGE:
6   Mr. Hill                        4
7
8   EXHIBITS MARKED:                      PAGE:
9   182 Expert Report                   4
10  183 CV                          107
11  184 USA Today Article               117
12  185 Erased In A Moment Report        126
13  186 Certificate of Translator       155
14  187 Agence France Presse Report      186
15  188 Salon.com Report                196
16  189 BBC Report - 4/1/2004          210
17  190 BBC News                       216
18
19
20      (Original Exhibits retained by counsel.)
21

Page 4

```
1               P-R-O-C-E-E-D-I-N-G-S
2       (Defendant's Deposition Exhibit Number
3   182 was premarked for identification.)
4   WHEREUPON --
5           DR. MATTHEW LEVITT,
6   a Witness called for examination, having been
7   first duly sworn, was examined and testified as
8   follows
9               EXAMINATION
10      BY MR. HILL:
11      Q.   Please tell us your name?
12      A.   Dr. Matthew Levitt.
13      Q.   What is your home address?
14      A.   11408 Heathercrest Lane, Silver
15  Spring, Maryland 20902.
16      Q.   What's your Social Security Number?
17      A.   O14-64-O488.
18      Q.   I'm showing you what we've marked as
19  Defendant's Deposition Exhibit Number 182.  Do
20  you recognize that?
21      A.   Yes.
```

Page 5

```
1       Q.   What is it?
2       A.   This is my report.
3       Q.   Turn, if you will, to the last page.
4   Is that your signature?
5       A.   It is.  Messy, but it is.
6       Q.   Did you, in fact, sign Page 26 of this
7   report on March 22nd of 2013?
8       A.   That's what it appears.  That's what
9   it's dated.
10      Q.   And was that signature with a pen or
11  with a computer?
12      A.   This would be with a pen.  I can't do
13  that on a computer.
14      Q.   Look, if you will, at Page 1 of the
15  report Roman Numeral Section I, Scope of
16  Engagement.  Does that, in fact, accurately
17  describe the Scope of Engagement of your work in
18  this case?
19      A.   Yes.
20      Q.   You indicate that you've been asked to
21  provide expert testimony about the relationship
```

Page 6

1  between the Al, A-L, Aqsa, A-Q-S-A, Martyrs
2  Brigades (AAMB) and Fatah, F-A-T-A-H, and any
3  support by the PA and PLO for terrorism,
4  including by the AAMB, during the second
5  Intifada, also known as the al-Aqsa Intifada.
6         Isn't that in fact what you were asked
7  to do in connection with this case?
8     A.   Correct.
9     Q.   Did you in fact provide any opinions
10 about whether the PLO supported terrorism during
11 the second Intifada?
12    A.   I have to check the report.
13    Q.   Please do so.
14    A.   Thanks.
15         (Witness Reviews Document.)
16    A.   You mind if I doggie ear just because
17 this is the one that's actually marked?  It's not
18 a problem?
19    Q.   You can fold it down if you'd like.
20    A.   So the answer is:  There's not a
21 section dedicated to the PLO as such.  The PLO

Page 7

1  comes up in the course of the discussion of PA
2  and Fatah, same as Fatah, F-A-T-A-H, because of
3  the close relationship between the PLO and the
4  PA, and the PLO and Fatah.  So throughout the
5  report there are will references to the PLO, but
6  there's not a section on the PLO as such.
7     Q.   Can you point me to an instance in the
8  report when you do offer an opinion about what
9  the PLO supported terrorism during the second
10 Intifada?
11    A.   So for example on Page 15, first full
12 paragraph:  "In addition to its intimate ties to
13 Fatah, the dominant faction within the PLO, the
14 Al-Aqsa Martyrs Brigades is also closely linked
15 to the PA and the various Palestinian security
16 forces."  So we make reference to the PLO there.
17    Q.   Okay.
18    A.   And if you go to Page 20 where we
19 start the section entitled "Palestinian Authority
20 control over PA security forces during the
21 2000-2002 period," so there's reference here to

Page 8

1  the PLOCCA -- all caps P-L-O-C-C-A -- reports,
2  assessing PLO and PA compliance with commitments
3  made under the peace accords.  And there are
4  several references here to PA and PLO.
5     Q.   Okay.  Any other instances where you
6  believe you've in the report expressed an opinion
7  about whether the PLO supported terrorism during
8  the second Intifada?
9     A.   So it continues throughout.  It's not
10 just Page 20, that section.  So Page 21 we have
11 references to the PLO, Page 22.
12    Q.   Is that it?
13    A.   Yeah.
14    Q.   Have you ever been a citizen of any
15 country other than the United States?
16    A.   No.
17    Q.   You ever applied for citizenship in
18 any nation other than the United States?
19    A.   No.  When I was young, my family lived
20 in Israel for a littler over two years.  My
21 father worked for an American company there.  I

Page 9

1  was never a citizen but, apparently, lived there
2  long enough to get the Israeli equivalent of a
3  Social Security Number.
4     Q.   Have you ever lived in any country
5  other than the U.S. or Israel?
6     A.   No.
7     Q.   Have you ever resided in Israel other
8  than the period that you've just described?
9     A.   I was in school there for the academic
10 year -- a gap year after high school, so '88,
11 '89, and then a third semester.  So I guess that
12 was through about January 1990, with breaks
13 coming home.
14    Q.   So you resided in Israel between 1988
15 and 1990 after high school; is that what you're
16 say?
17    A.   Yes, and as a student.
18    Q.   Where did you live?
19    A.   I was in Jerusalem.
20    Q.   What institution or institutions did
21 you attend?

3 (Pages 6 to 9)

Page 10

1    A.   I took a gap year for religious study,
2  so it was a religious school called -- and I'll
3  spell it for you -- Yeshivat Hakotel,
4  Y-E-S-H-I-V-A-T, which basically means school of,
5  H-A-K-O-T-E-L, which means The Kotel.  The Kotel
6  is the western wall.  It's a school in the Old
7  City of Jerusalem.
8    Q.   And you were enrolled in that
9  institution between 1988 and 1990?
10   A.   Yes, and that was in concert with my
11 undergraduate studies at Yeshiva University.
12   Q.   Did you receive any sort of degree or
13 certificate from the school in Jerusalem?
14   A.   No.  I got credit at Yeshiva
15 University for studies there, and that's part of
16 the Yeshiva University transcript.
17   Q.   Any other occasions where you've
18 resided in Israel other than those you've
19 described today?
20   A.   No.
21   Q.   Do you currently have any family in

Page 11

1  Israel, the West Bank, or Jerusalem?
2    A.   No.  I mean, I think I may have some
3  distant family I don't know about.  But my wife
4  has family in Jerusalem, a great uncle, and she
5  has some cousins, and I don't know where all they
6  live.  We're not particularly close.
7    Q.   Have you ever had a security
8  clearance?
9    A.   I have.
10   Q.   From what country or countries have
11 you received a security clearance?
12   A.   The United States.
13   Q.   Any others?
14   A.   No.
15   Q.   When did you receive the security
16 clearance from the U.S.?
17   A.   My first clearances came when I worked
18 at the FBI, so that was I think -- no, the
19 specific dates are on the report, but I think
20 it's November '98 is when I started.  And I left
21 the Bureau in I think -- anyway, the dates are in

Page 12

1  here.  And I left in I think it was November
2  2001.
3    Q.   Any other occasions when you've held a
4  security clearance from the United States?
5    A.   So first of all, in the interim
6  security clearance, you know, it's a five year
7  SSB review, so it continued a little while.  So
8  then I went back to government later as the
9  Deputy Assistant Secretary for Intelligence and
10 Analysis at the Treasury Department across the
11 street, and that was in 2005, I think also
12 November.  And I left in, I think it was January
13 2007.
14   Q.   When did the clearance that you first
15 obtained in 1998 expire or otherwise lapse?
16   A.   Probably five years later.
17   Q.   So you believe you had a security
18 clearance from approximately 1998 until 2003?
19   A.   It's not entirely clear.  When you
20 leave, you do sign out of certain things, you
21 sign out of certain clearances, so I'm not clear.

Page 13

1  I don't think it was active, but the five-year
2  review would have been active.  So there have
3  been times when, for specific consultancy that I
4  do for the government, I'll get read-in sometimes
5  just for the day, and then read-out.  And they
6  can do that so long as those five-year reviews
7  are still in standing, good standing.
8    Q.   Were there occasions between the time
9  you left the FBI in 2001, and the time that the
10 clearance you received as a result of your FBI
11 clearance ultimately lapsed, that you read-in and
12 received classified information?
13   A.   No.
14   Q.   So your testimony is that after you
15 left the FBI, you did not receive any further
16 classified information?
17   A.   That's right.
18   Q.   Have you ever used the process you've
19 just described of reading-in to receive
20 classified information while you were not a
21 government employee?

4 (Pages 10 to 13)

MATTHEW LEVITT DEPOSITION                September 24, 2013                Sokolow v. the PLO

Page 14

1    A.    Yes.
2    Q.    Okay.  When was that?
3    A.    Over the past few years.  I don't have
4  dates.
5    Q.    Was it after your stint at Treasury?
6    A.    Yes.
7    Q.    But you're testifying that did not
8  happen between the time you left the FBI and the
9  time you started at Treasury?
10   A.    Correct, to the best of my knowledge.
11 Certainly no case where I was just kind of
12 read-in and read-out for the day.  I don't think
13 there was any instance when I saw classified
14 information between the FBI and Treasury.
15   Q.    Okay.  What level of clearance did you
16 receive when you worked at the FBI?
17   A.    TSSCI.
18   Q.    And what level of clearance did you
19 receive when you worked at Treasury?
20   A.    The same.
21   Q.    And for the record, TSSCI, is that the

Page 15

1  highest level of clearance?
2    A.    In laymen's terms, yes.  There are
3  lots of additional clearances and read-ins, so
4  doesn't mean you get to see everything.  Even if
5  you have all the clearances, there's a need to
6  know.  You don't get to see everything.  But in
7  simple terms, it is the highest.  There are
8  actually higher.  But, yes.
9    Q.    Okay.  After you left Treasury in
10 2007, did you ever receive any classified
11 information?
12   A.    So I have seen classified information.
13 I have not received.  That is to say, I don't get
14 it in my office.  My office is not classified
15 space.  So there have been instances since then
16 where I've been asked to do a consultancy for the
17 government limited in time and scope, and have
18 been allowed to, or asked to see classified
19 information and comment on classified
20 information.
21   Q.    In connection with what consultancies

Page 16

1  have you viewed classified information?
2    A.    Well, I can't go into the details of
3  all of them, but I can put it to you this way:
4          Sometimes the government, after the
5  intelligence reform and Terrorism Prevention Act
6  and the effort, post the Iraq war, to fix some of
7  the intelligence and the local shortcomings, one
8  of the things that was instituted was requirement
9  for certain types of finished products to bring
10 in an outside reader or outside readers.  So I've
11 been asked to do that.
12          I also served as an advisor to General
13 Jones at the end of the Bush Administration,
14 before he was brought on as the National Security
15 Advisor in the Obama Administration.  President
16 Bush had made him one of three different Middle
17 East envoys to promote the Israeli-Palestinian
18 Peace Process.  General Dayton was the more
19 famous.  General Frazier was the least famous.
20 General Jones was somewhere in the middle.
21          And I was brought on as what's called

Page 17

1  a part-time government employee, which means that
2  it's a certain number of hours, most of it is not
3  in the State Department.  No classified
4  information ever came to me in my office, but
5  there were times when I was asked to review
6  classified information not in my office.
7          That, of course, has to remain
8  classified; I'm not allowed to use it for any
9  work I do, not for a case like this, a book or
10 anything.  And I signed that away many times
11 over.
12   Q.    Dr. Levitt, as you may know, by rule
13 we have a limited amount of time to examine you
14 in the case.  Do you understand that?
15   A.    I think you have seven hours or
16 something like that.
17   Q.    So I'd ask you to try and confine your
18 answers to the questions I ask because we don't
19 want to run the clock out, if you understand.
20   A.    Absolutely.  I thought I was answering
21 your question, and if you feel I'm not, feel free

                                          5 (Pages 14 to 17)

Page 18

1  to interrupt me.
2      Q.   Let me pose a different question:
3          Did any of the consultancies you've
4  just described, where you received classified
5  information from the United States, relate to the
6  Scope of Engagement in this case as described in
7  Roman Numeral I of your report?
8      A.   None of the classified information I
9  reviewed focused on the time period here.
10     Q.   So is the answer no?
11     A.   And some of the classified
12  information, though not included here, or in any
13  way relevant to the report, did involve issues
14  related to the peace process and terrorism in the
15  peace process, but not in the scope of time that
16  we're talking about here.
17     Q.   So let me ask you some more specific
18  questions about that in light of that answer:
19          While you were consulting for the
20  United States and receiving classified
21  information, did you ever see any classified

Page 19

1  information about the relationship between the
2  AAMB and Fatah?
3          MR. HORTON:  Object to the form.
4          You may answer.
5      A.   I'm not allowed to discuss details of
6  any classified information I've seen.  Nor,
7  frankly, would I honestly remember it.  It's very
8  detailed stuff.
9          But I did see classified information
10  about the Israelis, the Palestinians, the peace
11  process, Israeli compliance or noncompliance with
12  their obligations; Palestinian compliance or
13  noncompliance with their obligations, which are
14  included in my area that I was brought in to be
15  an expert on, was on the issue of terrorism from
16  both sides, mind you, but terrorism.
17     Q.   So would it be fair to say that while
18  you were consulting, you did see classified
19  information relating to support by the PA or PLO
20  for terrorism during the second Intifada?
21     A.   Again, I can't answer that question.

Page 20

1      Q.   You're refusing to answer the question
2  because that is a classified area?
3      A.   I wouldn't say refusing.  I'm
4  declining, because to get into the details of the
5  classified information I saw, is in violation of
6  all the different things I signed when I agreed
7  not to divulge classified information.
8      Q.   Let me just try and get at it this
9  way, Dr. Levitt:
10         Can you testify under oath that you
11  did not see classified information regarding
12  whether the PA or PLO supported terrorism during
13  the second Intifada?
14     A.   I have to say no, because I honestly
15  don't know.
16     Q.   Can you testify that you have never
17  seen classified information about the
18  relationship between the AAMB and Fatah?
19     A.   I honestly don't know, so I'd have to
20  say no.
21     Q.   I'd like to talk to you about your

Page 21

1  education.  Where did you go to high school?
2      A.   Maimonides, M-A-I-M-O-N-I-D-E-S,
3  School in Brookline, Massachusetts.
4      Q.   While you attended that school, did
5  you take any courses related to the Scope of
6  Engagement related, in this, as described in
7  Roman Numeral I of your report?
8      A.   No.  This is well before the time
9  period we're talking about, before the founding
10  of the Al Aqsa Martyrs Brigades.  No.
11     Q.   You went to college at Yeshiva
12  University?
13     A.   Yes.
14     Q.   While you were at Yeshiva, did you
15  take any classes related to the Scope of
16  Engagement in this report?
17     A.   Again, this predates the time period
18  and predates the existence of Al Aqsa Martyrs
19  Brigades.  I did take a course; I don't think it
20  was on the Israeli-Palestinian conflict and peace
21  process, but there were readings about it.  I

Page 22

1  think it was more general international relations
2  course, so there were readings that related to
3  the Israeli Palestinian conflict.
4      Q.   Did the readings that you had while
5  you were in college at Yeshiva, relate to the
6  relationship between AAMB and Fatah?
7      A.   No, AAMB did not yet exist.
8      Q.   Did they relate to any support by the
9  PA or PLO for terrorism during the second
10 Intifada?
11     A.   Possibly.
12     Q.   When did you graduate from college?
13     A.   1992.
14     Q.   How could work that you did in 1992,
15 relate to events that occurred in 2000 and
16 afterwards?
17     A.   I didn't understand that to be your
18 question.
19         It would relate to things that had
20 happened until then.  The PLO wasn't in existence
21 at the time.

Page 23

1      Q.   Let me ask a different question; maybe
2  we'll get a different answer:
3          While you were in college, did you
4  take any courses relating to any support by the
5  PA or PLO for terrorism during the second
6  Intifada?
7      A.   No.
8      Q.   Did you do any academic research in
9  college relating to the Scope of Engagement in
10 this case?
11     A.   Not during the second Intifada, no.
12     Q.   And the Scope of Engagement is limited
13 to the second Intifada, correct?  That's what it
14 says on the first page of your report.
15     A.   That's correct.
16     Q.   So it is the case that you did no
17 academic research in college related to the Scope
18 of Engagement in this case, correct?
19     A.   I did research that's related to the
20 issues that are covered in the Scope of
21 Engagement.  But as such, no, I did not do

Page 24

1  research on the specific Scope of Engagement.
2      Q.   You went to graduate school at Tuffs,
3  right?
4      A.   Correct, The Fletcher School of Law
5  and Diplomacy.
6      Q.   Did you take any classes at Tuffs
7  related to the Scope of Engagement in this case?
8      A.   I did.
9      Q.   What was that?
10     A.   I took a variety of Middle East
11 courses that touched on a variety of things,
12 including the Israeli-Palestinian conflict.  And
13 I had the Middle East, although they call it
14 Southwest Asia, as one of my cones of
15 concentration.
16         I also did a lot of work on this and
17 another cone, which was on international
18 negotiation and conflict resolution, and wrote
19 part of my Master's Thesis on Negotiations
20 Related to the Madrid Peace Conference.
21     Q.   Did any of your course work at Tuffs

Page 25

1  pertain to the relationship between the AAMB and
2  Fatah?
3      A.   No, the AAMB did not yet exist.
4      Q.   Did any of your course work at Tuffs
5  pertain to support by the PA or PLO for terrorism
6  during the second Intifada?
7      A.   Not during the second Intifada.
8      Q.   Did you do any academic research at
9  Tuffs relating to the relationship between the
10 AAMB and Fatah?
11     A.   Well, actually, the way you asked that
12 question just triggered in my mind:  Are we
13 asking now specifically about the Master's, the
14 Master's and Ph.D., because there's a very big
15 time difference between the two.
16     Q.   I mean any of your work at Tuffs.  Did
17 you do any academic research regarding the
18 relationship between the AAMB and Fatah, as part
19 of your education at Tuffs?
20     A.   It's possible that there was research
21 related to the AAMB and Fatah, towards the latter

7 (Pages 22 to 25)

Page 26

1  years, as I was writing my dissertation.  The
2  dissertation was on an earlier period, but a lot
3  of the research took me to more near-term things,
4  especially the field research on the ground --
5  not for the Master's -- which ended in 1995.
6      Q.   So we can agree that, as far as your
7  Master's degree goes, you did not do any academic
8  research on the relationship between AAMB and
9  Fatah, correct?
10     A.   Correct.
11     Q.   As far as your Master's Degree goes,
12 is it the case that you did not do any research
13 on support by the PA or PLO for terrorism during
14 the second Intifada?
15     A.   I'm not sure about the PA, which had
16 just been created just around the week that I
17 started graduate school.
18         But the PLO, I probably did.
19     Q.   When did you receive your Master's
20 Degree?
21     A.   Master's Degree in 1995.

Page 27

1      Q.   How could you have done research on
2  PLO support for terrorism during the second
3  Intifada, in 1995?
4      A.   Not the second Intifada, but the PLO.
5      Q.   Okay.  So let me ask the question
6  again:
7          As far as your Master's Degree goes,
8  it's accurate to say that you have not done any
9  academic research related to PA or PLO during the
10 second Intifada, correct?
11     A.   Correct.
12     Q.   When did you receive your Ph.D.?
13     A.   2005.
14     Q.   And you indicated that your
15 dissertation pertained to the Israeli-Palestinian
16 peace process?
17     A.   Correct.
18     Q.   What period of time did your
19 dissertation concern?
20     A.   Really was focused -- it was on the
21 1990s, primarily 1993 through -- we probably

Page 28

1  covered things in there through maybe even '98,
2  certainly '97.  The 1990s.
3      Q.   Is it your testimony that your
4  dissertation did not cover the period beginning
5  in 2000 and afterwards?
6      A.   Correct.
7      Q.   You said you might have done some
8  field research that related to the relationship
9  between AAMB and Fatah; is that correct?
10     A.   Not the AAMB.
11     Q.   Okay.  So you have not done any field
12 research about the relationship between the AAMB
13 and Fatah; is that correct?
14     A.   Incorrect.
15     Q.   What field research have you done
16 about the relationship between the AAMB and
17 Fatah?
18     A.   To be clear:  We're not moving beyond
19 The Fletcher School Master's and Ph.D.?
20     Q.   Let's be clear, then:
21         Your work at Fletcher did not involve

Page 29

1  field research on the AAMB and its relationship
2  to Fatah, correct?
3      A.   Correct.
4      Q.   Okay.  And your work at Fletcher did
5  not involve field research on support by the PA
6  or PLO for terrorism during the second Intifada,
7  correct?
8      A.   Correct.
9      Q.   Have you done any field research on
10 the relationship between the AAMB and Fatah?
11     A.   Yes.
12     Q.   For what academic degree did you do
13 that research?
14     A.   This was not for a degree.  This was
15 for what I do as a professional researcher on
16 these issues.
17     Q.   What do you mean when you say, field
18 research?
19     A.   Well, there are lots of ways to do
20 research -- I'll start over and take your
21 admonition to heart and try to make that shorter.

8 (Pages 26 to 29)

MATTHEW LEVITT DEPOSITION          September 24, 2013          Sokolow v. the PLO

Page 30

1    Q.   I appreciate it.
2    A.   Field research is travelling, or it
3  doesn't even have to be travel.  It could be
4  meeting someone here in Washington, D.C., but
5  meeting people, interviewing people, going and
6  seeing firsthand.  Primary field research is
7  going and experiencing it firsthand.
8    Q.   Have you done any primary field
9  research about the relationship between the Al
10 Aqsa Martyrs Brigades and Fatah?
11   A.   Yes.
12   Q.   Describe that for me.
13   A.   Well, I don't have the dates handy.
14 But for the period of the second Intifada, like
15 many others focused on counter-terrorism and
16 interested in Israeli-Palestinian peace, I was
17 highly focused on the issue of terrorism, as it
18 relates to the peace process, and spent time
19 interviewing people here in Washington, in
20 Europe, in Israel, and in the West Bank, many
21 different times on terrorism from all these

Page 31

1  parties, not only Fatah or Al Aqsa Martyrs, but
2  Hamas for Jewish extremist groups, and the full
3  spectrum.
4    Q.   Okay.  I'd like you to focus, if you
5  would, sir, on the field research relating to the
6  AAMB and Fatah, because that's what we're here to
7  talk about today.
8        Who did you interview in Washington
9  about the relationship between AAMB and Fatah?
10   A.   I'd have no way to remember that.
11 You're talking about this is what I do on a
12 regular basis, especially here in Washington,
13 where I'm based, so I'm meeting with people all
14 the time.  And at this period of time, I would
15 have been meeting with people all the time, too.
16   Q.   Is it correct that today you cannot
17 give me the name of a single person that you
18 believe you interviewed in Washington about the
19 relationship between AAMB and Fatah?
20   A.   By memory, no.
21   Q.   Who did you interview in Europe about

Page 32

1  the relationship between AAMB and Fatah?
2    A.   The answer is the same.  Within being
3  able to reference, you know, schedules or notes
4  or something, I couldn't tell you who I met with
5  several years ago on any given subject, including
6  Al Aqsa Martyrs and Fatah.
7    Q.   Just for the record --
8    A.   But to be clear -- I'm sorry to
9  interrupt.
10   Q.   Please finish.
11   A.   But to be clear:  By the nature of my
12 work, I'm not ever focused on any one issue in
13 isolation, so it wouldn't be that there was -- or
14 it would be rare for there to be a meeting that
15 was just about, for example, Al Aqsa and Fatah,
16 especially if it was Europeans or Americans.
17       Maybe it would be more specific
18 sometimes if it was with Palestinian authority
19 officials, or with Israeli officials.  But
20 especially in the West, usually we'll spend time
21 talking about the Israel/Palestinian peace

Page 33

1  process.  We'll spend time talking about
2  Al-Quaeda.
3    Q.   So for the record, you cannot tell me
4  today the name of a single person in Europe that
5  you have interviewed concerning the relationship
6  between AAMB and Fatah, correct?
7    A.   Correct.
8    Q.   Can you tell me the name of a single
9  person in Israel that you have interviewed about
10 the relationship between the AAMB and Fatah?
11   A.   That's going to be the same answer for
12 each of these questions.
13       I interview lots and lots of people.
14 I can't remember who I interviewed when, and on
15 what subject.  So, no.
16       So a lot of people -- and even if I
17 can remember specific names, I can't honestly
18 tell you that that conversation, we talked about
19 this issue as opposed to another issue.  So, no.
20   Q.   And can you tell me the name of a
21 single person in the West Bank that you've

9 (Pages 30 to 33)

MATTHEW LEVITT DEPOSITION                September 24, 2013                Sokolow v. the PLO

Page 34

1   interviewed about the relationship between the
2   AAMB and Fatah?
3       A.   Same.  I've been in lots of meetings,
4   but there's no way for me to be able to remember
5   that kind of detail in isolation.
6       Q.   Okay.  Apart from the interviews in
7   D.C., Europe, Israel, and the West Bank that
8   you've described, have you done any other primary
9   field research on the relationship between the Al
10  Aqsa Martyrs Brigades and Fatah?
11      A.   It's really difficult to say.
12          Again, I've had meetings many times
13  with Jordaneans.  The Palestinian issue often
14  comes up:  Could it have included PLO, PA, Fatah,
15  Al Aqsa Martyr Brigade issues?  Yes, and at some
16  points it may -- it probably did.
17      Q.   Am I correct, sir, that you cannot
18  tell me today the single name of any person any
19  where in the world that you have interviewed on
20  the issue of the relationship between the AAMB
21  and Fatah?

Page 35

1       A.   By memory, no.
2       Q.   This may be the same answer for the
3   other.  Let's see if we can shortcut it.
4          Can you tell me the name of a single
5   person anywhere in the world that you've
6   interviewed about support by the PA for terrorism
7   during the second Intifada?
8       A.   I'm going to have to answer no.  I
9   could sit here and try and recreate, and I may be
10  able to come up with some names, but not with
11  great confidence that I'm remembering the right
12  meeting at the right time.
13      Q.   Can you tell me the name of a single
14  person anywhere in the world that you've
15  interviewed about support by the PLO for
16  terrorism during the second Intifada?
17      A.   Not without reference to something.
18      Q.   Okay.  Apart from the interviews that
19  you've described, have you done any other field
20  research related to the Scope of Engagement of
21  your work on this case?

Page 36

1       A.   Again, I do lots and lots of field
2   research.  So what I've told you are the
3   instances, in general terms, of course, that are
4   the most likely to have covered this topic.
5          It's possible it came up in meetings
6   I've had, say, with Egyptians.  And it's
7   possible -- I mean, not possible.  It's very
8   likely that when Palestinians come here, I talk
9   to them, or Israelis come here.  It's not just
10  there.  This is something I do on a very, very
11  regular basis.
12          So without giving you a definitive --
13  I mean, I can't give you a definitive answer
14  other than:  Nothing that I can recall
15  specifically.
16      Q.   Are you relying on the field research
17  you've described as a basis for your opinions
18  that are expressed in your report in this case?
19      A.   So a report like this gets footnoted
20  extensively, and I try to provide there the
21  sources that I've relied upon for those specific

Page 37

1   facts.  And in that sense, the report relies on
2   the citations that are included here.  So in that
3   sense, no.
4          The reality is that we're all informed
5   and affected by our experiences.  And, so, you
6   know, my understanding of this issue set, one of
7   the larger issues set within which the specific
8   Scope of Engagement falls, is certainly informed
9   by the time I've spent researching this issue.
10  But I have tried to be very careful -- hopefully
11  I've been successful -- in providing, for all
12  parties' concern, the specific citations for any
13  particular facts included here in the report.
14      Q.   Let me try asking it this way:
15          Did you consider any of the field
16  research that you've described in forming your
17  opinions that are expressed in the report in this
18  case?
19      A.   I'm sorry, I don't understand the
20  question.
21          Did I consider them?  Is that the same

10 (Pages 34 to 37)

MATTHEW LEVITT DEPOSITION                September 24, 2013                Sokolow v. the PLO

Page 38

1    as:  Did I write them?  I'm not sure what you
2    mean.
3        Q.    Do you understand what the word
4    "consider" means?
5        A.    I'd like you to define it for me.
6        Q.    Why don't you tell me what you think
7    it means, and maybe we can go with that.
8        A.    It's your question, why don't you tell
9    me what you're asking.
10       Q.    So you don't know what the word
11   "consider" means?
12       A.    I'm going to ask you to tell me what
13   you're asking.
14       Q.    Did you take into mind or into
15   consideration?  Do you understand that
16   definition, sir?
17       A.    You realize you just used the same
18   word to define the word?  I'm not trying to play
19   games with you here.  I think I answered your
20   question the first time.  I'll try and do it
21   again, if you like.

Page 39

1        Q.    Okay.  Well, let's try it again.
2             You understand what the word
3    "consider" means, right?
4        A.    We're just going to go in circles
5    here.  I have an understanding of what it means.
6    But this is your question, so --
7        Q.    What does the word "consider" mean to
8    you, Dr. Levitt?
9        A.    It can mean lots of things.  It can
10   mean take into account.  Does that work for you?
11       Q.    Did you take into account the field
12   research that you have described today, in
13   forming your opinions that are expressed in your
14   report in this case?
15       A.    The opinions are based on the
16   citations that are provided here (Indicating).
17       Q.    Is it correct to say, then, that the
18   opinions are not based on the field research that
19   you've described today?
20            MR. HORTON:  Object to the form.
21       A.    It's correct to say that any given

Page 40

1    fact here is source to a specific citation.
2        Q.    Are the opinions based on the research
3    that you've described today?
4        A.    The opinions are based on the facts in
5    the report.
6        Q.    Are they based on the field research
7    that you've described here today, yes or no,
8    please?
9             MR. HORTON:  I object to the form.
10            If you can answer a question yes or
11   no, that's fine.  If you can't, then he can't
12   tell you how to answer a question.
13            BY MR. HILL:
14       Q.    Or you could say, "I don't know," if
15   you don't know, I suppose.  It's got to be one of
16   those three, right?
17            MR. HORTON:  I'll object.  No, I need
18   not be one of those three.
19            MR. HILL:  So I'll pose the question
20   again.
21       Q.    The field research you've described

Page 41

1    today, are your opinions, as expressed in the
2    report in this case, based on that field
3    research?
4        A.    They are based on the citations in the
5    report.
6        Q.    I understand that, sir.
7             Are they based on the field research?
8        A.    Nothing here is cited to the field
9    research.
10       Q.    Does the field research -- try a
11   different question.
12            Did you take into account the field
13   research in forming your opinions in this case?
14       A.    I honestly don't know how to answer
15   that question.
16            In other words, nothing in this report
17   is based on something that came directly out of
18   the field research.  But I feel like you're
19   asking me to try and divorce or parse out.  As
20   I'm writing something or as I'm reviewing
21   something it's in a particular source.  Can I

11 (Pages 38 to 41)

MATTHEW LEVITT DEPOSITION                September 24, 2013                Sokolow v. the PLO

Page 42

1  tell you that it didn't ring a bell or
2  recollection from something from an interview? I
3  can't say that.
4       I can say that I wouldn't put
5  something into a report that didn't fit the kind
6  of body of knowledge that I've accumulated from
7  that research. So in that sense, there is a
8  connection, but I can't say it's divorced. But I
9  can't say that this is based on that, either.
10      Q.   Are you relying on the field research
11  to support any of the opinions you've expressed
12  in the report in this case?
13      A.   I think it's safer to say no.
14          Again, I wouldn't reach a conclusion
15  if I thought it didn't fit the body of evidence
16  as I know it. But there are citations for the
17  points that are made here (Indicating).
18      Q.   You mentioned that you have lived in
19  Israel. Have you ever worked for the government
20  of Israel?
21      A.   No -- well, I had an internship when I

Page 43

1  was in graduate school, an unpaid internship at
2  the Israeli Consulate in Boston.
3      Q.   How long did that position last?
4      A.   It was just two, three, four, five
5  weeks, something like that. As part of the
6  Fletcher School's program, you're supposed to
7  have a summer internship before your first and
8  second years. And I was a parent already and
9  didn't have the flexibility to be able to come
10  down to Washington and New York, and so this is
11  what I was able to finagle, if you were in
12  Boston, to do something related to the
13  international relations I was studying over the
14  summer.
15      Q.   And again, Dr. Levitt, I hesitate to
16  interrupt you, but the question was: How long
17  did it last? So if you could just confine your
18  answers to the questions, I think we'll get
19  through more quickly, at least.
20          Did you receive any classified
21  information from the Israeli government?

Page 44

1      A.   No.
2      Q.   Have you ever received any classified
3  information from the Israeli government?
4      A.   Not to my knowledge.
5      Q.   Have you ever received any classified
6  information from any government other than the
7  United States?
8      A.   Not to my knowledge.
9      Q.   Have you ever received any money from
10  the Israeli government for any reason?
11      A.   Not to my knowledge, no.
12      Q.   Have you ever received any information
13  from the Israeli government about the Scope of
14  Engagement in this case?
15      A.   Yes.
16      Q.   Is the information you received from
17  the Israeli government anything other than what
18  you've cited in the report?
19      A.   Probably.
20      Q.   What other information have you
21  received from the Israeli government that relates

Page 45

1  to your Scope of Engagement in this case?
2      A.   I answered "probably" for a reason,
3  because I can't know for sure, and I wouldn't be
4  able to, therefore, tell you a specific report.
5          But the Israelis produced lots of
6  reports related to issues that relate to the
7  Scope of Engagement, especially during the second
8  Intifada, largely based on raids they have
9  conducted in the West Bank, in particular.
10          Most of that material has been made
11  public and some of that public material is
12  included in the report. And some of it, I don't
13  know if all of it -- let me rephrase. I don't
14  know if all of it has. And I believe that some
15  of it I got while it was in the process of being
16  kind of put online, so I might have had it before
17  it became public.
18      Q.   Is it fair to say that all of the
19  information you've received from the Israeli
20  government about the Scope of Engagement in this
21  case, that you're relying on for your opinions,

Page 46

1  is cited in your report?
2      A.   Yes, with the same caveat that, you
3  know, again I can't -- I'd like it to be simple,
4  but I can't lie to you and say that, you know --
5  I am informed by the body of evidence that I've
6  seen, so I can't remember anything specific,
7  but --
8      Q.   Okay.  Sitting here today, you can't
9  tell me any information you've received from the
10  Israeli government that relates to the Scope of
11  the Engagement other than that that you've cited
12  in the report, correct?
13     A.   Correct.
14     Q.   While you were working at the FBI, did
15  you do any work related to the Scope of
16  Engagement in this case?
17     A.   No, in the sense that it's predated Al
18  Aqsa Martyrs in part, so part of it I can say
19  definitively because it didn't exist.  But the
20  details of what I did at the FBI, I was on the
21  intelligence side of the house, so all the

Page 47

1  classification issues we discussed earlier, I
2  can't get into the details.
3      Q.   Okay.  Well, let me be more precise
4  and see if we can get to the nub here:
5           While you were at the FBI, did you do
6  any work about the relationship between the AAMB
7  and Fatah?
8      A.   No.
9      Q.   While you were at the FBI, did you do
10  any work about support by the PA or PLO for
11  terrorism during the second Intifada?
12     A.   I can't answer that.
13     Q.   How could you have done work on the
14  second Intifada before the second Intifada
15  started?
16     A.   I'm sorry, I was just hearing PA, PLO.
17     Q.   Let me ask the question again:
18           While you were at the FBI, did you do
19  any work regarding any support of the PA or PLO
20  for terrorism during the second Intifada?
21     A.   Well, actually, the second Intifada

Page 48

1  really started before I left.  I left in 2001.
2  And September 2000 is often the time period
3  that's pointed to.
4      Q.   So let me ask you the question again,
5  sir:
6           While you were at the FBI, did you do
7  any work relating to support by the PA or PLO for
8  terrorism during the second Intifada?
9      A.   I can't answer that.
10     Q.   Okay.  And you can't answer that
11  because?
12     A.   Because your original assumption that
13  the second Intifada didn't coincide with when I
14  was with the FBI, was erroneous.  And because I
15  am not allowed to talk about what I did at the
16  FBI, because it's classified.
17     Q.   Okay.  So can you testify that while
18  you were at the FBI, you did not do any work on
19  the issue of support by the PA or PLO for
20  terrorism during the second Intifada?
21     A.   I'm sorry, I don't see how that

Page 49

1  question is different than the first.
2      Q.   Okay.  So you can't say that, either?
3      A.   I can't say what I did or did not work
4  on when I was at the FBI.
5      Q.   Okay.  So just so the record is clear,
6  Dr. Levitt, you cannot tell me whether your work
7  at the FBI involved the issue of whether the PA
8  or PLO supported terrorism during the second
9  Intifada?
10     A.   I can't -- correct.
11     Q.   And that is because you believe that
12  the answer to that question would require you to
13  reveal classified information?
14     A.   Correct.
15     Q.   While you were at the Treasury
16  Department, did you do any work on the
17  relationship between the Al Aqsa Martyrs Brigades
18  and Fatah?
19     A.   Possibly.
20     Q.   You say "possibly."  Is that because
21  you don't remember?

13 (Pages 46 to 49)

Page 50

1     A.   I don't remember specifics.  It was a
2  different job.  I was not in the weeds, as such,
3  like when I was at the FBI, "A."
4        And "B," I can't remember when this
5  started percolating-up as an issue for Treasury.
6  Obviously, it did, at some point, and the
7  designation came later.  But I can't remember
8  when this first started percolating-up.
9  Probably, in earnest, after I left.
10    Q.   Okay.  So your best answer, your best
11 guess is that you did work on the relationship
12 between Fatah and AAMB at Treasury?
13    A.   No, my best guess is that I -- I don't
14 know.  I'm just trying to think this through for
15 a second.
16        (Witness Pausing)
17    A.   I guess the best guess is:  I don't
18 know.
19    Q.   Okay.  While you were working at
20 Treasury, did you do any work on whether the PA
21 or PLO supported terrorism during the second

Page 51

1  Intifada?
2     A.   Not that I recall.
3     Q.   While you were at Treasury, did you
4  see any classified information about the
5  relationship between the AAMB and Fatah?
6     A.   I can't talk about what classified
7  information I did or did not see when I was at
8  Treasury.
9     Q.   So for the record, you cannot tell me
10 whether, during your time at Treasury, you were
11 exposed to classified information about the
12 relationship between the AAMB and Fatah, correct?
13    A.   Correct.
14    Q.   While you were at Treasury, did you
15 see any classified information related to whether
16 the PA or PLO supported terrorism during the
17 second Intifada?
18    A.   I couldn't answer that, either.
19    Q.   And, again, you cannot tell me whether
20 you saw such classified information or not?
21    A.   Because it would be classified.

Page 52

1     Q.   And to tell me that you didn't see it,
2  would also be classified; is that your testimony?
3     A.   As I understand it, yes.
4     Q.   Would you agree with me, sir, that
5  there's no way for me to find out what you know
6  about the relationship between AAMB and Fatah, as
7  a result of your work at Treasury?
8     A.   There is no way for you to know what
9  work I specifically did at Treasury, correct.
10    Q.   Would you also agree with me that
11 there is no way for me to find out whether you
12 know anything about whether the PA or PLO
13 supported terrorism during the second Intifada,
14 as a result of your work at the Treasury?
15    A.   Come to think of it, I don't know if
16 there's no way.  There's no way for me to answer
17 the question.
18        You could probably petition to a
19 Freedom of Information Act, people who are in a
20 position to be able to say "that's not
21 classified" or "it's declassified" -- which I

Page 53

1  can't -- might be able to do that.  There might
2  be ways, but I can't tell you.
3     Q.   Did you also do some work for the
4  State Department?
5     A.   This is what we discussed earlier,
6  yes.
7     Q.   And did any of your work for the State
8  Department concern the relationship between the
9  AAMB and Fatah?
10    A.   Possibly.
11    Q.   You say "possibly."  Is that because
12 you can't remember, or you can't tell me?
13    A.   Well, I can't remember.  And if I
14 could, I couldn't have told you.
15    Q.   Okay.
16    A.   But, honestly, I can't remember.
17        It's likely because the Special Envoy
18 for Middle East Regional Security, SEMERS.
19        THE REPORTER:  Centers?
20        THE WITNESS:  SEMERS, Special Envoy
21 for Middle East Regional Security.

14 (Pages 50 to 53)

Page 54

1          MR. HILL:  It's an acronym.
2          THE WITNESS:  It's an acronym.  Thank
3    you, that's the word I'm looking for.  My
4    doctor's taken me off caffeine.  It's terrible.
5          A.    And was focused on, among other
6    things, terrorist actors from either the
7    Palestinian side of the equation, or the Israeli
8    side of the equation, trying to -- or effectively
9    undermining prospects for peace, so --
10         Q.    So is it your best recollection that
11   while you were working for State, you did do work
12   on the relationship between the AAMB and Fatah?
13         A.    It's my recollection?  No, I don't
14   recall specifically one way or the other.  It may
15   well have been part of the larger piece of what
16   we were doing, but I can't recall.
17         Q.    Okay.  While you were working at
18   State, did you receive any classified information
19   about the relationship between AAMB and Fatah?
20         A.    I don't recall.
21         Q.    Can you testify that while you were at

Page 55

1    State, you did not receive any classified
2    information about AAMB or Fatah?
3          A.    No, it would still require me to
4    recall one way or the other.  And I'd love to be
5    able to answer your question more definitively,
6    but still I can't recall.
7          Q.    Okay.  While you were working for the
8    State Department, did you do any work on the
9    issue of whether the PA or PLO supported
10   terrorism during the second Intifada?
11         A.    Also, I can't recall.
12         Q.    While you were working at State, did
13   you receive any classified information about
14   whether the PA or PLO supported terrorism during
15   the second Intifada?
16         A.    And, again, I honestly don't recall.
17   And if I did, I couldn't have told you.
18         Q.    Your report indicates that you
19   frequently work as an analyst and a commentator.
20   Have you done any analysis or commentary about
21   the Scope of Engagement in this case?

Page 56

1          A.    I've done plenty of analysis and
2    commentary on the Al Aqsa Martyrs Brigades and
3    Fatah, their relationship, their relationship to
4    the PA.  It may or may not have gone as far as,
5    then, the PLO.
6          Q.    What form did that analysis or
7    commentary take?
8          A.    It would be hard for me to recall
9    offhand the specifics.  But I believe you have a
10   copy of my full CV, which should have a full list
11   of all of my policy briefs and editorials and
12   journal articles, and all of that, in detail.
13         Q.    So you're saying, sir, that to the
14   extent you've done analysis or commentary about
15   the Scope of Engagement in this case, it will be
16   listed on your CV?
17         A.    It should be in that, you know, the
18   full CV.
19         Q.    You also mention that you frequently
20   do consulting.  Have you done any consulting
21   about the subject of this report?

Page 57

1          A.    No.  Other than to say, for example,
2    working in this case, no.
3          Q.    Okay.  Have you ever seen any wiretaps
4    or intercepts about the subject of this report?
5          A.    I'm sorry, if I could go back:  There
6    may have been other cases that I've given expert
7    advice or testimony on, that related
8    peripherally, but I don't think --
9          Q.    Other lawsuits, you mean?
10         A.    Right, right.  Kind of in my database,
11   that goes under consulting.
12         Q.    Okay.
13         A.    I'm sorry, I wanted to give you a full
14   answer.  Sorry to interrupt you.
15         Q.    The consulting that you've done, as it
16   relates to the Scope of Engagement, has been this
17   lawsuit and other lawsuits, right?
18         A.    To the best of my knowledge, yes.
19         Q.    And apart from work on lawsuits, have
20   you done any other consulting relating to your
21   Scope of Engagement in case?

15 (Pages 54 to 57)

Page 58

1    A.    Not to my knowledge.
2    Q.    Have you ever seen any intercepts or
3  wiretaps about the Scope of Engagement in this
4  case?
5    A.    I'm not allowed to comment on what
6  intercepts I've ever seen and what they relate
7  to.  But I do not recall ever being given any
8  intercepts outside of government -- you've asked
9  about some of the -- by anybody, U.S., Europeans,
10  Israelis, anybody, in terms of my research.
11    Q.    So the only intercepts or wiretaps
12  that you ever recall seeing about the Scope of
13  Engagement in this case, were part of your
14  government service, correct?
15    A.    I didn't say that.  I didn't say that
16  any wiretaps that I've seen, related to this.  I
17  didn't say what they related to, at all.
18        This or any wiretaps or intercepts
19  I've ever seen, I can't talk about.
20    Q.    I see.  So it's possible that you have
21  seen some wiretaps or intercepts about the

Page 59

1  relationship between the AAMB and Fatah, and you
2  just can't tell me about them because they're
3  classified, right?
4    A.    I can't tell you what I have or
5  haven't seen because it's classified.
6    Q.    Okay.  It's possible you've also seen
7  wiretaps or intercepts about support by the PA or
8  PLO for terrorism during the second Intifada,
9  but, again, you can't tell me about that because
10  it's classified?
11        (No Response)
12    Q.    Correct?
13    A.    I'm thinking it through.
14        (Witness Pause.)
15    A.    I just don't know where the line is
16  drawn.  If you were to ask me if I've ever seen
17  an interception about, you know, Dumbo the
18  Elephant, I could probably answer that.  But in
19  theory, I'm not supposed to answer whether or not
20  I've seen intercepts related to, confirm or deny,
21  you know, whatever I've seen.  So I think I'd

Page 60

1  just have to say:  I can't answer the question.
2    Q.    Okay.  As far as our inquiry goes
3  today, you're not going to tell me about any
4  classified information you've ever seen about
5  whether the PA or the PLO may have supported
6  terrorism during the second Intifada, correct?
7    A.    Right, I'm not going to be able to
8  comment about any of the intelligence that I've
9  ever seen.
10    Q.    Okay.  You teach at Johns Hopkins,
11  right?
12    A.    Not anymore.
13    Q.    You used to teach there?
14    A.    I used to teach there.
15    Q.    Okay.  And did you ever teach any
16  classes at Johns Hopkins about the Scope of
17  Engagement in this case?
18    A.    Not per se.  I originally taught a
19  course called something like Contemporary
20  Terrorism and Its Responses, or something like
21  that.  And it did have a -- you know, one week

Page 61

1  was on Al-Qaeda, and there was at least one week
2  that was on Palestinian terrorism groups and
3  Jewish extremists groups and --
4    Q.    Okay.  How many times did you teach
5  that class?
6    A.    I taught that class for a few years.
7  Let's see, I left the FBI in 2001, and I think I
8  started there in 2002, so probably three or four
9  years.
10    Q.    Did you teach it once a year?  Twice a
11  year?  Three times a year?
12    A.    Once a year.
13    Q.    So you think you taught that course
14  maybe three or four times?
15    A.    Something like that.
16    Q.    Okay.  Did part of the teaching in the
17  course you've described at Johns Hopkins, involve
18  discussions of the relationship between the AAMB
19  and Fatah?
20    A.    Probably not as such.  It probably
21  included discussions of AAMB, but probably was

16 (Pages 58 to 61)

Page 62

1   more focused on the larger groups, Hamas.
2       Q.    Okay.  Did you assign any readings on
3   the issue of the relationship between AAMB and
4   Fatah, to your students when you were teaching
5   that class?
6       A.    I don't recall.  But the syllabi are
7   probably still online, you could probably find
8   that out.
9       Q.    Okay.  Where would I go to find that?
10      A.    Probably SAIS's website or an archive
11  of it.
12      Q.    Okay.  And what's the name of the
13  class I'm looking for again?
14      A.    I think it was called Contemporary
15  Terrorism and the American Response, or something
16  like that.
17      Q.    Do you have the course number?
18      A.    No, not offhand.
19      Q.    Did that course that you taught at
20  Johns Hopkins involve any discussion of the issue
21  of whether the PA or PLO supported terrorism

Page 63

1   during the second Intifada?
2       A.    Not that I recall.  There was a week
3   session on state sponsorship, so it's possible
4   that came up as an example of something that's a
5   little more complicated, but I don't recall
6   offhand.
7       Q.    And do you recall assigning any
8   readings on the issue of whether the PA or PLO
9   supported terrorism during the second Intifada,
10  to your students for that course?
11      A.    I don't think I did.  But, honestly, I
12  don't remember the specific readings.
13      Q.    Were any of your course lectures
14  recorded in any fashion?
15      A.    It's possible.  If I had to, you know,
16  miss a class or something, sometimes they get
17  recorded.  I don't know if they kept them.  I
18  don't have them.
19      Q.    If I wanted to see if there were any
20  recordings of your teaching on this subject,
21  where would I go to look for that?

Page 64

1       A.    SAIS, S-A-I-S, the School of Advanced
2   International Studies.
3       Q.    And that's here in Washington, right?
4       A.    Yes.
5       Q.    Have you taught any other classes
6   about the Scope of Engagement in this course,
7   other than the one we've discussed?
8       A.    No.  The other course I taught at
9   SAIS -- let me be specific.  The course we've
10  discussed, I taught after I left the FBI and
11  before I went to Treasury.
12          When I left Treasury and was invited
13  to come back to SAIS, I taught a different course
14  called Combatting the Financing of Transnational
15  Threats, so that was more focused on the
16  financing issue.
17      Q.    Did that class involve the
18  relationship between the AAMB and Fatah?
19      A.    Not as such.  There was never a
20  lecture on that.  It's possible there were
21  readings that covered some stuff related to that.

Page 65

1       Q.    Okay.  Can you recall any of those
2   readings today?
3       A.    No.
4       Q.    And would those be on your course
5   syllabus, as well?
6       A.    They would, yes.
7       Q.    Do you have a copy of that?
8       A.    Not here, no.
9       Q.    Where would I go to find that?
10      A.    It's the same.  If they keep it, it
11  would be on their website or maybe on the archive
12  website.
13      Q.    Did you ever teach any other classes
14  about whether the PA or PLO supported terrorism
15  during the second Intifada?
16      A.    No, and I didn't teach any courses
17  that were specific to that.  That just might have
18  come up in those other courses I taught.
19      Q.    Sitting here today, you can't recall
20  if that subject ever came up in any of these
21  classes, can you?

17 (Pages 62 to 65)

Page 66

1    A.   No.
2    Q.   You can't remember a student saying,
3  "Professor Levitt, I want to talk about whether
4  the PA supported terrorism during the second
5  Intifada"?
6    A.   Sitting here today, I couldn't tell
7  you anything that my students specifically asked
8  me about.  So could they have?  Absolutely.  Do I
9  remember it over, what was it, eight or nine
10 years teaching?  No.
11       It was not the subject of the class,
12 but the class was kind of taking a cut across a
13 thematic issue and using lots of different case
14 studies.  So is it possible that this came up,
15 and even if it wasn't in the syllabus, that some
16 student wanted to write a paper about it or do a
17 weekly assignment about it?  It's possible.
18   Q.   Can you recall a student ever writing
19 a paper about the Scope of Engagement --
20   A.   I don't remember.
21   Q.   -- in this case?

Page 67

1    A.   Sorry to interrupt you.
2        I don't remember.  You know, I
3  couldn't tell you the specific topic of any of
4  their papers, no.
5    Q.   Is it fair to say, sir, that sitting
6  here today you can't recall doing any work as a
7  teacher on the Scope of Engagement in this case?
8    A.   Not specifically, no.
9    Q.   Have you ever been on tenure track
10 position at any University?
11   A.   No.
12   Q.   Have you ever given any interviews
13 where you were interviewed about the Scope of
14 Engagement in this case?
15   A.   I'm sure.
16   Q.   Okay.  When?
17   A.   God only knows.  The nature of my work
18 is I do a lot of television, radio interviews on
19 issues of the day.  This was one of the key
20 issues of the day in the time period in question
21 and so, I'm sure I did plenty of interviews,

Page 68

1  television, print, radio, related to this.
2    Q.   Okay.  Well, let me ask you a more
3  specific question:
4        Sitting here today, can you recall an
5  instance when you were interviewed about the
6  relationship between Al Aqsa and Fatah?
7    A.   No, I can't remember any specific
8  interview.  This was a --
9    Q.   Sitting here --
10   A.   I'm sorry.
11   Q.   That's okay.
12       Sitting here today, can you recall an
13 instance where you were interviewed about whether
14 the PA or PLO supported terrorism during the
15 second Intifada?
16   A.   No.
17   Q.   Your report indicates that you
18 frequently attend meetings as part of your
19 professional work.  Sitting here today, can you
20 recollect attending a meeting where a topic of
21 discussion was the relationship between AAMB and

Page 69

1  Fatah?
2    A.   Again, I don't remember any specific
3  meeting.  But this was one of the things that I
4  was most focused on at the time, doing a lot of
5  work on it.  I'm sure there were many meetings
6  about it.
7    Q.   But sitting here today, you can't give
8  me a specific meeting where that was the topic of
9  discussion, correct?
10   A.   No.  And to be honest, I'd have a hard
11 time remembering what the topics of discussions
12 were at meetings I had last week or the week
13 before, but --
14   Q.   So just, again, for the record, I
15 probably know the answer, but let's get it on the
16 record:
17       Sitting here today, can you recall for
18 me any particular meeting where the topic was
19 whether the PA or PLO supported terrorism during
20 the second Intifada, that you attended?
21   A.   Again, I'm sure I attended many, and I

18 (Pages 66 to 69)

Page 70

1  can't remember the specifics of any given one.
2  That was many years ago.
3      Q.   Your report also mentions that you
4  frequently attend conferences.  Can you recall
5  any conferences you attended where the subject
6  was the Scope of Engagement for this report?
7      A.   Not off the cuff, no.  I'm sure if I
8  had a list of my conferences in front of me, and
9  the panel discussions that were being had, it
10  might be possible to spark memory.
11         I'm sure this was a topic of -- it was
12  a topic of heated discussion, and I was very
13  focused on it at the time.  But I can't recall
14  for you the specifics of meetings, you know, a
15  decade ago.
16     Q.   You mention that you were in panel
17  discussions.  Can you recall a panel discussion
18  where the topic was the relationship between AAMB
19  and Fatah, that you participated in?
20     A.   Not as such, no.
21     Q.   Can you recall a panel discussion

Page 71

1  where the topic was whether the PA or PLO
2  supported terrorism during the second Intifada,
3  where you were part of the panel?
4      A.   Not off the cuff, no.
5      Q.   You mention that you frequently
6  lecture, in your report.  Can you recall ever
7  giving a lecture on the topic of the relationship
8  between the AAMB and Fatah?
9      A.   Again, not as such.  I was doing a lot
10  of research in this time, so it stands to reason
11  that I was speaking on the subject, though it
12  probably wouldn't have been entitled exactly
13  that, but --
14     Q.   Can you recall any occasion where
15  you've spoke publicly on the topic of the
16  relationship between AAMB and Fatah?
17     A.   The specifics, no.
18     Q.   Can you recall any occasion when you
19  spoke publicly on the issue of whether the PA or
20  PLO supported terrorism during the second
21  Intifada?

Page 72

1      A.   Same.  No.
2      Q.   You cannot?
3      A.   Not off the cuff.
4      Q.   You mention in your report that you
5  frequently read materials.
6         Other than the material you've cited
7  in your report, can you recollect any other
8  material you've read about the relationship
9  between the AAMB and Fatah?
10     A.   Seriously?  I mean, you're actually
11  asking me to tell you if I've ever read any
12  material related to this, and expect me to be
13  able to remember it?
14         I'm sure I read reams, reams and reams
15  of material related to this.
16     Q.   Can you tell me the name of any
17  particular document in the ream of material that
18  you believe you have read about the relationship
19  between AAMB and Fatah, other than the material
20  that's cited in your report?
21     A.   First of all, I couldn't remember for

Page 73

1  you the titles of the materials that's cited in
2  the report, to exclude them from this list, if I
3  could even remember the list.  So, no.
4      Q.   Can you tell me the name of any
5  material you've read about whether the PA or PLO
6  supported terrorism during the second Intifada,
7  other than the material that's cited in the
8  report?
9      A.   Same.  There's no way for any person
10  to be able to remember a specific name of
11  articles and journal articles and books that one
12  reads years ago.
13     Q.   Can you tell me the authors of any of
14  these publications that pertain to the
15  relationship between the AAMB and Fatah?
16     A.   No.
17     Q.   Can you tell me the names of any
18  authors that you've read regarding whether the PA
19  or PLO supported terrorism during the second
20  Intifada?
21     A.   I'm sorry, can you repeat that?

19 (Pages 70 to 73)

Page 74

1  Someone's flipping lights on and off behind you.
2      Q.   Beg your pardon.
3          Can you tell me the name of any
4  authors who you have read on the topic of whether
5  the PA or PLO supported terrorism during the
6  second Intifada?
7      A.   Off the cuff, no, I don't make it a
8  practice to memorize authors of things I've read.
9      Q.   Are you familiar with the term
10 "primary source"?
11     A.   I am.
12     Q.   What is a primary source?
13     A.   Well, a primary source is someone who
14 is close to the issue.  In other words, we were
15 talking earlier about primary sorts of resources,
16 going out talking to people, people who were
17 involved, who have direct-access involvement.
18     Q.   And we already talked earlier about
19 the field research that you've done in connection
20 with the report.
21         Other than what we've discussed, have

Page 75

1  you spoken to any other primary sources about the
2  Scope of Engagement in this report?
3      A.   So you're asking me:  Other than the
4  primary field research, have I ever spoken to a
5  primary source?  That's a mutually exclusive --
6      Q.   The answer is no?  It's a tautology;
7  is what you're saying?
8      A.   Right.  It's mutually exclusive, "Have
9  you ever spoken to anyone other than the people
10 you've spoken to?"
11     Q.   So we've covered the ground in terms
12 of primary sources that you have exposure to
13 about the topics in this report, right?
14     A.   Probably.
15     Q.   Your report indicates that you have
16 regular discussions with other experts in the
17 field.
18         Can you recollect the name of any
19 other expert that you have discussed the issue of
20 the relationship between Al Aqsa Martyrs Brigades
21 and Fatah with?

Page 76

1      A.   Not off the cuff, no.
2      Q.   Can you recollect the name of any
3  other expert that you've had a discussion with
4  about whether the PA or PLO supported terrorism
5  during the second Intifada?
6      A.   No.
7      Q.   Are you familiar with the term "peer
8  review"?
9      A.   I am.
10     Q.   What does peer review mean?
11     A.   Peer review means -- it's an academic
12 publishing term.  So if you publish, whether it's
13 a journal article or a book, with an
14 academically-oriented outfit, they will take the
15 article and submit it for peer review.  Review by
16 peers, professionals in the field who have some
17 type of expertise on the issue, almost always
18 anonymously, to review your article or chapter or
19 book, and provide input back.
20         That input can be, "Wonderful.
21 Publish it."  "Terrible.  Don't publish it."  Or

Page 77

1  more often than not, "Useful contribution," but
2  suggest to you, "Change this.  Add this," et
3  cetera.
4      Q.   Has any of your prior writing about
5  the relationship between AAMB and Fatah been
6  subject to peer review?
7      A.   I'd have to go back and check.  I
8  don't remember the list of articles I ever written
9  on this.  But I've written plenty, and I can't
10 remember where they were published.
11         A lot of my publishing is done in
12 newspaper editorials, or policy journals, which
13 are not peer reviewed.  A lot of it is done in
14 peer reviewed journals.  And Al Aqsa Martyrs
15 Brigade might have come -- I'm sure it did come
16 up -- not as a focus -- as an aside as it related
17 to Hamas, in my book on Hamas, which was
18 published by Yale, and was very much peer
19 reviewed.
20     Q.   Okay.  Apart from a potential aside in
21 the book on Hamas, can you today recollect any

20 (Pages 74 to 77)

Page 78

1 instance where you wrote something about the
2 relationship between AAMB and Fatah, that was
3 subject to peer review?
4     A.   By recollection, no.  But it's a
5 little -- don't get me wrong, but it's a little
6 silly question.  This is easily checkable.  You
7 should have the full list.
8     Q.   Sitting here today, can you recollect
9 any instance where you wrote something about
10 whether the PA or PLO supported terrorism during
11 the second Intifada, that was peer reviewed?
12     A.   I don't remember where they were
13 published.  But, again, we can check that.
14     Q.   The report has not been peer reviewed,
15 correct?
16     A.   Correct.
17     Q.   Are you familiar with the term "fact
18 check"?
19     A.   Yes.
20     Q.   What does that mean?
21     A.   Fact checking is the process of going

Page 79

1 back and literally checking the facts.
2         So it can be as simple as making sure
3 that a quote, as is written in an article or a
4 report, appears exactly as it was in the original
5 source; that you didn't have a typo, or didn't
6 remember something, or whatever.  And, so, just
7 checking the facts.
8         It can be as simple as typos to, you
9 know:  Was it this amount of money or that amount
10 of money?  Was it on this date or that date?
11         And sometimes you can fact check on
12 your own.  You can have someone else fact check.
13     Q.   Okay.  Did anyone fact check your
14 report?
15     A.   I do have a research assistant who
16 regularly does fact checking for me, and it's
17 possible that he or she did some fact checking
18 for this, I don't recall.
19     Q.   Who was your research assistant in
20 March of 2013?
21     A.   I'd have to go back and check.  It's

Page 80

1 now -- I'd have to go back and check.  And it
2 could have been a research assistant.  It could
3 have been an intern.  It could have been neither.
4     Q.   Okay.  Give me the names of the
5 possible candidates who might have fact checked
6 your reports?
7     A.   Jonathan Prohov.
8     Q.   Could you spell his name, please?
9     A.   P-R-O-H-O-V.  Divah, D-I-V-A-H,
10 Alshawa, A-L-S-H-A-W-A.  There were a couple
11 other short-term interns in there whose names
12 escape me.
13     Q.   So those are the possible candidates
14 who might have fact checked your report?
15     A.   As I recall.  As I said, there were
16 other short-term interns and --
17     Q.   And where is Mr. Prohov today?
18     A.   He is still a research assistant at
19 the Washington Institute.
20     Q.   And how about Ms. Alshawa?
21     A.   She is at the Treasury Department.

Page 81

1     Q.   How would you go about determining
2 whether, in fact, your report was fact checked?
3     A.   I'd have to check notes.
4     Q.   Do you have notes about this report?
5     A.   It's possible.  I'd have to check.
6     Q.   Where would your notes be located?
7     A.   They'd probably be in my office
8 somewhere.
9     Q.   Have you looked for whether you have
10 notes on this report?
11     A.   I have not.
12     Q.   Did anyone ask you to look for notes
13 about this report?
14     A.   No.
15     Q.   Are you aware that your office was
16 served with a subpoena related to this report?
17     A.   I was aware that there was a subpoena
18 back and forth, that eventually went to the
19 lawyers.  It was amusing.  I've done this many
20 times.  This is the only time there's ever been a
21 subpoena.

21 (Pages 78 to 81)

Page 82

1    Q.   Did you do anything to look for the
2  material requested by that subpoena?
3    A.   Very much so.
4    Q.   But you did not look for notes as part
5  of that process?
6    A.   Whatever it told me to do, believe you
7  me, I looked very carefully.
8    Q.   And did you find anything as a result
9  of looking for stuff in response to that
10  subpoena?
11    A.   If there was anything found -- and we
12  looked carefully -- it was provided.
13    Q.   And who did you provide that to?
14    A.   I don't remember if it was to the
15  lawyers I was working with, or whatever the
16  process was at the time.  I took some time, and I
17  didn't really have the time for it, but I did it
18  as required.
19    Q.   What's the name of the person that you
20  gave the material you found when you looked for
21  it?

Page 83

1    A.   If there was any material to give, I
2  don't remember, it was one of the lawyers
3  involved in this case.
4    I recall in the end, I assume it was
5  your law firm provided the subpoena to someone
6  else.  It wasn't actually provided to me, because
7  the person kept coming when I was out of town.
8  So I assume it would have been that person.
9    Q.   So just so the record is clear:  Today
10  you're not sure whether your report has been fact
11  checked, right?
12    A.   I'm sure I did my fact checking of it,
13  as best I could.  I'm can't remember if I had
14  someone else fact check it.
15    Q.   Now, when you said you did your fact
16  checking as best you could, what do you mean by
17  that?
18    A.   Well, you don't just, you know, write
19  something and type the last word, and hit enter
20  and print and send.  So you try the best you can
21  to review it for typos, or if there's at least

Page 84

1  one in there because I said, "the best you can."
2  And you go through -- or I go through the sources
3  and try and make sure that each thing corresponds
4  as it should.
5    You know how it is in the editing
6  process you, by mistake, maybe cut and pasted a
7  little too far and you include a footnote, and
8  suddenly a footnote drops and that shoves them
9  all off.  So you check to make sure that the
10  footnotes in the final product are as you
11  intended them to be.
12    Q.   Did you in fact check all the sources
13  that are cited in the footnotes of your report?
14    A.   I believe so.
15    Q.   When did you do that?
16    A.   I don't remember.  It would have been
17  sometime before the 22nd of March.
18    Q.   And at the time that you checked the
19  footnotes sometime before the 22nd of March of
20  this year, were the footnotes accurate?
21    A.   As far as I can remember.

Page 85

1    Q.   Your report also mentions that you've
2  received a number of awards and honors.
3    Have you received any awards or honors
4  for work related to the Scope of Engagement of
5  this report?
6    A.   I have received no honor that rewards
7  me for the specific language in the Scope of this
8  Engagement.
9    Q.   You also mention that you're in the
10  Council on Foreign Relations.
11    Have you done any work at the Council
12  of Foreign Relations related to the Scope of
13  Engagement in this case?
14    A.   Not that I recall.
15    Q.   You also mention that you worked for
16  something called the ICT.  What is that?
17    A.   I don't work for the ICT.  The ICT is
18  the Institute for Counterterrorism, and it is a
19  University-affiliated think tank in Israel.
20    Q.   Which University is it affiliated
21  with?

22 (Pages 82 to 85)

Page 86

1    A.   It's called the Interdisciplinary
2  Center.  It's, I think, the largest private
3  University in the country.
4    Q.   And what is your connection with ICT?
5  You said you did not work for them.  How are you
6  related to them?
7    A.   Lots of organizations like that will
8  have -- they'd call it different names, but
9  basically an international advisory board.  It's
10  not a staff position.  It's not paid position.
11  And what it means is that every once and
12  awhile -- and usually it's quite the while --
13  they'll ask your opinion about something.
14      THE REPORTER:  The last what?
15      THE WITNESS:  And it really is every
16  once in awhile they'll ask your opinion.
17      MR. HILL:  They'll ask your opinion
18  about something.
19      THE REPORTER:  Thank you.
20      MR. HILL:  And it really is:  Every
21  once in a while they'll ask your opinion.

Page 87

1      BY MR. HILL:
2    Q.   Did you finish your answer?
3    A.   Yes.
4    Q.   Have you ever received any money from
5  ICT?
6    A.   No.  They have covered -- I go to
7  their annual conference and they have paid I
8  think hotel, as they do I think for most of their
9  speakers.  Most or all or -- well, I don't know.
10    Q.   You've spoken at their conferences?
11    A.   Yes.
12    Q.   On how many occasions?
13    A.   Several.  It's an annual conference,
14  and I speak most years.
15    Q.   Is it always in the same place?
16    A.   Pardon?
17    Q.   Is it always held in the same place?
18    A.   Yes.
19    Q.   Where is that?
20    A.   Herzliya, H-E-R-Z-L-I-Y-A, in Israel.
21    Q.   So you go to Israel once a year to

Page 88

1  speak at that conference?
2    A.   Yeah.  I've missed it sometimes.  It's
3  not every year, but most years.
4    Q.   You also mention that you've had some
5  work related to something called the ICPVTR in
6  Singapore; is that right?
7    A.   Right.  And you have it in front of
8  you.  I'll ask you to spell it out.  I don't even
9  remember what it stands for.
10    Q.   The International Centre for Political
11  Violence and Terrorism Research.
12    A.   Thank you.
13    Q.   What work have you done with that
14  organization?
15    A.   Very similar.  It's really, in both
16  cases, it's a perfunctory sitting on their
17  international advisory board.  Occasionally, they
18  seek advice, or they'll have a student who's
19  doing research and they'll ask you to be
20  available for an interview, or provide some
21  guidance on the substance for a career type of

Page 89

1  thing.
2      I think I went out there to speak for
3  them only once, years ago.  I had a conference
4  that they -- I don't know if it was only them, or
5  if they co-sponsored it, but it was in Singapore,
6  where they're located.
7    Q.   Did your work for the ICT or the
8  ICPVTR, have anything to do with the Scope of
9  Engagement in this case?
10    A.   Well, again, I have not worked for
11  either.
12      My very limited affiliation with
13  either has not been on any project of any sort on
14  this or anything else.  No.
15    Q.   So the connection with that is not
16  connected to this report, right?
17    A.   Correct.
18    Q.   You've also mentioned that you've done
19  some teaching at West Point and George
20  Washington.  Just so the record is clear:  None
21  of that teaching has anything to do with the

Page 90

1  Scope of Engagement in this case, correct?
2        MR. HORTON:  Object to the form.
3        A.    So let me clarify:  George Washington
4  is not teaching.  I've had a fellowship at a
5  think tank, the Homeland Security Policy
6  Institute, HSPI, at George Washington.
7        And West Point, I had a fellowship
8  there at one point and periodically taught --
9  West Point had a contract to provide teaching for
10 the FBI Academy, and I think it might have been
11 some other FBI and other intelligence community
12 trainings.  And as part of that, I was an
13 instructor for some of their courses.  So just to
14 clarify.
15        And so the answer regarding George
16 Washington is:  No, I don't think I've done
17 anything with them relating to
18 Israeli-Palestinian conflict issues.
19        But, again, this is easily checked.
20 I'm just doing this from memory.
21        And West Point, I don't think that any

Page 91

1  of it was specifically on this, but it could have
2  come up in courses on larger issues.  Again, I
3  think I've taught a course for them on state
4  sponsorship issues, or that included state
5  sponsorship issues, so it might have come up
6  then.  I really don't remember.  But it would not
7  have been a course on the specifics of the Scope
8  of Engagements.
9        Q.    So sitting here today, you can't
10 recall any teaching in connection with the West
11 Point work related to the Scope of Engagement in
12 this case, correct?
13       A.    Again, no teaching of an entire course
14 on this.
15       Could it have come up?  Could it have
16 come up?  Yes, but it would have been as part of
17 a discussion related to a larger theme.
18       THE WITNESS:  Does anybody else want
19 water, by the way?
20       (No response.)
21       MR. HILL:  Go right ahead.

Page 92

1        THE WITNESS:  Sorry.
2        MR. HILL:  That's all right.
3        BY MR. HILL:
4        Q.    You mention that you've testified
5  before Congress.
6        Has any of your Congressional
7  testimony related to the Scope of Engagement in
8  this case?
9        A.    We'd have to check.  Again, you have
10 that list.  It's possible.
11       Q.    Sitting here today, you cannot
12 recollect an instance when you testified before
13 Congress about the relationship between the AAMB
14 and Fatah, correct?
15       A.    I don't remember the specific
16 testimony as I've given over the years.
17       It's very likely that this was part of
18 the Congressional testimony I'd given at one
19 point or another, but I don't recall.
20       Q.    Okay.  Sitting here today, you cannot
21 recollect any Congressional testimony relating to

Page 93

1  whether the PA or PLO supported terrorism during
2  the second Intifada, correct?
3        A.    No, I cannot recollect.
4        But, again, we can -- very quickly
5  you'd be able to check this.  You should have the
6  full list.
7        Q.    You mention that you previously
8  testified as an expert witness in court.
9        Has any of your prior testimony in
10 court pertained to the Scope of Engagement in
11 this case?
12       A.    I don't think so.
13       Q.    Okay.
14       A.    I've done it a few times and, so,
15 sometimes it kind of bleeds one thing into the
16 other.  Sometimes it's hard to remember, you
17 know:  Was that a case that I did testify in, or
18 didn't?  But I don't think I have.
19       Q.    Sitting here today, can you recollect
20 being deposed about the Scope of Engagement in
21 this case, in any other case?

24 (Pages 90 to 93)

Page 94

1    A.   No.  I've been deposed on issues
2   relating to the Israeli-Palestinian conflict, but
3   not specifically to the issues in the Scope of
4   Engagement.
5    Q.   Okay.  And is it correct, sir, that
6   you have never been previously qualified to
7   testify as an expert on the Scope of Engagement
8   in this case?
9    A.   That's a pretty narrow Scope of
10  Engagement, so I have not been -- I have never
11  been asked to provide testimony on this specific
12  Scope of Engagement, and have never been
13  qualified.
14         I have been qualified everytime it's
15  ever come up.  I've never not been qualified.
16  But I've never been asked to be qualified on
17  this.
18   Q.   Okay.  So on the other occasions where
19  you have been qualified as an expert witness,
20  those have been on subject matters other than
21  this particular Scope of Engagement, right?

Page 95

1    A.   Well not really, no.
2         Some of them where the case wasn't
3   specific to this, my testimony was quite broad
4   and I was qualified as an expert on things as
5   broad as, you know, Middle East terrorism;
6   terrorism in the Israeli-Palestinian conflict,
7   this type of thing.  And some of the testimony
8   might have touched on issues relating to the
9   Scope of Engagement, as sometimes the questions
10  would get very detailed and historical.
11   Q.   But you've never been qualified as an
12  expert on the relationship between the AAMB and
13  Fatah, correct?
14   A.   Correct.
15   Q.   And you've never been qualified as an
16  expert on whether the PA or PLO supported
17  terrorism during the second Intifada, correct?
18   A.   Correct.
19   Q.   You mention that you previously
20  testified in Canada or Europe.  Did that foreign
21  testimony, if you will, have anything to do with

Page 96

1   the Scope of Engagement in this case?
2    A.   One was a case that related to the
3   Israeli-Palestinian conflict, though not Al Aqsa
4   Martyrs Brigade.  That was a case involving the
5   PFOP in Denmark, not specific to the Scope of
6   Engagement, but related.  That's it.
7    Q.   And the Denmark testimony, just so the
8   record is clear, did not involve the issue of
9   whether the PA or PLO supported terrorism during
10  the second Intifada, correct?
11   A.   There may have been questions that got
12  to that line of questioning because of the
13  question of the PFOP was a constituent element of
14  the PLO.  So that might have come up, and it
15  might have come up in the written testimony, as
16  well.
17   Q.   Do you have a copy of that testimony?
18   A.   It's possible.  Not here.
19   Q.   Where would it be located?
20   A.   In the court in Denmark.
21   Q.   Is there any copy located in the

Page 97

1   United States that you're aware of?
2    A.   I don't know.
3    Q.   You mention that you submitted some
4   written testimony.  Do you have a copy of that?
5    A.   I mentioned that it might be.  I can't
6   remember if I did submit some written testimony.
7   As you're aware different cases even in the
8   United States, some do, some don't.  And I don't
9   maintain hard copies of those.  And it's possible
10  that there's soft, I don't know.
11   Q.   How much have you been paid for your
12  work on this case?
13   A.   As I say up front in the Scope of
14  Engagement, I was paid $5,000.00 for the drafting
15  of this report.  And the hourly rate we're
16  working at now is $400.00 an hour.
17   Q.   How much time did you spend in working
18  on this report?
19   A.   I don't recall.
20   Q.   Did you work on it before you signed
21  it on March 22nd?

25 (Pages 94 to 97)

Page 98

1      A.   By definition.
2      Q.   But you don't have any recollection of
3   how long you spent working on it prior to signing
4   it?
5      A.   That's right.
6      Q.   At your hourly rate, $5,000.00 would
7   be about 12 and a half hours, by my math.
8           Do you think you spent 12 and a half
9   hours working on the report before you signed it?
10      A.   I have no idea.
11      Q.   Could it have been less than 12 and a
12   half hours?
13      A.   Probably not.  It takes time.  It
14   happens to be an issue on which, as we've
15   discussed earlier, I've done a lot of work,
16   didn't need to do perhaps as much original work
17   for this research, that is to say, as I might
18   have for other things.  But I honestly don't know
19   the hours, the number of hours.  Probably a lot
20   more than 12, is my guess.
21      Q.   Okay.  When did you first start

Page 99

1   working on this report?
2      A.   No idea.
3      Q.   Was it in the Year 2012?
4      A.   No idea.  I have no idea when I was
5   first approached about this case.  I'd have to go
6   back and look.  It's probably some e-mails or
7   something somewhere, but I really don't remember.
8      Q.   Did anyone else work on this report?
9      A.   No.
10      Q.   Did you have help from anyone in
11   connection with this report?
12      A.   No.
13      Q.   Have you previously done work as an
14   expert witness in cases against the PA or the
15   PLO?
16      A.   I think there is one other, which I
17   don't know where it stands.  I think that was the
18   Klineman case.
19           THE REPORTER:  Klineman?
20           THE WITNESS:  Yeah, I think it's
21   Klineman.  I think K-L-I-N-E-M-A-N, perhaps.

Page 100

1      Q.   What work did you do in connection
2   with the Klineman case?
3      A.   I was an expert.
4      Q.   And did you prepare a report in that
5   case?
6      A.   I don't remember if there was a report
7   prepared in that case.  And there hasn't been
8   testimony yet.
9      Q.   This is, in fact, the first time
10   you've ever testified in a case against the PA or
11   PLO, right?
12      A.   It's possible, yes.
13      Q.   You can't recollect any other
14   testimony where the defendant was the PA or PLO?
15      A.   No, I don't think I was.  I'm pretty
16   certain this is the first.
17      Q.   Did you ever work on a case called
18   Sapperstein?
19      A.   I did.
20      Q.   What work did you do in that case?
21      A.   Sapperstein, I have to check.  I can't

Page 101

1   remember if I testified in that case, or wrote a
2   report.  I apologize, but that's easy to check.
3   It's not off memory sitting here.
4      Q.   Did you ever work on a case called
5   Parsons?
6      A.   Yes.  In that case, I'm pretty sure
7   that -- I don't think I did a report.  I did not
8   testify.  I don't think I testified.
9      Q.   Did you ever work on a case called
10   Ungar, U-N-G-A-R?
11      A.   I don't think I -- it's familiar.  I
12   can't recall if I had some involvement.
13           There are times when I'll be
14   approached for advice or something, or as a
15   consultant, and there's no report, there's no
16   testimony.  And sometimes just because I follow
17   these things, it's familiar.
18           But these are things that I can check
19   and definitively answer, just not sitting here
20   off memory.
21      Q.   Okay.  Who approached you about

26 (Pages 98 to 101)

Page 102

1    working as an expert witness in this case?
2        A.   I think it was first Nitsana Darshan
3    Leitner.
4            THE REPORTER:  Say that again.
5            THE WITNESS:  First name Nitsana,
6    N-I-T-S-A-N-A.  Middle name D-A-R-S-H-A-N.  Last
7    name L-E-I-T-N-E-R, I think.  It may not be
8    exact.
9            THE REPORTER:  Thank you.
10           BY MR. HILL:
11       Q.   Do you know how much you've been paid
12   to act as an expert in cases against the PA or
13   the PLO?
14       A.   No.
15       Q.   Do you know how much you've generally
16   been paid to serve as an expert witness across
17   all of the cases where you've testified?
18       A.   No.
19       Q.   Is it hundreds of thousands of
20   dollars?
21       A.   Not hundreds.  But over the more than

Page 103

1    a decade, all cases all totalled, it's over a
2    hundred.  I have no idea what the total figure
3    would be.
4        Q.   Somewhere between 100 and $200,000 for
5    serving as an expert witness over the last ten
6    years?
7        A.   It's possible.
8        Q.   Does that seem like the right
9    ballpark?
10       A.   I honestly don't know.
11       Q.   How much of that, let's call it over
12   $100,000, were you paid in connection with being
13   an expert in cases where the PA or the PLO were
14   defendants?
15       A.   Some tiny, tiny, tiny fraction.
16       Q.   At least $5,000, right?
17       A.   At least $5,000.
18       Q.   You have a series of publications
19   listed in your report which begin on Page 5.  Do
20   any of the books that you list on Page 5 relate
21   to the Scope of Engagement in this case?

Page 104

1        A.   So we discussed earlier there's some
2    references in the Hamas book.
3            Negotiating Under Fire is the
4    published book version of my dissertation which
5    we discussed earlier, which predates.
6            And Targeting Terror is a collection
7    of essays, and there are some that are
8    specifically related to the issues at hand, yes.
9        Q.   You mentioned that the Hamas book was
10   peer reviewed.
11           Was Targeting Terror peer reviewed?
12       A.   Yes, and no.
13           So Targeting Terror was published by
14   The Washington Institute, the think tank where I
15   work, not by a university press, so it did not go
16   out for independent, blind peer review.  It did
17   undergo peer review by other colleagues in the
18   Institute.  It might have gone to some people
19   outside of the Institute, too, which is sometimes
20   the case.  So it did get peer review, but it
21   didn't get the level of peer review that you

Page 105

1    would get, for example, in my books from
2    Georgetown or at Yale.
3        Q.   Who are the colleagues who did the
4    review, as you've described it, of Targeting
5    Terror?
6        A.   I don't remember.  Our Director of
7    Research is Dr. Patrick Clawson, so he would have
8    coordinated it.
9        Q.   Can you recall the name of any
10   reviewers of that book other than Mr. Clawson?
11       A.   I can't, and I can't tell you that he
12   was one of the ones who actually -- well,
13   presumably since he was coordinating it, but --
14       Q.   You think Mr. Clawson might have
15   reviewed it?  You're not sure?
16       A.   He would have coordinated the process,
17   I don't know, and he probably would have read
18   through it, given some review.  But he has to do
19   this for everyone on staff, so I imagine he
20   doesn't actually give a firm review to
21   everything.  Sometimes he maybe just coordinates

27 (Pages 102 to 105)

Page 106

1  it, I don't know.
2      Q.   So can you tell me today the name of
3  any person who reviewed the book Targeting
4  Terror?
5      A.   No.
6      Q.   You said it might have gone outside of
7  the Institute.  Do you recollect whether, in
8  fact, someone outside of WINEP reviewed it?
9      A.   I don't.
10         MR. HILL:  WINEP is W-I-N-E-P.
11     Q.    You have a series of monographs on
12  Page 5 to Page 6.  Do any of those monographs
13  pertain to the Scope of Engagement in this case?
14     A.   I don't think so.
15     Q.    You have a series of chapters on Page
16  6 of the report.  Do any of those pertain to the
17  Scope of Engagement in this case?
18     A.   I don't remember if it's included in
19  the third, The Evolving Threat of International
20  Terrorism and Government Response, and not on the
21  others here.

Page 107

1      Q.    You, beginning on Page 7, have a
2  series of journal articles listed in your report,
3  which carries over to Page 8.  Do any of those
4  journal articles pertain to the Scope of
5  Engagement in this case?
6         (Witness Reviews Document.)
7         MR. HILL:  Mark that next.
8         (Defendant's Deposition Exhibit Number
9  183 was marked for identification.)
10     A.   So on Page 8 -- again we'd have to
11  check.  Some of these are quite old and broad
12  titles.
13         Untangling the Terror Web, may have.
14         The Politics of Terrorist Financing in
15  the Middle East, may have.
16         I don't think the others do.
17     Q.   Dr. Levitt, let me hand you what we've
18  marked as Deposition Exhibit Number 183.  Do you
19  recognize this?
20     A.   This is a version of my CV.
21     Q.   I will represent to you that this is

Page 108

1  the version that was sent to me by the
2  Plaintiffs' lawyers in this case.  Can you tell
3  from looking at it if it's current?
4      A.   I'm sure there is stuff to be updated.
5  I'm sure it's not current in terms of articles,
6  testimonies, lectures.  It still has me -- oh,
7  no, it doesn't.  It's fairly current but, you
8  know --
9      Q.   Okay.  Let's look at the publications
10  which start on Page 3.
11     A.   Okay.
12     Q.   I think the books are the same as we
13  looked at the report.  But just for the record:
14  Do any of those books, other than the ones you've
15  previously described, relate to the Scope of
16  Engagement in this case?
17     A.   No, it's the same list.
18     Q.    There's a series of monographs
19  beginning on Page 4.  Do any of those monographs,
20  other than the one you've previously mentioned,
21  pertain to the Scope of Engagement in this case?

Page 109

1      A.   No, it looks like it's the same list.
2      Q.    And, again for the record:  The
3  chapters that begin on Page 5, do any of those
4  chapters, other than the ones you've previously
5  mentioned, relate to the Scope of Engagement in
6  this case?
7         (Witness Reviews Document.)
8      A.   It's possible that fourth from the
9  bottom, Iran and Syria; State Sponsorship in the
10  Age of Terror Networks, that may include some
11  relevance.
12     Q.   Okay.  Anything else on chapters?
13     A.   No.
14     Q.   On Page 6, there's a series of what's
15  described as Testimony/Lectures.  Do any of the
16  items listed there, which continue for several
17  pages, pertain to the Scope of Engagement in this
18  case?
19     A.    So on Page 7, second from the bottom,
20  the testimony on "The Fatah-Hamas
21  Reconciliation," that may have.

28 (Pages 106 to 109)

MATTHEW LEVITT DEPOSITION                    September 24, 2013                    Sokolow v. the PLO

Page 110

1    On Page 9, midway down the page,
2  "Combating the Financing of Transnational
3  Threats," that's a week-long course that I taught
4  there.
5    Oh, I forgot about this, if I may:
6  You asked me if I've ever been paid by the ICT or
7  the IDC. They paid me to teach this course.
8    Q.   Okay. Let's pause there for a second.
9  How much did they pay you?
10   A.   I don't remember. I think it was like
11 $1,000 or $2,000.
12   Q.   In addition to your expenses?
13   A.   I'm sure, yeah. I'm sorry, I forgot
14 about that.
15   Q.   That's okay.
16       Are those course materials publicly
17 available any where?
18   A.   I don't know.
19   Q.   Do you have a copy of them?
20   A.   I don't know.
21   Q.   If you could continue reviewing the

Page 111

1  material under the heading of Testimony/Lectures,
2  and let me know if there's any other items in
3  there that may relate to the Scope of Engagement
4  in this case?
5    A.   There are several with broad topics.
6  So, for example, at bottom of Page 9, "Missing
7  the Forest for the Trees: A Call for Strategic
8  Counterterrorism Ten Years after 9/11," that may
9  or may not -- that may have had nothing to do
10 with it, might have had some reference to the
11 issues.
12       And, again, on the top of Page 10,
13 this lecture, "Terrorism in and from the Middle
14 East," from the Royal Danish Defense College,
15 might not have touched on this at all, but I
16 honestly can't remember. And from the title,
17 it's just impossible to tell.
18       On the top of Page 11, there's another
19 one that may or may not. Glocal,
20 G-L-O-C-A-L-I-Z-A-T-I-O-N, "Glocalization of the
21 Global Jihad."

Page 112

1    The next one I can't remember if this
2  related to Al Aqsa at all, "What Policymakers can
3  Learn from Palestinian Social Media."
4    A couple more down, "Disrupting the
5  Flow of Funds to Terrorist Groups and their
6  Supporters: How The Justice Against Sponsors of
7  Terrorism Act Could Help."
8    Towards the top, second down on Page
9  13, "Contending with Iran's Proxies." Again, it
10 may have come up there.
11       Toward the middle of that page, still
12 on 13, "Contending with Iran's State Sponsorship
13 of Terrorism in the Context of its Nuclear
14 Program."
15       A couple more down, "Disrupting
16 Adversary Networks: Combating Terror Finance."
17 Again, so that obviously isn't a lecture on the
18 specific areas of the Scope of Engagement, but
19 that series of lectures tends to have a big
20 middle with case studies from across many
21 different groups that I might have included in

Page 113

1  one of these.
2    In the middle of Page 14, "Dealing
3  with Hamas: Future Pathways for Britain."
4    Further down that page, "Reforming
5  U.S. Counter-Terrorism Assistance Programs."
6    A couple farther down, "What Next in
7  Gaza?"
8    And after that, "Negotiating Under
9  Fire," this looks like it was a book talk when
10 that book came out. But while the book was
11 limited to a period earlier, the questions and
12 answers always come to what's happening now, so
13 that probably came up there.
14       Four down on Page 15, "Iran, Hamas and
15 the Palestinians."
16       And below that is, again, "Negotiating
17 Under Fire."
18       Five down on Page 16. There's an
19 extra word there, but "Israel, the Palestinian
20 Territories, and the Peace Process: Domestic,
21 Regional and International Perspectives."

29 (Pages 110 to 113)

Page 114

1    One farther down, "The Future of
2  Palestinian Terrorism."
3    At the bottom of that Page 16, "Panel
4  on 'Security in the West Bank' at a conference on
5  'Whither the Palestinians?  Politics and Policy
6  at a Time of Crisis'."
7    On Page 17 towards the bottom there
8  are a few more, again, book talks related now to
9  the Hamas book, where a few groups might have
10 come up.
11    Q.    Which ones are those, sir?
12    A.    So there tend to be a all-entitled,
13 the title of the book, "Hamas:  Politics, Charity
14 and Jihad."  There's one at Chatham House, five
15 from the bottom.
16    And then three from the bottom, the
17 Transatlantic Institute.
18    The very bottom of Page 17, "Teaching
19 Terror:  How Hamas Radicalizes Palestinian
20 Society," again, clearly focused on Hamas, but
21 this might have come up, as well.

Page 115

1    In the middle of Page 18, "Iranian
2  State Sponsorship of Terror:  Threatening U.S.
3  Security, Global Stability, and Regional Peace."
4    The bottom of Page 18, "Untangling the
5  Terror Web."
6    The top of Page 19, the "Panel
7  discussion on 'The Matrix of International
8  terrorism'."
9    Two down from that, "Combatting
10 Terrorist Financing:  Where the War on Terror
11 Intersects the 'Road Map'."
12    And then the last two in that section,
13 "Syrian Sponsorship of Global Terrorism," and
14 then "Charitable and Humanitarian Organizations,"
15 those also might have included some of this.
16    Q.    Okay.
17    A.    That's the end of this section.
18    Q.    So as far as the section that we've
19 just discussed, sitting here today, you cannot
20 recollect if any of those items that you've
21 identified, in fact, involved a discussion of the

Page 116

1  relationship between the AAMB and Fatah, correct?
2    A.    Correct.
3    Q.    And sitting here today, you cannot
4  recollect if any of the items that you've
5  identified involved a discussion of whether the
6  PA or PLO supported terrorism during the second
7  Intifada, correct?
8    A.    Correct.
9    Q.    We'll take a break in just a minute.
10 I just want to make sure that we have a common
11 understanding of what can happen on breaks.
12    Dr. Levitt, do you understand that
13 your testimony here today is conducted as if you
14 were at trial?  And that that means you may not
15 have conversations about the substance of your
16 testimony with anyone while you're on a break?
17    A.    Yes.
18    Q.    And, Dr. Levitt, do you also
19 understand that if you should have a conversation
20 about the substance of your testimony while
21 you're on the break, I may ask you about that?

Page 117

1    A.    Absolutely.
2    Q.    And do you understand that that covers
3  not only our break now, but our lunch break, and
4  our recess this evening, and applies until we
5  conclude the deposition tomorrow?
6    A.    Absolutely.
7    MR. HILL:  Okay.  Let's take a short
8  break.
9    (Brief Recess.)
10    MR. HILL:  Mark that one as the next
11 one.
12    (Defendant's Deposition Exhibit Number
13 184 was marked for identification.)
14    BY MR. HILL:
15    Q.    Doctor Levitt, did you communicate
16 with anyone about the substance of your testimony
17 over the break?
18    A.    No.
19    Q.    Let me show you what we've marked as
20 Defendant's Deposition Exhibit Number 184.  This
21 is an article from the USA Today, by Matthew

30 (Pages 114 to 117)

Page 118

1  Kalman.  And this is cited a number of times in
2  your report; is that correct?
3      A.  I'll take your word for it.
4      Q.  Have you seen the document before?
5      A.  Presumably.  I haven't seen it in a
6  long time.
7      Q.  Okay.  Well, look at, if you will,
8  Page 8 of your report.
9      A.  Page 8?
10     Q.  I think you want the report, Dr.
11 Levitt.  You're on the CV.
12     A.  There we go.
13     Q.  And you see there after the Roman
14 Numeral IV, there's a quote from someone called
15 Maslama, M-A-S-L-A-M-A, Thabet, T-H-A-B-E-T.  Do
16 you see that, sir?
17     A.  I do.
18     Q.  And your citation in Footnote 3 there
19 is to the exhibit that we've marked that's in
20 front of you, the USA Today article, correct?
21     A.  Correct.

Page 119

1      Q.  And have you ever spoken to
2  Mr. Thabet?
3      A.  No.
4      Q.  Have you ever spoken to the author of
5  this article, Mr. Kalman?
6      A.  I have.
7      Q.  You have spoken to Mr. Kalman?
8      A.  Yes.
9      Q.  Did you speak to him about the subject
10 of this article?
11     A.  If I had, it was years ago, not now.
12 I have no recollection, so --
13     Q.  And in what context did you speak to
14 Mr. Kalman?
15     A.  He's a reporter.  I'm an expert that
16 follows these things.  He calls sometimes for
17 quotes or for background information, or I see
18 him at conferences.  There's kind of that overlap
19 of Vin diagram of circles.
20     Q.  I see.  But to the best of your
21 recollection, you cannot remember ever speaking

Page 120

1  to Mr. Kalman about this particular article or
2  the people that he quotes in it, right?
3      A.  Correct.
4      Q.  Do you know if Mr. Thabet was
5  accurately quoted by Mr. Kalman?
6      A.  I assume he was because it made it
7  into the print, and there was never a retraction,
8  as far as I know.
9      Q.  Do you know if Mr. Thabet speaks
10 English?
11     A.  I do not.
12     Q.  Do you know if the English that he is
13 quoted as having said, is an accurate translation
14 of what he may have said in a foreign language?
15     A.  I would assume it is because it's a
16 reputable outlet, but I don't know that it was in
17 Arabic.
18     Q.  Do you know if Mr. Thabet is, in fact,
19 associated with the AAMB?
20     A.  That is how he is described here.
21     Q.  Apart from how he's described in the

Page 121

1  USA Today article, do you have any knowledge of
2  whether he is, in fact, associated with the AAMB?
3      A.  I'd have to check.  What I mean by
4  that is: In my business, I come across names of
5  lots and lots of different people, and there's
6  just no way to remember everything.
7          If you'd asked me this question around
8  the time when all this was happening, I probably
9  could have answered to you like that (snapping
10 fingers).  The same way I have a Hezbollah book
11 that just came out, if you ask me something like
12 that, I can answer it like that (snapping
13 fingers).  But now, offhand, I can't tell you
14 from where I would know that.
15     Q.  Have you attempted to verify the
16 accuracy of the facts asserted in the quote
17 attributed to Mr. Thabet, in any fashion?
18     A.  I'm sorry.  Does that mean have I
19 tried to verify the quote, or the facts in the
20 quote?
21     Q.  The facts in the quote.  We've already

Page 122

1  established that you haven't done anything to
2  verify the quote, right? You just read it from
3  the article and cited it, right?
4      A.  Well, yes and no. I read it in the
5  article, I cited it as we discussed earlier. I
6  know the author who's a credible journalist. I
7  have regular conversations with people about
8  these things all the time. I often do check
9  quotes with people, but I can't tell you if I did
10 this one or not.
11     Q.  Okay.
12     A.  And this is something that I was
13 spending a lot of time researching here and there
14 on the ground in Israel and the West Bank.
15     Q.  When were you on the ground in Israel
16 and the West Bank related to this issue?
17     A.  I'd have to check the dates, but
18 several times.
19     Q.  Were you there on or around March of
20 2002?
21     A.  I'm sure I was there 2002. I don't

Page 123

1  know if it was in March. I don't have the dates
2  handy.
3      Q.  So to return to the original question:
4  Have you done anything to verify the accuracy of
5  the facts asserted in the quote attributed to
6  Mr. Thabet by Mr. Kalman?
7      A.  Sure. The reason this is put up here
8  as a kind of upfront quote, is because it then is
9  something that is the subject of I don't know how
10 many pages of discussion, 20-something pages of
11 discussion as we follow, so it's not in
12 isolation.
13     Q.  Have you done anything to determine
14 whether other scholars have analyzed the accuracy
15 of Mr. Thabet's claim?
16     A.  Have I done anything to --
17         MR. HORTON: I'll object to the form.
18         You may answer.
19     A.  So you're not asking about Mr. Thabet
20 at all? You're asking about the claim? Yes,
21 absolutely.

Page 124

1      Q.  What other scholars have you looked at
2  to determine whether what Mr. Thabet claims is
3  accurate?
4      A.  I don't know offhand. As I said, I do
5  this work all the time. And this is, we're
6  talking, a decade ago. So who did I talk to a
7  decade ago?
8      Q.  Are you familiar with an organization
9  called Human Rights Watch?
10     A.  I am.
11     Q.  Do you believe it has any expertise in
12 this area?
13     A.  Human Rights Watch is a very credible
14 human rights organization. So, you know, in this
15 area, they're not -- they don't have terrorism
16 expertise. They're not necessarily in the best
17 position to be able to say whether someone is or
18 isn't a member of a group.
19         But on human rights issues, they're a
20 well-known group. I know they've been criticized
21 sometimes for some work they've done, and other

Page 125

1  times not. But as far as I understand, it's one
2  of the well-known human rights groups.
3      Q.  Have you ever considered the report
4  that Human Rights Watch prepared, about the
5  accuracy of Mr. Thabet's claim?
6      A.  I don't know offhand.
7      Q.  Is that something that you should take
8  into account as an expert in this area?
9      A.  There's no "should." I'd have to see
10 what it is we're talking about. And odds are
11 that I did see it at the time. Again, I was
12 focused very closely on these issues.
13         And just because a human rights group
14 writes something, doesn't mean that it is the
15 holy grail or that the opposite is the holy
16 grail. It would be the type of thing that you'd
17 talk to people about.
18     Q.  Well, let me show you this and we'll
19 see if you ever remember seeing it before.
20         MR. HILL: Let's mark this as our next
21 exhibit.

Page 126

1      (Defendant's Deposition Exhibit Number
2   185 was marked for identification.)
3      BY MR. HILL:
4      Q.   Let me hand you what we've marked as
5   185.  Dr. Levitt, if you'll turn to Page 81 of
6   that document.
7      A.   I'm sorry, 81?
8      Q.   Yes, sir.  And if you'll look at the
9   second paragraph on Page 81, it says, "At least
10  one ranking al-Aqsa Brigades cadre has asserted a
11  direct link between the militias and the Fatah
12  leadership."  Do you see that, sir?
13     A.   Yes.
14     Q.   And then there's a quote there from
15  Mr. Thabet, right?
16     A.   Correct.
17     Q.   And that's the same quote that you
18  have on Page 8 of your report, right?
19     A.   The second half.
20     Q.   And if you look at the next paragraph
21  it says, "Most observers, and al-Aqsa Brigades

Page 127

1   participants, disagree with Thabet's
2   characterization."  Do you see that?
3      A.   I do.
4      Q.   Is that information you were aware of
5   at the time you wrote your report?
6      A.   Now that I see the report in front of
7   me, I was very aware of this report.  It might
8   even be cited elsewhere in my report.  It
9   certainly was cited in other work I did.
10     Q.   Okay.  And you did not put in your
11  report this observation, this statement that most
12  observers disagreed with Thabet's
13  characterization, did you?
14     A.   I disagree with the statement.  And
15  it's a methodological question, right?  How many
16  observers did they interview to be able to say,
17  "Most observers"?  What does that even mean,
18  "Most observers"?  Methodologically, it's a
19  meaningless statement.
20     Q.   You have read this document, right,
21  sir?

Page 128

1      A.   Yeah.
2      Q.   So the next sentence says, "According
3   to 'spokesman' Usama an-Najjar:  'The members of
4   the al-Aqsa Martyrs are warriors who are not
5   subject to any political decision and have no
6   relation with the first rank of the PA, although
7   some of its members work in sensitive positions
8   in the PA's civil ministries or its security
9   apparatuses....  The Brigades respect the
10  national interest and choose the place and the
11  time to carry out its operations.'  He
12  characterized the Brigades as comprising
13  'hundreds of members, aged between twenty-two and
14  fifty-five, who were released from the Israeli
15  prisons or students in Palestinian universities
16  who operate sometimes with and sometimes without
17  coordination'."  Do you see that?
18     A.   I see it.
19     Q.   Are you familiar with this statement
20  by Mr. an-Najjar?
21     A.   I am.

Page 129

1      Q.   And you did not include this statement
2   of Mr. an-Najjar in your report, did you?
3      A.   No, I did not.
4      Q.   And, so, you chose to include the
5   statement from Mr. Thabet, but to exclude the
6   statement of Mr. an-Najjar, correct?
7      A.   I included the statement from
8   Mr. Thabet, along with a lot of other things that
9   underscores it, and decided not to include the
10  obvious and logical denial when approached by
11  human rights group.  It's like saying, "Al
12  Capone, are you a mob boss?"  And Al Capone says
13  "No."  We're not surprised.
14      So when Usama an-Najjar asks, "Is
15  there a intimate tie between or is there a tie
16  between al-Aqsa Martyrs and Fatah?" recognizing
17  the potential pitfalls therein, unsurprisingly
18  says "No."
19     Q.   Okay.  Now, you see the footnote for
20  the quote from Mr. an-Najjar is Footnote 218,
21  right?

33 (Pages 126 to 129)

Page 130

1  A.  Yes.
2  Q.  And that is referring to something
3  published by a group called MEMRI.  Do you see
4  that?
5  A.  Yes.
6  Q.  Do you regard MEMRI as a reliable
7  source of information?
8  A.  They do translations, and they
9  translate reliably.
10  Q.  Okay.  And, so, this in fact is not a
11  statement Mr. an-Najjar made to Human Rights
12  Watch?  This is a statement he made to MEMRI,
13  correct?
14  A.  Right.  And I don't have in front of
15  me the MEMRI document.  I don't know what the
16  context of that is.  But whoever it is, and Human
17  Rights Watch is choosing to include it here,
18  whether it's to a human rights group or to some
19  other public audience, it shouldn't surprise when
20  a group that is accused of being engaged in let's
21  call it illicit activities, is asked "Are you

Page 131

1  engaged in illicit activities?" it should never
2  surprise when they say "No."
3  Q.  Okay.  So your position, sir, is that
4  you did not include Mr. an-Najjar's statement
5  because you believe it to be untrue?
6  A.  Not because I don't like him.  But
7  Because the weight of the evidence, as we go on
8  in the rest of the 20 pages of the report, is
9  very much weighted in opposition to his claim.
10  Q.  Okay.  So you have determined that
11  Mr. Thabet's statement is true in your opinion,
12  correct?
13  A.  Correct.
14  Q.  And you've determined that
15  Mr. an-Najjar's statement is incorrect in your
16  opinion?
17  A.  Correct.
18  Q.  The next paragraph at the bottom of
19  Page 81 says, "Members of other armed groups
20  agreed that the al-Aqsa Martyrs' Brigades are not
21  a highly structured group.  'Around here an Aqsa

Page 132

1  Brigade is any five or six guys who call
2  themselves that,' one PFLP member told Human
3  Rights Watch in Jenin."  Do you see that?
4  A.  I do.
5  Q.  Were you aware of that quote at the
6  time you wrote the report?
7  A.  Yes.
8  Q.  And you did not include that quote in
9  your report; is that correct?
10  A.  I don't think so, no.
11  Q.  And did you again exclude that quote
12  because you believed that PFLP member was being
13  untruthful?
14  A.  Or it was just wrong.  I don't know if
15  he was being untruthful, or was stating what he
16  believed to be true.
17  Q.  Okay.
18  A.  It's also the case that Al Aqsa
19  Martyrs Brigades developed over time and
20  developed over time at a different pace in
21  different cities.  And, so, you could have had

Page 133

1  individual Al Aqsa Martyrs' cells that were more
2  a bunch of guys, and others that were much more
3  highly structured.
4     In fact, we get into the report, at
5  one point these bunch of guys start coalescing
6  and that's when they start reaching out to the
7  Palestinian authority and Fatah, for funding and
8  support.
9  Q.  Okay.  But it is correct to say that
10  you did not include the quote from the PFLP
11  member quoted here because you believed it was
12  incorrect, right?
13  A.  Correct.
14  Q.  The next sentence says, "According to
15  one high-level Western diplomat involved in
16  security liaison between Israeli and Palestinian
17  services, 'there is no [al-Aqsa Brigades]
18  infrastructure, just small groups making their
19  own small decisions'."  Do you see that?
20  A.  Yes.
21  Q.  And were you aware of that quote from

34 (Pages 130 to 133)

Page 134

1   the high-level Western diplomat at the time you
2   wrote your report?
3       A.   I was aware of this report, so,
4   presumably.
5       Q.   And you did not include that quote
6   from the high-level Western diplomat in your
7   report, correct?
8       A.   The unnamed, high-level diplomat,
9   correct.
10      Q.   And you did that because you believe
11  that high-level Western diplomate to be
12  incorrect?
13      A.   Again, I don't know who this Western
14  diplomat is. I don't know if he is high-level.
15          This was a Human Rights Watch
16  interview, name withheld. It's very difficult to
17  assess how much weight to give to this interview,
18  at all.
19          I don't know if the person's lying. I
20  don't know if the person's saying what they
21  believe to be true, but it isn't true. I don't

Page 135

1   know if they're still high-level. I don't know
2   if they're in a position to know or not know.
3   It's an anonymous source.
4       Q.   And you believe it would be
5   inappropriate to rely on an anonymous source?
6       A.   I believe that anonymous sources can
7   play a role, never in isolation. And I think
8   it's very important to try and give your reader
9   as much information as you can.
10          There is a place for anonymous sources
11  in all this. I even get into a description of
12  that in the Introduction of one of my peer
13  reviewed books.
14          But it is the case that it does make
15  it much more difficult to assess the veracity,
16  certainly in isolation.
17      Q.   So one of the reasons that you
18  question the veracity of the Western diplomat
19  who's quoted here is because their name is
20  withheld?
21      A.   It's only one piece of it.

Page 136

1           Again, at the time, I was doing a
2   tremendous amount of focused research on these
3   issues. And the interviews that I was doing,
4   which, to be honest, if I were to have cited them
5   in a report like this, probably also would have
6   had to have been anonymous.
7           The officials talk to you often, and
8   on background. But you use it as, you know, to
9   build your world view of this situation. The
10  consensus was quite the opposite.
11      Q.   And you cannot tell me the name of
12  anyone who shared this consensus with you, right?
13      A.   We've had this conversation already.
14      Q.   The answer is: You cannot tell me the
15  name of any person who told you what --
16      A.   The answer is I cannot --
17      Q.   -- you're representing is a consensus,
18  right?
19          MR. HORTON:  Make sure he gets his
20  question out before you answer. It makes it very
21  hard for her.

Page 137

1           THE WITNESS:  My apologies.
2       A.   I cannot remember the name of anybody
3   I met with a decade ago on these issues.
4       Q.   You also cite this same article again
5   on Page 11, as the source for a quote from
6   someone, and this is at Page 11, the first full
7   paragraph you quote someone who you describe as
8   "Arafat's foreign media spokesman, Mohammed
9   Odwan," O-D-W-A-N. Do you see that?
10      A.   Yes.
11      Q.   And you've never spoken to Mr. Odwan,
12  right?
13      A.   Correct.
14      Q.   And do you know if Mr. Kalman
15  accurately described him in the article as
16  Arafat's foreign media spokesman?
17      A.   I don't know. Again, at the time, I
18  was fairly focused on these issues, and was much
19  more familiar with the names than I am today, so
20  probably was in a position then to be able to
21  tell you more definitively, you know, what his

Page 138

1　position is, or was. But not right now.
2　　Q.　Have you ever heard of Mr. Odwan
3　outside of this article?
4　　A.　Again, probably. I'm not focused on
5　this issue now. I don't have this on my finger
6　tips. But I was a decade ago, and probably would
7　have been familiar with him.
8　　Q.　Did you do anything to verify whether
9　Mr. Odwan he was, in fact, Arafat's foreign media
10　spokesman before you quoted him in your report?
11　　A.　I don't recall.
12　　Q.　Would you agree with me that you took
13　the title from Mr. Kalman's article?
14　　A.　That sounds right.
15　　Q.　Are you aware that Mr. Odwan was
16　deposed in the Klineman case?
17　　A.　No.
18　　Q.　I take it, then, that the lawyers did
19　not provide you a copy of Mr. Odwan's testimony
20　in the Klineman case?
21　　A.　Either they did not. Or they did and

Page 139

1　I have completely forgotten. But I don't think
2　so.
3　　Q.　Then, would it affect your opinion at
4　all to learn that Mr. Odwan testified that his
5　job was actually press coordinator?
6　　A.　No.
7　　Q.　Would it affect your opinion to learn
8　that Mr. Odwan testified that his job was like
9　being a bell hop and escorting reporters around?
10　　A.　This was his testimony?
11　　Q.　Yes, sir.
12　　A.　It wouldn't surprise me. You know,
13　translating foreign media spokesman, press,
14　whatever he said it was, escorting people around,
15　you know, it wouldn't surprise me that he would
16　play down his role, and that it would have
17　slightly different translations in the English.
18　It wouldn't surprise me at all.
19　　Q.　Would it affect your reliance on the
20　accuracy of his quote?
21　　A.　His insistence that he was a

Page 140

1　lower-level functionary alone, no.
2　　Q.　Would the fact that he testified that
3　he was not authorized to make press statements
4　affect your reliance on his quotation?
5　　A.　That alone, no. Again, you'd want
6　them to follow up, right?
7　　Q.　Did you do anything to follow up on
8　the accuracy of his quote?
9　　A.　On the accuracy of his quote, or the
10　quotes that you're now telling me about that I
11　hadn't heard about before?
12　　Q.　On the accuracy of the quote that
13　you're relying on, sir, did you do anything to
14　follow up on the accuracy of that quote?
15　　A.　I don't recall. As I told you
16　earlier, I often will, and not every single time.
17　　　Matthew Kalman is a respected reporter
18　who has a good track record.
19　　Q.　Does the fact that Mr. Kalman
20　apparently inaccurately described Mr. Odwan's
21　title, in this instance, affect your relying on

Page 141

1　Mr. Kalman's statements?
2　　　MR. HORTON: Object to the form.
3　　　THE WITNESS: I do, too.
4　　A.　You're assuming that he got the title
5　wrong because you're choosing to believe what
6　Mr. Odwan told in this other case. Perhaps
7　Mr. Odwan has an interest in playing down his
8　role in all of this. I don't know, but I don't
9　think you do, either.
10　　Q.　So you're saying, sir, that you would
11　rely on Mr. Kalman over Mr. Odwan because you
12　don't believe Mr. Odwan was telling the truth at
13　his deposition?
14　　A.　I don't believe or not believe
15　Mr. Odwan or Mr. Kalman. But you just told me
16　that one was right and the other was wrong. I'm
17　telling you --
18　　Q.　Well, let's do it as a hypothetical.
19　Let's do it this way:
20　　　Assume that Mr. Odwan's title, in
21　fact, was press secretary, not foreign media

36 (Pages 138 to 141)

Page 142

1  spokesman.  Assume that to be true.
2      A.   Okay.
3      Q.   If that's true, does that affect your
4  view about whether Mr. Kalman is a reliable
5  source of information?
6      A.   No.
7          MR. HORTON:  Object to the form.
8      A.   No.  Between press secretary and
9  foreign media spokesman, there's a very fine
10 line.
11     Q.    Assume that Mr. Odwan testified he
12 never said what Mr. Kalman quoted him as saying,
13 does that affect your reliance on Mr. Kalman's
14 article?
15     A.    In isolation, no.
16         Again, should it surprise that someone
17 who is presented with a statement that they made,
18 which is -- seems to be kind of catching them in
19 something, somehow indicting them in something,
20 that they would deny it?  No, it wouldn't
21 surprise me at all.

Page 143

1      Q.   Do you believe every statement someone
2  has made, that's inconsistent with your
3  conclusions, is untrue?
4      A.   I didn't say that I disagree because
5  it's inconsistent with my conclusions, but --
6      Q.   Can you name a statement by anyone
7  that's inconsistent with your conclusions that
8  you think is untrue?
9          MR. HORTON:  Hold it, hold it, hold
10 it.  My question is:  Had you finished your
11 answer?
12         THE WITNESS:  No.
13         MR. HORTON:  He needs to be able to
14 finish his answer, then you're, of course,
15 welcome to ask a followup.
16         BY MR. HORTON:
17     Q.   Go ahead.
18     A.   It's your time.
19     Q.    Can you name me any statement that's
20 inconsistent with your conclusions that you
21 believe to be true?

Page 144

1      A.   Can I name a statement that's
2  inconsistent with my conclusions that I believe
3  to be true?  Why would I come to conclusions that
4  are contrary to something that I believe to be
5  true?
6      Q.   So you cannot?
7      A.   No.
8      Q.   There are no true inconsistent
9  statements with your opinions?
10     A.   If I knew something to be true and to
11 be inconsistent with my opinion, I would adjust
12 my opinion.
13     Q.   So on any occasion where you've
14 omitted a statement that's inconsistent with your
15 opinion, you've done so because you believe that
16 to be untrue?
17     A.   If I was aware of the opinion, I
18 believed -- I don't know.  You know, we're
19 dealing here a little bit with just that,
20 opinion.
21         Again, it could be untrue in the sense

Page 145

1  that they said something untrue.  Or it could be
2  untrue in the sense that they said something to
3  be completely true but, in fact, are wrong.
4          My responsibility as an outside
5  academic is to look at the full body of
6  information, and not based on one quote here or
7  one title there, to come to a conclusion on based
8  on the body of information.
9          Based on the body of information
10 that's out there, the statements that you're
11 presenting to me from Mr. Odwan, that I have not
12 yet seen, don't appear to be accurate.
13     Q.   Look, if you will, back at the USA
14 Today article because there is a quote in the
15 article, itself, that's inconsistent with your
16 opinion.  At the bottom of the page, it says --
17     A.   Which page?
18     Q.    The first page.  It says, "Spokesman
19 for Arafat give differing responses when asked
20 about his ties to Thabet and the brigade.  Nabil
21 Abu Rudeineh, Arafat's chief spokesman says he

37 (Pages 142 to 145)

MATTHEW LEVITT DEPOSITION                September 24, 2013                Sokolow v. the PLO

Page 146

1  has never heard of Thabet. 'The president has
2  nothing to do with these things, he has nothing
3  to say about this issue,' Rudeineh says." Do you
4  see that, sir?
5      A.   Yes.
6      Q.   And you were, of course, aware of that
7  quote since you've cited this very article,
8  right?
9      A.   Yes.
10     Q.   You did not include Mr. Rudeineh's
11  quote in your opinion, right?
12     A.   Rudeineh.  No, I did not include
13  Rudeineh's quote in here.  He is -- was very,
14  very close to Arafat, and would not surprise that
15  he would say things to defend his boss, put his
16  boss in a good light.
17          Again, this is not a story in
18  isolation of he-said/she-said.  That would make
19  for a very boring report.  It has to be the
20  totality of the evidence.  So a quote here, a
21  quote there, frankly, is kind of icing on the

Page 147

1  cake.
2          What does the actually evidence say?
3  What do the seized reports say?  And then you
4  build the scaffolding of what you can then base
5  your conclusions on.
6          But should it surprise anybody?  In
7  this case it happened to be Arafat.  It could
8  have been anybody.  It could have been the
9  Israeli Prime Minister.  Could have been anybody
10  that they're -- what is he described as here --
11  his chief spokesman is going to deny something
12  that puts him in a bad light?  No.
13     Q.   So, again, you excluded Mr. Rudeineh's
14  quote because you believe it to be untrue?
15     A.   I believed it to be inaccurate, and
16  there's a difference.
17     Q.   Have you heard of Mr. Rudeineh before?
18     A.   Rudeineh.  Yes.
19     Q.   Before this report?
20     A.   Yes.
21     Q.   Do you agree that he is or was

Page 148

1  Arafat's chief spokesman?
2      A.   I believe he had multiple titles at
3  different times.  And it's one of these things as
4  we just had, you know, he could have been quoted
5  here today in this title, and another one
6  tomorrow in another place.  But he was certainly
7  one of Arafat's chief functionaries.
8      Q.   Assume that Mr. Odwan, whose quote you
9  did rely on, testified that the person authorized
10  to make statements on behalf of President Arafat,
11  was Mr. Rudeineh.  Does that affect your opinion
12  about relying on Odwan's quote instead of his
13  boss's?
14          MR. HORTON:  Object to the form.
15     A.   So, in the first instance, that
16  doesn't necessarily make him his boss, "A."
17          But "B," not at all.  The senior
18  functionary is going to be, if he's good at his
19  job, very good at sticking to the script.  And
20  someone else might be a little more loose with
21  the tongue and say something beyond the script.

Page 149

1          Again, I know you're very interested
2  in the quotes, but it's not just a question of
3  this quote or that quote.  You can play
4  he-said/she-said on these things all day.  That's
5  the nature of this business.  Someone's doing
6  things that are legitimate and they also may be
7  doing things under the table that are
8  illegitimate.  And we're not surprised when they
9  deny the illegitimate.
10          Now, just because someone's charged as
11  doing illegitimate, it doesn't mean that that's
12  true, either.  You need to dig.  You need to
13  collect evidence.  And, so, that's what I did in
14  the report.
15     Q.   Well, the evidence you collected is
16  all on one side, isn't it, sir?
17     A.   The evidence I've collected here, you
18  know, this is supposed to be an expert report of
19  my opinion.  And, so, yes, it is an expert report
20  that provides the basis for what is the
21  conclusion of my opinion.  This is not meant to

38 (Pages 146 to 149)

Page 150

1  be.  I wasn't hired to provide a dissertation on
2  all sides of this issue.
3        Now, there are other things that I've
4  written where you would do exactly such a thing.
5  My dissertation and the book that came out of it,
6  for example, which goes, "The Israelis say this;
7  the Palestinians say that," and that's important
8  for that type of product.
9        For this type of a product, this is by
10 definition what is my opinion.  Now, the lawyers
11 who came to me, they didn't say, "Hey, could you
12 have this opinion?"  And I didn't then say,
13 "Sure.  How much are you paying?"
14       I have an opinion on this based on my
15 research and the evidence I've collected.  This
16 is what it is.
17       Q.   So this report does not follow this
18 sort of methodology you used in your
19 dissertation, correct?
20       A.   No, I didn't say that.
21       There is methodology and there is

Page 151

1  presentation.  A methodology really is how you go
2  about researching something.  That doesn't
3  change.
4        What type of a product you're
5  producing, dictates what you're doing.  You'll be
6  more pithy in an editorial, and you'll be more
7  serious in a journal article.  You'll provide
8  every side of an argument and maybe even not come
9  to a conclusion in a certain type of product.
10 And probably in more you'll include all sides and
11 come to a conclusion.  And in others, like this
12 one, the specific product that is being asked is,
13 "Can you provide an opinion and the basis for
14 that opinion?"  This is not a "They say.  On the
15 other hand, they say.  On the other hand, they
16 say."
17       Q.   So you'd agree with me your report
18 does not do the on-the-other-hand-type analysis,
19 right?
20       A.   Correct.
21       Q.   It does not, in fact, document

Page 152

1  evidence that you considered and rejected in
2  reaching your conclusions, right?
3        A.   Correct.
4        Q.   And can you tell me any of the
5  evidence that you considered but then rejected in
6  reaching your conclusions?
7        A.   No, because we're sitting here today,
8  and I didn't write this yesterday.
9        Q.   Okay.  So when you prepared the
10 report, you only selected the evidence that
11 supported your conclusions?
12       A.   Well, I did not --
13            MR. HORTON:  Object to the form.
14            You may answer.
15       A.   I did not select anything.
16       I looked at all the evidence that I
17 could get my hands on, and then I wrote a report
18 that provided my expert opinion, which is what
19 this is, it's an expert opinion, and the evidence
20 that underpins it.
21       Q.   Now, you said you looked at all the

Page 153

1  evidence you could get your hands on.  If I
2  wanted to see all the evidence you got your hands
3  on, how could I see that?
4        A.   I doubt you could.  I don't know that
5  I've kept it.
6        Q.   You didn't preserve the material that
7  you reviewed that's not cited in your report?
8        A.   I may not have preserved hard copies
9  of material that I did cite in the report since
10 it's all publicly-available material.
11       Q.   Well, how will I know what
12 publicly-available material you considered, but
13 did not cite in your report, sir?
14       A.   You won't.  That's not what this is.
15       Q.   There's no way for me to discover the
16 material you considered but, then, did not rely
17 on for your report?
18       A.   That's true.
19       Q.   On Page 10 of your report in the
20 second paragraph you referred to --
21       A.   One second.  I'm sorry.

39 (Pages 150 to 153)

Page 154

1    MR. HORTON:  Hold on a second.
2    Q.    You refer to something that you
3  describe as a 2005 confession of Tamer,
4  T-A-M-E-R, Rimawi, R-I-M-A-W-I.  Do you see that,
5  sir?
6    A.    The paragraph beginning, "Convicted
7  terrorists"?
8    Q.    Yes, sir.
9    A.    Yes.
10    Q.    And have you, in fact, seen this
11  confession?
12    A.    Yes.
13    Q.    What language is it written in?
14    A.    I believe it's written in Arabic and
15  English.
16    Q.    Do you know if Mr. Rimawi speaks or
17  writes English?
18    A.    I don't.  I believe it is a certified
19  translation.
20    MR. HILL:  Let's mark that as our next
21  exhibit, please.

Page 155

1    (Defendant's Deposition Exhibit Number
2  186 was marked for identification.)
3    BY MR. HILL:
4    Q.    Dr. Levitt, I'm showing you what we've
5  marked as Defendant's Exhibit Number 186.  Is
6  this the confession that is cited in Footnote 17
7  of your report?
8    A.    I believe so.
9    Q.    As you indicated, there is a
10  Certificate of Translation at the beginning.  Do
11  you see that?
12    A.    Yes.
13    Q.    And do you know the translator?
14    A.    I do not.
15    Q.    Do you have any idea if this person
16  is, in fact, qualified to accurately translate
17  between Arabic and English?
18    A.    This is an official notary, so I have
19  respect for the notary system, and I take it as
20  face value.
21    Q.    But you've not done anything to verify

Page 156

1  whether the English is, in fact, an accurate
2  translation of the Arabic, right?
3    A.    No.
4    Q.    If you look at the very last page of
5  the Arabic --
6    A.    The very last page overall?
7    Q.    Yes, sir.  You see that there's a spot
8  for a signature?
9    A.    Yeah.
10    Q.    And there's no signature.  Do you see
11  that?
12    A.    Yes.
13    Q.    Does it concern you at all that you're
14  relying on what purports to be a confession that
15  has no signature?
16    A.    No, because I don't know if there is
17  no signature on it.  I don't know is the Israeli
18  system people are allowed to decline to sign, the
19  system.  But it is an official government report,
20  and I give that more credence than I would, you
21  know, if some journalist told me.

Page 157

1    Q.    Let me just ask you this question:
2    You believe that this confession is an
3  official government report?
4    A.    That's what it appears to be.  It
5  appears to be taken by the State of Israel, a
6  public document signed by the Magistrate Court,
7  certified by the Magistrate Court.  We have the
8  names of the people who did it.  There's, you
9  know, for a person who was doing a story on this,
10  whatever, they could go back and find the people.
11  So this is -- it's much more official, of course,
12  than just, you know, a journalist saying, "I got
13  a quote from somebody and I've got the chicken
14  squall on my notebook."
15    Q.    So you actually think this is a more
16  reliable document than Mr. Kalman's report?
17    A.    Yes.
18    Q.    Okay.  Did you do anything to fact
19  check whether, in fact, this was an official
20  Israeli document?
21    A.    In a sense, yes.  I got it through

MATTHEW LEVITT DEPOSITION                September 24, 2013                Sokolow v. the PLO

Page 158

1 lawyers in another case and asked them and got --
2 I don't remember the details, but they explained
3 to me how they had gotten it, and the chain of
4 custody, and this wasn't something that, you
5 know, was picked up from the street litter.
6     Q.   What were you told about the chain of
7 custody of this document?
8     A.   I just said I don't remember.  I just
9 remember that it was given to me and --
10    Q.   Do you remember what case you were
11 given this document?
12    A.   No.  It might have been -- it might
13 have been Klineman again.  I don't remember
14 offhand.
15    Q.   Do you remember which lawyer in the
16 Klineman case gave you this document?
17    A.   No.
18    Q.   And you believe this is an Israeli
19 document?  Do Israeli documents usually come in
20 Arabic?
21    A.   It depends.  This is a -- they will

Page 159

1 often come in Arabic and Hebrew.
2     Q.   You agree with me there's no Hebrew in
3 this document, right?
4     A.   Correct.  And this appears, except on
5 the first page, with the Certification of
6 Translation is in English and in Hebrew.  And
7 then in both the second page, whatever this is,
8 Apostille, and it's stamped, official document as
9 being certified by the Magistrates' Court in
10 Tel-Aviv-Yafo, is in both English and Hebrew.
11 And then presumably the copy that was given to me
12 was the Arabic, which is the original, and the
13 English translation, as opposed to the Hebrew
14 translation, which wouldn't do any good for these
15 purposes.
16    Q.   Okay.
17    A.   My guess is that somewhere out there,
18 there is also a Hebrew translation.
19    Q.   Would it change your opinion about the
20 reliability of this document if you learned that
21 it is not, in fact, an Israeli State document?

Page 160

1     A.   Depends what it turned out it was.
2     Q.   Would it change your opinion about the
3 reliability of this document if you learned it
4 had been prepared by the lawyers in the Klineman
5 case representing the plaintiffs?
6     A.   Again, depends how it was prepared.
7 Lawyers take an oath.  You know, this seems to be
8 part of an official process, which probably not
9 unlike the one we're doing now, we're just
10 sitting across the table from each other in some
11 type of deposition, and that has officialed them
12 to that.
13    Q.   Are you aware that Mr. Rimawi was
14 deposed about this document?
15    A.   I'm presuming, because you're telling
16 me that this was taken by lawyers, that this was
17 some type of deposition.  I'm assuming he didn't,
18 you know, volunteer.  I don't know what the
19 circumstance was, or I don't recall.  I probably
20 was told at some point.  But there's no question
21 that this is an official translation by a

Page 161

1 qualified translator, and it is certified by a
2 recognized court.
3     Q.   Okay.  If, in fact, the document that
4 is Arabic was not prepared by Mr. Rimawi, would
5 that cause you to change your reliance on this
6 document?
7     A.   You know, the document's being
8 prepared, based on our conversation, not being
9 prepared by me either, but we have a court
10 reporter here.  So I guess it would depend on how
11 it was prepared.
12    Q.   Okay.  Assume, sir, that this document
13 was, in fact, prepared by Ms. Klineman's lawyers
14 and presented to Mr. Rimawi, would that change
15 your opinion about the accuracy of the document?
16    A.   So in your hypothetical, they wrote
17 out this confession, presented it to him?
18    Q.   Presented it to Mr. Rimawi, yes.
19 Would that change your --
20    A.   He refuses to sign it?
21    Q.   Well, we haven't got there yet.

41 (Pages 158 to 161)

Page 162

1    But just assume that it was written by
2  the lawyers for Ms. Klineman, who presented it to
3  Mr. Rimawi, would that affect your reliance on
4  its accuracy as a document?
5    A.  I'd be more curious if it was
6  presented to him and he agreed with it.  That
7  would give it more weight.
8    Q.  Okay.  Well, let's extend the
9  hypothetical a little bit.  Let's assume that it
10  was prepared by the lawyers for Ms. Klineman,
11  that it was presented to Mr. Rimawi, and that he
12  refused to sign it, would that affect your
13  opinion about the reliability of the document?
14    A.  Well, does he refuse to sign it
15  period?  Does he refuse to sign it after, let's
16  say, an hour- or seven-hour-long deposition in
17  which he ultimately agrees to everything in the
18  document but then says, "Oops, that was not a
19  good idea," and refuses to sign it?
20    And under what circumstances is this
21  certified by the court if it is simply one

Page 163

1  lawyer's opinion that was presented in front of
2  the guy, but the guy never agreed to it at all?
3  I would be surprised if that were the case.
4    Q.  Okay.  Well, assume that is the case.
5  Assume this is one lawyer's opinion that was
6  presented to the guy and the guy never agreed to
7  it at all, would you believe this would be a
8  reliable document on which to base your opinions?
9    A.  So in your hypothetical, a lawyer for
10  the other side writes this document.  Rimawi
11  looks at it, doesn't agree to it, never says
12  anything to agree with any part of it, and then
13  they present it as if it was his confession.
14  Yes, I would have an issue with that document.
15    Q.  Okay.  And if that had happened to you
16  in this case, how would that change your
17  opinions?
18    A.  Specifics, please?  If what had
19  happened to me?
20    Q.  What you've just described.  If this
21  was written by the lawyers for Ms. Klineman, it

Page 164

1  was provided to Mr. Rimawi, he refused to sign
2  it, he testified contrary to its contents, would
3  that affect your opinion in the case?
4    A.  I'd want to know more.  Who is at this
5  let's call it, for lack of better words, let's
6  call it a deposition.  Who was at this
7  deposition?  Were there witnesses?  Did he at the
8  deposition agree to it and only then later refuse
9  to sign it?
10    It wouldn't surprise me at all if he
11  had agreed to it and then later recanted.  I
12  mean, he would have gotten himself in some
13  trouble, I imagine.
14    So what are the exact circumstances?
15    Q.  Are these the sorts of questions you
16  should have asked before you cited this document
17  in your report?
18    A.  Again, I don't remember the
19  conversation, but I was comfortable with the
20  document when I got it, as it was given to me.
21    Q.  And you were comfortable with the

Page 165

1  document because of what the lawyers in the
2  Klineman case told you about it?
3    A.  Correct.
4    Q.  And if they misled you about the
5  nature of the document, would that affect your
6  opinions in the case?
7    A.  If I was fully misled, it would affect
8  my opinions about this particular document.  This
9  is one document in -- I'm assuming you're talking
10  about this case, not that case, correct?
11    Q.  Uh-huh.
12    A.  This is one piece in a much larger sea
13  of information.  So maybe this particular piece
14  would not be something I would have included, but
15  it wouldn't have affected the other material,
16  necessarily.
17    Q.  Well, setting aside the other material
18  for a moment, do you, in fact, believe the facts
19  that are asserted in this document to be true?
20    A.  I do.
21    Q.  And that's because the lawyers in the

42 (Pages 162 to 165)

Page 166

1  Klineman case told you how this document came
2  into existence?
3      A.   Well, so we're moving beyond the
4  document itself right now, correct?  He is a
5  convicted terrorist.  He did have a day in court.
6  He was convicted.  Whether or not there was an
7  actual --
8      Q.   How do you know he was convicted?
9      A.   This is a matter of public record.
10     Q.   Have you verified this public record?
11     A.   I believe I did.
12     Q.   How did you do that?
13     A.   I imagine can -- I don't remember what
14 I did at the time, but I imagine you can go and
15 Google and find it out.
16     Q.   Did you Google Mr. Rimawi and find out
17 whether he was convicted?
18     A.   I don't remember what I did at the
19 time.
20     Q.   Do you know what court he was
21 convicted in?

Page 167

1      A.   Not offhand, no.
2      Q.   Do you know what crimes he was
3  convicted for?
4      A.   I believe we have it in the report at
5  some place.  But, no, not offhand.
6      Q.   Do you know whether he had a trial?
7      A.   I believe he did.  I believe, if this
8  is the case I remembering, that he hid in the
9  Mukata, M-U-K-A-T-A, Arafat's compound in
10 Ramallah.  Then there was pressure by the
11 Israelis, and I think from the United States, as
12 well, and eventually he was released and taken
13 into custody.
14     Q.   And you believe those things because
15 you read that on the Internet?
16     A.   And, as I said, I do field research on
17 the ground, so --
18     Q.   Did you do field research about Mr.
19 Rimawi?
20     A.   I probably did.  I can't tell you --
21     Q.   Who did you talk to about Mr. Rimawi?

Page 168

1          MR. HORTON:  Hold it.  Let him finish
2  his answers, please.
3          MR. HILL:  Sure.  You wanted to finish
4  your answer?
5          MR. HORTON:  Do you need the question
6  back to finish your answer?
7          THE WITNESS:  No, I'm just going to
8  take my time.
9          MR. HORTON:  Okay.
10         THE WITNESS:  Go ahead.  Ask again.
11     BY MR. HILL:
12     Q.   Who did you talk to about Mr. Rimawi's
13 case?
14     A.   I don't remember offhand.
15     Q.   You can't tell me the name of any
16 person you talked to about Mr. Rimawi's case
17 other than the lawyers for Esther Klineman,
18 right?
19     A.   Correct.
20     Q.   Would it change your opinion about the
21 reliability of the document if Mr. Rimawi

Page 169

1  testified at his deposition that he had never
2  received any money from Fatah?
3      A.   That would contradict part of what's
4  in this document.
5      Q.   Yes, sir it would.
6          Would it change your opinion about the
7  reliability of Mr. Rimawi's so-called confession
8  if his testimony was that he never received money
9  from Fatah?
10     A.   Well, his subsequent testimony.
11         It would depend.  It would depend.
12 Again, it would not be --
13     Q.   Is that statement important to your
14 opinion?
15     A.   It would depend because it depends on
16 the circumstances.
17         One should not be surprised if a
18 person says something that is incriminating,
19 later denies saying it.
20         But if, in fact, Mr. Rimawi was found
21 guilty of crimes related to activity for Al Aqsa

43 (Pages 166 to 169)

MATTHEW LEVITT DEPOSITION                September 24, 2013                Sokolow v. the PLO

Page 170

```
1   Martyrs Brigades, et cetera, then that would be
2   weightier than his "he-said/she-said; no, no, I
3   didn't mean it when I said this earlier thing.  I
4   was convicted maybe, but I didn't actually get
5   the money."
6            There's something to be said for a
7   trial in a court of law, and the due process that
8   goes with that.
9       Q.   Do you believe Mr. Rimawi had a trial
10  in a court of law with due process?
11      A.   My understanding is that he did.
12      Q.   And that's based on what you read on
13  the Internet?
14      A.   You've asked me that question in that
15  weighted, biased way now twice.  That's not what
16  I said.
17      Q.   Okay.  So what source, other than the
18  Internet, do you have to believe that Mr. Rimawi
19  received a trial with due process?
20      A.   My understanding is that there was a
21  court trial.  There were reports of it in the
```

Page 171

```
1   press.  And this was exactly the kind of thing
2   that I was researching at the time, and would
3   have had long conversations with--with people
4   here, with people in Israel, with people in the
5   West Bank.
6       Q.   Can you give me the name of one person
7   you had a long conversation about Mr. Rimawi's
8   case?
9       A.   No.
10      Q.   You cannot, correct?
11      A.   I just said no.
12      Q.   Would it change your opinion if
13  Mr. Rimawi testified at his deposition that --
14      A.   Which deposition?
15      Q.   Mr. Rimawi's deposition in the
16  Klineman, would it change your opinion about the
17  reliability of this his so-called confession if
18  he testified that there was no such thing as the
19  Al Aqsa Martyrs Brigade?
20      A.   No, that would not affect my opinion
21  at all because we know definitively that there
```

Page 172

```
1   was an Al Aqsa Martyrs Brigade, and that would be
2   fanciful and farciful at face value.
3       Q.   And you know definitively that there
4   was an Al Aqsa Martyrs Brigade because of press
5   reports that you've read, right?
6       A.   Correct.
7       Q.   Who has told you that there was an Al
8   Aqsa Martyrs Brigade, apart from press reports?
9       A.   The State Department of the United
10  States of America.
11      Q.   Okay.
12      A.   The Treasury Department of the United
13  States of America.
14      Q.   That's something you learned while you
15  worked at Treasury?
16      A.   No.  That's something I learned when
17  the Treasury Department designated them as a U.S.
18  designated terrorist organization.
19           Something I learned when the State
20  Department wrote them up for their acts of
21  terrorism in the State Department's Annual
```

Page 173

```
1   Country Reports on Terrorism.
2            In conversations I had with officials
3   and meetings I had with people.
4            There were quite a few trials and
5   convictions of Al Aqsa terrorists.  Al Aqsa
6   maintained websites, had letterhead, had emblems,
7   had posters on the streets claiming credit for
8   its so called martyrs.
9            There is no one I know that denies
10  that the Al Aqsa Martyrs Brigade existed.
11      Q.   Did the State Department determine
12  that the Al Aqsa Martyrs Brigade was part of
13  Fatah?
14      A.   I don't know.  Let's take a look and
15  see.
16      Q.   Well, you would agree with me that the
17  State Department has not designated Fatah as a
18  foreign terrorist organization, correct?
19      A.   That's true, and it's neither here nor
20  there.  Having been a part of that process, I can
21  tell you that we don't designate every entity
```

44 (Pages 170 to 173)

Page 174

1   that is involved, ever, in any act of terrorism.
2        Q.   So your experience at the State
3   Department allows you to tell us what the State
4   Department meant by not designating Fatah as an
5   FTO; is that what you're saying?
6            MR. HORTON:  Object to the form.
7        A.   My experience in government, though
8   not specifically at State.  When I was at State,
9   I wasn't doing this type of thing.  When I was
10  the Deputy Assistant Secretary for Intelligence
11  and Analysis at Treasury, I was very much
12  involved in this process.
13       Q.   But you can't tell me which groups you
14  considered at that time, right?
15       A.   Correct.
16       Q.   So you can't tell me whether Treasury
17  decided not to designate Fatah as an FTO, and
18  their reasons why, can you?
19       A.   That's right.
20       Q.   You're just going to claim that you
21  know why State did something, but not tell me the

Page 175

1   underlying facts that that decision was based on,
2   right?
3        A.   Incorrect.  You're putting words in my
4   mouth again.
5        Q.   Tell me the underlying facts that were
6   made available to our State Department that they
7   relied on to decide that the Fatah was not an
8   FTO?
9            MR. HORTON:  Object to the form.
10       A.   I don't know.
11           All I'm telling you and, therefore,
12  all you're going to be able to quote back to me
13  is that:  As a matter of fact, it is not the case
14  that every individual or organization out there
15  involved in terrorism is designated as a
16  terrorist entity on State or Treasury's list.  In
17  fact, it's a small fraction because there are
18  lots of policy and other considerations.
19           For example, one could imagine that
20  the State Department would be very uncomfortable
21  designating as a terrorist entity, an entity that

Page 176

1   is directly involved in the Peace Process,
2   because the Peace Process is a very obvious U.S.
3   National Security priority, and that might
4   outweigh the potential benefit of putting them on
5   some list.
6        Q.   So your opinion is that Fatah and the
7   Al Aqsa Martyrs Brigade are the same thing, but
8   the United States Government treats them
9   differently for political reasons?
10       A.   I didn't say that.  You could ask me
11  if you like.
12       Q.   Is that your opinion?
13       A.   Not exactly, no.  You could have --
14       Q.   So you're saying --
15       A.   You're going to have to let me answer.
16       Q.   So are Al Aqsa Martyrs Brigade and
17  Fatah the same thing, or not?
18       A.   So you're asking a different question
19  now before you let me answer the previous one.
20  We're clear?
21       Q.   Answer the question, please.

Page 177

1        A.   Which one?
2        Q.   Are Al Aqsa Martyrs Brigade and Fatah
3   the same thing in your opinion, or not?
4        A.   Al Aqsa Martyrs Brigade is an element
5   of Fatah.
6        Q.   Okay.
7        A.   Fatah is more than the Al Aqsa Martyrs
8   Brigade.  Al Aqsa Martyrs Brigade is Fatah.
9        Q.   So if we did a Vin diagram and there
10  were two circles -- one was Fatah and one was Al
11  Aqsa Martyrs Brigades -- your opinion is that Al
12  Aqsa Martyrs Brigades is subsumed within Fatah?
13       A.   Almost entirely.
14       Q.   So portions of Al Aqsa Martyrs
15  Brigades are not subsumed within Fatah?
16       A.   So in the real world, there is no such
17  thing as kind of pure hundred percent.
18           So you could have an individual who
19  gets angry at the Israelis and get radicalized,
20  and is just looking for someone that will provide
21  him with a weapon to do something.  And he does

45 (Pages 174 to 177)

Page 178

1  something, and Al Aqsa provided him the weapon
2  and claims credit for it.  You could have things
3  like that.  Is that guy really Al Aqsa?  I mean,
4  there's a spectrum.
5          But as an organization, yes, Al Aqsa
6  is pretty much included within Fatah.  But Fatah
7  is much, much more than Al Aqsa.
8      Q.   Okay.
9      A.   And as I mentioned earlier, this
10  happened over a period of time.
11          Al Aqsa really was created by
12  disgruntled Fatah militant youth.  And Fatah then
13  later, in an effort not to lose momentum and
14  grassroots support, said, "Okay, boys, you're
15  part of us."  But they did start off as something
16  somewhat different.
17          They didn't get permission from the
18  heads of Fatah to do this, necessarily, or from
19  all the heads of Fatah.  In time, Fatah embraced
20  and supported the Al Aqsa Martyrs Brigades.
21      Q.   Did the Al Aqsa Martyrs Brigades, as

Page 179

1  you've described it, ever get permission from
2  Fatah to do any terrorist operations?
3      A.   I believe we have some examples in the
4  report where it appears that they did, yes.
5      Q.   And where are those, sir?
6      A.   It's your time.  I don't have the
7  report memorized.  I'll read through it right
8  now, if you like.
9      Q.   Can you find one?
10      A.   I can certainly try.
11          (Witness Reviews Document.)
12      A.   So what is your question again?
13      Q.   Can you find an instance in your
14  report where Fatah gave the Al Aqsa Martyrs
15  Brigades, as you've described it, permission to
16  engage in an act of terrorism?
17      A.   So certainly passive, and I'll explain
18  that in a second.  And the implication is yes.
19  That is to say, Al Aqsa Martyrs is carrying out
20  attacks.  Fatah refuses to disown them, disband
21  them, embraces them as their own, insists that

Page 180

1  there is no difference between Fatah and Al Aqsa
2  Martyrs Brigades.
3          And, by the way, to answer your
4  earlier question:  Yes, as I have here on Page
5  11, "Thus, it should not surprise that the
6  official U.S. government position is that the
7  AAMB is the military wing of Fatah. 'Fatah's
8  militant wing, the al-Aqsa Martyrs Brigade,
9  conducted numerous shooting attacks and suicide
10  bombings in 2004'."
11      Q.   So you still can't find an instance in
12  your report --
13      A.   Well, I'm just trying to save you
14  time --
15      Q.   No, that's quite all right.
16      A.   -- but I'm happy to continue reading
17  through.
18      Q.   Let's just make sure we get a clear
19  answer to the question, Dr. Levitt:
20          You cannot find an instance in your
21  report where anyone from Fatah approved a

Page 181

1  terrorist act by the Al Aqsa Martyrs Brigade?
2      A.   Well, I'll read through and we'll see.
3  And maybe they do.  And more likely they don't
4  because that's the nature of the operational
5  security at those organizations.
6          (Witness Reviews Document.)
7      A.   And certainly embraced them after the
8  fact.
9          (Witness Reviews Document.)
10      A.   On Page 15, we have two instances
11  where PA security services knew of pending
12  suicide attacks, but took no action to prevent
13  them.
14          And when told of 232 terrorists wanted
15  by Israel, informed those people to take
16  cautionary measures to prevent arrest.
17      Q.   I appreciate that answer, sir.  But
18  you still have not located --
19      A.   I'm still reading.
20      Q.   -- an instance where Fatah approved a
21  terrorist operation Al Aqsa Martyrs Brigades,

46 (Pages 178 to 181)

Page 182

1  have you?
2       MR. HORTON:  Please finish your
3  answer.
4       (Witness Reviews Document.)
5       A.    Then on Page 16, we have payments to
6  individuals who are directly involved in
7  terrorism.
8       (Witness Reviews Document.)
9       A.    On Page 19, we have a letter of Al
10 Aqsa Martyr Brigade asking Arafat's aides,
11 specifically, for funds for explosives.
12      Q.    And, again, sir, that is not
13 responsive to my question.
14      A.    I think it is, actually.
15      Q.    I've asked you to find an instance
16 where Fatah approved a terrorist action by AAMB.
17 So far you've not been able to find one, have
18 you?
19      A.    So if Fatah asks for funding for
20 explosives and gets that, that's not approving
21 the use of explosives?

Page 183

1       Q.    There's no evidence they got that
2  funding, is there?
3       MR. HORTON:  Hold on.  You can't talk
4  at the same time.  Make sure you finish your
5  answer.
6       BY MR. HILL:
7       Q.    There's no evidence they got that
8  funding, is there?
9       (No Response.)
10      Q.    Is there, sir?
11      A.    The evidence is that Arafat signed
12 saying that it should be allocated.  And when the
13 Head of States, or whatever the PA was --
14      Q.    Arafat signed which report, sir?
15      MR. HORTON:  Hold on, hold on.
16      Have you finished your answer?
17      A.    The first big paragraph on Page 19, at
18 the end, "At the bottom of the page, a
19 handwritten note signed by Arafat on September 19
20 instructs PA Treasury to allocate $600 to each."
21      Q.    That's what you're referring to?

Page 184

1       A.    Yes.
2       Q.    You believe that is to buy weapons?
3       A.    That's what it's talked about if you
4  read up in the paragraph.
5       Q.    Okay.  Well, we'll come back to that
6  one.
7       A.    Because they write earlier, "We need
8  every week 5-9 explosive charges.  Handwritten
9  notes tally the total at 20,000 New Israeli
10 Shekels, NIS, per month."
11      Q.    And you believe that document was
12 signed by President Arafat?
13      A.    That's what it indicates here, yes.
14      Q.    Where does it indicate that?
15      A.    At the bottom of the page, "a
16 handwritten note signed by Arafat."
17      Q.    Which paragraph are you in?
18      A.    The end of the second paragraph that
19 begins "Consider, for example," the very last
20 sentence -- second to last sentence:  Hassana
21 Sheikh, S-H-E-I-K-H, requests $2,500 for three

Page 185

1  different Al Aqsa terrorists involved in a
2  January 17, 2002 attack.
3       Q.    So you believe that the --
4       A.    And:  At the bottom of the page,
5  Arafat says to give each the money.
6       Q.    So you believe that the letter that's
7  cited in Footnote 67, is the same document that's
8  cited in Footnote 66?
9       A.    No, they're two different documents.
10      Q.    Okay.  So I believe the pending
11 question is still:  Is there anywhere in your
12 report that indicates Fatah approved an Al Aqsa
13 Martyrs Brigade terrorist attack?
14      A.    There's nothing about them
15 specifically approving a specific attack, which
16 doesn't surprise.  This is the nature of how such
17 organizations work.
18      Q.    Isn't it true that Fatah, in fact,
19 tried to disband the Al Aqsa Martyrs Brigade in
20 early 2002?
21      A.    That's an interesting conversation.

47 (Pages 182 to 185)

MATTHEW LEVITT DEPOSITION                September 24, 2013                Sokolow v. the PLO

Page 186

1      In essence, no.
2          MR. HILL: Let's mark this report,
3   please.
4          (Defendant's Deposition Exhibit Number
5   187 was marked for identification.)
6          BY MR. HILL:
7      Q.   We're handing you what we've marked as
8   Exhibit Number 187.  This is a press report from
9   Agence, A-G-E-N-C-E, France Presse, P-R-E-S-S-E,
10  in English.  Have you ever seen this before?
11     A.   I don't know.
12     Q.   Do you believe this to be a reliable
13  press outlet?
14     A.   It is a respected press outlet, yes.
15     Q.   If you'll see, the first paragraph
16  says, "The Al-Aqsa Martyrs Brigades, an armed
17  offshoot of Yasser Arafat's Fatah movement, said
18  Monday it was going to disband in line with a
19  decision made in secret by the Fatah leadership
20  last week."  Do you see that?
21     A.   Yep.

Page 187

1      Q.   And do you believe that statement to
2   be untrue?
3      A.   Inaccurate.  That is to say, I believe
4   the AFP accurately quoted some Al Aqsa person
5   that's saying it was planning to disband.  In
6   fact, it did not disband.  And, in fact, this was
7   not the only time that there was talk of either
8   disbanding Al Aqsa, or Palestinian militant
9   groups, in general, to include Al Aqsa.
10         Part of the frustration that the U.S.
11  Government had at the time, which ultimately led
12  the U.S. Government to decide that Arafat was not
13  someone that we could negotiate with, was that he
14  kept reneging on these types of pledges.
15     Q.   So to renege on a pledge, one must
16  have the ability to accomplish what one promises
17  to do, correct?
18     A.   Well, that's interesting.  Probably
19  not.
20         To renege on a pledge, you simply need
21  to not fulfill the pledge.

Page 188

1      Q.   So let's say --
2          MR. HORTON: Hold on.  Let him finish
3   his sentence.
4      A.   If you don't have the capability to
5   fulfill your pledge, you know, don't promise
6   things you can't deliver on.  And that's another
7   issue.
8      Q.   Well, let's say hypothetically I said,
9   "I'm going to fly out of the room," and then I
10  didn't, that would be reneging on my pledge in a
11  sense, right?
12     A.   Well, it's apples and oranges because
13  we all know you can't fly, and you would have
14  been laughed at for saying it, and no one would
15  have expected you to do it.
16         But in the case of Arafat, who is the
17  head of the PLO and the PA and Fatah, he
18  certainly had the capability, if he wanted, to be
19  able to exercise a monopoly over the use of
20  force.
21     Q.   Did he have that capability in

Page 189

1   February of 2002?
2      A.   It would have been difficult, but he
3   would have been in a better position to have
4   known what he could or could not have done
5   in-house, than anybody else.  Now --
6      Q.   So, why do you conclude --
7          MR. HORTON: Are you finished with
8   your answer?
9          THE WITNESS: I wasn't.  But, so be
10  it.
11         MR. HORTON: Please finish your
12  answer.
13         THE WITNESS: No, so be it.
14         BY MR. HILL:
15     Q.   Why do you conclude that President
16  Arafat reneged on a promise to disband the Al
17  Aqsa Martyrs Brigade, as opposed to concluding
18  that he attempted to and was unable to do so?
19     A.   Because the consensus across -- the
20  vast majority of people who focus on this issue,
21  is that he did not try, and that he was trying to

Overnite Court Reporters                301-593-0671                        Fax: 301-593-8353
Washington, DC Metro Area                                           www.DCcourtreporters.com

MATTHEW LEVITT DEPOSITION            September 24, 2013            Sokolow v. the PLO

Page 190

1   accommodate multiple different constituencies at
2   once.
3          He was under pressure from us,
4   certainly from the Israelis, also. But he was
5   under pressure from the international community
6   to put an end to the PA and Fatah's involvement
7   with people who were carrying out acts of
8   terrorism.
9          He struggles internally within Fatah.
10  And the whole reason, again, that he kind of
11  allowed these guys, is because he probably felt
12  he had no choice. He either co-opted them, as it
13  were, or began to lose control over Fatah.
14         But be that as it may, the fact is
15  that several times he said he would, he did not.
16  And even in 2002, the bottom line is he had the
17  capabilities to do it, and later when it was in
18  his interest, because Al Aqsa began to be
19  involved in just about as much crime targeting
20  the Palestinian people, as it was terrorism
21  targeting Israelis, that he did, in fact, put

Page 191

1   down his foot and arrested key people and
2   sidelined others, and made it clear that there
3   are certain things you can't do.
4          So he would maintain that it was very
5   difficult for him to crackdown on terrorism, but
6   if anybody within Al Aqsa, or anybody else, said
7   a bad thing about him or his health, they would
8   be at the receiving end of a swift, you know,
9   retribution.
10         So he did have capabilities, and I get
11  into it in the report in a little more detail.
12     Q.   Now, you said there was a consensus
13  that President Arafat had the ability to stop the
14  Al Aqsa Martyrs Brigades, and chose not to; is
15  that right?
16     A.   The consensus was that -- and it's not
17  specific to Al Aqsa -- that he had the capability
18  to cease supporting individuals who are engaged
19  in terrorism, and did not.
20     Q.   Okay. So that's a little different
21  than what you told me earlier.

Page 192

1          Is there, in fact, a consensus that
2   President Arafat had the ability to stop the Al
3   Aqsa Martyrs Brigade, and chose not to?
4      A.   I think that the dominant position is
5   that he did. There certainly are others, and
6   there are other experts involved in this case who
7   disagree --
8      Q.   Okay. Who shares this dominant
9   position with you?
10         MR. HORTON: Hold on. Have you
11  finished?
12         Counsel, you've got to give him a
13  chance to finish his answers. Ask whatever you
14  want, but you got to give him a chance to finish
15  his answers if we're going to proceed.
16         BY MR. HILL:
17     Q.   Go ahead.
18     A.   Again, I don't follow this issue on a
19  regular basis now, so --
20     Q.   Is it true that you can't tell me the
21  name of an expert, other than yourself, that

Page 193

1   holds what you've just described to be the
2   dominant view?
3          MR. HORTON: Here we are again,
4   counsel. He tried to finish his answer; you've
5   interrupted again. You're going to have to
6   restrain yourself simply to allow him to finish
7   his answer, and then you're welcome to ask
8   anything else you like.
9          Do you have a question in mind now,
10  Dr. Levitt?
11     A.   I'm not about to try and recollect and
12  give you names on either side of this debate.
13     Q.   Okay.
14     A.   There is a debate, but in my
15  experience, having worked this very closely a
16  decade ago, it was overwhelmingly in favor. And,
17  in deed, it was the U.S. Government position that
18  Arafat made a conscious decision not to do what
19  he had to do, and could have done. And,
20  therefore, President Bush, at the time, declared
21  that he was not someone we'd continue to work

49 (Pages 190 to 193)

MATTHEW LEVITT DEPOSITION                September 24, 2013                Sokolow v. the PLO

Page 194

1  with.  And needed it to wait until Fatah and the
2  PA -- I can't remember if he included Fatah in
3  that; maybe it was just the PA -- was no longer,
4  as he put it, tainted by terror.
5      Q.   Apart from President Bush, can you
6  give me the name of anyone that you believe holds
7  what you've described as the dominant view?
8      A.   No.  And if I were to go back to my
9  office and do research, within minutes I'd be
10  able to give you many, many, many names.
11     Q.   Sir, do you believe that your
12  knowledge of this area has deteriorated over the
13  past decade?
14     A.   In terms of immediate recollection,
15  sure, so has my knowledge of the Redsox standings
16  from two weeks ago, and I love them dearly.
17        I don't make it a point to try and
18  memorize and keep in my frontal lobe everything
19  that I've work on.
20        What makes this easier in some ways is
21  that this is a historical question:  What is my

Page 195

1  expert opinion based on, what evidence, of
2  activities that happened in a very distinct
3  period of time?
4        So this does not need to be something
5  that is:  What happened yesterday?  How have
6  things changed since yesterday?
7        This is a question of historical
8  consequence.
9      Q.   But here today you're not able to
10  recollect the name of a single academic that
11  shares what you have described as the dominant
12  view, with you?
13     A.   Because I'm not reading this
14  literature now.
15        And, again, I'm a Redsox fan, I
16  couldn't tell you who played third base for us
17  over the past few weeks.  I'm doing other things.
18     Q.   Do you know whether the Redsox are in
19  the Playoffs?
20     A.   The Redsox are blessedly in the
21  Playoffs.

Page 196

1      Q.   But you don't know the name of an
2  academic that shares your view on this issue, do
3  you?
4      A.   You're not truly trying to compare my
5  Redsox with the Al Aqsa Martyrs Brigades, are
6  you?
7      Q.   You're more interested in the Redsox
8  than the Al Aqsa Martyrs Brigade?
9      A.   As a general principle, yes.
10        THE REPORTER:  Counsel, can we just
11  take five minutes?
12        MR. HILL:  Sure.  Let's take a five
13  minute break.
14        (Brief Recess.)
15        MR. HILL:  We'll mark that one next.
16        (Defendant's Deposition Exhibit Number
17  188 was marked for identification.)
18        BY MR. HILL:
19     Q.   Dr. Levitt, did you communicate with
20  anyone about the substance of your testimony
21  while we were on the break?

Page 197

1      A.   No.
2      Q.   Let me show you what we've marked as
3  Exhibit Number 188.  This is an article printed
4  from the Internet that you cite in Footnote 24 of
5  your report on Page 11.  If you would look at
6  that.
7        MR. HORTON:  Counsel, by any chance
8  you have a second copy?
9        MR. HILL:  Oh, I beg your pardon.
10  Yes, I do.
11        MR. HORTON:  Thank you.
12        BY MR. HILL:
13     Q.   All right, sir.  And if you look at
14  the report on Page 11, you're quoting someone
15  called Nasser, N-A-S-S-E-R, Badawi, B-A-D-A-W-I,
16  who you describe as an AAMB senior commander.  Do
17  you see that?
18     A.   I do.
19     Q.   And the Footnote 24 is to the article
20  that we've marked and put in front of you, which
21  is Number 188?

Page 198

1      A.   Correct.
2      Q.   Okay.  And in this article -- by the
3   way, this is something called salon.com.  What is
4   salon.com?
5      A.   It's an online magazine of sorts.  I
6   think it's owned by the Washington Post.
7      Q.   Do you have any concern about relying
8   on a source that's online like salon.com?
9      A.   Not everything that's online is equal,
10  but salon.com is a respected publication.
11     Q.   Okay.  Are you aware that salon.com's
12  founder has described itself as an online
13  tabloid?
14     A.   No.
15     Q.   Does that cause you any concern about
16  relying on the accuracy of the reporting here?
17     A.   No.  I mean, I'm curious now to see
18  what he's referring to.  But it's actually
19  considered a little bit serious, and it's not
20  easy to publish in there.
21     Q.   Okay.  Look, if you will, at the

Page 199

1   second page of this.  The second paragraph is
2   about this interview with this guy Badawi that
3   you quote, right?
4      A.   The second full paragraph?
5      Q.   Yes.
6      A.   "Badawi says"?
7      Q.   Yeah.  And in the second paragraph of
8   this printout from Salon, it says, "Badawi paints
9   a picture of the Brigades as issuing forth from
10  grass-roots activists" --
11     A.   I'm sorry, I lost you.  I'm sorry,
12  this is the paragraph, "Badawi says the Brigades
13  are bound"?
14     Q.   No, the previous paragraph.
15     A.   Okay.  Sorry.  Go ahead.
16     Q.   "Badawi paints a picture of the
17  Brigades as issuing forth from grass-roots
18  activists on the local level without any
19  coordination with or instructions from the
20  political echelon."  Do you see that?
21     A.   I do.

Page 200

1      Q.   You did not quote that portion of the
2   article in your report, did you?
3      A.   I don't think I did.
4      Q.   The next says, "Its members recognize
5   Yasser Arafat and even Marwan Barghouti as
6   leaders of the political movement, but 'there is
7   no direct relationship at all' between those
8   leaders and the Brigades, Badawi maintains."  Do
9   you see that?
10     A.   I do.
11     Q.   And you did not quote that statement
12  from Mr. Badawi, right?
13     A.   Correct.
14     Q.   Instead, you quoted a statement in the
15  next paragraph which says, "We are still Fatah"?
16     A.   Correct.
17     Q.   So do you believe it's misleading to
18  quote Mr. Badawi as saying, "We are still Fatah,"
19  without quoting the prior paragraph where he said
20  there was no direct relationship at all between
21  Fatah leaders and the Brigades?

Page 201

1      A.   Well, I might throw it back:  Do you
2   not think that there is an intrinsic
3   contradiction in his terms?
4           And within the considerable amount of
5   evidence that's here in the report, that, in and
6   of itself, is part of the point.
7           Even Fatah's own people, even those
8   who were trying to maintain that there was no
9   contact, couldn't stop themselves, not one
10  paragraph later, from saying that there was.
11          Now, it's interesting.  Maybe I should
12  have written it as saying just that, "Badawi says
13  at first that there is no direct relationship.
14  But even he says, 'We are still Fatah'."  That is
15  my point.
16     Q.   Okay.  So your point is that you
17  believe Badawi when he says, "We are still
18  Fatah," but you don't believe him when he says
19  there's no direct relationship at all between the
20  Brigades and the Fatah leadership?
21     A.   Based on the world of evidence that's

51 (Pages 198 to 201)

Page 202

1  out there, yes, I think he's being untruthful
2  when he says there's no direct relationship at
3  all.
4         Or maybe to be more fair, maybe it's a
5  question of parsing words.  Maybe he's saying,
6  you know, "They don't tell us go blow up that
7  bus.  There's no direct relationship at all, but
8  we are still Fatah."
9         And maybe he and I would define
10  "direct" different.  Maybe he sees "direct"
11  literally as "direction."  Maybe I would see
12  "direct" as a direct connection with funding and
13  with propaganda, et cetera, getting your day
14  salary from within the PA and Fatah.  I would
15  consider that "direct."  So maybe it's not that
16  he's being untruthful.  Maybe it's just how he
17  understands these words.
18         But to my reading here, even someone
19  who is trying to paint a picture, as the article
20  puts it, of being a group that has no direct
21  relationship at all, admits that they are still

Page 203

1  Fatah, and that when Arafat did declare a
2  cease-fire in December, at one point, they obeyed
3  for that period of time.
4     Q.  And that cease-fire that started in
5  December of 2001, lasted until approximately
6  January of 2002, right?
7     A.  That sounds right.  It lasted very
8  brief.  I don't remember exact dates.
9     Q.  And the reason that that cease-fire
10  ended, is because someone named Raed Karmi,
11  R-A-E-D, K-A-R-M-I, was assassinated by the
12  Israelis, right?
13     A.  Well, it's that and more.
14         Raed Karmi, was targeted by the
15  Israelis because he was involved in terrorism.
16  They felt they had to take out someone who was
17  actively trying to plot the deaths of innocent
18  civilians.
19         And, then, the Palestinians felt that
20  the Israelis weren't being reciprocal when they
21  had issued a cease-fire, and there wasn't one in

Page 204

1  return.
2     Q.  Well, the concept of a cease-fire is
3  that both sides stop firing, right?
4     A.  If it's a bilateral cease-fire.
5     Q.  And this was purportedly a bilateral
6  cease-fire between Israel and Palestinian
7  militants, right?
8     A.  I don't recall, but could be.
9         Again, you know, the Israelis, when
10  they're targeting someone like that -- and don't
11  get me wrong; I'm not agreeing with everytime
12  they're targeting somebody like that -- but it's
13  because they believe this is someone who's in the
14  process of plotting something.  That, maybe to
15  them, isn't a cease-fire.
16     Q.  Is it true that the payments that you
17  point to, to Mr. Karmi, or requested by Mr. Karmi
18  and others, all occurred before the December 2001
19  cease-fire?
20     A.  Do you have a page?  We can look.
21     Q.  On Page 19, you reference a letter

Page 205

1  requesting money from Mr. Karmi, right?
2     A.  What paragraph are you in?
3     Q.  The second paragraph.
4     A.  The second paragraph.  So this is a
5  letter dated September 9th, 2001.  So it does
6  predate.
7     Q.  Have you ever considered whether the
8  monies that were requested there were to engage
9  in a cease-fire?
10     A.  Well, play out your hypothetical for
11  me.  What, during a cease-fire, requires what
12  funding?  The cessation of shooting requires
13  special funding for what?
14     Q.  Have you ever heard of a policy
15  whereby a government will pay militants to not
16  engage in military activity?
17     A.  I have.
18     Q.  In fact, our government, The United
19  States, has engaged in precisely that policy; has
20  it not?
21     A.  Sometimes.

52 (Pages 202 to 205)

MATTHEW LEVITT DEPOSITION                     September 24, 2013                     Sokolow v. the PLO

Page 206

1     Q.    Would it be inappropriate for the PA
2  to pay militants to stop engaging in militant
3  activity?
4     A.    Well, that's a tough one.
5           Part of it is within the context of
6  the fact that the Palestinian authority,
7  throughout this period and continuing past the
8  period that we're focused on here, had
9  cease-fires, or pledged it was going to
10 crackdown, or whatever.  Or said they'd arrested
11 people, and let them out the back door.  It was
12 never consistent.
13          So on that track record, maybe you'd
14 have a little less faith in the idea of providing
15 funds to individuals who are wanted, suspected
16 terrorists, for the purpose of convincing them
17 not to do something.
18          If it's not consistent, then all it
19 does is provide someone who, at a later date --
20 in a week, or a month, or whatever -- will do
21 something dangerous with the money you've just

Page 207

1  provided them.
2           You mentioned that the United States
3  has done this sometimes.  And there are some
4  instances where we usually, through proxies, have
5  done this, and it's usually come to bite us in
6  the derriere.
7           So this is well before the cease-fire,
8  in any event.  This is not during the cease-fire.
9  This is not leading up to the cease-fire.  There
10 is no evidence this has anything to do with the
11 cease-fire.
12    Q.    Are you aware of any indication that
13 interests outside of the West Bank were funneling
14 money to Palestinian militants during this time
15 frame?
16    A.    Certainly.  Though, it wasn't
17 primarily the Al Aqsa Martyrs Brigades.  Al Aqsa
18 Martyrs was getting money from the outside a few
19 years later, after the period that we're focused
20 on in this case.
21          There was a time later when Iran,

Page 208

1  through Hezbollah, was providing funds directly
2  to Al Aqsa Martyrs.
3           And at this time, though, it's
4  primarily still Hamas and Palestinian Islamic
5  Jihad, who were getting money from outside.
6     Q.    And were Hamas or Palestinian Islamic
7  Jihad militants paying money to Fatah militants
8  at this time?
9     A.    There were instances where that
10 happened.  I can't remember if it was in this
11 time or if it's in this report, but there were
12 times when they co-operated together.
13          I can't remember if it was directly
14 Hamas kind of paying the salary of an Al Aqsa
15 guy, or providing funds to, but there were times,
16 for example, when they co-operated to carry out
17 an operation.
18          And, so, the way it would work is
19 that, you know, as it would happen in one
20 particular place facing security crackdowns, you
21 know, one group might have a suicide bomber, and

Page 209

1  then another group might have a bomb, and they'd
2  co-operate to carry out something together.
3           There were reports of operating
4  together in a kind of war room of sorts in Jenin
5  at one point.  I don't want to get beyond what's
6  in the report.  I can't remember if that's in the
7  reporter, or if it's in the time that we're
8  talking about or not.
9     Q.    Well, I guess the question I want to
10 pose to you, sir, is:  Why do you believe that
11 these payments that you reference as having
12 happened here, were to support terrorism as
13 opposed to payments to militants to stop
14 terrorism?
15    A.    Because there's plenty of evidence
16 that these people were and continued to engage in
17 terrorism.  And there's none -- I've not seen any
18 evidence speaking to Israelis, Palestinians,
19 Americans, that that's what these payments were
20 about.  There's just no evidence for it.
21    Q.    Okay.  So when PA officials indicated

53 (Pages 206 to 209)

Page 210

1  that the payments were to encourage militants to
2  stop engaging in military activity, you've
3  disregarded those statements?
4      A.   You'd have to show me a source that
5  says that.
6      Q.   Well, let's try it this way:
7          (Defendant's Deposition Exhibit Number
8  189 was marked for identification.)
9          BY MR. HILL:
10     Q.   We've handed you what we've marked as
11 Exhibit 189, which is an April 1st, 2004 report
12 by the BBC.  You consider the BBC to be a
13 reliable press agency; do you not, sir?
14     A.   Let's be clear.  This is not BBC.
15         This is BBC Worldwide Monitoring,
16 which is simply a translation service.  This is
17 actually from Al-Hayat al-Jadidah.
18         THE REPORTER:  This is from where?
19         THE WITNESS:  A-L hyphen H-A-Y-A-T,
20 new word, A-L hyphen J-A-D-I-D-A-H.
21     A.   A Palestinian publication in the West

Page 211

1  Bank that was close to the Palestinian authority,
2  which the BBC is just translating.
3      Q.   Okay.  And do you think that because
4  it appeared in that publication, that the
5  statement is unreliable or should be disregarded?
6      A.   Well, let's see what the statement is.
7  What are we talking about?
8      Q.   Look at the third paragraph, it says,
9  "Speaking to Al-Hayat al-Jadidah, Hamayil said
10 these accusations are a flagrant game.  Some five
11 months ago, Israel leaked similar information
12 with the aim of making the public adopt positions
13 against the PNA and Arafat.  He added that the
14 whole story boils down to that the PNA, at the
15 time of the Abu-Mazin Mahmud Abbas government,
16 with the knowledge of the US administration and
17 the Israeli government and with the aim of
18 calming down the situation, sought to embrace
19 Al-Aqsa Martyrs Brigades activists and help them.
20 Many of them are unemployed and thus exposed to
21 parties that do not accept the PNA policy, which

Page 212

1  seeks calm.  He added that the PNA policy has
2  been to embrace the 'brothers in Al-Aqsa Martyrs
3  Brigades so that they will fall in line with the
4  PNA political line and thus avoid security
5  lawlessness'."  Do you see that?
6      A.   I do.
7      Q.   Are you familiar with the sorts of
8  reports from this time frame?
9      A.   Yes.
10         So to answer your first question:  I
11 do think that by virtue of the fact that this is
12 a PA statement being made to a sympathetic PA
13 outlet, makes it less credible than if it had
14 actually been, for example, the BBC or something
15 else.
16         It is around this time -- we're
17 jumping ahead now.
18     Q.   Go ahead.
19     A.   I'm sorry.  I just didn't want to
20 interrupt you.
21         We're jumping ahead now.  This is a

Page 213

1  report from April 2004, which is well beyond the
2  period that we're talking about here.  And at
3  this point, the PA and Fatah financial hands-out
4  for the Al Aqsa Martyrs Brigades had caused such
5  a stir that the European Union, in 2004, was
6  considering, and I think eventually did cut
7  significant payments to the Palestinian Authority
8  or the Palestinian National Authority, PA, PNA.
9  And, so, the PA was on a blitz at this point
10 trying to say, "No, no, it's not true."
11         Parenthetically, on Page 19, the start
12 of this conversation under the question of why
13 does one believe that this is not simply trying
14 to buy off good behavior?
15         One, this is 2001.  And what you just
16 showed me is three, four years later, more than
17 three years later.
18         But second, there's two different
19 things cited, two different letters cited in
20 these.  The second one was the September 9th that
21 we were talking about.  It comes in the context

54 (Pages 210 to 213)

Page 214

1  of the one above, which is September 16th, even a
2  few days later.
3          So let's even work with your
4  assumption that on September 9th, what they were
5  secretly trying to do is buy off good behavior.
6          In fact, a few days later, seven days
7  later on September 16th, there's another letter
8  which is talking about something that is clearly
9  not "Be good."
10         It's talking about the cost of an
11  explosive charge, "We need every week 5-9
12  explosive charges for squads in various areas."
13         I'd argue that's pretty explicitly not
14  cease-fire talk.
15    Q.   Okay.  And, so, you're referring to
16  the document that is involved with your Number
17  66?  You believe that's inconsistent with
18  cease-fire talk?
19    A.   Correct.  And comes a few days after
20  the document we were talking about earlier, which
21  is in Footnote 67.  It's the same footnote.  It's

Page 215

1  a report which includes as appendices all these
2  different letters.
3    Q.   Okay.
4    A.   So it's actually the same citation
5  below, just two obviously different letters
6  included in that report.
7    Q.   Well, I'm afraid we'll have to get to
8  that issue tomorrow.
9          But let me ask you about this, about
10  the exhibit that's in front of you, the statement
11  of Mr. Hamayil in 2004.  Do you believe the
12  statements that are reported in this exhibit are
13  untrue?
14    A.   Yes.
15         MR. HORTON:  To be clear, we're
16  talking about Defendant's Exhibit Number 189?
17         MR. HILL:  Yes, sir.
18    A.   Yes.
19    Q.   Okay.  You believe Mr. Hamayil is not
20  telling the truth in this instance?
21    A.   I believe Mr. Hamayil is doing what

Page 216

1  politicians do, which is trying to spin a
2  difficult situation.
3          There is tremendous amounts of press,
4  much more -- if you were to put a pile of this
5  type of press on one side, and the heat that was
6  going on about the EU withdrawing fundings in the
7  other, that would be a much higher pile.  And,
8  so, there was -- this is damage control.
9          MR. HILL:  Okay.  Let's mark this one.
10         (Defendant's Deposition Exhibit Number
11  190 was marked for identification.)
12         BY MR. HILL:
13    Q.   We're handing you what we've marked as
14  Exhibit 190.  This is a BBC News.
15    A.   One second.  I want to make sure I
16  keep these in order.
17         Sorry.  Okay.  190.
18    Q.   And do you believe the BBC to be a
19  reliable source of information?
20    A.   The BBC is a good journalistic outlet.
21    Q.   If you'll see under the heading

Page 217

1  "Living expenses," it says, "Abdel Fattah
2  Hamayel," that's the same person we were talking
3  about before, right?
4    A.   Yes.
5    Q.   Have you ever met him?
6    A.   No, I have not met him.
7    Q.   "The minister for sports and youth
8  until Abu Mazen resigned in September implemented
9  the policy of paying what he describes as living
10  expenses to the gunmen.  He told Correspondent:
11  'Originally, some people in these groups had been
12  chosen to work for the security services, so they
13  were getting salaries and still are doing so.'
14         "He says this summer a decision was
15  taken by the Palestinian Cabinet to pay living
16  expenses to those al-Aqsa members not getting
17  these salaries to help support their families.
18         "He says the money is intended to
19  ensure that al-Aqsa members were not influenced
20  by outside organizations to carry out further
21  suicide bombings.  Al-Aqsa has not claimed to

55 (Pages 214 to 217)

Page 218

1  have carried out any suicide bombings since May."
2      Do you see that?
3  A.  Yes.
4  Q.  Okay.  And you did not put those
5  quotes from Mr. Hamayel into your report, did
6  you?
7  A.  Oh, absolutely not.
8  Q.  And that's because you believe those
9  statements of Mr. Hamayel to be untrue?
10  A.  Again, it's not a question -- you
11  know, there's a lot of truth in a lot of
12  different statements.
13      I believe them to be inaccurate.
14      The Palestinian authority's under
15  tremendous pressure to all either cease payments
16  to all Al Aqsa Martyr militants, or to get them
17  to stop their ways, drop out of Al Aqsa, return
18  back to whichever post and security service they
19  had been part of, and to reinstate a monopoly on
20  the use of forces any sovereign state should.
21      And here he's explaining why:  "Well,

Page 219

1  we're sort of doing that, but we're not.  We need
2  to give salaries to the Aqsa guys.
3      What the international community,
4  eventually the Quartet and others were
5  saying is, "No.  You need to get the Al Aqsa guys
6  to stop engaging in terrorist behavior.  Then you
7  can provide them salaries as they're working for
8  Palestinian security force, or whatever it is,
9  but you cannot pay the salaries of a guy who's
10  engaged in terrorism.
11      By -- when was this?  This one here is
12  late 2003.  So I can't remember it.  We can look
13  in the document when it was that they were
14  officially designated by the U.S.
15      And the European issue really came up
16  I think mostly 2004.  It might have been also
17  late 2003, at this point.  The funding wasn't cut
18  back, but the discussion had already started in
19  late 2003.
20      It was a lot of pressure.  And this
21  was trying to kind of push back, push the envelop

Page 220

1  and say, "Well, we have to."
2      They were very, very concerned about
3  what happens if they do what's being asked of
4  them, and then they get all these angry militants
5  who are not getting salaries, and then they would
6  have to have a Palestinian-on-Palestinian
7  confrontation.  That would have been difficult,
8  no question.  But sometimes that's what's
9  required.
10      And you can't imagine anybody
11  accepting the Israelis saying, "Well, we got some
12  Jewish terrorists and we really should stop them,
13  but it's really uncomfortable for us to take on
14  Jewish terrorists that's fellow Jews, so we're
15  just not going to do it."
16      And, so, that's what this is about.
17  Q.  Sir, the testimony you just gave,
18  you're purporting to explain what Mr. Hamayel was
19  thinking when he made these statements?  Is
20  that --
21  A.  I'm not in his head.  But this was

Page 221

1  something that was going on throughout the
2  Palestinian authority.  I'm explaining the
3  context that was going on.
4  Q.  But you're explaining what the policy
5  of the Palestinian authority was at this time?
6  A.  Well, I wouldn't call it policy.
7      Their policy was two-faced, is the
8  bottom line.  They were trying to avoid having to
9  do --
10      MR. HORTON:  Hold it.
11  Q.  Sir, let's try and get an answer to
12  this question:
13      You're purporting to explain what the
14  Palestinian authority's policy was with respect
15  to Palestinian militants at this time; is that
16  right?
17  A.  I wouldn't put that it way.  But, in
18  essence, yes.
19  Q.  Okay.  And who from the Palestinian
20  authority has told you what you just told me?
21  A.  Again, I can't remember offhand the

56 (Pages 218 to 221)

Page 222

1  names of who I've spoken to. But around this
2  time I was going --
3      Q.    Sir --
4          MR. HORTON: Hold, hold, hold it.
5  You've got to let him finish his answers. If he
6  can't finish his answers --
7          MR. HILL: He did.
8          MR. HORTON: -- there aren't going to
9  be anymore questions.
10         THE WITNESS: No, actually, I didn't.
11         MR. HORTON: He didn't.
12         THE WITNESS: Mid-word, not
13 mid-sentence.
14         BY MR. HILL:
15     Q.    So what's the name of the person that
16 told you this?
17     A.    So as I was saying when you
18 interrupted me: I don't have a record in front
19 of me of who I've ever met. However, around this
20 time, I was going to Ramallah about once a year
21 meeting with Palestinian authority officials,

Page 223

1  police, Ministry of Interior, and others.
2      Q.    You went to Ramallah in 2003?
3      A.    I'd have to check, but I think I was
4  in Ramallah in 2003.
5      Q.    Which month?
6      A.    I'd have to check.
7      Q.    Did you go to Ramallah in 2002?
8      A.    I don't remember. And I don't want to
9  say I was there in 2003, either. I'd have to
10 check.
11     Q.    Did you go to Ramallah in 2001?
12     A.    2001 I almost all the year was still
13 with the FBI. No, I'd have to check.
14     Q.    But you can't tell me the name of
15 anybody you talked to on one of these trips to
16 Ramallah that you may have taken in 2002 or 2003,
17 can you?
18     A.    I know it's frustrating to you, but no
19 matter how many times you ask the question, my
20 memory's not going to be any better. I just
21 don't have it in front of me.

Page 224

1          Can you tell me who you met with on
2  September 19th in 2002?
3      Q.    Well, maybe if I was offering myself
4  as an expert in a case, I would try.
5      A.    I don't think that even as an expert
6  in a case, you'd be able to remember what you did
7  on a specific date ten years ago.
8      Q.    But you can't even tell me the name of
9  somebody you met regardless of the date, can you,
10 sir?
11     A.    Because I don't have any of it in
12 front of me. And I apologize deeply if that
13 frustrates you so.
14         MR. HILL: It's one o'clock. Why
15 don't we break here for the day.
16         MR. HORTON: Okay.
17         MR. HILL: And we'll pick up again at
18 10:30 tomorrow morning.
19         Dr. Levitt, you understand that you're
20 still under oath, and that you're not allowed to
21 talk about the substance of your testimony with

Page 225

1  anyone until we've concluded the deposition
2  tomorrow, correct?
3          THE WITNESS: That's correct.
4          (Reading and signing requested.)
5          (Deposition adjourned at 1:00 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21

57 (Pages 222 to 225)

Page 226

CERTIFICATE OF CERTIFIED COURT REPORTER

1
2    I, CHERYL JEFFERIES, a Certified Court
3    Reporter, do hereby certify that the within-named
4    witness personally appeared before me at the time
5    and place herein set out, and after having been
6    duly sworn by me, according to law, was examined
7    by counsel.
8        I further certify that the examination
9    was recorded stenographically by me and this
10   transcript is a true record of the proceedings.
11       I further certify that I am not of
12   counsel to any of the parties, nor in any way
13   interested in the outcome of this action.
14       As witness my hand this 30th day of
15   September, 2013.
16
17       - - - - - - - - - - -
         Cheryl Jefferies
18       Certified Court Reporter
19
20
21

Page 227

1    DATE SENT:  September 30, 2013
2            ERRATA SHEET
3    DEPOSITION OF:  Dr. Matthew Levitt - Volume I
4        DATE:  September 24, 2013
5        CASE:  Mark Sokolow, et al vs. The
              Palestine Liberation Org, et al
6
     INSTRUCTIONS:
7
8    1. Please read the transcript of your deposition
        and make note of any corrections or changes
        on this Errata Sheet.
9
10   2. Indicate below general reason for change,
        such as:
11          A. To correct stenographic error.
            B. To clarify record.
12          C. To conform to the facts.
13   3. Sign the Certificate of Deponent page.
14   4. Within 30 days of the Date Sent, return this
        Errata Sheet, and signed Certificate of
15      Deponent, to the Attorneys listed on the
        Appearance page.
16   PAGE #  LINE #  CORRECTION        REASON
17   _____
18   _____
19   _____
20   _____
21

Page 228

1            ERRATA SHEET
2    DEPOSITION OF DR. MATTHEW LEVITT:
3    PAGE #  LINE #  CORRECTION        REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____

Page 229

1        CERTIFICATE OF DEPONENT
2        I hereby certify that I have read and
3    examined the foregoing transcript and:
4    (Check one of the following)
5        (  ) The same is a true and accurate
6    record of the testimony given by me, and I have
7    made no corrections to this transcript.
8            -OR-
9        (  ) Any additions or corrections
10   that I feel are necessary, I have listed on the
11   attached Errata Sheet.
12       As witness my hand and signature this
13   _____ day of _____.
14
15       - - - - - - - - - - -
16       DR. MATTHEW LEVITT
17
18
19
20
21

58 (Pages 226 to 229)