# EXHIBIT B.31

1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2           FOR THE SOUTHERN DISTRICT OF NEW YORK
 3
 4    MARK I. SOKOLOW, et al.,        )
 5           Plaintiffs,             )
 6    v.                             ) Civil Action No.
                                     ) 04cv397(GBD)(RLE)
 7    THE PALESTINE LIBERATION       )
      ORGANIZATION, et al.,          )
 8                                   )
 9           Defendants.            )
      _____)
10
11
12
13
14            DEPOSITION OF ISRAEL SHRENZEL
15                  JERUSALEM, ISRAEL
16                  OCTOBER 23, 2013
17
18
19
20
21
22
23
24
25    REPORTED BY:  AMY R. KATZ, RPR
```

OCTOBER 23, 2013 - ISRAEL SHRENZEL

3

```
 1    APPEARANCES (Continued):
 2    ALSO PRESENT:
 3         RINA NE'EMAN, Official Hebrew Interpreter
 4         RUCHIE AVITAL, Check Hebrew Interpreter
 5         RACHEL WEISER, Esq.
 6         DINA ROVNER, Advocate
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

OCTOBER 23, 2013 - ISRAEL SHRENZEL

2

```
 1              Deposition of ISRAEL SHRENZEL, taken in
 2    the above-entitled cause pending in the United States
 3    District Court, for the Southern District of New York,
 4    pursuant to notice, before AMY R. KATZ, RPR, at the
 5    American Colony Hotel, Executive Room, First Floor,
 6    Jerusalem, Israel, on Wednesday, the 23rd day of
 7    October, 2013, at 9:41 a.m.
 8
 9
10    APPEARANCES:
11    FOR PLAINTIFFS:
12         ARNOLD & PORTER, LLP
           By:  KENT A. YALOWITZ, ESQ.
13         399 Park Avenue
           New York, New York 10022-4690
14         (212) 715-1000 / Fax (212) 715-1399
           kent.yalowitz@aporter.com
15
16    FOR DEFENDANTS:
17         MILLER & CHEVALIER CHARTERED
           By:  MICHAEL J. SATIN, ESQ.
18              BRIAN A. HILL, ESQ.
           655 Fifteenth Street, NW
19         Suite 900
           Washington, DC 20005-5701
20         (202) 626-5800 / Fax (202) 626-5801
           msatin@milchev.com
21         bhill@milchev.com
22
23
24
25
```

OCTOBER 23, 2013 - ISRAEL SHRENZEL

4

```
 1                   I N D E X
 2
 3    WITNESS
      Israel Shrenzel
 4
 5    EXAMINATION                              PAGE
 6    By Mr. Satin                               7
 7
 8
 9
10
11         D E F E N D A N T S'  E X H I B I T S
12    NUMBER        DESCRIPTION              MARKED
13    Exhibit 428   Hebrew Website Article, MEMRI,
                    Dated August 25, 2003
14                  (No Bates Number)            61
15    Exhibit 429   Arabic Newspaper Article,
                    Al-Quds, Al-Arabi, Volume 12,
16                  Issue 3460, Monday 26, June 2000
                    (Unclear Bates Number)       74
17    Exhibit 430   Website Article, Israel Ministry
                    of Foreign Affairs, Entitled
18                  "Marwan Barghouti Indictment -
                    Appendix - Terrorist Attacks and
19                  Activities Carried Out by the
                    Field Commanders and Activists,"
20                  Dated August 14, 2002
                    (No Bates Number)            88
21
22    Exhibit 431   Arabic Document, Palestinian
                    National Authority, Ministry
23                  of Detainees Affairs
                    (No Bates Number)           121
24    Exhibit 432   Hebrew Document
                    (No Bates Number)           125
25
```

OCTOBER 23, 2013 - ISRAEL SHRENZEL

5

```
 1          D E F E N D A N T S '  E X H I B I T S
 2   NUMBER        DESCRIPTION                   MARKED
 3   Exhibit 433   Arabic Document, Palestinian
                   National Authority, Preventive
 4                 Security H.Q., Ramallah
                   Directorate
 5                 (Bates P 8: 176)                127
 6   Exhibit 434   Hebrew Document                 132
                   (No Bates Number)
 7
     Exhibit 435   Article, Israel Ministry of
 8                 Foreign Affairs, Entitled
                   "Operation for the Confiscation
 9                 of Terror Funds - Background,"
                   Dated February 26, 2004
10                 (No Bates Number)               138
11   Exhibit 436   Excerpt Document Entitled "9/11
                   and the Search for a Policy"
12                 (No Bates Number)               147
13
14
15
16          D E F E N D A N T S '  E X H I B I T S
17          P R E V I O U S L Y  M A R K E D
                                           INITIAL
18   NUMBER        DESCRIPTION            REFERENCE
19   Exhibit 422   Document Entitled "Expert
                   Report of Israel Shrenzel
20                 in Sokolow v. Palestinian
                   Authority, Case No. 04-397
21                 (S.D.N.Y.)," Dated April 10,
                   2013
22                 (No Bates Number)               18
23
24
25
          OCTOBER 23, 2013 - ISRAEL SHRENZEL
```

6

```
 1          Q U E S T I O N S  I N S T R U C T E D
 2               N O T  T O  A N S W E R
 3                  PAGE       LINE
 4                   12          2
 5                   78          3
 6                   78          13
 7                   79          14
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
          OCTOBER 23, 2013 - ISRAEL SHRENZEL
```

7

```
 1             P R O C E E D I N G S
 2
 3             RINA NE'EMAN,
 4        the Official Hebrew Interpreter, was
 5        duly affirmed to translate from English
 6        to Hebrew and from Hebrew to English.
 7
 8             ISRAEL SHRENZEL,
 9        called as a witness, being first duly
10        affirmed, was examined and testified
11        as hereinafter set forth.
12
13        (The following section of the proceedings was
14   conducted through the Official Hebrew Interpreter,
15   unless otherwise indicated, and until page 64.)
16
17             EXAMINATION
18   BY MR. SATIN:
19        Q.  First, Mr. Shrenzel, would you please state
20   your name and spell it for the record.
21        A.  Israel Shrenzel.
22        MR. YALOWITZ:  So if we could just pause, what
23   I think we should do -- and we can do it on the record.
24   What I think we can do -- Mr. Shrenzel, as he says in
25   his report, is conversant in the English language.  But
          OCTOBER 23, 2013 - ISRAEL SHRENZEL
```

8

```
 1   I think he would prefer to do the translation.  And,
 2   frankly, although the initial questions like "what's
 3   your name" don't need to be translated, I think if
 4   we get in the habit of doing the translation, it's
 5   a better -- it will be less confusing to Rina and it
 6   will be a better system.  So with your permission, I
 7   would prefer to do it that way.
 8        MR. SATIN:  It's up to the witness.
 9        Q.  BY MR. SATIN:  Is that what you --
10        MR. YALOWITZ:  You have to speak.
11        THE WITNESS:  (In English.)  Yes.
12        Q.  BY MR. SATIN:  Do you want to testify in
13   English or in Hebrew?
14        A.  I prefer to speak in Hebrew, which is my
15   mother tongue.
16        Q.  Okay.  Mr. Shrenzel, my name is Michael Satin,
17   and I'm an attorney at Miller & Chevalier.  I represent
18   the defendants in this case.  I'm going to ask you some
19   questions.
20        A.  Go right ahead.
21        Q.  Where do you live?
22        A.  In Tel Aviv.
23        Q.  Is that where you're from?
24        A.  Yes.
25        Q.  Have you lived your whole life in Tel Aviv?
          OCTOBER 23, 2013 - ISRAEL SHRENZEL
```

9

```
1        A.   Yes.
2        Q.   When were you first contacted about working
3   on this case?
4        A.   I believe that it was approximately two weeks
5   prior to the date of the filing of the expert opinion.
6        Q.   Do you remember what date that was?
7        A.   No.
8        Q.   So you had two weeks from the time you were
9   first contacted to the time you had to produce your
10  report?
11       A.   It's possible that it was two weeks.  It might
12  have been two and a half weeks.
13       Q.   Who contacted you?
14       A.   An attorney by the name of Nitsana, who is the
15  head of the Shurat HaDin organization.
16       Q.   Did you know Nitsana before you were contacted
17  by her in relation to this case?
18       A.   Not personally.  Not personally.  I had heard
19  her name in the media.
20       Q.   Do you know how she was put in touch with you?
21       A.   She told me that she had received
22  recommendations about me.  I didn't ask on a more
23  extensive basis.
24       Q.   Do you know from whom she received the
25  recommendation?
```

OCTOBER 23, 2013 - ISRAEL SHRENZEL

10

```
1        A.   She did not tell me.  I can assume that it
2   was from people who knew me over the course of -- over
3   the course of my years of service in the government
4   establishment.  Perhaps subsequent to that.
5        Q.   Before you were contacted by Nitsana, were
6   you familiar with Shurat HaDin?
7        A.   Only as a reader of the press.
8        Q.   What did you know about Shurat HaDin?
9        A.   It's a little difficult to distinguish
10  between what I knew prior to that time and after
11  that time.  I knew that it's an organization that's
12  engaged in lawsuits against entities that aid and
13  abet terrorism.
14       Q.   That's what you knew before you started
15  working with them?
16       A.   I assume -- I'm assuming as a general concept,
17  not on an individual level.
18       Q.   And then you said you weren't sure how your
19  opinion may be different about them since, after you
20  worked with them.
21            What is your opinion about them since you've
22  started working with them?
23            MR. YALOWITZ:  Object to the form.
24            MR. SATIN:  Yeah, that was a poorly worded
25  question.
```

OCTOBER 23, 2013 - ISRAEL SHRENZEL

11

```
1            OFFICIAL INTERPRETER NE'EMAN:  Can I ask
2   something?
3            MR. SATIN:  Sure.
4            OFFICIAL INTERPRETER NE'EMAN:  When you're
5   saying "your opinion," you're not referring to his
6   expert opinion, are you?
7            MR. YALOWITZ:  He's going to rephrase it.
8            MR. SATIN:  I'll rephrase the question.
9            MR. YALOWITZ:  He's going to rephrase the
10  question.  That's why I objected.
11           MR. SATIN:  It's a fair objection.
12           MR. YALOWITZ:  And I'll just apologize, but
13  Israel, if you could only talk when Rina is not talking,
14  I know it will help her.  So you say it, then let her
15  speak, and then you can say more.
16           OFFICIAL INTERPRETER NE'EMAN:  And also if you
17  could speak in short segments and try to speak clearly,
18  it would be helpful to me.  Thank you.
19       Q.   BY MR. SATIN:  What did you come to believe
20  about Shurat HaDin after you started working with them?
21       A.   I wouldn't necessarily define it as an
22  opinion, but more as an impression.  I'm simply now
23  more familiar with their method of work.  Although
24  I also admit that I'm only familiar with this case
25  and I'm not proficient in other cases which I know
```

OCTOBER 23, 2013 - ISRAEL SHRENZEL

12

```
1   exist.
2        Q.   What is your impression of their methods?
3            MR. YALOWITZ:  Objection.  Instruction not
4   to answer.  Attorney work product.
5        Q.   BY MR. SATIN:  Have you been involved with
6   any other cases involving Shurat HaDin besides this one?
7        A.   No.
8        Q.   Are you aware that Nitsana, Ms. Leitner, has
9   said that, in its early years -- are you aware that the
10  director, the woman you referenced as Nitsana, has said
11  that her organization, Shurat HaDin, took direction from
12  the government of Israel on which cases to pursue?
13           MR. YALOWITZ:  Object to form.
14           You can answer.
15           THE WITNESS:  No, I was not aware of that.
16  It does not sound right to me, but I don't know.
17       Q.   BY MR. SATIN:  Do you know if this case
18  has been brought at the direction of the government
19  of Israel?
20       A.   I have no idea whatsoever.
21       Q.   Would it give you pause to work on a case
22  that was brought on behalf of the government of Israel?
23       A.   Does your question refer to a principle or
24  to this case in particular?
25       Q.   Hypothetically speaking, would it give you
```

OCTOBER 23, 2013 - ISRAEL SHRENZEL

13

1  pause to work on behalf of a case that was brought at
2  the direction of the government of Israel?
3      A.   Just like in this case, I would examine the
4  issue on a material basis.  And if I would be of the
5  opinion that I could contribute something in a positive
6  manner and in a manner that does not prejudice my
7  principles in any way, I would do so.
8      Q.   Did you examine this case before you decided
9  to work on it?
10     A.   Certainly.
11     Q.   What did you examine before you decided to
12  work on this case?
13     A.   I ascertained that it referred to a series
14  of events in which victims of terrorist attacks were
15  pursuing justice, even partial justice.  And I
16  definitely agree with that.
17     Q.   Is that information that you examined
18  something you received orally or in writing?
19          (Brief exchange in Hebrew between Official
20          Interpreter Ne'eman and the witness.)
21          THE WITNESS:  I made that decision after
22  I heard from a number of sources, including Nitsana.
23  I'm just saying that we should state her full name
24  for the record, Nitsana Darshan-Leitner.  And also,
25  when I began to receive the material, I understood

OCTOBER 23, 2013 - ISRAEL SHRENZEL

14

1  what was being referred to.
2      Q.   BY MR. SATIN:  For the record, I was only
3  referring to her as "Nitsana" because you had used
4  that word with her.
5      A.   (In English.)  Yes.
6          (Translated.)  Yes.
7      Q.   So I don't want to put words in your mouth.
8      A.   That's fine.
9      Q.   So other than Ms. Darshan-Leitner, who else
10  did you speak to about this case before you agreed to
11  work on this case?
12     A.   I spoke with the team of colleagues who were
13  involved in the preparation of the first draft before
14  I became involved in it.
15     Q.   The first draft of your report?
16     A.   Yes.
17     Q.   Who were those people?
18     A.   Arieh Spitzen and Noam Meridor.  I assume
19  that this was obvious or understood, in light of the
20  fact that there were just two weeks left prior to
21  the filing of the report.
22     Q.   So at some point, you received a draft of
23  your report?
24     A.   A draft, an outline.  Yes.
25     Q.   Who did you receive that from?

OCTOBER 23, 2013 - ISRAEL SHRENZEL

15

1      A.   Either from Nitsana's office or from one
2  of the individuals whose names I had mentioned.
3      Q.   How many pages was the draft that you
4  received?
5      A.   I can't recall precisely.  It's also
6  important to note that it was in Hebrew, several
7  dozen pages.
8      Q.   Is that your estimate?
9      A.   I assume that it's possible to reconstruct
10  that, to examine it, but that's what I recall.  It
11  could have been 60, 70, 50.  50 or more.
12     Q.   Do you still have a copy of the draft you
13  received when you first started working on this case?
14     A.   I'm not sure.  I'm a disorganized kind of guy,
15  and sometimes I delete files from computers.
16     Q.   Did you receive the draft in paper form or
17  electronically?
18     A.   Only electronically.
19     Q.   So is it still on your computer?
20     A.   I don't think so.  Because it was in April,
21  I'm almost certain that I deleted it.  And also because
22  I'm certain that, both in this deposition and when
23  I testify in court, I'll be testifying on the English
24  version.  Therefore, that's what I retained.  That's
25  what I kept and made sure to keep.

OCTOBER 23, 2013 - ISRAEL SHRENZEL

16

1      Q.   Was it your decision to get rid of the
2  original draft?
3      A.   There wasn't a decision to delete it.  I
4  periodically just delete e-mail that I had received
5  in the past two or three months.  I'm no computer
6  expert, but perhaps that also can be reconstituted.
7      Q.   So the original draft came in an e-mail;
8  correct?
9      A.   Yes.
10     Q.   Sometime around April or --
11     A.   It's definitely possible that it could have
12  been at the end of March.
13     Q.   And then at some point, two or three months
14  ago, you deleted the e-mail that had the draft attached
15  to it that you had received at the end of March or
16  April?
17     A.   I believe that's what it was.  I wasn't
18  asked to produce the Hebrew text for this get-together.
19  So my estimate is that it was, in fact, deleted from
20  my computer.  If it's of importance, I'm willing to
21  check that again.
22     Q.   Did you make changes to the document that
23  you had originally received?
24     A.   Definitely.
25     Q.   Did you make those changes into the document

OCTOBER 23, 2013 - ISRAEL SHRENZEL

17

```
1    that you had received?
2        A.    Yes.
3        Q.    Did you make those changes in Hebrew?
4        A.    Yes.
5        Q.    And then did you send a draft of the report
6    with your changes back to Ms. Darshan-Leitner?
7        A.    In any event, to her office.  Yes.
8        Q.    And then were there additional changes made
9    to that document?
10       A.    To the best of my knowledge, the process was
11   as follows:  The draft or the text that I approved in
12   Hebrew as the final text was sent out for professional
13   translation.  And I also reviewed the text in English.
14   And in a few places in which I thought that the
15   translation was not clear enough, I suggested some
16   changes, although I reiterate, they were quite minor
17   in nature, and I sent it back to the office.
18       Q.    Between the time that you received the
19   original draft --
20       A.    (In English.)  In Hebrew?
21       Q.    -- in Hebrew, at the end of March or early
22   April, to the time that it was sent out for translation,
23   had you sent your modified draft to the office of
24   Ms. Darshan-Leitner?
25       A.    No.
              OCTOBER 23, 2013 - ISRAEL SHRENZEL
```

18

```
1        Q.    And that period of time was just about two
2    weeks; correct?
3        A.    Indeed.
4        Q.    And it was during that two-week period that
5    you also received the documents that are referenced
6    in the report?
7        A.    Yes.
8        Q.    I show you, Mr. Shrenzel, what's been marked
9    already as Exhibit 422.
10       A.    Thank you.
11       Q.    And Exhibit 422 is the document you signed;
12   correct?
13       A.    Yes.
14       Q.    Did you actually sign this document, or did
15   somebody else put your signature on the document?
16       A.    I left a signature in the office, but I made
17   sure that it had been affixed to the document that I
18   had fully and thoroughly confirmed.
19       Q.    When you say you left your signature in the
20   office, what do you mean by that?
21       A.    I don't recall precisely.  It's possible that
22   it was a computer signature, an electronic signature.
23   Or perhaps I left an actual signature when I was in
24   the office.
25       Q.    If you would turn to page 2.
              OCTOBER 23, 2013 - ISRAEL SHRENZEL
```

19

```
1        A.    (In English.)  I don't have 2.
2        OFFICIAL INTERPRETER NE'EMAN:  Here.
3        THE WITNESS:  (In English.)  Aah, this is 2.
4        Q.    BY MR. SATIN:  Mr. Shrenzel, on page 2 there
5    is a list of documents; correct?
6        A.    Indeed.
7        Q.    Or to be precise, it says there are numbers
8    of documents that it says were produced.
9        A.    Indeed.
10       Q.    And those are documents listed on page 2
11   and on 3; correct?
12       A.    Yes.
13       Q.    And the documents that are referenced by
14   number on page 2 and 3, those are the documents you
15   received at the end of March or so?
16       MR. YALOWITZ:  Object to the form.
17       You can answer.
18       THE WITNESS:  Yes.
19       Q.    BY MR. SATIN:  How many pages of documents
20   did you receive?
21       A.    I'd like to be precise.  Some of them arrived
22   in computer form, and some of them I saw during the
23   course of the meetings that I held with the prep team.
24       Q.    Did you receive your own copy of every single
25   one of these documents?
              OCTOBER 23, 2013 - ISRAEL SHRENZEL
```

20

```
1        A.    Not necessarily.
2        Q.    Did you review every single document that
3    is referenced on pages 2 and 3 of the report?
4        A.    Yes.  Because of the lack of time, I did so
5    with varying degrees of attention.  And I can say that
6    I relied, to a very great extent, on the team which had
7    examined the documents over a very long period of time.
8        Q.    Who was on that team?
9        A.    I have already noted their names.
10       Q.    Please say them again.
11       A.    Definitely.  Arieh Spitzen and Noam Meridor.
12       Q.    Would you agree that for some of the documents
13   that are listed on pages 2 and 3 of the report, you only
14   spent a second or two looking at them?
15       (Brief exchange in Hebrew between Official
16   Interpreter Ne'eman and Check Interpreter Avital.)
17       THE WITNESS:  More than a second or two.
18       But definitely things that I thought were
19   obvious or clear, or with respect to which I fully
20   relied on the conclusions of the team, I spent less
21   time on that.
22       Q.    BY MR. SATIN:  You'd agree, though, that
23   for some of the documents, you did not study them?
24       A.    (Translated.)  No.  I definitely know the
25   general content --
              OCTOBER 23, 2013 - ISRAEL SHRENZEL
```

1    (In English.)  General content.

2    (Translated.)  -- and the significance of

3  each and every document.

4    Q.   You know the significance of each and every

5  document, even though you did not receive a copy of

6  every single document?

7    A.   Yes, certainly.  I both read it and wrote

8  several times the text and the references.  The fact

9  that I examined the document during the course of a

10  meeting with the members of the team and subsequently --

11  and, subsequently, they took the documents with them,

12  is not relevant.

13    Q.   How many hours did you spend with the team?

14    A.   Let's say at least two meetings of

15  approximately five hours each.

16    Q.   And how many hours did you spend reviewing

17  documents on your own?

18    A.   It's difficult for me to make a precise

19  differentiation between the review of the documents

20  and the handling of the draft.

21    Q.   Well, how much time did you spend working

22  on this case during that two-week period that was

23  not with the team?

24    A.   I believe that it was 20 to 25 hours,

25  approximately 20 to 25 hours.

OCTOBER 23, 2013 - ISRAEL SHRENZEL

1    MR. YALOWITZ:  That's fine with me.

2    CHECK INTERPRETER AVITAL:  That's what's

3  happened so far.

4    MR. HILL:  Because I'm not a Hebrew speaker,

5  so I obviously don't know if there's something you are

6  bringing to her attention.

7    OFFICIAL INTERPRETER NE'EMAN:  Her correction

8  was substantive:  I erred and said "the filing of the

9  report" he had said "submitting the invoice."  The

10  Hebrew word for "filing" and "submitting" is the same.

11  And because we were talking about the filing of reports,

12  I erred, and Ruchie kindly corrected me.

13    MR. HILL:  Okay.  Thank you.

14    MR. SATIN:  I don't know where the record

15  is right now in terms of what the answer was to that

16  question.

17    (Brief discussion held off the record.)

18    (Last answer read.)

19    MR. SATIN:  Let me just ask the question

20  again.

21    CHECK INTERPRETER AVITAL:  He said:  "I

22  submitted an invoice."

23    Q.   BY MR. SATIN:  Let's try this again.

24    Did you submit an invoice for the hours

25  you worked up until the submission of the report?

OCTOBER 23, 2013 - ISRAEL SHRENZEL

1    Q.   20 to 25 hours, approximately, during which

2  time you were on your own, either reading documents

3  or modifying the draft; correct?

4    A.   Indeed.

5    Q.   And you are being paid by the hour; correct?

6    A.   Yes.

7    Q.   Did you submit an invoice for the period of

8  time you worked before the report -- up until the time

9  that the report was submitted?

10    (Brief exchange in Hebrew between Official

11    Interpreter Ne'eman and Check Interpreter Avital.)

12    OFFICIAL INTERPRETER NE'EMAN:  Thank you.

13    THE WITNESS:  In fact, I submitted a report

14  for my working hours up until the period of the filing

15  of the report.

16    MR. HILL:  Let's just have a minute about

17  the translation protocol.

18    So if you disagree about what's being said

19  in English, you need to say that in English so it can

20  get picked up on the record.  If you're just prompting

21  Rina with a better Hebrew term, I guess it's okay to

22  do that in Hebrew, as long as everybody agrees that

23  what ends up in English is, in fact, what the witness

24  said.

25    Are we all on the same page?

OCTOBER 23, 2013 - ISRAEL SHRENZEL

1    A.   Yes.

2    Q.   How many hours are on that invoice?

3    A.   If I recall correctly, the invoice was for

4  31 hours.  I'd like to add that those are the hours

5  in which I was really sitting at my desk.  But, in

6  effect, for almost that entire two-week period, my

7  head was busy thinking and processing.

8    Q.   You also expected to get paid for the time

9  you were meeting with the team; correct?

10    A.   Yes.  That appears to be appropriate to me.

11  That's part of the time that I worked.

12    Q.   So the invoice you submitted, then, includes

13  the time spent meeting with the team?

14    A.   Yes.

15    Q.   The opinion portion of Exhibit 422 begins

16  on page 3; correct?

17    A.   Yes.

18    Q.   And there are three sections to the opinion

19  portion of this report?

20    A.   Yes.

21    Q.   Chapter A is called:

22    "Background and Introduction."

23    A.   Yes.

24    Q.   And in this part of the report, it explains

25  what was asked to be done in this case?

OCTOBER 23, 2013 - ISRAEL SHRENZEL

```
 1      A.   Indeed.
 2      Q.   And the report lists the six attacks that
 3  will be addressed?
 4      A.   Yes.
 5      Q.   And the specific discussion of each attack
 6  takes place later in the report, beginning on page 18;
 7  correct?
 8      A.   Indeed.
 9      Q.   Because what you do before then, or what
10  is done in the report before then, is a discussion
11  of the general characteristics of the conduct of the
12  Palestinian Authority during the relevant time period;
13  correct?
14      A.   Yes.
15      Q.   Before you get to the specific incidents,
16  there's also a discussion of the relationships among
17  the PLO, the Palestinian Authority, and Fatah; correct?
18      A.   Indeed.
19      Q.   And that's just a couple of pages?
20      A.   Indeed.
21      Q.   And then, finally, in Chapter C is the
22  specific discussion of the six incidents; correct?
23      A.   Indeed.  Indeed, that is the case.
24      Q.   And you'd agree that the main focus of the
25  report is the six incidents?
```

```
 1      A.   Definitely.
 2      Q.   Now, Mr. Shrenzel, you haven't written any
 3  books about the six attacks at issue in this case;
 4  correct?
 5      A.   Not at all.
 6      Q.   And you haven't written any books about the
 7  Second Intifada?
 8      A.   I will note what was done, and that's pursuant
 9  to the information that appears at the outset of the
10  report, which refers to my CV and my background.
11           Over the -- in recent years, I have worked --
12  to be precise, in 2007 and 2008 -- as the editor of two
13  books which also address the Second Intifada.  I wish
14  to emphasize that I'm the editor of the books and not
15  the author of the books.
16      Q.   I appreciate your trying to be helpful,
17  Mr. Shrenzel.  But if you could just listen to the
18  question that I ask and just answer that question.
19      A.   I will do my very best.
20      Q.   I think we will both be finished sooner if
21  we work that way.
22      A.   Definitely.
23      Q.   You agree, you have not written any books?
24           MR. YALOWITZ:  Object to the form.
25           Any books at all?
```

```
 1           MR. SATIN:  That was the question.
 2           MR. YALOWITZ:  I'm just helping you correct
 3  the form, but do what you want.  I object to the form.
 4           He can answer.
 5           THE WITNESS:  No.  I have not written any
 6  books that relate to the Second Intifada.
 7      Q.   BY MR. SATIN:  You haven't written any books
 8  that relate to any of the issues in this report?
 9      A.   No.
10      Q.   You've published three articles in your
11  lifetime; correct?
12      A.   Perhaps more, but that are related to the
13  issue at hand.  If your intent is those which are cited
14  here, I'm willing to take a look, if I may examine it
15  for a moment, and then I will confirm that.
16      Q.   Sure.
17      A.   (Examining.)  I did, in fact, write the three
18  articles that are cited here.  In fact, those, in my
19  opinion, are not related to the subject of the expert
20  opinion.  They're more related to the Islamic world
21  on a general basis.
22           But I believe that I have noted -- and I
23  don't know why it doesn't appear here -- an article
24  that I wrote that also appeared in the Haaretz newspaper
25  that dealt with a summary of ten years since the Second
```

```
 1  Intifada and the prospects and the danger of an
 2  additional Intifada.
 3           MR. YALOWITZ:  Mr. Satin, with your
 4  permission, I think the record should reflect my
 5  belief that we supplemented Mr. Shrenzel's report
 6  with some additional articles.
 7           Ms. Weiser would recall the precise
 8  circumstances of that supplementation.  But we have
 9  a copy of it on computer, if you wish to review it.
10           MR. HILL:  Why don't you e-mail it to us,
11  Counsel.  Neither of us recollects it.  Why don't
12  you e-mail it to us, since neither of us is presently
13  recollecting it.  And if you've got the original e-mail,
14  just forward that as well, and that way we'll be able
15  to verify whether we previously received it or not.
16           MR. YALOWITZ:  Very good.  We'll do that as
17  soon as logistics permit.
18           MR. HILL:  Ms. Rovner appears to be on the
19  Internet right now.  Perhaps she could do it while
20  we're sitting here.
21           MR. YALOWITZ:  I'm hoping that she'll be
22  able to.  And certainly we'll work as quickly as we
23  can to provide you an electronic copy so you have it
24  in your possession.
25           MR. HILL:  Thank you.
```

29

1      Q.    BY MR. SATIN:  Mr. Shrenzel, do you agree
2  that Exhibit 422 does not make any mention of an article
3  about the Second Intifada?
4      A.    As the text currently appears, no, it does
5  not.  However, I fully recollect that I was asked by
6  the office to provide a full list of everything that
7  I have written.  And that is what I did.
8      Q.    And again, Mr. Shrenzel, I would just ask you
9  to answer only my question, which was just about whether
10 it says that in your report.
11     A.    Yes.  I, in fact, confirm that.  I confirm
12 that, in this text, only the three articles appear.
13     Q.    And the Haaretz is a newspaper?
14     A.    The Haaretz newspaper is a daily newspaper,
15 a primary newspaper in Israel.
16     Q.    It's a lay publication?  It is not a scholarly
17 publication?
18           (Brief exchange in Hebrew between Official
19     Interpreter Ne'eman and Check Interpreter Avital.)
20           THE WITNESS:  It is, in fact, a lay
21 publication.  But the tone of the publication is
22 primarily that of an intellectual or a well-educated
23 audience.
24     Q.    BY MR. SATIN:  The article that you just
25 referenced was not subject to peer review; correct?

OCTOBER 23, 2013 - ISRAEL SHRENZEL

30

1            (Brief exchange in Hebrew between Official
2      Interpreter Ne'eman and Check Interpreter Avital.)
3            THE WITNESS:  Just like any article that is
4  submitted by a guest, not by a newspaper reporter.
5            CHECK INTERPRETER AVITAL:  "A regular
6  columnist."  "A regular columnist of a newspaper."
7            OFFICIAL INTERPRETER NE'EMAN:  A regular --
8  I'm not sure.
9            CHECK INTERPRETER AVITAL:  "A regular writer
10 for the paper."
11           OFFICIAL INTERPRETER NE'EMAN:  "A member of
12 the newspaper."  "Somebody who regularly writes for the
13 newspaper," perhaps we should say.
14           THE WITNESS:  The newspaper itself decides
15 whether or not to publish that guest article.
16     Q.    BY MR. SATIN:  Two of the three articles that
17 are referenced in Exhibit 422 are book reviews; correct?
18           (Brief exchange in Hebrew between Official
19     Interpreter Ne'eman and Check Interpreter Avital.)
20           THE WITNESS:  Indeed.
21     Q.    BY MR. SATIN:  Is the article that you just
22 mentioned that is not in Exhibit 422 a book review or
23 not?
24     A.    No, it is not a book review.
25     Q.    You mentioned books that you have edited?

OCTOBER 23, 2013 - ISRAEL SHRENZEL

31

1      A.    Indeed.
2      Q.    One is called "Ticking Bomb"?
3      A.    Yes.  The book is in Hebrew.
4      Q.    And it's a collection of articles?
5      A.    Indeed.
6      Q.    And you're not one of the named editors on
7  the cover of the book?
8      A.    If I recall correctly, my name appears as
9  a linguistic editor.
10     Q.    The editors on the cover are Haggai Golan
11 and Shaul Shay?
12     A.    It's been a long time since I took a look
13 at that book.  But, apparently, that is the case.
14     Q.    And the other book you cite in the report --
15 excuse me.  The other book that is cited in the report
16 is called "Hamas Lexicon"?
17     A.    Indeed, that's the case.
18     Q.    And your name is not on the cover of that
19 book either?
20     A.    Actually, in that case, I believe that it
21 is written "editing by Israel Shrenzel."  And, recently,
22 one of my students at the university drew my attention
23 to the fact that the book also appears under my name
24 in the university catalog.
25     Q.    But you did not write it?

OCTOBER 23, 2013 - ISRAEL SHRENZEL

32

1      A.    As I have explicitly explained, I did not
2  write it.
3      Q.    And you don't have a Ph.D.?
4      A.    Unfortunately or not, I don't have one.
5      Q.    And you are teaching at the university as
6  an adjunct professor?
7      A.    In Hebrew, the formal definition is an
8  "outside teacher."
9      Q.    You're not tenured?
10           (Brief exchange in Hebrew between Official
11     Interpreter Ne'eman and Check Interpreter Avital.)
12           THE WITNESS:  Tenure, no.  No tenure.
13     Q.    BY MR. SATIN:  You're not on a tenure track?
14     A.    No.
15     Q.    You've never served as an expert before?
16           CHECK INTERPRETER AVITAL:  Excuse me.  He
17 didn't say --
18           (Comment in Hebrew by Check Interpreter
19     Avital.)
20           OFFICIAL INTERPRETER NE'EMAN:  I think
21 they mean "expert witness."  But okay, I accept your
22 correction.
23           MR. YALOWITZ:  Do you mean "expert witness"?
24           MR. SATIN:  I do.  Thank you.
25     Q.    BY MR. SATIN:  So you've never served as an

OCTOBER 23, 2013 - ISRAEL SHRENZEL

1    expert witness before?

2         A.    No.

3         Q.    And how much have you been paid altogether

4    since you started your work in connection with this

5    case?

6         A.    I already stated, 31 hours, to be precise.

7    And that has to be multiplied by $120 per hour, and

8    with the deduction of tax and other deductions pursuant

9    to Israeli law.

10        Q.    Is the 31 hours just until the report was

11   submitted on April 10th or up until today?

12        A.    No, no.  The number of 31 hours refers to

13   the work up to the point of the filing of the report

14   on April 10th.

15        Q.    Have you worked in connection with this case

16   since April 10th up until 9:30 this morning?

17        A.    Definitely.

18        Q.    How many hours?

19        A.    I still don't have a full record of that.

20   I estimate that, to date, it's been approximately 80

21   hours.

22        Q.    Are those 80 hours time you spent working

23   by yourself or with a team?

24        A.    Both.

25        Q.    How many hours did you spend with the team,

                OCTOBER 23, 2013 - ISRAEL SHRENZEL

1    of those 80 hours?

2         A.    Again, it's difficult for me to provide very

3    precise information.  I would estimate that it was 25

4    hours with the team, 20, 25 hours.

5         Q.    Doing what?

6         A.    We examined the documents extremely

7    thoroughly.  We posed questions that appeared to

8    be relevant to us.  And we also did simulations about

9    questions that you might be likely to ask me.  There

10   were also several hours in which I met with counsel,

11   to explain about the procedures.

12        MR. YALOWITZ:  Don't talk about our meetings.

13        THE WITNESS:  (In English.)  Okay.

14        MR. YALOWITZ:  You've just given away the

15   secret sauce.

16        THE WITNESS:  I accept that.  You can really

17   see for sure that it's my first time.

18        Q.    BY MR. SATIN:  How many hours of the

19   approximate 80 did you spend working on your own?

20        A.    Well, if we do the simple math, it's about

21   55 hours.

22        Q.    What were you doing?

23        A.    I read the report several times, and I

24   thoroughly read the various documents.  And, again,

25   I thought about possible questions and the requisite

                OCTOBER 23, 2013 - ISRAEL SHRENZEL

1    answers.

2         Q.    The report, Exhibit 422, states -- uses the

3    phrase "Palestinian arena."

4         Do you see that on page 3?  The second

5    paragraph, under Chapter A, starts by saying:

6         "The basis for my opinions herein is my

7    decades of professional experience analyzing the

8    Palestinian arena."

9         Do you see that?

10        A.    Yes, I see that.

11        Q.    Is the term "Palestinian arena" a term that

12   you came up with or the team?

13        A.    I can't say that.  I assume that it was

14   me, because that's the section that deals with my

15   experience.  And apart from that, that concept, at

16   least in Hebrew, is a common concept.

17        Q.    The term "Palestinian arena" is not defined

18   anywhere in the report; correct?

19        A.    It's possible that not directly so.

20        Q.    Well, nowhere does it say what the definition

21   of "Palestinian arena" is in this report?

22        A.    Okay.

23        Q.    And there is no document here that explains

24   or that is cited here that explains what is meant by

25   "Palestinian arena"; correct?

                OCTOBER 23, 2013 - ISRAEL SHRENZEL

1         A.    In fact, that's the case.

2         Q.    Now, from 1980 to 1985, you were at the IDF;

3    correct?

4         A.    Yes.

5         Q.    And you focused, according to you, on Syrian

6    affairs as well as Palestinian issues; correct?

7         A.    Yes.

8         Q.    From 1988 to 2004, you were an intelligence

9    analyst at the GSS; correct?

10        A.    Yes.  Just for the record, we currently call

11   it the ISA.

12        Q.    And while you were at the ISA -- what was

13   it called then?

14        A.    The name in Hebrew was the same name.  At

15   a certain point in time, the official name in English

16   became ISA.

17        Q.    How do you -- what do you refer to it as

18   in that time period from '88 to 2004, GSS or ISA?

19        A.    I think that there is a rule that we call

20   something according to how it's most recently termed.

21   So as of this point in time, we'll call it the ISA.

22   Because, of course, I operated in an environment that

23   was all in Hebrew, so it's entirely devoid -- it's

24   devoid of significance.

25        Q.    Very well.  We'll call it the ISA.

                OCTOBER 23, 2013 - ISRAEL SHRENZEL

37

1    While you were at the ISA, you didn't develop
2  expertise in one particular field; correct?
3        MR. YALOWITZ:  Object to the form.  Vague.
4        THE WITNESS:  The question is not clear to me.
5     Q.  BY MR. SATIN:  You'd agree that you covered
6  a range of different fields while you were at the ISA?
7     A.  That's a matter of definition.  But it's
8  important to emphasize that all of my work focused
9  upon -- and I reiterate -- the Palestinian arena.
10    Q.  And you covered different areas within what
11 you call the Palestinian arena; correct?
12    A.  Are you referring to areas in terms of
13 geography?  Subject matter?
14    Q.  Well, I'm going to direct your attention
15 to page 1 of the report.
16    A.  (In English.)  Page 1.
17    Q.  The fourth paragraph down talks about your
18 experience in what is referred to here as the GSS.
19    A.  Definitely, yes.
20    Q.  And it says in the middle of that paragraph:
21       "In that position, I was responsible (among
22 other things) for supervising the work of GSS research
23 and assessment personnel in various fields relating
24 to Palestinian affairs."
25    A.  That is what's written and that's what was.

OCTOBER 23, 2013 - ISRAEL SHRENZEL

38

1     Q.  Did you write this sentence?
2     A.  In Hebrew, yes.
3     Q.  What did you mean by "various fields"?
4     A.  I will, in fact, explain that.  My intent
5  there was, for example --
6        CHECK INTERPRETER AVITAL:  "Cross-section
7  of subjects."
8        OFFICIAL INTERPRETER NE'EMAN:  Thank you.
9        THE WITNESS:  -- a cross-section of subjects,
10 key issues, such as policy of the Palestinian Authority
11 with respect to different issues, policy and actions
12 with respect to terrorism, the situation with respect
13 to entities or organizations.  Those are several
14 examples with regard to subject areas.
15       We can also address it on a geographical
16 basis.  The main work was, of course, what was going on
17 in the territories.  But if there was a relationship or
18 some kind of importance with activities of Palestinian
19 organizations that were not in the territories -- were
20 outside of the territories, when I say different or
21 many areas, that's also what this refers to.
22    Q.  BY MR. SATIN:  And here, this sentence uses
23 the term "Palestinian affairs."
24       (Brief exchange in Hebrew between Official
25       Interpreter Ne'eman and Check Interpreter Avital.)

OCTOBER 23, 2013 - ISRAEL SHRENZEL

39

1        THE WITNESS:  Affairs, issues, questions,
2  subjects.
3     Q.  BY MR. SATIN:  Do you mean for "Palestinian
4  affairs" to mean something different than "Palestinian
5  arena"?
6     A.  No.  In my opinion, they're very similar or
7  even identical.
8     Q.  And you'd agree that "Palestinian affairs"
9  is not defined in this report?
10    A.  There is no specific paragraph in which it
11 says "'Palestinian affairs' means so and so."  But,
12 of course, the report refers to things that definitely
13 fall within that category.
14    Q.  You did not investigate the six attacks that
15 are at issue in this case; correct?
16       MR. YALOWITZ:  Object to the form.
17       Time frame?
18    Q.  BY MR. SATIN:  At the time of these incidents,
19 you were not part of the investigative team; correct?
20    A.  No.
21    Q.  And you've never been involved in the
22 investigation of these incidents since then; correct?
23       MR. YALOWITZ:  Object to the form.  Vague.
24       But you can answer.
25       THE WITNESS:  No.  I was never involved in

OCTOBER 23, 2013 - ISRAEL SHRENZEL

40

1  that.
2     Q.  BY MR. SATIN:  Earlier we discussed the
3  documents that are listed on pages 2 and 3 of this
4  report.
5     A.  Indeed.
6     Q.  Now, portions of this report make reference
7  to other documents that are not listed on pages 2 and 3;
8  correct?
9     A.  To the best of my knowledge, the overwhelming
10 majority of what's stated in the report has been
11 validated or documented by the references.  If by
12 chance there is an error or an omission, then that
13 would be a function only of the great speed with which
14 the report was prepared.  And should you find that there
15 is a document missing, I assume that it's possible to
16 take care of that.
17    Q.  My only question here is:  You'd agree
18 that there are footnotes in this report that reference
19 documents that are not listed on pages 2 and 3; correct?
20    A.  I'll explain.  The method of numbering that
21 appears on pages 2 and 3 is not within the area of my
22 expertise.  I am familiar with the documents themselves.
23 And to the best of my knowledge, and underneath every
24 reference to the -- underneath every footnote, that
25 every footnote does, in fact, address and confirm what's

OCTOBER 23, 2013 - ISRAEL SHRENZEL

41

1  stated in the text to the best -- based on my knowledge
2  and interpretation.
3      Q.  Did you read any documents prior to April
4  10th, other than those that were given to you by the
5  team from Ms. Darshan-Leitner's office?
6      A.  No.  Only perhaps general things that I
7  read from things that appeared in the media.  But
8  not anything that I read on my own initiative, that
9  I reread.  Because I can state that, at least with
10 respect to the sections that are more general in nature,
11 they are familiar to me and I consider myself to be
12 proficient in them so that my primary focus was on the
13 incidents themselves, which I was not familiar with on
14 an individual basis.
15     Q.  During the two- to three-week period between
16 the time when you were first contacted about the case
17 and the time when the report was submitted, did you do
18 any research into any of the areas that are discussed
19 in the report?
20         MR. YALOWITZ:  Objection.  I don't understand
21 the question.
22         THE WITNESS:  I focused on the analysis and
23 the formulation of my understanding of the six incidents
24 that are discussed here.
25     Q.  BY MR. SATIN:  During that two- or three-week

OCTOBER 23, 2013 - ISRAEL SHRENZEL

42

1  period, did you read any documents for purposes of the
2  work in this case, other than those which were given
3  to you by the team?
4      A.  I don't recall at this moment in time.
5      Q.  Did you keep any type of record of the
6  documents you did review?
7      A.  The documents that I reviewed are the
8  documents that appear in the references to the report.
9      Q.  So if a document is not referenced in this
10 report, that means you did not review it in preparation
11 for the work in this case?
12     A.  No.  I'm having a hard time confirming that
13 statement.  If you could give me an example or ask me
14 to refer to a specific document, then I will be able
15 to answer.
16     Q.  What I'm getting at is whether or not you
17 read articles, exhibits, anything else, in preparation
18 for your work in this case that is not listed inside
19 this report.
20     A.  Again, that are not mentioned here?
21     Q.  Yes.
22     A.  No.  But it's possible that there are things
23 that are stated here that are based on my general
24 knowledge and that are a product of reading a review,
25 not necessarily during the course of those two weeks.

OCTOBER 23, 2013 - ISRAEL SHRENZEL

43

1          MR. SATIN:  Why don't we take a break now.
2          MR. YALOWITZ:  Sure.  That's fine.  We're
3  off the record.
4          (Recess from 11:04 a.m. to 11:17 a.m.)
5      Q.  BY MR. SATIN:  Good morning, Mr. Shrenzel.
6      A.  Good morning, Mr. Satin.
7      Q.  We're going to talk now about the substance
8  of the report.
9      A.  Go ahead.
10     Q.  Beginning on page 4 is the discussion of
11 what is referred to as:
12         "The general characteristics of the conduct
13 of the Palestinian Authority during the relevant period
14 of time."
15     A.  Indeed.
16     Q.  The second paragraph in the middle of that
17 page, it says:
18         "It is already clear at this stage."
19         Do you see that?
20     A.  Yes, I see it.
21     Q.  I'm going to read that sentence and ask you
22 a couple of questions about it.
23     A.  Go right ahead.
24     Q.  (Reading.)
25         "It is already clear at this stage that

OCTOBER 23, 2013 - ISRAEL SHRENZEL

44

1  the analysis of the Palestinian Authority's attitude
2  to the attacks and terrorists shows that the Palestinian
3  Authority supported, in various ways, the terrorists
4  who took part in these attacks and that the attacks
5  were committed in accordance with its policy."
6      A.  Yes.
7      Q.  Well, first, although it says "it is already
8  clear at this stage," you'd agree that the analysis
9  in the report hasn't started yet?
10     A.  Yes, it's possible to say that.  But the
11 statement refers primarily to the sentences that were
12 mentioned prior to that, in which I established --
13 that starts with:
14         "The role of these security forces ... was
15 central."  (As read.)
16         And, therefore, the sentence that you quoted
17 appears.  But I'm definitely also willing to agree that,
18 from a logical standpoint, it's possible to reach the
19 conclusion in its entirety after the individual analysis
20 of the attacks.
21     Q.  So you'd agree that, at the time that this
22 is written, there has been no proof even attempted to
23 be proven, attempted to be set forth in the report?
24         MR. YALOWITZ:  Do you need me to object to
25 the form, or do you want to try that again?

OCTOBER 23, 2013 - ISRAEL SHRENZEL

45

1   MR. SATIN:  I'll try it again.
2   Q.  BY MR. SATIN:  You'd agree that, at the
3   time in the report where it says the language "it is
4   already clear at this stage," there has been no attempt
5   to provide evidence for any of the claims?
6   A.  In principle, I agree.  However, I shall
7   explain.  This refers to preliminary statements.  And
8   the person who wrote them -- in other words, me -- is
9   certainly aware of the fact that he must provide full
10  proof of those claims.
11  Q.  Which hasn't happened, even according to you,
12  at this point?
13  MR. YALOWITZ:  Objection.  Object to the form.
14  I think you mean at this point in the report.
15  MR. SATIN:  I think that's clear from the
16  question.
17  MR. YALOWITZ:  Very good.
18  THE WITNESS:  Correct.
19  Q.  BY MR. SATIN:  That sentence also uses the
20  word "policy."
21  Do you see that?
22  A.  Yes.
23  Q.  In your report, you don't cite to any
24  document that says this is the policy of the
25  Palestinian Authority; correct?

OCTOBER 23, 2013 - ISRAEL SHRENZEL

46

1   A.  Is your intent to this text or in general?
2   Q.  Well, first, there's no footnote after that
3   sentence that references any policy; correct?
4   A.  That's correct.  There's no footnote that
5   appears here.  And this derives from the fact that,
6   as I state, to a certain extent, these are preliminary
7   sentences and then summarizing sentences.
8   And, certainly, as I stated before, the
9   author is aware of the need to provide evidence.  And
10  he hopes -- I hope -- that later on things become more
11  clear.  And, in fact, we have a picture before us of
12  policy.
13  Q.  Mr. Shrenzel, I don't think you're trying
14  to be disrespectful.  But it does seem that we're
15  going to spend a long day together if, after each
16  question, you provide a longer answer that is not
17  in response to that question.  I would ask you not
18  to do that.
19  MR. YALOWITZ:  Let's go off the record for
20  a second.
21  (Brief discussion held off the record.)
22  Q.  BY MR. SATIN:  Now, later you get into what
23  you refer to as the "general characteristics"; correct?
24  A.  Yes.
25  Q.  And beginning on page 5, you have a section

OCTOBER 23, 2013 - ISRAEL SHRENZEL

47

1   underlined called "General"; correct?
2   A.  Yes.
3   Q.  And by "General," you are referring here
4   to what you believe are the general characteristics
5   of the conduct of the Palestinian Authority during
6   the Second Intifada?
7   A.  That is, in fact, the case.
8   Q.  And these general characteristics, are they
9   characteristics that you came up with on your own?
10  A.  Definitely.
11  Q.  Did you come up with a test for whether or
12  not something is a general characteristic?
13  A.  No.  I do not have a scientific, mathematical
14  criterion for that.
15  Q.  And you don't cite to another person or source
16  for these so-called characteristics; correct?
17  A.  In fact, I see that there are no footnotes
18  that provide references for this.
19  Q.  Now, while you were at the ISA, you were
20  exposed to classified information; correct?
21  A.  Yes.
22  Q.  The report talks about or references thousands
23  of intelligence items.
24  MR. YALOWITZ:  I'm sorry, Counsel.  Can you
25  point me to a --

OCTOBER 23, 2013 - ISRAEL SHRENZEL

48

1   MR. SATIN:  Sure.  Page 1.
2   THE WITNESS:  Yes, in the section that
3   describes my work for the ISA.
4   Q.  BY MR. SATIN:  And did the classified
5   information that you received at the ISA pertain
6   to what you consider to be general characteristics
7   of the conduct of the PA?
8   A.  Generally speaking -- generally speaking,
9   I would be very happy not to make any references to
10  the types and the nature of the classified materials
11  that I have been exposed to.
12  Q.  So I can't ask you about any classified
13  information that pertains to general characteristics?
14  A.  Neither in the report itself, nor in any
15  reference to the report, I neither intend to nor
16  am I able to make any reference whatsoever to any
17  classified material that I have seen during the
18  course of the years of my service.
19  Q.  So are you saying that you can't even
20  tell me whether or not the classified information
21  you received pertains to the general characteristics
22  of the conduct of the Palestinian Authority during
23  the Second Intifada?
24  A.  By the very nature of things, both the
25  unclassified material and the classified material

OCTOBER 23, 2013 - ISRAEL SHRENZEL

49

1   deals with the Palestinian arena, in the broad sense
2   of the term as we have already discussed.
3           Any deviation to the area of specific
4   classified material is extremely problematic from
5   many points of view.
6       Q.   Can you tell me whether or not your period
7   of work at the ISA exposed you to classified information
8   as it relates to the general characteristics of the
9   conduct of the PA during the Second Intifada?
10      A.   Generally speaking, it can be stated that
11  there was a certain relationship.  But it's very
12  hard to differentiate among the types of material,
13  between open-source material and classified material,
14  particularly when discussing general characteristics.
15          I hope that you will not be angry at me.
16  But I wish to explain that, in the expert opinion,
17  I did not make any use of classified material.
18      Q.   Well, the report doesn't make reference,
19  as you pointed out, to the basis of those opinions;
20  correct?
21          MR. YALOWITZ:  Objection.  Objection.
22  Overbroad.
23      Q.   BY MR. SATIN:  You can answer.
24      A.   I believe that I did not understand the
25  question.  What do you mean by the word "opinions"?

50

1       Q.   You'd agree that, with respect to general
2   characteristics of the conduct of the PA, you have
3   classified information inside your head?
4       A.   If I do, then it's, relatively speaking,
5   a very small amount.  Eight years have gone by since
6   I retired.  And the natural tendency of intelligence
7   people is to kind of erase from their minds information
8   that it's not necessary to retain.
9       Q.   But you'd agree that the basis for your
10  expertise is primarily your work in intelligence;
11  correct?
12      A.   Yes.  But in addition to that, both my
13  education, and I also consider myself a specialist
14  on Arab affairs who is very proficient in various
15  fields.  But certainly my years dealing with the
16  Palestinian issue have contributed to that expertise.
17      Q.   And you were in Israeli intelligence at the
18  time of the Second Intifada; correct?
19      A.   As it says here, until the end of 2004.  Of
20  course, there's always that question of when exactly
21  the Second Intifada concluded.
22      Q.   And it was during your time at Israeli
23  intelligence that you received information about the
24  conduct of the Palestinian Authority during the Second
25  Intifada; correct?

51

1       A.   Yes.
2       Q.   And you can't sit here today and say that
3   your opinions about the general characteristics of the
4   Palestinian Authority during the Second Intifada have
5   nothing to do with your time in Israeli intelligence?
6       A.   No.  Of course.  A person is a complex entity.
7   But at the time that I wrote the report, I was very
8   strict about relying upon materials that, of course,
9   could be cited as references, as proof, as evidence.
10  And all of those materials are either open source or
11  were provided to us by the other side.
12      Q.   Well, the section on the general
13  characteristics is from page 5 until the top of page 8;
14  correct?
15      A.   No, I don't maintain so.  No.  I think that
16  the part pertaining to the general material -- the
17  general characteristics concludes on page 6.  And then
18  I give some more specific analysis of components that
19  were mentioned in the general section.
20      Q.   Well, at least on page 5 and up to where it
21  ends on page 6 --
22      A.   (In English.)  Yes.
23          (Translated.)  Excuse me.
24      Q.   -- the report doesn't reference any documents?
25      A.   Yes.

52

1       Q.   And on the bottom of page 5 on to page 6,
2   you provide what it states in the report is a brief
3   summary of some of the central components of the
4   conduct exhibited by the Palestinian Authority during
5   the period of the terrorist attacks that are at issue --
6   that are at the center of this action; correct?
7       A.   Was all of that a question?
8       Q.   Yes.
9       A.   Yes.
10      Q.   And it's lettered "a" to "e"?
11      A.   Yes.
12      Q.   And the report does not provide any support
13  for the claims made in letters "a" through "e"?
14      A.   I don't agree with that.  Because, later on,
15  when I discuss the content of sections "a" through "e"
16  in greater detail, rather extensive references are
17  provided with respect to the various issues that are
18  discussed.
19      Q.   Okay.  So we can at least agree that here,
20  on pages 5 and 6, you don't provide any support --
21  the report does not provide any support?
22          MR. YALOWITZ:  Objection.  Vague.
23          (Brief discussion held off the record.)
24          THE WITNESS:  Yes, please translate again
25  so I don't lose my line of thought and at least know

53

```
 1   what I'm answering.
 2              (Pending question re-translated.)
 3              THE WITNESS:  Yes, it's true that, on pages
 4   5 and 6, there are no references provided.
 5        Q.   BY MR. SATIN:  And on the bottom of page 5,
 6   you reference the "Karine A" incident; correct?
 7        A.   Indeed.
 8        Q.   And nowhere in the report is there any further
 9   discussion of that incident?
10        A.   I am not certain that that's the case.  It is
11   possible that it was mentioned in one of the footnotes.
12   I must state that I don't remember each and every one
13   of the 77 pages by heart.
14        Q.   Very well.  What I suggest we do is I will
15   move on to a different line of questioning for now.
16   And then over a break, you can review the document
17   and tell me if you find a footnote later in the report
18   that references that incident.
19              MR. YALOWITZ:  We'll take your suggestion
20   under advisement.
21              MR. SATIN:  Or we can spend a significant
22   portion of time while he reads the document.  I don't
23   seek to do that.  This is an easier way to do it, to
24   save everyone some time.
25              MR. YALOWITZ:  It's your deposition.
```
OCTOBER 23, 2013 - ISRAEL SHRENZEL

54

```
 1              THE WITNESS:  May I add something general?
 2        Q.   BY MR. SATIN:  Only if it's in response to
 3   a question I just asked you.
 4        A.   Then I will forgo that.
 5        Q.   On page 6, there is a section that begins:
 6              "The moves by the Palestinian Authority in
 7   the areas of incitement and indoctrination."
 8              Correct?
 9        A.   That is, in fact, the case.
10        Q.   And the first two paragraphs in the report
11   are supposed to be a summary of what follows; correct?
12              MR. YALOWITZ:  Object to form.
13              I think he understands the reference.  But
14   the record should reflect that the question is directed
15   to page 6 of the report.
16              THE WITNESS:  May I very briefly review the
17   two paragraphs?
18        Q.   BY MR. SATIN:  Sure.
19        A.   (Examining.)  Okay.  I'm ready.
20        Q.   There is no document cited in support for
21   anything that's written in those two paragraphs there;
22   correct?
23        A.   That is, in fact, the case that, on page 6,
24   there are no footnotes.  However, as I have noted,
25   there are references in support of this later on.
```
OCTOBER 23, 2013 - ISRAEL SHRENZEL

55

```
 1        Q.   We'll get to that.
 2              On page 8, you make reference to the words
 3   "armed struggle"; correct?
 4        A.   Yes.
 5        Q.   And the report states, where it says -- right
 6   after where it says "armed struggle":
 7              "The Palestinian euphemism for 'terrorism.'"
 8        A.   Not in the draft I have before me.
 9        Q.   And you're looking at page 8, underneath where
10   it says "Education"?
11        A.   I was looking at the beginning of the page.
12   I'd like to take a few seconds to review the paragraph.
13              (Examining.)  Yes, it does, in fact, state
14   here that "armed struggle" is a Palestinian euphemism
15   for terror -- "terrorism."
16        Q.   In general, you'd agree that the words
17   "armed struggle" and "terrorism" mean different things;
18   correct?
19              MR. YALOWITZ:  Objection.  Failure to specify
20   what language.
21        Q.   BY MR. SATIN:  You can answer the question.
22        A.   We're getting into a linguistic and
23   philosophical and political maze here.  And because
24   I am focused on the Palestinian arena, I think that
25   that sentence is -- that statement is certainly
```
OCTOBER 23, 2013 - ISRAEL SHRENZEL

56

```
 1   accurate.
 2        Q.   Okay.  You'd agree that Israel has been
 3   involved in armed conflicts before; correct?
 4        A.   (In English.)  Unfortunately.
 5              (Translated.)  Unfortunately, we are still
 6   not in a Switzerland-like situation here.
 7        Q.   And you're not saying that Israel has
 8   committed acts of terrorism when they've been involved
 9   in armed conflicts, armed struggles; correct?
10        A.   As an Israeli citizen, that is my belief, yes.
11   That's not an issue that I engaged in with respect to
12   this report.
13        Q.   You'd agree that Palestinians have the right
14   to resist the occupation; correct?
15        A.   Yes.
16        Q.   Do you believe that the boycotting of
17   settlement goods is an act of terror?
18        A.   Boycotting by who?
19        Q.   By Palestinians.
20        A.   I do not maintain that that falls within
21   the classic definition of an act of terror.
22        Q.   Is throwing rocks at tanks terror?
23        A.   When the throwing of stones or rocks
24   constitutes a danger, constitutes a significant
25   danger to those who are sitting in the tank, then
```
OCTOBER 23, 2013 - ISRAEL SHRENZEL

57

```
 1   it's certainly possible to cite that as an act of
 2   terrorism.
 3            But as I've stated, we're treading here
 4   in an extremely problematic field.  And, therefore,
 5   I have restricted myself, limited myself to a specific
 6   detailed conversation of the relevant subjects.
 7   Q.    Is shooting at soldiers an act of terror?
 8   A.    Yes.
 9   Q.    Even inside the occupied territories?
10   A.    Yes.  Particularly -- always, but particularly
11   in the framework of an arrangement that was in
12   effect between us and the entities that control the
13   territories; in other words, the Palestinian Authority.
14   Q.    You'd agree that when it says in the report
15   "'Armed struggle' is a euphemism for 'terrorism,'"
16   that is an interpretation?
17   A.    That is the accepted understanding, both
18   in terms of research and also in intelligence circles,
19   certainly Israeli intelligence circles, and perhaps
20   in much more extensive circles for -- with respect
21   to the concept that's called in Arabic --
22            (Comment in Arabic by the witness.)
23            THE WITNESS:  I must add that, in terms of
24   the nature of the concept, that's how it's perceived
25   also by speakers of the Arabic language.  Although it's
```

OCTOBER 23, 2013 - ISRAEL SHRENZEL

58

```
 1   possible that, for political or other reasons, they
 2   won't consider it to be terrorism.  They won't agree
 3   with the definition of "terrorism."
 4   Q.    BY MR. SATIN:  You'd agree that the report
 5   does not cite to a document or any source for this
 6   understanding that "armed struggle" means "terrorism";
 7   correct?
 8   A.    The drafting of the report also was based
 9   on an assumption that there are things that constitute
10   common knowledge.  And after more than 1,000 Israelis
11   who have been killed during the course of the armed
12   struggle in the Second Intifada, the identification
13   of that struggle as terrorism is perceived by the
14   author as something that is obvious.
15   Q.    Did you receive information about the term
16   "armed struggle" when you were in Israeli intelligence?
17   A.    I certainly encountered that term during
18   the course of the years of my service, from reading
19   Palestinian and other material.  And the meaning of
20   that concept then, as now, is unequivocal.
21   Q.    Did you receive classified information in
22   Israeli intelligence about the significance and meaning
23   of the term "armed struggle"?
24   A.    I don't recall, and I don't think that there
25   was any need for that.  As I have stated, this is a
```

OCTOBER 23, 2013 - ISRAEL SHRENZEL

59

```
 1   concept whose meaning is clear, whether you're within
 2   the intelligence community or outside the intelligence
 3   community.  And any reasonable reader of a newspaper
 4   on the streets of Jerusalem can explain that concept.
 5   Q.    You'd agree that the claim you just made,
 6   that any reasonable person on the streets of Jerusalem
 7   would understand that concept, there is no authority
 8   for that claim in this report?
 9   A.    That would be based upon the fact that the
10   residents of Jerusalem were the primary people who
11   suffered during the course of the Intifada, as far
12   as of that armed struggle.  And I believe that five
13   out of the six terrorist attacks that were mentioned
14   here took place in Jerusalem, a short walking distance
15   from the place where we are sitting.
16   Q.    (Not translated.)  Mr. Shrenzel, I didn't
17   ask you where the incidents took place.  My question
18   was simply whether or not the claim about what people
19   in Jerusalem know or knew is stated within the report.
20            Do you understand my question?
21            MR. YALOWITZ:  Objection.  Arguing with the
22   witness.  That's uncalled for.
23            (Pending question translated.)
24            THE WITNESS:  I understand the question, and
25   I'm answering it that, in fact, there are no references
```

OCTOBER 23, 2013 - ISRAEL SHRENZEL

60

```
 1   here that reflect the feelings of the residents of
 2   Jerusalem or the residents of Israel on a wider basis.
 3   Q.    BY MR. SATIN:  Very well.  Let's focus on
 4   page 8.
 5   A.    Yes.
 6   Q.    You've never conducted scholarly work on
 7   the Palestinian curriculum; correct?
 8   A.    Correct.
 9   Q.    And during the two weeks or so that you
10   were working on the draft of this report, you did not
11   conduct a formal study of the Palestinian curriculum;
12   correct?
13   A.    Correct.
14   Q.    During that two- or three-week period when
15   you were working on that draft, did you consider formal
16   studies that have been done upon the subject of the
17   Palestinian curriculum?
18   A.    Primarily those that appeared in the
19   references that were provided to me.  One of them
20   is a review by a research institute.
21   Q.    Is that listed in the report?
22   A.    Yes.
23   Q.    What are you referring to?
24   A.    If you might allow me to take a look?
25   Q.    Sure.
```

OCTOBER 23, 2013 - ISRAEL SHRENZEL

61

```
 1      A.   (Examining.)
 2           (In English.)  Footnote number 10 is the
 3  MEMRI --
 4           (Translated.)  Footnote number 10 refers
 5  to the MEMRI report.
 6           MR. HILL:  Off the record.
 7           (Brief discussion held off the record.)
 8           (Defendants' Exhibit 428 marked.)
 9      Q.   BY MR. SATIN:  (Not translated.)
10  Mr. Shrenzel, I'm handing you what's been
11  marked as Defendants' Exhibit 428 -- and a copy for
12  counsel as well.  This is -- Defense 428 is the
13  document referenced in footnote 10; correct?
14           (Comment in Hebrew by the witness.)
15      Q.   BY MR. SATIN:  (Not translated.)  That's
16  the MEMRI report; correct?
17           (Comment in Hebrew by the witness.)
18           (Court reporter clarification.)
19           MR. HILL:  Somebody's got to say it in
20  English.
21           MR. SATIN:  That's my fault.
22           MR. YALOWITZ:  Let's continue as we have been,
23  and let's see where we are at the lunch break.  And
24  then we'll re-evaluate.
25           MR. HILL:  That will be "exhibit A" to my
```

OCTOBER 23, 2013 - ISRAEL SHRENZEL

62

```
 1  suggestion.
 2           MR. YALOWITZ:  We now have the questions
 3  in English, answers in Hebrew, and no translation.
 4           MR. HILL:  The parties will stipulate that
 5  the witness answered the last two questions in Hebrew
 6  and that the correct translation of his answer is "yes"
 7  to both questions.
 8           (Brief discussion held off the record.)
 9           (Last two questions read back and translated.)
10           THE WITNESS:  That is, in fact, the case.
11      Q.   BY MR. SATIN:  And this is a document from
12  MEMRI; correct?
13      A.   MEMRI, yes.
14      Q.   And MEMRI is the Middle East Media Research
15  Institute?
16      A.   That's, in fact, the case.
17      Q.   And what is included in Defense 428 is not
18  a study of the Palestinian curriculum; correct?
19      A.   Correct.
20      Q.   If fact, footnote 10 isn't even a footnote
21  in a section about the Palestinian curriculum?
22      A.   If so, it's possible that there was an
23  error in my previous statement.  And, in fact, the
24  study by MEMRI refers to incitement in general terms.
25  And the sources for incitement are indoctrination
```

OCTOBER 23, 2013 - ISRAEL SHRENZEL

63

```
 1  in the Palestinian curriculum, relying, in fact, on
 2  samples of classroom books that were provided to me.
 3      Q.   So just to be clear, the MEMRI document,
 4  Defendants' 428, does not include a study of the
 5  Palestinian curriculum; correct?
 6      A.   Yes.  It was apparently my error.  Although
 7  in the MEMRI documents there is reference, for example,
 8  to summer camps which are part of the educational
 9  system.  However, I agree that the MEMRI document is
10  not a study of the Palestinian educational curriculum.
11      Q.   Do you agree that the report does not cite
12  any study of the Palestinian curriculum?
13      A.   I am willing to take a few seconds to examine
14  that.  (Examining.)  That is, in fact, the case.  The
15  references here all refer to specific classroom books.
16           With your permission, I'd like to add
17  something.  This was done, inter alia, because of the
18  fact that I know that there is supposed to be a full
19  expert opinion submitted on the subject of incitement
20  in the curriculum.  And for that reason, we chose
21  to limit ourselves -- I chose to limit myself and
22  be brief, just to give several examples for the sake
23  of illustration.  But this is certainly not an expert
24  opinion that's focused on the curriculum.
25           MR. SATIN:  Why don't we take our lunch break
```

OCTOBER 23, 2013 - ISRAEL SHRENZEL

64

```
 1  now.
 2           (Recess from 12:14 p.m. to 1:21 p.m.)
 3           MR. HILL:  Over lunch, we've discussed the
 4  interpretation and decided to try Mr. Satin propounding
 5  the questions in English, the witness answering the
 6  questions, without translation, in Hebrew, and then
 7  the witness' answers will be translated into English.
 8  So we'll proceed in that fashion and see how that goes.
 9           MR. YALOWITZ:  That's agreeable to us.  And
10  if it turns out to not be practical, then we'll let
11  everybody know.
12           Also, I raised at the break, there was an
13  item that the witness raised with me over the lunch
14  break regarding one answer that he gave to a line of
15  questions that Mr. Satin is pursuing.  And I would like
16  him to be given an opportunity to raise that issue, to
17  correct what he said before.
18
19           (The following section of the proceedings was
20           conducted with counsel's questions in English, not
21           translated into Hebrew, and the witness' answers
22           translated into Hebrew through the Official Hebrew
23           Interpreter, unless otherwise indicated.)
24
25      Q.   BY MR. SATIN:  Mr. Shrenzel, what is it that
```

OCTOBER 23, 2013 - ISRAEL SHRENZEL

65

1 you'd like to correct?
2      A.   (Translated.)  You asked me about reading
3 material prior to the formulation of the final draft,
4 the final text.  And I remembered that I examined, inter
5 alia, an expert's opinion that was written by Brigadier
6 General Yossi Kuperwasser --
7      (In English.)  "Retired."
8      (Translated.) -- retired Brigadier General
9 Yossi Kuperwasser.  I don't recall which action that
10 expert opinion was filed in.  But it was also reported
11 in the Israeli media when he testified about it in a
12 court in Israel.
13      That expert opinion dealt generally, on a
14 general basis, with the use of -- with the employment
15 of terrorism by the PLO since the time of its inception
16 up to and including the Second Intifada.  And that
17 expert opinion primarily helped me to organize my
18 thoughts with respect to the general section that
19 appears here.
20      I wish to emphasize two things.  One is
21 that that expert opinion by Kuperwasser did not deal
22 at all with any specific incident of terrorism, and
23 particularly not with the incidents that are under
24 discussion here.  And also, with respect to the general
25 issue at hand, there are, at the very least, differences

OCTOBER 23, 2013 - ISRAEL SHRENZEL

66

1 in emphasis between his approach and my approach.
2      Q.   Mr. Shrenzel, after reading this expert
3 opinion by the Brigadier General, did you also read
4 the documents and sources cited in that report?
5      A.   No.  No, there was no time or possibility
6 of engaging in that.
7      Q.   Did you talk to Mr. Yalowitz over the break
8 about anything else related to your testimony?
9      A.   No.  I just discussed this issue, raised
10 this issue.
11      Q.   Let's get back to education.
12      A.   (In English.)  Yes.
13      Q.   You'd agree that the perpetrators in these
14 six attacks were not influenced by the textbooks cited
15 in the report; correct?
16      A.   I cannot state that unequivocally.  Because
17 it's possible that they saw that material either in
18 their own homes or in the homes of others.  And if
19 we're talking about people in their late teens or early
20 20s, then the fact is that they were certainly exposed
21 to materials -- if not those materials that were set
22 forth in the report, then certainly to other materials
23 of similar content.
24      Q.   Well, the textbooks referenced in the report
25 were first published in 1999 into 2000; correct?

OCTOBER 23, 2013 - ISRAEL SHRENZEL

67

1      A.   Correct.
2      Q.   And it was only two school grades each year;
3 correct?
4      A.   Those are the examples that I cited.  There
5 are certainly a wide range of examples from different
6 years.  And I'm sure that it's possible to argue that
7 even the books that the -- the textbooks that were used
8 before 1999 or 2000 could have been problematic, even
9 if they were problematic in an informal kind of way.
10      The fact is that the Palestinian Authority
11 is operating in the area from 1994, 1995, so that it's
12 certainly possible that the atmosphere in the classrooms
13 was clearly full of incitement and anti-Israeli in
14 nature, even if the textbooks did not reflect this
15 at that period of time.
16      Q.   Mr. Shrenzel, your report only discusses
17 textbooks published beginning in 1999 to 2000; correct?
18      Excuse me.
19      The report that you signed your name to only
20 discusses the textbooks published beginning in 1999 to
21 2000; is that correct?
22      A.   Yes.
23      Q.   There is no discussions in the report about
24 textbooks back in the '80s and early '90s; correct?
25      A.   Yes.

OCTOBER 23, 2013 - ISRAEL SHRENZEL

68

1      Q.   And the alleged perpetrators of these six
2 attacks were not children; correct?
3      A.   Correct.
4      Q.   And you have no evidence that the alleged
5 perpetrators of these attacks read the textbooks that
6 are cited in your report; correct?
7      A.   I never argued that.
8      Q.   You have no evidence that the textbooks cited
9 in the report were read by the alleged perpetrators;
10 correct?
11      MR. YALOWITZ:  Asked and answered.
12      MR. SATIN:  It was asked but not answered.
13      THE WITNESS:  No, I have no such evidence.
14      Q.  BY MR. SATIN:  Let's discuss this next section
15 briefly about sermons, on page 9 in the first paragraph,
16 under where it says:
17      "Religious Preaching by Members of the
18 Clergy."
19      Do you see where I'm looking?
20      A.   (In English.)  Yes.  Yes.
21      Q.   The last sentence says:
22      "The imams and others serving the mosques
23 are officials of the Palestinian government's Ministry
24 of Religious Affairs.  They have occasionally attacked
25 Israel."

OCTOBER 23, 2013 - ISRAEL SHRENZEL

69

1    Do you see those two sentences?

2    A.    Yes.

3    Q.    There is no support for those two statements

4    in your report; correct?

5    A.    Once again, the reference will appear later

6    on, whereas here I gave a specific example.

7    Q.    Well, the specific -- the next paragraph

8    begins "an example of this"; correct?

9    A.    Yes.

10    Q.    And do you mean an example of religious

11    preaching or an example of an attack against Israel?

12    A.    My intent is to a sermon that contains

13    content, clearly anti-Israeli content, incitement for

14    violence against Israel, and praise and extollment [sic]

15    of perpetrators of terrorist attacks.

16    Q.    The example you're referring to is statements

17    by Ibrahim Mudeiris; correct?

18    A.    Yes.

19    Q.    That is in the MEMRI report that we discussed

20    earlier; correct?

21    A.    Correct.

22    Q.    Please take out that MEMRI report, which for

23    the record is Defendants' Exhibit 428.

24    A.    I have it in front of me.

25    Q.    Have you listened to the sermon?

OCTOBER 23, 2013 - ISRAEL SHRENZEL

70

1    A.    No.

2    Q.    Do you know how many Palestinians heard the

3    sermon?

4    A.    I certainly cannot provide you with an exact

5    number.

6    Q.    Do you know whether the sermon was broadcast

7    in its entirety?

8    A.    (In English.) Again, please?

9    Q.    (Translated.) Do you know whether the sermon

10    was broadcast in its entirety?

11    A.    No.

12    Q.    Looking at Defense 428, there are a number

13    of sections to this document; correct?

14    A.    Yes.

15    Q.    And the first section involves calls to end

16    incitement and violence; correct?

17    A.    Yes.

18    Q.    And, in fact, under the introduction at the

19    very top of the page is a statement from Palestinian

20    Prime Minister Mahmoud Abbas; right?

21    A.    Yes.

22    Q.    And it says:

23    "We will work against incitement to violence

24    and hatred, whatever their form or forum.  We will take

25    measures to ensure there is no incitement emanating from

OCTOBER 23, 2013 - ISRAEL SHRENZEL

71

1    Palestinian institutions."

2    That's what it says; correct?

3    A.    Yes.

4    Q.    And that's not put in your report, that

5    statement; correct?

6    A.    Correct.

7    Q.    On page 2, there is a section where it says,

8    "Calls to End Incitement and Violence"; correct?

9    A.    Yes.

10    Q.    And there is information provided by the

11    Palestinian daily Al-Hayat Al-Jadida; correct?

12    A.    Yes.

13    Q.    And what is reported is that the Palestinian

14    Authority told local media to reduce the, quote,

15    "combative tone against Israel"; correct?

16    A.    Yes.

17    Q.    But you didn't put that in your report either?

18    That was not put into the report; correct?

19    A.    Yes.  However, I provided the report in its

20    entirety as reference.

21    Q.    And below that quote from the newspaper --

22    the news agency Al-Hayat Al-Jadida, it says there is

23    a broadcast of a peace song on Palestinian TV; correct?

24    A.    (In English.) Again, please?  You mean in

25    the MEMRI report?

OCTOBER 23, 2013 - ISRAEL SHRENZEL

72

1    Q.    Yes, in the MEMRI report.

2    A.    On what page?

3    Q.    Page 2.

4    A.    (In English.) Under --

5    (Translated.) Under what heading, please?

6    Q.    Below the report of "reducing the combative

7    tone against Israel," there is discussion of a broadcast

8    of the peace song on Palestinian TV; correct?

9    A.    (In English.) Yes.

10    (Translated.) Yes, there is a mention of

11    a peace song.

12    Q.    And then there are lyrics from the song

13    as well; correct?

14    A.    Yes.

15    Q.    The document 428 is how many pages long?

16    A.    Thirteen pages.

17    Q.    And you just cited the one statement by

18    Ibrahim Mudeiris; correct?

19    That is the only one that is stated in your

20    report, or stated in the report.

21    A.    I'm not certain.  There's also reference

22    to the caricatures that appear later on.

23    Q.    Very well.

24    A.    Because there's a series of pages here --

25    there is a series of pages here, from page 8 until

OCTOBER 23, 2013 - ISRAEL SHRENZEL

73

1  the end of the report, which contain caricatures, all
2  of which belong to the category of incitement and not
3  to the category of reduction of incitement.
4       Q.  Well, the only footnote in the report that
5  cites the MEMRI report is footnote 10; correct?
6       A.  (In English.) Again, please?
7       Q.  The only place that the MEMRI report is listed
8  in this report is in footnote 10; correct?
9       A.  I can accept that as an assumption.  I
10  cannot -- I cannot say that with absolute certainty.
11  And for the purposes of this discussion, I'm willing
12  to accept that determination.
13      Q.  Okay.  Let's discuss speeches by Yasser
14  Arafat.  Page 11.
15          Do you agree that you do not conduct a
16  comprehensive analysis of Yasser Arafat's speeches?
17  Correct?
18      A.  Yes.  That would have necessitated hundreds
19  of additional pages.  And as stated, as I noted, I
20  knew that an extensive expert opinion was supposed
21  to be filed on the subject of incitement.
22      Q.  The report ends with the statement that
23  Yasser Arafat threatened to renew the armed struggle.
24          Do you see where it says that, on page 11?
25      A.  Are you talking about the place where the

                OCTOBER 23, 2013 - ISRAEL SHRENZEL

74

1  citation ends or where the quote ends?
2       Q.  Right before the quote, the report states:
3           "He threatened to renew the armed struggle."
4       A.  (In English.) I didn't find it.
5           (Comment in Hebrew by the witness.)
6           THE WITNESS:  (In English.) "He threatened
7  to renew the armed struggle."  Okay.
8       Q.  BY MR. SATIN:  And then there is a quote
9  that follows; right?
10      A.  Yes.
11      Q.  And that quote is cited to footnote 15;
12  correct?
13      A.  Yes.
14          (Defendants' Exhibit 429 marked.)
15      Q.  BY MR. SATIN:  I'm showing you what's been
16  marked as Defense Exhibit 429.
17      A.  Maybe you have an enlarged copy of this?
18  I can read this, but it'll be complicated.  And perhaps
19  it will also be damaging to my eyesight.
20      Q.  Well, Mr. Shrenzel, you'd agree that this
21  is the document that the report cites in footnote 15?
22      A.  Yes.
23      Q.  And this isn't the actual speech of Yasser
24  Arafat.  It's a newspaper article that covers one of
25  his speeches; correct?

                OCTOBER 23, 2013 - ISRAEL SHRENZEL

75

1       A.  (In English.) This is a Reuters --
2           (Translated.) This is a report by Reuters,
3  as I read here.  But it certainly gives direct quotes
4  from Arafat's speech according to Reuters.  It's not
5  a recording.  It's a report.
6       Q.  According to the Reuters report, Yasser Arafat
7  said:
8           "We support peace, but a just and
9  comprehensive one."
10          Correct?
11      A.  Could you show me the place?  Could you
12  show me the place?  I really am having a hard time
13  finding it, given the tiny size of the font.
14      Q.  It's in the ninth paragraph of that article.
15      A.  Okay.  With a modicum of effort, I have
16  located it.
17      Q.  It does say that; correct?
18      A.  (Translated.) I'll translate that to the
19  best of my generally good capacity in Arabic:
20          "We are with peace; however, with just and
21  comprehensive peace."
22          (In English.) And -- okay.  And there was
23  a continuation, but you didn't --
24          (Translated.) There was a continuation, but
25  you didn't address it.

                OCTOBER 23, 2013 - ISRAEL SHRENZEL

76

1       Q.  You'd agree that the portion of the newspaper
2  article in which Arafat stated "we support peace, but
3  a just and comprehensive one" is not in the report?
4           Correct?
5           MR. YALOWITZ:  Objection.  Misstates the
6  witness' testimony.
7       Q.  BY MR. SATIN:  Fair enough.
8           You'd agree that the language you just quoted
9  about peace was not placed into the report?
10      A.  Correct.
11      Q.  Was the decision to put in portions of that
12  article into the report made by you or the team?
13      A.  I cannot state that I can say unequivocally.
14  I assume that it was initially by the team.  But I'm
15  emphasizing that, with respect to the entire report,
16  the responsibility is mine and mine alone.
17          MR. SATIN:  Off the record.
18          (Brief discussion held off the record.)
19      Q.  BY MR. SATIN:  Mr. Shrenzel, for your work
20  in connection with this case, you didn't do a formal
21  study of the Palestinian media; correct?
22      A.  Correct.
23      Q.  And you've never done a formal study of the
24  Palestinian media; correct?
25      A.  Correct.

                OCTOBER 23, 2013 - ISRAEL SHRENZEL

77

1  Q.  Let's talk about the specific attacks at
2  issue in this case.
3       The report addresses six attacks; correct?
4  A.  Yes.
5  Q.  Are you aware that there are seven attacks
6  in this lawsuit?
7  A.  Yes.
8  Q.  Did the report draft you received include
9  information about a bombing that took place at Hebrew
10 University?
11 A.  No.
12 Q.  Were you ever asked to render an opinion
13 about the Hebrew University bombing?
14 A.  No.
15 Q.  And you didn't personally witness any of
16 the six attacks; correct?
17 A.  No.
18 Q.  And you don't personally know any of the
19 alleged perpetrators of these attacks; correct?
20 A.  Personally?  Do I know them personally?
21 Q.  Correct.
22 A.  No.
23 Q.  Did you ever interrogate any of the alleged
24 perpetrators?
25 A.  No.

OCTOBER 23, 2013 - ISRAEL SHRENZEL

78

1  Q.  Have you ever done interrogations?
2  A.  I prefer not to respond to that question.
3  Q.  You have to answer the question, Mr. Shrenzel.
4  MR. YALOWITZ:  I instruct the witness not
5  to answer the question.
6  MR. HILL:  What's the basis?
7  MR. YALOWITZ:  It calls for information that
8  might be of a confidential nature under his obligations
9  as a former employee of the ISA.
10 MR. SATIN:  He hasn't said that.
11 MR. HILL:  Well, let's see.  Why don't you
12 ask him that question and see what he says.
13 Q.  BY MR. SATIN:  Have you done interrogations,
14 Mr. Shrenzel?
15 MR. YALOWITZ:  Objection.
16 And instruct --
17 (Comment in Hebrew by the witness.)
18 MR. YALOWITZ:  Objection.
19 Instruct the witness --
20 THE WITNESS:  (In English.)  I am --
21 MR. YALOWITZ:  Just wait.
22 THE WITNESS:  (In English.)  Okay.
23 MR. YALOWITZ:  Objection.
24 I instruct the witness not to answer on the
25 basis previously asserted.

OCTOBER 23, 2013 - ISRAEL SHRENZEL

79

1  Q.  BY MR. SATIN:  Is the reason you don't want
2  to answer that question because you have received
3  classified information about interrogations?
4  A.  No.  The reason is that I'm not interested
5  in responding on anything in a detailed or individual
6  way to the characteristics of my overall employment
7  with the General Security Services, or the security
8  services.
9       At the outset of the report, it was stated --
10 and I stand by that -- that the primary focus of my
11 work was analysis, assessment, and supervision of
12 people who engage in that.  And beyond that, I do
13 not wish to provide any more detailed information.
14 Q.  Well, Mr. Shrenzel, since what you're
15 telling us is that it's not illegal for you to answer
16 the question, I'm going to ask you again:  Have you
17 conducted interrogations as part of your work in
18 Israeli intelligence?
19 MR. YALOWITZ:  Same instructions.  Same
20 objection.
21 MR. HILL:  What's the basis?
22 MR. YALOWITZ:  Same basis.
23 Q.  BY MR. SATIN:  Mr. Shrenzel, are you saying
24 there is something in the Israeli law that prohibits
25 you from answering questions about the interrogations

OCTOBER 23, 2013 - ISRAEL SHRENZEL

80

1  you've done at the intelligence agency?
2  A.  I don't know.  I'm no legal expert.  I am
3  present here without any legal counsel, on behalf of
4  my former employer.  But as a former member of the
5  intelligence community, who possesses common sense,
6  it seems to me that any statement beyond that which
7  I've set forth at the outset of the report is an
8  inappropriate one.
9  Q.  Has anyone told you not to answer questions
10 about the interrogations in the Israeli intelligence?
11 A.  No.  Nobody spoke to me about that, nobody
12 from the team, no one from the lawyers, and no one
13 from the ISA.
14 Q.  Mr. Shrenzel, when you were working in Israeli
15 intelligence at the ISA, did you review documents that
16 pertained to any of these six incidents?
17 A.  To the best of my recollection, no.
18 Q.  Have you ever met any of the alleged
19 perpetrators of these six attacks?
20 A.  No.
21 Q.  So for each of the six incidents, you provide
22 or the report provides a brief summary of what happened
23 in that incident; correct?
24 A.  Yes.
25 Q.  And the report also provides a summary of

OCTOBER 23, 2013 - ISRAEL SHRENZEL

81

1  the perpetrators allegedly involved in these attacks;
2  correct?
3      A.   Yes.
4      Q.   The report provides a profile of each of
5  their -- or of many of the perpetrators; correct?
6      A.   Yes.
7      Q.   And what you're saying is that that
8  information is based on documents you've read in
9  connection with your work in this case in 2013?
10     A.   Yes.
11     Q.   In other words, documents were provided
12  to you, and then you read them and provided the
13  information, based on your reading of those documents?
14     A.   That is, in fact, the case.
15     Q.   And one of the things that is done in the
16  report is an attempt to understand what the Palestinian
17  Authority was thinking at the time of these incidents;
18  correct?
19     A.   Definitely.
20     Q.   To show what the goals and motivations of
21  the Palestinian Authority were at the time; correct?
22     A.   Not only that.  More than that.
23          It was on the concrete level that pertains
24  to the organizational attribution or belonging of
25  the perpetrators of the terrorist attacks -- the

OCTOBER 23, 2013 - ISRAEL SHRENZEL

82

1  fact that they are on the payrolls of various and
2  sundry Palestinian organizations, as well as the
3  manner in which Palestinian elements addressed in
4  various publications, of course, were showing that
5  they referred to the perpetrators in a positive and
6  sympathetic manner, as well as to their actions.
7      Q.   But, in essence, Mr. Shrenzel, the report
8  is an attempt to get inside the head of the PA; correct?
9      A.   No, not necessarily to get inside the head
10  of -- not necessarily to get inside the head of it,
11  but more to get into the outcome of the Palestinian --
12  the various outcomes of the Palestinian bureaucracy.
13  To the contrary, the idea is not to focus on abstract
14  things, but rather on concrete evidence from which
15  we can deduce things with respect to the conduct and
16  attitudes of the Palestinian Authority.
17     Q.   Would you agree that attitude and conduct
18  refers to the thinking and feeling of the Palestinian
19  Authority?
20     A.   To a certain extent.  But, again, we arrive
21  there by way of concrete evidence.  Because your
22  statement, your prior statement, hinted at an attempt
23  to --
24          CHECK INTERPRETER AVITAL:  "Decipher."
25          OFFICIAL INTERPRETER NE'EMAN:  "Decipher."

OCTOBER 23, 2013 - ISRAEL SHRENZEL

83

1  Thank you.
2          THE WITNESS:  -- decipher some kind of
3  psychology.  And my preference is to speak in a
4  language of facts and documents.
5      Q.   BY MR. SATIN:  Now, the last incident
6  discussed in the report is the Guetta shooting; correct?
7      A.   Yes.
8      Q.   That incident happened chronologically before
9  the other five incidents; correct?
10     A.   Yes.
11     Q.   And the other incidents are discussed
12  chronologically; correct?
13     A.   Yes.
14     Q.   Who decided to put the Guetta incident last
15  instead of first?
16     A.   I think that was the way in which the things
17  appeared when I received the initial draft.
18     Q.   Well, let's talk about the Guetta shooting,
19  then.
20     A.   Yes.  I would just like to find the place
21  in which it appears, please.
22     Q.   The bottom of page 73.
23     A.   I have, in fact, found it.
24          MR. YALOWITZ:  Can we pause for a minute?
25          MR. HILL:  Let's take a break.

OCTOBER 23, 2013 - ISRAEL SHRENZEL

84

1          (Recess from 2:00 p.m. to 2:18 p.m.)
2      Q.   BY MR. SATIN:  Mr. Shrenzel, on page 74 to
3  page 75, you list nine shootings from 2000 to 2002;
4  correct?
5      A.   Yes.
6      Q.   And according to the report, these shootings
7  were all done by a PA or Palestinian Authority security
8  or police officer; correct?
9      A.   Allow me to take half a moment or a few more
10  seconds to review it.
11          (Examining.)  Yes, that is correct.
12     Q.   And the report states that these nine
13  shootings that were done by a Palestinian Authority
14  security or police officer, that information comes
15  from the verdict of Marwan Barghouti; correct?
16     A.   Yes.  And also from an official website --
17  website of the Foreign Ministry of the State of Israel.
18     Q.   And neither of those documents list the
19  Guetta shooting; correct?
20     A.   (In English.)  No.
21          (Translated.)  No.
22     Q.   As in that is correct?
23     A.   Yes.  It's correct that there is no mention
24  of the Guetta incident.  That might also be because
25  that ended only with an injury and not with murder.

OCTOBER 23, 2013 - ISRAEL SHRENZEL

85

1 And a majority of the published news items or the
2 published items have to do with cases that ended with
3 a loss of life.
4      Q.   Well, No. 8) on page 75 states that six
5 persons were injured; correct?
6      A.   Yes.
7      Q.   And No. 7) says one person severely?
8      A.   Yes.
9      Q.   It's not true that the Barghouti verdict
10 only discusses murder cases?
11      A.   No, I did not say solely and exclusively.
12 But, generally, the reference is to incidents that
13 ended with death.
14      Q.   Now, the report says, on page 74, before
15 discussing the nine incidents, that those attacks had,
16 quote:
17           "Similar characteristics to those of the
18 attack of January 8, 2001."
19      A.   That is, in fact, the case.
20      Q.   But the date of the shootings are not the
21 same; correct?
22      A.   I did not understand the point exactly.
23      Q.   The Guetta shooting happened on January 8th,
24 2001; correct?
25      A.   (In English.)  Okay.

OCTOBER 23, 2013 - ISRAEL SHRENZEL

86

1           (Translated.)  Yes.
2      Q.   The other shootings happened over a span of
3 15 months; correct?
4      A.   Yes.
5      Q.   The location of the shootings are not all
6 the same; correct?
7      A.   I shall explain.  The intent is to show a
8 similar pattern that takes place in the extended area
9 in which the Guetta terrorist attack took place.
10      Q.   The Guetta shooting happened on the Givat
11 Ze'ev Road; correct?
12      A.   Yes.
13      Q.   And the other shootings, the other nine
14 shootings that are mentioned in the report did not
15 happen on the same street; correct?
16      A.   Certainly not in the same exact place.
17      Q.   And not in the same town either; correct?
18      A.   Givat Ze'ev is not a town.  It's a settlement.
19      Q.   The other shootings did not happen in that
20 settlement; correct?
21      A.   (Translated.)  Okay.  Correct.
22           (In English.)  But not far.
23           (Translated.)  But not far from there either.
24      Q.   According to the report, all the shootings
25 happened within a 15-mile radius of Jerusalem; correct?

OCTOBER 23, 2013 - ISRAEL SHRENZEL

87

1      A.   (Translated.)  Correct.  Approximately.
2           (In English.)  Approximately.
3      Q.   And you agree Israel is a small country,
4 relatively speaking?
5      A.   Definitely.
6      Q.   The time of day of the shootings are not
7 all the same either; correct?
8      A.   Certainly.  As you have noted, we are talking
9 about a period of time extending over 15 months.
10      Q.   But I mean the time of the day -- morning,
11 afternoon, or evening -- the shootings did not all
12 happen at the same time of the day; correct?
13      A.   I assume so, but I did not examine that
14 issue at all.
15           MR. YALOWITZ:  I think the witness will
16 accept your representation.
17      BY MR. SATIN:  Mr. Shrenzel, you'd agree
18 that some of these shootings happened in the morning,
19 some in the afternoon, and some in the evening?
20      A.   I can't make any comment on that.  If that's
21 something that you have examined, I'll be happy to
22 hear about it.
23           MR. SATIN:  Unless you want to stipulate.
24           MR. YALOWITZ:  It's your deposition.  You're
25 asking questions.

OCTOBER 23, 2013 - ISRAEL SHRENZEL

88

1           MR. HILL:  Very well.
2           MR. YALOWITZ:  So if you want to show
3 documents and spend time on it, that's fine.  I don't
4 have enough knowledge to stipulate about it.  But if
5 you want to ask him questions on the assumption that
6 it's true, that's fine as well.  However you want to
7 proceed is fine with us.
8           (Defendants' Exhibit 430 marked.)
9      Q.   BY MR. SATIN:  Mr. Shrenzel, I'm showing you
10 what is marked as Defense Exhibit 430.
11           Defense Exhibit 430 is the website that is
12 cited in footnote 323; correct?
13      A.   I did not hear the number, please?
14      Q.   Footnote 323.
15      A.   It seems so.
16      Q.   And the first incident listed has a date of
17 December 21st, 2000; correct?
18      A.   I see that.  Yes.
19      Q.   And that's No. 1) on page 74 of the report;
20 correct?
21      A.   Yes.  There's no mention here of the name.
22 But that appears to be the case.  There's no mention
23 of the name of the victim here, but that appears to
24 be the case.
25      Q.   And you'd agree that, on page 74, it says

OCTOBER 23, 2013 - ISRAEL SHRENZEL

89

1    that the incident happened on Highway 443; correct?

2        A.   (In English.)  Highway 443.  Yes.

3             (Translated.)  Yes.

4        Q.   And on No. 1, it says "Place of Incident" --

5    it says "Road 443"?

6        A.   Therefore, I said that the things appear to

7    be consistent.

8        Q.   And the time of that incident is 20:30 hours;

9    correct?

10       A.   Yes.

11       Q.   And No. 2 on the website, which is Defense

12   Exhibit 430, has an incident date of December 31st,

13   2000?

14       A.   The 31st of December in the year 2000.  Yes.

15       Q.   And that is the incident which took place

16   on Road 60; correct?

17       A.   Yes.

18       Q.   And then, on page 74 of the report, it said

19   incident No. 2) is a shooting on December 31st, 2000,

20   on Highway 60; correct?

21       A.   Yes.

22       Q.   And the incident, as reflected in Defense 430,

23   shows that this incident happened at 06:30 hours;

24   correct?

25       A.   6:30 in the morning.  Yes.

                OCTOBER 23, 2013 - ISRAEL SHRENZEL

90

1        Q.   No. 3 on Defense 430 is an incident on

2    January 25th, 2001.

3        A.   That is, in fact, the case.

4        Q.   And the time of that incident is 18:15 hours;

5    correct?

6        A.   Yes.

7        Q.   And that's reflected in the incident No. 3)

8    on page 74?

9        A.   Yes.

10       Q.   If you'd turn to page 3 of Defense 430.

11       A.   Yes.

12       Q.   What's listed as No. 18 --

13       A.   Yes.

14       Q.   -- there is an incident dated February 25th,

15   2001; correct?

16       A.   Yes.

17       Q.   And that's at the Atara bridge; correct?

18       A.   Yes.

19       Q.   And then incident No. 7) in the report, on

20   page 75, has that incident; correct?

21       A.   That is, in fact, the case.

22       Q.   And according to Defense 430, this incident

23   occurred at 13:15 hours?

24       A.   Yes.

25       Q.   So even from just looking at a few of these,

                OCTOBER 23, 2013 - ISRAEL SHRENZEL

91

1    we have incidents that take place in the morning, the

2    afternoon, and the evening; correct?

3        A.   Yes.

4             May I add something?  You may be angry,

5    but the only thing that that proves is that they're

6    accustomed to getting up early in the morning --

7             (Brief exchange in Hebrew among Official

8        Interpreter Ne'eman, Check Interpreter Avital,

9        and the witness.)

10       OFFICIAL INTERPRETER NE'EMAN:  "Willing" --

11   "willing to get up early in the morning."

12            THE WITNESS:  -- willing to get up early

13   in the morning and to go to sleep very late at night

14   for the sole purpose of killing Jews.

15            And if I'm going to be a bit less cynical,

16   this derives from operational considerations on the

17   part of the terrorists.

18       Q.   BY MR. SATIN:  Mr. Shrenzel, the number

19   of shooters in each of the shootings is not the same;

20   correct?

21            I'm no longer looking at Defense 430.  I'm

22   just asking you the question.

23       A.   I did not go into the resolution in depth.

24   But if that's the situation, I accept your statements.

25       Q.   Well, your report doesn't cite any evidence

                OCTOBER 23, 2013 - ISRAEL SHRENZEL

92

1    for the claim that the shooters -- there were the

2    same number of shooters involved in each of these

3    nine incidents; correct?

4        A.   No, I didn't write any such thing.

5        Q.   And the victims in these nine cases were

6    not all the same sex; correct?

7        A.   There are only two options, no?

8        Q.   Correct?

9        A.   Yes.

10       Q.   And you would agree, they weren't all either

11   male or all female; correct?

12       A.   Definitely.

13       Q.   The victims were not all the same age;

14   correct?

15       A.   Definitely.

16       Q.   "Definitely" as in you agree?

17       A.   (In English.)  Yes, I agree with you.

18            (Translated.)  I agree with you on that

19   matter.

20       Q.   The victims were not all wearing a particular

21   type of religious garb?

22       A.   I did not examine that issue.  I assume that

23   you're correct.

24       Q.   There is no evidence in the report that says

25   they all were wearing a particular type of religious

                OCTOBER 23, 2013 - ISRAEL SHRENZEL

93

```
1  garb; correct?
2      A.   Definitely correct.
3      Q.   And you don't have any evidence to suggest
4  that they were; correct?
5      A.   Correct.
6      Q.   And the shooters were not always shooting
7  from a vehicle; correct?
8      A.   Correct.
9      Q.   And there is no evidence that the same
10 weapon was used in the Guetta shooting as in the
11 other shootings; correct?
12     A.   Correct.
13     Q.   According to the report, Fawzi Marar was
14 one of the shooters in the Guetta case; correct?
15     A.   Correct.
16     Q.   The report states on page 75:
17          "Counsel for the plaintiffs have informed
18 me that Mrs. Guetta has identified one of the terrorists
19 in the cell that opened fire towards her as Fawzi
20 Marar."
21     A.   That is, in fact, what's written.
22     Q.   Now, Mr. Shrenzel, did you speak to counsel
23 for the plaintiffs, or was that a conversation between
24 counsel for the plaintiffs and the team?
25     A.   (In English.)  Oh, I also can view --
```

OCTOBER 23, 2013 - ISRAEL SHRENZEL

94

```
1          (Translated.)  Those are things that I heard
2  from the team who I noted previously.  I was told that
3  there was a line-up that was conducted by the attorneys.
4  Because I'm not a legal expert and I'm not an expert
5  on the matter of line-ups, I wrote the things exactly
6  as they were reported to me, that these were the results
7  of the line-up.
8      Q.   Did you, Mr. Shrenzel, receive any other
9  information about this line-up other than what you
10 just testified to?
11     A.   No.
12     Q.   Did you know that Mrs. Guetta testified in
13 2007 under oath that she couldn't identify the shooter's
14 face?
15          MR. YALOWITZ:  Objection.  Misstates the
16 record.
17     Q.   BY MR. SATIN:  I'm asking a question:  Did
18 you know that Mrs. Guetta testified in 2007 under oath
19 that she couldn't identify the shooter's face?
20          MR. YALOWITZ:  Objection.  There's no basis
21 in the record for this question.
22          THE WITNESS:  (In English.)  I'm not aware
23 of this.
24          (Translated.)  I'm not aware of that.
25     Q.   BY MR. SATIN:  Do you know that she couldn't
```

OCTOBER 23, 2013 - ISRAEL SHRENZEL

95

```
1  tell -- Mrs. Guetta, that is -- if the shooters were
2  Palestinian or Israeli?
3          MR. YALOWITZ:  Objection.  Misstates the
4  record.
5          THE WITNESS:  I don't know anything about
6  that either.
7      Q.   BY MR. SATIN:  Do you know that the only
8  description of one of the shooters she gave was that
9  he had a mustache and dark skin?
10         MR. YALOWITZ:  Objection.  Misstates the
11 record.
12         THE WITNESS:  As I stated, I'm not proficient
13 about the details pertaining to the line-up.  And if
14 you will allow me to state so, I believe that the court
15 is the entity that will determine that.
16     Q.   BY MR. SATIN:  I'm going to ask you a series
17 of questions about this, Mr. Shrenzel, and I understand
18 that you don't --
19     A.   (In English.)  Yes, I respect --
20     Q.   -- that you haven't -- you respect that.
21 But then, afterwards, I'm going to ask you -- well,
22 let me just start.
23     A.   First, previously, you said that perhaps
24 there was something that was disrespectful.  So I'm
25 trying to learn the lesson from that and to be more
```

OCTOBER 23, 2013 - ISRAEL SHRENZEL

96

```
1  respectful.
2      Q.   Did you know that the identification, the
3  line-up that you mentioned, took place in 2013, over
4  twelve years after the shooting?
5      A.   No.
6      Q.   Do you know that the identification procedure,
7  what you're referring to as a line-up, was done by
8  Mrs. Guetta's lawyer, not by a police officer or
9  investigator?
10     A.   (In English.)  This is implied --
11         (Translated.)  This was perhaps implied
12 or hinted at.  But I'm explaining in the most explicit
13 possible terms that I didn't consider it part of my
14 responsibility to address the nuances of the line-up.
15 I'm not an expert either on drawings --
16         CHECK INTERPRETER AVITAL:  "Composite
17 portraits."
18         OFFICIAL INTERPRETER NE'EMAN:  Yes,
19 "composite portraits."  Thank you.
20         THE WITNESS:  -- composite portraits or
21 pictures pertaining to the line-up.
22     Q.   BY MR. SATIN:  Do you know the photo array,
23 the line-up -- what you're calling the line-up that was
24 shown to Mrs. Guetta did not have any known innocent
25 fillers?
```

OCTOBER 23, 2013 - ISRAEL SHRENZEL

97

1   A. What do you mean by "fillers"? I did not
2   understand.
3   Q. Are you aware that the line-up that was shown
4   to her, it was not clear -- there was no evidence that
5   any of the people in it were innocent?
6   MR. YALOWITZ: Objection. Misstates the
7   record.
8   THE WITNESS: No, I don't know about that.
9   Q. BY MR. SATIN: Do you know that the
10  identification procedure was not videotaped?
11  A. Same thing. Same as above. I don't know
12  anything about that.
13  Q. Now, Mr. Shrenzel, suppose that you did have
14  all of the information that I just asked you about.
15  Suppose all that information is true.
16  Would that information change your opinion
17  about whether Fawzi Marar was the shooter?
18  A. I'll explain again. I'm stating the fact
19  here that Fawzi Marar was identified in a line-up.
20  I'm not establishing here whether the outcome of
21  that line-up was accurate. And if I knew all of
22  those details, it's very possible that I would leave
23  the statement in place. Also -- that's also by virtue
24  of my understanding that the attorneys that conducted
25  the line-up knew, for example, that it was in 2013 --

OCTOBER 23, 2013 - ISRAEL SHRENZEL

98

1   OFFICIAL INTERPRETER NE'EMAN: 2003.
2   CHECK INTERPRETER AVITAL: He said "2013."
3   (Comment in Hebrew by Official Interpreter
4   Ne'eman.)
5   CHECK INTERPRETER AVITAL: He said "2013."
6   That's what he said.
7   THE WITNESS: The fact is that I have no
8   ability to substantiate your statements.
9   Q. BY MR. SATIN: What I'm saying is, assume
10  for the moment that the statements I have made were
11  true.
12  A. Uh-huh.
13  Q. Would that change your opinion that Fawzi
14  Marar was the shooter?
15  A. I have no determination -- contrary to the
16  other cases, I have no unequivocal determination that
17  Fawzi Marar was the shooter. I'm noting his name as
18  the person who was identified in a line-up. And it
19  shows how that terrorist attack was consistent with
20  other terrorist attacks that were perpetrated in a
21  similar area, against similar targets, and by similar
22  organizational attributions or belonging.
23  Q. So do you have an opinion about whether
24  or not Fawzi Marar was the shooter, other than the
25  information you received from the team that spoke to

OCTOBER 23, 2013 - ISRAEL SHRENZEL

99

1   the lawyers?
2   A. We're noting in the experts' opinion
3   information that was provided by another member of
4   the security forces that indicates the involvement
5   of Fawzi Marar in a shooting terrorist attack in
6   this form. The same person did not explicitly state
7   that Fawzi Marar was the shooter in the Guetta case.
8   Q. So apart from the information you learned
9   from the team, you don't have information that Fawzi
10  Marar was the shooter of this -- of the Guettas;
11  correct?
12  A. I think it would be accurate to state that.
13  Q. Now, at some point Israel announced --
14  A. I wish to add: To a certain extent, it
15  reminds me of the saying that, if Shakespeare didn't
16  write his plays, perhaps it was somebody else by the
17  name of Shakespeare.
18  Because, ultimately, the Palestinian
19  Authority, which is the defendant here, even if there
20  are doubts with respect to Fawzi Marar, then it could
21  be somebody else from the list that's mentioned here.
22  Whether or not there is any kind of decisive difference
23  here, that's not up to me to judge.
24  Q. You agree, though, Mr. Shrenzel, that apart
25  from the information you received from the team about

OCTOBER 23, 2013 - ISRAEL SHRENZEL

100

1   Fawzi Marar's involvement in the shooting, you don't
2   have information that Fawzi Marar was involved in the
3   shooting?
4   A. Yes, I have answered that. You are correct.
5   You are right.
6   Q. In the conclusion -- well, on page 75, it
7   says in bold:
8   "It is therefore very likely that the attack
9   on the Guettas, too, was carried out by PA security
10  forces."
11  Correct?
12  A. That is, in fact, the case.
13  Q. And the words "very likely," that's not in
14  reference to any type of legal standard; correct?
15  MR. YALOWITZ: Objection. Calls for a legal
16  conclusion.
17  MR. SATIN: No, it doesn't. I'm asking if,
18  in his mind, it is referring to a legal standard.
19  THE WITNESS: (In English.) I don't --
20  (Translated.) I generally don't write out
21  of a legal perspective. So I assume that this statement
22  as well was not written on the basis of any kind of
23  legal perspective. And we have to also remember --
24  OFFICIAL INTERPRETER NE'EMAN: Okay. We
25  need to do something, because --

OCTOBER 23, 2013 - ISRAEL SHRENZEL

101

```
1        MR. YALOWITZ:  You have to pause so that
2   the translator can translate.
3        THE WITNESS:  (In English.)  Okay.
4        (Comment in Hebrew by the witness.)
5        OFFICIAL INTERPRETER NE'EMAN:  I think you
6   should go back a couple of sentences, because I'm not
7   sure we have everything on the record.
8        THE WITNESS:  Because I'm not a legal
9   expert and I'm not accustomed to writing from a legal
10  perspective, therefore I assume that the expression
11  that's written here also is not written out of a legal
12  perspective or on the basis of a legal standard.
13       Q.   BY MR. SATIN:  You'd agree that no court
14  has ever said it is very likely that this attack was
15  carried out by the Palestinian security forces; correct?
16       A.   Yes, I know that neither Fawzi Marar nor any
17  other person was tried with respect to this terrorist
18  attack.
19       Q.   And at some point, Israel announced the death
20  of Fawzi Marar; correct?
21       A.   That is, in fact, the case.
22       Q.   And Israel listed those attacks that Fawzi
23  Marar was involved in; correct?
24       A.   I don't recall that.  I do not believe that
25  we noted that in the report.  I'm willing to examine
```

OCTOBER 23, 2013 - ISRAEL SHRENZEL

102

```
1   it again, with your permission.
2        Q.   I haven't asked you about the report,
3   Mr. Shrenzel.  I've just asked you to start over.
4        A.   (In English.)  Please.
5        Q.   Israel, when it announced the death of
6   Fawzi Marar, listed those attacks that Fawzi Marar
7   was involved in; correct?
8        A.   I do not know.  I'm not familiar with the
9   official document that the State of Israel published
10  that pertains to the terrorist record of Fawzi Marar.
11       Q.   Are you aware that Israel has never listed
12  the Guetta shooting as one of the shootings that was
13  done by Fawzi Marar?
14       A.   I cannot respond to that question accurately,
15  because I'm not familiar with the document that you
16  state that Israel sets forth the sins and wrongdoings
17  of that same person.
18       Q.   On page 20 --
19       A.   If you have that document in your possession,
20  I'm willing to review it.
21       Q.   On page 20, you discuss the incident on
22  January 22nd, 2002.
23       A.   (Translated.)  Allow me to breathe a little
24  bit.
25            (In English.)  Okay.  On page 20, yes?
```

OCTOBER 23, 2013 - ISRAEL SHRENZEL

103

```
1   Page 20.
2            (Translated.)  Yes.  Go ahead.
3        Q.   The third paragraph from the top states --
4   and now we're talking about the incident on January
5   22nd, 2002.  You understand that; correct?
6        A.   Yes, I understand which act of terror your
7   statements pertain to.
8        Q.   And the third paragraph says:
9            "Analysis of the individual profiles of the
10  six Palestinian Authority officers involved in this
11  attack indicates a positive and supportive attitude
12  on the part of the Palestinian Authority towards the
13  attacks and their perpetrators, as discussed below."
14            It says that; correct?
15       A.   Indeed.
16       Q.   It says "attacks."
17            Do you mean there are more than one, or do
18  you just refer -- is that a mistake?
19       A.   (In English.)  "Involved in this attack."
20            What do you mean?
21       Q.   Is the word "attacks" in the third sentence --
22       A.   (In English.)  Aah, "towards the attacks."
23       Q.   Is that a mistake?
24       A.   Okay.  You can delete the "s."
25       Q.   I just want to know, are you referring --
```

OCTOBER 23, 2013 - ISRAEL SHRENZEL

104

```
1   is the report referring to one -- more than one
2   attack or just one?
3        A.   In this specific case, on this page, the
4   report addresses one specific attack -- or -- or
5   a specific attack.  But, of course, because we're
6   analyzing the attitude of the Palestinian Authority
7   toward specific people, the fact is that, unfortunately,
8   these people perpetrated and were involved in more
9   than one attack so that, if we're talking about the
10  attitude toward them, the fact is that it's definitely
11  possible to say that this pertains to the attitude
12  toward a series of terrorist attacks that they
13  perpetrated.
14            For example, Nasser Aweis, when the
15  Palestinian Authority extolls him as a hero, it's
16  not only because of the terrorist attack that took
17  place on January 22nd, but due to the series of
18  actions that he perpetrated.
19       Q.   All right.  In the middle of page 20, down
20  below in the second sentence, it says:
21            "Indeed, the evidence indicates that these
22  men were recruited into the PA security forces because
23  of their prior records."
24       A.   Yes.
25       Q.   What evidence is cited in the report for
```

OCTOBER 23, 2013 - ISRAEL SHRENZEL

105

1  the claim that they were specifically recruited into
2  the PA security forces because of their prior records?
3      A.  (In English.)  Maybe there is no --
4          (Translated.)  Perhaps there is no specific
5  reference for that fact.  But those perhaps fall
6  within the purview of things that are general knowledge,
7  that most of the recruits for the Palestinian security
8  forces had a record of terrorist activity prior to
9  the emergence of the Palestinian Authority.
10     Q.  The report doesn't cite any evidence that
11 the hiring entity had actual knowledge of their prior
12 records; correct?
13     A.  I didn't understand the question.
14     Q.  The report does not cite any evidence that
15 the hiring entity had actual knowledge of their prior
16 records; correct?
17     A.  (In English.)  Again, I don't know --
18         (Translated.)  I don't know if this refers
19 to specific evidence or reference.  But I definitely
20 stand behind the argument that the Palestinian
21 Authority, at the time that it recruited most of the
22 people who are mentioned there, or even all of them,
23 clearly knew about their pasts in Israeli prisons,
24 Israeli courts.
25         And, in fact, we cite evidence later on,

OCTOBER 23, 2013 - ISRAEL SHRENZEL

---

106

1  specific evidence, that the period of service in
2  the security forces included the years in which they
3  served prison sentences even prior to the emergence
4  of the Palestinian Authority.
5      Q.  On page 21, you discussed the Zinni list.
6      A.  Yes.
7      Q.  You mention the Zinni list three times,
8  pages 21, 25, and 27; correct?
9      A.  Yes.
10     Q.  And the Zinni list was supposedly a list of
11 33 terrorists wanted by Israel that was given to the
12 Palestinian Authority; correct?
13     A.  Yes.  I would just like to explain, because
14 I believe that it's important to expand upon that a bit.
15         This, in general, refers to terrorists with
16 respect to whom Israel had requested their extradition
17 from the Palestinian Authority, encountered refusal,
18 and therefore an attempt was made to bring about their
19 extradition as a result of American involvement.
20     Q.  Have you seen the list?
21     A.  I did not see the list within the framework
22 of the preparations for the writing of this expert
23 opinion.  I have a hard time stating with certainty,
24 but I assume that I certainly must have encountered
25 it during the course of my work in the security forces.

OCTOBER 23, 2013 - ISRAEL SHRENZEL

---

107

1      Q.  So as you sit here today, have you seen the
2  list?
3          MR. YALOWITZ:  Wait a minute.  Objection.
4  I'm not sure the witness is understanding the question.
5  I'm not going to say anything further.
6          MR. HILL:  Why don't we have them translated.
7          MR. YALOWITZ:  I want the prior question
8  and then this question, because I think it's the same
9  question.
10         (Record read as follows:
11         "QUESTION:  So as you sit here today, have
12     you seen the list?")
13         THE WITNESS:  I'm stating once more I don't
14 recall today that I have seen the list.  However, on
15 the basis of a general assumption of my responsibilities
16 at that time, it would be reasonable to assume that,
17 at some point in time, it came under my radar or had
18 been brought to my attention.
19     Q.  BY MR. SATIN:  If I wanted to find out whether
20 or not, in fact, you had seen the Zinni list, could I
21 do that?
22         MR. YALOWITZ:  I don't understand the
23 question.
24         THE WITNESS:  I don't think that there's
25 any way, unless you wish to have me undergo some kind

OCTOBER 23, 2013 - ISRAEL SHRENZEL

---

108

1  of hypnosis.
2      Q.  BY MR. SATIN:  Is there a record -- are there
3  Israeli records that show whether or not you saw the
4  Zinni list?
5      A.  (In English.)  No.
6          (Translated.)  No, I wasn't such an important
7  guy that there was a record kept with respect to exactly
8  what I had seen or hadn't seen.
9          But, again, the fact that Zinni submitted
10 a list was known both in intelligence circles, and
11 I believe that it was also known outside intelligence
12 circles.  If I recall, if I recall accurately, Arafat
13 was asked about that in interviews around the time of
14 the submitting of the list.  I think that the fact that
15 the list was submitted was also published in the media.
16 However, I'm not convinced of that.
17     Q.  Mr. Shrenzel, just please answer just the
18 question that I'm asking you.
19     A.  (Translated.)  I apologize that I have gone
20 back to my --
21         (In English.)  Misbehavior.
22         OFFICIAL INTERPRETER NE'EMAN:  "My
23 misbehavior."  Yes.
24     Q.  BY MR. SATIN:  The report states that
25 Nasser Aweis was on the Zinni list; correct?

OCTOBER 23, 2013 - ISRAEL SHRENZEL

109

1    A.   Yes.

2    Q.   But the report, though, does not include

3    any evidence that the author saw the Zinni list;

4    correct?

5         MR. YALOWITZ:  I don't understand the

6    question.

7         THE WITNESS:  Correct.  The reliance is

8    on an official Israeli document that I assume that

9    you have seen in the material.  And I certainly, as

10   an Israeli citizen, attribute absolute credibility

11   to that.

12   Q.   BY MR. SATIN:  You'd agree that the claim

13   in the report that Nasser Aweis was on the Zinni list

14   is based just on an Israeli government report, not

15   on the list itself?

16   A.   When I wrote that, yes, I relied upon an

17   official Israeli document, and as well as on mentions

18   or references that I perhaps did not mention in the

19   references but that are familiar to me, for example,

20   interviews with Zinni himself, with various American

21   figures who were involved in the negotiations at that

22   time, as well as the fact that -- again, I'm not sure

23   that I mentioned it here specifically.  But it's obvious

24   and it's well known that Arafat himself, as well as

25   other figures, admitted that they had received such

OCTOBER 23, 2013 - ISRAEL SHRENZEL

110

1    a list, and they referred to that as fact.

2    Q.   So we're clear, the claim in the report that

3    Nasser Aweis was on the Zinni list was based on just

4    one Israeli governmental document; correct?

5    A.   Yes.

6    Q.   The report states that Yasser Arafat admitted

7    receiving the Zinni list; correct?

8    A.   Could you please direct me to the exact source

9    in which this is stated?

10   Q.   On page 21, the top paragraph in the middle,

11   states:

12        "Yasser Arafat personally" --

13   A.   I found it.

14   Q.   For the record, it states:

15        "Yasser Arafat personally admitted receiving

16   that list."

17        Correct?

18   A.   Uh-huh.

19   Q.   You have to say "yes" or "no" for the record.

20   A.   "Yes."

21   Q.   But Arafat does not say "I received the list

22   and Nasser Aweis is on the list"; correct?

23   A.   (Translated.)  If I recall correctly, Arafat

24   did not explicitly mention the name of Nasser Aweis.

25   But I did not review -- I did not cover all of the

OCTOBER 23, 2013 - ISRAEL SHRENZEL

111

1    statements that Arafat may have had with respect to

2    the list and all 38 of the names that appear on the

3    list.

4         (In English.)  Thirty-three.

5         OFFICIAL INTERPRETER NE'EMAN:  "Thirty-three."

6    Thank you.

7    Q.   BY MR. SATIN:  And you agree that the report

8    is not based on any statement Yasser Arafat ever made

9    that Nasser Aweis was on the Zinni list; correct?

10   A.   Yes.

11   Q.   You state on the bottom -- excuse me.

12        It states, on the bottom of page 23, referring

13   to Nasser Aweis:

14        "He was directly subordinate to Marwan

15   Barghouti, who was subordinate to Yasser Arafat,

16   president of the Palestinian Authority and chairman

17   of the PLO."

18        Correct?

19   A.   Yes.  That's what's written.

20   Q.   And there is a footnote, footnote 62, after

21   that sentence; correct?

22   A.   Yes.

23   Q.   But what is written in footnote 62 does not

24   support this claim about Nasser Aweis' position in the

25   hierarchy; correct?

OCTOBER 23, 2013 - ISRAEL SHRENZEL

112

1    A.   (Translated.)  In order to answer that

2    precisely, we have to return to the records of the

3    interrogation, the indictment, and the verdict.

4         (In English.)  The verdict -- and especially

5    the verdict.

6         (Translated.)  And particularly the verdict.

7    Q.   Well, there is a quote in footnote 62 from

8    the case; correct?

9    A.   (In English.)  In the footnote itself or in

10   the --

11   Q.   In the footnote itself.

12   A.   (In English.)  In the footnote itself, not

13   in the report.  Okay.

14        "Following the outbreak" --

15        Okay.

16        (Translated.)  Do you want to read it, or

17   do you want me to read it?

18   Q.   You can read it to yourself.

19   A.   (Examining.)  Yes, I see what this refers to.

20   It refers to a statement by Aweis in his interrogation.

21        We note here that, afterwards, he retracted

22   his statement.  But in spite of that, the court saw

23   fit to include it in the verdict of Marwan Barghouti.

24   Q.   Mr. Shrenzel, that quote does not mention

25   Yasser Arafat or Marwan Barghouti; correct?

OCTOBER 23, 2013 - ISRAEL SHRENZEL

113

1    A.    In fact, that's true.

2    Q.    Now, you state on page 27 --

3    A.    (In English.)  Twenty-seven, yes.

4    Q.    -- that Nasser Aweis was a Fatah military

5    commander.

6    A.    Could you refer me to the specific place?

7    Q.    The fourth line down from the first paragraph.

8    A.    (In English.)  "Aweis was under the command"?

9    This one?

10   Q.    Before that.

11   A.    (In English.)  Before that.  So --

12         (Translated.)  Where does the paragraph that

13   you're referring to begin?

14   Q.    So the sentence begins:

15         "This is reflected in his service as an

16   officer in the Palestinian security forces, both

17   before and after his imprisonment."

18   A.    Okay.  I found the paragraph.  I'm going

19   to read it now.  (Examining.)  Yes.

20   Q.    There is no support in the report for the

21   claim that Nasser Aweis was a Fatah military commander;

22   correct?

23   A.    Again, please?

24   Q.    There is no support -- there is no document

25   that's cited in support of the claim that Nasser Aweis

OCTOBER 23, 2013 - ISRAEL SHRENZEL

114

1    was a Fatah military commander; correct?

2          MR. YALOWITZ:  Objection.  Compound.

3          THE WITNESS:  No, no.  There are explicitly

4    stated in the indictment against him and in the verdict

5    and in the ruling.

6          (Brief exchange in Hebrew among Official

7    Interpreter Ne'eman, Check Interpreter Avital,

8    and the witness.)

9          OFFICIAL INTERPRETER NE'EMAN:  "In the

10   sentencing and the verdict."

11         THE WITNESS:  (In English.)  The verdict

12   comes first.  Then the --

13         MR. YALOWITZ:  Is everybody in agreement?

14         OFFICIAL INTERPRETER NE'EMAN:  Yes, I'm in

15   agreement.

16         MR. YALOWITZ:  Thank you.

17   Q.    BY MR. SATIN:  On the bottom of page 26 --

18   A.    And if you allow me to add, then Nasser

19   Aweis himself would be extremely proud to declare

20   his membership in that organization.

21   Q.    Mr. Shrenzel, have I asked you to speculate

22   as to how Mr. Aweis would think about his supposed

23   status in that organization?

24         MR. YALOWITZ:  Objection.  Arguing with the

25   witness.

OCTOBER 23, 2013 - ISRAEL SHRENZEL

115

1          MR. SATIN:  No, it's a question.

2    Q.    BY MR. SATIN:  Have I asked you that question?

3    A.    I thought that that would contribute to the

4    clarification of the issue at hand.

5    Q.    Mr. Shrenzel, understand, I'm not asking you

6    to clarify issues.  I'm asking you to just answer the

7    questions asked of you.

8          MR. YALOWITZ:  Objection.  Do we need to take

9    a break?  I don't want you arguing with the witness.

10   Ask your questions.

11   Q.    BY MR. SATIN:  Mr. Shrenzel, it says on

12   page 26, the last sentence:

13         "The PA has also portrayed and praised

14   Nasser Aweis as a hero in broadcasts on Palestinian

15   television."

16   A.    Yes.

17   Q.    Your report doesn't say what praise has been

18   given; correct?

19   A.    Yes.  I've noticed that problematic aspect,

20   and I think that it will be possible, if necessary,

21   to provide the concrete evidence of the television

22   programs and the broadcasts.

23   Q.    Mr. Shrenzel, you conclude your discussion

24   of Nasser Aweis by saying, quote, on page 27:

25         "Also, had the PA arrested Nasser Aweis,

OCTOBER 23, 2013 - ISRAEL SHRENZEL

116

1    as the U.S. requested, this terrorist attack (and

2    many others) would have been prevented."

3    A.    That is, in fact, the case.

4    Q.    Now, Nasser Aweis was not the shooter in

5    this case; correct?

6    A.    Indeed, that is the case.

7    Q.    Other people were involved in the planning

8    and execution of the incident; correct?

9    A.    Indeed.

10   Q.    The report states that Ahmed Barghouti was

11   responsible for the weapons and Ramadan's transportation

12   to Jerusalem; correct?

13   A.    Indeed.

14   Q.    The reports states that Muhammad Musalah took

15   care of logistics?

16   A.    Yes.

17   Q.    And Majid Al-Masri, according to the report,

18   put Ramadan on his way; correct?

19   A.    Indeed.

20   Q.    So without Nasser Aweis, this incident still

21   could have happened?

22   A.    (Translated.)  You asked me to refrain from

23   speculation.  So perhaps, with all due respect, that's

24   also a type of speculation, and I'm willing to explain,

25   very briefly.

OCTOBER 23, 2013 - ISRAEL SHRENZEL

117

1      A terrorist attack of the type that have
2   been depicted here is not perpetrated by a single
3   person.  There is an entire mechanism that aids and
4   abets it.  And certainly that statement -- there is
5   no question that the arrest of every cell, each and
6   every cell, has importance.
7      (In English.)  Or the element, or in this --
8      (Translated.)  Not "cell," but "component."
9   Or for the purpose of the matter at hand, the arrest
10  of each and every one of the people who are involved
11  in the terrorist attack would contribute to the
12  reduction or the mitigation of the ability to execute
13  the attack.
14      Certainly, had the Palestinian Authority
15  upheld its commitments and arrested more and more,
16  the likelihood that the terrorist attacks would not
17  have taken place would have increased.
18      Q.   Let's talk about Ahmed Barghouti.  You
19  write on page 28:
20      "Ahmed Barghouthi was the head of" the
21  "Al-Aqsa Martyrs Brigades in the Ramallah District."
22  (As read.)
23      A.   Yes.  Please.
24      Q.   And there is a footnote 88 at the conclusion
25  of the parenthetical statement; correct?

             OCTOBER 23, 2013 - ISRAEL SHRENZEL

118

1      A.   Yes.
2      Q.   I'm showing you what will be marked as --
3      A.   I'd like to have a few seconds to review
4   the document again.  (Examining.)  Yes.
5      Q.   That document does not state that Ahmed
6   Barghouti was head of the Al-Aqsa Martyrs Brigades;
7   correct?
8      A.   Correct.
9      Q.   You don't know who filled out the prisoner
10  file on that document; correct?
11      A.   Certainly not by name.
12      Q.   Well, you don't know which person, what role
13  that person was in, who filled out that form; correct?
14      A.   That is, in fact, the case.
15      I can hypothesize, engage in conjecture that
16  this refers to a person or operative or somebody in
17  the office in the Ministry of Prisoners.  In Arabic,
18  it's called the Ministry of Prisoners and Released
19  Prisoners.
20      Q.   Let's discuss the Sokolow incident on
21  January 27th, 2002.
22      You write on page 38 -- excuse me.  Strike
23  that.
24      It's written on page 38 --
25      MR. YALOWITZ:  I'm sorry.  Bear with us.

             OCTOBER 23, 2013 - ISRAEL SHRENZEL

119

1      Why don't you direct the witness to a page, and then
2   you can ask him questions about it.
3      Q.   BY MR. SATIN:  Page 38.
4      A.   (In English.)  Thirty-eight?
5      Q.   Yes, 38.
6      MR. YALOWITZ:  Thank you, Counsel.
7      Q.   BY MR. SATIN:  The second paragraph states:
8      "The suicide terrorist who detonated the
9   explosive device on her person was Wafa Idris, who
10  served as a confidential agent/informant for PA military
11  intelligence and was a Fatah operative."
12      That's what it states; correct?
13      A.   Yes.
14      Q.   And in that paragraph, in that statement,
15  there's no document cited in support of those claims;
16  correct?
17      A.   Which part of this statement are you claiming
18  has no reference?
19      Q.   The part that I just read, about Wafa Idris
20  allegedly being a confidential agent/informant for PA
21  military intelligence and being a PA operative?
22      A.   Yes, but it would be worthwhile to look at
23  her complete profile, which appears later on.
24      Q.   Okay.  Well, let's go to that.  On page 39,
25  the next page, you write just below No. 1:

             OCTOBER 23, 2013 - ISRAEL SHRENZEL

120

1      "Thus, for example, Wafa Idris was a Fatah
2   operative who had participated in stone throwing in
3   Ramallah, in addition to which she served as a courier
4   for Fatah, smuggling flyers and ammunition through
5   Israel Defense Force checkpoints in the Jerusalem area."
6      Correct?
7      A.   Yes.
8      Q.   Now, where it says that Wafa Idris was a
9   Fatah operative, there's no footnote there; correct?
10      A.   But if you look at further information, as
11  well as this very information, you see that Munzir Noor,
12  who was, as we know, the person who prepared her or
13  readied her for this terrorist attack, testified about
14  this clearly.  And this was confirmed, upheld by the
15  court.
16      Q.   Mr. Shrenzel, my only question now -- and
17  we will get to the statements of Munzir Noor in a
18  minute.
19      My only question now is where it says that
20  Wafa Idris was a Fatah operative, there is no footnote
21  there; correct?
22      A.   (In English.)  I don't know where --
23      (Translated.)  We need to return to footnote
24  155 and see what exactly Munzir Noor stated.  Because
25  he, among other people, has certainly confirmed that

             OCTOBER 23, 2013 - ISRAEL SHRENZEL

121

1    she was a Fatah operative.  I don't, of course, remember
2    all of the content of his testimony by heart.
3         Q.    Okay.  I haven't yet asked you about his
4    testimony, but I will do that now.  I'm showing you
5    what will be marked as Defense Exhibit 432.
6              OFFICIAL INTERPRETER NE'EMAN:  Could we take
7    a short break before we do that, or is this not a good
8    time for a break?
9              MR. SATIN:  Sure.  We can take a break.
10             (Recess from 3:25 p.m. to 3:45 p.m.)
11             (Defendants' Exhibit 431 marked.)
12        Q.    BY MR. SATIN:  Mr. Shrenzel, we were
13   discussing Munzir Noor's statements right before we
14   left for a break; right?
15        A.    Yes.
16        Q.    Mr. Noor had been taken into custody when
17   he spoke to the GSS; correct?
18        A.    (In English.)  Probably.
19              (Translated.)  It's certainly reasonable.
20        Q.    You worked at the GSS; correct?
21        A.    Indeed.
22        Q.    And you know, when people get interrogated,
23   that takes place in the custody of the GSS; correct?
24              MR. YALOWITZ:  Objection.  Object to the form.
25              (Comment in Hebrew by the witness.)

OCTOBER 23, 2013 - ISRAEL SHRENZEL

122

1              (Brief exchange in Hebrew between Official
2        Interpreter Ne'eman and the witness.)
3              THE WITNESS:  They are under arrest.
4        Q.    BY MR. SATIN:  And after someone is under
5    arrest, the GSS interrogates the individual; correct?
6              MR. YALOWITZ:  Objection.
7              THE WITNESS:  Not always.  But in most cases,
8    yes.
9        Q.    BY MR. SATIN:  And you've been present for
10   those interrogations?
11        A.    No.
12        Q.    Do you know what happens during those
13   interrogations?
14        A.    No.  Not on a detailed basis.  I have not
15   engaged in interrogations.
16        Q.    But at some point after a person is
17   interrogated, the police take a statement from that
18   individual; correct?
19        A.    I really have no in-depth proficiency in
20   the legal procedure.  But I believe that your statements
21   are accurate ones.
22        Q.    According to the report, there were statements
23   made by Munzir Noor to the police; correct?
24        A.    Indeed.
25        Q.    Statements made in the custody of the police?

OCTOBER 23, 2013 - ISRAEL SHRENZEL

123

1        A.    Yes.
2        Q.    And Munzir Noor gave three different
3    statements; correct?
4        A.    I actually have not examined the issues in
5    depth.  If you indicate specific points, I will try
6    to address them.
7        Q.    Well, the report makes reference to a
8    statement made under police interrogation dated
9    May 13th, 2002; correct?
10        A.    On what page, please?
11        Q.    So, for example, on page 43, footnote 177.
12        A.    Yes.
13        Q.    And if you look to the previous page, there
14   is reference made the statement of Munzir Noor, dated
15   April 25th, 2002.
16        A.    What is the number of the footnote, please?
17        Q.    165.
18        A.    (In English.)  So this is page --
19        Q.    Forty-one.
20        A.    (In English.)  Page 41, footnote 165?
21        Q.    Do you see that?
22        A.    Yes.
23        Q.    And then there is another statement that's
24   referenced in footnote 176 on page 42.
25        A.    Yes.

OCTOBER 23, 2013 - ISRAEL SHRENZEL

124

1        Q.    April 23rd, 2002.
2        A.    Yes.
3        Q.    So we have all together April 23rd, 2002,
4    April 25th, 2002, and May 13th, 2002?
5        A.    That is indeed the case.
6        Q.    Now, your report focuses -- the report
7    that has your name on it, I should say, focuses on
8    the statements of April 25th and May 13th; correct?
9        A.    (In English.)  Again, please.
10        A.    (Translated.)  Again, please.  I wasn't
11   able to follow you.
12        Q.    The report focuses on the statements on
13   April 25th and May 13th; correct?
14        A.    Those are the most-often cited.
15        Q.    The April 23rd statement is only cited one
16   time in footnote 176; correct?
17        A.    Indeed.
18              MR. YALOWITZ:  Objection.  Misstates the
19   record.
20              You shouldn't agree with him if it's wrong.
21   Continue.
22        Q.    BY MR. SATIN:  Footnote 176, the statement
23   April 23rd, 2002, that footnote is used to modify the
24   statement, quote:
25              "Until his arrest, he worked as a medic with

OCTOBER 23, 2013 - ISRAEL SHRENZEL

125

1  the Palestine Red Crescent Association."

2      A.   Yes.  But I see that the same testimony is

3  also mentioned in footnote 175.

4      Q.   Now, in the report, it does not state that

5  in the April 23rd, 2002, statement, Munzir Noor denied

6  his movement in this incident; correct?

7      A.   The truth is that you're confusing me with

8  the different versions.  And for this purpose, in order

9  for me to address them, I must see the documents in

10 their full form.

11         (Defendants' Exhibit 432 marked.)

12     Q.   BY MR. SATIN:  I'm showing you, Mr. Shrenzel,

13 what's been marked as Defense 432.

14     A.   This is -- appears in handwriting which

15 is very dense and crowded in Hebrew.  Even if the

16 handwriting was good handwriting, in order to read

17 through it thoroughly, it would take quite a few

18 moments.  Certainly, in the current state of affairs --

19 tell me what you're asking me to do, and I'll try and

20 do it.

21     Q.   First, Mr. Shrenzel, this Defense 432 is the

22 April 23rd, 2002, statement of Munzir Noor; correct?

23     A.   Yes.

24     Q.   Did you read this document during the two-week

25 period prior to the submission of the report?

OCTOBER 23, 2013 - ISRAEL SHRENZEL

126

1      A.   Not in a full format.  I definitely relied

2  on the conclusions that were drawn by Arieh Spitzen and

3  Noam Meridor, whom I have already praised previously.

4      Q.   Would you agree, Mr. Shrenzel, that this

5  document shows that Munzir Noor denied his involvement

6  in this suicide attack?

7      A.   In order for me to reach such a conclusion,

8  I would have to read through this again.  And if

9  necessary, if there is any misunderstanding in a

10 critical place, we would have to contact the policeman

11 who wrote the report, or at least to go back to the

12 members of the team and find out why they understood

13 what they understood.

14         But are you indicating some sort of a factual

15 error in the report in this context?

16     Q.   Do you know what this document says?

17     A.   This document is part of the entire set of

18 police statements that deal with the involvement of

19 Munzir Noor in this terrorist attack.

20         (Examining.)  Just a moment.

21         It's important to emphasize that the fact

22 that -- the fact that there are several different

23 testimonies and sometimes there are contradictions or

24 inconsistencies among them, is a well-known phenomenon.

25 I assume that that's true with respect to trials

OCTOBER 23, 2013 - ISRAEL SHRENZEL

127

1  in general and people who are interrogated or are

2  defendants.  Ultimately, all of that is presented

3  to the court, and the court decides which version

4  to believe.

5      Q.   Mr. Shrenzel, I'm showing you what's about

6  to be marked as Defense Exhibit 433.

7          MR. YALOWITZ:  Counsel, would you like

8  Mr. Shrenzel to read the Exhibit 432, or are you

9  finished with that exhibit?

10         MR. SATIN:  We're done with it.

11         (Defendants' Exhibit 433 marked.)

12     Q.   BY MR. SATIN:  Mr. Shrenzel, I'm showing

13 you what's been marked as Exhibit 433.

14     A.   (Examining.)  Yes.

15     Q.   Have you seen this document before?

16     A.   Certainly.  During the course of the

17 preparation of my expert opinion.

18     Q.   Did you receive information from the team

19 about this document?

20     A.   Yes.  But this document, because of its

21 importance, I read it with a great deal of attention.

22     Q.   This document is the basis for the author of

23 the report's belief that the PA's General Intelligence

24 Service was involved in the bombing and the attempted

25 cover-up of some sort; correct?

OCTOBER 23, 2013 - ISRAEL SHRENZEL

128

1      A.   I don't know whether that's the only source

2  that proves this.  I would have to go back and check

3  that again in the text.  But this document certainly

4  has weight.

5      Q.   On page 38 --

6      A.   (In English.)  Thirty-eight?

7      Q.   -- the last sentence in the first paragraph

8  reads:

9          "The PA's General Intelligence Service was

10 also involved in the bombing and an attempted cover-up."

11         That's what it says; correct?

12     A.   Yes.

13     Q.   And there is a footnote 150; correct?

14     A.   Yes.

15     Q.   And 150 references Defense Exhibit 433;

16 correct?

17     A.   Correct.

18     Q.   Now, Defense Exhibit 150 is a typewritten

19 document; correct?

20         I'm sorry.

21         Defense Exhibit 433 is, in part, a typewritten

22 document; correct?

23     A.   Yes.

24     Q.   And there is handwriting along the edges;

25 correct?

OCTOBER 23, 2013 - ISRAEL SHRENZEL

129

1    A.   Yes.

2    Q.   The name on the bottom of the typewritten

3  portion is Amaniya Ayadea (phonetic); correct?

4    A.   Correct.

5    Q.   Did you speak to that individual?

6    A.   Never.

7    Q.   Has your team told you that one member of

8  the team has spoken to this individual?

9    A.   No.

10    Q.   At the very top of the document is some

11  handwritten notes; correct?

12    A.   Yes.

13    Q.   Do you know who wrote those handwritten notes?

14    A.   No.  I wish to explain.  Our attention was

15  primarily drawn to the typed text.  The deciphering

16  of this handwriting -- in spite of the fact that we

17  invested a great deal of effort in it, the deciphering

18  of it is not certain and it's very difficult.  For me,

19  and perhaps to a lesser degree, but also for the team

20  that I mentioned.

21    Q.   So the opinion of the team, as far as you

22  know, is based on the typewritten portion; correct?

23        MR. YALOWITZ:  Objection.

24        THE WITNESS:  (In English.)  The team and me.

25        MR. YALOWITZ:  I don't understand the

OCTOBER 23, 2013 - ISRAEL SHRENZEL

---

130

1  question.

2        THE WITNESS:  (In English.)  Yes.

3        (Translated.)  This refers primarily to the

4  typewritten portion.  We were able to decipher some

5  of what's written in handwriting, but we were not able

6  to achieve full deciphering.  And what we were able to

7  obtain or what we were able to do did not change our

8  understanding of the document.

9    Q.   BY MR. SATIN:  The typewritten part includes

10  written information about Wafa Idris; correct?

11    A.   Correct.

12    Q.   The information about Wafa Idris that's

13  included in the typewritten portion of the document

14  does not state the source of that information; correct?

15    A.   (In English.)  Not exactly.

16        (Translated.)  Not exactly.  Because towards

17  the end, it refers to -- it says specifically that

18  Wafa's family emphasized this and that.  And I can

19  translate, if you wish:  That the last time she left

20  the house, there was no indication on her -- she did

21  not display any indication that she had no intention

22  of returning, and the only thing that she said was

23  that she was going to take a drive to Nablus and that

24  she might be late.

25        The general impression from other parts of

OCTOBER 23, 2013 - ISRAEL SHRENZEL

---

131

1  the document and from the content of the document is

2  based on the family members of Wafa Idris.

3    Q.   The information in that memo about Wafa

4  Idris and her family, you don't know who provided that

5  information to the person who wrote this memo; correct?

6    A.   I just said that, in the last paragraph,

7  it explicitly states that the family emphasized.  To

8  whom exactly the family had stated that -- but the

9  information reached the person who wrote this.

10    Q.   The first paragraph, the memo, the document,

11  does not state who provided the information contained

12  in that first paragraph; correct?

13    A.   I'm going to check that now.  (Examining.)

14        Yes, there's no mention of the specific

15  source of the information.

16    Q.   Let's discuss the March 23rd, 2002, incident.

17  If you'd turn to page 50.

18    A.   (In English.)  Fifty.  Okay.

19    Q.   And on to page 51, there's discussion of

20  Abd-el Karim Aweis; correct?

21    A.   (In English.)  Fifty-one, only in the --

22        (Translated.)  Only on the top portion of

23  the page, yes?

24    Q.   And in that section, that top portion,

25  there is again a discussion of the Zinni list; correct?

OCTOBER 23, 2013 - ISRAEL SHRENZEL

---

132

1    A.   Indeed.

2    Q.   And you have not seen the Zinni list in

3  relation to -- well, you have not seen any -- this

4  is the same Zinni list that we discussed earlier;

5  is that correct?

6    A.   Definitely.  Definitely.

7    Q.   On the previous page, under the section

8  where it says, "Public Praise," it states on page 50:

9        "PA television has broadcast programs praising

10  Abd-el Karim Aweis and presenting him as a hero."

11        That's what it says; correct?

12    A.   Yes.

13    Q.   And the report does not provide any evidence

14  to support that claim; correct?

15    A.   Yes.  As I have noted, that is really

16  something that is missing that we can provide.  We

17  certainly have many items in support of that statement.

18    Q.   Nasser Shalish was expelled from the general

19  security apparatus in 1997; correct?

20    A.   Indeed, yes.

21    Q.   I'm going to show you what's going to be

22  marked as Defense Exhibit 434.

23        (Defendants' Exhibit 434 marked.)

24    Q.   BY MR. SATIN:  Defense Exhibit 434 is a

25  court record in the case of Abd-el Karim Aweis; is

OCTOBER 23, 2013 - ISRAEL SHRENZEL

133

1 that correct?

2     A.    (In English.)  This is his sentencing.

3           (Translated.)  This is his sentencing.

4     Q.    And this is a document written by the court;

5 correct?

6     A.    Certainly.  This is the sentencing of the

7 court.

8     Q.    And I'd direct your attention to page 3.

9     A.    (In English.)  Page 3.  Okay.

10          (Translated.)  Where, please?

11    Q.    The last full paragraph on page 3.

12    A.    May I please read through it for several

13 seconds?

14    Q.    Sure.

15    A.    (Examining.)

16    Q.    Would you please read the first sentence

17 in that last paragraph.

18    A.    Yes, please.

19    Q.    I'm asking you to read it.  I don't read

20 Hebrew.

21    A.    (In English.)  Aah, okay.  I read it to

22 myself.  You want me to read it --

23    Q.    Please read it out loud.  I'm sorry for

24 not being clear.

25    A.    (In English.)  I'm not sure that --

              OCTOBER 23, 2013 - ISRAEL SHRENZEL

134

1           (Reading/translated.)

2           "I'm not certain that the American Colony

3 will allow me to open a Hebrew school here.  You know

4 they're a little" --

5     OFFICIAL INTERPRETER NE'EMAN:  I'm sorry.

6     MR. SATIN:  What did he say?

7     OFFICIAL INTERPRETER NE'EMAN:  He said:

8 "You know they're a little pro-Palestinian here."

9     THE WITNESS:  (In English.)  Okay.

10          (The relevant text was read aloud in Hebrew

11 by the witness.)

12    OFFICIAL INTERPRETER NE'EMAN:  Should I

13 translate it?

14    MR. SATIN:  Please.

15    OFFICIAL INTERPRETER NE'EMAN:

16          (Reading/translating.)

17          "After the death of the brother of the

18 defendant, his friend Nasser Shalish contacted him

19 and told him that he has a person who is willing to

20 perpetrate a suicide terrorist attack in revenge, in

21 order to avenge his brother's death.  However, that

22 person is detained in the Mukataa complex in Ramallah."

23    MR. SATIN:  Thank you.

24    OFFICIAL INTERPRETER NE'EMAN:  He also read

25 a second sentence.  Do you want me to translate that?

              OCTOBER 23, 2013 - ISRAEL SHRENZEL

135

1     MR. SATIN:  No, it was just the first sentence

2 that I asked him to read.

3     MR. YALOWITZ:  Wait a minute.  We need to

4 have a complete record.  Even though he didn't follow

5 your instructions, I want the record to reflect what

6 happened.

7     MR. SATIN:  That's not proper.

8     MR. YALOWITZ:  That's not proper for the

9 record to reflect what happened?

10    MR. HILL:  Well, just so the record is clear,

11 Rina, are you saying that you did not translate

12 everything that the witness said?

13    OFFICIAL INTERPRETER NE'EMAN:  I'm saying

14 that the witness translated [sic] two sentences, and

15 you had asked him to translate one sentence.

16    MR. HILL:  Then you should put on the record

17 what the witness did that wasn't responsive.

18    OFFICIAL INTERPRETER NE'EMAN:  Okay.  The

19 second sentence says that the defendant saw to the

20 release of that person, saw to or took care of the

21 release of that person.

22    Q.    BY MR. SATIN:  What you just read from the

23 court record of Abd-el Karim Aweis, that was not put

24 in the report; correct?

25    A.    I think that in general terms, overall terms,

              OCTOBER 23, 2013 - ISRAEL SHRENZEL

136

1 it was.

2     Q.    Where does the report state that the -- where

3 in the report does it state that the incident was done

4 as a revenge for the death of Abd-el Karim Aweis'

5 brother?

6     A.    Oh, okay.  Not necessarily every detail,

7 but the very relationship between the defendant and

8 his friend.  And -- and the important thing from

9 our perspective was that the suicide bomber had been

10 arrested and people saw to it that he would be released.

11 Those things certainly appear.

12    Q.    Abd-el Karim Aweis' brother was killed by

13 the IDF; correct?

14    A.    I did not express an opinion with respect

15 to the exact circumstances of his death.  I assume that,

16 if that's the information that's in your possession,

17 that we can accept that, at least as a working premise.

18    Q.    So what you're saying now is you don't know

19 one way or the other whether his brother was killed by

20 the IDF?  Is that what you're saying?

21    A.    I assume that, if I'm being presented with the

22 claim that this incident started to take form subsequent

23 to the death of his brother, I'm assuming that we're not

24 referring here to death from an illness.  But I don't

25 know, and I did not examine the specific circumstances

              OCTOBER 23, 2013 - ISRAEL SHRENZEL

137

1  of his death.
2       Q.   Hashaika also had relatives killed by the IDF?
3       A.   Could you show me the reference for that
4  determination?
5       Q.   I'm asking you a question, Hashaika -- if you
6  know the answer -- had been killed by the IDF?
7       A.   (In English.)  Hashaika himself?  No.  Or you
8  mean --
9       Q.   No, his relatives.  I'm sorry.
10      A.   (In English.)  Okay.
11      Q.   Let me start again.
12           Hashaika was the suicide attacker in this
13  case; correct?
14      A.   Correct.
15      Q.   Hashaika's relatives were killed by the IDF;
16  correct?
17      A.   I don't know about that at this moment.
18           Did you find that that had been noted in
19  the report?
20      Q.   The way this works is the law requires me
21  to ask the questions and for you to answer them.
22      A.   I certainly respect that.
23      Q.   Do you know that Hashaika had cousins that
24  were killed by the IDF as well?
25      A.   I don't know about that.

OCTOBER 23, 2013 - ISRAEL SHRENZEL

138

1       Q.   Let's talk about the incident on June 19th,
2  2002, beginning on page 56.
3           The report states that Naef Abu Sharh was
4  responsible for this incident; correct?
5       A.   Indeed.
6       Q.   Abu Sharh was never convicted in connection
7  with this incident; correct?
8       A.   That's correct.  He was not apprehended.
9  And as it is noted in the report, he was killed by
10  IDF forces two years after the terrorist attack.
11      Q.   Right.  And the basis for the belief that
12  Naef Abu Sharh was involved in this incident comes
13  from a report in the Israeli Ministry of Foreign
14  Affairs; correct?
15      A.   I must look at that again, take a look at
16  that.
17      Q.   You're welcome to look wherever you like.
18  But I'd direct your attention to the second paragraph
19  on page 57.
20      A.   Yes, I found that.  And I thank you for your
21  assistance.
22           (Defendants' Exhibit 435 marked.)
23      Q.   BY MR. SATIN:  I want to show you what we've
24  marked as Defense Exhibit 435.
25           Showing you what's been marked as Defense

OCTOBER 23, 2013 - ISRAEL SHRENZEL

139

1  Exhibit 435, Defense Exhibit 435 is a document
2  purporting to be from the Israel Ministry of Foreign
3  Affairs; correct?
4       A.   Indeed.
5       Q.   And this report is about the confiscation
6  of money; correct?
7       A.   That's what it states in the heading.  Yes.
8       Q.   I direct your attention to page 4 of this
9  document.
10           MR. YALOWITZ:  Counsel, you mean the fourth
11  unnumbered page?
12           MR. SATIN:  That is correct.
13           THE WITNESS:  Yes.
14      Q.   BY MR. SATIN:  And it says in the middle
15  of the fourth page:
16           "Personal bank accounts from which funds
17  were confiscated during the operation:"
18           "An account in the name of Naef Abu Sharh,
19  a senior fugitive of the Tanzim infrastructure in
20  Nablus who was behind the following terrorist acts:"
21           Bullet point:
22           "The" June 19, "2002, suicide bombing of
23  a crowded bus stop and hitchhiking post at the French
24  Hill intersection in northern Jerusalem, in which
25  seven people were murdered and over 35 were wounded."

OCTOBER 23, 2013 - ISRAEL SHRENZEL

140

1  (As read.)
2       A.   Yes.
3       Q.   That's what it says; correct?
4           And the information on this document is what
5  forms the basis for the report's claim that Abu Sharh
6  was involved in the June 19, 2002, incident; correct?
7       A.   Yes.
8       Q.   No other information?
9       A.   In the report itself.  In the report itself.
10          I am reiterating that it's likely that it
11  would be appropriate to go into more depth with respect
12  to the examination of the issue of the liability of
13  Naef Abu Sharh for the terrorist attack.  However, of
14  course, such a statement in an official document of
15  the State -- of the State of Israel is perceived by
16  me to be credible.  And I'm not aware that, subsequent
17  to the publication of this document, a Palestinian
18  claim or argument was raised that contradicts this
19  determination.
20      Q.   Have you examined the intelligence data that
21  formed the basis of the information in this report by
22  the Israeli Ministry of Foreign Affairs?
23      A.   No.  No, because I've already stated that,
24  for the purposes of the presentation of this expert
25  opinion, no use has been made of intelligence material.

OCTOBER 23, 2013 - ISRAEL SHRENZEL

141

1    Q. Are you saying that you have intelligence
2    material related to Naef Abu Sharh and the June 19,
3    2002, incident?
4        A. I personally have no such information in
5    my possession. But based on my familiarity with the
6    work methods of the Foreign Ministry with respect to
7    publications of this type, I am convinced that they
8    would not have published this information if they had
9    any substantive doubt with respect to its credibility.
10   Q. Do you know who provided the information that
11   forms the basis of the report about Naef Abu Sharh?
12       A. (In English.) This?
13       (Translated.) Are you referring to this
14   paragraph that you just read?
15       Q. Yes.
16       A. Again, without going into details of our
17   work methods of government ministries that I am not
18   proficient in, I can assume, with no certainty, that
19   information of this type was received by the Foreign
20   Ministry from the Army, from the police, from the ISA.
21   But, of course, with respect to the specific case, I
22   don't know where the information came from.
23       Q. So your opinion about --
24       MR. YALOWITZ: I'm sorry. Can I just have
25   the answer back? I apologize.

OCTOBER 23, 2013 - ISRAEL SHRENZEL

142

1        (Last answer read.)
2        MR. YALOWITZ: "With no certainty"?
3        OFFICIAL INTERPRETER NE'EMAN: "Without
4    any certainty." He said: "I can assume without
5    any certainty." That is, in fact, what he said.
6        THE WITNESS: Because it's possible that
7    there were other sources of information that were not
8    brought to our attention at the time of the preparation
9    of the report.
10       MR. SATIN: Why don't we take a break.
11       (Recess from 4:31 p.m. to 4:45 p.m.)
12       MR. HILL: We're back on the record after
13   a break. Right after the break commenced, there was
14   a conversation between Mr. Yalowitz and the witness,
15   in the presence of defense counsel, about the meaning
16   of the prior question and answer that had occurred
17   on the record.
18       I just want to note our standing objection
19   to substantive communications with the witness while
20   under oath, even on a break. As I understand it,
21   it's not permitted by the local court rules.
22       And I would, again, request plaintiffs'
23   counsel not have conversations with the witnesses
24   about their substantive testimony during a break.
25   I don't think it's proper. It certainly wouldn't

OCTOBER 23, 2013 - ISRAEL SHRENZEL

143

1    be proper if we were at trial. And under the rules,
2    the deposition is supposed to be conducted as if at
3    trial.
4        I'll assume Mr. Yalowitz will now want to
5    say something, and I'll let him say what he wants to
6    say.
7        MR. YALOWITZ: Just please don't assume, by
8    my silence, that I agree with anything you just said.
9        Q. BY MR. SATIN: Mr. Shrenzel --
10       A. What about my request?
11       Q. Say what you want to say.
12       A. I asked if it's possible to read or have read
13   the last sentence that I stated or perhaps the last two
14   sentences. And, parenthetically, I promise that, during
15   the course of the break, I did not have any conversation
16   in this respect with my counsel.
17       MR. SATIN: Sure.
18       (Record read as follows:
19       "ANSWER: Again, without going into details
20       of our work methods of government ministries
21       that I am not proficient in, I can assume, with
22       no certainty, that information of this type was
23       received by the Foreign Ministry from the Army,
24       from the police, from the ISA. But, of course,
25       with respect to the specific case, I don't know

OCTOBER 23, 2013 - ISRAEL SHRENZEL

144

1        where the information came from.")
2        THE WITNESS: Okay. So I would like to
3    clarify that I cannot indicate the specific source
4    of the information that served the Ministry of Foreign
5    Affairs. But I'm certain that it came from a source
6    that's considered to be credible, such as the Army,
7    the police, the ISA. Thank you.
8        Q. BY MR. SATIN: Mr. Shrenzel, I want to direct
9    your attention to page 57.
10       A. (In English.) Fifty-seven. Okay.
11       Q. On page 57 of the report, there is a claim
12   that there had been financial assistance for the
13   perpetrators of this attack by Arafat personally;
14   correct? Top of page 57.
15       A. Definitely. And this is of great importance.
16       Q. The report cites a passage from a book;
17   correct?
18       A. Indeed.
19       Q. The book is "Tested by Zion, The Bush
20   Administration and the Israeli-Palestinian Conflict";
21   correct?
22       A. Indeed.
23       Q. It was written by Elliot Abrams; correct?
24       A. Indeed.
25       Q. A member of the Bush administration?

OCTOBER 23, 2013 - ISRAEL SHRENZEL

145

```
1       A.    Correct.
2       Q.    And the passage that you cite from the book
3  references intelligence; correct?
4       A.    (In English.) I didn't follow the question.
5       Q.    The passage in the report that comes from
6  the book makes mention of intelligence; correct?
7       A.    (In English.) Aah, "makes mention of
8  intelligence." Yes.
9             (Translated.) Yes.
10      Q.    Specifically the line is:
11            "There is new intelligence showing that
12  Arafat had approved the payment of $20,000 to the
13  group."
14            Correct?
15      A.    Indeed.
16      Q.    Is this Israeli intelligence or United
17  States intelligence?
18      A.    It's hard for me to determine that with
19  certainty.  I assume that both of those things are true.
20  I think that they could be true.
21            According to Abrams' wording, it seems to
22  me that this refers to Israeli information that the
23  Americans were able to verify.  But that's just my
24  assessment.  I'll go the way Mr. Abrams went, insofar
25  as he did not cite the specific intelligence reports.
```

OCTOBER 23, 2013 - ISRAEL SHRENZEL

146

```
1       Q.    Have you seen the intelligence?
2       A.    I don't recall with certainty.  But the
3  intelligence, if I didn't see it, it's possible that
4  it was brought to my attention or that I was aware
5  of it.
6       Q.    So as you sit here today, you can't say one
7  way or the other whether you did see the intelligence?
8             (Comment in Hebrew by the witness.)
9       MR. YALOWITZ:  It's too much.  You have to
10  let her translate.
11            THE WITNESS:  I could definitely say that
12  I was aware of it.  I can't say that I saw one item
13  or three items.  But I can definitely say that I was
14  aware, that I was aware of the fact during this period
15  of time that information of this sort existed.
16      Q.    BY MR. SATIN:  I'm going to show you what's
17  been marked as --
18      A.    I'm even willing to say that, at that period,
19  during that period of time, I was on a mission abroad
20  and it's possible that I didn't see the information
21  itself.  However, I certainly have knowledge of the
22  fact that such firm information did exist.  And you
23  are certain -- you are certainly aware that that
24  information had a great deal to do with the decision
25  that was made by President Bush to disassociate
```

OCTOBER 23, 2013 - ISRAEL SHRENZEL

147

```
1  himself from Arafat.
2       Q.    So you don't know the source of the
3  intelligence, then; correct?
4       A.    I don't know the exact source.
5       Q.    I'm going to show you what will be marked
6  as Defense Exhibit 436.
7             (Defendants' Exhibit 436 marked.)
8       Q.    BY MR. SATIN:  I'm showing you what's been
9  marked as Defense Exhibit 436.
10            Defense 436 is the page from Abrams' book
11  that is cited in the report; correct?
12      A.    Indeed.
13      Q.    Did you read the entire book?
14      A.    No.
15      Q.    Have you read this page before?
16      A.    Definitely.
17      Q.    Who showed you just this page?
18      A.    This page -- the team that was preparing it
19  had the page.  But certainly, due to its importance,
20  I definitely read the entire relevant section.
21      Q.    Okay.  And according to the page in the book,
22  page 41, it states:
23            "New intelligence was received showing that
24  Arafat had authorized a $20,000 payment to the group."
25            Correct?
```

OCTOBER 23, 2013 - ISRAEL SHRENZEL

148

```
1       A.    (In English.) I'm lost a little bit.  It's
2  quite dense, and my eyes -- you found it?
3       Q.    It's in the first full paragraph about midway
4  through.
5       MR. YALOWITZ:  With your permission, I can
6  direct the witness?
7       MR. SATIN:  Sure.
8             THE WITNESS:  (In English.) See, if I
9  wear the glasses.  Without the glasses, it would be
10  difficult.
11      MR. YALOWITZ:  Which sentence is it?
12      MR. SATIN:  "Days later."
13            THE WITNESS:  (In English.) Okay, "days
14  later."  Okay.
15      Q.    BY MR. SATIN:  It doesn't say when the money
16  was given to the group; correct?
17      A.    (In English.) In this paragraph of -- yes.
18            (Translated.) No, it doesn't explicitly
19  state here when the money was given.
20      Q.    It doesn't say in the book what the money
21  was given to the group for; correct?
22      A.    Indeed, it does not explicitly state that.
23      Q.    And it doesn't say in the book that the money
24  was connected to this June 19, 2002, attack; correct?
25      A.    (In English.) In the book, no.
```

OCTOBER 23, 2013 - ISRAEL SHRENZEL

149

1    (Translated.)  In the book, no.  In the
2  paragraph that I just read, it doesn't state any
3  of that explicitly, in the sense that Abrams did
4  not wish to expose all of the intelligence sources.
5  But I think that it's definitely possible to rely
6  upon his understanding in that he connected the
7  terrorist attack with the transfer of the funds.
8    The issue is too important and too sensitive
9  to suspect that the link between the two things was
10  not clear to the decision makers at the White House.
11   Q.  The book itself is not classified; correct?
12   A.  Indeed.
13   Q.  I can read that book?
14   A.  (In English.)  Of course.
15   Q.  Not just that page.  I can even read the
16  whole book; right?
17   A.  (In English.)  From cover to cover, yes.
18    (Translated.)  By the way, that's very much
19  recommended, because there are a great many sections,
20  apart from the sections that were cited here, that will
21  address the omissions and the actions of the Palestinian
22  Authority --
23   Q.  But you didn't read the whole book; right?
24   A.  (Translated.)  -- and the weakness of the
25  Palestinian Authority.

OCTOBER 23, 2013 - ISRAEL SHRENZEL

150

1    (In English.)  But as I said, I just --
2  I looked at parts of it.  For example --
3    (Comment in Hebrew by the witness.)
4   Q.  BY MR. SATIN:  I just asked you if you read
5  the whole book.
6   A.  (In English.)  The whole book?  No.
7    MR. YALOWITZ:  Please don't interrupt the
8  witness.  Please.
9    MR. SATIN:  Please ask your witness, then,
10  to answer my questions.
11    THE WITNESS:  (In English.)  Okay.
12    MR. YALOWITZ:  You know what?  Let's take
13  a break.  We're not going to bicker, and we're not
14  going to badger the witness.  And we shouldn't
15  interrupt the witness.
16    Do we need a break?
17    MR. SATIN:  No.  Do you need a break?
18    MR. YALOWITZ:  Please continue, Mr. Shrenzel.
19    THE WITNESS:  What I'm saying is that I
20  did not, in fact, read the book in its entirety.  But
21  I took a look at another few sections that dealt with
22  the conduct of the Palestinian Authority, for example,
23  everything that pertained to the Zinni list, with
24  respect to which, for example -- just very briefly,
25  for example, how Arafat would deny responsibility to

OCTOBER 23, 2013 - ISRAEL SHRENZEL

151

1  Zinni for terrorist attacks and negative activities.
2  Whereas, later on, and sometimes even that very same
3  day, the responsibility of the Palestinians became
4  evident.
5    MR. YALOWITZ:  May I make a request of the
6  witness?
7    MR. SATIN:  No.  I want to ask my next
8  question.
9    MR. YALOWITZ:  Go ahead.  Ask your question.
10   Q.  BY MR. SATIN:  So now you've just repeated
11  other parts of the book that I can read; correct?
12   A.  It's just a recommendation.
13   Q.  Thank you.
14    Now I want to ask you about the January 29,
15  2004, incident.  You state on page 70 --
16   A.  (In English.)  Page 70.  Okay.  One minute.
17   Q.  Under the section entitled "Additional
18  Criminal and Hostile Activity - Background," it states:
19    "Prior to being hired as a PA police officer,
20  Hilmi Hamash was convicted and jailed repeatedly for
21  throwing stones at Israelis on scores of occasions."
22    Correct?
23   A.  Yes.
24   Q.  And you later state on page 73:
25    "The Palestinian police took Hamash into

OCTOBER 23, 2013 - ISRAEL SHRENZEL

152

1  its ranks, although it knew of his violent past, both
2  in the terror sphere and in the criminal sphere."
3    See that?
4   A.  Indeed.
5   Q.  Is this referring to Hilmi Hamash's being
6  jailed for throwing stones at Israelis?
7   A.  It's certainly possible that I did not
8  attribute such decisive importance to the nature of
9  the offenses, but in principle.
10   Q.  Would you agree that there are no alleged
11  crimes attributed to Hilmi Hamash in the report other
12  than the throwing of stones and the driving of an
13  unlicensed and uninsured vehicle?
14   A.  Yes.  I wish to explain.
15    The fact that a person sat in Israeli prison
16  several times, based on my understanding, required that
17  the Palestinian Authority engage in a greater prudence
18  prior to employing him.  For example, sitting in
19  prison could amplify the feelings of revenge, strong
20  anti-Israeli indoctrination that frequently occurs
21  in prison.  Therefore, the very fact that he had sat
22  in prison should have, at the very least, raised a
23  yellow light of caution.
24    Although I certainly agree that the throwing
25  of stones, although it is sometimes fatal, is, of

OCTOBER 23, 2013 - ISRAEL SHRENZEL

153

1  course, a less serious offense than murder, shooting,
2  et cetera.
3      Q.  Now, Mr. Shrenzel, you'd agree that the vast
4  majority of Palestinians were not involved in terror
5  acts during the Second Intifada; correct?
6      A.  How do you define "involvement"?
7      Q.  Well, would you agree that the vast majority
8  of Palestinians did not commit crimes against the State
9  of Israel during the Second Intifada?
10     A.  Yes, statistically, that's correct, of course.
11  We're talking about children.  We're talking about
12  women.
13          But it would be worthwhile to emphasize
14  that, when we're analyzing the big picture, a
15  not-inconsiderable portion -- perhaps it's not a
16  majority, but a not-inconsiderable portion of male
17  Palestinians of appropriate ages were, in fact,
18  involved in activity, some activity of some kind.
19     Q.  As part of your work in this case, did you
20  speak to the families of the alleged perpetrators?
21     A.  (In English.)  The perpetrators?
22          (Brief exchange in Hebrew between Official
23      Interpreter Ne'eman and the witness.)
24      THE WITNESS:  No.
25      BY MR. SATIN:  Did you speak to the friends

                OCTOBER 23, 2013 - ISRAEL SHRENZEL

154

1  of the alleged perpetrators?
2      A.  No.
3      Q.  You can't say that the alleged perpetrators
4  committed their alleged crimes in order to receive
5  martyrs payments; correct?
6      A.  Are you referring to those who died, were
7  killed during the course of their activity?
8      Q.  Correct.
9      A.  They certainly didn't do so in order for
10  the families to receive the money.  Their motivation
11  was, first and foremost, hatred, terror.
12          Sometimes we certainly have testimony that
13  the fact that they knew that if they, in fact, would
14  be killed, their family would receive both money and
15  status, let's say that it contributed to the fact that
16  they were willing to go wholeheartedly to perpetrate
17  the attacks.
18     Q.  You don't have any evidence that the alleged
19  suicide attackers in these cases did it for the purpose
20  of getting martyrs payments to their families; correct?
21     A.  No, and it's certainly not logical.
22     Q.  And you can't say that any of the alleged
23  accomplices in these incidents did it in order to get
24  prison payments; correct?
25     A.  No.  But, again, that's the kind of thing

                OCTOBER 23, 2013 - ISRAEL SHRENZEL

155

1  that we can add as a contributory factor.  When a
2  person knows that, if he sits in Israeli prisons,
3  there will be people who will take care of his family
4  and there will be people who will employ every effort,
5  including terrorist activity, in order to obtain his
6  release --
7      Q.  The report --
8      A.  -- those facts are an element that aids
9  and abets.  It's not the direct cause.
10     Q.  The report, you'd agree, does not present
11  any evidence that the alleged accomplices in these
12  cases did it in order to receive prison payments;
13  correct?
14     A.  No, and I certainly don't maintain so.
15  That was not their primary objective.
16      MR. SATIN:  Okay.  Why don't we take a
17  break now.
18      (Recess from 5:12 p.m. to 5:19 p.m.)
19      MR. SATIN:  Mr. Shrenzel, I have no more
20  questions for you at this time.
21      MR. YALOWITZ:  We're done.
22      (The deposition concluded at 5:20 p.m.)
23
24
25

                OCTOBER 23, 2013 - ISRAEL SHRENZEL

156

1          CERTIFICATE OF REPORTER
2
3      I, AMY R. KATZ, RPR, do hereby certify:
4      That, prior to being examined, the witness
5  named in the foregoing deposition was duly affirmed by
6  me to testify the truth, the whole truth, and nothing
7  but the truth;
8      That the foregoing deposition was taken before
9  me at the time and place herein set forth, at which time
10  the aforesaid proceedings were stenographically recorded
11  by me and thereafter transcribed by me;
12      That the foregoing transcript, as typed, is a
13  true record of the said proceedings;
14      And I further certify that I am not interested
15  in the action.
16
17      Dated this 22nd day of December, 2013.
18
19      _____
20      AMY R. KATZ, RPR
21
22
23
24
25

                OCTOBER 23, 2013 - ISRAEL SHRENZEL

157

```
1              CERTIFICATE OF WITNESS/DEPONENT

2

3        I, ISRAEL SHRENZEL, witness herein, do

4   hereby certify and declare the within and foregoing

5   transcription to be my examination under oath in said

6   action taken on October 23, 2013, with the exception

7   of the changes listed on the errata sheet, if any;

8        That I have read, corrected, and do hereby

9   affix my signature under penalty of perjury to said

10  examination under oath.

11

12

13

14

15  _____   _____

16      ISRAEL SHRENZEL, Witness        Date

17

18

19

20

21

22

23

24

25

        OCTOBER 23, 2013 - ISRAEL SHRENZEL
```

158

```
1                    ERRATA SHEET

2   Case:    MARK I. SOKOLOW, et al. vs. THE PALESTINE

3            LIBERATION ORGANIZATION, et al.

4   Date:    OCTOBER 23, 2013

5   Witness: ISRAEL SHRENZEL

6

7   Page _____ Line _____ Change _____

8   Reason _____

9   Page _____ Line _____ Change _____

10  Reason _____

11  Page _____ Line _____ Change _____

12  Reason _____

13  Page _____ Line _____ Change _____

14  Reason _____

15  Page _____ Line _____ Change _____

16  Reason _____

17  Page _____ Line _____ Change _____

18  Reason _____

19  Page _____ Line _____ Change _____

20  Reason _____

21  Page _____ Line _____ Change _____

22  Reason _____

23

24  _____   _____
        ISRAEL SHRENZEL, Witness        Date
25

        OCTOBER 23, 2013 - ISRAEL SHRENZEL
```