# EXHIBIT B.46

## Expert Rebuttal Report by Michael Newton

### Background and Qualifications

My name is Michael A. Newton.  I have been engaged as an expert by the plaintiffs in *Sokolow v. PLO*.  I submit this report in response to assertions made in the expert reports of Dr. Sharon Weill and Advocate Michael Sfard.

I am currently serving as Professor of the Practice of Law at Vanderbilt University Law School.[1] Prior to my service on the faculty at Vanderbilt, I taught at the United States Military Academy at West Point and at the U.S. Army Judge Advocate General's School and Center, Charlottesville Virginia.  I am a 1984 graduate of the U.S. Military Academy who served more than 21 years on active duty, both as a combat arms officer and as an operational lawyer.  My extensive operational and educational experience has included frequent interactions with Israeli officials and military experts including judge advocates, former military judges and prosecutors, and diplomats.  In addition, I handled more than 500 cases as a military prosecutor.

I am an elected member of the International Institute of Humanitarian Law in San Remo Italy, and am active in the International Association of Penal Law, the International Bar Association, and the International Association of Prosecutors.  I am currently serving on the Executive Council of the American Society of International Law, as well as the Advisory Board of the American Bar Association International Criminal Court Project.  I was the military expert on the ABA Task Force on U.S. Policy Towards the International Criminal Court.

I have published more than 80 works of varying lengths, including law review articles addressing the law of occupation.  My forthcoming book length treatment entitled *Proportionality in International Law* to be published in early 2014 by Oxford University Press deals in substantial part with the overlap between the fields of human rights law and the laws and customs of warfare as they are reflected in the modern understanding of the law of occupation.  Those issues are central to the *Sokolow v. PLO* litigation. I am the senior editor of the Terrorism International Case Law Reporter published annually by Oxford University Press since 2007.  In that capacity I

---

[1] http://law.vanderbilt.edu/bio/michael-newton

closely follow terrorism related litigation from within Israel and across a wide variety of jurisdictions.  My book on the trial of Saddam Hussein won the 2009 book of the Year Award awarded for outstanding scholarly contributions to the field from the International Association of Penal Law, American National Section.  My article entitled "Evolving Equality: The Development of the International Defense Bar," won the same award in the articles category in 2011. I have attached a *curriculum vitae* that details my publications in greater detail.

I am an internationally recognized expert in the substance of the field of International Humanitarian Law (frequently referred to, though with regrettable imprecision, as "IHL").  I negotiated the Elements of Crimes for the United States delegation to the International Criminal Court negotiations in the aftermath of the 1998 Rome Statute negotiations.  Though the United States remains opposed to full accession as a State Party to the International Criminal Court, I successfully negotiated the details of the *actus reus* and *mens rea* for each of the many crimes of genocide, crimes against humanity, and war crimes delineated in the Rome Statute to the point that the U.S. delegation could join consensus with all of the other national delegations on both the Elements and the Rules of Procedure and Evidence for the Court. Because the Elements of Crime were included in the Rome Statute as a U.S. innovation, we were deeply immersed with delegations from around the world in reaching agreement on the complex range of offenses during the subsequent negotiations on those Elements.  My professional interactions with local tribunals and the extant international courts in adjudicating the contours of IHL have been constant since 1998.  I am deeply knowledgeable on the details of the requisite conduct, consequences, and circumstantial elements required to prove violations of the substantive international law applicable in the Occupied Territories.

Furthermore, I shaped U.S. policy as the leading military expert personally selected to serve in the Office of the U.S. Ambassador-at-Large for War Crimes[2] in both the Clinton and George W. Bush Administrations.  In that capacity, in addition to advising U.S. policy makers on a wide range of legal issues related to the implementation of the laws and customs of warfare, I became one of the most knowledgeable insiders in the creation of domestic tribunals to adjudicate those substantive crimes.  I helped to craft the concept for the hybrid tribunals, and served as the U.S.

---

[2] Since renamed the Office of Global Criminal Justice, see http://www.state.gov/j/gcj/

representative on the United Nations Planning Mission for the Sierra Leone Special Court, which has been universally recognized as a striking success based on the model and the structural innovations employed on the ground. The model we implemented in Sierra Leone provided the comparative template for internationalized and local tribunals in Cambodia, the Balkans, Bangladesh, East Timor, Uganda, Peru, Kenya, and the Lebanon Tribunal currently working in The Hague. I have been and remain involved in all of those efforts at different times and in different ways, typically advising either prosecutors or judges on the interface between the procedural requirements of human rights norms and the substance of applicable IHL or in helping draft and implement the applicable legal regime to establish effective courts that comply with recognized human rights norms.

When the Security Council recognized coalition operations in Iraq as an occupation within the meaning of the laws of war, I was the external expert retained to assist the Iraqis and U.S. officials in applying that law to create accountability processes in compliance with international norms. I made eight trips to Iraq and served as the International Law Advisor for what became known as the Iraqi High Tribunal.

With particular relevance to the law of occupation as it applies to the Occupied Territory,[3] I have long experience. I was one of the two diplomats who brokered a delegate agreement with respect to the key occupation law related offense in the Rome Statute that was of great concern to delegations from the Arab League delegations as well as the Israeli delegation. Without deep knowledge of the law and practice related to occupations, we could not have had the successful outcome in the Elements of Crimes negotiations, nor could the United States have joined consensus on the final text of the agreements. I was asked by the United Nations Human Rights Council to fly to Geneva and testify to the Goldstone Commission regarding the application of

---

[3] The territories of Judea and Samaria which are subject to the law of "belligerent occupation" as that term is understood in the laws and customs of war and the Fourth Geneva Convention are called different names, such as "Yesha", "Yosh" and "Ahza" - Hebrew acronyms accepted in the Israeli Defense Force - or the "Occupied Territories", the "Administered Territories", the "Territories", and "Judea and Samaria" - names commonly used by the general public. Some scholars prefer to use the term "The Region" as reflected in early Israeli legislation. *See, e.g.,* Entry into Israel Law, 5712-1952, SH No. 111, § 12A. The original Law was passed by the Knesset on the 5th Elul, 5712 (26th August, 1952) and published in Sefer Ha-Chukkim No. 111 of the 15th Elul, 5712 (5th September, 1952), p. 354. For the purposes of this report, the phrase "Occupied Territory" refers to all the territory that remained under the control of the IDF following the ceasefire agreements and which has not since been transferred by legislation or agreement into the control of the State of Israel or any other authority.

the laws and customs of warfare with respect to the incursion into Gaza by the IDF. I have rendered frequent expert advice on issues related to the Israeli occupation and the application of the laws and customs of war to judges and prosecutors in the context of ongoing disputes and in academic settings. In 2010, I gave an expert affidavit in the asylum case of Issa Habeebi arising from the Occupied Territory and testified telephonically in that litigation.

In addition to this depth of experience, I have studied the structure and operation of the Israeli military courts for nearly two decades. This includes conversations with Israeli practitioners as part of my academic efforts. The senior editorship of the International Terrorism Case Law Reporter requires me to follow the jurisprudence generated by the Israeli system as closely as possible. My L.LM. thesis, which was subsequently published, addressed the law of occupation and the formation of military commissions. In preparing that thesis, I researched Israeli practices as well as other strands of the laws and customs of warfare, and the article was cited extensively in the debates over the formation of the U.S. military commissions in the wake of the 9/11 attacks.

I was also one of the handful of legal advisors present in the White House Counsel's office shortly after 9/11 when the decision was reached to study the formation of military commissions under the authority of the Commander-in-Chief. My expertise was instrumental in organizing the small group of interagency experts tasked with making recommendations over the formation and function of military commissions. Over the weeks of complex classified debate I carefully studied the Israeli practices for comparative exemplars. That inter-agency process was subsequently short circuited via executive order as has been publicly documented, but the intensive efforts over several months of inter-agency debates left me deeply aware of the contrast between Israeli practices and those initially adopted by the U.S. Department of Defense. My advice was sought from across the federal government as policymakers began to debate the necessary reforms to the U.S. system after its creation.

My knowledge of the comparative international practices also led to my selection as the American expert that participated in what came to be known as the Oud-Poelgeest process. I was asked to co-chair the working group of international experts that prepared policy

recommendations for improving international cooperation in the investigation and prosecution of terrorist acts. This project was organized with the full support of the Netherlands Ministry of Foreign Affairs, and lasted from April 2007 to April 2010. My knowledge of the Israeli practices as well as the comparative insights led us to adopt a consensus in the Working Group that was subsequently incorporated into the Leiden Policy Recommendations on Counter-terrorism and International Law. My knowledge of the Israeli practices is therefore couched in both an academic study and a practical experience of many years.

I am being compensated at the rate of $300 per hour to prepare this report and to provide follow up or testimony as requested. My compensation is not conditioned in any manner on the substance of my expert conclusions as reflect in this report.

**Summary of Report and Opinions Provided**

My report responds to the claim raised by Dr. Sharon Weill that the Israeli Military Courts are not "properly constituted" under international law, and the claim made by Dr. Weill and Adv. Michael Sfard that the Israeli Military Court system failed to provide adequate due process to defendants during the timeframe at issue in this case.

In the first section, I address the law that applies to the military court system and conclude that the international law of occupation unquestionably establishes the affirmative right of Israeli authorities to create military tribunals within the Occupied Territory.

In the second section, I address Dr. Weill's assertion that the Israeli Military Courts are not properly constituted and demonstrate the following:

- The military courts are properly constituted under applicable international law;

- The military courts have the authority under international law to enact the orders and legislation that has been enacted in the Occupied Territory; and

- The differences in laws and procedures that apply to Israelis and Palestinians in the Occupied Territories are in accordance with the modern laws and customs of war.

In the third section, I address Dr. Weill and Adv. Sfard's contention that the Israeli Military Court system failed to provide due process to those accused of a crime. I conclude that defendants are provided with adequate due process for the following reasons:

- Defendants have the right to counsel;

- The rules of evidence are the same in the Israeli Military Courts as in the Israeli civilian courts;

- Proceedings are translated into Arabic by an interpreter;

- The procedures that apply to classified evidence mirror the procedures common to U.S. litigation and international tribunals;

- The military judges in the Israeli Military Courts are sufficiently independent; and

- The system of appeals from the military court provides the most robust due process protections of any occupation in history.

## I. Legal Background for Military Courts

### A.  As Authorized by the Law of Occupation

The international law of occupation unquestionably establishes the affirmative right of Israeli authorities to create military tribunals within the Occupied Territory. The relationship of a civilian population living in an area where a foreign power is temporarily exercising *de facto*

sovereignty is regulated by the extensive development of the law of occupation.[4]  Israel has applied the law of belligerent occupation to all persons that live in the Occupied Territory since it was "actually placed under the authority of the hostile army."[5] The law of belligerent occupation applies when the following circumstances prevail on the ground: 1] that the existing government structures have been rendered incapable of exercising their normal authority; and 2] that the occupying power is in a position to carry out the normal functions of government over the affected area.[6]  For the purposes of United States policy, occupation is the legal state that occurs when military forces take "firm possession of enemy territory for the purpose of holding it."[7]

 Israel has treated the Occupied Territory within the mandates of the laws and customs of occupation since 1967.  The initial Order that prescribed the composition of the military courts in the Occupied Territory stated in paragraph 35 that "A military court and the administration of a military court shall comply with the principles of the Geneva Convention of 12th August 1949 relative to the Protection of the Civilian Persons in time of war insofar as concerns legal proceedings and in the event of a contradiction between this Order and the said Convention, the provisions of the Convention shall take precedence." [8]   Since that time, the Israeli Supreme court has issued dozens of opinions that, in the aggregate, constitute the most sweeping and sophisticated treatment of the law of occupation undertaken by the domestic courts of any nation in the world.

The modern law of occupation must be understood in contrast to the archaic concept of "*debellatio*" by which the utter defeat of a State by a hostile enemy army occasioned the defeated State to forfeit its legal personality.  This is why the law of occupation as reflected in the Geneva Conventions was intended to create a transient system of civil order precedent to the restoration

---

[4] Regulations annexed to Hague Convention IV of 1907 respecting the Laws and Customs of War on Land (hereinafter 1907 Hague Regulations), entered into force 26 Jan. 1910, reprinted in A. Roberts & R. Guelff (eds.), *Documentation on the Laws of War*, 3rd edition, Oxford University Press, Oxford, 2000, p. 73; Geneva Convention Relative to the Protection of Civilians in Time of War, arts. 47-78, *opened for signature* Aug. 12, 1949, 75 U.N.T.S. 287, 6 U.S.T. 3516 [commonly termed the Fourth Convention].
[5] 1907 Hague Regulations, art.42; *The Law of Land Warfare, Department of the Army Field Manual* 27-10, Washington, 1956, ¶ 351.  This authoritative statement of U.S. law and policy is under revision at the time of this writing but it is inconceivable to me that this aspect would be amended.
[6] *The Manual of the Law of Armed Conflict*, UK Ministry of Defence, Oxford University Press, Oxford, 2004), p. 275, ¶ 11.3.
[7] US *Army Field Manual 27-10,* ¶ 352.
[8] Order Concerning Security Provisions (Judea and Samaria) 5727, 1967.

of full sovereignty by the original state; *i.e*, the Occupied Territory was not absorbed into the sovereignty of Israeli authorities in accordance with the modern laws and customs of warfare.[9] The successful negotiation of the Geneva Conventions in the aftermath of World War II marked the definitive rejection of the concept of *debellatio*, under which the occupier assumed full sovereignty over the civilians in the occupied territory.  Although a state of occupation does not "affect the legal status of the territory in question",[10] the assumption of authority over the occupied territory implicitly means that the existing institutions of society have been swept aside. As a matter of international law, therefore, Israeli military officials appropriately created a system of military courts to fill a legal void in the Occupied Territory that is necessitated by the inapplicability, under international law, of the full sweep of Israeli law.

### B.  As Envisioned in the Textual Authorities Governing the Law of Occupation

The baseline principle of occupation law is that the civilian population should continue to live their lives as normally as possible. This concept in my view is properly termed the minimalist principle, though some observers have termed it the principle of normality.[11] In accordance with the baseline principle, Article 43 of the 1907 Hague Regulations stipulates that the occupying power must respect, "unless absolutely prevented, the laws in force in the country." In its temporary exercise of functional sovereignty over the occupied territory, and as a pragmatic necessity, the occupation authority must ensure the proper functioning of domestic criminal processes and cannot abdicate that responsibility to domestic officials of the civilian population who may or may not be willing or able to carry out their normal functions in pursuit of public order.[12]  As a policy priority, domestic law should be enforced by domestic officials insofar as

---

[9] M. Greenspan, *The Modern Law of Land Warfare*, University of California Press, Berkeley, 1959, pp. 600-601. *Debellatio* "refers to a situation in which a party to a conflict has been totally defeated in war, its national institutions have disintegrated, and none of its allies continue militarily to challenge the enemy on its behalf." Eyal Benvenisti, *The International Law of Occupation*, Princeton University Press, 1993, p. 59.

[10] Protocol I Additional to the Geneva Conventions of 12 August 1949 and Relating to the Protection of Victims Of International Armed Conflicts, *opened for signature* at Berne, 12 Dec. 1977, U.N. Doc. A/32/144 Annex I, art. 4, *entered into force* Dec. 7, 1978, *reprinted in* 16 I.L.M. 1391 (1977) United States policy in this regard is clear that occupation confers only the "means of exercising control for the period of occupation.  It does not transfer the sovereignty to the occupant, but simply the authority or power to exercise some of the rights of sovereignty." U.S. *Army Field Manual*, ¶ 358.

[11] Jean Pictet, *The Principles of International Humanitarian Law, ICRC, Geneva, 1967, p. 50.*

[12] Fourth Geneva Convention, art. 54: "The Occupying Power may not alter the status of public officials or judges in the occupied territories, or in any way apply sanctions to or take any measures of coercion or discrimination against

possible, and crimes not of a military nature that do not affect the occupant's security will normally be delegated to the jurisdiction of local courts.[13]  This is precisely the arrangement in the Occupied Territory following the establishment of Palestinian Authority courts in the aftermath of the Oslo Accords.

Pursuant to its temporary assumption of domestic authority, the occupier may detain civilians when there are "serious and legitimate reasons" to believe that the detained persons threaten the safety and security of the occupying power.[14]  The 1949 Geneva Conventions authorize two distinguishable grounds for exerting military judicial authorities over Palestinians in the Occupied Territory.  On the one hand, commanders commonly issue Military Orders that fill the void of applicable criminal law that are enforceable in military courts as envisioned in the Geneva Convention Relative to the Protection of Civilian Persons in Time of War (commonly termed the Fourth Convention).  The Fourth Convention also contains a parallel set of provisions that permit the internment of civilians based on the necessary security needs of the Detaining Power.  These dual strands of legal authority in fact are often indistinguishable to civilians on the ground, yet are grounded in distinctive legal authorities with different procedural requirements.

Because the foreign power has displaced the normal domestic offices, the cornerstone of the law of occupation is the broad obligation that the foreign power must "take *all* the measures in his power to restore, and ensure, as far as possible, public order and safety."[15] (my emphasis)  In the original and authoritative French text, the occupier must preserve "*l'ordre et la vie publique*" (i.e. public order and life).[16] The corresponding duty found in Article 43 to respect local laws unless "absolutely prevented" (in French "*empêchement absolu*") imposes a seemingly categorical imperative. However, rather than being understood literally, "*empêchement absolu*" has been interpreted as the equivalent of "*necessité*".[17]  The Israeli Supreme court has repeatedly

---

them, should they abstain from fulfilling their functions for reasons of conscience."
[13] US *Army Field Manual,* ¶ 370.
[14] *Prosecutor* v. *Delalic, Mucic, Delic, and Landzo (Celibici) (Judgment),* IT-96-21-T, 20 Feb 2001.
[15] 1907 Hague Regulations, art.43 (emphasis added).
[16] The authoritative and binding French text reads in full: "L'autorité du poivoir legal ayant passé de fait entre les mains de l'occupant, celui-ci prendra toutes les mesures qui dependent de lui en vue de rétablir et d'assurer, autant qu'l est possible, l'order et la vie publique end respectant, sauf empechement absolu les lois en virueur dans le pays."
[17] Yoram Dinstein, "Legislation under Article 43 of the Hague Regulations: Belligerent occupation and peacebuilding", No. 1, Fall 2004, Program on Humanitarian Policy and Conflict Research, Harvard University

reinforced this functional meaning and in doing so has expanded the authority of military authorities to include a variety of interests that seek to enhance public safety or welfare. In the language of the High Court of Justice in the well-known case *Abu Aita v. Commander of the Judea and Samaria Region*, the duty to "restore and ensure" is the dominant principle of occupation law that necessitates some amendments to preexisting legal structures. This interpretation also nicely accords with modern human rights law in that an occupier may amend local law to "remove from the penal code any punishments that are 'unreasonable, cruel, or inhumane' together with any discriminatory racial legislation."[18] For example, the Israeli decision to confer the vote in mayoral elections on women who had not formerly enjoyed this right comported with the Article 43 obligation of an occupier.

The jurisprudence in the Supreme Court of Israel sitting as the High Court of Justice with respect to Article 43 obligations is the most comprehensive of any domestic system in the world. In what became widely known as the *Quarries* case, the High Court of Justice embarked on a detailed analysis of the modern implications of Article 43 in the context of an extended occupation of enemy territory. In paragraph 8 of the complex opinion, the majority wrote that "As is well known, Article 43 has been recognized in our jurisprudence as a quasi-constitutional framework provision that sets out the general framework for the way the duties and powers of the military commander must be exercised in occupied territory."[19] As only one example for the application of this precept as it affects the operation of the military court system, in *Rashed Morar v. IDF Commander in Judaea and Samaria*,[20] the High Court of Justice recognized that Article 43 "sets out the duty and power of the military commander to maintain order and security in the territory under his control. There is no doubt that one of the main duties for which the military commander is responsible within this framework is the duty to ensure that law is upheld in the territories."[21] The High Court of Justice held in favor of the Palestinian plaintiffs on the basis that "except in cases of concrete need, which arises from reliable information or real

---

Occasional Paper Series 8; . See also Edmund Schwenk, "Legislative powers of the military occupant under Article 43, Hague Regulations", *Yale Law Journal*, No. 54, 1945, p. 393.
[18] Leslie C. Green, *The Contemporary Law of Armed Conflict*, Juris, 1999, p. 259.
[19] HCJ 2164/09, *Yesh Din v. Commander of IDF Forces in Judaea and Samaria, et. al*, (26 Dec. 2011).
[20] HCJ 9593/04, *Rashed Morar, Head of Yanun Village Council v. IDF Commander in Judaea and Samaria*, 2 Israel Law Reports 56 (26 June 2006).
[21] *Morar*, ¶ 30. *See also* HCJ 9132/07 Al-Bassiouni [2008] (Isr.), ¶ 12 (holding that Israeli officials must act in accordance with international law providing for basic humanitarian needs in the Palestinian conflict).

warnings in the field, the military commander should, as a rule, refrain from closing areas in a manner that prevents Palestinian inhabitants from having access to their land for their own protection, since the use of this measure in these circumstances is disproportionate."

The High Court of Justice has frequently overturned military orders in order to protect the human rights of the population or based on the determination that the effects of military discretion wrought an undue or inappropriate hardship on the civilian population.  On the other hand, it is striking that the Court has never sustained sweeping attacks on the structure of the entire military court system.  Despite the minimalist principle, international law allows reasonable latitude for an occupying power to modify, suspend or replace the existing penal structure in the interests of ensuring justice and the restoration of the rule of law.[22]  The subtle linkage between Article 43 of the 1907 Hague Regulations and Article 64 of the Fourth Geneva Convention (which entered into force in 1952) gave Israeli officials broad discretion to create the system of military authority to enforce the law in the Occupied Territory.  Article 64 of the Fourth Geneva Convention clarified the permissible exceptions to the minimalist principle in more concrete terms.  In doing so, its drafters did not extend the "traditional scope of occupation legislation."[23]

Article 64 reads in its entirety as follows:

> The penal laws of the occupied territory shall remain in force, with the exception that they may be repealed or suspended by the Occupying Power in cases where they constitute a threat to its security or an obstacle to the application of the present Convention. Subject to the latter consideration and to the necessity for ensuring the effective administration of justice, the tribunals of the occupied territory shall continue to function in respect of all offences covered by the said laws.
>
> The Occupying Power may, however, subject the population of the occupied territory to provisions which are essential to enable the Occupying Power *to fulfill its obligations under the present Convention, to maintain the orderly government of the territory, and to ensure the security of the Occupying Power*, of the members and property of the occupying forces or administration, and likewise of the establishments and lines of communication used by them. (emphasis added)

---

[22] Ken Watkin, "Breaking the Normative Chains," 41 Israel Law Review 175 (2007).
[23] G. Schwarzenberger, *The Law of Armed Conflict,* Stevens, London, 1968, p. 194.

The plain language of Article 64 must therefore be interpreted in good faith in light of the overarching object and purpose of the Fourth Convention,[24] which seeks to alleviate the suffering of the civilian population while balancing the imperative security needs of the occupying government.  The first paragraph strikes a balance between the minimalist intent of the framers and the vital purpose of making due allowance both for the rights of the civilian population and the concurrent right of the occupier to maintain the security of its forces and property.  This is one reason why the domestic law in the Occupied Territory is such a complex commingling of Palestinian Authority promulgations, Jordanian law, and principles drawn from the Ottoman practice. The second paragraph of Article 64 morphed the implicit meaning of "necessary" drawn from the old Hague Article 43 into an explicit authority to amend the domestic laws in order to achieve the core purposes of the Convention. United States doctrine accordingly states that the "occupant may alter, repeal, or suspend laws of the following types: *a.* Legislation constituting a threat to its security, such as laws relating to recruitment and the bearing of arms; *b.* Legislation dealing with political process, such as laws regarding the rights of suffrage and of assembly; or *c.* Legislation the enforcement of which would be inconsistent with the duties of the occupant, such as laws establishing racial discrimination."[25]

### C.  As Mandated by Other Legal Obligations

Quite apart from the authorization derived from the laws and customs of occupation law, the creation of Israeli military courts during the period of occupation was an obligatory measure insofar as the scope of the security offenses was (and remains) largely congruent with the scope of proscribed terrorist offenses under international treaty law.  The principle that states are obligated to use domestic forums to punish violations of international law has roots that run back to the ideas of Hugo Grotius.[26]  Grotius described the concept of *aut dedere aut judicare* (either extradite or punish) in his epochal 1625 work *On the Law of War and Peace*.[27]  The "Father of

---

[24] Vienna Convention on the Law of Treaties, Art. 31(1), 27 Jan. 1980, 1155 UNTS 331, *reprinted in* 8 ILM (1969).
[25] US *Army Field Manual 27-10,* ¶ 371.
[26] Richard Tuck, *The Rights of War and Peace: Political Thought and the International Order from Grotius to Kant* (Oxford University Press 1999).
[27] Hugo Grotius, *de Jure Belli Ac Pacis*, Bk. II, CH XXI, Secs. III and IV  (1625)("Since as a matter of fact states are not accustomed to permit other states to cross their borders with an armed force for the purpose of exacting punishment, and since such course is inexpedient, it follows that the state in which he who has been found guilty dwells ought to do one of two things.  When appealed to it should either punish the guilty person as he deserves, or

International Law" opined that a general obligation to extradite or punish exists with respect to "crimes which in some way affect human society."[28]  Modern international law embodies universal and strongly articulated support for the premise that "any acts of terrorism are criminal and unjustifiable, regardless of their motivation, whenever and by whomsoever committed and are to be unequivocally condemned."[29]  The U.N. General Assembly reaffirms that "no terrorist act can be justified in any circumstances,"[30] and regional instruments adhere to the same legal premise.[31]

As a qualitative matter of modern international law, terrorist offenses are on substantive par with the grave breach provisions of the 1949 Geneva Conventions, the 1948 Genocide Convention, and the provisions of the Torture Convention precisely because of the *aut dedere aut judicare* obligation.  The lofty status of these categories of criminality as the core *jus cogens* violations proscribed by the express language of universally binding international treaty regimes makes *aut dedere aut judicare* really nothing more than a common sense obligation rooted in community morality that morphed into international obligation.  Israel had a duty to establish its judicial authority over such acts in areas under its authority and control, which is particularly relevant in the Occupied Territory.

Sovereign states have an affirmative duty arising from the modern multilateral framework, as well as customary international law,[32] to extradite terrorist suspects to another state which itself has the motivation and jurisdictional basis to adjudicate the offender.  In the alternative, states must establish their own jurisdiction over suspected terrorist actors found on territory under their

---

it should entrust him to the discretion of the party making the appeal.  This latter course is rendition, a procedure most frequently mentioned in historical narratives.").
[28] M. Cherif Bassiouni and Edward M. Wise, *Aut Dedere Aut Judicare: The Duty to Extradite or Prosecute in International Law* (Springer Press 1995) 5.
[29] U.N. Doc. S/RES/1456 (2003).  The United Nations Global Counterterrorism Strategy reiterates the "strong condemnation" of the international community and states that "terrorism in all its forms and manifestations, committed by whomever, wherever and for whatever purposes."
[30] General Assembly, Draft Resolution *Measures to eliminate international terrorism*, U.N. Doc. A/C.6/62/L.14, 13 Nov 2007.
[31] EU Council Framework Decision on Combating Terrorism, 13 June 2002, 2002/475/JHA, pmbl (1)-(2); 1999 Convention of The Organisation of The Islamic Conference on Combating International Terrorism, 1999-1420H , pmbl; OAU Ministerial Communiqué on Terrorism, 11 November 2001; OAS Declaration of Lima to Prevent, Combat, and Eliminate Terrorism, 26 April 1996, pmbl.
[32] *See* Interlocutory Decision on the Applicable Law: Terrorism, Conspiracy, Homicide, Perpetration, Cumulative Charging, STL-11-01/I, ¶¶ 83-113 (Feb. 16, 2011).

authority.  States accept this obligation as an *a priori* matter "without exception whatsoever and whether or not that offense was committed in its territory, to submit the case without undue delay to its competent authorities for the purpose of prosecution through proceedings in accordance with the laws of that state."[33]  This *aut dedere aut judicare* obligates states to preserve the human rights of those citizens under their jurisdiction and to establish prosecutorial mechanisms to validate the rights of other states as well.  The judicial response to terrorist acts is accordingly at the very heart of the treaty regime designed to address multinational terrorist acts on a cooperative community basis.

 At the same time, the international treaties designed to address transnational terrorism preserve sovereign interests by reserving exclusive domestic jurisdiction over offenses committed within a single state, in cases where the victims are nationals of that state, the offender is also a national of that state and is present on its territory, and in which no other state has a colorable claim to jurisdiction.[34]  The Israeli system of military courts in the Occupied Territories fills a legal void that would otherwise result in a zone of impunity for terrorist suspects. To be clear, the formation of military courts in the Occupied Territory predated the textual commitments to uphold the *aut dedere aut judiare* principle as embodied in, *inter alia*, the International Convention for the Suppression of Terrorist Bombings.  Nevertheless, in my view, the failure to establish judicial authority to prevent and/or punish terrorist acts planned and launched from areas under occupation would have violated Israel's international obligations.

## III.  Legal Sufficiency of the Israeli Military Courts

### A.  Authority to Enact Military Orders and Legislation

As stated above, the international law of occupation unquestionably establishes the affirmative right of Israeli authorities to create military tribunals within the Occupied Territory. Article 64 of the Geneva Conventions should be read in a common sense manner that allows the occupier to modify the preexisting domestic law provided that the modifications preserve essential human rights and are linked to the military authority to ensure its own security and the general safety of

---

[33] U.N. Doc. A/52/49, 1997 International Convention for the Suppression of Terrorist Bombings, U.N. GAOR, 52nd Sess., Supp. No. 49, at 389, *entered into force* May 23, 2001, art. 8, para. 1.
[34] Terrorist Bombing Convention., art. 3.

all persons with the occupied zone.[35]  As the Official ICRC Commentary to the Fourth Geneva Convention notes, the legislative powers of the occupying forces are "reinforced by judicial powers designed to make good the deficiencies of the local courts."  This was the practice of the Coalition Provisional Authority in Iraq, and the exercise of that authority was uncontroversial among nation states.  The Coalition Provisional Authority issued dozens of orders under the authority of occupation law as validated by the resolutions of the United Nations Security Council passed under its Chapter VII powers.  Similarly, the Orders creating the military courts in the Occupied Territory create criminal jurisdiction over a range of security related offenses while also empowering those courts to enforce the measures properly promulgated by the military commanders.

The plain language of Article 64 must be understood in light of the overarching object and purpose of the Fourth Convention,[36] which seeks to alleviate the suffering of the civilian population while balancing the imperative security needs of the occupying government.  The Occupying Power may, on the face of the Geneva Conventions issue orders that "subject the population of the occupied territory to provisions which are essential to enable the Occupying Power *to fulfill its obligations under the present Convention, to maintain the orderly government of the territory, and to ensure the security of the Occupying Power*, of the members and property of the occupying forces or administration, and likewise of the establishments and lines of communication used by them. (emphasis added)  The High Court of Justice has written extensively about the contours of what matters are "essential" to enabling Israeli authorities to maintain order as opposed to merely desirable.  The jurisprudence is clear that the considerations of the human rights of the population must be carefully balanced against the absolute validity of Military Orders that preserve the security of the occupying power.  Despite the number of High Court of Justice decisions that curtail the use of unlimited military authority in the Occupied Territory, there is no precedent whatsoever for arguing that the formation of military courts to enforce those orders is unauthorized by the relevant body of international law.

---

[35] *The Manual of the Law of Armed Conflict*, UK Ministry of Defence, Oxford University Press, Oxford 2004, p. 275, ¶11.56.
[36] Vienna Convention on the Law of Treaties, Art. 31(1), 27 Jan. 1980, 1155 UNTS 331, *reprinted in* 8 ILM (1969).

## B. The "Properly Constituted" Test

Article 66 of the Fourth Convention sought to specify the acceptable scope of military courts created under the law of occupation. This provision, in itself, implicitly validates the Israeli authority to promulgate military orders that legally constrain the Palestinian population. Some commentators, including Dr. Weill, simply apply the text of Article 66 to the military courts in the Occupied Territory, but make the mistake of divorcing that provision from its moorings in Article 64 and the precursor provision of Article 43 of the 1907 Hague Regulations. Article 66 supports the conclusion that Israeli military officials responsible for overseeing the occupation have clear authority to establish military courts and to specify *sui generis* jurisdictional grounds. The text permits the occupying power to enforce the "penal provisions promulgated by it by virtue of the second paragraph of Article 64."

On its face, Article 66 limits enforcement efforts to courts that are "properly constituted, non-political military courts, on the condition that the said courts sit in the occupied country." At the trial level, Israeli military courts meet both of these conditions because they exemplify the intent of the drafters. The phrase "properly constituted" is synonymous with the concept of "regularly constituted" which is the express language of Article 3 Common found in all of the Geneva Conventions. The Official ICRC Commentary on the meaning of Article 66 makes plain that:

> The courts are to be "regularly constituted". This wording definitely excludes all special tribunals. It is the ordinary military courts of the Occupying Power which will be competent. Such courts will, of course, be set up in accordance with the recognized principles governing the administration of justice.[37]

"Regularly constituted" military courts such as those established in the Occupied Territory are "non-political" in the sense that the presumption underlying the Geneva Conventions is that professionalized military judges are not subject to the vicissitudes of public political life. Article 66 was designed to subject the population of the occupied territory to military courts as opposed to the experiences during World War II by which civilian judicial processes were corrupted to serve what the ICRC Commentary describes as "political or racial persecution." The military courts were the preferred option provided that they were established by normal military

---

[37] Jean Pictet (ed.), *The Geneva Conventions of 12 August 1949: Commentary,* Vol. IV, *Geneva Convention relative to the Protection of Civilian Persons in Time of War*, ICRC, Geneva, 1958, p. 339-340 (explaining the intended implementation of the provisions found in Article 66)

authorities and draw on normal processes to the extent feasible.  This explains in part why judges in the military courts operating in the Occupied Territory are selected by military authorities using normalized processes and standard professional qualities.

The concept of "regularly constituted" courts (synonymous with the "properly constituted" terminology of Article 66) means that they must be established in accordance with previously extant laws and procedures unless there are compelling reasons articulated for deviations.  In *Hamdan v. Rumsfeld*, the U.S. Supreme Court relied on precisely this rationale in overturning the executive branch action creating military commissions based on the reasoning that the executive branch deviated from the requirements of the applicable provisions of the Uniform Code of Military Justice without adequately demonstrating the necessity for doing so.[38]  "Properly (or regularly) constituted" means in practice that preexisting procedures and statutory rules provide the template that can be adapted, but not ignored, when establishing either military commissions or military courts in areas under occupation within the meaning of the Geneva Conventions.

The creation of military courts under the authority of Article 66 also complies with the underlying human rights considerations to the extent that the judicial processes embody the range of due process protections reflected in Article 67-78 of the Fourth Convention.  The United Nations Human Rights Commission adopted such a functional test that the tribunal should "genuinely afford the accused the full guarantees" in its procedural protections.[39]  As a result the drafters of the International Covenant on Civil and Political Rights rejected proposals specifying that only "pre-established" forums would meet human rights standards.[40]  The *sina qua non* for determining whether a tribunal is appropriately formed under international law, *i.e.* "regularly constituted" or "properly constituted", is that it is established and administered by the competent organs of the state in accordance with relevant requirements of procedural fairness.[41]  The

---

[38] Articles 21 and 36 in that case, each found in Title 10, §§ 821 and 836 respectively.

[39] *See* Human Rights Comm., General Comment on Article 14, P 4, U.N. Doc. A/43/40 (1988); Human Rights Comm., Cariboni v. Uruguay, U.N. Doc. A/39/40 (Oct. 27, 1987). The Inter-American Commission has taken a similar approach. See, e.g., Inter-Am C.H.R., Annual Report 1972, OEA/Ser. P, AG/doc. 305/73 rev. 1, 14 March 1973, at 1; Inter-Am. C.H.R., Annual Report 1973, 2-4, OEA/Ser. P, AG/doc. 409/174 (March 5, 1974).

[40] International Covenant on Civil and Political Rights art. 14, opened for signature Dec. 19, 1966, 999 U.N.T.S. 171, 6 I.L.M. 368 (entered into force Mar. 23, 1976)(describing analogous provisions derived from international human rights law).

[41] Prosecutor v. Tadic Case No. IT-94-1-AR72, 1995 WL 17205280, Decision on the Defense Motion for Interlocutory Appeal on Jurisdiction, 45 (Oct. 2, 1995), *available at* http://www.un.org/icty/tadic/appeal/decisione/

formation of the Israeli military courts meets this standard irrespective of the reality that they were established for a specific purpose or situation.

### C.  Concurrent Jurisdiction

By extension, this legal backdrop warrants the unequal application of law as between Israeli citizens and the local population.  The full scope of Israeli law does not apply to the citizens of the Occupied Territory because it cannot simply be subsumed into the full sovereignty of Israel. In itself, there is nothing remarkable about the application of dual bodies of law with dual procedural norms as applied to diverse groups of people within the same space.  For example, the application of U.S. federal law as applied to civilians in areas within the special maritime and territorial jurisdiction established under U.S. law commonly coexists with the application of military law as applied to persons within its jurisdiction or other legal norms as established by applicable treaties or agreements.  Israeli citizens present in the Occupied Territory remain subject to Israeli law based on the completely uncontroversial premise that Israeli law applies to Israeli citizens.  The Palestinian population is subject either to the *sui generis* Orders lawfully promulgated under the authority of the military commander or to the legal structures promulgated by domestic Palestinian Authority officials in the wake of the Oslo Accords, which include the residual body of law that was in place prior to the Israeli occupation as envisioned in Article 43 of the Hague Regulations.

Phrased another way, Israeli citizens are subject to what Israeli officials term "parallel"[42] jurisdiction of Israeli law.  Military Orders apply with what American practitioners would likely term concurrent jurisdiction and Israelis could in fact be charged in military courts for offenses cognizable as violations of the 'Security Provisions' contained in the Consolidated Order.  Israeli citizens are nevertheless customarily prosecuted in Israeli courts as a matter of policy and pragmatism rather than the military courts because the primary purpose of the latter is to regulate the conduct of the population subject to the occupation.  In addition, the focus of the military

---

51002.htm.

[42] Kathleen Cavanaugh, *The Israeli Military Court System in the West Bank and Gaza*, Vol. 12, Journal of Conflict and Security Law, 197, 206 (noting that Jewish Israelis can be charged and tried in military courts, but rarely are offenses committed by Jews considered 'security violations' and even those that are tend to be prosecuted in domestic courts).

courts is on preserving the security of the occupying forces, and it is not surprising that Israeli citizens do not normally threaten the security of Israeli forces, thereby making jurisdiction of the military courts unnecessary. The Palestinian population may view the resulting disparity in law and procedure as representing some grand conspiracy to deprive them of their human rights, but in fact the perceived inequity is the logical extension of the modern laws and customs of war. As a corollary, the history of occupations is replete with instances where specialized courts have been established specifically to govern the inhabitants of occupied territory. The disparity of legal obligation based on personal jurisdiction extended to Israeli citizens also operates to their disadvantage in areas such as taxation when the military commander's authority to ensure military interests is not implicated. For example, the High Court of Justice ruled against a group of Israelis who sought to annul the payment of land registration fees on the basis that the law of territory during a period of occupation properly derives from the underlying domestic law (in that case Jordanian property law) as supplemented by the Israeli law that applies extraterritorially to Israeli citizens on a personal basis.[43]

## IV. Due Process in the Israeli Military Courts

As noted above, the military court system in the Occupied Territories is firmly grounded in the authority of the laws and customs of war as they relate to the powers inherent in military occupation. By extension, the rights and procedural norms in Israeli military courts are also shaped with full cognizance of the requirements of international law. As the 2012 U.S. State Department Human Rights Report notes "Military court trials of Palestinians and others in the occupied territories provide some, but not all, of the procedural rights granted in criminal courts." Where there are deviations from the processes applicable to the ordinary system of military justice applicable to Israeli military personnel, they are warranted by the scope of authority drawn from the laws and customs of warfare. For example, as noted by the State Department Report, the rights of security detainees who are held without facing criminal charges are different from those that inhere to defendants in criminal proceedings and this disparity is perfectly consistent with the Fourth Geneva convention.

---

[43] *Malcha v. Civil Administration in Judea and Samaria*, HCJ 5324/10, Israel Supreme Court sitting as the High Court of Justice, 28 December 2011, *available at* http://elyon1.court.gov.il/files/10/240/053/m13/10053240.m13.htm (also decided on the basis the laws and customs of occupation generally require military commanders to leave the law of taxation intact absent genuine linkage to the security situation).

The Consolidated Order provides that defendants are entitled to defend themselves through a defense attorney (defined either as a member of the Israeli bar or a counsel licensed to practice in the Occupied Territory) or "to conduct his defense on his own." The right of self-representation has been extensively litigated in international human rights jurisprudence but is preserved in the military courts. In practice, there is a robust defense bar provided primarily by Non-Governmental organizations or human rights groups. When a defendant is charged with an offense punishable by ten years confinement or more and has failed to select counsel, the Consolidated Order provides that counsel will be appointed by the military court and paid from the budget of the regional military commander. Furthermore, current practice mandates that "A defense attorney who was chosen or appointed shall represent the defendant in all proceedings related to the case for which he was chosen or appointed" and that defense attorneys "shall not cease representing the defendant except by permission of court." Conviction rates are extremely high, but not disproportionately so when compared to the rates in the courts of other nations.

### A.  Evidentiary Rules are Consistent

The Israeli practice of adapting the use of military prosecutors, military judges, or normally applicable rules of evidence and procedure into the context of the military courts operating in the Occupied Territory perfectly comports with the intent of the Geneva Conventions. Paragraph 9 of Military Order 378 specified in that vein that "Military courts shall conduct themselves in accordance with the same laws of evidence which apply in cases in which soldiers are tried. However, military courts may diverge from the laws of evidence in special circumstances which must be recorded, if they deem it in the interests of justice to do so."

The rights in criminal proceedings reflect the influence of the well understood parameters of fundamental due process. Article 72 of the Fourth Convention, *inter alia*, outlines the right of Palestinians to present evidence in their defense during trial before military courts. The text specifically notes that "Accused persons shall, unless they freely waive the right to such assistance, be aided by an interpreter, both during preliminary investigation and during the hearing in court." The 2012 State Department Report notes "military courts use Hebrew, but the defendant has the right to simultaneous interpretation at every hearing." Some human rights

organizations argue that the provisions for aiding Palestinians with Arabic interpretation are insufficient because most interpreters are not paid professionals but are instead bilingual Israelis performing mandatory military service. This critique, however, is based on anecdotal evidence and, in any event, there are no demonstrable examples where such assistance has resulted in fundamental injustice, and there is certainly no provision of the laws and customs of war that would invalidate the Israeli practice.

Other aspects of fundamental due process are embedded in the system of military courts. Defendants can appeal through the Military Court of Appeals and petition the High Court of Justice. The same evidentiary rules used in Israeli criminal cases apply; for example, convictions cannot be based solely on confessions. The evidentiary rule in military courts offers an important, but subtle, rebuttal to those who criticize the fact that Israeli citizens are prosecuted in Israeli courts in Israel, while cases involving Palestinian defendants are tried in the military courts in the Occupied Territory. Paragraph 86 of the Consolidated Order provides that "[c]oncerning the law of evidence, the military court shall act in accordance with the obligatory rules in criminal matters in courts within the State of Israel." In other words, defendants charged in each system face the same evidentiary obstacles but benefit from the same protections.

### B. The Use of Classified Evidence

The High Court of Justice will review classified evidence that is submitted pursuant to a certification signed by the Minister of Defense. Supreme Court Justices in Israel conduct an *in camera* review of purportedly classified materials and can order materials to be withheld or redacted in the context of detention hearings if "disclosure of the evidence can expose an important security source."[44] The High Court of Justice has also upheld the provision of unclassified summaries of classified materials, but only after an *in camera* review by the bench. Under Israeli law, when a court limits a detainee's opportunity to review certain materials, it accepts an accompanying obligation to engage in an especially thorough review of the record. On occasion, the High Court of Justice has been critical of the military prosecutor's overreliance on classified information which in turn hinders the ability of detainees and their lawyers to

---

[44] HC Mot. 566/91 (HCJ 5168/90), Qarish v. Commander of IDF Forces in the West Bank (25 Feb. 1991).

litigate in habeas proceedings.[45]  In other instances, judges will require disclosure of evidence deemed improperly classified.

In practice, the Israeli practice closely mirrors the procedures common to U.S. litigation as well as the practices of international tribunals.  The Freedom of Information Act contains express exceptions that permit the nondisclosure of sensitive information that could disclose the sources and methods used to obtain intelligence.[46]  Section 4 of the Classified Information Procedures Act (CIPA) expressly permits the use of redactions and/or unclassified summaries of sensitive information, in lieu of defense access to classified information.[47]  Subchapter V of the Military Commissions Act of 2009[48] provides specific guidance for the protection of classified information.  § 949p-4 of the Military Commissions Act is reproduced in full below because it is virtually identical to the parallel processes followed in Israeli military courts:

### § 949p–4. Discovery of, and access to, classified information by the accused

(a) LIMITATIONS ON DISCOVERY OR ACCESS BY THE ACCUSED.—
(1) DECLARATIONS BY THE UNITED STATES OF DAMAGE TO NATIONAL SECURITY.—In any case before a military commission in which the United States seeks to delete, withhold, or otherwise obtain other relief with respect to the discovery of or access to any classified information, the trial counsel shall submit a declaration invoking the United States' classified information privilege and setting forth the damage to the national security that the discovery of or access to such information reasonably could be expected to cause. The declaration shall be signed by a knowledgeable United States official possessing authority to classify information.
(2) STANDARD FOR AUTHORIZATION OF DISCOVERY OR ACCESS.—Upon the submission of a declaration under paragraph (1), the military judge may not authorize the

---

[45] HCJ 317/13, Abra v. Military Commander in the West Bank, et. al (27 Jan. 2013).

[46] *See ACLU v. United States Department of Defense and Central Intelligence Agency*, 628 F.3d 612 (D.C. Cir. 2011).

[47] CIPA, 18 USCA APP. 3 § 4.

> *The court, upon a sufficient showing, may authorize the United States to delete specified items of classified information from documents to be made available to the defendant through discovery under the Federal Rules of Criminal Procedure, to substitute a summary of the information for such classified documents, or to substitute a statement admitting relevant facts that the classified information would tend to prove. The court may permit the United States to make a request for such authorization in the form of a written statement to be inspected by the court alone. If the court enters an order granting relief following such an ex parte showing, the entire text of the statement of the United States shall be sealed and preserved in the records of the court to be made available to the appellate court in the event of an appeal.*

*See also*, Canada Evidence Act (Canada); *and* National Information Security Act (Criminal and Civil Proceedings) Act 2004 (Australia).

[48] *Codified at* 10 U.S.C. §§ 949p1-7.

discovery of or access to such classified information unless the military judge determines that such classified information would be noncumulative, relevant, and helpful to a legally cognizable defense, rebuttal of the prosecution's case, or to sentencing, in accordance with standards generally applicable to discovery of or access to classified information in Federal criminal cases.  If the discovery of or access to such classified information is authorized, it shall be addressed in accordance with the requirements of subsection (b).

(b) DISCOVERY OF CLASSIFIED INFORMATION.—
(1) SUBSTITUTIONS AND OTHER RELIEF.—The military judge, in assessing the accused's discovery of or access to classified information under this section, may authorize the United States—
(A) to delete or withhold specified items of classified information;
(B) to substitute a summary for classified information; or
(C) to substitute a statement admitting relevant facts that the classified information or material would tend to prove.
(2) EX PARTE PRESENTATIONS.—The military judge shall permit the trial counsel to make a request for an authorization under paragraph (1) in the form of an ex parte presentation to the extent necessary to protect classified information, in accordance with the practice of the Federal courts under the Classified Information Procedures Act (18 U.S.C. App.). If the military judge enters an order granting relief following such an ex parte showing, the entire presentation (including the text of any written submission, verbatim transcript of the ex parte oral conference or hearing, and any exhibits received by the court as part of the ex parte presentation) shall be sealed and preserved in the records of the military commission to be made available to the appellate court in the event of an appeal.
(3) ACTION BY MILITARY JUDGE.—The military judge shall grant the request of the trial counsel to substitute a summary or to substitute a statement admitting relevant facts, or to provide other relief in accordance with paragraph (1), if the military judge finds that the summary, statement, or other relief would provide the accused with substantially the same ability to make a defense as would discovery of or access to the specific classified information.

(c) RECONSIDERATION.—An order of a military judge authorizing a request of the trial counsel to substitute, summarize, withhold, or prevent access to classified information under this section is not subject to a motion for reconsideration by the accused, if such order was entered pursuant to an ex parte showing under this section.

These processes are analogous to those followed in the ad hoc international tribunals.  Rule 70(B) of the Rules of Procedure and Evidence for the International Criminal Tribunal for the former Yugoslavia is the mechanism for sharing information on the basis of limited disclosure.  It is structured to incentivize State cooperation with the Tribunal by allowing disclosure "on a confidential basis and by guaranteeing information providers that the confidentiality of the information they offer and . . . the information's

sources will be protected."[49]  The Tribunal has dissected the balance between the rights of the defense and the obligation to protect sensitive information from unauthorized disclosures in a number of important cases.  In *Milutinović* this balance is discussed because the Rule 70 provider insisted, against an attempted compulsion order, on withholding the redacted information and denied the Trial Chamber an *in camera* examination of the redacted substance.  The Trial Chamber eventually allowed the documents to be admitted, but emphasized the case-by-case factual evaluation that is necessary for such permission.  The Trial Chamber noted that the blanket withholding of the information tested the outer limits of the Rule 70 privilege and required an examination of Rule 70(G) fairness protections.[50]  There is an extensive international jurisprudence regarding the protection of sensitive information from the defense and the conditions for doing so without undermining fundamental due process.  In the aggregate, U.S. law and the practice of international tribunals compares favorably to those used by the Israeli military courts as overseen by the High Court of Justice.

### C.  Independence and Impartiality of Military Judges

Much of the criticism of the Israeli military courts rests on an undercurrent of vitriol and distrust of professional military judges in my view.  I have been most impressed with the professionalism and dedication of Israeli judges and prosecutors whom I have met over the years.  The rule of law depends upon the effective enforcement of jurists that are free to exercise their independent judgment based upon deep integrity to the principles of justice and fairness.  Article 184 of the Israeli Military Justice Act provides that "In adjudication, military judges know no authority, other than the authority of Law, and they are not under the discipline of their commanders." This is not a hollow admonition as it is implemented.  With respect to the military courts in operation in the Occupied Territory, paragraph 8 of the Consolidated Order specifies that "In matters of adjudication there is no authority over one authorized to adjudicate, apart from the authority of the law and security legislation."  The last statistics that I have seen indicated that military judges granted the petitions of some 18% of the Palestinian detainees seeking release

---

[49] *Prosecutor v. Slobodan Milošević*, Case No. IT-02-54-A, Public Version of the Confidential Decision on the Interpretation and Application of Rule 70, 23 Oct. 2002, ¶ 19.
[50] *Prosecutor v. Milan Milutinović*, Case No. IT-05-87-T, Decision on Prosecution Motion For Order of Non-Disclosure in Relation to Shaun Byrnes, 15 February 2007, ¶¶ 6-7.

from detention.  This statistic unmistakably demonstrates judicial independence and warrants the inference that Israeli jurists seek to serve the ends of law and justice.

Military judges serving in the Occupied Territories are selected not by the regional commander, which could create the perception of obedience to a superior officer rather than a higher duty to apply the law fairly in light of the available facts and evidence.  The composition of the Selection Committee has varied through successive Orders, but the present composition is illustrative to show the extent that newly selected military judges are insulated from direct accountability to a particular superior officer.  The seven member Selection Committee is as follows: (1) The president of the courts-martial appeals court, who will chair the committee; (2) The head of the Personnel Branch of the IDF General Staff; (3) The coordinator of government activity in the Area of Judea, Samaria and the Gaza Strip; (4) The vice-president of the courts-martial appeals court; (5) The president of the military court of appeals; (6) A retired judge, to be appointed by the president of the courts-martial appeals court; (7) A representative of the Israel Bar Association, to be selected by the national council of the Bar Association.  The High Court of Justice has observed that military courts sitting in the Occupied Territory are judicial officers "independent of the investigators and prosecutors."  The mandate of the High Court that judges "must be free of bias" and "authorized to order the release of the detainee" has been demonstrated time and again during more than 45 years of military occupation by Israeli forces.

The Israeli practice is completely consistent with the structure of the system of military justice applicable to the United States military.  In *Weiss v. United States*,[51] the Supreme Court unanimously found that the Uniform Code of Military Justice preserves judicial independence despite the fact that military judges serve for fixed terms of office unlike Article III judges who serve for life following their confirmation by the legislative branch.  The Court found that American military judges are sufficiently insulated from the effects of command influence so as to ensure their independence and impartiality.

The twin grounds for upholding the American practice can be readily observed by analogy in the Israeli system: 1) military judges serve under the authority of the military judicial branch rather

---

[51] 510 U.S. 163, 179-81, 114 S. Ct. 752, 762-63, 127 L. Ed. 2d 1 (1994).

than the authority of a particular military commander.  The Court correctly observed that "[r]ather than exacerbating the alleged problems relating to judicial independence, as petitioners suggest, we believe this structure helps protect that independence. Like all military officers, Congress made military judges accountable to a superior officer for the performance of their duties. By placing judges under the control of Judge Advocates General, who have no interest in the outcome of a particular court-martial, we believe Congress has achieved an acceptable balance between independence and accountability;" 2) the military courts are subordinated to a higher level of appellate review, that is in turn subjected to the oversight of an entirely civilian bench that has "demonstrated its vigilance in checking any attempts to exert improper influence over military judges."  The High Court of Justice has repeatedly demonstrated its dedication to balancing the needs of security and compliance with the laws and customs of warfare, while respecting the human rights of defendants facing punishment before military judges.

### D.  The Rights to Appeal

The system of appeals from the orders of the military courts provides more robust due process protections than any other occupation in history to my knowledge.  Defendants can appeal through the Military Court of Appeals and petition the High Court of Justice.  Direct authority to petition the High Court of Justice is unprecedented in the world, and has often been invoked to the benefit of Palestinian plaintiffs.  The consistency of Israeli evidentiary law applicable to the military courts also supports the uniformity of practice guided by the High Court of Justice.

**V. Conclusion**

The formation and operation of Israeli military courts in the Occupied Territory comports with the contours of the law of occupation. The Israeli military courts permit military authorities to fulfill the mandates of occupation law, provide for order and security to the civilian population, and provide an essential structure to enforce lawfully promulgated Military Orders.

Respectfully Submitted on 16 September 2013:

_____

Michael A. Newton, Professor of the Practice of Law