# EXHIBIT B.49

# Expert Report by Daniel Reisner

## I.    Background & Qualifications

1.    I have been engaged as an expert on behalf of the plaintiffs in the case of *Sokolow v. PLO* currently pending in the United States District Court for the Southern District of New York. I submit this report in response to reports submitted to the court by the defendants' experts.

2.    I received my LLB from Tel Aviv University in 1985, and was admitted to the Israel Bar in 1987.

3.    From 1985, I served as a legal advisor in the Israel Defense Force's (IDF) International Law Department, which is the department in the Israeli equivalent of the JAG Corps in the United States that is responsible for all international and operational legal advice to the senior levels of the Israeli defense establishment. Commencing in 1986, one of the areas under my responsibility was to supervise (from the legal perspective) Israeli counter-terrorism and security related activities in the West Bank and the Gaza Strip. After several years serving as the deputy-head of the department, in 1995 I was appointed as the head of the International Law Department, providing advice directly to the highest levels of the Israeli Defense Forces, the Minister of Defense and the Israeli government, on a wide variety of international-law, operational and counter-terrorism related issues. I retired from the service in 2004 with the rank of Colonel.

4.    In parallel to the above, from 1994 onwards, I have served as a senior member of Israel's peace delegations with both Jordan and the Palestinians, working in the triple role

of negotiator, legal advisor and drafter. In this capacity, I have advised Prime Ministers Yitzhak Rabin, Shimon Peres, Benjamin Netanyahu, Ehud Barak, Ariel Sharon and Ehud Olmert, and participated in numerous negotiation sessions and summits, including those in Amman, Wye River, Camp David and Taba. In this context, I have been one of the primary negotiators and drafters of numerous Israeli-Palestinian agreements (including the 1995 Israeli-Palestinian Interim Agreement, the 1997 Note for the Record and Hebron protocol, the 1998 Wye River Memorandum, and the 1999 Sharm Al-Sheikh Memorandum), including many of the agreements relating to the relations between the Palestinian and Israeli legal and judicial systems. I continue to serve as an external special expert consultant to the Israeli Prime Minister and his team on the Middle East peace process today.

5.      Following my retirement from government service in 2004, and after approximately two years managing one of Israel's largest philanthropic foundations, I opened my own law firm, focusing on representing international clients (both private and governmental) in two specialist fields: public international law, and commercial and regulatory aspects of Defense and Homeland Security projects.

6.      Concurrently, I also served as a Fellow at the Israeli Democracy Institute (IDI), Israel's leading think-tank, where I headed the IDI's "democracy and terrorism" program, focusing on comparative international approaches to counter terrorism methods and practices within democratic countries.

7.      In 2008, my firm merged with Herzog, Fox & Neeman, one of Israel's leading law firms, where today I am the partner heading three separate practice groups and departments: International Law; Defense, Aerospace and Homeland Security; and Corporate Compliance and White Collar Crime.

8.      In addition to the above, over the last 13 years I have served as an adjunct professor at the Hebrew University in Jerusalem, Tel-Aviv University, the College of Management at Rishon Le-Zion, and the Interdisciplinary Center in Herzliya. The courses I have taught include: legal and historical aspects of the Arab-Israeli conflict; comparative legal aspects of counter-terrorism; negotiation skills; dispute resolution in international law; and the democratic dilemma faced by Western liberal democracies when facing security threats.

9.      I currently teach in two of the above institutions: Tel-Aviv University (a course on dispute resolution in international law in the International M.A Program in Conflict Resolution and Mediation) and the Interdisciplinary Center in Herzliya (a course on the "democratic dilemma" between countering terrorism and ensuring human rights – taught as part of the international M.A. program of the Lauder School of Government, Diplomacy & Strategy).

10.     I am also a frequent speaker and participant in academic and other conferences (in both Israel and abroad) on a variety of topics, including international law, counter-terrorism and the Arab-Israeli peace process. I also often participate in Israeli and foreign media interviews, on both radio and television, on the same topics.

11.     Finally, I continue to be deeply interested and involved in advancing Palestinian-Israeli relations. In this context, I am currently one of the founders of a ground-breaking international project to establish a joint Israeli-Palestinian commercial arbitration center in East Jerusalem, which will serve as a forum for Palestinians and Israelis to resolve commercial disputes in an objective and politics-free environment. The bilateral agreement to set up the Jerusalem Arbitration Center (JAC) was signed recently by the Israeli and

4

Palestinian branches of the International Chamber of Commerce, with the full support of both the Palestinian and Israeli governments, and we are quite hopeful that this center will commence operations towards the end of this year.

12.     In light of all the above, I have recognized international expertise in a wide range of fields of public international law, the Arab-Israeli conflict, the legal regime in the West Bank and the legal aspects of counter-terror operations, among others. More specifically relevant to this expert opinion, I have subject matter expertise, based upon almost two decades of practice, plus another decade of academic teaching, with respect to the legal aspects of the Israeli control over the West Bank, including regarding the Israeli Military.

13.     Attached as exhibit A is my detailed CV.

14.     Over the past four years I have not testified as an expert witness in any trial. I did provide a Declaration in the matter of *Biton v. the Palestinian Interim Self Governing Authority* in 2007, an Expert Report in *Ungar et al v. Palestinian Authority et al.* in 2010 and an Expert Report in *Shatsky v. the Syrian Arab Republic* in 2013.

15.     My firm is being compensated for my writing of this report on the basis of a discounted hourly rate of $365 plus expenses. In the event that I will be required to provide additional services, including testifying, I will be compensated at the same rate, plus expenses. All the above compensation is not conditional on the content of the opinions expressed in this report, nor is my compensation contingent on the results of these proceedings.

## II.    Summary of Report and Opinion

16.    My report will focus on the following three claims, repeatedly raised in the expert reports submitted on behalf of the defendants:

    a.  The claim that the Military Courts established by Israel in the West Bank were not properly constituted under the relevant rules of international law;

    b.  The claim that specific rules, norms and practices of the Israeli Military Courts in the West Bank fail to provide adequate safeguards for defendants' rights, thereby violating binding international law principles; and

    c.  The claim that the Israeli settlements in the West Bank constitute a violation of customary international law.

17.    In a nutshell, my responses to the above allegations are:

    a.  The Israeli Military Courts in the West Bank were established in 1967 in full conformity with all binding international law requirements and international practice then existent. Since then, the Israeli authorities have continuously updated and amended the structure, authority and norms of the Israeli Military Courts to ensure continued compliance with evolving binding international norms and practices;

    b.  I address specific rules, norms and practices of the Israeli Military Courts raised by the defendants' experts and show that these comply with binding international law principles and standards applicable in similar comparable situations;

    c.  The legality of the Israeli settlements in the West Bank is primarily dependent on whether or not one accepts that the West Bank, in its totality, is occupied

territory. I show that this question is much more complicated than commonly believed (or presented by defendants' experts), that Israel has strong legal and historical arguments which could justify recognition of its rights to parts of the West Bank, and that, to date, there has been no binding international determination in this regard, either for or against either side's position. As a result, the legality of the Israeli settlements in the West Bank remains an open question under international law.

## III.    Introductory Comment on Defense Experts' Methodologies

18.    In response to a number of claims raised by the defendants' experts, this report will focus on a presenting a clear and more accurate picture of the establishment, operation, rulings and international legitimacy of the Israeli Military Courts (hereinafter – "IMC" or "IMCs"). Before entering into these details, however, I would wish to first raise three preliminary points, all relating to the methodology used by defendants' experts:

a.  To a large extent, defense expert's opinions are based on sources of international law which are not applicable to or binding on Israel. I will obviously address this issue in more detail below, but I cannot overstate the importance of this fact when addressing the weight to be given to these expert opinions;

b.  Throughout their opinions, defense experts rely heavily on the black-letter text of the codified Orders issued by the Military Commander.[1] Accordingly, when they were unable to locate a relevant written Military Order embodying a certain tenet of international law or criminal law, defendants' experts concluded (often mistakenly) that such principle does not exist or is not enforced in practice in the

---

[1] As will be elaborated upon below, Military Orders, together with various other legal instruments, form an important part of the legislative framework applicable in the West Bank and IMC.

IMC. This is a result of the fact that defense experts consistently do not refer to IMC case law and precedent. Similarly to the U.S., U.K. and other common-law countries, Israel and the IMC rely heavily on case law and legal tradition ("*stare decisis*") as a complementary (and often binding) legal source. In common-law systems, courts of law are often called upon to interpret statutes and to fill-in, through judicial decisions, what appear to be legal gaps (or "*lacunae*") in formal legislation. This is especially true of the IMC, which operate within an extremely complex legal environment. As a result, it is impossible to create a true and clear understanding of the IMC and their operation, without addressing their judicial rulings as well. By focusing solely on the letter of the law, defense experts knowingly chose to draw a partial (and distorted) picture of the IMCs.

c.  In many instances, defense experts cite their own articles to substantiate certain factual and legal points, creating a "closed-circuit" reference. As a primary example, Advocate Michael Sfard relies heavily in his expert report on the *Yesh Din* report entitled "Backyard Proceedings: The Implementation of Due Process Rights in the Military Courts in the Occupied Territories" – a report for which he himself served as the editor and legal advisor. Moreover, in referencing this report he failed to bring attention to the extensive responses issued by various government authorities. These responses pointed out, among other things, a wide range of flawed research methods, faulty statistical analysis, adulterated data, and simple misunderstandings of matters of fact and law. One such response was authored by the official IMC Unit within the IDF and another, by the IDF's Military Advocate General Unit. These two reports were partially merged into a 28 page statement by the Human Rights and Public Inquiries Department of the

IDF Spokesperson Unit.[2] A fourth response was issued by the Israeli Prison Service.[3] Going back to my previous point regarding the fact that the defense experts omitted IMC case law, it is worth noting that in *Yesh Din's* response to criticisms, it acknowledged that doctrines or precedents developed through case law by the Israeli Military Court of Appeals (as well as first instance IMCs) were beyond the scope of their report, explaining that *"[i]f we had attempted to examine the judicial activities of the Military Courts, it would have been relevant...When at some future time the judgments of the Military Courts are examined in their own right – an examination that is not within the boundaries of the present report – there is no doubt it will be interesting to assess the distance or proximity between the worthy practices and the proceedings in the first instance Military Courts."*[4]

## IV.    The Legality of the Israeli Military Courts in the West Bank

### A.  Historical and Factual Background

19.    In June 1967, Israel faced extinction.[5] The combined might of four allied Arab armies (Syria, Egypt, Jordan and Iraq), supported by reinforcements and material assistance from other Arab countries, including Kuwait, Algeria and, Saudi Arabia, surrounded Israel,

---

[2]  A copy of a translated version of this response is available from Yesh Din's website at: http://www.yesh-din.org/userfiles/file/Reports-English/BackyardProceedings%20IDF%20Response%20ENG.pdf

[3]  This response is in fact annexed to the Yesh Din report, and available at p. 168, accessable at: http://www.yesh-din.org/userfiles/file/Reports-English/BackyardProceedingsfullreportEng.pdf .

[4]  See para. 7 of the Yesh Din response to the IDF Spokesperson Division, available at: http://www.yesh-din.org/userfiles/file/Reports-English/BackyardProceedings%20YD%20Response%20IDF%20ENG.pdf

[5]  For a concise history of the events leading up to the Six Day War see, and Brig. General Shoham, Uri The Principle Of Legality And The Israeli Military Government In The Territories, United States Military Law, Review - Volume 153 - Summer (July) 1996, available from the U.S. Library of Congress at:http://www.loc.gov/rr/frd/Military_Law/Military_Law_Review/1996.htm and http://www.loc.gov/rr/frd/Military_Law/Military_Law_Review/pdf-files/276C7D~1.pdf ; See also, http://www.jewishvirtuallibrary.org/jsource/History/67_War.html#N_6.

ready to attack and overpower the small Jewish State.[6] The leaders of the Arab nations made vociferous public statements and speeches, promising to completely destroy the State of Israel.[7]

20.    At the end of six days of fighting, Israel had (almost miraculously) succeeded in defeating the opposing armies, and found itself in control of territory which was more than triple the size of the country before the war (from 8,000 to 26,000 square miles).[8] This included the Sinai desert, the Golan Heights, the Gaza Strip, and the West Bank, including East Jerusalem.[9]

21.    Immediately following the cessation of hostilities, the Israeli military was required to address the legal status of these territories and their Arab residents. Due to a combination of legal and historical factors (all to be explained in detail below), Israel was unwilling to accept that the West Bank and the Gaza Strip were occupied territory, and as a result, refused to acknowledge the formal legal applicability of the Fourth Geneva Convention of 1949 (GCIV) - which had, in any event, yet to be implemented anywhere around the world - to these territories. At the same time, Israel understood the necessity to apply a clearly defined legal regime to these territories, which could not be left in legal "limbo". As a result, the Israeli government decided to adopt a mixed and pragmatic approach. It would undertake to apply *de facto* the humanitarian provisions of GCIV, whilst still maintaining that they have

---

[6] See the Jewish Virtual Library, referencing data from Chaim Herzog, The Arab-Israeli Wars, (NY: Random House, 1982), p. 149, available at: http://www.jewishvirtuallibrary.org/jsource/History/67_War.html#N_6_
[7] For a list of these statements see, Isi Leibler, *The Case For Israel*, (Australia: The Globe Press, 1972), p. 60, as cited by the Jewish Virtual Library at, http://www.jewishvirtuallibrary.org/jsource/History/67_War.html#N_6.
[8] Brig. General Shoham, Uri The Principle Of Legality And The Israeli Military Government In The Territories, United States Military Law, Review - Volume 153 - Summer (July) 1996, at p. 248. Available from the Library of Congress at:http://www.loc.gov/rr/frd/Military_Law/Military_Law_Review/1996.htm and http://www.loc.gov/rr/frd/Military_Law/Military_Law_Review/pdf-files/276C7D~1.pdf
[9] *Id.*

no formal *de jure* applicability. In other words, Israel committed itself to practically complying with GCIV, without acknowledging that it was legally obligated to do so.[10]

22.    In conformity with this approach, immediately following the cessation of hostilities, and in accordance with the relevant rules and principles of international law, Israel set about establishing its Military Government in all the newly controlled territories, including the West Bank.

23.    One required element of this Israeli Military Government was the setting up of the Israeli Military Courts, which I will now address.

**B.  The establishment of the IMC in the West Bank**

24.    On June 7, 1967, the Israeli Military Commander in the West Bank issued two Proclamations. The first (Proclamation No. 1) declared the assumption of power in the area by the Israeli Defense Forces (IDF) stating:

> *"The Israel Defense Forces have today entered the area and have assumed responsibility for government and for the security and public order of the area".*[11]

---

[10] See the Military Proclamations the Military Orders and the relevant case law cited in the following paragraphs.
[11] The Proclamation Concerning the Assumption of Power by the Israel Defense Forces (No. 1) – 1967, available in Hebrew from the IDF MAG website at:
http://www.mag.idf.il/Templates/GetFile/GetFile.aspx?FileName=XGF5b3NoLWRvY3NcdGhpa2FcbWluc2hhcmlttXGF5YTAzLTAwMS5wZGY=&InfoCenterItem=true

25.    While not strictly required under international law, the publication of this Proclamation was primarily intended to inform the local Arab residents of the West Bank that the IDF had formally assumed authority over the area. It should be noted that the Israeli military authorities based this Proclamation (as with other aspects, to be addressed later), to a large extent, on U.S. and U.K. practices post WWII, and specifically on the United States Department of the Army Field Manual on the Law of War from 1956 (hereinafter – "the US Field Manual" or "FM-27-10"), and the UK Military manual of 1958 (hereinafter – the UK Manual). The former states in this regard:

> *"In a strict legal sense no proclamation of military occupation is necessary. However, on account of the special relations established between the inhabitants of the occupied territory and the occupant by virtue of the presence of the occupying forces, the fact of military occupation, with the extent of territory affected, should be made known. The practice of the United States is to make this fact known by proclamation."*[12]

26.    Proclamation No. 2, issued concurrently with its predecessor, addressed various aspects of the administration of government and law, including (in section 2) the following:

> *"The law that was in force in the area on 7 June 1967 shall remain in force, insofar as it does not contradict this*

---

[12] Section 357 of FM 27-10, available at http://www.loc.gov/rr/frd/Military_Law/pdf/law_warfare-1956.pdf; See also Section 504 of the UK Manual for a similar position.

*Proclamation or any Proclamation or Order issued by me, and with the amendments deriving from the assumption of power by the Israel Defense Forces in the Area.*"[13]

27.    In so doing, Israel was complying with the specific requirements of Regulation 43 to the Regulations attached to the Fourth Hague Convention of 1907 ("HR1907" or the "Hague Rules"), which states that:

> *"The authority of the legitimate power having in fact passed into the hands of the occupant, the latter shall take all the measures in his power to restore, and ensure, as far as possible, public order and safety, <u>while respecting, unless absolutely prevented, the laws in force in the country</u>."* (emphasis added – D.R.).[14]

28.    This general obligation to respect the existing law (inasmuch as possible) was further clarified specifically with respect to penal law, in Art. 64 of GCIV, which states:

> *"The penal laws of the occupied territory shall remain in force, with the exception that they may be repealed or suspended by the Occupying Power in cases where they constitute a threat to its security or an obstacle to the*

---

[13] Proclamation Concerning the Regulation of Law and Order (No. 2) (The West Bank) 1967, available in Hebrew from the IDF MAG website at: http://www.mag.idf.il/962-he/Patzar.aspx.
[14] This Regulation was also adopted *verbatim* into Section 363 of the US Field Manual. See also Sections 511, 521 and 523 of the UK Manual.

> *application of the present Convention. Subject to the latter consideration and to the necessity for ensuring the effective administration of justice, the tribunals of the occupied territory shall continue to function in respect of all offences covered by the said laws.*
>
> *The Occupying Power may, however, subject the population of the occupied territory to provisions which are essential to enable the Occupying Power to fulfill its obligations under the present Convention, to maintain the orderly government of the territory, and to ensure the security of the Occupying Power, of the members and property of the occupying forces or administration, and likewise of the establishments and lines of communication used by them".*

29.    In other words, GCIV provides that the Occupying Power should make a real effort to reinstate the local criminal justice system, and to enable the local courts (assuming such existed prior to the hostilities) to administer justice with respect to the local population under the previously existing laws. At the same time, GCIV (similarly to HR1907) empowers said Occupying Power to amend and repeal those local laws which it feels are prejudicial to the security of the region or to its control thereof, and to legislate such laws as it feels required to ensure said security and control.

30.    With respect to such new military legislation, Art. 66 of GCIV explains that breaches of such laws should be tried not in the local courts (which are assumed not to be

willing to enforce the new laws legislated by the occupying forces), but by military courts established by the military government for this specific purpose:

> " In case of a breach of the penal provisions promulgated by it by virtue of the second paragraph of Article 64 the Occupying Power may hand over the accused to its properly constituted, non-political military courts, on condition that the said courts sit in the occupied country. Courts of appeal shall preferably sit in the occupied country."

31.    The UK Manual repeats and clarifies explains this provision, stating (in Section 568):

> "While, in general, the Occupant is bound to maintain the jurisdiction of the ordinary criminal courts in occupied territory, in case of  breach of criminal laws promulgated by him he may hand over the accused to his properly constituted non-political military courts, provided that such courts sit in the occupied territory. Courts of appeal should also preferably sit in occupied territory."

32.    In summary, international law requires the new military authorities to:

a.  Respect existing local laws, inasmuch as possible; and

    b.   Allow the continued functioning of the local judicial system in the enforcement of such existing laws, inasmuch as such system exists and is capable of so functioning.

33.    At the same time, international law also empowers the occupant to:

    c.   Repeal and amend local laws, and to legislate new laws, as necessitated by the exigencies of the situation; and

    d.   Establish its own military courts for the purpose of enforcing its legislation.

34.    In 1967, Israel followed these principles of international law to the letter. It publicly declared that existing local law (primarily Jordanian law) would remain in effect; it actively sought to reinstate the local legal and judicial system (which had entirely collapsed as a result of the fighting, including all of the Jordanian jails, which had been broken into and from which all the prisoners had escaped);[15] it commenced enacting and publishing security legislation; and it established the required military court system.

35.    Experts on behalf of the defendants have repeatedly alleged that, in spite all of the above, the IMC were not "properly constituted", *inter alia* as a result of the fact that:

    a.   They were appointed by, and were subject to the authority of, the Israeli military commander;

    b.   Not all judges were legally trained; and because

    c.   The IMC applied different rules for the local Arab population than those applicable to Israelis under Israeli law.

---

[15]See, "Interview with the Former Military Advocate General, Brig General (Res.) Dov Shefi", available at, http://www.law.idf.il/961-5359-he/patzar.aspx  (Hebrew)

I will deal with each of these arguments in turn.

    36.    <u>IMC and the Military Commander:</u>

    a.  Defendants' experts have claimed that, as a result of the fact that the IMC judges are military personnel and are appointed by and subject to military authority, there was an "improper constitution" of the IMC, which "*raises a serious doubt as to their ability to be impartial*"[16].

    b.  I have to say that I find this argument to be both legally and factually baseless.

    c.  From the legal perspective, as clearly indicated in all relevant legal instruments, international law actually <u>requires</u> that the military courts be subject to the military authorities of the occupant, and only to them. The reason for this requirement was to prevent any attempt on behalf of the Occupant to apply its own civilian legal system to the criminal courts in the territory, as such act could be perceived as part of an unlawful annexation of the territory. As explained in the UK Manual:

> "*This Article [reference to Art. 66 of GCIV – D.R.] prohibits the Occupying Power extending to the occupied territory its own system of civil courts, see F.R., vol. II, s.A.p. 814. The military courts may, apparently, consist of either military or civilian judges, <u>but they must be responsible to the military authorities of the Occupant</u> ...*"[17]  *[emphasis added – D.R.]*

---

[16] See Dr. Sharon Weill expert report at p. 10, final paragraph of Part II, section 1.a.
[17] Note 2 to Section 568 of the UK Manual.

d. Jean Pictet, the official commentator of the Geneva Conventions, repeats this requirement as follows:

> *"The accused may only be brought before "military courts", that is before courts whose members have military status and are subordinate to the military authorities".*[18]

e. From the practical perspective, the appointment of military judges to military courts in occupied territory was also the accepted practice at the time. As an example, General Eisenhower, in his capacity as Supreme Commander of the Allied Expeditionary Force in Europe, published Ordinance No. 2 establishing the U.S. Military Government Courts for the occupied parts of Germany. This Ordinance was later extended to apply to the American zone of occupation in post WWII Germany. Ordinance no. 2 specifically provided that the "*Military Government Courts are appointed by Army/Military District Commanders*."[19]

f. Finally, defendants' experts repeatedly make reference to a general principle according to which "*civilians should only be tried by civilian courts*".[20] However, it appears that even defendants' experts recognize, when writing outside the context of these proceedings and addressing specifically the IMCs in the West Bank, that the military nature of the IMC (and as a result, of its members) is a

---

[18]    Jean Pictet, on GCIV Article 66, at p. 340. available from the ICRC Treaty Database at http://www.icrc.org/applic/ihl/ihl.nsf/Comment.xsp?viewComments=LookUpCOMART&articleUNID=30151E36E88B6BCCC12563CD0051BF1D

[19]See, Library of U.S. Congress, "Law Reports of Trials of War Criminals, Selected and Prepared by the U.N. War Crimes Commission". at p. 116-117. Annex III reviews the different types of U.S. Military and military government tribunals. Available at: http://www.loc.gov/rr/frd/Military_Law/pdf/Law-Reports_Vol-3.pdf

[20] See Dr. Sharon Weill's report , final paragraph of p. 11, Part II Section 1(c).

requirement and characteristic of international law and a recognized exception to the abovementioned claimed principle:

> "...the occupation is a special situation in which civilians may be tried by a military legal system..."[21]

37.     <u>Legal training of IMC judges:</u>

a.   Defendants' experts claim that the fact that not all IMC judges were always legally trained is proof of the IMC's "improper constitution". Once again, I can find no basis for this allegation in either law or practice, which obviously stems from the belief that only people with formal legal training have the capacity to accurately assess evidence and testimony (an assumption which is rejected in those countries in which jury trials are practiced, such as the U.S.).

b.   As a matter of law, there existed in 1967 no legal requirement, in international law or elsewhere, requiring all judges of military courts to be legally trained.

c.   Jean Pictet, in his official commentary to GCIV, explains that the military courts will usually be the same courts set up by the military authorities to deal with offences committed by its own soldiers.[22] Then (as now) many armies did not (and still do not) require that all judges in military courts be legally trained. As a result, it is clear that mandatory legal training was not viewed as a precondition to membership in the IMC, or to the legality of the IMC under international law.

---

[21] Sharon Weill, "The Judicial arm of the occupation: the Israeli military courts in the occupied territories", in the ICRC International Review, Vol. 89 No. 866, June 2007, at p. 403. Available at http://www.icrc.org/eng/assets/files/other/irrc_866_weill.pdf,.

[22] Jean Pictet on GCIV Article 66, at p. 340 available from the ICRC Treaty Database at http://www.icrc.org/applic/ihl/ihl.nsf/Comment.xsp?viewComments=LookUpCOMART&articleUNID=30151E36E88 B6BCCC12563CD0051BF1D

d.  Similarly, General Eisenhower's abovementioned Ordinance no. 2, setting up the U.S. military courts in occupied Germany specifically set a minimal threshold, requiring that - *"At least one officer with legal training is detailed as a member of such Courts."*[23]

e.  In the same spirit, since their establishment in 1967, Israeli Military Orders required that each IMC bench (the President of each three-judge panel,[24] and all judges in single judge panels[25]) be presided over by a legally qualified judge, thus ensuring that the dominant judge in each case would always have a legal background. This requirement, it should be noted, was a minimum requirement of the law and in reality benches could be filled exclusively by legal professionals.

f.  Defendants' experts' arguments in this regard are probably intended to attempt to create the general impression that the judges appointed to the IMC over the years were somehow inferior or "second-rate" and incapable of administering just proceedings.

g.  A brief review of some of the names and subsequent careers of former IMC judges clearly disproves any such allegation:

   • Judge Uri Shoham, currently a justice in the Israeli Supreme Court, served as the first President of the Military Court of Appeals since its

---

[23] Library of U.S. Congress, "Law Reports of Trials of War Criminals, Selected and Prepared by the U.N. War Crimes Commission". at p. 117.  Annex III reviews the different types of U.S. Military and military government tribunals. Available at: http://www.loc.gov/rr/frd/Military_Law/pdf/Law-Reports_Vol-3.pdf

[24] As explained below, the Military Order now in effect, MO 378, allows only legally qualified judges to serve on IMC benches. However, in its earlier form, Article 4 of the MO stated that: *"(a) A three-judge court shall comprise three judges who are officers of the IDF, of whom one at least is a legally qualified judge; the bench of a court shall be determined by the President. (b) The President of the court shall act as presiding judge of every bench of which he sits. When he does not sit, he shall appoint another legally qualified judge to act as presiding judge"*.

[25] Article 50(a) of MO 378, which has since been amended, read: "*A single-judge Military Court shall be composed of a legally qualified judge who shall be appointed by the President of the Court from among the legally qualified judges. (Such court shall be hereinafter called a "Single Judge Court".)*"

establishment in 1989   (he was later appointed as the Military Advocate General).[26]

- Justice Oded Mudrik, currently the Deputy Chief Justice of the Tel-Aviv District Court, served as a judge on the Military Court of Appeals.[27]

- Retired Tel-Aviv District Court Judge Amnon Straschnov, also served on the IMC of First Instance (he too was later appointed as the Military Advocate General).[28]

- Professor Emmanuel Gross is a respected professor of law at Haifa University who served as the president of the Gaza IMC from 1987-1993.[29]

- Joseph [Yossef] Shapira is currently the Israeli National Comptroller and Ombudsman, prior to which he served as a judge on the Jerusalem District Court. Mr. Shapira served as an IMC judge in the reserves for several years.[30]

- Judge Ezrah Kamma (ret.) formerly Vice President of the Jerusalem District Court, serves as an IMC judge for his IDF reserve duty.[31]

- Mosheh Yoad Ha'Cohen, currently serves as a judge in Israel's Tel-Aviv District Court and serves as an IMC judge during his IDF reserve service. Formerly, Judge Ha'Cohen was one of the founders of the public defense attorney's office in Israel, and served as an

---

[26] See bio on the Israel Judiciary Website, at:
http://elyon1.court.gov.il/heb/cv/fe_html_out/judges/k_hayim/137289638.htm
[27] See bio on the Israeli Judiciary Website at:
http://elyon1.court.gov.il/heb/cv/fe_html_out/judges/k_hayim/17107838.htm
[28] See bio on the website of the law firm of Shomrony Cohen – Straschnov, at: http://www.scs-law.co.il/index.aspx?id=2680#p_1517
[29] See bio on the University of Haifa Website at: http://weblaw.haifa.ac.il/en/Faculty/Gross/Pages/default.aspx
[30] See bio on the website of the State Comptroller and Ombudsman, at:
http://www.mevaker.gov.il/serve/site/ntz_cv_shapira.asp
[31] See bio on the Israeli Judiciary Website at:
http://elyon1.court.gov.il/heb/cv/fe_html_out/judgesDimus/k_hayim/214980575.htm

active defense attorney in Israel's Public Defense Department (Jerusalem District) between 1997 and 2009. He is credited throughout Israel for significantly contributing to the rights of underprivileged defendants in Israeli courts. Prior to that he worked as legal counsel for the New Israel Fund, a well known civil rights and philanthropic organization which has contributed tens of millions of dollars to pro-Palestinian causes.[32]

h. Further regarding the allegations relating to competence of IMC judges, I can only assume that a secondary objective of the defense experts was to cast doubt on the relevant IMC rulings in the specific matter of *Sokolow*, by (wrongly) indicating that at the relevant time period non-legal professionals could theoretically have served as the judges in these cases. The defense experts sought to achieve this by giving the impression that the practice of employing non-legally qualified judges in IMCs continued throughout the 2nd *Intifada* (the relevant time period regarding *Sokolow*) and only ended in 2004 with the enactment of Amendment 89 to the Military Order No. 378 ("MO").  In reality, however, MO Amendment 89 was legislated in 2004 for the purpose of formalizing the practice, which had been implemented several years before (already in 2001/2002, i.e. before the *Sokolow* cases came to court), requiring that all IMC judges be legally qualified.[33] I would also note that, from the sources cited by one of defendants' experts in her opinion, it appears quite clear that she was most probably aware of this fact, but apparently chose to ignore it.[34]

---

[32] See bio on the Israeli Judiciary Website, at:
http://elyon1.court.gov.il/heb/cv/fe_html_out/judges/k_hayim/164154245.htm
[33] N. Benisho, "Criminal law in the West Bank and Gaza", IDF Law Review, Vol. 18 (2005), p. 299, at p. 305 (in Hebrew) available at: http://www.law.idf.il/SIP_STORAGE/files/0/320.pdf
[34] See the expert opinion of Dr. Sharon Weill at footnote 29 in which she references an article written by retired IMC Judge Netanel Benisho (*Id.*). Dr. Weill cites p. 312 of the article in question, while on p. 305 of the very same article the author explains that the IDF abolished the practice of "laymen" IMC judges several years before the 2004 amendment.

38.     Authority of the IMC regarding both Israelis and Palestinians:

  a.  A repeating theme of defendants' experts is that the IMC are unlawful due
      to the fact that they apply different laws to those applicable in Israeli
      courts. Defendants' experts continue by saying that, as the IMC try only
      Palestinian defendants, while Israeli defendants are tried by Israeli
      civilian courts, this difference in laws constitutes an unlawful
      discrimination and breach of the principle of equality.

  b.  Once again, this claim is both legally and factually misleading.

  c.  First and foremost - international law totally prohibits the Occupant from
      directly applying its own civil and criminal law to the occupied territory.
      As a result, requiring the IMC (which are established under international
      law principles) to directly apply Israeli law, as implied by defendants'
      experts, would in fact be a serious violation of international law.

  d.  That is not to say that, when establishing the IMC, Israel did not
      recognize that they should comply with modern principles of
      administration of justice. Accordingly, the security legislation
      establishing the IMC, eventually known as MO 378, allowed them to be
      guided by modern Israeli rules of evidence, ensuring adequate protection
      of the rights of the defendants.[35]

  e.  In practice, as detailed throughout this report, the IMC developed
      practices and procedures mirroring those of modern democratic countries,
      whilst ensuring full compliance with international law safeguards and
      prohibitions.

---

[35] See Article 9 of MO 378 as well as the numerous examples throughout this opinion.

f.  Accordingly, when IMCs identified due process rights available to defendants in Israeli civilian courts which were not sufficiently clear in the applicable law in the West Bank and Gaza, they were often quick to adopt these practices in their judicial rulings. The Military Court of Appeals explained this policy in 2000 by stating:

> "This reality [of parallel court systems] demands equality which, even if not absolute, **can rigorously ensure that serious distortions of justice and discrimination do not take place between those [defendants] being tried in one system versus their peers being tried in another system".** [emphasis in the original text – D.R.][36]

g.  As for the distinction between Israelis and Palestinians, defendants' experts paint a picture according to which Israelis are only subject to Israeli civilian law and courts, while Palestinians are only subject to IMC and Israeli security legislation. This also is incorrect, in both law and fact.[37]

h.  From the legal perspective, the authority of IMC encompasses all violations of Israel's security legislation in the West Bank. This authority does not distinguish between the nationality and place of residence of the defendants, but is solely focused on the fact that they have violated the

---

[36] 157/00 Abu Salim v. The Military Prosecutor. The importance of equality of defendant's rights in IMCs versus Israeli civilian courts was repeated in 2768/09. As explained in detail below, the IMC in this case identified that a right to contest administrative confiscation of property did not formally exist in the West Bank. The IMC however identified that such a right does exist in the Israeli legal system and then went on to explain that the inherent right of equality leads to the conclusion that Palestinian residents of the West Bank must possess this right as well.

[37] See examples in following footnotes but, also see, HCJ 2612/94 Abraham Sha'ar v. The Military Commander of the Judea and Samaria Region. In this case the defendant was an Israeli living in the West Bank who was detained by the local military commander for subversive anti-Arab behavior. He challenged his detention before the Supreme Court of Israel arguing that the IMC and local military law had no authority over Israelis. The Supreme Court flatly rejected these arguments, explaining that the military had equal authority over all residents in the West Bank.

relevant laws.[38] As a result, IMC have the authority to prosecute any and all perpetrators, be they Israelis, Palestinians or neither.

i.   Furthermore, similarly to other legal systems, IMC authority also applies to offences committed outside the West Bank which have a *nexus* to the West Bank (e.g. a terrorist attack committed outside the West Bank which was planned in and initiated from the West Bank would also fall under IMC jurisdiction, concurrently with the jurisdiction of the country in which the actual attack took place).

j.   The above is equally true for the Israeli civilian courts. Obviously – these courts have authority to prosecute any violations of Israeli criminal law, no matter the nationality or place of residence of the perpetrator. At the same time, Israeli courts also have jurisdiction to deal with offences committed outside of Israel, if a sufficient Israeli *nexus* exists.

k.   What this actually means is that, in the normal course of events, Palestinians are usually subject to the jurisdiction of the courts situated within the West Bank (i.e. the Palestinian Authority-operated regular courts for regular criminal offences, or the Israeli-operated IMC for security-related offences) while Israelis are usually subject to the jurisdiction of Israeli courts for all offences. However, both populations can also be tried in the other court system (Israelis in the IMC and Palestinians before Israeli courts) if they commit offences falling under the jurisdiction of the relevant courts. In other words, subject to the specific facts of each case, both populations could actually be tried in either court system, under either legal system.

---

[38] See Article 7 of the MO 378.

l.  Defendants' experts are correct in one point – that current Israeli policy is to prefer prosecuting criminal offences committed by Israelis before Israeli courts and not before IMC. However, it should be noted that:

    1.  This was not always the case, as for many years following the establishment of the IMC in 1967 they routinely handled cases against Israelis as well. One noteworthy example is the 1980s IMC trial of Elyakim Ha'etzni, a politician, activist and former member of Israel's parliament (or Knesset); although there are other more recent examples as well[39];

    2.  To this day IMC routinely handle judicial appeals filed by both Israelis and Palestinians against security measures to which they have been subjected by the Israeli military authorities (e.g. Israelis served with supervision or control orders issued against them by Israeli military commanders, a not uncommon occurrence[40]); and

    3.  The decision by Israel to generally prefer prosecuting its citizens in its own national courts totally conforms to accepted international practice by other western democratic countries. As an example, U.S. defendants accused of war crimes or terrorist-related activity can, for the same offence, often be tried in U.S.

---

[39] See HCJ 61/80 Elyakim Haetzni v. The State of Israel. For a more recent example, see the 2006 Military Court of Appeals case in 5/06 Eiran Schwartz v. The Military Commander of the Region. In this case, the defendant, an Israeli citizen, challenged in an IMC a restraining order  issued by the Military Commander which required he not travel outside his home neighborhood. Among other arguments, the defendant asserted that the military lacked authority over him. The Military Court simply rejected this argument and ruled in favor of the military. Historically, Israelis were brought before the IMC from the moment they were founded. As another example, less than two months after the Six Day War had concluded, an Israeli was accused of the crime of "pillage" for actions he had committed in the recently occupied territory. The defendant petitioned Israel's Supreme Court asserting that he should be tried instead before the Israeli Magistrate Court of Safed, an Israeli city in the Galilee region. The Supreme Court rejected his petition, emphatically stating that IMC are fully authorized to try Israeli citizens (See, 210/67 David Levy v. The Chief of the General Staff of the IDF).

[40] *Id*. 5/06 Eiran Schwartz v. the Military Commander of the Region; and see 5/05 Adler V. The Commander of IDF Forces in Judea and Samaria.

Federal Criminal Courts under the U.S. Criminal Code[41], by Military Commissions under the Military Commission Act, or by general courts-martial under the Uniform Code of Military Justice[42]. Furthermore, despite the concurrent jurisdiction with U.S. Federal Courts, the United States consistently prosecutes certain "unprivileged enemy belligerents" in military commissions with different (and allegedly significantly reduced) procedural protections. In the post- WWII U.S. Supreme Court *Quirin* case, the right of U.S. authorities to opt to try individuals in courts operated by the military was upheld, even if concurrent jurisdiction existed in civilian courts.[43]

### C.     The Legality of specific rules, norms and practices of the IMC

**<u>Introduction</u>**

39.     Defendants' experts have pointed to a long list of norms and practices of the IMC which they believe do not conform to international law principles. I will address each of these in turn, and show that IMC rulings reflect the finished product of a fully functional and just legal system and may be relied upon as such in forums throughout the world. Indeed,

---

[41] See the extraterritorial nature of terrorism crimes in 18 U.S.C. chapter 113B and of war crimes under 18 U.S.C. chapter 2441.

[42] See, for example, 10 U.S.C. section 818 which empowers general court-martial with jurisdiction over "any person triable under the law of war").

[43] Ex parte Quirin, 317 U.S. 1 (1942). In *Quirin*, authorities chose to try German spies caught on U.S. soil in military as opposed to civilian courts. Civilian courts in Washington D.C. refused to intervene in the military proceedings and, regarding this deference, the Supreme Court explained that the defendants could be tried by military commissions, "*notwithstanding the fact that, ever since their arrest, the courts in the jurisdictions where they entered the country and where they were arrested and held for trial were open and functioning*"

decisions rendered in IMC conform entirely to the principles articulated in the U.S. Supreme Court's *Hilton* case in which Justice Gray, in 1895, described what type of foreign court decisions would be recognized in the U.S.:

> *"[W]here there has been opportunity for a full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court, or in the system of laws under which it was sitting, or fraud in procuring the judgment, or any other special reason why the comity of this nation should not allow it full effect, the merits of the case should not, in an action brought in this country upon the judgment, be tried afresh".*[44]

40.     Israel has an extremely advanced and respected legal system. To the best of my knowledge, cases rendered in Israeli civilian courts are generally honored in U.S. proceedings, subject of course to local state and federal rules and procedures. It is my opinion that judgments of IMC are worthy of similar treatment.

---

[44] *Id.* 159 U.S. 113 (1895). at 202–03.

41.    More specifically, in response to the numerous specific claims and allegations raised by defendants' experts with respect to the IMC, I would wish to draw a truer picture of the IMC, their operation and practices, based upon the following points

    a.  The IMC structure and authority are under ongoing review by the Israeli authorities and therefore develop, change and evolve dramatically over time;

    b.  Despite defendants experts' contrary assertion, in many important aspects, the IMC are modeled upon the equivalent practice in Israel;

    c.  The IMC are subject to rigorous and continuous external supervision by the Israeli Supreme Court, thus further ensuring their objectivity and professionalism;

    d.  The IMC are also subject to the unceasing scrutiny of the local and international media, as well as an extremely large number of Israeli, Palestinian and international organizations, all focused on ensuring the preservation of Palestinian human rights;

    e.  Many of the purported legal sources quoted by defendants' experts as alleged proof of their claims are actually not binding sources of international law, are not binding on Israel, or do not specifically apply to Israel's activities in the West Bank;

    f.  IMC operate with true impartiality and independence;

    g.  Defendants' experts' claim that IMC consistently issue stricter and more severe sentences than their Israeli equivalents is factually incorrect;

    h.  The Israeli security legislation is published and is definitely not applied retroactively; IMC court hearings are public; and IMC decisions are accessible;

i.  <u>IMC recognize and strictly enforce the presumption of innocence</u>;

j.  <u>IMC defendants have a guaranteed and enforced right to understand the proceedings, including through the provision of interpreters, at no cost</u>;

k.  <u>IMC defendants are guaranteed and, in practice, provided with, a speedy and efficient trial</u>;

l.  <u>IMC defendants are guaranteed the right to a fair defense and access to legal counsel</u>;

m.  <u>IMC rules</u> relating to pre-trial detention <u>comprise a reasonable balance between</u> the conflicting <u>human rights</u> of the suspects, <u>and Israel's legitimate security concerns</u>;

n.  <u>Out of court confessions are not automatically adopted by IMC</u>; and

m.  <u>Under Israeli law, including the law applied before the IMC, it is categorically forbidden to use any form of coercive or abusive methods against anyone, including IMC defendants</u>, at any point in time and regardless of circumstances.

42.  **The first point** is that <u>the IMC are not static, and have evolved over time.</u> One of the more important characteristics of the IMC, which defendants' experts chose to minimize, is the fact that over the 46 years of their existence and operation, the IMC structure and authority have undergone several major changes and amendments, all intended to keep up with modern legal norms and practices and developments on the ground.

43.  The following is a timeline of some of these changes:

- 1967 – IMC established;

- 1989 – IMC Court of appeal established and commences operation;

- 1990 – MO 378 amended, cancelling the requirement that IMC decisions be reviewed and validated by the Military Commander. [45]

- 1995 – Following the signing and implementation of the 1995 Israeli-Palestinian Interim Agreement, the authority of the IMC was updated to conform to the provisions of the agreement[46].

- 2001-2002 – Internal IDF decision to appoint only legally trained judges to IMC (implemented immediately, but only formally legislated in 2004);

- 2004 – Internal IDF decision to transfer the authority over the IMC from the Military Advocate general's Unit to the IDF Courts-Martial Unit (the IDF specialist unit responsible for all judicial proceedings against IDF soldiers);

44.    These examples are a strong indication that the Israeli military authorities have consistently been aware of the need to review and update the IMC system, so as to ensure it continues to fully comply with ever-changing norms and practices.

45.    **The second point** is that, in practice, <u>many substantive and procedural aspects of the operation of the IMC have been modeled upon the equivalent practice in Israel</u>, thus ensuring compliance with modern legal standards.

46.    As an example,  Article 9 of MO 378 provides that the laws of evidence in IMCs are to be identical to those applicable in Israeli civilian courts:

---

[45] N. Benisho, "Criminal law in the West Bank and Gaza", IDF Law Review, Vol. 18 (2005), p. 299 (in Hebrew), available at: http://www.law.idf.il/SIP_STORAGE/files/0/320.pdf.  in which he explains that IMCs actually developed more quickly than the Israeli Military Court-Martial System (to try Israeli soldiers) which adopted a similar provision only 15 years later in 2004.
[46] Proclamation No. 7 Concerning the Implementation of the Interim Agreement – 1995, available in Hebrew from the IDF MAG website: http://www.law.idf.il/SIP_STORAGE/files/0/320.pdf

> *"Regarding the laws of evidence, Military Courts shall act in accordance with the rules prevailing in criminal cases before the courts of the State of Israel."*

47.     Another route utilized by IMC judges to ensure that the rule of law in the West Bank meets the high standards of the Israeli civilian legal system is through the use of Article 10 of MO 378  which provides:

> *"A Military Court may, in any matter of procedure not prescribed in this Order, give directions as to procedure as it deems most suitable for dispensing law and justice."*

48.     An identical provision exists in Section 3 of the Israeli Criminal Procedure Law [Combined Version], 1982 and in the Israeli Courts-Martial Law. Article 10 has allowed IMC judges to protect defendants and ensure due process through adopting principles equivalent to those applicable in Israeli criminal law. In one case tried during the heart of the second *Intifada* in 2003, the Military Appeals Court stated that in relation to Article 10 that:

> *"...In fact, the method by which Israeli Military Courts adopt, as a matter of routine, the legal procedures in place in Israel is fully rooted. Thus we have already adopted in the Area [of West Bank and Gaza], through use of this provision [Article 10 - DR], a large portion of the laws pertaining to detention which are in practice in Israel...*

...

> *We recognize the unique stature of the Israeli legal system, which has acquired for itself a reputation and which is considered advanced and proper by all measures. So too the Military Court System can and must strive to meet these standards, and accordingly, to the extent that adopting these legal standards is neither contrary to law nor otherwise inappropriate in light of the unique reality resulting from the status of the Area [of the West Bank and Gaza] and unique security needs, [the Israeli law standards] should be adopted and serve as guiding light to be followed".*[47]

49.    The above were some examples of IDF Military Orders which allow IMCs to adopt procedural safeguards which exist in the Israeli legal system.

50.    In addition, as mentioned earlier, defense experts failed to review the extensive IMC case law which has adopted a wide variety of due process rights. In so doing, they missed the many examples in which IMC case law adopted modern Israeli law standards on issues regarding which the military legislator was either silent or unclear.

51.    First and foremost, a basic principle adopted by IMC when performing statutory interpretation is that the law in the West Bank and Gaza should be interpreted so as to minimize differences in rights between defendants in IMCs and Israeli civilian courts.

---

[47] Military Court of Appeals 353/03 Military Prosecutor v. Omer Hamdan Abu S'nina

Thus, the IMCs have been called upon in many instances to fill gaps in locally applicable law through adopting Israeli law norms.[48]

52.    Another important aspect is the fact that both Israeli courts and IMCs have concluded that the constitutional rights enshrined in Basic Law: Human Dignity and Liberty (one of the Basic Laws comprising a part of Israel's incomplete multi-part Constitution, and which establishes such rights as; freedom from and protection against violations of life, body, dignity[49] and property[50]; freedom against deprivation of liberty by imprisonment, arrest, extradition, or otherwise[51]; freedom of movement and travel[52]; a right to privacy and a right against unlawful search and seizure[53]) are principles which must guide behavior of all authorities, in Israel and the West Bank alike. As will be further described below, this constitutional law served as the basis for a seminal 1999 Israeli Supreme Court ruling which emphasized and expanded the illegality of use by Israeli authorities of coercive methods of investigation.[54] The Israeli Supreme Court explained, in its reasoning, that the provisions of this Basic Law establish a framework binding on all Israeli authorities, wherever located and regardless of the circumstances.[55]

53.    Similarly, principles of "*de minimus*", "*abuse of process*" and "*selective enforcement*", all arguments which parties may raise in their defense and none of which were

---

[48] See above reference to and translated quote from the Military Court of Appeals 157/00 Abu Salim v. The Military Prosecutor, in which the IMC emphatically stated the principles of equality. As similarly stated above, the importance of equality of defendant's rights in IMCs as well as Israeli civilian courts was repeated in Military Court of Appeals 2768/09.

[49] Basic Law: Human Dignity and Liberty Sections 2 and 4.

[50] Basic Law: Human Dignity and Liberty Section 3.

[51] Basic Law: Human Dignity and Liberty Section 5.

[52] Basic Law: Human Dignity and Liberty Section 6.

[53] Basic Law: Human Dignity and Liberty Section 7.

[54] See *Infra,* the fifteenth point for further details regarding  HCJ 5100/94 Public Committee Against Torture in Israel v. The State of Israel, available in English from the website of the Israeli Supreme Court, at: http://elyon1.court.gov.il/Files_ENG/02/690/007/A34/02007690.A34.pdf

[55] In addition to the above case regarding the prohibition of coercive interrogations, see Military Court of Appeals 2631/11 the Military Prosecutor v. Gamal Abed Alhamid Mohamed Hag', in which the IMC applied Basic Law: Human Dignity and Liberty to imbue the defendant with due process rights (described at length in the following paragraph.)

enshrined in applicable local law, were incorporated into IMC procedure on the basis of Israeli precedents. [56]

54.    Specifically, the *"de minimus"* doctrine is a widely used legal concept according to which courts can dismiss cases relating to trifling or unimportant matters. In one IMC case, for example, a Palestinian defendant was issued an indictment for attending an assembly arranged by a designated terrorist organization. The IMC acquitted the defendant based upon the *"de minimus"* doctrine, explaining that charging the defendant served no public interest as it was not proven that any particularly problematic behavior took place at the assembly and as his mere attendance, while formally illegal, caused no actual harm.[57]

55.    The *"abuse of process"* principle is employed by courts to prevent prosecutions against defendants in circumstances in which government entities somehow abused their jurisdictional authorities for the purpose of the legal proceedings. This doctrine was expressed, for example, in Military Court of Appeals ruling 2631/11 in which the court ordered that the IDF drop charges against a certain Palestinian defendant. The defendant was a member of the Palestinian Parliament who was residing in Ramallah, but had an outstanding detention order for his arrest in Israel. As part of his political responsibilities he was called to travel to Nablus, and was told by the Israeli security authorities that he could travel their freely. Despite this commitment by the security authorities, he was arrested and brought before an IMC. The Military Court of Appeals ruled in favor of the defendant, despite his severe criminal record, and censured the Israeli security authorities for their misleading and inappropriate behavior.[58]

---

[56] See Judea First Instance Military Court 3975/04 The Military Prosecutor v. Nimer, in which these basic due legal procedural rights were applied to an IMC defendant.
[57] Samaria First Instance Court 1344/074 the Military Prosecutor v. Ahmed Tawfik Josef Tzualha
[58] 2631/11 the Military Prosecutor v. Gamal Abed Alhamid Mohamed Hag'

56.     In another IMC case, a defendant admitted to having stabbed an Israeli police officer adjacent to the Cave of the Patriarchs ("Abraham's Sanctuary"), a Jewish holy site in the city of Hebron in the West Bank. The first instance IMC determined that, while the defendant was mentally fit to stand trial at the time of the hearing, there was reasonable doubt that his terrorist act was induced by a medically diagnosed episode of schizophrenia, exempting him from criminal responsibility.  On appeal by the Military Prosecutor, the IMC Court of Appeals upheld the first instance IMC ruling and determined that in the West Bank, as in all developed legal systems, a mentally unfit defendant may not be held criminally liable for his actions. The IMC noted that the scope of the defendant's burden of proof to convince the court that he had been in a state of "legal sanity" was not spelled out explicitly in IMC law. Consequently, the IMC adopted the Israeli doctrines relevant in this regard.[59]

57.     Rights of discovery of classified documents in IMC were also modified to reflect those applied in Israeli civilian courts.[60] This ruling has lead to the military being ordered by IMC to disclose what it deemed classified and sensitive information.[61]

58.     In another matter, the IMC adopted grounds for arrest in the West Bank identical to those applicable in Israel.[62] (See sections below regarding "classified documentation" and "grounds for detention".) It is worth noting that the military often found these rulings very uncomfortable.

59.     Furthermore, when IMC judges felt that defendants lacked rights to which they would be entitled in Israeli civilian courts, they have not hesitated to adopt those rights and

---

[59] Military Court of Appeals 1981/08 The Military Prosecutor v. Iman Anuar Alsharif/Sai'd.
[60] Military Court of Appeals 71/03 John Doe v. The Military Prosecutor
[61] *Id.*
[62] See Military Court of Appeals 115/02 353/03 The Military Prosecutor v. Mah'mad Naif Salim; Military Court of Appeals 353/03 Military Prosecutor v. Omer Hamdan Abu S'nina; and Detention Appeal 157/00 The Military Prosecutor v. Abu Rashad Yossef A/Ha'adi Abu Salim.

even proactively call on the Military Commander to amend the security legislation accordingly. As an example, for several years there was no explicit provision in the IMC entitling defendants who were acquitted of charges to demand compensation for their legal costs or to be granted damages for the period of their detainment. Notwithstanding the lack of a formal legislative basis, the Military Court of Appeals recognized the existence of this right and admonished the Israeli authorities for having failed to incorporate this basic principle (which exists in Israeli criminal procedure and Israeli court- martial law).[63] As a result of the IMC's ruling, the military authorities amended the relevant Military Order which now grants this right explicitly[64].

60.    **The third point** is that the IMC are subject to extensive external supervision by the Israeli Supreme Court.

61.    Since its inception, the State of Israel has faced unremitting threats to its survival. As described above, enemy states voiced their clear desire and expectation to see Israel's destruction in the period leading up to the Six Day War.

62.    Thus, just in the years relevant to the *Sokolow* proceedings (between 2001 and 2007), 1067 Israelis lost their lives in terrorist attacks and another 6,333 were injured by such attacks.[65] Despite these statistics, and contrary to the practice of almost all other western liberal democracies, Israel has never seen fit to exempt security and counter-terror operations from external judicial scrutiny. On the contrary, since the establishment of the State of Israel,

---

[63] See Judea Court 1639/02 The Military Prosecutor v. Ahmed Halil Ahmed D'babsa;  Judea Court, Special Request, 88/05 Ahmed Halil Ahmed D'babsa v. the Military Prosecutor; and, finally, the appeals case in the Military Court of Appeals 2276/06 The Military Prosecutor v. Ahmed Halil Ahmed D'babsa.
[64] See Article 49A of MO 378.
[65] See the State of Israel Ministry of Foreign Affairs website, "Victims of Palestinian Violence and Terror Since September 2000, at:
http://www.mfa.gov.il/mfa/foreignpolicy/terrorism/palestinian/pages/victims%20of%20palestinian%20violence%20and%20terrorism%20sinc.aspx

Israeli courts have consistently reviewed Israeli government activities, including those of its defense establishment, to ensure that these pressing security needs do not unjustifiably ignore basic human and civil rights. On the preservation of these rights even amidst dire security concerns, the Israeli Supreme Court stated (years prior to the second *Intifada*):

> *"This is the destiny of a democracy—it does not see all means as acceptable, and the ways of its enemies are not always open before it. A democracy must sometimes fight with one hand tied behind its back. Even so, a democracy has the upper hand. The rule of law and the liberty of an individual constitute important components in its understanding of security. At the end of the day, they strengthen its spirit and this strength allows it to overcome its difficulties".*[66]

63.     In recognition of the immense importance of continuous and unreserved judicial review, Israel has adopted a unique approach, granting all residents of the territories it occupied in 1967 (including those who would view themselves as its enemies), nearly unrestricted access to its judicial *fora*. This Israeli approach is contrasted against the practice of the Allied Powers in post WWII occupied Europe, which consistently refused to allow residents of occupied territories to bring legal action against the occupying allied powers before the Allies' national courts. As an example, the French *Conseil d'Etat*, France's Supreme Court for administrative matters, consistently rejected contentions that the activities

---

[66] HCJ 5100/94 Pub. Comm. Against Torture in Israel v. The State of Israel, at para. 39.

of the French Commander-in-Chief in post-WWII occupied Germany were subject to jurisdiction by French courts.[67]

64.    Most prominent among the legal *fora* made available by Israel for such external review of its government practices is the Israeli Supreme Court. Under the *Basic Law: The Judiciary,* the Israeli Supreme Court, sitting in its capacity as the High Court of Justice (hereinafter – the "HCJ"), has jurisdiction to exercise judicial review over all actions by the State or its officials.[68] Any interested party (including NGOs) or any person (including non-citizens and non-residents) affected or potentially affected by a government action can petition the HCJ, on a claim that the action is *ultra vires* (beyond its legal authority), unlawful, or otherwise "substantially unreasonable" (a unique cause of action under Israeli law). In keeping with the goal of ensuring as wide a judicial review as possible, many traditional doctrines which typically limit jurisdiction of courts do not exist (or are interpreted very narrowly) in Israel.[69] The absence of almost all procedural, substantive and financial hurdles has opened the courtroom doors and has been utilized for the submission over the years of untold thousands of petitions by non-Israelis on a wide array of matters. As a consequence, HCJ rulings have resulted in numerous binding rulings against the Israeli government, including against the IDF, the Ministry of Defense, and other authorities. Even more uniquely, such petitions have lead Israeli courts to adjudicate matters pertaining to

---

[67] Brig. General Shoham, Uri The Principle Of Legality And The Israeli Military Government In The Territories, United States Military Law,  Review - Volume 153 - Summer (July) 1996, , at p. 257, available from the U.S. Library of Congress at:http://www.loc.gov/rr/frd/Military_Law/Military_Law_Review/1996.htm and http://www.loc.gov/rr/frd/Military_Law/Military_Law_Review/pdf-files/276C7D~1.pdf. And see footnote 25 citing Committee of US Citizens Living in Nicaragua et al. v. Ronald Reagan, 886 F2d (D.C. Cir. 1989).
[68] Article 15(c) of the Basic Law: The Judiciary (1984) provides the Court with original jurisdiction by providing that *"[t]he Supreme Court shall sit also as a High Court of Justice. When so sitting, it shall hear matters in which it deems it necessary to grant relief for the sake of justice and which are not within the jurisdiction of another court…."*
[69]  "Act of State doctrine", "judicial standing", "clean hands", "exhaustion of remedies", "delays", etc. – see Bendor, Ariel, "Justiciability of the Israeli Fight against Terrorism", 39 George Washington International Law Review (2007) 149-163.

national security and to intervene in issues relating to military operations, even amidst ongoing hostilities.[70]

65.    To put things in perspective, this Israeli practice would be more or less equivalent to the U.S. allowing Afghanis (with no U.S. citizenship,and including potential Al-Qaeda members) to petition the U.S. Supreme Court against the actions of the US military, while the U.S. is actively engaged in military operations in Afghanistan. I assume such a proposal (assuming it were feasible under U.S. constitutional law) would encounter stiff bi-partisan opposition, and yet, Israeli courts have, for more than forty years, continually reviewed the actions of the Israeli military authorities in the West Bank.[71]

66.    It should be noted that the expansion of the HCJ's jurisdiction to allow petitions by Palestinians was never formally legislated in Israel, but was rather a policy decision, with neither the government nor the courts questioning this authority. Ultimately, in 1981, the HCJ independently determined that, since the Six Day War:

> *"...the capacity of the Israeli courts to hear such cases has not been challenged, becoming, by virtue of precedent and judicial interpretation, an incontrovertible axiom of the Israeli legal system".*[72]

---

[70] HCJ 425/89 Tsufan v. IDF Attorney General (1989); HCJ 2056/04 Beit Sourik Village Council v. The Government of the State Israel (2004), available at http://elyon1.court.gov.il/Files_ENG/04/560/020/A28/04020560.A28.HTM.

[71] See HCJ 320/80 Kawasme v. Minister of Defense in which the Supreme Court stated in 1980 that *"there is no more potent weapon than the rule of law...This court will never accept the contention that while exercising power on behalf of the State anywhere in the world, a soldier or civil servant might repudiate these standards [of the rule of law]."*

[72] In 1982, the HCJ finally ruled that its jurisdiction over the activities of the Israeli Military Government is based on the specific provisions of the *Basic Law: The Judiciary* and does not emanate from an *ex lege* agreement of the Government. *See* HCJ 393/'82, Jama'aiat Iskan v. The Military Commander of the West Bank; and Brig. General Shoham, Uri THE PRINCIPLE OF LEGALITY AND THE ISRAELIMILITARY GOVERNMENT IN THE TERRITORIES, United States Military Law, Review - Volume 153 - Summer (July) 1996, at p. 258, available from

67.     There is no substantive limit on what type of requests Palestinians may bring before the HCJ.  Dozens if not hundreds of such petitions are brought before the Supreme Court every year on such diverse issues as travel permits, land appropriations and local traffic and municipal ordinances.[73]  Similarly, all Palestinians who believe they have been unfairly treated, or otherwise unlawfully adversely affected, by processes related to the IMCs, are free to seek recourse before the HCJ.

68.     The HCJ has not hesitated to strike down Military Orders and provide injunctive relief against the IDF or the Israeli Military Government in favor of Palestinians. Indeed, Military Order ("MO") No. 378, the primary legislation governing the operation of the IMCs (recently updated to, and sometimes referred to as, MO No. 1651) has itself been the subject of HCJ review in numerous cases. One example is the *Marabe Case*, brought before the HCJ at the onset of the second Palestinian *Intifada* in 2000. In that case, several Palestinians, together with various NGOs, petitioned the HCJ protesting an amendment to the MO enacted by the Military Commander who, faced with a significant manpower shortage amidst growing Palestinian terror, sought to increase detention times for suspected Palestinian terrorists. The IDF argued that prolonged detention times were necessary for logistical reasons, to allow each detainee to be properly processed. Petitioners argued that the changes proposed by the Military Commander were unreasonable and unlawful. The HCJ thoroughly reviewed the proposed amendment and invalidated provisions which it deemed were unjustified including, as one example, striking down the Military Commander's attempt to

---

the  U.S.  Library  of  Congress  at:http://www.loc.gov/rr/frd/Military_Law/Military_Law_Review/1996.htm  and http://www.loc.gov/rr/frd/Military_Law/Military_Law_Review/pdf-files/276C7D~1.pdf.
[73] See HCJ 4219/02 Gussin v. IDF Commander of the Gaza Strip, regarding claims brought regarding the demolition of homes of terrorists and HCJ 5591/02 Yassin v. Commander of Kziot Military Camp, regarding claims brought by convicted Palestinian terrorists challenging detention conditions at the Kziot detention facility.

extend the time before a detainee must be brought before a judge (the right to *habeas corpus*).[74]

69.     Access to the HCJ is neither a bureaucratically-burdensome nor a time-consuming process. Petitioners can petition the court seven days a week, throughout the year, paying a nominal fee, and in the appropriate cases, can receive on-the-spot relief from the Supreme Court judge on duty. The following, written by former Chief Justice Aharon Barak, well exemplifies this procedure, relating to an attempt by the Israeli military authorities in the West Bank and Gaza to deport over 400 Hamas and Islamic Jihad terrorists to Lebanon[75]:

> *"In one case, the state sought to deport 400 suspected terrorists to Lebanon. Human rights organizations petitioned us. I was the Justice on call at the time. Late that night, I issued an interim order enjoining the deportation. At the time, the deportees were in automobiles en route to Lebanon. The order immediately halted the deportation. Only after a hearing held in our Court throughout the night that included comprehensive argumentation, including testimony by the Army's Chief of Staff, did we invalidate the deportation order. We ruled that the state breached its obligation to grant the deportees the right to a hearing before deporting them, and we ordered a post factum right to a hearing."*[76]

---

[74] See HCJ 3239/02 *Marabe v. IDF Commander in the West Bank* (Available in English from the website of the Israeli Supreme Court, at http://elyon1.court.gov.il/Files_ENG/02/390/032/A04/02032390.A04.HTM) – For further analysis of this seminal case, see the chapter below concerning rights of detainees in the West Bank.

[75] I can personally attest to the incident described by Chief Justice Barak, as I represented the IDF in this case.

[76] Recorded in Israeli Ministry of Foreign Affairs Publication, "Judgments of the Israel Supreme Court: Fighting Terrorism within the Law", at p. 15, available at:

70.     In summary, Palestinians affected by any arm of the Israeli government, including the IMC, have been provided with a fast-track capability of petitioning the Israeli Supreme Court, which has proven itself quite willing to intervene in the function of the Israeli military authorities, including even during ongoing hostilities.

71.     I believe it important to note that, in spite of numerous  cases addressing the operation of the Israeli security authorities in the West Bank, including the IMC, the HCJ has never found the IMC to be "improperly constituted" or otherwise unlawful under either Israeli or international law.

72.     I also note that, in spite of the court's "open-door" policy, I am actually unaware of any significant attempt (including by defendants' experts) to challenge the overall legitimacy of the IMC before the Israeli Supreme Court.[77]

73.     **The fourth point** is that the activities of the Israeli military authorities in the West Bank in general, and the IMC in particular, have been the subject of extensive external review and criticism by human rights organizations, NGOs and international bodies. Israel does not operate in a legal or public opinion vacuum. Numerous Israeli, Palestinian and international organizations are dedicated to continuously supervising all Israeli activities in the West Bank, and are quick to "pounce" on any case of a perceived fault.

---

http://www.mfa.gov.il/MFA_Graphics/MFA%20Gallery/Documents/terrorirm_law.pdf , referring to See H.C. 5973/92, Association for Civil Rights in Israel v. The Minister of Defense, at p. 267, available in English from the website of the Israeli Supreme Court at, http://elyon1.court.gov.il/Files_ENG/92/730/059/Z01/92059730.Z01.HTM.

[77] The only relatively real attempt with which I am familiar was, surprisingly, made by an Israeli politician and former Knesset Member who was tried in an IMC and appealed the legality of the IMC institution before the. See *Supra regarding* HCJ 80/61 Elyakim Haetzni v. The State of Israel.

74.     In this regard, IMC are no exception. Israeli government officials have been repeatedly called to explain and defend Israeli practices before a variety of international *fora*, including U.N. committees. Numerous local and international reports have been published with respect to the various aspects of the Israeli security justice system in the West Bank. In fact, as mentioned above, one such report was attached by one of the defendants' experts to his report. As explained earlier, this report – despite its various shortcomings – generated extensive responses from various Israeli government authorities (including the IDF's IMC Unit), reflecting the transparency and dialogue revolving around the IMC institution.[78]

75.     And yet, in spite of this continuous and unceasing scrutiny, I am unaware of any decision by a serious authorized international body, declaring the IMC as inherently unlawful under international law, as is now claimed by defendants' experts.

76.     Experts on behalf of the defense have attempted to base their "de-legitimization" argument against the IMC on the fact that Marwan Bargouti, a notable Palestinian figure resident in the West Bank, was tried in an Israeli civilian court and not before an IMC. They allege that due to his notoriety, as a major instigator of the 2nd *Intifada*, had he been tried in the West Bank, he would likely have attracted unwanted public attention to the IMC and that is the primary reason why it was decided to prosecute him before an Israeli civilian court. This argument is simply untenable. Throughout the years, numerous equally if not more well known (not to say notorious) Palestinians were tried in IMCs, attracting broad media attention. The following are just a few examples of such high profile cases:

---

[78] See *Supra* references to the Yesh Din report.

a. Fuad Shabaki  - was a Palestinian Authority finance advisor who served as the right hand-man of Yasser Arafat (PLO President and PA Chairman). He orchestrated an illegal shipment of some 50 tons of Iranian-made weapons to Palestinian terror groups on the "*Karine-A*" cargo ship. He was convicted in an IMC and sentenced to 20 years imprisonment.[79]

b. Ahmad Sa'adat – a member of the Palestinian parliament and the Secretary General of the Popular Front for the Liberation of Palestine was tried in an IMC and was found, among other things, responsible for the murder of Rehavam Zeevi (the Israeli Minister of Tourism and member of Israel's Parliament murdered in 2001 at the Hyatt Hotel in Jerusalem).[80]

c. Muhammad Abu Tir and Aziz Duwaik – both extremely high ranking Hamas officials who were arrested shortly following the kidnapping of Israeli soldier Gilad Shalit were tried and sentenced in the IMC. [81]

d. Qassam Marwan Bargouti – Marwan Bargouti's son, was indicted before an IMC on four counts of attempted premeditated manslaughter of Israelis and of various shooting attacks against Israeli civilians. He was acquitted in the Judea IMC and, despite Israeli public criticism, his acquittal was upheld by the Military Court of Appeals.[82]

77.    **The fifth point,** mentioned in brief earlier, is that <u>many of the international legal sources quoted by defendants' experts, as the basis for the alleged illegality of the</u>

---

[79] See the BBC article at: http://news.bbc.co.uk/2/hi/middle_east/8229475.stm
[80] See BBC article at: http://news.bbc.co.uk/2/hi/middle_east/7799755.stm
[81]    See  BBC  article  at:  http://www.bbc.co.uk/news/10130258  ;  and  Ynet  News  Article  at: http://www.ynetnews.com/articles/0,7340,L-3735809,00.html
[82]    Israeli  Military  Court  of  Appeals  1853/07;  and  See  Al  Jazeera  Article  online  at, http://www.aljazeera.com/news/middleeast/2007/03/2008525142832811310.html; http://www.upi.com/Business_News/Security-Industry/2007/03/23/Fatah-leaders-son-out-from-Israeli-jail/UPI-61531174667258/; and, http://www.jpost.com/LandedPages/PrintArticle.aspx?id=55771 .

<u>functioning of the IMC, are actually non-binding (either generally or specifically with respect to Israel), or otherwise inapplicable to the IMC</u>.

78.     International law is a specialist (and some would say esoteric) field of law. As such, in my experience, I believe it safe to say that most legal practitioners worldwide have (understandably) no more than a basic grasp of its fundamental principles, at best. In their opinions, defendants' experts have made numerous references to international sources, without clarifying that not all of these are necessarily equally authoritative, binding or even applicable. In this regard, I have identified four different categories of sources cited by defendants' experts concerning which some additional clarifications and *caveats* would appear warranted:

<u>Category 1</u> - Decisions of international bodies cited by defendants' experts which have no binding authority in international law;

<u>Category 2</u> - Regional conventions and regimes cited by defendants' experts which do not apply to Israel.

<u>Category 3</u> - International conventions and regimes referred to by defendants' experts to which Israel is not a party; and

<u>Category 4</u> - International conventions referred to by defendants' experts which are indeed of a binding nature, but have no substantive application to the Israeli presence in the West Bank as a result of their specific provisions.

79.     <u>As regards Category 1</u> – one of defendants' experts relies heavily on various U.N. General Assembly Resolutions. While impressive sounding, such resolutions are by no means binding sources of international law, but are rather just reflections of the political discussions which characterize most of the U.N.s work. The U.N. Charter emphasizes this

point in Articles 10 and 14 in which it delimits the authority of the U.N. General Assembly and empowers it to merely issue non-binding "recommendations" to Member States.

80.    Another example is the reference by the defense experts to the U.N.s "Basic Principles on the Independence of the Judiciary", published in 1985. I believe it would have been proper for defendant's experts to point out that, specifically with respect to this document, the U.N. General Assembly itself, in its adopting resolution, simply recommended that these principles "*...should be taken into account and respected by Governments within the framework of their national legislation and practice...*" This document was never intended to, nor does it in fact, create any binding norm on U.N. Member States.

81.    <u>As regards Category 2</u> – defendants' experts rely on treaties such as the European Convention for the Protection of Human Rights and Fundamental Freedoms, the American Convention on Human Rights and the African Charter on Human and People's Rights. All three are regional human rights regimes of real importance. However, Israel is not a part of Europe, the Americas or Africa; is not a member of any of the regional organizations which drafted these conventions; and has never otherwise indicated a willingness to be bound by their provisions. As none of these regional conventions are viewed as generally embodying binding customary principles of international law, none of them is therefore binding on Israel. I believe this is a point which would have been worth mentioning, for the sake of the non-expert reader.

82.    <u>As regards Category 3</u> – defendants' experts refer to the Statute of the International Criminal Court from 1998. It is worth mentioning that neither Israel nor the U.S. is a party to this Statute. As a result, its provisions, as such, are not binding on these countries either.

47

83.   As regards Category 4 - the defendants' experts relied heavily, throughout their opinions, on the International Covenant on Civil and Political Rights (hereinafter – the "ICCPR"), signed in 1966 and which entered into force in 1976. This international treaty is, undoubtedly, an extremely important part of international human rights law to which Israel is, admittedly and gratefully, a party. However, the experts appear to have failed to sufficiently draw attention to the fact that the ICCPR includes, in Article 4, the option for states to "derogate" from many of its provisions in time of national emergency (i.e. to "opt out" of most of the convention's provisions) and that Israel exercised this option concurrently with the ratification of the ICCPR. As explained by the Government of Israel in its initial periodic report to the UN Human Rights Committee in 1998:

> "106. The State of Israel has remained in an officially proclaimed state of public emergency from 19 May 1948, four days after its founding, until the present day. The original declaration of a state of emergency was issued by the Provisional Council of State in the midst of the war with neighbouring States and the local Arab population that had begun several months prior to the declaration by Israel of its independence on 14 May 1948. Since then, the state of emergency has remained in force due to the ongoing state of war or violent conflict between Israel and its neighbours, and the attendant attacks on the lives and property of its citizens. Upon ratifying the Covenant, the State of Israel made a declaration regarding the existence of a state of emergency. The text of Israel's declaration, dated 3 October 1991, is as follows:

*'Since its establishment, the State of Israel has been the victim of continuous threats and attacks on its very existence as well as on the life and property of its citizens.*

*These have taken the form of threats of war, of actual armed attacks, and campaigns of terrorism resulting in the murder of and injury to human beings.*

*In view of the above, the State of Emergency which was proclaimed in May 1948 has remained in force ever since. This situation constitutes a public emergency within the meaning of article 4 (1) of the Covenant.*

*The Government of Israel has therefore found it necessary, in accordance with the said article 4, to take measures to the extent strictly required by the exigencies of the situation, for the defence of the State and for the protection of life and property, including the exercise of powers of arrest and detention.*

*"Insofar as any of these measures are inconsistent with article 9*] *of the Covenant* [DR - pertaining to the rights to

liberty and security of person]*, Israel thereby derogates from its obligations under that provision.''''*[83]

84.    The official State of Emergency is still in place in Israel to this day and, [84] as a result, Israel is not formally bound by many of the ICCPR provisions. Notwithstanding the continuing state of emergency, in practice, Israel maintains a policy of conducting itself in strict accordance with the principles established in the ICCPR and other relevant human rights conventions. This can be evidenced by reviewing the various periodic reports issued by Israel to the U.N. Human Rights Committee throughout the years. Nonetheless, as previously noted, from a legal (rather than policy) perspective, due to the Article 4 derogation (which is still in force and full effect), Israel is not formally bound by many of the ICCPR provisions cited by defendants' experts.

85.    Similarly, it would have been useful to mention that both the Israeli and U.S. governments and administrations do not agree with defendants' experts position that international human rights law has direct applicability to situations of armed conflict and occupation, and that this issue remains highly controversial within international law circles to this day.[85]

---

[83] Submission of Israel for the International Covenant on Civil and Political Rights – Initial Report, CCPR/C/81/Add.13 - 2 June. Available at: 1998http://unispal.un.org/UNISPAL.NSF/0/66A45F3F2C23394905256789005CDA6D or *http://www.unhchr.ch/tbs/doc.nsf/184758d9fcd7a2b1c12565a9004dc312/ff05b8854986b0398025662f00567574?opendocument*)

[84] It is worth noting that, nevertheless, the Israeli government is currently in the process of enacting comprehensive legislation specifically aimed at removing the necessity of retaining a legal state of emergency in Israel. A review of this process is available in the latest UN ICCPR Periodic Report submitted by Israel available at: http://index.justice.gov.il/Units/InternationalAgreements/IA/Reports/ReportsUnCommittees/ICCPR2008.pdf; as well as in HCJ 3091/99 The Association for Civil Rights in Israel v. The Knesset, rendered on May 8th, 2012, available from the website of the Israeli Supreme Court, at http://elyon1.court.gov.il/files/99/910/030/t38/99030910.t38.htm.

[85] Israel's position on this matter was clearly articulated in a 2001 submission to the U.N. Human Rights Committee in which it stated, regarding the applicability of the ICCPR to the West Bank and the Gaza Strip that *"Israel has consistently maintained that the Covenant does not apply to areas that are not subject to its sovereign territory and jurisdiction. This position is based on the well-established distinction between human rights and humanitarian law under international law. Accordingly, in Israel's view, the Committee's mandate cannot relate to events in the West Bank and the Gaza Strip, inasmuch as they are part and parcel of the context of armed conflict as distinct from a relationship of human rights"*. See CCPR/C/ISR/2001/2 4 December 2001, at para. 8 available at:

86.     To summarize, it would appear that defendants' experts have seen fit to base their legal positions on a wide variety of legal sources, many of which are not legally binding or relevant to the specific case under discussion. While such an approach is generally acceptable when writing academic articles, in which international law experts often tend to address the law as it *ought* to be (in their opinion) as opposed to as it is, such a methodology appears to me to be less appropriate for judicial proceedings, in which the distinction between binding principles of law and recommended concepts and ideas is of tantamount importance.

87.     **The sixth point** is that, contrary to defendant's experts' protestations, IMC judges have consistently proven themselves to be both objective and independent.

88.     Article 7A of MO 378 provides that:

> *"On judicial matters there is no mastery over those possessing the authority of judgeship other than the mastery of the law and the military ordinances."*

89.     IMC Judges are strictly bound by this Article 7A. As a result, their judgments must be well reasoned legal decisions. Any legal flaws, or any hint of bias, can rapidly result

---

http://unispal.un.org/UNISPAL.NSF/0/44CF316E24ACCD8B85256C4F00502FD3. Indeed, even if one asserts that human rights law applies extraterritorially and amidst situations of armed conflict, there is broad consensus that specific rules of international law relevant in such situations (rules identified as *"lex specialis"*) supersede norms of standard human rights law (or, rules deemed as *"lex generalis"*). Such an approach is even expounded upon in the sources cited by the experts of behalf of the defense. See, for example the second footnote in the report issued by Dr. Sharon Weill. There she references, *inter alia*, A. Roberts, "Transformative Military Occupation: Applying the Laws of the War and Human Rights". This article in fact clearly explains that in situations of conflict, human rights law is relegated and superseded by specific law-of-armed-conflict and occupation rules. (See A. Roberts, at p. 593, addressing specifically an example in which the ICCPR would not apply in a situation of occupation. available at http://www.iihl.org/iihl/Documents/roberts_militaryoccupation1.pdf.)

in decisions being overturned in the Military Court of Appeals or in the Israeli Supreme Court.

90.    The Israeli Supreme Court has emphasized the importance of the IMC judges' independence when commenting, in 2002, on the role of IMC judges charged with reviewing detention of unlawful belligerent combatants:

> "[T]he public officer must be independent of the investigators and prosecutors. He must be free of any bias. He must be authorized to order the release of the detainee".[86]

91.    One of the arguments raised by defendants' experts against the objectivity and impartiality of the IMC judges relates to the fact that, until 2004, they were part of the military unit ultimately commanded by the Military Advocate General (MAG), who was also concurrently responsible for the military prosecutors. While it is true that the IMC unit was structurally subordinate to the IDF MAG Corps until 2004, it is a mistake to assume that this generated any substantive dependency, or inherent pro-military bias in judicial matters.

92.    It should first be noted that, as opposed to their U.S. counterparts in the various U.S. JAG units, the IDF MAG Corps is an independent unit, which is not subordinate to any military authority in legal matters. In essence – the Israeli Military Advocate General is the army's independent "attorney general", serving in the dual role of both legal adviser and military law-enforcer. When providing legal advice, MAG Officers do not answer to the commanders they support, but are granted independent status, with the goal of ensuring that

---

[86] HCJ 3239/02 *Marabe v. IDF Commander in the West Bank* at p. 35. And available in English from the website of the Israeli Supreme Court at http://elyon1.court.gov.il/Files_ENG/02/390/032/A04/02032390.A04.HTM.

their military "clients" operate solely within their legal purviews. When serving in the latter capacity, the MAG's role is not to protect the interests of the military, but rather to ensure that the military upholds the rule of law. Due to this unique arrangement, the fact that IMC judges were organizationally placed underneath the MAG for many years, did not in any way detract from their capability to exercise their judicial duties independently and objectively.

93.    Defendants' experts have insinuated that fear of refused promotion could motivate IMC judges to adopt more military-focused positions. Experience and case law disprove this claim conclusively. Indeed, there is a long list of IMC rulings which the military has found extremely uncomfortable, a situation which one would not expect from judges fearful of ruining their chances for promotion (as alleged by defendant's experts). Firstly, one cannot overlook the existence of an untold number of rulings and interim orders of IMC judges against the military and in favor of defendants.[87] Secondly, the autonomy of IMCs can only be fully appreciated in light of their authority to scrutinize the military and other authorities operating in the West Bank. In a seminal IMC case, the military argued that it had sole authority to confiscate property and freeze assets affiliated with certain crimes committed in the West Bank and Gaza.[88] As a result, it claimed that local Palestinians could not petition the IMCs for relief against allegedly unreasonable executive actions of the IDF. The IMC rejected this contention and provided three reasons to substantiate its authority to hear and respond to petitions of Palestinians affected by IDF imposed property forfeitures. Firstly, the court explained that opening IMC court doors to such petitions would prevent inequality between rights of residents in Israel and the West Bank and Gaza. Secondly, the IMC

---

[87] As just one example, see below example citing when an IMC simply voided a military order signed by the Major General of Israel's Central Command (the most senior IDF officer in the West Bank) requiring that a trial be conducted behind closed doors. The IMC disregarded the Major Genera's authority and instead chose to conduct the hearings publicly, in the interest of the defendant's right to a public trial (Judea Case File No. 3324/02 presented in IDF Spokesperson's Response to the Yesh Din Report at para. 53); and see Judea IMC, Special Request, 2426/09 Avrahim J'mil Abed Algani Hamad v. The Military Prosecutor, in which the military's request for strict classification of the relevant materials was denied by the IMC.
[88] See Military Court of Appeals 2768/09 Ahmed Salam Musa Karshan v. The Military Prosecutor.

explicated the rule of statutory interpretation, according to which legislation, and activities of authorities subject to that legislation, is always subject to judicial review by local courts. Lastly, the court explained that from a practical/logistical perspective, IMC are the most able and professional body capable of scrutinizing petitions against military actions in the West Bank and Gaza and as such IMC authority should be viewed as expansive.[89]

94.     As a result (and often to the dismay of the military) the IMCs have not only operated independently but have also asserted their authority over military activities even when such authority was not explicitly granted by local law. This judicial independence is evident in light of the scope and magnitude of the judicial review applied by military courts upon the military and security authorities, as well as the internal review applied by the military court of appeals to lower military courts, resulting in acquittals and reversals of decisions which are found to have strayed from proper due process standards. In one case brought before the military court of Judea, in which a full acquittal was mandated, a minor was questioned in an Israeli General Security Service facility and charged with obstruction of public safety and order. The IMC applied Israeli Evidence Law and concluded that the burden of proof was not met and that the defendants' right for counsel was not adequately protected.[90] In another case brought before the military court of Samaria, a defendant charged with participation in rallies and membership in an illegal organization was acquitted of all charges for the reason that the court did not trust the credibility of a testimony of one of the incriminating witnesses, which it felt was given in order to "satisfy" investigators.[91] Even in cases of severe security offences the IMC Court of Appeals has not hesitated to strike indictments and to overturn convictions made by lower IMC. For instance, in a case brought before the IMC Court of Appeals, where the defendant was charged with 19 counts of severe

---

[89] See also Military Court of Appeals ruling regarding asset freezes in 84/10 Tagrid Shibli v. The West Bank and Samaria Legal Advisor.
[90] See Judea Military Court 1175/09 the Military Prosecutor v. Hamza Hsham Ali Aikat (p. 5-6)
[91] See Samaria Military Court 1344/074 the Military Prosecutor v. Ahmed Tawfik Josef Tzualha (para. 102-119)

security offences, the court, safeguarding the defendant's rights of fair trial, applied Israeli administrative law norms and as a result cancelled the indictment.[92]

95.    Additionally, defense experts fail to point out that the majority of IDF manpower is actually comprised of reservists, who serve in a military capacity only a few weeks every year. This is especially true of IMC judges. At any given moment, approximately 80% of all serving IMC judges are reservists, who are generally lawyers, law professors, or judges in their civilian life.[93] For such people, the alleged (and in reality nonexistent) threat of demotion/non-promotion is irrelevant, and the potential for undue influence by military commanders almost nonexistent.

96.    **The seventh point** is that, contrary to defendants' allegation and popular belief, IMC do not necessarily impose more severe or stricter punishments than Israeli civilian courts.

97.    In one pertinent example in 2006, a Palestinian convicted in an Israeli civilian court complained that he had been issued a sentence harsher than that which he would have received in an IMC.[94] In this specific case, the defendant was sentenced to 4 years imprisonment for providing financial support to the Hamas terrorist organization. The Israeli court, responding to his attorney's comparison to the more lenient sentencing standards in the IMC, emphasized that it had issued a sentence commensurate with the higher sentencing standards accepted in the Israeli civilian legal system and was not obligated to follow the more forgiving precedents set in the IMC.

---

[92] See Military Court of Appeals 2631/11 the Military Prosecutor v. Jamal Abed Alhamid Mohamed Hag' (p. 24)
[93] See Brief of Amici Curiae Specialists in Israeli Military Law and Constitutional Law, submitted in support of petitioners in Boumediene v. Bush, 553 U.S. 723 (2008), at p. 12 available at:
http://www.scotusblog.com/movabletype/archives/probono_Specialists_Israeli_Military.pdf  (Hereinafter - "Amici"), referencing Lisa Hajjar, Courting Conflict: The Israeli Military Court System in the West Bank and Gaza at p. 254.
[94] Israeli Supreme Court, Criminal Appeal 3827/06 John Doe v. The State of Israel.

98.    In another case, a Palestinian was convicted in an Israeli civilian court of membership in a proscribed terrorist organization and of having provided material support to that organization for the purpose of carrying out a terrorist attack in the Gaza region. Counsel for the defense appealed the 10 year prison sentence the defendant had received before the Israeli Supreme Court, which stated:

> *"...Finally, she [counsel for the defense] argued that the Israeli District Court should have adopted the sentencing standards in practice for years in Israeli Military Courts, which are far more lenient than those handed down on the appellant".[95]*

99.    The Israeli Supreme Court went on to reject the appeal, explaining that, in light of recent Palestinian terror, it was justified to issue harsher sentences than those issued in the IMC.[96]

100.    Another example in which IMC apply more lenient sentencing standards relates to the crime of premeditated murder. Under Israeli sentencing guidelines, in cases of conviction for the crime of premeditated murder judges are obligated to hand down at least one life sentence.[97] No such obligation exists in the IMC, where judges are free to decide on the appropriate sentencing.[98]

---

[95] Israeli Supreme Court, Criminal Appeal 6930/06 John Doe v. The State of Israel
[96] *Id.*
[97] Article 300 of the Israeli Penal Code - 1977
[98] See Article 51 of the MO 378.

101.   One of defendants' experts has used statistics to support his claims relating to IMC practices. He avers that only .29 % of IMC cases in 2006 resulted in acquittals, as opposed to a claimed higher acquittal rate for Israeli defendants in civilian courts. As is quite often the case with statistics, their use can often be more than an art-form than a science. Thus, the expert in question failed to point out that the statistics presented included all cases brought before IMC, including traffic violations and other minor "offenses" which are typically settled by admission of guilt and paying a small fine. He also did not point out that the statistics did not include the many instances in which the prosecution decided to withdraw the indictment before the court convened. I am informed that, had he taken this data into consideration, the expert would have discovered that the .29% IMC acquittal rate quoted is actually 3% higher (!) than the equivalent acquittal rate in Israel civilian courts.[99]

102.   To the best of  my knowledge, the first extensive and reliable research paper to be published on the subject of acquittal versus conviction rates in both Israeli civilian courts and IMC was prepared by the research department of the Israeli Supreme Court in 2008. This study employed reliable statistical analyses and its methods were described at length throughout the study. The results of this study indicate that, in fact, nearly 5.5% more defendants are acquitted in IMC than in Israeli first instance criminal courts (Magistrate Courts). Rates of full acquittals in Israeli Magistrate Courts are only .7%, whereas in 3.8% of cases brought before IMCs the defendants are set free.[100]

---

[99] See the IDF Spokesperson Official  Response to the Yesh Din Report, November 12th 2007, at p. 9.
[100] "Acquittal and Conviction Rates in Criminal Proceedings", available from the Israeli Supreme Court Research Department at http://elyon1.court.gov.il/heb/Research%20Division/doc%5CResearch1.pdf  (Hebrew)

103.    Strikingly, it is also reported that 33% of appeals submitted by defendants are accepted in the Military Court of Appeals.[101]  If anything, such statistics appear to indicate that, contrary to defendants' experts' claims, IMC are less strict than their Israeli counterparts.

104.    Defense experts similarly claimed that the use of plea bargains is more prevalent in IMC than in Israeli civilian courts. I can only assume that the experts were relying in this regard on their limited personal experiences and preconceived notions, as a 2012 study published by the Israeli Judiciary revealed that the percentage of prosecutions culminating in plea bargains is identical in both IMCs and Israeli civilian courts.[102]

105.    **The eighth point** is that, contrary to defendants' experts assertions, Israeli security legislation is published and is definitely not applied retroactively; IMC court hearings are public; and IMC decisions are accessible.

106.    Defense experts attempt to paint a grim picture of a covert government enacting secret legislation and rendering IMC verdicts behind closed doors and unbeknownst to the local Palestinian population. This simply is not the reality.

107.     As a starting point, and as repeated throughout this opinion, the Israeli authorities in the West Bank are subject to continuous judicial review by Israeli courts. A core principle of Israeli law is the requirement that all orders or regulations of "a statutory nature" must be made public. This principle is embodied in several places and supported by the Basic Law: Human Dignity and Liberty. Accordingly, no defendant will be liable in an IMC for a crime which he or she could not have known to constitute criminal behavior.

---

[101] *Id.* For an English source, see - http://www.haaretz.co.il/news/law/1.1578247
"Acquittal and Conviction Rates in Criminal Proceedings", available from the Israeli Supreme Court Research Department at http://elyon1.court.gov.il/heb/Research%20Division/doc%5CResearch1.pdf  (Hebrew)

108.   Israeli military law and practice regarding publication of legislation is fully in accordance with international law. For example, commenting on the requirement reflected in GCIV Article 65 that legislation be published and not retroactive, Jean Pictet (the Geneva Conventions' official commentator) explains that: *"[t]he Convention does not prescribe the mode of publication, which may be through the medium of the local press, in an "Official Gazette" specially issued for the purpose, or by posting notices in places specially set aside and known to the public"*.[103] In accordance with this provision, and to ensure that legislation be known to all relevant parties, immediately following the Six Day War the military commander began enacting a number of Military Orders describing permissible means of publication.[104] Indeed, the IMC was asked on several occasions to intervene in instances in which despite these orders a defendant felt that the relevant law was not sufficiently publicized.[105]

109.   In one case, a defendant was convicted in a first instance IMC of membership in a prohibited terrorist organization. However, the defendant argued that her membership and activities in the particular organization took place before it was publicized that the organization was unlawful. As a result, the IMC Court of Appeals acquitted the defendant and overturned the lower court ruling, thereby upholding the requirement that laws be public and never retroactively applied.[106]

---

[103] Commentary, IV Geneva convention relative to the protection of civilian persons in time of war, published under the general editorship of Jean S. Pictet ICRC, reprinted in 1994 Geneva, pp. 338-339. Available at http://www.icrc.org/applic/ihl/ihl.nsf/Comment.xsp?viewComments=LookUpCOMART&articleUNID=7CFC01CACB1E32A6C12563CD0051BF0E

[104] See, as examples: Interpretation Order (West Bank Region) (No. 130), 1967; and others cited in Military Court of Appeals 4869/07. As an additional example of the expression of the principle requiring publication, see Article 2 of the Interpretation Order (Additional Provisions) (No. 1) which states that:*"[f]or the avoidance of doubt, a Covert Law may never have legal effect.".*

[105] See Military Court of Appeals 3509/07 The Military Prosecutor v. Nada J'amal Hassan; The Military Court of Appeals 5/06 Eiran Shwartz v. The Military Commander of the Region; The Military Court of Appeals 4869/07 The Military Prosecutor v. Attaff Daoud Hassin Hudli.

[106] The Military Court of Appeals 4869/07 The Military Prosecutor v. Attaff Daoud Hassin Hudli.

110.    Notwithstanding the relatively minimal requirements under international law,[107] defense experts allege that there is insufficient access to legal documents such as Military Orders and other security legislation. I can attest from personal experience that, until the mid 1990's, all Israeli military legislation was regularly distributed throughout the West Bank. In the second half of the 90's, following the establishment of the Palestinian Authority, Palestinian legal authorities refused to receive and distribute the Israeli military legislation (which was incontrovertibly fully valid under the Israeli-Palestinian agreements) within the West Bank. As a result, the Israeli authorities were required to develop alternative methods for dissemination of such materials. Thus, for example, the military authorities worked together with selected leading Palestinian lawyers who had wide access to their communities and could distribute IDF and IMC materials. Similarly, the Israeli Civil Administration ensured that copies of materials were available at identified offices throughout the West Bank and Gaza. With the onset of the internet, a simpler solution was identified, and today Security Orders and other forms of military legislation, as well as IMC rulings, are published online. Legal databases upload these documents on the day of their publication and provide unhindered access to the materials.

111.    As concerns IMC hearings, defendants' experts further attempt to create the impression that IMC hearings take place behind closed doors, impinging upon the right to a public trial. Article 11 of MO 378 clearly states in this regard:

> *"The military court shall hold cases brought before it in*
> *public. However, a military court may order that a case*

---

[107] As mentioned above, GCIV Article 65 does not provide required modes of publication. Jean Pictet, however, lists certain examples, all of which are employed in IMC.

*brought before it shall be conducted wholly or in part behind closed doors if it considers it appropriate to do so in the interests of the security of the Israeli Defense Forces, justice, or for public safety".*

112.    Contrary to the defense allegations, it is important to understand that IMC judges do not casually rule that a case will be conducted behind closed doors.  In one notable case from 2002, the Major General commanding Israel's Central Command (the most senior IDF officer in the West Bank) actually signed a formal Military Order requiring that a specific trial be conducted behind closed doors. Nonetheless, the IMC decided to conduct the hearings publicly, claiming that the security and public safety concerns did not outweigh the defendants' right to a public trial.[108]

113.    Finally, in accordance with Article 11 of MO 378, IMC decisions are public and published. A library of all these published materials exists at the Military Court of Appeals in the West Bank and is open for public review by both Israelis and Palestinians.

114.    I think it relevant to point out that, notwithstanding the obvious importance of ensuring public awareness of, and access to, all relevant laws and judicial rulings, we should also not let these legal arguments cloud the fact that the crimes committed by the terrorists addressed in the *Sokolow* case include some of the most heinous acts known to man. I find it hard to believe that even defendants' experts would claim that the terrorists in question have any legitimate claim that they were unaware of the criminality or severity of their acts before committing them.

---

[108] See Judea Case File No. 3324/02 presented in IDF Spokesperson's Response to the Yesh Din Report at para. 53.

115.    **The ninth point** is that IMC, similarly to Israel and other modern legal systems, assuredly recognize and enforce the principle that defendants are innocent until proven guilty (the presumption of innocence).

116.    As in other instances throughout their reports, the defense experts attempt to present a misleading picture by apparently claiming that if a rule is not explicitly articulated in a specific Military Order it *ergo* does not exist. For example, Dr. Sharon Weill states - "*In the IMCs, there is no provision establishing the presumption of innocence*"[109].

117.    First and foremost, as noted throughout this opinion, Article 9 of MO 378 simply adopts Israeli evidence law, in its entirety, to the IMC. It is impossible to reasonably argue that this basic principle of a presumption of innocence is missing from Israeli civilian law. It cannot therefore be reasonably argued that this principle is missing in the IMC.

118.    Furthermore, while it is true that the words "presumption of innocence" are not to be specifically found in MO 378, the fact that the burden of proof rests with the prosecution is clearly reflected in MO 378 Article 29:

> *"If the accused does not admit the truth of any charge, or the*
> *court refuses to accept a plea of guilt, the court shall proceed*
> *to hear the case brought by the military prosecutor and his*
> *witnesses and any other evidence which it deems fit".*

---

[109] See report of Dr. Sharon Weill, final paragraph at p. 29, Part III, Section B Chapter 4.

119.    Another indication of the existence of the principle of the presumption of innocence in the IMC can be found in MO 378 Article 30:

> *"If upon the close of the prosecution's case it appears to the court that there is insufficient evidence with which to warrant a response by the defendant regarding a particular allegation the judge shall acquit the defendant of that particular allegation."*

120.    The fact is that, while  this basic principle is not overtly "spelled out" in MO 378 (just as it is not written in the Israeli Evidence Ordinance [New Version] – 1971), there is absolutely no doubt whatsoever that this principle is to be fully and unconditionally applied in all cases.

121.    **The tenth point** is that IMC defendants have a guaranteed and enforced right to understand the charges brought against them and the nature of the legal proceedings, including through the provision of interpreters, at no cost.

122.    Defendants in IMCs must be notified of the nature of the charges against them and be given a right to appeal these charges. Art. 21 of MO 378 provides:

> *"...A copy of the Indictment shall be delivered to the Defendant prior to trial".*

123.    IMC defendants, like those in other legal systems, are to be given full access to the non-classified evidence underlying the allegations against them. Indeed, in contrast to the defense experts' accusations, the law in the West Bank and Gaza has always been that all relevant evidence must be presented by the investigative and prosecution authorities to the defendant. While the operative obligation to supply this evidence isn't spelled out explicitly in a military order, the practice is undeniably well established. As the IMC Court of Appeals has articulated:

*"It appears that there is no need for verbosity or wordiness regarding the obligation on the prosecution to provide for the defendant's review, all disclosed investigative materials pertaining to his case. This is a fundamental obligation regarding which no one contests. Despite the fact that [Military Order 378] does not include an explicit arrangement regarding investigative materials, such as the one established through Section 74 of the [law applicable in Israel], the obligation to disclose investigative materials has been anchored through precedents in a long list of this court's decisions"*[110]

124.    Nevertheless, as with all investigations, access to classified information can at times severely prejudice vital interests. To balance this dilemma, Israeli evidence law, in effect in the West Bank (similarly to the situation in many other legal systems), grants defendants the right to challenge before a judge any decision of authorities to withhold or classify evidence.[111] When detainees are denied access to relevant but classified evidence, the reviewing judge must employ accepted standards of criminal law to balance between the conflicting interests.

---

[110] Military Court of Appeals 4006/07 Omer Fried Hassan A'lkem v. The Military Prosecutor.
[111] See Chapter C of the Israeli Evidence Ordinance [New Version] – 1971, applicable in the West Bank by virtue of MO 378, Article 9.

125.    Article 12 of MO 378 further supplements the right of a defendant to understand his or her rights by requiring that an interpreter accompany the defendant throughout the legal proceedings:

> *"If the accused does not understand Hebrew the military court shall appoint him an interpreter who will translate for him the statements made during the course of the hearing and the decisions of the court, unless the accused willingly renounces his right to have the proceedings translated wholly or in part. The accused has the right to object to a particular translator and to request that he/she be replaced".*

126.    Recognizing the need to ensure the availability of qualified IMC interpreters, the IDF regularly sends soldiers with appropriate background and skills to a professional military "court clerk translation course", following which they serve as non-commissioned-officers translators, under the command and supervision of designated responsible commissioned officers. Any and all complaints regarding the quality of interpreters are handled by the IDF officer in charge of the translation unit and can also be brought directly before the IMC.[112]

127.    The **eleventh** point is that IMC defendants are guaranteed and, in practice, provided with, a speedy and efficient trial.

---

[112] See IDF Spokesperson Response to the Yesh Din report, at para. 69-72.

65

128.    Article 78 of MO 378 requires that trials conclude within two years from their date of commencement. Defendants' experts attempt to give the impression that this seemingly long two-year period, with the possibility of extensions under certain circumstances, leaves IMC defendants in a state of legal "limbo" for long periods of time without their case being resolved. This is factually untrue. The two year limit (with its possible extensions), reflects only the upper limit established in the MO. In practice, the majority of the cases are concluded far more quickly, thereby guaranteeing speedy trial. In a 2006 study, for example, it was found that the average length of an IMC court file categorized as related to "terrorist activities" was 7.5 months. Files categorized as "rioting/disturbing the peace" were concluded, on average, within 3.9 months and "general criminal cases" were concluded within an average of 5.4 months.[113] All of these are timeframes which would be deemed highly respectable in any Western civilian legal system.

129.    The **twelfth** point is that IMC defendants are guaranteed the right to a fair defense and access to legal counsel.

130.    Article 8 of MO 378 provides that  -

*"The prosecution before a Military Court shall be conducted by a Military Prosecutor appointed by the Commander of the Region. The defendant may be defended by a defense counsel".*

---

[113] *Id* at para 65.

131.    The latter section of Article 8 was supplemented by Order No. 400 on Defense of the Accused in Military Courts from 1970, enacted in light of GCIV Article 72.[114] Accordingly, all defendants have a right to either chose legal counsel or represent themselves. With respect to crimes for which the penalty is 10 years imprisonment or above, the court is obligated to offer a court-appointed attorney, costs of which are to be covered by the military authorities. Furthermore, the court is entitled, but not obligated, to offer court-appointed attorneys for less severe crimes as well.

132.    The right to an attorney is upheld at all stages in the IMC process. Accordingly, there are examples in which the IMC released defendants from prison due to the fact that they had not benefitted from proper representation by counsel. In one case the defendant was released because the police failed to notify the defendant's counsel that the place of the hearing had been changed; resulting in the defendant's lack of adequate legal representation.[115] In another case the IMC released the defendant due to the fact that his attorney was not present when the suspect was identified as a suspect in the police lineup.[116] In another matter, when an IMC learned that an attorney was not afforded the opportunity to sufficiently study the investigative materials, it ordered the release of the defendant.[117] In yet another case, due to travel restrictions in the West Bank, a certain defense lawyer was unable to attend an IMC hearing. The IMC ultimately released the defendant from prison due to his lack of counsel.[118]

---

[114] In relevant part, GCIV Article 72 states that, "*Failing a choice by the accused, the Protecting Power may provide him with an advocate or counsel. When an accused person has to meet a serious charge and the Protecting Power is not functioning, the Occupying Power, subject to the consent of the accused, shall provide an advocate or counsel.*"
[115] Detention Hearing 2019/06 Darj'am Muhamed Abed Alkarim Almashni v. The Military Prosecutor.
[116] Detention Hearing 2881/09 The Military Prosecutor v. Bassam G'abrin Abu Marir
[117] Detention Hearing 3386/05 A"A Gani Muhammad G'umah Hamad v. The Military Prosecutor.
[118] Detention Hearing 3664/09 The Military Prosecutor v. Hamza Navil Mahmad Abi Id

133.    With respect to attorney-client meetings at detention facilities, Art. 78B(C) of MO 378 instructs that *"the commander of the detainment facility must facilitate [meetings] without delay"*. In the event there are delays, they must be explained in writing by the relevant commanders or investigating officers. In addition, Palestinian attorneys have unhindered access to the IMCs, which (in accordance with GCIV requirements) are located within the West Bank, so that accessibility is not an issue.

134.    **The thirteenth point** is that arrests and detention of suspects in the West Bank are fully consistent with accepted legal standards balancing between the rights of defendants and security and public order concerns.

135.    The following will briefly outline the grounds for the different forms of criminal arrest and detention applicable in the West Bank as well as the nature of detainees' judicial review (including their right to "*habeas corpus*"). As an introductory point, it is crucial to realize that the legal framework for arrest and detention in the West Bank is primarily identical to that in place concerning Israelis arrested in Israel.[119] As will be shown, variations relating to procedural matters (such as time frames, for example) reflect the different laws which apply in the West Bank and Israel. Despite this apparent difference, the following review of IMC case law demonstrates that judges do their utmost to ensure that detainees benefit from procedural safeguards identical to the ones applicable in Israel.

---

[119]See N. Benisho, "Criminal law in the West Bank and Gaza", IDF Law Review, Vol. 18 (2005), p. 299, available at: http://www.law.idf.il/SIP_STORAGE/files/0/320.pdf . Benisho references the Military Court of Appeals, Detention Appeal 157/00 The Military Prosecutor v. Abu Salim. In this case the IMC recognized that formally the Israeli statutory rules relating to criminal procedure did not apply in the West Bank. Nevertheless, the court explained that the IMC system had decided to act in accordance with those principles. Similarly, in Military Court of Appeals 42/01 Faddel v. The Military Prosecutor, Israeli rules of criminal procedure were directly applied by the IMC.

Individuals may not be arbitrarily arrested in the West Bank. Instead, criminal suspects may only be arrested in accordance with a legally mandated arrest order issued by a competent officer based on reasonable grounds for suspicion that such individual has actually committed an indictable crime.[120]

136.    Such an arrest order is further subject to judicial review by an IMC, which may extend the arrest only upon a judicial determination taking into account a variety of factors. Firstly, to support extending an arrest order, the evidence presented to the court by the investigating authority must clearly indicate a reasonable suspicion that the suspect has committed an indictable crime. Furthermore, there must be reasonable grounds to fear that (i) the suspect poses a security threat and/or (ii) there are reasonable grounds to fear that releasing the suspect will obstruct the investigation or judicial proceedings. Regarding a suspect posing a security threat, it is important to understand that the mere gravity of the suspected offence is not *per se* sufficient.[121] Rather, the security threat must stem directly from that individual, and no external factors may justify depriving a defendant's liberty.[122] Finally, a judge may extend the arrest warrant only if there are no alternative means with which to address those threats.[123]

137.    Judicial review of all of the above factors is conducted in a hearing before an IMC, with the suspect and his/her attorney in attendance to present their arguments and interrogate the representative of the investigation authorities. (As examples of these requirements; there are several IMC detention hearings, referred to earlier, in which the judges

---

[120] See MO 378, Chapter IV, beginning with Article 78.
[121] See Detention Appeal 115/02 for IMC Court of Appeals analysis of the grounds for detention in the West Bank.
[122] *Id.*
[123] For a review on grounds for arrest see, Military Court of Appeals 1570/00.

released the defendants because their counsel was not present, [124] or because the defendants themselves were not present at the hearing.)[125]

138.    Any decision by the IMC on matters relating to detentions and arrests is further subject to appeal to the Military Court of Appeals and, thereafter, to a petition to the HCJ. At the appellate level, the review is *de novo*, and the appeal judges assesses all of the evidence before determining whether the reason for detention outweighs the detainee's inherent right to liberty.[126]

139.    As for the standard of the review, while reviewing the evidence regarding the arrest, the IMC must conduct an in-depth review of such evidence. In the words of the Israeli Supreme Court:

*"[The judge must] ensure that every piece of evidence connected to the matter at hand be submitted to him. Judges should never allow quantity to affect either quality or the extent of the judicial examination"*[127]

140.    Experts on behalf of the defendants repeatedly point out that the relevant laws in the West Bank allow for relatively prolonged periods of pre-trial detention. It should be

---

[124] For some examples, see, Detention Hearing 2019/06 Darj'am Muhamed Abed Alkarim Almashni v. The Military Prosecutor; Detention Hearing 2881/09 The Military Prosecutor v. Bassam G'abrin Abu Marir; Detention Hearing 3386/05 A"A Gani Muhammad G'umah Hamad v. The Military Prosecutor; and Detention Hearing 3664/09 The Military Prosecutor v. Hamza Navil Mahmad Abi Id.

[125] See Detention Appeal 150/01 The Military Prosecutor v. Salama Mahmad Murshad Abu Akel; and Detention Appeal 3/02 The Military Prosecutor v. Susan Daoud A/Rzak Abu Tourki.

[126] See Brief of Amici Curiae Specialists in Israeli Military Law and Constitutional Law, submitted in support of petitioners in Boumediene v. Bush, 553 U.S. 723 (2008), at p. 12 available at: http://www.scotusblog.com/movabletype/archives/probono_Specialists_Israeli_Military.pdf (Hereinafter - "Amici")

[127] HCJ 3239/02 *Marabe v. IDF Commander in the West Bank* (Available in English from the website of the Israeli Supreme Court, at http://elyon1.court.gov.il/Files_ENG/02/390/032/A04/02032390.A04.HTM)

clarified in this regard that the periods mentioned in the Military Orders reflect only the upper limit of permissible detention lengths (the same holds true for periods of delay for meetings with counsel). Authorities must act expeditiously within these prescribed timeframes to avoid infringing on people's rights to liberty.

141.    In Detention Appeal 119/03 this point was made clear by the IMC, explaining that even if the law permits arrest warrants to be extended for periods of up to 30 days in certain situations, the appropriate practice of judges must be to issue drastically shorter detention times, and thereby ensure more consistent judicial review.[128]

142.    An additional point worth considering is the fact that it is not uncommon for large-scale detentions in the West Bank to take place during ongoing hostilities. It is obviously unworkable for a judge to accompany a soldier into the battlefield to review each case of proposed detention. It is similarly impossible to supply defense attorneys to enemy combatants in the field during the fighting. As explained by the Israeli Supreme Court, while certain delays are sometimes necessary, judicial review may be postponed only until "*detainees are taken out the battlefield to a place where the initial investigation and judicial intervention can be carried out properly*".[129] Some of the legislative timeframes which the defense experts refer to have been developed in response to such potential situations deemed necessary, *inter alia*, to allow for authorities to remove combatants from hostile combat environments to secure areas and facilities.

143.    The efficiency and legitimacy of Israel's pre-trial detention rules were especially put to the test during the period relevant in *Sokolow*. As a result of the waves of

---

[128] Detention Appeal 119/03 Padi A'adel G'ibrin v. The Military Prosecutor
[129] HCJ 3239/02 *Marabe v. IDF Commander in the West Bank* (Available in English from the website of the Israeli Supreme Court, at http://elyon1.court.gov.il/Files_ENG/02/390/032/A04/02032390.A04.HTM)

terror spawned during the 2nd *Intifada*, the Israeli military launched Operation Defensive Shield in March 2002. Shortly after the operation's launch, the IDF had detained approximately 7,000 detainees. By May 15, over 5,000 detainees had been released and some 1,600 remained in IDF detention.[130] Nevertheless, the constant influx of detainees placed an incredible burden on the already strained Israeli military, and its legal arms. To manage this burden, the Military Commander amended the military legislation in force in the West Bank and temporarily extended the period of detention before a suspect must be brought before a judge from 8 days to 18 days (this maximum period was shortened to 12 days shortly thereafter). These extended detention periods became extremely controversial in Israel. To put things in perspective, the U.S. Government, when addressing the legal and administrative burden placed upon it with respect to the detention of only several hundred detainees in the Guantanamo Bay detention facilities, has argued that arranging for judicial review for these few hundred individuals is "*consuming enormous resources and disrupting the day-to-day operation at the Guantanamo Bay Naval Facility*".[131]

144.    The Israeli Supreme Court, addressing the period of detention of the 1600 or so Defensive Shield detainees, nevertheless held that the extended periods of detention set out by the military commander violated the rule of law and were unacceptable, even during periods of emergency such as the 2nd *Intifada*. The court further explained that "*judicial review of detention proceedings is essential for the protection of individual liberty*".[132] Responding to the IDF's protestations that they simply did not have the resources to process the detainees within the 8 days allotted under previous legislation, the Israeli Supreme Court ruled:

---

[130] Amici at para. 27, quoting generally HCJ 3239/02 *Marabe v. IDF Commander in the West Bank* (Available in English from the website of the Israeli Supreme Court, at http://elyon1.court.gov.il/Files_ENG/02/390/032/A04/02032390.A04.HTM).

[131] Cert. Opp., p. 4 in Boumediene v. Bush Nos. 06-1195, 06-1196, (U.S. filed Mar. 21, 2007)

[132] HCJ 3239/02 *Marabe v. IDF Commander in the West Bank* at para. 26 (Available in English from the website of the Israeli Supreme Court, at http://elyon1.court.gov.il/Files_ENG/02/390/032/A04/02032390.A04.HTM) at para 26.

> *"Security needs, on the one hand, and the liberty of the individual on the other, all lead to the need to increase the number of investigators. This is especially true during these difficult times in which we are plagued by terrorism, and even more so when it was expected that the number of detainees would rise due to Operation Defensive Shield…"A society is measured, among other things, by the relative weight it attributes to personal liberty. This weight must express itself not only in pleasant remarks and legal literature, but also in the budget. The protection of human rights often has its price. Society must be ready to pay a price to protect human rights.".*[133]

145.    Similarly, the Court rejected the IDF's argument that it simply lacked sufficient numbers of judges to conduct the required judicial review, stating:

> *"[t]he current emergency conditions undoubtedly demanded large scale deployment of forces…However, by the same standards, effort and resources must be invested into the protection of the detainees' rights, and the scope of judicial review should be broadened."*[134]

---

[133] HCJ 3239/02 *Marabe v. IDF Commander in the West Bank*, at para. 48 (Available in English from the website of the Israeli Supreme Court, at http://elyon1.court.gov.il/Files_ENG/02/390/032/A04/02032390.A04.HTM)
[134] *Id.* at para. 35

146.    **The fourteenth point** relates to defendants experts' claims with respect to alleged abuse giving rise to out of court confessions.

147.    Defendants' experts, seeking to minimize the obvious negative impression resulting from the numerous convictions of Palestinian Authority personnel in multiple murders of innocent men, women and children, have raised a wide variety of allegations, all of which are aimed at convincing the U.S. courts to grant little weight to the confessions of the convicted terrorists. They accordingly claim that when a defendant pleads guilty the judge merely asks whether he or she confesses without further inquiry and simply "copies" the facts from the indictment to the judgment; they similarly allege that convictions are often entirely based upon out-of-court confessions which are often "embellished" by the suspected terrorist for the purpose of "impressing" other convicted terrorists.[135] The reality of IMC court practice is far detached from these allegations.

148.    As previously explained at some length, IMCs are subject to the rules of evidence applicable in Israeli courts (MO 378Article 9).

149.    Accordingly, Article 12 of the Evidence Ordinance [New Version], 1971 states that:

> *"Evidence of confession by the accused that he has committed an offence is admissible only when the prosecution has adduced evidence in relation to the circumstances in which it*

---

[135] See, for example, opinion of Michael Sfard at para. 10, and 11.

> *was made and the court is satisfied that it was free and*
> *voluntary."*

150.    This provision relates to all stages of the investigative process, and applies to interrogative materials of the Israeli General Security Services (hereinafter – the "GSS") as well as to police interviews and documentation. For example, in Detention Appeal 2730/09, the IMC determined that an out of court confession was given to someone lacking authority and there were insufficient details pertaining to the context of the confession. As a result, the defendant was immediately issued a conditional release.[136]

151.    In another, particularly interesting, case both defense counsel and the prosecutor jointly applied to submit to the court an out-of-court confession made by the defendant to a third party, who was not intended to be called as a witness by either party. The defense counsel and prosecution presented the court with an agreement they had reached between them according to which - if the court found the out-of-court statement incriminating - the defendant would plead guilty. However, it had further been agreed between defense and prosecution that if the court was not convinced by the statement, the defendant should be acquitted.

152.    The IMC refused the joint application, and found fault in the nature of the agreement between the two sides:

> *"A criminal court does not settle a legal conflict between the*
> *parties and is not an arbitrator between them on legal*

---

[136] Detention Appeal 2730/09 The Military Prosecutor v. A'atzam Hassan Yoseff Ha"Shalmon

> *problems. It does not accept a confession made by the accused*
>
> *out of court unless it is in accordance with section 12 of the*
>
> *Evidence Ordinance. The court decides the issue according to*
>
> *the evidence submitted to it, following prevailing procedure*
>
> *whether under Chapter II of the Military Order No. 378 or*
>
> *section 10 thereof, according to which a court may give*
>
> *directions as to procedure which seems to it most suitable in*
>
> *the interest of justice."[137]*

153.    The gravity and seriousness with which Israeli judges are required to consider out-of-court confessions was highlighted in a seminal case brought before the Israeli Supreme Court - the *Steven Smirk* case[138]. In this case, the Supreme Court explained that if due process rights were violated to ascertain a confession, the court could convict the defendant only if a second confession was given free from undue influences.[139] Indeed, over the years Israeli legal doctrine, voiced in a variety of Israeli Supreme Court precedents, has firmly established the principle that the nature and circumstances of any and all confessions must be thoroughly reviewed by the court before being accepted as statements of fact.[140]

154.    **The Fifteenth and final point** addresses the repeated allegation by defendants' experts of the extensive use of abusive and unlawful interrogation techniques by Israeli officials.

---

[137] Case cited, explained and partially translated to English in Military Government in the Territories Administered by Israel 1967-1980: The Legal Aspects, edited by Meir Shamgar, 1982 (Jerusalem) at p. 205.
[138] Criminal Appeal 6613/99 Steven Smirk v. the State of Israel
[139] *Id.*.
[140] Criminal Appeal 5121/98 Private (res.) Raphael Yissacharov v. The Chief Military Prosecutor

155.    Experts on behalf of the defendants raise repeating claims of inhumane treatment of Palestinian detainees. In response, and for the avoidance of any doubt, I wish to stress that Israeli law categorically and undeniably prohibits all forms of torture and inhumane or degrading treatment. Officials accused and convicted of inhumane treatment are punished harshly. This applies whenever and wherever Israeli authorities interact with civilians, and is relevant for GSS interrogations; for police investigations; in the field when conducting arrests; in the thick of IDF combat; throughout all forms of detention; and in any other scenario.

156.    At one time, Israel security agencies argued that the exigencies of the terror threat justified applying "mild" forms of stress against suspected terrorists. For a time this position was even partially endorsed by a Governmental Committee headed by a former justice of the Israeli Supreme Court in 1987.[141] This approach, however, was totally rejected in 1999 by the Israeli Supreme Court in the seminal *Public Committee Against Torture in Israel* case. The Supreme Court held that the provisions of Israel's constitutional Basic Law: Human Dignity and Freedom establish a framework binding on all Israeli security authorities, wherever located and regardless of the circumstances. Accordingly, the HCJ ruled that use by authorities of investigative methods such as sleep deprivation, stress positions, shaking, etc. was absolutely forbidden.

157.    The defense experts point out that the above HCJ ruling, while expressly prohibiting all forms of torture, left open the possibility that security officials could employ the "necessity" defense against criminal liability. In pointing this out, the defense experts insinuate that such a defense allows Israeli security authorities to engage in abusive tactics. This is not the case. The "necessity" defense is a recognized criminal law doctrine which

---

[141] See the Report of the Commission of Inquiry Regarding the Interrogation Practices of the GSS with Respect to Hostile Terrorist Activities headed by Justice (ret.) M. Landau, 1987, referenced in HCJ 5100/94 Public Committee Against Torture in Israel v. The State of Israel, at para. 1, available in English from the website of the Israeli Supreme Court, at: http://elyon1.court.gov.il/Files_ENG/02/690/007/A34/02007690.A34.pdf

77

relates to extenuating circumstances. Regarding investigations by security authorities, the only feasible invocation of the defense would be for real "ticking bomb" scenarios in which a security agent acted out of a concrete necessity to save human life. Thus, for example, authorities could never benefit from such a defense for abuse of individuals detained <u>after</u> having engaged in terror attacks - the relevant set of facts in the cases addressed in *Sokolow*. In such cases, were they to attempt to use abusive methods of interrogation, the authorities in question would be held criminally liable. In addition, while the HCJ did recognize the potential applicability of the "necessity" defense in exceptional cases, it should be clarified that, Hollywood movies notwithstanding, such situations are extremely rare, and certainly inapplicable in the relevant *Sokolow* IMC trials.

158.    Furthermore, experts for the defense fail to present the variety of mechanisms in place to prevent all forms of abuse by security authorities. They misleadingly portray a situation in which complaints are disregarded by Israeli authorities. This too is far from the truth.

159.    As mentioned throughout this opinion, all individuals affected by Israeli authorities may petition Israel's highest court, the HCJ. This has prevented inappropriate treatment to detainees in the past and remains an important safeguard to basic human rights. A prime example is the above seminal ruling forbidding abusive interrogations, *The Public Committee against Torture* case. That case did not come before the Israeli Supreme Court in the context of a criminal appeal, for example following coerced testimony. Rather, a suspect had been taken into custody by the GSS and, at the start of the interrogation, his lawyer immediately approached the HCJ claiming that, from past practices of the GSS, there was a high degree of likelihood that coercive tactics would be used. Just hours later, the state's representative was summoned before the court and agreed with the petitioner's claims - that

the suspect would likely be subjected to "tough" investigation tactics - but argued that such tactics were legal.[142] As indicated above, the HCJ ruled in favor of the petitioner. In another case, also relating to the GSS, the Supreme Court explained that:

> *"There is no security without law. The rule of law is a component of national security. Security requires us to find proper tools for interrogation. Otherwise, the General Security Service will be unable to fulfill its mission. The strength of the Service lies in the public's confidence in it. Its strength lies in the court's confidence in it. If security considerations tip the scales, neither the public nor the court will have confidence in the Security Service and the lawfulness of its interrogations. Without this confidence, the branches of the state cannot function. This is true of public confidence in the courts, and it true of public confidence in the other branches of state".[143]*

160.    While obviously of primary importance, the HCJ is just one of many supervising bodies charged with ensuring detainees are treated humanely and in accordance with the law.

161.    <u>Scrutiny of GSS Actions</u>

---

[142]    See The Israel Supreme Court: Fighting Terrorism within the Law: at p. 20, available at: http://www.mfa.gov.il/MFA_Graphics/MFA%20Gallery/Documents/terrorirm_law.pdf.
[143]    HCJ 428/86, Barzilai v. The Government of the State of Israel.,

a. In the early 1990s a position of Inspector of Complaints was established within the GSS. The GSS Inspector is obligated to inspect any and all allegations of abuse of power raised by subjects of GSS interrogations and investigations. GSS security forces are subject to virtually the same complaint mechanisms in place for members of the Israeli Police Force, who are investigated by the independent Police Internal Investigation Department.[144]

b. Beyond the above provisions, which require that in-depth investigations be carried out in cases of alleged abuse, the General Security Service Law – 2002 contains important provisions which require pro-active internal and external auditing and review of all GSS activities. First and foremost, Article 5 establishes a Ministerial Committee responsible for overseeing all operations of the GSS. The Ministerial Committee comprises of (1) the Prime Minister, serving as chairman, (2) the Minister of Defense, (3) the Minister of Justice, (4) the Minister of Internal Security, and (5) another member.  An additional sub-committee was further established in Article 6 to provide more comprehensive oversight. Under Article 12 of the GSS Law, the Head of the GSS must report to these committees on an ongoing basis, and no less than once every three months. Furthermore, Article 13 requires that the Prime Minister, in consultation with the Head of the GSS, appoint a GSS Comptroller. The GSS Comptroller is obligated to conduct internal GSS audits and submit periodic reports in accordance with the Israeli Internal Auditing Law, 5752-1992. Similarly, the GSS Comptroller may be asked to step in to handle complaints lodged

---

[144]   See Chapter 4 Part 2 of the Police Ordinance.

by detainees against the GSS.[145] Regarding all of his work, *"the Comptroller shall not be denied access to any document, information or place on grounds of privilege or secrecy"*[146]

c.  The defendants' experts appear to suggest that these mechanisms are merely formal and have led to no concrete action regarding abuse by Israeli security officials. However, statistics from the time period relevant to *Sokolow* indicate that the Inspector of Complaints initiated 81 examinations in the year 2002, 129 examinations in 2003, 115 examinations in 2004, and 61 examinations in 2005 (as of mid-December). These examinations were the result of exterior complaints, as well as incidents alleged in internal GSS reports. These investigations resulted in disciplinary sanctions to GSS interrogators.[147]

d.  In addition to *post facto* investigation of complaints, and periodic audits and review by external entities, GSS personnel receive ongoing training. Through this training, a strong "tone from the top" cascades down to all levels of the GSS emphasizing that all of the organization's activities are subject to the rule of law. As an expert in international law and national security law, I have personally been invited by the GSS to give many lectures to GSS personnel on matters relating to the relationship between security and the rule of law. I can therefore personally attest to the extensive efforts made by the GSS to train their staff in such matters.

162.    <u>Scrutiny of Israeli Police Actions</u>

---

[145] GSS Law, section 13(d)
[146] GSS Law, section 13(e)(2)
[147] See , Fourth periodic report of the State of Israel to the U.N. Committee Against Torture pursuant to the Convention against Torture and Other Inhumane, or Degrading Treatment or Punishment, CAT/C/ISR/4 (6 December 2007), at para. 46

a.  Even more aggressive review mechanisms are in place regarding conduct of Israeli Police officials.

b.  Each year, numerous complaints are filed against the Israeli Police Service for alleged misconduct. Such complaints are treated with the utmost gravity and have often resulted in disciplinary, civil and criminal legal actions. The Israeli Police as a whole, as well as Police personnel, are liable regardless of whether the subject of their abuse is Israeli, Palestinian, or any other nationality. The following examples reflect a few cases, relevant during the *Sokolow* time period, in which Israeli Police officers were convicted for unlawful acts committed against Palestinian residents of the West Bank.

1. See for example, Criminal Appeal 157/03 *The State of Israel V. Bassam Wahabi et. al.* In this case, and related criminal procedures cited therein, four Border-Police officers were indicted of manslaughter for detaining a Palestinian resident of Hebron and later throwing him off a moving military vehicle, which caused severe head trauma that resulted in his death. The primary perpetrators were sentenced to eight and a half years imprisonment, and the others were sentenced to five and a half and four and half years of imprisonment, respectively.[148]

2. Criminal File 390/04 (District Court-Jerusalem) *The State of Israel V. Itai Brayer et. al.* (5.4.05). Three Border-Police officers were convicted of causing severe bodily harm in aggravated circumstances, abuse of a minor/helpless-person, and obstruction of court procedures. They were sentenced to six to ten months of imprisonment, following a vigorous investigation by the Department for Investigation of Police Officers. The

---

[148] See also Criminal Appeal 4896/09 Shachar Boutvika v. The State of Israel.

charge stemmed from an incident where the officers detained and assaulted two Palestinian teenagers. It is noteworthy that following sentencing the Police Internal Investigation Department considered the verdict too lenient and recommended that the State Attorney's Office appeal for harsher sentencing.

3. Criminal File 436/04 (District Court-Jerusalem) *The State of Israel V. Nir Levy et. al.* (19.5.05). Five Border-Police officers were convicted of assault in aggravated circumstances, abuse of a minor/helpless person, and obstruction of court procedures. They were sentenced to between four and fourteen and a half months of imprisonment. The indictments were filed shortly after an immediate and extensive investigation was completed by the Police Internal Investigation Department, following complaints that the policemen had beaten a Palestinian while arresting him.

163.    Finally, it is worth noting that in 1991 Israel ratified the U.N. Convention against Torture and Other Inhumane, or Degrading Treatment or Punishment. Through its involvement with the U.N. Committee Against Torture, established by the convention, Israel engages in ongoing dialogue and opens itself up to external review of its interrogation methods.[149]

---

[149] For example, Israeli regularly submits reports to the Committee Against Torture, or "CAT". For a list of reports, see Israeli Ministry of Justice website at,
http://index.justice.gov.il/Units/InternationalAgreements/IA/Amanot/CAT/Pages/Tkufati.aspx

## V.    The Israeli Settlements in the West Bank

164.    In Part Three of his expert opinion, Adv. Sfard claims that the Israeli settlements in the West Bank are unlawful and are violations of international law.

165.    Truth be told, I am unsure exactly how this issue is related to the question of the defendants' responsibility for the terror attacks which are the subject of this case. Even if one were to accept Adv. Sfard's position that Israeli settlements violate international law, this has no bearing on the nature of the IMC and the validity of their rulings, unless Adv. Sfard is attempting to argue that, for the sake of ending the Israeli settlement enterprise, it is lawful and justified to launch terror attacks against innocent Israeli men, women and children.

166.    Putting aside such a disturbing possibility, I wish to point out that, in spite of the defendant's expert's protestations, the issue of the legality of the Israeli settlements in the West Bank is far from as clear as they would suggest, and the Israeli position on legality has more merit than they would give credit.

167.    The alleged illegality of the Israeli settlements is based upon two legal-factual assumptions:

a.    That the West Bank "belongs" to the Palestinians and, as a result, Israel is the "Occupier" of the West Bank and the Palestinians are "occupied" by Israel.

b.    That International law prohibits and criminalizes the establishment of settlements by the Occupier in Occupied territory, thus making all Israeli settlements unlawful.

168.    I will show that, as a matter of international law, the first assumption is both factually and legally wrong. As a direct result, it is far from clear that the settlements established by Israel are in fact prohibited under international law.

169.    Furthermore, I will also show that the primary sources often quoted by Palestinian supporters (including the experts on behalf of the defendants) as "proving" the alleged illegality of the Israeli settlements, are inapplicable to the Israeli settlements in the West Bank; are contested by both the U.S. and Israel; and do not enjoy any binding or customary status in international law.

170.    As background to this discussion, modern international law has its origins in the 17th and 18th centuries, as the realities of geopolitics brought Kingdoms, Empires and other forms of national manifestation into ever more direct contact (and potential dispute) in a wide variety of fields.

171.    Around the same time in Europe, another new concept was gaining foothold, the idea of the establishment of independent States[150]. It is therefore unsurprising that, from its humble beginnings, international law has been inextricably linked with the concept of Statehood.

172.    As a result, until this very day, and in spite of the significant developments the world has seen in the role of international organizations, non-governmental organizations and private corporations in the day-to-day complexities of the world, international law still remains focused on States as the only real "players" in the international law field.

---

[150] The common perception is that the concept of modern Statehood has its roots in the "Peace of Westphalia" of 1648.

173.    One direct consequence of this reality is that, under international law, territory generally "belongs" only to countries/states and not to "peoples" or ethnic groups. The international law terms which address such rights to territory are "sovereignty" and "title", both of which are unique to states.

174.    Territory belongs to the country which has the best "title" with respect to that territory. A country can acquire "title" to territory through a variety of methods (discovery, cession, treaty etc.).

175.    There are very few parts of the world which do not fall under the "title" of any country. The West Bank (and the Gaza Strip for that matter) are one such unique area, due to the following:

- For 400 years, between 1517 and 1917, the area that was known as "Palestine"[151] was ruled by the Ottoman Empire. Although most of this period predates modern international law, no one would contest that the Ottomans had "title" to all the areas under discussion in this Report.

- After the loss of the Ottoman Empire as a consequence of World War I, most of the Ottoman territories were divided up between the victorious powers. Palestine, the West Bank and the Gaza Strip all fell under the British control. However, the British made no claim to sovereignty or "title" to Palestine, but rather received a

---

[151] Until the establishment of the state of Israel in 1948, the term "Palestine" was used to describe the geographic region between the Mediterranean Sea and the Jordan River, that includes the current territories of the state of Israel, the West Bank, and the Gaza Strip.

League of Nations mandate to the territory. [152] It should be noted that, in accordance with the Palestine Mandate issued by the Council of the League of Nations on July 24th, 1922, the primary role of Britain in administering the mandate was:

> "...the establishment in Palestine of a national home for the Jewish people..."

- In addition, the British mandate was responsible for seeing that:

> "...no Palestine territory shall be ceded or leased to, or in any way placed under the control of, the Government of any foreign Power"[153]

- As a result of this development, "title" in Palestine did not transfer to any other then-existing country, but rather remained in abeyance, awaiting further developments.

- Throughout the years of the British Mandate, Jewish residents of Palestine settled throughout the Mandatory area, legally establishing tens of communities

---

[152] Under Article 22 to the Covenant of the League of Nations, available from the website of the Israeli Ministry of Foreign Affairs at:
http://www.mfa.gov.il/mfa/foreignpolicy/peace/guide/pages/the%20mandate%20for%20palestine.aspx
[153] *Id.*

throughout Palestine, including in what is today referred to as the West Bank and Gaza Strip.

- Following the end of World War II, the Middle-East saw the establishment of numerous new countries: Lebanon in 1943[154], Syria and Transjordan in 1946; and the State of Israel in 1948. None of the territories of these newly declared States included the West Bank and the Gaza Strip. As a result, none of them had "title" to or sovereignty over the West Bank.

- In 1948, immediately following the termination of the British mandate, Jordanian and Egyptian armies invaded and took control over the West Bank and the Gaza Strip, respectively. Upon gaining control of these new territories, the Arab armies decimated the Jewish communities which had been flourishing in those areas. Many of the residents were massacred and those who survived were forced to flee to safer areas under Israel's protection.

- Obviously, these acts of aggression did not grant either State "title" to or sovereignty over these areas.

- The 1948 War of Independence was finally concluded with the signing of Armistice Agreements between Israel and each of its neighbors. All of these Armistice Agreements specifically provided that the Armistice lines do not constitute international boundaries.

---

[154] In reality, Lebanon would only become independent in 1946, after the departure of the French military forces.

- In 1950, following the conclusion of the Israeli War of Independence, which had left the West Bank under Jordanian military control, Jordan attempted to formally annex the West Bank.[155] This Jordanian attempt was opposed and unrecognized by the international community.[156] Even the recently formed Arab League vehemently opposed this unlawful attempt at annexation, threatening to expel Jordan from the organization as a result. This inter-Arab crisis was finally resolved when it was agreed that Jordan would hold the West Bank only on a temporary basis (i.e. without "title").

- In June 1967, after the Jordanian Army launched a war against Israel, during the Six-Day War, Israel assumed control of the West Bank from the Jordanian Army.

- As the West Bank did not legally "belong" to any other state at the time (i.e. no state could claim either "title" or sovereignty over the West Bank in 1967), Israel's control cannot be considered as an "occupation" in the real legal sense of the word (which applies when one state physically takes control of territory which "belongs" to another state). In this context, it is important to note that both of the important international conventions repeatedly cited by the defendants' experts - the Fourth Hague Convention of 1907 respecting the Laws and Customs of War on Land and its Annex ("the Hague Rules") and the Fourth Geneva Convention of 1949 ("GC4" or "GCIV"), clearly state that an "occupation" requires that the occupied territory must first previously "belong" to another State. Thus, the entire chapter dealing with the legal effects of occupation in the Hague Rules is titled: "*Military Authority over the territory of the Hostile State*"

---

[155] To be supported by changing its name from "the Hashemite Kingdom of TransJordan" (i.e. the territory beyond the river Jordan) to the "Hashemite Kingdom of Jordan".
[156] With the exception of Great Britain, which was amongst Jordan's strongest allies, and British-controlled Pakistan.

[emphasis added – D.R.][157]. Similarly, Article 2 of GC4 specifically provides that:

> *"The Convention shall also apply to all cases of partial or total occupation <u>of the territory of a High Contracting Party</u> [which can only be a State – D.R.], even if the said occupation meets with no armed resistance." [Emphasis added – D.R.]*

176.   In light of the above, when Israeli forces ousted the Jordanian military from the West Bank in June 1967, the territory "belonged" to no State, including neither of the two belligerents. At this point, Israel was faced with two dilemmas: the first – should it attempt to claim sovereignty over this area, on the basis of its own legal and historical claims? The second – if not – under what regime should it rule this area?

177.   After deliberations, it was decided <u>not</u> to annex the West Bank but rather to adopt a unique middle-ground approach. Thus, as previously explained, the Israeli government officially proclaimed that it would *de facto* apply in this area the humanitarian provisions of GC4 (i.e. the international convention applicable to occupied territory) while maintaining that, *de jure*, this Convention does not formally apply to this area. The sole exception to this formula was East Jerusalem, concerning which Israel felt that the historic and religious ties of the Jewish people were so strong as to justify a formal application of Israeli law (and later a formal annexation). In other words, Israel decided to treat these territories "as if" they were occupied territory for humanitarian purposes, in spite of the fact that they were not "occupied" in the legal sense.

---

[157] Several of the regulations within this chapter also specifically refer to the "hostile State".

178.    The fact that no State has sovereignty or "title" over the West Bank was further confirmed in 1988 when King Hussein of Jordan (the only Arab country with some form of possible claim to the territory) formally declared Jordan's total disassociation from the West Bank, to include relinquishment of all territorial and political claims and ties to this region.

179.    This situation remained relatively unchanged until 1993, when Israel and the PLO commenced direct bilateral negotiations in the framework of the "Oslo Process", as a result of which the Palestinians would eventually establish the Palestinian Authority, and Israel would gradually transfer territories in the West Bank to Palestinian Authority control. This brings us, more or less, to the present day.

180.    In light of the above, the question remains – lacking national title, to whom does the West Bank "belong" today? The answer is that there is no clear answer, as the two sides have competing and legitimate claims.

181.    <u>On the one hand</u>, the Palestinians today lay claim to the territory primarily on the basis of the general "right of self determination" under international law, combined with their long-term historical presence in parts of the area.

    a.  In this context, it should be noted that in recent years, the Palestinians have made numerous attempts to gain recognition as a State in various international organizations. Thus, in September 2011, the Palestinians filed a formal request for full U.N. membership. As U.N. membership is only open to States, an acceptance of this request would have constituted international recognition of the existence of the Palestinian State. While this attempt was ultimately

unsuccessful, it is nevertheless important to note that even the Palestinian request for UN membership did not include any claim of Palestinian sovereignty or title to the West Bank. On the contrary, it included the specific recognition and acceptance that the borders of the future Palestinian State would need to be negotiated and agreed upon with Israel.[158] The Palestinians re-filed for U.N. membership the following year, this time applying for non-member state status. In its response to the Palestinian application (which was accepted), even the U.N. General Assembly (which is notoriously pro-Palestinian) explicitly noted that the question of the ultimate borders of the parties would need to be negotiated between them, stating that it *"[e]xpresses the urgent need for the resumption and acceleration of negotiations within the Middle East peace process… for the achievement of a just, lasting and comprehensive peace settlement between the Palestinian and Israeli sides that resolves all outstanding core issues, namely the Palestine refugees, Jerusalem, settlements, borders, security and water".*[159]

182.    <u>On the other hand</u>, Israel also has strong and valid historical and legal claims under international law to the West Bank, especially in those parts in which there has been a continuous Jewish presence for hundreds of years (if not more), often predating any Arab presence.

---

[158] See AS/66/371 S/2011/592, 23 September 2011, Application of Palestine for admission to membership in the United Nations, Annex II, Letter dated 23 September 2011 from the President of Palestine to the Secretary-General, available at:  http://unispal.un.org/UNISPAL.NSF/0/F6CF1ED25A5D8FE9852579170050C37F

[159] See A/RES/67/19, Status of Palestine in the United Nations, available at: http://www.un.org/ga/search/view_doc.asp?symbol=A/RES/67/19.

While the 2012 did not lead to the desired U.N. membership, the Palestinians did manage to receive the status of a "non-member observer state" from the UN General Assembly, against the objecting votes of the US, Canada, Israel, 5 other countries. See Sixty-seventh General Assembly, General Assembly Plenary, 44th & 45th Meetings (PM & Night), http://www.un.org/News/Press/docs/2012/ga11317.doc.htm

183.   Barring the possibility of a binding international resolution of these competing claims, the only real possibility for a positive conclusion is truly a negotiated settlement between the two sides.

184.   In summary:

- The West Bank is not "occupied territory" in the legal meaning of the word. The fact that the Palestinians have managed to "inject" the term Occupied Palestinian Territories (OPT) into much of the international narrative is a success of politics, not a result of law.

- Neither Israel nor the Palestinians currently have full legal "title" to or sovereignty over the West Bank.

- At the same time, both sides have strong competing legal claims to parts of the territory.

- The only practical way to resolve these competing claims is through direct bilateral negotiations and agreement.

185.   In light of these conclusions, we can now move to address the question of the legality of the Israeli settlements in the West Bank.

186.   The Palestinians' claim concerning the alleged illegality of these settlements is based on three primary legal sources:

a.  The provisions of the last paragraph of Article 49 of GC4, which reads as follows:

> *"The Occupying Power shall not deport or transfer parts of its*
> *own civilian population into the territory it occupies."*

    b.   The provisions of Article 8(2)(b)(viii) of the 1998 Rome Statute of the International Criminal Court which designates the following as a war crime:

> *"The transfer, directly or indirectly, by the Occupying Power*
> *of parts of its own civilian population into the territory it*
> *occupies, or the deportation or transfer of all or parts of the*
> *population of the occupied territory within or outside this*
> *territory;"* and

    c.   The advisory opinion of the International Court of Justice from 2004 on the legality of Israel's Security Fence in the West Bank, in which the ICJ opined (based upon its interpretation of Art. 49 of GC4 above) that:

> *"The Court concludes that the Israeli settlements in the*
> *Occupied Palestinian Territories (including East Jerusalem)*
> *have been established in breach of international law;"*

187.    As can be seen from the above, all three sources pre-suppose that the Israeli presence in the West Bank is "Occupation", in the legal sense. As has been previously explained, this supposition is not based on solid legal or historical grounds. If one accepts that the Israeli control of the West Bank is not occupation, as shown above, then neither Art. 49 of

94

GC4, nor Art. 8(2)(b)(viii) of the Rome Statute, actually apply to the situation in the West Bank and are therefore irrelevant to the discussion in hand.

188.    In addition, it is also important to point out the following:

a. There exist conflicting opinions between international law experts as to whether or not Article 49 of GCIV actually applies to the Israeli Settlement enterprise in the West Bank[160];

b. Neither the US nor Israel are a party to the 1998 Rome Statute, which does not have any independent binding customary international standing. It should further be noted that one of the reasons why both of these countries refused to become party to the Statute was actually the wording of Art. 8(2)(b)(viii), which was specifically modified by the drafters of the Statute to support the Palestinians' political claims.

c. The ICJ advisory opinion of 2004 was supposed to address the question of the legality of Israel's Security Fence. The issue of the legality of the Israeli settlements was therefore not within the scope of the ICJ's jurisdiction, and all of the court's statements in this regard could, as a result, be deemed a form of *obiter dictae*. With this in mind, it is perhaps unsurprising that none of the Court's

---

[160] See elaboration of Article 49 of GCIV, articulately described by Eugene V. Rostow, a former dean of Yale University Law School: *[T]he Convention prohibits many of the inhumane practices of the Nazis and the Soviet Union during and before the Second World War - the mass transfer of people into and out of occupied territories for purposes of extermination, slave labor or colonization, for example....The Jewish settlers in the West Bank are most emphatically volunteers. They have not been "deported" or "transferred" to the area by the Government of Israel, and their movement involves none of the atrocious purposes or harmful effects on the existing population it is the goal of the Geneva Convention to prevent. Irony would...be pushed to the absurdity of claiming that Article 49(6), designed to prevent repetition of Nazi-type genocidal policies of rendering Nazi metropolitan territories judenrein, has now come to mean that...the West Bank...must be made judenrein and must be so maintained, if necessary by the use of force by the government of Israel against its own inhabitants. Common sense as well as correct historical and functional context excludes so tyrannical a reading of Article 49(6.)*" Julius Stone in A.J.I.L. Vol. 84, 1990 at p. 719

opinions with respect to the settlements appear in any of the Court's numerous formal findings.

a. In any event, ICJ advisory opinions are, as a matter of international law, not binding on States (they are only authoritative for the U.N. entity which requested the advisory opinion in the first place). As a result, neither the U.S. nor Israel (who are, in any case, not members of the ICJ and do not accede to its jurisdiction) are bound by its opinion.

189.   In summary:

a. The Israeli settlements in the West Bank, many of which are based upon a continuous centuries-long Jewish presence, are not inherently unlawful under international law, due to the fact that the West Bank is not "occupied territory" under international law.

b. Additionally, both the ICC Statute and the ICJ advisory opinion relating to Israel's Security fence in the West Bank, the two primary "pillars" of the claim for illegality of the Israeli settlements, are neither customary international law (and a result are not universally binding) nor are the United States and Israel specifically bound by, or obligated to, comply with their provisions and findings. Similarly, there exist conflicting opinions concerning the relevance and applicability of GCIV Article 49 (the third "pillar" on which the defendants' expert bases his views) to the Israeli settlement enterprise.

190.   Before closing, I would wish to address two additional points which I view of importance to the issues in question.

191.   <u>First</u> – there is an underlying Palestinian claim, which has found many followers amongst the international community, that irrespective of the legal questions previously discussed, the establishment of Israeli settlements in the West Bank is somehow "unfair", as these settlements "take away" land from their rightful Palestinian owners. Defendants' experts echo this claim in their opinions.

192.   In order to place this claim in its proper perspective, I would wish to briefly relate the story of two specific Kibbutzim[161]: Kibbutz *Ramat Rachel,* and Kibbutz *Kfar Etzion.* While the story of these Kibbutzim is not necessarily representative of all the Israeli settlements in the West Bank, it should provide a much clearer perspective on the immense legal and historical complexities of the issues under discussion.

193.   Kibbutz *Ramat Rachel* (Rachel's Heights) is located immediately to the south of Jerusalem, and was first established in 1926, during the period of the British mandate over Palestine, by a group of young Jewish settlers on land purchased by the Jewish agencies[162].

194.   The Kibbutz was razed to the ground during the Arab riots of 1929 and was re-established in the early 30's.

195.   During the 1948 War of Independence, the Kibbutz found itself under repeated attacks from both the Jordanian Legion and the Egyptian Army. After intense fighting, during which control of the Kibbutz passed from side to side, the Jewish defenders managed to hold

---

[161] A Kibbutz is a form of socialist Jewish settlement, which was very popular in mandatory Palestine and the early of the Israeli State.

[162] As a general comment, it should be noted that, contrary to widely circulated misinformation, settlements are (generally) not built on Palestinian-owned land, but rather on Israeli-controlled "government land" (i.e. land which used to be public land during the Ottoman, British and Jordanian periods), or (as in the case of these Kibbutzim), on privately owned Jewish land. In the few cases in which it is discovered that a settlement has been established on privately owned Palestinian land, the Israeli courts consistently intervene and require full evacuation of the unlawful construction.

out, and the Kibbutz eventually remained in Israeli hands when the cease fire was finally declared. Today, Kibbutz Ramat Rachel is a part of the greater Jerusalem area and an undisputed part of the State of Israel.

196.     Kibbutz *Kfar Etzion* (Etzion Village) is located in *Gush Etzion* (the Etzion Bloc), a small grouping of settlements to the south of Jerusalem. It is some 12 miles from Kibbutz *Ramat Rachel*.

197.     The first attempts to establish a Jewish settlement in *Kfar Etzion* took place in 1927, on land purchased by the Jewish agencies, again under the eyes of the British mandate. Similarly to *Ramat Rachel,* the first settlers were forced to flee the location during the Arab riots of 1929. The second attempt at Jewish settlement occurred in 1935. That too was short-lived, as the Arab riots of 1936 again forced the Jewish settlers to flee for their lives. In 1943, the third attempt at settlement (this time in the form of a Kibbutz) was launched and was finally successful.

198.     During the War of Independence in 1948, the Kibbutz came under repeated attacks of the Jordanian Legion, working in cooperation with local Arab villagers. After many days of vicious fighting, the remaining defenders of the Kibbutz finally surrendered to the Jordanian attackers on the 13th of May, 1948, only one day before the declaration of the establishment of the State of Israel. All of those who surrendered, except for three fortunate individuals, were massacred by the attacking Arab forces. The Kibbutz was totally destroyed.

199.     In September 1967, three months after the end of the Six Day War, the Kibbutz was reestablished on its original site.

200.    As can be seen from this historical summary, both locations were first established in the same region of British-controlled Palestine in the mid 1920's, as part of the Jewish people's historic return to their homeland, in accordance with the dictates of the British mandate; both suffered repeated attacks from their Arab neighbors; and both were attacked by Arab forces during the War of Independence in 1948-1949. In truth, the only real difference between the two Kibbutzim is that the defenders of *Ramat Rachel* managed to stave off the attacking Arab armies, while the defenders of *Kfar Etzion* did not, and paid for it with their lives.

201.    Yet today, some 46 years later, Kibbutz *Kfar Etzion* is claimed to be an "unlawful Israeli settlement" in the "occupied" West Bank, while Kibbutz *Ramat Rachel* is a lawful and legitimate kibbutz within Israel.

202.    The second point relates to the fact that when Israel and the Palestinians entered into the "Oslo Peace Process" in 1993, the Israeli settlements were already a well-known fact on the ground. Notwithstanding this fact, both sides negotiated extensively and entered into complicated and multi-layered agreements, in a wide variety of fields[163].

203.    In this context, the two sides specifically agreed that the fate of the Israeli settlements would be decided only in the last stage of the peace process – the final status agreement – when both sides would also agree on the related question of borders. As regards the interim period until such final status agreement could be reached, it was agreed that the existing *status quo* would remain, including with respect to the Israeli settlements.

---

[163] I can attest to this from personal experience, as I have served as the legal adviser for the peace process for every Israeli prime minister since Yitzhak Rabin, and have personally participated in most of the relevant negotiations and summits.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Dated:  September 16, 2013
        Tel Aviv, Israel

Daniel Reisner