# EXHIBIT B.52

## **Expert Report by Dr. Boaz Shnoor, Adv.**

## **INTRODUCTION**

I am a senior lecturer at the Academic Center of Law and Business in Ramat Gan, Israel and have been a faculty member for the past nine years. During this time I also held positions teaching law at the Faculty of Law of the Hebrew University in Jerusalem, Israel, at the College of Management (Academic Studies Division) in Rishon Letzion, Israel, and at the Shaarei Mishpat College, in Hod HaSharon, Israel. During the academic year 2010-2011 I was a visiting scholar at Cornell University's law school.

My teaching and research fields focus primarily on Israeli tort law and environmental law. I am author of the book Torts and Pollution (2010, Sacher Institute) (Hebrew), co-author of the book Libel Law - *De Lege Lata* and *De Lege Ferenda* and have authored numerous other academic and professional papers on Israeli tort law and other legal topics.

I hold LL.B, LL.M and LL.D degrees from the Hebrew University. My doctoral dissertation dealt with Israeli and comparative tort law.

I am a member of the Israeli Bar and licensed to practice law in the State of Israel.

A copy of my curriculum vitae, which includes all publications authored by me in the past 10 years, is attached hereto as Exhibit A.

I have been retained by counsel for the plaintiffs in *Sokolow et al. v. The Palestinian Liberation Organization et al.*, Case No. 1:04-cv-00397 (G.B.D), as a testifying expert witness to respond to certain testimony to be given by defendants' witness, attorney Muhammad Dahleh, as set forth in the expert report submitted by him.

My opinions, both as discussed *infra* and in my testimony, will address only specific topics contained in the reports submitted by attorney Dahleh. No inferences should be drawn regarding my opinions in respect to topics that I do not address.

During the previous four years I have not testified as an expert at trial or by deposition. I did submit expert declarations in a few cases, including *Wultz v. Islamic Republic of Iran,* Civ. No. 11-01266 (S.D.N.Y.); *Ungar v. Palestinian Authority*, Civ. No. 00-105 (D.R.I.); *Botvin v. Islamic Republic of Iran*, Civ. No. 05-0220 (D.D.C.); *Rothstein v. UBS AG*, Civ. No. 08-4414 (S.D.N.Y.); and *Shatsky et al. v. The Syrian Arab Republic et al.*, Case No. 1:02-cv-2280 (D.D.C.).

The bases for my opinion as set forth herein are my professional and academic legal studies, research, teaching and publishing over the course of many years, as well as the statutes, case law and authorities cited in this Report.

In preparing this Report I have examined and reviewed the First Amended Complaint, the Expert Report by Muhammad Dahleh dated July 15, 2013 ("Dahleh Report") and the statutes, case law and authorities cited herein. In preparing Part II of this Report I have also relied upon a letter to me from plaintiffs' counsel, Dina Rovner, dated September 9, 2013 ("Rovner letter") which is attached to this opinion as Appendix A.

For the purpose of this Report, I will assume (a) that the facts alleged in the Complaint and in the Rovner letter are true; (b) that points of U.S. law asserted in the Complaint and referred to in this Report are accurately represented in the Complaint; and (c) that the United States District Court, Southern District of New York, would apply Israeli law to the claims.

## **OPINION**

## **Part I**

1.      Mr. Dahleh asserts that the Plaintiffs' Complaint does not state a viable claim for Negligence under Israel's **Civil Wrongs Ordinance [New Version] – 1968** ("CWO"). I completely disagree with this assertion for the reasons stated below. On the contrary, it is my opinion that an Israeli court would find the Palestinian Authority ("PA") and PLO liable towards the Plaintiffs in negligence.

### *The PA and PLO's responsibility for terrorist actions under Israeli law*

2.      There are almost no Israeli cases dealing directly with the tortious liability of the PA and PLO for terrorist actions. In the last decade many dozens of lawsuits arising from terrorist attacks have been filed against the PA and PLO in Israel. Currently almost all of them are still awaiting trial, and only two of them materialized into a verdict on the merits.

3.      In the first, (C.C. 1214/04 (Dist. Ct. Nazereth) *Gaon v. PA* (11/25/2009) the court ruled that the plaintiffs failed to bring evidence in support of their claim that the PA was responsible for the harm. However, the court did not rule that as a matter of principle the PA was not responsible for terrorist attacks, but rather that none of the relevant facts in that case were proved by admissible evidence. Since it is my assumption that the facts alleged in the Complaint are true, this case has no bearing on this Report.

4.      The second case is the *Mentin* case (C.C. 1047-04 *Mentin et al., v. Bezeq et al.* (2.26.2013)). The *Mentin* case dealt with the legal responsibility of various entities for a terrorist attack. In the attack a phone company employee was shot and killed. The shooter was a 15.5 year old boy who was trained for less than two months in a training camp ran by the PA in Jericho, but was not a member of any terrorist group, the weapon was not given to him by the PA directly or indirectly, and the PA did not order him, directly or indirectly, to commit the attack. The Court, applying Israeli law, found the PA liable for the attack primarily on the grounds that the

PA had provided paramilitary training to the shooter during the Intifada, when anti-Israel hostilities were rampant and at a minimum the PA could have foreseen that providing such training would encourage such attacks.

5.      In its comprehensive decision the court ruled, inter alia, that the PA does have a conceptual duty of care towards Israeli residents who are harmed in terrorist attacks; that the PA owed a concrete duty of care to the deceased; and that there is a causal connection, both factual and legal ("proximate cause") between the PA and the attack.

6.      The unequivocal conclusions of the court in the *Mentin* case stand in sharp contrast to Mr. Dahleh's arguments, and clearly show that his conclusions are not supported by Israeli case law, and that in effect Israeli courts would have ruled in favor of the Plaintiffs here based on the facts as stated in the Plaintiffs' Complaint.

7.      One can also learn about the Israeli courts' attitude toward the PA's liability, from a number of interim decisions made in the pending cases imposing pre-judgment attachments on the PA. In order for a court to grant such relief it has to be convinced, *inter alia*, that "there is allegedly admissible evidence that there is a good cause of action" (Civil Procedure Rules, 1984, § 362). In recent years many such motions were granted, which means that the Israeli courts believe that there is a good chance that the PA will be held liable for terrorist attacks. *See e.g.* C.C. 650/09 (1398/09) (Dist. Ct. Nazareth), *Hamud v. PA* (1/4/2010)).

***Negligence under Israeli law***

8.      Given the sparse case law dealing directly with our defendants, I will sketch Israeli negligence law in general and apply it to our case. In my opinion the current state of Israeli negligence law clearly leads to the conclusion that Israeli courts would have ruled in the Plaintiffs' favor. I shall now state the reasons for this opinion.

9.      As Chief Judge Lamberth correctly stated in *Wultz v. Islamic Republic of Iran*, 755 F.Supp.2d 1, 52-53 (2010) (hereinafter: *Wultz*), "A defendant is liable for negligence under Israeli law when the defendant has a duty to another and breaches that duty, causing injury to the other… Israeli law thus imposes liability for negligence in a manner roughly similar to American tort law: liability attaches where one has a duty to another and breaches that duty, causing injury to the other…".

10.      The duty in Israeli negligence law is sometimes divided between notional and concrete duties. As Chief Judge Lamberth observed: "the question of notional duty 'is normative in nature,' inquiring 'whether, as a matter of policy, a reasonable person *ought* to have foreseen the occurrence of the particular damage.' This question is 'disconnected from the concrete facts of the specific event.'" *Wultz* at p. 53.

11.      Mr. Dahleh first claims that defendants PA and PLO had no notional duty of care. Dahleh Report at ¶¶ 25-27. This claim is entirely unsupportable.

12.      The Israeli courts have repeatedly held that the notional (sometimes translated as "conceptual"') duty of care always, or almost always, exists. *See e.g.* C.A. 915/91 *State of Israel v. Levi* 48(3) P.D. 45, 67. Indeed, a recent Supreme Court decision proposed that the "conceptual duty of care" be eliminated as an element of negligence analysis, since it always exists. *See* C.A. 10078/03 *Shtil v. State of Israel* (3/19/2007) at ¶ 15.

13.      Furthermore, the Israeli Supreme Court has held that whenever the harm at issue is technically foreseeable (i.e. when it was <u>possible</u> to foresee that harm could be caused, irrespective of whether the specific defendant <u>actually</u> did in fact foresee it), a rebuttable presumption arises that a conceptual duty of care exists, which shifts the burden to the defendant to show "special" policy considerations that negate the conceptual duty of care:

> The rule is, that when the harm is foreseeable (on a technical level) … it also gives rise to a conceptual duty of care. The "burden" is therefore on those who assert the absence of a duty. Hence, it must be possible to point to special considerations of legal policy, which justify the creation of an exception, which negates the existence of the notional duty of care.

*City of Jerusalem v. Gordon* 39(1) P.D. 113, 131. See also C.A. 125/80 *Vaknin v. Local Council of Bet Shemesh*, 37(1) P.D. 113; Ariel Porat, *Tort Law*, in INTRODUCTION TO THE LAW OF ISRAEL 128 (Kluwer, A. Shapira & K. DeWitt-Arar eds. 1995) at 129; C.A. 4842/05 *Granit Engineering v. Clal Insurance Company Ltd.* (August 12, 2007) at ¶ 10; C.A. 1068/05 *Maimoni v. City of Jerusalem*, (December 14, 2006) at ¶ 13.

14.     The Complaint alleges, *inter alia*, that the PA provided various types of material support to the PLO and John Does 1-99, and encouraged them to carry out terrorist attacks, in the period prior to the terrorist attack, and that during this same period of time PLO, either directly or indirectly, carried out other deadly terrorist attacks. Clearly, then, in light of the allegations of the Complaint, the harms caused in this case – deadly PLO terrorist attacks – could easily have been foreseen by the PA and PLO. Accordingly, a conceptual duty of care is presumed to exist, unless the defendants can point to special policy considerations that would negate it. Mr. Dahleh cites no such duty-negating policy considerations, nor in my opinion would any Israeli court find that such considerations exist. On the contrary, as a matter of judicial policy the Israeli courts treat terrorism-related activity very harshly, and it is inconceivable that they would find that the PA or PLO owed no conceptual duty of care toward persons harmed by terrorist attacks.

15.     Indeed, many scores of civil suits arising from terrorist attacks have been filed against the PA and PLO over the past decade but, to the best of my knowledge, not one has been dismissed for lack of a conceptual duty of care. Furthermore, as mentioned above in ¶ 5, the

*Mentin* court clearly found that "between the deceased and the PA a notional duty of care does exist" (my translation – B.S.).

16.    Mr. Dahleh's claim that "the Israeli case law has never recognized a conceptual duty of care of the [S]tate of Israel itself towards the citizens of a foreign country for criminal acts committed against them by an Israeli citizen on the territory of a sovereign foreign country" (Dahleh Report at ¶ 27) was misleading even at the time it was stated. In C.A. 6970/99 *Abu Samara v. State of Israel* 56(6) P.D. 185 (2002), the Israeli Supreme Court expressly ruled that the State of Israel owed a conceptual duty of care to Palestinian residents of the Gaza Strip who had been attacked by Israeli residents of Gaza following the murder of a rabbi. The Supreme Court affirmed dismissal of the case, but only because Israeli authorities had tried to prevent the violence, and had not breached their duty of care, holding that: "Indeed, there is a duty of care of the defendants towards the plaintiffs, but this duty was not breached in our case." *Id*. at 188.

17.    The second part of duty is the concrete duty of care. In the words of Chief Judge Lamberth: "The question of duty in fact, also called a 'concrete duty,' 'is technical in nature,' inquiring 'whether a reasonable person *could* have foreseen, under the particular circumstances of the case, the occurrence of the damage.' This question 'takes into account the special facts of the circumstance.' A concrete duty arises when 'a reasonable person could have foreseen, under the particular circumstances of the case, the occurrence of the damage.'" *Wultz* at 53.

18.    Mr. Dahleh argues that no concrete duty of care exists here. *Id*. at 28-33. This argument, too, was rejected by Israeli court in the *Mentin* case, in which the court stated that such a duty exists between the PA and the victim of a terrorist attack even though the terrorist attack was carried out within Israel and the victim was a stranger to the PA. Moreover, even prior to the *Mentin* case, Mr. Dahleh's assertions could not be supported.

8

19.     In support of this claim that no concrete duty of care exists, Mr. Dahleh argues that the attacks were carried out in Israel or in areas which are under full Israeli control. But this argument appears, with all due respect, to be a "straw man," because it ignores the actual allegations of the Complaint. The Complaint alleges that the defendants are liable because they actively provided PLO as an organization, and the individual terrorists, with various types of material support and encouragement to carry out terrorist attacks. The Complaint clearly alleges far more than that the PA had control over the area in which the attack was carried out; indeed, from my reading of the Complaint, there appears to be no allegations at all regarding PA control over the areas in which the terrorist attacks took place. Rather, the Complaint alleges that the PLO as a whole, i.e. as an organization, and the individual terrorists themselves, operated from territories under the control of the PA.

20.     Mr. Dahleh does not assert that the actual allegations of the Complaint – i.e. that the PA and PLO affirmatively assisted and urged the individual terrorist to carry out the terrorist attack – do not give rise to a concrete duty of care. And for good reason: there is no question that they do, as I assume Mr. Dahleh himself would have to agree.

21.     Next, Mr. Dahleh argues that – like the duty of the State of Israel to maintain law and order within Israel – the PA's duty to maintain law and order is limited under Israeli law, and "does not impose a duty of care on the state (through its police and other security forces) for criminal act committed against its citizens (even by its citizens). The Israeli case law imposes duty of care only when a special link or relationship exists between the police and the criminal, and in their absence no duty of care is sustained." *Id*. at ¶¶ 31.

22.     While it is true that under Israeli negligence law there is no general duty on the State to prevent all crimes, when the State has enabled the committing of the crime (for example

by providing the means to do it), or when the State has prior knowledge about similar criminal actions that were done in the past, or about the possibility of the crime's occurrence, then there is a duty of care to prevent the crime. For example, when the police failed to stop the plaintiff's neighbors from repeatedly harassing him and damaging his property, the police were found liable in negligence for all the harms he subsequently suffered. C.A. 16780/01 *State of Israel v. Weiss* 58(5) P.D. 167 (2004). Likewise, in another case the Israeli police were held liable in negligence for the damage suffered by a woman whose husband managed to flee the country although there was a court order forbidding his departure. C.A. 429/82 *State of Israel v. Suhan* 42(3) P.D. 733 (1988). And in a recent case the court held a municipality liable in negligence for the damage that was caused to the plaintiff after falling from a horse. The ruling was based upon the fact that the horse farm was not licensed and although the municipality (which was responsible for enforcing the law) warned the owner of the farm to close the farm or get a license, it did not enforce its own order and therefore it was liable for all the damages stemming from the operation of the farm. C.A. 1068/05 *Maimoni v. The Municipality of Jerusalem* (12/14/2006).

23.     In another case (C.A. 3510/99 *Wales v. Egged* 55(5) P.D. 826 (8/6/2001)) the Supreme Court dealt with the liability of the owner and operator of a central bus station towards a man who was unexpectedly attacked by a group of hooligans while waiting for a bus. The court held that the existence of a concrete duty of care to prevent criminal actions by third parties is related to the actual awareness of the defendant to the possibility of the occurrence of the criminal act; to the past occurrence of similar acts in the area; to the exceptional, or routine, nature of the criminal act; to the level of control the defendant has over the criminals; to the extent to which the plaintiff could have relied on the plaintiff's reasonable precautions; and all the other circumstances of the case. *Id.* at 842-843.

24.     According to the Complaint the defendants were aware of the possibility of the occurrence of terrorist attacks; terrorist attacks happened in Israel dozens of times a year in those years and were not a rare occurrence; The PA had control, inter alia via its support of the various terrorist organizations, over the terrorists; and due to the Oslo agreements, the victims could reasonably rely on the PA to prevent terrorist acts, and not to encourage them.

25.     Moreover, there is a broad tendency in the Israeli case law to hold public authorities liable for negligence.

26.     Thus, there is no doubt that in the circumstances described in the Complaint the PA and PLO had a concrete duty of care towards the victims of the terrorist attacks under Israeli negligence law.

27.     The next element in a negligence claim is breach of duty. It is obvious that in circumstances where the defendants provided assistance knowing that it might be used in terrorist actions they should try stopping, there is a breach of duty, and Mr. Dahleh does not claim otherwise.

28.     Mr. Dahleh further asserts that the allegations of the Complaint do not sufficiently show causation. I disagree.

29.      "Israeli courts divide a causation analysis into cause in fact and legal, or proximate, causation. Factual causation depends on a but-for test." *Wultz* at 55. The question of cause in fact is a factual one and requires evidence. However, due to the hypothetical nature of the application of the but-for test (always requiring the determination of a hypothetical situation that would have happened but-for the breach of duty) if the plaintiff proves that the defendant's tortious behavior increased the risk of damage, and if proving actual causation seems

impractical, courts usually shift the burden of proof to the defendant to prove that he did not cause the damage. R.H. 5712/01 *Barazani v. Bezeq* 57(6) P.D. 385, 448-9 (2003).

30.      The Complaint alleges that the PA actively assisted the PLO to carry out terrorist attacks, and allowed the PLO to operate in PA-controlled territory. Moreover, the Complaint alleges that PA employees, within the scope of their agency and employment, committed those attacks. These allegations are more than adequate to plead factual causation under Israeli law. Furthermore, the Israeli Supreme Court has held that any provision of support to a terrorist organization serves to increase its ability to carry out attacks. Cr. A. 3827/06 *Doe v. The State of Israel* (27/3/07). In any event, because the defendants' conduct certainly increased the risk of harm, the burden is on them to show that they did not cause the harm. *See Barazani.*

31.      "Israeli courts use three tests to determine whether a plaintiff's negligence was the decisive cause of a defendant's injury: 'the foreseeability test, the risk test[,] and the common[-]sense test.' Israeli courts use all three tests together when evaluating legal causation." *Wultz* at 57. However, the main factor that determines the result of all three tests, when applied in negligence is the forseeability – the ability of the reasonable person to foresee the harm (L.C.A. 4394/09 *Landerman v. Sagiv Engineering* (12/30/2010). Once the reasonable person could have foreseen that a harm of the kind that happened might happen the legal causation requirement is met. The acts of a third party – even criminal acts or malicious acts – do not negate legal causation unless they were unforeseeable (C.A. 8199/01 *Estate of Miro v. Miro*, 57(2) P.D. 785, 791-794 (2003)). Thus, Mr. Dahleh's claim that the terrorist attack constituted an intervening cause that broke the chain of causation is incorrect.

32.     Given that the PLO launched numerous terrorist attacks prior to the terrorist attacks, a reasonable person could have seen that unless stopped, it might continue its actions, and therefore the attack was foreseeable by the PLO and PA and legal causation exists.

33.     Moreover, the Israeli Supreme Court has held that when a defendant has a duty to guard against the acts of a third party, and he breaches his duty, the acts of the third party do not constitute an intervening cause. C.A. 6649/9, *Gilead v. Hadassah* 53(3) P.D. 529 (1999). Since the PA has a duty to maintain law and order in the territories under its full control, and since according to the Complaint it breached this duty by encouraging terrorist attacks, defendants cannot argue that it was not foreseeable that such attacks would continue.

34.     In sum, the Complaint states a cause of action for Negligence under Israeli law, and Mr. Dahleh's claims to the contrary are without merit.

### *Battery and Assault*

35.     The terrorist attacks amount to battery under Israeli law under Article 23 of the CWO as interpreted by the courts. Under Israeli law, in order to succeed in an action for battery, a plaintiff has the burden of proving the following elements:

1.  The defendant knowingly (see e.g. CA 1272/05 *Karmi v. Sabag* (2007) (even a legally incompetent person might be liable in battery if he was aware of the physical nature of his actions);

2.  Used force – either directly or indirectly;

3.  Against the body of another person;

4.  Without the consent of that person.

36.     The facts concerning the Attacks fulfill all of these requirements. The shooting of other people and the detonation of powerful bombs in the vicinity of dozens of people, designed

13

to cause maximum pain, suffering and death, and constitutes "the knowing use of force." Dozens of people were killed, and even more were wounded, as the result of these attacks, thus it can be said with certainty that this force was used "against the body of other people," including the Plaintiffs. None of the innocent people who were killed or injured in the attacks agreed to the said use of force and therefore there is not a doubt in my mind that any Israeli court would have found the terrorists, sponsored and supported by the Defendants, liable for the Plaintiffs' harm through the civil tort of Battery and Assault under Article 23 of the CWO.

37.    Though the PA and PLO (which are not natural persons) did not commit the battery and assault themselves (since they can act only through natural persons) the individual terrorist's liability is important since it will give rise to the PA and PLO's vicarious liability and secondary liability as aiders and abetters.

### *Breach of Statutory Duty*

38.    Mr. Dahleh claims that if the Plaintiffs would have based their action on the tort of Breach of Statutory Duty, they would have failed. I disagree.

39.    Judge Lamberth correctly summarized the tort of breach of statutory duty under Israeli Law: "A plaintiff must show that a defendant was under a duty imposed by an enactment, that the enactment was enacted for the benefit of the plaintiff, that the defendant breached that duty, that the breach caused a plaintiff injury, and that the injury was of the sort intended to have been prevented by the enactment… Under Israeli law, the civil tort of breach of statutory duty serves as a private cause of action for nearly any violation of Israeli law, provided that certain conditions are met" *Wultz* at 67.

40.    The first element of breach of statutory duty is that a statute imposed a duty upon the defendant. In the current case, there are a few statutory duties that might be relevant: the

Prevention of Terrorism Ordinance, 5708–1948 (PTO); the Penal Law, 5737–1977(PL); and the Defense (Emergency) Regulations, 1945 (DER).

41.    S. 4 of the PTO "prohibits: the giving 'of money or money's worth' to any terrorist organization, which is defined as any 'body of persons resorting in its activities to acts of violence calculated to cause death or injury to a person or to threats of such acts of violence.'" *Wultz* at 68; §§ 145 148, of the Israeli Penal Law, 5737–1977 "prohibits the payment of any contribution to any unlawful association, which include groups engaged in terrorist activities." *Ibid*; Finally. the DER prohibit, among other things, the performance of any service for or the holding of any funds of any unlawful organization, including groups engaged in terrorist activities. *Defense (Emergency) Regulations* §§ 84(a)(iv), 85(1)(c), 85(1)(f)" *Ibid*. "In short, these three penal laws criminally prohibit the provision of support to terrorist organizations" *Ibid.*

42.    "A second condition for making out liability for breach of a statutory duty is that the statute be intended for the benefit or protection of the plaintiff." *Vaknin,* 37(1) PD at 140. For this purpose, it is sufficient if a statute is intended to protect both the State or the Israeli society and the individual plaintiff herself.

43.    As judge Lamberth observes, in relation to the aforementioned statutes: "[A]ll three penal laws cited by plaintiffs bridge the gap between the individual and the government, appearing to have been intended for both the benefit of the nation and the individual." *Wultz*, at 71. It is evident that the abovementioned laws intended, not only to protect the State of Israel and Israeli society as whole, but also to protect all the individuals that may be harmed by terrorist actions.

44.    Since these statutes "are intended for the benefit and protection of persons in general" *Wultz*, at 73, it is clear that the statutes were intended to benefit and protect the Plaintiffs.

45.    The third element of breach of statutory duty is that the defendant breached the statutory duty. According to the FAC, in each of the Attacks (except the Bombing Attack of July 31, 2002) the terrorists were Fatah activists. Fatah was designated by Israeli authorities an unlawful association according to the abovementioned laws. Fatah was funded by the Defendants, at the relevant times even though the Defendants knew that its actions render it a terrorist organization (FAC, at ¶¶ 49-53). Therefore the Defendants breached these statutory duties.

46.    The fourth condition of the breach of statutory duty tort is that the Defendants' behavior caused the Plaintiffs harm of the sort intended to have been prevented by the statute. This condition requires the Plaintiff to prove both cause in fact and legal causation.

47.    Cause in fact between the Defendants'' actions, and Plaintiffs' harms was discussed supra, at s. 28-29. My conclusion there, that such causal connection does exist, is applicable here as well.

48.    In breach of statutory duty, legal causation is determined mainly according to the Risk test. This test asks whether the harm that was caused is a materialization of the risk that the statute aims to protect against (L.C.A. 4394/09 *Landerman v. Sagiv* Para. 8 (12/30/2010)). The risk is defined by the identity of the victim, by the type of harm that was caused and by the way in which the risk materialized.

49.    As discussed supra, Para. 41-43, the plaintiffs are the people the abovementioned laws aim to protect; As judge Lamberth observed (*Wultz*, at 78), bodily injuries and death, and

the resulting harms, are the harms that these laws aim to protect against; and they materialized in the way that the laws anticipated – terrorist actions.

50.    Therefore, it is my opinion that according to the facts stated in the FAC the Plaintiffs have a valid cause of action in breach of statutory duty against the defendants in all cases except the Bombing Attack of July 31, 2002.

### Aiding and Abetting

51.    Section 12 of the CWO states that: "any person who joins or aids in, authorizes, counsels, commands, procures, or ratifies any act done or to be done, ... or any omission made or to be made, ... by any other person shall be liable for such act or omission."

52.    As Chief Judge Lamberth summarizes: "Awareness—i.e., knowledge—of the injurious nature of the act of another to be aided by a defendant, and the provision of aid despite that awareness, is sufficient to establish liability under § 12. Indeed, mere negligent provision of assistance to a wrongdoer has been sufficient establish such liability. Accordingly, plaintiffs need only plead [defendant's] knowledge, not intent, to support a claim under § 12." *Wultz* at 67. *See also* C.A. 5977/07 *Hebrew University v. Schocken Publishing House Ltd.*, (June 12, 2011). According to the Complaint, the defendants provided material help to the terrorists, knowing that that providing such aid might result in terrorist attacks, thus fulfilling all the requirements of § 12. Therefore they would have been found liable by Israeli courts for aiding and abetting.

### Vicarious Liability

53.    Under Israeli law, according to § 13 of the CWO, as interpreted by the courts, an employer will be vicariously liable for his employee's actions if the employee committed a tort "in his capacity as an employee and while he was performing the usual duties of and incidental to his employment, notwithstanding that the act was an improper mode of performing an act

authorized by the employer; but an act shall not be deemed to have been so done if it was done

by an employee for his own ends and not on behalf of the employer." *See also* C.A. 445/80

*Official Receiver v. Shteibel*, 44(3) P.D. 331, 338 (1990).

54.    According to § 14 of the CWO, as interpreted by the courts, states that "For the

purposes of this Ordinance, any man who appoints an agent, who is not an employee, to perform

an act or type of acts for him, will be liable for every action that the agent will commit in doing

that act or type of acts and for the way he performs them".

55.    According to the Complaint, the organizers of the terrorist attacks were employees

and agents of the PA. Moreover, the terrorist attacks were carried out by them as part of their

responsibilities as employees.

56.    The terrorists' actions themselves are clearly tortious actions. They constitute

battery, negligence and breach of several statutory duties (including murder, and criminal

assault).

57.    Given these facts, the logical conclusion is the PA is vicariously liable for the

terrorist acts, according to Israeli law.

***Damages***

58.    For the most part, I agree with Mr. Dahleh's analysis of Israeli's compensation law.

However, in the following points I disagree with his description of Israeli law.

59.    First, the principal victims' relatives have standing to sue according to Israeli law

in many capacities: If the principal victim died they can sue as a deceased victim's heirs; and as

her dependents. In addition, regardless of the principal's victim death they can sue for the harms

they suffered: whether monetary losses (expenses and loss of income that occurred while taking

care of the principal victim); or non-pecuniary damages (subject to four conditions which will be

18

reviewed later). In case of death, children and spouses might also sue for loss of father/spouse support, but this claim is irrelevant in the present case. Therefore, Israeli courts treat the principal victim's relatives as legitimate plaintiffs, who will receive compensation if they will prove compensable harm.

60.    Second, Israeli courts distinguish between principal and secondary victims. Principal victims are those people who were affected directly by the tortious behavior, including those who suffer fear or any other negative emotion as a result of being in the zone of danger. Secondary victims on the other hand are those people whose harm was caused solely due to principal's victim effect on their health and emotional state (C.A. 9466/05 *Shwaeki v. The State of Israel*, ¶ 20 of Justice Hayut's judgment (3.16.2008)).

61.    Principal victims are entitled to compensation for all their monetary and non-pecuniary damage. As Mr. Dahleh states (¶ 54) secondary victims are entitled to compensation only subject to four conditions (ibid. at ¶ 21):

a.    The secondary victim is a first degree family member (spouse, sibling, parent or child) of the principal;

b.    The secondary victim witnessed the event, or its consequences (e.g. witnessing the principal victim in hospital) *ibid*, ¶. 18 of VCJ *Rivlin*; LCA 5803/95 *Zion v. Zach* 51(2) P.D. 267, 270-275.

c.    Time and space proximity between the two harms. "This requirement was interpreted in a flexible way; it was ruled that even harm that occurred far away from the prime scene, after a long time, or as a result of continuing exposure and not immediate shock, might be compensable. The decisive factor is causal proximity" *Shweki,* S. 18 of VCJ rivlin.

d.    The secondary victim should suffer severe harm. Either neurosis or psychosis, or physical harm which obstructs daily function.

62.    It should be noted that only the fourth requirement is considered to be rigid, while the three other requirements are very flexible.

63.    Third, in the last years, it has been repeatedly ruled by the Supreme Court, that Israeli courts have the authority to grant punitive damages (e.g. C.A.140/00 *Etinger v. Hahevra Lw'Shikum HaRove HaYehudi* 58(4) PD 486, 566 (2004); C.A.9656/03 *Martziano v.Zinger* ¶ 34 (4/11/2005); C.A. 4576/08 *Ben-Zvi v .Hiss* ¶ 38 (7.7.2011)). It was also ruled that this authority should be used only in cases where the defendants acted out of malice with the intention of causing harm, or at the very least to cases where the defendants wwere grossly negligent, foresaw that their actions would result in harm and were indifferent to it (*ibid*).

64.    In the Complaint the plaintiffs claim that the PA provided the PLO and the terrorists with material support and conspired with it in order to carry out the terrorist bombing (¶¶ 50-53). In my opinion, in such circumstances every Israeli court would have to seriously consider the possibility of awarding punitive damages, and most of them would probably do so.

65.    Fourth, Mr. Dahleh claims that the Loss of Earnings will be calculated, in cases of young people who did not begin their career at the time of injury, according to the average salary in Israeli economy. This claim is generally true. However, in cases where the Plaintiff is not a Israeli resident and would have likely to live outside Israel had it not been for the harm he suffered, the damages will be calculated according to the salary, the Plaintiff would have had in his native country (C.A. 702/87 *State of Israel v. Cohen* 48(2) P.D. 705, 730-731 (5/8/1994).

66.    Fifth, for the purposes of calculating loss of earnings, the age of retirement for both men and women is 67, and the calculations should be amended accordingly.

67.    Sixth, when calculating loss of earnings for a person with dependents, the "hands" of the children are not eliminated when a child reaches 18. Rather, it is lowered to a third for the years between 18-21 (for males) or 18-20 (for females), and only then eliminated completely, and the calculations should be amended accordingly.

68.    Seventh, as Mr. Dahleh states, some of the Plaintiffs are entitled to receive various allowances from the State of Israel, according to the Law of Compensation of Victims of Hostile Acts, 1970. However, due to the explicit language of S. 17 of that Law, these funds should not be deducted from any compensation the Defendants have to pay the Plaintiffs. Rather, if the Court will find in favor of the Plaintiffs, they will have to choose between receiving the money from the Defendants (and returning to the State of Israel all the allowances they received from it) on the one hand, and wavering their rights against the Defendants, while maintaining their rights against the State of Israel (in which case, the State of Israel will be entitled to reimbursement from the Defendants for the money it gave the plaintiffs without the need for any further legal proceedings) on the other.

## Part II

69.    The facts that were presented in the Rovner letter (which I treat as true for the purpose of this Part) strengthen my conclusions regarding the PA's and PLO's liability towards the Plaintiffs in negligence, and for aiding and abetting the terrorist attack. Moreover, these facts establish the defendants' vicarious liability for the planning and organizing of the terrorist attacks.

### *Negligence*

70.    The Rovner letter claims that the PA endorsed and encouraged terrorist attacks by its personnel and by others, by paying them salaries, by publicly glorifying the terrorists, and by

advocating terror in the media; it funded Fatah, which was designated an unlawful association by Israel at all the relevant times, and was known to organize terrorist actions; it released convicted terrorists from prison against the wishes of the U.S. and Israeli governments, thus allowing them to organize more terrorist actions.

71.    Specifically regarding the Hebrew University bombing of July 2002 - the PA allowed Hamas, which was designated a Terrorist Organization by the U.S.A., and by the Israeli government, to operate from the PA territory, even though it was known that the Hamas is involved in terrorist actions and encourages them. More than that the PA released Abdullah Barghouti, from prison and through its agents provided him with a safehouse allowing him to continue his terrorist activities including the making of the bomb used in that attack.

72.    The above facts clearly show that the defendants could have foreseen that their actions would lead terrorists to organize more terrorist attacks, and actually anticipated such attacks. This strengthens the conclusion that in all the terrorist attacks, the defendants owed a concrete duty of care towards the plaintiffs. Moreover, given these facts it is obvious that no Israeli court would find policy considerations that will rebut the presumption that a notional duty of care arises out of the foreseeability of the terrorist attack.

73.    The above mentioned facts would also strengthen the tendency of Israeli courts to rule that the defendants did indeed breach their duty of care towards the Plaintiffs. The Fatah and the Hamas have long been classified as terrorist organizations in Israel under the Prevention of Terrorism Ordinance and the Defense (Emergency) Regulations and it is therefore illegal to fund them, support them, or to allow a member of them to use a house for the terrorist organization purposes. This means that the defendants' actions might constitute criminal offenses in Israel.

74.    The fact the defendants' actions might constitute a crime under Israeli law is relevant because the Israeli Supreme Court has ruled many times that statutory obligations reflect the scope of foreseeability and so are indicia of the existence of negligence. A statutory prohibition, which determines the range of risk, also sets the scope of foreseeability – which as noted, is a legal question – and so reflects the standard of care required of a reasonable person. *See e.g.* C.A. 8199/01 *Estate of Miro*, 57(2) P.D. 785, 793 (2003); C.A. 1639/01 *Mayan Zvi v. Krishov*, 58(5) P.D. 215, 280. Therefore, the abovementioned facts will no doubt increase the likelihood that Israeli courts would find the defendants' behavior negligent.

75.    The defendants' activities increased the chances that the terrorists would indeed succeed in organizing a terrorist attack, which indeed happened. As mentioned in the first part of this report, this increase is enough to shift the burden of proof to the defendants to show that but-for their activities the result would not have occurred. Therefore, these facts strengthen the conclusion that Israeli courts would find factual causal connection between the defendants' negligence and the Plaintiffs' harms.

76.    Given that the defendants, not only *could* foresee, and indeed foresaw, that their activities would result in a terrorist attack, but actually encouraged such attacks, it is also evident that Israeli courts would find that the attacks were the proximate cause of their attacks.

77.    All in all, the facts described in the Rovner letter increase even more the probability that Israeli courts would find that the Defendants were negligent toward the Plaintiffs, and will therefore find them liable in torts.

### Aiding and Abetting

78.    As mentioned above, § 12 of the CWO states that: "any person who joins or aids in, authorizes, counsels, commands, procures, or ratifies any act done or to be done, ... or any omission made or to be made, ... by any other person shall be liable for such act or omission."

79.    As discussed above, the Defendants aided and abetted the Fatah by giving it material support which enabled the Fatah to commit the terrorist attacks. They also endorsed and encouraged such activities.

80.    However, in at least one case – the July 2002 Hebrew University bombing - they also aided and abetted the organizer of the terrorist attacks specifically. Abdullah Barghouti, who made the bomb in that case, was a known terrorist prior to it. The PA arrested him and then released him into the care of the head of Fatah, and a PA policeman. They (and the PA which is vicariously liable to their actions, see infra) provided him with a safehouse and with money. This assistance enabled him to make the bomb.

81.    Since Barghouti made the bomb, he would be considered as a principal tortfeasor by Israeli courts, and therefore, the PA's responsibility as aider and abetter to his actions would be enough, by itself, to establish the PA's liability to the harms caused by the terrorist attack.

82.    The PA ratified terrorist actions prior to the ones in the Complaint, by paying salaries to the perpetrators; it also glorified them, and encouraged further attacks. These acts could be interpreted as PA authorization of further terrorist attacks.

83.    More than that, in all the terrorist actions in the complaint where the PA paid benefits to the perpetrators after the terrorist actions, such payment can be interpreted as official ratification or as joining after the act, which give rise, on their own, to liability (C.A. 3024/10 *Weiner v. Moyal* S. 27, 36 (4/2/13)).

84.    Therefore, it is clear in my eyes that Israeli courts would find the PA liable as aider and abetter to the actual terrorists.

**Vicarious Liability**

85.    In Israeli law, according to § 13 of the CWO, as interpreted by the courts, an employer will be vicariously liable for his employee's actions if the employee committed a tort "in his capacity as an employee and while he was performing the usual duties of and incidental to his employment, notwithstanding that the act was an improper mode of performing an act authorized by the employer; but an act shall not be deemed to have been so done if it was done by an employee for his own ends and not on behalf of the employer." *See also* C.A. 445/80 *Official Receiver v. Shteibel*, 44(3) P.D. 331, 338 (1990).

86.    The organizers of some of the terrorist attacks, and the people who assisted Abdullah Barghouti were PA employees. According to the Rovner letter, the PA encouraged its employees to commit terrorist activities, by glorifying these actions and their perpetrators and by continuing to pay salaries to PA employees who were convicted of terrorist acts. This PA policy was made public to its employees.

87.    Given these facts, the logical conclusion is that both the perpetrators and the PA saw terrorist activities, and assisting terrorists, as part of PA's employees' job. Therefore, it seems that the PA would be found vicariously liable for their activities, including organizing the terrorist attack, and helping Abdullah Barghouti, according to Israeli law.

Sep. 16, 2013

_____

Dr. Boaz Shnoor