# EXHIBIT B.107

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

MARK I. SOKOLOW, et al.,　　　)
　　　　　　　　　　　　　　)
　　　Plaintiffs,　　　　　)
　　　　　　　　　　　　　　)
v.　　　　　　　　　　) Civil Action No.
　　　　　　　　　　) 04cv397(GBD)(RLE)
THE PALESTINE LIBERATION　　　)
ORGANIZATION, et al.,　　　　)
　　　　　　　　　　　　　　)
　　　Defendants.　　　　　)
_____)

DEPOSITION OF MUHAMMAD DAHLEH
JERUSALEM, ISRAEL
OCTOBER 21, 2013

REPORTED BY: AMY R. KATZ, RPR

---

Page 2

1　　　Deposition of MUHAMMAD DAHLEH, taken in
2　the above-entitled cause pending in the United States
3　District Court, for the Southern District of New York,
4　pursuant to notice, before AMY R. KATZ, RPR, at the
5　King David Hotel, Jericho III Room, Jerusalem, Israel,
6　on Monday, the 21st day of October, 2013, at 9:28 a.m.
7
8
9　APPEARANCES:
10　FOR PLAINTIFFS:
11　　　ARNOLD & PORTER, LLP
　　　By: KENT A. YALOWITZ, ESQ.
12　　　399 Park Avenue
　　　New York, New York 10022-4690
13　　　(212) 715-1000 / Fax (212) 715-1399
　　　kent.yalowitz@aporter.com
14
15　FOR DEFENDANTS:
16　　　MILLER & CHEVALIER CHARTERED
　　　By: BRIAN A. HILL, ESQ.
17　　　655 Fifteenth Street, NW
　　　Suite 900
18　　　Washington, DC 20005-5701
　　　(202) 626-5800 / Fax (202) 626-5801
19　　　bhill@milchev.com
20
21　ALSO PRESENT:
22　　　RACHEL WEISER, Esq.
23　　　DR. BOAZ SHNOOR, Advocate
24　　　DINA ROVNER, Advocate
25

---

Page 3

1　　　　　　I N D E X
2　WITNESS
3　Muhammad Dahleh
4
5　EXAMINATION　　　　　　　　PAGE
6　By Mr. Yalowitz　　　　　　　4
7
8
9　　　P L A I N T I F F S' E X H I B I T S
10　NUMBER　　DESCRIPTION　　　　MARKED
11　Exhibit 107　Arabic Document Entitled
　　　　　"Dahleh December 2006 Legal
12　　　　　Critique"
　　　　　(No Bates Number)　　　20
13
　　Exhibit 108　Document Entitled "Expert Report
14　　　　　by Advocate Muhammad Dahleh,"
　　　　　Dated July 15, 2013
15　　　　　(No Bates Number)　　　90
16　Exhibit 109　Judgment of Hon. Dalia Ganot,
　　　　　Tel Aviv-Jaffa District Court,
17　　　　　in re Mentin v. Bezeq, et al.,
　　　　　Dated February 26, 2013
18　　　　　(No Bates Number)　　　96
19　Exhibit 110　Document Entitled "Expert Report
　　　　　by Dr. Boaz Shnoor, Adv.,"
20　　　　　Dated September 16, 2013
　　　　　(No Bates Number)　　　121
21
22
23　　Q U E S T I O N S  I N S T R U C T E D
24　　　　N O T  T O  A N S W E R
25　　　　　(None.)

---

Page 4

1　　　　P R O C E E D I N G S
2
3　　　MUHAMMAD DAHLEH,
4　　called as a witness, being first duly
5　　affirmed, was examined and testified
6　　as hereinafter set forth.
7
8　　　　EXAMINATION
9　BY MR. YALOWITZ:
10　　Q.　So would you state your name for the record,
11　please.
12　　A.　Muhammad Dahleh.
13　　Q.　So you're a member of the Bar of Israel?
14　　A.　Yes.
15　　Q.　And you are a member of the Bar of New York?
16　　A.　That's true.
17　　Q.　Although I noticed you have to get your CLE
18　done.
19　　A.　Yeah, you're right. How did you know that?
20　That's good. I need to pay the dues and send them the
21　information. You're right.
22　　Q.　And are you also a member of the Palestinian
23　Bar? Is there such a thing?
24　　A.　There is such a thing. It's relatively new,
25　but I am not a member of the Palestinian Bar.

Page 5

1    Up until several years ago, Israeli lawyers
2  were allowed to practice in the Palestinian legal
3  system without to be members of the Palestinian Bar.
4    Q.  So how would you become a member of the
5  Palestinian Bar?
6    A.  You would basically file an application to
7  the Palestinian Bar, and they would have -- you know,
8  first have to accept you.  And then you have to go
9  through some kind of a "staj" or training of one or
10  two years.  And then you become a lawyer.  There's not
11  even exams, as far as I recall, unless that's changed.
12    Q.  Is there a system where you can be waived in?
13    A.  They do.  They do.  It's -- in our situation,
14  it was a bit -- it was a bit weird, because they
15  consider people like myself, you know, people who
16  are Israeli citizens, even if they are -- even if they
17  speak Arabic or even if they are Israeli-Palestinians,
18  for the Palestinian Bar, they are considered to be
19  Israelis.
20    And one of the conditions that they have
21  put in the new Palestinian law regarding the Bar is
22  that you have to be with Palestinian nationality.  So
23  I don't have Palestinian nationality.  And, therefore,
24  I couldn't join the Palestinian Bar when they started
25  with this new policy.

Page 6

1    Q.  Are you allowed to practice in the courts
2  there?
3    A.  Now not anymore.  To practice in the courts
4  in terms of appearing before the courts, I'm not
5  allowed.  But I was allowed for a long period, and
6  I did that myself.  They changed the law.
7    Q.  When did that change come into effect?
8    A.  I guess several years ago, around maybe 2001,
9  2002, was the time when they changed that law.
10    Q.  Thank you.  That's it.  It's very interesting.
11    So you grew up as an Israeli citizen?  Which
12  city or town did you grow up in?
13    A.  I grew up in a town called -- in a village,
14  actually, called Turan.  It's next to Nazareth, up in
15  Galilee, until the age of 18.  And then I came to study
16  at the Hebrew University in Jerusalem, studied for three
17  and a half years.  Then my "staj" or training at an
18  Israeli firm in Jerusalem, and then in the Supreme Court
19  of Israel.
20    Q.  Did you study law at Hebrew University?
21    A.  Yes.
22    Q.  What was the university like when you were
23  there?
24    MR. HILL:  Objection.  Vague.
25    You can answer if you can.

Page 7

1    THE WITNESS:  What do you mean?
2    Q.  BY MR. YALOWITZ:  I mean, did you like it?
3  How was it?  How did you find it?
4    A.  That's a very broad question.  But, yeah,
5  generally speaking.  I mean, it's a nice experience,
6  leaving home.
7    You know, in our society, we stay at home
8  with our parents until the age of 15.  So we don't
9  have much of freedom and liberty and so on.  So you
10  go on your own, and all of a sudden, you'll be with --
11  you know, with friends from all over the place:
12  Israelis, Palestinians, some internationals.  Yeah,
13  it was fun.  Not as fun as the United States, but it
14  was good.
15    Q.  When you clerked at the Supreme Court of
16  Israel, did you work for a particular judge, and which
17  judge?
18    A.  Yes.  Justice Shlomo Levine.
19    Q.  And you helped Justice Levine write opinions
20  and do research and things like that?
21    A.  Of course.
22    Q.  Now, when you graduated, you went to work
23  with Yigal Arnon?
24    A.  Yes.  That's a law firm in Jerusalem and
25  Tel Aviv.

Page 8

1    Q.  It's a person, Yigal Arnon; right?  I don't
2  know if he's still alive.  Is he still alive?
3    A.  He is still alive, yes.  He is a bit old.
4  But he's -- yeah, he's still alive.  It's called Yigal
5  Arnon and Co.  They have other partners.  But he is
6  still alive, yeah.  He's one of the prominent lawyers
7  in Israel.
8    Q.  Very prominent.  Yeah, I've met him.
9    A.  Yes.
10    Q.  Now, did you become Barred in Israel before
11  you went to the United States or after you left?
12    A.  You mean a member of the Israeli Bar?
13    Q.  Yes.
14    A.  Before.  Well, it's funny, because I think
15  I was accepted to the Israeli Bar when I was in the
16  States.  I recall even my father going and getting
17  the certificate in the ceremony for the Israeli Bar,
18  because I was at that time studying in the United
19  States for my LLM.  It was in November 1991, and I
20  was in the States already.
21    Q.  Did you take any particular focus at American
22  University?
23    A.  Yeah.  It was more international human rights
24  and international humanitarian law.
25    Q.  Did you write a thesis or anything like that?

1    A.  A paper, a big paper.  Not a thesis, but yeah,
2  I did write.  It was about actually the legal status
3  of the Palestinian in Israel from a local point of
4  view and an international legal point of view.
5    Q.  Who was your advisor on that?
6    A.  Larry Gerber, I think, and Professor Herman
7  Schwartz.
8    Q.  So you returned to the United States in '92 --
9  I'm sorry.  You returned from the United States in '92?
10    A.  Yes.  I stayed there a complete year, 16th
11  of August until the 16th of August the next year.
12    Q.  Was there some visa reason why you stayed
13  exactly a year or just a coincidence?
14    A.  No.  It's just it was a student visa and I
15  had a scholarship.  You know, I was paid for a year.
16  So that's -- just that's the visa and that's the money
17  that I had.  And I finished all duties and came back
18  to see my family.
19    Q.  And when you returned, you joined the
20  Association for Civil Rights?
21    A.  That's correct.
22    Q.  So what is that organization?
23    A.  The Association for Civil Rights in Israel,
24  if you wish, it's a mirror organization of the ACLU
25  in the United States.  It's an organization that

1  deals with human rights for Israelis -- for citizens
2  in Israel and the occupied Palestinian territories and,
3  now in recent years, for actually foreigners, foreign
4  immigrants who come to Israel, and so on.
5    So these were the variety of human rights
6  issues in Israel, before Israeli courts and for the
7  Israeli legislators in the Knesset and so on.
8    MR. YALOWITZ:  Let's pause and go off the
9  record just to make introductions.
10    (Discussion held off the record.)
11    Q.  BY MR. YALOWITZ:  Would you describe your
12  work at the Association for Civil Rights?
13    A.  You know, it was writing letters to Israeli
14  institutions, to the Israeli government, to Israeli
15  governmental bodies, ministries, and so on.  And on
16  top of that, writing petitions to governmental bodies
17  and to the courts, to the Israeli Supreme Court and
18  the other courts.
19    The first case that I dealt with was
20  representing a newcomer from Russia.  At that time,
21  they had a problem with -- there was some arrangement
22  that they could come to Israel, but then they are not
23  allowed to leave or something, they should stay for
24  a specific period of time.  And he was not allowed to
25  leave.  So I represented him before the court basically

1  to convince the court that he should leave, should be
2  able to leave, that this is against the law or something
3  like that.
4    I also filed a petition at that time against
5  the municipality of Haifa, the city of Haifa, for not
6  including Arabic writing in the public signs in the
7  city.  Of course, Arabic is supposed to be an official
8  language of the State of Israel.  And, eventually, we
9  reached a settlement that they will do that, and they
10  did that afterwards.  Those are some examples.
11    Q.  Did you decide to go into private practice?
12  Did there come a time when you decided to go into
13  practice for yourself?
14    A.  Yes.
15    Q.  So just describe what your first private
16  practice experience was.
17    A.  I joined a law office in Jerusalem with
18  a lawyer called Mazen Qupty.  And we established some
19  kind of a partnership called Qupty, Dahleh & Associates.
20  And we worked together for about nine years, until the
21  year 2002.  And in that practice as well, I dealt with
22  similar things that I deal with right now, which is
23  lots of tort cases, civil litigation, consultation to
24  different bodies, local and international, stuff like
25  that.

1    Q.  Do you continue to do some civil rights work
2  as well?
3    A.  Not as much as I would want to, unfortunately,
4  because of, you know, having a family and working very
5  hard in the practice.  You know, occasionally, but not
6  really a lot, no.  Once in a while.
7    Q.  I noticed you were involved with the
8  delegation to the International Court of Justice
9  in the Hague?
10    A.  Yes.
11    Q.  On the separation barrier issue?
12    A.  That's true.
13    Q.  So just tell me about that work.
14    A.  At that time, I was representing many
15  Palestinian petitioners before the Israeli courts,
16  before the Israeli High Court mainly and before the
17  committee that sits next to the Magistrate's Court
18  in Tel Aviv, against confiscation orders or seizure
19  orders that were issued by the Israeli authorities.
20    And because I was expert on what's going
21  on on the ground, in the field, I was called upon
22  by a friend of mine who was with the Palestinian
23  delegation.  He was working for Adam Smith Institute,
24  and they were supporting the legal delegation before
25  the ICJ.  So I was called upon to be with them during

Page 13

1  that experience and give them sort of, you know, a
2  first-sight experience and be able to speak about the
3  matter in the media, especially Israeli media, Arabic
4  media, and even some English media.
5      Q.  You formed your own firm in 2002?
6      A.  That's correct.
7      Q.  And has your work changed since you formed
8  your own firm?
9      A.  Not really.  No.  I don't think so.
10     Q.  Okay.  I want to ask you some questions
11 about something you said in your report.
12         You said you've written, in the last ten
13 years, two legal critiques of rulings issued by the
14 High Palestinian Court in tort cases?
15     A.  That's true.  I sent them to you.
16     Q.  So I think I read one of them.  I'm not
17 sure I read the other.  Perhaps that's --
18     A.  They're in Arabic.  Maybe time for you
19 to be translated.
20     Q.  Somebody translated one for me.  Maybe
21 somebody read both and only translated one as a
22 selection process.  But thank you.
23         Did you write a critique of the Benzi Sau
24 case?  Was that your work?
25     A.  Aah, that's a different thing.  Yes.  Yes,

Page 14

1  I did write it.
2      Q.  I read that as well.
3      A.  Yes.
4      Q.  But that was in English, published in English.
5      A.  Maybe it was translated.  I didn't write
6  it in English, though.  I think I wrote it -- I think
7  I wrote that one in Hebrew, actually.  I'm not sure.
8      Q.  The article was about some cases dealing
9  with the appointment by a public authority of people
10 who had done bad acts in the past; right?
11     A.  Yes.  But that wasn't -- it was prior.
12 I mean, that was, you say, in the last ten years?
13     Q.  Maybe it was older?
14     A.  That's older.  That's older.  Yeah.
15     Q.  Your opinion was that a government authority
16 should not appoint police who have had criminal acts
17 in the past or something like that?  Is that it?
18         Just describe what your opinion was.
19     A.  Well, it was a long time ago.
20         What happened was that in the year 2000,
21 13 Israeli citizens, Arab citizens, were killed by
22 the Israeli police after demonstrations took place
23 in different cities and villages inside Israel.  And
24 the Israeli government decided to appoint what they
25 called an inquiry or investigation committee.  It's

Page 15

1  a statutory body, and it has specific authority by
2  law to investigate and deal with the -- as the mandate
3  was set for them.
4          And during that time, Benzi Sau, he was
5  a police officer.  I don't remember what kind of rank
6  he had at the time.  But he was a police officer, and
7  he was responsible or accused of being responsible for
8  some of the killing, or something like that.
9          And during the deliberations of that
10 commission -- it was called the Orr Commission, it
11 was named after Justice Orr, who was a justice of
12 the Supreme Court who was appointed to be the head
13 of that committee -- he was promoted.  Benzi Sau was
14 promoted by the Israeli minister, or minister of police,
15 as it's called, or minister of internal security.
16         And I wrote a critical argument, a critical
17 piece about that, that was published in a magazine,
18 saying that this was not basically correct.  This
19 was based on Israeli jurisprudence, based on other
20 Israeli decisions of the Supreme Court, that this
21 shouldn't have happened.  And they should -- the
22 guy should not be promoted.
23     Q.  Do you think that the principle, as I
24 understood it from reading your article, was that,
25 kind of in layperson's terms, it's a bad idea to put

Page 16

1  somebody in the police department who has committed
2  crimes of violence.
3          Is that kind of a fair conclusion that we
4  might draw from that case?
5          MR. HILL:  Objection.  It misstates what
6  the witness' testimony was about the rationale for
7  the article.
8          But he can respond.
9          THE WITNESS:  It's -- what I said in that
10 article was that he shouldn't be promoted.  I mean,
11 it was awkward.
12         As far as I remember, the investigation or
13 the deliberation of that commission, the Orr Commission,
14 was still taking place.  And this police officer was
15 accused of being one of the killers or responsible for
16 the killing.  And, you know, instead of taking actions
17 against the guy, instead of taking him to a trial, he
18 was promoted by the minister.  And I thought that was
19 incorrect, based on Israeli legal norms.
20     Q.  BY MR. YALOWITZ:  Do you think it's also
21 wrong based on international norms?
22     A.  I'm not expert on, you know, what the
23 international norms are in this regard.  But I
24 remember reviewing different cases.
25         Even one of them was, if I'm not mistaken,

1  called the Ginosar case, where this guy was involved
2  in -- somehow in a very interesting Israeli big case
3  called "Line 300," bus line 300.  And the guy was in
4  the Shin Bet, in the Israeli General Security Services.
5  And he was one of the team that killed the two guys
6  that kidnapped the bus at that time.  And they were
7  arrested alive, and there were -- actually, photographs
8  of them were taken when they were alive.  And then they
9  were killed immediately afterwards, when they were in
10  the custody of the Israeli security services.
11      And several years they thought -- the Israeli
12  government wanted to appoint that guy Ginosar -- they
13  wanted to appoint him as a general director or as a --
14  a deputy -- basically deputy minister for one of the
15  Israeli ministries.  And a petition was brought before
16  the Supreme Court.  And the Supreme Court said that
17  this is not okay, this is not legal, basically, based
18  on Israeli norms.
19      Q.  I also read, I think, one of the articles
20  you sent was a critique of a traffic accident case --
21      A.  Yes.
22      Q.  -- by the Court of Cassation?
23          Did I say that right?  Is that correct?
24      A.  Yes, that's true.  Very good translation.
25      Q.  And as I understand it, they got the number

1  mixed up of the military order that they decided, and
2  that was the beginning of their problems; right?
3      A.  That's true.
4      Q.  They said "677" when they should have said
5  "766" or maybe it was the other way around?
6      A.  I think the number should be "667" and
7  they wrote it "776" or something.  Maybe it was a
8  typo mistake, but I just didn't like it.  I said:
9  You want to establish a good legal system, at least
10  you've got to get the numbers right so the people
11  can follow what you're writing.
12      Q.  And then, I think, you had some substantive
13  criticism as well; right?
14      A.  Yes.
15      Q.  Before I come to that, the Court of Cassation,
16  what is it?  How would we translate it to, say, the
17  New York courts?
18          MR. HILL:  Objection.  Lack of foundation.
19          But he can answer.
20          THE WITNESS:  Generally speaking, it's
21  the highest -- it's the highest Palestinian court.
22      I mean, they have -- in the Palestinian
23  system, they have the Magistrate's Court, they have
24  District Court, they call it.  Both courts are courts
25  of first instance.  And then they have Appellate Court.

1  And then they have the Court of Cassation.
2      Q.  BY MR. YALOWITZ:  So it would be like our
3  Court of Appeals in New York?
4      A.  Yes, something similar to that.  I think
5  I called it the Supreme Court or something.  But it's
6  the highest court in the Palestinian legal system.
7      Q.  But in New York, you know, our trial courts
8  are called the Supreme Court, which is endlessly
9  confusing.
10      A.  Oh, really?
11      Q.  Yes.
12      A.  What we call the Magistrate's Court.
13      Q.  It's our court of first instance.
14          MR. HILL:  Objection to the lesson about
15  New York courts.
16          THE WITNESS:  That's confusing.
17          MR. YALOWITZ:  It's been a long time since
18  you were taking the New York Bar exam, so that was
19  a fair objection.  I'm glad we cleared it up.
20      Q.  BY MR. YALOWITZ:  Now, your substantive
21  criticism, as I understand it, was that the court
22  should have taken into account legal and factual
23  developments since the time of the military order
24  that they were relying on?
25      A.  I think there were two critiques.  I'm not

1  sure which one you're referring to.  If you can tell
2  me more details about the case, I can --
3      Q.  Sure.  Why don't I give you -- I think I
4  only have one copy of it.
5      A.  I'll give it back to you.  Is it in Arabic?
6          MR. YALOWITZ:  We'll mark it so forever more
7  the world will have a copy of it.  Let me just see if
8  I have an extra copy.  All right.
9          So we'll mark this as Plaintiffs' 107.
10          (Plaintiffs' Exhibit 107 marked.)
11          MR. YALOWITZ:  The record can reflect
12  Plaintiffs' 107 is a document in the Arabic language
13  with a cover page that says:
14          "Dahleh ... Legal Critique."  (As read.)
15          And I don't have extra copies of it.  But
16  I think there's nobody else who would be able to read
17  it besides the witness anyway.
18          THE WITNESS:  (Examining.)  Yes, I see what
19  you -- what you are referring to.
20          MR. HILL:  Wait for him to pose the question.
21          THE WITNESS:  Sure.
22      Q.  BY MR. YALOWITZ:  I was just going to ask
23  you the question, because our record is supposed to
24  be questions and answers.
25          So just describe the critique you were making

Page 21

1  of the Court of Cassation.
2      A.  I think it was about the need to send a notice
3  to the insurance company after a road traffic accident
4  within a certain period of time.  Otherwise, the victims
5  are not entitled to compensation.
6      This was something that the military commander
7  of the West Bank has presented or has enacted in his
8  capacity as legislator in the West Bank and one of the
9  military orders.  And one of the Palestinian insurance
10  companies afterwards was relying on this military order,
11  trying to claim that the victims are not entitled to
12  compensation because they did not file that notice
13  within the stated period of time in that military order.
14      Q.  And then you felt this was a -- just describe
15  your critique of the rationale for that decision.
16      A.  One of the things that I remember here is
17  that the military order that they were referring to,
18  that they were basing their decision on, was amended
19  by itself and that the period was extended.  That was
20  one of the things that I referred to, and that they
21  didn't -- basically, they didn't see that point either,
22  that it was amended by the Civil Administration and
23  the regulations that were issued.
24      Q.  So their interpretation of the military order
25  failed to account for subsequent legal developments?

Page 22

1      A.  Yes.
2      Q.  And then I think you also had a critique
3  that their interpretation failed to account for modern
4  factual realities and the changes that have taken place
5  in society since the order was issued?
6      A.  Yes.  I said that the military order was
7  issued and that this amendment was introduced into the
8  Military Order 677 by the military commander because
9  of many claims of the Israeli insurance companies that
10  were at that time monopolizing the market in the West
11  Bank and Gaza.  There were many cases of sort of forged
12  accidents, claiming there was an accident where there
13  wasn't, as a matter of fact.
14      And they were saying that it was very hard
15  for the insurance company to verify the accuracy of the
16  claim after years, if the claim is brought after several
17  years, based on the statute of limitations in the law.
18  And that's why they needed a notice immediately after
19  the accident, so that they can basically verify whether
20  the accident really took place or not.
21      So I remember saying that, since the situation
22  has changed, in terms of the fact that more Palestinian
23  insurance companies have been established, and there
24  is Palestinian police that can investigate the car
25  accidents immediately after the accident, and there

Page 23

1  are Palestinian private investigators that can also
2  investigate on behalf of the insurance companies, and
3  so on, I said that there are -- the situation is a bit
4  different than it was before for Israeli companies who
5  were finding it a bit difficult for them to verify after
6  a long time whether the accident actually occurred or
7  not.  And I said this should be taken into account now
8  that the situation has changed.
9      Q.  So is it typical of the Palestinian Court
10  of Cassation not to take into account developments in
11  the law, developments in the facts, in your experience?
12      MR. HILL:  Objection.  Lack of foundation.
13      The witness can respond.
14      THE WITNESS:  They can.  Look, you can say
15  it's -- you know, courts are usually conservative, I
16  mean, in any country in the world.  That's the way I
17  see it.  So they don't really -- they are not proactive.
18  They don't -- you know, they don't like to change things
19  very quickly.  So that's why we are here, for lawyers
20  and critiques and professors, or, you know, lectures
21  and law faculties, to just -- you know, to draw the
22  court's attention that, you know, they should think in
23  a different way.  And that's what I was trying to do.
24      Q.  BY MR. YALOWITZ:  Sure.  I'm not being
25  critical of your critique.

Page 24

1      I'm just asking, based on your experience
2  with the Palestinian legal system, is the approach
3  that they took in that case which you've described
4  typical of their approach to legal issues?
5      MR. HILL:  Same objection.
6      Go ahead.
7      THE WITNESS:  You should remember, you know,
8  that when you say the Palestinian court system, it's
9  relatively new.  I mean, we are talking about a new
10  system in a place that is not even a country or an
11  independent state and that it's in the forming.  It's
12  sort of a court system in the forming, really.  So
13  it's taking them time.
14      I mean, at the beginning, they didn't
15  have even enough capabilities.  You know, when the
16  Palestinian Authority was established, I remember
17  the number of lawyers in the entire West Bank was
18  maybe around 200 lawyers.  It was maybe the minimum --
19  the minimum number that I know for a population ever.
20      Because during -- during the period from 1967,
21  when the West Bank and Gaza were occupied by Israel
22  until the Oslo agreements were signed, Palestinian
23  lawyers went on a strike.  So there were -- actually,
24  95 percent of them were not even going to courts.
25  Because the courts at that time, the authority in the

1  courts was being held down by the military commander.
2  And as a way of protest against that, they decided to
3  go on strike and not appear before the military courts
4  or the military commissions, many military commissions
5  that were established by the military commander.
6       So, therefore, that -- you know, that judicial
7  basis for a good judiciary in Palestine or in the PA
8  area was lacking, in a way.  And so it's improving,
9  you know, day after day.  And now there were more --
10 and there wasn't even a law school at that time, you
11 know, even one law school.
12       Since that time, since 1993, there are several
13 law schools now in Palestinian universities and many
14 law graduates.  And some of them study outside of the
15 country and they come back.  So the reality is changing,
16 and the courts are changing.  The judges are changing.
17 And I guess, you know, the approach will soon change
18 and the way of thinking, you know.  I think they will
19 be more receptive to new changes and accept new ideas
20 and new theories.
21     Q.  BY MR. YALOWITZ:  So I wanted to ask you
22 about two things that I read about the Palestinian
23 courts.  One was written by an individual named Wadi
24 Fuad Muhassan?  Do you know that person?
25     A.  Maybe if you spell the name.  But either

1  way --
2      Q.  Do you know the person?
3      A.  Might have heard the name.  Yeah.
4      Q.  He wrote an essay or a book called "The
5  Palestinian Legal System" in 2003.
6      A.  Uh-huh.
7      Q.  Are you familiar with that publication?
8      A.  No.
9      Q.  He said something to the effect of:  The
10 Palestinian legal system is a tossed salad with layers
11 of different laws and systems all mixed up into a
12 confused mess.
13       Have you ever heard that description?
14     A.  A tossed salad?  No.  But I mean -- now,
15 forget about the judicial system.  The legal system
16 itself in the Palestinian Authority areas, because of
17 the different rulers of those areas in the last century,
18 in the 20th century, so there you have different layers
19 of laws, of legislation.
20       It started with the Ottomans until 1918, 1920.
21 And then with the British Mandate, the British presented
22 their own legislation, and it was part of this legal
23 system in entire historical Palestine -- actually,
24 including Israel, after Israel was established in 1948.
25 And, in 1948, the West Bank was annexed -- not in '48.

1  But in '51, it was annexed to Jordan.  So the Jordanians
2  also were legislating different laws, and those laws
3  were applicable in the West Bank.
4       And after 1967, 17 years later, Israel
5  occupied the West Bank and Gaza, and Israel was
6  presenting military orders from the military
7  commander.  And we're talking about hundreds of
8  military orders.  And in the year 1993, after Oslo
9  and after the establishment, I guess, in 1994 of the
10 Palestinian Authority, the Palestinian Legislative
11 Council started enacting Palestinian legislation.
12 So sometimes, in order to get the right answer, you
13 might need to go through those different layers of
14 legislation, which makes it a bit complicated.
15       Especially at the beginning -- I don't
16 know when he wrote that essay -- there weren't
17 enough electronic ways of researching the Palestinian
18 legal system.  Now there are -- there is.  Actually,
19 I helped the Birzeit Law Faculty -- it was the
20 Birzeit Law Center -- to establish something similar
21 to LexisNexis or Westlaw or, in Israel, it would be
22 Nevo or Takdin or whatever, which is to be able to
23 research on the Web.
24       If you are, you know, researching some
25 specific area of law, and you can research which period,

1  which legislator, and so on and so forth, or all of
2  them, and you can know -- at the beginning, you couldn't
3  know if the law was repealed.  Because the Ottomans
4  enacted an insurance law in 1910, and it was very
5  hard for you to know if it was actually repealed or
6  it's still valid or if the British changed it or what
7  happened afterwards.  So now it's easier.
8       Several -- I mean, now -- it's for a long
9  time now -- immediately after the establishment --
10 the establishment of the Palestinian Authority, and
11 the Birzeit Law Center in Ramallah, they started,
12 you know, compiling things and being able to get the
13 answers on the Web and to know if the law was repealed
14 or not, amended, how, and so on.
15       And, of course, different -- they had
16 different languages.  The Brits, it was English,
17 obviously.  That was the main language of legislation.
18 It was translated, but it was enacted in English.  And
19 the military orders were enacted in Hebrew, and they
20 were translated or even mistranslated, unfortunately,
21 in certain areas.  And this also added to the confusion
22 that that scholar that you spoke about was referring to.
23 But today it's much better.
24     Q.  The other person I wanted to ask you about
25 was Ibrahim Barghouthi of an organization called Musawa.

1         Do you know Mr. Barghouthi?
2     A.  I know him.
3     Q.  And do you find him to be -- well, what is
4  his work, first of all?
5     A.  I think he runs that organization.  He is
6  the director of that organization.  And I don't know
7  his work, but I know that he -- I mean, what he does
8  and what he thinks.  And he's invited me several
9  times to speak in symposiums or conferences that his
10  organization held in Ramallah about different legal
11  matters in Palestinian Authority areas.
12     Q.  I read "Musawa" translated as the Palestinian
13  Center for the Independence of the Judiciary and the
14  Legal Profession.
15     A.  That's the center that he runs.  Yes.
16     Q.  And I read an article in which he complained
17  of the growing influence of the security forces of
18  Palestine over the justice system.
19         Have you heard of that critique?
20     A.  I'm not aware of that critique.  I've never
21  experienced that, what he says.  I've heard that it's --
22  as some people speak about it in the media.  But I'm
23  not an expert on that.  I haven't seen it firsthand.
24     Q.  Do you think that Mr. Barghouthi is a reliable
25  reporter of the facts in this regard?

1     A.  As far as I know, he's not -- I'm not sure.
2  He doesn't practice law.  He's not a practicing lawyer.
3  So I don't know what he bases his conclusion on.  I
4  think it's an allegation that has to be proven.
5     Q.  Do you think that he's the kind of person
6  who would make such an allegation without a factual
7  basis for it?
8     MR. HILL:  Objection.  Lack of foundation.
9         You can respond, if you know.
10     THE WITNESS:  I'd like to read, you know,
11  the entire piece that he wrote, if it's just -- people
12  make, you know, proclamations or declarations all the
13  time.  Some say, you know, Israel is apartheid.  Some
14  say the Israeli judiciary is not objective or is biased
15  or is -- you know, some say it's proactive.  Some say
16  it's -- you know, it's -- you can't throw these things.
17  You need really to conduct a research, a survey.
18     Q.  BY MR. YALOWITZ:  Mr. Barghouthi also reported
19  that he -- he reported on a survey that said that 50
20  percent of people in the Palestinian territory say that
21  they trust the regular courts and 50 percent say that
22  they do not trust the regular courts.
23         Do you have a reaction to that critique?
24     A.  It's -- you know, it might be -- I can
25  understand why some people or a lot of people say

1  they don't trust.  You know, it's -- as I said, it's
2  a new legal system.  It's in the formation.  We're
3  trying to take the role and -- but a lot of things
4  are still missing.
5         You know, a Palestinian citizen, for example,
6  cannot sue an Israeli citizen in a Palestinian court
7  even if they have business together, just because the
8  Palestinian court is incompetent, based on the Oslo
9  agreements, to adjudicate on these cases.  Because
10  an Israeli person or company is involved, you know,
11  a Palestinian citizen would think that those courts
12  are not really -- you know, what do you say -- a
13  full-fledged court or they are not sovereign, courts
14  of a sovereign country.  They are -- basically they
15  lack authority, they lack jurisdiction.  They can
16  adjudicate only in certain cases, in certain areas.
17  So that might be the reason for, you know, some of
18  the mistrust that is shown in this survey.
19         I can tell you that in Israel -- surveys
20  done in Israel, you know, regarding the Israeli High
21  Court and the Israeli legal system are showing --
22  the last one was done by the Israeli Institute for
23  Democracy -- are showing not far from this.  Almost
24  66 percent think -- I don't know what the word is --
25  not "trust," but I think -- yeah, trust -- the trust the

1  Israeli legal system.  Yeah, that's -- I think that's
2  the word, sort of ranking the different institutions
3  in Israel.  I think the Israeli Defense Forces were
4  getting the highest score and the Israeli Supreme
5  Court -- the Supreme Court, not even the general --
6  was getting some 65 percent, or something like that.
7     Q.  So I've heard that there is a new effort to
8  create a joint Israeli/Palestinian arbitration court.
9     A.  That's true.
10     Q.  Are you involved with that?
11     A.  I was -- I think I was invited to be involved
12  but I didn't have the chance.  But I would be a great
13  candidate for that.  I would love to do that.
14     Q.  I think I might be able to introduce you
15  to someone.
16     A.  Thank you.  I'd love to.  I think it's very
17  interesting.  I think it's -- it can help commerce,
18  it can help business between the two parties, and it
19  can be neutral.
20         Because, you know, both sides feel awkward
21  going to the other side's legal system.  But if it's
22  some kind of arbitration and they have arbitrators,
23  people like me who speak and know both cultures --
24  I would be glad to do that.
25     Q.  So let's go through your report a little bit,

1  some of the opinions in your report.
2      A.  Sure.
3      Q.  First of all, do you recall when you were
4  engaged to prepare a report?
5      A.  When?  This year.  But exactly the date,
6  I don't remember.  I think I signed it on July 15th,
7  if I'm not mistaken.
8      Q.  Who did you get engaged by?
9      A.  Mr. Hill.  Brian.
10     Q.  Your contract is with the Miller & Chevalier
11 law firm?
12     A.  Yes.
13     Q.  And what materials did Mr. Hill and his
14 colleagues provide to you?
15     A.  The Complaint or the civil action, what
16 we call.
17     Q.  Did they provide to you any of the expert
18 reports in the case?
19     A.  No, not quite -- which experts?
20     Q.  Like Professor Shnoor's report.
21     A.  I think his report was written after mine.
22     Q.  Did they provide to you the quotes by Nick
23 Kaufman?
24     A.  No.
25     Q.  Or Alon Eviatar?

1      A.  No.
2      Q.  Or Israel Shrenzel?
3      A.  No.
4      Q.  So sitting here today, you have not read
5  those reports?
6      A.  No.
7      Q.  Did they provide to you any documents like
8  criminal convictions or court files of people convicted
9  in connection with the acts alleged in the Complaint?
10     A.  No.
11     Q.  Did they provide you with any documents like
12 pay and promotion records or martyr files of any of
13 the individuals involved in the actions that are the
14 subject of the Complaint?
15     A.  No.
16     Q.  Do you know what a "martyr file" is?
17     A.  I know what a "martyr" is.  I don't know
18 what a "martyr file" is, what that means.
19     Q.  Were you asked to make any assumptions,
20 assumptions of facts or anything like that, in forming
21 your opinions?
22     A.  It's not assumptions.  But I think I mentioned
23 it in the report, I was given certain details regarding
24 birth dates of some of the plaintiffs and, you know,
25 members of family and so on, so that I would be able to

1  do the calculation for the damages or the compensation.
2      Q.  Before you began your work, were you familiar
3  with any of the cases that are the subject of the
4  Complaint?
5      A.  No.  I mean, I've lived here.  So if you
6  mean the bombings, if that's what you mean, some of
7  them -- you know, I was here.  So I remember them
8  through the media or --
9      Q.  You remember the case of Wafa Idris?
10     A.  No, not really.  But I remember the case
11 in the Hebrew University generally, because I think
12 I was -- at that time, I was even still teaching there.
13 I'm not sure.  But I remember that case.  I refer --
14 I got -- the name, you know, rings a bell, as you say.
15 But I don't remember where it happened and so on.  No,
16 I don't remember.
17     Q.  What did you teach at Hebrew University?
18     A.  I was what we call an adjunct professor or
19 teacher for teaching constitutional law.
20     Q.  And did you know that cafeteria -- had you
21 eaten in that cafeteria?
22     A.  I don't recall where it was exactly.  I mean,
23 I know cafeterias are the best place in any university.
24 But I don't know exactly which cafeteria it was.  But
25 if you tell me which one, I would know which one.  I

1  would know it.
2      Q.  So just to refresh your recollection, does
3  the Frank Sinatra cafeteria ring a bell?
4      A.  Yes, I know -- I know it.  I know where the
5  Frank Sinatra is.  Yeah.  I used to eat there a lot.
6  I ate there a lot of times, most of the times.
7      Q.  As we say in English:  There but for the
8  grace of God.
9          Is your report based on earlier reports
10 that you prepared, or did you do it from scratch?
11     A.  I did earlier -- I did earlier reports,
12 I think two reports.  And yeah, I mean, it was based
13 on them.  Not from scratch, but a lot of changes and
14 additions.
15     Q.  Did anybody help you, or did you do all the
16 work by yourself?
17     A.  Myself.
18         MR. YALOWITZ:  So why don't we give you a
19 copy of your report so we can ask questions about it.
20 We'll go off the record.
21     (Recess from 10:18 a.m. to 10:25 a.m.)
22         MR. YALOWITZ:  While we were off the record,
23 we discovered that my copies of Mr. Dahleh's report
24 are not with us.  But thanks to the courtesy of counsel
25 for the defendants, we have put a copy of his expert

Page 37

1  report before him on an iPad. And we're getting paper
2  copies, so we'll mark them when they arrive. But in
3  the meantime, we can proceed.
4       So, Mr. Hill, I very much appreciate your
5  courtesy and understanding.
6       Q. BY MR. YALOWITZ: So, Mr. Dahleh, you have
7  a copy of your report before you?
8       A. I do.
9       Q. Great. Now, one thing I wanted to ask you:
10 On page 3 you mentioned, in paragraph D, two expert
11 opinions heard before American courts?
12      A. Uh-huh.
13      Q. So you have to speak in words so that --
14      A. Yes. Yes.
15      Q. All right. So could you just tell me what
16 those cases were?
17      A. Cases similar to this case, cases in which
18 American citizens were killed or injured -- I don't
19 recall the details -- in a suicide bombing or shooting
20 that occurred during the years of the Intifada. I'm
21 not sure if they were -- I think -- I guess one of
22 them was inside Israel and the other one took place
23 in the West Bank.
24      Q. Do you remember the names of those cases?
25      A. One of them I do. The Shatsky case, it's

Page 38

1  called. The first one, maybe the Ungar? Ungar, I
2  think. Yes, Ungar was the first one. The second was
3  the Shatsky case.
4       Q. And in both of those cases, were you retained
5  by the Miller & Chevalier firm as well?
6       A. Yes. Yes.
7       Q. Now, looking at page 4 of your report --
8       A. But here, before we move on -- I don't know
9  if it's the right time?
10      Q. Sure. Say it.
11      A. There was a mistake in paragraph D that
12 I noticed after you were asking for a certain -- how
13 is it called? -- an expert report. I confused the name.
14 I said in paragraph D that I have testified in three --
15 as an expert witness in three of the cases in which
16 I gave an expert opinion.
17      If you see, the third one was the District
18 Court of Nazareth. But I -- unfortunately, I confused
19 the names -- the names that I wrote here. And maybe
20 even the number is not correct. The correct one is
21 the one that you mentioned in your -- in your request
22 afterwards.
23      The names don't say a lot to me because they
24 are not really my clients. You know, the client is
25 the counsel who retains me to give an expert opinion.

Page 39

1  And that's why -- I'm sorry -- I confused just the name.
2  But it was the District Court of Nazareth.
3       Q. All right. That's very helpful. Thank you.
4  That's a helpful clarification.
5       Is there anything else that comes to mind
6  that you want to change or clarify about your report?
7       A. No.
8       Q. Okay. Thank you.
9       So if we could look together at page --
10      A. Four, you said?
11      Q. Four, paragraph 2.
12      Have you had a chance to read paragraph 2
13 to yourself?
14      A. Yes.
15      Q. Now, as I read it, you have expressed --
16 we could divide that opinion into three topics, which
17 I noted as facts, law, and damages.
18      A. Right.
19      Q. So with regard to facts, did you rely on
20 anything besides the Complaint?
21      A. Just the Complaint.
22      Q. Now, before we were on the record, we were
23 doing a little comparative discussion about New York
24 and Israeli law, legal systems.
25      Who is the finder of fact in the Israeli

Page 40

1  system?
2       A. The judge hearing the case.
3       Q. Then on appeal, is the judge's fact-finding
4  subject to review?
5       MR. HILL: You mean in an Israeli case?
6       MR. YALOWITZ: In the Israeli legal system.
7  Yes. Thank you for that objection.
8       THE WITNESS: In Israel, appellate courts
9  do not hear witnesses, or they do not hear them again.
10 It's very exceptional to accept -- to be able to present
11 new evidence in an appeal. Only in exceptional cases
12 with certain conditions. I can elaborate if you want.
13      But the evidence -- usually the witnesses,
14 the testimonies, and the written evidence is accepted
15 or denied by the trial court, by the first instance,
16 not by the Appellate Court, with exceptions, as I said,
17 but it's very exceptional.
18      Q. BY MR. YALOWITZ: And so the general rule,
19 do I have it right, is that if the trial court says
20 I believe a certain witness, that's very difficult
21 to overturn on appeal?
22      A. Yes. In terms of giving weight to the --
23 how trustworthy the witness is. Usually it's almost
24 up until the Appellate Court will not say -- even if
25 the first instance said that I believe the witness,

Page 41

1  or the other way around, that I do not believe the
2  witness because he is a liar or she's a liar -- that
3  the Appellate Court would say otherwise.
4        Yet, the Appellate Court, in certain
5  circumstances, might intervene even in factual
6  findings if there is -- you know, if they think that
7  the -- there's a mistake on the face of it or in the
8  face of the file, or if there are other documents that
9  are contradicting and so on. So there are exceptional
10  cases in which the Appellate Court intervenes in factual
11  findings as well.
12    Q.  So that's helpful. Thank you.
13        Other than your comment in paragraph 2,
14  I didn't really see anything else in your report
15  about the facts of the case.
16        Is that fair to say?
17    A.  It's a long report. I mean, it's very hard
18  for me to answer categorically. Maybe I -- I feel
19  maybe I did mention other parts.
20    Q.  Fair enough. I'm not --
21    A.  It's very hard for me to tell.
22    Q.  Fair enough. It was maybe perhaps too broad
23  of a question. So that's a fair answer.
24    A.  That's fine.
25    Q.  Why don't we focus on some of your legal

Page 42

1  analysis about liability. And then we'll talk about
2  your legal analysis about damages.
3    A.  Okay.
4    Q.  So with regard to liability, I noticed you
5  had some discussion of three cases. And I want to
6  ask you about each of those cases.
7        The first case is called the Gaon case?
8    A.  Yes. "Gaon" in Hebrew, yes.
9    Q.  "Gaon." And as I understand your report,
10  the Gaon case, as you translated it and put it in
11  your report, seemed to be about a failure to supply
12  evidence of a quality that the court would accept.
13        Is that a fair summary?
14    A.  Yes. That is a fair summary.
15        The court said that lots of allegations were
16  raised against defendants, including that one of them
17  was a policeman and that the PA -- with the Palestinian
18  Authority police forces. And the court eventually said
19  that they couldn't produce enough evidence other than
20  things that were mentioned in the media, in newspapers
21  and stuff like that, but they couldn't prove any
22  connection between the defendants -- meaning, I guess
23  the PA it was in this case -- and the occurrences, the
24  shooting that took place in the city of Afula in Israel.
25    Q.  Under the law of Israel, does the PA have

Page 43

1  immunity from suit?
2    A.  It was a very -- it was a very interesting
3  issue for a long time. And there was a -- there was
4  a lot of claims by the PA lawyers in Israeli courts
5  stating this.
6        Before that last change in the status of
7  the PA in the United Nations last year, when it was
8  actually recognized as a nonmember state in the United
9  Nations, the Israeli courts had decided that it doesn't
10  have immunity. And they based that mainly on the
11  declaration given by Israeli Foreign Ministry stating
12  that it doesn't have such an immunity.
13        There was an attempt, or there is an attempt
14  now -- I saw it in one of the cases, I don't recall
15  which one, I think it's a new case -- in which also
16  the case was actually dismissed or rejected or denied
17  against the PA and the PLO. It's a recent case. It's
18  just in August of this year. And the lawyers who were
19  representing the PA raised this argument again.
20        The District Court of Tel Aviv did not accept
21  this argument, that this change is -- changes the issue
22  of immunity. And the court said, if they wanted, they
23  could have invited or could have summoned somebody from
24  the Foreign Ministry for cross-examination on their
25  certificate or on their sort of report that they give

Page 44

1  the court.
2        They said: If you think there is a change
3  in the status of the PA, after what happened last
4  year in the United Nations when the PA was recognized
5  as a non-member state, then it's your right to ask
6  for cross-examination, which you haven't done. And,
7  therefore, I treat the opinion of the Foreign
8  Ministry -- the prior opinion of the Foreign Ministry
9  that the PA doesn't have an immunity, as a valid one.
10  But yet the court, as I said, rejected the case
11  eventually.
12    Q.  Rejected the case on other grounds?
13    A.  Yes, on other grounds.
14    Q.  What were the grounds that the court rejected
15  the case?
16    A.  Again, the court said that the plaintiff
17  couldn't basically prove the claims or the allegations
18  for negligence or for violation of statutory duty
19  and they couldn't prove any connection between the
20  perpetrators of the shooting and killing.
21        It was actually two incidents for the same
22  plaintiff. The first incident, he was injured. And
23  in the second incident, he was killed, I think a year
24  after. Both took place in the West Bank. And the court
25  said that plaintiffs couldn't prove the connection --

Page 45

1  the necessary connection between the shooting and the
2  Palestinian Authority or the PLO.
3      Q.  So sitting here today, the courts of Israel
4  do not recognize any immunity for the PA or the PLO?
5          Is that fair to say?
6      A.  That's true.
7      Q.  And both in the Gaon case and the case that
8  was decided in August -- what was the name of that case?
9      A.  You say "John Doe"; right?
10     Q.  "John Doe."
11     A.  John Doe v. El-Alul.
12     Q.  So both in the Gaon case and Doe v. El-Alul,
13  the cases were rejected for failure of evidence?
14     A.  That's true.
15     Q.  And not rejected for failure of a legal
16  theory?  Is that fair to say?
17         MR. HILL:  Objection.  Vague.
18         But the witness can respond.
19         THE WITNESS:  What was the objection?
20         MR. HILL:  That it's vague.
21     Q.  BY MR. YALOWITZ:  Well, it's true, it's
22  sort of an open-ended question.
23         Do you feel you can answer it?
24     A.  Yes, I can answer that.
25         The court did not go into the theory, the

Page 46

1  legal theory, because it said at the very beginning
2  that they didn't prove the necessary factual background
3  or basis for the case.
4          I mean, the second case, for example,
5  the court went, in my view, very -- in a very long
6  process of trying to see if the plaintiffs could --
7  if the plaintiffs have proven incitement on the side
8  of the PA.  There was an expert witness and lots of
9  videos and newspaper articles and what have you that
10  were presented to the judge.
11         Afterwards, it was the same judge that gave
12  the decision in the Mentin case, which is the third
13  case or the fourth case -- I forgot, four, three --
14  that were decided on the merits in Israel, and the
15  Peled case, which was not decided on the merits, and
16  the default judgment was vacated afterwards.
17         But the same judge that decided on the
18  Mentin case and on the El-Alul case, we'll call it,
19  it was Ganot from Tel Aviv.  And again, she went
20  on and on on the issue of incitement by the PA.  But,
21  eventually, she said -- she decided that there wasn't
22  a policy of incitement.  Although there might have
23  been incitement in one article or one interview by
24  one official or another, but that this is not enough
25  to base liability against the PA.

Page 47

1      Q.  Now, in the Mentin case, Judge Ganot did
2  find liability against the PA; is that right?
3      A.  That's correct.
4      Q.  And the Mentin case was before the El-Alul
5  case?
6      A.  Yes.  That's true.
7      Q.  So in the El-Alul case, she didn't change
8  her mind about the legal regime.  She just said the
9  evidence is insufficient in this particular case; is
10  that right?
11     A.  Yes.  She didn't change -- I mean, she
12  didn't -- as I said, she didn't go that far in terms
13  of legal theory and legal norms and legal principles,
14  because she focused mainly on the issue of facts,
15  whether they proved a connection between the
16  perpetrators and the defendants.
17     Q.  So let me ask you about the Peled case, and
18  then we'll come back to the Mentin case.
19         Now, the Peled case was a default judgment;
20  is that right?
21     A.  That's true.  It started as a default
22  judgment.
23     Q.  And then the Supreme Court of Israel vacated
24  the default, or the Appellate Court vacated the default?
25     A.  It went afterwards three instances.  It

Page 48

1  started with what we call in Israel the registrar
2  of the District Court.  This is a body that is a
3  little bit lower than a judge.  He sits like a judge
4  and decides like a judge, but he hasn't been appointed
5  as a judge yet.  When he gets promoted, he becomes
6  a judge.  He has certain authorities in certain cases,
7  including the authority to decide on vacating a default
8  judgment, because the first one -- that's the default
9  judgment itself -- was given by the registrar of the
10  District Court.
11         So first a motion was filed to the registrar,
12  the same authority, to vacate the judgment.  And this
13  was positively answered, meaning he decided to vacate
14  that judgment.  And an appeal was filed on that decision
15  before a judge in the District Court of Tel Aviv.  And
16  the District Court of Tel Aviv decided that the judgment
17  should be vacated, meaning they upheld the decision of
18  the registrar of the District Court of Tel Aviv that
19  vacated the judgment.
20         And then another appeal, a request to appeals
21  court, to the Supreme Court of Israel sitting as the
22  High Court of Appeals, was filed.  And, again, the
23  Israeli Supreme Court decided -- or High Court decided
24  to reject that request for appeal.
25     Q.  Now, did the Israeli Supreme Court, sitting

1  as the High Court of Appeals, express an opinion on
2  the legal arguments that were being made?
3      A.  Yeah, it did.  It hinted.  I mean, it said
4  that -- it said that it's -- it said about certain
5  norms.  The Supreme Court, as far as I recall, we spoke,
6  for example, about the issue of, if I'm not mistaken,
7  punitive damages a little bit.  I need to review that.
8  I think this was the District Court.
9      But the Supreme Court spoke about the fact
10 that it's not enough to prove -- I mean, that the
11 liability, the Supreme Court said that the liability
12 of the PA and the PLO has never been decided before
13 and that this is for, you know, attacks committed by
14 Palestinians against Israeli citizens.  And, therefore,
15 it was wise and correct to vacate the default judgment
16 and to give the parties a chance to try the case on
17 its merits.
18      Q.  So as I read your report -- and I'm looking
19 at page 13, paragraph 12 [sic], which is a carryover
20 from the prior page -- you've set out a quotation --
21      A.  Yes.
22      Q.  -- from the Supreme Court --
23      Which I understand to be your translation?
24      A.  Yes, my translation.
25      Q.  -- in which the -- I notice that it says

1  "I" -- it uses the pronoun "I" in that quotation.
2      Is that because a single judge decided that
3  issue?
4      A.  Yes.  That's true.  In a request to appeal,
5  they go before one judge to decide whether to grant
6  the request for appeal.  If they do, it goes to three
7  justices or three judges.
8      Q.  And the justice who heard the petition for
9  appeal or motion or request to appeal --
10      A.  Yes, Arbel.
11      Q.  Arbel?
12      A.  Edna Arbel.  She used to be the previous
13 Israeli general attorney -- or Attorney General.
14      Q.  She wrote:
15      "The defendants have claims that are worth
16 determining on the merits."
17      Is that right?
18      A.  Yes.
19      Q.  And she said:
20      "The assertions that the plaintiffs raise
21 against the District Court ruling" --
22      Which was to vacate the default?
23      A.  Exactly.
24      Q.  (Reading.)
25      -- "without expressing an opinion about

1  them, should be examined and determined in the main
2  proceeding."
3      A.  That's right.
4      Q.  So she's saying:  I'm not deciding the
5  merits of this.  I want the merits to be decided
6  in the main proceeding.
7      Is that fair to say?
8      A.  She said that.  And she said, as I said
9  earlier, that you can't make that factual jump in
10 the case based on letters sent to the General Assembly
11 of the UN or newspapers or TV reports and so on.  You
12 need to prove your case after hearing witnesses and
13 presenting admissible evidence.
14      Q.  So did the District Court, in its decision
15 to vacate the default judgment, express an opinion
16 on the merits, or did the District Court simply say
17 the merits should be decided along the lines that the
18 justice of the Supreme Court said?
19      A.  Very similar to the Supreme Court.  They
20 said -- they said that the fact that the dispute
21 regarding the legal responsibility of the PA for
22 terrorist attacks has not been determined in Israel
23 previously, this is a very important consideration
24 in its decision to vacate the default judgment.
25      Q.  And was that decision to vacate before

1  or after the Mentin case was decided?
2      A.  That was before.
3      Q.  Now, you mentioned in your prior -- I keep
4  meaning to hold Mentin, but it keeps popping up.
5      You mentioned in your report that the Mentin
6  case is on appeal?
7      A.  That's true.
8      Q.  Is it on appeal to an intermediate court,
9  or is it on appeal --
10      A.  No.  It is the Israeli Appellate Court, which
11 is the Israeli Supreme Court, sitting as Appellate
12 Court -- this Appellate Court in civil cases.
13      Q.  Have the briefs been fully submitted?
14      A.  As far as my knowledge, no.  It's just a
15 very big -- very early stages.  It's a new decision,
16 and it takes -- it takes time.  The Israelis -- the
17 Israeli High Court is a very busy court.
18      Q.  So I wanted to ask you a little bit about
19 the default judgment as well.
20      You mentioned the default judgment was
21 entered by the registrar of the court?
22      A.  Yes.  Late Judge Registrar Azar, who was
23 killed, himself, afterwards.  Adi Azar.  He was killed,
24 unfortunately.
25      Q.  How was he killed?  What happened to him?

Page 53

1      A.  He was killed in his home by a criminal.
2   It was a big case in Israel.  Just a criminal.  I'm
3   not -- I don't remember the details.  I don't know
4   if he was trying to break into his house or something.
5   But it was the first time, I think, a judge was killed
6   in Israel.
7          DR. SHNOOR:  Murdered.
8          THE WITNESS:  Murdered.  Yeah.
9      Q.  BY MR. YALOWITZ:  Was the crime solved?
10     A.  Afterwards?  I'm not sure.  I think there
11  was an indictment brought.  It was a very interesting
12  case.  Because, afterwards -- almost a book about it --
13  a lawyer -- I think a lawyer was representing from
14  the public defender office -- I don't know if you are
15  familiar with this story.
16         He got some news from some guy who was in
17  prison that he has enough information to reveal the
18  mystery about this murder.  And he was a very -- it
19  was a very decent lawyer in the public defender office,
20  and he went into some kind of adventure.  He went there,
21  he met him, and then he was accused of something,
22  being -- I don't know -- being -- playing a legal role
23  in it or something.
24         And the lawyer himself now killed himself.
25  He killed himself, the public defender.  He was trying

Page 54

1   to help -- as far as I know, was trying to help to
2   reveal the circumstances of the murder of the judge.
3   But then he was accused of doing some illegal work.
4   And because of his self-esteem, he decided to commit
5   suicide.  It was a big loss.
6      Q.  Terrible.  All right.
7          So the judge who entered the default awarded
8   compensation of approximately $2.7 million to each
9   member of the family of the victims who were killed?
10     A.  Unprecedented compensation.
11     Q.  Was that punitive damages, or was that
12  compensation based on some other theory?
13         What was the basis for the --
14     A.  I think it was a combination.  I think it
15  was a combination of the damages that dependents or
16  heirs of somebody who was murdered or killed in a
17  torturous act get, which I enumerated in my report.
18  And if you want, I can go further into details, and
19  punitive damages.
20     Q.  So the 2.7 million was --
21     A.  Total.
22     Q.  -- was in total, both reflecting the
23  seriousness of the loss of the family members, as
24  well as an element to punish the wrongdoers?
25     A.  Yes.  But I would say mainly it was punitive.

Page 55

1   Because if it was not punitive, it wouldn't reach those
2   amounts.
3          And that's why, in his decision to vacate
4   that default judgment, the other registrar who heard
5   the motion -- because, as I said, Adi Azar was killed.
6   This registrar who gave the decision was killed.  The
7   other registrar who heard the motion to vacate the
8   judgment mentioned this in his decision, when he said
9   that this issue of punitive damages -- there is no
10  final binding Supreme Court precedent as to punitive
11  damages.  And, therefore, he thought this was a good
12  defense for the defendants in their motion to vacate
13  the judgment.
14         Because, as you know -- I don't know about
15  other systems or in the United States.  But when you
16  ask for a default judgment, obviously, I mean, you are
17  ex parte, you are on your own before the judge, and you
18  can basically ask whatever you want.  So the judge is
19  bound, of course, by different norms and so on, but
20  usually grants amounts that are much higher than the
21  judge decides after hearing evidence and having both --
22  having claims of both parties.  And that's why this
23  default judgment was, you know, being very high
24  compensation, which are, again, unprecedented in Israel.
25     Q.  I guess now they're precedented.

Page 56

1      A.  Yeah.
2          MR. YALOWITZ:  Would you care for a break,
3   or should we continue for a while?
4          THE WITNESS:  Yes, good for five minutes.
5          MR. YALOWITZ:  Sure.  Thank you.
6          (Recess from 10:56 a.m. to 11:06 a.m.)
7      Q.  BY MR. YALOWITZ:  So why don't we talk about
8   the Mentin case.  You mentioned the Mentin case in
9   your report.  And I take it you had a chance to read
10  it before you reached your conclusions and rendered
11  your report?
12     A.  Yes, I read it.
13     Q.  And it was -- it was issued at the end of
14  February of 2013?
15     A.  That's true.
16     Q.  And you made your report in July of 2013;
17  is that right?
18     A.  That's correct.
19     Q.  So tell me what your view is of the Mentin
20  case.
21         MR. HILL:  Objection.  Overbroad.
22         But the witness can respond.
23         THE WITNESS:  What was the question again?
24  I'm sorry.
25     Q.  BY MR. YALOWITZ:  Sure.  What is your view

1  of the Mentin case?
2      MR. HILL:  Same objection.
3      THE WITNESS:  I think I expressed the view
4  regarding certain matters in my report, especially
5  regarding the issue of statutory obligations that the
6  PA might or -- might have or might not have vis-a-vis
7  Israeli citizens.  That was one of the points that I
8  said I disagree with the court.
9      The court decided that certain obligations
10 that the PA undertook under the Oslo agreements and
11 under agreements signed between the PLO and Israel
12 were actually statutory obligations in the local Israeli
13 system.  And, therefore, one can base an argument on
14 the violation of those statutory obligations and
15 although this was not the main base for the decision.
16 It was an arbiter, I think.
17     I thought this was incorrect.  I thought
18 it was incorrect because those obligations, based on
19 international agreements, are not part of the local
20 Israeli system or the Palestinian legal system.  Because
21 in both systems, international agreements are not part
22 of the local legal system unless they are incorporated
23 into a local piece of legislation by the parliament of
24 Israel or by the council of -- the Legislative Council
25 of the Palestinian Authority.

1      And although certain parts of the Oslo
2  agreements were incorporated in certain Israeli
3  pieces of legislation and in certain military orders
4  that were issued by the military commander in the
5  West Bank, they were not incorporated as a block.
6  I mean, not the entire document, but certain aspects
7  of those agreements were incorporated into the local
8  system.
9      And because the agreements are not customary
10 international law, so they're not part of the local
11 legal system in both areas, in the PA areas and in
12 Israel itself.  And, therefore, an individual cannot
13 base a legal argument on those obligations and try to
14 sue either Israel or the PA in a local court because
15 of the violation of those obligations.
16     And my view, the obligations of either party
17 based on those obligations, if violated -- if violated,
18 it's a matter of -- international relations issue.  It's
19 a matter of -- it's a political issue in between the
20 parties and in the international arena, international
21 bodies, including the United Nations, and so on and so
22 forth.  But it's not a legal issue.
23     Q.  BY MR. YALOWITZ:  So let me ask you a little
24 bit about the facts of the case.
25     A.  Yes.

1      Q.  So this is a case of an individual who was
2  killed; right?
3      A.  Yes.  He was working in an Israeli
4  telecommunication company, and he was killed when
5  he was doing his work.
6      Q.  And he was killed in a place called Baqa
7  Al-Gharbiyya?
8      A.  Baqa Al-Gharbiyya.
9      Q.  And was he in the part of Baqa that's inside
10 of Israel, or was he in the part of Baqa, like east
11 Baqa?
12     A.  He was inside.  Al-Gharbiyya in Arabic means
13 "west."
14     Q.  Aah.  So that's the tip-off so that you know
15 that it's west, not east?
16     A.  So when you say the name -- exactly.  When
17 you say the name, you know where it is.
18     Q.  So the court's principal basis for its
19 decision was the law of negligence; is that right?
20     A.  That's true.
21     Q.  And then the court went on to talk about
22 breach of a statutory obligation; right?
23     A.  That's correct.
24     Q.  And those are separate obligations; right?
25     A.  Yes, but the judgment was based on negligence.

1      Q.  On negligence?
2      A.  Yes.  For holding the defendants liable, it
3  was based on negligence.
4      Q.  And so the court held, as a legal matter,
5  that the PA had a duty of care to the plaintiff; right?
6      A.  Yes.  In this case, yeah, it did.
7      Q.  And that was based on the court's
8  determination that there was a concrete duty of care
9  and, therefore, what flowed from that was that there
10 was a notional duty of care as well.
11     Is that a fair --
12     A.  Usually it starts the other way around.  They
13 start with the notional duty of care, and then they go
14 to the concrete duty of care.  Although in this specific
15 decision, the court was going into the new approach,
16 which is -- it's really new in the Israeli legal system,
17 saying that this differentiation is not -- doesn't help
18 a lot, it's not good anymore, it should be reviewed,
19 and so on.
20     But, in any case, eventually the court said
21 there is a notional duty of care and there is a concrete
22 duty of care between the defendants and the plaintiff.
23     Q.  Do you disagree with those conclusions?
24     A.  That -- as I stated in my report, the issue
25 of notional duty of care, a conceptual duty of care,

Page 61

1   the Israeli court has said that this is usually a very
2   theoretical issue. And it's based on categorization
3   of types of wrongdoers, types of victims, types of
4   damage, and types of acts or omissions. They take
5   all those into consideration before they decide that
6   there is a notional duty of care.
7           And in the Israeli case law, they have
8   decided in different categories that there is a
9   notional duty of care. For example, between employer
10  and employee, driver and pedestrian or driver and
11  passengers in his car and the like, a physician and
12  her patients or -- and so on and so forth, a lawyer
13  and her clients. But, you know, when you decide a
14  notional duty of care of a governmental body -- in
15  this case, the Palestinian Authority vis-a-vis citizens
16  of another body, which is, in this case, Israel -- this
17  is not something that is easy to do.
18          And as I said in my report, the courts --
19  the Israeli case law has never decided, for example,
20  that Israel owes a duty of care, a notional duty of
21  care, to citizens of a foreign country because of the
22  killing of those citizens, the citizens of the foreign
23  country, by Israeli citizens. That has never been
24  the case.
25          There's one sort of an exception to that,

Page 62

1   which is that the Israeli Supreme Court, in one of
2   the cases that dealt with regard to settlers' violence
3   against Palestinians, it stated that the State of Israel
4   owes a notional duty of care to the Palestinian citizens
5   in the occupied territories.
6           But that's different. That's different
7   because that case happened, if I'm not mistaken, even
8   prior to the transfer of authority to the Palestinian
9   Authority, when Israel was fully controlling the
10  Palestinian occupied territories. When Israel was
11  an occupying power -- it is still, actually, based
12  on international law, but anyway -- Israel was an
13  occupying power, it had police forces inside the
14  Palestinian territories. It had Israeli Defense
15  Forces and had all the powers to control security
16  and so on in those territories, which is different
17  when you compare it to the Palestinian Authority's
18  vis-a-vis Israeli citizens in an Israeli town.
19          So they said, in the case of settler
20  violence against Palestinians, there is a notional
21  duty of care of the State of Israel vis-a-vis what
22  we call "the protected citizens" under international
23  humanitarian law, meaning the Palestinian residents
24  in the West Bank and Gaza, but there is no concrete
25  duty of care, it said, and there is no violation of

Page 63

1   that duty.
2       Q.  So let me make sure I understand your
3   opinions about conceptional duty of care.
4           We might think of a police force as having
5   a duty to protect; right?
6       A.  Yes.
7       Q.  And we might also think of a police force
8   as having a duty not to harm; right?
9       A.  Uh-huh. That's true.
10      Q.  So, for example, if a police officer in
11  Jerusalem hurts somebody during the course of making
12  an arrest, that's more about the duty not to harm than
13  about the duty to protect?
14          Do you see what I'm saying?
15      A.  Yeah, I do.
16      Q.  And you would agree with me that the police
17  force of the PA has a conceptual duty not to harm;
18  right?
19      A.  Generally?
20      Q.  Yes.
21      A.  I mean, for a notional duty to exist, again,
22  you have to examine that -- the perpetrator and the
23  victim, the act, and the harm. Now, not to harm, yeah,
24  I guess, towards people that it interacts with, yeah,
25  that's true, they have that notional duty of care.

Page 64

1       Q.  So, I mean, just to take a hypothetical, if
2   a member of the Palestinian police force, if the facts
3   were proven with evidence --
4       A.  Right.
5       Q.  -- that a member of the Palestinian police
6   force went to a civilian area and opened fire and shot
7   and killed and hurt civilians, you would agree that
8   that policeman had a notional duty of care not to do
9   those actions; right?
10          MR. HILL: Objection. Incomplete hypothetical
11  and vague.
12          The witness can respond.
13          THE WITNESS: A policeman, in that case,
14  had a notional duty of care. For you to hold liable
15  the PA in such a case, it's a different story. But
16  for the policeman himself, there is no doubt that
17  there is a notional duty of care. And in the case
18  that you are mentioning, he has breached that duty
19  as well.
20      Q.  BY MR. YALOWITZ: And just to complete the
21  hypothetical with our policeman -- and then I want to
22  come back to the PA.
23          The policeman has also breached the conceptual
24  duty -- the concrete duty of care; is that right?
25      A.  Yes. That's true.

Page 65

1      Q.   And in my hypothetical, the policeman has
2  caused harm; right?
3      A.   That's true.
4      Q.   And so the policeman would be liable under
5  the law of Israel for those actions; right?
6      A.   Himself, yes.
7      Q.   Now, we understand that organizations can
8  only act through people; right?
9      A.   That's true.
10     Q.   So, for example, in New York, a corporation
11  can only act through its officers, employees, or
12  directors; right?
13     A.   Yes.  Through its organs.
14     Q.   And the same is true of the PA; right?  The
15  PA can only act --
16     A.   That's correct.
17     Q.   The PA can only act through its employees
18  or governing officers; right?
19     A.   That's true.
20     Q.   And so in order to understand whether the
21  PA is responsible for the actions of the police officer
22  in my hypothetical, you would want to know some facts
23  about the relationship between the commanding officers
24  and the officer who perpetrated the crime; right?
25     A.   Also.  Not only that.  That's part of it.

Page 66

1  But in the hypothetical -- in the hypothetical example
2  that you brought, it's usually the -- it's considered
3  to be an intervening cause.  It's a willful killing
4  on the side of the policeman.
5          If this case happened in Israel by a
6  policeman -- an Israeli policeman who killed willfully
7  somebody, whether it's because of ideological reasons
8  or because of a personal fight or because he was
9  having an affair with his wife or whatever it is --
10  the Israeli police as such, or the Israeli state,
11  wouldn't necessarily be liable for that because it's
12  an intervening cause.
13     Q.   Suppose the policeman -- let's continue
14  our hypothetical and let's suppose that this Israeli
15  policeman did the act for ideological reasons.
16          So would such a policeman be permitted to
17  continue on the police force in Israel?
18     MR. HILL:  Objection.  Incomplete
19  hypothetical.  Lack of foundation.
20          The witness can respond.
21     THE WITNESS:  If a policeman --
22     Q.  BY MR. YALOWITZ:  The policeman was convicted
23  of committing the crime that I've described --
24     A.   Right.
25     Q.   -- and was in jail, serving a sentence for

Page 67

1  having committed that crime, based on your experience,
2  would the police force in Israel maintain that police
3  officer on the force?
4      MR. HILL:  Same objection.
5      THE WITNESS:  If he was convicted in a
6  willful killing?
7      Q.  BY MR. YALOWITZ:  Yes.
8      A.   I don't think so.
9      Q.   And would they continue to pay him?
10     MR. HILL:  Same objection.
11     THE WITNESS:  That's a different story.
12  I am -- you know, I am not familiar -- I mean, I
13  need to check that in the law.  It depends on if
14  it's a pension or if he has certain rights.  He
15  wouldn't be getting salary as if he was working if
16  he is not working.
17     Q.  BY MR. YALOWITZ:  Would they give him
18  promotions while he was in jail?
19     MR. HILL:  Same objection.
20     THE WITNESS:  I don't think so.  But I don't
21  have personal knowledge of that.  It's just a general --
22     Q.  BY MR. YALOWITZ:  Would you agree with me
23  that actions like that, paying the convicted police
24  officer and promoting him, could be considered acts
25  of ratification under Israeli law?

Page 68

1      A.   Not necessarily.  It depends.  I mean, it's --
2  it's very hard to prove actually ratification.  You're
3  talking about events that happened after the act.
4          In the case that, you know, you spoke about
5  in our hypothetical, if the police officer had killed
6  somebody because he was cheating on him or he stole
7  his car or whatever and then the Israeli government
8  is still paying salary to him or promoting him, I
9  don't think that the Israeli court would say this is --
10  this means that the -- that Israel or the Israeli
11  government is ratifying by that the act that he had
12  committed.
13          They might be paying him because of social
14  reasons, welfare reasons, whatever it is, charity,
15  helping, assistance, if they do that again.  But
16  I wouldn't think that this would mean that it's
17  ratification by the government.
18     Q.   Well, remember my hypothetical and, you know,
19  it's my hypothetical, so I get to choose the facts.
20          My hypothetical is that the police officer
21  acted for political motives.  And what's after the
22  hypothetical, that in his sentencing, he acknowledged
23  his crimes and said that he was proud of them.  And
24  the police force continued him on salary and promoted
25  him while he was in jail.  And let's add to that.  Let's

Page 69

1  say that the police force also created some promotional
2  videos, saying what a great hero this policeman was.
3      So in my hypothetical, has the police force
4  ratified the acts of the policeman?
5      MR. HILL:  Objection.  Incomplete
6  hypothetical.
7      The witness can respond.
8      THE WITNESS:  This has never happened in
9  Israel, so it's very hard.  Really, I mean, I don't
10  have case law in Israel for this to be able to compare.
11  And I don't see why, if it's a -- if it's political
12  rather than -- I mean, it's not a big difference.
13  There is a difference, but it's not a major difference.
14      If the state continues to pay the policeman,
15  you have to know why they are paying.  If they are
16  paying him because he committed the offense, it's
17  different.  If they are paying him because of other
18  reasons, then it has a different interpretation.
19      But again, in Israel, I don't recall any
20  example like this, in which a policeman willfully
21  killed somebody because of ideological reasons or
22  whatever reasons and he continued to be there.
23      You started with the Benzi Sau case, if
24  you remember.  And in that case, we mentioned the
25  decisions in the Supreme Court that said that the

Page 70

1  persons who were part of killings in the bus line
2  300 story should not be promoted.  So it's not -- it's
3  totally hypothetical.  I can't really relate to it.
4  Q.  BY MR. YALOWITZ:  So let me just add one
5  more fact to my hypothetical.
6      Let's assume that the police force
7  specifically paid him his salary because of his
8  actions, continued to pay his salary because of his
9  actions, paid his salary while he was in jail.
10      Does that give you enough to go on?
11  A.  Yeah, you are getting closer.
12      MR. HILL:  Same objection.
13      THE WITNESS:  You are getting closer to
14  ratification.  If they are paying him because he did
15  that specific action, it might be close or tantamount
16  to ratification.  If you find a correlation, a very
17  close correlation between the act and gain of benefits
18  after the act, it is a bit -- it's more complicated.
19  Yes, it can be tantamount to ratification.
20  Q.  BY MR. YALOWITZ:  Let me add to my
21  hypothetical that it's not one police officer but,
22  say, six police officers who together act -- some
23  commanders, some lower force members act together
24  to engage in the shooting attack that I'm describing.
25  And all six are convicted of their crimes, and all six

Page 71

1  are maintained on the police force and given salaries
2  continued because of their actions and given promotions
3  while they're in jail.
4      Does that feel even more like ratification
5  to you?
6      MR. HILL:  Same objection.
7      THE WITNESS:  Yes.
8  Q.  BY MR. YALOWITZ:  Now let's talk about the
9  duty of what we call the duty to protect, if you will.
10      So the police force in the PA has certain
11  authorities within Area A?
12      Is that fair to say?
13  A.  That's true.
14  Q.  They have the authority and duty, for example,
15  to make arrests in connection with criminal activities?
16  A.  That's correct.  And investigate.
17  Q.  And they have the authority to release
18  prisoners if they conclude that the prisoners haven't
19  done anything wrong; right?
20  A.  Yeah.  They can either press charges or
21  release them.
22  Q.  And so I want to ask you another hypothetical
23  and see what your views are.
24      So suppose that the PA police force is told
25  that an individual is a dangerous bomb maker and they

Page 72

1  arrest the individual.  And in his place of residence
2  they find bomb-making equipment, explosives and nails
3  and chemicals that can only be used for making bombs.
4  And suppose they arrest him and keep him under detention
5  for a period of weeks and then release him to Marwan
6  Barghouti.
7      Do you know who Marwan Barghouti is?
8  A.  From the media.
9  Q.  So before Marwan Barghouti was in jail, he
10  was a senior PA -- I'm sorry -- senior Fatah politician;
11  right?
12  A.  Right.
13  Q.  And suppose further that Marwan Barghouti
14  gives the bomb maker a place to live, money, a gun,
15  cellphone.  And suppose further that Marwan Barghouti
16  asks the bomb maker to make him some bombs.
17  A.  Asks -- sorry?
18  Q.  The bomb maker to make him some bombs for
19  his own personal use.  And suppose further that this
20  bomb maker then goes and places a bomb -- creates a
21  bomb and places it in a university.
22  A.  Who, the police officer?
23  Q.  No.  The bomb maker.
24  A.  The bomb maker, yes.
25  Q.  All right.  So that's my hypothetical.

Page 73

1 Now, in that hypothetical, do you feel that
2 the police and the organization led by Mr. Barghouti
3 have a notional duty of care to the students who were
4 killed by the bomb?
5 MR. HILL: Let me make my objection first.
6 Objection. Incomplete hypothetical and
7 a compound question.
8 But the witness can respond.
9 THE WITNESS: Well, regarding the police,
10 you say he was arrested after getting information
11 about the bad guy, as you'd call him, and then he
12 was released. The question would be, of course, why
13 he was released, which I don't have enough information
14 about.
15 If the police investigates and finds out
16 that the guy -- that the guy -- or that they don't
17 have enough information to press charges and they
18 should release that person, then that's one story.
19 But if they have all the evidence, they have enough
20 evidence to convict him in a court of law, it's a
21 different story.
22 You didn't say that the person was convicted
23 in a court of law. You said some intelligence
24 information or some information from other parties
25 that he's a bad guy. And you know, this makes a big

Page 74

1 difference in determining whether what happened would
2 eventually become a breach of duty of care on the side
3 of the police officers.
4 Q. BY MR. YALOWITZ: Would it depend in part
5 on the reliability of the information received?
6 MR. HILL: Same objections.
7 THE WITNESS: It's -- I mean, it -- the
8 reliability of the information is important. But,
9 again, you're talking about independent police that
10 had to do its work. So they get information, and
11 there are rules. You know, you have to investigate,
12 do the inquiry for the person and take him to court,
13 if possible, or release him, based on the facts that
14 you have and the evidence that you have.
15 I mean, if your hypothetical was that he
16 was convicted, you know, in a court of law, creating
17 bombs and so on, then the picture becomes different.
18 Although even then, as you know, you know, criminals,
19 even those who create bombs or use bombs, eventually
20 they are released, you know.
21 So if the police has a duty of care because
22 of the release of any criminal any time, whether charges
23 were pressed or whether he was convicted or whether he
24 was released after staying in prison, then it's very
25 broad. It's a very broad theory of putting a duty of

Page 75

1 care on the police. And I think financially the state
2 cannot handle this.
3 Q. BY MR. YALOWITZ: So my hypothetical is
4 even narrower than that.
5 My hypothetical is that the individual --
6 the information was given that the bomb maker was
7 who he was and where he was, that the police went
8 and arrested him, and when they arrested him, they
9 found bomb-making equipment, which they did not
10 confiscate but left for him to use at a later date.
11 And then after a period of weeks, they released him.
12 So my hypothetical is very specific in that
13 regard.
14 A. Yeah, well --
15 MR. HILL: Hold on. Let me make an objection
16 and let him pose a question first.
17 Q. BY MR. YALOWITZ: So my question is: In my
18 hypothetical, do you find a duty of care?
19 MR. HILL: Objection. Incomplete
20 hypothetical. Lack of foundation.
21 The witness can respond.
22 THE WITNESS: In your hypothetical, it's
23 becoming closer to finding a duty of care, yeah.
24 You need more -- still more information.
25 You say they found weapons, whatever, bombs.

Page 76

1 I mean, they can find that it's not his. And all the
2 time the police find stuff in different places. But
3 not necessarily a gun found in my office means that
4 I'm responsible for that gun or that drugs or whatever.
5 I mean, it's a beginning. It places suspicion.
6 But if the police goes and finds the bombs
7 or the parts of the bombs and they investigate, and
8 the confesses, for example, he admits that it's his,
9 it's his stuff, this is what he's doing and so on,
10 then of course, yeah. They take him for a while and
11 they release him, then he goes back to his business
12 that he has at home. Yeah, it is -- then it becomes
13 a duty of care -- a breach of a duty of care.
14 Q. BY MR. YALOWITZ: So your opinion is
15 that the -- whether there is a duty of care in the
16 hypothetical I've presented depends on the specific
17 facts that the finder of fact might conclude exists?
18 Is that what you're saying?
19 A. Concrete, yes. The concrete duty of care,
20 by nature, by its name, is based on the specific facts
21 of the case. And then the court asks itself whether
22 it was foreseeable, whether the act was foreseeable.
23 Q. And am I correct in understanding you that,
24 in part, you would want to know what the police's
25 explanation is for having released the bomb maker?

Page 77

1    A.  That's true.
2    Q.  Now, in the hypothetical I've described,
3  are all the other elements met:  Foreseeability,
4  causation, harm?
5        MR. HILL:  Same objections.
6        THE WITNESS:  Again, with no explanation
7  from the side of the police or --
8    Q.  BY MR. YALOWITZ:  With no explanation from
9  the side of the police.
10    A.  No, they are not met.  This is missing.
11  But if there is -- if the explanation is that they
12  just want to release him, then the police have a
13  problem.  If the explanation is that we couldn't
14  take him to a -- couldn't press charges and file
15  an indictment against the guy because we didn't
16  have enough evidence or he had a good explanation,
17  for example, an alibi, or somebody else is responsible,
18  or this is not mine, or whatever it is, then it changes
19  the picture.
20    Q.  When you say somebody else's responsibility,
21  do you mean --
22    A.  You find, as you said, elements of bombing
23  in a certain place and you think it belongs to A.
24  But the police investigates and gets convinced that
25  it belongs to B.  Then you can't keep A in under

Page 78

1  custody.  And if you release A and eventually A does
2  something bad, then you are not responsible for that.
3    Q.  Now, what I asked you before -- maybe it was
4  the way I asked it, but I'm not sure I understood your
5  answer.  But the hypothetical we've been discussing --
6  and in my hypothetical, I want you to assume that
7  the police don't have an explanation for why they
8  released A.
9      So in my hypothetical, has the element of
10  duty been met?
11        MR. HILL:  Objection.  Incomplete
12  hypothetical.  Lack of foundation.
13        The witness can respond.
14        THE WITNESS:  If the police had enough
15  information to press charges and he believed or they
16  believed that he could be convicted in a court of law
17  and, nonetheless, they worked against this legal law
18  and decided to release that guy from their custody
19  after finding enough evidence, after visiting his home
20  and finding bombs or elements of bombs, and that guy
21  eventually, after his immediate release -- if it's
22  a long time also it's different, I mean, but it could
23  be the proximate cause.
24      So if they released him in January and he
25  committed some kind of an offense a year or two years

Page 79

1  or three years later, again, there is no proximate
2  cause in those circumstances.  And this is also missing
3  in your hypothetical.
4        But, again, going back to the hypothetical,
5  that I'm adding to what you have explained.  They have
6  arrested, got all the information, and he had confessed
7  and admitted that he is preparing bombs to use them,
8  use them against civilians.  And then eventually they
9  don't press charges, although they could have, and they
10  release the guy.  And immediately afterwards, the guy
11  commits a crime.  Then there is a duty of care and a
12  breach thereto.
13    Q.  BY MR. YALOWITZ:  And certainly people that
14  are killed in the bombing, you would agree that the
15  element of harm has been met?
16    A.  Yes.
17    Q.  And in my hypothetical, the passage of time
18  is, say, three months from when he's released to when
19  the bomb explodes.
20      Does that effect your view --
21        MR. HILL:  Objection -- go ahead.
22    Q.  BY MR. YALOWITZ:  What's your view on
23  proximate cause in that situation?
24        MR. HILL:  Objection.  Incomplete
25  hypothetical.  Lack of a foundation.

Page 80

1      The witness can respond.
2        THE WITNESS:  It's what we call a gray area.
3  It's not -- I mean, for example, in the Mentin case,
4  the guy, the perpetrator who shot the plaintiff or
5  the employee of the Israeli telecommunication company,
6  he shot him ten days after being -- after finishing
7  his training, military training, and the court decided
8  that that was a proximate cause.
9      I'm sure if that had happened three months
10  after, the court might have questioned itself.  If
11  it happened a year later, the court would say it would
12  see no correlation in between the two acts.  And it's
13  similar here.
14    Q.  BY MR. YALOWITZ:  So now let me ask you,
15  in my hypothetical about the responsibility of Marwan
16  Barghouti, who, just to refresh your memory on my
17  hypothetical, he gave the bomb maker a place to live,
18  money, a gun, a cellphone, and asked him to make bombs
19  for him, Barghouti, personally.
20      So does Barghouti have total liability for
21  those actions?
22        MR. HILL:  Objection.  Lack of foundation.
23  Incomplete hypothetical.
24        The witness can respond.
25        THE WITNESS:  Barghouti himself, you mean?

1    Q.  BY MR. YALOWITZ:  Yes.
2    A.  Not necessarily.  I mean, it's -- in Israel,
3  you know, vicarious liability, it exists in certain
4  areas.  If he was an employee of Mr. Barghouti, then
5  he might be liable.  But if he was not, then you would
6  need to show something else.  Maybe -- I don't know
7  what you are looking for.
8        On what grounds do you think he would be
9  liable?
10    Q.  Sir, in my hypothetical, wouldn't Barghouti
11  be a co-conspirator, a principal actor?  He's giving --
12  he's giving aid and specifically assisting in the
13  preparation of the bomb maker's activities.
14        MR. HILL:  Objection.  Incomplete
15  hypothetical.  Lack of foundation.  This one is
16  compound as well.
17        The witness can respond.
18        THE WITNESS:  So you said -- you say he
19  was assisting in making the bomb?  Is that what
20  you're saying?
21        You said he's giving him a house, money.
22  That's what you said; right?  A safe house or sort of --
23  and a home and money?
24    Q.  BY MR. YALOWITZ:  And a gun.
25    A.  And a gun as well?

1    Q.  And a cellphone.
2    A.  And a cellphone?
3    Q.  So does that implicate --
4    A.  And what happened afterwards?
5    Q.  And, afterwards, the bomb maker creates
6  a bomb and plants it at Hebrew University.
7        MR. HILL:  Same objection.  Also, there's
8  no question pending.  So maybe we should pose a
9  question for the record.
10    Q.  BY MR. YALOWITZ:  So don't you think Barghouti
11  has liability as a principal actor in that case?
12        MR. HILL:  Same objections.
13        THE WITNESS:  Again, it's -- you said he
14  made that bomb.  He didn't make that bomb at his home,
15  unless you tell me otherwise.  He didn't use the
16  gun that he was given, under your hypothetical, by
17  Mr. Barghouti.  He was given money and a place to live.
18        I don't think this is enough to say that
19  Mr. Barghouti is a principal perpetrator based on
20  vicarious -- based on vicarious liability either.
21  He is not his employee.  He didn't send him to do that.
22  I mean, if you say he sent him to do that, then it's
23  a different story.
24    Q.  BY MR. YALOWITZ:  So suppose, in my
25  hypothetical, that the finder of fact concludes that

1  Barghouti, in fact, sent the bomber to do the bombing.
2    A.  In that case, Barghouti --
3        MR. HILL:  Hold on.  Wait for a question.
4  I know it's informal, but you've got to wait for Kent
5  to pose a question before you respond.
6        So what is the question?
7    Q.  BY MR. YALOWITZ:  So in that case, what's
8  your opinion?
9        MR. HILL:  Objection.  Incomplete
10  hypothetical.  Lack of foundation.
11        The witness can respond.
12        THE WITNESS:  If Mr. Barghouti had sent him
13  to install the bomb at Hebrew University or any other
14  place, then he would be responsible, of course.
15    Q.  BY MR. YALOWITZ:  And if the evidence
16  were that the bombing and the bomb-making activity
17  were politically motivated -- in other words, the
18  perpetrators said, I'm proud of this, I did it for
19  political reasons -- do you think that would implicate
20  Fatah?
21    A.  I'm sorry?
22    Q.  Implicate Fatah.
23        MR. HILL:  Objection.  Incomplete
24  hypothetical.  Lack of foundation.
25        The witness can respond.

1        THE WITNESS:  You mean would it impose
2  responsibility on Fatah, when you say "implicate"?
3    Q.  BY MR. YALOWITZ:  Yes.
4        MR. HILL:  Same objections.
5        THE WITNESS:  You know, that the perpetrator
6  that you are mentioning is a member of Fatah?  Is that
7  what you are saying as well?
8    Q.  BY MR. YALOWITZ:  Well, as I understand it,
9  Marwan Barghouti was the leader of Fatah.
10    A.  Oh, because -- because -- oh.  Now I
11  understand what you mean.  Because Marwan Barghouti
12  sent the perpetrator, does that implicate Fatah.
13        That's your question?
14    Q.  That's my question.  That's what I'm asking.
15        MR. HILL:  Same objections.
16        Go on.
17        THE WITNESS:  You can't make that jump
18  immediately.  Marwan Barghouti was some official in
19  Fatah, as I know from the media, as you've just said.
20  But that doesn't mean anything that Marwan Barghouti
21  does he does it in the name of Fatah or that it's
22  binding for Fatah.
23        As in any -- as in any organization or
24  corporation, you know, not every act or every single
25  organ in a corporation, company organization, does

1  binds that corporation. It's -- there are certain
2  conditions that have to be met.
3      Q. BY MR. YALOWITZ: Sure. So, for example,
4  if Marwan Barghouti went to, I don't know, go on a
5  vacation with his family, that wouldn't necessarily
6  be in the name of Fatah?
7      That's what you're saying; right?
8      A. Not only that. Other -- that's one of
9  things, but other things. Not committing --
10  committing a crime or asking somebody else to commit
11  a crime, you would suppose that it's -- this is not
12  being done in the name of the organization. This is
13  something exceptional. This is something not in the
14  normal course of business, I would say.
15     Q. And if the perpetrators of the crime said,
16  I'm doing this to advance the national struggle, do
17  you think that changes your view as to whether it
18  was done for purposes that would be consistent with
19  the mission of Fatah?
20     MR. HILL: Objection. Incomplete
21  hypothetical. Lack of foundation.
22     The witness can respond.
23     THE WITNESS: If the perpetrator says
24  that, you say? No, it doesn't change my answer. That
25  A perpetrator can do it for whatever reason. That

1  doesn't necessarily mean that Fatah is responsible.
2      Q. BY MR. YALOWITZ: It would depend on what
3  Fatah had to say about it too?
4      MR. HILL: Same objections.
5      Go ahead.
6      THE WITNESS: Lots of things. Lots of other
7  things. It depends on the -- it depends on whether this
8  is a clear policy of Fatah or that this is something in
9  Fatah's charter, for example, whether they advocate this
10  on -- you know, on their activities, whether, you know,
11  there is enough evidence that they instruct people to
12  do that. You know, it's broad. You can't just say
13  just because the guy says, I'm doing this because
14  of national reasons, then Fatah has been implicated.
15     Fatah, for example, itself had different
16  opinions regarding shootings and going -- what we call
17  military resistance. Shootings, whether it's suicide
18  bombings, whether it's throwing stones, whether --
19  in Fatah itself, as far as I know -- from the media;
20  again, I'm not a member of Fatah -- but there are
21  different opinions about this.
22     Some say it has to be peaceful -- not
23  opposition -- resistance to the occupation. Some
24  say it has to be military against settlers. Some
25  say it has to be military resistance against soldiers.

1  Others say just negotiations. You know, different
2  opinions.
3      Q. BY MR. YALOWITZ: So do I have it right
4  that your opinion on the responsibility of Fatah for
5  the bombing in my hypothetical would be something that
6  the finder of fact would have to determine, under the
7  law of Israel, based on the evidence presented to the
8  finder of fact?
9      MR. HILL: Let me make an objection to an
10  incomplete hypothetical.
11     And I don't think the witness has said
12  anything about which law he's applying in your
13  hypothetical. You've just added Israel. So the
14  record should reflect that this is the first time
15  Israeli law has been added.
16     The witness can respond.
17     MR. YALOWITZ: Please don't assume from
18  my silence that I agree with your statements.
19     THE WITNESS: That's what I thought until now.
20     Q. BY MR. YALOWITZ: Israel, that's what --
21     A. No, that's what I thought, that you agree
22  with what he says.
23     Q. I'm so glad I clarified.
24     A. So you're speaking about Israeli law?
25     Q. Yes. I mean, we've been talking about

1  Israeli law?
2      A. Mainly, yeah. That's fine. Okay.
3      I mean, again, in any legal system, but in
4  the Israeli system as well, facts are very important
5  in deciding liability. I mean, it's legal norms and
6  facts. And you are raising all these hypotheticals,
7  but you need to prove them in a court of law first.
8  And then the court would have to decide if there is
9  a legal duty, breach of that legal duty, causation
10  and so on.
11     I'm following your hypotheticals. But
12  I guess it's not going to be an easy task to prove
13  what you are assuming.
14     Q. Well, I take it -- I mean, you talked at
15  the beginning about what you looked at. And so you're
16  not expressing any view on the evidence in this case?
17     A. I don't know the evidence. I just know from
18  reading -- even Israeli case law, as I said, in Israel
19  itself, it's very hard to bring enough witnesses to
20  prove, you know, who was the killer and who sent the
21  killer and the correlation when you try to hold the
22  PA or the PLO liable.
23     And in Israel it's easier, because you can
24  bring Israeli witnesses, you can bring Israeli police,
25  security officers and so on, before an Israeli court,

Page 89

1   which I imagine is much easier than bringing those guys,
2   those folks to America to testify before the foreign
3   court on security issues.
4        And that's why I say it's very hard to
5   prove what you assume, what you are assuming for
6   your hypothetical.
7        Q.  So I was going to ask you about the Mentin
8   case.  But before I go there, I remember now:  Were
9   you asked to express in your report any opinions about
10  the relationship amongst the PLO, the PA, and Fatah?
11       A.  No, I don't think so.  I didn't -- I didn't
12  say anything about that.
13       Q.  Do you have any views about the relationship
14  amongst those three?
15       A.  Just from the media.  Not something that
16  I've researched or something that I've dealt with.
17  Just from the media and from reading stuff, I know
18  that an agreement between Israel -- agreements,
19  political agreements, were done between Israel and
20  the PLO.  I know that the PA was established based
21  on those agreements, as a legal body.
22       And Fatah has been -- it's lots of things.
23  It's a party and it's a popular -- it's a very, sort of,
24  movement, political movement, party, the main political
25  movement, actually, among Palestinians.

Page 90

1        Q.  During the years of the Second Intifada,
2   Fatah was led by Yasser Arafat?
3        MR. HILL:  Let me just make a foundational
4   objection, because I think there's a lack of personal
5   knowledge for this witness.
6        Q.  BY MR. YALOWITZ:  Sir, if you know.
7        A.  Again, just from the media, I've heard that.
8   I'm not a member of Fatah.  I've never attended any of
9   their activities, or political activities or otherwise.
10  So I don't have any personal knowledge.
11       From the media, it has been said that, because
12  the Fatah has the biggest political party or movement,
13  so the head of Fatah was elected -- at the time, Yasser
14  Arafat -- to be the head of the PA.  And he was the head
15  of the PLO as well.  So --
16       MR. YALOWITZ:  Would it be convenient for
17  you to -- well, let me do one other thing, unless you
18  wanted to break now.  It's up to you.  I could ask some
19  more questions or we could pause.
20       MR. HILL:  Let's go off the record for a
21  second.
22       (Recess from 11:57 a.m. to 1:07 p.m.)
23       (Plaintiffs' Exhibit 108 marked.)
24       MR. YALOWITZ:  Let's go back on the record.
25       Q.  BY MR. YALOWITZ:  While we were off the

Page 91

1   record, we rectified my error.  I was, once again,
2   saved by others in my group, and we now have a copy of
3   your expert report, and we've marked it as Plaintiffs'
4   108.  And the court reporter will hand it to you just
5   so that you have it before you.
6        And, again, I apologize for my error, and I
7   thank both the witness and counsel for their cooperative
8   attitudes toward this error.
9        A.  (Examining.)
10       Q.  Okay.  So thank you for having that before
11  you.  Really, I want to ask you some questions.  You
12  should, of course, feel free to refer to it at any point
13  in our time that we're speaking together.  I wanted to
14  go to the Mentin case and ask you a few questions about
15  it.
16       Did you follow that case before it came out,
17  or was it something you learned about as it came out?
18       A.  As it came out.
19       Q.  Is there a law journal that describes
20  developments in the law, a newspaper or anything
21  like that that you follow?
22       A.  Yeah, there are lots of things today.  It's
23  electronic -- mainly electronic things.  You know,
24  we get legal news or legal updates from different
25  commercial bodies, different companies that do this

Page 92

1   stuff, like Nevo, Takdin, Dinim, and others.  I don't
2   know if those names say anything to you, but it's
3   similar to Westlaw and LexisNexis, you know.  And
4   they send stuff daily, and I get to read them.
5        Q.  So the first you read of the Mentin case
6   is when it came out shortly after it was published?
7        A.  I don't recall now, but yeah, shortly after.
8        Q.  Do you know the lawyers who represented the
9   Palestinian Authority in that case?
10       A.  I know them through cases that I have against
11  them.  I know Yossi Arnon.  I know him for a long time
12  now.  I mean, I've been a lawyer in this city for more
13  than 21, 22 years.  So I've had cases against their
14  office, in tort cases, because they represent lots
15  of insurance companies as well.
16       Q.  Are they a well-known law firm here in
17  Jerusalem?
18       A.  Yes.
19       Q.  Do you consider them to be high quality?
20       MR. HILL:  Objection.  Vague.
21       The witness can respond.
22       THE WITNESS:  I mean, it's -- yeah.  Yeah,
23  they are.  They are a very good firm.
24       Q.  BY MR. YALOWITZ:  In reading the Mentin case,
25  did you have any impression that the defendants were

1 hampered in their ability to put on a defense?
2          MR. HILL:  Objection.  Vague.
3          The witness can respond.
4          THE WITNESS:  I mean, as it still goes here,
5 you don't get the full picture just from reading the
6 decision or the verdict or the judgment.  There are
7 lots of proceedings that take place that you don't
8 know about.
9          I'm not sure if in this case, but for sure,
10 before this, this judge -- there was an incident with
11 a lawyer who they have, with Judge Dano, that I read
12 the decision.  If I'm not mistaken, a lawyer that is
13 translating -- a lawyer that is working in the firm
14 whom I know also from cases.  And he had a big fight,
15 so to speak, with the judge.
16          And I remember reading the decision that
17 she wrote, because eventually -- I think they were
18 translating the -- one witness who speaks Arabic.
19 And the lawyer is an Israeli Arab, Israeli-Palestinian
20 lawyer who knows Arabic and Hebrew.  And he was
21 correcting all the time or trying to correct the
22 translator that the court has hired.  And he went
23 into a big fight because of this intervention with
24 the judge.  I think it was in the Mentin case.
25          And, eventually, the judge asked the lawyer

1 to leave the courtroom.  And he asked the judge to --
2 how do you say? -- to suspend itself from the case
3 or not to hear the case.  And, eventually, she wrote
4 a very long decision criticizing that lawyer in a very
5 exceptional term -- very exceptional terms.  I've never
6 seen something like this, a decision in which the judge
7 speaks in a bad way about a lawyer.  It was really --
8 to me, it was astonishing.
9          And then an appeal was filed on the decision
10 of the judge not to suspend herself from the case.  And
11 the appeal, as far as I remember, was rejected.  Almost
12 90 percent sure it was the Mentin case.
13          So if this is considered somehow a problem,
14 their use hampered the defense of the defendants, I
15 mean, that was an issue.  To me, it was weird that it
16 continued before the judge.  And, you know, a layman
17 would say after this judgment that the defendants
18 would lose the case.
19          MR. YALOWITZ:  There was one word that you
20 said that I didn't understand.
21          Did you pick it up, Amy?  Please read it back.
22          (Last answer read.)
23          MR. YALOWITZ:  All right.  Thank you.
24     Q.  BY MR. YALOWITZ:  We talked earlier about
25 factual findings versus legal findings.  And I noticed

1 that the judge in the Mentin case made some factual
2 findings about witnesses she found credible.
3          Did you even notice that as well?
4     A.  I don't recall the whole -- it's a long
5 decision.  But I remember one of the main, I think,
6 witnesses was a guy called Kuperwasser, if I'm not
7 mistaken.  He was the main witness in the case, and
8 the judge found him reliable.
9     Q.  And I think that she said that Kuperwasser's
10 credibility was enhanced by the fact that he came
11 with documents that had been captured from the PA's
12 headquarters.
13          Do you recall that?
14     A.  I don't, but maybe.  If you say, then that
15 might be true.  But I remember that he was the main --
16 sort of the main witness in deciding the facts of
17 that case.
18     Q.  Do you have any view about his credibility
19 or the facts that he stated?
20          MR. HILL:  Objection.  Lack of foundation.
21          You can answer.
22          THE WITNESS:  I don't know him personally.
23 So I don't -- I can't really say anything about his
24 credibility.
25     Q.  BY MR. YALOWITZ:  When you reached your

1 conclusions in your report, what weight did you
2 give to the findings of the Mentin court that found
3 Kuperwasser credible?
4          MR. HILL:  Same objection.
5          You can respond.
6          THE WITNESS:  Kuperwasser testified in a
7 specific incident regarding a specific case.  I have
8 no basis to believe that he knows facts other than
9 this case because, again, it was concrete, specific.
10 There was no -- I wasn't given any assumptions.  I
11 don't know if he knows anything about the current
12 cases in this civil action.
13          MR. YALOWITZ:  So let me give you a copy
14 of the Mentin decision.  I'll give you an English
15 translation of the Mentin decision, and we'll mark
16 it as Plaintiffs' 109.  And then I can just point you
17 to the passage that I'm thinking of, and we can talk
18 about that passage.
19          (Plaintiffs' Exhibit 109 marked.)
20     Q.  BY MR. YALOWITZ:  Okay.  Do you have 109
21 before you?
22     A.  (Examining.)  Yes, I do.
23     Q.  And you should feel free to flip through
24 it and confirm that it is indeed a translation of
25 the Mentin decision.  But I'm representing to you

1  that that's what it is.
2      A.  I will take your word.
3      Q.  I would not encourage you to read all 90
4  pages.  I mean, I assume you've read that?
5      A.  I've read it, yeah.  I've read the whole
6  thing, but in Hebrew and not recently.
7      Q.  Okay.  So let's look together at page 59.
8  Let me know when you're there.
9      A.  I'm there.
10         MR. HILL:  And for the record, 59 at the
11  bottom or 59 --
12         MR. YALOWITZ:  Yes.
13     Q.  BY MR. YALOWITZ:  So at the very bottom,
14  it says "59."  And then toward the top third of the
15  page, it says "58 of 90."
16     A.  Exactly.
17     Q.  That's like a starred page kind of a thing.
18  That's probably the original Hebrew.
19     A.  Aah, maybe, yeah.  Right.  You're right.
20     Q.  So I'm looking at paragraph 51.
21     A.  Yes.
22     Q.  And I'll just read you the thing that I'm
23  interested in.  It begins:
24         "The uniqueness of the expert opinion filed
25  submitted by Kuperwasser is due to its being founded

1  upon the documents attached to it, the captured
2  documents, the authenticity of which is not disputed."
3         So does that refresh your recollection that
4  the judge found Kuperwasser's report credible, in part,
5  by referring to the documents?
6      A.  Yes.
7      Q.  If the Palestinian Authority had considered
8  the documents to be inauthentic, they considered them
9  to be forgeries or something like that, would you have
10  expected the counsel for the Palestinian Authority to
11  raise that problem with the court?
12         MR. HILL:  Objection.  Lack of foundation.
13  Calls for the witness to speculate.
14         He can respond, if he can.
15         THE WITNESS:  It's very hard to tell.  I mean,
16  all the -- you know, only the lawyer who handles the
17  case can argue whatever he or she sees fit.  So I don't
18  know, you know, what information they had before them
19  and why they argued what they argued or why they didn't
20  argue.  It's very hard to tell.
21         But as you -- you asked me about them in
22  general, about the lawyers, and I told you that they
23  are -- this is known as a good firm.  So if this was
24  not raised, I assume that they didn't have a ground
25  to believe that they are forged.

1      Q.  BY MR. YALOWITZ:  And the Kuperwasser
2  testimony, I think we discussed earlier, was really
3  the central testimony in the case; right?
4      A.  That's true.
5      Q.  And the documents on which he based his
6  testimony were the essential element of his credibility;
7  right?
8      A.  Part of his credibility.  He is a
9  high-ranking -- I think ex-high-ranking security
10  officer in Israel.  And so it's his job, his CV, his
11  work, and the documents added to that credibility in
12  the eyes of the court.
13         As far as I remember also, the perpetrator
14  himself was called as a witness, the boy who committed
15  this shooting.
16     Q.  The boy was captured alive and treated in
17  a hospital?
18     A.  I think he was a witness also in the case.
19     Q.  And came and testified?
20     A.  Exactly.
21         And they brought his -- if I'm not mistaken,
22  they brought also his version or his inquiry or -- they
23  call it in Hebrew "hoda'a," which is the information
24  that he gave during the investigation, in writing.
25  They presented it to the court.

1      Q.  So just coming back to the documents attached
2  to the Kuperwasser expert opinion, certainly those were
3  important enough in the case that I think you said --
4  well, let me start again.
5         Coming back to the documents attached to
6  the Kuperwasser expert opinion, you agree that those
7  were very important documents in the case; right?
8      A.  Yes.
9      Q.  And you agree that the PA was represented
10  by competent counsel in that case?
11     A.  I do.
12     Q.  And you agree that they had unlimited and
13  unfettered access to their client, the lawyers; right?
14         MR. HILL:  Objection.  Lack of foundation.
15         The witness can respond if he knows.
16         THE WITNESS:  Not -- to their client?
17  I don't know.  I mean, it's -- you're talking about
18  Yossi Arnon, who is an Israeli Jewish lawyer.  You're
19  talking about the PA, that is based in the West Bank,
20  mainly in Ramallah.  I don't know if he's allowed even
21  to go to Ramallah.  I don't think he goes.  I think
22  it's forbidden for him to go there by military orders.
23  So --
24     Q.  BY MR. YALOWITZ:  It's forbidden without
25  permission?

Page 101

1    A.  If he gets the -- if it's possible to get
2  the permission, yeah.
3    Q.  So in any case -- fair enough.  It was a
4  fair objection, and I think your answer was fine.
5         It's just not within your sphere of knowledge?
6    A.  Yes, I don't know.  Exactly.
7    Q.  In any case, I think we agreed that, if the
8  counsel had reason to dispute the authenticity of the
9  documents, they would have done that; right?
10        MR. HILL:  Objection.  Lack of foundation.
11        The witness can respond if he knows.
12        THE WITNESS:  Can you remind me of the
13  documents that we are talking about?  I mean, I just
14  don't remember what the documents are.  If we can see
15  them?
16    Q.  BY MR. YALOWITZ:  I wish I had them.  I
17  apologize.  I don't.  I'm just referring to whatever
18  the court says here.  We see they were captured
19  documents and Kuperwasser attached them, so they
20  are of record.
21        So my question is:  Do you agree that, if
22  the defendant in the case had reason to dispute the
23  authenticity, it would have done that?
24        MR. HILL:  Okay.  Same objection.  Lack of
25  foundation to this witness to answer that question.

Page 102

1         He can respond if he knows what the defendant
2  was thinking in this matter.
3         THE WITNESS:  I think the authenticity was
4  disputed by them, if I'm not mistaken.  I saw something
5  like that.
6    Q.  BY MR. YALOWITZ:  So I was just looking at
7  the very beginning of 51, where the opinion says:
8         "The authenticity of which is not disputed."
9    A.  In the eyes of the court.  Eventually.
10        But if I'm not mistaken, he argued that they
11  were not authentic or something like that, or that they
12  are inadmissible or something of that sort.
13        Again, I wasn't part of the legal team in
14  this case, and I don't know every single detail.  But
15  if I'm not mistaken, this was raised by the lawyers.
16    Q.  You think it was raised and abandoned?
17    A.  I think it was raised --
18        MR. HILL:  Objection.  Lack of foundation.
19        You can respond.
20        THE WITNESS:  It was raised and rejected by
21  the court, if I'm not mistaken.  The court found that
22  it's admissible evidence.
23    Q.  BY MR. YALOWITZ:  Aah, admissibility.
24    A.  Yes.
25    Q.  So let me just make sure my question is clear.

Page 103

1  In the rules of evidence, we have authenticity and
2  admissibility.
3         Do you agree that there is a distinction?
4    A.  There is.  Usually when you argue that a
5  document is not authentic, that's one of the reasons
6  why you say it should not be accepted, should not be
7  admissible.
8    Q.  So a document may be authentic --
9    A.  But not admissible.
10    Q.  -- but not admissible.
11    A.  But if it's not authentic, then it's not
12  admissible.
13    Q.  If it's not authentic, then that would raise
14  a serious problem for --
15    A.  It can be authentic yet not admissible.
16    Q.  Agreed.  And what appears from the court's
17  opinion in the Mentin case is that the authenticity
18  of the documents was not disputed.
19        Do you agree with me?
20        MR. HILL:  Objection.  Lack of foundation.
21  The document speaks for itself.
22        THE WITNESS:  I can understand, from the
23  English translation, what is in the Hebrew.  And when
24  the court says what it says, "is not disputed," it
25  doesn't mean no argument was raised against it.  It's

Page 104

1  not disputed at that point, meaning after the court
2  has decided what it has decided, then from now on for
3  the court it's not disputed anymore.  But that doesn't
4  mean that both sides agreed on the authenticity or
5  the admissibility of the documents.
6         And a paragraph earlier, you know, the
7  court says that Kuperwasser impressed the court
8  "with his knowledge and his professionalism."  So
9  again, the documents were part of it, but I don't
10  see the documents as the main reason why the court
11  thought that Kuperwasser was a reliable witness.
12        MR. HILL:  I should note for the record
13  that I believe that plaintiffs' counsel, in the very
14  case that Mr. Yalowitz is inquiring about, are present
15  in the room.  And I have a suspicion that maybe the
16  extensive colloquy on this point may be for discovery
17  in another matter.
18        I'm not suggesting that Mr. Yalowitz is
19  behaving in bad faith at this point.  But I would
20  suggest that we move on to something relevant to
21  Mr. Dahleh's opinions in this case, please.
22    Q.  BY MR. YALOWITZ:  So, I'm sorry, Mr. Dahleh.
23  I thought that when the judge said the uniqueness of
24  the expert opinion submitted by Kuperwasser is "due to
25  its being founded upon the documents attached to it,"

Page 105

1    that was a suggestion that she found his opinion
2    credible based on the documents.
3        MR. HILL:  Okay.  Wait for a question.
4        What's the question?
5        Q.  BY MR. YALOWITZ:  Do you agree with that?
6        MR. HILL:  Objection.  Lack of foundation for
7    this witness to say what the judge meant in her opinion,
8    which we don't even have the original in front of us.
9        He can respond.
10       THE WITNESS:  It is the uniqueness.  This
11   is not -- this is an additional thing.  The court
12   doesn't say:  I think that Kuperwasser is reliable
13   because of those documents.  The judge says "the
14   uniqueness of the expert opinion."
15       This is on top of the things that she has
16   just written a paragraph earlier, when she said that:
17       "I ... endorse the expert opinion and the
18   testimony of Kuperwasser, who impressed me."
19       That's the most important thing.  She
20   was impressed by him, with his knowledge and his
21   professionalism.  That's why she thought he was
22   trustworthy or reliable.  And then this is an
23   additional thing.
24       Q.  BY MR. YALOWITZ:  Okay.  I think we understand
25   at least the face of the court's opinion.  This was an

Page 106

1    additional reason --
2        A.  Exactly.
3        Q.  -- why she found Kuperwasser to be a credible
4    witness?
5        A.  Exactly.
6        Q.  Now, I just want to direct your attention to
7    the next paragraph, and I'll read it for your benefit.
8    It says:
9        "The PA failed in its attempt to minimize
10   the conclusions stemming from the documents captured.
11   From the documents captured, it emerges that in the
12   course of the Second Intifada, the various organizations
13   joined hands in their efforts to perpetrate attacks
14   against Israel and against Israelis, and it was proven
15   beyond all doubt that they did this under the direct
16   command and supervision of the head of the PA - Yasser
17   Arafat - who guided them and ensured the funding for
18   their activities, including the approval of money for
19   the attackers and their families, and specifying the
20   sums to be given to them."
21       Do you have that paragraph in mind?
22       A.  Yeah, I saw it now.
23       Q.  And what weight did you give, if any, to
24   that factual finding by the court in the Mentin case,
25   when you reached your opinions and rendered your report?

Page 107

1        MR. HILL:  Objection.  Lack of foundation.
2        The witness can respond.
3        THE WITNESS:  The opinion on the documents
4    are related to a specific case.  The same judge in a
5    different case that gave a judgment after the Mentin
6    case had decided that there is no liability over or
7    with regard to the PA and the PLO, notwithstanding what
8    she wrote about those documents that you are referring
9    to, which means that the fact that the court said what
10   the court said regarding those documents, this is a
11   factual, specific decision in this case and this cannot
12   be a precedent for any future case.
13       Even if certain documents were found or were
14   captured and they suggested one thing or the other, that
15   doesn't mean automatic responsibility that the PA or the
16   PLO have.  This was my opinion.  And it seems this is
17   the opinion of the same judge who wrote this paragraph,
18   when she decided in the second case that we mentioned
19   at the beginning of this deposition, the El-Alul case.
20       Q.  BY MR. YALOWITZ:  So let me ask you this.
21       Did you -- in reaching your conclusions and
22   rendering your report, did you read the documents
23   attached to the Kuperwasser opinion?
24       A.  I did not read the documents.  And I was not
25   asked to read the documents.  And for the documents to

Page 108

1    be relevant in any case, they have -- as we said, they
2    have to be authentic, they have to be admissible, and
3    they have to become part of the admissible evidence in
4    the case.  And only then you can take them into account.
5        Q.  And just so I have it clear, the opinions you
6    reached might be different if you reviewed the documents
7    attached to the Kuperwasser case, which I don't have
8    with me.  I'm not suggesting that they are or are not
9    germane to our case.  I'm just saying you'd have to
10   look at them and reach your own conclusions about the
11   relevance?
12       A.  I can't --
13       MR. HILL:  Objection.  Lack of foundation.
14       The witness can respond.
15       Q.  BY MR. YALOWITZ:  Isn't that right?
16       A.  I cannot answer that question without reading
17   the documents and, again, having either a decision or
18   an assumption that the documents are admissible.
19       Q.  So let me just direct your attention to one
20   more paragraph, and then I think we can move off of
21   the topic.  At the bottom of our page 59 in the English
22   translation, the judge says:
23       "The conclusion, and without being
24   too elaborate on this matter, is that examination
25   of the documents attached to the surveys, as well

Page 109

1   as the surveys themselves, leads to one single
2   conclusion, which is that the activities of the
3   various organizations, including the Tanzim and
4   the Al Aqsa Brigades, were all conducted under the
5   orchestration and the funding of the PA and in view
6   of which, even were I to accept the current version
7   of the terrorist" --
8           This is the boy who did the shooting?
9       A.  Yes.
10      Q.  (Reading.)
11          -- "that he had carried out the attack
12  on behalf of the Al Aqsa Brigades, it would not alter
13  the basic liability of the PA, given its being a full
14  partner to what went on in the Al Aqsa Brigades, as
15  evidenced by the documents captured."
16          So do you have that paragraph in mind?
17      MR. HILL:  The record should reflect that
18  you didn't read the entire paragraph.  But if that's
19  the portion you want to focus on, that's fine.
20      MR. YALOWITZ:  Did we get an answer?
21      MR. HILL:  No.  I was making a statement for
22  the record.
23          You can respond.  The pending question is:
24  Do you have that paragraph in mind?
25      THE WITNESS:  Yes.  I've read it now.

Page 110

1       Q.  BY MR. YALOWITZ:  Okay.  So do you agree with
2   me that the reason that the judge was considering the
3   Kuperwasser opinion in this passage of her opinion was
4   to decide on the liability of the PA itself and the
5   link between the PA and the Al Aqsa Brigades?
6       MR. HILL:  Objection.  Lack of foundation.
7   The document speaks for itself.
8           The witness can respond.
9       THE WITNESS:  If I'm not mistaken, this
10  was written in the context of an attempt by the lawyers
11  of the PA to give a different interpretation to the
12  statement or the investigation of that boy in -- when
13  he was captured.
14          And that's -- I mean, that's what they are
15  referring to here, and saying -- the court says, really,
16  in this paragraph, "I do not accept that version" --
17  meaning that version, interpretation -- "and I hereby
18  determine" that "the murderous terrorist was trained
19  in weaponry by the Palestinian Authority."
20          I think they were trying to show or suggest
21  that he was not trained by the Palestinian Authority but
22  rather he was trained in an area within the Palestinian
23  Authority.  And the court said that, based on those
24  documents, it doesn't accept the second interpretation.
25      Q.  BY MR. YALOWITZ:  Right.  And she said,

Page 111

1   even if I did accept it, it wouldn't matter, because
2   the PA was "a full partner to what went on in the
3   Al Aqsa Brigades, as evidenced by the documents
4   captured"; right?
5       A.  No, that's not what the court says.  You're
6   talking about a different thing now.
7           The lawyers of the defendants said that the
8   boy, in this investigation, when he said, I was trained
9   in the PA, he meant, I was trained in the area that is
10  controlled by the PA.  Whereby, the plaintiffs argued
11  that this meant that he was trained by the PA itself,
12  as the PA apparatus.  And regarding this, the court
13  said here at the end of this paragraph that it doesn't
14  accept the interpretation or the version that the
15  defendants' counsel is suggesting.
16          Now, the beginning, it says something
17  different, what we are talking about now.
18      Q.  Right.  So she makes two conclusions in
19  this paragraph; is that right?
20      A.  Yes.  Yes.
21      Q.  The first conclusion is she rejects the
22  testimony; right?
23      A.  Yes.  She rejects the testimony, and she
24  rejects the second version or the interpretation of
25  the written testimony that the boy gave.

Page 112

1       Q.  And then the second finding she makes is that,
2   even if she were to accept the current testimony, she
3   would still find that it wouldn't alter the liability
4   of the PA because the evidence showed that the PA was
5   "a full partner to what went on in the Al Aqsa Brigades,
6   as evidenced by the documents captured"; right?
7       MR. HILL:  Objection.  Misstates the record.
8   The document speaks for itself.
9           The witness can answer.
10      THE WITNESS:  What is the question?
11      Q.  BY MR. YALOWITZ:  The question is:  The second
12  finding that she makes --
13      A.  Yes.
14      Q.  -- is that, even if she were to accept the
15  interpretation of the witness as being location rather
16  than being trained at the specific behest of the PA, she
17  would still find that the PA was liable, given its being
18  "a full partner to what went on in the Al Aqsa Brigades,
19  as evidenced by the documents captured"?
20      MR. HILL:  Objection.  Misstates the record,
21  and the document speaks for itself.
22      Q.  BY MR. YALOWITZ:  Isn't that right?
23      A.  It's not clear, actually, what the judge says.
24          "Given its being a full partner to what went
25  on in the Al Aqsa Brigades" -- I don't understand what

Page 113

1  she means by this.  "What went on in the Al Aqsa
2  Brigades"?  It's not really clear.
3      Q.  You don't think that it's clear from the
4  beginning of paragraph 51?
5      A.  At the beginning, she says it doesn't alter
6  her conclusion that the PA is liable.  That's fine.
7  But this sentence at the end where you're referring
8  me to is not clear.
9      Q.  So do you think that she's referring back
10  to the beginning of paragraph 51, where she says, "The
11  PA failed in its attempt to minimize the conclusions
12  stemming from the documents captured," right there in
13  the middle of the page, and then she goes on for two
14  paragraphs to explain what her conclusions are that
15  she draws from those documents?
16      MR. HILL:  Objection.  Lack of foundation.
17  Calls for the witness to speculate on what the judge
18  means based on a translation of the original document.
19      The witness can respond.
20      THE WITNESS:  I mean, if you read a -- if you
21  read the whole document or the whole paper or the whole
22  page, I think I can -- maybe I can give a better answer.
23      Q.  BY MR. YALOWITZ:  Sure.
24      A.  Because you are choosing, you know, different
25  sentences and so on.

Page 114

1      Q.  Sure.
2      A.  Do you want me to do that?  I can do that.
3      Q.  Fair enough.  I think that would be helpful.
4      A.  Okay.
5      Q.  My focus is on the entirety of 51.  But if,
6  in reviewing 51, you think it would be helpful in
7  answering the questions and the specific question
8  about the alternate finding of the judge, please
9  feel free to refer to any of it.  And also we do
10  have Internet here.  And if it would be helpful to
11  you to see the original, I'm quite sure we can pull
12  it up.
13      A.  You have it in Hebrew?  In Hebrew?  You have
14  it handy?
15      MR. HILL:  Why don't we go off the record,
16  see if we can find the Hebrew version.  And the witness
17  can look at it in Hebrew, and you can pose whatever
18  questions you want.
19      MR. YALOWITZ:  Sure.  Absolutely.
20      MR. HILL:  Without conceding that these
21  questions are proper or relevant, we can proceed in
22  that fashion.  We can go off the record.
23      (Recess from 1:42 p.m. to 1:53 p.m.)
24      MR. YALOWITZ:  We've taken a break, and we've
25  given Mr. Dahleh the opportunity to look at the original

Page 115

1  in Hebrew on our computer.
2      Q.  BY MR. YALOWITZ:  So now my question really
3  is a fairly simple one.
4      Mr. Dahleh, you've had the opportunity to
5  look at all of paragraph 51?
6      A.  Yes.
7      Q.  So as I understand paragraph 51, the judge
8  is making alternate findings.
9      Do you agree with me?
10      MR. HILL:  Objection.  Misstates the record.
11  Document speaks for itself.  Lack of foundation.
12      The witness can respond.
13      THE WITNESS:  The perpetrator in this case
14  tried to argue that he was trained by Al Aqsa Brigades
15  and not by the PA.  That was one argument.  Another
16  argument was that, when he said in his investigation
17  that he was trained in the PA, he meant in the PA
18  areas and not by the PA.
19      The court said it did not accept both
20  arguments of the perpetrator and of -- the
21  interpretation of the counsel of the PA.  But in
22  addition, the court said that, even if it accepts
23  the argument that the perpetrator was trained by
24  the Al Aqsa Brigades and not by the PA, it would
25  still hold the PA liable.

Page 116

1      Q.  BY MR. YALOWITZ:  Thank you.
2      Do you give any weight to that conclusion
3  of the court in expressing your opinion that you
4  rendered in your report?
5      MR. HILL:  Objection.  Vague.
6      The witness can respond.
7      THE WITNESS:  Again, you have to understand
8  that, in each case, you have to have the facts before
9  you so that you can decide.  That's why, in my report,
10  I said it would be very -- I think the wording was this
11  case -- paragraph 2, page 4:
12      "Based on the Israeli law, there is a good
13  chance it would be rejected, inter alia, because it
14  would be very hard to prove the allegations mentioned
15  in the claim."
16      And although, in this case, Kuperwasser
17  testified and the court accepted his testimony and
18  held that he is reliable, in other cases the court
19  might decide otherwise.  And you have, again, to
20  connect each single act to the plaintiff -- to the
21  defendants' intent, to the PA or the PLO.
22      And, again, the same judge, in a similar
23  shooting in the Palestinian -- in the West Bank,
24  against the PA and the PLO, a month ago, only a month
25  ago, decided that there is no responsibility with regard

1  to the PA.
2      Q.  BY MR. YALOWITZ:  So just to come back to
3  the Mentin case, the particular link that the judge
4  is making, as you described it, is between the PA and
5  the Al Aqsa Martyrs Brigades?
6      A.  Yes.
7      Q.  And my question is:  Did that link play any
8  role in your opinions that you rendered in our case?
9      MR. HILL:  Objection.  Vague.
10      The witness can respond.
11      THE WITNESS:  What the judge wrote in the
12  Mentin case regarding the connection between the
13  Al Aqsa Brigades and the PA doesn't mean that this
14  is a res judicata, doesn't mean that this is now a
15  legal precedent, above the fact that this is a decision
16  under appeal, it has been decided in that specific case,
17  based on certain documents, based on certain expert
18  opinion, based on certain surveys, as the judge calls
19  them, and based on the captured documents.
20      That doesn't mean that, in any future case,
21  including the case at hand, that this would be
22  presented, this would be admissible, this would
23  be accepted, and this would influence the different
24  occurrences in the current civil action.  Because
25  we're talking about many occurrences and different

1  bombings and shootings and stuff.
2      Q.  BY MR. YALOWITZ:  So I just want to ask you
3  two follow-ups, and hopefully then we can be finished
4  with the Mentin case.  And I very much appreciate the
5  thoroughness of your responses.
6      It's not a criticism, but I just want to
7  focus very narrowly on the finding that the judge made
8  about the link between the PA and Al Aqsa Brigades and
9  whether you weighed that finding as part of your report
10  or whether you said, in your report:  I'm not basing my
11  report on that finding.
12      MR. HILL:  Objection.  Compound.
13      Q.  BY MR. YALOWITZ:  Or neither.  I mean, it
14  could be neither.  But in any case, that's my question,
15  such as it is.
16      MR. HILL:  Lack of foundation.
17      You can respond.
18      THE WITNESS:  It's a lot of hypotheticals.
19  Again, as I said, there is a good chance it would be
20  rejected because it would be very hard to prove the
21  allegations.  And, again, I'm giving an expert opinion
22  before -- or without hearing any evidence in the case.
23  So I don't know which evidence would be presented or
24  not.  I don't know what will be accepted, what weight
25  it's going to be given, who will testify at all, and

1  so on.
2      So in the context of finding lawsuits against
3  the PA and PLO, in Israel, only three cases were decided
4  on the merits.  One we spoke about earlier, which is the
5  default judgment.  In two cases on the merits, the cases
6  were dismissed, and the court said that the allegations
7  were not proven.  On the default judgment, the court
8  decided eventually -- all Israeli courts decided to
9  vacate the default judgment.
10      Only in the Mentin case, which is pending
11  on appeal, the court found the PA liable, and the
12  court said that the connection with the PA was proven.
13  So if this wasn't -- maybe if this wasn't at all the
14  Mentin case, I would have even -- I would be even more
15  sort of decisive in drawing my conclusion.  I said a
16  good chance, and I said it would be very hard to prove.
17      Q.  BY MR. YALOWITZ:  Okay.  That's helpful.
18  Thank you so much.
19      Now, my second question about the Mentin case
20  is:  The English translation that I have uses the word
21  "surveys."
22      A.  Yes.
23      Q.  And I think of a survey as where you go and
24  ask people, the public --
25      A.  Exactly.  That's what I thought too.

1      MR. HILL:  Wait for him to pose a question.
2      THE WITNESS:  I'm sorry.  You told me that
3  I'm --
4      Q.  BY MR. YALOWITZ:  That's okay.
5      Just having read the original and focused
6  on this evidence, is there a different word that you
7  might use to explain what the judge is talking about
8  there?
9      A.  Will you be paying me my fees as a translator
10  now?
11      Q.  We are obliged to pay you for your time,
12  actually, as a lawyer for your testimony.  So --
13      A.  I think it might be actually -- it's a very --
14  what a surveyor does.  But this is not -- (Examining
15  document on computer screen.)  Something in between
16  analysis and reporting.  Report, analysis.  I think
17  that's a better translation.
18      Q.  Thank you.  That's very helpful.
19      Okay.  So the next topic I wanted to ask
20  you about -- and you can feel free to continue to look
21  over Mentin, but I don't have any more questions on it.
22      A.  She needs the laptop, so --
23      Q.  Thank you.
24      You've had the opportunity to read the report
25  of Professor Shnoor?  Have you had the opportunity to

Page 121

1    read his report?
2        A.  Yeah, I read his report.  In our terms,
3    he's a doctor, not a professor.  In American terms,
4    I know everybody who teaches at a law school becomes
5    a professor.  But he still has to sweat, as we say,
6    unfortunately, until he becomes a professor in Israel.
7        Q.  Well, in any case, why don't we just call it
8    "the Shnoor report."
9        A.  We can call him Dr. Shnoor.  That's fair.
10       Q.  I noticed, in his report, he commented on
11   some prejudgment attachment cases.
12          Do you recall that?
13       A.  No.  What do you mean?
14       MR. YALOWITZ:  Let's look at it together.
15   We'll mark it as the Shnoor report.
16       MR. HILL:  Off the record.
17       (Discussion held off the record.)
18       MR. YALOWITZ:  We're back on the record.
19   I'm sorry.  I've marked an incomplete copy, as counsel
20   pointed out.  So we're going to remark a complete copy
21   as Exhibit 110.
22       (Plaintiffs' Exhibit 110 marked.)
23       Q.  BY MR. YALOWITZ:  So do you have 110 before
24   you?
25       A.  (Examining.)  Yes.

Page 122

1        Q.  All right.  And could you look with me on
2    page 4, paragraph 7.
3        A.  Yes.
4        Q.  So Dr. Shnoor is pointing out about some
5    cases, interim decisions in pending cases imposing
6    prejudgment attachments on the PA.
7           Do you see that?
8        A.  Yes, I do.
9        Q.  And did you -- when you received his report,
10   did you look at some of those cases?
11       A.  I -- yeah.  Yeah, I think I did.
12       Q.  What is your view about his comment here on
13   paragraph 7?
14       A.  It's true that prejudgment attachments were
15   issued against the PA in certain cases.  And in those
16   cases, usually the prejudgment attachment is a temporary
17   order, and it's issued on what we call prima facie, a
18   prima facie cause of action.  It's not -- it's in the
19   very early stages of the case, where the court believes
20   that the plaintiff -- that the lawsuit of the plaintiff
21   is not really baseless, that it has some validity that
22   is worth giving that prejudgment attachment.
23       Q.  So would it be fair to say that those cases
24   are consistent with your view that you've expressed
25   today, that the liability of the PA for acts of

Page 123

1    terrorism would depend on the evidence that's actually
2    brought to the court?
3        A.  It's different.  Always the liability of
4    anybody depends on the facts.  That's safe to say.
5    And on top of that, here again, it's prejudgment
6    attachments.  They wanted to attach money that
7    Israel has or collects on behalf of the PA.  And
8    certain courts said that this should be done.  And
9    when doing so, one of the conditions that the court
10   should look at is whether -- whether we are talking
11   about a baseless case or whether we are talking about
12   a case that has some chances to be won at the end.
13          And if it was a baseless case at the very
14   beginning, before hearing any witness or hearing any
15   evidence, then the court wouldn't actually grant the
16   prejudgment attachment.  But the court, in those cases,
17   thought that it's not a baseless case and that there
18   is a chance -- a good chance or a chance, a fair chance
19   that those cases eventually might end with a victory
20   for the plaintiff.  And, therefore, they decided to
21   issue the prejudgment attachments.
22       Q.  Thank you.  So now I wanted to ask you about
23   breach of statutory obligation.
24       A.  Yes.
25       Q.  We talked a little bit about that earlier

Page 124

1    because Judge -- how do you say her name?  Ganot?
2        A.  Ganot.
3        Q.  Judge Ganot, in the Mentin case, did an
4    analysis about the Interim Agreement and whether it
5    had been incorporated into the law of the State of
6    Israel.  I want to ask you about some other statutes.
7           So both Dr. Shnoor and then Judge Lamberth,
8    in the Wultz case, pointed to some other statutes.
9           Do you recall those?
10          And I'll direct you -- it's not a memory
11   quiz -- to paragraph 41 on page 14 of his report.
12   Let me know when you've had a chance to review that
13   paragraph.
14       A.  (Examining.)  Yes.
15       Q.  Do you think that Dr. Shnoor fairly describes
16   the statutes that he's referring to in paragraph 41?
17       A.  I don't recall by heart the text of the
18   statutes.  But I guess Dr. Shnoor translated --
19   translated the statutes in Hebrew.
20       Q.  And do you think that he's described them
21   fairly, as you understand those statutes?
22       MR. HILL:  Objection.  Lack of foundation.
23   But the witness can respond if he knows.
24       THE WITNESS:  Again, I don't have them
25   before me.  But I don't have a reason to believe that

Page 125

1  Dr. Shnoor would distort the language or the meaning
2  of those statutes.
3      Q.  BY MR. YALOWITZ:  Did you notice that
4  Dr. Shnoor cites a case from the United States called
5  Wultz?
6      A.  Yes.
7      Q.  And that was decided by a judge named Royce
8  Lamberth?
9      A.  Yes, I've seen that.
10      Q.  Did you encounter Judge Lamberth when you were
11  in Washington?
12      A.  Did I what?
13      Q.  Did you encounter Judge Lamberth when you were
14  in Washington?
15      A.  I don't recall.  I don't think so.
16      Q.  He's a colorful personality.  I know him a
17  little bit.
18      A.  Really?
19      Q.  Yes.  So he also refers to these three
20  statutes as forming a basis for a statutory obligation.
21      Do you recall that?
22      A.  I recall Dr. Shnoor citing his decision on
23  this.
24      Q.  Did you have an opportunity to go look at
25  Judge Lamberth's decision?

Page 126

1      A.  No.
2      Q.  All right.  Do you disagree with Dr. Shnoor
3  that these three statutes could form the basis for a
4  statutory obligation under the law of Israel?
5      A.  I do.  I think you need to remember that those
6  are criminal laws in Israel itself.
7      Now, we are talking, if I understand -- I
8  mean -- and, again, I don't have the -- I don't have
9  that -- we don't have the full factual picture.  But
10  if we're talking, for example, about transfer of money,
11  or, you know, whatever, helping these organizations
12  and so on, I assume that if you want to speak about
13  statutory obligation vis-a-vis the PA with regard to
14  those sections -- for example, I'll assume again that
15  any money given from the PA to any of these groups
16  would occur outside of Israel.
17      And I don't think that Israeli law would
18  have extraterritorial jurisdiction, so that this act,
19  you know, giving money from the PA to one of those
20  organizations, would be conceived illegal under the
21  Israeli criminal code.
22      Q.  So your concern is extraterritoriality?
23      A.  Yes.  That's one of them.
24      Q.  Anything else?
25      A.  I mean, again, we're talking generally.  You

Page 127

1  have to direct me if you are talking about -- you know,
2  what kind of statutory obligation you're talking about
3  and then what breach, what harm, I mean, in a specific
4  context.
5      Generally speaking, that's my -- if that's
6  my general observation, that's my general comment.
7  But maybe, when you go into further details, we can
8  also discuss that.
9      Q.  Do you have experience with the new penal
10  code of the State of Israel?
11      MR. HILL:  Objection.  Vague.
12      But you can respond.
13      THE WITNESS:  If I know the penal code or
14  have experience?  I don't follow.
15      Q.  BY MR. YALOWITZ:  There's a statute called
16  the New Penal Code of the State of Israel.
17      Are you familiar with that statute?
18      A.  Yeah.  I mean, familiar generally.  I'm not
19  a lawyer who deals with criminal cases, but --
20      Q.  And there are provisions in that statute
21  that discuss when the penal code will apply
22  extraterritorially and when it will not; right?
23      A.  Yes.
24      Q.  Did you familiarize yourself with those
25  provisions?

Page 128

1      A.  Not before this deposition.  Generally
2  speaking, I mean, I have an idea.  I know.
3      I mean, it's -- but again, giving money --
4  if someone is giving money outside of Israel for an
5  organization, like from the PA or to the Fatah or
6  whatever, I doubt that this would be deemed as an
7  offense under the penal -- the Israeli Penal Code.
8      And here it's referred to as "the penal code,"
9  not "the new penal code."  But I guess we're talking
10  about the same penal codes there.  In the Shnoor report,
11  it's "penal code," not "new penal code."
12      Q.  And in holding that opinion, I take it you
13  have not read Judge Lamberth's decision in the Wultz
14  case?
15      A.  I didn't read it.  I think -- was it a
16  default decision as well?  I'm not sure.  I didn't
17  read it, anyway.
18      Q.  Well, anyway, since you asked, I'll tell you.
19  It was -- it's against the Bank of China, so they have
20  U.S. counsel who litigated the case.  Just since you
21  asked.
22      A.  Thank you for telling me.
23      Q.  Now, I also want to ask you a little bit
24  about secondary victims.
25      A.  Yes.

Page 129

1    Q.  I see you're still looking at the Shnoor
2  report.
3    A.  No, it's okay.
4    Q.  If you have an additional comment, you're
5  always welcome to make it.
6    A.  No, I'm okay.
7    Q.  The topic I wanted to address with you was
8  the secondary victims.
9    A.  Secondary.
10    Q.  So the first thing I wanted to ask you is
11  that the Peled case dealt with secondary victims; is
12  that right?
13    A.  There were heirs and secondary.  I mean,
14  that's the argument.
15        You're talking about the default judgment?
16    Q.  Yes, sir.
17    A.  Yeah, in the default judgment, the plaintiffs,
18  as far as I recall, part of them were heirs of the
19  deceased, and others were relatives of the deceased
20  that would, if granted eventually compensation, might
21  be considered secondary victims, but they were not.
22  Again, to be a secondary victim, you need to be --
23  there are certain criteria.
24        When you file a lawsuit in Israel -- anybody
25  can file a lawsuit at any time against anybody.  So

Page 130

1  the entire family can join, or the entire clan, or the
2  entire village, can join a lawsuit because of the death
3  or the murder of one person.  But you need to see what
4  the judgment is, what eventually the court says, if
5  the court accepts the status, so to speak, or grants
6  compensation to all the plaintiffs, if the court deems
7  those plaintiffs as primary or secondary victims.
8    Q.  So I think we talked a little bit earlier
9  about the procedural posture of a default judgment is
10  ex parte?
11    A.  Exactly.
12    Q.  And so does the judge in such a situation
13  have an obligation to act as something of a protector
14  of the judgment, to make sure that people who have no
15  claim aren't getting a default judgment?
16        In other words -- let me strike the question
17  and ask a different question, because I don't think
18  it's a very good one.
19        Does the judge have an obligation to determine
20  whether the plaintiff has a prima facie claim in a
21  default judgment situation?
22    A.  Not really.  It depends what kind of case
23  it is.  If it is -- I mean, in certain cases, just by
24  the mere fact that the defendant did not file an answer,
25  that's enough reason to grant a default judgment.  In

Page 131

1  certain cases, by the civil procedure code in Israel,
2  for example, even if there is no answer, the judge
3  is not allowed to give -- to grant a default judgment
4  unless some evidence is presented to the judge.
5        In both cases, though, the judge is not really
6  an automatic machine that just signs the judgment.  Yet
7  the judge doesn't become the counsel of the defendants
8  who did not file the answer, which means that the judge
9  usually uses some kind of discretion, and only if the
10  judge thinks it's totally nonsense, what the plaintiff
11  is asking for.  Otherwise, the judge would grant what
12  the plaintiff is asking for.
13    Q.  So which kind of a case was Peled?  Was
14  Peled a case where the mere filing of an answer was
15  sufficient?  Or did the judge, in that case, have to
16  make some kind of a prima facie determination?
17    A.  It's -- there wasn't an answer.  The judge
18  said that the defendants were actually served -- there
19  was -- legally they were served the Complaint, they
20  didn't file an answer, and then the plaintiffs asked
21  for a huge amount of money as compensation, based on
22  an American -- an American court.
23        And the judge said that there is no reason --
24  that it doesn't exist in the Israeli legal system, that
25  is, to give such amounts or huge amount of compensation,

Page 132

1  doesn't have any basis in the Israeli law.  Therefore,
2  he did not grant the amounts that were asked for.  Yet,
3  the judge or the registrar of the District Court granted
4  still --
5    Q.  $2.7 million.
6    A.  -- a huge amount of money, relatively
7  speaking, to what courts in Israel decide on similar
8  cases.  So the judge did some kind of trying to analyze
9  or to weigh the request, but he didn't go too far,
10  because there was no response from the side of the
11  defendant.
12        And when the motion to vacate the default
13  judgment was brought, the three judges that heard the
14  arguments of the defendant afterwards thought that this
15  default judgment wasn't correct and has to be vacated,
16  and it was vacated.
17    Q.  It was vacated -- I think we went over it.
18    A.  Yes.
19    Q.  It was vacated for the reasons we discussed
20  earlier; right?
21    A.  Yes.  Of course, yes.
22    Q.  Now --
23    A.  One of the things, for example, sorry to --
24  that it was vacated, that the registrar in the District
25  Court in Tel Aviv says that the default judgment gave

Page 133

1  punitive damages for a huge amount of money, something
2  that is questionable in the Israeli legal system.
3  That's his words.  And, therefore, it's -- basically
4  what the judge is saying here is that the judgment
5  is incorrect.
6       I mean, other than the fact that the
7  defendant should get their day in court, as we say
8  here in our local legal language, and they should be
9  heard, they should have a chance to defend themselves,
10  that judge said punitive damages that were granted
11  to the plaintiffs with said high amounts was basically
12  incorrect and, therefore, this is a good reason to
13  vacate the judgment and give a chance for both parties
14  to raise their arguments and give a decision or a
15  judgment on the merits.
16      Q.  Could you just show me where in your report --
17      A.  The judge says that?
18      Q.  -- the judge says that the decision was
19  basically incorrect?
20      A.  Page 10, paragraph 16.  No, wait.  I'm sorry.
21  Here.  (Indicating.)
22          MR. HILL:  What's the pending question?
23          MR. YALOWITZ:  Where in the report does it
24  say --
25          THE WITNESS:  Here, for example, in

Page 134

1  paragraph -- I'm sorry?
2          MR. HILL:  Just let me figure out what the
3  question is.  Let her read it first.
4          (Pending question read.)
5          THE WITNESS:  Paragraph 18, page 12.  In the
6  second paragraph, okay, the last three -- in the last
7  three sentences:
8          "And since there is no final binding Supreme
9  Court precedent as to punitive damages, the defendants
10  have succeeded to show, on its face, that they have a
11  defense."
12      Q.  BY MR. YALOWITZ:  I'm sorry.  You're on
13  page --
14      A.  Page 12, paragraph 18, the last three or
15  four --
16      Q.  (Reading.)
17          "Without expressing an opinion."
18      A.  Yes.  And the second one -- the second to the
19  end.
20      Q.  (Reading.)
21          "The defendants have succeeded to show, on
22  its face, that they have a defense."
23      A.  Yes.  And regarding the punitive damages,
24  this was actually another way, a diplomatic way, as
25  courts do, of saying that this was incorrect, or it's

Page 135

1  not easy to grant punitive damages at the said amounts
2  that were granted in that default judgment.
3      Q.  So what do you make of the first eleven words
4  of that sentence?
5      A.  You're talking about "and since" -- starting
6  from "and since there is no final"?
7      Q.  No, no.  The part where the judge says:
8          "Without expressing an opinion as to the
9  chances of the defense."
10     A.  Yes.  Those, you mean?
11     Q.  Right.  See, when I -- tell me if you agree
12  with me or disagree with me.
13     A.  Yes.
14     Q.  But when I see a judge say "without expressing
15  an opinion," I think that what the judge is saying is
16  that I'm not expressing an opinion, I just think this
17  is something that ought to be decided, and both sides
18  have arguments, and we are going to let it be decided.
19         MR. HILL:  That wasn't a question.
20     Q.  BY MR. YALOWITZ:  Do you agree with that or
21  disagree with that?
22         MR. HILL:  Objection.  Vague.
23         But the witness can respond.
24         THE WITNESS:  See, there was here a default
25  judgment.  In the default judgment, the judge said:

Page 136

1  I grant punitive damages.  Then a motion was brought
2  before the judge.  In that motion, they say that the
3  Israeli law doesn't recognize punitive damages as such
4  or in such amounts.
5          The judge, when he -- when the judge hears
6  the motion to vacate the default judgment, the judge
7  is not in a position to decide whether now he is going
8  to grant punitive damages or not.
9          Had the judge agreed that there is punitive
10  damages in Israel, he wouldn't have mentioned this
11  at all.  But at the same time, the judge doesn't want
12  to say at this stage that -- that there is no punitive
13  damages at all.  So he goes in between, sort of in a
14  diplomatic way, saying they have a defense.
15         He hints that this -- he states why:  Because
16  there is no precedent in the Supreme Court that says
17  that this category is recognized.  But at the same time,
18  he doesn't say they don't -- they will not -- they
19  will not get ever punitive damages, and he doesn't
20  say otherwise.
21     Q.  BY MR. YALOWITZ:  All right.  I think I
22  understand your opinion.  I mean, we can agree to
23  disagree on this point.
24     A.  I know.  But if it was -- this was an appeal
25  on the merits.  If it was not a default judgment -- if

Page 137

1    it was not a default judgment, it would be easier for
2    the judge to say this opinion, to say:  I don't think
3    there is punitive damages in Israel, therefore I don't
4    want to grant all in those amounts.  It's unprecedented
5    in Israeli law, and therefore I grant the following
6    amount.
7         But since it's a default judgment and he
8    didn't want to say anything that is binding, because
9    he actually now is opening the door for the defendants
10   to come to the case, and he wants both parties now to
11   raise their full arguments.  So he didn't want also to
12   infringe upon the rights of the plaintiffs while helping
13   the defendants to bring their defense before the court.
14        Q.  So I want to ask you one more question about
15   Peled, which was:  Was there any argument in Peled that
16   some of the plaintiffs did not have standing because
17   they were secondarily harmed?
18        A.  I don't recall that.  There might be, but
19   I don't recall it.
20        Q.  You talk in your report about secondary harm,
21   like on pages 21 and 22, paragraph 54.
22        A.  Yes.
23        Q.  And I just want to ask you about item "b"
24   in paragraph 54.
25        A.  Yes.

Page 138

1         Q.  You mentioned that the family member who
2    suffers secondary harm has to receive the impact
3    regarding the incident through an intermediary or --
4    let me say the question again, because I don't think
5    that's a good question.  So I'll strike the question.
6         My question is:  Have you had a chance to
7    read paragraph 54.b?
8         A.  Yes.
9         Q.  All right.  Can you please explain what you
10   mean by the term "through an intermediary" in that
11   paragraph?
12        A.  A typical situation was when somebody, a
13   family member or family, a relative, saw the accident,
14   saw the shooting, a car accident, saw the killing,
15   the injury of a family member.  That was the typical
16   situation.
17        But later on, the case law broadened that
18   definition or that situation.  And they said that
19   it's possible that, if it's they get the news about
20   the incident through an intermediary, that still they
21   might be considered -- if the other conditions are met,
22   they might be considered as secondarily harmed.
23        Q.  So is that established now, that in that
24   factual scenario, the family member has standing,
25   assuming that they meet the other elements that you've

Page 139

1    mentioned, proximity in time, severe mental injury?
2         A.  Yes.  As I said, it was expanded.  And the
3    case law in Israel does allow for that possibility.
4         Q.  Thank you.
5         I want to ask you also about paragraph 64
6    of your report, which concerns -- oh, no, I'm sorry.
7    I don't want to ask you about 64 yet.
8         With regard to the law of -- I'm sorry.
9    I wanted to ask you about 65, with regard to pain
10   and suffering and the shortening of life expectancy.
11        A.  Yes.
12        Q.  So could you just describe what are the
13   factors that are weighed with regard to the pain,
14   suffering, and the shortening of life expectancy?
15        MR. HILL:  Objection.  Vague.
16        But the witness can respond.
17        THE WITNESS:  Pain and suffering usually is
18   the pain and suffering of the deceased himself.  We
19   are talking about somebody who was shot, for example,
20   or who was hit --
21        Q.  BY MR. YALOWITZ:  Killed?
22        A.  Okay.  If he was shot and killed immediately,
23   the assumption is that the pain and suffering is not
24   tremendous.  If we speak about somebody who was shot
25   but then he was suffering for a long period of time

Page 140

1    and he died three months after, a week later, whatever,
2    a year later, then the pain and suffering is much
3    longer.  And, therefore, the amount of compensation
4    is much higher.
5         The shortening of life expectancy for the
6    deceased has to do basically with the fact that the
7    life has been shortened and, therefore, the deceased
8    lost the enjoyment of life.  And here the two main
9    factors are what was the age of the deceased when he
10   died and, the second one, what quality of life did he
11   have -- did he or she have prior to the death and was
12   expected to have.
13        So if he was younger, this means the value
14   of the shortening of life is bigger or is higher.  If
15   his life was better in terms of the quality of life --
16   and it's a weird notion.  But if we're talking about
17   somebody who was a professional and so on and had a
18   good life, whatever -- and, again, it's all a valuation
19   by the court -- then this would be considered in a
20   different way than somebody who was anyway living in
21   debt and was maybe a poor guy.
22        This is the system.  Those are the main
23   two factors when the court decides on the amount
24   of compensation given for the shortening of life
25   expectancy.

Page 141

1       Usually the courts grant one amount for
2  both categories of damage, especially if the death
3  occurred immediately after the incident.  And in this
4  case, the main amount would be for a shortening of
5  life expectancy.
6       Q.  Thank you.  That's very helpful.
7       And you mentioned, in paragraph 65 in your
8  report, that:
9       "The amounts granted under this category
10  are based on an intuitive assessment."
11       Is that right?
12       A.  Yes.  It's an assessment by the court.
13  There's no -- it's not mathematics.  There's nothing
14  here.  Unlike other categories of damage -- pain
15  and suffering in traffic accidents, in Israel, it's
16  a mathematical formula.
17       The same in the Palestinian Authority in law.
18  You just put the numbers, how many days there are --
19  the injured was in the hospital, what is the person's
20  permanent disability, how many surgeries she or he has
21  undergone, if it's in the Palestinian area, and the same
22  with loss of earning.
23       I've given an example in the report for
24  calculating the loss of earning.  It's a mathematical
25  formula.  Here it's assessment by the court.  But, I

Page 142

1  mean, it's not assessment in a way that it's a free
2  hand.  And there's still a range, a reasonable range
3  that the court based their assessment on.
4       And they take other precedents, recent cases
5  in which the court has granted compensation in this
6  category of damage, and they compare, you know, in
7  terms of the age of the deceased, the suffering, and
8  so on, and they give the amount.  So the amount that
9  I think was given in different cases that I cited in
10  my report were around 750,000 shekels to 1 million.
11       Q.  Is this an issue that is reviewed on
12  appeal de novo, or is it reviewed on appeal like
13  the credibility of witnesses?
14       MR. HILL:  Objection.  Lack of foundation.
15       But the witness can respond.
16       THE WITNESS:  Can you repeat the question
17  and explain a bit?
18       Q.  BY MR. YALOWITZ:  Sure.  Sure.  Let me give
19  you a little background.
20       So remember earlier we were talking about
21  appeals and the credibility of witnesses, and we
22  discussed the standards of review for that topic?
23       A.  Yes.
24       Q.  So with regard to the intuitive assessment
25  made for pain, suffering, and the shortening of life,

Page 143

1  is that reviewed on appeal under a similar standard
2  as the credibility of witnesses?
3       A.  No.  It's not a similar standard.  It's
4  different.  The court, in those issues, have more
5  space for intervention.  The Appellate Court, it's
6  a bigger space for intervention.  Yet the Appellate
7  Court restrains itself, usually, from intervening.
8       And the Appellate Court usually, when
9  deciding on appeals on those issues, they look at the
10  full picture, which means that, even if they think that
11  on life expectancy the court was too generous with the
12  plaintiffs, but if it was not -- if, on the other hand,
13  it was less generous on another category of damage but,
14  as a whole, the amount of compensation granted is
15  reasonable, fair, okay, then the court would say,
16  I will not intervene.
17       Q.  So when we're finished, when we're off the
18  record, I'll describe the American system, which is
19  quite complex.
20       A.  That would be lovely.
21       Q.  I think perhaps even more complex than yours.
22       Okay.  So now I want to ask you:  Did you
23  read Dr. Shnoor's comments about secondary victims?
24       Let's just look at that together and see if
25  we can make sure you're together on this.  I think he's

Page 144

1  paragraph 61 on this.  Yes.  Take a look at paragraph
2  61.
3       A.  Uh-huh.
4       Q.  Anyway, do you have any disagreement?
5       I read your opinion and his opinion as close
6  in this regard.
7       A.  Yes.  He doesn't say he disagrees.  He doesn't
8  say he disagrees on this.
9       Q.  Okay.  I just wanted to make sure I had that
10  right.
11       So the final thing I want to ask you about
12  is the calculation of economic damages which you made
13  for some of the --
14       A.  Yes.
15       Q.  -- some of the plaintiffs.
16       And, in particular, I wanted to focus on the
17  case of Dr. Goldberg, who you treat at page 28, where
18  you begin your comments about him.
19       A.  Yes.
20       Q.  By the way, did you read the report of
21  Weinstein that calculated economic damages of
22  Dr. Goldberg?
23       A.  No.
24       Q.  So you didn't have anything that dealt with
25  his particular expected income; right?

1    A.  No.  I think I mentioned this in the report,
2  that counsel had informed me that the plaintiff did
3  not produce this report.  And that's what I mentioned
4  in my report.
5    Q.  So let me ask you about some of the inputs.
6  What did you assume for life expectancy of
7  Dr. Goldberg?
8    A.  I calculate -- in calculating the loss of
9  earnings, the importance is not the life expectancy.
10   Q.  You assume --
11   A.  The importance is the retirement age.
12   Q.  You assume that Dr. Goldberg would retire
13 at age 67?
14   A.  That's correct.
15       MR. HILL:  I'm not sure he is a doctor, but
16 you're free to refer to him however you wish.
17       MR. YALOWITZ:  Oh, I think you're right.
18 I think he was working toward his Ph.D. before his
19 life was cut down.  Thank you.
20   Q.  BY MR. YALOWITZ:  Were you advised as to
21 what Mr. Goldberg's profession was?
22   A.  No, just -- I mean, not his profession and
23 not his salary.  And therefore, I assumed, for the sake
24 of calculation, the average salary in Israel.
25   Q.  So do you have a view as to how one would go

1  about calculating the expected salary of a professional
2  psychotherapist?
3        MR. HILL:  Incomplete hypothetical.  Misstates
4  the record.
5        But the witness can respond.
6        THE WITNESS:  You mean that was his
7  profession?  Or that's what he was doing, Goldberg?
8    Q.  BY MR. YALOWITZ:  Yes.
9    A.  If it was in Israel, of course, I can tell
10 you what the situation would be.  It's a matter of,
11 I mean, evidence and assumptions that the court will
12 make based on this evidence.
13       It's -- you know, the court might say that,
14 you know, based on the evidence, that he needs so-and-so
15 years until he graduates and then so-and-so years for
16 training and then, you know, the normal course of
17 business for graduates like him.  You know, at the
18 beginning, he works in a medical center or whatever
19 and then he becomes independent and so on.
20       There's a lot of assumptions that it's very
21 hard to tell right now because, you know, we do not
22 have enough information.  But that's how the courts
23 in Israel usually deal with this issue.  If you have
24 somebody who is an adult, who has chosen a career,
25 and who is studying at that time and, you know, after

1  presenting all the evidence, if the court thinks the
2  deceased was most likely or was supposed most likely
3  to succeed in his studies and become a professional
4  psychiatrist or physiotherapist or whatever it is,
5  then this would be taken into account, of course.
6    Q.  In estimating expected future earnings,
7  is it customary to use average wages of similar
8  professionals in the field?
9    A.  This is an indication.  It is an indication.
10 The court will take this into consideration.
11       And, again, we have to prove -- again, I don't
12 have enough facts about the late Mr. Scott Goldberg.
13 But if you are talking about somebody who is studying
14 medicine and he is in his first year of studies, so
15 then the court -- even though the court knows what
16 the -- let's say, what the general average of medical
17 doctors in Israel is, it might not assume that this
18 is the track or that this is the path for the said
19 plaintiff.  If you're talking about somebody who is
20 doing his "staj" or his training after finishing his
21 six years, then it's more probable.
22       But even then, it's very hard to anticipate
23 exactly the track, because there are different kinds
24 of doctors, different kinds of salaries.  But then it
25 would be safe to go for the average salary of doctors

1  in Israel, if he was at that stage.
2    Q.  Does Israel have a concept of damages
3  where exact calculation is difficult because of the
4  circumstances that have occurred, that the burden of --
5  that would fall on the defendant, the burden of
6  uncertainty would fall on the wrongdoer?
7        MR. HILL:  Objection.  Vague.
8        The witness can respond.
9        THE WITNESS:  The Israeli courts say more,
10 especially in the context of calculation of damages,
11 that sometimes when there is this ambiguity or it's
12 vague, the courts give damage -- they calculate based
13 on some kind of -- not exact calculation.  They call
14 it in Hebrew "derekh umdan," which is "assessment."
15 They assess.
16       And so they say, okay, we assess that the
17 amount is the following, although we are not clear
18 on the exact amount, so that they will not reject the
19 petition to grant compensation in a certain category
20 of damages if they didn't have full evidence.  They
21 will grant something based on the assessment.
22   Q.  BY MR. YALOWITZ:  Now, in estimating expected
23 future earnings, have you heard of using price lists
24 published by the Zap Group?  Do you know that source?
25   A.  Zap?

1    Q.  Zap.
2    A.  Prices -- I know Zap.  In Israel?
3    Q.  In Israel, yes.
4    A.  It's prices for products.  That's what I use
5  it for.
6    Q.  Sure.  Do they also have prices for services?
7      MR. HILL:  Objection.  Lack of foundation.
8      THE WITNESS:  I haven't seen that, and I don't
9  think this is a credible source.  In court I haven't
10  encountered this, nor as a lawyer for plaintiffs,
11  neither as a lawyer for defendants.  It's -- I don't
12  think it's a credible source for the courts to decide
13  based on.
14    Q.  BY MR. YALOWITZ:  What source would you use
15  if you wanted to evaluate the prospective earnings of
16  a professional, like a psychotherapist?
17    A.  Maybe the Israeli statistical bureau, the
18  Israel Bureau of Statistics, if they have information
19  or they have -- there is an organization called the
20  Histadrut Harofim, which is the doctors' union
21  organization, if they have enough credible data about
22  this.
23      It's not easy.  I've tried to do that in one
24  case for a medical doctor.  I didn't find one source
25  that is enough credible at that type of information,

1  either they don't want to disclose it or because it's
2  not important.
3      They have that -- Israel has that average
4  wage in the general economy.  And in the field of, you
5  know, medicine, for example, you have different types
6  of doctors:  Independent, working for the government,
7  for private hospitals, and what have you.  So you're
8  talking about different groups with huge gaps of
9  salaries, depending on the -- you know, on the
10  expertise.  How many -- you know, if the guy has
11  undergone only normal medicine or if he has done
12  post-doctoral trainings and studies.  It's really
13  very wide and broad.
14    Q.  There are various levels of professionals,
15  some who work privately, some who work on state salary,
16  and then is there an intermediate level as well?
17      MR. HILL:  Objection.  Vague.
18      The witness can respond.
19      THE WITNESS:  Are you talking about doctors
20  now?
21    Q.  BY MR. YALOWITZ:  Yes.
22    A.  Psychiatric doctors or, in general, doctors?
23    Q.  Psychiatric.
24    A.  Psychiatric?  Yeah, some of them work for the
25  government, some might work for private hospitals, some

1  might have their own clinic, some might combine.  It's
2  different types.
3    Q.  So all of those, again, that's one of those
4  situations where estimating Scott Goldberg's future
5  earnings, you'd want to have some sense of what his
6  career trajectory was?
7    A.  You need to know that first.  And maybe --
8  for example, maybe the family would present evidence
9  that the case was heard in Israel, that he was very much
10  interested in working in an organization in his own town
11  to help whatever, or he was -- or he had -- or he has
12  a contract to work in some hospital, you know, whatever.
13  Based on that information, the court starts assuming
14  different assumptions and assessing the potential
15  income.
16    Q.  What would be a way of estimating a
17  professional's expected hours of work per week?
18      MR. HILL:  Objection.  Vague.  Lack of
19  foundation.
20      The witness can respond.
21      THE WITNESS:  You mean how many hours a
22  professional would work per week?
23    Q.  BY MR. YALOWITZ:  Yes.
24    A.  What is the best way to do that?
25    Q.  Yes.

1    A.  Professionals -- I think there are different
2  groups that do this, you know, different private
3  businesses, and even maybe the government have some
4  surveys about that.  But it's -- you know, it's
5  different.
6      I mean, I've read different -- go back to
7  the word "surveys."  I've read different surveys
8  comparing the number of hours that professionals work
9  in Israel and in the other OECD countries, and the
10  number of hours that employees in general work in
11  different OECD countries.
12      I guess there are groups, business groups,
13  business corporations that are interested in this
14  information and might be gathering this.  But, again,
15  it's based -- sometimes they call me and ask me these
16  questions so they can have an idea.
17      It's not really something that is credible,
18  because, you know, they ask and it depends which week.
19  Sometimes they call me and ask this week, and I might
20  say I worked 70 hours.  And another week, you know, it
21  might be much less than that.  So it's not -- especially
22  with professionals, it's not based on real calculation.
23    Q.  Have you heard of something called a working
24  day variation table?
25    A.  The working -- no.  Maybe in Hebrew, if you

Page 153

1   have a name. I don't know.
2        MR. YALOWITZ: Do we know it in Hebrew?
3        DR. SHNOOR: No.
4        THE WITNESS: Tell me more about it. Maybe
5   I'll --
6        Q. BY MR. YALOWITZ: The Israel Hours of Work
7   and Rest Day Law of 1951?
8        A. The law, I know about it, yeah. The law
9   itself, I do know.
10       Q. And what does the law teach us, if anything,
11  about expected work hours?
12       MR. HILL: Objection. Vague. Foundation.
13       The witness can respond.
14       THE WITNESS: The law speaks about 45 hours
15  per week.
16       Q. BY MR. YALOWITZ: Is that a reasonable basis
17  for estimating expected work weeks for professionals?
18       MR. HILL: Objection. Lack of foundation.
19       The witness can respond if he knows.
20       THE WITNESS: It depends what kind of
21  questions you're talking about. I guess for lawyers
22  this is not enough. But I know doctors that work four
23  hours a day, you know, so a total of 16, 20 hours a
24  week. So I guess -- it depends, I guess, what kind
25  of professional we're talking about. It's different.

Page 154

1        Q. BY MR. YALOWITZ: Have you seen cases where
2   individuals are assumed to continue working part time
3   after the normal retirement age?
4        A. Yes.
5        Q. And is that based on -- what evidential basis
6   do the plaintiffs bring for that assumption?
7        A. You -- usually you are talking about cases
8   that the plaintiff himself is beyond the age. That's
9   one example. I mean, that's the best evidence. You
10  have a doctor who's 70 and he's still working and has
11  a successful practice, or a lawyer who is, whatever, 72,
12  and he's still going to his law firm, and he's a very
13  well-known professional. That's one. Or very close
14  to that age, somebody who is 65 and all the signs show
15  that the guy wants to continue in his business or
16  whatever he is doing.
17       Usually it has to be somebody who has his
18  own -- is independent. Usually it's an independent
19  business. Somebody who is working who is an employee,
20  then the retirement age is 67, and then the calculation
21  is until the age of 67. It's only with those who are
22  independent professionals, who have their own business,
23  that the court might assume a different age. And in
24  certain professions. Not all professions.
25       Q. Would the survey by the ministry for senior

Page 155

1   citizens be a good source of evidence about that kind
2   of an assumption?
3        MR. HILL: Objection. Lack of foundation.
4        THE WITNESS: I don't know what that is.
5        Q. BY MR. YALOWITZ: Anything else besides what
6   you've described that would be a source that you might
7   refer to in your work?
8        MR. HILL: Objection. Vague.
9        THE WITNESS: No, I don't have anything in
10  my mind.
11       MR. YALOWITZ: Okay. Why don't we pause
12  for a moment. And we can go off the record, and I'll
13  reflect on whether I have any other questions for you.
14       (Recess from 3:01 p.m. to 3:06 p.m.)
15       Q. BY MR. YALOWITZ: So to continue, in
16  calculating damages, economic damages, does the
17  court take a deduction for taxes?
18       A. It depends what type of case we're talking
19  about.
20       Q. So I'm asking especially about, say, the
21  Goldberg case or other cases that you looked at in
22  your report, where we're talking about loss of earnings.
23       A. Yes. There is -- it does. For example, in
24  certain cases, there is a limit on that. There is a
25  ceiling. For example, in traffic accidents, it's up

Page 156

1   to 25 percent in terms of taxation. That's what the
2   court decides.
3        Q. And in non-traffic cases?
4        A. In non-traffic cases, as far as I recall,
5   there is no limit.
6        Q. So there is no limit, meaning that the
7   court would take taxes as a deduction before awarding
8   the damages, or the damages would then be taxable after
9   the award?
10       MR. HILL: Objection. Compound question.
11       The witness can respond.
12       THE WITNESS: I don't recall that right now.
13  I can give you an answer later, if this is very
14  important. I'm not sure if it's the gross or the net
15  salary that the court calculates based on. I know
16  about the ceiling in road traffic accidents. I don't
17  want to mislead you in this. Most probably it's the
18  net salary, but I'm not 100 percent sure on this.
19       Q. BY MR. YALOWITZ: So how would you look that
20  up?
21       A. Go back to case law and the way it's being
22  done, or textbooks.
23       Q. So for a person who draws a salary or works
24  out of his home, would you think it would be appropriate
25  to take a deduction for office overhead from the court's

1  award?
2      MR. HILL: Objection. Compound. Lack of
3  foundation.
4      The witness can respond.
5      THE WITNESS: You're talking about a
6  professional that's working at his home, and then
7  the question of whether you should deduct expenses?
8      Usually when the courts want to decide this
9  issue, the court would look at the income that is
10 proven. And, usually, in the case of, for example,
11 an independent professional working from his home,
12 it's his tax declarations. And in the tax declarations,
13 the professional basically presents all of his income
14 and all of his expenses. So if the professional did
15 not present any expenses because he was working out
16 of his home, then the court would rely on the income
17 that was presented.
18     Usually the case is the other way around.
19 There are professionals who would like basically to
20 say that they have more expenses, even working at
21 their home, so they would pay less taxes. So, again,
22 what would be more decisive here is the tax declaration
23 that is filed on a yearly basis to the tax authorities
24 in Israel.
25     Q. BY MR. YALOWITZ: So the last thing I want

1  to ask you about is -- I just want to do as best I can
2  to clear this up. Because I think we cleared it up, but
3  I just want to make sure.
4      In your report, you mention some cases that
5  you provided expert opinion on?
6      A. Yes.
7      Q. And then you made a correction earlier in
8  the day --
9      A. That's right. Yes.
10     Q. -- to include, and I think it was called --
11     A. Muhasen.
12     Q. The Muhasen case.
13     A. Yes.
14     Q. Just to be 100 percent clear, are there any
15 other cases besides the ones listed in the Muhasen
16 case in which you've given a report that you'd like
17 to include there?
18     A. As I said, Ahmad Abu Zaban. Ahmad Abu Zaban,
19 this is not the District Court in Nazareth. I think
20 the Ahmad Abu Zaban case I gave only a report, but I
21 did not testify in, in any court hearing.
22 I think this was Kfar Saba or something, I'm not sure.
23 The District Court in Nazareth was the Muhasen. And
24 in that case, I testified.
25     So I testified totally -- I mean, in total,

1  in three cases, two mentioned here, and the third was
2  miscorrect. It should be the District Court of Nazareth
3  but not Ahmad Abu Zaban. It should be the Muhasen case.
4  And in the other cases, they're not mentioned in the
5  report. There are several cases in which I gave an
6  expert report but I did not testify.
7      MR. YALOWITZ: Okay. I think we have that
8  cleared up.
9      Rachel, are we good on that?
10     MS. WEISER: I think so. Yes.
11     MR. YALOWITZ: All right. Thank you. I don't
12 have any more questions for you on the record. I do
13 have some off-the-record questions.
14     MR. HILL: I have no questions for Mr. Dahleh
15 at this time.
16     By my calculation, we've spent slightly over
17 four hours on the record. So, Mr. Yalowitz, can we
18 stipulate that you'll pay him for four and a quarter
19 hours at this time at his stated rate?
20     MR. YALOWITZ: Yes. That'll be fine.
21     MR. HILL: You can make the check payable
22 to his firm, deliver it to me, and I'll transmit it
23 to Mr. Dahleh. And we are off the record.
24     (Discussion held off the record.)
25     MR. YALOWITZ: For the record, before we

1  depart for the day, I just want to report that I told
2  Mr. Hill that the plaintiffs are withdrawing the portion
3  of Mr. Eviatar's report dealing with interrogations.
4  It's the part in which Mr. Eviatar says, "I have no
5  experience with interrogations," and then makes some
6  comments, and we're withdrawing that.
7      MR. HILL: The record will reflect that, and
8  I appreciate counsel's courtesy in letting me know.
9  Thank you. We're off the record.
10     (The deposition concluded at 3:16 p.m.)

Page 161

CERTIFICATE OF REPORTER

I, AMY R. KATZ, RPR, do hereby certify:

That, prior to being examined, the witness named in the foregoing deposition was duly affirmed by me to testify the truth, the whole truth, and nothing but the truth;

That the foregoing deposition was taken before me at the time and place herein set forth, at which time the aforesaid proceedings were stenographically recorded by me and thereafter transcribed by me;

That the foregoing transcript, as typed, is a true record of the said proceedings;

And I further certify that I am not interested in the action.

Dated this 4th day of November, 2013.

_____

AMY R. KATZ, RPR

---

Page 162

CERTIFICATE OF WITNESS/DEPONENT

I, MUHAMMAD DAHLEH, witness herein, do hereby certify and declare the within and foregoing transcription to be my examination under oath in said action taken on October 21, 2013, with the exception of the changes listed on the errata sheet, if any;

That I have read, corrected, and do hereby affix my signature under penalty of perjury to said examination under oath.

_____     _____

MUHAMMAD DAHLEH, Witness          Date

---

Page 163

ERRATA SHEET

Case:    MARK I. SOKOLOW, et al. vs. THE PALESTINE
         LIBERATION ORGANIZATION, et al.

Date:    OCTOBER 21, 2013

Witness: MUHAMMAD DAHLEH

Page _____ Line _____ Change _____
Reason _____
Page _____ Line _____ Change _____
Reason _____
Page _____ Line _____ Change _____
Reason _____
Page _____ Line _____ Change _____
Reason _____
Page _____ Line _____ Change _____
Reason _____
Page _____ Line _____ Change _____
Reason _____
Page _____ Line _____ Change _____
Reason _____
Page _____ Line _____ Change _____
Reason _____

_____     _____

MUHAMMAD DAHLEH, Witness          Date

**A**

**aah**
13:25 59:14 97:19
102:23
**abandoned**
102:16
**ability**
93:1
**able**
11:2 13:2 20:16
27:22 28:12 32:14
34:25 40:10 69:10
**aboveentitled**
2:2
**absolutely**
114:19
**abu**
158:18,18,20
159:3
**accept**
5:8 25:19 40:10
42:12 43:20 109:6
110:16,24 111:1
111:14 112:2,14
115:19
**accepted**
8:15 40:14 103:6
116:17 117:23
118:24
**accepts**
115:22 130:5
**access**
100:13
**accident**
17:20 21:3 22:12
22:19,20,25 23:6
138:13,14
**accidents**
22:12,25 141:15
155:25 156:16
**account**
19:22 21:25 22:3
23:7,10 108:4
147:5
**accuracy**
22:15
**accused**
15:7 16:15 53:21
54:3

**acknowledged**
68:22
**aclu**
9:24
**act**
54:17 63:23 65:8
65:11,15,17 66:15
68:3,11 70:17,18
70:22,23 76:22
84:24 116:20
126:18 130:13
**acted**
68:21
**action**
1:6 33:15 70:15
96:12 117:24
122:18 161:15
162:6
**actions**
16:16 34:13 64:9
65:5,21 67:23
70:8,9 71:2 80:21
**activities**
71:15 81:13 86:10
90:9,9 106:18
109:2
**activity**
83:16
**actor**
81:11 82:11
**acts**
14:10,16 34:9
61:4 67:24 69:4
80:12 122:25
**adam**
12:23
**add**
68:25 70:4,20
**added**
28:21 87:13,15
99:11
**adding**
79:5
**addition**
115:22
**additional**
105:11,23 106:1
129:4
**additions**

**36:14**
**address**
129:7
**adi**
52:23 55:5
**adjudicate**
31:9,16
**adjunct**
35:18
**administration**
21:22
**admissibility**
102:23 103:2
104:5
**admissible**
51:13 102:22
103:7,9,10,12,15
108:2,3,18 117:22
**admits**
76:8
**admitted**
79:7
**adult**
146:24
**adv**
3:19
**advance**
85:16
**adventure**
53:20
**advised**
145:20
**advisor**
9:5
**advocate**
2:23,24 3:14 86:9
**affair**
66:9
**affirmed**
4:5 161:5
**affix**
162:9
**aforesaid**
161:10
**afula**
42:24
**age**
6:15 7:8 140:9
142:7 145:11,13

**154:3,8,14,20,21**
154:23
**ago**
5:1 6:8 14:19
116:24,25
**agree**
63:16 64:7 67:22
79:14 87:18,21
100:6,9,12 101:21
103:3,19 105:5
110:1 115:9
135:11,20 136:22
**agreed**
101:7 103:16
104:4 136:9
**agreement**
89:18 124:4
**agreements**
24:22 31:9 57:10
57:11,19,21 58:2
58:7,9 89:18,19
89:21
**ahead**
24:6 79:21 86:5
**ahmad**
158:18,18,20
159:3
**aid**
81:12
**al**
1:4,7 3:17 109:4
109:12,14 110:5
111:3 112:5,18,25
113:1 115:14,24
117:5,13 118:8
163:2,3
**algharbiyya**
59:7,8,12
**alia**
116:13
**alibi**
77:17
**alive**
8:2,2,3,4,6 17:7,8
99:16
**allegation**
30:4,6
**allegations**
42:15 44:17

**116:14 118:21**
119:6
**alleged**
34:9
**allow**
139:3
**allowed**
5:2 6:1,5,5 10:23
10:24 100:20
131:3
**alon**
33:25
**alter**
109:12 112:3
113:5
**alternate**
114:8 115:8
**ambiguity**
148:11
**amended**
21:18,22 28:14
**amendment**
22:7
**america**
89:2
**american**
8:21 37:11,18
121:3 131:22,22
143:18
**amount**
131:21,25 132:6
133:1 137:6 140:3
140:23 141:1,4
142:8,8 143:14
148:17,18
**amounts**
55:2,20 131:25
132:2 133:11
135:1 136:4 137:4
141:9
**amy**
1:25 2:4 94:21
161:3,19
**analysis**
42:1,2 120:16,16
124:4
**analyze**
132:8
**annexed**

26:25 27:1
**answer**
6:25 18:19 27:12
41:18,23 45:23,24
78:5 85:24 94:22
95:21 101:4,25
108:16 109:20
112:9 113:22
130:24 131:2,8,14
131:17,20 156:13
**answered**
48:13
**answering**
114:7
**answers**
20:24 28:13
**anticipate**
147:22
**anybody**
36:15 123:4
129:24,25
**anymore**
6:3 60:18 104:3
**anyway**
20:17 62:12
128:17,18 140:20
144:4
**apartheid**
30:13
**apologize**
91:6 101:17
**aporter**
2:13
**apparatus**
111:12
**appeal**
40:3,11,21 48:14
48:20,24 50:4,6,9
50:9 52:6,8,9 94:9
94:11 117:16
119:11 136:24
142:12,12 143:1
**appeals**
19:3 48:20,22
49:1 142:21 143:9
**appear**
25:3
**appearances**
2:9

**appearing**
6:4
**appears**
103:16
**appellate**
18:25 40:8,16,24
41:3,4,10 47:24
52:10,11,12 143:5
143:6,8
**applicable**
27:3
**application**
5:6
**apply**
127:21
**applying**
87:12
**appoint**
14:16,24 17:12,13
**appointed**
15:12 48:4
**appointment**
14:9
**appreciate**
37:4 118:4 160:8
**approach**
24:2,4 25:17
60:15
**appropriate**
156:24
**approval**
106:18
**approximately**
54:8
**aqsa**
109:4,12,14 110:5
111:3 112:5,18,25
113:1 115:14,24
117:5,13 118:8
**arab**
14:21 93:19
**arabic**
3:11 5:17 11:6,7
13:3,18 20:5,12
59:12 93:18,20
**arafat**
90:2,14 106:17
**arbel**
50:10,11,12

**arbiter**
57:16
**arbitration**
32:8,22
**arbitrators**
32:22
**area**
25:8 27:25 64:6
71:11 80:2 110:22
111:9 141:21
**areas**
26:16,17 28:21
29:11 31:16 58:11
58:11 81:4 115:18
**arena**
58:20
**argue**
98:17,20 103:4
115:14
**argued**
98:19,19 102:10
111:10
**argument**
15:16 43:19,21
57:13 58:13
103:25 115:15,16
115:23 129:14
137:15
**arguments**
49:2 115:20
132:14 133:14
135:18 137:11
**arnold**
2:11
**arnon**
7:23 8:1,5 92:11
100:18
**arrangement**
10:21
**arrest**
63:12 72:1,4
**arrested**
17:7 73:10 75:8,8
79:6
**arrests**
71:15
**arrive**
37:2
**article**

14:8 15:24 16:7
16:10 29:16 46:23
**articles**
17:19 46:9
**asked**
34:19 78:3,4
80:18 89:9 93:25
94:1 98:21 107:25
128:18,21 131:20
132:2
**asking**
24:1 38:12 84:14
85:10 131:11,12
155:20
**asks**
72:16,17 76:21
**aspects**
58:6
**assembly**
51:10
**assertions**
50:20
**assess**
148:15,16
**assessing**
151:14
**assessment**
141:10,12,25
142:1,3,24 148:14
148:21
**assistance**
68:15
**assisting**
81:12,19
**associates**
11:19
**association**
9:20,23 10:12
**assume**
70:6 78:6 87:17
89:5 97:4 98:24
126:12,14 145:6
145:10,12 147:17
154:23
**assumed**
145:23 154:2
**assuming**
88:13 89:5 138:25
151:13

**assumption**
108:18 139:23
154:6 155:2
**assumptions**
34:19,20,22 96:10
146:11,20 151:14
**astonishing**
94:8
**ate**
36:6
**attach**
123:6
**attached**
98:1 100:1,5
101:19 104:25
107:23 108:7,25
**attachment**
121:11 122:16,22
123:16
**attachments**
122:6,14 123:6,21
**attack**
70:24 109:11
**attackers**
106:19
**attacks**
49:13 51:22
106:13
**attempt**
43:13,13 106:9
110:10 113:11
**attended**
90:8
**attention**
23:22 106:6
108:19
**attitudes**
91:8
**attorney**
50:13,13
**august**
9:11,11 43:18
45:8
**authentic**
102:11 103:5,8,11
103:13,15 108:2
**authenticity**
98:2 101:8,23
102:3,8 103:1,17

104:4
**authorities**
  12:19 48:6 71:11
  157:23
**authority**
  14:9,15 15:1
  24:16,25 26:16
  27:10 28:10 29:11
  31:15 42:18 45:2
  48:7,12 57:25
  61:15 62:8,9
  71:14,17 92:9
  98:7,10 110:19,21
  110:23 141:17
**authoritys**
  62:17
**automatic**
  107:15 131:6
**avenue**
  2:12
**average**
  145:24 147:7,16
  147:25 150:3
**aviv**
  7:25 12:18 43:20
  46:19 48:15,16,18
  132:25
**avivjaffa**
  3:16
**award**
  156:9 157:1
**awarded**
  54:7
**awarding**
  156:7
**aware**
  29:20
**awkward**
  16:11 32:20
**azar**
  52:22,23 55:5

**B**

**back**
  9:17 20:5 25:15
  47:18 64:22 76:11
  79:4 90:24 94:21
  100:1,5 113:9
  117:2 121:18

**background**
  46:2 142:19
**bad**
  14:10 15:25 73:11
  73:25 78:2 94:7
  104:19
**bank**
  21:7,8 22:11
  24:17,21 26:25
  27:3,5 37:23
  44:24 58:5 62:24
  100:19 116:23
  128:19
**baqa**
  59:6,8,9,10,11
**bar**
  4:13,15,23,25 5:3
  5:5,7,18,21,24
  8:12,15,17 19:18
**barghouthi**
  28:25 29:1,24
  30:18
**barghouti**
  72:6,7,9,13,15
  73:2 80:16,19,20
  80:25 81:4,10
  82:10,17,19 83:1
  83:2,12 84:9,11
  84:18,20 85:4
**barred**
  8:10
**barrier**
  12:11
**base**
  46:25 57:13,15
  58:13
**based**
  15:19,19 16:19,21
  17:17 22:17 24:1
  31:8 36:9,12
  43:10 51:10 54:12
  57:18 58:17 59:25
  60:3,7 61:2 62:11
  67:1 74:13 76:20
  82:19,20 87:7
  89:20 99:5 100:19
  105:2 110:23
  113:18 116:12

117:17,17,18,19
  131:21 141:10
  142:3 146:12,14
  148:12,21 149:13
  151:13 152:15,22
  154:5 156:15
**baseless**
  122:21 123:11,13
  123:17
**bases**
  30:3
**basic**
  109:13
**basically**
  5:6 10:25 15:18
  17:14,17 21:21
  22:19 31:14 44:17
  55:18 133:3,11,19
  140:6 157:13,19
**basing**
  21:18 118:10
**basis**
  25:7 30:7 46:3
  54:13 59:18 96:8
  125:20 126:3
  132:1 153:16
  154:5 157:23
**bates**
  3:12,15,18,20
**becoming**
  75:23
**began**
  35:2
**beginning**
  18:2 24:14 27:15
  28:2 46:1 76:5
  88:15 102:7
  107:19 111:16
  113:4,5,10 123:14
  146:18
**begins**
  97:23
**behalf**
  23:2 109:12 123:7
**behaving**
  104:19
**behest**
  112:16
**believe**

40:20,25 41:1
  96:8 98:25 104:13
  124:25
**believed**
  78:15,16
**believes**
  122:19
**bell**
  35:14 36:3
**belongs**
  77:23,25
**benefit**
  106:7
**benefits**
  70:17
**benzi**
  13:23 15:4,13
  69:23
**best**
  35:23 151:24
  154:9 158:1
**bet**
  17:4
**better**
  28:23 113:22
  120:17 140:15
**beyond**
  106:15 154:8
**bezeq**
  3:17
**bhill**
  2:19
**biased**
  30:14
**big**
  9:1 17:2 52:15
  53:2 54:5 69:12
  73:25 93:14,23
**bigger**
  140:14 143:6
**biggest**
  90:12
**binding**
  55:10 84:22 134:8
  137:8
**binds**
  85:1
**birth**
  34:24

**birzeit**
  27:19,20 28:11
**bit**
  5:14,14 8:3 23:3,5
  27:14 32:25 48:3
  49:7 52:18 58:24
  70:18 123:25
  125:17 128:23
  130:8 142:17
**block**
  58:5
**boaz**
  2:23 3:19
**bodies**
  10:15,16 11:24
  58:21 91:25
**body**
  15:1 48:2 61:14
  61:16 89:21
**bomb**
  71:25 72:14,16,18
  72:20,20,21,23,24
  73:4 75:6 76:25
  79:19 80:17 81:13
  81:19 82:5,6,14
  82:14 83:13
**bomber**
  83:1
**bombing**
  37:19 77:22 79:14
  83:1,16 87:5
**bombings**
  35:6 86:18 118:1
**bombmaking**
  72:2 75:9 83:16
**bombs**
  72:3,16,18 74:17
  74:19,19 75:25
  76:6,7 78:20,20
  79:7 80:18
**book**
  26:4 53:12
**bottom**
  97:11,13 108:21
**bound**
  55:19
**boy**
  99:14,16 109:8
  110:12 111:8,25

**breach**
59:22 74:2 76:13
79:12 88:9 123:23
127:3
**breached**
64:18,23
**break**
53:4 56:2 90:18
114:24
**brian**
2:16 33:9
**briefs**
52:13
**brigades**
109:4,12,14 110:5
111:3 112:5,18,25
113:2 115:14,24
117:5,13 118:8
**bring**
88:19,24,24
137:13 154:6
**bringing**
89:1
**british**
26:21,21 28:6
**brits**
28:16
**broad**
7:4 41:22 74:25
74:25 86:12
150:13
**broadened**
138:17
**brought**
17:15 22:16 53:11
66:2 99:21,22
123:2 132:13
136:1
**burden**
148:4,5
**bureau**
149:17,18
**bus**
17:3,6 70:1
**business**
31:7 32:18 76:11
85:14 146:17
152:12,13 154:15
154:19,22

**businesses**
152:3
**busy**
52:17

**C**
**cafeteria**
35:20,21,24 36:3
**cafeterias**
35:23
**calculate**
145:8 148:12
**calculated**
144:21
**calculates**
156:15
**calculating**
141:24 145:8
146:1 155:16
**calculation**
35:1 144:12
145:24 148:3,10
148:13 152:22
154:20 159:16
**call**
18:24 19:12 33:16
35:18 46:18 48:1
62:22 71:9 73:11
80:2 86:16 99:23
121:7,9 122:17
148:13 152:15,19
**called**
4:4 6:13,14 8:4
11:18,19 12:21,25
14:25 15:10,15
17:1,3 19:5,8 26:4
28:25 38:1,13
42:7 59:6 95:6
99:14 125:4
127:15 149:19
152:23 158:10
**calls**
98:13 113:17
117:18
**candidate**
32:13
**capabilities**
24:15
**capacity**

21:8
**captured**
95:11 98:1 99:16
101:18 106:10,11
107:14 109:15
110:13 111:4
112:6,19 113:12
117:19
**car**
22:24 61:11 68:7
138:14
**care**
56:2 60:5,8,10,13
60:14,21,22,25,25
61:6,9,14,20,21
62:4,21,25 63:3
63:25 64:8,14,17
64:24 73:3 74:2
74:21 75:1,18,23
76:13,13,15,19
79:11
**career**
146:24 151:6
**carried**
109:11
**carryover**
49:19
**case**
10:19 13:24 16:4
17:1,2,20 20:2
24:3 33:18 35:9
35:10,13 37:17,25
38:3 40:2,5 41:15
42:7,7,10,23
43:15,16,17 44:10
44:12,15 45:7,7,8
46:13,13,15,18,18
47:1,4,5,7,9,17,18
47:19 49:16 51:10
51:12 52:1,6 53:2
53:12 56:8,8,20
57:1 58:24 59:1
60:6,20 61:7,15
61:16,19,24 62:7
62:19 64:13,15,17
66:5 68:4 69:10
69:23,24 76:21
80:3 82:11 83:2,7

88:16,18 89:8
91:14,16 92:5,9
92:24 93:9,24
94:2,3,10,12,18
95:1,7,17 96:7,9
98:17 99:3,18
100:3,7,10 101:3
101:7,22 102:14
103:17 104:14,21
106:24 107:4,5,6
107:11,12,18,19
108:1,4,7,9
115:13 116:8,11
116:16 117:3,8,12
117:16,20,21
118:4,14,22
119:10,14,19
121:7 122:19
123:11,12,13,17
124:3,8 125:4
128:14,20 129:11
130:22 131:13,14
131:15 137:10
138:17 139:3
141:4 144:17
149:24 151:9
155:18,21 156:21
157:10,18 158:12
158:16,20,24
159:3 163:2
**cases**
11:23 13:14 14:8
16:24 22:11 31:9
31:16 35:3 37:16
37:17,17,24 38:4
38:15 40:11 41:10
42:5,6 43:14
45:13 48:6 52:12
62:2 92:10,13,14
93:14 96:12
116:18 119:3,5,5
121:11 122:5,5,10
122:15,16,23
123:16,19 127:19
130:23 131:1,5
132:8 142:4,9
154:1,7 155:21,24
156:3,4 158:4,15
159:1,4,5

**cassation**
17:22 18:15 19:1
21:1 23:10
**categorically**
41:18
**categories**
61:8 141:2,14
**categorization**
61:2
**category**
136:17 141:9
142:6 143:13
148:19
**causation**
77:4 88:9
**cause**
2:2 66:3,12 78:23
79:2,23 80:8
122:18
**caused**
65:2
**ceiling**
155:25 156:16
**cellphone**
72:15 80:18 82:1
82:2
**center**
27:20 28:11 29:13
29:15 146:18
**central**
99:3
**century**
26:17,18
**ceremony**
8:17
**certain**
21:4 28:21 31:16
31:16 34:23 38:12
40:12,20 41:4
48:6,6 49:4 57:4,9
58:1,2,3,6 67:14
71:10 77:23 81:3
85:1 107:13
117:17,17,18
122:15 123:8
129:23 130:23
131:1 148:19
154:24 155:24
**certainly**

79:13 100:2
**certificate**
8:17 43:25 161:1
162:1
**certify**
161:3,14 162:4
**chance**
32:12 39:12 49:16
56:9 116:13
118:19 119:16
123:18,18,18,18
124:12 133:9,13
138:6
**chances**
123:12 135:9
**change**
6:7 23:18 25:17
39:6 43:6,21 44:2
47:7,11 85:24
163:7,9,11,13,15
163:17,19,21
**changed**
5:11 6:6,9 13:7
22:22 23:8 28:6
**changes**
22:4 25:19 36:13
43:21 77:18 85:17
162:7
**changing**
25:15,16,16
**charges**
71:20 73:17 74:22
77:14 78:15 79:9
**charity**
68:14
**charter**
86:9
**chartered**
2:16
**cheating**
68:6
**check**
67:13 159:21
**chemicals**
72:3
**chevalier**
2:16 33:10 38:5
**china**
128:19

**choose**
68:19
**choosing**
113:24
**chosen**
146:24
**circumstances**
41:5 54:2 79:2
148:4
**cited**
142:9
**cites**
125:4
**cities**
14:23
**citing**
125:22
**citizen**
6:11 31:5,6,11
**citizens**
5:16 10:1 14:21
14:21 37:18 49:14
57:7 61:15,21,22
61:22,23 62:4,18
62:22 155:1
**city**
6:12 11:5,7 42:24
92:12
**civil**
1:6 9:20,23 10:12
11:23 12:1 21:22
33:15 52:12 96:12
117:24 131:1
**civilian**
64:6
**civilians**
64:7 79:8
**claim**
21:11 22:16,16
116:15 130:15,20
**claiming**
22:12
**claims**
22:9 43:4 44:17
50:15 55:22
**clan**
130:1
**clarification**
39:4

**clarified**
87:23
**clarify**
39:6
**cle**
4:17
**clear**
86:8 102:25 108:5
112:23 113:2,3,8
148:17 158:2,14
**cleared**
19:19 158:2 159:8
**clerked**
7:15
**client**
38:24 100:13,16
**clients**
38:24 61:13
**clinic**
151:1
**close**
70:15,17 144:5
154:13
**closer**
70:11,13 75:23
**coconspirator**
81:11
**code**
126:21 127:10,13
127:16,21 128:7,8
128:9,11,11 131:1
**codes**
128:10
**coincidence**
9:13
**colleagues**
33:14
**collects**
123:7
**colloquy**
104:16
**colorful**
125:16
**com**
2:13,19
**combination**
54:14,15
**combine**
151:1

**come**
6:7 10:4,22 11:12
18:15 25:15 47:18
64:22 117:2
137:10
**comes**
39:5
**coming**
100:1,5
**command**
106:16
**commander**
21:6 22:8 25:1,5
27:7 58:4
**commanders**
70:23
**commanding**
65:23
**comment**
41:13 122:12
127:6 129:4
**commented**
121:10
**comments**
143:23 144:18
160:6
**commerce**
32:17
**commercial**
91:25
**commission**
15:10,10 16:13,13
**commissions**
25:4,4
**commit**
54:4 85:10
**commits**
79:11
**committed**
16:1 49:13 67:1
68:12 69:16 78:25
99:14
**committee**
12:17 14:25 15:13
**committing**
66:23 85:9,10
**companies**
21:10 22:9,23
23:2,4 91:25

92:15
**company**
21:3 22:15 31:10
59:4 80:5 84:25
**comparative**
39:23
**compare**
62:17 69:10 142:6
**comparing**
152:8
**compensation**
21:5,12 35:1 54:8
54:10,12 55:24
129:20 130:6
131:21,25 140:3
140:24 142:5
143:14 148:19
**competent**
100:10
**compiling**
28:12
**complained**
29:16
**complaint**
33:15 34:9,14
35:4 39:20,21
131:19
**complete**
9:10 64:20 121:20
**complex**
143:19,21
**complicated**
27:14 70:18
**compound**
73:7 81:16 118:12
156:10 157:2
**computer**
115:1 120:15
**conceding**
114:20
**conceived**
126:20
**concept**
148:2
**conceptional**
63:3
**conceptual**
60:25 63:17 64:23
**concern**

126:22
**concerns**
139:6
**conclude**
71:18 76:17
**concluded**
160:10
**concludes**
82:25
**conclusion**
16:3 30:3 108:23
109:2 111:21
113:6 116:2
119:15
**conclusions**
56:10 60:23 96:1
106:10 107:21
108:10 111:18
113:11,14
**concrete**
60:8,14,21 62:24
64:24 76:19,19
96:9
**conditions**
5:20 40:12 85:2
123:9 138:21
**conduct**
30:17
**conducted**
109:4
**conferences**
29:9
**confessed**
79:6
**confesses**
76:8
**confirm**
96:24
**confiscate**
75:10
**confiscation**
12:18
**confused**
26:12 38:13,18
39:1
**confusing**
19:9,16
**confusion**
28:21

**connect**
116:20
**connection**
34:9 42:22 44:19
44:25 45:1 47:15
71:15 117:12
119:12
**conservative**
23:15
**consider**
5:15 92:19
**consideration**
51:23 61:5 147:10
**considered**
5:18 66:2 67:24
94:13 98:7,8
129:21 138:21,22
140:19
**considering**
110:2
**consistent**
85:18 122:24
**constitutional**
35:19
**consultation**
11:23
**context**
110:10 119:2
127:4 148:10
**continue**
12:1 56:3 66:13
66:17 67:9 120:20
154:2,15 155:15
**continued**
68:24 69:22 70:8
71:2 94:16
**continues**
69:14
**contract**
33:10 151:12
**contradicting**
41:9
**control**
62:15
**controlled**
111:10
**controlling**
62:9
**convenient**

90:16
**convict**
73:20
**convicted**
34:8 66:22 67:5
67:23 70:25 73:22
74:16,23 78:16
**convictions**
34:8
**convince**
11:1
**convinced**
77:24
**cooperative**
91:7
**copies**
20:15 36:23 37:2
**copy**
20:4,7,8 36:19,25
37:7 91:2 96:13
121:19,20
**corporation**
65:10 84:24,25
85:1
**corporations**
152:13
**correct**
9:21 13:6 15:18
17:23 38:20,20
47:3 49:15 56:18
59:23 65:16 71:16
76:23 93:21
132:15 145:14
**corrected**
162:8
**correcting**
93:21
**correction**
158:7
**correlation**
70:16,17 80:12
88:21
**council**
27:11 57:24,24
**counsel**
36:24 38:25 91:7
98:10 100:10
101:8 104:13
111:15 115:21

121:19 128:20
131:7 145:2
**counsels**
160:8
**countries**
152:9,11
**country**
23:16 24:10 25:15
31:14 61:21,23
**course**
7:21 11:7 28:15
55:19 63:11 73:12
76:10 83:14 85:14
91:12 106:12
132:21 146:9,16
147:5
**court**
1:1 2:3 3:16 6:18
7:15 10:17,25
11:1 12:8,16,17
13:14 15:12,20
17:16,16,22 18:15
18:21,23,24,25
19:1,3,5,6,8,12,13
19:21 21:1 23:9
24:8,12 31:6,8,13
31:21 32:5,5,8
34:8 38:18 39:2
40:15,16,19,24
41:3,4,10 42:12
42:15,18 43:20,22
44:1,10,14,16,24
45:25 46:5 47:23
47:24 48:2,10,15
48:16,18,21,21,22
48:23,23,25 49:1
49:5,8,9,11,22
50:21 51:14,16,18
51:19 52:8,10,11
52:12,12,17,17,21
55:10 57:8,9
58:14 59:21 60:4
60:15,20 61:1
62:1 68:9 69:25
73:20,23 74:12,16
76:21 78:16 80:7
80:10,11 88:7,8
88:25 89:3 91:4
93:22 96:2 98:11

99:12,25 101:18
102:9,21,21
103:24 104:1,3,7
104:7,10 105:11
106:24 107:9,10
110:15,23 111:5
111:12 115:19,22
116:3,17,18 119:6
119:7,11,12
122:19 123:2,9,15
123:16 130:4,5,6
131:22 132:3,25
133:7 134:9
136:16 137:13
140:19,23 141:12
141:25 142:3,5
143:4,5,7,8,11,15
146:11,13 147:1
147:10,15,15
149:9 151:13
154:23 155:17
156:2,7,15 157:9
157:16 158:19,21
158:21,23 159:2
**courtesy**
36:24 37:5 160:8
**courtroom**
94:1
**courts**
6:1,3,4 10:6,17,18
12:15 18:17,24,24
19:7,15 23:15,22
24:24,25 25:1,3
25:16,23 30:21,22
31:11,13 37:11
40:8 43:4,9 45:3
59:18 60:7 61:18
103:16 105:25
119:8 123:8 132:7
134:25 141:1
146:22 148:9,12
149:12 156:25
157:8
**cover**
20:13
**create**
32:8 74:19
**created**
69:1

creates
  72:20 82:5
creating
  74:16
credibility
  95:10,18,24 99:6
  99:8,11 142:13,21
  143:2
credible
  95:2 96:3 98:4
  105:2 106:3 149:9
  149:12,21,25
  152:17
crime
  53:9 65:24 66:23
  67:1 79:11 85:10
  85:11,15
crimes
  16:2 68:23 70:25
criminal
  14:16 34:8 53:1,2
  71:15 74:22 126:6
  126:21 127:19
criminals
  74:18
criteria
  129:23
critical
  15:16,16 23:25
criticism
  18:13 19:21 118:6
criticizing
  94:4
critique
  3:12 13:23 17:20
  20:14,25 21:15
  22:2 23:25 29:19
  29:20 30:23
critiques
  13:13 19:25 23:20
crossexamination
  43:24 44:6
cultures
  32:23
current
  96:11 109:6 112:2
  117:24
custody
  17:10 78:1,18

customary
  58:9 147:7
cut
  145:19
cv
  99:10

────────────
          D
────────────
dahleh
  1:14 2:1 3:3,11,14
  4:3,12 11:19
  20:14 37:6 104:22
  114:25 115:4
  159:14,23 162:3
  162:15 163:5,24
dahlehs
  36:23 104:21
daily
  92:4
dalia
  3:16
damage
  61:4 141:2,14
  142:6 143:13
  148:12
damages
  35:1 39:17 42:2
  49:7 54:11,15,19
  55:9,11 133:1,10
  134:9,23 135:1
  136:1,3,8,10,13
  136:19 137:3
  144:12,21 148:2
  148:10,20 155:16
  155:16 156:8,8
dangerous
  71:25
dano
  93:11
data
  149:21
date
  33:5 75:10 162:15
  163:4,24
dated
  3:14,17,20 161:17
dates
  34:24
david

2:5
day
  2:6 25:9,9 133:7
  152:24 153:7,23
  158:8 160:1
  161:17
days
  80:6 141:18
dc
  2:18
de
  142:12
deal
  11:22 15:2 146:23
dealing
  14:8 160:3
deals
  10:1 127:19
dealt
  10:19 11:21 62:2
  89:16 129:11
  144:24
death
  130:2 140:11
  141:2
debt
  140:21
deceased
  129:19,19 139:18
  140:6,7,9 142:7
  147:2
december
  3:11
decent
  53:19
decide
  11:11 48:7 50:5
  61:5,13 88:8
  110:4 116:9,19
  132:7 136:7
  149:12 157:8
decided
  11:12 14:24 18:1
  25:2 43:9 45:8
  46:14,15,17,21
  48:13,16,23,23
  49:12 50:2 51:5
  51:17 52:1 54:4
  57:9 61:8,19

78:18 80:7 104:2
  104:2 107:6,18
  116:25 117:16
  119:3,8,8 123:20
  125:7 135:17,18
decides
  48:4 55:21 140:23
  156:2
deciding
  51:4 88:5 95:16
  143:9
decision
  21:15,18 46:12
  48:14,17 51:14,24
  51:25 52:15 55:3
  55:6,8 57:15
  59:19 60:15 93:6
  93:12,16 94:4,6,9
  95:5 96:14,15,25
  107:11 108:17
  117:15 125:22,25
  128:13,16 133:14
  133:18
decisions
  15:20 69:25 122:5
decisive
  119:15 157:22
declaration
  43:11 157:22
declarations
  30:12 157:12,12
declare
  162:4
deduct
  157:7
deduction
  155:17 156:7,25
deemed
  128:6
deems
  130:6
default
  46:16 47:19,21,24
  47:24 48:7,8
  49:15 50:22 51:15
  51:24 52:19,20
  54:7 55:4,16,23
  119:5,7,9 128:16
  129:15,17 130:9

130:15,21,25
  131:3 132:12,15
  132:25 135:2,24
  135:25 136:6,25
  137:1,7
defend
  133:9
defendant
  101:22 102:1
  130:24 132:11,14
  133:7 148:5
defendants
  1:8 2:15 36:25
  42:16,22 47:16
  50:15 55:12 60:2
  60:22 92:25 94:14
  94:17 111:7,15
  116:21 131:7,18
  134:9,21 137:9,13
  149:11
defender
  53:14,19,25
defense
  32:3 55:12 62:14
  93:1 94:14 134:11
  134:22 135:9
  136:14 137:13
definition
  138:18
delegation
  12:8,23,24
deliberation
  16:13
deliberations
  15:9
deliver
  159:22
democracy
  31:23
demonstrations
  14:22
denied
  40:15 43:16
depart
  160:1
department
  16:1
depend
  74:4 86:2 123:1

**dependents**
54:15
**depending**
150:9
**depends**
67:13 68:1 76:16
86:7,7 123:4
130:22 152:18
153:20,24 155:18
**deponent**
162:1
**deposition**
1:14 2:1 107:19
128:1 160:10
161:5,8
**deputy**
17:14,14
**derekh**
148:14
**describe**
10:11 11:15 14:18
20:25 21:14
139:12 143:18
**described**
24:3 66:23 77:2
117:4 124:20
155:6
**describes**
91:19 124:15
**describing**
70:24
**description**
3:10 26:13
**detail**
102:14
**details**
20:2 34:23 37:19
53:3 54:18 127:7
**detention**
72:4
**determination**
60:8 131:16
**determine**
87:6 110:18
130:19
**determined**
51:1,22
**determining**
50:16 74:1

**developments**
19:23 21:25 23:10
23:11 91:20
**died**
140:1,10
**difference**
69:12,13,13 74:1
**different**
11:24 13:25 14:23
16:24 23:4,23
26:11,17,18 27:2
27:13 28:15,16
29:10 32:2 55:19
61:8 62:6,6,16
64:15 67:11 69:17
69:18 73:21 74:17
76:2 78:22 82:23
86:15,21 87:1
91:24,25 107:5
108:6 110:11
111:6,17 113:24
117:23,25 120:6
123:3 130:17
140:20 142:9
143:4 147:23,24
150:5,8 151:2,14
152:1,2,5,6,7,11
153:25 154:23
**differentiation**
60:17
**difficult**
23:5 40:20 148:3
**dina**
2:24
**dinim**
92:1
**diplomatic**
134:24 136:14
**direct**
106:6,15 108:19
124:10 127:1
**director**
17:13 29:6
**directors**
65:12
**disability**
141:20
**disagree**
57:8 60:23 126:2

135:12,21 136:23
**disagreement**
144:4
**disagrees**
144:7,8
**disclose**
150:1
**discovered**
36:23
**discovery**
104:16
**discretion**
131:9
**discuss**
127:8,21
**discussed**
99:2 132:19
142:22
**discussing**
78:5
**discussion**
10:10 39:23 42:5
121:17 159:24
**dismissed**
43:16 119:6
**dispute**
51:20 101:8,22
**disputed**
98:2 102:4,8
103:18,24 104:1,3
**distinction**
103:3
**distort**
125:1
**district**
1:1,2 2:3,3 3:16
18:24 38:17 39:2
43:20 48:2,10,15
48:16,18 49:8
50:21 51:14,16
132:3,24 158:19
158:23 159:2
**divide**
39:16
**doctor**
121:3 145:15
149:24 154:10
**doctors**
147:17,24,25

149:20 150:6,19
150:22,22 153:22
**document**
3:11,13,19 20:12
58:6 103:5,8,21
110:7 112:8,21
113:18,21 115:11
120:15
**documents**
34:7,11 41:8
95:11 98:1,2,5,8
99:5,11 100:1,5,7
101:9,13,14,19
103:18 104:5,9,10
104:25 105:2,13
106:10,11 107:3,8
107:10,13,22,24
107:25,25 108:6
108:17,18,25
109:15 110:24
111:3 112:6,19
113:12,15 117:17
117:19
**doe**
45:9,10,11,12
**doing**
39:23 54:3 59:5
76:9 85:16 86:13
123:9 146:7
147:20 154:16
**door**
137:9
**doubt**
64:16 106:15
128:6
**dr**
2:23 3:19 53:7
121:9 122:4 124:7
124:15,18 125:1,4
125:22 126:2
143:23 144:17,22
145:7,12 153:3
**draw**
16:4 23:21
**drawing**
119:15
**draws**
113:15 156:23
**driver**

61:10,10
**drugs**
76:4
**due**
97:25 104:24
**dues**
4:20
**duly**
4:4 161:5
**duties**
9:17
**duty**
44:18 60:5,8,10
60:13,14,21,22,25
60:25 61:6,9,14
61:20,20 62:4,21
62:25 63:1,3,5,8
63:12,13,17,21,25
64:8,14,17,18,24
64:24 71:9,9,14
73:3 74:2,21,25
75:18,23 76:13,13
76:15,19 78:10
79:11 88:9,9

---

**E**

**earlier**
36:9,11,11 51:9
94:24 99:2 104:6
105:16 119:4
123:25 130:8
132:20 142:20
158:7
**early**
52:15 122:19
**earning**
141:22,24
**earnings**
145:9 147:6
148:23 149:15
151:5 155:22
**easier**
28:7 88:23 89:1
137:1
**east**
59:10,15
**easy**
61:17 88:12 135:1
149:23

eat
  36:5
eaten
  35:21
economic
  144:12,21 155:16
economy
  150:4
edna
  50:12
effect
  6:7 26:9 79:20
effort
  32:7
efforts
  106:13
either
  21:21 25:25 58:14
  58:16 71:20 82:20
  108:17 150:1
elaborate
  40:12 108:24
elalul
  45:11,12 46:18
  47:4,7 107:19
elected
  90:13
electronic
  27:17 91:23,23
element
  54:24 78:9 79:15
  99:6
elements
  77:3,22 78:20
  138:25
eleven
  135:3
elses
  77:20
emerges
  106:11
employee
  61:10 80:5 81:4
  82:21 154:19
employees
  65:11,17 152:10
employer
  61:9
enacted

21:7 28:4,18,19
enacting
  27:11
encounter
  125:10,13
encountered
  149:10
encourage
  97:3
endlessly
  19:8
endorse
  105:17
engage
  70:24
engaged
  33:4,8
english
  13:4 14:4,4,6
  28:16,18 36:7
  96:14 103:23
  108:21 119:20
enhanced
  95:10
enjoyment
  140:8
ensured
  106:17
entered
  52:21 54:7
entire
  24:17 26:23 30:11
  58:6 109:18 130:1
  130:1,2
entirety
  114:5
entitled
  3:11,13,19 21:5
  21:11
enumerated
  54:17
equipment
  72:2 75:9
errata
  162:7 163:1
error
  91:1,6,8
especially
  13:3 27:15 57:4

141:2 148:10
  152:21 155:20
esq
  2:11,16,22
essay
  26:4 27:16
essential
  99:6
establish
  18:9 27:20
established
  11:18 22:23 24:16
  25:5 26:24 89:20
  138:23
establishment
  27:9 28:9,10
estimating
  147:6 148:22
  151:4,16 153:17
et
  1:4,7 3:17 163:2,3
evaluate
  149:15
events
  68:3
eventually
  11:8 42:18 44:11
  46:21 60:20 74:2
  74:19 78:1,21
  79:8 93:17,25
  94:3 102:9 119:8
  123:19 129:20
  130:4
everybody
  121:4
eviatar
  33:25 160:4
eviatars
  160:3
evidence
  40:11,13,14 42:12
  42:19 45:13 47:9
  51:13 55:21 64:3
  73:19,20 74:14
  77:16 78:19 83:15
  86:11 87:7 88:16
  88:17 102:22
  103:1 108:3 112:4
  118:22,23 120:6

123:1,15 131:4
  146:11,12,14
  147:1 148:20
  151:8 154:9 155:1
evidenced
  109:15 111:3
  112:6,19
evidential
  154:5
ex
  55:17 130:10
exact
  148:3,13,18
exactly
  9:13 33:5 35:22
  35:24 50:23 59:16
  97:16 99:20 101:6
  106:2,5 119:25
  130:11 147:23
exam
  19:18
examination
  3:5 4:8 108:24
  162:5,10
examine
  63:22
examined
  4:5 51:1 161:4
examining
  20:18 91:9 96:22
  120:14 121:25
  124:14
example
  31:5 46:4 49:6
  61:9,19 63:10
  65:10 66:1 69:20
  71:14 76:8 77:17
  80:3 85:3 86:9,15
  126:10,14 131:2
  132:23 133:25
  139:19 141:23
  150:5 151:8 154:9
  155:23,25 157:10
examples
  11:10
exams
  5:11
exception
  61:25 162:6

exceptional
  40:10,11,17 41:9
  85:13 94:5,5
exceptions
  40:16
exhibit
  3:11,13,16,19
  20:10 90:23 96:19
  121:21,22
exhighranking
  99:9
exist
  63:21 131:24
exists
  76:17 81:3
expanded
  139:2
expectancy
  139:10,14 140:5
  140:25 141:5
  143:11 145:6,9
expected
  98:10 140:12
  144:25 146:1
  147:6 148:22
  151:17 153:11,17
expenses
  157:7,14,15,20
experience
  7:5 11:16 13:1,2
  23:11 24:1 67:1
  127:9,14 160:5
experienced
  29:21
expert
  3:13,19 12:20
  16:22 29:23 33:17
  36:25 37:10 38:13
  38:15,16,25 46:8
  91:3 97:24 100:2
  100:6 104:24
  105:14,17 117:11
  118:21 158:5
  159:6
expertise
  150:10
experts
  33:19
explain

113:14 120:7
138:9 142:17
**explained**
79:5
**explanation**
76:25 77:6,8,11
77:13,16 78:7
**explodes**
79:19
**explosives**
72:2
**express**
49:1 51:15 89:9
**expressed**
39:15 57:3 122:24
**expressing**
50:25 88:16 116:3
134:17 135:8,14
135:16
**extended**
21:19
**extensive**
104:16
**extra**
20:8,15
**extraterritorial**
126:18
**extraterritoriality**
126:22
**extraterritorially**
127:22
**eyes**
99:12 102:9

**F**

**face**
41:7,8 105:25
134:10,22
**facie**
122:17,18 130:20
131:16
**fact**
22:13,22 39:25
49:9 51:20 70:5
76:17 82:25 83:1
87:6,8 95:10
107:9 117:15
130:24 133:6
140:6

**factfinding**
40:3
**factors**
139:13 140:9,23
**facts**
23:11 29:25 34:20
39:17,19 41:15
47:14 58:24 64:2
65:22 68:19 74:13
76:17,20 88:4,6
95:16,19 96:8
116:8 123:4
147:12
**factual**
19:22 22:4 30:6
41:5,10 46:2 51:9
94:25 95:1 106:24
107:11 126:9
138:24
**faculties**
23:21
**faculty**
27:19
**failed**
21:25 22:3 106:9
113:11
**failure**
42:11 45:13,15
**fair**
16:3 19:19 41:16
41:20,22,23 42:13
42:14 45:5,16
51:7 60:11 71:12
101:3,4 114:3
121:9 122:23
123:18 143:15
**fairly**
115:3 124:15,21
**faith**
104:19
**fall**
148:5,6
**familiar**
26:7 35:2 53:15
67:12 127:17,18
**familiarize**
127:24
**families**
106:19

**family**
9:18 12:4 34:25
54:9,23 85:5
130:1 138:1,13,13
138:15,24 151:8
**far**
5:11 16:12 30:1
31:23 47:12 49:5
52:14 54:1 86:19
94:11 99:13
129:18 132:9
156:4
**fashion**
114:22
**fatah**
72:10 83:20,22
84:2,6,9,12,19,21
84:22 85:6,19
86:1,3,8,14,15,19
86:20 87:4 89:10
89:22 90:2,8,12
90:13 128:5
**fatahs**
86:9
**father**
8:16
**fax**
2:13,18
**february**
3:17 56:14
**feel**
32:20 41:18 45:23
71:4 73:1 91:12
96:23 114:9
120:20
**fees**
120:9
**felt**
21:14
**field**
12:21 147:8 150:4
**fifteenth**
2:17
**fight**
66:8 93:14,23
**figure**
134:2
**file**
5:6 21:12 34:16

34:18 41:8 77:14
129:24,25 130:24
131:8,20
**filed**
11:4 48:11,14,22
94:9 97:24 157:23
**files**
34:8,12
**filing**
131:14
**final**
55:10 134:8 135:6
144:11
**financially**
75:1
**find**
7:3 29:3 47:2
70:16 72:2 75:18
76:1,2 77:22
112:3,17 114:16
149:24
**finder**
39:25 76:17 82:25
87:6,8
**finding**
23:5 75:23 78:19
78:20 106:24
112:1,12 114:8
118:7,9,11 119:2
**findings**
41:6,11 94:25,25
95:2 96:2 115:8
**finds**
73:15 76:6
**fine**
41:24 88:2 101:4
109:19 113:6
159:20
**finished**
9:17 118:3 143:17
**finishing**
80:6 147:20
**fire**
64:6
**firm**
6:18 7:24 13:5,8
33:11 38:5 92:16
92:23 93:13 98:23
154:12 159:22

**first**
4:4 5:8 10:19
11:15 18:25 19:13
29:4 33:3 38:1,2
40:15,25 42:7
44:22 48:8,11
53:5 73:5 75:16
87:14 88:7 92:5
111:21 129:10
134:3 135:3
147:14 151:7
**firsthand**
29:23
**firstsight**
13:2
**fit**
98:17
**five**
56:4
**flip**
96:23
**flowed**
60:9
**focus**
8:21 41:25 109:19
114:5 118:7
144:16
**focused**
47:14 120:5
**folks**
89:2
**follow**
18:11 91:16,21
127:14
**following**
88:11 137:5
148:17
**followups**
118:3
**forbidden**
100:22,24
**force**
63:4,7,11 64:2,6
66:17 67:2,3
68:24 69:1,3 70:6
70:23 71:1,10,24
**forces**
29:17 32:3 42:18
62:13,15

**foregoing**
161:5,8,12 162:4
**foreign**
10:3 43:11,24
44:7,8 61:21,22
89:2
**foreigners**
10:3
**foreseeability**
77:3
**foreseeable**
76:22,22
**forever**
20:6
**forged**
22:11 98:25
**forgeries**
98:9
**forget**
26:15
**forgot**
46:13
**form**
126:3
**formation**
31:2
**formed**
13:5,7
**forming**
24:11,12 34:20
125:20
**formula**
141:16,25
**forth**
4:6 28:1 58:22
61:12 161:9
**found**
75:9,25 76:3 95:2
95:8 96:2 98:4
102:21 105:1
106:3 107:13
119:11
**foundation**
18:18 23:12 30:8
66:19 75:20 78:12
79:25 80:22 81:15
83:10,24 85:21
95:20 98:12
100:14 101:10,25

102:18 103:20
105:6 107:1
108:13 110:6
113:16 115:11
118:16 124:22
142:14 149:7
151:19 153:12,18
155:3 157:3
**foundational**
90:3
**founded**
97:25 104:25
**four**
39:10,11 46:13
134:15 153:22
159:17,18
**fourth**
46:13
**frank**
36:3,5
**free**
91:12 96:23 114:9
120:20 142:1
145:16
**freedom**
7:9
**friend**
12:22
**friends**
7:11
**front**
105:8
**fuad**
25:24
**full**
93:5 109:13 111:2
112:5,18,24 126:9
137:11 143:10
148:20
**fullfledged**
31:13
**fully**
52:13 62:9
**fun**
7:13,13
**funding**
106:17 109:5
**funny**
8:14

**further**
54:18 72:13,15,19
127:7 161:14
**future**
107:12 117:20
147:6 148:23
151:4

_____

**G**
**gain**
70:17
**galilee**
6:15
**ganot**
3:16 46:19 47:1
124:1,2,3
**gaon**
42:7,8,9,10 45:7
45:12
**gaps**
150:8
**gathering**
152:14
**gaza**
22:11 24:21 27:5
62:24
**gbd**
1:6
**general**
17:4,13 32:5
40:18 50:13,13
51:10 67:21 98:22
127:6,6 147:16
150:4,22 152:10
**generally**
7:5 18:20 35:11
63:19 126:25
127:5,18 128:1
**generous**
143:11,13
**gerber**
9:6
**germane**
108:9
**getting**
8:16 32:4,6 37:1
67:15 70:11,13
73:10 130:15
**ginosar**

17:1,12
**give**
13:1 20:3,5 36:18
38:25 43:25 49:16
67:17 70:10 96:2
96:13,14 106:23
110:11 113:22
116:2 131:3,25
133:13,14 142:8
142:18 148:12
156:13
**given**
34:23 43:11 48:9
71:1,2 75:6 82:16
82:17 96:10
106:20 109:13
112:17,24 114:25
118:25 126:15
140:24 141:23
142:9 158:16
**gives**
72:14
**giving**
40:22 81:11,12,21
118:21 122:22
126:19 128:3,4
**glad**
19:19 32:24 87:23
**go**
5:8 7:10 10:8
11:11,12 24:6
25:3 27:13 32:25
36:20 45:25 47:12
50:5 54:18 60:13
70:10 79:21 84:16
85:4 86:5 89:8
90:20,24 91:14
100:21,22 114:15
114:22 119:23
125:24 127:7
132:9 145:25
147:25 152:6
155:12 156:21
**god**
36:8
**goes**
50:6 72:20 76:6
76:11 93:4 100:21
113:13 136:13

**going**
8:16 12:20 20:22
24:24 32:21 60:15
79:4 86:16 88:12
89:7 118:25
121:20 135:18
136:7 154:12
**goldberg**
144:17,22 145:7
145:12 146:7
147:12 155:21
**goldbergs**
145:21 151:4
**good**
4:20 7:14 17:24
18:9 25:7 55:11
56:4 60:18 77:16
92:23 98:23
116:12 118:19
119:16 123:18
130:18 133:12
138:5 140:18
155:1 159:9
**governing**
65:18
**government**
10:14 14:15,24
17:12 68:7,11,17
150:6,25 152:3
**governmental**
10:15,16 61:14
**grace**
36:8
**graduated**
7:22
**graduates**
25:14 146:15,17
**grant**
50:5 123:15
130:25 131:3,11
132:2 135:1 136:1
136:8 137:4,5
141:1 148:19,21
**granted**
129:20 132:3
133:10 135:2
141:9 142:5
143:14
**grants**

55:20 130:5
**gray**
  80:2
**great**
  32:12 37:9 69:2
**grew**
  6:11,13
**gross**
  156:14
**ground**
  12:21 98:24
**grounds**
  44:12,13,14 81:8
**group**
  91:2 148:24
**groups**
  126:15 150:8
  152:2,12,12
**grow**
  6:12
**growing**
  29:17
**guess**
  6:8 25:17 27:9
  37:21 42:22 55:25
  63:24 88:12
  124:18 128:9
  152:12 153:21,24
  153:24
**guided**
  106:17
**gun**
  72:14 76:3,4
  80:18 81:24,25
  82:16
**guy**
  15:22 16:17 17:1
  17:3,12 53:16
  73:11,16,16,25
  77:15 78:18,20
  79:10,10 80:4
  86:13 95:6 140:21
  150:10 154:15
**guys**
  17:5 89:1

---
**H**

**hague**
  12:9

**haifa**
  11:5,5
**half**
  6:17
**hampered**
  93:1 94:14
**hand**
  91:4 117:21 142:2
  143:12
**handle**
  75:2
**handles**
  98:16
**hands**
  106:13
**handy**
  114:14
**happened**
  14:20 15:21 28:7
  35:15 44:3 52:25
  62:7 66:5 68:3
  69:8 74:1 80:9,11
  82:4
**hard**
  12:5 22:14 28:5
  41:17,21 68:2
  69:9 88:19 89:4
  98:15,20 116:14
  118:20 119:16
  146:21 147:22
**harm**
  63:8,12,17,23,23
  65:2 77:4 79:15
  127:3 137:20
  138:2
**harmed**
  137:17 138:22
**harofim**
  149:20
**head**
  15:12 90:13,14,14
  106:16
**headquarters**
  95:12
**hear**
  40:9,9 94:3
**heard**
  26:3,13 29:19,21
  32:7 37:11 50:8

55:4,7 90:7
  132:13 133:9
  148:23 151:9
  152:23
**hearing**
  40:2 51:12 55:21
  118:22 123:14,14
  158:21
**hears**
  136:5
**heart**
  124:17
**hebrew**
  6:16,20 14:7
  28:19 35:11,17
  42:8 82:6 83:13
  93:20 97:6,18
  99:23 103:23
  114:13,13,16,17
  115:1 124:19
  148:14 152:25
  153:2
**heirs**
  54:16 129:13,18
**held**
  10:10 25:1 29:10
  60:4 116:18
  121:17 159:24
**help**
  32:17,18 36:15
  54:1,1 60:17
  151:11
**helped**
  7:19 27:19
**helpful**
  39:3,4 41:12
  114:3,6,10 119:17
  120:18 141:6
**helping**
  68:15 126:11
  137:12
**hereinafter**
  4:6
**herman**
  9:6
**hero**
  69:2
**high**
  12:16 13:14 31:20

48:22,23 49:1
  52:17 55:23 92:19
  133:11
**higher**
  55:20 140:4,14
**highest**
  18:21,21 19:6
  32:4
**highranking**
  99:9
**hill**
  2:16 6:24 16:5
  18:18 19:14 20:20
  23:12 24:5 30:8
  33:9,13 37:4 40:5
  45:17,20 56:21
  57:2 64:10 66:18
  67:4,10,19 69:5
  70:12 71:6 73:5
  74:6 75:15,19
  77:5 78:11 79:21
  79:24 80:22 81:14
  82:7,12 83:3,9,23
  84:4,15 85:20
  86:4 87:9 90:3,20
  92:20 93:2 95:20
  96:4 97:10 98:12
  100:14 101:10,24
  102:18 103:20
  104:12 105:3,6
  107:1 108:13
  109:17,21 110:6
  112:7,20 113:16
  114:15,20 115:10
  116:5 117:9
  118:12,16 120:1
  121:16 124:22
  127:11 133:22
  134:2 135:19,22
  139:15 142:14
  145:15 146:3
  148:7 149:7
  150:17 151:18
  153:12,18 155:3,8
  156:10 157:2
  159:14,21 160:2,7
**hinted**
  49:3
**hints**

136:15
**hired**
  93:22
**histadrut**
  149:20
**historical**
  26:23
**hit**
  139:20
**hodaa**
  99:23
**hold**
  52:4 64:14 75:15
  83:3 88:21 115:25
**holding**
  60:2 128:12
**home**
  7:6,7 53:1 76:12
  78:19 81:23 82:14
  156:24 157:6,11
  157:16,21
**hon**
  3:16
**hopefully**
  118:3
**hospital**
  99:17 141:19
  151:12
**hospitals**
  150:7,25
**hotel**
  2:5
**hours**
  151:17,21 152:8
  152:10,20 153:6
  153:11,14,23,23
  159:17,19
**house**
  53:4 81:21,22
**huge**
  131:21,25 132:6
  133:1 150:8
**human**
  8:23 10:1,5
**humanitarian**
  8:24 62:23
**hundreds**
  27:7
**hurt**

64:7
**hurts**
63:11
**hypothetical**
64:1,10,21 65:1
65:22 66:1,1,14
66:19 68:5,18,19
68:20,22 69:3,6
70:3,5,21 71:22
72:25 73:1,6
74:15 75:3,5,12
75:18,20,22 76:16
77:2 78:5,6,9,12
79:3,4,17,25
80:15,17,23 81:10
81:15 82:16,25
83:10,24 85:21
87:5,10,13 89:6
146:3
**hypotheticals**
88:6,11 118:18

**I**

**ibrahim**
28:25
**icj**
12:25
**idea**
15:25 128:2
152:16
**ideas**
25:19
**ideological**
66:7,15 69:21
**idris**
35:9
**iii**
2:5
**illegal**
54:3 126:20
**imagine**
89:1
**immediate**
78:21
**immediately**
17:9 22:18,25
28:9 79:10 84:18
139:22 141:3
**immigrants**

10:4
**immunity**
43:1,10,12,22
44:9 45:4
**impact**
138:2
**implicate**
82:3 83:19,22
84:2,12
**implicated**
86:14
**importance**
145:9,11
**important**
51:23 74:8 88:4
100:3,7 105:19
150:2 156:14
**impose**
84:1
**imposing**
122:5
**impressed**
104:7 105:18,20
**impression**
92:25
**improving**
25:8
**inadmissible**
102:12
**inauthentic**
98:8
**incident**
44:22,23 93:10
96:7 138:3,20
141:3
**incidents**
44:21
**incitement**
46:7,20,22,23
**include**
158:10,17
**including**
11:6 26:24 42:16
48:7 58:21 106:18
109:3 117:21
**income**
144:25 151:15
157:9,13,16
**incompetent**

31:8
**incomplete**
64:10 66:18 69:5
73:6 75:19 78:11
79:24 80:23 81:14
83:9,23 85:20
87:10 121:19
146:3
**incorporated**
57:22 58:2,5,7
124:5
**incorrect**
16:19 57:17,18
133:5,12,19
134:25
**independence**
29:13
**independent**
24:11 74:9 146:19
150:6 154:18,18
154:22 157:11
**indicating**
133:21
**indication**
147:9,9
**indictment**
53:11 77:15
**individual**
25:23 58:12 59:1
71:25 72:1 75:5
**individuals**
34:13 154:2
**influence**
29:17 117:23
**informal**
83:4
**information**
4:21 53:17 73:10
73:13,17,24,24
74:5,8,10 75:6,24
78:15 79:6 98:18
99:23 146:22
149:18,25 151:13
152:14
**informed**
145:2
**infringe**
137:12
**injured**

37:18 44:22
141:19
**injury**
138:15 139:1
**inputs**
145:5
**inquiring**
104:14
**inquiry**
14:25 74:12 99:22
**inside**
14:23 37:22 59:9
59:12 62:13
**install**
83:13
**instance**
18:25 19:13 40:15
40:25
**instances**
47:25
**institute**
12:23 31:22
**institutions**
10:14 32:2
**instruct**
86:11
**insufficient**
47:9
**insurance**
21:3,9 22:9,15,23
23:2 28:4 92:15
**intelligence**
73:23
**intent**
116:21
**inter**
116:13
**interacts**
63:24
**interested**
97:23 151:10
152:13 161:14
**interesting**
6:10 17:2 32:17
43:2 53:11
**interim**
122:5 124:4
**intermediary**
138:3,10,20

**intermediate**
52:8 150:16
**internal**
15:15
**international**
8:23,24 9:4 11:24
12:8 16:21,23
57:19,21 58:10,18
58:20,20 62:12,22
**internationals**
7:12
**internet**
114:10
**interpretation**
21:24 22:3 69:18
110:11,17,24
111:14,24 112:15
115:21
**interrogations**
160:3,5
**intervene**
41:5 143:16
**intervenes**
41:10
**intervening**
66:3,12 143:7
**intervention**
93:23 143:5,6
**interview**
46:23
**intifada**
37:20 90:1 106:12
**introduce**
32:14
**introduced**
22:7
**introductions**
10:9
**intuitive**
141:10 142:24
**investigate**
15:2 22:24 23:2
71:16 74:11 76:7
**investigates**
73:15 77:24
**investigation**
14:25 16:12 99:24
110:12 111:8
115:16

investigators
  23:1
invited
  29:8 32:11 43:23
involved
  12:7 17:1 31:10
  32:10,11 34:13
ipad
  37:1
israel
  1:15 2:5 4:13
  6:19 7:16 8:7,10
  9:3,23 10:2,4,6,22
  11:8 14:23 24:21
  26:24,24 27:4,5
  27:21 30:13 31:19
  31:20 32:3 34:2
  37:22 40:8 42:24
  42:25 45:3 46:14
  47:23 48:1,21
  51:22 53:2,6
  55:24 57:11,24
  58:12,14 59:10
  61:16,20 62:3,9
  62:10,12,21 65:5
  66:5,17 67:2
  68:10 69:9,10,19
  81:2 87:7,13,20
  88:18,23 89:18,19
  99:10 106:14
  119:3 121:6 123:7
  124:6 126:4,6,16
  127:10,16 128:4
  129:24 131:1
  132:7 136:10
  137:3 139:3
  141:15 145:24
  146:9,23 147:17
  148:1,2 149:2,3
  149:18 150:3
  151:9 152:9 153:6
  157:24
israeli
  5:1,16 6:11,18
  8:12,15,17 10:6,7
  10:13,14,14,17
  12:15,16,19 13:3
  14:21,22,24 15:14
  15:19,20 16:19

17:2,4,10,11,15
17:18 22:9 23:4
30:14 31:6,10,20
31:21,22 32:1,3,4
32:8 39:24,25
40:5,6 43:4,9,11
48:23,25 49:14
50:13 52:10,11,17
57:7,12,20 58:2
59:3 60:16 61:1,7
61:19,23 62:1,14
62:18,18 66:6,10
66:10,14 67:25
68:7,9,10 80:5
87:15,24 88:1,4
88:18,24,24,25
93:19 100:18
116:12 119:8
126:17,21 128:7
131:24 132:1
133:2 136:3 137:5
148:9 149:17
israelipalestinian
  93:19
israelipalestinians
  5:17
israelis
  5:19 7:12 10:1
  52:16 106:14
issue
  12:11 43:3,21
  46:20 47:14 49:6
  50:3 55:9 57:5
  58:18,19,22 60:24
  61:2 94:15 123:21
  142:11 146:23
  157:9
issued
  12:19 13:13 21:23
  22:5,7 56:13 58:4
  122:15,17
issues
  10:6 24:4 89:3
  143:4,9
item
  137:23

---

**J**

jail

66:25 67:18 68:25
70:9 71:3 72:9
january
  78:24
jericho
  2:5
jerusalem
  1:15 2:5 6:16,18
  7:24 11:17 63:11
  92:17
jewish
  100:18
job
  99:10
john
  45:9,10,11
join
  5:24 130:1,2
joined
  9:19 11:17 106:13
joint
  32:8
jordan
  27:1
jordanians
  27:1
journal
  91:19
judge
  7:16,17 40:2
  46:10,11,17 47:1
  48:3,3,4,5,6,15
  50:2,5 52:22 53:5
  54:2,7 55:17,18
  55:21 93:10,11,15
  93:24,25 94:1,6
  94:10,16 95:1,8
  98:4 104:23 105:7
  105:13 107:4,17
  108:22 110:2
  112:23 113:17
  114:8 115:7
  116:22 117:3,11
  117:18 118:7
  120:7 124:1,3,7
  125:7,10,13,25
  128:13 130:12,19
  131:2,4,5,7,8,10
  131:11,15,17,23

132:3,8 133:4,10
133:17,18 135:7
135:14,15,25
136:2,5,5,6,9,11
137:2
judges
  25:16 40:3 50:7
  132:13
judgment
  3:16 46:16 47:19
  47:22 48:8,9,12
  48:14,16,19 49:15
  51:15,24 52:19,20
  55:4,8,13,16,23
  59:25 93:6 94:17
  107:5 119:5,7,9
  129:15,17 130:4,9
  130:14,15,21,25
  131:3,6 132:13,15
  132:25 133:4,13
  133:15 135:2,25
  135:25 136:6,25
  137:1,7
judicata
  117:14
judicial
  25:6 26:15
judiciary
  25:7 29:13 30:14
july
  3:14 33:6 56:16
jump
  51:9 84:17
jurisdiction
  31:15 126:18
jurisprudence
  15:19
just
  9:13,14,16 10:9
  11:15 12:13 14:18
  18:8 20:7,22,25
  21:14 23:21 24:1
  30:11 31:7 36:2
  37:15 39:1,21
  43:18 47:8 52:14
  53:2 64:1,20
  67:21 70:4 77:12
  80:16 84:19 86:12
  86:13 87:1,13

88:17 89:15,17
90:3,7 91:4 93:5
96:16 97:22 100:1
101:5,13,17 102:6
102:25 105:16
106:6 108:5,9,19
117:2 118:2,6
120:5 121:7
128:20 130:23
131:6 133:16
134:2 135:16
137:23 139:12
141:18 143:24
144:9 145:22
158:1,3,14 160:1
justice
  7:18,19 12:8
  15:11,11 29:18
  50:8 51:18
justices
  50:7

---

**K**

katz
  1:25 2:4 161:3,19
kaufman
  33:23
keep
  52:3 72:4 77:25
keeps
  52:4
kent
  2:11,13 83:4
kfar
  158:22
kidnapped
  17:6
killed
  14:21 17:5,9
  37:18 44:23 52:23
  52:23,25 53:1,5
  53:24,25 54:9,16
  55:5,6 59:2,4,6
  64:7 66:6 68:5
  69:21 73:4 79:14
  139:21,22
killer
  88:20,21
killers

16:15
**killing**
    15:8 16:16 44:20
    61:22 66:3 67:6
    138:14
**killings**
    70:1
**kind**
    5:9 11:19 15:5,25
    16:3 30:5 32:22
    53:20 78:25 97:17
    127:2 130:22
    131:9,13,16 132:8
    148:13 153:20,24
    155:1
**kinds**
    147:23,24
**king**
    2:5
**knesset**
    10:7
**know**
    4:19 5:7,15 7:7,11
    8:2 9:15 10:13
    12:4,5 13:1 16:16
    16:22 19:7 23:15
    23:18,20,21,22
    24:7,15,19 25:6,9
    25:11,17,18,24
    26:2 27:16,24
    28:2,3,5,12,13
    29:1,2,6,7 30:1,3
    30:9,10,12,13,15
    30:16,24 31:1,5
    31:10,12,17,20,24
    32:20,23 34:16,17
    34:17,24 35:7,14
    35:20,23,24,25
    36:1,4,4,4 38:8,24
    41:6 49:13 53:3
    53:14,22 54:1
    55:14,14,23 59:14
    59:17 61:13 65:22
    67:12 68:4,18
    69:15 72:7 73:25
    74:11,16,18,18,20
    76:24 81:3,6 83:4
    84:5,19,24 85:4
    86:10,10,12,19

87:1 88:17,17,20
89:17,20 90:6
91:23 92:2,3,8,10
92:11,11 93:8,14
94:16 95:22 96:11
97:8 98:16,18,18
100:17,20 101:6
102:14 104:6
113:24 118:23,24
121:4 124:12
125:16 126:11,19
127:1,13 128:2
136:24 142:6
146:13,14,16,17
146:21,25 148:24
149:2 150:5,9,10
151:7,12 152:2,4
152:18,20 153:1,2
153:8,9,22,23
155:4 156:15
160:8
**knowledge**
    52:14 67:21 90:5
    90:10 101:5 104:8
    105:20
**known**
    98:23
**knows**
    93:20 96:8,11
    100:15 101:11
    102:1 124:23
    147:15 153:19
**kuperwasser**
    95:6 96:3,6 97:25
    99:1 100:2,6
    101:19 104:7,11
    104:24 105:12,18
    106:3 107:23
    108:7 110:3
    116:16
**kuperwassers**
    95:9 98:4

L

**lack**
    18:18 23:12 30:8
    31:15,15 66:19
    75:20 78:12 79:25
    80:22 81:15 83:10

83:24 85:21 90:4
95:20 98:12
100:14 101:10,24
102:18 103:20
105:6 107:1
108:13 110:6
113:16 115:11
118:16 124:22
142:14 149:7
151:18 153:18
155:3 157:2
**lacking**
    25:8
**lamberth**
    124:7 125:8,10,13
**lamberths**
    125:25 128:13
**language**
    11:8 20:12 28:17
    125:1 133:8
**languages**
    28:16
**laptop**
    120:22
**larry**
    9:6
**late**
    52:22 147:12
**law**
    5:21 6:6,9,20 7:24
    8:24 11:2,17 15:2
    22:17 23:11,21
    25:10,11,13,14
    27:19,20,25 28:3
    28:4,11,13 30:2
    33:11 35:19 39:17
    39:24 42:25 58:10
    59:19 61:7,19
    62:12,23 65:5
    67:13,25 69:10
    73:20,23 74:16
    78:16,17 87:7,12
    87:15,24 88:1,7
    88:18 91:19,20
    92:16 116:12
    121:4 124:5 126:4
    126:17 132:1
    136:3 137:5
    138:17 139:3,8

141:17 153:7,8,8
153:10,14 154:12
156:21
**laws**
    26:11,19 27:2,2
    126:6
**lawsuit**
    122:20 129:24,25
    130:2
**lawsuits**
    119:2
**lawyer**
    5:10 11:18 30:2
    53:13,13,19,24
    61:12 92:12 93:11
    93:12,13,19,20,25
    94:4,7 98:16
    100:18 120:12
    127:19 149:10,11
    154:11
**lawyers**
    5:1 8:6 23:19
    24:17,18,23 43:4
    43:18 92:8 98:22
    100:13 102:15
    110:10 111:7
    153:21
**layers**
    26:10,18 27:13
**layman**
    94:16
**laypersons**
    15:25
**leader**
    84:9
**leads**
    109:1
**learned**
    91:17
**leave**
    10:23,25 11:1,2
    94:1
**leaving**
    7:6
**lectures**
    23:20
**led**
    73:2 90:2
**left**

8:11 75:10
**legal**
    3:11 5:2 9:2,4
    12:24 13:13 16:19
    17:17 18:9 19:6
    19:22 20:14 21:25
    24:2,4 26:5,10,15
    26:22 27:18 29:10
    29:14 31:2,21
    32:1,21 39:24
    40:6 41:25 42:2
    45:15 46:1 47:8
    47:13,13,13 49:2
    51:21 53:22 57:20
    57:22 58:11,13,22
    60:4,16 78:17
    88:3,5,9,9 89:21
    91:24,24 94:25
    102:13 117:15
    131:24 133:2,8
**legally**
    131:19
**legislating**
    27:2
**legislation**
    26:19,22 27:11,14
    28:17 57:23 58:3
**legislative**
    27:10 57:24
**legislator**
    21:8 28:1
**legislators**
    10:7
**lesson**
    19:14
**letters**
    10:13 51:10
**letting**
    160:8
**level**
    150:16
**levels**
    150:14
**levine**
    7:18,19
**lexisnexis**
    27:21 92:3
**liability**
    42:1,4 46:25 47:2

49:11,11 80:20
81:3 82:11,20
88:5 107:6 109:13
110:4 112:3
122:25 123:3
**liable**
60:2 64:14 65:4
66:11 81:5,9
88:22 112:17
113:6 115:25
119:11
**liar**
41:2,2
**liberation**
1:7 163:3
**liberty**
7:9
**life**
139:10,14 140:5,7
140:8,10,14,15,15
140:18,24 141:5
142:25 143:11
145:6,9,19
**limit**
155:24 156:5,6
**limitations**
22:17
**line**
17:3,3 70:1 163:7
163:9,11,13,15,17
163:19,21
**lines**
51:17
**link**
110:5 117:3,7
118:8
**listed**
158:15 162:7
**lists**
148:23
**litigated**
128:20
**litigation**
11:23
**little**
32:25 39:23 48:3
49:7 52:18 58:23
123:25 125:17
128:23 130:8

142:19
**live**
72:14 80:17 82:17
**lived**
35:5
**living**
140:20
**llm**
8:19
**llp**
2:11
**local**
9:3 11:24 57:12
57:19,22,23 58:7
58:10,14 133:8
**location**
112:15
**long**
6:5 14:19 19:17
23:6 28:8 41:17
43:3 46:5 78:22
92:11 94:4 95:4
139:25
**longer**
140:3
**look**
23:14 39:9 97:7
108:10 114:17,25
115:5 120:20
121:14 122:1,10
123:10 125:24
143:9,24 144:1
156:19 157:9
**looked**
88:15 155:21
**looking**
38:7 49:18 81:7
97:20 102:6 129:1
**lose**
94:18
**loss**
54:5,23 141:22,24
145:8 155:22
**lost**
140:8
**lot**
12:6 30:25 31:3
36:5,6,13 38:23
43:4 60:18 118:18

146:20
**lots**
11:23 42:15 46:8
86:6,6 89:22
91:22 92:14 93:7
**love**
32:13,16
**lovely**
143:20
**lower**
48:3 70:23

_____

## M

**machine**
131:6
**magazine**
15:17
**magistrates**
12:17 18:23 19:12
**main**
28:17 51:1,6
57:15 89:24 95:5
95:7,15,16 104:10
140:8,22 141:4
**maintain**
67:2
**maintained**
71:1
**major**
69:13
**maker**
71:25 72:14,16,18
72:20,23,24 75:6
76:25 80:17 82:5
**makers**
81:13
**making**
20:25 63:11 72:3
81:19 109:21
115:8 117:4
**mandate**
15:2 26:21
**mark**
1:4 20:6,9 37:2
96:15 121:15
163:2
**marked**
3:10 20:10 90:23
91:3 96:19 121:19

121:22
**market**
22:10
**martyr**
34:12,16,17,18
**martyrs**
117:5
**marwan**
72:5,7,9,13,15
80:15 84:9,11,18
84:20 85:4
**materials**
33:13
**mathematical**
141:16,24
**mathematics**
141:13
**matter**
13:3 22:13 58:18
58:19 60:4 102:2
104:17 108:24
111:1 146:10
**matters**
29:11 57:4
**mazen**
11:18
**mean**
7:1,2,5 8:12 14:12
16:10 18:22 23:16
24:9,14 26:14
28:8 29:7 35:5,6,6
35:22 36:12 40:5
41:17 46:4 47:11
49:3,10 55:16
58:6 63:21 64:1
67:12 68:1,16
69:9,12 74:7,15
76:1,5 77:21
78:22 80:3,25
81:2 82:22 84:1
84:11,20 86:1
87:25 88:3,5,14
92:12,22 93:4
94:15 97:4 98:15
100:17 101:13
103:25 104:4
107:15 110:14
113:20 117:13,14
117:20 118:13

121:13 126:8,25
127:3,18 128:2,3
129:13 130:23
133:6 135:10
136:22 138:10
142:1 145:22
146:6,11 151:21
152:6 154:9
158:25
**meaning**
42:22 48:13,17
52:4 62:23 104:1
110:17 125:1
156:6
**means**
34:18 59:12 68:10
76:3 107:9 113:1
113:18 131:8
140:13 143:10
**meant**
105:7 111:9,11
115:17
**media**
13:3,3,4,4 29:22
35:8 42:20 72:8
84:19 86:19 89:15
89:17 90:7,11
**medical**
146:18 147:16
149:24
**medicine**
147:14 150:5,11
**meet**
138:25
**member**
4:13,15,22,25 5:4
8:12 54:9 64:2,5
84:6 86:20 90:8
138:1,13,15,24
**members**
5:3 34:25 54:23
70:23
**memory**
80:16 124:10
**mental**
139:1
**mentin**
3:17 46:12,18
47:1,4,18 52:1,4,5

56:8,8,19 57:1
80:3 89:7 91:14
92:5,24 93:24
94:12 95:1 96:2
96:14,15,25
103:17 106:24
107:5 117:3,12
118:4 119:10,14
119:19 120:21
124:3
**mention**
41:19 158:4
**mentioned**
34:22 37:10 38:21
42:20 52:3,5,20
55:8 56:8 69:24
107:18 116:14
136:10 138:1
139:1 141:7 145:1
145:3 159:1,4
**mentioning**
64:18 84:6
**mere**
130:24 131:14
**merits**
46:14,15 49:17
50:16 51:5,5,16
51:17 119:4,5
133:15 136:25
**mess**
26:12
**met**
8:8 53:21 77:3,10
78:10 79:15 85:2
138:21
**middle**
113:13
**milchev**
2:19
**military**
18:1 19:23 21:6,9
21:10,13,17,24
22:6,8,8 25:1,3,4
25:4,5 27:6,6,8
28:19 58:3,4 80:7
86:17,24,25
100:22
**miller**
2:16 33:10 38:5

**million**
54:8,20 132:5
142:10
**mind**
39:5 47:8 106:21
109:16,24 155:10
**mine**
12:22 33:21 77:18
**minimize**
106:9 113:11
**minimum**
24:18,19
**minister**
15:14,14,15 16:18
17:14
**ministries**
10:15 17:15
**ministry**
43:11,24 44:8,8
154:25
**minutes**
56:4
**mirror**
9:24
**miscorrect**
159:2
**mislead**
156:17
**missing**
31:4 77:10 79:2
**mission**
85:19
**misstates**
16:5 112:7,20
115:10 146:3
**mistake**
18:8 38:11 41:7
**mistaken**
16:25 33:7 49:6
62:7 93:12 95:7
99:21 102:4,10,15
102:21 110:9
**mistranslated**
28:20
**mistrust**
31:18
**mixed**
18:1 26:11
**modern**

22:3
**moment**
155:12
**monday**
2:6
**money**
9:16 72:14 80:18
81:21,23 82:17
106:18 123:6
126:10,15,19
128:3,4 131:21
132:6 133:1
**monopolizing**
22:10
**month**
116:24,24
**months**
79:18 80:9 140:1
**motion**
48:11 50:9 55:5,7
55:12 132:12
136:1,2,6
**motivated**
83:17
**motives**
68:21
**move**
38:8 104:20
108:20
**movement**
89:24,24,25 90:12
**muhammad**
1:14 2:1 3:3,14
4:3,12 162:3,15
163:5,24
**muhasen**
158:11,12,15,23
159:3
**muhassan**
25:24
**municipality**
11:5
**murder**
53:18 54:2 130:3
**murdered**
53:7,8 54:16
**murderous**
110:18
**musawa**

28:25 29:12
**mystery**
53:18

_____
**N**
_____
**nails**
72:2
**name**
4:10 25:25 26:3
35:14 38:13 39:1
45:8 59:16,17
76:20 84:21 85:6
85:12 124:1 153:1
**named**
15:11 25:23 125:7
161:5
**names**
37:24 38:19,19,23
92:2
**narrower**
75:4
**narrowly**
118:7
**national**
85:16 86:14
**nationality**
5:22,23
**nations**
43:7,9 44:4 58:21
**nature**
76:20
**nazareth**
6:14 38:18 39:2
158:19,23 159:2
**necessarily**
66:11 68:1 76:3
81:2 85:5 86:1
**necessary**
45:1 46:2
**need**
4:20 21:2 27:13
30:17 49:7 51:12
67:13 75:24 81:6
88:7 126:5 129:22
130:3 151:7
**needed**
22:18
**needs**
120:22 146:14

**negligence**
44:18 59:19,25
60:1,3
**negotiations**
87:1
**neither**
118:13,14 149:11
**net**
156:14,18
**neutral**
32:19
**never**
29:20 49:12 61:19
61:23 69:8 90:8
94:5
**nevo**
27:22 92:1
**new**
1:2 2:3,12,12 4:15
4:24 5:21,25
18:17 19:3,7,15
19:18 24:9,9
25:19,19,20 31:2
32:7 39:23 40:11
43:15 52:15 60:15
60:16 65:10 127:9
127:16 128:9,11
**newcomer**
10:20
**news**
53:16 91:24
138:19
**newspaper**
46:9 91:20
**newspapers**
42:20 51:11
**nice**
7:5
**nick**
33:22
**nine**
11:20
**nonmember**
43:8 44:5
**nonsense**
131:10
**nontraffic**
156:3,4
**normal**

85:14 146:16
150:11 154:3
**norms**
16:19,21,23 17:18
47:13 49:5 55:19
88:5
**note**
104:12
**noted**
39:17
**notice**
2:4 21:2,12 22:18
49:25 95:3 125:3
**noticed**
4:17 12:7 38:12
42:4 94:25 121:10
**notion**
140:16
**notional**
60:10,13,21,25
61:6,9,14,20 62:4
62:20 63:21,25
64:8,14,17 73:3
**notwithstanding**
107:7
**november**
8:19 161:17
**novo**
142:12
**number**
3:10,12,15,18,20
17:25 18:6 24:17
24:19 38:20 152:8
152:10
**numbers**
18:10 141:18
**nw**
2:17

O

**oath**
162:5,10
**objection**
6:24 16:5 18:18
19:14,19 23:12
24:5 30:8 40:7
45:17,19 56:21
57:2 64:10 66:18
67:4,10,19 69:5

70:12 71:6 73:5,6
75:15,19 78:11
79:21,24 80:22
81:14 82:7 83:9
83:23 85:20 87:9
90:4 92:20 93:2
95:20 96:4 98:12
100:14 101:4,10
101:24 102:18
103:20 105:6
107:1 108:13
110:6 112:7,20
113:16 115:10
116:5 117:9
118:12 124:22
127:11 135:22
139:15 142:14
148:7 149:7
150:17 151:18
153:12,18 155:3,8
156:10 157:2
**objections**
74:6 77:5 82:12
84:4,15 86:4
**objective**
30:14
**obligation**
59:22 123:23
125:20 126:4,13
127:2 130:13,19
**obligations**
57:5,9,12,14,18
58:13,15,16,17
59:24
**obliged**
120:11
**observation**
127:6
**obviously**
28:17 55:16
**occasionally**
12:5
**occupation**
86:23
**occupied**
10:2 24:21 27:5
62:5,10
**occupying**
62:11,13

**occur**
126:16
**occurred**
23:6 37:20 141:3
148:4
**occurrences**
42:23 117:24,25
**october**
1:16 2:6 162:6
163:4
**oecd**
152:9,11
**offense**
69:16 78:25 128:7
**office**
11:17 53:14,19
76:3 92:14 156:25
**officer**
15:5,6 16:14
63:10 65:21,24
67:3,24 68:5,20
70:21 72:22 99:10
**officers**
65:11,18,23 70:22
74:3 88:25
**official**
11:7 46:24 84:18
**offtherecord**
159:13
**oh**
19:10 84:10,10
139:6 145:17
**okay**
13:10 17:17 39:8
42:3 88:2 91:10
96:20 97:7 101:24
105:3,24 110:1
114:4 119:17
120:4,19 129:3,6
134:6 139:22
143:15,22 144:9
148:16 155:11
159:7
**old**
8:3
**older**
14:13,14,14
**omissions**
61:4

**once**
12:6 91:1
**ones**
158:15
**opened**
64:6
**openended**
45:22
**opening**
137:9
**opinion**
14:15,18 38:16,25
39:16 44:7,8 49:1
50:25 51:15 76:14
83:8 87:4 97:24
100:2,6 102:7
103:17 104:24
105:1,7,14,17,25
107:3,16,17,23
110:3,3 116:3
117:18 118:21
128:12 134:17
135:8,15,16
136:22 137:2
144:5,5 158:5
**opinions**
7:19 33:1 34:21
37:11 63:3 86:16
86:21 87:2 89:9
104:21 106:25
108:5 117:8
**opportunity**
114:25 115:4
120:24,25 125:24
**opposition**
86:23
**orchestration**
109:5
**order**
18:1 19:23 21:10
21:13,17,24 22:5
22:6,8 27:12
65:20 122:17
**orders**
12:18,19 21:9
27:6,8 28:19 58:3
100:22
**organ**
84:25

**organization**
1:7 9:22,24,25
28:25 29:5,6,10
73:2 84:23,25
85:12 128:5
149:19,21 151:10
163:3
**organizations**
65:7 106:12 109:3
126:11,20
**organs**
65:13
**original**
97:18 105:8
113:18 114:11,25
120:5
**orr**
15:10,11 16:13
**oslo**
24:22 27:8 31:8
57:10 58:1
**ottomans**
26:20 28:3
**ought**
135:17
**outside**
25:14 126:16
128:4
**overbroad**
56:21
**overhead**
156:25
**overturn**
40:21
**owes**
61:20 62:4

P

**pa**
25:7 42:17,23,25
43:4,7,17,19 44:3
44:4,9 45:4 46:8
46:20,25 47:2
49:12 51:21 57:6
57:10 58:11,14
60:5 63:17 64:15
64:22 65:14,15,17
65:21 71:10,24
72:10 88:22 89:10

89:20 90:14 100:9
100:19 106:9,16
107:7,15 109:5,13
110:4,5,11 111:2
111:9,10,11,12
112:4,4,16,17
113:6,11 115:15
115:17,17,18,21
115:24,25 116:21
116:24 117:1,4,13
118:8 119:3,11,12
122:6,15,25 123:7
126:13,15,19
128:5
**page**
3:5 20:13 37:10
38:7 39:9 49:19
49:20 97:7,15,17
108:21 113:13,22
116:11 122:2
124:11 133:20
134:5,13,14
144:17 163:7,9,11
163:13,15,17,19
163:21
**pages**
97:4 137:21
**paid**
9:15 70:7,9
**pain**
139:9,13,17,18,23
140:2 141:14
142:25
**palestine**
1:7 25:7 26:23
29:18 163:2
**palestinian**
4:22,25 5:2,3,5,7
5:18,21,22,23,24
9:3 10:2 12:15,22
13:14 18:21,22
19:6 21:9 22:22
22:24 23:1,9 24:2
24:8,16,22 25:13
25:22 26:5,10,16
27:10,10,11,17
28:10 29:11,12
30:20 31:5,6,8,11
32:8 42:17 45:2

57:20,25 61:15
62:4,8,10,14,17
62:23 64:2,5 92:9
98:7,10 110:19,21
110:22 116:23
141:17,21
**palestinians**
7:12 49:14 62:3
62:20 89:25
**paper**
9:1,1 37:1 113:21
**paragraph**
37:10 38:11,14
39:11,12 41:13
49:19 97:20 104:6
105:16 106:7,21
107:17 108:20
109:16,18,24
110:16 111:13,19
113:4,10 115:5,7
116:11 122:2,13
124:11,13,16
133:20 134:1,5,6
134:14 137:21,24
138:7,11 139:5
141:7 144:1,1
**paragraphs**
113:14
**parents**
7:8
**park**
2:12
**parliament**
57:23
**part**
26:22 57:19,21
58:10 59:9,10
65:25 70:1 74:4
76:24 98:4 99:8
102:13 104:9
108:3 118:9
129:18 135:7
154:2 160:4
**parte**
55:17 130:10
**particular**
7:16 8:21 47:9
117:3 144:16,25
**parties**

32:18 49:16 55:22
58:20 73:24
133:13 137:10
**partner**
109:14 111:2
112:5,18,24
**partners**
8:5
**partnership**
11:19
**parts**
41:19 58:1 76:7
**party**
58:16 89:23,24
90:12
**pas**
95:11
**passage**
79:17 96:17,18
110:3
**passengers**
61:11
**path**
147:18
**patients**
61:12
**pause**
10:8 90:19 155:11
**pay**
4:20 34:12 67:9
69:14 70:8 120:11
157:21 159:18
**payable**
159:21
**paying**
67:23 68:8,13
69:15,16,17 70:14
120:9
**peaceful**
86:22
**pedestrian**
61:10
**peled**
46:15 47:17,19
129:11 131:13,14
137:15,15
**penal**
127:9,13,16,21
128:7,7,8,9,10,11

128:11
**penalty**
162:9
**pending**
2:2 82:8 109:23
119:10 122:5
133:22 134:4
**pension**
67:14
**people**
5:15,15 14:9
18:10 29:22 30:11
30:20,25,25 32:23
34:8 63:24 65:8
79:13 86:11
119:24 130:14
**percent**
24:24 30:20,21
31:24 32:6 94:12
156:1,18 158:14
**period**
6:5 10:24 21:4,13
21:19 24:20 27:25
72:5 75:11 139:25
**perjury**
162:9
**permanent**
141:20
**permission**
100:25 101:2
**permitted**
66:16
**perpetrate**
106:13
**perpetrated**
65:24
**perpetrator**
63:22 80:4 82:19
84:5,12 85:23,25
99:13 115:13,20
115:23
**perpetrators**
44:20 47:16 83:18
85:15
**person**
8:1 25:24 26:2
28:24 30:5 31:10
73:18,22 74:12
130:3 156:23

**personal**
66:8 67:21 72:19
90:4,10
**personality**
125:16
**personally**
80:19 95:22
**persons**
70:1 141:19
**petition**
11:4 17:15 50:8
148:19
**petitioners**
12:15
**petitions**
10:16
**ph**
145:18
**photographs**
17:7
**physician**
61:11
**physiotherapist**
147:4
**pick**
94:21
**picture**
74:17 77:19 93:5
126:9 143:10
**piece**
15:17 30:11 57:23
**pieces**
58:3
**place**
7:11 14:22 16:14
22:4,20 24:10
35:23 37:22 42:24
44:24 59:6 72:1
72:14 77:23 80:17
82:17 83:14 93:7
161:9
**places**
72:20,21 76:2,5
**plaintiff**
44:16,22 60:5,22
80:4 116:20
122:20,20 123:20
130:20 131:10,12
145:2 147:19

154:8
**plaintiffs**
1:5 2:10 20:9,10
20:12 34:24 44:25
46:6,7 50:20
90:23 91:3 96:16
96:19 104:13
111:10 121:22
129:17 130:6,7
131:20 133:11
137:12,16 143:12
144:15 149:10
154:6 160:2
**plants**
82:6
**play**
117:7
**playing**
53:22
**please**
4:11 87:17 94:21
104:21 114:8
138:9
**plo**
43:17 45:2,4
49:12 57:11 88:22
89:10,20 90:15
107:7,16 116:21
116:24 119:3
**point**
9:3,4 21:21 91:12
96:16 104:1,16,19
136:23
**pointed**
121:20 124:8
**pointing**
122:4
**points**
57:7
**police**
14:16,22 15:5,6
15:14 16:1,14
22:24 42:18 62:13
63:4,7,10,16 64:2
64:5 65:21 66:10
66:17 67:2,2,23
68:5,20,24 69:1,3
70:6,21,22 71:1
71:10,24 72:22

73:2,9,15 74:3,9
74:21 75:1,7 76:2
76:6 77:7,9,12,24
78:7,14 88:24
**policeman**
42:17 64:8,13,16
64:21,23 65:1,4
66:4,6,6,13,15,16
66:21,22 69:2,4
69:14,20
**polices**
76:24
**policy**
5:25 46:22 86:8
**political**
58:19 68:21 69:11
83:19 89:19,24,24
90:9,12
**politically**
83:17
**politician**
72:10
**poor**
140:21
**popping**
52:4
**popular**
89:23
**population**
24:19
**porter**
2:11
**portion**
109:19 160:2
**pose**
20:20 75:16 82:8
83:5 114:17 120:1
**position**
136:7
**positively**
48:13
**possibility**
139:3
**possible**
74:13 101:1
138:19
**postdoctoral**
150:12
**posture**

130:9
**potential**
151:14
**power**
62:11,13
**powers**
62:15
**practice**
5:2 6:1,3 11:11,13
11:16,21 12:5
30:2 154:11
**practicing**
30:2
**precedent**
55:10 107:12
117:15 134:9
136:16
**precedented**
55:25
**precedents**
142:4
**prejudgment**
121:11 122:6,14
122:16,22 123:5
123:16,21
**preparation**
81:13
**prepare**
33:4
**prepared**
36:10
**preparing**
79:7
**present**
2:21 40:10 104:14
151:8 157:15
**presented**
21:7 26:21 46:10
76:16 87:7 99:25
117:22 118:23
131:4 157:17
**presenting**
27:6 51:13 147:1
**presents**
157:13
**press**
71:20 73:17 77:14
78:15 79:9
**pressed**

74:23
**previous**
50:12
**previously**
51:23
**price**
148:23
**prices**
149:2,4,6
**prima**
122:17,18 130:20
131:16
**primary**
130:7
**principal**
59:18 81:11 82:11
82:19
**principle**
15:23
**principles**
47:13
**prior**
14:11 44:8 49:20
52:3 62:8 140:11
161:4
**prison**
53:17 74:24
**prisoners**
71:18,18
**private**
11:11,15 23:1
150:7,25 152:2
**privately**
150:15
**proactive**
23:17 30:15
**probable**
147:21
**probably**
97:18 156:17
**problem**
10:21 77:13 94:13
98:11 103:14
**problems**
18:2
**procedural**
130:9
**procedure**
131:1

**proceed**
37:3 114:21
**proceeding**
51:2,6
**proceedings**
93:7 161:10,13
**process**
13:22 46:6
**proclamations**
30:12
**produce**
42:19 145:3
**products**
149:4
**profession**
29:14 145:21,22
146:7
**professional**
140:17 146:1
147:3 149:16
151:22 153:25
154:13 157:6,11
157:13,14
**professionalism**
104:8 105:21
**professionals**
147:8 150:14
151:17 152:1,8,22
153:17 154:22
157:19
**professions**
154:24,24
**professor**
9:6 33:20 35:18
120:25 121:3,5,6
**professors**
23:20
**prominent**
8:6,8
**promoted**
15:13,14,22 16:10
16:18 48:5 68:24
70:2
**promoting**
67:24 68:8
**promotion**
34:12
**promotional**
69:1

**promotions**
  67:18 71:2
**pronoun**
  50:1
**proper**
  114:21
**prospective**
  149:15
**protect**
  63:5,13 71:9
**protected**
  62:22
**protector**
  130:13
**protest**
  25:2
**proud**
  68:23 83:18
**prove**
  42:21 44:17,19,25
  46:2 49:10 51:12
  68:2 88:7,12,20
  89:5 116:14
  118:20 119:16
  147:11
**proved**
  47:15
**proven**
  30:4 46:7 64:3
  106:14 119:7,12
  157:10
**provide**
  33:14,17,22 34:7
  34:11
**provided**
  158:5
**provisions**
  127:20,25
**proximate**
  78:23 79:1,23
  80:8
**proximity**
  139:1
**psychiatric**
  150:22,23,24
**psychiatrist**
  147:4
**psychotherapist**
  146:2 149:16

**public**
  11:6 14:9 53:14
  53:19,25 119:24
**publication**
  26:7
**published**
  14:4 15:17 92:6
  148:24
**pull**
  114:11
**punish**
  54:24
**punitive**
  49:7 54:11,19,25
  55:1,9,10 133:1
  133:10 134:9,23
  135:1 136:1,3,8,9
  136:12,19 137:3
**purposes**
  85:18
**pursuant**
  2:4
**put**
  5:21 15:25 36:25
  42:10 93:1 141:18
**putting**
  74:25

————————————
**Q**

**quality**
  42:12 92:19
  140:10,15
**quarter**
  159:18
**question**
  7:4 20:20,23
  41:23 45:22 56:23
  73:7,12 75:16,17
  82:8,9 83:3,5,6
  84:13,14 101:21
  101:25 102:25
  105:3,4 108:16
  109:23 112:10,11
  114:7 115:2 117:7
  118:14 119:19
  120:1 130:16,17
  133:22 134:3,4
  135:19 137:14
  138:4,5,5,6

  142:16 156:10
  157:7
**questionable**
  133:2
**questioned**
  80:10
**questions**
  13:10 20:24 36:19
  90:19 91:11,14
  114:7,18,21
  120:21 152:16
  153:21 155:13
  159:12,13,14
**quickly**
  23:19
**quite**
  33:19 114:11
  143:19
**quiz**
  124:11
**quotation**
  49:20 50:1
**quotes**
  33:22
**qupty**
  11:18,19

————————————
**R**

**rachel**
  2:22 159:9
**raise**
  50:20 98:11
  103:13 133:14
  137:11
**raised**
  42:16 43:19 98:24
  102:15,16,17,20
  103:25
**raising**
  88:6
**ramallah**
  28:11 29:10
  100:20,21
**range**
  142:2,2
**rank**
  15:5
**ranking**
  32:2

**rate**
  159:19
**ratification**
  67:25 68:2,17
  70:14,16,19 71:4
**ratified**
  69:4
**ratifying**
  68:11
**rationale**
  16:6 21:15
**reach**
  55:1 108:10
**reached**
  11:9 56:10 95:25
  106:25 108:6
**reaching**
  107:21
**reaction**
  30:23
**read**
  13:16,17,21 14:2
  17:19 20:14,16
  25:22 29:12,16
  30:10 34:4 39:12
  39:15 49:18 56:9
  56:12 92:4,5
  93:11 94:21,22
  97:3,4,5,5,22
  106:7 107:22,24
  107:25 109:18,25
  113:20,21 120:5
  120:24 121:1,2
  128:13,15,17
  134:3,4 138:7
  143:23 144:5,20
  152:6,7 162:8
**reading**
  15:24 50:24 88:18
  89:17 92:24 93:5
  93:16 108:16
  109:10 134:16,20
**real**
  152:22
**realities**
  22:4
**reality**
  25:15
**really**

  12:6 13:9 19:10
  22:20 23:17 24:12
  30:17 31:12 35:10
  38:24 41:14 60:16
  69:9 70:3 91:11
  94:7 95:23 99:2
  110:15 113:2
  115:2 122:21
  125:18 130:22
  131:5 150:12
  152:17
**reason**
  9:12 31:17 85:25
  101:8,22 104:10
  106:1 110:2
  124:25 130:25
  131:23 133:12
  163:8,10,12,14,16
  163:18,20,22
**reasonable**
  142:2 143:15
  153:16
**reasons**
  66:7,15 68:14,14
  69:18,21,22 83:19
  86:14 103:5
  132:19
**recall**
  5:11 8:16 33:3
  35:22 37:19 43:14
  49:5 69:19 92:7
  95:4,13 121:12
  124:9,17 125:15
  125:21,22 129:18
  137:18,19 156:4
  156:12
**receive**
  138:2
**received**
  74:5 122:9
**receptive**
  25:19
**recess**
  36:21 56:6 90:22
  114:23 155:14
**recognize**
  45:4 136:3
**recognized**
  43:8 44:4 136:17

recollection
  36:2 98:3
record
  4:10 10:9,10
  20:11,23 36:20,22
  39:22 82:9 87:14
  90:20,24 91:1
  97:10 101:20
  104:12 109:17,22
  112:7,20 114:15
  114:22 115:10
  121:16,17,18
  143:18 146:4
  155:12 159:12,17
  159:23,24,25
  160:7,9 161:13
recorded
  161:10
records
  34:12
rectified
  91:1
refer
  35:13 91:12 114:9
  145:16 155:7
referred
  21:20 128:8
referring
  20:1,19 21:17
  28:22 98:5 101:17
  107:8 110:15
  113:7,9 124:16
refers
  125:19
reflect
  20:11 87:14
  109:17 155:13
  160:7
reflecting
  54:22
refresh
  36:2 80:16 98:3
regard
  16:23 29:25 39:19
  42:4 62:2 75:13
  107:7 116:25
  126:13 139:8,9,13
  142:24 144:6
regarding

5:21 31:20 34:23
  51:21 57:4,5 73:9
  86:16 96:7 107:10
  111:12 117:12
  134:23 138:3
regime
  47:8
registrar
  48:1,9,11,18
  52:21,22 55:4,6,7
  132:3,24
regular
  30:21,22
regulations
  21:23
reject
  48:24 148:18
rejected
  43:16 44:10,12,14
  45:13,15 94:11
  102:20 116:13
  118:20
rejects
  111:21,23,24
relate
  70:3
related
  107:4
relations
  58:18
relationship
  65:23 89:10,13
relative
  138:13
relatively
  4:24 24:9 132:6
relatives
  129:19
release
  71:17,21 72:5
  73:18 74:13,22
  76:11 77:12 78:1
  78:18,21 79:10
released
  73:12,13 74:20,24
  75:11 76:25 78:8
  78:24 79:18
relevance
  108:11

relevant
  104:20 108:1
  114:21
reliability
  74:5,8
reliable
  29:24 95:8 104:11
  105:12,22 116:18
rely
  39:19 157:16
relying
  19:24 21:10
remark
  121:20
remember
  15:5 16:12,24
  21:16 22:21 24:7
  24:16 33:6 35:7,9
  35:10,13,15,16
  37:24 53:3 68:18
  69:24 89:8 93:16
  94:11 95:5,15
  99:13 101:14
  126:5 142:20
remind
  101:12
rendered
  56:10 106:25
  116:4 117:8
rendering
  107:22
repealed
  28:3,5,13
repeat
  142:16
report
  3:13,19 13:11
  32:25 33:1,4,20
  33:21 34:23 36:9
  36:19,23 37:1,7
  38:7,13 39:6
  41:14,17 42:9,11
  43:25 49:18 52:5
  54:17 56:9,11,16
  57:4 60:24 61:18
  89:9 91:3 96:1
  98:4 106:25
  107:22 116:4,9
  118:9,10,11

120:16,24 121:1,2
  121:8,10,15 122:9
  124:11 128:10
  129:2 133:16,23
  137:20 139:6
  141:8,23 142:10
  144:20 145:1,3,4
  155:22 158:4,16
  158:20 159:5,6
  160:1,3
reported
  1:25 30:18,19
reporter
  29:25 91:4 161:1
reporting
  120:16
reports
  33:18 34:5 36:9
  36:11,12 51:11
represent
  92:14
represented
  10:25 92:8 100:9
representing
  10:20 12:14 43:19
  53:13 96:25
request
  38:21 48:20,24
  50:4,6,9 132:9
res
  117:14
research
  7:20 27:23,25
  30:17
researched
  89:16
researching
  27:17,24
residence
  72:1
residents
  62:23
resistance
  86:17,23,25
respond
  16:8 23:13 30:9
  45:18 56:22 64:12
  66:20 69:7 73:8
  75:21 78:13 80:1

80:24 81:17 83:5
  83:11,25 85:22
  87:16 92:21 93:3
  96:5 98:14 100:15
  101:11 102:1,19
  105:9 107:2
  108:14 109:23
  110:8 113:19
  115:12 116:6
  117:10 118:17
  124:23 127:12
  135:23 139:16
  142:15 146:5
  148:8 150:18
  151:20 153:13,19
  156:11 157:4
response
  132:10
responses
  118:5
responsibility
  51:21 77:20 80:15
  84:2 87:4 107:15
  116:25
responsible
  15:7,7 16:15
  65:21 76:4 77:17
  78:2 83:14 86:1
rest
  153:7
restrains
  143:7
retained
  38:4
retains
  38:25
retire
  145:12
retirement
  145:11 154:3,20
returned
  9:8,9,19
reveal
  53:17 54:2
review
  40:4 49:7 124:12
  142:22
reviewed
  60:18 108:6

142:11,12 143:1
**reviewing**
  16:24 114:6
**right**
  4:19,21 8:1 11:22
  14:10 17:23 18:2
  18:10,13 20:8
  27:12 37:15 38:9
  39:3,18 40:19
  44:5 45:9 47:2,10
  47:20 50:17 51:3
  54:6 56:17 59:2
  59:19,22,24 60:5
  63:5,8,18 64:4,9
  64:24 65:2,5,8,12
  65:14,18,24 66:24
  71:19 72:11,12,25
  81:22 85:7 87:3
  94:23 97:19,19
  99:3,7 100:7,13
  101:9 108:15
  110:25 111:4,18
  111:19,22 112:6
  112:22 113:12
  122:1 126:2
  127:22 129:12
  132:20 135:11
  136:21 138:9
  141:11 144:10,25
  145:17 146:21
  156:12 158:9
  159:11
**rights**
  8:23 9:20,23 10:1
  10:5,12 12:1
  67:14 137:12
**ring**
  36:3
**rings**
  35:14
**rle**
  1:6
**road**
  21:3 156:16
**role**
  31:3 53:22 117:8
**room**
  2:5 104:15
**rovner**

**2:24
royce**
  125:7
**rpr**
  1:25 2:4 161:3,19
**rule**
  40:18
**rulers**
  26:17
**rules**
  74:11 103:1
**ruling**
  50:21
**rulings**
  13:13
**runs**
  29:5,15
**russia**
  10:20

**S**

**saba**
  158:22
**safe**
  81:22 123:4
  147:25
**sake**
  145:23
**salad**
  26:10,14
**salaries**
  71:1 147:24 150:9
**salary**
  67:15 68:8,24
  70:7,8,9 145:23
  145:24 146:1
  147:25 150:15
  156:15,18,23
**sau**
  13:23 15:4,13
  69:23
**saved**
  91:2
**saw**
  43:14 102:4
  106:22 138:13,14
  138:14
**saying**
  15:18 22:14,21

51:4 60:17 63:14
69:2 76:18 81:20
84:7 85:7 108:9
110:15 133:4
134:25 135:15
136:14
**says**
  20:13 29:21 40:19
  49:25 85:23 86:13
  87:22 97:14,15
  101:18 102:7
  103:24,24 104:7
  105:13 106:8
  108:22 110:15
  111:5,16 112:23
  113:5,10 130:4
  132:25 133:17,18
  135:7 136:16
  160:4
**scenario**
  138:24
**scholar**
  28:22
**scholarship**
  9:15
**school**
  25:10,11 121:4
**schools**
  25:13
**schwartz**
  9:7
**score**
  32:4
**scott**
  147:12 151:4
**scratch**
  36:10,13
**screen**
  120:15
**second**
  38:2 44:23 46:4
  90:1,21 106:12
  107:18 110:24
  111:24 112:1,11
  119:19 134:6,18
  134:18 140:10
**secondarily**
  137:17 138:22
**secondary**

128:24 129:8,9,11
129:13,21,22
130:7 137:20
138:2 143:23
**sections**
  126:14
**security**
  15:15 17:4,10
  29:17 62:15 88:25
  89:3 99:9
**see**
  9:18 20:7,18
  21:21 23:17 38:17
  41:14 46:6 63:14
  69:11 71:23 80:12
  101:14,18 104:10
  114:11,16 122:7
  129:1 130:3
  135:11,14,24
  143:24
**seen**
  29:23 94:6 125:9
  149:8 154:1
**sees**
  98:17
**seizure**
  12:18
**selection**
  13:22
**selfesteem**
  54:4
**send**
  4:20 21:2 82:21
  92:4
**senior**
  72:10,10 154:25
**sense**
  151:5
**sent**
  13:15 17:20 51:10
  82:22 83:1,12
  84:12 88:20
**sentence**
  66:25 113:7 135:4
**sentences**
  113:25 134:7
**sentencing**
  68:22
**separate**

59:24
**separation**
  12:11
**september**
  3:20
**serious**
  103:14
**seriousness**
  54:23
**served**
  131:18,19
**services**
  17:4,10 149:6
**serving**
  66:25
**set**
  4:6 15:3 49:20
  161:9
**settlement**
  11:9
**settler**
  62:19
**settlers**
  62:2 86:24
**severe**
  139:1
**shatsky**
  37:25 38:3
**sheet**
  162:7 163:1
**shekels**
  142:10
**shin**
  17:4
**shlomo**
  7:18
**shnoor**
  2:23 3:19 53:7
  120:25 121:8,9,15
  122:4 124:7,15,18
  125:1,4,22 126:2
  128:10 129:1
  153:3
**shnoors**
  33:20 143:23
**shooting**
  37:19 42:24 44:20
  45:1 70:24 99:15
  109:8 116:23

138:14
**shootings**
86:16,17 118:1
**shortened**
140:7
**shortening**
139:10,14 140:5
140:14,24 141:4
142:25
**shortly**
92:6,7
**shot**
64:6 80:4,6
139:19,22,24
**show**
81:6 110:20
133:16 134:10,21
154:14
**showed**
112:4
**showing**
31:21,23
**shown**
31:18
**shrenzel**
34:2
**sic**
49:19
**side**
46:7 66:4 74:2
77:7,9 132:10
**sides**
32:20,21 104:4
135:17
**signature**
162:9
**signed**
24:22 33:6 57:11
**signs**
11:6 131:6 154:14
**silence**
87:18
**similar**
11:22 19:4 27:20
37:17 51:19 80:13
92:3 116:22 132:7
143:1,3 147:7
**simple**
115:3

**simply**
51:16
**sinatra**
36:3,5
**single**
50:2 84:24 102:14
109:1 116:20
**sir**
81:10 90:6 129:16
**sits**
12:17 48:3
**sitting**
34:4 45:3 48:21
48:25 52:11
**situation**
5:13 22:21 23:3,8
79:23 130:12,21
138:12,16,18
146:10
**situations**
151:4
**six**
70:22,25,25
147:21
**slightly**
159:16
**smith**
12:23
**soandso**
146:14,15
**social**
68:13
**society**
7:7 22:5
**sokolow**
1:4 163:2
**soldiers**
86:25
**solved**
53:9
**somebody**
13:20,21 16:1
43:23 54:16 63:11
66:7 68:6 69:21
77:17,20 85:10
138:12 139:19,24
140:17,20 146:24
147:13,19 154:14
154:17,19

**soon**
25:17
**sorry**
9:9 39:1 56:24
72:10,17 83:21
104:22 120:2
121:19 132:23
133:20 134:1,12
139:6,8
**sort**
13:1 22:11 24:12
32:2 43:25 45:22
61:25 81:22 89:23
95:16 102:12
119:15 136:13
**source**
148:24 149:9,12
149:14,24 155:1,6
**southern**
1:2 2:3
**sovereign**
31:13,14
**space**
143:5,6
**speak**
5:17 13:2 29:9,22
32:23 37:13 93:15
126:12 130:5
139:24
**speaking**
7:5 18:20 87:24
91:13 127:5 128:2
132:7
**speaks**
93:18 94:7 103:21
110:7 112:8,21
115:11 153:14
**specific**
10:24 15:1 27:25
60:14 70:15 75:12
76:16,20 96:7,7,9
107:4,11 112:16
114:7 117:16
127:3
**specifically**
70:7 81:12
**specifying**
106:19
**speculate**

98:13 113:17
**spell**
25:25
**spent**
159:16
**sphere**
101:5
**spoke**
28:22 49:5,9 68:4
119:4
**stage**
136:12 148:1
**stages**
52:15 122:19
**staj**
5:9 6:17 147:20
**standard**
143:1,3
**standards**
142:22
**standing**
137:16 138:24
**starred**
97:17
**start**
60:13 100:4
**started**
5:24 26:20 27:11
28:11 47:21 48:1
69:23
**starting**
135:5
**starts**
60:12 151:13
**state**
4:10 11:8 24:11
43:8 44:5 62:3,21
66:10 69:14 75:1
124:5 127:10,16
150:15
**stated**
21:13 60:24 62:3
95:19 159:19
**statement**
109:21 110:12
**statements**
87:18
**states**
1:1 2:2 7:13 8:11

8:16,19,20 9:8,9
9:25 55:15 125:4
136:15
**stating**
43:5,11
**statistical**
149:17
**statistics**
149:18
**status**
9:2 43:6 44:3
130:5
**statute**
22:17 127:15,17
127:20
**statutes**
124:6,8,16,18,19
124:21 125:2,20
126:3
**statutory**
15:1 44:18 57:5
57:12,14 59:22
123:23 125:20
126:4,13 127:2
**stay**
7:7 10:23
**stayed**
9:10,12
**staying**
74:24
**stemming**
106:10 113:12
**stenographically**
161:10
**stipulate**
159:18
**stole**
68:6
**stones**
86:18
**story**
53:15 64:15 67:11
70:2 73:18,21
82:23
**street**
2:17
**strike**
24:23 25:3 130:16
138:5

**struggle**
85:16
**student**
9:14
**students**
73:3
**studied**
6:16
**studies**
147:3,14 150:12
**study**
6:15,20 25:14
**studying**
8:18 146:25
147:13
**stuff**
11:24 42:21 76:2
76:9 89:17 92:1,4
118:1
**subject**
34:14 35:3 40:4
**submitted**
52:13 97:25
104:24
**subsequent**
21:25
**substantive**
18:12 19:20
**succeed**
147:3
**succeeded**
134:10,21
**successful**
154:11
**sudden**
7:10
**sue**
31:6 58:14
**suffering**
139:10,14,17,18
139:23,25 140:2
141:15 142:7,25
**suffers**
138:2
**sufficient**
131:15
**suggest**
104:20 110:20
**suggested**

107:14
**suggesting**
104:18 108:8
111:15
**suggestion**
105:1
**suicide**
37:19 54:5 86:17
**suit**
43:1
**suite**
2:17
**summary**
42:13,14
**summoned**
43:23
**sums**
106:20
**supervision**
106:16
**supply**
42:11
**supporting**
12:24
**suppose**
66:13,14 71:24
72:4,13,15,19
82:24 85:11
**supposed**
11:7 20:23 147:2
**supreme**
6:18 7:15 10:17
15:12,20 17:16,16
19:5,8 32:4,5
47:23 48:21,23,25
49:5,9,11,22
51:18,19 52:11
55:10 62:1 69:25
134:8 136:16
**sure**
13:17 14:7 20:1,3
20:21 23:24 30:1
33:2 35:13 37:21
38:10 53:10 56:5
56:25 63:2 78:4
80:9 85:3 93:9,9
94:12 102:25
113:23 114:1,11
114:19 128:16

130:14 142:18,18
143:25 144:9
145:15 149:6
156:14,18 158:3
158:22
**surgeries**
141:20
**survey**
30:17,19 31:18
119:23 154:25
**surveyor**
120:14
**surveys**
31:19 108:25
109:1 117:18
119:21 152:4,7,7
**suspend**
94:2,10
**suspicion**
76:5 104:15
**sweat**
121:5
**symposiums**
29:9
**system**
5:3,12 18:9,23
19:6 24:2,8,10,12
26:5,10,15,15,23
27:18 29:18 31:2
31:21 32:1,21
40:1,6 57:13,20
57:20,22 58:8,11
60:16 88:3,4
131:24 133:2
140:22 143:18
**systems**
26:11 39:24 55:15
57:21

————————
**T**
————————
**table**
152:24
**takdin**
27:22 92:1
**take**
8:21 23:10 31:3
56:9 61:4 64:1
74:12 76:10 77:14
88:14 93:7 97:2

108:4 128:12
142:4 144:1
147:10 155:17
156:7,25
**taken**
2:1 17:8 19:22
22:4 23:7 114:24
147:5 161:8 162:6
**takes**
52:16,16
**talk**
42:1 56:7 59:21
71:8 96:17 137:20
**talked**
88:14 94:24
123:25 130:8
**talking**
24:9 27:7 68:3
74:9 87:25 100:17
100:19 101:13
111:6,17 117:25
120:7 123:10,11
126:7,10,25 127:1
127:2 128:9
129:15 135:5
139:19 140:16
142:20 147:13,19
150:8,19 153:21
153:25 154:7
155:18,22 157:5
**tantamount**
70:15,19
**tanzim**
109:3
**task**
88:12
**tax**
157:12,12,22,23
**taxable**
156:8
**taxation**
156:1
**taxes**
155:17 156:7
157:21
**teach**
35:17 153:10
**teacher**
35:19

**teaches**
121:4
**teaching**
35:12,19
**team**
17:5 102:13
**tel**
3:16 7:25 12:18
43:20 46:19 48:15
48:16,18 132:25
**telecommunication**
59:4 80:5
**tell**
12:13 20:1 31:19
35:25 37:15 41:21
56:19 82:15 98:15
98:20 128:18
135:11 146:9,21
153:4
**telling**
128:22
**temporary**
122:16
**ten**
13:12 14:12 80:6
**term**
94:5 138:10
**terms**
6:4 15:25 22:22
40:22 47:12 94:5
121:2,3 140:15
142:7 156:1
**terrible**
54:6
**territories**
10:2 62:5,10,14
62:16
**territory**
30:20
**terrorism**
123:1
**terrorist**
51:22 109:7
110:18
**testified**
4:5 38:14 96:6
99:19 116:17
158:24,25
**testify**

89:2 118:25
158:21 159:6
161:6
**testimonies**
40:14
**testimony**
16:6 99:2,3,6
105:18 111:22,23
111:25 112:2
116:17 120:12
**text**
124:17
**textbooks**
156:22
**thank**
6:10 13:22 32:16
39:3,8 40:7 41:12
56:5 91:7,10
94:23 116:1
119:18 120:18,23
123:22 128:22
139:4 141:6
145:19 159:11
160:9
**thanks**
36:24
**theoretical**
61:2
**theories**
25:20
**theory**
45:16,25 46:1
47:13 54:12 74:25
**thereto**
79:12
**thesis**
8:25 9:1
**thing**
4:23,24 13:25
37:9 90:17 97:6
97:17,22 105:11
105:19,23 107:14
111:6 129:10
144:11 157:25
**things**
7:20 11:22 21:16
21:20 23:18 25:22
28:12 30:16 31:3
42:20 85:9,9 86:6

86:7 89:22 91:22
91:23 105:15
132:23
**think**
8:14 9:6 13:9,16
14:6,6 15:23
16:20 17:19 18:6
18:12 19:4,25
20:3,16 21:2 22:2
23:22 25:18 29:5
29:24 30:4,5
31:11,24,25 32:1
32:3,11,14,16,17
33:6,21 34:22
35:11 36:12 37:21
38:2 41:6 43:15
44:2,23 49:8 53:5
53:10,13 54:14,14
57:3,16 63:4,7
67:8,20 68:9,16
75:1 77:23 81:8
82:10,18 83:19
85:17 87:11 89:11
90:4 93:17,24
95:5,9 99:2,9,18
100:3,21,21 101:4
101:7 102:3,16,17
105:12,24 108:20
110:20 113:3,9,22
114:3,6 116:10
119:23 120:13,16
122:11 124:15,20
125:15 126:5,17
128:15 130:8,17
132:17 135:15,16
136:21 137:2
138:4 142:9
143:10,21,25
145:1,17,18 149:9
149:12 152:1
156:24 158:2,10
158:19,22 159:7
159:10
**thinking**
25:18 96:17 102:2
**thinks**
29:8 131:10 147:1
**third**
38:17 46:12 97:14

159:1
**thoroughness**
118:5
**thought**
16:18 17:11 55:11
57:17,17 87:19,21
104:11,23 105:21
119:25 123:17
132:14
**three**
6:16 38:14,15
39:16 42:5 46:13
47:25 50:6,7 79:1
79:18 80:9 89:14
119:3 125:19
126:3 132:13
134:6,7,14 140:1
159:1
**throw**
30:16
**throwing**
86:18
**time**
6:9 8:18 10:20,24
11:4,12 12:14
13:18 14:19 15:4
15:6 17:6 19:17
19:23 21:4,13
22:10 23:6 24:13
24:25 25:10,12
28:9 30:13 35:12
38:9 43:3 52:16
53:5 74:22 76:2
78:22 79:17 87:14
90:13 91:13 92:11
93:21 120:11
129:25 136:11,17
139:1,25 146:25
154:2 159:15,19
161:9,9
**times**
29:9 36:6,6
**tipoff**
59:14
**today**
28:23 34:4 45:3
91:22 122:25
**told**
71:24 98:22 120:2

160:1
**top**
10:16 97:14
105:15 123:5
**topic**
108:21 120:19
129:7 142:22
**topics**
39:16
**tort**
11:23 13:14 92:14
**torturous**
54:17
**tossed**
26:10,14
**total**
54:21,22 80:20
153:23 158:25
**totally**
70:3 131:10
158:25
**town**
6:12,13 62:18
151:10
**track**
147:18,23
**traffic**
17:20 21:3 141:15
155:25 156:16
**trained**
110:18,21,22
111:8,9,11 112:16
115:14,17,23
**training**
5:9 6:17 80:7,7
146:16 147:20
**trainings**
150:12
**trajectory**
151:6
**transcribed**
161:11
**transcript**
161:12
**transcription**
162:5
**transfer**
62:8 126:10
**translate**

18:16
**translated**
13:19,20,21 14:5
28:18,20 29:12
42:10 124:18,19
**translating**
93:13,18
**translation**
17:24 49:23,24
96:15,24 103:23
108:22 113:18
119:20 120:17
**translator**
93:22 120:9
**transmit**
159:22
**treat**
44:7 144:17
**treated**
99:16
**tremendous**
139:24
**trial**
16:17 19:7 40:15
40:19
**tried**
115:14 149:23
**true**
4:16 12:12 13:15
17:24 18:3 32:9
45:6,14,21 47:6
47:21 50:4 52:7
56:15 59:20 63:9
63:25 64:25 65:3
65:9,14,19 71:13
77:1 95:15 99:4
122:14 161:13
**trust**
30:21,22 31:1,25
31:25,25
**trustworthy**
40:23 105:22
**truth**
161:6,6,7
**try**
49:16 58:13 88:21
**trying**
21:11 23:23 31:3
46:6 53:4,25 54:1

93:21 110:20
132:8
**turan**
6:14
**tv**
51:11
**two**
5:10 13:13 17:5
19:25 25:22 32:18
36:12 37:10 44:21
78:25 80:12
111:18 113:13
118:3 119:5 140:8
140:23 159:1
**type**
149:25 155:18
**typed**
161:12
**types**
61:3,3,3,4 150:5
151:2
**typical**
23:9 24:4 138:12
138:15
**typo**
18:8

_____ **U** _____
**uhhuh**
26:6 37:12 63:9
144:3
**umdan**
148:14
**un**
51:11
**uncertainty**
148:6
**undergone**
141:21 150:11
**understand**
17:25 19:21 30:25
42:9 49:23 63:2
65:7,20 84:8,11
94:20 103:22
105:24 112:25
115:7 116:7
124:21 126:7
136:22
**understanding**

37:5 76:23
**understood**
15:24 78:4
**undertook**
57:10
**unfettered**
100:13
**unfortunately**
12:3 28:20 38:18
52:24 121:6
**ungar**
38:1,1,2
**union**
149:20
**uniqueness**
97:24 104:23
105:10,14
**united**
1:1 2:2 7:13 8:11
8:18 9:8,9,25 43:7
43:8 44:4 55:15
58:21 125:4
**universities**
25:13
**university**
6:16,20,22 8:22
35:11,17,23 72:21
82:6 83:13
**unlimited**
100:12
**unprecedented**
54:10 55:24 137:4
**updates**
91:24
**upheld**
48:17
**use**
72:19 74:19 75:10
79:7,8 82:15
94:14 120:7 147:7
149:4,14
**uses**
50:1 119:20 131:9
**usually**
23:15 40:13,23
55:20 60:12 61:1
66:2 103:4 122:16
131:9 139:17
141:1 143:7,8

146:23 154:7,17
154:18 157:8,10
157:18

_____ **V** _____
**vacate**
48:12,13 49:15
50:22 51:15,24,25
55:3,7,12 119:9
132:12 133:13
136:6
**vacated**
46:16 47:23,24
48:17,19 132:15
132:16,17,19,24
**vacating**
48:7
**vacation**
85:5
**vague**
6:24 45:17,20
64:11 92:20 93:2
116:5 117:9
127:11 135:22
139:15 148:7,12
150:17 151:18
153:12 155:8
**valid**
28:6 44:9
**validity**
122:21
**valuation**
140:18
**value**
140:13
**variation**
152:24
**variety**
10:5
**various**
106:12 109:3
150:14
**verdict**
93:6
**verify**
22:15,19 23:5
**version**
99:22 109:6
110:16,17 111:14

111:24 114:16
**versus**
94:25
**vicarious**
81:3 82:20,20
**victim**
63:23 129:22
**victims**
21:4,11 54:9 61:3
128:24 129:8,11
129:21 130:7
143:23
**victory**
123:19
**videos**
46:9 69:2
**view**
9:4,4 46:5 56:19
56:25 57:3 58:16
79:20,22 85:17
88:16 95:18 109:5
122:12,24 145:25
**views**
71:23 89:13
**village**
6:13 130:2
**villages**
14:23
**violated**
58:17,17
**violation**
44:18 57:14 58:15
62:25
**violence**
16:2 62:2,20
**visa**
9:12,14,16
**visavis**
57:6 61:15 62:18
62:21 126:13
**visiting**
78:19
**vs**
163:2

_____ **W** _____
**wadi**
25:23
**wafa**

35:9
**wage**
150:4
**wages**
147:7
**wait**
20:20 83:3,4
105:3 120:1
133:20
**waived**
5:12
**want**
12:3 13:10 18:9
39:6 40:12 42:5
51:5 54:18 55:18
64:21 65:22 71:22
76:24 77:12 78:6
91:11 106:6
109:19 114:2,18
118:2,6 124:6
126:12 128:23
136:11 137:4,8,11
137:14,23 139:5,7
143:22 144:11
150:1 151:5
156:17 157:8,25
158:1,3 160:1
**wanted**
17:12,13 25:21
28:24 37:9 43:22
52:18 90:18 91:13
120:19 123:6,22
129:7,10 139:9
144:9,16 149:15
**wants**
137:10 154:15
**washington**
2:18 125:11,14
**way**
18:5 23:16,23
25:2,8,18 26:1
41:1 60:12 78:4
94:7 134:24,24
136:14 140:20
142:1 144:20
151:16,24 156:21
157:18
**ways**
27:17

weaponry
110:19
weapons
75:25
web
27:23 28:13
week
140:1 151:17,22
152:18,19,20
153:15,24
weeks
72:5 75:11 153:17
weigh
132:9
weighed
118:9 139:13
weight
40:22 96:1 106:23
116:2 118:24
weinstein
144:21
weird
5:14 94:15 140:16
weiser
2:22 159:10
welcome
129:5
welfare
68:14
wellknown
92:16 154:13
went
7:22 8:11 24:23
46:5,19 47:25
53:20,20 59:21
64:6 75:7 85:4
93:22 109:14
111:2 112:5,18,24
113:1 132:17
west
21:7,8 22:10
24:17,21 26:25
27:3,5 37:23
44:24 58:5 59:13
59:15 62:24
100:19 116:23
westlaw
27:21 92:3
weve

78:5 87:25 91:3
114:24,24 159:16
wide
150:13
wife
66:9
willful
66:3 67:6
willfully
66:6 69:20
wise
49:15
wish
9:24 101:16
145:16
withdrawing
160:2,6
witness
3:2 4:4 7:1 16:6,9
18:20 19:16 20:17
20:18,21 23:13,14
24:7 30:10 38:15
40:8,20,23,25
41:2 45:18,19
46:8 53:8 56:4,22
56:23 57:3 64:12
64:13 66:20,21
67:5,11,20 69:7,8
70:13 71:7 73:8,9
74:7 75:21,22
77:6 78:13,14
80:1,2,24,25
81:17,18 82:13
83:11,12,25 84:1
84:5,17 85:22,23
86:6 87:11,16,19
90:5 91:7 92:21
92:22 93:3,4,18
95:7,16,22 96:6
98:13,15 99:14,18
100:15,16 101:11
101:12,25 102:3
102:20 103:22
104:11 105:7,10
106:4 107:2,3
108:14 109:25
110:8,9 112:9,10
112:15 113:17,19
113:20 114:16

115:12,13 116:6,7
117:10,11 118:18
120:2 123:14
124:23,24 127:13
133:25 134:5
135:23,24 139:16
139:17 142:15,16
146:5,6 148:8,9
149:8 150:18,19
151:20,21 153:4
153:13,14,19,20
155:4,9 156:11,12
157:4,5 161:4
162:1,3,15 163:5
163:24
witnesses
40:9,13 51:12
88:19,24 95:2,6
142:13,21 143:2
won
123:12
word
31:24 32:2 94:19
97:2 119:20 120:6
152:7
wording
116:10
words
37:13 83:17
130:16 133:3
135:3
work
7:16,22 10:12
12:1,13 13:7,24
29:4,7 35:2 36:16
54:3 59:5 74:10
99:11 150:15,15
150:24,25 151:12
151:17,22 152:8
152:10 153:6,11
153:17,22 155:7
worked
11:20 78:17
152:20
working
12:4,23 59:3
67:15,16 93:13
145:18 150:6
151:10 152:23,25

154:2,10,19 157:6
157:11,15,20
works
146:18 156:23
world
20:7 23:16
worth
50:15 122:22
write
7:19 8:25 9:2
13:23 14:1,5
writing
10:13,16 11:6
18:11 99:24
written
13:12 25:23 33:21
40:14 105:16
110:10 111:25
wrong
16:21 71:19
wrongdoer
148:6
wrongdoers
54:24 61:3
wrote
14:6,7 15:16 18:7
26:4 27:16 30:11
38:19 50:14 93:17
94:3 107:8,17
117:11
wultz
124:8 125:5
128:13

_____

_____X_____

_____Y_____

yalowitz
2:11,13 3:6 4:9
7:2 10:8,11 16:20
19:2,17,20 20:6
20:11,22 23:24
25:21 30:18 36:18
36:22 37:6 40:6
40:18 45:21 53:9
56:2,5,7,25 58:23
64:20 66:22 67:7
67:17,22 70:4,20
71:8 74:4 75:3,17
76:14 77:8 79:13

79:22 80:14 81:1
81:24 82:10,24
83:7,15 84:3,8
85:3 86:2 87:3,17
87:20 90:6,16,24
90:25 92:24 94:19
94:23,24 95:25
96:13,20 97:12,13
99:1 100:24
101:16 102:6,23
104:14,18,22
105:5,24 107:20
108:15 109:20
110:1,25 112:11
112:22 113:23
114:19,24 115:2
116:1 117:2 118:2
118:13 119:17
120:4 121:14,18
121:23 125:3
127:15 133:23
134:12 135:20
136:21 139:21
142:18 145:17,20
146:8 148:22
149:14 150:21
151:23 153:2,6,16
154:1 155:5,11,15
156:19 157:25
159:7,11,17,20,25
yasser
90:2,13 106:16
yeah
4:19 7:4,12 8:4,6
8:8,23 9:1 14:14
26:3 31:25 32:1
36:5,12 49:3 53:8
56:1 60:6 63:15
63:23,24 70:11
71:20 75:14,23
76:10,12 88:2
91:22 92:7,22,22
97:5,19 101:2
106:22 121:2
122:11,11 127:18
129:17 150:24
153:8
year
9:10,11,13,15

11:21 14:20 27:8
33:5 43:7,18 44:4
44:23 78:25 80:11
140:2 147:14
**yearly**
157:23
**years**
5:1,10 6:8,17 10:3
11:20 13:13 14:12
17:11 22:16,17
27:4 37:20 78:25
79:1 90:1 92:13
146:15,15 147:21
**yigal**
7:23 8:1,4
**york**
1:2 2:3,12,12 4:15
18:17 19:3,7,15
19:18 39:23 65:10
**yossi**
92:11 100:18
**younger**
140:13

**Z**

**zaban**
158:18,18,20
159:3
**zap**
148:24,25 149:1,2

**0**

**000**
142:10
**01**
155:14
**04cv397**
1:6
**06**
56:6 155:14
**07**
90:22

**1**

**1**
90:22 114:23,23
142:10
**10**
36:21,21 56:6
133:20

**100**
156:18 158:14
**100224690**
2:12
**107**
3:11 20:9,10,12
**108**
3:13 90:23 91:4
**109**
3:16 96:16,19,20
**11**
56:6 90:22
**110**
3:19 121:21,22,23
**12**
49:19 134:5,14
**121**
3:20
**13**
14:21 49:19
**14**
124:11
**15**
3:14 7:8
**15th**
33:6
**16**
3:20 133:20
153:23 160:10
**16th**
9:10,11
**17**
27:4
**18**
6:15 36:21 134:5
134:14
**1910**
28:4
**1918**
26:20
**1920**
26:20
**1948**
26:24,25
**1951**
153:7
**1967**
24:20 27:4
**1991**

8:19
**1993**
25:12 27:8
**1994**
27:9

**2**

**2**
39:11,12 41:13
54:8,20 116:11
132:5
**20**
3:12 153:23
**200**
24:18
**2000**
14:20
**200055701**
2:18
**2001**
6:8
**2002**
6:9 11:21 13:5
**2003**
26:5
**2006**
3:11
**2013**
1:16 2:6 3:14,17
3:20 56:14,16
161:17 162:6
163:4
**202**
2:18,18
**20th**
26:18
**21**
1:16 92:13 137:21
162:6 163:4
**212**
2:13,13
**21st**
2:6
**22**
92:13 137:21
**25**
36:21 156:1
**26**
3:17

**28**
2:6 144:17

**3**

**3**
37:10 155:14,14
160:10
**300**
17:3,3 70:2
**399**
2:12

**4**

**4**
3:6 38:7 116:11
122:2
**41**
124:11,16
**42**
114:23
**45**
153:14
**48**
26:25
**4th**
161:17

**5**

**50**
30:19,21
**51**
27:1 97:20 102:7
113:4,10 114:5,6
115:5,7
**53**
114:23
**54**
137:21,24 138:7
**56**
56:6
**57**
90:22
**58**
97:15
**59**
97:7,10,11,14
108:21

**6**

**61**

144:1,2
**6265800**
2:18
**6265801**
2:18
**64**
139:5,7
**65**
32:6 139:9 141:7
154:14
**655**
2:17
**66**
31:24
**667**
18:6
**67**
145:13 154:20,21
**677**
18:4 22:8

**7**

**7**
54:8,20 122:2,13
132:5
**70**
152:20 154:10
**7151000**
2:13
**7151399**
2:13
**72**
154:11
**750**
142:10
**766**
18:5
**776**
18:7

**8**

**9**

**9**
2:6
**90**
3:15 94:12 97:3
97:15
**900**
2:17

**92**
  9:8,9
**95**
  24:24
**96**
  3:18