# EXHIBIT B.108

المحامي محمد دحله ومشاركوه ـ مكتب محاماة وكاتب عدل

מוחמד דחלה ושותי׳ - משרד עו״ד ונוטריון

## Muhammad Dahleh & Associates – Law Offices and Notary

| | | |
|---|---|---|
| 4 Ibn Batotah St. | רח׳ אבן בטוטה 4 | شارع ابن بطوطة 4, القدس |
| Pob 1342 Jerusalem 91013 | ת.ד. 1342 ירושלים 91013 | ص.ب. 1342, القدس 91013 |
| Tel: 02-6274070/1 | טל:1/6274070 – 02 | هاتف:1/6274070 – 02 |
| Fax: 02-6274060 | פקס: 6274060 – 02 | فاكس: 6274060 – 02 |

E-mail: Dahleh@Bezeqint.net

| | | |
|---|---|---|
| Muhammad Dahleh, Adv.* | מוחמד דחלה, עו״ד | المحامي محمد دحله* |
| LLB. LLM. | מוסמך למשפטים | ماجستير في القانون |
| Suhad Hammoud, Adv. | סוהאד חמוד, עו״ד | المحامية سهاد حمود |
| LLB. LLM. | מוסמך למשפטים | ماجستير في القانون |
| Saed Dacca, Adv. | סעיד דקה, עו״ד | المحامي سعيد دقه |
| Saleh Dahleh, Adv. | סאלח דחלה, עו״ד | المحامي صالح دحله |
| Murad Khatib, Adv. | מוראד ח׳טיב, עו״ד | المحامي مراد خطيب |
| Omier A. Mareed, Adv.** | עומייר א. מריד, עו״ד** | عبير أ. مريد** |
| Ahmad Dahleh, Adv. | אחמד דחלה, עו״ד | المحامي أحمد دحلة |

| | | |
|---|---|---|
| Also Member of New York Bar | חבר בלשכת עוה״ד בניו יורק | *عضو في نقابة المحامين في نيويورك |
| LLB. LLM. | מוסמך למשפטים | **ماجستير في القانون |

## Expert Report by Advocate Muhammad Dahleh

### Background & Qaulfications:

A.    **Introduction**

1.    My name is Muhammad Dahleh. I was born in Nazareth – Israel. I'm a member of the Israeli Bar Association as well as of the New York Bar. I am the owner of a law office in Jerusalem which specializes in Torts law, Human Rights Law and Civil Litigation. I am a graduate of the law faculty of the Hebrew University in Jerusalem and a post graduate of the Washington College of Law at the American University in Washington DC where I mainly studied International Human Rights Law. The PA/PLO counsel has engaged

me to serve as an expert witness in the Civil Action No: 1:04 – cv -00397 – GBD, Mark Sokolow and others vs. The Palestine Liberation Organization and other (hereinafter – the Civil Action). I hereby provide my opinions and the basis therefore on issues that are within my field of expertise – different issues in Israeli and Palestinian Torts Law.

## B. Qualifications to render my opinion

My academic studies and legal training, as well as my 22 years of practice as an attorney have provided me with the knowledge base and experience in the subject matter of my opinion.

Since the beginning of my practice I have handled hundreds of tort cases in which I represented either the plaintiff/s or the defendant/s in Israeli and Palestinian courts at all levels (Magistrate Courts, District Courts and the Supreme Court).

Since the year 1993 I have been the legal counsel for two Palestinian insurance companies and I have represented them in hundreds of tort cases in Israeli Courts and provided them with legal counseling and advice on torts issues in Israeli and Palestinian law. In addition, I have handled hundreds of tort cases of plaintiffs against different defendants

My Curriculum Vitae is attached as Exhibit A.

## C.   Biography

I was born in Nazareth in 1968. After high school graduation I studied law at the Hebrew University in Jerusalem after which I completed the first part of my legal internship in one of the leading law firms in Israel, Yigaal Arnon and Co, and the second part of my legal internship at the Israeli Supreme Court, being the first Arab legal trainee in the Supreme Court.

I passed the Israeli Bar exams and was admitted to the Israeli Bar in 1991. I
studied International Human Rights Law at the Washington College of Law for
one year and graduated in 1992, after which I worked for one year as an attorney
at the Association for Civil Rights in Israel (ACRI). In 1993 I joined the Law
Office of attorney Mazen Qupty and together established a partnership (Qupty,
Dahleh & Associates) which functioned out of two branches, one in East
Jerusalem and the second in Ramallah – the West Bank, practicing in both Israeli
and Palestinian legal and court systems. In 2002, I established my own office
which consists now of 7 lawyers (including me) and 3 interns. We represent,
among others, insurance companies, employers, employees, and persons injured
or killed in a variety of cases including road traffic accidents and shootings. For
more details see my attached C.V.

D.    **Prior testimony as expert witness** – In the previous four years I have given
      several expert reports in Israeli Courts as an expert on Torts in the Palestinian
      legal system. I also testified as an expert witness in 3 of the cases in which I
      gave an expert report (c.c. 8433/06 District Court in Jerusalem, Shosha Seham
      v. Migdal Insurance C. + c.c. 875/08 District Court In Haifa, Malak Taha v.
      Hachsharat Hayeshov Insurance Co. + c.c. 18567-11-09 District Court in
      Nazareth, Ahmad Abu Zaban v. Clal Insurance Co.) In addition, I gave two
      expert opinions in cases heard before American Courts, one regarding torts
      issues in the Israeli Legal system, and another regarding torts issues in the
      Israeli and Palestinian Legal system, but did not testify in trial or deposition.

E.    **List of publications in the last ten years:**
      I have written in the last ten years two legal critiques of rulings issued by The
      High Palestinian Court in tort cases, which were published in the legal
      magazine Justice and Law in October 2004 and December 2006.

F.    **Terms of engagement and compensation** – I am being compensated at the
      rate of 500 US$ per hour for my services as an expert in this case. The

3

compensation is not conditioned on the content of my opinions expressed in this report, nor is my compensation contingent on the results of these proceedings.

G.   **Material considered** – In addition to the materials cited in the report, I have also reviewed numerous Israeli Tort Law Text books, Israeli and Palestinian statutes and Israeli and Palestinian case law.

<u>My opinions and the basis therefore:</u>

2.   In my opinion if the Civil Action was filed in an Israeli Court, based on the Israeli law, there is a good chance it would be rejected, inter alia, because it would be very hard to prove the allegations mentioned in the claim and due to the relevant legal norms related to the matter. The Israeli Court, most probably, would find it very hard to hold the PLO or the PNA liable based on the tort law of Israel known as the Civil Wrongs Ordinance (New Version) – 1968, (hereinafter "CWO"). In addition, even if an Israeli court were to find liability **it would not award damages in anywhere near the amount asked for in the Complaint.**

3.   One of the incidents referred to in the complaint took place next to the Israeli Settlement of Givon, located in the West Bank (the case of Joseph Guetta which occurred on January 8, 2001 according to the complaint). Thus, the question of the applicable law regarding this incident should be addressed. The two possible applicable laws would be the Israeli CWO or the Palestinian CWO 1944. I understand that the United States District Court, Southern District of New York, where the Civil Action was filed would decide and rule on the issue of the applicable law. Therefore, I will relate, in my report, to both legal systems, if and when they differ.

4

4.   In my opinion if the Guetta Case was filed in a Palestinian Court, based on the applicable Palestinian law, it would be rejected. The Palestinian Court would not hold the PLO or the PNA liable based on the tort law of Palestine known as the Civil Wrongs Ordinance 1944, (hereinafter "CWO 1944"). In addition, even if a Palestinian court were to find liability it would not award damages in anywhere near the amount asked for in the complaint.

5.   It is worth noting that the Torts Law in Israel and Palestine is based on the British Civil Wrongs Ordinance 1944 that was enacted in 1944 during the British mandate over Palestine. In 1948 Israel was established on almost 78% of historical Palestine and it applied the laws that were in force prior to its establishment, including the CWO 1944, and during the years introduced several amendments to it. The CWO 1944 continued to be valid to date in the remainder of Palestine, including the West Bank in which the attack on the Guettas allegedly occurred. It should be remembered that no amendments were introduced to the CWO 1944 in Palestine.

6.   Throughout the years, the Israeli Courts have contributed in establishing a considerable case law, interpreting the CWO and adding different principles, tests and rules with regard to the issues of liability, categories of damages etc'. On the other hand, the contribution of the Palestinian Courts was very minor, therefore many principles, rules and tests that became part of the Israeli Torts Law based on the Israeli Case Law, were not adopted or utilized in the Palestinian Torts Law.

7.   Although numerous attacks have been carried out by Palestinians against Israelis in Israel and the Occupied Palestinian Territories (hereinafter the "OPT") since 1990, and dozens of lawsuits have been filed in Israeli Courts against the PA, to date not even one case was filed against the PA or the PLO in a Palestinian Court.

8.  In addition, there is not even one final Israeli Court ruling that holds the PLO or the PA liable in torts towards the injured or the heirs and dependants of those who were killed.

9.  On the contrary, in a final ruling on November 25, 2009 the District Court of Nazareth (Israel) rejected a lawsuit that was filed by an Israeli woman called Shola Gaon who was injured in an attack that took place on November 27, 2001 which was carried out by two Palestinians in the City of Afola in Israel[1]. The attackers came at noon that day and started shooting arbitrarily at innocent bystanders using machine guns that they brought with them. As a result of their attack, several people were killed and others were injured. Shola Gaon was one of the injured. She sustained a severe permanent disability. The attackers themselves were killed during the attack. Shola Gaon filed a lawsuit against the PA and the late Yasser Arafat.

10. According to the Court ruling, "The plaintiff claimed in her complaint that one of the two murderers was a policeman in the PA and the second was member of al-Aqsa Martyrs' Brigades who is the central body of the defendant (the PA)". The plaintiff's claim in her complaint is that the terrorist attack "was carried out by representatives and/or agents and/or employees of the defendants, according to clear instructions, alternatively by their retroactive approval, unfortunately without taking any action to prevent it, although they had the ability to do so" (§33 of the complaint). In addition, the complaint enumerates numerous arguments, factual and legal, aiming at imposing liability for the incident on the defendants, which include the encouragement of terror by the defendants, their abstention from taking actions to prevent terrorist attacks embarking from the PA territory etc"[2].

---

[1] Civil case no. 1214/04, District Court of Nazareth, Shola Gaon vs. the Palestinian Authority.
[2] This Court Judgment, like many of the Israeli legal materials I quote in this report, is in Hebrew. The English quotations represent my translation of the Hebrew original.

11.    The District Court of Nazareth rejected the lawsuit and stated:

"4. I have ordered to split the case so that the issue of liability of the defendant (the PA) for the terrorist attack is first decided.

5. In her attempt to prove the liability of the PA for the incident the plaintiff had testified (preceded by filing a main testimony affidavit), yet unfortunately I can not rely on anything that she said in her testimony which intend to engage the PA with the shooting incident. All what she said was hearsay, as she herself decently admitted in her cross examination, namely things that she heard in the media, things that she was told when she arrived to the hospital etc.

6. Other than her testimony the plaintiff presented before me a number of documents, based on which she is trying to convince me of the existence of a link between the PA and the terrorists and the terrorist act that they perpetuated. Sadly, the things that come out of these documents most probably will not assist in proving the liability of the PA for the incident. Those documents are partially not relevant (....) and the other part of the documents includes hearsay, which I can not rely on to determine a fact. From all said evidence I can not say that the plaintiff has met the burden of proving a relationship of the defendant to the terrorists and to the terrorist act they committed. None of numerous claims raised in the complaint was proved, not even the identity of the terrorists, their organizational membership and more.

7. The experienced attorney of the plaintiff tried to convince me to conclude to the defendant's detriment, its abstention to present evidence. This argument can not assist in proving the plaintiff's claims, since the burden of proof lies with her to prove her complaint. Considering that she did not present such evidence, she failed to prove what needed to be proven. The

7

abstention of the defendant from presenting witnesses can not support evidence that does not exist.

8. Also the plaintiff's assertion that she had difficulty in providing evidence because the State Authorities (the IDF – the Israeli Defense Forces or the General Security Services) refused to help her, can not substitute the presenting of evidence to prove the link between the defendant and the incident. Her grievance should be directed towards the Authorities but she can not benefit from it in her lawsuit against the defendant. In any case, I'm doubtful if the mentioned state bodies have evidence that could prove, in a court of law, what needs to be proven, since every investigator in those bodies can not testify on the subject matter from personal knowledge, therefore his conclusions would not prove in a court of law what needs to be proven.

9. Based on the above, the imperative result is rejecting the lawsuit. But before ending, I would like to make a few remarks.

The incident based on which the lawsuit was filed is a very harsh one, in which many innocent civilians were killed and others, including the plaintiff, were injured. My heart goes out to the victims of this despicable act that was carried out by two terrorists. The experienced attorney of the plaintiff asked the court, although not explicitly, to draw conclusions regarding the liability of the defendant, based on knowledge that we all have from the media, as people who lived here during the years of the Intifada. This request by the plaintiff is not acceptable. Once the plaintiff brought her case to a court of law, she has to prove it in the methods set fourth in the law, namely according to the evidence laws used in the court to prove alleged facts, and she failed to do so. The difficulty that she faced in proving her case is clear to me, yet the court acts based on the evidence laws, unlike other forums in which setting facts might be different, such as academic research (historical or other) journalist report etc.

8

10. Finally, since the plaintiff did not present any evidence whatsoever to prove the link of the defendant to the terrorist attack, I can not accept the claim, and I hereby reject it."

12.    It is important to note another similar incident in which a ruling was issued by an Israeli Court[3]. It started with a default ruling that was issued by the District Court of Tel Aviv and relating to a suicide bombing that took place on May 27, 2002 in a shopping mall in the city of Petah Tikva. In this bombing 56 year old Roti Peled and her toddler granddaughter, Sinai Peled, were killed. The lawsuit was filed by 6 family members:

    a.  Nathan Peled, who lost his wife Roti and his granddaughter Sinai

    b.  Ehud Peled who lost his mother Roti and his niece Sinai.

    c.  Lavi Peled who lost her mother Roti and her niece Sinai

    d.  Hen Kinan Peled who lost her mother Roti and her daughter Sinai and who was personally injured in the attack.

    e.  Leor Kinan who lost his daughter Sinai and his mother in law Roti and who was personally injured in the attack.

    f.  Rachel Simantov who lost her daughter Roti and her great granddaughter Sinai

13.    The lawsuit was brought against the PA and the Palestinian Council. The court stated that the complaint was duly served on the defendants but no answer was filed.

14.    The Court stated in its default ruling that the plaintiffs have petitioned the court to grant them huge amounts of compensation, based on rulings rendered by American Courts, especially the ruling that was given by an American

---

[3] Civil case no. 2276/03, District Court of Tel Aviv, Natan Peled vs. the Palestinian Authority.

Court in Washington in the case of Eisenfeld on July 11, 2000 in which the court granted the plaintiffs, relatives of the victims of the terrorist attack that was carried out on February 25, 1996 in bus line 18 in Jerusalem, the amount of 327 million US$.

15.     The Tel Aviv District Court also ruled that it could impose punitive damages in certain relevant cases especially when the tort act was done intentionally or maliciously.

16.     The court stated in its ruling:

"It is not arguable that this case deals with an act of terror that was committed with highly malicious criminal intention. The goal of the act and its intention was to kill innocent people with no distinction for the purpose of killing the utmost number of victims.

Yet the Israeli Case law does not recognize/accept such high amounts of compensation. The compensation petitioned for in this case is unprecedented in its amount. The amount of compensation should take into consideration the severe and exceptional suffering and the murderous and malicious activity of the defendants that was not denied by them, in the absence of any answer, based on normal parameters used in Israel for calculation of compensation.

Therefore the compensation granted should, on the one hand, reflect the normal amount of damages that are normally granted in case of loss of a family member, and on the other hand a punitive amount should be set fourth that suits the severity of the act.

The punitive amount that should be granted in such a very harsh case is much bigger than the amount granted in a normal case of tort act against negligent wrongdoer.

Thus, although the plaintiffs did not present an accurate calculation it is possible to evaluate the amount of compensation they are entitled to. There is

no reason to differentiate between the plaintiffs in relation to the amount of compensation, since the victims are next of kin to all plaintiffs.

Therefore I hereby grant every plaintiff the amount of 12 million NIS as requested in §37 of the request[4]. Some of the plaintiffs have asked for a higher amount but there is no justification for that".

17.   The defendants in the above case (the Peled case) filed a motion to vacate the default judgment. The Registrar of the District Court of Tel Aviv accepted the motion and vacated the default judgment[5]. After stating that it was convinced that the complaint was duly and legally served to the defendants and that there is no ground to repeal the default judgment based on the argument that the complaint was not duly served to the defendants the court added:

"Therefore, the only question that needs to be determined in the present motion is whether the default judgment should be rescinded based on the discretionary authority given to the court, in order to allow consideration of the case on the merits, a case that seemingly invokes complicated issues. In my opinion the answer to this question should be positive.

I have already written earlier that one should disconnect to the extent possible between the atrocities of the terrorist attack and its ruthless results and the not so simple legal issues arising in this case. For example, the petitioners have serious assertions that they are not the proper defendants in the lawsuit and although Mr. Rot (the plaintiff's attorney) wished to learn from websites and other rulings of the courts in other matters regarding the involvement of the current defendants in the wave of terror of which the terrorist act mentioned in the complaint was part, there is no possibility to do the requested "jump" without determining the arguments on the merits. Also the fact that somebody wrote a letter to the UN General Assembly in which he attributed liability to the petitioners (annex B of the references of the motion to grant a default

---

[4] Equivalent of 2,651,933 USD at the time the ruling was issued
[5] Civil case no. 2276/03, civil motion number 9505/04, District Court of Tel Aviv, The Palestinian Authority vs. Natan Peled

judgment) is not a substitute for acceptable evidence that links the petitioners to all that is attributed to them, it is certain to say that there is no judicial knowledge in such matters, that the PA is liable to the terrorist attack at hand (perhaps one can believe that there is a judicial knowledge regarding the involvement of the PA in terrorist attacks in general, but there should be a specific and concrete evidential foundation that was not present in the evidence that was provided to Honorable Judge Azar in support of the motion to grant a default judgment)".

18.    An appeal to a judge in the District Court of Tel Aviv was filed on the above decision that vacated the default judgment. The appeal was rejected[6]. In its reasoning, upon rejecting the appeal, the District Court stated:

"In this case, I'm of the opinion that given the serious factual and legal issues that the ruling invokes, the registrar has rightfully accepted the motion to vacate the default decision while imposing actual expenses that aim at reimbursing the plaintiffs for their expenses due to the refusal of the defendants to receive the complaint.

The Plaintiffs do not agree with this position, since they believe that the chances for the defendants to present a defense are very slim.

Without expressing an opinion as to the chances of the defense, I believe that given the fact that the dispute regarding the legal responsibility of the PA for terrorist attacks has not been determined in Israel, and since there is no final binding supreme court precedent as to punitive damages, the defendants have succeeded to show, on its face, that they have a defense".

19.    On this District Court ruling a motion to grant a permit to appeal was brought before the Supreme Court of Israel. The Supreme Court denied the motion and

---

[6] Civil appeals no. 1331/05 and 1469/5, the District Court of Tel Aviv, The Palestinian Authority vs. Natan Peled.

upheld the District Court ruling to vacate the default judgment[7]. In its reasoning the Supreme Court stated:

"On the merits, I do not believe that I should interfere in the District Court ruling. As it appears from the material before me, and as detailed, the defendants have claims that are worth determining on the merits. The assertions that the plaintiffs raise against the District Court ruling, without expressing an opinion about them, should be examined and determined in the main proceeding. In addition, I do not accept the assertions that were raised in the factual level as if they would substitute an examination on the merits. The District Court registrar stated in his decision that based on websites, other court rulings and letters to the General Assembly of the UN the plaintiffs attorney wished to do 'the necessary jump without examining the claims on the merits'. I agree with his viewpoint. The issue whether this is enough to link the defendants with the terrorist attack in which the deceased were killed needs to be determined based on an objective examination of the complaint on its merits".

20.   However, on February 26, 2013, for the first time, the District Court in Tel Aviv held the PLO and the PA liable for the killing of an Israeli Citizen by a 15.5 years old Palestinian (C.C. 1047-04 Mentin et al. V. Bezeq et al.). The judgment of the district court has been appealed to the Supreme Court of Israel, and the appeal is still pending.

21.   In its decision the court held the PLO and the PA negligent, it also held that the employer of Mentin, Bezeq Telecommunication Company, was negligent and divided the responsibility, so that the PA and PLO bear 70% and Bezeq bears 30%. The court ruled as a fact that the killer, a 15.5 years old boy was trained by the PA to use weapons for 50 days in a training camp run by the PA and that he killed the Israeli citizen 10 days after he finished the training.

---

[7] Motion to permit appeal no. 8274/05 The Supreme Court, Natan Peled vs. The Palestinian Authority

Those facts were decisive in holding the PA and the PLO accountable, especially the fact that the killer was minor.

## Negligence under Israeli Law and Palestinian Law

22. If the Civil Action was based on the Israeli or the Palestinian Torts law, it would be based, inter alia, on negligence pursuant to §35 of the CWO (§50 of the CWO 1944). As a matter of fact, negligence was mentioned in the complaint, inter alia, as the seventh count of the complaint.

23. The tort of negligence as it is construed in Israeli case law consists of the following elements:

   a. Duty of care that the defendant owes the plaintiff.
   b. Breach of duty (reflected in the defendant's failure to act as expected by a prudent person in the same circumstances).
   c. Factual and legal causation.
   d. Harm.

24. The duty of care is usually divided into two elements, the conceptual duty of care and the concrete duty of care.

25. When examining the conceptual duty of care, the question is an abstract one: "whether the general type of the wrongdoer, the harmed, the act and the harm might establish a duty of care". It is basically classifying "entire categories of wrongdoers (manufacturers, employers, drivers, teachers), of injured persons (consumers, employees, pedestrians, pupils), of damages (physical, monetary), and of activities (acts, omissions). The examination is detached from the concrete facts of the specific case"[8]. The question is one of law and of facts and is based on classifications and divisions that might determine the

---

[8] Civil Appeal 145/80 Vaaknin vs.the local council of Bet Shemesh.

end result of the lawsuit without even examining the concrete specific factual risk mentioned in the complaint.

26. According to this method a conceptual duty of care was recognized on the part of the driver towards pedestrians and passengers in his car, the employer towards his employees, the physician towards the patient, the teacher towards the pupil[9]…etc.

27. To date no conceptual duty of care has been recognized or set forth in a final Court Judgment in the relationship of the PLO or the PA and the Israeli citizens. As a matter of fact, and as far as my knowledge, the Israeli case law has never recognized a conceptual duty of care of the state of Israel itself towards the citizens of a foreign country for criminal acts committed against them by an Israeli citizen on the territory of a sovereign foreign country. Also, there has never been recognized a conceptual duty of care (nor tort liability in general) of any other foreign sovereign country towards Israeli civilians for criminal acts committed against them.

28. The concrete duty of care means whether there is (or should be) a duty of care between the concrete wrongdoer and the concrete injured with regard to the actions (or omissions) that actually were carried out with regard to the harm that actually occurred.

29. The incidents mentioned in the Civil Action were all carried out by suicide bombers, shooters or perpetuators in territory within or claimed by Israel itself, with the exception of the Guetta case, which took place next to the Israeli Settlement of Givon in the West Bank. This settlement has been, including at the time of the attack, part of Area C (according to the territorial division and classification of the West Bank and Gaza Strip in the Oslo agreements that were signed between the PLO and Israel), thus it has been

---

[9] Shirli Dagan Issues in Tort Law, page 282 and the Court rulings cited therein.

under full Israeli control, in civil and security matters and the PA had no control whatsoever over it. Therefore, it is not reasonable to say the PA and the PLO owe a concrete duty of care under those circumstances.

30.     It is worth noting that Israeli law sets a duty on the Israeli police to maintain public order, to investigate and discover criminal offenses and prevent them. According to the line of argument utilized in the Civil Action, and given the fact that the attacks were carried out in territory claimed by Israel itself (and one next to an Israeli settlement, under Israel's full control) the plaintiffs could have sued the state of Israel for not preventing the attack. As evident from the complaint, Israel has not been sued by the plaintiffs due to those attacks and it has never been sued by any other plaintiff due to any other attack.

31.     Moreover, the Israeli law generally does not impose a duty of care on the state (through its police and other security forces) for <u>criminal acts</u> committed against its citizens (even by its citizens). The Israeli case law imposes duty of care only when a special link or relationship exists between the police and the criminal, and in their absence no duty of care is sustained. Only when a link or relationship exists between the criminal act and the police acts or omissions, a duty of care will be imposed on the police. Such a link would be constituted if, for example, the police had succeeded to arrest the criminal but he escaped from its custody[10].

32.     A comparable case to the case at hand is the issue of liability of the state of Israel to compensate Palestinian residents of the OPT as a result of an act of assault perpetuated by the settlers against the Palestinians. Before digging into the comparison it is important to note that Israel's liability differs in a very substantial aspect, namely its control of the OPT and being the Occupying Power under international law with all that stems from that (military presence

---

[10] Civil case 2555/00 (District Court of Jerusalem) Raviv Margalit vs. The State of Israel.

and having police forces in the OPT). Notwithstanding this, the Israeli courts generally did not hold Israel liable for assaults of the settlers against Palestinians. In one case that was adjudicated in the District Court of Jerusalem[11], the Court rejected the complaint filed by the Palestinians explaining that there is no conceptual duty of care in the relationship between the state of Israel and every resident of the OPT and because there is no concrete duty of care towards the plaintiffs. The Jerusalem District Court ruled also that no violation of a statutory duty was sustained.

33.   The appeal that was filed to the Israeli Supreme Court was denied. Although the Supreme Court held that conceptual duty of care exists, it stated there was no breach of duty of care, namely, it was not proven that the state was in default and that it did not take the reasonable measures to prevent the harm.[12]

34.   In addition, to hold the defendants accountable, the plaintiffs have to prove and convince the court that the causation element has been met.

35.   Causation is regulated in Israeli Law in §64 of the CWO and in Palestinian Law in §55(b)1 of the CWO 1944.

36.   Based on Israeli case law, causation is composed of factual and legal causation.

37.   The factual causation means that for a defendant to be held liable, it must be shown that the particular acts or omissions were the cause of the loss or damage sustained. The basic test is to ask whether the injury would have occurred but for, or without, the accused party's breach of the duty owed to the injured party.

---

[11] Civil case 438/94 Ahmad abu Samara vs. 1.The State of Israel 2. The Israeli Military Commander of the Gaza Strip.
[12] Civil Appeal 6970/99 Ahmad Abu Samara vs. 1. The state of Israel 2. The Israeli military commander of the Gaza Strip.

38.    The legal causation is often a question of public policy: is this the sort of situation in which, despite the outcome of the factual inquiry, we might nevertheless release the defendant from liability, or impose liability? The law often intervenes and says that it will nevertheless not hold the defendant liable because in the circumstances the defendant is not to be understood, in a legal sense, as having caused the loss. The tests utilized in examining the legal causation are three: the foreseeability test, the risk test and the common sense test.

39.    In my opinion the killing and injury of the different plaintiffs as mentioned above by a suicide bomber or a shooter was in any case an intervening cause (novus actus interviens) under §64(2) of the CWO applicable in Israel (§55(b)1 of the CWO 1944 applicable in the Palestine/the West Bank) that breaks the chain of events, i.e. the liability of the PLO and the PA stops at that point, and the new actor, the attacker, will be liable for all that flows from his attack. §64(2) of the CWO (§55(b)1 of the CWO 1944) states that the causation is revoked "if somebody else's fault was the decisive cause for the damage".

40.    In this case the intervening cause was a willful felony by a third party. This, usually, is considered as an act that revokes causation. The question whether the intervening cause was the decisive cause of the harm is also determined based on the aforementioned tests of causation (foreseeability, the risk and the common sense test).

## Violation of a statutory obligation

41.    If the Civil Action case was based on the Israeli or the Palestinian Torts law, it would theoretically be based, inter alia, on violation of a statutory obligation

pursuant to §35 of the CWO (§50(1) of the CWO 1944). However, this tort was not mentioned in the complaint as one of its numerous counts.

42. According to Israeli case law and based on the CWO wording, this tort is composed of the following elements:
    a. A violation of a statutory obligation by the defendant.
    b. The statutory obligation is purposed to protect the injured.
    c. The harm is of the kind that the statute meant.
    d. The harm stems from the breach of the statutory obligation (factual and legal causation).

43. The complaint does not mention any statutory obligation that was violated by the PA or the PLO.

44. It should be noted that statutory obligation is an obligation set forth by a statute. In Israel, a statute is defined in the Interpretation Ordinance (new version) – 1951, as "any law or regulation".

45. There are no laws or regulations that set fourth a statutory obligation for the PA or the PLO to protect civilians from suicide bombing or shooting while being at a settlement in the West Bank or in Israel itself or any other place. It is true, that the PLO undertook some obligations under the different agreements signed with Israel. Yet, those are not tantamount to statutory obligations within the meaning of the CWO. In the Israeli and Palestinian legal systems, international agreements and conventions do not have the status of a local law and one can not base a claim based on them in the local courts. Only customary international law is considered part of the local laws.

46. The Agreements between Israel and the PLO were not fully incorporated in the Israeli or Palestinian legal regimes. Several Israeli laws and military orders were enacted following the said agreements, yet they aimed to implement only

certain parts and arrangements that were agreed upon between the parties (such as the transfer of taxes and custom dues to the PA).

47.   I'm aware of the fact that The District Court in Tel Aviv in the Mentin case expressed, in obiter, a different view. It held that the obligations of the PLO and PA were incorporated in certain local statutes and that the agreements signed between the PLO and the Government of Israel are in fact a contract for the benefit of third parties (the Israeli citizens), thus allowing the state of Israel and any of its citizens to sue based on them. With all due respect, I do not agree with this analysis. My view is different as stated earlier in my report. It is worth noting that the District Court did not hold the PA and the PLO liable for breach of statutory duty but for negligence. In any case, as mentioned above, this judgment has been appealed to the Supreme Court of Israel and the Appeal is pending.

48.   In my opinion this tort can not be proven in our case and the different elements of this tort would not be met. Thus no cause of action can be brought against the PA and the PLO based on this tort.

### The proper plaintiffs

49.   Death proximately caused by a tort gives a rise to a claim for the decedent's estate and his dependants. The dependants' claim is for the monetary damages they incurred due to the death. The estate's claim is for the damages of the deceased that passes to the heirs. Although those two legal claims are distinct they still partially overlap.

50.   As per the information provided to me by the defendants' Counsel, in the case at hand, 4 single people were killed in the Hebrew University Bombing (hereinafter – the deceased singles). Benjamin Blutstein and David Gritz were students; Janis Ruth Coulter and Diane Carter were working adults, but were

not supporting any family. Therefore, no dependents' claim can be brought due to their death, since they were not economically supporting a family at the time and the only lawsuit that can be brought is the decedent's estate lawsuit. The compensation received in such lawsuit goes to the estate, i.e. to the lawful heirs of the deceased.

51. Therefore the parents and siblings of the deceased singles can sue only in their capacity as the heirs of the deceased.

52. In case of injury due to a wrongful act, the main plaintiff is the injured person. Her/his family members usually do not have an independent cause of action. In some cases they are mentioned as plaintiffs in the lawsuit of the injured, yet the only category of damage they might be entitled to is loss of income or wage due to absence from work in order to aid or assist the injured when and if necessary. This category of damage to a large extent overlaps the category of damage titled "assistance by a third party" to which the injured is entitled to. Since the courts do not grant double compensation, i.e. do not simultaneously rule on help by a third party to the injured and loss of income to the family member who had to be absent from work to aid the injured, in most cases the lawsuit is filed only by the injured.

53. In addition, Under Israeli case law the parents and siblings can become secondary harmed (secondary victims) and thus could have an independent legal cause for emotional/mental injury due to the death or injury of their family member. Yet, this cause of action by parents and siblings has never been recognized by the Palestinian Courts.

54. According to the Israeli case law, recognizing family members as secondary harmed, requires that 4 conditions be met:

   a. The secondary harmed has to be a first degree relative to the injured person.

b.  The secondary harmed must be personally impacted by the incident. This traditionally meant that they need to witness the incident in which their loved one was injured or killed. Yet, this requirement was expanded by the case law to allow the possibility for a secondary harmed who received the impact regarding the incident through an intermediary, if the damage sustained was foreseeable.

c.  Proximity in time and place between the incident and the occurrence of damage to the secondary injured.

d.  A severe mental injury that is tantamount to psychosis or neurosis.

55.    In this case, it was not alleged in the complaint (let alone proven) that the parents or siblings (of those killed or injured in the bombing) have a severe mental injury that is tantamount to psychosis or neurosis. Thus, the fourth condition of the test is not met. In addition, based on the complaint, it seems that in almost most of the cases mentioned in the Civil Action, the second condition is not met either and it is questionable whether the third condition is met (with the exception of Varda Guetta who was present in the car with her child at the time of shooting).

56.    To conclude this section, it is my opinion that the parents and siblings of the deceased singles can be proper plaintiffs under Israeli and Palestinian law only in their capacity as the heirs of the deceased and they are not entitled to compensation as dependants. In addition, parents and siblings of the deceased and injured are not entitled to compensation as secondary harmed since they did not sustain psychosis or neurosis.

## Categories of damage

57.    The Israeli law recognizes the following categories of damage in the
       dependants' case:

       a.  Loss of financial support.

       b.  Loss of parental services.

       c.  Funeral costs and burial expenses.

58.    For the estate's case it recognizes the following categories of damages:

       a.  Pain and suffering and the shortening of life expectancy of the deceased.

       b.  Loss of earnings in the 'lost years'.

       c.  Funeral costs and burial expenses.

59.    As we can see the category of funeral costs is identical in both claims. Loss of
       financial support for the dependents overlaps with loss of earnings in the lost
       years, since both are based on the deceased's income that was lost. Yet, when
       calculated under the estate's claim, it is usually higher.

60.    It should be noted that there is no double compensation. Therefore, the
       categories of damage that are identical or partially overlap are not paid twice
       i.e. in the estate's claim and the dependants'.

61.    When the heirs of the estate and the dependants are identical as in the case of
       Late Scott Goldberg, the amount of damages in the estate's claim is higher
       (because in this claim we add a "saving hand" to the calculation, as explained

later). In such a case, the category of "loss of paternal services" should be added to the damages of the estate.

62. Calculating the compensation due the estate of Late Scott Goldberg based on the information provided to me by Defendants' counsel will be will be spelled out later in this report.

63. The Palestinian case law recognizes the following categories of damage in the dependants' case:

    a. Loss of financial support.

    b. Funeral costs and burial expenses.

64. For the estate's case the Palestinian case law recognizes the following categories of damage:

    a. Pain and suffering.

    b. Funeral costs and burial expenses.

    c. The Palestinian case law does not recognize the shortening of life expectancy of the deceased and the loss of earnings in the 'lost years' as categories of damage.

Calculation of the damages under Israeli and Palestinian Law in case of death

Pain and suffering and the shortening of life expectancy of the deceased:

65.    This category was not explicitly defined in the CWO, but is generally defined as non-monetary damage and a damage that can not be directly translated into monetary terms. Thus, the amounts granted under this category are based on intuitive assessment.

66.    This category includes the pain and suffering of the deceased during the period between the injury and the time of death. When assessing this part of the category the court takes into consideration all relevant circumstances, and mainly the length of the period of suffering. If it is longer, the pain is greater, and damages are higher and vice versa.

67.    The other part of this category, i.e. the shortening of life expectancy of the deceased is an objective one and not related to the subjective feelings of the deceased and his awareness of his upcoming death. It is meant to compensate for the non-economic loss sustained due to the shortening of life expectancy. The compensation for the shortening of life expectancy is based on assessment. When assessing, the court mainly considers the age of the deceased (i.e. the number of years lost due to the tort from the life expectancy of the deceased) and the quality of the lost years.

68.    Israeli courts usually combine the above two sub-categories and grant one total amount. This is usually the case when the death is almost simultaneous with the harmful act. In this case the main amount is for the shortening of life expectancy giving weight to the circumstances of the death. From reading the complaint it seems that the deaths of the plaintiffs were immediate, thus it is appropriate to grant one total amount for both sub categories.

69.    Comparable cases that were adjudicated before Israeli courts are as follow:

   a.  The Supreme Court of Israel upheld the amount of 750,000 NIS[13] that was
       granted by the district court in February 2002, for the shortening of the life
       expectancy of a three year old girl who inhaled poisonous gasoline from a
       heater. The District Court did not grant any compensation for pain and
       suffering, pointing out the girl was unconscious for two days after the
       incident. The Supreme Court upheld the decision including with regard to
       the pain the suffering stating that "the rule is that the estate is not entitled
       under these circumstances to compensation for pain and suffering, the
       existence of which, during the said two days was not proven"[14].

   b.  In another case adjudicated before the District Court of Jerusalem, the
       court granted in October 2002 the total amount of 1,000,000[15] NIS for the
       categories of pain and suffering and shortening of life expectancy for the
       estate of a 17 year old girl who drowned.

   c.  In the Mentin Case mentioned above, the District Court to Tel Avid,
       granted in February 2013, the total amount of 1,000,000 NIS for the
       categories of pain and suffering and shortening of life expectancy for the
       estate of a 31 years old man who was shot and died several minutes later.

70.    The Palestinian case law, however, does not recognize the shortening of life
       expectancy as a category of damage. Under pain and suffering the Palestinian
       courts grant modest amounts. In car traffic accidents, they used to grant an
       amount of about 10,000 US$ for the estate due to pain and suffering based on
       the Israeli military order that was in force in Palestine until 2005. In 2005 the
       Palestinian Authority passed the Insurance Act which stated that the
       maximum amount for pain and suffering for injury and/or death due to a car
       accident is approximately 14,100 US$. In cases that are based on the CWO

---

[13] Equivalent of 159,000 USD at the time the ruling was issued.
[14] Civil appeal 5145/02 The Supreme Court, Gross vs. Paz Gas Company.
[15] Equivalent of 207,200 USD at the time the ruling was issued

1944, the Palestinian courts grant higher amounts, usually not exceeding double the maximum amount granted in car accidents cases.

### Loss of earnings in the 'lost years'.

71.   The calculation of loss of earnings in the lost years for a single person (who is not supporting his family) is based on calculating the amount of savings the deceased is assumed to save by the end of his life. It was decided by the courts that the rule for calculating the savings of a minor/single man/woman (not supporting a family) lost due to his/her death are 30% of the net present value of his/her potential loss of income. The loss of income is based on the assumption that the potential salary for the minor is the average wage in the Israeli economy (around 2,535 US$ as of last published average wage to the date of this report).

72.   For example in the case of David Gritz, assuming the court would rule that his loss of income should be based on the said average wage, the calculation would be as follows: 2,535 US$ (average salary) * 245.5063 (net present value for 31 Years and 8 months, given his "age" at the day of calculation in this report 35 years and 4 months and the retirement age in Israel 67) * 30% = 186,706 US$.

73.   As for the loss of income in the past. i.e. until the date of calculation, the court has to decide the starting day for his work and employment, since he was a student at the time. If we assume for his benefit that he would have started working immediately, i.e. July 31, 2002 then the calculation for the past would be as follows: 6964 NIS (the average wage at the date of the incident 7/2002) * 99 (months since his death to date) * 0.30 = 206,830 NIS. On this amount interest and indexation differences should be added.

74.   In the case of Late Janis Ruth Coulter, taking into account her age at the date of hear death (37 years old) and assuming her monthly salary is 4,041 US$, as the plaintiffs maintain, the calculation would be as follows:

**For the past** (until the date of calculation July 15, 2103):

4,041 US$ * 98.5 (months from the date of incident to date) * 30% = 119,411 US$. On this amount interest and indexation differences should be added.

**For the Future** (i.e. for 17 yeas in the future, from the date of calculation until August 2030, the age of retirement at 65 for women):

4041 US$ (Plus indexation differences from date of incident) * 144.8054 (net present value for 17 years) * 30% = 175,547 US$

75. As previously stated this category of damage is not recognized by Palestinian case law.

76. **In the case of Late Scott Goldberg** I've been provided with the following information to be able to conduct the calculation:

**Dates of birth:**

Late Scott: November 8, 1962,

Karen: Goldberg, (his wife), November 28, 1962.

Chana: October 3, 1987

Esther: July, 10, 1989

Yitzhak: September 16, 1991

Shoshana: April 16, 1993

Eliezer: February 9, 1996

Yaakov: June 22, 1999

Tzvi: October 26, 2002

**Late Scott's salary prior to his death**: The defendants' counsel informed me that the plaintiffs did not produce this figure. For the sake of explaining the way the compensations are calculated, I'll assume that his salary was the average wage in Israel at the time of his death, namely 7,094 NIS. Of course, if the salary is different, the new salary should be inserted in the calculation below to get the right result. After adding indexation differences from the time of incident to the date of the calculation (i.e. July 15, 2013) the salary becomes 8,777 NIS.

77.     The total number of hands in the estate's claim is 11. One for Late Mr. Goldberg's living and one for his saving, one for the household, and one for each family member.

Loss of earnings from the date of incident, January 29, 2004, up to the age of maturity (the age of 18) of Chana, October 3, 2005:

During this period we had 10 hands out of 11 (taking away the hand for living of Late Scott). Thus the loss is 10/11* 8,777 NIS (the salary) = 7,979 NIS. This loss times 20 (months) = 159,581 NIS, together with accrued interest from the middle of the period (namely from December 5, 2004) to date, the amount is 214,528 NIS[16].

Loss of earnings from the date of the maturity of Chana, October 3, 2005 to the date of maturity of Esther (July 10, 2007):

78.     During this period we have 9 hands out of 10. Thus the calculation is 9/10* 8,777 NIS * 19 months, = 150,086 NIS, together with accrued interest from the middle of the period (namely from July 15, 2006) to date, the amount is: 192,110 NIS.

Loss of earnings from July 10 ,2007 until Yitzhak reaches maturity age : i.e. until September 16, 2009:

---

[16] Equivalent of 59,591 USD at the date of this report, as the dollar rate is 3.60 NIS.

79.    During this period we have 8 hands out of 9. Thus, the calculation is 8/9* 8,777 * 26 months = 202,846 NIS, together with accrued interest from the middle of the period (namely from August 10, 2008) to date, the amount is 241520 NIS.

Loss of earnings from September 16, 2009 until Shoshana reaches the age of maturity i.e. until April 16, 2011:

80.    During this period we have 7 hands out of 8. Thus, the calculation is 7/8 * 8,777 * 19 months = 145,917 NIS, together with accrued interest from the middle of the period (namely from June 2, 2010) to date, the amount is 164,114 NIS.

Loss of earnings from April 16, 2011 until Eliezer reaches the age of maturity i.e. until February 9, 2014:

81.    During this period we have 6 hands out of 7, and it should be divided to two periods. During the first, the calculation is 6/7* 8,777 * 27 months (namely until the date of calculation) = 203,312 NIS, together with accrued interest from the middle of the period (namely from May 15, 2012) to date, the amount is 212,592 NIS. The second is from the date of calculation until February 9, 2014 = 6/7 * 8,777 * 6.928 (net present value for immediate payment of allowance that was supposed to be paid throughout 7 months, from July 15, 2013 till February 9, 2014) = 52,120 NIS.

Loss of earnings from February 9, 2014 until Yaakov reaches the age of maturity i.e. until June 22, 2017:

82.    During this period we have 5 hands out of 6. Thus, the calculation is 5/6* 8,777 * 38.468899 (net present value for immediate payment of allowance that was supposed to be paid throughout 40.5 months) * 0.98296 (net present value for a payment due after 7 months from the day of calculation) = 276,573 NIS.

30

Loss of earnings from June 22, 2017 until Tzvi reaches the age of maturity i.e. until October 26, 2020:

83.    During this period we have 4 hands out of 5. Thus, the calculation is 4/5 * 8,777 * 38.017566 (net present value for immediate payment of allowance that was supposed to be paid throughout 40 months) * 0.888 (net present value for a payment due after 47 months from the day of calculation) = 237,046 NIS.

Loss of earnings from October 26, 2020 until Late Scott reaches the age of retirement i.e. until November 8, 2029:

84.    During this period we have 3 hands out of 4. Thus, the calculation is 3/4 * 8,777 * 94.54353 (net present value for immediate payment of allowance that was supposed to be paid throughout 96 months) * 0.8130 (net present value for a payment due after 87 months from the day of calculation) = 505,975 NIS.

85.    Thus the total amount under loss of earning is: 2,096,578 NIS.

86.    In addition, if the plaintiffs prove that the deceased and his employer were allocating monthly allowances to a pension fund, the estate would be entitled to the net present value of ¼ the expected pension (after proving its amount) until the expected age of the deceased, which is around 80 years old for a male.

**Funeral costs and burial expenses:**

87.   This category needs usually to be proven. Examining the Israeli and Palestinian case law shows that the amount granted under this category is around 15, 000 NIS.

## Loss of companionship and society; loss of consortium; severe emotional distress and mental anguish and loss of solatium

88.   In the complaint the different plaintiffs petition for compensation for loss companionship and society; loss of consortium; severe emotional distress and mental anguish and loss of solatium for themselves and for the decedents.

89.   Those categories of damage are recognized neither in Israeli case law nor in Palestinian case law.

90.   The Israeli case law recognizes a category of damage named loss of spouse/parental services according to which compensation is granted to the widowed spouse and his/her minors the sons/daughters of the deceased. Such compensation is granted, if at all, only in case of death due to a tort. They have not been granted in case of injury. In any case, compensation under this category of damage is not granted to siblings who are not proper plaintiffs in the first place, with the exception of filing a lawsuit as the heirs of the estate of the deceased. When granted to the spouse widow and the deceased's children, usually the amount it is based on estimation by the court, based on the facts of the case and the extent of help the deceased parent was providing in the household and the raising up of the children. The range of amounts the Israeli courts have ruled is between 30,000 US$ up to 150,000 US$ depending on the circumstances of the case.

91.   The loss of parental/spousal services as a category of damage was exceptionally expanded at a later stage in Israeli case law to include loss of

services of a deceased son or daughter. Yet, it is worth noting that for the court to grant compensation under this category of damage the parents should prove that the deceased son/daughter was in fact rendering such services to them during his/her life and that the death stopped the rendering of those services.

92. In our case, the 4 of the deceased were single, and no claim was raised in the complaint asserting they rendered services to their parents. Israeli Courts have never granted compensation for son/daughter services, once it was not proved that the latter was actually rendering special help to parents who need it because of their special circumstances (such as sickness, old age etc').

93. Even when the Israeli Courts granted compensation for loss of an adult son/daughter services the amount of compensation was very modest, not exceeding 10,000 US$ in average.

94. In the Mentin Case, the Court stated that it is not aware of a category of damage of loss of son services and rejected this category of damage

95. The Palestinian case law does not recognize the category of damage of loss of child services.

### Calculation of the damages under Israeli and Palestinian Law in case of Injury

96. In case of injury the Israeli and Palestinian laws recognize the main following categories of damages:

A. Loss of earning since the injury until the age of retirement. This is usually the main category of damages. The amount of compensation under this category is very much influenced by the percentage of permanent disability awarded to the injured and her/his salary.

B.    Medical Expenses and transportation expenses for medical treatment

C.    Pain and suffering.

D.    Third party assistance since the injury as long as the medical situation of the injured so requires.

97.    However, due to lack of information provided (birthdates, salary and percentage of disability) it is not possible to conduct the calculation of damages for any of the injured plaintiffs.

**Punitive damages:**

98.    The authority of the courts to grant punitive damages under Israeli Tort law is not yet beyond any doubt and some still question its existence.

99.    As matter of practice, the Israeli courts usually do not grant punitive damages. When they rarely did so, they did it cautiously and the amounts granted were very modest (usually not exceeding 20,000 US$).

100.    In any case the Israeli CWR and the Israeli case law do not have any punitive damages principle of tripling the compensation.

101.    In the Mentin Case, the District Court of Tel Aviv rejected the request to grant punitive damages.

102.    The Palestinian case law does not recognize the punitive damages as a category of damages or as legal principle at all and Palestinian Courts have never granted punitive damages in a tort case.

**Deductions:**

103. Under Israeli and Palestinian Tort Law any financial benefit that the plaintiff receives due to the tort and its result must be deducted from the compensation.

104. The injured and relatives of the deceased in the Civil Action are entitled under the law of Compensation for the Victims of Hostile Acts - 1970, to a monthly stipend and other different financial benefits. According to the common practice in Israeli courts in tort cases, an actuary (economist) usually prepares an actuarial opinion calculating the net present value of the payments that will be paid to the injured or to the relatives of the deceased by the National Insurance Institute under the said law.

105. In order to prepare the said actuary report, certain details regarding the injured and deceased persons should be provided.

106. Just to get a sense of the amounts paid under the law of Compensation for the Victims of Hostile Acts, in the Mentin case this amount was 2,200,000 NIS while the amount of compensation that the court adjudicated in the case against the defendants was 1,944,177 NIS plus 20% lawyers fees and expenses.

107. Since double compensation is not possible under Israeli Law, the court in the Mentin case ruled that the plaintiff has to choose one of two paths, either to get compensation under the law of Compensation for the Victims of Hostile Acts – 1970, and in this case she gets nothing from the defendants or to get compensation from the defendants and in this case, she has to return all amounts that she had received from the National Insurance Institute, as a precondition for receiving the damages that the court has ruled for her.

Muhammad Dahleh

July 15, 2013

35

**EXHIBIT A**

Curriculum Vitae

## MUHAMMAD A. DAHLEH

### PERSONAL:

| | |
|---|---|
| Name: | Muhammad Dahleh |
| Address: | 4 Ibn Batotah Street |
| | P.O.Box 1342 |
| | Jerusalem 91013 |
| Tel: | 02-6274070-1 |
| Mobile: | 050523910 |
| Fax: | 02-6274060 |
| E-mail: | Dahleh@014.net.il |

### LEGAL PRACTICE HISTORY

**The Law Offices of Muhammad Dahleh & Associates, Jerusalem.**
**2002-to present**

The head of a law firm located in Jerusalem composed of 7 lawyers.

**Primary practice** and areas of expertise are civil litigations, torts and insurance law, property law and constitutional law.

**June 2004, won the land mark case against the wall in the Israeli Supreme Court** (in which the Court ruled that 30 km of the Wall in the North West of Jerusalem are illegal).

**The Law Offices of Qupty, Dahleh & Associates, Jerusalem & Ramallah**
Partner, 1993 to 2002

**The Hebrew University, Faculty of Law, Jerusalem.**
Adjunct lecturer, Constitutional Law, 1993 to 2002

**Ramat Gan College of law**
Adjunct lecturer, the Legal Status of the Palestinians in Israel, 2002 to 2004

**The Association for Civil Rights, Jerusalem.**
Staff Attorney - September 1992 to September 1993.
Researched cases, documented civil rights complaints, and litigated cases before the Supreme Court of Israel.

**Yigal Arnon and Co., Advocates and Notary Public, Jerusalem.**
Law Clerkship in one Israel's leading corporate firm - 1990 to 1991.
Researched and drafted briefs, memorandum and motions in preparation for litigation in the areas of corporate Law, trading and banking, property law.

**The Supreme Court of Israel, Jerusalem.**
Judicial Clerkship under the Deputy Chief Justice of the Supreme Court- 1989 to 1990.

**First Arab legal trainee at the Supreme Court of Israel.**
Researched and drafted legal opinions concerning all aspects of Israeli Law, including:
civil procedure; corporations; trade; banking and administrative law.

## PROFESSIONAL ASSOCIATIONS:

**Israel Chemicals Company ltd**
One of the leading Israeli publicly traded companies
Member of Board of Directors 1999 - 2006

**Dead Sea Bromine Company ltd**
Member of Board of Directors 2002 - 2006

**The Israeli Cable Television Council.**
Member of Board of Directors (1994 to 1998)
The first Arab to serve as a member

**The Hebrew University, Faculty of Law, Jerusalem.**
Research Assistant to Dr. Gedon Lybson - 1990 to 1991.
Researched and edited drafts of articles on the Islamic Legal system and shari'a. Edited
a casebook on interaction between secular Israeli Law and shari'a.

**Israel Department of Industry and Trade Consumer Protection Division**, Jerusalem.
Law Clerk - (1988 to 1990).
Drafted pre-trial motions, and mediated settlements between consumers and businesses.

**Adalah – The Legal Center for Arab Minority Rights in Israel.**
Co-founder and Chairperson of the board (1997 to 2002)

**Israel/Palestine Center for Research and Information.**
Member of the advisory board of the Law and Development Program.

## EDUCATION:

**American University Washington College of Law, Washington, D.C.**
LL.M - 1992. International Legal Studies.

**The Hebrew University, Jerusalem**
LL.B - 1990.

**The Israeli Bar**, admitted 1991.

**The New York Bar**, admitted 1994.

## Honors:

Judge Kassan Award for Academic Excellence, 1988, 1989.
Dean's List, 1987.
Admissions Office Award for Academic Excellence, 1986.

# EXHIBIT B

### Additional Materials Considered by Muhammad Dahleh

1.  Reports of Plaintiffs' Expert Michael Soudry regarding the Estates of Benjamin Blutstein, Diane Carter, and Janis Coulter

2.  Reports of Plaintiffs' Expert Dov Weinstein regarding the Estates of Stuart Scott Goldberg and David Gritz

3.  Report of Plaintiffs' Expert Dov Weinstein regarding Karen Goldberg

4.  Transcript of Deposition of Karen Goldberg, dated October 14, 2012