# EXHIBIT B.111

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

MARK I. SOKOLOW, et al.,          )
                                  )
        Plaintiffs,          )
                                  )
v.                ) Civil Action No.
                  ) 04cv397(GBD)(RLE)
THE PALESTINE LIBERATION          )
ORGANIZATION, et al.,             )
                                  )
        Defendants.          )
_____)


DEPOSITION OF MICHAEL SFARD
JERUSALEM, ISRAEL
OCTOBER 24, 2013


REPORTED BY:  BRENDA MATZOV, CA CSR NO. 9243

Page 2

1        Deposition of MICHAEL SFARD, taken in the
2   above-entitled cause pending in the United States
3   District Court, for the Southern District of New York,
4   pursuant to notice, before BRENDA MATZOV, CA CSR 9243,
5   at the King David Hotel, Jericho III Room, Jerusalem,
6   Israel, on Thursday, the 24th day of October, 2013,
7   at 9:06 a.m.
8
9
10
11   APPEARANCES:
12   FOR PLAINTIFFS:
13       ARNOLD & PORTER, LLP
         By:  KENT A. YALOWITZ, ESQ.
14       399 Park Avenue
         New York, New York 10022-4690
15       (212) 715-1000 / Fax (212) 715-1399
         kent.yalowitz@aporter.com
16
17   FOR DEFENDANTS:
18       MILLER & CHEVALIER CHARTERED
         By:  BRIAN A. HILL, ESQ.
19           MICHAEL J. SATIN, ESQ.
         655 Fifteenth Street, NW
20       Suite 900
         Washington, DC 20005-5701
21       (202) 626-5800 / Fax (202) 626-5801
         bhill@milchev.com
22       msatin@milchev.com
23
24
25

Page 3

1   ALSO PRESENT:
2       RACHEL WEISER, Esq.
3       DINA ROVNER, Esq.
4       AHARON MISHNAYOT, Advocate
5       NOA AMRAMI, Advocate
6       SHIRIN ASHERIAN
7       YVETTE ESSAKHAR
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1              I N D E X
2   WITNESS
3   Michael Sfard
4
5   EXAMINATION                        PAGE
6   By Mr. Yalowitz                    6
7
8
9
10   P L A I N T I F F S'  E X H I B I T S
11   NUMBER     DESCRIPTION                 MARKED
12   Exhibit 111   Document Entitled "Expert
              Report by Adv. Michael Sfard,"
13            Dated July 15, 2013
              (No Bates Number)            35
14
     Exhibit 112   Article Entitled "Palestinians
15            Sue State Over Migron Land,"
              Dated October 5, 2008
16            (No Bates Number)            27
17   Exhibit 113   Article Entitled "Top Lawyers
              Debate:  Will Turkel Report be
18            Implemented?" Dated June 26,
              2013
19            (No Bates Number)            58
20   Exhibit 114   Article Entitled "State Says
              International Laws of Armed
21            Conflict Apply to Palestinian
              Terrorism," Dated December 11,
22            2005
              (No Bates Number)            63
23
24
25

Page 5

```
 1        P L A I N T I F F S'  E X H I B I T S
 2  NUMBER      DESCRIPTION              MARKED
 3  Exhibit 115   Document Entitled "Israel
                  Military Order No. 378,
 4                Order Concerning Security
                  Provisions"
 5                (No Bates Number)            81
 6  Exhibit 116   Hebrew Document
                  (No Bates Number)            81
 7
    Exhibit 117   Michael Sfard's Case Notes
 8                (No Bates Number)           156
 9
10
11
12        Q U E S T I O N S  I N S T R U C T E D
13              N O T  T O  A N S W E R
14              PAGE    LINE
15               289     25
16               291     23
17               292     16
18               292     21
19               293      1
20               293      8
21               294     24
22               295     13
23
24
25
```

Page 6

```
 1              P R O C E E D I N G S
 2
 3              MICHAEL SFARD,
 4    called as a witness, being first duly
 5      sworn, was examined and testified as
 6    hereinafter set forth.
 7
 8              EXAMINATION
 9  BY MR. YALOWITZ:
10    Q.   Where did you go to university?
11    A.   I've done my LLBs at the Hebrew University
12  in Jerusalem.
13    Q.   What year did you graduate from Hebrew
14  University?
15    A.   1998.
16    Q.   Did you -- did you like it there?
17    A.   I liked it a lot.
18    Q.   What was it like?
19    A.   What was, like, my law school years?
20    Q.   Yeah.
21    A.   They were hectic.  I was working as a --
22  as a legal reporter for the Jerusalem local weekly
23  called Ha'ir.  So I was spending a lot of time in
24  court in the Jerusalem district, in the Supreme Court,
25  in the Magistrate's Court, in the employment tribunals.
```

Page 7

```
 1  But I was also studying full time.  So it was not easy.
 2  But I remember those years as good years.
 3    Q.   Did you -- did you find Hebrew University
 4  to be a place of tolerance?
 5    A.   The Hebrew University has -- and the law
 6  faculty where I studied has students that are both
 7  Jewish and Arabs.  To be honest, looking back, I think
 8  that the two communities were completely separated from
 9  one another.  I don't recall any friends that I made
10  during those years with Palestinian students.
11         I remember a huge row in my law faculty
12  when Christian students wanted to place a Christmas
13  tree in the faculty before Christmas.  There was a huge
14  issue around it.  Eventually, if I remember correctly,
15  a Christmas tree was placed.  But it generated a lot
16  of hostility.
17         (Brief interruption in the proceedings.)
18         MR. YALOWITZ:  Why don't we pause while the
19  hotel staff give us an extra table.  Thank you.
20         We can go off.
21         (Brief pause in the proceedings.)
22    Q.   BY MR. YALOWITZ:  Do you wish to add
23  any --
24    A.   At the same time --
25    Q.   Do you wish to add anything further before
```

Page 8

```
 1  we -- you were speaking before we were interrupted.
 2         Do you wish to add anything further?
 3    A.   I'll just sum up and say that there were
 4  things that I can describe, in retrospect, as very
 5  problematic in -- in the faculty.  But there were also
 6  a lot of things that provided what we would call here
 7  in Israel a liberal way of thinking.  And that's it.
 8    Q.   Do you remember where you were when the cafe
 9  at Hebrew University was bombed?
10    A.   I was not a student in the Hebrew University.
11    Q.   You had graduated --
12    A.   That's right.
13    Q.   -- several years before?
14    A.   That's right.
15    Q.   But that's why I'm asking you.
16         Do you remember where you were when you found
17  out?
18    A.   No, I don't remember where I was.
19    Q.   Following graduation, you went to work for
20  Avigdor Feldman; is that right?
21    A.   That's right.
22    Q.   And could you describe Mr. Feldman?
23    A.   Mr. Feldman is a very famous, renowned Israeli
24  lawyer.  He has made his name known as a human rights
25  attorney in the '70s, '80s, and '90s.  He is probably
```

Page 9

1  the most famous Israeli human rights attorney of those
2  years.
3          What else do you want to know about him?
4      Q.  He has a criminal practice as well; is that
5  right?
6      A.  Yes.  In the '90s, he moved more, gradually,
7  to criminal practice.  I mean, also before, he was
8  practicing criminal law, but as part of his human
9  rights activities in the sense of defending -- in --
10  connection to the Israeli-Palestinian conflict
11  mainly, I think, in the military courts in the West
12  Bank and Gaza.
13          But during the '90s, he moved gradually more
14  to what we term as regular criminal law.
15      Q.  Do you think his fame and renown are well
16  deserved?
17      A.  I think he is the best lawyer.  If I would
18  be in trouble, I would like him to be my lawyer.
19      Q.  Do you think that his commitment to human
20  rights remains unwavering?
21      A.  I do.
22      Q.  What -- what's the name of the thing you do
23  that we call "internship" here?  It's called "staj"
24  or something like that?
25      A.  In English, we call it "internship."

Page 10

1      Q.  And you did that from '98 to '99?
2      A.  That's right.
3      Q.  Did you work in criminal practice with
4  Mr. Feldman or human rights or both?
5      A.  Both.
6      Q.  And during your internship year, you did
7  not appear in court; is that right?
8      A.  In general, I did not appear in court.
9  Although, in the second half of my internship, it
10  is permissible, according to the Bar regulations,
11  to appear in certain instances.  I recall that I
12  did appear but very, very rarely.
13      Q.  Did you appear, during that year, in the
14  Judea military court?
15      A.  Only with Mr. Feldman.
16      Q.  How about the Samaria military court?
17      A.  Well, when you said the "Judea," I didn't
18  mean specifically Judea.  I mean military courts in
19  general.  It's 15 years ago.  I don't remember exactly
20  where we were.  But, in principle, we had cases at
21  the military courts in -- I -- if I remember correctly,
22  back then, the Judea court was in Beit El, not in
23  Ofer as today.  And we did appear both in -- in those
24  tribunals.  I mean, he did the litigation.  I was
25  second chair.

Page 11

1      Q.  Do you -- do you recall the first time you
2  appeared and spoke in a military court?
3      A.  I don't remember the first occasion.  But
4  I am almost positive it was a detention proceeding,
5  extension of detention proceeding.  And I'm -- and I
6  think it was in one of the extensions of the military
7  court, the extension in Petach Tikva.  But, you know,
8  it's 15 years ago, 14 years ago.  I can't be positive.
9      Q.  Can you estimate how many times, in your
10  first year, you appeared with Mr. Feldman in a military
11  court?
12      A.  I can't.  I mean, it was so long ago, I
13  just -- and I can't make the distinction between the
14  first year and the -- the second or third year.  But
15  in -- in general, we had cases in the military courts,
16  and I've been traveling to the military courts now
17  and then.
18      Q.  Did you learn, in your first year, of the
19  existence of Shabak files?
20      A.  I learned about that long before I went into
21  internship.
22      Q.  How did you learn about it?
23      A.  Well, because I guess my work as a -- as
24  a reporter for Kol Ha'ir I covered security related
25  trials in the civil Israeli courts, in the Jerusalem

Page 12

1  District Court, Magistrate's Court.
2      Q.  What we would call civilian courts?
3      A.  Civilian courts.  That's what I meant.
4          And by covering these cases, I learned about
5  the fact that those type of cases -- the organ that is
6  conducting the investigation is the GSS rather than the
7  police.
8      Q.  Is that something that's commonly known among
9  people who follow legal matters in Israel?
10      A.  I wouldn't know if it is common.  I would
11  expect that it would be known among lawyers who practice
12  security related cases.
13      Q.  Now, after you completed your internship,
14  you stayed with Mr. Feldman for a second year before
15  continuing your education; is that correct?
16      A.  That's correct.
17      Q.  And did you appear alone in court that second
18  year?
19      A.  I did.
20      Q.  Did you appear alone in any military court
21  that second year?
22      A.  I suppose I did.  I remember cases that I
23  appeared.  To be sure whether it was on that second
24  year or the fourth year or the third year, I'm not sure.
25  But I'm almost positive that it was in the second year.

Page 13

1    Q. Do you -- did you ever examine a witness in
2    a military court?
3    A. I have.
4    Q. Can you recall the first one?
5    A. I can't recall the first one. I recall
6    bits and pieces of -- lawyers tend to re-examine their
7    witnesses even when the examination ends. So I have
8    those cases that I keep on thinking of.
9    Q. Which ones?
10    A. Well, I -- I don't think it's appropriate
11    for me to get into specific cases. But I remember
12    cases where I had to cross-examine witnesses in the
13    military courts, an accomplice who made a incriminated
14    state -- incriminating statement in his investigation
15    against my client, things of that sort.
16    Q. Do you recall -- can you give an estimate
17    of how many witnesses you've examined in the military
18    courts?
19    A. No, I can't. I don't know.
20    Q. Less than ten?
21    A. I would expect -- I think more, but -- but
22    that's the ballpark.
23    Q. Do you --
24    A. I mean, in -- in case -- in trials, not in
25    detention proceedings.

Page 14

1    Q. In criminal trials?
2    A. In criminal trials.
3    Q. Thank you for that clarification.
4    A. And, you know, in the military courts,
5    there are also appeals tribunals. And I appeared
6    there regularly. And you cross-examine witnesses
7    there as well. So --
8    Q. How many appeals do you estimate you argued
9    in the military courts?
10    A. Very small number.
11    Q. And do you give oral summations or written
12    summations in the military court system?
13    A. In -- in criminal cases?
14    Q. Criminal cases.
15    A. Oral summations and sometimes written
16    summations as a supplement or, if agreed -- only
17    if agreed by the parties, only written summations.
18    Q. Do you recall how many oral summations
19    you've given in the military courts in criminal trials?
20    A. No. And I'm not sure I have.
21    Q. Following your second year of practice, you
22    continued your studies in England?
23          Is that -- do I have that right?
24    A. UCL, University College of London.
25    Q. And you studied human rights law?

Page 15

1    A. International protection of human rights.
2    Q. Did you do a thesis or a essay or something --
3    anything like that --
4    A. I had -- had --
5    Q. -- as part --
6    A. -- written --
7    Q. -- of your studies?
8    A. Sorry. I've written two essays in two of
9    the seminars that I took. And my -- and I earned an
10    LLM.
11    Q. And that took one year?
12    A. That took one year, September to September.
13    Q. So -- so September of 2001 you returned to
14    Israel; is that right?
15    A. That's right.
16    Q. Is that before or after September 11th?
17    A. Eight days before September 11th. I was
18    looking for an apartment to rent when I heard of the
19    9/11 bombings.
20    Q. Everybody seems to remember where they were
21    when they heard about 9/11.
22    A. Yeah.
23    Q. You returned to work with Mr. Feldman?
24    A. Not immediately. I had a few months in
25    which I wrote a report for the Israeli human rights

Page 16

1    organization the Public Committee Against Torture in
2    Israel on the newly self-proclaimed policy of targeted
3    killings or what I term as assassinations. And I think
4    it was December when I returned to Avigdor's office,
5    but maybe November.
6    Q. The Public Committee Against Torture in
7    Israel, that's the -- that's the group that brought
8    the landmark case involving GSS investigations?
9    A. You mean torture? Yes.
10    Q. Is -- is it -- I mean, are we -- are you
11    being flip, or do you think every GSS investigation
12    is torture?
13    A. No. The -- issue at stake in that
14    case was five techniques of physical abuse of -- of
15    detainees and its aspects, which amount to torture.
16    Q. Either torture or cruel, degrading, and
17    inhuman treatment?
18    A. I agree.
19    Q. And do I have it right that the High Court
20    concluded that whether you define those investigative
21    techniques as torture or as cruel, degrading, or
22    inhuman treatment doesn't matter, they're forbidden?
23    A. Correct. Well, with one exception.
24          The court did leave a narrow -- well, I don't
25    know how narrow, but it left an exception. And that

1  was, under terms of the necessity defense, the criminal
2  defense of necessity, it would be permissible for a
3  GSS investigator, interrogator to use physical means
4  of interrogation. And indeed, in later years, the GSS
5  has invoked the necessity exception.
6      Q.  Does -- does an -- I'm a little ahead of
7  myself. But since you raised it, I'll ask.
8          Is it your understanding that an investigation
9  that -- that evidence obtained through the use of the
10  investigative techniques that were discussed in the
11  Public Committee Against Torture case, is it your
12  understanding that such evidence is admissible in
13  a criminal court case?
14     A.  There is no blanket rule about this.
15  According to the Supreme Court ruling, such statements
16  can be admissible and the court -- the criminal court
17  has to examine on a case-by-case basis whether these
18  techniques have undermined the interviewer -- the
19  interviewee's freedom of will.
20     Q.  And if the court concludes that the accused's
21  freedom of will was interfered with, what does the
22  court do?
23     A.  Then it has to suppress the evidence, the
24  statement.
25     Q.  Has that happened?

1      A.  I'm not aware of cases where it happened.
2      Q.  Has it been --
3      A.  But it might.
4      Q.  Has it been raised?
5      A.  The argument that an out-of-court statement
6  should be suppressed because of such methods, yes, it
7  has been raised frequently in the past.
8      Q.  Okay. To come back, you returned to work
9  with Mr. Feldman in approximately December of '01 and
10  you stayed --
11     A.  December of '01. Sorry.
12     Q.  And you stayed with him for how long?
13     A.  Until, I think, April of 2004.
14     Q.  And when -- when I was asking you earlier
15  about the number of times you've examined witnesses
16  and presented oral summations, you -- you were having
17  trouble distinguishing among your time before you
18  went to England and then your time after. But you
19  were referring the entire time that you were with
20  Mr. Feldman?
21     A.  Regarding the IMC?
22     Q.  Yes.
23     A.  Only at the IMC?
24     Q.  Yes.
25     A.  I would say that I've been involved,

1  during that time, probably in a dozen cases. In
2  the vast majority of them, Mr. Feldman was conducting
3  cross-examinations. I don't recall exactly when, but
4  there's -- I have no doubt that, in some of those cases,
5  I have cross-examined some of the witnesses, the less
6  important witnesses. How many they were I cannot say.
7      Q.  And have you argued appeals at the court of
8  military appeals -- Military Court of Appeals?
9      A.  I remember appearing at the Military Court
10  of Appeals. I don't remember if it was in an appeal
11  against a judgment of a criminal case or in the
12  detention proceedings. I truly -- or there is another
13  option, in a request to lift an immunity certificate.
14  I don't recall what was the exact subject matter. But
15  I did appear in the Court of Appeals.
16     Q.  Did your work with Mr. Feldman focus on human
17  rights matters as well?
18     A.  I would say that between 40 and 50 percent
19  of my time -- well, no, I exaggerate. About a third
20  of my time was human rights cases.
21     Q.  And was that -- was that work principally
22  in the High Court of Justice?
23     A.  Principally, yes.
24     Q.  So how many times would you estimate you
25  appeared in the High Court of Justice when you were

1  with Mr. Feldman?
2      A.  This is very difficult to answer, you know.
3  I -- many. But what -- what does constitute "many"?
4      Q.  More than 50?
5      A.  Less than 50.
6      Q.  More than 25?
7      A.  Maybe. Probably yes.
8      Q.  When you worked with Mr. Feldman on those
9  dozen or so cases in the military courts, were your
10  clients Palestinians?
11     A.  There are no non-Palestinian accused in
12  military courts. So yes, they were Palestinians.
13     Q.  And how did you communicate with them? Do
14  you speak Arabic?
15     A.  We usually had either an intern or a lawyer
16  that speaks Arabic. Or we had a -- the help of someone
17  who could translate. Some of them knew Hebrew to the
18  extent that we needed to communicate depending on --
19  on each case.
20     Q.  This is my fault because I asked you a
21  multiple-part question.
22          But do you yourself speak Arabic?
23     A.  No.
24     Q.  Does Mr. Feldman?
25     A.  No.

Page 21

1  Q.  Do you or he read Arabic?
2  A.  No.
3  Q.  You formed your own firm in '04 or '05?
4  A.  In 2004.
5  Q.  What would you describe as the mix between
6  human rights work and criminal defense work?
7  A.  We do a very small amount of criminal defense
8  work.  Most of our criminal cases are representation
9  of Israeli and Palestinian human rights defenders,
10  activists, in very minor offenses.  So most of the --
11  most of my practice is human rights.
12  Q.  When you say "minor offenses," you mean
13  things like civil disobedience?
14  A.  That's right.
15  Q.  Laying down in front of a tank or something
16  like that?
17  A.  Hopefully not a tank, but yes.
18  Q.  Joining arms together singing "We Shall
19  Overcome," this kind of thing?
20  A.  The Israeli 2013 version of it, yes.
21  Q.  All right.  Have you -- have you ever
22  represented anybody who was accused of a serious
23  security violation?
24  A.  I have.
25  Q.  Who?

Page 22

1  A.  You expect me to name names?
2  Q.  Only if it's public.  Only if it's somebody
3  who is -- well, let me ask a different question, then.
4  Because I don't want -- I certainly don't want to
5  interfere with any attorney-client relationships you
6  have.  So I'll withdraw the question, and I'll ask
7  a different one.
8      Have you defended anybody in a criminal case
9  accused of a serious security offense?
10  A.  Yes, I have.
11  Q.  Please say who that is.
12  A.  I was second-chairing the case of Smirek
13  that later went to the Supreme Court.  He was a
14  German national that was indicted, charged with
15  planning, assisting a terror organization, Hezbollah.
16  Q.  Stephen Smirek?
17  A.  Stephen Smirek.
18      I have litigated one or two cases myself
19  in the military courts in which my clients were charged
20  with homicide, among other charges.  I have and still
21  represent Palestinian prisoners in parole boards.  And
22  they were all sentenced to long terms for -- for serious
23  crimes and involvement in terror attacks.
24  Q.  You go with them to the parole board and ask
25  the parole board to give them early release from --

Page 23

1  A.  That's right.
2  Q.  -- their sentences?
3  A.  Correct.
4  Q.  Are parole hearings of public record?
5  A.  Sorry?
6  Q.  Are parole hearings of public record?
7  A.  Parole hearings are of public record.  I'm
8  not sure whether -- I think there is an issue with the
9  name on the identity of the -- of the prisoner.  I think
10  they omit the name of the prisoner.  I don't remember
11  exactly why.  But as far as I remember, these judgments
12  are -- you know what?  I don't want to guess.  I don't
13  remember.  I know that parole judgments are published.
14  They are public.  It might be that there is an issue
15  with the identity of the prisoner.
16  Q.  I suppose that could be checked?
17  A.  Yes.  Absolutely.
18  Q.  Okay.  In connection with your human rights
19  work, I've -- I have learned that you're quoted in the
20  press from time to time.
21      Is that true?
22  A.  It's true that I am quoted.  I'm not -- I'm
23  not sure that always the quote is accurate.  But -- no,
24  I'm kidding.
25  Q.  Well, let me ask you about some.

Page 24

1      You were quoted as commenting about mining
2  operations or quarrying operations in the West Bank?
3  A.  Yeah.
4  Q.  And it -- you were commenting on the practice
5  of quarrying stone in the West Bank and using it to
6  make construction materials in Israel; is that right?
7  A.  Yes, I have.
8  Q.  And I think you were quoted as saying you
9  felt that was a war crime?
10  A.  I have.
11  Q.  Do you -- do you believe that to be a war
12  crime?
13  A.  Well, I -- if I was quoted accurately, I
14  would have been quoted that it might amount to a war
15  crime.  Because in order for a war crime to be a war
16  crime -- for an act to be a war crime, it's not enough
17  that the facts are as defined in the -- in the crime,
18  but also there's a need for a mens rea.  But I do
19  believe that -- that taking away natural resources
20  from an occupied territory might amount to the crime
21  of pillage.
22  Q.  Do you -- do you have any cases involving
23  that, or were you more commenting about it as a --
24  A.  There's a --
25  Q.  -- matter of public interest?

Page 25

1      A.  There's an ICJ, International Court of Justice
2  case, rest case, between Uganda and the Congo.
3      Q.  I'm sorry.  I asked a bad question.
4          What I meant was:  Are you personally working
5  on a case involving that issue?
6      A.  Aah.  I have filed a High Court petition
7  on behalf of the Israeli human rights organization
8  Yesh Din, challenging the civil administration in
9  the West Bank's practice to provide permits to Israeli
10 corporations to excavate natural resources, arguing
11 that it's in violation of international humanitarian
12 law.
13     Q.  Is that case pending?
14     A.  No, it's not.
15     Q.  How did it come out?
16     A.  The Supreme Court has dismissed the case
17 on the basis of laches I think it's called.
18     Q.  Laches.
19     A.  Laches.  And also made some obiter dictum
20 assertions that, since we're dealing with a long-term
21 occupation rather than a short-term occupation, the
22 powers of the occupying power are more extensive.
23 We have filed a request for a de novo hearing before
24 a wider tribunal.  And the -- the deputy chief justice
25 decided that there is no room for a wider tribunal

Page 26

1  and that all these assertions were made as an obiter
2  dictum, so they're not binding.
3      Q.  Are you a member of something called the
4  Israel Action Committee for Palestinian Prisoners and
5  Detainees?
6      A.  No, I'm not.
7      Q.  You are their legal advisor?
8      A.  No.
9      Q.  Do you know that organization?
10     A.  I'm trying to translate word by word to
11 Hebrew.  And what I think you're referring to is --
12 is a group that asked me once or twice to represent
13 Palestinian detainees -- detainees in parole boards.
14 And if you're -- if I'm right about which body it is,
15 it no longer exists.  But I'm -- but I'm not sure.
16     Q.  I read a quotation from you in the Jerusalem
17 Post, talking about the relationship between the PA
18 and the Israeli government.  And I'll -- I'll read it,
19 and you tell me if it's --
20     A.  Accurate.
21     Q.  -- if it -- if you said it.  And then I'll
22 ask you --
23     A.  Okay.
24     Q.  Or if you remember it.  That's maybe a fairer
25 question.  So I'll read it to you, and then you just

Page 27

1  tell me if you remember it.
2          "Sfard charged that this was a case of cops
3  and robbers joining forces, a situation of countries
4  that are controlled by organized crime or the mafia."
5      A.  I do not recall this.  If it reminds me
6  anything, then it has to do with the relationship
7  between settlers and the government rather than the
8  PA and the government of Israel.
9      Q.  Do you --
10     A.  Can you read me the context?
11     Q.  You know, I'll -- I'm going to come -- see
12 if I can find it.
13     A.  Okay.
14     Q.  Bear with me one second.
15         Indeed I -- rather than read you the context,
16 I'm going to mark a copy of it and provide it to you.
17         MR. YALOWITZ:  Do you know what number this
18 is?
19         MS. WEISER:  112.
20         MR. YALOWITZ:  So this will be 112.
21         (Plaintiffs' Exhibit 112 marked.)
22         THE WITNESS:  Can you refer -- can you refer
23 me to the --
24     Q.  BY MR. YALOWITZ:  Let's look.  So it looks
25 like it's about six or eight lines down.  It seems to

Page 28

1  involve the Migron outpost.
2      A.  (Examining.)  Yes.  So I now read the context.
3          And indeed the context is that I said that the
4  government or the authorities -- the Israeli authorities
5  in the West Bank are joining forces with the settlers of
6  Migron, who robbed Palestinians of their land.  So that
7  was my remark.
8      Q.  What did you mean when you referred to the
9  "mafia"?
10     A.  I meant -- a mafia is a situation in which
11 elements of crime infiltrate the authorities.  And
12 much of the outpost phenomena in the West Bank is
13 based on the cooperation between the settlers and
14 public officials who are very sympathetic to the --
15 ideologically to the settler -- settlement movement.
16     Q.  Do you know much about the mafia?
17     A.  No.
18     Q.  Have you ever heard of something called
19 "Cosa Nostra"?
20     A.  In movies I have.
21     Q.  What is "Cosa Nostra"?
22     A.  Our -- "our cause."  "Our joint cause."
23         Isn't it?  In -- in Italian.
24     Q.  In Italian, I've heard it means "our thing."
25     A.  "Our thing."  Okay.

1    Q.  Do you know what a "don" is?
2    A.  No.  Aah, "don," like a "chief."
3    Q.  Do -- do you know what the "capo di tutti
4  capi" is?
5    A.  I'll -- I'll make it short for you.  My
6  knowledge of mafia is from the stepfather and -- and
7  the like.
8    Q.  "The Godfather"?
9    A.  "The Godfather," not the stepfather.  "The
10  Godfather," of course.
11    Q.  Okay.  That's all right.  That's all right.
12    So, like, have you ever heard of John Gotti?
13  Do you know who that is?
14    A.  I heard the name.  I remember it has something
15  to do with the mafia.  But I don't know.
16    Q.  Okay.  You -- you have -- can you estimate,
17  in your career, how many cases you've brought before
18  the High Court of Justice?
19    A.  Three figures.
20    Q.  And would it be fair to say that those cases
21  have -- well, let me ask a different question.
22    What proportion of those cases would you
23  identify as having an association with causes on the
24  left?
25    A.  Define "left."

1    Q.  Sure.  Do you -- do you have an -- well, do
2  you think of -- is there a left in Israel, a political
3  left?
4    A.  A very small one.
5    Q.  And would you -- would you consider yourself
6  part of it?
7    A.  I would.
8    Q.  And, I mean, you're not embarrassed about
9  that; right?
10    A.  Absolutely.  I'm very proud.  Absolutely not.
11    Q.  You're absolutely proud?
12    A.  Absolutely proud.
13    Q.  And what proportion of the cases you've
14  brought to the High Court of Justice would you estimate
15  are associated with causes on the left?
16    A.  Look, I understand that looking at a human
17  rights case which benefits, if one, Palestinians, can
18  be seen as a case that is brought with an aim to --
19  to advance a leftist agenda.  But I don't see it that
20  way.  90 percent of my cases are pure human rights
21  cases.  It is very saddening if we would define here
22  that promoting human rights, defending human rights
23  is only a left -- leftist thing.  But as far as this
24  is the agreement here, so that's my answer.
25    Q.  I -- I certainly didn't mean to suggest that

1  human rights were a left-wing or a right-wing cause.
2  I -- this isn't the forum, but you -- you might be
3  surprised if we had a conversation about it.
4    And I -- I understand that you've, for
5  example, represented officers of the GSS.
6    Isn't that right?
7    A.  I have.
8    Q.  And so I'm not -- I really wasn't -- wasn't
9  asking in order to confront you.  I was asking more
10  just to get a sense of the -- the mix of your works.
11    MR. HILL:  We'll wait for a question.
12    Q.  BY MR. YALOWITZ:  So -- so let me just ask
13  it this way.
14    Of the several hundred cases you've done,
15  what proportion would you say people in the public
16  in Israel would identify as -- as a left-wing cause?
17    A.  The vast majority.
18    Q.  And would it be fair to say that, in those
19  cases, you are speaking truth to power?
20    A.  I hope I do.
21    Q.  That's --
22    A.  That's what I mean to do.
23    Q.  That's your aim?
24    A.  That's my aim.
25    Q.  Now, does the High Court of Justice have

1  jurisdiction over cases in which a person who feels
2  he or she has been wrongly convicted could bring a
3  claim of actual innocence?
4    A.  The High Court of Justice is not a court
5  of appeals.  It's a first instance that has jurisdiction
6  against actions -- for judicial review of actions made
7  by the branches of government.
8    It is possible -- it is very, very, very
9  narrowly possible to file a High Court petition against
10  a court of law.  So, theoretically, it's possible to
11  bring a case against the district -- against -- well,
12  the District Court has an appeal procedure to the --
13  to the Supreme Court.  But let -- let's say against
14  the Military Court of Appeals.
15    But then the -- the only basis for such
16  a petition would be a procedural flow, not that the
17  court was -- has erred.  This is not a valid basis
18  for petition.
19    Q.  So suppose an individual were convicted of
20  a heinous rape and murder and were imprisoned.  And
21  later -- the trial was complete, and all the appeals
22  were exhausted.  And years later, DNA evidence was
23  developed, and it -- it really showed that the person
24  was innocent and, indeed, the -- person whose DNA
25  matched actually admitted that he was the perpetrator.

Page 33

1     What would -- how would you get such a person
2  out of jail, the -- the wrongly convicted person?
3     A.  In the Israeli civilian system, there is
4  a procedure for asking for a de novo trial, basing
5  on the claim that there was a miscarriage of justice.
6  And the chief justice of the Supreme Court or another
7  justice that was delegated that power from the chief
8  justice -- by the chief justice has the power to
9  instruct a new trial.
10    Q.  And -- and suppose there was nothing wrong
11 with the first trial.  The first trial -- I mean,
12 there's process and there's --
13    A.  Yeah.
14    Q.  -- innocence; right?
15    So even if there's nothing wrong with the
16 first trial, there must be some mechanism by which
17 an innocent person can be released?
18    A.  That was the -- that was the procedure I
19 discussed.
20    Q.  I see.
21    A.  There's --
22    Q.  So it doesn't -- the procedures don't matter.
23 It's actual innocence that matters?
24    A.  It's miscarriage of justice.
25    Q.  Now, does -- does a significant part of your

Page 34

1  work deal with international norms of due process?
2     A.  While I was --
3     Q.  By the way, would you like some water?  I'm
4  going to get some.
5     A.  I'm fine.  Thanks.
6     While I was working on the Yesh Din report,
7  I've done an extensive research on due process rights.
8  And now and then the issue comes up.
9     Q.  Have you done any work on American norms
10 of due process?
11    A.  No.
12    Q.  And in your expert report, you don't offer
13 any opinions about American norms of due process;
14 correct?
15    A.  I wouldn't offer opinions on things that
16 I'm not an expert on.
17    Q.  And you're not an expert on American norms
18 of due process?
19    A.  I'm not an expert.
20    Q.  So have we marked your report?
21    MS. WEISER:  Yeah.
22    MR. HILL:  I don't think so.
23    MR. YALOWITZ:  I think we have not.
24    MS. WEISER:  I thought we marked it as 111.
25    MR. YALOWITZ:  We were -- we were going to,

Page 35

1  but --
2     MS. WEISER:  Aah.  Okay.  Well, it is 111.
3     MR. YALOWITZ:  Okay.  So why don't we mark
4  a copy of your report as 111.  And I'll pause so that
5  we can do that.
6     (Plaintiffs' Exhibit 111 marked.)
7     Q.  BY MR. YALOWITZ:  Mr. Sfard, Brenda has
8  marked a copy of your report as Plaintiffs' 111.
9     Would you just take a moment and confirm
10 that it's the same as the one you have before you?
11 And I'm very happy for you to work with the one before
12 you because I know it has some flags that -- that you've
13 prepared so that you can refer to things.
14    A.  (Examining.)  This is my report but without
15 the annexes.
16    Q.  So would you look with me on page 23?  I'm
17 looking at paragraph 67.
18    Do you have it before you?
19    A.  Yes.
20    Q.  Paragraph 67 describes the basis for your
21 opinions on due process in the Israeli -- in the --
22 well, Israeli military courts in general?
23    Is that fair to say?
24    A.  Yes.
25    Q.  And it -- it appears to cite four items --

Page 36

1     A.  Uh-huh.
2     Q.  -- is that right?
3     A.  Yes, it is.
4     Q.  Personal experience is the first; correct?
5     A.  Correct.
6     Q.  Previous studies is the next; right?
7     A.  That's right.
8     Q.  The third is conversations with lawyers?
9     A.  That's right.
10    Q.  And the fourth is the Yesh Din report?
11    A.  That's correct.
12    Q.  Okay.  Have -- have we already talked about
13 your personal experience?
14    A.  Are you asking me if we talked about it?
15    Q.  Yeah.  So -- so that was a bad question.  Let
16 me ask a different question.
17    Your own experience that formed the basis for
18 your opinions about due process in the Israeli military
19 courts, have you described that to me already?
20    A.  I think I have.  I will add to that that
21 I have appeared in many detention hearings.  I've
22 spent long days in the military courts for many --
23 for reasons other than criminal cases, as I mentioned
24 before.  And in these instances, I've also came across
25 and audited hearings.  So -- but that's fairly my

Page 37

1  experience.
2      Q.  So, by the way, you've mentioned something
3  called detention hearings?
4      A.  Right.
5      Q.  That involves a thing called administrative
6  detention; is that right?
7      A.  No.  I meant extension of pre-trial detention.
8      Q.  I see.  So this is like whether -- whether
9  the person should be released pending trial?
10     A.  Well, it also means that.  But I mainly meant,
11 while investigation is ongoing and indictment was not
12 filed yet, for the sake of the investigation, there
13 is a need for the suspect to either remain in custody
14 or not.
15     Q.  Do they call that administrative detention?
16     A.  No.  Administrative detention is a specific,
17 special feature of the military commander's power, in
18 the occupied West Bank, to hold people in detention
19 without indictment as a preemptive measure for them
20 not to engage in hostile activities.  And there is a
21 judicial review in -- in such matters.
22     Q.  Are there other countries in the international
23 community that have that form of administrative
24 detention?
25     A.  Administrative detention is a power provided

Page 38

1  in the Fourth Geneva Convention.  So, in -- in theory,
2  countries who are in a situation where they occupy
3  territory, the military commander of the occupying
4  force has the power to detainee people administratively.
5      Q.  I read that there were complaints that the
6  PA was detaining Palestinians administratively for
7  long periods of time without trial.
8          Is that also a practice that goes on in --
9  in countries that are not occupying?
10     A.  I don't know Palestinian law.  And I don't
11 know if that happens.  But administrative detention
12 is something that, I guess, other countries engage in.
13 I don't know what's the -- the normative source for
14 that.
15     Q.  So you also mentioned, in paragraph 67,
16 previous studies?
17     A.  Uh-huh.
18     Q.  Which -- which ones were you basing your
19 opinion on?
20     A.  Well, there was a study made by B'Tselem
21 at the end of the '90s.  There was -- I think it's
22 mentioned in the Yesh Din report.  There was a study
23 made -- I don't recall the name.  A Palestinian author
24 made a study on military courts.  Again, I don't recall
25 the -- the citation.  But, sadly enough, there -- there

Page 39

1  was very little studies made on the military courts
2  prior to the Yesh Din report.
3      Q.  What was the name of the B'Tselem report?
4      A.  I will check -- I will -- if you want, I
5  can -- we can stop, and I'll check in the Yesh Din
6  report because it is cited.
7      Q.  It's cited in the --
8      A.  Yes, it is.
9      Q.  -- Yesh Din report?
10         And did you -- did you read it in preparation
11 for your --
12     A.  No.
13     Q.  -- opinion today?
14         It's just something that was in the -- the
15 background --
16     A.  That's right.
17     Q.  -- of your experience?
18     A.  That's right.
19     Q.  And since the Yesh Din report, have there
20 been subsequent reports by non-government organizations?
21     A.  I -- I know that there were several -- I don't
22 know if to call it reports -- but statements made by
23 Amnesty International and I think also Human Rights
24 Watch and U.N. organs like the Human Rights Committee
25 or the -- yeah, I think the Human Rights Committee

Page 40

1  of the U.N. -- regarding due process rights in the
2  military courts.  But I don't think there was any
3  extensive research done.
4      Q.  You've mentioned conversations with lawyers?
5      A.  Yeah.
6      Q.  Did you undertake particular conversations
7  for this report, or were you more referring to the
8  fact that you're in the legal community and you --
9      A.  Both.
10     Q.  So who did you speak to in preparation for
11 the report that we're here about today?
12     A.  Aah, sorry.  For the report here?  No,
13 I didn't discuss with anyone for the report today,
14 because the report deals with a time frame that is
15 not -- that is not now.
16         But in preparation of writing or editing
17 the Yesh Din report and also as a member of this legal
18 community, I had dozens of discussions with friends
19 and colleagues who are attorneys and prosecutors in
20 the military courts.
21     Q.  So did -- did you speak with any of the
22 defense lawyers in the 21 cases that were the subject
23 of Mr. Kaufman's report?
24     A.  I have not.
25     Q.  Did you speak with any of the prosecutors

Page 41

1  who prosecuted any of those 21 cases?
2      A.  I don't -- I did not.
3      Q.  Did you speak with any of the judges who
4  sat in judgment on any of those 21 cases?
5      A.  Of course I did not.
6      Q.  And did you speak with any judges at the
7  Military Court of Appeals about any of those 21 cases?
8      A.  No.
9      Q.  In connection with the Yesh Din report, did
10  you or any of your colleagues speak with any of the
11  defense attorneys in the 21 cases?
12      A.  I don't know if -- there were many defense
13  lawyers that were interviewed for -- to form the basis
14  for the report.  And I'm not sure if any of them, by
15  chance, was also a defense attorney in any of the 21
16  files.
17      Q.  Is -- is there a way to find that out?
18      A.  I'm -- I suppose there is.
19      Q.  How would we do that?
20      A.  I will have to do that after our deposition,
21  looking at the list of -- if there is one with Yesh
22  Din still.  There -- there are names of defense
23  attorneys that are listed in the report.  They are --
24  they are quoted in the report.  I don't think that
25  any of them mentioned in any of the 21 files.

Page 42

1      Q.  And -- and do you know whether anybody from
2  Yesh Din, in connection with the Yesh Din report, spoke
3  with any of the prosecutors in the 21 cases --
4      A.  I don't know.
5      Q.  -- we're dealing with?
6          And do you know whether any of the people
7  from Yesh Din, who participated in the preparation of
8  the Yesh Din report, spoke with any of the judges on
9  the 21 cases?
10      A.  No.
11      Q.  "No" meaning you don't know or --
12      A.  "No" meaning I don't think they have.
13      Q.  Now, do you believe that any of the previous
14  studies or subsequent -- well, let me break it up.
15          Do you think that any of the 21 cases were
16  the subject of the B'Tselem report that you referred to
17  earlier?
18      A.  I don't think so.
19      Q.  And do you think that any of the 21 cases
20  were the subject of any reporting or comment by Amnesty
21  International?
22      A.  I don't think those comments or reporting
23  dealt with specific cases.
24      Q.  And there -- there's an organ -- there's
25  an organ of the United Nations that deals with torture,

Page 43

1  cruel, inhuman, and degrading --
2      A.  CAT.
3      Q.  -- treatment.
4          What's that called?
5      A.  CAT.
6      Q.  C-A-T?
7      A.  Committee Against Torture, CAT.
8      Q.  U.N. CAT?
9      A.  Yeah.
10      Q.  Israel is a signatory to that convention;
11  is that right?
12      A.  It is.
13      Q.  And as part of its membership in that
14  convention, it's required to submit a periodic report?
15      A.  Yes, it is.
16      Q.  That report is a publicly available document;
17  right?
18      A.  I think it is.
19      Q.  And have any of the CAT reports mentioned
20  any allegations of cruel, inhuman, or degrading
21  treatment or torture in any of your 21 cases?
22      A.  The CAT's concluding observations as to
23  Israel every year alleges that Israel is engaging in
24  abusive means of interrogation.  It is not indicating
25  specific cases.

Page 44

1      Q.  Are the -- the conclusions of CAT are based
2  on self-reporting by Israel; is that right?
3      A.  Yes.  And with shadow reports by Israeli
4  human rights organizations.
5      Q.  And are the -- are the names of the cases
6  that Israel self-reports, are those publicly available?
7      A.  Sorry.  Could you clarify?
8      Q.  Sure.  So in -- in its -- I don't think
9  these are annual reports.  I think they're every few
10  years --
11      A.  That's right.
12      Q.  -- is that right?
13      A.  Yeah.
14      Q.  And so in -- in its periodic report, Israel
15  will report the number of allegations of cruel, inhuman,
16  or degrading treatment or torture that have come to
17  the attention of certain internal investigatory bodies
18  in Israel; right?
19      A.  I don't think that the -- the periodic report,
20  at least one that I saw and read, has a -- a number of
21  allegations made.  I think it includes only the number
22  of cases in which disciplinary measures were taken.
23  But this is from what I remember.
24      Q.  We could check --
25      A.  Yeah.  I think that --

Page 45

1    Q.  -- and then we would know.
2    A.  I think CAT --
3    Q.  Do you agree with me?
4    A.  That if we'll check, we'll know?  I agree.
5    Q.  Okay.  So we don't need to speculate.
6    A.  Sure.
7    Q.  Now -- now, on -- I want to ask you about
8  page 8 of your report.  And I'm -- I'm focused on
9  paragraph 1.
10       Do you have it before you?
11   A.  Yes.
12   Q.  You -- you write, in paragraph 1, that you
13 are:
14       "Familiar with the legal framework and the
15 actual practice of security investigations into alleged
16 security related offenses in Israel during the relevant
17 time frame."
18   A.  Yes.
19   Q.  Have you described earlier the basis for your
20 familiarity?
21   A.  No.  You mean when I said that, as a
22 journalist, I knew about GSS files?  No.
23   Q.  No, no.  I'm -- I'm -- well, let me do it
24 this way, then.  I --
25   A.  Okay.

Page 46

1    Q.  I'm not trying to --
2    A.  No, no.  Okay.  So the answer is "no."
3    Q.  Okay.  Please go ahead.
4    A.  My familiarity stems from my work in this
5  field of being a defense lawyer for defendants accused
6  in security related crimes.  Most of the cases that
7  I've conducted or been involved in were in Israeli
8  civilian courts.  But some of them were in the military
9  courts.  In all of them, I have been given, demanded,
10 and provided the GSS files.  And so it is a very --
11 I'm acquainted with this subject matter.
12   Q.  Is it fair to say that you've read hundreds
13 of GSS files?
14   A.  I would say that, yeah.
15   Q.  And --
16   A.  Maybe hundreds is -- is an exaggeration.
17   Q.  Many?
18   A.  But many.
19   Q.  And have you relied on them in your work?
20   A.  This is the basis for cross-examination.
21 This is the basis for understanding what happened in --
22 in the investigation.
23   Q.  Have you found them to be reliable statements
24 of what happened?
25   A.  Not always.

Page 47

1    Q.  Depends on the particular case?
2    A.  Depends on the particular case.  Depends on
3  the particular interrogator.  I found them to be very,
4  very important for a defense attorney because they
5  provide some peek to what happened in the investigation
6  room for many weeks.
7    Q.  So in addition to your human rights work in
8  which you've read GSS -- we're using "GSS."  Apparently
9  yesterday we were told really "ISA" is a better English?
10   A.  ISA.
11   Q.  So I'm afraid we're going to find ourselves
12 using both.
13       Which do you call them?
14   A.  I call them GSS.  But I could call them ISA.
15 I can call them Shabak.
16   Q.  We can use the convention you used in your
17 report.  That might be --
18   A.  Okay.
19   Q.  -- the easiest.  But, anyway, it's the same
20 thing?
21   A.  Right.
22   Q.  In addition to what you just described, which
23 is your human rights work in which you read -- you have
24 read many GSS files, could you describe what additional
25 familiarity you have with --

Page 48

1    A.  Just to correct, I -- I did not say that
2  this -- that I read GSS files as a -- in the framework
3  of my practice in human rights, but as a defense --
4  criminal defense attorney.
5        Additionally, I am involved in -- in human
6  rights work that includes working on behalf of and
7  consulting many Israeli human rights organizations.
8  Some of them, like the Public Committee Against Torture
9  in Israel, has work that has to do with the GSS.  So
10 in that -- that is another source of my knowledge and
11 understanding of the GSS work.
12   Q.  Do you -- do you feel that -- well, first
13 of all, thank you for that clarification.
14       Is there other work that you would draw
15 on that you would include in your familiarity with
16 the legal framework and actual practice of security
17 investigations as described in the first paragraph
18 of your report?
19   A.  No.  I think that is the main thing.  I am --
20 in my practice, this area of law is of interest to me,
21 and I am trying to keep updated.
22   Q.  Do you -- do you believe that the practice
23 of GSS investigations has changed since 1999?
24   A.  I believe it has.
25   Q.  Because of the Supreme Court opinion?

1    A.  Yes.

2    Q.  Describe how you believe it's changed.

3    A.  Well, I think, prior to 1999, there was almost

4  no Palestinian that didn't go through investigation in

5  the GSS that was not subjected to abusive interrogation

6  techniques, by the thousands, tens of thousands.  And

7  I think that the number has dropped significantly.

8        That is not to say that -- that there are

9  no more investigations with abusive techniques employed

10  against the suspects.  The more the allegation or the

11  suspicion is serious, the higher the risk or the chances

12  that the GSS has used physical means in interrogation.

13    Q.  And these are means that are described in

14  the -- the PCATI?  Is that -- is that an acronym that

15  we use?  Or do you say -- how do you say the name of

16  the case?

17    A.  We say it in Hebrew.  But PCATI is when we

18  say it in English.

19    Q.  So are you describing the physical techniques

20  that are described in the PCATI opinion?

21    A.  Yes, in the PCATI opinion.  Also, there were

22  allegations of mental abuse, threatening -- I mean,

23  when I say there were allegations, I mean that there

24  was a pattern of allegations.  One person alleges

25  something, that is one thing.  But when there is a

1  pattern, then as -- that -- that shows something.  So

2  there's a pattern of allegations that GSS interrogators

3  threat [sic] suspects of incarcerating their family

4  members and things of that sort.  So I said physical

5  means, but also mental abuses.

6    Q.  Were those also forbidden by the High Court

7  of Justice?

8    A.  The High Court of Justice case --

9    Q.  Let me rephrase the question.  Because I don't

10  want to -- I want to ask a question that you think is

11  fair.  And I apologize for interrupting.  But I don't

12  want to sort of debate the legalities of it.

13    A.  No, no.

14    Q.  So as I recall it -- and I'm sure you know

15  it much better than I do.  But as I recall that case,

16  the High Court of Justice described certain physical

17  techniques like the Shabak position and the frog crunch;

18  is that right?

19    A.  That's right.  There were five techniques

20  that were dealt with in this case.

21    Q.  And they said that -- they said in, I think,

22  fairly strong language that those techniques are not

23  authorized under Israeli law?

24    A.  Unless there is necessity.

25    Q.  And I think what they said -- and maybe it's

1  a nuance that would be lost on some people.  But I think

2  what they said is they are not authorized, but we're --

3  we understand that, if a interrogator is criminally

4  prosecuted, he could raise a necessity defense which

5  would be evaluated on the facts and circumstances.

6        Is -- is that -- do I have that right, or

7  do you disagree with my reading of it?

8    A.  I think your reading of it is accurate.  And

9  I would hope that the government of Israel would read

10  this case just like you did.

11        Unfortunately, from what we see in the years

12  after the case was rendered, the decision was rendered,

13  we see that instead of not -- instead of allowing the --

14  or sorry -- subjecting the GSS interrogator to a

15  criminal trial and then -- where he could raise the

16  necessity defense, it is the practice that those GSS

17  investigators receive a prior permit or consent that,

18  in this specific scenario, this is necessity.

19        And this, I think, is exactly what the Supreme

20  Court was not planning when they gave the ruling, the

21  judges.

22    Q.  And then do I have it right that -- well,

23  anyway, we -- we seem to have cases with the necessity

24  exception as well in the United States like the Boston

25  bomber case.

1        Did you read about that case?

2    A.  No.

3    Q.  Anyway, okay.  So -- so you mentioned a moment

4  ago that a -- an isolated allegation you thought was

5  different from a pattern.

6        Could you just explain what you meant by that?

7    A.  There is a force in a pattern of allegations

8  because it shows that there is a repeating occurrence

9  of such an -- such a practice.  It shows a practice

10  rather than an isolated event.

11    Q.  Thank you.  That's helpful.

12        Do you -- one thing I wanted to ask you before

13  about your experience that I forgot to was about plea

14  bargaining.

15        Does plea bargaining take place in the Israeli

16  civilian courts?

17    A.  Yes, it is -- it does.

18    Q.  And do you participate in that?

19    A.  When I was -- when I was a defense lawyer in

20  the main part of my practice, I have.

21    Q.  And did you participate in any plea bargain

22  negotiations in the military court system?

23    A.  Yes, I have.

24    Q.  Can you give me an estimate of how many in

25  your career you've participated in?

Page 53

1    A.  Again, difficult for me to say.
2        Most of them were plea bargain negotiations
3    that were led by Mr. Feldman.  I remember at least one
4    case that I negotiated a plea bargain.  And, eventually,
5    the case ended with a plea bargain.
6        Q.  The other thing that I wanted to ask you about
7    Mr. Feldman, did -- did you learn from him matters of
8    what we might call the art of being a lawyer, strategic
9    judgments and things like that?
10       A.  I think all I know I learned from him and
11   not only law.
12       Q.  And part of being a good lawyer is making
13   judgments about strategy?
14           Would you agree with that?
15       A.  This is fundamental.
16       Q.  So -- and would you agree that -- that, for
17   many excellent lawyers, their strategy is not always
18   obvious until it's been executed?
19       A.  I agree.  But I then want to make one
20   comment about it.  Strategy should not be tailored
21   until you have all the information about the case.
22   Only then you can tailor a strategy.  And I agree
23   that a good strategist might form a strategy that
24   you don't understand without the in or outs of the --
25   of the case.

Page 54

1        Q.  Are you familiar with the good goat joke?
2        A.  The good goat?
3        Q.  Yes.
4        A.  No.  I'm -- I'm familiar with the rabbi and
5    the goat, but not --
6        Q.  We'll exchange them at break.
7        A.  At the break.
8        Q.  Perhaps that would be more appropriate.
9            Now, the Yesh Din report has a number of
10   statistics in it?
11       A.  Right.
12       Q.  And then I think there was some criticism
13   of some of those statistics by the --
14       A.  By the organ that was criticized.
15       Q.  -- by the military courts and by the
16   prosecutors; right?
17       A.  Right.
18       Q.  And then the Yesh Din published a response
19   to those criticisms; right?
20       A.  Right.
21       Q.  And have I exhausted the public debate about
22   the Yesh Din report?
23       A.  I don't know.  It's your call.
24       Q.  No, I mean are there other -- that was sort
25   of a flip question.

Page 55

1        Are there other documents?
2        A.  Well, later on, I discovered something that
3    was not -- that I was not aware of when we formed our
4    response to the criticism of the figures.  The main
5    criticism that was presented dealt with comparison
6    to figures in the Israeli civilian system.  So we
7    wrote in the report that .29 percent of cases in the
8    military court system end up with full acquittal.  And
9    the response was:  Well, in Israel it's 0.1 percent.
10           We've double-checked ourselves later on, and
11   we found out that the Israeli figures do not include
12   cases that were -- that ended without a ruling, meaning
13   that the prosecution has canceled, annulled the
14   indictment or, for any other reason, backed it off.
15           And, for example, in 2010, there were
16   29 percent of cases in the Magistrate's and District
17   Courts that ended up like that.  So the equivalent
18   figure in the military courts at the year that we've
19   checked, 2006, was, I think, 2.9.  So 2.9 percent of
20   cases were annulled by the prosecution probably because
21   of not enough evidence or so.  So the difference is
22   almost 30 percent.
23       Q.  Why would they annul a prosecution if there
24   wasn't enough evidence?  Couldn't they just stand on
25   the charge itself?

Page 56

1        A.  I -- I honestly do not know what comprised
2    of those 2.9 percent or those 29 percent.  All I know
3    is that the chance -- if you're indicted in the civilian
4    courts or in the military courts, if you're indicted,
5    what is your blanket chance of stepping out of the
6    court without any conviction.  That's the question
7    that we've asked.  And -- and when you ask me whether
8    there's anything to add to this exchange that was very
9    fierce, this is the only thing that I have to add.
10       Q.  It was a lively exchange?  Would you agree
11   with that?
12       A.  The previous president of the military courts,
13   Shaul Gordon, said in a -- in a -- in a panel with me
14   that humanitarian law should govern the relationship
15   between Yesh Din and the military courts.
16       Q.  He was joking?
17       A.  Of course.
18       Q.  So -- so if the prosecution in the military
19   courts -- I just want to follow up on that.
20       A.  Yeah.
21       Q.  If the prosecution in the military courts
22   makes a charge and then doesn't have sufficient
23   evidence --
24       A.  Let's say a prosecution witness disappeared
25   or --

Page 57

1    Q.  -- could -- could they -- could they get
2  a conviction simply on the bear allegations of the
3  indictment?
4    A.  On the bear allegation of the indictment?  No.
5  But they could try to admit the out-of-court statements
6  of the -- of the witness that is not available.  And
7  in some cases, in some conditions are met -- if some
8  conditions are met, it is possible.  But -- but if other
9  things happen or if, for any other reason, they decide
10 not to continue the prosecution, they can annul it at
11 any stage.
12   Q.  So just -- just so I have it clear, though,
13 on the -- on the hypothetical, if you will, where the
14 prosecution brings a -- a fair indictment and offers
15 no evidence, would that result in a conviction or
16 acquittal?
17   A.  Where they bring no evidence?
18   Q.  Yeah.
19   A.  I would expect it to end in an acquittal.
20   Q.  Okay.  And do you have any rate -- do you
21 have any information on the rate of plea bargaining
22 in what we've being calling serious security offenses?
23   A.  There is no study of that at all.  The only
24 thing we do have is a comment made by the Deputy MAG,
25 the -- one of the previous Deputy MAGs at the Israeli

Page 58

1  Bar Association meeting or panel, in which he said --
2  said that, in the military courts, 95 percent of cases
3  end up in plea bargaining.  But this was, I think, not
4  a -- a scientific figure.  He just said what he thought
5  it was, the correct figure.
6    Q.  More of an estimate?
7    A.  Estimate.  That's the word I was looking for.
8    Q.  Based on his experience?
9    A.  Yes.
10   Q.  Do you think it's a reliable estimate?
11   A.  It seems to me fair.
12   Q.  Do you -- do you have any information on what
13 the rate of plea bargaining is in the civilian courts
14 in Israel?
15   A.  No, I don't.
16   Q.  Do you want to continue, or do you want to
17 take a short break?
18   A.  It's your call.  I'm at your disposal.
19   Q.  I'm happy to continue unless --
20     MR. YALOWITZ:  Well, Brenda, what do you
21 think?
22     MR. HILL:  I'll take a break.
23     MR. YALOWITZ:  Okay.
24     (Recess from 10:22 a.m. to 10:32 a.m.)
25     (Plaintiffs' Exhibit 113 marked.)

Page 59

1    Q.  BY MR. YALOWITZ:  During the break,
2  Mr. Sfard, we've marked as Plaintiffs' 113 a
3  newspaper article describing a spirited debate
4  that you had with a lawyer named Roy Schoyndorf.
5    A.  (Examining.)  Yeah.
6    Q.  And have you had a chance to read that, or
7  do you want a moment?
8    A.  I remember this.
9    Q.  The newspaper article reports that you opened
10 your remarks:
11     "By accusing Israel of having an investigative
12 apparatus that is a 'soulless scarecrow,' in which
13 indictments were only filed in 2.5 percent of 1,939
14 complaints submitted to the IDF in recent years."
15     Do you see where the newspaper article says
16 that?
17   A.  Yeah, I can see that.  Of course -- of course
18 this is not accurate.
19   Q.  I was --
20     MR. HILL:  Kent, just --
21   Q.  BY MR. YALOWITZ:  I was --
22     MR. HILL:  I'm sorry.
23   Q.  BY MR. YALOWITZ:  I was going to ask you --
24     MR. HILL:  Sorry to interrupt.  I think I've
25 got the wrong document.

Page 60

1      MR. YALOWITZ:  Oh, so sorry.  That's the next
2  one.  You can hold on to it.
3      MR. HILL:  Thank you.
4      MR. YALOWITZ:  You just have to cross the
5  number out.  Do you want a moment to -- is that --
6  does that say "Top lawyers debate"?
7      MR. HILL:  (Indicating.)
8      MR. YALOWITZ:  Yeah, that's it.  Okay.
9  I apologize.  Mr. Hill, do you want a moment to --
10     MR. HILL:  Just give me a --
11     MR. YALOWITZ:  -- catch up?
12     MR. HILL:  Give me one moment to read it.
13     MR. YALOWITZ:  Just let me know when you're
14 ready.
15     MR. HILL:  Thank you.
16   Q.  BY MR. YALOWITZ:  So my first question was
17 just:  Did you see that comment?
18     And I think the answer is "yes"?
19   A.  Yeah.
20   Q.  And then my next question was going to be:
21 Did it -- did the newspaper article quote you fairly?
22   A.  Now -- now -- now that I had a moment,
23 I can understand the context.  And barring that
24 I don't remember the exact figures, I suppose that
25 I read them from a paper or some -- some thing.  It

Page 61

1  seems like a fair representation of what I said. But
2  I don't remember the exact figures.
3      Q. What -- what --
4      A. So I cannot verify them.
5      Q. Sure. I didn't understand the comment
6  "soulless scarecrow."
7          What does that mean?
8      A. That means that -- well, I -- we're
9  discussing here -- I'm discussing here the operation
10  of the law enforcement agencies that are responsible
11  for investigating allegations that Israeli soldiers
12  and officers have wronged Palestinians in the West
13  Bank, which means mainly the military police central
14  investigating unit.
15          And what I'm -- the -- the metaphor of a
16  "soulless scarecrow" is trying to say that there is
17  an apparatus and there is -- there are authorities
18  that are investigators, there is a police station,
19  but it's soulless. It's without -- it's not really
20  doing anything significant and doesn't supply the
21  protection that it should to Palestinians.
22      Q. Did you mean it literally as a comment on
23  the souls of the people who were in that service, or
24  was it a metaphor to draw people's attention to the
25  issue?

Page 62

1      A. I definitely did not say anything about
2  the people in the service. I meant that the -- that
3  the system, as a system, is there in its -- like a
4  scarecrow. It doesn't really operate. It's just
5  there as a skeleton.
6      Q. Okay. And the figures, those are not figures
7  involving investigations by the GSS? Those are figures
8  involving IDF incidents?
9      A. That's right.
10      Q. Okay. Thank you.
11          So let's -- let's look at what we'll mark as
12  one --
13      MS. WEISER: 114.
14      MR. YALOWITZ: -- 114. And is it one page
15  or two pages?
16      MS. WEISER: It's one page.
17      MR. YALOWITZ: It looks like I gave Brian
18  a second page.
19      MS. WEISER: Let me see what that one is.
20      THE WITNESS: Can I add something?
21      Q. BY MR. YALOWITZ: Please go ahead.
22      A. Just to say that I was basing my figures on
23  a study -- an extensive study, also taken by Yesh Din,
24  that was published, I think, a year ago on the work
25  of the -- of the military police and military courts,

Page 63

1  those courts that try soldiers, not the courts in the
2  West Bank.
3      Q. Do the same procedures and rules apply to
4  both court systems?
5      A. No.
6      Q. Okay. Thank you.
7      A. Can I see that?
8      Q. So yeah, we'll -- we'll mark as Plaintiffs'
9  114 another article, and then Brenda will hand it to
10  you.
11      A. Okay.
12      Q. You're free to look at Mr. Hill's copy in
13  the meantime.
14          (Plaintiffs' Exhibit 114 marked.)
15      Q. BY MR. YALOWITZ: Let me know when you've
16  had a chance to look at that story.
17      A. (Examining.) Yeah.
18      Q. This -- this is an article about a -- an
19  oral argument you were giving or a hear -- de novo
20  hearing that you were giving in the High Court of
21  Justice; is that right?
22      A. It's an article that reports on -- yeah,
23  I guess an oral hearing in the PCATI case, the second
24  PCATI case, the one that dealt with targeted killings.
25      Q. So without getting too technical, if you

Page 64

1  could explain maybe in words that somebody who doesn't
2  have legal training would appreciate what your argument
3  is regarding the topic at hand.
4      A. The question was whether -- in what
5  circumstances is it permissible for an occupying
6  power to use lethal force against civilians who are
7  suspected of being involved in -- in terror attacks --
8  in terror activity, not just attacks. That was the
9  question.
10      Q. And was it your position that international
11  humanitarian law provides that, when an enemy fighter
12  is out of uniform and not carrying a weapon, that person
13  is treated as a civilian under international law?
14      A. No.
15      Q. That may have been a bad question.
16      A. No, it was not a bad question. But it didn't
17  reflect our argument -- my argument. My argument was
18  that a combatant is a legitimate target always and a
19  civilian is only a legitimate target during that window
20  of opportunity, that very narrow time frame in which
21  he directly engages in hostilities.
22          So targeting a combatant while he's asleep
23  in his barracks is not a violation of international
24  humanitarian law. Whereas, targeting a civilian
25  while he's asleep, even if before he went to sleep

Page 65

1    he has done some awful things, is not permissible
2    under international law.
3        Q.  Does international law forbid indiscriminate
4    killing of civilians?
5        A.  Of course.
6        Q.  In all circumstances?
7        A.  International law forbids targeting civilians.
8    It also forbids injury and -- and killing of civilians
9    as a -- as a side effect of targeting combatants
10   according to the principle of proportionality.
11       Q.  Is there a -- is there an exception in
12   international law for targeting civilians -- let
13   me ask the question again.
14       Does international law forbid targeting
15   civilians for injury or death as a retaliatory measure?
16       A.  Absolutely.
17       Q.  Absolutely and unequivocally; right?
18       A.  Absolutely, unequivocally.  And I know what
19   you're referring to.  And absolutely yes.
20       Q.  What I'm referring to is the crimes that
21   we're here about in this case.
22       A.  I agree that these are crimes.
23       Q.  I thought you might.
24       All right.  I -- I want to ask you now about
25   matters of due process.  And I want to distinguish

Page 66

1    among three things.  So, first, I'm going to describe
2    the three things that I want to distinguish about and
3    ask you if you -- if you understand the difference
4    among those three things.
5        So the first thing would be actual innocence.
6    We've talked a little bit about that before.  And I
7    think you understand that, do you?
8        A.  Yes, I think I do.
9        Q.  And then the second thing I want to talk
10   about would be what we might call minimum standards
11   of due process required for civilized jurisprudence
12   on a systemic level.
13       Do you have that in mind?
14       A.  I have in mind minimum standards of due
15   process according to international law.
16       Q.  And -- and by that, I mean does the system
17   provide that, as opposed to did an individual receive
18   due process in a particular case.
19       A.  I understand.
20       Q.  And -- and then the third question -- the
21   third topic that I want to cover with you in this set
22   of three will be actual due process in actual cases.
23       A.  Understood.
24       Q.  Okay.  Thank you.
25       So in the -- and I want to talk specifically

Page 67

1    about the Israel military court of justice system.
2        A.  Israeli --
3        Q.  I said it wrong.  The --
4        A.  The Israeli military courts in -- in the --
5    in the West Bank, Judea, and Samaria, whatever you
6    want to call it.
7        Q.  I think the neutral term seems to be the
8    West Bank?
9        A.  The West Bank.  That's --
10       Q.  We could --
11       A.  That's how I call it.
12       Q.  We could call it the liberated territories,
13   but that might offend some.
14       A.  OPT?
15       Q.  That might offend some as well.
16       A.  So West Bank.
17       Q.  Okay.  So in the military courts that we're
18   discussing, the West Bank military courts, the accused
19   may be defended by an advocate; is that correct?
20       A.  That's correct.
21       Q.  And does the accused have a right to a
22   court-appointed attorney for a crime for which the
23   sentence exceeds ten years?
24       A.  Yes, he has.
25       Q.  Now, in the military courts that we've been

Page 68

1    discussing, the same laws of evidence apply as the laws
2    of evidence in the civilian courts; is that correct?
3        A.  It is correct.  There are some nuances.
4        Q.  Would you describe the nuances?
5        A.  I'll give you an example.  In the relevant
6    time frame, in the Israeli military courts, a very
7    important judgment, ruling by the Israeli Supreme
8    Court was not implemented.  And that is what is called
9    as the Kinsey judgment, which states that an accomplice
10   cannot testify at a defendant's trial as a prosecution
11   witness before his own trial is over so that he will
12   not, you know, pass all the blame to the defendant.
13       That, for example, is the case in the --
14   that was in the time frame the ruling -- the rule
15   in Israeli courts and Israeli civilian courts.  And
16   it was not followed in the military courts, which
17   caused problems, for example, in the Marwan Barghouti
18   case.  Because the -- the military prosecution was
19   asked by the civilian prosecution to speed up the
20   trials at the IMC because those accomplices could
21   not testify against Marwan Barghouti in the Israeli
22   courts.
23       Q.  In the military court system, it -- is an
24   accomplice -- well, let me ask a different question.
25   Strike the last question.

Page 69

1     In the civilian court system, is an accomplice
2  allowed to testify after conviction or guilty plea,
3  but before sentencing?
4     A.  I don't recall if -- if the Kinsey -- if
5  Kinsey was applied -- I think after the sentencing.
6     Q.  So --
7     A.  I think so.  But this is, again, something
8  we can check.  But I think it's after sentencing.
9     Q.  So if a system permitted a -- an accomplice
10 to testify as a prosecution witness before sentencing,
11 would it be your view that that rule deprived defendants
12 of due process?
13    A.  No.
14    Q.  Coming back to the systemic topics we've
15 been talking about, do I have it right that the
16 military courts are typically open to the public?
17    A.  I would not agree.  And -- and I will --
18    Q.  Please explain.
19    A.  Yeah.  When you say "open," the question
20 is what -- what does it mean "open"?
21       A person from the public who wants to go to
22 a military court cannot just knock on the door and get
23 in.  Absolutely not.  Even a -- a journalist who wants
24 to cover a hearing in the military court cannot just
25 barge in.  They need -- and, again, I'm referring to

Page 70

1  the time frame that is -- that I refer to in my -- in
2  my report.  It might be that regulations have changed
3  today, so I'm not sure about today, but back then.
4       The military courts are situated in a military
5  base compound.  In order to enter there, you need a
6  kind of permit.  You need to be authorized to enter.
7  So, first of all, there was -- there is -- there was a
8  member of the military court staff who was responsible
9  for either allowing or prohibiting people from entering.
10 And when we've interviewed this specific person for the
11 Yesh Din report, we found out that his understanding
12 of what are reasonable grounds for dismissing a request
13 to enter are not our ideas of it.  He thought that it
14 was for his -- that he has a very wide discretion about
15 this.  That's one.
16       Two, family members.  Family members of
17 accused people could enter the -- the courthouse only
18 for their family member's trial.  And only two members
19 of the family could enter.  This not always has been
20 kept, but that was the general rule.
21       And, third, I don't think of a system that
22 is public if its judgments are not made public.  And
23 the judgment of the military -- judgments, rulings,
24 decisions of the military courts, definitely of first
25 instance, but most of the appeals instance as well,

Page 71

1  have not been made public until this day.
2     Q.  Okay.  So let me try to break that down a
3  little bit.  Thank you for that --
4     A.  My pleasure.
5     Q.  -- that explanation.
6       First of all, with regard to journalists,
7  do journalists have a right of access to the military
8  courts?
9     A.  In principle, yes.  In theory, yes.  In
10 practice, as I said, they need to announce their
11 arrival and discuss with the IDF spokesperson or the
12 specific guy at the IMC unit that they're coming and
13 they want to enter.  A journalist that wants to go in
14 eventually will get in.  I'm not suggesting that --
15 that the military courts are sealed.  I'm saying that
16 it is not in the standard of a public hearing as --
17 as it should be.
18    Q.  It's more restricted than a civilian court --
19    A.  There's not --
20    Q.  -- but not sealed?
21       Is that a fair statement?
22    A.  There's nothing to compare.  In a civilian
23 court, anyone from the public can enter any hearing
24 unless it's in closed doors.  But these are very small
25 number, and very narrow conditions are met.

Page 72

1     Q.  Was the Marwan Barghouti case -- that was
2  in a civilian court; right?
3     A.  That's right.  And -- and, as I said in my
4  report, I think it was in a civilian court because the
5  Israeli justice system did not want the international
6  media to cover a case in the military court system.
7     Q.  Was there heightened security in the Marwan
8  Barghouti trial?
9     A.  Yes, there was.
10    Q.  Did you go watch it?
11    A.  No.
12    Q.  Do you know people who did?
13    A.  I know -- I know a -- a lawyer that was,
14 at a very early stage, his lawyer.
15    Q.  Did journalists cover it?
16    A.  Absolutely.
17    Q.  Did Barghouti family members go attend?
18    A.  I don't know.
19    Q.  Did that include Palestinian journalists?
20    A.  I don't know.
21    Q.  Do you know what security precautions were
22 taken for his trial?
23    A.  I don't.
24    Q.  Do you know whether they were different
25 than the security precautions that were taken in the

Page 73

1  military courts?
2     A.  Mr. Yalowitz, I'm not talking about the
3  security precautions.  I'm talking about the access.
4  Security precautions in the Israeli High Court and the
5  Israeli District Courts and the Israeli Magistrate's
6  Court correspond to the threats that are similar to
7  ones that -- in the IMC.  But the question is whether
8  a person needs a permit and to explain where he goes
9  to and why in order to enter.
10    Q.  So let me ask the question again.
11        Were the -- were the security precautions --
12 would you agree that the purpose of a permit is for
13 security purposes, or do you disagree with that?
14    A.  I never got any explanation why.
15    Q.  Do you have a common sense thought about it?
16    A.  I don't think that the Israeli military courts
17 unit is -- understands the notion of a public trial.
18    Q.  Do you -- do you have -- so your concept
19 is that they're just unintelligent over there?
20    A.  Absolutely not.  This is not what I suggest.
21        I think it's a military unit.  Military units,
22 by their very nature, are secretive.  And I'm not --
23 I'm not holding that against them.  But in a military
24 unit that is -- that is trying civilians on a regular
25 basis, by the thousands through four or five decades,

Page 74

1  should digest the notion of public hearing.  And I
2  think they -- they -- they didn't at least at the
3  time frame that is relevant to our discussion here.
4     Q.  Do you -- do you think there's a difference
5  between the -- well, let me ask you this.
6         As I understand it, the military courts that
7  we've been discussing have jurisdiction over a wide
8  variety of kinds of offenses; is that true?
9     A.  That's true.
10    Q.  Things ranging from traffic violations on
11 the one hand, perhaps one end of the spectrum, speeding
12 tickets, to -- to acts of terrorism at the other end?
13        Is that fair to say?
14    A.  That's true.
15    Q.  Okay.  So -- and -- and the 21 cases we're
16 dealing with were all terrorism cases; right?
17    A.  Right.
18    Q.  So do you have a view on -- are you able
19 to compare security precautions taken for public
20 access in terrorism cases in the military courts
21 versus terrorism cases in the civilian courts, of
22 which the Marwan Barghouti --
23    A.  Is one.
24    Q.  -- seems to be the archetypical example?
25    A.  I don't have a knowledge and expertise in

Page 75

1  this.
2     Q.  Fair enough.  Okay.
3         Now, in the military courts that we've been
4  discussing, the accused is entitled to a translator;
5  is that right?
6     A.  The accused is entitled to an interpretator --
7  interpreter.
8     Q.  Interpreter.
9         And -- and the accused has a right to object
10 to a particular interpreter; isn't that right?
11    A.  That's right.
12    Q.  Now, in the military courts that we've been
13 discussing, a summary record of the trial is made rather
14 than a verbatim transcript; correct?
15    A.  That's correct.
16    Q.  And the summary record must be signed by the
17 president of the court; is that right?
18    A.  By the -- yeah.
19    Q.  And, commonly, the summary record is actually
20 signed by all three judges?
21        Have you seen that?
22    A.  No, I haven't.  But there is usually, at
23 the end of each hearing, a decision made by the --
24 by the judges, and the decision is signed by all three.
25 But that's not a confirmation of -- of the summary

Page 76

1  minutes.
2     Q.  Now, does -- as counsel for the defense,
3  were you provided with those summary records during
4  the course of the cases that you've handled?
5     A.  Yes, I have.
6     Q.  And do defense counsel have the opportunity
7  to object if they feel that the record is inaccurate
8  or incomplete?
9     A.  They do.
10    Q.  Now -- and is that -- is the fact of the
11 objection recorded in the record of the case?
12    A.  It should.
13    Q.  Now, the defendant may request the court
14 to summon witnesses for the defense; right?
15    A.  Right.
16    Q.  And the -- the court can hold witnesses
17 in contempt if they fail to obey the summons; right?
18    A.  That's true.
19    Q.  And the defense has the right to examine,
20 cross-examine, and re-examine witnesses; right?
21    A.  It has the right.  It doesn't -- it doesn't
22 mean that they have the opportunity always to do that.
23    Q.  The -- the right is subject to the control
24 of the court?
25    A.  That is -- that is correct.

Page 77

1    Q.   And that's true in our courts in New York
2    as well.
3    A.   Well, the question is:  What are the
4    evidentiary ramifications of not being able to use
5    your right to cross-examine?
6         I mean, it's true that no judge in the
7    world can compel a person to testify if he decided
8    that he will not say a word, if we're taking torture
9    out of the equation.  But the question --
10   Q.   I think you would agree with me it would
11   be inconsistent with the judicial mission for a --
12   for a judge to torture a witness?
13   A.   I -- I agree.  Of course.
14        But the question is:  What happens if the
15   defense did not have the opportunity to cross-examine
16   the witness?  Will his out-of-court statement be
17   admitted to the truth or not?  And that -- that is
18   a serious question which I deal with in my report.
19   Q.   Have the -- have the courts, either the
20   Military Court of Appeals or the Israel Supreme Court
21   dealt with that issue?
22   A.   It has.
23   Q.   And what have they said about that?
24   A.   The rules that govern are -- that govern now,
25   after a long evolution, is -- jurisprudential evolution,

Page 78

1    is that, under certain conditions, it is permissible
2    for the prosecution to use out-of-court statements
3    of a witness that refused to answer questions by the
4    defense.
5    Q.   Were those -- when you say "evolution," you
6    mean there were a number of cases that were decided --
7    A.   Yeah.
8    Q.   -- in our common law tradition to come to a --
9    A.   Exactly.
10   Q.   -- status that we have today?
11   A.   That's right.
12   Q.   All right.  And were those cases decided by
13   courts of first instance initially?
14   A.   Which cases?
15   Q.   The cases you're describing involving the
16   ramifications of the --
17   A.   Initially -- initially by first instance.
18   Q.   And -- and then the defendants had the
19   opportunity to present their legal arguments and
20   policy arguments to the Military Court of Appeals
21   on those cases; is that right?
22   A.   That's right.
23   Q.   Then the defendants had their opportunity
24   to present their legal and policy arguments to the
25   Supreme Court of Israel; is that right?

Page 79

1    A.   These are not the same defendants.  But the
2    issue has also arrived in the -- to the Israeli Supreme
3    Court.
4    Q.   And -- and do you think that the questions
5    and the nuances about the admission of out-of-court
6    statements in the circumstances you describe, where
7    witnesses either are unavailable or refuse to testify
8    and, therefore, are deemed unavailable, do you think
9    those were fairly ventilated before the courts?
10   A.   I don't know what "fairly ventilated" means.
11   I know that in the -- in the military courts, it's
12   a very frequent occurrence.
13   Q.   I mean -- I mean, in order to arrive at
14   the rule that exists today, were -- were the appeals
15   adequately argued in --
16   A.   I don't know.  I haven't seen the case --
17   the case files.
18   Q.   The cases that have created the rules you've
19   described, those are reasoned and published opinions?
20   A.   The Supreme Court's rulings are published
21   and reasoned.  I don't know about the court of --
22   Military Court of Appeals rulings.
23   Q.   The -- coming back to the question of general
24   process in the military court system, you agree that
25   guilt must be determined unanimously?

Page 80

1    A.   No.
2    Q.   You disagree with that?
3    A.   I disagree.  The majority is enough.
4    Q.   Maybe I can refresh you on this.  Let --
5    let's look at -- or perhaps you're right and I misread
6    the statute.  But let -- why don't we look together.
7    We'll mark a -- if it's -- with your permission, an
8    English translation of Military Order No. 378.  Bear
9    with us.
10   A.   Sure.
11   Q.   And I think I have the Hebrew.  I have the
12   Hebrew, and I have an English translation.  So we're
13   going to mark both of them so that -- so that you can
14   read it in the original --
15   A.   Sure.
16   Q.   -- and your counsel can follow along, since
17   he and I don't read Hebrew.  I mean, I read a little
18   bit.
19        (Brief discussion held off the record.)
20        MR. YALOWITZ:  Okay.  So what we're going
21   to do is we're going to -- we're going to mark as
22   Plaintiffs' 115 an unofficial English translation
23   of Military Order No. 378.  And then I'm -- I'm going
24   to mark as 116 a Hebrew copy of Military Order 378,
25   although I only have one copy.

1          (Plaintiffs' Exhibit 115 and Exhibit 116
2     marked.)
3          Q.  BY MR. YALOWITZ:  So you're going to be the
4     only one --
5          A.  Sure.
6          Q.  -- to use it.
7          A.  We'll share the exhibit.
8              MR. HILL:  Kent, do you have a copy of
9     115 for me?
10             MR. YALOWITZ:  Yes.  Have we -- have we
11    given the witness 115?
12             THE WITNESS:  Yes.
13             MR. HILL:  Thank you.
14             MR. YALOWITZ:  Sure.
15         Q.  BY MR. YALOWITZ:  Okay.  Now, do you have
16    116 before you, Mr. Sfard?
17         A.  What's 116?
18         Q.  It's the Hebrew version.
19         A.  (Examining.)  The Hebrew, yes.  Yes.
20         Q.  Can you tell what date that document is from?
21    Because I know that Military Order 378 has been updated
22    and consolidated from time to time.  And I'm just not
23    sure what date this one is from.
24         A.  It's one that contains amendments until
25    October -- 20th October, 2005.

1          Q.  Okay.  So -- so would you look with me at
2     Section 20?
3              MR. HILL:  So just off the record.
4              (Brief discussion held off the record.)
5          Q.  BY MR. YALOWITZ:  Do you have it before
6     you?
7          A.  Yeah.
8          Q.  My unofficial translation says:
9              "No person shall be found guilty in a
10    military court other than by the unanimous decision
11    of the president and its members."
12         A.  Your -- your translation is wrong.
13         Q.  Could you read -- could you translate it
14    for me?
15         A.  (Reading/translating.)
16             "The decisions of the military court,
17    including the verdict and sentence, will be given
18    in majority of opinions."
19         Q.  Okay.  Can -- can we pause one second --
20         A.  Sure.
21         Q.  -- while I --
22         A.  Of course.
23         Q.  -- consult with a colleague?
24         A.  Yeah.
25             (Brief discussion held off the record.)

1          Q.  BY MR. YALOWITZ:  And then "guilt must
2     be determined by a majority," and then the sentence
3     "must be agreed upon unanimously"; is that right?
4          A.  The majority, except death sentence.
5          Q.  Except a death sentence?
6          A.  That's right.  Which must be --
7          Q.  I see.
8          A.  -- unanimous --
9          Q.  Which -- which has never happened in Israel
10    except for Eichmann; right?
11         A.  It happened in a court-martial once during
12    the War of Independence.  And it happened in the
13    military court, but it was not carried out because
14    it was commuted.  It's one of the things that I'm
15    very proud of as an Israeli.
16         Q.  That Israel does not have the death penalty?
17         A.  That it doesn't carry out that penalty,
18    doesn't have a death penalty in practice.
19         Q.  It has it de jure, but not de facto?
20         A.  Yeah.
21         Q.  We could discuss further that topic, I
22    suppose.
23         A.  I'm sure we could.
24         Q.  The -- the accused has the right to have
25    the charge sheet read out at the beginning of the

1     hearing in front of the accused; is that right?
2          A.  You're asking about what says the law that
3     governs these here -- these cases.  And the answer
4     is "yes."
5              But, in practice, the indictment is almost
6     never read out to the defendant in court.  The practice
7     is, as we see in the 21 files, is that the judges ask
8     the defending -- counsel for the defendant whether
9     he has read out the indictment for the defendant, and
10    they settle for this -- for that.
11         Q.  It's a right that counsel can advise the
12    client to waive or not to waive?
13             Do I have that right?
14         A.  No, I didn't say that.  I'm saying that the --
15    the court -- the practice in the court is not to read
16    out the indictment, but to ask the defense counsel
17    whether the indictment was read out to the defendant.
18    Mind you that many times defense counsels are not
19    mastering Hebrew that well, and the indictment is
20    in Hebrew.
21         Q.  So -- so the indictment would be -- if the
22    indictment is read out, it must be read -- and the
23    accused does not speak Hebrew fluently, the indictment
24    would have to be translated as it's being read; isn't
25    that right?

Page 85

1    A.  As I said, the indictment is not read out.
2    Q.  Okay.  So I'm -- I'm -- we're -- we're
3  talking past each other.  So let me try to -- let's
4  try to focus -- I'll try to focus better.  I'm sure
5  it's my questions.
6        The accused has the right to a translator;
7  isn't that correct?
8    A.  To an interpreter.
9    Q.  To an interpreter.
10    A.  I'm saying "interpreter" because he's not --
11  nothing is translated in -- in -- from the material
12  from the indictment, the -- file.
13    Q.  Fair enough.
14        By "interpreter," you mean a person who
15  is in the courtroom?
16    A.  That's right.
17    Q.  And when words are spoken in Hebrew, the
18  interpreter gives the words in Arabic?
19    A.  That's what he's supposed to do.
20    Q.  Or if -- or if the accused were an English
21  speaker, the interpreter would have to read out the --
22  or trans -- interpret the Hebrew into English; right?
23    A.  That's what they are supposed to do.
24    Q.  And so when I say "translator," I'm --
25    A.  Okay.

Page 86

1    Q.  -- I'm being imprecise, and you're --
2  you're being more precise by talking about somebody
3  who translates written documents?
4    A.  That's what I mean by "translation."
5    Q.  That's the distinction that you're making?
6    A.  Yeah.
7    Q.  Okay.  So I'll try to go with your lingo.
8    A.  Okay.
9    Q.  And -- and so if -- if there -- whatever
10  proceedings there are in the -- in the military court,
11  the interpreter is required to interpret them.
12        And is the -- is the interpreter sworn to
13  interpret to the best or his or her ability?
14    A.  I don't remember if they're sworn.  I don't
15  think -- there is no swearing in general.  They're --
16  they're --
17    Q.  Affirming?
18    A.  -- affirming.
19    Q.  Yeah.
20    A.  Yeah.  I don't -- I don't recall seeing
21  a interpreter sworn in a case.  They might be sworn
22  in general -- I don't know -- or affirmed.
23        But in any event, they are supposed to
24  interpret to Hebrew Arabic and to Arabic Hebrew.
25  And as -- as mentioned in the -- in my report, in

Page 87

1  the Yesh Din report, those interpreters are not
2  professional interpreters.  They are young Druze
3  or Bedouins whose only quality for interpretation
4  is that they are native Arabic speakers.
5    Q.  Do you -- do you have any statistics on
6  how frequently the -- the interpreters are objected
7  to in the military courts?
8    A.  No, I do not.
9    Q.  Do you know whether, in any of our 21 cases,
10  the interpreter --
11    A.  I haven't --
12    Q.  -- was objected to?
13    A.  I haven't seen any objection in those 21
14  cases.
15    Q.  So coming back to the charge sheet, do we
16  agree that the Military Order 378 provides the accused
17  with a right to have the charge sheet read out?
18    A.  Can you point me to the article?
19    Q.  I was afraid you were going to say that.
20    A.  No, because I want to be very accurate --
21    Q.  Yeah, yeah.
22    A.  -- if it's the right to be read out or to
23  be handed.
24    Q.  Yeah.  Let's -- let's see if I can find it.
25  It appears -- it appears in my version of 21(b) like

Page 88

1  "bravo."
2    A.  21(b).  Yeah, you are right.
3    Q.  Okay.
4    A.  It says that the court will read out the
5  charge sheet.
6    Q.  And -- and when you say it's the practice
7  not to do that, you understand that that's a strategic
8  decision or a -- trial judgment that the counsel
9  are making or that the witness -- that the accused
10  is making; right?
11    A.  Okay.  My answer to you on this is the
12  following.  Being a defense attorney in the military
13  courts, you get accustomed -- you're -- you're joining
14  a culture in which there are many practices that deviate
15  from the letter of the law, like this one.  And it
16  is exactly the kind of failures that -- to uphold due
17  process rights to their letter that it was me -- I was
18  very much afraid to get accustomed to.
19        Yes, you're right, a defense attorney should
20  object to the idea that a judge would not read out the
21  charge sheet and instead let him, definitely if he is
22  not a master in Hebrew, interpret the charge sheet to
23  the defendant.  Yes, in most cases, the defense
24  attorneys cooperate with that practice.
25    Q.  So when you were with Avigdor Feldman, did

Page 89

1    he object to the -- or did he insist on the reading
2    out of the charge sheet?
3        A.  I don't recall that he did.
4        Q.  And you would agree with me that -- I can't
5    remember the exact -- you -- you made some critical
6    comment about being corrupted by the system or something
7    like that.
8            You would agree with me he's not such a
9    person; right?
10        A.  I agree that he's not.
11        Q.  Thank you.
12            Now, the court is required, before accepting
13    a guilty plea, to be satisfied the accused fully
14    understands the nature of the charge brought against
15    him and the implications of his admission of guilt;
16    correct?
17        A.  Again, which -- yeah, I -- it sounds like
18    what is said in the order.
19        Q.  Every person tried in the military courts
20    is entitled to be present during the whole trial,
21    so long as he conducts himself properly; correct?
22        A.  Correct.
23        Q.  I think we spoke about this earlier.  And I --
24    I didn't see it in 378.  But as I understand -- well,
25    let me ask you this.

Page 90

1            378 was re-codified as Military Order 1651
2    at some point; is that right?
3        A.  Correct.
4        Q.  And so was -- was 1651 revolutionary, or
5    was it simply a collection of orders that had been
6    in scattered places before?
7        A.  I have not made comparisons between 1658
8    [sic] and 378.  It is supposed not to be revolutionary.
9    It is supposed to be a reorganization of the -- of
10    the order.
11        Q.  Before I -- before I leave the reading out --
12    or I may have already left it, but let me come back
13    to it.
14            Do you know what the practice of reading
15    out of the charge sheet is in the civilian courts?
16        A.  It's the same.
17        Q.  Thank you.
18        A.  Can I add something?
19        Q.  Of course.
20        A.  In -- in the civilian courts, most, if not
21    all -- almost all accuseds read, write, and talk Hebrew,
22    and they get a charge sheet in Hebrew.
23        Q.  Are there -- and I'm just curious more than
24    anything, because I don't know.
25            There's a significant population of ethnic

Page 91

1    Arabs in -- who live in Israel; right?
2        A.  Yeah.
3        Q.  And they're -- they're educated in Arab
4    schools; right?
5        A.  In Hebrew.
6        Q.  And they're educated in Hebrew, so they all
7    speak and read and write Hebrew?
8        A.  Absolutely.
9        Q.  That was what I was curious about.
10            And the -- the same is true of Bedouins?
11        A.  Those who go to school.  This is a very big
12    problem in -- in Israel --
13        Q.  Uh-huh.  Now, I noticed --
14        A.  -- having schools for Bedouins.
15        Q.  I noticed, going around the countryside here,
16    that today there are many workers from foreign lands.
17            Have you noticed that as well?
18        A.  I have.
19        Q.  People from China?
20        A.  I have.
21        Q.  People from Thailand; is that right?
22        A.  Yes.
23        Q.  Do those people -- people speak and read
24    Hebrew?
25        A.  No.

Page 92

1        Q.  And --
2        A.  Well, most of them don't, I guess.
3        Q.  Many of them do not?  I mean, I'm -- just
4    in your experience?
5        A.  Yeah.
6        Q.  You obviously haven't done a study or
7    anything.
8            And then I noticed that going around the
9    streets of Tel Aviv -- you live in Tel Aviv?
10        A.  I do.
11        Q.  And have you noticed that, in recent years,
12    there's been an influx of refugees from Africa?
13        A.  Yeah.
14        Q.  And those are people who are not Jewish;
15    right?
16        A.  I guess they're not.
17        Q.  They're from Darfur and other places where
18    there --
19        A.  Sudan.
20        Q.  -- where there are war-torn regions?
21        A.  Yeah.
22        Q.  And Israel has taken them in?
23        A.  Israel has taken them in -- in is a very
24    bizarre way of --
25        Q.  They've come from --

Page 93

1    A. -- describing the way Israel tried to not
2  allow them in. But --
3    Q. They're --
4    A. -- nevertheless, they're here.
5    Q. They're here.
6       And do they speak, read, and write Hebrew?
7    A. Not as a Hebrew native speaker, absolutely
8  not.
9    Q. And -- and has -- I've heard -- I don't know
10 whether it's true. But I've heard that there's been
11 an increase in street crime among people who are not
12 native Israelis.
13   A. There are disagreements about the statistics.
14   Q. Some say yes, some say no?
15   A. There are statistics that suggest that the
16 rate of crime among asylum seekers is lower, actually,
17 than among permanent citizens.
18   Q. Do -- do you have any experience defending
19 non-native Hebrew speakers in Israel?
20   A. No, I don't.
21   Q. I'm going to ask you some questions. You
22 should feel free to flip through 378 in front of you.
23 But I'll tell you that they're not in there. So this --
24 these are questions that you're going to have to answer
25 from your brain.

Page 94

1    A. Okay.
2    Q. As I understand it, there is a right to
3  a re-trial if a piece of evidence is fundamentally
4  based on a lie or forgery?
5       Have you heard that?
6    A. Again?
7    Q. Sure. Why don't we take it bigger, and
8  then we'll bring it smaller.
9    A. Okay.
10   Q. There is ability to gain a re-trial in the
11 military court system; right?
12   A. Yes.
13   Q. And what are -- what do you understand the
14 bases for re-trial to be?
15      You mentioned miscarriage of justice as one?
16   A. Yeah. I mean, miscarriage of justice is
17 the -- is the presiding principle. Now, it can be
18 in the form of a central piece of evidence revealed
19 to be force. It may be other grounds. I'm not --
20 you know, I don't remember by heart what are the
21 grounds.
22   Q. New evidence would be one; right?
23   A. New evidence that have the potential of
24 overturning the judgment.
25   Q. That's true not only in the civilian courts

Page 95

1  but also in the military courts?
2       I think my question was military courts,
3  but --
4    A. I --
5    Q. -- just to make sure.
6    A. I'm not -- you know, I'm not familiar with
7  the exact governing principles of re-trial in the
8  military courts. I guess and I would expect it to
9  be pretty similar to those in the civilian courts.
10   Q. Now, there is an -- a provision in Military
11 Order 1651, which I don't have a paper copy of, but
12 we could look it up if you disagree -- but I think
13 you'll agree -- which provides words to the effect of:
14 In matters of adjudication, there is no authority over
15 one authorized to adjudicate apart from the authority
16 of the law and the security legislation.
17      Do you agree with that?
18   A. I agree that this is an article in -- in
19 Order 1651.
20   Q. And would you agree that the High Court
21 of Justice -- was the -- was the Marabi case, that
22 was a High Court of Justice case?
23   A. If you -- there are several Marabi -- if you
24 mean the -- the one that deals with the separation fence
25 in the Alfie Menashe area, the one that I've litigated,

Page 96

1  then yes. Or do you mean Mar'ab, which dealt -- Mar'ab,
2  which dealt with the -- with the period of detention
3  without judicial review in the military court system?
4    Q. That's the one I'm thinking of.
5    A. It was in the High Court.
6    Q. And in -- in that case, the court reiterated
7  that judicial officers in the military court must be
8  independent of the investigators and prosecutors, free
9  of bias, and authorized to release a detainee; is that
10 right?
11   A. I don't recall the exact words. But I agree
12 that that was the -- one of the things that was said
13 in -- in the judgment.
14   Q. Now, is it a -- is it a -- is there a basic
15 right to due process under the law of Israel?
16      I -- I may have said that in a way that was
17 not so good. But try it and, if you need me to restate
18 it, I will.
19   A. Israel does not have a bill of rights or
20 a constitution. It has a partial constitution made
21 up of basic laws. However, the Israeli High Court
22 of Justice and the Israeli Supreme Court have evolved
23 during the years and generated case law that provides
24 for basic rights. And, yeah, a fair trial and due
25 process rights are considered to be human rights in

1    Israel, in Israeli law.
2        Q.   And so if, during the course of a trial,
3    you feel that your client is not receiving due process,
4    are you -- do you have the opportunity to bring that
5    to the attention of the court while it's happening?
6        A.   Sure.
7        Q.   And does the court have an opportunity --
8    does the court have an obligation to listen to you
9    and evaluate whether or not it is, in fact, providing
10   adequate process?
11       A.   Yes.
12       Q.   And then having raised such an issue, if the
13   court rules against you, do you have the opportunity
14   to appeal that issue to a higher court?
15       A.   In criminal cases, there is no appeal in
16   term appeal, only appeal on judgment. In very rare
17   cases, as I mentioned before, it is possible to file
18   a High Court petition against the court.
19       Q.   Even without interlocutory appeal, certainly
20   at the end of the proceedings, you would have a right
21   to appeal your due process claims; right?
22       A.   Right.
23       Q.   And then, is that true not only in the
24   civilian courts but also in the military courts we've
25   been discussing?

1        A.   In general, yes.
2        Q.   And it's also true that, in the military
3    courts, the attorney has a right to object on the
4    grounds that the accused's due process rights are
5    not being upheld; correct?
6        A.   It may raise the issue before the court.
7        Q.   And the -- and the trial judges have an
8    obligation to consider that claim on the merits; right?
9        A.   They have an obligation.
10       Q.   And then, following appeal to the Military
11   Court of Appeals, if the Military Court of Appeals
12   rejects the due process claim, is there a further
13   right of direct appeal to the Supreme Court of Israel?
14       A.   No.
15       Q.   So the -- the only way to -- well, is there --
16   is there another way to raise that issue to the Supreme
17   Court of Israel at that time?
18       A.   One can file a petition to the High Court
19   of Justice against the Court of Appeals.
20       Q.   And that's called a Bagatz?
21       A.   That's it.
22       Q.   And what -- what are the procedural obstacles
23   to filing a Bagatz to the Military Court of Appeals?
24       A.   Procedural obstacles?  There is a court fee.
25       Q.   How much is the court fee?

1        A.   About 2,000 shekels.  Actually, for detainees
2    it's much less.
3        Q.   How much is it for detainees?
4        A.   Much, much less.  I think 100 shekels.
5        Q.   That's about $25?
6        A.   Yes.  There are -- there are no major
7    procedural obstacles.
8        Q.   Now, do you believe that -- well, have you
9    raised -- let me ask you this.
10           Have you raised due process concerns in
11   criminal cases that you've been involved with?
12       A.   Constantly.
13       Q.   And has -- when you were with Mr. Feldman,
14   did he do that as well?
15       A.   Constantly.
16       Q.   And did you believe that the judges who were
17   considering those due process claims had sufficient
18   objectivity to be able to rule on them?
19       A.   Sometimes yes and sometimes less.
20           The problems begin with interpreters who stop
21   interpreting.  And then you object to the continuation
22   of the hearing without instructing the interpreter to
23   keep on interpreting.  And then he does.  And then he
24   stops again.  It's with not allowing family members
25   to enter the courtroom, and then you object to that.

1        Look, you have to understand that, in this
2    system, you have to choose your battles.  You cannot
3    raise an objection for every due process problem.  The
4    only option is not to engage in that system.  And that
5    is what I've done since 2006.  It's impossible and
6    improbable to raise all the due process concerns that
7    you have if you are genuinely interested in providing
8    your client with due process.
9        Q.   Do you think Mr. Feldman is genuinely
10   interested in providing his clients with due process?
11       A.   I think Mr. Feldman, like many other attorneys
12   that operate in the military courts, is trying to do
13   the best for their client.  And I, by not going to the
14   military courts, have -- have done what is best for me.
15       Q.   I'm sorry.  I just want to look at my question
16   again.  (Examining.)
17           Would you like a break?
18       A.   No.
19       Q.   Okay.
20       A.   I'm fine.  I'm fired up.
21           (Brief discussion held off the record.)
22       Q.   BY MR. YALOWITZ:  Do you -- do you think that
23   Mr. Feldman is genuinely concerned about the due process
24   rights of his clients?
25       A.   I have no doubt, and I know that he does.

1    Q.   To the best of your knowledge, he continues
2  to participate in the military court system; is that
3  correct?
4    A.   At a very, very small scale, yes.
5    Q.   That would be a "yes"?
6    A.   That would be on a very, very small scale,
7  yes.
8    Q.   All right.  You agree with me that, in the
9  military courts, at the close of the prosecution's case,
10 if there's insufficient evidence, the judge -- judges
11 must acquit?
12   A.   Yes.
13   Q.   Have you found that, in the military courts,
14 in your experience, defendants have inadequate time
15 to prepare their cases?
16   A.   I found that, in military courts, defendants
17 have inadequate time with their counsels to prepare
18 a defense.  Most counsels, at the relevant time frame,
19 or many of the counsels were Palestinians from the
20 West Bank, who were not able to enter the sovereign
21 area of the State of Israel where most of the detainees
22 were held.
23   Q.   Does the -- does the counsel have a right to
24 ask for an adjournment if he or she has had inadequate
25 time to prepare a defense?

1    A.   They have a right to ask whatever they want.
2    Q.   And -- and does the court have an obligation
3  to provide them with an adjournment if they say that
4  they've had inadequate time with their client to provide
5  a -- to prepare a defense?
6    A.   The judges are supposed to allow enough time
7  for preparing a defense.
8    Q.   If the trial is unduly delayed, does the
9  defendant have the right to request a release?
10   A.   They have a right to request.
11   Q.   And if the trial is unduly delayed, does
12 the court have an obligation to provide a release?
13   A.   No.  But the court has an obligation to
14 examine their request and balance between the rights
15 of the -- of the defendant to be presump -- to be
16 seen as innocent and, thus, his liberty to be upheld,
17 and the security considerations and so on.
18        I don't have statistics.  But from my
19 experience and from my understanding of the subject
20 matter, I don't recall even one case where a detainee
21 was released because of the prolongation of the --
22 of the hearings in terror cases.
23   Q.   Do you think that's wrong?
24   A.   The question should be asked on a case-by-case
25 basis.

1    Q.   There's a case from the Military Court of
2  Appeals -- which I'm going to mangle the name -- Omer
3  Freed Hassan Acam against military prosecutor.
4        Are you familiar with that case?
5    A.   No.
6    Q.   The case has been translated for me to say
7  that there's a fundamental obligation for prosecutors
8  to provide for the defendant's review all disclosed
9  investigative materials pertaining to his case.
10       Is that a familiar concept to you?
11   A.   It is a familiar concept.  It is not followed
12 by the military prosecution, at least in the time frame
13 that we were dealing with.  As I write in my report,
14 GSS files were not given to the defense unless the
15 defense asks or even demands it.
16   Q.   Do you -- I'm sorry.  Say that -- say the
17 last thing again.
18   A.   The GSS files, interrogation files, are not
19 provided to the defense with the indictment, as they
20 should.  The defense has to ask for it.
21   Q.   How do you know that?
22   A.   From my practice and from the practice of
23 other defense attorneys.
24   Q.   Which ones?
25   A.   I don't remember the names of the defense

1  attorneys that I talked to.  But the -- the defense
2  attorneys that operate in -- in -- in the military
3  courts are -- have been meeting each other in the
4  military court during the time that I was active there.
5  And it was a known practice that you should ask for
6  the GSS file.  Otherwise, you don't get it.
7        Not only that, but once you ask for it, it
8  will take about two months for you to get it because
9  it has to go through a process of declassification.
10 And during that time, your client will be usually
11 in detention.
12   Q.   What's the procedure for requesting the
13 investigative file from the GSS?
14   A.   Well, you send a letter to them.  And if
15 they don't respond, you can file a motion.
16   Q.   Do you -- do you file the letter with the
17 court, or do you just send it to the prosecutor?
18   A.   I send it to the prosecutor.
19   Q.   So -- so -- and if you don't -- if you don't
20 get satisfaction, then you file a motion?
21   A.   That's right.
22   Q.   And -- and what if the -- what -- and --
23 and this was common practice that you learned from
24 your dozen or so cases in the military courts?
25   A.   Yes.

Page 105

1    Q.   And what is the practice with regard to
2  certificates of immunity?
3    A.   What do you mean by "what is the practice"?
4    Q.   So -- so suppose that the -- suppose that
5  the prosecutor comes back to -- is it the prosecutor
6  or the GSS that you send the request to?
7    A.   The prosecutor.
8    Q.   So -- so you'd ask the prosecutor for the
9  GSS files; right?
10    A.   Yeah.
11    Q.   And -- and as you -- I think you testified
12  earlier you've seen many, many GSS files; right?
13    A.   That's right.
14    Q.   And sometimes GSS files contain classified
15  information; right?
16    A.   Right.
17    Q.   And the prosecutor has an obligation, in
18  that case, to withhold certain portions of the files;
19  is that right?
20    A.   Yes.  There is a special unit -- military
21  unit that deals with declassification.
22    Q.   And -- and --
23    A.   Or maybe the GSS.  I'm not sure.
24    Q.   And then are the files redact -- if they
25  contain information that would compromise security

Page 106

1  if they're released, are they redacted before they're
2  released?
3    A.   Yes.
4    Q.   And are there other grounds for redaction,
5  like -- like personal information about the -- the
6  accused --
7    A.   No.
8    Q.   -- anything like that, like -- like his
9  salary or --
10    A.   That should be redacted from the defense
11  attorney?  No.
12    Q.   Right.  Okay.  And -- and then is there
13  a procedure for challenging the redactions?
14    A.   The redactions should be accompanied by a
15  immunity certificate.
16    Q.   And is the immunity certificate filed with
17  the court?
18    A.   It should, yes.
19    Q.   It should, but sometimes isn't in practice?
20    A.   In the 21 files that -- that you've supplied
21  us -- that the plaintiffs supplied the defense in this
22  case, I found only one immunity certificate.  And I'm
23  sure that there were immunity certificates in other --
24  others.
25    Q.   So the inference you draw is that the immunity

Page 107

1  certificates simply weren't filed with the courts?
2    A.   Well, if I understand correctly and the files
3  you've supplied us with come from the military court
4  files, then that's my understanding.  Yes.
5    Q.   And then if the -- what is the prosecution's
6  duty if the redacted portions contain exculpatory
7  information?
8    A.   The prosecution is not supposed to -- I mean,
9  it's not the prosecution.  It's the military commander
10  who signs a immunity certificate.  And I'm not sure
11  that they are -- that he is under any obligation to
12  review for -- for evidence that may help the accused.
13  It is the duty of the Military Court of Appeals, when a
14  motion is filed, to cancel or narrow down the immunity.
15    Q.   So do I have it right that defendants in
16  the military courts are entitled to all exculpatory
17  evidence, even exculpatory evidence found in GSS files?
18    A.   They are.  Well --
19    Q.   And then --
20        MR. HILL:  Hold on.
21        THE WITNESS:  They -- they're --
22        MR. HILL:  Let him finish his question.
23        THE WITNESS:  Okay.
24    Q.   BY MR. YALOWITZ:  You go ahead.  But I --
25  you -- you --

Page 108

1    A.   No, you understand.
2    Q.   No, no.  I insist.  You go ahead.
3    A.   They -- they are entitled to either get all
4  the --
5    Q.   Exculpatory evidence.
6    A.   -- exculpatory evidence or that the indictment
7  will be canceled if they don't get it.
8    Q.   That was what I was going to ask.
9        Now, counsel has the right and obligation
10  to make legal arguments to the court in the military
11  courts of justice; is that right?
12    A.   In the military courts, yes.
13    Q.   And the -- and the court has the obligation
14  and right to consider those arguments in good faith;
15  right?
16    A.   Right.
17    Q.   I think you told me earlier that the -- the
18  basic -- we talked about the basic law.
19        There is now a -- something called the basic
20  law of human dignity and liberty?
21    A.   Right.
22    Q.   When -- when was that adopted?
23    A.   1992.
24    Q.   And that applies to all authorities; right?
25    A.   Right.

Page 109

```
1        Q.  That applies to military courts?
2        A.  It does.
3        Q.  And did you have an opportunity to read the
4   report of Daniel Reisner?
5        A.  I have.
6        Q.  Do you know Mr. Reisner?
7        A.  Very well.
8        Q.  Do you work with him?
9        A.  I worked in some cases where he was the
10  attorney for the -- for the Army.
11       Q.  Did you find him to be a competent and
12  professional adversary?
13       A.  You want me to pass judgment on a colleague?
14           I think Mr. Reisner is a very knowledgeable
15  attorney.  I think that his views on legal matters of
16  international humanitarian law are not acceptable.
17  I think that he has, in many cases, made arguments
18  that are completely -- or he didn't make the cases.
19  He -- he was behind the scenes.  But he tailored
20  the legal justification for some practices in a --
21  in a fashion that is not in -- in conformity with
22  international humanitarian law.  We -- we see things
23  differently.
24       Q.  Fair enough.  I -- I think that's --
25       A.  But I like him.
```

Page 110

```
1        Q.  That's not uncommon among lawyers that they
2   see things differently but still respect each other.
3            Is that your situation with Reisner?
4        A.  Yeah.
5        Q.  He mentioned in his report -- did I ask you
6   if you read his report?
7        A.  Yes.
8        Q.  And you did?
9        A.  I did.
10       Q.  And he -- he mentioned that -- that the
11  de minimis doctrine applies in the military courts.
12           Do you agree with that?
13       A.  I don't.  Mr. Reisner has made a report that
14  is based on the law and case law.  That is a -- that
15  is a work that can be done by students and has nothing
16  to do with practice.
17       Q.  Let me ask the question again.  Well, let me
18  ask it a little differently, then, because I -- I don't
19  want to -- I really don't want to debate with you about
20  Mr. Reisner's report.
21       A.  Okay.
22       Q.  There's a -- there's a doctrine called the
23  de minimis doctrine.
24           Do you know what that is?
25       A.  I do.
```

Page 111

```
1        Q.  What is it?
2        A.  It's a doctrine which states that if -- that,
3   for certain very minor issues, the court would not deal
4   with, and so it will cancel or acquit defendants.
5        Q.  That applies in the military courts?
6        A.  I read for the first time, in Reisner's
7   report, that there was such a judgment.
8            Since judgments of the military courts are
9   not disseminated, I couldn't check it.  And since we
10  didn't get -- I didn't get -- I asked for the -- for
11  the judgments to be supplied, because there is no way
12  for me to get these judgments.  They were not cited
13  with any publication that I can go to a library and --
14  and look for it.  So I did not have the opportunity
15  to go through, so I cannot -- I cannot say.
16       Q.  Did you try?
17       A.  How?
18       Q.  Did you go to a library?  Did you go to the --
19       A.  No.  The military courts' cases -- military
20  courts' cases of first instance are not published.
21  Military court cases of the Court of Appeals, only
22  a selection of them is being published.  And since
23  Mr. Reisner, in his report, did not cite publication --
24  the publication, I didn't try to -- to look for them.
25  I asked for them to be handed over.  And until
```

Page 112

```
1   yesterday, I didn't get it.  So it might --
2        Q.  You mean until today, even sitting here today,
3   you haven't seen it?
4        A.  No, I haven't seen it.
5        Q.  I just wanted to make that clear, because
6   you said "until yesterday."
7        A.  No, no, no.
8        Q.  But you haven't actually seen it?
9        A.  No, no, I haven't seen it.
10       Q.  Okay.  It must be an idiom.
11       A.  Yeah.
12       Q.  All right.  Abusive process, that's a defense
13  that applies in the military courts as well; is that
14  right?
15       A.  I understand -- I know that it is.
16       Q.  And there's a -- a rule that mentally unfit
17  defendants may not be held criminally liable in the
18  military courts; is that right?
19       A.  I believe that this is -- this applies in
20  the military courts.
21       Q.  I -- I think we've established this, but
22  just so I'm 100 percent sure, there is a right to
23  appeal every final judgment in the military courts?
24       A.  Yes.
25       Q.  And if -- if a defendant pleads guilty and
```

Page 113

1    is unhappy with the sentence that's handed down, the
2    defendant can appeal just the sentence; is that right?
3        A.   That's right.
4        Q.   And the defendant can agree on certain
5    facts and -- and argue that, even though the facts
6    are stipulated, for -- for various legal reasons,
7    he should be acquitted; right?
8        A.   Right.
9        Q.   And -- and can the defendant plead guilty
10   and then appeal on the basis of some agreed issue
11   that has been resolved adverse to him?
12       A.   Sorry.  Can you repeat that?
13       Q.   Sure.  I mean, sometimes situations arise
14   where -- where there's a -- oh, I don't know -- a
15   very important piece of evidence that -- that the
16   witness asks be suppressed, for example, a post-arrest
17   statement --
18       A.   Uh-huh.
19       Q.   -- right?
20       A.   Right.
21       Q.   So in -- I don't -- I'm not sure we touched
22   on this.  But if -- if -- I think we did -- that the
23   defendant has a right to a supression hearing to have
24   the court evaluate whether his post-arrest statements
25   were coerced; right?

Page 114

1        A.   Right.
2        Q.   And if -- if the court concludes, based on
3    the evidence, that the post-arrest statements were
4    coerced, those are going to be excluded; right?
5        A.   That's -- that's how it's supposed to happen.
6        Q.   And -- and then it happens, from time to time,
7    both in the military courts and in the civilian courts,
8    that post-arrest statements are not suppressed despite
9    the defendant's argument to the contrary; right?
10       A.   That they're not suppressed, right.
11       Q.   And so are there cases where the -- the
12   defendant pleads guilty following the denial of a
13   request to suppress evidence, while preserving the
14   right to appeal on the ground that the evidence
15   should have been suppressed?
16       A.   I actually must say that I've never
17   encountered such a thing.
18       Q.   If the evidence --
19       A.   Pleads guilty and -- and retain the --
20   possibility of appealing against -- I -- I honestly
21   don't think that this is something we have ever
22   encountered.
23       Q.   We do that.
24       A.   Yeah.  Well --
25       Q.   But we have juries too.

Page 115

1        A.   Yeah.  So it's different.
2        Q.   Very different; right?  You don't have any
3    juries here in Israel; right?
4        A.   No.
5        Q.   What do you think of the jury system?
6        A.   I know very little about the jury system.
7    But we do have lay judges in -- in the Israeli system,
8    both in military courts that try judges -- sorry --
9    try soldiers, in employment tribunals.  And in the past,
10   in the military courts there were lay judges.  So --
11   and -- and lay judges are a remnant of juries of your
12   peers.
13       Q.   Uh-huh.
14       A.   But -- but lay judges in the military courts
15   is not the same because the equivalent would have been
16   a Palestinian on the military bench.
17       Q.   So -- so there's been some back-and-forth
18   in some of the expert reports about exactly when lay
19   judges were eliminated in military courts that tried
20   security offenses.
21            Do you -- do you have an opinion on when
22   that practice ended?
23       A.   The law changed in 2004.  The practice was
24   changed between 2002 and 2004 gradually.
25       Q.   And --

Page 116

1        A.   If the --
2        Q.   And if I have it right -- I'm sorry.  I
3    didn't mean to interrupt.  Please continue.
4        A.   I don't know when was the last time that
5    a lay judge was sitting in the military courts between
6    2002 and 2004.
7        Q.   It's a pretty narrow window?
8        A.   Yeah.
9        Q.   All right.  Now -- and do I have it right
10   that lay judges continue to sit in the military courts
11   that try soldiers?
12       A.   Yes.  But they are sold -- they are also
13   soldiers -- officers and -- that represent the idea
14   of being tried by your peers.
15       Q.   Do -- do you think that it's appropriate to --
16   well, let me strike the question.
17            Do you think the ethnicity of the lay judges
18   matters?
19       A.   I think the question of whether a lay judge
20   is an officer or a civilian in a court that tries
21   civilians is of matter.
22       Q.   Well, what about the -- I think you mentioned
23   labor courts or employment courts --
24       A.   Yes.
25       Q.   -- where there are lay judges?

1    A.  Yeah.
2    Q.  Does the ethnicity of those judges matter?
3    A.  Again, in employment court, it's not ethnicity
4  but rather being a -- a representative of employees
5  or employers.
6    Q.  Uh-huh.  So -- so unions appoint some of
7  these judges and management appoints some judges?
8    A.  Right.
9    Q.  I see.  And then are -- well, I'll ask you
10  at a break.  Sometimes I just get curious.
11    A.  I -- I --
12    Q.  We did that.
13      Let me ask you about scrutiny of GSS
14  investigations post PCATI.
15    A.  Right.
16    Q.  What -- what are the mechanisms of -- what
17  are the official mechanisms within the State of Israel
18  for scrutiny of such investigations?
19    A.  The GSS has an internal fonctionnaire whose
20  role is to consider allegations made by -- by suspects
21  who were interrogated by GSS investigators.  It was the
22  contention of the human rights community in Israel that
23  this is inappropriate that -- that this is an internal
24  affair and that this role must be handed over to an
25  external person that is not a member of the GSS.

1      As I wrote in my report, the numbers --
2  the figures show that this comptroller -- internal
3  comptroller has audited some 700 cases and found no
4  reason to launch a criminal investigation against --
5  in any of the cases.
6    Q.  This -- this is an internal GSS -- like
7  an inspector general type?
8    A.  I don't know what "inspector general" is.
9  But if --
10    Q.  I was going to ask you if you knew what
11  that was.
12    A.  No.  But what I'll say is the following.
13      A criminal investigation would not open
14  against a GS -- a member of the GSS unless this --
15  this position, this guy, will first review the
16  allegations.  And only if he thinks, or she, that
17  the allegations have merits, only then it will be
18  passed on to the civilian authorities in order to
19  launch an investigation.  This has not happened.
20    Q.  Now, what is the -- what is the reporting
21  mechanism from the government of Israel to the U.N.
22  Committee Against Torture?
23    A.  There is a periodic report.
24    Q.  And who -- who's responsible for preparing
25  that report?  Is it the same GSS invest -- inspector?

1    A.  No.  It's the Ministry of Justice.
2    Q.  And how does the Ministry of Justice get
3  the information about the number of times in which
4  allegations of torture, cruel, inhuman, or degrading
5  treatment occurs?
6    A.  I don't know.
7    Q.  In addition to the GSS inspector, is there
8  a civilian oversight board of some kind?
9    A.  The -- the Israeli Parliament, the Knesset,
10  has a committee that is supposed to preside over --
11  a committee of security and -- and foreign affairs.
12  And they have a -- a subcommittee that deals with --
13  with intelligence agencies.  But they do not review
14  allegations or -- or specific cases.  They're --
15  they're -- this is the Parliament overseeing the
16  Executive.
17    Q.  Do -- do they have a staff, that -- that
18  Knesset committee?
19    A.  Do they have a staff?
20    Q.  Yeah.
21    A.  I suppose they do.  I don't know.
22    Q.  Do they have subpoena power?
23    A.  They have subpoena power, but it can be
24  suppressed by the minister.  So the minister can
25  appear instead of the civil servants if -- if --

1  if they so wish.
2    Q.  The -- the minister in charge?
3    A.  In -- in charge.  In -- in this case, the --
4  the Prime Minister.
5    Q.  So -- so I'm not sure I follow it.  But --
6    A.  If -- if -- sorry.  Go on.
7    Q.  Can you explain?
8    A.  Look, I haven't examined this because I
9  wasn't aware you're going to ask me this question.
10  So I can check this and be sure.
11      But from what I remember, Knesset committees
12  may subpoena civil servants to appear before them and
13  answer questions.  The minister of the governmental
14  office, where this civil servant serves, may decide
15  that he will appear instead of --
16    Q.  I see.
17    A.  -- the civil servant.
18    Q.  But somebody has to appear and --
19    A.  Yeah.
20    Q.  -- explain?
21      All right.  Now, and -- and, by the way,
22  it's not a -- if you don't know something, it's --
23  you're doing very well.  You're -- you're --
24    A.  Thank you.
25    Q.  You shouldn't feel like I'm -- I'm not trying

Page 121

1    to embarrass you or anything like that.  All right.
2        The -- to your knowledge, besides the GSS
3    inspector, the Knesset committee we've just described,
4    and the report to the U.N. committee, are there other
5    official mechanisms within the government of Israel
6    that deal with allegations of torture, cruel, inhuman,
7    or degrading treatment?
8        A.  There is the High Court of Justice.
9        Q.  And -- and does the High Court of Justice --
10   it means there was just that one famous case, or do --
11   do these issues come up from time to time?
12       A.  The issues come up very rarely.  And they
13   come in the form of reviewing whether the oversight
14   mechanisms are -- are effective or not.  I think the
15   main oversight over GSS investigations can only be
16   the criminal trials in which the statements taken
17   from the suspects in the GSS investigations are being
18   admitted into trial.  This is one of the -- one of
19   the most important roles of a court of law.
20       Q.  May -- may I just interrupt you?  Because I
21   want to make sure that I understand.  And I apologize.
22       A.  No problem.
23       Q.  But are you -- are you describing criminal
24   trials in which -- in which the accused or witnesses
25   assert that their statements were coerced and the

Page 122

1    court has to examine the facts and circumstances
2    about the allegations of coercion?
3        A.  I'm saying, in these circumstances, a
4    court should investigate fully what happened.  And
5    I think that that should have been -- and it's not
6    unfortunately -- should have been the main oversight
7    mechanism over GSS investigations.
8        Q.  And is it -- is it your understanding that
9    the Attorney General has no independent authority
10   to bring a case of a criminal prosecution against
11   an individual member of the security services or the
12   IDF who engages -- well, let me ask the question again,
13   because I want to limit it just to the General Security
14   Service.
15       Is it your understanding that the Attorney
16   General has no independent authority to open or conduct
17   an investigation of a member of the General Security
18   Service that the Attorney General believes engaged in
19   acts of cruel, inhuman, or --
20       A.  Degrading.
21       Q.  -- degrading treatment or torture?
22       A.  No.  I think the Attorney General does have
23   the power to do so.  But the policy is not to launch
24   such investigations before a -- this internal procedure
25   that I've described takes place.

Page 123

1        I have to say that I understand that recently,
2    very recently, indeed this -- this issue of taking the
3    role of internal investigation out of the GSS was one
4    of the recommendations of the Turkel committee.  And
5    I understand that there was now appointed a new, like,
6    controller who is not a GSS employee.  So that's --
7    that's very recent.
8        Q.  So let me make sure I -- I've exhausted the
9    possibilities.  So I'm -- I'm going to summarize and
10   then -- and if I get it wrong, please tell me.  I'm
11   not trying to put words in your mouth.
12       A.  Okay.
13       Q.  But as I understand it, at least at the time
14   period we're talking about, pre-Turkel Commission, we
15   had a GSS inspector, number one; we had reports to the
16   U.N. Committee Against Torture, number two; we had a
17   committee of the Knesset, number three; we have the High
18   Court of Justice, number four; we have individualized
19   criminal trials, number five; and we have, at least in
20   power, the Attorney General, number six.
21       Are there any other official channels by which
22   allegations of cruel, inhuman, degrading treatment or
23   torture can be investigated and brought to light?
24       A.  I agree with your description.  That is not
25   to say that I think that any of those have been, in

Page 124

1    practice, effective.
2        Q.  And I'm -- I understand, you know, you have
3    a perspective about -- it's valuable for society to
4    have a minority view, I think.
5        A.  Minorities many times are -- get it right.
6        Q.  We -- I'm not sure we're -- it's worth our
7    time or -- or it's the appropriate forum to --
8        A.  Yeah.
9        Q.  -- debate on that topic.
10       I -- I just -- what I'm asking is:  Is there
11   any other official channel, or have we exhausted your
12   knowledge of the official channels for these --
13       A.  I don't --
14       Q.  -- complaints?
15       A.  Let's -- let's -- let's, again, be accurate.
16       You've now mentioned the word "complaint."
17       The Knesset committee is not a place where
18   you can file any complaint.  The Attorney General, as
19   I said, has a very clear policy that he will not launch
20   a criminal investigation prior to the -- what you called
21   an inspector -- internal inspector will review the
22   allegation.
23       Basically, the -- the -- the suspect has two
24   channels.  One is the controller or the inspector that
25   he can file a written allegation.  And in his trial, he

Page 125

1    can raise the issue.  These are the two open doors for
2    a -- an -- a suspect that was -- that alleges that he
3    was maltreated in the GSS interrogation.
4        Q.  And the Bagatz?
5        A.  Bagatz is a court in which you can ask for
6    an order.  What -- the order that you can -- this is
7    a judicial review -- administrative judicial review
8    instance.
9        So if one of those -- one of those authorities
10   that I mentioned before does not do their job right, you
11   can go to Bagatz.  But you don't complain to the Bagatz
12   or to the High Court of Justice that you were maltreated
13   in -- in the interrogation.  What order are you seeking?
14       Q.  Okay.  Fair enough.  Thank you for that
15   clarification.
16       And -- and I think we got wrapped around the
17   axle of -- by a bad question which had to do -- in which
18   I used the word "complaint" and I didn't mean to.  But
19   I did use it.  And I think you rightly narrowed your
20   answer based on my question.
21       So now my question is:  Are there -- well,
22   I want to talk now about unofficial, non-governmental
23   institutions that have the ability to investigate and
24   bring to light allegations of cruel, inhuman, degrading
25   treatment or torture.

Page 126

1        So does the -- have such allegations appeared
2    in the popular press?
3        A.  Yes.
4        Q.  And -- and does the press have adequate access
5    to people who feel that they've been treated cruelly,
6    degradingly, inhumanly, or tortured, that they're able
7    to communicate those assertions?
8        A.  If they are not in prison.
9        Q.  And if they are in prison, can they speak
10   to the press?
11       A.  Not freely.
12       Q.  What do you mean?
13       A.  They need the permission of the prison
14   authorities, which is not always given or many times
15   it's not given.
16       Q.  Do you have either a statistical estimate
17   or directional, based on your experience, of how often
18   detainees are permitted to speak to the press?
19       A.  In all the cases that I asked for permission
20   for my client to be interviewed, I was denied.  It was
21   one or two cases -- two or three cases, not more.  So
22   it's not -- it's not representing it.  But --
23       Q.  What about after conviction?
24       A.  I am talking about after conviction.
25       Q.  So -- and do you have a sense -- I mean, I

Page 127

1    understand a sample of three sounds sort of antidotal
2    to me.
3        A.  Just to -- not to -- to make things clear,
4    it was not about torture or degrading treatment.  It
5    was just detainee -- Palestinian detainees that wanted
6    to be interviewed and were not permitted.
7        Q.  Do -- do detainees have the right -- well,
8    do convicted security offenders have the right to visit
9    their family?
10       A.  To have their family --
11       Q.  To have their family come to the prison and
12   see them?
13       A.  Yes.
14       Q.  And do they have the right to be visited by
15   the International Red Cross?
16       A.  Yes.
17       Q.  Are there other non-governmental organizations
18   that come visit with them?
19       A.  Not that I know of.
20       Q.  So -- and do they have the right to speak to
21   their counsel?
22       A.  Absolutely.
23       Q.  And what recourse does a -- if a client --
24   a family came to you and said -- said, you know, we
25   have a family member who was convicted of a security

Page 128

1    crime and his confession was illegally coerced and we'd
2    like to -- we'd like to challenge that, is -- is -- do
3    they have any ability to do that once the trial's been
4    completed?
5        A.  To challenge that legally or publicly?
6        Q.  Either one.
7        A.  Well, publicly, the attorney may -- may
8    himself be interviewed or the family members may be
9    interviewed.  But that's not, you know, the press and,
10   rightly, once -- the account of the person involved,
11   not someone who heard.
12       Q.  Is the press free to report on allegations
13   of torture, cruel, degrading, or inhuman treatment in
14   Israel?
15       A.  Everything that has to do with the GSS must
16   to go through censorship, military censorship.  However,
17   the fact is that these allegations have been made in
18   public, in the press, and the censorship has not
19   censured them.
20       Q.  Okay.  What about the Public Committee Against
21   Torture in Israel, is that -- is that an institution
22   that has the ability to investigate charges of --
23       A.  Okay.  So I -- I was -- I omitted -- when
24   you asked me if there are any other non-governmental
25   organizations, indeed Public Committee Against Torture

Page 129

1   in Israel is sending attorneys to prisoners and -- who
2   get an affidavit from them regarding the way they were
3   treated in custody.
4       Q.   And -- and just to be fair to you, I don't
5   think you missed it.  I don't think I asked it of you
6   yet.
7       A.   Okay.
8       Q.   So --
9       A.   We're fine.
10      Q.   So, in that regard, would -- would you like
11  to -- I'd like to -- I don't want to take a lunch break
12  quite yet.
13      A.   Okay.
14      Q.   But if you'd like to take a short break now,
15  if you're getting tired, I'm -- I'm happy to take a
16  break.  Or I'm happy to continue for another 20, 25
17  minutes.
18      A.   Another 20, 25 minutes is fine.
19      Q.   Okay.
20          MR. HILL:  Well, actually, I would like
21  a break.  We have been on the record for an hour and
22  35 minutes now.
23          MR. YALOWITZ:  Okay.  So let's take a restroom
24  break --
25          THE WITNESS:  Sure.

Page 130

1           MR. YALOWITZ:  -- for the convenience of --
2           THE WITNESS:  Everybody.
3           MR. YALOWITZ:  -- of all involved.
4           (Recess from 12:06 p.m. to 12:18 p.m.)
5           MR. YALOWITZ:  We're back after a short break.
6       Q.   BY MR. YALOWITZ:  Now, we were talking before
7   the break about unofficial, non-government places or
8   institutions or channels, if you will, for complaints
9   about cruel, degrading, inhuman treatment or torture.
10          So -- so if -- if a person in the custody of
11  the GSS has been subjected to such treatment, he or she
12  is allowed to tell his family; right?
13      A.   Allowed to tell the family?
14      Q.   Yes.
15      A.   Yes, they're allowed.
16      Q.   And -- and he or she is allowed to tell his
17  attorney -- right? -- his or her attorney?
18      A.   Yes.
19      Q.   And I think you describe that the press is
20  free to report on allegations of such behavior; right?
21      A.   Right.
22          MR. HILL:  Objection.  Misstates the
23  testimony.
24      Q.   BY MR. YALOWITZ:  Okay.  Well, let me ask
25  you:  Is the press allowed to?

Page 131

1       A.   As I said before, there is censorship.  But
2   as I said, there are from time to time such allegations
3   in the Israeli press.
4       Q.   Thank you.
5           And then we described that attorneys are
6   certainly allowed to be told of such activities; right?
7       A.   Right.
8       Q.   And -- and the attorneys are free to publicize
9   the facts described by the clients; right?
10      A.   Again, publishing issues that have to do with
11  the GSS must go through the Israeli military censorship.
12  Nevertheless, as I said before, such allegations have
13  been made publicly.
14      Q.   Now, then the International Red Cross visits
15  detainees and prisoners; right?
16      A.   Right.
17      Q.   And is the International Red Cross subject
18  to censorship?
19      A.   The International Red Cross never publishes
20  and publicizes any -- any communications that it holds
21  with detainees or with government, State actors.
22      Q.   I see.  Their job is purely humanitarian,
23  to try to solve the problems if they exist?
24      A.   That's right.
25      Q.   Now, we also discussed the Public Committee

Page 132

1   Against Torture in Israel.  That's a non-government
2   institution that works to prevent torture in Israel,
3   I presume, from its name; is that right?
4       A.   That's right.
5       Q.   And does it also work to prevent cruel,
6   degrading, and inhuman treatment, or is that group
7   fine with that particular type of practice?
8       A.   They were formed to monitor violations of
9   the convention against torture, degrading, and inhumane
10  treatment or punishment.
11      Q.   I mean, I don't want to quibble about whether
12  something is, quote, unquote, "torture," as opposed to
13  cruel, degrading, or inhumane.
14      A.   Okay.
15      Q.   You agree with that; right?
16      A.   Well, there is a difference as a matter of
17  law.  But I agree that all -- all types are -- are
18  illegal.
19      Q.   In Israel?
20      A.   In Israel.
21      Q.   And --
22      A.   Well, again --
23      Q.   Subject to the --
24      A.   Subject to the necessity defense.
25      Q.   -- necessity defense?

Page 133

1    I'm sorry.  I interrupted you.  You -- you
2  said --
3       A.  Subject to the necessity defense.
4       Q.  Thank you.
5          Now, in addition to the public committee,
6  is -- has Yesh Din been involved in communications with
7  prisoners or detainees involving potential allegations
8  of cruel, inhuman, degrading treatment or torture?
9       A.  No.
10      Q.  What about B'Tselem?
11      A.  I'm sure B'Tselem had, in the past, reported
12 of such matters.  But it doesn't do it on a regular
13 basis.
14      Q.  And -- and is -- is B'Tselem free to report
15 about these matters?  Or is it the same that -- that
16 they're subject to review, but they've been permitted
17 to report?
18      A.  The same.
19      Q.  Okay.  And is there -- is there sort of like
20 a friendly rivalry among organizations like B'Tselem,
21 Yesh Din, Public Committee --
22      A.  Not all the organizations that you've
23 mentioned deal with the same things.  So I don't
24 think there is a rivalry between some.  There is
25 healthy competition among others.  But many times,

Page 134

1  there are collaborations and fighting petitions
2  together.
3       Q.  So is there both collaboration and healthy
4  competition in the area of -- of reporting on and
5  working to prevent cruel, degrading, inhuman treatment
6  and torture?
7       MR. HILL:  Objection.  Vague.
8       THE WITNESS:  Between --
9       MR. HILL:  But he can respond.
10      THE WITNESS:  Between whom?
11      Q.  BY MR. YALOWITZ:  Amongst non-governmental
12 organizations like B'Tselem, Yesh Din, the Public
13 Committee Against Torture in Israel.
14      A.  As I said, Yesh Din doesn't deal with this
15 matter.  And regarding the others, I haven't been
16 involved in their work in the last few years.  So
17 I wouldn't know.
18      Q.  Have -- have we now spoken about all of the
19 non-governmental channels that you're aware of in which
20 allegations of cruel, degrading, or inhuman treatment
21 or torture can be raised?
22      A.  I -- I think so.
23      Q.  Okay.  Now, I want to come back and ask you
24 about -- about reporting of military court decisions.
25      A.  Yeah.

Page 135

1       Q.  So are you familiar with a service called
2  Nevo?
3       A.  Yes.
4       Q.  What is Nevo?
5       A.  It's a legal -- it's a legal database.
6       Q.  And have you checked it for military court
7  decisions?
8       A.  In the time frame we're dealing with, there
9  were no military court decisions on Nevo.  Maybe
10 several -- and it's subject to -- to a fee, of course.
11      Q.  So when did military court decisions come
12 online at Nevo?
13      A.  I am -- I don't know if ever on Nevo --
14 military court decisions systematically were uploaded
15 to Nevo.  And I don't know when it started.
16      Q.  Do you -- do you know an individual named
17 Aaron Mishnael?
18      A.  I certainly do.
19      Q.  And did he serve for a period of time in the
20 Military Court of Appeals?
21      A.  Yes.  Not in the time frame relevant to my
22 report.
23      Q.  Do you know when he joined that court?
24      A.  Several years ago.
25      Q.  Do you know how many of his opinions are on

Page 136

1  Nevo?
2       A.  Today?  No.
3       Q.  If -- if it were represented to me that there
4  are 700 such decisions authored by Judge Mishnael, would
5  that sound reasonable to you, on Nevo?
6       A.  I will have to check that.  But I know that
7  Judge Nevo [sic] has also served for many years as a
8  judge in the military court for soldiers.  And I -- and
9  it has to be made clear that these are judgments in the
10 West Bank court, not in Israel proper.  But I will have
11 to check that.
12      Q.  Okay.  I think you meant Judge Mishnael.  I
13 think you said Judge Nevo, but that was just a --
14      A.  So no.
15      Q.  That was just a -- that was just a --
16      A.  Judge Mishnael definitely.
17      Q.  Okay.  And I -- I didn't say that to embarrass
18 you.  I just said it so that it would be clear for our
19 transcript.
20      A.  That's clear.
21      Q.  Okay.  Now -- oh, I also wanted to ask you
22 about administrative detention because I just want to
23 make sure we're together on this.
24          Are you aware that administrative detention
25 is a law enforcement tool that is used in Israel against

1  civilians?

2      A.  Extremely rarely.  There is a -- there is

3  a power to do so.  And I would say that the last time

4  it was used -- I might be wrong -- was after the Rabin

5  assassination.

6      Q.  So are you familiar with an individual named

7  Noam Federman?

8      A.  Yes.

9      Q.  When was Mr. Federman detained?

10      A.  2007 or so.

11      Q.  And -- and are you familiar with the decisions

12  of the District Court in Jerusalem that addressed the

13  propriety of his detention?

14      A.  I didn't -- I didn't read it.  But I was

15  under the impression that he was -- that he was

16  administratively detained according to the laws of

17  the West Bank rather than the laws of Israel.  But I --

18  again, I might be wrong.  If you show me the judgment,

19  the ruling, I will address it.

20      Q.  I may come back to you on that.

21      A.  Okay.

22      Q.  But I don't have it just right in front of

23  me or I would.

24      A.  But, nevertheless, the -- the -- the use of --

25  wait.

1      Did you say that Noam Federman was

2  administratively detained?

3      Q.  That's -- that's my question to you.

4      A.  I think he was not.

5      Q.  Okay.

6      A.  Okay.

7      Q.  Do you --

8      A.  So there was no administrative detention

9  order against -- issued against Mr. Federman.

10      Q.  As far as you're aware?

11      A.  There was an administrative restriction

12  order issued against him, not detention.  As far as

13  I remember, the last time administrative detention in

14  Israel took place was in 1995.

15      Q.  And what -- what -- what do you know about

16  Noam Federman?  What kind of an individual is he?  Why

17  would -- why would he be administratively restricted

18  or detained?

19      MR. HILL:  Objection.  Compound.

20      But the witness can answer.

21      MR. YALOWITZ:  Do you want me to say it again?

22  It was a lot of questions.

23      MR. HILL:  No, no.  It was just several at

24  once.

25      The witness can respond.

1      MR. YALOWITZ:  Okay.

2      THE WITNESS:  Noam Federman is a resident of

3  Kiryat Arba, I think, a settlement near -- near Hebron.

4  He's a member -- he was a member of the party Kach,

5  which was Meir Kahane's party that later on was

6  pronounced illegal.  And he's a right-wing extremist.

7      Q.  BY MR. YALOWITZ:  He's a right-wing extremist?

8      A.  Yeah.

9      Q.  So in your judgment, would it be appropriate

10  for the State of Israel to restrict or detain such an

11  individual?

12      A.  Administratively?

13      Q.  Yes.

14      A.  No.

15      Q.  You think that he should be prosecuted

16  criminally or left to his own devices?

17      A.  Absolutely.

18      Q.  Even if he poses a security risk?

19      A.  I think that he should not be in the West

20  Bank, like I think the rest of those settlers that

21  live in the West Bank should not be there, should be

22  in Israel.  But if there are any suspicions against

23  Mr. Federman, they have to be pronounced, investigated,

24  charged according to the safeguards in criminal law.

25      Q.  We -- I noticed, in your report, that you

1  were critical of the military court system as being

2  the product of a non-democratic regime.

3      Do I have that right?

4      A.  Yeah.

5      Q.  And do you think that the fact -- and I --

6  I take it you're not -- well, I take it you are of

7  that view because it is the product of a military

8  regime?

9      Do I have that right?

10      A.  You have that right.

11      Q.  And is it your view that it is impossible

12  for a person -- for a -- for a person who is not a

13  soldier in the military of which the military court

14  is a -- let me start over.

15      Okay.  Let me ask you a -- let me do it in

16  a hypothetical.  Okay.  No, no, I won't do that either.

17  We were on such a good roll until the break, weren't we?

18      All right.  Now, is it your view that a --

19  that a person is deprived of due process merely

20  by virtue of the fact that he or she is tried in a

21  military court when he or she is not in the military

22  that established that court?

23      A.  Not as a blanket assertion, no.

24      Q.  So now let me give you my hypothetical.

25      A.  Okay.

Page 141

```
1       Q.  Okay.  So imagine the year is 1942.  And
2   eight German soldiers sneak into the United States
3   to perform acts of sabotage.  And they are -- they
4   are not in uniform.  They're in civilian clothing.
5   And the United States authorities catch them.
6       Would it be inconsistent with due process,
7   in your mind, for those individuals to be tried in
8   a U.S. military court-martial?
9       MR. HILL:  Objection.
10      MR. YALOWITZ:  I guess that's a --
11      MR. HILL:  Incomplete hypothetical.
12      The witness can respond.
13      Q.  BY MR. YALOWITZ:  I guess it's also redundant.
14  But --
15      A.  Look, I think I'm not in a position to answer
16  this question because I haven't looked into the legal
17  and moral traits of the circumstances you've described.
18      We're dealing with a court that applies
19  jurisdiction over an occupied territory, an occupied
20  people, occupied people for -- five decades almost.
21  This is completely different than the question of who
22  is supposed to try saboteurs that infiltrated your own
23  jurisdiction.  And that question is important as well,
24  I agree.  But I -- I didn't -- I didn't delve into it,
25  and I didn't think it over.  I know -- I know the case
```

Page 142

```
1   you're referring to.  I don't have a crystalized view
2   on that matter.
3       Q.  Fair enough.  That's helpful.
4       Okay.  I want to come now to the topic of
5   actual innocence.  And I -- I want to focus on the
6   21 cases that you and Mr. Kaufman studied.
7       So you reviewed all of the files of the
8   21 convicted individuals; right?
9       A.  Yes.
10      MR. HILL:  Objection.  Lack of foundation.
11      MR. YALOWITZ:  I don't understand the
12  objection.
13      MR. HILL:  Well, I think we've already
14  established that the material that was provided
15  to the defendants is not the complete file.  And
16  so to the extent your foundation for the question
17  is that the complete files were provided to us and
18  then provided to Mr. Sfard, that's the failure of
19  foundation.
20      MR. YALOWITZ:  What do you mean?
21      MR. HILL:  Well, we established at the
22  deposition of Mr. Kaufman that there were missing
23  pages from --
24      MR. YALOWITZ:  Aah.
25      MR. HILL:  -- the files and so on and so
```

Page 143

```
1   forth.
2       MR. YALOWITZ:  Okay.
3       MR. HILL:  So that's my foundational objection
4   to the question:  "You've reviewed the complete file?"
5       MR. YALOWITZ:  I see.  All right.
6       Q.  BY MR. YALOWITZ:  Other than the -- there --
7   there -- were two documents that -- you were at
8   Mr. Kaufman's deposition; right?
9       A.  Yes, I have [sic].
10      Q.  And you noticed that there were two documents
11  that were exhibited that had some missing pages and some
12  mixed up -- one had missing pages and one had missing
13  and mixed-up pages; right?
14      A.  Right.
15      MR. SATIN:  Objection.  Misstates the
16  evidence.
17      MR. YALOWITZ:  How many lawyers are going
18  to be objecting here?
19      MR. SATIN:  I guess two.
20      MR. HILL:  However many it takes.
21      MR. YALOWITZ:  All right.  Well, two on one,
22  that's getting close to an even match.  We'll see.
23      Q.  BY MR. YALOWITZ:  So other than those two
24  documents, did you notice anything that, on its face,
25  was -- appeared missing or incomplete?
```

Page 144

```
1       A.  There's a huge amount of material that is
2   missing, including -- for example, just out of my mind,
3   in Case No. 7, the whole transcript of the testimony
4   of the GSS investigators is not -- is not included in --
5   in the material that was passed to us.
6       There are many, many pieces of material that
7   I would expect to see in a military court file and is
8   not there.  And I don't know whether it's not there
9   because it was never there or because it was not copied.
10  So as I wrote in my report, this is a very partial --
11  these are very partial files.
12      And to add to that, that we don't have the
13  GSS files, which is the -- as I said, the flesh and
14  blood of -- of -- of the cases.
15      Q.  Did -- did you hear Mr. Kaufman testify that
16  he went to the military court and compared the files he
17  had received from counsel for the plaintiffs with the
18  court's in -- with the files in the court record?
19      A.  I did hear, and I was astonished.  Because,
20  when I wanted to review transcripts of military court
21  files, I had to file a High Court petition.  Because
22  the military court would not allow me -- not in this
23  case.
24      But when we've worked on the Yesh Din file,
25  we asked to review some transcripts.  And they just
```

Page 145

1  wouldn't -- the court would not allow us to review
2  the files. We had to file a High Court petition in
3  order to get a permit to review transcripts. But I
4  did hear Mr. Kaufman that he has equated the cases --
5  the -- the court files with -- with the copies that
6  he has received.
7      Q.  Do you believe him?
8      A.  Of course I believe him.
9      Q.  And did you make an effort to do that as well?
10 Or did you assume, from your prior experience, that it
11 would be futile?
12     A.  I assumed that I would have to file another
13 High Court petition if I would want to see those files.
14     Q.  And did you -- I think I asked you this, but
15 let me make sure I've got it. I'll just ask it all
16 at once so you can not answer, or your counsel might
17 object. [sic]
18         But did you speak with, in any of the 21
19 cases, any of the defense lawyers, prosecutors, judges,
20 or defendants to ask about any information about those
21 21 cases?
22     A.  I have not spoken to any of these -- of those.
23     Q.  Okay. Did you read any other documents about
24 the 21 cases that were not in those files?
25     A.  No.

Page 146

1      Q.  So you didn't read any documents that were
2  attached to the report of Alon Eviatar?
3         Do you know who Alon Eviatar is?
4      A.  I know who Alon Eviatar is. I'm trying to
5  figure out what were the attachments. But I think I
6  didn't. So --
7      Q.  And do you know who Israel Shrenzel is?
8      A.  I do.
9      Q.  Did you read his report?
10     A.  I glanced through his report. I didn't read
11 it word by word.
12     Q.  Did you read any of the attachments to his
13 report?
14     A.  No.
15     Q.  Okay. Now, I want to ask you a very precise
16 question. I want you to listen to it very carefully.
17 Not that you -- I mean, you've been very careful.
18 I'm not -- it's not a criticism.
19         But I want to know if you believe, to a
20 reasonable degree of certainty, that any of the 21
21 people who were convicted of the crimes that we're
22 talking about here today are actually innocent?
23     A.  I cannot have any informed opinion about
24 your question.
25         MR. YALOWITZ:  Okay. It would be a convenient

Page 147

1  time for me to break.
2         MR. HILL:  Let's take our lunch break.
3         MR. YALOWITZ:  Okay.
4         (Recess from 12:40 p.m. to 1:43 p.m.)
5      Q.  BY MR. YALOWITZ:  We're back.
6         Mr. Sfard, are you familiar with a printed
7  book that collects decisions of the military court
8  which is published annually?
9      A.  I know of it. When we prepared the Yesh
10 Din report, we didn't find it in -- in the library
11 that we checked.
12     Q.  What's it called?
13     A.  "Selected Judgments From the Military Courts."
14     Q.  "Piskei din" or something like that?
15     A.  Judgment -- "piskei din" is "judgments."
16 Selected -- if I'm not mistaken, it's only judgments
17 from the appeals court.
18     Q.  That -- that would be the precedential kind?
19     A.  Yes.
20     Q.  Now, I -- I also was curious about one thing
21 about your -- your views about the State of Israel from
22 the territorial perspective.
23         There -- there are -- as it's been described
24 to me, there are people who believe that from the
25 Jordan River to the Mediterranean Sea should be owned

Page 148

1  by Jews. And there are people who believe that from
2  the Jordan River to the Mediterranean Sea should be
3  owned by Muslims. And there are people who believe
4  that there must be some form of coexistence.
5         So which do you categorize yourself as?
6      A.  I categorize myself in -- as someone who
7  believes that, between the Jordan River and the sea,
8  there's supposed to be two states --
9      Q.  And --
10     A.  -- living in peace and coexistence, preferably
11 with open borders.
12     Q.  And do you -- do you agree that within the
13 '67 borders is sovereign territory of Israel?
14         MR. HILL:  Objection. Vague.
15         Which '67 borders are we talking about?
16     Q.  BY MR. YALOWITZ:  I'm sorry. Within the
17 pre-'67 borders.
18         Thank you for the --
19     A.  Yes.
20     Q.  -- heads-up there.
21     A.  Yes.
22     Q.  So let me just ask it again --
23     A.  Okay.
24     Q.  -- just so we have it, just to make sure
25 I understand it.

Page 149

1          Are you of the belief that, within the
2    pre-1967 borders, the State of Israel is sovereign?
3          A.   Yes.
4          Q.   Now, are you familiar with a requirement
5    that the GSS report to the Knesset annually the
6    number of cases in which a GSS investigator invokes
7    the necessity defense?
8          A.   I'm not sure.  I -- I don't remember if --
9    it sounds like something that is there.  But I'm not
10   sure.  I'm not positive.
11         Q.   And so, then, I take it you wouldn't know
12   whether such a report is publicly available or not?
13         A.   I don't think there -- I mean, even if there
14   is such a demand, it's not public.
15         Q.   Okay.  As far as you know?
16         A.   As far as I know.
17         Q.   Now, I want to turn now to the specific
18   process afforded to the 21 individuals who were
19   convicted of the killings that took place in our case.
20         MR. HILL:  Objection.  Misstates the record.
21         Go ahead.
22         Q.   BY MR. YALOWITZ:  You -- you examined
23   those and commented on some of the convictions in
24   your report; right?
25         A.   I didn't really comment on their convictions

Page 150

1    in my report.  I made some comments regarding due
2    process issues that I -- that are common in the 21
3    files.  But since then, I reviewed them more closely.
4    And if you want to go over them and see what kind of
5    due process issues and problems they raise, I'm willing
6    to do so.
7          Q.   Thank you.
8               And you have the files that the plaintiffs
9    provided to the defendants?  I think I noticed, when
10   we were together last time, you had them accessible
11   on your iPad?
12         A.   No, I don't have them accessible on my iPad.
13   Last time we've been in Kaufman's deposition, it was
14   accessible on Mr. Hill's iPad.
15         Q.   Okay.
16         A.   I have it only in -- in a physical form.
17         Q.   Do you -- do you have it with you?
18         A.   I do.
19         Q.   So if, at any time during our conversation,
20   you would like to refer to something that's in your
21   physical files, please feel free to do so.
22         A.   I will.
23         Q.   Now -- now -- and also please feel free
24   to refer to your report.
25         A.   Okay.

Page 151

1          Q.   Now, I'm going to ask you again a very
2    specific question.  And if you would just give me
3    the answer to the specific question, and then we can
4    discuss the answer.
5               But I just want to start with a very specific
6    question, which is:  Based on the evidence that you have
7    reviewed pertaining specifically to the case of Moonzer
8    Mahmood Halil Nur --
9          A.   Yeah.
10         Q.   -- do you believe, to a reasonable degree of
11   certainty, that Mr. Nur was denied due process of law?
12         A.   Okay.  As I wrote in my report, as I said I
13   think here, I have been -- I have received only a very
14   small part of the relevant material to all of the cases,
15   including Mr. -- Mr. Nur's case.  So it is difficult
16   for me to provide an assessment regarding the -- the
17   overall due process that he has received.
18              However, from my review of his file,
19   I understand that he was convicted based on his
20   out-of-court testimonies, out-of-court statements
21   that were filed, admitted with the court, without
22   any objection by the defense and with corroboration
23   of out-of-court statements made by alleged accomplices
24   that were also filed with consent of the defense without
25   cross-examination.  I can see that he was detained from

Page 152

1    April 17th, 2002, in pre-trial detention, pre-indictment
2    detention, until June 25th, 2002.  That's almost two
3    and a half months.
4          Q.   Are you -- are you referring to your report?
5          A.   No, I'm -- these are notes that I made
6    while reviewing different cases.  So I'm -- instead of,
7    you know, every detail looking into the case, I have
8    summations that I made of these points.
9          Q.   Would -- would it be possible for us to pause
10   and have a copy so we can look at them together?
11         MR. HILL:  Sure.
12         THE WITNESS:  Absolutely.
13         MR. YALOWITZ:  Thank you so much.  So why
14   don't we -- why don't we do that.
15         MR. HILL:  You want to go off the record?
16         MR. YALOWITZ:  Sure.  Thank you.
17         (Recess from 1:51 p.m. to 1:52 p.m.)
18         Q.   BY MR. YALOWITZ:  Actually, why don't
19   we go back on the record and try a little different
20   question.  And it may be impossible for you to
21   answer the question.  If it's impossible, then
22   we'll just pause until we get the notes back.  But
23   let me ask you -- and I -- I appreciate your answer,
24   and I do want to explore those comments with you.
25              But what I'd like to begin with is a specific

Page 153

1   question.  So let me say it again.  And if you can --
2   and you may not be able to answer the question.  But
3   if you can, it would be helpful, which is:  Based on
4   the evidence you have reviewed, pertaining specifically
5   to Mr. Nur's case, do you believe, to a reasonable --
6   reasonable degree of certainty, that Mr. Nur was
7   denied due process?
8       A.  According to the material that I have, there
9   is a reasonable degree of certainty that Mr. Nur --
10  Mr. Nur's investigation and trial have been infected
11  with due process failures.
12      Q.  Okay.
13      A.  However, I do not have the full material.
14  And it might be that, in the full material, there will
15  be some documents that suggest that some due process
16  rights failures were even greater than I think or that
17  some of the things that are under suspicion for due
18  process issues have actually been repaired.
19          So I'm saying this as a -- I'm very careful,
20  and I'm very accurate about what I'm saying.  My review
21  of Mr. Nur's case shows that there are due process --
22  grave due process issues.
23      Q.  And you believe that to a reasonable degree
24  of certainty?
25      A.  I'll give you an example, and this is how

Page 154

1   I think we can proceed.
2           It seems to me that Mr. Nur was denied access
3   to a lawyer.  I do not know that for sure because I do
4   not have the GSS file and I do not have the denial of
5   a client/attorney meeting order in front of me.
6       Q.  So I just -- and I appreciate your answers.
7   And I do want to get into the specifics, particularly
8   once we have your notes back so that you can refer
9   to them.
10      A.  Yeah.
11      Q.  My question is -- is sort of the ultimate
12  conclusion, which is:  Based on the evidence that you
13  have reviewed, specifically relating to Mr. Nur's case,
14  have you concluded, to a reasonable degree of certainty,
15  that Mr. Nur was actually denied due process of law?
16      A.  I will have to repeat what I said before.
17          I believe, according to the material that
18  I have, that in Mr. Nur's trial and investigation,
19  there were due process failures.  And I cannot say
20  that for certainty because I do not have the full
21  material.  However, some of the issues are definite.
22  And that is -- when I'll get back my notes, I can
23  list them for you.  And some of them are -- let's
24  call them under suspicion.
25      Q.  Okay.  So I want to explore that with you.

Page 155

1   But I think, in fairness to you, we need your notes
2   back.
3       A.  Okay.
4       Q.  So --
5       A.  We will wait for that.
6       Q.  -- we'll wait off the record.
7           (Brief discussion held off the record.)
8       Q.  BY MR. YALOWITZ:  Mr. Sfard, while we were
9   off the record, we had one copy of your notes made.
10  And with your permission, we could mark yours as
11  the official court copy, and then you'll get a --
12      A.  Confiscated?
13      Q.  It's just in temporary detention.
14      A.  Okay.
15          MS. WEISER:  Administrative even.
16      Q.  BY MR. YALOWITZ:  You'll get a copy back --
17      A.  Okay.
18      Q.  -- as soon as your counsel gets it from
19  Brenda.  So we'll mark it as Plaintiffs' 117.
20          MR. HILL:  So the -- the witness may have
21  changed the page order.  You should put them back in
22  the original order and have them marked in that fashion.
23          THE WITNESS:  Sorry?
24          MR. YALOWITZ:  Let's just check and make sure
25  that the pages are in the correct order.

Page 156

1           MR. HILL:  So Kent, just to assist you, the
2   first page is the --
3           THE WITNESS:  Yeah.
4           MR. HILL:  -- table of contents.
5           (Plaintiffs' Exhibit 117 marked.)
6       Q.  BY MR. YALOWITZ:  Okay.  So do you have
7   Plaintiffs' 117 before you now?
8       A.  Sorry?  (Examining.)  Yeah, 117.
9       Q.  All right.  And these are notes that you
10  prepared in anticipation of today's testimony; is
11  that correct?
12      A.  Yeah.
13      Q.  Did you also prepare them to assist in the
14  examination of Mr. Kaufman?
15      A.  No.  I made them -- I began making them when
16  I prepared my own report.  And I finished them after
17  that.  Yeah.
18      Q.  Did you use these to help with the examination
19  of Mr. Kaufman?
20      A.  I have -- I had -- I had them during his
21  deposition.
22      Q.  Now -- okay.  You were going to tell me --
23  and I'm sorry.  I just have one more question about
24  the notes.
25          You -- these -- these assisted you also in

Page 157

1  the preparation of your report or a portion of these,
2  something like that?
3      A.  A portion of these.  I -- I didn't manage to
4  review as -- in full before writing the report.  I mean,
5  I have went through the files.  But I haven't managed
6  to write down all this.  I began doing that before the
7  report was completed and ended after.
8      Q.  So -- so the -- your opinions, sitting here
9  today, are more fully formed than they were when you
10  prepared the report?
11      Do I have that right?
12      A.  In the sense of the details of every case
13  and case.  [sic]
14      Q.  Okay.  That's helpful.  Thank you.
15      Now, you were going to tell me about the
16  due process issues that you perceived in Mr. Nur's case.
17  So if you could describe the first one, that would be
18  helpful.  If we take it in small bites, perhaps it
19  might be better.
20      A.  So he was arrested in April -- 17 April of
21  2002.  And the indictment was filed on June 25th, 2002.
22  That means that he was in pre-indictment interrogation,
23  detention for more than two months, two months and
24  a week.  And we have no -- we have no documents from
25  that period of time.  It's a very long period of time,

Page 158

1  two months and a week.
2      From my experience and from the research that
3  I was involved in, I have to infer, as did Mr. Kaufman
4  in his deposition, that he was denied access to a
5  lawyer.  I don't know for how long.  Maybe a few days.
6  It may be weeks.  He was probably not permitted to see
7  anyone from the outer world.  And it -- it is more than
8  possible that a gag order, prohibiting any publication
9  of the matter of his arrest, was issued.
10      Again, these are things that I do not know
11  for sure.  But this is the regular practice in such
12  cases.  His trial took place indeed.  But there was no
13  evidence phase whatsoever in the sentence that -- there
14  were no evidential hearings, no cross-examinations.
15      I refer you to the document that is marked
16  as Bate P 11-1 to 127, which is a request to -- for
17  extension of his detention beyond two years that
18  was filed with the Military Court of Appeals.  And
19  in that document, the military prosecution details
20  the happenings of Nur's trial.  And according to
21  these details, every hearing that was scheduled ended
22  up with -- in -- as scheduled to hear a witness, a
23  prosecution witness, ended up with the out-of-court
24  statements of the witness admitted with consent of
25  the defense to the court so that one, two, three, four,

Page 159

1  five different chunks of the out-of-court material was
2  admitted.  And at the end, the defense waived its right
3  for -- to -- to hold the defense in the sense that the
4  defendant did not take the stand.
5      There were several occasions where the
6  defense attorney has not appeared in trial.  Eventually,
7  the -- and -- and what I can say about the conduct
8  of the defense in that case is that it looks like
9  a practice that I've encountered more than once in
10  the military courts.  And that is a strategy -- a
11  strategy that is based on getting a plea bargain with
12  the prosecution and is faced with the problem of having
13  hearings scheduled with -- before the negotiations are
14  fruitful.
15      What happens in these cases many times --
16  and I saw it in several of the cases that I've been
17  reviewing -- that the defense, in order to get a
18  continuance to keep on negotiating, is -- waives
19  its rights to cross-examine the witness and instead
20  consents to the admission of the out-of-court statement
21  so that it will have more time -- will buy time to
22  negotiate a plea bargain with the prosecution.
23      Q.  So this was a strategy that Mr. Nur was
24  pursuing in the case before you, as far as --
25      A.  I --

Page 160

1      Q.  -- you're inferring?  I mean, you -- you
2  didn't speak to the lawyer?
3      A.  Exactly.  I'm inferring.
4      In many of the cases we have before us,
5  the court file consists of out-of-court investigating
6  material that was admitted in chunks without any
7  cross-examination in consent.  And the reason why
8  it was admitted in -- in installments rather than in --
9  in one go is because every time the defense is facing
10  with a hearing scheduled, in order to get a continuance,
11  it is compelled to agree to file the -- to admit the --
12  the out-of-court statements of the witness that is
13  supposed to take the stand.
14      Q.  Did you notice, in the case of Mr. Nur, any
15  instance in which his counsel said "I would like to
16  cross-examine a witness"?
17      A.  No.  And we will not see that in other cases.
18      Q.  Okay.
19      A.  What we see is a defense that -- that is
20  doing very little.
21      Q.  Did you see any circumstances, in the Nur
22  case, in which Mr. Nur's counsel was denied by the
23  court a request to cross-examine?
24      A.  As I said, I did not see that.
25      Q.  And did you see, in Mr. Nur's case, any

Page 161

1  situation in which his counsel complained that there
2  was evidence he wanted to bring to the court's attention
3  that he was not permitted to submit?
4      A.  I did not see that.
5      Q.  Did you see, in Mr. Nur's case, any evidence
6  that led you to believe he didn't have notice of the
7  charges against him?
8      A.  I have not seen a -- an indictment in Arabic.
9  I do not know the defendant's attorney.  But it is
10  reasonable to assume that -- that he is -- is not as
11  good in Hebrew as a native Hebrew speaker.  And I have
12  no -- I -- and I don't know what was the quality of
13  translation that was provided of the indictment to
14  Mr. Nur.  I don't know.
15      Q.  So -- so I guess, among the answers of "yes,
16  I saw such evidence," "no, I didn't," or "I can't reach
17  a conclusion," you would pick "C," "I can't reach a
18  conclusion"?
19      A.  Yes.
20      Q.  Now, did you -- did you notice that Mr. Nur
21  was convicted of attempted homicide and acquitted of
22  kidnapping?
23      A.  Yes.
24      Q.  Did you notice that he appealed his sentence?
25      A.  Yes.

Page 162

1      Q.  The prosecution also appealed the sentence;
2  is that right?
3      A.  I don't remember by heart.  But I take your
4  word for it.
5      Q.  Well, I'm -- I'm asking a question based on
6  Mr. Kaufman's summary.  But --
7      A.  Yeah.
8      Q.  But --
9      A.  I can see -- I can see that he has appealed,
10  an appeal of one page, one and -- and a third with --
11  he appealed both the -- his -- he appealed both the
12  sentence and the fact that he was convicted -- and
13  the conviction.
14      Q.  Well, what is the standard of review in the
15  Military Court of Appeals?
16      A.  Standard of review?
17      Q.  Yeah.  So do they -- is it de novo, or
18  they review them for clear error?  What -- what's
19  the standard that they apply in reviewing a judgment
20  of a lower court?
21      MR. HILL:  Objection.  Lack of foundation.
22  I'm not sure the witness understands the --
23      MR. YALOWITZ:  Sure.
24      MR. HILL:  -- terms you've just used.
25      Q.  BY MR. YALOWITZ:  Do you under -- do you

Page 163

1  understand the question I've asked?
2      A.  I understand.  I do not -- I do not know
3  the -- the tests that you've provided.  I know that
4  in the Military Court of Appeals, like in -- in
5  appellant court in civilian courts, the -- the court
6  will adjudicate mainly mistakes of law and, in very
7  rare cases, mistakes of fact.
8      Q.  What record does the Military Court of
9  Appeals have in making its review?
10      A.  What do you mean "what record"?
11      Q.  So as a counsel for a client who's been
12  convicted of a crime in the military court and you
13  wish to make an appeal, you write a brief?
14      A.  Uh-huh.
15      Q.  Is that right?
16      A.  Yeah.
17      Q.  And then -- and then you submit documents
18  showing what happened in the lower court; right?
19      A.  You submit the writ of appeal with -- and --
20  and the file from the lower court.  You send it over
21  to the appellant court.
22      Q.  So the appellant judges have not only the
23  brief itself, but they have whatever file was created
24  in the trial court?
25      A.  Yeah.

Page 164

1      Q.  Having had a chance to review the file --
2  well, have you had a chance to review the file as
3  well as your notes and your report from July of this
4  year on the topic of Mr. Nur?
5      A.  Here?
6      Q.  Yes.
7      A.  If I have anything to add?
8      Q.  I was going to ask you next --
9      A.  Okay.
10      Q.  -- if you had anything to add.
11      A.  So let me just make -- look it over.
12      Q.  Sure.
13      MR. HILL:  And just so the question is clear,
14  you want him to add what?  Additional due process issues
15  he hasn't told you about yet or something different?
16      MR. YALOWITZ:  Well, the first question is:
17  Has he had a chance to review all that?
18      MR. HILL:  All right.
19      MR. YALOWITZ:  And he's now reviewing it,
20  and then I can --
21      MR. HILL:  Fine.
22      MR. YALOWITZ:  -- ask him questions after
23  he's had that opportunity.
24      MR. HILL:  Fine.
25      THE WITNESS:  (Examining.)  Yeah.  Let me

Page 165

1 just add that we do not have, in this case, as I said,
2 the GSS memorandums and the file, the detention hearing
3 meetings -- minutes -- sorry -- all the interrogation
4 documents. We have only out-of-court -- only custody
5 statements. We have nothing other than that, not the
6 gag orders, not the client-attorney prevention orders.
7     We do not have any immunity certificate to
8 withhold disclosure of evidence, which I'm sure was
9 issued. Or if not issued, then -- then it's another
10 problem. And we -- for some reason, we didn't -- I
11 didn't find defense summations. So I don't know if
12 the defense waived its rights for summations or we
13 just don't have it.
14     Q. BY MR. YALOWITZ: Mr. Kaufman reports in
15 his report -- I'll just read it to you.
16     A. Okay.
17     Q. (Reading.)
18     "Comprehensive" --
19     He's speaking of Mr. Nur, of the case of
20 Mr. Nur.
21     A. Yeah.
22     Q. He says:
23     "Comprehensive legal arguments were made
24 that the accused's statements did not make out a
25 guilty state of mind (apart from the offense of

Page 166

1 failing to prevent the commission of a crime)."
2     Does that refresh your memory that legal
3 arguments were made to the court?
4     A. I -- I do not have this. It may be that
5 he inferred that from the judgment, from the ruling
6 of the court, which might have said what the defense
7 has argued. No, I don't see any -- any reference
8 in the judgment to defense summations or to defense
9 argumentation. It might be that I didn't -- that
10 I missed something. But I don't see it.
11     I want to add, though, that -- sorry.
12 I forgot what I wanted to say. Go on.
13     Aah, can I add something?
14     Q. Of course.
15     A. The police custody statements that Mr. Nur
16 made were recorded in Hebrew. And he signed on
17 a Hebrew version of them. And that raises another
18 due process issue. He signed them at the end of his
19 April 23rd, 2002, statement, mind you a week after he
20 was detained. It says -- and I inter -- I translate
21 to English:
22     (Reading/translating.)
23     "This is my statement that was read out to
24 me and -- and translated to Arabic orally."
25     So it is clear to me that Mr. Nur does not

Page 167

1 master Hebrew. And yet -- and I'm sure that he -- I'm
2 sure -- it seems reasonable that he was interrogated
3 in Arabic, but his statement was recorded in Hebrew.
4 And that is a problem.
5     Q. And just so the record is clear, because I
6 think we all understood each other in the room. But
7 when you said "I'm sure" and then you said "I'm sure"
8 again, what you meant was you're actually not sure --
9     A. Let's --
10     Q. -- and you're making an inference?
11     A. Let's say -- let's put it that way. If he
12 was interrogated in Hebrew, then we have even a bigger
13 problem. So I, for the benefit of the doubt, that
14 the GSS interrogators or the police officer in this --
15 in -- in the police custody statement has not done
16 something and invented completely the interview --
17 the interview was conducted in Arabic, but recorded
18 in Hebrew, without being documented by video or audio
19 so that we can retro -- in retrospect, make sure that
20 indeed what -- the things that are attributed to Mr. Nur
21 he indeed said.
22     Q. Did Mr. Nur's counsel, at the trial, ever make
23 a claim that his custodial statements were inaccurate?
24     A. Not only that he didn't, he consented to its
25 admission in court.

Page 168

1     Q. And -- and do you think that the strategy
2 that Mr. Nur's counsel pursued -- well, let me withdraw
3 that question.
4     Is there anything else in the record that
5 you've seen that you wish to highlight as either a
6 definite or an under suspicion due process problem?
7     A. No.
8     Q. And when you mentioned the absence of the
9 GSS files and the absence of an immunity certificate,
10 would you categorize those as definite due process
11 problems or under suspicion due process problems?
12     A. If counsel for the defendant did not ask
13 for the GSS file, did not get it, did not receive it,
14 and kept on managing, litigating the case without
15 the memorandums from the GSS interrogation, that
16 is a definite due process issue that -- because
17 counsel has provided ineffective representation.
18     Q. Okay. So I don't want you to speculate
19 or engage in hypotheticals here. We're talking about
20 the evidence before you.
21     A. I don't -- I don't know if the defendant
22 lawyer has asked for -- for the -- for those documents
23 and whether he received them.
24     Q. So we talked about GSS files earlier in your
25 deposition.

Page 169

1    You remember that?
2    A.  We have.
3    Q.  And -- and you said that you knew about the
4  existence of such files before you were even admitted
5  to the Bar; right?
6    A.  Yes.
7    Q.  You said it's common knowledge for lawyers
8  who practice in the military courts to be aware of
9  files like that; correct?
10    A.  Correct.
11    Q.  And you said that, in order to request them,
12  you don't make a file in the court; right?
13    A.  No.
14    Q.  "No" meaning I'm correct?
15    A.  You're right.
16    Q.  And you said that when they're provided,
17  the prosecutor doesn't make a filing in the court
18  showing that he provided them; right?
19    A.  Absolutely.
20    Q.  Okay.  Is there anything else about the
21  Nur case that you consider to be a denial, in whole
22  or in part, of Mr. Nur's due process rights?
23    A.  Okay.  My answer to you will -- my following
24  answer will be correct for if we'll talk about other
25  cases and when you'll ask me if I have more due process

Page 170

1  issues.
2    I do not have more due process issues to
3  raise except those general due process issues that are
4  the traits of the military court system as described in
5  my report, interpretation, translation, public hearing,
6  and so on and so forth.  I don't want to miss any of
7  them, but those are listed in my report.
8    Q.  And what I would like you to do is feel free
9  to refer to your report at any time.  And if there is
10  an issue such as translation or public hearing, as to
11  which there is specific evidence about one of the 21,
12  you should include that in our discussion.
13    So, for example, I think I asked you
14  earlier -- well, let me stop there and say:  Is
15  that agreeable to you?
16    A.  I didn't understand what you said.
17    Q.  Okay.  So you and I spoke earlier about
18  the issue of interpretation?
19    A.  Right.
20    Q.  And I asked you, in any of the 21 files, was
21  there a request to change interpreters; right?  I think
22  I asked you that.
23    A.  You did.
24    Q.  And you said you didn't think so; right?
25    A.  I didn't see any such request.

Page 171

1    Q.  Right.  And then -- and then I -- if I didn't
2  ask you, I'll ask you now:  Did you see in any of the
3  21 files any --
4    A.  Complaint.
5    Q.  -- complaint that the translator wasn't --
6  that the interpreter wasn't doing what he or she was
7  supposed to do?
8    A.  I didn't see, and I didn't expect to see.
9  Because these are the kind of things that do not go
10  into a transcript which is not verbatim, as you rightly
11  said before about a summary.  So when I, in the military
12  courts, time and again, ask the judges to instruct the
13  interpreter to interpret, nothing of that was documented
14  in the court transcript.
15    Q.  So if you have, in any of the 21, any
16  evidential basis for any concern about the specific
17  case, please include that in our discussion.
18    A.  Well, I --
19    Q.  But we -- if I may?
20    A.  Sure.
21    Q.  But we can have a standing understanding
22  that you're not withdrawing any of the comments you
23  made in your report about the systemic issues that
24  you've identified.
25    Is that fair?

Page 172

1    A.  It is fair.  And I attribute these systemic
2  failures to the 21 cases as well.  Because these
3  systemic failures that we've documented and reported
4  in Yesh Din -- in the Yesh Din report -- my report
5  here have been in place during the time frame that
6  the 21 cases were litigated.
7    Q.  I think what we'll do is agree that that's --
8  that that's your position.
9    A.  Right.
10    Q.  And you don't need to repeat it.
11    A.  Okay.
12    Q.  But if there's particularized evidence about
13  any of those issues, it's important that we discuss it.
14    A.  Fair enough.
15    Q.  Thank you.
16    Okay.  Have we talked -- is there anything
17  that you wish to add about the Nur case, other than
18  what we've just discussed with regard to your -- your
19  systemic concerns you raised in your report?
20    A.  No.  But I want to correct what -- what
21  I said before.  His conviction is based only on his
22  out-of-court statements.  And the only corroborative
23  evidence that the court found was the actual occurrence
24  of the attack that he was charged with.  So that was
25  the additional we call it --

Page 173

1    Q.  Corroborating evidence?
2    A.  Well, additional corroborating evidence.  So
3  whatever strategy there is to -- that includes con --
4  consenting to admission of out-of-court statements when
5  they themselves, together with the actual fact that the
6  attack occurred, may cause a conviction is a strategy
7  that I, for one, cannot figure out.
8    Q.  Do you know whether today Mr. Nur maintains
9  his innocence?
10    A.  I have no idea.
11    Q.  Do -- do you know whether Mr. Nur was ever
12  identified in any of the dozen or so potential channels
13  with regard to coercion?
14    Remember we talked about lots of different
15  outlets for allegations of coercion?
16    A.  Yes, I remember.  And it might be.  I have
17  not looked through the files of PCATI.  And I have
18  definitely not looked through the -- well, that's the
19  only one.  Aah, maybe he lodged a complaint.  I don't
20  know.  It wouldn't be public.
21    Q.  So -- so why don't we talk about Abd-el Karim
22  Ratheb Younis Aweis.
23    A.  Let's.
24    Q.  All right.  I need to ask you a question.
25  Before I can do that, I need to find my notes.  You

Page 174

1  don't have to write that down.  You can if you want.
2  All right.
3    You've -- you've reviewed the files plaintiffs
4  provided about Mr. Aweis; right?
5    A.  Right.
6    Q.  Based on the evidence that you've reviewed,
7  pertaining specifically to the case of Abd-el Karim
8  Ratheb Younis Aweis, do you believe, to a reasonable
9  degree of certainty, that Mr. Aweis was actually denied
10  due process of law?
11    A.  Mr. Aweis has been found guilty as part
12  of a plea bargain after a three-month pre-trial GSS
13  interrogation between March 30th of 2002 and June 30th
14  of 2002.  We have not even a single document in -- in
15  our -- I don't have in -- in the file that I've been
16  given to suggest what happened during those three
17  months.  So much of the case was actually decided
18  during those three months.
19    Q.  So -- I -- I'm sorry.  Were you finished?
20    A.  Yeah.
21    Q.  Okay.  So see if you can answer my question
22  with a "yes" or "no."
23    A.  Okay.  I'll try.
24    Q.  If you -- if you can't answer it with a "yes"
25  or "no," you can just say:  I can't answer it "yes" or

Page 175

1  "no."
2    A.  Okay.
3    Q.  That's fine.  I'm not trying to bully you,
4  as I think you can tell.
5    Let me ask the question.
6    A.  Okay.
7    Q.  Based on the evidence that you have reviewed,
8  pertaining specifically to the case of Abd-el Karim
9  Ratheb Younis Aweis, do you believe, to a reasonable
10  degree of certainty, that Mr. Aweis was actually
11  denied due process of law?
12    A.  I believe that he was denied due process
13  of law during his interrogation.  With the absence
14  of the documents, I cannot say that for certainty.
15  But it is very likely.  I believe that he suffered
16  from due process failures of the general type we've
17  discussed, and I will not repeat them.  And -- and
18  I would say that there are question marks surrounding
19  the effective [sic] of his representation -- the
20  effectiveness of his representation.  But I wouldn't
21  say that for sure.
22    Q.  Do you -- did you have an opportunity to
23  read Mr. Aweis' pre-sentencing statement to the court?
24    A.  I'm sure I have, but I don't remember it.
25  Yeah, I can see it.

Page 176

1    Q.  Would -- would you be kind enough to -- well,
2  there's a -- there's a part in my English translation
3  from Mr. Kaufman's report that begins:
4    "The acts which I did, I am proud of them,
5  and there is justification for what I did."
6    Do you see that in the original?
7    A.  That's before sentencing or before conviction?
8    Q.  According to Mr. Kaufman's report, it was
9  immediately before sentencing.
10    A.  Yeah, I can see that.
11    Q.  Would you feel comfortable translating
12  on-the-fly?
13    A.  I -- I think what you've just read out
14  is quite accurate.
15    Q.  So I --
16    A.  Things that I've --
17    Q.  So -- so I'm going to read Mr. Kaufman's
18  translation.  And if you disagree with it, you just
19  let me know.  Okay?
20    A.  Okay.
21    Q.  Mr. Kaufman is translating the statement
22  of Abd-el Karim Ratheb Younis Aweis.  And he says:
23    "The acts which I did, I am proud of them,
24  and there is justification for what I did.  The reason
25  for them is the Israeli occupation and the Israeli Army,

Page 177

1  which every day kills civilians and the last among
2  them is the killing of my brother Samar. If I could
3  kill more Jews, I would not hesitate. What I would
4  like to state here is this: The Intifada will continue
5  and also the attacks will continue within Israeli
6  territory until the state of Palestine is created
7  and the Army withdraws from the occupied territories."
8       Is that a fair translation?
9     A. It is.
10    Q. And what was Mr. Aweis convicted of doing
11  that he was proud of?
12       MR. HILL: Objection. Lack of foundation
13  as to what Mr. Aweis meant.
14       The witness can respond.
15       THE WITNESS: What's the question?
16    Q. BY MR. YALOWITZ: What was Mr. Aweis
17  convicted of?
18    A. He was convicted of involvement in the
19  March 21st, 2002, terror attack in King George Street
20  in Jerusalem, in membership in an illegal organization,
21  holding weapons, throwing stones, and -- I mean,
22  manslaughter.
23    Q. I'm sorry?
24    A. Man -- manslaughter in connection to this
25  terror attack. That's the -- the criminal charge.

Page 178

1     Q. Would we say --
2     A. Attempted manslaughter. Murder.
3     Q. Would we say homicide?
4     A. Murder. Well, in -- in -- in military law,
5  it's the -- there is one -- one offense for -- for
6  murder and -- and manslaughter. And -- and some more
7  weapons-related offenses.
8     Q. Do you -- do you understand Mr. Aweis to
9  be justi -- first of all, do you understand Mr. Aweis
10  to have been convicted of an incident of terrorism?
11    A. Yes.
12    Q. And do you understand him to be attempting
13  to justify that as retaliation for the killing of
14  civilians, including his brother?
15    A. Yes. And I resent that.
16    Q. What do you mean you resent it?
17    A. I don't like what I hear.
18    Q. Explain what you mean.
19    A. I do not accept his -- I do not -- if that
20  is indeed what he said and that is the justification
21  for the things --
22    Q. You reject it?
23    A. -- I reject it. But that doesn't mean he's
24  not entitled to a fair trial and due process. And
25  this is what I was looking for and not whether he

Page 179

1  was an angel or not.
2     Q. And so you, I think, said -- well, I think
3  I wrote down what you said about your opinion on whether
4  he received due process. So I don't need to re-ask you.
5       But is there anything else about his case
6  that gives you an evidential basis for your opinion
7  that there is specific evidence pertaining to his case
8  showing whether, to a reasonable degree of certainty,
9  he was actually denied due process of law?
10    A. On July 2nd, 2002, Bate 11-29 is the -- the
11  trial detention hearing -- hearing for to -- to decide
12  whether he will stay in detention and remand during
13  the trial. His attorney has not arrived. And the --
14  the court has -- has conducted the hearing without
15  the defense attorney present and concluded to remand
16  him. Also the --
17    Q. May I just ask one question about that?
18  And then I'll continue on.
19       That -- that incident that you've just
20  described, did that go to Mr. Aweis' guilt or innocence,
21  or was that a failure of --
22    A. Due process.
23    Q. -- due process with regard to -- with regard
24  to whether he would remain in custody pending a final
25  decision --

Page 180

1     A. Whether he remain --
2     Q. -- of his trial?
3     A. Whether he remained in custody pending trial.
4     Q. Okay. Now, you -- I didn't mean to --
5  I did mean to interrupt you. I apologize for that.
6  But tell me what's your --
7     A. So on -- on the same -- on the same date
8  and on the -- in the same hearing, Mr. Aweis said
9  that he is in solitude for 90 days. And then the
10  court transcript says that the defendant is pointing
11  to -- to cuts in his body, his arms, his shoulders,
12  and his back, and to -- and on his legs and then,
13  quote, continues "every day I ask to see a doctor,
14  and I didn't get one."
15    Q. And does that -- does that go to his guilt
16  or innocence, or does it go to whether he should
17  be receiving medical treatment?
18    A. Mr. Yalowitz, look, you cannot distinguish
19  between the different parts of due process. Due
20  process rights is a bundle of rights that are supposed
21  to create the atmosphere that enables a defendant to
22  defend himself, not to be coerced, not to be pressured
23  into something that is to his detriment.
24       I do not know, Mr. Yalowitz -- I do not know
25  what his mental and physical powers are and what drives

Page 181

1    people into plea bargains or to admit things they might
2    have not done. I don't know. All I know is that, not
3    by chance, international legal standards, as most --
4    national legal standards in civilized countries have
5    made these safeguards in order -- in order to be certain
6    that people do not -- that we lower the risk that people
7    say things they don't want to say, that they plead when
8    they don't want to plead.
9        So you can say that detaining a person for
10   five years doesn't go to his innocence or -- or guilt.
11   But if a person is in detention for five years --
12   and we have a case in the 21 cases where a person
13   was in detention for six years. And I don't know
14   what eventually leads a person to say: I want a
15   plea bargain. Let's -- let's just get -- get over
16   with all of this.
17       So yeah, I mean, this is an example. He
18   did not get a lawyer. He did not get a doctor. He
19   was 90 years [sic] in solitude. No one knew about
20   his case. These are all due process issues that
21   may have an effect on guilt. I'm not saying it had,
22   because I don't know, but it may.
23   Q.  Thank you.
24       MR. HILL: For the record, the witness said
25   "90 years." I think he meant --

Page 182

1        THE WITNESS: "90 days."
2        MR. HILL: -- "90 days."
3        THE WITNESS: Of course, "90 days."
4    Q.  BY MR. YALOWITZ: I -- I thought it was
5    "90 days." But I trust you that it was -- I thought
6    he said "90 days." We're on the same wavelength on
7    some things.
8    A.  Yeah.
9    Q.  Perhaps not everything we're discussing.
10       Shall we go to the case of Nasser Jamal
11   Mussa Shwaysh?
12   A.  Yeah.
13   Q.  Okay. Would you like to get your file?
14   A.  Yes. It's a big case.
15   Q.  Now -- Mr. Sfard, let me know when you're
16   ready.
17   A.  I'm ready.
18   Q.  Now, I think you know by now I'm going to
19   give you the opportunity to say everything you want
20   to about the case of Nasser Jamal Mussa Shwaysh.
21   A.  Yes.
22   Q.  But, first, I want to ask you my specific
23   question. And do your best, if you can, to give me
24   either a "yes" or a "no" or "I can't answer it 'yes'
25   or 'no.'"

Page 183

1        Here's my question. Based on the evidence
2    you have reviewed, pertaining specifically to the
3    case of Nasser Jamal Mussa Shwaysh, do you believe,
4    to a reasonable degree of certainty, that Mr. Shwaysh
5    was actually denied due process of law?
6    A.  I do.
7    Q.  Okay. Please state the evidential basis for
8    your opinion.
9    A.  Okay. This defendant was not represented.
10   At a certain hearing on the -- November 14 -- November
11   14th of 2002, he told the court:
12       (Reading/translating.)
13       "I still haven't been appointed a lawyer,
14   and regarding this case, I do not know what to do."
15       Eventually, he decides not to have a lawyer,
16   and he conducts the -- case by himself. In his
17   case, four different witnesses -- prosecution witnesses
18   allege that they were tortured, they were abused in
19   interrogation into saying -- into incriminating him.
20   And their statements were all admitted by the judges.
21   Q.  I'm sorry. Could you just say the last
22   thing again before their "statements were admitted"?
23   A.  Four --
24   Q.  Did they -- did they allege torture? Is
25   that what you're saying?

Page 184

1    A.  They have alleged torture. I'll give you
2    a few examples.
3    Q.  I mean, "torture" is such a loaded word,
4    you know. It brings to mind the pulling of fingernails
5    or things like this.
6        Is that what they were alleging?
7    A.  They were alleging beatings, threats of
8    rape -- these are women -- threats of rape, threats to
9    demolish their home, 130 days of solitary confinement,
10   which the Committee Against Torture has found to be
11   torture, solitary confinement of that type. Again,
12   threat of rape. An officer that hit -- hit Kahira --
13   this is Kahira Sa'adi -- three times. And again
14   threats and so on and so forth. I think I mentioned
15   these in my report. That was one of the --
16   Q.  Well, just -- just give us -- I'm sorry.
17   I didn't mean to interrupt. Go ahead.
18       Did you want to continue on that line?
19   Because I wanted to probe it a little bit more.
20       Why don't I ask a question?
21   A.  Okay.
22   Q.  Okay. I mean, I know it's difficult because
23   you're looking at your notes and --
24   A.  Right.
25   Q.  -- so forth. I don't want to interrupt you.

Page 185

1    But I want to take it in bite-size pieces so that you
2    can describe something and then we can talk about it.
3         So with regard to allegations of coercion --
4    A.  Right.
5    Q.  -- you mentioned several things.
6         Were there any other specific things that
7    came to your attention?
8         MR. HILL:  With regard to coercion?  Is
9    that your question?
10        MR. YALOWITZ:  With regard to alleged
11   coercion.
12        THE WITNESS:  There were -- I mean, there --
13   again, four witnesses, two of them -- no, four -- all
14   four women, all four allege threats of rape, beatings
15   in different nuances, and threats on demolishing their
16   family house, things of -- things of that sort.  These
17   were generally the allegations made.
18        Since he had no attorney and since he had --
19   didn't ask for the GSS file of the investigation of
20   the prosecution witnesses, he didn't -- couldn't and
21   didn't ask to -- to interrogate or to cross-examine --
22   sorry -- the GSS interrogators, the whole allegation
23   didn't -- was not examined.  That is one section of
24   due process issues in this case.
25        Another is --

Page 186

1    Q.  BY MR. YALOWITZ:  I'm sorry.  Just to
2    summarize, the -- the issue was the one section --
3    A.  The admission of out-of-court statements
4    that were allegedly coerced without -- I'm not saying
5    that it's -- that it's -- in no circumstances a court
6    of law cannot admit out-of-court statements when there
7    is an allegation that they have been coerced.
8         The court has a duty to examine such
9    allegations, to review them, to make sure that they
10   have not been coerced.  In this case, no such review
11   has been conducted.  And a serious judge should have
12   initiated such inquiry, not -- definitely in a case
13   where the defendant is not represented.  So this is
14   one section.
15        Another section is that Mr. Shwaysh --
16   Q.  Before we go on to the next section, may
17   I just ask you a couple questions about --
18   A.  Yes.
19   Q.  -- that section?
20        Thank you.
21        Karim Ratheb Younis Aweis [sic] testified
22   in the trial of Nasser Jamal Mussa Shwaysh; right?
23   A.  I think he did.  Yes.  He was the first --
24   he was the first prosecution witness.
25   Q.  Did Karim Ratheb Younis Aweis [sic] contend

Page 187

1    that his testimony was coerced?
2    A.  He denied that he signed some of the -- some
3    of the out-of-court statements and affirmed regarding
4    others.  He didn't -- in his testimony at Shwaysh's
5    trial, he didn't allege coercion.
6    Q.  Aweis was the one that we just talked about
7    a moment --
8    A.  Right.
9    Q.  -- ago who said that the -- that the killings
10   were revenge and he would kill more Jews if he had the
11   chance?  Is that the same guy?
12   A.  That's the guy.
13   Q.  Okay.  Now, you were going to tell us next
14   other -- about any other due process concerns that
15   you had?
16   A.  Mr. Shwaysh was in pre-trial detention --
17   pre-indictment detention for three months and nine
18   days between June 3rd, 2002, and September 12th, 2002.
19   We have no record of his happenings during that time.
20   And, again, I refer to my general assertions regarding
21   investigations in the GSS.
22        He eventually was convicted through
23   confessions he made, again, in installments and --
24   and not in -- not in a -- an official way.  It's
25   not that he was asked, "do you confess, do you plead

Page 188

1    guilty?" and he pled guilty.  He didn't.  Instead,
2    the court has convicted him based on things he said
3    in different hearings.
4         Again, I remind you that he was not
5    represented.  So I see that as a major due process flaw.
6    Q.  The -- the failure of representation?
7    A.  Yes.  The failure of representation, the
8    failure for effective defense --
9    Q.  So --
10   A.  -- to have an effective defense.
11   Q.  So -- so doesn't a defendant here in Israel
12   have the right to choose to represent himself if he
13   choses?
14   A.  That's right.
15   Q.  And do you believe that -- do you believe
16   that Mr. Shwaysh's choice was -- was not an informed
17   one?
18   A.  I do not know if it was an informed one
19   or not.  But I know that there is no record that the
20   judges in this court have made the extra mile they
21   had to do in order to explain to him before he says
22   things that can -- can incriminate himself.  Because
23   he didn't -- again, his -- he confessed in -- in --
24   again, in installments, in --
25   Q.  Do -- do you have the October 6th, 2002,

Page 189

1  transcript before you?
2      A.  October 6?
3      Q.  2002.
4      A.  Let's see.  You sure it's 2002?
5      Aah, October 6.  Yes, I can see it.
6      Q.  Mr. Kaufman reports that the -- the record
7  reflects the following statement by the defendant.
8  I'll read the English translation Mr. Kaufman provided.
9      "I do not want to be represented by a lawyer.
10 I have understood what the court has told me concerning
11 the need to be represented, but I maintain this
12 refusal."
13     Is that a fair translation?
14     A.  It is.  And then what happens next in the
15 same day?  The -- the defendant is giving his -- his
16 reaction to the -- to the indictment and actually
17 incriminates himself time and again.  It's not a plea.
18 The court does not find him guilty on that day.
19     Only after a case -- after several -- several
20 months, in January of 2003 -- on the 14th of January,
21 2003, the court says that, on the basis of what he
22 said back then in the first hearing, evidence hearing
23 on 6 October, 2002, they find him guilty of a list of --
24 of offenses.
25     Q.  What did the defendant say after the court --

Page 190

1  after he acknowledged that he understood what the
2  court told him --
3      A.  He said on --
4      Q.  -- concerning the need to be represented,
5  what did he then say that incriminated himself?
6      MR. HILL:  Objection.  Lack of foundation.
7      The witness can respond.
8      THE WITNESS:  He said on -- on Counts 1, 4,
9  10, 11, 12, 16, 20, 21:
10     (Reading/translating.)
11     "I have a -- I have a serious case, serious
12 problem.  If I" --
13     I -- no.  Sorry.
14     (Reading/translating.)
15     "I have a serious case.  If I would do these
16 small things, I would tell it to the court.  In No. 22,
17 she asked me.  I didn't send her."
18     Look, this -- these are things that the court
19 should have stopped him and say:  Look, I will -- you
20 don't want a lawyer, at least let me explain to you
21 what are the ramifications of things of that sort that
22 you're saying in open court, what you will be facing.
23 And then maybe you'll want to think again whether you
24 want a lawyer or not.
25     Q.  BY MR. YALOWITZ:  Mr. Kaufman reports that

Page 191

1  the witness gave evidence on the 10th of December,
2  2002.
3      A.  20th of December?
4      Q.  10th.
5      A.  10th of December?  Yes.
6      Q.  Is that correct?
7      A.  Uh-huh.  Yes, it is.
8      Q.  When Mr. Kaufman reports:
9      "At page 8 of the transcript, line 8 onwards,
10 the defendant admitted that he knew that" Nasser --
11     I'm sorry.
12     -- "the defendant admitted that he knew
13 that" Abd-el Karim Ratheb Younis "Aweis had armed
14 the suicide bomber ... with an explosives belt and
15 confessed to transferring" the suicide bomber "by car
16 to a location from where he made his way to Jerusalem
17 by hitchhiking."  (As read.)
18     Is that a --
19     A.  Which lines in the -- in page No. 8?
20     Q.  Page 8, line 8.
21     A.  Line 8?
22     MS. WEISER:  No, no.
23     MR. HILL:  What's the question?
24     Q.  BY MR. YALOWITZ:  I want to make sure the
25 witness --

Page 192

1      A.  What is the --
2      Q.  Is that a fair -- is that a fair translation?
3      A.  Let -- let me translate it from what I see.
4      (Reading/translating.)
5      "If one wants to send" --
6      This is the defendant speaking.
7      (Reading/translating.)
8      "If one wants to send a suicide bomber, there
9  is no need for four or five people -- people for this."
10     It doesn't say "people."  "For this."
11     (Reading/translating.)
12     "It's not true.  The person who put the
13 explosive belt on Mohammed was Abd-el Karim Aweis
14 and Abd-el Karim Mohammed Hasheika.  And they were
15 alone in the room."
16     I don't know what to infer from this, if
17 he knows that after the fact or he knew that back then.
18 I don't know.
19     Q.  Do you -- have you had an opportunity to
20 read Mr. Shwaysh's comments at his sentencing?
21     A.  I'm sure I have.  But let me remind myself
22 of it.  Which -- do you remember -- do you know which
23 date it is?
24     Q.  March 10th, 2003.
25     A.  I can't seem to find it.  Let's -- let's

Page 193

1    go on. I can't seem to find it, but let's go on.
2        Q. Okay. Fair enough.
3        Did you have an opportunity to read
4    Mr. Kaufman's report in advance of your deposition
5    here today?
6        A. Yes.
7        Q. And did you study his report carefully and
8    check it to see if it was accurate?
9        A. Factually?
10       Q. Yes.
11       A. I was more interested in the due process
12   assertions that he made. So I can't say that I have.
13       Q. All right. Did -- did you notice any errors
14   in his report with regard to his reporting of the facts?
15       A. Let me get his -- my copy of his report.
16       Q. Sure.
17       A. It's full of coffee stains. Sorry.
18       Q. That's all right.
19       A. Aah, this is not the one where I -- okay.
20   I don't -- I don't recall.
21       Q. Fair enough.
22       A. I'm not saying there wasn't and -- there
23   weren't any errors that I found, but I don't recall.
24       Q. Did -- did you come away with an impression
25   that he was an accurate reporter of the facts?

Page 194

1        A. I didn't really examine the accuracy of his
2    reports, definitely not in a resolution of translation
3    or dates or things of that sort.
4        Q. Do you believe, to a reasonable degree of
5    certainty, that Nasser Jamal Mussa Shwaysh is actually
6    innocent?
7        A. I cannot answer that question.
8        Q. And let me just ask you the same question
9    of Abd-el Karim Ratheb Younes Aweis.
10       Do you believe, to a reasonable degree of
11   certainty, that Abd-el Karim Ratheb Younis Aweis is
12   actually innocent?
13       A. I cannot answer that question. And, also,
14   it was not my mandate.
15       Q. When you say you can't answer that question,
16   what do you mean by that?
17       A. I mean that, as a lawyer, as a -- someone
18   that wants to be a serious lawyer, I cannot make
19   judgment calls based on partial -- a very small part
20   of the information in -- those cases.
21       Q. So do you think it's a tip-off as to guilt
22   or innocence that Abd-el Karim Ratheb Younis Aweis
23   said "the acts I did I am proud of them and there
24   is justification for what I did"?
25       MR. HILL: Objection. Lack of foundation.

Page 195

1        Q. BY MR. YALOWITZ: Do you think that that's
2    a tip-off that he's actually guilty?
3        A. Well, as a defense lawyer, it actually
4    raises my suspicion whether -- if he's so proud, maybe
5    he enlarges his role in those -- in those charges. But
6    it's not a tip-off not to this, nor -- nor to the other.
7        Q. In your view, when a man says, immediately
8    before his sentence, that he's proud of the acts, that
9    that doesn't give you any evidence as to whether he's
10   innocent or guilty?
11       A. No.
12       Q. Do you think that that's one of those things
13   where you're in sort of the small minority?
14       A. No. I think that serious defense attorneys --
15   I'm in a large majority. I think that especially in --
16   in cases where there is institutional due process
17   issues, there are many things that drive people to
18   admit to things they didn't do. And I didn't -- and
19   I'm not suggesting that any of those didn't do what
20   they were convicted of. I'm just saying that their --
21   their guilty pleas, their admissions out of court and
22   especially their pride, when they express such pride,
23   may be motivated by many things that are not necessarily
24   the truth.
25       Q. Have you ever had a client who maintained

Page 196

1    his innocence?
2        A. Did I have a client that maintained his
3    innocence? I had.
4        Q. And do clients -- in your experience, do
5    clients who maintain their innocence, immediately
6    before they're being sentenced, tell the court that
7    they're proud of what they did and they'd kill more
8    people if they could?
9        A. It happens only in -- in security related
10   cases.
11       Q. You've had such a client?
12       A. I don't recall that I had a client that
13   said that. But I recall many cases of that sort. Yes.
14       Q. Where clients maintained their innocence
15   and said that they're proud that they killed Jews?
16       A. Maintained their innocence in the sense
17   that -- instructed their attorneys to -- to present
18   a defense and to try to acquit them. And when they
19   are convicted, then they say things that might be
20   because these are -- this is the truth and it might
21   be because they want to be -- get some respect among
22   whatever community that thinks these kind of things
23   are -- are a matter to be proud of.
24       Q. In the parole system in Israel, does the
25   acceptance of responsibility and the acknowledgment

Page 197

1   of remorse play a role in whether parole will be
2   granted?
3       A.   A very significant role.
4       Q.   And so a defendant who is actually innocent
5   and wishes parole is in a tough spot?
6       A.   Very, very tough spot.  I had -- I had such
7   cases.
8       Q.   And in the cases that you've had in that
9   situation, did your clients say "I'm proud of what
10  I did"?
11      A.   In the parole board?
12      Q.   Yes.
13      A.   Look, someone that goes to the parole board
14  wants to get something.  So he wouldn't say that he's
15  proud.
16      Q.   Why don't we -- why don't we move to the
17  case of Kahira Sa'id Ali Sa'adi.
18      A.   Yeah.
19      Q.   Ali Sa'adi.  Do you have her file?
20      A.   No. 4.  Yeah.
21      Q.   She's the fourth one on the list.
22      A.   Yeah.
23      Q.   And before we go to her specifically, I've --
24  I've asked you a number of times about actual innocence.
25  And I think I've asked it before, but let me just make

Page 198

1   sure I've got it right.
2           Is it your opinion, to a reasonable degree
3   of certainty, that any of the 21 individuals who
4   were convicted of the terrorist activity that we're
5   discussing is actually innocent?
6           MR. HILL:  Objection.  Asked and answered.
7           THE WITNESS:  I have answered.  And I said
8   that I cannot make this.  And while we're at it, I'll
9   just say that what I need to have is a reasonable doubt
10  that they're innocent.
11      Q.   BY MR. YALOWITZ:  Well, you would agree
12  that's -- that's not up to you; right?
13      A.   No, no.  I mean, if you want me to make a
14  judgment call, this is the test that I should employ,
15  rather than what you suggested be with a degree of
16  certainty and so on.  But as I said, I didn't do
17  neither.  So I don't have any.
18      Q.   You didn't do either one?
19      A.   Right.
20      Q.   You don't have an opinion as to whether
21  there's a reasonable doubt of guilt or innocence?
22      A.   I cannot make any judgment without having
23  the full information, file, and all the relevant
24  material of the case.
25      Q.   So -- so let me just ask it in a really

Page 199

1   specific way, just so I have it on the record.  Okay?
2       A.   Okay.
3       Q.   For any of the 21 individuals convicted of
4   the crimes we're discussing today, is it your opinion
5   that you have a reasonable doubt about their actual
6   guilt?
7       A.   Reasonable doubt I might have.  But -- but
8   it's -- it's -- again, this is not the way to conduct
9   a -- a review of guilt or innocence.  You have to have
10  the full -- the full information.
11          And since, out of 21 cases, 21 are based
12  on out-of-court statements, admissions, about 17 or
13  18 of them of the accuseds themselves, some of them
14  of -- of co-conspirators, it is not possible for me
15  to make any judgment call without having the -- the
16  material that documents how these statements came about.
17      Q.   So I -- and I appreciate your answer.  And
18  I'm not trying to argue with you.  I just want to see
19  if I can get an answer to the very specific question.
20  And, again, "yes," "no," or "I can't answer 'yes' or
21  'no'" is fine.
22          For any of the 21, is it your opinion,
23  to a reasonable degree of certainty, that there is
24  a reasonable doubt about their guilt?
25          Do you have such opinion?

Page 200

1       A.   I cannot answer this question.
2       Q.   Thank you.  Okay.
3           MR. HILL:  Kent, do you mind, before you
4   start the next file, if we take a break?  We've been
5   on for a little over an hour.
6           MR. YALOWITZ:  That's fine.
7           (Recess from 3:11 p.m. to 3:19 p.m.)
8       Q.   BY MR. YALOWITZ:  Do you have the file of
9   Kahira Sa'id Ali Sa'adi before you?
10      A.   To say that I have the file would be an
11  exaggeration.  I have a very small part of the file
12  in front of me.
13      Q.   Well, I mean, are you -- are you saying
14  that you don't have something you were provided, or
15  are you making sort of a forensic point?
16      A.   No, no.  I'm saying that it is clear that
17  I don't have the full file.  This is -- but this is
18  what I received.
19      Q.   You have whatever file -- whatever file
20  your colleagues at Miller & Chevalier provided, you
21  have?
22      A.   Yes.
23          MR. HILL:  And for the record, he has what
24  Mr. Kaufman has.
25          MR. YALOWITZ:  Fine.  Okay.

Page 201

1        MR. HILL:  Or I guess, more precisely, what
2   the plaintiffs produced to us and represented as what
3   Mr. Kaufman had.
4        THE WITNESS:  Kaufman mentions an evidential
5   hearing and cross-examinations.  We don't -- we didn't
6   find any in our -- in -- in what we've received.
7        Q.  BY MR. YALOWITZ:  Let me ask my question
8   first, and then we'll go to your discussion.  Okay?
9        A.  Yes.
10       Q.  Based on the evidence you have reviewed,
11  pertaining specifically to the case of Kahira Sa'id
12  Ali Sa'adi, do you believe, to a reasonable degree
13  of certainty, that Ms. Sa'adi was actually denied
14  due process of law?
15       A.  I do.
16       Q.  Okay.  Please explain the evidential basis
17  for your opinion.
18       A.  Apart from the general assertions that I made
19  about the military court system as a whole, specifically
20  regarding Ms. Kahira Sa'adi, we have the benefit of
21  having Mr. Shwaysh's file.  And we know that she has
22  raised allegations of abuse during her interrogation
23  then.  And as I said, this was not reviewed.
24       She was detained for two months in a
25  pre-indictment detention, which was -- and most

Page 202

1   probably -- again, I cannot know for sure what, but
2   was probably denied access to an attorney.  One --
3   the only prosecution witness that we know for certainty
4   that took the stand in her case refused to answer any
5   questions.  And his out-of-court statement was admitted
6   eventually.
7        What else?  This is the only -- these are
8   the things that I have to say.
9        Q.  So the refusal of a prosecution witness to
10  testify and the admission of the witness' out-of-court
11  statement, is that a denial of due process?
12       A.  One of the main, most important due process
13  rights is to cross-examine evidence -- cross-examine
14  witnesses, incriminated -- incriminating witnesses.
15       Q.  Is the -- is the right of the prosecution
16  to admit an out-of-court statement, in the circumstances
17  where the witness refuses to testify, different in the
18  military courts and in the civilian courts?
19       A.  In theory, it is not.  In practice, it is
20  very frequent in military court and very rare in the
21  civilian court.
22       Q.  In the civilian courts, if a prosecution
23  witness refuses to testify, his or her out-of-court
24  statement will be admissible against the defendant;
25  correct?

Page 203

1        A.  It may be.
2        Q.  Please explain.
3        A.  It may be the judges would have to evaluate
4   what kind of damage has been done to the defense by
5   not being able to cross-examine.
6        Q.  Do the judges in the military courts have
7   the same obligation?
8        A.  I have never seen a serious consideration
9   of this in military courts.  But, again, in theory,
10  they are.
11       Q.  Is the -- is detention for two months a
12  violation of due process?
13       A.  Detention of two months may be a violation
14  of due process, especially when it comes with complete
15  isolation from the outer world and -- well, that's
16  my answer.
17       Q.  Do you have any evidential basis to conclude
18  that Kahira Sa'id Ali Sa'adi was isolated from the
19  outside world for two months?
20       A.  No.
21       Q.  Do you have any evidential basis to conclude
22  that Kahira Sa'id Ali Sa'adi was denied access to
23  an attorney for any period of time?
24       A.  I know that this is the policy of the GSS
25  in such cases and to, one, deny access to an attorney

Page 204

1   and, two, issue gag orders regarding the investigation,
2   not for the full two months necessarily.  It may be 10
3   or 20 days.  It may be more.  It may be less.  I would
4   expect, if I get the GSS file, to find there gag orders
5   and denial of access to attorney orders.
6        Q.  Let me try it again.
7        Do you have any evidential basis to conclude,
8   based on the evidence before you, that Kahira Sa'id
9   Ali Sa'adi was denied access to an attorney?
10       MR. HILL:  Objection.  Asked and answered.
11       THE WITNESS:  I don't have any -- any document
12  in this case that says this.
13       Q.  BY MR. YALOWITZ:  Thank you.
14       Now, did Kahira Sa'id Ali Sa'adi testify in
15  the trial of Nasser Jamal Mussa Shwaysh before or after
16  she was convicted of her crimes?
17       A.  Let's see.  Her conviction is on -- from July
18  15th, 2004.  Her -- she gave evidence on November --
19  24th November, 2002.  She gave evidence in Shwaysh's
20  trial before she was convicted in her trial.
21       Q.  Can -- can you explain why her counsel did
22  not raise the issue of coercion in her trial?
23       A.  That's a question that I'm struggling with.
24  I don't know.
25       Q.  Do you agree with me that her statements in

Page 205

1  the trial of Nasser Jamal Mussa Shwaysh would have been
2  available to her counsel?
3      A.  If they were available to her counsel?
4  I guess that, if he would demand to receive them or
5  ask the defense attorney of Shwaysh, he would get it.
6      Q.  Or ask her?
7      A.  Ask her for the transcript of what she said
8  at Shwaysh's trial?  She wouldn't have it.
9      Q.  Ask her to tell him what she said?
10     A.  Yes.
11     Q.  And was he permitted to accompany her to
12  her testimony in the Shwaysh trial?
13     A.  I don't see why not.
14     Q.  Why don't we go to the case of Sana'a Mohammed
15  Shchada.
16     A.  No. 5.
17     Q.  By the way, were you aware that Kahira Sa'id
18  Ali Sa'adi has been released?
19     A.  I think I heard that from defense attorneys
20  in recent days.  But I was not aware.
21     Q.  Did you speak to her about her conviction?
22     A.  No.
23     Q.  Was there anything preventing you from doing
24  that?
25     A.  I have no idea where she is.  I have no idea.

Page 206

1  I don't know her.
2      Q.  She -- she's -- she's a Palestinian resident;
3  is that right?
4      A.  I have no idea.
5          MR. HILL:  Objection.  Lack of foundation.
6      Q.  BY MR. YALOWITZ:  Are you aware that
7  Palestinian residents carry ID cards that -- that
8  the Palestinian Authority issues?
9      A.  With the consent of the civil administration,
10  yes.  But if she was released under some kind of
11  a prisoners' release thing, she might be deported.
12  I don't -- I have no idea.
13     Q.  Do -- do you think the Palestinian Authority
14  would be able to find her?
15     A.  I don't know.
16     Q.  Do you have the case of Sana'a Mohammed
17  Shchada before you?
18     A.  Yes.
19     Q.  And do you have the -- your notes about her
20  case as well?
21     A.  Yes.
22     Q.  Now, based on the evidence you have reviewed,
23  pertaining specifically to the case of Sana'a Mohammed
24  Shchada, do you believe, to a reasonable degree of
25  certainty, that Ms. Shchada was actually denied due

Page 207

1  process of law?
2      A.  According to the very limited material that
3  I have -- and it's really limited, it's only a small
4  fraction of what I would expect to have in this file --
5  and with the benefit of knowing that Ms. Shchada has
6  given testimony at Shwaysh's trial, I can say that
7  there is a grave chance that she was denied due
8  process both because she alleged to have been abused
9  in custody and this abuse was not inquired -- this
10  allegation was not inquired.  She actually alleged
11  that she was abused, intimidated, and coerced to sign
12  statements.  Allegations of rape, threats, threat to
13  arrest her mother, forced to sign, and so on.
14     Q.  I'm sorry.  Did you say allegations of rape
15  or allegations of --
16     A.  Of threatened rape.
17     Q.  -- of threatened rape?
18     A.  Of threatened rape.  Right.
19         And -- and since she has pleaded -- she has
20  pleaded guilty as part of a plea bargain, there was
21  no evidential hearing whatsoever.
22     Q.  What was the date of her plea?
23     A.  It's the 20 -- April 29th, 2004, which
24  means that both Sana'a and Kahira have testified
25  at Shwaysh's trial before their trial was over, in

Page 208

1  contravention to the predominating judgment at that
2  time in the Israeli civilian courts, which, as I
3  explained, prohibit accomplices testifying before
4  their own trials conclude.
5      Q.  Do you know her counsel?
6      A.  I do not know her counsel.  But according
7  to the name, it's a woman, Ahlam Hadad.
8      Q.  Ahlam Hadad.
9      A.  But I don't -- you know what?  I'm not sure.
10  I think that --
11         (Inaudible comment by Mr. Mishnayot.)
12     Q.  BY MR. YALOWITZ:  Mr. Kaufman reported
13  that Ahlam Hadad is an extremely experienced
14  attorney with whom he is familiar and who he
15  knows to represent many individuals facing trial
16  at the JMC.
17         Do you have any reason to doubt that
18  statement?
19     A.  I don't know Attorney Hadad.
20     Q.  That would be a "no"?
21     A.  That would be I don't know her and I can't
22  make any judgment about her.
23     Q.  Fair enough.
24         Other than the allegation of coercion, was
25  there anything else that you noticed that gave you

Page 209

1  due process concerns?
2     A.  I just defer to the general due process
3  failures that I find in the military court system
4  as a system.
5     Q.  And as with the case of Kahira Sa'id Ali
6  Sa'adi, do you have any explanation for why Sana'a
7  Mohammed Shchada did not raise allegations of coercion
8  in her own case?
9     A.  I would -- I -- I guess that the reason for
10  that was the desire to plea.  That was probably one --
11  this is just an assessment that I make, that this
12  was one of the cards they had in the negotiations,
13  that they would raise it in court.  But I don't know.
14     Q.  One of the cards that the defendant had?
15     A.  Yeah.  I don't know.  This is just --
16     Q.  So should we talk about Abdullah Barghouti?
17     A.  Yes.
18     Q.  Have you heard of Mr. Barghouti before your
19  work in this case?
20     A.  I guess I have like any Israeli.
21     Q.  Tell me what -- just -- just, like, maybe
22  in New York we know more about John Gotti than you
23  might.  Just tell -- tell -- for the benefit of the
24  New Yorkers who are on the jury, just tell us who
25  Abdullah Barghouti is.

Page 210

1     MR. HILL:  Objection.  Lack of foundation.
2     THE WITNESS:  I -- I'm --
3     MR. HILL:  The witness can respond.
4     THE WITNESS:  I'm not able to say something
5  that is not based on newspaper clips.  And even that
6  I cannot do because it was 2003 or '4 or '5 when he
7  was detained and -- and tried.  So it will be improper
8  for me to start giving him crowns.  But he was a major
9  wanted guy, a guy that was wanted by the security forces
10  for being an important figure in Palestinian militant
11  organizations.
12     Q.  BY MR. YALOWITZ:  Wanted for being a
13  terrorist?
14     A.  Wanted for being engaged -- yeah, for being
15  a terrorist.
16     Q.  Wanted for many years for being a terrorist?
17     A.  I don't know.
18     Q.  It was big news when he was arrested?
19     A.  You really think that I remember what the
20  news were like ten years ago?
21     Q.  I don't know.
22     A.  Well --
23     Q.  I'm asking.
24     A.  I don't know.  I don't remember.
25     Q.  You lived here.  I didn't.  So I'm trying

Page 211

1  to find out.
2     A.  Okay.  So I don't remember.  You know, in
3  Israel, we have big news every other day.
4     Q.  Based on the evidence you've reviewed,
5  pertaining specifically to the case of Abdullah
6  Barghouti, do you believe, to a reasonable degree
7  of certainty, that Mr. Barghouti was denied due
8  process of law?
9     A.  If, in previous cases, I said that I have
10  a small fraction of the file, here I would say that
11  I have almost one digit percent of what I would expect
12  to be -- to have -- to have in the file.  It is very
13  difficult for me to answer the question.
14        I know for sure, not because of -- of this
15  file, but because of the next one that we will deal
16  with, that Mr. Barghouti was interrogated under the
17  necessity doctrine and -- and that he was -- physical
18  means of interrogation were used against him.  He was
19  detained for three months before an indictment was
20  served.
21     Q.  Mr. Sfard, what I'd like to do is do how we
22  did before, where you give an answer to the question
23  and then we can -- I promise you you'll get a chance
24  to --
25     A.  Okay.

Page 212

1     Q.  -- say all the basis.  I really do promise
2  that.  I don't -- I don't want to be rude.  I don't
3  want to cut you off.  But I need to make my record.
4     A.  There were due process failures in his case.
5     Q.  And you believe, to a reasonable degree of
6  certainty, that he was actually denied due process of
7  law?
8     A.  That -- I would say it in my language.  There
9  were due process failures in his case.
10     Q.  Well, I appreciate there's a distinction.
11        Can you tell me -- I'll just -- I'll just
12  try it one more time.
13        Can you tell me:  Is it your opinion,
14  to a reasonable degree of certainty, that Abdullah
15  Barghouti was actually denied due process of law?
16     A.  In order to make that, I need more information
17  about his case.  As I said, unlike other cases in
18  this case, the amount of evidence that I have is even
19  smaller, which still suggests to due process failures.
20  If that amounts -- if -- does that translate to he
21  did not get a fair trial?  I guess that it might.
22     Q.  Is -- is that the highest degree of certainty
23  you can provide me with regard to the case of Abdullah
24  Barghouti?
25     A.  Yes.

Page 213

1    Q.  Thank you.
2         Okay.  Now, please tell me, in summary
3    fashion, and then we can -- well, no.  Let me strike
4    the question.
5         Please tell me the due process concerns
6    that you have with the case of Abdullah Barghouti.
7    A.  Well, as I began to say, he was interrogated
8    under the necessity means, which means that he was
9    physically abused and maybe mentally.  I do not know
10   what exactly were the methods that were used against
11   him because the evidence as to the methods were denied
12   from plaintiffs and defense in this case.  I do not
13   have the --
14   Q.  I'm sorry.  What did you mean by "plaintiffs"?
15   A.  I mean your clients.
16   Q.  Oh, you mean the -- the evidence was not
17   available in the court --
18   A.  No.
19   Q.  -- file?
20   A.  Was not available to us here.  We --
21   Q.  I -- I don't understand.
22   A.  Okay.  Let me -- let me start over.
23        In the next case, Case No. 7, of Ibrahim
24   Hamed, we've received a judgment, a ruling of the court,
25   which described the evidence that was presented there.

Page 214

1    And in the -- in the ruling, the judges have commented
2    that one or two of the GSS interrogators of Abdullah
3    Barghouti that was a prosecution witness in the other
4    case, in Ibrahim Hamed's case, confirmed that he,
5    meaning Abdullah Barghouti, was interrogated according
6    to the necessity defense, meaning that they have used
7    physical means and other means in interrogation.
8         What are the exact means except a slap or
9    slaps that they have -- that the judges have affirmed to
10   have happened, we do not know, because their testimonies
11   in Ibrahim Hamed's case were held in closed doors and
12   we do not have the transcripts of their testimonies.
13        So I would expect that, in Abdullah
14   Barghouti's file, we will find more information
15   about this.  Unfortunately, we do not have the GSS
16   file that -- that would teach us what happened in
17   the interrogation room.  So --
18   Q.  What else besides coercive interrogation
19   tactics do you have in mind when you say that you
20   believe that Abdullah Barghouti was actually denied
21   due process?
22   A.  No, this is the main thing, the coercive
23   methods of interrogation.
24   Q.  Okay.
25   A.  Then --

Page 215

1    Q.  May I ask about that before we move on?
2    A.  Sure.
3    Q.  In the case of Abdullah Barghouti, was --
4    were his post-arrest statements admitted as evidence
5    against him?
6    A.  No.  He pleaded guilty.
7    Q.  So -- so --
8    A.  Without a bargain [sic].
9    Q.  So the -- without a -- without a plea bargain?
10   A.  That's right.
11   Q.  And -- and then he made a lengthy statement
12   to the court?
13   A.  That's right.
14   Q.  He said:  "I do not regret even one of the
15   acts that I carried out, and the court is -- and the
16   court knows that I taught dozens of engineers who will
17   do the work better than me."
18        MR. HILL:  Objection.
19   Q.  BY MR. YALOWITZ:  Is that right?
20        MR. HILL:  Lack of foundation.
21        The witness can respond.
22        THE WITNESS:  That -- that's what is written
23   in the transcript.  Yes.
24   Q.  BY MR. YALOWITZ:  And when he's speaking
25   of engineers, he's speaking of people who make bombs

Page 216

1    to blow up civilians; right?
2    A.  That's what I --
3        MR. HILL:  Objection.  Lack of foundation.
4        THE WITNESS:  That's what I --
5        MR. HILL:  The witness can respond.
6        THE WITNESS:  -- understand from that.
7    Q.  BY MR. YALOWITZ:  And -- and I -- I take
8    it -- we've discussed this before.
9        But I take it you categorically reject that
10   tactic; right?
11   A.  Yes.
12   Q.  You believe it's a war crime; right?
13   A.  I think it's even a crime against humanity
14   when it's con -- when it is conducted as part of a
15   large-scale attack.
16   Q.  Do you think that -- do you -- is it your
17   opinion that the attacks against Israeli civilians
18   during the Second Intifada was sufficiently wide
19   scale that it constituted crimes against humanity?
20   A.  Yes, I do.
21        Can I say something?
22   Q.  Of course.
23   A.  This is where a society is measured, in
24   providing due process and a fair trial to the most
25   heinous crimes, even crimes against humanity, to

Page 217

1    the most heinous alleged perpetrators.
2        Q.   Do -- do you have any doubt that Abdullah
3    Barghouti is guilty of the crimes he admitted?
4        A.   This is not something that I have assessed
5    or had the mandate to assess.  And since I do not
6    have the full file, I cannot answer this question.
7        Q.   Did -- did you -- did the counsel for the
8    Palestinian Authority and the PLO provide you with
9    Abdullah Barghouti's testimony in this case?
10       A.   Testimony?  You mean --
11       Q.   Were you aware that Abdullah --
12       A.   There was -- there was -- there was a request
13   that I saw here and the transcript of a Magistrate
14   Court in Jerusalem hearing, in which the -- the lawyers
15   for plaintiffs asked for a contempt of court order
16   against Mr. Barghouti.
17       Q.   Were you aware that Mr. Barghouti was brought
18   to give testimony so that the jury could hear for itself
19   what he had to say?
20       A.   I only was aware of what I said, that there
21   was a -- I under -- all I saw was a request for legal
22   assistance and then a -- a transcript of a motion for
23   a contempt of court order against Mr. Barghouti for,
24   if I understood correctly, not willing to give
25   testimony --

Page 218

1        Q.   Did -- did you --
2        A.   -- to testify.
3        Q.   Were you aware that a videotape was made
4    of Mr. Barghouti's -- the questioning of Mr. Barghouti
5    in connection with the request that the plaintiffs in
6    my case made to question him?
7        A.   No, I was not aware.
8        Q.   And -- and did -- who -- who did you work
9    with -- who did you work with in preparing for today?
10   Mr. Hill?
11       A.   Mr. Hill.
12       Q.   Did Mr. Hill show you that videotape of
13   Abdullah Barghouti?
14       A.   No, he didn't.
15       Q.   Should we go to Ibrahim Hamed?
16       MR. HILL:  I'm not sure -- maybe it's been
17   asked and I missed it.  But I don't know if the witness
18   has fully answered the question about due process with
19   respect to this individual or not.
20       MR. YALOWITZ:  Well, it's a little unorthodox,
21   but --
22       MR. HILL:  Well, you promised him that you'd
23   give him a chance to do so.  So I -- I don't know if
24   that was done or not.  That's the only --
25       MR. YALOWITZ:  I -- I --

Page 219

1        MR. HILL:  -- objection I guess I'm raising.
2        Q.   BY MR. YALOWITZ:  I thought that -- I
3    thought that we talked about it.
4        But is there anything else that you feel we
5    should discuss about Abdullah Barghouti?
6        A.   Only the general assertions that I've made
7    about the system as a whole.
8        Q.   Thank you.
9        A.   Yes.  Mr. Hamed.
10       Q.   Mr. -- do we say "Hamed"?
11       A.   "Hamed."
12       Q.   "Hamed."  I don't know if we need to write
13   that down, but it's okay if you did.
14       Do you have the Hamed file before you?
15       A.   I do.
16       Q.   You've reviewed it before?
17       A.   I have.
18       Q.   Based on the evidence that you've reviewed,
19   pertaining specifically to the case of Ibrahim Hamed,
20   do you believe, to a reasonable degree of certainty,
21   that Mr. Hamed was actually denied due process of law?
22       A.   I do.
23       Q.   I'm sorry?
24       A.   I do.
25       Q.   What is the evidential basis for your opinion?

Page 220

1        A.   Okay.  This is the only case in which some
2    at least of the GSS file has been provided and that
3    show -- and what we see from the file is, as a whole,
4    first of all, that the case took six years.  The
5    prosecution has received extensions, continuances,
6    time and again to provide investigation material to
7    the defense.  So the only case in which, you know,
8    the whole 21 files, where the defense apparently
9    asked for the GSS memorandums.
10       Q.   Mr. Sfard, I apologize for interrupting.
11   But if I could just ask you about that topic, and
12   then we'll --
13       A.   Okay.
14       Q.   -- we'll continue to others.
15       Would that be helpful to you, or did you --
16       A.   I don't mind.
17       Q.   -- want to continue?
18       A.   I don't mind.  Go on.
19       Q.   Okay.  The -- I mean, I don't want to debate
20   with you any further about the absence of requests for
21   GSS files.  I think we've --
22       A.   Covered that.
23       Q.   I think we've covered that.
24       So with regard to the GSS files in the Hamed
25   case --

Page 221

1    A.  Yeah.
2    Q.  -- is it your impression that -- that counsel
3  for Hamed and counsel for the prosecutor [sic] kind of
4  fought it out over what was going to be produced over
5  a long period of time?
6    A.  I was not under the impression that they
7  fought it out.  But I was under the impression that
8  the prosecution failed to provide.  And every -- every
9  time there was a revelation that more material was not
10  handed over, and then the trial was stopped for months
11  and months.
12    And, eventually, the -- the defense attorney
13  asked the tribunal to recuse itself because it keeps
14  on providing continuances to the prosecution.  So the
15  case -- the -- the actual evidence hearings took place
16  almost three years after the indictment was filed.
17    Q.  And do I have it right that the court itself
18  expressed displeasure at the continuances?
19    A.  I think it has, but --
20    Q.  Okay.
21    A.  -- but, nevertheless, provided them.
22    Q.  Okay.  Please -- please continue with other --
23  in addition to the delay, anything else --
24    A.  So --
25    Q.  -- specific that you felt raised a due

Page 222

1  process concern?
2    A.  So Mr. Hamed was interrogated for five
3  consecutive days with -- almost with no rest,
4  according to the GSS memorandums.  Interrogations
5  that took 16 hours and then half hour rest and then
6  another 16 hours and so on and so forth, at the end
7  of which he incriminated himself.  He kept -- he kept --
8  he kept his innocence plea -- or not a plea.  He kept
9  saying that he was innocent or not incriminating himself
10  until that fifth or sixth day.  If you want the dates,
11  he was detained on -- in the morning of May 23rd, 2006.
12  And then he was -- and he has incriminated himself on
13  the 29th of May, 2006.
14    He -- later he was -- he was denied a lawyer
15  for at least 11 days.  I don't know if, after that,
16  he saw a lawyer.  But, nevertheless, we have documents
17  that show that he was denied a lawyer for at least 11
18  days.  And he saw a lawyer only after he incriminated
19  himself.  He has alleged --
20    Q.  I'm sorry.  Did -- were his statements to
21  the GSS used as evidence in his trial?
22    A.  Yes.
23    Q.  And did he allege that those statements have
24  been coerced?
25    A.  I do not have the transcript of the trial,

Page 223

1  unfortunately.  I only have bits and pieces of it.
2  Much of it is -- is missing.  I know, by reading
3  the ruling of the trial, that -- that the -- the
4  judgment -- that -- in which the judges describe
5  the cross-examination of GSS interrogators, that
6  in the cross-examination, his defense attorney has
7  alleged that they have abused him, just as they
8  have been confronted with an allegation that they
9  have abused prosecution witnesses.  And they have
10  confirmed -- some of them have confirmed to have
11  used physical means, both against Abdullah Barghouti,
12  a prosecution witness, and against Mohammad Arman,
13  also a prosecution witness.
14    Q.  And did -- did the defense succeed in getting
15  the post-arrest statements suppressed on the grounds
16  of coercion?
17    A.  You're referring to the defendant's detention
18  custody statements?
19    Q.  Right.  We're sort of jumping around a little
20  bit.
21    A.  Yes.
22    Q.  Why don't we start with the defendant --
23    A.  But let -- that's simple.
24    Q.  -- himself?
25    A.  None of the out-of-court statements were

Page 224

1  suppressed.
2    Q.  Okay.  Did the -- did the defendant instruct
3  his counsel to tell the court that his view of the
4  court is that he doesn't recognize the competence
5  of the court to try him?
6    A.  It did happen in some of those case -- cases.
7  I can't remember if in this case it happened.  But --
8    Q.  Mr. Kaufman reports that this happened on
9  the 30th of October, 2011.
10    A.  30th of October, 2011?  I do not have a
11  transcript from October 30th, 2011.
12    Are you sure this is the date?
13    Q.  Perhaps there's a typo?
14    A.  Let's see.
15    Q.  We'll have to check it.
16    Why don't we -- why don't we assume that
17  Mr. Kaufman has accurately transcribed something --
18    A.  Okay.
19    Q.  -- but has perhaps has misrecorded the date.
20  If it turns out that our assumption is incorrect, then
21  our discussion will not be shown to the jury.
22    A.  Though it seems odd that, after five years,
23  he would say that.  But it's fine.  It is possible.
24  The case started in 2006.
25    Q.  So I think you said there were cases in

Page 225

1 which the defendant instructed his counsel to tell
2 the court that they rejected the court's competency?
3     A.  Yes.  But if it happened in this case, it
4 didn't -- it didn't -- it wasn't translated into an
5 instruction not to hold a defense.
6     Q.  All right.  Anything else about the --
7 anything else about the trial of Ibrahim Hamed that
8 you want to point out as raising due process concerns?
9     A.  Yes.  So on June 5th, 2006 -- sorry -- yeah,
10 June 5th, 2006, which is almost two weeks after his
11 arrest and after he has incriminated himself, he
12 withdrew his -- his previous confessions and asked
13 to see a lawyer.  This is how we know that he hasn't
14 seen a lawyer.  And he was told that he's denied.
15     But he withdrew his previous confessions,
16 which -- which gives us a window, a peek into what
17 you can get in the GSS file.  If we would not receive
18 the GSS file and we would have a skeleton file, like
19 we have in the other 20, we would miss the fact that,
20 at a certain point, the defendant has retracted from
21 a previous statement and demanded to see a lawyer.
22 So we see that here.
23     In his -- in a hearing at the Military Court
24 of Appeals on July 20th of 2006 -- that's -- that's
25 two months after he was detained -- there was a decision

Page 226

1 of the first instance to prolong his detention.  And
2 he appealed.  And he said in court -- he claimed that
3 he was coerced to sign false statements and that he
4 was attacked by the investigators after he refused
5 to sign the statement.
6     Q.  I'm sorry.  I -- I was asking in -- you've --
7 you've said that Mr. Hamed raised allegations of
8 coercion?
9     A.  Yes.
10     Q.  Okay.  In addition to his allegations of
11 coercion --
12     A.  Oh, okay.
13     Q.  -- is there anything else that you believe
14 supplies an evidential basis in his case for your
15 conclusion that there is specific evidence raising
16 due process concerns?
17     MR. HILL:  Let me just object to the form.
18     You don't mean to exclude anything that he's
19 already testified to; right?
20     MR. YALOWITZ:  Anything else.
21     MR. HILL:  Okay.
22     MR. YALOWITZ:  Right.
23     Q.  BY MR. YALOWITZ:  We've already gone over
24 one thing.  Rather than have -- I mean -- and I mean
25 no -- I mean no disrespect.

Page 227

1     MR. HILL:  No, but I think he --
2     THE WITNESS:  Okay.  I just said --
3     MR. HILL:  My -- my objection is that he's
4 mentioned more than one thing and you're not trying
5 to limit his testimony now, are you?
6     Q.  BY MR. YALOWITZ:  Go ahead.
7     A.  Okay.  I mentioned several things, including
8 the length of the trial and all -- all those six years
9 he was in detention.  So --
10     Q.  Fair enough.
11     A.  -- the idea of --
12     Q.  You did -- you did mention --
13     A.  I mentioned that.  I mentioned the coercive
14 measures allegedly used against him.  I mentioned
15 the coercive measures allegedly used against other
16 prosecution witnesses.
17     Q.  Right.  So in addition to the things you've
18 already mentioned, is there anything else you want
19 to mention?
20     A.  Let me see.
21     Q.  Right.  I'm not trying to trick you --
22     A.  No, no.  Okay.
23     Q.  -- into agreeing --
24     A.  I'm -- I'm --
25     Q.  -- with something.

Page 228

1     A.  I just want to make sure I don't -- I'll
2 just mention the fact that he was eventually convicted
3 based on out-of-court statements that were admitted
4 and the general due process failures that I again
5 and again refer to.
6     Q.  All right.  And -- and I'm -- I mean, look,
7 I'm -- I'm trying to get through it.  You've got a
8 lot of things that you're telling me that were not
9 in your report.  And so I'm trying to let you describe
10 all of your opinions so that we understand them.  And
11 I honestly have said that I'll assume that your general
12 comments will apply to --
13     A.  Okay.
14     Q.  -- all of the cases.
15     A.  Okay.
16     Q.  And -- and you -- you know, we don't know
17 each other that well.  But when I say that, I'm not
18 screwing around.  So --
19     A.  Okay.
20     Q.  So I'm trying to get through the evidence
21 with you.  And -- and I know it's -- would you like
22 a break?  Would that help us focus?  Shall we pursue
23 it now?  What's your pleasure?
24     A.  I'm -- I'm okay.  I mean, if you want to
25 have a break, I'm willing to have a break.

Page 229

1    Q.  All right.  I -- let's take a break.
2    A.  Okay.
3        (Recess from 4:04 p.m. to 4:10 p.m.)
4    Q.  BY MR. YALOWITZ:  I just wanted to ask you
5  one thing about Abdullah Barghouti.
6        He was convicted of being a bomb maker; right?
7    A.  I'll take your word for it.  He was convicted
8  of so many things that I -- I guess he was.  Yes.
9    Q.  And this necessity defense that we've been
10  talking about, have you sometimes heard it called the
11  "ticking time bomb"?
12    A.  Yes.  There were -- in -- in the past,
13  before the High Court has ruled out the five physical
14  techniques, the language used by the GSS was "ticking
15  bomb."  Now they're talk -- now it's "necessity."
16    Q.  Same concept?
17    A.  I never equated between the two.  But this
18  is the concept that the High Court has used.  This is
19  why today we're talking about "necessity."
20    Q.  I mean, I'm -- I'm not asking you to agree
21  that the concern that there is a ticking bomb actually
22  is a necessity.  You -- I --
23    A.  I may agree.
24    Q.  You may.  I don't know.
25    A.  I may agree.  But I don't think that -- or

Page 230

1  I'm positive that statements made in such -- under
2  such conditions can be an evidence in a court of law.
3  It's one thing to -- to do something that is illegal,
4  but you have a defense.  And it's completely a different
5  thing to use it in a court of law in order to convict
6  someone.
7    Q.  Should we go to Ahmed Barghouti?
8    A.  Yeah.  I -- I would have to say that I do
9  not accept that torture is ever permissible.  And the
10  idea of a ticking bomb is never, like in the Hollywood
11  movies, a sure thing.  So I do not accept the idea that
12  there can be a -- a framework in which it is permissible
13  to torture anyone.
14    Q.  I have to say I was surprised at your last
15  answer, because I thought that would have been your
16  opinion.
17    A.  Well --
18    Q.  But anyway --
19    A.  As we -- as we discussed before, not every
20  abuse is -- amounts to torture.
21    Q.  Oh, fair enough.  Okay.  I understand what
22  you're saying.
23        Torture is never acceptable?
24    A.  That's right.
25    Q.  Period, full stop?

Page 231

1    A.  I -- this is -- I -- I cannot agree with
2  you more.
3    Q.  And do you know -- just before -- I can't
4  help it.  But do you know, before we leave Barghouti,
5  what the coercive tactics that were alleged --
6    A.  Against --
7    Q.  -- against -- against [sic] Abdullah
8  Barghouti?
9    A.  I do not, because the detailing of those
10  techniques have not been provided to us.
11    Q.  Did -- did his counsel argue that they
12  amounted to torture, as opposed to cruel, inhuman,
13  and degrading treatment?
14    A.  Mr. Barghouti pled guilty with no bargain,
15  as -- as I explained before.  And there was no --
16  almost no defense with merits.
17    Q.  And -- and did -- did the counsel of Hamed
18  argue that coerced statements by Barghouti and others
19  that were offered in the Hamed case were the product
20  of torture, as opposed to cruel, inhuman, and degrading
21  treatment?
22    A.  What we have is the ruling of the court.
23  And from that, I learned what the parties have argued,
24  because we do not have their summations.  And from
25  what the court described, the reference of the defense

Page 232

1  was to supression of evidence rather than to the
2  classification of whether it's torture or degrading
3  or inhumane treatment or just abuse that is neither.
4    Q.  And -- and -- I -- okay.  I think I have it.
5  Thank you.
6        Now, let's go to Ahmed Barghouti.  Do you
7  have the Ahmed Barghouti file?
8    A.  Yeah.
9    Q.  Do you believe, to a reasonable degree of
10  certainty, based on the evidence that you've reviewed
11  pertaining specifically to Ahmed Barghouti's case,
12  that he was actually denied due process of law?
13    A.  Since you want me to be short, I will say
14  that, regarding his investigation, I do have -- I
15  do believe that he was denied due process.  His trial
16  was, as far as I understand, very short, no evidential
17  hearings.  He pleaded guilty.  And -- and so I don't
18  have much to say about the trial.  I can say that he
19  alleged physical abuse in interrogation.  But since he
20  pled -- pleaded guilty, there was no inquiry of that.
21    Q.  And other than his allegation of physical
22  abuse, what other evidential basis do you have for
23  your opinion concerning due process with regard to
24  Ahmed Barghouti?
25    A.  I know that -- I -- well, in this case, the --

Page 233

1  the missing material is -- is the vast portion of the
2  case. We only have the indictment -- amended indictment
3  and the judgment. So I cannot say much. I -- I can
4  say that -- no, I said already.
5      Q.  Thank you.
6          Do you -- did you see, in the file, that
7  Ahmed Barghouti had sentenced -- called for the death
8  penalty against Ariel Sharon and said he regretted
9  nothing?
10     A.  I remember that.
11     Q.  Should we talk about Mohammed Messalah?
12     A.  Yes. One second. Yeah.
13     Q.  Do you have the Messalah file before you?
14     A.  I have the parts of it that were given to me.
15     Q.  You have everything that was given to you?
16     A.  Yes.
17     Q.  Based -- and you've reviewed it in the past;
18  right?
19     A.  I'm sorry. I'm not on the right one.
20         Yeah. And I have, yes.
21     Q.  All right. Let me know when you're ready.
22  I don't want to rush you.
23     A.  Okay. I'm -- I'm with you.
24         Let -- let me just say for the record, what
25  I have is an amended indictment, a verdict based on

Page 234

1  a plea, and one police statement. That's all I have.
2  This is a very, very slim file that we've received.
3  And, of course, it doesn't represent the whole file.
4      Q.  This is a case that -- that ended early in
5  a plea bargain; is that right?
6      A.  Yes.
7      Q.  Now, based on the evidence that you've
8  reviewed, pertaining specifically to the Mohammed
9  Messalah case, do you believe, to a reasonable degree
10  of certainty, that Mr. Messalah was actually denied
11  due process of law?
12     A.  It is difficult for me to make assertions
13  on this case because I have a very limited part of
14  the file. So I defer to the general points that
15  I made and also to the fact that, in this case,
16  the plea of guilt was made by the -- by the defense
17  attorney and -- sorry. I -- I have nothing to add
18  to what I said.
19     Q.  You're not saying it's a violation of due
20  process for the defense attorney to communicate the
21  plea of guilt?
22     A.  No, no, no, no, no. I -- I was -- I thought
23  something. I was wrong. I take it back. Fine.
24     Q.  Okay.
25     A.  Okay.

Page 235

1      Q.  Very good.
2          Is there anything you'd like to add, other
3  than your general statements which we've -- which
4  we've agreed amongst ourselves apply to all 21 of
5  the defendants?
6      A.  Not in this case. I don't have anything to
7  add.
8      Q.  Okay. Thank you.
9          Now then, let's go to Mahmoud [sic] Sami
10  Ibrahim Abdallah.
11     A.  Yes.
12     Q.  Do you have the -- the files you've been
13  provided before you of Mahmoud [sic] Sami Ibrahim
14  Abdallah?
15     A.  Yeah.
16     Q.  And based on the evidence you've reviewed,
17  pertaining specifically to the case of Mahmoud [sic]
18  Sami Ibrahim Abdallah, do you believe, to a reasonable
19  degree of certainty, that Mr. Abdallah was actually
20  denied due process of law?
21     A.  Here I also want to make clear, for the
22  record, that all we've received was a statement,
23  out-of-court police statement, an amended indictment,
24  a verdict, and a sentence. This is all we have --
25  all I have.

Page 236

1          From the little that I have, I can say that
2  Mr. Abdallah was in pre-trial detention for two months.
3  He has implicated himself 19 days after he was detained.
4  If we had the full file, maybe we would see that he'd
5  implicated himself earlier. But from what I see in
6  the file that I have, his first self-incrimination is
7  19 days after he was detained. And so all the things
8  that I've said about the GSS interrogations apply and,
9  of course, the general things that I've said before.
10     Q.  This is a case that ended also in a plea
11  bargain; right?
12     A.  Yes. With no evidence heard.
13     Q.  And at sentencing, the accuse -- the accused
14  stated that he had committed the offenses for which he
15  had been convicted because of the occupation; right?
16         MR. HILL:  Objection. Lack of foundation.
17         THE WITNESS:  This is what the -- did he --
18  what did he say?
19     Q.  BY MR. YALOWITZ:  Sure. Why don't we get
20  you oriented.
21     A.  Yeah, but I --
22     Q.  Take a moment.
23     A.  I don't think I have --
24     Q.  May 13th of '03?
25     A.  What Bate number? I -- I -- I do not --

Page 237

1  but go on.  I don't have it.  But --
2      Q.  That's all right.
3      A.  -- it might -- I mean, this is common for
4  people to say that, because of the occupation.
5      Q.  All right.  Fair enough.  I think it's not
6  necessary.  I think everybody understands the point.
7      A.  Okay.  Are we moving to Mr. Ghanem?
8      Q.  "Ghanem."
9      A.  "Ghanem."  That's right.
10         MR. HILL:  You guys are just clipping along
11 now.  What were you worried about?
12         MR. YALOWITZ:  Was that off the record?
13         MR. HILL:  I don't know.  If Brenda took
14 it down, it's on -- then it's on.
15         THE WITNESS:  Mr. Ghanem, yeah.
16     Q.  BY MR. YALOWITZ:  All right.  Let's -- let's
17 do the "yes" or "no" question first.  And -- and -- and
18 then you'll give me your comments.
19         You -- you've reviewed the files that your
20 counsel has been provided in the case of --
21     A.  Pharess.
22     Q.  -- Pharess Ghanem; is that right?
23     A.  Yes.
24     Q.  Based on the evidence that you've reviewed,
25 pertaining specifically to the case of Pharess Ghanem,

Page 238

1  do you believe, to a reasonable degree of certainty,
2  that Mr. Ghanem was denied actual due process of law?
3      A.  I do.
4      Q.  Please state your evidential basis for that
5  opinion.
6      A.  I don't know where to start.  Mr. Ghanem
7  has not confessed neither in court -- neither in the
8  investigation rooms, nor in court.  He was convicted
9  based on out-of-court statements of prosecution
10 witnesses that were not cross-examined and corroborated
11 each other.  The defense has agreed to -- to admit
12 out-of-court incriminating statements of alleged
13 accomplices eight times in eight different occasions,
14 if I remember correctly.
15     Q.  Okay.  May I just ask you about that one
16 piece of it?
17     A.  Yeah.
18     Q.  That -- that's the same technique we saw
19 earlier where -- where you -- you inferred that the
20 defendant was negotiating for a plea; is that right?
21     A.  Yeah.  Here we -- we -- we know for sure
22 that they have -- they were negotiating for a plea
23 because they say it in court.
24     Q.  And -- and, ultimately, the parties were
25 not able to degree on a plea; is that right?

Page 239

1      A.  Yes.  And what we see is that we have
2  a hearing after hearing that is scheduled for a
3  cross-examination of prosecution witnesses.  And
4  every hear -- sorry.  The parties, instead of
5  holding the -- the -- the cross-examination, file
6  more out-of-court statements and admit it to the
7  court file.
8      Q.  Can I ask you one -- about one incident
9  that I read about in the file?
10     A.  Yeah.
11     Q.  I can't say I read the file.
12     A.  Okay.
13     Q.  Okay.  On April 29th of '04, the defendant's
14 attorney said that his client would waive the right
15 to testify in his own defense, but by agreement with
16 the prosecution, the decision was not to corroborate
17 any prosecutorial evidence where the corroboration
18 was required; is that correct?
19     A.  First of all, it is correct.  And, second,
20 the -- the -- immediately after that, the -- the
21 parties say we -- and -- and I -- and I translate:
22         (Reading/translating.)
23         "It is our intention to make another attempt
24 to get to a plea bargain in -- in this file -- in this
25 case.  And for that, we are asking a continuance.  If

Page 240

1  we will not get to a -- to a -- to an agreement until
2  the next hearing, then we'll ask for a continuance
3  for summations, for closing arguments."
4      Q.  So -- so do you draw the inference, from the
5  evidence you've described, that the defendant's counsel
6  had made a strategic decision to try to get to a plea
7  bargain?
8      A.  I am positive that he wanted to get to a
9  plea bargain.  I cannot understand how waiving the
10 right to cross-examine a witness that implicates your
11 client is a reasonable thing to do in these -- under
12 these conditions.
13     Q.  Did you -- do you -- do you know who -- who
14 the attorney was at this point?  Was it Osama Saadi?
15     A.  Yes.  It's the only attorney in these files
16 that I know.
17     Q.  And -- and what is your impression of Osama
18 Saadi?
19     A.  I never saw him in trial.  I know him as
20 a colleague.  And so I can't make any judgments as
21 to his quality.  But he's considered to be a good
22 and one -- and a central figure in -- among Palestinian
23 lawyers.
24     Q.  By "central," you mean a prominent and
25 well-respected attorney?

Page 241

1        A.  I don't know what "well-respected" means.
2   But prominent and known.
3        Q.  And I think Mr. Kaufman had some comments
4   about Attorney Saadi; is that right?
5        A.  Yeah.  I read -- I read his comments.
6        Q.  And I -- I think he spoke about it at his
7   deposition as well?  Were you there?
8        A.  He -- he did.
9        Q.  Do you disagree with his comments?
10       A.  I will say the following, without commenting
11  specifically on Osama Saadi.
12          Tragedy is not when bad people do bad things,
13  but when good people do bad things.  And one of the
14  reasons that I stopped going to military courts is
15  because I was afraid that I will get accustomed to
16  the practices in the military courts and will be
17  one of those lawyers who is, instead of waging a
18  fierce defense for their client, is fighting for
19  a plea bargain and knowing that there is no real
20  trial going on.
21          So I don't know what exactly motivated
22  Mr. Saadi when he has done what he has done in this
23  case.  I really don't.  I'm just saying that the
24  fact that he is a prominent, respected lawyer doesn't
25  mean that, in the military court, he didn't do what

Page 242

1   is customary in the military courts.
2        Q.  This -- this technique that you've mentioned
3   about agreeing to submission of evidence, is this
4   something you've ever done in the civilian courts?
5        A.  Not if I thought that the evidence that
6   we were submitting is to the detriment of my client.
7        Q.  Well, let me ask it again, because you kind
8   of qualified it.
9          Have you ever done it?
10       A.  If I ever asked for a continuance and, in
11  order to get it, agreed to -- to -- to file evidence?
12  I don't think I have ever done this.
13       Q.  No, I -- maybe I'm misunderstanding the
14  technique.  But --
15       A.  Okay.  So let me explain it to you.
16          In order for -- these cases take a long time,
17  as you know.  And these cases there's a -- there's a
18  pressure to shorten the -- the period, to end the trial.
19       Q.  I'm familiar with such situations.
20       A.  Okay.  So the parties do want to hold
21  more negotiations, but a hearing is nearing.  And so,
22  eventually, without the consent of both parties, the --
23  the tribunal will never agree to a postponement just
24  because they want to hold negotiations.
25          So the -- the defense attorney comes to

Page 243

1   the prosecutor and suggests that they will ask for
2   a continuance.  The prosecutor would say:  Well, if
3   you want us jointly to ask for a continuance, we will
4   have to submit evidence and show that there is progress
5   in the trial.  That's more or less how it works.
6        Q.  And where have you seen that technique?
7        A.  In the military courts.
8        Q.  Have you ever seen it used in the civilian
9   courts?
10       A.  I don't think that I have.
11       Q.  Have you ever seen Avigdor Feldman use it?
12       A.  Absolutely not.
13       Q.  Is it -- do you believe that it's -- it --
14  do you believe that it is a violation of due process
15  for counsel to use that technique in order to continue
16  plea negotiations?
17       A.  If submission --
18       Q.  Can you just answer it "yes" or "no"?
19          MR. HILL:  Objection.
20          THE WITNESS:  I -- yes, I think it's not a
21  violation of the counsel -- it's the -- the -- if the
22  evidence submitted is incriminating your client, then --
23  and -- and you waive cross-examination and you don't
24  have any other reason but you need a continuance, that
25  would be a failure on the part of the defense to provide

Page 244

1   effective defense.  And that would constitute a due
2   process issue.
3        Q.  BY MR. YALOWITZ:  Has that -- has -- have
4   you ever expressed that opinion to a court?
5        A.  Specifically about this issue, about this
6   practice?
7        Q.  About what you just described.  Yeah.
8        A.  No.
9        Q.  Never in any of your 300 cases that you've
10  filed regarding human rights violations?
11       A.  I have never filed a case against any --
12  against this practice which I know of and -- and
13  identified in some of these files.
14       Q.  Well, maybe I've given you an idea for your
15  next case.  We'll see.  When we're together again in --
16       A.  Next time we meet.
17       Q.  -- New York, we'll see -- we'll see if you've
18  done it then.
19          Now, other than the things you've described
20  with regard to Pharess Ghanem --
21       A.  Yeah.
22       Q.  -- and your general reservations, is there
23  anything else about the Pharess Ghanem case that you
24  feel implicates due process concerns?
25       A.  No.

Page 245

1    Q.  Okay.  Let's go to the case of Majid Al-Masri.
2    A.  Yes.
3    Q.  And -- and I -- I want to ask you if -- I
4  want to ask you two different questions about the case
5  of Majid Al-Masri.
6        The first question is:  Do you believe that
7  the case of Majid Al-Masri raises due process concerns?
8    A.  I do.
9    Q.  And the second is:  Do you believe, to a
10  degree of certainty -- to any degree of certainty,
11  that Mr. Al-Masri was actually denied due process
12  of law?
13    A.  Can you repeat?
14    Q.  Sure.  The first question --
15    A.  Aah, issues.
16    Q.  The first question is:  Does it raise due
17  process concerns?
18    A.  Concerns.
19    Q.  The second question is:  Do you believe,
20  based on the evidence you've reviewed, that to a
21  reasonable degree of certainty, Mr. Al-Masri was
22  actually denied due process of law?
23        Have you reached that conclusion?
24    A.  I think he has been denied due process rights.
25    Q.  Okay.  Please tell me about your opinions

Page 246

1  with regard to Majid Al-Masri.
2    A.  We have here another case of a defendant
3  that has not -- that has kept arguing for his innocence
4  both in the investigation and throughout the trial.
5  And he was convicted based on custody statements of
6  prosecution witnesses, who were allegedly accomplices.
7  One of them refused to testify.  And eight others have
8  actually testified that what was ascribed to them, as
9  if they said in the investigation, is not true.  And
10  their out-of-court custody statements were -- were
11  admitted to their truth.
12    Q.  I'm sorry.  Say -- just say the last part
13  again.
14    A.  Eight prosecution witnesses have either
15  alleged that what they -- what their out-of-court
16  statements have said is not true or had a different
17  narrative on the stand.  And their out-of-court
18  statements were used to incriminate Mr. Al-Masri.
19    Q.  All eight?
20    A.  Well, not all eight are relevant to the
21  Jaffa bombing of January 22nd, 2002.  Some of them
22  were on two other allegations, other charges.
23    Q.  Among the co-perpetrators, whose testimony
24  was relied on by the court in convicting Al-Masri,
25  were Ibrahim Abd Al-Hai; right?

Page 247

1    A.  Right.
2    Q.  And Nasser Aweis; right?
3    A.  Yes.
4    Q.  Mohammed Messalah; right?
5    A.  Right.
6    Q.  Mohammed Abdallah; right?
7    A.  Right.
8    Q.  And Ahmed Barghouti?
9    A.  Yes.
10    Q.  These are names we've heard before?
11    A.  We have.
12    Q.  And did -- did you evaluate the testimony
13  of those individuals in the file -- was -- was there
14  testimony actually in the file?
15    A.  Their -- their testimony in court is not in
16  the file.
17    Q.  Did -- did you --
18    A.  All I know about them, about their appearance
19  in court is from the judgment.
20    Q.  And the judges concluded that the testimony
21  corroborated each other; right?
22    A.  Yes.
23    Q.  Okay.  In addition to the -- well, continue.
24        What other things raised due process concerns,
25  in your view, in the case of Al-Masri?

Page 248

1    A.  I just want to add that Mr. Abd Al-Hai, who
2  was a prosecution witness in -- in Al-Masri's case, his
3  out-of-court statement was his plea in his own trial.
4  And he alleged that he has affirmed, in general, the
5  amended indictment that was filed against him in his
6  plea -- in his -- for his plea bargain.  And the
7  implication of Al-Masri in that amended indictment was
8  one fragment of a -- of -- of a phrase in a very long
9  indictment.  And he said that it was not read out to
10  him.  So he basically rejected that he implicated
11  Al-Masri.  I'll just say that, because this belong --
12  this is relevant to Al-Masri's engagement in the Jaffa
13  bombing.
14        Apart from the fact that most -- that his
15  conviction was based on out-of-court statements of
16  accomplices, that one of them did not even -- was not
17  even -- did not allow cross-examination.  And apart
18  from the general assertions -- let me just check.
19  I don't think I have anything to say.  No.
20        I'm sorry.  It's five -- five witness --
21  prosecution witnesses, not eight.  One, two, three --
22  sorry.  I take it back.  I was correct.  Eight.
23    Q.  Five who implicated him in the --
24    A.  Eight.
25    Q.  -- Jaffa Street bombing?

Page 249

1    A.  No.  One implicated him of -- of the Jaffa
2  Street bombing.
3         MR. HILL:  For the record, I think you mean
4  a Jaffa Street shooting.
5         THE WITNESS:  Yeah.
6         MR. HILL:  Both --
7         THE WITNESS:  Jaffa Street shooting.
8         MR. HILL:  Both of you are doing it.
9         THE WITNESS:  Yeah, yeah, yeah, yeah.
10        MR. HILL:  It's that point in the day.
11        THE WITNESS:  Jaffa Street shooting.  Yes.
12        He was -- he was convicted of the -- of --
13 of his knowledge of and involvement in the Jaffa Street
14 bombing on the basis of -- of Abd Al-Hai's plea of guilt
15 in his own trial, as I said.  And the corroboration to
16 it, I have to say, is based on -- yeah, on other --
17 other out-of-court statements of other witnesses.
18    Q.  BY MR. YALOWITZ:  Do you have anything
19 further you want to mention about Majid Al-Masri,
20 or shall we move to Ali Mohammed Hamed Abu Halil?
21    A.  We can move to Abdel -- Ali Abu Halil.
22    Q.  Say that three times fast.
23    A.  Sorry?
24    Q.  Ali Mohammed Hamed Abu Halil, let me know
25 when you have his file.

Page 250

1    A.  Yeah.
2    Q.  Mr. --
3    A.  Yeah.
4    Q.  Mr. Abu Halil was convicted of co-perpetrating
5  homicide by way of procuring materials for explosives
6  used in a suicide bombing on a bus; isn't that right?
7    A.  In Jerusalem.  Yes.
8    Q.  And so I'm going to ask you my two questions.
9       My first question is:  Do you have due process
10 concerns about his case?
11    A.  Yes.
12    Q.  My second question is:  Do you have -- what
13 degree of certainty do you have that his due process
14 rights were violated?
15    A.  I'm certain that some of his due process
16 rights were violated and others I have suspicion that
17 they have.
18    Q.  Why don't -- why don't you tell me about the
19 ones that you're certain of?
20    A.  Well, I think that he has his -- he has --
21 he had violation of his right to assistance by counsel,
22 ineffective representation, counsel that forgot to file
23 summations and did not file summations even after he
24 was given more extensions from the court.
25       I read out from his -- from the judgment,

Page 251

1  the first page of the judgment.  The court says:
2         (Reading/translating.)
3         "Unfortunately, I mean, on September 18th,
4  2005, the prosecution has filed its closing arguments
5  and, for some reason, the defense attorney has not filed
6  his.  We have given more time.  And, unfortunately, even
7  after that time, the -- the defense attorney did not
8  file the closing arguments."
9         And two phones calls that were initiated by
10 the court secretary, where he was notified that, if he
11 will not file his closing arguments, it will be seen
12 like waiving the right to file them, didn't help.  So --
13    Q.  Perhaps this suggested that he waived his
14 rights?
15    A.  He didn't even notify that he waived the
16 right.
17       I think a court of law, a criminal court that
18 is faced -- I actually think there is a good ground for
19 appeal here.  Because, as we said before, a defendant
20 in the military courts has a right to a counsel on the
21 expense of the court for any -- if he is facing more
22 than ten years in prison.  The court was bound to stop
23 the trial, get a lawyer or get an official waiver.
24    Q.  Didn't we talk earlier about submissions,
25 oral submissions and written submissions?  Wasn't

Page 252

1  that you and me?  We talked about that; right?
2    A.  We talked about so many things today.
3    Q.  And -- and didn't you tell me earlier today
4  that written submissions are not always filed?
5    A.  But here we know that there were.  We know
6  that there was a decision to file written submissions.
7  And the prosecution has filed them.
8    Q.  And so, if the prosecution files written
9  submissions, the defense is required to?
10       There's a rule that says that?
11    A.  There is no doubt in my mind that there is
12 an official decision by the court to -- with deadlines
13 when would the prosecution file its closing arguments
14 and when will the defense.
15    Q.  Do you have that?
16    A.  Yeah, I have it.
17    Q.  All right.
18    A.  August 4th, 2005, the court -- court's
19 decision:
20       (Reading/translating.)
21       "Prosecution will file its closing summations
22 in writing to the court docket and to the defense
23 by September 19th, 2005.  And defense will file its
24 summations in writing by October 20th, 2005."
25       And then we hear in the -- we read in the

Page 253

1    judgment that the defense has failed to do that, failed
2    to do it after another extension was given, and failed
3    to do it after telephone calls to the defense attorney.
4    And the court says:
5         (Reading/translating.)
6         "So I have to -- to decide without defense
7    closing arguments."
8         Q.   And -- and then the court concurred with the
9    defendant's line of defense?
10        A.   The court has --
11        Q.   It seems like it was pretty crafty of that
12   defense lawyer.
13        A.   The defense -- the court has convicted the
14   defendant in 19 charges of complicity to aiding and
15   abetting homicide and two -- two attempts -- aiding
16   and abetting and attempt -- attempted homicide.
17        Was that the defense line?  Maybe it was.
18        Q.   I'm -- I'm asking you, yeah.
19        Kaufman reports that the court rendered its
20   judgment wherein it concurred with the defendant's
21   line of defense.
22        A.   The defend -- the line of defense was that
23   he is -- he should be convicted of aiding and abetting
24   rather than the completed crime.  Yeah.
25        Q.   So it turns out he got what he was arguing

Page 254

1    for even without written submissions; right?
2         A.   That doesn't cure the fact that he was denied
3    effective defense.
4         Q.   Let me just ask it again.
5         It turns out he got what he was arguing for
6    even without submitting a written submission --
7         A.   Yes.
8         Q.   -- right?
9         MR. HILL:  Objection.  Asked and answered.
10        Q.   BY MR. YALOWITZ:  Other than what we've
11   discussed, did you have any other due process
12   concerns in the question -- in the case of Ali
13   Mohammed Hamed Abu Halil?
14        A.   I just want to mention that he was in custody
15   for two and a half months.  We have no record from the
16   interrogation phase.  The sentence reasoning was signed
17   eight months after the sentence hearing -- sentencing
18   hearing.
19        Q.   Is that a due process violation?
20        A.   It's a -- it's a concern.
21        Q.   Okay.
22        A.   Absolutely a concern.  If a court of law
23   hears arguments and then takes a long time to -- to
24   adjudicate, that is a concern.
25        Q.   We have that phrase in New York, "justice

Page 255

1    delayed is justice denied."
2         A.   I think it's British, the source.  It --
3    we have -- we have the same phrase in Hebrew, which
4    is very well -- just the same.
5         Q.   We -- we're fond of it in Virginia.
6         A.   Yeah.
7         Q.   Now, anything else that you want to add
8    about --
9         A.   No.
10        Q.   -- Ali Mohammed Hamed Abu Halil?
11        A.   No.
12        Q.   All right.  So then let's go to Mr. -- he's
13   got a really long name, this fellow -- Abd Al-Rahman
14   Zahar Youssef Abd Al-Rahman Mekadad.
15        Should we just call him Mekadad?
16        A.   Mekadad.  Mr. Mekadad.
17        Q.   Let me know when you're ready.
18        A.   Yeah.
19        Q.   First of all, do you have an opinion about
20   whether Mekadad is innocent or guilty?
21        A.   I do not have -- I do not have any opinion.
22        Q.   Do you -- do you -- are you certain that
23   Mekadad was denied due process?
24        A.   I'm certain that he was denied several due
25   process rights.

Page 256

1         Q.   And do you -- do you think that those due
2    process denials were material to his conviction?
3         A.   I don't know.
4         Q.   So describe the due process violations that
5    you believe -- or describe the due process concerns
6    that you have with regard to Mekadad.
7         A.   Okay.  Length of detention pre-trial and
8    during-trial detention, the quality of representation
9    he has received, and the general issues that we've
10   discussed.
11        Q.   Do you have the July 27th, 2006, proceedings
12   in the Mekadad case?
13        A.   Can you tell me what is the -- what has
14   happened that day?
15        Q.   Closing arguments.
16        A.   July 27th --
17        Q.   2006.
18        A.   Yeah.  No.  Six -- May 16 -- May 16th of 2006.
19        Q.   This is the closing speech of defense counsel?
20        A.   Wait a minute.  It might be a different day.
21   Let me just look at this.  Yeah, I have on -- instead
22   case number --
23        Q.   2271?
24        A.   Yeah.  I have it.
25        Q.   Under '04?

Page 257

1    A.  But it's May 16, 2006.
2    Q.  The parties agree to allow the court to
3  decide the defendant's guilt based on the evidential
4  materials submitted in the past?
5    A.  What I have is a May 16th, 2006, transcript
6  in which the defense complains that they didn't get
7  enough time to prepare their summations.
8    Q.  Let me see.  I might have it.  Bear with me.
9  This one is so good I might have just pulled it out.
10        What do you know?  I'm sorry.
11        September 28 of 2006.  Try that.  Arguments
12  for sentencing.
13    A.  Aah, for sentencing.  I thought you said
14  closing arguments.
15    Q.  My -- my error.  I apologize.
16    A.  Okay.
17    Q.  Closing speech in the arguments for
18  sentencing.
19    A.  For sentencing, yes, 27th of July, 2006.
20    Q.  Kaufman reports on the defense counsel's
21  speech.  I'll read you what he has to say, and you
22  tell me if he's fairly reporting.
23        "The defendant's case is that he does not
24  wish me to make closing submissions and that all the
25  facts contained in the indictment are correct and

Page 258

1  that his case is that he murdered and wounded all the
2  people mentioned in the indictment, but he did so in
3  the context of his struggle against the occupation.
4  It is the defendant's right to do this.  Therefore,
5  although he murdered, he believes he is not pleading
6  guilty."
7        Is that consistent with what you're reading?
8    A.  Was that a quote or a paraphrase?  Because
9  these were -- this is not the way it reflects here.
10    Q.  Why don't you say it how you're reading it?
11    A.  The defense attorney, all he said was:
12        (Reading/translating.)
13        "I cannot detail the position of -- of the
14  defendant as he will do.  Hence, my closing arguments
15  will be the defendant's last words."
16    Q.  And then what does the defendant say?
17    A.  Then he says:
18        (Reading/translating.)
19        "I admit to have killed people in Israel.
20  But I'm not guilty.  It was my right.  It was -- it
21  was a reaction to those tens -- tens of thousands that
22  you have killed of us without a reason, just" --
23        And he also says:
24        (Reading/translating.)
25        "I promise you, the judges, if there will

Page 259

1  be peace, we will be friends in peace.  And if you
2  will continue the same way, I will be fighting.  And
3  I also promise that one day I will sit in your place
4  and judge you for all the things you've done to the
5  Palestinian people.  I promise you that I will get
6  out of prison and the punishment you're giving me is
7  a big" --
8    Q.  "Honor"?
9    A.  (Reading/translating.)
10        -- "honor to my wife and to my son -- and
11  to my son" --
12    Q.  "Age three"?
13    A.  (Reading/translating.)
14        -- "age three.  And I hope that, by the time
15  he grows up, there will be peace."
16    Q.  "And if there will be war"?
17    A.  (Reading/translating.)
18        "If there will be war, as you are accustomed
19  to killing children and babies, I hope from him to be
20  a better fighter and to struggle more than me."
21    Q.  I asked you a question with regard to Mekadad
22  that I hadn't asked with regard to any of our previous
23  ones.  So let me do it as a group.  If we have to, we
24  can go back.
25        Mekadad is our fourteenth or thirteenth?

Page 260

1    A.  Fourteen.
2    Q.  In the prior 13 that we discussed, you had
3  identified due process concerns and questions.
4        In any of those 13, is it your view that the
5  due process concerns or violations you've identified
6  were material to the convictions?
7        MR. HILL:  Objection.  Misstates the
8  testimony.
9        But the witness can respond to the question.
10        THE WITNESS:  I cannot make any, again,
11  overall assessment as to the impact of the due process
12  failures on the conviction.
13        I would like to add, at this opportunity,
14  that many of the due process failures may have impacted
15  severely certain parts of the conviction or certain
16  facts that have been asserted by the court in their
17  judgments.  So, you know, if we're dealing with 21
18  cases that 17 of them have been concluded in plea
19  bargains or pleas without bargains, it -- it would be
20  impossible -- and given the system and the due process
21  concerns in the system and the due process concerns
22  in the specific cases, it would be impossible to rely
23  on facts that have been asserted by the courts in
24  those cases, regardless of the question of whether
25  the conviction can stand or whether miscarriage of

Page 261

```
 1   justice has occurred.
 2       Q.  BY MR. YALOWITZ:  Well, let me ask you --
 3   and I appreciate your comment.  And you're welcome
 4   to make comments as we go along.
 5           But my question is:  On any of the 13 that
 6   we've discussed previously, is it your opinion that
 7   the due process concerns or violations that you've
 8   identified were material to the convictions?
 9           MR. HILL:  Objection.  Asked and answered.
10           THE WITNESS:  I couldn't make that assessment.
11       Q.  BY MR. YALOWITZ:  And is that true of all
12   21?
13       A.  That I can't make the assessment?
14       Q.  Yes.
15       A.  There are -- let's say that there are cases
16   in which I have more material that I can say that the
17   due process concerns are so -- are grave -- graver
18   than others.
19       Q.  So have we talked about any of those yet?
20       A.  Well, I think that Pharess Ghanem's case is --
21   is one that -- let's put it that way.  If I was a judge,
22   I wouldn't sleep at night, if I would be a judge in that
23   case.
24       Q.  So I think, if you were a judge, you wouldn't
25   sleep at night at all; right?
```

Page 262

```
 1       A.  I don't know.
 2       Q.  In -- in the case of Pharess Ghanem, is it
 3   your opinion that the due process concerns you described
 4   were material to his conviction?
 5       A.  They were -- directly affected his conviction.
 6   I remind you that, in Pharess Ghanem's case, the
 7   admission of out-of-court statements was the sole
 8   base for his conviction.
 9       Q.  Anybody besides Pharess Ghanem?
10       A.  If you want, I can go through the 13 cases.
11   I -- Pharess Ghanem is one that I -- you know, it
12   stands out for me now because we went through them.
13           I think the cases that involve allegations
14   of -- of abuse are such that the directness of the
15   effect of the due process concerns on conviction is
16   material.  So if I have to point to two groups, these
17   would be the groups.
18       Q.  The -- I'm sorry.  The first was solely --
19       A.  I would say --
20       Q.  -- solely out-of-court statements, and the
21   second was coercive statements that were -- that were
22   admitted into evidence over objections that they were
23   obtained through coercive techniques?
24       A.  Yes.
25       Q.  Okay.  I mean, have I fairly stated the --
```

Page 263

```
 1       A.  Yeah.  These -- these two groups and -- and --
 2   and convictions that are based on statements made by
 3   witnesses that were not available for cross-examination
 4   for whatever reason.  In these cases, the due process
 5   concerns affect directly the conviction.  In other
 6   cases, in other concerns, affect indirectly -- may
 7   affect indirectly convictions.
 8       Q.  May affect?
 9       A.  May affect.  But in all of them, it affects
10   the fact-finding process.
11       Q.  Now, let's go to Hilmi Abd Al-Karim Mohammed
12   Hamash.
13       A.  Oh, it's here.  Fifteen, yeah.
14       Q.  This is another defendant who was convicted
15   of charges that included the January 29th, 2004, suicide
16   bombing of the No. 19 bus; right?
17       A.  Right.
18       Q.  Do you recall this defendant said at
19   sentencing that he committed the crimes in retaliation
20   for what happened -- happened to Khan Yunis?
21           MR. HILL:  Objection.  Lack of foundation.
22           THE WITNESS:  Sorry?  Where -- where is that
23   in his --
24       Q.  BY MR. YALOWITZ:  In his sentencing
25   hearing.
```

Page 264

```
 1           MR. HILL:  Same objection.
 2           THE WITNESS:  I'll just take your word for it.
 3       Q.  BY MR. YALOWITZ:  Okay.  All right.
 4       A.  Yeah.
 5       Q.  Why don't we -- why don't we identify the due
 6   process concerns that you have with regard to the case
 7   of Hilmi Abd Al-Karim Mohammed Hamash.
 8       A.  Mr. Hamash was represented by the same lawyer
 9   that represented Mr. Mekadad and Mr. Ahmed Salah, No.
10   16, and Mr. Ma'ali, No. 17.  They were all prosecution
11   witnesses in his case.  It seems odd that a defense
12   attorney will represent a prosecution witness against
13   a defendant that he represents.  I do not say that I
14   can assert with certainty that there was malpractice
15   here, but it calls for a grave concern.  On the face of,
16   it is problematic.
17           Mr. Mekadad was prosecution witness No. 4.
18   And Mr. Ahmed Salah was prosecution witness No. 7.
19   And Mr. Ma'ali was prosecution witness No. 3.  All
20   implicated Mr. Hamash in the charges that he was
21   charged with.
22       Q.  In addition to the general concerns that
23   you have and the concern about one lawyer representing
24   multiple defendants, tell me what other concerns you
25   have.
```

Page 265

1    A.  Length of his detention.  He was detained
2  for, I think, three years.  And lack -- again, the
3  same phenomena that we saw at Mekadad's case, the --
4    Q.  The plea bargain strategy?
5    A.  Defense does not file summations.
6    Q.  Aah, summations.
7    A.  Summations.  And -- just a second.  Let me
8  make sure that I didn't omit anything.
9      Yeah, I mean, on April 3rd, 2006, parties
10  notified the court that all those guy -- all those
11  out-of-court statements of the other defendants that
12  are Cases No. 14 and 16 and 17 will be filed with the
13  consent of the defense.  So that means that defense
14  waived its right to cross-examination against the
15  implicating -- implicating witnesses.
16    Q.  So, in Israel, are defendants allowed to
17  mount a joint defense?
18    A.  Defendants in the same charge sheet?  Yes.
19    Q.  And -- and how about defendants in separate
20  cases, are they also allowed to try to stick together
21  and mount a joint defense?
22    A.  They're allowed.  Attorneys have a ethical
23  duty not -- not to enter into a situation which they
24  are in conflict of interest.
25    Q.  And if -- if attorneys are in a conflict

Page 266

1  of interest situation, can they be disciplined?
2    A.  Yes.
3    Q.  And does the court conduct the discipline?
4    A.  No.  But the court would notify the Bar.
5    Q.  And if an attorney is found to have engaged
6  in a inappropriate ethical violation -- I guess that's
7  redundant -- the attorney is found to have engaged in
8  an unethical violation, are the consequences of that
9  publicly reported?
10    A.  No.  I mean, they are reported without the
11  identity of -- of the -- without disclosing the identity
12  of the lawyer involved.
13    Q.  So -- so the lawyer has an obligation, when
14  entering into a joint defense arrangement, to avoid
15  conflicts; right?
16    A.  That's right.
17    Q.  And I take it the lawyer has an obligation
18  to explain to the client the nature of the potential
19  conflicts that can arise in a joint representation;
20  right?
21    A.  Right.
22    Q.  And so do you know, in the cases you've
23  described here, what the lawyer who engaged in the
24  joint representation said to his clients?
25    A.  I do not know.

Page 267

1    Q.  Did the lawyer who engaged in the joint
2  representation cross-examine any of his clients?
3    A.  I do not think so.  As I -- if I recollect,
4  he agreed to file their statement.
5    Q.  Sitting here today, do you know whether
6  those -- was it four defendants?
7    A.  Yeah.
8    Q.  Do you know whether those four defendants
9  had a joint defense arrangement or not?
10    A.  I don't know.
11    Q.  Thank you.
12    A.  But the only reason they were convicted
13  is because of the out-of-court statements that they
14  have consensually allowed to be admitted one against
15  the other.  That -- that's a very -- I will only say
16  that it's a very peculiar strategy, if we have a joint
17  defense, that means that we'll all go to prison together
18  and be convicted.
19    Q.  Okay.  Did any of those four take guilty
20  pleas?
21    A.  Mr. Hamash admitted to the facts, admitted
22  in the sense -- by way of allowing the incriminating
23  out-of-court statements to be admitted.  Mr. Salah
24  has done the same.  Mr. Ma'ali had a plea bargain.
25  And Mr. Mekadad had admitted the out-of-court statements

Page 268

1  of his accomplices on his own.
2    Q.  So these -- these were four defendants who
3  did not maintain their innocence; right?
4    A.  They have maintained.  Three of them have
5  maintained their innocence in the sense that they did
6  not plead guilty.
7    Q.  Sure.  It's a terminology issue.
8    A.  Well, we're all about terminology.
9    Q.  Fair enough.  So let me ask it -- let me ask
10  a better question.
11    A.  Sure.
12    Q.  These are not defendants, any of them, who
13  went to the court and testified and said "I didn't do
14  this"; right?
15    A.  I don't think any of them has testified at
16  all.
17    Q.  And -- and at their sentencings, a number
18  of the defend -- these four defendants made statements,
19  indicating that they were proud of what they did and
20  they would do it again or words to that effect; right?
21    A.  You have read out to me what Mr. Mekadad
22  has said or what the transcript says that he has said.
23  And you have read out to me what Mr. Hamash has said,
24  I think.  We discussed that.  I'm not sure actually.
25      But I do not remember exactly what every one

Page 269

1    of them has said. If you want, we can go through it.
2    I don't -- I don't remember. It's 21 files.
3        Q. All right. It's a lot of files --
4        A. Yeah.
5        Q. -- and it's in -- late in the afternoon.
6        MR. HILL: When you get to a stopping point --
7        THE WITNESS: Yeah, let's --
8        MR. HILL: -- let's take a break.
9        THE WITNESS: Let's make a break. I just --
10   can we have a break?
11       MR. YALOWITZ: "Tov."
12       (Recess from 5:22 p.m. to 5:27 p.m.)
13       Q. BY MR. YALOWITZ: We were on Hamash?
14       A. Yeah.
15       Q. And -- okay.
16       A. And I said that he didn't -- that -- that --
17       Q. Well, let me ask you a question.
18       A. Sorry.
19       Q. Okay. With regard to Mr. Hamash, my notes
20   reflect -- I'll tell you what my notes reflect. And
21   then I'm going to ask you if you would like to add
22   anything.
23       A. Okay.
24       Q. Okay. My notes reflect -- reflect you had
25   concerns that he had the same lawyer as Mekadad and

Page 270

1    two other defendants in other cases, that you were
2    concerned about the length of his detention, that
3    you were concerned that there was a lack of written
4    summations --
5        A. Right.
6        Q. -- and that you were concerned about the
7    out-of-court statements of his co-conspirators --
8        A. Right.
9        Q. -- that were admitted against him.
10       A. And I add to that, very shortly, that he
11   was detained for two and a half months pre-indictment
12   and that the sentencing -- the sentence reasoning was
13   provided eight months after the sentencing hearing.
14   And mind you, you can only appeal after you get the
15   reasoning. So that also pushes back the appeal timing.
16       Q. And which, if any, of these five concerns
17   you've mentioned would you consider material to the
18   outcome in the Hamash case?
19       A. Well, the admission of -- of his accomplices'
20   out-of-court statements, of course. And -- and I don't
21   know if -- I don't remember if he implicated himself.
22   But if he did, so also the investigation occurrences.
23       Q. That one -- that one is a possible thing that
24   would need to be explored?
25       A. Yes.

Page 271

1        Q. There's -- there's no evidence in the file
2    that -- that he made allegations of coercion; right?
3        A. He -- there was -- there was no evidence
4    phase in this case in the sense of he did not take the
5    stand, the prosecution witnesses did not take the stand,
6    so no.
7        Q. And his counsel at no time said "I need a
8    supression hearing because my clients' post-arrest
9    statements were coerced"; right?
10       A. "Clients" in plural, yes, he didn't.
11       Q. He didn't say that about any of his four
12   clients?
13       A. No.
14       Q. Okay. Maybe I'll remember that when we come
15   to the other ones so I don't have to ask you again.
16       Let's -- let's go to Ahmed Salah Ahmed Salah
17   Ma'ali [sic]. That's like Sirhan Sirhan, I guess;
18   right?
19       A. Here it is. Yeah.
20       So Mr. -- do you want to pose a question?
21       Q. Do you know who Sirhan Sirhan was?
22       A. Sorry?
23       Q. Sirhan Sirhan?
24       A. No. Sirhan Sirhan --
25       Q. Yeah.

Page 272

1        A. -- from the Jungle Book?
2        MR. HILL: I know it's late in the day, but
3    why don't we pose relevant questions.
4        MR. YALOWITZ: I think it's highly relevant.
5        Q. BY MR. YALOWITZ: Now, with regard to Ahmed
6    Salah Ahmed Salah, would you please describe --
7        A. We're -- we're at Mohammed Issa Ma'ali, no?
8    I'm sorry. Maybe I flipped too fast.
9        Q. Well, we can do Mohammed --
10       A. He's No. 17.
11       Q. -- Issa Mohammed Ma'ali and then we can --
12       A. Okay.
13       Q. -- come back to Ahmed Salah Ahmed Salah,
14   if you wish.
15       A. Okay.
16       Q. Okay. So we're on Mohammed Issa Mohammed
17   Ma'ali?
18       A. Yeah.
19       Q. Would you please describe the due process
20   concerns that you have about Mr. Ma'ali's case?
21       A. Well, in Mr. Ma'ali's case, there was a very,
22   very bizarre plea bargain, which includes him admitting
23   to all counts and getting nothing in return. And even
24   so, the court says that he's not bound by the -- by the
25   plea bargain. I just don't get it. I don't understand

Page 273

1   what the lawyer has done here. He has alleged --
2       Q. So -- so the substance of the plea bargain
3   was of concern to you?
4       A. It was -- the advocacy of his representation
5   is of concern to me. Because, in fact, without probably
6   understanding that, he pled guilty to all counts with
7   no bargain whatsoever. It is represented as a bargain.
8   But it -- the -- the prosecution -- the prosecutor says:
9           (Reading/translating.)
10          "We have reached a plea bargain in the
11  framework of which the defendant will ask to retract
12  from his plea of innocence and will admit to the
13  indictment. And the parties will argue as to the
14  sentence."
15          And then the court says:
16          (Reading/translating.)
17          "I am -- I want the defendant -- I am
18  explaining to the defendant that the court is not
19  bound by the bargain." [sic]
20          (Inaudible comment by Mr. Mishnayot.)
21          THE WITNESS: But that's not a bargain [sic].
22  This is -- this is an admission of guilt, clear and
23  simple.
24          So it seems like the -- the defense attorney
25  has presented to his client the procedure as if it's

Page 274

1   a bargain [sic] when, in fact, it's just a plea of
2   guilt.
3           MR. HILL: The record should reflect that
4   the judge made a comment in Hebrew. I don't know what
5   that was.
6           THE WITNESS: The judge made a comment --
7           MR. YALOWITZ: I think the judge's comment
8   was in English.
9           MR. HILL: Oh, well, then I miss -- didn't
10  understand it.
11          MR. YALOWITZ: Did you get the comment,
12  Brenda?
13          THE COURT REPORTER: No.
14          MR. YALOWITZ: The comment was that the
15  court always has the right to reject an agreement.
16  And Mr. Sfard, I think, agrees with that.
17          THE WITNESS: Yes.
18          MR. HILL: And let me just say for the record,
19  we're in the last half hour of the seven hours allotted
20  by the rule. It's late in the day. Some of us are
21  traveling tonight. I would appreciate it if everyone
22  would just let Mr. Yalowitz pose questions. And
23  Mr. Sfard can answer it. And we can move on.
24          THE WITNESS: The next concern that I have
25  is that the defendant has alleged in court that the

Page 275

1   escort guards have abused him and made a search on him
2   when he was naked. And the defense attorney said that
3   he tried to understand why they did it. And they said
4   so that he will learn how to behave.
5           He also charged that he was threatened before
6   the court and that the guard said: I will take care
7   of you after the court. My concern is that the -- the
8   judges, upon hearing this, have not done anything but to
9   say in a decision -- and I'm referring to September 27,
10  2004:
11          (Reading/translating.)
12          "We are convinced that the prison authorities
13  will behave according to the law and assume that what
14  was done, if done, will be examined."
15          That's it. Apart from these two things
16  and the issue of the -- of the "joint defense," quote,
17  unquote, and the general things, I do not have any
18  other.
19      Q. BY MR. YALOWITZ: Do you -- which of these
20  items do you consider, if any, material to the
21  conviction?
22      A. Taking into account that the alleged abuse
23  of the defendant took place -- let me just double-check
24  that -- yes. On the same day that the defendant has
25  pled guilty, I would say that both or all -- all due

Page 276

1   process concerns that I have raised have a direct,
2   rather than indirect, effect on conviction.
3       Q. Do you -- when I use the word "material,"
4   do you understand what -- what I mean by that?
5       A. I prefer "direct" and "indirect." Because
6   I don't know if indirect is not material. It can be
7   material.
8       Q. So it's your opinion that all of the items
9   you've raised with regard to Mohammed Issa Mohammed
10  Ma'ali -- Ma'ali are --
11      A. I'll just add one more thing. And -- and,
12  you know, I didn't refer to Mr. Kaufman's report today.
13  But some of his assertions regarding the cases have
14  really made me puzzled. In this case, he said:
15          "Nothing in the materials with which I have
16  been supplied suggests that ... his guilty plea was
17  anything other than genuine." (As read.)
18          Now, in any other guilty plea, I would --
19  I would not say anything. But in this guilty plea,
20  that is presented as a plea bargain, I would say
21  that any defense or criminal lawyer, not just defense
22  lawyer, would say that something irregular happened
23  here, irregular at least. Apart from that, I have
24  nothing to add about Mr. Ma'ali.
25      Q. Okay. And you believe that all of the items

Page 277

1   that you've described are material?
2       Do I have that right?
3       A.  As I said, I -- I thought they were.  They
4   had a direct effect on conviction.  I do not -- I do
5   not know to say to what degree.
6       Q.  All right.  Is it fair to say you're not
7   offering an opinion that any of these items were
8   material?
9       A.  I said that I think these items had an
10  effect on the conviction.  Whether conviction would
11  have happened without them is a speculation which
12  I cannot make.
13      Q.  And is that true of all the 21 items?
14      A.  Twenty-one files?
15      Q.  Yes.
16      A.  I never asked myself "what if."
17      Q.  So we -- we need to come back to Ahmed Salah
18  Ahmed Salah.
19      A.  Okay.  Just a second.  That's No. 16; right?
20      Q.  Correct.
21      A.  Yeah.
22      Q.  Do you have Ahmed Salah Ahmed Salah's file
23  before you?
24      A.  I do.
25      Q.  And tell me the due process concerns that

Page 278

1   you have with regard to Ahmed Salah Ahmed Salah.
2       A.  I have the due process concerns that I had
3   regarding Mr. Mekadad and Mr. Ma'ali and Mr. Hamash.
4       Q.  The joint representation?
5       A.  The joint representation.
6       Q.  Please continue.
7       A.  He was also detained for two and a half
8   months.  And we have -- we do not have the documentation
9   of what happened during those two and a half months.
10      Q.  Pre-indictment detention?
11      A.  Pre-indictment.  He was detained for two
12  and a half years trial -- pending-trial detention.
13  His counsel has agreed to submit all evidence against
14  him.  Most of it are statements of his other clients.
15          Just as a matter of antidote, the court
16  did not allow him to shake his hand -- his father's
17  hand in court.  And the defense did not file written
18  submissions.  Probably Attorney Awdeh doesn't believe
19  in written closing arguments.
20      Q.  Anything else?
21      A.  No.
22      Q.  Why don't we turn to Ahmed Mohammed Ahmed
23  Sa'ad.
24      A.  Mr. Sa'ad's detention was very lengthy, two
25  and a half months pre-trial and two and a half years

Page 279

1   pending trial.  In this case, his -- he's one of the
2   four -- no.  Sorry.  He's not one of the four joint
3   defense team.  But he was also represented by the same
4   defense attorney who has pled, on his behalf, guilty
5   to a charge that he did not want to be pled guilty for
6   and, later on, asked the court to retract.
7       Q.  And the court permitted him to do that?
8       A.  Yes.
9       Q.  So I think we could agree that error
10  definitely was not material to the conviction?
11      A.  No.  But it reflects on the quality of --
12  of representation that he has received.
13      Q.  "No" meaning you agree with me on materiality?
14      A.  I agree with you.
15      Q.  Okay.  Please continue.
16      A.  We do not have the GSS material, just like
17  in the other 20 cases.
18      Q.  That would be one of your general --
19      A.  Yes.
20      Q.  -- reservations?
21      A.  I will not repeat them.  So --
22      Q.  You may, but we have an understanding.
23      A.  Okay.  So this is all I have.
24      Q.  Okay.  Is it your opinion that the pre-trial
25  detention or the detention pending trial was material to

Page 280

1   the outcome of the case?  Or would that be speculation?
2       A.  That would be speculation.
3       Q.  And do I have it right, that's your view on
4   all 21 cases?
5       A.  You mean the length of detention?
6       Q.  No.
7       A.  Or do you mean what happened during detention?
8       Q.  That your view -- well, is it your view that
9   any of the 21 -- do you have an opinion on whether any
10  of the 21 cases would have come out differently absent
11  the due process violations and concerns that you believe
12  exist?
13      A.  It would be a completely different trial.
14  And I do not know how it would end.
15      Q.  Okay.  That's helpful.
16          Please turn to the case of Ibrahim Abd Al-Hai.
17      A.  Yes.
18      Q.  Okay.  Would you please describe the due
19  process concerns you have with regard to Abd Al-Hai's
20  conviction?
21      A.  The length of his pre-trial detention I'm
22  not certain of.  Because what I have is, I know that
23  he was detained on March 3rd, 2002, and the indictment
24  was served August 29th of 2002.  That's six months.  It
25  is possible.  But if it's -- if that is the case, that

Page 281

1    is a very long pre-trial detention. So I don't know
2    if it's a mistake or if it's actually the case.
3         Q.   What else?
4         A.   This case ended with a plea bargain. There
5    was no evidence hearing whatsoever. And I do not have
6    any specific things to say about his trial.
7         Q.   You're -- you're not suggesting that the fact
8    that there was a plea bargain, that's not a due process
9    concern?
10        A.   No. I'm saying that there was a waiver on
11   cross-examining witnesses, which might be of whatever
12   reasons that I do not know of.
13        But it was -- let me -- let me say
14   the -- the following in general about plea bargains.
15   A plea bargain is something that is legitimate and it
16   is done in every jurisdiction that I know of. A plea
17   bargain that sends your client to 21 life sentences
18   is very peculiar, because there's nothing to lose from
19   waging a fierce defense. If you don't get, in a plea
20   bargain, something that can be -- that can be of benefit
21   to your client, then you have just waived for nothing
22   your right to cross-examine witnesses and to examine
23   the -- the evidence.
24        So I am suspicious when I see plea bargains
25   that send people to consecutive life sentences.

Page 282

1         Q.   As a matter of law, is the death penalty
2    available in cases of terrorism like the 21 that
3    we're looking at?
4         A.   Yes. It's a dead letter, but it's in the law.
5         Q.   And so does a plea bargain definitely avoid
6    any chance of death penalty?
7         A.   Not in these cases, because in none of them
8    did the prosecution state that it is planning to ask
9    for the death sentence.
10        Q.   Is that something that needs to be charged
11   at the outset of the case?
12        A.   In the -- in the Israeli civilian courts,
13   definitely. I can check it, but I'm almost positive
14   that in the military court system as well. If you want,
15   I can check. You have the -- we have the -- the order.
16   If you want, I can --
17        Q.   Do you think you could check that?
18        Well, why don't we --
19        A.   We can do it --
20        Q.   -- consult with each other at the break?
21   All right.
22        MR. HILL: For the record, I think we have
23   about ten minutes left in the seven hours. So let's
24   proceed, please.
25        MR. YALOWITZ: Well, are you -- are you going

Page 283

1    to cut it off after seven hours?
2         MR. HILL: Well, no, but I would like to get
3    done --
4         MR. YALOWITZ: You'd like to --
5         MR. HILL: -- as soon as we can.
6         MR. YALOWITZ: -- keep going?
7         MR. HILL: Yes, please.
8         MR. YALOWITZ: Okay. Fair enough.
9         THE WITNESS: Can I ask something off record
10   procedural?
11        MR. HILL: Let's go off.
12        MR. YALOWITZ: Yeah.
13        (Brief discussion held off the record.)
14        Q.   BY MR. YALOWITZ: Please tell me about
15   the case of -- please tell me about the due process
16   concerns you have with regard to the case of Bashar
17   Barghouti.
18        A.   I do not have any specific concerns regarding
19   that case. I refer to the --
20        Q.   Your general --
21        A.   -- general --
22        Q.   -- reservations?
23        A.   -- general reservations and to the fact that
24   he was in pre-trial detention for a month and a half.
25   Again, it is reasonable to assume that he was denied

Page 284

1    access to a lawyer and that whatever confessions he
2    made there had a direct effect on his conviction, also
3    on his defense strategy.
4         Q.   Anything else?
5         A.   No.
6         Q.   Please tell me the due process concerns, if
7    any, in addition to your general reservations that you
8    have about the case of Uzz-a-Din Hamamra.
9         A.   Okay. I can't find it, but I'll just use
10   my -- my notes.
11        Q.   Please go ahead.
12        A.   Okay. So my concerns here are the length of
13   detention, the -- the waiver to cross-examine witnesses,
14   and the decision not to -- oh, thank you -- not to bring
15   evidence for the defense. Here it is.
16        Q.   Do you think it's a violation of due process
17   for the defendant to elect not to put on a case?
18        A.   It's a concern. It's a concern. And it's --
19   and we should take in mind that he pled not guilty.
20   So he was -- he maintained his innocence. So waiving
21   his right to cross-examine and waiving his right to
22   bring evidence seems to me like another one of those
23   cases where the strategy was to plea but didn't --
24   but -- but failed.
25        Q.   Or it could be a good goat case?

Page 285

1      MR. HILL: I'm sorry. I didn't hear the
2  question. What was the question?
3      Q. BY MR. YALOWITZ: It could be a good goat
4  case; right?
5      MR. HILL: A good goat case?
6      THE WITNESS: We didn't get to you telling
7  me the joke. So I don't know.
8      MR. YALOWITZ: All right. Let's --
9      MR. HILL: Let's get a question, please.
10     Q. BY MR. YALOWITZ: That is a question.
11     A. I don't know what it means.
12     Q. Okay.
13     A. Apart from this and my general assertions,
14 I do not know -- because I have a very partial file,
15 I do not know when the indictment was filed. Sorry.
16 I know when the indictment was filed. I do not know
17 when he was arrested. So I can't say what -- what
18 was the length of his pre-trial detention. And I
19 don't know what happened in the investigation room.
20     Q. You mentioned the length of his detention
21 during trial?
22     A. I said that there's a concern. He was
23 detained for two and a half or three years. I know
24 that more than two years because a request to extend
25 his detention by six months has been lodged with the

Page 286

1  Military Court of Appeals. Defense -- defense attorney
2  agreed.
3      Q. Why is that a --
4      A. Concern?
5      Q. -- due process concern for a defendant who
6  is not pleading and not -- or who ends up not pleading?
7      A. Well, first of all, a speedy trial is a
8  due process right acknowledged by all human rights
9  instruments.
10     Q. We can agree on that.
11     A. And especially when a trial is conducted
12 while the defendant is in custody. That generates
13 pressure on the defendant.
14     Q. It generates pressure to plead; right?
15 I mean, isn't that part of the concern?
16     A. Sorry?
17     Q. Isn't that part of the concern?
18     A. That's part of the concern. Absolutely.
19     Q. All right. I'm sorry. I interrupted you.
20 Please continue.
21     A. No, I don't think I have anything to add.
22     Q. Okay. You've described all of the due process
23 concerns you have about Uzz-a-Din Hamamra?
24     A. Yes.
25     Q. Okay. Now I want to ask you one more line

Page 287

1  of questions, and I don't expect it to take very long.
2      You and I met before today; right?
3      A. Yeah.
4      Q. You were with us at Mr. Kaufman's deposition;
5  right?
6      A. Right.
7      Q. What was your role at Mr. Kaufman's
8  deposition?
9      A. I advised counsel for the defense.
10     Q. And were you looking things up for Mr. Hill
11 and Mr. Satin as they were asking questions?
12     A. Looking things up? What do you mean?
13     Q. I thought I noticed you pulling documents
14 up on the iPad to help them with their questions.
15     A. I hope I did help them with the questions.
16 I didn't -- I was looking at the iPad when certain
17 documents were handed to Mr. Kaufman and I wanted to
18 know what it's about. And Mr. Hill has uploaded them
19 on his iPad.
20     Q. You translated for Mr. Hill and Mr. Satin?
21     A. During the deposition?
22     Q. Yes.
23     A. No.
24     Q. I thought I noticed you whispering in their
25 ear and showing them what place --

Page 288

1      A. Well, it's -- it's interpret --
2      MR. HILL: Hold on. The conversation --
3  the communications are privileged. So don't say what
4  you were telling us.
5      Q. BY MR. YALOWITZ: You were interpreting
6  for them on-the-fly? It -- it gets back to the
7  translation, interpretation thing. It was a bad
8  translation?
9      A. It was -- it was definitely the quality of
10 interpretation that is accorded in the military courts
11 on-the-fly.
12     Q. Do you -- you're being self-deprecating;
13 right?
14     A. I'm not sure what "deprecating" means.
15     Q. All right. Well, anyway, you marked pages
16 for Mr. Satin to use so that he could ask questions;
17 right?
18     A. I think that during the -- first of all, I
19 did not mark for him any pages prior to the deposition.
20 I have, if I remember correctly, passed a note when
21 I thought that Mr. Kaufman was not accurate or things
22 of that sort.
23     Q. You wrote out questions for him to ask; right?
24     A. Never.
25     Q. You wrote on Mr. Hill's pad; right?

Page 289

1    A.  No.  There were two iPads.  One was --
2    Q.  No, no.  His -- his yellow notepad --
3    A.  Aah.
4    Q.  -- that he has in front of him.
5        Is that right?
6    A.  Yeah.  In one or two occasions, I wrote on
7    the yellow pad.
8    Q.  You whispered in his ear; right?
9    A.  I whispered once or twice in his ear.
10   Q.  You huddled up with him at every break?
11   A.  "Huddled up"?  If I understand you correctly,
12   then I had communication with him.
13   Q.  Private --
14   A.  Private --
15   Q.  -- communication?
16   A.  -- communication with him and Mr. Satin during
17   the break.
18   Q.  And you did that at the lunch break as well;
19   right?
20   A.  Yes.  But it was dedicated to lunch.
21   Q.  You -- I -- I counted that we were off the
22   record for about two hours, two hours and 15 minutes
23   roughly.  Does that sound about right to you?
24   A.  If you counted, I trust you.
25   Q.  Thank you.

Page 290

1        What -- and -- and you were helping them
2    with their strategic thinking in -- during the course
3    of the Kaufman deposition; is that right?
4        MR. HILL:  Objection.  To the extent it
5    calls for communications, I think I'll instruct you
6    not to answer.
7        MR. YALOWITZ:  Are you -- are you asserting
8    work product over the conversations that you had with
9    Mr. Sfard during the deposition of --
10       MR. HILL:  Read the --
11       MR. YALOWITZ:  -- Kaufman?
12       MR. HILL:  Read the question back.
13       (Pending question read.)
14       MR. HILL:  Yes, I think it calls for a
15   protected communication that doesn't fall within one
16   of the exceptions.  So I'll stand on my instruction.
17       MR. YALOWITZ:  All right.
18       MR. HILL:  Do you have any more questions?
19       MR. YALOWITZ:  I'm sorry?
20       MR. HILL:  Do you have any more questions?
21       MR. YALOWITZ:  Oh, indeed I do.  Indeed I do.
22   Q.  BY MR. YALOWITZ:  Did -- did you understand
23   your role in the Kaufman deposition to be helping them
24   with strategy?
25   A.  You know, to be honest, I don't recall what --

Page 291

1    I didn't get any instructions as to my role.  I was
2    asked to come and to provide my opinion on things
3    that emerge.
4    Q.  And did you, in fact, help them with their
5    strategic thinking?
6        MR. HILL:  Objection.  Lack of foundation.
7        You can respond if you have an answer.
8        THE WITNESS:  I don't know if I'm supposed
9    to answer or not.
10   Q.  BY MR. YALOWITZ:  Yeah, you -- you --
11   you're allowed to answer.
12   A.  The question was whether I helped in their
13   strategic decisions?
14   Q.  Yes.
15       MR. HILL:  But you have to answer without
16   revealing the communications.
17       THE WITNESS:  Okay.
18       MR. HILL:  So answer that if you can.
19       THE WITNESS:  I think there were issues in
20   which I expressed my views that were more strategic
21   than -- than specific, if that's the difference between
22   specific and strategic.
23   Q.  BY MR. YALOWITZ:  Were there situations
24   in which you suggested the lines of questioning
25   for them to pursue?

Page 292

1        MR. HILL:  Objection.
2        Instruct him not to answer.
3    Q.  BY MR. YALOWITZ:  Were there -- were
4    there -- did you -- did you consider it as part of
5    your role during the deposition to suggest lines of
6    questions?
7        Without telling me whether you did that or
8    not, is that something that you considered was part
9    of the job that you were retained to do?
10   A.  As I explained, I -- I didn't get any
11   specific instructions.  So there was no specific role.
12   I thought that I'm invited because I know the material,
13   I understand -- I am the expert for the defense, and
14   they want my input on -- on things that Mr. Kaufman
15   says.
16   Q.  Did they tell you that they wanted your
17   input during the course of the deposition?
18       MR. HILL:  Objection.
19       Instruct him not to answer.
20       It calls for a communication with counsel.
21   Q.  BY MR. YALOWITZ:  Does -- did -- did your
22   communications with Mr. Hill and Mr. Satin, did they
23   tell you their litigation strategy?
24       MR. HILL:  Objection.
25       Instruct the witness not to answer.

Page 293

1      Q.  BY MR. YALOWITZ:  In your communications
2  with Mr. Hill and Mr. Satin, during the two hours
3  and 15 minutes we spent off the record, did you
4  suggest to them that there were things they could
5  do to help improve their case?
6          MR. HILL:  Objection.
7          Instruct the witness not to answer.
8      Q.  BY MR. YALOWITZ:  Did you ask -- did
9  you suggest questions that Mr. Hill and Mr. Satin
10  actually asked?
11          MR. HILL:  Objection.
12          Instruct the witness not to answer.
13          THE WITNESS:  My hands are tied.
14      Q.  BY MR. YALOWITZ:  For now.  Did --
15          MR. HILL:  I think, Kent, let me just --
16  we can stipulate that, if you're going to ask him
17  about communications with me that don't fall within
18  the exception contained in Rule 26, I'm going to
19  instruct him not to answer.
20          We're over the seven hours.  Unless you
21  have another line, I suggest that we conclude.
22      Q.  BY MR. YALOWITZ:  Well, what do you
23  understand your role to have been at -- in this
24  case?
25      A.  I've provided an expert opinion on several

Page 294

1  matters.  One of them you have grilled me over in the
2  last seven hours "neto" -- net.  And the others were
3  on the status -- the legal status of the West Bank and
4  the implications of the settlements.
5      Q.  Did you -- do you -- did you participate with
6  Mr. Hill and Mr. Satin in -- in their advocacy mission
7  for their client?
8      A.  What's "advocacy mission"?
9      Q.  So when you're counsel in a case, you're
10  an advocate; right?
11      A.  Right.
12      Q.  So is -- was that your role in this case?
13      A.  To be an advocate?
14      Q.  Yeah.
15      A.  Absolutely not.
16      Q.  Why were you having privileged communications
17  with Mr. Hill and Mr. Satin at Mr. Kaufman's deposition?
18          MR. HILL:  Objection.  I'm not sure the
19  witness has a foundation to answer that question.
20          He can respond if he knows.
21          THE WITNESS:  I don't know what America law
22  says about privileged communications.  That's between
23  you two.
24      Q.  BY MR. YALOWITZ:  Right.  So you were --
25  you were discussing their litigation strategy;

Page 295

1  right?
2          MR. HILL:  Objection.
3          Instruct the witness not to answer.
4          MR. YALOWITZ:  You're --
5          MR. HILL:  Communications with me.
6          MR. YALOWITZ:  You're instructing the witness
7  not to answer if he was discussing litigation strategy?
8          MR. HILL:  I don't know how the witness can
9  answer the question without revealing communications
10  with counsel, which are privileged.
11          MR. YALOWITZ:  He can say "yes" or "no."
12          MR. HILL:  Well, that would reveal --
13      Q.  BY MR. YALOWITZ:  Can you answer the question
14  "yes" or "no"?
15          MR. HILL:  That would reveal the content of
16  the communication.  So I'll instruct him not to answer.
17          MR. YALOWITZ:  All right.  I think the court
18  will draw the inference that he did, in fact, discuss
19  litigation strategy.
20          MR. HILL:  I don't agree.
21          We're over the seven hours.  Do you have any
22  other questions you want to ask him that don't pertain
23  to protected communications?  If you do, let's have
24  them.  If not, why don't we wrap up?
25          MR. YALOWITZ:  All right.  Why don't we take

Page 296

1  a break, and we'll reflect on this and -- and --
2          MR. HILL:  Well, let's take a quick break --
3          MR. YALOWITZ:  -- circle back.
4          MR. HILL:  -- because, as I told you, I need
5  to travel.  So --
6          MR. YALOWITZ:  I understand.  I understand.
7  I do too.
8          MR. HILL:  Okay.
9          (Recess from 6:05 p.m. to 6:07 p.m.)
10      Q.  BY MR. YALOWITZ:  All right.  Mr. Sfard,
11  thank you so much for coming to visit with me today
12  and for staying late and starting early.  It's been
13  a lengthy and spirited conversation.  And I think
14  you've answered the questions in the spirit in which
15  you -- your reputation precedes you.
16      A.  Thank you very, very much.
17      Q.  All right.
18          MR. YALOWITZ:  For the record, by my count,
19  we're at seven hours and eight minutes.  So I'd ask
20  that you pay Mr. Sfard for seven hours of his time.
21  You can make the check out to his firm and deliver
22  it to me, and I'll take care of getting it to him.
23          Thank you very much.
24          MR. YALOWITZ:  All right.
25          (The deposition concluded at 6:08 p.m.)

Page 297

CERTIFICATE OF REPORTER

I, BRENDA MATZOV, CA CSR No. 9243, do hereby certify:

That, prior to being examined, the witness named in the foregoing deposition was duly sworn by me to testify the truth, the whole truth, and nothing but the truth;

That the foregoing deposition was taken before me at the time and place herein set forth, at which time the aforesaid proceedings were stenographically recorded by me and thereafter transcribed by me;

That the foregoing transcript, as typed, is a true record of the said proceedings;

And I further certify that I am not interested in the action.

Dated this 20th day of December, 2013.

_____

BRENDA MATZOV, CA CSR No. 9243

---

Page 298

CERTIFICATE OF WITNESS/DEPONENT

I, MICHAEL SFARD, witness herein, do hereby certify and declare the within and foregoing transcription to be my examination under oath in said action taken on October 24, 2013, with the exception of the changes listed on the errata sheet, if any;

That I have read, corrected, and do hereby affix my signature under penalty of perjury to said examination under oath.

_____  _____

MICHAEL SFARD, Witness          Date

---

Page 299

ERRATA SHEET

Case:    MARK I. SOKOLOW, et al. vs. THE PALESTINE LIBERATION ORGANIZATION, et al.

Date:    OCTOBER 24, 2013

Witness:  MICHAEL SFARD

Page _____ Line _____ Change _____
Reason _____
Page _____ Line _____ Change _____
Reason _____
Page _____ Line _____ Change _____
Reason _____
Page _____ Line _____ Change _____
Reason _____
Page _____ Line _____ Change _____
Reason _____
Page _____ Line _____ Change _____
Reason _____
Page _____ Line _____ Change _____
Reason _____
Page _____ Line _____ Change _____
Reason _____

_____  _____

MICHAEL SFARD, Witness          Date

**A**

**aah**
25:6 29:2 35:2
40:12 142:24
166:13 173:19
189:5 193:19
245:15 257:13
265:6 289:3
**aaron**
135:17
**abd**
246:25 248:1
249:14 255:13,14
263:11 264:7
280:16,19
**abdallah**
235:10,14,18,19
236:2 247:6
**abdel**
173:21 174:7
175:8 176:22
191:13 192:13,14
194:9,11,22
249:21
**abdullah**
209:16,25 211:5
212:14,23 213:6
214:2,5,13,20
215:3 217:2,9,11
218:13 219:5
223:11 229:5
231:7
**abetting**
253:15,16,23
**ability**
86:13 94:10
125:23 128:3,22
**able**
74:18 77:4 99:18
101:20 126:6
153:2 203:5
206:14 210:4
238:25
**aboveentitled**
2:2
**absence**
168:8,9 175:13
220:20
**absent**

280:10
**absolutely**
23:17 30:10,10,11
30:12 65:16,17,18
65:19 69:23 72:16
73:20 91:8 93:7
127:22 139:17
152:12 169:19
243:12 254:22
286:18 294:15
**abu**
249:20,21,24
250:4 254:13
255:10
**abuse**
16:14 49:22
201:22 207:9
230:20 232:3,19
232:22 262:14
275:22
**abused**
183:18 207:8,11
213:9 223:7,9
275:1
**abuses**
50:5
**abusive**
43:24 49:5,9
112:12
**acam**
103:3
**accept**
178:19 230:9,11
**acceptable**
109:16 230:23
**acceptance**
196:25
**accepting**
89:12
**access**
71:7 73:1 74:20
126:4 154:2 158:4
202:2 203:22,25
204:5,9 284:1
**accessible**
150:10,12,14
**accompanied**
106:14
**accompany**

205:11
**accomplice**
13:13 68:9,24
69:1,9
**accomplices**
68:20 151:23
208:3 238:13
246:6 248:16
268:1 270:19
**accorded**
288:10
**account**
128:10 275:22
**accuracy**
194:1
**accurate**
23:23 26:20 51:8
59:18 87:20
124:15 153:20
176:14 193:8,25
288:21
**accurately**
24:13 224:17
**accuse**
236:13
**accused**
20:11 21:22 22:9
46:5 67:18,21
70:17 75:4,6,9
83:24 84:1,23
85:6,20 87:16
88:9 89:13 106:6
107:12 121:24
236:13
**accuseds**
17:20 90:21 98:4
165:24 199:13
**accusing**
59:11
**accustomed**
88:13,18 241:15
259:18
**acknowledged**
190:1 286:8
**acknowledgment**
196:25
**acquainted**
46:11
**acquit**

101:11 111:4
196:18
**acquittal**
55:8 57:16,19
**acquitted**
113:7 161:21
**acronym**
49:14
**act**
24:16
**action**
1:6 26:4 297:16
298:6
**actions**
32:6,6
**active**
104:4
**activists**
21:10
**activities**
9:9 37:20 131:6
**activity**
64:8 198:4
**actors**
131:21
**acts**
74:12 122:19
141:3 176:4,23
194:23 195:8
215:15
**actual**
32:3 33:23 45:15
48:16 66:5,22,22
142:5 172:23
173:5 197:24
199:5 221:15
238:2
**add**
7:22,25 8:2 36:20
56:8,9 62:20
90:18 144:12
164:7,10,14 165:1
166:11,13 172:17
234:17 235:2,7
248:1 255:7
260:13 269:21
270:10 276:11,24
286:21
**addition**

47:7,22 119:7
133:5 221:23
226:10 227:17
247:23 264:22
284:7
**additional**
47:24 164:14
172:25 173:2
**additionally**
48:5
**address**
137:19
**addressed**
137:12
**adequate**
97:10 126:4
**adequately**
79:15
**adjournment**
101:24 102:3
**adjudicate**
95:15 163:6
254:24
**adjudication**
95:14
**administration**
25:8 206:9
**administrative**
37:5,15,16,23,25
38:11 125:7
136:22,24 138:8
138:11,13 155:15
**administratively**
38:4,6 137:16
138:2,17 139:12
**admissible**
17:12,16 202:24
**admission**
79:5 89:15 159:20
167:25 173:4
186:3 202:10
262:7 270:19
273:22
**admissions**
195:21 199:12
**admit**
57:5 160:11 181:1
186:6 195:18
202:16 238:11

239:6 258:19
273:12
**admitted**
32:25 77:17
121:18 151:21
158:24 159:2
160:6,8 169:4
183:20,22 191:10
191:12 202:5
215:4 217:3 228:3
246:11 262:22
267:14,21,21,23
267:25 270:9
**admitting**
272:22
**adopted**
108:22
**adv**
4:12
**advance**
30:19 193:4
**adversary**
109:12
**adverse**
113:11
**advise**
84:11
**advised**
287:9
**advisor**
26:7
**advocacy**
273:4 294:6,8
**advocate**
3:4,5 67:19
294:10,13
**affair**
117:24
**affairs**
119:11
**affect**
263:5,6,7,8,9
**affidavit**
129:2
**affirmed**
86:22 187:3 214:9
248:4
**affirming**
86:17,18

**affix**
298:9
**afforded**
149:18
**aforesaid**
297:11
**afraid**
47:11 87:19 88:18
241:15
**africa**
92:12
**afternoon**
269:5
**age**
259:12,14
**agencies**
61:10 119:13
**agenda**
30:19
**ago**
10:19 11:8,8,12
52:4 62:24 135:24
187:9 210:20
**agree**
16:18 45:3,4
53:14,16,19,22
56:10 65:22 69:17
73:12 77:10,13
79:24 87:16 89:4
89:8,10 95:13,17
95:18,20 96:11
101:8 110:12
113:4 123:24
132:15,17 141:24
148:12 160:11
172:7 198:11
204:25 229:20,23
229:25 231:1
242:23 257:2
279:9,13,14
286:10 295:20
**agreeable**
170:15
**agreed**
14:16,17 83:3
113:10 235:4
238:11 242:11
267:4 278:13
286:2

**agreeing**
227:23 242:3
**agreement**
30:24 239:15
240:1 274:15
**agrees**
274:16
**aharon**
3:4
**ahead**
17:6 46:3 62:21
107:24 108:2
149:21 184:17
227:6 284:11
**ahlam**
208:7,8,13
**ahmed**
230:7 232:6,7,11
232:24 233:7
247:8 264:9,18
271:16,16 272:5,6
272:13,13 277:17
277:18,22,22
278:1,1,22,22
**aiding**
253:14,15,23
**aim**
30:18 31:23,24
**al**
1:4,7 299:2,3
**alfie**
95:25
**alhai**
246:25 248:1
280:16
**alhais**
249:14 280:19
**ali**
197:17,19 200:9
201:12 203:18,22
204:9,14 205:18
209:5 249:20,21
249:24 254:12
255:10
**alkarim**
263:11 264:7
**allegation**
49:10 52:4 57:4
124:22,25 185:22

186:7 207:10
208:24 223:8
232:21
**allegations**
43:20 44:15,21
49:22,23,24 50:2
52:7 57:2 61:11
117:20 118:16,17
119:4,14 121:6
122:2 123:22
125:24 126:1
128:12,17 130:20
131:2,12 133:7
134:20 173:15
185:3,17 186:9
201:22 207:12,14
207:15 209:7
226:7,10 246:22
262:13 271:2
**allege**
183:18,24 185:14
187:5 222:23
**alleged**
45:15 151:23
184:1 185:10
207:8,10 217:1
222:19 223:7
231:5 232:19
238:12 246:15
248:4 273:1
274:25 275:22
**allegedly**
186:4 227:14,15
246:6
**alleges**
43:23 49:24 125:2
**alleging**
184:6,7
**allotted**
274:19
**allow**
93:2 102:6 144:22
145:1 248:17
257:2 278:16
**allowed**
69:2 130:12,13,15
130:16,25 131:6
265:16,20,22
267:14 291:11

**allowing**
51:13 70:9 99:24
267:22
**almasri**
245:1,5,7,11,21
246:1,18,24
247:25 248:7,11
249:19
**almasris**
248:2,12
**alon**
146:2,3,4
**alrahman**
255:13,14
**amended**
233:2,25 235:23
248:5,7
**amendments**
81:24
**america**
294:21
**american**
34:9,13,17
**amnesty**
39:23 42:20
**amount**
16:15 21:7 24:14
24:20 144:1
212:18
**amounted**
231:12
**amounts**
212:20 230:20
**amrami**
3:5
**angel**
179:1
**annexes**
35:15
**announce**
71:10
**annual**
44:9
**annually**
147:8 149:5
**annul**
55:23 57:10
**annulled**
55:13,20

**answer**
20:2 30:24 46:2
60:18 78:3 84:3
88:11 93:24
120:13 125:20
138:20 141:15
145:16 151:3,4
152:21,23 153:2
169:23,24 174:21
174:24,25 182:24
194:7,13,15
199:17,19,20
200:1 202:4
203:16 211:13,22
217:6 230:15
243:18 274:23
290:6 291:7,9,11
291:15,18 292:2
292:19,25 293:7
293:12,19 294:19
295:3,7,9,13,16
**answered**
198:6,7 204:10
218:18 254:9
261:9 296:14
**answers**
154:6 161:15
**anticipation**
156:10
**antidotal**
127:1
**antidote**
278:15
**anybody**
21:22 22:8 42:1
262:9
**anyway**
47:19 51:23 52:3
230:18 288:15
**apart**
95:15 165:25
201:18 248:14,17
275:15 276:23
285:13
**apartment**
15:18
**apologize**
50:11 60:9 121:21
180:5 220:10

257:15
**aporter**
2:15
**apparatus**
59:12 61:17
**apparently**
47:8 220:8
**appeal**
19:10 32:12 97:14
97:15,16,16,19,21
98:10,13 112:23
113:2,10 114:14
162:10 163:13,19
251:19 270:14,15
**appealed**
161:24 162:1,9,11
162:11 226:2
**appealing**
114:20
**appeals**
14:5,8 19:7,8,8,10
19:15 32:5,14,21
41:7 70:25 77:20
78:20 79:14,22
98:11,11,19,23
103:2 107:13
111:21 135:20
147:17 158:18
162:15 163:4,9
225:24 286:1
**appear**
10:7,8,11,12,13
10:23 12:17,20
19:15 119:25
120:12,15,18
**appearance**
247:18
**appearances**
2:11
**appeared**
11:2,10 12:23
14:5 19:25 36:21
126:1 143:25
159:6
**appearing**
19:9
**appears**
35:25 87:25,25
**appellant**

163:5,21,22
**applied**
69:5
**applies**
108:24 109:1
110:11 111:5
112:13,19 141:18
**apply**
4:21 63:3 68:1
162:19 228:12
235:4 236:8
**appoint**
117:6
**appointed**
123:5 183:13
**appoints**
117:7
**appreciate**
64:2 152:23 154:6
199:17 212:10
261:3 274:21
**appropriate**
13:10 54:8 116:15
124:7 139:9
**approximately**
18:9
**april**
18:13 152:1
157:20,20 166:19
207:23 239:13
265:9
**arab**
91:3
**arabic**
20:14,16,22 21:1
85:18 86:24,24
87:4 161:8 166:24
167:3,17
**arabs**
7:7 91:1
**arba**
139:3
**archetypical**
74:24
**area**
48:20 95:25
101:21 134:4
**argue**
113:5 199:18

231:11,18 273:13
**argued**
14:8 19:7 79:15
166:7 231:23
**arguing**
25:10 246:3
253:25 254:5
**argument**
18:5 63:19 64:2
64:17,17,17 114:9
**argumentation**
166:9
**arguments**
78:19,20,24
108:10,14 109:17
165:23 166:3
240:3 251:4,8,11
252:13 253:7
254:23 256:15
257:11,14,17
258:14 278:19
**ariel**
233:8
**arman**
223:12
**armed**
4:20 191:13
**arms**
21:18 180:11
**army**
109:10 176:25
177:7
**arnold**
2:13
**arrangement**
266:14 267:9
**arrest**
158:9 207:13
225:11
**arrested**
157:20 210:18
285:17
**arrival**
71:11
**arrive**
79:13
**arrived**
79:2 179:13
**art**

53:8
**article**
4:14,17,20 59:3,9
59:15 60:21 63:9
63:18,22 87:18
95:18
**ascribed**
246:8
**asherian**
3:6
**asked**
20:20 25:3 26:12
56:7 68:19 102:24
111:10,25 126:19
128:24 129:5
144:25 145:14
163:1 168:22
170:13,20,22
187:25 190:17
197:24,25 198:6
204:10 217:15
218:17 220:9
221:13 225:12
242:10 254:9
259:21,22 261:9
277:16 279:6
291:2 293:10
**asking**
8:15 18:14 31:9,9
33:4 36:14 84:2
124:10 162:5
210:23 226:6
229:20 239:25
253:18 287:11
**asks**
103:15 113:16
**asleep**
64:22,25
**aspects**
16:15
**assassination**
137:5
**assassinations**
16:3
**assert**
121:25 264:14
**asserted**
260:16,23
**asserting**

290:7
**assertion**
140:23
**assertions**
25:20 26:1 126:7
187:20 193:12
201:18 219:6
234:12 248:18
276:13 285:13
**assess**
217:5
**assessed**
217:4
**assessment**
151:16 209:11
260:11 261:10,13
**assist**
156:1,13
**assistance**
217:22 250:21
**assisted**
156:25
**assisting**
22:15
**associated**
30:15
**association**
29:23 58:1
**assume**
145:10 161:10
224:16 228:11
275:13 283:25
**assumed**
145:12
**assumption**
224:20
**astonished**
144:19
**asylum**
93:16
**atmosphere**
180:21
**attached**
146:2
**attachments**
146:5,12
**attack**
172:24 173:6
177:19,25 216:15

**attacked**
226:4
**attacks**
22:23 64:7,8
177:5 216:17
**attempt**
239:23 253:16
**attempted**
161:21 178:2
253:16
**attempting**
178:12
**attempts**
253:15
**attend**
72:17
**attention**
44:17 61:24 97:5
161:2 185:7
**attorney**
8:25 9:1 41:15
47:4 48:4 67:22
88:12,19 98:3
106:11 109:10,15
122:9,15,18,22
123:20 124:18
128:7 130:17,17
154:5 159:6 161:9
179:13,15 185:18
202:2 203:23,25
204:5,9 205:5
208:14,19 221:12
223:6 234:17,20
239:14 240:14,15
240:25 241:4
242:25 251:5,7
253:3 258:11
264:12 266:5,7
273:24 275:2
278:18 279:4
286:1
**attorneyclient**
22:5
**attorneys**
40:19 41:11,23
88:24 100:11
103:23 104:1,2
129:1 131:5,8
195:14 196:17

205:19 265:22,25
**attribute**
172:1
**attributed**
167:20
**audio**
167:18
**audited**
36:25 118:3
**august**
252:18 280:24
**author**
38:23
**authored**
136:4
**authorities**
28:4,4,11 61:17
108:24 118:18
125:9 126:14
141:5 275:12
**authority**
95:14,15 122:9,16
206:8,13 217:8
**authorized**
50:23 51:2 70:6
95:15 96:9
**available**
43:16 44:6 57:6
149:12 205:2,3
213:17,20 263:3
282:2
**avenue**
2:14
**avigdor**
8:20 88:25 243:11
**avigdors**
16:4
**aviv**
92:9,9
**avoid**
266:14 282:5
**aware**
18:1 55:3 120:9
134:19 136:24
138:10 169:8
205:17,20 206:6
217:11,17,20
218:3,7
**awdeh**

278:18
**aweis**
173:22 174:4,8,9
174:11 175:9,10
175:23 176:22
177:10,13,16
178:8,9 179:20
180:8 186:21,25
187:6 191:13
192:13 194:9,11
194:22 247:2
**awful**
65:1
**axle**
125:17

**B**
**babies**
259:19
**back**
7:7 10:22 18:8
69:14 70:3 79:23
87:15 90:12 105:5
130:5 134:23
137:20 147:5
152:19,22 154:8
154:22 155:2,16
155:21 180:12
189:22 192:17
234:23 248:22
259:24 270:15
272:13 277:17
288:6 290:12
296:3
**backandforth**
115:17
**backed**
55:14
**background**
39:15
**bad**
25:3 36:15 64:15
64:16 125:17
241:12,12,13
288:7
**bagatz**
98:20,23 125:4,5
125:11,11
**balance**

102:14
**ballpark**
13:22
**bank**
9:12 24:2,5 28:5
28:12 37:18 61:13
63:2 67:5,8,9,16
67:18 101:20
136:10 137:17
139:20,21 294:3
**banks**
25:9
**bar**
10:10 58:1 169:5
266:4
**bargain**
52:21 53:2,4,5
159:11,22 174:12
181:15 207:20
215:8,9 231:14
234:5 236:11
239:24 240:7,9
241:19 248:6
265:4 267:24
272:22,25 273:2,7
273:7,10,19,21
274:1 276:20
281:4,8,15,17,20
282:5
**bargaining**
52:14,15 57:21
58:3,13
**bargains**
181:1 260:19,19
281:14,24
**barge**
69:25
**barghouti**
68:17,21 72:1,8
72:17 74:22
209:16,18,25
211:6,7,16 212:15
212:24 213:6
214:3,5,20 215:3
217:3,16,17,23
218:4,13 219:5
223:11 229:5
230:7 231:4,8,14
231:18 232:6,7,24

233:7 247:8
283:17
**barghoutis**
214:14 217:9
218:4 232:11
**barracks**
64:23
**barring**
60:23
**base**
70:5 262:8
**based**
28:13 44:1 58:8
94:4 110:14 114:2
125:20 126:17
151:6,19 153:3
154:12 159:11
162:5 172:21
174:6 175:7 183:1
188:2 194:19
199:11 201:10
204:8 206:22
210:5 211:4
219:18 228:3
232:10 233:17,25
234:7 235:16
237:24 238:9
245:20 246:5
248:15 249:16
257:3 263:2
**bases**
94:14
**bashar**
283:16
**basic**
96:14,21,24
108:18,18,19
**basically**
124:23 248:10
**basing**
33:4 38:18 62:22
**basis**
17:17 25:17 32:15
32:17 35:20 36:17
41:13 45:19 46:20
46:21 73:25
102:25 113:10
133:13 171:16
179:6 183:7

189:21 201:16
203:17,21 204:7
212:1 219:25
226:14 232:22
238:4 249:14
**bate**
158:16 179:10
236:25
**bates**
4:13,16,19,22 5:5
5:6,8
**battles**
100:2
**bear**
27:14 57:2,4 80:8
257:8
**beatings**
184:7 185:14
**bedouins**
87:3 91:10,14
**began**
156:15 157:6
213:7
**beginning**
83:25
**begins**
176:3
**behalf**
25:7 48:6 279:4
**behave**
275:4,13
**behavior**
130:20
**beit**
10:22
**belief**
149:1
**believe**
24:11,19 42:13
48:22,24 49:2
99:8,16 112:19
145:7,8 146:19
147:24 148:1,3
151:10 153:5,23
154:17 161:6
174:8 175:9,12,15
183:3 188:15,15
194:4,10 201:12
206:24 211:6

212:5 214:20
216:12 219:20
226:13 232:9,15
234:9 235:18
238:1 243:13,14
245:6,9,19 256:5
276:25 278:18
280:11
**believes**
122:18 148:7
258:5
**belong**
248:11
**belt**
191:14 192:13
**bench**
115:16
**benefit**
167:13 201:20
207:5 209:23
281:20
**benefits**
30:17
**best**
9:17 86:13 100:13
100:14 101:1
182:23
**better**
47:9 50:15 85:4
157:19 215:17
259:20 268:10
**beyond**
158:17
**bhill**
2:21
**bias**
96:9
**big**
91:11 182:14
210:18 211:3
259:7
**bigger**
94:7 167:12
**bill**
96:19
**binding**
26:2
**bit**
66:6 71:3 80:18

184:19 223:20
**bites**
157:18
**bitesize**
185:1
**bits**
13:6 223:1
**bizarre**
92:24 272:22
**blame**
68:12
**blanket**
17:14 56:5 140:23
**blood**
144:14
**blow**
216:1
**board**
22:24,25 119:8
197:11,13
**boards**
22:21 26:13
**bodies**
44:17
**body**
26:14 180:11
**bomb**
229:6,11,15,21
230:10
**bombed**
8:9
**bomber**
51:25 191:14,15
192:8
**bombing**
246:21 248:13,25
249:2,14 250:6
263:16
**bombings**
15:19
**bombs**
215:25
**book**
147:7 272:1
**borders**
148:11,13,15,17
149:2
**boston**
51:24

**bound**
251:22 272:24
273:19
**brain**
93:25
**branches**
32:7
**bravo**
88:1
**break**
42:14 54:6,7
58:17,22 59:1
71:2 100:17
117:10 129:11,14
129:16,21,24
130:5,7 140:17
147:1,2 200:4
228:22,25,25
229:1 269:8,9,10
282:20 289:10,17
289:18 296:1,2
**brenda**
1:25 2:4 35:7
58:20 63:9 155:19
237:13 274:12
297:3,20
**brian**
2:18 62:17
**brief**
7:17,21 80:19
82:4,25 100:21
155:7 163:13,23
283:13
**bring**
32:2,11 57:17
94:8 97:4 122:10
125:24 161:2
284:14,22
**brings**
57:14 184:4
**british**
255:2
**brother**
177:2 178:14
**brought**
16:7 29:17 30:14
30:18 89:14
123:23 217:17
**btselem**

38:20 39:3 42:16
133:10,11,14,20
134:12
**bully**
175:3
**bundle**
180:20
**bus**
250:6 263:16
**buy**
159:21

**C**

**ca**
1:25 2:4 297:3,20
**cafe**
8:8
**call**
8:6 9:23,25 12:2
37:15 39:22 47:13
47:14,14,15 53:8
54:23 58:18 66:10
67:6,11,12 154:24
172:25 198:14
199:15 255:15
**called**
6:4,23 9:23 25:17
26:3 28:18 37:3,5
43:4 68:8 98:20
108:19 110:22
124:20 135:1
147:12 229:10
233:7
**calling**
57:22
**calls**
194:19 251:9
253:3 264:15
290:5,14 292:20
**cancel**
107:14 111:4
**canceled**
55:13 108:7
**capi**
29:4
**capo**
29:3
**car**
191:15

**cards**
206:7 209:12,14
**care**
275:6 296:22
**career**
29:17 52:25
**careful**
146:17 153:19
**carefully**
146:16 193:7
**carried**
83:13 215:15
**carry**
83:17 206:7
**carrying**
64:12
**case**
5:7 13:24 16:8,14
17:11,13 19:11
20:19 22:8,12
25:2,2,5,13,16
27:2 30:17,18
32:11 47:1,2
49:16 50:8,15,20
51:10,12,25 52:1
53:4,5,21,25
63:23,24 65:21
66:18 68:13,18
72:1,6 76:11
79:16,17 86:21
95:21,22 96:6,23
101:9 102:20
103:1,4,6,9
105:18 106:22
110:14 120:3
121:10 122:10
141:25 144:3,23
149:19 151:7,15
152:7 153:5,21
154:13 157:12,13
157:16 159:8,24
160:14,22,25
161:5 165:1,19
168:14 169:21
171:17 172:17
174:7,17 175:8
179:5,7 181:12,20
182:10,20 183:3
183:14,16,17

185:24 186:10,12
189:19 190:11,15
197:17 198:24
201:11 202:4
204:12 205:14
206:16,20,23
209:5,8,19 211:5
212:4,9,17,18,23
213:6,12,23,23
214:4,4,11 215:3
217:9 218:6
219:19 220:1,4,7
220:25 221:15
224:6,7,24 225:3
226:14 231:19
232:11,25 233:2
234:4,9,13,15
235:6,17 236:10
237:20,25 239:25
241:23 244:11,15
244:23 245:1,4,7
246:2 247:25
248:2 250:10
254:12 256:12,22
257:23 258:1
261:20,23 262:2,6
264:6,11 265:3
270:18 271:4
272:20,21 276:14
279:1 280:1,16,25
281:2,4 282:11
283:15,16,19
284:8,17,25 285:4
285:5 293:5,24
294:9,12 299:2
**casebycase**
17:17 102:24
**cases**
10:20 11:15 12:4
12:5,12,22 13:8
13:11,12 14:13,14
18:1 19:1,4,20
20:9 21:8 22:18
24:22 29:17,20,22
30:13,20,21 31:14
31:19 32:1 36:23
40:22 41:1,4,7,11
42:3,9,15,19,23
43:21,25 44:5,22

46:6 51:23 55:7
55:12,16,20 57:7
58:2 66:22 74:15
74:16,20,21 76:4
78:6,12,14,15,21
79:18 84:3 87:9
87:14 88:23 97:15
97:17 99:11
101:15 102:22
104:24 109:9,17
109:18 111:19,20
111:21 114:11
118:3,5 119:14
126:19,21,21
142:6 144:14
145:4,19,21,24
149:6 151:14
152:6 158:12
159:15,16 160:4
160:17 163:7
169:25 172:2,6
181:12 194:20
195:16 196:10,13
197:7,8 199:11
203:25 211:9
212:17 224:6,25
228:14 242:16,17
244:9 260:18,22
260:24 261:15
262:10,13 263:4,6
265:12,20 266:22
270:1 276:13
279:17 280:4,10
282:2,7 284:23
**cat**
43:2,5,6,7,8,19
44:1 45:2
**catch**
60:11 141:5
**categorically**
216:9
**categorize**
148:5,6 168:10
**cats**
43:22
**cause**
2:2 28:22,22 31:1
31:16 173:6
**caused**

68:17
**causes**
29:23 30:15
**censorship**
128:16,16,18
131:1,1,11,18
**censured**
128:19
**central**
61:13 94:18
240:22,24
**certain**
10:11 44:17 50:16
78:1 105:18 111:3
113:4 181:5
183:10 225:20
250:15,19 255:22
255:24 260:15,15
280:22 287:16
**certainly**
22:4 30:25 97:19
131:6 135:18
**certainty**
146:20 151:11
153:6,9,24 154:14
154:20 174:9
175:10,14 179:8
183:4 194:5,11
198:3,16 199:23
201:13 202:3
206:25 211:7
212:6,14,22
219:20 232:10
234:10 235:19
238:1 245:10,10
245:21 250:13
264:14
**certificate**
19:13 106:15,16
106:22 107:10
165:7 168:9 297:1
298:1
**certificates**
105:2 106:23
107:1
**certify**
297:4,15 298:4
**chair**
10:25

challenge
  128:2,5
challenging
  25:8 106:13
chance
  41:15 56:3,5 59:6
  63:16 164:1,2,17
  181:3 187:11
  207:7 211:23
  218:23 282:6
chances
  49:11
change
  170:21 299:7,9,11
  299:13,15,17,19
  299:21
changed
  48:23 49:2 70:2
  115:23,24 155:21
changes
  298:7
channel
  124:11
channels
  123:21 124:12,24
  130:8 134:19
  173:12
charge
  55:25 56:22 83:25
  87:15,17 88:5,21
  88:22 89:2,14
  90:15,22 120:2,3
  177:25 265:18
  279:5
charged
  22:14,19 27:2
  139:24 172:24
  264:21 275:5
  282:10
charges
  22:20 128:22
  161:7 195:5
  246:22 253:14
  263:15 264:20
chartered
  2:18
check
  39:4,5 44:24 45:4
  69:8 111:9 120:10

136:6,11 155:24
193:8 224:15
248:18 282:13,15
282:17 296:21
checked
  23:16 55:19 135:6
  147:11
chevalier
  2:18 200:20
chief
  25:24 29:2 33:6,7
  33:8
children
  259:19
china
  91:19
choice
  188:16
choose
  100:2 188:12
choses
  188:13
christian
  7:12
christmas
  7:12,13,15
chunks
  159:1 160:6
circle
  296:3
circumstances
  51:5 64:5 65:6
  79:6 122:1,3
  141:17 160:21
  186:5 202:16
citation
  38:25
cite
  35:25 111:23
cited
  39:6,7 111:12
citizens
  93:17
civil
  1:6 11:25 21:13
  25:8 119:25
  120:12,14,17
  206:9
civilian

12:2,3 33:3 46:8
52:16 55:6 56:3
58:13 64:13,19,24
68:2,15,19 69:1
71:18,22 72:2,4
74:21 90:15,20
94:25 95:9 97:24
114:7 116:20
118:18 119:8
141:4 163:5
202:18,21,22
208:2 242:4 243:8
282:12
civilians
  64:6 65:4,7,8,12
  65:15 73:24
  116:21 137:1
  177:1 178:14
  216:1,17
civilized
  66:11 181:4
claim
  32:3 33:5 98:8,12
  167:23
claimed
  226:2
claims
  97:21 99:17
clarification
  14:3 48:13 125:15
clarify
  44:7
classification
  232:2
classified
  105:14
clear
  57:12 112:5
  124:19 127:3
  136:9,18,20
  162:18 164:13
  166:25 167:5
  200:16 235:21
  273:22
client
  13:15 84:12 97:3
  100:8,13 102:4
  104:10 126:20
  127:23 154:5

163:11 195:25
196:2,11,12
239:14 240:11
241:18 242:6
243:22 266:18
273:25 281:17,21
294:7
clientattorney
  165:6
clients
  20:10 22:19
  100:10,24 131:9
  196:4,5,14 197:9
  213:15 266:24
  267:2 271:8,10,12
  278:14
clipping
  237:10
clips
  210:5
close
  101:9 143:22
closed
  71:24 214:11
closely
  150:3
closing
  240:3 251:4,8,11
  252:13,21 253:7
  256:15,19 257:14
  257:17,24 258:14
  278:19
clothing
  141:4
coconspirators
  199:14 270:7
coerced
  113:25 114:4
  121:25 128:1
  180:22 186:4,7,10
  187:1 207:11
  222:24 226:3
  231:18 271:9
coercion
  122:2 173:13,15
  185:3,8,11 187:5
  204:22 208:24
  209:7 223:16
  226:8,11 271:2

coercive
  214:18,22 227:13
  227:15 231:5
  262:21,23
coexistence
  148:4,10
coffee
  193:17
collaboration
  134:3
collaborations
  134:1
colleague
  82:23 109:13
  240:20
colleagues
  40:19 41:10
  200:20
collection
  90:5
collects
  147:7
college
  14:24
com
  2:15,21,22
combatant
  64:18,22
combatants
  65:9
come
  18:8 25:15 27:11
  44:16 78:8 90:12
  92:25 107:3
  121:11,12,13
  127:11,18 134:23
  135:11 137:20
  142:4 193:24
  271:14 272:13
  277:17 280:10
  291:2
comes
  34:8 105:5 203:14
  242:25
comfortable
  176:11
coming
  69:14 71:12 79:23
  87:15 296:11

commander
38:3 107:9
commanders
37:17
comment
42:20 53:20 57:24
60:17 61:5,22
89:6 149:25
208:11 261:3
273:20 274:4,6,7
274:11,14
commented
149:23 214:1
commenting
24:1,4,23 241:10
comments
42:22 150:1
152:24 171:22
192:20 228:12
237:18 241:3,5,9
261:4
commission
123:14 166:1
commitment
9:19
committed
236:14 263:19
committee
16:1,6 17:11 26:4
39:24,25 43:7
48:8 118:22
119:10,11,18
121:3,4 123:4,16
123:17 124:17
128:20,25 131:25
133:5,21 134:13
184:10
committees
120:11
common
12:10 73:15 78:8
104:23 150:2
169:7 237:3
commonly
12:8 75:19
communicate
20:13,18 126:7
234:20
communication

289:12,15,16
290:15 292:20
295:16
communications
131:20 133:6
288:3 290:5
291:16 292:22
293:1,17 294:16
294:22 295:5,9,23
communities
7:8
community
37:23 40:8,18
117:22 196:22
commuted
83:14
compare
71:22 74:19
compared
144:16
comparison
55:5
comparisons
90:7
compel
77:7
compelled
160:11
competence
224:4
competency
225:2
competent
109:11
competition
133:25 134:4
complain
125:11
complained
161:1
complains
257:6
complaint
124:16,18 125:18
171:4,5 173:19
complaints
38:5 59:14 124:14
130:8
complete

32:21 142:15,17
143:4 203:14
completed
12:13 128:4 157:7
253:24
completely
7:8 109:18 141:21
167:16 230:4
280:13
complicity
253:14
compound
70:5 138:19
comprehensive
165:18,23
comprised
56:1
compromise
105:25
comptroller
118:2,3
con
173:3 216:14
concept
73:18 103:10,11
229:16,18
concern
171:16 222:1
229:21 254:20,22
254:24 264:15,23
273:3,5 274:24
275:7 281:9
284:18,18 285:22
286:4,5,15,17,18
concerned
100:23 270:2,3,6
concerning
5:4 189:10 190:4
232:23
concerns
99:10 100:6
172:19 187:14
209:1 213:5 225:8
226:16 244:24
245:7,17,18
247:24 250:10
254:12 256:5
260:3,5,21,21
261:7,17 262:3,15

263:5,6 264:6,22
264:24 269:25
270:16 272:20
276:1 277:25
278:2 280:11,19
283:16,18 284:6
284:12 286:23
conclude
203:17,21 204:7
208:4 293:21
concluded
16:20 154:14
179:15 247:20
260:18 296:25
concludes
17:20 114:2
concluding
43:22
conclusion
154:12 161:17,18
226:15 245:23
conclusions
44:1
concurred
253:8,20
conditions
57:7,8 71:25 78:1
230:2 240:12
conduct
122:16 159:7
199:8 266:3
conducted
46:7 167:17
179:14 186:11
216:14 286:11
conducting
12:6 19:2
conducts
89:21 183:16
confess
187:25
confessed
188:23 191:15
238:7
confession
128:1
confessions
187:23 225:12,15
284:1

confinement
184:9,11
confirm
35:9
confirmation
75:25
confirmed
214:4 223:10,10
confiscated
155:12
conflict
4:21 9:10 265:24
265:25
conflicts
266:15,19
conformity
109:21
confront
31:9
confronted
223:8
congo
25:2
connection
9:10 23:18 41:9
42:2 177:24 218:5
consecutive
222:3 281:25
consensually
267:14
consent
51:17 151:24
158:24 160:7
206:9 242:22
265:13
consented
167:24
consenting
173:4
consents
159:20
consequences
266:8
consider
30:5 98:8 108:14
117:20 169:21
270:17 275:20
292:4
consideration

203:8
**considerations**
102:17
**considered**
96:25 240:21
292:8
**considering**
99:17
**consistent**
258:7
**consists**
160:5
**consolidated**
81:22
**constantly**
99:12,15
**constitute**
20:3 244:1
**constituted**
216:19
**constitution**
96:20,20
**construction**
24:6
**consult**
82:23 282:20
**consulting**
48:7
**contain**
105:14,25 107:6
**contained**
257:25 293:18
**contains**
81:24
**contempt**
76:17 217:15,23
**contend**
186:25
**content**
295:15
**contention**
117:22
**contents**
156:4
**context**
27:10,15 28:2,3
60:23 258:3
**continuance**
159:18 160:10

239:25 240:2
242:10 243:2,3,24
**continuances**
220:5 221:14,18
**continuation**
99:21
**continue**
57:10 58:16,19
116:3,10 129:16
177:4,5 179:18
184:18 220:14,17
221:22 243:15
247:23 259:2
278:6 279:15
286:20
**continued**
14:22
**continues**
101:1 180:13
**continuing**
12:15
**contrary**
114:9
**contravention**
208:1
**control**
76:23
**controlled**
27:4
**controller**
123:6 124:24
**convenience**
130:1
**convenient**
146:25
**convention**
38:1 43:10,14
47:16 132:9
**conversation**
31:3 150:19 288:2
296:13
**conversations**
36:8 40:4,6 290:8
**convict**
230:5
**convicted**
32:2,19 33:2
127:8,25 142:8
146:21 149:19

151:19 161:21
162:12 163:12
177:10,17,18
178:10 187:22
188:2 195:20
196:19 198:4
199:3 204:16,20
228:2 229:6,7
236:15 238:8
246:5 249:12
250:4 253:13,23
263:14 267:12,18
**convicting**
246:24
**conviction**
56:6 57:2,15 69:2
126:23,24 162:13
172:21 173:6
176:7 204:17
205:21 248:15
256:2 260:12,15
260:25 262:4,5,8
262:15 263:5
275:21 276:2
277:4,10,10
279:10 280:20
284:2
**convictions**
149:23,25 260:6
261:8 263:2,7
**convinced**
275:12
**cooperate**
88:24
**cooperation**
28:13
**coperpetrating**
250:4
**coperpetrators**
246:23
**copied**
144:9
**copies**
145:5
**cops**
27:2
**copy**
27:16 35:4,8
63:12 80:24,25

81:8 95:11 152:10
155:9,11,16
193:15
**corporations**
25:10
**correct**
12:15,16 16:23
23:3 34:14 36:4,5
36:11 48:1 58:5
67:19,20 68:2,3
75:14,15 76:25
85:7 89:16,21,22
90:3 98:5 101:3
155:25 156:11
169:9,10,14,24
172:20 191:6
202:25 239:18,19
248:22 257:25
277:20
**corrected**
298:8
**correctly**
7:14 10:21 107:2
217:24 238:14
288:20 289:11
**correspond**
73:6
**corroborate**
239:16
**corroborated**
238:10 247:21
**corroborating**
173:1,2
**corroboration**
151:22 239:17
249:15
**corroborative**
172:22
**corrupted**
89:6
**cosa**
28:19,21
**counsel**
76:2,6 80:16 84:8
84:11,16 88:8
101:23 108:9
127:21 144:17
145:16 155:18
160:15,22 161:1

163:11 167:22
168:2,12,17
204:21 205:2,3
208:5,6 217:7
221:2,3 224:3
225:1 231:11,17
237:20 240:5
243:15,21 250:21
250:22 251:20
256:19 271:7
278:13 287:9
292:20 294:9
295:10
**counsels**
84:18 101:17,18
101:19 257:20
**count**
296:18
**counted**
289:21,24
**countries**
27:3 37:22 38:2,9
38:12 181:4
**countryside**
91:15
**counts**
190:8 272:23
273:6
**couple**
186:17
**course**
29:10 41:5 56:17
59:17,17 65:5
76:4 77:13 82:22
90:19 97:2 135:10
145:8 166:14
182:3 216:22
234:3 236:9
270:20 290:2
292:17
**court**
1:1 2:3 6:24,24,25
10:7,8,14,16,22
11:2,7,11 12:1,1
12:17,20 13:2
14:12 16:19,24
17:13,15,16,16,20
17:22 19:7,8,9,15
19:22,25 22:13

25:1,6,16 29:18
30:14 31:25 32:4
32:4,9,10,12,13
32:14,17 33:6
41:7 48:25 50:6,8
50:16 51:20 52:22
55:8 56:6 63:4,20
67:1 68:8,23 69:1
69:22,24 70:8
71:18,23 72:2,4,6
73:4,6 75:17
76:13,16,24 77:20
77:20 78:20,25
79:3,21,22,24
82:10,16 83:13
84:6,15,15 86:10
88:4 89:12 94:11
95:20,22 96:3,5,6
96:7,21,22 97:5,7
97:8,13,14,18,18
98:6,11,11,13,17
98:18,19,23,24,25
101:2 102:2,12,13
103:1 104:4,17
106:17 107:3,13
108:10,13 111:3
111:21,21 113:24
114:2 116:20
117:3 121:8,9,19
122:1,4 123:18
125:5,12 134:24
135:6,9,11,14,20
135:23 136:8,10
137:12 140:1,13
140:21,22 141:18
144:7,16,18,20,21
144:22 145:1,2,5
145:13 147:7,17
151:21 155:11
158:18,25 160:5
160:23 162:15,20
163:4,5,5,8,12,18
163:20,21,24
166:3,6 167:25
169:12,17 170:4
171:14 172:23
175:23 179:14
180:10 183:11
186:5,8 188:2,20

189:10,18,21,25
190:2,16,18,22
195:21 196:6
201:19 202:20,21
209:3,13 213:17
213:24 215:12,15
215:16 217:14,15
217:23 221:17
224:3,4,5 225:2
225:23 226:2
229:13,18 230:2,5
231:22,25 238:7,8
238:23 239:7
241:25 244:4
246:24 247:15,19
250:24 251:1,10
251:17,17,21,22
252:12,18,22
253:4,8,10,13,19
254:22 257:2
260:16 265:10
266:3,4 268:13
272:24 273:15,18
274:13,15,25
275:6,7 278:15,17
279:6,7 282:14
286:1 295:17
**courtappointed**
67:22
**courthouse**
70:17
**courtmartial**
83:11 141:8
**courtroom**
85:15 99:25
**courts**
9:11 10:18,21
11:15,16,25 12:2
12:3 13:13,18
14:4,9,19 20:9,12
22:19 35:22 36:19
36:22 38:24 39:1
40:2,20 46:8,9
52:16 54:15 55:17
55:18 56:4,4,12
56:15,19,21 58:2
58:13 62:25 63:1
63:1 67:4,17,18
67:25 68:2,6,15

68:15,16,22 69:16
70:4,24 71:8,15
73:1,5,16 74:6,20
74:21 75:3,12
77:1,19 78:13
79:9,11,20 87:7
88:13 89:19 90:15
90:20 94:25 95:1
95:2,8,9 97:24,24
98:3 100:12,14
101:9,13,16 104:3
104:24 107:1,16
108:11,12 109:1
110:11 111:5,8,19
111:20 112:13,18
112:20,23 114:7,7
115:8,10,14,19
116:5,10,23,23
144:18 147:13
159:10 161:2
163:5 169:8
171:12 202:18,18
202:22 203:6,9
208:2 225:2
241:14,16 242:1,4
243:7,9 251:20
252:18 260:23
282:12 288:10
**cover**
66:21 69:24 72:6
72:15
**covered**
11:24 220:22,23
**covering**
12:4
**crafty**
253:11
**create**
180:21
**created**
79:18 163:23
177:6
**crime**
24:9,12,15,15,16
24:16,17,20 27:4
28:11 67:22 93:11
93:16 128:1
163:12 166:1
216:12,13 253:24

**crimes**
22:23 46:6 65:20
65:22 146:21
199:4 204:16
216:19,25,25
217:3 263:19
**criminal**
9:4,7,8,14 10:3
14:1,2,13,14,19
17:1,13,16 19:11
21:6,7,8 22:8
36:23 48:4 51:15
97:15 99:11 118:4
118:13 121:16,23
122:10 123:19
124:20 139:24
177:25 251:17
276:21
**criminally**
51:3 112:17
139:16
**critical**
89:5 140:1
**criticism**
54:12 55:4,5
146:18
**criticisms**
54:19
**criticized**
54:14
**cross**
60:4 127:15
131:14,17,19
**crossexamination**
46:20 151:25
160:7 223:5,6
239:3,5 243:23
248:17 263:3
265:14
**crossexaminations**
19:3 158:14 201:5
**crossexamine**
13:12 14:6 76:20
77:5,15 159:19
160:16,23 185:21
202:13,13 203:5
240:10 267:2
281:22 284:13,21
**crossexamined**

19:5 238:10
**crossexamining**
281:11
**crowns**
210:8
**cruel**
16:16,21 43:1,20
44:15 119:4 121:6
122:19 123:22
125:24 128:13
130:9 132:5,13
133:8 134:5,20
231:12,20
**cruelly**
126:5
**crunch**
50:17
**crystalized**
142:1
**csr**
1:25 2:4 297:3,20
**culture**
88:14
**cure**
254:2
**curious**
90:23 91:9 117:10
147:20
**custodial**
167:23
**custody**
37:13 129:3
130:10 165:4
166:15 167:15
179:24 180:3
207:9 223:18
246:5,10 254:14
286:12
**customary**
242:1
**cut**
212:3 283:1
**cuts**
180:11

**D**

**damage**
203:4
**daniel**

109:4
**darfur**
92:17
**database**
135:5
**date**
81:20,23 180:7
192:23 207:22
224:12,19 298:15
299:4,24
**dated**
4:13,15,18,21
297:18
**dates**
194:3 222:10
**david**
2:5
**day**
2:6 71:1 177:1
180:13 189:15,18
211:3 222:10
249:10 256:14,20
259:3 272:2
274:20 275:24
297:18
**days**
15:17 36:22 158:5
180:9 182:1,2,3,5
182:6 184:9
187:18 204:3
205:20 222:3,15
222:18 236:3,7
**dc**
2:20
**de**
25:23 33:4 63:19
83:19,19 110:11
110:23 162:17
**dead**
282:4
**deadlines**
252:12
**deal**
34:1 77:18 111:3
121:6 133:23
134:14 211:15
**dealing**
25:20 42:5 74:16
103:13 135:8

**deals**
40:14 42:25 95:24
105:21 119:12
**dealt**
42:23 50:20 55:5
63:24 77:21 96:1
96:2
**death**
65:15 83:4,5,16
83:18 233:7 282:1
282:6,9
**debate**
4:17 50:12 54:21
59:3 60:6 110:19
124:9 220:19
**decades**
73:25 141:20
**december**
4:21 16:4 18:9,11
191:1,3,5 297:18
**decide**
57:9 120:14
179:11 253:6
257:3
**decided**
25:25 77:7 78:6
78:12 174:17
**decides**
183:15
**decision**
51:12 75:23,24
82:10 88:8 179:25
225:25 239:16
240:6 252:6,12,19
275:9 284:14
**decisions**
70:24 82:16
134:24 135:7,9,11
135:14 136:4
137:11 147:7
291:13
**declare**
298:4
**declassification**
104:9 105:21
**dedicated**
289:20
**deemed**

79:8
**defend**
180:22 253:22
268:18
**defendant**
68:12 76:13 84:6
84:8,9,17 88:23
102:9,15 112:25
113:2,4,9,23
114:12 159:4
168:12,21 180:10
180:21 183:9
186:13 188:11
189:7,15,25
191:10,12 192:6
197:4 202:24
209:14 223:22
224:2 225:1,20
238:20 246:2
251:19 253:14
258:14,16 263:14
263:18 264:13
273:11,17,18
274:25 275:23,24
284:17 286:5,12
286:13
**defendants**
1:8 2:17 46:5
68:10 69:11 78:18
78:23 79:1 101:14
101:16 103:8
107:15 111:4
112:17 114:9
142:15 145:20
150:9 161:9
223:17 235:5
239:13 240:5
253:9,20 257:3,23
258:4,15 264:24
265:11,16,18,19
267:6,8 268:2,12
268:18 270:1
**defended**
22:8 67:19
**defenders**
21:9
**defending**
9:9 30:22 84:8
93:18

**defense**
17:1,2 21:6,7
40:22 41:11,12,15
41:22 46:5 47:4
48:3,4 51:4,16
52:19 76:2,6,14
76:19 77:15 78:4
84:16,18 88:12,19
88:23 101:18,25
102:5,7 103:14,15
103:19,20,23,25
104:1 106:10,21
112:12 132:24,25
133:3 145:19
149:7 151:22,24
158:25 159:2,3,6
159:8,17 160:9,19
165:11,12 166:6,8
166:8 179:15
188:8,10 195:3,14
196:18 203:4
205:5,19 213:12
214:6 220:7,8
221:12 223:6,14
225:5 229:9 230:4
231:16,25 234:16
234:20 238:11
239:15 241:18
242:25 243:25
244:1 251:5,7
252:9,14,22,23
253:1,3,6,9,12,13
253:17,21,22
254:3 256:19
257:6,20 258:11
264:11 265:5,13
265:13,17,21
266:14 267:9,17
273:24 275:2,16
276:21,21 278:17
279:3,4 281:19
284:3,15 286:1,1
287:9 292:13
**defer**
209:2 234:14
**define**
16:20 29:25 30:21
**defined**
24:17

**definite**
154:21 168:6,10
168:16
**definitely**
62:1 70:24 88:21
136:16 173:18
186:12 194:2
279:10 282:5,13
288:9
**degrading**
16:16,21 43:1,20
44:16 119:4 121:7
122:20,21 123:22
125:24 127:4
128:13 130:9
132:6,9,13 133:8
134:5,20 231:13
231:20 232:2
**degradingly**
126:6
**degree**
146:20 151:10
153:6,9,23 154:14
174:9 175:10
179:8 183:4 194:4
194:10 198:2,15
199:23 201:12
206:24 211:6
212:5,14,22
219:20 232:9
234:9 235:19
238:1,25 245:10
245:10,21 250:13
277:5
**delay**
221:23
**delayed**
102:8,11 255:1
**delegated**
33:7
**deliver**
296:21
**delve**
141:24
**demand**
149:14 205:4
**demanded**
46:9 225:21
**demands**

103:15
**demolish**
184:9
**demolishing**
185:15
**denial**
114:12 154:4
169:21 202:11
204:5
**denials**
256:2
**denied**
126:20 151:11
153:7 154:2,15
158:4 160:22
174:9 175:11,12
179:9 183:5 187:2
201:13 202:2
203:22 204:9
206:25 207:7
211:7 212:6,15
213:11 214:20
219:21 222:14,17
225:14 232:12,15
234:10 235:20
238:2 245:11,22
245:24 254:2
255:1,23,24
283:25
**deny**
203:25
**depending**
20:18
**depends**
47:1,2,2
**deponent**
298:1
**deported**
206:11
**deposition**
1:14 2:1 41:20
142:22 143:8
150:13 156:21
158:4 168:25
193:4 241:7 287:4
287:8,21 288:19
290:3,9,23 292:5
292:17 294:17
296:25 297:6,9

**deprecating**
288:14
**deprived**
69:11 140:19
**deputy**
25:24 57:24,25
**describe**
8:4,22 21:5 47:24
49:2 66:1 68:4
79:6 130:19
157:17 185:2
223:4 228:9 256:4
256:5 272:6,19
280:18
**described**
36:19 45:19 47:22
48:17 49:13,20
50:16 79:19 121:3
122:25 131:5,9
141:17 147:23
170:4 179:20
213:25 231:25
240:5 244:7,19
262:3 266:23
277:1 286:22
**describes**
35:20
**describing**
49:19 59:3 78:15
93:1 121:23
**description**
4:11 5:2 123:24
**deserved**
9:16
**desire**
209:10
**despite**
114:8
**detail**
152:7 258:13
**detailing**
231:9
**details**
157:12 158:19,21
**detain**
139:10
**detained**
137:9,16 138:2,18
151:25 166:20

201:24 210:7
211:19 222:11
225:25 236:3,7
265:1 270:11
278:7,11 280:23
285:23
**detainee**
38:4 96:9 102:20
127:5
**detainees**
16:15 26:5,13,13
99:1,3 101:21
126:18 127:5,7
131:15,21 133:7
**detaining**
38:6 181:9
**detention**
11:4,5 13:25
19:12 36:21 37:3
37:6,7,15,16,18
37:24,25 38:11
96:2 104:11
136:22,24 137:13
138:8,12,13 152:1
152:2 155:13
157:23 158:17
165:2 179:11,12
181:11,13 187:16
187:17 201:25
203:11,13 223:17
226:1 227:9 236:2
256:7,8 265:1
270:2 278:10,12
278:24 279:25,25
280:5,7,21 281:1
283:24 284:13
285:18,20,25
**determined**
79:25 83:2
**detriment**
180:23 242:6
**developed**
32:23
**deviate**
88:14
**devices**
139:16
**di**
29:3

**dictum**
25:19 26:2
**difference**
55:21 66:3 74:4
132:16 291:21
**different**
22:3,7 29:21
36:16 52:5 68:24
72:24 115:1,2
141:21 152:6,19
159:1 164:15
173:14 180:19
183:17 185:15
188:3 202:17
230:4 238:13
245:4 246:16
256:20 280:13
**differently**
109:23 110:2,18
280:10
**difficult**
20:2 53:1 151:15
184:22 211:13
234:12
**digest**
74:1
**digit**
211:11
**dignity**
108:20
**din**
25:8 34:6 36:10
38:22 39:2,5,9,19
40:17 41:9,22
42:2,2,7,8 54:9,18
54:22 56:15 62:23
70:11 87:1 133:6
133:21 134:12,14
144:24 147:10,14
147:15 172:4,4
**dina**
3:3
**direct**
98:13 276:1,5
277:4 284:2
**directional**
126:17
**directly**
64:21 262:5 263:5

**directness**
262:14
**disagree**
51:7 73:13 80:2,3
95:12 176:18
241:9
**disagreements**
93:13
**disappeared**
56:24
**disciplinary**
44:22
**discipline**
266:3
**disciplined**
266:1
**disclosed**
103:8
**disclosing**
266:11
**disclosure**
165:8
**discovered**
55:2
**discretion**
70:14
**discuss**
40:13 71:11 83:21
151:4 172:13
219:5 295:18
**discussed**
17:10 33:19
131:25 172:18
175:17 216:8
230:19 254:11
256:10 260:2
261:6 268:24
**discussing**
61:9,9 67:18 68:1
74:7 75:4,13
97:25 182:9 198:5
199:4 294:25
295:7
**discussion**
74:3 80:19 82:4
82:25 100:21
155:7 170:12
171:17 201:8
224:21 283:13

**discussions**
40:18
**dismissed**
25:16
**dismissing**
70:12
**disobedience**
21:13
**displeasure**
221:18
**disposal**
58:18
**disrespect**
226:25
**disseminated**
111:9
**distinction**
11:13 86:5 212:10
**distinguish**
65:25 66:2 180:18
**distinguishing**
18:17
**district**
1:1,2 2:3,3 6:24
12:1 32:11,12
55:16 73:5 137:12
**dna**
32:22,24
**docket**
252:22
**doctor**
180:13 181:18
**doctrine**
110:11,22,23
111:2 211:17
**document**
4:12 5:3,6 43:16
59:25 81:20
158:15,19 174:14
204:11
**documentation**
278:8
**documented**
167:18 171:13
172:3
**documents**
55:1 86:3 143:7
143:10,24 145:23
146:1 153:15

157:24 163:17
165:4 168:22
175:14 199:16
222:16 287:13,17
**doing**
61:20 120:23
157:6 160:20
171:6 177:10
205:23 249:8
**don**
29:1,2
**door**
69:22
**doors**
71:24 125:1
214:11
**doublecheck**
275:23
**doublechecked**
55:10
**doubt**
19:4 100:25
167:13 198:9,21
199:5,7,24 208:17
217:2 252:11
**dozen**
19:1 20:9 104:24
173:12
**dozens**
40:18 215:16
**draw**
48:14 61:24
106:25 240:4
295:18
**drive**
195:17
**drives**
180:25
**dropped**
49:7
**druze**
87:2
**due**
34:1,7,10,13,18
35:21 36:18 40:1
65:25 66:11,14,18
66:22 69:12 88:16
96:15,24 97:3,21
98:4,12 99:10,17

100:3,6,8,10,23
140:19 141:6
150:1,5 151:11,17
153:7,11,15,17,21
153:22 154:15,19
157:16 164:14
166:18 168:6,10
168:11,16 169:22
169:25 170:2,3
174:10 175:11,12
175:16 178:24
179:4,9,22,23
180:19,19 181:20
183:5 185:24
187:14 188:5
193:11 195:16
201:14 202:11,12
203:12,14 206:25
207:7 209:1,2
211:7 212:4,6,9
212:15,19 213:5
214:21 216:24
218:18 219:21
221:25 225:8
226:16 228:4
232:12,15,23
234:11,19 235:20
238:2 243:14
244:1,24 245:7,11
245:16,22,24
247:24 250:9,13
250:15 254:11,19
255:23,24 256:1,4
256:5 260:3,5,11
260:14,20,21
261:7,17 262:3,15
263:4 264:5
272:19 275:25
277:25 278:2
280:11,18 281:8
283:15 284:6,16
286:5,8,22
**duly**
6:4 297:6
**duringtrial**
256:8
**duty**
107:6,13 186:8
265:23

—————————
**E**
—————————
**ear**
287:25 289:8,9
**earlier**
18:14 42:17 45:19
89:23 105:12
108:17 168:24
170:14,17 236:5
238:19 251:24
252:3
**early**
22:25 72:14 234:4
296:12
**earned**
15:9
**easiest**
47:19
**easy**
7:1
**editing**
40:16
**educated**
91:3,6
**education**
12:15
**effect**
65:9 95:13 181:21
262:15 268:20
276:2 277:4,10
284:2
**effective**
121:14 124:1
175:19 188:8,10
244:1 254:3
**effectiveness**
175:20
**effort**
145:9
**eichmann**
83:10
**eight**
15:17 27:25 141:2
238:13,13 246:7
246:14,19,20
248:21,22,24
254:17 270:13
296:19
**either**
16:16 20:15 37:13

70:9 77:19 79:7
108:3 126:16
128:6 140:16
168:5 182:24
198:18 246:14
**el**
10:22
**elect**
284:17
**elements**
28:11
**eliminated**
115:19
**embarrass**
121:1 136:17
**embarrassed**
30:8
**emerge**
291:3
**employ**
198:14
**employed**
49:9
**employee**
123:6
**employees**
117:4
**employers**
117:5
**employment**
6:25 115:9 116:23
117:3
**enables**
180:21
**encountered**
114:17,22 159:9
**ended**
53:5 55:12,17
115:22 157:7
158:21,23 234:4
236:10 281:4
**ends**
13:7 286:6
**enemy**
64:11
**enforcement**
61:10 136:25
**engage**
37:20 38:12 100:4

168:19
**engaged**
122:18 210:14
266:5,7,23 267:1
**engagement**
248:12
**engages**
64:21 122:12
**engaging**
43:23
**engineers**
215:16,25
**england**
14:22 18:18
**english**
9:25 47:9 49:18
80:8,12,22 85:20
85:22 166:21
176:2 189:8 274:8
**enlarges**
195:5
**enter**
70:5,6,13,17,19
71:13,23 73:9
99:25 101:20
265:23
**entering**
70:9 266:14
**entire**
18:19
**entitled**
4:12,14,17,20 5:3
75:4,6 89:20
107:16 108:3
178:24
**equated**
145:4 229:17
**equation**
77:9
**equivalent**
55:17 115:15
**errata**
298:7 299:1
**erred**
32:17
**error**
162:18 257:15
279:9
**errors**

**escort**
275:1
**especially**
195:15,22 203:14
286:11
**esq**
2:13,18,19 3:2,3
**essakhar**
3:7
**essay**
15:2
**essays**
15:8
**established**
112:21 140:22
142:14,21
**estimate**
11:9 13:16 14:8
19:24 29:16 30:14
52:24 58:6,7,10
126:16
**et**
1:4,7 299:2,3
**ethical**
265:22 266:6
**ethnic**
90:25
**ethnicity**
116:17 117:2,3
**evaluate**
97:9 113:24 203:3
247:12
**evaluated**
51:5
**event**
52:10 86:23
**eventually**
7:14 53:4 71:14
159:6 181:14
183:15 187:22
202:6 221:12
228:2 242:22
**everybody**
15:20 130:2 237:6
**eviatar**
146:2,3,4
**evidence**
17:9,12,23 32:22

55:21,24 56:23
57:15,17 68:1,2
94:3,18,22,23
101:10 107:12,17
107:17 108:5,6
113:15 114:3,13
114:14,18 143:16
151:6 153:4
154:12 158:13
161:2,5,16 165:8
168:20 170:11
172:12,23 173:1,2
174:6 175:7 179:7
183:1 189:22
191:1 195:9
201:10 202:13
204:8,18,19
206:22 211:4
212:18 213:11,16
213:25 215:4
219:18 221:15
222:21 226:15
228:20 230:2
232:1,10 234:7
235:16 236:12
237:24 239:17
240:5 242:3,5,11
243:4,22 245:20
262:22 271:1,3
278:13 281:5,23
284:15,22
**evidential**
158:14 171:16
179:6 183:7 201:4
201:16 203:17,21
204:7 207:21
219:25 226:14
232:16,22 238:4
257:3
**evidentiary**
77:4
**evolution**
77:25,25 78:5
**evolved**
96:22
**exact**
19:14 60:24 61:2
89:5 95:7 96:11
214:8

**exactly**
10:19 19:3 23:11
51:19 78:9 88:16
115:18 160:3
213:10 241:21
268:25
**exaggerate**
19:19
**exaggeration**
46:16 200:11
**examination**
4:5 6:8 13:7
156:14,18 298:5
298:10
**examine**
13:1 17:17 76:19
102:14 122:1
186:8 194:1
281:22
**examined**
6:5 13:17 18:15
120:8 149:22
185:23 275:14
297:5
**examining**
28:2 35:14 59:5
63:17 81:19
100:16 156:8
164:25
**example**
31:5 55:15 68:5
68:13,17 74:24
113:16 144:2
153:25 170:13
181:17
**examples**
184:2
**excavate**
25:10
**exceeds**
67:23
**excellent**
53:17
**exception**
16:23,25 17:5
51:24 65:11
293:18 298:6
**exceptions**
290:16

**exchange**
54:6 56:8,10
**exclude**
226:18
**excluded**
114:4
**exculpatory**
107:6,16,17 108:5
108:6
**executed**
53:18
**executive**
119:16
**exhausted**
32:22 54:21 123:8
124:11
**exhibit**
4:12,14,17,20 5:3
5:6,7 27:21 35:6
58:25 63:14 81:1
81:1,7 156:5
**exhibited**
143:11
**exist**
131:23 280:12
**existence**
11:19 169:4
**exists**
26:15 79:14
**expect**
12:11 13:21 22:1
57:19 95:8 144:7
171:8 204:4 207:4
211:11 214:13
287:1
**expense**
251:21
**experience**
36:4,13,17 37:1
39:17 52:13 58:8
92:4 93:18 101:14
102:19 126:17
145:10 158:2
196:4
**experienced**
208:13
**expert**
4:12 34:12,16,17
34:19 115:18

292:13 293:25
**expertise**
74:25
**explain**
52:6 64:1 69:18
73:8 120:7,20
178:18 188:21
190:20 201:16
203:2 204:21
242:15 266:18
**explained**
208:3 231:15
292:10
**explaining**
273:18
**explanation**
71:5 73:14 209:6
**explore**
152:24 154:25
**explored**
270:24
**explosive**
192:13
**explosives**
191:14 250:5
**express**
195:22
**expressed**
221:18 244:4
291:20
**extend**
285:24
**extension**
11:5,7 37:7
158:17 253:2
**extensions**
11:6 220:5 250:24
**extensive**
25:22 34:7 40:3
62:23
**extent**
20:18 142:16
290:4
**external**
117:25
**extra**
7:19 188:20
**extremely**
137:2 208:13

**extremist**
139:6,7

---
**F**
---
**face**
143:24 264:15
**faced**
159:12 251:18
**facing**
160:9 190:22
208:15 251:21
**fact**
12:5 40:8 76:10
97:9 128:17 140:5
140:20 162:12
163:7 173:5
192:17 225:19
228:2 234:15
241:24 248:14
254:2 273:5 274:1
281:7 283:23
291:4 295:18
**factfinding**
263:10
**facto**
83:19
**facts**
24:17 51:5 113:5
113:5 122:1 131:9
193:14,25 257:25
260:16,23 267:21
**factually**
193:9
**faculty**
7:6,11,13 8:5
**fail**
76:17
**failed**
221:8 253:1,1,2
284:24
**failing**
166:1
**failure**
142:18 179:21
188:6,7,8 243:25
**failures**
88:16 153:11,16
154:19 172:2,3
175:16 209:3

212:4,9,19 228:4
260:12,14
**fair**
29:20 31:18 35:23
46:12 50:11 57:14
58:11 61:1 71:21
74:13 75:2 85:13
96:24 109:24
125:14 129:4
142:3 171:25
172:1,14 177:8
178:24 189:13
192:2,2 193:2,21
208:23 212:21
216:24 227:10
230:21 237:5
268:9 277:6 283:8
**fairer**
26:24
**fairly**
36:25 50:22 60:21
79:9,10 257:22
262:25
**fairness**
155:1
**faith**
108:14
**fall**
290:15 293:17
**false**
226:3
**fame**
9:15
**familiar**
45:14 54:1,4 95:6
103:4,10,11 135:1
137:6,11 147:6
149:4 208:14
242:19
**familiarity**
45:20 46:4 47:25
48:15
**family**
50:3 70:16,16,18
70:19 72:17 99:24
127:9,10,11,24,25
128:8 130:12,13
185:16
**famous**

8:23 9:1 121:10
**far**
23:11 30:23
138:10,12 149:15
149:16 159:24
232:16
**fashion**
109:21 155:22
213:3
**fast**
249:22 272:8
**fathers**
278:16
**fault**
20:20
**fax**
2:15,21
**feature**
37:17
**federman**
137:7,9 138:1,9
138:16 139:2,23
**fee**
98:24,25 135:10
**feel**
48:12 76:7 93:22
97:3 120:25 126:5
150:21,23 170:8
176:11 219:4
244:24
**feels**
32:1
**feldman**
8:20,22,23 10:4
10:15 11:10 12:14
15:23 18:9,20
19:2,16 20:1,8,24
53:3,7 88:25
99:13 100:9,11,23
243:11
**fellow**
255:13
**felt**
24:9 221:25
**fence**
95:24
**field**
46:5
**fierce**

56:9 241:18
281:19
**fifteen**
263:13
**fifteenth**
2:19
**fifth**
222:10
**fighter**
64:11 259:20
**fighting**
134:1 241:18
259:2
**figure**
55:18 58:4,5
146:5 173:7
210:10 240:22
**figures**
29:19 55:4,6,11
60:24 61:2 62:6,6
62:7,22 118:2
**file**
32:9 85:12 97:17
98:18 104:6,13,15
104:16,20 124:18
124:25 142:15
143:4 144:7,21,24
145:2,12 151:18
154:4 160:5,11
163:20,23 164:1,2
165:2 168:13
169:12 174:15
182:13 185:19
197:19 198:23
200:4,8,10,11,17
200:19,19 201:21
204:4 207:4
211:10,12,15
213:19 214:14,16
217:6 219:14
220:2,3 225:17,18
225:18 232:7
233:6,13 234:2,3
234:14 236:4,6
239:5,7,9,11,24
242:11 247:13,14
247:16 249:25
250:22,23 251:8
251:11,12 252:6

252:13,21,23
265:5 267:4 271:1
277:22 278:17
285:14
**filed**
25:6,23 37:12
59:13 106:16
107:1,14 151:21
151:24 157:21
158:18 221:16
244:10,11 248:5
251:4,5 252:4,7
265:12 285:15,16
**files**
11:19 41:16,25
45:22 46:10,13
47:24 48:2 79:17
84:7 103:14,18,18
105:9,12,14,18,24
106:20 107:2,4,17
142:7,17,25
144:11,13,16,18
144:21 145:2,5,13
145:24 150:3,8,21
157:5 168:9,24
169:4,9 170:20
171:3 173:17
174:3 220:8,21,24
235:12 237:19
240:15 244:13
252:8 269:2,3
277:14
**filing**
98:23 169:17
**final**
112:23 179:24
**find**
7:3 27:12 41:17
47:11 87:24
109:11 147:10
165:11 173:25
189:18,23 192:25
193:1 201:6 204:4
206:14 209:3
211:1 214:14
284:9
**fine**
34:5 100:20 129:9
129:18 132:7

164:21,24 175:3
199:21 200:6,25
224:23 234:23
**fingernails**
184:4
**finish**
107:22
**finished**
156:16 174:19
**fired**
100:20
**firm**
21:3 296:21
**first**
6:4 11:1,3,10,14
11:18 13:4,5 32:5
33:11,11,16 36:4
48:12,17 60:16
66:1,5 70:7,24
71:6 78:13,17
111:6,20 118:15
156:17 157:17
164:16 178:9
182:22 186:23,24
189:22 201:8
220:4 226:1 236:6
237:17 239:19
245:6,14,16 250:9
251:1 255:19
262:18 286:7
288:18
**five**
16:14 50:19 73:25
123:19 141:20
159:1 181:10,11
192:9 222:2
224:22 229:13
248:20,20,23
270:16
**flags**
35:12
**flaw**
188:5
**flesh**
144:13
**flip**
16:11 54:25 93:22
**flipped**
272:8

**flow**
32:16
**fluently**
84:23
**focus**
19:16 85:4,4
142:5 228:22
**focused**
45:8
**follow**
12:9 56:19 80:16
120:5
**followed**
68:16 103:11
**following**
8:19 14:21 88:12
98:10 114:12
118:12 169:23
189:7 241:10
281:14
**fonctionnaire**
117:19
**fond**
255:5
**forbid**
65:3,14
**forbidden**
16:22 50:6
**forbids**
65:7,8
**force**
38:4 52:7 64:6
94:19
**forced**
207:13
**forces**
27:3 28:5 210:9
**foregoing**
297:6,9,13 298:4
**foreign**
91:16 119:11
**forensic**
200:15
**forgery**
94:4
**forgot**
52:13 166:12
250:22
**form**

37:23 41:13 53:23
94:18 121:13
148:4 150:16
226:17
**formed**
21:3 36:17 55:3
132:8 157:9
**forth**
6:6 143:1 170:6
184:14,25 222:6
297:10
**forum**
31:2 124:7
**fought**
221:4,7
**found**
8:16 46:23 47:3
55:11 70:11 82:9
101:13,16 106:22
107:17 118:3
172:23 174:11
184:10 193:23
266:5,7
**foundation**
142:10,16,19
162:21 177:12
190:6 194:25
206:5 210:1
215:20 216:3
236:16 263:21
291:6 294:19
**foundational**
143:3
**four**
35:25 73:25
123:18 158:25
183:17,23 185:13
185:13,14,14
192:9 267:6,8,19
268:2,18 271:11
279:2,2
**fourteen**
260:1
**fourteenth**
259:25
**fourth**
12:24 36:10 38:1
197:21
**fraction**

207:4 211:10
**fragment**
248:8
**frame**
40:14 45:17 64:20
68:6,14 70:1 74:3
101:18 103:12
135:8,21 172:5
**framework**
45:14 48:2,16
230:12 273:11
**free**
63:12 93:22 96:8
128:12 130:20
131:8 133:14
150:21,23 170:8
**freed**
103:3
**freedom**
17:19,21
**freely**
126:11
**frequent**
79:12 202:20
**frequently**
18:7 87:6
**friendly**
133:20
**friends**
7:9 40:18 259:1
**frog**
50:17
**front**
21:15 84:1 93:22
137:22 154:5
200:12 289:4
**fruitful**
159:14
**full**
7:1 55:8 153:13
153:14 154:20
157:4 193:17
198:23 199:10,10
200:17 204:2
217:6 230:25
236:4
**fully**
89:13 122:4 157:9
218:18

**fundamental**
53:15 103:7
**fundamentally**
94:3
**further**
7:25 8:2 83:21
98:12 220:20
249:19 297:15
**futile**
145:11

**G**

**gag**
158:8 165:6 204:1
204:4
**gain**
94:10
**gaza**
9:12
**gbd**
1:6
**general**
10:8,19 11:15
35:22 70:20 79:23
86:15,22 98:1
118:7,8 122:9,13
122:16,17,18,22
123:20 124:18
170:3 175:16
187:20 201:18
209:2 219:6 228:4
228:11 234:14
235:3 236:9
244:22 248:4,18
256:9 264:22
275:17 279:18
281:14 283:20,21
283:23 284:7
285:13
**generally**
185:17
**generated**
7:15 96:23
**generates**
286:12,14
**geneva**
38:1
**genuine**
276:17

**genuinely**
100:7,9,23
**george**
177:19
**german**
22:14 141:2
**getting**
63:25 129:15
143:22 159:11
223:14 272:23
296:22
**ghanem**
237:7,8,9,15,22
237:25 238:2,6
244:20,23 262:2,9
262:11
**ghanems**
261:20 262:6
**give**
7:19 13:16 14:11
22:25 52:24 60:10
60:12 68:5 140:24
151:2 153:25
182:19,23 184:1
184:16 195:9
211:22 217:18,24
218:23 237:18
**given**
14:19 46:9 81:11
82:17 103:14
126:14,15 174:16
207:6 233:14,15
244:14 250:24
251:6 253:2
260:20
**gives**
85:18 179:6
225:16
**giving**
63:19,20 189:15
210:8 259:6
**glanced**
146:10
**go**
6:10 7:20 22:24
46:3 49:4 62:21
69:21 71:13 72:10
72:17 86:7 91:11
104:9 107:24

108:2 111:13,15
111:18,18 120:6
125:11 128:16
131:11 149:21
150:4 152:15,19
160:9 166:12
171:9 179:20
180:15,16 181:10
182:10 184:17
186:16 193:1,1
197:23 201:8
205:14 218:15
220:18 227:6
230:7 232:6 235:9
237:1 245:1
255:12 259:24
261:4 262:10
263:11 267:17
269:1 271:16
283:11 284:11
**goat**
54:1,2,5 284:25
285:3,5
**godfather**
29:8,9,10
**goes**
38:8 73:8 197:13
**going**
27:11,16 34:4,25
47:11 59:23 60:20
66:1 80:13,20,21
80:21,23 81:3
87:19 91:15 92:8
93:21,24 100:13
103:2 108:8 114:4
118:10 120:9
123:9 143:17
151:1 156:22
157:15 164:8
176:17 182:18
187:13 221:4
241:14,20 250:8
269:21 282:25
283:6 293:16,18
**good**
7:2 53:12,23 54:1
54:2 96:17 108:14
140:17 161:11
235:1 240:21

241:13 251:18
257:9 284:25
285:3,5
**gordon**
56:13
**gotti**
29:12 209:22
**govern**
56:14 77:24,24
**governing**
95:7
**government**
26:18 27:7,8 28:4
32:7 51:9 118:21
121:5 131:21
**governmental**
120:13
**governs**
84:3
**gradually**
9:6,13 115:24
**graduate**
6:13
**graduated**
8:11
**graduation**
8:19
**granted**
197:2
**grave**
153:22 207:7
261:17 264:15
**graver**
261:17
**greater**
153:16
**grilled**
294:1
**ground**
114:14 251:18
**grounds**
70:12 94:19,21
98:4 106:4 223:15
**group**
16:7 26:12 132:6
259:23
**groups**
262:16,17 263:1
**grows**

259:15
**gs**
118:14
**gss**
12:6 16:8,11 17:3
17:4 31:5 45:22
46:10,13 47:8,8
47:14,24 48:2,9
48:11,23 49:5,12
50:2 51:14,16
62:7 103:14,18
104:6,13 105:6,9
105:12,14,23
107:17 117:13,19
117:21,25 118:6
118:14,25 119:7
121:2,15,17 122:7
123:3,6,15 125:3
128:15 130:11
131:11 144:4,13
149:5,6 154:4
165:2 167:14
168:9,13,15,24
174:12 185:19,22
187:21 203:24
204:4 214:2,15
220:2,9,21,24
222:4,21 223:5
225:17,18 229:14
236:8 279:16
**guard**
275:6
**guards**
275:1
**guess**
11:23 23:12 38:12
63:23 92:2,16
95:8 141:10,13
143:19 161:15
201:1 205:4 209:9
209:20 212:21
219:1 229:8 266:6
271:17
**guilt**
79:25 83:1 89:15
179:20 180:15
181:10,21 194:21
198:21 199:6,9,24
234:16,21 249:14

257:3 273:22
274:2
**guilty**
69:2 82:9 89:13
112:25 113:9
114:12,19 165:25
174:11 188:1,1
189:18,23 195:2
195:10,21 207:20
215:6 217:3
231:14 232:17,20
255:20 258:6,20
267:19 268:6
273:6 275:25
276:16,18,19
279:4,5 284:19
**guy**
71:12 118:15
187:11,12 210:9,9
265:10
**guys**
237:10

**H**

**hadad**
208:7,8,13,19
**hair**
6:23 11:24
**half**
10:9 152:3 222:5
254:15 270:11
274:19 278:7,9,12
278:25,25 283:24
285:23
**halil**
151:8 249:20,21
249:24 250:4
254:13 255:10
**hamamra**
284:8 286:23
**hamash**
263:12 264:7,8,20
267:21 268:23
269:13,19 270:18
278:3
**hamed**
213:24 218:15
219:9,10,11,12,14
219:19,21 220:24

221:3 222:2 225:7
226:7 231:17,19
249:20,24 254:13
255:10
**hameds**
214:4,11
**hand**
63:9 64:3 74:11
278:16,17
**handed**
87:23 111:25
113:1 117:24
221:10 287:17
**handled**
76:4
**hands**
293:13
**happen**
57:9 114:5 224:6
**happened**
17:25 18:1 46:21
46:24 47:5 83:9
83:11,12 118:19
122:4 163:18
174:16 214:10,16
224:7,8 225:3
256:14 263:20,20
276:22 277:11
278:9 280:7
285:19
**happening**
97:5
**happenings**
158:20 187:19
**happens**
38:11 77:14 114:6
159:15 189:14
196:9
**happy**
35:11 58:19
129:15,16
**hasheika**
192:14
**hassan**
103:3
**headsup**
148:20
**healthy**
133:25 134:3

**hear**
63:19 144:15,19
145:4 158:22
178:17 217:18
239:4 252:25
285:1
**heard**
15:18,21 28:18,24
29:12,14 93:9,10
94:5 128:11
205:19 209:18
229:10 236:12
247:10
**hearing**
25:23 63:20,23
69:24 71:16,23
74:1 75:23 84:1
99:22 113:23
158:21 160:10
165:2 170:5,10
179:11,11,14
180:8 183:10
189:22,22 201:5
207:21 217:14
225:23 239:2,2
240:2 242:21
254:17,18 263:25
270:13 271:8
275:8 281:5
**hearings**
23:4,6,7 36:21,25
37:3 102:22
158:14 159:13
188:3 221:15
232:17
**hears**
254:23
**heart**
94:20 162:3
**hebrew**
5:6 6:11,13 7:3,5
8:9,10 20:17
26:11 49:17 80:11
80:12,17,24 81:18
81:19 84:19,20,23
85:17,22 86:24,24
88:22 90:21,22
91:5,6,7,24 93:6,7
93:19 161:11,11

166:16,17 167:1,3
167:12,18 255:3
274:4
**hebron**
139:3
**hectic**
6:21
**heightened**
72:7
**heinous**
32:20 216:25
217:1
**held**
80:19 82:4,25
100:21 101:22
112:17 155:7
214:11 283:13
**help**
20:16 107:12
156:18 228:22
231:4 251:12
287:14,15 291:4
293:5
**helped**
291:12
**helpful**
52:11 142:3 153:3
157:14,18 220:15
280:15
**helping**
290:1,23
**hereinafter**
6:6
**hesitate**
177:3
**hezbollah**
22:15
**high**
16:19 19:22,25
25:6 29:18 30:14
31:25 32:4,9 50:6
50:8,16 63:20
73:4 95:20,22
96:5,21 97:18
98:18 121:8,9
123:17 125:12
144:21 145:2,13
229:13,18
**higher**

49:11 97:14
**highest**
212:22
**highlight**
168:5
**highly**
272:4
**hill**
2:18 31:11 34:22
58:22 59:20,22,24
60:3,7,9,10,12,15
81:8,13 82:3
107:20,22 129:20
130:22 134:7,9
138:19,23 141:9
141:11 142:10,13
142:21,25 143:3
143:20 147:2
148:14 149:20
152:11,15 155:20
156:1,4 162:21,24
164:13,18,21,24
177:12 181:24
182:2 185:8 190:6
191:23 194:25
198:6 200:3,23
201:1 204:10
206:5 210:1,3
215:18,20 216:3,5
218:10,11,12,16
218:22 219:1
226:17,21 227:1,3
236:16 237:10,13
243:19 249:3,6,8
249:10 254:9
260:7 261:9
263:21 264:1
269:6,8 272:2
274:3,9,18 282:22
283:2,5,7,11
285:1,5,9 287:10
287:18,20 288:2
290:4,10,12,14,18
290:20 291:6,15
291:18 292:1,18
292:22,24 293:2,6
293:9,11,15 294:6
294:17,18 295:2,5
295:8,12,15,20

296:2,4,8,18
**hills**
63:12 150:14
288:25
**hilmi**
263:11 264:7
**hit**
184:12,12
**hitchhiking**
191:17
**hold**
37:18 60:2 76:16
107:20 159:3
225:5 242:20,24
288:2
**holding**
73:23 177:21
239:5
**holds**
131:20
**hollywood**
230:10
**home**
184:9
**homicide**
22:20 161:21
178:3 250:5
253:15,16
**honest**
7:7 290:25
**honestly**
56:1 114:20
228:11
**honor**
259:8,10
**hope**
31:20 51:9 259:14
259:19 287:15
**hopefully**
21:17
**hostile**
37:20
**hostilities**
64:21
**hostility**
7:16
**hotel**
2:5 7:19
**hour**

129:21 200:5
222:5 274:19
**hours**
222:5,6 274:19
282:23 283:1
289:22,22 293:2
293:20 294:2
295:21 296:19,20
**house**
185:16
**huddled**
289:10,11
**huge**
7:11,13 144:1
**human**
8:24 9:1,8,19 10:4
14:25 15:1,25
19:16,20 21:6,9
21:11 23:18 25:7
30:16,20,22,22
31:1 39:23,24,25
44:4 47:7,23 48:3
48:5,7 96:25
108:20 117:22
244:10 286:8
**humanitarian**
25:11 56:14 64:11
64:24 109:16,22
131:22
**humanity**
216:13,19,25
**hundred**
31:14
**hundreds**
46:12,16
**hypothetical**
57:13 140:16,24
141:11
**hypotheticals**
168:19

———————
**I**
**ibrahim**
213:23 214:4,11
218:15 219:19
225:7 235:10,13
235:18 246:25
280:16
**icj**

25:1
**idea**
88:20 116:13
173:10 205:25,25
206:4,12 227:11
230:10,11 244:14
**ideas**
70:13
**identified**
171:24 173:12
244:13 260:3,5
261:8
**identify**
29:23 31:16 264:5
**identity**
23:9,15 266:11,11
**ideologically**
28:15
**idf**
59:14 62:8 71:11
122:12
**idiom**
112:10
**iii**
2:5
**illegal**
132:18 139:6
177:20 230:3
**illegally**
128:1
**imagine**
141:1
**imc**
18:21,23 68:20
71:12 73:7
**immediately**
15:24 176:9 195:7
196:5 239:20
**immunity**
19:13 105:2
106:15,16,22,23
106:25 107:10,14
165:7 168:9
**impact**
260:11
**impacted**
260:14
**implemented**
4:18 68:8

**implicated**
236:3,5 248:10,23
249:1 264:20
270:21
**implicates**
240:10 244:24
**implicating**
265:15,15
**implication**
248:7
**implications**
89:15 294:4
**important**
19:6 47:4 68:7
113:15 121:19
141:23 172:13
202:12 210:10
**impossible**
100:5 140:11
152:20,21 260:20
260:22
**imprecise**
86:1
**impression**
137:15 193:24
221:2,6,7 240:17
**imprisoned**
32:20
**improbable**
100:6
**improper**
210:7
**improve**
293:5
**inaccurate**
76:7 167:23
**inadequate**
101:14,17,24
102:4
**inappropriate**
117:23 266:6
**inaudible**
208:11 273:20
**incarcerating**
50:3
**incident**
178:10 179:19
239:8
**incidents**

62:8
**include**
48:15 55:11 72:19
170:12 171:17
**included**
144:4 263:15
**includes**
44:21 48:6 173:3
272:22
**including**
82:17 144:2
151:15 178:14
227:7
**incomplete**
76:8 141:11
143:25
**inconsistent**
77:11 141:6
**incorrect**
224:20
**increase**
93:11
**incriminate**
188:22 246:18
**incriminated**
13:13 190:5
202:14 222:7,12
222:18 225:11
**incriminates**
189:17
**incriminating**
13:14 183:19
202:14 222:9
238:12 243:22
267:22
**independence**
83:12
**independent**
96:8 122:9,16
**indicating**
43:24 60:7 268:19
**indicted**
22:14 56:3,4
**indictment**
37:11,19 55:14
57:3,4,14 84:5,9
84:16,17,19,21,22
84:23 85:1,12
103:19 108:6

157:21 161:8,13
189:16 211:19
221:16 233:2,2,25
235:23 248:5,7,9
257:25 258:2
273:13 280:23
285:15,16
**indictments**
59:13
**indirect**
276:2,5,6
**indirectly**
263:6,7
**indiscriminate**
65:3
**individual**
32:19 66:17
122:11 135:16
137:6 138:16
139:11 218:19
**individualized**
123:18
**individuals**
141:7 142:8
149:18 198:3
199:3 208:15
247:13
**ineffective**
168:17 250:22
**infected**
153:10
**infer**
158:3 192:16
**inference**
106:25 167:10
240:4 295:18
**inferred**
166:5 238:19
**inferring**
160:1,3
**infiltrate**
28:11
**infiltrated**
141:22
**influx**
92:12
**information**
53:21 57:21 58:12
105:15,25 106:5

107:7 119:3
145:20 194:20
198:23 199:10
212:16 214:14
**informed**
146:23 188:16,18
**inhuman**
16:17,22 43:1,20
44:15 119:4 121:6
122:19 123:22
125:24 128:13
130:9 132:6 133:8
134:5,20 231:12
231:20
**inhumane**
132:9,13 232:3
**inhumanly**
126:6
**initially**
78:13,17,17
**initiated**
186:12 251:9
**injury**
65:8,15
**innocence**
32:3 33:14,23
66:5 142:5 173:9
179:20 180:16
181:10 194:22
196:1,3,5,14,16
197:24 198:21
199:9 222:8 246:3
268:3,5 273:12
284:20
**innocent**
32:24 33:17
102:16 146:22
194:6,12 195:10
197:4 198:5,10
222:9 255:20
**input**
292:14,17
**inquired**
207:9,10
**inquiry**
186:12 232:20
**insist**
89:1 108:2
**inspector**

118:7,8,25 119:7
121:3 123:15
124:21,21,24
**installments**
160:8 187:23
188:24
**instance**
32:5 70:25,25
78:13,17 111:20
125:8 160:15
226:1
**instances**
10:11 36:24
**institution**
128:21 132:2
**institutional**
195:16
**institutions**
125:23 130:8
**instruct**
33:9 171:12 224:2
290:5 292:2,19,25
293:7,12,19 295:3
295:16
**instructed**
196:17 225:1
**instructing**
99:22 295:6
**instruction**
225:5 290:16
**instructions**
291:1 292:11
**instruments**
286:9
**insufficient**
101:10
**intelligence**
119:13
**intention**
239:23
**inter**
166:20
**interest**
24:25 48:20
265:24 266:1
**interested**
100:7,10 193:11
297:15
**interfere**

22:5
**interfered**
17:21
**interlocutory**
97:19
**intern**
20:15
**internal**
44:17 117:19,23
118:2,6 122:24
123:3 124:21
**international**
4:20 15:1 25:1,11
34:1 37:22 39:23
42:21 64:10,13,23
65:2,3,7,12,14
66:15 72:5 109:16
109:22 127:15
131:14,17,19
181:3
**internship**
9:23,25 10:6,9
11:21 12:13
**interpret**
85:22 86:11,13,24
88:22 171:13
288:1
**interpretation**
87:3 170:5,18
288:7,10
**interpretator**
75:6
**interpreter**
75:7,8,10 85:8,9
85:10,14,18,21
86:11,12,21 87:10
99:22 171:6,13
**interpreters**
87:1,2,6 99:20
170:21
**interpreting**
99:21,23 288:5
**interrogate**
185:21
**interrogated**
117:21 167:2,12
211:16 213:7
214:5 222:2
**interrogation**

17:4 43:24 49:5
49:12 103:18
125:3,13 157:22
165:3 168:15
174:13 175:13
183:19 201:22
211:18 214:7,17
214:18,23 232:19
254:16
**interrogations**
222:4 236:8
**interrogator**
17:3 47:3 51:3,14
**interrogators**
50:2 167:14
185:22 214:2
223:5
**interrupt**
59:24 116:3
121:20 180:5
184:17,25
**interrupted**
8:1 133:1 286:19
**interrupting**
50:11 220:10
**interruption**
7:17
**interview**
167:16,17
**interviewed**
41:13 70:10
126:20 127:6
128:8,9
**interviewees**
17:19
**interviewer**
17:18
**intifada**
177:4 216:18
**intimidated**
207:11
**invented**
167:16
**invest**
118:25
**investigate**
122:4 125:23
128:22
**investigated**

123:23 139:23
**investigating**
61:11,14 160:5
**investigation**
12:6 13:14 16:11
17:8 37:11,12
46:22 47:5 49:4
118:4,13,19
122:17 123:3
124:20 153:10
154:18 185:19
204:1 220:6
232:14 238:8
246:4,9 270:22
285:19
**investigations**
16:8 45:15 48:17
48:23 49:9 62:7
117:14,18 121:15
121:17 122:7,24
187:21
**investigative**
16:20 17:10 59:11
103:9 104:13
**investigator**
17:3 149:6
**investigators**
51:17 61:18 96:8
117:21 144:4
226:4
**investigatory**
44:17
**invited**
292:12
**invoked**
17:5
**invokes**
149:6
**involve**
28:1 262:13
**involved**
18:25 46:7 48:5
64:7 99:11 128:10
130:3 133:6
134:16 158:3
266:12
**involvement**
22:23 177:18
249:13

**involves**
37:5
**involving**
16:8 24:22 25:5
62:7,8 78:15
133:7
**ipad**
150:11,12,14
287:14,16,19
**ipads**
289:1
**irregular**
276:22,23
**isa**
47:9,10,14
**isolated**
52:4,10 203:18
**isolation**
203:15
**israel**
1:15 2:6 5:3 8:7
12:9 15:14 16:2,7
24:6 26:4 27:8
30:2 31:16 43:10
43:23,23 44:2,6
44:14,18 45:16
48:9 51:9 55:9
58:14 59:11 67:1
77:20 78:25 83:9
83:16 91:1,12
92:22,23 93:1,19
96:15,19 97:1
98:13,17 101:21
115:3 117:17,22
118:21 121:5
128:14,21 129:1
132:1,2,19,20
134:13 136:10,25
137:17 138:14
139:10,22 146:7
147:21 148:13
149:2 188:11
196:24 211:3
258:19 265:16
**israeli**
8:23 9:1 11:25
15:25 21:9,20
25:7,9 26:18 28:4
33:3 35:21,22

36:18 44:3 46:7
48:7 50:23 52:15
55:6,11 57:25
61:11 67:2,4 68:6
68:7,15,15,21
72:5 73:4,5,5,16
79:2 83:15 96:21
96:22 97:1 115:7
119:9 131:3,11
176:25,25 177:5
208:2 209:20
216:17 282:12
**israelipalestinian**
9:10
**israelis**
93:12
**issa**
272:7,11,16 276:9
**issue**
7:14 16:13 23:8
23:14 25:5 34:8
61:25 77:21 79:2
97:12,14 98:6,16
113:10 123:2
125:1 166:18
168:16 170:10,18
186:2 204:1,22
244:2,5 268:7
275:16
**issued**
138:9,12 158:9
165:9,9
**issues**
111:3 121:11,12
131:10 150:2,5
153:18,22 154:21
157:16 164:14
170:1,2,3 171:23
172:13 181:20
185:24 195:17
206:8 245:15
256:9 291:19
**italian**
28:23,24
**items**
35:25 275:20
276:8,25 277:7,9
277:13

_____
**J**
_____
**jaffa**
246:21 248:12,25
249:1,4,7,11,13
**jail**
33:2
**jamal**
182:10,20 183:3
186:22 194:5
204:15 205:1
**january**
189:20,20 246:21
263:15
**jericho**
2:5
**jerusalem**
1:15 2:5 6:12,22
6:24 11:25 26:16
137:12 177:20
191:16 217:14
250:7
**jewish**
7:7 92:14
**jews**
148:1 177:3
187:10 196:15
**jmc**
208:16
**job**
125:10 131:22
292:9
**john**
29:12 209:22
**joined**
135:23
**joining**
21:18 27:3 28:5
88:13
**joint**
28:22 265:17,21
266:14,19,24
267:1,9,16 275:16
278:4,5 279:2
**jointly**
243:3
**joke**
54:1 285:7
**joking**
56:16

**jordan**
147:25 148:2,7
**journalist**
45:22 69:23 71:13
**journalists**
71:6,7 72:15,19
**judea**
10:14,17,18,22
67:5
**judge**
77:6,12 88:20
101:10 116:5,19
136:4,7,8,12,13
136:16 186:11
259:4 261:21,22
261:24 274:4,6
**judges**
41:3,6 42:8 51:21
75:20,24 84:7
98:7 99:16 101:10
102:6 115:7,8,10
115:11,14,19
116:10,17,25
117:2,7,7 145:19
163:22 171:12
183:20 188:20
203:3,6 214:1,9
223:4 247:20
258:25 274:7
275:8
**judgment**
19:11 41:4 68:7,9
70:23 88:8 94:24
96:13 97:16
109:13 111:7
112:23 137:18
139:9 147:15
162:19 166:5,8
194:19 198:14,22
199:15 208:1,22
213:24 223:4
233:3 247:19
250:25 251:1
253:1,20
**judgments**
23:11,13 53:9,13
70:22,23 111:8,11
111:12 136:9
147:13,15,16

240:20 260:17
**judicial**
32:6 37:21 77:11
96:3,7 125:7,7
**july**
4:13 164:3 179:10
204:17 225:24
256:11,16 257:19
**jumping**
223:19
**june**
4:18 152:2 157:21
174:13 187:18
225:9,10
**jungle**
272:1
**jure**
83:19
**juries**
114:25 115:3,11
**jurisdiction**
32:1,5 74:7
141:19,23 281:16
**jurisprudence**
66:11
**jurisprudential**
77:25
**jury**
115:5,6 209:24
217:18 224:21
**just**
8:3 11:13 26:25
31:10,12 35:9
39:14 47:22 48:1
51:10 52:6 55:24
56:19 57:12,12
58:4 59:20 60:4
60:10,13,17 62:4
62:22 64:8 69:22
69:24 73:19 81:22
82:3 90:23 92:3
95:5 100:15
104:17 112:5,22
113:2 117:10
121:3,10,20
122:13 124:10
127:3,5 129:4
136:13,15,15,18
136:22 137:22

138:23 144:2,25
145:15 148:22,24
148:24 151:2,5
152:22 154:6
155:13,24 156:1
156:23 162:24
164:11,13 165:1
165:13,15 167:5
172:18 174:25
176:13,18 179:17
179:19 181:15
183:21 184:16,16
186:1,17 187:6
194:8 195:20
197:25 198:9,25
199:1,18 209:2,11
209:15,21,21,23
209:24 212:11,11
220:11 223:7
226:17 227:2
228:1,2 229:4
231:3 232:3
233:24 237:10
238:15 241:23
242:23 243:18
244:7 246:12
248:1,11,18 254:4
254:14 255:4,15
256:21 257:9
258:22 264:2
265:7 269:9
272:25 274:1,18
274:22 275:23
276:11,21 277:19
278:15 279:16
281:21 284:9
293:15
**justi**
178:9
**justice**
19:22,25 25:1,24
29:18 30:14 31:25
32:4 33:5,6,7,8,8
33:24 50:7,8,16
63:21 67:1 72:5
94:15,16 95:21,22
96:22 98:19
108:11 119:1,2
121:8,9 123:18

125:12 254:25
255:1 261:1
**justification**
109:20 176:5,24
178:20 194:24
**justify**
178:13

──────── **K** ────────

**kach**
139:4
**kahanes**
139:5
**kahira**
184:12,13 197:17
200:9 201:11,20
203:18,22 204:8
204:14 205:17
207:24 209:5
**karim**
173:21 174:7
175:8 176:22
186:21,25 191:13
192:13,14 194:9
194:11,22
**kaufman**
142:6,22 144:15
145:4 156:14,19
158:3 165:14
176:21 189:6,8
190:25 191:8
200:24 201:3,4
208:12 224:8,17
241:3 253:19
257:20 287:17
288:21 290:3,11
290:23 292:14
**kaufmans**
40:23 143:8
150:13 162:6
176:3,8,17 193:4
276:12 287:4,7
294:17
**keep**
13:8 48:21 99:23
159:18 283:6
**keeps**
221:13
**kent**

2:13,15 59:20
81:8 156:1 200:3
293:15
**kept**
70:20 168:14
222:7,7,8,8 246:3
**khan**
263:20
**kidding**
23:24
**kidnapping**
161:22
**kill**
177:3 187:10
196:7
**killed**
196:15 258:19,22
**killing**
65:4,8 177:2
178:13 259:19
**killings**
16:3 63:24 149:19
187:9
**kills**
177:1
**kind**
21:19 70:6 88:16
119:8 138:16
147:18 150:4
171:9 176:1
196:22 203:4
206:10 221:3
242:7
**kinds**
74:8
**king**
2:5 177:19
**kinsey**
68:9 69:4,5
**kiryat**
139:3
**knesset**
119:9,18 120:11
121:3 123:17
124:17 149:5
**knew**
20:17 45:22
118:10 169:3
181:19 191:10,12

192:17
**knock**
69:22
**know**
9:3 11:7 12:10
13:19 14:4 16:25
20:2 23:12,13
26:9 27:11,17
28:16 29:1,3,13
29:15 35:12 38:10
38:11,13 39:21,22
41:12 42:1,4,6,11
45:1,4 50:14
53:10 54:23 56:1
56:2 60:13 63:15
65:18 68:12 72:12
72:13,13,18,20,21
72:24 79:10,11,16
79:21 81:21 86:22
87:9 90:14,24
93:9 94:20 95:6
100:25 103:21
109:6 110:24
112:15 113:14
115:6 116:4 118:8
119:6,21 120:22
124:2 127:19,24
128:9 134:17
135:13,15,16,23
135:25 136:6
138:15 141:25,25
144:8 146:3,4,7
146:19 147:9
149:11,15,16
152:7 154:3 158:5
158:10 161:9,12
161:14 163:2,3
165:11 168:21
173:8,11,20
176:19 180:24,24
181:2,2,13,22
182:15,18 183:14
184:4,22 188:18
188:19 192:16,18
192:22 201:21
202:1,3 203:24
204:24 206:1,15
208:5,6,9,19,21
209:13,15,22

210:17,21,24
211:2,14 213:9
214:10 218:17,23
219:12 220:7
222:15 223:2
225:13 228:16,16
228:21 229:24
231:3,4 232:25
233:21 237:13
238:6,21 240:13
240:16,19 241:1
241:21 242:17
244:12 247:18
249:24 252:5,5
255:17 256:3
257:10 260:17
262:1,11 266:22
266:25 267:5,8,10
270:21 271:21
272:2 274:4 276:6
276:12 277:5
280:14,22 281:1
281:12,16 285:7
285:11,14,15,16
285:16,19,23
287:18 290:25
291:8 292:12
294:21 295:8
**knowing**
207:5 241:19
**knowledge**
29:6 48:10 74:25
101:1 121:2
124:12 169:7
249:13
**knowledgeable**
109:14
**known**
8:24 12:8,11
104:5 241:2
**knows**
192:17 208:15
215:16 294:20
**kol**
11:24

**L**
**labor**
116:23

**laches**
25:17,18,19
**lack**
142:10 162:21
177:12 190:6
194:25 206:5
210:1 215:20
216:3 236:16
263:21 265:2
270:3 291:6
**land**
4:15 28:6
**landmark**
16:8
**lands**
91:16
**language**
50:22 212:8
229:14
**large**
195:15
**largescale**
216:15
**late**
269:5 272:2
274:20 296:12
**launch**
118:4,19 122:23
124:19
**law**
6:19 7:5,11 9:8,14
14:25 25:12 32:10
38:10 48:20 50:23
53:11 56:14 61:10
64:11,13,24 65:2
65:3,7,12,14
66:15 78:8 84:2
88:15 95:16 96:15
96:23 97:1 108:18
108:20 109:16,22
110:14,14 115:23
121:19 132:17
136:25 139:24
151:11 154:15
163:6 174:10
175:11,13 178:4
179:9 183:5 186:6
201:14 207:1
211:8 212:7,15

219:21 230:2,5
232:12 234:11
235:20 238:2
245:12,22 251:17
254:22 275:13
282:1,4 294:21
**laws**
4:20 68:1,1 96:21
137:16,17
**lawyer**
8:24 9:17,18
20:15 46:5 52:19
53:8,12 59:4
72:13,14 154:3
158:5 160:2
168:22 181:18
183:13,15 189:9
190:20,24 194:17
194:18 195:3
222:14,16,17,18
225:13,14,21
241:24 251:23
253:12 264:8,23
266:12,13,17,23
267:1 269:25
273:1 276:21,22
284:1
**lawyers**
4:17 12:11 13:6
36:8 40:4,22
41:13 53:17 60:6
110:1 143:17
145:19 169:7
217:14 240:23
241:17
**lay**
115:7,10,11,14,18
116:5,10,17,19,25
**laying**
21:15
**leads**
181:14
**learn**
11:18,22 53:7
275:4
**learned**
11:20 12:4 23:19
53:10 104:23
231:23

**leave**
16:24 90:11 231:4
**led**
53:3 161:6
**left**
16:25 29:24,25
30:2,3,15,23
90:12 139:16
282:23
**leftist**
30:19,23
**leftwing**
31:1,16
**legal**
6:22 12:9 26:7
40:8,17 45:14
48:16 64:2 78:19
78:24 108:10
109:15,20 113:6
135:5,5 141:16
165:23 166:2
181:3,4 217:21
294:3
**legalities**
50:12
**legally**
128:5
**legislation**
95:16
**legitimate**
64:18,19 281:15
**legs**
180:12
**length**
227:8 256:7 265:1
270:2 280:5,21
284:12 285:18,20
**lengthy**
215:11 278:24
296:13
**lethal**
64:6
**letter**
88:15,17 104:14
104:16 282:4
**level**
66:12
**liable**
112:17

**liberal**
8:7
**liberated**
67:12
**liberation**
1:7 299:3
**liberty**
102:16 108:20
**library**
111:13,18 147:10
**lie**
94:4
**life**
281:17,25
**lift**
19:13
**light**
123:23 125:24
**liked**
6:17
**limit**
122:13 227:5
**limited**
207:2,3 234:13
**line**
5:14 184:18 191:9
191:20,21 253:9
253:17,21,22
286:25 293:21
299:7,9,11,13,15
299:17,19,21
**lines**
27:25 191:19
291:24 292:5
**lingo**
86:7
**list**
41:21 154:23
189:23 197:21
**listed**
41:23 170:7 298:7
**listen**
97:8 146:16
**literally**
61:22
**litigated**
22:18 95:25 172:6
**litigating**
168:14

**litigation**
 10:24 292:23
 294:25 295:7,19
**little**
 17:6 39:1 66:6
 71:3 80:17 110:18
 115:6 152:19
 160:20 184:19
 200:5 218:20
 223:19 236:1
**live**
 91:1 92:9 139:21
**lived**
 210:25
**lively**
 56:10
**living**
 148:10
**llbs**
 6:11
**llm**
 15:10
**llp**
 2:13
**loaded**
 184:3
**local**
 6:22
**location**
 191:16
**lodged**
 173:19 285:25
**london**
 14:24
**long**
 11:12,20 18:12
 22:22 36:22 38:7
 77:25 89:21
 157:25 158:5
 221:5 242:16
 248:8 254:23
 255:13 281:1
 287:1
**longer**
 26:15
**longterm**
 25:20
**look**
 27:24 30:16 35:16

**litigation** 62:11 63:12,16
 80:5,6 82:1 95:12
 100:1,15 111:14
 111:24 120:8
 141:15 152:10
 164:11 180:18
 190:18,19 197:13
 228:6 256:21
**looked**
 141:16 173:17,18
**looking**
 7:7 15:18 30:16
 35:17 41:21 58:7
 152:7 178:25
 184:23 282:3
 287:10,12,16
**looks**
 27:24 62:17 159:8
**lose**
 281:18
**lost**
 51:1
**lot**
 6:17,23 7:15 8:6
 138:22 228:8
 269:3
**lots**
 173:14
**lower**
 93:16 162:20
 163:18,20 181:6
**lunch**
 129:11 147:2
 289:18,20

—————————
**M**
**maali**
 264:10,19 267:24
 271:17 272:7,11
 272:17 276:10,10
 276:24 278:3
**maalis**
 272:20,21
**mafia**
 27:4 28:9,10,16
 29:6,15
**mag**
 57:24
**magistrate**

217:13
**magistrates**
 6:25 12:1 55:16
 73:5
**mags**
 57:25
**mahmood**
 151:8
**mahmoud**
 235:9,13,17
**main**
 48:19 52:20 55:4
 121:15 122:6
 202:12 214:22
**maintain**
 189:11 196:5
 268:3
**maintained**
 195:25 196:2,14
 196:16 268:4,5
 284:20
**maintains**
 173:8
**majid**
 245:1,5,7 246:1
 249:19
**major**
 99:6 188:5 210:8
**majority**
 19:2 31:17 80:3
 82:18 83:2,4
 195:15
**maker**
 229:6
**making**
 53:12 86:5 88:9
 88:10 156:15
 163:9 167:10
 200:15
**malpractice**
 264:14
**maltreated**
 125:3,12
**man**
 177:24 195:7
**manage**
 157:3
**managed**
 157:5

**management**
 117:7
**managing**
 168:14
**mandate**
 194:14 217:5
**mangle**
 103:2
**manslaughter**
 177:22,24 178:2,6
**marab**
 96:1,1
**marabi**
 95:21,23
**march**
 174:13 177:19
 192:24 280:23
**mark**
 1:4 27:16 35:3
 62:11 63:8 80:7
 80:13,21,24
 155:10,19 288:19
 299:2
**marked**
 4:11 5:2 27:21
 34:20,24 35:6,8
 58:25 59:2 63:14
 81:2 155:22 156:5
 158:15 288:15
**marks**
 175:18
**marwan**
 68:17,21 72:1,7
 74:22
**master**
 88:22 167:1
**mastering**
 84:19
**match**
 143:22
**matched**
 32:25
**material**
 85:11 142:14
 144:1,5,6 151:14
 153:8,13,14
 154:17,21 159:1
 160:6 198:24
 199:16 207:2

**management** 220:6 221:9 233:1
 256:2 260:6 261:8
 261:16 262:4,16
 270:17 275:20
 276:3,6,7 277:1,8
 279:10,16,25
 292:12
**materiality**
 279:13
**materials**
 24:6 103:9 250:5
 257:4 276:15
**matter**
 16:22 19:14 24:25
 33:22 46:11
 102:20 116:21
 117:2 132:16
 134:15 142:2
 158:9 196:23
 278:15 282:1
**matters**
 12:9 19:17 33:23
 37:21 53:7 65:25
 95:14 109:15
 116:18 133:12,15
 294:1
**matzov**
 1:25 2:4 297:3,20
**mean**
 9:7 10:18,18,24
 11:12 13:24 16:9
 16:10 21:12 28:8
 30:8,25 31:22
 33:11 45:21 49:22
 49:23 54:24 61:7
 61:22 66:16 69:20
 76:22 77:6 78:6
 79:13,13 80:17
 85:14 86:4 92:3
 94:16 95:24 96:1
 105:3 107:8 112:2
 113:13 116:3
 125:18 126:12,25
 132:11 142:20
 146:17 149:13
 157:4 160:1
 163:10 177:21
 178:16,18,23
 180:4,5 181:17

184:3,17,22
185:12 194:16,17
198:13 200:13
213:14,15,16
217:10 220:19
226:18,24,24,25
228:6,24 229:20
237:3 240:24
241:25 249:3
251:3 262:25
265:9 266:10
276:4 280:5,7
286:15 287:12
**meaning**
42:11,12 55:12
169:14 214:5,6
279:13
**means**
17:3 28:24 37:10
43:24 49:12,13
50:5 61:8,13
79:10 121:10
157:22 207:24
211:18 213:8,8
214:7,7,8 223:11
241:1 265:13
267:17 285:11
288:14
**meant**
12:3 25:4 28:10
37:7,10 52:6 62:2
136:12 167:8
177:13 181:25
**measure**
37:19 65:15
**measured**
216:23
**measures**
44:22 227:14,15
**mechanism**
33:16 118:21
122:7
**mechanisms**
117:16,17 121:5
121:14
**media**
72:6
**medical**
180:17

**mediterranean**
147:25 148:2
**meet**
244:16
**meeting**
58:1 104:3 154:5
**meetings**
165:3
**meir**
139:5
**mekadad**
255:14,15,16,16
255:20,23 256:6
256:12 259:21,25
264:9,17 267:25
268:21 269:25
278:3
**mekadads**
265:3
**member**
26:3 40:17 70:8
117:25 118:14
122:11,17 127:25
139:4,4
**members**
50:4 70:16,16,18
70:18 72:17 82:11
99:24 128:8
**membership**
43:13 177:20
**memorandums**
165:2 168:15
220:9 222:4
**memory**
166:2
**menashe**
95:25
**mens**
24:18
**mental**
49:22 50:5 180:25
**mentally**
112:16 213:9
**mention**
227:12,19 228:2
249:19 254:14
**mentioned**
36:23 37:2 38:15
38:22 40:4 41:25

43:19 52:3 86:25
94:15 97:17 110:5
110:10 116:22
124:16 125:10
133:23 168:8
184:14 185:5
227:4,7,13,13,14
227:18 242:2
258:2 270:17
285:20
**mentions**
201:4
**merely**
140:19
**merits**
98:8 118:17
231:16
**messalah**
233:11,13 234:9
234:10 247:4
**met**
57:7,8 71:25
287:2
**metaphor**
61:15,24
**methods**
18:6 213:10,11
214:23
**michael**
1:14 2:1,19 4:3,12
5:7 6:3 298:3,15
299:5,24
**migron**
4:15 28:1,6
**milchev**
2:21,22
**mile**
188:20
**militant**
210:10
**military**
5:3 9:11 10:14,16
10:18,21 11:2,6
11:10,15,16 12:20
13:2,13,17 14:4,9
14:12,19 19:8,8,9
20:9,12 22:19
32:14 35:22 36:18
36:22 37:17 38:3

38:24 39:1 40:2
40:20 41:7 46:8
52:22 54:15 55:8
55:18 56:4,12,15
56:18,21 58:2
61:13 62:25,25
67:1,4,17,18,25
68:6,16,18,23
69:16,22,24 70:4
70:4,8,23,24 71:7
71:15 72:6 73:1
73:16,21,21,23
74:6,20 75:3,12
77:20 78:20 79:11
79:22,24 80:8,23
80:24 81:21 82:10
82:16 83:13 86:10
87:7,16 88:12
89:19 90:1 94:11
95:1,2,8,10 96:3,7
97:24 98:2,10,11
98:23 100:12,14
101:2,9,13,16
103:1,3,12 104:2
104:4,24 105:20
107:3,9,13,16
108:10,12 109:1
110:11 111:5,8,19
111:19,21 112:13
112:18,20,23
114:7 115:8,10,14
115:16,19 116:5
116:10 128:16
131:11 134:24
135:6,9,11,14,20
136:8 140:1,7,13
140:13,21,21
141:8 144:7,16,20
144:22 147:7,13
158:18,19 159:10
162:15 163:4,8,12
169:8 170:4
171:11 178:4
201:19 202:18,20
203:6,9 209:3
225:23 241:14,16
241:25 242:1
243:7 251:20
282:14 286:1

288:10
**miller**
2:18 200:20
**mind**
66:13,14 84:18
141:7 144:2
165:25 166:19
184:4 200:3
214:19 220:16,18
252:11 270:14
284:19
**minimis**
110:11,23
**minimum**
66:10,14
**mining**
24:1
**minister**
119:24,24 120:2,4
120:13
**ministry**
119:1,2
**minor**
21:10,12 111:3
**minorities**
124:5
**minority**
124:4 195:13
**minute**
256:20
**minutes**
76:1 129:17,18,22
165:3 282:23
289:22 293:3
296:19
**miscarriage**
33:5,24 94:15,16
260:25
**mishnael**
135:17 136:4,12
16:16
**mishnayot**
3:4 208:11 273:20
**misread**
80:5
**misrecorded**
224:19
**missed**
129:5 166:10

218:17
**missing**
142:22 143:11,12
143:12,25 144:2
223:2 233:1
**mission**
77:11 294:6,8
**misstates**
130:22 143:15
149:20 260:7
**mistake**
281:2
**mistaken**
147:16
**mistakes**
163:6,7
**misunderstanding**
242:13
**mix**
21:5 31:10
**mixed**
143:12
**mixedup**
143:13
**mohammad**
223:12
**mohammed**
192:13,14 205:14
206:16,23 209:7
233:11 234:8
247:4,6 249:20,24
254:13 255:10
263:11 264:7
272:7,9,11,16,16
276:9,9 278:22
**moment**
35:9 52:3 59:7
60:5,9,12,22
187:7 236:22
**monitor**
132:8
**month**
283:24
**months**
15:24 104:8 152:3
157:23,23 158:1
174:17,18 187:17
189:20 201:24
203:11,13,19

204:2 211:19
221:10,11 225:25
236:2 254:15,17
270:11,13 278:8,9
278:25 280:24
285:25
**moonzer**
151:7
**moral**
141:17
**morning**
222:11
**mother**
207:13
**motion**
104:15,20 107:14
217:22
**motivated**
195:23 241:21
**mount**
265:17,21
**mouth**
123:11
**move**
197:16 215:1
249:20,21 274:23
**moved**
9:6,13
**movement**
28:15
**movies**
28:20 230:11
**moving**
237:7
**msatin**
2:22
**multiple**
264:24
**multiplepart**
20:21
**murder**
32:20 178:2,4,6
**murdered**
258:1,5
**muslims**
148:3
**mussa**
182:11,20 183:3
186:22 194:5

204:15 205:1
_____
**N**
_____
**naked**
275:2
**name**
8:24 9:22 22:1
23:9,10 29:14
38:23 39:3 49:15
103:2 132:3 208:7
255:13
**named**
59:4 135:16 137:6
297:6
**names**
22:1 41:22 44:5
103:25 247:10
**narrative**
246:17
**narrow**
16:24,25 64:20
71:25 107:14
116:7
**narrowed**
125:19
**narrowly**
32:9
**nasser**
182:10,20 183:3
186:22 191:10
194:5 204:15
205:1 247:2
**national**
22:14 181:4
**nations**
42:25
**native**
87:4 93:7,12
161:11
**natural**
24:19 25:10
**nature**
73:22 89:14
266:18
**near**
139:3,3
**nearing**
242:21
**necessarily**

195:23 204:2
**necessary**
237:6
**necessity**
17:1,2,5 50:24
51:4,16,18,23
132:24,25 133:3
149:7 211:17
213:8 214:6 229:9
229:15,19,22
**need**
24:18 37:13 45:5
69:25 70:5,6
71:10 96:17
126:13 155:1
172:10 173:24,25
179:4 189:11
190:4 192:9 198:9
212:3,16 219:12
243:24 270:24
271:7 277:17
296:4
**needed**
20:18
**needs**
73:8 282:10
**negotiate**
159:22
**negotiated**
53:4
**negotiating**
159:18 238:20,22
**negotiations**
52:22 53:2 159:13
209:12 242:21,24
243:16
**neither**
198:17 232:3
238:7,7
**net**
294:2
**neto**
294:2
**neutral**
67:7
**never**
73:14 83:9 84:6
114:16 131:19
144:9 203:8

229:17 230:10,23
240:19 242:23
244:9,11 277:16
288:24
**nevertheless**
93:4 131:12
137:24 221:21
222:16
**nevo**
135:2,4,9,12,13
135:15 136:1,5,7
136:13
**new**
1:2 2:3,14,14 33:9
77:1 94:22,23
123:5 209:22,24
244:17 254:25
**newly**
16:2
**news**
210:18,20 211:3
**newspaper**
59:3,9,15 60:21
210:5
**night**
261:22,25
**nine**
187:17
**noa**
3:5
**noam**
137:7 138:1,16
139:2
**nondemocratic**
140:2
**nongovernment**
39:20 130:7 132:1
**nongovernmental**
125:22 127:17
128:24 134:11,19
**nonnative**
93:19
**nonpalestinian**
20:11
**normative**
38:13
**norms**
34:1,9,13,17
**nostra**

28:19,21
**note**
288:20
**notepad**
289:2
**notes**
5:7 152:5,22
154:8,22 155:1,9
156:9,24 164:3
173:25 184:23
206:19 269:19,20
269:24 284:10
**notice**
2:4 143:24 160:14
161:6,20,24
193:13
**noticed**
91:13,15,17 92:8
92:11 139:25
143:10 150:9
208:25 287:13,24
**notified**
251:10 265:10
**notify**
251:15 266:4
**notion**
73:17 74:1
**november**
16:5 183:10,10
204:18,19
**novo**
25:23 33:4 63:19
162:17
**nuance**
51:1
**nuances**
68:3,4 79:5
185:15
**number**
4:11,13,16,19,22
5:2,5,6,8 14:10
18:15 27:17 44:15
44:20,21 49:7
54:9 60:5 71:25
78:6 119:3 123:15
123:16,17,18,19
123:20 149:6
197:24 236:25
256:22 268:17

**numbers**
118:1
**nur**
151:8,11 153:6,9
154:2,15 159:23
160:14,21 161:14
161:20 164:4
165:19,20 166:15
166:25 167:20
169:21 172:17
173:8,11
**nurs**
151:15 153:5,10
153:21 154:13,18
157:16 158:20
160:22,25 161:5
167:22 168:2
169:22
**nw**
2:19

## O

**oath**
298:5,10
**obey**
76:17
**obiter**
25:19 26:1
**object**
75:9 76:7 88:20
89:1 98:3 99:21
99:25 145:17
226:17
**objected**
87:6,12
**objecting**
143:18
**objection**
76:11 87:13 100:3
130:22 134:7
138:19 141:9
142:10,12 143:3
143:15 148:14
149:20 151:22
162:21 177:12
190:6 194:25
198:6 204:10
206:5 210:1
215:18 216:3

219:1 227:3
236:16 243:19
254:9 260:7 261:9
263:21 264:1
290:4 291:6 292:1
292:18,24 293:6
293:11 294:18
295:2
**objections**
262:22
**objectivity**
99:18
**obligation**
97:8 98:8,9 102:2
102:12,13 103:7
105:17 107:11
108:9,13 203:7
266:13,17
**observations**
43:22
**obstacles**
98:22,24 99:7
**obtained**
17:9 262:23
**obvious**
53:18
**obviously**
92:6
**occasion**
11:3
**occasions**
159:5 238:13
289:6
**occupation**
25:21,21 176:25
236:15 237:4
258:3
**occupied**
24:20 37:18
141:19,19,20
177:7
**occupy**
38:2
**occupying**
25:22 38:3,9 64:5
**occurred**
173:6 261:1
**occurrence**
52:8 79:12 172:23

**occurrences**
270:22
**occurs**
119:5
**october**
1:16 2:6 4:15
81:25,25 188:25
189:2,5,23 224:9
224:10,11 252:24
298:6 299:4
**odd**
224:22 264:11
**ofer**
10:23
**offend**
67:13,15
**offenders**
127:8
**offense**
22:9 165:25 178:5
**offenses**
21:10,12 45:16
57:22 74:8 115:20
178:7 189:24
236:14
**offer**
34:12,15
**offered**
231:19
**offering**
277:7
**offers**
57:14
**office**
16:4 120:14
**officer**
116:20 167:14
184:12
**officers**
31:5 61:12 96:7
116:13
**official**
117:17 121:5
123:21 124:11,12
155:11 187:24
251:23 252:12
**officials**
28:14
**oh**

**okay**
60:1 113:14
136:21 213:16
226:12 230:21
263:13 274:9
284:14 290:21
**okay**
18:8 23:18 26:23
27:13 28:25 29:11
29:16 35:2,3
36:12 45:5,25
46:2,3 47:18 52:3
57:20 58:23 60:8
62:6,10 63:6,11
66:24 67:17 71:2
74:15 75:2 80:20
81:15 82:1,19
85:2,25 86:7,8
88:3,11 94:1,9
100:19 106:12
107:23 110:21
112:10 123:12
125:14 128:20,23
129:7,13,19,23
130:24 132:14
133:19 134:23
136:12,17,21
137:21 138:5,6
139:1 140:15,16
140:25 141:1
142:4 143:2
145:23 146:15,25
147:3 148:23
149:15 150:15,25
151:12 153:12
154:25 155:3,14
155:17 156:6,22
157:14 160:18
164:9 165:16
168:18 169:20,23
170:17 172:11,16
174:21,23 175:2,6
176:19,20 180:4
182:13 183:7,9
184:21,22 187:13
193:2,19 199:1,2
200:2,25 201:8,16
211:2,25 213:2,22
214:24 219:13
220:1,13,19

221:20,22 224:2
224:18 226:10,12
226:21 227:2,7,22
228:13,15,19,24
229:2 230:21
232:4 233:23
234:24,25 235:8
237:7 238:15
239:12,13 242:15
242:20 245:1,25
247:23 254:21
256:7 257:16
262:25 264:3
267:19 269:15,19
269:23,24 271:14
272:12,15,16
276:25 277:19
279:15,23,24
280:15,18 283:8
284:9,12 285:12
286:22,25 291:17
296:8
**omer**
103:2
**omit**
23:10 265:8
**omitted**
128:23
**once**
26:12 83:11 104:7
128:3,10 138:24
145:16 154:8
159:9 289:9
**ones**
13:9 38:18 73:7
103:24 250:19
259:23 271:15
**ongoing**
37:11
**online**
135:12
**onthefly**
176:12 288:6,11
**onwards**
191:9
**open**
69:16,19,20
118:13 122:16
125:1 148:11

190:22
**opened**
59:9
**operate**
62:4 100:12 104:2
**operation**
61:9
**operations**
24:2,2
**opinion**
38:19 39:13 48:25
49:20,21 115:21
146:23 179:3,6
183:8 198:2,20
199:4,22,25
201:17 212:13
216:17 219:25
230:16 232:23
238:5 244:4
255:19,21 261:6
262:3 276:8 277:7
279:24 280:9
291:2 293:25
**opinions**
34:13,15 35:21
36:18 79:19 82:18
135:25 157:8
228:10 245:25
**opportunity**
64:20 76:6,22
77:15 78:19,23
97:4,7,13 109:3
111:14 164:23
175:22 182:19
192:19 193:3
260:13
**opposed**
66:17 132:12
231:12,20
**opt**
67:14
**option**
19:13 100:4
**oral**
14:11,15,18 18:16
63:19,23 251:25
**orally**
166:24
**order**

5:3,4 24:15 31:9
70:5 73:9 79:13
80:8,23,24 81:21
87:16 89:18 90:1
90:10 95:11,19
118:18 125:6,6,13
138:9,12 145:3
154:5 155:21,22
155:25 158:8
159:17 160:10
169:11 181:5,5
188:21 212:16
217:15,23 230:5
242:11,16 243:15
282:15
**orders**
90:5 165:6,6
204:1,4,5
**organ**
12:5 42:24,25
54:14
**organization**
1:7 16:1 22:15
25:7 26:9 177:20
299:3
**organizations**
39:20 44:4 48:7
127:17 128:25
133:20,22 134:12
210:11
**organized**
27:4
**organs**
39:24
**oriented**
236:20
**original**
80:14 155:22
176:6
**osama**
240:14,17 241:11
**outcome**
270:18 280:1
**outer**
158:7 203:15
**outlets**
173:15
**outofcourt**
18:5 57:5 77:16

78:2 79:5 151:20
151:20,23 158:23
159:1,20 160:5,12
165:4 172:22
173:4 186:3,6
187:3 199:12
202:5,10,16,23
223:25 228:3
235:23 238:9,12
239:6 246:10,15
246:17 248:3,15
249:17 262:7,20
265:11 267:13,23
267:25 270:7,20
**outpost**
28:1,12
**outs**
53:24
**outset**
282:11
**outside**
203:19
**overall**
151:17 260:11
**overcome**
21:19
**overseeing**
119:15
**oversight**
119:8 121:13,15
122:6
**overturning**
94:24
**owned**
147:25 148:3

──────────
**P**
──────────
**pa**
26:17 27:8 38:6
**pad**
288:25 289:7
**page**
4:5 5:14 35:16
45:8 62:14,16,18
155:21 156:2
162:10 191:9,19
191:20 251:1
299:7,9,11,13,15
299:17,19,21

**pages**
62:15 142:23
143:11,12,13
155:25 288:15,19
**palestine**
1:7 177:6 299:2
**palestinian**
4:21 7:10 21:9
22:21 26:4,13
38:10,23 49:4
72:19 115:16
127:5 206:2,7,8
206:13 210:10
217:8 240:22
259:5
**palestinians**
4:14 20:10,12
28:6 30:17 38:6
61:12,21 101:19
**panel**
56:13 58:1
**paper**
60:25 95:11
**paragraph**
35:17,20 38:15
45:9,12 48:17
**paraphrase**
258:8
**park**
2:14
**parliament**
119:9,15
**parole**
22:21,24,25 23:4
23:6,7,13 26:13
196:24 197:1,5,11
197:13
**part**
9:8 15:5 30:6
33:25 43:13 52:20
53:12 151:14
169:22 174:11
176:2 194:19
200:11 207:20
216:14 234:13
243:25 246:12
286:15,17,18
292:4,8
**partial**

96:20 144:10,11
194:19 285:14
**participate**
52:18,21 101:2
294:5
**participated**
42:7 52:25
**particular**
40:6 47:1,2,3
66:18 75:10 132:7
**particularized**
172:12
**particularly**
154:7
**parties**
14:17 231:23
238:24 239:4,21
242:20,22 257:2
265:9 273:13
**parts**
180:19 233:14
260:15
**party**
139:4,5
**pass**
68:12 109:13
**passed**
118:18 144:5
288:20
**pattern**
49:24 50:1,2 52:5
52:7
**pause**
7:18,21 35:4
82:19 152:9,22
**pay**
296:20
**pcati**
49:14,17,20,21
63:23,24 117:14
173:17
**peace**
148:10 259:1,1,15
**peculiar**
267:16 281:18
**peek**
47:5 225:16
**peers**
115:12 116:14

**penalty**
83:16,17,18 233:8
282:1,6 298:9
**pending**
2:2 25:13 37:9
179:24 180:3
279:1,25 290:13
**pendingtrial**
278:12
**people**
12:9 31:15 37:18
38:4 42:6 51:1
61:23 62:2 70:9
70:17 72:12 91:19
91:21,23,23 92:14
93:11 126:5
141:20,20 146:21
147:24 148:1,3
181:1,6,6 192:9,9
192:10 195:17
196:8 215:25
237:4 241:12,13
258:2,19 259:5
281:25
**peoples**
61:24
**perceived**
157:16
**percent**
19:18 30:20 55:7
55:9,16,19,22
56:2,2 58:2 59:13
112:22 211:11
**perform**
141:3
**period**
96:2 123:14
135:19 157:25,25
203:23 221:5
230:25 242:18
**periodic**
43:14 44:14,19
118:23
**periods**
38:7
**perjury**
298:9
**permanent**
93:17

**permissible**
10:10 17:2 64:5
65:1 78:1 230:9
230:12
**permission**
80:7 126:13,19
155:10
**permit**
51:17 70:6 73:8
73:12 145:3
**permits**
25:9
**permitted**
69:9 126:18 127:6
133:16 158:6
161:3 205:11
279:7
**perpetrator**
32:25
**perpetrators**
217:1
**person**
32:1,23,24 33:1,2
33:17 37:9 49:24
64:12 69:21 70:10
73:8 77:7 82:9
85:14 89:9,19
117:25 128:10
130:10 140:12,12
140:19 181:9,11
181:12,14 192:12
**personal**
36:4,13 106:5
**personally**
25:4
**perspective**
124:3 147:22
**pertain**
295:22
**pertaining**
103:9 151:7 153:4
174:7 175:8 179:7
183:2 201:11
206:23 211:5
219:19 232:11
234:8 235:17
237:25
**petach**
11:7

**petition**
25:6 32:9,16,18
97:18 98:18
144:21 145:2,13
**petitions**
134:1
**pharess**
237:21,22,25
244:20,23 261:20
262:2,6,9,11
**phase**
158:13 254:16
271:4
**phenomena**
28:12 265:3
**phones**
251:9
**phrase**
248:8 254:25
255:3
**physical**
16:14 17:3 49:12
49:19 50:4,16
150:16,21 180:25
211:17 214:7
223:11 229:13
232:19,21
**physically**
213:9
**pick**
161:17
**piece**
94:3,18 113:15
238:16
**pieces**
13:6 144:6 185:1
223:1
**pillage**
24:21
**piskei**
147:14,15
**place**
7:4,12 52:15
122:25 124:17
138:14 149:19
158:12 172:5
221:15 259:3
275:23 287:25
297:10

**placed**
7:15
**places**
90:6 92:17 130:7
**plaintiffs**
1:5 2:12 27:21
35:6,8 58:25 59:2
63:8,14 80:22
81:1 106:21
144:17 150:8
155:19 156:5,7
174:3 201:2
213:12,14 217:15
218:5
**planning**
22:15 51:20 282:8
**play**
197:1
**plea**
52:13,15,21 53:2
53:4,5 57:21 58:3
58:13 69:2 89:13
159:11,22 174:12
181:1,15 189:17
207:20,22 209:10
215:9 222:8,8
234:1,5,16,21
236:10 238:20,22
238:25 239:24
240:6,9 241:19
243:16 248:3,6,6
249:14 260:18
265:4 267:24
272:22,25 273:2
273:10,12 274:1
276:16,18,19,20
281:4,8,14,15,16
281:19,24 282:5
284:23
**plead**
113:9 181:7,8
187:25 268:6
286:14
**pleaded**
207:19,20 215:6
232:17,20
**pleading**
258:5 286:6,6
**pleads**

112:25 114:12,19

**pleas**
195:21 260:19
267:20

**please**
22:11 46:3 62:21
69:18 116:3
123:10 150:21,23
171:17 183:7
201:16 203:2
213:2,5 221:22,22
238:4 245:25
272:6,19 278:6
279:15 280:16,18
282:24 283:7,14
283:15 284:6,11
285:9 286:20

**pleasure**
71:4 228:23

**pled**
188:1 231:14
232:20 273:6
275:25 279:4,5
284:19

**plo**
217:8

**plural**
271:10

**point**
87:18 90:2 200:15
225:8,20 237:6
240:14 249:10
262:16 269:6

**pointing**
180:10

**points**
152:8 234:14

**police**
12:7 61:13,18
62:25 166:15
167:14,15 234:1
235:23

**policy**
16:2 78:20,24
122:23 124:19
203:24

**political**
30:2

**popular**

126:2

**population**
90:25

**porter**
2:13

**portion**
157:1,3 233:1

**portions**
105:18 107:6

**pose**
271:20 272:3
274:22

**poses**
139:18

**position**
50:17 64:10
118:15 141:15
172:8 258:13

**positive**
11:4,8 12:25
149:10 230:1
240:8 282:13

**possibilities**
123:9

**possibility**
114:20

**possible**
32:8,9,10 57:8
97:17 152:9 158:8
199:14 224:23
270:23 280:25

**post**
26:17 117:14

**postarrest**
113:16,24 114:3,8
215:4 223:15
271:8

**postponement**
242:23

**potential**
94:23 133:7
173:12 266:18

**power**
25:22 31:19 33:7
33:8 37:17,25
38:4 64:6 119:22
119:23 122:23
123:20 137:3

**powers**

25:22 180:25

**practice**
9:4,7 10:3 12:11
14:21 21:11 24:4
25:9 38:8 45:15
48:3,16,20,22
51:16 52:9,9,20
71:10 83:18 84:5
84:6,15 88:6,24
90:14 103:22,22
104:5,23 105:1,3
106:19 110:16
115:22,23 124:1
132:7 158:11
159:9 169:8
202:19 244:6,12

**practices**
88:14 109:20
241:16

**practicing**
9:8

**pre1967**
149:2

**pre67**
148:17

**precautions**
72:21,25 73:3,4
73:11 74:19

**precedential**
147:18

**precedes**
296:15

**precise**
86:2 146:15

**precisely**
201:1

**predominating**
208:1

**preemptive**
37:19

**prefer**
276:5

**preferably**
148:10

**preindictment**
152:1 157:22
187:17 201:25
270:11 278:10,11

**preparation**

39:10 40:10,16
42:7 157:1

**prepare**
101:15,17,25
102:5 156:13
257:7

**prepared**
35:13 147:9
156:10,16 157:10

**preparing**
102:7 118:24
218:9

**present**
3:1 78:19,24
89:20 179:15
196:17

**presented**
18:16 55:5 213:25
273:25 276:20

**presentencing**
175:23

**preserving**
114:13

**preside**
119:10

**president**
56:12 75:17 82:11

**presiding**
94:17

**press**
23:20 126:2,4,10
126:18 128:9,12
128:18 130:19,25
131:3

**pressure**
242:18 286:13,14

**pressured**
180:22

**presume**
132:3

**presump**
102:15

**pretrial**
37:7 152:1 174:12
187:16 236:2
256:7 278:25
279:24 280:21
281:1 283:24
285:18

**pretty**
95:9 116:7 253:11

**preturkel**
123:14

**prevent**
132:2,5 134:5
166:1

**preventing**
205:23

**prevention**
165:6

**previous**
36:6 38:16 42:13
56:12 57:25 211:9
225:12,15,21
259:22

**previously**
261:6

**pride**
195:22,22

**prime**
120:4

**principally**
19:21,23

**principle**
10:20 65:10 71:9
94:17

**principles**
95:7

**printed**
147:6

**prior**
39:2 49:3 51:17
124:20 145:10
260:2 288:19
297:5

**prison**
126:8,9,13 127:11
251:22 259:6
267:17 275:12

**prisoner**
23:9,10,15

**prisoners**
22:21 26:4 129:1
131:15 133:7
206:11

**private**
289:13,14

**privileged**

288:3 294:16,22
295:10
**probably**
8:25 19:1 20:7
55:20 158:6 202:1
202:2 209:10
273:5 278:18
**probe**
184:19
**problem**
91:12 100:3
121:22 159:12
165:10 167:4,13
168:6 190:12
**problematic**
8:5 264:16
**problems**
68:17 99:20
131:23 150:5
168:11,11
**procedural**
32:16 98:22,24
99:7 283:10
**procedure**
32:12 33:4,18
104:12 106:13
122:24 273:25
**procedures**
33:22 63:3
**proceed**
154:1 282:24
**proceeding**
11:4,5
**proceedings**
7:17,21 13:25
19:12 86:10 97:20
256:11 297:11,14
**process**
33:12 34:1,7,10
34:13,18 35:21
36:18 40:1 65:25
66:11,15,18,22
69:12 79:24 88:17
96:15,25 97:3,10
97:21 98:4,12
99:10,17 100:3,6
100:8,10,23 104:9
112:12 140:19
141:6 149:18

150:2,5 151:11,17
153:7,11,15,18,21
153:22 154:15,19
157:16 164:14
166:18 168:6,10
168:11,16 169:22
169:25 170:2,3
174:10 175:11,12
175:16 178:24
179:4,9,22,23
180:19,20 181:20
183:5 185:24
187:14 188:5
193:11 195:16
201:14 202:11,12
203:12,14 207:1,8
209:1,2 211:8
212:4,6,9,15,19
213:5 214:21
216:24 218:18
219:21 222:1
225:8 226:16
228:4 232:12,15
232:23 234:11,20
235:20 238:2
243:14 244:2,24
245:7,11,17,22,24
247:24 250:9,13
250:15 254:11,19
255:23,25 256:2,4
256:5 260:3,5,11
260:14,20,21
261:7,17 262:3,15
263:4,10 264:6
272:19 276:1
277:25 278:2
280:11,19 281:8
283:15 284:6,16
286:5,8,22
**procuring**
250:5
**produced**
201:2 221:4
**product**
140:2,7 231:19
290:8
**professional**
87:2 109:12
**progress**

243:4
**prohibit**
208:3
**prohibiting**
70:9 158:8
**prolong**
226:1
**prolongation**
102:21
**prominent**
240:24 241:2,24
**promise**
211:23 212:1
258:25 259:3,5
**promised**
218:22
**promoting**
30:22
**pronounced**
139:6,23
**proper**
136:10
**properly**
89:21
**proportion**
29:22 30:13 31:15
**proportionality**
65:10
**propriety**
137:13
**prosecuted**
41:1 51:4 139:15
**prosecution**
55:13,20,23 56:18
56:21,24 57:10,14
68:10,18,19 69:10
78:2 103:12 107:8
107:9 122:10
158:19,23 159:12
159:22 162:1
183:17 185:20
186:24 202:3,9,15
202:22 214:3
220:5 221:8,14
223:9,12,13
227:16 238:9
239:3,16 246:6,14
248:2,21 251:4
252:7,8,13,21

264:10,12,17,18
264:19 271:5
273:8 282:8
**prosecutions**
101:9 107:5
**prosecutor**
103:3 104:17,18
105:5,5,7,8,17
169:17 221:3
243:1,2 273:8
**prosecutorial**
239:17
**prosecutors**
40:19,25 42:3
54:16 96:8 103:7
145:19
**protected**
290:15 295:23
**protection**
15:1 61:21
**proud**
30:10,11,12 83:15
176:4,23 177:11
194:23 195:4,8
196:7,15,23 197:9
197:15 268:19
**provide**
25:9 27:16 47:5
66:17 102:3,4,12
103:8 151:16
212:23 217:8
220:6 221:8
243:25 291:2
**provided**
8:6 37:25 46:10
76:3 103:19
142:14,17,18
150:9 161:13
163:3 168:17
169:16,18 174:4
189:8 200:14,20
220:2 221:21
231:10 235:13
237:20 270:13
293:25
**provides**
64:11 87:16 95:13
96:23
**providing**

97:9 100:7,10
216:24 221:14
**provision**
95:10
**provisions**
5:4
**public**
16:1,6 17:11 22:2
23:4,6,7,14 24:25
28:14 31:15 48:8
54:21 69:16,21
70:22,22 71:1,16
71:23 73:17 74:1
74:19 128:18,20
128:25 131:25
133:5,21 134:12
149:14 170:5,10
173:20
**publication**
111:13,23,24
158:8
**publicize**
131:8
**publicizes**
131:20
**publicly**
43:16 44:6 128:5
128:7 131:13
149:12 266:9
**published**
23:13 54:18 62:24
79:19,20 111:20
111:22 147:8
**publishes**
131:19
**publishing**
131:10
**pulled**
257:9
**pulling**
184:4 287:12
**punishment**
132:10 259:6
**pure**
30:20
**purely**
131:22
**purpose**
73:12

**purposes**
73:13
**pursuant**
2:4
**pursue**
228:22 291:25
**pursued**
168:2
**pursuing**
159:24
**pushes**
270:15
**put**
123:11 155:21
167:11 192:12
261:21 284:17
**puzzled**
276:14

**Q**

**qualified**
242:8
**quality**
87:3 161:12
240:21 256:8
279:11 288:9
**quarrying**
24:2,5
**question**
20:21 22:3,6 25:3
26:25 29:21 31:11
36:15,16 50:9,10
54:25 56:6 60:16
60:20 64:4,9,15
64:16 65:13 66:20
68:24,25 69:19
73:7,10 77:3,9,14
77:18 79:23 95:2
100:15 102:24
107:22 110:17
116:16,19 120:9
122:12 125:17,20
125:21 138:3
141:16,21,23
142:16 143:4
146:16,24 151:2,3
151:6 152:20,21
153:1,2 154:11
156:23 162:5

163:1 164:13,16
168:3 173:24
174:21 175:5,18
177:15 179:17
182:23 183:1
184:20 185:9
191:23 194:7,8,13
194:15 199:19
200:1 201:7
204:23 211:13,22
213:4 217:6 218:6
218:18 237:17
245:6,14,16,19
250:9,12 254:12
259:21 260:9,24
261:5 268:10
269:17 271:20
285:2,2,9,10
288:8 290:12,13
291:12 294:19
295:9,13
**questioning**
218:4 291:24
**questions**
78:3 79:4 85:5
93:21,24 120:13
138:22 164:22
186:17 202:5
245:4 250:8 260:3
272:3 274:22
287:1,11,14,15
288:16,23 290:18
290:20 292:6
293:9 295:22
296:14
**quibble**
132:11
**quick**
296:2
**quite**
129:12 176:14
**quotation**
26:16
**quote**
23:23 60:21
132:12 180:13
258:8 275:16
**quoted**
23:19,22 24:1,8

24:13,14 41:24

**R**

**rabbi**
54:4
**rabin**
137:4
**rachel**
3:2
**raise**
51:4,15 98:6,16
100:3,6 125:1
150:5 170:3
204:22 209:7,13
245:16
**raised**
17:7 18:4,7 97:12
99:9,10 134:21
172:19 201:22
221:25 226:7
247:24 276:1,9
**raises**
166:17 195:4
245:7
**raising**
219:1 225:8
226:15
**ramifications**
77:4 78:16 190:21
**ranging**
74:10
**rape**
32:20 184:8,8,12
185:14 207:12,14
207:16,17,18
**rare**
97:16 163:7
202:20
**rarely**
10:12 121:12
137:2
**rate**
57:20,21 58:13
93:16
**ratheb**
173:22 174:8
175:9 176:22
186:21,25 191:13
194:9,11,22

**rea**
24:18
**reach**
161:16,17
**reached**
245:23 273:10
**reaction**
189:16 258:21
**read**
21:1 26:16,18,25
27:10,15 28:2
38:5 39:10 44:20
46:12 47:8,23,24
48:2 51:9 52:1
59:6 60:12,25
80:14,17,17 82:13
83:25 84:6,9,15
84:17,22,22,24
85:1,21 87:17,22
88:4,20 90:21
91:7,23 93:6
109:3 110:6 111:6
137:14 145:23
146:1,9,10,12
165:15 166:23
175:23 176:13,17
189:8 191:17
192:20 193:3
239:9,11 241:5,5
248:9 250:25
252:25 257:21
268:21,23 276:17
290:10,12,13
298:8
**reading**
51:7,8 82:15 89:1
90:11,14 165:17
166:22 183:12
190:10,14 192:4,7
192:11 223:2
239:22 251:2
252:20 253:5
258:7,10,12,18,24
259:9,13,17 273:9
273:16 275:11
**ready**
60:14 182:16,17
233:21 255:17
**real**

241:19
**really**
31:8 32:23 47:9
61:19 62:4 110:19
149:25 194:1
198:25 207:3
210:19 212:1
241:23 255:13
276:14
**reask**
179:4
**reason**
55:14 57:9 118:4
160:7 165:10
176:24 208:17
209:9 243:24
251:5 258:22
263:4 267:12
299:8,10,12,14,16
299:18,20,22
**reasonable**
70:12 136:5
146:20 151:10
153:5,6,9,23
154:14 161:10
167:2 174:8 175:9
179:8 183:4 194:4
194:10 198:2,9,21
199:5,7,23,24
201:12 206:24
211:6 212:5,14
219:20 232:9
234:9 235:18
238:1 240:11
245:21 283:25
**reasoned**
79:19,21
**reasoning**
254:16 270:12,15
**reasons**
36:23 113:6
241:14 281:12
**recall**
7:9 10:11 11:1
13:4,5,5,16 14:18
19:3,14 27:5
38:23,24 50:14,15
69:4 86:20 89:3
96:11 102:20

193:20,23 196:12
196:13 263:18
290:25
**receive**
51:17 66:17
168:13 205:4
225:17
**received**
144:17 145:6
151:13,17 168:23
179:4 200:18
201:6 213:24
220:5 234:2
235:22 256:9
279:12
**receiving**
97:3 180:17
**recess**
58:24 130:4 147:4
152:17 200:7
229:3 269:12
296:9
**recodified**
90:1
**recognize**
224:4
**recollect**
267:3
**recommendations**
123:4
**record**
23:4,6,7 75:13,16
75:19 76:7,11
80:19 82:3,4,25
100:21 129:21
144:18 149:20
152:15,19 155:6,7
155:9 163:8,10
167:5 168:4
181:24 187:19
188:19 189:6
199:1 200:23
212:3 233:24
235:22 237:12
249:3 254:15
274:3,18 282:22
283:9,13 289:22
293:3 296:18
297:14

**recorded**
76:11 166:16
167:3,17 297:11
**records**
76:3
**recourse**
127:23
**recuse**
221:13
**red**
127:15 131:14,17
131:19
**redact**
105:24
**redacted**
106:1,10 107:6
**redaction**
106:4
**redactions**
106:13,14
**redundant**
141:13 266:7
**reexamine**
13:6 76:20
**refer**
27:22,22 35:13
70:1 150:20,24
154:8 158:15
170:9 187:20
228:5 276:12
283:19
**reference**
166:7 231:25
**referred**
28:8 42:16
**referring**
18:19 26:11 40:7
65:19,20 69:25
142:1 152:4
223:17 275:9
**reflect**
64:17 269:20,20
269:24,24 274:3
296:1
**reflects**
189:7 258:9
279:11
**refresh**
80:4 166:2

**refugees**
92:12
**refusal**
189:12 202:9
**refuse**
79:7
**refused**
78:3 202:4 226:4
246:7
**refuses**
202:17,23
**regard**
71:6 105:1 129:10
172:18 173:13
179:23,23 185:3,8
185:10 193:14
212:23 220:24
232:23 244:20
246:1 256:6
259:21,22 264:6
269:19 272:5
276:9 278:1
280:19 283:16
**regarding**
18:21 40:1 64:3
129:2 134:15
150:1 151:16
183:14 187:3,20
201:20 204:1
232:14 244:10
276:13 278:3
283:18
**regardless**
260:24
**regime**
140:2,8
**regions**
92:20
**regret**
215:14
**regretted**
233:8
**regular**
9:14 73:24 133:12
158:11
**regularly**
14:6
**regulations**
10:10 70:2

**reisner**
109:4,6,14 110:3
110:13 111:23
**reisners**
110:20 111:6
**reiterated**
96:6
**reject**
178:22,23 216:9
274:15
**rejected**
225:2 248:10
**rejects**
98:12
**related**
11:24 12:12 45:16
46:6 196:9
**relating**
154:13
**relationship**
26:17 27:6 56:14
**relationships**
22:5
**release**
22:25 96:9 102:9
102:12 206:11
**released**
33:17 37:9 102:21
106:1,2 205:18
206:10
**relevant**
45:16 68:5 74:3
101:18 135:21
151:14 198:23
246:20 248:12
272:3,4
**reliable**
46:23 58:10
**relied**
46:19 246:24
**rely**
260:22
**remain**
37:13 179:24
180:1
**remained**
180:3
**remains**
9:20

**remand**
179:12,15
**remark**
28:7
**remarks**
59:10
**remember**
7:2,11,14 8:8,16
8:18 10:19,21
11:3 12:22 13:11
15:20 19:9,10
23:10,11,13 26:24
27:1 29:14 44:23
53:3 59:8 60:24
61:2 86:14 89:5
94:20 103:25
120:11 138:13
149:8 162:3 169:1
173:14,16 175:24
192:22 210:19,24
211:2 224:7
233:10 238:14
268:25 269:2
270:21 271:14
288:20
**remind**
188:4 192:21
262:6
**reminds**
27:5
**remnant**
115:11
**remorse**
197:1
**rendered**
51:12,12 253:19
**renown**
9:15
**renowned**
8:23
**rent**
15:18
**reorganization**
90:9
**repaired**
153:18
**repeat**
113:12 154:16
172:10 175:17

245:13 279:21
**repeating**
52:8
**rephrase**
50:9
**report**
4:12,17 15:25
34:6,12,20 35:4,8
35:14 36:10 38:22
39:2,3,6,9,19 40:7
40:11,12,13,14,17
40:23 41:9,14,23
41:24 42:2,8,16
43:14,16 44:14,15
44:19 45:8 47:17
48:18 54:9,22
55:7 70:2,11 72:4
77:18 86:25 87:1
103:13 109:4
110:5,6,13,20
111:7,23 118:1,23
118:25 121:4
128:12 130:20
133:14,17 135:22
139:25 144:10
146:2,9,10,13
147:10 149:5,12
149:24 150:1,24
151:12 152:4
156:16 157:1,4,7
157:10 164:3
165:15 170:5,7,9
171:23 172:4,4,19
176:3,8 184:15
193:4,7,14,15
228:9 276:12
**reported**
1:25 133:11 172:3
208:12 266:9,10
**reporter**
6:22 11:24 193:25
274:13 297:1
**reporting**
42:20,22 118:20
134:4,24 193:14
257:22
**reports**
39:20,22 43:19
44:3,9 59:9 63:22

115:18 123:15
165:14 189:6
190:25 191:8
194:2 224:8
253:19 257:20
**represent**
22:21 26:12
116:13 188:12
208:15 234:3
264:12
**representation**
21:8 61:1 168:17
175:19,20 188:6,7
250:22 256:8
266:19,24 267:2
273:4 278:4,5
279:12
**representative**
117:4
**represented**
21:22 31:5 136:3
183:9 186:13
188:5 189:9,11
190:4 201:2 264:8
264:9 273:7 279:3
**representing**
126:22 264:23
**represents**
264:13
**reputation**
296:15
**request**
19:13 25:23 70:12
76:13 102:9,10,14
105:6 114:13
158:16 160:23
169:11 170:21,25
217:12,21 218:5
285:24
**requesting**
104:12
**requests**
220:20
**required**
43:14 66:11 86:11
89:12 239:18
252:9
**requirement**
149:4

**research**
34:7 40:3 158:2
**resent**
178:15,16
**reservations**
244:22 279:20
283:22,23 284:7
**resident**
139:2 206:2
**residents**
206:7
**resolution**
194:2
**resolved**
113:11
**resources**
24:19 25:10
**respect**
110:2 196:21
218:19
**respected**
241:24
**respond**
104:15 134:9
138:25 141:12
177:14 190:7
210:3 215:21
216:5 260:9 291:7
294:20
**response**
54:18 55:4,9
**responsibility**
196:25
**responsible**
61:10 70:8 118:24
**rest**
139:20 222:3,5
**restate**
96:17
**restrict**
139:10
**restricted**
71:18 138:17
**restriction**
138:11
**restroom**
129:23
**result**
57:15

**retain**
114:19
**retained**
292:9
**retaliation**
178:13 263:19
**retaliatory**
65:15
**retract**
273:11 279:6
**retracted**
225:20
**retrial**
94:3,10,14 95:7
**retro**
167:19
**retrospect**
8:4 167:19
**return**
272:23
**returned**
15:13,23 16:4
18:8
**reveal**
295:12,15
**revealed**
94:18
**revealing**
291:16 295:9
**revelation**
221:9
**revenge**
187:10
**review**
32:6 37:21 96:3
103:8 107:12
118:15 119:13
124:21 125:7,7
133:16 144:20,25
145:1,3 151:18
153:20 157:4
162:14,16,18
163:9 164:1,2,17
186:9,10 199:9
**reviewed**
142:7 143:4 150:3
151:7 153:4
154:13 174:3,6
175:7 183:2

201:10,23 206:22
211:4 219:16,18
232:10 233:17
234:8 235:16
237:19,24 245:20
**reviewing**
121:13 152:6
159:17 162:19
164:19
**revolutionary**
90:4,8
**right**
8:12,14,20,21 9:5
10:2,7 14:23
15:14,15 16:19
21:14,21 23:1
24:6 26:14 29:11
29:11 30:9 31:6
33:14 36:2,6,7,9
37:4,6 39:16,18
43:11,17 44:2,11
44:12,18 47:21
50:18,19 51:6,22
54:11,16,17,19,20
62:9 63:21 65:17
65:24 67:21 69:15
71:7 72:2,3 74:16
74:17 75:5,9,10
75:11,17 76:14,15
76:17,19,20,21,23
77:5 78:11,12,21
78:22,25 80:5
83:3,6,10,24 84:1
84:11,13,25 85:6
85:16,22 87:17,22
88:2,10,19 89:9
90:2 91:1,4,21
92:15 94:2,11,22
96:10,15 97:20,21
97:22 98:3,8,13
101:8,23 102:1,9
102:10 104:21
105:9,12,13,15,16
105:19 106:12
107:15 108:9,11
108:14,15,16,21
108:24,25 112:12
112:14,18,22
113:2,3,7,8,19,20

113:23,25 114:1,4
114:9,10,14 115:2
115:3 116:2,9,9
117:8,15 120:21
121:1 124:5
125:10 127:7,8,14
127:20 130:12,17
130:20,21 131:6,7
131:9,15,16,24
132:3,4,15 137:22
140:3,9,10,18
142:8 143:5,8,13
143:14,21 149:24
156:9 157:11
159:2 162:2
163:15,18 164:18
169:5,12,15,18
170:19,21,24
171:1 172:9
173:24 174:2,4,5
184:24 185:4
186:22 187:8
188:12,14 193:13
193:18 198:1,12
198:19 202:15
206:3 207:18
215:10,13,19
216:1,10,12
221:17 223:19
225:6 226:19,22
227:17,21 228:6
229:1,6 230:24
233:18,19,21
234:5 236:11,15
237:2,5,9,16,22
238:20,25 239:14
240:10 241:4
246:25 247:1,2,4
247:5,6,7,21
250:6,21 251:12
251:16,20 252:1
252:17 254:1,8
255:12 258:4,20
261:25 263:16,17
264:3 265:14
266:15,16,20,21
268:3,14,20 269:3
270:5,8 271:2,9
271:18 274:15

277:2,6,19 280:3
281:22 282:21
284:21,21 285:4,8
286:8,14,19 287:2
287:5,6 288:13,15
288:17,23,25
289:5,8,19,23
290:3,17 294:10
294:11,24 295:1
295:17,25 296:10
296:17,24
**rightly**
125:19 128:10
171:10
**rights**
8:24 9:1,9,20 10:4
14:25 15:1,25
19:17,20 21:6,9
21:11 23:18 25:7
30:17,20,22,22
31:1 34:7 39:23
39:24,25 40:1
44:4 47:7,23 48:3
48:6,7 88:17
96:19,24,25,25
98:4 100:24
102:14 117:22
153:16 159:19
165:12 169:22
180:20,20 202:13
244:10 245:24
250:14,16 251:14
255:25 286:8
**rightwing**
31:1 139:6,7
**risk**
49:11 139:18
181:6
**rivalry**
133:20,24
**river**
147:25 148:2,7
**rle**
1:6
**robbed**
28:6
**robbers**
27:3
**role**

117:20,24 123:3
195:5 197:1,3
287:7 290:23
291:1 292:5,11
293:23 294:12
**roles**
121:19
**roll**
140:17
**room**
2:5 25:25 47:6
167:6 192:15
214:17 285:19
**rooms**
238:8
**roughly**
289:23
**rovner**
3:3
**row**
7:11
**roy**
59:4
**rude**
212:2
**rule**
17:14 68:14 69:11
70:20 79:14 99:18
112:16 252:10
274:20 293:18
**ruled**
229:13
**rules**
63:3 77:24 79:18
97:13
**ruling**
17:15 51:20 55:12
68:7,14 137:19
166:5 213:24
214:1 223:3
231:22
**rulings**
70:23 79:20,22
**rush**
233:22

――――――――――
S
――――――――――
**saad**
278:23

**saadi**
184:13 197:17,19
200:9 201:12,13
201:20 203:18,22
204:9,14 205:18
209:6 240:14,18
241:4,11,22
**saads**
278:24
**sabotage**
141:3
**saboteurs**
141:22
**saddening**
30:21
**sadly**
38:25
**safeguards**
139:24 181:5
**sake**
37:12
**salah**
264:9,18 267:23
271:16,16 272:6,6
272:13,13 277:17
277:18,22 278:1,1
**salahs**
277:22
**salary**
106:9
**samar**
177:2
**samaria**
10:16 67:5
**sami**
235:9,13,18
**sample**
127:1
**sanaa**
205:14 206:16,23
207:24 209:6
**sat**
41:4
**satin**
2:19 143:15,19
287:11,20 288:16
289:16 292:22
293:2,9 294:6,17
**satisfaction**

104:20
**satisfied**
89:13
**saw**
44:20 159:16
161:16 217:13,21
222:16,18 238:18
240:19 265:3
**saying**
24:8 71:15 84:14
85:10 122:3
153:19,20 181:21
183:19,25 186:4
190:22 193:22
195:20 200:13,16
222:9 230:22
234:19 241:23
281:10
**says**
4:20 59:15 82:8
84:2 88:4 165:22
166:20 176:22
180:10 188:21
189:21 195:7
204:12 251:1
252:10 253:4
258:17,23 268:22
272:24 273:8,15
292:15 294:22
**scale**
101:4,6 216:19
**scarecrow**
59:12 61:6,16
62:4
**scattered**
90:6
**scenario**
51:18
**scenes**
109:19
**scheduled**
158:21,22 159:13
160:10 239:2
**school**
6:19 91:11
**schools**
91:4,14
**schoyndorf**
59:4

scientific
58:4
screwing
228:18
scrutiny
117:13,18
sea
147:25 148:2,7
sealed
71:15,20
search
275:1
second
10:9,25 11:14
12:14,17,21,23,25
14:21 27:14 62:18
63:23 66:9 82:19
216:18 233:12
239:19 245:9,19
250:12 262:21
265:7 277:19
secondchairing
22:12
secretary
251:10
secretive
73:22
section
82:2 185:23 186:2
186:14,15,16,19
security
5:4 11:24 12:12
21:23 22:9 45:15
45:16 46:6 48:16
57:22 72:7,21,25
73:3,4,11,13
74:19 95:16
102:17 105:25
115:20 119:11
122:11,13,17
127:8,25 139:18
196:9 210:9
see
27:11 30:19 33:20
37:8 51:11,13
59:15,17 60:17
62:19 63:7 83:7
84:7 87:24 89:24
109:22 110:2

117:9 120:16
127:12 131:22
143:5,22 144:7
145:13 150:4
151:25 158:6
160:17,19,21,24
160:25 161:4,5
162:9,9 166:7,10
170:25 171:2,8,8
174:21 175:25
176:6,10 180:13
188:5 189:4,5
192:3 193:8
199:18 204:17
205:13 220:3
224:14 225:13,21
225:22 227:20
233:6 236:4,5
239:1 244:15,17
244:17 257:8
281:24
seeing
86:20
seekers
93:16
seeking
125:13
seen
30:18 75:21 79:16
87:13 102:16
105:12 112:3,4,8
112:9 161:8 168:5
203:8 225:14
243:6,8,11 251:11
selected
147:13,16
selection
111:22
selfdeprecating
288:12
selfincrimination
236:6
selfproclaimed
16:2
selfreporting
44:2
selfreports
44:6
seminars

15:9
send
104:14,17,18
105:6 163:20
190:17 192:5,8
281:25
sending
129:1
sends
281:17
sense
9:9 31:10 73:15
126:25 157:12
159:3 196:16
267:22 268:5
271:4
sentence
67:23 82:17 83:2
83:4,5 113:1,2
158:13 161:24
162:1,12 195:8
235:24 254:16,17
270:12 273:14
282:9
sentenced
22:22 196:6 233:7
sentences
23:2 281:17,25
sentencing
69:3,5,8,10 176:7
176:9 192:20
236:13 254:17
257:12,13,18,19
263:19,24 270:12
270:13
sentencings
268:17
separate
265:19
separated
7:8
separation
95:24
september
15:12,12,13,16,17
187:18 251:3
252:23 257:11
275:9
serious

21:22 22:9,22
49:11 57:22 77:18
186:11 190:11,11
190:15 194:18
195:14 203:8
servant
120:14,17
servants
119:25 120:12
serve
135:19
served
136:7 211:20
280:24
serves
120:14
service
61:23 62:2 122:14
122:18 135:1
services
122:11
set
6:6 66:21 297:10
settle
84:10
settlement
28:15 139:3
settlements
294:4
settler
28:15
settlers
27:7 28:5,13
139:20
seven
274:19 282:23
283:1 293:20
294:2 295:21
296:19,20
severely
260:15
sfard
1:14 2:1 4:3,12
6:3 27:2 35:7
59:2 81:16 142:18
147:6 155:8
182:15 211:21
220:10 274:16,23
290:9 296:10,20

298:3,15 299:5,24
sfards
5:7
shabak
11:19 47:15 50:17
shadow
44:3
shake
278:16
share
81:7
sharon
233:8
shaul
56:13
shchada
205:15 206:17,24
206:25 207:5
209:7
sheet
83:25 87:15,17
88:5,21,22 89:2
90:15,22 265:18
298:7 299:1
shekels
99:1,4
shirin
3:6
shooting
249:4,7,11
short
29:5 58:17 129:14
130:5 232:13,16
shorten
242:18
shortly
270:10
shortterm
25:21
shoulders
180:11
show
118:2 137:18
218:12 220:3
222:17 243:4
showed
32:23
showing
163:18 169:18

179:8 287:25
**shown**
224:21
**shows**
50:1 52:8,9
153:21
**shrenzel**
146:7
**shwaysh**
182:11,20 183:3,4
186:15,22 187:16
194:5 204:15
205:1,5,12
**shwayshs**
187:4 188:16
192:20 201:21
204:19 205:8
207:6,25
**sic**
50:3 90:8 136:7
143:9 145:17
157:13 175:19
181:19 186:21,25
215:8 221:3 231:7
235:9,13,17
271:17 273:19,21
274:1
**side**
65:9
**sign**
207:11,13 226:3,5
**signatory**
43:10
**signature**
298:9
**signed**
75:16,20,24
166:16,18 187:2
254:16
**significant**
33:25 61:20 90:25
197:3
**significantly**
49:7
**signs**
107:10
**similar**
73:6 95:9
**simple**

223:23 273:23
**simply**
57:2 90:5 107:1
**singing**
21:18
**single**
174:14
**sirhan**
271:17,17,21,21
271:23,23,24,24
**sit**
116:10 259:3
**sitting**
112:2 116:5 157:8
267:5
**situated**
70:4
**situation**
27:3 28:10 38:2
110:3 161:1 197:9
265:23 266:1
**situations**
113:13 242:19
291:23
**six**
27:25 123:20
181:13 220:4
227:8 256:18
280:24 285:25
**sixth**
222:10
**skeleton**
62:5 225:18
**slap**
214:8
**slaps**
214:9
**sleep**
64:25 261:22,25
**slim**
234:2
**small**
14:10 21:7 30:4
71:24 101:4,6
151:14 157:18
190:16 194:19
195:13 200:11
207:3 211:10
**smaller**

94:8 212:19
**smirek**
22:12,16,17
**sneak**
141:2
**society**
124:3 216:23
**sokolow**
1:4 299:2
**sold**
116:12
**soldier**
140:13
**soldiers**
61:11 63:1 115:9
116:11,13 136:8
141:2
**sole**
262:7
**solely**
262:18,20
**solitary**
184:9,11
**solitude**
180:9 181:19
**solve**
131:23
**somebody**
22:2 64:1 86:2
120:18
**son**
259:10,11
**soon**
155:18 283:5
**sorry**
15:8 18:11 23:5
25:3 40:12 44:7
51:14 59:22,24
60:1 100:15
103:16 113:12
115:8 116:2 120:6
133:1 148:16
155:23 156:8,23
165:3 166:11
174:19 177:23
183:21 184:16
185:22 186:1
190:13 191:11
193:17 207:14

213:14 219:23
222:20 225:9
226:6 233:19
234:17 239:4
246:12 248:20,22
249:23 257:10
262:18 263:22
269:18 271:22
272:8 279:2 285:1
285:15 286:16,19
290:19
**sort**
13:15 50:4,12
54:24 127:1
133:19 154:11
185:16 190:21
194:3 195:13
196:13 200:15
223:19 288:22
**soulless**
59:12 61:6,16,19
**souls**
61:23
**sound**
136:5 289:23
**sounds**
89:17 127:1 149:9
**source**
38:13 48:10 255:2
**southern**
1:2 2:3
**sovereign**
101:20 148:13
149:2
**speak**
20:14,22 40:10,21
40:25 41:3,6,10
84:23 91:7,23
93:6 126:9,18
127:20 145:18
160:2 205:21
**speaker**
85:21 93:7 161:11
**speakers**
87:4 93:19
**speaking**
8:1 31:19 165:19
192:6 215:24,25
**speaks**

20:16
**special**
37:17 105:20
**specific**
13:11 37:16 42:23
43:25 51:18 70:10
71:12 119:14
149:17 151:2,3,5
152:25 170:11
171:16 179:7
182:22 185:6
199:1,19 221:25
226:15 260:22
281:6 283:18
291:21,22 292:11
292:11
**specifically**
10:18 66:25 151:7
153:4 154:13
174:7 175:8 183:2
197:23 201:11,19
206:23 211:5
219:19 232:11
234:8 235:17
237:25 241:11
244:5
**specifics**
154:7
**spectrum**
74:11
**speculate**
45:5 168:18
**speculation**
277:11 280:1,2
**speech**
256:19 257:17,21
**speed**
68:19
**speeding**
74:11
**speedy**
286:7
**spending**
6:23
**spent**
36:22 293:3
**spirit**
296:14
**spirited**

59:3 296:13
**spoke**
  11:2 42:2,8 89:23
  170:17 241:6
**spoken**
  85:17 134:18
  145:22
**spokesperson**
  71:11
**spot**
  197:5,6
**staff**
  7:19 70:8 119:17
  119:19
**stage**
  57:11 72:14
**stains**
  193:17
**staj**
  9:23
**stake**
  16:13
**stand**
  55:24 159:4
  160:13 202:4
  246:17 260:25
  271:5,5 290:16
**standard**
  71:16 162:14,16
  162:19
**standards**
  66:10,14 181:3,4
**standing**
  171:21
**stands**
  262:12
**start**
  140:14 151:5
  200:4 210:8
  213:22 223:22
  238:6
**started**
  135:15 224:24
**starting**
  296:12
**state**
  4:15,20 13:14
  101:21 117:17
  131:21 139:10

147:21 149:2
165:25 177:4,6
183:7 238:4 282:8
**stated**
  236:14 262:25
**statement**
  13:14 17:24 18:5
  71:21 77:16
  113:17 159:20
  166:19,23 167:3
  167:15 175:23
  176:21 189:7
  202:5,11,16,24
  208:18 215:11
  225:21 226:5
  234:1 235:22,23
  248:3 267:4
**statements**
  17:15 39:22 46:23
  57:5 78:2 79:6
  113:24 114:3,8
  121:16,25 151:20
  151:23 158:24
  160:12 165:5,24
  166:15 167:23
  172:22 173:4
  183:20,22 186:3,6
  187:3 199:12,16
  204:25 207:12
  215:4 222:20,23
  223:15,18,25
  226:3 228:3 230:1
  231:18 235:3
  238:9,12 239:6
  246:5,10,16,18
  248:15 249:17
  262:7,20,21 263:2
  265:11 267:13,23
  267:25 268:18
  270:7,20 271:9
  278:14
**states**
  1:1 2:2 51:24
  68:9 111:2 141:2
  141:5 148:8
**station**
  61:18
**statistical**
  126:16

**statistics**
  54:10,13 87:5
  93:13,15 102:18
**status**
  78:10 294:3,3
**statute**
  80:6
**stay**
  179:12
**stayed**
  12:14 18:10,12
**staying**
  296:12
**stems**
  46:4
**stenographically**
  297:11
**stepfather**
  29:6,9
**stephen**
  22:16,17
**stepping**
  56:5
**stick**
  265:20
**stipulate**
  293:16
**stipulated**
  113:6
**stone**
  24:5
**stones**
  177:21
**stop**
  39:5 99:20 170:14
  230:25 251:22
**stopped**
  190:19 221:10
  241:14
**stopping**
  269:6
**stops**
  99:24
**story**
  63:16
**strategic**
  53:8 88:7 240:6
  290:2 291:5,13,20
  291:22

**strategist**
  53:23
**strategy**
  53:13,17,20,22,23
  159:10,11,23
  168:1 173:3,6
  265:4 267:16
  284:3,23 290:24
  292:23 294:25
  295:7,19
**street**
  2:19 93:11 177:19
  248:25 249:2,4,7
  249:11,13
**streets**
  92:9
**strike**
  68:25 116:16
  213:3
**strong**
  50:22
**struggle**
  258:3 259:20
**struggling**
  204:23
**student**
  8:10
**students**
  7:6,10,12 110:15
**studied**
  7:6 14:25 142:6
**studies**
  14:22 15:7 36:6
  38:16 39:1 42:14
**study**
  38:20,22,24 57:23
  62:23,23 92:6
  193:7
**studying**
  7:1
**subcommittee**
  119:12
**subject**
  19:14 40:22 42:16
  42:20 46:11 76:23
  102:19 131:17
  132:23,24 133:3
  133:16 135:10
**subjected**

49:5 130:11
**subjecting**
  51:14
**submission**
  242:3 243:17
  254:6
**submissions**
  251:24,25,25
  252:4,6,9 254:1
  257:24 278:18
**submit**
  43:14 161:3
  163:17,19 243:4
  278:13
**submitted**
  59:14 243:22
  257:4
**submitting**
  242:6 254:6
**subpoena**
  119:22,23 120:12
**subsequent**
  39:20 42:14
**substance**
  273:2
**succeed**
  223:14
**sudan**
  92:19
**sue**
  4:15
**suffered**
  175:15
**sufficient**
  56:22 99:17
**sufficiently**
  216:18
**suggest**
  30:25 73:20 93:15
  153:15 174:16
  292:5 293:4,9,21
**suggested**
  198:15 251:13
  291:24
**suggesting**
  71:14 195:19
  281:7
**suggests**
  212:19 243:1

276:16
**suicide**
191:14,15 192:8
250:6 263:15
**suite**
2:20
**sum**
8:3
**summarize**
123:9 186:2
**summary**
75:15,16,19,25
76:3 162:6 171:11
213:2
**summations**
14:11,12,15,16,17
14:18 18:16 152:8
165:11,12 166:8
231:24 240:3
250:23,23 252:21
252:24 257:7
265:5,6,7 270:4
**summon**
76:14
**summons**
76:17
**supplement**
14:16
**supplied**
106:20,21 107:3
111:11 276:16
**supplies**
226:14
**supply**
61:20
**suppose**
12:22 23:16 32:19
33:10 41:18 60:24
83:22 105:4,4
119:21
**supposed**
85:19,23 86:23
90:8,9 102:6
107:8 114:5
119:10 141:22
148:8 160:13
171:7 180:20
291:8
**suppress**

17:23 114:13
**suppressed**
18:6 113:16 114:8
114:10,15 119:24
223:15 224:1
**supreme**
6:24 17:15 22:13
25:16 32:13 33:6
48:25 51:19 68:7
77:20 78:25 79:2
79:20 96:22 98:13
98:16
**supression**
113:23 232:1
271:8
**sure**
12:23,24 14:20
23:8,23 26:15
30:1 41:14 44:8
45:6 50:14 61:5
70:3 80:10,15
81:5,14,23 82:20
83:23 85:4 94:7
95:5 97:6 105:23
106:23 107:10
112:22 113:13,21
120:5,10 121:21
123:8 124:6
129:25 133:11
136:23 145:15
148:24 149:8,10
152:11,16 154:3
155:24 158:11
162:22,23 164:12
165:8 167:1,2,7,7
167:8,19 171:20
175:21,24 186:9
189:4 191:24
192:21 193:16
198:1 202:1 208:9
211:14 215:2
218:16 224:12
228:1 230:11
236:19 238:21
245:14 265:8
268:7,11,24
288:14 294:18
**surprised**
31:3 230:14

**surrounding**
175:18
**suspect**
37:13 124:23
125:2
**suspected**
64:7
**suspects**
49:10 50:3 117:20
121:17
**suspicion**
49:11 153:17
154:24 168:6,11
195:4 250:16
**suspicions**
139:22
**suspicious**
281:24
**swearing**
86:15
**sworn**
6:5 86:12,14,21
86:21 297:6
**sympathetic**
28:14
**system**
14:12 33:3 52:22
55:6,8 62:3,3
66:16 67:1 68:23
69:1,9 70:21 72:5
72:6 79:24 89:6
94:11 96:3 100:2
100:4 101:2 115:5
115:6,7 140:1
170:4 196:24
201:19 209:3,4
219:7 260:20,21
282:14
**systematically**
135:14
**systemic**
66:12 69:14
171:23 172:1,3,19
**systems**
63:4

———————
**T**
———————
**table**
7:19 156:4

**tactic**
216:10
**tactics**
214:19 231:5
**tailor**
53:22
**tailored**
53:20 109:19
**take**
35:9 52:15 58:17
58:22 94:7 104:8
129:11,14,15,23
140:6,6 147:2
149:11 157:18
159:4 160:13
162:3 185:1 200:4
216:7,9 229:1,7
234:23 236:22
242:16 248:22
264:2 266:17
267:19 269:8
271:4,5 275:6
284:19 287:1
295:25 296:2,22
**taken**
2:1 44:22 62:23
72:22,25 74:19
92:22,23 121:16
297:9 298:6
**takes**
122:25 143:20
254:23
**talk**
66:9,25 90:21
125:22 169:24
173:21 185:2
209:16 229:15
233:11 251:24
**talked**
36:12,14 66:6
104:1 108:18
168:24 172:16
173:14 187:6
219:3 252:1,2
261:19
**talking**
26:17 69:15 73:2
73:3 85:3 86:2
123:14 126:24

130:6 146:22
148:15 168:19
229:10,19
**tank**
21:15,17
**target**
64:18,19
**targeted**
16:2 63:24
**targeting**
64:22,24 65:7,9
65:12,14
**taught**
215:16
**teach**
214:16
**team**
279:3
**technical**
63:25
**technique**
238:18 242:2,14
243:6,15
**techniques**
16:14,21 17:10,18
49:6,9,19 50:17
50:19,22 229:14
231:10 262:23
**tel**
92:9,9
**telephone**
253:3
**tell**
26:19 27:1 81:20
93:23 123:10
130:12,13,16
156:22 157:15
175:4 180:6
187:13 190:16
196:6 205:9
209:21,23,23,24
212:11,13 213:2,5
224:3 225:1
245:25 250:18
252:3 256:13
257:22 264:24
269:20 277:25
283:14,15 284:6
292:16,23

telling
    228:8 285:6 288:4
    292:7
temporary
    155:13
ten
    13:20 67:23
    210:20 251:22
    282:23
tend
    13:6
tens
    49:6 258:21,21
term
    9:14 16:3 67:7
    97:16
terminology
    268:7,8
terms
    17:1 22:22 162:24
territorial
    147:22
territories
    67:12 177:7
territory
    24:20 38:3 141:19
    148:13 177:6
terror
    22:15,23 64:7,8
    102:22 177:19,25
terrorism
    4:21 74:12,16,20
    74:21 178:10
    282:2
terrorist
    198:4 210:13,15
    210:16
test
    198:14
testified
    6:5 105:11 186:21
    207:24 226:19
    246:8 268:13,15
testify
    68:10,21 69:2,10
    77:7 79:7 144:15
    202:10,17,23
    204:14 218:2
    239:15 246:7

297:7
testifying
    208:3
testimonies
    151:20 214:10,12
testimony
    130:23 144:3
    156:10 187:1,4
    205:12 207:6
    217:9,10,18,25
    227:5 246:23
    247:12,14,15,20
    260:8
tests
    163:3
thailand
    91:21
thank
    7:19 14:3 48:13
    52:11 60:3,15
    62:10 63:6 66:24
    71:3 81:13 89:11
    90:17 120:24
    125:14 131:4
    133:4 148:18
    150:7 152:13,16
    157:14 172:15
    181:23 186:20
    200:2 204:13
    213:1 219:8 232:5
    233:5 235:8
    267:11 284:14
    289:25 296:11,16
    296:23
thanks
    34:5
theoretically
    32:10
theory
    38:1 71:9 202:19
    203:9
thesis
    15:2
thing
    9:22 21:19 28:24
    28:25 30:23 37:5
    47:20 48:19 49:25
    52:12 53:6 56:9
    57:24 60:25 66:5

66:9 103:17
    114:17 147:20
    183:22 206:11
    214:22 226:24
    227:4 229:5 230:3
    230:5,11 240:11
    270:23 276:11
    288:7
things
    8:4,6 13:15 21:13
    34:15 35:13 50:4
    53:9 57:9 65:1
    66:1,2,4 74:10
    83:14 96:12
    109:22 110:2
    127:3 133:23
    153:17 158:10
    167:20 171:9
    176:16 178:21
    181:1,7 182:7
    184:5 185:5,6,16
    185:16 188:2,22
    190:16,18,21
    194:3 195:12,17
    195:18,23 196:19
    196:22 202:8
    227:7,17 228:8
    229:8 236:7,9
    241:12,13 244:19
    247:24 252:2
    259:4 275:15,17
    281:6 287:10,12
    288:21 291:2
    292:14 293:4
think
    7:7 9:11,15,17,19
    11:6 13:10,21
    16:3,11 18:13
    23:8,9 24:8 25:17
    26:11 30:2 34:22
    34:23 36:20 38:21
    39:23,25 40:2
    41:24 42:12,15,18
    42:19,22 43:18
    44:8,9,19,21,25
    45:2 48:19 49:3,7
    50:10,21,25 51:1
    51:8,19 53:10
    54:12 55:19 58:3

58:10,21 59:24
    60:18 62:24 66:7
    66:8 67:7 69:5,7,8
    70:21 72:4 73:16
    73:21 74:2,4
    77:10 79:4,8
    80:11 86:15 89:23
    95:2,12 99:4
    100:9,11,22
    102:23 105:11
    108:17 109:14,15
    109:17,24 112:21
    113:22 114:21
    115:5 116:15,17
    116:19,22 121:14
    122:5,22 123:25
    124:4 125:16,19
    129:5,5 130:19
    133:24 134:22
    136:12,13 138:4
    139:3,15,19,20
    140:5 141:15,25
    146:5 149:13
    150:9 151:13
    153:16 154:1
    155:1 167:6 168:1
    170:13,21,24
    172:7 175:4
    176:13 179:2,2
    181:25 182:18
    184:14 186:23
    190:23 194:21
    195:1,12,14,15
    197:25 205:19
    206:13 208:10
    210:19 216:13,16
    220:21,23 221:19
    224:25 227:1
    229:25 232:4
    236:23 237:5,6
    241:3,6 242:12
    243:10,20 245:24
    248:19 249:3
    250:20 251:17,18
    255:2 256:1
    261:20,24 262:13
    265:2 267:3
    268:15,24 272:4

274:7,16 277:9
    279:9 282:17,22
    284:16 286:21
    288:18 290:5,14
    291:19 293:15
    295:17 296:13
thinking
    8:7 13:8 96:4
    290:2 291:5
thinks
    118:16 196:22
third
    11:14 12:24 19:19
    36:8 66:20,21
    70:21 162:10
thirteenth
    259:25
thought
    34:24 52:4 58:4
    65:23 70:13 73:15
    182:4,5 219:2,3
    230:15 234:22
    242:5 257:13
    277:3 287:13,24
    288:21 292:12
thousands
    49:6,6 73:25
    258:21
threat
    50:3 184:12
    207:12
threatened
    207:16,17,18
    275:5
threatening
    49:22
threats
    73:6 184:7,8,8,14
    185:14,15 207:12
three
    29:19 66:1,2,4,22
    75:20,24 123:17
    126:21 127:1
    158:25 174:16,18
    184:13 187:17
    211:19 221:16
    248:21 249:22
    259:12,14 265:2
    268:4 285:23

threemonth
174:12
throwing
177:21
thursday
2:6
tickets
74:12
ticking
229:11,14,21
230:10
tied
293:13
tikva
11:7
time
6:23 7:1,24 11:1
18:17,18,19 19:1
19:19,20 23:20,20
38:7 40:14 45:17
64:20 68:6,14
70:1 74:3 81:22
81:22 98:17
101:14,17,18,25
102:4,6 103:12
104:4,10 111:6
114:6,6 116:4
121:11,11 123:13
124:7 131:2,2
135:8,19,21 137:3
138:13 147:1
150:10,13,19
157:25,25 159:21
159:21 160:9
170:9 171:12
172:5 187:19
189:17 203:23
208:2 212:12
220:6 221:5,9
229:11 242:16
244:16 251:6,7
254:23 257:7
259:14 271:7
296:20 297:10,10
times
11:9 18:15 19:24
84:18 119:3 124:5
126:14 133:25
159:15 184:13

197:24 238:13
249:22
timing
270:15
tipoff
194:21 195:2,6
tired
129:15
today
10:23 39:13 40:11
40:13 70:3,3
78:10 79:14 91:16
112:2,2 136:2
146:22 157:9
173:8 193:5 199:4
218:9 229:19
252:2,3 267:5
276:12 287:2
296:11
todays
156:10
told
47:9 108:17 131:6
164:15 183:11
189:10 190:2
225:14 296:4
tolerance
7:4
tonight
274:21
tool
136:25
top
4:17 60:6
topic
64:3 66:21 83:21
124:9 142:4 164:4
220:11
topics
69:14
torture
16:1,6,9,12,15,16
16:21 17:11 42:25
43:7,21 44:16
48:8 77:8,12
118:22 119:4
121:6 122:21
123:16,23 125:25
127:4 128:13,21

128:25 130:9
132:1,2,9,12
133:8 134:6,13,21
183:24 184:1,3,10
184:11 230:9,13
230:20,23 231:12
231:20 232:2
tortured
126:6 183:18
touched
113:21
tough
197:5,6
tov
269:11
tradition
78:8
traffic
74:10
tragedy
241:12
training
64:2
traits
141:17 170:4
trans
85:22
transcribed
224:17 297:12
transcript
75:14 136:19
144:3 171:10,14
180:10 189:1
191:9 205:7
215:23 217:13,22
222:25 224:11
257:5 268:22
297:13
transcription
298:5
transcripts
144:20,25 145:3
214:12
transferring
191:15
translate
20:17 26:10 82:13
166:20 192:3
212:20 239:21

translated
84:24 85:11 103:6
166:24 225:4
287:20
translates
86:3
translating
82:15 166:22
176:11,21 183:12
190:10,14 192:4,7
192:11 239:22
251:2 252:20
253:5 258:12,18
258:24 259:9,13
259:17 273:9,16
275:11
translation
80:8,12,22 82:8
82:12 86:4 161:13
170:5,10 176:2,18
177:8 189:8,13
192:2 194:2 288:7
translator
75:4 85:6,24
171:5
travel
296:5
traveling
11:16 274:21
treated
64:13 126:5 129:3
treatment
16:17,22 43:3,21
44:16 119:5 121:7
122:21 123:22
125:25 127:4
128:13 130:9,11
132:6,10 133:8
134:5,20 180:17
231:13,21 232:3
tree
7:13,15
trial
32:21 33:4,9,11
33:11,16 37:9
38:7 51:15 68:10
68:11 70:18 72:8
72:22 73:17 75:13
88:8 89:20 96:24

97:2 98:7 102:8
102:11 121:18
124:25 153:10
154:18 158:12,20
159:6 163:24
167:22 178:24
179:11,13 180:2,3
186:22 187:5
204:15,20,20,22
205:1,8,12 207:6
207:25,25 208:15
212:21 216:24
221:10 222:21,25
223:3 225:7 227:8
232:15,18 240:19
241:20 242:18
243:5 246:4 248:3
249:15 251:23
278:12 279:1,25
280:13 281:6
285:21 286:7,11
trials
11:25 13:24 14:1
14:2,19 68:20
121:16,24 123:19
128:3 208:4
tribunal
25:24,25 221:13
242:23
tribunals
6:25 10:24 14:5
115:9
trick
227:21
tried
89:19 93:1 115:19
116:14 140:20
141:7 210:7 275:3
tries
116:20
trouble
9:18 18:17
true
23:21,22 74:8,9
74:14 76:18 77:1
77:6 91:10 93:10
94:25 97:23 98:2
192:12 246:9,16
261:11 277:13

297:14
**truly**
19:12
**trust**
182:5 289:24
**truth**
31:19 77:17
195:24 196:20
246:11 297:7,7,8
**try**
57:5 63:1 71:2
85:3,4,4 86:7
96:17 111:16,24
115:8,9 116:11
131:23 141:22
152:19 174:23
196:18 204:6
212:12 224:5
240:6 257:11
265:20
**trying**
26:10 46:1 48:21
61:16 73:24
100:12 120:25
123:11 146:4
175:3 199:18
210:25 227:4,21
228:7,9,20
**turkel**
4:17 123:4
**turn**
149:17 278:22
280:16
**turns**
224:20 253:25
254:5
**tutti**
29:3
**twentyone**
277:14
**twice**
26:12 289:9
**two**
7:8 15:8,8 22:18
62:15 70:16,18
104:8 123:16
124:23 125:1
126:21,21 143:7
143:10,19,21,23

148:8 152:2
157:23,23 158:1
158:17,25 185:13
201:24 203:11,13
203:19 204:1,2
214:2 225:10,25
229:17 236:2
245:4 246:22
248:21 250:8
251:9 253:15,15
254:15 262:16
263:1 270:1,11
275:15 278:7,9,11
278:24,25 285:23
285:24 289:1,6,22
289:22 293:2
294:23
**type**
12:5 118:7 132:7
175:16 184:11
**typed**
297:13
**types**
132:17
**typically**
69:16
**typo**
224:13

**U**

**ucl**
14:24
**uganda**
25:2
**uhhuh**
36:1 38:17 91:13
113:18 115:13
117:6 163:14
191:7
**ultimate**
154:11
**ultimately**
238:24
**unanimous**
82:10 83:8
**unanimously**
79:25 83:3
**unavailable**
79:7,8

**uncommon**
110:1
**undermined**
17:18
**understand**
30:16 31:4 51:3
53:24 60:23 61:5
66:3,7,19 74:6
88:7 89:24 94:2
94:13 100:1 107:2
108:1 112:15
121:21 123:1,5,13
124:2 127:1
142:11 148:25
151:19 163:1,2
170:16 178:8,9,12
213:21 216:6
228:10 230:21
232:16 240:9
272:25 274:10
275:3 276:4
289:11 290:22
292:13 293:23
296:6,6
**understanding**
17:8,12 46:21
48:11 70:11
102:19 107:4
122:8,15 171:21
273:6 279:22
**understands**
73:17 89:14
162:22 237:6
**understood**
66:23 167:6
189:10 190:1
217:24
**undertake**
40:6
**unduly**
102:8,11
**unequivocally**
65:17,18
**unethical**
266:8
**unfit**
112:16
**unfortunately**
51:11 122:6

214:15 223:1
251:3,6
**unhappy**
113:1
**uniform**
64:12 141:4
**unintelligent**
73:19
**unions**
117:6
**unit**
61:14 71:12 73:17
73:21,24 105:20
105:21
**united**
1:1 2:2 42:25
51:24 141:2,5
**units**
73:21
**university**
6:10,11,14 7:3,5
8:9,10 14:24
**unofficial**
80:22 82:8 125:22
130:7
**unorthodox**
218:20
**unquote**
132:12 275:17
**unwavering**
9:20
**updated**
48:21 81:21
**upheld**
98:5 102:16
**uphold**
88:16
**uploaded**
135:14 287:18
**use**
17:3,9 47:16
49:15 64:6 77:4
78:2 81:6 125:19
137:24 156:18
230:5 243:11,15
276:3 284:9
288:16
**usually**
20:15 75:22

104:10
**uzzadin**
284:8 286:23

**V**

**vague**
134:7 148:14
**valid**
32:17
**valuable**
124:3
**variety**
74:8
**various**
113:6
**vast**
19:2 31:17 233:1
**ventilated**
79:9,10
**verbatim**
75:14 171:10
**verdict**
82:17 233:25
235:24
**verify**
61:4
**version**
21:20 81:18 87:25
166:17
**versus**
74:21
**video**
167:18
**videotape**
218:3,12
**view**
69:11 74:18 124:4
140:7,11,18 142:1
195:7 224:3
247:25 260:4
280:3,8,8
**views**
109:15 147:21
291:20
**violated**
250:14,16
**violation**
21:23 25:11 64:23
203:12,13 234:19

243:14,21 250:21
254:19 266:6,8
284:16
**violations**
74:10 132:8
244:10 256:4
260:5 261:7
280:11
**virginia**
255:5
**virtue**
140:20
**visit**
127:8,18 296:11
**visited**
127:14
**visits**
131:14
**vs**
299:2

**W**

**waging**
241:17 281:19
**wait**
31:11 137:25
155:5,6 256:20
**waive**
84:12,12 239:14
243:23
**waived**
159:2 165:12
251:13,15 265:14
281:21
**waiver**
251:23 281:10
284:13
**waives**
159:18
**waiving**
240:9 251:12
284:20,21
**want**
9:3 22:4,4 23:12
39:4 45:7 50:10
50:10,12 53:19
56:19 58:16,16
59:7 60:5,9 65:24
65:25 66:2,9,21

66:25 67:6 71:13
72:5 87:20 100:15
102:1 109:13
110:19,19 121:21
122:13 125:22
129:11 132:11
134:23 136:22
138:21 142:4,5
145:13 146:15,16
146:19 149:17
150:4 151:5
152:15,24 154:7
154:25 164:14
166:11 168:18
170:6 172:20
174:1 181:7,8,14
182:19,22 184:18
184:25 185:1
189:9 190:20,23
190:24 191:24
196:21 198:13
199:18 212:2,3
220:17,19 222:10
225:8 227:18
228:1,24 232:13
233:22 235:21
242:20,24 243:3
245:3,4 248:1
249:19 254:14
255:7 262:10
269:1 271:20
273:17 279:5
282:14,16 286:25
292:14 295:22
**wanted**
7:12 52:12 53:6
112:5 127:5
136:21 144:20
161:2 166:12
184:19 210:9,9,12
210:14,16 229:4
240:8 287:17
292:16
**wants**
69:21,23 71:13
192:5,8 194:18
197:14
**war**
24:9,11,14,15,15

24:16 83:12
216:12 259:16,18
**wartorn**
92:20
**washington**
2:20
**watch**
39:24 72:10
**water**
34:3
**wavelength**
182:6
**way**
8:7 30:20 31:13
34:3 37:2 41:17
45:24 92:24 93:1
96:16 98:15,16
111:11 120:21
129:2 167:11
187:24 191:16
199:1,8 205:17
250:5 258:9 259:2
261:21 267:22
**weapon**
64:12
**weapons**
177:21
**weaponsrelated**
178:7
**week**
157:24 158:1
166:19
**weekly**
6:22
**weeks**
47:6 158:6 225:10
**weiser**
3:2 27:19 34:21
34:24 35:2 62:13
62:16,19 155:15
191:22
**welcome**
261:3
**wellrespected**
240:25 241:1
**went**
8:19 11:20 18:18
22:13 64:25
144:16 157:5

262:12 268:13
**west**
9:11 24:2,5 25:9
28:5,12 37:18
61:12 63:2 67:5,8
67:9,16,18 101:20
136:10 137:17
139:19,21 294:3
**weve**
55:10,18 56:7
57:22 59:2 66:6
67:25 69:14 70:10
74:7 75:3,12
97:24 112:21
121:3 142:13
144:24 150:13
172:3,18 175:16
200:4 201:6
213:24 216:8
220:21,23 226:23
229:9 234:2 235:3
235:4,22 247:10
254:10 256:9
261:6
**whatsoever**
158:13 207:21
273:7 281:5
**whispered**
289:8,9
**whispering**
287:24
**wide**
70:14 74:7 216:18
**wider**
25:24,25
**wife**
259:10
**willing**
150:5 217:24
228:25
**window**
64:19 116:7
225:16
**wish**
7:22,25 8:2 120:1
163:13 168:5
172:17 257:24
272:14
**wishes**

197:5
**withdraw**
22:6 168:2
**withdrawing**
171:22
**withdraws**
177:7
**withdrew**
225:12,15
**withhold**
105:18 165:8
**witness**
4:2 6:4 13:1
27:22 56:24 57:6
62:20 68:11 69:10
77:12,16 78:3
81:11,12 88:9
107:21,23 113:16
129:25 130:2
134:8,10 138:20
138:25 139:2
141:12 152:12
155:20,23 156:3
158:22,23,24
159:19 160:12,16
162:22 164:25
177:14,15 181:24
182:1,3 185:12
186:24 190:7,8
191:1,25 198:7
201:4 202:3,9,10
202:17,23 204:11
210:2,3,4 214:3
215:21,22 216:4,5
216:6 218:17
223:12,13 227:2
236:17 237:15
240:10 243:20
248:2,20 249:5,7
249:9,11 260:9,10
261:10 263:22
264:2,12,17,18,19
269:7,9 273:21
274:6,17,24 283:9
285:6 291:8,17,19
292:25 293:7,12
293:13 294:19,21
295:3,6,8 297:5
298:1,3,15 299:5

299:24
**witnesses**
13:7,12,17 14:6
18:15 19:5,6
76:14,16,20 79:7
121:24 183:17,17
185:13,20 202:14
202:14 223:9
227:16 238:10
239:3 246:6,14
248:21 249:17
263:3 264:11
265:15 271:5
281:11,22 284:13
**woman**
208:7
**women**
184:8 185:14
**word**
26:10,10 58:7
77:8 124:16
125:18 146:11,11
162:4 184:3 229:7
264:2 276:3
**words**
64:1 85:17,18
95:13 96:11
123:11 258:15
268:20
**work**
8:19 10:3 11:23
15:23 18:8 19:16
19:21 21:6,6,8
23:19 34:1,9
35:11 46:4,19
47:7,23 48:6,9,11
48:14 62:24 109:8
110:15 132:5
134:16 209:19
215:17 218:8,9
290:8
**worked**
20:8 109:9 144:24
**workers**
91:16
**working**
6:21 25:4 34:6
48:6 134:5
**works**

31:10 132:2 243:5
**world**
77:7 158:7 203:15
203:19
**worried**
237:11
**worth**
124:6
**wounded**
258:1
**wrap**
295:24
**wrapped**
125:16
**writ**
163:19
**write**
45:12 90:21 91:7
93:6 103:13 157:6
163:13 174:1
219:12
**writing**
40:16 157:4
252:22,24
**written**
14:11,15,17 15:6
15:8 86:3 124:25
215:22 251:25
252:4,6,8 254:1,6
270:3 278:17,19
**wrong**
33:10,15 59:25
67:3 82:12 102:23
123:10 137:4,18
234:23
**wronged**
61:12
**wrongly**
32:2 33:2
**wrote**
15:25 55:7 118:1
144:10 151:12
179:3 288:23,25
289:6

_____
**X**
_____
**Y**
_____
**yalowitz**
2:13,15 4:6 6:9

7:18,22 27:17,20
27:24 31:12 34:23
34:25 35:3,7
58:20,23 59:1,21
59:23 60:1,4,8,11
60:13,16 62:14,17
62:21 63:15 73:2
80:20 81:3,10,14
81:15 82:5 83:1
100:22 107:24
129:23 130:1,3,5
130:6,24 134:11
138:21 139:1,7
141:10,13 142:11
142:20,24 143:2,5
143:6,17,21,23
146:25 147:3,5
148:16 149:22
152:13,16,18
155:8,16,24 156:6
162:23,25 164:16
164:19,22 165:14
177:16 180:18,24
182:4 185:10
186:1 190:25
191:24 195:1
198:11 200:6,8,25
201:7 204:13
206:6 208:12
210:12 215:19,24
216:7 218:20,25
219:2 226:20,22
226:23 227:6
229:4 236:19
237:12,16 244:3
249:18 254:10
261:2,11 263:24
264:3 269:11,13
272:4,5 274:7,11
274:14,22 275:19
282:25 283:4,6,8
283:12,14 285:3,8
285:10 288:5
290:7,11,17,19,21
290:22 291:10,23
292:3,21 293:1,8
293:14,22 294:24
295:4,6,11,13,17
295:25 296:3,6,10

296:24
**yeah**
6:20 15:22 24:3
33:13 34:21 36:15
39:25 40:5 43:9
44:13,25 46:14
56:20 57:18 59:5
59:17 60:8,19
63:8,17,22 69:19
75:18 78:7 82:7
82:24 83:20 86:6
86:19,20 87:21,21
87:24 88:2 89:17
91:2 92:5,13,21
94:16 96:24
105:10 110:4
112:11 114:24
115:1 116:8 117:1
119:20 120:19
124:8 134:25
139:8 140:4 151:9
154:10 156:3,8,12
156:17 162:7,17
163:16,25 164:25
165:21 174:20
175:25 176:10
181:17 182:8,12
197:18,20,22
209:15 210:14
221:1 225:9 230:8
232:8 233:12,20
235:15 236:21
237:15 238:17,21
239:10 241:5
244:7,21 249:5,9
249:9,9,9,16
250:1,3 252:16
253:18,24 255:6
255:18 256:18,21
256:24 263:1,13
264:4 265:9 267:7
269:4,7,14 271:19
271:25 272:18
277:21 283:12
287:3 289:6
291:10 294:14
**year**
6:13 10:6,13
11:10,14,14,18

12:14,18,21,24,24
12:24,25 14:21
15:11,12 43:23
55:18 62:24 141:1
164:4
**years**
6:19 7:2,2,10 8:13
9:2 10:19 11:8,8
17:4 32:22 44:10
51:11 59:14 67:23
92:11 96:23
134:16 135:24
136:7 158:17
181:10,11,13,19
181:25 210:16,20
220:4 221:16
224:22 227:8
251:22 265:2
278:12,25 285:23
285:24
**yellow**
289:2,7
**yesh**
25:8 34:6 36:10
38:22 39:2,5,9,19
40:17 41:9,21
42:2,2,7,8 54:9,18
54:22 56:15 62:23
70:11 87:1 133:6
133:21 134:12,14
144:24 147:9
172:4,4
**yesterday**
47:9 112:1,6
**york**
1:2 2:3,14,14 77:1
209:22 244:17
254:25
**yorkers**
209:24
**young**
87:2
**younis**
173:22 174:8
175:9 176:22
186:21,25 191:13
194:9,11,22
**youssef**
255:14

**yunis**
263:20
**yvette**
3:7

**Z**

**zahar**
255:14

**0**

**0**
55:9
**000**
99:1
**01**
18:9,11
**03**
236:24
**04**
21:3 229:3 239:13
256:25
**04cv397**
1:6
**05**
21:3 296:9
**06**
2:7 130:4
**07**
296:9
**08**
296:25

**1**

**1**
5:19 45:9,12 55:9
59:13 147:4
152:17,17 190:8
**10**
58:24,24 190:9
204:2 229:3
**100**
99:4 112:22
**100224690**
2:14
**10th**
191:1,4,5 192:24
**11**
4:21 15:19,21
190:9 200:7
222:15,17

**111**
4:12 34:24 35:2,4
35:6,8 158:16
**112**
4:14 27:19,20,21
**1129**
179:10
**113**
4:17 58:25 59:2
**114**
4:20 62:13,14
63:9,14
**115**
5:3 80:22 81:1,9
81:11
**116**
5:6 80:24 81:1,16
81:17
**117**
5:7 155:19 156:5
156:7,8
**11th**
15:16,17
**12**
130:4,4 147:4
190:9
**127**
158:16
**12th**
187:18
**13**
5:22 260:2,4
261:5 262:10
**130**
184:9
**13th**
236:24
**14**
11:8 183:10
265:12
**14th**
183:11 189:20
**15**
4:13 10:19 11:8
289:22 293:3
**156**
5:8
**15th**
204:18

**16**
5:17 190:9 222:5
222:6 256:18
257:1 264:10
265:12 277:19
**1651**
90:1,4 95:11,19
**1658**
90:7
**16th**
256:18 257:5
**17**
157:20 199:12
260:18 264:10
265:12 272:10
**17th**
152:1
**18**
130:4 199:13
**18th**
251:3
**19**
200:7 236:3,7
253:14 263:16
**1942**
141:1
**1992**
108:23
**1995**
138:14
**1998**
6:15
**1999**
48:23 49:3
**19th**
252:23

**2**

**2**
55:19,19 56:2
59:13 99:1
**20**
82:2 129:16,18
190:9 204:3
207:23 225:19
279:17
**200055701**
2:20
**2001**

15:13
**2002**
115:24 116:6
152:1,2 157:21,21
166:19 174:13,14
177:19 179:10
183:11 187:18,18
188:25 189:3,4,23
191:2 204:19
246:21 280:23,24
**2003**
189:20,21 192:24
210:6
**2004**
18:13 21:4 115:23
115:24 116:6
204:18 207:23
263:15 275:10
**2005**
4:22 81:25 251:4
252:18,23,24
**2006**
55:19 100:5
222:11,13 224:24
225:9,10,24
256:11,17,18
257:1,5,11,19
265:9
**2007**
137:10
**2008**
4:15
**2010**
55:15
**2011**
224:9,10,11
**2013**
1:16 2:6 4:13,18
21:20 297:18
298:6 299:4
**202**
2:21,21
**20th**
81:25 191:3
225:24 252:24
297:18
**21**
5:18 40:22 41:1,4
41:7,11,15,25

42:3,9,15,19
43:21 74:15 84:7
87:9,13,25 88:2
106:20 142:6,8
145:18,21,24
146:20 149:18
150:2 170:11,20
171:3,15 172:2,6
181:12 190:9
198:3 199:3,11,11
199:22 220:8
235:4 260:17
261:12 269:2
277:13 280:4,9,10
281:17 282:2
**212**
2:15,15
**21st**
177:19
**22**
58:24 190:16
269:12
**2271**
256:23
**22nd**
246:21
**23**
5:16 35:16
**23rd**
166:19 222:11
**24**
1:16 5:21 298:6
299:4
**24th**
2:6 204:19
**25**
5:15 20:6 99:5
129:16,18
**25th**
152:2 157:21
**26**
4:18 293:18
**27**
4:16 269:12 275:9
**27th**
256:11,16 257:19
**28**
257:11
**289**

5:15
**29**
  55:7,16 56:2
**291**
  5:16
**292**
  5:17,18
**293**
  5:19,20
**294**
  5:21
**295**
  5:22
**29th**
  207:23 222:13
  239:13 263:15
  280:24
**2nd**
  179:10

─────── **3** ───────
**3**
  200:7,7 264:19
**30**
  55:22
**300**
  244:9
**30th**
  174:13,13 224:9
  224:10,11
**32**
  58:24
**35**
  4:13 129:22
**378**
  5:3 80:8,23,24
  81:21 87:16 89:24
  90:1,8 93:22
**399**
  2:14
**3rd**
  187:18 265:9
  280:23

─────── **4** ───────
**4**
  190:8 197:20
  210:6 229:3,3
  264:17
**40**

19:18 147:4
**43**
  147:4
**4th**
  252:18

─────── **5** ───────
**5**
  4:15 59:13 205:16
  210:6 269:12,12
**50**
  19:18 20:4,5
**51**
  152:17
**52**
  152:17
**58**
  4:19
**5th**
  225:9,10

─────── **6** ───────
**6**
  4:6 189:2,5,23
  296:9,9,25
**6265800**
  2:21
**6265801**
  2:21
**63**
  4:22
**655**
  2:19
**67**
  35:17,20 38:15
  148:13,15
**6th**
  188:25

─────── **7** ───────
**7**
  144:3 213:23
  264:18
**700**
  118:3 136:4
**70s**
  8:25
**7151000**
  2:15
**7151399**

2:15

─────── **8** ───────
**8**
  5:20 45:8 191:9,9
  191:19,20,20,21
**80s**
  8:25
**81**
  5:5,6

─────── **9** ───────
**9**
  2:7 15:19,21
  55:19,19 56:2
**90**
  30:20 180:9
  181:19,25 182:1,2
  182:3,5,6
**900**
  2:20
**90s**
  8:25 9:6,13 38:21
**9243**
  1:25 2:4 297:3,20
**939**
  59:13
**95**
  58:2
**98**
  10:1
**99**
  10:1