# EXHIBIT B.112

1

```
1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE SOUTHERN DISTRICT OF NEW YORK

3

4    MARK I. SOKOLOW, et al.,          )

5              Plaintiffs,             )

6    v.                               ) Civil Action No.
                                       ) 04cv397(GBD)(RLE)
7    THE PALESTINE LIBERATION          )
     ORGANIZATION, et al.,             )
8                                      )
              Defendants.              )
9    _____  )

10

11

12

13

14            DEPOSITION OF RAJA SHEHADEH

15                 JERUSALEM, ISRAEL

16                 OCTOBER 13, 2013

17

18

19

20

21

22

23

24

25   REPORTED BY:  BRENDA MATZOV, CA CSR NO. 9243

            OCTOBER 13, 2013 - RAJA SHEHADEH
```

2

```
1              Deposition of RAJA SHEHADEH, taken in the

2    above-entitled cause pending in the United States

3    District Court, for the Southern District of New York,

4    pursuant to notice, before BRENDA MATZOV, CA CSR 9243,

5    at the American Colony Hotel, Pasha Room, Second Floor,

6    Jerusalem, Israel, on Sunday, the 13th day of October,

7    2013, at 9:31 a.m.

8

9    APPEARANCES:

10   FOR PLAINTIFFS:

11           ARNOLD & PORTER, LLP
             By:  KENT A. YALOWITZ, ESQ.
12           399 Park Avenue
             New York, New York 10022-4690
13           (212) 715-1000 / Fax (212) 715-1399
             kent.yalowitz@aporter.com
14

15   FOR DEFENDANTS:

16           MILLER & CHEVALIER CHARTERED
             By:  BRIAN A. HILL, ESQ.
17               ANDREW T. WISE, ESQ.
             655 Fifteenth Street, NW
18           Suite 900
             Washington, DC 20005-5701
19           (202) 626-5800 / Fax (202) 626-5801
             bhill@milchev.com
20           awise@milchev.com

21

22   ALSO PRESENT:

23           MORDECHAI HALLER, Advocate

24           RACHEL WEISER, Esq. (partial)

25           ARIEH SPITZEN

            OCTOBER 13, 2013 - RAJA SHEHADEH
```

3

```
1                    I N D E X

2    WITNESS

3    Raja Shehadeh

4

5    EXAMINATION                              PAGE

6    By Mr. Yalowitz                            5

7

8

9        P L A I N T I F F S'  E X H I B I T S

10   NUMBER       DESCRIPTION              MARKED

11   Exhibit 101  Document Entitled "Expert
                  Report by Raja Shehadeh"
12                (No Bates Number)           19

13   Exhibit 102  Document Entitled "Israel-Palestine
                  Liberation Organization Agreement:
14                1993"
                  (No Bates Number)
15                                            37

16   Exhibit 103  Document Entitled "The
                  Israeli-Palestinian Interim
17                Agreement (Oslo II)," Dated
                  September 28, 1995
                  (No Bates Number)
18                                            37

19   Exhibit 104  Document Entitled
                  "Israeli-Palestinian Interim
20                Agreement on the West Bank
                  and the Gaza Strip, Annex I:
21                Protocol Concerning Redeployment
                  and Security Arrangements,"
22                Copyright Date 2000
                  (No Bates Number)           85

23

24

25
```

            OCTOBER 13, 2013 - RAJA SHEHADEH

4

```
1        P L A I N T I F F S'  E X H I B I T S

2    NUMBER       DESCRIPTION              MARKED

3    Exhibit 105  Document Entitled
                  "Israeli-Palestinian Interim
4                 Agreement on the West Bank
                  and the Gaza Strip, Annex IV:
5                 Protocol Concerning Legal
                  Affairs," Copyright Date 2000
6                 (No Bates Number)          113

7    Exhibit 106  Document Entitled "Erased in a
                  Moment:  Suicide Bombing Attacks
8                 Against Israeli Civilians,"
                  Copyright Date October 2002
9                 (No Bates Number)          141

10

11

12

13       Q U E S T I O N S  I N S T R U C T E D

14            N O T  T O  A N S W E R

15            PAGE      LINE

16             26        22

17

18

19

20

21

22

23

24

25
```

            OCTOBER 13, 2013 - RAJA SHEHADEH

5

```
1              P R O C E E D I N G S
2
3              RAJA SHEHADEH,
4         called as a witness, being first duly
5         sworn, was examined and testified as
6         hereinafter set forth.
7
8              EXAMINATION
9  BY MR. YALOWITZ:
10    Q.   Mr. Shehadeh, we met briefly before we went
11  on the record.  But just again to introduce myself,
12  my name is Ken Yalowitz.  I'll be asking you questions
13  today.
14         Will you state your name for the record?
15    A.   My name is Raja Shehadeh.
16    Q.   Thank you.
17         And Mr. Shehadeh --
18    A.   You're doing it right.
19    Q.   What?
20    A.   You're doing it very well.
21    Q.   Thank you.  I'm -- I'm working on it.  As the
22  day goes by, I think I'll do better.  Thank you.
23         Would -- would you describe your education
24  for me, when -- where did you go to school and -- at
25  the college level.  Let's start with the university
```

OCTOBER 13, 2013 - RAJA SHEHADEH

7

```
1  I joined his office.
2    Q.   I see.  So it was part of your education,
3  but you didn't practice law in England?
4    A.   No, no.  I never intended to practice law
5  in England.
6    Q.   So then you -- where did you grow up?
7    A.   In Ramallah.
8    Q.   And you returned to Ramallah in '77, '78,
9  something like that?
10    A.   '77, yeah.  '78.
11    Q.   Did you begin to practice law immediately?
12    A.   No.  I had two years of practice.  We call
13  it "staj." "Pupilage" they call it in England.
14    Q.   Were you working for another lawyer --
15    A.   No.  Sorry.  No.  I was at my father's office.
16    Q.   And you helped him doing legal matters, but
17  you weren't admitted to practice law?
18    A.   That's right.
19    Q.   So what kind of law practice do you have,
20  and are you still -- is that still your practice?
21         You are still in that practice?
22    A.   I'm practicing still, yeah, at the same law
23  office.
24    Q.   What kind of work do you do?
25    A.   Over the years, I did different kinds of --
```

OCTOBER 13, 2013 - RAJA SHEHADEH

6

```
1  level.
2    A.   I went to school first to the American
3  University in Beirut, where I did the BA -- Bachelor
4  of Arts in English literature and philosophy.  And
5  then I went to London and became a member of the
6  Lincoln's Inn.  I did the professional exams.
7    Q.   Did -- did you study law in England?
8    A.   I studied law in England.  Yeah.
9    Q.   And which law school did you attend there?
10    A.   I -- I did the professional exams.  I was at
11  the College of Law.  And I did -- passed the qualifying
12  examinations and then joined the Lincoln's Inn and
13  became a barrister-in-law.
14    Q.   What year did you graduate from the American
15  University of Beirut?
16    A.   '73.
17    Q.   And then when did you go to England?
18    A.   Immediately after.
19    Q.   And when were you called to the Bar?
20    A.   '78, I believe.  '77.
21    Q.   And were you -- were you working as an
22  apprentice in a -- in a law firm?
23    A.   No.  No, I didn't.  No.  I just did the
24  qualifying exams and then caught the Bar and immediately
25  went back.  Because my father is -- was a lawyer and
```

OCTOBER 13, 2013 - RAJA SHEHADEH

8

```
1  of law -- practice.  Now it's mainly commercial.
2    Q.   Uh-huh.  And did you -- have you done --
3  it appears from your report that you've done some
4  work in international law, human rights, this kind
5  of thing?
6    A.   I did a lot -- I was one of the founders
7  of the human rights organization Al-Haq, which is an
8  affiliate of the International Commission of Jurists.
9  And that was in 1979.  And I was a volunteer co-director
10  for many years.  And during that time, we did a lot
11  of work on human rights.  And during that period,
12  I was active in defending cases in military courts,
13  bank cases, writing also about the work and the human
14  rights situation.
15    Q.   Do you practice criminal law as well?
16    A.   No.  I don't practice criminal law.
17    Q.   Have you done any?
18    A.   Very, very little.
19    Q.   Do -- do you appear in the courts in the PA?
20    A.   Well, now my -- I -- there are others in the
21  office who appear.  I -- I don't appear now because it
22  takes too much time.  I concentrate on office work and
23  giving legal advice and so on.
24    Q.   And are you Barred in Israel as well?
25    A.   No, I'm not.
```

OCTOBER 13, 2013 - RAJA SHEHADEH

9

1      Q.  Do you still have a Bar in England, or you
2  just did it as your training and then you didn't keep
3  it up?
4      A.  I didn't keep it up because I was never
5  intending to practice in England.
6      Q.  Well, it's not a criticism.  I'm just curious.
7         So -- so describe your client base today.
8      A.  Well, today we represent banks, companies --
9  large companies, projects that come from the
10  municipalities, the universities, big foundations.
11  This is the kind of work now that we do.  We are one
12  of the earliest and most established offices in the
13  West Bank.
14      Q.  How many lawyers do you have?
15      A.  We have, I think, something like altogether
16  eight and -- and other trainees and staff.
17      Q.  Are there firms that are larger than yours,
18  or is yours one of the largest?
19      A.  Ours is one of the largest.
20      Q.  So can you tell me a little bit more about
21  Al-Haq?  What -- what is its mission?
22      A.  Its mission, which was explicit in everything
23  we did from the beginning is two-pronged:  To monitor
24  and try and relieve the human rights violations and
25  document the violations and seek to relieve them --

OCTOBER 13, 2013 - RAJA SHEHADEH

10

1  so we did a lot of interventions with -- first with
2  the military and now with the PA, you know -- and
3  also to entrench the principle of the rule of law in
4  the occupied territories, for which we did human rights
5  education and writing in local papers and publishing
6  explanations about what -- the principle of the rule
7  of law and how it can be realized in the occupied
8  territories.
9      Q.  Did you -- is that how you became familiar
10  with international law and human rights law?
11      A.  Yes.  That is mainly how.  But I also did
12  a lot of reading.  And -- and from the time I came back
13  from my education, we were at the office very careful
14  to keep these military orders that Israel was issuing.
15  And I was reviewing these military orders and indexing
16  them and -- and curious at what -- what was happening
17  to the law.
18         And so I can say that, from 1979, I've
19  been monitoring and keeping up with the changes and
20  assessing their consistency with international law
21  by reading and -- of course, I did a lot of reading,
22  a lot of reading, a lot.  I kept up with the literature
23  that was being -- and there's plenty of it -- that
24  was being published all over about the human rights
25  situation and the international law situation.  And

OCTOBER 13, 2013 - RAJA SHEHADEH

11

1  I also became familiar with the Israeli arguments
2  about the international law.
3      Q.  You mentioned there was a lot of literature
4  about -- you mentioned there was a lot of literature.
5         Do you mean literature about international
6  law?
7      A.  International law as it applies to the
8  occupied territories and lots of studies from all
9  kinds of organizations, local, international, Israeli.
10      Q.  What are some of the organizations that
11  you've found reliable?
12      A.  Well, in the beginning, there wasn't many
13  who -- who were doing work on the situation in the
14  occupied territories.
15         Amnesty had done some, but very little.  The
16  Lawyers' Committee, America, had done one report.  Human
17  Rights Watch was not yet established.  It came into the
18  picture much later.  The Israeli organization B'Tselem
19  also came later in '88.  There was the civil -- civil --
20  what is it called? -- "raili," Civil Rights Association
21  which -- with which we met regularly with Ruth Gavison
22  at the time who was involved and with the International
23  Red Cross.
24         And we had week -- monthly meetings with
25  Al-Haq and these organizations throughout the '80s.

OCTOBER 13, 2013 - RAJA SHEHADEH

12

1  And the Civil Rights Association, Israel, in the
2  beginning, did not think that they can report or
3  do anything in the West Bank or in the occupied
4  territories.  This changed later.
5         But it's mainly B'Tselem and now Human
6  Rights Watch since it came into the picture.  Certainly
7  the ICRC.  The United States, of course, has the annual
8  report -- human rights report.  Amnesty is now much more
9  active, Amnesty International.  These are the ones that
10  come to mind.  There are many others.
11      Q.  I noticed you -- you referenced a report by
12  international -- I'm sorry -- by Human Rights Watch in
13  your report.
14         Is -- is Human Rights Watch -- they -- they
15  issue -- is that part of their work, they issue reports?
16      A.  Human Rights Watch began with the Helsinki
17  Watch.  I'm not sure exactly when, but quite a while
18  ago.  And then -- and they didn't do any work on the
19  Middle East for the -- for the longest time.  And I'm
20  not sure exactly of the date.
21         But they established the Middle East Watch
22  maybe 20 years, or maybe more than 20 years now, ago
23  and started being very active in -- in doing reports
24  on the situation here.  So they have plenty of work
25  that they've done all over -- all over the Middle East,

OCTOBER 13, 2013 - RAJA SHEHADEH

13

1   not just here.

2       Q.   Have you found Human Rights Watch reports

3   to be reliable?

4       A.   They're very careful, and -- and they have

5   people on the ground.  And they are usually reliable.

6   Yes.

7       Q.   Is it reasonable for people in the field

8   of international and human rights law to rely on

9   reports by Human Rights Watch?

10      A.   I think yes, because it's -- it's a neutral

11  organization and it's neither on this side or that side.

12  So -- and -- and they have people on the ground, and

13  they rely on documentation -- firsthand documentation,

14  careful documentation.  And they have analysts who

15  then take this data and -- and analyze it.  So -- so

16  yes.

17      Q.   Are -- are you still active with Al-Haq?

18      A.   No, I'm not.  I -- I was very active as

19  a co-director.  And then the organization grew, and

20  I decided to withdraw because it could stand on its own.

21  I mean, I was always interested in the organization

22  standing on its own.  So when it became able to stand

23  on its own, so I withdrew.  And now I'm available for

24  advice and so on, but not directly active.  No.

25      Q.   Your report mentions that you have served

OCTOBER 13, 2013 - RAJA SHEHADEH

14

1   as an expert witness in some other cases?

2       A.   That's right.  I served as an expert --

3   expert witness in other cases.

4       Q.   In the Saperstein case, you were retained

5   by the defendants; is that right?

6       A.   That's right.  I was retained by the

7   defendants.

8       Q.   And who were the defendants in that case,

9   or who are the defendants in that case?

10      A.   I'm -- I wouldn't remember names.  I'm sorry.

11      Q.   That's okay.

12           And Shatsky and Ungar, also by the defendants?

13      A.   That's right.  Shatsky and Ungar by the

14  defendants as well.

15      Q.   Were the -- were the attorneys in that case --

16  the attorneys in the Ungar case was Ramsey Clark; is

17  that right?

18           Who was the -- who were the lawyers --

19      A.   I never worked with Ramsey Clark.

20      Q.   No?

21      A.   No.

22      Q.   I knew him.

23      A.   No, I never worked with him.  I mean, I

24  knew him, but I never worked with him or for him.

25      Q.   So it was with the Miller and Chevalier

OCTOBER 13, 2013 - RAJA SHEHADEH

15

1   people?

2       A.   That's right.

3       Q.   Now, United States against Union Bank for

4   Savings and Investments, you gave an expert report

5   in that case as well?

6       A.   That's right.  I did give an expert report

7   in that case as well.

8       Q.   What was the subject of your report?

9       A.   It's many years now.  So I wouldn't -- I

10  wouldn't remember the details.  But I did work on that.

11  I gave them a report.

12      Q.   Did you give testimony in court?

13      A.   No.  It was just a written report.

14      Q.   Uh-huh.  And did you give a deposition like

15  today?

16      A.   No.  There was no need.  I think they won the

17  case.

18      Q.   So have you ever given testimony in -- in a

19  court in the United States?

20      A.   Never.  I never gave testimony to a court in

21  the United States.

22      Q.   You mentioned in your report that you served

23  as a legal advisor in the '91 and '92 time frame to the

24  Palestinian delegation to some peace talks.

25           Could you just describe that -- what your

OCTOBER 13, 2013 - RAJA SHEHADEH

16

1   role was to the extent you can describe it publicly

2   and what the mission was and so on?

3       A.   After the Madrid Peace Conference,

4   the negotiations between Israel and the Palestinian

5   delegation began.  It was a joint Palestinian,

6   Jordanian delegation composed of delegates from the

7   occupied territories.  And they asked me to help as

8   a legal advisor because I knew about the legal situation

9   in the occupied territories.  And -- indeed I tried

10  to explain as much as possible and interpret the Israeli

11  offers that were being presented and put them in a legal

12  context.

13      Q.   Were you paid for that work?

14      A.   I was paid.  Yeah.  Yeah, I was paid.

15      Q.   Who -- who was your client?

16      A.   It wasn't very clear.  It was -- the

17  delegation -- I said:  I'm leaving the office and

18  spending a lot of time in the United States.  And

19  so I -- I didn't -- I couldn't afford to leave the

20  office --

21      Q.   Sure.

22      A.   -- without getting paid.

23      Q.   Of course.  Everybody must draw water from

24  the well.  I don't doubt that.

25           I just was curious, were you -- did you have

OCTOBER 13, 2013 - RAJA SHEHADEH

17

1  an engagement with the PLO?
2     A.   It wasn't -- it wasn't -- no, it wasn't
3  an engagement with the PLO.  At that time, of course,
4  engaging with the PLO was a criminal offense.  So I
5  was with the Palestinian delegation, which was from
6  here and Israel knew about it.
7     Q.   Did you work -- did you do any other work
8  on peace negotiations that -- led that led to Oslo I,
9  Oslo II, anything like that?
10    A.   No.  I stayed with the negotiations in
11 Washington for one year.  And then I left and I never
12 was engaged again or involved.
13    Q.   You said you stayed in Washington for a year?
14    A.   I mean, you know, in and out.
15    Q.   Uh-huh.  Where did you stay when you were
16 there?
17    A.   Mainly in the Grand Hotel.  And then across
18 the street.  I don't know what it was called.
19    Q.   The Anna?
20    A.   Now it's called the Anna.  But it had
21 a different name.  Or maybe it was Anna then.  I'm
22 not sure.  But mainly the Grand Hotel.
23    Q.   I used to stay there too.
24    A.   Yeah.  It used to be very nice, but I don't
25 know now.

                OCTOBER 13, 2013 - RAJA SHEHADEH

18

1     Q.   So I take it you have not worked as an
2  employee of the PA ever; is that right?
3     A.   I never worked as an employee of the PA.
4  In fact, I never worked as an employee at all.
5     Q.   And has the PA ever been your client?
6          Have you ever been engaged by the PA to
7  provide legal services to it?
8     A.   No.  I mean, we have at the office done
9  projects which the PA companies and public companies
10 and things that the PA might have had an interest in.
11 But not an employee of the PA.  No.
12    Q.   And these were commercial projects --
13    A.   Commercial projects.
14    Q.   -- consistent with your practice?
15    A.   That's right.  Commercial projects consistent
16 with our practice.
17    Q.   So with regard to matters of PA governance,
18 you don't have any personal involvement?
19         Is that fair to say?
20         MR. HILL:  Objection.  Vague.
21         MR. YALOWITZ:  Sure.  Let me --
22         MR. HILL:  Go ahead and answer.
23         MR. YALOWITZ:  Well, I'll -- let me rephrase
24 it --
25         MR. HILL:  Sure.

                OCTOBER 13, 2013 - RAJA SHEHADEH

19

1          MR. YALOWITZ:  -- if that's all right.
2          MR. HILL:  Go ahead.
3     Q.   BY MR. YALOWITZ:  Do you have any personal
4  experience serving as a legal advisor to the PA on
5  matters of their internal procedures?
6     A.   No.  But I did studies and I was concerned
7  about the procedures and how the operations were --
8  how the government was taking place.  I mean, I was
9  curious and continued to study how the evolution
10 of the PA was taking place and, in particular, in
11 relationship to the Oslo agreements.
12    Q.   Did you publish those studies?
13    A.   I published, in 1997, a study which was a
14 legal analysis of the Oslo agreements and went into
15 some detail as to how the PA evolved out of the Oslo
16 agreements.  It was called "From Occupation to Interim
17 Accords."
18    Q.   I think that you mentioned it in your report.
19         Anything after that publication?
20    A.   I did articles for various books and articles.
21 I think I mentioned them.
22         (Plaintiffs' Exhibit 101 marked.)
23    Q.   BY MR. YALOWITZ:  Why don't we hand you
24 what we've marked as Plaintiffs' Exhibit 101 and you
25 can just show me.  Because you seem --

                OCTOBER 13, 2013 - RAJA SHEHADEH

20

1     A.   In the list of publications I mentioned them.
2     Q.   You seem to be a prolific writer.  Wait one
3  second.  We're just going to hand out the document.
4     A.   (Examining.)  Sorry.  You want me to point
5  out what exactly?
6     Q.   So if you could just tell -- you mentioned
7  that you've done some evaluation of internal PA process.
8  And I was just wondering which articles.
9     A.   Well, the main one that I did was the:
10         "From Occupation to Interim Accords."
11         It doesn't have the --
12         (Examining.)  Well, the first one is:
13         "Declaration of Principles and the Legal
14 System in the West Bank."
15    Q.   So -- I'm sorry.  What page are you on?
16    A.   I didn't make -- this is page 1 of 7 at the
17 end, "Publications."
18    Q.   Yes.
19    A.   Publication No. 6.
20    Q.   Aah.
21    A.   And then I did a chapter in a book which
22 was published by University of London.  It's called:
23         "The Weight of Legal History:  Constraints
24 and Hope in the Search for a Sovereign Legal Language."
25         And then:

                OCTOBER 13, 2013 - RAJA SHEHADEH

21

1       "Can the Declaration of Principles Bring
2   About a 'Just and Lasting Peace'?"
3       Which was done for the European Journal
4   of International Law.
5       Q.   This was about internal PA matters?
6       A.   No.  It was mainly about the Oslo agreements.
7       And then:
8       "Questions of Jurisdiction:  Legal Analysis
9   of the Gaza-Jericho Agreement."
10      Q.   Also about the agreement?
11      A.   Yeah.  And then:
12      "Early Transfer of Powers in the West Bank."
13      Q.   Did you touch in that article on matters of
14  internal PA procedures?
15      A.   Well, they were all concerned with the Oslo
16  [sic] and -- and the way it was being implemented and
17  executed.
18      Q.   Any others?
19      A.   "Justice under Occupation."
20      The review article.
21      Q.   I see it.  And what's the topic of that
22  article?
23      A.   I don't remember now.  It's been a while.
24      Q.   Any other articles that you think might
25  address internal PA structure?

OCTOBER 13, 2013 - RAJA SHEHADEH

22

1       A.   Well, I did for the Israeli Business Law Guide
2   the piece on the Palestinian territories, which was
3   called:
4       "Business Law in the Palestinian Autonomous
5   Areas."
6       And that went into the details of the various
7   sections -- sectors of the law which, of course, by
8   then was also PA.
9       Q.   I see it on your list.
10      A.   Page 5.
11      Q.   Yes.  Any other articles that concern internal
12  matters of PA organization?
13      A.   Well, I gave a long interview for the
14  International Review of the Red Cross in 2012, which
15  also went partly into that.
16      Q.   Is that interview in World Literature Today?
17      A.   No.  It's in the -- it's called the review
18  of the international -- it's called the review or the --
19  the International Committee of the Red Cross.
20      Q.   I just don't see it on your list.
21      A.   On page 6, three -- third from the bottom.
22      Q.   Oh, I see it.  Thank you.
23      A.   Well, these are the ones that I can think
24  of now.
25      Q.   Okay.  Have we gone through the whole list

OCTOBER 13, 2013 - RAJA SHEHADEH

23

1   and you've mentioned the ones that come to mind as
2   potentially responsive?
3       A.   The ones that come to mind, yeah.  But there
4   are a lot.
5       Q.   Now, have you written about the organization
6   of the PLO?
7       A.   No, I haven't.  I haven't written about the
8   organization of the PLO because I don't know very much.
9       Q.   We talked a little bit about international
10  law and human rights law a few minutes ago.  And we've
11  talked about sources of facts and data and you mentioned
12  the reports.
13      What are the sources of law that you would
14  typically rely on?
15      A.   Well, mainly the Fourth Geneva Convention
16  and its interpretation, the Hague regulations of 1907,
17  and the -- again, the interpretations of these --
18  and the various books on jurisprudence that interpret
19  these and interpret human rights law and humanitarian
20  law -- international humanitarian law.
21      Q.   In the Geneva Convention -- there was an
22  addition to the Geneva Convention in 1977.
23      A.   Yeah.
24      Q.   What was that called?
25      A.   The protocol of -- Additional Protocol.

OCTOBER 13, 2013 - RAJA SHEHADEH

24

1       Q.   Additional Protocol.
2       And would you include that in the --
3       A.   Yeah.
4       Q.   -- body that you would rely on?
5       A.   Yeah.  Yeah, I would include the additional
6   protocols.
7       Q.   And then I know some of the organizations
8   you've -- you've mentioned before offer interpretations
9   of international law from time to time.
10      Have you found those to be a useful source
11  as well?
12      A.   Of course.
13      Q.   You would include among that the Human Rights
14  Watch reports we've discussed?
15      A.   Yeah.  Because they -- they often refer to
16  international law and interpret -- give their opinion
17  on its applicability.
18      Q.   You mentioned in your report that you come
19  from a family that has long been a proponent of a
20  two-state solution.
21      Is that correct?
22      A.   That's right.  My father was one of the
23  first to propose a two-state solution.
24      Q.   And I take it you -- even from our short
25  discussion we've had, I take it you oppose the use

OCTOBER 13, 2013 - RAJA SHEHADEH

25

```
1   of violence to achieve a two-state solution?
2        A.   I have always opposed the use of violence
3   in bringing about the two-state solution.
4        Q.   I seem to recall that there have been --
5   there have been advertisements in newspapers by Al-Quds
6   taken out by people -- Palestinians saying "stop the
7   suicide attacks" during the Second Intifada.
8             Did you sign those kinds of ads?
9        A.   I make it a point never to sign petitions.
10  I think I've never in my life signed a petition.  There
11  might be an exception that I've forgotten.  But, in
12  general, whenever I'm asked to sign petitions -- I
13  don't think petitions is the way to go.  I -- I don't
14  sign petitions.
15       Q.   Okay.  Thank you.
16            So let's talk about your report.  Did you --
17  did you prepare the first draft of your report?
18       A.   I prepared all the report, all the drafts,
19  everything.
20       Q.   What were you asked to do?
21       A.   I was given these case [sic] and asked to
22  give my opinion on -- on the events.
23       Q.   Did -- did you do a draft before the expert
24  reports from the plaintiffs were produced?
25       A.   Oh, yeah.  Yeah, certainly.  I saw these
```

OCTOBER 13, 2013 - RAJA SHEHADEH

26

```
1   much later.
2        Q.   And then -- and then you read the reports
3   of the plaintiffs?
4        A.   I did.
5        Q.   And then you made some comments on some of
6   the reports?
7        A.   Yes.  I made some comments on the reports
8   of the plaintiffs.
9        Q.   And I noticed you read the report of Nick
10  Kaufman?
11       A.   That's right.  I did read, amongst others,
12  the report of Nick Kaufman.
13       Q.   He was speaking about the judicial process
14  in the Israeli military court system?
15       A.   That's right.  He was.
16       Q.   And I noticed you didn't offer any opinions
17  in your report about his report.
18            Do I have that right?
19       A.   I didn't give an opinion on all the reports
20  in -- in my report.  But that's not because -- I --
21  I didn't.  No.
22       Q.   Is that -- did you discuss whether to give
23  an opinion on Mr. Kaufman's report with counsel for
24  the defendants?
25       MR. HILL:  Hold on.  I'm going to object
```

OCTOBER 13, 2013 - RAJA SHEHADEH

27

```
1   and instruct the witness not to answer that question.
2   It calls for communications with counsel.
3             So don't answer that.
4        Q.   BY MR. YALOWITZ:  Do you have an opinion
5   on whether Mr. Kaufman's report is reasonable?
6        A.   I do have an opinion.  And I think that
7   I was very surprised and distressed to read Kaufman's
8   report.  Because I have, in my experience with the
9   military courts, found that what he said was rather
10  shocking.
11       Q.   Now, in your report, you speak about the
12  legal regime in the OPT.
13            Is that an acronym that legal people use?
14       A.   Most reports now, including, I think, U.N.
15  reports, use this "OPT" as "occupied Palestinian
16  territories."
17       Q.   And is that a term you use in conversation,
18  or is it more just a term that we see in the literature?
19       A.   Well, it's very strange in conversation
20  to say "OPT," "OPT," you know.  But we would say it
21  "occupied Palestinian territories."
22       Q.   Now, maybe it would be helpful to me just
23  to have some of your understanding of the historical
24  sovereignty in those areas, in those territories.
25            I gather that there was a period of mandatory
```

OCTOBER 13, 2013 - RAJA SHEHADEH

28

```
1   rule; is that right?
2        A.   Well, if you want to start from the history,
3   it -- mandatory rule came after World War I, after the
4   dismemberment of the Ottoman Empire.  And the mandatory
5   rule came with the terms of the mandate, which were
6   very specific and which began in, I think, 1921 and
7   ended in 1948.
8        Q.   The beginning was the Treaty of Lausanne?
9        A.   In the Treaty of Lausanne.  Yeah.
10       Q.   And so is that -- was that treaty sort of
11  recognized under international law as the appropriate
12  governing instrument for the --
13       A.   No.  The -- the government -- the governing
14  instrument was the terms of the British Mandate, which
15  was given by the League of Nations at that time.  And
16  so the French had a mandate over other parts of the
17  eastern Mediterranean -- Lebanon and Syria -- and the
18  British had the mandate over Palestine.  And it is
19  a League of Nations mandate, which was very specific
20  with the terms of the mandate.  And it lasted until
21  1948.
22       Q.   And so I take it you're familiar with the
23  '47 Partition Plan?
24       A.   I'm familiar with the Partition Plan.
25       Q.   And I think you used a term for Jerusalem
```

OCTOBER 13, 2013 - RAJA SHEHADEH

29

1  that was used in that plan, a Latin term.  I can't
2  remember it.
3      A.  Corpus separatum.
4      Q.  Corpus separatum.
5      A.  Because the -- under the partition scheme
6  of 1947, Jerusalem was to be an international city
7  neither with the Jewish side nor with the Arab side.
8  It's corpus separatum.
9      Q.  Okay.  What caused the end of the mandatory
10 period?
11     A.  Well, the -- the cause of the end was that
12 the British decided to withdraw.  They were bankrupt.
13     Q.  So -- and what is -- what is the international
14 law community's view on the 1947 Partition Plan, if any?
15         Is it -- does it have any legal status?
16     A.  I think it does -- does.  The 1947 partition
17 scheme still stands.  It is recognized and still is
18 part of the U.N. resolutions that remain unfulfilled
19 or only partially fulfilled.
20     Q.  So then, following the mandatory period, what
21 was the legal status of the West Bank area?
22     A.  Well, then Israel was established in 1948.
23 And it was established in an area larger than what was
24 determined to be a Jewish state in the '47 partition
25 scheme.  The Jordanian Army fought with the Israeli

30

1  Army to -- I think to keep the West Bank.  Because there
2  was an attempt to take over all of Jerusalem and -- and
3  the West Bank.  And Israel, I think, had the military
4  means of doing it.  But the Jordanian Army fought, and
5  then there was a cease-fire line between the two sides.
6      Q.  An armistice demarcation line?
7      A.  Armistice.  Yeah.
8          And the West Bank, including East Jerusalem,
9  was placed under military rule by the Jordanians.  And
10 then in 1950, I think -- yeah, 1950 there was an --
11     Q.  Armistice Agreement?
12     A.  -- an annexation.  And it came under Jordanian
13 jurisdiction and became part of the -- what was called
14 the Hashemite -- or still is -- Hashemite Kingdom of
15 Jordan.
16     Q.  So from 1950 until 1967, the West Bank was
17 annexed by Jordan?
18     A.  That's right.
19     Q.  And what is the -- what is the international
20 legal community's view of that annexation?
21         Is it recognized as lawful?  Is it considered
22 to be an occupation?
23     A.  Some states recognized that the Hashemite
24 Kingdom of Jordan includes both sides of the river.
25 Some were quiet.

31

1      Q.  And in Gaza, the Egyptian Army occupied the
2  area we now call the Gaza Strip?
3      A.  The Gaza Strip came under Egyptian
4  jurisdiction of -- limited jurisdiction.  It wasn't --
5  it was never made part of Egypt.  And at a certain
6  point, they established a legislative council which
7  started issuing legislative instruments that began
8  to change some of the mandatory laws in the Gaza Strip.
9          And -- but the ultimate -- it wasn't an
10 independent state.  I mean, it wasn't independent,
11 and it was still under Egyptian rule of some sort.
12     Q.  I noticed, in your report, that you mentioned
13 that there was some kind of a Jordanian department
14 for dealing with the land of Jewish people who had
15 been living in the West Bank before the 1948 war.
16         What was that entity called?
17     A.  There was a custodian of absentee properties.
18 And property that belonged to the Jewish people who
19 were in -- no longer were in Israel was recognized
20 as absentee property and protected.  They -- they
21 didn't allow anybody to encroach on it.
22     Q.  What was the concept of that, that it would
23 be held in trust until some future time?
24     A.  Yeah.  It would be protected until the end
25 of hostilities.  And I'm not sure if they had any --

32

1  I mean, he was a custodian, a trustee of this property.
2      Q.  And so the -- in this way, despite the fact
3  that there was -- there were hostilities, the property
4  rights of individual civilians were preserved to some
5  extent?
6      A.  I think that's right.
7      Q.  And, I mean, that sounds like something that
8  international law and humanitarian law would require.
9          Do I have that right?
10     A.  Yeah.  I'm not sure exactly what is the --
11 what international law says about this.  But I -- I
12 know that, under Jordanian law, they had this law for --
13 and the custodian for absentee property, which was
14 mainly property of Jewish people.
15     Q.  Was there a similar entity in the Gaza area?
16     A.  I don't know.  I don't know.
17     Q.  What is your understanding under international
18 law of the status of the armistice demarcation line?
19     A.  When my --
20         MR. HILL:  Back in 1967, you mean?
21         MR. YALOWITZ:  No, no.
22     Q.  BY MR. YALOWITZ:  The armistice -- when I
23 say the "armistice demarcation line," you understand
24 what I mean; right?
25     A.  I understand that you are referring to the --

33

1  what was post '48.
2      Q.  And what is your understanding of the status
3  of that line under international law?
4      A.  It -- it was, as far as I know and have read,
5  believed to be the international border of -- of Israel.
6  But I've never looked deep into it.
7      Q.  It's -- it's governed by some treaties; is
8  that right?
9      A.  Well, I -- I haven't looked into it, I must
10  admit.  But I believe that they must have had -- drawn
11  a -- some kind of document on which they said that this
12  is the armistice and maps and so on.  But I've never
13  looked into it.
14     Q.  Fair enough.
15         So let's talk about the Declaration of
16  Principles and the Interim Agreement.
17         Are -- are those different, or are they part
18  of -- considered the same document?
19         Just explain how they fit together.
20     A.  They're usually referred to jointly or
21  collectively as the Oslo Accords.  And the Oslo
22  Accords are constituted of the Declaration of
23  Principles of 1993 and the Interim Agreement of 1995.
24         The first document, the Declaration of
25  Principles, was signed in Washington, DC, with the

                OCTOBER 13, 2013 - RAJA SHEHADEH

34

1  presence of the American president and representatives
2  from both sides, the Palestinian and the Israeli.  And
3  it is exactly that, a declaration of principles that
4  are to guide the -- the Peace Process.  And it begins
5  by referring to the U.N. Resolution 242 and then states
6  very clearly that the two sides have agreed to reach
7  an agreement between them and end the state of war and
8  so on.
9         And then it goes into details regarding
10  how the Palestinian areas are to be governed by the
11  Palestinian Authority and how that authority -- they
12  call it "council" in the Declaration of Principles,
13  the Palestinian council -- who will head the Palestinian
14  council, and not great detail, but some detail, and then
15  how it's going to be elected, regional, operation --
16  economic operation between the two sides, and very
17  specifically those matters which will be outside of
18  the jurisdiction of the Palestinian Authority.  These
19  are Jerusalem, Israelis, settlements, and also a very
20  clear indication that these, including the question
21  of refugees, will be deferred to the final negotiations
22  that will take place between the two sides.
23         And then, in the Declaration of Principles,
24  it also indicates that a full document, which is the
25  Interim Agreement, will be negotiated between the two

                OCTOBER 13, 2013 - RAJA SHEHADEH

35

1  sides, specifying and flushing out all these matters.
2  The Declaration of Principles also includes, very
3  importantly, a document which is attached and made
4  part of the declaration called the Agreed Minutes,
5  which if you read the Declaration of Principles without
6  the Agreed Minutes, you might think there are certain
7  ways of interpreting what is said in the Declaration of
8  Principles.  But then the Agreed Minutes make it clear
9  that there can be no interpretation except this.  And
10  it is specified and spelled out in the Agreed Minutes.
11     Q.  Are there Agreed Minutes also to the Oslo II?
12     A.  I'd rather not say Oslo I, Oslo II.  I'd
13  rather say the Declaration of Principles of 1993 and
14  the Interim Agreement of 1995.  Because in between
15  there was another document, which was the 1994, which
16  then was replaced by the Interim Agreement of '95.
17     Q.  Let me rephrase the question, then, in
18  deference to your preference.
19         Are there Agreed Minutes to the Interim
20  Agreement of 1995?
21     A.  There are no Agreed Minutes for the Interim
22  Agreement of 1995.
23     Q.  And is there a -- is there a place in the
24  Interim Agreement of 1995 that discusses what -- which
25  document governs in the event of a conflict between

                OCTOBER 13, 2013 - RAJA SHEHADEH

36

1  the two?
2      A.  Yes, there are.  Well, yeah, the Interim
3  Agreement is an agreement, which is rather lengthy,
4  and annexes.  And one of the annexes is called legal
5  assistance, which is Annex IV, I believe, which is
6  legal assistance.  And it spells out the jurisdiction
7  of each side in criminal and civil matters and specifies
8  exactly who would have jurisdiction and when in -- in
9  case of conflict.
10     Q.  So I guess I have a little narrower question,
11  which is:  It strikes me that the Interim Agreement of
12  1995 supersedes the Declaration of Principles.
13         Is that correct or is that incorrect?
14     A.  That is incorrect.  The Interim Agreement
15  was referred to in the Declaration of Principles.
16         And the Declaration of Principles made very
17  clear that there would be negotiations for an Interim
18  Agreement that would make much more elaborate details
19  about the running and -- and the composition and the
20  jurisdiction and all matters related to the Palestinian
21  Authority and to the relationship between the two sides.
22     Q.  So let's just put the two documents before us,
23  and then we can go over them a little bit.  So we'll
24  mark as 102 a copy of the Israel-Palestine Liberation
25  Organization Agreement of 1993.  And then we'll mark

                OCTOBER 13, 2013 - RAJA SHEHADEH

37

1   as 103 the Israeli-Palestinian Interim Agreement on
2   the West Bank and the Gaza Strip of 1995, without its
3   annexes.
4       A.   Sorry.  What's the first document?
5       Q.   I think it's the Declaration of Principles,
6   but we'll look together.  I hope it is.
7            (Plaintiffs' Exhibit 102 and Exhibit 103
8   marked.)
9            MR. HILL:  Kent, just for the record, these
10  are not from the -- from the U.N.  These are, I guess,
11  secondary reproductions of the agreements.
12           But you're representing that these are the
13  full and accurate texts of the agreements?
14           MR. YALOWITZ:  I hope so.
15           MR. HILL:  Okay.
16           MR. YALOWITZ:  I can't honestly say I've
17  checked them.  But they appear to be authentic.  If
18  it turns out that there's an error, we'll figure that
19  out and get it straightened out.  Wouldn't do me much
20  good if there is, but that's the way it goes sometimes.
21           THE WITNESS:  (Examining.)  These are
22  incomplete.
23       Q.   BY MR. YALOWITZ:  So let's just look at 102
24  together.
25       A.   Uh-huh.

                OCTOBER 13, 2013 - RAJA SHEHADEH

38

1       Q.   And 102 -- what is 102?
2       A.   It seems to be the Declaration of Principles
3   of 1993.  But I think --
4       Q.   And as you've mentioned, it's -- you've
5   mentioned that it's incomplete.
6            What is missing?
7       A.   Well, it's missing the annexes which are
8   about the economic operation and regional and various
9   other matters that they agreed would happen.  And it's
10  missing the Agreed Minutes, which are a very important
11  part of it.
12      Q.   So you would identify 102 as a portion of
13  the 1993 Declaration of Principles?
14      A.   Yeah.  I would -- I would consider it as
15  a portion of the Declaration of Principles of 1993.
16      Q.   All right.  And then what is 103?
17      A.   103 appears to be the Interim Agreement of
18  1995.  But, again, it is incomplete because the full
19  agreement includes the annexes, which are a very
20  important part of the agreement.
21      Q.   And I think they're seven annexes.
22           Is that right?
23      A.   I believe so.  Yeah.
24      Q.   And then some maps as well, which are not
25  included in the exhibit?

                OCTOBER 13, 2013 - RAJA SHEHADEH

39

1       A.   Yeah.
2       Q.   So -- so you would identify 103 also as --
3   well, let me strike that and ask again.
4            So you would identify 103 as a portion of
5   the Israeli-Palestinian Interim Agreement on the West
6   Bank and the Gaza Strip?
7       A.   Yeah.  I would -- I would refer to it as an
8   incomplete agree -- section of the Interim Agreement
9   of 1995.
10      Q.   And -- and in addition to the annexes and
11  the maps, is there anything else that you would include
12  as part of that agreement?
13      A.   No.  No.  Just the annexes and the maps.
14      Q.   So could we look together at the -- well,
15  let me ask you this.  Strike the question.
16           Is -- is there anything in the 1995 Interim
17  Agreement that -- that references the 1993 Declaration
18  of Principles?
19      A.   I would think there would be in the preamble.
20      Q.   So it appears in the first page of the --
21  of 103; is that right?
22      A.   Yeah.  No, it's on page 2:
23           "Desirous of putting into effect the
24  Declaration of Principles on interim self-government"
25  agreements "signed" in "Washington, DC, on September 13,

                OCTOBER 13, 2013 - RAJA SHEHADEH

40

1   1993, and the Agreed Minutes."  (As read.)
2       Q.   I see.  Okay.
3            Now, do the 1993 Declaration of Principles
4   designate Areas A, B, and C, or was that a convention
5   of the 1995 agreement?
6       A.   If my memory is correct, it's a 1995 matter.
7       Q.   And do you have a general understanding
8   of the -- some of the larger cities that are in the
9   Area A designated lands?
10      A.   What do you mean by "understanding"?
11      Q.   So what -- what cities were in Area A?
12      A.   Well, if I remember correctly, it was Hebron,
13  Ramallah, Nablus, Bethlehem, Jericho, and Jenin.  These
14  come to mind.  But I'm -- there -- there might be more.
15      Q.   Gaza City?
16      A.   Oh.  No.  Well, in -- the Area A, B, and C
17  were mainly in the West Bank.  In -- in the Gaza Strip,
18  they confined the division to specifically those areas
19  where the Jewish settlements were established.  And the
20  rest was not divided into A, B, and C as in the West
21  Bank.
22      Q.   What -- what was the legal status of the
23  non-settlement areas in the Gaza Strip?
24      A.   They were under the Palestinian Authority.
25      Q.   The same as Area A or the same as Area B?

                OCTOBER 13, 2013 - RAJA SHEHADEH

41

1    A.   I imagine -- I never looked into it to be
2  honest.  But I -- I imagine the same as Area A.
3    Q.   The -- the cities you named, those are the
4  largest cities in the -- in the West Bank?
5    A.   That's right, yeah.  They are the largest
6  cities.
7    Q.   And what was the difference between the --
8  the control available to the PA in Area A and the
9  control available to the PA in Area B?
10    A.   Well, it's specified very clearly in the
11  Interim Agreement.  The Interim Agreement divided or
12  distinguished three levels of jurisdiction, territorial
13  jurisdiction, functional jurisdiction, and personal
14  jurisdiction.
15         And the Palestinian Authority had territorial
16  jurisdiction only in Area A, functional jurisdiction
17  in Area B, shared with the Israelis, and in Area C,
18  only personal jurisdiction over the Palestinians.
19    Q.   There's something I noticed in Annex IV
20  about what they call security crimes, that Israel
21  reserved jurisdiction over security crimes, for the
22  criminal prosecution of security crimes.
23         Do I have that right?
24    A.   In -- from the beginning, from the Declaration
25  of Principles, Israel reserved its jurisdiction over

OCTOBER 13, 2013 - RAJA SHEHADEH

42

1  anything to do with security.  So yeah.  And -- and --
2  and that has been carried through consistently all --
3  following.
4    Q.   With -- with the exception of security crimes,
5  did the PA have personal jurisdiction over Palestinian
6  individuals extraterritorially?
7         MR. HILL:  Objection.  Vague.
8         You can go ahead and answer.
9         THE WITNESS:  What do you mean
10  "extraterritorial"?
11    Q.   BY MR. YALOWITZ:  So, for example, if
12  you're an American citizen and you live here in
13  Jerusalem, say, the United States still exercises
14  jurisdiction over you.  You're required to pay
15  taxes, for example.  That's extraterritorial
16  jurisdiction.
17    A.   Yeah, I understand "extraterritorial."  But
18  in -- in the context of this --
19    Q.   So did the --
20    A.   -- where is the extraterritorial?
21    Q.   You mentioned personal jurisdiction over --
22    A.   No.  Personal jurisdiction means over matters
23  such as personal status.
24    Q.   I see.
25    A.   That's -- that's what it means.

OCTOBER 13, 2013 - RAJA SHEHADEH

43

1    Q.   Matters of marriage or land ownership?
2    A.   Not land ownership.  Matters of marriage.
3    Q.   Marriage?
4    A.   Divorce.
5    Q.   Inheritance?
6    A.   Inheritance.  Yeah.
7    Q.   What we might call family law?
8    A.   What you would call family law.  That's right.
9    Q.   Now -- and what is -- what is territorial
10  jurisdiction?
11    A.   Territorial jurisdiction meant that -- well,
12  we can look it up here exactly what it means.
13         (Examining.)  It's in Article XVII.
14  Chapter 3, Article XVII.
15    Q.   I see it.
16    A.   (Reading.)
17         "Accordingly, the authority of the
18  council encompasses all matters that fall within
19  its territorial, functional, and personal jurisdiction
20  as follows:"
21         "The territorial jurisdiction of the council
22  shall encompass ... except for the settlements" ...
23  (As read.)
24         "Territorial jurisdiction includes land,
25  subsoil, and territorial waters, in accordance with

OCTOBER 13, 2013 - RAJA SHEHADEH

44

1  the provisions of this agreement."
2    Q.   I see.  So what -- what does that -- what --
3  what does that mean -- how do you explain that to, say,
4  an American lawyer?  What does -- what does territorial
5  jurisdiction encompass?
6    A.   In other words, the courts would have
7  jurisdiction over any matter that took place, whether
8  civil or criminal, in the area of the -- in -- in the
9  area which -- on which -- over which the Palestinian
10  Authority has territorial jurisdiction.  They can --
11  the Palestinian Authority police can function fully
12  and with uniforms in the Palestinian area under their
13  jurisdiction -- territorial jurisdiction, which is
14  Area A.  The -- the -- I think at -- at some point
15  also -- yeah.  And -- and -- and they -- they don't
16  have the power outside of the area under their
17  territorial jurisdiction to -- to exercise jurisdiction.
18    Q.   So --
19    A.   But -- but also there were exceptions in the
20  Annex IV, on the legal assistance it was called, as
21  to how the jurisdiction is -- is divided between the
22  two sides.  But in all cases, territorial jurisdiction
23  does not mean jurisdiction over Israelis or settlers.
24    Q.   So let me make sure I do it methodically here,
25  lawyer like.

OCTOBER 13, 2013 - RAJA SHEHADEH

45

```
 1        First of all, the Interim Agreement refers
 2   to something called the "council."  Do I have that
 3   right?
 4        A.   Yeah.  Which later became the Palestinian
 5   Authority.
 6        Q.   And -- and -- and I think it even says that --
 7   that, before the council is established, the Palestinian
 8   Authority will -- there's some definition that says
 9   the council -- Palestinian Authority shall be deemed
10   the council for purposes of this agreement or something
11   like that.
12        Do you recall that?
13        A.   There might be.
14        Q.   I thought I read it in your report.
15        Article I, Section 2, do you have that?
16        A.   In the -- in the --
17        "Pending the inauguration of the council,
18   the powers and responsibilities transferred to
19   the council shall be exercised by the Palestinian
20   Authority."
21        Yeah.
22        Q.   So anywhere it says the "council" in the
23   Interim Agreement, we read that as a reference to
24   the Palestinian Authority?
25        A.   That's right.
```

OCTOBER 13, 2013 - RAJA SHEHADEH

46

```
 1        Q.   And -- and do I have it right that the
 2   Palestinian Authority has all the rights, liabilities,
 3   and obligations to be assumed by the council under
 4   the Interim Agreement of 1995?
 5        A.   That's right.  That's right.
 6        Q.   Now, within the Area A territory -- I guess
 7   they call it the "territory"; right?
 8        The agreement calls Area A and the Gaza Strip,
 9   other than settlements and military, the agreement calls
10   that the "territory"?
11        A.   I don't remember.  But let's call it Area A.
12        Q.   Okay.  So when we -- our convention will
13   be that, when we refer to Area A, we're including
14   Gaza City and other portions of the Gaza territory
15   that were treated as if -- they were treated, for
16   legal purposes, the same as they were in Area A.
17        Does that sound right to you?
18        A.   That sounds right.
19        Q.   Okay.  Now, the -- you mentioned that there
20   were Palestinian courts that could hear cases, both
21   civil and criminal; is that right?
22        A.   That's right.
23        Q.   Okay.  And then there was a legislature that
24   could enact laws that would govern matters within the
25   jurisdiction of the territory; is that right?
```

OCTOBER 13, 2013 - RAJA SHEHADEH

47

```
 1        A.   That is right.  But we have to keep in
 2   mind the restrictions that the Oslo Accords in both
 3   cases, in -- in -- in both documents, placed on the
 4   legislative powers of the Palestinian Legislative
 5   Council.
 6        Q.   So -- so within the -- what's the word that
 7   they use?  Within the -- within the rights, liabilities,
 8   and obligations assigned by the Interim Agreement, the
 9   legislature had the power to enact laws?
10        A.   That's right.
11        Q.   And then there was a president who would
12   function as the chief executive for the relevant
13   territory?
14        A.   That's right.
15        Q.   And, again, within the rights, liabilities,
16   and obligations assigned and assumed under the 1995
17   agreement, the president had what we might call
18   classical executive powers?
19        MR. HILL:  Objection.  Vague.
20        Go ahead.  You can answer.
21        THE WITNESS:  No.  We cannot say classical,
22   because it's very unclassical, very particular, very
23   specific, very limited, and limited by the terms of
24   the agreement.
25        Q.   BY MR. YALOWITZ:  So the -- the agreement
```

OCTOBER 13, 2013 - RAJA SHEHADEH

48

```
 1   calls for a Palestinian police force; is that right?
 2        A.   It called -- it calls for a Palestinian
 3   police but restricts the powers of the police both
 4   territorially and in terms of who the police can
 5   monitor and express their powers over.
 6        Q.   So it calls for police but limits their
 7   operations territorially and in persona; is that right?
 8        A.   That is right.  Because, in all cases, nothing
 9   in the agreement allowed for what is accepted from the
10   agreement.  The exceptions override anything, including
11   the Palestinian police.  But -- but then there are other
12   specific instances where the -- the -- Annex II, these
13   were the question of the police and the powers of the
14   police, Annex II of the Interim Agreement.
15        Q.   The police included a naval force; is that
16   right?  A coast guard?
17        A.   A naval force?
18        Q.   Yeah.
19        A.   That I don't know.  I'm sorry.
20        Q.   A maritime police, you don't recall?
21        A.   I don't -- I don't know.
22        Q.   It included -- I think there's a list in
23   Annex II of the divisions of the police force.
24        Is that right?
25        A.   That's right probably.
```

OCTOBER 13, 2013 - RAJA SHEHADEH

49

```
 1    Q.   What was Force 17?
 2    A.   That I don't know.
 3    Q.   Did the PA establish a professional
 4  prosecutor's office for crimes?
 5         MR. HILL: Objection. Vague.
 6         Go ahead.
 7         THE WITNESS:  The -- PA took over from
 8  the organization of the judiciary that was in place
 9  under the Israeli occupation.  And under that system,
10  there was a prosecutor's office.  So that -- that was
11  continued.
12    Q.   BY MR. YALOWITZ:  And what is the prosecutor's
13  office -- who's in charge of the prosecutor's office?
14    A.   A Palestinian.
15    Q.   No, I mean, is it -- what's the title of
16  the -- of the office?  Is it like Attorney General or --
17  you know, there must be something like that.
18    A.   Prosecutor's office.  The prosecutor's office.
19    Q.   Is that an elected position or an appointed
20  position?
21    A.   No.  That's an appointed position.
22    Q.   Who makes the appointment?
23    A.   I'm not sure to be honest.
24    Q.   Somebody within the PA government?
25    A.   Yeah.  There is a structure.  Yeah.  There
```

OCTOBER 13, 2013 - RAJA SHEHADEH

51

```
 1    A.   That's right.  There are prisons that are
 2  in the West Bank, which Israel manages, and area --
 3  and prisons in Area A, which the Palestinian Authority
 4  manages.
 5    Q.   And what's the purpose of having prisons in
 6  Area A?
 7    A.   For criminal matters.
 8    Q.   Does the PA have the authority to confiscate
 9  contraband?
10         MR. HILL: Objection.  Vague.
11         You can answer.
12         THE WITNESS:  In -- if -- if -- if found in
13  Area A, yeah, they have.
14    Q.   BY MR. YALOWITZ:  And the PA has the authority
15  to investigate crimes within Area A?
16    A.   That's right.  They can investigate crimes
17  in Area A.
18    Q.   And they -- the PA has a preventative
19  intelligence group within Area A; is that right?
20         MR. HILL: Objection.  Vague.
21         You can respond.
22         THE WITNESS:  I don't know exactly how the
23  intelligence works.  But I -- I would expect they
24  might -- I don't know.  This is not something I've
25  looked into.
```

OCTOBER 13, 2013 - RAJA SHEHADEH

50

```
 1  is a structure.
 2    Q.   It's not appointed by Israel?  It's appointed
 3  by the PA?
 4    A.   Yeah.  It's appointed by the PA.  Certainly.
 5    Q.   The PA took over prisons that were preexisting
 6  as well; is that right?
 7    A.   Some prisons.  It took over some prisons that
 8  were preexisting if -- if they fell within Area A.  So
 9  it's a limited number.
10    Q.   Where were the prisons that the PA took over?
11  Do you know?
12    A.   Well, for example, the prison in Ramallah
13  they took over before it was destroyed, bombed.  They
14  took over a prison near Nablus called Jneid.  Every
15  city had a prison.  So I suppose they took over prisons
16  in the cities.  But there were other prisons around,
17  outside of Area A that they didn't take over.
18    Q.   Prisons that continued to be run by the
19  Israeli government?
20    A.   That's right.  Or -- or some that were since
21  established by the Israeli government.
22    Q.   And so today there -- there are prisons
23  outside of Area A that the Israeli government manages,
24  and there are prisons inside of Area A that the PA
25  manages?
```

OCTOBER 13, 2013 - RAJA SHEHADEH

52

```
 1    Q.   BY MR. YALOWITZ:  The -- the PA has social
 2  welfare departments; is that right?
 3    A.   They have a social welfare department,
 4  which -- which they inherited from the Israeli
 5  authority -- occupation.
 6    Q.   And there is also -- there are certain
 7  departments that they inherited from the PLO; is
 8  that right?
 9    A.   Not in -- as far as I know, not in the
10  occupied territories.  No.
11    Q.   Are you familiar with something called the
12  Welfare Fund for Families of the Shahid and Wounded?
13    A.   I'm not familiar.
14    Q.   Do you -- do you know what the percentage
15  of land area in the -- in the West Bank is Area A?
16    A.   I'm not sure exactly.  But it's very small,
17  something like 1.1 percent, something like that.
18    Q.   And do you know what the percentage of
19  population of Palestinian people who live in the West
20  Bank live in Area A?
21    A.   I don't know for sure.  No.
22         But in the West Bank, there are large numbers
23  of villages spread all over.  And it's not as urbanized,
24  and -- and cities have not attracted all the people.
25  Because the West Bank is a small area and so people
```

OCTOBER 13, 2013 - RAJA SHEHADEH

53

1  live in villages and continue to live in villages.
2  So I'm not sure, but -- I'm not sure.
3      Q.  And the -- the villages, are those Area B
4  or Area C or --
5      A.  Both.  Mainly in Area B.  But there are some
6  villages in Area C as well.
7      Q.  And when I say "villages," I mean villages
8  where Palestinian citizens live.
9      A.  Palestinian villages.  Yeah.
10     Q.  Now, the powers of the police in -- within
11  Area A, with regard to Palestinian citizens, include
12  the power to make arrests?
13     A.  That's right.
14         MR. HILL:  Let me just lodge an objection
15  to the term "Palestinian citizens."  I'm not sure what
16  you mean by that.  I think it's vague.
17         But please respond.
18         MR. YALOWITZ:  Sure.  Is there -- that's a --
19  perhaps a fair objection.  Let me probe around it a
20  little bit before we go to that line.
21     Q.  BY MR. YALOWITZ:  Is there a concept of
22  Palestinian citizenship?
23     A.  Well, we say "Palestinian residents" because
24  it isn't a state yet.  So we say "Palestinian
25  residents."

                OCTOBER 13, 2013 - RAJA SHEHADEH

54

1      Q.  So why don't I use that term.  I'll be
2  guided by you in this regard.
3         So within Area A and with regard to
4  Palestinian residents, do the police have the power
5  to make arrests?
6      A.  They have the power to make arrests in the
7  areas in which they can function.  So in -- in most
8  cities, they can function in all parts of the cities,
9  but not in all cities.  So, for example, in Hebron,
10  they cannot function in parts of Hebron.  And so
11  they cannot make arrests there.
12     Q.  Well, Hebron seems complicated to me.
13  So let's leave Hebron out of Area A.
14     A.  Yeah, but it's another Palestinian city.
15     Q.  It's something of a special case; is that
16  true?
17     A.  Well, it's only -- I mean, it's -- it's
18  one of the Palestinian cities which is under Area A,
19  although parts of it are not.
20     Q.  So when I say "within Area A," I guess the
21  parts of Hebron that are not in Area A are automatically
22  excluded.  So we can discuss it in those terms.
23         So within Area A and with regard to
24  Palestinian residents, the Palestinian police have
25  the power to make arrests; is that right?

                OCTOBER 13, 2013 - RAJA SHEHADEH

55

1      A.  Yes.  That is right.
2         But, again, I must say that it's complicated
3  by the fact that the police cannot go after people whom
4  they want to arrest if these people go to areas that the
5  Palestinian police have no jurisdiction to act within.
6  So this has given the police hardships.  Because, if
7  they go to areas that the police cannot function in,
8  the police cannot go after them.
9      Q.  So -- so is there any limit on the kinds
10  of crimes that an arrest can be made of a Palestinian
11  resident within Area A by the Palestinian police?
12     A.  Well, the kind of offenses -- criminal
13  offenses are in the criminal law that is enforced
14  in the Palestinian Authority.
15     Q.  So let me ask -- I'm not sure that answers
16  the question.  I guess it's -- it's a fair limitation.
17         Is the -- is the -- is there -- are there
18  provisions of Palestinian criminal law that forbid
19  acts of violence against civilians?
20     A.  Of course.
21     Q.  And are those laws limited to Palestinians,
22  or do the laws also forbid acts of violence against
23  non-Palestinians?
24     A.  The -- the law would say "acts of violence."
25  They would not say against whom.  They would say "acts

                OCTOBER 13, 2013 - RAJA SHEHADEH

56

1  of violence."
2      Q.  And so the Palestinian police have the power
3  within Area A to make arrests of Palestinian residents
4  who are suspected of committing crimes of violence?
5         Is that fair to say?
6      A.  That's right.
7      Q.  And they have the -- the Palestinian police,
8  within that territory, have the power to interrogate
9  Palestinian residents who are suspected of acts of
10  violence?
11     A.  That's right.
12     Q.  And the Palestinian police have the power
13  within Area A to detain Palestinian residents who are
14  suspected of acts of violence?
15     A.  That's right.
16     Q.  And they have the power -- the Palestinian
17  Authority has the power within Area A to prosecute
18  Palestinian residents who are accused of committing
19  acts of violence; is that right?
20     A.  That's right.
21     Q.  And then, if those people are convicted,
22  the Palestinian Authority has the power to incarcerate
23  those Palestinian residents for committing acts of
24  violence if they're convicted?
25     A.  That's right.

                OCTOBER 13, 2013 - RAJA SHEHADEH

57

```
 1        Q.   And does -- does Palestinian law give the
 2  Palestinian Authority the power to detain individuals
 3  suspected of acts of violence, Palestinian residents,
 4  for a period of time within bringing them to trial?
 5        A.   No.  They have to be brought to trial.
 6        Q.   Do they -- is there a speedy trial clock?
 7        Do you know what that means --
 8        A.   I'm not familiar with criminal law.  I'm --
 9  I'm not.  I've never practiced in criminal law.  I'm
10  not familiar with the details of the criminal law.
11        Q.   Did -- does the Palestinian -- do you know
12  whether the Palestinian law permits the Palestinian
13  police to question Palestinian residents before they
14  obtain a lawyer?
15        A.   I'm not sure to tell you the truth.  I'm
16  not -- I'm not familiar with the details of criminal
17  law.
18        Q.   And just to come back to my line --
19        A.   The right to have a lawyer is enshrined in
20  the basic law.
21        Q.   And does -- does the -- does the PA pay for
22  a lawyer for the accused if the accused can't afford
23  to hire one?
24        A.   I'm not familiar with the procedure.
25        Q.   We have that.
```

OCTOBER 13, 2013 - RAJA SHEHADEH

58

```
 1        A.   I know.
 2        Q.   Just to come back to my line of questioning
 3  before about Palestinian police and prosecutors, do
 4  Palestinian police have the authority within Area A
 5  to confiscate illegal weapons of any kind?
 6        A.   Yes, they do.
 7        Q.   Do you know what the PA's Ministry of
 8  Information is?
 9        A.   I know there is a Ministry of Information.
10  But I don't know anything about the function.
11        Q.   Do you know what the Ministry of Prisoners
12  and Released Prisoners does?
13        A.   Again, I'm not familiar with it.
14        Q.   Do you know whether there are PA-owned media
15  in the West Bank?
16        A.   I don't know.  I don't know.
17        Q.   So --
18        MR. HILL:  Kent, we've been going about an
19  hour and a half.
20        MR. YALOWITZ:  Oh, this would be a good
21  time --
22        MR. HILL:  Brenda needs a break.
23        MR. YALOWITZ:  -- for me to take a break.
24  Let's take a break.
25        MR. HILL:  Okay.
```

OCTOBER 13, 2013 - RAJA SHEHADEH

59

```
 1        (Recess from 11:04 a.m. to 11:16 a.m.,
 2    after which Ms. Weiser was not present.)
 3        Q.   BY MR. YALOWITZ:  Could you look with me
 4  at Plaintiffs' 103?  Do you -- and if you could turn
 5  to Article XIX.
 6        A.   Uh-huh.
 7        Q.   Would you agree with me that Article XIX
 8  imposes an obligation on both Israel and the PA to
 9  exercise their powers and responsibilities pursuant to
10  the Interim Agreement with due regard to internationally
11  accepted norms and principles of human rights and the
12  rule of law?
13        A.   I agree it does impose that obligation.
14        Q.   And would you agree with me that, even without
15  Article XIX, both Israel and the PA have the obligation
16  to exercise their powers and responsibilities with due
17  regard to internationally accepted norms and principles
18  of human rights and the rule of law?
19        A.   Absolutely, I do.
20        But I also must say that it has not fulfilled
21  this obligation by simply -- or -- or the possibility
22  of fulfilling that obligation is not secured by stating,
23  in so many words, that the two sides have to observe
24  that principle.  Because that principle certainly
25  of the rule of law and of human rights requires the
```

OCTOBER 13, 2013 - RAJA SHEHADEH

60

```
 1  ability of the sides -- the conditions should allow
 2  for that possibility of fulfilling the rule of law.
 3        So the PA -- let's leave Israel aside now,
 4  which also does not observe the rule of law or -- or
 5  the international law of human rights.  But let's --
 6  leaving that aside, the PA in the way it was structured
 7  and the limitations that was put on it, I don't see
 8  how it could have observed, in a meaningful sense,
 9  human rights and the -- the rule of law.
10        Q.   Is it -- is it your opinion that the PA
11  failed to observe internationally accepted norms and
12  principles of human rights and the rule of law?
13        MR. HILL:  Objection.  Vague.
14        THE WITNESS:  Yeah, this is impossible to --
15  to give a judgment.  But I can safely say that the
16  way the situation, both legal and territorial, was
17  and -- and -- and the terms of the agreement itself --
18  hampered the PA in serious and fundamental ways in --
19  in observing the rule of law and in human rights
20  principles.
21        Because if somebody is arrest -- has
22  committed a crime and runs and takes refuge in an
23  area not under the Palestinian Authority, then they
24  are unable to pursue that person -- criminal.  So in
25  order to -- to have the ability to make criminals pay
```

OCTOBER 13, 2013 - RAJA SHEHADEH

61

1  for their actions, they must have jurisdiction that
2  enables them to fulfill this.  And they don't.
3      Q.  BY MR. YALOWITZ:  So what do you think was
4  the purpose of including Article XIX in the Interim
5  Agreement?
6      A.  I -- I think Israel and the PA wanted to
7  show the world that they will observe these principles.
8  And it's the declaratory thing that sounds good.  And
9  I think to -- to make it real, to make -- I mean, it's
10  very difficult to -- the occupation continued after the
11  Interim Agreement.  And the occupation and rule of law
12  are incompatible in many regards.
13      Q.  So do you think that they included this and
14  didn't mean it?
15      A.  I have no idea why they included it.  I
16  wasn't privy to the negotiations.  And I don't know
17  why they included it.
18      Q.  Did -- was -- was it understood in the
19  Interim Agreement that the occupation would continue
20  for a period of time until a final agreement was
21  reached?
22      A.  I don't think they went into that.  But
23  there are no jurists and human rights organizations
24  that consider that, with the Interim Agreement, the
25  occupation ended.

OCTOBER 13, 2013 - RAJA SHEHADEH

62

1      Q.  And I think that certainly the Interim
2  Agreement contemplated continued military presence
3  in the West Bank; right?
4      A.  Certainly.  That's right.
5      Q.  And -- and the Interim Agreement contemplated
6  continued civilian population of Israel living in the
7  West Bank for a period of time; correct?
8      A.  That's right.
9      Q.  And -- and so those things were not only
10  well understood, but actually written out in the
11  agreement; right?
12      A.  That's right.
13      I think one has to say that -- and understand
14  that the Oslo Accords were a process, the Oslo process.
15  And that process had many stages.  And the first stage
16  was to create a Palestinian Authority, to create the
17  first agreement, Interim Agreement.  And then -- and
18  then it would be followed by further negotiations and
19  withdrawals from the -- by the Army.  Well, they didn't
20  call them withdrawals.  They called them redeployment.
21      And as far as the Palestinians were concerned,
22  they assumed all along that this is a first step towards
23  a process that will lead to an independent Palestinian
24  state in the West Bank and the Gaza Strip.
25      Q.  Now, you would agree with me that

OCTOBER 13, 2013 - RAJA SHEHADEH

63

1  international law forbids indiscriminate violence
2  against civilians; is that right?
3      MR. HILL:  Objection.  Vague.
4      Go ahead.
5      Q.  BY MR. YALOWITZ:  You can answer.
6      A.  I -- I -- which civilians do you mean?
7      Q.  Sure.  So let's be a little more particular.
8      You mentioned before the 1977 additional
9  protocols to the Geneva Convention?
10      A.  Uh-huh.
11      Q.  That governs hostilities of national
12  liberation; is that correct?
13      A.  Uh-huh.
14      Q.  You have to say "yes."
15      A.  Yes.
16      Q.  Or "no."  I mean, you can say whatever you
17  want.  But you have to give a verbal response.
18      But it's "yes"?
19      A.  Yes.
20      Q.  And representatives of the PLO attended that
21  conference; right?
22      A.  I don't know.
23      Q.  And do you know whether the PLO has --
24  has indicated its commitment to abide by the 1977
25  additional protocols to the Geneva Convention?

OCTOBER 13, 2013 - RAJA SHEHADEH

64

1      A.  I never looked into it.  I don't know.
2      Q.  Do you think that the 1977 additional
3  protocols to the Geneva Convention are the kind of
4  accepted norms and principles of human rights that
5  the parties were referring to in Article XIX of the
6  Interim Agreement?
7      MR. HILL:  Objection.  Lack of foundation.
8      You can respond.
9      THE WITNESS:  I don't know.  I don't know.
10  I wasn't part of that negotiation.  I don't know what
11  they had in mind.
12      Q.  BY MR. YALOWITZ:  Right.  I understand you
13  weren't part of the negotiations.  But you're here as
14  an expert on matters of international law; isn't that
15  right?
16      A.  Well, I mean, within my abilities and --
17  I mean --
18      Q.  Didn't we go over, at the beginning, how you
19  were very familiar with human rights law, and we talked
20  about different sources and things like that?
21      A.  Yeah.  But you're asking about whether this
22  article was put with a view of something.  And that is
23  intention, which I am not privy to know whether this
24  was their intention or -- or not.
25      Q.  Well, how do you think a reasonable person

OCTOBER 13, 2013 - RAJA SHEHADEH

65

1    reading this agreement would view it?
2         MR. HILL:  Objection.  Vague.
3         Go ahead and respond.
4         THE WITNESS:  Would -- a reasonable person
5    would feel about what?
6         Q.   BY MR. YALOWITZ:  So let me ask the
7    question.
8         Looking at Article XIX, as an expert on
9    international human rights law, understanding you
10   weren't present when the parties included it, would --
11   is it your understanding that one of the internationally
12   accepted norms and principles of human rights and the
13   rule of law is the 1977 additional protocols to the
14   Geneva Convention?
15        A.   Yeah.  I'm -- I'm sure they -- they meant
16   to -- to observe the rule of law and -- and human
17   rights principles.
18        And the -- the question that I have is
19   whether the agreement -- I mean, it's one thing to
20   declare "we want to" and another whether the agreement
21   and the reality that the agreement created allowed for
22   the -- these principles to be observed.
23        Q.   The answer is that one of the internationally
24   recognized norms of human rights and the rule of law is
25   the 1977 additional protocols to the Geneva Convention;

                OCTOBER 13, 2013 - RAJA SHEHADEH

66

1    correct?
2         A.   Correct.
3         Q.   And the Geneva Convention, in Article 52 [sic]
4    of the Additional Protocol I, provides that:
5             "The civilian population as such, as well as
6    individual citizens, shall not be the object of attack.
7    Acts or threats of violence, the primary purpose of
8    which is to spread terror among the civilian population,
9    are prohibited."
10        Are you familiar with that provision?
11        A.   I am familiar with that provision.  But you
12   must realize that the Geneva Convention of 1949 and --
13   and international law in general does not allow for
14   the occupying power to place its own citizens in the
15   occupied territories.  So when they say "protect the
16   citizens and the civilians," they -- they cannot mean
17   civilians who are placed by the occupying authority
18   in the occupied territories.
19        Q.   So is it your position, as an expert on
20   international law, that civilians who live in the
21   occupied territories are not protected by Article 51.2
22   of Additional Protocol I to the Geneva Convention?
23        MR. HILL:  Objection.  Vague.
24        Go ahead.
25        THE WITNESS:  I think that the citizens --

                OCTOBER 13, 2013 - RAJA SHEHADEH

67

1    Israeli citizens placed in the occupied territories
2    have been -- they're in violation of the international
3    law and, in specific, of the Fourth Geneva Convention.
4         Q.   BY MR. YALOWITZ:  Let -- let's assume, for
5    purposes of my question, that that's correct.
6         So assuming that the settlements in the
7    West Bank violate the Fourth Geneva Convention, do
8    you think that -- and, by the way, that -- that is a --
9    is it your understanding of international law that --
10   that the Fourth Geneva Convention operates on civilians
11   or operates on governments?
12        A.   It operates on both levels.
13        Q.   So -- so do you think that a civil -- your
14   understanding of international law is that a person
15   who is not in the Armed Services, say, a seven-year-old
16   child who lives in the West Bank, relinquishes his
17   rights under Article 51.2 of Additional Protocol I?
18        MR. HILL:  Objection.  Vague.
19        You can respond.
20        THE WITNESS:  I think that Israel took no
21   chance in leaving the protection of its citizens who
22   are settling in the occupied territories under the
23   protection of the Palestinian Authority that -- that
24   they helped establish by these agreements.
25        And they made every effort, in very clear

                OCTOBER 13, 2013 - RAJA SHEHADEH

68

1    terms, in all the agreements, at every point, repeated
2    over and over, that the security of Israeli citizens
3    are under responsibility of the Israeli government.
4    So that's the main thing.  And that's been repeated
5    over and over and over.  Israel did not take any
6    chance in -- in keeping its citizens under security
7    of the Palestinian Authority.
8         Q.   BY MR. YALOWITZ:  So -- so my question was
9    not about Israel.
10        My question was about our seven-year-old boy
11   who lives in the territories.  Has he relinquished
12   his rights under the Geneva Convention to be free of
13   threats and acts of terrorism?
14        MR. HILL:  Objection.  Vague.
15        Go ahead.
16        THE WITNESS:  He by being -- well, he isn't
17   a person who -- who decides.  But his family, by placing
18   him in the occupied territories, are placing him in --
19   illegally in a place where they should not be.
20        Q.   BY MR. YALOWITZ:  I'm afraid you still
21   haven't answered my question.  So let me ask it one
22   more time.  Let me try it a little different way.
23        The question is:  Does the Geneva Convention
24   Article 52 -- I'm sorry -- Article 51 of Additional
25   Protocol I apply to civilians living in the West Bank?

                OCTOBER 13, 2013 - RAJA SHEHADEH

69

```
 1          MR. HILL:  Objection.  Vague.
 2          Go ahead.
 3          THE WITNESS:  I don't think the Geneva
 4   Convention apply -- related to -- I mean, we have to
 5   read it in terms of the principles.
 6          And the principle that is clearly enunciated
 7   in the Fourth Geneva Convention is that placing citizens
 8   of the occupied -- occupying power in the occupied
 9   territories is illegal.
10          Now, every person, regardless of his status,
11   has the right to life and right to -- to being free
12   from violence.  So, in that sense, a seven-year-old
13   has the freedom -- has the right to be protected.  Yes.
14          Q.  BY MR. YALOWITZ:  So I'm -- I'm going to
15   read you a statement, and I'm going to ask you if
16   you agree with it or disagree with it.
17          "Under international humanitarian law, a
18   failure by one party to a conflict to respect the laws
19   of war does not relieve the other of its obligation
20   to respect those laws."
21          Do you agree with that?
22          A.  Read it again.
23          Q.  (Reading.)
24          "Under international humanitarian law, a
25   failure by one party to a conflict to respect the laws
                OCTOBER 13, 2013 - RAJA SHEHADEH
```

70

```
 1   of war, does not relieve the other of its obligation
 2   to respect those laws."
 3          A.  I agree.
 4          Q.  I'm going to read you another statement, and
 5   I'm going to ask you if you agree with it.
 6          "The Geneva Convention specifically prohibit
 7   reprisals against civilians, private property of
 8   civilians in occupied territory, or enemy foreigners
 9   on friendly territory."
10          Do you agree with that?
11          MR. HILL:  Objection.  The statement itself
12   is vague.  But the witness can respond whether he
13   agrees or disagrees.
14          THE WITNESS:  I think it's too vague to --
15   to -- to say whether I agree or not.
16          Q.  BY MR. YALOWITZ:  Okay.  We'll come back
17   to it perhaps.
18          Do you -- do you have an understanding,
19   under international law, of what the PLO is today?
20          A.  No, I don't.  I haven't looked into this.
21          I have an understanding of where the PLO
22   fits in the scheme of things in the Oslo Accords, in
23   the occupied territories, because this was specifically
24   stated and reference was made to it.  And -- and the
25   role of the PLO was specifically specified in the
                OCTOBER 13, 2013 - RAJA SHEHADEH
```

71

```
 1   Interim Agreement.
 2          Q.  Could you share with us that understanding,
 3   please?
 4          A.  Yeah.  In the -- there is a specific provision
 5   which gives the powers of the PLO that -- that it can
 6   exercise under the Interim Agreement.
 7          Q.  Are you having a little trouble locating
 8   the proceedings?
 9          A.  Yeah.  I remember the provision as giving
10   power to sign agreement -- economic agreements.  And
11   I referred to it in my statement.  It -- it comes in
12   the -- early -- in the early articles.
13          Q.  Did -- did the -- was it expected that the
14   PLO would continue negotiations for further agreements?
15          A.  It was expected.  And -- and the article says
16   all -- it has the right to sign agreements with third
17   parties.
18          Q.  Was it expected that the PLO would maintain
19   its status at the United Nations?
20          A.  It was expected, although it wasn't stated.
21          Q.  Do you think that the -- I'm sorry.  I can't
22   find it either.  I have it in mind as well.
23          A.  It is definitely in the agreement.
24          Q.  Do you -- do you think that the PLO had
25   obligations to support and fulfill the responsibilities
                OCTOBER 13, 2013 - RAJA SHEHADEH
```

72

```
 1   undertaken by the PA in this agreement?
 2          A.  I'm sorry.  Could you repeat the question?
 3          Q.  Sure.  Let me -- let me ask it a little
 4   different way so that --
 5          MR. HILL:  Do you still want him to try and
 6   find the reference in the Interim Agreement?  If you do,
 7   you should let him do that.  If you don't, he can set
 8   it aside, and you can pose him your question.
 9          MR. YALOWITZ:  Sure.
10          MR. HILL:  You shouldn't make him multitask.
11          MR. YALOWITZ:  Sure.  That's a fair objection,
12   although an unconventional one.
13          Q.  BY MR. YALOWITZ:  Why don't we look together
14   at Article IX.  Perhaps we can find it and then move
15   to the next task.
16          A.  Yeah.  Article IX, 5.b:
17          "The PLO may conduct negotiations and sign
18   agreements with states or international organizations
19   for the benefit of the council," including -- (As
20   read.)
21          And that's -- that's the one I was looking
22   for.
23          Q.  Thank you.
24          A.  I thought it came in the earlier parts.  So
25   I was looking in the earlier parts.
                OCTOBER 13, 2013 - RAJA SHEHADEH
```

73

1    Q.   Do you think that the PLO had any obligations
2  with regard to this agreement, even though most of the
3  provisions deal with the rights and responsibilities
4  of the PA?
5    A.   I don't -- I don't think so.  I think the
6  responsibilities that were specified and transferred
7  by Israel were transferred to the Palestinian Authority.
8    Q.   So the PLO -- if the PLO -- the PLO was still
9  going to exist -- right? -- continue as an organization?
10   A.   Right.
11   Q.   And so suppose the PLO -- like just look with
12 me at the next page from where you are, paragraph 6:
13       "Subject to the provisions of this agreement,
14 the council shall, within its jurisdiction, have an
15 independent judicial system."
16       And it goes on from there.
17   A.   Uh-huh.
18   Q.   So suppose that the PLO interfered with the
19 independence of the judiciary.
20       Would that -- in your judgment, would that
21 be consistent with the obligations it undertook in
22 the Interim Agreement?
23   A.   No.  They -- nobody should interfere with
24 the independence of the judiciary, neither the PLO,
25 nor anybody else.

OCTOBER 13, 2013 - RAJA SHEHADEH

74

1    Q.   So is it fair to say the PLO had something
2  of an obligation of non-interference?
3    A.   Well, the way I see it is the -- the life and
4  the running of affairs in the occupied territories was
5  determined by these documents, by these agreements.  And
6  anything that violates these documents and agreements
7  is in violation of the agreement.  So these agreements
8  do not put any rights and obligations on the PLO beyond
9  what is mentioned in the Article IX.
10   Q.   And the other thing -- well, you just
11 mentioned one that's not mentioned in Article IX
12 that you thought would violate -- violate something.
13 I don't know what it violates.
14       If the PLO -- what -- what's wrong with the
15 PLO interfering with the independence of the judiciary?
16   A.   Because the judiciary should be independent
17 from any executive.  Even if the PA should interfere
18 in the independence of the judiciary, that would be
19 a violation.
20   Q.   Is that a -- an international law matter,
21 or what is it?
22   A.   Well, the basic law which is in force in
23 the Palestinian Authority area says the law should
24 be the only governing thing and -- and no -- and the
25 judiciary should be independent from any interference.

OCTOBER 13, 2013 - RAJA SHEHADEH

75

1    Q.   Is it -- is it an international norm --
2  internationally accepted norm to have an independent
3  judiciary?
4    A.   Well, the rule of law -- the principles of
5  the rule of law require that there be independence of
6  the judiciary.
7    Q.   Is it your understanding that the -- Israel
8  and the PA undertook an obligation to foster mutual
9  understanding and tolerance?
10   A.   The way I understand it is, when the
11 negotiations started, they -- hopefully on both sides,
12 but I can speak more of the Palestinian side -- wanted
13 to start a new era and one where negotiations would
14 lead to the end of the conflict and one where, in
15 a process which is gradual, they would arrive at
16 a situation where there is tolerance and peace and
17 justice between the two sides.
18   Q.   Did the -- did Israel and the PA undertake
19 an express obligation to abstain from incitement?
20   A.   Yes, they did.  But the main thing is that
21 the aim of the negotiations, which is in the Declaration
22 of Principles, Article I, is -- among other things,
23 established a Palestinian interim self-government
24 authority for a -- for a period of five -- five years,
25 leading to a permanent settlement based on Security

OCTOBER 13, 2013 - RAJA SHEHADEH

76

1  Council Resolution 242 and 338.
2       And then the preamble is very important.
3  The government of Israel and the -- and the Palestinian
4  team, representing the Palestinian people, agree that
5  it is time to put an end to decades of confrontation
6  and conflict, recognize their mutual legitimate and
7  political rights, and strive to live in peaceful
8  coexistence and mutual dignity and security to achieve
9  a just, lasting, and comprehensive peace settlement
10 and historic reconciliation between the agreed political
11 process -- through the agreed political process.
12   Q.   So did the -- Israel and the PA undertake
13 an express obligation to take legal measures to prevent
14 incitement by any organization, group, or individual
15 within their jurisdiction?
16   A.   That's right.
17   Q.   And Israel and the PA agreed to cooperate
18 on matters of legal assistance in criminal and civil
19 matters through a legal committee; is that right?
20   A.   That's right.
21   Q.   And the parties agreed that the PA would
22 establish a strong police force; right?
23   A.   That's right.
24   Q.   And that police force was responsible for
25 internal security and public order in Area A; is that

OCTOBER 13, 2013 - RAJA SHEHADEH

77

```
1    right?
2        A.    That's right.  Excluding the matters that
3    were outside of its jurisdiction, which is the security
4    of Israelis and settlers.
5        Q.    Can we look at Article XIII, paragraph 1,
6    together?
7        MR. HILL:  This is of the Interim Agreement?
8        MR. YALOWITZ:  Yes.
9        THE WITNESS:  Yes.
10       Q.    BY MR. YALOWITZ:  It says:
11            "The council will, upon completion of
12   the redeployment of Israeli military forces in each
13   district, as set out in Appendix 1 to Annex I, assume
14   the powers and responsibilities for internal security
15   and public order in Area A in that district."
16       A.    That's right.
17       Q.    Do you agree that that was true?
18       A.    That's what was decided.  Yes.
19       Q.    What -- what does "internal security" mean?
20       A.    Well, it has to be interpreted in relationship
21   to the rest of the agreement and the Proclamation No. 7,
22   which was a proclamation implementing the agreement
23   by -- by Israel -- by the Israeli Civil Administration.
24   And -- and in all these documents, including the DOP
25   and the Interim Agreement, the -- responsibility
```

OCTOBER 13, 2013 - RAJA SHEHADEH

78

```
1    over settlements, Israelis, are excluded from the
2    responsibility of the council and the Palestinian
3    police.
4        Q.    Is it -- I think the language that the
5    agreement uses is the -- that Israel shall continue
6    to carry the responsibility for overall security
7    of Israelis and settlements.
8            Is that right?
9        A.    That's right.
10       Q.    The Palestinian police had responsibilities
11   of cooperation in that regard?
12           Is that fair to say?
13       A.    That's right.
14       Q.    The agreement provided that the only armed
15   forces established -- the only armed forces permitted
16   in the West Bank and the Gaza Strip would be the
17   Palestinian police and the Israeli military forces;
18   is that right?
19       A.    That's right.
20       MR. HILL:  Kent, I don't want to interrupt
21   your question.  But would you mind specifying which
22   provision you're reading from so at least I can follow
23   along?  Thank you.
24       MR. YALOWITZ:  I'll -- I'll take your request
25   under advisement.
```

OCTOBER 13, 2013 - RAJA SHEHADEH

79

```
1        Q.    BY MR. YALOWITZ:  Now, the agreement
2    provided that nobody other than the Palestinian
3    police and the Israeli military could:
4            "Manufacture, sell, acquire, possess, import,
5    or otherwise introduce into the West Bank or the Gaza
6    Strip any firearms, ammunition, weapons, explosives,
7    gunpowder, or any related agreement."
8        A.    Which article are you referring to?
9        Q.    I'm looking at XIV.4.
10       A.    Uh-huh.
11       Q.    Do I have that right?
12       A.    Uh-huh.  That's right.
13       Q.    That was -- that was an express obligation
14   undertaken by the PA; correct?
15       A.    That's right.  But then, in order for that
16   to be enforceable and realizable, the PA should have
17   had jurisdiction over the entire region, territory.
18   And they didn't.
19       Q.    So -- so is it fair to say that within
20   Area A -- well, let me ask you this.
21           Suppose that the Palestinian police found
22   out that there was an individual with large supplies
23   of explosives in Area A.  Would you say that they
24   would have an obligation, under Article XIV, to take
25   corrective action?
```

OCTOBER 13, 2013 - RAJA SHEHADEH

80

```
1        A.    If they knew of the presence of weaponry, yes,
2    they do have an obligation.
3        Q.    Now, in Article XV, both sides undertook to
4    take all measures necessary in order to prevent acts
5    of terrorism; is that right?
6        A.    That's right.
7        Q.    And that included acts of terrorism directed
8    against individuals falling under the other's authority;
9    right?
10       A.    Uh-huh.
11       Q.    You have to say "yes" or "no."
12       A.    Yes.  That's right.
13       Q.    And -- and they had -- they undertook an
14   obligation to take legal measures against offenders;
15   is that right?
16       A.    That's right.
17       Q.    So, for example, if -- if an Israeli went
18   to an Arab village or to Ramallah and committed an
19   act of violence against Palestinian residents, Israel
20   undertook an obligation to prosecute that person and
21   punish him; right?
22       A.    Not only that.  If an Israeli, including
23   Israeli settlers, took violence -- had acted violently
24   against Palestinians or their property anywhere, not
25   only in Area A, they had the obligation to -- to take
```

OCTOBER 13, 2013 - RAJA SHEHADEH

81

```
1    action.
2            And in the course of these -- from the
3    time of the Interim Agreement to this day, Israel
4    has consistently failed in doing that.  So many acts
5    of violence committed by the settlers have not been
6    punished, and they continue all the time.  And they
7    have been ongoing since the beginning of the Oslo
8    Accords.
9        Q.   And do you agree with me that, if -- if
10   a person who was injured by reason of that kind of
11   act could -- could go to a court of law and show
12   who's responsible, the people who are responsible
13   and the entities who are responsible should be held
14   to account?
15       A.   Absolutely.  And in the -- in the course
16   of these years, so many Palestinians have complained
17   to the Israeli police and continue to complain to
18   Israeli police.  And the record of the Israeli police
19   and Army in following these matters is very, very bad.
20   They -- they never, if ever, pursue the perpetrator
21   of the acts of violence against the Palestinians.
22       Q.   And, conversely, you would agree with me
23   that an Israeli who's injured in his personal property
24   by reason of an act of violence by a Palestinian should
25   be able to go to court and hold those responsible to
```

82

```
1    account?
2        A.   Well, it depends where the act has been
3    committed.  If the action has been committed outside
4    of the jurisdiction of the Palestinian areas, then
5    it's difficult to see how the Palestinian Authority
6    can be held responsible.
7        Q.   So is it your opinion that all measures
8    necessary in order to prevent an act of -- acts of
9    terrorism only applies to terrorism that occurs in
10   Area A?
11       A.   Well, in terms of practical implementation
12   of this, the -- the Palestinian Authority can only
13   be held responsible for acts that are committed in
14   the areas over which it has authority, over which it
15   can act, over which it can send its -- its security
16   forces to take action.
17       Q.   So let's distinguish among the legal and
18   the practical.
19            As a de jure matter, as a legal matter,
20   you and I agree that all measures necessary in order
21   to prevent acts of terrorism are not limited to acts
22   of terrorism that physically take place in Area A;
23   right?
24       A.   Not exactly.  Because, again, it has to be
25   read in the context of the rest of the agreement.  And
```

83

```
1    the rest of the agreement places huge limitations and
2    responsibilities on the Israeli security forces to take
3    actions against perpetrators who commit actions against
4    their people or against Israelis and settlers.
5        Q.   Does -- are you -- do you have Article XV
6    before you?
7        A.   Yeah.
8        Q.   Does it say both sides shall take measures
9    that are practically available in order to prevent
10   acts of terrorism?
11       A.   No.  It doesn't say that.
12       Q.   Does it say both sides shall take measures
13   that -- that are exclusive to their own territory in
14   order to prevent acts of terrorism?
15       A.   No.  But it -- it cannot be read in isolation
16   of the rest of the agreement, which says -- limits
17   maneuverability and jurisdiction over those who are
18   responsible for security.
19       Q.   Do you understand that Israelis are not
20   allowed to enter Area A?
21       A.   Do I understand?
22       Q.   Yes.
23       A.   This only came into force much later.
24       Q.   I see.  Do you -- do you think that -- well,
25   do you see it says:
```

84

```
1            "Specific provisions for the implementation
2    of this article are set out in Annex I."
3        A.   Uh-huh.
4        Q.   Do you see that?
5        A.   Yeah.
6        Q.   And that's a -- that's an integral part of
7    the agreement; right?
8        A.   Annex I, yeah, which is about the police and
9    the powers of the police.
10       Q.   And I think we went over earlier -- you said
11   you didn't know much about the police; is that right?
12       A.   Well --
13            MR. HILL:  Objection.  Misstates his
14   testimony.
15            Go ahead.
16       Q.   BY MR. YALOWITZ:  You said you didn't know
17   who --
18       A.   No.
19       Q.   -- Force 17 was; right?
20       A.   I -- I know about the powers of the police,
21   which are stated in the agreement.
22       Q.   Who -- who is Force 17 again?
23       A.   I don't know who is Force 17.  I know that
24   there is a Palestinian police, which is established
25   under the Palestinian Authority.
```

85

```
 1        Q.   Now -- now, why don't we -- why don't we
 2   look together at Annex I.  Shall we do that?  We're
 3   going to mark Annex I to the Interim Agreement as
 4   Plaintiffs' 104.
 5              (Plaintiffs' Exhibit 104 marked.)
 6        Q.   BY MR. YALOWITZ:  Do you have what we've
 7   marked as Plaintiffs' 104?
 8        A.   (Examining.)  I do.
 9        Q.   And indeed does it appear to be Annex I
10   to the Interim Agreement?
11        A.   Well, it appears to be that.  But I haven't
12   checked it.
13        Q.   Sure.  It's -- it's a lengthy document.
14   I must confess that I haven't -- I have not myself
15   gone over it word for word.
16              But it seems to -- it certainly purports
17   to be Annex I; right?
18        A.   It purports to be Annex I.  That's right.
19        Q.   And you're familiar with Annex I; right?
20        A.   I am.
21        Q.   And it's -- it's -- if you notice anything
22   that jumps out at you as incorrect, you'll let me know,
23   won't you?
24        A.   Yeah.
25        Q.   Thank you.
```

                    OCTOBER 13, 2013 - RAJA SHEHADEH

86

```
 1              Article II is -- what -- what's the focus
 2   of Article II?
 3        A.   (Reading.)
 4              "Security Policy for the Prevention of
 5   Terrorism and Violence."
 6        Q.   Fair to say this was a subject that was dealt
 7   with expressly in Annex I?
 8        A.   Yeah.
 9        Q.   And -- and it -- the parties agreed that
10   the Palestinian police would be the only Palestinian
11   security authority; right?
12        A.   Right.
13        Q.   And the parties agreed that the Palestinian
14   police would act systematically against all expressions
15   of violence and terror; right?
16        A.   Right.
17        Q.   And there was no limitation there to violence
18   and terror occurring in Area A; right?
19        A.   Well, there -- there didn't need to be a
20   limitation specified here.  Because it's understood
21   that all of this Annex to the Interim Agreement
22   is part of the Oslo Declaration of Principles.  And
23   anything limiting the power of the police and security
24   forces -- Palestinian security forces are, thereby,
25   limited.  So they didn't have to keep repeating it.
```

                    OCTOBER 13, 2013 - RAJA SHEHADEH

87

```
 1        Q.   So would you agree with me that, within the
 2   authority that was provided to the Palestinian police,
 3   which we went over earlier, the Palestinian police had
 4   a duty to act systemically [sic] against all expressions
 5   of violence and terror?
 6        A.   Yeah, they did.
 7        Q.   Thank you.
 8              Do you agree with me that the Palestinian
 9   police were obliged to confiscate any illegal arms?
10        A.   If they found them, yes.
11        Q.   Do you agree with me that the Palestinian
12   police were obliged -- again, within the authority
13   assigned to them, Area A, Palestinian residents --
14   they were obliged to arrest and prosecute individuals
15   who were suspected of perpetrating acts of violence
16   and terror?
17        A.   Yeah.  But we have to take into consideration
18   the atmosphere that existed at the time.  And without
19   taking that context into consideration, there is a
20   terrible distortion that results.
21              Because when the Oslo Accords and Oslo
22   process began, there was a lot of hope and expectation
23   by the Palestinians that this would lead to peace and
24   resolution of -- of conflict.  And then Rabin, who --
25   who was very much responsible for the agreement and
```

                    OCTOBER 13, 2013 - RAJA SHEHADEH

88

```
 1   made a breakthrough in Israel by signing this agreement,
 2   was murdered by an extremist who was on the side of
 3   those who did not like this reconciliation and the
 4   Oslo Accords.
 5              And, in 1996, Netanyahu -- Prime Minister
 6   Benjamin Netanyahu took over the government and
 7   immediately stated that the settlement -- Israeli
 8   settlements would continue.  And this made -- was
 9   made part of his program.  And then he was followed
10   by Barak, who did the same, and Sharon, who did the
11   same.
12              And all of this was acts of incitement by
13   the Israeli government against the Palestinians and
14   made it very difficult for the Palestinian police to
15   fulfill obligations that they have, which they made
16   on the basis that there was going to be a process that
17   was leading to a reconciliation and peace.
18              In addition, in 1996, in September, there
19   was another provocative act -- action by the -- and --
20   and -- and there are many more.  But I'm mentioning
21   examples, which is the digging and opening of the
22   tunnels, which created a lot of worries and fears
23   by the Palestinians about the status of the religious
24   places and the Dome of the Rock, which is the third
25   holiest shrine, mosque in Islam.
```

                    OCTOBER 13, 2013 - RAJA SHEHADEH

89

1    And there were demonstrations.  And a large
2  number of people were shot and killed and a large number
3  were injured by the Israeli police.  So the Israeli
4  government and security forces made no attempt to calm
5  things down, to inform the Palestinians, coordinate
6  with the Palestinians on things that they were going
7  to do in order to reduce conflict and incitement.
8  And so that made it very difficult for the Palestinian
9  police to act.
10       MR. YALOWITZ:  I'm sorry, Brenda.  Could
11  I have the question back?
12       (Last question read.)
13       Q.  BY MR. YALOWITZ:  So let me just ask the
14  question again.  And I appreciate the fulsomeness of
15  your answer.
16       But just focused on the question:  In the
17  Interim Agreement, the Palestinian police undertook
18  an obligation to confiscate illegal arms; is that right?
19       MR. HILL:  Objection.  Asked and answered.
20  Go ahead.
21       THE WITNESS:  Yeah.  That's right.
22       Q.  BY MR. YALOWITZ:  Thank you.
23       Now, the Palestinian police undertook an
24  obligation in the Interim Agreement to act to ensure
25  the immediate, efficient, and effective handling of

OCTOBER 13, 2013 - RAJA SHEHADEH

90

1  any incident involving a threat or act of terrorism;
2  correct?
3       A.  Correct.
4       Q.  And the Palestinian police undertook an
5  obligation to immediately and effectively respond to
6  the occurrence or anticipated occurrence of an act of
7  terrorism; correct?
8       A.  Correct.
9       But, again, all of this is done at the
10  initial stages of a process which was then seeming very
11  hopeful.  And then the Israeli side made it less hopeful
12  by continuing with processes that, to the Palestinians,
13  seemed like entrenchment of the occupation and further
14  deprivation of rights to property and to the possibility
15  of a Palestinian state.
16       And then, furthermore, the Palestinian -- the
17  Israeli Army made it more difficult for the Palestinian
18  police to act by shooting at demonstrators.  When the
19  Palestinian police tried to keep them away from the
20  point of confrontation, they shot at the police and --
21  and incited the police and made it -- made their job
22  very difficult.
23       And then all throughout the period, there
24  were attacks on police installations and obstruction
25  of means -- I mean, you know, you -- you're talking

OCTOBER 13, 2013 - RAJA SHEHADEH

91

1  not about an established police.  You're talking about
2  a very new and fresh and inexperienced police, which
3  was trying very hard to establish itself.  And the
4  police is part of the population.  It's not an
5  imposed -- group of people imposed on the population.
6       So the -- the -- the acts of Israel, both in
7  terms of policies that it pursued and violence against
8  Palestinians and against the police, made the job of
9  the police very difficult and made these principles that
10  were agreed to difficult to fulfill because they were
11  not being respected by the power which is the stronger
12  power, which is Israel, which had full control over
13  security in the area.
14       Q.  Mr. Shehadeh, are you an expert on police
15  work?
16       A.  No.
17       Q.  Are you an expert on penology?
18       A.  No.
19       Q.  Are you an expert on military affairs?
20       A.  No.  But I'm a resident of the territories.
21  And all these matters happened when I was living there.
22  And I could feel and see and read the -- the reactions
23  of people and pursued and followed the developments
24  as they occurred.  So I'm --
25       Q.  Do you have -- did you ever -- did you know

OCTOBER 13, 2013 - RAJA SHEHADEH

92

1  Arafat?
2       A.  Yeah.
3       Q.  Did you speak to him about these matters?
4       A.  No.  I wasn't -- I'm -- I've never been a
5  political person.  So I never had any political role
6  or interfered.  No.
7       Q.  You -- you've never served in the military;
8  right?
9       A.  No.
10       Q.  You've never --
11       A.  I'm against the military.
12       Q.  You -- you've never served in the police
13  force; right?
14       A.  No.  No.  I'm for non-violence in all ways
15  and means.
16       Q.  In fact, I think you would agree that -- with
17  me that violence is not an excuse to beget additional
18  violence; right?
19       A.  It is certainly not.  And I think violence
20  is no answer to anything.
21       Q.  So -- so just coming back to Article II,
22  where each side undertook an obligation to actively
23  prevent incitement to violence -- is that right?
24       A.  Yeah.  But I think it's folly to interpret
25  violence only in -- in a narrow sense.  I think violent

OCTOBER 13, 2013 - RAJA SHEHADEH

1   actions include settling people in other people's lands.
2   That's a violent action.
3          And -- and if we're talking about violence,
4   we have to interpret violence in the correct way, which
5   includes acts of settling other people on the land of
6   others and depriving the people of a land who -- and the
7   land has scarce resources -- from the scarce resources
8   of land and water --
9       Q.   Actually, my --
10      A.   -- and access.
11      Q.   My question was about inciting violence.
12      A.   Yeah, inciting violence.
13      Q.   So -- so whether there was or was not --
14   whether -- each -- each side had grievances; right?
15           Both sides have grievances?
16      A.   More than grievances, I would say.
17      Q.   And -- and those grievances do not excuse
18   incitement to violence; right?
19      A.   They do not excuse incitement to violence.
20   But if we want to speak about incitement of -- to
21   violence, we have to look at both sides and look at
22   both sides equally.
23           Recently, there was a study of the
24   curricula in Israeli schools.  And the incitement
25   against Arabs in Israeli schools and in the Army is

1   tremendous.  And -- and this has been going on for
2   a long time.  And -- and that is, again, incitement
3   which leads to violence just as much.
4       Q.   Mr. Shehadeh, is the government of Israel
5   a defendant in this lawsuit to your knowledge?
6       A.   No.  But we're talking about a situation
7   which the government of Israel is responsible for.
8   I mean, there is not --
9       Q.   So are you saying that the Palestinian
10   Authority is not responsible for its actions?
11      A.   The actions within its jurisdiction it's
12   responsible for.  Yes.
13      Q.   And you understand that the Palestinian
14   Authority undertook, in the Interim Agreement, to
15   refrain from incitement; correct?
16      A.   That's right.
17      Q.   And you understand that the Palestinian
18   Authority undertook, in the agreement, an obligation
19   to apprehend, investigate, and prosecute perpetrators
20   and persons directly or indirectly involved in acts
21   of terrorism; correct?
22      A.   Correct.  Within its means.
23      Q.   Well, is that what the agreement says?  Does
24   the agreement say "within its means"?
25      A.   It doesn't.  But you cannot read the

1   agreement without thinking of "within its means."
2   And it certainly limits the -- the means and the
3   maneuverability of the agreement -- doesn't limit.
4       Q.   Let's -- let's talk about the Palestinian
5   police.
6            Would you agree that, in Article IV of
7   Annex I, the Palestinian police had to carry out
8   duties and functions or -- let me start over.
9            Why don't you turn to Article IV and have
10   it before you before I ask you a question about it.
11      A.   Uh-huh.
12      Q.   Do you have it?
13      A.   Yeah.
14      Q.   Article IV details the duties and functions
15   of the Palestinian police in Section 1; is that right?
16      A.   Uh-huh.
17      Q.   "Yes"?
18      A.   Yes.
19      Q.   And they had a duty and function of
20   maintaining internal security and public order --
21      A.   Uh-huh.
22      Q.   -- correct?
23      A.   Correct.
24      Q.   And they had a duty and function of combating
25   terrorism and violence; correct?

1       A.   Correct.
2       Q.   And they had a duty and function of preventing
3   incitement to violence; correct?
4       A.   Correct.
5            Now --
6       A.   However -- however, all of this has to be
7   read in -- in relationship to Article I, which says
8   nothing -- Article I.7, which says:
9            "Nothing in this article shall derogate
10   from Israel's security powers and responsibilities
11   in accordance with this agreement."
12           And -- and these include large areas and
13   large sectors of the people residing in the occupied
14   territories.
15      Q.   The Palestinian police had -- had a number
16   of sections -- right? -- a number of branches?
17      A.   Yeah.
18      Q.   And that's true today; right?
19      A.   Yeah.
20      Q.   By the way, the -- the Interim Agreement
21   is a legally operating document even today; right?
22      A.   Yeah.
23      Q.   So there's something called the civil police;
24   right?
25      A.   Uh-huh.

97

```
1    Q.   What -- what do they do?
2    A.   Traffic and civil matters.
3    Q.   Then there's something called public security?
4    A.   Yeah.
5    Q.   What do they do?
6    A.   I don't know.  I don't know the details.
7    Q.   Then there's something called preventative
8  security?
9    A.   Yeah.
10   Q.   What do they do?
11   A.   I think -- I'm not sure.  But I know that
12 the preventative security headquarters were bombed
13 by the -- by Israel.  And what I do know is that all
14 these police branches were rudimentary in the beginning.
15 Because there was -- when the PA took over, there was
16 no police force whatsoever.  And so they were trying
17 to establish a police force and --
18   Q.   How do you know that?
19   A.   I know that because during -- prior to the --
20 to the Oslo Accords, the only police force was the
21 Israeli police force in the area.  And then, when
22 the Palestinians took over, they had to start from
23 scratch.
24   Q.   You understand that the PLO had armed
25 factions?
           OCTOBER 13, 2013 - RAJA SHEHADEH
```

98

```
1    A.   Yeah.
2    Q.   And -- and you understand that many of
3  those -- many of the people who were in those armed
4  factions then joined the Palestinian police force;
5  right?
6    A.   Yeah, they did.  But, you know, you don't --
7    Q.   In fact --
8    A.   The police force is -- is a -- is a very
9  highly developed structure which has to have traditions
10 and order and -- and structures that enable it to keep
11 control and -- and fulfill its mission well.  And so
12 the people who came from the outside were not the police
13 force.  I mean, they were -- they were doing liberation
14 action outside.
15   Q.   Is it your testimony that the armed factions
16 of the PLO were disorganized and -- and lacked training
17 and skill?
18   A.   As far as I could tell, from my direct
19 experience in the area, when the police force was
20 established, it didn't -- it -- it would take time for
21 a police force to -- I mean, they -- they didn't start
22 from day one being well-established, well-coordinated,
23 well-structured with -- with the traditions that are
24 a necessity for a police force.
25           The traffic was a mess.  The sense of security
           OCTOBER 13, 2013 - RAJA SHEHADEH
```

99

```
1  for -- for the individual living in the area was very
2  precarious.  They were -- they were making an effort
3  to -- to establish and organize.
4           And -- and, in fact, Israel was not very
5  helpful in that.  Because when -- for example, I know
6  of the preventative security headquarters.  They were
7  rather elaborate, I was told.  And I saw the building
8  from the outside.  And -- and they built headquarters
9  for the police as well in Ramallah other than the old
10 headquarters.  And they were trying to organize this
11 structure.  And then, in more than one case, Israel
12 bombed the headquarters.  And so the police had to
13 go to -- you know, spread around.  And -- and it was
14 rather pathetic.
15   Q.   You were never in the preventative security?
16   A.   Sorry?
17   Q.   You were never in the preventative security
18 police force; right?
19   A.   No, of course not.
20   Q.   Did you ever provide legal advice to the
21 preventative --
22   A.   No, no, no.
23   Q.   -- security police force?
24   A.   No.
25   Q.   Did you ever -- did you ever go into their
           OCTOBER 13, 2013 - RAJA SHEHADEH
```

100

```
1  offices?
2    A.   No, I never did.  But --
3    Q.   Did you ever read legal studies on how they
4  operated?
5    A.   No.  But I read about the police force
6  from reports.  And -- and there's a whole book that
7  I mentioned in my testimony [sic] about the police
8  force.  So -- so my -- my --
9    Q.   You wrote a --
10   A.   I think it --
11   Q.   You wrote a book about the police force?
12   A.   It's -- it's in Norwegian.  I -- I have a
13 reference here if you want me to look it up.  But --
14   Q.   Which book?
15   A.   -- my -- my --
16   Q.   I'm sorry.  Which book?
17   A.   It's called -- it's called "A Police Force
18 Without a State," Lia Brynjar.  On page 25 of 40 I
19 make reference to it.
20   Q.   All right.  Thank you.
21   A.   But my point is that we cannot expect that
22 a police force which has such difficult objectives
23 to fulfill is going to arise in a day or two or in --
24 even in a year or two.  And -- and if we are to
25 assess the work of that police force and its failures
           OCTOBER 13, 2013 - RAJA SHEHADEH
```

101

1  and successes, we have to take into consideration
2  the conditions under which they were operating and
3  the experiences which -- which were very limited --
4      Q.   Do you know what --
5      A.   -- and -- and the Israeli policies, which
6  made life for the police very, very difficult.  Because
7  it made it seem as though the police was agents of
8  the -- of the Israelis.
9      Q.   Do you know what Amn Al-Ri'asah is?
10     A.   Amn Al-Ri'asah.
11     Q.   Say it again.
12     A.   Amn Al-Ri'asah.  "Amn" means security.  And
13 "Ri'asah" means "presidency."  So Amn Al-Ri'asah.
14     Q.   What is that?
15     A.   I think -- I suppose it's like "presidential
16 guard."
17     Q.   And what about intelligence, what was their
18 job?
19     A.   Well, I suppose gathering intelligence.  But
20 I have no idea how much they did or what they did.
21     Q.   And -- and Amn Al-Ri'asah -- Amn Al-Ri'asah --
22     A.   Amn Al-Ri'asah, which I suppose --
23     Q.   -- do you know what they did?
24     A.   I suppose to protect the "ri'asah," which
25 is the -- the president and the head of the Palestinian

OCTOBER 13, 2013 - RAJA SHEHADEH

102

1  Authority.
2      Q.   And emergency services and rescue, what did
3  they do?
4      A.   I don't know.
5      Q.   The Palestinian coastal police unit, do you
6  know what they did?
7      A.   I don't.  I don't.
8           But I -- what I -- what I do know is that
9  they were having great difficulty organizing and getting
10 the police force to be functional in a proper manner.
11 And then the -- the European authority started putting
12 a lot of money.  And there is now -- there has been
13 for a while experts who have been helping the police
14 organize and -- and are -- have a presence in the --
15 in Ramallah, actually, and spend a lot of money on
16 getting the police to organize.  And they have made
17 good inroads in that.  And -- and there's a police
18 academy even, which has been established in Jericho.
19          So none of this was in the beginning.  And
20 it took many years for that to -- to happen.  And once
21 it happened, there was more efficiency of the police.
22 But it -- it started without the means, the traditions,
23 the experience of the police force.  And Israel made
24 it very, very difficult by its actions and its policies
25 for a local police force to -- to operate.

OCTOBER 13, 2013 - RAJA SHEHADEH

103

1      Q.   Do you know how many --
2      A.   But -- sorry.  I -- I want to add.
3           My reading of the whole thing -- and -- and
4  that goes back to the Camp David agreement with Egypt --
5  between Egypt and Israel.  From that time, the Israeli
6  position has been consistent.  And we see it -- we see
7  it reflected in the Interim Agreement.
8           From '79, the basis for the agreement with
9  the Palestinians included a strong police force to
10 relieve the Israelis from the internal Palestinian
11 security over the Palestinians and to establish an
12 entity which had jurisdiction over people but not
13 over land, which is what happened more or less in
14 the Interim Agreement and in the Oslo Accords.
15          And so there has been a consistent Israeli
16 position which left the land under Israel, by and
17 large, which allowed for more settlements of Israeli
18 Jews in the territories, which made clear that
19 the responsibility over the Israelis in -- in the
20 territories was under Israel and, at the same time,
21 allowed the Palestinians to establish an authority
22 which would relieve the Israelis from the expense of
23 doing public health and education and -- and policing,
24 but all related to the Palestinians separate from the
25 responsibility over the Israelis and over the territory

OCTOBER 13, 2013 - RAJA SHEHADEH

104

1  as a whole.  I think there is a consistent vision by
2  the Israelis, which you can read from '79.  And -- and
3  that's not -- I mean, it's not speculation.  It's fact.
4      MR. YALOWITZ:  Sorry, Brenda.  Could I have
5  my question back?
6           (Last full question read.)
7      Q.   BY MR. YALOWITZ:  So the answer is you
8  don't know?
9      A.   I don't.
10     Q.   Okay.  Do you know how many Palestinian
11 police, all branches, there are today?
12     A.   I don't.
13     Q.   Do you know how many Palestinian police,
14 all branches, there were in the year 2000?
15     A.   I don't.
16     Q.   Do you understand that the PA is forbidden
17 to employ policemen who have been convicted of serious
18 crimes?
19     A.   Where do you reference for this?
20     Q.   So I guess my first question is:  Is that
21 customary in the PA police force?
22     A.   I wouldn't know if it's customary.  But I
23 would imagine, yes, that if somebody has committed --
24 has committed a serious crime, he should not be in
25 the police force.

OCTOBER 13, 2013 - RAJA SHEHADEH

105

1    Q.   I mean, we would say that in New York.

2    A.   Yeah.

3    Q.   If a police officer has committed a serious

4    crime, he shouldn't stay on the force.

5         Is it the same in the PA?

6    A.   Well, in the PA, the civil service --

7    officials of the civil service or officials of the

8    state must be of good character and not be convicted

9    of crimes.

10   Q.   So -- so then there is -- there is a reference

11   in the document as well which we could look at, which

12   is in Article IV, paragraph 4.e, like "echo."

13        MR. HILL:  What's the question?

14   Q.   BY MR. YALOWITZ:  I'm just directing the

15   witness to the paragraph.  Thank you.

16   A.   Uh-huh.  Yeah.

17   Q.   Do you see that?

18   A.   Yeah.

19   Q.   That's consistent with your understanding

20   of good police practice; right?

21   A.   Uh-huh.  Uh-huh.

22   Q.   You have to say --

23   A.   Yes, I do.

24   Q.   Thank you.

25        Do you -- do you have an opinion on whether

                  OCTOBER 13, 2013 - RAJA SHEHADEH

106

1    the PA has followed that practice laid out in Item 4.e

2    in the cases that we're here today about?

3    A.   Well, I would -- I don't have any inside

4    information on this.  But I would comment on the

5    fact that terrorist activities would be of a different

6    interpretation to the two sides.  Because terrorism

7    is committing terrorism, which is against -- but acts

8    of -- committed by the PLO in fighting the Israeli Army,

9    which are considered by Israelis terrorism, are not

10   considered by the Palestinians as terrorism.  So they

11   never defined what are the understanding of the two

12   sides about this term.  I mean, not any --

13   Q.   So for purposes of our conversation, let's

14   limit terrorism to the Geneva Convention definition

15   we discussed before, which is acts of violence directed

16   against civilians to obtain a political purpose or

17   something along those lines.

18        Does that sound fair to you?

19   A.   Against civilians.  But the question is:

20   Which civilians, of course?

21   Q.   You think there are civilians who live in

22   Israel?

23   A.   Of course.

24   Q.   And so you familiarized yourself with the

25   cases that we're here about; right?

                  OCTOBER 13, 2013 - RAJA SHEHADEH

107

1    A.   Yeah.

2    Q.   You know about the Sokolow family, for

3    example?

4    A.   Uh-huh.

5    Q.   You know about the Sokolow family?

6    A.   Uh-huh.

7    Q.   They're civilians; right?

8    A.   Yeah.

9    Q.   And Mr. Sokolow is a lawyer from New York;

10   right?

11   A.   Right.

12   Q.   He's not a combatant of any kind, is he?

13   A.   No.

14   Q.   And -- and so -- and the Goldberg family,

15   you know about them?

16   A.   You don't have to go on with this.

17        I -- I'll tell you immediately I -- I do not

18   believe that killing civilians in Israel is legitimate.

19   I -- I don't think it is.  So you don't have to pursue

20   this.

21   Q.   So when we look at 4.e together, we see that

22   Palestinian police who have been convicted of serious

23   crimes or have been found to be actively involved in

24   terrorist activities subsequent to their recruitment

25   were to be immediately terminated, and their weapons

                  OCTOBER 13, 2013 - RAJA SHEHADEH

108

1    and police identification and documentation were to

2    be confiscated; right?

3    A.   Right.

4    Q.   And do you have an opinion as to whether

5    that has occurred in the cases that we're here today

6    to discuss?

7    A.   I have no knowledge of the details whatsoever.

8    Q.   Could we look at Article IX together?

9        MR. HILL:  Article IX of Annex I?

10       MR. YALOWITZ:  Yes.  I myself am paging

11   through to find it.

12       THE WITNESS:  It's on page 22:

13       "Movement Into, Within and Outside the West

14   Bank and the Gaza Strip."

15       MR. YALOWITZ:  Oh, you know -- bear with me

16   one second.  Well, let's just pause for a minute and

17   see if I can find it.

18       THE WITNESS:  I'd like to take a break.

19       MR. HILL:  Why don't we go off the record.

20       MR. YALOWITZ:  It's convenient.  Let's take

21   a break.

22       MR. HILL:  It's been about an hour and a half.

23       (Recess from 12:39 p.m. to 1:56 p.m., after

24   which Mr. Wise was not present.)

25   Q.   BY MR. YALOWITZ:  Before we went off the

                  OCTOBER 13, 2013 - RAJA SHEHADEH

109

```
 1  record and had a break, I was referring you to
 2  Article IX of the Annex I.  But I should have been
 3  referring you to Article XI, which is why in this
 4  agreement they should have adopted Arabic -- Arabic
 5  numbering instead of Roman numbering.
 6         So if you could look with me on Article XI.
 7     A.   I think somehow they think it looks more
 8  impressive to have Roman numerals.
 9     Q.   It's impressive to those who don't actually
10  have to use the document.
11         So if you could look with me on paragraph 2.f.
12     A.   Uh-huh.
13     Q.   This is an obligation on the Palestinian
14  police to prevent the manufacture of weapons.
15         Do you see that?
16     A.   Oh, sorry.  You said 11?
17     Q.   Yes.  Eleven of Annex I.
18     A.   Oh.  Oh, I'm looking at the agreement itself.
19     Q.   Aah, sorry.
20     A.   That's my -- my mistake.
21         Uh-huh.  Eleven and 2.f.  Yeah, now I see it.
22     Q.   And that -- that obliges the Palestinian
23  police to prevent the manufacture of weapons; right?
24     A.   Uh-huh.
25     Q.   You have to give a --
```
                OCTOBER 13, 2013 - RAJA SHEHADEH

110

```
 1     A.   Yeah.
 2     Q.   And it obliges the Palestinian police to
 3  prevent the transfer of weapons to persons who are
 4  not licensed to possess them; right?
 5     A.   That's right.
 6     Q.   Now, we -- we discussed Annex IV before
 7  the break a little bit.  I think you were referring
 8  to Annex IV --
 9     A.   Uh-huh.
10     Q.   -- is that right?
11     A.   Uh-huh.
12     Q.   So I --
13         MR. HILL:  Just for the record, Kent, do
14  you mean Article IV of Annex I?
15         MR. YALOWITZ:  No.  I mean Annex IV.
16         THE WITNESS:  Legal assistance.
17         MR. HILL:  Thank you.
18     BY MR. YALOWITZ:  That's what we -- we --
19  you were referencing it before; right?
20     A.   Yes.  That's right.
21     Q.   Okay.  So I want to ask you some questions
22  about Annex IV.  So I'm going to mark a copy of it
23  and share it with you and your counsel, if I can
24  find it.
25     A.   Before we move on, I would like to say
```
                OCTOBER 13, 2013 - RAJA SHEHADEH

111

```
 1  something that might be helpful for the Court and
 2  for the jury to -- to understand, which is that
 3  when you refer or when you read this article about
 4  the manufacture of weapons and transfer of weapons
 5  to persons, it's important and helpful to realize
 6  two things.
 7         First, the Palestinian police did not have
 8  control over the borders or the entry points to the
 9  occupied territories.  And the second thing is they
10  didn't have control over the whole territory itself.
11  So in order to manufacture weapons, you need products
12  to be brought in from the outside.  Israel controls
13  the entrance to these borders and to everything that
14  is brought in from the outside and not the Palestinian
15  police.  So the Palestinian police cannot prevent people
16  from bringing in if they want to.
17         Second thing is the manufacture and transfer.
18  The transfer can take place to areas outside of the
19  jurisdiction of the Palestinian police, and the
20  Palestinian police would have no means of stopping them.
21  And the fact that the Palestinian police, given how
22  young a police force it is, did not have the means
23  to operate effectively to -- to determine where these
24  manufacturing is taking place and how.  You know, you
25  need intelligence for that.
```
                OCTOBER 13, 2013 - RAJA SHEHADEH

112

```
 1         And -- and I -- I'm -- I can't say, because
 2  I'm no expert on this.  But all I can say is, from
 3  my observation of the police force, it was in the
 4  very initial stages of development.  And I cannot
 5  believe that they would have the ability, professional,
 6  intelligencewise, to -- to really fulfill their
 7  obligation under this.
 8     Q.   Thank you for -- thank you for that.  And
 9  I want to ask you two follow-up questions.
10         The first is:  I -- I -- am I correct that
11  you are not offering expert opinions on the maturity
12  or competency of the Palestinian police force?
13     A.   No, I'm not.  But I -- I see myself as
14  somebody who has always been living here.  And as these
15  things developed, I was a witness to -- to how things
16  were and -- and a recipient of the good and the bad.
17  And so I feel I can be helpful in elucidating some
18  of these matters.  But I -- I'm no police expert.  No.
19     Q.   Now, the second thing I want to ask you is
20  that, as we've discussed before, you've mentioned some
21  limitations on the Palestinian police authority.  And
22  I just want to be clear.
23         Within the territory, as it's used in Annex I,
24  with regard to Palestinian residents, the police had
25  the obligation to prevent the unauthorized manufacture
```
                OCTOBER 13, 2013 - RAJA SHEHADEH

113

1  of weapons; is that correct?
2      A.   Within Area A, yes, that's right.
3      Q.   And, certainly, if -- if Palestinian police
4  officers were actually aware of the manufacture of
5  illegal weapons, they had an obligation to take action
6  with that regard?
7      A.   Yeah.  That's right.
8      Q.   Now, we were going to look at Annex IV.  So
9  we'll pause so Brenda can mark it as Plaintiffs' 105.
10         (Plaintiffs' Exhibit 105 marked.)
11     Q.   BY MR. YALOWITZ:  And so I'd like to
12  direct your attention to Article II, paragraph 2:
13         "Cooperation in Criminal Matters."
14     A.   (Examining.)  Uh-huh.
15     Q.   Under the Interim Agreement, the Palestinian
16  police and the Israeli police have an obligation to
17  cooperate in the conduct of investigations?
18         Is that fair to say?
19     A.   Sorry.  Where are you reading now?  Two?
20     Q.   2.a.
21     A.   Aah, 2.a.  Yeah.  Yeah, that's right.  This
22  is what the agreement says.
23     Q.   And then I was also looking at 7.b, which is:
24         "Transfer of Suspects and Defendants."
25         Do you have that?

OCTOBER 13, 2013 - RAJA SHEHADEH

114

1      A.   Yeah.
2      Q.   (Reading.)
3         "Where an individual suspected of, or
4  charged with, or convicted of, an offense that falls
5  within Israeli criminal jurisdiction, is present in
6  the territory, Israel may request the" PA "to arrest
7  and transfer the individual to Israel."  (As read.)
8         Right?
9      A.   Right.  That's right.  That's what it reads.
10     Q.   And that was an obligation that existed from
11  the very beginning of the Interim Agreement in 1995;
12  correct?
13     A.   Correct.  But I would like to say something
14  on this annex.
15     Q.   If I -- if I may -- I want to give you that
16  opportunity.
17     A.   Okay.
18     Q.   I just want to ask you a couple questions
19  about this paragraph.  And then I'll ask you to come
20  back to that thought, if I may.
21         Is that all right with you?
22     A.   That's absolutely all right.  Yeah.
23     Q.   Okay.  Thank you.
24         So the obligation to transfer -- arrest and
25  transfer, that still exists today, does it?

OCTOBER 13, 2013 - RAJA SHEHADEH

115

1      A.   In principle, yes.
2      Q.   And are you aware of requests by the Israeli
3  authorities to the PA to arrest individuals suspected
4  of activities that fall within the criminal jurisdiction
5  of Israel?
6      A.   I'm not aware of individual cases.  But I --
7  we constantly now hear of Israelis who are brought
8  back to Israel who -- who happen to be in the occupied
9  territory.  And no, I don't know of cases.  I mean,
10  I'm not involved.
11     Q.   So one of the areas that Israel retained
12  criminal prosecutorial authority over was what's called
13  security crimes; right?
14     A.   Yes.
15     Q.   And security crimes are crimes committed by
16  anybody that involve -- well, let me ask you -- let
17  me ask you a different question.
18         A crime committed by anybody that involves
19  a -- an attack of violence against a civilian, that's
20  a security crime; right?
21     A.   I think we can be more specific.  Because
22  security crimes are those crimes which are defined
23  in the security legislation that Israel put in place.
24  And this was Military Order 378, which then got into
25  a consolidated version many years later.  I think

OCTOBER 13, 2013 - RAJA SHEHADEH

116

1  maybe after the events of this.  But, anyway, there
2  is a consolidated version, and security crimes are
3  defined there.  So it's a very specific term.
4      Q.   And you understand the -- in our case --
5  our case involves seven actions of violence against
6  civilians; right?
7      A.   Uh-huh.
8      Q.   And you understand that the crimes that took
9  place in our case were security crimes; right?
10     A.   I can't say that for sure.  Because they
11  took place, in all except one incident, in Israel
12  itself.  And so the -- whether they -- what they
13  amount to in law would be determined by Israeli law.
14  And I'm not so familiar with Israeli law to say.
15     Q.   Fair enough.  And I appreciate that.
16         So the crimes that took place in Israel
17  against Israeli civilians, those are clearly within
18  the criminal prosecutorial jurisdiction of the Israeli
19  authorities; right?
20     A.   Uh-huh.  Yeah, absolutely.
21     Q.   And then there was one crime, which was
22  a shooting against a 12-year-old boy and his mother
23  that took place in the West Bank.
24         And that was also a security crime; right?
25     A.   Yeah.  That took place near a settlement

OCTOBER 13, 2013 - RAJA SHEHADEH

117

```
 1   called Givat Ze'ev, which is in the West Bank, but
 2   outside of the jurisdiction of the Palestinian
 3   Authority.
 4       Q.   It took place in Area C?
 5       A.   I think it's Area C.  Yeah.
 6       Q.   Now -- so those -- all of -- all of the
 7   incidents that we're talking about here or all of
 8   the crimes that are at issue in our case were crimes
 9   that fall within Israeli criminal jurisdiction as
10   used in Annex IV; is that right?
11       A.   I would think so.  Yes.
12       Q.   And so -- and so individuals suspected of
13   crimes like that were subject to requests by Israel
14   to the PA to arrest and transfer those individuals
15   to Israel; right?
16       A.   I would think so.  Yes.
17       Q.   Thank you.  Now --
18       A.   Now can I make my point?
19       Q.   Yes, now please say --
20       A.   Yeah.
21       Q.   -- what you were going to say.
22       A.   Yeah.
23       Q.   Thank you.
24       A.   I was going to say two things.  The first
25   is that, from my knowledge of the military orders,
```

OCTOBER 13, 2013 - RAJA SHEHADEH

118

```
 1   the -- Annex IV mainly follows a military order
 2   that was in force prior to the Oslo Accords, also
 3   called legal assistance, which dealt with -- because,
 4   even before the Oslo Accords, there was a judicial
 5   system and court system in the West Bank and -- and
 6   certain laws that applied in the West Bank.
 7       And there were security legislations, of
 8   course, applicable in the form of military orders.
 9   And so there were cases of -- criminal cases and civil
10   cases that happened in the West Bank or in Israel and --
11   and required something like a private international law
12   relationship between two entities, although they were
13   not exactly two countries.
14       But so -- so to take into consideration
15   enforcement of judgments done here in the other
16   jurisdiction -- enforced in the other jurisdiction,
17   they made this military order to specify how that
18   process can happen.  And this annex is, to a large
19   extent, based on those.  It's not anything new as such.
20       However, my experience as a lawyer working
21   in the occupied territories was that, under the full
22   occupation, when the military order was in force, when
23   we tried to enforce a decision in Israel or Israel tried
24   to enforce a decision in the West Bank, whether criminal
25   or civil, the process happened better -- I mean, it was
```

OCTOBER 13, 2013 - RAJA SHEHADEH

119

```
 1   functioning.
 2       My experience of a civil case involving a
 3   civil matter in Israel which we were trying to enforce
 4   in the West Bank, we said there is this annex.  And the
 5   annex says it has to -- there has -- there's a process
 6   and there's a committee which is to be appointed that
 7   you go to with the decision that you want to enforce
 8   in -- in Israel that was taken here.
 9       And I found out that it's all paper.  In fact,
10   we were not able to enforce that decision in Israel.
11   So it didn't really operate.  That's my experience of --
12   with this annex.  And I was very disappointed at the
13   time because I thought it was more than just words on
14   paper.
15       Q.   That sounds like an injustice.
16       A.   Yes.  Well, it's one of many injustices.
17   You're right.  It's an injustice.
18       Q.   I mean, if the -- the parties undertake these
19   agreements, they have an obligation to live up to them?
20       A.   Yeah.  But you see, the -- the problem with
21   these agreements is they're taken between two sides
22   without a third party as a guardian or enforcer or
23   arbiter.  And the two sides are unequal.
24       One side is, by far, more -- stronger than
25   the other side.  So if you have a grievance, if you
```

OCTOBER 13, 2013 - RAJA SHEHADEH

120

```
 1   have a point at which the Israeli side is violating
 2   as clearly as possible, you have no resort really,
 3   except if you want to go to the High Court.  And the
 4   record in the High Court hasn't been very good.  And
 5   you can't keep going to the High Court for every small
 6   thing.  And --
 7       Q.   I think there are many Israelis who would
 8   agree with you in your criticism of the High Court --
 9       A.   Yeah.
10       Q.   -- on both sides.
11       A.   Yeah.  So -- so it is -- it is an injustice.
12   But it's also a fault of the agreement that they didn't
13   have mechanisms.
14       In fact, I believe I read somewhere that,
15   in the course of the negotiations, they were thinking
16   of a arbitration process and then it was ruled out.
17   But it doesn't matter what -- what they were thinking.
18   Because the result is that there is an agreement that,
19   in many cases, as you have pointed out by pointing to
20   several articles, reads so beautifully, human rights,
21   rule of law, justice, and all of that.  But these are
22   words.  You can -- you can declare words very nicely,
23   and -- and they -- they mean words.
24       If you look at the constitution of Syria,
25   you will find beautiful words about the rule of law
```

OCTOBER 13, 2013 - RAJA SHEHADEH

121

```
 1   and human rights and everything.  And it goes on and
 2   on for many African countries as well.  But they're
 3   words.  So it doesn't make much difference what you
 4   declare.  It's what -- what makes the difference is
 5   how you can enforce and whether you have the enforcement
 6   mechanisms and the means for enforcement.  And in many
 7   instances in the -- in the situation here, you don't
 8   have the means for enforcement.
 9        Q.   So in that regard, that reminds me -- that's
10   very helpful.
11             And it reminds me:  There was another element
12   I wanted to ask you about, which is the -- the agreement
13   provides that the PA can sue and be sued; is that right?
14        A.   That's right.
15        Q.   And -- has the PA brought lawsuits in
16   accordance with that power and authority?
17        A.   Well, I'm a member of the commission --
18   human rights commission -- independent human rights --
19   commission for human rights, which is like an ombudsman,
20   which was established right after the agreement.  And
21   the point of the commission is to act as an ombudsman
22   and to observe that the PA does not violate human rights
23   and so on.
24             And -- they have -- and the commission
25   took cases against the PA to the courts.  Now, again,
```
OCTOBER 13, 2013 - RAJA SHEHADEH

122

```
 1   the courts are -- it's -- it's all a new entity and
 2   all a new -- we've had -- we've suffered a lot from
 3   the disruption.
 4             I mean, my father was a lawyer from --
 5   from the mandate times.  And during the mandate times,
 6   there was a rather respectable judiciary and proper
 7   law reports and -- and effort -- real effort made.
 8   And then he served as a lawyer under Jordan.  And,
 9   again, they kept on the system, and there was some
10   merit to -- and -- and integrity -- some, not fully --
11   to the system.
12             And then we had the occupation, and everything
13   came to a standstill, because there was a lawyer strike
14   against the occupation, which my father was against.
15   And he was one of the first people to go back to work,
16   but not many went to work.  And slowly more and more
17   started going to work.  But it caused a complete
18   disruption.
19             So all the judges who were part of the
20   judiciary went on strike, and they had to have new
21   judges.  And so it was a slow evolution and not a
22   very good one under occupation.  Although sometimes
23   the occupation tried to set things a bit and so on.
24   But it was all new and -- and rudimentary one could say.
25             And then comes the Palestinian Authority
```
OCTOBER 13, 2013 - RAJA SHEHADEH

123

```
 1   run mainly by people who have no experience in running
 2   a state.  They have -- their other life was lived in
 3   camps and here and there and never had experience.
 4   And so I and others like me were trying very hard
 5   to see that things could do -- go right and that the
 6   things happened properly.  But there was no experience.
 7             So you see these articles saying rule of law,
 8   human rights, proper things.  But it takes more than
 9   a declaration.  It takes experience.  It takes hard
10   work and slow work.  And -- and we kept on getting
11   disrupted because of things happening that created
12   violence and -- and disruptions, which -- so it -- it --
13   we have not had the chance to build up.  So all this
14   has to be taken into consideration.
15        Q.   Thank you.
16             You mentioned some work you did bringing
17   lawsuits against the PA, human rights lawsuits.
18        A.   Uh-huh.
19        Q.   Could you just describe those cases?
20        A.   Well, there was -- I mean, you know, this
21   is in -- in later years when -- when it became -- when
22   this human rights commission became better established
23   and had the means to do that.
24             So, for example, there was a case that has
25   been -- that went on for many years to the local High
```
OCTOBER 13, 2013 - RAJA SHEHADEH

124

```
 1   Court, Palestinian High Court, against the dismissal
 2   of teachers who were civil servants, who working for
 3   the government because of a decision or bad -- you know,
 4   because of the order effectively of the security forces.
 5             And the law in the West Bank doesn't allow
 6   for that to happen.  There cannot be an interference.
 7   And so they -- they were dismissed not in accordance
 8   with the law in any way.  And -- and so the case was
 9   very strong --
10        Q.   So you were --
11        A.   -- on this.
12        Q.   -- suing the PA to enforce the rights of --
13        A.   Yeah.  To --
14        Q.   -- individuals?
15        A.   -- to return them to their work.  And after
16   many, many, many years, finally the Court dared --
17   because it's not a strong court -- dared to side in
18   favor of -- of these workers.
19             And then the question was:  Would they be
20   returned?  And I don't know if they ever were returned
21   to their work.  So it's -- it's hard work.  It's --
22   it's not easy to establish these norms in a society
23   that has had so many disruptions and didn't have the
24   experience and the tradition.
25        Q.   Did -- has the PA brought claims -- or perhaps
```
OCTOBER 13, 2013 - RAJA SHEHADEH

125

```
1    it's the PLO.
2         There -- there -- there was a case about the
3    separation barrier; right?
4    A.    Oh, yeah.
5    Q.    Who -- who brought that case?
6    A.    Yes.  The PLO brought the case -- and I was
7    actually involved in that case -- to the International
8    Court at the Hague.
9    Q.    Who was your client?
10   A.    The P -- PLO.
11   Q.    Aah.
12   A.    Yeah.  Yeah.  PLO took the case.  And --
13   and they had a number of lawyers who prepared a very
14   good case.  And the decision was -- well, it's not
15   a decision.  It's an advisory opinion.  Because they
16   were asked by the U.N. to give an advisory opinion on
17   the question of the legality of the wall.  And -- and
18   they gave an opinion that it was illegal.
19   Q.    Was -- were there any questions raised in
20   that case -- you know, in the court, not -- I don't
21   want to hear about your private deliberations with
22   your client.
23        But in the court, were there questions
24   ventilated about the ability of the PLO to sue or
25   be sued?
```

OCTOBER 13, 2013 - RAJA SHEHADEH

127

```
1         I think -- you know, I didn't -- did I come
2    back?  No, I didn't come back after that.
3    Q.    There was an individual named Jabarin?
4    A.    Jabarin.  Yeah.
5    Q.    Jabarin.
6    A.    He -- he was in the organization from the
7    beginning and then now is a director.
8    Q.    And so he was there with you?
9    A.    He -- he was working at the organization --
10   in the organization, but not as a director.
11   Q.    So just coming back to Annex IV, I wanted
12   to ask you one thing about Annex IV.
13        Is it your understanding that -- that
14   nothing in Annex IV derogates from each side's
15   powers and responsibilities as detailed in Annex I?
16        MR. HILL:  Objection.  Vague.
17        But you can answer if you can.
18        THE WITNESS:  I'm not sure what you mean.
19   I mean, what specifically would it derogate from?
20   Q.    BY MR. YALOWITZ:  So Annex I includes --
21   we went over Annex I with the police and the security
22   cooperation and preventing terrorism and all that.
23        Do you remember that?
24   A.    Yeah, of course.
25   Q.    Yeah.
```

OCTOBER 13, 2013 - RAJA SHEHADEH

126

```
1    A.    Not to my knowledge.
2    Q.    That was accepted?
3    A.    It was accepted.  Yeah.
4    Q.    By -- by the way, I was wondering when did
5    you leave Al-Haq?
6    A.    In '91.  You know, my position with Al-Haq
7    was that we did not want an organization that was
8    factional or political.  And we insisted that anybody
9    working for the organization leave politics outside.  So
10   they cannot bring in their politics to the organization,
11   which was very difficult in a very factionalized society
12   and when most organizations were political and -- and
13   belonging to one faction or the other.  So Al-Haq, in
14   that sense, was a model and has continued to be such.
15        So when I joined as a legal advisor, I was
16   partly aware that I was following a route that was not
17   necessarily in agreement to everybody, because I believe
18   in negotiations and the two-state solution and so on.
19   And so, in a sense, I was taking a political stance
20   on the one hand.
21        On the other hand, I was going to be away
22   for so long that I wasn't going to be able to do my
23   work for the organization.  And I was looking for
24   a way out because I was very tired of working on so
25   many fronts.  And so I decided that I will suspend.
```

OCTOBER 13, 2013 - RAJA SHEHADEH

128

```
1    A.    Sorry.
2    Q.    That's all right.
3         And then -- and then Annex IV discusses
4    legal cooperation and division of certain prosecutorial
5    discretion and other things like that; right?
6    A.    Right.
7    Q.    And -- and so is it your understanding
8    that nothing in Annex IV derogates from the powers
9    and responsibilities that are detailed in Annex I?
10   A.    It doesn't derogate, because there are --
11   there are two different functions.  One is -- is what
12   are the police functions in the areas of operation
13   of the police and the means of operating.  And one
14   has to do with legal cooperation.
15        So in a -- in a normal state, the -- an
16   example would be the private international law aspect,
17   the conflict of law sometimes it's called, how to
18   manage between two different entities in terms of
19   enforcement of foreign judgment and so on.  It wouldn't
20   be foreign judgments because they're not exactly two
21   countries.  But it is akin to that.
22   Q.    I think your answer is:  No, Annex IV does
23   not derogate from Annex I.  And then you explained why.
24        Do I have that right?
25   A.    You could say so.  But I'm hesitant to --
```

OCTOBER 13, 2013 - RAJA SHEHADEH

129

1  to give an unqualified answer because I think you're
2  comparing oranges and apples.  They are two different
3  instruments.  And -- and so one doesn't derogate
4  from the other.  It, in a sense, explains the other
5  or provides a mechanism for enforcement of something
6  which -- which Annex I has nothing to do with
7  enforcement of judgments and so on.
8      I mean, even the name legal -- legal
9  affairs -- actually, I thought it was legal -- legal
10  assistance.  I'm not sure.  Maybe it is legal affairs.
11  I thought it was legal assistance.
12      Q.  We could check it.
13      A.  It's possibly right.  I'm probably thinking
14  of the military order which was called legal assistance,
15  historic memory.
16      Q.  This is what happens to us as we reach a
17  certain age.
18      A.  Exactly.
19      Q.  Are you offering any opinions about whether
20  the Palestinian Authority had internal control of the
21  Palestinian police?
22      A.  Well, not as an expert on -- all I can say
23  is that the context in which the Palestinian Authority
24  was working and its effectiveness in controlling the
25  police and -- and -- is something I know about and I

OCTOBER 13, 2013 - RAJA SHEHADEH

130

1  can offer some help in elucidating.  But that's as far
2  as it goes.
3      I -- the mechanisms of how the Palestinian
4  police worked in terms of the Palestinian Authority
5  is not something that I looked into, and I can't claim
6  to understand very well.  But I can help in giving the
7  context in which this operated.
8      Q.  So you have no -- you're not offering any
9  expert opinions in that regard?
10      Do I have that right?
11      A.  Well, I don't know what expert opinion is --
12  but it's an opinion on -- on the -- on the context.
13  That's what I'm able to say.
14      Q.  And so --
15      A.  And the conditions.
16      Q.  So leaving aside -- what I'm interested in
17  asking you about -- I want to try and be very focused
18  about it -- is you've mentioned the ability of the
19  police force to operate with regard to civilians.
20  And you mentioned a concern that you observed as a
21  layperson about the degradation of that police force.
22      Do I have that right?
23      A.  The degradation of the police force?
24      Q.  Yes.
25      A.  In -- in general?

OCTOBER 13, 2013 - RAJA SHEHADEH

131

1      Q.  Over -- over time during the Second Intifada?
2      A.  Well, even before the Second Intifada, there
3  was a degradation of the police force.
4      Q.  So how was the police force degraded before
5  the Second Intifada?
6      A.  Well, you know, it was -- it was a police
7  force that was a new police force that was attempting
8  to operate under the most difficult conditions.  So
9  I'll give a concrete example.
10      In 1996, when everything flared up because
11  of this tunnel business, there were confrontations
12  between -- in other words, people from Ramallah walked
13  and demonstrated and came towards the checkpoint that
14  separated -- at the outskirts of Ramallah.  The police
15  force tried to make a buffer zone between the Israeli
16  side and the Palestinian side.  Rather than be assisted
17  in this, the Israeli police was firing at them.  And --
18  and -- many people got injured, including police.
19      And so the image of the police was tarnished
20  because not only were they acting as surrogates for
21  the Israeli police, it looked like, but they were being
22  attacked by the Israeli police.  And so they lost face,
23  so to speak.  And how do you operate as a police force
24  under these circumstances?
25      Q.  So you're -- you're -- thank you.  That

OCTOBER 13, 2013 - RAJA SHEHADEH

132

1  example is helpful.
2      So you -- you've offered some opinions and
3  observations about the relations between the police
4  force on the one hand and the civil population on the
5  other; right?
6      A.  Yes.
7      Q.  And then I'd like to ask you some questions
8  about matters -- internal matters within the police
9  force.
10      Do you have any knowledge, from your own
11  personal observations, about matters of internal police
12  procedures and affairs?
13      A.  No, I don't.  All I could say is:  Looking
14  from outside at the police, at the individual members
15  of the police force, it was pathetic.  They -- they --
16  they looked totally lacking in confidence, not -- not
17  able to stop even traffic offenses.  They -- they --
18  they were not empowered.  And that's because of many
19  reasons.
20      But the main reason, I think, is that if
21  you had an agreement between the two conflicting sides,
22  two warring sides, Israel and the PLO, and that
23  agreement was intended to end the conflict and the
24  police force and the security people were convinced
25  that they are going to be helpful in enforcing that

OCTOBER 13, 2013 - RAJA SHEHADEH

133

1    agreement, because that's in the interest of the
2    Palestinian people, as we all believed, because
3    it was going to bring an end to our miseries and
4    occupation, and all that came out of that -- and
5    then instead of being in that situation, the police
6    force, like all of us, saw that the Israeli side
7    was not really pursuing its intentions of ending
8    the conflict.
9            It was continuing with the same things
10   that were the cause of all the problems, mainly
11   the settlements and encroaching more on the land
12   and taking more land and considering Area C, which
13   is 61 percent of the whole -- of the West Bank, as
14   theirs by right and able to settle any -- anywhere
15   they like, including continuing with practices that
16   were so provocative such as house demolitions.
17           So the Palestinian side was subjected to
18   all these horrors of the occupation, which we had
19   suffered from before and which we were convinced by
20   the PLO and/or the media that all of this would come
21   to an end because now they have decided on an agreement
22   and on a way of resolving the dispute.  And the security
23   forces were there to enforce that very good agreement.
24   It turned out not to be so.  It wasn't a very good
25   agreement.  It wasn't as presented.

                 OCTOBER 13, 2013 - RAJA SHEHADEH

134

1            And so the security forces and police, who
2    are part of the society, were in a -- in a difficult
3    situation.  I mean, I -- I would find it -- and --
4    and so many people in the police force who -- who
5    had joined because they thought they would be doing
6    that kind of job of enforcing the law that was in the
7    interest of the Palestinian people and in the interest
8    of peace were getting so much evidence in -- not in
9    theoretical, but in concrete terms, seeing some of
10   their fellow Palestinians being shot dead and wounded,
11   houses being demolished, more land being taken, all
12   the horrors of the occupation continuing.  And so they
13   were in a difficult situation.
14           MR. YALOWITZ:  I'm sorry.  Could I have the
15   question back?
16           (Last question read.)
17           MR. YALOWITZ:  Thank you.
18   Q.   BY MR. YALOWITZ:  So do you have any
19   knowledge about matters of internal police procedure
20   and internal police affairs?
21           MR. HILL:  Objection.  Asked and answered.
22   Go ahead.
23           MR. YALOWITZ:  I agree with the "asked" part.
24           MR. HILL:  Well, I think he responded to the
25   question.  But if you want him to repeat it, he can.

                 OCTOBER 13, 2013 - RAJA SHEHADEH

1            THE WITNESS:  I -- I -- I don't know the --
2    the mechanisms -- the internal mechanisms of how the
3    police -- all I know is from the reading and observing.
4    Q.   BY MR. YALOWITZ:  And based on reading and
5    observing, do you think that the police department
6    leadership exercised supervision over police
7    department personnel?
8    A.   Well, I'll give you an example of Jabril
9    Rajoub, who -- who was the head of the preventative
10   security.  And -- and he was very strong and brought
11   some order to the preventative security and built
12   a huge building and structures for the preventative
13   security and -- and did arrest Palestinians who were
14   Hamas or -- or otherwise who had committed crimes
15   against the Israelis.
16           And in the invasion of 2002, when I was
17   there -- I think it was April -- we heard a huge
18   explosion.  And his headquarters were bombed by --
19   by the Israelis.  And so after that, I don't know how
20   he -- or whether he was able to restructure.  So all
21   the work that he had done for all these years and --
22   and got somewhere, much more than others, I think --
23   was destroyed.  So -- so it wasn't -- it wasn't a good
24   signal to Palestinian enforcement mechanisms.
25   Q.   Do you know -- how do you say his name?

                 OCTOBER 13, 2013 - RAJA SHEHADEH

136

1    Jabril?
2    A.   Jabril Rajoub.
3    Q.   Jabril --
4    A.   Rajoub.
5    Q.   -- Rajoub.  Do you know him?
6    A.   Yeah, I mean, I know him.  I'm not -- I
7    don't know him well, but I -- I've met him.
8    Q.   And what is his job today?
9    A.   Football association.  He's -- he's very
10   active in -- in sports and in developing a football
11   team for Palestine.  And he seems to be doing well,
12   actually.  Maybe he's happier.
13   Q.   Do you know when he left the preventative
14   security?
15   A.   I don't know for -- the details.  But I
16   remember very well his interviews during the invasion
17   and how stressed he was and how he -- he said -- he --
18   he had arrested some people and he was willing to give
19   them up to Israel in order -- negotiating.  And then
20   negotiations -- rather than continuing negotiations,
21   Israel just bombed the place up.
22   Q.   Did you read, in the expert reports submitted
23   by the plaintiffs, that -- that he was involved with
24   the release of Ahmed Barghouti?
25   A.   He was involved with the release?  I must

                 OCTOBER 13, 2013 - RAJA SHEHADEH

137

1    have read, but I -- I don't recall now.  Give me the
2    details.
3        Q.  I'm sorry.  I -- I misspoke.  I said Ahmed
4    Barghouti.  I meant Abdullah Barghouti.
5        A.  I don't remember.  There were so many names
6    and people.
7        Q.  Are you familiar with an individual named
8    Abdullah Barghouti?
9        A.  No, I'm not.
10       Q.  "Barghouti" is a -- is that a fairly common
11   name?
12       A.  It's a very common name.  And not necessarily
13   all Barghoutis are related.  So there are Barghoutis
14   in various places totally unrelated to each other.
15   But it is a common name.
16           But I must also say that the preventative
17   security was not the only security police building
18   that was destroyed.  There were two more in Ramallah
19   that were destroyed, which one was near my school, a
20   French school, and it's an Ottoman building, actually,
21   which was a great loss to have destroyed there.  And
22   it -- it was reduced to rubble completely.  And the
23   other was in the quarter called Tireh in Ramallah.
24   Again, that was reduced to rubble.
25       Q.  Those were police buildings?

OCTOBER 13, 2013 - RAJA SHEHADEH

138

1        A.  Police buildings.
2           And the second one was built after the first
3    one was destroyed in order to house the police.  So --
4    so the police were on the -- on the run to a large
5    extent.
6        Q.  In 2002?
7        A.  No.  Before even.
8        Q.  The police were on the run?
9        A.  I mean, you know, they had -- they -- they --
10       Q.  When did you think -- I'm sorry.
11       A.  They had no place to stay.
12           In -- in 2002, before -- in -- when was it? --
13   March, I think -- two policemen -- and I mention this
14   in one of my books -- came to -- to our office and said:
15   We heard that you have a relationship to a place where
16   we can rent somewhere.  Can we rent?  You know, they --
17   they had no place to stay.  So they were -- they were
18   destitute.  It was pathetic.
19       Q.  So before 2002, did you observe police on
20   the run?
21       A.  On the run in the sense that they -- they
22   had no place to stay.  They had no accommodation
23   because their accommodation was destroyed.  And --
24   and they were -- they were -- I think it's a fault
25   also that they should have been given alternative

OCTOBER 13, 2013 - RAJA SHEHADEH

139

1    accommodation.  But they would have left on their
2    own maybe.
3        Q.  Other than what you've described, do
4    you have any information about the internal police
5    procedures?
6        A.  No, I don't.  I don't.  I can say that the
7    police procedure was a very long time before it began
8    to get off the ground.  And I think one of the main
9    manifestations of this is the traffic.
10       Q.  Would you agree with me that a professional
11   police force has an obligation to have appropriate
12   procedures for the discipline of police officers?
13       A.  Absolutely.  But then it has to be a
14   professional police force.  And it takes effort
15   and time and experience and money to develop a
16   professional police force.  And -- and there wasn't
17   any of these ingredients for a long time.
18       Q.  How do you know?
19       A.  Because I saw the police and -- and saw the
20   process.
21       Q.  You saw the traffic police and so forth?
22       A.  Well -- no, no.  You know, I -- I know from
23   personal experience that after -- during Israeli time,
24   there was only Israeli police.  There was no, I mean,
25   there were a few people that worked with Israeli police,

OCTOBER 13, 2013 - RAJA SHEHADEH

140

1    but they also -- many of them had left.
2           So when the Palestinian Authority was
3    established, they had to start from zero, from scratch.
4    And -- and you could see that they -- they were not
5    getting it together.  It took a while.  And then the
6    traffic was completely unmanaged, completely unmanaged.
7    If something happened, a theft or a burglary, you --
8    you couldn't resort to anybody because there was nobody
9    to resort to.  So that's from personal experience.
10       Q.  Did you have personal experience with the --
11   with the coastal police?
12       A.  How could I have?  There's no coastline in --
13   I mean, the West Bank is landlocked.
14       Q.  Did you have personal experience with the
15   presidential guard?
16       A.  No.  No.
17       Q.  Did you have personal experience with the
18   preventative security service?
19       A.  No.
20       Q.  Did you have -- well, that's enough.  We
21   can ask more later, but I think we understand each
22   other.
23           We had talked earlier about Human Rights
24   Watch.  So I -- I want to -- I want to show you a
25   report prepared by Human Rights Watch and ask your

OCTOBER 13, 2013 - RAJA SHEHADEH

141

1    opinions about some of the matters in it. So we'll --
2    it's been marked, actually. It's -- mine doesn't
3    have it, but -- this is a copy without the sticker
4    page, Defendants' 185. So why don't we mark it as
5    Plaintiffs' 106.
6           (Plaintiffs' Exhibit 106 marked.)
7    Q. BY MR. YALOWITZ: Why don't you take a
8    moment and look at it and let me know if it's a
9    document you've read before.
10   A. (Examining.) I don't believe I read this one.
11   No. I might have known that they did the report because
12   they were around investigating. But I -- no, I'm not
13   familiar with it.
14   Q. So when you reached your conclusions and
15   rendered your report, the Human Rights Watch report
16   that we've just marked is not something you had
17   considered?
18          Is that fair to say?
19   A. Yeah. That's fair to say. I mean, there
20   are so many reports that nobody can be familiar with
21   all of them.
22   Q. Sure.
23   A. There are hundreds. It's the most reported
24   region in the world, I believe, on human rights, not
25   that it has brought much good.

OCTOBER 13, 2013 - RAJA SHEHADEH

142

1    Q. We're sometimes like boats against the
2    current.
3           This is published in October of 2002 --
4    A. Uh-huh.
5    Q. -- is that right?
6    A. Yeah. This is -- I can read it. Yes.
7    Q. If you look on the second page, we see --
8    A. Yeah.
9    Q. -- October 2002.
10          So I wanted to ask you to turn to page 49
11   with me.
12   A. Whoever did the collation of this document
13   did a very bad job because some pages are turned.
14   Q. I apologize for that.
15   A. It's okay.
16   Q. It was a bit last minute.
17   A. Yes. I have 49 now -- 149; right?
18   Q. No, I'm sorry. Forty-nine.
19   A. Oh. Uh-huh.
20   Q. Do you have page 49?
21   A. I do.
22   Q. This is Human Rights Watch talking about
23   the legal standards applicable to times of armed
24   conflict.
25          Do you see that?

OCTOBER 13, 2013 - RAJA SHEHADEH

143

1    A. Yes.
2    Q. And their opinion is:
3           "In all situations of armed conflict, the
4    deliberate killing of civilians is a war crime."
5           Do you agree with Human Rights Watch on that?
6    A. There has been a lot of discussion of this
7    point, I remember. And Human Rights Watch went all --
8    all the way out in saying that it is a war crime.
9           I must say this, that I am horrified by
10   killings of civilians, unarmed civilians in Israel
11   and -- and consider it a crime. Now, whether it
12   constitutes a war crime, which is a very specific
13   extra level of -- or not, is not something that I
14   have looked into enough to form an opinion on. But
15   it doesn't matter, the end result is, I think, the
16   commission of crimes against civilians in Israel
17   are crimes and horrific crimes -- crimes. That's --
18   that's my position. I -- I'm not sympathetic to that,
19   and I -- I was never sympathetic to it.
20   Q. Now, I think you and I agreed earlier that,
21   under international humanitarian law, failure by one
22   party to a conflict to respect the laws of war does
23   not relieve the other of its obligation to respect
24   those laws?
25   A. Yeah, I agree. I agree.

OCTOBER 13, 2013 - RAJA SHEHADEH

144

1    Q. And -- and then I asked you about the Geneva
2    Convention as a follow-up to that. And I'm just going
3    to show you, on page 53 of the Human Rights Watch
4    report, what Human Rights Watch says about the Geneva
5    Convention in this regard, with regard to reprisals.
6           So let me know when you've arrived at 53.
7    A. Yes. You know, I -- I'll relieve you of this.
8           When I was with Al-Haq in the -- towards
9    the end of the '80s -- 1980s, there were killings by
10   Palestinians of people accused of being collaborators
11   with Israel. And we had lengthy discussions at Al-Haq
12   whether this is allowed or not -- or to be condemned
13   by us, a human rights Palestinian organization or not.
14          And at the end of the discussion, we decided
15   that, yes, we would condemn it. And -- and I think
16   it's very complicated business. Because when it is
17   a state and the state commits violations, then it's
18   a state. And -- and the state has organized systems
19   and powers and authorities. And it's much easier to
20   condemn a state.
21          When it's armed conflict and the other --
22   the case now, for example, in Syria. Now they're
23   saying that both the Syrian government, which is
24   obviously creating havoc and -- and committing crimes,
25   but also the resistance to the civilian -- to the

OCTOBER 13, 2013 - RAJA SHEHADEH

145

1  government is also committing -- committing crimes.
2         Now, it's easier to condemn the government
3  because you know what you're dealing with.  But when
4  you're dealing with armed conflict and armed civilians,
5  who are resisting an authority, it's important to hold
6  them to account.  I think it's important to hold them
7  to account, although it's a complicated question how
8  to hold them to account, who to hold to account, how
9  to define who -- who has done wrong.  They're not an
10  army.  So it's a much more complicated question.
11        But I agree that, if we are to uphold
12  principles and human rights principles, we have to
13  be fair and -- and not encourage any side to commit.
14  Because if -- if you -- if you do, then when that
15  side takes over, they will be -- be guilty of crimes
16  as well.  And -- that would not help the cause.
17    Q.    And -- and so -- so with regard to reprisals,
18  could you just look with me on page 53?
19    A.    Uh-huh.
20    Q.    Human Rights Watch says -- and I'm quoting:
21        "The Geneva Conventions specifically prohibit
22  reprisals against civilians."
23    A.    Uh-huh.
24    Q.    Do you see that?
25    A.    Yes, I do.

                    OCTOBER 13, 2013 - RAJA SHEHADEH

146

1    Q.    And you agree with that?
2    A.    Yes, I do.  I do.  I do.
3         I -- I want to say something about the Human
4  Rights Watch.  I want to say that Human Rights Watch
5  is fair and has said things that are condemnatory of
6  Israel and condemnatory of the Palestinians.  And we
7  have to take all of what they said into consideration.
8         I quoted, in my report on page 37, a report
9  that they did called "Israel's Closure of the West
10  Bank and the Gaza Strip."  And it's one of many reports.
11  But in this report, they said:
12        "The Israeli government has appeared to fall
13  back on the policy of closure in order to prove to an
14  outraged public that it is doing something in response
15  to terrorism, regardless of that policy's impact on
16  the welfare of the population."
17        And so Human Rights Watch was aware that
18  Israel's policies are inciting the population.  And --
19  and so that is an important background and context to
20  take into consideration.  You know, we didn't arrive
21  at the horrible suicide bombings that happened later
22  in the eighty -- in -- in the end of 1990 and beginning
23  of 2000 out of the blue.  It was a process and a gradual
24  process.
25        And -- and these policies that Israel was

                    OCTOBER 13, 2013 - RAJA SHEHADEH

147

1  doing were contributing to the brutalization of the
2  population that led to -- it's not to explain because
3  one should never explain away these things.  But it's
4  important to keep in mind to understand better how
5  things got to that point.  And I must say that there
6  were no similar happenings throughout the occupation
7  and until the end of the -- or -- or until the '90s.
8    Q.    I'm sorry.  Say -- say that again.
9         There were no similar what?
10    A.    Suicide --
11    Q.    Happenings?
12    A.    Suicide bombings.
13        I remember there were suicide bombings in
14  south Lebanon.  And I asked somebody -- we were talking,
15  and he was sort of more politically involved than I was.
16  I said:  Why isn't there similar things happening in --
17  in the occupied territories as in south Lebanon?  I just
18  was -- was curious to get his opinion.
19        And he said:  The Palestinians love life
20  too much to kill themselves in the process.  And --
21  and I believe it was correct, because we didn't have
22  any such suicide bombings until the '90s.  And I think
23  it was partly the brutalization and the emergence of
24  less nationalism and more fundamentalism.  But it was --
25    Q.    I'm familiar with this story.

                    OCTOBER 13, 2013 - RAJA SHEHADEH

148

1    A.    Well, there was more --
2    Q.    Continue.  I didn't mean to interrupt you.
3    A.    But there was more brutalization.  I remember,
4  from Al-Haq days, I got an affidavit, statement under
5  oath, from Gaza -- the Gaza City actually.  No, it
6  was in a refugee camp near Gaza City.  And I remember
7  this -- the -- the details.
8         The details were that the Israeli Army had
9  broken into the house of -- of some Palestinian and
10  proceeded to beat the father up before the children.
11  And -- and in the report, they had something about
12  the reaction of the children and so on.
13        And the question on my mind was -- and this
14  is late '80s.  The question on my mind was:  Are the
15  Israeli policymakers and soldiers and Army not aware of
16  what is going to be the outcome to this new generation
17  that will grow up off these policies of brutalization,
18  when you see your father being beaten before your eyes
19  and a child looks up to the father and doesn't want
20  to see the father humiliated before him?  Are they
21  not aware of what they're doing to the population?
22        I remember so clearly thinking that.  And --
23  and maybe even I wrote an article because I used
24  to write to the Israeli papers and -- and ask these
25  questions and -- and tried to sort of alert the Israeli

                    OCTOBER 13, 2013 - RAJA SHEHADEH

149

1  public to this.  And I didn't have to wonder very long.
2  Because the kind of brutal behavior that was manifested
3  later on has its roots in these times.
4      It's -- it's a very wrong policy.  You know,
5  the Israelis were in full control of the Gaza Strip and
6  the West Bank.  And they could have gone one way or the
7  another way.  Instead they went the wrong way, which led
8  to terrible consequences and suffering for everybody,
9  for all of us.  And it continues.
10     MR. YALOWITZ:  What was my question?
11     (Record read as follows:
12     "QUESTION:  Human Rights Watch says -- and
13  I'm quoting:  'The Geneva Conventions specifically
14  prohibit reprisals against civilians.'
15     "ANSWER:  Uh-huh.
16     "QUESTION:  Do you see that?
17     "ANSWER:  Yes, I do.
18     "QUESTION:  And you agree with that?
19     "ANSWER:  Yes, I do.  I do.  I do.")
20     Q.  BY MR. YALOWITZ:  Do you agree with me
21  that, under international human rights law, anybody
22  who is not a combatant is considered a civilian?
23     A.  Yes.
24     Q.  And I want to direct you to page 55 of the
25  Human Rights Watch report.

                OCTOBER 13, 2013 - RAJA SHEHADEH

150

1      A.  Yeah.
2      Q.  Fifty-five?
3      A.  Yeah.
4      Q.  So we're -- we're in the "Legal Standards"
5  section.  And I think -- do I have it right that Human
6  Rights Watch has -- well, I'm -- I'm not sure.  So I'm
7  not going to ask.  I'm not sure.  I'll withdraw the
8  question.
9      Do you have page 55 before you?
10     A.  Yeah, I do.
11     Q.  And they're quoting somebody named Hussein
12  Al-Sheikh --
13     A.  Al-Sheikh.  Yes.
14     Q.  -- Al-Sheikh, a Fatah official, who says:
15     "We sent a message to Al-Aqsa.  Don't touch
16  Israeli civilians.  Never.  Focus on the army and
17  settlers.  We don't consider settlers to be civilians."
18     Do you see that quotation?
19     A.  Uh-huh.
20     Q.  And then Human Rights Watch says:
21     "These assertions are inconsistent with
22  international humanitarian law."
23     Do you see that?
24     A.  Yeah.
25     Q.  Do you agree with that?

                OCTOBER 13, 2013 - RAJA SHEHADEH

151

1      MR. HILL:  Objection.  Vague.
2      But go ahead.
3      THE WITNESS:  Well, I'm -- I think -- I've
4  never looked into the question.  But I would think --
5  I would say that it's not the place for the settlers
6  to be in the occupied territories on land that has
7  been taken from the Palestinians.  It is not for them
8  to be there.
9      Now, whether they are civilians or not --
10 they are certainly not combatants.  But they are serving
11 an illegal objective.
12     Q.  BY MR. YALOWITZ:  So then Human Rights
13 Watch explains their opinion.  They say:
14     "The illegal status of settlements under
15 international humanitarian law does not negate the
16 rights of the civilians living there.  The fact that
17 a person lives in a settlement, whether legal or not,
18 does not make him or her a legitimate military target."
19     Do you see that?
20     A.  Yeah.
21     Q.  Do you agree with it?
22     A.  Well, I think the right to life is a --
23 a sacred right to life.  And the fact that you
24 live in a settlement, you don't forfeit that right
25 to life.  But I -- I still think that settlers should

                OCTOBER 13, 2013 - RAJA SHEHADEH

152

1  take responsibility to the fact that they have placed
2  themselves in areas which they are inciting the local
3  population.
4      Q.  So I just want to make sure I understand
5  your opinion because I want to be very, very clear
6  about this.
7      Your opinion is that the settlements in
8  the West Bank violate international law; correct?
9      A.  Absolutely, yeah.
10     Q.  And your opinion is that acts of terror
11 against civilians violates international law; correct?
12     A.  Yes.  In other words, I don't believe that
13 the illegal presence of the settlers should be dealt
14 with through violence.  Because violence is not going
15 to get anybody anywhere.  And -- and the amount of
16 suffering that violence causes is terrible.
17     I think the illegal presence of the settlers
18 in the occupied territories should be dealt with through
19 negotiations.
20     Q.  And -- and just so I'm clear, you're not just
21 offering that as sort of a political prescription.
22     You're opining on international law; right?
23     A.  Yeah.
24     Q.  Now, do you think that it violates
25 international law for a country to apply its law

                OCTOBER 13, 2013 - RAJA SHEHADEH

153

1   extraterritorially to its own citizens?
2       A.  It depends.  I mean, there are cases all over
3   the world where a country applies extraterritoriality
4   to its citizens outside of its territory.  Tax laws
5   is something that I would say.  So -- so yes, there
6   are cases.
7       But in this case, it's a different matter.
8   In this case, Israel has decided against -- except
9   for East Jerusalem -- against annexing the occupied
10  territories formally and went about annexing them,
11  to all intents and purposes, using all kinds of legal
12  ploys, one -- one of which is to apply its own law
13  extraterritorially.  And there was a very specific
14  process by which it did this.  It connected legislation,
15  it applied certain laws extraterritorially, and military
16  orders.
17      So, for example, the regional councils
18  and the local councils, which are how the settlements
19  are administered, are administered under a military
20  order which applied Israeli local council and regional
21  council law to these settlements.  So the Israeli law
22  came to be applied outside of Israel through a military
23  order, which applies only to the settlers and not to
24  the Palestinians.  And -- and so the settlements are,
25  in fact, under Israeli law but not in name, which was

OCTOBER 13, 2013 - RAJA SHEHADEH

154

1   a very clever way that Israel devised to -- to apply
2   its law extraterritorially.
3       But you see, in this case, the objective
4   is illegal.  The objective of establishing settlements
5   outside of its territory is illegal under international
6   law.
7       Q.  Just so I understand your opinion on this,
8   you're not objecting to the application of law
9   extraterritorially per se as being in violation
10  of international law.
11      You're saying the objective by -- the
12  objective served by the application of international --
13  of Israeli law extraterritorially in this case is what
14  you're objecting to?
15      A.  No.  I'm objecting on both accounts.
16      Because -- because the Hague regulations make
17  it clear what laws -- first of all, that all the laws
18  should stay and what laws may be amended by legislation.
19  And this very specifically refers to the security and
20  public order of the local inhabitants.  And the settlers
21  are not, under international law, local inhabitants,
22  although the Israeli law --
23      (Court reporter clarification.)
24      THE WITNESS:  Are not local inhabitants under
25  the Hague regulations, although the -- the High Court

OCTOBER 13, 2013 - RAJA SHEHADEH

155

1   has, to some extent, treated them as local inhabitants.
2       Did -- did I make that clear?
3       Q.  BY MR. YALOWITZ:  Yes.  That was helpful to
4   understand your opinion.  Thank you.
5       Now, I want to direct your attention to page 1
6   of the Human Rights Watch report.  And -- and just so
7   we have the report in context, October 2002 was sort
8   of two years into the Second Intifada period; is that
9   right?
10      A.  That's right.
11      Q.  And there were still another couple of years
12  to go, although they didn't know it in 2002; right?
13      A.  That's right.
14      Q.  And I just want to read -- I just want you
15  to read the introductory paragraph to yourself and
16  let me know when you've finished.
17      MR. HILL:  You want him to read the first
18  paragraph on page 1?
19      MR. YALOWITZ:  Yes.  Thank you.
20      MR. HILL:  Okay.
21      THE WITNESS:  (Examining.)  Yes.
22      Q.  BY MR. YALOWITZ:  Is there anything in that
23  paragraph you disagree with?
24      A.  No, I don't disagree with it.  No.
25      Q.  I'd like to direct your attention to page 2,

OCTOBER 13, 2013 - RAJA SHEHADEH

156

1   and I'd like to focus on the third paragraph from the
2   top with you.  It's the one that begins:
3       "The Palestinian Authority is not a state
4   and is therefore not a party to the major international
5   humanitarian law treaties, but it has on several
6   occasions signaled its willingness to abide by those
7   standards."
8       Do you see that paragraph?
9       A.  Yeah.
10      Q.  That's true?  You agree with that?
11      A.  Yeah.  Absolutely.
12      Q.  We talked about that earlier?
13      A.  Yeah.
14      Q.  And -- and it goes on -- Human Rights Watch
15  goes on to say:
16      "International humanitarian law, through
17  the well-established doctrine of command responsibility,
18  requires that those who occupy positions of authority
19  cannot escape accountability for war crimes or other
20  grave abuses committed by persons under their control
21  if they ordered their subordinates to commit such
22  crimes, failed to take reasonable preventive action,
23  or failed to punish the perpetrators."
24      Do you agree that that is a correct statement
25  of international humanitarian law?

OCTOBER 13, 2013 - RAJA SHEHADEH

157

```
 1        A.   I think it might be a correct statement.
 2             But I don't necessarily agree that Human
 3   Rights Watch is being fair in this case by saying
 4   that -- by putting all -- all the blame and all the
 5   responsibility on the Palestinian Authority, treating
 6   it as a fully fledged entity that is capable, under
 7   the conditions in which it self-existed and operated
 8   and all the restrictions, that it -- it could have but
 9   didn't prevent or hold accountable or -- or ordered or
10   failed to -- to take reasonable preventative action.
11             I -- I'm not in agreement that they were able
12   to do all these things because of the conditions under
13   which they operated.
14        Q.   Well, let -- let me -- let me try to be clear
15   in my question.  I'm not asking -- I take it you haven't
16   read the entire report yet?
17        A.   No.
18        Q.   But I suspect you will.  I mean, not with me
19   right now today.  But we'll look at some parts of it.
20             I'm just asking you about the statement of
21   international humanitarian law on page 2, which is --
22   which is a statement by Human Rights Watch of its
23   understanding of international law.
24             And I'm asking you, as a person knowledgeable
25   about international humanitarian law, do you agree with
```

                    OCTOBER 13, 2013 - RAJA SHEHADEH

158

```
 1   the Human Rights Watch statement?
 2        A.   You know, the statement cannot be divorced
 3   from the assertion made in the beginning -- in the
 4   clause in the beginning of this second sentence,
 5   which says:
 6             "International humanitarian law, through
 7   the well-established doctrine of command responsibility,
 8   requires" --
 9             So if there is a well-established doctrine
10   of command responsibility, which I am doubtful that
11   there was in the case of the PA, the Palestinian
12   Authority, then I cannot agree that there is that
13   obligation.  Because that obligation is related to
14   and subordinate to the command responsibility.  And --
15   and I'm not sure there was one, a clear one or a
16   well-defined one or a working one.
17        Q.   So you're an attorney; right?
18        A.   Right.
19        Q.   Do I have that right?
20        A.   Yeah.
21        Q.   You're trained in the common law system --
22        A.   That's right.
23        Q.   -- right?
24        A.   Sorry.
25        Q.   And so you understand that there are rules
```

                    OCTOBER 13, 2013 - RAJA SHEHADEH

159

```
 1   of law and then there are facts which the -- to which
 2   the rules of law apply; right?
 3        A.   Right.
 4        Q.   And in -- in the sentence we're focused on,
 5   Human Rights Watch is describing a rule of law; right?
 6        A.   Right.
 7        Q.   And they -- the report then goes on to apply
 8   that rule of law to the facts as Human Rights Watch
 9   saw it.  That's what we lawyers do; right?
10        A.   Right.
11        Q.   But in this sentence that we've been
12   discussing, they're describing a rule of law; correct?
13        A.   Correct.
14        Q.   And so I'm asking -- leave aside the facts.
15   We're going to come to the facts.
16             I'm asking, as an expert on international
17   humanitarian law, do you agree with Human Rights Watch
18   in their statement about international humanitarian
19   law through the well-established doctrine of command
20   responsibility?  And then they go on from there.
21        A.   I do.  I do.
22        Q.   Okay.  Thank you.  That's very helpful.
23             Now let's talk about facts.  When -- when
24   you -- are you familiar with an organization called
25   Hamas?
```

                    OCTOBER 13, 2013 - RAJA SHEHADEH

160

```
 1        A.   Yes.
 2        Q.   What is it?
 3        A.   It's the Islamic -- what does it stand for?
 4   It's an acronym for --
 5             (Comments in Arabic by the witness and
 6        Mr. Spitzen.)
 7             THE WITNESS:  The -- the Islamic resistance
 8   movement.
 9             MR. HILL:  The record should reflect that
10   Mr. Spitzen suggested the answer to the witness, just
11   so it's clear.  I'm not sure if the court reporter got
12   it.
13             MR. YALOWITZ:  Right.  The record can reflect
14   that Mr. Spitzen and the witness exchanged words in the
15   Arabic language that I think they were helpful to the
16   witness.
17             THE WITNESS:  It's the acronym of the Hamas.
18   And -- and yes.
19        Q.   BY MR. YALOWITZ:  And -- and are -- are
20   they -- are they known to endorse violence to
21   achieve political objectives?
22        A.   I'm no expert on -- on Hamas.  But I can
23   tell you that, in my experience and recollection,
24   Hamas began long before the -- not long, but before
25   the Palestinian Authority ever came into existence.
```

                    OCTOBER 13, 2013 - RAJA SHEHADEH

161

1    And they were beginning to come into the picture at
2    the end of the 1980s.  And they were -- because until
3    then the only political organization was the PLO.  And
4    so Hamas was beginning to come into the picture, and
5    they were more extreme than the PLO.
6          And the surprising thing was that Israel
7    was not declaring them a forbidden organization,
8    an illegal organization.  And I wondered about this.
9    And the only political explanation I can find is that
10   it was convenient to have a rival to the PLO.  And,
11   in fact, my understanding of why the PLO was so into
12   making an agreement with Israel and why they were
13   speeding it up is because they were worried that they
14   would be challenged by other organizations such as
15   Hamas.  So there is a political aspect to the whole
16   thing.
17         And -- and certainly Hamas, from the
18   beginning, took a stance against the Oslo Accords
19   and thought it was a wrong and mistaken thing on the
20   part of the PLO.  And they were very active in opposing
21   it.  And -- and this is part of the political and --
22   and the reality of the -- the situation, just as
23   in Israel there were groups who were opposed to it,
24   including the government of Netanyahu and the Likud,
25   who voted against the Oslo Accords and took power

OCTOBER 13, 2013 - RAJA SHEHADEH

162

1    after Rabin was killed and did everything they could
2    to destroy the Oslo Accords and are still doing it.
3          Q.  So would you agree with me that Hamas is
4    an organization that has claimed responsibility for
5    acts of violence against civilians in order to achieve
6    political ends?
7          MR. HILL:  Objection.  Lack of foundation.
8          THE WITNESS:  I mean, I -- all I know is from
9    the newspaper declarations.  And -- and sometimes Hamas
10   declared it was responsible for acts of violence over
11   the years.
12         MR. HILL:  Kent, we've been going about an
13   hour and a half.  Can we get a break?  Is it okay?
14         MR. YALOWITZ:  Sure.  You ready for a break?
15         THE WITNESS:  Yeah.
16         MR. YALOWITZ:  Well, your counsel wants a
17   break.  So let's take a break.
18         MR. HILL:  Thank you.
19         (Recess from 3:21 p.m. to 3:38 p.m.)
20         Q.  BY MR. YALOWITZ:  So Human Rights Watch --
21   Human Rights Watch calls Hamas a -- perpetrator
22   organization in its report because they say that
23   Hamas perpetrated suicide bombings.  So I want to
24   direct your attention to page 16.
25         Are you there?

OCTOBER 13, 2013 - RAJA SHEHADEH

163

1          A.  Uh-huh.
2          Q.  So could you look with me at the beginning
3    of the second full paragraph.  Human Rights Watch is
4    saying:
5          "The perpetrator organizations have also
6    sought to use the bombings to build publicity for
7    their cause, to drum up new recruits for suicide
8    missions, and to sow anxiety and terror among Israelis."
9          Do you see that?
10         A.  Yeah.
11         Q.  Do you have any basis to disagree with Human
12   Rights Watch on that?
13         MR. HILL:  Objection.  Lack of foundation.
14         You can respond.
15         THE WITNESS:  I -- I don't -- I don't know
16   the report, and I don't know the basis for this.  And
17   I -- I can't have an opinion on the report.
18         You know, I want to say that Human Rights
19   Watch has done many reports.  And -- as I know, from
20   working in human rights, even human rights organizations
21   are not free from pressures and from the context and
22   the times.  So the time that this report was made was
23   a very difficult and sad time with all these bombings
24   and happenings on all sides.  And so I think this might
25   be reflected in the report.

OCTOBER 13, 2013 - RAJA SHEHADEH

164

1          After the Gaza -- invasion of Gaza -- when
2    was it? -- in 2008, Human Rights Watch did a very strong
3    report as well, which also accused Israel of war crimes
4    and -- because the situation was so strong and harsh and
5    so on.  So I think human rights organizations also are
6    affected by these.  And -- and this report is obviously
7    done in the heat of great tragedy and trouble and so on.
8    And so it seems to be reflected in the report.  But I
9    have no opinion on the report.  I -- I'm not familiar
10   with it.
11         Q.  BY MR. YALOWITZ:  You lived in the West
12   Bank during the period?
13         A.  Absolutely.
14         Q.  And you're aware that -- that the perpetrators
15   of suicide bombings often filmed videos of themselves
16   before they committed their crimes?
17         MR. HILL:  Objection.  Lack of foundation.
18         Q.  BY MR. YALOWITZ:  Right?
19         A.  Well, I've seen television clips of -- of
20   things of that sort.
21         Q.  And you're aware that -- that the media in the
22   West Bank wrote articles glorifying those individuals;
23   right?
24         MR. HILL:  Objection.  Lack of foundation.
25         THE WITNESS:  You know, I -- the experience

OCTOBER 13, 2013 - RAJA SHEHADEH

165

1  of living in the occupied territories during that time
2  was one of the Israeli Army invading Ramallah and other
3  Palestinian cities and putting us under lengthy curfew.
4        And my mother was living in the center
5  of town, and she had five Israeli tanks around her
6  house, shooting and creating havoc.  And so there
7  was a period of four or five months of absolute terror
8  that the population was subjected to.  My brother had
9  Israeli soldiers living in his house for three days,
10  living in his house.  They put them all in one room,
11  and -- and they took the rest of the house.  His
12  children were, I think, at that time four and six.
13  And -- and we all worried how this is going to affect
14  them for the rest of their lives.
15        There were so many people that were stuck.
16  And a good friend of ours died in that time and couldn't
17  be buried.  People -- I mean, all kinds of tragedies
18  occurred during the course of these.  So it was a very
19  intense and terrible time, very insightful.  We didn't
20  need to be told anything.  We -- we were experiencing
21  things.
22     Q.  BY MR. YALOWITZ:  Human Rights Watch
23  states in its report:
24        "The organizers sought to portray the bombers
25  as 'martyrs' - that is, as heros prepared to make the

OCTOBER 13, 2013 - RAJA SHEHADEH

166

1  ultimate sacrifice in defense of their people."
2        That's true, isn't it?
3        MR. HILL:  Objection.  Lack of foundation.
4        MR. YALOWITZ:  That's not a valid objection,
5  Brian, and you know it.  You're disrupting the
6  deposition.  Now stop it.
7        MR. HILL:  I'll make proper objections.
8  This witness has no foundation to answer the question.
9  You haven't established that he has personal knowledge
10  of the facts that you're asking him to agree with.
11  That's a proper objection.  I've made it.
12        He can respond.
13     Q.  BY MR. YALOWITZ:  Do you need the question
14  back?
15     A.  Well, I can see that the Palestinians were
16  divided.  And -- and this idea that we needed to be
17  told that people who were exploding themselves were
18  doing it on our behalf did not agree with the thoughts
19  of so many of the Palestinians, even if it were
20  purported to be the case.
21        I mean, of course, in -- in the Western media,
22  there was a lot of hype made of -- of this.  But if
23  you're living there and you're -- you're -- sometimes
24  you know people on the other side, sometimes you know
25  how -- how -- what violence means, you -- you don't

OCTOBER 13, 2013 - RAJA SHEHADEH

167

1  easily get influenced by statements because you --
2  you know it for yourself.  You don't need to be told.
3     Q.  Human Rights Watch wrote in their report
4  that the targeting of civilians, often using perfidious
5  methods, made the suicide bombers and their sponsors
6  criminals.
7        You agree with that, don't you?
8     A.  Well, they -- well, they -- they died.
9  They -- they killed themselves.  So they -- I mean,
10  a criminal has to be alive to be --
11     Q.  Human Rights Watch wrote the:
12        "Targeting of civilians often using perfidious
13  methods made the suicide bombers and their sponsors
14  criminals."
15     A.  I don't know about that.
16     Q.  And --
17     A.  Sorry.
18     Q.  And Human Rights Watch wrote in their report
19  that these people's:
20        "Actions and disregard for basic human
21  rights has tainted and undermined the wider struggle
22  for Palestinian human rights."
23        Do you agree with that?
24     A.  It's difficult for me to agree or disagree
25  with parts of the report when I'm not familiar with

OCTOBER 13, 2013 - RAJA SHEHADEH

168

1  the whole report.  Because I trust Human Rights
2  Watch and trust their ability to be fair and careful.
3  And I know that they have had all kinds of reports,
4  sometimes critical of Israel, sometimes critical of
5  the West Bank authority -- the Palestinian Authority.
6  And, in general, I trust their reports.  But this
7  particular report I'm not familiar with enough to
8  give an opinion on that.
9     Q.  So do you have an opinion generally about
10  the topic -- let me read the sentence to you.  And
11  I understand that you haven't read the report.  And
12  that's fair.  The -- the assertion that Human Rights
13  Watch makes is that the actions of suicide bombers
14  and their:
15        "Disregard for basic human rights has tainted
16  and undermined the wider struggle for Palestinian human
17  rights."
18        MR. HILL:  What's the question?
19     Q.  BY MR. YALOWITZ:  Do you agree with that?
20     A.  I don't know if it undermines the wider
21  struggle of Palestinian rights.  Because I don't
22  think to begin with that suicide bombing serves any
23  good purpose for the Palestinians or for anybody.
24  So it's -- it's not a good objective.  It's not the
25  right way of going about things.  And so it's wrong

OCTOBER 13, 2013 - RAJA SHEHADEH

169

1  on the face of it.  That's all I can say.
2      Q.   Can we go back to the early period of the
3  PA authority, '96, '97 time period.
4      A.   Uh-huh.
5      Q.   This is -- '96, '97 is the first -- first
6  period of the new Palestinian Authority?
7           Do I have that right?
8      A.   That's right.
9      Q.   That's when they're forming up their police
10 force and things like that?
11     A.   That's right.
12     Q.   And I think you and I have talked about that
13 there were elements in the Palestinian society who were
14 against the Peace Process; right?
15     A.   Right.
16     Q.   And they used violence in the '96, '97 period
17 to achieve their aims against the Peace Process; right?
18          MR. HILL:  Objection.  Lack of foundation.
19          You can respond.
20          THE WITNESS:  I can't say that.  I -- all
21 I say is that they were opposed and tried to undermine
22 it, as the Likud in -- in Israel and the Netanyahu
23 government tried to undermine the Oslo process by
24 not withdrawing from -- by not following it up, by --
25 by breaking down whatever had been achieved and --

                OCTOBER 13, 2013 - RAJA SHEHADEH

170

1  and stopping the progress of the process.
2      Q.   BY MR. YALOWITZ:  Did Likud send suicide
3  bombers to Ramallah?
4      A.   No.  But they sent settlers to settle and
5  take more land and facilitated that and reduced the
6  possibility of coordination with the police and made
7  every effort to undermine the confidence of the people
8  and the representatives of the people in the process,
9  which was very difficult and made the life of the
10 Palestinian Authority very difficult.
11     Q.   So could you look with me -- just coming
12 back to the '96, '97 period, could you look with me
13 on page 14 of the Human Rights Watch report?
14     A.   By the way, I want to say that you don't
15 kill human beings only by suicide bombings.  You also
16 kill them by shooting them.  And the Israeli Army, at
17 several occasions, one of them in '96, shot -- I think
18 the number was over 100 people and injured.  And these
19 are Israeli Army officers who are certainly accountable.
20          Which page?
21     Q.   Fourteen.
22     A.   Yes.
23     Q.   So there's a heading:
24          "Previous Use of Suicide Attacks Against
25 Civilians."

                OCTOBER 13, 2013 - RAJA SHEHADEH

171

1      A.   Uh-huh.
2      Q.   Do you see that?
3      A.   Uh-huh.
4      Q.   And then Human Rights Watch is reporting that:
5           "Palestinian groups carried out 14 suicide
6  bombing attacks against Israeli civilians, mostly in
7  1996 through '97."
8           Do you see that?
9      A.   Yeah.
10     Q.   Is that consistent with your recollection?
11          MR. HILL:  Objection.  Lack of foundation.
12          You can respond.
13          THE WITNESS:  You know, I -- I was around.
14 But I haven't been counting or observing -- I mean,
15 you know, there were so many things happening.  And
16 this was amongst the things that possibly were
17 happening.
18     Q.   BY MR. YALOWITZ:  You're not disagreeing
19 with Human Rights Watch?
20     A.   I would -- I would think that Human Rights
21 Watch is usually careful in its documentation.  So on
22 that basis, I cannot, on the face of it, dispute their
23 facts, although I cannot confirm them either because
24 I have no knowledge of them.
25     Q.   And if you could just look with me at the

                OCTOBER 13, 2013 - RAJA SHEHADEH

172

1  next paragraph, Human Rights Watch has reported:
2           "The PA responded by detaining hundreds of
3  Hamas and Islamic Jihad members and supporters, but
4  they were not charged or brought to trial in connection
5  with the bombings."
6      A.   I can't comment on this because I don't know
7  the facts and I don't know the details and I have no
8  knowledge of this myself.
9      Q.   And then Human Rights Watch reports:
10          "Following these detentions, the bombings
11 ceased."
12          Do you have any knowledge about whether
13 that's correct or incorrect?
14     A.   I don't have any knowledge.  I can't be
15 helpful to you on this at all.
16     Q.   And -- and then Human Rights Watch reports:
17          "Many of the detainees, however, were released
18 from PA custody once the clashes between Palestinians
19 and Israelis resumed in September 2000."
20          Do you see that?
21     A.   Yes, I see that.  But, again, I have no
22 ability to confirm or deny or add to this or help --
23 be helpful about this.
24     Q.   That was going to be my next question.  So
25 there we are.

                OCTOBER 13, 2013 - RAJA SHEHADEH

173

1        Now, do you know who Ahmed Barghouti was?
2    A.   No.  No, I don't.
3    Q.   Have you ever heard of Ahmed Barghouti?
4    A.   I don't -- no, I haven't heard of Ahmed
5  Barghouti.  I've heard of many other Barghoutis, but
6  not Ahmed.
7    Q.   Marwan, I suppose --
8    A.   Marwan, yes, I knew him as a student.
9    Q.   So you -- you have -- I take it you have no
10  opinions about his activities; right?
11    A.   No.  I --
12        MR. HILL:  Objection.  Vague.
13        Who's -- who's the "his"?
14        MR. YALOWITZ:  Fair enough.  Let me rephrase
15  the question.
16    Q.   BY MR. YALOWITZ:  I take it you have no
17  opinions about Ahmed Barghouti's activities in the
18  2001 and 2002 period?
19    A.   I have no opinions on the activities of
20  Ahmed Barghouti.
21    Q.   And I take it you have no opinions on the
22  activities of PA authorities who arrested him or
23  released him or anything like that?
24    A.   I have no opinions on the PA authorities
25  who arrested or detained him.  I know nothing about
              OCTOBER 13, 2013 - RAJA SHEHADEH

174

1  this.
2    Q.   Are you aware that, in December 2001 and
3  January 2002, the PA made sustained efforts at achieving
4  a cease-fire?
5    A.   Yes.  I -- I know this from reading, yeah,
6  papers.  But I have no direct involvement or engagement
7  with this.
8    Q.   Do you have any knowledge about what the PA
9  did to achieve that cease-fire?
10    A.   I'm afraid not.
11    Q.   Do you recall that this -- that -- that at
12  the end of January 2002 the cease-fire failed?
13    A.   No, I don't know.  I don't remember this.
14    Q.   Do you -- do you recall -- have you ever
15  heard of an individual named Wafa Idris?
16    A.   I haven't heard of Wafa Idris.  "Idris"
17  probably.
18    Q.   Idris.
19        You never heard of her as a suicide bomber?
20    A.   Oh, it's a woman?  No, I haven't.
21    Q.   We talked about Jabril Rajoub.
22        Did we talk about him?
23    A.   Yes, we did.
24    Q.   But you said you don't know when he left the
25  Palestinian police?
              OCTOBER 13, 2013 - RAJA SHEHADEH

175

1    A.   No, I don't know when.  I know he did leave,
2  but -- or maybe he didn't.  I don't know.  I mean, you
3  know, he may -- he might have something to do with it
4  still.  But he's more active with football.
5    Q.   Do you know of an individual named Nasser
6  Aweis?
7    A.   Nasser Aweis?
8    Q.   Aweis.
9    A.   No.  I'm afraid not.
10    Q.   Do you know of an individual named Abd
11  Al-Karim Aweis?
12    A.   Again, no.
13    Q.   Would you agree with me that it is -- it's
14  not -- well, let me ask you a different way.  I'm
15  going to strike the question and start again.
16        Would you agree with me that it's not okay
17  to pay people who commit acts of terrorism?
18        MR. HILL:  Objection.  Vague.  Lack of
19  foundation.
20        You can respond.
21        THE WITNESS:  What -- what do you mean "pay"?
22  What do you mean by "pay"?
23    Q.   BY MR. YALOWITZ:  Pay, like to pay money,
24  to pay money to people who commit acts of terrorism.
25        Is that permitted under international law?
              OCTOBER 13, 2013 - RAJA SHEHADEH

176

1    A.   No, of course not.
2    Q.   Is it permitted under international law
3  to keep somebody on the -- on your payroll, as an
4  employer, who's committed acts of terrorism?
5    A.   I don't know what's the position on the
6  international law on this specific point.
7    Q.   Do you think that it's consistent with
8  international law to give an employee a promotion
9  after he's convicted of committing an act of terrorism?
10    A.   I don't know these circumstances.  And I
11  don't know -- I can't answer.
12    Q.   Do you -- do you think it's consistent with
13  international law to incite acts of terrorism?
14    A.   No.  And incitement in any form is -- is --
15  to acts of terrorism is wrong, of course.
16    Q.   Do you -- do you think it's permitted under
17  international law to release prisoners who are suspected
18  of participating in acts of international terrorism?
19        MR. HILL:  Objection.  Vague.
20        You can respond.
21        THE WITNESS:  Well, you know, if -- if
22  something is a criminal offense and somebody is
23  arrested, they should not be released to begin with.
24  So I think that's how -- what it comes down to.
25    Q.   BY MR. YALOWITZ:  And I -- and I think you
              OCTOBER 13, 2013 - RAJA SHEHADEH

177

1  said that you have no -- you -- you mentioned you
2  knew Marwan Barghouti as a student.
3         Did you know him when he was leading the
4  Al-Aqsa Martyrs Brigades?
5         MR. HILL: Objection. Lack of foundation.
6         THE WITNESS: When Marwan Barghouti was
7  at the university in Birzeit and I served as a legal
8  advisor for the university and I used to see him
9  at the university, he was active in student politics.
10 And then he was deported.
11        And I -- when I went with the delegation
12 through Amman, Jordan, I saw him in Amman because he
13 came to the hotel with others and so on. And then
14 after the Oslo Accords were signed, he was one of the
15 people who was allowed to return home.
16        And I remember speaking to him and finding
17 out that his positions have increased -- have changed
18 entirely, so he was willing -- and he was telling me
19 about meetings that he was holding with Israelis and
20 the joint things that he was doing. And -- and he was
21 saying that we must give a chance -- complete chance
22 to this agreement, which rather surprised me, because
23 he was -- he had changed 180 degrees from his earlier
24 positions. And --
25     Q. BY MR. YALOWITZ: Perhaps not.

OCTOBER 13, 2013 - RAJA SHEHADEH

178

1      A. No. I had no doubt that he was being genuine.
2  And then -- and this was in the late '90s, you know,
3  '96, '97, maybe '98 even. I'm not sure of the exact
4  date.
5         And then he, like many others, were so
6  disappointed and so crushed by what was happening
7  in the occupied territories, in view of the agreement
8  and the willingness of the Palestinians to accommodate
9  the Israelis and -- and give so much up and so on, that
10 he must have changed. But since then, I didn't speak
11 to him to find out. So I don't know of his activities.
12     Q. Did you know him in the 2002 period?
13     A. No, I didn't.
14     Q. Did you have any dealings with him?
15     A. No. No, I didn't. And I wasn't -- I wasn't
16 so curious, actually. You know, the place is very
17 small, and sometimes you run into people you know.
18 But this happened to have been done before.
19     Q. You mentioned Jabril Rajoub.
20        Did -- did you deal with Jabril Rajoub in
21 the 2002 time period?
22     A. I never dealt with Jabril Rajoub at all
23 except that he was around in -- in society things,
24 weddings sometimes, or receptions that I would go into,
25 and I would see him. But I -- I wasn't somebody --

OCTOBER 13, 2013 - RAJA SHEHADEH

179

1  I mean, he's a different kind of person than I am.
2  And we're not attracted to each other.
3      Q. Did you read, in one of the expert reports,
4  that Mr. Rajoub and Mr. Barghouti were implicated in
5  the Hebrew University bombing?
6      A. I -- I don't remember that. But it might be.
7  It might be. I don't remember. I don't remember. I
8  mean, I read so many now of these reports that --
9      Q. In any case, you don't have any personal
10 knowledge of their activities in the March through
11 July 2002 time frame, do you?
12     A. Absolutely not.
13        MR. HILL: Just for the record, "their
14 activities" is Mr. Rajoub?
15        Is that who you're referring to?
16     Q. BY MR. YALOWITZ: So you understood I was
17 asking about Barghouti and Rajoub; right?
18     A. Yeah.
19        MR. HILL: Okay.
20        THE WITNESS: And I didn't have --
21        MR. HILL: Thank you.
22        THE WITNESS: -- anything to do with them.
23     Q. BY MR. YALOWITZ: So I want to direct your
24 attention to page 32 of the Human Rights Watch
25 report. And I'm -- I'm looking at the last full

OCTOBER 13, 2013 - RAJA SHEHADEH

180

1  paragraph on page 32, which runs over to page 33.
2  And I'll -- I'll just read a little bit of it for
3  you to orient you.
4         "Seeming public justifications of the
5  bombings, however, came from figures close to Arafat,
6  especially after the Al-Aqsa Martyrs Brigades began
7  carrying out suicide bombing attacks against civilians
8  in early 2002."
9         And then Human Rights Watch quotes Ahmad Abd
10 Al-Rahman.
11     A. Ahmad Abd Al-Rahman.
12     Q. Abd Al --
13     A. Rahman.
14     Q. Rahman. Who was Abd Al-Rahman?
15     A. I don't know. They say he's an advisor.
16     Q. But you -- you've never heard of him?
17     A. I've heard of him. Yeah, I've heard of him.
18     Q. And what did you hear of him as?
19     A. He was involved with the Palestinian
20 Authority.
21     Q. And then further down in the paragraph,
22 there's a quotation from Marwan Barghouti.
23        Do you see that?
24     A. Uh-huh. Okay.
25     Q. Do you have any basis to disagree with

OCTOBER 13, 2013 - RAJA SHEHADEH

181

1  the comments in this paragraph or the quotations --
2  the accuracy of the quotations?
3      A.   I -- I --
4      MR. HILL:  Objection.  Foundation.
5      You can respond.
6      THE WITNESS:  I cannot vouch for these
7  quotations because there are so much that has been said
8  and so many quotations and so many political statements,
9  as I saw also from the reports you submitted from your
10  experts, which I think have -- have to be assessed in --
11  in the context.  Sometimes they are political statements
12  that are said for public consumption.
13      I mean, you know, Palestinian culture is an
14  oral culture and people say a lot, speak a lot, and are
15  emotional.  And -- and you can't always take everything
16  they say as word of God or word of -- so you can find
17  so many things to quote and condemn a person or an
18  authority.
19      But, you know, I don't know what is the
20  authority here, whether these people said it, what
21  context they said it in, what they meant by it, how
22  is the translation.  They obviously said it in Arabic.
23  I don't know if it was carefully translated.  I can't
24  give an opinion on this.
25      Q.   BY MR. YALOWITZ:  The only basis you have

OCTOBER 13, 2013 - RAJA SHEHADEH

182

1  to judge is that it's in the Human Rights Watch
2  report; right?
3      A.   Yeah.  Which -- which usually are careful
4  people in doing -- but, again, it's such a lengthy
5  report that I haven't read.  And, I mean, you know,
6  they're -- they're a careful organization.  But they
7  can make mistakes.  They can -- they have people who
8  interpret these things, and they can be wrong in their
9  interpretation.  They're not indelible.
10      Q.   So I want to direct your attention to page 36
11  of the Human Rights Watch report.
12      A.   Uh-huh.
13      Q.   And I'm just going to read a statement to you,
14  and I want to ask you if you have any opinions about it.
15  Okay.
16      "Public officials, because of the political
17  authority they embody, should never legitimize attacks
18  on civilians."
19      A.   This is in the report, or you're reading it?
20      Q.   Yes.  I'm reading from the bottom of page 36,
21  the last full paragraph.
22      Do you see it?
23      A.   Yeah.
24      Q.   You agree with that, don't you?
25      A.   Yeah.

OCTOBER 13, 2013 - RAJA SHEHADEH

183

1      Q.   And then Human Rights Watch, speaking about
2  the PA, says:
3      "Yet political leaders have made statements
4  that appear to endorse attacks against civilians, both
5  within the occupied territories and externally.  These
6  span the range from ambiguity to outright support and
7  undermine other statements condemning attacks against
8  civilians."
9      A.   I don't have an opinion on this.  And I think
10  that it's very dangerous to pick and choose statements
11  made by political people.  Because political people
12  speak all kinds of things for political consumption --
13  for public consumption.
14      I think you can condemn so many Israeli
15  leaders, as has happened, of course, who -- when they
16  said things for public consumption and sometimes not
17  being aware that they were recorded.  And they were
18  recorded, and they were condemned for what they said.
19      Because political leaders speak a lot of
20  things and say a lot of things.  And -- and sometimes
21  they're saying them because they feel they need to
22  say them because, otherwise, they will not be popular.
23  They don't necessarily mean what they say always.
24  I wish they did.
25      Q.   Could you look with me on page 38 of the

OCTOBER 13, 2013 - RAJA SHEHADEH

184

1  Human Rights Watch report.  The Human Rights Watch
2  report -- and I'm looking at the last paragraph on
3  page 38 --
4      A.   Uh-huh.
5      Q.   -- writes:
6      "Apologetic statements by public officials
7  have also been accompanied by the broadcast of
8  incendiary statements on publicly funded television."
9      Do you see that?
10      A.   I see that.  And I must tell you that
11  publicly funded television was a farce.  Because this
12  is Palestine Television.  I've rarely watched Palestine
13  Television.  Now it's improved a bit.  But the times
14  I did watch Palestine Television, it -- it was so badly
15  done, so mediocre, so inaccurate -- I don't know how
16  many people watched it.  Because you watch television
17  either for entertainment or to get something that you
18  can trust about the news or about what is happening
19  or discussions and so on.
20      Publicly funded television, no matter what
21  was there spoken on it, might not have reached many
22  people because I don't believe many people were watching
23  Palestine Television.  They were other stations that
24  did a much better job in reporting on the situation
25  or giving entertainment.

OCTOBER 13, 2013 - RAJA SHEHADEH

185

1    Q.  I take it you -- you do not make it a practice
2  to watch televised sermons by imams that are broadcast
3  on Palestinian television?
4    A.  I don't watch television entirely.  I don't
5  waste my time with television.
6    Q.  So -- so you probably are unfamiliar with
7  some of the incendiary statements that were made on
8  Palestinian television?
9    A.  Absolutely unfamiliar.  And even I don't
10  believe I knew where to find Palestine Television on
11  the channel lists.
12    Q.  Do you know who owns Palestinian television?
13      Is it privately owned?
14    A.  No, it's not -- certainly not privately owned.
15  It must be the PA.
16    Q.  And does it -- does it have a -- a tradition
17  of independence from the PA political authorities?
18      MR. HILL:  Objection.  Lack of foundation.
19      THE WITNESS:  I don't know about how it's
20  organized.  But, you know, again, the Authority came
21  without this tradition.  And -- and, in general, the
22  PA and the PLO did a very bad job with public relations
23  throughout.  Now they're doing a little better job of
24  it.  They're getting a little more sophisticated.  But
25  no, they -- they didn't have independence -- independent

OCTOBER 13, 2013 - RAJA SHEHADEH

186

1  television, I wouldn't think.  But I -- I don't know
2  for sure how it's run and how it's done.
3    Q.  BY MR. YALOWITZ:  I'm sorry.  I lost
4  focus.  I just need to read what you said.
5    A.  Can we take a quick break?
6    Q.  Yes, of course.
7      (Recess from 4:15 p.m. to 4:23 p.m.)
8    Q.  BY MR. YALOWITZ:  I just have a couple
9  more questions and a hypothetical.
10      You mentioned a common name of Barghouti.
11      Is Shehadeh also a common name?
12    A.  It's absolutely a common name because it's --
13  it's all over the Middle East.  There are Shehadehs
14  in Lebanon.  One of them is a -- or was a famous
15  playwright in Paris and since died.  There are
16  Shehadehs in Nazareth.  There are Shehadehs in Gaza.
17  There are Shehadehs all over the West Bank.  And it's
18  both Christian and Muslim.
19    Q.  There was a leader in Hamas called Salah
20  Shehadeh?
21    A.  That's right.
22    Q.  Was he a relative of yours?
23    A.  No, he wasn't.
24      And he was -- this was a time when they
25  bombed the quarter in which they thought that, I

OCTOBER 13, 2013 - RAJA SHEHADEH

187

1  suppose, he was living and killed about 100 people,
2  civilians, with a one-ton bomb.  And children and
3  young and old and everybody was killed because they
4  wanted to kill Salah Shehadeh.  And it was a big crime.
5  A big crime.
6    Q.  Why did they kill him?
7    A.  Well, they thought he was a illegal activist.
8    Q.  In Hamas?
9    A.  I think Hamas.
10    Q.  Did -- did -- you never met him; right?
11    A.  No.
12    Q.  So I want to ask you a hypothetical question.
13  I want you to assume that you met him -- that he came
14  to your house and you met him.
15      Is there anything in the culture that would
16  require you to take him in and be a host for him?
17    A.  What do you mean?
18    Q.  I mean, would it be customary for you to
19  accept him as a guest in your home?
20    A.  I don't accept anybody -- anybody coming
21  to my home without a prior arrangement.  So no.
22    Q.  And -- and is it -- would it be --
23    A.  I mean, if he just rang the bell and wanted
24  to come in, I would feel it's an imposition.  I would
25  feel that about anybody.

OCTOBER 13, 2013 - RAJA SHEHADEH

188

1    Q.  And -- and knowing what his job was, what
2  his work was -- you know what his work was?
3    A.  I don't know, frankly.
4    Q.  So you understand that he was a leader in
5  Hamas?
6    A.  Maybe.
7    Q.  So if -- if a leader of Hamas came to your
8  home and said, "I would like to stay with you," would
9  you accept him into your home just because he had the
10  same last name as you?
11    A.  No.
12    Q.  And --
13    A.  No.  It has -- it doesn't have anything to
14  do with -- I mean, sharing a last name can -- is not
15  a basis for making claims, even in our very hospitable
16  culture.  No, it's not.
17    Q.  And -- and what about giving him money, would
18  you give him money?
19    A.  I wouldn't give money.  No, I wouldn't give
20  money to anybody.
21    Q.  And what about giving a cell phone so he
22  could do his work in Hamas, would you do that?
23    A.  That's not my job to do that.  No.  I mean,
24  why should I?
25    Q.  It would be inappropriate; right?

OCTOBER 13, 2013 - RAJA SHEHADEH

189

1     A.   I mean, why -- my position in the politics
2  is negotiations.  And -- and I'm not involved in
3  political action -- political action or resistance
4  activities.  And so I don't see myself as contributing
5  in any form or shape to action that is of a political
6  nature or resistance nature.  I mean, I made that
7  choice long ago.
8     Q.   Would it be part of expected Arab hospitality
9  to give Salah Shehadeh a gun so that he could do his
10 work for Hamas?
11    A.   No, it's not.  Because, anyway, guns are not
12 so available.  So how would -- how would I have access
13 to a gun to begin with?
14    Q.   If you happened to have one lying around,
15 there is no cultural imperative that would encourage
16 you to give it to him; right?
17    A.   No.  There is no cultural imperative about
18 guns.
19    Q.   Okay.  Okay.  So I don't have any questions,
20 more.  You were a most engaging and cooperative witness,
21 somewhat loquacious at times.  But it's very helpful.
22    A.   I wanted to be helpful.
23    Q.   Thank you.
24         MR. HILL:  I do not have any questions for
25 Mr. Shehadeh.  He will read and sign.

OCTOBER 13, 2013 - RAJA SHEHADEH

---

190

1          And I believe we have agreed that the
2  plaintiffs would pay him five and a half hours for
3  his time.  Make the check payable to his firm and
4  deliver it to my firm for transmission to him.
5          MR. YALOWITZ:  That is agreeable.
6          MR. HILL:  We're off the record.
7          MR. YALOWITZ:  Thank you.
8          (The deposition concluded at 4:29 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

OCTOBER 13, 2013 - RAJA SHEHADEH

---

191

1                CERTIFICATE OF REPORTER
2
3          I, BRENDA MATZOV, CA CSR No. 9243, do hereby
4  certify:
5          That, prior to being examined, the witness
6  named in the foregoing deposition was duly sworn by me
7  to testify the truth, the whole truth, and nothing but
8  the truth;
9          That the foregoing deposition was taken before
10 me at the time and place herein set forth, at which time
11 the aforesaid proceedings were stenographically recorded
12 by me and thereafter transcribed by me;
13         That the foregoing transcript, as typed, is a
14 true record of the said proceedings;
15         And I further certify that I am not interested
16 in the action.
17
18         Dated this 4th day of November, 2013.
19
20         _____
21         BRENDA MATZOV, CA CSR No. 9243
22
23
24
25

OCTOBER 13, 2013 - RAJA SHEHADEH

---

192

1             CERTIFICATE OF WITNESS/DEPONENT
2
3          I, RAJA SHEHADEH, witness herein, do
4  hereby certify and declare the within and foregoing
5  transcription to be my examination under oath in said
6  action taken on October 13, 2013, with the exception
7  of the changes listed on the errata sheet, if any;
8          That I have read, corrected, and do hereby
9  affix my signature under penalty of perjury to said
10 examination under oath.
11
12
13
14
15 _____    _____
16      RAJA SHEHADEH, Witness            Date
17
18
19
20
21
22
23
24
25

OCTOBER 13, 2013 - RAJA SHEHADEH

```
 1                    ERRATA SHEET
 2  Case:     MARK I. SOKOLOW, et al. vs. THE PALESTINE
 3            LIBERATION ORGANIZATION, et al.
 4  Date:    OCTOBER 13, 2013
 5  Witness: RAJA SHEHADEH
 6
 7  Page _____ Line _____ Change _____
 8  Reason _____
 9  Page _____ Line _____ Change _____
10  Reason _____
11  Page _____ Line _____ Change _____
12  Reason _____
13  Page _____ Line _____ Change _____
14  Reason _____
15  Page _____ Line _____ Change _____
16  Reason _____
17  Page _____ Line _____ Change _____
18  Reason _____
19  Page _____ Line _____ Change _____
20  Reason _____
21  Page _____ Line _____ Change _____
22  Reason _____
23  _____    _____
24        RAJA SHEHADEH, Witness              Date
25

           OCTOBER 13, 2013 - RAJA SHEHADEH
```