# EXHIBIT B.113

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - -

MARK I. SOKOLOW, et al.,
          Plaintiffs,

- vs -                    Case No.
                    04-CV-397(GBD)(RLE)


PALESTINE LIBERATION
ORGANIZATION, et al.,

          Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF DR. SHARON WEILL
Friday, November 22, 2013
9:12 a.m.


Reported by:
Fiona Farson
Ref. No.: 10764

---

Page 2

```
 1
 2          Deposition of Dr. Sharon Weill
 3          November 22, 2013
 4          9:12 a.m.
 5
 6
 7   Taken at:
 8   The offices of Arnold & Porter LLP
 9   International Financial Centre
10   25 Old Broad Street
11   London EC2N
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 3

```
 1            A P P E A R A N C E S
 2   Appearing for the Plaintiffs:
 3        Kent A. Yalowitz, Esq.
 4        Lucy McMillan, Esq.
 5        ARNOLD & PORTER LLP
 6        399 Park Avenue
 7        New York, NY 10022-4690
 8        Tel: +1 212.715.1113
 9        Fax: +1 212.715.1399
10        Email: Kent.Yalowitz@aporter.com
11             Lucy.McMillan@aporter.com.
12
13   Appearing for the Defendants:
14        Brian A. Hill, Esq.
15        Michael J. Satin, Esq.
16        MILLER CHEVALIER CHARTERED
17        655 Fifteenth Street, N.W.
18        Suite 900
19        Washington, D.C. 20005-5701
20        Tel: 202-626-5800
21        Fax: 202-626-5801
22        Email: bhill@milchev.com
23             msatin@milchev.com
24
25
```

---

Page 4

```
 1            I N D E X
 2   EXAMINATION OF DR. SHARON WEILL      PAGE
 3   BY MR. YALOWITZ            5
 4
 5
 6        E X H I B I T   I N D E X
 7   EXHIBIT NO.    DESCRIPTION        PAGE
 8   Exhibit 1   Expert report by Sharon Weill    14
 9   Exhibit 2   The Judicial Arm of the Occupation,
10            by Sharon Weill      14
11   Exhibit 3   Expert report of Daniel Reisner    32
12   Exhibit 4   Salim Hamdam v. Donald H. Rumsfeld 124
13   Exhibit 5   36 I.L.M. 551         134
14   Exhibit 6   36 I.L.M, *634        134
15
16
17
18
19
20
21
22
23
24
25
```

1          Friday, November 22, 2013
2          Deposition of DR. SHARON WEILL
3    (9:12 a.m.)
4          Examination by MR. YALOWITZ
5    BY MR. YALOWITZ:
6    Q. Good morning, Dr. Weill.
7    A. Good morning.
8    Q. Thank you for coming in today.
9          I wanted to ask you what a "lord law bachelor" is.
10   A. The first degree in law.
11   Q. Is it like a university degree, or a --
12   A. Yeah.
13   Q. -- an advanced degree?
14   A. It's the first -- it's three and a half years studying
15       in university, and it's the first degree of law.
16   Q. All right; thank you. That's helpful to me.
17          You were admitted to the Israeli Bar in the year
18       2000?
19   A. Yeah.
20   Q. Did you practice law in Israel?
21   A. No. I did my law training -- after I studied law in Tel
22       Aviv University, I did one year training, and then I did
23       the exam at the Bar, but I have not practiced;
24       I continue studying.
25   Q. Where did you do your training?

1    A. In the prosecutor office in Tel Aviv, the criminal
2        division.
3    Q. Is that a civilian court, or a military court?
4    A. No, it's Tel Aviv District Court, civil -- but criminal
5        law.
6    Q. Civilian --
7    A. Yeah, civilian and criminal matters, yeah.
8    Q. And did you, as part of your work in the Tel Aviv
9        District Court, as a trainee, did you appear in court
10       and speak to the judges?
11   A. No, we -- because we are not yet lawyer; right? So we
12       are "stagiaire," they call it in Israel; so we work on
13       the files with prosecutor; we help in this kind of
14       thing. And then we appear in court, but not the
15       District Court; only first instance court, or rather
16       minor offenses.
17   Q. Magistrate court?
18   A. Yeah. But really minor offenses. Because the -- the
19       cases I was working with the prosecutor were big cases
20       of rape and whatever, but we didn't appear in these
21       cases.
22   Q. Did you work on any security-related matters during your
23       one year of training?
24   A. No, it was -- I mean, the prosecutor I was working with
25       her, she was -- let's say specialty was sexual assault

1        cases. So it was mostly rape cases.
2    Q. Did you -- did you ever work with the GSS during your
3        training?
4    A. No. Not in the training.
5    Q. And not elsewhere?
6    A. No.
7    Q. Not ever?
8          You served in the IDF?
9    A. Yeah.
10   Q. What did you do?
11   A. I was in the human resource department; I think it's
12       called Chalizhut, human resources. And I was based in
13       the Navy, so I was in an office in Haifa, of the Navy.
14       It's -- because I lived quite close, so I was, like,
15       working in the office there.
16   Q. Did you grow up in Israel?
17   A. After -- since eight years old. I was born in France,
18       and at eight, I arrived with my family.
19   Q. You speak like you're French.
20   A. Yeah? I am French.
21   Q. It it's okay; I just ...
22   A. Yeah.
23   Q. Uh-huh.
24          Have you -- do you teach at a university?
25   A. Yes, several universities, yeah.

1    Q. Do you teach any classes about the Israeli military
2        courts?
3    A. So -- currently, at that moment, no; but I did -- when
4        I was -- sorry, I --
5    Q. That's okay.
6    A. -- when I was at -- I was teaching at Tel Aviv
7        University, and there, I had specific courses on this;
8        we went even, with the class, to the military courts
9        three time -- I mean, three different years -- three
10       years; I'm almost sure it's three.
11          And -- but here in -- when I teach in Paris, or
12       Geneva, I don't have specifically -- maybe there are
13       mention, you know, as a part of the law, military
14       occupation.
15   Q. Did -- was your -- what was the class in Tel Aviv
16       that -- at Tel Aviv University that dealt with the
17       Israeli military court system?
18   A. I need to -- I think the specific topic was the issue of
19       IHL and human rights, and the question of the due
20       process right in the military courts. I think on this
21       I concentrate to one specific lecture of two hours.
22       Yeah.
23   Q. And you repeated that lecture for three years?
24   A. I think so. I need to check the syllabus, but I believe
25       I did, yeah, or maybe two years. I don't remember,

1    yeah.
2  Q. Other than the lecture that's part of the class that you
3    described -- and first of all, do I have it right that
4    the class was a full semester class?
5  A. Yes.
6  Q. And what was the title of the class?
7  A. Do you mean in Tel Aviv?
8  Q. Yeah.
9  A. The class in Tel Aviv that I did?
10 Q. Yes.
11 A. It was "The Law of Military Occupation and its
12   Application by the Israeli High Court of Justice." This
13   was the title, I think. It's an optional course.
14 Q. And so what -- what kinds of topics did it cover?
15 A. Many topics. Every lecture was a different topic. And
16   it was all related to the occupation -- the Israeli
17   occupation. So you have one class, for example, on
18   targeted killing; one class on legislation power; one
19   class -- you know.
20 Q. Different things?
21 A. Different -- yeah, different topics.
22 Q. And one of the -- one of the lectures was dedicated to
23   the Israeli military courts?
24 A. Yeah. I think it was at the part of IHL and human
25   rights, yeah. And the right of due process, yeah.

1  Q. So can I just ask you about IHL and HRL. So "IHL"
2    stands for "international humanitarian law"; is that
3    right?
4  A. Yeah.
5  Q. And sometimes that's referred to as the law of war?
6  A. Mm-hmm.
7  Q. Is that correct?
8  A. Mm-hmm.
9  Q. So you have to say "yes," or "no," or --
10 A. Sorry: Yes.
11 Q. -- some word --
12 A. Yes. Yes. Yes.
13 Q. -- for Fiona.
14   Okay. And that's like the Geneva -- Fourth Geneva
15   Convention and the Fourth Hague Convention, and that --
16   that's sort of the field of IHL?
17 A. Yeah. There's other laws, also, but these are the main
18   conventions, you can say.
19 Q. And then human rights law is a different thing; right?
20 A. A different branch of law, yeah.
21 Q. A different branch of law. And that's -- what are some
22   of the main sources of that legal field?
23 A. Human rights law?
24 Q. Yes.
25 A. So you have the UN conventions, the International

1    Covenant on Civil and Political Rights, the UN
2    Convention Against Torture. So you had the
3    international convention; then you had conventions on
4    regional level, like the European Convention. Then you
5    have decision of different courts.
6  Q. So in a sort of a supernutshell, international human
7    rights law could be thought of as like protecting basic
8    human rights in any circumstance?
9  A. Exactly.
10 Q. War, non-war; doesn't matter. Right?
11 A. Mm-hmm -- yes.
12 Q. Okay.
13   Now, is part of the -- other -- well, first of all,
14   other than the lecture you've described from the course
15   that you taught about the occupation in Tel Aviv
16   University, have you done other teaching about the
17   Israeli military court system?
18 A. No.
19 Q. And you have published some articles --
20 A. Mm-hmm.
21 Q. -- about the Israeli military court system; right?
22 A. Yes.
23 Q. I think I -- I read an article called "The Judicial Arm
24   of the Occupation," or something like that.
25 A. I'm happy you read it.

1  Q. And -- sadly I didn't pay for it, or you would --
2  A. Pay?
3  Q. -- get a royalty -- yeah.
4  A. I have not -- I don't have any ...
5  Q. And then -- and then there was another -- I think
6    a chapter of a book that I read recently called
7    "Reframing the Legality" --
8  A. Yeah.
9  Q. -- "of the Israeli Military Courts"?
10 A. Yeah.
11 Q. Is that a more recent publication?
12 A. Yeah, this is from 2011.
13 Q. Is there anything else that you've published that
14   touches on those topics, the topic of the Israeli
15   military court system?
16 A. So there is one article that is going to be published on
17   9th December, so -- like, it's very soon; in two weeks.
18   It's about torture, so I believe it's linked, more or
19   less. So there is this article -- I think you received
20   this as well; right? I think so.
21 Q. I think I did.
22 A. Yeah. Yeah.
23 Q. Right. Did we -- I think we received that.
24 A. Yeah.
25 MR. YALOWITZ: You sent that to us; right?

Page 13

1   MR. HILL: For the record, you recently requested it, and
2      I did send it to you.
3   A. Yeah.
4   MR. YALOWITZ: I thought you did. Thank you for -- thank
5      you for that, both of you.
6   A. And so this -- now I'm going to publish the book, and
7      it's not specifically on the Israeli military courts;
8      it's on national courts in general. But there are some
9      passages related to the military court.
10  BY MR. YALOWITZ:
11  Q. All right. And is that book in prepublication? How far
12     along is it?
13  A. It will be published on the 6th of March. I have the
14     date.
15  Q. That's exciting. So you're still work on the galleys
16     and proofs and things like that?
17  A. I sent the proofs.
18  Q. Outstanding.
19  A. Yeah.
20  Q. Well, we'll keep an eye out for it when it's published.
21     This one, we can -- we can purchase.
22  A. Yes.
23  Q. All right.
24  A. This one you will need to pay.
25  Q. Very good.

Page 14

1      So -- so maybe I'll ask you about the judicial arm
2      of the occupation; I have a few questions about that.
3      Why don't we -- why don't we look at it together, and
4      I'll give you a copy -- by the way, would you like
5      a copy of your report also?
6   A. Yeah, sure, why not.
7   Q. Yeah.
8   MR. YALOWITZ: Why don't we mark both of those. So
9      we'll mark, as Weill deposition exhibit 1, your report;
10     and we'll mark as Weill deposition exhibit number 2
11     a copy of your article, "The Judicial Arm of the
12     Occupation."
13     (Exhibits 1 and 2 marked for identification.)
14  BY MR. YALOWITZ:
15  Q. So I was going to ask you about the article, which is
16     "The Judicial Arm of the Occupation." You have it
17     before you; right?
18  A. Yes.
19  Q. And you -- you published this in 2007?
20  A. Yes.
21  Q. What research did you do for this article?
22  A. Oh, the article is a smaller version of my master thesis
23     that I submitted in the University of Geneva, under the
24     supervision of Marco Sassoli. And this was
25     a publication based on that research.

Page 15

1      So what -- sorry, you asked me what was the ... ?
2   Q. What was the research?
3   A. What was the research? So I -- the question of my
4      research was the question of jurisdiction of the
5      military courts.
6   Q. And you attended some military court hearings in
7      connection with that work; is that right?
8   A. I attended some hearing. Actually, what I did, I -- in
9      order to conduct the research, I studied the
10     legislation -- which is, by the way, not that evident,
11     because -- you know, the order is amended quite
12     frequently, and it was quite difficult to find the
13     relevant legislation for the relevant time.
14     So I looked for the legislation; I read a number of
15     case law; I went to the military court. Yeah.
16  Q. You spoke with Judge Shaul Gordon?
17  A. Gordon, yeah.
18  Q. And I think I asked about your notes of your
19     conversation with him, but you didn't have them; is that
20     right?
21  A. I don't have them now. I did that for the thesis,
22     and --
23  Q. I see.
24  A. -- it's part of the research then. I don't think I kept
25     notes since then.

Page 16

1   Q. It's been some time?
2   A. Yeah.
3   Q. All right. So -- anything else? Did you -- did you
4      read any trial transcripts, or anything like that?
5   A. For the research of the -- the article, so I read the --
6      I read mainly cases. I -- it was less transcript of
7      cases, although I imagine I read a few; but you know,
8      I read cases that started from '67, so it's not
9      necessarily that you have access to the -- to the
10     transcript.
11     Then I was discussing also with defense lawyer and
12     prosecutor. But transcript, as such, I don't remember
13     reading -- maybe one or two. Not more.
14  Q. You --
15  A. And then -- sorry. And then of course I read also all
16     the academic material that was available at that time,
17     and also -- and joint press report, which was quite
18     restrained. There weren't a lot of publication at that
19     time. And in this footnote here, I mention more or less
20     what was available, in footnote number 1.
21     And you can see that it wasn't very, very -- it's
22     not all the bibliography of my thesis, but there weren't
23     very much reports at that time.
24  Q. When you say "restrained," you mean there just wasn't
25     very much material --

Page 17

1  A. Publications, yeah.
2  Q. All right.
3  A. Yeah.
4  Q. I noticed you mentioned a thing called collection of
5     proclamations, orders, and appointments of the military
6     commander in the West Bank region.
7  A. Yeah, this is -- sorry. This is the official gazette,
8     we can call it, yeah, for the military orders.
9  Q. How did you find it?
10 A. In the law library. But -- you know, you have one shelf
11    with classes, so starting from '67, and then you have
12    all the orders in chronologic issue; you know? So in
13    order to try to understand -- it's very complicated.
14       So you have this official gazette there, and it stop
15    at -- sometimes, so you don't have everything; it's not
16    very completed, it -- what was at the university. These
17    -- these where I saw the gazette. Yeah.
18 Q. Do you -- do you -- your article noted, and I think you
19    mentioned --
20 A. Mm-hmm.
21 Q. -- that the military courts you were studying were first
22    constituted in 1967; is that right?
23 A. Yes.
24 Q. And have they been in session ever since?
25 A. Yes.

Page 18

1  Q. They're not sort of -- nobody is tried, in a one-shot
2     court; right? You know what I mean by that?
3  A. No, no. They are well -- how to say -- they are since
4     1967, exactly.
5  Q. Well established?
6  A. Long established.
7  Q. Long established.
8  A. "Well," I don't know; but "long."
9  Q. Fair enough. "Long established"; right?
10 A. Right.
11 Q. Do you know what the basis under Israeli law for the
12    establishment of the court in 1967 was?
13 A. Yeah, the proclamation order.
14 Q. And -- and is that -- has that proclamation order ever
15    been challenged under the law of Israel?
16 A. No. As far as I know.
17 Q. Now, you said in the article that -- and I'm looking at
18    page 398 -- you said:
19       "Intervention by the occupying power in the local
20    administration of justice is authorized only for reasons
21    of security, for the application of the Convention" --
22    and by that, I think you were referring to the Fourth
23    Geneva Convention?
24 A. Exactly.
25 Q. "... and for 'the necessity for ensuring the effective

Page 19

1  administration of justice'."
2     And you're -- you're relying for that statement on
3  Article 64 of the Fourth Geneva Convention; do I have
4  that right?
5  A. Yes.
6  Q. And that -- that statement is a correct statement of
7     applicable law today as well; right?
8        The statement I read is correct; right?
9  A. The statement -- what do you mean? The article, if the
10    article is correct today?
11 Q. Well, the sentence -- let me break it down.
12 A. Yeah. Okay.
13 Q. Okay. So -- so I read you a sentence --
14 A. Can you just tell me where you start the sentence? I --
15    you know ...
16 Q. Sure. I'm so sorry.
17 A. No, no.
18 Q. So do you see footnote 10?
19 A. Yes, I see it, yeah.
20 Q. Do you see the reference to footnote 10? It's in the
21    second paragraph.
22 A. Yeah.
23 Q. So that's the sentence I read.
24 A. The -- "intervention," yeah.
25 Q. So what you're describing there is the application of

Page 20

1  Article 64 of the Fourth Geneva Convention; right?
2  A. Mm-hmm.
3  Q. You have to --
4  A. Yes.
5  Q. And you described it in 2007, but it's -- it's still
6     correct today, that description of --
7  A. Yes, the article -- yes.
8  Q. And -- and the article -- Article 64 was in effect in
9     1967; right?
10 A. Right.
11 Q. And has remained in effect ever since; right?
12 A. Exactly.
13 Q. Okay. And so just to narrow our focus to security,
14    certainly legislation and judicial administration in the
15    military courts, for reasons of protecting security of
16    the State of Israel, you would agree, is appropriate for
17    the military courts?
18 MR. SATIN: Objection as to --
19 BY MR. YALOWITZ:
20 Q. Do I have that right?
21 MR. SATIN: Objection as to -- vague.
22       You can answer.
23 WITNESS: I can answer?
24 A. When I refer to Article 64, or any article that is
25    related to the law of military occupation, we have to

1     remind that they were draft for occupation; and at that
2     time, the drafting of the convention in 1949, occupation
3     was seen as a transit situation, a temporary situation.
4     And therefore, during this time, as it's stipulated in
5     this article, you could have some authorities related to
6     legislation and to judicial enforcement and to
7     execution, in order to safeguard the order and security
8     for this short time that you are governing there.
9        So there wasn't -- I mean, I think that when the
10    Geneva Convention was drafted, no one had expected that
11    this law will govern during 45 years.  So this is
12    something that we must remember when we are dealing with
13    the law of military occupation.
14   Q.  You had a French phrase that you used to describe that
15    concept that you just said -- which I'll mangle, because
16    my French is very bad -- but you said (French spoken),
17    something like that --
18   A.  What?  I can't understand your French.
19   Q.  Yeah.  Lucy will read it.
20   MS. McMILLAN:  (French spoken.)
21   A.  (French spoken.)
22   BY MR. YALOWITZ:
23   Q.  What does that mean?
24   A.  "Nothing lasts as the temporary."
25   Q.  So -- and I think you've written about -- what you just

1     said about temporary versus long term --
2   A.  Mm-hmm.
3   Q.  -- that was the subject of your article, "Reframing the
4    Legality of the Israeli Military Courts on the West
5    Bank"; right?
6   A.  Yes, with other issues, yeah.
7   Q.  And I think that one of the arguments you made was
8    that -- was that -- I'm not seeing it here; bear with me
9    one second.
10   A.  Yeah, sure.
11   Q.  I'm not seeing it here, but let me try to explain what I
12    -- what I'm curious about.
13      You described international humanitarian law as
14    governing the process of the administration of a
15    military court system in occupation.
16   A.  "Process"?  What do you mean by "process"?
17   Q.  So -- like, it regulates the conduct of the trials, or
18    it regulates the conduct of the courts, and so forth.
19    It doesn't -- it doesn't address the legality of the
20    occupation itself, which is really a political question.
21    Does that -- was that you who wrote that?
22   A.  The IHL is -- IHL more in generally; not only relating
23    to the military court -- is relating how to administrate
24    an occupation.
25   Q.  Right.  And that it really doesn't -- international

1     humanitarian law really isn't designed to answer the
2     question whether an occupation should continue, how
3     a conflict should be resolved; it doesn't answer those
4     larger questions.  Right?
5   A.  You have some provision, like Article 47, saying that if
6    there have been, for example, an annexation, then still
7    the rights, as defined by the Geneva Convention, are
8    applicable.
9      And then you have, of course, other branches of
10    law -- as public international law, the right to
11    self-determination, the nonacquirement of territory by
12    force -- that are similarly applicable.
13   Q.  So --
14   A.  And then they will have a stand about the illegality of
15    an occupation.
16   Q.  Things like public international law might speak to
17    that?
18   A.  Yes.
19   Q.  Do you think that Articles 64 and 66 speak to the
20    legality of an occupation?
21   A.  No, it gives the -- it grant the authority to establish
22    military court and provide legislation.
23   Q.  All right.  And Article 64 also gives the authority to
24    the military to establish legislation relating to
25    security around the conflict; is that fair to say?

1   A.  Right, yeah, it provides a bit more detail that were --
2    of Article 43 of the regulation.
3   Q.  All right.  Now, you -- would you agree with me that
4    the -- that under the -- under Article 64, the military
5    government centralizes judicial, legislative and
6    executive powers?
7   MR. SATIN:  Objection, compound question.
8      You can answer.
9   A.  Yeah.  I didn't -- can you repeat this?  I didn't
10    understand very well.
11   BY MR. YALOWITZ:
12   Q.  Sure.  No, no, that's okay; bear with me.  I'm going to
13    try to get it just right.
14      In an occupation, under Article 64 of the Fourth
15    Geneva Convention, the military government centralizes
16    in its hands all government powers:  The legislative,
17    judiciary, and enforcement authorities?
18   A.  The military government centralize all these powers, and
19    it is beyond, also, Article 64, as you first asked me
20    how the courts were created, and I told you it's the
21    proclamation order.  So you see, it's the military
22    commander that is legislating.  It established the
23    courts, it created the law that will be in force there,
24    and of course it's also the enforcement authority.
25    Yeah.

Page 25

1   Q. And in fact, I think you would agree with me that Israel
2      is actually forbidden from extending its own legal
3      system to the West Bank; right?
4   A. It is forbidden, and unfortunately, it does so for the
5      settlements.
6   Q. So -- but -- but yes, it's forbidden to do that; right?
7      Israel couldn't establish civilian courts in the West
8      Bank to try Palestinians for security crimes; right?
9   A. Israel couldn't establish civilian court ... ?
10  Q. In the West Bank.
11  A. What do you mean by "civilian court"? That you will --
12     you will have civilian judging the person?
13  Q. Right.
14  A. I think it could. Why not?
15  Q. So, for example, you know in our case here, there
16     were 21 convictions of Palestinians for security crimes.
17     You -- you read those files; right?
18  A. I admit I didn't really read them, because it was
19     very -- I received them, but I didn't have -- I just --
20     you know, look in them very briefly, yeah. So I can't
21     recall the facts, or -- you know.
22  Q. All right.
23  A. Yeah.
24  Q. Counsel for the Palestinian Authority gave you those
25     files to use as you thought might be relevant for your

Page 26

1      opinions; is that fair to say?
2   MR. SATIN: Objection, calls for speculation.
3      You can answer.
4   A. Sorry, I -- your -- if it was -- no. Yeah.
5   BY MR. YALOWITZ:
6   Q. Okay. Counsel --
7   A. Yeah.
8   Q. You were hired by counsel for the Palestinian
9      Authority --
10  A. Right.
11  Q. -- right? And -- and the PLO?
12  A. Mm-hmm.
13  Q. Is that right?
14     You have to say "yes" or "no."
15  A. Yes.
16  Q. Okay. And -- and that's -- was that Mr. Satin or
17     Mr. Hill?
18     Who hired you?
19  A. Mr. Hill.
20  Q. Mr. Hill?
21     Who hired you?
22  A. Mr. Hill.
23  Q. Mr. Hill. Okay. And Mr. Hill sent you those files;
24     right?
25  A. I -- I've received these files, yeah.

Page 27

1   Q. All right. And your -- you had them to use as you saw
2      fit for the purposes of your report?
3   A. Yeah.
4   Q. Okay. And you understand all the defendants were
5      Palestinian residents; right?
6   A. Mm-hmm -- yes.
7   Q. Okay. Would it have been appropriate under IHL, in your
8      opinion, for the State of Israel to have established
9      a civilian criminal court, say in Ramallah, staffed by
10     citizens of Israel, non-military, to try criminal cases
11     like the 21 that we're here to discuss?
12  A. Yeah. I think the question is not whether the judges
13     are wearing -- are military or civilian; it's the
14     question of the structure of the court, to be
15     nonpolitical and to be competent court, to be
16     independent. And then the applicable law will safeguard
17     the basics rule of due process.
18        This is the requirement. Then, how you really do
19     it, it's a -- it can be -- you know, it can vary. But
20     these are the requirements.
21  Q. So -- so in your judgment, the -- there would not be
22     a problem establishing a civilian court to apply Israeli
23     law in the West Bank?
24  A. I'm not sure if I understand what you mean, "civilian."
25     If it is the State of Israel establishing it?

Page 28

1   Q. Yes.
2   A. No. The State of Israel cannot establish a court in the
3      occupied territory. Is this what you mean by saying
4      "a civilian court"?
5   Q. That's what I meant by saying "a civilian court."
6   A. So if this is the meaning of the word "civilian court,"
7      like a court established by the State, so it's
8      impossible, because the military commander is the
9      legislative authority in the Occupied Territory.
10  Q. That's what I thought you would think. Okay. I think
11     we understand each other now.
12  A. Okay.
13  Q. I say "civilian" to contrast with "military." So
14     military courts are under the military commander;
15     civilian courts are nonmilitary courts, established by
16     the State of Israel.
17  A. By the State, okay. So if this is a -- okay.
18  Q. Sorry for the confusion.
19  A. So we understand -- yeah.
20  Q. Okay, excellent.
21     Now, did you read enough of the 21 --
22  A. And by the way, can I just add something?
23  Q. Please.
24  A. What is astonishing is that they established civilian
25     court, this kind of court, in the settlements; right?

Page 29

1   Q. So --
2   A. Okay, but this is --
3   Q. So -- our case isn't -- isn't about any of those courts;
4       fair to say?
5   A. No, without -- fair enough, yeah.
6   Q. Okay. So did you -- did you read enough of the 21 case
7       files to understand that these were all cases of people
8       accused of security crimes?
9   A. Yes, they are accused of security crime, I'm -- I know.
10  Q. And do you agree with me that that's within the core
11      competency of the military courts?
12  A. Yes.
13  Q. Did -- after you submitted your report --
14  A. Mm-hmm.
15  Q. -- we retained an individual named Daniel Reisner, to
16      prepare a report and submit it to the lawyers for the
17      defendants. Did you have a chance to read that report?
18  A. Yes, I've read it.
19  Q. And do you -- I take it you don't know Mr. Reisner
20      personally?
21  A. Personally, no.
22  Q. You've met, but quite briefly, I gather? Is that right?
23  A. Yeah.
24         What -- what do you mean, we met?
25  Q. I heard you met recently at a lecture --

Page 30

1   A. I was --
2   Q. -- or something --
3   A. No, no, I was in -- yes, I was in a conference, and he
4       was saying Professor Kvechver -- yes, I'm -- how you say
5       -- I give an expert opinion, and there is this Sharon
6       Weill from Geneva. And then a friend of mine said, "She
7       is here."
8          This is how I remember. But I -- I didn't speak to
9       him, and I don't know him personally at all.
10  Q. Perhaps after the case you can -- you'll have a lot to
11      discuss.
12  A. I don't know.
13  Q. All right. Did you -- did I ask you this? Did you read
14      his report?
15  A. I read, yes, of course.
16  Q. Okay. Good.
17         Do you know -- other than Israel and the West Bank,
18      which is really the focus of our conversation today, are
19      there other places where military occupation courts have
20      been established and in compliance with -- well, let me
21      ask it again; let me ask it a different way. I'll ask
22      a background question first.
23         You understand that the -- when the Israel -- when
24      the Israeli military commander established the military
25      courts, the intention was to make an effort to comply

Page 31

1   with the Fourth Geneva Convention; is that fair to say?
2   A. I think -- I think that the reason the military courts
3       were established -- because you don't have any
4       obligation to establish them, so I think that the
5       obligation was -- and I've read this in the Yesh Din
6       report, there are sitting Shamgar that was part of
7       the -- the ones that established the military court,
8       saying that they needed this court to handle security
9       issue. And at that time, they were sure that the
10      structure will be of short -- short -- how to say --
11      that it will operate for a short term.
12  Q. "Short duration"?
13  A. Yeah.
14  Q. It was established to handle security matters; is that
15      what you're saying?
16  A. I believe so, yeah.
17  Q. And is it your understanding that they -- that they made
18      an effort to model the courts on the Fourth Geneva
19      Convention and the US and UK manuals on how to comply
20      with the Fourth Geneva Convention?
21  MR. SATIN: Objection, calls for speculation, and compound
22      question.
23         You can answer.
24  A. (French spoken.) So the question was if they made
25      effort to comply with the Geneva Convention?

Page 32

1   BY MR. YALOWITZ:
2   Q. That's a fair summary.
3   A. I don't know if they made effort.
4   Q. Well, I mean, did you read --
5   A. Yeah.
6   Q. -- the section of Reisner where he talks about the way
7       that the Fourth Geneva Convention and the US and UK
8       manuals were used to create the military court? Did you
9       read that section of his report? Do you recall it?
10  A. The report that -- I don't remember this part, no.
11  Q. I'd better show it to you.
12  A. Yeah. Maybe.
13  Q. I'll show it to you.
14  MR. YALOWITZ: All right. We'll mark as Weill 3 the expert
15      report of Reisner.
16         (Exhibit 3 marked for identification.)
17  BY MR. YALOWITZ:
18  Q. So would you please turn to page 10 of Mr. Reisner's
19      report. I want to direct your attention to
20      paragraph 24.
21  A. Mm-hmm.
22  Q. Is there anything in paragraph 24 that you disagree
23      with?
24  A. No, of course not.
25  Q. And then I'd like to direct your attention to

Page 33

1     paragraph 25. Is there anything in paragraph 25 that
2     you disagree with?
3   A. While not strictly required under international law,
4     what is -- I think that publication is required of
5     orders by military.
6       Ah, the proclamation: Yes. Yes, and I think -- you
7     can also read the -- you can see also, this also reflect
8     Article 43 of the Hague regulation, absolutely, yeah.
9   Q. So -- I probably should have given you a chance to read
10     article -- read paragraph 25 before I asked my question,
11     so let me ask it again.
12   A. Yeah, sure.
13   Q. You've read paragraph 25; right?
14   A. Mm-hmm.
15   Q. You have to say --
16   A. Yes, I've read it.
17   Q. And is there anything in paragraph 25 that you disagree
18     with?
19   A. Yes, I think there is a -- mistaken about the fact that
20     you don't require publication of orders. Because once
21     you do orders, you need to publish them. Now, you might
22     say that you don't need to issue an order to exercise an
23     occupation, because this is a de facto situation, and
24     this you don't need any law to say I'm now occupying or
25     not; this is a question of fact.

Page 34

1       But I don't agree that you don't need to publish
2     orders once they are issued.
3   Q. So I think I see your criticism of paragraph 25.
4   A. Yeah.
5   Q. Do I have it right that if you were rewriting or editing
6     paragraph 25, would you take out words "the publication
7     of," and then it would be correct?
8   A. Yes.
9   Q. Okay. Excellent.
10       I'd -- I'd like now to direct your attention to
11     paragraph 26 of the Reisner report.
12   A. Mm-hmm.
13   Q. If you just take a moment, and let me know when you've
14     had a chance --
15   A. Finished, yeah.
16   Q. -- to read that.
17   A. Yeah, exactly, this is the reflection of Article 43.
18     Yes, absolutely, I know that proclamation.
19   Q. All right. And do you --
20   A. I agree with this. This is what they said.
21   Q. Outstanding.
22       I'd like to direct your attention to paragraph 27,
23     and just let me know --
24   A. Yeah.
25   Q. -- when you've had a chance --

Page 35

1   A. And then the Hague regulation, yeah, it's fine.
2     Exactly. No problem, yeah.
3   Q. You agree with paragraph 27?
4   A. Yeah, yeah, absolutely. Yeah, yeah. I think
5     I mentioned this also in my expert opinion, the same.
6     Yeah.
7   Q. And if -- if I could also direct you to paragraph 28.
8   A. Yeah, it's like copying the article, yeah.
9   Q. And you agree with paragraph 28; right?
10   A. Exactly, yeah.
11   Q. And I'd like you to review paragraph 29.
12   A. Yeah, so --
13   Q. Have you had a chance to review paragraph 29?
14   A. Yes.
15   Q. Do you agree with it?
16   A. I would not say that a commander can change a law when
17     it feels -- you know, it's not a question of feeling;
18     he's using the -- I mean, you know, the -- the article
19     43 that we just spoke about was saying while -- "unless
20     absolutely prevented."
21       And similarly, the commentary of the Geneva
22     Convention also are talking about real needs. So it's
23     not a feeling, but -- yes, let's say, when it's
24     absolutely prevented and there is a need. Yeah.
25   Q. So I take it you'd make -- if you were editing

Page 36

1     paragraph 29 --
2   A. Yeah, I'm editing now the opinion of Reisner, yeah.
3   Q. You would take out words "it feels"?
4   A. Okay, yeah. Let's say, "It feels" seems a bit
5     not -- out of place, yeah.
6   Q. And so you would read --
7   A. Because it should be an objective test, not a subjective
8     one.
9   Q. And there are two places where those words appear --
10   A. Mm-hmm.
11   Q. -- and you would take them out in both places; right?
12   A. Mm-hmm. Yeah.
13   Q. And then would you add some additional -- I think you --
14     just in fairness --
15   A. Yeah, I --
16   Q. -- you added a sentence about --
17   A. Unless absolutely prevented. This is Article 43; right?
18   Q. All right. Anything else on 29?
19   A. I -- no, I think it's fine.
20   Q. All right.
21       Please look at article -- look at paragraph 30 with
22     me.
23   A. Yeah.
24   Q. And let me know when you've had a chance to review it.
25   A. Yeah, I think it's fine.

Page 37

1   Q. You agree with paragraph 30?
2   A. Mm-hmm.
3   Q. You have to say --
4   A. Yes, yes.
5   Q. All right.
6       And please review --
7   A. We continue here.
8   Q. -- paragraph 31.
9       We're not going to do the whole thing --
10  A. Not all day, I hope.
11  Q. -- I promise. I promise.
12      But -- but just do look at paragraph 31.
13  A. The UK one? From what date is the UK one? It's not
14      written.
15      From '58.
16  Q. It appears on paragraph 25 as 1958.
17  A. Yeah, I think it's -- it's really repeat Article 66.
18      Yeah, it's endorse Article 66, yeah.
19  Q. And so if you could read paragraphs 32 and 33, that
20      would be helpful to me. Let me know when you've
21      finished reading 32 and 33.
22  A. Yeah. I mean, again, you know, it's using a word that
23      is -- for example, at c:
24      "Repeal and amend local laws and to legislate new
25      law, as necessitate by the exigenc[y] of the situation."

Page 38

1       Yes, but -- okay, so you have the convention that is
2       saying security application of the convention. But
3       generally, I will say okay.
4   Q. Generally, you think that --
5   A. Yeah, yeah.
6   Q. -- 32 and 33 --
7   A. Not to review every word; you know?
8       (Reporter clarification.)
9   BY MR. YALOWITZ:
10  Q. Let me finish the question.
11      Generally, you think that 32 and 33 are a fair
12      summary of what Mr. Reisner has said before?
13  A. Yes.
14  Q. All right. And I take it you don't endorse every word
15      that he's said here, but you think he fairly captures
16      the spirit of it; is that fair to say?
17  A. Yes, you can say.
18  Q. All right. Are there any particular things in
19      paragraph 32 or 33 that you would omit?
20  A. "Omit"? 32 -- okay, so in respect -- exist in local law
21      unless absolutely prevented, I would say, and --
22  Q. Instead of -- inasmuch as -- in 32a --
23  A. Yeah. You see, it's like a question of --
24  Q. In 32a, you would say respect existing local laws unless
25      absolutely prevented?

Page 39

1   A. Mm-hmm.
2   Q. Anything else?
3   A. I think it's -- it's fine.
4   Q. Okay.
5       Now, my -- would you look with me at paragraph 34.
6   A. Mm-hmm.
7   Q. In the first -- well, why don't you take a moment and
8       read paragraph 34.
9   A. Read, yes. Thank you.
10  Q. Sure.
11  A. Yes, I -- I would agree. I would agree, really, but
12      only the last sentence, "and it established the ...
13      military court system"; I would omit "required."
14  Q. Okay, thank you. That's helpful.
15      All right. So I want to ask you, are there other
16      conflicts or occupations where a military court system
17      has been established as contemplated in Article 66?
18  A. Not that I know.
19  Q. I want to ask you about sources of law --
20  A. Mm-hmm.
21  Q. -- in the West Bank, which you describe on page 6 of
22      your report.
23  A. Mm-hmm.
24  Q. Let's look together at page 6.
25  A. This is my report.

Page 40

1   Q. Do you have it before you?
2   A. Yeah.
3   Q. So I -- I was wondering whether, since 1995, you would
4       also include the Interim Agreement as a source of law in
5       the West Bank.
6   A. It's an international agreement, yes, that is
7       applicable, yeah.
8   Q. So you --
9   A. But you know -- sorry.
10  Q. No, please, go ahead; I didn't mean to interrupt.
11  A. It's an international agreement which is applicable.
12  Q. So is it included, or would you amend your report, maybe
13      to add an additional bullet point?
14  A. This is a a -- the international agreement, like peace
15      agreement, are not -- then depends, I think, on every
16      domestic legal system, but I don't think that they are
17      applicable as laws, for example, that you can enforce in
18      court, but you need to endorse local -- local -- local
19      laws on this.
20      So I'm not sure that -- I mean, the question is
21      whether a peace treaty, an international agreement, is
22      the source of law. I --
23  Q. So --
24  A. It's questionable. I mean --
25  Q. So, for example, if -- if I were to say to you what --

Page 41

1  what is the organic source of authority for the
2  Palestinian Authority to have a police department,
3  wouldn't that be the interim agreement?
4  A. Yeah, but then they -- okay, it's an organic source; but
5  then they need to establish the legal -- the legal
6  structure. Right?
7  Q. But --
8  A. And then this will be the law which is applicable.
9  Yeah, but -- in that sense, yes. So you could --
10  yeah, I would then -- in that sense, I would -- as
11  a source of constitution -- yeah. Yeah.
12  Q. Certainly the interim agreement binds the parties who
13  signed it?
14  A. Yeah, yeah. Of course, of course. I -- maybe I was
15  more referring to the legislation that is applicable in
16  the military court.
17  Q. I see.
18  A. Yeah.
19  Q. I see. All right.
20  A. No, no, not only, no, it's not true, because I put
21  other -- yeah, but -- yeah, I would --
22  Q. You would include it?
23  A. Probably, yeah. Yeah.
24  Q. All right. So I want to talk with you -- and by the
25  way, I didn't sort of do the courtesies at the beginning

Page 42

1  of our conversation, but if you'd like to pause and take
2  a break at any time, you just let me know; it's okay.
3  A. Yeah, I know. Thank you.
4  Q. Okay.
5  I'd like to ask you a little bit about sources of
6  international law.
7  A. Yeah, please.
8  Q. There are conventions or treaties which are binding by
9  virtue of ratification; right?
10  A. Right.
11  Q. And unless the treaty or convention is a norm-creating
12  convention, or has norm-creating provisions, the
13  convention is only binding -- or the treaty is only
14  binding on the parties that ratify it; is that fair to
15  say?
16  A. Unless it represents a customary norm that has emerged,
17  or -- since what the -- crystallized within these
18  customary laws.
19  Q. So -- but in any case, Israel is indeed a signatory to
20  the Fourth Geneva Convention; right?
21  A. And the Human Rights Convention, yeah.
22  Q. And the Human Rights Convention? Which Human Rights
23  Convention is it a signatory to?
24  A. The Convention Against Torture. Let's say the relevance
25  for here is the Convention Against Torture and the

Page 43

1  International Covenant on Civil and Political Rights,
2  since the '90s.
3  Q. Okay. And then -- and then there are -- sort of
4  a second source of law we might consider to be
5  norm-creating provisions, customary international law?
6  A. "Second"? Why customary are second? No.
7  Q. Well, the first one I identified was treaties --
8  A. Ah, okay, yeah, but it's not in here, or it's simply --
9  yeah. Okay.
10  Q. Sure. Okay, fair enough. I'm not --
11  A. Yeah.
12  Q. I'm not contending that one is --
13  A. Okay.
14  Q. -- superior to the other.
15  A. Yeah, okay.
16  Q. Customary international law results from a general and
17  consistent practice of states followed by a sense of
18  legal obligation; correct?
19  A. Correct.
20  Q. It's been said that the -- within the relevant states,
21  the will to follow such a norm has to be formed that the
22  rule will become law if a relevant number of states who
23  share this will is reached; is that right?
24  A. Can you read this again, more fluently? Yeah, I mean --
25  Q. I think that the concept is -- it's not merely that

Page 44

1  a number of states follow a practice, but they have to
2  have the will that it become law, the practice.
3  A. No, they have to believe that -- yeah, that this is the
4  law, that they are doing it because it is the law. An
5  opinion juris system, yeah.
6  Q. I'm sorry --
7  A. Oh, it's the Latin word, "opinion juris," but it's
8  not --
9  Q. J-U-R-I-S?
10  A. Yeah. Yeah.
11  Q. In order for something to be a norm-creating provision,
12  state practice should have been both extensive and
13  virtually uniform in the sense of the provision invoked;
14  would you agree with that?
15  A. The question of "extensive" is always a question.
16  I mean, do you need a lot of country, or do you need the
17  country that can exercise this, because, you know -- so,
18  yes, but -- it's true that anyway, identifying a custom
19  is not an easy task; this, I agree.
20  Q. The Fourth Hague Convention has provisions on the law of
21  war; right?
22  A. (Witness nods.)
23  Q. You have to speak.
24  A. It -- it was a question?
25  Q. Yes. But -- I'll say it again.

Page 45

1    A.  Yeah.
2    Q.  I'll ask it in a different way --
3    A.  Yeah, sorry, yeah.
4    Q.  -- to make sure -- does the Fourth Hague Convention --
5    A.  Ah, that -- if it's a custom.
6    Q.  Well, first of all, the Fourth Hague Convention deals
7         with the laws of war; right?
8    A.  Mm-hmm, yes.
9    Q.  And has that entered into customary international law,
10        in your opinion?
11   A.  Yes.
12   Q.  What is your evidential basis for that view?
13   A.  It was stated by -- in the Hague regulation.  I'm also
14        referring to the annexed Hague regulation.  It was
15        recognized as such, for example, by the Israeli High
16        Court of Justice; by the ICJ, International Court of
17        Justice; by the ICRC customary study, so ...
18   Q.  Now I want to ask you about a third source of
19        international law, which really is maybe a special case,
20        or a third form of international law, which I think of
21        as a special case of norm-creating provisions.  And
22        that's jus cogens, or preemptory norms.  Could you
23        explain what that is?
24   A.  Yeah.  So if we were speaking about hierarchy, this was
25        the first one to sit; right?

Page 46

1    Q.  Mm-hmm.
2    A.  This has what we -- what we call the nonderogable right,
3         and they have -- if you compare it to national law, they
4         have, like, a constitutional statute, okay, we can say,
5         compared to domestic legislation, which means that all
6         legislation have to comply with this jus cogens.  And it
7         is a nonderogable rule.
8    Q.  Is it fair to say that if a norm has achieved the status
9         of jus cogens, under no circumstances is it permitted to
10        derogate from it?
11   A.  Yes.
12   Q.  And some -- some forms of -- well, some actions that
13        I think you and I would agree fall into the jus cogens
14        category would include piracy?
15   A.  Yes.
16   Q.  Slavery?
17   A.  Yes.
18   Q.  War crimes?
19   A.  War crime -- where do you bring this citation --
20   Q.  Perhaps that's too broad of a term --
21   A.  Yeah, it may be.  I would say torture achieved the jus
22        cogens.
23   Q.  Genocide?
24   A.  Genocide, yes.
25   Q.  Others that you can think of?

Page 47

1    A.  These are the -- usually the ones that -- yeah.
2    Q.  Those are the usual suspects?
3    A.  The usuals, yeah.
4    Q.  I want to ask you about one other concept --
5    A.  Mm-hmm.
6    Q.  -- in international law, general international law,
7         which is lex specialis.
8    A.  Mm-hmm.
9    Q.  What is that?
10   A.  In public international law, you have different rules to
11        solve problems of conflict of law.  So one of them is --
12        for example, that a later norm should prevail on an
13        older one; this is one rule.
14        Another rule is the rule of lex specialis, the --
15        the one that is better specified -- right, speciality,
16        specified -- is the applicable norm.
17        So these norms come from the conflict of law norms.
18   Q.  So it's -- the specific trumps the general?
19   A.  Yes, exactly.
20   Q.  And it can take the form of a derogation from general
21        law; right?
22   A.  It can be different, yes.
23   Q.  So I'm thinking of, like, in --
24   A.  I mean -- yeah.
25   Q.  Like, the example I'm thinking of is like Article 4 of

Page 48

1    the ICCPR.  So that article provides for exceptions to
2    certain --
3    A.  A derogation clause.
4    Q.  -- rights.
5    A.  Yeah.
6    Q.  Right.  Certain -- it's a -- Article 4 of the ICCPR is
7         a derogation clause; right?
8    A.  Right.
9    Q.  And it -- it allows for derogation of some of the
10        provisions of the ICCPR --
11   A.  Right.
12   Q.  In times of public emergency --
13   A.  Right.
14   Q.  Is that fair to say?
15   A.  Yes.
16   Q.  And that would be an example of lex specialis?
17   A.  Of -- no, I -- no, because -- of what?  Of the general
18        rule?
19   Q.  Where -- where a state --
20   A.  It's a derogation clause within the treaty.
21   Q.  Right.  And so when -- when a State declares a public
22        emergency --
23   A.  Yeah.
24   Q.  -- and says, "We're -- we're going to derogate from this
25        generally applicable provision because we're in

Page 49

1    a special circumstance," they've in essence created lex
2    specialis?
3    A. No, we don't call it "lex specialis"; it's a derogation
4        from the obligation and -- you know, and the article
5        requires for the extent strictly required for the
6        time -- for the time of national emergency, I think is
7        the wording, actually.
8    Q. And then another -- I'm sorry?
9    A. No, no, I'm just trying to remember if it's written
10       "national threat" or "national security" -- I don't
11       remember the wording exactly.
12   Q. "Public emergency," I think, is the wording.
13   A. I don't know.  We need to check.
14   Q. We can look it up.
15   A. Yeah, it's not ...
16          (Discussion off the record.)
17   MR. YALOWITZ:  Let's do a break now, take a break now.
18          (A break was taken.)
19   (10:35 a.m.)
20   BY MR. YALOWITZ:
21   Q. So I want to ask you also -- I read that lex specialis
22       could be an elaboration or application of general law to
23       a particular situation; do you agree with that?
24   A. "Elaboration of the law"?  What do you mean,
25       "elaboration of the law"?

Page 50

1    Q. Sure.  So -- so parties are entitled to establish
2        specific rights or obligations to govern their behavior
3        against the backdrop of a more general obligation;
4        right?
5    A. Parties -- parties to what?  To a treaty?
6    Q. For example.
7          So -- maybe if I gave you an example --
8    A. Yeah.  Maybe.
9    Q. -- it might be helpful.
10   A. Maybe.
11   Q. Okay.  There is a convention on the law of the sea;
12       right?
13   A. Mm-hmm, mm-hmm.
14   Q. You have to --
15   A. Yes.  Yes.
16   Q. And -- and then parties can decide -- rather than apply
17       the exact provisions of the convention of the law of the
18       sea, they're going to reach an agreement to specify how
19       that might apply to them in their particular situation?
20   A. So you might call, sometime, reservations for a general
21       treaty, for example; this may be the word,
22       "reservation."  For example, if they join a treaty, but
23       some provision, it doesn't want -- doesn't fit to
24       advice, you say, "I reserve from this provision."
25          And now, if you do another bilateral agreement, it

Page 51

1    depends if the treaty lets you to do it or not.  But
2    I mean, normally, you -- with great reservation, yeah.
3    Q. So -- so the ICJ said in the North Sea cases it's well
4        understood that in practice, rules of international law
5        can, by agreement, be derogated from in particular cases
6        or as between particular parties.
7    A. Yeah.
8    Q. You agree with that?
9    A. Yeah, yeah.  Yes.  But lex specialis is not -- yeah, you
10       could also connect lex specialis in the sense that --
11       I will -- I will use "derogation," better than "lex
12       specialis," okay, but it's term -- yeah.
13   Q. Excellent.
14   A. Okay.
15   Q. Okay.  I don't really care what word we call it.
16   A. Exactly.  Yeah.
17   Q. It's the idea that matters.  Okay.
18          So do you know, in general, about how many
19       prosecutions there have been in the Israeli military
20       courts since 1967?
21   A. The number of cases prosecuted -- I cannot tell you the
22       exact figure.  I read -- one statistic was speaking from
23       the '90s until -- until 2007, I think, was one hundred
24       -- let me -- (French spoken) --
25   Q. 160,000?

Page 52

1    A. Yeah, 150,000 cases.  But not from '67; from the '90s.
2          So I don't know the exact, but it's -- a huge amount
3        of cases.  I think -- it's one statistic that I read,
4        I didn't count.  I don't know.
5    Q. Does that sound about right, directionally?  Do you know
6        what I mean by "directionally"?  Like, it's not that
7        there've only been 50 cases; it's been thousands and
8        thousands --
9    A. Yes.
10   Q. -- of cases?
11   A. Yes.
12   Q. And does that statistic -- did the statistic that you
13       read, did it include administrative detentions, or was
14       it simply prosecutions?
15   A. I can't tell; I'm sorry.  I don't remember.  Yeah.
16   Q. In -- I have it right that in the military courts of
17       Israel, if a defendant chooses to have counsel, he or
18       she is entitled to have counsel; right?
19   A. The -- the defendant are entitled to have a -- a lawyer,
20       by law.  Now the law restricts sometimes the meeting
21       with the lawyer.  During the interrogation, it can be up
22       to 30 days without seeing a lawyer, which is longer than
23       in Israel.  Then you have quite -- problems of access,
24       because -- during interrogation, they are detained in
25       Israel, the arrested people; and then the lawyer --

Page 53

1  Palestinian lawyers cannot access these places.
2  Q. By the time a person has been -- by the time a person
3      has been convicted in the military courts of Israel, he
4      or she shall, if he chooses or she chooses to have
5      a lawyer, can retain one; right? I mean, I understand
6      there's some nuance about how soon they can get one; but
7      at some point, if they want a lawyer to represent them
8      during the course of a trial, they're entitled to that.
9      Right?
10 A. I don't think it's a nuance where you are investigated
11     and you don't know exactly your rights, and then you
12     give a confession that sometimes is a forced confession;
13     and then, when you meet with your lawyer, you already
14     have your confession.
15     And this is very important when you meet your
16     lawyer. The entire point is to meet the lawyer during
17     your interrogation. When you do it after, yes, you have
18     a lawyer that will administrate your trial in the
19     military court -- and do a plea bargain, usually.
20 Q. And the -- the defendant who does not plead is entitled
21     to appeal; right?
22 A. There is an appeal to -- there is the -- the military
23     court, they have two instance; first instance and
24     military court of appeal. Yeah.
25 Q. Do you have a sense of how many appeals in the military

Page 54

1  courts there have been since 1967?
2  A. The military court of appeal was established in '99.
3      Now, how many appeals were accepted for the defendant?
4      This is what you are asking me? Or how many cases?
5  Q. How many appeals were filed?
6  A. No, I don't know. I mean, this is statistic; I don't
7      remember.
8  Q. Is it -- would it be fair to say thousands?
9  A. I can assume, but I don't have the numbers. Yeah.
10 Q. You've read reported cases from the military court of
11     appeals?
12 A. Yes.
13 Q. Hundreds?
14 A. I haven't read hundreds; I won't say this. But
15     I read -- I read -- I don't think hundreds.
16 Q. Are there hundreds?
17 A. Hundreds? Again, I -- I don't know how many.
18     I didn't --
19 Q. But one could check?
20 A. Yeah. I mean, I don't know.
21 Q. All right. Fair enough.
22     Are there -- are there human rights lawyers who
23     practice in Israel?
24 A. Yes.
25 Q. Are they highly regarded?

Page 55

1  MR. SATIN: Objection, calls for speculation.
2      You can answer, if you can.
3  A. I don't -- I don't really -- by whom?
4  BY MR. YALOWITZ:
5  Q. Well, let me --
6  A. By the -- yeah.
7  Q. Well, let me ask a different question.
8      So would you consider Avigdor Feldman a human rights
9      lawyer?
10 A. He's a criminal law lawyer, and he did human rights
11     cases, yeah.
12 Q. And would you agree with me that his -- from
13     a reputational perspective, he's highly regarded as
14     a lawyer?
15 MR. SATIN: Objection, lack of foundation.
16     If you know, you can answer.
17 A. It depends by whom. I don't understand who's -- who you
18     -- if judge of the court, or the general public, they
19     probably don't know him, even. I don't know.
20 Q. So -- well, do you regard --
21 A. If the question is if there are good lawyers, there are
22     good lawyers in Israel, yes.
23 Q. Yeah, that's -- that's the question.
24 A. Okay.
25 Q. And they -- and then, like Michael Sfard; is he

Page 56

1  a well-regarded lawyer, in your opinion?
2  MR. SATIN: Objection, calls for speculation.
3      But you can answer if you know.
4  A. I -- I don't know what you mean by "well regarded."
5  BY MR. YALOWITZ:
6  Q. All right. I --
7  A. It's -- I mean ...
8  Q. All right. It's fine.
9      Okay. So you mentioned that you've taught on the
10     subject of the way the Supreme Court of Israel has dealt
11     with matters relating to the occupation; is that right?
12 A. Yes.
13 Q. And do I have it right that the jurisdiction of the
14     Supreme Court of Israel includes not only appellate
15     jurisdiction, but a right of access of original
16     jurisdiction for petitions relating to government
17     actions?
18 A. Yes. The High Court of Justice is sitting as a -- as
19     the High Court of Justice and as the Supreme Court. So
20     one of the function of the High Court of Justice,
21     individual and organization can submit petitions. Yeah.
22 Q. And has it -- has it been your experience that the High
23     Court of Justice has accepted petitions addressing the
24     ways in which the Israeli military court system
25     operates?

Page 57

1    A. Can you be more specific when this question? On the
2        military courts -- yeah.
3    Q. So to take an iconic example --
4    A. Yeah.
5    Q. -- the PICATI case: Do you know that acronym, Public
6        Committee Against Torture in Israel?
7    A. Yeah. Which one? From '99, or 2006?
8    Q. From '99.
9    A. From '99, yeah.
10   Q. Right.
11   A. The torture case; that's --
12   Q. That's an iconic case --
13   A. Yeah.
14   Q. -- right?
15       You have to --
16   A. Yes.
17   Q. -- wait for me to finish, and then speak. You're doing
18       pretty well, but ...
19       That's an iconic case; right?
20   A. "Iconic"; it means "landmark," or ... ?
21   Q. Yeah, very famous.
22   A. "Famous"; it is a famous case, yes.
23   Q. And that -- that relates to GSS investigations; right?
24   A. Yes.
25   Q. And GSS investigations are of security prisoners; right?

Page 58

1    A. Yes.
2    Q. And then if they're charged with crimes, those crimes
3        are prosecuted in the military courts; right?
4    A. Usually; not always. They can be also in civilian in
5        Israel. It depends, because -- but in some cases, it
6        will be in military court. Most of them.
7    Q. Most of them?
8    A. Most of them.
9    Q. Fair enough.
10       And are there other cases that the High Court of
11       Justice has addressed dealing with aspects relating to
12       prosecutions in the military courts?
13   A. I don't know if you will -- for example, there was the
14       -- reviewing an order concerning detention in 2003.
15       There was recently, again, a reviewing -- I mean, it is
16       still pending, about the -- how long you can be arrested
17       before seeing a judge. You know, it was eight days, and
18       now it is -- it is before the court.
19       There are different cases, yeah.
20   Q. Can you give us an estimate as to how many cases the
21       High Court of Justice has decided on the merits in which
22       some aspect of the system -- from arrest through to
23       detention, prosecution, appeal, imprisonment -- that the
24       entire sort of cycle of a criminal encounter with the
25       judicial system -- let me start the question over.

Page 59

1    A. Mm-hmm.
2    Q. It's too long a question.
3    A. No, no, I follow. Yeah.
4    Q. Okay. Can you give me a sense of how many cases the
5        High Court of Justice has decided on the merits relating
6        to encounters between residents of the West Bank or Gaza
7        and the military system of justice?
8    A. With the issue of administrative detention, or only
9        prosecution of criminal case? Only prosecution, let's
10       say; okay? I will answer only --
11   Q. As you -- as you wish.
12   A. Yeah. I will answer only related to issue related to
13       prosecution, except of administrative detention.
14       Now, there were also some cases on condition of
15       detention; would you include them also?
16   Q. Yes. Yes.
17   A. I will say dozen -- maybe ten, something like this.
18   Q. And do you have a sense as to how many petitions there
19       have been presenting questions to the High Court of
20       Justice relating to the real -- relating to the
21       administration of justice in the military court system?
22   A. I don't know.
23   Q. Fair to say hundreds?
24   A. But then -- and then the -- you think that -- I mean,
25       your point is they were -- the State agreed, and they

Page 60

1    didn't have to deliver a judgment? Like, there was --
2    Q. No, no --
3    A. -- an agreement between the sides? Or what do you mean?
4    Q. No, no. So -- so my question was intended --
5    A. Because this happens also. You know.
6    Q. Sure.
7        My question -- it's a fair request for
8        clarification.
9    A. Mm-hmm.
10   Q. My question was more broadly: A petition to the High
11       Court of Justice, I suppose, could end with -- with an
12       order in favor of the petitioner, or an order in favor
13       of the State, or if you will, a plea bargain, which is
14       what your -- right? Some form of an agreement?
15   A. Yeah.
16   Q. Of any of those three outcomes, how many petitions to
17       the High Court of Justice relating to the military court
18       system do you believe have been commenced?
19   A. "Commesed"? What does it mean, "commesed"? Ah,
20       "commenced."
21   Q. "Filed."
22   A. "Filed"?
23   Q. Yes.
24   A. I don't know. I don't know how many. You need to look
25       for the -- I don't know how many.

Page 61

1  Q. Would you say hundreds?
2  A. No.
3  Q. Less?
4  A. It's difficult for me to assess this. How -- I mean,
5    you know, it's something ...
6  Q. All right.
7      Has the High Court of Justice applied the Fourth
8    Geneva Convention to the military courts in Israel?
9  A. Yes.
10  Q. How many times?
11  A. In one particular case, there was the Mareva case; that
12    was in 2003. And then, when he was checking also the
13    condition of detention, he referred to the Geneva
14    Convention. How many times -- again, since we are in
15    a question of numbers; I'm not -- I'm not -- I'm not
16    sure of numbers.
17  Q. Has the High Court of Justice applied the Fourth Hague
18    Convention to the --
19  A. The Hague regulation, yes.
20  Q. And can you think of some cases, off the top of your
21    head, in which that has happened?
22  A. Relating to the military courts?
23  Q. Yes.
24  A. But military court is less relevant to Hague regulation;
25    it's more the Geneva Convention.

Page 62

1  Q. So -- so let me ask, then, a broader question.
2  A. Broader; yeah.
3  Q. Has the High Court of Justice applied the Hague
4    regulations to conduct of the Israeli military in the
5    West Bank and Gaza?
6  A. Yes.
7  Q. How many times?
8  A. I don't know how many times --
9  Q. So -- so what are --
10  A. -- but in all the -- in all the petitions dealing with
11    the -- with the army -- with the Occupied Territories,
12    it first says that it is a belligerent occupation;
13    applicable law is the Hague regulation and the Fourth
14    Geneva Convention. I mean, usually, this is the opening
15    of the -- there were a lot of cases.
16  Q. That's what I'm sort of getting at. Maybe not there's
17    an exact number, but would you agree with me that it's
18    well established in Israel that when evaluating matters
19    relating to the military conduct in the West Bank and
20    Gaza, the courts begin with the Geneva Convention and
21    The Hague regulations.
22  A. It applies -- yes.
23  Q. Okay.
24      To your knowledge, has there been any case decided,
25    either by the military courts themselves or by the High

Page 63

1  Court of Justice, that has addressed whether the
2  military courts are properly constituted within the
3  meaning of Article 66 of the Fourth Geneva Convention?
4  A. This -- I know that there's never been a petition on
5    this.
6  Q. There's -- there's never been even a petition?
7  A. No, there's never been a petition on this question.
8  Q. No human rights group has ever raised this as an
9    argument within Israel?
10  A. Specifically on the military courts, there were much
11    less cases that any other issue related to the -- for
12    example, conduct of hostilities, or settlements, or
13    whatever. Most of the cases were dealing with due
14    process issue, but we see that even today, we still have
15    a petition -- a very recent one was demanding the
16    translation of the indictment and the cases.
17      These courts, since '67, are doing it, and we have
18    this petition only in 2013, or '12. So you see, it's
19    a question of maturing, to bring cases to the petition,
20    to -- to have this -- and the issue of military courts
21    were less -- this issue of structure were not brought to
22    the High Court of Justice.
23    (Discussion off the record.)
24  BY MR. YALOWITZ:
25  Q. Okay. Thank you.

Page 64

1  A. You're welcome.
2  Q. Do you -- have you ever compared and contrast the
3    military courts sitting in the West Bank and Gaza,
4    before disengagement, on the one hand, with the military
5    courts in Israel that try soldiers for violation of
6    military law?
7  A. Never. And I -- I'm not at all an expert on the martial
8    court, if you mean the martial court. They are working
9    under Israeli law. And -- you know, it's a different --
10    different structure. I'm not at all an expert on this
11    issue. I've been focusing on the law of military
12    occupation in the military court.
13  Q. Do you know whether the appointment system in the -- in
14    the two courts are different, or the same?
15  A. I know exactly what the appointment system in the
16    military courts is, which is deriving from the military
17    order enacted by the military commander. So I can only
18    assume that it's not the same, because the military --
19    the martial court -- I don't know the (French spoken) --
20    the provision of how military court and martial court
21    are established, but it is a law enacted by the State,
22    and not a military order.
23  Q. So in order to know whether the appointment system is
24    the same --
25  A. We need to read the -- this law specific to the court

1    martial, yeah.
2    Q.  Have you done that?
3    A.  No.
4    Q.  Would you agree with me that jus cogens applies to the
5        PLO and the PA?
6    MR. SATIN:  Objection.  Compound question.
7    A.  Generally, international law apply to state.  This is
8        a law that is applicable to state.  I say "generally,"
9        because more and more -- the international law evolved
10       to include also nonstate actors, and for sure in IHL,
11       the rule of -- for example, in noninternational
12       conflict, applied both to state and nonstate actors.
13           But then, it depends:  Human rights obligation, it
14       is not very clear if they apply to nonstate actors.
15       There is some authors that said yes, some authors said
16       no.  So when we speak about jus cogens, we'd better to
17       think about a specific -- a specific --
18   Q.  A specific -- a specific norm?
19   A.  Yeah, what are we talking about, yeah.  Because if it's
20       something related to IHL relation during an armed
21       conflict, which a nonstate actor is a part, of course,
22       it is bound by it.
23   Q.  It is ... ?
24   A.  It is bound by the law, yeah.
25   Q.  Are you familiar with the 1977 Additional Protocol 1 to

1    the Geneva Convention?
2    A.  Of course.
3    Q.  And what is it?
4    A.  What it says?  The protocol?
5    Q.  Yeah.
6    A.  You want me to cite you the entire article?
7    Q.  I do not.  I trust that you could; I just --
8    A.  No, in what relation?
9    Q.  So it -- by its terms, it governs wars of national
10       self-determination; is that right?
11   A.  The first protocol is a protocol that apply in
12       international armed conflict.  Now, what you are
13       referring to is Article 14, and it's questioning when
14       a conflict will be classified an international conflict.
15       So, of course, it's state against state; it is an
16       international conflict.
17           And there is one provision in the protocol saying
18       war or national liberation, which could be war of --
19       against colonization, apartheid, occupation, would be
20       seen as an international conflict.
21   Q.  And do you understand that the PLO indicated its intent
22       to be bound by that protocol?
23   MR. SATIN:  Objection, calls for speculation.
24           If you know ...
25   A.  Can you just repeat?

1    BY MR. YALOWITZ:
2    Q.  Sure.  I --
3    A.  Is it intended to -- this was your question?
4    Q.  Sure.  I believe I -- I believe I read that the PLO
5        submitted to the designated authority some type of an
6        accession to the 1977 Additional Protocol --
7    A.  When they did this?  Recently?
8    Q.  No, I believe they did it --
9    A.  No?  Something -- yeah.
10   Q.  I believe they did it a long time ago.  Does that --
11   A.  Somewhat --
12   Q.  Is that familiar to you?
13   A.  If they wanted to accede, but -- I can't -- I can't say
14       if they accede or not.  I don't know.
15   Q.  In any case --
16   A.  Yeah.
17   Q.  -- we agree that -- that Protocol 1 -- Additional
18       Protocol 1 applies to the PLO and the PA; right?
19   MR. SATIN:  Objection, compound question.
20   A.  First of all, Israel -- you know, Israel is not a party
21       to this protocol, exactly because of this provision.
22       And -- now, normally, the protocol would apply only
23       reciprocally; it means that in a conflict, the protocol
24       will apply only if both parties ratify the protocol.
25           But then we need to look on the -- what provision

1    are we talking about?  Because if there are customary
2    laws, so anyone, anyway, they are bound.
3        Now, you are asking me if the conflict with the PLO
4    is an international armed conflict; this is actually
5    your question.  Right?
6    Q.  Well, you could answer that question.  It wasn't my
7    question, but I'm interested in your opinion on that.
8    A.  So my opinion, I think that Justice Barak well
9    articulated this in the targeted killing case in 2006,
10   and this is exactly what he said.  He said that -- he
11   was citing Professor Cassese there -- I think it was
12   paragraph 18, but I'm not sure about the number of
13   paragraphs; I think so.  No, it was a very important
14   paragraph and he was saying that when under occupation,
15   the -- if you want to fight the occupation, it is an
16   international armed conflict.
17       So this is the legal analysis of the Israeli High
18   Court of Justice.  But they -- I'm not sure -- they
19   won't apply Protocol 1 as such, only the customary one.
20   Q.  So it's a -- it's a preemptory norm that civilian
21   populations, as such, as well as individual civilians,
22   may not be the object of attack; right?
23   A.  This is for sure.  And this is absolutely customary
24   norm.  And this is also a criminal norm, and -- yeah.
25   I mean, the rule of distinction is the basic principle

Page 69

1    in IHL.
2    Q.  It is -- it is peremptory norm that acts or threats of
3        violence, the primary purpose of which is to spread
4        terror among the civilian population, are prohibited;
5        right?
6    A.  Right.
7    Q.  And people who attack civilians intentionally, while
8        aware of their civilian status, are committing war
9        crimes; right?
10   A.  Yes.
11   Q.  And the obligations not to do that are absolute; right?
12   A.  Right.  I mean, there is targeting as such; then you
13       have the question of proportionality.  I mean, you are
14       probably aware of this proportion that says that
15       sometimes you have may have civilians as casualties, but
16       they must not be targeted as such, of course.
17   Q.  So in your opinion, was the targeting of civilians
18       during the Al-Aqsa Intifada, were those war crimes?
19   MR. SATIN:  Objection, lack of foundation.
20   A.  The killing of civilian is a crime.  This is murder, for
21       sure.  I mean, if someone kills someone, this is a
22       murder.  Then whether it is a war crime, "yes" or "no,"
23       then it depends whether it's a conflict; it depends on
24       different issues.  Right?  But of course, it's a crime.
25   BY MR. YALOWITZ:

Page 70

1    Q.  And you're aware -- or are you aware of arguments that
2        were put toward to justify or excuse suicide bombings
3        and other attacks on Israeli civilians?
4    A.  I'm not aware of jurists saying that it's legal;
5        absolutely not.  I've never read something like this.
6    Q.  Have you -- did you ever read statements by Palestinian
7        politicians trying to justify attacking Israeli
8        civilians?
9    MR. SATIN:  Objection.  Assumes facts not in evidence.  Lack
10       of foundation.
11   A.  If I've ever -- I don't -- I don't know.  I don't
12       remember.  I -- maybe I've heard once -- I don't know.
13   BY MR. YALOWITZ:
14   Q.  So for example, did you ever hear anyone say that the --
15       that the illegal status of settlements in the West Bank
16       is a justification for attacking civilians?
17   A.  This is not a legal stand.  It can't be a legal stand.
18       I don't know if people said this; I don't know.
19   Q.  If anyone said that, they would be wrong; right?
20       That's not a good question.
21   A.  Okay.
22   Q.  Let me ask you a different question.
23       You agree with me that the status -- that the legal
24       status of settlements in the West Bank does not justify
25       attacks against Israeli civilians; right?

Page 71

1    A.  Of course.
2    Q.  And you agree with me that anyone who is not a combatant
3        is a civilian; right?
4    A.  Yes.
5    Q.  You agree me that reprisals or retaliation against
6        civilians is absolutely prohibited; correct?
7    A.  Absolutely.
8    Q.  There is no legal excuse or justification for that,
9        whatsoever; right?
10   A.  Absolutely.
11   Q.  You agree with me that under international humanitarian
12       law, failure by one party to a conflict to respect the
13       laws of war does not relieve the other party of its
14       obligation to respect those laws; right?
15   A.  Absolutely.
16   Q.  That obligation is not premised on reciprocity; right?
17   A.  Yes.
18   Q.  You agree with me that -- well, are you familiar with an
19       organization called Human Rights Watch?
20   A.  Yes.
21   Q.  And do you -- is it reasonable for people in your field
22       to rely on reports by Human Rights Watch?
23   A.  Not -- rely -- the legal analyze, no, because the legal
24       analyze, I don't know -- the legal analyze, I rely on
25       academic journals and on professor -- academic --

Page 72

1    judges, et cetera.  Of course, Human Rights Watch, you
2    know, they are sometimes written by my students; you
3    know?
4        But some of the -- it could be interesting to -- as
5    a source of facts; sometimes this can be -- not as
6    a source, but as a report, and then you can look for the
7    facts and ...
8    Q.  So I'm sure, if they're written by your students, they
9        must be excellent work.
10   A.  Yeah.
11       Not -- so I mean -- what I mean by my answer is it
12       depends; what do you mean "to rely on it"?  You know?
13   Q.  Fair enough.
14   A.  Yeah.
15   Q.  What I was thinking of is not the legal analysis --
16   A.  Mm-hmm.
17   Q.  -- but the facts and data reported.
18   A.  Okay.  So again, this is always a problem with facts;
19       right?  Who reports on the fact, and how do you know
20       they are reliable?  So for me, as -- if it's in the
21       context of the research or whatever, of course you need
22       to have -- you gather information.  So this can be one
23       source of information.  But then you will look for what
24       source they receive this; right?  Maybe it's the press,
25       and then you go to press, and then you try -- but of

Page 73

1    course it remains -- it remains what it is; you know?
2    Q. So -- so are you familiar with the Human Rights Watch
3       report about the suicide bombings during the Al-Aqsa
4       Intifada?
5    A. I must say that no, I'm not reading all their reports.
6       I'm -- no. You know, there are so many reports on
7       Israel and Palestine, and so many NGOs, this one --
8       Human Rights Watch, in general, I don't read so much;
9       I prefer to read local -- like local NGOs, mostly
10      I read. But you know, sometimes I can read Human Rights
11      Watch, and Amnesty, but I don't read all their reports.
12   Q. Do you have a view on whether the PA and the PLO incited
13      violence during the Al-Aqsa Intifada?
14   A. I have absolutely no -- no information of that. I never
15      worked on this question. I don't know.
16   Q. All right. So I want to ask you some questions about
17      structure and process in judicial systems generally.
18   A. Yeah.
19         Sorry, would you mind if I go to the toilet?
20   Q. Of course.
21   (11:14 a.m.)
22         (A break was taken.)
23   (11:24 a.m.)
24   BY MR. YALOWITZ:
25   Q. Would you agree with me that the form that a court takes

Page 74

1       is not subject to any customary norm?
2    MR. SATIN: Objection, vague.
3    A. Yes, could you rephrase this?
4    BY MR. YALOWITZ:
5    Q. Sure. So for example, there's no customary norm that
6       requires an adversarial system instead of an
7       inquisitorial system; right?
8    A. Ah, specifically on this, so -- of course there are
9       customary norms regarding due process issues; yes, of
10      course.
11         Now, the important issue that you will have a due
12      process, of course inquisitory process and adversarial
13      are both legitimate; I mean, you have wonderful
14      countries, like France, with the inquisitory system, and
15      you have wonderful state like the UK with the
16      adversarial system. So this is not a problem.
17   Q. Then having a jury or not having a jury is not the
18      subject of a customary norm; right?
19   A. No. There is no obligation to have a jury or not.
20   Q. Having judges elected does not violate customary norms;
21      right?
22   A. Judges need to be independent and impartial.
23   Q. But if a judge is elected, goes out and runs for
24      election, like in the United States -- we elect judges;
25      they run in elections; did you know that?

Page 75

1    A. Again, the judges go to election, when there are judges
2       or after the judges are --
3    Q. In order to become a judge --
4    A. Yeah.
5    Q. -- in many states --
6    A. Yeah.
7    Q. -- in the United States, you have to run for election,
8       like as if you were running for mayor.
9    A. To be elected as a judge, you mean?
10   Q. Yeah?
11   A. Yeah.
12   MR. SATIN: Objection as to the statements of counsel.
13   MR. YALOWITZ: Trust me; I'm right on this one.
14   A. Every -- no, every system need to have guaranteed to
15      have independent and impartial judges. So every state
16      has its own mechanism, and you need to verify the
17      mechanism. I don't know about this --
18         (Reporter clarification.)
19   MR. YALOWITZ: "Mechanism" --
20   A. Obligation to make sure that judges are independent and
21      impartial, and every state can have its own mechanism to
22      ensure that.
23         So specifically how is it in the US, I don't know;
24      but I'm sure in the US, they have check and balance to
25      make sure that they are independent and impartial.

Page 76

1    I won't believe otherwise.
2    BY MR. YALOWITZ:
3    Q. Having -- having a judge appointed by a military
4       commander, in and of itself, is not a violation of any
5       customary norm; right?
6    A. Can you just repeat? I didn't hear very well the
7       beginning.
8    Q. Sure.
9    A. Yeah.
10   Q. Having a judge who's appointed by a military commander
11      does not, in and of itself, violate any customary norm,
12      right?
13   A. Again, the customary norm is the judge need to be
14      independent and impartial. Now, what we had until 2004
15      in the Occupied Territory, under the military order that
16      was issued by the military commander, was that judges
17      are appointed by the recommendation of the prosecutor --
18      military prosecutor general -- and are appointed by the
19      military commander. So this raised serious question
20      about the issue of impartiality and independency,
21      structural.
22   Q. So -- so is it your view that having a judge appointed
23      by a military commander is, in and of itself,
24      a violation of a customary norm?
25   A. If it is appointed by a military commander through the

Page 77

1    recommendation of the military prosecutor, I think that
2    this is a violation of the requirement of independency,
3    yes.
4    Q. And is -- is it -- is it your view that it's impossible
5    to be independent because of the way in which a judge is
6    appointed?
7    A. Structurally, it's -- let me answer from the beginning.
8       In order to ensure the judges are independent, we
9    establish structural requirement to make sure, like,
10   that they have tenure, like the way they're elected is
11   independent, that they can function as they want. This
12   is the issue of structure. Then you have the issue of
13   any individual person, whether he is -- you know,
14   independent, and et cetera.
15      I'm looking at the structural issue. There are
16   basic requirements to be respected in order to maintain
17   that structurally, the judges are independent. So if
18   they need the promotion from the one who is depending on
19   their election, it's problematic. If there are -- if
20   there is no separation between the prosecution, the
21   execution and the -- the judge themselves, this is
22   problematic.
23      If judges are not enough competent to know the law,
24   criminal law, it's problematic. Everything brings that
25   there's a problem with independency of the judges.

Page 78

1       And -- yes.
2    Q. So if you have a structure in which the chief executive
3    is in charge of the prosecutor, and also in charge of
4    nominating a judge for elevation, say, to a court of
5    appeals, would that be a problematic situation, in your
6    view?
7    A. What is "elevation"?
8    Q. Like -- promotion. Promotion from, say, a lower court
9    to a higher court.
10   A. So the question was if the judge will promote another
11   judge -- no, what was --
12   Q. No.
13   A. I'm sorry.
14   Q. So -- suppose you -- I'll start with giving you a
15   hypothetical situation.
16   A. Yeah. Mm-hmm.
17   Q. Suppose you have a single individual who is in charge of
18   the prosecutor, all prosecutors, and the same individual
19   is responsible for nominating --
20   A. The judges?
21   Q. -- all judges. Would that be problematic, in your view?
22   A. Yes.
23   Q. In your view, would that violate international norms?
24   A. In my view, it violate the requirement of independency,
25   and -- yes, that should be safeguarded by , inter

Page 79

1    alia, the separation of powers, of course.
2    Q. And so is it -- the situation that I just described in
3    my hypothetical, is that a violation of international
4    law?
5    A. It is a violation of the requirement of independency,
6    yes.
7    Q. Okay. Thank you.
8       Now I want to ask you about a statement you make on
9    page 13 of your report.
10   A. Yes, I have it.
11   Q. Let's look together.
12      You wrote under subheading 2 -- first you quoted
13   from Article 14 of the ICCPR; do you see that?
14   A. The second sentence?
15   Q. Yes.
16   A. Yes. Mm-hmm.
17   Q. And then following that, you wrote this means
18   establishing separate courts for different groups of
19   people based on a variety of factors, including national
20   origin, is a contravention of Article 14.
21   A. Yes.
22   Q. Am I fairly summarizing that?
23   A. Yes, yes, absolutely.
24   Q. I didn't quote it --
25   A. No, no, it's fine.

Page 80

1    Q. -- exactly.
2       And would you -- would you agree with me that --
3    well, let me ask you this: How would you reconcile that
4    statement with Article 66, which requires civilians from
5    an occupied territory to be tried in a military court?
6    MR. SATIN: Objection. Misstates the evidence.
7    A. I don't see any contradiction. In occupied territories,
8    the territorial jurisdiction is under the responsibility
9    of the military commander, which can establish military
10   court, as we discussed at the beginning.
11      Now, what happened during the years -- so in '67,
12   when they were established, there is absolutely no
13   problem, and people were under the jurisdiction of this
14   court, Palestinian residents.
15      Now, with the time when Israeli presence start to be
16   more and more important in the Occupied Territory, there
17   is a situation created where you have people living in
18   the same territorial jurisdiction, while the Palestinian
19   will be under the jurisdiction of this court, and
20   Israeli of another court.
21      This is the problem. So you can have a situation --
22   and you have situation -- in which two people commit the
23   exact same crime on the exact same place, and they will
24   be under the jurisdiction of two different courts, two
25   different criminal courts, two different rules of

Page 81

1   procedure.  And this is absolutely unacceptable from the
2   point of view of international law and equality.
3   Q.  So in your opinion, would it cure the problem if
4     Israelis who commit security crimes were to be tried,
5     de facto, in the military court sitting in the Occupied
6     Territories?
7   A.  What would cure the problem -- and I want to go back now
8     to the fact that IHL and the law of military occupation
9     was not designed to govern a civilian population during
10    45 years.  We must remember this.  So any adaptation
11    that we will do, modulation --
12  Q.  Modulate?
13  A.  Modulating the law, in order to fit, will be necessarily
14    a kind of twisting and distortion of the law.
15      So I would like civilians not to be tried in
16    military occupation by an alien army.  I would like
17    these civilians, including children, to have due process
18    right by regular court.
19      Now, the fact that we have this occupation for
20    45 years, it means that these courts are still
21    functioning, but this is wrong.  Now, if you would put
22    Israeli civilians under the jurisdiction of this court,
23    it won't cure their situation; it will only cure the
24    situation of the kind of apartheid that had been
25    established.

Page 82

1      So for this, it would cure this difference; but to
2    cure the situation is that military court should not try
3    civilian, and as you know, they try them -- they expand
4    the jurisdiction to try them for car traffic, drugs
5    issues, stealing cars.  I mean, it's not only -- you
6    know, notorious terrorists that are being prosecuted.
7   Q.  Well, our case is about notorious terrorists being
8    prosecuted; right?
9   A.  Everyone is entitled to due process, as the US Supreme
10    Court in Hamdan said.
11  Q.  Agreed.  I -- I have no debate with you about -- about
12    defendants being entitled to due process, and I want to
13    ask you some questions about due process in our cases.
14      My question, really, was more directed to the
15    specific thing that you're talking about in item 2 of
16    your report, which is an unequal -- unequal prosecution,
17    which -- I think we agree; let me -- let me just ask you
18    a more pointed question.
19      You agree that as a de jure matter, Israelis are
20    subject to prosecution in the military courts for crimes
21    committed in the West Bank; right?
22  A.  "Jury matter"?
23  Q.  "De jure"; "de jure."
24  A.  Ah.  Okay.  Sorry, I didn't understand this word.
25    De jure --

Page 83

1   Q.  Do you want me to say it again?
2   A.  Yeah, can -- please, yeah.
3   Q.  Sure; okay, as a legal matter --
4   A.  Yes.
5   Q.  -- Israeli citizens who commit crimes in the West Bank
6     that threaten the security of the State of Israel are
7     subject to prosecution in the Israeli military courts;
8     right?
9   A.  Yes.
10  Q.  And your criticism is that in fact, when Israelis commit
11    such crimes, they are prosecuted in the civilian courts
12    in Israel; right?  That is a criticism you render in
13    section 2 of your report?
14  A.  My criticism is that showing this practice, that as a
15    matter of policy, Israeli citizens -- Jewish Israeli
16    citizens are prosecuted in Israel civilian courts, its
17    only reinforce the assumption that the military courts
18    are political courts that are there, one, to exercise
19    a kind of control, domination of this population, and to
20    impose on them a due process rule that are less good.
21    Because why would Israeli be prosecuted in Israel if
22    this system was so great?
23      It's not only a question whether it's civil or
24    military, it's the question of the intent of the rules
25    that you have applied.

Page 84

1   Q.  So I want to be very, very specific:  Your criticism in
2    section 2 of your report that we're looking at, which
3    begins on 13, is not of the military courts themselves;
4    it's of the policy decision not to try Israelis in those
5    courts.  Is that fair to say?
6   A.  In order to assess the legality of the courts, one has
7    to look at the broader picture.  And this is exactly
8    what this article from 2011 is dealing with, meaning
9    that, yes, the policy is that now there is a segregated
10    policy; this is how you should name it.
11      Now, in this state of affairs, that what we have -- we
12    have two different kind of legal system, two different
13    populations, and therefore the assumption is that these
14    courts are not properly constituted, in the sense they
15    are a political court.  I mean, I said that.
16  Q.  Do you think that -- well, how would you cure the
17    problem you're identifying?
18  A.  I will end occupation.
19  Q.  Other than ending the occupation.
20  A.  No, it's not "other," but this is the source of the
21    problem, that we are applying -- okay, so I have two
22    proposition.  One is to end the occupation and to stop
23    applying IHL, a law that was designed to apply for
24    a short term, and not to govern 45 years a civilian
25    population.  Okay?  They don't have any basics right,

Page 85

1    but subordinate to an alien army, one -- this is -- this
2    is the one.  How can you govern a population with such
3    a general law?
4    Q. So let me -- let me ask it specifically.  Let's
5        assume --
6    A. Yeah.
7    Q. -- that it is not within our power to establish peace
8        between Israel and the PLO today.
9    A. Mm-hmm.
10   Q. But suppose you were -- you were asked by the powers
11       that be in the State of Israel:  "We would like to have
12       a court system that protects the security of the
13       citizens of Israel" --
14   A. Okay.
15   Q. -- "and recognizes the fact that we have -- we cannot
16       withdraw from the West Bank.  What kind of court system
17       would you recommend?"
18   A. So we have to -- in order to cure the situation, we have
19       to address several issues.  First of all is stopping
20       the -- a process of colonialization is directly linked
21       to this, because this brought to be what we call the
22       apartheid system in the West Bank, because you bring
23       Israelis with their own law, and you have the
24       Palestinians under the IHL law and military law,
25       et cetera.  So you have two people living in the same

Page 86

1    place in the same population.
2        So what we will need to have is that the entire
3    territorial jurisdiction, the entire West Bank, will be
4    under the law of military occupation, unified.  And what
5    is interesting is that the settlements are bound by
6    military orders, because they are established through
7    military orders; right?  But some of them were --
8    I mean -- not established, but many of the -- many of
9    the organization, through military orders.
10       But of course, their military orders are different
11   from the military orders from the Palestinians.  So you
12   have an entire legislation which is different.  And not
13   only the legislation is different, but they were
14   excluded from the jurisdiction of -- that had the
15   territorial jurisdiction; right?  We are talking
16   territorial jurisdiction.
17       So in order to cure this, you need to make first of
18   all a unified legal system in the West Bank, which is
19   the law of the occupation, local law, Jordanian law,
20   what we mentioned before.  But creating these two zones
21   of law, this is what brought to this segregated legal
22   regime.  So this is first.
23       Second is that the military court should not exceed
24   the jurisdiction beyond the explicit and limited
25   authority provided by the Geneva Convention, because it

Page 87

1    is generally violating the right of civilian to be
2    prosecuted by independent court.  In general, it's
3    better that civilian are prosecuted in civilian court.
4        Therefore, military court should not expand their
5    jurisdiction.  When I'm talking about "military court,"
6    I'm talking about the legislation applicable and their
7    own case law.  Because, as you read in my 2007 article,
8    military court keep expanding their jurisdiction over
9    different crimes, that normally should not be under this
10   jurisdiction; extraterritorial application of the law.
11   So this is the kind of expanding on one hand and
12   reducing on the other hand, which means to exclude the
13   settlers.
14       So to cure, it's very simplicit to say, "Let's put
15   them in Tel Aviv and prosecute them there."  It's not --
16   it's -- much more work will be needed to cure the
17   situation.
18       But if I go back to -- just to summarize what I've
19   said, so not to create two legal system, and one that
20   the jurisdiction of the military court will be to
21   restrict it to what has been provided.
22       So there are two -- you know ...
23   Q. I'm not sure I understood the part about Tel Aviv.
24   A. No, because you said to cure the -- no, no, no, sorry;
25       right.  I did -- you said that to cure the situation,

Page 88

1    everyone should be prosecuted in the military court,
2    yes.  Sorry.
3    Q. That was the premise of my --
4    A. Yeah, yeah, yeah, sorry.  Yeah.
5    Q. Not Tel Aviv.
6    A. Not Tel Aviv, yes.  No, this is a mistake, sorry.  Yeah.
7    Q. Okay.  So now I want you -- well, you've just described
8        a -- what we might call a hypothetical legal system for
9        the West Bank.
10   A. What -- which one?
11   Q. The one where all Israelis and Palestinians are subject
12       to the military courts, number 1, instead of having two
13       systems, we have only one system; and number 2, the
14       military court jurisdiction is limited to its core
15       competency of things such as security crimes.
16       Have I fairly summarized --
17   A. It's not -- I'm not speaking about -- nothing
18       hypothetical; I'm speaking about how the law should be,
19       and how Israel, through the colonialization, created
20       this dual legal system.  But it's not a question of
21       hypothetical; it's a question in a territory, you
22       have an applicable law, and you cannot have islands of
23       places with a different law.
24   Q. I apologize; I was skipping ahead.  So --
25   A. Okay.

Page 89

1    Q. You've -- it's my fault.
2        You've described changes that you would make to the
3        law to make it comply with international law?
4    A. Yeah, not only to the law; to a policy also.
5    Q. And good policy.
6        So now I want you to imagine a hypothetical in which
7        the -- starting in the year 1999, the Israeli military
8        commander and the Knesset and the prime minister all
9        adopted the Weill plan, and the Weill plan was exactly
10       as you've just described it.
11       So this is my hypothetical. Do you understand the
12       hypothetical, or should I elaborate on it further?
13   A. Okay, if I'm a legal adviser of the State, and -- yeah,
14       okay.
15   Q. Right.
16   A. But I mean, what are --
17   Q. Okay.
18   A. Yeah, what is the question? Yeah.
19   Q. So -- so the question is: Would any of the 21 cases
20       that we've described, the 21 cases that we are here
21       about, would any of those 21 cases have come out
22       differently in a legal regime that you've described?
23   MR. SATIN: Objection, lack of foundation, assumes facts not
24       in evidence.
25   A. You are asking me whether it is important if the judge

Page 90

1        is independent or not, if in any case they did the act,
2        and they will be guilty. What can I answer for this?
3        Is it a serious question?
4    BY MR. YALOWITZ:
5    Q. Yes, it's a very serious question.
6    A. Yes? To ask me it's important if the judges are
7        independent or not, I think it is important.
8    Q. That wasn't the question. The question is: You've
9        described -- well, let me try to be very clear.
10       You've described changes that you would make to the
11       structural regime. You talked about having Israeli
12       citizens subject to military court law; right?
13   A. (Witness nods.)
14   Q. You have to speak.
15   A. Yes, yes, sorry. Yes.
16   Q. And you talked about restricting the jurisdiction of the
17       military court to --
18   A. Yes.
19   Q. -- things that are --
20   A. Security.
21   Q. -- security-related?
22   A. Yes.
23   Q. Okay. In that -- and that would cure the issues you're
24       describing in section 2 of your report; do I have that
25       right? Part 2, section 2, starting on page 13.

Page 91

1    A. Okay, part 2 of my -- part 2 of my opinion -- not part 2
2        of my opinion; this section that you were referring to
3        is analyzing -- is the second point of my analysis,
4        whether the courts are properly constitute as the
5        requirement of a military court to -- to function and to
6        provide justice in criminal cases. So the first point
7        was the point of independence and impartiality, and it's
8        not referring to this.
9        The second point of the opinion was that why -- why
10       it is a not properly constituted court, because it is
11       shown that through the years, it becomes a political
12       court, in the sense that it's prosecuting not according
13       to regular territorial jurisdiction, but according to
14       the nationality of the person.
15       So if this point will be cured, as you propose, it
16       will simply mean that for -- the question whether the
17       court are properly constitute. I will not say any more
18       that it is a court that is political, in that sense.
19   Q. Okay. I think I --
20   A. Just if it is cured, hypothetically, yeah.
21   Q. I think I understand your --
22   A. Okay.
23   Q. -- your views on that.
24       And is it your opinion that a -- a person who enters
25       into the territory of Israel and -- without a uniform,

Page 92

1        and commits acts of violence against civilians for
2        political purposes, has the right not to be tried in
3        a military court?
4    MR. SATIN: Objection to the ambiguous nature of "territory
5        of Israel."
6        You can answer, if you understand.
7    A. Any person who commit a crime have the right of due
8        process. This is the question. And to be tried by
9        an independent, impartial and competent court. This is
10       the requirement of international law, that the courts
11       are independent, professional, impartial, and are rule
12       of due process.
13       Then, I don't know; you can constitute this as a
14       military/civilian, but these are the requirements.
15   BY MR. YALOWITZ:
16   Q. There's nothing per se -- there's nothing per se
17       improper about trying a person who commits a security
18       crime in military court; is that fair to say?
19   A. According to Article 66, the occupying power can
20       establish military court to prosecute security offenses.
21   Q. So the answer is yes?
22   A. Yes. We've established that already.
23   Q. Okay.
24       I'm going to read some statements about due process,
25       and I want to ask if you agree or disagree.

Page 93

1  A. Yes.
2  Q. Okay. "Due process, unlike some legal rules, is not
3     a technical conception but a fixed content unrelated to
4     time, place and circumstances."
5        Do you agree with that?
6  A. I'm sorry, I don't -- is it possible for me to read
7     this? Or if you can read it again, more fluently --
8  Q. I'll read it again.
9  A. Yeah.
10 Q. I'll read it again.
11 A. Just more -- yeah.
12 Q. Sure.
13 A. Sorry.
14 Q. "Due process ... is not a technical conception with
15    a fixed content, unrelated to time, place and
16    circumstances."
17 A. Yes, due process is not a fixed content -- due process
18    -- what do you want me to answer? If I agree --
19 Q. Do you agree with that?
20 A. -- with this statement?
21 Q. Yeah.
22 A. I think that any human rights that we have is a question
23    of context. And yes, I will agree with this also.
24 Q. Do you agree that the requirements of due process are
25    a function not only of the extent of the governmental

Page 94

1     restriction imposed, but also of the extent of the
2     necessity for the restriction?
3  MR. SATIN: Objection, compound question.
4  WITNESS: Can I answer it?
5  MR. SATIN: Yes.
6  A. Human rights, generally, can be -- can be balanced by
7     necessity needs and security needs, and then one needs
8     to see if the essence of the right is -- is not harm
9     beyond the restrictive necessity, yes, but we can agree
10    on this. I mean, human rights are a balance of needs;
11    yes.
12 BY MR. YALOWITZ:
13 Q. All right. I want to ask you some questions about your
14    opinion with regard to whether the military courts are
15    properly constituted.
16 A. Mm-hmm.
17 Q. We talked about one part of that, in a section of your
18    report; I want to ask you about some other ones.
19       First of all, is it your -- are you applying
20    Article 66 in that section of your report?
21 A. Which section? Sorry.
22 Q. Sure.
23 A. The second one, or third one?
24 Q. So the questions I'm going to ask you are limited to
25    part 2.

Page 95

1  A. 2 -- the -- apartheid. Okay.
2  Q. Which begins on --
3  A. Segregation.
4  Q. No, no; I'm sorry.
5  A. No?
6  Q. Part (ii), which begins on page 9 and runs through
7     page 17.
8  A. The entire section, yes.
9  Q. Okay.
10 A. Yeah.
11 Q. So as I understand --
12 A. Yes.
13 Q. Do you have that section in mind?
14 A. 1 and 2 -- yes, the numbers.
15 Q. Roman 2?
16 A. Yes, (ii), exactly.
17 Q. So as I understand your argument, you -- you have three
18    arguments that you make in this section. Impartiality
19    is the first argument you make; right? That's
20    section 1, impartiality and independence?
21 A. Lack of independence, and impartiality, yeah.
22 Q. And then part 2 --
23 A. 2.
24 Q. -- is unequal treatment?
25 A. Yes -- sorry, can I interrupt you?

Page 96

1  Q. Please.
2  A. Yeah, so if you want me just to structure the -- how it
3     was constructed, so the first part deals with the -- why
4     they don't -- are not impartial and independent. So
5     we're looking at the important procedure, the lack of
6     training, and the lack of separation of powers. So this
7     was this part of independence and impartiality -- and
8     competency; we can put it together.
9        And then the second part will be the fact that as
10    the court is a political court, because different
11    treatment is provided to different group of
12    nationality -- yeah.
13 Q. And then the third part is --
14 A. In page 17?
15 Q. Yes.
16 A. Yes.
17 Q. No, I'm sorry --
18 A. No?
19 Q. -- in pages 16 to 17, you offer a third argument, which
20    is --
21 A. Ah, yes, this one. Yes, yes. Sorry. Yeah.
22 Q. Which is about laws have --
23 A. The issue of publicity, yeah.
24 Q. Right. The laws have to be known, published --
25 A. Exactly.

Page 97

1   Q. -- and not retroactive?
2   A. Yeah.
3   Q. Okay. So I want to take you through those three things
4      and ask you some questions about them.
5   A. Let's go.
6   Q. With regard to impartiality and independence, the first
7      thing you point to is the appointment process?
8   A. Yes.
9   Q. And is it -- is it your view that Article 66 of the
10     Fourth Geneva Convention requires the appointing power
11     to be a military commander?
12  A. It required the court to be properly constituted and
13     nonpolitical. Then, every selection process need to be
14     reviewed under this prism.
15  Q. So -- bear with me for a minute.
16        Is it your view that the -- under Article 66, the
17     courts have to be military courts?
18  A. Article 66 grant the authority to establish courts. So
19     first of all, it's not an obligation; it's
20     a possibility. And it will be military court in the
21     sense that they are established by the military, because
22     the authority granted is the military commander.
23  Q. So could you look with me at Reisner's report for
24     a moment.
25  A. Which page?

Page 98

1   Q. Pages 16 and 17.
2   A. Mm-hmm.
3   Q. If I could ask you to read -- do you have 16 and 17 with
4      you?
5   A. Yes -- wow, it's long. No, it's 36 -- sorry, I'm
6      sorry -- page 16, or paragraph 16?
7   Q. Page 16, paragraph -- what I'd like you to do is to read
8      paragraphs 36(c) and (d) only.
9   A. Okay.
10        Yes, yes, this is what we said before, yeah.
11        Only (c), you wanted me to read?
12  Q. (c) and (d).
13  A. (d); sorry.
14        Yeah.
15  Q. Do you agree with Mr. Reisner's paragraphs 36(c) and
16     36(d)?
17  A. Yeah. As I said, it's the court that should be
18     established under the authority of the -- of the courts
19     of -- just -- again with the words, just -- but
20     I would -- yes, he mentioned "required." He did, like,
21     underlining "require." As I understand Article 66, the
22     occupying power may establish the court; this is how the
23     language -- if you want to open Article 66.
24        Do you have Article 66 with you?
25  Q. I think I do.

Page 99

1   A. So let's look at it.
2   Q. I suspect I do, in my --
3   A. Just to be sure on the wording.
4   Q. In my study materials.
5        Would you like a copy of --
6   A. No, no, I don't -- just let's read it once again.
7   Q. Shall I read it aloud?
8   A. Yes, maybe, yeah.
9   Q. "In case of a breach of the penal provisions promulgated
10     by it by virtue of the second paragraph of Article 64,
11     the occupying power may hand over the accused to its" --
12  A. "May."
13  Q. -- "properly constituted nonpolitical military
14     courts" --
15  A. Mm-hmm.
16  Q. -- "on condition that said courts sit in the occupied
17     country. Courts of appeal shall preferably sit in the
18     occupied territory."
19        So this confirms your view that --
20  A. They may. Yeah.
21  Q. The military commander is permitted to establish
22     military courts --
23  A. But not obliged to.
24  Q. But I think you would also agree that if they do
25     establish courts, they must be subject to the

Page 100

1      supervision of the military commander?
2   A. The court?
3   Q. Yes.
4   A. No, the courts are established by the military
5      commander.
6        What do you mean, "supervision"? That he supervises
7      the judges? No, I don't think so.
8   Q. So, for example, Pictet -- Pictet? Is that right?
9   A. Pictet.
10  Q. Pictet says -- is quoted in Reisner's paragraph 36d as
11     saying:
12        "The accused may only be brought before 'military
13     courts', that is before courts whose members have
14     military status and are subordinate to the military
15     authorities."
16  A. Yes, it is in the sense, I think, if we continue to read
17     his commentary, the idea is that -- and then we go back
18     to what we said before, that one cannot extend its own
19     legal system to occupied territories. This is the
20     point. Yeah.
21  Q. All right. So it's not the -- it's not the placement of
22     the courts within the military structure that's -- you
23     have to criticism of that; right?
24  A. This is the law. I mean ...
25  Q. All right.

1  A. But the law also required it to be properly constituted
2     and nonpolitical.
3  Q. And your criticism is the appointment process, rather
4     than the -- rather than the supervising process?
5  A. Not only the appointment; it's all the points that
6     I wrote in my opinion, that they are -- you know, it's
7     every point separately, and especially the accumulation
8     of all of these points, they make it not properly
9     constituted and not nonpolitical.
10       In the long run, being 44 years working like this;
11    we're not talking about courts doing this for one month.
12    Hundreds of thousands of cases.
13 Q. Bear with me.
14       So I -- I just want to focus with you on part 1(a).
15 A. Mm-hmm.
16 MR. SATIN: Mr. Yalowitz, are you now referring to
17    Ms. Weill's report, or Mr. Reisner's?
18 BY MR. YALOWITZ:
19 Q. So could I direct your attention to --
20 A. It's my report; right? Yeah.
21 Q. -- to your report, page 9.
22 A. Yes, my report.
23 Q. Okay. Do you have page 9 before you?
24 A. Yes.
25 Q. This is -- this is where you're discussing the

1     appointment --
2  A. Yes.
3  Q. -- procedure; right?
4        And do I have it right that your criticism in this
5     part of your report is not related to the fact of being
6     a military court, but is derived from the particular
7     appointment process that you're describing; do I have
8     that right?
9  A. Okay, appointment process and the structure, the unity
10    structure, as you can see, were also changed in 2004,
11    because of this default. During --
12 Q. The 2004 change was a change to the appointment
13    procedure; right?
14 A. Both. You have one change -- I mean, the first change
15    was that during -- from '67 to 2004, you have long years
16    of situation in which the judge were appointment through
17    the recommendation of the prosecutor. That changes in
18    2004, and they establish a -- how do you say it -- an
19    appointment committee that recommends for the military
20    commander. This was --
21 Q. These --
22 A. Just -- if I may finish?
23 Q. Please, please. I apologize.
24 A. Yeah.
25       This was one change. And the second change was that

1     until 2004, the judges, prosecutor were under the same
2     unit, subordinate to the same structure; and then, in
3     2005, they divided the -- the units, they created the
4     special unit for the military courts, which is now in
5     the branch with the other martial court, which is
6     separated from the prosecution, which is the minimum
7     standard of -- of requirement that the prosecution and
8     the judges are not in the same -- in the same place.
9  Q. Is it your opinion that people who were convicted of
10    crimes in the military courts before the changes took
11    place in 2004 should be released from prison because of
12    the appointment procedures?
13 A. People who do not have due process have the right to be
14    judged by a competent tribunal and to have right to due
15    process.
16       Then the -- you know, criminal case should be
17    reviewed and decided upon the facts. If they are
18    guilty, they are guilty; if they are not guilty, they
19    are not guilty. But the point is that everyone deserves
20    a due process, that's right.
21 Q. Sure. So do you think that the appointment process that
22    existed before 2004 was so central to the core of due
23    process that the people who were convicted of crimes
24    under that system should be released from prison?
25 A. I don't remember that I said that someone should be

1     released from prison.
2  Q. I'm asking you.
3  A. Okay. I thought that you are referring to my other
4     answer.
5  Q. No, no; I'm asking you.
6  A. First of all, what -- now I'm -- the question?
7  Q. Do you want me to ask it again?
8  A. Yeah.
9  Q. Sure.
10       Is it your opinion that the appointment procedures
11    that existed before 2004 are so central to the core of
12    due process that people who are convicted of crimes in
13    the military courts, who are still serving time, should
14    be released from prison because of the appointment
15    process?
16 A. I think that court -- in order to be a competent court,
17    should have a correct procedural appointment of judges
18    to secure their independency, impartiality, and being
19    nonpolitical. This is the accepted rule.
20       Whether -- now, the military -- you are asking me,
21    "Do you think that if a judge is not really independent,
22    it's worth making another trial?"
23       These are the rules of fair trial; you know? We
24    can't just put people in prison without any rule of fair
25    trial, if anyway they did this. I don't know; what can

Page 105

1    I answer of this?  For me -- this is -- was a sarcasm;
2    yes?  It's not my position.
3        The rule of fair trial are established to make sure
4    that procedure are well conducted, and that people that
5    are guilty will be in prison; people that are innocent
6    will be free.  This the criminal law.
7        I think that court should be independent, and if
8    they are not, it is a serious problem in the due
9    process, and maybe you should have a retrial.
10   Q.  So --
11   A.  I don't know how to cure the situation; I don't have any
12       position on what to do with these people.  I'm just
13       observing that the court are not guaranteeing fair trial
14       as a question of independency.
15   Q.  So we -- we're here about 21 convictions; right?
16   MR. SATIN:  Objection.  Lack of foundation.  Calls for
17       speculation.
18   A.  I'm here for an expert opinion I gave on military
19       courts.
20   BY MR. YALOWITZ:
21   Q.  All right.  You were provided the files of 21 people who
22       were convicted of terrorism; right?
23   MR. SATIN:  Objection, asked and answered, lack of
24       foundation.
25   A.  I was sent the link to the cases, yeah.

Page 106

1    BY MR. YALOWITZ:
2    Q.  Okay.  And most of those people were convicted before
3        2004?
4    MR. SATIN:  Objection, lack of foundation.
5    A.  Yeah, this, I'm sorry, I told you, I don't know.
6        I don't remember the fact.  I have not any particular
7        position on these specific trials.
8    BY MR. YALOWITZ:
9    Q.  Are you advocating that any of those 21 individuals were
10       actually innocent?
11   MR. SATIN:  Objection, lack of foundation.
12   A.  Is that what you -- I don't know.
13   BY MR. YALOWITZ:
14   Q.  No, no, I'm asking --
15   A.  I didn't read the cases.
16   BY MR. YALOWITZ:
17   Q.  I'm asking -- I'm just asking the question.
18   A.  Yeah.
19   Q.  You shouldn't assume from my answer that I believe
20       you --
21   A.  No, no, so if I think that --
22   Q.  -- feel a certain way -- let me speak.  Let me speak.
23       I'm going to ask you questions, and you just answer
24       from your heart.  Don't assume that I believe -- I'm not
25       arguing; I'm just asking questions.  So you may agree,

Page 107

1    and then you say "I agree," or you may disagree, you say
2    you disagree.  Or you may have no opinion; whatever your
3    answer is.
4    A.  Mm-hmm.
5    Q.  Okay, but don't assume from my question that I'm
6        agreeing with you or disagreeing with you; I'm just
7        asking you questions.  Does that make sense?
8    A.  Yes.
9    Q.  Okay.
10       So are you offering any opinion at all about the
11       guilt or innocence of the 21 cases?
12   A.  Absolutely no.  I have no position on this.
13   Q.  And are you offering an opinion on whether any of those
14       21 convicted criminals should be released from prison?
15   MR. SATIN:  Objection, lack of foundation.
16   A.  I don't have any position on this question.
17   BY MR. YALOWITZ:
18   Q.  Are you offering any opinion on whether those 21
19       individuals should be subject to any kind of retrial?
20   MR. SATIN:  Objection, lack of foundation.
21   A.  You are -- more generally are asking me what is the --
22       how to cure a situation in which military courts which
23       are not properly constitute provide sentence and
24       decision.  I'm not -- I don't know.  I don't know what
25       to do with it now.  I'm just observing it and telling

Page 108

1    you that these process are not according to
2    international standard of due process.  I'm not here --
3    I'm not the legal adviser on how -- how to cure the
4    situation.  I don't know.
5    BY MR. YALOWITZ:
6    Q.  Do you -- do you have any opinion at all about whether
7        any of the 21 verdicts is reliable?
8    MR. SATIN:  Objection, lack of foundation.
9    A.  Of course not.  I didn't read the cases.  I don't know.
10   BY MR. YALOWITZ:
11   Q.  So do you know whether, in any of the 21 cases, there
12       was a judge on the court who had no legal training?
13   A.  I don't know this.
14   MR. SATIN:  Objection, lack of foundation.
15   A.  Yeah.  This could be checked, but I have no idea.
16   BY MR. YALOWITZ:
17   Q.  Do you know whether, in any of the 21 cases, there was
18       a rule change in the middle of trial?
19   MR. SATIN:  Objection, lack of foundation.
20   A.  Of course I can have no idea.  I don't know when the
21       trial were taken, and most importantly, I don't know the
22       rules.  You know?  It's so difficult to know when they
23       were published, and et cetera.  This would require real
24       work.
25   BY MR. YALOWITZ:

Page 109

1  Q. So -- so the answer is you --
2  A. No.
3  Q. You don't know?
4  A. I don't know.
5  Q. I want to ask you about a statement you make on page 11
6     of your report.
7  A. Yeah.
8  Q. You write on page 11:
9        "Human rights law, which was developed after the
10    drafting of the Geneva Conventions, prohibits the trial
11    of civilians by military courts exactly because they
12    generally do not comply with the requirement of
13    an independent and impartial judiciary."
14       Did I read that correctly?
15 A. Yeah, it's what I wrote -- what I wrote.
16 Q. And so I'm -- you're making a distinction there between
17    human rights law on the one hand and international
18    humanitarian law on the other hand.
19 A. Mm-hmm. Mm-hmm. Mm-hmm. Yes.
20 Q. And what is the point that you're making in this
21    sentence? Because I didn't understand it.
22 A. The general rule is that military courts would not reach
23    the requirement of independency and impartiality
24    structurally, according to human rights law; and
25    therefore the requirement of human rights law is that

Page 110

1     civilians, generally, yes, should not be tried in a
2     military court.
3        Now, we have the IHL provision that is allowing
4     this -- yes, we agree, Article 66 -- so here we can see
5     there is a kind of -- not a kind; there is a clash
6     between these two branches of law. Right?
7        Then what do we do with the clash of two norms? So
8     in order to resolve a clash of norm in international
9     law, you have two positions, or two -- two ways of doing
10    it. One is that the later norm prevail on the former
11    norm; the other one is the lex specialis, that we
12    discussed, later.
13       But anyway, the point was to show that there is
14    a problem of independency in military courts.
15 Q. That -- so --
16 A. Yeah, I mean, I don't know where -- we didn't -- what
17    that you don't understand?
18 Q. I'm sorry?
19 A. What did you -- didn't you understand?
20 Q. Which word didn't I understand?
21 A. Yeah.
22 Q. So --
23 A. The point, you didn't understand.
24 Q. So I -- I guess I didn't understand the point. Are you
25    arguing that Article 66 has become obsolete and should

Page 111

1  be disregarded?
2  A. No. No. No, no, the -- I didn't -- did not write this.
3     I think maybe if you read the last paragraph, you
4     can understand my -- my position.
5  Q. Is it more of a rhetorical point, that --
6  A. No. No. No, no. The issue is that because IHL is --
7     let's say that the establishment of military court to
8     try civilians, it is an exception of the general rule
9     that civilians shall not be tried by military court; we
10    agree on this?
11 Q. Okay.
12 A. Yeah?
13 Q. I understand that.
14 A. Yeah. So from this, the idea that if we have an
15    exception, it should be restricted; it should be framed
16    within its own authority and not -- first not enlarged,
17    and second, to understand this authority in the context
18    which it was provided, which is the law of military
19    occupation, equal temporary situation, transit
20    situation, and not possible to have these trials that
21    are illegal according to human rights law to generate an
22    entire population, including children, for 45 years.
23 Q. So is that an argument about independence, or does
24    that really go more toward limiting the scope to
25    security crimes?

Page 112

1  A. Both.
2  Q. How does it relate to independence?
3  A. Here I provide a citation why the human rights law said
4     this; you can read them in footnote -- no, sorry, it's
5     not here. Let me show you -- in footnote 35, for
6     example. And in the text -- you can write it -- and in
7     the text that is before footnote 36, that is customary
8     law, ICRC customary law study.
9  Q. So -- right; I appreciate that.
10 A. Yeah, I mean -- yeah.
11 Q. And I read it.
12 A. Yeah, exactly, so -- yeah.
13 Q. But what I'm not understanding is, it sounds like the
14    sources you've brought --
15 A. Yeah.
16 Q. -- in this report are saying, as a matter of human
17    rights law in the world, it's a bad idea to have
18    military courts because of independence concerns.
19 A. Right.
20 Q. Is that a fair summary?
21 A. Yeah.
22 Q. And then there's a special situation, which is described
23    by IHL, which is when there is an occupation, if the
24    foreign military chooses to establish a court for
25    security purposes, then that court must be a military

Page 113

1    court.
2    MR. SATIN:  Objection, compound.
3    BY MR. YALOWITZ:
4    Q.  Do I have that right?
5    A.  Article -- IHL allow the creation of military courts;
6    yes, you had it -- this is true.
7        We have to remember that human rights law has been
8    developed after the Geneva Convention.  So that means
9    that the Geneva Convention -- the -- should be
10   interpreted in light of developing human rights law, and
11   this is how things have been made.
12       So through that the authority in itself, until there
13   is not another provision that will repeal IHL, exists;
14   but then we must view the function, jurisdiction, the
15   long-term function, in light of human rights law, which
16   is another body of law which applied on the occupation
17   in the West Bank.
18   Q.  So if you were the legal adviser to the nation of
19   Israel --
20   A.  Lots of things will change.
21   Q.  How -- if they -- and they took your advice, which
22   they --
23   A.  Can you recommend me?
24   Q.  With pleasure.  I don't know if you're familiar with
25   this, but legal advisers are not always obeyed, you

Page 114

1    know.
2        But suppose you were the legal adviser --
3    A.  Yes.
4    Q.  -- for the State of Israel, and they were -- they were
5    planning to obey you, how would you -- if they said,
6    "Look, we'll obey you, but we just cannot end the
7    occupation today.  It's too complicated, there's too
8    many factors; we just can't do it.  But we want to have
9    as good of a system as possible governing the security
10   laws, because we want to prosecute terrorists, we want
11   to give them a fair trial, and then, if they're
12   convicted, we'll punish them; but we really do want to
13   give them as fair a trial as we can in a court that's
14   structurally sound as we can.  How would you reconcile
15   -- what recommendations would you make to reconcile
16   Article 66, on the one hand, with the human rights law
17   norms that you've described on pages 11 and 12?"
18   A.  Before I go back to Article 66, you remember I was
19   speaking about they may bring them to military court.
20   Now -- so there is a sense of -- kind of emergency in
21   this article.  You see, you are in the middle -- you are
22   in the middle of the war; the occupation starts; you
23   still have major occupation issue to -- the security
24   issue to regulate.  You know, occupation can take one
25   year, two years, until there is political agreement --

Page 115

1        (Reporter clarification.).
2    MR. YALOWITZ:  "Until there's a political agreement."
3    A.  And the occupation.  And -- so during this period, you
4    are granted this -- this authority which can today, in
5    an anachronistic view, be seen as a provision that will
6    not comply to human rights law.  And, by the way, maybe
7    today it wouldn't have been drafted like this; but
8    I don't know.  This is a speculation.
9        Anyway, the point is that during that time, yes, you
10   may do this, because there is a sense of emergency,
11   there is chaos, you need to establish your authority.
12       45 years doing it, you could -- you may also not do
13   this, and provide a better court, in the sense of being
14   independent, impartial, and applying a law with --
15   involve better due process than we have today.
16       Because, frankly, what can be a justification not to
17   have a due process right?  What can be a justification
18   not to have independent judge?  No justification.  No
19   situation can bring to have nonindependent court.  It's
20   simply nothing.  You don't need trials, then; just --
21   you know, put people in jail, and this is it.
22   Q.  Anything else?
23   A.  I mean -- so I don't -- the point how to cure the
24   situation, I would do other courts.
25   Q.  Would you have -- what kind of courts would you have?

Page 116

1    A.  I mean, why should -- I need now to think alternatives
2    to the existing military courts?  Is this -- yeah?
3    Q.  I'm just asking.
4    A.  I need to think about that.  It's a big question, you
5    know.  I can do a proposal for the Israeli State, if
6    they need it, you know.
7    Q.  All right.
8    A.  No, I mean ...
9    Q.  Is there any case you're aware of that holds that human
10   rights law prohibits the trial of civilians by military
11   courts?
12   A.  What if there is human rights law -- what?
13   Q.  Sure.  Do you know of a case --
14   A.  Yeah?
15   Q.  -- a decision by a court that says human rights law
16   prohibits the trial of civilians by any military court?
17   A.  There were a decision of the Human Rights Committee on
18   this -- Human Rights Committee on this issue.  The Human
19   Rights Committee is the -- the treaty body established
20   by the UN commission -- the UN covenant on civil and
21   political rights, stated the possibility to send
22   communication to this committee.
23       Now, they are not a binding court, but they give
24   decisions, and it's written by law professors, and there
25   was two or three cases in the context of the Turkey

Page 117

1  military courts, if I'm not wrong.  I can have the -- I
2  think maybe here, even, I have the citation, if you need
3  me to look -- one second.
4      Yes -- oh, here, it was even -- sorry.
5      Yes, exactly.  So it's not only the Human Rights
6  Commission; it's even the European Court of Human
7  Rights, with this is -- so I noted the Human Rights
8  Committee, and you have also the European Court of Human
9  Rights in Sahin versus Turkey.
10 Q.  What page are you on?
11 A.  Page 400 on my 2007 article, footnote 17.  It's a case
12     from 2001.  Footnote 17.
13 Q.  Okay, thank you.
14     Are you aware of the other cases -- this paragraph
15     says "See for example"?
16 A.  Yeah.  So there is a Human Rights Committee decision.
17     I don't remember by heart the references, but there are.
18 Q.  And that's the committee that's referenced in -- you
19     quote that committee in your report?
20 A.  It's possible.  Let me -- I don't remember.
21 Q.  So just directing your attention to --
22 A.  Yeah, here, yeah, footnote -- no, this is a general
23     comment.
24 Q.  Bear with me.  I just had it -- directing your attention
25     to page 12.

Page 118

1  A.  Yeah, exactly, yeah.
2  Q.  You -- you referenced the general comments of the UN
3      Human Rights Committee.  And are you saying you believe
4      there are some advisory opinions by the UN Human Rights
5      Committee that -- that would comment on this topic?
6  A.  It's not advisory opinion; it's what we call decision on
7      communication.  It's like the victims and -- the case to
8      the Human Rights Committee, and they give decision --
9      yes.  I -- if my memory is -- I'm, like, almost certain
10     that they have -- there are a few cases of the Human
11     Rights Committee.
12 Q.  And is it -- is it a binding decision, or is it
13     a precatory decision?
14 A.  It's a binding decision for the states before them.
15 Q.  And is the United States a party to this -- is it due to
16     a convention, or what is it?
17 A.  Yeah, it's the convention -- the UN Convention of
18     Political and Civil Rights, which -- in which they are
19     a party.  But then you need to accept the communication
20     process.  But anyway, the Human Rights Committee is an
21     organ created from this convention, which they're
22     a party of.
23     And now what is interesting in this decision, like
24     the general comments -- which are, by the way, cited
25     even by the High Court of Justice; the UN Human Rights

Page 119

1  Committee was cited in several cases by the -- because
2  they form what we call the customary law, so it's law,
3  right?  We have more and more decision, opinions, and --
4  yeah.
5      So they are binding for the litigating party, but
6  today, international law is also -- is influenced by
7  different things.  As you can see, the High Court of
8  Justice, which refer more than one time to their
9  decisions.
10 Q.  Is the -- you read the United States Supreme Court in
11     Hamdan; right?
12 A.  Yeah.
13 Q.  You talked about it in your report?
14 A.  Yeah, I studied this, yeah.
15 Q.  It was -- it was an important case --
16 A.  Important.
17 Q.  -- in the United States.
18 A.  Very good case, yeah.
19 Q.  Yeah.  And was -- did you read the briefs in that case
20     as well?
21 A.  Not a lot -- not -- not all of them, because there are
22     a lot; that's what I meant.  Not all of them, because
23     there are a lot.  Some of them I read; not everything.
24 Q.  Did anybody make the argument in that case that
25     international human rights law prohibits the trial of

Page 120

1  civilians by any military court?
2  A.  I don't remember.  I don't -- I -- you know, I don't
3      remember the briefs.  I mean, I read the decisions.
4  Q.  I didn't see it in -- I didn't see that argument raised
5      in the decisions.  Did you?
6  A.  In the decision?
7  Q.  Yeah.
8  A.  No, in the decision, they referred to the general
9      practice of -- maybe what we can refer to the -- the
10     customary law, they refer to Protocol 1, for example,
11     that the US is even not a party to; but they recognized
12     that Article 75 constituted customary law.  And indeed,
13     most of the due process rule are reflected there.
14     But I think they -- they left this more open,
15     because they referred to the general rule of civilized
16     state, or whatever -- yeah, I don't remember the exact
17     thing.
18 Q.  I mean, the -- the issue in Hamdan --
19 A.  Yeah.
20 Q.  -- was that there was a special constituted military
21     court that had rules that the Supreme Court found
22     offensive; is that fair to say?  Or at least the
23     majority of the Supreme Court found offensive.
24 A.  Can you repeat that?  I'm not sure --
25 Q.  Sure.

Page 121

1  A. -- I'm following until the end.  If you want, I can tell
2     you what I -- but repeat this again?
3  Q. Sure.
4       So the facts in Hamdan were -- Hamdan is a case
5     about Guantanamo Bay --
6  A. Yeah.
7  Q. -- detainees; right?  And Hamdan was to be tried by
8     a specially constituted military court.  Right?
9  A. Right.
10 Q. And he objected to that on the basis of a number of
11    things, including international humanitarian law; right?
12 A. Right.
13 Q. And in fact the -- a majority of the Supreme Court
14    agreed with Hamdan that the specially constituted
15    military commission violated international humanitarian
16    law, for a number of reasons; right?
17 A. Yes.  They violated Article 3; they were not properly
18    constituted.  Yeah.
19 Q. For example, they criticized the idea that it would be
20    okay to try a person for a crime and not allow him to be
21    present --
22 A. Yeah, in that sense.
23 Q. -- to see the evidence; right?
24 A. Right.
25 Q. Okay.  Did -- did any of -- did the opinion in the case

Page 122

1  in any way treat the topic of whether the whole idea of
2     trying Hamdan in a military court was somehow improper,
3     and that he should only be tried in a civilian court?
4  A. No.  If I remember well, no.
5  Q. And I can't remember --
6  A. Sorry, can I complete my answer?
7  Q. Yeah, yeah, please.
8  A. The answer is "no," and exactly the issue was whether
9     this court are properly constituted.
10 Q. Correct.
11 A. Yeah, and --
12 Q. I agree with that.
13 A. And then they review it not only according to IHL, but
14    I think -- you know, domestic US law was very important
15    there.
16 Q. Agreed.
17      So they relied on a case from the 1940s called
18    Quirin; do you recall that case?
19 A. Mm-hmm.  Yeah.
20 Q. Are you familiar with that case?
21 A. Yeah.
22 Q. That's a case in which German military officers snuck
23    into the United States, right, or German military
24    personnel --
25 A. Mm-hmm.

Page 123

1  Q. -- snuck into the United States.  Do you recall that
2     case?
3  A. Mm-hmm.  Yes.
4  Q. And they were -- they were apprehended, and they were
5     remitted to a military tribunal for trial; right?
6  A. Yeah.  What year was it?  I can't recall exactly.
7  Q. Does 1942 sound right to you?
8  A. '42?  Yeah, maybe, yeah.
9  Q. And by 1942, the United States had entered the war.
10 A. Mm-hmm.  Yeah.
11 Q. And -- and the argument in Quirin by the defendants was
12    that they should be tried in a civilian court rather
13    than military court; does that sound right to you?
14 A. Mm-hmm.  Yeah.
15 Q. And the Supreme Court rejected that argument; right?
16 A. Yeah.
17 Q. And then in Hamdan, the Supreme Court relied on Quirin;
18    is that right?
19 A. I don't remember in what context.  Can you recall me the
20    content --
21 Q. Yeah, I don't remember either.
22 A. Maybe we need to read the paragraph related, yeah.
23 Q. Yeah.  We'll -- we'll look for it --
24 A. Yeah.
25 Q. -- at the lunch break.

Page 124

1  A. Yeah.  Okay.
2  Q. And we can resume --
3  A. Yeah.
4  MR. SATIN:  Is perhaps now a good time --
5  A. Yeah, perhaps.  I need to go to the toilet also.
6  MR. YALOWITZ:  I think so.  Yeah, let's -- let's take
7     a lunch break.
8  (12:45 p.m.)
9       (Lunch break taken.)
10      (Exhibit 4 marked for identification.)
11 BY MR. YALOWITZ:
12 Q. So before we went to take lunch, we were talking about
13    the citation in Quirin -- I'm sorry, in Hamdan, of
14    Quirin.  So I just wanted to direct your attention to
15    exhibit 4, which we've placed before you, which is the
16    Hamdan case; right?
17 A. Yes.
18 Q. And if you go to page 28.
19      Just to orient you, do you see we're in part 5 of
20    the principal opinion?
21 A. Yes.
22 Q. And then if you turn the next page, they are discussing
23    Quirin; right?
24 A. Yes.
25 Q. And does that refresh your recollection that the Supreme

1    Court in Hamdan found Quirin to continue to be good law,
2    and relied on it to the degree stated in the opinion?
3    MR. SATIN: Well, objection, improper refreshing of
4        recollection.
5        But you can answer.
6    A. I -- I would need to -- more time to read what exactly
7        they rely on Quirin, in what context. Like this,
8        I can't really recall what was that, so maybe if you ask
9        me a more specific question?
10   BY MR. YALOWITZ:
11   Q. Sure. I -- I don't think it's actually very important.
12   A. Okay.
13   Q. I just felt, as a courtesy, since you had asked about
14       where in the opinion it might be, I would show it to
15       you. But if it doesn't refresh your memory, that's
16       okay.
17   A. No, but what was the question?
18   Q. Were they -- in Hamdan, were they citing Quirin with
19       approval?
20   A. If -- if I recall well, I mean, wasn't Quirin brought in
21       the context of the -- whether conspiracy constitutes
22       a crime, a war crime?
23       I mean, I'm not sure it was brought as to the
24       question whether commission are -- are well set.
25   Q. It's all right. If you don't remember off the top of

1    your head, it's not important.
2    A. Okay. So let's continue.
3    Q. Okay. I just felt duty bound to show it to you.
4    A. Mm-hmm.
5    Q. All right. We discussed briefly earlier today the
6        interim agreement; do you recall that?
7    A. I'm sorry, so we finished about Hamdan?
8    Q. Yes.
9    A. Yeah, so it wasn't any -- no, because I recall you asked
10       me a question before we went to -- to the break.
11   Q. I think I asked you, did they rely on Quirin?
12   A. Ah, but for whether it was properly constitute the --
13       the court, Quirin was brought in another context, I
14       think.
15   Q. Quirin --
16   A. Yeah.
17   Q. Do you recall that Quirin was a case about enemy
18       combatants who went to the United States, and they were
19       apprehended while they were in the United States --
20   A. Yeah.
21   Q. -- not in uniform?
22   A. Yeah.
23   Q. And the question in Quirin was, was it appropriate in
24       that circumstance to turn them over for trial to a
25       military tribunal?

1    A. Mm-hmm.
2    Q. Right? You have to say --
3    A. Yeah, but in the -- okay, but in the context of Hamdan,
4        I -- we need more time to -- to read this.
5    Q. Okay. That's okay; I think it's enough.
6    A. Enough -- okay.
7    Q. Okay. Can we turn to the interim agreement between the
8        PA and the PLO?
9    A. Yeah, sure.
10   Q. You're familiar with it; right?
11   A. Yeah.
12   Q. Have you read the provisions dealing with criminal
13       jurisdiction?
14   A. I read it. I read them -- not yesterday; it was quite
15       long time ago. But yes, of course, I read them.
16       I can't recall every word, but yes, of course I read
17       them.
18   Q. Do you recall generally that the interim agreement
19       required the redeployment of Israeli military forces out
20       of what they called Area A?
21   A. Yes.
22   Q. And it required the creation of a PA judicial system;
23       right?
24   A. Yeah.
25   Q. Palestinian Authority judicial system? Is that right?

1    A. Yes.
2    Q. And it also provided that the Israeli military
3        government would continue in areas B and C; right?
4    A. Yes.
5    Q. And that Israel would retain the necessary legislative
6        judicial and executive powers required to fulfill its
7        obligations and rights under the interim agreement; is
8        that right?
9    A. Yes.
10   Q. And do you recall that Israel, through its military
11       government, had the powers and responsibilities that
12       were not transferred to the PA?
13   A. Yes.
14   Q. Now, the judicial powers that the military government
15       retained surely included the criminal jurisdiction set
16       out in the annex to the interim agreement; right?
17   A. Mm-hmm.
18   Q. Do you recall --
19   A. It was annex 4, I think; right?
20   Q. I was going to ask you if you recall annex 4.
21   A. Yeah.
22   Q. All right. And you would agree with me that by 1995,
23       the PLO and its negotiators were well aware of the
24       existence and contours of the Israeli military court
25       system as it existed at that time in the West Bank;

Page 129

1    right?
2    A. If the PLO were aware of the military court?
3    Q. Yes.
4    A. I can imagine, yeah.
5    Q. How could they not have been; right?
6    A. Yes, I mean -- I think --
7    MR. SATIN: Objection, calls for speculation.
8    BY MR. YALOWITZ:
9    Q. You can answer.
10   A. If they were aware of the -- for sure they were aware of
11      existence. To tell you they know every legal structure
12      of the military court, this, I cannot answer. For sure
13      they know they exist.
14   Q. So you recall that under annex 4, and under the interim
15      agreement, Israel had the overriding responsibility for
16      security for the purpose of protecting Israelis and
17      confronting the threat of terrorism?
18   A. Yes.
19   Q. And that Israel had sole criminal jurisdiction over
20      offenses relating to Israel's security interests?
21   A. Yes.
22   Q. The interim agreement provided that Israel was to
23      continue to carry the responsibility for overall
24      security of Israelis; is that right?
25   A. Yes, from the jurisdiction of Israelis, yeah.

Page 130

1    Q. But not just jurisdiction over Israeli individuals, but
2       responsibility for the overall security of Israelis;
3       right?
4    A. Probably -- I don't remember the wording, but I imagine,
5       if you were reading the provision of the interim
6       agreement, so yes.
7    MR. SATIN: Don't guess.
8    WITNESS: Okay.
9    A. No, but I mean --
10   BY MR. YALOWITZ:
11   Q. It's not controversial; right?
12   A. Yes.
13   Q. You recall that the interim agreement provided that both
14      sides were to act to ensure the immediate, efficient and
15      effective handling of any incident involving a threat or
16      act of terrorism?
17   A. Legal assistance, you mean?
18   Q. Yeah.
19   A. Yeah, there was something about regulation about --
20      again, I can't recall by heart, but there was some
21      provision on that.
22   Q. Do you -- do you want to see it? Should I show it to
23      you?
24   A. I don't -- I don't know. Do I need any specific
25      question relating to this?

Page 131

1    Q. Well, the -- my specific question is this: So we're
2       talking about an agreement between Israel and the PLO.
3    A. Mm-hmm.
4    Q. Right?
5       You have to say --
6    A. Yes. Yes.
7    Q. And they -- the PLO understood that the military courts
8       existed; right?
9    MR. SATIN: Objection, calls for speculation.
10   A. I don't know what it has to do with the interim
11      agreement, anyway.
12   BY MR. YALOWITZ:
13   Q. Just bear with me.
14   A. I don't know what they understood. I wasn't entering
15      the negotiation.
16   Q. It wasn't -- the military courts were not secret; right?
17   A. No, they existed at that time; on this, we can agree.
18   Q. I mean, it was -- it was open, and notorious, and
19      anybody --
20   A. They were known.
21   MR. SATIN: Objection --
22   BY MR. YALOWITZ:
23   Q. They were well known; right?
24   MR. SATIN: Objection, compound question.
25   MR. YALOWITZ: Too many people speaking at once.

Page 132

1    Q. They were well known; right?
2    MR. SATIN: Objection, calls for speculation.
3    A. They were known, I think so, yeah.
4    BY MR. YALOWITZ:
5    Q. And -- and in the interim agreement, Israel and the PLO
6       agreed that Israel, through its military government,
7       would retain its judicial functions for security
8       purposes; right?
9    A. Yeah. They also agreed that the settlements will
10      continue. Yeah.
11   Q. And -- and so when -- when a legal document uses words
12      like "continue" and "retain," does that suggest some
13      form of ratification to you of the existing system, at
14      least insofar as the PLO and the PA were concerned?
15   A. Ratification in the sense that they think they are
16      legitimate bodies?
17   Q. Yes.
18   A. I don't think so. I think this is a question of
19      negotiation, you know, and -- for example, Israel
20      continued to -- to hold control over settlements, and
21      I don't think that the PLO will think that settlement
22      are legitimate under international law. But -- you
23      know, those were the negotiation. When you are --
24      negotiate with an occupying force, you sometimes -- you
25      need to -- you have to accept some conditions.

33 (Pages 129 to 132)

Page 133

1    Q.  You think that the continuation of the military courts
2        was a condition accepted by the PLO in the interim
3        agreement?
4    MR. SATIN:  Objection, calls for speculation.
5    A.  I don't know.  I don't know anything about these
6        negotiations.  I don't know.
7    BY MR. YALOWITZ:
8    Q.  Well, I'm not speaking of the --
9    A.  Yeah.
10   Q.  -- negotiations themselves; I mean, in an agreement, we
11       have to go by the text of the agreement?
12   A.  I agree.
13   Q.  So when the agreement uses words like "continue" and
14       "retain" to describe the relationship between the
15       military courts and security crimes, isn't that a tipoff
16       to you that the PLO was agreeing that those entities
17       should continue until further agreement is reached?
18   MR. SATIN:  Objection, lack of foundation.
19          You can answer, if you can.
20   A.  Maybe they will -- they agreed that their existence will
21       continue, but again, it's not accepting that they are
22       legitimate and legal bodies.
23   BY MR. YALOWITZ:
24   Q.  Well, remember we talked earlier about how parties can
25       reach agreement on the expression of various

Page 134

1        international norms?
2    A.  Yeah.
3    Q.  And so isn't this an example of that?
4    A.  Of what?  That --
5    Q.  Sure.  So --
6    A.  Yeah.  Read me -- maybe here it's worth reading the
7        exact phrase that referred to the military court.
8    Q.  Sure.  So why don't we give you --
9    A.  I'm sorry about all these photocopies.
10   Q.  Yeah.  No, that's okay.  I'll give you the interim
11       agreement.
12   A.  Just the provision we are talking about, the military
13       court, specifically.
14   MR. YALOWITZ:  So we can mark these as 5 and 6.  The interim
15       agreement is 5, and annex 4 is 6.
16   (Exhibits 5 and 6 marked for identification.)
17   BY MR. YALOWITZ:
18   Q.  So -- so you want me to take you through the things --
19   A.  No, just the relevant for the -- you say that they
20       agreed that the military courts are what is --
21   Q.  So -- so just directing your attention in the main
22       agreement to 17.4(b).
23   A.  Page 17?
24   Q.  No, no.
25   A.  No?

Page 135

1    Q.  I'm sorry:  Article 17.
2    A.  Oh, okay.  I'm a bit lost.
3          Do you have the number of the page?  No?
4    Q.  Page 18.
5    A.  18 -- here?  I'm sorry; is this the right one?  This is
6        the protocol -- do you want the protocol?
7    Q.  Yeah, yeah, perfect -- no, no, that's good.
8    A.  No?  This one?
9    Q.  So to start, while we look at that -- so do you see
10       chapter 3, "Legal Affairs," toward the bottom?
11          No, no, it's -- it's on page 18.
12   A.  Ah, chapter 3; I was looking for the Roman number.
13       Sorry.
14   Q.  And then Roman 17, which is really impossible to see;
15       it's jurisdiction.  Right?
16   A.  Yes.
17   Q.  And then if we turn to paragraph 4, you see 4.a.:
18          "Israel, through its military government, has the
19       authority over areas that are not under the territorial
20       jurisdiction of the Council, powers and responsibilities
21       not transferred to the Council and Israelis."
22          Are you with me?
23   A.  Yes, of course, yes.
24   Q.  And then 4b:
25          "To this end, the Israeli military government shall

Page 136

1        retain the necessary legislative, judicial and executive
2        powers and responsibilities, in accordance with
3        international law."
4          Right?
5    A.  Yeah, this is the -- this is the authority as an
6        occupying power.
7    Q.  Right.
8    A.  Yes.
9    Q.  So -- so the -- doesn't this suggest to you that both
10       sides understood that the military courts would
11       continue?
12   MR. SATIN:  Objection.  It's a compound question and calls
13       for speculation.
14   A.  Yeah, it's -- exactly.  And it says -- I hope -- I think
15       that's what is written here.  If I read it as a legal
16       observer, it's that the -- that the Israeli government
17       keeps its authority as an occupying power within the
18       territory which were not transferred to the council.
19   Q.  And on -- and over powers and responsibilities not
20       transferred to the council; right?
21   A.  Yeah.  Right.
22   Q.  Which included security matters; right?
23   A.  In Area B?  Yeah.
24   Q.  Well, not just Area B, but overall -- overall
25       responsibility for security --

Page 137

1  A. Yes.
2  Q. -- and prevention of terrorism --
3  A. Yes.
4  Q. -- was not transferred; right?
5  A. Yes.
6  Q. And so in order to effect its continuing rights and
7    obligations with regard to security crimes, the State of
8    Israel, through its military government, retained the
9    necessary legislative, judicial and executive powers?
10 A. Yes, it's meaning to say that they continued to be
11   occupying forces, except from the places that
12   transferred -- yeah.
13 Q. Okay. And, this paragraph 4 --
14 A. Yes.
15 Q. -- indicates, particularly in the context of the
16   continuing jurisdiction -- well, let me -- let's look at
17   this, too, now. Okay, let's look at annex 4 --
18 A. Yeah.
19 Q. -- just so we have it in mind --
20 A. Okay.
21 Q. Which is the next document. And annex 4, we need to
22   look at. It's a little bit roundabout; you know how
23   these documents sometimes are.
24     So we have -- we have article 1, "Criminal
25   Jurisdiction"; are you there?

Page 138

1  A. Yes.
2  Q. And then the -- section 2:
3     "Israel has sole criminal jurisdiction over the
4    following offenses..."
5  A. Yeah.
6  Q. "Offenses committed outside the Territory"; right?
7  A. The territory is referred to --
8  Q. Is under 1.a. It's just right up above --
9  A. Okay. Ah, yes, yes.
10 Q. And then, if you look at 1.c.
11    Do you have 1.c. before you?
12 A. Article 1?
13 Q. Article 1, section -- paragraph 1.c. Right on the very
14   first page.
15 A. I have 1.a. Let's see; where --
16 Q. It's -- it's on the first page.
17 A. On the first -- ah, yes. So 1.a.c., you mean?
18 Q. Yeah. 1.c.:
19    "Notwithstanding the provisions of subparagraph a.
20   ... the criminal jurisdiction of each side over offenses
21   committed in Area B shall be in accordance with the
22   provisions of paragraph 2.a of Article XIII of [the]
23   Agreement."
24    Right?
25    Are you with me?

Page 139

1  A. Yes, yes. You read the article.
2  Q. And then if we flip back to the main agreement, and we
3    look at Article XIII, that might just square the circle
4    here.
5     Article XIII, 2.a, Article XIII, page 16, second
6    sentence:
7     "Israel shall have the overriding responsibility for
8    security for the purpose[s] of protecting Israelis and
9    confronting the threat of terrorism."
10    Right?
11 A. Mm-hmm. Yeah.
12 Q. So -- and then --
13 A. This is in Area B, yeah.
14 Q. And then, if you look at Article XII, just a little
15   higher up --
16 A. Yeah.
17 Q. -- second sentence of paragraph 1:
18    "Israel shall continue to carry the responsibility
19   for defense against external threats" -- and then
20   there's some language which I'm skipping, and then it
21   says:
22    "... as well as the responsibility for overall
23   security of Israelis and Settlements..."
24 A. Mm-hmm.
25 Q. Right?

Page 140

1  A. Mm-hmm.
2  Q. "...and will have all the powers to take the steps
3    necessary to meet this responsibility"?
4  A. Mm-hmm.
5  Q. Right?
6  A. Mm-hmm -- yes.
7  Q. Okay. So this is just -- what we're doing now is we're
8    just looking at the language that you and I discussed
9    earlier; right?
10 A. Right.
11 Q. And so we see, by looking at the main agreement and
12   looking at annex 4, that the PA agreed that Israel would
13   continue to carry overall responsibility for confronting
14   security threats; right?
15 MR. SATIN: Objection, misstates the record.
16    You can answer.
17 A. That they retained security for it, yeah.
18 BY MR. YALOWITZ:
19 Q. And -- and that they retained -- did I -- did we look at
20   the -- did we look at the part about -- did we look
21   at 17? We did; right?
22    Then they -- they were to retain -- in order to do
23   that, they were to retain the necessary -- Israel was to
24   retain the necessary legislative, judicial and executive
25   powers and responsibilities; right?

Page 141

1  A. Yes.
2  Q. And they were going to do that through the military
3     government; right?
4  A. Yes.
5  Q. Okay. And that included the judicial arm of the
6     military government?
7  A. Yes. Mm-hmm.
8  Q. And this was something to which the PLO agreed?
9  A. Yes.
10  Q. Okay. Thank you.
11     So I want to ask you also about --
12  A. But if you -- your question at first was articulated
13     that they accepted them as a legitimate body, and I'm
14     not sure it is related, this question, because they also
15     accepted that there are settlements. And, you know,
16     settlements are in violation of the law, the -- the way
17     that the military courts function are in violation.
18     But ...
19  Q. Have you ever heard people from the PA say that the
20     reason that they conducted the second Intifada was to
21     rid the Palestinian people of the military courts?
22  MR. SATIN: Objection, no foundation.
23  A. If I heard Palestinian Authority --
24  BY MR. YALOWITZ:
25  Q. Yeah.

Page 142

1  A. -- you're saying? I don't know people -- no, I don't.
2     I don't.
3  Q. I never heard that either.
4     All right. Did -- are you aware that there are
5     defendants in the military courts who refuse to
6     cooperate with the proceedings of the court?
7  A. I personally haven't read any case like this.
8  Q. Have you ever heard of defendants in the military courts
9     who have said, "I refuse to recognize the legitimacy of
10     the court"?
11  A. I haven't read cases on this.
12  Q. I think I've asked you this before, and if I did,
13     I apologize; but let me just make sure I have it.
14     You're not expressing any opinion whatsoever about
15     the guilt or innocence of any of the 21 defendants;
16     right?
17  A. No.
18  Q. "No" meaning I'm correct?
19  A. I'm not taking any position on this. I think the only
20     question that I was reviewing in my opinion were whether
21     this case has -- even not that the personal, as such,
22     but this case, as other cases, has received due process
23     and a decision by an independent and impartial court,
24     and my answer is no. So these 21 cases is other cases.
25  Q. I'm sorry, the 21 cases are what?

Page 143

1  A. Were put on a trial within a court that did not comply
2     with the requirement of due process and impartiality and
3     independency.
4  Q. Do you -- are you expressing an opinion on whether any
5     of the individual judges in the 21 cases exhibited bias
6     or partiality?
7  A. I don't know who were the judges, so I --
8  Q. So the answer is no?
9  A. Is no.
10  Q. Are you expressing any opinions about whether any of the
11     21 defendants was deprived of notice of the reasons for
12     their arrest?
13  A. I didn't read the -- I don't know whether they were
14     notified.
15  Q. So the answer is "no," you were --
16  A. No. I don't know whether they were notified.
17  Q. Are you expressing any opinion as to whether any of the
18     21 defendants was deprived of their right to be informed
19     of the nature of the charges?
20  A. Again, I didn't follow the facts and the due process
21     personally, so -- on each personal -- personal case, so
22     I can't tell you.
23  Q. You have no opinion on that?
24  A. No, I didn't read enough of the material to -- to know.
25  Q. Do you -- are you expressing any opinion on whether any

Page 144

1     of the 21 was deprived of his or her right to be brought
2     before a judge without undue delay?
3  A. I mean, I'm repeating myself: No, I didn't read the --
4     I don't know how many time they saw a judge, but
5     this could be looked at. I don't know.
6  Q. Are you -- "I don't know" meaning you have no opinion on
7     that?
8  A. Because don't know the facts, yeah.
9  Q. Are you expressing any opinion on whether any of the
10     21 were deprived of their right to have access to an
11     attorney?
12  A. On the specific case, again, I don't have the fact; I
13     don't know where they meet for the first time the
14     lawyer, whether it was after two days, eight days, or
15     30 days. I don't know.
16  Q. So that would be a "no"?
17  A. Yes. Yes.
18  Q. Yes? "Yes," you're expressing no opinion; right?
19  A. Right. I don't know the facts.
20  Q. Are you expressing any opinion on whether any of the
21     21 were deprived of the presumption of innocence?
22  A. If -- you know, if you linked it with the equality of
23     the arms, without knowing their specific facts and
24     cases, what they did and how their trial was handle,
25     I would tell you that without knowing specifically

1    and -- generally, from the structure of the court --
2    I can tell you that there is no equality of arms, in
3    general, in military court cases, especially because how
4    the prosecution and the judges are very close to each
5    other.
6        So in that sense, trials in general do not have
7    equality of arms in military courts.
8  Q. Is -- is equality of arms the same thing as the
9    presumption of innocence?
10 A. It's not the same thing as -- it's not directly the same
11   thing, of course, but a way to -- to safeguard the
12   presumption of innocence and to make it meaningful, not
13   just to say "Yes, they are innocent until I prove the
14   contrary."
15       To make it meaningful, you need to provide, for
16   example, equality of arms; you need to provide due
17   process, et cetera, et cetera.
18       (Reporter clarification.)
19 WITNESS: "Due process."
20 A. Otherwise, it is meaningful, the presumption of
21   innocence -- it is nonmeaningful; is meaningless.
22   Sorry. Meaningless.
23 BY MR. YALOWITZ:
24 Q. That's okay.
25 A. I'm sorry. My English sometimes ...

1  MR. HILL: We've got like 3 hours and 37 minutes on the
2    record, so -- what will you pay?
3  MR. YALOWITZ: Let's round up to 4.
4  MR. HILL: 4? She'll read and sign.
5      Off the record.
6  (2:38 p.m.)
7      (Whereupon the deposition concluded.)

1  Q. Are you expressing any opinion on whether any of the
2    21 defenda was deprived a trial without undue delay?
3  A. Again, this will require a look on the date when they
4    started since their investigation. I have no idea.
5  Q. Are you expressing any opinion on whether any of the
6    21 defendants was compelled to testify against himself,
7    or to confess guilt?
8  A. I don't know if anyone was compelled; I -- I didn't read
9    their investigation.
10 Q. Are you expressing any opinion on whether any of the 21
11   was subjected to cruel, inhuman or degrading treatment
12   or torture?
13 A. I have no position on this.
14 MR. SATIN: Are you done?
15 MR. YALOWITZ: Okay. I have no further questions.
16 MR. SATIN: We could have a few minutes? We may have a few.
17 MR. YALOWITZ: Okay.
18 MR. SATIN: Give us five minutes.
19 MR. YALOWITZ: Take as long as you need.
20       (A break was taken.)
21 MR. SATIN: We have no questions for Dr. Weill.
22 MR. YALOWITZ: Okay.
23       Thank you so much, Dr. Weill, for coming in.
24 WITNESS: Thank you.
25 MR. YALOWITZ: We much appreciate it.

1        CERTIFICATE OF DEPONENT
2
3  I, DR. SHARON WEILL, hereby certify that I have read the
4  foregoing pages of my deposition of testimony taken in these
5  proceedings on Friday, November 22, 2013, and, with the
6  exception of the changes listed on the next page and/or
7  corrections, if any, find them to be a true and accurate
8  transcription thereof.
9
10
11
12
13 Signed: _____
14 Name:   DR. SHARON WEILL
15 Date:   _____
16
17
18 Signed and subscribed to before me
19 this _____ day of _____, 2013.
20 _____
21 NOTARY PUBLIC
22
23
24
25

```
                                              Page 149
  1          CERTIFICATE OF COURT REPORTER
  2
  3   I, FIONA FARSON, with TransPerfect Legal Solutions, hereby
  4   certify that the testimony of the witness Sharon Weill in
  5   the foregoing transcript, taken on Friday, November 22, 2013
  6   was recorded by me in machine shorthand and was thereafter
  7   transcribed by me; and that the foregoing transcript is a
  8   true and accurate verbatim record of the said testimony.
  9
 10   I further certify that I am not a relative, employee,
 11   counsel or financially involved with any of the parties to
 12   the within cause, nor am I an employee or relative of any
 13   counsel for the parties, nor am I in any way interested in
 14   the outcome of the within cause.
 15
 16
 17   Signed: _____
 18      FIONA FARSON
 19   Dated:   Friday, November 22, 2013
 20
 21
 22
 23
 24
 25
```

```
                                              Page 150
  1          E R R A T A
  2          Deposition of DR. SHARON WEILL
  3   Page/Line No.  Description    Reason for change
  4   _____
  5   _____
  6   _____
  7   _____
  8   _____
  9   _____
 10   _____
 11   _____
 12   _____
 13   _____
 14   _____
 15   _____
 16   _____
 17   _____
 18   _____
 19   _____
 20   _____
 21   _____
 22
 23   Signed: _____
 24   Name:   DR. SHARON WEILL
 25
```

**A**

**absolute**
69:11
**absolutely**
33:8 34:18 35:4
35:20,24 36:17
38:21,25 68:23
70:5 71:6,7,10,15
73:14 79:23 80:12
81:1 107:12
**academic**
16:16 71:25,25
**accede**
67:13,14
**accept**
118:19 132:25
**accepted**
54:3 56:23 104:19
133:2 141:13,15
**accepting**
133:21
**access**
16:9 52:23 53:1
56:15 144:10
**accession**
67:6
**accumulation**
101:7
**accurate**
148:7 149:8
**accused**
29:8,9 99:11
100:12
**achieved**
46:8,21
**acronym**
57:5
**act**
90:1 130:14,16
**actions**
46:12 56:17
**actor**
65:21
**actors**
65:10,12,14
**acts**
69:2 92:1
**adaptation**
81:10

**add**
28:22 36:13 40:13
**added**
36:16
**additional**
36:13 40:13 65:25
67:6,17
**address**
22:19 85:19
**addressed**
58:11 63:1
**addressing**
56:23
**administrate**
22:23 53:18
**administration**
18:20 19:1 20:14
22:14 59:21
**administrative**
52:13 59:8,13
**admit**
25:18
**admitted**
5:17
**adopted**
89:9
**advanced**
5:13
**adversarial**
74:6,12,16
**advice**
50:24 113:21
**adviser**
89:13 108:3
113:18 114:2
**advisers**
113:25
**advisory**
118:4,6
**advocating**
106:9
**affairs**
84:11 135:10
**ago**
67:10 127:15
**agree**
20:16 24:3 25:1
29:10 34:1,20
35:3,9,15 37:1

39:11,11 44:14,19
46:13 49:23 51:8
55:12 62:17 65:4
67:17 70:23 71:2
71:5,11,18 73:25
80:2 82:17,19
92:25 93:5,18,19
93:23,24 94:9
98:15 99:24
106:25 107:1
110:4 111:10
122:12 128:22
131:17 133:12
**agreed**
59:25 82:11
121:14 122:16
132:6,9 133:20
134:20 140:12
141:8
**agreeing**
107:6 133:16
**agreement**
40:4,6,11,14,15
40:21 41:3,12
50:18,25 51:5
60:3,14 114:25
115:2 126:6 127:7
127:18 128:7,16
129:15,22 130:6
130:13 131:2,11
132:5 133:3,10,11
133:13,17,25
134:11,15,22
138:23 139:2
140:11
**ah**
33:6 43:8 45:5
60:19 74:8 82:24
96:21 126:12
135:12 138:9,17
**ahead**
40:10 88:24
**al**
1:5,13
**alaqsa**
69:18 73:3,13
**alia**
79:1
**alien**

81:16 85:1
**allow**
113:5 121:20
**allowing**
110:3
**allows**
48:9
**aloud**
99:7
**alternatives**
116:1
**ambiguous**
92:4
**amend**
37:24 40:12
**amended**
15:11
**amnesty**
73:11
**amount**
52:2
**anachronistic**
115:5
**analysis**
68:17 72:15 91:3
**analyze**
71:23,24,24
**analyzing**
91:3
**annex**
128:16,19,20
129:14 134:15
137:17,21 140:12
**annexation**
23:6
**annexed**
45:14
**answer**
20:22,23 23:1,3
24:8 26:3 31:23
55:2,16 56:3
59:10,12 68:6
72:11 77:7 90:2
92:6,21 93:18
94:4 104:4 105:1
106:19,23 107:3
109:1 122:6,8
125:5 129:9,12
133:19 140:16

142:24 143:8,15
**answered**
105:23
**anybody**
119:24 131:19
**anyway**
44:18 68:2 104:25
110:13 115:9
118:20 131:11
**apartheid**
66:19 81:24 85:22
95:1
**apologize**
88:24 102:23
142:13
**aporter**
3:10,11
**appeal**
53:21,22,24 54:2
58:23 99:17
**appeals**
53:25 54:3,5,11
78:5
**appear**
6:9,14,20 36:9
**appearing**
3:2,13
**appears**
37:16
**appellate**
56:14
**applicable**
19:7 23:8,12
27:16 40:7,11,17
41:8,15 47:16
48:25 62:13 65:8
87:6 88:22
**application**
9:12 18:21 19:25
38:2 49:22 87:10
**applied**
61:7,17 62:3
65:12 83:25
113:16
**applies**
62:22 65:4 67:18
**apply**
27:22 50:16,19
65:7,14 66:11

67:22,24 68:19
84:23
**applying**
84:21,23 94:19
115:14
**appointed**
76:3,10,17,18,22
76:25 77:6
**appointing**
97:10
**appointment**
64:13,15,23 97:7
101:3,5 102:1,7,9
102:12,16,19
103:12,21 104:10
104:14,17
**appointments**
17:5
**appreciate**
112:9 146:25
**apprehended**
123:4 126:19
**appropriate**
20:16 27:7 126:23
**approval**
125:19
**area**
127:20 136:23,24
138:21 139:13
**areas**
128:3 135:19
**arguing**
106:25 110:25
**argument**
63:9 95:17,19
96:19 111:23
119:24 120:4
123:11,15
**arguments**
22:7 70:1 95:18
**arm**
4:9 11:23 14:1,11
14:16 141:5
**armed**
65:20 66:12 68:4
68:16
**arms**
144:23 145:2,7,8
145:16

**army**
62:11 81:16 85:1
**arnold**
2:8 3:5
**arrest**
58:22 143:12
**arrested**
52:25 58:16
**arrived**
7:18
**article**
11:23 12:16,19
14:11,15,21,22
16:5 17:18 18:17
19:3,9,10 20:1,7,8
20:8,24,24 21:5
22:3 23:5,23 24:2
24:4,14,19 33:8
33:10 34:17 35:8
35:18 36:17,21
37:17,18 39:17
47:25 48:1,6 49:4
63:3 66:6,13
79:13,20 80:4
84:8 87:7 92:19
94:20 97:9,16,18
98:21,23,24 99:10
110:4,25 113:5
114:16,18,21
117:11 120:12
121:17 135:1
137:24 138:12,13
138:22 139:1,3,5
139:5,14
**articles**
11:19 23:19
**articulated**
68:9 141:12
**asked**
15:1,18 24:19
33:10 85:10
105:23 125:13
126:9,11 142:12
**asking**
54:4 68:3 89:25
104:2,5,20 106:14
106:17,17,25
107:7,21 116:3
**aspect**

58:22
**aspects**
58:11
**assault**
6:25
**assess**
61:4 84:6
**assistance**
130:17
**assume**
54:9 64:18 85:5
106:19,24 107:5
**assumes**
70:9 89:23
**assumption**
83:17 84:13
**astonishing**
28:24
**attack**
68:22 69:7
**attacking**
70:7,16
**attacks**
70:3,25
**attended**
15:6,8
**attention**
32:19,25 34:10,22
101:19 117:21,24
124:14 134:21
**attorney**
144:11
**authorities**
21:5 24:17 100:15
**authority**
23:21,23 24:24
25:24 26:9 28:9
41:1,2 67:5 86:25
97:18,22 98:18
111:16,17 113:12
115:4,11 127:25
135:19 136:5,17
141:23
**authorized**
18:20
**authors**
65:15,15
**available**
16:16,20
**basic**

**avenue**
3:6
**avigdor**
55:8
**aviv**
5:22 6:1,4,8 8:6
8:15,16 9:7,9
11:15 87:15,23
88:5,6
**aware**
69:8,14 70:1,1,4
116:9 117:14
128:23 129:2,10
129:10 142:4

**B**
**bachelor**
5:9
**back**
81:7 87:18 100:17
114:18 139:2
**backdrop**
50:3
**background**
30:22
**bad**
21:16 112:17
**balance**
75:24 94:10
**balanced**
94:6
**bank**
17:6 22:5 25:3,8
25:10 27:23 30:17
39:21 40:5 59:6
62:5,19 64:3
70:15,24 82:21
83:5 85:16,22
86:3,18 88:9
113:17 128:25
**bar**
5:17,23
**barak**
68:8
**bargain**
53:19 60:13
**based**
7:12 14:25 79:19

11:7 68:25 77:16
**basics**
27:17 84:25
**basis**
18:11 45:12
121:10
**bay**
121:5
**bear**
22:8 24:12 97:15
101:13 117:24
131:13
**beginning**
41:25 76:7 77:7
80:10
**begins**
84:3 95:2,6
**behavior**
50:2
**believe**
8:24 12:18 31:16
44:3 60:18 67:4,4
67:8,10 76:1
106:19,24 118:3
**belligerent**
62:12
**better**
32:11 47:15 51:11
65:16 87:3 115:13
115:15
**beyond**
24:19 86:24 94:9
**bhill**
3:22
**bias**
143:5
**bibliography**
16:22
**big**
6:19 116:4
**bilateral**
50:25
**binding**
42:8,13,14 116:23
118:12,14 119:5
**binds**
41:12
**bit**
24:1 36:4 42:5

135:2 137:22
**bodies**
132:16 133:22
**body**
113:16 116:19
141:13
**bombings**
70:2 73:3
**book**
12:6 13:6,11
**born**
7:17
**bottom**
135:10
**bound**
65:22,24 66:22
68:2 86:5 126:3
**branch**
10:20,21 103:5
**branches**
23:9 110:6
**breach**
99:9
**break**
19:11 42:2 49:17
49:17,18 73:22
123:25 124:7,9
126:10 146:20
**brian**
3:14
**briefly**
25:20 29:22 126:5
**briefs**
119:19 120:3
**bring**
46:19 63:19 85:22
114:19 115:19
**brings**
77:24
**broad**
2:10 46:20
**broader**
62:1,2 84:7
**broadly**
60:10
**brought**
63:21 85:21 86:21
100:12 112:14
125:20,23 126:13

**144:1**
**bullet**
40:13

### C
**call**
6:12 17:8 46:2
49:3 50:20 51:15
85:21 88:8 118:6
119:2
**called**
7:12 11:23 12:6
17:4 71:19 122:17
127:20
**calls**
26:2 31:21 55:1
56:2 66:23 105:16
129:7 131:9 132:2
133:4 136:12
**captures**
38:15
**car**
82:4
**care**
51:15
**carry**
129:23 139:18
140:13
**cars**
82:5
**case**
1:8 15:15 25:15
29:3,6 30:10
42:19 45:19,21
57:5,11,12,19,22
59:9 61:11,11
62:24 67:15 68:9
82:7 87:7 90:1
99:9 103:16 116:9
116:13 117:11
118:7 119:15,18
119:19,24 121:4
121:25 122:17,18
122:20,22 123:2
124:16 126:17
142:7,21,22
143:21 144:12
**cases**
6:19,19,21 7:1,1

16:6,7,8 27:10
29:7 51:3,5,21
52:1,3,7,10 54:4
54:10 55:11 58:5
58:10,19,20 59:4
59:14 61:20 62:15
63:11,13,16,19
82:13 89:19,20,21
91:6 101:12
105:25 106:15
107:11 108:9,11
108:17 116:25
117:14 118:10
119:1 142:11,22
142:24,24,25
143:5 144:24
145:3
**cassese**
68:11
**casualties**
69:15
**category**
46:14
**cause**
149:12,14
**central**
103:22 104:11
**centralize**
24:18
**centralizes**
24:5,15
**centre**
2:9
**certain**
48:2,6 106:22
118:9
**certainly**
20:14 41:12
**certificate**
148:1 149:1
**certify**
148:3 149:4,10
**cetera**
72:1 77:14 85:25
108:23 145:17,17
**chalizhut**
7:12
**challenged**
18:15

**chance**
29:17 33:9 34:14
34:25 35:13 36:24
**change**
35:16 102:12,12
102:14,14,25,25
108:18 113:20
150:3
**changed**
102:10
**changes**
89:2 90:10 102:17
103:10 148:6
**chaos**
115:11
**chapter**
12:6 135:10,12
**charge**
78:3,3,17
**charged**
58:2
**charges**
143:19
**chartered**
3:16
**check**
8:24 49:13 54:19
75:24
**checked**
108:15
**checking**
61:12
**chevalier**
3:16
**chief**
78:2
**children**
81:17 111:22
**chooses**
52:17 53:4,4
112:24
**chronologic**
17:12
**circle**
139:3
**circumstance**
11:8 49:1 126:24
**circumstances**
46:9 93:4,16

**citation**
46:19 112:3 117:2
124:13
**cite**
66:6
**cited**
118:24 119:1
**citing**
68:11 125:18
**citizens**
27:10 83:5,15,16
85:13 90:12
**civil**
6:4 11:1 43:1
83:23 116:20
118:18
**civilian**
6:3,6,7 25:7,9,11
25:12 27:9,13,22
27:24 28:4,5,6,13
28:15,24 58:4
68:20 69:4,8,20
71:3 81:9 82:3
83:11,16 84:24
87:1,3,3 92:14
122:3 123:12
**civilians**
68:21 69:7,15,17
70:3,8,16,25 71:6
80:4 81:15,17,22
92:1 109:11 110:1
111:8,9 116:10,16
120:1
**civilized**
120:15
**clarification**
38:8 60:8 75:18
115:1 145:18
**clash**
110:5,7,8
**class**
8:8,15 9:2,4,4,6,9
9:17,18,19
**classes**
8:1 17:11
**classified**
66:14
**clause**
48:3,7,20

**clear**
65:14 90:9
**close**
7:14 145:4
**cogens**
45:22 46:6,9,13
46:22 65:4,16
**collection**
17:4
**colonialization**
85:20 88:19
**colonization**
66:19
**com**
3:10,11,22,23
**combatant**
71:2
**combatants**
126:18
**come**
47:17 89:21
**coming**
5:8 146:23
**commander**
17:6 24:22 28:8
28:14 30:24 35:16
64:17 76:4,10,16
76:19,23,25 80:9
89:8 97:11,22
99:21 100:1,5
102:20
**commenced**
60:18,20
**comment**
117:23 118:5
**commentary**
35:21 100:17
**comments**
118:2,24
**commesed**
60:19,19
**commission**
116:20 117:6
121:15 125:24
**commit**
80:22 81:4 83:5
83:10 92:7
**commits**
92:1,17

**committed**
82:21 138:6,21
**committee**
57:6 102:19
116:17,18,19,22
117:8,16,18,19
118:3,5,8,11,20
119:1
**committing**
69:8
**communication**
116:22 118:7,19
**compare**
46:3
**compared**
46:5 64:2
**compelled**
146:6,8
**competency**
29:11 88:15 96:8
**competent**
27:15 77:23 92:9
103:14 104:16
**complete**
122:6
**completed**
17:16
**compliance**
30:20
**complicated**
17:13 114:7
**comply**
30:25 31:19,25
46:6 89:3 109:12
115:6 143:1
**compound**
24:7 31:21 65:6
67:19 94:3 113:2
131:24 136:12
**concentrate**
8:21
**concept**
21:15 43:25 47:4
**conception**
93:3,14
**concerned**
132:14
**concerning**
58:14

**concerns**
112:18
**concluded**
147:7
**condition**
59:14 61:13 99:16
133:2
**conditions**
132:25
**conduct**
15:9 22:17,18
62:4,19 63:12
**conducted**
105:4 141:20
**conference**
30:3
**confess**
146:7
**confession**
53:12,12,14
**confirms**
99:19
**conflict**
23:3,25 47:11,17
65:12,21 66:12,14
66:14,16,20 67:23
68:3,4,16 69:23
71:12
**conflicts**
39:16
**confronting**
129:17 139:9
140:13
**confusion**
28:18
**connect**
51:10
**connection**
15:7
**consider**
43:4 55:8
**consistent**
43:17
**conspiracy**
125:21
**constitute**
91:4,17 92:13
107:23 126:12
**constituted**

17:22 63:2 84:14
91:10 94:15 97:12
99:13 101:1,9
120:12,20 121:8
121:14,18 122:9
**constitutes**
125:21
**constitution**
41:11
**constitutional**
46:4
**constructed**
96:3
**contemplated**
39:17
**contending**
43:12
**content**
93:3,15,17 123:20
**context**
72:21 93:23
111:17 116:25
123:19 125:7,21
126:13 127:3
137:15
**continuation**
133:1
**continue**
5:24 23:2 37:7
100:16 125:1
126:2 128:3
129:23 132:10,12
133:13,17,21
136:11 139:18
140:13
**continued**
132:20 137:10
**continuing**
137:6,16
**contours**
128:24
**contradiction**
80:7
**contrary**
145:14
**contrast**
28:13 64:2
**contravention**
79:20

**control**
83:19 132:20
**controversial**
130:11
**convention**
10:15,15 11:2,3,4
18:21,23 19:3
20:1 21:2,10 23:7
24:15 31:1,19,20
31:25 32:7 35:22
38:1,2 42:11,12
42:13,20,21,22,23
42:24,25 44:20
45:4,6 50:11,17
61:8,14,18,25
62:14,20 63:3
66:1 86:25 97:10
113:8,9 118:16,17
118:17,21
**conventions**
10:18,25 11:3
42:8 109:10
**conversation**
15:19 30:18 42:1
**convicted**
53:3 103:9,23
104:12 105:22
106:2 107:14
114:12
**convictions**
25:16 105:15
**cooperate**
142:6
**copy**
14:4,5,11 99:5
**copying**
35:8
**core**
29:10 88:14
103:22 104:11
**correct**
10:7 19:6,8,10
20:6 34:7 43:18
43:19 71:6 104:17
122:10 142:18
**corrections**
148:7
**correctly**
109:14

**council**
135:20,21 136:18
136:20
**counsel**
25:24 26:6,8
52:17,18 75:12
149:11,13
**count**
52:4
**countries**
74:14
**country**
44:16,17 99:17
**course**
9:13 11:14 16:15
23:9 24:24 30:15
32:24 41:14,14
53:8 65:21 66:2
66:15 69:16,24
71:1 72:1,21 73:1
73:20 74:8,10,12
79:1 86:10 108:9
108:20 127:15,16
135:23 145:11
**courses**
8:7
**court**
1:1 6:3,3,4,9,9,14
6:15,15,17 8:17
9:12 11:17,21
12:15 13:9 15:6
15:15 18:2,12
22:15,23 23:22
25:9,11 27:9,14
27:15,22 28:2,4,5
28:6,7,25,25 31:7
31:8 32:8 39:13
39:16 40:18 41:16
45:16,16 53:19,23
53:24 54:2,10
55:18 56:10,14,18
56:19,19,20,23,24
58:6,10,18,21
59:5,19,21 60:11
60:17,17 61:7,17
61:24 62:3 63:1
63:22 64:8,8,12
64:19,20,20,25
68:18 73:25 78:4

78:8,9 80:5,10,14
80:19,20 81:5,18
81:22 82:2,10
84:15 85:12,16
86:23 87:2,3,4,5,8
87:20 88:1,14
90:12,17 91:5,10
91:12,17,18 92:3
92:9,18,20 96:10
96:10 97:12,20
98:17,22 100:2
102:6 103:5
104:16,16 105:7
105:13 108:12
110:2 111:7,9
112:24,25 113:1
114:13,19 115:13
115:19 116:15,16
116:23 117:6,8
118:25 119:7,10
120:1,21,21,23
121:8,13 122:2,3
122:9 123:12,13
123:15,17 125:1
126:13 128:24
129:2,12 134:7,13
142:6,10,23 143:1
145:1,3 149:1
**courtesies**
41:25
**courtesy**
125:13
**courts**
8:2,8,20 9:23 11:5
12:9 13:7,8 15:5
17:21 20:15,17
22:4,18 24:20,23
25:7 28:14,15,15
29:3,11 30:19,25
31:2,18 51:20
52:16 53:3 54:1
57:2 58:3,12 61:8
61:22 62:20,25
63:2,10,17,20
64:3,5,14,16
79:18 80:24,25
81:20 82:20 83:7
83:11,16,17,18
84:3,5,6,14 88:12

91:4 92:10 94:14
97:17,17,18 98:18
99:14,16,17,22,25
100:4,13,13,22
101:11 103:4,10
104:13 105:19
107:22 109:11,22
110:14 112:18
113:5 115:24,25
116:2,11 117:1
131:7,16 133:1,15
134:20 136:10
141:17,21 142:5,8
145:7
**covenant**
11:1 43:1 116:20
**cover**
9:14
**create**
32:8 87:19
**created**
24:20,23 49:1
80:17 88:19 103:3
118:21
**creating**
86:20
**creation**
113:5 127:22
**crime**
29:9 46:19 69:20
69:22,24 80:23
92:7,18 121:20
125:22,22
**crimes**
25:8,16 29:8
46:18 58:2,2 69:9
69:18 81:4 82:20
83:5,11 87:9
88:15 103:10,23
104:12 111:25
133:15 137:7
**criminal**
6:1,4,7 27:9,10
55:10 58:24 59:9
68:24 77:24 80:25
91:6 103:16 105:6
127:12 128:15
129:19 137:24
138:3,20

**criminals**
107:14
**criticism**
34:3 83:10,12,14
84:1 100:23 101:3
102:4
**criticized**
121:19
**cruel**
146:11
**crystallized**
42:17
**cure**
81:3,7,23,23 82:1
82:2 84:16 85:18
86:17 87:14,16,24
87:25 90:23
105:11 107:22
108:3 115:23
**cured**
91:15,20
**curious**
22:12
**currently**
8:3
**custom**
44:18 45:5
**customary**
42:16,18 43:5,6
43:16 45:9,17
68:1,19,23 74:1,5
74:9,18,20 76:5
76:11,13,24 112:7
112:8 119:2
120:10,12
**cycle**
58:24

**D**

**daniel**
4:11 29:15
**data**
72:17
**date**
13:14 37:13 146:3
148:15
**dated**
149:19
**day**

37:10 148:19
**days**
52:22 58:17
144:14,14,15
**de**
33:23 81:5 82:19
82:23,23,25
**dealing**
21:12 58:11 62:10
63:13 84:8 127:12
**deals**
45:6 96:3
**dealt**
8:16 56:10
**debate**
82:11
**december**
12:17
**decide**
50:16
**decided**
58:21 59:5 62:24
103:17
**decision**
11:5 84:4 107:24
116:15,17 117:16
118:6,8,12,13,14
118:23 119:3
120:6,8 142:23
**decisions**
116:24 119:9
120:3,5
**declares**
48:21
**dedicated**
9:22
**default**
102:11
**defenda**
146:2
**defendant**
52:17,19 53:20
54:3
**defendants**
1:15 3:13 27:4
29:17 82:12
123:11 142:5,8,15
143:11,18 146:6
**defense**

16:11 139:19
**defined**
23:7
**degrading**
146:11
**degree**
5:10,11,13,15
125:2
**delay**
144:2 146:2
**deliver**
60:1
**demanding**
63:15
**department**
7:11 41:2
**depending**
77:18
**depends**
40:15 51:1 55:17
58:5 65:13 69:23
69:23 72:12
**deponent**
148:1
**deposition**
1:18 2:2 5:2 14:9
14:10 147:7 148:4
150:2
**deprived**
143:11,18 144:1
144:10,21 146:2
**derived**
102:6
**deriving**
64:16
**derogate**
46:10 48:24
**derogated**
51:5
**derogation**
47:20 48:3,7,9,20
49:3 51:11
**describe**
21:14 39:21
133:14
**described**
9:3 11:14 20:5
22:13 79:2 88:7
89:2,10,20,22

90:9,10 112:22
114:17
**describing**
19:25 90:24 102:7
**description**
4:7 20:6 150:3
**deserves**
103:19
**designated**
67:5
**designed**
23:1 81:9 84:23
**detail**
24:1
**detained**
52:24
**detainees**
121:7
**detention**
58:14,23 59:8,13
59:15 61:13
**detentions**
52:13
**developed**
109:9 113:8
**developing**
113:10
**difference**
82:1
**different**
8:9 9:15,20,21,21
10:19,20,21 11:5
30:21 45:2 47:10
47:22 55:7 58:19
64:9,10,14 69:24
70:22 79:18 80:24
80:25,25 84:12,12
86:10,12,13 87:9
88:23 96:10,11
119:7
**differently**
89:22
**difficult**
15:12 61:4 108:22
**din**
31:5
**direct**
32:19,25 34:10,22
35:7 101:19

124:14
**directed**
82:14
**directing**
117:21,24 134:21
**directionally**
52:5,6
**directly**
85:20 145:10
**disagree**
32:22 33:2,17
92:25 107:1,2
**disagreeing**
107:6
**discuss**
27:11 30:11
**discussed**
80:10 110:12
126:5 140:8
**discussing**
16:11 101:25
124:22
**discussion**
49:16 63:23
**disengagement**
64:4
**disregarded**
111:1
**distinction**
68:25 109:16
**distortion**
81:14
**district**
1:1,2 6:4,9,15
**divided**
103:3
**division**
6:2
**document**
132:11 137:21
**documents**
137:23
**doing**
44:4 57:17 63:17
101:11 110:9
115:12 140:7
**domestic**
40:16 46:5 122:14
**domination**

83:19
**donald**
4:12
**dozen**
59:17
**dr**
1:18 2:2 4:2 5:2,6
146:21,23 148:3
148:14 150:2,24
**draft**
21:1
**drafted**
21:10 115:7
**drafting**
21:2 109:10
**drugs**
82:4
**dual**
88:20
**due**
8:19 9:25 27:17
63:13 74:9,11
81:17 82:9,12,13
83:20 92:7,12,24
93:2,14,17,17,24
103:13,14,20,22
104:12 105:8
108:2 115:15,17
118:15 120:13
142:22 143:2,20
145:16,19
**duration**
31:12
**duty**
126:3

————————————————
                E
————————————————
**earlier**
126:5 133:24
140:9
**easy**
44:19
**ec2n**
2:11
**editing**
34:5 35:25 36:2
**effect**
20:8,11 137:6
**effective**

18:25 130:15
**efficient**
130:14
**effort**
30:25 31:18,25
32:3
**eight**
7:17,18 58:17
144:14
**either**
62:25 123:21
142:3
**elaborate**
89:12
**elaboration**
49:22,24,25
**elect**
74:24
**elected**
74:20,23 75:9
77:10
**election**
74:24 75:1,7
77:19
**elections**
74:25
**elevation**
78:4,7
**email**
3:10,22
**emerged**
42:16
**emergency**
48:12,22 49:6,12
114:20 115:10
**employee**
149:10,12
**enacted**
64:17,21
**encounter**
58:24
**encounters**
59:6
**endorse**
37:18 38:14 40:18
**enemy**
126:17
**enforce**
40:17

enforcement
21:6 24:17,24
english
145:25
enlarged
111:16
ensure
75:22 77:8 130:14
ensuring
18:25
entered
45:9 123:9
entering
131:14
enters
91:24
entire
53:16 58:24 66:6
86:2,3,12 95:8
111:22
entities
133:16
entitled
50:1 52:18,19
53:8,20 82:9,12
equal
111:19
equality
81:2 144:22 145:2
145:7,8,16
especially
101:7 145:3
esq
3:3,4,14,15
essence
49:1 94:8
establish
23:21,24 25:7,9
28:2 31:4 41:5
50:1 77:9 80:9
85:7 92:20 97:18
98:22 99:21,25
102:18 112:24
115:11
established
18:5,6,7,9 24:22
27:8 28:7,15,24
30:20,24 31:3,7
31:14 39:12,17

54:2 62:18 64:21
80:12 81:25 86:6
86:8 92:22 97:21
98:18 100:4 105:3
116:19
establishing
27:22,25 79:18
establishment
18:12 111:7
estimate
58:20
et
1:5,13 72:1 77:14
85:25 108:23
145:17,17
european
11:4 117:6,8
evaluating
62:18
evidence
70:9 80:6 89:24
121:23
evident
15:10
evidential
45:12
evolved
65:9
exact
50:17 51:22 52:2
62:17 80:23,23
120:16 134:7
exactly
11:9 18:4,24
20:12 34:17 35:2
35:10 47:19 49:11
51:16 53:11 64:15
67:21 68:10 80:1
84:7 89:9 95:16
96:25 109:11
112:12 117:5
118:1 122:8 123:6
125:6 136:14
exam
5:23
examination
4:2 5:4
example
9:17 23:6 25:15

37:23 40:17,25
45:15 47:12,25
48:16 50:6,7,21
50:22 57:3 58:13
63:12 65:11 70:14
74:5 100:8 112:6
117:15 120:10
121:19 132:19
134:3 145:16
exceed
86:23
excellent
28:20 34:9 51:13
72:9
exception
111:8,15 148:6
exceptions
48:1
exciting
13:15
exclude
87:12
excluded
86:14
excuse
70:2 71:8
execution
21:7 77:21
executive
24:6 78:2 128:6
136:1 137:9
140:24
exercise
33:22 44:17 83:18
exhibit
4:7,8,9,11,12,13
4:14 14:9,10
32:16 124:10,15
exhibited
143:5
exhibits
14:13 134:16
exigenc
37:25
exist
38:20 129:13
existed
103:22 104:11
128:25 131:8,17

existence
128:24 129:11
133:20
existing
38:24 116:2
132:13
exists
113:13
expand
82:3 87:4
expanding
87:8,11
expected
21:10
experience
56:22
expert
4:8,11 30:5 32:14
35:5 64:7,10
105:18
explain
22:11 45:23
explicit
86:24
expressing
142:14 143:4,10
143:17,25 144:9
144:18,20 146:1,5
146:10
expression
133:25
extend
100:18
extending
25:2
extensive
44:12,15
extent
49:5 93:25 94:1
external
139:19
extraterritorial
87:10
eye
13:20

_____
      F
_____
fact
25:1 33:19,25

72:19 81:8,19
83:10 85:15 96:9
102:5 106:6
121:13 144:12
facto
33:23 81:5
factors
79:19 114:8
facts
25:21 70:9 72:5,7
72:17,18 89:23
103:17 121:4
143:20 144:8,19
144:23
failure
71:12
fair
18:9 23:25 26:1
29:4,5 31:1 32:2
38:11,16 42:14
43:10 46:8 48:14
54:8,21 58:9
59:23 60:7 72:13
84:5 92:18 104:23
104:24 105:3,13
112:20 114:11,13
120:22
fairly
38:15 79:22 88:16
fairness
36:14
fall
46:13
familiar
65:25 67:12 71:18
73:2 113:24
122:20 127:10
family
7:18
famous
57:21,22,22
far
13:11 18:16
farson
1:24 149:3,18
fault
89:1
favor
60:12,12

**fax**
3:9,21
**feel**
106:22
**feeling**
35:17,23
**feels**
35:17 36:3,4
**feldman**
55:8
**felt**
125:13 126:3
**field**
10:16,22 71:21
**fifteenth**
3:17
**fight**
68:15
**figure**
51:22
**filed**
54:5 60:21,22
**files**
6:13 25:17,25
26:23,25 29:7
105:21
**financial**
2:9
**financially**
149:11
**find**
15:12 17:9 148:7
**fine**
35:1 36:19,25
39:3 56:8 79:25
**finish**
38:10 57:17
102:22
**finished**
34:15 37:21 126:7
**fiona**
1:24 10:13 149:3
149:18
**first**
5:10,14,15 6:15
9:3 11:13 17:21
24:19 30:22 39:7
43:7 45:6,25
53:23 62:12 66:11

67:20 79:12 85:19
86:17,22 91:6
94:19 95:19 96:3
97:6,19 102:14
104:6 111:16
138:14,16,17
141:12 144:13
**fit**
27:2 50:23 81:13
**five**
146:18
**fixed**
93:3,15,17
**flip**
139:2
**fluently**
43:24 93:7
**focus**
20:13 30:18
101:14
**focusing**
64:11
**follow**
43:21 44:1 59:3
143:20
**followed**
43:17
**following**
79:17 121:1 138:4
**footnote**
16:19,20 19:18,20
112:4,5,7 117:11
117:12,22
**forbidden**
25:2,4,6
**force**
23:12 24:23
132:24
**forced**
53:12
**forces**
127:19 137:11
**foregoing**
148:4 149:5,7
**foreign**
112:24
**form**
45:20 47:20 60:14
73:25 119:2

132:13
**formed**
43:21
**former**
110:10
**forms**
46:12
**forth**
22:18
**found**
120:21,23 125:1
**foundation**
55:15 69:19 70:10
89:23 105:16,24
106:4,11 107:15
107:20 108:8,14
108:19 133:18
141:22
**fourth**
10:14,15 18:22
19:3 20:1 24:14
31:1,18,20 32:7
42:20 44:20 45:4
45:6 61:7,17
62:13 63:3 97:10
**framed**
111:15
**france**
7:17 74:14
**frankly**
115:16
**free**
105:6
**french**
7:19,20 21:14,16
21:16,18,20,21
31:24 51:24 64:19
**frequently**
15:12
**friday**
1:19 5:1 148:5
149:5,19
**friend**
30:6
**fulfill**
128:6
**full**
9:4
**function**

56:20 77:11 91:5
93:25 113:14,15
141:17
**functioning**
81:21
**functions**
132:7
**further**
89:12 133:17
146:15 149:10

**G**

**galleys**
13:15
**gather**
29:22 72:22
**gaza**
59:6 62:5,20 64:3
**gazette**
17:7,14,17
**gbd**
1:9
**general**
13:8 43:16 47:6
47:18,20 48:17
49:22 50:3,20
51:18 55:18 73:8
76:18 85:3 87:2
109:22 111:8
117:22 118:2,24
120:8,15 145:3,6
**generally**
22:22 38:3,4,11
48:25 65:7,8
73:17 87:1 94:6
107:21 109:12
110:1 127:18
145:1
**generate**
111:21
**geneva**
8:12 10:14,14
14:23 18:23 19:3
20:1 21:10 23:7
24:15 30:6 31:1
31:18,20,25 32:7
35:21 42:20 61:8
61:13,25 62:14,20
63:3 66:1 86:25

97:10 109:10
113:8,9
**genocide**
46:23,24
**german**
122:22,23
**getting**
62:16
**give**
14:4 30:5 53:12
58:20 59:4 114:11
114:13 116:23
118:8 134:8,10
146:18
**given**
33:9
**gives**
23:21,23
**giving**
78:14
**go**
40:10 72:25 73:19
75:1 81:7 87:18
97:5 100:17
111:24 114:18
124:5,18 133:11
**goes**
74:23
**going**
12:16 13:6 14:15
24:12 37:9 48:24
50:18 92:24 94:24
106:23 128:20
141:2
**good**
5:6,7 13:25 30:16
55:21,22 70:20
83:20 89:5 114:9
119:18 124:4
125:1 135:7
**gordon**
15:16,17
**govern**
21:11 50:2 81:9
84:24 85:2
**governing**
21:8 22:14 114:9
**government**
24:5,15,16,18

56:16 128:3,11,14
132:6 135:18,25
136:16 137:8
141:3,6
**governmental**
93:25
**governs**
66:9
**grant**
23:21 97:18
**granted**
97:22 115:4
**great**
51:2 83:22
**group**
63:8 96:11
**groups**
79:18
**grow**
7:16
**gss**
7:2 57:23,25
**guantanamo**
121:5
**guaranteed**
75:14
**guaranteeing**
105:13
**guess**
110:24 130:7
**guilt**
107:11 142:15
146:7
**guilty**
90:2 103:18,18,18
103:19 105:5

**H**
**hague**
10:15 33:8 35:1
44:20 45:4,6,13
45:14 61:17,19,24
62:3,13,21
**haifa**
7:13
**half**
5:14
**hamdam**
4:12

**hamdan**
82:10 119:11
120:18 121:4,4,7
121:14 122:2
123:17 124:13,16
125:1,18 126:7
127:3
**hand**
64:4 87:11,12
99:11 109:17,18
114:16
**handle**
31:8,14 144:24
**handling**
130:15
**hands**
24:16
**happened**
61:21 80:11
**happens**
60:5
**happy**
11:25
**harm**
94:8
**head**
61:21 126:1
**hear**
70:14 76:6
**heard**
29:25 70:12
141:19,23 142:3,8
**hearing**
15:8
**hearings**
15:6
**heart**
106:24 117:17
130:20
**help**
6:13
**helpful**
5:16 37:20 39:14
50:9
**hierarchy**
45:24
**high**
9:12 45:15 56:18
56:19,20,22 58:10

58:21 59:5,19
60:10,17 61:7,17
62:3,25 63:22
68:17 118:25
119:7
**higher**
78:9 139:15
**highly**
54:25 55:13
**hill**
3:14 13:1 26:17
26:19,20,22,23,23
147:1,4
**hired**
26:8,18,21
**hold**
132:20
**holds**
116:9
**hope**
37:10 136:14
**hostilities**
63:12
**hours**
8:21 147:1
**hrl**
10:1
**huge**
52:2
**human**
7:11,12 8:19 9:24
10:19,23 11:6,8
42:21,22,22 54:22
55:8,10 63:8
65:13 71:19,22
72:1 73:2,8,10
93:22 94:6,10
109:9,17,24,25
111:21 112:3,16
113:7,10,15
114:16 115:6
116:9,12,15,17,18
116:18 117:5,6,7
117:8,16 118:3,4
118:8,10,20,25
119:25
**humanitarian**
10:2 22:13 23:1
71:11 109:18

121:11,15
**hundred**
51:23
**hundreds**
54:13,14,15,16,17
59:23 61:1 101:12
**hypothetical**
78:15 79:3 88:8
88:18,21 89:6,11
89:12
**hypothetically**
91:20

**I**
**iccpr**
48:1,6,10 79:13
**icj**
45:16 51:3
**iconic**
57:3,12,19,20
**icrc**
45:17 112:8
**idea**
51:17 100:17
108:15,20 111:14
112:17 121:19
122:1 146:4
**identification**
14:13 32:16
124:10 134:16
**identified**
43:7
**identifying**
44:18 84:17
**idf**
7:8
**ihl**
8:19 9:24 10:1,1
10:16 22:22,22
27:7 65:10,20
69:1 81:8 84:23
85:24 110:3 111:6
112:23 113:5,13
122:13
**ii**
95:6,16
**illegal**
70:15 111:21
**illegality**

23:14
**imagine**
16:7 89:6 129:4
130:4
**immediate**
130:14
**impartial**
74:22 75:15,21,25
76:14 92:9,11
96:4 109:13
115:14 142:23
**impartiality**
76:20 91:7 95:18
95:20,21 96:7
97:6 104:18
109:23 143:2
**important**
53:15 68:13 74:11
80:16 89:25 90:6
90:7 96:5 119:15
119:16 122:14
125:11 126:1
**importantly**
108:21
**impose**
83:20
**imposed**
94:1
**impossible**
28:8 77:4 135:14
**imprisonment**
58:23
**improper**
92:17 122:2 125:3
**inasmuch**
38:22
**incident**
130:15
**incited**
73:12
**include**
40:4 41:22 46:14
52:13 59:15 65:10
**included**
40:12 128:15
136:22 141:5
**includes**
56:14
**including**

79:19 81:17
111:22 121:11
**independence**
91:7 95:20,21
96:7 97:6 111:23
112:2,18
**independency**
76:20 77:2,25
78:24 79:5 104:18
105:14 109:23
110:14 143:3
**independent**
27:16 74:22 75:15
75:20,25 76:14
77:5,8,11,14,17
87:2 90:1,7 92:9
92:11 96:4 104:21
105:7 109:13
115:14,18 142:23
**indicated**
66:21
**indicates**
137:15
**indictment**
63:16
**individual**
29:15 56:21 68:21
77:13 78:17,18
143:5
**individuals**
106:9 107:19
130:1
**influenced**
119:6
**information**
72:22,23 73:14
**informed**
143:18
**inhuman**
146:11
**innocence**
107:11 142:15
144:21 145:9,12
145:21
**innocent**
105:5 106:10
145:13
**inquisitorial**
74:7

**inquisitory**
74:12,14
**insofar**
132:14
**instance**
6:15 53:23,23
**intended**
60:4 67:3
**intent**
66:21 83:24
**intention**
30:25
**intentionally**
69:7
**inter**
78:25
**interested**
68:7 149:13
**interesting**
72:4 86:5 118:23
**interests**
129:20
**interim**
40:4 41:3,12
126:6 127:7,18
128:7,16 129:14
129:22 130:5,13
131:10 132:5
133:2 134:10,14
**international**
2:9 10:2,25 11:3,6
22:13,25 23:10,16
33:3 40:6,11,14
40:21 42:6 43:1,5
43:16 45:9,16,19
45:20 47:6,6,10
51:4 65:7,9 66:12
66:14,16,20 68:4
68:16 71:11 78:23
79:3 81:2 89:3
92:10 108:2
109:17 110:8
119:6,25 121:11
121:15 132:22
134:1 136:3
**interpreted**
113:10
**interrogation**
52:21,24 53:17

**interrupt**
40:10 95:25
**intervention**
18:19 19:24
**intifada**
69:18 73:4,13
141:20
**investigated**
53:10
**investigation**
146:4,9
**investigations**
57:23,25
**invoked**
44:13
**involve**
115:15
**involved**
149:11
**involving**
130:15
**islands**
88:22
**israel**
5:20 6:12 7:16
18:15 20:16 25:1
25:7,9 27:8,10,25
28:2,16 30:17,23
42:19 52:17,23,25
53:3 54:23 55:22
56:10,14 57:6
58:5 61:8 62:18
63:9 64:5 67:20
67:20 73:7 83:6
83:12,16,21 85:8
85:11,13 88:19
91:25 92:5 113:19
114:4 128:5,10
129:15,19,22
131:2 132:5,6,19
135:18 137:8
138:3 139:7,18
140:12,23
**israeli**
5:17 8:1,17 9:12
9:16,23 11:17,21
12:9,14 13:7
18:11 22:4 27:22
30:24 45:15 51:19

56:24 62:4 64:9
68:17 70:3,7,25
80:15,20 81:22
83:5,7,15,15,21
89:7 90:11 116:5
127:19 128:2,24
130:1 135:25
136:16
**israelis**
81:4 82:19 83:10
84:4 85:23 88:11
129:16,24,25
130:2 135:21
139:8,23
**israels**
129:20
**issue**
8:18 17:12 31:9
33:22 59:8,12
63:11,14,20,21
64:11 74:11 76:20
77:12,12,15 96:23
111:6 114:23,24
116:18 120:18
122:8
**issued**
34:2 76:16
**issues**
22:6 69:24 74:9
82:5 85:19 90:23
**item**
82:15

---

**J**

**jail**
115:21
**jewish**
83:15
**join**
50:22
**joint**
16:17
**jordanian**
86:19
**journals**
71:25
**judge**
15:16 55:18 58:17
74:23 75:3,9 76:3

76:10,13,22 77:5
77:21 78:4,10,11
89:25 102:16
104:21 108:12
115:18 144:2,4
**judged**
103:14
**judges**
6:10 27:12 72:1
74:20,22,24 75:1
75:1,2,15,20
76:16 77:8,17,23
77:25 78:20,21
90:6 100:7 103:1
103:8 104:17
143:5,7 145:4
**judging**
25:12
**judgment**
27:21 60:1
**judicial**
4:9 11:23 14:1,11
14:16 20:14 21:6
24:5 58:25 73:17
127:22,25 128:6
128:14 132:7
136:1 137:9
140:24 141:5
**judiciary**
24:17 109:13
**jure**
82:19,23,23,25
**juris**
44:5,7,9
**jurisdiction**
15:4 56:13,15,16
80:8,13,18,19,24
81:22 82:4 86:3
86:14,15,16,24
87:5,8,10,20
88:14 90:16 91:13
113:14 127:13
128:15 129:19,25
130:1 135:15,20
137:16,25 138:3
138:20
**jurists**
70:4
**jury**

74:17,17,19 82:22
**jus**
  45:22 46:6,9,13
  46:21 65:4,16
**just**
  7:21 10:1 16:24
  19:14 20:13 21:15
  21:25 24:13 25:19
  28:22 34:13,23
  35:19 36:14 37:12
  42:2 49:9 66:7,25
  76:6 79:2 82:17
  87:18 88:7 89:10
  91:20 93:11 96:2
  98:19,19 99:3,6
  101:14 102:22
  104:24 105:12
  106:17,23,25
  107:6,25 114:6,8
  115:20 116:3
  117:21,24 124:14
  124:19 125:13
  126:3 130:1
  131:13 134:12,19
  134:21 136:24
  137:19 138:8
  139:3,14 140:7,8
  142:13 145:13
**justice**
  9:12 18:20 19:1
  45:16,17 56:18,19
  56:20,23 58:11,21
  59:5,7,20,21
  60:11,17 61:7,17
  62:3 63:1,22 68:8
  68:18 91:6 118:25
  119:8
**justification**
  70:16 71:8 115:16
  115:17,18
**justify**
  70:2,7,24

**K**
**keep**
  13:20 87:8
**keeps**
  136:17
**kent**

3:3,10
**kept**
  15:24
**killing**
  9:18 68:9 69:20
**kills**
  69:21
**kind**
  6:13 28:25 81:14
  81:24 83:19 84:12
  85:16 87:11
  107:19 110:5,5
  114:20 115:25
**kinds**
  9:14
**knesset**
  89:8
**know**
  8:13 9:19 15:11
  16:7 17:10,12
  18:2,8,11,16
  19:15 25:15,20,21
  27:19 29:9,19
  30:9,12,17 32:3
  34:13,18,23 35:17
  35:18 36:24 37:20
  37:22 38:7 39:18
  40:9 42:2,3 44:17
  49:4,13 51:18
  52:2,4,5 53:11
  54:6,17,20 55:16
  55:19,19 56:3,4
  57:5 58:13,17
  59:22 60:5,24,24
  60:25 61:5 62:8
  63:4 64:9,13,15
  64:19,23 66:24
  67:14,20 70:11,12
  70:18,18 71:24
  72:2,3,12,19 73:1
  73:6,10,15 74:25
  75:17,23 77:13,23
  82:3,6 87:22
  92:13 101:6
  103:16 104:23,25
  105:11 106:5,12
  107:24,24 108:4,9
  108:11,13,17,20
  108:21,22,22

109:3,4 110:16
113:24 114:1,24
115:8,21 116:5,6
116:13 120:2
122:14 129:11,13
130:24 131:10,14
132:19,23 133:5,5
133:6 137:22
141:15 142:1
143:7,13,16,24
144:4,5,6,8,13,15
144:19,22 146:8
**knowing**
  144:23,25
**knowledge**
  62:24
**known**
  96:24 131:20,23
  132:1,3
**kvechver**
  30:4

**L**
**lack**
  55:15 69:19 70:9
  89:23 95:21 96:5
  96:6 105:16,23
  106:4,11 107:15
  107:20 108:8,14
  108:19 133:18
**landmark**
  57:20
**language**
  98:23 139:20
  140:8
**larger**
  23:4
**lasts**
  21:24
**latin**
  44:7
**law**
  5:9,10,15,20,21
  5:21 6:5 8:13
  9:11 10:2,5,19,20
  10:21,23 11:7
  15:15 17:10 18:11
  18:15 19:7 20:25
  21:11,13 22:13

23:1,10,10,16
24:23 27:16,23
33:3,24 35:16
37:25 38:20 39:19
40:4,22 41:8 42:6
43:4,5,16,22 44:2
44:4,4,20 45:9,19
45:20 46:3 47:6,6
47:10,11,17,21
49:22,24,25 50:11
50:17 51:4 52:20
52:20 55:10 62:13
64:6,9,11,21,25
65:7,8,9,24 71:12
77:23,24 79:4
81:2,8,13,14
84:23 85:3,23,24
85:24 86:4,19,19
86:19,21 87:7,10
88:18,22,23 89:3
89:3,4 90:12
92:10 100:24
101:1 105:6 109:9
109:17,18,24,25
110:6,9 111:18,21
112:3,8,8,17
113:7,10,15,16
114:16 115:6,14
116:10,12,15,24
119:2,2,6,25
120:10,12 121:11
121:16 122:14
125:1 132:22
136:3 141:16
**laws**
  10:17 37:24 38:24
  40:17,19 42:18
  45:7 68:2 71:13
  71:14 96:22,24
  114:10
**lawyer**
  6:11 16:11 52:19
  52:21,22,25 53:5
  53:7,13,16,16,18
  55:9,10,14 56:1
  144:14
**lawyers**
  29:16 53:1 54:22
  55:21,22

**lecture**
  8:21,23 9:2,15
  11:14 29:25
**lectures**
  9:22
**left**
  120:14
**legal**
  10:22 25:2 40:16
  41:5,5 43:18
  68:17 70:4,17,17
  70:23 71:8,23,23
  71:24 72:15 83:3
  84:12 86:18,21
  87:19 88:8,20
  89:13,22 93:2
  100:19 108:3,12
  113:18,25 114:2
  129:11 130:17
  132:11 133:22
  135:10 136:15
  149:3
**legality**
  12:7 22:4,19
  23:20 84:6
**legislate**
  37:24
**legislating**
  24:22
**legislation**
  9:18 15:10,13,14
  20:14 21:6 23:22
  23:24 41:15 46:5
  46:6 86:12,13
  87:6
**legislative**
  24:5,16 28:9
  128:5 136:1 137:9
  140:24
**legitimacy**
  142:9
**legitimate**
  74:13 132:16,22
  133:22 141:13
**level**
  11:4
**lex**
  47:7,14 48:16
  49:1,3,21 51:9,10

51:11 110:11
**liberation**
1:12 66:18
**library**
17:10
**light**
113:10,15
**limited**
86:24 88:14 94:24
**limiting**
111:24
**line**
150:3
**link**
105:25
**linked**
12:18 85:20
144:22
**listed**
148:6
**litigating**
119:5
**little**
42:5 137:22
139:14
**lived**
7:14
**living**
80:17 85:25
**llp**
2:8 3:5
**local**
18:19 37:24 38:20
38:24 40:18,18,18
73:9,9 86:19
**london**
2:11
**long**
18:6,7,8,9 22:1
58:16 59:2 67:10
98:5 101:10
102:15 127:15
146:19
**longer**
52:22
**longterm**
113:15
**look**
14:3 25:20 36:21

36:21 37:12 39:5
39:24 49:14 60:24
67:25 72:6,23
79:11 84:7 97:23
99:1 114:6 117:3
123:23 135:9
137:16,17,22
138:10 139:3,14
140:19,20,20
146:3
**looked**
15:14 144:5
**looking**
18:17 77:15 84:2
96:5 135:12 140:8
140:11,12
**lord**
5:9
**lost**
135:2
**lot**
16:18 30:10 44:16
62:15 119:21,22
119:23
**lots**
113:20
**lower**
78:8
**lucy**
3:4,11 21:19
**lunch**
123:25 124:7,9,12

**M**

**machine**
149:6
**magistrate**
6:17
**main**
10:17,22 134:21
139:2 140:11
**maintain**
77:16
**major**
114:23
**majority**
120:23 121:13
**making**
104:22 109:16,20

**mangle**
21:15
**manuals**
31:19 32:8
**march**
13:13
**marco**
14:24
**mareva**
61:11
**mark**
1:5 14:8,9,10
32:14 134:14
**marked**
14:13 32:16
124:10 134:16
**martial**
64:7,8,19,20 65:1
103:5
**master**
14:22
**material**
16:16,25 143:24
**materials**
99:4
**matter**
11:10 82:19,22
83:3,15 112:16
**matters**
6:7,22 31:14
51:17 56:11 62:18
136:22
**maturing**
63:19
**mayor**
75:8
**mcmillan**
3:4,11 21:20
**mean**
6:24 8:9 9:7
16:24 18:2 19:9
21:9,23 22:16
25:11 27:24 28:3
29:24 32:4 35:18
37:22 40:10,20,24
43:24 44:16 47:24
49:24 51:2 52:6
53:5 54:6,20 56:4
56:7 58:15 59:24

60:3,19 61:4
62:14 64:8 68:25
69:12,13,21 72:11
72:11,12 74:13
75:9 82:5 84:15
86:8 89:16 91:16
94:10 100:6,24
102:14 110:16
112:10 115:23
116:1,8 120:3,18
125:20,23 129:6
130:9,17 131:18
133:10 138:17
144:3
**meaning**
28:6 63:3 84:8
137:10 142:18
144:6
**meaningful**
145:12,15,20
**meaningless**
145:21,22
**means**
46:5 57:20 67:23
79:17 81:20 87:12
113:8
**meant**
28:5 119:22
**mechanism**
75:16,17,19,21
**meet**
53:13,15,16 140:3
144:13
**meeting**
52:20
**members**
100:13
**memory**
118:9 125:15
**mention**
8:13 16:19
**mentioned**
17:4,19 35:5 56:9
86:20 98:20
**merely**
43:25
**merits**
58:21 59:5
**met**

29:22,24,25
**michael**
3:15 55:25
**middle**
108:18 114:21,22
**milchev**
3:22,23
**military**
6:3 8:1,8,13,17,20
9:11,23 11:17,21
12:9,15 13:7,9
15:5,6,15 17:5,8
17:21 20:15,17,25
21:13 22:4,15,23
23:22,24 24:4,15
24:18,21 27:13
28:8,13,14,14
29:11 30:19,24,24
31:2,7 32:8 33:5
39:13,16 41:16
51:19 52:16 53:3
53:19,22,24,25
54:2,10 56:24
57:2 58:3,6,12
59:7,21 60:17
61:8,22,24 62:4
62:19,25 63:2,10
63:20 64:3,4,6,11
64:12,16,16,17,18
64:20,22 76:3,10
76:15,16,18,19,23
76:25 77:1 80:5,9
80:9 81:5,8,16
82:2,20 83:7,17
83:24 84:3 85:24
86:4,6,7,9,10,11
86:23 87:4,5,8,20
88:1,12,14 89:7
90:12,17 91:5
92:3,14,18,20
94:14 97:11,17,20
97:21,22 99:13,21
99:22 100:1,4,12
100:14,14,22
102:6,19 103:4,10
104:13,20 105:18
107:22 109:11,22
110:2,14 111:7,9
111:18 112:18,24

112:25 113:5
114:19 116:2,10
116:16 117:1
120:1,20 121:8,15
122:2,22,23 123:5
123:13 126:25
127:19 128:2,10
128:14,24 129:2
129:12 131:7,16
132:6 133:1,15
134:7,12,20
135:18,25 136:10
137:8 141:2,6,17
141:21 142:5,8
145:3,7
**miller**
3:16
**mind**
73:19 95:13
137:19
**mine**
30:6
**minimum**
103:6
**minister**
89:8
**minor**
6:16,18
**minute**
97:15
**minutes**
146:16,18 147:1
**misstates**
80:6 140:15
**mistake**
88:6
**mistaken**
33:19
**mmhmm**
10:6,8 11:11,20
17:20 20:2 22:2
26:12 27:6 29:14
32:21 33:14 34:12
36:10,12 37:2
39:1,6,20,23 45:8
46:1 47:5,8 50:13
50:13 59:1 60:9
72:16 78:16 79:16
85:9 94:16 98:2

99:15 101:15
107:4 109:19,19
109:19 122:19,25
123:3,10,14 126:4
127:1 128:17
131:3 139:11,24
140:1,4,6 141:7
**model**
31:18
**modulate**
81:12
**modulating**
81:13
**modulation**
81:11
**moment**
8:3 34:13 39:7
97:24
**month**
101:11
**morning**
5:6,7
**msatin**
3:23
**murder**
69:20,22

**N**
**name**
84:10 148:14
150:24
**named**
29:15
**narrow**
20:13
**nation**
113:18
**national**
13:8 46:3 49:6,10
49:10 66:9,18
79:19
**nationality**
91:14 96:12
**nature**
92:4 143:19
**navy**
7:13,13
**necessarily**
16:9 81:13

**necessary**
128:5 136:1 137:9
140:3,23,24
**necessitate**
37:25
**necessity**
18:25 94:2,7,9
**need**
8:18,24 13:24
33:21,22,24 34:1
35:24 40:18 41:5
44:16,16 49:13
60:24 64:25 67:25
72:21 74:22 75:14
75:16 76:13 77:18
86:2,17 97:13
115:11,20 116:1,4
116:6 117:2
118:19 123:22
124:5 125:6 127:4
130:24 132:25
137:21 145:15,16
146:19
**needed**
31:8 87:16
**needs**
35:22 94:7,7,7,10
**negotiate**
132:24
**negotiation**
131:15 132:19,23
**negotiations**
133:6,10
**negotiators**
128:23
**never**
63:4,6,7 64:7 70:5
73:14 142:3
**new**
1:2 3:7 37:24
**ngos**
73:7,9
**nods**
44:22 90:13
**nominating**
78:4,19
**nonacquirement**
23:11
**nonderogable**

46:2,7
**nonindependent**
115:19
**noninternational**
65:11
**nonmeaningful**
145:21
**nonmilitary**
27:10 28:15
**nonpolitical**
27:15 97:13 99:13
101:2,9 104:19
**nonstate**
65:10,12,14,21
**nonwar**
11:10
**norm**
42:16 43:21 46:8
47:12,16 65:18
68:20,24,24 69:2
74:1,5,18 76:5,11
76:13,24 110:8,10
110:11
**normally**
51:2 67:22 87:9
**normcreating**
42:11,12 43:5
44:11 45:21
**norms**
45:22 47:17,17
74:9,20 78:23
110:7 114:17
134:1
**north**
51:3
**notary**
148:21
**noted**
17:18 117:7
**notes**
15:18,25
**notice**
143:11
**noticed**
17:4
**notified**
143:14,16
**notorious**
82:6,7 131:18

**notwithstanding**
138:19
**november**
1:19 3:5:1
148:5 149:5,19
**nuance**
53:6,10
**number**
14:10 15:14 16:20
43:22 44:1 51:21
62:17 68:12 88:12
88:13 121:10,16
135:3,12
**numbers**
54:9 61:15,16
95:14
**ny**
3:7

**O**
**obey**
114:5,6
**obeyed**
113:25
**object**
68:22
**objected**
121:10
**objection**
20:18,21 24:7
26:2 31:21 55:1
55:15 56:2 65:6
66:23 67:19 69:19
70:9 74:2 75:12
80:6 89:23 92:4
94:3 105:16,23
106:4,11 107:15
107:20 108:8,14
108:19 113:2
125:3 129:7 131:9
131:21,24 132:2
133:4,18 136:12
140:15 141:22
**objective**
36:7
**obligation**
31:4,5 43:18 49:4
50:3 65:13 71:14
71:16 74:19 75:20

97:19
**obligations**
50:2 69:11 128:7
137:7
**obliged**
99:23
**observer**
136:16
**observing**
105:13 107:25
**obsolete**
110:25
**occupation**
4:9 8:14 9:11,16
9:17 11:15,24
14:2,12,16 20:25
21:1,2,13 22:15
22:20,24 23:2,15
23:20 24:14 30:19
33:23 56:11 62:12
64:12 66:19 68:14
68:15 81:8,16,19
84:18,19,22 86:4
86:19 111:19
112:23 113:16
114:7,22,23,24
115:3
**occupations**
39:16
**occupied**
28:3,9 62:11
76:15 80:5,7,16
81:5 99:16,18
100:19
**occupying**
18:19 33:24 92:19
98:22 99:11
132:24 136:6,17
137:11
**offenses**
6:16,18 92:20
129:20 138:4,6,20
**offensive**
120:22,23
**offer**
96:19
**offering**
107:10,13,18
**office**

6:1 7:13,15
**officers**
122:22
**offices**
2:8
**official**
17:7,14
**oh**
14:22 44:7 117:4
135:2
**okay**
7:21 8:5 10:14
11:12 19:12,13
20:13 24:12 26:6
26:16,23 27:4,7
28:10,12,17,17,20
29:2,6 30:16 34:9
36:4 38:1,3,20
39:4,14 41:4 42:2
42:4 43:3,8,9,10
43:13,15 46:4
50:11 51:12,14,15
51:17 55:24 56:9
59:4,10 62:23
63:25 70:21 72:18
79:7 82:24 83:3
84:21,25 85:14
88:7,25 89:13,14
89:17 90:23 91:1
91:19,22 92:23
93:2 95:1,9 97:3
98:9 101:23 102:9
104:3 106:2 107:5
107:9 111:11
117:13 121:20,25
124:1 125:12,16
126:2,3 127:3,5,5
127:6,7 130:8
134:10 135:2
137:13,17,20
138:9 140:7 141:5
141:10 145:24
146:15,17,22
**old**
2:10 7:17
**older**
47:13
**omit**
38:19,20 39:13

**once**
33:20 34:2 70:12
99:6 131:25
**ones**
31:7 47:1 94:18
**oneshot**
18:1
**open**
98:23 120:14
131:18
**opening**
62:14
**operate**
31:11
**operates**
56:25
**opinion**
27:8 30:5 35:5
36:2 44:5,7 45:10
56:1 68:7,8 69:17
81:3 91:1,2,9,24
94:14 101:6 103:9
104:10 105:18
107:2,10,13,18
108:6 118:6
121:25 124:20
125:2,14 142:14
142:20 143:4,17
143:23,25 144:6,9
144:18,20 146:1,5
146:10
**opinions**
26:1 118:4 119:3
143:10
**optional**
9:13
**order**
15:9,11 17:13
18:13,14 21:7,7
24:21 33:22 44:11
58:14 60:12,12
64:17,22,23 75:3
76:15 77:8,16
81:13 84:6 85:18
86:17 104:16
110:8 137:6
140:22
**orders**
17:5,8,12 33:5,20

33:21 34:2 86:6,7
86:9,10,11
**organ**
118:21
**organic**
41:1,4
**organization**
1:13 56:21 71:19
86:9
**orient**
124:19
**origin**
79:20
**original**
56:15
**outcome**
149:14
**outcomes**
60:16
**outside**
138:6
**outstanding**
13:18 34:21
**overall**
129:23 130:2
136:24,24 139:22
140:13
**overriding**
129:15 139:7

---

**P**

**pa**
65:5 67:18 73:12
127:8,22 128:12
132:14 140:12
141:19
**page**
4:2,7 18:18 32:18
39:21,24 79:9
90:25 95:6,7
96:14 97:25 98:6
98:7 101:21,23
109:5,8 117:10,11
117:25 124:18,22
134:23 135:3,4,11
138:14,16 139:5
148:6 150:3
**pages**
96:19 98:1 114:17

148:4
**palestine**
1:12 73:7
**palestinian**
25:24 26:8 27:5
41:2 53:1 70:6
80:14,18 127:25
141:21,23
**palestinians**
25:8,16 85:24
86:11 88:11
**paragraph**
19:21 32:20,22
33:1,1,10,13,17
34:3,6,11,22 35:3
35:7,9,11,13 36:1
36:21 37:1,8,12
37:16 38:19 39:5
39:8 68:12,14
98:6,7 99:10
100:10 111:3
117:14 123:22
135:17 137:13
138:13,22 139:17
**paragraphs**
37:19 68:13 98:8
98:15
**paris**
8:11
**park**
3:6
**part**
6:8 8:13 9:2,24
11:13 15:24 31:6
32:10 65:21 87:23
90:25 91:1,1,1
94:17,25 95:6,22
96:3,7,9,13
101:14 102:5
124:19 140:20
**partiality**
143:6
**particular**
38:18 49:23 50:19
51:5,6 61:11
102:6 106:6
**particularly**
137:15
**parties**

41:12 42:14 50:1
50:5,5,16 51:6
67:24 133:24
149:11,13
**party**
67:20 71:12,13
118:15,19,22
119:5 120:11
**passages**
13:9
**pause**
42:1
**pay**
12:1,2 13:24
147:2
**peace**
40:14,21 85:7
**penal**
99:9
**pending**
58:16
**people**
29:7 52:25 69:7
70:18 71:21 79:19
80:13,17,22 85:25
103:9,13,23
104:12,24 105:4,5
105:12,21 106:2
115:21 131:25
141:19,21 142:1
**peremptory**
69:2
**perfect**
135:7
**period**
115:3
**permitted**
46:9 99:21
**person**
25:12 53:2,2
77:13 91:14,24
92:7,17 121:20
**personal**
142:21 143:21,21
**personally**
29:20,21 30:9
142:7 143:21
**personnel**
122:24

**perspective**
55:13
**petition**
60:10 63:4,6,7,15
63:18,19
**petitioner**
60:12
**petitions**
56:16,21,23 59:18
60:16 62:10
**photocopies**
134:9
**phrase**
21:14 134:7
**picati**
57:5
**pictet**
100:8,8,9,10
**picture**
84:7
**piracy**
46:14
**place**
36:5 80:23 86:1
93:4,15 103:8,11
**placed**
124:15
**placement**
100:21
**places**
30:19 36:9,11
53:1 88:23 137:11
**plaintiffs**
1:6 3:2
**plan**
89:9,9
**planning**
114:5
**plea**
53:19 60:13
**plead**
53:20
**please**
28:23 32:18 36:21
37:6 40:10 42:7
83:2 96:1 102:23
102:23 122:7
**pleasure**
113:24

**plo**
26:11 65:5 66:21
67:4,18 68:3
73:12 85:8 127:8
128:23 129:2
131:2,7 132:5,14
132:21 133:2,16
141:8
**point**
40:13 53:7,16
59:25 81:2 91:3,6
91:7,9,15 97:7
100:20 101:7
103:19 109:20
110:13,23,24
111:5 115:9,23
**pointed**
82:18
**points**
101:5,8
**police**
41:2
**policy**
83:15 84:4,9,10
89:4,5
**political**
11:1 22:20 43:1
83:18 84:15 91:11
91:18 92:2 96:10
114:25 115:2
116:21 118:18
**politicians**
70:7
**population**
69:4 81:9 83:19
84:25 85:2 86:1
111:22
**populations**
68:21 84:13
**porter**
2:8 3:5
**position**
105:2,12 106:7
107:12,16 111:4
142:19 146:13
**positions**
110:9
**possibility**
97:20 116:21

**possible**
93:6 111:20 114:9
117:20
**power**
9:18 18:19 85:7
92:19 97:10 98:22
99:11 136:6,17
**powers**
24:6,16,18 79:1
85:10 96:6 128:6
128:11,14 135:20
136:2,19 137:9
140:2,25
**practice**
5:20 43:17 44:1,2
44:12 51:4 54:23
83:14 120:9
**practiced**
5:23
**precatory**
118:13
**preemptory**
45:22 68:20
**prefer**
73:9
**preferably**
99:17
**premise**
88:3
**premised**
71:16
**prepare**
29:16
**prepublication**
13:11
**presence**
80:15
**present**
121:21
**presenting**
59:19
**press**
16:17 72:24,25
**presumption**
144:21 145:9,12
145:20
**pretty**
57:18
**prevail**

47:12 110:10
**prevented**
35:20,24 36:17
38:21,25
**prevention**
137:2
**primary**
69:3
**prime**
89:8
**principal**
124:20
**principle**
68:25
**prism**
97:14
**prison**
103:11,24 104:1
104:14,24 105:5
107:14
**prisoners**
57:25
**probably**
33:9 41:23 55:19
69:14 130:4
**problem**
27:22 35:2 72:18
74:16 77:25 80:13
80:21 81:3,7
84:17,21 105:8
110:14
**problematic**
77:19,22,24 78:5
78:21
**problems**
47:11 52:23
**procedural**
104:17
**procedure**
81:1 96:5 102:3
102:13 105:4
**procedures**
103:12 104:10
**proceedings**
142:6 148:5
**process**
8:20 9:25 22:14
22:16,16 27:17
63:14 73:17 74:9

74:12,12 81:17
82:9,12,13 83:20
85:20 92:8,12,24
93:2,14,17,17,24
97:7,13 101:3,4
102:7,9 103:13,15
103:20,21,23
104:12,15 105:9
108:1,2 115:15,17
118:20 120:13
142:22 143:2,20
145:17,19
**proclamation**
18:13,14 24:21
33:6 34:18
**proclamations**
17:5
**professional**
92:11
**professor**
30:4 68:11 71:25
**professors**
116:24
**prohibited**
69:4 71:6
**prohibits**
109:10 116:10,16
119:25
**promise**
37:11,11
**promote**
78:10
**promotion**
77:18 78:8,8
**promulgated**
99:9
**proofs**
13:16,17
**properly**
63:2 84:14 91:4
91:10,17 94:15
97:12 99:13 101:1
101:8 107:23
121:17 122:9
126:12
**proportion**
69:14
**proportionality**
69:13

**proposal**
116:5
**propose**
91:15
**proposition**
84:22
**prosecute**
87:15 92:20
114:10
**prosecuted**
51:21 58:3 82:6,8
83:11,16,21 87:2
87:3 88:1
**prosecuting**
91:12
**prosecution**
58:23 59:9,9,13
77:20 82:16,20
83:7 103:6,7
145:4
**prosecutions**
51:19 52:14 58:12
**prosecutor**
6:1,13,19,24
16:12 76:17,18
77:1 78:3,18
102:17 103:1
**prosecutors**
78:18
**protecting**
11:7 20:15 129:16
139:8
**protects**
85:12
**protocol**
65:25 66:4,11,11
66:17,22 67:6,17
67:18,21,22,23,24
68:19 120:10
135:6,6
**prove**
145:13
**provide**
23:22 91:6 107:23
112:3 115:13
145:15,16
**provided**
86:25 87:21 96:11
105:21 111:18

128:2 129:22
130:13
**provides**
24:1 48:1
**provision**
23:5 44:11,13
48:25 50:23,24
64:20 66:17 67:21
67:25 110:3
113:13 115:5
130:5,21 134:12
**provisions**
42:12 43:5 44:20
45:21 48:10 50:17
99:9 127:12
138:19,22
**public**
23:10,16 47:10
48:12,21 49:12
55:18 57:5 148:21
**publication**
12:11 14:25 16:18
33:4,20 34:6
**publications**
17:1
**publicity**
96:23
**publish**
13:6 33:21 34:1
**published**
11:19 12:13,16
13:13,20 14:19
96:24 108:23
**punish**
114:12
**purchase**
13:21
**purpose**
69:3 129:16 139:8
**purposes**
27:2 92:2 112:25
132:8
**put**
41:20 70:2 81:21
87:14 96:8 104:24
115:21 143:1

_____

**Q**

**question**

8:19 15:3,4 22:20
23:2 24:7 27:12
27:14 30:22 31:22
31:24 33:10,25
35:17 38:10,23
40:20 44:15,15,24
55:7,21,23 57:1
58:25 59:2 60:4,7
60:10 61:15 62:1
63:7,19 65:6 67:3
67:19 68:5,6,7
69:13 70:20,22
73:15 76:19 78:10
82:14,18 83:23,24
88:20,21 89:18,19
90:3,5,8,8 91:16
92:8 93:22 94:3
104:6 105:14
106:17 107:5,16
116:4 125:9,17,24
126:10,23 130:25
131:1,24 132:18
136:12 141:12,14
142:20
**questionable**
40:24
**questioning**
66:13
**questions**
14:2 23:4 59:19
73:16 82:13 94:13
94:24 97:4 106:23
106:25 107:7
146:15,21
**quirin**
122:18 123:11,17
124:13,14,23
125:1,7,18,20
126:11,13,15,17
126:23
**quite**
7:14 15:11,12
16:17 29:22 52:23
127:14
**quote**
79:24 117:19
**quoted**
79:12 100:10

_____

**R**

_____

**raised**
63:8 76:19 120:4
**ramallah**
27:9
**rape**
6:20 7:1
**ratification**
42:9 132:13,15
**ratify**
42:14 67:24
**reach**
50:18 109:22
133:25
**reached**
43:23 133:17
**read**
11:23,25 12:6
15:14 16:4,5,6,7,8
16:15 19:8,13,23
21:19 25:17,18
28:21 29:6,17,18
30:13,15 31:5
32:4,9 33:7,9,10
33:13,16 34:16
36:6 37:19 39:8,9
43:24 49:21 51:22
52:3,13 54:10,14
54:15,15 64:25
67:4 70:5,6 73:8,9
73:10,10,11 87:7
92:24 93:6,7,8,10
98:3,7,11 99:6,7
100:16 106:15
108:9 109:14
111:3 112:4,11
119:10,19,23
120:3 123:22
125:6 127:4,12,14
127:14,15,16
134:6 136:15
139:1 142:7,11
143:13,24 144:3
146:8 147:4 148:3
**reading**
16:13 37:21 73:5
130:5 134:6
**real**
35:22 59:20

108:23
**really**
6:18 22:20,25
23:1 25:18 27:18
30:18 37:17 39:11
45:19 51:15 55:3
82:14 104:21
111:24 114:12
125:8 135:14
**reason**
31:2 141:20 150:3
**reasonable**
71:21
**reasons**
18:20 20:15
121:16 143:11
**recall**
25:21 32:9 122:18
123:1,6,19 125:8
125:20 126:6,9,17
127:16,18 128:10
128:18,20 129:14
130:13,20
**receive**
72:24
**received**
12:19,23 25:19
26:25 142:22
**reciprocally**
67:23
**reciprocity**
71:16
**recognize**
142:9
**recognized**
45:15 120:11
**recognizes**
85:15
**recollection**
124:25 125:4
**recommend**
85:17 113:23
**recommendation**
76:17 77:1 102:17
**recommendations**
114:15
**recommends**
102:19
**reconcile**

**record**
13:1 49:16 63:23
140:15 147:2,5
149:8
**recorded**
149:6
**redeployment**
127:19
**reducing**
87:12
**ref**
1:25
**refer**
20:24 119:8 120:9
120:10
**reference**
19:20
**referenced**
117:18 118:2
**references**
117:17
**referred**
10:5 61:13 120:8
120:15 134:7
138:7
**referring**
18:22 41:15 45:14
66:13 91:2,8
101:16 104:3
**reflect**
33:7
**reflected**
120:13
**reflection**
34:17
**reframing**
12:7 22:3
**refresh**
124:25 125:15
**refreshing**
125:3
**refuse**
142:5,9
**regard**
55:20 94:14 97:6
137:7
**regarded**
54:25 55:13 56:4

80:3 114:14,15
**regarding**
74:9
**regime**
86:22 89:22 90:11
**region**
17:6
**regional**
11:4
**regular**
81:18 91:13
**regulate**
114:24
**regulates**
22:17,18
**regulation**
24:2 33:8 35:1
45:13,14 61:19,24
62:13 130:19
**regulations**
62:4,21
**reinforce**
83:17
**reisner**
4:11 29:15,19
32:6,15 34:11
36:2 38:12
**reisners**
32:18 97:23 98:15
100:10 101:17
**rejected**
123:15
**relate**
112:2
**related**
9:16 13:9 20:25
21:5 59:12,12
63:11 65:20 102:5
123:22 141:14
**relates**
57:23
**relating**
22:22,23 23:24
56:11,16 58:11
59:5,20,20 60:17
61:22 62:19
129:20 130:25
**relation**
65:20 66:8
**relationship**

133:14
**relative**
149:10,12
**released**
103:11,24 104:1
104:14 107:14
**relevance**
42:24
**relevant**
15:13,13 25:25
43:20,22 61:24
134:19
**reliable**
72:20 108:7
**relied**
122:17 123:17
125:2
**relieve**
71:13
**rely**
71:22,23,24 72:12
125:7 126:11
**relying**
19:2
**remained**
20:11
**remains**
73:1,1
**remember**
8:25 16:12 21:12
30:8 32:10 49:9
49:11 52:15 54:7
70:12 81:10
103:25 106:6
113:7 114:18
117:17,20 102:3
120:16 122:4,5
123:19,21 125:25
130:4 133:24
**remind**
21:1
**remitted**
123:5
**render**
83:12
**repeal**
37:24 113:13
**repeat**
24:9 37:17 66:25

76:6 120:24 121:2
**repeated**
8:23
**repeating**
144:3
**rephrase**
74:3
**report**
4:8,11 14:5,9
16:17 27:2 29:13
29:16,17 30:14
31:6 32:9,10,15
32:19 34:11 39:22
39:25 40:12 72:6
73:3 79:9 82:16
83:13 84:2 90:24
94:18,20 97:23
101:17,20,21,22
102:5 109:6
112:16 117:19
119:13
**reported**
1:23 54:10 72:17
**reporter**
38:8 75:18 115:1
145:18 149:1
**reports**
16:23 71:22 72:19
73:5,6,11
**represent**
53:7
**represents**
42:16
**reprisals**
71:5
**reputational**
55:13
**request**
60:7
**requested**
13:1
**require**
33:20 98:21
108:23 146:3
**required**
33:3,4 39:13 49:5
97:12 98:20 101:1
127:19,22 128:6
**requirement**

27:18 77:2,9
78:24 79:5 91:5
92:10 103:7
109:12,23,25
143:2
**requirements**
27:20 77:16 92:14
93:24
**requires**
49:5 74:6 80:4
97:10
**research**
14:21,25 15:2,3,4
15:9,24 16:5
72:21
**reservation**
50:22 51:2
**reservations**
50:20
**reserve**
50:24
**residents**
27:5 59:6 80:14
**resolve**
110:8
**resolved**
23:3
**resource**
7:11
**resources**
7:12
**respect**
38:20,24 71:12,14
**respected**
77:16
**responsibilities**
128:11 135:20
136:2,19 140:25
**responsibility**
80:8 129:15,23
130:2 136:25
139:7,18,22 140:3
140:13
**responsible**
78:19
**restrained**
16:18,24
**restrict**
87:21

**restricted**
111:15
**restricting**
90:16
**restriction**
94:1,2
**restrictive**
94:9
**restricts**
52:20
**results**
43:16
**resume**
124:2
**retain**
53:5 128:5 132:7
132:12 133:14
136:1 140:22,23
140:24
**retained**
29:15 128:15
137:8 140:17,19
**retaliation**
71:5
**retrial**
105:9 107:19
**retroactive**
97:1
**review**
35:11,13 36:24
37:6 38:7 122:13
**reviewed**
97:14 103:17
**reviewing**
58:14,15 142:20
**rewriting**
34:5
**rhetorical**
111:5
**rid**
141:21
**right**
5:16 6:11 8:20
9:3,25 10:3,19
11:10,21 12:20,23
12:25 13:11,23
14:17 15:7,20
16:3 17:2,22 18:2
18:9,10 19:4,7,8

20:1,9,10,11,20
22:5,25 23:4,10
23:23 24:1,3,13
25:3,6,8,13,17,22
26:10,11,13,24
27:1,5 28:25
29:22 30:13 32:14
33:13 34:5,19
35:9 36:11,17,18
36:20 37:5 38:14
38:18 39:15 41:6
41:19,24 42:9,10
42:20 43:23 44:21
45:7,25 46:2
47:15,21 48:6,7,8
48:11,13,21 50:4
50:12 52:5,16,18
53:5,9,21 54:21
56:6,8,11,13,15
57:10,14,19,23,25
58:3 60:14 61:6
66:10 67:18 68:5
68:22 69:5,6,9,11
69:12,24 70:19,25
71:3,9,14,16
72:19,24 73:16
74:7,18,21 75:13
76:5,12 81:18
82:8,21 83:8,12
84:25 86:7,15
87:1,25 89:15
90:12,25 92:2,7
94:8,13 95:19
96:24 100:8,21,23
100:25 101:20
102:3,4,8,13
103:13,14,20
105:15,21,22
110:6 112:9,19
113:4 115:17
116:7 119:3,11
121:7,8,9,11,12
121:16,23,24
122:23 123:5,7,13
123:15,18 124:16
124:23 125:25
126:5 127:2,10,23
127:25 128:3,8,16
128:19,22 129:1,5

129:24 130:3,11
131:4,8,16,23
132:1,8 135:5,15
136:4,7,20,21,22
137:4 138:6,8,13
138:24 139:10,25
140:5,9,10,14,21
140:25 141:3
142:4,16 143:18
144:1,10,18,19
**rights**
8:19 9:25 10:19
10:23 11:1,7,8
23:7 42:21,22,22
43:1 48:4 50:2
53:11 54:22 55:8
55:10 63:8 65:13
71:19,22 72:1
73:2,8,10 93:22
94:6,10 109:9,17
109:24,25 111:21
112:3,17 113:7,10
113:15 114:16
115:6 116:10,12
116:15,17,18,19
116:21 117:5,7,7
117:9,16 118:3,4
118:8,11,18,20,25
119:25 128:7
137:6
**rle**
1:9
**roman**
95:15 135:12,14
**round**
147:3
**roundabout**
137:22
**royalty**
12:3
**rule**
27:17 43:22 46:7
47:13,14,14 48:18
65:11 68:25 83:20
92:11 104:19,24
105:3 108:18
109:22 111:8
120:13,15
**rules**

47:10 51:4 80:25
83:24 93:2 104:23
108:22 120:21
**rumsfeld**
4:12
**run**
74:25 75:7 101:10
**running**
75:8
**runs**
74:23 95:6

————————
**S**
**sadly**
12:1
**safeguard**
21:7 27:16 145:11
**safeguarded**
78:25
**sahin**
117:9
**salim**
4:12
**sarcasm**
105:1
**sassoli**
14:24
**satin**
3:15 20:18,21
24:7 26:2,16
31:21 55:1,15
56:2 65:6 66:23
67:19 69:19 70:9
74:2 75:12 80:6
89:23 92:4 94:3,5
101:16 105:16,23
106:4,11 107:15
107:20 108:8,14
108:19 113:2
124:4 125:3 129:7
130:7 131:9,21,24
132:2 133:4,18
136:12 140:15
141:22 146:14,16
146:18,21
**saw**
17:17 27:1 144:4
**saying**
23:5 28:3,5 30:4

31:8,15 35:19
38:2 66:17 68:14
70:4 100:11
112:16 118:3
142:1
**says**
48:24 62:12 66:4
69:14 100:10
116:15 117:15
136:14 139:21
**scope**
111:24
**se**
92:16,16
**sea**
50:11,18 51:3
**second**
19:21 22:9 43:4,6
43:6 79:14 86:23
91:3,9 94:23 96:9
99:10 102:25
111:17 117:3
139:5,17 141:20
**secret**
131:16
**section**
32:6,9 83:13 84:2
90:24,25 91:2
94:17,20,21 95:8
95:13,18,20 138:2
138:13
**secure**
104:18
**security**
18:21 20:13,15
21:7 23:25 25:8
25:16 29:8,9 31:8
31:14 38:2 49:10
57:25 81:4 83:6
85:12 88:15 90:20
92:17,20 94:7
111:25 112:25
114:9,23 129:16
129:20,24 130:2
132:7 133:15
136:22,25 137:7
139:8,23 140:14
140:17
**securityrelated**

6:22 90:21
**see**
15:23 16:21 19:18
19:19,20 24:21
33:7 34:3 38:23
41:17,19 63:14,18
79:13 80:7 94:8
102:10 110:4
114:21 117:15
119:7 120:4,4
121:23 124:19
130:22 135:9,14
135:17 138:15
140:11
**seeing**
22:8,11 52:22
58:17
**seen**
21:3 66:20 115:5
**segregated**
84:9 86:21
**segregation**
95:3
**selection**
97:13
**selfdetermination**
23:11 66:10
**semester**
9:4
**send**
13:2 116:21
**sense**
41:9,10 43:17
44:13 51:10 53:25
59:4,18 84:14
91:12,18 97:21
100:16 107:7
114:20 115:10,13
121:22 132:15
145:6
**sent**
12:25 13:17 26:23
105:25
**sentence**
19:11,13,14,23
36:16 39:12 79:14
107:23 109:21
139:6,17
**separate**

79:18
**separated**
103:6
**separately**
101:7
**separation**
77:20 79:1 96:6
**serious**
76:19 90:3,5
105:8
**served**
7:8
**serving**
104:13
**session**
17:24
**set**
125:24 128:15
**settlement**
132:21
**settlements**
25:5 28:25 63:12
70:15,24 86:5
132:9,20 139:23
141:15,16
**settlers**
87:13
**sexual**
6:25
**sfard**
55:25
**shamgar**
31:6
**share**
43:23
**sharon**
1:18 2:2 4:2,8,10
5:2 30:5 148:3,14
149:4 150:2,24
**shaul**
15:16
**shelf**
17:10
**shell**
147:4
**short**
21:8 31:10,10,11
31:12 84:24
**shorthand**

149:6
**show**
32:11,13 110:13
112:5 125:14
126:3 130:22
**showing**
83:14
**shown**
91:11
**side**
138:20
**sides**
60:3 130:14
136:10
**sign**
147:4
**signatory**
42:19,23
**signed**
41:13 148:13,18
149:17 150:23
**similarly**
23:12 35:21
**simplicit**
87:14
**simply**
43:8 52:14 91:16
115:20
**single**
78:17
**sit**
45:25 99:16,17
**sitting**
31:6 56:18 64:3
81:5
**situation**
21:3,3 33:23
37:25 49:23 50:19
78:5,15 79:2
80:17,21,22 81:23
81:24 82:2 85:18
87:17,25 102:16
105:11 107:22
108:4 111:19,20
112:22 115:19,24
**skipping**
88:24 139:20
**slavery**
46:16

**smaller**
14:22
**snuck**
122:22 123:1
**sokolow**
1:5
**soldiers**
64:5
**sole**
129:19 138:3
**solutions**
149:3
**solve**
47:11
**somewhat**
67:11
**soon**
12:17 53:6
**sorry**
8:4 10:10 15:1
16:15 17:7 19:16
26:4 28:18 40:9
44:6 45:3 49:8
52:15 73:19 78:13
82:24 87:24 88:2
88:4,6 90:15 93:6
93:13 94:21 95:4
95:25 96:17,21
98:5,6,13 106:5
110:18 112:4
117:4 122:6
124:13 126:7
134:9 135:1,5,13
142:25 145:22,25
**sort**
10:16 11:6 18:1
41:25 43:3 58:24
62:16
**sound**
52:5 114:14 123:7
123:13
**sounds**
112:13
**source**
40:4,22 41:1,4,11
43:4 45:18 72:5,6
72:23,24 84:20
**sources**
10:22 39:19 42:5

112:14
**southern**
1:2
**speak**
6:10 7:19 23:16
23:19 30:8 44:23
57:17 65:16 90:14
106:22,22
**speaking**
45:24 51:22 88:17
88:18 114:19
131:25 133:8
**special**
45:19,21 49:1
103:4 112:22
120:20
**specialis**
47:7,14 48:16
49:2,3,21 51:9,10
51:12 110:11
**speciality**
47:15
**specially**
121:8,14
**specialty**
6:25
**specific**
8:7,18,21 47:18
50:2 57:1 64:25
65:17,17,18,18
82:15 84:1 106:7
125:9 130:24
131:1 144:12,23
**specifically**
8:12 13:7 63:10
74:8 75:23 85:4
134:13 144:25
**specified**
47:15,16
**specify**
50:18
**speculation**
26:2 31:21 55:1
56:2 66:23 105:17
115:8 129:7 131:9
132:2 133:4
136:13
**spirit**
38:16

**spoke**
15:16 35:19
**spoken**
21:16,20,21 31:24
51:24 64:19
**spread**
69:3
**square**
139:3
**staffed**
27:9
**stagiaire**
6:12
**stand**
23:14 70:17,17
**standard**
103:7 108:2
**stands**
10:2
**start**
19:14 58:25 78:14
80:15 135:9
**started**
16:8 146:4
**starting**
17:11 89:7 90:25
**starts**
114:22
**state**
20:16 27:8,25
28:2,7,16,17
44:12 48:19,21
59:25 60:13 64:21
65:7,8,12 66:15
66:15 74:15 75:15
75:21 83:6 84:11
85:11 89:13 114:4
116:5 120:16
137:7
**stated**
45:13 116:21
125:2
**statement**
19:2,6,6,8,9 79:8
80:4 93:20 109:5
**statements**
70:6 75:12 92:24
**states**
1:1 43:17,20,22

44:1 74:24 75:5,7
118:14,15 119:10
119:17 122:23
123:1,9 126:18,19
**statistic**
51:22 52:3,12,12
54:6
**status**
46:8 69:8 70:15
70:23,24 100:14
**statute**
46:4
**stealing**
82:5
**steps**
140:2
**stipulated**
21:4
**stop**
17:14 84:22
**stopping**
85:19
**street**
2:10 3:17
**strictly**
33:3 49:5
**structural**
76:21 77:9,15
90:11
**structurally**
77:7,17 109:24
114:14
**structure**
27:14 31:10 41:6
63:21 64:10 73:17
77:12 78:2 96:2
100:22 102:9,10
103:2 129:11
145:1
**students**
72:2,8
**studied**
5:21 15:9 119:14
**study**
45:17 99:4 112:8
**studying**
5:14,24 17:21
**subheading**
79:12

**subject**
22:3 56:10 74:1
74:18 82:20 83:7
88:11 90:12 99:25
107:19
**subjected**
146:11
**subjective**
36:7
**submit**
29:16 56:21
**submitted**
14:23 29:13 67:5
**subordinate**
85:1 100:14 103:2
**subparagraph**
138:19
**subscribed**
148:18
**suggest**
132:12 136:9
**suicide**
70:2 73:3
**suite**
3:18
**summarize**
87:18
**summarized**
88:16
**summarizing**
79:22
**summary**
32:2 38:12 112:20
**superior**
43:14
**supernutshell**
11:6
**supervises**
100:6
**supervising**
101:4
**supervision**
14:24 100:1,6
**suppose**
60:11 78:14,17
85:10 114:2
**supreme**
56:10,14,19 82:9
119:10 120:21,23

**subject**
121:13 123:15,17
124:25
**sure**
8:10 14:6 19:16
22:10 24:12 27:24
31:9 33:12 39:10
40:20 43:10 45:4
50:1 60:6 61:16
65:10 67:2,4
68:12,18,23 69:21
72:8 74:5 75:20
75:24,25 76:8
77:9 83:3 87:23
93:12 94:22 99:3
103:21 104:9
105:3 116:13
120:24,25 121:3
125:11,23 127:9
129:10,12 134:5,8
141:14 142:13
**surely**
128:15
**suspect**
99:2
**suspects**
47:2
**syllabus**
8:24
**system**
8:17 11:17,21
12:15 22:15 25:3
39:13,16 40:16
44:5 56:24 58:22
58:25 59:7,21
60:18 64:13,15,23
74:6,7,14,16
75:14 83:22 84:12
85:12,16,22 86:18
87:19 88:8,13,20
100:19 103:24
114:9 127:22,25
128:25 132:13
**systems**
73:17 88:13

**T**

**take**
29:19 34:6,13
35:25 36:3,11

38:14 39:7 42:1
47:20 49:17 57:3
97:3 114:24 124:6
124:12 134:18
140:2 146:19
**taken**
2:7 49:18 73:22
108:21 124:9
146:20 148:4
149:5
**takes**
73:25
**talk**
41:24
**talked**
90:11,16 94:17
119:13 133:24
**talking**
35:22 65:19 68:1
82:15 86:15 87:5
87:6 101:11
124:12 131:2
134:12
**talks**
32:6
**targeted**
9:18 68:9 69:16
**targeting**
69:12,17
**task**
44:19
**taught**
11:15 56:9
**teach**
7:24 8:1,11
**teaching**
8:6 11:16
**technical**
93:3,14
**tel**
3:8,20 5:21 6:1,4
6:8 8:6,15,16 9:7
9:9 11:15 87:15
87:23 88:5,6
**tell**
19:14 51:21 52:15
121:1 129:11
143:22 144:25
145:2

**telling**
107:25
**temporary**
21:3,24 22:1
111:19
**ten**
59:17
**tenure**
77:10
**term**
22:1 31:11 46:20
51:12 84:24
**terms**
66:9
**territorial**
80:8,18 86:3,15
86:16 91:13
135:19
**territories**
62:11 80:7 81:6
100:19
**territory**
23:11 28:3,9
76:15 80:5,16
88:21 91:25 92:4
99:18 136:18
138:6,7
**terror**
69:4
**terrorism**
105:22 129:17
130:16 137:2
139:9
**terrorists**
82:6,7 114:10
**test**
36:7
**testify**
146:6
**testimony**
148:4 149:4,8
**text**
112:6,7 133:11
**thank**
5:8,16 13:4,4 39:9
39:14 42:3 63:25
79:7 117:13
141:10 146:23,24
**thereof**

148:8
**thesis**
14:22 15:21 16:22
**thing**
6:14 10:19 17:4
37:9 82:15 97:7
120:17 145:8,10
145:11
**things**
9:20 13:16 23:16
38:18 88:15 90:19
97:3 113:11,20
119:7 121:11
134:18
**think**
7:11 8:18,20,24
9:13,24 11:23
12:5,19,20,21,23
15:18,24 17:18
18:22 21:9,25
22:7 23:19 25:1
25:14 27:12 28:10
28:10 31:2,2,4
33:4,6,19 34:3
35:4 36:13,19,25
37:17 38:4,11,15
39:3 40:15,16
43:25 45:20 46:13
46:25 49:6,12
51:23 52:3 53:10
54:15 59:24 61:20
65:17 68:8,11,13
77:1 82:17 84:16
90:7 91:19,21
93:22 98:25 99:24
100:7,16 103:21
104:16,21 105:7
106:21 111:3
116:1,4 117:2
120:14 122:14
124:6 125:11
126:11,14 127:5
128:19 129:6
132:3,15,18,18,21
132:21 133:1
136:14 142:12,19
**thinking**
47:23,25 72:15
**third**

45:18,20 94:23
96:13,19
**thought**
11:7 13:4 25:25
28:10 104:3
**thousands**
52:7,8 54:8
101:12
**threat**
49:10 129:17
130:15 139:9
**threaten**
83:6
**threats**
69:2 139:19
140:14
**three**
5:14 8:9,9,9,10,23
60:16 95:17 97:3
116:25
**time**
8:9 15:13 16:1,16
16:19,23 21:2,4,8
31:9 42:2 49:6,6
53:2,2 67:10
80:15 93:4,15
104:13 115:9
119:8 124:4 125:6
127:4,15 128:25
131:17 144:4,13
**times**
48:12 61:10,14
62:7,8
**tipoff**
133:15
**title**
9:6,13
**today**
5:8 19:7,10 20:6
30:18 63:14 85:8
114:7 115:4,7,15
119:6 126:5
**toilet**
73:19 124:5
**told**
24:20 106:5
**top**
61:20 125:25
**topic**

8:18 9:15 12:14
118:5 122:1
**topics**
9:14,15,21 12:14
**torture**
11:2 12:18 42:24
42:25 46:21 57:6
57:11 146:12
**touches**
12:14
**traffic**
82:4
**trainee**
6:9
**training**
5:21,22,25 6:23
7:3,4 96:6 108:12
**transcribed**
149:7
**transcript**
16:6,10,12 149:5
149:7
**transcription**
148:8
**transcripts**
16:4
**transferred**
128:12 135:21
136:18,20 137:4
137:12
**transit**
21:3 111:19
**translation**
63:16
**transperfect**
149:3
**treat**
122:1
**treaties**
42:8 43:7
**treatment**
95:24 96:11
146:11
**treaty**
40:21 42:11,13
48:20 50:5,21,22
51:1 116:19
**trial**
16:4 53:8,18

104:22,23,25
105:3,13 108:18
108:21 109:10
114:11,13 116:10
116:16 119:25
123:5 126:24
143:1 144:24
146:2
**trials**
22:17 106:7
111:20 115:20
145:6
**tribunal**
103:14 123:5
126:25
**tried**
18:1 80:5 81:4,15
92:2,8 110:1
111:9 121:7 122:3
123:12
**true**
41:20 44:18 113:6
148:7 149:8
**trumps**
47:18
**trust**
66:7 75:13
**try**
17:13 22:11 24:13
25:8 27:10 64:5
72:25 82:2,3,4
84:4 90:9 111:8
121:20
**trying**
49:9 70:7 92:17
122:2
**turkey**
116:25 117:9
**turn**
32:18 124:22
126:24 127:7
135:17
**twisting**
81:14
**two**
8:21,25 12:17
16:13 36:9 53:23
64:14 80:22,24,24
80:25 84:12,12,21

85:25 86:20 87:19
87:22 88:12 110:6
110:7,9,9,9
114:25 116:25
144:14
**type**
67:5

_____
**U**
**uhhuh**
7:23
**uk**
31:19 32:7 37:13
37:13 74:15
**un**
10:25 11:1 116:20
116:20 118:2,4,17
118:25
**unacceptable**
81:1
**underlining**
98:21
**understand**
17:13 21:18 24:10
27:4,24 28:11,19
29:7 30:23 53:5
55:17 66:21 82:24
89:11 91:21 92:6
95:11,17 98:21
109:21 110:17,19
110:20,23,24
111:4,13,17
**understanding**
31:17 112:13
**understood**
51:4 87:23 131:7
131:14 136:10
**undue**
144:2 146:2
**unequal**
82:16,16 95:24
**unfortunately**
25:4
**unified**
86:4,18
**uniform**
44:13 91:25
126:21
**unit**

103:2,4
**united**
1:1 74:24 75:7
118:15 119:10,17
122:23 123:1,9
126:18,19
**units**
103:3
**unity**
102:9
**universities**
7:25
**university**
5:11,15,22 7:24
8:7,16 11:16
14:23 17:16
**unrelated**
93:3,15
**use**
25:25 27:1 51:11
**uses**
132:11 133:13
**usual**
47:2
**usually**
47:1 53:19 58:4
62:14
**usuals**
47:3

_____
**V**
**vague**
20:21 74:2
**variety**
79:19
**various**
133:25
**vary**
27:19
**verbatim**
149:8
**verdicts**
108:7
**verify**
75:16
**version**
14:22
**versus**
22:1 117:9

**victims**
118:7
**view**
45:12 73:12 76:22
77:4 78:6,21,23
78:24 81:2 97:9
97:16 99:19
113:14 115:5
**views**
91:23
**violate**
74:20 76:11 78:23
78:24
**violated**
121:15,17
**violating**
87:1
**violation**
64:5 76:4,24 77:2
79:3,5 141:16,17
**violence**
69:3 73:13 92:1
**virtually**
44:13
**virtue**
42:9 99:10
**vs**
1:8

_____
**W**
**wait**
57:17
**want**
32:19 39:15,19
41:24 45:18 47:4
49:21 50:23 53:7
66:6 68:15 73:16
77:11 79:8 81:7
82:12 83:1 84:1
88:7 89:6 92:25
93:18 94:13,18
96:2 97:3 98:23
101:14 104:7
109:5 114:8,10,10
114:12 121:1
130:22 134:18
135:6 141:11
**wanted**
5:9 67:13 98:11

124:14
**war**
10:5 11:10 44:21
45:7 46:18,19
66:18,18 69:8,18
69:22 71:13
114:22 123:9
125:22
**wars**
66:9
**washington**
3:19
**watch**
71:19,22 72:1
73:2,8,11
**way**
14:4 15:10 28:22
30:21 32:6 41:25
45:2 56:10 77:5
77:10 106:22
115:6 118:24
122:1 141:16
145:11 149:13
**ways**
56:24 110:9
**wearing**
27:13
**weeks**
12:17
**weill**
1:18 2:2 4:2,8,10
5:2,6 14:9,10 30:6
32:14 89:9,9
146:21,23 148:3
148:14 149:4
150:2,24
**weills**
101:17
**welcome**
64:1
**wellregarded**
56:1
**went**
8:8 15:15 124:12
126:10,18
**west**
17:6 22:4 25:3,7
25:10 27:23 30:17
39:21 40:5 59:6

62:5,19 64:3
70:15,24 82:21
83:5 85:16,22
86:3,18 88:9
113:17 128:25
**weve**
89:20 92:22
124:15 147:1
**whatsoever**
71:9 142:14
**wish**
59:11
**withdraw**
85:16
**witness**
20:23 44:22 90:13
94:4 130:8 145:19
146:24 149:4
**wonderful**
74:13,15
**wondering**
40:3
**word**
10:11 28:6 37:22
38:7,14 44:7
50:21 51:15 82:24
110:20 127:16
**wording**
49:7,11,12 99:3
130:4
**words**
34:6 36:3,9 98:19
132:11 133:13
**work**
6:8,12,22 7:2
13:15 15:7 72:9
87:16 108:24
**worked**
73:15
**working**
6:19,24 7:15 64:8
101:10
**world**
112:17
**worth**
104:22 134:6
**wow**
98:5
**write**

109:8 111:2 112:6
**written**
21:25 37:14 49:9
72:2,8 116:24
136:15
**wrong**
70:19 81:21 117:1
**wrote**
22:21 79:12,17
101:6 109:15,15

**X**
**xii**
139:14
**xiii**
138:22 139:3,5,5

**Y**
**yalowitz**
3:3,10 4:3 5:4,5
12:25 13:4,10
14:8,14 20:19
21:22 24:11 26:5
32:1,14,17 38:9
49:17,20 55:4
56:5 63:24 67:1
69:25 70:13 73:24
74:4 75:13,19
76:2 90:4 92:15
94:12 101:16,18
105:20 106:1,8,13
106:16 107:17
108:5,10,16,25
113:3 115:2 124:6
124:11 125:10
129:8 130:10
131:12,22,25
132:4 133:7,23
134:14,17 140:18
141:24 145:23
146:15,17,19,22
146:25 147:3
**yeah**
5:12,19 6:7,7,18
7:9,20,22,25 8:22
8:25 9:1,8,21,24
9:25,25 10:4,17
10:20 12:3,8,10
12:12,22,22,24
13:3,19 14:6,7

15:15,17 16:2
17:1,3,7,8,17
18:13 19:12,19,22
19:24 21:19 22:6
22:10 24:1,9,25
25:20,23 26:4,7
26:25 27:3,12
28:19 29:5,23
31:13,16 32:5,12
33:8,12 34:4,15
34:17,24 35:1,2,4
35:4,4,4,6,8,8,10
35:12,24 36:2,2,4
36:4,5,12,15,23
36:25 37:17,18,18
37:22 38:5,5,23
40:2,7 41:4,9,10
41:11,11,14,14,18
41:21,21,23,23
42:3,7,21 43:8,9
43:11,15,24 44:3
44:5,10,10 45:1,3
45:3,24 46:21
47:1,3,24 48:5,23
49:15 50:8 51:2,7
51:9,9,9,12,16
52:1,15 53:24
54:9,20 55:6,11
55:23 56:21 57:2
57:4,7,9,13,21
58:19 59:3,12
60:15 62:2 65:1
65:19,19,24 66:5
67:9,16 68:24
72:10,14 73:18
75:4,6,10,11 76:9
78:16 83:2,2 85:6
88:4,4,4,4,6 89:4
89:13,18,18 91:20
93:9,11,21 95:10
95:21 96:2,12,21
96:23 97:2 98:10
98:14,17 99:8,20
100:20 101:20
102:24 104:8
105:25 106:5,18
108:15 109:7,15
110:16,21 111:12
111:14 112:10,10

112:12,12,15,21
116:2,14 117:16
117:22,22 118:1,1
118:17 119:4,12
119:14,14,18,19
120:7,16,19 121:6
121:18,22 122:7,7
122:11,19,21
123:6,8,8,10,14
123:16,21,22,23
123:24 124:1,3,5
124:6 126:9,16,20
126:22 127:3,9,11
127:24 128:21
129:4,25 130:18
130:19 132:3,9,10
133:9 134:2,6,10
135:7,7 136:5,14
136:21,23 137:12
137:18 138:5,18
139:11,13,16
140:17 141:25
144:8
**year**
5:17,22 6:23 89:7
114:25 123:6
**years**
5:14 7:17 8:9,10
8:23,25 21:11
80:11 81:10,20
84:24 91:11
101:10 102:15
111:22 114:25
115:12
**yesh**
31:5
**yesterday**
127:14
**york**
1:2 3:7

**Z**
**zones**
86:20

**0**
**000**
51:25 52:1
**04cv397**
1:9

**1**
**1**
3:8,9 4:8 14:9,13
16:20 65:25 67:17
67:18 68:19 88:12
95:14,20 101:14
120:10 137:24
138:8,10,11,12,13
138:13,15,17,18
139:17
**10**
19:18,20 32:18
49:19
**100224690**
3:7
**10764**
1:25
**11**
73:21,23 109:5,8
114:17
**1113**
3:8
**12**
1:20 2:4 5:3
63:18 114:17
117:25 124:8
**124**
4:12
**13**
79:9 84:3 90:25
**134**
4:13,14
**1399**
3:9
**14**
4:8,10 66:13
73:21 79:13,20
**150**
52:1
**16**
96:19 98:1,3,6,6,7
139:5
**160**
51:25
**17**
95:7 96:14,19
98:1,3 117:11,12
134:22,23 135:1
135:14 140:21

**18**
68:12 135:4,5,11
**1940s**
122:17
**1942**
123:7,9
**1949**
21:2
**1958**
37:16
**1967**
17:22 18:4,12
20:9 51:20 54:1
**1977**
65:25 67:6
**1995**
40:3 128:22
**1999**
89:7

---
**2**
---

**2**
4:9 14:10,13
79:12 82:15 83:13
84:2 88:13 90:24
90:25,25 91:1,1,1
94:25 95:1,14,15
95:22,23 138:2,22
139:5 147:6
**2000**
5:18
**200055701**
3:19
**2001**
117:12
**2003**
58:14 61:12
**2004**
76:14 102:10,12
102:15,18 103:1
103:11,22 104:11
106:3
**2005**
103:3
**2006**
57:7 68:9
**2007**
14:19 20:5 51:23
87:7 117:11

**2011**
12:12 84:8
**2013**
1:19 2:3 5:1
63:18 148:5,19
149:5,19
**2026265800**
3:20
**2026265801**
3:21
**21**
25:16 27:11 28:21
29:6 89:19,20,21
105:15,21 106:9
107:11,14,18
108:7,11,17
142:15,24,25
143:5,11,18 144:1
144:10,21 146:2,6
146:10
**212**
3:8,9
**22**
1:19 2:3 5:1
148:5 149:5,19
**24**
32:20,22 73:23
**25**
2:10 33:1,1,10,13
33:17 34:3,6
37:16
**26**
34:11
**27**
34:22 35:3
**28**
35:7,9 124:18
**29**
35:11,13 36:1,18

---
**3**
---

**3**
4:11 32:14,16
121:17 135:10,12
147:1
**30**
36:21 37:1 52:22
144:15
**31**

37:8,12
**32**
4:11 37:19,21
38:6,11,19,20
**32a**
38:22,24
**33**
37:19,21 38:6,11
38:19
**34**
39:5,8
**35**
49:19 112:5
**36**
4:13,14 98:5,8,15
98:16 112:7
**36d**
100:10
**37**
147:1
**38**
147:6
**398**
18:18
**399**
3:6

---
**4**
---

**4**
4:12 47:25 48:6
124:10,15 128:19
128:20 129:14
134:15,22 135:17
135:17 137:13,17
137:21 140:12
147:3,4
**400**
117:11
**42**
123:8
**43**
24:2 33:8 34:17
35:19 36:17
**44**
101:10
**45**
21:11 81:10,20
84:24 111:22
115:12 124:8

**47**
23:5
**4b**
135:24

---
**5**
---

**5**
4:3,13 124:19
134:14,15,16
**50**
52:7
**551**
4:13
**58**
37:15

---
**6**
---

**6**
4:14 39:21,24
134:14,15,16
**634**
4:14
**64**
19:3 20:1,8,24
23:19,23 24:4,14
24:19 99:10
**655**
3:17
**66**
23:19 37:17,18
39:17 63:3 80:4
92:19 94:20 97:9
97:16,18 98:21,23
98:24 110:4,25
114:16,18
**67**
16:8 17:11 52:1
63:17 80:11
102:15
**6th**
13:13

---
**7**
---

**715**
3:8,9
**75**
120:12

---
**8**
---

---
**9**
---

**9**
1:20 2:4 5:3 95:6
101:21,23
**900**
3:18
**90s**
43:2 51:23 52:1
**99**
54:2 57:7,8,9
**9th**
12:17