# EXHIBIT B.114

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - -x
MARK I. SOKOLOW, et al.,
    Plaintiffs,    No. 04 Civ. 00397
           (GBD) (RLE)
vs.
THE PALESTINE LIBERATION
ORGANIZATION, et al.,

    Defendants.
- - - - - - - - - - - - - -x


DEPOSITION OF GARY L. WELLS, Ph.D.
Des Moines, Iowa
Wednesday, October 30, 2013


Reported by:
Debra A. Hoadley
Ref. No.: 10543

---

Page 2

```
 1
 2
 3                  October 30, 2013
 4                     8:42 a.m.
 5
 6
 7          Deposition of GARY L. WELLS,
 8   Ph.D., held at the Doubletree by Hilton
 9   Hotel, 6800 Fleur Drive, Des Moines, Iowa,
10   pursuant to notice before Debra A. Hoadley,
11   a Certified Shorthand Reporter and Notary
12   Public of the State of Iowa.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 3

```
 1            A P P E A R A N C E S:
 2
 3   ARNOLD & PORTER, LLP
 4   Attorneys for Plaintiffs
 5   BY:   CARMELA T. ROMEO, ESQ.
 6         TAL R. MACHNES, ESQ.
 7         399 Park Avenue
 8         New York, NY 10022-4690
 9         (212) 715-1000
10         Carmela.Romeo@aporter.com
11         Tal.Machnes@aporter.com
12
13   MILLER & CHEVALIER
14   Attorneys for Defendants
15   BY:   MICHAEL J. SATIN, ESQ.
16         ANDREW T. WISE, ESQ.
17         Suite 900
18         655 Fifteenth Street, N.W.
19         Washington, D.C. 20005-5701
20         (202) 626-5800
21         msatin@milchev.com
22         awise@milchev.com
23
24
25
```

---

Page 4

```
 1   ----------------INDEX--------------------
 2
 3   WITNESS          EXAMINATION BY    PAGE
 4   GARY L. WELLS, Ph.D.   MS. ROMEO      5
 5
 6   ----------------EXHIBITS------------------
 7   FOR IDENTIFICATION DESCRIPTION        PAGE
 8   Plfs' Exhibit 1  curriculum vitae      6
 9   Plfs' Exhibit 2  Morgan study         21
10   Plfs' Exhibit 3  Wells' expert report  22
11   Plfs' Exhibit 4  People vs. Abney case  26
12   Plfs' Exhibit 5  15 photos          196
13   Plfs' Exhibit 6  E-mail and photo    197
14   Plfs' Exhibit 7  11-20-12 transcript  200
15
16   ----------------REQUESTS------------------
17   7:17 - updated list of publications
18   198:16 - updated documents reviewed list
19
20
21
22
23
24
25
```

Draft Copy

Page 5

1          GARY L. WELLS, Ph.D.,
2  called as a witness, having been first duly
3  sworn by Debra A. Hoadley, a Notary Public
4  within and for the State of Iowa, was
5  examined and testified as follows:
6          DIRECT EXAMINATION
7  BY MS. ROMEO:
8      Q.   Dr. Wells.
9      A.   Yes.
10     Q.   My name is Carmela Romeo.
11     A.   Hi.
12     Q.   And I'm here with Tal Machnes.  We're
13  with Arnold & Porter, and we represent the
14  plaintiffs in the above-referenced action.
15          So have you been deposed before?
16     A.   Yes.
17     Q.   How many times?
18     A.   That's a good question.  I could only
19  estimate probably at least 20.
20     Q.   So you're familiar with the ground
21  rules then?
22     A.   Yes.
23     Q.   So I'll just remind you of a couple of
24  brief ones.
25     A.   Sure.

Page 6

1      Q.   I'm going to ask you a series of
2  questions.  If any of my questions are not
3  clear, please ask me to rephrase, and I will do
4  so.  And if you want to take a break at any
5  point, please also let me know.  We're going to
6  shoot to take breaks every hour, hour and a
7  half, okay?
8      A.   Yes.
9      Q.   So the first thing I want to do is
10  hand you what's going to be marked as Plaintiffs'
11  Exhibit 1.  Just give me one minute, okay?
12          (Plaintiffs' Exhibit 1 marked on
13       the record)
14     Q.   Can you just take a look at it and
15  review it; and when you're ready, just let me
16  know.
17     A.   Yes.
18     Q.   Okay.  What is that?
19     A.   This is my curriculum vitae.
20     Q.   And does that also include a list of
21  your publications?
22     A.   Yes, it does.
23     Q.   And I see on the top of page 1 it says
24  that this is through June 2013?
25     A.   That would be right.

Page 7

1      Q.   Do you have anything to add since
2  then, whether with respect to publications or
3  anything else that's on the C.V.?
4      A.   Probably.  Nothing that significant,
5  but there would be another article or two in
6  press.
7      Q.   Are they relevant to your testimony
8  here today?
9      A.   They would not be something that I
10  would need to rely upon at all, no.
11     Q.   Do they touch upon the subject of
12  eyewitness testimony?
13     A.   Oh, yes.
14     Q.   And do they touch upon the subject
15  of human memory and judgment?
16     A.   Yes.
17          MS. ROMEO:  We ask that you could
18  please produce an updated list of publications
19  reflecting the two articles that Dr. Wells has
20  just referenced.
21     Q.   And so let's talk a little bit about
22  your professional background.  I see from your
23  C.V. you've had a number of teaching positions
24  over the years.  You've also had a number of
25  research positions over the years.  So when did

Page 8

1  you first start studying eyewitness IDs?
2      A.   1974.
3      Q.   And how much of your professional
4  academic career would you say has been devoted
5  to studying eyewitness IDs?
6      A.   Well, it's been continuous throughout
7  that time, and so it would be my dominant area
8  of scholarship.  So I don't know how one would
9  calculate the percentage, but at least half of
10  all my time is spent in research, so most of
11  that time would be on eyewitness ID issues.
12     Q.   And have you ever studied any of these
13  topics in the context of terrorism?
14     A.   In the context of terrorism --
15     Q.   Uh-huh.
16     A.   -- per se, no.
17     Q.   And just to be clear, that would include
18  either domestic terrorism or international
19  terrorism?
20     A.   Right.  I mean, I guess depending on
21  how one defines terrorism, I would say that --
22  no.  I would say, no, not in the context of
23  terrorism per se.
24     Q.   Going on with that, is there literature
25  that does study eyewitness IDs in the context of

1    terrorism that you're aware of?
2        A.   No, I don't think there would be any
3    need for such a literature.  I mean, eyewitness
4    ID is eyewitness ID whether it's in criminal acts
5    or -- you know, domestic criminal acts or terrorism.
6    I mean, the presumption is that psychological
7    processes are the same.
8        Q.   But you would agree that different types
9    of crimes produce different kinds of psychological
10   trauma; correct?
11       A.   That different types of crimes produce
12   different types of psychological trauma?  Well,
13   psychological trauma is psychological trauma.
14   It doesn't matter what contributes.
15       Q.   Well, I'll give you an example.  I
16   mean, is it possible for a victim of a sexual
17   assault to experience different psychological
18   trauma from somebody who is mugged?  At gunpoint.
19   We can add that in.
20       A.   Well, phenomenologically perhaps in
21   terms of -- I mean, it's a different event, but
22   the principles are the same, whether it's being
23   a victim of a mugging or a sexual assault or
24   something that would occur, you know, on a
25   battlefield.  I mean, it's the same -- it's the

1    same brain operating the same principles.
2        Q.   Right.
3             But is it your position that
4    because the processes are generally the same
5    throughout victims of various crimes, that each
6    victim would experience the same type of
7    psychological trauma regardless of the event
8    that they experienced?
9        A.   Well, I don't know exactly how you're
10   using the term "trauma."
11       Q.   By "trauma," I mean in your report you
12   discuss how, for instance, various factors such
13   as fear and stress can affect a person's ability
14   to remember --
15       A.   Right.
16       Q.   -- and to encode details.
17       A.   Right.
18       Q.   And what I'm getting at is whether
19   every single person who is the victim of a crime
20   experiences those factors and are affected across
21   the board in the same manner or whether people
22   have varying responses, depending on the situation
23   that they're presented with.
24            MR. SATIN:  Objection.  Compound
25   question.  You can answer.

1        A.   Well, fear and stress are fear and
2    stress no matter their source.
3        Q.   Correct.
4             Is it your position that people
5    don't process fear and stress differently?
6        A.   From one individual to another?
7        Q.   Correct, from one individual to
8    another.
9        A.   People can try to cope with those
10   stresses and different -- may have different
11   coping strategies.
12       Q.   So then it is your position that a
13   person of a crime, regardless of what the crime
14   is, they would be affected across the board in
15   terms of their memory being impeded?
16            MR. SATIN:  Objection.  Vague.
17       A.   The same kinds of -- if the same kinds
18   of -- if they're experiencing stress and fear,
19   it doesn't matter what its source is.
20       Q.   Can a person who experiences stress or
21   fear make a reliable identification?
22       A.   It's possible, but stress and fear
23   lower that likelihood dramatically.
24       Q.   Is it possible for a victim of a crime
25   to make an accurate identification?

1        A.   Is it possible for a victim of a crime
2    to make -- of course, yes.
3        Q.   Going back to the point of the
4    literature generally, is there literature that
5    discusses eyewitness evidence in the context of
6    crimes that occur in conflict zones?  And I can
7    explain further if you don't understand the
8    question.
9        A.   Well, I think I -- I think I understand
10   the question.  No, there's no presumption that
11   there's any difference between a conflict zone
12   and an event that might occur in a nonconflict
13   zone as long as it's -- you know, in other words,
14   if you -- if you have a gun pointed at you, it
15   doesn't matter if you're in a combat zone or a
16   noncombat zone.
17       Q.   Well, to you what is the difference
18   between a conflict zone and a nonconflict zone?
19       A.   A conflict zone would be one in which
20   I presume there are ongoing animosities among
21   groups.
22       Q.   And then in the nonconflict zone there
23   would be no ongoing conflict; is that right?
24       A.   Well, there would -- there would still
25   be individuals who may be engaged in violent

1    acts.
2        Q.    Right.
3            But the difference is that one can
4    be more continuous and ongoing as opposed to
5    another?
6        A.    Yes.
7        Q.    And is it your position that a victim
8    who lives in a conflict zone where there may be
9    ongoing conflict and may be accustomed or have
10    seen such conflict is going to respond in the
11    same way as a person in a nonconflict zone?
12        A.    Yes.
13        Q.    In your research and work to date, have
14    you primarily focused on crime in the United
15    States?
16        A.    Well, I've focused on how people
17    witness events and variables that influence the
18    reliability of those events.  The United States
19    is no different from anyplace else in the world,
20    humans are humans, in studying the psychological
21    processes.
22        Q.    So you don't think that different
23    cultures play a role into those processes?
24        A.    No.
25        Q.    So then you would say that your work

1    is primarily universal in the sense that you
2    look at a person who has certain psychological
3    processes and that applies across the board?
4            MR. SATIN:  Objection.  Vague.
5        A.    It applies to people, yes.
6        Q.    Right.
7            And that applies to people
8    regardless of whether they live in the United
9    States or whether they live in the Middle East?
10        A.    Yes.
11        Q.    And that applies to a person who is
12    the victim of a sexual assault or of a robbery?
13        A.    Yes.
14        Q.    Have you written any articles on the
15    issue of crime severity?
16        A.    Yes, a very early article just looking
17    at how something that is very mundane might not
18    draw the attention as much as something that is
19    more significant.
20        Q.    Is that still your position today?
21        A.    What?
22        Q.    The position you took in that article
23    where you said that something that is more
24    mundane might not draw attention to details such
25    as a significant event.

1            MR. SATIN:  Objection.  Misstates
2    the testimony.
3        A.    That it might not go as noticed, yes.
4        Q.    So in that publication you state that
5    if the event is more significant.  And actually,
6    can you explain what you mean by "significant"?
7    What does "significant" mean?
8        A.    Well, in that work we just simply
9    looked at whether someone might be a better
10    eyewitness if they saw someone stealing an item
11    that was of more value than some other item.
12        Q.    And what do you mean by "mundane"?
13        A.    By "mundane," I mean more everyday
14    kinds of events.
15        Q.    And in that article what was the
16    result of your study?
17        A.    Well, that someone paid more attention
18    if they were asked to watch over an item that
19    had higher value than if it had lower value and,
20    therefore, were better able to identify later
21    the person who took the item.
22        Q.    So would you agree with me that
23    property theft of higher value is generally
24    categorized as more severe of a property crime
25    as opposed to property theft of a lower value?

1        A.    Sure.
2        Q.    And while we're talking about kind of
3    where the severity of crimes fall, to you in
4    your opinion, where does terrorism fall?
5            MR. SATIN:  Objection.  Vague.
6        A.    At a very extreme level.  Unlike the
7    kind of level in which we were just talking
8    about which just might catch one's attention
9    more, terrorism would begin to invoke notions
10    like fear, distress and arousal.
11        Q.    So is it your position that property
12    theft doesn't invoke fear or stress?
13        A.    It could, but I don't think it did in
14    the work we did.  We were just -- we were at a
15    very low level.  I don't think there's any --
16    certainly no fear or stress.
17        Q.    And if you had to give me a time
18    estimate, how long ago was that, that article?
19        A.    Oh, that was like published in like
20    1978 or 1979.
21        Q.    So you haven't done any work since then
22    on issues of crime severity and how that may
23    impact stress and fear levels?
24        A.    I have not, no.
25        Q.    Have others?

1    A.   Well, not with crime severity per se,
2  but with inducing stress, yes.
3    Q.   And what other studies are there that
4  are out there?
5    A.   Well, there's -- for example, there's
6  a study by Charles Morgan published in, I think,
7  Psychiatry and Law looking at -- what Morgan did
8  was took advantage of the military, U.S.
9  military, interrogation simulations that were
10  attempts to train U.S. military people to resist
11  giving up information, for example, if they were
12  captured.
13        And in that work the military, in
14  some conditions, they would use a very intense,
15  high stressful interrogation.  In other
16  conditions something that was more low level,
17  almost interview-like.  And then to the surprise
18  of these military people later, they're shown a
19  lineup to try to identify their interrogator,
20  and they were much less able to do so and made
21  many more mistakes if it was a stressful
22  experience than if it was not a stressful
23  experience.
24    Q.   So you mentioned that to their
25  surprise they were asked to attempt to identify

1  the person that was administering the
2  interrogation.
3    A.   Yes.
4    Q.   Isn't that different from a victim of
5  a crime who is experiencing the crime and knows
6  that he or she is experiencing the crime and may
7  later need to identify the suspect or the
8  perpetrator?
9    A.   Well, it could be if somehow under a
10  high stressful circumstance, whether there are
11  threats involved and so on, the person's primary
12  motivation for some reason wasn't survival,
13  wasn't attending to the carnage and so on and
14  instead sat around calmly trying to encode or
15  acquire information in some kind of prescient
16  anticipation of a later need to try to identify
17  someone, but that's not what people do.
18    Q.   So then you stand by your earlier
19  statement that the psychological process is
20  going to be exactly the same for the person who
21  is in a military course who is merely trying to
22  survive conditions knowing that they may
23  encounter them later on versus a person who is a
24  victim of a crime and knows that he or she is
25  experiencing the crime?

1        MR. SATIN:  Objection.  Misstates
2  the testimony.
3    A.   Can you repeat that again?
4    Q.   Sure.
5        The point of my question is, you
6  said earlier that psychological processes are
7  the same.
8    A.   Right.
9    Q.   Because people are people.
10    A.   Right.
11    Q.   So we have a situation here where in
12  the Morgan study they asked subjects who
13  underwent a military survival training course to
14  later identify their interrogator; so my
15  question is, do you still stand by your earlier
16  statement that the psychological processes, so
17  of the military recruit subject, would be exactly
18  the same and respond exactly the same as a
19  victim who is experiencing a crime and knows
20  that he or she is experiencing the crime?
21    A.   Well, I think there's a lot going on
22  in your question.  The way I would have to
23  answer it is that the -- yes, the psychological
24  processes would be the same.
25    Q.   So the psychological processes are the

1  same even though the incentive to identify is
2  different?
3    A.   Psychological process in that kind of
4  situation is one of survival, and --
5    Q.   I'm sorry, in which situation?
6    A.   Both.
7    Q.   Okay.  You can continue.
8    A.   Stress and fear have automatic
9  responses in humans, and lower animals I might
10  add; and it's a general principle of psychology
11  that when stress and fear occur, the psychological
12  processes involve one of survival.  And what's
13  congruent with survival is the -- is that the
14  cognitive resources -- we have limited cognitive
15  resources.  Those cognitive resources are geared
16  toward -- are geared toward surviving that
17  situation, which is incompatible with calmly
18  forming memories, so stress and fear impair
19  memory for detail.
20    Q.   In the Morgan study, was there a 0
21  percent identification rate in the high-stress
22  situations across the board?
23    A.   0 percent?
24    Q.   Yes.
25    A.   No.

Page 21

1    Q.   So it is the case that under high-
2  stress situations one can make an identification?
3    A.   Well, it was pretty close to guessing,
4  so when you guess, you can sometimes get things
5  right.
6    Q.   What's your basis for saying that it
7  was pretty close to guessing?
8    A.   Well, if you guess in a five-person
9  lineup, one out of five are going to identify
10  the right person.
11    Q.   But what is that based on?  Is that
12  based on the study or is that based on --
13    A.   Yes.
14    Q.   What part of the study is that based
15  on?
16    A.   It's based on the data in the study.
17    Q.   So I'm going to -- give me one second.
18  We're going to mark the Morgan study as
19  Plaintiffs' Exhibit 2.
20       (Plaintiffs' Exhibit 2 marked on
21       the record)
22    Q.   And just take a moment to flip through
23  that and let me know when you're finished.
24    A.   Okay.  I guess I have two copies here.
25  I thought that was a little thicker than I

Page 22

1  remembered it.  Okay.
2    Q.   Now, do you usually cite to the study
3  in your reports?
4    A.   Do I usually?
5    Q.   Yes.
6    A.   Pretty commonly, sure.
7    Q.   And in your expert report in this
8  case, was this the only study that you cited on
9  the point for fear and stress affecting the
10  plaintiff Varda Guetta's identification in this
11  case?
12    A.   I don't know.  I'd have to see my
13  report.
14    Q.   Give me one moment.  We will mark that
15  as Plaintiffs' Exhibit 3.
16       (Plaintiffs' Exhibit 3 marked on
17       the record)
18    Q.   You can take a look at that and then
19  let me know when you're finished.
20    A.   Okay.  Well, at this point I don't
21  even see where I cited Morgan.
22    Q.   I can point you to that.  Why don't
23  you take a look at page 3, Footnote 1.
24    A.   Right.  Yeah, okay.  Looks like in
25  answer to your question, that's the only study

Page 23

1  that I cited on that point.
2    Q.   Okay.  So let's turn to the Morgan
3  study, and let's turn to page 272 of the Morgan
4  study.
5    A.   Uh-huh.
6    Q.   And this goes back to my earlier
7  question, whether there was a 0 percent rate of
8  identification across the board in situations of
9  high stress.  Is that the case?
10    A.   Right.  Oh.
11    Q.   It's not the case; correct?
12    A.   No, and I said it wasn't the case, right.
13    Q.   So we talked about the methodology of
14  the study, which is that Dr. Morgan asked subjects
15  after they underwent a military survival training
16  course --
17    A.   Uh-huh.
18    Q.   -- to attempt to identify their
19  interrogators?
20    A.   Right.
21    Q.   Can you tell me a little bit about the
22  interrogations and what the difference is between
23  the high-stress and the low-stress interrogations?
24       MR. SATIN:  Objection.  Compound
25  question.

Page 24

1    A.   Well, only in the sense that the high-
2  stress interrogation was threatening.  It was a
3  high-intensity exchange meant to stress the
4  individual, and the low-stress interrogation was
5  more interview-like.
6    Q.   And when you say intended to stress
7  the individual, that's for purposes of the
8  military survival training course?
9    A.   Right.
10    Q.   Because those subjects may later have
11  experienced conditions similar to that, and the
12  purpose of the course was to prepare them for
13  that?
14    A.   Yes.
15    Q.   Do you know what "high intensity"
16  means?  What kind of threat were the subjects
17  exposed to?
18    A.   Well, I don't -- I don't recall them
19  being highly explicit about that.  I mean, I
20  could look here and try to refresh my memory on
21  that.  Is that what you'd prefer I do?
22    Q.   Well, why don't you take -- I'll
23  direct your attention to page 268 to -69.
24    A.   All right.
25    Q.   And if you go to the last paragraph

Page 25

1  and you read that going on to page 269. And you
2  can let me know when you're finished.
3       A.   Okay. I'm finished.
4       Q.   Does that refresh your memory at all
5  as to what the high-stress interrogations
6  entailed?
7       A.   Well, it refreshes my memory as to
8  what they said it entailed, yes.
9       Q.   And what's your understanding of that?
10      A.   That there was high-stress interrogation
11 involved, physical confrontation; where the low-
12 stress interrogation involved no physical
13 confrontation, but instead attempts to sort of
14 trick the witness.
15      Q.   So it's your position that this is
16 your understanding of what the high-stress
17 interrogation entailed, what's in this study?
18      A.   Well, that's my understanding. My
19 understanding can only be what they -- what they
20 say.
21      Q.   So you don't know what types of
22 physical confrontation these subjects were
23 exposed to?
24      A.   They're not specific about that.
25      Q.   Okay. I'm going to mark this as --

Page 26

1  not this one, excuse me. We're going to mark
2  the next exhibit as Plaintiffs' Exhibit --
3            MS. ROMEO:  What are we on now, 4?
4  5?
5            THE COURT REPORTER:  4.
6            (Plaintiffs' Exhibit 4 marked on
7        the record)
8       Q.   Do you recognize this?
9       A.   No.
10      Q.   Have you ever seen it before?
11      A.   Not to my knowledge, no.
12      Q.   Let's turn to -- it's going to be the
13 Westlaw cites page 26 to 27. I'll tell you
14 exactly what page that is, though, of the
15 document. And just for the record, this is a
16 case called People versus Abney. The cite is 31
17 Misc.3d 1231(A) 932 N.Y.S.2d 762, 2011 WL
18 2026894 in the New York State Supreme Court.
19           And if you turn to page 15 of the
20 actual document, you'll see that there's a 27
21 with a star in the middle of the page. Just let
22 me know if you are following along. You're
23 correct, it's right there.
24      A.   Okay.
25      Q.   So why don't you take a look at this

Page 27

1  and then let me know when you're finished.
2       A.   Okay.
3       Q.   And then before we discuss it, why don't
4  you also -- we're going to turn to Footnote 35,
5  which is on page 32 of the document, and it's
6  the very first footnote. Just take a look at
7  that.
8       A.   Okay.
9       Q.   So you've never seen this case before;
10 correct?
11      A.   Right.
12      Q.   And were you aware that there was
13 testimony in the New York State Court by another
14 expert, Dr. Nancy Franklin, who at least at the
15 time was a professor at Stony Brook, New York,
16 who testified that she learned during a
17 telephone conversation with Dr. Morgan that the
18 high-stress interrogations involved violent acts
19 such as waterboarding or having a loaded gun
20 placed to their heads?
21           MR. SATIN:  Objection. Compound
22 question.
23      A.   I'm unaware of that.
24      Q.   And the study does acknowledge that
25 there was food and sleep deprivation, correct,

Page 28

1  for the subjects?
2       A.   For everyone.
3       Q.   Correct. It does; is that what you're
4  saying?
5       A.   Yes.
6       Q.   Right.
7            And also after this initial period
8  of food and sleep deprivation, the subjects were
9  then confined in separate cells. Is that your
10 understanding as well of the study?
11      A.   For everyone, both high and low stress.
12      Q.   And then they went on and, to their
13 surprise, were asked to identify their
14 interrogator?
15      A.   Yes.
16      Q.   Do you have any reason to believe that
17 the plaintiff Varda Guetta in this case was
18 deprived of food and sleep for forty-eight hours
19 before she was driving down the road upon which
20 there was a shooting attack against her?
21      A.   No, but I think it's irrelevant.
22      Q.   Do you have any reason to believe it?
23      A.   No.
24      Q.   Do you have any reason to believe that
25 she was confined to a solitary cell for a

Page 29

1  certain number of hours prior to being shot at?
2      A.   No.
3      Q.   Do you have any reason to believe that
4  she was waterboarded before she was shot at?
5      A.   No.
6      Q.   And even though she was shot at, did
7  she have a loaded gun in her face or to her
8  head?
9      A.   No.  She was too far away from the
10  shooter for that.
11      Q.   Well, she was being shot at by the
12  shooter from his car --
13      A.   Right.
14      Q.   -- to her car.
15      A.   Right.
16      Q.   So why is this study relevant?
17      A.   Because they induced stress, and they
18  showed that stress impaired their ability to
19  identify the person later.
20      Q.   Not across the board.  There were
21  people that were in the high-stress interrogation
22  settings that did make accurate identifications,
23  whether they were positive or negative ones;
24  correct?
25      A.   Right.  I mean, they made a lot of

Page 30

1  misidentifications.  Some of them did pick out
2  the right person, but at a greatly impaired
3  level of performance.
4      Q.   If your position is that everyone
5  experiences this type of psychological trauma in
6  the same way, then how could it be that anybody
7  made an accurate identification, even if it was
8  one person?  How is that possible?
9      A.   Well, you still -- you still get bits
10  and pieces of information, and those bits and
11  pieces might allow you to do better than chance,
12  which is all we're seeing here.  It's just
13  better than chance.
14      Q.   Before we move on, let's talk about
15  another point in the Morgan study.  If you go to
16  page 272.  We're going back to Exhibit 3.  Just
17  let me know when you're there.
18      MR. SATIN:  I have this as
19  Exhibit 2.  Is this Exhibit 3?
20      MS. ROMEO:  Oh, I'm sorry.  Is it
21  Exhibit 2?
22      THE WITNESS:  Correct.
23      MS. ROMEO:  You may be correct.
24      Q.   So Exhibit 2.
25      A.   I am there.

Page 31

1      Q.   The one finding that I found
2  interesting, and maybe you can tell me why you
3  think this is, is that there was a hundred
4  percent identification rate in both the high-
5  stress and low-stress conditions for true
6  negative responses in the sequential photo
7  method.
8          So first of all, can you explain
9  to me what a sequential photo method is?
10      A.   Yes.  It's where you're presented with
11  photos one at a time and you have to make a
12  decision on each before you can get to the next
13  one.
14      Q.   And can you explain to me what a true
15  negative response is?
16      A.   A true negative is where you reject --
17  where you reject, hence the negative, correctly.
18      Q.   So that would mean that the interrogator
19  was not in the lineup and the subject correctly
20  noted that the person was not in the lineup?
21      A.   The witness did not identify anyone.
22      Q.   Is achieving a 100 percent rate common
23  in any of these studies?
24      A.   No, but it's also uncommon to only
25  test ten people there.

Page 32

1      Q.   So usually how many people does a
2  study need for there to be a better
3  representative sample?
4      A.   With these kinds of data, which are
5  what we call a dichotomous data, you know, you
6  need -- you need at least 30 to stabilize, to
7  have any kind of meaningful statement.
8      Q.   Just looking through these numbers, it
9  seems like there are quite a number of low
10  subjects.  There's the live lineup method for
11  true negative responses, 38 people.  Photo-
12  spread method, 23 people.  Sequential photo
13  method for false negative responses, 41 people.
14  Photo-spread method for low stress, 24 people.
15      A.   And where did you see the 21?
16      Q.   The 21 is -- maybe I misspoke.  Sorry,
17  24.  So the photo-spread method in the low
18  stress was 24.  There's also photo-spread method
19  for true negative response, 23.  And then we've
20  got a bunch of numbers in the forties and the
21  fifties.
22          So if your position is you need at
23  least 30, then aren't many of these examinations
24  of the various identifications flawed?
25      A.   Well, if you break it down too finely

Page 33

1  they are; but if you collapse over high and low
2  stress, you have large ends.
3      Q.  But you feel this is the best study
4  that you can cite to in this field?
5          MR. SATIN:  Objection.  Vague.
6      A.  I think it's -- I would say it's
7  probably the best that the field has on the
8  stress question.
9      Q.  One other thing.  Let's go back to the
10  sequential photo method and the hundred percent
11  rate.  Do you know what instructions those
12  individuals were given prior to making the
13  identification?
14      A.  I would have to look.  Want me to
15  look?
16      Q.  Sure.  I'll direct you to it.  Why
17  don't you take a look at 270.  And you can take
18  a look at the second large paragraph with the
19  concluding, so it's basically Section 2.3.
20      A.  Okay.
21      Q.  So what instructions were they given?
22      A.  Well, they're just given instructions
23  to write, to indicate yes or no to each photo,
24  and then to indicate 1 to 10 where that's meant
25  to reflect their level of confidence or

Page 34

1  certainty.
2      Q.  Were they also instructed that once
3  they chose a person, to hand in their paper and
4  then put down their head on their desk?
5      A.  Once they chose a person, they were --
6  the procedure was stopped, yes.
7      Q.  For that person?
8      A.  Right.
9      Q.  All of these subjects were assembled
10  in one classroom, though; correct?  That's what
11  the beginning of the second paragraph says, "Once
12  the subjects were assembled in the classroom"?
13      A.  Yes.
14      Q.  So they were all in one classroom.
15  And a sequential lineup is, as you explained,
16  one photo coming up at a time, and each subject
17  was given one full minute to view each photo;
18  correct?
19      A.  Right.
20      Q.  So a true negative rate means that the
21  person was -- they said that the person who
22  interrogated them was not in the lineup; correct?
23      A.  But they never said yes to any of them.
24      Q.  Right.
25          So wouldn't that mean by the end,

Page 35

1  by the last picture, every single person's head
2  would still be up and not one person would have
3  put their head down?
4      A.  That would be a logical conclusion.
5      Q.  So is that one reason that there
6  was -- potentially a reason, that there could
7  have been a hundred percent rate achieved in
8  both categories?
9      A.  I mean, I don't think it's a great
10  procedure, but the sequential procedure does
11  produce fewer false IDs.
12      Q.  But in this case for the 100 percent
13  rate that was achieved in this study, could that
14  have been a reason why that rate was achieved?
15      A.  I suppose it's possible.
16      Q.  So when you choose to put a study in
17  your report, do you look at the methodology and
18  evaluate all of those factors?
19      A.  Sure.  I make a judgment about any
20  study that I cite.
21      Q.  And did you do that with this one?
22      A.  Certainly.  I mean, it's been quite a
23  while since I read it, but, yes.
24      Q.  When was the last time you read it?
25      A.  It's probably been four or five years,

Page 36

1  anyway.
2      Q.  When did you draft your report in this
3  case?
4      A.  Earlier this year.
5      Q.  Can you give me an approximate time?
6      A.  The report has a date on it, doesn't
7  it?  Maybe it doesn't have a date on it.
8      Q.  I believe it does.
9      A.  I would say July 15, 2013.
10      Q.  That's correct.
11          So you didn't read the study while
12  you prepared this report?
13      A.  I didn't feel I had to.
14      Q.  So you didn't.  You decided to cite to
15  it?
16      A.  Oh, I read the study before the report.
17  I've probably read it five times.
18      Q.  Right.
19          But my question is, did you read
20  the study while you were preparing your report
21  in connection with this case?
22      A.  No.
23      Q.  What about the other studies in your
24  report?  Did you read them while you were
25  preparing your report in this case?

Page 37

1    A.   I don't feel like I have to
2  necessarily read them all again.  I know the
3  conclusions.  I know my original judgments on
4  them.
5    Q.   But wouldn't you say that the way that
6  a study is conducted has a very big impact on
7  the validity of its conclusion?
8    A.   Right.
9    Q.   So if you were presented with a study
10 where you felt it was methodologically flawed --
11   A.   Right.
12   Q.   -- would you put it in your report?
13   A.   No.
14   Q.   Would you put it in your report even
15 if other people cited to it in the field?
16   A.   No.
17   Q.   So do you feel that this is a
18 methodologically sound study?
19   A.   For the purpose of the point I made.
20   Q.   And what's that purpose of that point?
21   A.   Stress interferes with memory for
22 details.
23   Q.   How could the conclusion be reliable
24 if in order to get to that conclusion, the
25 procedures were flawed, or may have been flawed?

Page 38

1    A.   I'm not looking at the little ten
2  people who in the sequential procedure were
3  shown what we call an absent lineup.  I'm
4  looking at the overall results when you collapse
5  across these and consistently show that
6  performance is weaker in the stress conditions.
7    Q.   But isn't a whole made up of parts?
8         MR. SATIN:  Objection.
9  Argumentative, vague.
10   Q.   For example, if the underlying
11 information is flawed, how could the results be
12 accurate?
13   A.   Well, even if you ignore that cell,
14 you still have plenty to look at, and there's --
15 that cell is contributing very little to anything
16 that's there.
17   Q.   Is that even the case --
18   A.   Moreover, the procedure was the same
19 whether it was -- the sequential procedure that
20 you're talking about, whether it was stress or
21 no stress, so it can't explain the stress
22 variable to focus on something about that
23 procedure.
24   Q.   So then you stand by your use of this
25 study in your report?

Page 39

1    A.   I stand by the idea that this study
2  supports, helps support, the proposition that --
3  and the general assumption and the psychological
4  literature that stress impairs memory, doesn't
5  help memory.
6    Q.   But you would agree that this does
7  not, by any means, definitively establish that?
8    A.   No single study can.
9    Q.   So that's all it is.  It's an assumption
10 based on research that's conducted by various
11 people; correct?
12        MR. SATIN:  Objection.  Misstates
13 the testimony.
14   A.   Well, that's what all scientific
15 assumptions and conclusions are based on,
16 research conducted by various people.
17   Q.   So let's move on to -- let's talk
18 little bit about your experience as an expert
19 witness.  At the beginning of this deposition,
20 you testified that you have testified
21 approximately 20 times; is that correct?
22   A.   It's a guess.
23   Q.   A rough estimate is fine.  You don't
24 need to --
25   A.   That would be approximately right, I

Page 40

1  think.
2    Q.   And that's over the course of your
3  career?
4    A.   Right.  Although your question was --
5  you know, I'm not a lawyer, so when you said
6  "testified," I assume that -- so you mean even
7  if it's just a deposition --
8    Q.   Yeah.  So let's --
9    A.   -- and it never goes to trial.
10   Q.   Yeah.  I'll be more specific.
11   A.   Okay.
12   Q.   When I say "expert witness," right now
13 just for purposes of getting an idea of your
14 experience, I just want to know everything, so
15 deposition testimony as well as trial testimony.
16   A.   Okay.  Then I would -- I would say 20
17 is about right.
18   Q.   20 is about right.  Okay.
19        And on average, how many cases are
20 you retained to do expert work in over the course
21 of a year?
22   A.   I agree to no more than two in any given
23 year.
24   Q.   And what's the breakdown for plaintiffs
25 and/or the state, depending on if it's civil or

1  criminal, versus defendants?  What's the
2  breakdown?  Who do you usually work for?
3    A.   Well, I haven't given expert testimony
4  in a criminal trial for probably fifteen years.
5  I just don't do it.  I refer all those cases to
6  other people, so -- and then in the civil trials
7  it's -- they've all been for the plaintiffs.
8    Q.   And is there a reason why you don't
9  testify in criminal trials anymore?  Why the
10  change?
11    A.   Because I don't have time, and I find
12  that they're less interesting.
13    Q.   Why do you find them less interesting?
14    A.   Because most of them are pretty
15  run-of-the-mill robbery cases and other things,
16  and usually the discovery processes are -- you
17  don't learn a lot about what really happened.
18  Civil cases you tend to learn more, although
19  this case may be an exception to that.
20    Q.   So prior to that, did you testify in
21  criminal trials?
22    A.   I did, some.
23    Q.   Now, with respect to the civil cases,
24  what type of civil cases?  You said you usually
25  represent plaintiffs, so --

1    A.   Right.
2    Q.   -- what's the subject matter of these
3  cases?
4    A.   Well, it's eyewitness identification.
5  They are cases in which a person was convicted
6  based on primarily or sometimes exclusively
7  eyewitness identification evidence.  And the --
8  and it was proven to be a wrongful conviction,
9  overturned, and then the question is what were
10  the procedures that were used by investigators
11  to obtain that identification and in what ways
12  were those procedures flawed, if they were
13  flawed.
14    Q.   And the convictions were overturned,
15  you said.  Is that because of DNA evidence?
16  What other sorts of things?
17    A.   DNA, fingerprints leading to the real
18  perpetrator who then confesses.  You know,
19  anything that -- mostly DNA cases, but anything
20  that would prove definitive enough for a court
21  of law to step in, free the person from prison
22  and declare them innocent.
23    Q.   Here this is a civil case; correct?
24    A.   Right.
25    Q.   But you're actually representing a

1  defendant.
2    A.   Yes.
3    Q.   Or you're working with defendants.
4    A.   Yes.
5    Q.   Is this the first case that you've
6  worked with the defendant on the civil side?
7    A.   Yes.
8    Q.   And is this also the first case that
9  you're working with on the civil side where the
10  ID is not known to be either accurate or
11  inaccurate?
12    A.   Well, it depends on -- I would have to
13  answer that in a more nuanced fashion, because
14  there have been some cases in which despite a
15  Court declaring a person innocent, the defense
16  wants to maintain the idea that but maybe they
17  did it anyway.  So there sometimes is a
18  contention that or a failure to stipulate that
19  the person was innocent.
20    Q.   But in those cases the defendant is
21  still usually the city or the county or
22  something of that sort?
23    A.   Yes.
24    Q.   And the basis for the conviction,
25  which was primarily the ID, was still overturned

1  for some reason; correct?
2      MR. SATIN:  Objection.  Vague.
3    A.   Yes.
4    Q.   So then this is the first case where
5  we have no idea whether her ID is right or wrong
6  that you're testifying in?
7      MR. SATIN:  Objection.  Misstates
8  the record.
9    A.   Correct.  I think that's why I was
10  retained, is to speak to that issue.
11    Q.   Right.
12      But what I'm trying to get at and
13  just to get a clear answer for the record, prior
14  to this case, none of your prior expert work has
15  been in a civil case where the perpetrator or
16  suspect has not yet been convicted of anything
17  and all you have is an ID and we don't know
18  whether it's accurate or inaccurate; is that
19  right?
20    A.   Yes, I believe that would be correct.
21    Q.   Have you ever testified in a case that
22  involved acts of terrorism?  And by "terrorism,"
23  you know, we can go forward with the definition
24  of domestic or international.
25    A.   No.

Page 45

1    Q.   Is this your first antiterrorism act
2  case?
3    A.   First what?
4    Q.   Antiterrorism act case that you're
5  testifying in?
6    A.   Yes.
7    Q.   Are you aware that this case is
8  brought under the antiterrorism act in part?
9    A.   I don't know.  No, I wasn't aware of
10 that.  It's irrelevant to me.
11   Q.   Have you been involved in any other
12 case that involves the PA, the Palestinian
13 Authority?
14   A.   No.
15   Q.   What about the Palestinian Liberation
16 Organization?
17   A.   No.
18   Q.   Let's talk about now the substance of
19 your prior expert experience.  You explained to
20 me that you used to testify in some criminal
21 trials.
22   A.   Yes.
23   Q.   What was the scope of your expert
24 opinion in those cases?  What did you opine on?
25 What was the purpose of your expert opinion?

Page 46

1        MR. SATIN:  Objection to compound
2  question.
3    A.   The purpose of the expert opinion was
4  to assess the various factors that might bear on
5  the reliability of the identification evidence
6  that's being used in the case.
7    Q.   And did you ever opine on whether the
8  ID at issue in a criminal case was, in fact,
9  reliable or unreliable?
10   A.   As long as I was asked that question,
11 I answered that question, yes.
12   Q.   So in a criminal case you've testified
13 as to whether an ID based on the facts of that
14 case is reliable or not reliable?
15   A.   I have, although most prosecutors will
16 not ask that question.  And if the question gets
17 asked, I wait to see if the Court's going to
18 allow me that opinion, and they have a couple of
19 times, but --
20   Q.   But not all -- oh, finish.
21   A.   But my -- but in general I try to -- I
22 restrict my testimony to the question of whether
23 under the circumstances an identification could
24 be reliable.  I try to not speak to the ultimate
25 issue of whether the defendant is guilty, which

Page 47

1  is a totally different question.
2    Q.   So in civil cases these have all
3  involved cases where the ID is known to be
4  inaccurate, wrong for some reason?
5    A.   Yes.
6    Q.   And the scope of your expert opinion
7  in those cases, can you tell me what the purpose
8  of your opinion in those cases is?
9    A.   To talk about the procedures that were
10 used for obtaining the identification, how did
11 this mistake happen.
12   Q.   So then what's the purpose of your
13 expert testimony in this case?
14        MR. SATIN:  Objection.
15   A.   To speak to the reliability of an
16 identification that would occur under these
17 circumstances.
18   Q.   Could you not get to the same result
19 by just identifying the factors that may affect
20 the ID or may not affect the ID?
21   A.   I'm not sure I understand the question.
22   Q.   My question is really, is the second
23 part of your report necessary to effectuate that
24 purpose?
25   A.   Well, ultimately there's an integration

Page 48

1  of the prior material, like taking into
2  consideration the science that we know on
3  eyewitness identification, how memory works and
4  so on and to make a statement that integrates
5  that about the reliability of the identification.
6    Q.   But by making -- let me back up for
7  one moment.
8        So it's your position that the
9  question of whether an ID is reliable or not
10 reliable is different from the ultimate question
11 of whether a suspect, in fact, committed the
12 crime, the ultimate issue?
13   A.   Yes, because you can use a totally
14 unreliable procedure, but let's suppose -- for
15 example, let's suppose that you have a case
16 where it was pitch-dark.  We know that the human
17 eye can't see in that light.  I'm just using a
18 hypothetical here.
19   Q.   Uh-huh.
20   A.   Where if we had that, for example, we
21 could say that any subsequent ID itself is
22 unreliable, but the question of whether the
23 defendant is guilty would have to rest on other
24 evidence.  So what it's saying is this is not
25 evidence.  The ID is not evidence.  If you've

1    got something else that speaks to the question
2    of guilt, that's another matter.
3         So I'm not making a statement
4    about whether the -- let's say, the suspect in a
5    criminal case is guilty.  That's for the Court
6    to decide.  What I'm saying, what I might say,
7    though, is that this is not evidence of it.
8         Q.   Well, isn't it the jury's position to
9    assess the weight of evidence?
10        A.   The weight of a -- of a -- of course
11   it is, the weight of a category of evidence,
12   so --
13        Q.   So when you opine that an ID is not
14   reliable, it's your position that that ID should
15   be taken away from the jury; is that correct?
16        A.   Not necessarily.  That's up to the
17   Court to decide.  My opinion would be that the
18   ID is unreliable.  It's up to the Court to decide
19   whether to take it away or not.
20        Q.   But if the ID is not --
21        A.   The Court might allow it and also
22   allow me to say that I think it's unreliable.
23        Q.   Is it your position that an unreliable
24   ID is not evidence?
25        A.   Yes, by definition, I think.

1         Q.   So if it's not evidence, why should it
2    go before a jury?
3         A.   That's up to the Court to decide.
4         Q.   So why are you rendering an opinion on
5    whether it's reliable?
6         A.   Well, the Courts often say let it go
7    to weight, let it go to the jury, let the jury
8    hear what Dr. Wells has to say and decide
9    themselves.
10        Q.   So do unreliable -- let's define a
11   couple of terms.
12             What does "reliable" mean to you
13   in the context of eyewitness evidence?
14        A.   "Reliable," assuming it's -- in the
15   context of eyewitness evidence, "reliable" is
16   similar to what the Court would call or Courts
17   would call probative value; that is, does it --
18   you know, with or without this evidence, does it
19   make it more or less -- does the presence or
20   absence of this evidence make it more or less
21   likely that the ultimate question to be decided
22   would go one way or another.
23        Q.   And what does "unreliability" or
24   "unreliable" mean in the context of eyewitness
25   evidence?

1         A.   It means that the presence and absence
2    of this evidence does not actually change the
3    probability of the ultimate fact.
4         Q.   And if I use the term "accurate
5    identification," what does that mean to you?
6         A.   An accurate identification is just
7    simply when a witness identifies someone who
8    also turns out to be the perpetrator.
9         Q.   And an accurate ID can be reached from
10   either an unreliable ID or a reliable ID?
11             MR. SATIN:  Objection.  Vague.
12        A.   Well, an accurate ID can be reached
13   through an unreliable process through -- by a
14   number of means.
15             One is, for example, if someone
16   used the dark room example again; right?  I
17   mean, if prior to the lineup or photographic
18   lineup or any other kind of identification
19   procedure someone were to tell the witness,
20   "Hey, pick Number 3," right, that's an unreliable
21   identification.  But if Number 3 happens to be,
22   in fact, the perpetrator, it would be an
23   accurate identification.  That would be among
24   the sort of illegitimate ways in which a
25   reliable ID sort of manages to get the right

1    answer anyway.
2         Q.   And then an inaccurate ID, from my
3    understanding, would be an ID that turns out to
4    be, in fact, false, so like a DNA exoneration
5    case, for example?
6         A.   Yes.
7         Q.   So reliability and accuracy are
8    different concepts; is that right?
9         A.   They are.
10        Q.   And as we've just discussed, an
11   unreliable ID can still yield an accurate
12   identification?
13        A.   Despite being unreliable.
14        Q.   And a reliable ID could yield an
15   inaccurate identification despite its being
16   reliable?
17        A.   It could by those definitions, yes.
18        Q.   So your expert opinion then in this
19   case, just explain to me one more time what the
20   purpose of it is.
21             MR. SATIN:  Objection.  Asked and
22   answered.
23        Q.   Using these terms that we've just
24   defined.
25             MR. SATIN:  Asked and answered.

1    A.    Is to speak to the reliability of the
2  identification.
3    Q.    And in order to speak to the
4  reliability of the identification, what do you
5  need to do?  How do you assess whether an ID is
6  or is not reliable?
7    A.    Well, you assess all of the known
8  relevant factors, so you assess the conditions
9  of -- the known conditions that existed for
10  purposes of acquisition, of a reliable memory
11  trace; the storage of what we call retention
12  phase, things that might have happened during
13  that time of retention, the length of the
14  retention and so on.  And then you assess also
15  the retrieval phase, that is by which we mean
16  primarily the methods that were used for testing
17  that memory, the identification methods.
18    Q.    But this is really only kind of part
19  one; right?  You would also assess the actual
20  identification procedure; correct?
21    A.    That's the third.
22    Q.    That's the third one?
23    A.    Yeah, that's part of retrieval.
24    Q.    Okay.  So can you just elaborate a
25  little bit on the retrieval factor?

1    A.    Well, retrieval, successful -- you
2  know, successful retrieval or, you know what I
3  mean, retrieval can have lots of various kinds
4  of biases in the test.
5       And so, for example, if you use a
6  method in which you, let's say, put in front of
7  the witness a number of people, or photos of
8  people, who any one of which would be construed
9  as a suspect if picken -- if picked, that's an
10  unreliable procedure in and of itself regardless
11  of what preceded it.  The end product can't be
12  better than any one of the steps along the way.
13       The problem with that one, of
14  course, is that it's not really a test.  It's
15  not a controlled test of the witness' memory at
16  all in the sense that there's no known way to
17  fail it.
18    Q.    So going back to what you just said
19  that the end product can't be better than the
20  steps?
21    A.    Right.
22    Q.    So if it's your opinion that the
23  chances of acquisition -- let's take this
24  step-by-step.  That the chances of acquisition
25  are so low as to be almost at -- you know,

1  almost zero here, okay --
2    A.    Uh-huh.
3    Q.    -- why is it relevant to go on to
4  retention?
5    A.    You would always -- you would always
6  assess all three levels.  You know, when you --
7  you can't say -- with some exceptions.  I mean,
8  there are exceptions.  We know, for example --
9  so let me give -- let me give the nuanced answer,
10  I guess.  You're being patient with me on this.
11    Q.    Sure.
12    A.    But if, for example, at the level of
13  acquisition we could truly say that it was zero,
14  then one could argue that anything that follows
15  that isn't necessary.
16       So, for instance, we know that,
17  you know, if illumination is zero, human vision
18  doesn't work.  We know that -- for example, we
19  know now from controlled studies that if someone
20  is 300 yards away, it's the same as it being
21  pitch-dark, even if it's the bright part of the
22  day.
23       So again, the acquisition is
24  functionally zero; but unless you have something
25  that's that extreme and you can definitively say

1  it's zero, you're always going to look at the
2  other -- the other stages of memory.
3    Q.    And that would be the same if even at
4  the retention stage the chances are so low, you
5  would still go on to retrieval?
6    A.    Right.
7    Q.    If the acquisition and retention
8  variables together are so low, so the
9  opportunity to view the lighting, et cetera, as
10  well as retention, so let's just say the ID
11  takes place after a long period of time, how
12  could an ID ever be reliable looking at
13  retrieval factors?
14       Let's say you have that situation
15  with poor acquisition and retention variables
16  and you have the most optimal procedure used for
17  retrieval.  How would that affect your analysis?
18    A.    Well, it would still -- you know,
19  obviously it would still be -- in the end the
20  analysis would still be no better than the --
21  than the poor previous two stages that preceded
22  it.  But generally speaking, what happens is
23  that if you have very extremely poor conditions
24  at acquisition, extremely unfavorable conditions
25  during the retention or storage phase, right,

Page 57

1  that if you then use a pristine procedure at
2  retrieval, you're not going to end up with a
3  contentious outcome in the first place because
4  the witness can't perform the task.
5      Q.   So in that situation it's not
6  necessary to analyze retrieval?
7      A.   For purposes of the thoroughness of
8  any report, you would do all three no matter
9  what.  You would never stop that process.
10     Q.   And in assessing these three
11 variables, what are the sorts of materials that
12 you usually review?
13     A.   Whatever's available that bears on
14 them.  So any kind of reports that were taken at
15 the time, statements of witnesses, known factors
16 that were documented; things like any kind of
17 description, verbal description, that the
18 witness was able to give of the perpetrator; any
19 statements that a witness might have made about --
20 early on about their viewing conditions.
21           You're looking for consistency
22 across time in those documents and basically
23 trying to create convergence on anything that
24 bears on the reliability.  So early statements,
25 police reports, other kinds of reports,

Page 58

1  depositions, materials, like if there were
2  photos involved, and so any kind of -- I'm
3  always asking for any kind of document that can
4  bear on any of those questions.
5      Q.   So say you have a situation where a
6  crime occurs and it's some time before the
7  actual ID is made, but throughout that course
8  the witness is showed various pictures.  So, you
9  know, like at Point A in time the witness is
10 showed a couple of pictures.  Then Point B the
11 witness is showed another couple of pictures and
12 either says she thinks it's the person or maybe
13 it's not the person.  Is that relevant to
14 assessing the ID?
15     A.   Yes.
16     Q.   How important is that to your analysis?
17     A.   Well, it's quite important.  I mean,
18 and you have to -- you have to -- you have to
19 look at all of the eyewitness' behaviors that
20 are relevant to the issue of that witness'
21 ability to make an identification.
22     Q.   Well, why is prior exposure to
23 photographs or lineups and things like that, why
24 is that relevant to the analysis?
25     A.   Well, you want to know things like --

Page 59

1  I mean, you're always on the lookout for
2  questions like had this witness been previously
3  exposed to a photo that was then later used,
4  which could be construed as suggestive.  You're
5  looking for whatever information happens to be
6  present in those -- in those procedures.
7      Q.   And in that case you would look at all
8  of the photographs, if they're available to you?
9      A.   If they're available.
10     Q.   And then do you ever interview or meet
11 the victim or suspect?
12     A.   No.
13     Q.   So it's purely based on documents and
14 video transcripts of -- or videotapes of
15 deposition transcripts and things like that?
16     A.   Yes.
17          MS. ROMEO:  Do you guys want to
18 take a short break?  I think we've been going
19 for about an hour and a half, so, yeah, let's
20 take a short break.
21          (A recess was taken.)
22          MS. ROMEO:  All right.  So we are
23 back on the record after taking a short break.
24     Q.   Let's go back to, I have a couple of
25 questions going back to your professional

Page 60

1  background.  I see that you have had a number of
2  consulting positions over the years.  Can you
3  tell me what kind of work you've done in that
4  regard?
5      A.   Well, I don't know if I would call
6  them consulting positions.  I mean, they are
7  mostly post-Ph.D.  It's been consulting on
8  specific projects or on specific cases as well
9  as things like -- I guess my position as
10 director of social sciences for the Center of
11 Forensic Science and Public Policy could be
12 called a consulting position, but it largely
13 revolves around trying to initiate specific and
14 execute specific projects.
15     Q.   And what kind of projects?
16     A.   Well, the primary one, for example,
17 for the American Judicature Society was to
18 conduct field experiments on eyewitness
19 identification in conjunction with the police
20 departments in San Diego; Tucson; Austin, Texas;
21 and Charlotte, North Carolina.
22     Q.   And are those active projects or are
23 these projects that you've already worked on?
24     A.   The data is all collected.  We have
25 done certain analyses and released those, and

Page 61

```
1    we're continuing to analyze those cases in
2    greater detail.
3         Q.   So what sorts of things are you
4    looking for with these analyses?
5         A.   Well, the primary driving -- the
6    primary measures we're looking at for every
7    lineup that these police departments did over a
8    period of time, developing careful records, we
9    had an explicit protocol that we trained all the
10   detectives to analyze how often witnesses
11   pick fillers in lineups, known innocent suspects
12   who are just in the lineup to fill it out,
13   versus how often they pick the suspect that the
14   police had in the lineup versus how often they
15   make no identification at all.
16        Q.   Are these based on actual crimes?
17        A.   Yes.
18        Q.   What kind of crimes?
19        A.   All over the place.  Robbery would be
20   the most common one, but there's some murder
21   cases in there.  Assault cases.  An assortment.
22        Q.   Are they all cases of crime in the
23   United States?
24        A.   Yes.
25        Q.   And do any of the crimes touch upon
```

Page 62

```
1    any kind of terrorist acts?
2         A.   There are victims in there.  They're
3    being terrorized, but I don't know how you
4    define a terrorist act.
5         Q.   By defining "terrorism," I mean a
6    terrorist attack in the sense of the word that a
7    crime is committed to inflict terror and fear on
8    a random number of people.
9         A.   No, none of these cases would be like
10   that.
11        Q.   And are any of these crimes that
12   occurred in conflict zones, what we talked about
13   earlier?
14        A.   In what?
15        Q.   Conflict zones, what we talked about
16   earlier.
17        A.   No.  I think that San Diego might
18   consider some of its neighborhoods to be
19   equivalent of conflict zones, but no.
20        Q.   Generally speaking, though, you
21   wouldn't equate the United States and the Middle
22   East as similar conflict zones?
23        A.   As similar conflict zones?
24        Q.   Yes.
25        A.   No.
```

Page 63

```
1         Q.   And are all of these projects that
2    you're talking about, are they all disclosed on
3    your C.V. or is there anything after June 2013
4    that you would need to add?
5         A.   There's nothing with regard to those
6    after June '13 that would be added, no.
7         Q.   And I see that you have also received
8    various research grants from the National
9    Science Foundation?
10        A.   Yes.
11        Q.   Can you tell me about those research
12   projects?
13        A.   Well, the National Science Foundation
14   is the primary government funding of scientific
15   research in the United States and funds some
16   scientific research in other countries too, but
17   for physics, chemistry, all the sciences,
18   including the social sciences, and so they have
19   consistently funded my research to study
20   eyewitness identification.
21        Q.   And what sorts of research projects
22   have you undertaken with those grants?
23        A.   Well, primarily those grants are for
24   controlled experiments where we create events
25   for -- that people view, and then we follow up
```

Page 64

```
1    those events and those viewings with questioning
2    the people about what they saw, doing lineups,
3    and then we systematically manipulate variables
4    to see how it increases them and decreases their
5    reliability.
6         Q.   So would you say that the main purpose
7    of these studies are to identify various variables
8    that may increase or decrease the likelihood of
9    a reliable identification?
10        A.   Yes.  And that would increase or
11   decrease false certainty.  A number of the
12   things that the National Science Foundation have
13   funded me for to look at, how false certainty is
14   created.  False certainty is simply where a
15   witness is mistaken, but they nevertheless are
16   certain or positive that they're right.
17        Q.   What's the relevance of a witness
18   picking nobody from a lineup?
19        A.   What's the relevance of it?
20        Q.   Yeah, or a show-up, for instance.
21        A.   The relevance of it.  That's a pretty
22   broad question.
23        Q.   How is it relevant to the analysis of
24   assessing the ID?
25        A.   Well, there's more than one kind of
```

Page 65

1 nonidentification. What you're talking about is
2 in a broad category called nonidentifications.
3 And one kind of nonidentification is what we
4 call a rejection, so that's where, for example,
5 a witness might look at a lineup and say
6 definitively it's none of these people.
7           There's another kind of
8 nonidentification where a witness might say --
9 which we call more of a not-sure category where
10 the witness doesn't pick anyone, but they're not
11 saying it's none of these people. They're just
12 not -- they're just -- either they might be
13 wavering back and forth between some people and
14 they don't pick someone because they can't
15 discriminate between the two or because they
16 just don't have a good enough memory, and they
17 know it, to try to make an identification.
18     Q.   What does rejection, whether it's
19 absolute or -- and you can take it one by one.
20 Whether it's absolute or uncertainty, what does
21 rejection tell you about the witness' memory?
22           MR. SATIN: Objection. Vague.
23     A.   Well, a true rejection where the
24 person says it's none of these, confidently says
25 it's none of these, can indicate any number of

Page 66

1 things. I mean, one of the things it can
2 indicate is it can indicate that the witness has
3 a good enough memory to reject them all.
4           Another possibility is that the
5 same thing will happen, though, even if a
6 witness has a very weak memory, but what you're
7 showing them are individuals who are so discrepant
8 from even -- from what little memory they have,
9 that they can confidently reject them.
10           So, for instance, maybe all you
11 remember is that this person, you know, had sort
12 of a round face and all the photos that you're
13 shown are really skinny faces. You may not be
14 able to distinguish between one round-faced
15 person and another, but you can still reject all
16 of the skinny faces.
17     Q.   But what does that tell you about the
18 witness' memory? Does it tell you that the
19 chances of the witness' memory being -- does it
20 increase the chances of the witness' memory as
21 reliable or does it decrease the chances of a
22 witness' memory being reliable?
23     A.   Well, I don't think -- I don't think
24 the -- well, what it tells you is that -- I
25 mean, well, it depends. I mean, it depends on

Page 67

1 the circumstance. I mean, in the kind of case I
2 was just talking about where, you know, you
3 remember the face being sort of round, I mean,
4 it's reliable at the level of you knew it was a
5 round face, but that's all. You know, so you
6 rejected on the basis of some very partial kinds
7 of information in which case that doesn't tell
8 you much about reliability.
9           It can under certain circumstances
10 increase the reliability of a witness if they
11 totally reject some highly plausible possibilities
12 and reject an entire set, but reliability is based
13 on a lot more considerations than just that.
14     Q.   But in any event, you would consider
15 this in assessing the reliability of an ID?
16     A.   You would if you -- if you had all the
17 information that you needed to know. I mean, if
18 you had enough information about it, you would
19 take it into consideration.
20     Q.   How much information do you think you
21 would need?
22     A.   You would want -- you would want all
23 the photos, and you would want to know -- you
24 would want some clear and unambiguous record of
25 exactly what the witness said.

Page 68

1     Q.   What if you were missing one of those
2 things? Would you not assess it?
3     A.   Well, you would -- you would start
4 relying more on other things to assess
5 reliability, I mean.
6     Q.   Right.
7           But would you still discuss that?
8 Would it be noted in analysis?
9     A.   If you had -- if you had enough
10 information about it, it would, yes.
11     Q.   If you knew that there had been a prior
12 identification procedure, even if you didn't have
13 all of the photos and some clear record, is that
14 not still relevant to mention in assessing the
15 ID even if you state there isn't sufficient
16 information?
17     A.   It could be.
18     Q.   Generally speaking, when you decide
19 how to assess an ID, do you discuss all of the
20 factors that are relevant, regardless of whether
21 there is support, or do you simply exclude
22 factors that are relevant but for which there
23 are no support?
24     A.   Well, I mean, if you have -- if you
25 have enough information to have some confidence

Page 69

1  in what you think happened, then you would bring
2  it into the analysis, yes.
3      Q.   But even knowing the pure facts that
4  that -- that a nonidentification occurred, even
5  if you can't assess it, isn't that still relevant
6  to whether the ID is reliable or not?
7      A.   It could have relevance.
8      Q.   So the conclusion at the end of the
9  day if there isn't supporting information would
10  technically be incomplete?
11     A.   Would technically be incomplete if --
12     Q.   What I'm wondering is, if there are
13  relevant factors --
14     A.   Uh-huh.
15     Q.   -- and there are certain things that
16  you decide aren't going to factor in here
17  because of supporting evidence, is it still your
18  professional opinion that you can render an
19  opinion on the identification, the reliability?
20     A.   Depending on the level of all the
21  other factors that you did consider, yes.
22     Q.   So going back to your expert testimony
23  for a moment, have you ever not been qualified
24  by a Court on the basis of your credentials?
25     A.   I think that's possible, but -- like

Page 70

1  I've been told about some old case, that
2  somewhere in the record there's something that --
3  in a criminal case that I was not allowed to
4  testify on; but as far as I can tell, I didn't
5  even know about the case.  It was a defense
6  attorney who wanted to call me, told the judge
7  what he thought I would say, but I don't -- I
8  have no recollection.
9      Q.   You weren't retained for that case?
10     A.   No.  But somehow my name got in the
11  record --
12     Q.   Oh.
13     A.   -- because the attorney said, "This is
14  who I want to call."
15     Q.   Do you have any idea what the case
16  name is for that?
17     A.   I don't.  I don't remember.
18     Q.   Approximately what year it was?
19     A.   Oh, it would have been in the -- it
20  would have been late '80s, early '90s, I think.
21     Q.   So to the best of your recollection,
22  that's the only case that you've never been
23  qualified for is a case for which you were not
24  even retained?
25     A.   That's the only case I can recall.

Page 71

1  There was a -- there was a civil case for the
2  plaintiffs in Texas a couple years ago where I
3  did not testify, but I did not testify because
4  it had nothing to do with my qualifications or
5  the admissibility per se, but rather because it
6  was considered cumulative; because a police
7  practices expert preceded me on the stand, and I
8  was going to be saying pretty much the same
9  things, at least in the mind of the judge.
10     Q.   Do you remember the case name?
11     A.   It's probably on this list.  Yeah, I
12  think -- I believe it would have been the
13  Sifuentes and Ramirez versus Abreo, a Texas
14  case.
15     Q.   Got it.  So that's on page 2 of your
16  report?
17     A.   Yes.
18     Q.   In 2011?
19     A.   Yes.
20     Q.   Taking a look at your --
21     A.   So all I list here is the deposition,
22  not testimony, because it didn't result in
23  testimony.
24     Q.   Right.
25          So looking at this list from page

Page 72

1  1 to 2 --
2      A.   Yeah.
3      Q.   -- you typically only give deposition
4  testimony; is that right?
5      A.   It's pretty common for these things to
6  settle out of court.
7      Q.   So you don't typically in these cases
8  then actually testify at trial?
9      A.   No.  I mean, I have.  I did in
10  Washington/Yancy and Galindo versus O'Donnell.
11     Q.   So that's approximately like two cases
12  out of 15; right?  See how many you have here.
13     A.   I guess that would be right.
14     Q.   14.  So 14 cases are listed here since
15  2008, and it looks like two --
16     A.   Three, I think.
17     Q.   Three.  So three out of 14 cases
18  actually resulted in trial testimony.
19          Do you know if that's because all
20  the cases settled or is it because your report
21  was excluded?
22          MR. SATIN:  Objection.  Calls for
23  speculation and lack of foundation.
24     A.   I don't think my report was excluded
25  in any -- in any of the cases.  There was the

Page 73

1    one that I mentioned that the judge ruled it
2    would be cumulative, but I don't believe it's
3    been excluded in any -- in any case, no.
4        Q.    So you don't believe that you've ever
5    had a report that's been excluded in all of the
6    expert testimony that you've given?
7        A.    Not that I'm aware of.
8        Q.    And you're also not aware of not being
9    qualified in any of these cases as well?
10       A.    No.
11       Q.    Has your testimony ever been limited?
12            MR. SATIN:  Objection.  Calls for
13   speculation.  Lack of foundation.
14       A.    You know, I don't -- I don't -- I'm
15   not sure.  Certainly I think that there have
16   been times in which perhaps an attorney said
17   don't -- you know, might have said something
18   like the judge won't allow you to, for example,
19   reach a conclusion about the innocence or guilt
20   of the defendant, which he didn't need to tell
21   me because I knew that and I always presume
22   that.  So maybe there was a discussion of that
23   and a judge made a ruling like that, but I don't
24   know.
25       Q.    Have you ever rendered an opinion that

Page 74

1    touches upon the guilt or innocence of a
2    suspect?
3        A.    Only at a -- in a very constrained
4    fashion of saying that this evidence would not
5    in itself be, for example, indicative of guilt,
6    but the question -- but that's not speaking to
7    the ultimate issue of innocence or guilt,
8    because there could be other evidence.
9        Q.    Right.
10           But do you qualify your statement
11   in your reports?
12       A.    Yes.  I'm only speaking about the
13   identification itself, not the other evidence.
14       Q.    To your knowledge, has a Court ever
15   rejected your opinion?
16       A.    "Rejected," what does that --
17           MR. SATIN:  Objection.  Vague.
18       A.    What does that mean?
19       Q.    Rejected your assessment of the
20   reliability of an ID?
21           MR. SATIN:  Objection.  Calls for
22   speculation.
23       A.    How would they do that?
24       Q.    If you present testimony that an ID is
25   unreliable and that it is thereafter rejected

Page 75

1    and not presented to the jury.
2        A.    Not that I'm aware of.
3        Q.    Have you ever testified in court?
4        A.    Oh, yes.
5        Q.    Before a jury?
6        A.    Yes.
7        Q.    And tell me about that kind of
8    testimony.  What do you tell the jurors?
9            MR. SATIN:  Objection.  Vague.
10       A.    Well, it's pretty straightforward.  I
11   mean, it always starts off with, you know, the --
12   my qualifications, and then it's often asked in
13   the form of a common -- it varies.  I mean, it
14   varies.  This is a big country, so there's all
15   kinds of different practices across the country.
16           The fairly typical practice is to --
17   is for the attorney who retained me on direct to
18   begin to ask me about some general principles of
19   memory and eyewitness identification, and then
20   in many cases they're restricted to kind of the
21   hypothetical.  So, you know, suppose, and it's a
22   hypothetical, as opposed to describing the
23   specifics of that particular case.
24           But other times they'll ask about
25   the specifics of the case; and so, for example,

Page 76

1    they may bring forward exhibits like a
2    photographic lineup and had I seen this before
3    and do I see problems with this particular one.
4    You know, what would be a proper instruction
5    before a witness was given something like this;
6    what happens if the proper -- if that instruction
7    is not given, you know, and so on and so forth.
8        Q.    So you noted that there's sometimes
9    a distinction between testimony on general
10   principles as opposed to testimony on the specific
11   circumstances affecting a particular ID at issue
12   in the case?
13       A.    Right.
14       Q.    Is that correct?
15       A.    Right.
16       Q.    Now, that distinction, does that depend
17   on whether the case is civil or criminal, in
18   your experience?
19       A.    I think so.  I think that in my
20   experience that's not much of a consideration or
21   concern of the Court for civil cases, but is
22   more so for criminal cases, depending on the
23   jurisdiction.
24       Q.    When you say is "not much of a
25   consideration," can you just explain to me what

1    you're referring to?  What's the consideration
2    that you're talking about?
3        A.   Well, in a civil case it's fairly
4    common to be talking about the specifics of that
5    particular case, circumstances of that particular
6    case.  So questions about, you know, what my
7    understanding was of, let's say, the distance of
8    viewing that was involved or the lighting or
9    what my view was of the specific way in which
10   the -- in which this particular photographic
11   lineup was conducted, even referring to individual
12   names of detectives and witnesses and so on.  So
13   it's not hypothetical at all.  It's the specifics
14   of that case.
15       Q.   But in these civil cases, these are
16   cases where the conviction is already known to
17   be overturned; correct?
18       A.   Yes.
19       Q.   So the ID is already known to be
20   inaccurate for one reason or another?
21       A.   Yes, although sometimes defendants don't
22   admit that.
23       Q.   Regardless, the conviction was actually
24   overturned?
25           MR. SATIN:  Objection.  Asked and

1    answered.
2        Q.   Correct?
3        A.   Right.
4        Q.   So there was reason to believe that
5    the ID was, in fact, inaccurate?
6        A.   Right.
7        Q.   And in the criminal cases, the whole
8    point of the proceeding is to determine whether
9    the defendant committed the crime; correct?
10       A.   Right.
11       Q.   And in those situations you've seen,
12   at least in some jurisdictions, that testimony
13   has been limited just to general factors
14   affecting the ID or hypothetical; is that
15   correct?
16           MR. SATIN:  Objection.  Lack of
17   foundation, calls for speculation.
18       A.   In some jurisdictions, yes.
19       Q.   And even speaking more broadly than
20   your own personal experience, are you aware that
21   that's the case with respect to other experts in
22   your field?
23           MR. SATIN:  Objection.  Vague.
24       A.   Other experts tell me that sometimes
25   they can talk about the very specifics and

1    sometimes it just works through the
2    hypothetical.
3        Q.   Is that in criminal cases or are
4    they --
5        A.   Right.
6        Q.   -- speaking about civil cases?
7        A.   Criminal.
8        Q.   So have you ever been the victim of a
9    crime?
10       A.   Just property crimes.
11       Q.   And have you had to ever make a later
12   identification?
13       A.   No.
14       Q.   Have you ever been a victim of a
15   terrorist attack?
16       A.   No.
17       Q.   Or of a crime that occurred in a
18   conflict zone?
19       A.   No.
20       Q.   Generally speaking, have you ever had
21   to make an identification after experiencing
22   fearful or stressful conditions?
23       A.   No.
24       Q.   And have you ever been to Israel?
25       A.   No.

1        Q.   Do you speak Hebrew?
2        A.   No.
3        Q.   Have you ever been to West Bank?
4        A.   No.
5        Q.   Or Gaza?
6        A.   No.
7        Q.   Do you speak Arabic?
8        A.   No.
9        Q.   Do you have any experience with
10   terrorism-related subjects?
11           MR. SATIN:  Objection.  Vague,
12   undefined term.
13       A.   No.
14       Q.   Have you ever studied terrorism
15   generally?
16       A.   No.
17       Q.   And typically speaking, over the
18   course of your career in the research that
19   you've conducted on eyewitness IDs, if you had
20   to, what crime have you studied the most?
21       A.   What crime have I studied the most?
22       Q.   In the context of eyewitness
23   identifications.
24       A.   Well, I don't think that there's -- I
25   mean, I've looked -- you know, my source of data

1    and materials for analysis runs a broad gamut
2    from the controlled laboratory studies, for
3    example, that are funded by the National Science
4    Foundation to the DNA exoneration cases to what
5    we refer to as field studies of eyewitnesses in
6    both victims and bystanders in ongoing criminal
7    investigations.
8            The DNA exoneration cases are
9    primarily cases that involve sexual assault, not
10   exclusively or primarily, because that's where
11   the DNA is.  The field studies, though, are a
12   broad spectrum -- we talked about that before --
13   where they include all kinds of crime.
14   Q.    And how do controlled laboratory
15   studies differ from the field studies?
16   A.    The principal way in which they differ
17   is because -- is that we create the event so we
18   know exactly what happened.
19   Q.    In which one?
20   A.    The lab studies.
21   Q.    Okay.
22   A.    So we know who the perpetrator is.  We
23   can systematically then include the perpetrator
24   in a lineup, not have the perpetrator in a
25   lineup.  We can -- you know, we have this power

1    over ground truth, which is what -- which is
2    what is appealing to the National Science
3    Foundation, that we know the actual answer.  We
4    don't have to guess.
5    Q.    But in these studies you're typically
6    testing for one factor; is that right?
7    A.    Well, we manipulate a variable at a
8    time, yes.  We try to hold everything else
9    constant.  So, for instance, if we're looking
10   at, let's say -- the prelineup instruction
11   factor is very important.  Prelineup warning to
12   witnesses that the person might not be here,
13   that in police parlance this is often referred
14   to as the prelineup admonition.  The person who
15   you saw might not be here.  That it's just as
16   important to exclude the innocent from suspicion
17   as it is to incriminate the guilty.  The correct
18   answer might be none of the above.
19           What we do in our experiments then
20   is we'll -- if we're interested in that variable,
21   is that that's the only -- that's the focal
22   variable.  That's the thing that we manipulate,
23   so we hold other things constant in a study like
24   that.
25   Q.    In an actual crime, is there one focal

1    variable that takes precedence over all others?
2    A.    No.
3    Q.    So what is your professional opinion
4    on how far lab study results can go in terms of
5    identifying a reliable or unreliable ID?
6    A.    Well, they identify factors that
7    increase and decrease reliability.
8    Q.    But, for instance, you don't just --
9    so say you have an ID.  You don't just start at
10   a hundred percent of potential accuracy and then
11   say this study showed X variable can increase
12   the likelihood of the unreliability of an ID, so
13   therefore, we're going to knock down the 100
14   percent to 75 percent.  That's not how it works;
15   is that right?
16   A.    Well, you're never starting at a
17   hundred percent.  I mean, you always have a
18   comparison condition, a so-called control
19   condition; right?  And, you know, it's more
20   likely to be, you know, in the -- let's say
21   when the perpetrator is present, maybe 70
22   percent of the time they're able to pick him
23   out; and when he's absent, they're still
24   choosing somebody, you know, 30 percent of the
25   time.  So you're starting there.  You manipulate

1    some variable and you see what happens to those
2    numbers.
3    Q.    Okay.  Well, I'll clarify my question.
4    My question is, taking the study, the results of
5    the study, after you've done the manipulation
6    and you've yielded various percentages of
7    increasing or decreasing the reliability.
8    Taking that percentage --
9    A.    Uh-huh.
10   Q.    -- and taking an actual real-world ID
11   and then saying because this factor was present
12   in this situation, we're going to now knock it
13   down 25 percent or we're going to knock it down
14   50 percent, depending on the severity of the
15   condition, my question is, does that work?
16   A.    No, not really.  I mean, what you know
17   is the direction that it's going, but to -- but
18   to assume that the -- to assume that you can
19   quantify that at the same percentage when in the
20   real world other things are floating around, you
21   know, you wouldn't -- you wouldn't do that.
22   Q.    And that same principle would apply to
23   increasing the reliability of an actual ID, for
24   example?
25   A.    Right.

1      Q.   And you can't just take, you know,
2   five different studies and say five different
3   factors yield, you know, 25 percent chance each
4   and then just knock an ID out and say there's no
5   way that that can be reliable.  You can't do
6   that either; is that right?
7      A.   No.  If we were to take a -- take a
8   concrete example of let's say you have created
9   these conditions where, let's say, 70 percent of
10  the witnesses when the perpetrator is in there
11  will pick him; and when he's not in there, it's
12  still the case that 30 percent will pick an
13  innocent person.  Let's say that's what you
14  start with.
15          And then let's say you add in the
16  admonishment variable and you do little to the
17  70 percent, but you knock that 30 percent down
18  significantly.  So what you've identified then
19  is a factor, the admonition, that when present
20  increases reliability by lowering those mistakes.
21          But let's suppose that you have
22  conditions in which you start in which the
23  acquisition of the memory, what you gave them
24  was such a horrible view; they're greatly
25  stressed.  You wait, you know, two years before

1   you even have them attempt an ID.  That variable
2   is not going to have a huge impact.  It's
3   certainly not going to -- you know, you're not
4   going to be -- you know, you're never going to be starting
5   at the original numbers.  It's sort of like what
6   we were talking about before, that horrible
7   initial view plus the long retention interval
8   knocks everything down so low that you're not
9   going to be able to do much with it.
10     Q.   But the point that I want to make
11  clear for the record, though, that the social
12  science controlled laboratory studies, the
13  purpose of them is not to yield a mathematical
14  formula from which you could then apply to a
15  particular case and say there is an X percent
16  chance that this is a reliable or an unreliable
17  ID; is that right?
18     A.   That's true.  The primary purpose is
19  to establish cause and effect.
20     Q.   Right.
21          And also, there are degrees of
22  reliability as well; correct?
23     A.   Certainly.
24     Q.   Can you elaborate on that?  What's
25  your professional opinion on, let's call it, the

1   sliding scale of reliability of an ID?
2          MR. SATIN:  Objection.  Vague.
3      A.   Depends on the circumstances.
4      Q.   So it can vary?  Just I'm trying to
5   gauge the level at which -- you know, when you
6   say something is reliable --
7      A.   Right.
8      Q.   -- are you saying that that is
9   reliable and it's accurate or when you say
10  something is unreliable, are you saying it's
11  unreliable and, therefore, cannot be correct or
12  is there levels of gradation which go with both
13  categories?
14     A.   Well, it's all one continuum.
15     Q.   Can you elaborate?
16     A.   Well, you have high reliability on one
17  end of the continuum and high unreliability on
18  the other end of that.
19     Q.   And can IDs be anywhere on this
20  continuum?
21     A.   Yes.
22     Q.   So when you render your opinion on
23  assessing the reliability of an ID, do you qualify
24  it in that sense based on this continuum?
25     A.   Do you qualify it?

1      Q.   Yes, or do you -- do you qualify it?
2          MR. SATIN:  Objection.  Vague.
3      A.   Well, yes.  I mean, certainly when
4   it's -- when it's -- when the conditions are at
5   an extreme, you would -- you would have a
6   statement that would be roughly associated with
7   somewhere along that continuum.
8      Q.   So generally speaking, when you render
9   an expert opinion, how do you phrase your
10  conclusion for whether an ID is reliable or
11  unreliable?
12     A.   You would phrase it along the lines
13  of, you know, all of -- you know, considering
14  all of the relevant variables that are known in
15  this particular case, that, you know, you might
16  say that reliability is low.  You might say,
17  depending on the circumstances, that reliability
18  is close to zero.  You might say that the
19  circumstances are such that reliability would be
20  high.
21     Q.   How can you say that reliability is
22  close to zero?
23     A.   Well, you can say reliability is close
24  to zero under the conditions of an accumulation
25  of factors.  I gave the example earlier, for

1   example, if it was pitch-dark, you can say
2   reliability would be low.  As you start to get
3   into illumination, if illumination was low.  If
4   you have -- if you look at things like, for
5   example, the witness was unable to give any kind
6   of meaningful sort of beyond the generic
7   description of the person they saw, that's an
8   indication of a weak memory, and that factors
9   into reliability.
10              If vast amounts of time have
11  passed, we know, and we've known since the
12  earliest experiments in psychology in the 1880s,
13  that memory gets worse with time.  And then on
14  top of that, if you have a procedure that is not
15  well-controlled where you can clearly know
16  exactly how that took place and that has these
17  various controls in it, then, you know, some --
18  a constellation of factors like that can lead to
19  a conclusion of reliability close to zero.
20      Q.   Is there literature that discusses
21  accumulating the factors and then leading you to
22  a reliability of zero?
23      A.   There's literature discussing --
24  there's literature that makes it clear that the
25  reliability of the end product can't be any

1   higher than the individual -- than the
2   reliabilities of the individual factors that
3   went into it, so, yes, they cumulate.
4       Q.   So then is it your position that the
5   lab studies which control for one factor and
6   yield a certain result, then you can use those
7   to knock down the reliability or increase the
8   reliability of an ID?
9       A.   Yes.
10      Q.   So can you walk me through what the
11  formula would be?  I mean, is there a generally
12  accepted percentage to knock down an ID for --
13      A.   No, because you --
14      Q.   -- darkness?
15      A.   For darkness?
16      Q.   Yeah.  So say the witness -- say
17  it's nighttime.  Is there a generally acceptable
18  percentage that you can knock down the reliability
19  of an ID?
20      A.   Well, no.  I mean, we know where -- we
21  know where vision stops operating.  We know --
22  and there are formulas.  If you can get out and
23  measure the lighting that existed at the time,
24  then we know how to -- and, you know, it's not
25  just a matter of measuring the lighting.  It's

1   complex.  It can be done, but the problem
2   that -- because you have to know something about
3   the reflection of the object, right, so darker
4   objects are going to reflect less than lighter
5   objects and so on and so forth.  If you have all
6   that information, yes, you could calculate that.
7       Q.   So you could calculate that and then
8   take a particular ID and say it is now 25 percent
9   less reliable because of the lighting conditions?
10      A.   You can -- you can match it to human
11  performance under those conditions and show
12  that, for example, that it knocks the ability to
13  accurately identify a person under those
14  circumstances down by X percent, but you'd have
15  to recreate all those conditions.
16      Q.   Are there studies that you can point
17  me to that discuss this?
18      A.   That discuss lighting?
19      Q.   Yeah, as one example, or any of the
20  other factors that if you recreate the
21  situation, you can knock it down by X percent?
22      A.   Well, I think the best work on that
23  was done by Goeff Loftus, and the -- and what
24  he's done is shown with respect to distance,
25  which is a cleaner variable, that there is a

1   very precise relation between distance and
2   between the witness and the target that directly
3   relates to percentage accuracy scores.
4       Q.   And in your analysis do you cite to
5   these studies to support your conclusions about
6   the various factors that are at issue in the ID
7   here?
8       A.   I don't talk about distance in my
9   report.
10      Q.   Well, you were saying that this could
11  happen with various factors.
12      A.   Right.
13      Q.   So generally speaking, in your report
14  in this case do you cite to studies that support
15  the reduction of reliability of the ID being
16  reliable by a certain percentage?
17      A.   No.  As I indicated, we don't presume
18  that these exact percentages are comparable from
19  one set of circumstance to another.  We're
20  looking at the direction that these variables go.
21      Q.   So you can't actually reduce the
22  accuracy -- or you can't actually reduce the
23  given reliability or unreliability of any
24  actual-world ID by using these controlled
25  study results?

1    A.   Well, you can reduce it.  You just
2  don't -- you can't say that it reduced it by
3  27.6 percent versus some other number.
4    Q.   So then how do you reduce it?  So if
5  the controlled laboratory studies yield results
6  that you can use to knock the percentage down --
7    A.   Uh-huh.
8    Q.   -- but then you can't knock it down by
9  a specific percentage, how do you knock down the
10 percentage?
11   A.   How do you knock down the percentage?
12 Well, I think you'll notice there are no
13 percentages in here.
14   Q.   So then what's the basis for -- so why
15 don't you explain to me the basis for assessing
16 these relevant factors and how they're supported
17 by the research.
18   A.   That these factors cumulate.  They
19 cumulate in a particular direction that when
20 considered together, bring reliability down
21 close to zero.
22   Q.   But how can you say they accumulate to
23 bring reliability down close to zero?  How do
24 you get to zero?  You have to be starting from
25 somewhere.

1    A.   Well, no, I disagree.  You don't have
2  to be starting from somewhere.  For example, you
3  wouldn't take the retention factor, let's say,
4  that -- you know, all of this time that passed
5  between the event and the identification, and
6  say that that's knocking things down by 60
7  percent, because you might have started off with
8  circumstances that would only be 10 percent, so
9  you can't end up with a negative number.
10              We know that, for example, in the
11 absence of a long passage of time, so, for
12 example, even identification procedures that
13 happen twenty-four or forty-eight hours later,
14 that there are -- that there could be huge
15 reliability problems.  So longer delay just
16 contributes to that, knocks it down further.
17   Q.   So what if you have two factors that
18 indicate unreliability and you have three
19 factors that indicate reliability, how does that
20 affect the probability that a given ID in an
21 actual case is reliable or not reliable?
22   A.   Well, you'd have to -- you'd have to
23 consider what those factors are.
24   Q.   Is it your position that you can take
25 those factors and you can adjust the probability

1  upward and downward to then potentially get to a
2  zero chance of possibility?
3    A.   Well, yeah, I mean, you could get to
4  zero chance of -- or near zero chance of
5  reliability from considering one factor no matter
6  what all the other factors are.
7    Q.   How do you accumulate these factors
8  with consistency amongst various actual cases,
9  real-world cases?
10   A.   I'm not sure I understand.
11   Q.   So I'll rephrase.
12              Is it your professional opinion
13 that a result of a study can be generalized with
14 consistency across victims of crime?
15   A.   Well, you know, victims can differ in,
16 for example, visual acuity, so there certainly
17 are factors that can account for differences
18 between witnesses all exposed to the same
19 situation.
20              There are other circumstances in
21 which situations are so powerful that they leave
22 no room at all for individual differences.  I
23 keep coming back to the kind of extreme example,
24 but, I mean, no one can see in the dark.  We
25 know that.  Doesn't matter if you're from the

1  Middle East or whatever; right?  And I'm not
2  saying that's a factor in this case.  I'm just
3  saying -- I'm just throwing out an example of a
4  variable to the question to show kind of an
5  extreme.
6              So no matter in that case, doesn't
7  matter what your visual acuity is.  Doesn't
8  matter whether you were looking.  Doesn't matter
9  whether you were trying to pay close attention
10 or not pay close attention.
11   Q.   So let's take the visual acuity
12 difference, okay?  So let's say you have a
13 study and it says, you know, ID's -- I'm going
14 to keep using 25 percent.  Let's just say for
15 general visual acuity, opportunity to view the
16 perpetrator, say the person is across the
17 table from you, okay?  In that situation you
18 manipulate the variables and you get a 25 percent
19 chance that you can knock down the reliability
20 of an ID.
21              If people have different visual
22 acuities -- I have glasses on right now.  She
23 doesn't, right -- can you generalize that result
24 of that study to predict my identification of
25 you as well as my colleague's identification of

1  you?
2       MR. SATIN:  Objection.  Vague.
3    Q.   How would you adjust for the visual
4  acuity difference?
5       MR. SATIN:  Objection.  Vague.
6    A.   Well, we don't adjust for visual
7  acuity differences.  We look at how some
8  variable affected the general population of
9  people who were tested.  In our -- in our
10  studies we only use people who have good visual
11  acuity.  If they have to wear -- if they have to
12  wear glasses, they have to be wearing the
13  glasses at the time and so on.  So we -- you
14  know, people who have poor visual acuity, you
15  know, things just get worse, that's all.
16    Q.   So is it your opinion that you can
17  adjust factors affecting the reliability of an
18  ID upward or downward, in a particular case an
19  actual ID and not in the context of a controlled
20  laboratory study, even though there's no
21  mathematical formula that you can refer to?
22       MR. SATIN:  Objection.  Vague.
23    A.   Yes.
24    Q.   So is the jury just supposed to take
25  your word for it if they don't have supporting

1  studies to show the percentages?
2       MR. SATIN:  Objection.  Calls for
3  speculation and legal conclusion.
4    A.   Well, there are plenty of supporting
5  studies all of which report percentages.  They
6  report the magnitude and direction of the effect
7  observed.
8    Q.   But what about your generalization of
9  those studies to an actual ID, the mathematical
10  formula that you would use to yield the
11  reliability of the ID in a particular case?
12    A.   Well, there is no mathematical
13  formula, and any testimony that I would give to
14  a jury, you know, the jury can do with it whatever
15  they want.  They take it into consideration, and
16  it goes to weight.
17    Q.   But if you've already said that
18  there's a zero, near-zero chance of reliability,
19  haven't you already done the work for them?
20    A.   No, because that's opinion testimony.
21  It's an expert opinion testimony, but it's still
22  opinion testimony.
23    Q.   But isn't the jury relying on you to
24  provide them with the information necessary to
25  make such a judgment?

1       MR. SATIN:  Objection.  Calls for
2  speculation.
3    A.   If the Court admits the testimony,
4  it's up to the jury to decide the credibility of
5  every witness.
6    Q.   Is there a single agreed-upon rate of
7  misidentification in the literature?
8       MR. SATIN:  Objection.  Vague.
9    A.   There's -- well, yes and no.
10    Q.   Let's start with the yes.
11    A.   Okay.  The yes comes from the field
12  studies of eyewitness identification in criminal --
13  actual criminal cases.  Witnesses are not a part
14  of a study per se or whatever.  These are ongoing
15  criminal cases in which we know that there's
16  pretty good consistency here that one out of
17  every three times that a witness makes a pick,
18  they pick a known innocent filler.
19       Now, about one of every -- well,
20  about -- almost one of every two -- well, and
21  then the rest of the time, so about two out of
22  every three times, they'll pick the suspect.  We
23  don't know how often they're wrong when they
24  pick the suspect.  Obviously in every DNA
25  exoneration case they were wrong in picking the

1  suspect.
2       But so that establishes sort of
3  this idea of a minimal estimate of a level of
4  unreliability.  One out of every three picks we
5  know are wrong.  The actual number has to be
6  higher than that for a number of reasons, but
7  one out of every three we know are wrong.
8    Q.   What number of reasons?
9    A.   Some of the picks of suspects are
10  wrong too.  We just don't know it.  Also, some
11  of these -- in some of these studies, the
12  suspect in a lineup stands out.  It's biased
13  against the suspect.  Stands out more than the
14  others.  And so by estimating how often they
15  pick the others, we're kind of underestimating
16  how often if the person was innocent they would
17  have -- if the suspect is innocent, they would
18  have picked him because they'll load up on that.
19       And then in some of the archival --
20  some of these archival studies, the police have
21  more than one suspect in the lineup in which
22  case you can't pick a filler, and so that
23  underestimates in those cases how often the
24  witnesses were in error.
25    Q.   This single rate of misidentification

1    that you're talking about, before you said field
2    studies.  Is that the same thing as an archival
3    study or are those two different things?
4       A.   Well, there are more than one kind of
5    field study.  Archival studies are where you go
6    into the police department records.  You're
7    looking for every instance that you can find in
8    which they did a lineup, so they're retrospective.
9             There's another type of field study,
10   the type that we've done, where it's prospective.
11   In other words, what happens is you don't allow --
12   you're collecting every -- you're collecting data
13   on every lineup as it happens as opposed to going
14   back into the detective's files.
15            The problem with going back into
16   the detective's files is that -- and we just did
17   a national survey of law enforcement agencies in
18   the U.S.  37 percent of law enforcement agencies
19   in the U.S. admit, which was an amazing admission,
20   that they don't write up reports when the witness
21   doesn't pick their suspect.  So those tend to be
22   missing from a lot of the case files, and it's
23   one of the reasons why we do prospective studies
24   where we will not allow them to misrecord
25   anything.

1       Q.   So is your statement that one out of
2    every three IDs will be a pick of an innocent
3    filler and that two out of three will be a pick
4    of the suspect, is that based on the field
5    studies or the archival studies and its --
6       A.   It's based on --
7       Q.   Yeah.
8       A.   It's based on an accumulation of all
9    those into one database.
10      Q.   So it's just statistics?
11      A.   Yes.
12      Q.   And you said that there was a yes and
13   no to the question of is there a single rate of
14   misidentification.
15      A.   Right.
16      Q.   So what's the no?
17      A.   Well, the no is just simply that the
18   rate of misidentification is a moving target, and
19   it's a moving target because how you -- because
20   of a number of things.  One is we believe that
21   the rate of misidentification has been lower in
22   recent years than it was before, and the reason
23   is because we've been pressing law enforcement
24   agencies very hard to use better procedures and
25   also because a significant, although definitely

1    not thorough, penetration into the police
2    departments on our part have made them much more
3    aware of the dangers of putting together an
4    identification procedure prematurely.
5             So what happens is that a lot of
6    agencies have operated in a way that, you know,
7    just on a hunch maybe it's Joe, and so they
8    throw Joe in a lineup.  And when you do that,
9    you have -- because it was just a hunch, there's
10   a good chance you're showing a witness a
11   culprit-absent lineup, and that's when bad
12   things start to happen.  We're trying to get
13   them to make sure that you have clear evidence
14   against somebody before you put them into a
15   lineup.
16      Q.   Can you just define the term "culprit-
17   absent lineup"?
18      A.   Yeah.  It's where, you know, you have,
19   let's say, a detective who thinks that maybe,
20   you know, Joe committed this robbery, so gets
21   maybe a photo of Joe and some filler photos.
22   Calls in the witness; but, in fact, it turns out
23   it wasn't Joe at all.  You know, it was some guy
24   Sam who is still at large.  You're showing the
25   witness a perpetrator-absent lineup.

1       Q.   So in your report you say that there
2    is no single rate of mistaken identification,
3    but instead the rates vary as a function of a
4    large number of variables relating to the
5    various stages that we talked about.
6       A.   Right.
7       Q.   So do you really mean yes and no to
8    the first part of that sentence, there is no
9    single rate of mistaken identification?
10      A.   I do mean yes and no.  I told you what
11   I meant by yes, namely that if by that we mean --
12   if by single rate of misidentification we mean,
13   you know, considering all the things that vary
14   out there in the real world, right, and the cases
15   that police are dealing with, right, what's that
16   rate minimally of misidentification versus, yeah,
17   if we wanted to -- you know, if we were to do
18   certain things, the rate would go up; do other
19   things, the rate would go down.  In certain
20   kinds of cases, that rate's going to be higher
21   than others.
22      Q.   Do you explain this in your report?  I
23   just don't remember reading that there's a one
24   in three chance that an ID is going to be mistaken
25   or that there's a two out of three chance that

1    the suspect is going to be picked by the victim.
2        A.   I don't know as though -- no, I did
3    not, I did not include that, because that's a
4    statement about cases in general, not a statement
5    that's pertinent to this particular case,
6    necessarily.
7        Q.   So in this particular case then there
8    is no single rate of misidentification that we
9    can use to assess the reliability of the
10   plaintiff's identification?
11       A.   No, and there never -- there never
12   would be in a specific case.  I mean, regardless
13   of what that general rate of misidentification is
14   out there, like the one in three, for example --
15       Q.   Right.
16       A.   -- right, if you come across a witness
17   who -- again, I'll just keep falling back on
18   this example.  I'm not saying that this example
19   is relevant to this specific case, but where you
20   have a witness who saw something, quote, saw
21   something in complete darkness, right, that
22   rate's irrelevant.  What's going to happen is
23   that among those who make a pick, if there are
24   six people there, five out of six of them have
25   to pick a filler.

1        Q.   Well, you would agree with --
2        A.   Not one out of three.
3        Q.   You would agree that things that are
4    not relevant to this case do not play into the
5    analysis then?
6        A.   I think, generally speaking, if it's
7    not that relevant to the case, then it's probably
8    not part of the analysis, yeah.
9        Q.   And so is there a single rate of
10   misidentification in the controlled studies?
11       A.   Well, we can average across the studies,
12   but it's moving up and down as a function of the
13   kinds of conditions that you gave me.
14       Q.   So, I mean, has anybody averaged the
15   various results?
16       A.   There have -- there have been
17   averagings of those results.  They look a lot
18   like what you see in the field if you average
19   across all those variables.
20       Q.   So do they also average across
21   variable by variable?
22       A.   Yes.  Those would be, you know, what
23   are referred to as meta-analyses.
24       Q.   And so let's go back to averaging all
25   of the variables.  Is there an approximate rate

1    that's been reached that's generally accepted in
2    the community?
3        A.   Well, I mean, there's a general
4    acceptance at the level of saying, yeah, that's
5    what the -- that's what the average of the
6    studies is; right?  I mean, an average is an
7    average.  I mean, anybody can go in and we do
8    all of that and calculate an overall average.
9             What that average means is a whole
10   other question, because you've created these
11   conditions.  I mean, so if -- if you throw in a
12   whole bunch of studies that look at what happens
13   when people witness something in darkness, right,
14   it's going to start bringing down that average.
15   That doesn't mean that most witnesses are
16   witnessing things in dark.
17            So when you collapse over all
18   those variables, you end up with something that
19   could be misleading.  It could be misleadingly
20   low.  It could be misleadingly high in the sense
21   that there's all this variation from study to
22   study depending on the situation or the conditions
23   that you set up for the witnesses.
24       Q.   So like we talked about before, it's
25   not a one-to-one relationship.  You can't take a

1    study and put it next to a case file and take
2    that study to estimate with precision the
3    likelihood that the ID is or is not reliable?
4        A.   That's correct, yeah.
5        Q.   And in the eyewitness literature, is
6    there a distinction between eyewitnesses who are
7    victims of the crime versus eyewitnesses who may
8    observe a crime, but they're not actually the
9    victim?
10       A.   There is, yes.
11       Q.   And can you tell me about that?
12       A.   Well, the bystander versus victim, you
13   know, overall we don't see a lot of evidence for
14   there being much difference.  Bystanders are
15   sometimes less likely to be stressed than
16   victims, but victims sometimes get a better view
17   than bystanders.
18            So, for instance, if you were to
19   take -- let's say everybody sees the same event,
20   but one of them is a victim and the others are
21   bystanders.  Chances are the bystanders are
22   farther away.  On the other hand, the victim
23   might feel more stress or fear, so those might
24   cancel out leading to no difference between
25   victims and bystanders in that case.

1          Other things being equal, you
2    know, where they're both equally stressed or
3    unstressed, they both have equally good or bad
4    views, then there's no particular reason to
5    think that bystanders and victims would be any
6    different.
7        Q.    The studies that you rely on in your
8    report, are they primarily victim-based studies
9    or are they bystander-based studies?
10       A.    They would be primarily bystander-based.
11       Q.    And why is that?
12       A.    Because -- mainly because institutional
13   review boards don't want us to do studies in which
14   people become -- people think that they're -- that
15   they're victims, so they tend to be bystander
16   studies.
17       Q.    And when you're accumulating the various
18   reliability factors that can either knock an ID
19   up or knock an ID down, how does this factor in?
20   How do you adjust for whether the eyewitness is
21   a bystander or the victim?  What percentage does
22   that --
23       A.    You don't.  You consider -- you consider
24   that -- because bystander or victim is primarily
25   a question of -- you know, the only reason there

1    should be differences between bystander and
2    victim have to do with viewing conditions, fear
3    and stress.  And so you go straight to the
4    viewing conditions and fear and stress, whether
5    the person is a victim or a bystander doesn't
6    really much matter.
7        Q.    Well, what about the fact that a
8    bystander may not immediately notice that
9    something is even going on?  I mean, a victim is
10   being victimized, so the victim knows that the
11   crime is happening.
12       A.    Right.
13       Q.    A bystander is in the vicinity.
14       A.    Right.
15       Q.    So how is that not also a relevant
16   difference between the two?
17            MR. SATIN:  Objection.  Vague.
18       A.    It is, and we consider it to be part
19   of the view.  In other words, the view question
20   is not just how good was their opportunity, but,
21   in fact, what was -- what was their viewing
22   behavior.
23       Q.    So there could be differences in the
24   incentive to view, so to speak?
25       A.    There can be, and it can go the other

1    way around too.  So, for example, a victim might
2    not want to look directly at the perpetrator;
3    whereas a bystander may be quite willing to
4    stand there and at a safer distance and look
5    straight at that perpetrator.
6        Q.    Right.
7              But you have no way of knowing
8    that in any given case?
9        A.    Well, that's what you try to -- no,
10   but that's what you try to discern.  You're
11   trying to discern that.  You're not trying to
12   discern their victim or bystander status per se,
13   but rather what -- you know, what are these
14   other variables, because that's how you would
15   find any difference between bystanders and
16   victims is that they differ in those ways.
17       Q.    Right.
18             But a victim could also want to
19   look the perpetrator in the face as well?
20       A.    Sure.
21       Q.    And do the studies also distinguish
22   between law enforcement involvement in the
23   identification versus nonlaw enforcement
24   involvement in the identification?
25       A.    That's not -- that's not a distinction

1    that has really been made within this
2    literature, no.
3        Q.    So it doesn't matter whether a police
4    officer administers the procedure or some third
5    party?
6        A.    Other things being equal, it doesn't
7    matter.  I mean, the question is what was the
8    protocol that was used on the procedure, not was
9    this person a police officer or a civilian.
10       Q.    But the protocol that you have been
11   talking about today, that's all been studied
12   largely and primarily in the context of law
13   enforcement administration of IDs?
14       A.    Well, in any -- it's been studied in
15   the context of anyone administering an ID.  I
16   mean, when we do our experiments, it's not law
17   enforcement per se that's doing -- that's doing
18   these and not even -- except in some studies.
19   There have been some studies that we've done
20   like this where the witness presumes that it's
21   law enforcement.  But, no, there's no presumption
22   here on the part of -- within the lab studies
23   that it's -- that it's law enforcement that is
24   administering that procedure.
25       Q.    So then there is a distinction between

Page 113

1  the two and there is research on both?
2      A.   There's a distinction between the two
3  in the sense that one's law enforcement, one's
4  not.  There's no presumption that it matters.
5      Q.   So there is no general literature then
6  that talks about that distinction and whether it
7  has any impact or significance on the reliability
8  of an ID?
9          MR. SATIN:  Objection.  Compound
10 question.
11     A.   Right.
12         MS. ROMEO:  Do you want to break
13 for lunch soon and then come back or how --
14         MR. WISE:  It's kind of up to --
15         MS. ROMEO:  Yeah, what do you guys
16 think?
17         THE COURT REPORTER:  I can go
18 through or -- I mean, I'm fine.
19         MS. ROMEO:  All right.  So we'll
20 just go for a little bit longer, and then we'll
21 break for a short lunch break.
22         MR. SATIN:  Is that okay with you?
23         THE WITNESS:  Yeah.  I feel like I
24 just ate that breakfast.
25         MS. ROMEO:  Oh, okay.  Well, we

Page 114

1  can keep going.
2          THE WITNESS:  But don't let me
3  take things longer than you guys want to take
4  them.
5      Q.   All right.  So let's talk generally
6  about the factors that you consider to be
7  important in assessing the reliability of an ID.
8  Can you kind of give me a list?
9      A.   Well, they fall in the three categories
10 of acquisition, or what we sometimes call
11 encoding; storage, or what we sometimes refer to
12 as retention; and retrieval, or in the case of
13 eyewitness identification, the identification
14 procedures and matters surrounding it.  So they
15 fall -- they fall in those general three
16 categories.
17     Q.   So let's take each category in turn.
18 Can you elaborate on when you're assessing an ID
19 what are the sorts of things you're looking for
20 with respect to acquisition?
21     A.   Right.  So there you're looking at
22 things like view, attention, stress, fear; and
23 view broadly to include relevant variables like
24 lighting, distance, clarity.
25         And then for attention factors

Page 115

1  you're looking at things like the presence of
2  distractions, the percentage of time devoted --
3  you know, how much -- the percentage of time
4  that's functionally then devoted to view even
5  if -- so the opportunity to view may be X amount
6  of time, but actual viewing is more likely to be
7  some subset of that.  Fear and stress being
8  something that one would assess based on the
9  nature of the circumstances.  There are times in
10 which that wouldn't be a factor or be present at
11 all.
12         And then opportunity, which is
13 still a part of acquisition, to have some kind
14 of restful, calm reflection right after the
15 event to think about what you just saw and
16 consolidate that.  So those are all factors that
17 go into the acquisition of a memory.
18     Q.   With respect to the research that's
19 been done on these various acquisition factors,
20 do all of the studies, whether of actual cases
21 or controlled lab studies, I mean, do they all
22 come out the same way?
23     A.   Well, they all come out the same way
24 in the sense that as you -- you know, when you
25 create, for example, distractions, there's

Page 116

1  something else also to pay attention to, that it
2  reduces acquisition of the central or focal
3  variable under consideration like a face.  So,
4  for example, we know that weapons distract.
5  People pay attention to weapons.  It's called
6  the weapon focus effect.  They'll observe the
7  weapon.  That's time away from the face.
8          So we know that the shorter the
9  exposure, the longer the exposure, the less
10 light, the less reliable.  So they come out the
11 same way in the sense that they always push
12 things in the same direction.
13     Q.   Right.
14         But do they come out the same in
15 the sense of yielding consistent results across
16 the general population?
17     A.   Well, that is what we consider to be
18 consistent results.
19     Q.   So do they come out with consistent
20 results, these studies?
21     A.   Yes.
22     Q.   And what are those consistent results?
23     A.   Well, just the things that I have
24 answered.
25     Q.   Right.

Page 117

1    But by "consistent results," I
2 mean, do they yield a number?  Like do they
3 yield a percentage or do they just say this is a
4 relevant factor and it may?
5    A.   Well, any given study has a percentage.
6 Doesn't mean you take that percentage and treat
7 it like it's -- which as we talked about before,
8 treat it like that's the same percentage it's
9 going to be in any other situation.
10    Q.   Right.
11        So these studies, as we discussed
12 before, the purpose is to identify factors which
13 may or may not affect the actual witness who is
14 viewing the suspect at issue?
15    A.   Well, these studies identify factors
16 that do have that impact.
17    Q.   With respect to the view, are there
18 studies that discuss the viewing opportunities
19 of a suspect in the sense that say you have
20 somebody who is directly across from you, so
21 they're looking face-to-face, as opposed to
22 someone who gets mugged on the street and the
23 perp runs away.  Are there studies that discuss
24 the likelihood of reliability with respect to
25 those viewing conditions?

Page 118

1    A.   Well, I mean, there are studies that
2 give better or worse views, and that's what
3 you're describing.
4    Q.   So if somebody is directly opposite
5 you, that's a better view than if somebody --
6    A.   Is behind you?  Yes.
7    Q.   What about to the side of you?
8    A.   Well, if you turn and look at them,
9 it's the same as being right in front of you, so
10 you have to know what they're doing.
11    Q.   Well, what if you only turn your head,
12 but not your entire body?
13    A.   Your body -- it turns out our eyes
14 work just as well whether our body follows them
15 or not.
16    Q.   So there isn't a study that discusses
17 the particular difference about the viewing
18 opportunities that we just talked about?  And if
19 there is, if you could point me to it.
20    A.   As to whether you turn your head to
21 the side to see something or --
22    Q.   No, just general viewing conditions,
23 so that discusses the witness' ability to view
24 the person, which could be in a number of
25 different situations.  It could be directly

Page 119

1 across.  Could be just turning your head.  It
2 could be, you know, you don't even see the
3 person; the person is behind you.  You know, has
4 there been a study done that talks about that?
5        MR. SATIN:  Objection.  Vague as
6 to "that."
7    A.   Well, there are -- there are studies
8 that manipulate viewing conditions in various
9 ways.  I mean, for example, how long the person
10 was in view, their distance from you.  And it
11 seems to me that what you're describing with,
12 you know, your sort of hypothetical, no one
13 would describe a study in which they would say,
14 okay, the person was directly in front of them
15 versus the person was behind.  I mean, what you
16 would want to know is how long was the exposure
17 time.
18    Q.   So what are the studies on exposure
19 time?
20    A.   There are studies that -- there are
21 many studies that manipulate exposure time.
22 They'll manipulate it not as a focal variable,
23 because it's just so obvious, but rather as what
24 we call a background variable, so let me explain
25 what I mean by that, or what's called a

Page 120

1 moderator variable.
2        So, for instance, you know,
3 suppose that your primary interest in the study
4 is in whether people have more trouble, more
5 difficulty identifying someone of your own race
6 than another race; right?  Well, what they might
7 do is give -- is manipulate also not just the
8 race of the person that you're looking at, but
9 also how long the exposure time was.
10        And they're not really interested
11 in exposure time, because they know what that's
12 going to do.  They're interested in the question
13 of, for example, if exposure time is long enough,
14 can you overcome the cross-race effect.
15    Q.   So then since it is obvious, it would
16 be the case that being directly across from the
17 perpetrator would increase the chances that an
18 ID is reliable?
19    A.   It's functional exposure time, not
20 opportunity that matters.  So someone could be
21 directly across from you; but if -- you know, if
22 your attention is directed down here, right,
23 them being directly across from you doesn't
24 really matter.  So it's functional exposure
25 time, not just opportunity to view.

Page 121

1    Q.   Right.
2         But let's isolate that factor.
3    A.   Uh-huh.
4    Q.   So let's isolate the viewing
5    opportunity --
6    A.   Correct.
7    Q.   -- away from --
8    A.   Right.
9    Q.   -- attention --
10   A.   Right.
11   Q.   -- or from weapon focus or from
12   whatever.
13   A.   Right.
14   Q.   If you have a direct view, because
15   you're directly across from the person who is
16   victimizing you, that is an indication of
17   reliability; would you not agree?
18   A.   Well, it's a -- it would be a -- it
19   would go into -- it would -- it would allow for
20   reliability depending on other things that you
21   would observe.
22   Q.   Right.
23   A.   I mean, you still would -- you would
24   consider the totality of circumstances. For
25   example, if one is claiming that they had a

Page 122

1    great view, right, you would want to see a great
2    description.
3    Q.   Right.
4         But my question is, let's isolate
5    the one factor, the viewing opportunities, from
6    everything else and just answer whether that is
7    an indicator of reliability. Whether it's
8    affected down the line by other factors is a
9    separate question.
10   A.   If you isolated that one --
11   Q.   Yes.
12   A.   -- variable, then that would -- you
13   know, and you're hypothetically comparing it to
14   them not being in front of you?
15   Q.   Correct.
16   A.   Then yes.
17   Q.   And even if the person is not directly
18   in front of you where you have at least this
19   opportunity to have an optimal viewing condition --
20   A.   Being directly in front of you doesn't
21   necessarily make it an opportunity for an
22   optimal viewing condition.
23   Q.   Correct.
24        But let's just say --
25   A.   Okay, right.

Page 123

1    Q.   -- for the purposes of this hypo a
2    person is directly in front of you.
3    A.   Uh-huh.
4    Q.   And perhaps there are some other
5    things that affect the viewing conditions, so
6    let's just say it's nighttime, but there are,
7    you know, lights, traffic lights and the sort.
8    A.   Uh-huh.
9    Q.   The presence of not having the direct --
10   one person directly in front of the other, it
11   doesn't make an ID impossible?
12   A.   No.
13   Q.   And if the lighting conditions, you
14   know, it's not broad daylight and it is
15   nighttime and there's streetlights, that doesn't
16   make an identification impossible?
17   A.   No.
18   Q.   And if there's some distance between
19   the perpetrator and the victim, that wouldn't
20   make an ID impossible; is that correct?
21   A.   Depending on that distance, yes.
22   Q.   But let's say it's a modest distance.
23   Let's say 25 feet.
24   A.   Right.
25   Q.   It's not impossible; correct?

Page 124

1    A.   Right, right.
2    Q.   What about 50 feet, is that impossible?
3    A.   No.
4    Q.   What about a hundred feet, is that
5    impossible?
6    A.   It's not impossible, but it's starting
7    to push some limits.
8    Q.   Where would you put the limit on
9    distance?
10   A.   It generally is being -- it's
11   generally being put at around 140, 150 feet.
12   Q.   Is there a leading study on that?
13   A.   Geoffrey Loftus' work.
14   Q.   Loftus? Okay.
15   A.   When you look up -- if you look up
16   Loftus, you're going to see most of the work
17   that you'll go to will be Elizabeth Loftus.
18   It's not Elizabeth Loftus. This is Geoff with a
19   G.
20   Q.   Okay. So once you start to hit the
21   line where things might get a bit blurry in
22   terms of distance --
23   A.   Uh-huh.
24   Q.   -- how do you adjust for that distance
25   factor when you're assessing the reliability of

1 the ID? How do you do it? What's the value?
2     A.   When you get out to that point?
3     Q.   Yeah.
4     A.   You know, if you were out around the
5 fringes like that, you would -- you would refer
6 to Geoff Loftus' tables and formulas.
7     Q.   So he actually has numbers where you
8 could say, you know, this ID should be knocked
9 down, the reliability is knocked down, 10
10 percent or 15 percent?
11     A.   Right.
12     Q.   But Geoff Loftus, he makes the
13 distinction at like 140, 150 feet; correct?
14     A.   Yeah. And it's a -- it's a continuous
15 process once you get beyond, you know, 40 feet
16 or so. So there's not all of a sudden some
17 dramatic drop-off at that point where you draw a
18 line at some point in time.
19     Q.   Do his tables give you figures across
20 the board like the whole continuum from 0 feet
21 to 150 or do they start at a certain point?
22     A.   Not at every interval, but, you know,
23 we know a lot about the visual system, and we
24 know that it's basically a linear process, so
25 you sample along those numbers.

1     Q.   So what are the intervals?
2     A.   I don't remember what ones he used.
3 He's done more than one study and probably used
4 different testing intervals in there.
5     Q.   Do you think that he's put an interval
6 on a hundred feet, for example? Like do you
7 think the intervals start lower or higher is my
8 question.
9     A.   Well, they start much lower than that.
10     Q.   How low would you estimate that they
11 start?
12     A.   Oh, they start at like 5 feet. As I
13 recall, that's about where he starts them.
14     Q.   Okay.
15     A.   And then you don't see much difference
16 between 5 and 15. I mean, the human eye makes
17 certain adjustments and -- but it just has
18 limits.
19     Q.   So you said it's a continuum and it's
20 not like there's a, you know, dramatic -- where
21 do you start to see the differences? Is it at 5
22 to 15 or is it a further distance?
23     A.   You don't see much happening in 5 --
24 in 5 to 15. There's a little bit going on in
25 there, but not much.

1     Q.   So where does it start?
2     A.   Well, I mean, most people start it at
3 around 20 and say, yeah, look at what's starting
4 to happen at that point.
5     Q.   Right.
6          And then when does the -- is there
7 a dramatic drop-off at any point?
8     A.   No. It's a continuum.
9     Q.   And it's fairly consistent along the
10 way?
11     A.   It's fairly predictable from the
12 previous data point, yeah.
13     Q.   So the time that you could view a
14 perpetrator can obviously vary.
15     A.   Right.
16     Q.   It could be seconds. It could be
17 minutes.
18     A.   Right.
19     Q.   Even if it's relatively brief, does
20 that make an ID impossible?
21     A.   No.
22     Q.   And even if it was really long, does
23 it make an ID absolutely possible?
24     A.   Makes it possible. You mean -- you
25 mean -- is that what you meant to ask?

1     Q.   Yeah. What I mean -- no, what I mean
2 is, if a person had a really long time to view
3 the perpetrator, does that guarantee that
4 they're going to be able to ID the person?
5     A.   No.
6     Q.   If the person is stressed, does that
7 make giving an ID impossible?
8     A.   No.
9     Q.   If the person is experiencing fear,
10 does that make it impossible for a person to
11 make an accurate identification?
12     A.   No.
13     Q.   And if the person didn't have -- I
14 think you identified that there's a period where
15 they can reflect on the event. If they didn't
16 have that, does that make the ID impossible?
17     A.   No.
18     Q.   And going to weapon focus for a
19 minute, can you tell me about the literature on
20 that?
21     A.   Well, weapon focus has primarily tried
22 to -- as the name implies, has primarily tried
23 to look at the fact that or look at the question
24 of if there's a weapon present, if there's a
25 weapon visible to the witness, does it draw

Page 129

1    attention.  Is some percentage of the witness'
2    attention then drawn to that, which means
3    anytime it's drawn to that, it can't be focused
4    on the face.  And that literature is pretty
5    consistent in showing that, yes, the presence of
6    a weapon does that.
7              These studies have tried to do
8    this kind of thing in a variety of ways.  I
9    mean, some of the very earliest just simply
10   asked, you know, does it, does the presence or
11   absence of a weapon, impair memory for the --
12   for the perpetrator in the scene.  But then
13   others begin to look at things like eye
14   movements, so measuring people's tendencies to
15   glance away and focus on the weapon, which they
16   do.  And then other work has come along and
17   pointed out that actually attention gets
18   misdirected or gets directed to any unusual
19   object.
20      Q.   Is there a distinction --
21      A.   So if you pull out a carrot, for
22   example, the same thing.  Same kind of thing
23   happens, but --
24      Q.   So is there a distinction between a
25   weapon that is placed, you know, directly to a

Page 130

1    victim's head, for example, versus a situation
2    where, you know, as is the case here, the
3    plaintiff was shot at in her car, while she was
4    in her car, from another car?  So a weapon is
5    pointed, quite clearly, but it's not in the
6    face.
7       A.   There hasn't been a distinction like
8    that made in the literature.
9       Q.   Is that because the studies have
10   yielded results that don't show a distinction or
11   is it because the studies focus on weapons in
12   the close proximity of the victim?
13      A.   Well, they're not dealing with weapons
14   in the close proximity of the victim.  They're
15   dealing with weapons that are in the hands of
16   the perpetrator.  They're not -- it's not --
17   it's not up close to them.
18      Q.   Right.
19             But wouldn't viewing -- let's say
20   it's a gun; right?  So let's say the gun is
21   right in front of your face.  I mean, that's
22   different than if the gun is where that coat
23   rack is over there.
24      A.   It probably would be different.
25      Q.   So what I'm trying to get at is

Page 131

1    whether the literature has tested that
2    difference and whether there's been a finding
3    that that difference doesn't have significance
4    or whether the literature has focused more on
5    the situation where the weapon is actually in
6    the very, very near vicinity of the victim.
7       A.   None of the studies have been done
8    where it's very near the vicinity.  It would
9    always be of the type where somebody is standing
10   at a distance with a weapon.
11      Q.   So do you think that there's a
12   distinction between based on your professional
13   experience?
14      A.   Yeah, but there would be a lot of
15   differences.  For example, it may be impossible
16   at that short distance to actually even see the
17   person, so it could even obstruct view.  It may
18   be that fear is even greater if it's right at
19   your head, but on the other hand, if it's being
20   fired at you.
21             You know, so that's the whole
22   other element of the weapon effect, and that is
23   that there's sort of these two components.  It's
24   called weapon focus effect because that's what --
25   because what the work has shown is that people

Page 132

1    focus on the weapon, but the presence of a
2    weapon also escalates fear and stress quite
3    independently of what it does to attention.
4       Q.   Right.
5             But, I mean, that's not capable of
6    mathematical precision.  I mean, everybody
7    experiences stress and fear differently; correct?
8       A.   Yes.
9       Q.   So, I mean, one person -- and let's --
10      A.   But the effect of stress and fear is
11   the same.
12      Q.   Well, let's take an example.  Let's
13   take an example of a person that lives in a
14   conflict zone where people walk around with
15   machine guns every day versus a person in New
16   York City who may have never even seen a handgun
17   in their entire life.  Do you think that the
18   reaction to seeing a weapon is going to be
19   exactly the same?
20      A.   Probably not under that hypothetical,
21   but I think that if a weapon is being fired at
22   you, I think that the reaction is pretty much
23   the same whether you're in New York or in a
24   conflict zone.
25      Q.   Right.

Page 133

1        But in terms of -- but talking
2   about the weapon focus, the idea that your
3   attention is going to go to the weapon, I'm
4   trying to see whether there's a distinction
5   between, you know, persons who may or may not be
6   more accustomed --
7        A.   For whom it's more novel?
8        Q.   Right, exactly.
9        A.   And so -- and so, you know, you always
10  try to assess that possibility by looking at,
11  for example, things that the witness might have
12  said.  If the witness said, "I saw the weapon,"
13  that's -- then obviously in order to see the
14  weapon, they had to have been looking at the
15  weapon.
16        If you've got a witness, even if
17  there was a weapon present, who says, you know,
18  "I didn't -- I think he had a weapon, but I
19  didn't see one," well, then whether they had a
20  weapon or not doesn't matter.  So the question
21  is relevant in terms of what they were focused
22  on.  And in that sense it doesn't matter.  You
23  know, there's nothing special about weapon focus
24  in that situation.
25        It may also be the case that, for

Page 134

1   example, if someone right next to you was shot
2   and that's your focus, it's the same thing.  It's
3   a distraction, something else that's cutting
4   down dramatically on functional exposure time to
5   the face of the perpetrator.
6        Q.   That's all relevant to the analysis of
7   whether weapon focus is at play, correct, all of
8   these things you just talked about?
9        A.   Sure.
10        Q.   So do you know whether the plaintiff
11  in this case has ever seen a gun before?
12        A.   Well, she claims she saw this gun.
13        Q.   Right.
14        But before this are you aware?
15        A.   No.
16        Q.   And even if a gun is present, does
17  that make it impossible for a person to render
18  an accurate identification?
19        A.   No.  I'll always answer that question
20  with no.  And you're asking me whether something
21  is impossible, and scientists don't say
22  anything's impossible.
23        Q.   So it's not impossible if somebody was
24  pointing a gun at me and the gun was where the
25  coat rack is; correct?

Page 135

1        A.   It's not impossible.
2        Q.   And it's not impossible if the gun was
3   right here next to my head either for me to make
4   an identification?
5        A.   I mean, it's not impossible.
6        Q.   Is there a difference, in your opinion,
7   between getting shot at directly at your person,
8   like your body, as opposed to being shot at while
9   you're in a car where you can duck, for instance,
10  or, you know, do something like that?
11        MR. SATIN:  Objection.  Vague.
12        A.   Well, there's no reason to think there
13  would be a difference unless it brought into
14  play other things.  Like, for example, by having
15  some kind of barrier like a seat inside of a car
16  to get away from, let's say, a shot being fired
17  means that you've lost all opportunity to
18  observe the shooter; whereas if you were out in
19  the open, you might still be -- you know, in an
20  attempt to protect yourself, you might still be
21  looking at least in the direction of the shooter
22  as you're trying to engage in this survival kind
23  of thing, although in most cases your concern is
24  with the weapon, not the face of the shooter.
25        Q.   Even in a case where you're shot at in

Page 136

1   a car, though, you could still make an accurate
2   identification; correct?  It's not impossible.
3        A.   It's not impossible.
4        Q.   And even if you were in a car, you
5   could still do the same exact thing that you
6   just mentioned for somebody out in the open to
7   kind of look up, you know, look down; look up,
8   look down; look up, look down, so to speak?
9        A.   You could.
10        Q.   Do you know whether that's the case
11  here?
12        A.   Whether what's the case?
13        Q.   That Varda Guetta was in a car when
14  the shooting attack occurred.  Are you aware of
15  what she did while she was in the car and being
16  shot at?
17        MR. SATIN:  Objection.  Compound
18  question, and counsel is editorializing the
19  evidence.
20        Q.   You can answer.
21        A.   Well, my recollection is that she
22  reported trying to tend to her son, and I don't
23  recall specifically what she might have said
24  about trying to duck down to protect herself.
25  Most of -- as I recall, what she had to say was

1  that her primary concern was her son, who would
2  have been obviously occupying a lot of her
3  attention during this episode.
4      Q.   So is it your position that if there's
5  a family member present at the scene of a crime
6  while a crime is occurring, that that person
7  can't make an identification?
8      A.   I don't think I said anything like
9  that.
10     Q.   So then it's not impossible for
11 someone who is tending to a family member that
12 may also be present during the crime to make an
13 accurate identification?
14     A.   Nothing's impossible.
15     Q.   And even if a crime takes place at
16 night with some light, it's not impossible to
17 make an identification?
18     A.   It's not impossible.
19     Q.   So let's talk now about -- I think the
20 next set of variables that you identified are
21 the retention variables.  Do you want to expand
22 on what factors are encompassed under that
23 category that are relevant to your analysis?
24     A.   Well, the primary factor involved
25 here, and typically involved in retention, is

1  the frailty of memory across time.  So, you know,
2  the oldest findings in scientific psychology
3  concern the question of how -- you know, the
4  fate of memory across time, the so-called what
5  most people talk about as forgetting.
6          And so what happens here, of course,
7  is that we know the -- we know the direction of
8  this variable quite well.  We know that memory
9  doesn't get better with time, and so the longer
10 the time passes, the longer the passage of time
11 between acquisition and retrieval, the less
12 reliable the memory.
13         Now, the actual function,
14 mathematical function, that relates the passage
15 of time to memory, we know the shape of that.
16 It's a so-called negatively decelerating curve.
17 So what that means is that forgetting is more
18 rapid in the early times after an event than it
19 is later, so it starts to level off.  It becomes
20 proportional to what's left.
21         So, for instance, you'll lose more
22 information in memory during the first month after
23 an event than between the first month and the
24 second month, because this negatively decelerating
25 curve is ultimately flattening out over a long

1  period of time.
2          And so the other thing about the
3  retention period is that there are what we call
4  postevent information that can occur where, for
5  example, someone can suggest something to a person
6  about their memory about the original event and
7  they will incorporate it in even though it's not
8  something that they directly observed or they
9  directly experienced, and it can become a part of
10 what they ultimately report.  So the retention
11 interval is a critical interval because its length
12 matters, but also things that occur during that
13 period.
14         We know that, for example, people
15 will -- even without external suggestion, they'll
16 go back and because if it's a significant event
17 and they have gaps in their memory, they will
18 fill those -- the tendency is to fill in those
19 gaps with inferences and guesses and suppositions
20 and deductions so as to achieve a kind of sense
21 of closure on it, a sense of having a more
22 complete memory, so those are things that happen
23 during that retention interval too.
24     Q.   So you mentioned that the mathematical
25 curve with respect to retention will flatten

1  out, so the month immediately after, you know,
2  you may forget certain things and then it starts
3  to kind of bottom out.  So is it correct to say
4  that once you hit that baseline of what you're
5  going to remember, then that's still what you're
6  going to remember a year from now or two years
7  from now?
8      A.   Well, it never stops dropping until it
9  gets down to zero, but the rate of drop is lower.
10 So, for example, what you forget -- what's
11 forgotten in the first year, from zero time
12 after the event until one year, is much greater
13 than what's forgotten between Years 7 and 8;
14 right?  But -- and so what that means is that
15 there's probably not a lot of difference between
16 four years and nine years, quite frankly, because
17 it's already so low by that point that it's not --
18 it's not rapidly accelerating down.
19     Q.   Right.
20         But it's not impossible to make an
21 identification at four years; correct?
22     A.   It's not impossible.
23     Q.   It's not impossible to make an
24 identification at nine years either; correct?
25     A.   Not impossible.  Just highly improbable.

1    Q.    What's "highly improbable" mean?
2    A.    It means that the -- unless -- it
3  means that it could be done under the right
4  circumstances.  So, for instance, if you had
5  hours and hours of interaction with somebody, a
6  lot of exposure to them, then it may be that
7  nine years later you could do that; but if
8  you're already starting off with a relatively
9  weak memory, you're -- it's going to be very
10 improbable that with that kind of passage of
11 time you can make a reliable identification, but
12 not impossible.
13    Q.    Have you seen circumstances in which
14 there is something that you view as a highly
15 improbable ID has turned out to actually be, in
16 fact, accurate?
17    A.    I can't think of -- I can't think of
18 such a situation, such a case.
19    Q.    Have you ever seen what you would call
20 a reliable ID turning out to be inaccurate?
21    A.    I've seen -- I have seen cases that if
22 I had not known otherwise, I would have probably
23 assumed were reliable.
24    Q.    Can you give me an example?
25    A.    Yeah.  I think that the case of

1  Jennifer Thompson and what turned out to be her
2  misidentification of a guy named Ronald Cotton
3  proven to be incorrect through DNA testing.  She
4  gave amazing testimony about how she
5  studied her attacker's face very carefully.  She
6  spent a lot of time with him.  How she was
7  absolutely determined that she would never
8  forget his face, that she was going to make him
9  pay for this.
10          And she gave a rather detailed
11 description and even did a composite -- and had
12 what she believed to be such a good memory that
13 she actually did a composite drawing of him.
14 And she identified him first from photos and
15 then from a live lineup and then at trial said
16 she would never forget that face, she was
17 absolutely positive, there was absolutely no
18 doubt in her mind.
19          He was convicted.  Eleven and a
20 half years later DNA proved he didn't do it and
21 pointed to the real perpetrator, Bobby Poole.
22 At that time, prior to the DNA testing, I would
23 have said, you know, a lot of these IDs are
24 questionable, but I wouldn't have called that
25 one questionable.

1    Q.    So other than that ID, have you ever
2  opined that an ID was reliable?
3    A.    I've opined that ID procedures that
4  were used were good, reliable procedures, but
5  not that the ID itself was necessarily reliable.
6    Q.    So in all of your cases for which
7  you've been retained as an expert then, you have
8  opined that the actual ID is unreliable based on
9  the totality of the circumstances?
10    A.    Yes.
11    Q.    And in all of those cases did you go
12 through and assess all three levels, acquisition,
13 retention and retrieval?
14    A.    Yes.
15    Q.    Even if acquisition and retention,
16 according to you, there's a nearly zero chance
17 that the ID is reliable?
18    A.    Then would I look at retrieval?
19    Q.    Right.
20          Yeah, my question is, in situations
21 where you have found that the acquisition and
22 retention variables are so low, have you then
23 gone on in every case to look at the retrieval
24 factors?
25    A.    Yes.

1    Q.    Can you give me an example of some of
2  the other unreliable IDs that you've opined on?
3    A.    Sure.  There was the case of Chicago
4  versus Newsome where the -- it was a murder
5  case, and the -- but I -- but I came in after,
6  postexoneration.
7    Q.    So all of these examples would include
8  cases where you knew that the ID was actually
9  inaccurate?
10    A.    Right.
11    Q.    So you can just finish giving me that
12 example.
13    A.    Well, in the Newsome case, there were
14 three eyewitnesses to a murder.  All three
15 testified at trial that they identified Newsome
16 from a live lineup.  Ultimately it was proven
17 after, I think, seventeen years in prison that
18 Newsome didn't do it, and it was also proven who
19 did.
20          And the sole surviving witness --
21 two of them were dead by that point -- came
22 forward and said, "Here's what really happened.
23 The police, Chicago Police Department, when I
24 was viewing the live lineup, I said, 'I don't
25 see the guy there.  The guy that -- the guy that

Page 145

1    committed this murder is not there.' And they
2    said, 'Yes, he is,' and they forced me to pick
3    Number 2." Well, of course, this just became,
4    you know, that's what he says. The Chicago
5    Police Department says, "No, we didn't do that,"
6    right, the detectives.
7         So in that case I did an analysis
8    of the lineup. We know who the real perpetrator
9    was. In fact, we had a picture of the real
10   perpetrator from within a week of the actual
11   murder.
12        And what I showed was that if
13   you -- using various experimental methods, that
14   in that lineup Newsome would have been the last
15   person anyone would have picked if they'd have
16   seen the real murderer. The chances of three
17   out of three of these witnesses independently
18   picking Newsome was astronomically low, which
19   the Court accepted. The jury accepted. They
20   rendered a verdict for the plaintiffs. Chicago
21   bitched. It went to the Seventh Circuit.
22   Seventh Circuit, very conservative circuit,
23   upheld the ruling and said that my analysis was
24   correct.
25        Q.   So as you noted, all those cases were

Page 146

1    exoneration cases of some type. So would this
2    be the first case that you're opining on whether
3    the ID is reliable or not and we don't know
4    whether the identified person, in fact, committed
5    the crime?
6         A.   In the civil domain?
7         Q.   Correct.
8         A.   That might be true, with -- again,
9    with the exception that when you say we know for
10   sure that the person didn't commit the crime,
11   I'm going to give you another kind of example
12   where, for example, the DNA in a rape victim
13   does not match ultimately -- once forensic DNA
14   testing came along, does not match the person
15   who was convicted.
16        And on the basis of that, the
17   conviction is overturned, but the county or the
18   city takes the view that, oh, we don't know
19   whose DNA that is and maybe the rapist did not
20   ejaculate, and just showing that it's not him,
21   and so they fight it on the grounds that they
22   think that --
23        Q.   So let's --
24        A.   And so it works out exactly the same
25   where what you're doing is you're still trying

Page 147

1    to say yes, but -- so let's assess the ID,
2    because they're saying we got the ID. We'll
3    assess the ID with regard to its reliability, in
4    which case there's not a concession at all that
5    he was definitely innocent, and so it becomes
6    that same kind of situation.
7         Q.   Well, this would be the first time,
8    though, that you're opining on a case where the
9    ID is shown -- let's just say that there's a
10   very high probability that the ID is inaccurate,
11   so this would be the first time that you're
12   opining on the reliability of an ID in the
13   context of a case where we do not know that
14   there's a high probability that it's inaccurate?
15        MR. SATIN:  Objection.  Vague.
16        A.   That would probably be true among the
17   civil cases, yes.
18        Q.   So going back to the passage of time,
19   would you say that -- you stated earlier your
20   position that because people are people, we all
21   experience trauma from a crime in exactly the
22   same manner and that it will manifest in exactly
23   the same manner.
24        MR. SATIN:  Objection.  Compound
25   question.

Page 148

1         Q.   Is that correct?
2         A.   I don't think I ever said that.
3         Q.   So then victims of --
4         A.   By the way, the word "trauma," I'm not
5    talking about trauma at all here.
6         Q.   Okay.  Well, what does "trauma" mean
7    to you in the context of eyewitness IDs?
8         A.   Well, trauma would typically be some
9    kind of indication that there -- it would be
10   indicated if there's some kind of strong
11   dysfunction on the part of the, for example,
12   victim where let's say they can't even remember
13   the event or -- you know, so that would be an
14   example of trauma.  What I talk about is stress
15   and fear.
16        Q.   How is that different from trauma?
17        A.   Well, I mean, you can be stressed and
18   you can be fearful and still be aware and be
19   functioning.  If one is traumatized at the time,
20   which is what's relevant here, it's not a
21   question of whether she's felt some kind of
22   posttraumatic stress afterward.  That's not
23   really relevant to my analysis.
24        Q.   So victims don't experience trauma
25   while they're being victimized?

Page 149

1      A.   Well, they can.  I don't -- I don't
2  see any level of total dysfunctional trauma that
3  might have occurred here.  I mean, she was still
4  attending to her son, for example.  But if it --
5  but if it were trauma, then, which is not
6  something that I've been opining about at all;
7  but if it were trauma, then that goes way beyond
8  stress and fear to be basically a form of
9  cognitive processing, a disruption that would be
10 even less favorable for anything having to do
11 with witnessing.
12     Q.   Well, what I am trying to get an
13 answer to is in a situation where a victim is
14 subject to a crime, and you've stated that we
15 all process fear and stress in the same manner,
16 is that the same principle that you would apply
17 to the passage of time?  So, for example, our
18 memories are all similar.  They all retain at
19 the same rates.
20          MR. SATIN:  Objection.  Misstates
21 the testimony, vague and compound question.
22     A.   The negative accelerating curve of
23 forgetting applies -- we've never seen an
24 exception to that in anybody who's ever been
25 tested.  You've got two ways you can do that,

Page 150

1  what we call between-subjects designs and within-
2  subjects designs.  So between-subjects designs
3  you're collapsing across a lot of people and
4  looking at this curve.  But you can also look at
5  it within a given person and you see the same
6  kinds of things; and, you know, it's always --
7  it's always following that curve, so --
8      Q.   Right.
9           But can the curve start at a
10 different point for one person?
11     A.   Absolutely.  Of course it can start at
12 a different point.
13     Q.   Right.
14          And the point that it could start
15 at could be higher for one person as opposed to
16 lower for another person?
17     A.   Sure.  And most of that's going to
18 depend not so much on the person as the
19 circumstances.
20     Q.   So postevent information, if there is
21 the presence of postevent information prior to a
22 witness making an identification, does that make
23 the identification impossible?
24     A.   Impossible, no.
25     Q.   How important do you think that that

Page 151

1  factors into the analysis, that particular
2  factor?
3      A.   Into my analysis?
4      Q.   Yes.
5      A.   Well, there's -- the records are so
6  poor that it's unclear, but the timespan is so
7  long that it's unclear what postevent information
8  might have occurred in that period of time.
9      Q.   I mean, by definition a long period of
10 time would mean that there's more opportunity
11 for postevent information to occur; correct?
12     A.   Yes.
13     Q.   So then how can an identification be
14 possible at nine years?
15     A.   Because everything's possible.
16 Identification would be improbable at nine years,
17 but not impossible.
18     Q.   Where would you categorize the witness'
19 description of a subject?  What stage does that
20 fall under?
21     A.   Well, it's an indication of when it --
22 to the extent that the description is occurring
23 relatively soon after the event, it's an
24 indication of the extent of acquisition.  It's
25 an indication of that.

Page 152

1           The description itself is not
2  acquisition, storage or retrieval.  The
3  description itself is -- well, I mean, it is a
4  type of retrieval that's occurring at that
5  point; right?  When you ask someone what did
6  he look like, they're engaged in a form of
7  retrieval at that point.  The significance of
8  it, among other things, is that how extensive
9  detailed that description is is an indicator of
10 how good the acquisition was.
11     Q.   Is there research to support that?
12     A.   Well, there's research showing that
13 the longer you give someone to view a face, the
14 more descriptors they'll generate of that face.
15 The better the view you give them, the more
16 descriptors they'll show, they'll come up with.
17     Q.   But are there studies that show that
18 the amount of detail that a suspect gives in a
19 description correlates to identification
20 reliability or identification accuracy?
21     A.   Yeah.  The correlation is a modest
22 one, and it depends on how you calculate it.  So
23 for instance, in one study that Jack Brigham at
24 Florida State and his colleagues did, they had
25 everybody view exactly the same event, exactly

Page 153

1   the same face and everybody's tested with that
2   face. And what they found was that how well you
3   could describe that face did not do a good job
4   of predicting how well you could identify that
5   face.
6         But what we did was we showed that
7   if you test across people multiple faces, you
8   let other things vary, like they do in real
9   cases, that there is a correlation between how
10  good the description is and how good their
11  identification is. And the reason for that is
12  because when conditions foster an easy
13  identification -- an easy description are the
14  same factors that foster an easy identification.
15      Q.   So at the very least, though, there
16  isn't a study that you could point me to that
17  says that the general description will increase
18  the likelihood that the identification will be
19  unreliable?
20      A.   I can point to a study that shows that
21  faces -- that faces that are more easily
22  described are also faces that are more easily
23  identified.
24      Q.   And what study is that?
25      A.   That's one of my articles from -- it's

Page 154

1   going back a ways. I was thinking it was '85.
2   Why does that ring a bell? Okay. Let me look
3   in '85.
4       Q.   Okay.
5       A.   Yeah. Published in the Journal of
6   Applied Psychology in 1985, verbal descriptions
7   of faces from memory: are they diagnostic of
8   identification accuracy.
9       Q.   And you would agree that just because
10  a witness isn't asked to give a description at
11  the time of the crime, that it's still possible
12  for them to remember what the face looked like?
13      A.   It is not impossible.
14      Q.   What's your position on that? If a
15  witness is not asked right after the attack for
16  a description of the suspect, what is your
17  position on how that affects the reliability of
18  an ID?
19      A.   If they're not asked for a description
20  right afterward?
21      Q.   Right. And we'll take a break after
22  this question, so --
23      A.   Well, I don't -- I don't think we
24  have -- so your question, so it would be like
25  asking versus not asking for a description right

Page 155

1   afterward, does that have an impact on a later
2   ID?
3       Q.   Yes.
4       A.   I don't know that we know anything
5   about that.
6         MS. ROMEO: Okay. So why don't we
7   take a break here.
8         (A recess was taken.)
9       Q.   So when were you retained by
10  defendants' counsel in this case?
11      A.   You know, I don't remember exactly.
12  I'm thinking that it was in probably early
13  spring.
14      Q.   Of 2013?
15      A.   I think so, but sometimes I say in the
16  report, and I don't know if it's -- I don't say,
17  but that's my best recollection is it was
18  sometime around that.
19      Q.   And have you worked with Miller &
20  Chevalier before?
21      A.   No.
22      Q.   And what were you retained to do?
23      A.   Evaluate the eyewitness identification
24  evidence related to this case.
25      Q.   And did you speak to anyone in the

Page 156

1   process of preparing this report?
2       A.   Just maybe a phone call or two asking
3   if there were any more materials that were
4   related to the case. I thought it was relatively
5   sparse in the way of documentation, especially
6   of the ID procedure.
7       Q.   So when you asked for more documents,
8   did you ask for specific documents?
9       A.   No. I asked, you know, what was there,
10  was there anything more, for example, about who
11  the other individuals were in these photos.
12      Q.   In which photos?
13      A.   The photos from which the witness made
14  an identification.
15      Q.   The identification that's at issue in
16  this case; correct?
17      A.   Uh-huh.
18      Q.   And there are about 15 photos?
19      A.   That sounds right.
20      Q.   Did you ask for anything else?
21      A.   No. I think more of a general sort of
22  updating request for, you know, anything else
23  that they -- that they might have in a case.
24      Q.   And if they had given you more
25  materials, then you would have included that in

1    your analysis?
2       A.   If it was relevant, yes.
3       Q.   How do you determine what's relevant?
4       A.   If it bears on the reliability issue
5    that I was asked to address.
6       Q.   And just to be specific, you would
7    include it if it makes it more reliable; correct?
8       A.   Sure, yeah.
9       Q.   Or less reliable?
10      A.   Right.
11      Q.   And what if it's just a wash?
12      A.   Then it has -- then it has no bearing.
13   Probably wouldn't end up in the report at all,
14   except maybe listed as something that I was
15   given.
16      Q.   So what materials did you rely on in
17   writing this report?
18      A.   Well, I relied on all of the documents
19   that are listed on page 18 of my report.
20      Q.   Did you read any other materials even
21   if you didn't actually use them in your report?
22      A.   I don't think so.  I think this is the
23   full set.
24      Q.   So in preparing your report, can you
25   tell me what you did to prepare it?

1       A.   What I did?
2       Q.   Yes.
3       A.   Well, I would just simply -- generally
4    speaking, I tried to look at these in sort of
5    the chronological order in which they had
6    unfolded, so I'm looking at dates on them and
7    kind of trying to sort and then work my way
8    through them that way, and making notes to
9    myself about things that might be significant
10   and then going through them again and trying to
11   formulate an opinion.  Then I -- and then I
12   began sitting down and writing the report.
13      Q.   And so that sounds like it relates to
14   the second part of your report, which is the
15   application.  How do you prepare the first part
16   of your report, which is the general overview of
17   research?
18           MR. SATIN:  Objection to the
19   commenting on the testimony.
20      Q.   You can answer.
21      A.   Well, none of that is written before I
22   go through this, but certainly I think in theory
23   the first part of the report could be written
24   without necessarily having reviewed materials
25   first, but that's not the way I did it.

1       Q.   Is it similar to your other expert
2    reports that you've rendered in other civil
3    cases, the first part?
4       A.   It would be -- it would be pretty
5    similar, yes.
6       Q.   And in writing that first section this
7    year for this case, with the exception of the
8    Morgan study, did you read all of the other
9    studies before putting them into the report?
10      A.   Read them anew?
11      Q.   Yes, read them anew.
12      A.   For purpose of this?
13      Q.   Correct.
14      A.   No.
15      Q.   So how did you decide what to put in
16   and what not to put in?
17      A.   Put in things that were relevant to
18   the -- to the points.
19      Q.   And how did you choose the sources if
20   you didn't go back and read them anew?
21      A.   Because I know what's in them.
22      Q.   And in this case you've rendered an
23   invoice in, I believe it was, June or July of
24   2013.  Have you billed Miller & Chevalier since
25   that time for anything?

1       A.   No.
2       Q.   And did you meet with defense counsel
3    before this deposition to prepare?
4       A.   No.
5       Q.   Did you speak with defense counsel
6    during any of the breaks today about your
7    testimony?
8       A.   No.
9       Q.   And going back to just the process
10   that you used in putting together this report,
11   at what point did you come to the conclusion
12   that the plaintiff's ID is unreliable?
13      A.   Probably after a second time through
14   the set of materials.
15      Q.   So the first time through it wasn't
16   immediately apparent to you?
17      A.   Well, the first time -- well, it might
18   have been readily apparent, but the first time
19   through I was just trying to make judgments
20   about what's relevant and what's not relevant,
21   where are things at in there, so that on the
22   second time through I could begin to form
23   opinions about those things.
24      Q.   So how about you walk me through that
25   process from the first stage to the second

Page 161

1  stage.  Which factors did you identify as
2  relevant to this case?
3      A.    Well, it probably won't surprise you
4  for me to say that any factor that was relevant
5  to acquisition, storage and retrieval, any
6  things like descriptions or what a witness might
7  have said about their own ability to make an ID,
8  would be relevant.
9      Q.    But let's talk about specifically what
10  you identified as relevant with respect to the
11  plaintiff Varda Guetta.  With looking through
12  her documents, what did you find relevant in
13  your analysis?
14      A.    Early -- fairly early statements
15  saying that she didn't get a good view.  One of
16  the things that was relevant was her inability
17  to give specific descriptions of the gunman, her
18  statements about her primary concern being her
19  son.  What she had to say about, you know, the
20  dynamics of, of that incident; what she had
21  to say about -- well, I guess that's most of in
22  terms of what was of interest to me about that.
23  But then also what she says about -- this would
24  be in, I think, a deposition that she gave
25  earlier this year -- about this process by which

Page 162

1  these photos were dropped off to her, and I
2  think -- I mean, those seem like the main things
3  that were relevant.
4      Q.    The statements that you referred to
5  that she stated she didn't get a good view of
6  the shooters, where are you getting that from?
7  What statements are you referring to?
8      A.    That would be probably going back then
9  to the 2007 deposition, I think.
10      Q.    Varda Guetta testified that she was
11  directly opposite the perpetrator.  Well, she
12  was directly opposite one of the four shooters
13  in this case and that she could see the face of
14  one of the individuals, so are you referring --
15  when you say that she didn't get a good view,
16  are you referring to the person she identified,
17  the face that she testified she saw, or are you
18  referring to the other three faceless gunmen?
19          MR. SATIN:  Objection to the
20  counsel's commenting on the evidence, and it
21  also misstates the evidence.
22      Q.    You can answer.
23      A.    I don't know.  I mean, I'd have to go
24  back and find that, but my recollection was that
25  she referred to the fact that she couldn't

Page 163

1  really provide a very good description and --
2      Q.    In the deposition transcript that
3  you're referring to, was she asked by counsel to
4  give a description?
5      A.    I don't know as though she was in
6  2007.
7      Q.    So how can you be sure that she
8  couldn't give a description if she wasn't asked?
9      A.    Because even though no one specifically
10  said, "Can you give a description?" -- I don't
11  think anyone specifically said, "Can you
12  describe this person's face?" -- there was all
13  kinds of opportunity to do so.
14      Q.    But typically in a deposition you're
15  instructed to answer the question that's asked;
16  correct?
17      A.    Yes.
18      Q.    And you've been deposed before; correct?
19      A.    Right.
20      Q.    So you answer the questions that are
21  asked, generally speaking; correct?
22      A.    Right.
23      Q.    Do you answer questions that aren't
24  asked?
25      A.    No.  But if witnesses have information

Page 164

1  like a relatively specific description, they're
2  going to be giving it all along, including in
3  their initial police reports, which they never
4  did -- which she never did.
5      Q.    Can you be sure of that in this case?
6      A.    Be sure of what?
7      Q.    That if she had a description, she
8  would have given it?
9      A.    It's my opinion if she had a
10  description, she would have given it, yes,
11  because that would have helped.  You know, any
12  reasonable person knows that would have helped
13  to narrow this down to who might have been that
14  particular gunman.
15      Q.    Right.
16          But this was a deposition; correct?
17      A.    Right.
18      Q.    So counsel was asking her questions
19  related to the case; correct?
20      A.    Right.
21      Q.    She wasn't talking to the police, was
22  she?
23      A.    No, but she had earlier and also not
24  given a description.
25          MR. SATIN:  Objection.  Calls for

1  speculation.
2      Q.   So is it your position that -- well,
3  actually, was Varda Guetta asked by the police
4  to give a description?
5      A.   She says she was not.
6      Q.   Do you have any reason to believe that
7  that's not the case?
8      A.   Well, I've never known police not to
9  ask for a description.
10     Q.   Well, the attack occurred not in the
11  United States.
12     A.   I understand.
13     Q.   So do you express an expertise in law
14  enforcement procedures in Israel?
15     A.   No.
16     Q.   So going back to your process and the
17  factors that are relevant to you in this case,
18  you identified a number of factors. Can you
19  explain to me how the calculus of these factors,
20  how you arrived at your ultimate conclusion?
21     A.   An accumulation of the various
22  circumstances and evidence and in conjunction
23  with what we know about factors that influence
24  the reliability of eyewitness identification and
25  principles of perception and memory.

1      Q.   Right.
2           But how did you translate those
3  principles into rendering an opinion on the
4  reliability in this case?
5      A.   By taking them all into consideration.
6  I mean, what else can I say?
7      Q.   Well, what does "consideration" mean?
8  How -- what does "consideration" mean?
9      A.   Well, considering the acquisition,
10  storage and retrieval circumstances and the
11  accumulation of all of these in a downward
12  direction, that when compared even to more ideal
13  circumstances, for example, that don't involve
14  stress or fear, I mean, even those can be
15  unreliable; but when you consider them all
16  together, it's a very low likelihood that a
17  person could make a reliable identification
18  under those circumstances.
19     Q.   By "very low," where does that fall in
20  the continuum that you were speaking about
21  earlier?
22     A.   I think it's near zero.
23     Q.   Isn't that expressing an opinion on
24  the mathematical certainty from which she can
25  make an identification in this case?

1      A.   Well, it's stating a zone of
2  certainty, yes.
3      Q.   So it's your position that the
4  plaintiff cannot or could not make a reliable
5  identification in this case?
6      A.   In the way in which we discussed
7  reliability before, yes.
8      Q.   In getting to the almost zero
9  possibility, can you walk me through the
10  accumulation of factors? So, for example, one
11  factor knocks it down. One factor knocks it up.
12  One factor knocks it back down. How was your
13  process in assessing those factors?
14     A.   Right. Well, one of the things about
15  these particular factors is that there's very
16  little within the record and the known information
17  that knocks it up. You've got, you know, the --
18  all of the factors at the level of acquisition
19  where you have weapon focus, fear, stress,
20  something other than optimal lighting. You're
21  being fired at.
22          You have distractions. You have a
23  greater need to attend to other things than to
24  the gunman's face such as where the gun is
25  pointed, protecting your own safety, tending to

1  your son. The chaos of the situation does not
2  give you time to stop, reflect back on what you
3  just saw and try to consolidate those things.
4          And then -- and then you have an
5  incredible, out of the range of perhaps any
6  identification that I've ever seen, of the
7  passage of time, and so you -- so you have that
8  long interval during which nothing can improve
9  memory. It can only go in the downward
10  direction.
11          And then you have an identification
12  procedure that is not only undocumented, again,
13  it's something that I've never seen in a real
14  case, where you literally leave photos with a
15  witness. There's no one else there to -- you
16  know, you're not giving admonitions about being
17  careful, making sure, because there's -- you
18  know, it may be that the real perpetrator is not
19  present in here.
20          You have all of these -- sort of
21  the ill-defined status of everyone in there, you
22  don't know whether they were -- whether they
23  were really fillers that could be a priori ruled
24  out. You have no indication of immediate
25  identification, which is a reliability factor,

Page 169

1  and so -- and you have no definitive prior
2  description against which to compare the person
3  identified to the description.
4      Q.   Well, the identification of Fawzi
5  Murar in this case occurred in early 2013;
6  correct?
7      A.   Yes.
8      Q.   But the plaintiff gave a description
9  in one of her depositions in June of 2012;
10 correct?
11     A.   Yes.
12     Q.   So why is that not relevant?
13     A.   Well, it is relevant.  2012 is awfully
14 late to be giving a description, of course, but --
15     Q.   Do you know that that's the first time
16 she ever gave a description?
17     A.   As far as I know.
18          MR. SATIN:  Objection.  The witness
19 should be allowed to answer the question.
20     A.   At far as I know it is.
21     Q.   Do you need to finish your answer?
22     A.   At least in the records I saw, I
23 didn't see any evidence of a description, other
24 than, you know, something very generic, but
25 nothing specific.  And I think the only thing

Page 170

1  that sort of got added in at that point was
2  something about a mustache.
3      Q.   But again, I mean, you're not aware of
4  whether anyone had asked her prior to that point
5  to give a description?
6      A.   No, but it seems to me that, you know,
7  it's also sort of fruitless after all those years
8  to only at that point ask for a description.  I
9  mean, the fact that it's missing is -- you know,
10 that it's not there is relevant.  It speaks to --
11 it speaks to the credibility of the witness.
12     Q.   But here it's not missing.  She did
13 give a description; correct?
14     A.   In 2012.
15     Q.   She still gave one; correct?
16     A.   A pretty general one.
17     Q.   She still gave a description; correct?
18     A.   Well, not all descriptions are equal.
19     Q.   But that's not my question.  My question
20 is, did Varda Guetta give a description?
21          MR. SATIN:  Objection.  Asked and
22 answered.
23     Q.   You can answer.
24     A.   In 2012 she did.
25     Q.   To the best of your knowledge, that's

Page 171

1  the earliest time she gave a description?
2      A.   Other than -- other than something
3  very generic.
4      Q.   And, I mean, is it your position that
5  if a witness is not asked to give a description,
6  then they can no longer ever give a description?
7          MR. SATIN:  Objection.  Calls for
8  speculation.
9      Q.   You can answer.
10     A.   Well, as time goes by, reliability of
11 the description, like any other memory factor,
12 gets lower.  And what happens during that
13 retention interval is again that witnesses begin
14 to fill in things in their heads.
15     Q.   Is it impossible for a witness who is
16 not asked to give a description after an event
17 to give a description later on in the case even
18 if some time has passed?
19     A.   Not impossible.
20     Q.   It's not impossible; correct?
21     A.   It's not impossible.
22     Q.   Do you know how long Varda Guetta
23 looked at the people that were shooting at her
24 prior during this exchange?
25     A.   I don't think anyone knows how long

Page 172

1  she looked at them.
2      Q.   Is this something you note in your
3  analysis?
4          MR. SATIN:  Objection.  Vague.
5      A.   Is what something I note in my
6  analysis?
7      Q.   The amount of the exposure, the amount
8  of time that she had to observe.
9      A.   I might have referred to it as not
10 being a long time or being a short time or
11 something, but no one knows how long she was
12 actually looking at anything.
13     Q.   That would play into whether she could
14 reliably ID somebody, could it not?
15     A.   It would.
16     Q.   And when we were talking about the
17 continuum of reliability, the Newsomebaum case
18 that you talked about?
19     A.   Newsome.
20     Q.   Newsome, sorry.
21     A.   Uh-huh.
22     Q.   Where does that fall in the spectrum
23 of unreliable and reliable IDs?
24     A.   Well, I think that the witnesses
25 themselves were, as far as we can tell, quite

1   capable of being reliable.  They actually got a
2   good view.  And as far as we can tell, they all
3   made what would be considered a reliable decision,
4   namely the guy who committed that murder is not
5   in this lineup.  But the conditions of testing
6   were such that they were led into a false pick,
7   so the conditions of testing created an
8   unreliable witness, unreliable witnesses.
9       Q.   Well, here, unlike that case, you
10  don't know how long Varda Guetta looked at the
11  people that were shooting at her; correct?
12      A.   Yeah, and we don't know in that case
13  either, because the most you can do is ask the
14  witness, and witnesses tend not to be very
15  reliable in reporting about that, but --
16      Q.   Did you also consider -- how did the
17  fact that she testified that there were four
18  shooters, how did that play into your analysis?
19      A.   Well, one thing it means is that she
20  was also looking at some others, and so there's
21  divided attention, but it doesn't -- it doesn't
22  play a big role, because maybe there were six.
23  Maybe there were three.  We don't know if she's
24  accurate on that.
25      Q.   Well, if she testified that there were

1   four shooters and she testified that she saw the
2   face of one of the four shooters, would that not
3   indicate an increased chance of reliability
4   since her attention was focused on one face as
5   opposed to say she had testified "I saw all four
6   faces"?
7       A.   Well, she obviously spent some of her
8   attention trying to look at the others, because
9   there were -- otherwise, she wouldn't have a
10  number; right?  I mean --
11      Q.   But how do you know that she spent
12  time trying to look at others?  I mean, she --
13      A.   Well, you can't not know the number or
14  have a number that you're giving if you weren't
15  spending some time looking.
16      Q.   But do you know how much time she
17  spent doing that?
18      A.   No.
19      Q.   So it could have been two seconds;
20  correct?
21      A.   Could have been.
22      Q.   But all of this is relevant; right?
23           MR. SATIN:  Objection.  Vague.
24      A.   Not completely irrelevant, I suppose,
25  but not a major consideration.

1       Q.   Did you mention the number of shooters
2   in your report?
3       A.   I don't think I did.
4       Q.   Is that because you found it to not be
5   a relevant consideration?
6       A.   Yes.
7       Q.   And even as we talk about it now, do
8   you still think it's not a relevant consideration?
9       A.   Well, if I would have mentioned it, I
10  would have mentioned it as yet other distractions
11  from the one shooter.
12      Q.   But it could also be flipped to the
13  reverse.  She could have -- the fact that she
14  focused on one as opposed to trying to identify
15  all four, isn't that still relevant?
16      A.   No, because if there had been only one
17  shooter, it wouldn't have -- even if there had
18  only been one shooter, that doesn't -- that doesn't
19  negate all of these more important variables, the
20  fear, the stress, the --
21      Q.   What's the difference -- so say there
22  was one shooter and she looked at one shooter
23  the entire time or there are four shooters and
24  she looked at one shooter the entire time.  How
25  does that decrease the chances of reliability?

1       A.   I don't think it impacts it one way or
2   the other.
3       Q.   But you just said that if you were to
4   include this in your report, you would say that
5   the fact that there were four shooters decreased
6   the reliability.
7       A.   If anything, but we know that she
8   didn't look at the one shooter the whole time,
9   because you can't count the number of shooters
10  and only be looking at one shooter.
11      Q.   Right.
12           But that's just your -- you don't
13  have any reason, other than the facts as you
14  know them, to make that conclusion; correct?
15           MR. SATIN:  Objection.  Vague.
16      A.   I think --
17      Q.   Did you read a police report, for
18  example?
19      A.   What was the prior -- what was the
20  previous question?
21      Q.   The previous question is, what are you
22  basing that statement on?
23      A.   Which statement?
24      Q.   The statement that she couldn't have
25  looked -- she had to have spent a certain amount

1  of time looking at all four shooters in order to
2  know that there are four shooters there.
3      A.   Well, if she's the source, the
4  original source, of the information that there
5  were four shooters as opposed to, for example,
6  which I don't know, afterward on some other
7  grounds somebody else gives her information
8  saying there were four shooters, then in order
9  to know that there were four shooters, some of
10 her attention -- and it could be minuscule.  It
11 could be more -- would have had to have been
12 directed at the other three in order to know
13 that.
14     Q.   So going back to your balancing of the
15 factors, you've identified factors that have
16 played into your analysis, but can you describe
17 to me the value that you're ascribing to each
18 of these factors in order to arrive at the
19 conclusion that there is a nearly zero chance
20 that the plaintiff could make an accurate
21 identification in this case?
22     A.   Well, I would -- in order to answer
23 that, I would have to ask you probably to
24 rephrase it in order to -- because I don't say
25 0 percent chance of accurate identification.  I

1  think 0 percent chance of -- I think it's more
2  that the reliability of the identification is
3  close to zero, and that's not the same thing;
4  right?
5          If you give somebody a choice
6  between two photos, one of whom is the real one,
7  right, and I can -- and then what they do is
8  they close their eyes and they're mixed up and
9  then they throw a dart and they hit one of the
10 two, they got a fifty-fifty chance; right?
11 But it's still an unreliable procedure.  So
12 we're talking about -- or, I mean, unreliable
13 identification, so we're talking about
14 reliability being nearly zero; right?
15          So with that qualification, what
16 weight did I give to the various factors?
17     Q.   Yes, but before you answer that, did
18 Varda Guetta --
19          MR. SATIN:  I think there's a
20 question pending, though, so I think he needs to
21 answer that question that's pending.
22     Q.   Well, I'll withdraw that question and
23 then I'll reask it.
24          Did Varda Guetta take the photo
25 array and put them out and mix them around and

1  close her eyes and say, "That's the guy"?  Do
2  you know that to be the case?
3      A.   No, and I'm not saying she did.  I was
4  making a distinction between reliability and
5  accuracy, which we discussed extensively early
6  on.
7      Q.   Correct.
8          But I'm asking you, in this case
9  did she do that?
10     A.   No.
11     Q.   She actually looked at the pictures;
12 correct?
13     A.   Oh, yes.
14     Q.   Now, going back to my earlier question
15 about the value that you've ascribed to these
16 factors, if you could walk me through the balance
17 of these factors and how they ultimately led you
18 to your conclusion about the reliability of the
19 ID.
20     A.   Right.  Well, I would -- I would take
21 the acquisition, storage and retrieval factors
22 in this particular case, and I would say that
23 they are roughly equal in their impact on that
24 conclusion.
25     Q.   Roughly equal in what sense?

1      A.   Well, you asked me how I weighted
2  those, so I'm saying I'm weight -- in this
3  particular case I would weight them about
4  equally.
5      Q.   So you're saying that they each have a
6  third relevance to this?
7      A.   Right.  You know, they are -- each of
8  the three are huge factors here.  It's not that
9  one of them is small, you know, and the other
10 two are huge.
11     Q.   So in this case, and correct me if I'm
12 mistaken, but you view these three categories as
13 roughly equal, so to get to a zero -- nearly
14 zero chance of reliability, as distinguished
15 from accuracy, you would ascribe approximately a
16 one-third percentage to each one?
17     A.   I guess I wouldn't say it exactly like
18 that, because I think that any two of the three
19 could get you to the nearly zero reliability.
20 So when I say that they're roughly equal, what I
21 mean is that you can take any two of those three
22 and probably get to that conclusion.
23     Q.   Do you explain this in your report?
24     A.   No.
25     Q.   In assessing the reliability of the

Page 181

1  ID, don't you think that the way that you reach
2  that conclusion is relevant?
3      A.   No, because I'm taking into account
4  the totality in getting to the bottom line.  I'm
5  not going along the line and saying by this
6  point here would be my opinion.  I'm saying --
7  you know, I mean, I'm looking at these things
8  and then at the end reaching an overall opinion.
9  I'm not bringing the report reader or in my
10  report going along and assigning some kind of
11  opinion with regard to overall reliability at
12  each point in moving through it.
13      Q.   But when you render an opinion in a
14  case, aren't you supposed to explain your
15  rationale and formula in reaching that?
16      A.   And formula?  Well, it's not a
17  formula.  I mean, we've talked about that, but I
18  think -- let me see, if I might look at my report
19  here.  I think I -- I think I do so in my
20  summary that I get to that last -- well --
21      Q.   If you can point me to that sentence,
22  or explanation, rather.
23      A.   All right.  "The conditions of memory
24  acquisition are so poor as to render it unlikely
25  that VG could reliably distinguish between the

Page 182

1  actual gunman and other dark-skinned Palestinian-
2  looking men with mustaches."  "Twelve-year
3  retention interval between the shooting event
4  and the identification attempt."  "The procedures
5  used for securing a pick of a photo by VG" and
6  then "in totality."  So those are the -- I mean,
7  I think that is saying how I got there.
8      Q.   But it doesn't explain the breakdown,
9  does it?
10      A.   No, but I've never seen anyone ever do
11  that, and I can't see why one would.  I mean,
12  say, okay, if you take these two, you would
13  reach this conclusion.  If you take this other
14  two combination, you reach this.  And then
15  there's a third two combination in which you
16  might reach this.
17           It's irrelevant, because the
18  question is what's the totality of it, not what
19  are some hypothetical combinations of this that
20  might -- and how they would combine if you only
21  had two of these instead of all three.
22      Q.   All right.  So why don't you turn to
23  page 12 to 13 of your report.  And I'm going to
24  draw your attention to the paragraph that begins
25  with "With regard to acquisition."

Page 183

1      A.   Uh-huh.
2      Q.   Specifically to the sentence, "Hence,
3  she was experiencing great fear, stress, and
4  panic, each of which would impair her ability to
5  encode details about the face of the gunman.
6  The chances that an individual under these
7  circumstances could acquire the type of detailed
8  memory for the face of a stranger that would
9  permit a reliable identification of the gunman
10  among a set of other dark-skinned individuals
11  with mustaches is nearly zero."
12           How do you know that this happened
13  for sure, that we -- we'll take it one step at
14  a time.  How do you know that the fear, stress
15  and panic that she experienced actually, in
16  fact, impaired her memory?
17      A.   Because fear, stress and panic impair
18  human memory.
19      Q.   But all you're relying on for that are
20  the studies; correct?
21      A.   That's what science relies on.  What
22  are they supposed to -- what's science supposed
23  to rely on if not studies?
24      Q.   But I just want to get the answer for
25  the record.  That's what you're relying on when

Page 184

1  you make the statement; correct?
2      A.   And our general understanding in
3  psychological science about how the brain works.
4      Q.   Couldn't there be a situation where a
5  person who experienced fear, stress and panic
6  did not have their memory impaired to an extent
7  where they would not be able to ID somebody?
8      A.   Did not have it impaired to that
9  degree?
10      Q.   Yeah.
11      A.   Sure.
12      Q.   So in this situation would it not have
13  also been accurate to say she was experiencing
14  great fear, stress and panic, each of which may
15  have impaired her ability to encode details?
16      A.   No, I would stick with "would impair
17  her ability to encode."
18      Q.   So you're saying in this situation her
19  memory -- her ability to encode was, in fact,
20  impaired?
21      A.   That's what stress and fear do.
22      Q.   So in her situation you're saying that
23  Varda Guetta's memory was impaired?
24      A.   If you -- if one were to somehow be
25  able to make a persuasive case that she wasn't

Page 185

1    undergoing fear and stress, then no.  I mean,
2    I'm -- but as long as there's fear and stress,
3    that's what happens.
4        Q.   So my question is, because Varda
5    Guetta experienced fear and stress during this
6    event, it's your position that her memory was
7    impaired so that she could not encode details
8    about the crime?
9        A.   It impaired her ability to encode
10   details.  I'm not saying that she couldn't
11   encode something, but details, that's another
12   matter.
13       Q.   And moving on to the next sentence
14   where you talk about "The chances that an
15   individual under these circumstances could
16   acquire the type of detailed memory for the face
17   of a stranger that would permit a reliable
18   identification is nearly zero."  So what's the
19   significance of the details in this statement?
20       A.   What's the -- what's the significance
21   of the details?
22       Q.   You just said that her ability to
23   encode --
24       A.   Right.
25       Q.   -- is a separate issue from her

Page 186

1    ability to have a detailed memory; is that
2    correct?
3        A.   No, I didn't mean to say that if I
4    did.
5        Q.   Okay.  So just explain to me then your
6    basis for this statement.
7        A.   The basis for that statement is the --
8    is the circumstances within that event; right?
9        Q.   Uh-huh.
10       A.   Where her primary concern is her son.
11   She's experiencing fear, stress, panic.  She's
12   being fired upon.  And so in order to be able to
13   recognize the face of someone under
14   the -- who was seen under those circumstances at
15   a later point in time requires this -- requires
16   having acquired significant detail.
17            Faces are very complex.  Especially
18   since it has to be -- it can't just be, you
19   know, something like Arab-looking male.  I mean,
20   it has to be specific.  It has to have that all --
21   you know, for accurate recognition to occur, you
22   have to have a memory for, you know, mouth,
23   eyes, nose, chin.  You've got to have detail.
24       Q.   And do you have any reason to believe
25   that that was not the case here?

Page 187

1        A.   Yes.
2        Q.   What's that reason?
3        A.   Well, that it's hard enough to acquire
4    those memories without those kinds of
5    circumstances going on.  You know, eyewitness
6    misidentification occurs under much more
7    favorable circumstances than that, and yet
8    people misidentify and fail to come away with
9    detailed information.
10            And the fact that she could never
11   articulate any of those facial features beyond
12   by the -- by 2012, which is many, many, many
13   years later, saying something about a mustache.
14   Otherwise, there's really nothing -- there's no
15   detail there.
16       Q.   Do you know whether anybody asked her
17   about details prior to 2012?
18       A.   Well, the records are very poor, and
19   so it's hard for me to believe someone didn't,
20   but certainly there's no -- there's nothing on
21   record indicating that there was any detailed
22   description.
23       Q.   If the records are really poor, how
24   can you render an opinion on whether the ID is
25   reliable?

Page 188

1        A.   Well, if there had been a detailed
2    description and -- you know, that would have
3    changed my opinion, but there appears to not
4    have been one.
5        Q.   But didn't we talk earlier about how
6    description accuracy is not necessarily a -- I
7    think you described it as a modest indicator of
8    reliability.  So how could that take this ID,
9    which has a nearly zero chance --
10       A.   An indicator of the --
11       Q.   Well, let me finish my question first.
12       A.   Go ahead.  Okay.
13       Q.   How could taking a modest factor such
14   as a detailed description take an ID that is
15   nearly zero and change your opinion on the
16   reliability of it?
17       A.   Can you re -- can you rephrase it?
18       Q.   So say there was a detailed
19   description.  Let's use a hypothetical.
20       A.   Uh-huh.
21       Q.   Let's say everything else being equal,
22   the plaintiff gave an extremely detailed -- she
23   gave a detailed description sometime after the
24   crime with enough of a time passage that it
25   wouldn't cause you concern.

Page 189

1    A.    Uh-huh.
2    Q.    With everything else being equal, that
3  one factor, that would change the whole calculus
4  of reliability here?
5    A.    It would -- it would raise it some,
6  because it would indicate that she must have had
7  a reasonable view somehow despite these conditions
8  and circumstances.
9    Q.    And is it your position that just because
10  she wasn't asked, that there's no way that she
11  could have these details properly encoded in her
12  mind?
13    A.    No.  I think it's my position that the
14  fact that no such details were ever provided is
15  consistent with what you might expect from this
16  level of fear, stress, anxiety and distraction
17  and chaos of that scene.
18    Q.    Can stress and fear make a person
19  hyperfocused?
20    A.    Hyperfocused?
21    Q.    Even more attentive to detail than
22  they otherwise would be.
23    A.    No, there's no -- there's no evidence
24  of that.  Sometimes under fear or stress, at
25  later points in time people will when recalling

Page 190

1  it have this experience of it being all kind of
2  slow motion and so on, but it's largely just an
3  illusion from having rehearsed it many times.
4    Q.    Is the Morgan study one of the leading
5  pieces of literature in this field on this topic?
6    A.    It is.
7    Q.    So when you say that there is no
8  evidence to support the conclusion that stress
9  may make someone hyperfocused, you're really
10  relying on that body of literature?
11    A.    And our understanding of how the brain
12  works.
13    Q.    Where does that come from?
14    A.    It comes from the broadly accepted
15  view that especially when fear is involved, that
16  it triggers automatically survival mechanisms so
17  that all the resources of the cognitive system,
18  of the thinking system, of the processing system,
19  are devoted to survival-relevant things, which
20  means things like avoiding the gunfire, tending
21  to your son, ducking out of the way and not to
22  details that are irrelevant to survival like,
23  for example, what somebody's face looked like.
24    Q.    So would you say that there's a
25  difference between crimes against the person and

Page 191

1  crimes against property in the sense -- let me
2  actually just be more precise in my question.
3    A difference in the sense of the
4  fear and stress that will be produced by either
5  type of crime?
6    A.    Yes.  I mean, stress and fear levels
7  are going to be higher when there's some -- when
8  there's some level of fear for your own personal
9  safety as opposed to, let's say, things that you
10  own.  But certainly you can feel stress and fear
11  from a property crime if you're a witness to it,
12  but not -- generally speaking, wouldn't be as
13  high.
14    Q.    So shouldn't there be a distinction
15  then in the studies and the literature that show
16  that identifications in property crimes are
17  higher than in crimes against the person?
18    A.    No, not necessarily, because crimes
19  against the person -- like, for example, when we
20  break down things and we look at things like --
21  if we just look at things like, for example, we
22  find that victim witnesses -- like when we break
23  down from actual cases, we sit and we break down
24  these kinds of factors, we see that victim
25  witnesses tend to be closer to the perpetrator

Page 192

1  than bystander witnesses.  So you have to
2  consider then not -- at the same time, victim
3  witnesses do have higher levels -- would, as
4  generally expected, have higher levels of
5  fear and stress than bystander witnesses.
6    But so you have to consider not
7  necessarily whether they're a victim or a
8  bystander, but rather what are these -- there's
9  nothing special about being a victim or a
10  bystander.  It's sort of asking what are the
11  relevant mechanisms that are at play there, not
12  the status of being a victim or a bystander.
13    Q.    So then there isn't literature that
14  distinguishes between crimes that induce
15  different levels of fear or stress and then
16  compares those levels to identification
17  reliability?
18    A.    Well, certainly in the -- you know,
19  actual levels of fear and stress are difficult
20  to measure like in real cases, so you have to
21  make inferences from the nature of the -- of the
22  crime.  So, for example, when we study real
23  cases, one could assume that if one -- if it was
24  an armed robbery where there's a gun involved
25  that was pointed at you, that your fear and

Page 193

1  stress level was higher.
2      But there are other things going
3  on there, so you have to compare it to whether
4  there -- when you -- when there wasn't a gun
5  involved, are you holding constant all of the
6  other variables like distance and how long they
7  looked at the person and things like that.
8      Q.  Has there been any comparisons of this
9  issue in actual cases as opposed to controlled
10  studies?
11      A.  Yeah, where you -- we've coded --
12  we've coded those variables in actual cases, and
13  then what we do is we look at their propensity
14  to -- their ability then to make any kind of
15  identification, the rates at which they pick
16  fillers and rate which they pick suspects.
17      Q.  And are any of those tied to crime
18  severity?
19      A.  Any what?
20      Q.  Are any of those tied to crime
21  severity?
22      A.  Well, they're naturally confounded
23  with crime severity.  In other words, if you
24  code something like, you know, weapon, no
25  weapon, right, I mean, weapons are more severe --

Page 194

1  involve more severe crimes.  If you -- you know,
2  and so, I mean -- and you can look at things
3  like simple assault versus armed robbery versus
4  murder cases, and obviously those are three
5  levels of crime severity.
6      But it's not the -- but what you
7  have to do is you have to recognize that there
8  are lots of things that change when you look at
9  one of these cases versus another case versus
10  another kind of case, such as you have to
11  control for how close the witness was, whether
12  the lighting conditions are the same.
13      When you're looking at these real
14  cases, what you find is that for some reason, we
15  found this kind of repeatedly, that when there
16  is a weapon involved, there tends to be a
17  shorter period of time between the event and the
18  lineup, maybe because they find the suspect
19  faster.  So there's lots of -- lots of things
20  going on in those real cases.
21      Q.  And couldn't the fact that the
22  plaintiff in this case had her son in the car
23  and obviously wanted to make sure that he was
24  going to be okay, would that have displaced her
25  own fear and stress at all for herself?

Page 195

1      A.  Well, it's not a question of whether
2  you are --
3      MR. SATIN:  Objection.  Calls for
4  speculation.
5      A.  -- stressed for yourself.  You know,
6  if your loved one's shot, you're stressed.
7      Q.  Correct.
8      But are the same psychological
9  processes at work in a situation where you are
10  thinking about yourself and survival versus a
11  loved one?
12      A.  Yes, because the same process is
13  involved because your cognitive resources are
14  going to the survival task, not to some kind of
15  calm and optimal kind of encoding of details of
16  something else.
17      MS. ROMEO:  Okay.  Let's take a
18  quick break, a couple-minute break.
19      THE WITNESS:  Okay.
20      (A recess was taken.)
21      Q.  What photos did you review in this
22  case?
23      A.  The 15 or so photos that were given to
24  the witness in this case earlier in 2013.
25      Q.  We're going to mark this as -- I

Page 196

1  believe it's Plaintiffs' Exhibit 5.
2      (Plaintiffs' Exhibit 5 marked on
3      the record)
4      MS. ROMEO:  What I'm handing Dr.
5  Wells is a packet of -- I believe it's 15
6  photos.  15 photos.
7      Q.  Are these the photos that you just
8  referenced?
9      A.  They appear to be, yes.
10      Q.  And did you review any other photos?
11      A.  I don't believe I did, no.
12      Q.  Did you review any other E-mails -- or
13  which E-mails did you review in this case?
14      A.  Just this one that I listed here that
15  was an E-mail from Tolchin, Tolchin.
16      Q.  Right.
17      And the date of that is what?
18      A.  February 19, 2013, apparently.
19      Q.  And you also note on your documents
20  reviewed list that you viewed a photograph of
21  Fawzi Murar.
22      A.  Right.
23      Q.  Is that the same photograph that's in
24  this photo array or is it a different one?
25      A.  I can't remember if it was exactly

Page 197

1   this photograph or another one.
2       Q.   I'm going to mark as Plaintiffs'
3   Exhibit 6 an exhibit which was attached to a
4   letter submitted to the Court by defendants,
5   Exhibit 10 -- I believe it was sometime in May
6   2013 -- with an E-mail.
7           (Plaintiffs' Exhibit 6 marked on
8        the record)
9       Q.   And you can take a look at that.
10          MR. SATIN:  I'll object to the
11  commenting on the evidence.
12      Q.   You can take a look and let me know if
13  you've seen that before.
14      A.   Yes, this appears to be the same as
15  what I was sent.
16      Q.   So just to be clear, what's the date
17  on this E-mail?
18      A.   February 19, 2013.
19      Q.   And who sent it?
20      A.   It says it was sent by Bob Tolchin,
21  Tolchin.
22      Q.   And is there an attachment to this
23  document?
24      A.   Yes.
25      Q.   And what's that attachment?

Page 198

1       A.   A pretty bad copy of a photograph.
2       Q.   Does that photograph appear to be the
3   same photograph of the picture that Varda Guetta
4   identified in the photo array that was the 15
5   pictures?
6       A.   It's certainly consistent with it.
7   You know, it's difficult to know for sure, but
8   it appears to me to be the same.
9       Q.   So then to the best of your
10  recollection, did you only view one photograph
11  of Fawzi Murar?  I'm just trying to -- here you
12  say you viewed, Number 2, "Photograph of Fawzi
13  Murar," and Number 1, "Array of photographs."
14      A.   Yeah, I think I had gotten something
15  like this before I got these.
16          MS. ROMEO:  If you reviewed
17  pictures that are not listed on this report, we
18  ask that defense counsel update that list and
19  then produce any of the -- if you viewed a
20  different picture of Fawzi Murar.
21      Q.   So aside from this photo array, and
22  potentially that picture, did you view any other
23  photographs in this case?
24      A.   I don't believe I did, no.
25      Q.   And did you review any other E-mails

Page 199

1   in this case?
2       A.   No.
3       Q.   Are you aware that Varda Guetta, for
4   the purposes of identifying a suspect in this
5   case, looked at a photo prior to the photo array
6   in February of this year?
7       A.   Yes.
8       Q.   And where did you see that?
9       A.   I can't remember.  You know, I can't
10  remember where I got that information.
11      Q.   You can take a minute to look at the
12  documents reviewed list and see if anything
13  refreshes your memory.
14      A.   It doesn't, so I'm not sure -- I did
15  know that.  I'm not sure how I knew it.
16      Q.   Do you remember anything else about
17  that, about those circumstances?
18      A.   That she had not identified anyone
19  from whatever she might have been shown.
20      Q.   Do you know what she was shown?
21      A.   I was never provided with any photos
22  at that point about that; so when I say do I
23  know what she was shown, no, because I've never
24  seen that.
25      Q.   But you were aware that she had

Page 200

1   negatively ID'd somebody?
2       A.   Somehow I was aware of that.
3       Q.   You reviewed the November 20
4   transcript in this case, right, that was before
5   Judge Ellis?
6       A.   That hearing.
7       Q.   That hearing transcript?
8       A.   Right.
9       Q.   Do you think you learned it from
10  there?
11      A.   That's possible.  As I think about it,
12  that would be my guess, but --
13      Q.   Well, why guess when we have exhibits.
14  So we're going to mark this as Exhibit --
15          MS. ROMEO:  I'm sorry, what are we
16  on now before I lose track?  7?
17          THE COURT REPORTER:  7.
18          (Plaintiffs' Exhibit 7 marked on
19       the record)
20          MS. ROMEO:  And I'd just like to
21  note for the record that I believe there's a
22  date transcription error on the front cover of
23  this.  It says "November 20, 2011," but this is
24  a transcript from November --
25          THE WITNESS:  2012.

Page 201

1    MS. ROMEO:  Yeah, this is from
2  2012, so just noting that for the record.  This
3  is a discovery conference that was held before
4  Magistrate Judge Ellis in this case.
5    Q.   I am going to turn your attention to
6  the top of page 26.  Just take a look at that
7  and let me know when you're finished.
8      Just let me know when you're
9  finished.
10    A.   Yeah, I'm finished.
11    Q.   So does this refresh your recollection
12  as to whether you reviewed a document that
13  indicates that she negatively ID'd somebody?
14    A.   Right, although it --
15    Q.   It's just a yes or no question.  Is
16  this the document that you were referring to?
17    A.   This is the document.  This would have
18  been the document I was referring to about her
19  being shown a photo previously, yes.
20    Q.   So after you read this, was this one
21  of the things that you called defense counsel up
22  for and asked them?
23    A.   I might have asked them for that.  I
24  was actually -- although my main interest in
25  asking for more photos, or for more information

Page 202

1  about photos, concerned these photos.
2    Q.   Why would it not have been equally
3  important to see the photo or photos that she
4  was shown prior to this photo array?
5    A.   Well, you know, I think it -- I think
6  it was relevant potentially.  And I'm assuming
7  that I did ask if they had that.  I'm not -- but
8  I never received something like that, so I
9  suspect that they didn't have it.
10    Q.   If you had received -- so taking a
11  step back, do you remember asking them, yes or
12  no?
13    A.   Not explicitly.
14    Q.   So does that mean no?
15    A.   It means I don't -- do not explicitly
16  remember.  Yeah, I do not remember asking them,
17  but I do not remember not asking them.
18    Q.   So the answer to that question is no?
19    MR. SATIN:  Asked and answered.
20    A.   The answer to that question is I don't
21  know.
22    Q.   I'm just going to pose the question
23  one more time.
24    A.   Okay.
25    Q.   Do you remember, do you recall asking

Page 203

1  defense counsel for more information about the
2  photo or photos that Varda Guetta viewed prior
3  to the February 2013 photo array?
4    MR. SATIN:  Objection.  Asked and
5  answered.
6    Q.   You can answer.
7    A.   I do not recall.
8    Q.   And do you know whether the photo or
9  photos that were shown to Varda Guetta prior to
10  this photo array, do you know whether the same
11  photos appear in this photo array?
12    A.   I do not know.
13    Q.   Wouldn't that be extremely relevant if
14  the same photo showed up again?
15    A.   Yes.
16    Q.   So wouldn't that have been extremely
17  important to have asked defense counsel for?
18    A.   Well, and I did ask if any of these
19  photos were what was shown to her before.  I do
20  remember that.
21    Q.   And when did you ask that?
22    A.   When?
23    Q.   Yeah, when.
24    A.   I don't know.  I'm guessing in June or
25  something.

Page 204

1    Q.   Do you remember who you asked?
2    A.   No.  Maybe Tim O'Toole.
3    Q.   And what was his response?
4    MR. SATIN:  Objection.  Privileged.
5  Don't answer.
6    MS. ROMEO:  The documents that
7  he reviewed are subject to -- they're not
8  privileged, so you can go ahead and answer.
9    MR. SATIN:  No, don't answer the
10  question.
11    Q.   Are you following that instruction or
12  are you going to answer the question?
13    A.   I don't know.  I've never been placed
14  in this situation before.
15    MR. SATIN:  We're instructing the
16  witness not to answer the question.
17    Q.   So are you going to follow the
18  instruction or are you going to answer whether
19  you received an answer in response to your
20  question about more information needed to assess
21  this ID?
22    A.   Umm.
23    Q.   Okay.
24    MR. WISE:  Hold on.  He's been
25  instructed not to answer.

1     Q.   I'll rephrase.
2          Did you receive any documents
3  after asking for more information in this case?
4          MR. SATIN:  Objection.  Assumes
5  facts not in evidence.
6     Q.   You can answer that.
7     A.   All the documents I received, as far
8  as I know, are listed here.
9     Q.   And no one provided you with a photo
10 or photos that Varda Guetta viewed prior to this
11 photo ID; correct?
12    A.   Correct.  Although I do remember reading
13 this and, frankly, not being able to quite tell
14 what they're talking about here, so -- because
15 at one point it seems to -- one way of reading
16 this is they showed her a photo, and it doesn't
17 show that she rejected it, which is different
18 from what we talked about before.  We talked
19 about the phrasing is "and she wasn't able to
20 identify," which is not the same thing.
21    Q.   Right.
22         But beyond this, you reviewed no
23 documentation about this prior ID; correct?
24    A.   Umm.
25    Q.   It's a yes or no question, if you

1  reviewed any documents about --
2          MR. SATIN:  Just because you say
3  it's a yes or no question doesn't make it a yes
4  or no question.  The witness may answer as he
5  sees fit to the question.
6          MS. ROMEO:  The witness can
7  answer.
8     A.   So ask me the question again.
9     Q.   So the question is, aside from this
10 reference that you just pointed to in this
11 transcript, did you review any other
12 documentation, whether photos or E-mails, et
13 cetera, relating to the prior identification?
14    A.   There was no prior identification, was
15 there?
16    Q.   Prior negative identification.
17    A.   No.
18    Q.   So you don't know what this statement
19 really means?
20    A.   I still don't know what this statement
21 means.
22    Q.   Did you include this in your report?
23    A.   No.
24    Q.   Why not?
25    A.   Because I don't know what this

1  statement means.
2     Q.   Can you say with confidence that the
3  circumstances surrounding this prior negative
4  identification could have no effect on your
5  opinion as it stands today?
6     A.   Not with 100 percent confidence, no.
7     Q.   So you felt that despite not having
8  this information, that you could take what was
9  already, I think you testified earlier, a poor
10 record and render an opinion on the reliability
11 of this ID?
12         MR. SATIN:  Objection.  Misstates
13 the testimony.
14    Q.   You can answer.
15    A.   Well, the records -- there are poor
16 records, but there also are known facts.  The
17 amount of time that passed, for example, is a
18 known fact.  The chaos of the original situation
19 is a known fact.  The dropping off of photos to
20 her with -- of 15 photos, totally unsupervised
21 and undocumented, is a fact.
22         There's not -- it's hard for me to
23 imagine that there would be much of anything in
24 the prior -- although it's possible.  I mean, I'm
25 not rule -- you know, I can't rule out anything --

1  in a previous photo that was shown to her that
2  she could not confidently identify.  I don't see
3  how that could dramatically -- that's not going
4  to change the poor acquisition, retention and
5  retrieval conditions.
6     Q.   But regardless of whether it ultimately
7  would have changed your conclusion to saying it
8  was reliable, for example, it still would be a
9  relevant factor in the analysis; correct?
10    A.   It could be relevant.  It depends on
11 what's there, yes.
12    Q.   But in this case you don't know what's
13 there?
14    A.   Right.
15    Q.   And you don't state this in your report;
16 correct?
17    A.   Correct.
18         MS. ROMEO:  Let's take a quick
19 break.
20         Can we just go on for one moment?
21 I'm sorry.  We're taking a quick break, and I
22 just want to instruct the witness not to discuss
23 his testimony with counsel.  Thanks.
24         (A recess was taken.)
25         MS. ROMEO:  We can go back on the

Page 209

1  record.
2      Q.   So, Dr. Wells, is it your professional
3  opinion that Fawzi Murar was not present on the
4  night of the attack that took place on January 8,
5  2001?
6      A.   I've said nothing about that in my
7  report.  That's not my task.
8      Q.   So what is your professional opinion
9  on that question, that he was not present?
10         MR. SATIN:  Objection.  Asked and
11 answered.
12     Q.   You don't have one; is that correct?
13     A.   My opinion has to do with the
14 reliability of the eyewitness' identification,
15 not with where he was or anybody else was on
16 that night.
17     Q.   And then you're also not rendering a
18 professional opinion on whether if Fawzi Murar
19 was there whether he is actually, in fact, the
20 man that Varda Guetta saw; correct?
21     A.   That's not -- that's not my task.
22     Q.   And you're also not rendering a
23 professional opinion that if Fawzi Murar was
24 there, that maybe he was a fifth shooter or a
25 sixth shooter, for example?

Page 210

1          MR. SATIN:  Objection.  Vague.
2      A.   I have no basis for any such opinion.
3      Q.   So you have no basis for any opinion
4  about whether Murar is actually, in fact, the
5  man that the plaintiff saw that night; correct?
6      A.   I have an opinion about the evidence
7  that's being used to claim that he is, the
8  eyewitness evidence that's being used to claim
9  that he is.
10     Q.   Right.
11         But is it your professional
12 opinion then that Murar, Fawzi Murar, is not the
13 man that Varda Guetta saw?
14     A.   How's that different from the question
15 you asked before?
16     Q.   Well, you just told me that your opinion
17 is about the reliability of the ID; correct?
18     A.   Right.
19     Q.   So what I'm asking you is whether you
20 are rendering any professional opinion on whether
21 Murar was, in fact, the person that she saw.
22     A.   That would require me to know everything
23 in this case.
24     Q.   Which you don't know?
25     A.   I don't know everything.  I don't know

Page 211

1  why he was singled out in the first place.  I
2  don't know what alibi he might have.  I don't
3  know what other witnesses might say about where
4  he was at the time.  I don't know about -- I
5  don't know anything about him.  The question
6  you're asking -- of course, I would have no
7  opinion on that, because that depends on the
8  totality of all the facts in the case, whereas
9  I'm only talking about the reliability of the
10 identification.
11     Q.   So do you have any reason, independent
12 of this ID then, to believe that Fawzi Murar is
13 not one of the four shooters in this attack?
14     A.   I don't have reason to believe he is
15 or he isn't.  I think that's clear in my opinion
16 that with regard to the evidence I reviewed, it
17 really doesn't -- it doesn't incriminate or
18 exculpate.
19     Q.   So you have no professional opinion on
20 that issue; is that correct?
21     A.   Where that issue is?
22     Q.   That issue is whether Murar was, in fact,
23 one of the shooters on the night of the attack
24 against the plaintiff and her then twelve-year-
25 old son.

Page 212

1      A.   It would be unprofessional of me to
2  render such an opinion.
3          MS. ROMEO:  All right.  I think we
4  are done here.
5          MR. SATIN:  Okay.
6          (Deposition concluded at 3:32 p.m.)
7          (The deposition of Gary L.
8  Wells, Ph.D., is now complete.  When
9  transcribed, the original of the deposition
10 shall be given to Ms. Romeo.  The original
11 exhibits shall be distributed as follows:
12 Plaintiffs' Exhibits 1-7 enclosed with
13 original transcript.)
14
15
16
17
18
19
20
21
22
23
24
25

Page 213

ACKNOWLEDGMENT

        I, GARY L. WELLS, Ph.D., hereby
certify that I have read the transcript of my
testimony taken under oath in my deposition on
October 30, 2013; that the transcript is a true,
complete and correct record of my testimony, and
that the answers on the record as given by me
are true and correct.

        _____
        GARY L. WELLS, Ph.D.


Signed and subscribed to before me
this _____ day of _____, 2013.
_____
Notary Public, State of Iowa

---

Page 215

CERTIFICATE

        I, DEBRA A. HOADLEY, C.S.R., a
Notary Public within and for the state of
Iowa, do hereby certify:
        That GARY L. WELLS, Ph.D., the
witness whose deposition is herein set
forth, was fully sworn by me and that such
deposition is a true record of the
testimony given by such witness.
        I further certify that I am not
related to any of the parties to this action
by blood or marriage; and that I am in no way
interested in the outcome of this matter.
        IN WITNESS WHEREOF, I have
hereunto set my hand this _____ day of
_____, 2013.


        _____
        DEBRA A. HOADLEY, C.S.R.

---

Page 214

        *ERRATA SHEET*
CASE:  MARK I. SOKOLOW, ET AL., vs. THE
PALESTINE LIBERATION ORGANIZATION, ET AL.
DATE:  OCTOBER 30, 2013
WITNESS:  GARY L. WELLS, Ph.D.
PAGE    LINE    FROM        TO
_____|_____|_____|_____
_____|_____|_____|_____
_____|_____|_____|_____
_____|_____|_____|_____
_____|_____|_____|_____
_____|_____|_____|_____
_____|_____|_____|_____
_____|_____|_____|_____
_____|_____|_____|_____
_____|_____|_____|_____
_____|_____|_____|_____
_____|_____|_____|_____
_____|_____|_____|_____

        _____
        GARY L. WELLS, Ph.D.

Subscribed and sworn to before me
this _____day of _____,2013.
_____
        Notary Public

Draft Copy

**A**

**ability**
10:13 29:18 58:21
91:12 118:23
161:7 183:4
184:15,17,19
185:9,22 186:1
193:14
**able**
15:20 17:20 57:18
66:14 83:22 86:9
128:4 184:7,25
186:13 205:13,19
**abney**
4:11 26:16
**abovereferenced**
5:14
**abreo**
71:13
**absence**
50:20 51:1 94:11
129:11
**absent**
38:3 83:23 103:17
**absolute**
65:19,20
**absolutely**
127:23 142:7,17
142:17 150:11
**academic**
8:4
**accelerating**
140:18 149:22
**acceptable**
90:17
**acceptance**
107:4
**accepted**
90:12 107:1
145:19,19 190:14
**account**
95:17 181:3
**accumulate**
93:22 95:7
**accumulating**
89:21 109:17
**accumulation**
88:24 102:8
165:21 166:11

167:10
**accuracy**
52:7 83:10 92:3
92:22 152:20
154:8 179:5
180:15 188:6
**accurate**
11:25 29:22 30:7
38:12 43:10 44:18
51:4,6,9,12,23
52:11 87:9 128:11
134:18 136:1
137:13 141:16
173:24 177:20,25
184:13 186:21
**accurately**
91:13
**accustomed**
13:9 133:6
**achieve**
139:20
**achieved**
35:7,13,14
**achieving**
31:22
**acknowledge**
27:24
**acknowledgment**
213:1
**acquire**
18:15 183:7
185:16 187:3
**acquired**
186:16
**acquisition**
53:10 54:23,24
55:13,23 56:7,15
56:24 85:23
114:10,20 115:13
115:17,19 116:2
138:11 143:12,15
143:21 151:24
152:2,10 161:5
166:9 167:18
179:21 181:24
182:25 208:4
**act**
45:1,4,8 62:4
**action**

5:14 215:12
**active**
60:22
**acts**
9:4,5 13:1 27:18
44:22 62:1
**actual**
26:20 53:19 58:7
61:16 82:3,25
84:10,23 94:21
95:8 97:19 98:9
99:13 100:5 115:6
115:20 117:13
138:13 143:8
145:10 182:1
191:23 192:19
193:9,12
**actualworld**
92:24
**acuities**
96:22
**acuity**
95:16 96:7,11,15
97:4,7,11,14
**add**
7:1 9:19 20:10
63:4 85:15
**added**
63:6 170:1
**address**
157:5
**adjust**
94:25 97:3,6,17
109:20 124:24
**adjustments**
126:17
**administering**
18:1 112:15,24
**administers**
112:4
**administration**
112:13
**admissibility**
71:5
**admission**
101:19
**admit**
77:22 101:19
**admits**

99:3
**admonishment**
85:16
**admonition**
82:14 85:19
**admonitions**
168:16
**advantage**
17:8
**affect**
10:13 47:19,20
56:17 94:20
117:13 123:5
**afterward**
148:22 154:20
155:1 177:6
**agencies**
101:17,18 102:24
103:6
**ago**
16:18 71:2
**agree**
9:8 15:22 39:6
40:22 106:1,3
121:17 154:9
**agreedupon**
99:6
**ahead**
188:12 204:8
**al**
1:5,10 214:2,3
**alibi**
211:2
**allow**
30:11 46:18 49:21
49:22 73:18
101:11,24 121:19
**allowed**
70:3 169:19
**amazing**
101:19 142:4
**american**
60:17
**amount**
115:5 152:18
172:7,7 176:25
207:17
**amounts**
89:10

**analyses**
60:25 61:4
**analysis**
56:17,20 58:16,24
64:23 68:8 69:2
81:1 92:4 106:5,8
134:6 137:23
145:7,23 148:23
151:1,3 157:1
161:13 172:3,6
173:18 177:16
208:9
**analyze**
57:6 61:1,10
**andrew**
3:16
**anew**
159:10,11,20
**animals**
20:9
**animosities**
12:20
**answer**
10:25 19:23 22:25
43:13 44:13 52:1
55:9 82:3,18
122:6 134:19
136:20 149:13
158:20 162:22
163:15,20,23
169:19,21 170:23
171:9 177:22
178:17,21 183:24
202:18,20 203:6
204:5,8,9,12,16
204:18,19,25
205:6 206:4,7
207:14
**answered**
46:11 52:22,25
78:1 116:24
170:22 202:19
203:5 209:11
**answers**
213:10
**anticipation**
18:16
**antiterrorism**
45:1,4,8

**anxiety**
  189:16
**anybody**
  30:6 106:14 107:7
  149:24 187:16
  209:15
**anymore**
  41:9
**anyplace**
  13:19
**anythings**
  134:22
**anytime**
  129:3
**anyway**
  36:1 43:17 52:1
**aporter**
  3:10,11
**apparent**
  160:16,18
**apparently**
  196:18
**appealing**
  82:2
**appear**
  196:9 198:2
  203:11
**appears**
  188:3 197:14
  198:8
**application**
  158:15
**applied**
  154:6
**applies**
  14:3,5,7,11
  149:23
**apply**
  84:22 86:14
  149:16
**approximate**
  36:5 106:25
**approximately**
  39:21,25 70:18
  72:11 180:15
**arabic**
  80:7
**arablooking**
  186:19

**archival**
  100:19,20 101:2,5
  102:5
**area**
  8:7
**argue**
  55:14
**argumentative**
  38:9
**armed**
  192:24 194:3
**arnold**
  3:3 5:13
**arousal**
  16:10
**array**
  178:25 196:24
  198:4,13,21 199:5
  202:4 203:3,10,11
**arrive**
  177:18
**arrived**
  165:20
**article**
  7:5 14:16,22
  15:15 16:18
**articles**
  7:19 14:14 153:25
**articulate**
  187:11
**ascribe**
  180:15
**ascribed**
  179:15
**ascribing**
  177:17
**aside**
  198:21 206:9
**asked**
  15:18 17:25 19:12
  23:14 28:13 46:10
  46:17 52:21,25
  75:12 77:25
  129:10 154:10,15
  154:19 156:7,9
  157:5 163:3,8,15
  163:21,24 165:3
  170:4,21 171:5,16
  180:1 187:16

  189:10 201:22,23
  202:19 203:4,17
  204:1 209:10
  210:15
**asking**
  58:3 134:20
  154:25,25 156:2
  164:18 179:8
  192:10 201:25
  202:11,16,17,25
  205:3 210:19
  211:6
**assault**
  9:17,23 14:12
  61:21 81:9 194:3
**assembled**
  34:9,12
**assess**
  46:4 49:9 53:5,7,8
  53:14,19 55:6
  68:2,4,19 69:5
  105:9 115:8
  133:10 143:12
  147:1,3 204:20
**assessing**
  57:10 58:14 64:24
  67:15 68:14 87:23
  93:15 114:7,18
  124:25 167:13
  180:25
**assessment**
  74:19
**assigning**
  181:10
**associated**
  88:6
**assortment**
  61:21
**assume**
  40:6 84:18,18
  192:23
**assumed**
  141:23
**assumes**
  205:4
**assuming**
  50:14 202:6
**assumption**
  39:3,9

**assumptions**
  39:15
**astronomically**
  145:18
**ate**
  113:24
**attached**
  197:3
**attachment**
  197:22,25
**attack**
  28:20 62:6 79:15
  136:14 154:15
  165:10 209:4
  211:13,23
**attackers**
  142:5
**attempt**
  17:25 23:18 86:1
  135:20 182:4
**attempts**
  17:10 25:13
**attend**
  167:23
**attending**
  18:13 149:4
**attention**
  14:18,24 15:17
  16:8 24:23 96:9
  96:10 114:22,25
  116:1,5 120:22
  121:9 129:1,2,17
  132:3 133:3 137:3
  173:21 174:4,8
  177:10 182:24
  201:5
**attentive**
  189:21
**attorney**
  70:6,13 73:16
  75:17
**attorneys**
  3:4,14
**austin**
  60:20
**authority**
  45:13
**automatic**
  20:8

**automatically**
  190:16
**available**
  57:13 59:8,9
**avenue**
  3:7
**average**
  40:19 106:11,18
  106:20 107:5,6,7
  107:8,9,14
**averaged**
  106:14
**averaging**
  106:24
**averagings**
  106:17
**avoiding**
  190:20
**aware**
  9:1 27:12 45:7,9
  73:7,8 75:2 78:20
  103:3 134:14
  136:14 148:18
  170:3 199:3,25
  200:2
**awfully**
  169:13
**awise**
  3:22

**B**

**back**
  12:3 23:6 30:16
  33:9 48:6 54:18
  59:23,24,25 65:13
  69:22 95:23
  101:14,15 105:17
  106:24 113:13
  139:16 147:18
  154:1 159:20
  160:9 162:8,24
  165:16 167:12
  168:2 177:14
  179:14 202:11
  208:25
**background**
  7:22 60:1 119:24
**bad**
  103:11 109:3

198:1
**balance**
179:16
**balancing**
177:14
**bank**
80:3
**barrier**
135:15
**based**
21:11,12,12,14,16
39:10,15 42:6
46:13 59:13 61:16
67:12 87:24 102:4
102:6,8 115:8
131:12 143:8
**baseline**
140:4
**basically**
33:19 57:22
125:24 149:8
**basing**
176:22
**basis**
21:6 43:24 67:6
69:24 93:14,15
146:16 186:6,7
210:2,3
**battlefield**
9:25
**bear**
46:4 58:4
**bearing**
157:12
**bears**
57:13,24 157:4
**began**
158:12
**beginning**
34:11 39:19
**begins**
182:24
**behavior**
110:22
**behaviors**
58:19
**believe**
28:16,22,24 29:3
36:8 44:20 71:12

73:2,4 78:4
102:20 159:23
165:6 186:24
187:19 196:1,5,11
197:5 198:24
200:21 211:12,14
**believed**
142:12
**bell**
154:2
**best**
33:3,7 70:21
91:22 155:17
170:25 198:9
**better**
15:9,20 30:11,13
32:2 54:12,19
56:20 102:24
108:16 118:2,5
138:9 152:15
**betweensubjects**
150:1,2
**beyond**
89:6 125:15 149:7
187:11 205:22
**biased**
100:12
**biases**
54:4
**big**
37:6 75:14 173:22
**billed**
159:24
**bit**
7:21 23:21 39:18
53:25 113:20
124:21 126:24
**bitched**
145:21
**bits**
30:9,10
**blood**
215:13
**blurry**
124:21
**board**
10:21 11:14 14:3
20:22 23:8 29:20
125:20

**boards**
109:13
**bob**
197:20
**bobby**
142:21
**body**
118:12,13,14
135:8 190:10
**bottom**
140:3 181:4
**brain**
10:1 184:3 190:11
**break**
6:4 32:25 59:18
59:20,23 113:12
113:21,21 154:21
155:7 191:20,22
191:23 195:18,18
208:19,21
**breakdown**
40:24 41:2 182:8
**breakfast**
113:24
**breaks**
6:6 160:6
**brief**
5:24 127:19
**brigham**
152:23
**bright**
55:21
**bring**
69:1 76:1 93:20
93:23
**bringing**
107:14 181:9
**broad**
64:22 65:2 81:1
81:12 123:14
**broadly**
78:19 114:23
190:14
**brook**
27:15
**brought**
45:8 135:13
**bunch**
32:20 107:12

**bystander**
108:12 109:15,21
109:24 110:1,5,8
110:13 111:3,12
192:1,5,8,10,12
**bystanderbased**
109:9,10
**bystanders**
81:6 108:14,17,21
108:21,25 109:5
111:15

——————————
**C**
**calculate**
8:9 91:6,7 107:8
152:22
**calculus**
165:19 189:3
**call**
32:5 38:3 50:16
50:17 53:11 60:5
65:4,9 70:6,14
86:25 114:10
119:24 139:3
141:19 150:1
156:2
**called**
5:2 26:16 60:12
65:2 116:5 119:25
131:24 142:24
201:21
**calls**
72:22 73:12 74:21
78:17 98:2 99:1
103:22 164:25
171:7 195:3
**calm**
115:14 195:15
**calmly**
18:14 20:17
**cancel**
108:24
**capable**
132:5 173:1
**captured**
17:12
**car**
29:12,14 130:3,4
130:4 135:9,15

136:1,4,13,15
194:22
**career**
8:4 40:3 80:18
**careful**
61:8 168:17
**carefully**
142:5
**carmela**
3:5,10 5:10
**carnage**
18:13
**carolina**
60:21
**carrot**
129:21
**case**
4:11 21:1 22:8,11
23:9,11,12 26:16
27:9 28:17 35:12
36:3,21,25 38:17
41:19 42:23 43:5
43:8 44:4,14,15
44:21 45:2,4,7,12
46:6,8,12,14
47:13 48:15 49:5
52:5,19 59:7 67:1
67:7 70:1,3,5,9,15
70:22,23,25 71:1
71:10,14 73:3
75:23,25 76:12,17
77:3,5,6,14 78:21
85:12 86:15 88:15
92:14 94:21 96:2
96:6 97:18 98:11
99:25 100:22
101:22 105:5,7,12
105:19 106:4,7
108:1,25 111:8
114:12 120:16
130:2 133:25
134:11 135:25
136:10,12 141:18
141:25 143:23
144:3,5,13 145:7
146:2 147:4,8,13
155:10,24 156:4
156:16,23 159:7
159:22 161:2

162:13 164:5,19
165:7,17 166:4,25
167:5 168:14
169:5 171:17
172:17 173:9,12
177:21 179:2,8,22
180:3,11 181:14
184:25 186:25
194:9,10,22
195:22,24 196:13
198:23 199:1,5
200:4 201:4 205:3
208:12 210:23
211:8 214:2
**cases**
40:19 41:5,15,18
41:23,24 42:3,5
42:19 43:14,20
45:24 47:2,3,7,8
60:8 61:1,21,21
61:22 62:9 72:7
72:11,14,17,20,25
73:9 75:20 76:21
76:22 77:15,16
78:7 79:3,6 81:4,8
81:9 95:8,9 99:13
99:15 100:23
104:14,20 105:4
115:20 135:23
141:21 143:6,11
144:8 145:25
146:1 147:17
153:9 159:3
191:23 192:20,23
193:9,12 194:4,9
194:14,20
**catch**
16:8
**categories**
35:8 87:13 114:9
114:16 180:12
**categorize**
151:18
**categorized**
15:24
**category**
49:11 65:2,9
114:17 137:23
**cause**

86:19 188:25
**cell**
28:25 38:13,15
**cells**
28:9
**center**
60:10
**central**
116:2
**certain**
14:2 29:1 60:25
64:16 67:9 69:15
90:6 92:16 104:18
104:19 125:21
126:17 140:2
176:25
**certainly**
16:16 35:22 73:15
86:3,23 88:3
95:16 158:22
187:20 191:10
192:18 198:6
**certainty**
34:1 64:11,13,14
166:24 167:2
**certificate**
215:1
**certified**
2:12
**certify**
213:6 215:5,11
**cetera**
56:9 206:13
**chance**
30:11,13 85:3
86:16 95:2,4,4
96:19 98:18
103:10 104:24,25
143:16 174:3
177:19,25 178:1
178:10 180:14
188:9
**chances**
54:23,24 56:4
66:19,20,21
108:21 120:17
145:16 175:25
183:6 185:14
**change**

41:10 51:2 188:15
189:3 194:8 208:4
**changed**
188:3 208:7
**chaos**
168:1 189:17
207:18
**charles**
17:6
**charlotte**
60:21
**chemistry**
63:17
**chevalier**
3:13 155:20
159:24
**chicago**
144:3,23 145:4,20
**chin**
186:23
**choice**
178:5
**choose**
35:16 159:19
**choosing**
83:24
**chose**
34:3,5
**chronological**
158:5
**circuit**
145:21,22,22
**circumstance**
18:10 67:1 92:19
**circumstances**
46:23 47:17 67:9
76:11 77:5 87:3
88:17,19 91:14
94:8 95:20 115:9
121:24 141:4,13
143:9 150:19
165:22 166:10,13
166:18 183:7
185:15 186:8,14
187:5,7 189:8
199:17 207:3
**cite**
22:2 26:16 33:4
35:20 36:14 92:4

92:14
**cited**
22:8,21 23:1
37:15
**cites**
26:13
**city**
43:21 132:16
146:18
**civ**
1:6
**civil**
40:25 41:6,18,23
41:24 42:23 43:6
43:9 44:15 47:2
71:1 76:17,21
77:3,15 79:6
146:6 147:17
159:2
**civilian**
112:9
**claim**
210:7,8
**claiming**
121:25
**claims**
134:12
**clarify**
84:3
**clarity**
114:24
**classroom**
34:10,12,14
**cleaner**
91:25
**clear**
6:3 8:17 44:13
67:24 68:13 86:11
89:24 103:13
197:16 211:15
**clearly**
89:15 130:5
**close**
21:3,7 88:18,22
88:23 89:19 93:21
93:23 96:9,10
130:12,14,17
178:3,8 179:1
194:11

**closer**
191:25
**closure**
139:21
**coat**
130:22 134:25
**code**
193:24
**coded**
193:11,12
**cognitive**
20:14,14,15 149:9
190:17 195:13
**collapse**
33:1 38:4 107:17
**collapsing**
150:3
**colleagues**
96:25 152:24
**collected**
60:24
**collecting**
101:12,12
**com**
3:10,11,21,22
**combat**
12:15
**combination**
182:14,15
**combinations**
182:19
**combine**
182:20
**come**
105:16 113:13
115:22,23 116:10
116:14,19 129:16
152:16 160:11
187:8 190:13
**comes**
99:11 190:14
**coming**
34:16 95:23
**commenting**
158:19 162:20
197:11
**commit**
146:10
**committed**

48:11 62:7 78:9
103:20 145:1
146:4 173:4
**common**
31:22 61:20 72:5
75:13 77:4
**commonly**
22:6
**community**
107:2
**comparable**
92:18
**compare**
169:2 193:3
**compared**
166:12
**compares**
192:16
**comparing**
122:13
**comparison**
83:18
**comparisons**
193:8
**complete**
105:21 139:22
212:8 213:9
**completely**
174:24
**complex**
91:1 186:17
**components**
131:23
**composite**
142:11,13
**compound**
10:24 23:24 27:21
46:1 113:9 136:17
147:24 149:21
**concepts**
52:8
**concern**
76:21 135:23
137:1 138:3
161:18 186:10
188:25
**concerned**
202:1
**concession**

147:4
**concluded**
212:6
**concluding**
33:19
**conclusion**
35:4 37:7,23,24
69:8 73:19 88:10
89:19 98:3 160:11
165:20 176:14
177:19 179:18,24
180:22 181:2
182:13 190:8
208:7
**conclusions**
37:3 39:15 92:5
**concrete**
85:8
**condition**
83:18,19 84:15
122:19,22
**conditions**
17:14,16 18:22
24:11 31:5 38:6
53:8,9 56:23,24
57:20 79:22 85:9
85:22 88:4,24
91:9,11,15 106:13
107:11,22 110:2,4
117:25 118:22
119:8 123:5,13
153:12 173:5,7
181:23 189:7
194:12 208:5
**conduct**
60:18
**conducted**
37:6 39:10,16
77:11 80:19
**conference**
201:3
**confesses**
42:18
**confidence**
33:25 68:25 207:2
207:6
**confidently**
65:24 66:9 208:2
**confined**

28:9,25
**conflict**
12:6,11,18,19,23
13:8,9,10 62:12
62:15,19,22,23
79:18 132:14,24
**confounded**
193:22
**confrontation**
25:11,13,22
**congruent**
20:13
**conjunction**
60:19 165:22
**connection**
36:21
**conservative**
145:22
**consider**
62:18 67:14 69:21
94:23 109:23,23
110:18 114:6
116:17 121:24
166:15 173:16
192:2,6
**consideration**
48:2 67:19 76:20
76:25 77:1 98:15
116:3 166:5,7,8
174:25 175:5,8
**considerations**
67:13
**considered**
71:6 93:20 173:3
**considering**
88:13 95:5 104:13
166:9
**consistency**
57:21 95:8,14
99:16
**consistent**
116:15,18,19,22
117:1 127:9 129:5
189:15 198:6
**consistently**
38:5 63:19
**consolidate**
115:16 168:3
**constant**

82:9,23 193:5
**constellation**
89:18
**constrained**
74:3
**construed**
54:8 59:4
**consulting**
60:2,6,7,12
**contention**
43:18
**contentious**
57:3
**context**
8:13,14,22,25
12:5 50:13,15,24
80:22 97:19
112:12,15 147:13
148:7
**continue**
20:7
**continuing**
61:1
**continuous**
8:6 13:4 125:14
**continuum**
87:14,17,20,24
88:7 125:20
126:19 127:8
166:20 172:17
**contributes**
9:14 94:16
**contributing**
38:15
**control**
83:18 90:5 194:11
**controlled**
54:15 55:19 63:24
81:2,14 86:12
92:24 93:5 97:19
106:10 115:21
193:9
**controls**
89:17
**convergence**
57:23
**conversation**
27:17
**convicted**

42:5 44:16 142:19
146:15
**conviction**
42:8 43:24 77:16
77:23 146:17
**convictions**
42:14
**cope**
11:9
**copies**
21:24
**coping**
11:11
**copy**
198:1
**correct**
9:10 11:3,7 23:11
26:23 27:10,25
28:3 29:24 30:22
30:23 34:10,18,22
36:10 39:11,21
42:23 44:1,9,20
49:15 53:20 76:14
77:17 78:2,9,15
82:17 86:22 87:11
108:4 121:6
122:15,23 123:20
123:25 125:13
132:7 134:7,25
136:2 140:3,21,24
145:24 146:7
148:1 151:11
156:16 157:7
159:13 163:16,18
163:21 164:16,19
169:6,10 170:13
170:15,17 171:20
173:11 174:20
176:14 179:7,12
180:11 183:20
184:1 186:2 195:7
205:11,12,23
208:9,16,17
209:12,20 210:5
210:17 211:20
213:9,11
**correctly**
31:17,19
**correlates**

152:19
**correlation**
  152:21 153:9
**cotton**
  142:2
**counsel**
  136:18 155:10
  160:2,5 163:3
  164:18 198:18
  201:21 203:1,17
  208:23
**counsels**
  162:20
**count**
  176:9
**countries**
  63:16
**country**
  75:14,15
**county**
  43:21 146:17
**couple**
  5:23 46:18 50:11
  58:10,11 59:24
  71:2
**coupleminute**
  195:18
**course**
  12:2 18:21 19:13
  23:16 24:8,12
  40:2,20 49:10
  54:14 58:7 80:18
  138:6 145:3
  150:11 169:14
  211:6
**court**
  1:1 26:5,18 27:13
  42:20 43:15 49:5
  49:17,18,21 50:3
  50:16 69:24 72:6
  74:14 75:3 76:21
  99:3 113:17
  145:19 197:4
  200:17
**courts**
  46:17 50:6,16
**cover**
  200:22
**create**

57:23 63:24 81:17
  115:25
**created**
  64:14 85:8 107:10
  173:7
**credentials**
  69:24
**credibility**
  99:4 170:11
**crime**
  10:19 11:13,13,24
  12:1 13:14 14:15
  15:24 16:22 17:1
  18:5,5,6,24,25
  19:19,20 48:12
  58:6 61:22 62:7
  78:9 79:9,17
  80:20,21 81:13
  82:25 95:14 108:7
  108:8 110:11
  137:5,6,12,15
  146:5,10 147:21
  149:14 154:11
  185:8 188:24
  191:5,11 192:22
  193:17,20,23
  194:5
**crimes**
  9:9,11 10:5 12:6
  16:3 61:16,18,25
  62:11 79:10
  190:25 191:1,16
  191:17,18 192:14
  194:1
**criminal**
  9:4,5 41:1,4,9,21
  45:20 46:8,12
  49:5 70:3 76:17
  76:22 78:7 79:3,7
  81:6 99:12,13,15
**critical**
  139:11
**crossrace**
  120:14
**culprit**
  103:16
**culpritabsent**
  103:11
**cultures**

13:23
**cumulate**
  90:3 93:18,19
**cumulative**
  71:6 73:2
**curriculum**
  4:8 6:19
**curve**
  138:16,25 139:25
  149:22 150:4,7,9
**cutting**
  134:3

—————————————
                D
—————————————
**dangers**
  103:3
**dark**
  51:16 95:24
  107:16
**darker**
  91:3
**darkness**
  90:14,15 105:21
  107:13
**darkskinned**
  182:1 183:10
**dart**
  178:9
**data**
  21:16 32:4,5
  60:24 80:25
  101:12 127:12
**database**
  102:9
**date**
  13:13 36:6,7
  196:17 197:16
  200:22 214:4
**dates**
  158:6
**day**
  55:22 69:9 132:15
  213:17 214:23
  215:16
**daylight**
  123:14
**dead**
  144:21
**dealing**

104:15 130:13,15
**debra**
  1:24 2:11 5:3
  215:3,21
**decelerating**
  138:16,24
**decide**
  49:6,17,18 50:3,8
  68:18 69:16 99:4
  159:15
**decided**
  36:14 50:21
**decision**
  31:12 173:3
**declare**
  42:22
**declaring**
  43:15
**decrease**
  64:8,11 66:21
  83:7 175:25
**decreased**
  176:5
**decreases**
  64:4
**decreasing**
  84:7
**deductions**
  139:20
**defendant**
  43:1,6,20 46:25
  48:23 73:20 78:9
**defendants**
  1:12 3:14 41:1
  43:3 77:21 155:10
  197:4
**defense**
  43:15 70:5 160:2
  160:5 198:18
  201:21 203:1,17
**define**
  50:10 62:4 103:16
**defined**
  52:24
**defines**
  8:21
**defining**
  62:5
**definitely**

102:25 147:5
**definition**
  44:23 49:25 151:9
**definitions**
  52:17
**definitive**
  42:20 169:1
**definitively**
  39:7 55:25 65:6
**degree**
  184:9
**degrees**
  86:21
**delay**
  94:15
**department**
  101:6 144:23
  145:5
**departments**
  60:20 61:7 103:2
**depend**
  76:16 150:18
**depending**
  8:20 10:22 40:25
  69:20 76:22 84:14
  88:17 107:22
  121:20 123:21
**depends**
  43:12 66:25,25
  87:3 152:22
  208:10 211:7
**deposed**
  5:15 163:18
**deposition**
  1:16 2:8 39:19
  40:7,15 59:15
  71:21 72:3 160:3
  161:24 162:9
  163:2,14 164:16
  212:6,7,9 213:7
  215:7,9
**depositions**
  58:1 169:9
**deprivation**
  27:25 28:8
**deprived**
  28:18
**des**
  1:17 2:10

**describe**
119:13 153:3
163:12 177:16
**described**
153:22 188:7
**describing**
75:22 118:3
119:11
**description**
4:7 57:17,17 89:7
122:2 142:11
151:19,22 152:1,3
152:9,19 153:10
153:13,17 154:10
154:16,19,25
163:1,4,8,10
164:1,7,10,24
165:4,9 169:2,3,8
169:14,16,23
170:5,8,13,17,20
171:1,5,6,11,16
171:17 187:22
188:2,6,14,19,23
**descriptions**
154:6 161:6,17
170:18
**descriptors**
152:14,16
**designs**
150:1,2,2
**desk**
34:4
**despite**
43:14 52:13,15
189:7 207:7
**detail**
20:19 61:2 152:18
186:16,23 187:15
189:21
**detailed**
142:10 152:9
183:7 185:16
186:1 187:9,21
188:1,14,18,22,23
**details**
10:16 14:24 37:22
183:5 184:15
185:7,10,11,19,21
187:17 189:11,14

190:22 195:15
**detective**
103:19
**detectives**
61:10 77:12
101:14,16 145:6
**determine**
78:8 157:3
**determined**
142:7
**developing**
61:8
**devoted**
8:4 115:2,4
190:19
**diagnostic**
154:7
**dichotomous**
32:5
**diego**
60:20 62:17
**differ**
81:15,16 95:15
111:16
**difference**
12:11,17 13:3
23:22 96:12 97:4
108:14,24 110:16
111:15 118:17
126:15 131:2,3
135:6,13 140:15
175:21 190:25
191:3
**differences**
95:17,22 97:7
110:1,23 126:21
131:15
**different**
9:8,9,11,12,17,21
11:10,10 13:19,22
18:4 20:2 47:1
48:10 52:8 75:15
85:2,2 96:21
101:3 109:6
118:25 126:4
130:22,24 148:16
150:10,12 192:15
196:24 198:20
205:17 210:14

**differently**
11:5 132:7
**difficult**
192:19 198:7
**difficulty**
120:5
**direct**
5:6 24:23 33:16
75:17 121:14
123:9
**directed**
120:22 129:18
177:12
**direction**
84:17 92:20 93:19
98:6 116:12
135:21 138:7
166:12 168:10
**directly**
92:2 111:2 117:20
118:4,25 119:14
120:16,21,23
121:15 122:17,20
123:2,10 129:25
135:7 139:8,9
162:11,12
**director**
60:10
**disagree**
94:1
**discern**
111:10,11,12
**disclosed**
63:2
**discovery**
41:16 201:3
**discrepant**
66:7
**discriminate**
65:15
**discuss**
10:12 27:3 68:7
68:19 91:17,18
117:18,23 208:22
**discussed**
52:10 117:11
167:6 179:5
**discusses**
12:5 89:20 118:16

118:23
**discussing**
89:23
**discussion**
73:22
**displaced**
194:24
**disruption**
149:9
**distance**
77:7 91:24 92:1,8
111:4 114:24
119:10 123:18,21
123:22 124:9,22
124:24 126:22
131:10,16 193:6
**distinction**
76:9,16 108:6
111:25 112:25
113:2,6 125:13
129:20,24 130:7
130:10 131:12
133:4 179:4
191:14
**distinguish**
66:14 111:21
181:25
**distinguished**
180:14
**distinguishes**
192:14
**distract**
116:4
**distraction**
134:3 189:16
**distractions**
115:2,25 167:22
175:10
**distress**
16:10
**distributed**
212:11
**district**
1:1,2
**divided**
173:21
**dna**
42:15,17,19 52:4
81:4,8,11 99:24

142:3,20,22
146:12,13,19
**document**
26:15,20 27:5
58:3 197:23
201:12,16,17,18
**documentation**
156:5 205:23
206:12
**documented**
57:16
**documents**
4:18 57:22 59:13
156:7,8 157:18
161:12 196:19
199:12 204:6
205:2,7 206:1
**doing**
64:2 112:17,17
118:10 146:25
174:17
**domain**
146:6
**domestic**
8:18 9:5 44:24
**dominant**
8:7
**doubletree**
2:9
**doubt**
142:18
**downward**
95:1 97:18 166:11
168:9
**dr**
5:8 7:19 23:14
27:14,17 50:8
196:4 209:2
**draft**
36:2
**dramatic**
125:17 126:20
127:7
**dramatically**
11:23 134:4 208:3
**draw**
14:18,24 125:17
128:25 182:24
**drawing**

142:13
**drawn**
  129:2,3
**drive**
  2:10
**driving**
  28:19 61:5
**drop**
  140:9
**dropoff**
  125:17 127:7
**dropped**
  162:1
**dropping**
  140:8 207:19
**duck**
  135:9 136:24
**ducking**
  190:21
**duly**
  5:2
**dynamics**
  161:20
**dysfunction**
  148:11
**dysfunctional**
  149:2

**E**

**earlier**
  18:18 19:6,15
  23:6 36:4 62:13
  62:16 88:25
  147:19 161:25
  164:23 166:21
  179:14 188:5
  195:24 207:9
**earliest**
  89:12 129:9 171:1
**early**
  14:16 57:20,24
  70:20 138:18
  155:12 161:14,14
  169:5 179:5
**easily**
  153:21,22
**east**
  14:9 62:22 96:1
**easy**

153:12,13,14
**editorializing**
  136:18
**effect**
  86:19 98:6 116:6
  120:14 131:22,24
  132:10 207:4
**effectuate**
  47:23
**either**
  8:18 43:10 51:10
  58:12 65:12 85:6
  109:18 135:3
  140:24 173:13
  191:4
**ejaculate**
  146:20
**elaborate**
  53:24 86:24 87:15
  114:18
**element**
  131:22
**eleven**
  142:19
**elizabeth**
  124:17,18
**ellis**
  200:5 201:4
**email**
  4:13 196:15 197:6
  197:17
**emails**
  196:12,13 198:25
  206:12
**enclosed**
  212:12
**encode**
  10:16 18:14 183:5
  184:15,17,19
  185:7,9,11,23
**encoded**
  189:11
**encoding**
  114:11 195:15
**encompassed**
  137:22
**encounter**
  18:23
**ends**

33:2
**enforcement**
  101:17,18 102:23
  111:22,23 112:13
  112:17,21,23
  113:3 165:14
**engage**
  135:22
**engaged**
  12:25 152:6
**entailed**
  25:6,8,17
**entire**
  67:12 118:12
  132:17 175:23,24
**episode**
  137:3
**equal**
  109:1 112:6
  170:18 179:23,25
  180:13,20 188:21
  189:2
**equally**
  109:2,3 180:4
  202:2
**equate**
  62:21
**equivalent**
  62:19
**errata**
  214:1
**error**
  100:24 200:22
**escalates**
  132:2
**especially**
  156:5 186:17
  190:15
**esq**
  3:5,6,15,16
**establish**
  39:7 86:19
**establishes**
  100:2
**estimate**
  5:19 16:18 39:23
  100:3 108:2
  126:10
**estimating**

100:14
**et**
  1:5,10 56:9
  206:12 214:2,3
**evaluate**
  35:18 155:23
**event**
  9:21 10:7 12:12
  14:25 15:5 67:14
  81:17 94:5 108:19
  115:15 128:15
  138:18,23 139:6
  139:16 140:12
  148:13 151:23
  152:25 171:16
  182:3 185:6 186:8
  194:17
**events**
  13:17,18 15:14
  63:24 64:1
**everybody**
  108:19 132:6
  152:25
**everybodys**
  153:1
**everyday**
  15:13
**everythings**
  151:15
**evidence**
  12:5 42:7,15 46:5
  48:24,25,25 49:7
  49:9,11,24 50:1
  50:13,15,18,20,25
  51:2 69:17 74:4,8
  74:13 103:13
  108:13 136:19
  155:24 162:20,21
  165:22 169:23
  189:23 190:8
  197:11 205:5
  210:6,8 211:16
**exact**
  92:18 136:5
**exactly**
  10:9 18:20 19:17
  19:18 26:14 67:25
  81:18 89:16
  132:19 133:8

146:24 147:21,22
  152:25,25 155:11
  180:17 196:25
**examination**
  4:3 5:6
**examinations**
  32:23
**examined**
  5:5
**example**
  9:15 17:5,11
  38:10 48:15,20
  51:15,16 52:5
  54:5 55:8,12,18
  60:16 65:4 73:18
  74:5 75:25 81:3
  84:24 85:8 88:25
  89:1,5 91:12,19
  94:2,10,12 95:16
  95:23 96:3 105:14
  105:18,18 111:1
  115:25 116:4
  119:9 120:13
  121:25 126:6
  129:22 130:1
  131:15 132:12,13
  133:11 134:1
  135:14 139:5,14
  140:10 141:24
  144:1,12 146:11
  146:12 148:11,14
  149:4,17 156:10
  166:13 167:10
  176:18 177:5
  190:23 191:19,21
  192:22 207:17
  208:8 209:25
**examples**
  144:7
**exception**
  41:19 146:9
  149:24 159:7
**exceptions**
  55:7,8
**exchange**
  24:3 171:24
**exclude**
  68:21 82:16
**excluded**

72:21,24 73:3,5
**exclusively**
42:6 81:10
**exculpate**
211:18
**excuse**
26:1
**execute**
60:14
**exhibit**
4:8,9,10,11,12,13
4:14 6:11,12
21:19,20 22:15,16
26:2,2,6 30:16,19
30:19,21,24 196:1
196:2 197:3,3,5,7
200:14,18
**exhibits**
4:6 76:1 200:13
212:11,12
**existed**
53:9 90:23
**exoneration**
52:4 81:4,8 99:25
146:1
**expand**
137:21
**expect**
189:15
**expected**
192:4
**experience**
9:17 10:6 17:22
17:23 39:18 40:14
45:19 76:18,20
78:20 80:9 131:13
147:21 148:24
190:1
**experienced**
10:8 24:11 139:9
183:15 184:5
185:5
**experiences**
10:20 11:20 30:5
132:7
**experiencing**
11:18 18:5,6,25
19:19,20 79:21
128:9 183:3

184:13 186:11
**experimental**
145:13
**experiments**
60:18 63:24 82:19
89:12 112:16
**expert**
4:10 22:7 27:14
39:18 40:12,20
41:3 44:14 45:19
45:23,25 46:3
47:6,13 52:18
69:22 71:7 73:6
88:9 98:21 143:7
159:1
**expertise**
165:13
**experts**
78:21,24
**explain**
12:7 15:6 31:8,14
38:21 52:19 76:25
93:15 104:22
119:24 165:19
180:23 181:14
182:8 186:5
**explained**
34:15 45:19
**explanation**
181:22
**explicit**
24:19 61:9
**explicitly**
202:13,15
**exposed**
24:17 25:23 59:3
95:18
**exposure**
58:22 116:9,9
119:16,18,21
120:9,11,13,19,24
134:4 141:6 172:7
**express**
165:13
**expressing**
166:23
**extensive**
152:8
**extensively**

179:5
**extent**
151:22,24 184:6
**external**
139:15
**extreme**
16:6 55:25 88:5
95:23 96:5
**extremely**
56:23,24 188:22
203:13,16
**eye**
48:17 126:16
129:13
**eyes**
118:13 178:8
179:1 186:23
**eyewitness**
7:12 8:1,5,11,25
9:3,4 12:5 15:10
42:4,7 48:3 50:13
50:15,24 58:19
60:18 63:20 75:19
80:19,22 99:12
108:5 109:20
114:13 148:7
155:23 165:24
187:5 209:14
210:8
**eyewitnesses**
81:5 108:6,7
144:14

**F**
**face**
29:7 66:12 67:3,5
111:19 116:3,7
129:4 130:6,21
134:5 135:24
142:5,8,16 152:13
152:14 153:1,2,3
153:5 154:12
162:13,17 163:12
167:24 174:2,4
183:5,8 185:16
186:13 190:23
**faceless**
162:18
**faces**

66:13,16 153:7,21
153:21,22 154:7
174:6 186:17
**facetoface**
117:21
**facial**
187:11
**fact**
46:8 48:11 51:3
51:22 52:4 78:5
103:22 110:7,21
128:23 141:16
145:9 146:4
162:25 170:9
173:17 175:13
176:5 183:16
184:19 187:10
189:14 194:21
207:18,19,21
209:19 210:4,21
211:22
**factor**
53:25 69:16 82:6
82:11 84:11 85:19
90:5 94:3 95:5
96:2 109:19
115:10 117:4
121:2 122:5
124:25 137:24
151:2 161:4
167:11,11,12
168:25 171:11
188:13 189:3
208:9
**factors**
10:12,20 35:18
46:4 47:19 53:8
56:13 57:15 68:20
68:22 69:13,21
78:13 83:6 85:3
88:25 89:8,18,21
90:2 91:20 92:6
92:11 93:16,18
94:17,19,23,25
95:6,7,17 97:17
109:18 114:6,25
115:16,19 117:12
117:15 122:8
137:22 143:24

151:1 153:14
161:1 165:17,18
165:19,23 167:10
167:13,15,18
177:15,15,18
178:16 179:16,17
179:21 180:8
191:24
**facts**
46:13 69:3 176:13
205:5 207:16
211:8
**fail**
54:17 187:8
**failure**
43:18
**fairly**
75:16 77:3 127:9
127:11 161:14
**fall**
16:3,4 114:9,15
114:15 151:20
166:19 172:22
**falling**
105:17
**false**
32:13 35:11 52:4
64:11,13,14 173:6
**familiar**
5:20
**family**
137:5,11
**far**
29:9 70:4 83:4
169:17,20 172:25
173:2 205:7
**farther**
108:22
**fashion**
43:13 74:4
**faster**
194:19
**fate**
138:4
**favorable**
149:10 187:7
**fawzi**
169:4 196:21
198:11,12,20

209:3,18,23
210:12 211:12
**fear**
10:13 11:1,1,5,18
11:21,22 16:10,12
16:16,23 20:8,11
20:18 22:9 62:7
108:23 110:2,4
114:22 115:7
128:9 131:18
132:2,7,10 148:15
149:8,15 166:14
167:19 175:20
183:3,14,17 184:5
184:14,21 185:1,2
185:5 186:11
189:16,18,24
190:15 191:4,6,8
191:10 192:5,15
192:19,25 194:25
**fearful**
79:22 148:18
**features**
187:11
**february**
196:18 197:18
199:6 203:3
**feel**
33:3 36:13 37:1
37:17 108:23
113:23 191:10
**feet**
123:23 124:2,4,11
125:13,15,20
126:6,12
**felt**
37:10 148:21
207:7
**fewer**
35:11
**field**
33:4,7 37:15
60:18 78:22 81:5
81:11,15 99:11
101:1,5,9 102:4
106:18 190:5
**fifteen**
41:4
**fifteenth**

3:18
**fifth**
209:24
**fifties**
32:21
**fiftyfifty**
178:10
**fight**
146:21
**figures**
125:19
**file**
108:1
**files**
101:14,16,22
**fill**
61:12 139:18,18
171:14
**filler**
99:18 100:22
102:3 103:21
105:25
**fillers**
61:11 168:23
193:16
**find**
41:11,13 101:7
111:15 161:12
162:24 191:22
194:14,18
**finding**
31:1 131:2
**findings**
138:2
**fine**
39:23 113:18
**finely**
32:25
**fingerprints**
42:17
**finish**
46:20 144:11
169:21 188:11
**finished**
21:23 22:19 25:2
25:3 27:1 201:7,9
201:10
**fired**
131:20 132:21

135:16 167:21
186:12
**first**
5:2 6:9 8:1 27:6
31:8 43:5,8 44:4
45:1,3 57:3 104:8
138:22,23 140:11
142:14 146:2
147:7,11 158:15
158:23,25 159:3,6
160:15,17,18,25
169:15 188:11
211:1
**fit**
206:5
**five**
21:9 35:25 36:17
85:2,2 105:24
**fiveperson**
21:8
**flatten**
139:25
**flattening**
138:25
**flawed**
32:24 37:10,25,25
38:11 42:12,13
**fleur**
2:10
**flip**
21:22
**flipped**
175:12
**floating**
84:20
**florida**
152:24
**focal**
82:21,25 116:2
119:22
**focus**
38:22 116:6
121:11 128:18,21
129:15 130:11
131:24 132:1
133:2,23 134:2,7
167:19
**focused**
13:14,16 129:3

131:4 133:21
174:4 175:14
**follow**
63:25 204:17
**following**
26:22 150:7
204:11
**follows**
5:5 55:14 118:14
212:11
**food**
27:25 28:8,18
**footnote**
22:23 27:4,6
**forced**
145:2
**forensic**
60:11 146:13
**forget**
140:2,10 142:8,16
**forgetting**
138:5,17 149:23
**forgotten**
140:11,13
**form**
75:13 149:8 152:6
160:22
**forming**
20:18
**formula**
86:14 90:11 97:21
98:10,13 181:15
181:16,17
**formulas**
90:22 125:6
**formulate**
158:11
**forth**
65:13 76:7 91:5
215:8
**forties**
32:20
**fortyeight**
28:18 94:13
**forward**
44:23 76:1 144:22
**foster**
153:12,14
**found**

31:1 143:21 153:2
175:4 194:15
**foundation**
63:9,13 64:12
72:23 73:13 78:17
81:4 82:3
**four**
35:25 140:16,21
162:12 173:17
174:1,2,5 175:15
175:23 176:5
177:1,2,5,8,9
211:13
**frailty**
138:1
**franklin**
27:14
**frankly**
140:16 205:13
**free**
42:21
**fringes**
125:5
**front**
54:6 118:9 119:14
122:14,18,20
123:2,10 130:21
200:22
**fruitless**
170:7
**full**
34:17 157:23
**fully**
215:8
**function**
104:3 106:12
138:13,14
**functional**
120:19,24 134:4
**functionally**
55:24 115:4
**functioning**
148:19
**funded**
63:19 64:13 81:3
**funding**
63:14
**funds**
63:15

**further**
  12:7 94:16 126:22
  215:11

**G**
**galindo**
  72:10
**gamut**
  81:1
**gaps**
  139:17,19
**gary**
  1:16 2:8 4:4 5:1
  212:7 213:5,13
  214:5,21 215:6
**gauge**
  87:5
**gaza**
  80:5
**gbd**
  1:7
**geared**
  20:15,16
**general**
  20:10 39:3 46:21
  75:18 76:9 78:13
  96:15 97:8 105:4
  105:13 107:3
  113:5 114:15
  116:16 118:22
  153:17 156:21
  158:16 170:16
  184:2
**generalization**
  98:8
**generalize**
  96:23
**generalized**
  95:13
**generally**
  10:4 12:4 15:23
  56:22 62:20 68:18
  79:20 80:15 88:8
  90:11,17 92:13
  106:6 107:1 114:5
  124:10,11 158:3
  163:21 191:12
  192:4
**generate**

  152:14
**generic**
  89:6 169:24 171:3
**geoff**
  124:18 125:6,12
**geoffrey**
  124:13
**getting**
  10:18 40:13 135:7
  162:6 167:8 181:4
**give**
  6:11 9:15 16:17
  21:17 22:14 36:5
  55:9,9 57:18 72:3
  89:5 98:13 114:8
  118:2 120:17
  125:19 141:24
  144:1 146:11
  152:13,15 154:10
  161:17 163:4,8,10
  165:4 168:2 170:5
  170:13,20 171:5,6
  171:16,17 178:5
  178:16
**given**
  33:12,21,22 34:17
  40:22 41:3 73:6
  76:5,7 92:23
  94:20 111:8 117:5
  150:5 156:24
  157:15 164:8,10
  164:24 195:23
  212:10 213:10
  215:10
**gives**
  152:18 177:7
**giving**
  17:11 128:7
  144:11 164:2
  168:16 169:14
  174:14
**glance**
  129:15
**glasses**
  96:22 97:12,13
**go**
  15:3 24:25 30:15
  33:9 44:23 50:2,6
  50:7,22 55:3 56:5

  59:24 83:4 87:12
  92:20 101:5
  104:18,19 106:24
  107:7 110:3,25
  113:17,20 115:17
  121:19 124:17
  133:3 139:16
  143:11 158:22
  159:20 162:23
  168:9 188:12
  204:8 208:20,25
**goeff**
  91:23
**goes**
  23:6 40:9 98:16
  149:7 171:10
**going**
  6:1,5,10 8:24 12:3
  13:10 18:20 19:21
  21:9,17,18 25:1
  25:25 26:1,12
  27:4 30:16 46:17
  54:18 56:1 57:2
  59:18,25 69:16,22
  71:8 83:13 84:12
  84:13,17 86:2,3,4
  86:4,9 91:4 96:13
  101:13,15 104:20
  104:24 105:1,22
  107:14 110:9
  114:1 117:9
  120:12 124:16
  126:24 128:4,18
  132:18 133:3
  140:5,6 141:9
  142:8 146:11
  147:18 150:17
  154:1 158:10
  160:9 162:8 164:2
  165:16 177:14
  179:14 181:5,10
  182:23 187:5
  191:7 193:2
  194:20,24 195:14
  195:25 197:2
  200:14 201:5
  202:22 204:12,17
  204:18 208:3
**good**

  5:18 65:16 66:3
  97:10 99:16
  103:10 109:3
  110:20 142:12
  143:4 152:10
  153:3,10,10
  161:15 162:5,15
  163:1 173:2
**gotten**
  198:14
**government**
  63:14
**gradation**
  87:12
**grants**
  63:8,22,23
**great**
  35:9 122:1,1
  183:3 184:14
**greater**
  61:2 131:18
  140:12 167:23
**greatly**
  30:2 85:24
**ground**
  5:20 82:1
**grounds**
  146:21 177:7
**groups**
  12:21
**guarantee**
  128:3
**guess**
  8:20 21:4,8,24
  39:22 55:10 60:9
  72:13 82:4 161:21
  180:17 200:12,13
**guesses**
  139:19
**guessing**
  21:3,7 203:24
**guetta**
  28:17 136:13
  161:11 162:10
  165:3 170:20
  171:22 173:10
  178:18,24 185:5
  198:3 199:3 203:2
  203:9 205:10

  209:20 210:13
**guettas**
  22:10 184:23
**guilt**
  49:2 73:19 74:1,5
  74:7
**guilty**
  46:25 48:23 49:5
  82:17
**gun**
  12:14 27:19 29:7
  130:20,20,22
  134:11,12,16,24
  134:24 135:2
  167:24 192:24
  193:4
**gunfire**
  190:20
**gunman**
  161:17 164:14
  182:1 183:5,9
**gunmans**
  167:24
**gunmen**
  162:18
**gunpoint**
  9:18
**guns**
  132:15
**guy**
  103:23 142:2
  144:25,25,25
  173:4 179:1
**guys**
  59:17 113:15
  114:3

**H**
**half**
  6:7 8:9 59:19
  142:20
**hand**
  6:10 34:3 108:22
  131:19 215:16
**handgun**
  132:16
**handing**
  196:4
**hands**

130:15
**happen**
47:11 66:5 92:11
94:13 103:12
105:22 127:4
139:22
**happened**
41:17 53:12 69:1
81:18 144:22
183:12
**happening**
110:11 126:23
**happens**
51:21 56:22 59:5
76:6 84:1 101:11
101:13 103:5
107:12 129:23
138:6 171:12
185:3
**hard**
102:24 187:3,19
207:22
**head**
29:8 34:4 35:1,3
118:11,20 119:1
130:1 131:19
135:3
**heads**
27:20 171:14
**hear**
50:8
**hearing**
200:6,7
**hebrew**
80:1
**held**
2:9 201:3
**help**
39:5
**helped**
164:11,12
**helps**
39:2
**hereunto**
215:16
**hey**
51:20
**hi**
5:11

**high**
17:15 18:10 21:1
23:9 24:1,15
28:11 31:4 33:1
87:16,17 88:20
107:20 147:10,14
191:13
**higher**
15:19,23 90:1
100:6 104:20
126:7 150:15
191:7,17 192:3,4
193:1
**highintensity**
24:3
**highly**
24:19 67:11
140:25 141:1,14
**highstress**
20:21 23:23 25:5
25:10,16 27:18
29:21
**hilton**
2:9
**hit**
124:20 140:4
178:9
**hoadley**
1:24 2:11 5:3
215:3,21
**hold**
82:8,23 204:24
**holding**
193:5
**horrible**
85:24 86:6
**hotel**
2:10
**hour**
6:6,6 59:19
**hours**
28:18 29:1 94:13
141:5,5
**hows**
210:14
**huge**
86:2 94:14 180:8
180:10
**human**

7:15 48:16 55:17
91:10 126:16
183:18
**humans**
13:20,20 20:9
**hunch**
103:7,9
**hundred**
31:3 33:10 35:7
83:10,17 124:4
126:6
**hyperfocused**
189:19,20 190:9
**hypo**
123:1
**hypothetical**
48:18 75:21,22
77:13 78:14 79:2
119:12 132:20
182:19 188:19
**hypothetically**
122:13

---

**I**

**idd**
200:1 201:13
**idea**
39:1 40:13 43:16
44:5 70:15 100:3
133:2
**ideal**
166:12
**identification**
4:7 11:21,25
20:21 21:2 22:10
23:8 30:7 31:4
33:13 42:4,7,11
46:5,23 47:10,16
48:3,5 51:5,6,18
51:21,23 52:12,15
53:2,4,17,20
58:21 60:19 61:15
63:20 64:9 65:17
68:12 69:19 74:13
75:19 79:12,21
94:5,12 96:24,25
99:12 103:4 104:2
104:9 105:10
111:23,24 114:13

114:13 123:16
128:11 134:18
135:4 136:2 137:7
137:13,17 140:21
140:24 141:11
150:22,23 151:13
151:16 152:19,20
153:11,13,14,18
154:8 155:23
156:14,15 165:24
166:17,25 167:5
168:6,1,15 169:4
177:21,25 178:2
178:13 182:4
183:9 185:18
192:16 193:15
206:13,14,16
207:4 209:14
211:10
**identifications**
29:22 32:24 80:23
191:16
**identified**
85:18 128:14
137:20 142:14
144:15 146:4
153:23 161:10
162:16 165:18
169:3 177:15
198:4 199:18
**identifies**
51:7
**identify**
15:20 17:19,25
18:7,16 19:14
20:1 21:9 23:18
28:13 29:19 31:21
64:7 83:6 91:13
117:12,15 153:4
161:1 175:14
205:20 208:2
**identifying**
47:19 83:5 120:5
199:4
**ids**
8:1,5,25 35:11
80:19 87:19 96:13
102:2 112:13
142:23 144:2

148:7 172:23
**ignore**
38:13
**illdefined**
168:21
**illegitimate**
51:24
**illumination**
55:17 89:3,3
**illusion**
190:3
**imagine**
207:23
**immediate**
168:24
**immediately**
110:8 140:1
160:16
**impact**
16:23 37:6 86:2
113:7 117:16
155:1 179:23
**impacts**
176:1
**impair**
20:18 129:11
183:4,17 184:16
**impaired**
29:18 30:2 183:16
184:6,8,15,20,23
185:7,9
**impairs**
39:4
**impeded**
11:15
**implies**
128:22
**important**
58:16,17 82:11,16
114:7 150:25
175:19 202:3
203:17
**impossible**
123:11,16,20,25
124:2,5,6 127:20
128:7,10,16
131:15 134:17,21
134:22,23 135:1,2
135:5 136:2,3

137:10,14,16,18
140:20,22,23,25
141:12 150:23,24
151:17 154:13
171:15,19,20,21
**improbable**
140:25 141:1,10
141:15 151:16
**improve**
168:8
**inability**
161:16
**inaccurate**
43:11 44:18 47:4
52:2,15 77:20
78:5 141:20 144:9
147:10,14
**incentive**
20:1 110:24
**incident**
161:20
**include**
6:20 8:17 81:13
81:23 105:3
114:23 144:7
157:7 176:4
206:22
**included**
156:25
**including**
63:18 164:2
**incompatible**
20:17
**incomplete**
69:10,11
**incorporate**
139:7
**incorrect**
142:3
**increase**
64:8,10 66:20
67:10 83:7,11
90:7 120:17
153:17
**increased**
174:3
**increases**
64:4 85:20
**increasing**

84:7,23
**incredible**
168:5
**incriminate**
82:17 211:17
**independent**
211:11
**independently**
132:3 145:17
**index**
4:1
**indicate**
33:23,24 65:25
66:2,2 94:18,19
174:3 189:6
**indicated**
92:17 148:10
**indicates**
201:13
**indicating**
187:21
**indication**
89:8 121:16 148:9
151:21,24,25
168:24
**indicative**
74:5
**indicator**
122:7 152:9 188:7
188:10
**individual**
11:6,7 24:4,7
77:11 90:1,2
95:22 183:6
185:15
**individuals**
12:25 33:12 66:7
156:11 162:14
183:10
**induce**
192:14
**induced**
29:17
**inducing**
17:2
**inferences**
139:19 192:21
**inflict**
62:7

**influence**
13:17 165:23
**information**
17:11 18:15 30:10
38:11 59:5 67:7
67:17,18,20 68:10
68:16,25 69:9
91:6 98:24 138:22
139:4 150:20,21
151:7,11 163:25
167:16 177:4,7
187:9 199:10
201:25 203:1
204:20 205:3
207:8
**initial**
28:7 86:7 164:3
**initiate**
60:13
**innocence**
73:19 74:1,7
**innocent**
42:22 43:15,19
61:11 82:16 85:13
99:18 100:16,17
102:2 147:5
**inside**
135:15
**instance**
10:12 55:16 64:20
66:10 82:9 83:8
101:7 108:18
120:2 135:9
138:21 141:4
152:23
**institutional**
109:12
**instruct**
208:22
**instructed**
34:2 163:15
204:25
**instructing**
204:15
**instruction**
76:4,6 82:10
204:11,18
**instructions**
33:11,21,22

**integrates**
48:4
**integration**
47:25
**intended**
24:6
**intense**
17:14
**intensity**
24:15
**interaction**
141:5
**interest**
120:3 161:22
201:24
**interested**
82:20 120:10,12
215:14
**interesting**
31:2 41:12,13
**interferes**
37:21
**international**
8:18 44:24
**interrogated**
34:22
**interrogation**
17:9,15 18:2 24:2
24:4 25:10,12,17
29:21
**interrogations**
23:22,23 25:5
27:18
**interrogator**
17:19 19:14 28:14
31:18
**interrogators**
23:19
**interval**
86:7 125:22 126:5
139:11,11,23
168:8 171:13
182:3
**intervals**
126:1,4,7
**interview**
59:10
**interviewlike**
17:17 24:5

**investigations**
81:7
**investigators**
42:10
**invoice**
159:23
**invoke**
16:9,12
**involve**
20:12 81:9 166:13
194:1
**involved**
18:11 25:11,12
27:18 44:22 45:11
47:3 58:2 77:8
137:24,25 190:15
192:24 193:5
194:16 195:13
**involvement**
111:22,24
**involves**
45:12
**iowa**
1:17 2:10,13 5:4
213:19 215:5
**irrelevant**
28:21 45:10
105:22 174:24
182:17 190:22
**isolate**
121:2,4 122:4
**isolated**
122:10
**israel**
79:24 165:14
**issue**
14:15 44:10 46:8
46:25 48:12 58:20
74:7 76:11 92:6
117:14 156:15
157:4 185:25
193:9 211:20,21
211:22
**issues**
8:11 16:22
**item**
15:10,11,18,21

**J**

jack
  152:23
january
  209:4
jennifer
  142:1
job
  153:3
joe
  103:7,8,20,21,23
journal
  154:5
judge
  70:6 71:9 73:1,18
  73:23 200:5 201:4
judgment
  7:15 35:19 98:25
judgments
  37:3 160:19
judicature
  60:17
july
  36:9 159:23
june
  6:24 63:3,6
  159:23 169:9
  203:24
jurisdiction
  76:23
jurisdictions
  78:12,18
jurors
  75:8
jury
  49:15 50:2,7,7
  75:1,5 97:24
  98:14,14,23 99:4
  145:19
jurys
  49:8
just
  5:23 6:11,14,15
  7:20 8:17 14:16
  15:8 16:7,8,14
  21:22 26:15,21
  27:6 30:12,16
  32:8 33:22 40:7
  40:13,14 41:5
  44:13 47:19 48:17

51:6 52:10,19,23
53:24 54:18 56:10
61:12 65:11,12,16
67:2,13 76:25
78:13 79:1,10
82:15 83:8,9 85:1
85:4 87:4 89:6
90:25 93:1 94:15
96:2,3,14 97:15
97:24 100:10
101:16 102:10,17
103:7,9,16 104:23
105:17 110:20
113:20,24 115:15
116:23 117:3
118:14,18,22
119:1,23 120:7,25
122:6,24 123:6
126:17 129:9
134:8 136:6
140:25 144:11
145:3 146:20
147:9 154:9 156:2
157:6,11 158:3
160:9,19 168:3
176:3,12 183:24
185:22 186:5,18
189:9 190:2 191:2
191:21 196:7,14
197:16 198:11
200:20 201:2,6,8
201:15 202:22
206:2,10 208:20
208:22 210:16

**K**

keep
  95:23 96:14
  105:17 114:1
kind
  16:2,7 18:15 20:3
  24:16 32:7 51:18
  53:18 57:14,16
  58:2,3 60:3,15
  61:18 62:1 64:25
  65:3,7 67:1 75:7
  75:20 89:5 95:23
  96:4 100:15 101:4
  113:14 114:8

115:13 129:8,22
135:15,22 136:7
139:20 140:3
141:10 146:11
147:6 148:9,10,21
158:7 181:10
190:1 193:14
194:10,15 195:14
195:15
kinds
  9:9 11:17,17
  15:14 32:4 54:3
  57:25 67:6 75:15
  81:13 104:20
  106:13 150:6
  163:13 187:4
  191:24
knew
  67:4 68:11 73:21
  144:8 199:15
knock
  83:13 84:12,13
  85:4,17 90:7,12
  90:18 91:21 93:6
  93:8,9,11 96:19
  109:18,19
knocked
  125:8,9
knocking
  94:6
knocks
  86:8 91:12 94:16
  167:11,11,12,17
know
  6:5,16 8:8 9:5,24
  10:9 12:13 21:23
  22:12,19 24:15
  25:2,21 26:22
  27:1 30:17 32:5
  33:11 37:2,3 40:5
  40:14 42:18 44:17
  44:23 45:9 48:2
  48:16 50:18 54:2
  54:2,25 55:6,8,16
  55:17,18,19 56:18
  58:9,25 60:5 62:3
  65:17 66:11 67:2
  67:5,23 70:5
  72:19 73:14,17,24

75:11,21 76:4,7
77:6 80:25 81:18
81:22,25 82:3
83:19,20,24 84:16
84:21 85:1,3,25
86:3 87:5 88:13
88:13,15 89:11,15
89:17 90:20,21,21
90:24,24 91:2
94:4,10 95:15,25
96:13 97:14,15
98:14 99:15,23
100:5,7,10 103:6
103:18,20,23
104:13,17 105:2
106:22 108:13
109:2,25 111:13
115:3,24 116:4,8
118:10 119:2,3,12
119:16 120:2,11
120:21 122:13
123:7,14 125:4,8
125:15,22,23,24
126:20 129:10,25
130:2 131:21
133:5,9,17,23
134:10 135:10,19
136:7,10 138:1,3
138:7,7,8,15
139:14 140:1
142:23 145:4,8
146:3,9,18 147:13
148:13 150:6
155:4,4,11,16
156:9,22 159:21
161:19 162:23
163:5 164:11
165:23 167:17
168:16,18,22
169:15,17,20,24
170:6,9 171:22
173:10,12,23
174:11,13,16
176:7,14 177:2,6
177:9,12 179:2
180:7,9 181:7
183:12,14 186:19
186:21,22 187:5
187:16 188:2

192:18 193:24
194:1 195:5
197:12 198:7,7
199:9,15,20,23
201:7,8 202:5,21
203:8,10,12,24
204:13 205:8
206:18,20,25
207:25 208:12
210:22,24,25,25
211:2,3,4,5
knowing
  18:22 69:3 111:7
knowledge
  26:11 74:14
  170:25
known
  43:10 47:3 53:7,9
  54:16 57:15 61:11
  77:16,19 88:14
  89:11 99:18
  141:22 165:8
  167:16 207:16,18
  207:19
knows
  18:5,24 19:19
  110:10 164:12
  171:25 172:11

**L**

lab
  81:20 83:4 90:5
  112:22 115:21
laboratory
  81:2,14 86:12
  93:5 97:20
lack
  72:23 73:13 78:16
large
  33:2,18 103:24
  104:4
largely
  60:12 112:12
  190:2
late
  70:20 169:14
law
  17:7 42:21 101:17
  101:18 102:23

111:22 112:12,16
112:21,23 113:3
165:13
**lawyer**
40:5
**lead**
89:18
**leading**
42:17 89:21
108:24 124:12
190:4
**learn**
41:17,18
**learned**
27:16 200:9
**leave**
95:21 168:14
**led**
173:6 179:17
**left**
138:20
**legal**
98:3
**length**
53:13 139:11
**letter**
197:4
**level**
16:6,7,15 17:16
30:3 33:25 55:12
67:4 69:20 87:5
100:3 107:4
138:19 149:2
167:18 189:16
191:8 193:1
**levels**
16:23 55:6 87:12
143:12 191:6
192:3,4,15,16,19
194:5
**liberation**
1:9 45:15 214:3
**life**
132:17
**light**
48:17 116:10
137:16
**lighter**
91:4

**lighting**
56:9 77:8 90:23
90:25 91:9,18
114:24 123:13
167:20 194:12
**lights**
123:7,7
**likelihood**
11:23 64:8 83:12
108:3 117:24
153:18 166:16
**limit**
124:8
**limited**
20:14 73:11 78:13
**limits**
124:7 126:18
**line**
122:8 124:21
125:18 181:4,5
214:6
**linear**
125:24
**lines**
88:12
**lineup**
17:19 21:9 31:19
31:20 32:10 34:15
34:22 38:3 51:17
51:18 61:7,12,14
64:18 65:5 76:2
77:11 81:24,25
100:12,21 101:8
101:13 103:8,11
103:15,17,25
142:15 144:16,24
145:8,14 173:5
194:18
**lineups**
58:23 61:11 64:2
**list**
4:17,18 6:20 7:18
71:11,21,25 114:8
196:20 198:18
199:12
**listed**
72:14 157:14,19
196:14 198:17
205:8

**literally**
168:14
**literature**
8:24 9:3 12:4,4
39:4 89:20,23,24
99:7 108:5 112:2
113:5 128:19
129:4 130:8 131:1
131:4 190:5,10
191:15 192:13
**little**
7:21 21:25 23:21
38:1,15 39:18
53:25 66:8 85:16
113:20 126:24
167:16
**live**
14:8,9 32:10
142:15 144:16,24
**lives**
13:8 132:13
**llp**
3:3
**load**
100:18
**loaded**
27:19 29:7
**loftus**
91:23 124:13,14
124:16,17,18
125:6,12
**logical**
35:4
**long**
12:13 16:18 46:10
56:11 86:7 94:11
119:9,16 120:9,13
127:22 128:2
138:25 151:7,9
168:8 171:22,25
172:10,11 173:10
185:2 193:6
**longer**
94:15 113:20
114:3 116:9 138:9
138:10 152:13
171:6
**look**
6:14 14:2 22:18

22:23 24:20 26:25
27:6 33:14,15,17
33:18 35:17 38:14
56:1 58:19 59:7
64:13 65:5 71:20
89:4 97:7 106:17
107:12 111:2,4,19
118:8 124:15,15
127:3 128:23,23
129:13 136:7,7,7
136:8,8,8 143:18
143:23 150:4
152:6 154:2 158:4
174:8,12 176:8
181:18 191:20,21
193:13 194:2,8
197:9,12 199:11
201:6
**looked**
15:9 80:25 154:12
171:23 172:1
173:10 175:22,24
176:25 179:11
190:23 193:7
199:5
**looking**
14:16 17:7 32:8
38:1,4 56:12
57:21 59:5 61:4,6
71:25 82:9 92:20
96:8 101:7 114:19
114:21 115:1
117:21 120:8
133:10,14 135:21
150:4 158:6
161:11 172:12
173:20 174:15
176:10 177:1
181:7 182:2
194:13
**lookout**
59:1
**looks**
22:24 72:15
**lose**
138:21 200:16
**lost**
135:17
**lot**

19:21 29:25 41:17
67:13 101:22
103:5 106:17
108:13 125:23
131:14 137:2
140:15 141:6
142:6,23 150:3
**lots**
54:3 194:8,19,19
**loved**
195:6,11
**low**
16:15 17:16 25:11
28:11 32:9,14,17
33:1 54:25 56:4,8
86:8 88:16 89:2,3
107:20 126:10
140:17 143:22
145:18 166:16,19
**lower**
11:23 15:19,25
20:9 102:21 126:7
126:9 140:9
150:16 171:12
**lowering**
85:20
**lowstress**
23:23 24:4 31:5
**lunch**
113:13,21

**M**

**machine**
132:15
**machnes**
3:6,11 5:12
**magistrate**
201:4
**magnitude**
98:6
**main**
64:6 162:2 201:24
**maintain**
43:16
**major**
174:25
**making**
33:12 48:6 49:3
150:22 158:8

168:17 179:4
**male**
186:19
**man**
209:20 210:5,13
**manages**
51:25
**manifest**
147:22
**manipulate**
64:3 82:7,22
83:25 96:18 119:8
119:21,22 120:7
**manipulation**
84:5
**manner**
10:21 147:22,23
149:15
**mark**
1:5 21:18 22:14
25:25 26:1 195:25
197:2 200:14
214:2
**marked**
6:10,12 21:20
22:16 26:6 196:2
197:7 200:18
**marriage**
215:13
**match**
91:10 146:13,14
**material**
48:1
**materials**
57:11 58:1 81:1
156:3,25 157:16
157:20 158:24
160:14
**mathematical**
86:13 97:21 98:9
98:12 132:6
138:14 139:24
166:24
**matter**
9:14 11:2,19
12:15 42:2 49:2
57:8 90:25 95:5
95:25 96:6,7,8,8
110:6 112:3,7

120:24 133:20,22
185:12 215:14
**matters**
113:4 114:14
120:20 139:12
**mean**
8:20 9:3,6,16,21
9:25 10:11 15:6,7
15:12,13 24:19
29:25 31:18 34:25
35:9,22 40:6
50:12,24 51:5,17
53:15 54:3 55:7
58:17 59:1 60:6
62:5 66:1,25,25
67:1,3,17 68:5,24
72:9 74:18 75:11
75:13 80:25 83:17
84:16 88:3 90:11
90:20 95:3,24
104:7,10,11,12
105:12 106:14
107:3,6,7,11,15
110:9 112:7,16
113:18 115:21
117:2,6 118:1
119:9,15,25
121:23 126:16
127:2,24,25 128:1
128:1 129:9
130:21 132:5,6,9
135:5 141:1 148:6
148:17 149:3
151:9,10 152:3
162:2,23 166:6,7
166:8,14 170:3,9
171:4 174:10,12
178:12 180:21
181:7,17 182:6,11
185:1 186:3,19
191:6 193:25
194:2 202:14
207:24
**meaningful**
32:7 89:6
**means**
24:16 34:20 39:7
51:1,14 107:9
129:2 135:17

138:17 140:14
141:2,3 173:19
190:20 202:15
206:19,21 207:1
**meant**
24:3 33:24 104:11
127:25
**measure**
90:23 192:20
**measures**
61:6
**measuring**
90:25 129:14
**mechanisms**
190:16 192:11
**meet**
59:10 160:2
**member**
137:5,11
**memories**
20:18 149:18
187:4
**memory**
7:15 11:15 20:19
24:20 25:4,7
37:21 39:4,5 48:3
53:10,17 54:15
56:2 65:16,21
66:3,6,8,18,19,20
66:22 75:19 85:23
89:8,13 115:17
129:11 138:1,4,8
138:12,15,22
139:6,17,22 141:9
142:12 154:7
165:25 168:9
171:11 181:23
183:8,16,18 184:6
184:19,23 185:6
185:16 186:1,22
199:13
**men**
182:2
**mention**
68:14 175:1
**mentioned**
17:24 73:1 136:6
139:24 175:9,10
**merely**

18:21
**metaanalyses**
106:23
**method**
31:7,9 32:10,12
32:13,14,17,18
33:10 54:6
**methodologically**
37:10,18
**methodology**
23:13 35:17
**methods**
53:16,17 145:13
**michael**
3:15
**middle**
14:9 26:21 62:21
96:1
**milchev**
3:21,22
**military**
17:8,9,10,13,18
18:21 19:13,17
23:15 24:8
**miller**
3:13 155:19
159:24
**mind**
71:9 142:18
189:12
**minimal**
100:3
**minimally**
104:16
**minuscule**
177:10
**minute**
6:11 34:17 128:19
199:11
**minutes**
127:17
**misc**
26:17
**misdirected**
129:18
**misidentification**
99:7 100:25
102:14,18,21
104:12,16 105:8

105:13 106:10
142:2 187:6
**misidentifications**
30:1
**misidentify**
187:8
**misleading**
107:19
**misleadingly**
107:19,20
**misrecord**
101:24
**missing**
68:1 101:22 170:9
170:12
**misspoke**
32:16
**misstates**
15:1 19:1 39:12
44:7 149:20
162:21 207:12
**mistake**
47:11
**mistaken**
64:15 104:2,9,24
180:12
**mistakes**
17:21 85:20
**mix**
178:25
**mixed**
178:8
**moderator**
120:1
**modest**
123:22 152:21
188:7,13
**moines**
1:17 2:10
**moment**
21:22 22:14 48:7
69:23 208:20
**month**
138:22,23,24
140:1
**morgan**
4:9 17:6,7 19:12
20:20 21:18 22:21
23:2,3,14 27:17

30:15 159:8 190:4
**motion**
190:2
**motivation**
18:12
**mouth**
186:22
**move**
30:14 39:17
**movements**
129:14
**moving**
102:18,19 106:12
181:12 185:13
**msatin**
3:21
**mugged**
9:18 117:22
**mugging**
9:23
**multiple**
153:7
**mundane**
14:17,24 15:12,13
**murar**
169:5 196:21
198:11,13,20
209:3,18,23 210:4
210:12,12,21
211:12,22
**murder**
61:20 144:4,14
145:1,11 173:4
194:4
**murderer**
145:16
**mustache**
170:2 187:13
**mustaches**
182:2 183:11

**———— N ————**
**name**
5:10 70:10,16
71:10 128:22
**named**
142:2
**names**
77:12

**nancy**
27:14
**narrow**
164:13
**national**
63:8,13 64:12
81:3 82:2 101:17
**naturally**
193:22
**nature**
115:9 192:21
**near**
95:4 131:6,8
166:22
**nearly**
143:16 177:19
178:14 180:13,19
183:11 185:18
188:9,15
**nearzero**
98:18
**necessarily**
37:2 49:16 105:6
122:21 143:5
158:24 188:6
191:18 192:7
**necessary**
47:23 55:15 57:6
98:24
**need**
7:10 9:3 18:7,16
32:2,6,6,22 39:24
53:5 63:4 67:21
73:20 167:23
169:21
**needed**
67:17 204:20
**needs**
178:20
**negate**
175:19
**negative**
29:23 31:6,15,16
31:17 32:11,13,19
34:20 94:9 149:22
206:16 207:3
**negatively**
138:16,24 200:1
201:13

**neighborhoods**
62:18
**never**
27:9 34:23 40:9
57:9 70:22 83:16
86:4 105:11,11
132:16 140:8
142:7,16 149:23
164:3,4 165:8
168:13 182:10
187:10 199:21,23
202:8 204:13
**nevertheless**
64:15
**new**
1:2 3:8 26:18
27:13,15 132:15
132:23
**newsome**
144:4,13,15,18
145:14,18 172:19
172:20
**newsomebaum**
172:17
**night**
137:16 209:4,16
210:5 211:23
**nighttime**
90:17 123:6,15
**nine**
140:16,24 141:7
151:14,16
**noncombat**
12:16
**nonconflict**
12:12,18,22 13:11
**nonidentification**
65:1,3,8 69:4
**nonidentifications**
65:2
**nonlaw**
111:23
**north**
60:21
**nose**
186:23
**notary**
2:12 5:3 213:19
214:25 215:4

**note**
172:2,5 196:19
200:21
**noted**
31:20 68:8 76:8
145:25
**notes**
158:8
**nothings**
137:14
**notice**
2:11 93:12 110:8
**noticed**
15:3
**noting**
201:2
**notions**
16:9
**notsure**
65:9
**novel**
133:7
**november**
200:3,23,24
**nuanced**
43:13 55:9
**number**
7:23,24 29:1 32:9
51:14,20,21 54:7
60:1 62:8 64:11
65:25 93:3 94:9
100:5,6,8 102:20
104:4 117:2
118:24 145:3
165:18 174:10,13
174:14 175:1
176:9 198:12,13
**numbers**
32:8,20 84:2 86:5
125:7,25
**ny**
3:8

**———— O ————**
**oath**
213:7
**object**
91:3 129:19
197:10

**objection**
10:24 11:16 14:4
15:1 16:5 19:1
23:24 27:21 33:5
38:8 39:12 44:2,7
46:1 47:14 51:11
52:21 65:22 72:22
73:12 74:17,21
75:9 77:25 78:16
78:23 80:11 87:2
88:2 97:2,5,22
98:2 99:1,8
110:17 113:9
119:5 135:11
136:17 147:15,24
149:20 158:18
162:19 164:25
169:18 170:21
171:7 172:4
174:23 176:15
195:3 203:4 204:4
205:4 207:12
209:10 210:1
**objects**
91:4,5
**observe**
108:8 116:6
121:21 135:18
172:8
**observed**
98:7 139:8
**obstruct**
131:17
**obtain**
42:11
**obtaining**
47:10
**obvious**
119:23 120:15
**obviously**
56:19 99:24
127:14 133:13
137:2 174:7 194:4
194:23
**occupying**
137:2
**occur**
9:24 12:6,12
20:11 47:16 139:4

139:12 151:11
186:21
**occurred**
62:12 69:4 79:17
136:14 149:3
151:8 165:10
169:5
**occurring**
137:6 151:22
152:4
**occurs**
58:6 187:6
**october**
1:18 2:3 213:8
214:4
**odonnell**
72:10
**officer**
112:4,9
**oh**
7:13 16:19 23:10
30:20 36:16 46:20
70:12,19 75:4
113:25 126:12
146:18 179:13
**okay**
6:7,11,18 20:7
21:24 22:1,20,24
23:2 25:3,25
26:24 27:2,8
33:20 40:11,16,18
53:24 55:1 81:21
84:3 96:12,17
99:11 113:22,25
119:14 122:25
124:14,20 126:14
148:6 154:2,4
155:6 182:12
186:5 188:12
194:24 195:17,19
202:24 204:23
212:5
**old**
70:1 211:25
**oldest**
138:2
**once**
34:2,5,11 124:20
125:15 140:4

146:13
**ones**
5:24 16:8 29:23
113:3,3 126:2
195:6
**onethird**
180:16
**onetoone**
107:25
**ongoing**
12:20,23 13:4,9
81:6 99:14
**open**
135:19 136:6
**operated**
103:6
**operating**
10:1 90:21
**opine**
45:24 46:7 49:13
**opined**
143:2,3,8 144:2
**opining**
146:2 147:8,12
149:6
**opinion**
16:4 45:24,25
46:3,18 47:6,8
49:17 50:4 52:18
54:22 69:18,19
73:25 74:15 83:3
86:25 87:22 88:9
95:12 97:16 98:20
98:21,22 135:6
158:11 164:9
166:3,23 181:6,8
181:11,13 187:24
188:3,15 207:5,10
209:3,8,13,18,23
210:2,3,6,12,16
210:20 211:7,15
211:19 212:2
**opinions**
160:23
**opportunities**
117:18 118:18
122:5
**opportunity**
56:9 96:15 110:20

115:5,12 120:20
120:25 121:5
122:19,21 135:17
151:10 163:13
**opposed**
13:4 15:25 75:22
76:10 101:13
117:21 135:8
150:15 174:5
175:14 177:5
191:9 193:9
**opposite**
118:4 162:11,12
**optimal**
56:16 122:19,22
167:20 195:15
**order**
37:24 53:3 133:13
158:5 177:1,8,12
177:18,22,24
186:12
**organization**
1:10 45:16 214:3
**original**
37:3 86:5 139:6
177:4 207:18
212:9,10,13
**otoole**
204:2
**outcome**
57:3 215:14
**overall**
38:4 107:8 108:13
181:8,11
**overcome**
120:14
**overturned**
42:9,14 43:25
77:17,24 146:17
**overview**
158:16

_____
**P**
**pa**
45:12
**packet**
196:5
**page**
4:3,7 6:23 22:23

23:3 24:23 25:1
26:13,14,19,21
27:5 30:16 71:15
71:25 157:19
182:23 201:6
214:6
**paid**
15:17
**palestine**
1:9 214:3
**palestinian**
45:12,15 182:1
**panic**
183:4,15,17 184:5
184:14 186:11
**paper**
34:3
**paragraph**
24:25 33:18 34:11
182:24
**park**
3:7
**parlance**
82:13
**part**
21:14 45:8 47:23
53:18,23 55:21
99:13 103:2 104:8
106:8 110:18
112:22 115:13
139:9 148:11
158:14,15,23
159:3
**partial**
67:6
**particular**
75:23 76:3,11
77:5,5,10 86:15
88:15 91:8 93:19
97:18 98:11 105:5
105:7 109:4
118:17 151:1
164:14 167:15
179:22 180:3
**parties**
215:12
**parts**
38:7
**party**

112:5
**passage**
94:11 138:10,14
141:10 147:18
149:17 168:7
188:24
**passed**
89:11 94:4 171:18
207:17
**passes**
138:10
**patient**
55:10
**pay**
96:9,10 116:1,5
142:9
**pending**
178:20,21
**penetration**
103:1
**people**
4:11 10:21 11:4,9
13:16 14:5,7
17:10,18 18:17
19:9,9 26:16
29:21 31:25 32:1
32:11,12,13,14
37:15 38:2 39:11
39:16 41:6 54:7,8
62:8 63:25 64:2
65:6,11,13 96:21
97:9,10,14 105:24
107:13 109:14,14
116:5 120:4 127:2
131:25 132:14
138:5 139:14
147:20,20 150:3
153:7 171:23
173:11 187:8
189:25
**peoples**
129:14
**percent**
20:21,23 23:7
31:4,22 33:10
35:7,12 83:10,14
83:14,17,22,24
84:13,14 85:3,9
85:12,17,17 86:15

91:8,14,21 93:3
94:7,8 96:14,18
101:18 125:10,10
177:25 178:1
207:6
**percentage**
8:9 84:8,19 90:12
90:18 92:3,16
93:6,9,10,11
109:21 115:2,3
117:3,5,6,8 129:1
180:16
**percentages**
84:6 92:18 93:13
98:1,5
**perception**
165:25
**perform**
57:4
**performance**
30:3 38:6 91:11
**period**
28:7 56:11 61:8
128:14 139:1,3,13
151:8,9 194:17
**permit**
183:9 185:17
**perp**
117:23
**perpetrator**
18:8 42:18 44:15
51:8,22 57:18
81:22,23,24 83:21
85:10 96:16 111:2
111:5,19 120:17
123:19 127:14
128:3 129:12
130:16 134:5
142:21 145:8,10
162:11 168:18
191:25
**perpetratorabsent**
103:25
**person**
10:19 11:13,20
13:11 14:2,11
15:21 18:1,20,23
21:10 29:19 30:2
30:8 31:20 34:3,5

34:7,21,21 35:2
42:5,21 43:15,19
58:12,13 65:24
66:11,15 82:12,14
85:13 89:7 91:13
96:16 100:16
110:5 112:9
118:24 119:3,3,9
119:14,15 120:8
121:15 122:17
123:2,10 128:2,4
128:6,9,10,13
131:17 132:9,13
132:15 134:17
135:7 137:6 139:5
145:15 146:4,10
146:14 150:5,10
150:15,16,18
162:16 164:12
166:17 169:2
184:5 189:18
190:25 191:17,19
193:7 210:21
**personal**
78:20 191:8
**persons**
10:13 18:11 35:1
133:5 163:12
**persuasive**
184:25
**pertinent**
105:5
**ph**
1:16 2:9 4:4 5:1
212:8 213:5,13
214:5,21 215:6
**phase**
53:12,15 56:25
**phenomenologic...**
9:20
**phone**
156:2
**photo**
4:13 31:6,9 32:11
32:12 33:10,23
34:16,17 59:3
103:21 178:24
182:5 196:24
198:4,21 199:5,5

201:19 202:3,4
203:2,3,8,10,11
203:14 205:9,11
205:16 208:1
**photograph**
196:20,23 197:1
198:1,2,3,10,12
198:20,22
**photographic**
51:17 76:2 77:10
**photographs**
58:23 59:8 198:13
198:23
**photos**
4:12 31:11 54:7
58:2 66:12 67:23
68:13 103:21
142:14 156:11,12
156:13,18 162:1
168:14 178:6
195:21,23 196:6,6
196:7,10 199:21
201:25 202:1,1,3
203:2,9,11,19
205:10 206:12
207:19,20
**photospread**
32:14,17,18
**phrase**
88:9,12
**phrasing**
205:19
**physical**
25:11,12,22
**physics**
63:17
**pick**
30:1 51:20 61:11
61:13 65:10,14
83:22 85:11,12
99:17,18,22,24
100:15,22 101:21
102:2,3 105:23,25
145:2 173:6 182:5
193:15,16
**picked**
54:9 100:18 105:1
145:15
**picken**
54:9

**picking**
64:18 99:25
145:18
**picks**
100:4,9
**picture**
35:1 145:9 198:3
198:20,22
**pictures**
58:8,10,11 179:11
198:5,17
**pieces**
30:10,11 190:5
**pitchdark**
48:16 55:21 89:1
**place**
56:11 57:3 61:19
89:16 137:15
209:4 211:1
**placed**
27:20 129:25
204:13
**plaintiff**
22:10 28:17 130:3
134:10 161:11
167:4 169:8
177:20 188:22
194:22 210:5
211:24
**plaintiffs**
1:6 3:4 5:14 6:10
6:12 21:19,20
22:15,16 26:2,6
40:24 41:7,25
71:2 105:10
145:20 160:12
196:1,2 197:2,7
200:18 212:12
**plausible**
67:11
**play**
13:23 106:4 134:7
135:14 172:13
173:18,22 192:11
**played**
177:16
**please**
6:3,5 7:18
**plenty**

38:14 98:4
**plfs**
4:8,9,10,11,12,13
4:14
**plus**
86:7
**point**
6:5 12:3 19:5
22:9,20,22 23:1
30:15 37:19,20
58:9,10 78:8
86:10 91:16
118:19 125:2,17
125:18,21 127:4,7
127:12 140:17
144:21 150:10,12
150:14 152:5,7
153:16,20 160:11
170:1,4,8 181:6
181:12,21 186:15
199:22 205:15
**pointed**
12:14 129:17
130:5 142:21
167:25 192:25
206:10
**pointing**
134:24
**points**
159:18 189:25
**police**
57:25 60:19 61:7
61:14 71:6 82:13
100:20 101:6
103:1 104:15
112:3,9 144:23,23
145:5 164:3,21
165:3,8 176:17
**policy**
60:11
**poole**
142:21
**poor**
56:15,21,23 97:14
151:6 181:24
187:18,23 207:9
207:15 208:4
**population**
97:8 116:16

**porter**
3:3 5:13
**pose**
202:22
**position**
10:3 11:4,12 13:7
14:20,22 16:11
25:15 30:4 32:22
48:8 49:8,14,23
60:9,12 90:4
94:24 137:4
147:20 154:14,17
165:2 167:3 171:4
185:6 189:9,13
**positions**
7:23,25 60:2,6
**positive**
29:23 64:16
142:17
**possibilities**
67:11
**possibility**
66:4 95:2 133:10
167:9
**possible**
9:16 11:22,24
12:1 30:8 35:15
69:25 127:23,24
151:14,15 154:11
200:11 207:24
**postevent**
139:4 150:20,21
151:7,11
**postexoneration**
144:6
**postph**
60:7
**posttraumatic**
148:22
**potential**
83:10
**potentially**
35:6 95:1 198:22
202:6
**power**
81:25
**powerful**
95:21
**practice**

75:16
**practices**
71:7 75:15
**preceded**
54:11 56:21 71:7
**precedence**
83:1
**precise**
92:1 191:2
**precision**
108:2 132:6
**predict**
96:24
**predictable**
127:11
**predicting**
153:4
**prefer**
24:21
**prelineup**
82:10,11,14
**prematurely**
103:4
**prepare**
24:12 157:25
158:15 160:3
**prepared**
36:12
**preparing**
36:20,25 156:1
157:24
**prescient**
18:15
**presence**
50:19 51:1 115:1
123:9 129:5,10
132:1 150:21
**present**
59:6 74:24 83:21
84:11 85:19
115:10 128:24
133:17 134:16
137:5,12 168:19
209:3,9
**presented**
10:23 31:10 37:9
75:1
**press**
7:6

**pressing**
102:23
**presume**
12:20 73:21 92:17
**presumes**
112:20
**presumption**
9:6 12:10 112:21
113:4
**pretty**
21:3,7 22:6 41:14
64:21 71:8 72:5
75:10 99:16 129:4
132:22 159:4
170:16 198:1
**previous**
56:21 127:12
176:20,21 208:1
**previously**
59:2 201:19
**primarily**
13:14 14:1 42:6
43:25 53:16 63:23
81:9,10 109:8,10
109:24 112:12
128:21,22
**primary**
18:11 60:16 61:5
61:6 63:14 86:18
120:3 137:1,24
161:18 186:10
**principal**
81:16
**principle**
20:10 84:22
149:16
**principles**
9:22 10:1 75:18
76:10 165:25
166:3
**prior**
29:1 33:12 41:20
44:13,14 45:19
48:1 51:17 58:22
68:11 142:22
150:21 169:1
170:4 171:24
176:19 187:17
199:5 202:4 203:2

203:9 205:10,23
206:13,14,16
207:3,24
**priori**
168:23
**prison**
42:21 144:17
**pristine**
57:1
**privileged**
204:4,8
**probability**
51:3 94:20,25
147:10,14
**probably**
5:19 7:4 33:7
35:25 36:17 41:4
71:11 106:7 126:3
130:24 132:20
140:15 141:22
147:16 155:12
157:13 160:13
161:3 162:8
177:23 180:22
**probative**
50:17
**problem**
54:13 91:1 101:15
**problems**
76:3 94:15
**procedure**
34:6 35:10,10
38:2,18,19,23
48:14 51:19 53:20
54:10 56:16 57:1
68:12 89:14 103:4
112:4,8,24 156:6
168:12 178:11
**procedures**
37:25 42:10,12
47:9 59:6 94:12
102:24 114:14
143:3,4 165:14
182:4
**proceeding**
78:8
**process**
11:5 18:19 20:3
51:13 57:9 125:15

125:24 149:15
156:1 160:9,25
161:25 165:16
167:13 195:12
**processes**
9:7 10:4 13:21,23
14:3 19:6,16,24
19:25 20:12 41:16
195:9
**processing**
149:9 190:18
**produce**
7:18 9:9,11 35:11
198:19
**produced**
191:4
**product**
54:11,19 89:25
**professional**
7:22 8:3 59:25
69:18 83:3 86:25
95:12 131:12
209:2,8,18,23
210:11,20 211:19
**professor**
27:15
**projects**
60:8,14,15,22,23
63:1,12,21
**propensity**
193:13
**proper**
76:4,6
**properly**
189:11
**property**
15:23,24,25 16:11
79:10 191:1,11,16
**proportional**
138:20
**proposition**
39:2
**prosecutors**
46:15
**prospective**
101:10,23
**protect**
135:20 136:24
**protecting**

167:25
**protocol**
61:9 112:8,10
**prove**
42:20
**proved**
142:20
**proven**
42:8 142:3 144:16
144:18
**provide**
98:24 163:1
**provided**
189:14 199:21
205:9
**proximity**
130:12,14
**psychiatry**
17:7
**psychological**
9:6,9,12,13,13,17
10:7 13:20 14:2
18:19 19:6,16,23
19:25 20:3,11
30:5 39:3 184:3
195:8
**psychology**
20:10 89:12 138:2
154:6
**public**
2:13 5:3 60:11
213:19 214:25
215:4
**publication**
15:4
**publications**
4:17 6:21 7:2,18
**published**
16:19 17:6 154:5
**pull**
129:21
**pure**
69:3
**purely**
59:13
**purpose**
24:12 37:19,20
45:25 46:3 47:7
47:12,24 52:20

64:6 86:13,18
117:12 159:12
**purposes**
24:7 40:13 53:10
57:7 123:1 199:4
**pursuant**
2:11
**push**
116:11 124:7
**put**
34:4 35:3,16
37:12,14 54:6
103:14 108:1
124:8,11 126:5
159:15,16,17
178:25
**putting**
103:3 159:9
160:10

**Q**

**qualification**
178:15
**qualifications**
71:4 75:12
**qualified**
69:23 70:23 73:9
**qualify**
74:10 87:23,25
88:1
**quantify**
84:19
**question**
5:18 10:25 12:8
12:10 19:5,15,22
22:25 23:7,25
27:22 33:8 36:19
40:4 42:9 46:2,10
46:11,16,16,22
47:1,21,22 48:9
48:10,22 49:1
50:21 64:22 74:6
84:3,4,15 96:4
102:13 107:10
109:25 110:19
112:7 113:10
120:12 122:4,9
126:8 128:23
133:20 134:19

136:18 138:3
143:20 147:25
148:21 149:21
154:22,24 163:15
169:19 170:19,19
176:20,21 178:20
178:21,22 179:14
182:18 185:4
188:11 191:2
195:1 201:15
202:18,20,22
204:10,12,16,20
205:25 206:3,4,5
206:8,9 209:9
210:14 211:5
**questionable**
142:24,25
**questioning**
64:1
**questions**
6:2,2 58:4 59:2,25
77:6 163:20,23
164:18
**quick**
195:18 208:18,21
**quite**
32:9 35:22 58:17
111:3 130:5 132:2
138:8 140:16
172:25 205:13
**quote**
105:20

**R**

**race**
120:5,6,8
**rack**
130:23 134:25
**raise**
189:5
**ramirez**
71:13
**random**
62:8
**range**
168:5
**rape**
146:12
**rapid**

138:18
**rapidly**
140:18
**rapist**
146:19
**rate**
20:21 23:7 31:4
31:22 33:11 34:20
35:7,13,14 99:6
100:25 102:13,18
102:21 104:2,9,12
104:16,18,19
105:8,13 106:9,25
140:9 193:16
**rates**
104:3,20 105:22
149:19 193:15
**rationale**
181:15
**reach**
73:19 181:1
182:13,14,16
**reached**
51:9,12 107:1
**reaching**
181:8,15
**reaction**
132:18,22
**read**
25:1 35:23,24
36:11,16,17,19,24
37:2 157:20 159:8
159:10,11,20
176:17 201:20
213:6
**reader**
181:9
**readily**
160:18
**reading**
104:23 205:12,15
**ready**
6:15
**real**
42:17 84:20
104:14 142:21
145:8,9,16 153:8
168:13,18 178:6
192:20,22 194:13

194:20
**really**
41:17 47:22 53:18
54:14 66:13 84:16
104:7 110:6 112:1
120:10,24 127:22
128:2 144:22
148:23 163:1
168:23 187:14,23
190:9 206:19
211:17
**realworld**
84:10 95:9
**reask**
178:23
**reason**
18:12 28:16,22,24
29:3 35:5,6,14
41:8 44:1 47:4
77:20 78:4 102:22
109:4,25 135:12
153:11 165:6
176:13 186:24
187:2 194:14
211:11,14
**reasonable**
164:12 189:7
**reasons**
100:6,8 101:23
**recall**
24:18 70:25
126:13 136:23,25
202:25 203:7
**recalling**
189:25
**receive**
205:2
**received**
63:7 202:8,10
204:19 205:7
**recess**
59:21 155:8
195:20 208:24
**recognition**
186:21
**recognize**
26:8 186:13 194:7
**recollection**
70:8,21 136:21

155:17 162:24
198:10 201:11
**record**
6:13 21:21 22:17
26:7,15 44:8,13
59:23 67:24 68:13
70:2,11 86:11
167:16 183:25
187:21 196:3
197:8 200:19,21
201:2 207:10
209:1 213:9,10
215:9
**records**
61:8 101:6 151:5
169:22 187:18,23
207:15,16
**recreate**
91:15,20
**recruit**
19:17
**reduce**
92:21,22 93:1,4
**reduced**
93:2
**reduces**
116:2
**reduction**
92:15
**ref**
1:25
**refer**
41:5 81:5 97:21
114:11 125:5
**reference**
206:10
**referenced**
7:20 196:8
**referred**
82:13 106:23
162:4,25 172:9
**referring**
77:1,11 162:7,14
162:16,18 163:3
201:16,18
**reflect**
33:25 91:4 128:15
168:2
**reflecting**

7:19
**reflection**
91:3 115:14
**refresh**
24:20 25:4 201:11
**refreshes**
25:7 199:13
**regard**
60:4 63:5 147:3
181:11 182:25
211:16
**regardless**
10:7 11:13 14:8
54:10 68:20 77:23
105:12 208:6
**rehearsed**
190:3
**reject**
31:16,17 66:3,9
66:15 67:11,12
**rejected**
67:6 74:15,16,19
74:25 205:17
**rejection**
65:4,18,21,23
**related**
155:24 156:4
164:19 215:12
**relates**
92:3 138:14
158:13
**relating**
104:4 206:13
**relation**
92:1
**relationship**
107:25
**relatively**
127:19 141:8
151:23 156:4
164:1
**released**
60:25
**relevance**
64:17,19,21 69:7
180:6
**relevant**
7:7 29:16 53:8
55:3 58:13,20,24

64:23 68:14,20,22
69:5,13 88:14
93:16 105:19
106:4,7 110:15
114:23 117:4
133:21 134:6
137:23 148:20,23
157:2,3 159:17
160:20,20 161:2,4
161:8,10,12,16
162:3 165:17
169:12,13 170:10
174:22 175:5,8,15
181:2 192:11
202:6 203:13
208:9,10
**reliabilities**
90:2
**reliability**
13:18 46:5 47:15
48:5 52:7 53:1,4
57:24 64:5 67:8
67:10,12,15 68:5
69:19 74:20 83:7
84:7,23 85:20
86:22 87:1,16,23
88:16,17,19,21,23
89:2,9,19,22,25
90:7,8,18 92:15
92:23 93:20,23
94:15,19 95:5
96:19 97:17 98:11
98:18 105:9
109:18 113:7
114:7 117:24
121:17,20 122:7
124:25 125:9
147:3,12 152:20
154:17 157:4
165:24 166:4
167:7 168:25
171:10 172:17
174:3 175:25
176:6 178:2,14
179:4,18 180:14
180:19,25 181:11
188:8,16 189:4
192:17 207:10
209:14 210:17

211:9
**reliable**
11:21 37:23 46:9
46:14,14,24 48:9
48:10 49:14 50:5
50:12,14,15 51:10
51:25 52:14,16
53:6,10 56:12
64:9 66:21,22
67:4 69:6 83:5
85:5 86:16 87:6,9
88:10 91:9 92:16
94:21,21 108:3
116:10 120:18
138:12 141:11,20
141:23 143:2,4,5
143:17 146:3
157:7,9 166:17
167:4 172:23
173:1,3,15 183:9
185:17 187:25
208:8
**reliably**
172:14 181:25
**relied**
157:18
**relies**
183:21
**rely**
7:10 109:7 157:16
183:23
**relying**
68:4 98:23 183:19
183:25 190:10
**remember**
10:14 66:11 67:3
70:17 71:10
104:23 126:2
140:5,6 148:12
154:12 155:11
196:25 199:9,10
199:16 202:11,16
202:16,17,25
203:20 204:1
205:12
**remembered**
22:1
**remind**
5:23

**render**
69:18 87:22 88:8
134:17 181:13,24
187:24 207:10
212:2
**rendered**
73:25 145:20
159:2,22
**rendering**
50:4 166:3 209:17
209:22 210:20
**repeat**
19:3
**repeatedly**
194:15
**rephrase**
6:3 95:11 177:24
188:17 205:1
**report**
4:10 10:11 22:7
22:13 35:17 36:2
36:6,12,16,20,24
36:25 37:12,14
38:25 47:23 57:8
71:16 72:20,24
73:5 92:9,13 98:5
98:6 104:1,22
109:8 139:10
155:16 156:1
157:13,17,19,21
157:24 158:12,14
158:16,23 159:9
160:10 175:2
176:4,17 180:23
181:9,10,18
182:23 198:17
206:22 208:15
209:7
**reported**
1:23 136:22
**reporter**
2:12 26:5 113:17
200:17
**reporting**
173:15
**reports**
22:3 57:14,25,25
74:11 101:20
159:2 164:3

**represent**
 5:13 41:25
**representative**
 32:3
**representing**
 42:25
**request**
 156:22
**requests**
 4:16
**require**
 210:22
**requires**
 186:15,15
**research**
 7:25 8:10 13:13
 39:10,16 63:8,11
 63:15,16,19,21
 80:18 93:17 113:1
 115:18 152:11,12
 158:17
**resist**
 17:10
**resources**
 20:14,15,15
 190:17 195:13
**respect**
 7:2 41:23 78:21
 91:24 114:20
 115:18 117:17,24
 139:25 161:10
**respond**
 13:10 19:18
**response**
 31:15 32:19 204:3
 204:19
**responses**
 10:22 20:9 31:6
 32:11,13
**rest**
 48:23 99:21
**restful**
 115:14
**restrict**
 46:22
**restricted**
 75:20
**result**
 15:16 47:18 71:22

90:6 95:13 96:23
**resulted**
 72:18
**results**
 38:4,11 83:4 84:4
 92:25 93:5 106:15
 106:17 116:15,18
 116:20,22 117:1
 130:10
**retain**
 149:18
**retained**
 40:20 44:10 70:9
 70:24 75:17 143:7
 155:9,22
**retention**
 53:11,13,14 55:4
 56:4,7,10,15,25
 86:7 94:3 114:12
 137:21,25 139:3
 139:10,23,25
 143:13,15,22
 171:13 182:3
 208:4
**retrieval**
 53:15,23,25 54:1
 54:2,3 56:5,13,17
 57:2,6 114:12
 138:11 143:13,18
 143:23 152:2,4,7
 161:5 166:10
 179:21 208:5
**retrospective**
 101:8
**reverse**
 175:13
**review**
 6:15 57:12 109:13
 195:21 196:10,12
 196:13 198:25
 206:11
**reviewed**
 4:18 158:24
 196:20 198:16
 199:12 200:3
 201:12 204:7
 205:22 206:1
 211:16
**revolves**

60:13
**right**
 6:25 8:20 10:2,15
 10:17 12:23 13:2
 14:6 19:8,10 21:5
 21:10 22:24 23:10
 23:12,20 24:9,24
 26:23 27:11 28:6
 29:13,15,25 30:2
 34:8,19,24 36:18
 37:8,11 39:25
 40:4,12,17,18
 42:1,24 44:5,11
 44:19 51:16,20,25
 52:8 53:19 54:21
 56:6,25 59:22
 64:16 68:6 71:24
 72:4,12,13 74:9
 76:13,15 78:3,6
 78:10 79:5 82:6
 83:15,19 84:25
 85:6 86:17,20
 87:7 91:3 92:12
 96:1,22,23 102:15
 104:6,14,15
 105:15,16,21
 107:6,13 110:12
 110:14 111:6,17
 113:11,19 114:5
 114:21 115:14
 116:13,25 117:10
 118:9 120:6,22
 121:1,8,10,13,22
 122:1,3,25 123:24
 124:1,1 125:11
 127:5,15,18
 130:18,20,21
 131:18 132:4,25
 133:8 134:1,13
 135:3 140:14,19
 141:3 143:19
 144:10 145:6
 150:8,13 152:5
 154:15,20,21,25
 156:19 157:10
 163:19,22 164:15
 164:17,20 166:1
 167:14 174:10,22
 176:11 178:4,7,10

178:14 179:20
 180:7 181:23
 182:22 185:24
 186:8 193:25
 196:16,22 200:4,8
 201:14 205:21
 208:14 210:10,18
 212:3
**ring**
 154:2
**rle**
 1:7
**road**
 28:19
**robbery**
 14:12 41:15 61:19
 103:20 192:24
 194:3
**role**
 13:23 173:22
**romeo**
 3:5,10 4:4 5:7,10
 7:17 26:3 30:20
 30:23 59:17,22
 113:12,15,19,25
 155:6 195:17
 196:4 198:16
 200:15,20 201:1
 204:6 206:6
 208:18,25 212:3
 212:10
**ronald**
 142:2
**room**
 51:16 95:22
**rough**
 39:23
**roughly**
 88:6 179:23,25
 180:13,20
**round**
 66:12 67:3,5
**roundfaced**
 66:14
**rule**
 207:25,25
**ruled**
 73:1 168:23
**rules**

5:21
**ruling**
 73:23 145:23
**runofthemill**
 41:15
**runs**
 81:1 117:23

---
S

**safer**
 111:4
**safety**
 167:25 191:9
**sam**
 103:24
**sample**
 32:3 125:25
**san**
 60:20 62:17
**sat**
 18:14
**satin**
 3:15 10:24 11:16
 14:4 15:1 16:5
 19:1 23:24 27:21
 30:18 33:5 38:8
 39:12 44:2,7 46:1
 47:14 51:11 52:21
 52:25 65:22 72:22
 73:12 74:17,21
 75:9 77:25 78:16
 78:23 80:11 87:2
 88:2 97:2,5,22
 98:2 99:1,8
 110:17 113:9,22
 119:5 135:11
 136:17 147:15,24
 149:20 158:18
 162:19 164:25
 169:18 170:21
 171:7 172:4
 174:23 176:15
 178:19 195:3
 197:10 202:19
 203:4 204:4,9,15
 205:4 206:2
 207:12 209:10
 210:1 212:5
**saw**

15:10 64:2 82:15
89:7 105:20,20
115:15 133:12
134:12 162:17
168:3 169:22
174:1,5 209:20
210:5,13,21
**saying**
21:6 28:4 48:24
49:6 65:11 71:8
74:4 84:11 87:8
87:10 92:10 96:2
96:3 105:18 107:4
147:2 161:15
177:8 179:3 180:2
180:5 181:5,6
182:7 184:18,22
185:10 187:13
208:7
**says**
6:23 34:11 58:12
65:24,24 96:13
133:17 145:4,5
153:17 161:23
165:5 197:20
200:23
**scale**
87:1
**scene**
129:12 137:5
189:17
**scholarship**
8:8
**science**
48:2 60:11 63:9
63:13 64:12 81:3
82:2 86:12 183:21
183:22 184:3
**sciences**
60:10 63:17,18
**scientific**
39:14 63:14,16
138:2
**scientists**
134:21
**scope**
45:23 47:6
**scores**
92:3

**se**
8:16,23 17:1 71:5
99:14 111:12
112:17
**seat**
135:15
**second**
21:11 33:18 34:11
47:22 138:24
158:14 160:13,22
160:25
**seconds**
127:16 174:19
**section**
33:19 159:6
**securing**
182:5
**see**
6:23 7:22 22:12
22:21 26:20 32:15
46:17 48:17 60:1
63:7 64:4 72:12
76:3 84:1 95:24
106:18 108:13
118:21 119:2
122:1 124:16
126:15,21,23
131:16 133:4,13
133:19 144:25
149:2 150:5
162:13 169:23
181:18 182:11
191:24 199:8,12
202:3 208:2
**seeing**
30:12 132:18
**seen**
13:10 26:10 27:9
76:2 78:11 132:16
134:11 141:13,19
141:21,21 145:16
149:23 168:6,13
182:10 186:14
197:13 199:24
**sees**
108:19 206:5
**sense**
14:1 24:1 54:16
62:6 87:24 107:20

113:3 115:24
116:11,15 117:19
133:22 139:20,21
179:25 191:1,3
**sent**
197:15,19,20
**sentence**
104:8 181:21
183:2 185:13
**separate**
28:9 122:9 185:25
**sequential**
31:6,9 32:12
33:10 34:15 35:10
38:2,19
**series**
6:1
**set**
67:12 92:19
107:23 137:20
157:23 160:14
183:10 215:7,16
**settings**
29:22
**settle**
72:6
**settled**
72:20
**seventeen**
144:17
**seventh**
145:21,22
**severe**
15:24 193:25
194:1
**severity**
14:15 16:3,22
17:1 84:14 193:18
193:21,23 194:5
**sexual**
9:16,23 14:12
81:9
**shape**
138:15
**sheet**
214:1
**shoot**
6:6
**shooter**

29:10,12 135:18
135:21,24 175:11
175:17,18,22,22
175:24 176:8,10
209:24,25
**shooters**
162:6,12 173:18
174:1,2 175:1,23
176:5,9 177:1,2,5
177:8,9 211:13,23
**shooting**
28:20 136:14
171:23 173:11
182:3
**short**
59:18,20,23
113:21 131:16
172:10
**shorter**
116:8 194:17
**shorthand**
2:12
**shot**
29:1,4,6,11 130:3
134:1 135:7,8,16
135:25 136:16
195:6
**show**
38:5 91:11 96:4
98:1 130:10
152:16,17 191:15
205:17
**showed**
29:18 58:8,10,11
83:11 145:12
153:6 203:14
205:16
**showing**
66:7 103:10,24
129:5 146:20
152:12
**shown**
17:18 38:3 66:13
91:24 131:25
147:9 199:19,20
199:23 201:19
202:4 203:9,19
208:1
**shows**

153:20
**showup**
64:20
**side**
43:6,9 118:7,21
**sifuentes**
71:13
**signed**
213:16
**significance**
113:7 131:3 152:7
185:19,20
**significant**
7:4 14:19,25 15:5
15:6,7 102:25
139:16 158:9
186:16
**significantly**
85:18
**similar**
24:11 50:16 62:22
62:23 149:18
159:1,5
**simple**
194:3
**simply**
15:8 51:7 64:14
68:21 102:17
129:9 158:3
**simulations**
17:9
**single**
10:19 35:1 39:8
99:6 100:25
102:13 104:2,9,12
105:8 106:9
**singled**
211:1
**sit**
191:23
**sitting**
158:12
**situation**
10:22 19:11 20:4
20:5,17 56:14
57:5 58:5 84:12
91:21 95:19 96:17
107:22 117:9
130:1 131:5

133:24 141:18
147:6 149:13
168:1 184:4,12,18
184:22 195:9
204:14 207:18
**situations**
20:22 21:2 23:8
78:11 95:21
118:25 143:20
**six**
105:24,24 173:22
**sixth**
209:25
**skinny**
66:13,16
**sleep**
27:25 28:8,18
**sliding**
87:1
**slow**
190:2
**small**
180:9
**socalled**
83:18 138:4,16
**social**
60:10 63:18 86:11
**society**
60:17
**sokolow**
1:5 214:2
**sole**
144:20
**solitary**
28:25
**somebody**
9:18 83:24 103:14
117:20 118:4,5
131:9 134:23
136:6 141:5
172:14 177:7
178:5 184:7 200:1
201:13
**somebodys**
190:23
**son**
136:22 137:1
149:4 161:19
168:1 186:10

190:21 194:22
211:25
**soon**
113:13 151:23
**sorry**
20:5 30:20 32:16
172:20 200:15
208:21
**sort**
25:13 43:22 51:24
51:25 66:11 67:3
86:5 89:6 100:2
119:12 123:7
131:23 156:21
158:4,7 168:20
170:1,7 192:10
**sorts**
42:16 57:11 61:3
63:21 114:19
**sound**
37:18
**sounds**
156:19 158:13
**source**
11:2,19 80:25
177:3,4
**sources**
159:19
**southern**
1:2
**sparse**
156:5
**speak**
44:10 46:24 47:15
53:1,3 80:1,7
110:24 136:8
155:25 160:5
**speaking**
56:22 62:20 68:18
74:6,12 78:19
79:6,20 80:17
88:8 92:13 106:6
158:4 163:21
166:20 191:12
**speaks**
49:1 170:10,11
**special**
133:23 192:9
**specific**

25:24 40:10 60:8
60:8,13,14 76:10
77:9 93:9 105:12
105:19 156:8
157:6 161:17
164:1 169:25
186:20
**specifically**
136:23 161:9
163:9,11 183:2
**specifics**
75:23,25 77:4,13
78:25
**spectrum**
81:12 172:22
**speculation**
72:23 73:13 74:22
78:17 98:3 99:2
165:1 171:8 195:4
**spending**
174:15
**spent**
8:10 142:6 174:7
174:11,17 176:25
**spread**
32:12
**spring**
155:13
**stabilize**
32:6
**stage**
56:4 151:19
160:25 161:1
**stages**
56:2,21 104:5
**stand**
18:18 19:15 38:24
39:1 71:7 111:4
**standing**
131:9
**stands**
100:12,13 207:5
**star**
26:21
**start**
8:1 68:3 83:9
85:14,22 89:2
99:10 103:12
107:14 124:20

125:21 126:7,9,11
126:12,21 127:1,2
150:9,11,14
**started**
94:7
**starting**
83:16,25 86:4
93:24 94:2 124:6
127:3 141:8
**starts**
75:11 126:13
138:19 140:2
**state**
2:13 5:4 15:4
26:18 27:13 40:25
68:15 152:24
208:15 213:19
215:4
**stated**
147:19 149:14
162:5
**statement**
18:19 19:16 32:7
48:4 49:3 74:10
88:6 102:1 105:4
105:4 176:22,23
176:24 184:1
185:19 186:6,7
206:18,20 207:1
**statements**
57:15,19,24
161:14,18 162:4,7
**states**
1:1 13:15,18 14:9
61:23 62:21 63:15
165:11
**stating**
167:1
**statistics**
102:10
**status**
111:12 168:21
192:12
**stealing**
15:10
**step**
42:21 183:13
202:11
**stepbystep**

54:24
**steps**
54:12,20
**stick**
184:16
**stipulate**
43:18
**stony**
27:15
**stop**
57:9 168:2
**stopped**
34:6
**stops**
90:21 140:8
**storage**
53:11 56:25
114:11 152:2
161:5 166:10
179:21
**straight**
110:3 111:5
**straightforward**
75:10
**stranger**
183:8 185:17
**strategies**
11:11
**street**
3:18 117:22
**streetlights**
123:15
**stress**
10:13 11:1,2,5,18
11:20,22 16:12,16
16:23 17:2 20:8
20:11,18 21:2
22:9 23:9 24:2,3,6
25:12 28:11 29:17
29:18 31:5 32:14
32:18 33:2,8
37:21 38:6,20,21
38:21 39:4 108:23
110:3,4 114:22
115:7 132:2,7,10
148:14,22 149:8
149:15 166:14
167:19 175:20
183:3,14,17 184:5

184:14,21 185:1,2
185:5 186:11
189:16,18,24
190:8 191:4,6,10
192:5,15,19 193:1
194:25
**stressed**
85:25 108:15
109:2 128:6
148:17 195:5,6
**stresses**
11:10
**stressful**
17:15,21,22 18:10
79:22
**strong**
148:10
**studied**
8:12 80:14,20,21
112:11,14 142:5
**studies**
17:3 31:23 36:23
55:19 64:7 81:2,5
81:11,15,15,20
82:5 85:2 86:12
90:5 91:16 92:5
92:14 93:5 97:10
98:1,5,9 99:12
100:11,20 101:2,5
101:23 102:5,5
106:10,11 107:6
107:12 109:7,8,9
109:13,16 111:21
112:18,19,22
115:20,21 116:20
117:11,15,18,23
118:1 119:7,18,20
119:21 129:7
130:9,11 131:7
152:17 159:9
183:20,23 191:15
193:10
**study**
4:9 8:25 15:16
17:6 19:12 20:20
21:12,14,16,18
22:2,8,25 23:3,4
23:14 25:17 27:24
28:10 29:16 30:15

32:2 33:3 35:13
35:16,20 36:11,16
36:20 37:6,9,18
38:25 39:1,8
63:19 82:23 83:4
83:11 84:4,5
92:25 95:13 96:13
96:24 97:20 99:14
101:3,5,9 107:21
107:22 108:1,2
117:5 118:16
119:4,13 120:3
124:12 126:3
152:23 153:16,20
153:24 159:8
190:4 192:22
**studying**
8:1,5 13:20
**subject**
7:11,14 19:17
31:19 34:16 42:2
149:14 151:19
204:7
**subjects**
19:12 23:14 24:10
24:16 25:22 28:1
28:8 32:10 34:9
34:12 80:10 150:2
**submitted**
197:4
**subscribed**
213:16 214:23
**subsequent**
48:21
**subset**
115:7
**substance**
45:18
**successful**
54:1,2
**sudden**
125:16
**sufficient**
68:15
**suggest**
139:5
**suggestion**
139:15
**suggestive**

59:4
**suite**
3:17
**summary**
181:20
**support**
39:2 68:21,23
92:5,14 152:11
190:8
**supported**
93:16
**supporting**
69:9,17 97:25
98:4
**supports**
39:2
**suppose**
35:15 48:14,15
75:21 85:21 120:3
174:24
**supposed**
97:24 181:14
183:22,22
**suppositions**
139:19
**supreme**
26:18
**sure**
5:25 16:1 19:4
22:6 33:16 35:19
47:21 55:11 73:15
95:10 103:13
111:20 134:9
144:3 146:10
150:17 157:8
163:7 164:5,6
168:17 183:13
184:11 194:23
198:7 199:14,15
**surprise**
17:17,25 28:13
161:3
**surrounding**
114:14 207:3
**survey**
101:17
**survival**
18:12 19:13 20:4
20:12,13 23:15

24:8 135:22
190:16,22 195:10
195:14
**survivalrelevant**
190:19
**survive**
18:22
**surviving**
20:16 144:20
**suspect**
18:7 44:16 48:11
49:4 54:9 59:11
61:13 74:2 99:22
99:24 100:1,12,13
100:17,21 101:21
102:4 105:1
117:14,19 152:18
154:16 194:18
199:4 202:9
**suspects**
61:11 100:9
193:16
**suspicion**
82:16
**sworn**
5:3 214:23 215:8
**system**
125:23 190:17,18
190:18
**systematically**
64:3 81:23

_____

**T**

_____

**table**
96:17
**tables**
125:6,19
**take**
6:4,6,14 21:22
22:18,23 24:22
26:25 27:6 33:17
33:17 49:19 54:23
59:18,20 65:19
67:19 85:1,7,7
91:8 94:3,24
96:11 97:24 98:15
107:25 108:1,19
114:3,3,17 117:6
132:12,13 154:21

155:7 178:24
179:20 180:21
182:12,13 183:13
188:8,14 195:17
197:9,12 199:11
201:6 207:8
208:18
**taken**
49:15 57:14 59:21
155:8 195:20
208:24 213:7
**takes**
56:11 83:1 137:15
146:18
**tal**
3:6,11 5:12
**talk**
7:21 30:14 39:17
45:18 47:9 78:25
92:8 114:5 137:19
138:5 148:14
161:9 175:7
185:14 188:5
**talked**
23:13 62:12,15
81:12 104:5
107:24 117:7
118:18 134:8
172:18 181:17
205:18,18
**talking**
16:2,7 38:20 63:2
65:1 67:2 77:2,4
86:6 101:1 112:11
133:1 148:5
164:21 172:16
178:12,13 205:14
211:9
**talks**
113:6 119:4
**target**
92:2 102:18,19
**task**
57:4 195:14 209:7
209:21
**teaching**
7:23
**technically**
69:10,11

telephone
  27:17
tell
  23:21 26:13 31:2
  47:7 51:19 60:3
  63:11 65:21 66:17
  66:18 67:7 70:4
  73:20 75:7,8
  78:24 108:11
  128:19 157:25
  172:25 173:2
  205:13
tells
  66:24
ten
  31:25 38:1
tend
  41:18 101:21
  109:15 136:22
  173:14 191:25
tendencies
  129:14
tendency
  139:18
tending
  137:11 167:25
  190:20
tends
  194:16
term
  10:10 51:4 80:12
  103:16
terms
  9:21 11:15 50:11
  52:23 83:4 124:22
  133:1,21 161:22
terror
  62:7
terrorism
  8:13,14,18,19,21
  8:23 9:1,5 16:4,9
  44:22,22 62:5
  80:14
terrorismrelated
  80:10
terrorist
  62:1,4,6 79:15
terrorized
  62:3

test
  31:25 54:4,14,15
  153:7
tested
  97:9 131:1 149:25
  153:1
testified
  5:5 27:16 39:20
  39:20 40:6 44:21
  46:12 75:3 144:15
  162:10,17 173:17
  173:25 174:1,5
  207:9
testify
  41:9,20 45:20
  70:4 71:3,3 72:8
testifying
  44:6 45:5
testimony
  7:7,12 15:2 19:2
  27:13 39:13 40:15
  40:15 41:3 46:22
  47:13 69:22 71:22
  71:23 72:4,18
  73:6,11 74:24
  75:8 76:9,10
  78:12 98:13,20,21
  98:22 99:3 142:4
  149:21 158:19
  160:7 207:13
  208:23 213:7,9
  215:10
testing
  53:16 82:6 126:4
  142:3,22 146:14
  173:5,7
texas
  60:20 71:2,13
thanks
  208:23
theft
  15:23,25 16:12
theory
  158:22
thicker
  21:25
thing
  6:9 33:9 66:5
  82:22 101:2 129:8

129:22,22 134:2
135:23 136:5
139:2 169:25
173:19 178:3
205:20
things
  21:4 41:15 42:16
  53:12 57:16 58:23
  58:25 59:15 60:9
  61:3 64:12 66:1,1
  68:2,4 69:15 71:9
  72:5 82:23 84:20
  89:4 94:6 97:15
  101:3 102:20
  103:12 104:13,18
  104:19 106:3
  107:16 109:1
  112:6 114:3,19,22
  115:1 116:12,23
  121:20 123:5
  124:21 129:13
  133:11 134:8
  135:14 139:12,22
  140:2 150:6 152:8
  153:8 158:9
  159:17 160:21,23
  161:6,16 162:2
  167:14,23 168:3
  171:14 181:7
  190:19,20 191:9
  191:20,20,21
  193:2,7 194:2,8
  194:19 201:21
think
  9:2 12:9,9 13:22
  16:13,15 17:6
  19:21 28:21 31:3
  33:6 35:9 40:1
  44:9 49:22,25
  59:18 62:17 66:23
  66:23 67:20 69:1
  69:25 70:20 71:12
  72:16,24 73:15
  76:19,19 80:24
  91:22 93:12 106:6
  109:5,14 113:16
  115:15 126:5,7
  128:14 131:11
  132:17,21,22

133:18 135:12
137:8,19 141:17
141:17,25 144:17
146:22 148:2
150:25 154:23
155:15 156:21
157:22,22 158:22
161:24 162:2,9
163:11 166:22
169:25 171:25
172:24 175:3,8
176:1,16 178:1,1
178:19,20 180:18
181:1,18,19,19
182:7 188:7
189:13 198:14
200:9,11 202:5,5
207:9 211:15
212:3
thinking
  154:1 155:12
  190:18 195:10
thinks
  58:12 103:19
third
  53:21,22 112:4
  180:6 182:15
thompson
  142:1
thorough
  103:1
thoroughness
  57:7
thought
  21:25 70:7 156:4
threat
  24:16
threatening
  24:2
threats
  18:11
three
  55:6 57:8,10
  72:16,17,17 94:18
  99:17,22 100:4,7
  102:2,3 104:24,25
  105:14 106:2
  114:9,15 143:12
  144:14,14 145:16

145:17 162:18
173:23 177:12
180:8,12,18,21
182:21 194:4
throw
  103:8 107:11
  178:9
throwing
  96:3
tied
  193:17,20
tim
  204:2
time
  8:7,10,11 16:17
  27:15 31:11 34:16
  35:24 36:5 41:11
  52:19 53:13 56:11
  57:15,22 58:6,9
  61:8 82:8 83:22
  83:25 89:10,13
  90:23 94:4,11
  97:13 99:21 115:2
  115:3,6 116:7
  119:17,19,21
  120:9,11,13,19,25
  125:18 127:13
  128:2 134:4 138:1
  138:4,9,10,10,15
  139:1 140:11
  141:11 142:6,22
  147:7,11,18
  148:19 149:17
  151:8,10 154:11
  159:25 160:13,15
  160:17,18,22
  168:2,7 169:15
  171:1,10,18 172:8
  172:10,10 174:12
  174:15,16 175:23
  175:24 176:8
  177:1 183:14
  186:15 188:24
  189:25 192:2
  194:17 202:23
  207:17 211:4
times
  5:17 36:17 39:21
  46:19 73:16 75:24

99:17,22 115:9
138:18 190:3
**timespan**
151:6
**today**
7:8 14:20 112:11
160:6 207:5
**tolchin**
196:15,15 197:20
197:21
**told**
70:1,6 104:10
210:16
**top**
6:23 89:14 201:6
**topic**
190:5
**topics**
8:13
**total**
149:2
**totality**
121:24 143:9
181:4 182:6,18
211:8
**totally**
47:1 48:13 67:11
207:20
**touch**
7:11,14 61:25
**touches**
74:1
**trace**
53:11
**track**
200:16
**traffic**
123:7
**train**
17:10
**trained**
61:9
**training**
19:13 23:15 24:8
**transcribed**
212:9
**transcript**
4:14 163:2 200:4
200:7,24 206:11

212:13 213:6,8
**transcription**
200:22
**transcripts**
59:14,15
**translate**
166:2
**trauma**
9:10,12,13,13,18
10:7,10,11 30:5
147:21 148:4,5,6
148:8,14,16,24
149:2,5,7
**traumatized**
148:19
**treat**
117:6,8
**trial**
40:9,15 41:4 72:8
72:18 142:4,15
144:15
**trials**
41:6,9,21 45:21
**trick**
25:14
**tried**
128:21,22 129:7
158:4
**triggers**
190:16
**trouble**
120:4
**true**
31:5,14,16 32:11
32:19 34:20 65:23
86:18 146:8
147:16 213:8,11
215:9
**truly**
55:13
**truth**
82:1
**try**
11:9 17:19 18:16
24:20 46:21,24
65:17 82:8 111:9
111:10 133:10
168:3
**trying**

18:14,21 44:12
57:23 60:13 87:4
96:9 103:12
111:11,11 130:25
133:4 135:22
136:22,24 146:25
149:12 158:7,10
160:19 174:8,12
175:14 198:11
**tucson**
60:20
**turn**
23:2,3 26:12,19
27:4 114:17 118:8
118:11,20 182:22
201:5
**turned**
141:15 142:1
**turning**
119:1 141:20
**turns**
51:8 52:3 103:22
118:13
**twelveyear**
182:2 211:24
**twentyfour**
94:13
**two**
7:5,19 21:24
40:22 56:21 65:15
72:11,15 85:25
94:17 99:20,21
101:3 102:3
104:25 110:16
113:1,2 131:23
140:6 144:21
149:25 156:2
174:19 178:6,10
180:10,18,21
182:12,14,15,21
**type**
10:6 30:5 41:24
101:9,10 131:9
146:1 152:4 183:7
185:16 191:5
**types**
9:8,11,12 25:21
**typical**
75:16

**typically**
72:3,7 80:17 82:5
137:25 148:8
163:14

**U**

**uhhuh**
8:15 23:5,17
48:19 55:2 69:14
84:9 93:7 121:3
123:3,8 124:23
156:17 172:21
183:1 186:9
188:20 189:1
**ultimate**
46:24 48:10,12
50:21 51:3 74:7
165:20
**ultimately**
47:25 138:25
139:10 144:16
146:13 179:17
208:6
**umm**
204:22 205:24
**unable**
89:5
**unambiguous**
67:24
**unaware**
27:23
**uncertainty**
65:20
**unclear**
151:6,7
**uncommon**
31:24
**undefined**
80:12
**underestimates**
100:23
**underestimating**
100:15
**undergoing**
185:1
**underlying**
38:10
**understand**
12:7,9 47:21

95:10 165:12
**understanding**
25:9,16,18,19
28:10 52:3 77:7
184:2 190:11
**undertaken**
63:22
**underwent**
19:13 23:15
**undocumented**
168:12 207:21
**unfavorable**
56:24
**unfolded**
158:6
**united**
1:1 13:14,18 14:8
61:23 62:21 63:15
165:11
**universal**
14:1
**unprofessional**
212:1
**unreliability**
50:23 83:12 87:17
92:23 94:18 100:4
**unreliable**
46:9 48:14,22
49:18,22,23 50:10
50:24 51:10,13,20
52:11,13 54:10
74:25 83:5 86:16
87:10,11 88:11
143:8 144:2
153:19 160:12
166:15 172:23
173:8,8 178:11,12
**unstressed**
109:3
**unsupervised**
207:20
**unusual**
129:18
**update**
198:18
**updated**
4:17,18 7:18
**updating**
156:22

**upheld**
145:23
**upward**
95:1 97:18
**use**
17:14 38:24 48:13
51:4 54:5 57:1
90:6 93:6 97:10
98:10 102:24
105:9 157:21
188:19
**usually**
22:2,4 32:1 41:2
41:16,24 43:21
57:12

**V**

**vague**
11:16 14:4 16:5
33:5 38:9 44:2
51:11 65:22 74:17
75:9 78:23 80:11
87:2 88:2 97:2,5
97:22 99:8 110:17
119:5 135:11
147:15 149:21
172:4 174:23
176:15 210:1
**validity**
37:7
**value**
15:11,19,19,23,25
50:17 125:1
177:17 179:15
**varda**
22:10 28:17
136:13 161:11
162:10 165:3
170:20 171:22
173:10 178:18,24
184:23 185:4
198:3 199:3 203:2
203:9 205:10
209:20 210:13
**variable**
38:22 82:7,20,22
83:1,11 84:1
85:16 86:1 91:25
96:4 97:8 106:21

106:21 116:3
119:22,24 120:1
122:12 138:8
**variables**
13:17 56:8,15
57:11 64:3,7
88:14 92:20 96:18
104:4 106:19,25
107:18 111:14
114:23 137:20,21
143:22 175:19
193:6,12
**variation**
107:21
**varies**
75:13,14
**variety**
129:8
**various**
10:5,12 32:24
39:10,16 46:4
54:3 58:8 63:8
64:7 84:6 89:17
92:6,11 95:8
104:5 106:15
109:17 115:19
119:8 145:13
165:21 178:16
**vary**
87:4 104:3,13
127:14 153:8
**varying**
10:22
**vast**
89:10
**verbal**
57:17 154:6
**verdict**
145:20
**versus**
18:23 26:16 41:1
61:13,14 71:13
72:10 93:3 104:16
108:7,12 111:23
119:15 130:1
132:15 144:4
154:25 194:3,3,9
194:9 195:10
**vg**

181:25 182:5
**vicinity**
110:13 131:6,8
**victim**
9:16,23 10:6,19
11:24 12:1 13:7
14:12 18:4,24
19:19 59:11 79:8
79:14 105:1 108:9
108:12,20,22
109:21,24 110:2,5
110:9,10 111:1,12
111:18 123:19
130:12,14 131:6
146:12 148:12
149:13 191:22,24
192:2,7,9,12
**victimbased**
109:8
**victimized**
110:10 148:25
**victimizing**
121:16
**victims**
10:5 62:2 81:6
95:14,15 108:7,16
108:16,25 109:5
109:15 111:16
130:1 148:3,24
**video**
59:14
**videotapes**
59:14
**view**
34:17 56:9 63:25
77:9 85:24 86:7
96:15 108:16
110:19,19,24
114:22,23 115:4,5
117:17 118:5,23
119:10 120:25
121:14 122:1
127:13 128:2
131:17 141:14
146:18 152:13,15
152:25 161:15
162:5,15 173:2
180:12 189:7
190:15 198:10,22

**viewed**
196:20 198:12,19
203:2 205:10
**viewing**
57:20 77:8 110:2
110:4,21 115:6
117:14,18,25
118:17,22 119:8
121:4 122:5,19,22
123:5 130:19
144:24
**viewings**
64:1
**views**
109:4 118:2
**violent**
12:25 27:18
**visible**
128:25
**vision**
55:17 90:21
**visual**
95:16 96:7,11,15
96:21 97:3,6,10
97:14 125:23
**vitae**
4:8 6:19
**vs**
1:8 4:11 214:2

**W**

**wait**
46:17 85:25
**walk**
90:10 132:14
160:24 167:9
179:16
**want**
6:4,9 33:14 40:14
58:25 59:17 67:22
67:22,23,24 70:14
86:10 98:15
109:13 111:2,18
113:12 114:3
119:16 122:1
137:21 183:24
208:22
**wanted**
70:6 104:17

194:23
**wants**
43:16
**warning**
82:11
**wash**
157:11
**washington**
3:19 72:10
**watch**
15:18
**waterboarded**
29:4
**waterboarding**
27:19
**wavering**
65:13
**way**
13:11 19:22 30:6
37:5 50:22 54:12
54:16 77:9 81:16
85:5 103:6 111:1
111:7 115:22,23
116:11 127:10
148:4 149:7 156:5
158:7,8,25 167:6
176:1 181:1
189:10 190:21
205:15 215:13
**ways**
42:11 51:24
111:16 119:9
129:8 149:25
154:1
**weak**
66:6 89:8 141:9
**weaker**
38:6
**weapon**
116:6,7 121:11
128:18,21,24,25
129:6,11,15,25
130:4 131:5,10,22
131:24 132:1,2,18
132:21 133:2,3,12
133:14,15,17,18
133:20,23 134:7
135:24 167:19
193:24,25 194:16

**weapons**
116:4,5 130:11,13
130:15 193:25
**wear**
97:11,12
**wearing**
97:12
**wednesday**
1:18
**week**
145:10
**weight**
49:9,10,11 50:7
98:16 178:16
180:2,3
**weighted**
180:1
**wellcontrolled**
89:15
**wells**
1:16 2:8 4:4,10
5:1,8 7:19 50:8
196:5 209:2 212:8
213:5,13 214:5,21
215:6
**went**
28:12 90:3 145:21
**west**
80:3
**westlaw**
26:13
**weve**
32:19 52:10,23
59:18 89:11
101:10 102:23
112:19 149:23
181:17 193:11,12
**whatevers**
57:13
**whereof**
215:15
**willing**
111:3
**wise**
3:16 113:14
204:24
**withdraw**
178:22
**witness**

4:3 5:2 13:17
25:14 30:22 31:21
39:19 40:12 51:7
51:19 54:7,15
57:4,18,19 58:8,9
58:11,20 59:2
64:15,17 65:5,8
65:10,21 66:2,6
66:18,19,20,22
67:10,25 76:5
89:5 90:16 92:2
99:5,17 101:20
103:10,22,25
105:16,20 107:13
112:20 113:23
114:2 117:13
118:23 128:25
129:1 133:11,12
133:16 144:20
150:22 151:18
154:10,15 156:13
161:6 168:15
169:18 170:11
171:5,15 173:8,14
191:11 194:11
195:19,24 200:25
204:16 206:4,6
208:22 214:5
215:7,10,15
**witnesses**
57:15 61:10 77:12
82:12 85:10 95:18
99:13 100:24
107:15,23 145:17
163:25 171:13
172:24 173:8,14
191:22,25 192:1,3
192:5 211:3
**witnessing**
107:16 149:11
**wl**
26:17
**wondering**
69:12
**word**
62:6 97:25 148:4
**words**
12:13 101:11
110:19 193:23

**work**
13:13,25 15:8
16:14,21 17:13
40:20 41:2 44:14
55:18 60:3 84:15
91:22 98:19
118:14 124:13,16
129:16 131:25
158:7 195:9
**worked**
43:6 60:23 155:19
**working**
43:3,9
**works**
48:3 79:1 83:14
146:24 184:3
190:12
**world**
13:19 84:20
104:14
**worse**
89:13 97:15 118:2
**write**
33:23 101:20
**writing**
157:17 158:12
159:6
**written**
14:14 158:21,23
**wrong**
44:5 47:4 99:23
99:25 100:5,7,10
**wrongful**
42:8

X

Y

**yancy**
72:10
**yards**
55:20
**yeah**
22:24 40:8,10
53:23 59:19 64:20
71:11 72:2 90:16
91:19 95:3 102:7
103:18 104:16
106:8 107:4 108:4
113:15,23 125:3

125:14 127:3,12
128:1 131:14
141:25 143:20
152:21 154:5
157:8 173:12
184:10 193:11
198:14 201:1,10
202:16 203:23
**year**
36:4 40:21,23
70:18 140:6,11,12
159:7 161:25
199:6
**years**
7:24,25 35:25
41:4 60:2 71:2
85:25 102:22
140:6,13,16,16,21
140:24 141:7
142:20 144:17
151:14,16 170:7
187:13
**yield**
52:11,14 85:3
86:13 90:6 93:5
98:10 117:2,3
**yielded**
84:6 130:10
**yielding**
116:15
**york**
1:2 3:8 26:18
27:13,15 132:16
132:23

Z

**zero**
55:1,13,17,24
56:1 88:18,22,24
89:19,22 93:21,23
93:24 95:2,4,4
98:18 140:9,11
143:16 166:22
167:8 177:19
178:3,14 180:13
180:14,19 183:11
185:18 188:9,15
**zone**
12:11,13,15,16,18

12:18,19,22 13:8
13:11 79:18
132:14,24 167:1
**zones**
12:6 62:12,15,19
62:22,23

0

**0**
20:20,23 23:7
125:20 177:25
178:1
**00397**
1:6
**04**
1:6

1

**1**
4:8 6:11,12,23
22:23 33:24 72:1
198:13
**10**
33:24 94:8 125:9
197:5
**100**
31:22 35:12 83:13
207:6
**100224690**
3:8
**10543**
1:25
**112012**
4:14
**12**
182:23
**1231**
26:17
**13**
63:6 182:23
**14**
72:14,14,17
**140**
124:11 125:13
**15**
4:12 26:19 36:9
72:12 125:10
126:16,22,24
156:18 195:23
196:5,6 198:4

207:20
**150**
124:11 125:13,21
**16**
4:18
**17**
4:17 212:12
**18**
157:19
**1880s**
89:12
**19**
196:18 197:18
**196**
4:12
**197**
4:13
**1974**
8:2
**1978**
16:20
**1979**
16:20
**198**
4:18
**1985**
154:6

---
**2**
---
**2**
4:9 21:19,20
30:19,21,24 33:19
71:15 72:1 145:3
198:12
**20**
5:19 39:21 40:16
40:18 127:3 200:3
200:23
**200**
4:14
**200055701**
3:19
**2001**
209:5
**2007**
162:9 163:6
**2008**
72:15
**2011**

26:17 71:18
200:23
**2012**
169:9,13 170:14
170:24 187:12,17
200:25 201:2
**2013**
1:18 2:3 6:24
36:9 63:3 155:14
159:24 169:5
195:24 196:18
197:6,18 203:3
213:8,17 214:4,23
215:17
**202**
3:20
**2026894**
26:18
**21**
4:9 32:15,16
**212**
3:9
**22**
4:10
**23**
32:12,19
**24**
32:14,17,18
**25**
84:13 85:3 91:8
96:14,18 123:23
**26**
4:11 26:13 201:6
**268**
24:23
**269**
25:1
**27**
26:13,20 93:3
**270**
33:17
**272**
23:3 30:16
**2d**
26:17

---
**3**
---
**3**
4:10 22:15,16,23

30:16,19 33:19
51:20,21 212:6
**30**
1:18 2:3 32:6,23
83:24 85:12,17
213:8 214:4
**300**
55:20
**31**
26:16
**32**
27:5 212:6
**35**
27:4
**37**
101:18
**38**
32:11
**399**
3:7
**3d**
26:17

---
**4**
---
**4**
4:11 26:3,5,6
**40**
125:15
**41**
32:13
**42**
2:4

---
**5**
---
**5**
4:4,12 26:4
126:12,16,21,23
126:24 196:1,2
**50**
84:14 124:2

---
**6**
---
**6**
4:8,13 93:3 197:3
197:7
**60**
94:6
**6265800**
3:20
**655**

3:18
**6800**
2:10
**69**
24:23

---
**7**
---
**7**
4:14,17 140:13
200:16,17,18
**70**
83:21 85:9,17
**7151000**
3:9
**75**
83:14
**762**
26:17

---
**8**
---
**8**
2:4 140:13 209:4
**80s**
70:20
**85**
154:1,3

---
**9**
---
**900**
3:17
**90s**
70:20
**932**
26:17