IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

———————————————————— )
)
MARK I. SOKOLOW, *et al.*, )
)
Plaintiffs, )
)
v. )    Civil Action No. 04cv397 (GBD) (RLE)
)
THE PALESTINE LIBERATION )
ORGANIZATION, *et al.*, )
)
Defendants. )
———————————————————— )

**MEMORANDUM OF LAW IN REPLY TO PLAINTIFFS' OPPOSITION TO
DEFEENDANTS' MOTION IN LIMINE TO EXCLUDE THE TESTIMONY OF
PLAINTIFFS' CASE IN CHIEF LIABILITY EXPERTS**

Mark J. Rochon
Laura G. Ferguson
Brian A. Hill
Michael J. Satin
MILLER & CHEVALIER CHARTERED
655 15th Street, NW, Suite 900
Washington D.C. 20005-6701
(202) 626-5800 (tel)
(202) 626-5801(fax)

*Counsel for Defendants the Palestinian Authority
and the Palestine Liberation Organization*

June 30, 2014

1435781.1

## TABLE OF CONTENTS

Page

ARGUMENT .......................................................................................................... 1

I.    PLAINTIFFS FAIL TO RESPOND TO THE ARGUMENTS DEFENDANTS
      ACTUALLY MADE ....................................................................................... 1

II.   ITAMAR MARCUS'S TESTIMONY SHOULD BE EXCLUDED ................... 6

      A.    MARCUS IS NOT QUALIFIED ......................................................... 6

      B.    MARCUS'S OPINIONS ARE NOT BASED ON A RELIABLE
            METHODOLOGY ............................................................................. 9

      C.    MARCUS'S TESTIMONY WILL NOT ASSIST THE JURY
            AND IS HIGHLY PREJUDICIAL ................................................. 10

III.  ALON EVIATAR'S TESTIMONY SHOULD BE EXCLUDED ................... 11

      A.    EVIATAR IS NOT QUALIFIED ...................................................... 11

      B.    EVIATAR'S OPINIONS ARE NOT BASED ON A RELIABLE
            METHODOLOGY ........................................................................... 13

      C.    EVIATAR'S TESTIMONY WILL NOT ASSIST THE JURY ........... 15

IV.   ISRAEL SHRENZEL'S TESTIMONY SHOULD BE EXCLUDED ............. 16

      A.    SHRENZEL IS NOT QUALIFIED ................................................... 16

      B.    SHRENZEL'S OPINIONS ARE NOT BASED ON A RELIABLE
            METHODOLOGY ........................................................................... 17

      C.    SHRENZEL'S TESTIMONY WILL NOT ASSIST THE JURY ........ 20

V.    NICK KAUFMAN'S TESTIMONY SHOULD BE EXCLUDED .................. 20

      A.    KAUFMAN IS NOT QUALIFIED ................................................... 20

      B.    KAUFMAN'S OPINIONS ARE NOT BASED ON A RELIABLE
            METHODOLOGY ........................................................................... 21

      C.    KAUFMAN RELIED ON DOCUMENTS PRODUCED AFTER
            THE CLOSE OF FACT DISCOVERY ............................................. 25

1435781.1

VI.     JEFFREY ADDICOTT'S TESTIMONY SHOULD BE EXCLUDED.............................26

        A.      ADDICOTT IS NOT QUALIFIED.......................................................................26

        B.      ADDICOTT'S OPINIONS ARE NOT BASED ON A RELIABLE
                METHODOLOGY ...................................................................................................28

        C.      ADDICOTT'S TESTIMONY WOULD NOT ASSIST THE JURY ..................29

VII.    EFRAIM KARSH'S TESTIMONY SHOULD BE EXCLUDED. ...................................30

        A.      KARSH IS NOT QUALIFIED................................................................................30

        B.      KARSH'S OPINIONS ARE NOT BASED ON A RELIABLE
                METHODOLOGY ...................................................................................................31

        C.      KARSH'S OPINIONS WILL NOT ASSIST THE JURY ...................................33

VIII.   MATTHEW LEVITT'S TESTIMONY SHOULD BE EXCLUDED ............................33

        A.      LEVITT IS NOT QUALIFIED ..............................................................................33

        B.      LEVITT'S OPINIONS ARE NOT BASED ON A RELIABLE
                METHODOLOGY ...................................................................................................35

        C.      LEVITT'S TESTIMONY WOULD NOT ASSIST THE JURY ..........................36

CONCLUSION ....................................................................................................................................36

1435781.1

## ARGUMENT

### I.   PLAINTIFFS FAIL TO RESPOND TO THE ARGUMENTS DEFENDANTS ACTUALLY MADE

Plaintiffs' apparent strategy is to avoid addressing the merits of Defendants' arguments for excluding Plaintiffs' seven case-in-chief liability experts.  Instead of responding to the actual arguments presented in Defendants' motion in limine, Plaintiffs respond to straw man arguments Defendants did not make, wrongly argue that Defendants are barred from making certain arguments, or ignore Defendants' arguments altogether.

First, Plaintiffs claim that Defendants' "principal argument [on qualifications] is that expert witnesses must have advanced academic credentials" and then they point out that "[t]his ignores the well established principle – recognized by *Daubert* – that experts can testify from practical experience."  Pl. Opp. at 1.  Defendants, however, do not argue that the Court should exclude Plaintiffs' four non-academic experts (Marcus, Eviatar, Shrenzel, and Kaufman) simply because they lack Ph.Ds.  Rather, as Defendants state in their opening brief, the Court should find them unqualified because "[they] are not academics, *and their work experience is not a sufficient basis for their opinions*."  DE 500 at 1 (emphasis added).

For each of these experts, Defendants highlight the experts' lack of academic training before examining the witness's experience because Rule 702 establishes this framework: "If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  Fed. R. Evid. 702 Advisory Committee's Note (2000).  Marcus describes his work at Palestinian Media Watch, but he does not explain how that experience qualifies him to reach his sweeping conclusion that "[t]he Palestinian Authority bears overall responsibility for the violence and killings of the intifada in

1

general and every particular act of killing in particular." DE 500-4 at 1-13, 64. Eviatar and

Shrenzel give generic and identical descriptions of their work experience in Israeli intelligence,

even though they worked at different agencies and they cover different topics in their reports.

*Compare* DE 500-25 at 1-2 *with* DE 500-26 at 1-2; *see also* DE 500 at 49-50, 59. Kaufman

claims that he is "extremely familiar with the workings of the IMC" but he does not explain how

that alleged familiarity permits him to render an opinion about the quality of due process in the

IMC or to assess the quality of due process afforded to the individuals whose case files he

reviewed. DE 500-34 at 2. In short, none of Plaintiffs' non-academic experts has shown how his

work experience qualifies him to render his expert opinions. Thus, the Court should not find

them qualified.

 Second, Plaintiffs claim that Defendants "essentially fault plaintiffs' experts for not

adhering to the *Daubert* standards for scientific and technical experts" and then point out that

"[t]hese standards are not appropriate here." Pl. Opp. at 1. Nowhere in Defendants' motion do

Defendants allege that Plaintiffs' experts fail to adhere to the standards for scientific experts. *See*

DE 500. Defendants do not claim that their methodologies can be and have not been tested, that

they lack a known or potential error rate, that they do not include standards controlling the

technique's operation, or that the technique has not been generally accepted in the scientific

community. *See id*; *cf. Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593-94 (1993).

 Instead, Defendants show that Plaintiffs' experts (1) do not follow any methodology at all

to reach their conclusions; (2) do not base their opinions on sufficient and reliable data; (3) base

their opinions on the *ipse dixit* of the witness; (4) cherry-pick data that supports their conclusions

and ignore data that contradicts them; (4) transmit hearsay without applying any expertise; and

(5) draw unfounded conclusions from their data. *See generally* DE 500. Importantly, none of

2

these methodological deficiencies is a mere disagreement with the expert's conclusions, as

Plaintiffs claim.  Pl. Opp. at 2.  Not only that, the methodologies (or, rather, lack thereof) of

Plaintiffs' experts contrast with those of experts approved by other courts in terrorism cases.

*See e.g., Linde v. Arab Bank, PLC*, 922 F. Supp. 2d 316, 322-23 (E.D.N.Y. 2013); *United States*

*v. Paracha*, No. 03 Cr. 1197, 2006 U.S. Dist. LEXIS 1, at *62-63 (S.D.N.Y. Jan. 3, 2006).

Third, in response to Defendants' argument that the testimony of Addicott, Eviatar, and

Shrenzel should be excluded because each did not actually generate the opinions in his report

(*see* DE 500 at 35-36, 52-54, 61-62), Plaintiffs contend that Defendants are "barred" from

seeking to exclude their testimony on this ground because "they asked Judge Ellis to disqualify

[Eviatar and Addicott] for these very same reasons, and Judge Ellis denied their request."  Pl.

Opp. at 20; *see also id.* at 27, 40.  Plaintiffs are wrong.  They have confused Federal Rule of

Evidence 702 with Federal Rule of Civil Procedure 26(a)(2).  Defendants never asked Judge

Ellis to exclude expert testimony under Rule 702.

Rather, Defendants asked Judge Ellis to exclude the testimony of Addicott and Eviatar

because they violated Rule 26(a)(2), which governs disclosure of expert testimony.  *See* DE 401.

In that request, Defendants cited only Rule 26(a)(2).  *See* DE 406.  They also noted that

"[w]hether Mr. Addicott's and Mr. Eviatar's qualifications and methodologies pass muster under

*Daubert* is an issue for another day."  *See id.* at 2.  That day has come.  Defendants have now

moved to exclude their expert testimony under Rule 702 because the adoption of another's expert

opinion shows that they have not "employ[ed] in the courtroom the same level of intellectual

rigor that characterizes the practice of an expert in the relevant field."  *Kumho Tire Co. v.*

*Carmichael*, 526 U.S. 137, 152 (1999); *see Bouygues Telecom, S.A. v. Tekelec*, 472 F. Supp. 2d

722, 729 (E.D.N.C. 2007) ("The wholesale adoption of the opinion of another expert verbatim

cannot be within the intent of Fed. R. Evid. 702."). Tellingly, Plaintiffs do not respond to these arguments.

Fourth, Plaintiffs fail to address Defendants' argument that the expert testimony will not assist the trier of fact, one of the three prongs under Rule 702. *See Nimely v. City of New York*, 414 F.3d 381, 396-97 (2d Cir. 2005). They do not explain why it would be helpful for the jury to hear from the four experts (Marcus, Levitt, Addicott, and Karsh) who "do not address any of the seven incidents in this case." DE 500 at 2. This Court should preclude Plaintiffs from shifting the focus of this lawsuit from the attacks at issue to broader narratives of responsibility for, and attitudes about, the longstanding Israeli-Palestinian conflict. *See* DE 524 at 1-5. Yet that is exactly what Plaintiffs are seeking to do with four of their experts. Karsh provides an historical polemic of the Palestinian-Israeli conflict. *Id.* at 2-3. Marcus charges the PA with responsibility for every violent act that took place during the Second Intifada. *Id.* at 3. Addicott and Levitt also fail to meaningfully discuss any of the seven attacks at issue in this case. *See id.* at 3-4. In sum, the testimony of these four experts would not assist the jury, whose directive is to determine only whether Defendants are liable under the ATA for proximately causing the plaintiffs' injuries in these seven incidents.

Plaintiffs also fail to give a meaningful response to Defendants' contention that their experts "invade the province of the jury by opining on the state of mind of the PA, the alleged perpetrators of the seven incidents, and Palestinians in general." DE 500 at 2. They simply dismiss it, stating that that their experts "will not testify directly as to state of mind" and that "[t]o the extent defendants interpret isolated statements by plaintiffs' experts to suggest that they intend to give such direct testimony, they are misreading them." Pl. Opp. at 8. But they do not explain *how* Defendants are "misreading" them. What is Marcus's opinion, for example, that

"the Palestinian terrorists saw themselves as fulfilling the instructions of the [PA] leadership" (DE 500-4 at 63; DE 500 at 21), if not direct testimony of their state of mind?  What is Shrenzel's opinion that "Wafa Idris is considered by the PA to be an icon of the Palestinian struggle against Israel" (DE 500-26 at 42; DE 500 at 68), if not direct testimony of the PA's state of mind?  These are just two examples from reports and deposition testimony that are replete with such improper state of mind evidence.

Finally, Plaintiffs try to side-step Defendants' argument that "Shrenzel's and Kaufman's testimony should also be excluded because Plaintiffs' counsel obtained an extension for their expert reports based on false representations to the Court" (DE 500 at 80) by mischaracterizing Defendants' position.  *See* Pl. Opp. at 27, n.16.  Plaintiffs claim (in a footnote) that Defendants "argue that Mr. Shrenzel's testimony (as well as that of Nicholas Kaufman) should be excluded because he had allegedly not yet begun to work on his report when plaintiffs sought to extend the date for expert reports."  *Id.*  They also claim that "it is far too late for defendants to try to relitigate the deadline . . . for submitting expert reports."  *Id.* at 28, n.16.  But Defendants do not argue that the testimony should be excluded because Shrenzel and Kaufman started to work on their reports late.  Nor are they seeking to relitigate the deadline for submitting expert reports.

Rather, Defendants argue that Shrenzel's and Kaufman's testimony should be excluded because Plaintiffs' previous counsel misrepresented the facts to the Court to obtain an extension of the expert disclosure deadline.  *See* DE 500 at 80-82.  Specifically, in his March 20, 2013 letter to Magistrate Judge Ellis, Robert Tolchin stated that Shrenzel and Kaufman "have made intensive and extraordinary efforts to translate, review and digest this massive quantity of foreign-language documents, and integrate them into their expert reports, but despite their best efforts . . . still require a brief extension of time to finish their reports."  Letter at 2.  This

1435781.1

statement was false.  Neither Shrenzel nor Kaufman had even begun working on his report when Plaintiffs sought this extension.  *See* DE 500 at 81.  Notably, Plaintiffs do not – and could not – deny that their counsel's representation to the Court was false.  *See* Pl. Opp. at 27-28, n.16.

With respect to Kaufman, Plaintiffs do not even try to give an excuse.  *See id.*  For good reason: Kaufman testified that he was "pretty furious" with Plaintiffs' counsel for having asked him to write his report "within ten days or something like that" of the April 10, 2013 deadline. DE 500-36 at 16:24-17:11.  With respect to Shrenzel, they assert that "the *team* assisting Mr. Shrenzel had in fact done a great deal of work by the time plaintiffs asked Judge Ellis to adjust that date."  Pl. Opp. at 27, n.16 (emphasis added).  But Plaintiffs' counsel's representation to the Court in their March 20, 2013 letter was not that the *team* drafting Shrenzel's report had already begun their work; they claimed – falsely – that the experts themselves (Shrenzel and Kaufman) had begun their work and needed more time.  This Court should not countenance Plaintiffs' counsel's false representation to the Court by permitting Shrenzel and Kaufman to testify.

## II.   ITAMAR MARCUS'S TESTIMONY SHOULD BE EXCLUDED

### A.   MARCUS IS NOT QUALIFIED

Plaintiffs claim that Marcus is qualified to render his opinions because (1) he has "studied Palestinian politics and society for two decades," and (2) courts in the Second Circuit have admitted media experts like Marcus.  Pl. Opp. at 9-11.  Neither claim is correct.  Marcus has not "studied Palestinian politics and society for two decades."  He has merely reviewed translations of selected Palestinian media.  This is how he described his work at Palestinian Media Watch:

> The procedures that we follow, we have a series of
> translators . . . [T]hey read the newspapers and watch Palestinian
> television on a daily basis . . .
>       And toward end of the day we have a meeting, we try to do
> it most days, we don't usually get to it most days.  We have a

1435781.1

> meeting where we'll get a review from the various researchers,
> what they found, what they saw, what's important.
>     We get a sense of what's happening in the Palestinian
> leadership's directive, what's going on with Palestinian leadership,
> what activities they are having.
>     And based on that I will then, either I or an associate of
> mine, will give instructions what to do final translations on.

DE 500-5 at 105:1-19.  Reviewing translations of selected Palestinian media is hardly studying

Palestinian politics and society.  Yet, that is the sole basis for Marcus's alleged qualifications.

He never formally studied Palestinian politics and society (DE 500-4 at 2), he does not speak or

read Arabic (DE 500-5 at 10:10-14), and he did not speak to Palestinian leaders when preparing

his report (*id.* at 7:21-8:4).

   Nor is it correct that "the Second Circuit and a number of other courts have repeatedly

ruled that a very similar expert who monitors the public statements of al Qaeda is qualified to

give the same kind of testimony that Mr. Marcus will provide" (Pl. Opp. at 10).  Plaintiffs rely on

*United States v. Farhane*, 634 F.3d 127 (2d Cir. 2011), where the Second Circuit permitted Evan

Kohlmann to testify as an expert witness "about al Qaeda and Azzam Publications, the publisher

of a jihadist videotape." *Id.* at 158.  But Plaintiffs fail to mention that the Second Circuit

qualified Kohlmann, in part, because he studied at Georgetown University's School of Foreign

Service and Contemporary Arab Studies and at the University of Pennsylvania Law School, and

he published "various academic papers and a book on al Qaeda." *Id.* at 157, 159.  Similarly,

Plaintiffs fail to mention that the court in *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp.2d 414

(E.D.N.Y. 2013), another case relied on by Plaintiffs, qualified Kohlmann, in part, because "he is

the author of a textbook on terrorism that is used in graduate level courses at Harvard

University's Kennedy School of Government and Princeton University." *Id.* at 446; *see* Pl. Opp.

at 10-11.  Plaintiffs also fail to mention that, unlike Marcus's work, "Kohlmann's work had

1435781.1

undergone various forms of peer review, that his opinions were generally accepted within the relevant community, and that his methodology was similar to that employed by experts that have been permitted to testify in other federal cases involving terrorist organizations." *Farhane,* 634 F.3d at 159. Plaintiffs' omissions are no accident: unlike Kohlmann, Marcus lacks relevant academic training, he has not published academic papers or an academic book on the PA, and his opinions are not generally accepted in the relevant community.

Plaintiffs also state that Defendants "offer no legitimate basis for [their] claim" that Marcus "is not qualified to testify about the PA's control and censorship of the media in the West Bank." Pl. Opp. at 11. Plaintiffs are wrong. Marcus's review of selected translations of Palestinian media does not establish expertise on who controlled the media, and he has no personal knowledge that the PA controlled the media. Expert opinions "may not be a conduit for the introduction of factual assertions that are not based on personal knowledge." *Estate of Parsons v. Palestinian Authority*, 715 F. Supp. 2d 27, 33 (D.D.C. 2010); *Master-Halco, Inc. v. Scillia,* 2010 U.S. Dist. LEXIS 38113, at *9-10 (D. Conn. Apr. 19, 2010) ("[A]n expert cannot simply serve as a conduit through which a party can transmit inadmissible evidence to the jury."). Plaintiffs therefore cannot pass along this alleged fact under the pretext of expert testimony. To be sure, Rule 703 permits an expert to "testify to opinions based on inadmissible evidence, including hearsay, if 'experts in the field reasonably rely on such evidence in forming their opinions.'" *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008) (quoting *United States v. Locascio*, 6 F.3d 924, 938 (2d Cir. 1993)). But in this case Marcus is not applying expertise to the hearsay; he is passing it along as the finished product. *See Strauss*, 925 F. Supp. 2d at 446 (excluding part of Kohlmann's report because it "is nothing more than a recitation of secondary evidence, not all of which is admissible").

Plaintiffs' claim that Marcus should be permitted to testify about "the meaning that Palestinians, especially Islamic extremists, would likely assign to terms, such as 'martyrdom' and 'resistance,' used by the PA media" (Pl. Opp. at 12) is also wrong. Just because Marcus reads about these terms in the media does not mean that he knows what meaning Palestinians give to them. Notably, Plaintiffs do not even attempt to explain how Marcus is qualified to testify about the meaning of terms. *See* Pl. Opp. at 12-13. For good reason: he is not qualified.[1]

### B.   MARCUS'S OPINIONS ARE NOT BASED ON A RELIABLE METHODOLOGY

Plaintiffs' claim that Marcus describes his methodology in his report (Pl. Opp. at 13) is wrong. Marcus describes the methodology of PMW in his report, not the methodology he employed to reach his conclusions in this case. *See* DE 500-4 at 1. PMW and Marcus's report have different agendas.   PMW monitors "about 30 topics that [the] translators are supposed to bring to [Marcus's] attention . . ." DE 500-5 at 114:9-13. PMW's goal is "to present an authentic picture of what was representative of what was happening at all times." *Id.* at 171:18-20. Marcus's report, in contrast, seeks to show "that the Palestinian Authority under the direction of Yasser Arafat was responsible for, supervised, supported, promoted, glorified and reinforced the Palestinian terror campaign from October 2000 – 2005." DE 500-4 at 14. To the extent that Marcus employed a comparable methodology in preparing his report – having his translators bring him articles and clips that he thinks would be important (*see id.* at 105:1-19) – that methodology is not reliable because it necessarily involves cherry-picking information. *Cf.*

---

[1] Plaintiffs also state that Marcus "has testified as an expert in numerous terrorism cases in Israel." *Id.* at 10.  They fail to mention that at least one Israeli court soundly rejected his testimony, concluding that his data does not support his opinions, expertise is not required to read and understand newspaper articles, he ignored data that undermined his conclusions, and his data is not a representative sample of the media during the relevant time period.  *See Bequest of "X" v. Mahmoud Al-Aloul,* 1321/03 T.A. (Isr.) (civil case).

1435781.1

*Paracha*, 2006 U.S. Dist. LEXIS 1, at * 63 (approving Kohlmann's methodology because "it is more reliable than a simple cherry-picking of information from websites and other sources").

Plaintiffs also claim that Marcus properly failed to consider the most consumed media by Palestinians during the Second Intifida because foreign media sources "are irrelevant to state of mind, ratification, and *respondeat superior*." Pl. Opp. at 14. But Marcus's opinion has a much broader focus. He relies on his review of the media to opine that "[t]he [Palestinian] population was made to believe" that they were part of a national mission that "involved killing as many Israelis, including civilians, as possible." DE 500-4 at 15. And he concludes that "the Palestinian terrorists saw themselves as fulfilling the instructions of the leadership." *Id.* at 63. Thus, Marcus opines on the effect of the media on the Palestinian population, even though he ignores the most watched and the most read publications and concentrates on a deliberately limited sample. This is cherry-picking. His opinion is therefore not based on sufficient data or a reliable methodology.

C.    MARCUS'S TESTIMONY WILL NOT ASSIST THE JURY AND IS HIGHLY PREJUDICIAL

Plaintiffs ignore Defendants' argument that Marcus's testimony should be excluded because it is not beyond the ken of the average juror. *See* DE 500 at 21. They also ignore Defendants' argument that Marcus impermissibly opines on the state of mind of the PA and Palestinian individuals. *See id.* Yet, they still claim that Marcus will testify about "how the PA's messages were likely to be *understood* by Palestinians." Pl. Opp. at 9 (emphasis added). What Palestinians understood is exactly the type of state of mind testimony that is forbidden. As the district court held in *Linde v. Arab Bank ("Linde I")*, 920 F. Supp. 2d 282 (E.D.N.Y. 2011), "Insofar as many of the expert reports submitted by the defendant express opinions as to the state

10

of mind, intent, or motive of a government, a charitable entity, or a person, they do not contain relevant expert evidence." *Id.* at 285.

Plaintiffs *do* respond to Defendants' argument that Marcus's testimony is highly prejudicial because it would expose the jury to highly inflammatory statements. *See* Pl. Opp. at 15-16. Plaintiffs assert that a statement by a Palestinian cleric "is inflammatory, but it is defendants' own statement." *Id.* at 16. But Marcus has no basis to conclude that the statements of Palestinian clerics are statements of the PA. At his deposition Marcus admitted that a "Palestinian Authority cleric" is simply a cleric in the area that the PA governs (Marcus Tr. at 255:10-18) and that he refers to a cleric as "senior PA official" because of the cleric's position in the religious establishment (*id.* at 254:19-255:5). The jury should therefore not hear these undisputedly inflammatory statements by members of the clergy, any more than a Southern Baptist minister's statements should be admitted against the State of Texas.

## III.   ALON EVIATAR'S TESTIMONY SHOULD BE EXCLUDED

### A.   EVIATAR IS NOT QUALIFIED

Plaintiffs do not dispute that Eviatar's experience in the Israeli Defense Forces (IDF) is the sole basis of his alleged qualifications. *See* Pl. Opp. at 17. Instead, they claim that "[c]ourts in terrorism cases have repeatedly qualified former Israeli government security officials." *Id.* But courts have admitted former Israeli security officials for different purposes only where the expert has shown how and why their experience allowed them to reach the conclusions set forth in their expert report. *See e.g., Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 523 (E.D.N.Y. 2012); *Linde, PLC*, 922 F. Supp. 2d 316. Eviatar has not shown "how [his IDF] experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 Advisory Committee's Note

1435781.1

(2000).  His report provides the same generic description of his work experience as that of another expert, Shrenzel, even though they worked at different agencies in the Israeli government <u>and</u> they cover different topics in their expert reports.  In addition, Eviatar was untruthful about his authorship of the language in his report that is identical to Shrenzel's.  At his deposition he claimed that he wrote the language in his report that is identical to that in Shrenzel's report (DE 500-24 at 37:17-41:2), even though Shrenzel submitted his report on April 10, 2013 (DE 500-26 at 77) and Eviatar was first contacted about serving as an expert in May 2013 (DE 500-24 at 13:6-14:16).

Plaintiffs have no meaningful response to Defendants' argument.  Instead, they assert (in a footnote) that the "wording of the job descriptions of Messrs. Eviatar and Shrenzel is irrelevant" and that "[e]ven if Mr. Eviatar had used the Mr. Shrenzel's language, that would not justify disqualification."  Pl. Opp. at 18, n.4.  But to support these assertions, they cite a case, *Lorme v. Delta Air Lines, Inc.*, No. 03 CV 5239, 2005 WL 1653871, at *4 (S.D.N.Y. July 13, 2005), that considers exclusion of expert testimony under Federal Rule of Civil Procedure 26. Pl. Opp. at 18, n.4.  As noted, Rule 26 and Rule 702 are separate provisions of entirely different areas of law.  *Compare* Fed. R. Civ. P. 26 *with* Fed. R. Evid. 702.  They should not be confused. Eviatar's testimony should be excluded under Rule 702 regardless of whether his testimony should be excluded under Rule 26, all the more so in light of his false testimony under oath.

Plaintiffs also misconstrue Defendants' argument that Eviatar is not qualified because he refused to disclose confidential information.  Defendants are not saying that Eviatar is unqualified because his opinions in this case are based on confidential information.  *See* Pl. Opp. at 18.  Rather, Eviatar is unqualified because by refusing to disclose papers he claims to have

1435781.1

written about the very topics in his report, Defendants cannot know, much less challenge, his qualification to render his expert opinions. *See* DE 500 at 50-51.

Plaintiffs similarly misconstrue Defendants' argument that Eviatar has not shown that he is qualified to testify about the Hebrew University bombing. Defendants are not saying that Eviatar is unqualified to testify about this attack because he "was not responsible for investigating this attack when he was serving in the IDF." *See* Pl. Opp. at 19. Rather, Eviatar is not qualified because he had no role in the Hebrew University investigation and he has not shown how a commander of the Coordination and Liaison Administration in Jericho and the Jordan Valley is qualified to testify about an attack that happened in Jerusalem.

In the end, Eviatar has provided a generic description of his work experience at IDF that is identical to that of another expert who opines on different topics; he has not told the truth about the authorship of the description; he has refused to disclose papers he claims he wrote on the topics of his report; and he has failed to show how his IDF experience permits him to reach his conclusions about the Hebrew University bombing or any of the other topics in his report.

B.     EVIATAR'S OPINIONS ARE NOT BASED ON A RELIABLE METHODOLOGY

Plaintiffs state that the appropriate methodology for an expert like Eviatar is "'gathering multiple sources of information . . . , cross-checking and juxtaposing new information against existing information and evaluating new information.'" Pl. Opp. at 19 (quoting *United States v. Kassir*, No. 04 CR 356, 2009 WL 910767, at *6 (S.D.N.Y. Apr. 2, 2009)). They then state, "That is precisely what Mr. Eviatar did." *Id.* Plaintiffs' conclusion is astounding. Eviatar admitted that "[he] was requested to read [Shaked's] report and to make amendments to it." DE 500-24 at 13:6-9. That's all he did. So he certainly did not gather multiple sources of information, cross-check and juxtapose new information against existing information, and

13

evaluate new information.  Because Eviatar did not generate the opinions in his report, the Court cannot find that he, Eviatar, employed a reliable methodology in reaching his conclusions.

Plaintiffs contend that "[s]ince Mr. Shaked withdrew very shortly before reports were due, the only way that Mr. Eviatar could produce a timely report was to work from Mr. Shaked's draft, making whatever changes were necessary."  Pl. Opp. at 20.  Plaintiffs, of course, could have sought sufficient additional time for Eviatar to prepare his own report.  Having failed to do so, they cannot rely on improper methodology just because it was exigent.

Plaintiffs also claim that Defendants are "barred" from seeking to exclude Eviatar on this ground "because they asked Judge Ellis to disqualify [Eviatar] for these very same reasons, and Judge Ellis denied their request."  Pl. Opp. at 20.  Plaintiffs are wrong.  Defendants never asked Judge Ellis to exclude Eviatar's testimony under Rule 702.  Once again, Plaintiffs have confused Rule 26 and Rule 702.  *See supra* at 3.

Plaintiffs' response to Defendants' other major attack on Eviatar's methodology – that his opinions are based on the *ipse dixit* of the witness (*see* DE 500 at 54-57) – is also without merit. Plaintiffs have wrongly accused Defendants of "quibbling."  *See* Pl. Opp. at 21.  Defendants do not contend that "Eviatar should not be allowed to testify about the Hebrew University bombing . . . because he fails to cite any documents confirming the location of the attack" (Pl. Opp. at 21). Rather, Eviatar should not be allowed to testify because "[his] failure to provide support for his claims pervades the entire discussion of the Hebrew University bombing," including his thesis that the PA supported and encouraged Hamas to carry out the attack.  *See* DE 500 at 54-55.

Plaintiffs also quarrel with Defendants' argument that Eviatar draws unfounded conclusions from his data when he opines that the PA's permitting Abdullah Barghouti to make telephone calls from prison was intended to send Barghouti a message that he could continue to

carry out terrorist attacks with impunity. *See* Pl. Opp. at 21-22. Plaintiffs state that "providing a phone to a terrorist for use in coordinating with his terrorist co-conspirators *is* a crime . . . [and that] Defendants' argument to the contrary says nothing about Mr. Eviatar's methodology – and volumes about their own lack of self-awareness." *Id.* (emphasis in original). Plaintiffs' rhetorical flourish fails because Eviatar's data does not show that the PA *knew* that Barghouti intended to call an alleged co-conspirator when they allowed him to make a phone call from jail. Prisoners make phone calls from jails all the time, and the governments which permit them to do so cannot have their intentions inferred as to what the prisoners then do with the phones.

Finally, Plaintiffs fail to rebut Defendants' point that Eviatar's conclusion that the PA is promoting terrorism does not follow from the fact that Israel declared Tawfiq Tirawi, the head of the Palestinian General Intelligence, to be a wanted person. *Compare* DE 500 at 56-57 *with* Pl. Opp. at 22-23. Instead, they merely cite a Washington Post article that reaffirms that the Israelis wanted to arrest Tirawi. *See id.* at 23. Like Eviatar, Plaintiffs fail to recognize that the fact that Israel declared Tirawi to be a wanted person does not mean that Tirawi was, in fact, a terrorist or that the PA was promoting terrorism.

C.    EVIATAR'S TESTIMONY WILL NOT ASSIST THE JURY

Plaintiffs fail to respond to Defendants' argument that Eviatar is opining on the state of mind of the PA and Palestinians, even though Defendants give three clear examples (among many) of impermissible testimony. *See* DE 500 at 57. Plaintiffs' claim that their experts are not opining as to state of mind is belied by their experts' own words, including those highlighted in Defendants' motion, but not repeated here to avoid redundancy.

15

## IV.   ISRAEL SHRENZEL'S TESTIMONY SHOULD BE EXCLUDED

### A.   SHRENZEL IS NOT QUALIFIED

As with Eviatar, Plaintiffs contend that Shrenzel is qualified to render his opinions by virtue of his Israeli intelligence experience. *See* Pl. Opp. at 24. But Shrenzel has not explained "how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 Advisory Committee's Note (2000). First, he does not explain how he is qualified to render an opinion on the PA's alleged "incitement and indoctrination" of terrorism, including in the Palestinian curriculum. *See* Pl. Opp. at 24-26. To the contrary, at his deposition, Shrenzel (1) admitted that he has not studied the Palestinian curriculum (*see* DE 500-31 at 60:6-13), (2) mistakenly referred to a report about the media as a study about the curriculum (*see id.* at 60:14-63:15), and (3) volunteered that "this is certainly not an expert opinion that's focused on the curriculum" (*id.* at 63:23-24).

Second, Shrenzel does not show that he is qualified to discuss the six attacks. *See* DE 500-26 at 18-77. Plaintiffs do not even allege that Shrenzel's experience had anything to do with the six attacks. *See* Pl. Opp. at 24-26. Instead, they claim that "there is no requirement for expert or summary witnesses to have such personal involvement." *Id.* at 26. Maybe so. But Shrenzel must show how and why his Israeli intelligence experience allowed him to reach his conclusions about the six attacks and he has not done that. Plaintiffs also claim that "defendants engage in semantics by objecting to Mr. Shrenzel's statement that his expertise involves 'the Palestinian arena'" and that "[i]f defendants did not understand this phrase they were free to question Mr. Shrenzel during his deposition." *Id.* at 25-26. Defendants did ask Shrenzel about this phrase, and Shrenzel testified that he did not know if it was a phrase that he came up with or

16

1435781.1

that the "team" of consultants who drafted his report came up with.  DE 500-31 at 35:11-13.

Thus, he could not explain what the phrase meant.

Finally, Plaintiffs contend that Defendants "misstate [Shrenzel's] testimony" by stating

that Shrenzel "'would not explain the nature of his work at GSS.'"  Pl. Opp. at 26.  They claim

that "[t]he only GSS work that Mr. Shrenzel declined to discuss involved interrogations" and that

"Defendants did not bother to ask Mr. Shrenzel to elaborate on his other duties as an intelligence

analyst."  *Id.*  Plaintiffs are wrong.  In explaining his refusal to answer specific questions,

Shrenzel testified, "I'm not interested in responding on *anything* in a detailed or individual way

to the characteristics of my overall employment with the General Security Services, or the

security services."  DE 500-31 at 79:4-8 (emphasis added).   Shrenzel could not have been

clearer: he would not answer *any* questions about his work at the GSS.  As a result, Defendants

could not probe Shrenzel's qualification to serve as an expert witness in this case.

B.     SHRENZEL'S OPINIONS ARE NOT BASED ON A RELIABLE
       METHODOLOGY

In their motion in limine, Defendants give three reasons why Shrenzel's methodology is

not reliable: (1) Shrenzel did not generate the opinions in his report (*see* DE 500 at 61-62); (2)

Shrenzel transmits hearsay without applying any expertise (*see id.* at 62-64); and (3) Shrenzel's

opinions are based on the *ipse dixit* of the witness (*see id.* at 64-67).

Plaintiffs' response to the first reason is that "a team of researchers assisted him

reviewing the voluminous source materials and prepared an initial draft" and "[t]he law permits

experts to work with assistants in their field."  Pl. Opp. at 27.  Plaintiffs' characterization of the

production of Shrenzel's report is misleading.  A team of consultants drafted Shrenzel's report

*before* Shrenzel was retained to work on the case, not the other way around.  *See* DE 500 at 61;

DE 500-31 at 9:2-15, 14:12-15:11.  And those consultants worked for Plaintiffs' counsel, not

Shrenzel. *See id.* Plaintiffs' reliance on *Am. Universal Ins. Co. v. Falzone*, 644 F.2d 65 (1st Cir. 1981), is therefore misplaced. In *Falzone*, the First Circuit held that "it is reasonable for one state fire marshal to rely on the contemporaneous and on-the-scene opinions of other investigators on his team as to the portion of the investigation that they carried out within their competence." *Id.* at 66. By contrast, Shrenzel did not rely on the "contemporaneous" opinions of members of "his" team. Rather, he made minor edits to a report produced before he was retained to work on the case by a team of consultants retained by Plaintiffs' counsel.

Plaintiffs' response to the second reason is that Shrenzel can rely on inadmissible hearsay as an expert witness because "experts are permitted to rely on secondary sources." Pl. Opp. at 29. But Plaintiffs' statement is misleading. An expert cannot rely on *any* inadmissible hearsay to reach his conclusions; rather, Rule 703 permits experts to rely on inadmissible hearsay only "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." Fed. R. Evid. 703. In this case, Shrenzel relies on inadmissible hearsay that an expert in his field would not reasonably rely on. For example, Shrenzel relies on a single line from a non-scholarly book by a member of the Bush administration to support his opinion that President Arafat personally approved payment to the alleged perpetrators of the June 19, 2002 attack. The book "did not cite the specific intelligence reports" it purports to describe (DE 500-31 at 145:25) and did not even say whether the alleged intelligence was Israeli or American (*id.* at 145:16-25). Moreover, the line at issue – "new intelligence was received showing that Arafat had authorized a $20,000 payment to the group" (DE 500-33) – does not stand for the proposition that Shrenzel attributes to it (*id.* at 148:20-25),

namely, that such payment "allowed the terrorist attack in the neighborhood of French Hill to be carried out" (DE 500-26 at 57).[2]

Plaintiffs' response to the third reason is that Defendants "point to a few statements in Mr. Shrenzel's report that have no citation" and that "such a tiny number of omissions cannot possibly justify excluding the testimony of an expert whose report contains 300 footnotes documenting virtually every assertion." Pl. Opp. at 29. Actually, Defendants point to *dozens* of examples, including entire paragraphs, where Shrenzel does not provide support for his claims. *See* DE 500 at 64-65. And Defendants could have provided more examples had space permitted. Moreover, Plaintiffs do not deny that Shrenzel "cherry-picked data" by including in his report the portion of a speech by Arafat that called for armed resistance but failing to mention the portion of the same speech that called for peace. *See* Pl. Opp. at 26, n.14. Instead, they claim that "as an expert on these types of materials, Mr. Shrenzel is permitted to make the determination that the latter quote need not appear in his report." *Id.* But Plaintiffs are conflating qualifications and methodology. They cannot excuse Shrenzel's cherry-picking of information by claiming that he is an expert. Otherwise, Rule 702 would not require courts to consider an expert's methodology. Shrenzel has cherry-picked his information and cherry-picking is the *sine quo non* of an unreliable methodology. *See, e.g., Paracha*, 2006 U.S. Dist. LEXIS 1, at *63.

---

[2] Plaintiffs' claim that Shrenzel "was aware of the book's underlying source data" (Pl. Opp. at 29, n.19) is dubious. Shrenzel testified that "it's *possible* that [the intelligence data] was brought to [his] attention or that [he] was aware of it" before later testifying that he was aware of it. DE 500-31 at 146:1-15 (emphasis added). That he did not even know if the intelligence was Israeli or American (*id.* at 145:16-19) casts further doubt on his claim that he was ever aware of the intelligence, to the extent it existed.

1435781.1

### C.      SHRENZEL'S TESTIMONY WILL NOT ASSIST THE JURY

As with their other experts, Plaintiffs address only Shrenzel's qualifications and the reliability of his methodology.  They ignore Defendants' argument that Shrenzel's testimony will not assist the jury.  *See* Pl. Opp. at 23-30. That is because they have no meritorious response.

## V.      NICK KAUFMAN'S TESTIMONY SHOULD BE EXCLUDED

### A.      KAUFMAN IS NOT QUALIFIED

Plaintiffs claim that "Defendants make only a half-hearted attempt to argue that Mr. Kaufman is not qualified to opine on the workings of the IMC." Pl. Opp. at 31.  In fact, Defendants do not make *any* attempt to argue that Kaufman is not qualified to opine on the "workings of the IMC."  That is because Kaufman does not seek to testify as to the "workings of the IMC."  Rather, Kaufman seeks "to deliver an expert opinion on the quality of justice dispensed by the [IMC]" and on the quality of justice afforded to 21 individuals convicted in the IMC.  DE 500-34 at 1.  In this regard, Kaufman is not qualified.

Nothing in Kaufman's background – not his academic training, his experience as a lawyer, or his experience as a part-time judge – qualifies him to answer the empirical question of whether the IMC provides adequate due process or whether it provided due process as to the specific cases in question.  Kaufman has never assessed the IMC or any legal system before.  DE 500-36 at 31:21-33:3.  He has never evaluated a case for which he was not the judge.  *Id.* at 67:23-68:1.  As Plaintiffs concede, "it is the job of judges to decide cases before them, not to write critiques of the entire system." Pl. Opp. at 32.[3]

---

[3] Plaintiffs allege that Defendants' representation that Kaufman has worked as a criminal defense attorney only in the Israeli civilian courts, not in the IMC, is incorrect. Pl. Opp. At 32, n.21.  Kaufman testified at his deposition, "I was never a defense attorney in the Israeli military courts."  Kaufman Tr. at 34:22-23. Although he has represented Israeli soldiers in a separate military court inside Israel, he has never represented a single defendant in the IMC in the occupied territories, the only judicial system at issue in

Plaintiffs are correct that "Mr. Kaufman's experience contrasts sharply with that of defendants' expert witness on the IMCs, Michael Sfard." *Id.* at 32. Sfard, unlike Kaufman, *has* experience assessing the IMC. He was the editor and legal advisor of the Yesh Din Report: "Backyard Proceedings: The Implementation of Due Process Rights in the Military Courts in the Occupied Territories" (December 2007). DE 500-43 at 2. The Yesh Din Report is a comprehensive examination of due process in the IMC. *See* DE 500-37 through 42. Yet, Kaufman was not even aware of it until he read Sfard's expert report. DE 500-36 at 63:6-14. Once he became aware of it, "[he] didn't study the Yesh Din report in too much detail because [he] didn't feel it was relevant to the mandate that [he] was given." *Id.* at 140:7-9. One can only wonder how an expert "requested to deliver an expert opinion on the quality of justice dispensed by the [IMC]" (DE 500-34 at 1) could conclude that a comprehensive examination of due process in the IMC during the relevant time period was not relevant, particularly when that expert has no experience evaluating the IMC or any legal system.

### B.   KAUFMAN'S OPINIONS ARE NOT BASED ON A RELIABLE METHODOLOGY

Plaintiffs do not dispute that Kaufman did not employ any methodology in assessing the quality of due process in the IMC or in determining whether each of the 21 defendants received due process. *See* Pl. Opp. at 33-36. Plaintiffs never identify Kaufman's methodology. *See id.* Instead, they argue that Kaufman "is not required to adhere to [an academic or scientific] methodology" because his alleged expertise is "based on practical experience." *Id.* at 33. But Plaintiffs cite no case – and Defendants are aware of none – that would permit an expert to forego a methodology (academic or otherwise) because he is testifying based on practical

---

his report. *Id.* at 34:20-35:8. Plaintiffs' suggestion that Kaufman has served as a defense attorney in the only court system at issue in his report is misleading, at best.

1435781.1

experience.  Plaintiffs also misread Defendants' criticism of Kaufman for relying on the

Universal Declaration of Human Rights (UDHR).  *See id.*  Defendants' point is not that it was

wrong for him to consider the UDHR, but that his admission that it was "[a]n arbitrary choice" to

start with the UDHR shows that he was not following a reliable methodology.  *See* DE 500 at 71.

Plaintiffs claim that "Defendants' principal attack on Mr. Kaufman's methodology is that

he assessed the fairness of the IMC proceedings against the 21 perpetrators by reviewing the

records of those proceedings."  Pl. Opp. at 33.  That is partially correct.  Defendants argue that

the court records of the 21 defendants do not provide sufficient data for anyone to find that the

defendants received due process.  *See* DE 500 at 72-73.  But Defendants also argue that Kaufman

drew conclusions based on the *ipse dixit* of the witness and ignored data that undermines his

conclusions.  *See id.* at 74-79.  Plaintiffs do not address these arguments.  *See* Pl. Opp. at 33-36.

As for Defendants' argument that Kaufman's opinions are not based on sufficient data,

Plaintiffs misrepresent it.  Defendants' argument is not "that Mr. Kaufman cannot testify . . .

unless he can both reinvestigate the 21 cases from scratch and convince this Court that, in a

perfect world, it would have reached the same results reached by the IMCs."  Pl. Opp. at 34.

Defendants' argument is that Rule 702 explicitly requires expert testimony to be "based on

sufficient facts or data" and that the IMC case records do not provide sufficient data for anyone

to conclude that the defendants received due process.  *See* DE 500 at 72-75.  The 21 case records

are missing records of pre-trial detention hearings, immunity certificates issued to withhold the

disclosure of evidence, gag orders, client-attorney prevention orders, and records of trial

testimony.  *See* DE 500-43 at 29-30; DE 500-44 at 164:25-165:13; 222:25-223:1; 247:12-19.

They are also missing the records of the General Security Service (GSS), the Israeli entity that

interrogated the defendants and elicited their alleged confessions.  *See* DE 500-36 at 79:5-20.

These GSS records were, as Sfard put it, "the flesh and blood [of] the cases." DE 500-44 at 144:12-14. That is because, as Kaufman acknowledged, "a large proportion of [the defendants] did confess and were convicted on the basis of their own confession." DE 500-36 at 80:12-81:6. Kaufman even admitted that he wanted to see those GSS records. *See id.* at 87:19-25. To be sure, Sfard "did not review or obtain the GSS files either." Pl. Opp. at 34, n.24. But Sfard is not opining that the 21 individuals received due process. Also, neither Kaufman nor Sfard knows whether defense counsel in the 21 cases received the GSS files. DE 500-36 at 88:1-4. Even Kaufman agreed that defense counsel should have requested to see those records. *Id.* at 89:20-91:3. If counsel did not receive the GSS files, "it means that there was a significant failure to provide adequate representation to the defendants." DE 500-43 at 31.[4]

Even so, Defendants are not saying that Kaufman had an obligation to reinvestigate the cases, as Plaintiffs allege. *See* Pl. Opp. at 34, n.25. Rather, Defendants' argument is that Kaufman's opinion that the 21 defendants received due process is not reliable because (1) he considered only the limited information in the case records; (2) the evidence in the case records strongly suggests that defense counsel were not competent (*see* DE 524 at 9-11); and (3) Yesh

---

[4] Plaintiffs' claim that the GSS files are the "equivalent of the FBI's investigative files" (Pl. Opp. at 34, n.24) is wrong. The FBI, unlike the GSS, does not have the authority to interrogate suspects for up to 90 days without access to an attorney, to prevent the suspect's attorney from meeting with his client for up to 30 days, to request and obtain a gag order preventing disclosure of the investigation, to invoke the "necessity" defense to use torture or inhumane or degrading treatment against the suspect, to inform the suspect that his silence may be used against him at trial, to put informants in jail cells to trick suspects into admitting guilt, and to call in a police officer following the suspect's confession to memorialize the confession for use at trial. *See* Sfard Report at 8-11. Moreover, the GSS is not equivalent to the FBI in many other regards. The GSS is a security service imposed on the Palestinian populace through occupation, not the consent of the governed.

1435781.1

Din's comprehensive assessment of due process in the IMC during the relevant time period found widespread due process violations (*see* DE 500-37 through 42).[5]

Finally, Plaintiffs state that "the whole point of [Rule 803(22)] is that the evidence of prior convictions is admissible without the need to retry the criminal case." That is certainly true. But Rule 803(22) was not drafted with foreign convictions, much less foreign military court convictions of an occupying power, in mind. *See* DE 497 at 33; *see also Lloyd v. American Export Lines*, Inc., 580 F.2d 1179, 1189 (3d Cir. 1978) ("In considering the application of Rule 803(22) to the judgment of conviction, we note that Congress made no specific references to convictions obtained in foreign countries."). Because Rule 803(22) does not encompass foreign convictions, the Court should exclude the IMC convictions without even considering Kaufman's opinion. *See* DE 497 at 32-34. If the Court concludes that Rule 803(22) does encompass foreign court convictions, the Court may not admit the 21 IMC convictions unless the Court finds both that the IMC system meets the criteria for recognition of foreign judgments and that the 21 defendants received due process. *See id.* at 34-36. Because the Court cannot make either of these findings, Kaufman's testimony should be excluded and the convictions should not be admitted.

---

5 Plaintiffs' reliance on *Strickland v. Washington*, 466 U.S. 668 (1984), for their claim that it was "proper" for Kaufman to assume that counsel were competent and acted in good faith (*see* Pl. Opp. at 33, n.23) is misplaced. It is one thing for U.S. courts to presume the competence and good faith of counsel appearing in U.S. cases, where defense counsel must, among other things, pass a bar exam to practice. It is quite another thing to presume the competence of counsel in the IMC, where defense counsel are not even required to be members of the Israeli bar (*see* DE 500-36 at 144:20-23). Plaintiffs' efforts to equate the U.S. criminal justice system with the IMC cannot withstand the least scrutiny. And, in any event, the records indicate strongly that counsel were not effective.

1435781.1

C.     KAUFMAN RELIED ON DOCUMENTS PRODUCED AFTER THE CLOSE
       OF FACT DISCOVERY

In their motion, Defendants contend that Kaufman's testimony should be excluded

because he based his testimony on records that were not produced to Defendants until *after* the

close of fact discovery.  *See* DE 500 at 83.  In response, Plaintiffs claim (in a footnote) that

"Plaintiffs timely produced the IMC records in their possession, but Mr. Kaufman decided to

review additional records that had to be obtained from the court's files."  Pl. Opp. at 36, n.27.

Plaintiffs are wrong.  First, Plaintiffs did not timely produce the IMC records.  Defendants

requested them during fact discovery but Plaintiffs did not produce most of them until they

produced Kaufman's expert report on April 10, 2013, nearly four months after the close of fact

discovery.  *See* DE 500 at 83.  Second, Kaufman did not "decide[] to review additional records

that had to be obtained from the court's files" (Pl. Opp. at 36, n.27).  In fact, Kaufman did not

choose which materials to review at all.  To the contrary, he testified that his instructions were to

render opinions "on the basis of the information made available to [him]."  DE 500-36 at 29:21-

30:2.  His only request of Plaintiffs' counsel was for them "to make sure that, when they brought

[him] the photocopies of the case files, that they did photocopy every document."  *Id.* at 23:23-

24:1.  This request hardly shows that "Kaufman decided to review additional records that had to

be obtained from the court's files" (Pl. Opp. at 36, n.27).  Plaintiffs' strained attempt to show that

they timely produced the documents is not surprising given that Judge Ellis previously ruled that

"any responsive documents not produced during discovery will be inadmissible at trial" and

Plaintiffs' counsel responded to Judge Ellis that "you're stating something that nobody disagrees

with."  July 10, 2012 Hearing Tr. at 30.  Judge Ellis also previously ruled that "[i]f you have an

expert who relies on a document you didn't produce to the defendants, that expert's testimony is

not going to be allowed."  Mar. 20, 2012 Hearing Tr. at 62.  The Court should now enforce that

1435781.1

order, to which Plaintiffs did not object, and prohibit Kaufman from testifying about records that were not produced during fact discovery.

Plaintiffs also allege that the IMC files are "publicly available."  Pl. Opp. at 36, n.27. This is also incorrect.  While it may be true that "theoretically, anybody could walk in and *ask* to see those files" (DE 500-36 at 26:18-19) (emphasis added), the IMC will not simply hand over the files to anyone who asks.  Sfard testified at his deposition that he was "astonished" that Kaufman was able to gain access to the case files because when he wanted to review cases files in the past, he had to file a petition with the Israeli High Court of Justice to get a permit to review them.  *See* DE 500-44 at 144:15-23.  Indeed, Kaufman testified that his access to the case files was "coordinated in advance through counsel for the plaintiffs."  DE 500-36 at 27:6-8.[6]

In the end, Plaintiffs have dictated which files Defendants would receive and when they would receive them.  This Court issued Hague requests for Israeli government documents pertaining to the suspects in this case, including their GSS records.  *See* DE 136.  To date, the government of Israel has not produced any documents in response to this Court's request.  The Court should not let Plaintiffs benefit from their failure to comply with discovery obligations because they have elements of the Israeli government on their side, and Kaufman should not be allowed to testify about documents that were not produced during fact discovery.

## VI.   JEFFREY ADDICOTT'S TESTIMONY SHOULD BE EXCLUDED.

### A.   ADDICOTT IS NOT QUALIFIED

In response to Defendants' argument that "[a] cursory examination of Addicott's background reveals the enormous mismatch between his actual experience and his opinions in

---

[6] Shurat Hadin, the Israeli organization representing the plaintiffs in this case, boasts on their website that they have access "to places inaccessible to the general public, such as military courts . . ."  Shurat Hadin, Shurat Hadin's Internship Program, available at http://www.israellawcenter.org/page.asp?id=384, (last visited on June 27, 2014).

1435781.1

this case" (DE 500 at 32), Plaintiffs have redefined Addicott's proposed testimony. Plaintiffs *now* state that "[t]he overarching theme of his testimony . . . will be to demonstrate how defendants have acted in the ways that governments supporting terrorism act." Pl. Opp. at 36. They say that Addicott "will testify that, like terrorist supporters elsewhere, defendants often acted through affiliates and front groups" and that "defendants' public statements purporting to renounce terror . . . are predictable for such organizations and do not detract from their ongoing support for terrorism." *Id.* at 36-37. Plaintiffs' description of Addicott's testimony in these broad terms is hardly surprising because Addicott does not have expertise on the PA, the PLO, or the Second Intifada. *See* DE 500 at 32-35.

Addicott's qualification to serve as an expert witness in this case, however, must be measured against his expert report, not Plaintiffs' characterization of that testimony in an opposition brief. Addicott's report – which Addicott did not draft (DE 500-15 at 9:13-16, 12:12-13:4) – does not "demonstrate how defendants have acted in ways that governments supporting terrorism act." Pl. Opp. at 36. Rather, Addicott's report purports to "demonstrate herein that the Fatah faction and the Palestinian Authority (PA), which were effectively indistinguishable from one another and both led by Yasser Arafat during the relevant time period, were responsible for the terror campaign known as the al-Aqsa Intifada, or second Intifada." DE 500-14 at 11-12. Because Addicott is not qualified to testify about the opinions given in his report, the Court should not fall for Plaintiffs' bait-and-switch, and should exclude his testimony, both as originally conceived and as re-packaged.

To be sure, Plaintiffs also try to show that Addicott has expertise on the PA, Fatah, and the Second Intifada. *See* Pl. Opp. at 38-39. But of the eleven bullet points in Defendants' motion that describe Addicott's lack of qualification to opine on these topics, Plaintiffs respond

1435781.1

to just two of them. *Compare* DE 500 at 32-33 *with* Pl. Opp. at 38-39. Not only that, their responses are either exaggerated or flat-out wrong. For example, they claim that Palestinian terrorism "was a topic during his frequent lectures to the FBI" (Pl. Opp. at 38), but Addicott first testified that he did not discuss the actions of the PA or Fatah during the Second Intifada in his lectures to the FBI (DE 500-15 at 60:13-61:6) and then later testified that he would "mention" the PA or Fatah as part of a "broader discussion" (*id.* at 69:7-19). They also claim that Addicott pointed to "*several* instances" where he discussed the PA or Fatah in the media (Pl. Opp. at 38) (emphasis added), but Addicott actually testified that he could recall just one instance (DE 500-15 at 64:1-14). Finally, they claim that Addicott attended a conference "where he was a panel member and discussed the PA, Fatah and the Al Aqsa Intifada" (Pl. Opp. at 38-39), but Addicott testified that he could not recall the topic of his discussion and that he "would *assume*" that it covered the PA, Fatah, and the Second Intifada simply because it was in Israel (DE 500-15 at 88:21-90:6) (emphasis added). In sum, Addicott does not have expertise on the PA, Fatah, or the Second Intifada, the specific subjects of his expert report. *See Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 81 (2d Cir. 1997) ("[A] district court may properly conclude that witnesses are insufficiently qualified despite the relevance of their testimony because their expertise is too general or too deficient."). Thus, the Court should exclude his testimony.

     B.     ADDICOTT'S OPINIONS ARE NOT BASED ON A RELIABLE METHODOLOGY

Like Eviatar and Shrenzel, Addicott did not generate the opinions in his report or write his report. *See* DE 500-15 at 9:14-16, 12:12-13:4. Like with Eviatar and Shrenzel, Plaintiffs contend that Defendants are "barred" from arguing that the Court should exclude his testimony on this ground. *See* Pl. Opp. at 40. But once again, Plaintiffs confuse Rule 26 and Rule 702. *See supra* at 3. Addicott's adoption of someone else's opinion and report shows that he has not

"employ[ed] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152. Not only that, Addicott hardly did any work after he received the draft from Plaintiffs' counsel. He received the draft on March 21 and he signed his expert report on March 22. DE 500-15 at 7:20-14:2. He even signed it without locating one of the sources (a video) cited in the report. *Id.* at 16:12-17:5. Remarkably, he did not remove that cite from his report. *Id.* Thus, the Court cannot credit Plaintiffs' claim that Addicott "carefully reviewed the draft – including reading the sources cited in it." Pl. Opp. at 40.

Plaintiffs also claim that Defendants are "nit-picking a few words in [Addicott's] report" and disagreeing with his conclusions when they dissect Addicott's use of the term "martyr." *Id.* at 40-41. To the contrary, this example shows that Addicott will say one thing (that Arafat was glorifying the unlawful violence of a martyr) and then when confronted with contrary evidence (that Arafat was referring to a 12-year-old boy who was killed by cross-fire), he will say something else entirely (that Arafat was using the boy to incite others to commit violence). *See* DE 500 at 37-39. The example also shows that Addicott will make things up (that a crowd at the really was "frenzied") despite the absence of any evidence to support his opinion. *See id.* at 39. This is neither "nit-picking" nor disagreeing with conclusions; it is showing that a methodology is not reliable because it is based on nothing more than the *ipse dixit* of the witness.

C.   ADDICOTT'S TESTIMONY WOULD NOT ASSIST THE JURY

Plaintiffs claim (in their discussion of Addicott's qualifications) that Addicott will not testify to state of mind but "will simply explain why defendants were on notice of the United States Government's position that they were killing Americans." Pl. Opp. at 40. But Addicott's report goes much further than that. It states that "the Palestinian terrorist groups surely *knew*

that, by perpetrating terrorist attacks in public streets, on passenger buses, in cafes and on highways, there was a high probability that American citizens could be murdered and injured." DE 500-14 at 21 (emphasis added). It also concludes that "the Palestinian Authority was *unconcerned* with the loss of American lives." *Id.* at 27 (emphasis added). Addicott's sweeping conclusions about what Palestinian terrorist groups knew and what the PA was or was not concerned with invade the province of the jury and are not permissible expert testimony. *See Linde I,* 920 F. Supp. 2d at 285.

## VII.   EFRAIM KARSH'S TESTIMONY SHOULD BE EXCLUDED.

### A.   KARSH IS NOT QUALIFIED

Plaintiffs claim that Karsh is qualified to render his opinions because, according to them, he is "is a leading scholar in the field of the Middle Eastern studies" who "has a special emphasis on the Palestinian-Israeli conflict." Pl. Opp. at 42, 43 (internal quotation marks omitted). But Karsh may be qualified as an expert in this case only if he has specific expertise on the PA's role in the Second Intifada. *See Calhoun v. Yamaha Motor Corp.*, U.S.A., 350 F.3d 316, 322 (3d Cir. 2003) ("While the background, education, and training may provide an expert with general knowledge to testify about general matters, more specific knowledge is required to support more specific opinions."). Karsh is not qualified to opine on this specific topic.

Although he can claim "15 authored books, 15 edited volumes, and over 100 academic articles to his credit" (Pl. Opp. at 42), only *Arafat's War* focuses on the PA's role in the Second Intifada. His publication of this book does not qualify him to testify as an expert in this case for two reasons. First, the book was not the product of a reliable methodology. *See* DE 500 at 42-47. He abandoned the rigorous methodology that typically accompanies academic work when he wrote it in 2003. *See id.* Second, and more importantly, Karsh has not educated himself about

30

the issues in his report since he wrote the book in 2003, even though the Second Intifada was not

over when he wrote his book and new information has since come to light about the causes of the

Second Intifada.  For example, he testified that he was not aware of statements by the former

heads of the Israeli Security Agency (ISA), Avi Dichter and Yuval Diskin, that the Intifada was a

grassroots uprising.  DE 500-20 at 273:6-275:1.  He also admitted that did not read a 2004

investigation by Israel's Military Intelligence's Palestinian Desk that the Second Intifada erupted

as a popular protest.  *Id.* at 254:21-256:17.  Thus, even assuming that Karsh was, in 2003,

sufficiently informed of the topics in his report to be considered an expert then, he was not in

2013 when he submitted his report.

## B.   KARSH'S OPINIONS ARE NOT BASED ON A RELIABLE METHODOLOGY

Plaintiffs claim that "Defendants' principal attack on Professor Karsh's methodology is

that his report is based on the research he conducted for *Arafat's War*."  Pl. **Opp.** at 44. This is

only partially correct.  Defendants' principal attack on Karsh's methodology is twofold: (1)

Karsh did not employ a reliable methodology when he wrote his book in 2003, and (2) Karsh

conducted no research on the topics in his report since he wrote his book.  *See Newton v. City of*

*Muskogee*, No. CIV-06-532, 2007 U.S. Dist. LEXIS 85796, at *3 (E.D. Ok. Nov. 19, 2007)

(excluding an expert because he is "offering opinions based on outdated information").  Karsh's

failure to conduct additional research is particularly problematic because, as noted above, the

new information contradicts his conclusions.  Indeed, if a proposed expert wrote a (non-peer

reviewed) book in 2003 that claimed that Saddam Hussein had weapons of mass destruction and

then filed an expert report in 2013 based exclusively on his research for that book – and failed to

discuss relevant information that came out following the publication of the book – a court could

not find that expert's methodology to be reliable.  Yet, that is the situation here.  Karsh's failure

31

to conduct research following the publication of his book and his failure to consider information that contradicts his opinions are therefore not matters for cross-examination, as Plaintiffs claim (*see* Pl. Opp. at 45). It is proof of his unreliable methodology.

Plaintiffs suggest that Defendants make inconsistent arguments when they "criticize [Karsh] for not taking certain media stories into account, but in the very next sentence they attack him for citing media stories." *Id.* Defendants' arguments are not inconsistent. Karsh's reliance on "unattributed hearsay from media sources" shows that his opinions are not based on sufficient or reliable data. *See* DE 500 at 43-45. And his failure to consider media sources that contradict his opinions makes his opinions that much more unreliable. *See id.* at 43. Put another way, an expert should not rely so heavily on unattributed hearsay from media sources. But if he does, he should not cherry-pick those media sources that support his conclusions and ignore others that contradict his conclusions, as Karsh has done.

Plaintiffs also confuse attacks on Karsh's methodology, which Defendants do in their motion, with attacks on Karsh's conclusions, which Defendants do not do. Plaintiffs claim, for example, that Defendants disagree with Karsh's conclusion "that the PA's official media outlets are 'controlled' by the PA." Pl. Opp. at 45. But Defendants' criticism is that "[Karsh] cites no support for his assertion that certain media is controlled by the PA and PLO." DE 500 at 45-46. Moreover, this argument is not the same "charge [Defendants] leveled against Mr. Marcus." Pl. Opp. at 45. Marcus transmits hearsay without applying expertise, *see* DE 500 at 14-15, whereas Karsh fails to provide support for his claim, *see id.* at 45-46. But the result is the same: Karsh's opinion and Marcus's opinion that the PA controlled the media are not admissible.

32

## C.      KARSH'S OPINIONS WILL NOT ASSIST THE JURY

Plaintiffs state that Karsh "will testify on the defendants' long history of support for terrorism." Pl. Opp. at 41. But they fail to explain why Karsh should be permitted to provide an historical account of the Israeli-Palestinian conflict when they recently criticized Defendants for presenting their own "historical narrative" and even stated – correctly – that "[t]he issue is whether the defendants injured the plaintiffs, not who is right in a decades-old conflict" (DE 487 at 7). Indeed, Plaintiffs never respond to Defendants' argument that Karsh's opinions will not assist the jury because they do not address any of the attacks at issue in this case.

Plaintiffs also do not respond to Defendants' argument that Karsh impermissibly opines on the state of mind (and "feelings") of Palestinians. Instead, they state, in the section on methodology, that Karsh is qualified to testify to the meaning of certain words to Palestinians. *See* Pl. Opp. at 46. But this testimony does not pertain to qualifications or methodology. The issue is whether Karsh's testimony about what Palestinians think and feel invades the province of the jury. The answer is yes. Karsh's testimony should therefore be excluded.

## VIII.  MATTHEW LEVITT'S TESTIMONY SHOULD BE EXCLUDED

### A.      LEVITT IS NOT QUALIFIED

Plaintiffs spend two-plus pages discussing Levitt's qualifications to serve as an expert in international terrorism in general before addressing Defendants' argument that he is not qualified to testify about Fatah or the Al Aqsa Martyrs' Brigade (AAMB) in particular. *See* Pl. Opp. at 46-49. They have two responses to Defendants' argument. First, they argue that "a similar argument was rejected in *Linde*, which held that Mr. Levitt is qualified to testify on a range of terrorist groups involved in the Second Intifada." *Id.* at 49. But Plaintiffs mischaracterize *Linde*. The court's focus in *Linde* was on whether Levitt was qualified to testify about Hamas. *See*

33

*Linde*, 922 F. Supp. 2d at 321-22, 324-25.  The court discussed Levitt's testimony in a section

entitled "Hamas and Charitable Organization Experts" (*id.* at 321) and noted that "Plaintiffs

claim that defendant Arab Bank provided material support not only to Hamas or Hamas

leadership but also to twelve charitable organizations that were fronts for Hamas."  *Id.* at 321-22.

Although the court stated that "Dr. Levitt is clearly qualified to testify as an expert in terrorist

organizations," it immediately noted that "Hamas, its history and organization, and the structure

of the social wing of Hamas (including zakat committees) . . . are precisely the subjects at issue

here."  *Id.* at 324-25.  Thus, Plaintiffs' reliance on *Linde* for the claim that Levitt is qualified to

testify about Fatah and the AAMB is misplaced.

 Second, Plaintiffs argue that despite the fact that Levitt has focused on Hamas,

Hezbollah, and Al-Qaeda, Levitt is qualified to opine on Fatah and the AAMB because "[h]is

[deposition] testimony makes clear . . . that he has done extensive work on these subjects."  Pl.

Opp. at 49.  But Levitt's non-specific assertions that he has given interviews, attended meetings,

and read about these groups (*see id.* at 49-50) are not enough to show that "how [those]

experience[s] lead[] to the conclusion reached, why [those] experience[s] [are] a sufficient basis

for the opinion, and how [those] experience[s] [are] reliably applied to the facts."  Fed. R. Evid.

702 Advisory Committee's Note (2000).   Plaintiffs suggest that it is understandable that Levitt

"could not remember, off the top of his head, the names of specific persons he spoke to in the

West Bank or the media outlets that interviewed him years ago about the AAMB and the

defendants."  Pl. Opp. at 49.  Maybe so.  But Levitt's seven-page, single-spaced discussion of his

qualifications in his report does not mention Fatah or the AAMB even once.  *See* DE 500-11 at

1-8.  Indeed, one would not know from reading the qualifications section that Levitt purports to

be an expert on Fatah or the AAMB.  Thus, Plaintiffs cannot reasonably complain that

Defendants asked Levitt to substantiate his bare assertions that he is qualified to testify about these topics. And Levitt's failure to identify a person interviewed, a document read, or an interview given on Fatah or the AAMB shows that he has not explained how he is qualified to testify on these topics.

### B.   LEVITT'S OPINIONS ARE NOT BASED ON A RELIABLE METHODOLOGY

Plaintiffs do not address Defendants' arguments that "Levitt applied no methodology at all, much less a reliable one" (DE 500 at 25). Instead, they conflate the qualifications and reliability requirements. Plaintiffs claim that Levitt describes his methodology when he writes, "'In my efforts to study and understand terrorism and militant Islamic ideology I interview experts . . . I engage in private, personal meetings . . . I travel to the Middle East regularly . . . '" Pl. Opp. at 50 (quoting DE 500-11 at 3). But this description does not explain the method Levitt followed to reach his conclusions *in this case*. Rather, it explains what Levitt does to stay informed about "terrorism and militant Islamic ideology" *in general*. In fact, this passage is taken from Levitt's discussion of his qualifications. *See* DE 500-11 at 3. Importantly, Levitt's report does not include a description of his methodology in this case. Moreover, at his deposition Levitt admitted that his methodology in this case deviated from his general methodology. For example, he testified that he did not rely on any field research to reach his conclusions in this case, even though his general methodology calls for field research. *Compare* DE 500-13 at 36:16-37:3 *with* DE 500-11 at 3. It is therefore irrelevant that a district court in the Fourth Circuit once described his methodology as "the gold standard in the field of international terrorism," *see United States v. Damrah*, 412 F.3d 618, 625 (4th Cir. 2005), when Levitt declined to follow that methodology here.

The closest Levitt gets to describing his methodology in this case is the following statement at his deposition: "I looked at all the evidence that I could get my hands on, and then I wrote a report that provided my expert opinion, which is what this is, it's an expert opinion, and the evidence that underpins it." DE 500-13 at 152:16-20. But this methodology does not explain how Levitt searched for material or what material Levitt "got his hands on." To make matters worse, Levitt ignored evidence that contradicts his conclusions. *See* DE 500 at 27-30. Plaintiffs claim that Levitt "did not ignore defendants' arguments; he considered and rejected them on the ground that they were not correct." Pl. Opp. at 51. Presumably, Plaintiffs mean to say that Levitt did not ignore "contrary evidence" as opposed to "defendants' arguments." But either way, at his deposition Levitt could not say what he supposedly considered and rejected before reaching his conclusions. He testified that he did not set out to "include all sides [of an issue] and come to a conclusion" (DE 500-13 at 151:4-16), he did not discuss in his report the material that contradicts his conclusions (*id.* at 151:17-152:3), and he could not recall and did not preserve the material he supposedly considered but then rejected (*id.* at 152:4-153:18). So Levitt's claim that he considered but rejected evidence that contradicts his conclusions is, like many of his opinions in his report, based on nothing more than the *ipse dixit* of the witness.

C.     LEVITT'S TESTIMONY WOULD NOT ASSIST THE JURY

Plaintiffs ignore Defendants' argument that Levitt's testimony not only fails to address any of the seven attacks at issue in this case but also includes "extraneous (and frequently unsourced) 'evidence'" (DE 500 at 31). The testimony should be excluded.

## CONCLUSION

For the reasons stated above, the Court should exclude Plaintiffs' seven case-in-chief liability experts from testifying at trial in this matter.

1435781.1

June 30, 2014                    Respectfully Submitted,


                                 /s/ *Michael J. Satin*
                                 Michael J. Satin
                                 Mark J. Rochon
                                 Laura G. Ferguson
                                 Brian A. Hill
                                 MILLER & CHEVALIER CHARTERED
                                 655 15th Street, NW, Suite 900
                                 Washington, DC  20005-6701
                                 (202) 626-5800 [tel]
                                 (202) 626-5801 [fax]
                                 mrochon@milchev.com [email]

                                 *Counsel for Defendants the Palestinian Authority and the*
                                 *Palestine Liberation Organization*

1435781.1

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 30th day of June, 2014, a true and genuine copy of the

foregoing was filed by ECF, which automatically provided service to all ECF counsel, including

the following:

> Robert J. Tolchin, Esq.
> The Berkman Law Office, LLC
> 111 Livingston Street – Suite 1928
> Brooklyn, NY 11201
> (718) 855-3627
> E-mail:  rtolchin@berkmanlaw.com
>
> Kent A. Yalowitz
> Philip W. Horton
> Arnold & Porter LLP
> 399 Park Avenue
> New York, NY 10022
> (212) 715-1000
> Email:  Kent.Yalowitz@aporter.com

> /s/ Michael J. Satin
> Michael J. Satin