UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

MARK I. SOKOLOW, *et al.*,

                Plaintiffs,

vs.

THE PALESTINE LIBERATION
ORGANIZATION, *et al.*,

                Defendants.

No. 04 Civ. 00397 (GBD) (RLE)

# MEMORANDUM IN SUPPORT OF
# PLAINTIFFS' MOTION FOR AN ANONYMOUS JURY

ARNOLD & PORTER LLP
399 Park Avenue
New York, NY  10022-4690
(212) 715-1113 [tel]
(212) 715-1399 [fax]

*Counsel for Plaintiffs*

July 2, 2014

## PRELIMINARY STATEMENT

Plaintiffs respectfully ask the Court to empanel an anonymous and semi-sequestered jury. That is, plaintiffs request that (1) the names, addresses, and workplaces of members of the *venire* and *petit* juries remain undisclosed; (2) jurors be kept together during recesses and taken to or provided lunch as a group each day during trial; and (3) jurors be escorted to and from the courthouse each day during trial in a manner to be arranged by the United States Marshals Service.

These protections are routinely given to juries in high-profile terrorism cases—in this Circuit and elsewhere. In such cases, jurors are faced with evidence of gruesome acts targeting innocent civilians and they find themselves the subject of media publicity that, absent protections, would broadcast their likenesses and identities around the world. Courts permit jurors to remain anonymous to ensure that jurors are not intimidated and that fear for their personal safety does not affect their impartiality.

These concerns are present here. Defendants conducted a relentless campaign of terror that killed and injured dozens of Americans. The evidence will show that defendants organized and executed violent attacks in order to achieve political goals that—even today—remain contentious, unresolved and highly publicized. The substantial publicity this case is sure to attract—as well as the violent nature of the crimes at issue—warrant a grant of anonymity and partial sequestration to the jury, to protect the jurors and the integrity of the judicial process.

## FACTUAL BACKGROUND

The evidence plaintiffs intend to submit in support of their case would give reasonable jurors good reason for concern that the factual determinations they will be charged with making may have serious personal consequences—for their reputations, their ability to travel, and their safety at home and abroad.

At the heart of plaintiffs' case are seven terrorist attacks that injured and killed United States citizens and their family members.[1]  Plaintiffs will submit to the jurors evidence that those shootings and suicide bombings were part of a calculated campaign of attacks on markets, bus stops, train stations, nightclubs, and other civilian locations,[2] killing more than 400 civilians and injuring hundreds more.[3]

Jurors will review statements by twenty-one individuals convicted of the attacks—and in some, there is a promise of continued violence.  For example, at his sentencing Abdullah Barghouti, the maker of the bomb that killed five Americans in the Hebrew University terrorist attack, said: "I do not regret any of the acts that I have carried out, and the Court knows that I have taught dozens of engineers to do the work better than me.  In the future you will see cases that are ten times greater than my case.  I promise that."  Pls. Ex. 435.  Similarly, Abdel Karim Aweis, the mastermind of the March 21, 2002 bombing, said: "I am proud of the acts that I have committed and there is a just reason for my having done them . . . .  If I could have murdered more Jews, I would not hesitate."  Pls. Ex. 376.  Jurors will also evaluate documents from defendants' files that congratulate suicide bombers as "heroes" who performed their "national duty."

The jury will see anti-American invective published in media defendants control.  For example, on PA-controlled television, a member of the PA's "Religious Consultative Council"

---

[1] At this stage, the facts of the case and substantial portions of relevant evidence have been described in motion papers before this Court—most recently, and most completely, in the plaintiffs' memorandum in opposition to defendants' motion for summary judgment and accompanying Rule 56.1 statement of material facts.

[2] Robert Pape, Dying to Win:  The Strategic Logic of Suicide Terrorism (2006), Pls.' Ex. 503.

[3] B'Tselem, Israeli Information Center for Human Rights in the Occupied Territories, Statistics: Fatalities before Operation "Cast Lead," *available at* http://www.btselem.org/statistics/fatalities/before-cast-lead/by-date-of-event.

called on Palestinians to "[h]ave no mercy on the Jews anywhere in any country: 'Fight them wherever you are, wherever you meet them—kill them.' Wherever you are—kill those Jews and those Americans who are like them and those who stand with them. They are all together against the Arabs and the Muslims." Pls.' Ex. 644. Jurors will review political messages in publications that were approved and disseminated by the defendants, glorifying terrorist acts against the United States. On September 11, 2001, a newspaper controlled by defendants published an op-ed piece saying: "The martyrdom seekers [*i.e.*, the September 11 attackers] are the finest successors of the finest predecessors. These martyrdom seekers are the salt of the earth and the engines of history . . . . They are more honorable than us all . . . ." Pls. Tr. Ex. 1074. A year later, on September 11, 2002, this same PA-mouthpiece newspaper printed a political cartoon depicting the date "September 11" as two legs chasing Uncle Sam, who is running in terror. Another political cartoon in the PA's newspaper depicted Osama Bin Laden smiling and making a "V for Victory" sign on his right hand—with the "V" depicting the smoking twin towers. Pls. Exs. 1072, 1073. *See* 56.1 Stmt., Part II ¶¶ 50-54, 57-60.

      The evidence will also include extensive documentation showing that the defendants glorify and support terrorists long after they have been convicted of crimes. Dozens, if not hundreds, of the terrorists who perpetrated terrorist attacks during the Al Aqsa Intifada were members of the PA's security and police forces, including perpetrators of the seven attacks. Jurors will hear that, after being convicted of mass murder for their roles in terrorist attacks, these individuals ███████████████████████████████████████████████, and that the defendants ████████████████████████████████████ apparently considering ███████████████████████. Even terrorists who █████ █████████████████ are rewarded and praised—they are proclaimed national heroes,

3

their ███████████████████████████████, and those who are released receive massive public PA/PLO-sponsored celebrations.

This evidence may cause jurors concern for their own personal safety—all the more so, since this is not a case in which jurors could have any confidence that their findings would go unnoticed. Media outlets are particularly attuned to the status of relations among defendants, Israel, and the United States—especially where issues of terrorism are concerned. In this regard, we expect that both the trial and the outcome of this case will be widely reported, and jurors might rightly be worried that their roles in making factual determinations will be the subject of international scrutiny.

## **ARGUMENT**

A district court has discretion to empanel an anonymous jury "upon (a) concluding that there is strong reason to believe the jury needs protection, and (b) taking reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected." *United States v. Paccione*, 949 F.2d 1183, 1192 (2d Cir. 1991); *see also United States v. Kadir*, 718 F.3d 115, 120-21 (2d Cir. 2013); *United States v. Stewart*, 590 F.3d 93, 124 (2d Cir. 2009); *United States v. Gotti*, 459 F.3d 296, 345 (2d Cir. 2006); *United States v. Thai*, 29 F.3d 785, 800-01 (2d Cir. 1994).

Congress has confirmed the Court's authority to grant anonymity to a jury in "*any case where the interests of justice so require.*" 28 U.S.C. § 1863(b)(7) (emphasis supplied); *see also* Amended Jury Plan of the U.S. District Court for the Southern District of New York (February 13, 2009). Thus, in considering protections for civil jurors, courts apply the same standards as are applied in criminal cases. *See United States v. 77 East 3rd Street, N.Y., N.Y.*, 849 F. Supp. 876, 878-80 (S.D.N.Y. 1994) (Sotomayer, J.) (anonymous jury impaneled in forfeiture hearing

4

for the Hell's Angels clubhouse based upon defendants' threats of violence); *see also Gibson v. Brooks*, 175 F. App'x. 491 (2d Cir. 2006) (district court conducted retrial with new jury operating under anonymity conditions, after first jury could not return a fair verdict due to fears that they might become targets of violent reprisal).  In *77 East 3rd Street*, the court explained that "[t]he gravity of the consequences to individuals affected and their potential for retaliatory violence, rather than the nature of the action, should control the inquiry."  849 F. Supp. at 879.

In reviewing anonymous jury decisions in terrorism cases, the Second Circuit generally considers the nature of the claims in the case, the "reasonable likelihood that the pervasive issue of terrorism would raise in the jurors' minds a fear for their individual safety," the existence of widespread publicity, and the safeguards imposed by the trial court to guard against prejudice to the defendants.  *Stewart*, 590 F.3d at 125 (charges included terrorist conspiracy to murder and material support for terrorism, leading to the "reasonable likelihood that the pervasive issue of terrorism would raise in the jurors' minds a fear for their individual safety," with widespread pretrial publicity about the case); *Kadir*, 718 F.3d at 120-21 (defendants charged with plotting to blow up oil pipelines and jet fuel tanks led trial court to reasonably conclude that "jurors would be fearful if their identities were revealed to these defendants," where there was extensive media coverage of the case).

By these standards, an anonymous jury is both necessary and appropriate in this case.  *First*, the jury will have before it evidence that the defendants were ultimately responsible for the organization and commission of extremely serious, and violent, crimes against civilians.  *Second*, there is a "reasonable likelihood that the pervasive issue of terrorism would raise in the jurors' minds a fear for their individual safety."  *Stewart*, 590 F.3d at 125.  *Third*, in view of the divisive political issues in the case (relating to a long-standing conflict in the Middle East) and explosive

5

evidence that the Palestinian government itself organized a terrorist campaign, this case is sure to attract extensive media coverage. *Finally*, through use of standard instructions, the Court can eliminate any arguable prejudice to the defendants.

I. **THE CHARGES ARE EXTREMELY SERIOUS AND INVOLVE CRIMES OF VIOLENCE**

The seriousness of the claims here militates strongly in favor of an anonymous jury. Defendants are accused of inciting, conducting, and ratifying a series of terrorist attacks over four years—attacks that claimed the lives of hundreds of civilians and injured thousands more. The jurors will consider multiple violent predicate crimes—including murder (18 U.S.C. §§ 956, 2332), use of a destructive device on a mass transportation vehicle (18 U.S.C. §§ 1992, 2332f), bombing (18 U.S.C. §§ 832, 2332a, 2332f), and conspiracy (18 U.S.C. § 371).

In this case alone, defendants are responsible for seven terrorist attacks that resulted in the deaths of six Americans and the injuries of dozens of others. And the jury will hear evidence that defendants organized indiscriminate and sustained violent acts against civilians even beyond those seven attacks, while expressing virulently anti-Semitic and anti-American views.

Some of defendants' witnesses are themselves convicted terrorists, and the jury will see evidence of their terrorist activities and threatening rhetoric as well. For instance, defense witness Jibreen Al-Bakri has been arrested 17 times. At the funeral for a Palestinian terrorist who shot and killed three high school students, Al-Bakri stated: "These are heroes and they defend their cause, and they have a special place in the heart of the Palestinian people. Therefore they are honored as heroes should be honored."[4]

---

[4] Palestinian Media Watch, PA Official Glorifies Killer of 3 Teens (Al Quds TV, Feb. 12, 2004), *available at* http://palwatch.org/main.aspx?fi=458&fld_id=458&doc_id=10682.

6

The stakes for these defendants here are extremely high. Plaintiffs seek a substantial judgment, which the defendants have argued could impact "the PA's very stability." DE 408.

Terror charges have led courts in this Circuit to empanel anonymous juries repeatedly. *E.g.*, *Stewart*, 590 F.3d at 125; *Kadir*, 718 F.3d at 120-21; *United States v. Medunjanin*, No. 10-CR-19 (RJD) (E.D.N.Y. Feb. 22, 2010) (DE 173); *United States v. Sarachandran*, No. 06-CR-615 (RJD) (E.D.N.Y. July 31, 2008) (DE 129); *United States v. Rahman*, 93-CR-181 (MBM) (S.D.N.Y. Nov. 21, 1994) (DE 367).

## II. AN ANONYMOUS JURY WILL MITIGATE RISK TO THE JUDICIAL PROCESS

Given the nature of the charges in this case, and evidence that would make any reasonable jurors concerned for their own personal safety, an anonymous jury is necessary to protect the judicial process. The court cannot expect the jurors to "'take their chances' on what might happen to them as a result of a guilty verdict." *E.g.*, *United States v. Thomas*, 757 F.2d 1359, 1364 (2d Cir. 1985) (noting that "even a general fear of retaliation could well affect the jury's ability to render a fair and impartial verdict"). Rather, the Court can ensure a verdict that is untainted by the jurors' fear for their own personal safety by providing for juror anonymity and partial sequestration.

As described above, jurors in this case will face evidence that:

- Defendants organized brutal acts of violence against innocent civilians;
- The violence was undertaken for political purposes;
- Perpetrators of the attacks forecast—even promised—further violence;
- Defendants specifically glorified and incited terrorist acts against Americans; and
- Dozens of employees and officers within the defendants' security and police apparatuses have been convicted of acts of terrorism.

7

There can be little question that such evidence creates a "reasonable likelihood that the pervasive issue of terrorism would raise in the jurors' minds a fear for their individual safety." *Stewart*, 590 F.3d at 125.

## III. TRIAL PUBLICITY CAN BE EXPECTED

Defendants have sought to litigate this case in secret and, since the initial complaint was filed in 2004, defendants have fought to keep critical evidence and court filings under seal. Their ardent desire to keep inculpatory evidence confidential is an obvious acknowledgment of how much publicity this case is likely to garner.

Indeed, the facts and claims in this case are directly connected to issues that have been of intense interest in the U.S. and international media for many decades. The legitimacy of defendants' political aspirations and the violent methods they use to achieve them are the subject of nearly daily press in the United States and around the world. Terrorism in the Middle East is a regular focus of news organizations, and the continuation of Palestinian terror—and the special resonance it can have in New York—was underscored just last week with the discovery of the bodies of three teen-aged boys whose kidnapping earlier this month was heavily covered by the world press. One of the boys was an American citizen with family in Brooklyn, a short ride from this courthouse.[5] The government of Israel has attributed the murders to Hamas, which collaborated with the defendants in the Hebrew University bombing at issue here—and which recently joined a "unity government," hand-in-hand with PLO and PA incumbents. The status of relations between Israel and defendants is an ever-present political issue. Even the individuals and the specific attacks in this case have been the subject of media attention. Thus, as this case

---

[5] *See, e.g.*, Jodi Rudoren and Isabel Kershner, *Israel's Search for 3 Teenagers Ends in Grief*, N.Y. Times, June 30, 2014 at http://nyti.ms/1mAHPse.

8

moves toward trial, the Court may reasonably anticipate that the case will be the subject of intense press scrutiny, as have other cases in this District concerning terrorism.

The inevitable media coverage of this case also weighs in favor of an anonymous jury. *See, e.g.*, *United States v. Scala*, 405 F. Supp. 2d 450, 452 (S.D.N.Y. 2005) ("Extensive pretrial publicity in cases involving allegations of violent conduct may justify empaneling an anonymous jury.") (citing *Thai*, 29 F.3d at 801); *see also United States v. Barnes*, 604 F.2d 121, 133-43 (2d Cir. 1979). According to the Second Circuit, it is important to shield jurors who are sitting on a highly publicized trial from exposure "to inappropriate contacts that could compromise the trial." *E.g.*, *United States v. Paccione*, 949 F.2d 1183, 1193 (2d Cir. 1991). This is because "the potential for juror harassment is increased" in an "emotionally-charged atmosphere." *United States v. Koubriti*, 252 F. Supp. 2d 418, 422 (E.D. Mich. 2003). In *United States v. Barnes*, for instance, the Second Circuit upheld the use of an anonymous jury, explaining that "in a case that generated as much pretrial publicity as [*Barnes*] and in which allegations of dangerous and unscrupulous conduct abounded, precaution was best taken so that fears would not become realities." 604 F.2d at 141. "If 'the anonymous juror feels less pressure' as a result of anonymity, … this is as it should be a factor contributing to his impartiality." *Id*. at 140-41.

Because anonymity would be useless if jurors were permitted to interact freely with the public in the courthouse during recesses and at the beginning and end of each trial day, the jurors should be kept together during recesses, taken to or provided lunch as a group, and escorted to and from the courthouse in a manner designated by the Marshals Service. *See*, *e.g*., *United States v. Maldonado-Rivera*, 922 F.2d 934, 967 (2d Cir. 1990).

### IV.  AN ANONYMOUS JURY WILL NOT PREJUDICE THE DEFENDANTS

"[S]o long as the court conducts a careful *voir dire* designed to uncover any bias as to the

issues or the defendants and takes care to give the jurors a plausible and non-prejudicial reason for not disclosing their identities," the defendants cannot claim any prejudice from an anonymous and semi-sequestered jury. *United States v. Aulicino*, 44 F.3d 1102, 1116 (2d Cir. 1995); *see also Kadir*, 718 F.3d at 120-21; *Thai*, 29 F.3d at 801.

The Second Circuit has provided ample guidance to ensure that jurors are given reasonable explanations for anonymity—including instructions explaining that "'an anonymous jury is not an unusual practice and has been followed in many cases in the Federal Court'" and that "'[a]nonymity will ward off curiosity that might infringe on juror's privacy.'" *See, e.g.*, *Thai*, 29 F.3d at 801; *Paccione*, 949 F.2d at 1193 (anonymity explained as protection against pressures from the media); *see also Kadir*, 718 F.3d at 120-21 (same); *United States v. Tutino*, 883 F.2d 1125, 1133 (2d Cir. 1989) (jury instructed: "[i]t is a common practice followed in many cases in Federal court to keep the names and identities of the jurors in confidence. This is in no way unusual."). The Court may also tell jurors that "anonymity would protect the jurors' 'rights of privacy' and assist them 'in discharging [their] responsibly as jurors independently, fairly and impartially.'" *Kadir*, 718 F.3d at 120-21. Such prophylactic instructions, if employed by the Court, will foreclose any possible prejudice to the defendants.

## CONCLUSION

For the foregoing reasons, plaintiffs respectfully request that the Court order that the names, addresses and workplaces of members of both the *venire* and *petit* juries not be revealed, that the jurors be kept together during recesses and taken to or provided lunch as a group each day during trial, and that they be escorted to and from the courthouse each day during trial in a manner to be arranged by the United States Marshals Service.

Dated: New York, New York
July 2, 2014

**ARNOLD & PORTER LLP**

By: _____
Kent A. Yalowitz
 *KENT.YALOWITZ@APORTER.COM*
Philip W. Horton
 *PHILIP.HORTON@APORTER.COM*
Sara K. Pildis
 *SARA.PILDIS@APORTER.COM*
Ken L. Hashimoto
 *KEN.HASHIMOTO@APORTER.COM*
Carmela T. Romeo
 *CARMELA.ROMEO@APORTER.COM*
Tal R. Machnes
 *TAL.MACHNES@APORTER.COM*

399 Park Avenue
New York, New York 10022
(212) 715-1000