IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| MARK I. SOKOLOW, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 04cv397 (GBD) (RLE) |
| THE PALESTINE LIBERATION ORGANIZATION, *et al.*, | ) ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION FOR SEPARATE TRIALS AND FOR BIFURCATION OF
THE LIABILITY AND DAMAGES PHASES OF THE TRIAL**


Mark J. Rochon
Laura G. Ferguson
Brian A. Hill
Michael J. Satin
MILLER & CHEVALIER CHARTERED
655 15th Street, NW, Suite 900
Washington D.C. 20005-6701
(202) 626-5800 (tel)
(202) 626-5801(fax)

*Counsel for Defendants the Palestinian Authority
and the Palestine Liberation Organization*

July 9, 2014

1436985.1

**INTRODUCTION**

Plaintiffs have brought a single lawsuit involving seven separate attacks. The attacks did not occur on the same day, month, or even year. They did not occur in the same location. They were not perpetrated by the same individuals or even by members of the same group. They did not involve the same victims. Therefore, the evidence for each attack varies considerably, and indeed, the theories of liability vary across the attacks as well. As a result, a single trial of all of the incidents will be lengthy and will thereby preclude many individuals from being able to serve as jurors. Plaintiffs estimate that it will last 10 to 12 weeks. A single trial will also be confusing to the jury. Plaintiffs have made allegations against dozens of Palestinians in the attacks. Many of them have the same or similar sounding Palestinian names, yet none of them will testify at trial and keeping them straight – and avoiding a general castigation of "Palestinians" – will present an unnecessary challenge to jurors. But above all, a single trial will cause unfair prejudice to Defendants. The risk of evidence conflation and spillover prejudice from one attack is simply too great. Thus, the Court should order separate trials, pursuant to Federal Rule of Civil Procedure 42(b).

Regardless of whether the Court orders separate trials for each attack, the Court should bifurcate the liability and damages phases of the trial. Bifurcation is warranted for a number of reasons. First, bifurcation is efficient. Litigating the issue of liability first could obviate the need to litigate the issue of damages. If the jury does not find Defendants liable for one or more of the attacks, the jury would not have to hear any evidence on damages related to those attacks. Second, bifurcation will enhance the jury's understanding of the facts and issues in each phase. Each phase has complicated facts and issues. Bifurcation will allow the jury to focus on and resolve each issue in turn. Third, bifurcation will protect Defendants from prejudice. Many of

1

the plaintiffs were victims of violent attacks and the jury understandably will have tremendous sympathy for them.  Allowing the jury to hear this evidence before they render a verdict on liability will cause prejudice to Defendants.  The jury should not hear such testimony before they render a verdict on liability.  Finally, Plaintiffs will not be prejudiced by bifurcation.

## LEGAL STANDARDS

Federal Rule of Civil Procedure 42(b) permits a trial court to order separate trials on any issues or claims "[f]or convenience, to avoid prejudice, or to expedite and economize."  Fed. R. Civ. P. 42(b). "[B]ifurcation requires the presence of only one of these conditions."  *Ricciuti v. New York City Transit Authority*, 796 F. Supp. 84, 86 (S.D.N.Y. 2008).  The decision to bifurcate a trial rests "firmly within the discretion of the trial court."  *Katsaros v. Cody*, 744 F.2d 270, 278 (2d Cir. 1984).  "As one commentator has put it, 'Rule 42(b) is sweeping in its terms and allows the district court, in its discretion, to grant a separate trial of any kind of issue in any kind of case.'"  *Chevron Corp. v. Donziger*, 800 F. Supp. 2d 484, 491 (S.D.N.Y. 2011) (quoting 9A Charles Alan Wright et al., *Federal Practice and Procedure: Civil 3d* § 2398 at 126 (2008)); *see also Abu Dhabi Commercial Bank v. Morgan Stanley*, 2013 U.S. Dist. LEXIS 35806 at *5 (S.D.N.Y. Feb. 25, 2013) ("The district court has considerable discretion in determining whether and how to bifurcate a trial.").

"The application of Rule 42(b) does not lend itself to a bright-line test but, rather, requires case-by-case analysis."  *Dallas v. Goldberg*, 143 F. Supp. 2d 312, 315 (S.D.N.Y. 2001). In deciding whether to bifurcate, courts in this jurisdiction consider a number of issues, including whether (1) the issues sought to be bifurcated are significantly different from one another; (2) the bifurcated issues require different evidentiary proof; (3) the party opposing bifurcation would be prejudiced if the motion is granted; and (4) the party requesting bifurcation would be prejudiced

if the motion is not granted. *Gafney v. Department of Information Technology and Communications*, 579 F. Supp. 2d 455, 459 (S.D.N.Y. 2008); *Lewis v. Triborough Bridge and Tunnel Authority*, 2000 U.S. Dist. LEXIS 4982 at *4-5 (S.D.N.Y. Apr. 19, 2000). Bifurcation is appropriate where the evidence offered on two different issues will be distinct, *see, e.g., Katsaros v. Cody*, 744 F.2d 270, 278 (2d Cir. 1984) (affirming bifurcation "because the two phases involved different types of evidence"), or where litigation of one issue may obviate the need to try another issue, *see Union Carbide Corp. v. Montell N.V.*, 28 F. Supp. 2d 833, 837 (S.D.N.Y. 1998) (citing M*orse/Diesel, Inc.. v. Fidelity and Deposit Co.*, 763 F. Supp.28, 35 (S.D.N.Y. 1991)). Bifurcation is also appropriate where it "will lessen or eliminate the likelihood of juror confusion," *Crown Cork & Seal Co., Inc. v. Credit Suisse*, 288 F.R.D. 335, 337 (S.D.N.Y. 2013) (internal quotation marks omitted), or where it "would enhance juror comprehension of the issues presented in the case," *Abu Dhabi Commercial Bank*, 2013 U.S. Dist. LEXIS at *6.

## ARGUMENT

### I.  THE COURT SHOULD ORDER A SEPARATE TRIAL FOR EACH OF THE SEVEN ATTACKS

The Court should order separate trials to prevent unfair prejudice to Defendants. Courts have long recognized the prejudice accruing to a defendant facing multiple offenses at a joint trial. In the leading case of *United States v. Lotsch*, 102 F.2d 35 (2d Cir. 1939), Judge Learned Hand said, "There is indeed always a danger when several crimes are tried together, that the jury may use the evidence cumulatively; that is, that, although so much as would be admissible upon any one of the charges might not have persuaded them of the accused's guilt, the sum of it will convince them as to all." *Id.* at 36. The prejudice is especially great when the offenses are similar. *See, e.g., United States v. Johnson*, 820 F.2d 1065, 1071 (9th Cir. 1987) ("joinder of

3

counts similar in nature . . . creates a greater danger of prejudice than the joinder . . . of dissimilar charges"). As the D.C. Circuit explained in the seminal case of *Drew v. United States*, 331 F.2d 85 (D.C. Cir. 1964):

> (1) [the defendant] may become embarrassed or confounded in presenting separate defenses; (2) the jury may use the evidence of one of the crimes charged to infer a criminal disposition on the part of the defendant from which is found his guilt of the other crime or crimes charged; or (3) the jury may cumulate the evidence of the various crimes charged and find guilt when, if considerably separately, it would not so find. A less tangible, but perhaps equally persuasive, element of prejudice may reside in a latent feeling of hostility engendered by the charging of several crimes as distinct from only one.

*Id.* at 88. The court in *Drew* therefore held that severance of offenses that are of the "same or similar character" is required unless evidence of the joined offenses would be mutually admissible in separate trials, or if not, unless the evidence of each offense is sufficiently "simple and distinct" to mitigate the prejudice created by joinder. *Id.* at 90-92; *see also* Fed. R. Cr. P. 14(a) (providing relief from prejudicial joinder of offenses). The Second Circuit explicitly endorsed this rule in *United States v. Halper*, 590 F.2d 422, 431 (2d Cir. 1978). *See also United States v. Werner*, 620 F.2d 922, 927 (2d Cir. 1980).

    To be sure, this is a civil lawsuit. But Plaintiffs' federal law Anti-Terrorism Act claim, 18 U.S.C. § 2333, has a predicate criminal act requirement, and Plaintiffs have alleged that Defendants have violated numerous federal criminal statutes. In any event, both Federal Rule of Civil Procedure 42(b) and Federal Rule of Criminal Procedure 14(a) address the same concern: prejudiced caused by joinder. In fact, courts in this jurisdiction have looked to criminal cases for guidance in assessing prejudice to defendants from joint trials in civil cases. *See, e.g., In re Blech Securities Litig.*, 2003 U.S. Dist. LEXIS 4650, at *39 (S.D.N.Y. Mar. 27, 2003) (stating in in a consolidated securities action that "[i]n the criminal context, courts have recognized that

4

guilt by association and spillover prejudice is less likely when there is a 'reasonable number of defendants.'"); *Deskovic v. City of Peekskill*, 673 F. Supp. 2d 154, 171 (S.D.N.Y. 2009) (stating in a civil rights action that "there is a risk that trying all of Plaintiff's claims in a single trial could lead to 'guilt by association and spillover prejudice.'") (quoting *In re Blech Securities Litig.*, 2003 U.S. Dist. LEXIS at *39). Thus, the law of severance in the criminal context is an appropriate and useful guide to assessing prejudice here.

There is no question that a single trial involving seven attacks would cause tremendous prejudice to Defendants. The instant case easily passes the test for prejudice established by the D.C. Circuit in *Drew* and endorsed by the Second Circuit in *Halper*. First, the seven attacks are similar in nature. *See Werner*, 620 F.2d at 926 (defining "similar" as "early corresponding; resembling in many respects; somewhat alike; having a general likeness"). They were all violent attacks allegedly perpetrated by Palestinian militants against civilians during the Second Intifada. Plaintiffs have alleged that each of the attacks involved at least one PA security employee. Second, most of the evidence for each attack would not be admissible at a separate trial for any of the other attacks. For example, if the January 8, 2001 shooting attack involving the Guettas were tried separately from the January 27, 2002 attack involving the Sokolows, Plaintiffs would not call Mark Sokolow to testify at the trial about the January 8, 2001 attack and they would not call Varda Guetta to testify at the trial about the January 27, 2002 attack. Indeed, Plaintiffs have not argued that Defendants' liability for one attack proves their liability for another attack. Finally, the evidence for each attack is not "simple and distinct." Plaintiffs have *seven* liability expert witnesses in their case-in-chief. They have multiple (and by no means simple) theories of liability – vicarious liability, ratification, incitement, and various forms of material support – and Israeli as well as federal law claims. *See* Proposed Joint Pretrial Order ("JPTO") at 9-14. With

the possible exception of Varda Guetta in the January 8, 2001 attack, they have no percipient witnesses for the attacks. The near absence of fact witnesses will increase the risk of jury confusion, making it difficult to identify which evidence is associated with which attack.

In addition, it will be extremely difficult for the jury to keep straight which perpetrators allegedly committed which attack. Plaintiffs have implicated dozens of Palestinian militants in the attacks, including:

1. Fawzi Murar (January 8, 2001 attack) (Plaintiffs' Rule 56. 1 Response at 28);
2. Nasser Aweis (January 22, 2002 attack) (*id.* at 31)
3. Ahmed Barghouti (January 22, 2002 attack) (*id.*)
4. Majed al-Masri (January 22, 2002 attack) (*id.*)
5. Mohamed Mousleh (January 22, 2002 attack) (*id.*)
6. Ibrahim Abdel Hai (January 22, 2002 attack) (*id.*)
7. Sa'id Ramadan (January 22, 2002 attack) (*id.*)
8. Feras Ghanem (January 22, 2002 attack) (*id.* at 37)
9. Mohammed Sami Abdullah (January 22, 2002 attack (*id.*)
10. Wafa Idris (January 27, 2002 attack) (*id.* at 38)
11. Kamal Al Abed (aka Abu Talal) (January 27, 2002 attack) (*id.*)
12. Munzar Noor (January 27, 2002 attack) (*id.*)
13. Mohammed Hashaika (March 21, 2002 attack) (*id.* at 41)
14. Abdel Karim Aweis (March 21, 2002 attack) (*id.* at 42)
15. Marwan Barghouti (March 21, 2002 attack) (*id.* at 43)
16. Hassan Al Sheikh (March 21, 2002 attack) (*id.*)
17. Nasser Shawish (March 21, 2002 attack) (*id.* at 44)
18. Kahira Sa'adi (March 21, 2002 attack) (*id.*)
19. Sana'a Shehadeh (March 21, 2002 attack) (*id.*)
20. Naef Abu Sharkh (June 19, 2002 attack) (*id.* at 46)
21. Mazen Freitakh (June 19, 2002 attack) (*id.*)
22. Sa'id Awada (June 19, 2002 attack) (*id.*)
23. Abdullah Barghouti (July 31, 2002 attack) (*id.* at 48)
24. Bilal Barghouti (July 31, 2002 attack) (*id.* at 49)
25. Marwan Barghouti (July 31, 2002 attack) (*id.* at 50)
26. Ahmed Barghouti (July 31, 2002 attack) (*id.*)
27. Hassan Yousef (July 31, 2002 attack) (*id.*)
28. Abut Ali Tarifi (July 31, 2002 attack) (*id.*)
29. Aiman Halawa (July 31, 2002 attack) (*id.*)
30. Jibril Rajoub (July 31, 2002 attack) (*id.* at 51)
31. Abu Ali Mustafa (July 31, 2002 attack) (*id.* at 51)
32. Ibrahim Hamed (July 31, 2002 attack) (*id.* at 52)
33. Sid Abed Karim Khader Sheikh-Qassam (July 31, 2002 attack) (*id.* at 53)
34. Mohamed Arman (July 31, 2002 attack) (*id.* at 54)

1436985.1

      35. Walid Anjas (July 31, 2002 attack) (*id.*)
      36. Wael Qassam (July 31, 2002 attack) (*id.*)
      37. Mohamed Odeh (July 31, 2002 attack) (*id.* at 55)
      38. Abdul Rahman Maqdad (January 29, 2004 attack) (*id.* at 58)
      39. Ahmed Salah (January 29, 2004 attack) (*id.*)
      40. Ali Ja'ara (January 29, 2004 attack) (*id.*)
      41. Hilmi Hamash (January 29, 2004 attack) (*id.* at 59)
      42. Ali Abu Haliel (January 29, 2004 attack) (*id.* at 64)
      43. Ahmed Sa'ad (January 29, 2004 attack) (*id.*)
      44. Mohamed Ma'ali (January 29, 2004) (*id.*)

This list includes six Mohameds or Mohammeds (Mousleh, Abdullah, Hashaika, Arman, Odeh, and Ma'ali), four Barghoutis (Ahmed, Abdullah, Marwan, and Bilal), three Ahmeds (Barghouti, Salah, and Sa'ad), two Nassers (Aweis and Shawish), two Alis (Ja'ara and Halil), two Aweises (Nasser and Abdel Karim), and an Abdel (Karim Aweis), an Abut (Ali Tarifi), an Abu (Ali Mustafa), and an Abdul (Rahman Maqdad).  None of these individuals will testify at trial.  Thus, the jury will not be able to rely on in-court observations of their faces, builds, voices, demeanors, or any other characteristics that would help them distinguish one individual from the next. Any doubt about whether the jury would be able to keep these names straight was confirmed when Plaintiffs' counsel mistakenly referred to Nasser *Aweis* (of the January 22, 2002 attack) as Nasser *Shawish* (of the March 21, 2002 attack) in their Rule 56.1 Response.  *See id.* at 23.

      Still, it is not enough for the jury to do what Plaintiffs' counsel cannot, namely, to keep the perpetrators and the attacks straight.  The jury's job is not simply to determine whether certain perpetrators committed certain attacks.  None of these individuals is on trial here.  Rather, if the jury first finds that certain perpetrators committed a particular attack, the jury must then decide whether Defendants are liable for that attack.  Plaintiffs' principal theory of liability is vicarious liability.  Thus, for each attack for which Plaintiffs allege vicarious liability, the jury will need to ascertain (1) who committed that attack, (2) what was their relationship to the PA and the PLO at the time of the attack, and (3) were they acting within the scope of their

7

1436985.1

employment at the time of the attack. The first two questions will be very difficult for the jury to determine in a joint trial because the alleged perpetrators and their relationship to the PA and the PLO are different in each case. Meanwhile, Plaintiffs have little or no evidence that any of the alleged perpetrators were acting within the scope of their employment at the time of the attacks. Yet, the total number of PA employees involved in the seven attacks is likely to lead the jury to conclude – wrongly and improperly – that they must have been acting within the scope of their employment. This is exactly the kind of improper accumulation of evidence that Judge Hand identified decades ago.

To make matters worse, Plaintiffs have different theories of liability for different attacks. For example, Plaintiffs' theory for the January 8, 2001 attack is that Defendants are vicariously liable for the acts of Fawzi Murar, an alleged PA security officer. DE 545 at 6-7. Their principal theory for the July 31, 2002 attack, by contrast, is that Defendants provided material support to Hamas, which perpetrated the attack. *See id.* at 10-12; *see also* Eviatar Report at 4-16. Thus, the jury will have to understand and apply the right theory to the right attack. In addition, the jury will have to determine whether Defendants acted with the requisite state of mind and whether their actions proximately caused the plaintiffs' injuries. The jury would also have to render a verdict for Plaintiffs non-federal claims arising out of each attack, including wrongful death, battery, assault, loss of consortium and solatium, negligence, intentional infliction of emotional distress, and negligent infliction of emotional distress. JPTO at 12-14. Finally, the jury will hear expert testimony on a range of issues that jurors in this jurisdiction may have little or no familiarity with, including the causes of the Second Intifada, Palestinian politics and policies during the Second Intifada, and the quality of due process in the Israeli military courts.

8

<017>
<018>
<019>
<020>

<021>

In the end, a single trial involving seven separate attacks will leave the jury confused about all but one thing: Defendants are foreign entities from the Middle East who are charged with responsibility for terrorist attacks that resulted in numerous violent deaths and other injuries to innocent civilians, including Americans. They will preside over a trial when the alleged murder of Israeli teenagers by Palestinian extremists is front-page news in mainstream American publications. *See e.g.,* New York Times as of July 8, 2014. They will deliberate at a time when Americans hold a mere 15% favorability opinion of the Palestinian Authority, which is only slightly higher than that of Syria, Pakistan, North Korea, and Iran. *See* http://www.gallup.com/poll/161159/americans-least-favorable-toward-iran.aspx. The Court should therefore order separate trials so that Defendants can receive a fair trial. And the Court should order separate trials to avoid juror confusion and enhance their understanding of the issues in this case. *See Crown Cork & Seal Co.,* 288 F.R.D. at 337; *Abu Dhabi Commercial Bank*, 2013 U.S. Dist. LEXIS 35806 at *6.

## II. THE COURT SHOULD BIFURCATE THE LIABILITY AND DAMAGES PHASES OF THE TRIAL

Federal courts in this and other jurisdictions have frequently bifurcated the liability and damages phases of a trial. *See, e.g., Mandal v. City of New York*, 2006 U.S. Dist. LEXIS 83891 at *5 (S.D.N.Y. Nov. 20, 2006); *In re Lake George Tort Claims*, 2010 U.S. Dist. LEXIS 45387 at *12 (N.D.N.Y. May 10, 2010); *Cherdak v. Stride Rite Corp.*, 396 F. Supp. 2d 602, 603 (D. Md. 2005). "'The separation of issues of liability from those relating to damages is an obvious use for Federal Rule 42(b).'" *In re Lake George Tort Claims*, 2010 U.S. Dist. LEXIS 45387 at *12 (quoting Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2390

9

(3d. ed. 2008)).  In this case, bifurcation of the liability and damages phases of the trial is warranted for a number of reasons.

First, bifurcation is more efficient than a joint trial.  The liability phase of the trial will focus on Defendants' liability for acts committed by Palestinians, while the damages phase will focus on the injuries and other damages sustained by the plaintiffs.  Litigating the issue of liability first could obviate the need to litigate the issue of damages.  *See id.*; *Mandal*, 2006 U.S. Dist. LEXIS 83891 at \*5-6; *Morse/Diesel, Inc.*, 763 F. Supp. at 35.  Should the jury find Defendants not liable for one or more of the attacks, the jury would not have to hear any evidence on damages related to those attacks.  *See Mandal*, 2006 U.S. Dist. LEXIS 83891 at \*5-6 ("In the event Defendants are found not liable in the first phase, a significant investment of time, cost and effort in trying issues related to individual damages may be avoided.").  This could be a significant time-save because there are seven separate incidents and each attack includes fact and expert witness testimony on damages.

Second, bifurcation will enhance the jury's understanding of the complex issues in this case.  As previously discussed, the liability facts and issues in this case are complicated.  So too are the damages issues.  There are 44 plaintiffs and each one has a unique claim for damages.  It will therefore aid the jury's understanding of the liability issues if they can focus on and resolve the liability issues first.  And it will aid the jury's understanding of the damages issues if they can focus on and resolve that issue separately.  Otherwise, the jury will have to hear and process both liability and damages evidence during Plaintiffs' case before doing the same during Defendants' case and again during Plaintiffs' rebuttal case.

Moreover, this case lends itself to bifurcation because the evidence related to liability is separate and distinct from the evidence related to damages.  *See Crown Cork & Seal Co.*, 288

F.R.D. at 338 ("Bifurcation may be appropriate where 'the two phases involve[] different types of evidence.'") (quoting *Katsaros*, 744 F.2d at 278).  Of the 44 plaintiffs in the case, only one, Varda Guetta, has evidence that is arguably probative of Defendants' liability.[1]  The remaining plaintiffs cannot provide any evidence about who committed the attack or whether Defendants are liable for it.  Similarly, each expert witness addresses liability issues or damages issues, but not both.  Thus, the parties can easily separate the evidence for liability from the evidence for damages.  In the end, bifurcation will promote the goals of Rule 42(b) by "easing the burden on the jury in a long, highly complex trial by separating it into phases." *Abu Dhabi Commercial Bank*, 2013 U.S. Dist. LEXIS 35806 at *8.

Third, bifurcation will protect Defendants from unfair prejudice.  In *Lake George Tort Claims*, the district court bifurcated the liability and damages phases of a tort case to avoid undue prejudice to defendants.  2010 U.S. Dist. LEXIS 45387 at *13.  The court noted that "evidence concerning the several drownings, including testimony from persons who witnessed the drownings . . . may arouse juror sympathy and frustrate the jury's deliberation on complex factual issues regarding the cause of the capsizing of the [boat]." *Id.* at *13-14 (internal quotation marks omitted).  Similarly, in *Zofcin v. Dean*, 144 F.R.D. 203 (S.D.N.Y. 1992), the district court bifurcated the liability and damages phases of a personal injury and wrongful death where the plaintiff "will offer detailed evidence of extreme pain and suffering, including burning flesh and screams of pain." *Id.* at 205.  As the court explained, "Courts in this jurisdiction have recognized that 'evidence of a harm to a plaintiff, regardless of the cause, may result in sympathetic jurors more concerned with compensating plaintiff for his injury than whether or not

---

[1] Defendants maintain that this evidence – Varda Guetta's alleged identification of one of the shooters 12 years after the shooting – is not admissible.  *See* DE 497 at 26-29.  But even if her identification were admissible, her testimony about damages is separate and distinct from her testimony about liability.

11

defendant is at fault.'" *Id.* (quoting *Buscemi v. Pepsico, Inc.*, 736 F. Supp. 1267, 1272 (S.D.N.Y. 1990)).

So too here, evidence concerning the physical and emotional damages sustained by the plaintiffs will arouse enormous sympathy from the jury and frustrate their deliberation on liability issues. A written description of those damages here will hardly have the impact of live testimony. In any event, below are just a few examples of the damages evidence:

- "Shayna Gould was shot in the chest, appeared dead on arrival at the hospital, was resuscitated, and underwent emergency surgery in which her left lung was removed. . . . She continues to be affected adversely psychologically and suffers from resulting chronic PTSD and anxiety. . . . [Her mother] has suffered from adjustment disorder and depression, and chronic partial PTSD disorder since her daughter was shot . . . [and] [her father and sister] have suffered significant mental and emotional trauma and pain as a result of Shayna's terror attack injuries." DE 546 at 65-66.

- "Yehonathan Bauer was placed on a ventilator and into a medically induced coma for four days. He suffered a serious head trauma and brain injury, muscle atrophy, gait abnormalities, decreased fine motor coordination, leg length discrepancy, and visual field loss. . . .Yehonathan has also suffered serious mental and psychological damages as a result of the attack." *Id.* at 68. His father, Alan Bauer, "suffered shrapnel wounds to his arm, which required surgery." *Id.* Yehonathan's mother and brothers "also suffered significant mental injuries as a result of the terrorist attack and the injuries that resulted to Alan and Yehonathan Bauer." *Id.*

- "Shaul Mandelkorn was shot, and sustained serious injuries to his elbow, abdomen, and right eye. . . . [M]any of his injuries are permanent. He suffers from resulting significant depressive and anxiety disorder symptomology and continues to suffer from partial PTSD, anxiety disorder NOS, and chronic moderate dysthymia, which affect his functioning, ambition, and direction." *Id.* at 68.

In addition to the injuries suffered by the survivors and their family, the jury will also hear about those who did not survive. They will hear that David Gritz, Benjamin Blutstein, and Janis Coulter "died violently in the Hebrew University bombing on July 31, 2002." *Id.* at 69-70. And they will hear how their families have been affected by their deaths. The jury will also hear that Stuart Scott Goldberg "died violently in a suicide bombing on January 29, 2004." *Id.* at 70. And they will hear how his family was affected by his death. *Id.* at 70-71. In sum, the damages

evidence will describe trauma to innocent civilians that are beyond any parent's worst nightmare. And though the physical injuries were sustained half-way around the world, the jury will hear about them blocks away from the worst terrorist act committed on American soil. None of this emotional evidence, however, is probative of whether Defendants are liable. Thus, the Court should not permit the jury to hear about them unless and until the jury has found Defendants liable.

Finally, Plaintiffs would not be prejudiced by bifurcation. In the event that the jury finds Defendants liable, they will have a full opportunity to present their damages evidence.

## CONCLUSION

For the reasons stated above, the Court should exclude order seven separate trials and bifurcate the liability and damages phases of the trial.


July 9, 2014                                   Respectfully Submitted,


                                            /s/ Mark J. Rochon
Mark J. Rochon
Laura G. Ferguson
Brian A. Hill
Michael J. Satin
MILLER & CHEVALIER CHARTERED
655 15th Street, NW, Suite 900
Washington, DC  20005-6701
(202) 626-5800 [tel]
(202) 626-5801 [fax]
mrochon@milchev.com [email]

*Counsel for Defendants the Palestinian Authority and the Palestine Liberation Organization*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on this 9th day of July, 2014, a true and genuine copy of the foregoing was filed by ECF, which automatically provided service to all ECF counsel, including the following:

>Robert J. Tolchin, Esq.
>The Berkman Law Office, LLC
>111 Livingston Street – Suite 1928
>Brooklyn, NY 11201
> (718) 855-3627
>E-mail:  rtolchin@berkmanlaw.com
>
>Kent A. Yalowitz
>Philip W. Horton
>Arnold & Porter LLP
>399 Park Avenue
>New York, NY 10022
>(212) 715-1000
>Email:  Kent.Yalowitz@aporter.com

>>/s/ Michael J. Satin
>>Michael J. Satin

14

1436985.1