REDACTED - PUBLICLY FILED VERSION

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

MARK I. SOKOLOW, *et al.*,

                    Plaintiffs,

    vs.

THE PALESTINE LIBERATION
ORGANIZATION, *et al.*,

                Defendants.

No. 04 Civ. 00397 (GBD) (RLE)

---

## DECLARATION OF ARIEH DAN SPITZEN

Arieh Dan Spitzen hereby declares pursuant to 28 U.S.C. § 1746, as follows:

1.      I make this declaration of my own personal knowledge.  I am fluent in Hebrew and Arabic and in English reading and comprehension.  I served in the Israel Defense Forces (the "IDF") from 1976 to 2009 (with a three-year break from 1978 to 1981), entering at the rank of Major and retiring at the rank of Colonel.

**My Professional Background**

2.      Following my graduation with honors from Jerusalem's Hebrew University in 1976, I established the Research Section of the Advisor for Arab Issues in the Military Government in the West Bank.  I served as head of the Research Section for two years.  From 1978 to 1981 served as a researcher-assistant in the Van Leer Jerusalem Institute, where I dealt with issues concerning the integration of the Arab population into all levels of Israeli society.

3.      From 1981 to 1993 I was Head of the Research Section in the office of the IDF's Advisor for Arab Affairs in the West Bank, as well as Deputy Advisor.  In these capacities I was involved in researching the socio-economic and political situation of the Palestinian population,

while focusing on political and social trends and the prevailing atmosphere. In addition, my staff and I prepared research papers, staff papers, articles, anthologies, and studies in civilian matters used by the decision-making echelons at the Ministry of Defense, the office of the Coordinator of Government Activities in the Territories ("COGAT"), and at the field level of the IDF's Central Command.

4.      From 1993 to 1995, I participated in the face-to-face negotiations of and drafting of agreements called for by the Oslo Accords including the Gaza-Jericho Agreement between Israel and the PLO, signed in 1994, and the Interim Agreement between Israel and the PLO, signed in 1995. My principal area of coverage was civil affairs, and my responsibilities required participation in and familiarity with security arrangements and other areas.

5.      The Interim Agreement reflected a desire to implement several important principles, including the creation of self-government arrangements for the Palestinian people and the PLO's adherence to its commitment to renounce the use of terrorism and to assume responsibility over all PLO elements and personnel in order to assure their compliance, prevent violations and discipline violators. A significant element of this agreement was the transfer of specified powers and responsibilities from the Israeli military government and its Civil Administration to the PA.

6.      In the Summer of 1995, I was nominated to participate in the implementation of the Interim Agreement by supervising the transfer and assumption of authority in civil spheres covered by 38 ministries from the Israeli military government's Civil Administration to the PA in the West Bank. From 1996 to 1998, I served as Supervisor, for the Israeli side, of the Regional Civil Affairs Coordination and Cooperation Committee for the West Bank. In that capacity, I worked with counterparts in the Palestinian Authority (PA) government on the

transfer of specified civil powers and responsibilities from the Israeli military government to the PA.    Some of these powers and responsibilities required close coordination with those responsible for the security function.

7.    From 1998 to 2000, I served as Department Head for Palestinian Affairs in the West Bank for COGAT.  COGAT carries out and implements civilian policy and coordinates the activities of government departments, IDF and security forces vis-à-vis the Palestinians in the West Bank and the Gaza Strip.  COGAT also leads the coordination and liaison with the Palestinian Authority and with the Palestinian population the West Bank and the Gaza Strip. From 2001 to 2009, I served as COGAT's Department Head for Palestinian Affairs in the Administered Territories (*i.e.*, the West Bank and Gaza), and as the Advisor for Palestinian Affairs for COGAT.  By virtue of these positions I became the top authority on the socio-economic civilian situation in the West Bank and Gaza and was responsible for writing hundreds of surveys and studies about civilian conditions, political and social trends, the economic atmosphere and its influence, and other diverse civilian issues connected to the civilian Palestinian realm.  My responsibilities extended into the military sphere and to activities connected with terror organizations.

8.    Since retiring from public service, I have served as an expert consultant to a number of law firms in the United States in lawsuits that have been filed by American victims of terrorism against entities that participated in terrorism or provided material support or resources to terrorists.  I also provide consulting services to a number of academic research institutions and various other entities.  I have been qualified to testify as an expert witness by Judge Weinstein in *Gill v. Arab Bank*, by Judge Irizarry in *Strauss v. Credit Lyonnais*, and by Judge Gershon in

*Linde v. Arab Bank*.  I have also appeared dozens of times in the Israeli military and civilian courts.

**Opinions Concerning the Abu al-Yaman Declaration**

9.    I have reviewed the Declaration of General Khaled Abu al-Yaman (the "Abu al-Yaman Dec.") and wish to provide the Court with information on three topics, based on my personal experience with the GIS.  Contrary to the suggestions of General Abu al-Yaman:

      1.  The GIS gathers information from outside of Area A;

      2.  The GIS maintains files in an organized and professional manner; and

      3.  It is not plausible that the IDF took the missing GIS documents.

10.    My opinions in this regard are based on my own knowledge and experience, gained by virtue of my government responsibilities and post-retirement experience.  I am very familiar with the working methods, organizational abilities, and record keeping of the PA's security forces.  While at COGAT, I coordinated directly with the GIS and maintained a close connection with GIS officers because of the GIS's need for licenses and permissions on various matters.  I have met and worked with many GIS officers, and I have seen and analyzed hundreds of pages of GIS intelligence documents, in both my past and present employment, including (among many others) the GIS documents that defendants produced to the plaintiffs in this case.

11.    Based on my knowledge and observation of the GIS, and on my review of GIS documents in this case and in other contexts, I am of the opinion that the GIS is a professional intelligence service that operates like other modern intelligence services around the world, and, indeed, that many of its agents have received training and equipment from nations around the world.

1.    **The GIS Gathers Information From Outside of Area A**

12.    ███████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████    If these statements are meant to suggest that the GIS does not

collect information about terrorists who attack outside Area A, or that the GIS does not have

such information about the terrorists of interest in this case, then they are not credible.

13.    As noted above, the Interim Agreement reflected both sides' "mutual commitment

to act, in accordance with this Agreement, immediately, efficiently and effectively against acts or

threats of terrorism, violence or incitement, whether committed by Palestinians or Israelis."  To

that end, the Interim Agreement established a system of close coordination by the Palestinian

side with the Israeli side on matters of security.  This can be seen in the language of the

document itself.  For example, Article 15 states:  "Both sides shall take all measures necessary in

order to prevent acts of terrorism, crime and hostilities directed against each other, against

individuals falling under the other's authority and against their property, and shall take legal

measures against offenders."  Article 4 of Annex I, which deals with security measures, states

that the Palestinian Police (including its "intelligence" function) would be "one integral unit"

with the responsibility, among other things, "combating terrorism and violence, and preventing

incitement to violence."  Article 2 of the Security Annex states that "the Palestinian Police will

act systematically against all expressions of violence and terror" and "will arrest and prosecute

individuals who are suspected of perpetrating acts of violence and terror." It also states that

"Both sides will…cooperate in the exchange of information and coordinate policies and

activities.  Each side shall immediately and effectively respond to the occurrence or anticipated

occurrence of an act of terrorism, violence or incitement and shall take all necessary measures to prevent such an occurrence." Article 2 of the Security Annex also states that each side shall "apprehend, investigate and prosecute perpetrators and all other persons directly or indirectly involved in acts of terrorism, violence and incitement" in the areas under its security responsibility. For the Palestinian side, this included what is known as "Area A"—the major cities in the West Bank such as Ramallah, Jenin, and Tulkarem.

14. Without question, in furtherance of the commitments and responsibilities described above, the GIS gathers information concerning the terror activities of individuals living within the boundaries of "Area A" such as possession of weapons, safe houses, explosives labs, their social connections, their connections with dangerous individuals and the like. Preparation for terror activities in "Area A" endangers not only Israeli civilians, but Palestinian people who live in "Area A" itself, where terrorists live among the population, operate explosive laboratories and maintain caches of illegal weapons in civilian buildings and heavily populated areas. The terrorists of interest in this case came from and conducted their planning and preparations in "Area A."

15. Based on my experience, as well as evidence from this and other cases, I can confirm that the GIS also collected information about the activities of terrorists and their supporters in areas under the control of Israel, such as Jerusalem and "Area C," and elsewhere.

16. As one example, I direct the Court to a report prepared in 2001 by then-Major Khaled Abu al-Yaman about an organization called the "Holy Land Foundation." I have attached a copy as Exhibit A. Major Abu al-Yaman reported that the Holy Land Foundation "was established in America in the mid-1970s," "has branches in most of the countries in the region," and "provides financial aid to Hamas-affiliated needy people" with funds raised by

"Arabs and Muslims who live in America and Europe."  In other words, ███████████

███████████████████████████████████████████████████████████████████

████████ the 2001 report of Major Abu al-Yaman reflected an investigation of activities in

America, and in "countries in the region."

17.    ████████████████████████████████████████████████████

███████████████████████████████████████████████ For security

clearances to be effective and reliable, they need to reflect information about not only domestic

activities but activities abroad.  This is true of any professional intelligence agency.  ████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

█████████████████████████████

**2.    The GIS Maintains Files in an Organized and Professional Manner**

18.    The Abu al-Yaman declaration leaves the overall impression ████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████ This is not credible.

19.    Like other modern intelligence agencies, the GIS conducts its intelligence-

gathering activities through use of, *inter alia*, signal intelligence, monitoring of public source

information, and collection of human intelligence.

      a.  Signal intelligence includes electronic surveillance methods such as telephone

         wiretaps and monitoring of other communications systems.  ████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████ .

b. Public-source intelligence is acquired by monitoring and collecting public information.   The Abu al-Yaman declaration shows that the GIS ██████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████ Abu al-Yaman Dec. ¶¶ 18(c), 23(a). ██████████

██████████████████████████████████████████████████

█████████████████████ ███████████████████████████

██████████████████████████████████████████████████

███████████████████████ These 70 pages

consist entirely of publicly available court documents and police reports.

c. Gathering human intelligence involves the use of "sources," or individuals who supply information of all types.   The operation of a network of sources by an intelligence agency requires that the agency have professionalized personnel, established operational protocols, and a robust logistical support system.   It is my opinion, based on my experience and observation, that the GIS has all of these.   ██████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████

20.    No intelligence agency could make effective use of the continuous stream of data generated by these various types of intelligence without a highly-organized structure for cataloguing, maintaining and analyzing it.  Based on my personal knowledge, I am aware that the GIS has such capabilities.  █████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████

21.    ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████But entry of data into a computer summary format does not necessarily mean that the GIS does not maintain the original source reports.

22.    Moreover, it is implausible to think that the GIS maintains only single copies of individual documents, within "individual" files; instead, the GIS almost certainly keeps multiple copies of the same document in different types of files.

23.    For example, it is almost certain that the GIS, like other modern professional intelligence agencies, maintains a file for each human intelligence source it operates.  For any intelligence organization, administering a system of human intelligence sources requires that information received from each source be filed in a file that is attributable to that source.  Each such source file is maintained in parallel with, and without relation to, incident-based files, subject-based files, and files compiled regarding people under investigation ██████████████

████████████████████████████████ and each source file compiles all information supplied by a particular human intelligence source.  Maintaining a file for each source allows the intelligence agency to evaluate each source′s credibility and the quality of information provided by the source, to allow the agency to verify the source′s accessibility to information and track the subject or geographical areas that the source cover.  This allows the intelligence agency to manage its coverage, adjust the scale of its intelligence networks, and trace sources and trends. Were the GIS to keep its documents only in "individual files"—that is, files organized upon the identities of persons under investigation—the GIS could not evaluate any of these things.

24.    ███████████████████████████████████████

███████████████████████████████ ████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

████████

25.    The December 2001 Abu al-Yaman report on the Holy Land Foundation further illustrates why keeping only ███████████████████would not make sense for an intelligence agency—that report is not about an *individual* person; it is instead concerned with an organization.  *See* Exhibit A.  The document mentions two individuals, in passing—but neither appears to be the "focus" of an investigation.  It would make no sense for the GIS to keep or index the Abu al-Yaman Holy Land Foundation report only under the name of either individual—doing so would make it impossible for an intelligence analyst to gather existing information in order to compile a comprehensive report about the Holy Land Foundation, if it

were required.  Any professional intelligence agency would place a copy of this report in a file for the Holy Land Foundation and in files for each of the two individuals.

26.    Finally,  ██████████████████████████████████████

██████████████████████████████████████████████████████████

██████ is highly questionable.  ██████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████.

██████████████████████████████████████

██████and, it is not plausible that GIS personnel would remember information that was received in oral reports and not written down.

**3.    It is Not Plausible That the IDF Took the Missing GIS Documents**

27.    ██████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████  This is not a plausible explanation, because the specifically identified, non-exhaustive list of missing documents reflects sporadic and selective absence, rather than wholesale absence, of documents. The IDF system for collecting information such as intelligence files would not be consistent with the haphazard pattern of missing documents seen in this case.

28.    The IDF employs a highly-organized system for collecting and processing captured information.  A specialized unit designated for such work accompanies the military forces.  I became very familiar with the work of that unit during my service within COGAT.  No entrance by the IDF into Palestinian Institutions was permitted without approval from senior officers including by myself.  Written orders were required before the collection of any

information, and the orders uniformly included a technical annex detailing the method of collection. Either I or soldiers under my supervision accompanied the collection unit during its operations.

29.     When that unit conducts operations in the field and encounters materials to be confiscated, it gathers the materials systematically, prepares an inventory, and then transfers the material to other intelligence divisions for analysis. Members of the collection unit do not make individualized determinations, in the field, about whether a specific document should be collected from a file. Instead, documents are gathered *en masse*, in whatever organization they might have at the time they are collected.

30.      Put simply, IDF forces do not conduct a document-by-document review in the midst of a military operation.

**Comment on Certain Terrorists of Interest**

31.     It is particularly suspicious that the GIS produced no internal intelligence files about certain terrorists of interest in this case.

32.     

████████████████████████████████████████████

███████████████████████  ████████  ███████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

33.    ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████  ████████  ████████████████████

████████████

34.    Finally, based on my experience with and observation of the GIS, I can state that ██

████████████████████████████████████████████

████████████████████████████████████████████

████████.

35.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 25  2014



13