E7mgsokc

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    MARK I. SOKOLOW, et al.,

4              Plaintiffs,

5          v.             04 CV 00397(GBD)

6    PALESTINIAN LIBERATION
     ORGANIZATION, et al.,
7
              Defendants.
8
    ------------------------------x
9                      New York, N.Y.
                      July 22, 2014
10                   11:30 a.m.

11   Before:

12             HON. GEORGE B. DANIELS,

13                    District Judge

14             APPEARANCES

15   ARNOLD & PORTER, LLP
       Attorneys for Plaintiffs
16   KENT YALOWITZ
    KEN HASHIMOTO
17   PHILIP HORTON
    TAL MACHNES
18   CARMELA ROMEO
    SARA PILDIS
19     -and-
    THE BERKMAN LAW OFFICE, LLC
20   ROBERT TOLCHIN

21   MILLER & CHEVALIER, CHARTERED
       Attorneys for Defendants
22   LAURA FERGUSON
    BRIAN HILL
23   MARK ROCHON
    MICHAEL SATIN

24

25

E7mgsokc

```
1           (In open court)

2           MR. YALOWITZ:  Good morning, your Honor.  Kent

3    Yalowitz from Arnold Porter on behalf of the plaintiffs.  With

4    me today are my colleagues Phil Horton, Carmela Romeo and Tal

5    Machnes, as well as Ken Hashimoto and Sara Pildis, who are in

6    the gallery and our cocounsel, Robert Tolchin.

7           Also I should advise the Court two of our clients are

8    here in the courtroom today, Shmuel Waldman and Mark Sokolow

9    himself.  Mr. Sokolow, as the Court may be aware, is an

10   attorney and he is part of a group of attorneys that recently

11   joined our firm, so he's not only a client, he's also now a

12   colleague.

13          Thank you, your Honor.

14          THE COURT:  You're welcome.

15          MR. ROCHON:  Mark Rochon on behalf of the defendants.

16   With me from Chevalier is Michael Satin, Brian Hill to my

17   right, and Ms. Ferguson on the far right.

18          Your Honor, in terms of the people present in the

19   courtroom today, we do have some observers as counsel noted and

20   we just want to make sure that no one refers to the matters

21   covered by the protective order during the hearing.  Since

22   those parties aren't covered by it, I'm confident we can have

23   our arguments without any reference thereto.

24          MR. YALOWITZ:  We're in open court.  I don't expect to

25   be displaying copies of exhibits or anything like that, but I
```

E7mgsokc

1    don't think there's any restriction on saying so and so was

2    paid such and such on such and such a date or something like

3    that.

4            THE COURT:  Let me give you some guidance.  What I

5    really want to spend the time on is hearing the parties with

6    regard primarily to the defendants' motion for summary

7    judgment, and I don't really need to go through factually all

8    of the allegations here.  I have read all of the papers.  I

9    have a pretty good idea of what your arguments are.  I want to

10   give you an opportunity to highlight what you think are the

11   significant portions of those arguments and to answer my

12   questions that have been raised in the papers.

13           Then I have some other information related to my

14   decision-making and related to some of the other issues that

15   I'm probably going to request from you before I make a

16   decision, particularly with regard to the exhibits and the

17   admissibility of certain evidence in the documentation.

18           As we talk, you'll start to get a feel for what kinds

19   of things I think are relevant for me to have from you and then

20   we can proceed along those lines.

21           I think what probably makes sense is for me to hear

22   first from Mr. Rochon.  You're going to argue the motion?

23           MR. ROCHON:  Ms. Ferguson is going to address the

24   motion for summary judgment filed by the defendants.

25           THE COURT:  Ms. Ferguson.

E7mgsokc

1          MS. FERGUSON:  Good morning, your Honor.  I collected

2     in a binder some of the exhibits I may be referencing in my

3     argument.  For ease of reference, I have a copy for you as well

4     as for Mr. Yalowitz.

5          THE COURT:  Okay.  As I say, to the extent that that

6     part of the argument is dependent on the admissibility of the

7     proposed exhibits, I don't think we need to go through the

8     details of each exhibit.  Just give me some guidance as to the

9     legal position you have and the approach that you think I

10    should take with regard to the admissibility of that evidence,

11    the essence of it.

12         MS. FERGUSON:  I want to focus on the seven specific

13    attacks shortly and highlight the key evidence and what our

14    position is on that.  First, I just want to make a few more

15    overarching comments and I'll keep it brief.

16         The Israeli/Palestinian conflict is an ongoing

17    tragedy.  There's no shortage of moral outrage and extremist

18    and inflammatory rhetoric on both sides, but the role of this

19    Court is not to resolve the Israeli/Palestinian conflict, it's

20    not to sort through the propaganda wars on both sides, nor is

21    it in judgment of how Palestinians take care of families that

22    have been affected by the conflict.  This is a tort case, and,

23    in fact, it's seven separate tort cases, each with different

24    sets of plaintiffs, different perpetrators.

25         I think when you cut through all of the exhibits you

E7mgsokc

1    have been given and all of the rhetoric and all of the

2    inflammatory media clips you've been shown, I think what you'll

3    find is that the core of the plaintiffs' argument is this:

4    Some employees were convicted by Israeli military courts of

5    involvement in these attacks and after the employees' death or

6    while the employee is in prison, their families have received

7    some financial support from the Palestinian Authority, but none

8    of this creates liability under the Federal Anti-Terrorism Act

9    and that's the plaintiffs' sole federal law claim.

10           When you sue under the Federal Anti-Terrorism Act, a

11   statute that provides for treble damages, you need to establish

12   a few very key elements:  First, that the defendant, which is

13   here the PA and PLO, not the individual employees, but the

14   defendants have engaged in deliberate wrongdoing; that that

15   deliberate wrongdoing constituted an act of international

16   terrorism, they have to meet that predicate criminal act

17   requirement; and the conduct has to be an actual cause of the

18   plaintiffs' injuries.  So the fact that some sheik in a mosque

19   said something pretty hateful five years ago about Israelis has

20   nothing to do with the plaintiffs' injuries.  Further, the

21   plaintiffs have to show that there was an intent to injure

22   Americans because the reason this case is here is because U.S.

23   nationals were killed, but there also has to be a showing of

24   intent to harm Americans.

25           With respect to the *respondeat superior* theory, the

E7mgsokc

1   idea that because some employees were involved with the PA and

2   PLO are liable, I just want to underscore that the Palestinian

3   Authority at this time had 100,000 employees and it was a time

4   of intense conflict.  And the fact that a handful of employees

5   turned to militancy doesn't make the Palestinian Authority as

6   the chief employer in the region liable.

7           Employers are not liable for everything their

8   employees do.  And as we go through the seven incidents and you

9   hear Mr. Yalowitz' evidence about these incidents, I think the

10  thing you need to focus on is the absence of evidence that any

11  employee was acting within the scope of employment.

12          Plaintiffs rely a lot on the Israeli military court

13  convictions to show what employees did, but strikingly, even

14  from the Israeli military court, they don't state these acts

15  were carried out by PA employees acting under the direction of

16  the PA or within the scope of their employment.

17          And with respect to the so-called martyr payments or

18  prisoner payments, which is a big theme in the plaintiffs'

19  case, I think it's important to understand that these are

20  generalized policies that with respect to the martyr payments,

21  they applied to thousands of families, not just in the West

22  Bank and Gaza but Palestinians who have been affected by the

23  conflict elsewhere.  So it's families who have lost a loved one

24  in a conflict, whether it was during the second intifada,

25  whether somebody was an innocent bystander, whether it's

E7mgsokc

1    someone in the Gaza strip today injured in the Israeli/Hamas

2    conflict, so it's a broad-based policy.  It wasn't targeted to

3    suicide bombers.

4          Similarly, Palestinians have had many men in Israeli

5    prisons over the course of the conflict and many of them may be

6    as political prisoners, many of them had no involvement in

7    harming civilians.  So there is a governmental policy to

8    provide some support for those families.

9          Under the Anti-Terrorism Act, that doesn't amount to

10    material support for terrorism, it happens after the attack,

11    and it's not provided with any intent to support terrorism or

12    to support harming Americans.

13         THE COURT:  Let me focus on what I think is the

14    primary issue and I think could be a primary issue for the jury

15    on whether or not, on the edges, the plaintiffs cannot prevail

16    by proving less or they're going to have to prove more or

17    something or they can't be disburdened.

18          The first and primary issues issue is whether or not

19    there will be evidence before a jury that certain individuals

20    either employed by, associated with or at the behest of the PLO

21    and the PA, engaged in terrorist acts or acts of violence; and

22    that the jury in examining their relationship with the PLO and

23    the PA, in examining the evidence of the activity prior to any

24    joint activity, prior to those acts and considering the actions

25    of the PLO in relationship to these individuals after those

E7mgsokc

1    acts were perpetrated, whether or not that direct and/or

2    circumstantial evidence will give a jury a basis to conclude

3    that it's more likely than not that they were doing this at the

4    behest or urging or cooperation or assistance of the PLO and

5    the PA.  That seems to be, to me, the central issue.  It may or

6    may not be the sole issue as I've characterized it with regard

7    to most of the claims and the PLO and the PA's responsibility

8    for acts that caused death or injury to victims of these

9    attacks.

10          The question is a little bit more than they worked for

11   the PLO.  So anybody who works for the PLO who commits a crime,

12   you can sue the PLO for, that's not as I understand it their

13   theory.  I don't think they're trying to convince me that they

14   can prevail on such a theory.  If somebody who is employed by

15   the PA or PLO goes out and robs a bank or robs an individual,

16   that individual can't sue the PA or PLO and say you got to give

17   me that money back because that person was employed by you at

18   the time they committed the robbery.

19          MS. FERGUSON:  Exactly.

20          THE COURT:  Focus me on what the legal theory is that

21   you say prevents them from getting before a jury to resolve

22   whether or not the PA and the PLO were involved in and

23   participants in acts of violence that were committed as they

24   allege.

25          MS. FERGUSON:  Your Honor, when you start to focus in

E7mgsokc

1    on particular attacks or incidents, in some cases, there is no

2    evidence of any employee involvement.  If I could just give an

3    example, I think that would be helpful.  The Mandelkorn

4    plaintiffs:  The Mandelkorn plaintiffs, this is the June 19,

5    2002 bombing in French Hill.  A man by the name of Sayeed Awada

6    carried out a suicide bombing which injured Shaul Mandelkorn.

7    And there's no claim by the plaintiffs that the suicide bomber

8    was a PA or PLO employee.  Their only claim for PA liability is

9    their claim that a man named Nayef Abu Sharkh was involved in

10   some way in the bombing.  They don't say how.  And they have

11   one piece of evidence for that claim.  I think it will be

12   helpful for you to focus on it so you start to get a flavor of

13   their case.  It's Plaintiffs' Exhibit 339, it's in your binder

14   and they're in numerical order.  It's from the Israeli Ministry

15   of Foreign Affairs.

16            THE COURT:  Which exhibit?

17            MS. FERGUSON:  It's 339.  It's from the Israeli

18   Ministry of Foreign Affairs.  It appears to have been printed

19   off of their website.  It's about an operation for the

20   confiscation of terror funds.  It's dated 2004.  On the

21   surface, it's hearsay.  It's communicated by the GPO, which is

22   apparently the general press office or Government Press Office.

23            THE COURT:  Quote to me, and this is going to be my

24   approach with all of the exhibits because your general argument

25   or your repeated argument that it is based on inadmissible

E7mgsokc

1    evidence, I can examine that separately, but I want to, one,

2    assume for part of this argument that they get the evidence in,

3    so if they overcome your objection, then I'd like to know

4    whether you're making an argument that that's not sufficient

5    evidence.

6              MS. FERGUSON:  So would you like me to focus on our

7    view of the standard?

8              THE COURT:  Well, the second thing I'd like you to do,

9    when you point to an exhibit, show me the fact that you say

10   that they are trying to put before the jury and that you

11   believe is either objectionable, or most of the objections are

12   hearsay, but objectionable as hearsay or objectionable because

13   there's some dispute, genuine dispute, about that fact.  For

14   example, quote to me what part of this document is a concern to

15   you.

16             MS. FERGUSON:  Sure.  If you turn to the fourth page,

17   it's marked with a Bates number P4:38.  It states that the bank

18   account of Nayef Abu Sharkh was seized, that he's a fugitive of

19   the Tanzim infrastructure, and that say he was behind the

20   following terrorist acts, and it identifies the June 19, 2002

21   suicide bombing that injured Shaul Mandelkorn.  So this is the

22   sole basis for their claim that they should take to the jury

23   this case.

24             THE COURT:  Give me more specifics.  You say that the

25   statement that an account in the name of Abu Sharkh, a senior

E7mgsokc

1   fugitive who was behind the following terrorist acts -- and

2   which bullet-point you say is the terrorist act that is at

3   issue here?

4           MS. FERGUSON:  The first one at 19 June 2002, the

5   suicide bombing.

6           THE COURT:  With regard to this document so I can

7   start getting a real feel, not just on this motion, but on my

8   further review of admissibility documents, you believe that

9   that's the factual assertion that they want to make and they

10  want to make it in this form, and that in this form, it is

11  inadmissible as a piece of factual evidence.

12          MS. FERGUSON:  To be more specific, in opposing a

13  motion for summary judgment, this is the only evidence on which

14  they rely to support their claim of PA involvement in this

15  bombing.

16          THE COURT:  This statement doesn't say anything about

17  PA involvement.

18          MS. FERGUSON:  Well, they take the next step and they

19  say he's an employee and, in fact, there's no evidence of that

20  either, but they say he's an employee.

21          THE COURT:  And that's another thing:  They state that

22  he's an employee.  Do you deny he was an employee?

23          MS. FERGUSON:  The only documentation that is in the

24  record that I'm aware of that we have shows – it's not in your

25  binder but it's Plaintiffs' Trial Exhibit 44 – it shows that

E7mgsokc

1    this individual Nayef Abu Sharkh was employed by the General

2    Intelligence Service.

3            THE COURT:  You're giving me a lawyer's answer and I

4    asked a simple question.

5            Do you deny that he was a PA or PLO employee at the

6    time?

7            MS. FERGUSON:  There's no evidence that he was

8    employed --

9            THE COURT:  Again, that's a lawyer's answer.  Do you

10   deny that he was a PLO or PA employee at the time?

11           MS. FERGUSON:  Yes, we do.

12           THE COURT:  All right.  You say it is not a fact that

13   he was employed by the PA or the PLO.

14           MS. FERGUSON:  At the time of the bombing, yes.

15           THE COURT:  Are you saying it that way to leave room

16   for the possibility that he was an employee before that or an

17   employee after that?

18           MS. FERGUSON:  He was an employee.  As of September 1,

19   2000, he moved from the General Intelligence Service to

20   something called the General Personnel Council, but there's no

21   record showing what happened after that.

22           THE COURT:  Is that an arm of the PLO or the PA?

23           MS. FERGUSON:  The General Personnel Council is an arm

24   of the PA, but there's no evidence showing that he continues

25   his employment as of 2002.

E7mgsokc

1          THE COURT:  So you have some evidence to indicate to

2    me that he discontinued his employment?

3          MS. FERGUSON:  I don't.

4          THE COURT:  When you say you deny, I'm assuming you're

5    not saying to me there's no evidence.  I'm assuming you

6    affirmatively are saying to me that the true fact is that

7    there's evidence that he was no longer employed by the PA or

8    the PLO at this time.

9          Are you affirmatively making that statement?

10         MS. FERGUSON:  The only thing I can affirmatively

11   state is that there's no evidence -- we're through discovery.

12   There's no evidence that this individual Nayef Abu Sharkh was

13   employed in 2002, but the plaintiffs can't establish that he

14   was.

15         THE COURT:  I'm not asking what the plaintiffs can

16   establish.

17         You are, for all intents and purposes, standing in

18   front of me as the PA and the PLO.  I want to know whether or

19   not this person is in your employ.  That's all I'm asking.  And

20   you don't want to answer that question or do you want to shift

21   it to, well, it may be true, but the plaintiffs can't prove it.

22         Is that sort of the response?

23         MS. FERGUSON:  I honestly don't know.

24         THE COURT:  I know, but how are you disputing the

25   fact?  Why are you saying this is an unreliable, incorrect

E7mgsokc

1    statement to put before the jury if, in fact, the statement

2    happens to be true?

3            MS. FERGUSON:  Plaintiffs have made allegations about

4    many, many employees.

5            THE COURT:  Right, and I use this as an example.  This

6    is the way I'm going to first approach it.

7            MS. FERGUSON:  We produced all of the personnel

8    records that we have that were sought in discovery.

9            Let's assume, for purposes of this argument, that he

10   was an employee, there's no evidence of his involvement in this

11   attack, other than what's clearly hearsay.

12           THE COURT:  I know, but I'm trying to understand.

13   Now, you say that you dispute whether or not he was involved in

14   this attack?

15           MS. FERGUSON:  Yes, absolutely.  And neither side will

16   have any witnesses to talk about who was involved in this

17   attack; the only thing they have is what is clearly

18   inadmissible hearsay.  This is their only evidence of an

19   alleged employee's -- let's say we don't know -- his

20   involvement in this particular bombing is these layers of

21   hearsay from this website.  That's all there is.

22           THE COURT:  I'm not particularly persuaded by your

23   position on every document that we know the true facts, but we

24   are objecting to their assertion of those facts because they

25   can't prove it because we can hide it.

E7mgsokc

1              MS. FERGUSON:  I'm truly not trying to quarrel with

2      you.  I truly don't know.  There's been so many employees whose

3      names --

4              THE COURT:  I know, but wouldn't it be a most

5      important fact for your client and you as a lawyer, given the

6      nature of this claim, to figure out whether this guy was in the

7      employ of the PLO or the PA at the time?  Wouldn't that be the

8      most logical thing?  Isn't that the first thing you would, in

9      your mind, want to know?

10             MS. FERGUSON:  Your Honor, the only evidence they

11     have --

12             THE COURT:  Not "they have."  What's the evidence that

13     you have?

14             MS. FERGUSON:  We have no evidence whatsoever that

15     this man was involved in the bombing.

16             THE COURT:  You have no clue whether you hired this

17     guy or not.

18             MS. FERGUSON:  No.  I'm saying we have no evidence he

19     was involved in the bombing.

20             THE COURT:  I'm not talking about the bombing.  That's

21     a separate issue.  I understand your argument on the bombing.

22     We discussed that.

23             But a lot your argument is that, well, they can't

24     prove X.  Well, I'm trying to figure out is whether X is

25     genuinely a factor in dispute.

E7mgsokc

1          MS. FERGUSON:  It is their burden of proof and it's

2     their burden to show they have admissible evidence to take to

3     the jury.

4          THE COURT:  I understand, but it's your burden upon

5     your objections to show me why the form of their evidence is

6     prejudicial to you or it's unreliable or it is not the true

7     fact.

8          If they want to allege that you're wearing a blue suit

9     today, the first question I'm going to ask you is, well, is

10    that true or not?  And you say, well, it doesn't matter whether

11    it's true, they can't prove it because they heard it from

12    somebody else.  Well, I'm trying to figure out is what part of

13    this is a lawyer's tactic or what part of this is a genuine

14    dispute about facts.

15         Is it a genuine disputed fact about whether or not he

16    worked for the PLO on this particular day?

17         MS. FERGUSON:  Yes, yes, it is.

18         THE COURT:  And you deny that he does; you have

19    evidence that he does.  Then how is it a genuine dispute of

20    fact if you don't deny that he did?

21         MS. FERGUSON:  Let me just say --

22         THE COURT:  Saying that they don't have admissible

23    evidence is not the same as saying there's a genuine dispute of

24    fact.

25         A genuine dispute of fact is when they claim X and you

E7mgsokc

1   say no.  They have evidence that he worked there or they think

2   they have evidence that he worked there, but we deny that he

3   worked there because we know who our employees are and we say

4   no, that is not a true fact.

5            Are you saying that it is not a true fact that he

6   worked for the PLO at that point in time?  I hear you not

7   saying that.  I hear you not genuinely disputing the fact of

8   whether or not he worked there at that time.

9            MS. FERGUSON:  Let me be clear:  Our motion for

10  summary judgment on Mandelkorn does not at all turn on Nayef

11  Abu Sharkh's employment status.  We didn't make a point of it

12  in the brief.

13           THE COURT:  I know, but I'm using this as an example

14  because I can tell you, I have a list of 177 exhibits that

15  everybody wants me to personally go through to figure out

16  whether or not it is inappropriately asserting facts that it is

17  unfair to put before the jury to believe those facts to be

18  true.  And I'm trying to figure out whether or not you're

19  saying that simply because that's the way you want to keep it

20  out or are you saying that because you are denying the fact.

21           MS. FERGUSON:  In most cases, there is no dispute

22  about whether someone was an employee or not, so maybe we have

23  gotten off on a bit of a wrong foot here.  In almost all cases,

24  there's no dispute about the employment status, in part because

25  I don't know.  We didn't focus on the employment status.  We're

E7mgsokc

1    not relying on whether he was or whether he's not employed.

2         THE COURT:  So to the extent that they're alleging

3    that any of these individuals was employed by the PLO at the

4    time, you're not disputing that fact?

5         MS. FERGUSON:  Let me just be clear:  For almost all

6    of these individuals, the allegations are that they were

7    employed by the PA, not the PLO.

8         THE COURT:  All right.  The PA or the PLO.  I'm sorry.

9    One or the other.

10        MS. FERGUSON:  Yes, for most of these people, we have

11   personnel records, we have payment records.

12        THE COURT:  So that's not the nature of your hearsay

13   objection or unreliability objection with regard to any of the

14   exhibits.  So when I look at an exhibit and it says X was

15   employed by the PA or the PLO, that's not what you're objecting

16   to.

17        MS. FERGUSON:  Ninety-nine percent of this case will

18   not be about whether somebody was on the payroll or not.

19        THE COURT:  Fine.

20        MS. FERGUSON:  There will be questions about whether

21   there's any evidence that person was involved in the terrorist

22   attack, which is what I was trying to focus on here, and I'm

23   sorry if we got off on the wrong foot.  I apologize.

24        THE COURT:  No, this is advancing it significantly for

25   me, so let me close out that loop so I can concentrate on where

E7mgsokc

1    the genuine dispute is.

2         With regard to your objection to the admissibility of

3    evidence, you're not objecting, at least on a hearsay basis, to

4    the assertions that these individuals were employed by the PLO

5    on the dates in which the terrorist acts were allegedly

6    committed.

7         MS. FERGUSON:  Correct.

8         THE COURT:  That's not the nature of your objection to

9    a document that says he was employed by the PA or PLO.

10        MS. FERGUSON:  No.  As I say, in most cases, almost

11   all, we produced the personnel records and payment records.

12   There's no dispute about it.

13        THE COURT:  With regard to most, if not all, of the

14   exhibits that would indicate that the PA or the PLO took

15   certain actions with regard to those individuals subsequent to

16   the alleged terrorist acts, you're not disputing most or any of

17   that.  When they say, well, they made payments to family

18   members or they indicated they were martyrs, most of that,

19   that's not the nature of most of your objection.

20        MS. FERGUSON:  We perused the records that showed

21   payments to the prisoners' families, payments through the

22   martyrs institute.

23        THE COURT:  You're not disputing that, and you don't

24   really have a genuine basis to say that evidence of that is

25   inadmissible to show a relationship between the PA and the PLO

E7mgsokc

1    and these individuals or to demonstrate that they at least took

2    in most cases a positive and supportive view of these

3    individuals subsequent to these acts, as opposed to a negative

4    and unsupportive position with regard to these individuals and

5    their families?  "Why" is a different question.  You say

6    because that's what they do generally, but you're not disputing

7    as to that.

8            MS. FERGUSON:  I think it's fair to say that there's

9    not going to be a lot of dispute about whether someone was

10   employed by the PA.  There certainly will be dispute about, for

11   example, with this Nayef Abu Sharkh, whether there's evidence

12   that he had any involvement in the attack.

13           THE COURT:  Right.  Let's put that aside.

14           MS. FERGUSON:  There won't be any significant dispute

15   on was this person an employee, there will not be a dispute

16   about did they get payments from the Ministry of Detainees, did

17   their families get payments, what those payments mean in terms

18   of whether it was just supporting the family or whether it was

19   glorifying terrorism, we certainly don't agree with.

20           THE COURT:  Right.  I understand.

21           MS. FERGUSON:  Right.

22           THE COURT:  So your primary basis for your summary

23   judgment motion and for your objection to the admissibility of

24   certain exhibits and how they're interrelated has to primarily

25   do with their hearsay and unreliable attempt to demonstrate

E7mgsokc

1    that these individuals were, in fact, the perpetrators of these

2    acts.

3         Is that primarily it?

4         MS. FERGUSON:  Well, I would say in my mind, the cases

5    fall into two categories.  There's a few cases.  And this case

6    involving the Mandelkorns falls into this category, as does the

7    case involving the Guettas, and the case involving the

8    Sokolows, so let's say three.  Don't told hold me to that.

9         So there's one group where I would say there's no

10    admissible evidence that the PA or PLO employee had any role in

11    the attack at all.

12         THE COURT:  I want to be more specific than that.

13    There's no evidence that the person that they want to

14    demonstrate perpetrated the act or a person that they say was

15    directly a participant in assisting and perpetrating that act,

16    there's no evidence, they have no admissible evidence to prove

17    that those PA or PLO employees were, in fact, participants in

18    those acts prior to or during when those acts were committed,

19    that's basically the essence of the argument, right?

20         MS. FERGUSON:  Correct.  So I'm not trying to draw a

21    distinction between the actual bomber or shooter versus the

22    people who were alleged planners.

23         THE COURT:  Right, but the people who they identified

24    as associated with the PLO and the PA that they say they want

25    to present evidence that they perpetrated or participated in

E7mgsokc

1   those crimes, you say that primarily the problem with their

2   case is they cannot prove, by admissible evidence, that these

3   individuals that they say are associated with the PA or the PLO

4   did, in fact, participate in the acts of violence.

5           MS. FERGUSON:  That's certainly true with this

6   Mandelkorn case where this Israeli Ministry of Foreign Affairs

7   is the only evidence of a PA employee involvement.

8           You'll also hear about the Guetta case where the

9   allegation that a PA employee was involved was based on an

10  eye-witness identification 12 years after the shooting based on

11  a photo array provided by counsel.  There's no evidence that

12  that person was identified as a PA employee.

13          THE COURT:  Again, you say there's no evidence that

14  that person identified was a PA employee.  Are you denying that

15  that person was a PA employee?

16          MS. FERGUSON:  I don't know --

17          THE COURT:  Well, you should know, right?  The only

18  person that knows is the employer, right?

19          MS. FERGUSON:  Right.  There's 12 very murky photos.

20          THE COURT:  Do you completely not know as the lawyer

21  or is there some reason why you can't know that?

22          MS. FERGUSON:  I think there is a dispute in the

23  Guetta case about the reliability of that eye-witness

24  identification.

25          THE COURT:  I understand that.  Now, I have to decide

E7mgsokc

1    whether that goes to its admissibility or it goes to its

2    weight.  The woman saw somebody, pointed him out and said

3    that's guy who committed the act.  I'm not sure that your

4    attacks on whether or not she is correct or incorrect precludes

5    that as evidence.  I'll look at it more closely.

6         But I can tell you that there are plenty of times when

7    people make identifications under similar circumstances.  The

8    only thing that you have that is significantly different in

9    this case than other postoffense identifications is the passage

10   of time.  I don't know whether or not anything that you say is

11   so suggestive about the identification that it would

12   automatically make it inadmissible rather than give you an

13   argument that it is unreliable and the jury shouldn't accept

14   that.

15        MS. FERGUSON:  Just to make sure we don't miss the

16   big-picture point:  I guess my only point is that there are,

17   like I say, three incidents, shootings, bombings, where our

18   position is that the plaintiffs can't establish even any PA

19   employee involvement.

20        There are others where we're arguing even if they

21   could establish PA employee involvement, this is the

22   fundamental point:  There's no evidence of any PA or PLO

23   culpability beyond the fact that these people were on the

24   payroll.  And as I said, there's 100,000 people on the payroll.

25   So for *respondeat superior* liability to apply here, the

E7mgsokc

1    plaintiffs have to show that these people were acting within

2    the scope of their employment.

3           THE COURT:  I understand that.

4           MS. FERGUSON:  There's a complete absence of evidence

5    of that.

6           THE COURT:  But I need to get by the first basic point

7    of whether or not you're genuinely telling me that no, these

8    people didn't work for us.  If you're not telling me that, then

9    there's a genuine dispute.  You can't say to me, well, we know

10   it.  Our clients know whether they worked for them.  In fact,

11   we know they worked for us, but the other side just really

12   doesn't have a way to prove that.  That sounds like your

13   argument at this point unless you're going to affirmatively

14   make a statement.

15          Quite frankly, with regard to some of these exhibits,

16   depending on the nature of what statements in these exhibits

17   are being offered for their truth, I'm, at this point,

18   contemplating whether or not you should have to simply respond

19   to a request to admit one way or the other and put this issue

20   to rest.

21          If you say they can't prove whether this person is an

22   employee, then they should put in a request to admit to you

23   whether or not this person was employed and you should either

24   say yes, he was or no, he wasn't.  And then at least tell me

25   there's a genuine dispute over this if your response has to be

E7mgsokc

1    yes, he was, then I can make a decision whether or not that

2    means the document can be admitted to demonstrate that fact, or

3    your simple admission that he was a PA employee should be

4    admitted and then put that to rest and move on and figure out

5    whether or not they have enough of a case to put to the jury

6    for the jury to otherwise determine liability of the PA and

7    PLO.

8              MS. FERGUSON:  I think for purposes of the motion for

9    summary judgment, our position would be that even if the people

10   they claim are PA employees are PA employees – and in 95

11   percent of the time, we would agree – that even if they're all

12   PA employees, people who are alleged to be PA employees,

13   there's still no triable issue of fact as to PA or PLO

14   involvement.

15             THE COURT:  Because they have no admissible evidence

16   prior to or during the act or any evidence that would indicate

17   their acknowledgment after those acts or evidence that they

18   were aware that those acts were planned, that they or some

19   employee or agents of those defendants participated in planning

20   that, assisting or the acts taking place; and if the evidence

21   simply showed that they, as the plaintiffs would argue,

22   rewarded those individuals after the fact, that that would not

23   make them necessarily liable or it might be sufficient alone to

24   make them liable for the acts themselves that were committed.

25             MS. FERGUSON:  Exactly.  There's no admissible

E7mgsokc

 1    evidence of any preattack knowledge by the PA or PLO.  There's

 2    no evidence that the PA or PLO officials directed or authorized

 3    the attack.  There's no admissible evidence that the PA or PLO

 4    provided any material support to the people involved in the

 5    attack.  And there's no evidence that these postattack payments

 6    to prisoners and families which is part of a more generalized

 7    policy caused the attacks, was provided with any intent to

 8    support the attacks.  A government has lots of reasons why it

 9    provides programs to its people, and there's no evidence that

10    these policies in any way caused the plaintiffs' injuries.  The

11    scope of employment issue I really think is key to this case.

12         THE COURT:  Sure.  If they're hired to do terrorist

13    acts, there the defendants are liable for those acts that are

14    within what they were expected to do as PA or PLO employees.

15         If they were off the ranch, as they say, on their own

16    personal vendettas, then I think you're probably right; that is

17    not sufficient alone to establish their liability under any

18    theory.

19         MS. FERGUSON:  For example, because we have this

20    document here, this Nayef Abu Sharkh, so even if this document

21    were admissible, and we contend it's not, it describes this man

22    as a senior fugitive of the Tanzim infrastructure.  It doesn't

23    say he committed the attack as a PA or PLO employee, and

24    there's no other evidence that he did, and there won't be a

25    witness that he did.

E7mgsokc

1          THE COURT:  Let's agree that there is little to no

2     direct evidence that the PA or the PLO were direct participants

3     in these terrorist acts before or while they were taking place.

4          MS. FERGUSON:  Correct.  That's right.

5          THE COURT:  They can point it out to me, but this is

6     clearly a case that is dependent on the circumstantial evidence

7     and the reasonable inferences to be drawn from facts.

8          And unless they have some direct evidence of some memo

9     or email or some witness who is going to say, yeah, I was at

10    the meeting at the PLO and they planned this or something,

11    that's not the nature of their proof here as I understand it.

12          MS. FERGUSON:  Right.

13          THE COURT:  Now, if they want to point out some direct

14    evidence that they want to emphasize that saves one or two of

15    these cases, that's fine, but I don't think that direct

16    evidence exists.

17          So the real question is, is whether or not the

18    circumstantial evidence and the reasonable inferences to be

19    drawn by a trier of fact based on what one might anticipate the

20    admissible evidence would be would be enough to persuade a

21    reasonable jury that it is more likely than not that the PLO

22    and the PA was involved in these acts sufficiently to hold them

23    liable or not.

24          MS. FERGUSON:  I think when you look at the

25    circumstantial evidence and you address two key factors for

E7mgsokc

*respondeat superior*, what was the time and place and scope of

limitations of the person's job and were they doing it at the

behest of the employer without a personal motive?  I think the

circumstantial evidence makes clear that these didn't fall

within the scope of employment.

For example, there's the Goldberg case that arises out

of the suicide bomber who had been fired from his job and set

off a bomb.

THE COURT:  No one here was fired from their job, so

it's a little bit of a different analogy you're drawing.  In

fact, as they say, their position is they have evidence they

were further embraced after these acts took place.

MS. FERGUSON:  My main point is that his job was at

the Bethlehem Police Department and the bombing is in

Jerusalem.  So there's no evidence that these people were all

working together as part of their job, that they were wearing

uniforms, that they were in any way on-duty.  In fact, some of

the evidence, even in the Israeli military court files,

suggests that if his colleague had only reported him to the PA

as missing, then this act wouldn't have happened, so it's

assuming the PA would have responded if they had only known he

was missing.

The other evidence is that the people who carried out

these attacks, these are desperate, unhinged people that

carried out these suicide bombings and shootings, and many of

E7mgsokc

1    them acted because their brother was killed.

2            THE COURT:  But the circumstantial evidence, the

3    question is, does it go in the direction of noninvolvement,

4    does it go into the direction of involvement or is it neutral?

5    Is it consistent with they're not involved or is it more

6    consistent with they are involved?

7            Well, obviously, if someone commits a violent crime

8    causing death or injury and my response is "good job," that is

9    evidence, obviously, that we would all have to agree may not be

10   proof sufficient, but it is some evidence to consider as to

11   whether or not this person may have been doing it at my behest.

12           MS. FERGUSON:  I think the only documents that would

13   suggest the good job are some of these so-called martyr files

14   where the family is seeking compensation.  Often because the

15   Israelis have this so-called punitive home destruction policy

16   where they would mow down the family's home even if the family

17   had no involvement in the bombing at all, so that's the reason

18   for these policies.  And, again, it wasn't just for suicide

19   bombers.  The people that are dying in Gaza would be eligible

20   for these martyr payments.

21           THE COURT:  That's an argument to be made, don't you

22   think, to a reasonable jury, depending on whether or not the

23   circumstantial evidence is sufficient if I assume the facts in

24   their favor — and I'm thinking of it from a juror's

25   perspective, not from a lawyer's perspective.  The argument is,

E7mgsokc

```
1    is that if you do a martyr payment, the question is, you have

2    three choices:  You can give everybody martyr payments, which

3    apparently is the position here; you can say you all get martyr

4    payments for certain kinds of activity and not include acts of

5    violence and death; or you can say we will give martyr payments

6    for activity, unless it is that kind of activity, because we

7    don't want to encourage people to engage in that kind of

8    activity, and we know that giving them martyr payments is

9    obviously some incentive for them to do so.  Once we give

10   martyr payments to the first person who does it, it is

11   obviously some incentive for others to continue to do it.  And

12   one might argue our tacit, if not explicit, approval of

13   encouragement of other people to do it because we're letting

14   them know if we do it, we will reward them, wouldn't a

15   reasonable jury be interested in at least considering that if

16   there's a factual basis to support such a position?

17            MS. FERGUSON:  I think it has to be legally relevant.

18   It has to fit within the framework of the Anti-Terrorism Act.

19            THE COURT:  That would be relevant; you would admit

20   that.  It's relevant whether or not I paid you for doing the

21   act after you did it as to whether or not I have some

22   involvement in the act.

23            If you had said if they had come to me and said, you

24   know, I just killed ten people, can I have $10,000 and you said

25   no, you can't have $10,000 because we're not going to give you
```

E7mgsokc

1    money for doing that kind of thing, you would be standing in

2    front of me saying that's the relevant evidence to indicate

3    that they don't have any involvement.

4         MS. FERGUSON:  This is the money that was paid to the

5    families.  It's a very small amount of money.  There's no

6    evidence that these payments are --

7         THE COURT:  You can say it may be a small amount of

8    money, as they say, and that's all relevant, but it is not an

9    insignificant amount of money because it was obviously money

10   that they thought should be given to the family and would

11   benefit the family.

12        MS. FERGUSON:  But there's no evidence that any of the

13   people that carried out these shootings or bombings were in any

14   way motivated by the prospect that their family would get some

15   small amount of money.

16        There was a much greater chance the family's home was

17   going to be destroyed if they had some sort of financial

18   calculus in mind, it wouldn't lead them to carry out a bombing

19   or shooting that would end their life.

20        THE COURT:  Let's put it this way:  It wouldn't

21   discourage them.  If I were to put it on one side of the scale

22   or the other, I'm not going to put it on the side of

23   discouraging them.  I'm going to put it on the side of the

24   scale of encouraging them, right?  That would be logical,

25   right?

E7mgsokc

1          MS. FERGUSON:  I think this is where it's important to

2     focus on the causation standard.

3          THE COURT:  Right.

4          MS. FERGUSON:  And the Supreme Court in the 2014

5     *Paroline* case and then the Second Circuit in *Rothstein v. UBS*

6     and then again in the *September 11* case from 2013 really make

7     clear that proximate cause is not this completely loosey-goosey

8     standard; that you have to show that the defendants' wrongful

9     conduct was an actual cause in a sense that a lay person would

10     understand of the plaintiffs' injuries.

11          THE COURT:  Let me play out this scenario as best I

12     can from their point of view.

13          They want to argue to the jury that, look, we have the

14     circumstantial evidence and the facts from which you should

15     infer that the PA and the PLO are responsible for these acts of

16     terror.  The nature of our evidence is this:

17          One, the individuals who perpetrated these crimes,

18     they were, in fact, employees of the PA or the PLO primarily at

19     the time they committed the acts, but we don't have to debate

20     about whether or not prior to or after, but primarily we're

21     going to show that primarily they were employed by the PA and

22     PLO.

23          We're going to also show you evidence that there was

24     contact and assistance provided to these individuals by other

25     PLO or PA employees or agents of the PA or PLO itself, whether

E7mgsokc

1    it's releasing people or assisting them or protecting them from

2    apprehension when there were warrants out for them or whatever

3    evidence that they say they're going to present.

4          And we're going to present evidence that after these

5    acts were perpetrated, that these individuals were all

6    rewarded, and rewarded for committing these acts.  And the PA

7    and the PLO made statements complimenting these individuals for

8    committing these acts, and they made payments to their families

9    in remuneration in support of that.  And they took other

10    actions to promote them further in the PA and the PLO because

11    they committed these acts.

12          Basically, you will conclude that this was part of

13    their employment by the PA and the PLO, that if they wanted to

14    sacrifice themselves or otherwise commit violent acts of

15    terror, that that was what the PLO wanted them to do or the PA

16    wanted them to do, that's what they encouraged them to do and

17    that's what they rewarded them for doing.  That's the case that

18    we intend to present, and after you hear the evidence of those

19    instances, you will also conclude that it is more likely than

20    not that what we saw is the case is the case, and that it will

21    be sufficient for you to find the PA and/or the PLO liable.

22          Now, I don't know if you would disagree with my

23    attempted characterization of their case, and I'm not sure that

24    if they were able to prove that, that you would say that that

25    kind of case couldn't get to the jury, but what I hear you

E7mgsokc

1    saying is although they say that that's what they want to

2    prove, their proof is deficient in certain respects.

3            You're not arguing about whether or not if that's what

4    they can prove, that that would make them liable.  That's not

5    the legal argument.

6            The legal argument is, they don't have primarily any

7    evidence that, one, that these individuals who they want to

8    accuse and that Israel and other determinations have been made

9    unreliably or assumptions have been made that these were the

10    people responsible for that, they have no proof, admissible

11    proof, in order to be able to prove that these people were, in

12    fact, responsible for this act.  And they have no other

13    evidence, other than simply that these people were treated just

14    like any other families or people or individuals who suffered

15    or were injured or killed in pursuit of the general cause were

16    treated, and that doesn't make the PA responsible for every act

17    of terror that may have been committed by others.  And it

18    certainly doesn't make the PA or PLO responsible for acts of

19    terror that they want to prove were perpetrated by the PLO and

20    the PA employees when they have absolutely no admissible

21    evidence to prove that.  And they can't just walk in here and

22    say before a jury, look, an Israeli military authority wrote a

23    report and there's a line in the report that says they think

24    this person did it, so that's admissible evidence in a court of

25    law to convince you that this person did it.  It doesn't work

E7mgsokc

1      that way.

2                  MS. FERGUSON:  Right.

3                  THE COURT:  They can't just do that.  That's just like

4      going to the corner and asking somebody standing on the corner

5      who shot Kennedy and they say, well, I think it was conspiracy.

6      All right.  So you come back in here and you say to the jury I

7      spoke to a guy on the corner and he says it was a conspiracy,

8      so you're supposed to conclude that it was conspiracy.

9                  I think I understand generally your theory of what you

10     want me to apply.  If I have mischaracterized that, tell me in

11     what way I mischaracterized what my analysis should be of the

12     facts that they say they want to rely on.

13                 MS. FERGUSON:  Two refinements on that:  One would be

14     that certainly our position is a lack of admissible evidence to

15     support claims of scope of employment, things like the release,

16     we say there's no evidence of that, so it's largely a lack of

17     admissible evidence.

18                 THE COURT:  When you say "scope of employment," I

19     assume you're limiting that to committing acts of terror within

20     the scope of employment of these individuals who committed

21     those acts and what they were employed to do, that was part of

22     what they were employed to do by the PA and the PLO.

23                 MS. FERGUSON:  Right.  And I think because you have

24     these seven different separate lawsuits or separate bombings,

25     shootings combined together and the case is largely built on

E7mgsokc

1    inadmissible evidence, you get the sense the cumulative impact

2    is, well, there must be some connection here.  But if you look

3    at each incident and the evidence that supports it, it's

4    largely based on this kind of thing you're seeing in the

5    Mandelkorn case where it's just very thin.  It's not

6    admissible.

7              So, if you weed out all of the admissible evidence, I

8    don't think a reasonable jury could conclude that there was

9    some pattern of having PA employees engage in terrorism.  There

10   is no admissible evidence to support that claim.

11             THE COURT:  As I say, there's always a question of

12   whether or not it is simply coincidence that all of the people

13   who are accused of committing these terrorist acts were PA or

14   PLO employees at the time.

15             MS. FERGUSON:  I guess the other refinement I want to

16   make is we have to keep remembering that this is a foreign

17   government and an almost-socialist society where the government

18   is the main employer.  The population is pretty impoverished,

19   so it's providing a lot of support payments and it also has to

20   make a lot of payments to keep a lid on things to prevent

21   extremists from taking over.  So to take the fact that the

22   government is shelling out lots of money to the population in

23   general, providing lots of jobs, and then to take the fact that

24   a few people have turned to militancy, you can't make a

25   government liable and also subject the public fisc to treble

E7mgsokc

1    damages.

2            THE COURT:  Right.  I wouldn't disagree with that nor

3    couldn't they convince me to disagree with that if there's no

4    evidence to conclude that this was the intent of the PLO or the

5    PA.

6            MS. FERGUSON:  I do think while our case is largely a

7    lack of admissible evidence sort of burden of proof case, there

8    are some key areas where we do disagree with the plaintiffs on

9    the legal standard, and I'll refer to the Court to the

10   briefing, but we have argued that you shouldn't have *respondeat*

11   *superior* liability in a statute with extraterritorial scope and

12   treble damages, but if you do, that because it's a government,

13   it should be a standard that requires a showing that it was

14   pursuant to a PA official policy or custom or practice.

15           THE COURT:  I understand, as I say, the lawyer's

16   disagreement about that, but I'm not sure I really

17   realistically understand the difference in terms of what a jury

18   would have to determine under either one of these theories.

19           The jury is still going to have to determine that it

20   was either the intent of the PA or the PLO that these people

21   carried out these acts or it was in the scope of what they were

22   expected to do, right?  I don't care which standard you use.

23   It seems to me that they would be liable under some theory if

24   it was their intent that these people commit terrorist acts and

25   they, in fact, were hired to do so.  It was within the scope of

E7mgsokc

1    what they were expected to do.

2            MS. FERGUSON:  If you think about the New York City

3    Police Department and you have a cop that shoots someone, so

4    the first question is going to be was he on-duty?

5            THE COURT:  Well, it's the same two questions that I

6    have:  One, whether it was within the scope of his employment

7    to just go out and shoot people for no reason or whether or not

8    it was the intent of the police department to have him go out

9    and shoot somebody that day or to go out and shoot somebody.

10           Now, if that was the case, *respondeat superior*, that

11   theory doesn't even apply simply because he went out and shot

12   somebody because he was a police officer.

13           MS. FERGUSON:  I think the plaintiffs have argued it's

14   enough for them to show that he was an employee but they don't

15   have to show that it was consistent with the PA intent or

16   policy.

17           THE COURT:  You two are sort of arguing about

18   *respondeat superior* as opposed to a *Monell* claim.  Also, what's

19   going to be helpful to me is I want to get your requests to

20   charge because I'm not quite sure how a jury is supposed to

21   make that distinction given these set of facts.

22           Either these people were doing this at the behest of

23   the PLO and the PA or they weren't.  I don't care which theory

24   you want to proceed on.  If it was within the scope of their

25   employment to go out and do terrorist acts, I'm not sure what

E7mgsokc

1    theory you say would not make the PLO liable.

2              MS. FERGUSON:  I think as you listen to plaintiffs'

3    counsel, I think it's really important to think about what

4    evidence they have that anything was done at the behest of the

5    PA or PLO.  There's a complete absence of that evidence which

6    is why we think there's no triable issue of fact.

7              THE COURT:  The one piece of evidence that they do

8    have whether or not it's sufficient or not to get to the jury

9    is that they'll argue, well, look, when they did these acts,

10   they rewarded them for it.  That's a piece of evidence, isn't

11   it?  It may not be determinative of the issue.  It may not be

12   sufficient evidence, but that's evidence that it's within the

13   scope of their employ.  They're being paid to do it, right?

14   They're getting financial remuneration after they do it.

15             MS. FERGUSON:  But it's part of a generalized payment

16   policy of broad application, and when a government has a

17   general payment policy of broad application, you don't have the

18   necessary scienter for purposes of the Anti-Terrorism Act which

19   imposes automatic treble damages.

20             THE COURT:  I understand that, but think about the

21   example you just gave me, which I think is a very good example

22   and in the case law.  Take the police example.

23             You would agree that it would be some relevant

24   evidence as to, and whether you want to call it a *Monell* claim

25   or you want to call it *respondeat superior*, it would be

E7mgsokc

relevant evidence of whether or not the police officer who shot
somebody was relieved of duty and fired after that or whether
or not he was promoted to captain and given a bonus, right?

You would have to agree that would be a relevant
consideration to try to determine whether or not the police
department should be responsible for the conduct that is at
issue here, right?

MS. FERGUSON:  That sounds like sort of a ratification
theory of liability.

THE COURT:  No, it's not a ratification theory of
liability.  The question is, I may agree with you that that, in
and of itself, doesn't make them liable, but I'm trying to say
that at least that's evidence of what they intended that's some
evidence of whether or not this was within the scope of his
employment, that's some evidence of whether or not this is what
they expected him to do or whether or not they directed him to
do so.  One is inconsistent with being a participant of that
and one is more consistent with having the intent and being a
participant of that.

You would agree that depending on how they reacted to
it, that's some evidence of whether or not they had nothing to
do with it or had something to do with it.

MS. FERGUSON:  This is the real peril of having a jury
sitting in New York in 2014 trying to judge what the
Palestinian Authority was doing ten, 12 years ago in the

E7mgsokc

1    context of a completely different society and government.  It

2    wasn't, in fact, evidence of support for bombing because

3    they're providing these payments across the board.

4              THE COURT:  That's a reasonable argument to make to a

5    jury.  I think a jury can understand that argument.  If the

6    facts are persuasive on that issue, a jury could understand

7    that.  I don't think the rules that we're applying here are

8    somehow dated.  It applies to the PLO now and it applies to the

9    PLO then.

10             If you say that there's a reasonable, logical way to

11   look at this other than looking at it in the way that the

12   plaintiffs want the jury to look at it --

13             MS. FERGUSON:  So you're saying a jury could find and

14   impose to the plaintiffs - at one point were seeking $3 billion

15   in damages - because the PA pays people in prison and has an

16   across-the-board practice of promoting people while they're in

17   prison?

18             THE COURT:  No, because they would obviously  be

19   entitled to hear that part of the evidence as part of their

20   evaluation of whether or not they believed that the PA or the

21   PLO were responsible for the acts that these individuals

22   committed.

23             MS. FERGUSON:  I guess my point is, that's all there

24   is here.

25             THE COURT:  That's what I have to look at and that's

E7mgsokc

1    your primary argument.

2              MS. FERGUSON:  And that that's enough.

3              THE COURT:  They can try to convince me that's enough

4    and maybe they have an argument that that's enough, but no,

5    they have to show it.  They have to put a case before a jury so

6    that the jury could logically conclude that the PA and the PLO

7    was involved in the terrorist act itself, either commanded

8    these individuals to commit those acts, either encouraged these

9    individuals to commit these acts, that there were circumstances

10   that one could logically conclude that it was in the scope of

11   their employment to commit these acts, that it would be

12   expected of them, and that there is evidence to conclude that

13   this is what the PLO and the PA wanted them to do and were glad

14   that they did it.

15             MS. FERGUSON:  There's no evidence of that.

16             THE COURT:  And the PA or PLO either directly

17   participated in that or hired them or expected them to do that

18   as part of their work.  My understanding is most of the

19   individuals that they say that they will prove are the

20   perpetrators were employed in either a military or paramilitary

21   way by the PA or the PLO; that would be some relevant

22   consideration, too.

23             I think there was a woman bomber who was not in that

24   capacity.

25             MS. FERGUSON:  She wasn't employed by the PLO.

E7mgsokc

1          THE COURT:  She wasn't the person directly employed.

2     Their theory with that is that the person that assisted her was

3     directly employed.

4          MS. FERGUSON:  There's no admissible evidence of that.

5     They're relying on a custodial statement that's implicated by a

6     third party.

7          THE COURT:  Again, are you denying he was employed?

8          MS. FERGUSON:  There's no evidence he was involved --

9     I can deny that this man named Abu Sharkh, I deny he was

10    employed.  I deny that there's any evidence that he had any

11    role in orchestrating this bombing.  Their only evidence is

12    this custodial statement of Munzar Noor, and that's a good

13    example.

14         You can't use a custodial statement of a Palestinian

15    under interrogation by Shin Bet to finger someone else to

16    establish that there's a third person who did it, but that's

17    what their case is based on.

18         THE COURT:  I hear the essence of your argument is

19    that the two primary disputed issues of fact which they cannot

20    even present admissible evidence on, and that is, one, with

21    regard to who, in fact, were the individuals who perpetrated

22    these acts; and, two, that there is any connection between the

23    PA and the PLO and these acts, any involvement as an

24    institution, government or how ever way either side wants to

25    characterize it; that the entity of the PLO or the PA, they

E7mgsokc

have no evidence to offer that they were participants in

planning, directing or executing the plans that were committed,

the violent acts that caused death or injury by whomever it is

who committed these acts.

Therefore, unless they can point to me what would be

admissible evidence of these individuals committing these acts

and admissible evidence that the PA or the PLO has some

connection with these acts that they shouldn't give it to a

jury.  That's what I hear the essence of your argument is.

MS. FERGUSON:  The last thing I'd add on because I

understand these prisoner payments and martyr payments are

something that you're focused on, I wanted to provide a little

context about the prisoner payments and the promotion of people

in prison.

We focused a lot of the briefing about the problems of

the Israeli military court convictions and the very high

conviction rates.  Most Palestinians just plead guilty.  We

don't view it as a fair system, and the Palestinians don't view

it as a fair system.  And the PA didn't have jurisdiction to

investigate these attacks in Jerusalem.  There was a history

that human rights organizations have recognized that a lot of

people were sent to these detention centers that didn't kill

civilians, so the PA wasn't in a position to make guilt or

innocence determinations and, as I said, a lot of these people

were viewed as political prisoners.

E7mgsokc

1              It's difficult for them to be making assessments.  Is

2      this person in prison because the Israelis are engaging in

3      social control or is this person in prison because they did it?

4      Now, in some cases, somebody got up in open court and said they

5      did it, but in other cases, it was unclear, so there was this

6      policy.  We don't know, they couldn't investigate it and they

7      didn't address this in the military court system.

8              THE COURT:  I know, but I'm not sure in what context

9      that you say that I'm supposed to evaluate that in order to say

10     that I determined that there's a good reason why they did this

11     so, therefore, it shouldn't be part of this case.  I can't

12     determine that.  That's a factual determination.  It's a

13     reasonableness determination that's a defense.

14             If they say they gave money to people who committed

15     terrorist acts after they committed the terrorist acts and

16     because they committed terrorist acts, for you to come back and

17     say, yeah, but we got a good reason for it, isn't that

18     something I, as a judge, can do anything about.

19             MS. FERGUSON:  There is no evidence of that at all.

20     There's evidence that they paid detainees and detainees'

21     families, not because they committed terrorist acts.  There's

22     no evidence of that.

23             THE COURT:  Again, but still, I'm not sure what I'm

24     supposed to do with that.

25             If they say to me, Judge, we have evidence that we

E7mgsokc

1    want to present that they paid every single one of these

2    individuals after they committed the terrorist act, we want the

3    jury to infer from that that they were being rewarded for their

4    terrorist acts, for you to come back to me and say, well, no,

5    that's not why they did it, we have a lot of other reasons why

6    they did it and that wasn't it, I'm not sure why that's summary

7    judgment.

8         They say, absent some other good excuse, the jury is

9    at least entitled to hear that they paid these people after

10   they committed the terrorist acts and there's no evidence that

11   they paid them for something other than the terrorist acts.

12        Now, you want to come back and say no, but that's not

13   why they paid them for and we want to demonstrate that they

14   paid them because they just give out remuneration for family

15   members who are killed in the cause or family members who are

16   suffering because their relative is in jail, and that's what

17   they routinely do, that's fine, but that's not a legal issue.

18        MS. FERGUSON:  You have to go back to the elements of

19   the Anti-Terrorism Act and whether there's any evidence that

20   the PA pays detainees with this intent to support terrorism, in

21   particular attacks on Americans, and whether this policy of

22   paying detainees actually caused the injuries to these

23   particular plaintiffs.

24        Ultimately, it is a tort case that comes down to what

25   was the tortious conduct, is it tortious, was it conducted with

E7mgsokc

1    the requisite scienter and did it cause injuries?

2         THE COURT:  But the PA and PLO make their own

3    determination as to whether or not people who commit acts of

4    terror will be included in those payments.  That in and of

5    itself is some evidence that they're not excluding people from

6    those payments or discouraging people from not taking these

7    acts.

8         Now, that's not in and of itself sufficient to prove a

9    case or to even get a case to the jury, but it's clearly

10    evidence to be considered as to whether or not they approved or

11    disapproved of the conduct that these people were engaged in.

12         If they can prove that these people were engaged in

13    that conduct and they can prove that as a result of being

14    engaged in that conduct, that was the reason that they

15    would -- remember, here it's not just the payments; it's the

16    payments coupled with, in many cases, promotions within the

17    PLO.  And they want to argue that they were promoted and paid

18    as reward for compensation for committing these acts of terror.

19         MS. FERGUSON:  There was a lock-step promotion system

20    for all security service employees.

21         THE COURT:  If that's the answer from the other side,

22    that's fine, and the jury can reject it but that doesn't take

23    away from the fact that if a person commits --

24         MS. FERGUSON:  But there's no admissible evidence --

25         THE COURT:  If my law clerk goes out and robs a bank

E7mgsokc

1    this afternoon and then comes back and tells me I just robbed a

2    bank and I say, okay, here's an extra $10, there would be

3    evidence of at least that I'm not disapproving your bad

4    activity.  As I say, this is not law.  That's factual, common

5    sense.

6         MS. FERGUSON:  The only evidence is the evidence of

7    the existence of these policies, not that they're targeted to

8    particular people for rewarding particular people, and I think

9    that is the only evidence in this case.

10         THE COURT:  Okay.

11         MS. FERGUSON:  And for a jury to decide that the

12   Palestinian Authority's policy of continuing to pay security

13   service employees while they're in prison when many of them are

14   in prison, just because they belong to what's considered an

15   illegal organization or have engaged in stone-throwing, for a

16   host of reasons, and to pay families whose homes have been

17   destroyed, who lost their breadwinner, who are going to be

18   starving, for a jury to say, oh, we think that's supporting

19   terrorism, there's no evidence of that.  So that's all their

20   case is.

21         THE COURT:  I may have the facts wrong or the

22   allegations wrong, but my understanding is there's at least on

23   one occasion that the PLO or the PA took action to arrest an

24   individual, and after taking action that they determined was

25   sufficient to arrest this individual, this individual was

E7mgsokc

1    released.  And the plaintiffs allege he committed the terrorist

2    act and after committing the terrorist act, the PA or the PLO

3    rewarded him for committing that terrorist act.

4           Now, your factual argument and reason for making the

5    payment is a legitimate one for the jury to consider, but it

6    seems to me that if that is what the evidence is that they can

7    present, it would be reasonable for the jury to consider

8    whether or not that was truly the reason for this payment since

9    they arrested the person themselves and they kept the person in

10   jail and they didn't pay the family and they did it at the

11   behest and insistence of, if not the Israeli authorities, but

12   they did it because of certain acts that this person committed.

13   So the question would be, well, why didn't you pay him before?

14          If you were going to arrest him yourself, what would

15   be the rationale for once he commits a terrorist act now to

16   compensate him or his family when you didn't compensate them

17   before without the terrorist act?  Then at least one could

18   consider whether the logic is what's motivating you is the

19   terrorist act.

20          Now, I may have the facts wrong.  It's obviously a

21   complicated to the actual scenario in six different situations.

22          MS. FERGUSON:  There are two different cases where

23   there's an alleged arrest and release.

24          THE COURT:  Right.

25          MS. FERGUSON:  In both cases, one was a Hamas bombing

E7mgsokc

1    who wasn't a PA or PLO employee and the other was man, Mohamed

2    Hashaika, who had been a PA employee, but his personnel records

3    show he had been fired.

4            But leaving that aside, there's no evidence of the

5    so-called releases.  For Abdullah Barghouti, the only evidence

6    of release is that during his interrogation, he told the

7    Israelis that they let him go.  And for Hashaika, the only

8    evidence of release is some speculation from one of these

9    Israeli Ministry of Foreign Affairs websites.  Actually, it's

10   the prime minister's office website saying that Hashaika

11   carried out this attack and the PA must have released him.

12   They just assumed that he had been released.

13           THE COURT:  Doesn't the PA know whether they released

14   him or not?

15           MS. FERGUSON:  The files that we produced in this case

16   that are part of their exhibits show that he escaped during the

17   conflict.

18           THE COURT:  That's a factual dispute.

19           MS. FERGUSON:  I'm saying there is no admissible

20   evidence of his release.  So it sounds provocative, but there's

21   no evidence that it would come in.

22           THE COURT:  Those are the kinds of things that I'm

23   looking for, specifically as to whether or not there is, in

24   fact, any admissible evidence.  They'll have to explain to me

25   how they intend to prove this.  And as you say, you're right,

E7mgsokc

1    with regard to things that are genuinely believed to be not

2    reliable facts or are genuinely disputed by the PLO or the PA,

3    they're going to have to give me some basis to admit what would

4    be inadmissible evidence in any other case in this courthouse.

5         It can't simply be that somebody said that they think

6    this is the guy who did it.  That's not the way it works, and

7    it never works that way.  That's why we have the rules that we

8    have.  If they don't have it, if they can't convince me that

9    they have clearly admissible evidence on these issues, then

10   they shouldn't get to the jury on these issues on one or more

11   of these situations.  I think I understand the overall argument

12   that you're making.

13        MS. FERGUSON:  Thank you, your Honor.

14        THE COURT:  Thank you.

15        Let me just first start with ten minutes for the

16   plaintiffs and then we'll take a lunch break.

17        MR. YALOWITZ:  Ten minutes?

18        THE COURT:  Yes.

19        MR. YALOWITZ:  May it please the Court.

20        I'd like to begin with the hypothetical that

21   Ms. Ferguson mentioned of the NYPD officer.  What we have here

22   in this case is evidence not just of the fact that some of

23   these perpetrators – I think of the seven attacks, we have

24   about 15 employees who are perpetrators – it's not just that

25   they were employees.

E7mgsokc

1          Imagine a case where the NYPD was hiring people with

2     prior records of violent crimes and they bring them onto the

3     force, number one; number two, imagine that some of these

4     police officers, while they're on the force, are known to be

5     engaging in terrorist activity and, in fact, go over to New

6     Jersey and shoot people up and do stuff like that and the New

7     Jersey authorities say, this particular police officer is

8     committing terrorism, please arrest him, and they do arrest

9     him.

10          The NYPD arrests him and they interrogate him.  And,

11     in fact, there's a document in our case where they were

12     interrogating this guy Hashaika who, by the way, we have

13     evidence that he remained on the force until his death and in

14     fact, he was promoted posthumously, so that's a disputed issue

15     of fact.  But in any case, this fellow Hashaika is being

16     interrogated and not only is he being interrogated but that's

17     being reported to Arafat himself.

18          So imagine Mayor de Blasio gets a particular report

19     that we're interrogating this police officer.  Find out what it

20     is that he was doing.  He is released.  Another disputed issue

21     of fact:  We have government reports and custodial statements

22     of Hashaika and Shawish, who was his coconspirator, he was not

23     a police officer.  He was teamed up with Hashaika in this

24     particular crime.  And those statements say that he was

25     actually released, affirmatively released.  And then, you have

E7mgsokc

cases where it's not just a rookie cop or a beat cop, but

pretty senior officers, captains, people who a jury could

conclude are managerial agents planning and conducting this

activity.

THE COURT:  Planning and conducting what activity?

MR. YALOWITZ:  Terrorism, planning the shootings,

planning the bombings.

THE COURT:  You mean other shootings and bombings?

MR. YALOWITZ:  Correct.  Correct.  And then they get

arrested and they get convicted and they have sentencings.

Your Honor, I just watched today's sentencing and I

saw a man express what appeared to me to be genuine remorse,

and I think it affected me.  I think it may have affected the

Court in terms of the sentence that the Court provided.  He

seemed to speak very genuinely about his life.

Well, in our cases, the police officers at their

sentencings, they didn't express that kind of remorse.  They

said I'm sorry I didn't kill more Jews.  That's what they said.

Or they said there are more like me or I hope my son grows up

to do what I did.  That's what the evidence will show about

these officers.

Then, it's not just the conduct of the officers; it's

a series of police magazines.  These are magazines not

independently published.  These are published by the police

department.  The magazines, we have quoted from them in

E7mgsokc

1    paragraph 56 of our Rule 56.1 statement, conveniently number 56

2    so it's easy to find.  These are really inflammatory statements

3    saying spill your blood in favor of Palestine; saying the

4    presence of the Jews on this land is a crime; comparing Jewish

5    people to Nazis.

6           Those are not like random people out there in the

7    world speaking about their prejudices.  These are official

8    police publications, which is evidence of what the official PA

9    policy might be.

10          Then after these people are convicted, as we have

11   pointed out, they're not paid under some social welfare

12   program.  They are kept on the payroll and they are given

13   promotions.  Some of them have had four promotions while they

14   sit in jail.

15          And it's not just the promotions and the pay, they

16   also put on TV shows about these guys on the PA-owned TV

17   station.  And the evidence will show that it's not like ABC or

18   CBS.  They don't have a First Amendment in the West Bank and

19   Gaza.  It's owned and controlled by the PA itself.  And these

20   TV shows say what a great guy Nasser Shawish was or what a hero

21   these people were.

22          Then multiply that not by a few random, radicalized

23   guys, which is what the defendants will say, multiply that by a

24   hundred PA police officers who are listed as being in jail for

25   committing terrorist crimes on the PA police's own website.

E7mgsokc

1    They put them up there saying these are the guys who are in

2    jail for security crimes, here is their rank and here is who

3    they are.  I think there are 97 of them, and that's just from

4    one branch.  That's not from the intelligence service.  That's

5    not from the preventative security.  They have six branches of

6    the PA police.

7            I'm happy to talk for a while.

8            THE COURT:  I don't want to interrupt you, but I

9    wanted you to finish that complete story, because the story you

10   just gave me, I assume you're not finished with it because it

11   still doesn't tell me in what theory you have that the PA or

12   the PLO were involved in this particular act of terrorism.

13           MR. YALOWITZ:  Sure.

14           THE COURT:  That's what I'm looking for.  I'm trying

15   to figure out what is your theory.  I assume your theory isn't

16   just they support terror in general so that means we can sue

17   them for this particular act.

18           MR. YALOWITZ:  You are correct.  So in these cases, we

19   have got four legal theories to connect the PA with these

20   individuals.

21           THE COURT:  All right.

22           MR. YALOWITZ:  Legal theory number one as we have been

23   talking about is *respondeat superior*.

24           THE COURT:  Why don't you run through the four and

25   then we'll come back after lunch.

E7mgsokc

1              MR. YALOWITZ:  Then we can talk further.  So that's

2      number one.  Number two, acts of a managerial agent.  So if a

3      person is senior enough, if they're a managerial agent and they

4      commit an act, then that's within the scope.  It's a variation

5      on *respondeat superior*.

6              THE COURT:  Right.  It's not much different.

7              MR. YALOWITZ:  It depends on their seniority level.

8              Number three is ratification.  Even if you didn't have

9      the approval — and you'll see this in the request to charge —

10     even if you didn't have the approval in advance, if they are

11     aware of the circumstances, which they were here, and they

12     expressed an approval of the activity, which they did here,

13     there's ratification.

14             Then number four is material support and resources for

15     terrorists and terrorist organizations.

16             THE COURT:  We can discuss it further, but I want to

17     focus you on one and two I don't think are significantly

18     different theories.  Three and four require, and you can

19     convince me if you think I'm incorrect, they require a certain

20     element.

21             Three is which one?

22             MR. YALOWITZ:  Ratification.

23             THE COURT:  Ratification:  I'm not sure that I know of

24     a legal theory that simply says that because I later said that

25     I approve of what they did, that makes me responsible for the

E7mgsokc

1    act.

2            If a guy goes out and shoots somebody because he beat

3    up his wife, for you to say you know what, I think he did the

4    right thing, it doesn't mean they can sue you, right?  Right.

5            So that ratification theory, you have to give me a

6    different theory other than they later approved of it to make

7    them culpable for the acts when they took place.  I'm not sure

8    I understand completely your theory.  I'll let you respond.

9            And the last one with regard to the material support.

10           MR. YALOWITZ:  Material support and resources.

11           THE COURT:  Material support, it cannot simply be

12   material support of terrorism in general.

13           MR. YALOWITZ:  Correct.

14           THE COURT:  It's got to be material support of the

15   terrorist act that you're basing the claim on.  So it can't

16   simply be we're in favor of terrorism in general.  You both

17   have cited cases, and I'm more than intimately familiar with *In

18   Re: Terrorist* and the case behind that because that's the case

19   I'm involved in.

20           MR. YALOWITZ:  Right.

21           THE COURT:  The circuit and the Supreme Court have

22   made it clear that you can't just say you support terror, you

23   gave money because you knew these guys were terrorists and,

24   therefore, you're liable under the act.  They say you have to

25   give money with the reasonable expectation that this is the act

E7mgsokc

1    that they were going to support; that act of terror.

2           MR. YALOWITZ:  If I may.  You continue.  I didn't mean

3    to interrupt.

4           THE COURT:  I'm done.  I was just going to say you can

5    address all of that after lunch.

6           MR. YALOWITZ:  I can't wait.  If your Honor can bear

7    with me for a minute.

8           THE COURT:  Sure.

9           MR. YALOWITZ:  First of all, on the ratification,

10    there's an important Second Circuit case which is pretty

11    recent.  I think it's called *Choudhary* or something like that.

12    I may have the name wrong.  It was a torture victim case out of

13    the Eastern District.

14           The charge to the jury was if you find that the

15    employee was acting in a way that was contrary to the

16    directions originally given, but later the employer knew about

17    the actions and approved of them and manifested an approval,

18    then you can find ratification.

19           THE COURT:  When you say "manifested an approval," it

20    depends on what you mean.  They can't just say I approve and

21    then that makes them liable.

22           MR. YALOWITZ:  Right.  Well, it could be "I approve,"

23    but we don't have just "I approve."  We have they kept them on

24    the payroll, they gave them promotions, they put TV shows out

25    saying they were national heros.  We have guys who were

E7mgsokc

1    employees, they blew themselves up and in their martyr file,

2    the PA says this person is a national hero because of what he

3    did, and we're going to give his family money for the rest of

4    their lives.

5         THE COURT:  You'd have to convince me.  And as I say,

6    part of it, it will be interesting to see what you say is the

7    relevant jury instruction on that, but you have to convince me

8    that simply because they did one or more of those things

9    subsequent to the act, that makes them *nunc pro tunc*

10   responsible for the act.

11        MR. YALOWITZ:  I would say it a little differently,

12   which is that is evidence which a reasonable jury could

13   conclude makes them liable *nunc pro tunc*.  And I do want to get

14   to that jury instruction.  We have been looking at it.  We had

15   to go dig it out of the docket because the circuit approved it,

16   so it's very useful in that regard.

17        THE COURT:  The factual awkwardness of that theory is

18   that it's not consistent with multiple acts of terror.

19        If your theory is that seven different acts of terror

20   occurred and after the acts of terror occurred, they ratified

21   it independently and that's what makes them individually

22   liable, well, that's a little inconsistent with arguing that

23   they wanted all of these acts to take place and they took some

24   affirmative act during the time to encourage these acts to take

25   place.  I understand that part of the theory.  But unless they

E7mgsokc

1    participated in the act prior to or during their commission, it

2    is unclear to me what factual scenario you say would make them

3    responsible for it even if they said we thought it was a good

4    thing.

5            MR. YALOWITZ:  You mean before the fact or after?

6            THE COURT:  No.  After the fact.  Your ratification

7    theory only deals with activity after the fact.

8            MR. YALOWITZ:  Right.

9            THE COURT:  You're saying that you can make them

10   liable simply because of the conduct that you want to point to

11   that they engaged in in relationship to that particular

12   employee after the fact.

13           The fact that they didn't fire the employee by itself

14   you would probably have to agree could not constitute

15   ratification.  The fact that they promoted the person after the

16   fact you probably would have to agree alone does not constitute

17   ratification so that they could be sued.  The fact that they

18   made payments to family members after the fact alone, I assume

19   you're not saying that that would make them liable for the acts

20   itself.

21           It seems to me that unless you prove one of your first

22   two theories, you don't even have a ratification theory.  I

23   don't know how you could demonstrate that it was not within the

24   scope of the employment and was not a managerial employee who

25   did it at the time, but they ratified it later, that there

E7mgsokc

1    would be some ratification theory that could make them liable

2    for an act that they never participated in, they never helped

3    plan, they never helped execute, simply because after the fact

4    you want to argue that they, quote, somehow ratified it.

5           I guess your theory would have to be they ratified it

6    because they compensated him for committing that act.

7           MR. YALOWITZ:  First of all, in your hypothetical, I

8    think I would be entitled to the *Choudhary* charge.  I wish I

9    could confirm that that's the name, *Choudhary*.

10          THE COURT:  I'll look it up if you want.

11          MR. YALOWITZ:  It's in my brief.  I just didn't bring

12   it up to the podium.

13          THE COURT:  I'll look at it over lunch.

14          MR. YALOWITZ:  It starts with a "Ch."

15          THE COURT:  *Choudhary*, I think.

16          MR. YALOWITZ:  It's a 2014 Second Circuit case.

17          THE COURT:  Fine.

18          MR. YALOWITZ:  That's the exact jury instruction.  So

19   I think given the facts of my case, I am entitled to that jury

20   instruction even without all of the other circumstantial

21   evidence that goes to pattern, practice, custom, incitement.

22          THE COURT:  I'd have to look at it, but you believe

23   that even if there was a situation where I was totally unaware

24   that they were planning to commit this act, that I had

25   absolutely nothing to do with them committing the act, and I

E7mgsokc

1    did nothing to help, encourage or command them to commit the

2    act, that my actions alone of continuing to employ them,

3    promoting them, saying I agree with what they did and giving

4    them a bonus for what they did in and of itself would make me

5    liable to the victims of the crime even though I had absolutely

6    nothing to do with the crime?

7            MR. YALOWITZ:  I think it would.

8            THE COURT:  I'll look at your theory, but I'm not sure

9    I understand it.

10           MR. YALOWITZ:  That's obviously not our case.

11           THE COURT:  If it's not your case, it can't be your

12   theory.

13           MR. YALOWITZ:  It's a jury instruction.  I want the

14   instruction.

15           THE COURT:  I don't know of any case, I don't know of

16   any theory of ratification -- and I assume you're only arguing

17   it in an employee/employer context.

18           MR. YALOWITZ:  Absolutely.

19           THE COURT:  But I don't know any theory of

20   ratification where the evidence would be insufficient to

21   demonstrate *respondeat superior* or insufficient to demonstrate

22   managerial acts, but it would still be sufficient to

23   demonstrate some sort of postconduct, postterrorist act

24   ratification.

25           MR. YALOWITZ:  Let me just take back what I agreed to,

E7mgsokc

1    because I think there are circumstances.  Take the female

2    bomber Wafa Idris who blew herself up in front of Mark Sokolow

3    and his family on a public street, she was not an employee of

4    the PA.

5          THE COURT:  Right.

6          MR. YALOWITZ:  Then they studied her case, the

7    official martyr institute studied her case and they came out

8    saying with a martyr file, the report, like their government

9    report saying she blew herself up in Israel.

10         THE COURT:  Right.

11         MR. YALOWITZ:  She's a hero of the intifada and her

12   family is entitled to money for the rest of their lives.

13         THE COURT:  Right.

14         MR. YALOWITZ:  Then they go and they name summer camps

15   for children after her.

16         THE COURT:  Right.

17         MR. YALOWITZ:  She's like a national hero.  They made

18   her into a national hero, so my theory of the case is that is

19   ratification.

20         THE COURT:  So that makes anybody who was a victim of

21   her terrorist act, that gives them the right to sue them

22   because they applauded the act afterwards.  Your theory isn't

23   even that she's an employee of them.  Your theory on that

24   theory is they had nothing to do with her.

25              Suppose it was another entity that sort of agreed with

E7mgsokc

1    that and they say you know what?  I agree with you, they did a

2    good thing and we're going to make a scholarship in her name

3    and we call her a martyr, and we're going to help the family.

4    Do you think the victim could sue that entity?

5              MR. YALOWITZ:  I'd have to think about it.

6              THE COURT:  That would be a tough one.  This is a

7    politically charged circumstance.  You can't say everybody

8    agreed with what she did, no matter how terrible it would be,

9    what any of these terrorists did, you can't say that everybody

10   agreed with it or took some acts to say I'm glad it occurred

11   that that they can be sued as a defendant by one of the victims

12   of the perpetrator.

13             That can't be your theory.

14             MR. YALOWITZ:  No, it's not.  So Sadam Hussein gave

15   money to a lot of terrorist families.  We're not suing Sadam

16   Hussein.

17             THE COURT:  Right.  Do you think you have a right to

18   sue Sadam Hussein?

19             MR. YALOWITZ:  I don't think so.

20             THE COURT:  As I say, a terrible example, but if

21   Microsoft decided to do it, do you think you can sue Microsoft?

22   That's not a theory that I'm familiar with that you can sue the

23   company that has nothing to do with the act because they

24   decided that they agreed with what occurred.

25             MR. YALOWITZ:  Now, in the case of Idris, of course,

E7mgsokc

1   there was other evidence of PA involvement.

2          THE COURT:  Yes, but I'm talking about your theory.

3   You gave me four different independent theories.  And I'm not

4   as confident about an independent theory on these set of facts

5   of ratification that if they had no participation whatsoever in

6   planning or in executing the terrorist act, that there would be

7   another theory that you can sue them under because they simply

8   later ratified, whether they're an employee or not, because

9   some are employees and some are not.

10          MR. YALOWITZ:  Our case is in between.  It's not

11   Microsoft.  It's her government.  And they're putting out

12   incitement and literature and speeches saying this is a good

13   thing to do.  When people, even if they're not employees, when

14   their citizens do it, they reward it.

15          THE COURT:  Let me reverse that and then we'll take a

16   break.  Let's switch the entities here.  Suppose someone took a

17   terrorist act against the PLO or the PA, and that person took a

18   terrorist act and it turned out to be a citizen of Israel.  And

19   the PLO said it was a terrorist act.  The person said no, this

20   was a person who was a threat to Israel and we thought it was

21   necessary to assassinate the person and then Israel said we

22   agree, we have looked at the circumstances.  We agree that this

23   was a person who should have been assassinated, we're glad that

24   person was assassinated, we think this person is a national

25   hero.

E7mgsokc

1        Do you think that they could sue the government of

2   Israel under a theory of they ratified it?

3        MR. YALOWITZ:  Leaving aside the sovereign immunity

4   issues?

5        THE COURT:  Yes, leaving aside sovereign immunity.

6        MR. YALOWITZ:  This is a sovereign immunity act of

7   war.

8        THE COURT:  I'm trying to see this theory of

9   ratification.

10       You wouldn't argue that they could sue an entity that

11  didn't have sovereign immunity simply because they said they

12  agreed with it in this politically charged atmosphere?

13       MR. YALOWITZ:  Right.  It's not the mere agreement.

14  It's the combination of encouragement in advance.

15       THE COURT:  But encouragement in advance is not

16  ratification.

17       MR. YALOWITZ:  Agreed.  Agreed.

18       THE COURT:  I'm talking about a theory that you have

19  that you say is independent of whether or not they had any

20  involvement with it prior to that, and having involvement with

21  it prior to that is not a ratification theory.

22       MR. YALOWITZ:  I want to look at it further, but I

23  think the Court is right here that ratification goes to

24  employees or agents.

25       THE COURT:  It's not really a separate theory.

E7mgsokc

1          MR. YALOWITZ:  It goes to a way in which the acts of

2     the employee or agent can be traced to the entity.

3          THE COURT:  Ratification may be a way to demonstrate

4     that it is evidence that this person did an act within the

5     scope of their employment, but I don't understand it as a

6     separate theory if they didn't do the act within the scope of

7     their employment.

8          MR. YALOWITZ:  Where I was getting crossed up is that

9     it's not just employment; there are other ways of showing

10    agency.

11         THE COURT:  Right.

12         MR. YALOWITZ:  Our theory would be that somebody who

13    is encouraged and talks to employees and so on and so forth,

14    hanging around the edges, even if they're not a formal

15    employee, they're hanging around the edges, and then they go

16    off and commit a tort, and then the entity says, yeah, they did

17    a good thing, so I think they have to have some prior

18    relationship.

19         THE COURT:  I think they have to have more than just a

20    prior relationship; I think they have to have some prior

21    involvement in the act or it's an act that was within the scope

22    of their employment.

23         If they had no prior relationship to the act, it's

24    rather dangerous for me to say that we can start suing people

25    who had nothing to do with the act but they later said that it

E7mgsokc

1    was a good thing and they later did things that demonstrated

2    that they took that position.

3           It would be like if I owned a store in Alabama and

4    somebody decided they want to kill somebody because he's a

5    civil rights worker, that because I say I think it was a good

6    thing and I would have killed him myself, that means I could be

7    sued for the act that was committed because I ratified it.

8    That doesn't work that way.

9           MR. YALOWITZ:  We're talking about a much more subtle

10   issue here.  We're talking about a guy who hangs around the

11   store and does odd jobs and there's a nod that somebody needs

12   taken care of.

13          THE COURT:  Yes, but that's not ratification.  Every

14   time you give me a fact that occurs before the act takes place,

15   that takes it out of a ratification argument.

16          I'm talking about a theory where I had nothing to do

17   with it prior to it, and your only legal theory that I should

18   be sued and be liable for it is because of my subsequent

19   ratification of an act that I had nothing to do with before it

20   took place.

21          MR. YALOWITZ:  Right.

22          THE COURT:  I don't know of such a thing.

23          MR. YALOWITZ:  I think you and I agree that we need

24   some circumstantial evidence of prior encouragement and I think

25   we have a lot of that.

E7mgsokc

1           THE COURT:  Let's take the lunch break.  Let's

2     continue at 2:30.  I'll give you a full opportunity to respond.

3           MR. YALOWITZ:  Thank you.

4           (Luncheon recess)

5                         AFTERNOON SESSION

6                           2:35 p.m.

7           (In open court)

8           THE COURT:  Yes, Mr. Yalowitz.

9           MR. YALOWITZ:  Thanks, Judge.

10          While we were on the break, I had a chance to find the

11    charge from the *Choudhary* case. I didn't find it.  My

12    colleague, Mr. Hashimoto, called back to the office and he

13    found it.

14          It confirms I think what I was trying to say, which is

15    that the relationship between the person who perpetrated the

16    crime or tort and the entity has to be some relationship of

17    agency or employee.

18          So Wafa Idris getting a scholarship from Microsoft,

19    she has no agency relationship with Microsoft.  The

20    ratification is a way of dealing with the agency or employment

21    relationship and if I could just read the charge to you from

22    *Choudhary*, and I'll give you the cite.

23          THE COURT:  I don't think it was in the case.

24          MR. YALOWITZ:  Right.  The charge is not in the Second

25    Circuit case.  We had to go to the docket and look up the

E7mgsokc

1    charge.  The charge is ratification, adoption or approval means

2    to treat the act as if it was originally authorized.

3                THE COURT:  Okay.

4                MR. YALOWITZ:  A defendant is liable for the conduct

5    of the agent if after the fact the defendant ratified, adopted

6    or approved of that conduct, even if it was originally

7    unauthorized.  *Choudhary* was an agency case.  It wasn't an

8    employment case.  I think I would concede that there has to be

9    some prior relationship of some kind.

10               THE COURT:  I'll keep that in mind when I look at your

11   jury instructions, but my initial reaction would be that it's

12   got to be some sort of ratification, and to the extent that the

13   employer is taking on some sort of legal obligation which was

14   represented by the acts of the agent.

15               When you loosely use the word "ratification," I don't

16   think it's defined as simply we agree with what he did.  It has

17   to be "Yes, he has done that on our behalf."  That's a

18   ratification.

19               MR. YALOWITZ:  I think that's a nuance that we're

20   going to need to sort out in the jury charge.  I don't want it

21   to be a loose, you know, just anybody who says "it's good" has

22   ratified.  That wouldn't be helpful.

23               THE COURT:  Right.

24               MR. YALOWITZ:  That's not what I'm looking for.

25               THE COURT:  As long as the ratification means that you

E7mgsokc

1      adopt the activities of the agent as your own.

2              MR. YALOWITZ:  Right.

3              THE COURT:  Let's put it this way:  It obviously

4      doesn't rise in this case to the extent that the PLO or the PA

5      is saying that he acted on our behalf, so we take full

6      responsibility for his actions; that would be the ultimate

7      ratification.

8              MR. YALOWITZ:  I think that we have here a facts and

9      circumstances ratification rather than a they passed a national

10     resolution saying, you know, these acts are officially

11     ratified.  It's not like a board of directors' ratification.

12             THE COURT:  Yes.  I'm saying in most instances of

13     ratification, there has to be clear evidence that they have

14     accepted the act as their own.

15             MR. YALOWITZ:  Based on the facts and circumstances.

16             THE COURT:  Right.

17             MR. YALOWITZ:  Correct.

18             THE COURT:  And now to what extent do you say that

19     they have manifested an intent to accept that terrorist act as

20     their own, I'm not sure, and I'll look at your jury

21     instructions, but I'm not sure that you have such an

22     independent theory beyond whether or not --

23             MR. YALOWITZ:  I think actually Wafa Idris is a good

24     example of this.

25             The evidence is that she was a confidential informant

E7mgsokc

1    to the General Intelligence Service.  She was not an employee.

2    She gave them intelligence information.  And the evidence which

3    Ms. Ferguson helpfully provided in our binder in Exhibit 465 is

4    that this fellow, Abu Talal, who was a GIS employee, wanted a

5    female suicide bomber.

6            THE COURT:  Right.

7            MR. YALOWITZ:  Do you have 465?

8            THE COURT:  Yes.

9            MR. YALOWITZ:  So, if you look at the second and third

10   page, this is a confession by a guy who ultimately pled guilty

11   to participating in this suicide bombing and here is his

12   confession.  If you look at the bottom of page two he says, and

13   I'm looking at lines 19 and 20, he says:  Abu Talal asked me

14   what I thought about Wafa.  I said to him that I didn't know

15   and we should ask her.  And then Abu Talal approached Wafa

16   Idris and invited her to his home.

17            So that's kind of the set-up.

18            Then if you look at the next page, this is sort of a

19   key admission.  He says:  In the home of Abu Talal, that's the

20   GIS employee, we sat down, Abu Talal and Wafa Idris and I, and

21   we talked about the subject, I mean a suicide attack.

22            THE COURT:  Okay.

23            MR. YALOWITZ:  Then the other document that

24   Ms. Ferguson gave us that's very helpful is Exhibit 233, which

25   is a Palestinian Authority report and that report says at the

E7mgsokc

1    night in which it was revealed that the person who carried out

2    the attack was shaheeda Wafa Idris.  Shaheeda is an Arabic word

3    meaning martyr.  And before anybody claimed responsibility for

4    the attack, Tawfiq Tirawi, head of the General Intelligence,

5    which is the same agency that Abu Talal works for, called

6    Khalil Idris, the elder brother of the shaheeda several times

7    and requested that the family would not announce that Wafa was

8    the one who carried out the attack.

9            So a reasonable inference from these two documents is

10   that there was an agency relationship between Wafa Idris and

11   employees of the GIS who knew about the attack even before it

12   was publicly announced and who recruited her to do it.

13           The jury could infer that from the document.

14           THE COURT:  Still, that's not an adoption theory.

15           MR. YALOWITZ:  Right.  That's an agency theory and

16   then ratification goes on top of that.

17           THE COURT:  On those facts, if you urge these facts,

18   you don't need ratification.

19           MR. YALOWITZ:  I don't even need ratification.

20           THE COURT:  So I don't know in what case there's a

21   separate theory of ratification if you don't have a theory that

22   they were employees or agents or known participants at the

23   time.

24           Let's put it this way:  I assume every one of your

25   factual scenarios that you believe you're going to demonstrate,

E7mgsokc

1   it's going to be your position that the person working for the

2   PA or the PLO at the time.

3           MR. YALOWITZ:  Yes.

4           THE COURT:  And/or the PA or the PLO participated in

5   either the planning or execution of that act.

6           MR. YALOWITZ:  Yes, correct.

7           THE COURT:  Where do we get ratification?

8           MR. YALOWITZ:  Because it's an additional basis for

9   liability.  It's an additional basis.

10          THE COURT:  The only thing I don't understand is on

11  these facts, as you're trying to rely upon them, if one cannot

12  conclude on a *respondeat superior* theory or direct

13  participation theory that they were involved, I don't know

14  what's the factual scenario that you have given that

15  constitutes ratification.

16          MR. YALOWITZ:  Suppose the jury says, well, I'm not

17  really sure.  Okay.  I see the evidence that this person was an

18  agent, but I'm just really on the fence about whether they were

19  or not.

20          THE COURT:  Then they're not.  You lose.  You have the

21  burden of proof.  If the evidence is equally one way or the

22  other, the plaintiff who has the burden of proof loses on that

23  issue.

24          MR. YALOWITZ:  Let me say it a different way:  I'm

25  really on the fence as to whether this is an authorized act.

E7mgsokc

1           THE COURT:  Okay.

2           MR. YALOWITZ:  They're an employee.

3           THE COURT:  So they're not convinced that it's an

4    authorized act.

5           MR. YALOWITZ:  Right.  So now we go and say, all

6    right, even if they didn't preauthorize it, which there are a

7    lot of reasons why the circumstances would -- I would argue to

8    the jury, there are a lot of reasons why the circumstances do

9    support *respondeat superior* preauthorization, but even if they

10   didn't preauthorize it, they adopted it as their own through

11   the glorification, through the pay and promotion and naming

12   soccer stadiums after her and that kind of stuff.

13          THE COURT:  How does that adopt her acts?  How does

14   that make them responsible?

15          If the jury says I'm not convinced that they had any

16   prior knowledge or participated in any way in this act, how is

17   it that any of those subsequent acts makes them responsible for

18   her activity?

19          MR. YALOWITZ:  Because if they say in an official

20   report she did this as part of her national duty, now they're

21   saying she did this for us, our nation, the nation that we

22   would like to create in the West Bank called Palestine.

23          THE COURT:  Okay.  But they're not talking about she

24   did this for the PA.

25          MR. YALOWITZ:  Well, I think the jury could infer

E7mgsokc

1    that.  I think the jury could infer it when they say she's a

2    hero.

3                THE COURT:  They can say anything they want to say

4    about her.  They could compliment her.  They could criticize

5    her.  They could say she did a good thing.  They could say she

6    did a bad thing.  They could say that she did something that

7    advances our interests.  They could say she did something that

8    complicates our situation and was detrimental to our interests.

9                Those postacts, those aren't adoptions of her act.

10   Those are judgments about her act.  You have to give me

11   something more that makes them legally now responsible for what

12   she did if she did it without their knowledge and without their

13   participation.  Simply because they say they're glad she did it

14   doesn't make them legally responsible for her.

15               MR. YALOWITZ:  Let's take a starker case.  Let's take

16   the case of a police officer who stands up in court and says

17   I'm guilty, I'm proud of what I did, I would do it again, and

18   there are hundreds of police officers just like me waiting to

19   do the same thing.

20               THE COURT:  Okay.

21               MR. YALOWITZ:  And his court documents are in the file

22   of the PA.  And the PA says he's good from a security and

23   morals perspective.

24               THE COURT:  Okay.

25               MR. YALOWITZ:  They give him promotions.

E7mgsokc

1            THE COURT:  Right.

2            MR. YALOWITZ:  They give him raises.

3            THE COURT:  Right.

4            MR. YALOWITZ:  They put articles out on their

5    government-owned newspapers and television programs saying he's

6    a national hero.

7            THE COURT:  Okay.

8            MR. YALOWITZ:  Couldn't a jury reasonably infer that

9    even if we don't have the order saying "go do it," the jury

10   could reasonably infer that postact, given all their knowledge,

11   the fact that they pay him, the fact that they compliment him,

12   the fact that they promote him, those are all, either

13   independently or in combination, a manifestation in the facts

14   and circumstances that they approve of his act, even if it was

15   not originally authorized.  That's my theory of ratification.

16           THE COURT:  If you say yes, that's true in the way you

17   characterized it, it indicates they approved of his act, but it

18   doesn't tell me why, simply because they do those things

19   postact, it makes them legally responsible for his acts.

20           If a police officer shoots somebody in the street and

21   the person turns out to have been a mass murderer and the

22   police department says later we're glad that he shot this

23   person and now that he shot this person, we have decided that

24   we can close out all of these cases and we have discovered that

25   he murdered ten people.  If his family sues the police officer

E7mgsokc

1    for some wrongful act for some tort, it doesn't mean because

2    they decided to give him a medal for killing a mass murderer

3    that that makes them liable for the wanton, unjustified

4    shooting that he engaged in which they had nothing to do with.

5           MR. YALOWITZ:  There's a case from the First

6    Department that we talk about in our brief.  I think it's

7    called Lauani or Laudi, something like that.  It's a First

8    Department case.  It was an unreasonable force case.  It was a

9    hostage situation where the perpetrator had a hostage.  It

10   wasn't a 1983 case, so there wasn't the issue of pattern and

11   practice, so it was a classical New York State tort case.

12          THE COURT:  Right.

13          MR. YALOWITZ:  The First Department said in this case

14   there was enough evidence to go to the jury on unreasonable

15   force, and nobody in advance said to any cop on the

16   scene -- what happened is, somebody shot without hearing

17   orders.  Somebody just randomly shot at the perpetrator and

18   killed the hostage.  Now the hostage's family goes to sue the

19   NYPD.

20          The first part of the goes to the jury because it's

21   imputing the acts of the employee to the employer, even though

22   it's not preauthorized, and the question was, Were they

23   unreasonably using force?

24          THE COURT:  That's because he was on-duty and he was

25   acting within the scope of his employment.

E7mgsokc

1          MR. YALOWITZ:  Correct.

2          THE COURT:  That's not a ratification theory.

3          MR. YALOWITZ:  Well, if they then go and give him a

4    medal, that's all the more so; that's just a plus factor.

5          THE COURT:  I know.  It may be a plus factor, but it's

6    not an independent theory.

7          MR. YALOWITZ:  Okay.

8          THE COURT:  That's all I'm saying.  Your position is

9    you could today decide you want to drop all of those theories

10   except for ratification and you could go to this jury just on a

11   ratification theory.

12         MR. YALOWITZ:  That's not going to happen.

13         THE COURT:  And just rely upon what they said and did

14   after the acts and not have to have the burden of proving that

15   they had anything to do with the acts before they took place

16   and that you could prove liability that way.

17         The big distinction that you just drew between the

18   example you gave is the distinction of whether the person is

19   on-duty or off-duty.  If this was an off-duty cop, your

20   analysis wouldn't hold up because the analysis is dependent on

21   he's within the scope of his employment.

22         So if these people were in the scope of their

23   employment, and I agree with you that you have a *respondeat*

24   *superior* legal claim, then the fact you've proved he's within

25   the scope of his employment may be enough to demonstrate that

E7mgsokc

1    they're liable.

2            But if you say that, well, I can't prove that he was

3    working for the PLO or the PA at the time that they engaged in

4    the act, but even though they weren't working for them at the

5    time, I want to use a ratification theory or I'm not sure that

6    there is such a theory to simply say somebody who does an act,

7    not in the scope of their employment, not participated in by

8    the employer or either ordered by the employer or engaged in by

9    the employer, that the employer is simply liable because later

10   on they say that they approve of it and they do things that

11   indicate that they were glad he engaged in this improper

12   conduct.

13           MR. YALOWITZ:  I can guarantee you, you're not going

14   to have to decide that issue because we're not going to drop

15   our *respondeat superior* claims, so it's an interesting

16   theoretical question.

17           THE COURT:  The only realistic analysis that I need to

18   undergo is that if you have a *respondeat superior* claim, if you

19   can't prove that claim, whether you have the right to prove

20   some adoption or ratification claim, or if you can prove that

21   claim, do you have the right to try to still prove some

22   adoption or ratification claim.

23           There's no such thing as being a participant in the

24   crime and also ratifying it.  If you're a participant in the

25   crime, in the conduct, there's no such theory of ratification.

E7mgsokc

1   The facts don't support a ratification.  They support a theory

2   that you were a participant in the crime.

3           Now, as you say, you can think about whether or not,

4   well, if I'm short on that proof, maybe they can use the other

5   theory.  But the way you say it, it approaches it a criminal

6   case if it's somehow a lesser or included offense.  It's not.

7   It's a totally different theory that has to be supported by a

8   different set of facts than the facts that you intend to put

9   before the jury.

10          MR. YALOWITZ:  I don't think it's a lesser-included

11  offense.

12          THE COURT:  Right.  So you can't say, well, if I'm

13  missing the element that they were participating beforehand,

14  that even though I proved everything else, I can make it a

15  ratification.

16          MR. YALOWITZ:  I think it goes to authorization.  It

17  goes to whether it's within the scope of the employment or

18  agency.

19          THE COURT:  Right.

20          MR. YALOWITZ:  If there's some doubt about whether

21  it's within the scope of employment or agency, it's an

22  alternate way to get there.  It's not a substitute.

23          THE COURT:  As they say, there are always alternate

24  legal theories, but there's not an alternate set of facts.

25          MR. YALOWITZ:  Right.

E7mgsokc

1          THE COURT:  Only one thing happened.  And you have to

2     determine whether or not -- what the evidence is.  You can't

3     say they did it this way, but if you don't believe that, then

4     I've got another way that they did it.  No.  It one thing

5     happened.  So you can always have an alternative legal theory,

6     but you can't have alternative facts.

7          So either you're going to put before this jury that

8     these people were working for them at the time, that their acts

9     were approved of when they did it, that they even knew about it

10    or participated in it, encouraged it --

11         MR. YALOWITZ:  Or reasonably foresaw it.

12         THE COURT:  Again, I'm not sure that you two will

13    agree that that's the language that meets the standard, but

14    reasonably foresaw it --

15         MR. YALOWITZ:  Right, that's what Judge Friendly said

16    in the *Bushey* case.

17         THE COURT:  Now, whether that defines itself as that's

18    what they intended or --

19         MR. YALOWITZ:  Intent is a separate thing.  Maybe I

20    should go to material support also.  If we have *respondeat*

21    *superior* liability, the intent of the perpetrators is imputed

22    to the employer, right?  If they're acting within the scope of

23    their employment, they commit an intentional tort, that intent

24    is imputed to the employer.

25         THE COURT:  Yes, but I guess I'm using in a more

E7mgsokc

1    generic sense the word "intent."  It's got to be intended that

2    this is what they were supposed to be employed to do.

3              MR. YALOWITZ:  Yes; it has to be within the

4    foreseeable scope of their employment.

5              THE COURT:  Right.  This is what they were hired for,

6    partially.

7              MR. YALOWITZ:  Let's be really careful about this

8    because we have the *Riviello* case is sort of the classical case

9    with a short order cook and he throws the knife at the

10   customer.  And they employer says, look, I didn't tell him to

11   throw a knife at the customer.  I didn't give him a medal to

12   throw a knife at a customer and he did it and he shouldn't have

13   done it.  And the New York Court of Appeals says that's

14   reasonably foreseeable.  He's within the context of those

15   circumstances and they go through like a multifactor test.

16   They say within all of those circumstances, that question goes

17   to the jury whether it's within the scope of his employment.

18             THE COURT:  But the simpler analysis there is that

19   he's on the job.

20             MR. YALOWITZ:  Right.

21             THE COURT:  There's no dispute that he's on the job.

22             MR. YALOWITZ:  Right.

23             THE COURT:  So that's the classic *respondeat superior*

24   case.  You want to put it in a not-so-classical theory that

25   somehow 24 hours a day, seven days a week that anyone employed

E7mgsokc

```
1   by the PLO is employed in a manner that if they decide to
2   commit a terrorist act, it's foreseeable to them and they
3   should be sued for it.
4              MR. YALOWITZ:  I think you're overstating my theory.
5              THE COURT:  I am overstating it because I want you to
6   correct me.
7              MR. YALOWITZ:  Right.  That's not my theory.
8         My theory is you have to look at the evidence and the
9   circumstances of this case, with these perpetrators in the
10  context of the time and place where they were acting.
11             THE COURT:  Right.  But that's not a legal theory.  I
12  understand that's what you have to do.  The legal theory is
13  what do you have to find.
14             MR. YALOWITZ:  Right.
15             THE COURT:  In this case, you have to find that it was
16  foreseeable that they would commit this act while they were
17  employed in furtherance of their employment by the PLO.
18             MR. YALOWITZ:  Right.  Reasonably foreseeable.
19        This is the New York State Pattern Jury Instruction.
20  Among the factors to be considered:  The connection between the
21  time, place and occasion for the act.
22             THE COURT:  Right.
23             MR. YALOWITZ:  The history of the relationship between
24  the employer and the employee as spelled out in actual
25  practice.
```

E7mgsokc

1          THE COURT:  Right.

2          MR. YALOWITZ:  Whether the action was commonly done by

3    such employees.

4          THE COURT:  Okay.

5          MR. YALOWITZ:  The extent of departure from normal

6    methods of performance.

7          THE COURT:  Right.

8          MR. YALOWITZ:  Whether the specific act was one that

9    the employer could reasonably have anticipated.

10          THE COURT:  Okay.  Why don't you give me an example,

11    take one of the incidents, and give me the example of the proof

12    that you say matches each one of those elements.

13          MR. YALOWITZ:  Sure.  Let's take the case of the 2004

14    bombing that killed Scott Goldberg.

15          THE COURT:  Okay.

16          MR. YALOWITZ:  So three of the perpetrators were

17    employees of the Palestinian Authority.  They were police

18    officers.  They had prior criminal records.  And they were kept

19    on the force.

20          During the events of the Al-Aqsa intifada, these

21    particular individuals took hostages in the Church of the

22    Nativity in Bethlehem and they held those hostages for a long

23    time and then they finally negotiated a release.  They stayed

24    on the police force, notwithstanding their hostage-taking.

25          By the time of this bombing, there had been literally

E7mgsokc

1    hundreds of articles, statements of incitement, not just by,

2    like, some random guy in a mosque, but by Arafat himself, by

3    his top lieutenants, by government-owned newspapers saying this

4    is a good thing to do.  There are police magazines.  There was

5    a pattern of not just a few guys, but dozens of guys, maybe

6    hundreds of guys who had committed these crimes and who didn't

7    get punished for it.

8             THE COURT:  I understand what inferences you want

9    drawn from that, but you're not corresponding that to the

10   elements that you just gave me.  Let's go through the elements

11   that you just gave and start with the first element.

12            MR. YALOWITZ:  Okay.

13            THE COURT:  What about the time, place or anything

14   else --

15            MR. YALOWITZ:  Time, place and occasion.

16            THE COURT:  Right.  What is the time, place and

17   occasion that one would examine that would make this *respondeat*

18   *superior*?

19            MR. YALOWITZ:  I would contend that the time, place

20   and occasion is the year 2004, in the West Bank where you have

21   a situation where there's violence being perpetrated by

22   Palestinian police officers.  So that's the time, place and

23   occasion.

24            THE COURT:  Yes, but that applies to millions of

25   people.

E7mgsokc

1              MR. YALOWITZ:  Right.  Well, it's not millions of

2     people because there's not millions of police officers.

3              THE COURT:  You didn't say police officers.

4              MR. YALOWITZ:  I meant to.  I meant to.

5              THE COURT:  No.  Police officers is not part of the

6     element that we're discussing.  We're discussing the time,

7     place of the incident.

8              MR. YALOWITZ:  And occasion.

9              THE COURT:  Right:  Time, place and occasion.  What is

10    it about the time, place and occasion that brings this closer

11    to a *respondeat superior* case?

12             Under your theory, if it happened anywhere in the

13    Middle East -- quite frankly, under your theory, if it happened

14    anywhere in the world, if it happened any time of day, and if

15    it happened on any particular occasion, that's evidence of

16    *respondeat superior*.

17             You're not claiming that the timing is relevant at all

18    if it takes you one way or the other in the direction of

19    *respondeat superior* or not *respondeat superior*, right?  Suppose

20    it happened at 8:00 in the morning?

21             MR. YALOWITZ:  That doesn't matter.

22             THE COURT:  Suppose it happened in 2005 instead of

23    2004?

24             MR. YALOWITZ:  That matters.

25             THE COURT:  That matters?

E7mgsokc

1            MR. YALOWITZ:  Right.

2            THE COURT:  Why does that matter?

3            MR. YALOWITZ:  Because Arafat was dead in 2005.

4            THE COURT:  So you said it has to be a time when

5    Arafat was alive?

6            MR. YALOWITZ:  When Arafat was instigating terror;

7    right.

8            THE COURT:  What does that have to do with -- well, I

9    shouldn't say it like that, but Arafat is not a defendant in

10   this case.

11           MR. YALOWITZ:  No, but he was the president of the PA.

12   He was the chairman of the PLO.

13           THE COURT:  So you say only when Arafat was head of

14   the PA and the PLO that the PLO is somehow in timing

15   responsible for the acts of terror?

16           MR. YALOWITZ:  Right.  It's a factor that weighs in

17   favor of *respondeat superior*.  It's not the sole factor.

18           THE COURT:  When you say "time," you're not talking

19   about time of day.

20           MR. YALOWITZ:  Correct.

21           THE COURT:  You're talking about only what year it

22   happened.

23           MR. YALOWITZ:  Correct.

24           THE COURT:  When you talk about place, what place are

25   you talking about?

E7mgsokc

1              MR. YALOWITZ:  Jerusalem.

2              THE COURT:  As opposed to any other city?

3              MR. YALOWITZ:  As opposed to Cairo or New York.

4              THE COURT:  Suppose it was in Cairo or New York and it

5    was an American citizen killed by someone who was targeting an

6    American citizen and employed by the PLO?

7              MR. YALOWITZ:  Different case.  Less likely.

8              THE COURT:  So you say Jerusalem makes it more likely

9    that it was a PLO *respondeat superior* occasion?

10             MR. YALOWITZ:  Right.

11             THE COURT:  And the circumstances, what about about

12   circumstances.

13             MR. YALOWITZ:  Occasion.

14             THE COURT:  Occasion.

15             MR. YALOWITZ:  Time, place or occasion.  The occasion

16   is a suicide bombing, so that's a technique.

17             THE COURT:  That's not an occasion.

18             MR. YALOWITZ:  It's the incident; that's what we're

19   talking about.

20             THE COURT:  A suicide bombing as opposed to a

21   shooting, that's not an occasion.  That's an m.o.

22             MR. YALOWITZ:  Yes, as opposed to a street crime.  As

23   opposed to, like, a bank robbery or a mugging.  The fact that

24   it's a suicide bombing on a bus makes it another factor.

25             THE COURT:  Let's go to the second factor.

E7mgsokc

          MR. YALOWITZ:  The second factor is the history of the

relationship between the employee and the employer as spelled

out in actual practice.

          THE COURT:  What are we looking for in that history?

          MR. YALOWITZ:  So we're look at did they hire him even

though he had a criminal record?  Which they did.  Did they

keep him on the payroll even though they understood that he was

committing terrorist acts?  They did.  Did they keep him on the

payroll even though they knew he was a member of a designated

terror entity called the Al-Aqsa Martyrs Brigades?  They did.

So their relationship with this guy is like what Judge Posner

said in Boyne:  You give a child a loaded gun and that's an

indication that you were reckless in your conduct.  So they

keep a guy on the payroll who has a history of attacking

civilians, that's a plus factor on *respondeat superior*.

          THE COURT:  How do you anticipate proving that he had

a history of attacking civilians?

          MR. YALOWITZ:  We have his record, his prior criminal

record, and our expert has analyzed it.

          THE COURT:  I'm not sure whether that's subject to

expert opinion.  Either he has committed acts of terror or he

hasn't.  No expert adds anything to that.

          MR. YALOWITZ:  There's a record.

          THE COURT:  What do you intend to offer?  I assume not

live testimony from a witness.

E7mgsokc

1            MR. YALOWITZ:  Our expert will sponsor the evidence.

2            THE COURT:  Your expert is not a fact witness.

3            MR. YALOWITZ:  No.

4            THE COURT:  This is a fact issue.

5            MR. YALOWITZ:  Right.

6            THE COURT:  How do you intend to prove that he

7    committed prior acts of terror?

8            MR. YALOWITZ:  So for example, coming back to these

9    guys with the Church of the Nativity of Bethlehem, we have

10   documents from the General Intelligence Service, which is the

11   defendants' own documents which say he did it, so that's an

12   easy one.

13           THE COURT:  That's what I'm asking.  That's part of

14   their argument that you say you have this evidence to present.

15           MR. YALOWITZ:  They say I don't.  I say I do.  So you

16   have to look at the documents.

17           THE COURT:  But obviously most of the evidence that

18   you intend to present that indicates that these individuals

19   were involved in these acts of terror or prior acts of terror

20   will be in the form of documents.

21           MR. YALOWITZ:  Correct.

22           THE COURT:  What makes generally those documents

23   admissible?

24           MR. YALOWITZ:  For example, to stay on the General

25   Intelligence Service, that's an admission from the defendants.

E7mgsokc

1    That's a document in the regular course.  First of all, it's

2    their document that they created in the regular course of

3    business that they produced to me saying this is in response to

4    your document request for intelligence reports.

5              THE COURT:  What do they admit in that document?

6              MR. YALOWITZ:  They said prior history, and I don't

7    remember it exactly.  I don't want to say it wrong.

8              THE COURT:  In general.

9              MR. YALOWITZ:  In general, he took over the Church of

10   the Nativity or something like that, so that's the history.

11             Should we go to the next one?

12             THE COURT:  I went off on a tangent.

13             MR. YALOWITZ:  You have the favor of it.

14             THE COURT:  I think I have the favor of it.  What's

15   much more important really is their main attack is you don't

16   have admissible evidence of this.

17             MR. YALOWITZ:  Let me give you one more because I

18   think it's really powerful, and then I do want to talk about

19   material support.

20             The next one is whether the act is one commonly done

21   by such an employee.  It's not common for NYPD officers to plan

22   suicide operations, right?

23             THE COURT:  You're saying it's common for PLO and PA

24   employees to do that?

25             MR. YALOWITZ:  Right.

E7mgsokc

1          THE COURT:  If they have 100,000 employees --

2          MR. YALOWITZ:  Let me give you just one piece of

3    evidence, it's a document, it's from their website, PA police

4    and it says these are our guys who are in jail for committing

5    security crimes, which are crimes like targeting civilians.

6          THE COURT:  In jail?

7          MR. YALOWITZ:  In Israel.

8          THE COURT:  In Israeli jails?

9          MR. YALOWITZ:  Right.  So they have got 97 guys

10   convicted of committing terror.  Now you start to see a

11   pattern, right?  It's not just three guys who did this crime.

12   It's part of a pattern.

13         THE COURT:  I don't know what those individuals are in

14   jail for.

15         MR. YALOWITZ:  I think that could be a reasonable

16   subject of expert testimony.  What's a security crime?  Why

17   would somebody have a life sentence?

18         THE COURT:  I'm just trying to figure out what you say

19   the jury is supposed to conclude from that.  Are they supposed

20   to conclude that these 97 people committed terrorist acts by

21   killing or attempting to kill civilians?

22         MR. YALOWITZ:  Civilians, right.  Right.

23         THE COURT:  Is there anything else that they would be

24   in jail for other than that?

25         MR. YALOWITZ:  They could be in jail for attempting to

E7mgsokc

1     kill soldiers or killing soldiers.

2            THE COURT:  I don't know what's the basis you have for

3     saying this, you know, I don't, but you're saying that those

4     individuals are in jail for in fact committing acts of violence

5     against civilians?

6            MR. YALOWITZ:  I can't say that all 97 are because I

7     haven't gone through every single one of the 97.  We could.  It

8     wouldn't be hard to do and give a little summary.

9            THE COURT:  I'm trying to figure out what inference

10    you're asking the jury to draw from the fact that 97 people are

11    being held in an Israeli jail.

12           MR. YALOWITZ:  The inference is that committing crimes

13    of a security nature is an act commonly done by such employee.

14           THE COURT:  What's a crime of a security nature?

15    That's the question.

16           MR. YALOWITZ:  It's like a term of art under Israeli

17    law.

18           THE COURT:  Right.  That's what I want I know.  What

19    does it include?

20           MR. YALOWITZ:  I will say it goes the gamut from being

21    a member of a terrorist organization on up to multiple mass

22    murders.

23           THE COURT:  So if I'm a member of Hamas and I've never

24    committed any terrorist act, I could still be in jail for it?

25           MR. YALOWITZ:  You wouldn't be a member of Hamas.

E7mgsokc

1           THE COURT:  But a member of Hamas could be one of

2    these 97 people who are in a security status because their

3    membership, not because they, in fact, engaged in any violent

4    terrorist act.

5           MR. YALOWITZ:  I don't think 13 years after the fact,

6    I don't think so.

7           THE COURT:  I don't know.  I'm asking.

8           MR. YALOWITZ:  I don't think so.  Look, this is a

9    reasonable subject for the experts on what are the security

10   crimes, what are these people in jail for?  And there's a lot

11   of admissions, it's not just this one, there are a lot of

12   admissions where they say we send our people, these were our

13   people, we want them back and so on and so forth.

14          THE COURT:  I understand the thrust of the argument.

15   I agree with you with regard to genuine admissions by the

16   defendants that those are admissible against them in court.

17          MR. YALOWITZ:  Right.

18          THE COURT:  Now, other than an admission by them, what

19   other type of evidence do you want to offer other than live,

20   under oath, nonhearsay testimony?

21          MR. YALOWITZ:  Convictions.  Convictions, that's a

22   good document to put in to prove that somebody is a terrorist,

23   right, their actual conviction.

24          Then I think where we're having some conflict with the

25   defendant is on government reports.  So if there's a government

E7mgsokc

1    report, an Israeli government report that's a legally

2    authorized representation of fact and they say we have done an

3    investigation and we conclude that this guy committed this

4    bombing and that's why we're seizing his bank account, that's a

5    legally authorized investigation, the report on which is

6    admissible under 803(8).

7         THE COURT:  Explain to me what would be the relevant

8    purpose of that evidence?  To prove what?

9         MR. YALOWITZ:  This is the document that Ms. Ferguson

10   was showing you where the report says Nayef Abu Sharkh was

11   behind the bombing on June 19, 2002, so I'm offering it for the

12   truth of that statement.

13        THE COURT:  To prove what?  What's the relevant

14   purpose of that?

15        MR. YALOWITZ:  To prove Abu Sharkh is an employee of

16   the defendants, so there's evidence that he participated, he

17   was behind the bombing that injured my client.

18        THE COURT:  How does that advance your argument that

19   they're responsible for the incident that happened to your

20   client?

21        MR. YALOWITZ:  Because he's unrelated to the

22   defendant.  If he's unrelated to the defendant, right, if he's

23   just a guy, if he's a guy that they had nothing to do with,

24   they never heard of, then how are they legally responsible?

25        THE COURT:  No.  My question is different.  It's not

E7mgsokc

focusing on his relationship with them; it's focusing on what
is the logical conclusion you want the jury to draw from the
fact that he committed a unrelated act of terror?

            MR. YALOWITZ:  No.  It's one of our cases.

            THE COURT:  So this is not a situation where you're
trying to demonstrate that they were known terrorists.  You're
trying to demonstrate that there was some conclusion that they
committed this act?

            MR. YALOWITZ:  Correct.

            THE COURT:  Now, from this document, would you believe
that this document in any other context would be admissible for
the truth of that statement in any other case in this court?

            MR. YALOWITZ:  Yes, of course.

            THE COURT:  What's the exception to the hearsay rule?

            MR. YALOWITZ:  It's 803(8) because it's a factual
finding from a legally authorized investigation.

            THE COURT:  Why is this a factual finding with regard
to a legal investigation if this wasn't what the investigation
was about?

            MR. YALOWITZ:  If you look on the very front page, and
which exhibit is it, your Honor?

            THE COURT:  It's 339.

            MR. YALOWITZ:  If you look on the very front page, it
says operation for the confiscation of terror funds.

            THE COURT:  Right.

E7mgsokc

1              MR. YALOWITZ:  And then the second paragraph says

2       information regarding these bank accounts was presented to the

3       legal elements of the ISA, IDF, the ISA is the Internal

4       Security Authority, IDF which is the army and the attorney

5       general's office, all of whom authorized the operation, a

6       person whose funds was confiscated will be able to appeal the

7       decision.  What we have here is an investigation for the

8       purpose of seizing funds.

9              Just like in OFAC, if OFAC seized some of these funds

10      and OFAC made a finding that a guy did a particular act and

11      issued a report on it and then the attorney general's office or

12      some public spokesman made a press release, now we're in a

13      civil case, I'm not in a criminal case, so it's a fact finding,

14      a legally authorized report of an investigation finding a fact.

15      It's admissible under that hearsay exception because it's a

16      civil case.

17             THE COURT:  This is one of the documents of the 177

18      exhibits that they lodged an objection to?

19             MR. YALOWITZ:  No.  The 177 are their records.  This

20      is an Israeli government record.  The 177 records are like

21      employment records, pay records, martyr files, documents that

22      came from the defendants' own files, and the plaintiffs said

23      would you please produce the payroll records of Marwan

24      Barghouti, and then they produced them and now they say, well,

25      we deny they're authentic.

E7mgsokc

1          THE COURT:  Is this document also objected to?

2          MR. YALOWITZ:  Every document is objected to.  They

3     will not stipulate.

4          THE COURT:  I'm not talking about a stipulation.  Is

5     there an objection to the admissibility of this document?

6          MR. YALOWITZ:  Every document.

7          THE COURT:  So what's the difference between what's on

8     the 177 list and what's not on the 177 list?

9          MR. YALOWITZ:  The 177 are their own documents.  I

10    wanted to try the low-hanging fruit.

11         THE COURT:  How many other exhibits are we talking

12    about that they object to that they believe that those

13    documents are inadmissible other than the 177?

14         MR. YALOWITZ:  800.

15         THE COURT:  Is there any document that they don't

16    claim falls under that category that you intend to offer?

17         MR. YALOWITZ:  They have no objection to three

18    documents.

19         THE COURT:  So approximately of the 980 exhibits that

20    you want to offer, there are three that they don't have an

21    objection to.

22         MR. YALOWITZ:  Something like that, yes.  But really,

23    the motion on the 177 was -- look, the real issue with the 177,

24    as you'll remember, is kind of right when I came in the case,

25    we were trying to get a 30(b)(6) to authenticate the 177 and

E7mgsokc

1    foundationalize them.  And Judge Ellis said I'm not going to

2    allow any more discovery.  We took it to you.  And you said

3    Judge Ellis didn't use his discretion.  We're going to find a

4    reasonable way to foundationalize those documents.  So that's

5    the 177.

6         Frankly, looking at the briefing on it, I don't think

7    that we need a foundational witness.  I think the act of

8    production is enough to foundationalize these documents.

9         THE COURT:  It depends.  And this is what I have been

10   thinking about getting from both of you:  It depends on what

11   factual statement in the document you want to offer for the

12   truth.  I need you to identify that for me, and I need them to

13   identify what factual assertion in the document that they

14   believe is inadmissible or prejudicial.

15        So if it says John Doe has three sisters, I'm not

16   particularly interested in fighting about whether or not John

17   Doe has three sisters if there's no relevant, germane issue

18   with regard to that.

19        If you want to offer a document that, and they seem to

20   have today conceded that they're not taking a stance that they

21   think that there's some objection to any of the statements or

22   activities that are directly attributable to them that are, in

23   fact, true, for example, if this terrorist act happened on

24   June 19 of 2002 and one of their documents says on June 20,

25   2002, they paid this individual a certain sum of money, it

E7mgsokc

1    doesn't seem to me that they can genuinely dispute if that is a

2    true statement that fact if that's the evidence that you want

3    to put before the jury.

4            And unless they tell me that they're saying that's not

5    true, then it seems to me that you would be entitled in some

6    form to put that true piece of evidence undisputed before this

7    jury, either in the form of a document or in the form of their

8    admission, because if they're not going to deny it and they say

9    it is, in fact, true, I'm not particularly interested in

10   hearing an objection to the document that says it.

11           MR. YALOWITZ:  I feel the same way, but we can't seem

12   to get them to withdraw any of their objections.

13           So do you want to take an example of one?

14           THE COURT:  You have advanced this significantly for

15   me.  I know that the nature of your proof is admissions by

16   them.

17           MR. YALOWITZ:  Right.

18           THE COURT:  It's documents created by them and in

19   their files, official reports.

20           MR. YALOWITZ:  Right, admissions like in their police

21   magazines and so forth.

22           THE COURT:  Give me an example of that.

23           MR. YALOWITZ:  I'll give you an example.  I'm going to

24   look at paragraph 56 if I can find my 56.1 statement.

25           This is from a police magazine.  This is, like,

E7mgsokc

1   political guidance put out by the PA police department for its

2   police.

3           THE COURT:  So you say it is a statement put out by

4   the PA.

5           MR. YALOWITZ:  Right.  I'll just read it.  I'm reading

6   from page 14 of my 56.1.  Their idea to choose existence on

7   their land is a crime.  The creation of their western state on

8   this very land is a crime.  Their insinuations are crimes.

9   Their smiles, like snake poison, are crimes.  Honor is far from

10  these creatures.  It is not found in the dictionaries of their

11  language.

12          Obviously, I'm not offering that for the truth.  I'm

13  offering that to show intent, to show state of mind, to show

14  the circumstances under which it's reasonably foreseeable that

15  your employees who read that kind of crap will go out and kill

16  people.

17          THE COURT:  Putting aside any objection on relevance

18  grounds or any objection that somehow is more prejudicial than

19  probative, what purpose would you be offering it other than to

20  demonstrate that, in fact, this is a statement that was made by

21  the PA?

22          MR. YALOWITZ:  You've caught it exactly right:  It's a

23  statement made by the PA.

24          THE COURT:  Okay.  What do you understand the nature

25  of their objection is?  That it's not a statement made by the

E7mgsokc

1    PA?

2            MR. YALOWITZ:  No.  I think the nature of their

3    objection is that they will object to everything they can to

4    run up the expense for me as much as they can.

5            You've asked me what my views are.  That's what my

6    views are.

7            THE COURT:  I'm asking you to give me something that

8    would be helpful for me to resolve this.

9            MR. YALOWITZ:  Let me put it this way:  I don't think

10   they have a legitimate basis for any objection.

11           THE COURT:  What is their stated objection?

12           MR. YALOWITZ:  I'd have to look.  You can ask them.

13   It's their objection, but I'm sure they made a hearsay

14   objection.  Authenticity is an issue.

15           THE COURT:  Why is that hearsay?

16           MR. YALOWITZ:  It's not hearsay.  It's offered for

17   truth.  I'm sure they made an authenticity objection, but it's

18   their own document and it has PA police files, and we have

19   experts who can come that they say I know these magazines.

20           THE COURT:  As I say, as I already indicated to them,

21   if they genuinely tell me that it's in dispute and they deny

22   that they ever put out that statement, then I may put you to

23   the heavier burden to demonstrate that they did put out that

24   statement.

25           MR. YALOWITZ:  Right.

E7mgsokc

1          THE COURT:  But if the fact is that they put out that

2    statement and there's no genuine objection that it is not what

3    it purports to be, then they have got to give me another basis

4    to keep it out because that's not a basis to keep it out.

5          As I say, if they want to say it's irrelevant or

6    somehow more prejudicial than probative, I can weigh those

7    things, but that doesn't go to the foundation for its

8    admissibility.

9          MR. YALOWITZ:  Agreed.

10          THE COURT:  There may be other reasons to exclude it.

11          MR. YALOWITZ:  And that would be something that I

12    would think you would decide in the context of trial.  That's

13    up to you.

14          THE COURT:  I'll give you as early a ruling I can give

15    you in the context in which I'm confident that I understand

16    that it's going to come in and the purpose for which it's going

17    to come in.

18          MR. YALOWITZ:  Right.

19          THE COURT:  But if you tell me that, look, your

20    primary evidence are statements and admissions of the

21    defendants and official results of investigations, at least I

22    understand the nature of what you want to offer.

23          What other category of document do you think I should

24    focus on?

25          MR. YALOWITZ:  I think you have the core categories:

E7mgsokc

```
1    Convictions, the defendants' own records, the defendants' own
2    admissions.
3              THE COURT:  What is the form of the convictions that
4    you want to offer?
5              MR. YALOWITZ:  In Israel, they don't have a judgment
6    of conviction like we do.  I'm talking to you, but they don't
7    have that, so you have to piece it together a little bit from
8    the hearing transcripts.
9              Often you have, like, an amended indictment.  They'll
10   plead to an amended indictment and then they'll plea and
11   they'll just say I plead to the indictment.  There's no Rule 11
12   allocution.  They don't do that.  There's just a plea of guilt.
13   There's an indictment or an amendment of indictment, there's a
14   plea of guilt, and then there's a sentencing verdict that says
15   what their sentence is, so those three.
16             If they didn't plead, then there's a verdict which is
17   like a written opinion.  They have a three-judge trial system;
18   they don't have a jury system.
19             THE COURT:  Right.  So why is anything more relevant
20   or admissible other than the plea or the page of the judgment?
21             MR. YALOWITZ:  Because you got to know what they pled
22   to.
23             THE COURT:  I don't know what they pled to by looking
24   at their plea?
25             MR. YALOWITZ:  Right.  It just says "I plea to the
```

E7mgsokc

1    amended indictment."

2              THE COURT:  Okay.

3              MR. YALOWITZ:  "I'm guilty of the amend indictment."

4              THE COURT:  What is the form of the amended

5    indictment?

6              MR. YALOWITZ:  It kind of looks what we would have.

7              THE COURT:  So other than the accusation, the amended

8    indictment and the plea of guilty itself, what else?

9              MR. YALOWITZ:  Sentencing.

10             THE COURT:  Why is sentencing relevant?

11             MR. YALOWITZ:  Because you have to know that they're

12   in jail for life.

13             THE COURT:  Why?  What's that relevant to?

14             MR. YALOWITZ:  It goes to the gravity of the crime.

15   It goes to the seriousness of it.

16             THE COURT:  I'm not sure I understand that.  I didn't

17   even understand that in the context of the United States.

18             If somebody is convicted of murder, I don't know, I

19   don't say necessarily that I will exclude it, but if somebody

20   is convicted of murder, why do I need to know how much time you

21   got?

22             MR. YALOWITZ:  Let me reflect on that, your Honor,

23   because it was my assumption that you would need the whole

24   package to understand the conviction.  But as you rightly point

25   out, it may be that we don't need the sentencing.

E7mgsokc

1          THE COURT:  It depends on for what purpose you're

2    offering it, you see.  I don't have that context.

3          MR. YALOWITZ:  Right.

4          THE COURT:  If you're saying you're offering this to

5    show that he's a really bad person because he got a really long

6    sentence, that's one thing.  If you say I'm offering it to show

7    that this person was convicted of a certain terrorist act so it

8    is evidence to the jury to consider whether he, in fact,

9    committed that act, that's a different question.

10          MR. YALOWITZ:  It's both.

11          THE COURT:  Then you have to tell me why both are

12    relevant.

13          MR. YALOWITZ:  Obviously, the fact that he did it, the

14    fact that an employee did it, we understand why that's

15    relevant, right?  That goes to the causation.

16          THE COURT:  We're talking about the acts at issue, not

17    prior act?

18          MR. YALOWITZ:  Correct.  Correct.

19          So the indictment will say, for example, this guy is

20    charged with murdering Scott Goldberg.

21          THE COURT:  Right, and then it says he pled guilty to

22    murdering Scott Goldberg.

23          MR. YALOWITZ:  Right.  And then he gets 16 life

24    sentences, one for each person killed.

25          THE COURT:  What difference does that make?

E7mgsokc

1          MR. YALOWITZ:  I'll tell you why.

2          THE COURT:  Other than its prejudicial value?

3          MR. YALOWITZ:  I don't think it's prejudicial, but I

4    understand why somebody might argue that.

5          THE COURT:  I'm trying to figure out the relevance.

6          MR. YALOWITZ:  Yes.  Then that information is

7    transmitted back to his employer.  And so it's not that he's in

8    jail as Ms. Ferguson said for throwing stones; he's in jail for

9    killing 16 people.

10          THE COURT:  I know.  We have what he was accused of

11    and we have that he pled guilty to killing 16 people.  What

12    else do we need?

13          MR. YALOWITZ:  It goes to the serious of the crime.

14          THE COURT:  I'm sorry.  Whether he got one life

15    sentence, five life sentences or ten life sentences doesn't

16    make it anymore or less serious if you told me he killed 16

17    people.

18          MR. YALOWITZ:  I hear what you're saying.  I hear what

19    you're saying.  I'd like to reflect on it, but I do hear what

20    you're saying.  It does go to the issue of the employer's state

21    of mind, but I do want to reflect on it.

22          THE COURT:  See, that's the problem:  It's not a

23    relevant state of mind because the sentence I assume is long

24    after or after he committed the acts.  So whether or not a year

25    or two years later or three years later he got 16 life

E7mgsokc

1    sentences, it doesn't tell me anything about whether or not

2    they participated in the 16 murders.

3           MR. YALOWITZ:  Don't you think it goes to punitive

4    damages, though?  If you have guys who go to jail for huge life

5    terms -- we don't have punitive damages on the federal claims

6    but we have punitive damages on the nonfederal claims.

7           THE COURT:  I'm not sure the probative value outweighs

8    the potential prejudice because you tell me he killed 16

9    people, I get a jury in this box and you're telling me he

10   killed 16 people, I don't think that they particularly care

11   about whether or not he got five, ten or 15 life sentences.  In

12   their mind, he should have gotten 16 life sentences if he

13   killed 16 people, but they know that's not the way the world

14   works.  If you get convicted of 20 people in the United States,

15   you may only get life in prison concurrently.  That doesn't

16   tell me more or less about the circumstances under which he

17   committed the crime.

18          Quite frankly, you know what the other side is going

19   to argue?  They're going to argue simply, what else did you

20   think they were going to do with it?  That that was not a

21   objective legal determination.  That was a biased political

22   decision that they made to give him 16 life sentences.  That's

23   not a side issue for the jury.  The seriousness of the crime is

24   not judged by the length of the sentence when somebody is

25   killed.  When somebody is killed, there's no more serious crime

E7mgsokc

1    that the killing of one human being.

2            MR. YALOWITZ:  I agree with that.

3            Let me say this because you raise a really important

4    issue about the nature and scope of this trial, your Honor,

5    which is I do not want there to be arguments on either side

6    about biased political issues; that this was a political

7    decision, this or that.

8            I heard Ms. Ferguson say that the reason for the

9    policy of paying employees who continue in jail is because of

10   the Israelis this or the Israelis that.  Frankly, I don't get

11   that.  First of all, does she have legislative history or some

12   finding of the legislature of the PA saying why they have a

13   certain policy?  So I don't even get it.

14           But the idea that we're going to have people in this

15   courtroom trashing the Israelis this, the Israelis that, the

16   Zionist entity, I don't want to hear any of that and I don't

17   think your Honor wants to hear then any of that.

18           THE COURT:  As opposed to trashing the PA or the PLO

19   in general?  Come on.  Let's be realistic about the sides that

20   are lined up here.

21           MR. YALOWITZ:  The state of Israel is not on trial

22   here.  The PA and the PLO are on trial.  And what I'm talking

23   about is using their words, not mine.  I'm not going to go say

24   nasty things about people of Arabic descent and that kind of

25   thing.  I'm saying what are their words.

E7mgsokc

1           THE COURT:  Unless they can convince me otherwise, I

2     can assure you that that's not how this trial is going to be

3     conducted.

4           MR. YALOWITZ:  Good.

5           THE COURT:  This trial is going to be conducted on

6     whether or not you have sufficient evidence to demonstrate that

7     they're responsible for the acts that you are accusing them of.

8           MR. YALOWITZ:  Right.

9           THE COURT:  That has nothing to do with the relevant

10    part of that discussion we had about payments to people.  The

11    question is not why they paid people in general.  They can give

12    some minimal background as to why they pay people.  The

13    question is why did they pay these people?

14          MR. YALOWITZ:  Right.

15          THE COURT:  And the question is, did they pay these

16    people because they're similarly situated as the other people

17    that they routinely pay or whether it's paying these people is

18    evidence that they paid them for committing these acts.

19          MR. YALOWITZ:  Right.

20          First of all, if they come forward with some documents

21    saying this is our policy and this is why we have it and we pay

22    everybody is same, that would be one thing.  I haven't seen any

23    documents like that.

24          THE COURT:  I assume you would agree it that doesn't

25    have to be a written document.

E7mgsokc

1          MR. YALOWITZ:  I haven't seen any indication that they

2    have got a witness to say that either, a witness with actual

3    personal knowledge instead of experts who are going to come in

4    and say generally trashy things.

5          THE COURT:  As they say, I am cautious about both

6    sides' experts who just want to come in and say trashy things.

7          MR. YALOWITZ:  That's not going to happen with my

8    experts.  I can promise you that.

9          THE COURT:  This is a fact-based case.

10         MR. YALOWITZ:  I agree with that.

11         THE COURT:  Not an expert-based case.  An expert's

12   opinion is not appropriate to simply tell me that they have an

13   opinion that a certain fact occurred.  The jury doesn't need

14   them for that.

15         What they need is the underlying facts that the expert

16   is using to reach that conclusion so we can see whether they

17   can reach that conclusion on their own; and if they can't, then

18   it is not appropriate to try to say that they should reach that

19   conclusion because the expert decided he reached that

20   conclusion.

21         MR. YALOWITZ:  The experts are really needed in this

22   case to lay down the context for what is the General

23   Intelligence Service?  What is the PA police?  How do they

24   work?  That kind of stuff.

25         THE COURT:  That's beyond the usual knowledge of most

E7mgsokc

1    jurors.

2           MR. YALOWITZ:  Right.

3           THE COURT:  Therefore, in the abstract, it would be

4    appropriate to have someone who has specialized knowledge in

5    that area to explain that to the jury.  That's true.

6           But with regard to "I've looked at a whole bunch of

7    documents and I conclude that this guy is the guy who

8    perpetrated this act," that's not an expert opinion.

9           MR. YALOWITZ:  I don't think we want our experts to

10   opine on ultimate conclusions like that.

11          THE COURT:  As I said, we go through this now because

12   I think this is the guidance I want to give you and set you up

13   in terms of how to approach things.

14          MR. YALOWITZ:  That's very helpful.  I think our

15   experts are basically going to perform two complementary

16   functions:  One is to give the background and knowledge and

17   understanding to the average juror about what goes on in the PA

18   in terms of their ownership of media or their control of media

19   or the way their GIS works and things like that; the other

20   thing is, you need some witness to explain what a document is

21   and how it relates to that general understanding.  The experts

22   will be there to provide some commentary on what the documents

23   are and how they relate to that context.

24          THE COURT:  That might be appropriate in some

25   instances, but the usual practice is that the person who either

E7mgsokc

1  generates the document or is the custodian of the document or

2  has received the document or utilizes the document is the

3  person usually that is appropriate for that purpose.  Now, you

4  don't have a lot of that.

5         On some issues, an expert may be appropriate to do

6  that, particularly to the extent that the parties don't

7  disagree that that is what it is and that is what it means, but

8  to the extent both sides object to anything the other side

9  wants, I don't have a real feel for where the genuine issues

10  lie here.  Everything you want to do they oppose; everything

11  they want to do, you oppose, so it doesn't give me a whole lot

12  of guidance.

13         MR. YALOWITZ:  Some of the experts I like.

14         THE COURT:  Why don't you write the list down for

15  them.

16         MR. YALOWITZ:  I think they know.  They saw me talk to

17  their experts.

18         THE COURT:  Maybe they saw your list.

19         MR. YALOWITZ:  I don't think they like our experts,

20  but they know which ones of theirs I like.

21         THE COURT:  To the extent that I can do some

22  examination and make at least some preliminary assessment to

23  what extent I think the evidence that you want to admit is in

24  admissible form and if that evidence is admitted in admissible

25  form, that that evidence would be sufficient for a reasonable

E7mgsokc

1    jury to use to conclude that the defendants are liable for the

2    conduct that you say they're liable for, that would be my

3    approach.

4         It's still a little difficult for me to figure out

5    what you are really fighting about when you say to me that,

6    well, the only thing I want to offer is admissions, official

7    government reports, judgments of conviction, and -- I forget

8    what other category you had.

9         MR. YALOWITZ:  And their own records.  I would sort of

10   subdivide the admissions.  They're all admissions.

11        THE COURT:  Well, not necessarily.  Again, it depends

12   on what part of the document that you're offering for the

13   truth.

14        If they generate a document and the document says I

15   spoke to John Doe and John Doe said Sally committed the crime,

16   it's difficult to offer that simply as a business record to

17   prove that Sally committed the crime.

18        MR. YALOWITZ:  Right.  There's one more bucket I would

19   say.  Just let me come back to the last bucket, but first I

20   want to answer your question, which is, let's take, for

21   example, the payroll records which you would think wouldn't be

22   that hard.  If you look at Exhibit 1, just pull it up.

23        I don't know if you have it in Ms. Ferguson's binder,

24   but I can tell you it's a document that says pay the following

25   people, and one of the people on there is Marwan Barghouti.

E7mgsokc

1    Marwan Barghouti is an important player in the case.  He was

2    kind of the underboss for Arafat.  He was convicted of

3    terrorism.  He's sitting in an Israeli jail, even today.  So

4    there's this list, and it says how much they paid him.  They

5    produced that because we said please give us your documents

6    relating to Marwan Barghouti, and they did.

7              THE COURT:  Right.

8              MR. YALOWITZ:  That's a document we want to use to

9    prove that they paid that amount of money to Marwan Barghouti.

10             THE COURT:  Right.  They don't deny making those

11   payments?

12             MR. YALOWITZ:  All I can tell you is they won't

13   withdraw their objection to that document.

14             THE COURT:  You understand the nature of their

15   objection to that document is what?

16             MR. YALOWITZ:  Authenticity and hearsay.

17             THE COURT:  What is it that makes it unauthentic?

18             MR. YALOWITZ:  I can't imagine why they would say it's

19   unauthentic.  They produced it in response to plaintiffs'

20   document request, so I can't imagine why they won't admit its

21   authenticity.  It boggles my mind.  My mind begins to go to

22   things like vexatious litigation and things like that.  And I

23   can't imagine why they won't acknowledge that it's admissible

24   for the truth.  It's their record.

25             THE COURT:  I assume you haven't examined any witness

E7mgsokc

1    who denies that payment was made?

2              MR. YALOWITZ:  Correct.  I think their gain here, your

3    Honor, and remember, this is -- before I came to the case, we

4    didn't sit with a witness and go document by document.

5              THE COURT:  And a lot of these documents you say

6    weren't produced.

7              MR. YALOWITZ:  A lot weren't produced until after the

8    close of discovery, that's right.  Not every single one.  And

9    there were some that they admitted were authentic because they

10   were produced before and there was a request for admission.

11             Anyway, here we are.  I'm very happy to go document by

12   document from one until the end with you or Judge Ellis or the

13   defendants, but I can't get them to agree on anything so it's a

14   fool's errand to sit with them it seems to me, or at least it

15   has been so far.

16             THE COURT:  If I told you, for example, on that

17   document, I told you to articulate in a sentence or quote the

18   line from the document that you believe is admissible for its

19   truth, what would you say?

20             MR. YALOWITZ:  Well, if your Honor will indulge me, I

21   can hand up the document.  I'll show it to you.

22             THE COURT:  I want to figure out how you'd

23   characterize it.

24             MR. YALOWITZ:  On the date indicated on the document,

25   the amount of money indicated on the document was paid to

E7mgsokc

1    Marwan Barghouti; that's what I'm looking for.

2              Just coming to the other bucket, there are a few

3    documents, not a whole lot, but there are documents that are

4    confessions.  Like the one we read where the guy said Abu Talal

5    and I and Wafa sat together and talked about a suicide bombing,

6    so that's a postarrest statement in custody.

7              THE COURT:  On what basis do you say that it's

8    admissible in the form that you want to offer it?

9              MR. YALOWITZ:  It is an admission, it is a statement.

10             THE COURT:  It's not an admission by them.

11             MR. YALOWITZ:  No.  It's a statement against penal

12   interest by an unavailable witness, so the witness is not

13   within the subpoena power.  It's a statement against interest.

14             THE COURT:  Is this a statement by someone who is

15   convicted or not convicted?

16             MR. YALOWITZ:  Convicted.  He was convicted on the

17   basis of that statement and other evidence.

18             THE COURT:  Why do you need both?

19             MR. YALOWITZ:  There are occasions where, for example,

20   if they pled, it's not crystal clear.  The statement itself is

21   a better piece of evidence than the accusatory instrument.

22             THE COURT:  But you're offering both of those for the

23   same purpose to demonstrate that, in fact, he committed that

24   offense?

25             MR. YALOWITZ:  Or that the conversation took place.

E7mgsokc

1           THE COURT:  What conversation?

2           MR. YALOWITZ:  The declarant says Abu Talal, which is

3    a PA employee, and I sat together with Wafa Idris, the suicide

4    bomber, and talked about a suicide bombing.  I want to offer

5    that statement for the truth.  I want that to come in for the

6    truth because it links a PA employee to the perpetration of the

7    terror act.  It's a useful statement.  It's not an admission by

8    the defendants, but it's a statement against interest.

9           THE COURT:  See, the awkward part about that is you

10   want to use it against not the person who made the statement,

11   but you want to use it against this defendant.

12          MR. YALOWITZ:  Right.

13          THE COURT:  Why?

14          MR. YALOWITZ:  It's a statement by an unavailable

15   witness against interest.

16          THE COURT:  But the part of the statement where he

17   said I committed the offense is a statement against penal

18   interest; the part of the statement that accuses a third party

19   is not a statement against penal interest.

20          MR. YALOWITZ:  I think it's the *Williamson* case, if

21   you look at that, they talk about a statement very similar to

22   this:  So and so and I committed the crime.

23          THE COURT:  Right.

24          MR. YALOWITZ:  That is a statement that comes in not

25   only -- with the Sixth Amendment, you've got to redact if

E7mgsokc

1    you're using it, but there's no confrontation clause issue

2    here.

3             THE COURT:  Right.

4             MR. YALOWITZ:  So it is a statement against interest,

5    and in the context of a statement against interest, he's

6    inculpating an additional coconspirator.

7             THE COURT:  The problem is, and I'd have to examine

8    the statement, examine the statement and assess it further,

9    what you want to offer and the purpose that you want to offer

10   it for is not consistent with why the rule exists and why a

11   statement against penal interest or a statement against

12   interest is more reliable than another statement because the

13   rationale is I wouldn't confess to a crime under circumstances

14   that I believed that it would expose me to penalties unless it

15   were true.

16            MR. YALOWITZ:  Right.

17            THE COURT:  But that rationale doesn't apply to I

18   wouldn't accuse a third party of a crime because accusing the

19   third party would expose me to criminal or civil penalty.

20            MR. YALOWITZ:  Right.  So if he's in custody and he

21   says --

22            THE COURT:  He says you did it.

23            MR. YALOWITZ:  I didn't do anything; Abu Talal did it,

24   okay, that's not a selfinculpatory statement.

25            THE COURT:  All right.  Suppose he says, I did it, I

E7mgsokc

1   did it with Yalowitz, would it be admissible against Yalowitz?

2           MR. YALOWITZ:  There would be confrontation clause

3   issues.

4           THE COURT:  No, I'm not talking about the

5   confrontation clause issues.  This is a civil case.  If he,

6   outside of court, said that he committed the crime with you, do

7   you think that would be admissible against you in a civil

8   proceeding?

9           MR. YALOWITZ:  I think it would.

10          THE COURT:  Why?  Why is the portion that you want,

11  that he's accusing a third party, why does that qualify as a

12  statement against his penal interest?

13          MR. YALOWITZ:  Because it's integral to the statement.

14          THE COURT:  No, it's not integral to the statement.

15  He can say I committed it, and I committed it with others.  Who

16  did you commit it with?  I'm not going to tell you.

17          MR. YALOWITZ:  He can do that.

18          THE COURT:  It's not integral to the statement against

19  penal interest.

20          MR. YALOWITZ:  I think that the purpose of the rule is

21  to protect against false accusations.

22          THE COURT:  Right.

23          MR. YALOWITZ:  So where you have a guy who says, yeah,

24  I did it and I did it with X, and he's indicating that he did

25  it with somebody who is an important intelligence senior

E7mgsokc

1    officer, he's explaining the circumstances of what he did, and

2    I think if you look, there's a discussion in the *Williamson*

3    case about this exact scenario and we have to look at it.  But

4    my recollection of that case is that at least under 804, it

5    comes in.  Now, the defendant can argue the circumstances are

6    untrustworthy or you can't believe him.

7            THE COURT:  How does one defend themselves against

8    that, an out-of-court statement accusing the third party?

9            MR. YALOWITZ:  They can bring Mr. Abu Talal to court.

10   He's their employee.  They can bring him in and have him

11   testify.  I didn't see him on their witness list but they can

12   bring him in.

13           THE COURT:  What makes you think that he's necessarily

14   under their control and he will say the truth here as opposed

15   to falsely accusing them still?

16           MR. YALOWITZ:  No.  They could bring Abu Talal.

17           THE COURT:  I see.

18           MR. YALOWITZ:  Right.  The custodial statement is by a

19   guy who is now jail.  He's an unavailable witness.  But he

20   inculpates their employee, a senior employee.  They could bring

21   him.

22           THE COURT:  How many instances of that do you wish to

23   put before this jury?

24           MR. YALOWITZ:  I don't know.  There's half a dozen,

25   something like that.

E7mgsokc

1          THE COURT:  Out-of-court statements by people who were

2     convicted and they have accused third parties, and you want to

3     offer that as evidence that the third parties committed the

4     crime?

5          MR. YALOWITZ:  That the third parties participated in

6     some way.

7          THE COURT:  Committed the crime.

8          MR. YALOWITZ:  Right.

9          The other example of that is this fellow Abdullah

10    Barghouti.  Abdullah Barghouti was the Hamas bomber who killed

11    66 people.  He was one of the ones who was let out of jail and

12    he was given bomb-making equipment, money, cell phone, stuff

13    like that.  So a lot of his postarrest statements are also very

14    relevant.

15         THE COURT:  Is that the only evidence that you have

16    with regard to most of these individuals that you want to offer

17    that would indicate that they were participants in the crime?

18         MR. YALOWITZ:  No.  I think Barghouti and Noor are the

19    only ones I can think of.  There may be others, but they're not

20    ones that I think have a high focus.

21         THE COURT:  Say that again.  They're the only ones

22    that what?

23         MR. YALOWITZ:  They're the only ones I think I know

24    of, the only ones I can think of are those two.

25         THE COURT:  Think of as what?

E7mgsokc

1          MR. YALOWITZ:  As examples of the custodial statements

2     that I want to use for the truth.

3          THE COURT:  What I'm trying to understand is whether

4     or not you have -- the only evidence of that is the custodial

5     statement, as opposed to some other evidence that they were

6     involved.

7          MR. YALOWITZ:  In both cases, it's really important

8     evidence.  In the case of Abu Talal, it's that statement and

9     the document that I read to you and then the conviction of

10    Noor, so there are three documents.  That custodial statement

11    is really clear and it really crystalizes it.

12         THE COURT:  With regard to those two other

13    individuals, those two other individuals, you have no other

14    evidence other than the custodial statement that they

15    perpetrated the terrorist act?

16         MR. YALOWITZ:  With regard to Talal, that's the only

17    link I have, the custodial statement, and the conviction of

18    Noor, which finds the custodial statement credible.

19         Noor is the guy who made the statement.  Noor says,

20    look, I confess, I did it; I recruited Wafa with this PA

21    employee.

22         THE COURT:  So the only evidence that you have against

23    Talal is Noor's statement that Talal committed the offense.

24         MR. YALOWITZ:  Right.

25         THE COURT:  On two occasions, he made that statement:

E7mgsokc

1    One is when he was interrogated and two is when he pled guilty.

2          MR. YALOWITZ:  Right.  I want to say he pled guilty.

3    I'm not 100 percent sure on that.  He may have appealed his

4    sentence.

5          THE COURT:  But did he make that statement in his

6    court proceeding?

7          MR. YALOWITZ:  No.  I think what happened with Noor is

8    that he pled guilty but appealed his sentence.  I may be wrong

9    about that, but I know he appealed.  And the appellate court

10   repeated the statement as explaining his involvement.

11         THE COURT:  You want to offer both Noor's statement

12   and the appellate decision.

13         MR. YALOWITZ:  The appellate decision, it might come

14   in as a government report or something.

15         THE COURT:  But it's simply a regurgitation of the

16   same statement that you want to independently --

17         MR. YALOWITZ:  Correct.  It finds it credible.  It's a

18   judicial finding that the statement was credible.

19         Then with Abdullah Barghouti, I have go back and think

20   about what other evidence I have with him.  Abdullah Barghouti,

21   we haven't really talked about him.  There are a lot of guys

22   named Barghouti, but Abdullah Barghouti was a Hamas bomb-maker.

23   He was on the most-wanted list that General Anthony Zinni gave

24   to Arafat and said you've got to arrest these guys.  Then there

25   was intelligence that he was going to blow up a restaurant and

E7mgsokc

1    then he did blow up the restaurant.

2            It was a very devastating attack.  He was arrested

3    that day and he was held for about three weeks and then they

4    released him.  The PA arrested him, kept him for three weeks.

5            THE COURT:  Right.

6            MR. YALOWITZ:  They let him go.  And from the time of

7    his release to the time of his rearrest, he killed another 50

8    people.  He was a bomb-maker.  He made these Mother of Satan

9    bombs.

10           So a lot of what we know about what he did during the

11   time of his freedom, if you will, the time between when he was

12   released and rearrested, comes from his custodial statements:

13   Who he was protected by, who he got money from, who he got

14   bomb-making equipment from, where he stayed.

15           THE COURT:  That was before or after the incident,

16   that testimony?

17           MR. YALOWITZ:  Before our bombing.

18           THE COURT:  Right.

19           MR. YALOWITZ:  Right.  So he's released, and he's

20   protected by senior PA operatives that give him money, they

21   give him bomb-making equipment, and then he's in a Hamas terror

22   cell.  He and his co-Hamas terrorists go on a killing spree.

23   It must be six or eight separate suicide bombings, including

24   one that killed four of our clients' family members.  What we

25   know about what he did during the interim period comes

E7mgsokc

1    primarily from his postarrest confession.

2                THE COURT:  So you want to offer some law enforcement

3    recorded report of what this witness said occurred?

4                MR. YALOWITZ:  Correct.  These are of a similar

5    nature.  So I got bomb-making equipment from X or I got money

6    from X or X gave me a safe house.

7                THE COURT:  And the grounds on which you want to do

8    this is, again, a statement against penal interest?

9                MR. YALOWITZ:  Right.

10               THE COURT:  I understand.

11               MR. YALOWITZ:  Your Honor, if you could indulge me,

12   there's just one other thing that Ms. Ferguson said that I want

13   to try to address, which is this business about intent to

14   target Americans.  I think if you read Judge Weinstein's

15   opinion in *Gill*, this gets straightened out.

16               There are certain crimes where the nationality of the

17   victim is an element of the crime, like killing a U.S. national

18   abroad.  So if that's a predicate crime, the courts have said,

19   like the Seventh Circuit said, if you're using that as a

20   predicate crime, killing a U.S. national abroad, that's an

21   element that you need to prove, like your predicate crime, and

22   one of the elements of that crime is recklessness, knowledge or

23   intent with regard to Americans.

24               THE COURT:  Right.

25               MR. YALOWITZ:  But there are other crimes which are

E7mgsokc

1    the crimes that we're charging like material support to a

2    terrorist organization.  And material support to a terrorist

3    organization doesn't have in it an element that the terrorist

4    organization is targeting Americans.  So under that

5    circumstance, intent to target Americans is not an element of

6    my burden of proof.  I could read it because there's a lot of

7    evidence that the place, Israel, the West Bank, it's crawling

8    with Americans, you can't swing a dead cat without hitting an

9    American.

10           THE COURT:  You have two different issues, and even if

11   I were to accept that, then it puts you in a circumstance where

12   you have a crime that was committed abroad against non-U.S.

13   citizens, how do you get an ATA crime?

14           MR. YALOWITZ:  It's an element of my case that my

15   client is a U.S. citizen, but there's no factual dispute about

16   which clients are U.S. citizens and which are not.

17           THE COURT:  So I'm not sure which allegations are

18   counts that you say this is going to be dispositive of.

19           MR. YALOWITZ:  My dispute with the defendants is I

20   don't want a jury instruction saying that I have to prove that

21   the defendants were intentionally, recklessly, knowingly or

22   intentionally putting Americans in harm's way.  That's not an

23   element of the state of mind.

24           THE COURT:  You just want to be able to prove that

25   Americans happened to be the victims, even unintended victims,

E7mgsokc

1    of the crime.

2            MR. YALOWITZ:  Right, even if they were unintended

3    victims.

4            THE COURT:  I'll look at that.  I have to remind

5    myself.  I think I have dealt with it in the *In Re: Terrorist*

6    situation.

7            MR. YALOWITZ:  Right.  I don't always agree with him

8    but Judge Weinstein I think got this one right.

9            THE COURT:  Smart guy.

10           MR. YALOWITZ:  He was my evidence professor.  He's a

11   special human being.

12           THE COURT:  He wrote the rules of evidence.  He said

13   to me once:  This is the way they interpret it, but that's not

14   what we meant.

15           MR. YALOWITZ:  Not today, but I'll tell you a great

16   story about Judge Weinstein and Judge Gleason that you'll be

17   amused by.  Anyway, we don't need to do it on the record.

18           If your Honor doesn't have more questions, I'm done.

19           THE COURT:  Let me wind up Ms. Ferguson, and then I

20   want to tell you what I need from you on guidance.

21           MR. YALOWITZ:  Thank you.

22           THE COURT:  Yes, Ms. Ferguson.

23           MS. FERGUSON:  Thank you, your Honor.  I just wanted

24   to touch on a couple of points.

25           I wanted to emphasize that both the Sokolow incident

E7mgsokc

1    as well as the Hebrew University incident turn entirely on the

2    admissibility of these custodial statements implicating a third

3    party.  So they're trying to use them to show what the PA and

4    PLO did and that just doesn't come in under 804(8)(3).  So I

5    want to emphasize when you look at the papers you'll see that,

6    in fact, those are very critical and it's our position they're

7    not admissible, and we briefed that.

8         With respect to the Mandelkorn incident which we

9    started with, the only evidence linking the PA is the Israeli

10   Ministry of Foreign Affairs document that we have looked at a

11   couple of times.  That's Trial Exhibit 339.

12        Mr. Yalowitz treats this very quickly as an 803(8)

13   public record but, in fact, it doesn't set out the activities

14   of the Israeli Ministry of Foreign Affairs.  It talks about

15   activities of other offices and it's just relaying a couple of

16   layers of hearsay.

17        In addition, it doesn't show factual findings from a

18   legally authorized investigation.  It doesn't reflect any

19   factual findings that Abu Sharkh was involved in this bombing

20   that's at issue here.

21        THE COURT:  You're saying that your position is it has

22   to articulate specifically those factual findings?

23        MS. FERGUSON:  It doesn't even purport to be factual

24   findings on the investigation; it's just saying we seized the

25   suspected terrorists' funds and if they want to challenge that,

E7mgsokc

1  they can come appeal.

2          THE COURT:  That's not what it says.  It doesn't say

3  anything about "suspected."  It says he committed a crime.

4  That was their conclusion.

5          MS. FERGUSON:  There's no factual findings backing

6  this up.  This would be highly prejudicial for a jury to see

7  this.

8          THE COURT:  Are you arguing that the requirement is

9  that it's not admissible unless it comes along with the

10 specific factual evidence that they examined to reach this

11 conclusion?

12         MS. FERGUSON:  As an initial matter, it would have to

13 be the factual findings of the Israeli Ministry of Affairs

14 which created the document, and it's clearly not.

15         They're just relaying, I don't know what.  They're

16 relaying something communicated by something called the GPO

17 that they apparently heard from one of several other agencies.

18 And we don't know anything about what the investigation was or

19 what the findings were.

20         THE COURT:  I'm not sure where you get that from.

21         MS. FERGUSON:  It's Plaintiffs' Exhibit 339.  It's an

22 Israeli Ministry of Foreign Affairs' website.  In the next

23 after you get to the operation for the confiscation heading, in

24 parentheses it says communicated by the GPO, so that's one

25 level of hearsay.

E7mgsokc

1              THE COURT:  Why isn't this then a report by the GPO, a

2       conclusion by the GPO?

3              MS. FERGUSON:  It says the Israeli Ministry of Foreign

4       Affairs is communicating this as something they got from the

5       General Press Office, which is talking about what, in the next

6       line, what the IDF forces guided by ISA officers did, and

7       there's no evidence that the Israeli Ministry of Foreign

8       Affairs conducted any investigation that made findings into Abu

9       Sharkh's involvement in the attack.

10             I think the question is if this is all there is for

11      the Mandelkorn case, can a reasonable jury looking at this

12      document – and this is the only evidence – could a reasonable

13      jury find liable the PA and PLO for engaging in an act of

14      international terrorism and subject them to treble damages

15      based on this alone?  And this is all there is.

16             I would say they can't get past summary judgment with

17      just this document.  It's way too attenuated.  It's way too

18      slender a reed to link the PA and the indicia of liability are

19      not there, right?  So the ISA is sweeping in seizing people's

20      funds and saying we think he did this.  There's no evidence of

21      indicia of reliability there in the context of this conflict,

22      and it just doesn't meet the terms of 803(8).

23             Again, I wanted to highlight that there are a few of

24      these cases that are relatively simple to resolve because

25      they're based on either a custodial statement or one of these

E7mgsokc

1    Israeli ministry documents where it's multiple levels of

2    hearsay that doesn't fall under 803(8).

3              THE COURT:  I'm not sure that the multiple layers of

4    hearsay apply to this exception.  I have to look at that.  I

5    don't think it's directed at layers of hearsay.  It's directed

6    as to whether or not it is a conclusion that is drawn based

7    upon an investigation that was conducted.

8              It doesn't say, and I don't think the requirement is,

9    that that investigation can't include hearsay statements.  I

10   conduct hearings all the time and some of those hearings

11   involve hearsay statements that are admissible, and I make

12   conclusions based on some of those hearsay statements.

13             MS. FERGUSON:  I guess the difference would be if the

14   FBI conducted an investigation and issued a report, that might

15   be one thing, but this is the FBI engaged in an operation and

16   they told another agency that they had done something and then

17   that agency reported it to the State Department and the State

18   Department says it.

19             THE COURT:  Why isn't that a report by the State

20   Department based on the State Department's investigation?

21             MS. FERGUSON:  Because it's not setting out the

22   activities.  Reading the language of the rule, it's not setting

23   out the activities of the declarant.  It has to be a record or

24   statement of a public office if it sets out that office's

25   activities.

E7mgsokc

1          THE COURT:  It's the record of the Israeli Ministry of

2     Foreign Affairs.

3          MS. FERGUSON:  Or factual findings from a legally

4     authorized investigation, and there's no evidence that that was

5     the factual findings of a legally authorized investigation.

6          THE COURT:  I'll look at that more carefully.

7          MS. FERGUSON:  But I guess the overriding point would

8     be if that's all there is, it's not enough to survive summary

9     judgment because a reasonable jury couldn't find just based on

10    that alone PA and PLO liability.

11         With respect to the issue of intent with respect to

12    Americans, in the *Gill* case, the Court does find that to be a

13    critical element.  In fact, plaintiffs are relying on material

14    support statutes.  Under 2339A, a predicate criminal act is an

15    intent to kill Americans; and 2339B has a strong U.S. nexus

16    requirement.

17         So the reason these cases are brought here is because

18    there's to be a showing that the defendants had some scienter

19    or some state of mind with respect to harming Americans.

20         THE COURT:  I'll look at that more carefully, but I've

21    never seen a situation of an attack on civilians in Israel

22    where it was not available as a reasonable inference that they

23    knew or should have known that it's likely that American

24    citizens were going to be harmed.

25         MS. FERGUSON:  I think this is where some of these

E7mgsokc

1    generalized payment policies and causation and intent all

2    mingle together.  If their main evidence, their main claim is

3    that we paid prisoners after the fact and that shows something,

4    there's no evidence that prisoners are paid or general salary

5    payments were made with any sort of knowledge or intent that

6    those particular people would go out and harm Americans. So

7    again, we have to focus on evidence of intent, evidence of

8    causation and that's absent.

9        THE COURT:  The question really is, is whether or not

10   on this evidence it would be reasonable for a jury to review

11   this evidence and have the opportunity to conclude that the

12   perpetrators of the act knew that it was likely that Americans

13   would be killed.

14       MS. FERGUSON:  I think it's not just the question of

15   whether the perpetrators knew but whether the defendants who

16   are being sued, they're the ones that need to have engaged in

17   the act of international terrorism and need to have the

18   scienter.

19       THE COURT:  I'm not sure that there's a fine line

20   there to be drawn.  If the perpetrator knew, I'm not sure I'd

21   be in a situation to be able to keep from the jury a

22   determination of whether or not if the perpetrator knew and the

23   perpetrator was doing it at the behest of his employer or her

24   employer that that knowledge should be imputed to the employer.

25       MS. FERGUSON:  There's no evidence at all of anybody

E7mgsokc

1    acting on the behest of the PA or PLO.  There's no evidence of

2    any of the perpetrators were acting with an intent to harm

3    Americans.  They mostly had beef with the Israelis and the IDF

4    and were acting to avenge deaths of relatives or friends.

5         THE COURT:  The question is, it seems to me, a close

6    one in terms of whether or not a jury would be entitled to

7    reasonably conclude on this evidence that the perpetrators of

8    this act understood that it was likely that they were going to

9    be killing or injuring Americans.

10        I'd have to exclude that reasonable conclusion by the

11   jury that it's more likely than not that that was the case

12   based on if you're sitting in an English-speaking restaurant

13   where Americans are known to congregate, I'm not sure it

14   wouldn't be the jury's determination of whether or not it's

15   reasonable to conclude under those circumstances whether or not

16   the perpetrators of the crime, or those who participated in it,

17   were disregarding the likelihood that Americans were going to

18   be killed and that Americans would be expendable under their

19   intended target.

20        MS. FERGUSON:  I know the afternoon is wearing on, so

21   I would say in closing that there's been a lot of statements

22   about knowledge of people being terrorists and Arafat

23   instigating terror and there's been a lot of claims.

24        I think, at the end of the day, we need to look at the

25   evidence and decide whether it would be admissible and whether

E7mgsokc

1    the admissible evidence is such that a reasonable jury could

2    find in the plaintiffs' favor.  I think when you actually look

3    at the evidence and see what a lot of these cases are based on,

4    things like custodial statements implicating third parties and

5    documents that aren't, in fact, admissions of the PA and PLO,

6    then I think you'll find we're entitled to summary judgment.

7             Thank you, your Honor.

8             THE COURT:  Let me focus on what I need from you and

9    whether or not this is a genuine issue.

10            Is it going to be your position that documents that

11   were produced by you that were prepared by one of your

12   employees and kept as records in your files, the files of the

13   PA or PLO, that something is lacking with regard to foundation?

14            MS. FERGUSON:  I'm going to let my colleague Brian

15   Hill address that.

16            MR. HILL:  For the record, Brian Hill.

17            If I can address that.  It's going to depend on the

18   document.

19            THE COURT:  Why should it depend on the document?

20            MR. HILL:  Because there are different kinds of

21   documents with different kinds of statements, and it's going to

22   depend on what statement the plaintiffs want to offer and for

23   what purpose they want to offer it.

24            THE COURT:  Right, but I'm trying to separate the two

25   issues.  I'm trying to separate particularly when you said "it

E7mgsokc

1    depends," I assume it primarily depends upon if they're

2    offering the document for the truth of a statement that's made

3    in the document that is either genuinely in dispute or not made

4    by your client.

5              MR. HILL:  Or repeats hearsay from a third source;

6    yes, your Honor.

7              THE COURT:  I assume it would fall outside of the two

8    categories.

9              MR. HILL:  Those are the principal issues.

10             THE COURT:  Right.  But the records themselves, if

11   they're able to overcome the hearsay objection or they're

12   offering it for a nonhearsay purpose, do you genuinely have a

13   foundation objection to documents that are kept in your

14   clients' files prepared by your clients' employees and produced

15   by your clients in discovery?

16             MR. HILL:  There's three different categories there:

17   In the file, produced in discovery and prepared by employees.

18             THE COURT:  Right.

19             MR. HILL:  Not everything in the file is produced by

20   employees.

21             THE COURT:  Okay.  I'm talking about documents that

22   fall into all three of those categories.

23             MR. HILL:  We're excluding things that we got from

24   third parties.  The only things that our employees created?

25             THE COURT:  Well, I'm not sure.  It's difficult for me

E7mgsokc

1    to understand what it is you've produced that was obtained from

2    third parties.

3              MR. HILL:  We have newspaper records, we have oral

4    statements that have been written down in the files.

5              THE COURT:  What obligation would you have to

6    produce -- I understand what your production would be in

7    response to him.

8              MR. HILL:  I want to correct something.  Mr. Yalowitz

9    suggested that he requested specific types of records.  That's

10   untrue.  The request was for any document that had a person's

11   name in it and we've responded to that.

12             THE COURT:  So, why would you go out and get a

13   newspaper article that's not in your possession to produce in

14   this case?

15             MR. HILL:  Because we produced intelligence files,

16   which include hearsay.

17             THE COURT:  Whose intelligence files?

18             MR. HILL:  The intelligence files of the Palestinian

19   Authority.

20             THE COURT:  Why doesn't that qualify as a document in

21   the files of the Palestinian Authority created by an employee

22   of the Palestinian Authority?

23             MR. HILL:  A newspaper is not created by the

24   Palestinian Authority, but it is in my clients' files because

25   they gather intelligence.  There's all sorts of hearsay in the

E7mgsokc

1  files.  That's what intelligence files are, a collection of

2  hearsay.

3          THE COURT:  Other than newspaper articles, which

4  depends on, again, they had some other nonhearsay basis --

5          MR. HILL:  Our files contain oral and written

6  statements from third parties that the plaintiffs, I

7  understand, want to offer for the truth of the matter asserted.

8  They want to offer it for exactly as your Honor suggested that

9  John Doe told me Sally did it and they want to prove that to

10  show that Sally did it.  That's what I understand, and this is

11  part of the problem:  They won't tell me which statements in

12  the documents they wish to offer and whether they wish to offer

13  them for their truth or for some other purpose.  So we're

14  preserving the objections not knowing what it is that they

15  intend to offer it for.

16          The other issue, frankly, is the discovery issue.  If

17  the Court will indulge me.  I want to read from the transcript

18  of the first discovery conference in the case which was held

19  before --

20          THE COURT:  No.  I don't want to go into that detail

21  on this issue.

22          MR. YALOWITZ:  I really don't --

23          MR. HILL:  I'll withhold it.  The bottom line is the

24  plaintiffs recognized at the outset that they would need to

25  take discovery to lay the foundation for this sort of document.

E7mgsokc

1    Because the witnesses were going to be unavailable, they chose

2    to forego that.  You denied it twice.

3            THE COURT:  We have been through this already.  This

4    part we have been through.  I'm trying to move forward.

5            This is what I want from both sides:  With regard to

6    the 177 documents, I want the plaintiffs to identify, as simply

7    as possible, the information, and if it can be quoted, quote

8    the statement in that document that you say is admissible,

9    relevant, and that you wish to offer.

10           If I have a three-page document you tell me what it is

11   in that document you're trying to get before the jury.  Quote

12   it to me if you can if it's simple; otherwise, try to simplify

13   it for me so I can look at it.

14           What I also want at the same time, and I'll give you a

15   date so you can simultaneously do this, I want to know from the

16   defendants what information in the document that you said you

17   want to keep out of this case, that you say is inadmissible and

18   should not be offered.  I want to know what you're objecting

19   to.  We have two problems, not just your problem.  Your problem

20   is not knowing what they want to offer and for what purpose; my

21   problem is not knowing what it is you're objecting to and why.

22           So I need to know exactly what it is you want to put

23   before this jury in that document, what fact you want to put

24   before the jury, and if that fact is simply quoted from there,

25   that's simple.

E7mgsokc

```
 1              I want to know from the defense at the same time what

 2       allegation in that document that they're objecting to, all

 3       right, not a general objection to the document.  I want to know

 4       what they say is the inadmissible portion of that document that

 5       they want me to rule cannot come in.  Then I can focus on it

 6       and I can make some judgment with regard to the nature of the

 7       information that is at issue.

 8              MR. HILL:  If I can make a suggestion:  I think it

 9       would make sense for us to get their admission first;

10       otherwise, there may be a lot of unnecessary time.

11              THE COURT:  Not for me.

12              MR. HILL:  There may be things they want to offer that

13       we object to and that's just a waste.

14              THE COURT:  No, that's not a waste for me because

15       that's exactly what I want to see.  I want to know what you

16       genuinely believe at this point that you're objecting to.  If

17       you don't know it, then you don't have an objection, a specific

18       objection.

19              I want to know if you've looked that documents and

20       whether you say, you know what, he wants that and that's not

21       admissible against us.  You should have gone through that

22       process and you should be able to tell me what that is if you

23       are at this point standing on your objection to the document.

24              MR. HILL:  Yes.  The only point I mention is the way

25       you've articulated it is that I, as the defendant, know he
```

E7mgsokc

1   wants that and I object to it.

2          THE COURT:  No, I didn't say that.

3          MR. HILL:  I'm sorry.  I apologize.

4          THE COURT:  I'm saying I wanted you to tell me what in

5   that document that you object to, all right?  Now, you say we

6   object to this line because it is a hearsay statement and I

7   don't want to know why.  I don't want an argument.  If you say

8   you object to this line that says John Doe said Sally committed

9   the crime, then you tell me that's what you object to so I can

10  focus.

11          All I want to know is the exact factual statement in

12  the document.  I want to know from the plaintiffs what factual

13  statement they want to put before the jury in that document and

14  I want to know from you what statement in that document that

15  you're objecting to to coming before the jury.  And I don't

16  even want to know why.  I just want you to lay it, pull it out

17  of that document, put it next to the document number and tell

18  me this is what we want out of this document, this is what we

19  object to going before this jury.  That's all I want at this

20  point in time first.  Then I can examine that.

21          Now, I can tell you, and I may not have to get there,

22  but I can tell you to the extent that they want something in

23  the document that is genuinely not a factual issue that's in

24  dispute, I am not going to be favorably inclined to spend time

25  trying to keep that out.

E7mgsokc

And if, to the extent that it is a statement of what the PLO or the PA did or a statement about what the PLO or the PA said through any actual representative, then it is likely that I will first want from you and have them submit to you a request to admit whether that's true or not, and you'll either deny it or admit it.

Then if you deny it, then I can determine whether or not it is something that should come in and under a different form if you have a genuine basis, a factual basis, or whether it should come in at all.

If you admit it, I can decide whether or not that means that it should come in in the form of the document or whether or not that means that the admission itself should come in in place of the document, because if that's the relevant information and you admit that relevant information, then I have to make a decision of whether the document comes in either in any form, redacted or unredacted.

So if they gave me something with regard to Exhibit 177 and they tell me they want this statement for its truth and you tell me that it's another part of the document that you have an objection to, then maybe I'll have them redact the document and redact the portion you have an objection to and put in the portion that they say is relevant and admissible and would further the jury's determination in this case, but I need to see that. And I need to see that simply by going through

E7mgsokc

1    each exhibit, pulling out of that exhibit what the statements

2    are in that exhibit that you want to offer before the jury.

3          The simpler the better because I'll put it to you this

4    way:  The more complicated it gets, the less likely that you're

5    going to get what you want.  Let's keep it simple and keep it

6    to the point and don't quote me two-thirds of the document and

7    then after having me read the document and realize that three

8    quarters of what you quoted to me don't advance the true

9    consideration in this case whatsoever.

10         There have to be some critical facts in this document

11   that have to be fairly obvious to me why the plaintiffs want it

12   and fairly obvious me as to why the defendants don't want it.

13   So identify those for me and exchange those at the same time.

14         Once I get those, and I may ask for some response, but

15   I want to see it first, and if you want to spend some time

16   trying to come to terms given our discussion today to work out

17   some issues based on what you think I am likely to do rather

18   than what you want to do, then I would encourage that.

19         But otherwise, I'm going to go through that list and

20   I'm going to see what the nature of the information is that is

21   being offered and what the nature of the information is that

22   you want to keep out.  I'll see what the pattern is to that.

23         I'll see whether or not it advances my determination,

24   whether or not those facts are going to be presented at all,

25   whether those facts are going to be presented through this

E7mgsokc

document, whether that document is going to be redacted or

unredacted, or whether that document is going to be admitted to

the jury in the form of the admission by the other side that

that is, in fact, a true fact.

        That's the situation I want to be in so that I can be

in a position to intelligently resolve this dispute and any

anticipated disputes about the documents and the admissibility

of the documents.  I'm going to take that approach with most of

the documents that you're fighting about.  Let's see if you can

do that for me.

        I don't think it's necessary at this point given the

discussion, but I was thinking about asking the defense to go

through each one of these exhibits to tell me whether or not

you agree whether or not it's a document that's in your file,

whether or not it's a document that was prepared or a file that

was prepared by your employee and whether or not it was kept in

your file, but I'm not going to do that because I think, as I

indicated here, to the extent that that's the case, it's not

likely that you're going to be able to object on the basis that

the document itself is inadmissible because it is not a

business record.

        With regard to documents taken from other sources,

again, I need to know what it is that we're really fighting

about in those documents and for what purpose those documents

are being offered, and we can have a further discussion the

E7mgsokc

1    next time we meet as to how those documents will be dealt with.

2          What I'm anticipating at this point, I think I'm

3    anticipating receiving it by August 29.  I think I'm receiving

4    a request to charge by August 29.

5          MR. YALOWITZ:  The request to charge is August 8 and

6    the objections to the request to charge -- I forget what the

7    last business day of August is.

8          THE COURT:  I think that's the 29th.  That's the

9    objection to the request that I'm receiving.

10          MR. YALOWITZ:  Right.

11          THE COURT:  And our next date is --

12          MR. YALOWITZ:  September 16, I think.

13          THE COURT:  If you can give me what I have just

14    requested by August 15, that would be appreciated.  Is that an

15    unreasonably short period of time or can you do that with

16    regard to the 177 exhibits?

17          MR. YALOWITZ:  Your Honor, if we can just have an

18    extra couple of days.  Both Mr. Horton and I are out of the

19    country, or I'm out of the country.  Maybe a week later.

20          THE COURT:  A week later, the 22nd.

21          MR. YALOWITZ:  That would be great.

22          THE COURT:  I'm getting a lot of paper so I need to

23    keep going through it.  Let's say the 22nd.  Give me that on

24    the 22nd.  As I said, that should be a simple list that I can

25    run down and see as to Exhibit 10, what part you want to offer

E7mgsokc

1    and what part they are objecting to at this point in time, and

2    then we can have further discussion by the September date with

3    regard to those issues.

4            As I say, to the extent they end up not objecting to

5    the part that you say that you want to admit --

6            MR. YALOWITZ:  Then we're done.

7            THE COURT:  -- then maybe I can redact the document if

8    they're concerned about something different, but I assume

9    there's going to be a combination of those things depending on

10   the exhibits.

11           Let's do that.  Let me get the request to charge.  I

12   want to see if we can keep ourselves on schedule, see if I can

13   go forward and try to resolve this and any outstanding motions

14   by the time we meet next.  Then I think we have another

15   conference scheduled in November.  Then we can start talking

16   about ensuring that we're on schedule for the dates and talk

17   more about what the actual length of the trial might be and

18   whether we're going to continue with the trial dates that we

19   were talking about.

20           MR. HILL:  There is one other legacy date that I think

21   it makes sense to put off for now.  There is, from several

22   orders ago, a deadline of September first for additional

23   pretrial matters.  I think since you have summary judgment

24   under advisement, it would make sense to await your ruling and

25   then at that point address pretrial matters.

E7mgsokc

1              THE COURT:  What's additional pretrial matters?

2              MR. YALOWITZ:  I beg you not to do that.

3              The game here is to bring more *in limine* motions, more

4       motions, they want to dream up a bunch of new motions.

5       Whatever pretrial motions we have, we have a schedule for it,

6       everybody agreed to it, your Honor so ordered it.  Let's not be

7       moving the schedule and delaying things.

8              We have witnesses.  We have told all of our witnesses

9       come, you're going to be coming in January and February.

10      People are coming from all over the world to New York.  They're

11      planning their lives.  To start with eroding the schedule now,

12      I beg you not to do it.  It's a delay tactic.

13             THE COURT:  I'm not sure what the substance of the

14      applications are.

15             MR. HILL:  Right now there's this old deadline of

16      September first for any other pretrial matters.

17             THE COURT:  What do you intend to do on that date or

18      subsequent?

19             MR. HILL:  For example, we haven't addressed

20      plaintiffs' damages and plaintiffs' damages experts yet and I

21      can file by September first.  But it's going to be a waste of

22      time if you're going to dismiss any of these cases, which

23      obviously we're waiting for your ruling on that.  So it seems

24      to me we should wait until October first to bring those matters

25      and that we can resolve them at the November conference.

E7mgsokc

1              MR. YALOWITZ:  I'm absolutely outraged.

2              Your Honor gave these people 90 pages to do whatever

3    *in limine* motions they wanted.  And you said I'm going to give

4    you one round of *in limine* motions.  Now I'm hearing they want

5    to file a new round of *in limine* motions in October when I'm

6    supposed to be getting my witnesses ready to testify.

7              It's an outrage.  It's an absolute outrage.

8              THE COURT:  I've been around long enough; there are

9    very little outrages.  The bottom line is my dispassionate

10   response is I'm going to leave the same dates that we have set.

11             MR. YALOWITZ:  Thank you, sir.

12             THE COURT:  You should move forward.

13             As a matter of fact, if there's anything that you

14   think that you want to raise with regard to this trial, if

15   you're aware of it now, you should raise it early rather than

16   later.  So I will move forward and I will move forward to

17   resolve these issues.  But to the extent that you have issues

18   that you feel need to be addressed for trial, you should at

19   least focus those issues and make me and the other side aware

20   of those issues on the schedule that we have, even if we have

21   to do a further examination of those issues.

22             I set a very tight schedule and carved out a

23   significant amount of my time and other cases' time so we can

24   stay on this schedule.

25             MR. YALOWITZ:  Thank you, your Honor.

E7mgsokc

1            THE COURT:  I'm going to move as efficiently as we

2      possibly can so we can all be prepared to go forward in

3      January.

4            MR. YALOWITZ:  If I may, I just want to respond to one

5      thing that Ms. Ferguson said.

6            THE COURT:  Yes.

7            MR. YALOWITZ:  The attack that the Mandelkorn family

8      was injured in June 19, 2002, Ms. Ferguson said the only

9      evidence that we have is this one document that we have been

10     going over.  I just want to be very clear that that's not

11     correct because by June of 2002, the Al-Aqsa Martyrs Brigades

12     was a designated terrorist organization.  So in addition to our

13     *respondeat superior* theory, for that case, we also have a

14     material support where they're giving weapons, money and

15     resources to Al-Aqsa Martyrs Brigades, which claimed

16     responsibility for this particular attack.

17            It's not a 2339A claim where I have to show that they

18     were supporting an attack; it's a 2339B claim where I have to

19     show they were giving money, weapons and so forth, freedom of

20     operation, to the terrorist organization which perpetrated the

21     attack.  I just didn't want to leave the record to suggest that

22     this case depends on so thin a reed.  Thank you.

23            THE COURT:  I'm going to start moving forward and

24     going through this material so we can resolve this.  As soon as

25     I get your request to charge, I'm going to start looking at

E7mgsokc

1    that because that helps in giving some guidance about how you

2    think these issues should be resolved by a jury.

3            Then I'll see you in September.  I'll get the other

4    materials and whatever other issues come up, we'll start

5    gearing those up so we can resolve those and decide those

6    between September and November.

7            MR. YALOWITZ:  Thank you.

8            MS. FERGUSON:  Thank you.

9            (Adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25