UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------- X
    :
COURTNEY LINDE et al.,   :
    :   **ORDER**
            Plaintiffs,   :
    :   04 Civ. 2799 (BMC) (VVP)
        - against -   :   and related cases[1]
    :
ARAB BANK, PLC,   :
    :
            Defendant.   :
    :
    :
---------------------------------------------------------- X

**I.    Defense Witnesses**

Plaintiffs' motion to preclude defendant's 30(b)(6) witnesses from testifying is denied. They may testify live at trial in their personal capacity. Of course, like all fact witnesses, their testimony will have to be within their personal knowledge. Information learned by them in connection with preparing to testify as Rule 30(b)(6) witnesses is not within their personal knowledge. Plaintiffs' concern that the witnesses do not have personal knowledge concerning the matters about which they will testify can be easily solved if they timely object to questions or testimony.

Plaintiffs' motion to compel defendant to give a more specific proffer of its witnesses' testimony is also denied. The descriptions that defendant has provided are certainly general, but plaintiffs' descriptions were as well. Plaintiffs have deposed these individuals, and thus should

---

[1] The following related cases have been consolidated with this case for the purposes of discovery and other pretrial proceedings: Philip Litle, et al. v. Arab Bank, PLC, 04-CV-5449; Oran Almog, et al. v. Arab Bank, PLC, 04-CV-5564; Robert L. Coulter, Sr., et al. v. Arab Bank, PLC, 05-CV-365; Gila Afriat-Kurtzer, et al. v. Arab Bank, PLC, 05-CV-388; Michael Bennett, et al. v. Arab Bank, PLC, 05-CV-3183; Arnold Roth, et al. v. Arab Bank, PLC, 05-CV-03738; Stewart Weiss, et al. v. Arab Bank, PLC, 06-CV-1623.

1

know what their testimony will be. Should defendant try to elicit testimony that is barred by the Sanctions Order, plaintiffs' remedy, again, is to timely object. Should the testimony the witnesses offer prove cumulative and repetitive, the Court will cut off the questioning.

Plaintiffs' motion regarding the defense witnesses is granted in one respect only: defendant must disclose the order of their witnesses – as best they can – by Wednesday, September 3. The Court previously requested that defendant make a good faith effort to figure out the order in which their witnesses would testify, and again instructs it to do so. The Court is concerned that defendant may be trying to surprise plaintiffs with last minute identification of witnesses, and if that proves to be the case, it will not be tolerated.

**II.   Evidentiary Issues**

   A.   <u>Martyr Files</u>

First, the Court finds plaintiffs' argument that these documents serve a not-for-truth purpose to be unpersuasive. That the Al-Tadamun Society kept detailed martyr files is not, by itself, relevant to any disputed issue in the case. That the Al-Tadamun Society kept detailed martyr files <u>indicating that the families of terrorists were beneficiaries</u> is relevant. But the latter purpose is clearly using the document for its truth: that the individuals listed and pictured therein were, in fact, beneficiaries.

Second, based on the proffer thus far, Mr. Spitzen cannot provide the foundation for admitting these files as business records, and it seems unlikely that he has a basis to do that. He may be familiar with the documents themselves, but neither his expert report nor plaintiffs' proffer give any indication that he is familiar with the way in which those documents were created and stored. <u>See</u> <u>United States v. Brown</u>, 553 F.3d 768, 793 (5th Cir. 2008) (holding that expert could not lay foundation for business records because although he "knew about the

pharmacy computer system, how to operate the system, and how to extract information from it . . . that is not knowledge about the pharmacy's record keeping. . . . [a]midst all of his unquestioned expertise, [the expert] lacked this necessary familiarity.").

The Court will permit two examples of the martyr files to be disclosed to the jury under Rule 703, to help the jury evaluate Mr. Spitzen's opinion. Mr. Spitzen may also testify as to the existence of the other martyr files. The Court will give a limiting instruction at defendant's request.

### B. Union of Good, Saudi Committee, and Zakat Charity Websites

Mr. Kohlmann was able to sufficiently authenticate websites as communication outlets for Hamas through detailed testimony based on his specific expertise in the online activities of terrorists. Mr. Spitzen has no comparable expertise that would permit him to authenticate the Saudi Committee, Union of Good, or zakat charitable foundation websites.

Further, the websites are hearsay. Plaintiffs' proffered not-for-truth purposes are unpersuasive. To the extent they mean to suggest that offering the Union of Good website as evidence "of links and relationships between two organizations" is not using it for its truth, they are incorrect. PX565, the Union of Good website they have offered, lists the Saudi Committee as a "member organization." It is clearly offered for the truth of that statement.

Plaintiffs' argument that the websites show the public perception of the charities at issue is similarly unpersuasive, as the websites simply give no indication as to how the public perceived the charities at issue. Finally, the co-conspirator hearsay exception is inapplicable, as plaintiffs have not proven (nor given any indication before now that they sought to prove) the existence of a joint criminal venture between defendant and the Saudi Committee. Cf. United States v. Sayles, No. 11–CR–30162, 2012 WL 1252986, at *3-4 (S.D. Ill. April 13, 2012).

3

The websites will not be admitted into evidence. The Court will permit the disclosure of the websites containing beneficiary lists (PX468, PX4735, PX573, PX764), and the Union of Good website (PX566), for Rule 703 purposes only. Disclosing this evidence to the jury will help them evaluate the expert's opinion, and their importance for that purpose outweighs the risk of prejudice. The Court will give an appropriate limiting instruction at defendant's request.

C. Videos

At the most recent conference, the Court indicated that it would admit 10 or 20 seconds of the two videos that plaintiffs have proffered, PX1061 and PX4712, as relevant to showing the connection between Hamas and individuals involved certain of the charities at issue in this case. Disregarding this instruction, plaintiffs now state that their video clips are both approximately one minute long. The Court takes this to mean that plaintiffs cannot cut the videos any further and maintain their relevance.

But plaintiffs' demonstratives make clear that still images from the videos, or very short excerpts, are sufficient to make the point for which the videos are offered: because Mr. Al-Bitawi attended a funeral for a Hamas bombmaker, and spoke at a Hamas rally in front of a mural of Hamas "martyrs," he is likely affiliated with Hamas, and by extension the charities in which he is involved are too. The additional context that plaintiffs argue the videos provide – e.g., a sense of the size of the crowd – is largely captured by the still images in plaintiffs' demonstratives, and can be discussed in Mr. Spitzen's testimony. Plaintiffs may use the stills, subject to proper foundation and authentication by Mr. Spitzen, but the videos will not be played in the form plaintiffs request.

4

D. <u>Government Documents</u>

PX480, the letters from the Palestinian Ambassador complaining about Saudi Committee payments to Hamas, are inadmissible. They do not contain the factual results of a legally authorized investigation, nor anything observed under a legal duty to report. Moreover, they contain multiple levels of hearsay – the declarant is relating what Yasser Arafat told him to tell the Saudis.

Nor is disclosure of these letters essential to the jury's understanding of the expert's opinion, when weighed against the risk of prejudice. The slide featuring PX480 will be removed.

The Court now turns to the two Israeli government documents that plaintiffs now indicate they intend to offer into evidence, PX1078, the Israeli designation of certain charities as unlawful organizations (the "blacklist"), and PX1234, a 2004 Israeli government report entitled "Mapping the Da'wa Infrastructure In the Region of Judea and Samaria" (the "Da'wa Report").

When defendant moved *in limine* to exclude PX1234 and other IDF documents, plaintiffs filed a letter withdrawing those documents from their case-in-chief, with the exception of one document they stated would be used solely for authentication purposes. <u>See</u> Docket Entry 1044, Letter from Gary M. Osen to the Hon. Brian M. Cogan regarding Defendant's Motion in Limine to Preclude Israeli Defense Force Exhibits and Related Testimony of Plaintiffs Fact Witness Colin Hames. Plaintiffs are bound by that representation, and cannot now introduce PX1234 into evidence.

As for the Israeli blacklist, the Court has so far permitted its use solely in support of the opinions of plaintiffs' experts that certain charities were affiliated with Hamas, as that was

5

heretofore the only purpose for which plaintiffs sought to use it. Plaintiffs have now clarified their intent to move the Israeli blacklist into evidence.

First, PX1078 is clearly admissible under Federal Rule of Evidence 803(8). It contains a certification by an official from the Israeli Ministry of Justice, stating that he had examined Israeli regulations and found that certain organizations had been declared unlawful by the State of Israel. It thus states the factual findings of a legally authorized investigation. See, e.g., Bridgeway Corp. v. Citibank, 201 F.3d 134, 143 (2d Cir. 2000). There is no contention that the document is untrustworthy, and in any event, consideration of the factors enumerated in Bridgeway indicates that this document does not lack trustworthiness. See id. (considering "(a) the timeliness of the investigation, (b) the special skills or experience of the official, (c) whether a hearing was held and the level at which it was conducted, and (d) possible motivation problems.").

Defendant's principal objection is prejudice. At the July 30, 2013 conference, the Court expressed some skepticism as to the admissibility of the Israeli blacklist, but suggested it might be admissible as a foreign public document. Defendant had originally moved to exclude the blacklist as "irrelevant to its operations," given that the list applied only in Israel and none of defendant's Israeli operations are at issue in this case.

This argument is similar to the one rejected by Judge Gershon, that defendant's "'duties' were to comply with foreign laws" in each specific jurisdiction in which it operated. See Linde v. Arab Bank, 944 F. Supp. 2d 217, 219 (E.D.N.Y. 2013). That argument was rejected because defendant was unable to articulate "how such compliance would affect its 'duties' to comply with United States law under the extraterritorial ATA." Id. Here, the Israeli blacklist is relevant evidence, in admissible form, that particular charities were in fact affiliated with Hamas.

6

Further, defendant has contended that the Israeli blacklist was not available to it until 2005, i.e., after the last attack at issue in this case. If that fact is undisputed – and the Court believes that it is, given that if plaintiffs had evidence that the blacklist was available to defendant before 2005, they surely would have offered it by now – the Court will instruct the jury that it is only to consider the Israeli blacklist as evidence that the specific charities listed therein were connected to Hamas, and not defendant's knowledge that they were.

On August 23, 2013, this Court excluded a number of witnesses that defendant proffered. Several of those witnesses had formerly been identified as expert witnesses and excluded by Judge Gershon, including a retired Israeli General named Ilan Paz. Defendant re-offered these individuals fact witnesses. The Court excluded them, finding that (1) their testimony would be largely based on hearsay or specialized knowledge, because as former government officials the witnesses would mainly be testifying as to what they were told by others; (2) testimony that the these witnesses did not know the charities at issue to be fronts for Hamas was relevant only to raise the inference that if these witnesses didn't know, defendant couldn't have known either, and was therefore barred by the Sanctions Order; and (3) testimony concerning the knowledge of the Israeli and other governments posed the risk of creating a sideshow.

None of these concerns apply here. Most obviously, a live witness like General Paz is not a government report. Testimony by General Paz that the Israeli government did not believe a certain charity to be affiliated with Hamas would be either an impermissible lay opinion or testimony founded on hearsay. A government report indicating that the Israeli government blacklisted that same charity for its affiliation with Hamas, by contrast, is admissible. And plaintiffs, of course, are not limited by the Sanctions Order.

7

Nor is there a risk of a mini-trial regarding the beliefs of the Israeli government should the Israeli blacklist be admitted. That the Israeli government designated these charities is a discrete, objective fact, and one that none of defendant's excluded witnesses could reasonably have disputed.

PX1078 will be admissible. However, it must be redacted to remove references to charities not at issue in this case, as those are irrelevant.

### III. Defendant's letters of August 31

#### A. Motion to Strike Spitzen Testimony

Judge Gershon held that Mr. Spitzen was qualified to give nearly all of the opinions for which he was proffered. That decision noted that:

> [I]t is important to note that defendant does not challenge Mr. Spitzen's opinions regarding payments from the Bank to senior Hamas leaders; his Arabic naming methodology used to determine whether Bank accountholders and wire transfer beneficiaries were in fact identifiable terrorists; and the identification of individual terrorists or their relatives who received funds through Arab Bank.
>
> What defendant does challenge are those portions of Mr. Spitzen's report which opine on the establishment and organization of Hamas; whether certain charities were under the control of Hamas between 2000 and 2004; or whether certain individuals named on transactions processed by Arab Bank on behalf of Yousef Al–Hayek and others are leaders, members, or relatives of leaders or members, of Hamas. It also challenges Mr. Spitzen's expert opinions as to the Saudi Committee, the Al–Shahid Foundation, and the Al Ansar Society.

Linde v. Arab Bank, PLC, 922 F. Supp. 2d 316, 322-23 (E.D.N.Y. 2013). The decision then rejected defendant's challenges to Mr. Spitzen's testimony, except as to a few scattered opinions as to the state of mind of organizations or individuals.

Defendant now moves to strike certain portions of Mr. Spitzen's testimony from August 28. Defendant argues that, because Mr. Spitzen is not a banking expert, he is not qualified to offer opinions as to whether certain terrorists were "accountholders" at Arab Bank.

8

The Court does not see how defendant can take this position in light of the prior ruling regarding Mr. Spitzen's testimony (to which defendant's letter does not cite). That prior ruling explicitly upheld the methodology Mr. Spitzen used to "to determine whether Bank accountholders and wire transfer beneficiaries were in fact identifiable terrorists." Id. As near as the Court can tell, defendant is arguing that plaintiffs have not proved that the wire transfer beneficiaries were, in fact, "accountholders," and that therefore Mr. Spitzen should be precluded from testifying that they were.

The Court rejects this artificial distinction. Where a wire transfer names an individual as a beneficiary, and lists an account number at an Arab Bank branch, that is at the very least *prima facie* evidence that the individual named is indeed an "accountholder." PX2080 does just that: it lists an account number of 36444 and a beneficiary party of "Ahmad Ismail Yasine." When Mr. Spitzen testifies that in his opinion the "Ahmad Ismail Yasine" named in the SWIFT transfer is Sheikh Yassin, the leader of Hamas, he is applying his expertise in terrorism and Arabic names, not in banking.

That Al-Rantisi, a senior Hamas leader, appealed in an interview for donations to Sheikh Yassin and identified the same bank account number, 36444, is evidence on which Mr. Spitzen relied to form his opinion that Sheikh Yassin was the "Yasine" named in the SWIFT transfer. The Court did not admit the Al-Rantisi interview into evidence, because it was hearsay that plaintiffs could not authenticate. But Mr. Spitzen was permitted to disclose it under Rule 703 as a basis for his opinion. Defendant may raise Mr. Spizen's lack of banking qualifications on cross-examination.

Further, as an aside, defendant's witnesses were asked directly in deposition whether Sheikh Yassin, the well-known leader of Hamas, was an accountholder. In the face of the

9

evidence above suggesting that he was, they refused to answer, or to turn over documents. To now argue that the wire transfer beneficiaries were not necessarily "accountholders" thus rings hollow, even if such an argument does not fall directly within the ambit of the Sanctions Order where it is addressed to plaintiffs' expert.

### B. Declarations Against Interest

#### 1. Al-Sayyed Confession

The Court remains of the view that Abbas Muhammad Mustafa Al-Sayyed's confession is sufficiently reliable to be admissible as a declaration against interest, and that the portion mentioning his Arab Bank account was sufficiently against his penal interest at the time it was made.

As the Court noted on the record, one of the crimes for which Mr. Sayyed was convicted was that "he received tens of thousands of dollars from the Hamas leadership in Syria to fund Hamas's operations. As part of his activities, [Sayyed] conspired with Hamas operatives in Tulkarm to purchase different types of weapons and ammunition."

During his interview with the Israeli police, Mr. Sayyed made incriminating statements that supported this very charge. After describing the prices he and his Hamas co-conspirators paid for weapons, he was asked where he got the money, and stated

> The money that I paid for the weapons was transferred to my private bank account in Arab Bank in Tulkarem. This money was sent from the USA to my account and this was coordinated with Abu al-Anwar in Syria. He is one of Hamas's leaders in Syria. The money was intended to support only the political activities of Hamas, but I decided on my own to use it for buying weapons to be used by the al-Qassam Brigades of Hamas. I used to receive the money in monthly payments. Each payment was between ten to thirteen thousand dollars.

PX3524, at 4-5.

Defendant argues that the portion of the statement mentioning Arab Bank is not sufficiently self-incriminating to be admissible. The Court carefully considered the circumstances of Mr. Sayyed's confession before deciding that the portion at issue was admissible, and disagreed.

The statement, viewed in context, provides corroborating details of the crimes for which Mr. Sayyed was facing prosecution. As the Supreme Court noted in <u>Williamson</u>, "statements that give the police significant details about the crime may . . . depending on the situation, be against the declarant's interest." <u>Williamson v. United States</u>, 512 U.S. 594, 603, 114 S. Ct. 2431 (1994). Here, Al-Sayyed's statement gave to the police one of the most significant details of his illegal weapons transactions: the exact method by which he carried them out.[2]

Defendant also points to Mr. Sayyed's claim in the Israeli courts that he was tortured. It is true a coercive atmosphere may contribute to a finding that a confession is not truly a declaration against interest, and that here it appears that Mr. Sayyed was subjected to some coercive pressures in a separate interrogation by the ISA that occurred before he was taken into custody by the Israeli police and gave the statement at issue. But it does not appear that Mr. Sayyed was under coercive pressures at the time he made his statement.

Mr. Sayyed raised this very claim in his appeal in the Israeli courts. The appellate court found that

> It transpires that the appellant's good and free will were not denied to him when interrogated by the police and he confessed to the acts described in the second count. It is true that not an especially long time had passed between the ISA

---

[2] Defendant's apparent contention that these statements are not relevant because Al-Sayyed did not use the weapons in question to carry out the Park Hotel attack at issue in this case is incorrect. The fact that Mr. Sayyed received money through his Arab Bank account alone is relevant, because plaintiffs do not need to trace the money that a terrorist received to a specific attack at issue. <u>See</u> Boim v. Holy Land Foundation for Relief and Development, 549 F.3d 685, 697-99 (7th Cir. 2008).

11

> interrogation and the police interrogation and his admission of the facts. However, countering this is the fact that during the interrogation of the appellant at the police, he took control of the event. He asked for a pen and wrote down the things in his own hand. He directed the course of the investigation.

PX3555, at 29.

This Court accepts that characterization of the facts for the limited purpose of determining admissibility. Several days had passed between Mr. Sayyed's ISA interrogation and his police confession at issue here. He was told of the charges against him, and indicated he understood them and was giving his written statement of his own free will. He also deleted certain portions of his confession, including the phrase "I confirm" at the end of it, further illustrating his control of the situation.

Moreover, Sayyed's confession bears no indicia of any attempt to shift responsibility to others, or to exonerate himself. See Williamson, 512 U.S. at 601 ("Due to his strong motivation to implicate the defendant and to exonerate himself, a codefendant's statements about what the defendant said or did are less credible than ordinary hearsay evidence.") (quoting Lee v. Illinois, 476 U.S. 530, 541, 106 S. Ct. 2056, 2062 (1986)). His confession is a straightforward factual account of what Sayyed did himself, and nearly all of it is self-incriminating. Nor do the circumstances indicate that Sayyed was trying to curry favor with the authorities. The Israeli courts found that Sayyed felt "in control" of the interrogation, and that he spoke with a certain pride in his Hamas activities. The fact that Sayyed admitted to certain facts, but not to others, and never formally admitted his guilt are further indications that he was not trying to curry favor in order to receive a lesser sentence. Were he attempting to curry favor, he would not have tried to make things difficult for the authorities through such evasiveness.

Quite simply, Sayyed's statements regarding his Arab Bank account were incriminating, and he had no reason to make them if they were not true. They are therefore sufficiently reliable to be admissible.

It bears noting that this is a civil case. Thus, the requirement of Federal Rule of Evidence 804(b)(3)(B) that the statement be "supported by corroborating circumstances that clearly indicate its trustworthiness" does not apply, because the statement is not "offered in a criminal case as one that tends to expose the declarant to criminal liability." Nonetheless, Mr. Sayyed's statements regarding his Tulkarem Arab Bank account are indeed corroborated, at least as to that account's existence: the record includes several SWIFT transfers from Lebanon to an Arab Bank account in Tulkarem, for a beneficiary named "Abbas Mohamed Al-Sayed." See United States v. Gupta, 747 F.3d 111, 128-29 (2d Cir. 2014) (holding statements admissible as against declarant's penal interest where those statements were corroborated by other evidence in the record).

Finally, to the extent defendant argues that the Al-Sayyed confession is unduly prejudicial under Rule 403, that argument is rejected. The confession is certainly damaging evidence, but it is not unfairly prejudicial. Moreover, any prejudice to defendant is far outweighed by the high probative value of this evidence.

### 2. *Claims of Responsibility*

Defendant repeats its objection to the Court's admission of Hamas' claims of responsibility for the terrorist attacks at issue in this case as declarations against penal interest under Rule 804(b)(3). The Court has noted its disagreement with the decisions in Strauss v. Credit Lyonnais, S.A., 925 F. Supp. 2d 414, 449 (E.D.N.Y. 2013), and Gill v. Arab Bank, PLC, 893 F. Supp. 2d 542, 569 (E.D.N.Y. 2012), on this score. The additional citation of Gilmore v.

13

Palestinian Interim Self-Gov't Auth., CV 1853 (GK), 2014 WL 3719160, *9-10 (D.D.C. July 28, 2014), does not change the Court's view.

First, claiming responsibility for a terrorist attack is plainly against Hamas' penal interest. For a statement to be admissible under Rule 803(b)(3), a court must determine that "a reasonable person in the declarant's shoes would perceive the statement as detrimental to his or her own penal interest." United States v. Saget, 377 F.3d 223, 231 (2d Cir. 2004). The rule does not require that the declarant be aware that the incriminating statement could subject him to immediate criminal prosecution, only that it tended to subject him to criminal liability. United States v. Lang, 589 F.2d 92, 97 (2d Cir. 1978).

This part of the analysis is relatively simple. It is beyond reasonable dispute that Hamas is well-aware that claiming responsibility for a violent terrorist attack on Israeli civilians could subject it as an organization and its members individually to penal consequences, including crackdowns, arrests and even assassination by Israel.

The fact that Hamas may *also* have other motivations for claiming responsibility for an attack does not automatically render such claims inadmissible. After all, it is rare for anyone to say anything purely for the sake of getting themselves in trouble. Courts regularly admit statements under Rule 803(b)(3) despite the argument that the declarant had another motive for making the statement. See Gupta, 747 F.3d at 129 (rejecting argument that the declarant "was merely attempting to impress" the person to whom he was speaking as "a contention that could be argued to the jury"); see also United States v. Hamilton, 19 F.3d 350, 357 (7th Cir. 1994) (rejecting argument that statements were mere "jailhouse boasting"); United States v. Mills, 704 F.2d 1553 (11th Cir. 1983) (rejecting as "disingenuous" the argument that "that under the circumstance of one inmate bragging to another about crimes committed, the statement was not

14

against penal interest at the time it was made" where the declarant "well understood the possibility that his statement might be overheard by prison guards . . . and that penal consequences might result."); cf. United States v. Williams, 506 F.3d 151, 155 (2d Cir. 2007) (noting that declarant "was boastful regarding his participation in the murders").

Thus, the question is not whether Hamas' claims of responsibility were undiluted by any other motive, but whether those other motives outweighed the effect of the severe penal consequences that Hamas faced. In the Court's view, they do not, and Hamas would not have made these statements unless they had at least a kernel of truth. Where the potential penal consequences are as severe as they are in this case, the propaganda motives that Hamas also possesses are insufficient to render its statements inadmissible.

As noted above, this is not a criminal case, and so the requirement of "corroborating circumstances that clearly indicate [the statement's] trustworthiness" does not apply. See Fed. R. Evid. 804(b)(3)(B) (requiring such corroboration where a statement "is offered in a criminal case as one that tends to expose the declarant to criminal liability"). Nevertheless, many of the claims of responsibility in this case are indeed corroborated by Israeli government reports assigning blame to Hamas, and by court records of convictions of Hamas operatives for the attacks.

Defendant rightly pointed out the lack of such corroboration for some of the attacks on cross-examination. Defendant also pointed to claims of responsibility by other groups,[3] and further drew out its argument that Hamas may have incentive to lie for propaganda purposes. But as a factor countervailing Hamas' motives to lie, plaintiffs' experts also testified that a claim of responsibility that turns out to be false can damage Hamas' standing in the community.

---

[3] The fact that some of those claims were presented in newspaper articles, however, added an extra level of hearsay and rendered them inadmissible.

15

These competing contentions were thus presented where they should be presented: to the jury. See Gupta, 747 F.3d at 129. The jury can and should consider these factors in determining the weight to assign the Hamas claims of responsibility. But they do not render the statements inadmissible. It is not the Court's role to determine the weight of the evidence before determining its admissibility, where the statements at issue so plainly carry significant penal consequences, and those penal consequences are not clearly outweighed by a motive to fabricate. On the facts presented here, for the limited purpose of determining admissibility, rather than weight, the knowledge of the declarants of the penal consequences of their statements is more significant than the manner in which they balanced those consequences against their motivations for making the statements.

**SO ORDERED.**

_____
U.S.D.J.

Dated: Brooklyn, New York
       September 1, 2014