# EXHIBIT A

11-3934-cv (L)
*Gucci v. Bank of China*

1    **UNITED STATES COURT OF APPEALS**
2    **FOR THE SECOND CIRCUIT**
3
4    August Term 2013
5
6
7    Argued: December 6, 2013
8    Decided: September 17, 2014
9
10    No. 11-3934-cv; 12-4557-cv
11
12    _____
13
14    GUCCI AMERICA, INC., BALENCIAGA AMERICA, INC., BALENCIAGA, S.A., BOTTEGA
15    VENETA INTERNATIONAL S.A.R.L., BOTTEGA VENETA, INC., LUXURY GOODS
16    INTERNATIONAL S.A., YVES SAINT LAURENT AMERICA, INC.,
17    *Plaintiffs-Appellees,*
18
19    -v-
20
21    BANK OF CHINA,
22    *Appellant,*
23
24    WEIXING LI, DBA REDTAGPARTY, DBA MYLUXURYBAGS.COM, DBA
25    XPRESSDESGINERS.COM, DBA XPRESSDESIGNER.NET, DBA DESIGNER HANDBAGS,
26    AKA XIN LI, ET AL.,
27    *Defendants.*
28    _____
29
30
31    Before:    LIVINGSTON, LYNCH, and LOHIER, *Circuit Judges.*
32

1

Appeal from: (1) an August 23, 2011 order granting plaintiffs' motion to compel nonparty Bank of China ("the Bank" or "BOC") to comply with a 2010 document subpoena and a 2010 asset freeze injunction; (2) a May 18, 2012 order denying the Bank's motion to reconsider; and (3) a November 15, 2012 order holding the Bank in civil contempt and imposing civil monetary penalties for failure to comply with the August 23, 2011 order. We conclude that the district court properly issued its June 25, 2010 and July 12, 2010 orders freezing the defendants' assets and "restrain[ing] and enjoin[ing]" the defendants from transferring assets and others with notice of the order from "acting in concert or in participation with any of [the defendants]" to do so. However, we vacate the August 23, 2011 order, as well as the May 18, 2012 order, denying the Bank's motion to reconsider. On remand, the district court may consider its jurisdiction over the Bank and, if jurisdiction exists, apply principles of comity to determine whether compliance with its orders should be compelled. We reverse the November 15, 2012 order holding the Bank in civil contempt and imposing civil monetary penalties.

AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, AND REMANDED.

> ANDREW RHYS DAVIES (Bradley Stephen Pensyl, Pamela Rogers Chepiga, *on the brief,*) Allen & Overy LLP, New York, NY, *for Appellant.*
>
> ROBERT L. WEIGEL (Howard S. Hogan, Anne M. Coyle, Jennifer C. Halter, *on the brief*), Gibson, Dunn & Crutcher LLP, New York, NY, *for Plaintiffs-Appellees.*

DEBRA ANN LIVINGSTON, *Circuit Judge*:

This case arises out of the legal efforts of a number of luxury goods retailers to protect their intellectual property and stop alleged counterfeiters from marketing fake merchandise over the Internet and then hiding the profits from the sale of their

1    counterfeit products.  This case was argued in tandem with a related case, *Tiffany*

2    *LLC v. China Merchants Bank, et al.*, Nos. 12-2317; 12-2330.  We decide the *Tiffany*

3    appeal in a summary order issued simultaneously with this opinion.

4         Plaintiffs-Appellees Gucci America, Inc. ("Gucci"), Balenciaga America, Inc.,

5    Balenciaga, S.A., Bottega Veneta International S.A.R.L., Bottega Veneta, Inc., Luxury

6    Goods International S.A., and Yves Saint Laurent America, Inc. ("plaintiffs") are

7    manufacturers of well-known luxury handbags, clothing, jewelry, fragrances, and

8    other products.  Over the years, millions of consumers have been exposed to

9    plaintiffs' trademarks through extensive advertising campaigns.  As a result of this

10   advertising, plaintiffs' brands and trademarks are among the most widely-

11   recognized in the United States.

12        Plaintiffs assert that in or around June 2010, they discovered that certain

13   unauthorized parties, including the defendants in this action, were selling

14   counterfeit versions of plaintiffs' products on the Internet.  Defendants advertised

15   these products as guaranteed authentic.  Plaintiffs contend that the defendants not

16   only copied the designs, patterns, and color schemes associated with the plaintiffs'

17   products, but also "expressly identif[ied] the counterfeit products as 'Gucci,'

3

'Balenciaga,' 'Bottega Veneta' and 'YSL' products."  J.A. 630.  Defendants displayed authentic pictures of the plaintiffs' goods on websites, but purchasers received counterfeit versions that were not produced by the plaintiffs.[1]  Plaintiffs allege that defendants have manufactured and sold these counterfeit products without the permission, authorization, or approval of the plaintiffs.  All told, defendants have allegedly violated at least 20 of plaintiffs' trademarks and have sold millions of dollars worth of counterfeit products to American consumers.

The present appeal by Bank of China ("the Bank" or "BOC"), the nonparty appellant, concerns the plaintiffs' efforts both to freeze the defendants' assets so that the profits of defendants' alleged counterfeiting can be recovered and to obtain the assistance of the Bank in gathering evidence of defendants' purportedly unlawful conduct.  BOC appeals from: (1) an August 23, 2011 order granting plaintiffs' motion to compel the Bank to comply with a document subpoena and an asset freeze injunction and denying the Bank's cross-motion to modify the court's orders; (2) a May 18, 2012 order denying the Bank's motion to reconsider; and (3) a November 15, 2012 order holding the Bank in civil contempt and imposing monetary penalties.

---

[1] Gucci's investigator alleges that he purchased items from one of the defendants and was charged $220 for a "Gucci" wallet and $850 for a "Bottega Veneta" handbag in Internet transactions.  Neither item was authentic.

For the reasons set forth herein, we first conclude that BOC's claim that the district court was without authority to issue orders restraining the defendants' assets pending adjudication, either because it lacks jurisdiction over the Bank or, alternatively, pursuant to the Supreme Court's decision in *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999), is without merit.  We vacate the August 23, 2011 and the May 18, 2012 orders, however, so that, on remand, the district court may consider whether it may exercise specific personal jurisdiction over the Bank to compel compliance with its orders[2] and (if so) whether it should exercise such jurisdiction, properly applying principles of comity.  We reverse the November 15, 2012 order holding the Bank in civil contempt and imposing civil monetary penalties.

## I.  Background

On June 25, 2010, plaintiffs brought an action in the United States District Court for the Southern District of New York against Weixing Li, Lijun Xu, and certain "John Does," doing business as, *inter alia*, Redtagparty, Designer Handbags, Myluxurybags.com, Xpressdesigners.com, and Xpressdesigner.net, pursuant to the

---

[2] In light of *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014), and for the reasons set forth *infra*, we conclude that the district court erred in exercising general jurisdiction over the Bank.

1    Lanham Act, 15 U.S.C. § 1501, *et seq.*, and related state law causes of action.

2    Plaintiffs filed a First Amended Complaint on October 4, 2010 to include Ting Xu

3    and Kuelala.com as additional defendants.  Plaintiffs subsequently entered into a

4    settlement agreement with defendant Lijun Xu.  No other defendants have appeared

5    in this action.

6          Simultaneously with their initial complaint, plaintiffs filed a motion for a

7    temporary restraining order ("TRO") in the district court.  On June 25, 2010, the

8    United States District Court for the Southern District of New York (Sullivan, *J.*)

9    granted this motion, freezing defendants' assets and enjoining the defendants from

10    selling counterfeit goods.  On July 12, 2010, the district court converted the TRO into

11    a preliminary injunction ("Asset Freeze Injunction").  This Asset Freeze Injunction,

12    issued pursuant to Rule 64 of the Federal Rules of Civil Procedure, provides that:

13

14          Defendants and their . . . agents . . . and all persons acting in concert or
15          in participation with any of them, and any banks . . . who receive actual
16          notice of this order . . . without prior approval of the Court [are]
17          restrained and enjoined from transferring, disposing of, or secreting
18          any money . . . or other assets of Defendants . . . .

19    J.A. 240.  The plaintiffs had gathered evidence that, following the issuance of the

20    TRO, certain defendants wired proceeds of their counterfeit sales to accounts at

6

1    BOC.  Therefore, the Asset Freeze Injunction expressly states that it applies to (but

2    is not limited to) "any and all Bank of China accounts associated with or utilized by

3    Weixing Li, Lijun Xu, Redtagparty, Myluxurybags.com and/or any of the other

4    Defendants."  J.A. 241.  Plaintiffs served the Bank with the Asset Freeze Injunction

5    at its New York City branch on July 13, 2010.

6        BOC, the nonparty appellant, is not incorporated or headquartered anywhere

7    in the United States and maintains its principal place of business in China.  The

8    Bank, which is owned in major part by the Chinese government, has a significant

9    global presence (maintaining four branches in the United States) but only a portion

10   of the Bank's worldwide activity takes place in New York.  Gucci ECF No. 288

11   (citing OCC Evaluation Aug. 18, 2008) ("At year-end 2007, [BOC] had 10,145

12   domestic branches, 689 overseas branches and subsidiaries in 27 countries around

13   the world and 1200 correspondent banks."  *Id.* at 1).  BOC contends that bank

14   officials who work in its two New York branches cannot search the records of the

15   China-based offices, nor can they ascertain whether individuals have accounts at

16   BOC branches outside of the United States.

Having served the Bank with the Asset Freeze Injunction, plaintiffs proceeded, on July 16, 2010, by serving BOC, at its New York City branch, with a subpoena requesting all documents concerning the "Defendants" and the "Defendants' accounts" (the "2010 Subpoena").  J.A. 1152.  The 2010 Subpoena defines "Accounts" to include a variety of types of accounts "at Bank of China held by Defendants; including, but not limited to, any account or deposit in the name of Lijun Xu a/k/a Jack London" with an account number ending in 1235 or 2443.  J.A. 1150.  The 2010 Subpoena defines "Defendants" as "Weixing Li, Lijun Xu a/k/a Jack London, all doing business as Redtagparty, Myluxurybags.com, Xpressdesigner.net, Xpressdesigners.com, Designer Handbags, ABC Companies and John Does, as well as their officers, directors, agents, representatives, and all persons acting on their behalf."  J.A. 1150.

BOC informed plaintiffs that its New York City branch does not have possession or control over information located "in any other branch or office of the Bank of China" and that compliance with the subpoena would violate Chinese law. J.A. 773.  The Bank produced responsive documents that were in the possession of its New York branch.  It refused to produce responsive documents located in any of its branches or offices in China, however, notwithstanding plaintiffs' evidence

8

suggesting that the proceeds of defendants' unlawful activity had been transferred there.[3]

On December 6, 2010, plaintiffs filed a motion to compel compliance with both the Asset Freeze Injunction and the 2010 Subpoena.  The Bank filed its opposition and cross-moved to modify the district court's orders so as to terminate any provisions requiring the Bank to freeze defendants' assets held by BOC in China. The motions were fully submitted to the district court as of January 3, 2011.

After the motion to compel compliance with the 2010 Subpoena was submitted, on February 23, 2011, plaintiffs served a second subpoena ("2011 Subpoena") on BOC.  The 2011 Subpoena requests documents concerning accounts "held by Defendants or into which Defendants transferred funds" and specifically identifies six new BOC accounts by account number.   The 2011 Subpoena defines "Defendants" much the same way as the 2010 Subpoena.[4]  J.A. 1162.  After serving

---

[3] Plaintiffs also made several requests for confirmation from the Bank that it had frozen defendants' assets.  The Bank refused to provide such confirmation, responding that it "disagree[d] with [plaintiffs'] assertion that the Court's orders require[d] that the Bank of China freeze accounts located in China."  J.A. 339.

[4] Namely, as "Weizing Li, Lijun Xu a/k/a Jack London, and Ting Xu, all doing business as Redtagparty, Myluxurybags.com, Kuelala.com, Xpressdesigner.net, Xpressdesigners.com, Designer Handbags, ABC Companies and John Does, as well as their officers, directors, agents, representatives, and all persons acting on their behalf."  J.A. 1162.

1    the 2011 Subpoena, plaintiffs sought and were granted leave to file a Second

2    Amended Complaint.  On March 10, 2011, plaintiffs filed a Second Amended

3    Complaint which, among other changes, named seven new defendants.[5]

4        On August 23, 2011, the district court denied the Bank's cross-motion to

5    modify the Asset Freeze Injunction and ordered the Bank to comply both with the

6    2010 Subpoena and with the Injunction ("August 23 Order").  BOC timely noticed

7    an appeal.[6]  In September, BOC produced some documents, all concerning the

8    accounts ending in 1235 and 2443 specifically requested in the 2010 Subpoena.

9        The Bank then moved, pursuant to Rule 60(b) of the Federal Rules of Civil

10   Procedure, for the district court to reconsider its August 23 Order.  The Bank relied

11   principally on a letter, dated November 3, 2011, from two regulatory agencies in

12   China: the People's Bank of China and the China Banking Regulatory Commission

---

1    [5] The Second Amended Complaint added the following defendants: Wenying Guo,
2    Xiaochao Shang, Lei Xu, Fengyuan Zhao, Liqun Zhao, Ming Zhao, and Peiyuan Zhao
3    (collectively, the "New Defendants").

1    [6] Following the Bank's notice of appeal, plaintiffs moved to dismiss for lack of
2    jurisdiction.  A motions panel of this court denied the motion to dismiss, concluding that
3    28 U.S.C. § 1292(a)(1) provides appellate jurisdiction over interlocutory appeals from
4    orders declining to modify injunctions.  *See Official Comm. of Unsecured Creditors of*
5    *Worldcom, Inc. v. SEC*, 467 F.3d 73, 78 (2d Cir. 2006) (concluding that nonparties have
6    standing to appeal in this context when they can demonstrate a "plausible affected
7    interest").

(the "November 3 Regulators' Letter"). In this letter, the Chinese banking regulators informed the district court that China's laws prohibit commercial banks from freezing accounts or turning over account records pursuant to foreign court orders, that the Bank's September 2011 document production in response to the August 23 Order violated those laws, and that the Chinese regulators had issued a severe warning to the Bank and were evaluating appropriate sanctions. The district court denied the motion for reconsideration in an order dated May 18, 2012, holding that the Bank's Rule 60(b) motion was procedurally premature because there was no final order and that even if it were to consider the motion on the merits, it was deficient because the November 3 Regulators' Letter was not "newly discovered evidence" and was cumulative of expert declarations before the court prior to its original decision. S.P.A. 19. The Bank again noticed a timely appeal.

On September 27, 2012, the district court ordered the Bank to show cause why it should not be sanctioned for failing to comply with the August 23 Order, insofar as it compelled compliance with the 2010 Subpoena. Following additional briefing and argument, in a November 15, 2012 order, the district court held BOC in civil contempt for its failure to comply with the Order. The district court ordered the Bank to pay (1) an initial "coercive fine in the amount of $75,000" for its alleged past

11

noncompliance with the August 23 Order; (2) "an additional coercive fine of $10,000" per day for any future noncompliance; and (3) attorneys' fees and costs. J.A. 1291-92. The district court did not address whether BOC was in compliance with the Asset Freeze Injunction, which was already the subject of appeal. Bank of China timely appealed the November 15, 2012 order.[7]

After oral argument in connection with this matter, this Court received a letter dated December 19, 2013 signed in the names of Huai Peng Mu, the Director-General of the Legal Affairs Department of the People's Bank of China, and Yi Huang, the Director-General of the Supervisory Rules and Regulations Department of the China Banking Regulatory Commission. The views expressed in this letter are not necessary to our decision today and therefore we need not and do not decide whether the letter is properly before this Court.[8] Finally, upon invitation from the

---

[7] A motions panel of this Court thereafter granted BOC's motion for a stay, pending appeal, of the district court's civil contempt order and consolidated the Bank's appeals.

[8] Filings of this sort by nonparties must generally be made in accordance with Federal Rule of Appellate Procedure 29. Alternatively, a party may move to supplement the record or request that the Court take judicial notice of such a letter and the Court may take such action provided it is proper to do so and, *inter alia*, the letter is properly authenticated. Upon remand, the district court may consider in the first instance whether this letter is relevant and should be considered.

panel, the United States Government, as amicus curiae, filed a brief expressing its

views on this case.

* * *

We address the issues in turn.  First, as an initial matter, we conclude that the

Bank's argument that the district court lacked the authority to issue the Asset Freeze

Injunction has no merit.  The court had personal jurisdiction over the defendants,

as well as the equitable authority to issue the prejudgment freeze.  However, as to

the portion of the August 23 Order compelling the Bank to comply with the Asset

Freeze Injunction and the May 18, 2012 order denying the Bank's motion to

reconsider, we vacate.  We conclude that in light of *Daimler AG v. Bauman*, 134 S. Ct.

at 746, decided only this year, the district court erred in finding that BOC is properly

subject to general jurisdiction.  We remand for the district court to consider:

(1) whether it may exercise specific jurisdiction over the Bank to order such

compliance; and (2) whether, assuming the necessary jurisdiction is present, such

an order is consistent with principles of international comity.  We also vacate that

portion of the August 23 Order (and the May 18, 2012 order) compelling compliance

with the 2010 Subpoena for the district court to consider whether it has specific

13

1  jurisdiction over the Bank and may order it to comply with the subpoena.  Finally,

2  we reverse the November 15, 2012 order holding the Bank in civil contempt and

3  imposing civil monetary penalties.

4  ## II.  Asset Freeze Injunction

5  BOC first challenges the district court's authority to issue the Asset Freeze

6  Injunction restraining and enjoining the defendants "from transferring, disposing

7  of, or secreting any money" or other assets. J.A. 240.  The Bank argues that the Asset

8  Freeze Injunction was impermissible because: (1) the district court lacked

9  jurisdiction over the Bank to issue it; and (2) the court lacked the equitable authority

10  pursuant to *Grupo Mexicano* to do so.  As to both arguments, we disagree.

11  ### A. Personal Jurisdiction to Enjoin Defendants

12  We reject BOC's argument that personal jurisdiction over the Bank was

13  required for the district court to issue the June 25, 2010 TRO and the subsequent

14  Asset Freeze Injunction restraining the *defendants'* assets.  BOC does not argue that

15  the *defendants* are not subject to personal jurisdiction in New York State. And

16  personal jurisdiction over the *defendants*, not the Bank, is all that was needed for the

17  district court to restrain the defendants' assets pending trial.  *United States v. First*

*Nat'l City Bank*, 379 U.S. 378, 384 (1965) ("Once personal jurisdiction of a party is obtained, the District Court has authority to order it to 'freeze' property under [the party's] control, whether the property be within or without the United States.").

This proposition is clear from our decision in *NML Capital, Ltd. v. Republic of Argentina*, 727 F.3d 230 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 2819 (2014). There, we noted that because the injunctions in that case "d[id] not directly enjoin payment system participants [such as banks], it [was] irrelevant whether the district court ha[d] personal jurisdiction over them" in issuing such injunctions. *Id.* at 243. Granted, once a district court issues a preliminary asset freeze order enjoining parties over whom it has jurisdiction, that injunction "automatically forbids others — who are not directly enjoined but who act 'in active concert or participation' with an enjoined party — from assisting in [its] violation." *Id.* (citing Fed. R. Civ. P. 65(d)). But such injunctions do not directly restrain the conduct of nonparties. Instead, they provide these nonparties with notice that "they could become liable through Rule 65 if they assist . . . in violating the district court's orders."[9]  *Id.*

---

[9] Rule 65, concerning injunctions and restraining orders, provides by its terms that such orders bind only those nonparties who receive actual notice and "who are in active concert or participation with" a party to whom the injunction or restraining order applies, or its officer, agent, servant, employee, or attorney. *See* Fed. R. Civ. P. 65.  Nonparties, of course, may seek clarification from district courts "when questions arise as to who is bound

"[B]efore any finding of liability or sanction against a non-party," as we said in *NML Capital*, "questions of personal jurisdiction may be properly raised." *Id*. *See also id*. (observing that "questions of personal jurisdiction . . . are premature" until the nonparties "are summoned to answer for assisting in a violation of the district court's injunctions"). But the district court need not have personal jurisdiction over nonparties to issue a preliminary injunction requiring a party before it to refrain from moving assets during the pendency of the proceedings.

### B.  Equitable Authority to Issue Asset Freeze Injunction

We turn next to BOC's argument that the district court lacked the equitable authority under *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. at 308, to issue the prejudgment Asset Freeze Injunction. This argument is without merit. Plaintiffs in trademark infringement actions may recover defendants' profits. 15 U.S.C. § 1117(a). Plaintiffs here seek the equitable remedy of an accounting of profits. In such circumstances, the district court had the inherent equitable authority to issue the Asset Freeze Injunction.

---

by an injunction through operation of Rule 65." *NML Capital*, 727 F.3d at 243. *See also Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 15 (1945) (expressing expectation that district courts will not in such circumstances "withhold a clarification in the light of a concrete situation").

16

1  In *Grupo Mexicano*, the Supreme Court held that a district court "had no

2  authority" pursuant to Rule 65 of the Federal Rules of Civil Procedure "to issue a

3  preliminary injunction preventing [a defendant] from disposing of [its] assets

4  pending adjudication of [a] contract claim for money damages."  527 U.S. at 333.

5  This was because the preliminary relief the plaintiffs sought was not traditionally

6  accorded by courts of equity in the context of legal claims for money damages and

7  "'the general availability of injunctive relief [is] not altered by [Rule 65] and

8  depend[s] on traditional principles of equity jurisdiction.'"  *Id*. at 318-19 (second

9  alteration in original) (quoting 11A Charles Alan Wright, Arthur R. Miller & Mary

10  Kay Kane, *Federal Practice and Procedure* § 2941, at 31 (2d ed. 1995)).  The Court's

11  holding was limited to actions for money damages in which plaintiffs seek a

12  preliminary injunction to prevent the defendant "from transferring assets in which

13  no lien or equitable interest is claimed."  *Id*. at 310.  Accordingly, the Supreme Court

14  carefully distinguished its earlier decision in *Deckert v. Independence Shares Corp*., 311

15  U.S. 282 (1940), on the grounds that in *Deckert* — where a prejudgment asset freeze

16  *was* permissible — "the bill stated a cause of action for . . . *equitable* remedies" that

17  included "rescission of the contracts and restitution of the consideration paid."

18  *Grupo Mexicano*, 527 U.S. at 325 (emphasis added).  As the Supreme Court explained,

17

"[t]he preliminary relief available in a suit seeking equitable relief has nothing to do with the preliminary relief available in a creditor's bill seeking equitable assistance in the collection of a legal debt." *Id.*

Pursuant to *Grupo Mexicano*, then, district courts have no authority to issue a prejudgment asset freeze pursuant to Rule 65 where such relief was not "traditionally accorded by courts of equity." *Id.* at 319. But they maintain the equitable power to do so where such relief *was* traditionally available: where the plaintiff is pursuing a claim for final equitable relief, *see id.*, and the preliminary injunction is ancillary to the final relief. *See De Beers Consol. Mines v. United States*, 325 U.S. 212, 219-20 (1945).[11]

Such is the case here. Plaintiffs are seeking an *accounting* of the defendants' profits, in addition to injunctive relief and monetary damages, under the Lanham Act. J.A. 671 (Gucci's complaint requests that defendants "account to Plaintiffs for their profits"). *See also* 15 U.S.C. § 1117(a). And as plaintiffs correctly contend, the common law action of "account" is one of the earliest examples of a restitutionary

---

[11] A district court may also issue a preliminary injunction restraining a defendant from dissipating assets if it has specific statutory authority to do so. *See Grupo Mexicano*, 527 U.S. at 326 (distinguishing *United States v. First Nat'l City Bank*, 379 U.S. at 385, on the ground that "it involved not the Court's general equitable powers under the Judiciary Act of 1789, but its powers under the statute authorizing issuance of tax injunctions").

action in equity, imposing on a defendant the obligation to disclose and return profits from the use of the plaintiff's property, 3 W. Holdsworth, *A History of English Law* 426-28 (3d ed. 1923); Barbour, *The History of Contract in Early English Equity*, *in* 4 *Oxford Studies in Social and Legal History* 13, 13-14 (1914), and founded in the Chancellor's equitable power to compel an accounting of wrongly gained assets. *See S.E.C. v. Cavanagh*, 445 F.3d 105, 119  (2d Cir. 2006) (citing Joseph Story, *Commentaries on Equity Jurisprudence as Administered in England and America* 423-504 (photo. reprint 1972) (1835), which describes the "remedy of 'account,' by which chancery ordered an accounting of assets so that wrongly gained profits might be recovered").

The Supreme Court, in *Hamilton-Brown Shoe Co. v. Wolf Bros. & Co.*, 240 U.S. 251 (1916), has explained that a trademark "infringer is required *in equity to account* for and yield up his gains to the true owner," and "profits are then allowed as an *equitable* measure of compensation." *Id.* at 259 (emphases added); *accord Sheldon v. Metro-Goldwyn Pictures Corp.*, 309 U.S. 390, 399 (1940) ("[R]ecovery [of profits] had been allowed in equity [prior to the statutory remedy] both in copyright and patent cases as appropriate equitable relief incident to a decree for an injunction."). *See also Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962, 1967 n.1 (2014) (noting that

19

recovery of profits "is not easily characterized as legal or equitable," but treating

profit-recovery remedy under Copyright Act as "equitable") (citation omitted));

*United States v. Louisiana*, 339 U.S. 699, 706 (1950) (referring to action to recover

royalties and other money received by the state pursuant to leases on land claimed

by the government as "an equity action for an injunction and accounting").  This

Court, moreover, has expressly attested to the ancient roots of this remedy,

explaining that "the ancient remedies of accounting, constructive trust, and

restitution have compelled wrongdoers to 'disgorge' — *i.e.*, account for and

surrender — their ill-gotten gains for centuries." *Cavanagh*, 445 F.3d at 119 (citing

*United States ex rel. Taylor v. Gabelli*, No. 03-cv-8762, 2005 WL 2978921, at *5 (S.D.N.Y.

Nov. 4, 2005)).  *See also* 1 Dan B. Dobbs, *Law of Remedies* § 4.3(1), at 587-89 (2d ed.

1993) (discussing equitable remedies of constructive trust and accounting for

profits).

Given the weight of this authority, it is not surprising that all three of our

sister circuits to have considered the issue have unanimously held that district

courts have the authority to issue a prejudgment asset restraint injunction in favor

of plaintiffs seeking an accounting against allegedly infringing defendants in

Lanham Act cases. *See Animale Grp. Inc. v. Sunny's Perfume Inc.*, 256 Fed. App'x 707,

20

709 (5th Cir. 2007) (per curiam) (ruling that the district court was "authorized to preserve the status quo by entering a limited asset freeze" in a Lanham Act infringement case); *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 987 (11th Cir. 1995) (concluding that the "district court had the authority to freeze those assets which could have been used to satisfy an equitable award of profits" in a Lanham Act case); *Reebok Int'l, Ltd. v. Marnatech Enters., Inc.*, 970 F.2d 552, 562 (9th Cir. 1992) ("The district court's inherent equitable power to freeze defendants' assets in cases in which an accounting is the ultimate relief sought is therefore not limited by the Lanham Act."); *see also CSC Holdings, Inc. v. Redisi*, 309 F.3d 988, 996 (7th Cir. 2002) (noting that because plaintiff sought an "accounting and profits remedy" as an alternative form of relief under the Cable Communications Policy Act, an "asset freeze [was] thus proper" under *Grupo Mexicano*). Countless district courts, moreover, have determined that after *Grupo Mexicano* they maintain the authority to issue preliminary injunctions freezing the assets of defendants in this context.[12]

---

[12] *See, e.g., NFL v. Sunmei,* No. 13-cv-2572 (S.D.N.Y. Apr. 24, 2013) (No. 5) (preliminary injunction order); *Salvatore Ferragamo, S.p.A. v. Does 1-15*, No. 13-cv-0542 (S.D.N.Y. Feb. 25, 2013) (No. 14) (preliminary injunction order); *Stuart Weitzman IP, LLC v. Doe 1*, No. 13-cv-0732 (S.D.N.Y. Feb. 4, 2013) (No. 4) (temporary restraining order); *Rolex Watch U.S.A., Inc. v. Kulyk*, No. 13-cv-0391 (S.D.N.Y. Jan. 31, 2013) (No. 15) (temporary restraining order); *Burberry, Ltd. (US) v. Doe*, No. 12-cv-8815 (S.D.N.Y. Dec. 20, 2012) (No. 7) (preliminary injunction order); *Sweet People*

BOC asserts three arguments to the contrary, but none has merit. The Bank argues first that pursuant to *Dairy Queen, Inc. v. Wood*, 369 U.S. 469 (1962), an accounting of profits is a legal remedy. But contrary to the Bank's reading, *Dairy Queen* does not abrogate the longstanding treatment of an accounting of *profits* as an equitable remedy, nor could it change how the remedy was treated at the time of the Court of Chancery. In *Dairy Queen*, the Supreme Court held that a defendant in a trademark action was entitled to a jury trial under the Seventh Amendment, despite the fact that the plaintiffs' complaint included a request for an accounting. 369 U.S. at 476-79. *Dairy Queen*, however, involved a claim entirely different from the one at issue here. Plaintiffs in *Dairy Queen* did not seek an award of profits, but amounts owed under a contract and *damages* for trademark infringement. *Id.* at 476. The Court concluded that both an action for debt due under a contract and an action for

---

*Apparel, Inc. v. XYZ Co.*, No. 12-cv-07506 (S.D.N.Y. Nov. 5, 2012) (No. 9) (preliminary injunction order); *Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*, No. 12-cv-5354 (E.D.N.Y. Oct. 31, 2012) (No. 14) (order to show cause for a temporary restraining order and preliminary injunction); *Klipsch Grp., Inc. v. Big Box Store Ltd.*, No. 12-cv-6283 (S.D.N.Y. Aug. 29, 2012) (No. 10) (preliminary injunction order); *Richemont N. Am., Inc. v. Huang, No.* 12-cv-4443 (S.D.N.Y. July 19, 2012) (No. 39) (preliminary injunction order); *Rolex Watch U.S.A., Inc. v. City Styles 313, LLC*, No. 12-cv-4754 (S.D.N.Y. July 2, 2012) (No. 25) (preliminary injunction order); *Estée Lauder Cosmetics Ltd. v. Chen*, No. 12-cv-3046 (S.D.N.Y. May 18, 2012) (No. 19) (temporary restraining order); *Hill v. Doe 1*, No. 12-cv-3014 (S.D.N.Y. May 1, 2012) (No. 8) (preliminary injunction order).

damages based upon a charge of trademark infringement are legal claims. *Id.* at 477. In contrast here, plaintiffs ask for an award of the defendant's *profits*. And there is no basis to conclude that the equitable character of such relief — as recognized by the Court in *Hamilton-Brown Shoe* — is affected by the Court's treatment of the *legal* forms of monetary relief at issue in *Dairy Queen*.

The Bank next argues that the Asset Freeze Injunction exceeded the court's equitable authority because it failed to identify the "particular property" derived from the defendants' allegedly unlawful activities that the plaintiffs seek to recover. We know of no requirement, however, and certainly there is none in the Lanham Act, that would obligate plaintiffs to make this identification prior to obtaining a preliminary injunction. To the contrary: a plaintiff seeking an accounting of profits is "required to prove defendant's sales only." 15 U.S.C. § 1117(a). And then the burden shifts to the defendants to "prove all elements of cost or deduction." *Louis Vuitton S.A. v. Spencer Handbags Corp.*, 765 F.2d 966, 973 (2d Cir. 1985) (quoting 15 U.S.C. § 1117(a)).

Finally (and implicitly conceding the weakness of its argument that this case is governed by *Grupo Mexicano*) the Bank maintains that the plaintiffs' accounting claim is "illusory." Under the Lanham Act, however, plaintiffs "may elect" between

23

statutory or actual damages "at any time before final judgment is rendered."  15

U.S.C. § 1117(c).  Each of plaintiffs' three complaints has sought an accounting of

profits (or actual damages) and there is no basis, on this record, to conclude that

plaintiffs are not seeking what they ask for.  We conclude, accordingly, that the

district court had the equitable authority to issue the Asset Freeze Injunction and

that BOC's argument to the contrary is without merit.

### III.  The August 23 Order and the Asset Freeze Injunction

The district court's August 23 Order compels the Bank to comply with the

Asset Freeze Injunction and denies its motion to modify that injunction so as to

make clear that the Bank is under no obligation to freeze the defendants' assets held

in China.  As to the August 23 Order, we conclude that in light of the Supreme

Court's recent decision in *Daimler*, 134 S. Ct. at 746, the district court erred in

subjecting the Bank to all-purpose general jurisdiction in New York.  We conclude

that both the August 23 Order, as it relates to the Asset Freeze Injunction, and the

related May 28, 2012 order denying the Bank's motion to reconsider should be

vacated and remanded for two reasons: *first,* for the district court to consider

whether it has *specific* jurisdiction over the Bank to compel compliance with the

Asset Freeze Injunction; and *second,* assuming such jurisdiction exists, for the district

24

court to perform a proper comity analysis drawing upon the framework set forth in § 403 of the Restatement (Third) of Foreign Relations Law.

### A. Personal Jurisdiction to Compel Bank's Compliance

As we have said, a district court need not preliminarily establish personal jurisdiction over a nonparty bank to restrain a defendant's assets. However, a district court can enforce an injunction against a nonparty such as BOC only if it has personal jurisdiction over that nonparty. *See Canterbury Belts Ltd. v. Lane Walker Rudkin, Ltd.*, 869 F.2d 34 (2d Cir. 1989) (concluding that the district court did not have personal jurisdiction to enforce an injunction in a case where plaintiff requested the district court to impose contempt sanctions); *see also Heyman v. Kline*, 444 F.2d 65 (2d Cir. 1971); 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2960 (2014). Following oral argument in this case, the Supreme Court decided *Daimler AG v. Bauman*, 134 S. Ct. at 746. BOC asserts, in post-argument letter briefs, that in light of *Daimler* the district court erred in concluding that the Bank was properly subject to all-purpose general jurisdiction. We agree. We also conclude, however, that this matter should be remanded so that the district court may consider whether it has specific jurisdiction to enforce the Asset Freeze Injunction against the Bank and may exercise such jurisdiction, consistent with due process.

25

Since *International Shoe Co. v. Washington*, the touchstone due process principle has been that, before a court may exercise jurisdiction over a person or an organization, such as a bank, that person or entity must have sufficient "minimum contacts" with the forum "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). This principle "presaged the development of two categories of personal jurisdiction": general and specific personal jurisdiction. *Daimler*, 134 S. Ct. at 754. *See generally* Arthur T. von Mehren & Donald T. Trautman, *Jurisdiction to Adjudicate: A Suggested Analysis*, 79 Harv. L. Rev. 1121 (1966). General, all-purpose jurisdiction permits a court to hear "any and all claims" against an entity.[13] *See Daimler*, 134 S. Ct. at 755 (quoting *Goodyear Dunlop*

---

[13] Unlike BOC, the party contesting jurisdiction in *Daimler* was a civil defendant. *See Daimler*, 134 S. Ct. at 750. The Supreme Court's other decisions addressing general jurisdiction have also involved defendants, not nonparties. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984); *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 438 (1952). But BOC's nonparty status does not alter the applicability of these cases to the question presented here. The essence of general personal jurisdiction is the ability to entertain "any and all claims" against an entity based solely on the entity's activities in the forum, rather than on the particulars of the case before the court. *See Daimler*, 134 S. Ct. at 762 n.20 (deciding that "[w]hen a corporation is genuinely at home in the forum" the district court need not "assess the reasonableness of entertaining the case"). Thus, if a court has general personal jurisdiction over an entity, that entity, by definition, is subject both to suit and to judicial orders affecting nonparties.

26

*Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011)).  Specific jurisdiction, on the other hand, permits adjudicatory authority only over issues that "aris[e] out of or relat[e] to the [entity's] contacts with the forum."  *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984).

In *Daimler,* the Supreme Court for the first time addressed the question whether, consistent with due process, "a foreign corporation may be subjected to a court's general jurisdiction based on the contacts of its in-state subsidiary."  134 S. Ct. at 759.   Assuming without deciding that such contacts may in some circumstances be imputed to the foreign parent, the Court held that a corporation may nonetheless be subject to general jurisdiction in a state only where its contacts are so "continuous and systematic," judged against the corporation's national and global activities, that it is "essentially at home" in that state.  *Id.* at 761-62.  Aside from "an exceptional case," the Court explained, a corporation is at home (and thus subject to general jurisdiction, consistent with due process) only in a state that is the company's formal place of incorporation or its principal place of business.  *Id.* at 761 & n.19.  In so holding, the Court expressly cast doubt on previous Supreme Court and New York Court of Appeals cases that permitted general jurisdiction on the basis that a foreign corporation was doing business through a local branch office in

27

the forum. *See id.* at 735 n.18 (citing *Barrow S.S. Co. v. Kane*, 170 U.S. 100 (1898), and *Tauza v. Susquehanna Coal Co.*, 220 N.Y. 259 (1917) (Cardozo, J.)). And the Court, reversing the Ninth Circuit's determination that general jurisdiction was appropriately exercised over a German corporation based on the California contacts of its Delaware- and New Jersey-based subsidiary, expressly warned against the "risks to international comity" of an overly expansive view of general jurisdiction inconsistent with "the 'fair play and substantial justice' due process demands." *Id.* at 763 (quoting *Int'l Shoe*, 326 U.S. at 316).

We conclude that applying the Court's recent decision in *Daimler*, the district court may not properly exercise general personal jurisdiction over the Bank. Just like the defendant in *Daimler*, the nonparty Bank here has branch offices in the forum, but is incorporated and headquartered elsewhere. Further, this is clearly not "an exceptional case" where the Bank's contacts are "so continuous and systematic as to render [it] essentially at home in the forum." *Daimler*, 134 S. Ct. at 761 & n.19 (alteration in original) (quoting *Goodyear*, 131 S. Ct. at 2851). BOC has only four branch offices in the United States and only a small portion of its worldwide business is conducted in New York. Gucci ECF No. 288 (citing OCC Evaluation Aug. 18, 2008) ("At year-end 2007, [BOC] had 10,145 domestic branches, 689

28

overseas branches and subsidiaries in 27 countries around the world and 1200 correspondent banks." *Id.* at 1); *Bank of China America Branches*, Bank of China, http://www.bankofchina.com/en/aboutboc/ab6/200812/t20081216_494260.html (last visited Aug. 19, 2014). Thus, BOC's activities here, as with those of the defendant in *Daimler*, "plainly do not approach" the required level of contact. 134 S. Ct. at 761 n.19. Following *Daimler*, there is no basis consistent with due process for the district court to have exercised general jurisdiction over the Bank.

Although the Bank appeared in the district court and did not argue there that the court lacked personal jurisdiction, we also conclude that its objection to the exercise of general jurisdiction has not been waived. While arguments not made in the district court are generally waived, *see Datskow v. Teledyne, Inc., Cont'l Prods. Div.*, 899 F.2d 1298, 1303 (2d Cir. 1990), "a party cannot be deemed to have waived objections or defenses which were not known to be available at the time they could first have been made," *Hawknet, Ltd. v. Overseas Shipping Agencies*, 590 F.3d 87, 92 (2d Cir. 2009) (citation omitted). Accordingly, we have held that a defendant does not waive a personal jurisdiction argument — even if he does not make it in the district court — if the "argument that the court lacked jurisdiction over [the] defendant

would have been directly contrary to controlling precedent in this Circuit." *Id.*[14]

Prior to *Daimler*, controlling precedent in this Circuit made it clear that a foreign bank with a branch in New York *was* properly subject to general personal jurisdiction here. *See, e.g., Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 93-95 (2d Cir. 2000) (discussing New York's rule that a business is subject to personal jurisdiction when it is "doing business" in the State and finding general jurisdiction over a large international corporation based on the maintenance of an affiliate investor relations office in New York City); *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 57-58 (2d Cir. 1985) (discussing the requirements of New York's "doing business" test); *Dietrich v. Bauer*, No. 95-cv-7051, 2000 WL 1171132, at *4 n.4 (S.D.N.Y. Aug. 16, 2000) (holding that "a foreign bank with a branch in New York is 'doing business' in New York for purposes of personal jurisdiction"). Under prior controlling precedent of this Circuit, the Bank was subject to general jurisdiction because through the activity of its New York branch, it engaged in a "continuous and systematic course of doing business in New York." *Hoffritz*, 762 F.2d at 58.

---

[14] To the extent that plaintiffs attempt to ground their waiver argument on Federal Rule of Civil Procedure 12(h), we note that the waiver provisions of that rule are inapplicable because the Bank is not a "party" that could fail to assert its personal jurisdiction defense in an answer or a motion to dismiss. Fed. R. Civ. P. 12(h).

1    Therefore, we conclude that the Bank did not waive its personal jurisdiction objection.

2    Even without general personal jurisdiction, the district court may be able to

3    require BOC's compliance with the Asset Freeze Injunction by exercising specific

4    jurisdiction.[15]   To assert specific personal jurisdiction over civil defendants, the

5    Supreme Court requires a two-step analysis.  *See Licci ex rel. Licci v. Lebanese Canadian*

6    *Bank, SAL*, 732 F.3d 161, 169 (2d Cir. 2013).   First, the court must decide if the

7    defendant has "'purposefully directed' his activities at . . . the forum and the

8    litigation . . . 'arise[s] out of or relate[s] to' those activities."  *Burger King Corp. v.*

9    *Rudzewicz*, 471 U.S. 462, 472 (1985) (citation omitted).   Second, once the court has

10   established these minimum contacts, it "determine[s] whether the assertion of

11   personal jurisdiction would comport with fair play and substantial justice."  *Id.* at

12   476 (quoting *Int'l Shoe*, 326 U.S. at 320).  *See also Asahi Metal Indus. Co. v. Superior Ct.*

13   *of Cal., Solano Cnty.*, 480 U.S. 102, 113-14 (1987) (identifying fairness factors that

14   courts should consider).   The Supreme Court has not, however, addressed specific

---

1   [15] The district court may also consider whether BOC has consented to personal
2   jurisdiction in New York by applying for authorization to conduct business in New York
3   and designating the New York Secretary of State as its agent for service of process.  N.Y.
4   Bus. Corp. Law §§ 1301(a), 1304(a)(6); N.Y. Banking Law § 200; *Bagdon v. Phila. & Reading*
5   *Coal & Iron Co.*, 217 N.Y. 432 (1916) (Cardozo, J.).  *See also Daimler*, 134 S. Ct. at 755-56
6   (noting that general jurisdiction defines the scope of a court's jurisdiction when an entity
7   "has not consented to suit in the forum" (quoting *Goodyear*, 131 S. Ct. at 2856)).

jurisdiction over nonparties.[16]  Lower federal courts presented with the issue have adapted the test for civil defendants for use in assessing the question whether they may properly exercise jurisdiction over a nonparty.  These courts first assess the connection between the nonparty's contacts with the forum and the order at issue, and then decide whether exercising jurisdiction for the purposes of the order would comport with fair play and substantial justice.  *See infra* pp. 32-33, 43.[17]

In the context of asset freeze injunctions, other circuits have permitted the exercise of specific jurisdiction over *domestic* nonparties who, with knowledge of an injunction, intentionally aided in its violation.  *See, e.g., Waffenschmidt v. MacKay*, 763 F.2d 711, 718-19 (5th Cir. 1985) (holding that a domestic nonparty's knowing, intentional violation of an injunction is sufficient on its own to create specific personal jurisdiction to enforce the injunction against that party); *ClearOne*

---

[16]  The Supreme Court has addressed jurisdiction over absent plaintiffs, *see Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985), but it has not addressed jurisdiction over entities who are not parties to the suit.

[17]  This Court has, at different times, observed that nonparty status may alter the equities of asserting jurisdiction.  On the one hand, a "person who is subjected to liability . . . far from home may have better cause to complain of an outrage to fair play" than a nonparty.  *First Am. Corp. v. Price Waterhouse LLP*, 154 F.3d 16, 20 (2d Cir. 1998).  But on the other hand, a nonparty with few if any connections to the activities giving rise to the suit may have a strong interest in its freedom to take actions that are "genuinely independent" of any intent to frustrate a court's injunction.  *Heyman v. Kline*, 444 F.2d 65, 65-66 (2d Cir. 1971).

*Commc'ns, Inc., v. Bowers*, 651 F.3d 1200, 1215-16 (10th Cir. 2011) (affirming that "a district court may properly exercise personal jurisdiction over a nonparty for purposes of entering contempt orders, when the nonparty, with actual notice of an injunctive order issued by the district court, and in active concert or participation with a party, violates that order"); *SEC v. Homa*, 514 F.3d 661, 673-75 (7th Cir. 2008) (affirming contempt order against two American nonparties living abroad who knowingly aided and abetted the violation of an order to freeze the defendant's assets).   Following the framework discussed above, these decisions rely on the theory that intentionally violating an asset freeze injunction is conduct "designed to have purpose and effect in the forum," and that the authority to force compliance "is necessary to the proper enforcement and supervision of a court's injunctive authority and offends no precept of due process."  *E.g.*, *Homa*, 514 F.3d at 675 (quoting *Waffenschmidt*, 763 F.2d at 716); *ClearOne Commc'ns*, 651 F.3d at 1215.  *See also Calder v. Jones*, 465 U.S. 783, 788-89 (1984).  Using that same approach, this Court has permitted a district court to exercise specific jurisdiction over a domestic nonparty who violated a protective order.  *See Eli Lilly & Co. v. Gottstein*, 617 F.3d 186, 195-96 (2d Cir. 2010).[18]

---

[18]   This Court has not resolved this issue in the context of asset freezes.  *See Canterbury Belts*, 869 F.2d at 40 (suggesting, in passing, that "[a] district court cannot

We have found no case, however, applying such an analysis in the context of a *foreign* nonparty with only limited contacts in the forum.[19]  The question whether the exercise of personal jurisdiction is appropriate in this context may depend, in part, on the nature of the foreign nonparty's contacts with the forum.  BOC's presence and activity in the forum may thus be relevant for determining whether specific jurisdiction to force compliance with the Asset Freeze Injunction is appropriate in this case.  *Compare Homa*, 514 F.3d at 675 (noting that nonparties were required to obey the district court's order because they were citizens), *with Reebok Int'l Ltd. v. McLaughlin*, 49 F.3d 1387, 1392-93 (9th Cir. 1995) (refusing to subject a foreign bank with no American branches to an asset freeze).  After all, "[i]t must be remembered that the relatedness test is but a part of a general inquiry . . . to determine whether the exercise of personal jurisdiction . . . does or does not offend

---

exercise personal jurisdiction over a nonparty . . . on the basis that the nonparty is acting 'in active concert or participation,' within the meaning of Fed. R. Civ. P. 65(d), with a party who is subject to an injunction, unless personal jurisdiction is established over the nonparty").

[19]   The Ninth Circuit has concluded that district courts lack specific personal jurisdiction to order foreign, nonparty banks with *no contacts* in the United States to comply with an asset freeze injunction.  *See Reebok Int'l Ltd. v. McLaughlin*, 49 F.3d 1387, 1391-93 (9th Cir. 1995).  In that opinion, the Ninth Circuit emphasized that *Waffenschmidt* was "grounded . . . on the simple fact that the 'mandate of an injunction issued by a federal district court runs nationwide,'" and therefore did not apply to a situation where "[a] national of a foreign country . . . followed the law . . . of its own country . . . when it did acts within that country."  *Id.* at 1391, 1394 (quoting *Waffenschmidt*, 763 F.2d at 716).

34

'traditional notions of fair play and substantial justice.'"  *Chew v. Dietrich*, 143 F.3d 24, 29 (2d Cir. 1998) (quoting *Int'l Shoe*, 326 U.S. at 316).

Since the factual record has not been developed and the panel has not had the benefit of oral argument or full briefing on the subject, we express no view on whether the exercise of specific jurisdiction is appropriate in this case.  Prior to *Daimler*, courts in this Circuit often asserted general jurisdiction over nonparty foreign corporations based on the presence of corporate branches, subsidiaries, or affiliates in the Circuit.  *See, e.g., Wiwa*, 226 F.3d at 93-95; *Dietrich*, 2000 WL 1171132, at *4.  In light of that pre-*Daimler* case law, the district court had no need to consider specific jurisdiction or to develop a record sufficient for that purpose.  On remand, the district court must give the issue due consideration.

## B.  District Court's Obligation to Conduct a Comity Analysis

BOC next argues that the district court's August 23 Order (compelling the Bank to comply with the Asset Freeze Injunction and denying the Bank's motion to modify it) must also be vacated because the district court failed properly to consider legal principles of comity.  Although we need not reach this issue, we do so in order to give guidance to the district court in the event that the district court concludes that the exercise of personal jurisdiction over BOC is appropriate.  If it so concludes,

35

the district court should undertake a comity analysis before ordering the Bank to comply with the Asset Freeze Injunction.

Before the district court, the Bank, which is domiciled and principally based in China, identified an apparent conflict between the obligations set forth in the Asset Freeze Injunction and applicable Chinese banking laws. Specifically, the Bank introduced a declaration from a Chinese law expert, Professor Zhipan Wu, asserting that Chinese banking laws prohibit BOC from freezing bank accounts pursuant to a foreign court order, and that doing so could render it civilly and criminally liable. The Bank also submitted the November 3 Regulators' Letter with its motion for reconsideration, which states that "China's commercial banks . . . may not . . . freeze or deduct funds from such accounts pursuant to a U.S. court's order." J.A. 834. According to the Bank's expert and the November 3 Regulators' Letter, China's sovereign interest in such laws is to "engender client confidence in the banking system and therefore promote the further development of the banking system." J.A. 834.

In such circumstances, where the Bank objected to application of the Asset Freeze Injunction to it, specifically citing an apparent conflict with the requirements of Chinese banking law, comity principles required the district court to consider the

36

Bank's legal obligations pursuant to foreign law before compelling it to comply with the Asset Freeze Injunction.  Comity is "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws." *Hilton v. Guyot*, 159 U.S. 113, 164 (1895).  The doctrine of international comity "refers to the spirit of cooperation in which a domestic tribunal approaches the resolution of cases touching the laws and interests of other sovereign states."  *Société Nationale Industrielle Aérospatiale v. U.S. Dist. Ct. for the S. Dist. of Iowa*, 482 U.S. 522, 543 n.27 (1987).

We have previously suggested that when a court order will infringe on sovereign interests of a foreign state, district courts may appropriately conduct an analysis using the framework provided by § 403 of the Restatement (Third) of Foreign Relations Law, entitled "Limitations on Jurisdiction to Prescribe." *See United States v. Davis*, 767 F.2d 1025, 1036-39 (2d Cir. 1985) (using § 403 factors to hold that district court properly ordered a litigant to terminate litigation in the Cayman Islands); *see also Republic of Arg. v. NML Capital, Ltd.*, 134 S. Ct. 2250, 2258 n.6 (2014). (noting that "other sources of law" — including "comity interests" — might limit

37

district courts' discretion when issuing orders extraterritorially).  As the district court recognized with regard to § 442 and the 2010 Subpoena, courts in this circuit, before "order[ing] a party to produce documents in contravention of the laws of a foreign country," already conduct a comity analysis pursuant to Restatement (Third) of Foreign Relations Law § 442(1)(c), entitled "Requests for Disclosure: Law of the United States."   J.A. 776.  *See also Gucci Am., Inc. v. Curveal Fashion*, No. 09-cv-8458, 2010 WL 808639, at *2 (S.D.N.Y. Mar. 8, 2010); *Strauss v. Credit Lyonnais, S.A.*, 249 F.R.D. 429, 438 (E.D.N.Y. 2008).  A comity analysis drawing upon § 403 is similarly appropriate before ordering a nonparty foreign bank to freeze assets abroad in apparent contravention of foreign law to which it is subject.[20]

_____

[20] Section 403 instructs that when a state has jurisdiction, it should not exercise it "to prescribe law with respect to a person or activity having connections with another state when the exercise of such jurisdiction is unreasonable."  Restatement (Third) of Foreign Relations Law § 403(1).  Section 403 identifies eight non-exclusive factors to be evaluated in determining whether the exercise of jurisdiction is unreasonable in a given case:

(a) the link of the activity to the territory of the regulating state, *i.e.*, the extent to which the activity takes place within the territory, or has substantial, direct, and foreseeable effect upon or in the territory;
(b) the connections, such as nationality, residence, or economic activity, between the regulating state and the person principally responsible for the activity to be regulated, or between that state and those whom the regulation is designed to protect;
(c) the character of the activity to be regulated, the importance of regulation to the regulating state, the extent to which other states regulate such activities, and the degree to which the desirability of such regulation is generally accepted;

Acknowledging that the district court did not conduct such an analysis,

plaintiffs make three arguments opposing vacatur and remand on this basis, but

none are persuasive.  First, they argue that remand would serve no purpose because

the district court, in analyzing whether to order BOC to produce documents in

response to the 2010 Subpoena, considered the comity factors listed in § 442, which

overlap with the factors in § 403.  Ordering compliance with an asset freeze,

however, implicates different concerns from those implicated by an order for the

production of documents.   And while the factors in §§ 403 and 442 of the

---

(d) the existence of justified expectations that might be protected or hurt by
the regulation;
(e) the importance of the regulation to the international political, legal, or
economic system;
(f) the extent to which the regulation is consistent with the traditions of the
international system;
(g) the extent to which another state may have an interest in regulating the
activity; and
(h) the likelihood of conflict with regulation by another state.

*Id.* § 403(2).  Importantly, even "[w]hen it would not be unreasonable for each of two states
to exercise jurisdiction over a person or activity," if "the prescriptions by the two states are
in conflict, each state has an obligation to evaluate its own as well as the other state's
interest in exercising jurisdiction, in light of all the relevant factors." *Id.* § 403(3).  "[A] state
should defer to the other state if that state's interest is clearly greater." *Id.*

1 Restatement partially overlap, subsections 403(2)(a), (c), (d), (e), (g), and (h), in

2 particular, are not fully reflected in § 442.[18]

3     Second, plaintiffs posit that by not requesting that the district court apply

4 § 403 below, the Bank has waived the issue.  It is correct that the Bank did not make

5 this argument below.  However, given the important role that comity plays in

6 ensuring the "recognition which one nation allows within its territory to the

7 legislative, executive or judicial acts of another nation, having due regard both to

8 international duty and convenience," *see In re Maxwell Commc'n Corp.*, 93 F.3d 1036,

9 1046 (2d Cir. 1996) (quoting *Hilton*, 1259 U.S. at 164), we do not deem the issue

10 forfeited.

11     Finally, plaintiffs review a variety of the comity factors and urge that remand

12 is not necessary because even upon a full analysis employing § 403's factors, the

---

1    [18] Restatement (Third) of Foreign Relations Law § 442(1)(c) provides:

3    In deciding whether to issue an order directing production of information
4    located abroad, and in framing such an order, a court or agency in the United
5    States should take into account the importance to the investigation or
6    litigation of the documents or other information requested; the degree of
7    specificity of the request; whether the information originated in the United
8    States; the availability of alternative means of securing the information; and
9    the extent to which noncompliance with the request would undermine
10   important interests of the United States, or compliance with the request
11   would undermine important interests of the state where the information is
12   located.

40

August 23 Order properly issued.  We express no view on this question, but conclude simply that the district court on remand should conduct a comity analysis in the first instance if it determines that it has specific jurisdiction over the bank.  In doing so, it should give due regard to the various interests at stake, including: (1) the Chinese Government's sovereign interests in its banking laws; (2) the Bank's expectations, as a nonparty, regarding the regulation to which it is subject in its home state *and* also in the United States, by reason of its choice to conduct business here; and (3) the United States' interest in enforcing the Lanham Act and providing robust remedies for its violation.[19]

## IV.  The August 23 Order and the 2010 Subpoena

As already noted, before ordering the Bank to comply with the 2010 Subpoena, the district court performed a comity analysis pursuant to § 442 of the Restatement (Third) of Foreign Relations Law.  We discern no abuse of discretion in this analysis and conclude that BOC's arguments to the contrary are without merit. *Allstate Life Ins. Co. v. Linter Grp. Ltd.*, 994 F.2d 996, 999 (2d Cir. 1993) (recognizing

---

[19] On remand, when analyzing the last factor of § 403 (the likelihood of conflict with regulation by another state)  the district court should give proper weight to the December 4, 2013 Civil Judgment issued by the Second Intermediate People's Court of Beijing Municipality, and any subsequent court decisions in this matter that it deems appropriate to consider.

that "the extension or denial of comity is within the court's discretion, [and therefore] we will reverse the court's decision only when we find an abuse of discretion").  A district court, however, must have personal jurisdiction over a nonparty in order to compel it to comply with a valid discovery request under Federal Rule of Civil Procedure 45.[20]  Because the district court erroneously (if

---

[20]  *See, e.g., First Am. Corp.*, 154 F.3d at 20 (holding that personal service of a subpoena on a general partner established personal jurisdiction over a partnership and allowed a court to compel it to comply with a subpoena); *In re Sealed Case*, 141 F.3d 337, 341 (D.C. Cir. 1998) (recognizing that in Rule 45 discovery transfer motions "a transferee court . . . would often lack personal jurisdiction over the nonparty" and that "[t]he principle that courts lacking jurisdiction over litigants cannot adjudicate their rights is elementary, and cases have noted the problem this creates for the prospect of transferring nonparty discovery disputes"); *In re Application to Enforce Admin. Subpoenas Duces Tecum of the S.E.C. v. Knowles*, 87 F.3d 413, 418 (10th Cir. 1996) (requiring that a Bahamian nonparty have minimum contacts with the United States before holding it subject to an administrative agency subpoena); *Ariel v. Jones*, 693 F.2d 1058, 1061 (11th Cir. 1982) (upholding the quashing of a subpoena "[i]n view of the minimal contacts of the [nonparty] with [the forum]"); *Estate of Ungar v. Palestinian Auth.*, 400 F. Supp. 2d 541, 549 (S.D.N.Y. 2005) (holding that a party must "make out a prima facie case for personal jurisdiction" in order to take "any discovery — even jurisdictional discovery — from a foreign corporation"); *Elder-Beerman Stores Corp. v. Federated Dep't Stores, Inc.*, 45 F.R.D. 515, 516 (S.D.N.Y. 1968) (quashing a  document subpoena based on complete lack of contacts with the forum); *see also* Wright & Miller, 9A *Federal Practice and Procedure* § 2454, at 398-99 (3d ed. 2008) ("A corporation is amenable to service of a subpoena under Rule 45(b) in any forum in which it has sufficient minimum contacts."); 16 Moore et al., *Moore's Federal Practice* § 108.125, at 108-48 (3d ed. 2008) ("A nonparty witness cannot be compelled to testify at a trial, hearing, or deposition unless the witness is subject to the personal jurisdiction of the court."); Gary B. Born, *International Civil Litigation in United States Courts* 865 (3d ed. 1996) ("[A] non-party witness can only be compelled to produce documents if it is subject to the court's personal jurisdiction.").

42

1    understandably) assumed that it had general jurisdiction over BOC in ordering it to

2    comply with the 2010 Subpoena, we must also vacate the August 23 Order and the

3    May 18, 2012 order insofar as they relate to this Subpoena. In light of *Daimler*,

4    BOC's contacts with the forum were insufficient to support the exercise of general

5    personal jurisdiction. *See supra* pp. 25-28.

6         But once again, specific personal jurisdiction may permit the district court to

7    order the Bank to comply with particular discovery demands, a question we leave

8    to the district court to address on remand. As already stated, the test for specific

9    jurisdiction over defendants examines whether a cause of action arises out of or

10   relates to the defendant's contacts with the forum. *See Burger King*, 471 U.S. at 472.

11   At least one circuit has translated this test to nonparty discovery requests by

12   focusing on the connection between the nonparty's contacts with the forum and the

13   discovery order at issue. *See Application to Enforce Admin. Subpoenas Duces Tecum of*

14   *the S.E.C. v. Knowles*, 87 F.3d 413, 418 (10th Cir. 1996) (finding specific jurisdiction

15   where the "subpoena enforcement action" at issue "ar[ose] out of [the nonparty's]

16   contacts" with the forum); *see also* Ryan W. Scott, Note, *Minimum Contacts, No Dog:*

17   *Evaluating Personal Jurisdiction for Nonparty Discovery*, 88 Minn. L. Rev. 968, 1005-06

18   (2004) (suggesting that the inquiry in this context should "focus on the relationship

between (1) the discovery request and (2) the nonparty's contacts with the forum").

In evaluating BOC's contacts with the forum, the district court may wish to consider

whether the relevant contacts for this inquiry are with the United States, rather than

with New York.[21]   In the event the district court concludes on remand that the

exercise of jurisdiction over the Bank is appropriate, moreover, it should consider

the question of comity again in light of the newly available December 4, 2013

Judgment of the Second Intermediate People's Court of Beijing Municipality, and any

subsequent judgments it finds relevant.

### III.  Order Holding Bank in Civil Contempt and Imposing Civil Monetary Penalties

Finally, we turn to the district court's November 15, 2012 order holding the

Bank in civil contempt and imposing civil monetary penalties for the Bank's failure

to comply with the August 2010 Subpoena.   We conclude that the Bank did not

---

[21] Federal Rule of Civil Procedure 45(b)(2), as amended, permits service of a subpoena "any place within the United States."  Several of our sister circuits have endorsed the position that, when a civil case arises under federal law and a federal statute authorizes nationwide service of process, the relevant contacts for determining personal jurisdiction are contacts with the United States as a whole.  *See, e.g.*, *In re Oil Spill by Amoco Cadiz Off Coast of Fr. on Mar. 16, 1978*, 954 F.2d 1279, 1294 (7th Cir. 1992); *Max Daetwyler Corp. v. R. Meyer*, 762 F.2d 290, 293-97 (3d Cir. 1985).  This Court has not yet decided that issue.  *See Chew*, 143 F.3d at 27 n.3.  We note that the district court might also appropriately consider whether nationwide contacts are relevant in evaluating its specific jurisdiction to enforce the Asset Freeze Injunction as against the Bank.

44

violate a clear and unambiguous provision of the 2010 Subpoena (and therefore the August 23 Order) by not producing documents relating to the New Defendants.  We therefore reverse the finding of contempt.[23]  We also conclude that the civil monetary penalties were impermissibly punitive.

We review a district court's finding of contempt for abuse of discretion, *Perez v. Danbury Hosp.*, 347 F.3d 419, 423 (2d Cir. 2003) (citation omitted), but are mindful that a district court's contempt power is "narrowly circumscribed," *id.*  As we have said, "contempt is a powerful weapon."  *Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 291 (2d Cir. 2008).  To demonstrate it, "a movant must establish that (1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner."  *Perez*, 347 F.3d at 423-24 (quoting *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995)).

---

[23] As we have vacated the district court's August 23 order compelling compliance with the subpoena — the order that the district court determined to have been violated — the finding of contempt does not stand.  Because the contempt finding and the sanctions themselves were impermissible for other reasons, however, we specifically reverse the November 15, 2012 order to make clear that the court may not impose sanctions, in the event it determines that personal jurisdiction is appropriately exercised over the Bank, without finding a new violation of a court order.

45

A clear and unambiguous order is one that "leaves no uncertainty in the minds of those to whom [the order] is addressed." *Id.* at 424 (alteration in original) (citation omitted). "[T]he longstanding, salutary rule in contempt cases is that ambiguities and omissions in orders redound to the benefit of the person charged with contempt." *Drywall Tapers & Pointers of Greater N.Y., Local 1974 of I.B.P.A.T. AFL-CIO v. Local 530 of Operative Plasterers & Cement Masons Int'l Ass'n*, 889 F.2d 389, 400 (2d Cir. 1989) (quoting *Ford v. Kammerer*, 450 F.2d 279, 280 (3d Cir. 1971)). Thus, unless the parties can "'ascertain from the four corners of the order precisely what acts are forbidden,'" the order cannot form the basis for contempt. *King*, 65 F.3d at 1058 (citation omitted).

The district court's November 15, 2012 finding of contempt is based on the Bank's violation of the August 23 Order compelling compliance with the 2010 Subpoena. S.P.A. 13 (August 23 Order requiring BOC to "produce all information requested by the [2010] Subpoena within fourteen days of the date of this Order"). Thus, to support a finding of contempt, BOC must have failed to produce information that is clearly and unambiguously sought in the 2010 Subpoena.

The district court found that the Bank was in contempt at least in part for failing to produce documents relating to the seven New Defendants first named in

46

the Second Amended Complaint. Specifically, the district court determined that references in the August 23 Order to these New Defendants as recipients of wire transfers "ma[de] clear that the 2010 Subpoena covered accounts affiliated with" these Defendants. S.P.A. 28. We conclude, however, that the 2010 Subpoena (and therefore the August 23 Order) did not clearly and unambiguously require the Bank to produce documents as to these New Defendants. The 2010 Subpoena requested all documents concerning the "Defendants" and the "Defendants' accounts." J.A. 1152. It defined "Accounts" as "[a variety of types of bank accounts] at Bank of China held by Defendants; including, but not limited to, an account or deposit in the name of Lijun Xu a/k/a Jack London with account number [ending in 2443]" and "an account in the name of 'Lijun Xu' with account number [ending in 1235]." J.A. 1150. The 2010 Subpoena defined "Defendants" as "Weixing Li, Lijun Xu a/k/a Jack London, all doing business as Redtagparty, Myluxurybags.com, Xpressdesigner.net, Xpressdesigners.com, Designer Handbags, ABC Companies and John Does, as well as their officers, directors, agents, representatives, and all persons acting on their behalf." *Id*.

After receiving an inadequate response to the 2010 Subpoena, on December 6, 2010, plaintiffs filed a motion to compel. It was not until *after* this motion was

47

fully submitted to the court that plaintiffs served the 2011 Subpoena on BOC, specifically identifying additional accounts, and thereafter filed the Second Amended Complaint adding the New Defendants. J.A. 1156-57.

The district court erroneously concluded that BOC was required to produce documents as to the seven New Defendants on the theory that "[t]he August 23 Order . . . made clear that the Second Amended Complaint identified the New Defendants by name and alleged 'that the New Defendants are recipients of wire transfers from [BOC] accounts registered to Defendants,' thus making clear that the 2010 Subpoena covered accounts affiliated with even those Defendants identified previously as only 'John Does.'" S.P.A. 28. The plain terms of the 2010 Subpoena establish otherwise, however, and certainly the New Defendants are not clearly and unambiguously included in the definition of "Defendants" in the 2010 Subpoena.

The 2010 Subpoena does not define "Defendants" in an open-ended fashion to include all newly-named defendants in the case. Instead, the Subpoena defines "Defendants" as including only "Weixing Li, Lijun Xu a/k/a Jack London, all doing business as Redtagparty, Myluxurybags.com, Xpressdesigner.net, Xpressdesigners.com, Designer Handbags, ABC Companies and John Does, as well as their officers, directors, agents, representatives, and all persons acting on their

48

behalf."   The New Defendants are not Li or Xu.   Nor are there facts in the record to

show they were doing business as the listed entities, or were acting on their behalf.

Therefore, they are only included in the definition of Defendants if they are the

"John Does" from the original complaint.   There are no facts in the record to show

that the New Defendants are the John Does.   Certainly, there are none to show that

the New Defendants are clearly and unambiguously the John Does.

The court's August 23 Order does not provide any additional clarity.

Although plaintiffs argue that the August 23 Order "made clear that all [new and

old defendants] were 'Defendants' for purposes of the [2010] Subpoena," that is

simply not the case.   The district court mentions only that plaintiffs filed a Second

Amended Complaint including new defendants *in the facts section* of the Order.

Other than mentioning this amendment in the facts section, the district court does

not hint that the 2010 Subpoena or August 23 Order apply to the New Defendants.

And that makes sense.   Plaintiffs moved to compel compliance with the 2010

Subpoena *before* they sought account information concerning additional specified

accounts they believed to be associated with the New Defendants and before

plaintiffs named these New Defendants in the Second Amended Complaint.   The

motion was fully briefed and submitted to the district court *before* plaintiffs issued

the 2011 Subpoena or amended their complaint.  Thus, the August 23 Order did not

clearly and unambiguously require production of documents relating to the New

Defendants.  And for that reason, the contempt order must be reversed.

We also reverse the district court's imposition of civil monetary sanctions for

the additional reason that the *civil* contempt sanctions were impermissibly punitive.

The district court imposed: (1) an initial "coercive fine in the amount of $75,000" for

alleged past noncompliance with the August 23 Order, (2) "an additional coercive

fine of $10,000" per day if the Bank did not comply, and (3) attorneys' fees and costs.

J.A. 1292.   The $75,000 sanction for past noncompliance, although labeled as

"coercive," was in fact impermissibly punitive.

It is basic law that a civil contempt sanction must only be compensatory or

coercive, and may not be punitive.  *See United States v. United Mine Workers of Am.*,

330 U.S. 258, 303-04 (1947); *Hess v. N.J. Transit Rail Operations, Inc.*, 846 F.2d 114, 115

(2d Cir. 1988).   The $75,000 sanction for *past* noncompliance provided no

compensatory relief.  Instead, it was punitive and therefore impermissible.  *See*

*Mackler Prods., Inc. v. Cohen*, 146 F.3d 126, 129 (2d Cir. 1998) (vacating litigation

sanctions where "[t]he imposition was retrospective, by reason of past wrongful

conduct; it did not seek to coerce future compliance, and no opportunity to purge

50

was provided"). For these reasons, we reverse the finding of civil contempt and the

imposition of civil monetary sanctions.

## CONCLUSION

To summarize, we reject BOC's challenge to the district court's authority to

issue the Asset Freeze Injunction, concluding that personal jurisdiction over the

Bank was not necessary to issue the injunction and that *Grupo Mexicano* is

inapplicable. We nevertheless vacate the August 23, 2011 and the May 18, 2012

orders enforcing the Asset Freeze Injunction and the 2010 Subpoena so that on

remand the district court may consider whether it may exercise specific personal

jurisdiction over the Bank to compel compliance with these orders and, if so,

whether proper application of the principles of comity demonstrates that it may

exercise such jurisdiction. Finally, we reverse the November 15, 2012 order holding

the Bank in civil contempt and imposing civil monetary penalties.[24]

---

[24] We deny as moot the Bank's pending motions to supplement the record or alternatively to take judicial notice of certain Chinese court decisions. We leave it to the district court to take up these matters on remand.