IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| MARK I. SOKOLOW, *et al.*, | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. 04cv397 (GBD) (RLE) |
| THE PALESTINE LIBERATION ORGANIZATION, *et al.*, | ) | |
| Defendants. | ) | |

### DEFENDANTS' OPPOSITION TO PRESS APPLICANTS' MOTION TO INTERVENE AND UNSEAL JUDICIAL DOCUMENTS

Press Applicants, self-styled "world-class," "world-renowned investigative journalists" Sharyl Attkisson, Edwin Black and Steven Emerson move to intervene in this lawsuit for the purpose of unsealing all "sealed documents filed on the docket" as well as "substantive correspondence or other unfiled submission by the parties." DE 628, Mem. at 1-2, 11. Defendants the Palestinian Authority ("PA") and the Palestine Liberation Organization ("PLO") hereby oppose the motion because the law of this jurisdiction precludes the putative intervenors from obtaining the relief they seek.

### THE PUTATIVE INTERVENORS

The Press Applicants purport to advance the First Amendment and common law rights of press and public to have access to judicial documents. As an initial matter, it bears noting that none of the Press Applicants is in fact employed by any press organization. Although her "professional biography" suggests she is currently employed by CBS News, DE 623-1 at 1, 3, Attkisson resigned earlier this year and is busy promoting her new book "*Stonewalled: My Fight for Truth Against the Forces of Obstruction, Intimidation, and Harassment in Obama's*

1

*Washington*."[1]  Emerson has changed status from journalist to terrorologist.  Emerson is the Executive Director of the Investigative Project on Terrorism, which he describes as "one of the world's largest storehouses of archival data and intelligence on Islamic and Middle Eastern terrorist groups."  *Id.* at 9.  According to his website, Emerson is "one of the first terrorism experts to have testified and warned about the threat of Islamic militant networks operating in the United States."  *Id.*  The most recent publication identified in his biography ("*Jihad Incorporated:  A Guide to Militant Islam in the U.S.*") dates back to 2006.  *Id.*  Edwin Black also is not employed by a media organization.  *See id.* at 6-8.

The Press Applicants purport to have "particular expertise and interest in the global, political and moral issues being litigated in this Court."  DE 628, Mem. at 2.  This assertion is troubling on two fronts.  First, this is a civil lawsuit in which the jury is to decide tort liability based on evidence, not based on "global, political and moral issues."  Given the potential for extreme prejudice to Defendants, the Court should be watchful of attempts by Plaintiffs and those allied with them to use the lawsuit as a vehicle to advance their "global, political and moral" agenda of demonizing and delegitimizing the Palestinian government.  Second, there is no evidence the Press Applicants in fact have any journalism expertise relevant to this lawsuit.  Attkisson claims to have published news articles on payments received by Palestinian "martyrs," *id.* at 5, but provides no citation to these articles and Defendants have not been able to locate any.[2]  Emerson has made a career out of fanning the flames of Islamophobia in the United States,

---

[1] http://www.politico.com/blogs/media/2014/03/sharyl-attkisson-to-leave-cbs-news-184836.html

[2] Defendants did locate Attkisson's 2013 interview with the Sokolow plaintiffs on CBS This Morning about their lawsuit against the Arab Bank for their alleged role in so-called martyr payments. https://archive.org/details/KPIX_20130421_130000_CBS_News_Sunday_Morning#start/2700/end/2760

with such works as "*American Jihad: The Terrorists Living Among Us*." DE 623-1 at 9.[3] It is not apparent he has any experience covering the Israeli-Palestinian conflict as a journalist. The Palestinian Authority is not a jihadist organization, nor is it an Islamist state.

The only specific example the Media Applicants offer of prior coverage of the Defendants is Mr. Black's 2013 book, "*Financing the Flames: How Tax-Exempt and Public Money Fuel a Culture of Confrontation and Terrorism in Israel*," DE 628, Mem. at 6, in which he inaccurately characterizes the Palestinian Authority as providing "payment for terrorist acts that follows a schedule of compensation pegged directly to the number of victims murdered and the amount of carnage inflicted." *Id.* Plaintiffs' counsel previously used this same book excerpt to argue for the unsealing of documents covered by the Protective Order. In Mr. Yalowitz's March 27, 2014 letter to the Court, he stated:

> The fact that defendants pay generous salaries to convicted terrorists is not confidential. . . . This policy is also discussed in a recent book by historian Edwin Black, entitled "Financing the Flames." As Mr. Black's website states, the book describes funding mechanisms by which the PA pays "the salaries of specific terrorists sitting in Israeli prisons, salaries that are among the best paid jobs in the Palestinian Authority, and are calculated to increase with the level of mass murder and destruction.'"

Letter at 5-6.

There can be little doubt that the Press Applicants have been recruited to further Plaintiffs' agenda. In their overwrought submission, the Press Applicants claim there has been a "cloak of secrecy over the contents of public filings in this litigation" and that "the information

---

[3] Emerson also was quick to pronounce that the Oklahoma City bombing had a "Middle Eastern trait" and that the Boston Marathon bombing was perpetrated by a Saudi national. *See* Alex Seitz Wald, "Why is Steve Emerson Still a Terrorism Expert," Salon.com (Apr. 16, 2013), available at http://www.salon.com/2013/04/16/the_perils_of_steve_emersons_expertise/; *see also* John F. Sugg, "Steven Emerson's Crusade: Why Is a Journalist Pushing Questionable Stories from Behind the Scenes," FAIR: Fairness & Accuracy in Reporting (Jan. 1, 1999), available at http://fair.org/extra-online-articles/steven-emersons-crusade/

1474107.1

thus freed from improper occlusion would reveal an unlawful, pernicious and murderous system established and organized by the defendant," which they irresponsibly and wrongly characterize as a "suicide-murder for hire" system. DE 628, Mem. at 1-2. So much for impartial journalism. The Press Applicants' claims that the martyr and prisoner payment practices of the Defendants are "cloaked in secrecy" by virtue of the Protective Order also is squarely at odds with their claims to special expertise on these practices. Indeed, as just noted, Mr. Yalowitz previously has argued – citing Black's book – that they are a matter of public knowledge.

The Press Applicants also irresponsibly engage in fear-mongering by implying Palestinian Authority policies put the American public at risk. *See id.* at 2 (mischaracterizing the martyr payment system and stating it presents "[a]n ongoing danger to the public, regardless of nationality and location"); *see also id.* at 3 (characterizing the litigation over events in 2001-2004 as "bear[ing] on issues of grave, immediate and ongoing concern"). This fear-mongering is reminiscent of Plaintiffs' opposition to Defendants' motion for summary judgment which began by wrongly implying that President Obama viewed the Defendants as posing a current terrorism threat to Americans at home. DE 545, Mem. at 1. There is a substantial risk that if the Press Applicants obtain confidential discovery material before trial they will taint the jury pool with inflammatory articles mischaracterizing the documents and making outlandish claims of "suicide-murder for hire" programs that pose a grave threat to Americans at home. Plaintiffs may well then cite these articles as reasons why the jury will be fearful for its safety, necessitating an anonymous jury, which would further prejudice the Defendants. *See* DE 557 (Plaintiffs' Motion for an Anonymous Jury in which they argue that trial publicity and the jurors' concern for their personal safety provide justification for an anonymous jury).

**ARGUMENT**

I.   **The Motion to Intervene Must Be Denied Because There Is No First Amendment or Common Law Right of Public Access to the "Record in this Action."**

   A.   *The Presumptive Right to Public Access Applies Only to "Judicial Documents."*

The Press Applicants claim the public and press have an affirmative presumptive right to inspect "all motion papers and the record in this action." DE 628, Mem. at 7. They seek an order unsealing all motion papers and "all other sealed documents filed on the docket" and also "all substantive correspondence or other unfiled submissions by the parties." *Id.* at 11. The Press Applicants offer no support for their position that there is a right of public access to correspondence and other unfiled, under-seal submissions to the Court. The Press Applicants cite *Lugosch v. Pyramid Co.*, 435 F.3d 110, 119 (2d Cir. 2006), as their principal legal authority. That case, however, makes abundantly clear that the First Amendment and federal common law right of public access applies only to "judicial documents." *Id.*[4] A judicial document is an item filed on the docket that is "relevant to the performance of the judicial function and useful in the judicial process." *Id.* Thus unfiled submissions are not judicial documents, and there is no presumptive right of public access to them.

Nor does the presumption of public access apply to all sealed documents filed on the docket. The "mere filing of a paper or document with the court is insufficient to render that paper a judicial document subject to the right of public access." *United States v. Amodeo*, 44 F.3d 141, 145 (2d Cir. 1995) ("*Amodeo I*"). Only a small fraction of documents filed on the docket may be treated as "judicial documents," for "an abundance of statements and documents generated in federal litigation actually have little or no bearing on the exercise of Article III

---

[4] "Federal courts employ two related but distinct presumptions in favor of public access to court proceedings and records: a strong form rooted in the First Amendment and a slightly weaker form based in federal common law." *Newsday LLC v. Cty. of Nassau*, 730 F.3d 156, 163 (2d Cir. 2013).

judicial power." *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995) ("*Amodeo II*").

Summary judgment motions and the documents relied upon in adjudicating them are considered judicial documents. *Newsday LLC v. Cty. of Nassau*, 730 F.3d 156, 164 (2d Cir. 2013). Documents filed with discovery motions are generally not considered "judicial documents" and are not subject to the public right of access. *Chicago Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1312 (11th Cir. 2001); *EEOC v. GMT, LLC*, 2012 U.S. Dist. LEXIS 96585, at *7-8 (D. Neb. July 11, 2012). And, the "mere fact that a dispute exists about whether a document should be sealed or disclosed . . . cannot ipso facto create a presumption of access," because "such a rule would bootstrap materials that are not closely related to judicial proceedings into judicial documents." *Newsday*, 730 F.3d at 167. Thus, although the Press Applicants complain that "much of the correspondence with the Court" on the scope and application of the Protective Order "is not available to the public," DE 628, Mem. at 4, they have no right to access these documents.

As the Second Circuit observed in *Newsday*, "[p]arties are entitled to litigate issues that divide them, if they can fairly do so, without thereby exposing to public view confidential materials." 730 F.3d at 167 n.15. Further, "when a party chooses not to rely on documents or other confidential information in court, the fact that the information is sufficiently relevant to the proceeding that it could have been introduced into evidence does not entitle the press or public to demand access to it or to put courts to the burden of evaluating whether the strict standards for rebutting the presumption of public access have been met." *Id.* Accordingly, here, the parties are entitled to litigate the confidentiality, relevance, admissibility, and discoverability of the under-seal documents without subjecting the documents to public scrutiny.

B.   *The Motion Must Be Denied Because the Press Applicants Failed to Identify the "Judicial Documents" They Wish to Unseal.*

Given the Press Applicants' position that they are entitled to a blanket unsealing of all documents in the record currently under seal, their motion fails to specifically analyze whether particular documents in fact constitute "judicial documents." As set forth in Part I.A. above, the Press Applicants' blanket approach to unsealing is not sanctioned by the law of this Circuit. With the exception of the summary judgment papers, as discussed in I.C. below, the Press Applicants failed to articulate a fall-back position, and they did so at their peril.

There are over 600 entries on the docket, many of which include numerous exhibits. The burden of particularizing the Press Applicants' request and analyzing which ones were filed under seal or in redacted form and arguably constitute judicial documents should not fall to the Defendants or the Court. *See Federal Housing Finance Agency v. JP Morgan Chase & Co.*, No. 11-cv-6188, 2014 U.S. Dist. LEXIS 50788, at *6 (S.D.N.Y. Apr. 11, 2014) (under similar circumstances, denying non-party's motion for an itemization of records under seal because, in part, he offered "no authority to support burdening the parties or the Court with such a task"). Accordingly, the Press Applicants' motion must be denied.

C.   *The Summary Judgment Papers Have Been Mischaracterized.*

The Press Applicants correctly note that summary judgment motion papers are generally treated as "judicial documents" entitled to a presumption of public access. DE 628, Mem. at 8. The Press Applicants, however, fail to analyze the summary judgment papers to assess the extent to which judicial documents have in fact been filed under seal.

Each party filed a summary judgment motion. Plaintiffs' motion for summary judgment is fully briefed on the record. None of the briefing was redacted and none of the exhibits was filed under seal. *See* DE 492, 523, 552. Defendants' opening summary judgment brief was filed

7

in unredacted form. DE 497. Only three exhibits were filed under seal, only one of which was produced by Defendants. DE 497-63. Defendants' reply brief was filed with minimal redactions, and no exhibits were filed under seal. DE 554. Plaintiffs' opposition brief was filed with minimal redactions. DE 545. Rather than providing a set of exhibits to their opposition brief, Plaintiffs' counsel instead submitted as "Exhibit A" a CD with 18,400 pages of their "Selected Trial Exhibits," which included just about every document Defendants produced in discovery. *See* DE 521 (Declaration of Kent A. Yalowitz) at 1. The index of the "Selected Trial Exhibits" itself is 31 pages. *See* DE 521-1. Thus, Plaintiffs chose not to submit exhibits tailored to their summary judgment motion. Plaintiffs, in conjunction with Press Applicants, may not transform discovery materials as to which there is no presumptive right of public access, into "judicial documents" merely by submitting with their summary judgment motion a data dump of all discovery material submitted in the case. Those documents remain the raw fruits of discovery, to which the public is not entitled access. *See In re Terrorist Attacks on Sept. 11, 2001*, 454 F. Supp. 2d 220, 222 (S.D.N.Y. 2006) ("[N]o public right of access exists with respect to materials produced during the initial stages of discovery").

Moreover, the public's right to access is less pressing where there has been a public hearing on the summary judgment motion. *See Lugosch*, 435 F.3d at 124 ("[a]ccess to written documents filed in connection with pretrial motions is particularly important in the situation . . . where no hearing is held and the court's ruling is based solely on the motion papers") (quoting *Westmoreland v. Columbia Broad. Sys., Inc.*, 752 F.2d 16, 23 (2d Cir. 1984)). Here, the Court conducted an extensive public hearing on the Defendants' motion for summary judgment on July 22, 2014, the transcript of which is publicly available.

In sum, any characterization of the judicial documents in this case being cloaked in secrecy, *see* DE 628, Mem. at 1, is plainly wrong.

## II.     Even as to the Relatively Few Documents That Arguably Be Characterized as Judicial Documents, There Is No Right to Unfettered Public Access.

While there is a legal presumption favoring access to judicial records, "the fact that a document is a judicial record does not mean that access to it cannot be restricted." *Amodeo I*, 44 F.3d at 146.  According to the Supreme Court, "it is uncontested…that the right to inspect and copy judicial records is not absolute." *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 598 (1978).  Indeed, "a district court has the authority to redact a document to the point of rendering it meaningless, or not to release it at all." *In re Application of Newsday, Inc.*, 895 F.2d 74, 80 (2d Cir. 1990).

Once a court has determined that the documents are judicial documents, it must determine the weight of that presumption. *Lugosch*, 435 F.3d at 119.  As the Second Circuit explained in *Lugosch*, the "weight to be given the presumption of access must be governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts." *Id.*  Then, after determining the weight of the presumption of access, the court must "balance competing considerations against it." *Id.* at 120 (quoting *Amodeo II*, 71 F.3d at 1050).  "Such countervailing factors include but are not limited to 'the danger of impairing law enforcement or judicial efficiency' and 'the privacy interests of those resisting disclosure.'" *Id.* (quoting *Amodeo II*, 71 F.3d at 1050); *see also United States v. Longueuil*, 567 Fed. Appx. 13, 16 (2d Cir. 2014) (recognizing law enforcement techniques and procedures and privacy interests of third parties as strong countervailing interests).

1474107.1

The parties cited less than two dozen under-seal exhibits in their summary judgment briefs. Those documents fell into three categories: (1) personnel files (PTE 88); (2) General Intelligence Service ("GIS") files (PTE 129, 131, 143, 163, 164, 233, 1038, 1060); and (3) the so-called "martyr" files (PTE 16, 19, 21, 22, 23, 24, 36A, 60).[5] Given the general transparency of the summary judgment briefing and hearing and the limited nature of the under-seal exhibits, the law enforcement and privacy interests associated with the under-seal documents override any public right to access.

In particular, potential damage to law enforcement is a legitimate basis for sealing documents and restricting public access to them. *See Amodeo I*, 44 F.3d at 147 ("We have recognized the law enforcement privilege as an interest worthy of protection."). The law enforcement privilege is designed

> to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witness and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation.

*Id.* Indeed, "protect[ing] witnesses and law enforcement personnel" is just "one purpose of the law enforcement privilege." *Dinler v. City of New York*, 607 F.3d 923, 934-935 (2d Cir. 2010); *see also In re United States Dep't of Homeland Sec.*, 459 F.3d 565, 569 (5th Cir. 2006) ("Our case law has acknowledged the existence of a law enforcement privilege beyond that allowed for identities of confidential informants.").

---

[5] Press Applicants will no doubt argue that all of Defendants' discovery materials are "judicial documents" because they provided them to the Court on a CD marked as Exhibit A to their opposition to Defendants'' motion for summary judgment. The Court should not sanction such a cynical attempt to bootstrap plainly confidential material into "judicial documents." In addition, the admissibility of these documents is contested by the parties, and the Court has yet to rule which, if any, of the under seal documents would be relevant to a summary judgment ruling.

The Court should not unseal any of the GIS documents or require the Defendants to reveal redacted material relating to such documents.  Throughout this litigation, Defendants have argued that the GIS documents are privileged, and Defendants only produced the GIS documents to Plaintiffs pursuant to court order and subject to Defendants' objections.  The PA clearly has a compelling interest in preventing disclosure of its intelligence materials.  *See* Declaration of Majed Faraj  ¶¶ 12-14, 17 (attached as Exhibit A) (declaring that disclosure of GIS investigative methods would, *inter alia*, increase security threats and impair GIS's ability to conduct future investigations); *see also In re United States Dep't of Homeland Sec.*, 459 F.3d at 569 ("[I]n today's times the compelled production of government documents could impact highly sensitive matters relating to national security."); *Gilmore v. Palestinian Interim Self-Government Auth.*, No. 01-853, 2014 U.S. Dist. LEXIS 38037, at *6 (D.D.C. Mar. 24, 2014) (noting the court's previous finding that Defendants had made "numerous persuasive arguments for concluding that disclosure of the requested [GIS] files would 'undermine important interests' of the PA.").

Moreover, GIS documents are protected from public disclosure by the PA's Intelligence Law, which prohibits public revelation of "[i]nformation regarding the regulation of [GIS] and its activities, functions, documents, headquarters, and properties," and provides that GIS investigations and information may only be viewed by "special permission of the President." *See* Ex. A ¶¶ 12, 18; *see also* GIS Law at 253, 259 (attached as Exhibit B).  Violation of this law is a criminal offense.  Ex. A ¶ 18; Ex. B at 259.  Courts have considered the following factors in determining whether to order disclosure of documents in contravention of foreign law: (1) the importance of the documents to the litigation; (2) the specificity of the request; (3) whether the information originated in the United States; (4)  alternate means to secure the information; (5) the extent that disclosure or non-disclosure would undermine interests of the United States or the

11

state where the information is; (6) hardship of compliance on the party or witness from whom discovery is sought; and (7) the good faith of the party resisting discovery. *Gucci Am., Inc. v. Weixing Li*, No. 10-cv-4974, 2011 U.S. Dist. LEXIS 97814, at *15-16 (S.D.N.Y. Aug. 23, 2011).

These factors weigh against any type of disclosure of GIS materials. Because the GIS is a law enforcement body, its records are protected. *See United States v. Basciano*, No. 97-1264, 1998 U.S. App. LEXIS 3085, at *6 (2d Cir. Feb. 26, 1998). Access to GIS records would cause irreparable harm to the PA's compelling interest in keeping its intelligence materials confidential. *In re United States Dep't of Homeland Sec.*, 459 F.3d at 569; *Gilmore*, 2014 U.S. Dist. LEXIS 38037, at *6. And no other alternative restriction would adequately protect the PA's interests in avoiding an increase in security threats and in avoiding any impairment in the GIS's ability to conduct future investigations. *See* Ex. A ¶¶ 12-14, 17.

The remaining under-seal exhibits referenced in the parties' summary judgment briefing are a personnel file and the so-called martyr files, which at the very least could be produced only in redacted form. These documents contain personal identifying information, including birth years and government-issued identification numbers, and many also include bank account numbers. *See*, *e.g.*, PTE 21, 22, and 36A. Under Federal Rule of Civil Procedure 5.2, public filings must redact the last four digits of the individuals' identification number, the year of the individual's birth, and the last four digits of the financial account number. Fed. R. Civ. P. 5.2(a).

Before the Court could publicly disclose any under-seal exhibits ultimately found to be judicial documents, the Court also would have to weigh the public's presumptive right to access against privacy and safety interests of individuals referenced in the files. Some exhibits include information about individuals' mental health or identify intelligence sources. The Second Circuit has held that privacy is a "proper concern[] for a trial court in performing the balancing

test required to determine whether access should be allowed or denied." *Amodeo I*, 44 F.3d at 147; *see also Newsday LLC*, 730 F.3d at 165 (holding that the common law right should be "balanced against countervailing interests favoring secrecy"). Private information should therefore be protected:

> We have previously held that the privacy interests of innocent third parties should weigh heavily in a court's balancing equation. Such interests, while not always fitting comfortably under the rubric "privacy," are a venerable common law exception to the presumption of access. Courts have long declined to allow public access simply to cater to a morbid craving for that which is sensational and impure.

*Amodeo II*, 71 F.3d at 1050-51 (internal citations and quotation marks omitted). "The job of protecting such interests rests heavily with the trial judge, since all the parties who may be harmed by disclosure are typically not before the court." *In re Application of Newsday, Inc.*, 895 F.2d at 80.

Moreover, the individuals whose private information is at risk of being made public also have a strong interest in preventing its disclosure. *See In re Terrorist Attacks on Sept. 11, 2001*, 454 F. Supp. 2d 220, 223 (S.D.N.Y. 2006) (entering protective order based on "privacy and prejudice concerns," where most of the individual defendants were accused of committing terrorist acts and where they would "be asked to turn over a vast array of private and confidential information during discovery, much of which will have little or no bearing on the resolution of these actions but will be subject to widespread public scrutiny with prejudicial effects in the absence of a protective order"). If the Court were to disclose all of the materials accompanying the parties' summary judgment papers, this would include, *inter alia*, bank account numbers, government-issued identity numbers, and potentially embarrassing mental health information. As the Plaintiffs have previously conceded, *see* DE 455 at 8, all such information should be

1474107.1

redacted.  *Amodeo II*, 71 F.3d at 1050-51; *In re Application of Newsday, Inc.*, 895 F.2d at 80; *see also* Fed. R. Civ. P. 5.2(a).

## CONCLUSION

The Press Applicants' motion to intervene should be denied.  They have not demonstrated that the public has a presumptive right of access to all material that has been filed under seal.  Because they failed to limit their requested relief to "judicial documents," the Press Applicants are not entitled to intervene.  In any event as to the relatively few arguable "judicial documents" filed under seal, countervailing law enforcement and privacy interests outweigh the public interest in access, especially in light of the general openness in which the motions for summary judgment have been litigated and the fact that the Court has yet to determine which exhibits will be relevant to any judicial decisions on the merits.

November 13, 2014                              Respectfully Submitted,

/s/ Laura G. Ferguson
Mark J. Rochon
Laura G. Ferguson
Brian A. Hill
Dawn E. Murphy-Johnson
Michael J. Satin
MILLER & CHEVALIER CHARTERED
655 15th Street, NW, Suite 900
Washington D.C. 20005-6701
(202) 626-5800 [tel]
(202) 626-5801 [fax]
lferguson@milchev.com [email]

*Counsel for Defendants the Palestinian Authority and the Palestine Liberation Organization*