UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MARK I. SOKOLOW, et al.,                            :

                Plaintiffs,            :

                            :

          -against-                            :

THE PALESTINE LIBERATION                            :
ORGANIZATION, THE PALESTINIAN
AUTHORITY, et al.,                                  :

                            :

             Defendants.            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**USDC SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
DOC #: _____
DATE FILED: NOV 1 9 2014

ORDER
04 Civ. 397 (GBD)

GEORGE B. DANIELS, United States District Judge:

      Plaintiffs brought this case pursuant to the Antiterrorism Act of 1992, 18 U.S.C. § 2331,

*et. seq.* ("ATA"), as well as several non-federal causes of action.  Defendants, the Palestine

Liberation Organization ("PLO") and the Palestinian Authority ("PA"), move for summary

judgment in their favor to dismiss all of the counts in the First Amended Complaint.  (Def.

Mem., ECF No. 497.)  Plaintiffs are United States citizens and the guardians, family members,

and personal representatives of the estates of United States citizens who were killed or injured

during terrorist attacks that occurred between January 8, 2001 and January 29, 2004 in or near

Jerusalem.

      Defendants' motion for summary judgment is DENIED with respect to the ATA claims

of vicarious liability against the PA, except it is GRANTED as to the Mandelkorn Plaintiffs'

ATA claim of vicarious liability.

      Defendants' motion for summary judgment is GRANTED with respect to the ATA

claims of vicarious liability against the PLO.

      Defendants' motion for summary judgment is DENIED with respect to the ATA claims

of direct liability.

Defendants' motion for summary judgment is GRANTED with respect to all of Plaintiffs' non-federal claims.[1]

## ALLEGATIONS

Plaintiffs allege that the "PLO has funded, planned and carried out thousands of terrorist bombings and shootings, resulting in the deaths of hundreds of innocent civilians and the wounding of thousands more," and the "PA has planned and carried out hundreds of terrorist bombings and shootings, resulting in the deaths of hundreds of civilians and the wounding of thousands more." (Am. Compl., ECF No. 4, ¶¶ 49-50.)

Plaintiffs further allege that Defendants "planned and carried out terrorist attacks against civilians through their officials, agents and employees." (*Id.* ¶ 51.) Among these attacks are the seven bombings and shootings at issue.[2] Plaintiffs allege that these attacks were planned and carried out by individuals "acting as agents and employees of the PLO and PA and within the scope of their agency and employment, pursuant to the prior authorization, instructions, solicitation and directives of defendants PLO and PA, in furtherance of the goals and policies of defendants PLO and PA, and using funds, weapons, means of transportation and communication and other material support and resources supplied by defendants PLO and PA for the express purpose of carrying out [these] attack[s] and terrorist attacks of this type." (*Id.* ¶¶ 60, 76, 85, 99, 107, 115, 116, 125.) Plaintiffs allege that "[t]he actions of defendants violate, or if committed

---

[1] Plaintiffs also move for summary judgment on Defendants' affirmative defense that they lack the capacity to be sued on the non-federal claims. (Pl. Mot., ECF No. 489.) That motion is denied.

[2] Specifically, a shooting on January 8, 2001 (Am. Compl. ¶¶ 54-60); a shooting on January 22, 2002 (*id.* ¶¶ 61-76); a bombing on January 27, 2002 (*id.* ¶¶ 77-85); a bombing on March 21, 2002 (*id.* ¶¶ 86-99); a bombing on June 19, 2002 (*id.* ¶¶ 100-07); a bombing on July 31, 2002 (*id.* ¶¶ 108-17); and a bombing on January 29, 2004 (*id.* ¶¶ 118-25).

within U.S. jurisdiction would violate literally scores of federal and state criminal statutes." (*Id.* ¶ 127.)

In addition to the ATA claims, Plaintiffs bring non-federal law claims, including: wrongful death (count two); battery (count four); assault (count five); loss of consortium and solatium (count six); negligence (count seven); intentional infliction of emotional distress (count eight); and negligent infliction of emotional distress (count nine).

## FACTUAL BACKGROUND[3]

The PLO was founded in 1964 by the Arab League and was recognized as the representative of the Palestinian people by Israel as part of the Oslo Accords in 1993. (Def. 56.1, ECF No. 498, Ex. A, ¶ 1.)[4]  The PA was established by the PLO after the Oslo Accords to serve as the governing authority in the West Bank and Gaza Strip. (*Id.* ¶ 2.)  Neither the PLO nor the PA is an individual, corporation or partnership. (*Id.* ¶¶ 17-22.)  Defendants state that "[i]n 2002, the PA had over 100,000 employees." (*Id.* ¶ 40.)

Seven separate attacks occurred in or near Jerusalem between 2001 and 2004.  The parties dispute almost all of the facts concerning who was responsible for these attacks.  Defendants argue that Plaintiffs cannot meet their burden to show which individuals were responsible for the attacks, that they were employees or agents of Defendants, that they acted within the scope of any employment by Defendants, or that they received any material support from Defendants causally related to the attacks.  The information hereafter is from Plaintiffs' recitation of the facts, which

---

[3] Defendants argue that in the absence of any admissible evidence supporting Plaintiffs' claims, no reasonable jury could find Defendants liable.  This opinion assumes the admissibility of Plaintiffs' evidence.  If certain evidence is deemed inadmissible prior to or during trial, and is necessary for Plaintiffs to prove their claims by a preponderance of the evidence, Defendants may be entitled to a directed verdict.

[4] All citations accompanying the disputed facts are to the parties' statements of fact pursuant to Federal

they note are largely in dispute.[5]

The attacks at issue involve two shootings and five bombings. Plaintiffs contend that at least one PA "security" employee was involved in each of these attacks, and that Defendants provided material support to the attackers or to the terrorist groups backing the attacks, Hamas and the al-Aqsa Martyrs Brigades ("AAMB").

Plaintiffs claim that following these attacks, Defendants demonstrated support for those involved by, *inter alia*, keeping them on their payroll and promoting them after their convictions, declaring suicide terrorists "al-Aqsa Martrys," providing their families with cash payments, and glorifying the attackers through PA-owned and controlled media outlets. (Pl. 56.1, ECF No. 546, ¶ 13.)

## MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "An issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is material when "it 'might affect the outcome of the suit under the governing law.'" *Id.*

The moving party has the burden of demonstrating that no genuine issue of material fact exists. *See Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002). In turn, to

---

Rule of Civil Procedure 56.1. (Def. 56.1 (ECF No. 498, Ex. A); Pl. 56.1 (ECF No. 546).)

[5] The facts that Plaintiffs intend to prove at trial relevant to these attacks are discussed in greater detail in Section I.A.

defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. To do so, it "'must do more than simply show that there is some metaphysical doubt as to the material facts,'" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), and it "may not rely on conclusory allegations or unsubstantiated speculation." *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (citations and quotations omitted). Rather, the non-moving party must produce admissible evidence that supports its pleadings. *See First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289-90 (1968). In this regard, "[t]he 'mere existence of a scintilla of evidence' supporting the non-movant's case is also insufficient to defeat summary judgment." *Niagara Mohawk Power Corp. v. Jones Chem., Inc.*, 315 F.3d 171, 175 (2d Cir. 2003) (quoting *Anderson*, 477 U.S. at 252).

In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the non-moving party and draw all inferences in that party's favor. *See Niagara Mohawk*, 315 F.3d at 175. Accordingly, the court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Summary judgment is therefore inappropriate "if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." *Marvel*, 310 F.3d at 286 (citation omitted).

While courts do assess the admissibility of evidence to determine if a party is entitled to summary judgment, *see Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009), at this stage, this Court limits its analysis to whether the probative force of Plaintiffs' proffered proof is such that there is a genuine need for trial.[6]

---

[6] Defendants object to the admission of all of Plaintiffs' liability experts and virtually all of Plaintiffs'

5

## I.      THE ANTI-TERRORISM ACT

The Anti-Terrorism Act, 18 U.S.C. § 2333(a), provides:

> Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.[7]

To prevail under the ATA, Plaintiffs must prove "three formal elements: unlawful *action*, the requisite *mental state*, and *causation*." *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 542, 553 (E.D.N.Y. 2012) (emphasis in original) (citation and quotation omitted).

To establish an "unlawful action," Plaintiffs must show that their injuries resulted from an act of "international terrorism." The statute defines "international terrorism" as activities that, among other things, "involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State." 18 U.S.C. § 2331(1)(A).

Plaintiffs advance two theories to support their claim that Defendants committed predicate acts and should therefore be found liable by a jury under the ATA. First, Plaintiffs contend that Defendants could be found vicariously liable under a theory of respondeat superior for the criminal activities of their employees during the scope of their employment. Second, Plaintiffs contend that Defendants could be found liable for their direct violations of the anti-terrorism laws by providing material support and resources to the terrorist groups behind the

---

trial exhibits, and have refused to stipulate to the authenticity of 177 exhibits produced from Defendants' records.

[7] To be eligible for civil relief under the ATA, a plaintiff must be either a U.S. national or an estate, a survivor, or an heir of a U.S. national. A U.S. national is "a citizen of the United States" or "a person who, though not a citizen of the United States, owes permanent allegiance to the United States." 8

attacks.

The predicate crimes that Plaintiffs assert Defendants are responsible for under their respondeat superior theory include: murder and attempted murder (18 U.S.C. §§ 1111, 2332), use of a destructive device on a mass transportation vehicle (18 U.S.C. § 1992), detonating an explosive device on a public transportation system (18 U.S.C. § 2332f), and conspiracy to commit those acts (18 U.S.C. § 371). Although criminal convictions under these statutes require proof beyond a reasonable doubt, where the statutes are the basis for civil liability under the ATA, Plaintiffs need only demonstrate proof by a preponderance of the evidence. *See Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 491 (1985) (collecting cases).

In addition, Plaintiffs claim that Defendants are responsible for directly violating the ATA by providing support to Fatah's AAMB, Hamas, and individual terrorists in order for them to commit terrorist acts. Specifically, Plaintiffs argue that Defendants provided known terrorists or terrorist organizations with personnel, weapons, funds, and protection in violation of 18 U.S.C. §§ 2339A, 2339B, 2339C, and 2339. (Pl. Opp'n Mem., ECF No. 545, at 22-27.)

To establish the requisite mental state, Plaintiffs must show that Defendants committed a terrorist act intentionally, knowingly or recklessly, that injured Americans.

To establish causation, Plaintiffs must show that their injuries were proximately caused by Defendants' predicate criminal acts. *See Rothstein v. UBS AG*, 708 F.3d 82, 95-97 (2d Cir. 2013). The ATA specifically requires that the harm to Plaintiffs occur *by reason of* an act of international terrorism, which has been interpreted to "require something more than 'but for' causation." *See Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.*, 36 F. Supp. 2d 560, 569 (E.D.N.Y. 1999) (citing *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268

---

U.S.C. § 1101(a)(22); *see also Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 43 (D.D.C. 2010).

(1992)). "[C]ourts have always utilized the concept of foreseeability as a touchstone for proximate cause analysis." *Blue Cross*, 36 F. Supp. 2d at 580 (citation omitted). This Court "rejects the contention that *any* reckless contribution to a terrorist group or its affiliate, no matter how attenuated, will result in civil liability, without the demonstration of a proximate causal relationship to the plaintiff's injury." *Gill v. Arab Bank, PLC*, 891 F. Supp. 2d 335, 382 (E.D.N.Y. 2012) (citations omitted), *amended and superseded on other grounds by Gill*, 893 F. Supp. 2d at 744. Thus, Plaintiffs must demonstrate by a preponderance of the evidence that it was reasonably foreseeable that Defendants' actions would cause the resulting injuries. The more attenuated the cause and effect, and the more inferential leaps the jury would have to make to find that Defendants' actions resulted in Plaintiffs' injuries, the less likely it is that Plaintiffs can meet their burden with respect to causation. *See In re Terrorist Attacks on September 11, 2011*, 714 F.3d 118, 124 (2d Cir. 2013) (holding that allegations that defendants "provided funding to purported charity organizations known to support terrorism that, in turn, provided funding to al Qaeda" were insufficient to allege causation and survive a Rule 12(b)(6) motion to dismiss).

The ultimate question as to Plaintiffs' ATA claim is whether a reasonable jury could find that Defendants, acting with the requisite scienter, committed predicate crimes which proximately caused injuries to American citizens, either vicariously through the acts of their employees or directly through their own actions.[8]

---

[8] Defendants argue that recovery under the ATA is limited to (1) U.S. nationals physically, rather than emotionally, injured by acts of international terrorism; or (2) heirs or survivors of U.S. nationals killed by acts of international terrorism. Courts that have considered this issue universally allow ATA claims based on the emotional distress that U.S. nationals experience as a result of the death or injury of their family members. *See, e.g.*, *Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 426 (E.D.N.Y. 2009) ("The history and structure of the statute suggest that Congress intended to include non-physical injuries in the phrase 'injured in [their] person.'"); *Biton v. Palestinian Interim Self-Gov't Auth.*, 310 F. Supp. 2d 172,

## A. **Vicarious Liability**

The ATA was "intended to incorporate general principles of tort law," of which respondeat superior is unquestionably one. *See Wultz*, 755 F. Supp. 2d at 55; *Estate of Parsons v. Palestinian Auth.*, 651 F.3d 118, 148 (D.C. Cir. 2011) (Brown, J., concurring) ("Respondeat Superior liability is an elementary principle of tort law and must therefore inform our interpretation of the federal torts created in the [ATA]. Thus, the [PA] is liable for the acts of its employees committed within the scope of their employment.") (citation omitted); *see also Gill*, 893 F. Supp. 2d at 558 (finding that plaintiff was correct in contending that the ATA provides for liability on a theory of respondeat superior); *Abecassis v. Wyatt*, 785 F. Supp. 2d 614, 649-50 (S.D. Tex. 2011).[9]

To prevail under a theory of respondeat superior, Plaintiffs must establish sufficient evidence of causation and scienter as to the individuals who carried out the seven attacks. The attacks at issue were the foreseeable cause in fact of Plaintiffs' injuries. Moreover, there is no genuine dispute as to whether these individuals executed these bombings and shootings with the intent to cause serious harm.

Defendants argue that the standard articulated in *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978), applies here, requiring that Plaintiffs prove by a

---

181-82 (D.D.C. 2004) ("The statute does not specifically require that a plaintiff suffer *physical* harm prior to filing suit.") (emphasis in original). Moreover, Plaintiffs do not need to be present during the attack to collect for their non-physical injuries under the ATA. *See id.*

[9] Defendants suggest that respondeat superior is unavailable where a statute—like the ATA—allows for treble damages. This Court agrees with Judge Janice Rogers Brown's concurring opinion in *Estate of Parsons*, in which she explained that the ATA's allowance for treble damages has no bearing on a plaintiff's ability to pursue his respondeat superior theory. *See* 651 F.3d at 148. Treble damages in this context are statutory or liquidated—rather than punitive—damages. *See id.* Therefore, any heightened requirements for showing that punitive damages are available as articulated in *Kolstad v. ADA*, 527 U.S. 526, 542-43 (1999), are not applicable under the ATA.

preponderance of the evidence that the conduct of the individuals responsible for the attacks was pursuant to Defendants' official policy or custom.  That standard was carved out as a specific exception to respondeat superior liability in the limited context of a Section 1983 action against a United States municipality.  This is neither a Section 1983 case, nor are the PA or PLO United States municipalities.[10]  Therefore, the illegal acts "of an individual PA employee acting within the scope of his employment suffice[] to make the PA itself liable" under the ATA.  *Parson*, 651 F.3d at 150 (Brown, J., concurring).

Defendants next argue that Plaintiffs have no admissible evidence that any PA employees acted within the scope of their employment.  Plaintiffs dispute this assertion and claim that the evidence is sufficient under the relevant common law standard.  Respondeat superior applies where the employee's tortious "conduct was not so 'unforeseeable' as to make it unfair to charge the [defendant] with responsibility." *Ira S. Bushey & Sons, Inc. v. United States*, 398 F.2d 167, 171 (2d Cir. 1968).  Moreover, a defendant may be found liable even where his employee's conduct is intentional or at odds with his employer's stated policy.  *See Kwon v. Yun*, 606 F. Supp. 2d 344, 363 (S.D.N.Y. 2009) (citing factors courts consider "[i]n determining whether a tortious act was committed within the scope of employment"); *see also Riviello v. Waldron*, 47 N.Y.2d 297, 304 (1979) ("[W]here the element of general foreseeability exists, even intentional tort situations have been found to fall within the scope of employment.") (citation omitted).  Courts have held that "[b]ecause the determination of whether a particular act [is] within the

---

[10] Defendants cite, and this Court is aware of, only one case in which a court has extended the *Monell* rule to apply outside of the context of a Section 1983 action involving a municipality.  *Tracy v. Islamic Republic of Iran*, No. 01-2517 (TFH), 2003 U.S. Dist. LEXIS 15844, at *23-24 (D.D.C. Aug. 21, 2003) (citing *Monell*, 436 U.S. at 694-95).  The court in *Tracy* was faced with a claim against a foreign state under the Foreign Sovereign Immunity Act, and did not explain why the *Monell* exception should extend beyond the limited context for which it was designed.

scope of the servant's employment is so heavily dependent on factual considerations, the question is ordinarily one for the jury." *Bruce v. Port Auth. of N.Y. and N.J.*, 531 F. Supp. 2d 472, 476 (E.D.N.Y. 2008) (quoting *Riviello*, 47 N.Y.2d at 303).

This Court identifies below certain alleged and disputed facts that Plaintiffs intend to present to the jury. If this evidence is deemed admissible, all of the Plaintiffs, except the Mandelkorn Plaintiffs, have demonstrated that a reasonable jury could find the PA vicariously liable under Plaintiffs' ATA claims.

i.   ***The Guetta Plaintiffs (January 8, 2001 Attack)***

On January 8, 2001, Varda Guetta and her son, Oz Guetta, were attacked by four gunman (Pl. 56.1 ¶ 1); in February 2013, Varda Guetta identified one of the shooters from a photo array as Fawzi Murar, a Lieutenant in the PA's Force 17 (the commando unit responsible for protecting Yasser Arafat) (Pl. 56.1 ¶¶ 99, 103, 108, 110); perpetrators of other attacks between October 2000 and February 2002 confirmed that Murar was involved in attacks similar to the January 8 shooting (*id.* ¶ 105); following Murar's death in March 2002, the PA's and PLO's Institute for the Care of the Families of Martyrs and the Wounded granted Murar the post-death status of "martyr" and made payments to his family (*id.* ¶ 107).[11]

ii.  ***The Gould and Waldman Plaintiffs (January 22, 2002 Attack)***

On January 22, 2002, Shayna Gould and Shmuel Waldman were injured during a shooting carried out by Sa'id Ramadan, a PA maritime police officer, who conspired with five

---

[11] Plaintiffs seem to argue that Defendants' post-attack "ratification" of their employees' actions is itself a violation of the ATA. (Pl. Opp'n Mem. at 22.) A showing of support—even post-attack financial support to the families of terrorists—is not sufficient to demonstrate that Defendants were somehow responsible for the attacks. However, this information may be presented to a jury—assuming it is otherwise admissible—as relevant circumstantial evidence in further support of Plaintiffs' argument that the PA employees were acting within the scope of their employment.

other PA employees to carry out the attack (*id.* ¶¶ 119-20); several of those involved confessed or were convicted for their roles in the attack (*id.* ¶¶ 133-37); following the attack, the PA continued to pay and promote certain of these individuals (*id.* ¶¶ 145, 157); official PA documents describe two of the employees involved in the attack as having been "detained in the prisons of the Israeli occupation as a result of [their] fight for [their] country" (*id.* ¶ 146); and the shooter was martyred in part because he was "performing his national duty" (*id.* ¶ 152).

### iii.     *The Sokolow Plaintiffs (January 27, 2002 Attack)*

On January 27, 2002, Mark, Rena, Jamie, and Lauren Sokolow were injured by a suicide bomber, Wafa Idris, who conspired with a Lieutenant in the PA's Military Intelligence Unit, "Abu Talal" (*id.* ¶¶ 161, 164-67); Talal coordinated with another individual, Munzar Noor, to have Wafa Idris perform the suicide bombing (*id.* ¶¶ 162, 167); numerous senior PA General Intelligence Service ("GIS") employees were aware that Idris was the suicide bomber before the medics or press identified her (*id.* ¶ 169); Idris was subsequently given martyr status and her family was given monthly payments (*id.* ¶ 172); Noor's family received monthly payments while he was serving his prison sentence in Israeli prison for his conviction (*id.* ¶ 175); Talal was promoted to the rank of major after the attack in 2008 (*id.* ¶ 165).

### iv.     *The Bauer Plaintiffs (March 21, 2002 Attack)*

On March 21, 2002, Alan and Yehonathon Bauer were injured by a suicide bomber, Mohammed Hashaika, a PA police officer, although there is a question as to whether he was employed at the time of the attack (*id.* ¶¶ 180-82); on February 10, 2002, Hashaika was arrested by the PA because he wanted to perpetrate a suicide operation, but was released prior to the bombing (*id.* ¶¶ 183-85); the attack was planned by a lieutenant in the PA's GIS, Abdel Karim Aweis (*id.* ¶ 187); the day before the attack, Aweis communicated his intentions to Marwan

Barghouti, who gave him money for the attack (*id.* ¶¶ 194-95); Aweis admitted to his role in open court (*id.* ¶ 197); Hashaika was recognized as a martyr and his family was given money (*id.* ¶¶ 199, 202); Aweis remained on the PA payroll and has been promoted four times since his conviction (*id.* ¶ 204).

**v.**       ***The Mandelkorn Plaintiffs (June 19, 2002 Attack)***

On June 19, 2002, Shaul Mandelkorn was injured by a suicide bomber, Sa'id Awada, who was not an employee of the PA or PLO. (*Id.* ¶ 215.) The Mandelkorn Plaintiffs' only evidence linking the PA to the relevant attack is that Naef Abu Sharkh, an officer of the GIS and PA's Director of Civil Personnel in the West Bank, was deemed to be "behind" the attack by an Israeli Ministry of Foreign Affairs report without any explanation as to the circumstances of his individual involvement. (*Id.* ¶ 225.) With this information alone, a reasonable jury would not have a sufficient basis to conclude that Sharkh was acting within the scope of his employment when Awada executed the bombing. Therefore, the Mandelkorn Plaintiffs cannot proceed under a theory of respondeat superior.

**vi.**       ***The Coulter, Carter, Blutstein, and Gritz Plaintiffs (July 31, 2002 Attack)***

On July 31, 2002, Hamas operatives detonated a bomb at Hebrew University which killed nine people, including Benjamin Blutstein, Diane Carter, Janis Coulter, and David Gritz (*id.* ¶ 63); Abdullah Barghouti, the individual responsible for the Hebrew University bombing, was a member of the Az A-Din Al Qassam Brigades of Hamas (*id.* ¶ 229); following a separate bombing that preceded the Hebrew University bombing, the head of the PA Preventative Security Force in the West Bank arrested Abdullah Barghouti (*id.* ¶ 237); PA authorities seized from Abdullah Barghouti's laboratory prepared devices but did not seize other bomb-making materials found in his possession (*id.* ¶ 240); during his detention, a PA Preventative Security Officer gave

13

Abdullah Barghouti a mobile phone (*id.* ¶ 245); after less than three weeks in custody, Abdullah Barghouti was released to the custody of *Marwan* Barghouti who, along with PA employee *Ahmed* Barghouti, provided Abdullah Barghouti with a safe house, materials for bomb making, and weapons (*id.* ¶¶ 248-49); *Ahmed* Barghouti was convicted of sheltering and aiding Abdullah Barghouti by providing him with a safe house and weapons (*id.* ¶ 251); *Marwan* Barghouti also provided Abdullah Barghouti with financial assistance (*id.* ¶ 252); Abdullah Barghouti admitted he was responsible for creating the bomb that was detonated in the cafeteria at Hebrew University after his March 5, 2003 arrest in Israel (*id.* ¶¶ 268-84); Defendants, through the Ministry of Detainees' Affairs, began making monthly payments to Abdullah Barghouti's family, as well as the families of others who were convicted for their part in the attack (*id.* ¶¶ 290, 294).

### vii. *The Goldberg Plaintiffs (January 29, 2004 Attack)*

On January 29, 2004, Stuart Goldberg was killed by a suicide bomber (*id.* ¶ 299); those responsible for the bombing included four members of the PA police and security forces (*id.* ¶ 300); one of the men, Abdul Rahman Maqdad, was previously convicted for terrorist activity, after which the PA continued to employ him in its police forces (*id.* ¶¶ 304-05); Maqdad prepared the suicide bomb used in the January 29, 2004 bombing, which he admitted in open court (*id.* ¶¶ 306-08); GIS documents state that Maqdad admitted to "planning, preparing and executing acts of martyrdom" in connection with the bombing (*id.* ¶ 309); Ahmed Salah and Hilmi Hamash, who assisted in making the bomb and executing the attack, were convicted for their roles in the attack and Salah admitted to his role in open court (*id.* ¶¶ 311-19); the PA continued to pay the salaries of Salah, Hamash, and Maqdad after their arrests, and they were promoted through the ranks while in jail (*id.* ¶¶ 320-21, 333, 337-40); the suicide bomber, Ali Ja'ara, was a PA police officer at the time; however, he was to be fired in January 2004 due to

"lack of commitment towards work" (*id.* ¶ 325); Ja'ara was recognized as an "al-Aqsa Martyr," and his family received monthly payments (*id.* ¶¶ 326-28).

*       *       *

Based on the above disputed facts offered by Plaintiffs to support their claims for vicarious liability under the ATA, a reasonable jury could find the PA liable as to all Plaintiffs, except the Mandelkorn Plaintiffs because there is insufficient evidence that a PA employee was involved in the June 19, 2002 attack or acted within the scope of his employment.

Plaintiffs' claims are based on actions by PA employees acting within the scope of their employment for the PA, not the PLO. Plaintiffs have not provided any factual basis for a reasonable jury to find the PLO liable for violating the ATA under a theory of vicarious liability as an employer.[12] Therefore, all Plaintiffs but the Mandelkorn Plaintiffs are able to proceed on their theory of vicarious liability against the PA.

**B.  Direct Liability**

Plaintiffs also claim that Defendants directly violated federal and state antiterrorism laws, including 18 U.S.C. §§ 2339, 2339A, 2339B, and 2339C, by providing support to Fatah's AAMB, Hamas, and individual terrorists. (Pl. Opp'n Mem. at 22-26.)

Plaintiffs argue that Defendants violated 18 U.S.C. § 2339A by "provid[ing] material support or resources . . . knowing or intending that they are to be used in preparation for, or in

---

[12] The only possible support for implicating the PLO under this theory is that Plaintiffs refer to Marwan Barghouti in at least one section of their memorandum in opposition to Defendants' motion as a "Senior PLO leader." (Pl. Opp'n Mem. at 25.) However, in their Rule 56.1 statement, Barghouti is identified as a member of the AAMB and the Fatah Secretary General, not a PLO employee. (Pl. 56.1 ¶¶ 6, 39-44). If Plaintiffs' argument here is premised on the interconnectedness between Fatah and the PLO, that is not sufficient evidence for a reasonable jury to conclude that as a function of his association with Fatah, the PLO is liable for his actions.

carrying out, a violation of" specific violent crimes.[13,14]   According to Plaintiffs, Defendants provided support to terrorist groups by providing personnel, weapons, funds, and a safehouse.

Plaintiffs also rely on 18 U.S.C. § 2339B on the grounds that Defendants knowingly provided, attempted to provide, or conspired to provide material support or resources to a foreign terrorist organization ("FTO"), as designated by the Secretary of State under Section 219 of the Immigration and Nationality Act.[15]   "Material support" under this section has the same meaning as under Section 2339A.

Under 18 U.S.C. § 2339C, it is illegal "by any means, directly or indirectly, unlawfully and willfully [to] provide[] or collect[] funds with the intention that such funds be used, or with the knowledge that such funds are to be used, in full or in part, in order to carry out" certain terrorist activities.  18 U.S.C. § 2339C(a)(1).

Section 2339 makes it unlawful to harbor a person who Defendants knew or had reasonable grounds to believe committed or was about to commit an offense relating to acts of terrorism. *See* 18 U.S.C. § 2339.

---

[13] "Material support or resources" includes "currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation." 18 U.S.C. § 2339A(b)(1).

[14] Section 2339A itself requires that Defendants' support be for a specific violent crime.  Plaintiffs claim that the violent crimes at issue here include bombing in violation of §§ 832, 2332a, and 2332f, or murder in violation of §§ 956 and 2332.  (Pl. Opp'n Mem. at 23.)  Certain of these statutes were enacted after the attacks at issue.  Thus, Plaintiffs have no triable claim to present to the jury under Section 2339A insofar as it is premised on a violent action that was not criminal at the time of the relevant attacks.  In other words, this Court will not apply retroactively the predicate criminal acts to support a Section 2339A claim.

[15] "To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization (as defined in subsection (g)(6)), that the organization has engaged or engages in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act), or that the organization has engaged or engages in terrorism (as defined in section 140(d) (2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989)." 18 U.S.C.A. § 2339B(a)(1).

As with Plaintiffs' claims of indirect liability under a theory of respondeat superior, the evidence must be sufficient for a reasonable jury to find that Defendants violated these provisions with the requisite mental state and that the support provided to terrorist groups proximately caused Plaintiffs' injuries.

### i.       Support to Hamas[16]

Plaintiffs allege that Defendants violated the ATA (specifically Sections 2339, 2339A, 2339B, and 2339C) by providing material support in the form of money, a phone, weapons, bomb-making supplies, and a safehouse to Abdullah Barghouti who was a Hamas operative and known terrorist. (Pl. Opp'n Mem. at 26-27; Pl. 56.1 ¶¶ 72-79.) Based on the cited evidence, a reasonable jury could conclude that the PA's support of Abdullah Barghouti was accompanied by the requisite mental state and proximately caused the July 2002 Hebrew University bombing. (Pl. 56.1 ¶ 79); *see also supra* Section I.A.vi. Therefore, the Coulter, Carter, Blutstein, and Gritz Plaintiffs have raised a triable issue of fact for the jury regarding Defendants' support of Hamas via their direct support for Abdullah Barghouti. (*See id.* ¶¶ 228-68.)

### ii.      Support to the AAMB

#### Personnel

Plaintiffs claim that because the PA employees, specifically its police and security forces, assisted the AAMB with the attacks at issue, the PA provided material support in the form of personnel in violation of Section 2339A. However, Plaintiffs' argument is premised on the fact that some PA employees are AAMB members, (*see* Pl. 56.1 ¶¶ 80-82), which is insufficient to prove that the PA provided their employees to the AAMB with the knowledge or intent that they would assist in terrorist acts. Thus, Plaintiffs may not proceed under Section 2339A on the

---

[16] The U.S. designated Hamas as an FTO in 1997. *Goldberg*, 660 F. Supp. 2d at 415.

grounds that Defendants provided the AAMB with personnel.

***Weapons***

To show that Defendants provided the AAMB with weapons, Plaintiffs rely primarily on the Israeli Military Court conviction of Fouad Shubaki and his custodial statements, including that "[a]ll of the al-Aqsa Martyrs organizations used the weapons which were supplied by the security forces which carried out the massive procurement." (*Id.* ¶ 88.) He further explained that the PA Finance Office acquired these weapons at the direction of Yasser Arafat "so that he himself would be able to control everything that happened." (*Id.*) If this evidence is admissible, a jury could reasonably conclude that Defendants had the requisite knowledge under Section 2339A that their provision of weapons would be used in attacks perpetrated by the AAMB, satisfying the mental state and causation requirements.

Under Section 2339B, Plaintiffs can also proceed on their "material support to an FTO" claim. To demonstrate intent under Section 2339B, Plaintiffs must establish that Defendants had "knowledge about the organization's connection to terrorism," rather than "specific intent to further the organization's terrorist activities." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 16-17 (2010); *United States v. Al Kassar*, 660 F.3d 108, 129 (2d Cir. 2011). Pursuant to the Second Circuit's recent decision in *Weiss v. National Westminister Bank PLC*, the question here is whether Defendants had knowledge that, or exhibited deliberate indifference to whether, they were providing support to a terrorist organization, rather than whether their support aided terrorist activities of the terrorist organization. 768 F.3d 202, 205, 208 (2d Cir. 2014) (citations omitted) ("[A] defendant has knowledge that an organization engages in terrorist activity if the defendant has actual knowledge of such activity or if the defendant exhibited deliberate indifference to whether the organization engages in such activity."). Defendants still argue that a

18

reasonable jury would be unable to find that the provision of weapons proximately caused Plaintiffs' injuries.  However, a direct connection between providing material support to the terrorist organization and injury to Plaintiffs is not required.  *Cf. Gill*, 893 F. Supp. 2d at 556 ("[T]he money alleged to have changed hands need not be shown to have been used to purchase the bullet that struck the plaintiff.") (citations and quotations omitted).  Instead, the question is whether the resulting harm to Plaintiffs was foreseeable.  Thus, it is a factual issue for the jury whether Defendants provided weapons to the AAMB with the requisite knowledge of the AAMB's connection to terrorism (as provided in Section 2339B(a)(1)).[17]

***Funds***

Plaintiffs also argue that the PA provided funds to the AAMB and individuals involved in terrorist acts in violation of the ATA (specifically Sections 2339A, 2339B, and 2339C).  While Plaintiffs' evidence demonstrates an attenuated connection in some instances between the provision of funds and the terrorist acts at issue, there is sufficient evidence for a jury to determine if the requisite scienter and causation requirements are met under the relevant statutes.  For example, Plaintiffs cite a report stating that "[d]ocuments . . . show direct payments from the PA to Fatah party activists, some of whom were also affiliated with the [AAMB]" and "[t]he payments were likely made with the knowledge that the intended recipients had been involved in violence and terrorism."  (Pl. 56.1 ¶ 83; *see also id.* ¶ 84 (citing evidence to support that the PA gave funds to Fatah activists, including AAMB commanders and individuals involved in violent attacks); *id.* ¶ 85 (citing evidence supporting that in early 2002, Arafat signed a check for then-fugitive Nasser Shawish, who later carried out the January 22, 2002 shooting at issue in this

---

[17] A reasonable jury could conclude that support in the form of weapons provided to the AAMB violated Section 2339B at the earliest on March 27, 2002, at which time the AAMB was designated as an FTO. Similarly, and as discussed below, a jury could reasonably conclude that Defendants violated Section

case)).  Plaintiffs also intend to show that Fatah leader Marwan Barghouti served as the direct line between Yasser Arafat, chairman of the PA, and the AAMB for purposes of obtaining PA funds to support AAMB members.  (*Id.* ¶ 86; *see also id.* ¶¶ 87, 195).  Therefore, assuming this evidence is admissible, Plaintiffs may proceed on these claims.

### *Harboring Terrorists*

Finally, Plaintiffs argue that support was provided to the AAMB in the form of harboring terrorists.  Plaintiffs rely primarily on evidence that Defendants at times had known terrorists in custody or had the capacity to arrest known terrorists and released or failed to arrest them.  (*See* Pl. 56.1 ¶¶ 114-15, 121, 170, 190-93.)  Viewing the disputed facts in the light most favorable to Plaintiffs, that is a factual issue that may be presented to the jury.

Therefore, Plaintiffs have demonstrated triable issues under 18 U.S.C. 2339, *et seq.*, regarding Defendants' support of the AAMB and Hamas.

## II.   Non-Federal Law Claims

Defendants claim under their fourth affirmative defense that they lack capacity to be sued on non-federal claims.  (Pl. Mem., ECF No. 492.)  Plaintiffs assert that under New York choice of law rules, this Court should apply Israeli law in determining that Defendants have capacity.  In the alternative, Plaintiffs contend that Defendants should be sued as "public bodies" under New York law.  Defendants argue that New York law applies, and under New York law, they are "unincorporated associations" and therefore may not be sued on Plaintiffs' non-federal claims.

Pursuant to Federal Rule of Civil Procedure 17(b)(3) and N.Y. C.P.L.R. § 1025, Defendants do not have the capacity to be sued on Plaintiffs' non-federal claims under New York law.

---

2339B insofar as they provided any funds to the AAMB after the AAMB was designated an FTO.

Federal Rule of Civil Procedure 17(b) addresses the applicable law to determine if a defendant has the capacity to be sued. If the defendant is an individual sued in her individual capacity, the law of the defendant's domicile determines capacity. Fed. R. Civ. P. 17(b)(1). If the defendant is a corporation, the law under which it was organized determines capacity. Fed. R. Civ. P. 17(b)(2). Finally, "for all other parties," the law of the state where the court is located determines whether the defendant has the capacity to be sued. Fed R. Civ. P. 17(b)(3); *see also La Russo v. St. George's Univ. of Med.*, 747 F.3d 90, 95 (2d Cir. 2014). Here, the parties agree that Defendants are neither individuals nor corporations. Thus, they are captured by the catch-all language of Rule 17(b)(3), and the law of the forum state applies—i.e., New York law.[18]

Thus, applying New York law, the parties dispute whether Defendants are "unincorporated associations," pursuant to N.Y. C.P.L.R. § 1025,[19] or "public bodies," pursuant to N.Y. C.P.L.R. § 1023.[20]

Courts that have considered this issue agree that Defendants are most appropriately treated as unincorporated associations. *See Estate of Parsons v. Palestinian Auth.*, No. 07-cv-

---

[18] Plaintiffs argue that applying New York law requires that this Court apply New York's choice of law rules. Under New York's choice of law rules, Plaintiffs contend that Israeli law applies, and that under Israeli law, Defendants have the capacity to be sued as to all of Plaintiffs' claims. Even applying New York's choice of law rules, Plaintiffs do not articulate why Israel would have a greater interest where U.S. citizens are the victims of terrorism. Moreover, Rule 17(b) is itself a choice of law provision, and does not require that this Court take the additional step of determining if New York choice of law requires application of foreign law as to the issue of capacity. Moreover, the record does not support a conclusion that Plaintiffs have complied with Federal Rule of Civil Procedure 44.1 by timely indicating their written intent to rely on foreign law. *See* Fed. R. Civ. P. 44.1.

[19] "[A]ctions may be brought by or against the president or treasurer of an unincorporated association on behalf of the association in accordance with the provisions of the general associations law." N.Y. C.P.L.R. § 1025.

[20] "When a public officer, body, board, commission or other public agency may sue or be sued in its official capacity, it may be designated by its official title, subject to the power of the court to require names to be added." N.Y. C.P.L.R. § 1023.

1847, ECF No. 14 at 13-14 (D.D.C. Sept. 30, 2008) (treating the PA and PLO as unincorporated associations and dismissing the non-federal claims); *see also Estate of Klieman v. Palestinian Auth.*, 467 F. Supp. 2d 107, 113 (D.D.C. 2006) ("It has also been determined by other federal courts that the PLO qualifies as an unincorporated association under Rule 4(h) of the Federal Rules of Civil Procedure for purposes of service of process, because it is 'composed of individuals, without a legal identity apart from its membership, formed for specific objectives.'") (quoting *Estate of Ungar v. Palestinian Auth.*, 153 F. Supp. 76, 89 (D.R.I. 2001)); *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 739 F. Supp. 854, 858 (S.D.N.Y 1990), *vacated and remanded on other grounds by* 937 F.2d 44 (2d Cir. 1991) ("Rather, as its name indicates, the PLO is an organization . . . composed of individuals, without a legal identity apart from its membership, formed for specific objectives.  For present purposes, it may be treated as an unincorporated association."). "At common law, an unincorporated association is not an entity, and has no status distinct from the persons composing it, but is, rather, a body of individuals acting together for the prosecution of a common enterprise without a corporate charter but upon methods and forms used by corporations." 6 Am. Jur. 2d Associations and Clubs §1.[21]

Defendants are therefore unincorporated associations that lack the capacity to be sued

---

[21] Plaintiffs are correct that Defendants do not fit perfectly within the description of an unincorporated association as described in cases such as *Martin v. Curran*, 303 N.Y. 276, 280-81 (N.Y. 1951).  For example, Defendants explain: "[S]ince its creation by the PLO, the PA has provided many government services, including local policing and civil authority over traditional matters such as agriculture, banking, employment, environment protection, unclaimed property, health, labor, zoning, postal services, social welfare, telecommunications, transportation, water and sewage, and that the PA has a police force and levies taxes." (Def. Reply to Pl. 56.1, ECF No. 523-1, at 6.)  However, Defendants advance these arguments to support a finding that they are a non-recognized foreign government, and are therefore immune from suit.  This Court again rejects this argument.

under New York law as to Plaintiffs' non-federal claims.[22]

## CONCLUSION

Defendants' motion for summary judgment is DENIED with respect to the ATA claims of vicarious liability against the PA, except it is GRANTED as to the Mandelkorn Plaintiffs' ATA claim of vicarious liability.  Defendants' motion for summary judgment is GRANTED with respect to the ATA claims of employer vicarious liability against the PLO.  Defendants' motion for summary judgment is DENIED with respect to the ATA claims of direct liability.  Defendants' motion for summary judgment is GRANTED as to Plaintiffs' non-federal claims.

Dated: November 19, 2014
    New York, New York

SO ORDERED:

GEORGE B. DANIELS
United States District Judge

---

[22] Five plaintiffs are not pursuing ATA claims, namely: Varda Guetta, Revital Bauer, Shaul Mandelkorn, Nurit Mandelkorn, and Scott Goldberg.  (Pl. Objections to Def. Proposed Jury Instructions, ECF No. 591, at 46.)  Therefore, these plaintiffs are dismissed from this case.