PLAINTIFF'S EXHIBIT 384

**Date: June 2, 2005**          1          **Case No.: 5398/03**

## The Military Court

### Samaria

### – Transcript –

| | | |
|---|---|---|
| Court hearing:<br>June 6, 2005 | Before a panel: | Lt. Col. Erez Hasson – **President of the Court**<br>Major Eliyahu Nimni – **Judge**<br>Captain Erez Seri - **Judge** |

Prosecutor: Captain Irit Deitsh

Defense Counsel: Adv. Darawshe

**Defendant: Majed Ismail Mohamed Masri, Identity No. 904460862**

Stenographer: Sergeant Alina

Interpreter: Sergeant Baha

**- The President of the Court has identified the Defendant -**

## Verdict

Owing to the large scale of this case, the arguments for the verdict are still being written. However, we shall now provide a summary of the verdict.

We have seen fit to convict the Defendant of the offenses that have been attributed to him in the indictment, with the exception of Count No. 4, which the prosecution has withdrawn. The Defendant is convicted of the following offenses:

**Membership in an illegal organization**, an offense pursuant to Regulation 85(1) (A) of the Defense Regulations (Time of Emergency), 1945.

**Holding of an office**, an offense pursuant to Regulations 85(1) (B) of the Defense Regulations (Time of Emergency), 1945.

**Shooting at a person**, an offense pursuant to Section 58(A) of the Defense Regulation (Time of Emergency) 1945.

[Stamp] P 6: 11

**Attempt to shoot at a person**, an offense pursuant to Section 58(A) of the Defense Regulation (Time of Emergency) 1945 and Sections 19, 20 of the Rules of Liability for an Offense Order (Judea and Samaria (No. 225), 5728-1968.

**Causing intentional death**, an offense under Section 51 of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 (**10 counts**).

**Attempt to cause intentional death**, an offense under Section 51 of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Sections 19, 20 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968 (**3 counts**).

**Conspiring to cause intentional death**, an offense under Section 51 of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Sections 21, 22 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

It shall be clarified that on the matter of the primary counts of the indictment, i.e. the offenses of murder, the Defendant is convicted as a primary accomplice, in view of his senior status in the organization; the fact that he was involved in operative stages of executing the murders, including the filming of the suicide terrorist; financing the attack and delivering the weapon that was used in it.

Issued and notified this day, June 2, 2005, in public and in the presence of the parties.

| [Signature] | [Signature] | [Signature] |
|:-----------:|:-----------:|:-----------:|
| **Judge** | **President of the Court** | **Judge** |

[Stamp] P 6: 11 [continued]

2

#### Evidence for sentencing

P: There is no evidence for sentencing.

D: There is no evidence for sentencing.

#### The Prosecutor summates:

Today, the Defendant is standing trial for his responsibility as the primary perpetrator of the act of causing the deaths of 10 human beings. Alongside this, the Defendant has been convicted of severe, extensive security activity, actions which, when examined, make clear the single aim and purpose of his determination – the taking of human life. While the Defendant is the last to stand trial, after all the "protagonists", i.e. the perpetrators of the attack in Metzer and in Hermesh, to my mind, in many respects, he may be considered the first and foremost of them.

As an aspect of the severity, it is not possible to ignore his senior status in the Tanzim Organization. We have learned to our regret that although terrorism often strikes out against random victims, it also has its own rules, or to be more precise, interests, which involve cynicism surrounding human life. It is often convenient to carry out one particular attack or another, on a certain occasion, with certain timing, in a certain settlement, on either side of the Green Line. Here, in the view of the prosecution, the Defendant had a pivotal role in passing judgment of sorts on the lives of future unknown victims; if he wanted it, a murder would be carried out; if he did not, the lives of the victims would be spared.

I shall emphasize that prior to the attack in Hermesh, the explicit consent of the Defendant was required for arch-murderer, Mohamed Naifa, to carry out the attack. The consent of the Defendant was given, and only afterward did the next stages take place, which as we might recall led to the death of three human beings. The Defendant went further after carrying out the attack; possibly as a sign of its success, the Defendant transferred money to Mohamed Naifa, exactly because of the "success" of the attack. And if anybody wonders at this, this is no accident, as the Defendant served in a capacity in which he transferred money on different occasions and with routine regularity to key operatives in the organization.

The action of the Defendant had a pivotal contribution to the commission of the attack in Metzer too, as he was the one who effectively transferred the weaponry to the murderers involved. Regarding this contribution it is certainly not necessary to describe at length the causal relationship between his acts here and the outcome.

[Stamp] P 6: 12

3

With respect to the attack in Jaffa Street in Jerusalem, the Defendant served as the photographer of the suicide terrorist prior to his departure for the attack. The prosecution asserted on more than one occasion before this Honorable Court the cardinality that it finds in this action. I shall briefly emphasize that another severe aspect of the suicide attacks that were unleashed against us is the media coverage that follows them, whose effect is intimidation, incapacitation and sowing of terror in the lives of every Israeli, whoever and wherever he may be. The death images of those suicide attackers are a major contributing factor in that they serve as a graphic example to people who will follow in their footsteps. Moreover, the prosecution contends that the act of photographing [the perpetrator] serves to facilitate directly, in the end, the commission of the offense itself by that suicide attacker inasmuch as this act constitutes encouragement of that suicide attacker and reinforces his decision to depart to carry out the attack.

The prosecution will refer in this matter its pleadings in the case of Iad Nasser, Court Case 5572/03. In that case, the Defendant was sentenced to life imprisonment, but not for the reason that the prosecution requested, which was participation in the photographing of the suicide attacker, but due to the many offenses that were attributed to him. However, I must point out that the prosecution filed an appeal against his case and it is still pending in the Appellate Court.

I also wish to refer to the case of Kamil Shaablu, who was tried in this Court, in which the Court accepted the position of the prosecution with respect to the genuine contribution of the act of the photographing of the suicide attacker.

Today, a circle has been closed. The blood of the victims of the Defendant calls out to the Court and the prosecution will request that he be sentenced to 10 consecutive terms of life imprisonment for each life that he has taken. The prosecution will also request another term of imprisonment, set in years, for the other offenses for which the Defendant has been convicted.

[Stamp] P 6: 12 [continued]

4

Date: June 2, 2005          3          Case No.: 5398/03

### Defense counsel summates:

The Defendant has denied all along everything that has been attributed to him in the indictment, but his conviction today before the Court constitutes a grievous blow to the Defendant and to his family. The Defendant, in the direct examination and cross examination in the Court and in his interview by the police alike condemned acts of violence against the State of Israel.

This is a defendant who has been subjected to a miscarriage of justice in the legal proceeding before the Court.

The Defendant is a 32 year old man. He is the sole supporter of his family, and has two children. His wife is here and his sick mother is with us too. The Defendant has a great deal of debts and a mortgage. Prior to the event that is the object of the indictment, the Defendant worked as an officer in the Palestinian Police. He worked with devotion and loyalty. The financial situation of the Defendant is very bad. His small children are learning at school and they need their father to support them financially and it is important for their father to with them.

The Defendant is a sick man; he has problems with his legs.

I have other arguments, as I have not yet received the reasons. The Defendant has no blood on his hands – that is what he has contended throughout the proceeding. Even the conduct of the Defendant is not like that of the other defendants, who would have admitted the acts that they had committed, but the Defendant is not doing this.

We ask for the Court to consider the circumstances.


Defendant:

I have brought the evidence to the Court form the outset. The prosecution has sealed my fate from the outset. I have said that I am not scared, except of God alone, and that I am against the murder of Israeli and Palestinian civilians. I was an officer in the Palestinian Police and I have been framed by car thieves. I have respected the Court until now. I hope that you take into account all these things; you care for your children; I have children, too.

[Stamp] P 6: 13

5

Date: June 2, 2005                          4                          Case No.: 5398/03

## Sentence

The Defendant has been convicted, as set forth in the verdict, of the offenses that are attributed to him in the indictment (except for the fourth count, which the prosecution withdrew). This is a list of vicious, grave offenses, of unparalleled severity, which reveal the responsibility of the Defendant for the murder of ten human beings, and a list of additional offenses, including attempt to cause intentional death, shooting and more.

The Defendant assumed the function of the head of the Al Aqsa Brigades in the Nablus area, in which capacity he orchestrated many attacks that were dispatched under his guidance, with his financing, with his blessing and using weapons that he had provided.

The Defendant was involved in a series of suicide attacks, in which he and his fellow bloodthirsty organization members dispatched one suicide attacker after another, who sowed murder and death in the streets of Israel's cities. The facts of the indictment, for which the Defendant was convicted, describe at length the detailed stages that preceded the dispatch of the murderers to the scene of the carnage.

The Defendant, in his senior role, was the one who orchestrated this shameful death industry and gave instructions to the operatives who answered to him to send attackers to mass murders. However, the Defendant did not make do with a merely "ministerial function", but was also a full accomplice in dispatching the actual attackers, including the photographing of a suicide attacker in one case, the financing of another attack and the supplying of the instruments of murder in a third event.

This is the place to emphasize facts that also arise in the verdict, that the full responsibility of the Defendant for the acts is also learned both from the degree of his "operative" involvement, and his senior status that arises throughout the evidence material. It has been found that in the Nablus area, the Defendant handed down judgment on matters on life and death, and exploited his authority over others to dispatch murderers. The Defendant is the one who hastened to take responsibility for the murders before the media, as well.

[Stamp] P 6: 14

6

The Defendant is the one who is responsible, along with his fellow murderous gang members, for the bloody attack in Jaffa Street in Jerusalem, in the settlement of Hermesh and in Kibbutz Metzer. As a result of his acts, ten human beings met their deaths, including two small children in Kibbutz Metzer, whose mother was murdered with them; two residents of the kibbutz, girls who were murdered a short distance from their home in the settlement of Hermesh; and women who walked down the street in Jaffa Street in Jerusalem. The bloody attacks in Jaffa Street, in the settlement of Hermesh and in Kibbutz Metzer shocked the country with their cruelty and vileness

The Defendant did not put an end to his acts, even when his victim count increased, and even when the ages of the victims decreased. In the wake of the murder of little children, the Defendant did not rest from his acts and continued to spin the webs of death through his acts. The Defendant unhesitatingly ordered the human animal, the murderer Sirhan Sirhan, to carry out another murder, which fortunately was not completed.

Indeed, apart from the many murders for which he has been convicted, and apart from the injuries that he has caused to those who survived the terrible attacks of the attackers whom he dispatched, the Defendant also engaged in acts of shooting and attempted shooting.

[Stamp] P 6: 14 [continued]

7

Date: June 2, 2005                              5                              Case No.: 5398/03

As we have stated in the verdict, we have found that the role of the Defendant is one of a full accomplice. Indeed, the fact that the Defendant acted with cowardice and hid behind the video camera and dispatched others to kill and be killed, that he hid behind orders that he gave to others, that he wrapped his cowardice in wads of money, that he took responsibility for the acts of others, the fact of the cowardice of the Defendant does not mean that he will escape the sentence that befits him and others like him. The Defendant is fully responsible for the deaths of ten innocent human beings, and he shall not evade his culpability with respect thereto.

**We sentence the Defendant to 10 consecutive sentences of life imprisonment.**

**Right of appeal pursuant to law from the day of provision of the reasons for the verdict to the parties**

Issued and notified, February 6, 2005, in public and in the presence of the parties.

| [Signature] | [Signature] | [Signature] |
|---|---|---|
| **Judge** | **President of the Court** | **Judge** |

[Stamp] P 6: 15

8

Date: June 28, 2005                    1                    Case No.: 5398/03

## The Military Court

### Samaria

#### – Transcript –

Before a panel:    Lt. Col. Erez Hasson – **President of the Court**
                   Major Eliyahu Nimni – **Judge**
                   Captain Erez Seri - **Judge**

Prosecutor: Captain Irit Deitsh
Defense Counsel: Adv. Darawshe

#### Defendant: Majed Ismail Mohamed Masri, Identity No. 904460862

- The President of the Court identifies the Defendant –

## Verdict

### The charges and the arena of the dispute:

On February 6, 2005, we handed down the verdict of the Defendant and sentenced him. As promised, our full reasons for the verdict are as follows.

A grave and lengthy indictment was filed against the Defendant, regarding both the severity and the scope of the offenses. The Defendant is charged with having served in 2002 as the head of the Al Aqsa Brigades in the Nablus area, in which capacity he orchestrated the execution of a number of attacks – including the bloody attack on Jaffa Street in Jerusalem, in the settlement Hermesh and in Kibbutz Metzer – in which 10 people met their deaths, including two toddlers and their mother, and dozens of others were injured. The Defendant is also charged with acts of shooting and attempting to shoot at a person and conspiring to cause intentional death.

The Defendant pled not guilty to all the charges attributed to him, both in his answer to the indictment and (for most charges attributed to him) in his police interview, and the indictment against him is based on many incriminatory statements made by his colleagues and fellow organization members and murderers. It must be noted initially that the central issue in this case pertains to the identification of the Defendant, who is usually referred to by his colleagues as "Bazbaz" – which alias the Defendant denies.

[Stamp] P 6: 16

1

Alongside the Defendant's denial of his involvement in the acts of murder, there is no genuine dispute concerning the occurrence of the events (in view of the consent of the defense to the submission of the technical evidence material[1]), or, it seems, concerning the part of the other persons involved, most of whom have already been tried and convicted for their acts.

**The evidence:**

**The statements of the Defendant:**

The witness before us, First Sergeant Matanes Hadad, took two of the statements of the Defendant. His testimony indicates that the interviewing of the Defendant took place in an ordinary manner. Indeed, no procedural arguments were made by the Defendant, not in the general sense or towards the witness Hadad in particular, and the defense also consented to the submission of the statements of the Defendant that were taken by the witness.

In its summations, the defense asked that it be determined that the statements of the Defendant should be given less weight, owing to the fact that the statement was not written in Arabic, that it had not been recorded and that the witness did not conduct an identity line-up involving the Defendant.

[Stamp] P 6: 16 [continued]

---

[1] See transcript of September 2, 2003, page 1.

2

Date: June 28, 2005                          2                    Case No.: 5398/03

We have not seen fit to accept the arguments of the defense in this regard. A reading of the two statements of the Defendant makes it clear that the Defendant was offered a chance for his statements to be written in his own handwriting, but he refused to do so, and also refused to sign [them]. It shall be noted that in the first statement, the Defendant also explained this refusal by saying that he did not "recognize the legality of the judicial proceedings of the Israeli occupation". It shall be further noted that the act of the offer to write the statement and the refusal thereof were carried out by police investigator Hadad in the presence of his colleague, First Sergeant Lutuf Marai. In view of these things, it is not clear what the advantage of writing the statement in Arabic or Hebrew would have been.

The Defense Counsel did not show us the statutory source of the alleged duty of the investigator to record the interview and why the statement should allegedly be disqualified for this reason. An inspection of the statements and the testimony of the statement taker indicates that the conditions of the "Regulations of Judges", which assess the admissibility of statements, were upheld, including giving a warning as required by law, giving an opportunity to write and sign the statement, reading out the translated statement at the end of the interview and so on. The recording of the investigation is not a condition for the admissibility of the statement according to the laws of the Area, and does not diminish its weight.

Concerning the identity line-up, as the Prosecutor declared[2], the taker of the statement was not in charge of the overall interviewing of the Defendant, and questions on the alleged deficiencies in the interviewing must be addressed to his investigators. We shall attend to the issue of the duty of conducting an identity line-up below.

Concerning the weight of the statements, we have not found any reason to give them less weight. On the contrary, the statements indicate that the interview was conducted in a positive atmosphere, during which the Defendant was also offered a cup of tea and a cigarette and he went out for lunch.[3] The Defendant confirmed that he felt well. In the statements, the Defendant confirmed his relations with the other witnesses of the prosecution, who will be discussed below.

[Stamp] P 6: 17

---

[2] *Ibid*, page 2 lines 22-24.

[3] See P / 1, page 2 line 1; page 5 lines 25-26.

3

The Defendant gave detailed descriptions of money transfers that he made, his relations – which had ups and downs – with other operatives, addresses of websites that he used and other such details that seemed to have come from firsthand knowledge.

Concerning the arguments of the defense in its summations whereby "the Defendant denied that which was attributed to him in the indictment, cooperated with his investigators in his police interview, gave full details and full information, but throughout his interview by the police and his examination in the Honorable Court, the Defendant did not admit the acts that were attributed to him" (Section C of the summations of the defense) – it would have been better for these words, which are completely detached from reality, never to have been written, inasmuch as a simple reading of the statement would have spared the defense the need to write them.

In conclusion – we have seen fit to accept the statements of the Defendant and give them full weight.

#### Prosecution witness Mohamed Naifa:

The witness Mohamed Naifa testified before us on September 2, 2003, and his testimony effectively consisted of the direct examination only, in view of the refusal of the witness to continue his testimony, as set forth on page 6 of the transcript on that day. There is no genuine dispute that he was the person responsible for the bloody attack in the settlement Hermesh and in Kibbutz Metzer.

First, we must address the argument of the defense that the Defendant has fallen victim to a distortion of justice insofar as the cross examination of the witness was not completed and that in such a state of affairs his statements must not be admitted pursuant to Section 10 A. Indeed, the witness was brought in to give testimony and the Court and the parties convened in order to hear his testimony in full. This testimony was interrupted solely due to the wish of the witness, who refused to continue to answer the questions that he was asked. The Court took a list of steps in order to continue the hearing of the testimony, including calling the Defense Counsel of the witness, but the witness persisted with his defiance (see the course of events on pages 6-7 of the transcript of that hearing, including our decision that ended the testimony).

[Stamp] P 6: 17 [continued]

4

It is well known that since the Supreme Court handed down its famous verdict on the matter of Haj-Yahya, in Additional Criminal Hearing 4390/91, **State of Israel v. Haj Yahya**, PD 47 (3) 661, there has been a rule in effect concerning the status of "the silent witness", a rule which was handed down by an expanded panel of justices of the Supreme Court, which also considered a silent witness to be a witness whom the parties were given an opportunity to examine. As a result, the way is open to filing his statements according to Section 10 A of the Evidence Ordinance. See also on this matter **Judea and Samaria Appeal 114+99/00**, which is also referred to in our decision on that day. The Defense Counsel cited in his summations a list of references from which it may, according to his claim, be learned that in the absence of a cross examination, the weight of the testimony should be canceled altogether, but these are very old judgments, from the 1970s and earlier, all of which were before the Haj-Yahya rule was accepted, and some of which were handed down even before the amendment to Section 10A of the Evidence Ordinance was passed.

[Stamp] P 6: 17 [continued]

5

Date: June 28, 2005                            3                              Case No.: 5398/03

The other conditions underlying Section 10A have been fulfilled, including the fact that the witness confirmed the giving of his statements[4] and the existence of material contradictions between the testimony and the statement (the Prosecutor stated a long list of contradictions in her summations without the defense having disputed this in its summations. We must mention, for example, the differences in accounts between the testimony and the statement concerning the identification of the Defendant, the background to receiving the sum of $3,000 from him and more).

After we found that the conditions for the admissibility of the statements of Mohamed Naifa pursuant to Section 10A of the Evidence Ordinance had been fulfilled, we also saw fit to prefer the statements of the witness over his partial testimony before us. We shall explain why below:

- Firstly, it is important to point out in general that even from the partial, arbitrary testimony of the witness before us, the witness confirms the highlights of his incrimination of the Defendant in his statement. The witness confirms in his testimony before us, albeit after being evasive several times, that he had received[5] a weapon from a person called "Bazbaz" and had also received from him an amount of $3,000 after the Hermesh attack. However, the witness contended that the Defendant was not the same Bazbaz, but this does not add or diminish anything, because his testimony does not indicate that he had met that "Bazbaz" in any case, but contacted him based on a telephone number that he had received by way of inheritance from Raed Karmi, when he took his place as the head of the Al Aqsa Brigades in the Tulkarm area. He did not receive the weapons and money from "Bazbaz" directly either, but through couriers. This account of the Defendant's, in his statement, albeit partial, also indicates that the transfers of money and weapons from him to the witness were through couriers. This means that even based on the limited account of the witness, his incrimination of the Defendant still remains unchanged.

[Stamp] P 6: 18

---

[4] See transcript of the statement of Mohamed Naifa dated September 2, 2003, page 5 lines 14-30.
[5] *Ibid*, page 3 line 46 to page 4 line 13; page 5 lines 42-45.+

6

- In his various statements, the witness elaborates further than the limited account that he provided in his partial testimony before us. We have seen fit to accept the statements of the witness. Inspection of the statements reveals them to be of very great weight. The witness wrote one of the statements in his own handwriting and started to write the other one, but stopped writing it of his free will. The statements were given by the witness after he was duly warned and he signed the bottoms of the statement pages. In the statements, the witness assumes responsibility for vicious, terrible murderous acts, while providing extensive details on the circumstances that preceded their execution. A comparison of the content of the statements to the rest of the evidence material before us, including the statements of the Defendant, which confirms his acquaintance with the witnesses and the transfer of the weapon and the money to him, further supports the weight of the statements of the witness.

Therefore, we have seen fit to accept the statements of the witnesses, both by virtue of the adoption of their content in general, by the witness during his testimony, and by virtue (to the extent that this relates to the contradictions between the account of the witnesses and the written content of his statements) of Section 10A, for the reasons set forth above.

## Prosecution witness Mansour Sharim:

This witness, who testified before us on November 30, 2003, also bears his share of guilt and is also responsible for a list of vicious murders.

Firstly, we shall address the issue of the request of the prosecution in its summations to accept the statement of the witness pursuant to Section 10A. The request of the prosecution indicates that it had forgotten to submit the statement during the hearing of June 14, 2004, and it now wishes to correct the error. The Defense Counsel objects to submission of the statement at present, because the request is being made after the end of the prosecution case and this represents infringement of the defense of the Defendant.

[Stamp] P 6: 18 [continued]

7

We can only address, once again, the reference **Judea and Samaria Appeal 114+99/00**, which was mentioned earlier in this verdict in another context, and is also cited by the learned prosecution in its summations. The Appellate Court cites the well-known statements of the late Honorable President Zamora, which seem to have found their place in the pantheon of criminal procedure since having been uttered – as early as in the first criminal appeal that was heard by the Supreme Court of the State of Israel!! Indeed, President Zamora tells us that a criminal procedure is not the same as a chess game in which one wrong move is enough to settle its outcome forever. The Appellate Court has recognized the possibility of summoning witnesses or filing evidence on the part of the prosecution after the end of the procedural stage, even if this means that such motions may be permitted restrictively, even if the prosecution must avoid this, subject to the qualification that this must not impair the defense of the defendant.

In the circumstances of the matter before us, we have not seen a reason to believe that accepting the request of the prosecution, even in the summations stage, is wrong in any way. **First,** there is no doubt that the request of the prosecution was made in good faith and not out of improper tactics. An inspection of the transcript of the hearing of June 14, 2004 will reveal that the prosecution had filed a list of motions for submitting material pursuant to Section 10

[Stamp] P 6: 18 [continued]

8

Date: June 28, 2005        4              Case No.: 5398/03

A, and there is no doubt that the motion to file the statement of the witness Mansour Sharim had been forgotten inadvertently. **Second**, the request of the prosecution is unsurprising. The prosecution heard the testimony of the witness Mansour Sharim, confronted him with his words in the statement, announced in advance and using clear words its intent to hear the testimony of the taker of his statement Ya'akov Barazani[6], and also heard the testimony of the taker of the statement concerning the circumstances in which the statement was taken (a course that has no other explanation except its wish for the statement of the witness to be submitted pursuant to Section 10A). **Third**, the late motion to submit the statement of Mansour Sharim constitutes no impairment of the defense of the Defendant. The witness testified and was examined by the parties, including a cross examination by Counsel for the Defendant. The Defendant was also given an opportunity to examine the taker of his statement. The Defendant also related in his testimony[7] in the case of the defense to the incrimination of Mansour Sharim **in his statement** and gave an account concerning it. The motion for filing the statement of the witness represents no impairment of the defense of the Defendant.

Having crossed the hurdle of the procedural stage for the filing of the motion, we quickly discover that the conditions prescribed beside Section 10A for admitting the statement are fulfilled in their entirety, for the witness had testified and the parties were given an opportunity to examine him, the giving of the statement was demonstrated, both in the testimony of the witness who identified his statement and the testimony of the taker of the statement, and in view of the existence of material contradictions between the statement and the testimony. We shall now address the question of whether there is reason to prefer the statement over the testimony. Our answer to this question is affirmative and our reasons are as follows:

[Stamp] P 6: 19

---

[6] See transcript of March 30, 2004, page 11 lines 22-23, where it says "taker of the position of Mansour Sharim", should be "statement"

[7] See transcript of the testimony of the Defendant dated June 14, 2004, page 10, lines 12-17

9

A.   The testimony of Mansour Sharim was also confused to the extent that he was requested to give an explanation for the explicit phrases that incriminated the Defendant in his statement, phrases which he asked not to repeat during his testimony. The witness confirmed that he had signed the statement and that the investigator had also read out its content, but asserted his argument that the investigator had written things that were different to what he had said himself when taking the statement. The witness also purported to state with skepticism that the investigator had added things to his statement after it was written before him, but in answer to the question of the Prosecutor, he was not able to elaborate what these things were.

B.   It is best not to discuss the weight of the witness' denial of the things stated against the Defendant in his statement, which was given during the cross examination while the witnesses was parroting answers to a series of blatantly leading questions in accordance with the account that the Defense Counsel put into his mouth.[8] Strangely, without an explanation except for the desire to repeat the account that had been prepared in advance, the Defendant was transformed, during the testimony of Mansour Sharim, from a friend (in the direct examination) to a bad cop (in the cross examination), who had arrested him for the theft of vehicles and treated him roughly, which caused the witness to nurse hard feelings – which account, unsurprisingly, would recur a few sessions later in the statement of the Defendant. Needless to say, these things did not ring true to us in any way.

C.   The witness confirmed in his own words that he was a member of the Al Aqsa Martyrs Organization, and his statements also indicated that he was responsible for a list of vicious murders for the organization, as the holder of a senior position therein. The witness was also able to provide an exact description of the "change of command" chain of the organization in the Nablus area, from Nasser Aweis, through Mahmoud Titi, but when he was asked about the identity of Titi's successor (whom the prosecution claimed to be the Defendant), he suddenly became afflicted with feigned forgetfulness, contended that he did not know the identity of the head of the organization in the Nablus area (to whom he answered himself) and did not make the effort to find out who he was either.

[Stamp] P 6: 19 [continued]

---

[8] See transcript of the testimony of Mansour Sharim dated November 30, 2003, page4.

10

D.   Sharim Mansour's statement stands in contrast to his incoherent, biased testimony before us. The weight of his statement arises both from the taker of the statement, First Sergeant Ya'akov Barazani – who testified before us on June 14, 2004, and in his testimony denied the arguments of the witness and said that the statement had been taken according to the ordinary rules – and by inspection of the body of the text of the statement itself, which the witness signed after being warned. A reading of the body of the statement and the testimony of the taker of the statement reveals that the statement was based on things that the witness wrote in his own handwriting. It is regrettable that the witness was not allowed to write his statement in his own handwriting, but in the circumstances of the matter, after it was proved to our satisfaction – both from our impression of the witnesses and from a comparison with the remaining evidence material that was put forth before us – that the written text in the body of the statement reflects the words of the witness, which were read out to him before he signed them, we did not believe that there was any flaw in the weight of the statement (see on this matter also the fascinating judgment of the Honorable Judge Colonel Friedman in Judea and Samaria Appeal 1129 + 1136 + 1130 + 1137/04).

Therefore, we have seen fit to reject the testimony of Sharim Mansour and prefer his statement over it.

## Prosecution witness Fahed Sharia

This witness testified before us on November 30, 2003 and in his testimony hastened to deny the explicit incrimination statement that he provided against the Defendant, in which he described how he drove the Defendant, along with others, to carry out shooting attacks. When he was requested

[Stamp] P 6: 19 [continued]

11

Date: June 28, 2005                          5                      Case No.: 5398/03

to give an explanation for the explicit incrimination of the Defendant in his statement, he contended that this had been extracted from him using illicit means; that he was forced to sign it; that he was surprised to see the indictment that was filed against him, which included charges to which he had not confessed and so on. We would have made the effort to elaborate the contradictions that arose in the account of the witness on this matter had it not been shown clearly that the witness had kept the procedural arguments concerning the weight of his statements for his testimony in the case of the Defendant only, whereas in his trial[9], he did not raise any of those arguments, and also consented to the submission of his statements, including the statement in question, concerning which he suddenly raised procedural arguments from out of the blue in his testimony. It is also understandable that the procedural arguments of an interviewee concerning his statement, which appear in the trials of others and not in his own trial, are unconvincing.

For all of these reasons, we have seen fit to dismiss the account of the witness concerning his statement, accept his statement (after the conditions set forth in Section 10A have been fulfilled) and prefer it over his testimony.

## Prosecution witness Nasser Aweis

This witness testified before us on March 30, 2004. Despite strongly incriminating the Defendant, as his accomplice in dispatching the suicide terrorist who carried out the murder on Jaffa Street in Jerusalem and as an accomplice in shooting acts, the witness denied the things in his testimony. The witness also contended that he knew the Defendant by his first name only, despite just the content of his testimony revealing that his acquaintance with him was much more established (all the more so when his statements and those of the Defendant reveal that the two had close ties, and were even expelled from the Area and spent a period in Jordan and Baghdad – see below). The witness explained the fact that he incriminated the Defendant in his statements by claims that he raised against investigator Roni Amar, who forced him to write things (the witness himself did not remember the investigator who interviewed him and did not identify him, but stated that he was a bald police officer), but he was not able to elaborate what whose arguments were ("There was a problem with that investigator. I do not remember the details[10]"). He further contended that he did not recognize his statements that were shown to him or his own handwriting, but these words did not impress us, as the witness barely made the effort to look at the statements before replying.

[Stamp] P 6: 20

---

[9] See the transcript of the trial of the witness (Samaria 5004/03) dated May 4, 2003 and July 16, 2003 (P 72 + 73) and the transcript of the remand hearing of December 12, 2002 (P/ 71). The transcripts from the trial of the witness were accepted at the request of the prosecutor in the hearing of June 14, 2004 after the defense counsel left the question to the discretion of the Court and while the transcripts constituted a public certificate that was acceptable without any testimony from its originator.

[10] See transcript of the testimony of Nasser Aweis dated March 30, 2004, page 3 lines 5-10).

12

Investigator Roni Amar testified before us that he took the statements of the witness and his testimony seemed completely reliable to us. In his testimony, investigator Amar said that he took the statements of the witness Aweis and that he (Aweis) was the one who wrote his statements in his own handwriting (as also indicated by reading the statements themselves). The investigator also denied the argument of the witness that he had given additional statements in which he said other things, which is also shown by inspecting the statements, which bear serial numbers.

Therefore, the testimony of Nasser Aweis, which was confused, arbitrary testimony ("You have it all written down in your files, there is no need to go into detail", "I don't have to answer anyone"[11]) did not impress us as being reliable. The conditions for the submission of his statements to the police pursuant to Section 10A were fulfilled after the witness testified; the fact that statements were given was proved by the testimony of the taker of the statements Roni Amar; and the witness contradicted his statements in his testimony. We have seen fit to prefer the statements over the testimony. In contrast to the confused, unconvincing testimony, we have found his statements to be reliable and weighty. In accordance with that which has been set forth, a reading of the statements reveals that they were given by the witness after he was duly warned and after he had signed the statements, **which he wrote in his own handwriting**. It is further shown that his statements were taken in a positive atmosphere, and that the witness drank coffee and smoked cigarettes while the statements were being taken. The testimony of Roni Amar also reveals that the statements were taken in a standard manner, in cooperation with the witness. In any case, it is noted that a comparison of the testimony of the witness before us and the content of his statements also reveals that in general, he confirmed his responsibility for the attacks on Jaffa Street and at the "Sea Food Market" restaurant in Tel Aviv, confirmed the names of the suicide terrorists whom he dispatched, **in accordance with the content of his statements. In other words, the witness Nasser Aweis himself confirmed the correctness of his statements, except for the part dealing with the Defendant, without a genuine explanation as to why this part was deficient.**

In view of these things, we have seen fit to prefer the statements over the testimony.

[Stamp] P 6: 20 [continued]

---

[11] *Ibid*, page 2 line 16; lines 47-48.

13

Date: June 28, 2005                                    6                                    Case No.: 5398/03

## Prosecution witness Ibrahim Abdel Hai

This witness, like the previous witness and most of the witnesses in this case, also confirmed his responsibility for the acts that are attributed to him in his testimony, to which he confessed in his trial and in his statements, he also stated the names of his accomplices, except for one – the Defendant. The prosecution argues that the Defendant acted along with the witnesses in the first stages of the execution of the murderous attack on Jaffa Street (the sixth count of the indictment, Subsections A-E). The witness confirmed, in his testimony, the facts in question in the relevant part of the count of the indictment, except for the part of the Defendant, regarding whom the witness stated that he was not present at the time of filming the suicide terrorist.

It has been found that during his trial, the witness admitted his responsibility for the murderous act on Jaffa Street, and the facts to which he confessed also included the acts that were attributed to him with the Defendant, including the filming of the suicide terrorist. The prosecution asked[12] to file the transcript of the confession of the witness in his trial pursuant to Section 10A, while the Defense Counsel left the request to the discretion of the Court[13]. In our decision of that day, we granted the request to submit the transcript and we shall attach our reasons for doing so below.

The Defense Counsel argued in his summations that the confession of the witness in his trial, in the framework of a plea bargain and without witnesses having been heard, cannot serve as evidence in this trial; however, he did not provide a genuine explanation as to why this was not the case, and did not attach any references to support his argument either. Our opinion in this matter is different. But it is taken as given that an answer of the Defendant to an indictment that is said in the courtroom and that is written in the transcript, constitutes a "statement" of a person in writing that fulfills the conditions of Section 10A (see Y. Kedmi, "About Evidence", first part, p. 274, paragraph 4.B.). And not only does the transcript of the confession constitute an outside statement pursuant to Section 10A, but on the face of it, this is a statement of unparalleled reliability that is presumed to have been made freely out of good will and has significant weight, insofar as the witness made it in answer to charges that are directed against him in person while being represented by an advocate. This means that there is no impediment to accepting it pursuant to Section 10A and granting it full weight.

[Stamp] P 6: 21

---

[12] See transcript of the hearing dated June 14, 2004, page 3 lines 24-26.

[13] *Ibid*, page 5 lines 36-37.

14

The argument of the witness in his testimony[14] that the indictment had been read to him in general terms, in outlines only and without the names having been mentioned is far from being the truth, as the transcripts from his trial prove. An inspection of the transcript of the trial of the witness in Case 6446/02 dated December 19, 2002 (P/ 68) reveals that the indictment had been read to the witness (the defendant in that case) in full, in view of the fact that he was not represented at that stage and refused to accept representation for himself (see the decision of the Court in that hearing, page 2). The witness / Defendant also started to provide a detailed answer, which proved that his testimony before us that the indictment had not been read out to him in full was a complete lie. An inspection of the transcript of the confession of the witness in his case dated June 29, 2003 (P/ 69) will reveal that after a few months, the witness changed his mind and confessed to an amended indictment while he was being represented. This time too, the nature of the indictment in our case was made clear to the witness. The witness pled guilty to the indictment in clear words, which were stated both by his Defense Counsel and by him in person. The Defense Counsel asked in his summations to rely on the fact that the witness did not mention the Defendant in the framework of his answer to the indictment, but it is clear that this does not add or diminish anything. A person reading the confession transcript would see that the witness confessed to the indictment and the offenses attributed and while doing so stated prominent facts out of that which was attributed to him. A simple reading of the transcript would reveal that the witness's mentioning of the names of his accomplices was alongside his confession to the facts in the indictment that was attributed to him and did not constitute a "closed list".

Alongside the clear weight of the transcript of the trial of the witness, we must point out that his testimony before us was not free of contradictions, for example on the matter of the degree of his acquaintance with the Defendant[15].

**Therefore, we have seen that in his trial, Ibrahim Abdel Hai admitted the facts of the offense of causing intentional death concerning the attack on Jaffa Street, including the part of the Defendant. This transcript represents an "outside statement" of the witness, and we have accepted it and seen fit to prefer it over his testimony before us, from which the part of the Defendant had been omitted.**

[Stamp] P 6: 21 [continued]

---

[14] See transcript of the statement of Ibrahim Abdel Hai dated March 30, 2004, page 7 lines 29-38.

[15] *Ibid*, page 4 line 35; compare *ibid* page 7 lines 10-11.

15

Date: June 28, 2005                          7                          Case No.: 5398/03

## Prosecution witness Ahmed Barghouti

It is easy to see that this witness is not the type of witness who comes to tell the truth in his testimony, or to cooperate with the Court while it tries to uncover the truth. As soon as he took the witness stand, the witness covered his ears and refused to answer the questions of the Prosecutor. He answered the questions of the Defense Counsel only after finding out that he was the advocate of the Defendant, and when he did respond, he confirmed only things that were not disputed by the prosecution, i.e. he did not mention the Defendant at all.

Indeed, the prosecution does not contest that the witness did not mention the Defendant at all, and even declared that that was not the reason for which it had brought the witness to testify; rather, it was in order to prove the second part of the sixth count of the indictment, a part which the Defendant did not participate in even according to the indictment. It is an important to know why we have to deal with the question of the testimony of the witness that undisputedly does not incriminate the Defendant, but concerning which, in view of the answer of the Defense Counsel, he did not even agree that the event occurred!![16] This seems to be inescapable.

We did not have to think for long when we came to decide the question of preferring the transcript of the confession from the trial of the witness as a defendant over his so-called "testimony" before us, and in any case, this testimony is not convincing. In contrast to the arbitrary, ridiculous testimony of the witness before us, the transcript of the confession of the witness in his trial, while he was being represented by an advocate, still stands. For the reasons stated above concerning Ibrahim Abdel Hai, we have seen fit to prefer the transcript of the trial over the testimony.

## Prosecution witness Riad Ouda

This witness, like Fahed Sharia, also attributed his decisive incrimination of the Defendant to illicit measures that were employed against him in his trial, but he did not raise, for whatever reason, these arguments in his own trial[17]. For the reasons mentioned above, which are accompanied by the biased, evasive testimony of the witness (he evaded answering the question of whether he knew the Defendant, and also did not know who the object of the question was,

[Stamp] P 6: 22

---

[16] See transcript of the hearing dated March 30, 2004, page 8 lines 31-37.
[17] See transcript of the statement of Riad Ouda dated March 30, 2004, page 10 lines 15-17.

16

despite only one Defendant being present in the dock), we have seen fit to prefer the statement of the witness over his testimony, which is evidently truthful, including the fact that he wrote it in his own handwriting; that he was duly warned before it was taken; and that he signed the bottom of every page thereof.

## Prosecution witness Ibrahim Habisha

This witness, when he took the stand, repeated the line of his colleagues and also confirmed what had been written in his statement and the acts written therein, except for a point pertaining to the circumstances of his acquaintance with the Defendant. According to the witness, the investigator forced him to write that he had been injured by Majed Masri (whom he claimed not to know at all) while they were on their way to lay an explosive device for an attack.

When he attempted to keep the Defendant out of his explicit incrimination of him at any price, tarnishing the reputation of his investigator in his process, Ibrahim Habisha forgot the simple fact that his statement did not even mention the Defendant in the context of a planned attack, but it seemed that the injury was within the framework of a "training accident", which occurred when the Defendant started to play with a grenade launcher that he held, during an introductory meeting with various cells in the organization. In other words, the argument of the witness that the investigator tried to force him to admit that he had been injured during preparations for an attack with the Defendant has no foundation, not even from the written statement.

In any event, the account of the witness is thoroughly unconvincing. The witness was not able to provide a genuine explanation on how he was injured. In addition, he did not make the effort to provide a genuine explanation on how the investigator forced him to incriminate the Defendant falsely and why only this part of his statement was false while all the rest was true.

Against the lies of the witness there is his statement, which he wrote in his own handwriting, after being duly warned, and which he signed. The conditions for the fulfillment of Section 10A are fulfilled, as the witness identifies his statement and contradicts its content. In view of the fact that his testimony did not leave us an impression of reliability and that his statement seems to bear signs of the truth, we have seen fit to prefer it over the testimony.

[Stamp] P 6: 22 [continued]

17

Date: June 28, 2005                          8                          Case No.: 5398/03

## The defense case

The testimony of the Defendant in the defense case was short, full of contradictions and unconvincing. Firstly, it must be noted that despite the mountains of evidence material on the part of the prosecution, which has been extensively reviewed above, the Defendant opted to provide almost no comments on this evidence, and his testimony in the direct examination was short and laconic.

But there are contradictions even in the testimony of the Defendant. The argument of the Defendant in his direct examination was that there were many people in the Nablus area called Majed Masri, that it was the largest family in the area, and that he himself knew a person whose name was identical to his own, who also worked for the Palestinian Authority. To support this argument, the Defendant stated that even two of the people who incriminated him, Mansour Sharim and Mohamed Naifa, when they were brought before him for a confrontation during the examination, immediately stated that the Defendant was not the same Majed Masri whom they had referred to in their incriminating statements. However, in the cross examination, the Defendant changed his mind and "to be on the safe side" also added the account that the two had incriminated him owing to a previous conflict that he had had with them, in view of the fact that in the course of his duty he had arrested the two for vehicle theft.

It is clear that the two accounts cannot both be true. And if Mohamed Naifa had told his GSS investigators immediately that the Defendant was not the Majed Masri who was the object of his incriminating statements, why did the Defendant not talk to him, in the spirit of "I have nothing to say to someone who would do such a thing to me"[18]?

These contradictions are compounded by the general trend of the Defendant to distance himself, at any price, from any connection to security activity, even concerning things that he has admitted in his statement, and there is no doubt that these can connect him in any way to the severe counts of the indictment that are attributed to him. Thus, the Defendant, in his testimony, denies any general shooting at security forces, which he admitted in his statement, and any money transfers in which he was involved and other subjects, which are extensively elaborated on pages 26-27 of the summations of the claim. The Defendant, in his attempt to extricate himself, also down-played his connections with Nasser Aweis, despite the fact that the two had been together in the early 1990s in Jordan and Baghdad, as his statements indicate.

[Stamp] P 6: 23

---

[18] See transcript of the Defendant's testimony in the defense case from June 14, 2004, page 9 lines 48-52.

See below, in the chapter dealing with the identification of the Defendant concerning the lies of the Defendant, on the existence of another person who answers to his four-part name.

In conclusion, we have not found that the testimony of the Defendant before us gives us any impression of reliability. The Defendant failed, and did not even make the effort, in his testimony, to refute the great evidence of the prosecution and made do with a categorical, laconic denial, even of the few things that he admitted in his statements. During this, the Defendant complicated matters for himself by giving contradicting versions and actual lies, which do not add to the weight of his testimony.

## Interim summation:

Therefore, we have found that there is reason to prefer the evidence of the prosecution over the testimony of the Defendant in the defense case; and the statements of the prosecution witnesses over their biased, false testimonies, for the reasons that are set forth above extensively. These pieces of evidence complement one another and reveal an orderly, coherent account that shows up the Defendant to be an arch-terrorist who deals, with other accomplices, in the dispatching of suicide terrorists. We shall now examine whether the responsibility of the Defendant for that which has been attributed to him arises from that evidence.

### The identification of the Defendant:

It seems that the central question in this case pertains to the matter of identification of the Defendant before us as the figure appearing in the many incriminating statements of the witnesses of the prosecution as the great perpetrator to whom the acts described in the indictment are attributed. The various witnesses of the prosecution describe a person called Majed Masri, give various personal details about him and also state the alias by which he is known, "Bazbaz". The Defendant contended that this was not the case, that he had no nickname, and certainly is not called "Bazbaz". The Defendant further contended that the Masri family was a large family in the Nablus area, and that it would be natural for there to be other people who answer to the name Majed. The Defendant contended that there was another person called Majed Masri who worked for the Palestinian Authority. Is the Defendant before us the same "Bazbaz"?

[Stamp] P 6: 23 [continued]

19

First, it must be noted that the Defendant himself answers this question in his statement[19], in which he confirms his nickname from childhood as "Bazbaz". This is the place to indicate that it is not a common or usual nickname (such as the teknonym-based naming of a person after his firstborn son, such as "Abu Mohamed", of which there are thousands of instances). The uniqueness of this nickname, along with the other personal details of the Defendant, indicates the congruence between him and the Defendant.

But the conviction of the Defendant for the severe offenses that are attributed to him does not rely on this alias only, but also on his personal identification by the witnesses of the prosecution, with whom he had good relations. Concerning the arguments that the prosecution witnesses had "gotten confused" or that they meant another person, extensive examination of the evidence material reveals that there is no substance behind this. The Defendant confirms in his statements his acquaintance with the other "protagonists" of the events, the prosecution witnesses who incriminate him, and also admits to committing security offenses with them. Thus, the Defendant admits[20] his acquaintance with Nasser Aweis and shooting, together with him, at an IDF position, and also performing an attempt at shooting. The Defendant was also expelled with Nasser Aweis from the Area in 1992, and they traveled to Baghdad together[21]. The conjecture that Nasser Aweis did not know the Defendant and had referred to another Majed Masri in his words is truly fallacious in these circumstances. The Defendant further confirms in his statements that he had delivered money to Mansour Sharim and Mohamed Naifa, and that he also confirmed his personal acquaintance with them. He also confirmed the transfer of a Kalashnikov rifle to Mohamed Naifa (according to the account of the Defendant, due to an internal conflict)[22].

[Stamp] P 6: 24

---

[19] P/ 1, page 8 lines 22-25.
[20] See P/ 1, page 2 lines 5-12.
[21] See P/ 2, page 5 lines 13-24.
[22] See P/ 1, page 3 line 26 to page 5 line 21.

20

Therefore, the acquaintance of the Defendant with the witnesses of the prosecution is explicitly shown by his own statements. But the prosecution witnesses did not stand idle, and they went into further detail concerning their acquaintance with the Defendant. Mansour Sharim identified the Defendant by his full name in his testimony before him and stated that the Defendant was his friend[23]. Fahed Sharia gave in his statement[24] an exact description of the Defendant, including his workplace as an officer in the Palestinian Police, his age, marital status and his being a father of two daughters (details that the Defendant himself confirmed in his statement) and added that the nickname of the Defendant was "Bazbaz". The prosecution witness Riad Ouda, who even in his biased testimony[25] confirmed his personal acquaintance with the Defendant in view of their joint service in the Palestinian Police, also noted in his statement[26], which was received and preferred over his testimony, the alias of the Defendant and the fact that he was a member of the "Al Aqsa Brigades" Organization. there is no concern that prosecution witness Ibrahim Habisha would forget the Defendant after he had caused his severe injury when he played with a grenade launcher that he was holding. He also mentioned[27] the Defendant by his name and alias and stated his membership in the terrorist organization. **The prosecution witness Mohamed Naifa stated[28] the cellular telephone number of "Bazbaz", 059-200596, which is surprisingly similar to the number that the Defendant himself gave in his statement[29], 059-200569.**

The Defense Counsel contended that there were genuine flaws in the investigation, insofar as no identity line-up had been held for the witnesses. The Defense Counsel did not provide references to prove his argument and we have not found any substance in it. It seems from all that which has been expansively set forth above that the witnesses know the Defendant well, provided many details that identified him, some of them pointed him out in the courtroom (even if they withdrew their incrimination or gave various odd explanations to account for it). If this is the case, we have before us a situation of witnesses who "pointed out" the Defendant, as a person whom they knew beforehand, rather than the identification of an unfamiliar person using various visual methods (identity line-up), and there is no duty to hold an identity line-up in these circumstances. See also **Y. Kedmi**, On Evidence (1999 edition), second part, pp. 851-852.

This is also the place to address the statistical question of whether it is possible that it is another Majed Masri. The Defendant asked to submit for this purpose a record of the Palestinian Ministry of the Interior concerning the frequency of the name Majed Masri. The defense asked to submit the document based on the testimony of the Defendant.

[Stamp] P 6: 24 [continued]

---

[23] See the transcript of the testimony of Mansour Sharim dated November 30, 2003, page 1 lines 35-50

[24] See P/ 70, page 1 lines 19-22.

[25] See transcript of the testimony of Riad Ouda dated March 30, 2004, page 9 lines 18-22, page 10 lines 34-39.

[26] See P/ 3, page 4 lines 4-8.

[27] See P/ 61, page 2 line 17 and page 3 line 2.

[28] See P/ 60, page 25 line 12.

[29] See P/ 1, page 2 line 25.

**Date: June 28, 2005**                          10                          **Case No.: 5398/03**

[The circumstances of the submission were also odd, to say the least. The submission of the document was not requested in the direct examination, but suddenly emerged in the reexamination. The Defendant purported to confirm the list that the Defense Counsel showed, without any explanation as to why this list was authentic or in what ways it was produced.].

The prosecution objected to the submission of the document, and we accepted[30] its position that the document could not be accepted other than through its originator. However, in order to placate him, we suggested – which suggestion the parties accepted – that the prosecution submit an agreed upon document that would be produced by the Ministry of the Interior at the Civil Administration.

An inspection of the query indicates that a number of people in the Nablus area answer to the name of Majed Masri, but all of them are especially old or especially young and do not match the description of the Majed Masri who is mentioned in the testimonies of the prosecution as a person aged about 30 – except for one person, who is the Defendant before us. Concerning the argument of the Defendant[31] that he once learned that there was another person called Majed Ismail Mohamed al-Masri, who took a loan at a bank under his name – inspection of the query will reveal the extent to which this argument is a lie, as the Defendant is the only person who answers to this four part name, not only in the relevant age profile and not just in the Nablus District but throughout the West Bank and even the Gaza Strip.

**Therefore, we determine that the Defendant before us is the same Majed Masri, known as "Bazbaz", who appears in most of the prosecution evidence. We must now examine whether this evidence is enough to lead to the conviction of the Defendant for the acts attributed to him.**

### The counts of the indictment that are attributed to the Defendant

The proof of the counts of the indictment is based on the evidence of the prosecution as set forth below. The Defendant did not address the matter of proving the facts of the indictment from the evidence material (but sufficed with denying them).

### First count of indictment

[Stamp] P 6: 25

---

[30] See transcript of June 14, 2004, pages 11-12.
[31] *Ibid*, page 11, lines 16-20.

22

This count of indictment attributes to the Defendant membership in the well-known terrorist organization the "All Aqsa Brigades". The Defendant is incriminated on this count by three of the prosecution witnesses, Fahed Sharia, Ibrahim Habisha and Riad Ouda. These testimonies dovetail with one another, support each other and fulfill the requirement of the evidentiary addition.

## Second count of indictment

This count of indictment attributes to the Defendant holding an office in the prohibited organization, insofar as he headed the Al Aqsa Brigades in the Nablus area in 2002, commanded the military operations that the organization performed during that bloody year, coordinated the activity of the military operatives, provided them with arms and financing, which he received from Marwan Barghouti and others and used to take responsibility for the acts of the organization in the media.

Contrary to the insistent denials of the Defendant, it seems that the abundant activity in which the Defendant engaged and his status in the organization were burned into the memory of many operatives, who remembered that he commanded them, the money with which he had enriched them and the weapons that he had provided to them. A long list of prosecution witnesses incriminate the Defendant of that which has been attributed to him in this count of the indictment, as expansively set forth in the summations of the prosecution. For example, Mansour Sharim describes the status of the Defendant in the organization, the large amounts of money that he received from him on several occasions for the purpose of carrying out attacks and that the Defendant had taken the responsibility for attacks on behalf of the organization. Thus, Nasser Aweis described the Defendant as the financer who financed him and also received from him a sum of NIS 12,000. Thus, Mohamed Naifa described the Defendant as the commander of the Al Aqsa Brigades in Nablus, as the one who cleared him to carry out attacks and took responsibility for them on behalf of the organization (the witness sent to him for this purpose a photocopy of the will of Sirhan Sirhan, the murderer in the Kibbutz Metzer attack) and as the one who financed the execution of attacks and provided weapons for that purpose. Fahed Sharia also described at length the status of the Defendant as the one who would give him instructions; as the one who organized processions for the organization, for which purpose he ordered him to distribute photographs of martyrs and shoot in processions; and as the one who transferred weapons from one operative to another on a series of occasions. These testimonies support one another and fully satisfy the demand of the evidentiary addition, and the place of the statement of the Defendant is not amiss in this regard. The Defendant did try, as per his habit, to distance himself from both his membership in the organization and the office that he held therein, but in his statement, he also gave details that verified the incriminating statements made by his colleagues, including the fact that he had transferred money to the people who had incriminated him of doing so (Nasser

[Stamp] P 6: 25 [continued]

23

Date: June 28, 2005                    11                    Case No.: 5398/03

[…] Aweis, Mohamed Naifa, Mansour Sharim), that he had received money from Marwan Barghouti, Munir Makdah (also mentioned by Nasser Aweis) and others, that he had supplied weapons to Naifa, that he had made contact with Arabic television stations, that he had helped build a website for the organization and more.

The facts that are elaborated in this count of the indictment concerning the function of the Defendant, his place in the hierarchy of the organization at the given time and the various actions that he took within his function will be discussed again when we point out the responsibility of the Defendant for the offenses that were carried out on behalf of the organization.

### Third count of indictment

This count attributes to the Defendant an offense of shooting at a person, insofar as on a number of occasions, he carried out shooting with his fellow organization members at IDF soldiers. Prosecution witness Nasser Aweis incriminated him in the commission of shooting acts with him. The Defendant also indicated in his statement an act of shooting that was carried out with Nasser Aweis, which provides full evidential infrastructure for the conviction of the Defendant for this count of indictment.

### Fourth count of indictment

The prosecution withdrew this charge and we are exempt from discussing it.

### Fifth count of indictment

This charge attributes to the Defendant the offense of attempted shooting, insofar as he departed with Nasser Aweis to shoot at IDF soldiers, but in the end they changed their minds after they were discovered by military forces. The Defendant and Nasser Aweis described the event similarly in their statements and we have seen fit to convict the Defendant for this offense.

### The responsibility of the Defendant for the acts of murder by virtue of his function

The severe counts of indictment numbers 6-18 attribute to Defendant the responsibility for the deaths of 10 people in the suicide attacks on Jaffa Street in Jerusalem, in the settlement Hermesh and in Kibbutz Metzer, and the injury and attempted murder of others in the same events. All of these murderous acts were carried out by suicide terrorists who had been dispatched on behalf of the Al Aqsa Brigades Organization and by the Defendant and his accomplices.

[Stamp] P 6: 26

24

Naturally, it is not possible to prosecute the suicide terrorist who sacrificed himself on the altar of the shameful ideology. This does not mean that the people who stood behind him, and who used him as a tool for fulfilling their shameful goals, should evade punishment. Penal law has also recognized the possibility of imposing culpability, including full culpability, on a person who pursuant to his function or status (even an unofficial status, see the "Meshulam" case mentioned below) motivated others to commit offenses.

### The responsibility of the heads of the terrorist organization for the acts of the members of the organization – the normative aspect

It is well known that military legal theory accepts the doctrine of "command responsibility", whereby a higher ranking operative is responsible for the acts of his subordinates that have been carried out by his order and with his approval, even if in effect he took a minor or even insignificant practical part in the acts themselves. We feel that anybody who has eyes in his head cannot fail to reach the categorical conclusion that parallel responsibility, albeit in completely different circumstances, must also be imposed on the heads of criminal and terrorist organizations who direct their criminal activity and order the execution of murders by "remote control".

The statements of Honorable Justice Kedmi in Criminal Appeal 5589/98 **Bisan Sultan v. State of Israel**, Supreme Court Compendium 99(3) 98 applies to this case. In that case, the appellant was convicted of the offense of premeditated murder, after it had been proved that he gave his consent and approval to execute the murder and dispatched the primary perpetrator to carry out the murder, and also guided him concerning the method of execution. Justice Kedmi emphasized that were it not for the consent of the appellant, the murder would not have been carried out, and therefore the giving of the approval to carry out the murder was akin to **"the start signal that is fired to signal an athlete to start a race"**, and it constitutes "an act of participation in the commission of the offense". Therefore the appellant was convicted as the co-perpetrator and not for soliciting the act, and was the "mastermind of the gang", while one who solicits is outside the inner circle of execution. The Honorable Justice Kedmi further

[Stamp] P 6: 26 [continued]

25

stated that in the circumstances described above, in which the appellant gave a "green light to murder" and the operative directions as to the manner of execution, his behavior constituted at least "a hefty amount of solicitation by way of encouragement".

In Further Criminal Hearing 1294/96 **Uzi Meshulam** *et al.* **v. State of Israel**, PD 52 (5) 1, the Honorable Justice A. Matza ruled that: "Such a participant – who has full control over the execution and whose action includes not only actions of solicitation and preparation but also directing the acting offenders and overseeing their activity – is to be considered a co-perpetrator to all intents and purposes". He emphasized that presence at the crime scene is not a vital basis for a person to be a co-perpetrator, and said:

> "In the new legal reality, making presence at the scene a condition for direct responsibility would mean that 'godfathers' and leaders of criminal groups, who dispatch to the scene of the act the "small fry" who answer to them, while they lead the criminal activity remotely, would not be considered as co-perpetrators but only as having solicited the offense. And this possibility, which certainly does not reflect the desirable legal theory, is not mandatory in the legal system that is in place either".

The same judgment was handed down after a thorough analysis of the character of Rabbi Uzi Meshulam and the conclusions of the judges concerning the authority that he held over his followers.

These principles are expressed not only concerning criminal organizations, but also concerning senior officers in terrorist organizations, in the instructive judgment of the Tel Aviv District Court, in Felony Case 1158/02 **State of Israel v. Marwan Barghouti**. See also similar principles that are cited in the above mentioned Barghouti judgment, which are cited in the articles of M. Kremnitzer "The Perpetrator in Penal Law, a Character Portrait", Plilim A (5740-1990) 65, p. 72, and M. Gur-Arieh, "Parties to an offense – Amendment 39 to the Penal Code in the Test of Case Law", Megamot Beplilim, p. 83.

**From the specific to the general**

[Stamp] P 6: 27

There is no easier task than proving the senior status of the Defendant in the Al Aqsa Brigades Organization in and around Nablus, and his absolute control over the military activity of the organization while he served as the head of the organization in the city. We have seen that the Defendant acted as the commander of the Al Aqsa Brigades in the Nablus area in 2002, and the operatives of the organization answered to him directly. The Defendant was involved in the distribution of money to the operatives of the organization – money which powered the wheels of terrorism. The Defendant coordinated the activity of the members of the organization in the Area and was in contact with Marwan Barghouti, the commander of the Tanzim Organization. The Defendant provided weapons to operatives for executing their tasks and was also involved in additional aspects of the activity of the organization, such as organizing processions and building a website and other such illicit actions.

The following facts of the count of the indictment will reveal how the Defendant was involved in the preliminary preparations for carrying out suicide attacks and how a military operative contacted him in order to get his approval for murdering innocents. It is blatantly obvious that he considered himself the arbiter of life and death in the Nablus area. At the initiative, with the approval and with the blessing of the Defendant, the suicide attacks described below were launched, and he assumes lawful liability for them.

We shall conclude this chapter by mentioning the symbolic fact that within the framework of his capacity, the Defendant was the one who hastened to assume responsibility on behalf of the organization for the suicide attacks that the organization carried out. However, when standing trial for his actions, the Defendant feigned shyness and did not repeat this, but things seem to speak for themselves, and show why there is no room for letting the Defendant evade the responsibility that he assumes, within the framework of his position, for the murderous acts committed by the organization that he headed and for which he hastened to be proud.

**But the responsibility of the Defendant for the murderous acts does not end with the "ministerial" level alone,** for the Defendant was also involved in performing actual deeds within the execution of the suicide attacks in question, which acts lead him into the framework of the "inner circle" of the perpetrators of the offense, who assume responsibility as direct perpetrators. We shall not discuss the part of the Defendant within the framework of the execution of each of the attacks.

## The general chain of events

The Defendant's denial of the charges against him was general and categorical. The Defendant did not show us any clearly delineated point of dispute, even concerning the parts of the counts of the indictment that had no bearing on him. The defense demanded the proof of every letter and punctuation mark in them, including concerning the events that were carried out after the Defendant was no longer in the picture [Stamp] P 6: 27 [continued]

27

(see the chapter dealing with the testimony of Ahmed Barghouti that is referred to above) and was unable to provide a position even concerning the fact of the occurrence of the attacks.

The act of the defense in persistently using a categorical denial, even to the fact of the death of the victims, is regrettable, particularly when the technical material that substantiates these facts was filed with its consent. Unfortunately, we have not been seized by the concern that the Defendant would be held accountable for murders that were not carried out. The large amount of technical evidence that was filed with the consent of the defense substantiates the facts of the events described and the terrible pictures of the murder victims, including small children and leave no room for doubt in this regard.

In effect there is no genuine dispute concerning the chain of events relating to the stages of execution of the attacks either. If we look further, beyond the dust clouds that the prosecution witnesses have attempted to kick up in their various evasive maneuvers, it seems that they (Mohamed Naifa, Mansour Sharim, Nasser Aweis, Ibrahim Abdel Hai) do not effectively deny the execution processes of the murderous acts and focus primarily on (the denial of) the part of the Defendant. In any case, a reading of their statements extensively and elaborately reveals the chain of these events (including the preparations, arming and filming of the suicide attackers and driving them to the murder scene and so on).

Therefore, we have found that the general chain of events has been adequately proved out of the evidence that was brought before us, and it is doubtful whether it is truly disputed, and we shall now focus our view on the part of the Defendant.

## Counts 6-8 of the indictment, the attack on Jaffa Street

These counts of the indictment attribute to the Defendant responsibility for the murder of the late Ora Sandler and Sarah Hamburger and an attempt to cause the death of 45 civilians who were injured in the event. The event was executed on behalf and in the name of the Al Aqsa Brigades Organization. The Defendant is charged with having received the suicide terrorist in an apartment in the Balata Camp and having filmed him holding a rifle and a book of the Koran along with Mahmoud Titi. Thereafter, the Defendant dispatched the suicide terrorists, Sa'id, on his last way. After these things, Sa'id departed for Ramallah, where he was sent by Ahmed Barghouti to Jerusalem, where he opened fire [at others] indiscriminately until he was vanquished, but not before he had caused the murder of two women and injured dozens of others.

[Stamp] P 6: 28

28

Prosecution witness Ibrahim Abdel Hai talks about the part of the Defendant, as set forth in the transcript of his confession in his trial (P/ 69, Subsection 6 of the sixth count of the indictment) and the part of the charge relating to the Defendant is based on this testimony. We learn about the background leading up to the event from the statements of Abdel Hai and of Nasser Aweis. The statements of prosecution witnesses 16, 17, Mohamed Masleh and Mohamed Abdullah were filed consensually[32] and their content is considered to be agreed to (**Judea and Samaria Single Judge Appeal 114/01, Abu Hilal**). From these statements, along with the transcript of the confession of Ahmed Barghouti, we learn about the responsibility of that Sa'id after having been sent and filmed by the Defendant. The technical material indicates the deadly results of the event. But it is understood that all of the evidence comes together to provide support that greatly exceeds the high level of support that is required for the testimony of Abdel Hai.

It seems that at present, one does not need much imagination concerning the meaning of the act of filming a suicide terrorist who is reading his will before departing on his last journey, and the act of the Defendant in this context speaks for itself. This act, along with the status of the Defendant referred to above, substantiate his place as part of the "inner circle" of the dispatchers of the suicide terrorist and his full responsibility for the attack and its murderous results.

For these reasons, we convict the Defendant for responsibility for the suicide attack on Jaffa Street in Jerusalem, the injury of the civilians and the attempt to murder others.

### Counts 9-12 of the indictment, the attack in the settlement Hermesh

This attack was executed by Mohamed Naifa, with the assistance of Akram Abu-Bakar, Osama Eshkar and Amjad Yahya. The Defendant is charged (Subsection A & I of the count of the indictment) of being the one to give explicit approval to Mohamed Naifa to carry out the attack, after which he took responsibility for it on behalf of the organization and transferred to Naifa the sum of $3,000. In the event, the late Linory Seroussi, Hadas Turgeman and Orna Eshel were murdered and Yuval Eshel was injured.

[Stamp] P 6: 28 [continued]

---

[32] See transcript of hearing dated June 14, 2004, page 1 lines 21-22.

The part of the Defendant arises from the statements of Naifa, which we saw fit, as stated above, to accept. Naifa describes how, after Akram Abu Bakar told him that he had a suicide terrorist who was prepared to carry out an attack, he contacted the Defendant, who approved his execution of the murderous act (or in the words of the Defendant, "Why not?"[33]). It shall be emphasized from the words of Naifa that he instructed Akram to continue to work on the attack only after his talk with the Defendant and receipt of approval from him. Naifa also describes how, after the attack, the Defendant assumed responsibility for the attack on behalf of the organization and also transferred the amount of money to him.

Naifa's words are supported by none other than the statement of the Defendant, who confirmed that he had handed money over to Naifa the day after the attack for erecting a mourning tent for the martyr[34]. The other persons involved in the attack, whose statements were filed consensually[35], substantiate the facts of the charge in general and the technical material substantiates its deadly results and the injury of Yuval Eshel, whose late wife Orna was murdered before his very eyes.

We can see how the Defendant had complete control over the execution of the attack, and its perpetrators answered to him, by words and by actions, before it and after it. The Defendant assumes full responsibility for the event that was dispatched with his blessing, approval and financing, and which he hastened to assume responsibility for, and we convict him for this responsibility.

## Counts 13-18 of the indictment, the Metzer attack

In this event, too, the suicide terrorist, Hayat Hadem Sirhan Sirhan, was dispatched by Mohamed Naifa to Kibbutz Metzer. In his shooting spree in the kibbutz, Sirhan murdered the children of the Ochayon family, Matan and Noam, their mother Revital and kibbutz residents, the late Tirza Damari and Yitzhak Dori.

Examination of the statements of Naifa indicates that once again, he contacted the Defendant, informing him that he had another suicide terrorist who was prepared to be dispatched and a request to arm him with a weapon, and the Defendant saw to this. Thereafter, Naifa asked the Defendant to take responsibility for the attack, and had the film of Sirhan reading his will transferred to him.

[Stamp] P 6: 29

---

[33] See P/ 60, page 4 line 25.
[34] See P/1, page 5 lines 5-9.
[35] See transcript of September 2, 2003, page 3 lines 27-28.

30

The Defendant himself supports the statements of Naifa significantly (while taking the sting out of those things, as per his habit) by indicating in his statement that he had provided Naifa with a weapon (he contended that this was following an encounter that Naifa had with another person) and that after the attack he called the television station to announce that he objected to carrying out attacks within the State of Israel. Needless to say, this endnote alongside the account of the Defendant is not reliable for our purposes. The Defendant made no effort to repeat this evasive account in his testimony and distanced himself from any involvement with Naifa and providing a weapon.

The other prime suspect involved in the event, Osama Sakar, who did not mention the Defendant, substantiated the facts of the indictment related to the preparations for sending Sirhan on the murder mission and the technical material from the scene of the massacre confirms its deadly results.

The hierarchy of relations between Naifa and the Defendant have already been described above and the acts that were performed before and after the attack substantiate the responsibility of the Defendant pursuant to his authority over the perpetrators of the murder and giving the approval for the attack and taking responsibility for it. But this time too, besides "ministerial responsibility", the Defendant also has significant responsibility for the attack as the one who actually provided the murderers with the weapon that took the lives of the residents of the Kibbutz. There is no doubt that the Defendant bears full responsibility for the murderous event and we convict him of this.

## 19th count of the indictment

This count attributes to the Defendant the offense of conspiring to cause intentional death, insofar as he was involved in the plot to dispatch Sirhan to carry out another attack after the Metzer attack.

This charge is also based on the statements of Mohamed Naifa, who described how it was decided, after finding that Sirhan was still alive after the murderous attack in Kibbutz Metzer, to send him again to carry out a suicide attack,

[Stamp] P 6: 29 [continued]

31

Date: June 28, 2005                    15                    Case No.: 5398/03

for which purpose he contacted the Defendant. The Defendant gave his consent to the plan and also granted the request of Naifa to provide him with a weapon, and the gang members also departed to Nablus to meet him and take the weapon from him, but they were arrested before they did so.

We have already dealt with the considerable support for the statements of Naifa on a series of matters. There is no doubt that this conspiracy is part of a single "factual sequence", which relates to terrorist attacks that were carried out by Naifa and the Defendant within the framework of the organization and through Sirhan; therefore, we consider these to support the matter of incrimination of the Defendant for this charge too.

We have also discussed the course of action and the connection between the Defendant and Naifa and there is no doubt that the approval of the murderous plan by the Defendant and his commitment to provide a weapon make him an accomplice in the conspiracy.

**In summation, we convict the Defendant of all of that which has been attributed to him, except for the fourth count of the indictment, which the prosecution has withdrawn.**

**Right of appeal as prescribed by law**

Handed down and notified, June 28, 2005, at the office. The court clerk will provide a copy to the parties.

| [Signature] | [Signature] | [Signature] |
|:-----------:|:-----------:|:-----------:|
| **Judge** | **President of the Court** | **Judge** |

[Stamp] P 6: 30

32

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

MARK I. SOKOLOW, *et al.*,

Plaintiffs,

vs.

No. 04 Civ. 00397 (GBD) (RLE)

THE PALESTINE LIBERATION
ORGANIZATION, *et al.*,

Defendants.

## DECLARATION OF RINA NE'EMAN

Rina Ne'eman hereby certifies as follows:

1.  The attached translation from Hebrew to English is an accurate representation of the
    document received by Rina Ne'eman Hebrew Language Services, to the best of my
    knowledge and belief. The document is designated as P6: 11-15.

2.  I am a professional translator with a B.A. in International Relations from the Hebrew
    University of Jerusalem (Israel) and 30 years of translation experience. I am fluent in
    Hebrew and English, and I am qualified to translate accurately from Hebrew to English.

3.  To the best of my knowledge and belief, the accompanying text is a true, full and
    accurate translation of the Hebrew-language document bearing the bates number, P6: 11-
    15.

Rina Ne'eman

ss.: New Jersey

On the 28 day of February, 2014 before me, the undersigned, personally appeared Rina Ne'eman, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is signed to this Declaration and acknowledged to me that he executed the same in his capacity, and that by his signature on this Declaration, the individual executed the Declaration.

Sworn to me this
28 day of February, 2014

Notary Public

MIRUT J MHRETE
NOTARY PUBLIC
STATE OF NEW JERSEY
MY COMMISSION EXPIRES SEPT. 7, 2015
I.D.# 2850704

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

MARK I. SOKOLOW, *et al.*,

Plaintiffs,

No. 04 Civ. 00397 (GBD) (RLE)

vs.

THE PALESTINE LIBERATION
ORGANIZATION, *et al.*,

Defendants.

## DECLARATION OF RINA NE'EMAN

Rina Ne'eman hereby certifies as follows:

1.    The attached translation from Hebrew to English is an accurate representation of the
document received by Rina Ne'eman Hebrew Language Services, to the best of my
knowledge and belief. The document is designated as P 6: 16-30.

2.    I am a professional translator with a B.A. in International Relations from the Hebrew
University of Jerusalem (Israel) and 30 years of translation experience. I am fluent in
Hebrew and English, and I am qualified to translate accurately from Hebrew to English.

3.    To the best of my knowledge and belief, the accompanying text is a true, full and
accurate translation of the Hebrew-language document bearing the bates number, P 6: 16-
30.

Rina Ne'eman

ss.: New Jersey

March

On the [ 6 ] day of February, 2014 before me, the undersigned, personally appeared Rina Ne'eman, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is signed to this Declaration and acknowledged to me that he executed the same in his capacity, and that by his signature on this Declaration, the individual executed the Declaration.

Sworn to me this March
6 day of February, 2014

Notary Public

LEONOR TROYANO
ID # 2385580
NOTARY PUBLIC OF NEW JERSEY
Commission Expires 5/8/2014

תאריך: 06/02/05                1                תיק מס': 5398/03

בית המשפט הצבאי
ש ו מ ר ו ן
- פ ר ו ט ו ק ו ל -

דיון בית משפט מיום: 06/02/05    בפני הרכב: סא"ל ארו· חסון    -אב"ד
                                   רס"ן אליהו נימני  -שופט
                                   סרן ארז סרי    -שופט

תובע: סרן אירית דייטש
סניגור: עו"ד דראושה

נאשם: מאג"ד אסמאעיל מוחמד מצרי   ת.ז.: 904460862

רשמת: סמל אלינה
מתורגמן: סמל בהאא

- אב"ד זיתח את הנאשם -

## הכרעת דין

עקב היקפו הגדולים של תיק זה, נימוקי הכרעת הדין נמצאים עדיין בשלבי כתיבתם. עם
זאת, נמסור כעת את תמצית הכרעת הדין.

מצאנו לנכון להרשיע את הנאשם בעבירות המיוחסות לו בכתי"א, למעט פ"א 4, ממנו חזרה
התביעה בסיכומיה. הנאשם מורשע בעבירות הבאות:

**חברות בהתאחדות בלתי מותרת** – עבירה לפי תקנה 85 (1) (א) לתקנות ההגנה (שעת
חירום), 1945.

**נשיאת משרה** – עבירה לפי תקנה 85 (1)(ב) לתקנות ההגנה (שעת חירום), 1945.
**ירי לעבר אדם** – עבירה לפי תקנה 58א) לתקנות ההגנה (שעת חירום), 1945.
**ניסיון ירי לעבר אדם** – עבירה לפי תקנה 58(א) לתקנות ההגנה (שעת חירום), 1945 ולפי
סעי 19,20 לצו בדבר כללי האחריות לעבירה (יהודה והשומרון) (מסי 225), תשכ"ח – 1968.
**גרימת מוות בכוונה** – עבירה לפי סעי 51 לצו בדבר הוראות ביטחון (יהודה ושומרון) (מסי
378), התשי"ל – 1970 (**10 פרטי אישום**).
**ניסיון גרימת מוות בכוונה** – עבירה לפי סעי 51 לצו בדבר הוראות ביטחון (יהודה ושומרון)
(מסי 378), התשי"ל – 1970 ולפי סעי 19,20 לצו בדבר כללי האחריות לעבירה (יהודה
והשומרון) (מסי 225), תשכ"ח – 1968 (**3 פרטי אישום**).
**קשירת קשר לגרימת מוות בכוונה** – עבירה לפי סעי 51 לצו בדבר הוראות ביטחון (יהודה
ושומרון) (מסי 378), התשי"ל – 1970 ולפי סעי 21,22 לצו בדבר כללי האחריות לעבירה
(יהודה והשומרון) (מסי 225), תשכ"ח – 1968.

יובהר כי לעניין פרטי האישום המרכזיים, דהיינו עבירות הרצח, מורשע הנאשם כשותף
עיקרי וזאת לאור מעמדו הבכיר בארגון, העובדה כי היה מעורב בשלבים אופרטיביים של
ביצוע מעשי הרצח ובהם צילום המתאבד, מימון הפיגוע ומסירת כלי הנשק אשר שימש בו.

ניתן והו_רע היום, 06/02/05, בפומבי ובמעמד הצדדים.

_____        _____        _____
שופט                   אב"_                   שופט

תאריך: 06/02/05                    2                    תיק מס': 5398/03

1    <u>ראיות לעונש</u>
2    ת: אין ראיות לעונש
3    ס: אין ראיות לעונש
4
5    <u>נובעת מסכמתו:</u>
6    היום נותן הנאשם את הדין בגין אחריותו  כמבצע עיקרי לגרימת מותם של 10 בני אנוש.
7    לצד זאת, הורשע הנאשם בפעילות ביטחונית חמורה ענפה, תוך שהם מסקירות מעשים אלו
8    ברורה נחישותו ותכניתו כדי מטרה אחת- גדיעת חיי אדם. הנאשם אמנם נותן את הדין
9    אחרון בזמן, לאחר כל "גיבורי", מבצעי הפיגועים במגר ותרמיש, אולם מטעמו, מבחינת
10   רבות, ניתן לראות בו ראש וראשון להם.
11
12   לא ניתן להתעלם כהזיבט לתומרה ממעמדו הבכיר בארגון התנזים. למדנו, לצערנו, כי
13   הטורר, הגם שהיגו מכה באזון עיוור בקורבנות מקריים, פעמים רבות יש בו דוזלק חוקיות
14   או ביתר דיוק אינטרסנטנות, ציונים בתיי אדם. לעתים נוח לבצע פיגוע זה או אחר במעשו
15   מסויים, בתזמון מסויים, בישוב מסויים, בתוך תחומו הקו הירוק או מחוצה לו. וכאן,
16   לטעמה של התבועה, נכנס תפקידו המכריע של הנאשם כמעין פוסק באותם היום של
17   קורבנות עולמום עתידיים, ירצה יבוצע פיגוע רצח, לא ירצה יינצלו הפעם חייהם.
18
19   אדגיש כי עובר לפיגוע בחרמיש נתבקשה הסכמתו המפורשת של הנאשם לביצוע הפיגוע על
20   ידי בכיר המרצחים, מוחמד נאיפה, הסכמתו של הנאשם ניתנה ורק לאחריה יצאו לפועל
21   השלבום הבאים, שתביאו כזכור למותם של שלושה בני אנוש. הנאשם אף הגדיל לעשות
22   לאחר ביצוע הפיגוע, אילו כשלטמוני ההצלחות, העביר הנאשם למוחמד נאיפה, בדינים בשל
23   "הצצלחתו" של הפיגוע סכום כסף. ואם יתמנה התנומה על כך, גם זה היו מקרה, שכן
24   הנאשם נשא תפקיד אשר במסגרתו העביר כספים בהוזדמניות רבות ובשיטתיות לפעילים
25   מרכזיים בארגון.
26   גם לביצוע הפיגוע במגר נודעה תרמונה מכרעת לפעילו של הנאשם, היות שהוא זה שהעביר
27   למעשה את כלי המשחיתו לידי המרצחים, בסופו של דבר. על תרומה זו ודאי שאין צורך
28   להכביר מילים כבר לקשר הסיבתי בין מעשיו כאן ובין קרות התוצאה.
29
30   בנוגע לפיגוע ברחוב יפו בירושלים, שימש הנאשם כצלם של המתאבד לפני יציאתו לפיגוע.
31   התביעה טעונה לא אחת לפני בימ"ש נכבד זה, אודות הקרדינליות שהיא מוצאת בפעולה זו.
32   אדגיש בקצרה כי פאן נוסף חמור זה לפיגוע ההתאבדות שבאו בקרבנו הינו החד
33   התנקשורתי שבא בעקבותן, בו יש למעשה להפחיד, לשתק ולזרוע אימה בחיי של כל
34   ישראלי, באשר הוא ישראלי. תרומה רבה לכך יש כצילומו מוות של אותם מתאבדים, ואת
35   גם מתחנהינה שהם משמשים דוגמא מצולמת בו לבאים בעקבותום. יותר מכך, לטעמה של
36   התביעה, באקט הצילום יש כדי לאפשר במינשירין, בסופו של דבר, את ביצוע העבירה
37   עצמה על ידי אותו מתאבד בכך שלמעשה יש באקט זה משום עידוד רוחו של אותו
38   מתאבד, חיזוק החלטתו לצאת לביצוע הפיגוע.
39
40   התביעה תפנה לעניין זה לטיענניה בתקקו של איאד נאצר, תיק בימ"ש 5572/03. בתיק זה
41   נגזר על הנאשם מאסר עולם ואולם לא מן הטעם שביקשה התביעה, היינו השתתפותו
42   בצילום המתאבד, אלא אם כי ריבוי העבירות שיוחסו לו. עם זאת, אציין כי התביעה
43   הגישה ערעור בתיק זה והוא עדיין תלוי ועומד בבימ"ש לערעורים.
44   כן אבקש לחפנות לתיקו של כמאל שבצלי, שנידון בבימ"ש זה, שם קיבל ביהמ"ש את
45   עמדתה של התביעה באשר לתרומה הממשית של אותו אקט של צילום המתאבד.
46
47   היום נסגר מעגל. דמם של קורבנות הנאשם זועק אל ביהמ"ש והתביעה תבקש כי ענושו
48   יינגר ל-10 ענושי מאסר עולם מצטברים בגין כל נפש נופש אותה קטע. כן תבקש התביעה
49   מאסר נוסף קצוב בשנים, בגין יתר העבירות בהן הורשע הנאשם.
50
51

P 6: 12

תאריך: 06/02/05    3    תיק מס': 5398/03

**סניגור מסכם:**

1  חנאשם הכחיש כל הדרך את כל המיוחס לו בכתייא, אולם בהרשעתו היום בפני
2  ביהמייש מהווה מכה קשה לנאשם ולמשפחתו. הנאשם בחקירה הראשית ובחקירתו
3  הנגדית בביהמייש, וגם בחקירתו במשטרה, הוא הוקיע מעשי אלימות נגד מדינת ישראל.
4  מדובר בנאשם שאפילו בהליך המשפטי שהיה בפני ביהמייש נגרמו לו עוונות דין.
5  מדובר בנאשם בן 32 שנים. הוא המפרנס היחידי למשפחתו, אשר מורכבת משני ילדים.
6  אשתו נמצאת כאן וגם אימו החולה. לנאשם יש המון חובות ומשכנתא. הנאשם עבר
7  לאירוע נשוא כתייא עבד בתור קצין במשטרה הפלשתינאית. הוא עבד במסירות ובנאמנות.
8  מצבו הפיננסי של הנאשם רעוע מאוד. ילדיו הקטנים לומדים בבייס ויש צורך שאביהם
9  יתמוך בהם מבחינה כלכלית וחשוב שאביהם יימצא לידם.
10  הנאשם הוא אדם חולה, יש לו בעיות ברגליים.
11  יש לי טיעונים אחרים, הואיל ועד לא קיבלתי את הנימוקים לידיי. לנאשם אין דם על
12  הידיים- זה מה שהוא טען לאורך כל הדרך. אפילו התנהגותו של הנאשם היום, אינה כמו
13  של האשמים האחרים, אשר היו מודים במעשים שעשו, אך הנאשם לא עושה זאת.
14  אנו מבקשים שביהמייש יתחשב בנסיבות.
15
16  **נאשם:**
17  אני מהתחתלה הבאתי את הראיות לביהמייש. התביעה בהתחלה קבעה את גורלי. אני
18  אמרתי שאני לא מפחד רק מאלוהים ואני נגד רצח של אזרחים ישראלים ופלשתינים.
19  הייתי קצין במשטרה הפלשתינית והפללתי אותי גובי רכבים. אני כיבדתי את הבניהמייש עד
20  עכשיו. אני מקווה שתיקח בחשבון את כל הדברים האלו, אתה מטפל בילדים שלך, גם לי
21  יש ילדים.
22
23
24
25
26
27

תאריך: 05/02/06          4          תיק מס': 5398/03

## גזר דין

הנאשם הורשע, כאמור בהכרעת הדין, בעבירות המיוחסות לו בכתב האישום (למעט פרט
האישום הרביעי, ממנו חזרה התביעה). המדובר בשורת עבירות קשות וחמורות, שאין
חמורות מהן, מהן עולה אחריותו של הנאשם לרציחתם של עשרות בני אדם וכן שורת
עבירות נוספות ובהם עבירות ניסיון לגרימת מוות בכוונה, ירי ועוד.

הנאשם נשא בתפקיד ראש "גדודי אל אקצה" באזור שכם, ובתפקידו זה משך בחוטיהם
של פיגועים רבים אשר יצאו תחת הנחייתו, במימונו, בברכתו ותוך שימוש בכלי הנשק
שמסר.

הנאשם היה מעורב בשורת פיגועי התאבדות כאשר הוא והבריו לארגון צמא-הדם, שילחו
בזה אחר זה מפגעים מתאבדים אשר זרעו בחוצות ערי ישראל רצח ומוות. עובדות כתב
האישום, בהם הורשע הנאשם, מתארות ארוכות את השלבים המפורטים שקדמו להוצאת
המרצחים לעבר זירת הקטל.

הנאשם, בתפקידו הבכיר, הוא זה שניצח על תעשיית מוות בזויה זו ומסר הוראות לפעולים
הכפופים לו לשלח מפגעים למעשי רצח המוניים. אולם הנאשם לא הסתפק בתפקיד
"מיניסטריאלי" בלבד, אלא שלח ידו גם בשותפות מלאה לשילות המפגעים ממש, ובכלל
זה צילום מתאבד במקרה אחד, מימון פיגוע אחר והספקת כלי הרצח באירוע שלישי.

כאן המקום להדגיש, את אשר אף עולה מהכרעת הדין, כי אחריותו המלאה של הנאשם
למעשים נלמדת הן ממינית מעורבותו ה"אופרטיבית", אולם גם ממעמדו הבכיר העולה
לאורך כל חומר הראיות. מתברר כי הנאשם היה, באזור שכם, פוסק בעניני חיים ומוות,
והוא ניצל את מרותו על פני אחרים לשם שילוח מרצחים. הנאשם הוא זה שמיהר אף
ליטול אחריות על מעשי הרצח, בפני אמצעי התקשורת.

הנאשם הוא האחראי, ביחד עם שאר חבריו לכנופית המרצחים, לפגוע חמורים ברחוב יפו
בירושלים, בישוב חרמש ובקיבוץ מצר. כתוצאה ממעשיו מצאו את מותם עשרה בני אדם,
בהם שני ילדים רכים בקיבוץ מצר, אמם שנרצחה ביחד עמם, שניים תושבי הקיבוץ, נערתו
שנרצחו מרחק קצר מביתם בישוב חרמש, נשים שהלכו ברחוב יפו בירושלים. פיגועי
הדמים ברחוב יפו, בישוב חרמש ובקיבוץ מצר זיעזעו את המדינה באכזריותם ובשפלותם.

הנאשם לא חדל ממעשיו, גם כאשר הלמו ורבו קורבנותיו, גם כאשר הלך ופתח גילם. גם
לנוכח חירגומם של ילדים רכים, לא נח הנאשם ממעשיו והוסיף לטוות את קורי המוות
תחת ידו. הנאשם לא היסס והורה לשלוח את חיוני-האדם, את הרוצח סירחאן סירחאן,
לביצוע מעשה רצח נוסף, אשר למרבה המזל לא יצא אל הפועל.

ואכן, מלבד מעשי הרצח בהם הורשע, ומלבד הפציעות שגרם לאלו ששרדו את התקפות
התופת של המפגעים ששילח, עוד שלח הנאשם את ידו במעשיו ירי וניסיון לירי.

תאריך: 06/02/05                    5        תיק מס׳: 5398/03

1
2  כפי שציינו בהכרעת הדין, מצאנו כי חלקו של הנאשם הוא של שותפות מלאה. ואכן,
3  העובדה כי הנאשם נהג בפחדנות והסתתר מאחורי מצלמת הווידאו ושלח אחרים להרוג
4  ולההרג, כי התחבא מאחורי מגן הוראות לאחרים, כי עטף בשטרות כסף את מוג לבו, כי
5  נטל אחריות על מעשי אחרים, עובדת פחדנותו של הנאשם אינה מחייבת כי יחמוק מן
6  העונש הראוי לו ולשכמותו. הנאשם אחראי באופן מלא למותם של עשרה בני אדם חפים
7  מפשע, ומאחריותו זו לא יחמוק.
8
9  אנו גוזרים עם הנאשם 10 מאסרי עולם מצטברים.
10
11
12
13
14  זכות ערעור כחוק  התל מיום המצאת נימוקי הכרעת הדין לידי הצדדים
15  ניתן והודע, 06/02/05 , בפומבי ובמעמד הצדדים.
16
17
18  שופט              אב״ד              שופט
19
20

תאריך: 28/06/05                              תיק מס': 5398/03                  1

<div dir="rtl">

בית המשפט הצבאי                                                                1
ש ו מ ר ו ן                                                                    2
- פ ר ו ט ו ק ו ל -                                                            3
                                                                               4
                                                                               5
בפני ההרכב: סא"ל   ארז   חסון   -אב"ד                                           6
רס"ן   אליחו   נימני  -שופט                                                     7
סרן    ארז   סרי   -שופט                                                        8
                                                                               9
                                                                              10
תובע: סרו אירית דייטש                                                          11
סניגור: עו"ד דראוושה                                                           12
                                                                              13
נאשם: מאג'ד אסמאעיל מוחמד מצרי   ת.ז.: 904460862                               14
                                                                              15
                                                                              16
                                                                              17
- אב"ד זיהה את הנאשם -                                                         18
                                                                              19
הכרעת דין                                                                     20
                                                                              21
                                                                              22
האישומים וזירת המחלוקת:                                                        23

ביום, 06/02/05 מסרנו את הכרעת דינו של הנאשם וגזרנו את דינו. כמובטח, להלן נימוקינו    24
המפלים להכרעת הדין [1]:                                                        25
                                                                              26
כנגד הנאשם הוגש כתב אישום קשה וארוך, חן מבחינת חומרת העבירות והן מבחינת היקפן.    27
מיוחד לנאשם כי בשנת 2002 שימש כראש "גדודי אל-אקצה" באזור שכם.ומתוקף תפקידו ניצח    28
על הוצאתם לפועל של מספר פיגועים - ונבהם פיגועי הדמים ברחוב יפו בירושלים, בישוב חרמש    29
ובקיבוץ מצר - בהם מצאו את מותם 10 אנשים, בהם 2 פעוטות נאמם, ונפצעו עשרות אחרים. עוד    30
מיוחסם לנאשם מעשיי ירי ונניסיון לירי לעבר אדם וקשירת קשר לגרימת מוות בכוונה.       31
                                                                              32
הנאשם כפר בכל המיוחס לו, הן בתשובתו לאישום וכן (במרבית המיוחסם לו) בחקירתו    33
המשטרתית האישום כנגדו מבוסס על הפללות רבות מאת חבריו ושותפיו לארגון ולמעשי הרצח.    34
כבר בתחילת הדברים יש לציין כי הסוגיה המרכזית בתיק זה, נוגעת לזיחויו של הנאשם, אשר    35
לרוב מכונה ע"י חבריו בכינוי "בוזבו" - כינוי אותו מכחיש הנאשם.                   36
                                                                              37
לצד הכחשתו של הנאשם את מעורבותו שלו במעשי הרצח, הרי שאין מחלוקת של ממש באשר    38
לקרות האירועים לאור הסכמת ההגנה להגשת חומר תראיות הטכני), ונראה כי אף לא לחלקם    39
של שאר המעורבים, אשר ברובם נשפטו והורשעו זה מכבר על מעשיהם.                     40
                                                                              41
תומר הראיות:                                                                   42
                                                                              43
אמרות הנאשם:                                                                   44
                                                                              45
העד בפניו גובה 2 אמרותיו של הנאשם, רס"מ מטאנס חדאד. מעדותו עולה כי הקירתו של    46
הנאשם התנהלה באופן רגיל. ואכן לא נטענו מצד הנאשם כל טענות זוטא, לא בכלל ולא כלפי העד    47
חדאד בפרט, וההגנה אף הסכימה כי יוגשו אמרותיו של הנאשם שנגבו ע"י העד.            48
                                                                              49
בסיכומיה ביקשה ההגנה לקבוע כי יש ליתן משקל מופחת לאמרותיו של הנאשם, וזאת עקב    50
השבדה כי האמרה לא נכתבה בערבית, כי לא הוקלטה וכי העד לא ערך לנאשם מסדר זיהוי.    51

─────────────
[1] ראה פרוטוקול מיום 2/09/03, עמ' 1.

</div>

<div dir="rtl">

תאריך: 28/06/05          2          תיק מס׳: 5398/03

לא ראינו לנכון לקבל את טענות הגנת ההנגה במישור זה. מעיון בשתי אמרותיו של הנאשם ברור כי
חוצע לנאשם לכתוב את אמרותיו בכתב ידו, אולם הוא סירב לעשות כן ונאף נוהג לחתום. יצוין כי
באמרתו הראשונה אף נימק הנאשם סירובו זה בכך שהוא אינו ״מכיר בחוקיות התקינים
הנשפטים של הכינוס הישראלי״. יצוין עוד כי אקט הוצעתו לכתוב את האמרה והסירוב לה,
נעשו ע״י חוקר המשטרה הדאג בנוכחות עמיתו לתפקיד, רס״מ לוטוף מרעי. לאור דברים אלו, לא
ברור מה הרבותא בכתיבת האמרה בערבית או בעברית.

הטענה לא הצג בפנינו מהו המקור הסטטוטורי לחובה, כביכול, של החוקר להקליט את החקירה
ומדוע יש בכך כדי לפסול את האמרה, כטענתו. מעיון באמרות ובעדות גובה האמרה, עולה כי
תנאי ״תקנות השופטים״, המכשירים קבונליות של אמרות, התקיימו ובכלל זה מתן אזהרה כחוק,
מתן הזדמנות לכתיבת האמרה וחתימה עליה, הקראת האמרה המתורגמת בסוף החקירה וכי׳.
הקלטת החקירה איננה תנאי על פי דיני האזור לקבילות האמרה ואינה מובחת במשפלה.

באשר למסדר תצוהיו, כפי שהצהירה התובעת[*], לא היית גובה האמרה ממונה על חקירתו הכוללת
של הנאשם ושאלות בתחום מחדלי חקירה, לטענת ההנגה, יש להפנות לחוקריו. באשר לסוגיית
חובת עריכת מסדרי זיהוי, נדרש בהמשך.

באשר למשקל האמרות, לא מצאנו מקום להפחית ממשקול, להיפך. ניכר מן האמרות כי החקירה
התנהלה באוירה חיובית, ובמהלכה אף הוצעו לנאשם כוס תה וסיגריה והוא יצא לאורחות
נחרים[**]. הנאשם אישר כי הוא תש בטוב. באמרות מאשר הנאשם את קשריו עם שאר עדי
התובעה, בהם יובצר לחלן. הנאשם מוסיף ותאורים מפורטים של הערבות כפסף שביצע, קשריו -
שידע עלית ומרדבות - עם פעילים אחרים, כתובות אינטרנט בהן השתמש וכיו״ג פרטים אשר
ניכר בהם כי רק באים ממקור ראשוני.

<div style="text-align:center">״ו</div>

באשר לטענת ההנגה בסיכומיה כי ״הנאשם הכחיש את המיוחם לו בכתב האישום, שותף פעולה
עם חוקריו בחקירתו המשטרתית ונתן פרטים מלאים ואינפורמציה מלאה, אולם בכל חקירותיו
במשטרה ובבית המשפט הכחד הנאשם את הזדה במעשיים המיוחסים לו״[*] (סעיף ג׳ לסיכומי
ההנגה) - נובעב היה לדברים, התשלושם לגמרי מן המציאות, שלא היו עולים על הכתב, שכן קריאה
תמה באמרה היתה חוסכת את כתיבתם.

סוף דבר - מצאנו לקבל את אמרותיו של הנאשם ולהניק להן משקל מלא.

### עד התביעה מוחמד נאיפה :

העיד בפנינו העד מוחמד נאיפה ביום 02/09/03, עדות אשר כללה, למעשה, את החקירה הראשית
בלבד, וזאת לאור סירובו של העד להמשיך את עדותו, כמברר בעמ׳ 6 לפרוטוקול מאותו היום.
אין מתלתיים של ממש כי מדובר בני שאההראי לפימגעי חרמים ביישוב אמאתם ובקיבוץ מצר.

ראשית עלינו להידרש לטענת ההנגה כי ננרם לנאשם עיוות דין בכך שלא הושלמה חקירותו הנגדית
של העד וכי במצב דברים זה אין לקבל את אמרותיו מכוח סי׳ 10 א׳. אכן, העד חובה למסור עדות
בבית המשפט והזדדים התבקנסו על מנת לשמוע את עדותו במלואה. עדות זו נקטעה בשל רצונו של
העד בלבד, אשר סירב לחמשין ולהשיב לשאלות שנשאל. בית המשפט נקט בשורת צעדים על מנת
להשמיע את שמעת העדות כולה, ובכלל זה קריאה לסנגורו של העד, אולם העד התמרד במריו (ראה
מהלך הדברים בעמ׳ 6-7 לפרוטוקול אותו דיון, ובכלל זה החלטתנו החותמות את העדות).

כידוע, מאז ניתן פסק דינו הנודע של בית המשפט העליון בעניין חני-יחיא, דני״פ 4390/91, מדינת
ישראל נ׳ חני יחיא, פ״ד מו (3) 661, עמודה על מכונה ההלכה בעניין מעמדמו של הייעד השתוקקי,
הלכה שאשר ננתנה ע״י הרכב מורחב של שופטי בית המשפט העליון, אשר ראה נני בעד השותף כעד
אשר ננתנה לצדדים הזדמנות לחוקרו, ומכאן שפותנתה הדרך להעשה אמרותיו על פי סי׳ 10 אי
לפקודת הראיה. עוד ראה לעניין זה, ע׳ אי״יש 99/00+114, הונכר אף בהחלטתנו מאותו היום.
הטענה תבוא בסיכומיו שורת אסמכתאות מהן ניתן ללמוד - לטענתו - כי בהעדר חקירה נגדית, יש
לבטל את משקל העדות כולה, אולם המדובר בפסקי דין ישנים ביותר, משנות חשנבעים ועד קודם
לכן, אשר כולם נמסרו טרם שנתקבלה הלכת חני-יחיא, חלקם אפילו עוד לפני שנחקק תיקון סי׳ 10
אי לפקודת הראיות..

---

<sup>*</sup> שם, עמ׳ 2, שי 24-22.

<sup>**</sup> ראה ת/ 1, עמ׳ 2, שי 2 ; עמ׳ 5, שי 26-25.

</div>

שאר התנאים העומדים ביסוד ס' 10 א' התקיימו, ובכלל זה העובדה כי העד אישר את מתן
אמרותו[4] וכן קיומן של סתירות מהותיות בין העדות לבין האמרה (התובעת ציינה שורה ארוכה
של סתירות בסיכומיה בלא שההגנה חלקה על כך בסיכומיה. נזכיר, למשל, את הבדלי הגרסאות
בין עדותו לאמרה לעניין זיהוי הנאשם, הרקע לקבלת הסכום של 3,000$ ממנו ועוד).

לאחר שמצאנו כי התקיימו התנאים לקבילות אמרותיו של מוחמד נאפח ע"ש ס' 10 א' לפקודת
הראיות, מצאנו אף להעדיף את אמרותיו של העד על פני עדותו החלקית ובפנינו. נגמק מדוע:

- ראשית, חשוב לציין באופן כללי, כי אפילו מתוך עדותו החלקית והשריורתיות של העד בפנינו,
מאשר העד את עיקרי הפלילתו את הנאשם באמרותו. העד מאשר בעדותו בפנינו, גם אם לאחר
התחמקויות שונות, כי קיבל[4] כשם מדיני של אדם בשם "יבוב" ואף קיבל מידיו סכום של
3,000 $ לאחר פגיעתו חרמו. אמנם הינה העד טוען כי הנאשם אינו אותו בוב, אולם הדבר אינו
מעלה ואינו מוריד, כי הרי גם מתוך עדותו שלו לא עולה כי פגש את אותו "יבוב", אלא יצר
איתו קשר על סמך מספר טלפון שקיבל לידיו בירושה מראאד כרמן, שעה שהחליף את מקומו
כראש "מדודי אל-אקצה" באזור טול-כרם. גם את הנשקים והכספים ע"ש קיבל מדיני של
"יבוב" ישירות אלא באמצעות שליחים. גם מתוך גרסתו, החלקית אף היא, של הנאשם
באמרותו, עולה כי העברות הכספים ותנשק מידיו לעד היו באמצעות שליחים. מכאן, שאפילו
מתוך גרסת המצומצמת של העד, עדיין עומדת הפלילתו את הנאשם על כנה.

- באמרותיו השונות, מרחיב העד עוד יותר מאשר הגרסה המצומצמת שמסר בעדותו החלקית
בפנינו. ראינו לנכון לקבל את אמרותיו של העד. ניכר מעיון באמרות כי המדובר באמרות
בעלות משקל רב ביותר. העד כתב את אחת האמרות בכתב ידו והחל לכתוב גם את האחרת,
אך הפסיק את כתיבתה מרצונו. האמרות ניתנו ע"י העד לאחר שהוזהר כוחוק והוא חתום
בחתימת ידי האמרות. באמרות ניטל על עצמו העד אחריות למעשיר רצח קשים ואיומים תוך
פירוט נרחב של תנסיבות שקדמו לביצועם. השוואה של תוכן האמרות לשאר התמוזר הראייתי
שבא בפנינו – ובכלל זה לאמרות הנאשם, המאשר רצת קשים עם העד וכן את החברות הנשק
והכספים לידיו – מחזקת עוד יותר את משקל אמרותיו של העד.

אם כן, מצאנו לנכון לקבל את אמרותיו של העד, הן מכות אימוץ תוכנו, באופן כללי, ע"י העד
במהלך עדותו והן מכות (בכל שהדברים נוגעים בסתירות שבין גרסת העד לבין חרשום באמרותו,
מכות ס' 10 א', וזאת מן הנימוקים האמורים מעלה.

## עד התביעה מנצור שרים:

גם עד זה, שהעיד בפנינו ביום 30/11/03, נשא על גבו קופת שרצים ואף הוא אחראי לשורת מעשי
רצח קשים.

ראשית, נידרש לסוגייית בקשת התביעה בסיכומיה לקבל את אמרותו של העד מכות ס' 10 א'.
כעולה מבקשת התביעה, נשתכחה הנשת האמרות ממנה בזמן הדיון ביום 14/06/04, וכעת מבקשת
היא לתקן את הטעות. הסנכור מתנגד לתהגשת האמרה כעת, מאחר והבקשה נעשתה לאחר תום
פרשת התביעה ויש בדבר משום פגיעה בהגנת הנאשם.

לא נוכל לנו אלא לשוב ולתיקוק. פעם נוספת, לאזכור ע' אי"ש 99/00+114, אשר נזכר קודם
לכן בהקרבה זינון זו בקשר אחר, ואף מצוטט ע"י התביעה המלומדת בסיכומיה. בית המשפט
לערעורים נדרש לדברוה חידועים של כב' הנשיא זמורה המנונה, אשר דומה כי מאו אאמ נאמרו –
ככב בערעור לפללית הראשונן שנדוןן לבית משפטה העליון של מדיית שראאלו – מאאו את מקומם
בפתתאם סדר הדיון הפללית. ואכן, הורען הנשיא זמורה כי סדר דין פלילי אינו משחק שח-
מט אשר בו במהלך שגוי אחד לחתוץ את גורלו לעד. בית המשפט לערעורים הכיר באפשרות לזמן
עדים או להגיש ראיות מטעם התביעה לאחר תום השלב הדיוני – גם אם יש להתיר בקשות כאמור
בצמצום, גם אם העד התבחשה להגמנע מכך והכל בפופ לסייג כי אין בדבר לפגוא בהגנת הנאשם.

בנסיבות העניין שבפנינו, לא ראינו מדוע ושלבת מקבלת בקשת התביעה, אפילו בשלב הסיכומים, יש בה
פסול בלשהו. ראשית, אין ספק כי בקשת התביעה נעשתה בתום לב ולא מתוך שיקול פסול. עיון
בפרוטוקול הדיון מיום 14/06/04 יגלה כי התבראש הגישה שורת בקשות להגשת חומר מכות ס' 10

[4] רהה פרוטוקול עדותו של מוחמד נאפח מיום 02/09/03, עמ' 5 ש' 30-14.
[4] שם, עמ' 3 ש' 46 ועד עמ' 4 ש' 13 ; עמ' 5 ש' 42-45.

1　אי, ואין ספק כי הבקשות להגשת אמרתו של העד מנצור שרים, נשתכחה ממנה בהיסח הדעת.
2　שנית, כל הפתעה אין בבקשת התובעים. התביעה העידה את העד מנצור שרים, עימתה אותו עם
3　דבריו באמרתו, הודיעה מראשו ובמילים ברורות ועל כוונתה להיעזר את גובה אמרתו יעקוב ברזוי[*],
4　ואף העידה את גובה האמרה ביחס לנסיבות גבייתה (מהלך שאין לו כל הסבר אחר, זולת רצונה
5　להגיש את אמרתו של העד מכוח ס׳ 10 א1). שלישית, כל פגיעה אין בהגנתו של הנאשם בבקשת
6　המוארחת להגשת אמרתו של מנצור שרים. העד העיד ונחקר עיי הצדדים, ובכלל זה חקירה נגדית
7　עיי בייכ הנאשם. לנאשם ניתנה אף הזדמנות לחקור את גובה אמרתו. הנאשם אף התייחס
8　בעדותו[1] בפרשת ההגנה להפללות של מנצור שרים באמרתו ומסר גרסה באשר אליה. הבקשה
9　להגשת אמרתו של העד, אין בה כל פגיעה בהגנת הנאשם.
10
11　לאחר שצללנו את משובת השלב הדיוני להגשת הבקשה, נגלה הוא יותר כי התנאים הקבועים
12　בצדו של ס׳ 10 א1 לקבלת האמרה, מתקיימים במלואם, שהלא העד העיד וניתנה לצדדים
13　הזדמנות לחקרו, מתן האמרה הוכח, הן מעדותו של העד שזיהה את אמרתו והן מעדות גובה
14　האמרה, וכן לאור קיומן של סתירות מהותיות בין האמרה ובין העדות. כעת נדרש לשאלת כלום
15　יש מקום להעדיף את האמרה על פני העדות? תשובתנו לשאלה זו חיובית ולהלן נימוקינו:
16
17　א.　גם עדותו של מנצור שרים היתה מבולבלת בכל שנתבקש ליתן הסבר להפללות המפורשות
18　　　שהפליל את הנאשם באמרתו, הפללות מהן ביקש הוא לחזור במהלך עדותו. העד אישר כי
19　　　חתם על האמרה וכי החותך אף קרא לו את תוכנה, אולם דבק בטענתו כי החותך כתב
20　　　דברים אחרים מאלו שאמר הוא עצמו במהלך גביית האמרה. העד אף התיישר לקבוע
21　　　בפסקנות כי חקותך הוסיף דברים על אמרתו לאחר שזו נכתבה בפניו, אולם לשאלת התובע
22　　　לא ידע לפרט על אלו עניינים מדובר.
23　ב.　באשר למשקל גרסת ההכחשה של העד את דבריו כנגד הנאשם באמרתו, אשר ניתנה במהלך
24　　　החקירה הנגדית בעוד העד משיב בתוכי לסידרת שאלות מדריכות בעלות התוכן הגרסה שם
25　　　הסתגנר בפני, מוטב לא לחרחיב את הדיבור[2]. באופן מזור, ולכלא הסבר מלבד חרצון לחזור על
26　　　הגרסה המוכרת מראש, הפך הנאשם, במהלך עדותו של מנצור שרים, מחבר (בחקירה
27　　　הראשית) לשוטר רשע (בנגדית) אשר עצר אותו בגין גניבת רכבים, נהג בו בקשיחות, דרך
28　　　שערור בעד תחושות קשה - גרסה, אשר צמוחה בלתי מפתיע, עתידית לחזור פעם נוספת מספר
29　　　ישיבות לאחר מכן בעדות הנאשם. למותר לציין, כי בו לא עורר הדברים רושם של מהימנות
30　　　כלל וכלל.
31　ג.　העד אישר בדבריו כי היה חבר בארגון גדודי אל-אקצא, וכעולה מאמרותיו, אף היה אחראי
32　　　לשורת מעשי רצח קשים מטעם הארגון, כבעל עמדה בכיר בארגון. העד אף ידע למסור תיאור
33　　　מודיע של שרשרת יהתחלפות הפיקוד[3] על הארגון באזור שבם, תחל באמצ רעוז ועבור
34　　　במחוזיד תתיי, אולם משנשאל באשר לזהות מחליפו של חודין (לטענת התובעים, הנאשם),
35　　　ונתמלא לפתע שכחת משושה, טען כי לא ידע את זהות ראש הארגון באזור שבם (אלו היה
36　　　כפוף הוא עצמו) ואף לא טרח לנסות לברר זאת.
37　ד.　לעומת עדותו המעורות והממומנמת של מנצור שרים בפנינו, עומדת אמרתו. משקלה של זו
38　　　עולה הן מעדותו של גובה האמרה רסיים יעקוב ברזוי - אשר העיד בפנינו ביום 14/06/04
39　　　ומעדותו הכחוש את טענותיו של העד וציין כי האמרה נגבתה על פי הכללים הרגילים - והן
40　　　מעינו בגוף האמרה עצמה, עלייה התום העד לאחר אזהרה. מקריאת גוף הדברים ומעולה
41　　　מעדות גובה האמרה, נראה כי האמרה מבוססת על דברים שכתב העד בכתב ידו. יש לצטער
42　　　על כך שלא נתאפשר לעד לכתוב את אמרתו בכתב ידו, אולם בנסיבות העניין, ולאחר שהוכח
43　　　להנחת דעתנו – הן מהתרשמות מן העדים והן מתוך השוואות לשאר חומר הראיות שבא
44　　　בפנינו - כי הכתוב בגוף האמרה משקף את דבריו של העד שהוקראו לו טרם שחתם עליהם,
45　　　לא סברנו כי יש מקום בטשקלה של האמרה (ראה לעניין זה גם את פסק דינו המאלף של כבי
46　　　השופט אלייקמ פרידמן בעי אייייש 1137/04+1130+1136+1129).
47
48　אם כן, מצאנו לדחות את עדותו של מנצור שרים ולהעדיף על פניה את פגיעה את אמרתו.
49
50　### עד התביעה פהד שראיעה
51
52　עד זה העיד בפנינו ביום 30/11/03 ובעדותו מיהר להתכחש לאמרת ההפללה המפורשת שמסר כנגד
53　הנאשם, בה הוא מתאר כיצד הסיע את הנאשם, ביחד עם אחרים, לבצע פיגועי ירי. משנתבקש

---

[*]　ראה פרוטוקול מיום 30/03/04, עמי 11 שי 22-23, במקום יגובה עמדתו של מנצור שרים׳, ציל יאמרתו׳.
[1]　ראה פרוטוקול עדות הנאשם מיום 14/06/04, עמי 10 שי 17-12.
[2]　ראה פרוטוקול עדותו של מנצור שרים מיום 30/11/03, עמי 4.

תאריך:28/06/05     5     תיק מסי:5398/03

ליתן הסבר להפללתו המפורשת את הנאשם באמרתו, טען כי זו הוצאה ממנו באמצעים פסולים,  1
כי הוכרח לחתום עליה, כי הופתע למראות כתב האישום שהוגש כנגדו הכולל אשמות בהן לא הודה  2
וכוי"ב. עוד היינו טורחים לפרט את הסתירות שעלו בגרסת העד לעניין זה, אלמלא היה עולה  3
באופן ברור כי את טענות הזוטא באשר למשקל אמרותיו, שמר העד לעדויות בתיקו של הנאשם  4
בלבד, ואילו בנשפטו[9] שלו לא העלה אף אחת מאותן טענות, ואף הסכים לחתום אמרותיו, ובכלל  5
האמרה המזכרות, אשר ביחס אליה על לפתוע מן האוב טענות הזוטא שבעדותו. אך מובן הוא כי  6
טענות זוטא של נחקר ביחס לאמרתו, אשר מופיעות במשפטי אחרים ולא במשפטו שלו עצמו, אין  7
בהן לשכנע.  8
  9
בשל כל אלו, מצאנו לנכון לדחות את גרסת העד ביחס לאמרתו, לקבל את האמרה (לאחר  10
שהתנאה האמורים בסעיף 10 אי התקיימו) ולהעדיפה על פני עדותו.  11
  12

### עד התכוינה נאצר עוויס  13
  14
עד זה העיד בפנינו ביום 30/03/04. על אף הפללות קשות שהפליל את הנאשם, כשנתפו לשילוח  15
המחבל מתמאבד אשר ביצע את הרצא ברחוב יפו בירושלים וכן כשנתפו למעשי יירי, הכחיש העד  16
את הדברים בעדותו. כך טען העד כי הוא מכיר את הנאשם בשמו הפרטי בלבד, למרות שלו רק  17
מתוכן עדותו בלבד עולה כי היכרותו עמו מקיפה בהרבה (על אחת כמה וכמה שמאמרותיו  18
ומאמרות הנאשם, עולה כי השניים היו בקשרים הדוקים, ואף גרושו מן האזור וגולה תקופה  19
נירחן ובבתד – ראת בהמשך). את העובדה כי באמרותיו הוא מפליל את הנאשם, הסביר העד  20
בטענות שהעלה כנגד החוקר רוני שנאמר שהכריח אותו לכתוב דברים (העד עצמו לא זכר מוחו  21
החוקר שחקר אותו ולא זיהה אותו, אך ציין כי המדובר בשוטר קירחן, אולם לא ידע לפרט מהן  22
אותן טענות (יעם החוקר הוה היתה הבעיה. איני זוכר את הפרטים[10]). העד טען כי אינו מזהה  23
את אמרותיו שהוצגו בפניו ואת כתב ידו, אולם דבריו לא עורו בנו רושם, שכן העד בקשיי טרח  24
לעיין באמרות טרם שהשיב.  25
  26
העיד בפנינו החוקר רוני נאמר, אשר גבה את אמרותיו של העד ועדותו עוררה בנו רושם מהימן  27
לגמרי. בעדותו אישר החוקר שאמר כי גבה את אמרותיו של העד עוויס וכי הוא (עוויס) זה שכתב  28
את אמרותיו בכתב ידו (כפי שגם עולה מעיון באמרות עצמן). עוד הכחיש החוקר את טענת העד כי  29
נתן אמרות נוספות בהן מכר דברים אחרים, דבר תעולה גם מעיון באמרות הנושאות מספר  30
סידורי.  31
  32
  33
אם כן, עדותו של נאצר עוויס, שהיתה עדות מבולבלת ושריריותית ,(הכל רשום אצלכם בתקים,  34
לא צריך לחיכנס לפרטים" ; "אני לי חיב לענות לאף אחד[11] ) לא עוררה בנו רושם של מהימנות.  35
התנאים לחנשת אמרותיו במשטרה מכוח סי 10 א, התמלאו לאחר שהעד העיד, מנן האמרות  36
הוכח בעדותו של גובה האמרות רוני שנאמר וחעד סתר את אמרותיו בעדותו. מצאנו לנכון להעדיף  37
את האמרות על פני העדות. מול העדות המבולבלת והבלתי-משכנעת, מצאנו את האמרות  38
כמהימנות ובעלות משקל. כאמור, עולה מקריאת האמרות כי הן ניתנו עי' העד לאחר שהוזהר  39
כחוק ולאחר שהם על האמרות, אותן כתב בכתב ידו. עולה עד כי גביית האמרות התנהלה  40
באורחה חיובית, וכי העד שתה קפה ועישן סיגריות במהלך גבית האמרות. גם מעדותו של רוני  41
שנאמר עולה כי גביית האמרות התנהלה באופן סטנדרטי והנך שיתוף פעולה של העד. ממילא יוזכר  42
כי אפילו מתוך השוואה בין עדותו של העד בפנינו לבין תוכן אמרותיו, עולה כי הוא באופן כללי  43
מאשר את אחריותו למגיעים ברחוב יפו וכן במטעודת יסו פוד מרקטי בתי"א, מאשר את שמות  44
המתאבדים ששלח, והכל מתוך התאמה לתוכן אמרותיו. דהיינו, העד נאצר עוויס בעצמו מאשר  45
את נכונות אמרותיו, למעש הקטע הנוגע לנאשם, בלא הסבר של ממש מדוע דווקא חלק זה לוקה.  46
  47
לאור דברים אלו, מצאנו לנכון להעדיף את האמרות על פני העדות.  48
  49
  50
  51

---

[9] ראה פרוטוקול משפטו של העד (שומרון 5004/03) מימים 04/05/03 ו 16/07/03 (עי' 72+73) וכן פרוטוקול הארכת
מצרים מיום 12/12/02 (עי' 71). הפרוטוקולים ממשופטו של העד, תוקבלו כהודעה לכקשת התובעה בדיון מיום
14/06/04 לאחר שהוסכם שהוזהר אותיר את האשוה לשיקול דעת בית המשפט (בהיות הפרוטוקולים משום תעודה ציבורית
המתקבלת בלא עדות עורכה.

[10] ראה פרוטוקול עדותו של נאצר עוויס מיום 30/03/04, עמי 3 שי 10-15.

[11] שם, עמי 2 שי 16 ; שי 47-48.

P 6: 20

תאריך: 28/06/05                6                תיק מס': 5398/03

עד התביעה אברהים ע"א חי

גם עד זה, בדומה לעד הקודם ולרוב העדים בתיק זה, אישר בעדותו את אחריותו למעשים
המיוחסים לו עליהם הודה במשפטו ובאחריותו ואף נקב בשמותיהם של שותפיו, מלבד אחד –
הנאשם. התביעה מייחסת לנאשם כי פעל בחדר עם העד בשלבים הראשונים של הוצאתו לפועל של
פיגוע הרצח ברחוב יפו (פרט האישום השישי, סייק א-ח'). העד אישר, למעשה, בעדותו, את
העובדות המפורטות בחלק הרלוונטי של פרט האישום, למעט חלקו של הנאשם, שחצו ציון כי לא
נכח בעת צילומו של המתאבד.

מתברר כי דווקא בעת משפטו שלו, הודה העד באחריותו למעשה הרצח ברחוב יפו, ובכלל
העובדות בינו הודה אף ממעשים המיוחסים לו עם הנאשם, כולל צילומו של העד. התביעה
ביקשה[12] להגיש את פרוטוקול הודאתו של העד במשפטו מכוח סי 10 א', ואילו הסנגור התיר את
בקשתו לשיקול דעתו של בית המשפט[13]. בהחלטתנו מאותו חיום קיבלנו את בקשתו להגשת
הפרוטוקול ולחלק נצרך נימוקינו.

הסנגור טען בסיכומיו כי הודאתו של העד במשפטו שלו, במסגרת הסדר טיעון וללא שנשמעו
עדים, לא יכולה לשמש כראיה במשפט זה, אולם לא הסביר הסבר של ממש מדוע כך הם הדברים,
אף לא צירף אסמכתאות לחיזוק טענתו. דעתנו בעניין זה שונה. אך מובן הוא כי תשובה של נאשם
לבתי"א באמרות באולם בית המשפט ואשר נרשמה בפרוטוקול, היא משום "אימרתיו" של אדם
בכתב הענוה על תנאי סי 10 א' (ראה י. קדמי, "על הראיות", חלק ראשון, עמ' 274 פסקה 3.4 ב.).
ולא רק שיש בו בפרוטוקול תחודאה משום אמרת-חוץ לפי סי 10א', אלא שעל פנו המודבר
באמרה מהימנה מאין כמוה אשר חזקה עליה כי נאמרה מרצון טוב וחופשי ובעלת משקל ניכר,
כאשר העד מוסר אותה בתשובה לאישומים חמומנים אליו גופו ובעדר הוא מיוצג עיי עו"ד. מכאן
שאין כל מניעה מלקבלה לפי סי 10א' ואף להעניק לה משקל מלא.

טענתו של העד בעדותו[14] כתב האישום הוקרא לו באופן כללי ובכותרות וללא שהוזכרו השמות,
רחוקה מלחיות אמת, כפי שמוכיחים הפרוטוקולים ממשפטו. מעיון בפרוטוקול משפטו של העד
בתיק 6446/02 מיום 19/12/02 (ת/ 68) רואים אנו כי כתב האישום הוקרא לעד (הנאשם באותו
תיק) במלואו לאור העובדה כי לא היה מיוצג באותו שלב נסירב לקבל על עצמו ייצוג (ראה החלטת
בית המשפט באותו דיון, עמ' 2). העד/נאשם, אף חהל למסור תגובה מפורטת, המוכיחה כי עדותו
בפנינו כאילו כתב האישום לא הוקרא לו במלואו – שקרית היא בעליל. עיון בפרוטוקול הודאתו
של העד בתיקו מיום 29/06/03 (ת/ 69), יגלה כי לאחר מספר חודשים נזכל העד בדעתו והודה
בכתב אישום מתוקן שעה שהוא מיוצג. גם הפעם הובהרה לעד מהות כתב האישום בעניינו. העד
הודה בכתב האישום במילים ברורות, הן מפי סנגורו וחן במו פיו. הסנגור ביקש בסיכומיו להקשות
בעובדה כי העד לא הזכיר את הנאשם במסגרת תשובתו לכתב האישום, אולם ברור כי אין בכך
להעלות או להוריד. המעיין בפרוטוקול התהודאה, יגלה כי העד הודה בכתב האישום ונעצרות
המיוחסות לו ולצד זאת ציין עובדות בולטות מתוך המיוחס לו. קריאתה תמה בפרוטוקול תגלה כי
הזכרת שמות שותפיו ע"י העד היא לצד הודאתו בעובדות בכתב האישום המיוחס לו, ואינה
משום "רשימה סגורה".

לצד משקלו הרבין של פרוטוקול המשפט של העד, נציין כי עדותו בפנינו לא היתה נקייה
מסתירות, למשל לעניין מידת הכירותו עם הנאשם[15].

אם כן – ראינו כי במשפטו הודה אברהים ע"ז חי בעובדות עבירת גרימת המוות בכוונה לעניין
המפגע ברחוב יפו, ובכלל זה חלקו של הנאשם. פרוטוקול זה הוא משום "אמרת-חוץ" של העד,
ואנו קיבלנו אותה ומצאנו לנכון להעדיפה על פני עדותו בפנינו, אשר גמגמה נשמטה חלקו של
הנאשם.

[12] ראה פרוטוקול הדיון מיום 14/06/04, עמ' 3 ש' 24-26.

[13] שם, עמ' 5 ש' 36-37.

[14] ראה פרוטוקול עדותו של אברהים עיא חי מיום 30/03/04, עמ' 7 ש' 38-29.

[15] שם, עמ' 4 ש' 35, השווה שם עמ' 7 ש' 11-10.

עד התביעה אחמד ברגותי

נקל לראות כי עד זה איננו נמנה על העדים הבאים לומר את האמת בעדותם; או לשתף פעולה עם
בית המשפט שעה שהוא מבקש להתחקות אחרי האמת. מייד עם עלותו לדוכן העדים אטם העד
את אוזניו וסירב לענות לשאלות התובעת. לשאלות הסנגור ענה רק לאחר שבירר כי הוא עורך דינו
של הנאשם וגם שעה שהשיב אישר את שאינו שנוי במחלוקת ע"י התביעה, דהיינו כי איננו מזכיר
כלל וכלל את הנאשם.

ואכן התביעה איננה חולקת כי העד אינו מזכיר כלל את הנאשם, ואף הצהירה כי לא לשם כך
הביאה את העד לעדות, אלא על מנת להוכיח את חלקו השני של פרט האישום השישי, חלק אשר
אפילו אליבא דכתב האישום הנאשם לא נטל בו חלק. שאלה נכבדה היא לשם מה כלל צריכים אנו
להתדרש לשאלת עדותו של העד אשר אין מחלוקת כי כלל אינו מפליל את הנאשם, אולם לאור
התשובה של הסנגור כי אפילו עצם קרות האירוע אינו מוטכם[16], דומה כי אין מנוס מכך.

לא התלבטנו רבות בבואנו להכריע בשאלת העדפת פרוטוקול ההודאה ממשפטו של העד כנאשם
על פני עדותו (ו) בפנינו, אשר ספק רב האמנם "עדותי" יוקרת לה, ומכל מקום אין היא משכנעת.
לעומת עדותו השרירותית והמגוחכת של העד בפנינו, עומד פרוטוקול הודאתו של העד במשפטו
שלו, בעוד הוא מיוצג ע"י עו"ד. מן הטעמים האמורים מעלה לעניין אברהים ע"א חי, מצאנו לנכון
להעדיף את פרוטוקול המשפט על פני העדות.

עד התביעה ריאד' עודה

גם עד זה, בדומה לפחד שראיעה, תלה את קולר הפללתו הנחרצת את הנאשם, באמצעים פסולים
שהופעלו כנגדו במשפטו, אולם גם הוא לא העלה - משום מה - טענות אלו במשפטו שלו[17]. מאותו
נימוקים חוכרים מעלה, המצטרפים לעדותו המנמתית והמתחמקת של העד (התחמק מלהשיב
לשאלה האם הוא מכיר את הנאשם, ואף לא ידע למי הכוונה, למרות שנכח רק נאשם אחד בתא
הנאשמים), מצאנו לנכון להעדיף על פני עדותו את אמרתו של העד, אשר סימני האמת ניכרים בה
בעליל, ובכלל זה העובדה כי כתב אותה בכתב ידו, כי הוזהר כחוק טרם גבייתה והוא חתום
בחתימת כל דף בה.

עד התביעה אברהים חבישה

עד זה, בעלותו על הדוכן, חזר על הקנו של חבריו וגם הוא אישר את הכתוב באמרתו ואת המעשים
חרשומים שם, למעט נקודה הנוגעת לנסיבות היכרותו עם הנאשם. לטענת העד, החוקר אילץ אותו
לכתוב כי נפצע מידיו של מאביד' מצרי (אוותו, לטענתו), אינו מכיר כלל) שעה שהיו בדרכם לבצע
פיגוע תנועת מטעו.

בבקשה להותחיק את הנאשם בכל מתיר מן הפללה המפורשת אותה הפלילו, ואגב כך להטיל רפש
בחוקרו, נשתכחה מאברהים הבושה העובדה הפשוטה כי באמרתו כלל אין מוזכר הנאשם בהקשר
של פיגוע מתנוכו, אלא דווקא נראה כי הפצייעה היתה במסגרת "תאונת אימונים", כאשר הנאשם
התל לשחק בנושל רימונים שבידיו, תוך כדי פגישת היכרות של חוליות שונות בארגון. כלומר,
לטענת העד כי תחזיר ביקש לאלץ לחודות כי נפצע תוך כדי הכנות לפיגוע עם הנאשם, אין שחר -
אפילו לא מתוך תאמרה הכתובה.

ממילא גרסתו של העד אינה משכנעת כלל. העד לא ידע ליתן הסבר של ממש כיצד נפצע. הוא אף
לא טרח למסור הסבר של ממש כיצד אילץ אותו החוקר להפליל את הנאשם הפללת שווא ומדוע
רק חלק זה באמרתו כוזב ואילו כל השאר נכון.

אל מול כוזבו של העד, עומדת אמרתו, אותה כתב בכתב ידו, לאחר אזהרה כחוק ועליה הוא
חתום. הנתונים לקיום ס' 10 א' מתקיימים, שכן העד מזחה את אמרתו וסותר את תוכנה. לאור
העובדה כי עדותו לא עוררה בנו רושם של מהימנות ודווקא אמרתו נושאת עליה את סימני האמת,
מצאנו לנכון להעדיפה על פני העדות.

[16] ראה פרוטוקול הדיון מיום 30/03/04, עמ' 8 ש' 37-31.
[17] ראה פרוטוקול עדותו של ריאד' עודה מיום 30/03/04, עמי 10 ש' 17-15.

תאריך: 28/06/05    8    תיק מס׳: 5398/03

פרשת ההגנה

עדות הנאשם בפרשת ההגנה היתה קצרה, רווייית סתירות ובלתי משכנעת. ראשית יש לציין כי
למרות הנוהג הראוייה מטעם התביעה, אשר נסקר בהרחבה לעיל, בחר הנאשם כמעט ולא
להתייחס ישירות לראיות אלו ועדותו בחקירה הראשית היתה קצרה ולאקונית.

אלא שאפילו מתוך עדותו של הנאשם, עולות הסתירות. טענת הנאשם בחקירה הראשית היתה כי
ישנם אנשים רבים באזור שכם בשם מאג'ד מצרי, כי המוגזר במשפחה הגדולה ביותר באזור והוא
עצמו מכיר אדם רבים וזהו לשלו העובד אף חוא ברשות הפלסטינית. לחיזוק טענותו זו ציין הנאשם
כי אפילו שניים מן המפללים אתו, מנצור שרים ומוחמד נאימף, שעה שהוצאו בפניו לעימות
במהלך חקירה, ציינו מיד כי הנאשם אינו אוונו מאג'ד מצרי, אלו התכוונו בתפללתם. עם זאת
בחקירה הנגדית שינה הנאשם מטעמו "ילענתר בטחון" הוסיף גם את הגרסה כי חשניים הפליל
אותו בשל סכסוך קודם, וזאת לאור העובדה כי במסגרת תפקידו עצר את השניים בהותיהם גנבי
רכבים.

ברור כי שתי הגרסאות אינן יכולות לדור בכפיפה אחת. ואם אכן מוחמד נאיפף ציין מיד בפני
חוקרי חשב"כ כי הנאשם אינו מאג'ד מצרי נשוא הפלליותיו, מדוע הנאשם אינsusu מדבר איתו,
בחינת "עם מי שעושה לי דבר כזה, אין לי מה לדבר"[18]?

סתירות אלו מצטרפות לממוחת הכללית של הנאשם להרחיק עצמו, ובכל מחיר, מקשר כלשהו
לפעוליות בטחונית, גם בדברים שהודה בהם באמרתו, ואין כל ספק שאין בהם לקשור ולו במאום
לפרטי האישום החמורים המיוחסים לו. כך מכחיש הנאשם בעדותו גם ירי כללל לעבר כוחות
בטחון, בו הודה באמרתו, העברות כספיים בהם היה מעורב ועוד נושאים, הממפורטים בהרחבה
בעמודים 26-27 לסיכומו התביעה. הנאשם, במיסיונו למלט עצמו, אף הצגיע את קשריו עם מצר
עוויס, על אף העובדה כי השניים התרהגצו בראשית שנות התשעיים בירדן ובבגדד, כעולה
מאמרותיו.

לשקריו של הנאשם אודות קיומו של אדם אחר העונה לשמו המרובע, ראה להלן בפרק העוסק
בזיהוי הנאשם.

סוף דבר, לא מצאנו כי עדותו של הנאשם בפניו יש בה לעורר רושם של מהימנות. הנאשם נכשל -
ואף לא טרח - בעדותו מלהפריך את שלל ראיות התביעה והסתפק בהכחשה גורפת ולאקונית, גם
במעשים המצטמצמים בהם הודה באמרותיו. תוך כדי כך הסתבך הנאשם בגרסאות סותרות
ושקרים של ממש, אשר אף בהם אין להחמיא למשקל עדותו.

סיכום ביניים:

הנה כי כן, מצאנו כי יש מקום להעדיף את ראיות התביעה על פני עדות הנאשם בפרשת ההגנה,
את אמרות עדי התביעה על פני עדויותיהם המנוגמתיות והשקריות - הכל מן הנימוקים האמורים
מעלה בהרחבה. ראיות אלו משתלבות זו בזו ומצטרות גרסה סדורה וקוהרנטית מצד מצד דמותו
של הנאשם כרב-מחבלים העוסק, ביחד עם שותפים נוספים, בשיללוח מחבלים מתאבדים. כעת
נבחן האם אחריותו של הנאשם למיוחס לו, עולה מתוך אותן ראיות.

זיהויו של הנאשם:

דומה כי השאלה המרכזית בתיק זה נוגעת לענין זיהויו של הנאשם אשר בפנינו, כדמות המופיעה
בהפללות הרבות של עדי התביעה כרב-הממללים לו מיוחסים המעשים המנוארים בכתב האישום.
עדי התביעה השונים מתארים אדם בשם מאג'ד מצרי, מוסרים פרטים אישיים שונים שלו ואף
נוקבים בכינוי בו הוא מוכר, "בזבו". לטעמת הנאשם אין כל הדבר, אין לו כינוי כלשהו, ובוודאי
לא "בזבזי". עוד טען הנאשם כי משפחת מצרי היא משפחה גדולה באזור שכם, ומן הסתם יש בה
אנשים נוספים העונים לשם מאג'ד. לטעמת הנאשם, ישנו אדם נוסף בשם מאג'ד מצרי אשר אף
הוא עובד ברשות הפלסטינית. האם הנאשם שבפנינו הוא אותו "בזבזי"?

---

[18] ראה פרוטוקול עדות הנאשם בפרשת הגנת הנאשם מיום 14/06/04, עמ׳ 9, שי 52-46.

P 6: 23

```
                                                                                    1
                                                                                    2
ראשית, יש לציין כי הנאשם ענה בעצמו על שאלה זו באמרתו[19], בה הוא מאשר את כינויו     3
מילדות "חבזה". כאן המקום לציין כי אין המדובר בכינוי שגור או מפץ (כגון כינוי של אדם על שם    4
בנו בכורו, למשל ״אבו מוחמד״, כינוי אשר כמותו ימצאו לאלפים). ייחודו של הכינוי, בצירוף שאר    5
הפרטים האישיים של הנאשם, מצביע על החפיפה בינו לבין הנאשם.                            6
                                                                                    7
אלא שהרשעתו של הנאשם בעבירות החמורות המיוחסות לו, אינה נשענת על כינוי בלבד, אלא גם    8
על ייחומו באופן פרסונאלי ע״י עדי התביעה, איתם עמד בקשרים טובים. באשר לטענות כי עדי    9
התביעה ״התכחלבלו״ או כיוונו לאדם אחר, הרי שבחינה מעמיקה של חומר הראיות תגלה כי אין    10
בכך ממש. הנאשם מאשר באמרותיו את היכרותו עם שאר ״הגורו״ התורעים, עדי התביעה    11
המפליליים אותו, ואף מודה בביצוע עבירות בטחוניות עמם. כך מודה[20] הנאשם בהיכרותו עם    12
נאצר עוויס ובבצועע ירי עמו לעבר עמדת צה״ל וכן בצוע ניסיון ירי. ביחד עם נאצר עוויס אף גורש    13
הנאשם בשנת 1992 מהאזור וביחד נסעו לבגדד[21]. הסברה כי נאצר עוויס אינו מכיר את הנאשם    14
וכינוי בדרכינו למאניר מזניר אחר, מופרכת ממש בנסיבות אלו. עוד מאשר הנאשם באמרותיו כי    15
מסר כספים למנצר שרים ומוחמד נאיפה והוא אף מאשר את היכרותו האישית עמם. הוא אף    16
מאשר העברת רובה קלצ׳ניקוב לידיו של מוחמד נאיפה (על פי גרסת הנאשם, בשל סכסוך פנימי)[22].    17
                                                                                    18
אם כן, ההיכרות של הנאשם עם עדי התביעה עולה במפורש מאמרותיו שלו עצמו. אלא שגם עדי    19
התביעה לא טומנים ידם בצלחת ומרחיבים בענין היכרותם עם הנאשם. מנצר שרים ויהה את    20
הנאשם בשמו מפלא בעדותו בפנינו וציין כי הנאשם הוא חברו[23]. פהד שראעיה מוסר באמרתו[24]    21
תיאור מדויק של הנאשם, כולל מקום עבודתו כקצין במשטרה הפלסטינית, גילו, מצבו המשפחתי    22
והיותו אב נשוי בנות (פרטים אותם מאשר הנאשם עצמו באמרותו) ומוסיף כי כינויו של הנאשם    23
הוא ״חבזה״. עד התביעה ריאד עודה, אשר אפולל בעדותו[25] הנגמתית אישר את היכרותו האישית    24
עם הנאשם לאור שירותם המשותף במשטרה הפלסטינית, מציין גם הוא באמרתו[26], שנתקבלה    25
והועדה על פני עדותו, את כינויו של הנאשם ואת העובדה כי הוא חבר בארגון ״ג׳ודי״ אל אקצא״.    26
אין לחלוחית בעד התביעה אברהים חבושה כי ישכח את הנאשם, לאחר שזה גרם לפציעתו הקשה    27
שעה ששימש בכמיסל רימונים שחחזיק. גם הוא מוכיר[27] את הנאשם בשמו ובכינויו ומציין את    28
**חברותו בארגון הטרור. עד התביעה מוחמד נאיפה מוסר[28] את מספר הטלפון הסלולארי של**    29
**״חבזה״, 200596-059, הדומה באופן מפתיע למספר שמוסר הנאשם עצמו באמרתו[29], 059-**    30
**200569.**                                                                         31
                                                                                    32
                                                                                    33
טוען הסנגור כי נפלו בחקירה פגמים של ממש בכך שלא נערך לעדים מסדר זיהוי. הסנגור לא    34
הביא אסמכתאות להוכחת טענתו, ואנו לא מצאנו בה כל ממש. ניכר מכל האמור למעלה בהרחבה    35
כי העדים מכירים את הנאשם היטב, מוסרים פרטים מזהים רבים שלו, חלקם אף הצביעו עליו    36
באולם בית המשפט (גם אם חזרו בהם מחפללתם או תירצו אותה בהסברים שונים ומשונים). אם    37
כן – בפנינו מצב של ״הצבעתו״ של העדים על העדתים, כעל מי שהם מכירים אותו היכרות מוקדמת    38
ולא זיהוי של אדם לא מוכר באמצעים חזותיים שונים (מסדר זיהוי), ואין כל חובת קיום מסדר    39
זיהוי בנסיבות אלו. ראה גם י. קדמי, על הראיות (מהדורת 1999), חלק שני, עמ׳ 851-852.    40
                                                                                    41
                                                                                    42
                                                                                    43
כאן המקום אף להידרש לשאלה הסטטיסטית, האמנם יתכן כי המדובר במאניר מזניר אחר?    44
הנאשם ביקש להניא, לצורך כך, רשימה של משרד הפנים הפלסטיני באשר לשכיחות השם מאניר    45
מזניר. את המסמך ביקשה ההגנה להניש על סמך עדותו של הנאשם..                            46
                                                                                    47
```

_____

[19] ת/ז 1, עמ׳ 8 שי 22-25.
[20] ראה ת/ז 2, עמ׳ 2 שי, 12-5.
[21] ראה ת/ז 2, עמ׳ 5, שי 24-13.
[22] ראה ת/ז 1, עמ׳ 6 עד 2ש׳ עד עמ׳ 5 שי 21.
[23] ראה פרוטוקול עדותו של מנצר שרים מיום 30/11/03, עמ׳ 1 שי 35-50.
[24] ראה ת/ז 70, עמ׳ 1, שי 22-19.
[25] ראה פרוטוקול עדותו של ריאד עודה מיום 30/03/04, עמ׳ 9, שי 18-22, עמ׳ 10, שי 34-39.
[26] ראה ת/ז 3, עמ׳ 5, שי 8-4.
[27] ראה ת/ז 61, עמ׳ 2 שי 17 ועד עמ׳ 3 שי 2.
[28] ראה ת/ז 60, עמ׳ 5 שי 12.
[29] ראה ת/ז 1, עמ׳ 2 שי 25.

[ גם נסיבות בקשת ההגשה היו, לכל הפחות, מוזרות. הגשת המסמך כלל לא נתבקשה בחקירה 1
הראשית, אלא צצה לפתע בחקירה החוזרת. הנאשם התיימר לאשר את הרשימה שהציג הסנגור, 2
בלא כל הסבר מדוע רשימות זו אותנטית או מה היו דרכי הפקתה..]. 3

4
התביעה התנגדה להגשת המסמך, ואנו קיבלנו[30] את עמדתה כי לא ניתן לקבל את הנטאמך שלא 5
באמצעות עורכו. עם זאת, נעל מנת לחפיס את הדעת הצענו - והצדדים קיבלו את הצעתנו - כי 6
התביעה תגיש מסמך מוקטם שיופק ע״י משרד הפנים במנהל האזרחי. 7

8
מעיון בשאילתא עולה כי מספר אנשים באזור שכם ענים לשם מאגד מצרי, אולם כולם מבוגרים 9
במועחד או צעירים במידחד ולא ענים על תיאורו של מאגד מצרי מנוכר בעדויות התביעה, כאדם 10
כבן 30 - כולם למעט אדם אחד, הוא הנאשם שבפנינו.. באשר לטענת הנאשם[31] כי פעם נכח לדעת 11
שישנו אדם נוסף בשם מאגד אסמעיל מוחמד אלמצרי, אשר לקח הלוואה בנק על שמו - עיון 12
בשאילתא יגלה עד כמה הטענה שקרית, שכן הנאשם הוא האדם היחיד העונה לשם מרובע זה, לא 13
רק בחתך הגילאים הדלוונטי ולא רק באזור נפת שכם אלא בכל הגדה ואף רצועה עזה?! 14

15
16
אם כן, אנו קובעים כי הנאשם שבפנינו הוא אותו מאג׳ד מצרי, המכונה "בזבז" המופיע לרוב 17
בראיות התביעה. כעת שומה עלינו לבחון האמנם יש באותן ראיות כדי להביא להרשעת הנאשם 18
במיוחס לו. 19

20
21

### פרטי האישום המיוחסים לנאשם

22
23
הוכחת פרטי האישום מתבססת על ראיות התביעה, כמפורט לחלן. ההגנה לא נדרשה לענין הוכחת 24
עובדות האישום מתוך חומר הראיות (אלא הסתפקה בהכחשתם). 25

26

### פרט אישום ראשון

27
28
פרט אישום זה מייחס לנאשם חברות בארגון הטרור תנדע "יגודי אל-אקצה". הנאשם מופלל 29
בפרט זה ע״י שלושה מעדי התביעה, פד״ שריעה, אברהים חביצה וראאד עודה. עדויות אלו 30
נשתובבות זו בזו, מחזקות זו את זו וענונות על דרישת התוספת הראייתית. 31

32

### פרט אישום שני

33
34
אישום זה מייחס לנאשם נשיאת משרה בארגון האסור, דהיינו כי עמד בראש "יגודי אל-אקצה" 35
באזור שכם בשנת 02׳, פיקד על הפעלוות הצבאית שביצע הארגון באותה שנה-דמס, ונתאם את 36
פעילות הפעילים הצבאיים, סיפק להם נשק ומימון אותו קיבל מידי מרואן ברגותי ואחרים וכן 37
נהג ליטול אחריות על מעשי הארגון בכלי התקשורת. 38

39
בניגוד להכחשותיו הנמרצות של הנאשם, נראה כי הצע העשייה שפעל הנאשם ומעמדו בארגון, 40
נחקקו בזכרונם של פעילים רבים, אשר וכרו לו את מיקומו עליהם, את הכספים שהעניקו עליהם 41
והתשקים שסיפק להם. שורה ארוכה של עדי תביעה מפללים את הנאשם במיוחס לו בפרט אישום 42
זה, כמפורט בהתרבה בסיכומי התביעה. כך, למשל, מנצור שריס מתאר את מעמדו של הנאשם 43
בארגון, את הכספים הרבים שקיבל מידי בכמסף הזדמנויות לצורך ביצוע פיגועים וכן כי הנאשם 44
נטל אחריות על פיגועים מטעם הארגון. כך, נאצר עויס ממתאר את הנאשם כאיש חכמפים אשר 45
היה ממומן אותו ואף קיבל מידיו סכום של 12,000 ש״ח. כך, מוחמד סוגפה מתאאר את הנאשם 46
כמפעל "יגודי אל-אקצה" בשכם, כמי שאישר לו לבצע פיגועים וכן נטל עליהם אחריות בשם 47
הארגון (תער שלח לו לצורך כך את צילום צואתו של סירחאן) של סירחאן, הרוצח פפרנין קיבוץ מצר) 48
וכן כמי שמימן ביצוע פיגועים וסיפק לשם כך כלי נשק. כך גם פהד׳ שריעה המתאר ארוכות את 49
מעמדו של הנאשם כמי שחיכק לו הוראאות, כמי שנהג לארגן תהלוכות מטעם הארגון ולצורך כך 50
הורה לו לחפוך תמונות שהדיים ולירות בתהלוכות וכן כמי שהעביר כלי נשק מפעיל אחד למשנהו 51
בשורת הזדמנויות. שורת עדויות אלו מחזקות זו את זו וענונות למכבוד על דרישת התוספת 52
הראייתית, אולם גם מקומם של אמרת הנאשם לא נפקד לענין זה. הנאשם אמנם, כדרכו, מנסה 53
להתרחק מחברתו בארגון ומהתפקיד שנשא בן, אולם גם הוא מוסר באמראו פרטים מאמתתים 54
את אשר מפללים אותו חבריו, ובכלל זה כי העביר כספים לאנשים המפללים אותו בכך (נאצר 55

---
[30] ראה פרוטוקול מיום 14/06/04, עמ׳ 11-12.
[31] שם, עמ׳ 11, שו׳ 20-16.

עוויס, מוחמד נאיפה, מנצור שרים, כי קיבל כספים מידי מרואן ברגותי, מונ'ר מקדח (המוזכר גם 1
עיי נאצר עווזג) ואחרים, כי סיפק נשק לידיו של נאיפה, כי יצר קשר עם תחנות טלוויזיה ערביות, 2
כי סייע להקים אתר אינטרנט עבור הארגון ועוד. 3
4
העובדות המפורטות בהרחבה בפרט אישום זה לענין תפקידו של הנאשם, מקומו בהיארכיה 5
הארגון בזמן חנתנו והפעולות השונות אשר נקט במסגרת תפקידו, ישובו ויידונו שעה שנבקש 6
להצביע על אחריותו של הנאשם לעבירות שבוצעו מטעם הארגון. 7
8
9
**פרט אישום שלישי** 10
11
פרט זה מייחס לנאשם עבירת ירי של ירי לעבר אדם, וזאת בכך שבמספר הזדמנויות ביצע ירי ביחד 12
עם חבריו לארגון לעבר חיילי צה"ל. עד התבצעה נאצר עווזג מפליל אותו בביצוע מעשי ירי ביחד 13
עמו. גם הנאשם מציין באמרתו מעשה ירי שביצע ביחד עם נאצר עווזג, כך שבפנינו תשתית 14
ראייתית מלאה להרשעת הנאשם בפרט אישום זה. 15
16
**פרט אישום רביעי** 17
18
התביעה חזרה בה מאישום זה, ופטורים אנו מלדון בו. 19
20
**פרט אישום חמישי** 21
22
אישום זה מייחס לנאשם עבירת ניסיון לירי, כך שביחד עם נאצר עוזיס יצא לירות לעבר חיילי 23
צה"ל, אולם בסופו של דבר נמלט בדעתם לאחר שנתפשו עיי כוחות הצבא. גם הנאשם וגם נאצר 24
עווזג מתארים את האירוע באופן דומה באמרותיהם ומצאנו לנכון להרשיע את הנאשם בגין 25
עבירה זו. 26
27
28
29
**אחריות הנאשם למעשי הרצח מכות תפקידו** 30
31
פרטי האישום התמורים 6-18 מייחסים לנאשם אחריות למותם של 10 בני אדם בפגועני 32
ההתאבדות ברחבי יפו בירושלים, בישוב חרמש ובקיבוץ מצר, וכן את פצועתם ונסיון רציתתם 33
של נוספים באותם אירועים. כל מעשה הרציחות הלל בוצעו עיי מחבדים מתאבדים אשר נשלחו 34
מטעם ארגון "גדודי אל-אקצה" תעיי הנאשם ושותפיו. 35
36
מטבע הדברים, אין אפשרות להעמיד לדין את המחבל המתאבד אשר מוסר את נפשו על מובח 37
האידאולוגיה הבווח. אין זאת אומרת כי אלו העומדים מאחוריו, ואשר עשותו ככלי שרת בידם 38
למילוי מטרותיהם הבווחות, צריכים לחמוג מן העונש. דיני העונשין הכרו בם באמשורות להטיל 39
אחריות, ואף אחריות מלאה, על מי שמבצע תפקידו או מעמד (ניהיה זה גם מעמד בלתי רשמי - 40
ראה ענין "משולט" הנזכר לחל) הניע אחרים לביצוע עבירות. 41
42
**אחריות ראשי הארגון הטרוריסטי למעשי חברי הארגון - הפן הנורמטיבי** 43
44
כידוע, מקובלת בתורת המשפט הצבאי דוקטרינת ה"אחריות הפיקודית", לפיה אחראי בעל דרך 45
פיקודי בכיר למעשי פקודיו אשר נעשו על פי הוראתו ואישורו, גם אם בפועל נטל הוא חלק מעשי 46
קטן או אף שולי במעשים עצמם. דומה כי כל מי שעניינים לו בראש, לא יוכל לחמוג מן המסקנה 47
החוזקת כי אחריות מקבילה, להבדיל אלפי הבדלות, יש להטיל גם על ראשי ארגוני פשע וטרור 48
המכוונים את פעילותם המשעת והמורים על ביצועם של מעשי רצח ב"שלט רחוק". 49
50
יפים לענין זה כבי רבי השופט קדמי בעיים 5589/98 **ביטאן ג. מדינת ישראל**, תק-על 51
3/99(8 98. באותו ענין הורשע המערער בעבירת רצח בכוונה תחילה, כאשר הוכח שנתן את הסכמתו 52
לביצועה של הרצח, ושלה את המבצע העיקרי להוציא לפועל את הרצח, ואף נתנה אותו לגבי 53
שיטת הביצוע. השופט קדמי הדגיש שלולא הסכמתו של המערער לא היה הרצח מתבצע, ולכן מתן 54
האישור לבצע את הרצח היה משול "לירית ההזנה המשלחת ספורוטא למרוזי, והיא עולה כדי 55
"מעשה" של השתתפות בביצוע העבירה". לכן הורשע המערער כמבצע בצוותא ולא כמשדל, ובית 56
המשפט הדגיש כי הוא היה מצוי "במעגל הפנימי של הביצוע", כמי שהיה לו תפקיד בביצוע, והיה 57
"הימום של החבורחי", בעוד שמשדל מצוי מחוץ למעגל הפנימי של הביצוע. כבי השופט קדמי הוסיף 58

ואמר כי בנסיבות המתוארות לעיל, כאשר המערער נתן "אור ירוק לרצח" וההתנהגות אופרטיבית 1
בדבר דרך הביצוע, היה ההתנהגותו לפחות "מנגה גדושה" של שידול על דרך העידוד". 2
3
בדנ"פ 1294/96 **עווז ו'נאת' נ' מדינת ישראל**, פי"ד נב(5) 1, פסק כבי השופט א. מצא כי: "יש 4
לראות במשתתף בזה -- שבידו שליטה מלאה על הביצוע ושעשייתו כוללת לא רק פעולות שידול 5
והכנה, אלא גם הנחיית העצריינים הפועלים ופיקוח על פעילותם - מגצע בצוותא לכל דבר". 6
הוא הדירש כי נוכחות בזירת העבירה איננה יסוד חיוני להיותו של אדם מבצע בצוותא, ואמר: 7
8
"במציאות המשפטית החדשה, התניית האחריות הישירה בנוכחות, פרושה ש'סנדיקים' 9
ומנהיגי קבוצות עבריינים, הממלחים לזירת הביצוע את 'דגי הרקק' הסירים למרותם, 10
בעוד הם מנחים את הפעילות תפעילית מרחוק, יראו לא כמבצעים בצוותא אלא רק 11
כמשדלים. ואפשרות זו, שבודאי איננה משקפת את הדין הרצוי, איננה מתחייבת אף מן 12
הדין המצווי". 13
14
אותו פסק דין ניתן לאחר ניתות מעמיק של דמותו של הרב עווי משולם ומסקנת השופטים באשר 15
למרות שהטיל על חסידיו. 16
17
עקרונות אלו באו לידי ביטוי לא רק לענין ארגוני פשע, אלא גם לענין נושאי משרה בכירה בארגוני 18
סרוד, בפסק דינו תמאלך של בית המשפט המחוזי ת"א אביב, תפ"ח 1158/02 **מי"ץ נ' מרואן ברגוותי**. 19
ראה גם עקרונות דומים המצוטטים בפסי"ד ברגותי הנ"ל, המובאים במאמריתם של מ. קרמניצר 20
"הממלצ בדיני העונשין קווים לרמותו", פלילים-א' (תשיין-1990) 65, בעמי 72, ומ. גור-אריה, 21
"צדדים לעבירה-תיקון 39 לחוק העונשין במבחן הפסיקה", מגמות בפלילים, עמי 83. 22
23
מן הפרט אל הכלל 24
25
אין לך משיחה קלה מאשר הוכחת מעמדו  חבכיר של הנאשם בארגון גדודי אל-אקצה בשכם 26
וסביבותיה ושליטתו המוחלטת בפעילות הצבאית של הארגון בזמן ששימש כראש הארגון בעיר. 27
ראיני כי הנאשם פעל כמפקד "גדודי אל-אקצה" באזור שכם בשנת 02', ולמרות סרח פעילי 28
הארגון בנותו שרה. הנאשם היה מערב בחלקים הכספים לפעילי הארגון - בספסף אשר הזין את 29
גלגלי הטרור. הנאשם תיאם על פעולות חברי הארגון באזור ועמד בקשר עם מפקד ארגון התנגונם, 30
מרואן ברגותי. הנאשם סיפק כלי נשק לפעילים לביצוע משימותיהם ואף היה מעורב בצדדים 31
נוספים בפעילות הארגון כגון ארגון תהלונות והקמת אתר אינטרנט ועוד כהנה וכהנה מרעין 32
בישין. 33
34
עובדות פרטי האישום הבאים יגוללו כיצד היה הנאשם מעורב בהכנות המקדימות לביצוע פיגועי 35
התאבדות, כיצד פנה פעיל בבאי אליו על מנת לקבל את אישורו לרצח הפים מפשע. נראה בעליל כי 36
ראה עצמו כפוסק בעניני חיים ומוות באזור שכם. ביוזמתו, באישורו ובהכרתו של הנאשם יצאו 37
לדרכם פיגועי התאבדות המתוארים להלן, ובדין נושא הוא באחריות אליהם. 38
39
נסיים פרק זה ולו באזכור העובדרה הטמלית כי במסגרת תפקידי הנאשם הוא היה שמידה ליטול 40
אחריות בשם הארגון על פיגועי ההתאבדות שביצע הארגון. אמנם, בבואו לתת את הדין על 41
מעשיו, נתקף הנאשם בבישנות מעושה ולא חזר על כך, אולם דומה כי הדברים מדברים בעד 42
עצמם ומצביעים מדוע אין מקום ליתן לנאשם לחמון מהאחריות לה הוא נושא במסגרת תפקידו 43
למעשי הרצח שביצע הארגון כראשו עמד ואשר מיהר להתאות בהם. 44
45
46
אלא שאחריותו של הנאשם למעשי הרצח לא מתמצת במישור "הממיניסטריאלי" בלבד. שכן 47
הנאשם גם שלח ידו בביצוע מעשים של ממש במסגרת הוצאתם לפועל של פיגועי ההתאבדות 48
הנדונים, מעשים המבטאים אותו אל מסגרת "הממעל הפנימי" של מבצעי העבירה, הנושאים 49
באחריות כמבצעים ישירים. נדון כעת בחלקו של הנאשם במסגרת הוצאתם הוצאתם לפועל של כל אחד 50
מהפיגועים. 51
52
השתלשלות האירועים הכללית 53
54
כפירתו של הנאשם באישומים כנגדו היתה כללית וגורפת. הנאשם לא הציג בפנינו כל זירת 55
מחלוקת מונומת, אפילו ביחס לחלקים מתוך פרטי האישום אשר כלל אינם נוגעים לו. ההגנה 56
עמדה על הוכחת כל פסיק ותג בהם, גם ביחס לאירועים שבוצעו לאחר שיצא הנאשם מן התמונה 57

1 (ראה הפרק הדן בעדותו של אחמד ברגותי הנזכר מעלה) ולא ידעה למוסור אפילו באשר
2 לעצם קרות הפיגועים.

4 נוהג זה של ההנהגה להתמיד בהכחשה הגורפת, גם באשר לעצם מותם של הקורבנות, יש להצטער
5 עליה, בפרט שהחומר הטכני המנכסס עובדות אלו הוגש בהסכמתו. לצערנו, לא הוגשו לבכנו
6 החשש שמא עומד הנושא ליתן את הדין בגין מעשי רצח שלא בצעו. הראיות הטכניות חרבות
7 שהוגשו בהסכמת ההגנה, מבססות את עובדות האירועים המתוארים והתמצולות חקשיות של
8 קורבנות מעשי הרצח, בהם פעולות רכים בשנים, לא מותירות מקום לספק בענין זה.

10 למעשה, אין מחלוקת של ממש גם ביחס לחשתלשלות העניינים הנוגעת לשלכי הוצאתם לפועל של
11 הפיגועים. אם נעמיק ראות, מעבר לעניי האבכן שבקשו עדי התבבאה להתערים בהתחמקויותיהם
12 השונות, נראה כי למעשה הללו (מותמד טיבה, מנצור שרים, נאצר עוויס, אברהים עי"א ח) אינם
13 מכחשים את תהליכי ההוצאה לפועל של מעשי הרצח, ומתקוסדים בעיקר ב (בהכחשה) חלקו של
14 הנאשם. מכל מקום, קריאה באמרותיהם, מעלה באזנן נרחב ומפורט את השתלשלות אירועים זו
15 (ובכלל זה ההכנות, חימוש המתאבדים, צילומם, הטעתם לעבר זירת הרצח וכו').

17 אם כן, מצאנו השתלשלות האירועים הכללית, הוכחה כדבעי מתוך הראיות שהובאו בפנינו, וספק
18 אם היא שנויה במחלוקת אמיתית, וכעת נמקד מבטנו לעבר חלקו של הנאשם.

20 **פרטי האישום 8-6, הפיגוע ברחוב יפו**

23 פרטי אישום אלו מיחסים לנאשם אחריותו לרציחתן של אורה סנדלר ושרה המבורגר ז"ל וניסיון
24 גרימת מותם של 45 אזרחים שנפצעו באירוע. האירוע הוצא לפועל מטעמו ובשמו של ארגון "גדודי
25 אל-אקצה". מיוחס לנאשם כי הוא קיבל לידיו את המחבל המתאבד בדיריה במחתה בלאסון וביתה
26 עם מתכונ' טיטיי צילם אותו כשהוא מחזיק ברובה וספר קוראן. לאחר מכן שולח הנאשם את
27 המתאבד, סעיד, לדרכו האחרונה. לאחר חדברים האלת יצא סעיד לכיוון רמאללה שם נשלח עי"י
28 אחמד ברגותי לירושלים, מקום בו פתח בירית לכל עבר, עד אשר הוכרע, אולם לא טרם שגרם
29 לרצח שני נשים ופציעת עשרות רבות.

31 על חלקו של הנאשם מספר עד התבבעה אברהים עי"א חיי, כאמור בפרוטוקול הודאתו במשפטו
32 (ת/ 69, סיק 6 לפרט האישום השישי בכתב האישום) ועל עדותו מתבכס חחלק באישום הנוגע
33 לנאשם. על הרקע לאירוע, למדים אנו מאמרותיהם של עי"א חי ושל נאצר עוויס. אמרותיהם של
34 עדי התבבעה 17,16, מותמד מצלח ומותמד עבדאללה הוגשו בהסכמה" ורואים בציונם כמוסכם
35 (עדי"י איו"ש 114/01, אבו הלאל). מאמרות אלו, בציירוף פרוטוקול תודאתו של אחמד ברגותי,
36 למדים אנו על אחריותו של אותו סעיד לאחר שנשלח וצולם עי"י הנאשם. מן החומר הטכני למדין
37 על התוצאות הקטלניות של האירוע. אך מובן הוא כי שלל הראיות משתלבות זו בזו ומהוות חרבה
38 מעבר לחיוק המונבר הנדרש לעדותו של עי"א חי.

41 דומה כי בנימים אלו אין אדם נדרש לדמיון רב באשר למשמעותו של אקט צילום מתאבד, כשחוא
42 מקריא את צוואתו טרם צאתו לדרכו האחרונה, ומעשהו של הנאשם בהקשר זה נמצא בעד עצמו.
43 אקט זה, בציירו מעמדו של הנאשם הנזכר מעלה, מבסס את היותו חלק מן "המנגעל הפנימי"
44 של משלחי המתאבד ואת אחריותו המלאה לפיגוע ולתוצאותיו הרצחניות.

46 מטעמים אלו מרשיעים אנו את הנאשם באחריות לפיגוע התהאבדות ברחוב יפו בירושלים,
47 לפציעת האזרחים והניסיון לרצוח נוספים.

50 **פרטי האישום 12-9, הפיגוע ביישוב חרמש**

52 פיגוע זה הוצא לפועל עי"י מותמד נאיפה, בסיועם של אכרם אבו-בכר, אוסאמה אשכר ואמניד
53 יחיא. מיוחס לנאשם (ס"יק א'-ט' לפרט האישום) כי הוא זה שנתן אישור מפורש לבצע את הפיגוע
54 לבצע את הפיגוע, ולאחריו אף נטל אחריות עליו בשם הארגון וכן העביר לידיו של נאיפה סכום של
55 $3,000. באירוע נרצחו לוני סרוסי, חדס תורגימן ואורנה אשל זכרן לברכה וכן נפצע יובל אשל.

---
[11] ראה פרוטוקול הדיון מיום 14/06/04, עמ' 1 ש' 21-22.

חלקו של הנאשם עולה מתוך אמרותיו של נאיפה אוונו מצאנו, כזכור, לקבל. נאיפה מתאר כיצד, 1
לאחר שסיפר לו אברם אבו-בכר כי ברשותו מתאבד המוכך לבצע פיגוע, יצר קשר עם הנאשם 2
שאישר לו לבצע את מעשה הרצח (או בלשונו של הנאשם, ״למה לאי?״). ודגש מתוך דבריו של 3
נאיפה כי הורה לאברם להמשיך בגלגול הפיגוע, רק לאחר שיחתו עם הנאשם וקבלת האישור 4
ממנו. עוד מתאר נאיפה כיצד, לאחר הפיגוע, נטל הנאשם אחריות לפיגוע בשם הארגון ואף העביר 5
לו את סכום הכסף. 6

חיזוק לדבריו של נאיפה אנו מוצאים לא אחת מאשר באמרותו של הנאשם המאשר כי מסר 9
לנאיפה סכום כסף יום לאחר הפיגוע להקמת סוכת אבלים לשהיד. שאר המעורבים באירוע, 10
שאמרותיהם הוגשו בהסכמה, מבססים את עובדות האישום בכללל והותחמו הטכני מבסס את 11
תוצאותיו הקטלניות ופציעתו של יובל אשל, שאשתו אורנה נ׳׳ל נרצחה לנגד עיניו. 12

רואים אנו כי הנאשם היה בעל שליטה מוחלטת בהוצאתו לפועל של הפיגוע, ומבצעיו סרו למרותו, 15
הן באומר והן במעשה, הן לפניו והן אחריו. הנאשם נושא באחריות מלאה לאירוע שיצא בברכתו, 16
באישורו ובמימונו ושעליהו הוהרו ליטול אחריותו ואנו מרשיעים אותו באחריות לו. 17

<u>פרטי האישום 13-18, פיגוע מצר</u> 19

גם באירוע זה, נשלח המחבל המתאבד, חניק האדם סירחאן, עלי מוהמד נאיפה לקיבוץ 21
מצר. במקום הירו שלו בקיבוץ רצח סירחאן את ילדי משפחת אוחיון, מתן ונועם, את אמם רויטל 22
וכן את תושבי הקיבוץ תרצה דמארי ויצחק דורי, זברם לברכה. 23

מעיון באמרותיו של נאיפה עולה כי פעם נוספת פנה לנאשם, בצ׳יט באוזניו כי ברשותו מתאבד 25
נוסף המוכך לפעול ובנקשת לחמשו בכל נשק, והנאשם דאג לעשות כן. לאחר מכן, פנה נאיפה אל 26
הנאשם כי ייקח אחריות על הפיגוע, ואף דא׳ל לחעציר לידיו את סרט הצילום של סירחאן מקריא 27
את צוואתו. 28

הנאשם בכבודו ובעצמו מחזק את דבריו של נאיפה באופן מובהק (תוך הוצאת העוקץ מן הדברים, 30
כהרגל) כאשר הוא מציין באמרתו כי מסר לנאיפה כלי נשק (לטענתו, בעקבות סכסוך של נאיפה 31
עם אדם אחר) וכן כי לאחר הפיגוע התקשר לוחתנה הטלויזיה להודיע כי הוא מתנגד לביצוע 32
פיגועים בתוך תחומי מדינת ישראל..למותר לצ׳ין כי הסיפא שבצד גרסתו של הנאשם, לא אמין 33
בעיניני. הנאשם לא טרח לחזור אפילו על גרסה מתחמקת זו בעדויותו ותרחיק עצמו מכל מעורבות 34
עם נאיפה או מתן כלי נשק. 35

המעורב העיקרי הנוסף באירוע אוסאמה אשכר, אשר אינו מזכיר את הנאשם, מבסס את עובדות 37
כתב האישום הנוגעות להכנות לשילוח סירחאן למשימת הרצח והתומר הטכני מזירת הטבח 38
מאשש את תוצאותיו הקטלניות. 39

דפוס התיראכיה שבין נאיפה לנאשם, כבר תואר לתלן והמעשים שנעשו לפני ואחרי הפיגוע, 42
מבססים את אחריותו של הנאשם מכוח מרותו על מבצעי הרצח ומתן האישור לפיגוע (ונטילת 43
האחריות עליו. אלא שגם הפעם, מלבד האחריות ״המוניסטריאלית״, נושא הנאשם באחריות 44
מובחקת לפיגוע בתור מי שהמצביא לידיהם של הרוצחים בפועל את כלי הנשק שקטל את תושבי 45
הקיבוץ. אין ספק כי הנאשם נושא באחריות מלאה לאירוע הרצח ואנו מרשיעים אותו בכך. 46

<u>פרט האישום 19</u> 48

פרט זה מייחס לנאשם עבירת קשירת קשר לגרימת מות בכוונה, זאת בכך שהיה שותף למזימה 50
לשלח את סירחאן, לביצוע פיגוע נוסף לאחר פיגוע מצר. 51

גם אישום זה מתבסס על אמרותיו של מוהמד נאיפה, המתאר כיצד משנתבבר כי סירחאן נותר 53
בחיים לאחר ההתקפה הרצחנית בקיבוץ מצר, הוחלט לשלות אותו שוב לבצע פיגוע התאבדות, 54

---
[33] ראה ת/ 60, עמ׳ 4 ש׳ 25.
[34] ראה ת/ 1, עמ׳ 5 ש׳ 9-5.
[35] ראה פרטוקול מיום 02/09/03, עמ׳ 3 ש׳ 28-27.

תאריך: 28/06/05                                    15                תיק מסי: 5398/03

ולשם כך חונקשר אל הנאשם. הנאשם מסר את הסכמתו לתוכנית ואף נענה לבקשת נאיפה            1
להמצוא לידיו כלי נשק, ובני תחבורה אף יצאו לשבב לפגושו ולקחת מידיו את הנשק, אולם נעצרו    2
קודם לכן.                                                                        3
                                                                                4
אודות התיזוקים הרבים לאמרותיו של נאיפה בשורת ענייניס - עמדנו זה מכבר. אין ספק כי          5
הקשר הנדון, הוא חלק מתוך "מסכת עובדתיתי" אחת, חנוגעת לפיגועי טרור שבוצעו ע"י נאיפה       6
ותנאשם במסגרת הארגון ובאמצעות סירחאן, ועל כן רואים בהם כחיזוקים גם לענין הפללונו את      7
הנאשם לענין אישום זה.                                                              8
                                                                                9
גם באשר לדפוס הפעולה ותקשר בין הנאשם ונאיפה, עמדנו זה מכבר ואין ספק כי אישורו של        10
הנאשם את התוכנית הרצתנית והתהייבותו להמצוא כלי נשק, חופכים אותו לשותף בקשירת            11
הקשר.                                                                            12
                                                                                13
                                                                                14
                                                                                15
**סוף דבר, מרשיעים אנו את הנאשם בכל המיוחס לו, למעט פרט האישום הרביעי, ממנו**            16
**חזרה התביעה.**                                                                   17
                                                                                18
                                                                                19
                                                                                20
זכות ערעור כחוק                                                                    21
ניתן והודע,28/06/05, בלשכה. המזכירות תמציא עותק לידי הצדדים.                           22
                                                                                23
                                                                                24
שופט                        אב"ד                    שופט                         25
                                                                                26
                                                                                27
                                                                                28