

PLAINTIFF'S
EXHIBIT
357
tabbies

Israel                                    Defense                                              Forces
Before the Military Court                 Court Case:          3459/02
In Beit El                                Prosecution case:    444/02
Before a panel                            Detailed incident case:  1282/02 Binyamin
                                                                   1283/02 Binyamin
                                                                   1284/02 Binyamin
                                                                   1285/02 Binyamin
                                                                   234/01 Jerusalem Special
                                                                     Duties Department
                                                                   457/01 Binyamin
                                                                   2159/01 Binyamin
                                                                   7915/01 Zion
                                                                   481/01 Zion
                                                                   8379/01 Zion
                                                                   39/02 Binyamin
                                                                   502/02 Zion
                                                                   483/02 Shafat
                                                                   4258/02 Yarkon
                                                                   568/02 Shafat
                                                                   783/02 Binyamin

[Stamp]  This indictment was received  _____
         on date: October 1, 2002
         and entered into the log in case  _____
         by the court [Signature]

### In the trial between the military prosecutor – The Prosecutor

### - v. -

Ahmed Taleb Moustafa Barghouti (alias: "Al Faransi")
Identity No. 994466860, born on March 15, 1976, a resident of Albira – Ramallah
detained since April 15, 2002

### - The Defendant -

### Amended Indictment

### The above mentioned Defendant is accused hereby of committing the following offenses:

### First count:

**Nature of the offense:** Membership in an illegal organization, an offense pursuant to
Regulations 84 (1) (A) and 85 (1) (A) of the Defense Regulations (Time of Emergency), 1945.

[Stamp] P 5: 175

Prosecution Case 444/02 Amended

1

**Details of the offense:** The above mentioned Defendant, in the Area, from late 2000 until the day of his arrest, was a member or acted as a member of an illegal organization, as follows:

The above mentioned Defendant, from early 2006 until the day of his arrest, acted as the driver and bodyguard of Marwan Barghouti, who is the head of the "Tanzim" of the Fatah.

The above mentioned Defendant, from early 2001 until the day of his arrest, operated within the framework of the "Tanzim" of the Fatah, which is an illegal organization, and conducted military activity against Israeli targets.

During the course of his military activity, the Defendant regularly received financial assistance from operatives of the "Tanzim" of the Fatah. The Defendant received through his bank account an amount of approximately NIS 7,000 from Nasser Mahmoud Aweis, a senior military operative from the Nablus area, and an amount of approximately NIS 10,000 from Faraj Barghouti, a senior operative in the Ramallah area.

[Stamp] P 5: 175 [continued]

Prosecution Case 444/02 Amended

2

During his military activity, the Defendant was in constant contact with the Head of the "Al Aqsa Martyrs' Brigades", the military arm of the "Tanzim" of the Fatah in Nablus – Nasser Mahmoud Aweis, the Head of the "Al Aqsa Martyrs' Brigades" in the Tul-Karm Area – Raed Karmi, the Head of the "Al Aqsa Martyrs' Brigades" in the Jenin area – Abed Karim Rateb Younes Aweis, the Head of the "Al Aqsa Martyrs' Brigades" in the Bethlehem and Hebron area – Jihad Jaara, the Head of the "Al Aqsa Martyrs' Brigades" in the Area – Nasser Mohamed Yusef Naji (Abu-Hamid), and with the Head of the "Tanzim" of the Fatah – Marwan Barghouti.

Within the framework of his above mentioned military activity, the Defendant distributed in Ramallah leaflets on taking the responsibility for attacks that were carried out in Israel and in the Area by operatives of the "Tanzim" of the Fatah.

**Second count:** Holding an office in an illegal organization, an offense under Regulations 84(1) (A) and 85(1) (B) of the Defense Regulations (Time of Emergency), 1945.

**Details of the offense:** The above mentioned Defendant, in the Area, from 2001 until the day of his arrest, managed or helped in the management of an illegal organization, or held any office or position in or under the authority of an illegal organization, as follows:

The above mentioned Defendant, during the period set forth, was one of the persons responsible for the "Al Aqsa Martyrs Brigades" Organization (Kataib Shuhada al-Aqsa) in the Ramallah area – the military arm of the "Tanzim" of the Fatah, which is an illegal organization. "The Al Aqsa Martyrs Brigades" were responsible for the commission of a large number of attacks against IDF soldiers and Israeli civilians both in the Area and within the territory of the State of Israel, in which a large number of Israeli civilians and IDF soldiers were killed.

Among other things, the Defendant served as the contact person between the other regional coordinators of the "Al Aqsa Martyrs Brigades" and the head of the "Tanzim" of the Fatah – Marwan Barghouti.

**Third count:**

**Nature of the offense:** Execution of a service for an illegal organization, an offense pursuant to Regulations 84(1) (A) and 85(1) (C) of the Defense Regulations (Time of Emergency), 1945.

[Stamp] P 5: 176

Prosecution Case 444/02 Amended

3

**Details of the offense:** The above mentioned Defendant, in the Area, during the period set forth in the first count of the indictment or thereabouts, performed some work or executed some service for an illegal organization, as follows:

The above mentioned Defendant, during the period set forth, in Ramallah or thereabouts, on a large number of different opportunities, distributed money to military operatives of the "Tanzim" of the Fatah. The Defendant frequently received money from the operative of the "Tanzim" of the Fatah Ali Faraj Barghouti and distributed it to many people who carried out attacks against IDF soldiers and Israeli civilians. On each opportunity, the Defendant provided to each of the operatives various amounts of money, from 100 to 300 U.S. dollars. In addition, the Defendant regularly transferred larger amounts to military operatives in the "Tanzim" of the Fatah through bank transfers.

Among other things, the Defendant transferred to Mantzour Sharam, a senior military operative in the "Tanzim" of the Fatah in Tul-Karm, who is deputy of Raed Karmi – the Head of the "Al Aqsa Martyrs Brigades" in Tul-Karm, which is the military arm of the "Tanzim" of the Fatah, the amount of NIS 3,000.

In addition, the Defendant transferred to Nasser Mohamed Yusef Naji (Abu-Hamid), who is the Head of the "Al Aqsa Martyrs Brigades" amounts from NIS 1,000 to 2,000 on approximately 6-7 different occasions, for the purpose of purchasing cartridges.

In addition to money, the Defendant regularly provided military operatives of the "Tanzim" of the Fatah cellular telephone handsets for the purpose of their military activity.

[Stamp] P 5: 176 [continued]

Prosecution Case 444/02 Amended

4

**Fourth count:**

**Nature of the offense:** Trading in war materiel, an offense pursuant to Section 2 of the Prohibition of Trading in War Materiel Order (Judea and Samaria) (No. 243), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in the Area, in 1998 or thereabouts, traded in or otherwise handled war materiel, without a permit signed by or on behalf of the commander of the Area, as follows:

The above mentioned Defendant, at the time set forth, in the Amari Refugee Camp or thereabouts, purchased from Samer Almimi an MP-5 submachine gun for 4,000 Jordanian dinars and a short barreled M-16 assault rifle with telescopic sights in exchange for 5,000 Jordanian dinars, without a permit signed by or on behalf of the commander of the Area. The above mentioned Defendant, during the years 2001-2002, regularly delivered the above mentioned MP-5 submachine gun to various persons for them to use it to carry out shooting attacks against Israeli civilians, as will be described further in the indictment.

**Fifth count:**

**Nature of the offense:** Possession of a firearm, an offense pursuant to Section 53(A) (1) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970.

**Details of the offense:** The above mentioned Defendant, in the Area, during the period set forth in the first count of the indictment, possessed a firearm, ammunition, bomb, hand grenade or explosive or incendiary device, a tool or object or thing that is planned to cause or is capable of causing death or severe injury, without a permit certificate granted by or for a military commander, as follows:

The above mentioned Defendant, during the period set forth, in Ramallah or thereabouts, kept in his possession an MP-5 submachine gun, a pistol and a short barreled M-16 assault rifle with telescopic sights, without a permit certificate granted by or for a military commander.

**Sixth count:**

**Nature of the offense:** Trading in war materiel, an offense pursuant to Section 2 of the Prohibition of Trading in War Materiel Order (Judea and Samaria) (No. 243), 5728-1968.

[Stamp] P 5: 177

Prosecution Case 444/02 Amended

5

**Details of the offense:** The above mentioned Defendant, in the Area, in late 2000 or thereabouts, traded in or otherwise handled war materiel, without a permit signed by or on behalf of the commander of the Area, as follows:

The above mentioned Defendant, at the time set forth, at the time set forth, [Translator's note: as written] in Ramallah or thereabouts, delivered to Nasser Mohamed Yusef Naji (Abu-Hamid) -- the head of the military arm of the "Tanzim" of the Fatah, a Kalashnikov assault rifle and 50 cartridges for a Kalashnikov assault rifle, without a permit signed by or on behalf of the commander of the Area. Nasser Abu-Hamid delivered the above mentioned Kalashnikov assault rifle and the above mentioned cartridges to Ahmad Andour, an operative in Force 17 of the Palestinian Authority. Ahmad Andour reported to Nasser Abu-Hamid that he had carried out a shooting attack using the above mentioned Kalashnikov assault rifle in which the late Kahane couple were killed, and carried out a shooting attack in which an Israeli civilian was killed, using the above mentioned cartridges.

#### Seventh count:

**Nature of the offense:** Trading in war materiel, an offense pursuant to Section 2 of the Prohibition of Trading in War Materiel Order (Judea and Samaria) (No. 243), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in the Area, from late 2000 until the day of his arrest or thereabouts, traded in or otherwise handled war materiel, without a permit signed by or on behalf of the commander of the Area, as follows:

The above mentioned Defendant, at the time set forth, during the period set forth, in Ramallah or thereabouts, on many different occasions, delivered to Nasser Mohamed Yusef Naji (Abu-Hamid) -- the head of the military of the "Tanzim" of the Fatah, large amounts of money totaling some tens of thousands of shekels and tens of thousands of U.S. dollars for the purpose of purchasing arms and cartridges for carrying out shooting attacks against IDF soldiers and Israeli civilians. The Defendant also regularly kept at home cartridges that had been purchased with this money and deliver them to Nasser Abu-Hamid and the latter's colleagues as necessary, without a permit signed by or on behalf of the commander of the Area.

[Stamp] P 5: 177 [continued]

Prosecution Case 444/02 Amended

6

**Eighth count:**

**Nature of the offense:** Trading in war materiel, an offense pursuant to Section 2 of the Prohibition of Trading in War Materiel Order (Judea and Samaria) (No. 243), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in the Area, from late 2001 or thereabouts, traded in or otherwise handled war materiel, without a permit signed by or on behalf of the commander of the Area, as follows:

The above mentioned Defendant, at the time set forth, in Ramallah or thereabouts, delivered to Nasser Mohamed Yusef Naji (Abu-Hamid), the head of the "Al Aqsa Martyrs Brigades", the military arm of the "Tanzim" of the Fatah, 100 cartridges for an M-16 assault rifle, without a permit signed by or on behalf of the commander of the Area.

**Ninth count:**

**Nature of the offense:** Undermining the security of the area, an offense pursuant to Section 53(A) (4) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970.

**Details of the offense:** The above mentioned Defendant, in the Area, in early 2001 or thereabouts, committed an act or an omission constituting an undermining of or damage to, disruption of or danger to the security of the Area or the security of IDF forces and soldiers or the action, use or security of any of the following: a ship, aircraft, port, quay, jetty, dock, airport, railway, sea lane, road, dirt road, locomotive, vehicle, any cargo or other public transport or public communication device, or any factory, institute or equipment that is used or is capable of being used for the manufacture, supply, storage, transfer, delivery or distribution of water, fuel, gas or electricity or any property of the State of Israel or the Israel Defense Forces, as follows:

The above mentioned Defendant, at the time set forth, in Ramallah or thereabouts, purchased a stolen white Mazda vehicle, a recent model. The above mentioned Defendant delivered the above mentioned vehicle to Muhannad Abu Halawa, who departed in the above mentioned vehicle to execute attacks against Israeli civilians and IDF soldiers in the Area.

**Tenth count: (Detailed Incident 234/01 Jerusalem Special Duties Department)**

[Stamp] P 5: 178

Prosecution Case 444/02 Amended

7

**Nature of the offense:** Causing intentional death, an offense under Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on January 25, 2001 or thereabouts, caused the intentional death of another person, as follows:

1.  The above mentioned Defendant, at the time set forth, met in Ramallah Mohamed Abed Rahman Salam Mousleh (alias "Abu Satha") and Jad Ibrahim Musa Maala.

2.  Jad Maala and Mohamed Mousleh asked the Defendant for a vehicle for the purpose of carrying out a shooting attack against Jews. The Defendant provided Jad Maala and Mohamed Salah a stolen silver Volkswagen Bora vehicle, bearing Israeli license plates, in order for his above mentioned colleagues to carry out a shooting attack from this vehicle with the intent of causing the death of Israeli civilians.

3.  Mohamed Mousleh drove the Volkswagen vehicle while Jad Maala sat next to him armed with a "16" pistol.

4.  Jad Maala and Mohamed Mousleh traveled in the Volkswagen vehicle in the Atarot area in order to search for an Israeli vehicle with the aim of carrying out a shooting attack against it and causing the death of the vehicle occupants.

5.  At about 6:15 p.m., in the Atarot Industrial Zone, Jad Maala and Mohamed Mousleh noticed a GMC Safari vehicle, license No. 7901306 (hereinafter: "the Vehicle"), which the late Elazar Akiva Fashkos drove.

6.  Jad Maala and Mohamed Mousleh started to drive after the Vehicle. The Defendant and Mohamed Mousleh followed the Vehicle from the Atarot Industrial Zone to A-Ram Junction and back.

7.  When the vehicle returned to the Atarot Industrial Zone and drove on the main road, Jad Maala and Mohamed Mousleh drove the Volkswagen vehicle near the Vehicle.

[Stamp] P 5: 178 [continued]

Prosecution Case 444/02 Amended

8.    At this stage, Jad Maala opened the window and fired with the above mentioned "16" pistol approximately 7 rounds at the Vehicle with the intent of causing the death of the driver of the Vehicle. A number of bullets that were fired by Jad Maala hit the Vehicle, one of which hit the late Elazar Akiva Fashkos, who was driving the vehicle in the neck and another hit him in the chest.

9.    Once Jad Maala and Mohamed Mousleh saw that the vehicle had stopped, the two escaped in the Volkswagen vehicle to Ramallah.

[Stamp] P 5: 178 [continued]

Prosecution Case 444/02 Amended

9

10.    In Ramallah, Jad Maala and Mohamed Mousleh returned the Volkswagen vehicle to the Defendant and reported to him on the attack that they had carried out.

11.    A day later, the Defendant delivered to Jad Maala approximately 300 U.S. dollars for carrying out the above mentioned attack. The Defendant received the above mentioned money from Ali Faraj Barghouti.

12.    By his acts described above, the above mentioned Defendant caused the intentional death of the late **Elazar Akiva Fashkos**, who died as a result of the impact of the bullets that were fired by Jad Maala as described above.

## Eleventh count: (Detailed Incident 457/01 Binyamin)

**Nature of the offense:** Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 14(A) and 19 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in the Area, on February 25, 2001 or thereabouts, attempted to cause the intentional death of another person, as follows:

1.    The above mentioned Defendant, at the time set forth, met in Ramallah Muhannad Abu Halawa, Mohamed Abed Rahman Salam Mousleh ("Abu Satha") and Tarek Malahi (A-Nuf).

2.    The Defendant and his above mentioned colleagues discussed the situation in the Area. The Defendant and his above mentioned colleagues contended that there was no activity against Israeli targets. The Defendant asked his above mentioned colleagues what could be done to improve the situation. The above mentioned colleagues of the Defendant asked the Defendant to provide them a vehicle and weapons and they would carry out an attack against Israeli civilians with the aim of causing their death.

3.    The Defendant consented to the above mentioned proposal. The Defendant delivered to his above mentioned friends his vehicle, a gray Volkswagen Bora, 2001 model, bearing Israeli license plates, and an MP-5 submachine gun with a magazine and cartridges.

4.    Muhannad Abu Halawa, Mohamed Mousleh (alias: "Abu Satha") and Tarek Malahi (A-Nuf) traveled in the vehicle of the Defendant, armed with the above mentioned MP-5

[Stamp] P 5: 179

Prosecution Case 444/02 Amended

10

submachine gun, which they had received from the Defendant. The above mentioned colleagues of the Defendant reached the Atara Bridge area.

5. At about 1:15 p.m., the above mentioned colleagues of the Defendant noticed a GMC Vandura vehicle, license No. 3082518, which Yosef Cohen was driving, this vehicle departing from the settlement Ateret and turning towards the Atara Bridge.

6. The above mentioned colleagues of the Defendant decided to carry out a shooting attack against the above mentioned GMC vehicle with the intent of causing the death of its occupants.

7. The above mentioned colleagues of the Defendant decided to wait until the Citroen vehicle that was driving in front of them would overtake the GMC vehicle and then [they themselves would] overtake the GMC vehicle and carry out the planned shooting attack against it.

8. In the above mentioned Citroen vehicle, William Sameh Fares el Khatib (Rimawi), Rebhi Zuhdi Alamsar (Rimawi) and Akram Abdullah Mohamed Qassam (Azawi), were traveling, armed with 2 Kalashnikov assault rifles and an M-16 assault rifle. The above mentioned occupants of the Citroen vehicle opened fire using the weapons above at the above mentioned GMC vehicle with the intent of causing the death of its occupants. 29 bullets that were fired by these persons hit the above mentioned GMC vehicle. Three bullets hit the head and neck of Yosef Cohen, who was driving the above mentioned GMC vehicle. As a result of the impact of these bullets and the impact of fragments throughout his body, Yosef Cohen was severely injured.

9. After the above mentioned colleagues of the Defendant noticed that the GMC vehicle was hit, that it had swerved off the road and the driver of the vehicle was injured as a result of the shooting attack that was carried out from the Citroen vehicle that was driving before them, the colleagues of the Defendant escaped back to Ramallah.

10. In Ramallah, the above mentioned colleagues of the Defendant returned the above mentioned Volkswagen vehicle and the above mentioned MP-5 submachine gun back to the Defendant. Muhannad Abu Halawa, Tarek Malahi (A-Nuf) and Mohamed Mousleh (alias: "Abu Satha") reported to the Defendant that they had carried out a shooting attack using the above mentioned vehicle and weapons and that a Jewish driver had been wounded as a result.

[Stamp] P 5: 179 [continued]

Prosecution Case 444/02 Amended

11

**Twelfth count:**

**Nature of the offense:** Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 14(A) and 19 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in the Area, in June 2001 or thereabouts, attempted to cause the intentional death of another person, as follows:

Ziad Hamuda Yaakub Hamuda together with Mamoun Bassam Abdullah Abu-Shama, Haitham Azat, Sa'id Abrash and Ahmad Abu Alam, at the time set forth, decided to carry out a shooting attack against the settlement of Psagot with the aim of causing the death of Israeli civilians.

The above mentioned persons approached the office of Marwan Barghouti, the head of the "Tanzim" of the Fatah. The above mentioned persons met Marwan Barghouti and asked the latter for weapons for carrying out a shooting attack against Israeli civilians in the settlement of Psagot. Marwan Barghouti was happy to hear this plan to carry out a shooting attack at the settlement of Psagot and promised to supply weapons for carrying out the planned shooting attack.

After about a week, Ziad Hamuda and his above mentioned colleagues approached the office of Marwan Barghouti in Ramallah again. Marwan Barghouti was not in his office at that time and the Defendant was the one who talked with Ziad Hamuda and his above mentioned colleagues. The Defendant promised to talk to Marwan Barghouti concerning the request of his above mentioned colleagues to receive weapons for the purpose of carrying out a shooting attack against the settlement of Psagot.

After about three days, Ziad Hamuda and his above mentioned colleagues approached the office of Marwan Barghouti in Ramallah again. These persons again asked Marwan Barghouti for weapons for carrying out a shooting attack against the settlement of Psagot. Marwan Barghouti called Muhannad Abu Halawa, a senior military operative in the "Tanzim" of the Fatah. It was agreed that Muhannad Abu Halawa would meet the above mentioned persons in Manara Square in Ramallah and would to deliver them weapons there for the purpose of carrying out the planned shooting attack.

[Stamp] P 5: 180

Prosecution Case 444/02 Amended

12

Ziad Hamuda and his above mentioned colleagues met on that day, in Manara Square in Ramallah, Muhannad Abu Halawa. During the said meeting, Muhannad Abu Halawa promised to transfer weapons to them for the purpose of carrying out the planned shooting attack.

That night, the Defendant arrived at the home of Ziad Hamuda in Al-Bira and delivered to Ziad Hamuda an MP-5 submachine gun and cartridges for the purpose of carrying out a shooting attack against Israeli civilians.

After about an hour, Ziad Hamuda departed from his home along with Mamoun Abu-Shama in the vehicle of Ziad Hamuda, while in possession of the above mentioned MP-5 submachine gun. Ziad Hamuda and Mamoun Abu-Shama arrived at a site near the settlement of Psagot. There the two got out of the vehicle. Mamoun Abu-Shama fired all of the cartridges that the Defendant had delivered with the above mentioned MP-5 submachine gun at the settlement of Psagot with the aim of causing the death of the residents of the settlement of Psagot and of IDF soldiers who were in the settlement of Psagot.

Immediately after the shooting, Ziad Hamuda and Mamoun Abu-Shama returned in their above mentioned vehicle to Ramallah.

### Thirteenth count:

**Nature of the offense:** Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 14(A) and 19 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in the Area, on June 26, 2001 or thereabouts, attempted to cause the intentional death of another person, as follows:

The above mentioned Defendant, in June 2001 or thereabouts, in Ramallah, in the circumstances described in the previous count of the indictment, delivered to Ziad Hamuda Yaakub Hamuda an MP-5 submachine gun for the purpose of carrying out shooting attacks against Israeli civilians and IDF soldiers.

Ziad Hamuda, at the time set forth, with Mamoun Bassam Abdullah Abu-Shama and Haitham Azat, departed from Ramallah towards the road leading from Pisgat Ze'ev to the [neighborhood of French Hill] in Jerusalem, in order to carry out a shooting attack there and cause the intentional death of Israeli civilians. Ziad Hamuda and his above mentioned colleagues departed as set forth armed with an

[Stamp] P 5: 180 [continued]

Prosecution Case 444/02 Amended

13

MP-5 rifle [Translator's note: as written], which had been delivered to them for this purpose by the Defendant as set forth above, and with a "9" pistol. Ziad Hamuda and his colleagues departed to execute the said attack while possessing a drawing of the [neighborhood of] French Hill, which had been made out by Mamoun Abu-Shama where they had planned to carry out the shooting attack.

Ziad Hamuda and his above mentioned colleagues departed to execute the said attack in arrangement with Muhannad Abu Halawa, and also asked the latter to inform Marwan Barghouti, the head of the "Tanzim" of the Fatah, whether any of the perpetrators of the attack would be killed during the execution of the said shooting attack. Ziad Hamuda and his colleagues were unable to reach the place at which they had planned to carry out the shooting attack due to the large presence of IDF forces in the Hizma area.

[Stamp] P 5: 180 [continued]

Prosecution Case 444/02 Amended

14

**Fourteenth count: (Detailed Incident 2159/01 Binyamin)**

**Nature of the offense:** Causing intentional death, an offense under Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in the Area, on August 25, 2001 or thereabouts, caused the intentional death of another person, as follows:

1.  The above mentioned Defendant, in August 2001, in Ramallah or thereabouts, met Mohamed Abed Rahman Salam Mousleh (alias "Abu Satha"). Mohamed Mousleh (alias: "Abu Satha") informed the Defendant that he had met a number of operatives of the "Tanzim" of the Fatah, who carried out shooting attacks against Israeli civilians. Mohamed Mousleh asked to receive the approval of the Defendant to join this cell and carry out attacks against Israeli civilians with the intent of causing their death. The Defendant permitted Mohamed Mousleh to joint in the said activity.

2.  Mohamed Mousleh met the above mentioned "Tanzim" operatives, who were Hussam Akel Rajb Shahada, Fares Sadak Mohammed Ghanem (alias "al Hittawi") and Tarek Malahi A-Nuf. The above mentioned three persons told Mohamed Mousleh that they intended to carry out a shooting attack with the aim of causing the death of Israeli civilians. The three asked Mohamed Mousleh to provide them weapons for carrying out the planned shooting attack.

3.  On August 25, 2001, Fares Ghanem, Hussam Shahada and Tarek A-Nuf approached Mohamed Mousleh and asked for more weapons that day for the purpose of carrying out the shooting attack.

4.  On that day, Mohamed Mousleh approached the Defendant. Mohamed Mousleh asked the Defendant for weapons for the purpose of carrying out a shooting attack against Israeli civilians. A short time later, on that day, the Defendant delivered to Mohamed Mousleh an MP-5 submachine gun with a magazine filled with cartridges, in order for Mohamed Mousleh and his above mentioned colleagues to use it to carry out a shooting attack and cause the death of Israeli civilians.

[Stamp] P 5: 181

Prosecution Case 444/02 Amended

15

5.  In the evening hours, on the same day, in Ramallah or thereabouts, Mohamed Mousleh delivered the above mentioned MP-5 submachine gun and ammunition to Fares Ghanem and Hussam Shahada, who arrived in an Isuzu pickup vehicle belonging to Fares, in order for Fares and Hussam to use the above mentioned weapon to carry out a shooting attack and cause the death of Israeli civilians.

6.  Immediately after receiving the weapon, Fares Ghanem, Hussam Shahada, Haitham Almutfak Hamdan and Ali Alian departed from Ramallah towards Highway 443 with the aim of carrying out the planned shooting attack there. The above mentioned persons traveled in two vehicles – one was an Isuzu pickup belonging to Fares Ghanem and the other was a stolen Subaru vehicle that Ali Alian had brought for the purpose of carrying out the planned attack.

7.  Upon reaching Highway 443, Fares Ghanem continued to travel alone in the Isuzu vehicle, about a kilometer before the Subaru vehicle in which Hussam, Haitham and Ali Alian were traveling, in order to inform his above mentioned colleagues of IDF and police checkpoints on the way.

8.  All of these individuals traveled on Highway 443 towards Tel Aviv, Ali driving the Subaru vehicle, while Haitham Hamdan, armed with a Kalashnikov assault rifle, sat next to him, while Hussam Shahada, armed with an MP-5 submachine gun, which the Defendant had delivered to him, sat in the rear seat.

9.  On that day, August 25, 2001, at about 10:30 p.m., next to the Dor Energy gas station, the occupants of the above mentioned Subaru vehicle noticed a Volkswagen Passat vehicle, License No. 6902818, in which the late Yaniv and Sharon Ben Sharon with their children and the late Doron Yosef Savari were traveling.

10. Ali Alian, who was driving the Subaru vehicle, overtook the above mentioned Volkswagen vehicle and drove parallel to it. At this stage, Haitham Hamdan ad Hussam Shahada discharged automatic gunfire using the MP-5 submachine gun, which the Defendant had provided, and the Kalashnikov assault rifle, at the above mentioned Volkswagen vehicle with the aim of causing the death of its occupants.

11. A large number of bullets that were fired by Haitham Hamdan and Hussam Shahada hit the Volkswagen vehicle and its occupants.

[Stamp] P 5: 181 [continued]

Prosecution Case 444/02 Amended

16

12.   After the occupants of the Subaru vehicle noticed that the Volkswagen vehicle was zigzagging, they sped up and escaped to the village Beit Likia. There, Fares Ghanem waited for them. Ali Alian, Hussam Shahada and Haitham Hamdan boarded Firs Ghanem's Isuzu vehicle and traveled to the village Beit Sira, where they hid the weapons near Haitham Hamdan's house. Thereafter, Hussam Shahada, Fares Ghanem, Haitham Hamdan and Ali Alian returned to Ramallah in Fares Ghanem's vehicle.

13.   Immediately after they returned to Ramallah, Mohamed Mousleh met in Ein Um Sharait Fares Ghanem, who reported to Mohamed Mousleh the attack that had been carried out with the weapon that had been delivered for this purpose by the Defendant.

14.   A few days later, Fares Ghanem brought the above mentioned MP-5 submachine gun from Beit Sira and returned it to Mohamed Mousleh. Mohamed Mousleh transferred the above mentioned weapon to the Defendant and reported to the latter the shooting attack that had been carried out with this weapon.

15.   The Defendant transferred to the perpetrators of the attack a sum of 500 U.S. dollars for executing this attack. The above mentioned Defendant received this money from Ali Faraj Barghouti.

[Stamp] P 5: 181 [continued]

Prosecution Case 444/02 Amended

17

16.   The above mentioned Defendant, by his acts described above, caused the intentional death of the late Yaniv Ben Shalom, who died of gunshot wounds to his head and back, from bullets that were fired from the MP-5 submachine gun described above, and from a Kalashnikov assault rifle by Haitham Hamdan and Hussam Shahada.

### Fifteenth count: (Detailed Incident 2159/01 Binyamin)

**Nature of the offense:** Causing intentional death, an offense under Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in the Area, on August 25, 2001 or thereabouts, caused the intentional death of another person, as follows:

The above mentioned Defendant, on the date set forth, at the place set forth in the fourteenth count of the indictment, by his acts described in the fourteenth count of the indictment, caused the intentional death of the late Sharon Ben Shalom, who died of gunshot wounds to her head and back, from bullets that were fired from an MP-5 submachine gun, which the Defendant delivered as described in the fourteenth count of the indictment, and from a Kalashnikov assault rifle.

### Sixteenth count: (Detailed Incident 2159/01 Binyamin)

**Nature of the offense:** Causing intentional death, an offense under Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in the Area, on August 25, 2001 or thereabouts, caused the intentional death of another person, as follows:

The above mentioned Defendant, on the date set forth, at the place set forth in the fourteenth count of the indictment, by his acts described in the fourteenth count of the indictment, caused the intentional death of the late Doron Yosef Savari, who died of gunshot wounds, from bullets that were fired from an MP-5 submachine gun, which the Defendant delivered as described in the fourteenth count of the indictment, and from a Kalashnikov assault rifle.

[Stamp] P 5: 182

Prosecution Case 444/02 Amended

18

**Seventeenth count: (Detailed Incident 2159/01 Binyamin)**

**Nature of the offense:** Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 14(A) and 19 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in the Area, on August 25, 2001 or thereabouts, attempted to cause the intentional death of another person, as follows:

The above mentioned Defendant, on the date set forth, at the place set forth in the fourteenth count of the indictment, by his acts described in the fourteenth count of the indictment, attempted to cause the intentional death of the occupants of the Volkswagen Passat vehicle stated in the fourteenth count of the indictment. As a result of the gunfire set forth in the fourteenth count of the indictment from an MP-5 submachine gun, which the Defendant delivered as described in the fourteenth count of the indictment, and from a Kalashnikov assault rifle, the daughter of the late Ben Shalom couple was slightly injured by fragments in her leg.

[Stamp] P 5: 182 [continued]

Prosecution Case 444/02 Amended

19

**Eighteenth count:**

**Nature of the offense:** Undermining the security of the area, an offense pursuant to Section 53(A) (4) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970.

**Details of the offense:** The above mentioned Defendant, in the Area, in September 2001 or thereabouts, committed an act or an omission constituting an undermining of or damage to, disruption of or danger to the security of the Area or the security of IDF forces and soldiers or the action, use or security of any of the following: a ship, aircraft, port, quay, jetty, dock, airport, railway, sea lane, road, dirt road, locomotive, vehicle, any cargo or other public transport or public communication device, or any factory, institute or equipment that is used or is capable of being used for the manufacture, supply, storage, transfer, delivery or distribution of water, fuel, gas or electricity or any property of the State of Israel or the Israel Defense Forces, as follows:

Nasser Mohamed Yusef Naji (Abu-Hamid) – the Head of the "Al Aqsa Martyrs' Brigades" – the military arm of the "Tanzim" of the Fatah in the Area, Tarek Malahi A-Nuf and Abed Bast Shawabka, approached the above mentioned Defendant, at the time set forth, in Ramallah or thereabouts. The above mentioned persons told the Defendant that they had manufactured a mortar and had also purchased a mortar bomb for NIS 1,500. The above mentioned persons asked the Defendant to give them money, which they had paid for the above mentioned mortar bomb. The above mentioned persons said that they intended to fire the above mentioned mortar bomb towards the settlement of Psagot.

The Defendant asserted to these persons that if they would be able to fire the above mentioned mortar bomb at the settlement of Psagot, he would pay them the money for the bomb.

Later, that night, the above mentioned persons returned to the Defendant and informed him that they had fired the above mentioned mortar bomb towards the settlement of Psagot. The above mentioned persons informed the Defendant that they did not know exactly where the mortar bomb that they had fired impacted. In view of that which has been set forth above, the Defendant refused to pay the above mentioned persons money for the above mentioned mortar bomb.

Later, the Defendant reported the firing of the mortar bomb at the settlement of Psagot by the above mentioned persons to Marwan Barghouti, the Head of the "Tanzim" of the Fatah.

**Nineteenth count: (Detailed Incident 7915/01 Zion)**

**Nature of the offense:** Causing intentional death, an offense under Section 51(A) of the Security

[Stamp] P 5: 183

Prosecution Case 444/02 Amended

20

Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on September 15, 2001 or thereabouts, caused the intentional death of another person, as follows:

1.  Mohamed Abed Rahman Salam Mousleh (alias "Abu Satha"), approached the above mentioned Defendant, at the time set forth, in Ramallah or thereabouts, and stated that Fares Sadak Mohammed Ghanem (alias "al Hittawi") had approached him with another person and asked to receive an MP-5 submachine gun in order to use it to carry out a shooting attack with the aim of causing the death of Israeli civilians. Mohamed Mousleh asked the Defendant to deliver the MP-5 submachine gun to him, after he had already delivered it to Mohamed Mousleh previously for carrying out shooting attacks.

2.  The Defendant consented to provide the requested weapon for the purpose of carrying out the planned shooting attack.

3.  The Defendant referred Mohamed Mousleh to Khaled Shawish for receiving the above mentioned MP-5 submachine gun. Mohamed Mousleh contacted Khaled Shawish and received from the latter the MP-5 submachine gun of the Defendant. In addition, the Defendant provided Hussam Akel Rajb Shahada a "14" pistol for carrying out the planned shooting attack.

4.  Later that day, Mohamed Mousleh delivered the above mentioned MP-5 submachine gun to Fares Ghanem with the aim of the latter using it to carry out a shooting attack and cause the death of Israeli civilians.

5.  Later that day, Mohamed Sami Ibrahim Abdullah met Hussam Akel Rajb Shahada, Fares Sadak Mohammed Ghanem (alias "Al Hittawi"), Haitham Almutfak Hamdan and Ali Alian. Hussam Shahada arrived to this meeting armed with an MP-5 submachine gun and a "14" pistol, which the Defendant had supplied to him as set forth above for the purpose of carrying out a shooting attack.

6.  At about 10:00 p.m., on September 15, 2001, the above mentioned Defendants traveled from Ramallah to Jerusalem in Fares Ghanem's Isuzu pickup vehicle.

[Stamp] P 5: 183 [continued]

Prosecution Case 444/02 Amended

7.    Fares Ghanem drove the above mentioned Isuzu vehicle and traveled with Mohamed Abdullah and his colleagues in order to show them a place where they would carry out the planned shooting attack and in order to show his colleagues how to escape after carrying out the attack set forth. Fares Ghanem transported his colleagues to Highway No. 9, connecting the Ramot neighborhood to the [neighborhood of] French Hill neighborhood in Jerusalem. Fares Ghanem showed his colleagues where to carry out

[Stamp] P 5: 183 [continued]

Prosecution Case 444/02 Amended

22

the planned attack and how to escape thereafter. At the end of the said visit, the above mentioned gang returned to Ramallah.

8.  At about 10:30 p.m. that day, Mohamed Abdullah along with Hussam Shahada and Haitham Hamdan traveled in a stolen gray vehicle with Israeli license plates, which Ali Alian had supplied to them for carrying out the planned attack (hereinafter: the Vehicle). Fares Ghanem drove in front of them, in the above mentioned Isuzu vehicle, in order to inform his colleagues by cellular telephone of police and IDF checkpoints.

9.  Mohamed Abdullah drove the above mentioned Vehicle, next to him sat Haitham Hamdan, who was armed with a "14" pistol, which the Defendant had also supplied.

10. The above mentioned gang stopped on Highway No. 9 near a junction leading to the Ramat Shlomo neighborhood and waited for a single Israeli vehicle to arrive at the site with the aim of carrying out a shooting attack against it and causing the death of the occupants of the vehicle.

11. After a few minutes, at about 11:10 p.m., a white Renault express vehicle, license No. 2273706 (hereinafter: the Renault), arrived at the site from the direction of the Ramat Shlomo nationhood and turned to Highway No. 9 towards the Ramot neighborhood.

12. Mohamed Abdullah started to drive after the Renault and overtook it.

13. When the Vehicle was driving parallel to the Renault, Hussam Shahada and Haitham Hamdan opened fire using an MP-5 submachine gun and "14" pistol, which the Defendant had supplied to them, against the occupants of the Renault with the aim of causing their death.

14. A number of bullets that were fired by Hussam Shahada and Haitham Hamdan hit the Renault and the two occupants of the Renault – the late Moshe Weiss and Meir Weisshaus. Thereafter, Mohamed Abdullah continued to travel towards the neighborhood of Ramot and near a site at which a new bridge was being built, turned right to a dirt track leading to Bir Nabala.

[Stamp] P 5: 184

Prosecution Case 444/02 Amended

23

15. Before entering Bir Nabala, Mohamed Abdullah and his colleagues, who were with him in the Vehicle, met Fares Ghanem who was waiting for them at the site in the Isuzu vehicle. From them, they all continued to travel together to Bir Nabala and thereafter escaped to Ramallah.

16. By his acts described above, the Defendant caused the intentional death of the late Meir Weisshaus, who died in hospital later that day as a result of gunshot wounds from bullets that were fired by the colleagues of the Defendant using the MP-5 submachine gun and the "14" pistol, which the Defendant had supplied.

### Twentieth count: (Detailed Incident 7915/01 Zion)

**Nature of the offense:** Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 14(A) and 19 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on September 15, 2001 or thereabouts, attempted to cause the intentional death of another person, as follows:

The above mentioned Defendant, at the time set forth, at about 11:10 p.m., at the place described in the previous count of the indictment, by his acts set forth in the previous count of the indictment, attempted to cause the intentional death of Moshe Weiss, who was driving a white Renault Express vehicle, license No. 2273706, described in the previous count of the indictment. One of the bullets that were fired by the colleagues of the Defendant, as described in the previous count of the indictment, hit the head of Moshe Weiss and severely injured him.

### Twenty first count: (Detailed Incident 7915/01 Zion)

**Nature of the offense:** Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 14(A) and 19 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on October 3, 2001 or thereabouts, attempted to cause the intentional death of another person, as follows:

[Stamp] P 5: 184 [continued]

1. The above mentioned Defendant, in early October 2001, in Ramallah or thereabouts, Mohamed Abed Rahman Salam Mousleh (alias "Abu Satha"). Mohamed Mousleh asked

Prosecution Case 444/02 Amended

24

the Defendant for an MP-5 submachine gun, ammunition for the above mentioned MP-5 submachine gun and a vehicle for the purpose of carrying out a shooting attack against Israeli civilians in Jerusalem with the intent of causing their death.

2.  Mohamed Abed Rahman Salam Mousleh (alias "Abu Satha") informed the Defendant that he was planning to carry out the planned attack along with Mohamed Sami Ibrahim Abdullah, Hussam, Akel Rajb Shahada and Fares Sadak Mohammed Ghanem (alias "al Hittawi").

[Stamp] P 5: 184 [continued]

Prosecution Case 444/02 Amended

3. Initially, the Defendant told Mohamed Mousleh to carry out the planned attack from the vehicle of Fares Ghanem. But Mohamed Mousleh contended that he needed two vehicles, with the spotters traveling in the first vehicle and the shooters traveling in the second. In view of this, the Defendant delivered to Mohamed Mousleh a stolen Mazda 323 vehicle bearing Israeli license plates, which he had purchased for that purpose from Iad Alshafai for NIS 5,000.

4. For the purpose of carrying out the planned shooting attack, the Defendant delivered to Mohamed Mousleh an MP-5 submachine gun and ammunition for this MP-5 submachine gun.

5. On October 3, 2001, Mohamed Mousleh departed from Ramallah towards Jerusalem with the aim of carrying out the planned shooting attack, in possession of the above mentioned MP-5 submachine gun and traveling in the above mentioned Mazda vehicle, which Mohamed Abdullah was driving.

6. Fares Ghanem and Hussam Shahada traveled in an Isuzu pickup vehicle belonging to Fares Ghanem before the Mazda vehicle in which Muhammad Mousleh was traveling, with the aim of informing him of police and IDF checkpoints on the way.

7. The above mentioned colleagues of the Defendant arrived at New Beit Hanina in Jerusalem. There, Mohamed Abdullah parked the Mazda vehicle and with his other colleagues hid the above mentioned MP-5 submachine gun in the vehicle.

8. Mohamed Mousleh and Mohamed Abdullah boarded the Isuzu vehicle and from there continued in the Isuzu vehicle with Fares Ghanem and Hussam Shahada towards the Begin Road.

9. The above mentioned colleagues of the Defendant reached the Begin road. From there, Fares Ghanem showed his other colleagues where to carry out the planned shooting attack and how to escape after carrying out the shooting attack. The above mentioned colleagues of the Defendant decided to carry out the planned shooting attack in the first tunnel of the Begin Road from the direction of Ramot, in order for the gunshots to go unheard. Thereafter, all of these persons were to return to Beit Hanina, to the place at which the above mentioned Mazda Vehicle was left.

[Stamp] P 5: 185

Prosecution Case 444/02 Amended

26

10. Mohamed Mousleh boarded the Mazda vehicle armed with the above mentioned MP-5 submachine gun, while Mohamed Abdullah drove the said Mazda vehicle. Mohamed Mousleh and Mohamed Abdullah drove the Mazda vehicle to the Begin road with the aim of carrying out the planned shooting attack there and causing the death of Israeli civilians.

11. Mohamed Mousleh and Mohamed Abdullah traveled on the road back and forth several times looking for a single Israeli vehicle with the aim of carrying out the planned shooting attack against it with the aim of causing the death of the occupants of the vehicle.

12. At about 11:35 p.m., while driving northward, in the last tunnel in their direction of travel, Mohamed Mousleh and Mohamed Abdullah noticed a Honda Accord vehicle, License No. 1103217, traveling on the Begin road northward. The occupants of the Honda vehicle were Tonie Amiel, Pini Maimon and Pazit Maimon.

13. Mohamed Abdullah overtook the above mentioned Honda Vehicle. While Mohamed Abdullah was driving parallel to the above mentioned Honda vehicle, Mohamed Mousleh fired a single round from the MP-5 submachine gun, which the Defendant had supplied, at the occupants of the Honda vehicle, with the intent of causing their deaths. The bullet that was fired by Mohamed Mousleh did not hit the above mentioned Honda vehicle.

14. After carrying out the said shooting attack, Mohamed Mousleh and Mohamed Abdullah continued their journey towards Highway No. 9 connecting the Ramot neighborhood to the [neighborhood of] French Hill neighborhood.

**Twenty second count: (Detailed Incident 8379/01 Zion)**

**Nature of the offense:** Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 14(A) and 19 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on October 3, 2001 or thereabouts, attempted to cause the intentional death of another person, as follows:

[Stamp] P 5: 185 [continued]

Prosecution Case 444/02 Amended

1.   After Mohamed Abed Rahman Salam Mousleh (alias "Abu Satha") and Mohamed Sami Ibrahim Abdullah carried out the shooting attack as described in the previous count of the indictment, the two continued to travel in the Mazda vehicle, which the Defendant had supplied to them as described in the previous count of the indictment, towards Highway No. 9, connecting the Ramot neighborhood to the [neighborhood of] French Hill neighborhood, with the aim of reaching Beit Hanina from there and then continuing to Ramallah.

2.   During this journey, Mohamed Mousleh, at the request of Mohamed Abdullah, checked the function of the MP-5 submachine gun, which the Defendant had delivered, and also fired several rounds into the air.

3.   During the journey on the above mentioned Highway No. 9, at about 11:45 p.m., Mohamed Mousleh and Mohamed Abdullah noticed a Skoda vehicle, license No. 6567709, which was traveling on Highway No. 9 towards the [neighborhood of] French Hill. Malka Cohen and Pinchas Cohen were traveling in this Skoda vehicle.

4.   Mohamed Abdullah, who as set forth was driving the Mazda vehicle, overtook the Skoda vehicle.

[Stamp] P 5: 185 [continued]

Prosecution Case 444/02 Amended

28

5.   While Mohamed Abdullah was driving parallel to the above mentioned Skoda vehicle, Mohamed Mousleh fired the MP-5 submachine gun, which the Defendant had supplied to them for the purpose of carrying out a shooting attack as described in the previous count of the indictment, discharging a few shots at the above mentioned Skoda vehicle with the aim of causing the death of the occupants of the Skoda vehicle.

6.   A number of bullets that were fired by Mohamed Mousleh hit the Skoda vehicle. Two bullets that were fired by Mohamed Mousleh hit Pinchas Cohen and another bullet hit Malka Cohen.

7.   Pinchas Cohen was moderately injured by gunshot wounds from two bullets in his abdomen, while Malka Cohen, who was 28 weeks pregnant, was moderately injured by a gunshot wound from a bullet to her head.

8.   After carrying out the said shooting attack, Mohamed Mousleh and Mohamed Abdullah continued to drive towards the [neighborhood of] French Hill and from there they reached New Beit Hanina. There, Mohamed Mousleh and Mohamed Abdullah parked the above mentioned Mazda vehicle and contacted by telephone Hussam Akel Rajb Shahada and Fares Sadak Mohammed Ghanem (alias "al Hittawi"), who arrived at the site in the Isuzu vehicle belonging to Fares Ghanem in order to pick up Mohamed Mousleh and Mohamed Abdullah, according to the planning set forth in the previous count of indictment.

9.   Mohamed Mousleh and Mohamed Abdullah concealed the above mentioned MP-5 submachine gun in the Isuzu vehicle and boarded the Isuzu vehicle.

10.  These four persons tried to return from Jerusalem to Ramallah, but were unable to do so because of IDF and police checkpoints. The above mentioned colleagues of the Defendant stayed to sleep overnight in the home of Yasser Abu al Hatib, a friend of Hussam Shahada, in New Beit Hanina in Jerusalem.

11.  On the following day, October 4, 2001, Mohamed Mousleh and Mohamed Abdullah returned to Ramallah in the vehicle of Fares Ghanem.

12.  After returning to Ramallah, Muhammad Mousleh reported to the Defendant the attacks that he had carried out using the Mazda vehicle and the MP-5 submachine gun that he had received from the Defendant.

[Stamp] P 5: 186

### Twenty third count:

Prosecution Case 444/02 Amended

29

**Nature of the offense:** Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 14(A) and 19 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in the Area, in late 2001 – early 2002 or thereabouts, attempted to cause the intentional death of another person, as follows:

The above mentioned Defendant, in late 2001 or thereabouts, in Ramallah or thereabouts, when he was with Marwan Barghouti, the head of the "Tanzim" of the Fatah, met Nasser Mohamed Yusef Naji (Abu-Hamid) the Head of the "Al Aqsa Martyrs' Brigades", the military arm of the "Tanzim" of the Fatah. Nasser Abu-Hamid told Marwan Barghouti of his intentions to purchase a mortar and mortar bombs for the purpose of carrying out mortar fire at Israeli settlements with the intent of causing the death of Israeli civilians. Nasser Abu-Hamid asked Marwan Barghouti for financial aid for purchasing the mortar and mortar bombs. Marwan Barghouti refused to provide him the financial aid and referred Nasser Abu-Hamid to the Defendant. The Defendant explained to Nasser Abu-Hamid that there was no need to pay a lot of money for a mortar and mortar bombs, as the Defendant already possessed a makeshift mortar and mortar bombs.

In early 2002, the Defendant referred Nasser Abu-Hamid and the latter's colleague – a senior military operative in the "Al Aqsa Martyrs Brigades" – Muhannad Abu Halawa, to the home of Ali Barghouti in order for them to receive the above mentioned mortar and mortar bombs there.

Nasser Abu-Hamid, Muhannad Abu Halawa and Abed Basat received the above mentioned makeshift mortar and 5 mortar bombs.

Nasser Abu-Hamid, with his above mentioned colleagues, fired using the above mentioned makeshift mortar a mortar bomb at the settlement of Psagot with the intent of causing the death of residents of the above mentioned settlement and IDF soldiers who were in the above mentioned settlement. The above mentioned mortar bomb did not hit the settlement of Psagot and exploded near it.

After carrying out the said attack, Nasser Abu-Hamid, reported what had happened to the Defendant. The Defendant took Nasser Abu-Hamid, to Marwan Barghouti in order to report the mortar bomb firing attack that had been performed for the first time in the Area to Marwan Barghouti too.

[Stamp] P 5: 186 [continued]


**Twenty fourth count: (Detailed Incident 39/02 Binyamin)**

Prosecution Case 444/02 Amended

30

**Nature of the offense:** Causing intentional death, an offense under Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in the Area, on January 15, 2002 or thereabouts, caused the intentional death of another person, as follows:

1.  On January 14, 2002, Raed Karmi, who was a senior military operative in the "Tanzim" of the Fatah Organization, which is an illegal organization, was killed. Following the death of the above mentioned Raed Karmi, the head of the "Tanzim" of the Fatah in the area, Marwan Barghouti pitched a mourning tent in Albira.

2.  The above mentioned Defendant, on January 15, 2002, in the above mentioned mourning tent, met Mohamed Abed·Rahman Salam Mousleh (alias "Abu Satha"), Mohamed Sami Ibrahim Abdullah, Fares Sadak Mohammed Ghanem (alias "al Hittawi"), Tarek Malhi A-Nuf and Zidan Mahareb Al Badawi.

3.  The Defendant informed his above mentioned colleagues that Marwan Barghouti, the head of the "Tanzim" of the Fatah in the Area, asked for them to carry out an attack immediately to avenge the death of the above mentioned Raed Karmi and cause the death of Israeli civilians.

4.  For the purpose of carrying out the said attack, the Defendant provided his above mentioned colleagues an MP-5 submachine gun, a "16" pistol and a Mazda vehicle bearing Israeli license plates.

5.  The above mentioned colleagues of the Defendant, in the above mentioned mourning tent, decided that in view of the demand of the Defendant, they would carry out an attack that very evening at the Hagivonim gas station, located on Highway 443, near the entrance to Givat Ze'ev, with the intent of causing the death of Israeli civilians.

6.  In the evening hours of that day, January 15, 2002, Mohamed Abdullah left the above mentioned mourning tent with Fares Ghanem. Mohamed Abdullah and Fares Ghanem traveled in an Isuzu pickup vehicle belonging to Fares Ghanem to the above mentioned gas station with the intent of carrying out the planned shooting attack there. Mohamed

[Stamp] P 5: 187

Mousleh, armed with a "14" pistol, Zidan Mahareb, armed with the above mentioned "16" pistol, and Tarek A-Nuf, armed with the above mentioned MP-5 submachine gun,

Prosecution Case 444/02 Amended

drove behind the above mentioned Isuzu vehicle. The three traveled in a Mazda vehicle, which they had received for this purpose from the Defendant.

7. The above mentioned colleagues of the Defendant reached an earth mound that blocked the exit from the villages Bir Nabala and Aljib to Highway 443, about 100 meters from the Hagivonim gas station. The above mentioned colleagues of the Defendant parked their vehicles, the Isuzu and Mazda, facing the village Bir Nabala so that they could escape from the site immediately after carrying out the planned attack.

8. Mohamed Mousleh, armed with a "14" pistol, Zidan, armed with a 16 pistol, and Tarek A-Nuf, armed with an MP-5, alighted form the vehicles and walked to the above mentioned gas station with the aim of carrying out the planned shooting attack and causing the death of Israeli civilians there.

9. Mohamed Abdullah and Fares Ghanem stayed in the above mentioned vehicles in order to make sure that no IDF patrol or other people would come to the site. Mohamed Abdullah sat in the driver's seat of the Mazda vehicle so that he could immediately evacuate his three colleagues who had departed to carry out the planned attack immediately after executing the attack.

10. Mohamed Mousleh and Tarek A-Nuf stood at the entrance to the above mentioned gas station.

11. After a few minutes, at about 7:45 p.m., Mohamed Mousleh and Tarek A-Nuf noticed a white Fiat Uno vehicle, license No. 6424905, entering the above mentioned gas station, which was driven by the late Yoela Chen, and Rachel Eini was sitting next to her.

12. Mohamed Mousleh and Tarek A-Nuf approached the above mentioned Fiat vehicle with the aim of carrying out a shooting attack against it and causing the death of the vehicle occupants. The occupants of the Fiat vehicle noticed the pistol that Mohamed Mousleh was holding and started to shout and sound the horn. Mohamed Mousleh put the pistol into his trousers and told the vehicle occupants not to fear.

[Stamp] P 5: 187 [continued]

Prosecution Case 444/02 Amended

13.     At this stage, Tarek A-Nuf opened fire with burst from the MP-5 submachine gun, which the Defendant provided, at the occupants of the Fiat vehicle with the intent of causing their death. Then, Mohamed Mousleh took out his pistol to and started to shoot at the vehicle occupants with the intent of causing their death.

14.     Mohamed Mousleh and Tarek A-Nuf fired at very close range a large number of rounds at the late Yoela Chen, and at Rachel Eini, who were in the above mentioned Fiat vehicle.

15.     Approximately 28 bullets, which were fired by Mohamed Mousleh and Tarek A-Nuf, hit the front windshield of the vehicle, a number of bullets hit the side of the vehicle and the driver's door window.

16.     During the commission of the described shooting attack, Zidan, who was standing a short distance behind Mohamed Mousleh and Tarek A-Nuf, served as a lookout and spotter.

17.     Fares Ghanem, immediately after hearing the gunfire, drove from the site with his Isuzu vehicle in order to inform his colleagues whether there were checkpoints on the way to Ramallah.

[Stamp] P 5: 187 [continued]

Prosecution Case 444/02 Amended

18. Mohamed Mousleh, Tarek A-Nuf and Zidan, after having carried out the shooting attack as set forth above, ran back to the Mazda vehicle in which Mohamed Abdullah was waiting. After the three got into the vehicle, Mohamed Abdullah drove them to Ramallah.

19. In Ramallah, Mohamed Mousleh, Tarek A-Nuf, Mohamed Abdullah and Zidan met Fares Ghanem.

20. Thereafter, Mohamed Mousleh met the Defendant in Ramallah, returned the MP-5 submachine gun and the Mazda vehicle to him and reported the attack that he had carried out as described above.

21. By his acts described above, the Defendant caused the intentional death of **the late Yoela Chen**, who died at the scene as a result of gunshot wounds from bullets that were fired by Mohamed Mousleh and Tarek A-Nuf.

#### Twenty fifth count: (detailed incident 39/02 Binyamin)

**Nature of the offense:** Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 14(A) and 19 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in the Area, on January 15, 2002 or thereabouts, attempted to cause the intentional death of another person, as follows:

The above mentioned Defendant, at the above mentioned time, in the described in the previous count of the indictment, by his acts set forth in the previous count of the indictment, attempted to cause the intentional death of Rachel Eini, who was traveling in a white Fiat Uno vehicle, license No. 6424905, described in the previous count of the indictment. One of the bullets that were fired by Mohamed Abed Rahman Salam Mousleh (alias "Abu Satha") and Tarek Malhi A-Nuf using the weapons that had been delivered to them by the Defendant for the purpose of carrying out the shooting attack, as described in the previous count of the indictment, hit Rachel Eini in the head and two other bullets hit her left shoulder, injuring her moderately.

#### Twenty sixth count: (Detailed Incident 502/02 Zion)

[Stamp] P 5: 188

Prosecution Case 444/02 Amended

34

**Nature of the offense:** Causing intentional death, an offense under Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on January 22, 2002 or thereabouts, caused the intentional death of another person, as follows:

1.  The above mentioned Defendant, in January 2002, the Defendant decided that he wanted to execute a suicide attack inside the territory of the State of Israel in order to cause the death of as many Israeli civilians as possible.

2.  The above mentioned Defendant telephoned Nasser Mahmoud Aweis, a senior operative of the "Tanzim" of the Fatah, which is an illegal organization, in Nablus. The Defendant asked Nasser Aweis to send him a person who would be prepared to carry out a suicide attack. The Defendant told Nasser Aweis that he himself would see to bringing the suicide terrorist into Jerusalem in order to carry out a suicide attack there.

3.  A few days later, on January 22, 2002, in Ramallah, the Defendant met Sa'id Ramadan, a resident of Kfar Tal in the Nablus district, who informed the Defendant that he had been sent by Nasser Aweis for the purpose of carrying out a suicide attack.

4.  The Defendant called Mohamed Abed Rahman Salam Mousleh (alias "Abu Satha") and asked the latter to come to him.

5.  Mohamed Mousleh met the Defendant and the above mentioned Sa'id Ramadan that day in Ramallah. The Defendant introduced the two to each other. The Defendant and Mohamed Masalah took Sa'id Ramadan to a barber shop to have his hair cut before carrying out the planned suicide attack.

6.  Thereafter, the Defendant and Mohamed Masalah called Fares Sadak Mohammed Ghanem (alias "Hittawi") and asked the latter to transport a suicide terrorist from Ramallah to Jerusalem in order for the suicide terrorist to carry out a suicide attack in Jerusalem and cause the death of as many Israeli civilians as possible.

7.  Fares Ghanem came to Ramallah with Mohamed Sami Ibrahim Abdullah, after the latter agreed to participate in driving the suicide terrorist from Ramallah to Jerusalem. Fares Ghanem came to the meeting in his Isuzu pickup vehicle with Israeli license plates.

[Stamp] P 5: 188 [continued]

Prosecution Case 444/02 Amended

8.  According to the instruction of the Defendant, Fares Ghanem and Mohamed Abdullah traveled in the above mentioned Isuzu vehicle from Ramallah to Jerusalem in order to find a way that had no police or IDF checkpoints, with the aim of driving the suicide terrorist who would carry out the planned attack in Jerusalem later using the same route.

[Stamp] P 5: 188 [continued]

Prosecution Case 444/02 Amended

36

9.    Mohamed Abdullah and Fares Ghanem traveled from Ramallah via Rafat and arrived at the Atarot Industrial Zone, where the two returned to the Jerusalem – Ramallah main road and traveled left to the junction leading to the Rama Camp, where they turned right and traveled to Adam Junction. At Adam Junction the two turned right and traveled to Hizma Junction, where they turned right and entered Anta. Through Anta, they arrived at the French Hill Junction, where the two turned right and returned to Ramallah. Mohamed Abdullah and Fares Ghanem saw that on the way that they were traveling the suicide terrorist could be driven to Jerusalem without being stopped at police or IDF checkpoints.

10.    At the same time, in Ramallah, the Defendant and Mohamed Mousleh took the above mentioned Sa'id Ramadan to pray and also bought for the above mentioned Sa'id Ramadan food, new clothes and shoes. The Defendant paid with his own money for these purchases in the amount of NIS 1,200.

11.    Mohamed Mousleh, at the instruction of the Defendant, brought an M-16 assault rifle and 3 magazines for the said assault rifle, filled with cartridges two of which were connected with a magazine coupler ("jungle clip").

12.    According to the plan of the Defendant and his above mentioned colleagues, Sa'id Ramadan should have arrived in Jerusalem and shoot there at Israeli civilians with the intent of causing their death until he himself would be killed by the Israeli security forces.

13.    Thereafter, on the same day, the Defendant, Mohamed Mousleh and Sa'id Ramadan met Mohamed Abdullah and Fares Ghanem in the area of the City Inn Hotel in Albira. The Defendant introduced Sa'id Ramadan to Mohamed Abdullah and to Fares Ghanem.

14.    The Defendant explained to Mohamed Abdullah and to Fares Ghanem that the above mentioned Sa'id Ramadan was the suicide terrorist that they had to drive to Jerusalem in order for him to carry out a suicide attack by shooting at Israeli civilians with the aim of causing the death of as many Israeli civilians as possible.

15.    Mohamed Abdullah and Fares Ghanem hid the above mentioned M-16 assault rifle and magazines in the above mentioned Isuzu vehicle.

[Stamp] P 5: 189

Prosecution Case 444/02 Amended

37

16. The Defendant and Mohamed Mousleh wished Sa'id Ramadan luck and the three traveled to Jerusalem. The Defendant told Mohamed Abdullah and Fares Ghanem that they would have to take Sa'id Ramadan to carry out the suicide attack in any place in Jerusalem of their choosing.

17. Fares Ghanem drove the Isuzu vehicle, Sa'id Ramadan sat in the seat next to the driver's seat and Mohamed Abdullah sat in the rear seat.

18. Mohamed Abdullah and Fares Ghanem transported Sa'id Ramadan to Jerusalem on a route that they had inspected earlier that day as described above.

19. In Jerusalem, Mohamed Abdullah and Fares Ghanem traveled to Sheikh Jarah St. There they took out the M-16 assault rifle and magazines that were hidden inside the vehicle and handed them over to Sa'id Ramadan. Mohamed Abdullah moved to the seat next to the driver's seat while Sa'id Ramadan moved to the back seat, holding the M-16 assault rifle and the magazines in his hands.

20. Mohamed Abdullah and Fares Ghanem drove Sa'id Ramadan to Hanevi'im Street.

21. During the journey, Sa'id Ramadan complained to Mohamed Abdullah and Fares Ghanem that his new shoes, which the Defendant had purchased for the attack, were too small and pinched him. Mohammed Abdullah took of his "Reebok" shoes and handed them over to Sa'id Ramadan saying "go up to heaven with "Reebok" shoes".

22. Upon reaching the junction of Strauss and Hanevi'im Streets, Mohammed Abdullah and Fares Ghanem stopped the Isuzu vehicle.

23. Mohammed Abdullah and Fares Ghanem told Sa'id Ramadan to walk down to Jaffa Street and start to shoot at a place where he would see many people.

24. After Sa'id Ramadan got out of the vehicle with the M-16 assault rifle and the ammunition, Muhammad Abdullah and Fares Ghanem drove away from the site in the Isuzu vehicle, departed through the Musrara neighborhood to Highway No. 1 and from there drove by way of the main road to Ramallah.

25. Sa'id Ramadan, a few minutes after having got out of the vehicle of Mohamed Abdullah and Fares Ghanem, arrived at Jaffa Street.

[Stamp] P 5: 189 [continued]

Prosecution Case 444/02 Amended

26. At about 4:20 p.m., while standing opposite Building No. 47 on Jaffa Street or thereabouts, Sa'id Ramadan loaded the M-16 assault rifle that he was carrying, shouted "Allahu Akbar" and discharged automatic gunfire indiscriminately at the people who were on Jaffa Street, at the bus stop at the site, aboard the "Egged" bus No. 27 that was at this stop at the time and at the people who were within the stores nearby with the aim of causing the death of as many people as possible. Sa'id Ramadan, while continuing to fire, fled from the site towards the parking lot in Harav Kook Street. There, Sa'id Ramadan changed magazines and continued to shoot at civilians with the aim of causing their death. Sa'id Ramadan fired through the M-16 assault rifle that he carried more than 38 cartridges. Sa'id Ramadan continued to shoot at civilians until he was killed by civilians and policemen who arrived at the site.

[Stamp] P 5: 189 [continued]

Prosecution Case 444/02 Amended

27. By his acts described above, the above mentioned Defendant caused the intentional death of the late **Ora (Svetlana) Sandlar**, who died as a result of gunshot wounds caused by the bullets that were fired by Sa'id Ramadan.

28. After the Defendant learned about the execution of the above mentioned attack, the Defendant approached Ali Faraj Barghouti and received from the latter the amount of 1,000 U.S. dollars for executing the said attack. The Defendant gave Mohamed Mousleh, Mohamed Abdullah and Fares Ghanem 100 U.S. dollars each for their participation in the execution of this attack.

## Twenty seventh count: (Detailed Incident 502/02 Zion)

**Nature of the offense:** Causing intentional death, an offense under Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on January 22, 2002 or thereabouts, caused the intentional death of another person, as follows:

The above mentioned Defendant, at the time set forth, at the place set forth in the previous count of the indictment, by his actions described in the previous count of the indictment, caused the intentional death of **the late Sarah Hamburger**, who died of gunshot wounds from the bullets that were fired by Sa'id Ramadan, who was dispatched to carry out the above shooting attack by the Defendant.

## Twenty eighth count: (Detailed Incident 502/02 Zion)

**Nature of the offense:** Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 14(A) and 19 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on January 22, 2002 or thereabouts, attempted to cause the intentional death of another person, as follows:

[Stamp] P 5: 190

Prosecution Case 444/02 Amended

40

The above mentioned Defendant, at the time set forth, at the place set forth in the twenty sixth count of the indictment, by his actions described in the twenty sixth count of the indictment, attempted to cause the intentional death of as many civilians as possible who at the time were on and near Jaffa Street. As a result of the gunfire at the site that was fired by Sa'id Ramadan, who was dispatched to carry out the above shooting attack by the Defendant, **more than 45 civilians were injured.**

**Twenty ninth count: (Detailed Incident 502/02 Zion)**

**Nature of the offense:** Malicious damage to property, an offense pursuant to Section 53C of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on January 22, 2002 or thereabouts, maliciously and unlawfully destroyed or damaged property, as follows:

The aforesaid Defendant, at the above mentioned time, at the place set forth in the twenty sixth count of the indictment, through his actions described in the twenty sixth count of the indictment, maliciously and unlawfully damaged a large amount of property, including stores on Jaffa Street, an "Egged" bus stop, an "Egged" company bus, No. 27, and many vehicles, which were damaged by the gunfire that was discharged at the site by Sa'id Ramadan, who was dispatched to carry out the said attack by the Defendant.

[Stamp] P 5: 190 [continued]

Prosecution Case 444/02 Amended

## Thirtieth count:

**Nature of the offense:** Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Section 19 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in the Area, in late January – early February, 2002 or thereabouts, attempted to cause the intentional death of another person, as follows:

1.  The above mentioned Defendant, at the above mentioned time, in Ramallah or thereabouts, met Zafir Abed Jawad Abed Rahman Rimawi.

2.  Zafir Rimawi informed the Defendant that his cousin, Mujahed Khader Rimawi, was prepared to carry out a suicide attack.

3.  At the request of the Defendant, Zafir Rimawi arranged a meeting between the Defendant and the above mentioned Mujahed Rimawi.

4.  After the above mentioned meeting, the Defendant consented to the suggestion of Zafir Rimawi to send Mujahed Rimawi to carry out a suicide attack in Jerusalem in order for Mujahed Rimawi to cause the death of as many Israeli civilians as possible.

5.  The plan was for Mujahed Rimawi to carry out a suicide attack using a rifle, i.e. he would shoot at Israeli civilians in Jerusalem with the intent of causing the death of as many Israeli civilians and possible and would continue to fire until he would be killed by the Israeli security forces.

6.  The Defendant took an M-16 assault rifle and a number of magazines for the above mentioned assault rifle filled with cartridges from Nasser (Halum) Mohamed Yusef Naji (Abu-Hamid) for the purpose of carrying out the planned suicide attack.

7.  The Defendant contacted Mohamed Sami Ibrahim Abdullah, Fares Sadak Mohammed Ghanem (alias "al Hittawi") and Tarek Malhi A-Nuf. At the request of the Defendant, the above mentioned three individuals arrived in Ramallah and met the Defendant there.

[Stamp] P 5: 191

Prosecution Case 444/02 Amended

8.     The Defendant informed his above mentioned colleagues that he was asking them to bring another terrorist into Jerusalem, who would carry out a suicide attack in Jerusalem, such as the attack described in the twenty-sixth count of the indictment, with the aim of causing the death of as many civilians as possible. The above mentioned colleagues of the Defendant consented to participate in the driving of this suicide terrorist to Jerusalem.

9.     The Defendant provided Mohamed Abdullah and Fares Ghanem with a gray Subaru vehicle, which belonged to the family of the Defendant. Mohamed Abdullah returned with the Subaru vehicle to his home in Bir Nabala, while Fares Ghanem traveled with his Isuzu pickup vehicle to his home in Kfar Aqab.

10.    On the following day, The Defendant called Mohamed Abdullah and Fares Ghanem and instructed them to come to the gas station located in downtown Ramallah, pick up the suicide terrorist from there and drive him to Jerusalem in order for him to carry out the suicide attack there with the aim of causing the death of as many civilians as possible.

11.    Mohamed Abdullah traveled in the Subaru vehicle until the Kalandia checkpoint, where he parked the vehicle and boarded the Isuzu vehicle of Fares Ghanem, who arrived at the site. From there, the two continued to the said meeting place.

12.    In Ramallah, at the above mentioned gas station, Mohamed Abdullah and Fares Ghanem met the Defendant, who introduced them to Mujahed Rimawi, who was the suicide terrorist. The Defendant handed the above mentioned M-16 assault rifle and the above mentioned three magazines filled with cartridges for M-16 assault rifles over to Mujahed Rimawi.

13.    Mohamed Abdullah and Fares Ghanem hid the M-16 assault rifle and the magazines inside the Isuzu vehicle.

14.    Mohamed Abdullah and Fares Ghanem traveled together with the suicide terrorist to Jerusalem with the aim of the latter carrying out a shooting attack there and causing the death of as many civilians as possible.

[Stamp] P 5: 191 [continued]

Prosecution Case 444/02 Amended

43

15. Mohamed Abdullah, Fares Ghanem and Mujahed Rimawi arrived at the Kalandia Checkpoint and bypassed it. Thereafter, Mohamed Abdullah switched to the Subaru vehicle, which he had left at the site earlier and drove to A-Ram Junction. Mohamed Abdullah passed the A-Ram checkpoint in the Subaru vehicle and waited at the site for Fares Ghanem and Mujahed Rimawi, who had bypassed the A-Ram checkpoint on foot.

[Stamp] P 5: 191 [continued]

Prosecution Case 444/02 Amended

44

Thereafter, Fares Ghanem returned, boarded the Isuzu vehicle, in which the weapon was hidden, and passed the A-Ram checkpoint while driving alone in the Isuzu vehicle with the weapon.

16. Mohamed Abdullah drove the suicide terrorist up to a mosque in Shuafat. Fares Ghanem also arrived at this site in the Isuzu vehicle with the weapon and the ammunition.

17. There, the suicide terrorist, Mujahed Rimawi, asked to enter the mosque and to pray prior to carrying out the suicide attack. Mohamed Abdullah and Fares Ghanem agreed to this request.

18. While Mujahed Rimawi was praying at the above mentioned mosque, Mohamed Abdullah and Fares Ghanem traveled in the above mentioned Subaru vehicle to Givat Shaul in Jerusalem with the aim of checking whether there were IDF or police checkpoints on the way. The two decided to drive the suicide terrorist to Givat Shaul with the aim of carrying out the planned shooting attack there, because there were many civilians at this site.

19. When Mohamed Abdullah and Fares Ghanem returned to the mosque in Shuafat in order to pick up Mujahed Rimawi and drive him to Givat Shaul with the aim of him carrying out the planned shooting attack there, the two did not find the suicide terrorist in the mosque.

[Stamp] P 5: 191 [continued]

Prosecution Case 444/02 Amended

20. Mohamed Abdullah and Fares Ghanem called the Defendant and reported to him that the suicide terrorist had fled from them. The Defendant instructed Mohamed Abdullah and Fares Ghanem to return to Ramallah.

21. Mohamed Abdullah and Fares Ghanem returned to Ramallah, met the Defendant there and handed over to him the above mentioned Subaru vehicle, the above mentioned M-16 assault rifle and the above mentioned magazines. The Defendant returned the above mentioned M-16 assault rifle to Nasser (Halum) Mohamed Yusef Naji (Abu-Hamid).

22. The Defendant informed Zafir Rimawi that his cousin had fled when he was on his way to carrying out a shooting attack in Jerusalem.

## Thirty first count:

**Nature of the offense:** Undermining the security of the area, an offense pursuant to Section 53(A) (4) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970.

**Details of the offense:** The above mentioned Defendant, in the Area, in February 2002 or thereabouts, committed an act or an omission constituting an undermining of or damage to, disruption of or danger to the security of the Area or the security of IDF forces and soldiers or the action, use or security of any of the following: a ship, aircraft, port, quay, jetty, dock, airport, railway, sea lane, road, dirt road, locomotive, vehicle, any cargo or other public transport or public communication device, or any factory, institute or equipment that is used or is capable of being used for the manufacture, supply, storage, transfer, delivery or distribution of water, fuel, gas or electricity or any property of the State of Israel or the Israel Defense Forces, as follows:

The above mentioned Defendant, at the time set forth, in Ramallah or thereabouts, met Mohamed Naifa, alia "Abu Rabia" and Abed Karim Rateb Yunes Aweis. The two above mentioned individuals informed the Defendant that they had a suicide terrorist and requested the help of the Defendant. The Defendant consented to help send the suicide terrorist into the State of Israel in order for him to carry out a suicide attack and cause the death of as many Israeli civilians as possible.

The Defendant reached the apartment in Ramallah in which were "Abu Rabia", Abed Karim Aweis and a person who wanted to carry out a suicide attack. The Defendant talked to Muhannad Bader Mahmoud Al-Shaar (hereinafter: the Suicide Terrorist) and felt that the latter had serious intentions.

[Stamp] P 5: 192

Prosecution Case 444/02 Amended

46

The above mentioned Suicide Terrorist informed the Defendant that his father was also a "martyr" because he had been killed by IDF soldiers.

The Defendant transferred to Abu Rabi an M-16 assault rifles and 4 magazines filled with cartridges in order for him to deliver them to the above mentioned Suicide Terrorist for the purpose of carrying out the planned suicide attack.

On the following day, the Defendant returned to the above mentioned apartment with a video camera. Abed Karim filmed using the above mentioned video camera the above mentioned Suicide Terrorist, while he was reading out a leaflet, in preparation for his departure for carrying out the suicide attack inside the State of Israel. The Defendant and his above mentioned colleagues trained the above mentioned Suicide Terrorist in the use and firing of the M-16 assault rifle. Thereafter, the Defendant transferred the above mentioned Suicide Terrorist to the apartment of the Defendant in downtown Ramallah. The Defendant let the above mentioned Suicide Terrorist sleep in his home in order for him to depart from there on the following day to carry out the planned suicide attack.

When on the following morning the Defendant and Abed Karim Aweis came to the above mentioned apartment of the Defendant, the two discovered that the suicide terrorist had disappeared. In view of the disappearance of the above mentioned suicide terrorist, the above mentioned plan for executing the suicide attack was not put into action.

### Thirty second count:

**Nature of the offense:** Undermining the security of the area, an offense pursuant to Section 53(A) (4) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970.

**Details of the offense:** The above mentioned Defendant, in the Area, in February 2002 or thereabouts, committed an act or an omission constituting an undermining of or damage to, disruption of or danger to the security of the Area or the security of IDF forces and soldiers or the action, use or security of any of the following: a ship, aircraft, port, quay, jetty, dock, airport, railway, sea lane, road, dirt road, locomotive, vehicle, any cargo or other public transport or public communication device, or any factory, institute or equipment that is used or is capable of being used for the manufacture, supply, storage, transfer, delivery or distribution of water, fuel, gas or electricity or any property of the State of Israel or the Israel Defense Forces, as follows:

[Stamp] P 5: 192 [continued]

Prosecution Case 444/02 Amended

The above mentioned Defendant, at the time set forth, talked by telephone with Nasser Mahmoud Aweis, the Head of the "Al Aqsa Martyrs' Brigades", the military arm of the "Tanzim" of the Fatah in the Nablus area. Nasser Aweis informed the Defendant that he was sending to him two suicide terrorists. It was agreed between the Defendant and Nasser Aweis that the Defendant would have delivered weapons and hand grenades to the above mentioned suicide terrorists and have them brought to the western part of Jerusalem in order for them to carry out the suicide attack in which they would fire at Israeli civilians, with the intent of causing

[Stamp] P 5: 192 [continued]

Prosecution Case 444/02 Amended

the death of as many Israeli civilians as possible and continue to shoot until they would be killed by the Israeli security forces.

According to the instruction of the above mentioned Nasser Aweis, on February 17, 2002, Ahmed Abu Khader, a senior operative of the "Al Aqsa Martyrs Brigades", sent from Nablus to Ramallah, to the Defendant, Saadi Jihad Mohamed-Ali Makboul, Alaa Mohamed Ali Hassan (Abed Aziz) (alias "Aswad"), who were accompanied by Ula Juma Mustafa. The two were already armed with two hand grenades.

Saadi Makboul and Alaa Hassan were supposed to carry out the suicide attack as the Defendant and Nasser Aweis had planned.

Within the preparation for the above mentioned suicide attack, in the home of Mahmoud Abu Khader, the brother of the above mentioned Ahmed Abu Khader, in the Balata Refugee Camp, Ahmed Abu Khader, using a video camera, filmed Saadi Makboul and Alaa Hassan holding M-16 assault rifles. The two also read before the video camera a leaflet of the "Al Aqsa Martyrs Brigades". Ahmed Abu Khader provided Alaa Hassan and to Saadi Makboul training in the use of weapons in preparation for carrying out the planned attack.

On February 17, 2002, Saadi Makboul and Alaa Hassan departed from Nablus to Ramallah along with Ula Mohamed Juma Mustafa and Aiman Alaa Salah Bader. Ahmed Abu Khader explained to the four that they must travel to Ramallah in the taxi of Aiman Bader. Ahmad Abu Khader explained that Ula Mustafa would be responsible for Alaa Hassan and Saadi Makboul to meet "Al Aqsa Martyrs Brigades" operatives in Ramallah, who would supply them weapons and driver them to Jerusalem according to this planning.

The above mentioned four individuals were not able to come to Ramallah and meet the Defendant for the purpose of executing the planned suicide attack. The four were arrested at an IDF checkpoint, near the village Douma in the Ramallah region. The two hand grenades that were in the above mentioned taxi were detonated at the site by an explosive ordnance disposal technician.

### Thirty third count:

**Nature of the offense:** Conspiring to cause intentional death, an offense under Section 22 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 57828-1968 and Section

[Stamp] P 5: 193

Prosecution Case 444/02 Amended

49

51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970.

**Details of the offense:** The above mentioned Defendant, in the Area, in mid-February 2002 or thereabouts, conspired with another person to cause the intentional death of another person, as follows:

The above mentioned Defendant, on February 15, 2002 or thereabouts, in Ramallah or thereabouts, met Mohamed Sami Ibrahim Abdullah, Hussam Akel Rajb Shahada and Fares Sadak Mohammed Ghanem (alias "Al Hittawi").

During the above mentioned meeting, the Defendant asked his above mentioned colleague to bring into Jerusalem a suicide terrorist, who would carry out a suicide attack with the aim of causing the death of as many people as possible. The above mentioned colleagues of the Defendant agreed to the said proposal. The Defendant promised to pay his above mentioned colleagues 300 U.S. dollars in exchange for the transport of the suicide terrorist to Jerusalem. The Defendant informed his above mentioned colleagues that he would bring to them the suicide terrorist in another day or two or so.

The Defendant also gave his above mentioned colleagues a Subaru vehicle bearing Israeli license plates, in order for his above mentioned colleagues to drive the suicide terrorist in it to Jerusalem.

Mohamed Abdullah, Fares Ghanem and Hussam Shahada planned to bring the suicide terrorist into Jerusalem in an Isuzu pickup vehicle belonging to Fares Ghanem. The above mentioned colleagues of the Defendant planned to transport the suicide terrorist to one of the places in Jerusalem that had many people in it for the suicide terrorist to carry out the planned suicide attack there. Mohamed Abdullah, Fares Ghanem and Hussam Shahada also conducted a tour of Jerusalem and chose the places that in their opinion were suitable for carrying out a shooting attack against Israeli civilians. Among other places, the above mentioned colleagues of the Defendant chose the "Ramada" hotel, the tunnels of the Begin Highway and the French Hill Junction.

The above mentioned plan of the Defendant and his above mentioned colleagues did not go ahead because about two days after the above mentioned meeting, on February 17, 2002, Hussam Shahada was arrested by the Israeli security forces, and after a day, on February 18, 2002, Fares Ghanem was arrested by the Israeli security forces.

[Stamp] P 5: 193 [continued]

Prosecution Case 444/02 Amended

According to the instruction of the Defendant, after the arrest of Fares Ghanem [and] Hussan Shahada, Mohamed Abdullah, met Mohamed Zadek Mohamed Ghanem, the brother of the above mentioned Fares Ghanem, and Tarek Malhi A-Nuf, on February 19, 2002 or thereabouts, in Ramallah,. During the said meeting, Mohamed Abdullah and Mohamed Ghanem agreed to the suggestion of Tarek A-Nuf to drive a suicide terrorist into Jerusalem in order for him to carry out a suicide attack there with the aim of causing the death of as many people as possible.

This plan did not go ahead either because Mohamed Abdullah himself was arrested on the following day, February 20, 2002, by the Israeli security forces.

[Stamp] P 5: 193 [continued]

Prosecution Case 444/02 Amended

51

**Thirty fourth count: (Detailed Incident 483/02 Shafat)**

**Nature of the offense:** Causing intentional death, an offense under Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on February 25, 2002 or thereabouts, caused the intentional death of another person, as follows:

1.  The above mentioned Defendant, in mid-February 2002, in Ramallah or thereabouts, the Defendant decided to send a suicide terrorist to Jerusalem in order to carry out a shooting attack against Israeli targets with the aim of causing the death of as many civilians as possible. The Defendant planned for the suicide terrorist to shoot at Israeli civilians until he would be killed by the Israeli security forces.

2.  The Defendant made telephone contact with Nasser Mahmoud Aweis, a senior military operative in the "Tanzim" of the Fatah, an illegal organization, in Nablus. The Defendant asked Nasser Aweis to send a suicide terrorist to him in Ramallah for the purpose of carrying out the planned suicide attack.

3.  After a few days, Rami Mohamed Mahmoud Nur contacted the Defendant and informed him that he had been sent by Nasser Aweis for the purpose of carrying out the planned suicide attack and that he was in Ramallah.

4.  According to the instruction of the Defendant, Tarek Malhi A-Nuf met Rami Nur. Tarek A-Nuf brought Rami Nur to the Defendant.

5.  The Defendant talked to Rami Nur and thereafter took Rami Nur to a barber shop in order for the latter to have his hair cut in preparation for executing the planned suicide attack.

6.  The Defendant purchased clothes for Rami Nur, for which he paid NIS 1,000 out of his own funds.

7.  Thereafter, the Defendant led Rami Nur to an apartment in Ramallah, in which the Defendant, Tarek A-Nuf and Zidan Ramadan lived (hereinafter: "the Apartment").

[Stamp] P 5: 194

Prosecution Case 444/02 Amended

52

8.  On February 23, 2002, Sharif Mohamed Yusef Naji (Abu-Hamid) also came to the apartment, bringing an M-16 assault rifle which he had received from the Defendant for executing the planned attack. Sharif Naji (Abu-Hamid) also brought magazines for the above mentioned M-16 assault rifle from the home of his brother, Nasser Naji (Abu-Hamid).

9.  In the evening hours on that day, Sharif Naji (Abu-Hamid) and Zidan Ramadan provided Rami Nur with information about the place at which Rami Nur was assigned to carry out the planned attack. The Defendant and his colleagues explained to Rami Nur that he had to carry out the planned attack in the Neve Ya'akov neighborhood in Jerusalem, at a place about which Sharif Naji and Zidan Ramadan had gathered information earlier.

10. The Defendant, along with others, filmed Rami Nur with a video camera in the framework of the preparations for the execution the planned attack.

11. At the request of Sharif Naji (Abu-Hamid), his brother, Nasser (Halum) Naji (Abu-Hamid), contacted Kamil Ghanem and asked the latter to drive Rami Nur to Jerusalem.

12. On February 25, 2002, in the evening, Rami Nur departed from Ramallah towards Jerusalem in the vehicle of Kamil Ghanem, in which the above mentioned M-16 assault rifle, the magazines and a hand grenade, which Rami Nur Nasser (Halum) Naji (Abu-Hamid) had delivered, were hidden.

13. Rami Nur arrived at the main road in the Neve Ya'akov neighborhood in Jerusalem.

14. Rami Nur got out of the above mentioned vehicle at the site specified above, armed with the above mentioned M-16 assault rifle, magazines and a hand grenade. Rami Nur approached the bus stop of the number 25 "Egged" bus line, which was at the site, and discharged automatic gunfire from the above mentioned M-16 assault rifle at vehicles that passed by and at Israeli civilians who were at the site with the aim of causing the death of as many people as possible. A police car arrived at the site and Rami Nur discharged automatic gunfire at two policemen of the Israel Police who were in the above mentioned police car with the aim of causing their deaths. The rounds that were fired by Rami Nur hit the two above mentioned policemen, who rushed towards Rami Nur and shot at him. As a result of the gunshot wounds from the rounds that were fired by Rami Nur, the late policewoman Galit Arviv was wounded and fell to the ground. Rami Nur

[Stamp] P 5: 194 [continued]

Prosecution Case 444/02 Amended

approached the late policewoman Galit Arviv and fired an additional burst at her from close range. As a result of the gunshot wounds from the bullets that were fired by Rami Nur, the late policewoman Galit Aviv died a few hours later.

15.  After Rami Nur ran out of ammunition, he threw the hand grenade that he was carrying at an IDF jeep that had arrived at the site with the intent of causing the death of IDF soldiers. Only after Rami Nur was wounded and was out of ammunition were the policemen and civilians who were at the site able to overpower him.

16.  By his acts described above, the above mentioned Defendant caused the intentional death of the late policewoman **Galit Arviv.**

[Stamp] P 5: 194 [continued]

Prosecution Case 444/02 Amended

54

**Thirty fifth count: (Detailed Incident 483/02 Shafat)**

**Nature of the offense:** Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 14(A) and 19 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on February 25, 2002 or thereabouts, attempted to cause the intentional death of another person, as follows:

The above mentioned Defendant, at the time set forth, by his acts described in the previous count of the indictment, attempted to cause the intentional death of as many Israeli civilians as possible. As a result of the gunshot wounds from the bullets that were fired by Rami Mahmoud Nur, who was dispatched to carry out the said attack by the Defendant, eight Israeli civilians and policemen were wounded.

**Thirty sixth count: (Detailed Incident 483/02 Shafat)**

**Nature of the offense:** Malicious damage to property, an offense pursuant to Section 53C of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on January 22, 2002 or thereabouts, maliciously and unlawfully destroyed or damaged property, as follows:

The above mentioned Defendant, at the time set forth, in the place set forth in the thirty fourth count of the indictment, by his acts described in the thirty fourth count of the indictment, maliciously and unlawfully caused damage to the bus stop of "Egged" line 25 in Neve Ya'akov, proximate to homes and vehicles that were at the above mentioned site, which were damaged by the gunfire that was discharged by Rami Mohamed Mahmoud Nur.

**Thirty seventh count: (Detailed Incident 4258/02 Yarkon)**

**Nature of the offense:** Causing intentional death, an offense under Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

[Stamp] P 5: 195

Prosecution Case 444/02 Amended

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on March 5, 2002 or thereabouts, caused the intentional death of another person, as follows:

1.    The above mentioned Defendant, in early March 2002, in Ramallah or thereabouts, made telephone contact with Nasser Mahmoud Aweis, a senior military operative of the "Tanzim" of the Fatah, which is an illegal organization, in Nablus.

2.    Nasser Aweis informed the Defendant that he was sending him another suicide terrorist in order for the Defendant to dispatch him into the State of Israel in order to commit a shooting attack. The plan was for the suicide terrorist to shoot at Israeli civilians with the intent of causing the death of as many civilians as possible and continuing to fire until being killed by the gunfire of the Israeli security forces.

3.    On March 4, 2002, the Defendant contacted Ibrahim Hasouna, a policeman in the Naval Police of the Palestinian Authority, who stated that he had come to Ramallah at the instruction of Nasser Aweis and that he was the suicide terrorist for the purpose of carrying out the planned shooting attack. According to the instruction of the Defendant, Tarek Malhi A-Nuf met Ibrahim Hasouna in Ramallah.

4.    On that day, in Ramallah, Tarek A-Nuf met Sharif Mohamed Yusef Naji (Abu-Hamid). During the said meeting, Tarek A-Nuf introduced Ibrahim Hasouna to Sharif Naji (Abu-Hamid).

5.    Tarek A-Nuf informed Sharif Abu-Hamid that the Defendant had brought the above mentioned Ibrahim Hasouna from Nablus in order for him to carry out a suicide attack with the intent of causing the death of as many Israeli civilians as possible.

6.    According to the instruction of the Defendant, Tarek A-Nuf took Ibrahim Hasouna to a barber shop in order for him to have his hair cut in preparation for carrying out the planned suicide attack. In addition, Tarek A-Nuf and Sharif Naji (Abu-Hamid) purchased new clothes for Ibrahim Hasouna. Tarek A-Nuf paid for these clothes NIS 1,000, which he had received from the Defendant for this purpose.

7.    Thereafter, according to the instruction of the Defendant, Tarek A-Nuf led Ibrahim Hasouna to an apartment in downtown Ramallah, in which Tarek A-Nuf, Zidan Ramadan and the Defendant lived (hereinafter: "the Apartment").

[Stamp] P 5: 195 [continued]

Prosecution Case 444/02 Amended

8.    The Defendant arrived at the Apartment and filmed Ibrahim Hasouna with a video
camera in preparation for carrying out the planned suicide attack.

[Stamp] P 5: 195 [continued]

Prosecution Case 444/02 Amended

57

9.   The Defendant instructed Tarek A-Nuf to drive Ibrahim Hasouna into the State of Israel in order for the latter to carry out the planned suicide attack there. The Defendant instructed Tarek A-Nuf to bring a weapon to Ibrahim Hasouna for the purpose of carrying out the planned attack.

10.  The above mentioned colleagues of the Defendant started to look for a person who would bring Ibrahim Hasouna into the State of Israel in order for the latter to carry out the planned suicide attack there and to cause the death of as many Israeli civilians as possible.

11.  Sharif Naji (Abu-Hamid) contacted Murad Nazmi Rizak Ajluni, the holder of an Israeli identity card living in Jerusalem, and asked the latter to come to Ramallah urgently.

12.  Sharif Naji (Abu-Hamid) met the above mentioned Murad Ajluni in a café in Ramallah and asked him to drive a suicide terrorist into the State of Israel. Murad Ajluni agreed to this suggestion, but asked for Sharif Naji (Abu-Hamid) to make sure to supply a vehicle that was not stolen with Israeli license plates for this purpose.

13.  Sharif Naji (Abu-Hamid), Zian Ramadan and Murad Ajluni met Mohamed Mohamed Yusef Naji (Abu-Hamid), who was with Mazen Mahmoud Omar Alkadi, in Ramallah. Mazen Alkadi drove a Ford Transit vehicle with Israeli license plates, license plate No. 7014515 (hereinafter: the Vehicle). The above mentioned persons asked Mazen Alkadi for the vehicle and the licenses of the vehicle for the purpose of driving a suicide terrorist into the territory of the State of Israel in order for the suicide terrorist to carry out a suicide attack there. Mazen Alkadi handed the vehicle over to Sharif Naji (Abu-Hamid) and Zidan Ramadan, but he asked that he himself be the one to drive it.

14.  At this stage, Tarek A-Nuf and Ibrahim Hasouna went to the apartment. There, Ibrahim Hasouna showered and put on the new clothes, which had been purchased for him according to the instruction of the Defendant as set forth above.

15.  At about 8:00 p.m., Sharif Naji (Abu-Hamid), Zidan Ramadan and Mazen Alkadi, who traveled in the vehicle, met Tarek A-Nuf and Ibrahim Hasouna in the Clock Square in Ramallah. Tarek A-Nuf and Ibrahim Hasouna, who were armed with an M-16 assault rifle, six magazines filled with cartridges and two hand grenades, got into the vehicle. Nasser (Halum) Mohamed Yusef Naji (Abu-Hamid) also arrived at the site, and handed over to Ibrahim Hasouna a commando knife of approximately 25 cm length.

[Stamp] P 5: 196

Prosecution Case 444/02 Amended

58

Nasser Abu-Hamid told Ibrahim Hasouna to stab Israeli civilians in order to cause their death after running out of ammunition.

16. All of the above mentioned persons traveled in the vehicle to Refidin Square in Ramallah, because there were not many passersby there.

17. In the above mentioned Refidin Square, Nasser (Halum) Naji (Abu-Hamid), Tarek A-Nuf and Ibrahim Hasouna field stripped the above mentioned M-16 assault rifle and put it into the side door of the vehicle.

18. Sharif Naji (Abu-Hamid), Tarek A-Nuf and Zidan Ramadan kissed Ibrahim Hasouna and wished him success.

19. Murad Ajluni informed his friends that he was working in Tel Aviv and therefore knew a place in Tel Aviv at which the planned suicide attack could be carried out.

20. It was decided that after Murad Ajluni and Mazen Alkadi would drop off Ibrahim Hasouna in Tel Aviv in a crowded place, Ibrahim Hasouna would wait a few minutes in order for his above mentioned colleagues to have time to escape from the site in the vehicle and would thereafter discharge automatic gunfire from the above mentioned M-16 assault rifle at Israeli civilians who would be at the site, with the aim of causing the death of as many Israeli civilians as possible and would continue to fire until being killed by gunfire from the Israeli security forces that would arrive at the site.

21. Ibrahim Hasouna got into the vehicle, which Mazen Alkadi was driving, with Murad Ajluni sitting beside him, and the three traveled towards Tel Aviv in order to carry out the planned suicide attack there.

22. During the journey of Murad Ajluni, Mazen Alkadi and Ibrahim Hasouna to Tel Aviv, Sharif Naji (Abu-Hamid) talked to them by cellular telephone.

23. On that night, after Mazen Alkadi, Murad Ajluni and Ibrahim Hasouna had arrived in Tel Aviv, near Ma'ariv Bridge on Petach Tikva Road, Murad Ajluni showed Ibrahim Hasouna a crowded place and instructed him to carry out the planned attack there.

24. Ibrahim Hasouna took out the above mentioned M-16 assault rifle, magazines and hand grenades, which had been concealed in the door of the vehicle as set forth above.

[Stamp] P 5: 196 [continued]

Prosecution Case 444/02 Amended

25.    At about 2:15 a.m., on March 5, 2002 or thereabouts, Mazen Alkadi and Murad Ajluni let Ibrahim Hasouna, who was armed with the above mentioned M-16 assault rifle, hand grenades and commando knife, out of the vehicle near the "Seafood Market" restaurant located on Petach Tikva Road in Tel Aviv (hereinafter: the Restaurant) in order for him to carry out the planned attack.

26.    Murad Ajluni and Mazen Alkadi drove away from the site towards Jerusalem in the vehicle.

27.    Ibrahim Hasouna approached the "Seafood Market" restaurant and discharged automatic gunfire from the M-16 assault rifle at the occupants of the restaurant and passersby in Petach Tikva Road with the intent of causing their death.

28.    Thereafter, Ibrahim Hasouna threw the two above mentioned hand grenades at the restaurant with the intent of causing the death of the occupants of the restaurant and passersby, but the two hand grenades did not detonate.

[Stamp] P 5: 196 [continued]

Prosecution Case 444/02 Amended

29.    After the M-16 assault rifle, which Ibrahim Hasouna carried, ceased firing due to a stoppage, Ibrahim Hasouna took out the above mentioned commando knife and started to stab Israeli civilians who were at the site with the intent of causing their death.

30.    The late policeman Master Sergeant Salim Birkat arrived at the said site. The late Master Sergeant Salim Birkat rushed at Ibrahim Hasouna and overpowered him. The late Master Sergeant Salim Birkat had the chance to inform his commanders of having overpowered the terrorist.

31.    At this stage, Ibrahim Hasouna stabbed the late Master Sergeant Salim Birkat in the neck using the above mentioned commando knife with the intent of causing his death. As a result of this stab wound, the late Master Sergeant Salim Birkat died at the site.

32.    By his acts described above the above mentioned Defendant caused the intentional death of the late Master Sergeant Salim Birkat.

33.    After Sharif Naji (Abu-Hamid) learned from the television broadcasts that the planned attack had been carried out as set forth above, he contacted the Defendant and updated the latter of the execution of the said attack.

34.    Immediately thereafter, the Defendant informed Marwan Barghouti, the head of the "Tanzim" of the Fatah in the Area, and Nasser Mohamed Yusef Naji (Abu-Hamid), the Head of the "Al Aqsa Martyrs' Brigades", the military arm of the "Tanzim" of the Fatah, of the attack that had been carried out. In addition, the Defendant contacted the Reuters news agency and announced the attack that had been carried out as set forth above.

## Thirty eighth count: (Detailed Incident 4258/02 Yarkon)

Nature of the offense: Causing intentional death, an offense under Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

Details of the offense: The above mentioned Defendant, whether within the Area or outside of it, on March 5, 2002 or thereabouts, caused the intentional death of another person, as follows:

[Stamp] P 5: 197

Prosecution Case 444/02 Amended

61

The above mentioned Defendant, at the time set forth, in the place set forth in the thirty seventh of the indictment, by his actions described in the thirty seventh count of the indictment, caused the intentional death of **the late Yosef Habi,** who was stabbed by Ibrahim Hasouna in the thorax and other parts of his body and died as a result.

### Thirty ninth count: (Detailed Incident 4258/02 Yarkon)

**Nature of the offense:** Causing intentional death, an offense under Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on March 5, 2002 or thereabouts, caused the intentional death of another person, as follows:

The above mentioned Defendant, at the time set forth, in the place set forth in the thirty seventh count of the indictment, by his actions described in the thirty seventh count of the indictment, caused the intentional death of **the late Eliyahu Dahan,** who was stabbed by Ibrahim Hasouna in the thorax, abdomen and back and died as a result.

### Fortieth count: (Detailed Incident 4258/02 Yarkon)

**Nature of the offense:** Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 14(A) and 19 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on March 5, 2002 or thereabouts, attempted to cause the intentional death of another person, as follows:

The above mentioned Defendant, at the time set forth, in the place set forth in the thirty seventh count of the indictment, by his actions described in the thirty seventh count of the indictment, attempted to cause the intentional death of as many civilians as possible. As a result of the gunshots that were discharged by Ibrahim Hasouna dozens of Israeli civilians were wounded. ·

[Stamp] P 5: 197 [continued]

Prosecution Case 444/02 Amended

**Forty first count:** (Detailed Incident 4258/02 Yarkon)

**Nature of the offense:** Malicious damage to property, an offense pursuant to Section 53C of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on March 5, 2002 or thereabouts, maliciously and unlawfully destroyed or damaged property, as follows:

The above mentioned Defendant, at the time set forth, in the place set forth in the thirty seventh count of the indictment, by his actions described in the thirty seventh count of the indictment, maliciously and unlawfully caused extensive damage to the "Seafood Market" Restaurant, the "Mifgash HaSteak" Restaurant, and to the nearby buildings and the vehicles that were in the area, which were damaged by the gunshots that were discharged by Ibrahim Hasouna.

**Forty second count:** (Detailed Incident 568/02 Shafat)

**Nature of the offense:** Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 14(A) and 19 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on March 8, 2002 or thereabouts, attempted to cause the intentional death of another person, as follows:

1. The above mentioned Defendant, at the time set forth, talked by telephone with Nasser Mahmoud Aweis, a military operative in the "Tanzim" of the Fatah, which is an illegal organization, in Nablus.

2. Nasser Aweis asked the Defendant to meet Louis Mohamed Ahmed Ouda, who had been released a short time earlier from the prison of the Preventive Security of the Palestinian Authority.

3. The Defendant met Louis Ouda in Ramallah. During the talk between the two, Louis Ouda told the Defendant that he had a suicide terrorist and that he needed an explosive belt in order for the suicide terrorist to be able to use it to carry out a suicide attack inside

[Stamp] P 5: 198

Prosecution Case 444/02 Amended

63

the territory of the State of Israel and thus cause the death of as many Israeli civilians as possible. The Defendant consented to provide Louis Ouda with the requested explosive belt for the purpose of carrying out the planned suicide attack. In addition, the Defendant consented to the request of Louis Ouda to organize a sleeping place in Ramallah for the suicide terrorist.

4.     Earlier, the above mentioned Louis Ouda talked to the above mentioned Nasser Aweis. The above mentioned Nasser Aweis announced that he had found a person who was prepared to carry out a suicide attack in Jerusalem, who was Mahmoud Salah, a resident of Samaria. Nasser Aweis asked Louis Ouda to transfer Mahmoud Salah to Jerusalem in order to carry out a shooting attack with the intent of causing the death of Israeli civilians. Louis Ouda agreed to this. Louis Ouda met Mahmoud Sa'id Abed Rahim Salah. Mahmoud Salah told Louis Ouda that he intended to carry out a suicide attack, after his fiancée, Darín, had also carried out a suicide attack.

5.     Louis Ouda called Khaled Shwiki Habib Halabi, a resident of Beit Hanina, an operative in the "Popular Front for the Liberation of Palestine" organization, and informed him that he intended to carry out an attack in Jerusalem, by dispatching a suicide terrorist that he had. Louis Ouda asked Khaled Halabi to find people who would bring the suicide terrorist into Jerusalem. Khaled Halabi agreed to do what he was asked to do.

6.     Khaled Halabi called his colleague Ghannadi Isa Ouda, a resident of Beit Hanina, an operative in the "Popular Front for the Liberation of Palestine" organization, and he met him on March 6, 2002 in Ramallah. Louis Ouda came to this meeting and met Khaled Halabi and Ghannadi Ouda near the "Arabesque" Café. Louis Ouda and Khaled Halabi suggested to Ghannadi Ouda to bring a suicide terrorist from Ramallah to Jerusalem for the purpose of carrying out an attack. Louis Ouda instructed Ghannadi Ouda to transport the suicide terrorist to the [neighborhood of] French Hill in Jerusalem, on routes bypassing checkpoints, in order for him to carry out an attack there and cause by doing so the death of Israeli civilians. Louis Ouda and Khaled Halabi suggested to Ghannadi Ouda alternatives to the attack execution site: a supermarket near the gas station in the Ramat Eshkol neighborhood, the "Domino's Pizza" restaurant in the [neighborhood of] French Hill or one of the bus stops at the French Hill Junction.

[Stamp] P 5: 198 [continued]

Prosecution Case 444/02 Amended

64

7.  For the purpose of receiving the explosive belt for the suicide terrorist, the Defendant had Louis Ouda meet Khaled Shawish, an operative in Force 17 of the Palestinian Authority, who promised to transfer to Louis Ouda and to the suicide terrorist an explosive belt that he had and to make it available to Louis Ouda, a Force 17 operative of the Palestinian Authority by the name of Mazid, who would attach the suicide belt to the suicide terrorist.

8.  The Defendant brought the suicide terrorist to the apartment in downtown Ramallah, which the Defendant had rented (hereinafter: "the Apartment").

[Stamp] P 5: 198 [continued]

Prosecution Case 444/02 Amended

65

9.  On March 8, 2002, Ghannadi Ouda came to Ramallah at the behest of Khaled Halabi. In Ramallah, Louis Ouda, who had come to the meeting by vehicle, and Khaled Halabi, waited for Ghannadi Ouda. Louis Ouda and Khaled Halabi informed Ghannadi Ouda that he had to lead the suicide terrorist to the bus stop in the direction heading toward the Dead Sea, at the French Hill Junction in Jerusalem. Louis Ouda and Khaled Halabi made sure that Ghannadi Ouda was familiar with the bypass routes to the site, and Ghannadi Ouda told them that he intended to drive the suicide terrorist by bypassing the Kalandia checkpoint through the Quarry Road, and to continue from there to drive the terrorist to the site for carrying out the attack via Beit Hanina and Shuafat, while bypassing the Dahyat Al-Brid checkpoint.

10. Thereafter, Louis Ouda traveled to the Apartment, where he met the Defendant and Mazid, who had brought an explosive belt with him. Mazid installed the explosive belt on Mahmoud Mousleh and explained to Mahmoud Salah how to activate the explosive belt. In addition, Mahmoud Salah shaved off his beard.

11. Thereafter, the Defendant and his above mentioned colleagues hailed a taxi, and the suicide terrorist, Mahmoud Salah, wearing the explosive belt, got into the taxi on his way to carrying out a suicide attack in Jerusalem with the intent of causing the death of Israeli civilians. Khaled Halabi accompanied Mahmoud Salah to the point of meeting with Ghannadi Ouda.

12. Ghannadi Ouda and the suicide terrorist, Mahmoud Salah, continued to travel in the taxi and got out of the taxi on a dirt track near the quarries in Kalandia. From there, Ghannadi Ouda led the suicide terrorist on foot on their way to executing the planned attack.

13. In the Nuseiba quarters in Beit Hanina in Jerusalem, Ghannadi Ouda and Mahmoud Salah were arrested, at about 4:00 p.m., by Border Guard policemen. When Mahmoud Salah tried to activate the explosive belt that he was wearing, he was shot dead by one of the members of the security forces.

**Forty third count: (Detailed Incident 783/02 Binyamin)**

[Stamp] P 5: 199

Prosecution Case 444/02 Amended

**Nature of the offense:** Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 14(A) and 19 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in the Area, on March 17, 2002 or thereabouts, attempted to cause the intentional death of another person, as follows:

1.  On March 5, 2002, a senior military operative of the "Al Aqsa Martyrs Brigades" (the military arm of the "Tanzim" of the Fatah) – Muhannad Abu Halawa, was killed in Ramallah.

2.  About ten days later, Majd Mahmoud Ahmad Ziada decided to avenge the death of Muhannad Abu Halawa by carrying out a lethal attack.

3.  Louis Yusef Mansi and Rafat Salah agreed to join Majd Ziada to carry out the above mentioned revenge attack.

4.  Louis Mansi contacted the Defendant, and received his approval to carry out the planned attack.

5.  Following the approval that was given by the Defendant, Majd Ziada and Louis Mansi arrived at the home of the Defendant.

6.  The Defendant delivered to the two a "Beretta" type rifle and a Kalashnikov assault rifle with magazines for carrying out the planned attack.

7.  On the following day, on March 17, 2002, Majd Ziada traveled with Louis Mansi and Rafat Salah, in his "Mazda" type vehicle to the Beit El-Psagot Road, while Majd Ziada was driving the vehicle. Louis Mansi held the "Beretta" type rifle, and Rafat Salah was holding the Kalashnikov assault rifle.

8.  The above mentioned persons arrived at the planned attack site at about 6:30 a.m. Louis Mansi and Rafat Salah got out of the vehicle, while Majd Ziada stayed to wait for them in the vehicle for extracting them at the end of the execution of the attack.

[Stamp] P 5: 199 [continued]

Prosecution Case 444/02 Amended

9. About a quarter of an hour later, a white Volkswagen Passat vehicle, license No. 7741115, which was being driven by Samir Karash, arrived at the site.

10. Louis Mansi and Rafat Salah fired bursts at the driver of the vehicle from the weapons, which the Defendant had provided to them for that purpose, with the intent of causing the death of the above mentioned driver of the Volkswagen vehicle.

11. As a result of the gunfire, Samir Karash was injured in his shoulder, sustaining a fracture to his proximal left humerus with crushing and metal fragments along the trajectory of the bullet, and was in need of hospitalization and surgery. In addition, three of the rounds that were discharged by Louis Mansi and Rafat Salah hit the said vehicle and caused it damage.

12. After completing the execution of the attack, Louis Mansi and Rafat Salah returned to the vehicle of Majd Ziada and the three fled from the attack site to Ramallah.

13. Thereafter, Louis Mansi called the Defendant and reported the successful execution of the attack to him.

[Stamp] P 5: 199 [continued]

Prosecution Case 444/02 Amended

## Forty fourth count:

**Nature of the offense:** Undermining the security of the area, an offense pursuant to Section 53(A) (4) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970.

**Details of the offense:** The above mentioned Defendant, in the Area, in early 2002 or thereabouts, committed an act or an omission constituting an undermining of or damage to, disruption of or danger to the security of the Area or the security of IDF forces and soldiers or the action, use or security of any of the following: a ship, aircraft, port, quay, jetty, dock, airport, railway, sea lane, road, dirt road, locomotive, vehicle, any cargo or other public transport or public communication device, or any factory, institute or equipment that is used or is capable of being used for the manufacture, supply, storage, transfer, delivery or distribution of water, fuel, gas or electricity or any property of the State of Israel or the Israel Defense Forces, as follows:

The above mentioned Defendant, at the time set forth, in Ramallah or thereabouts, met Nizar Shahin, the bodyguard of Jibril Rajoub, the Head of the Preventive Security of the Palestinian Authority in the Area. Nizar Shahin informed the Defendant that he wanted to carry out a shooting attack against IDF soldiers who were at the Surda checkpoint and to cause their death. The Defendant provided Nizar Shahin with two pistols, a short barreled M-16 assault rifle with telescopic sights and a box of cartridges for the purpose of carrying out the said attack.

A short time later, a shooting attack was carried out at the Surda checkpoint during the course of which an IDF soldier was killed. The Defendant hastened to contact Nizar Shahin, but the latter said that he was not the one who had carried out the said attack. Thereafter, Nizar Shahin returned the weapons to the Defendant, which he had delivered to him earlier for the purpose of carrying out the said attack.

## Forty fifth count:

**Nature of the offense:** Undermining the security of the area, an offense pursuant to Section 53(A) (4) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970.

**Details of the offense:** The above mentioned Defendant, in the Area, in March 2002 or thereabouts, committed an act or an omission constituting an undermining of or damage to, disruption of or danger to the security of the Area or the security of IDF forces and soldiers or the action, use or security of any of the following: a ship, aircraft, port, quay, jetty, dock, airport, railway, sea

[Stamp] P 5: 200

Prosecution Case 444/02 Amended

lane, road, dirt road, locomotive, vehicle, any cargo or other public transport or public communication device, or any factory, institute or equipment that is used or is capable of being used for the manufacture, supply, storage, transfer, delivery or distribution of water, fuel, gas or electricity or any property of the State of Israel or the Israel Defense Forces, as follows:

The above mentioned Defendant, at the time set forth, conversed by telephone with Mahmoud Altiti, a senior operative in the "Al Aqsa Martyrs Brigades", the military arm of the "Tanzim" of the Fatah, which is an illegal organization.

Mahmoud Altiti told the Defendant that he had a suicide terrorist who was prepared to carry out a suicide attack inside the State of Israel. The Defendant consented to dispatching the suicide terrorist into the territory of the State of Israel in order for him to cause the death of as many Israeli civilians as possible.

On the following day, a person called Faiz from Nablus came to the Defendant. Faiz informed the Defendant that he had been sent by Mahmoud Altiti for the purpose of carrying out a suicide attack inside of Israel.

The Defendant talked to Faiz and discovered that Faiz was a poor marksman. Following this, the Defendant contacted Mahmoud Altiti again. The Defendant told Mahmoud Altiti that Faiz could carry out the suicide attack using an explosive belt that he would wear on his body. Mahmoud Altiti agreed to the suggestion of the Defendant and promised to have an explosive belt sent to the Defendant for the purpose of carrying out a planned suicide attack.

According to the instruction of the Defendant, Tarek Malhi A-Nuf purchased new clothes for Faiz and thereafter accompanied Faiz to an apartment in down tom Ramallah, in which Tarek A-Nuf, Zidan Ramadan and the Defendant lived (hereinafter: the Apartment).

The planned attack did not take place in view of the fact that the explosive devices were not sent to the Defendant and because Faiz was arrested by the Israeli security forces.

After the arrest of Faiz, the Defendant talked to the above mentioned Nasser Aweis about what had happened. Nasser Aweis promised to the Defendant to send him additional suicide terrorists in order for the Defendant to dispatch them into the territory of the State of Israel for the purpose of carrying out suicide attacks. Nasser Aweis did not have time to send additional suicide terrorist to the Defendant, because both the Defendant and Nasser Aweis were arrested by IDF forces during Operation "Defensive Shield".

[Stamp] P 5: 200 [continued]

Prosecution Case 444/02 Amended

**Forty sixth count:**

**Nature of the offense:** Attempt to manufacture an explosive object, an offense pursuant to Section 53(A) (3) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in the Area, in mid-March 2002 or thereabouts, manufactured a firearm, ammunition[,] a bomb, a hand grenade, an explosive or incendiary object, without holding a permit certificate which was issued to him by or on behalf of a military commander, as follows:

The above mentioned Defendant, at the time set forth, in Ramallah, met Louis Mohamed Mohamed Ouda, who asked the Defendant for money for military activity. In response to this, the Defendant transferred to Louis Ouda the amount of NIS 8,000, which Ali Faraj Barghouti received.

Louis Ouda, with Sharif Mohamed Yusef Naji (Abu-Hamid) purchased with the above mentioned money various chemicals.

Abed Karim Rateb Younes Aweis manufactured a large explosive device using the above mentioned chemicals.

**Forty seventh count:**

**Nature of the offense:** Trading in war materiel, an offense pursuant to Section 2 of the Prohibition of Trading in War Materiel Order (Judea and Samaria) (No. 243), 5728-1968.

**Details of the offense:** The above Defendant, in the Area, in March 2002 or thereabouts, traded in or otherwise handled war materiel, without a permit signed by or on behalf of the commander of the Area, as follows:

The above mentioned Defendant, at the time set forth, in Ramallah or thereabouts, delivered to Abed Karim Rateb Younes Aweis, the Head of the "Al Aqsa Martyrs' Brigades" – the military arm of the "Tanzim" of the Fatah in the Jenin area, who was then staying in Ramallah, a "14" pistol, without a permit signed by or on behalf of the commander of the Area.

[Stamp] P 5: 201

Prosecution Case 444/02 Amended

71

**Forty eighth count:**

**Nature of the offense:** Trading in war materiel, an offense pursuant to Section 2 of the Prohibition of Trading in War Materiel Order (Judea and Samaria) (No. 243), 5728-1968.

**Details of the offense:** The above Defendant, in the Area, in March 2002 or thereabouts, traded in or otherwise handled war materiel, without a permit signed by or on behalf of the commander of the Area, as follows:

The above mentioned Defendant, at the time set forth, in Ramallah or thereabouts, purchased from Nasser (Halum) Mohamed Yusef Naji (Abu-Hamid) a long-barreled M-16 assault rifle for 4,000 Jordanian dinars, without a permit signed by or on behalf of the commander of the Area.

**Forty ninth count:**

**Nature of the offense:** Trading in war materiel, an offense pursuant to Section 2 of the Prohibition of Trading in War Materiel Order (Judea and Samaria) (No. 243), 5728-1968.

**Details of the offense:** The above Defendant, in the Area, in the first half of 2001 or thereabouts, traded in or otherwise handled war materiel, without a permit signed by or on behalf of the commander of the Area, as follows:

The above mentioned Defendant, at the time set forth, in Ramallah or thereabouts, met Ashraf Khader Ali Jaber (Yasini) and received from the latter 1,500 cartridges for M-16 assault rifles. The Defendant paid the above mentioned Ashraf Jaber NIS 3,000 for the above mentioned cartridges. The Defendant carried out that which has been attributed to him in this count of the indictment at the instruction of Marwan Barghouti, the head of the "Tanzim" of the Fatah in the Area.

[Stamp] P 5: 201 [continued]

Prosecution Case 444/02 Amended

**Fiftieth count:**

**Nature of the offense:** Trading in war materiel, an offense pursuant to Section 2 of the Prohibition of Trading in War Materiel Order (Judea and Samaria) (No. 243), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in the Area, in May 2001 or thereabouts, traded in or otherwise handled war materiel, without a permit signed by or on behalf of the commander of the Area, as follows:

The above mentioned Defendant, at the time set forth, in Ramallah or thereabouts, at the request of Ashraf Khader Ali Jaber, delivered to the latter a Kalashnikov assault rifle with a magazine and 28 cartridges. The Defendant carried out that which has been attributed to him in this count of the indictment after having received approval to do so from Marwan Barghouti, the head of the "Tanzim" of the Fatah in the Area.

Ashraf Jaber participated in a procession in Ramallah while holding the above mentioned Kalashnikov assault rifle in the air. Thereafter, Ashraf Jaber, at the instruction of the Defendant, transferred the above mentioned Kalashnikov assault rifle to Ziad Abu Ain.

**Fifty first count:**

**Nature of the offense:** Giving shelter, an offense pursuant to Section 57 of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970.

**Details of the offense:** The above mentioned Defendant, in the Area, in late 2001 or thereabouts, assisted or gave shelter to an unspecific person who had committed an offense against the security legislation or had been or was involved in any activity which was intended to harm the public welfare, the welfare of the Israel Defense Forces troops and soldiers and the maintenance of public order or concerning whom there are reasonable grounds to suspect that he did so, whether by giving information, shelter, food, beverages, money, clothing, weapons, ammunition, supplies, animal fodder, means of transport, petroleum or fuel of any type and kind whatsoever, or in any other way, as follows:

The above mentioned Defendant, at the time set forth, with Marwan Barghouti, transferred Bilal Yaakub Ahmed Barghouti and Abdullah Barghouti from the prison of the Preventive Security of

[Stamp] P 5: 202

Prosecution Case 444/02 Amended

73

the Palestinian Authority in Bitunia to an apartment, which the Defendant had rented in downtown Ramallah.

The above mentioned Bilal Barghouti and Abdullah Barghouti are senior operatives of the Hamas Organization, which is an illegal organization, and are responsible for carrying out a number of attacks against Israeli civilians, including the bombing attack at the "Sbarro" Restaurant in Jerusalem on August 9, 2001. The Defendant and Marwan Barghouti provided lodging to Bilal Barghouti and Abdullah Barghouti in the above mentioned apartment for several days.

Before Bilal Barghouti and Abdullah left the above mentioned apartment of the Defendant, the Defendant provided each of them a "14" pistol.

#### Fifty second count:

**Nature of the offense:** Trading in war materiel, an offense pursuant to Section 2 of the Prohibition of Trading in War Materiel Order (Judea and Samaria) (No. 243), 5728-1968.

**Details of the offense:** The above Defendant, in the Area, in late 2001 – early 2002 or thereabouts, traded in or otherwise handled war materiel, without a permit signed by or on behalf of the commander of the Area, as follows:

The above mentioned Defendant, at the time set forth, talked by telephone with Nasser Mahmoud Aweis, a senior military operative in the "Tanzim" of the Fatah, which is an illegal organization, in Nablus. Nasser Aweis told the Defendant that he needed 1,000 cartridges for M-16 assault rifles. The Defendant promised to bring to Nasser Aweis the requested cartridges. After a few days, a person came on behalf of Nasser Aweis to the Defendant. The Defendant delivered to the later 1,000 cartridges for M-16 assault rifles in order for him to transfer them to Nablus, to Nasser Aweis. In exchange for the above mentioned 1,000 cartridges, Nasser Aweis transferred to the bank account of the Defendant the amount of NIS 3,000.

[Stamp] P 5: 202 [continued]

Prosecution Case 444/02 Amended

## Fifty third count:

**Nature of the offense:** Trading in war materiel, an offense pursuant to Section 2 of the Prohibition of Trading in War Materiel Order (Judea and Samaria) (No. 243), 5728-1968.

**Details of the offense:** The above Defendant, in the Area, in January 2002 or thereabouts, traded in or otherwise handled war materiel, without a permit signed by or on behalf of the commander of the Area, as follows:

At the time set forth, in Ramallah or thereabouts, Nizar Shukri Amin Shahin approached the above mentioned Defendant. Nizar Shahin asked the Defendant for three pistols in order to deliver them to a military operative in the "Al Aqsa Martyrs Brigade", the military arm of the "Tanzim" of the Fatah, Zafir Abed Jawad Abed Rahman Rimawi, for the purpose of carrying out a shooting attack at the Surda checkpoint of the IDF.

The Defendant agreed to the request of Nizar Shahin and provided the latter with 3 pistols: a 9 mm Belgian pistol, a 9 mm Star pistol and a pistol of a type that is not known to the prosecution, and a box of cartridges for these pistols, containing 50 cartridges for a 9 mm caliber pistol.

On that day, at the headquarters of the Preventive Security of the Palestinian Authority in Bitunia or thereabouts, Nizar Shahin transferred the above mentioned three pistols and cartridges to Zafir Abed Jawad Abed Rahman Rimawi.

The planned attack was not carried out using these pistols, because on the night before the time at which the above mentioned attack was supposed to be carried out, another shooting attack was carried out at the Surda checkpoint.

After about three days, in Ramallah or thereabouts, Nizar Shahin returned the above mentioned pistols with the above mentioned box of cartridges to the Defendant.

The Defendant carried out that which has been attributed to him in this count of the indictment without a permit signed by or on behalf of the commander of the Area.

**Witnesses for the prosecution:**

[Stamp] P 5: 203

Prosecution Case 444/02 Amended

75

1. Master Sergeant David Mizrachi, Badge No. 94857, Judea Investigations Office [taker of the statement of the Defendant on April 14, 2002 and on May 3, 2002, and submitter of the handwriting of the Defendant in Arabic + identity line-up report, photographs + photograph table]

2. Master Sergeant Yitzhak Yaakovof, Badge No. 1008358, Judea Investigations Office. [taker of the statements of the Defendant on April 21, 2002 and May 13, 2002 and submitter of the two handwriting specimens of the Defendant in Arabic]

3. Moshe Moshe, Badge No. 993725, Aman Lakhish Questioning. [taker of the statement of the Defendant on September 5, 2002].

4. Ashraf Khader Ali Jaber, Identity No. 901183764. (detained).

5. Hussam Akel Rajb Shahada, Identity No. 975564733. (detained) (Prosecution Case 243/02).

6. Mohamed Abed Rahman Salam Mousleh, Identity No. 902845643. (detained) (Prosecution Case 242/02).

7. Mohamed Sami Ibrahim Abdullah, Identity No. 979469954. (detained) (Prosecution Case 241/02)

8. Haitham Almutfak Hamdan, Identity No. 906934823. (detained) (Prosecution Case 265/02).

9. Abed Karim Rateb Yunes Aweis, Identity No. 980136675. (detained)

10. Nasser Mohamed Yusef Naji (Abu-Hamid), Identity No. 923918882. (detained)

11. Nasser (Halum) Mohamed Yusef Naji (Abu Hamid), Identity No. 923918890. (detained) (Prosecution Case 339/02).

12. Sharif Mohamed Yusef Naji (Abu Hamid), Identity No. 959770843. (detained) (Prosecution Case 355/02)

13. Louis Mohamed Ahmed Ouda, Identity No. 035775055. (detained) (Prosecution Case 311/02)

[Stamp] P 5: 203 [continued]

Prosecution Case 444/02 Amended

14. Zafir Abed Jawad Abed Rahman Rimawi, Identity No. 900070020. (detained) (Prosecution Case 345/02)

15. Amir Hassan Sa'id Abu Radaha, Identity No. 954263042. (detained) (Prosecution Case 356/02).

16. Majd Mahmoud Ahmad Ziada, Identity No. 914081757. (detained) (Prosecution Case 318/02).

17. Nasser Mahmoud Aweis, Identity No. 900358664. (detained)

18. Bilal Yaakub Ahmed Barghouti, Identity No. 902826262. (detained)

19. Ziad Hamuda Yaakub Hamuda, Identity No. 902924117. (detained) (Prosecution Case 353/02)

20. Rami Mohamed Mahmoud Nur, Identity No. 960791075. (detained) (Prosecution Case 221/02)

21. Mazen Mahmoud Omar Alkadi, Identity No. 907898134. (detained) (Prosecution Case 212/02)

22. Murad Nazmi Rizak Ajluni, Identity No. 081099095 (detained).

23. Mamoun Bassam Abdullah Abu-Shama, Identity No. 906138490. (detained) (Prosecution Case 639/01)

24. Alaa Mohamed Ali Hassan (Abed Aziz), Identity No. 907276406. (detained) (Prosecution Case 174/02).

25. Saadi Jihad Mohamed-Ali Makboul, Identity No. 920101466. (detained) (Prosecution Case 173/02).

26. William Sameh Fares el Khatib (Rimawi), Identity No. 904383452. (detained) (Prosecution Case 322/02)

27. Nizar Shukri Amin Shahin, Identity No. 902004928. (detained) (Prosecution case 775/02).

[Stamp] P 5: 203 [continued]

Prosecution Case 444/02 Amended

77

**Detailed Incident 234/01 Jerusalem Special Duties Department.**

28.     Herman Spak, Serial No. 6961290, Israel Defense Forces. (details in the prosecution) [statement]

29.     Arie Rakah, Identity No. 032271918. (details in the prosecution) [statement]

30.     Yuval Lev, Identity No. 05405709. (details in the prosecution) [statement]

31.     Superintendent Lior Nedivi, Badge No. 952127, Forensic Identification – Zion Station. [submitter of seizure and marking report]

32.     Superintendent Ofer Chelouche, Badge No. 916718, the Mobile Laboratory, Forensic Identification, National Headquarters – Jerusalem. [submitter of vehicle inspection report]

33.     Master Sergeant Avi Beckerman, Badge No. 972762, Investigations – Zion Station. [submitter of exhibit cover form]

34.     Sergeant First Class Daniel Turgeman, Badge No. 1013796, the Exhibits Office – Forensic Identification, National Headquarters – Jerusalem. [submitter of civil servant certificate – receipt of exhibits for examination] (will be summoned upon explicit demand of the defense only)

35.     Superintendent Uri Ben Tuvin, Firearms Laboratory, Forensic Identification, National Headquarters – Jerusalem. [submitter of expert opinion from Forensic Identification Case BI/07 – 555/01] (will be summoned upon explicit demand of the defense only)

36.     David Hazan, M.D., License No. 29086, IDF. [statement – pronouncement of the death of the late Elazar Akiva Fashkos]

37.     David Moral, M.D., License No. 29052, Clalit Healthcare Service – Jerusalem. [statement + submitter of death notice]

**Detailed Incident 457/01**

[Stamp] P 5: 204

Prosecution Case 444/02 Amended

78

38. First Sergeant Eli Suto, Serial No. 588038, Binyamin Station. [submitter of action report]

39. First Sergeant Moshe Lavi, Badge No. 903260, Binyamin Station. [submitter of memorandum – GMC vehicle + drawing of incident scene + seizure and marking report + exhibit cover form]

40. First Sergeant Shabi Ovadia, Badge No. 560441, Yehuda Forensic Identification. [submitter of photograph tables + memorandum].

41. Superintendent Nissim Mizrachi, Badge No. 926998, the Mobile Laboratory, Forensic Identification, National Headquarters – Jerusalem. [submitter of photograph tables + vehicle inspection report]

42. Yosef Cohen, Identity No. 069397198. (details in the prosecution) [wounded in the shooting attack]

43. Avi Ben-Shimol, Identity No. 031310677. (details in the prosecution) [arrived first at the scene of the attack]

44. Isabella Schwartz, M.D., License No. 28684, Hadassah Hospital – Mount Scopus, Jerusalem. [submitter of physician certificate – interim summary] (will be summoned upon explicit demand of the defense only)

---

**Detailed Incident 2159/01 Binyamin**

45. Master Sergeant Ronen Amar, Badge No. 956813, Binyamin Station. [submitter of action report]

46. First Sergeant Class Shabi Ovadia, Badge No. 560441, Binyamin Station. [submitter of photograph tables + seizure and marking report].

47. Superintendent Ofer Chelouche, Badge No. 916718, the Mobile Laboratory, Forensic Identification, National Headquarters – Jerusalem. [submitter of initial incident scene visit report – seizure of cartridge cases and bullet fragments]

48. Master Sergeant Chaim Toledano, Badge No. 1004332, Binyamin Station. [submitter of memorandum – exhibit chain + exhibit cover form + crime scene visit report]

[Stamp] P 5: 204 [continued]

Prosecution Case 444/02 Amended

49. Sergeant First Class Daniel Turgeman, Badge No. 1013796, the Exhibits Office –
Forensic Identification, National Headquarters – Jerusalem. [submitter of civil servant
certificate – receipt of exhibits for examination] (will be summoned upon explicit
demand of the defense only)

50. Superintendent Avi Kofman, Firearms Laboratory, Forensic Identification, National
Headquarters – Jerusalem. [submitter of expert opinion from Forensic Identification Case
BI/07 – 4238/01] (will be summoned upon explicit demand of the defense only)

51. Vladimir Goler, M.D., License No. 26163, Magen David Adom ambulance service – Lod
station. [submitter of medical reports from scene + death notice + statement]

52. Nir Alon, M.D., Identity No. 031849201, Israel Defense Forces. [statement]

53. Ricardo Nachman, M.D., the National Institution of Forensic Medicine. [submitter of two
expert opinions] (will be summoned upon explicit demand of the defense only)

54. Zion Swiri, Identity No. 000048850 (details in the prosecution) [identification of victims]

## Detailed Incident 7915/01

55. Master Sergeant Zion Sasson, Badge No. 957068, Zion Station. [submitter of action
report]

56. Superintendent Lior Nedivi, Badge No. 952127, Forensic Identification – Zion Station.
[submitter of initial scene visit report + photograph tables]

57. Superintendent Yoram Saar, Zion Station. [finder of cartridge cases at the incident scene
– chain of evidence]

58. Superintendent Ami Leifer, Badge No. 959841, the Mobile Laboratory, Forensic
Identification, National Headquarters – Jerusalem. [submitter of vehicle inspection report
– seizure of bullet fragments]

[Stamp] P 5: 204 [continued]

Prosecution Case 444/02 Amended

59.    Cadet Adva Malka, Badge No. 1049089, Zion Station Special Duties Department. [submitter of exhibit cover form]

60.    Sergeant Major Ziva Hoter, Badge No. 512699, Exhibits Office – Forensic Identification, National Headquarters – Jerusalem. [submitter of civil servant certificate – receipt exhibits for examination] (will be summoned upon explicit demand of the defense only)

[Stamp] P 5: 204 [continued]

Prosecution Case 444/02 Amended

81

61.   Superintendent Avi Kofman, Firearms Laboratory, Forensic Identification, National Headquarters – Jerusalem. [submitter of expert opinion from Forensic Identification Case BI/07 – 4239/01] (will be summoned upon explicit demand of the defense only)

62.   Eyal Yitzhakiak, M.D., License No. 31004, Hadassah Ein Kerem Hospital, Jerusalem. [submitter of discharge certificate of Moshe Weiss] (will be summoned upon explicit demand of the defense only)

63.   Yaakov Globerman, M.D., Hadassah Ein Kerem Hospital, Jerusalem. [submitter of death certificate of the late Meir Weisshaus] (will be summoned upon explicit demand of the defense only)

64.   Moshe Weiss, Identity No. 024001505. (details in the prosecution) (severely injured in the attack)

65.   Yaffa Vaknin, Identity No. 058857863. (details in the prosecution) (eyewitness)

---

**Detailed Incident 481/01 Zion**

66.   Tonie Amiel, Identity No. 032441040. (details in the prosecution) (driver of the Honda vehicle)

67.   Pini Maimon, Identity No. 025759762. (details in the prosecution) (passenger in the Honda vehicle)

68.   Pazit Maimon, Identity No. 040128084. (details in the prosecution) (passenger in the Honda vehicle)

---

**Detailed Incident 8379/01 Zion**

69.   Superintendent Lior Nedivi, Badge No. 952127, Forensic Identification – Zion Station. [submitter of initial scene visit report + seizure and marking report]

[Stamp] P 5: 205

Prosecution Case 444/02 Amended

82

70.  Master Sergeant Gavriel Abed, Identity No. 958736, Special Duties Department – Zion Station. [submitter of exhibit cover report]

71.  Superintendent Ami Leifer, Badge No. 959841, the Mobile Laboratory, Forensic Identification, National Headquarters – Jerusalem. [submitter of vehicle inspection report – seizure of bullet fragments]

72.  Cadet Dror Avram, Badge No. 1039080, Special Duties Department – Zion Station. [submitter of exhibit cover report]

73.  Zion Sadeh, Identity No. 029505724, Exhibits Office – Forensic Identification, National Headquarters – Jerusalem. [submitter of civil servant certificate – receipt of exhibits for examination] (will be summoned upon explicit demand of the defense only)

74.  Sergeant Major Yossi Ben Israel, Badge No. 44771, Exhibits Office – Forensic Identification, National Headquarters – Jerusalem. [submitter of civil servant certificate – receipt of exhibits for examination] (will be summoned upon explicit demand of the defense only)

75.  Superintendent Avi Kofman, Firearms Laboratory, Forensic Identification, National Headquarters – Jerusalem. [submitter of expert opinion from Forensic Identification Case BI/07 – 4723/01] (will be summoned upon explicit demand of the defense only)

76.  Sigal Shazu, Zion Station. [finding of cartridge cases in the field – evidence chain]

77.  Malka Cohen, Identity No. 038791386. (details in the prosecution) (injured in the attack)

78.  Pinchas Cohen, Identity No. 038348256. (details in the prosecution) (injured in the attack)

79.  Ohav Ami Yechiel, Identity No. 059214320. (details in the prosecution) (eyewitness – cared for casualties)

80.  Yair Eden, M.D., License No. 33272, Hadassah Ein Kerem Hospital, Jerusalem. [submitter of discharge certificate of Pinchas Cohen] (will be summoned upon explicit demand of the defense only)

[Stamp] P 5: 205 [continued]

Prosecution Case 444/02 Amended

81.    Menachem Gross, M.D., License No. 30146, Hadassah Ein Kerem Hospital, Jerusalem. [submitter of discharge certificate of Malka Cohen] (will be summoned upon explicit demand of the defense only)

_____

### Detailed Incident 39/02 Binyamin

82.    Inspector Michael Malka, Badge No. 104032, Patrol Unit – Binyamin Station. [submitter of action report]

83.    First Sergeant Kobi Sabag, Badge No. 56494, Binyamin Station. [submitter of investigation memorandum / seizure and marking]

84.    Sergeant Major Eli Kojman, Badge No. 46951, Yehuda Forensic Identification. [submitter of photograph tables + collected cartridge cases from the incident scene]

85.    Superintendent Ami Leifer, Badge No. 959841, the Mobile Laboratory, Forensic Identification, National Headquarters – Jerusalem. [submitter of photograph tables + vehicle inspection report]

86.    Master Sergeant Meir Vaanunu, Badge No. 1018332, Binyamin Station. [submitter of exhibit cover report]

87.    Sergeant Major Ziva Hoter, Badge No. 512699, Exhibits Office -- Forensic Identification, National Headquarters – Jerusalem. [submitter of civil servant certificate – receipt exhibits for examination] (will be summoned upon explicit demand of the defense only)

88.    Lieutenant Nir Eilon, M.D., License No. 33216, Israel Defense Forces (details in the prosecution) [statement – pronouncement of the death of the late Yoela Chen + care for the casualty]

89.    Shaul Beit, M.D., License No. 33027, Hadassah Ein Kerem Hospital, Jerusalem. [submitter of physician certificate – illness summary of Rachel Eini] (will be summoned upon explicit demand of the defense only)

90.    Rachel Eini, Identity No. 075966614. (details in the prosecution) (injured in the attack)

[Stamp] P 5: 205 [continued]

Prosecution Case 444/02 Amended

91.     Sami Vaknin, Identity No. 027798040. (details in the prosecution) [statement + sketch] (eyewitness)

9.2     Nachshon Barashi, Identity No. 05033235 (details in the prosecution) (identification of the victim)

**Detailed Incident 502/02 Zion**

93.     Chief Inspector Dror Asraf, Badge No. 942276, Special Duties Department – Zion Station [submitter of memorandum, seizure and marking report]

94.     Sergeant Major Yigal Daniel Special Duties Department – Zion Station [submitter of seizure and marking report]

95.     Cadet Zvika Reisner, Special Duties Department – Zion Station [submitter of memorandum, seizure and marking report + photographs]

[Stamp] P 5: 205 [continued]

Prosecution Case 444/02 Amended

96. Sergeant First Class Zion Tabadi, Badge No. 1043413, Special Duties Department – Zion Station [submitter of action report – finding of magazine coupler]

97. Sergeant Major Asher Levi, Badge No. 47720, Questioning – Zion Station [submitter of seizure and marking report]

98. Benny Azriel, Identity No. 303647598. (details in the prosecution) (eyewitness – pursued the terrorist)

99. Amed Anidat, Badge No. 739037, Jerusalem Border Guard. (eyewitness – pursued and shot at the terrorist)

100. Shai Cohen, Badge No. 1042043, Patrol Unit 2 – Zion Station. (eyewitness – shot at the terrorist)

101. Noam Gabai, Identity No. 033121070, Jerusalem Subdistrict Unit. (eyewitness – pursued and shot at the terrorist)

102. Chanan Benaim, Badge No. 1049188, Motorcycle Special Patrol Unit – Shalem Station. (eyewitness – pursued the terrorist, disarmed the terrorist after the terrorist was killed)

103. Genadi (Guy) Melnik, Identity No. 309130540. (details in the prosecution). (eyewitness – a security guard who was at the site – opened fire and shot the terrorist)

104 Alon Halfon, Badge No. 761775, Detectives – Jerusalem Central Unit. (eyewitness – pursued and shot at the terrorist)

105. Avi Ben-Ami, Badge No. 996140, Detectives – Jerusalem Central Unit. (eyewitness – shot at the terrorist)

106. Chaim Salah, Identity No. 033401019. (details in the prosecution) (eyewitness – driver of "Egged" bus who was at the site of the attack)

107. Boris Abtisian, Identity No. 309086171. (details in the prosecution) (eyewitness)

108. Yekutiel-Israel Alouche, Identity No. 310101647. (details in the prosecution) (eyewitness)

109. Moshe Maman, Identity No. 60246911. (details in the prosecution) (eyewitness)

[Stamp] P 5: 206

Prosecution Case 444/02 Amended

86

110.  Tova Yitzhaki, Identity No. 051270353. (details in the prosecution) (eyewitness)

111.  Mazal Yitzhaki, Identity No. 04330150. (details in the prosecution) (eyewitness)

112.  Yaron Avrahami, Identity No. 640712770. (details in the prosecution) (eyewitness)

113.  Pinchas Bentura, Identity No. 055611230. (details in the prosecution) (eyewitness)

114.  Kfir Kedem, Identity No. 039381249. (details in the prosecution) (eyewitness – saw the terrorist arriving at the attack site on foot)

115.  Yaakov Sandlar, Identity No. 307750984. (details in the prosecution) (identification of the body of the late Ora (Svetlana) Sandlar)

116.  Dafna Wilner, M.D., License No. 29234, Hadassah Ein Kerem Hospital, Jerusalem. (submitter of death notice of the late Ora (Svetlana) Sandlar) (will be summoned upon explicit demand of the defense only)

117.  Elena Vaslov, M.D., Hadassah Ein Kerem Hospital, Jerusalem. (submitter of death notice of the late Sarah Hamburger) (will be summoned upon explicit demand of the defense only)

An additional list of witnesses concerning the casualties in the attack on Jaffa Street on January 22, 2002 and medical certificates related to their injury will be delivered during the trial

---

## Detailed Incident 483/02 Shafat

118.  Sergeant First Class Avi Pinchasi, Special Duties Department, Jerusalem Central Unit. [submitter of seizure and marking report]

119.  Master Sergeant Oded Meiri, Badge No. 1065937, Special Duties Department, Jerusalem Central Unit. [submitter of photograph table + two exhibit cover forms]

120.  Superintendent Lior Nedivi, Badge No. 952127, Forensic Identification -- Zion Station. [submitter of seizure and marking report + crime scene visit report + transfer of exhibits to Forensic Identification – National Headquarters]

[Stamp] P 5: 206 [continued]

121.  Dan Uzana, Patrol Unit 4, Zion Station. [submitter of seizure and marking report]

Prosecution Case 444/02 Amended

122. Superintendent Avi Kaufman, Firearms Laboratory, Forensic Identification, National Headquarters – Jerusalem. [submitter of expert opinion] (will be summoned upon explicit demand of the defense only)

123. Aviram Nissan, M.D., Hadassah Mt. Scopus Hospital, Jerusalem. [submitter of death certificate] (will be summoned upon explicit demand of the defense only)

124. Meir Dahan, Badge No. 081086407. (details in the prosecution) [overpowered the terrorist, wounded in the attack]

125. Dan Mor, Identity No. 086019812. (details in the prosecution) [overpowered the terrorist]

126. Nir Ben Simchon, Identity No. 037670213. (details in the prosecution) [overpowered the terrorist]

127. Afif Halwani, Identity No. 023307358. (details in the prosecution) [eyewitness]

128. Yosef Karadi, Identity No. 0099752. (details in the prosecution) [eyewitness]

129. Stas Krisensky, Identity No. 304389240. (details in the prosecution) [wounded in the attack]

130. Lior Skizada, Identity No. 032087587. (details in the prosecution) [wounded in the attack]

131. Keren Kadmi, Identity No. 032777716. (details in the prosecution) [wounded in the attack]

132. Adam Garfield, Identity No. 011935426. (details in the prosecution) [wounded in the attack]

133. Eli Ochana, Identity No. 033404773. (details in the prosecution) [wounded in the attack]

134. Amichai Dahan, Identity No. 039243944. (details in the prosecution) [wounded in the attack]

[Stamp] P 5: 206 [continued]

Prosecution Case 444/02 Amended

135. Tamara Lifschitz Fisch, Identity No. 306706318. (details in the prosecution) [wounded in the attack]

---

**Detailed Incident 4258/02**

136. Avshalom Friedman, Identity No. 055594097, volunteer in Yarkon Patrol Unit (details in the prosecution) [two statements, was with the late Salim Birkat]

137. Efi Yamin, Yarkon Identification, Israel Police.

138. Superintendent Mirod Daniel, Yarkon Investigations Branch Officer.

139. Shimon Rachamim, Yarkon Special Investigations Team.

140. Yaakov Abed, Identity No. 025714502. (details in the prosecution) [eyewitness -- was inside the restaurant]

141. Igor Kotbitzky, Identity No. 321940751. (details in the prosecution) [security guard at the restaurant, injured in the attack]

142. Adi Moriz, Identity No. 304615230. (details in the prosecution) [security guard at the restaurant]

143. Yoni Chayal, Identity No. 049170392. (details in the prosecution) [eyewitness]

144. Irit Rachamim, Identity No. 027293034. (details in the prosecution) [eyewitness]

145. Limor Forma, Identity No. 025377029. (details in the prosecution) [eyewitness]

146. Shlomo David, Identity No. 00022280. (details in the prosecution) [severely injured in the attack by stab wound]

147. Sharon Yifrach, Identity No. 9802115980. (details in the prosecution) [eyewitness, injured in the attack]

148. Yiftach Kariti, Identity No. 029022902. (details in the prosecution) [eyewitness, injured in the attack]

[Stamp] P 5: 207

Prosecution Case 444/02 Amended

89

149.    Eliyahu Tzaka, Identity No. 028804599. (details in the prosecution) [eyewitness, injured in the attack]

150.    Ivana Richtman, Identity No. 309998540. (details in the prosecution) [eyewitness, injured in the attack]

151.    Yaakov Horovitz, Identity No. 054188644. (details in the prosecution) [eyewitness, saw the vehicle in which the terrorist arrived]

152.    Ravit Avishag-Yosefi, Identity No. 024315632. (details in the prosecution) [eyewitness]

153.    William Hazan, Identity No. 069828374. (details in the prosecution) [eyewitness, injured in the attack]

154.    Ala Mahmoud, Identity No. 061247623. (details in the prosecution) [eyewitness – statement + drawing of the incident scene]

155.    Bassam Abu Laham, Identity No. 035704568. (details in the prosecution) [eyewitness]

156.    Baha Abu Laham, Identity No. 049824865. (details in the prosecution) [eyewitness]

157.    Ala Mahamid, Identity No. 061247623. (details in the prosecution) [eyewitness]

158.    Yomi Kontanta, Identity No. 033876954. (details in the prosecution) [eyewitness]

159.    Avinoam Yosef, Identity No. 056230584. (details in the prosecution) [eyewitness]

160.    Igor Postinensky, Identity No. 311660328. (details in the prosecution) [eyewitness]

161.    Daniel Kradi, Identity No. 02234597. (details in the prosecution) [eyewitness – two statements – saw the terrorist stabbing people]

162.    Meir Habi, Identity No. 5452229. (details in the prosecution) [identification of the body of the late Yosef Habi]

163.    Noam Asafi, Identity No. 031877665. (details in the prosecution) [injured in the attack]

164.    Yossi Azuz, Identity No. 029416740. (details in the prosecution) [severely injured in the attack]

[Stamp] P 5: 207 [continued]

Prosecution Case 444/02 Amended

165. Michael Gruber, Identity No. 043401140. (details in the prosecution) [injured in the attack]

166. Prof. Yehuda Hiss, the National Institution of Forensic Medicine, Tel Aviv. [submitter of expert opinion] (will be summoned upon explicit demand of the defense only)

167. Hospital records – institutional record

An additional list of witnesses concerning the casualties and victims in the attack at the "Seafood Market" Restaurant in Tel Aviv on March 5, 2002 will be delivered during the trial

---

**Detailed Incident 568/02 Shafat**

168. Nissim Cohen, Badge No. 70755855, Border Guard. (details in the prosecution) [statement and submitter of action report]

169. Dekel Ozer, Badge No. 7015187, Border Guard [details in the prosecution].

170. Shlomi Aton, Badge No. 70192463, Border Guard [details in the prosecution].

171. Dror Cohen, Badge No. 1034842, Identification – Zion Station [submitter of 2 seizure and marking reports + exhibits from exhibit entry card No. 294/02].

172. First Sergeant Zehava Ful, Badge No. 57989, Zion Station – Bomb Disposal [submitter of action report]

173. Superintendent Marco Elmaliach, Badge No. 942979, Forensic Identification – Bomb Disposal Laboratory, National Headquarters, Jerusalem. [submitter of expert opinion and exhibit cover reports] (will be summoned upon explicit demand of the defense only)

174. Sergeant First Class Daniel Turgeman, Badge No. 1013796, the Exhibits Office – Forensic Identification, National Headquarters – Jerusalem. [submitter of civil servant certificate – receipt of exhibits for examination] (will be summoned upon explicit demand of the defense only)

[Stamp] P 5: 207 [continued]

Prosecution Case 444/02 Amended

175.    Prof. Yehuda Hiss, the National Institution of Forensic Medicine, Tel Aviv. [submitter of expert opinion] (will be summoned upon explicit demand of the defense only)

**Detailed Incident 783/02 Binyamin**

176.    Sergeant First Class Yitzhak Rokach, Badge No. 1011626, Binyamin Station. [submitter of action report]

[Stamp] P 5: 207 [continued]

Prosecution Case 444/02 Amended

92

177. Sergeant Major Eli Kojman, Badge No. 46951, Yehuda Forensic Identification. [submitter of crime scene visit report + photograph tables]

178. First Sergeant Avi Menachem, Badge No. 57556, Binyamin Station. [submitter of exhibit cover form + memorandum + exhibits from card No. 106/02]

179. Samir Karash, Identity No. 080062771 (details in the prosecution) [wounded in the shooting attack]

180. Shaul Beit, M.D., License No. 33027, Hadassah Ein Kerem Hospital, Jerusalem. [submitter of medical report] (will be summoned upon explicit demand of the defense only)

181. Query for finding and projection of vehicle and owner details [institutional record].


[Signature]
Michael Kotlik, Captain
Military Prosecutor

Date: September 29, 2002

Reference: 444-02 amended


[Stamp] P 5: 208


Prosecution Case 444/02 Amended

93

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

MARK I. SOKOLOW, *et al.*,

Plaintiffs,

vs.

No. 04 Civ. 00397 (GBD) (RLE)

THE PALESTINE LIBERATION
ORGANIZATION, *et al.*,

Defendants.

### DECLARATION OF RINA NE'EMAN

Rina Ne'eman hereby certifies as follows:

1. The attached translation from Hebrew to English is an accurate representation of the document received by Rina Ne'eman Hebrew Language Services, to the best of my knowledge and belief. The document is designated as P5: 175-208.

2. I am a professional translator with a B.A. in International Relations from the Hebrew University of Jerusalem (Israel) and 30 years of translation experience. I am fluent in Hebrew and English, and I am qualified to translate accurately from Hebrew to English.

3. To the best of my knowledge and belief, the accompanying text is a true, full and accurate translation of the Hebrew-language document bearing the bates number, P5: 175-208.

Rina Ne'eman

ss.: New Jersey

On the [28] day of February, 2014 before me, the undersigned, personally appeared Rina Ne'eman, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is signed to this Declaration and acknowledged to me that he executed the same in his capacity, and that by his signature on this Declaration, the individual executed the Declaration.

Sworn to me this
28 day of February, 2014

Notary Public

NIRUT J MIRSTE
NOTARY PUBLIC
STATE OF NEW JERSEY
MY COMMISSION EXPIRES SEPT. 7, 2015
I.D.# 2333704

| צבא | הגנה | לישראל |
|---|---|---|

| בבית | המשפט | הצבאי | תיק ביה"מ : | 3459/02 |
|---|---|---|---|---|
| בבית | | אל | תיק תביעה : | 444/02 |
| במפי | | הרכב | תיק פ.א. : | 1282/02 בנימין |

1283/02 בנימין
1284/02 בנימין
1285/02 בנימין
234/01 מתי"מ י-ם
457/01 בנימין
2159/01 בנימין
7915/01 ציון
481/01 ציון
8379/01 ציון
39/02 בנימין
502/02 ציון
483/02 שפט
4258/02 ירקון
568/02 שפט
783/02 בנימין



**במשפט שבין התובע הצבאי - המאשים**

**- נ ג ד -**

אחמד טאלב מוצטפא ברנוטי (מכונה "אל פראנסיי")
ת.ז. 994465860, יליד 15.03.76, תושב אלבירה - רמאללה
עצור מיום 15.04.02

**- ה נ א ש ם -**

# כתב - אישום מתוקן

**הנאשם הנ"ל מואשם בזאת בביצוע העבירות הבאות:**

**פרט ראשון:**

**מהות העבירה:** חברות בהתאחדות בלתי מותרת, עבירה לפי תקנות 84(1)(א)(א) ו-85(1)(א) לתקנות ההגנה (שעת חירום), 1945.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, החל מסוף שנת 2000 ועד ליום מעצרו, היה חבר או פעל כחבר בהתאחדות בלתי מותרת, דהיינו:

הנאשם הנ"ל, החל משנת 1996 ועד ליום מעצרו עבד כנהג וכשומר ראש של מרואן ברגותי, שהוא ראש "התנזים" של הפתייח.

הנאשם הנ"ל, החל מתחילת שנת 2001 ועד ליום מעצרו פעל במסגרת "התנזים" של הפתייח, שהוא חתאחדות בלתי מותרת, פעילות צבאית נגד המטרות הישראליות.

במהלך פעילותו הצבאית, הנאשם' נהג' לקבל סיוע כספי מפעילי "התנזים" של הפתייח. הנאשם קיבל באמצעות חשבון הבנק שלו סכום של כ-7,000 ש"ח מנאצר מחמוד עוויס, פעיל צבאי בכיר מאיזור שכם, וכן סכום של כ-10,000 ש"ח מעלי פרני ברנותי, פעיל בכיר באיזור רמאללה.

ת.ת. 444/02 מתוקן           1

במהלך פעילותו הצבאית הנאשם היה בקשר מתמיד עם ראש "יגדודי חללי אלאקצא", הזרוע הצבאית של "יהתנויים" של הפתייח בשכם - נאצר מחמוד עווים, ראש "יגדודי חללי אלאקצא" באיזור טול-כרם - ראאד כרמי, ראש "יגדודי חללי אלאקצא" באיזור גיניו - עבדרים ראתב יונס עווים, ראש "יגדודי חללי אלאקצא" באיזור בית-לחם וחברון - ג'יהאד ג'עדה, ראש "יגדודי חללי אלאקצא" באיזור - נאצר מחמד יוסף נאג'י (אבו-חמיד), וכן עם ראש "התנויים" של הפתייח - מרואן ברגותי.
במסגרת פעילותו הצבאית הנייל, הנאשם הפיץ ברמאללה כרוזים בדבר לקיחת האחריות לפיגועים שבוצעו בישראל ובאיזור על-ידי פעילי "התנויים" של הפתייח.

**פרט שני:**

**מהות העבירה:** נשיאת משרה בהתאחדות בלתי מותרת, עבירה לפי תקנות 84(1)(א) ו-85(1)(ג) לתקנות ההגנה (שעת חירום), 1945.

**פרטי העבירה:** הנאשם הנייל, באיזור, החל מתחילת שנת 2001 ועד ליום מעצרו, ניהל או עזר להנהלת התאחדות בלתי מותרת, או החזיק בכל משרה או עמדה בהתאחדות בלתי מותרת או תחת מרותה, דהיינו:
הנאשם הנייל, במהלך תקופות האמורה, היה אחד האחראיים על ארגון "יגדודי חללי אלאקצא" ("כותאיב שוהאדה אלאקצא") באיזור רמאללה - הזרוע הצבאית של "התנויים" של הפתייח, שהוא התאחדות בלתי מותרת. "יגדודי חללי אלאקצא" היו אחראיים לביצוע מספר רב של פיגועים נגד חיילי צהייל ואזרחים ישראלים הן באיזור הן בתוך שטחה של מדינת ישראל, אשר בהן נהרגו מספר רב של אזרחים ישראלים וחיילי צהייל.
בין היתר, הנאשם שימש כאיש קשר בין שאר האחראיים האיזוריים ב"יגדודי חללי אלאקצא" לבין ראש "התנויים" של הפתייח - מרואן ברגותי.

**פרט שלישי:**

**מהות העבירה:** ביצוע שירות עבור התאחדות בלתי מותרת, עבירה לפי תקנות 84(1)(א) ו-85(1)(ג) לתקנות ההגנה (שעת חירום), 1945.
**פרטי העבירה:** הנאשם הנייל, באיזור, במהלך התקופה האמורה בפרט האישום הראשון או בסמוך לכך, עשה עבודה כל שהיא או ביצע שירות כל שהוא בשביל התאחדות בלתי מותרת, דהיינו:
הנאשם הנייל, במהלך תקופות האמורה, ברמאללה או בסמוך לכך, במספר רב של הזדמנויות שונות, חילק כספים לפעילים צבאיים של "התנויים" של פתייח. הנאשם נהג לקבל כספים מפעיל "התנויים" של הפתייח עלי פרג'י ברגותי ולחלק אותם לאנשים רבים אשר ביצעו פיגועים נגד חיילי צהייל ואזרחים ישראלים. בכל הזדמנות הנאשם מסר לכל אחד מהפעילים סכומי כסף שונים בין 100 ל-300 דולר ארהייב. כמו כן, הנאשם נהג להעביר סכומים גדולים יותר לפעילים צבאיים ב"התנויים" של הפתייח באמצעות העברות בנקאיות.
בין היתר, הנאשם העביר למנצור שרם, פעיל צבאי בכיר ב"התנויים" של הפתייח בטול-כרם, שהוא סגנו של ראאד כרמי - ראש "יגדודי חללי אלאקצא" בטול-כרם, שהוא הזרוע הצבאית של "התנויים" של פתייח, סכום של 3,000 שייח.
כמו כן, הנאשם העביר לנאצר מחמד יוסף נאג'י (אבו-חמיד), שהוא ראש "יגדודי חללי אלאקצא", סכומים בין 1,000 ל-2,000 שייח בכ-7-6 הזדמנויות שונות וזאת לצורך רכישת כדורים.
בנוסף לכספים, הנאשם נהג לספק לפעילים צבאיים של "התנויים" של פתייח מכשירי טלפון סלולריים לצורכי פעילותם הצבאית.

ת.פ. 444/02 מתוקן

**פרט רביעי:**

**מהות העבירה:** סחר בציוד מלחמתי, עביר לפי סעיף 2 לצו בדבר איסור סחר בציוד מלחמתי (יהודה והשומרון) (מסי 243), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, בשנת 1998 או בסמוך לכך, סחר או עסק בצורה אחרת בציוד מלחמתי, ללא היתר חתום על-ידי מפקד האיזור או מטעמו, דהיינו: הנאשם הנ"ל, במועד האמור, במחנה הפליטים אמערי או בסמוך לכך, רכש מידי סאמר אלכימי ותמ"ק MP-5 תמורת 4,000 דינר ירדני וכן רוסי"ר M-16 מקוצר עם כוונת טלסקופית תמורת 5,500 דינר ירדני, וזאת ללא היתר חתום על-ידי מפקד האיזור או מטעמו. הנאשם הנ"ל, במהלך השנים 2001 – 2002, נהג למסור את תמ"ק MP-5 הנ"ל לידי אנשים שונים על מנת שיבצעו באמצעותו פיגועי ירי נגד אזרחים ישראליים וזאת כפי שיתואר בהמשך כתב-האישום.

**פרט חמישי:**

**מהות העבירה:** החזקת כלי-יריה ללא היתר, עבירה לפי סעיף 53(א)(1) לצו בדבר הוראות ביטחון (יהודה והשומרון) (מסי 378), תש"ל-1970.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, במהלך התקופה האמורה בפרט האישום הראשון, החזיק ברשותו כלי-יריה, תחמושת, פצצות, רימון-יד או חפץ נפיץ או מבער, בלי או חפץ או דבר המתוכנן או מסוגל לגרום מוות או חבלה חמורה, ללא תעודת היתר שהוענקה על-ידי מפקד צבאי או מטעמו, דהיינו: הנאשם הנ"ל, במהלך התקופה האמורה, ברמאללה או בסמוך לכך, החזיק ברשותו תמ"ק MP-5, אקדח וכן רוסי"ר M-16 מקוצר עם כוונת טלסקופית, וזאת ללא תעודת היתר שהוענקה על-ידי מפקד צבאי או מטעמו.

**פרט שישי:**

**מהות העבירה:** סחר בציוד מלחמתי, עביר לפי סעיף 2 לצו בדבר איסור סחר בציוד מלחמתי (יהודה והשומרון) (מסי 243), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, בסוף שנת 2000 או בסמוך לכך, סחר או עסק בצורה אחרת בציוד מלחמתי, ללא היתר חתום על-ידי מפקד האיזור או מטעמו, דהיינו: הנאשם הנ"ל, במועד האמור, במועד האמור, ברמאללה או בסמוך לכך, מסר לידי נאצר מחמד יוסף טאני אבו-חמדי – ראש הזרוע הצבאית של "תנזים" של הפתיית, רוסי"ר קלצניקוב 1-50 כדורים כרוסי"ר קלצניקוב, וזאת ללא היתר חתום על-ידי מפקד האיזור או מטעמו. נאצר אבו-חמדי מסר את רוסי"ר קלצניקוב הנ"ל הכדורים הנ"ל לידי אחמד עיודיר, פעיל בכוח 17 של חרושת הפלסטינית. אחמד עיודיר ביצוע דיווח לנאצר אבו-חמדי כי ביצע באמצעות רוסי"ר קלצניקוב הנ"ל פיגועי ירי שבו נהרגו בני הזוג כהנא ז"ל, וכן כי ביצע באמצעות תכדורים הנ"ל פיגועי ירי שבו נהרג אזרח ישראלי.

**פרט שביעי:**

**מהות העבירה:** סחר בציוד מלחמתי, עביר לפי סעיף 2 לצו בדבר איסור סחר בציוד מלחמתי (יהודה והשומרון) (מסי 243), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, החל מסוף שנת 2000 ועד ליום מעצרו או בסמוך לכך, סחר או עסק בצורה אחרת בציוד מלחמתי, ללא היתר חתום על-ידי מפקד האיזור או מטעמו, דהיינו: הנאשם הנ"ל, במועד האמור, במהלך התקופה האמורה, ברמאללה או בסמוך לכך, במסגרת רב של הדמטות שונות, מסר לידי נאצר מחמד יוסף טאני אבו-חמדי) – ראש הזרוע הצבאית של "תנזים" של הפתיית, סכומי כסף גדולים של עשרות אלפי שקלים ועשרות אלפי דולרים של ארה"ב לצורך רכישת כלי נשק והדורים לביצוע פיגועי ירי נגד חיילי צה"ל ואזרחים ישראליים. הנאשם אף נהג להשאיר אצלו בבית את הכדורים שנרכשו בכסף הנ"ל ולמסור אותם לידי נאצר אבו-חמדי וחבריו של האחרון לפי מידת הצורך, וזאת ללא היתר חתום על-ידי מפקד האיזור או מטעמו.

ת.ת. 444/02 מתוקן

3

#### פרט שמיני:

**מהות העבירה:** סחר בציוד מלחמתי, עביר לפי סעיף 2 לצו איסור סחר בציוד מלחמתי (יהודה והשומרון) (מס' 243), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, בַּמְהַלֶךְ שנת 2001 או בסמוך לכך, סחר או עסק בצורה אחרת בציוד מלחמתי, ללא היתר חתום על-ידי מפקד האיזור או מטעמו, דהיינו:
הנאשם הנ"ל, במועד האמור, ברמאללה או בסמוך לכך, מסר לנאצר מראמד יוסף נאג'י אבו-חמדי, ראש "יחידי זׂ" חלקי אלאקצאי, הוזיע הצבאית של "התנזים" של הפתי"ח, 100 כדורים לרוסי"ר M-16, וזאת ללא היתר חתום על-ידי מפקד האיזור או מטעמו.

#### פרט תשיעי:

**מהות העבירה:** פגיעה בביטחון האיזור, עבירה לפי סעיף 53(א)(4) לצו בדבר הוראות בטחון (יהודה והשומרון) (מס' 378), תש"ל-1970.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, בתחילת שנת 2001 או בסמוך לכך, עשה מעשה או מחדל שיש בהם פגיעה, היזק, הפרעה או סכנה לביטחון האיזור או לביטחון כוחות צה"ל וחייליו או לפעולתם, שימושם או ביטוחם של כל אחד מאלה: אניה, אוירון, נמל, רציף, מזח, מעגן, שדה תעופה, מסילת ברזל, מניב מים, דרך, דרך-עפר, קטע, כלי רכב, כלי משא או כל אמצעי אחד של הובלה ציבורית, או תקשורת ציבורית, או כל מפעל, מוסד, או ציוד הממשמש או מסוגל לשמש ליצורם, הספקתם, התחנתם, העברתם, נסירותם או הפצתם של מים, דלק, גז או חשמל או כל רכוש של מדינה ישראל או של צה"ל, דהיינו:
הנאשם הנ"ל, במועד האמור, ברמאללה או בסמוך לכך, <u>רֶכַש רכב מזדה לְבֶן גונב, מוּדֶל חֲדִיש</u>. הנאשם הנ"ל מסר את חרכב הנ"ל לידי <u>מֻהֻנֵד אבו חֻלאוֹוֶה</u>, אשר יצא ברכב האמור לביצוע פיגועים נגד אזרחים ישראליים וחיי"ל צה"ל באיזור.

#### 7 **פרט עשירי:** (פ.א. 234/01 מת"פ י-ם)

**מהות העבירה:** גרימת מוות בכוונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות ביטחון (יהודה והשומרון) (מס' 378), תש"ל-1970 וסעיף 14(א) לצו בדבר כללי האחריות לעבירה (יהודה והשומרון) (מס' 225), תשכ"ח-1968.

<u>ס</u>י`יּ **פרטי העבירה:** הנאשם הנ"ל, בין באיזור ובין מחוצה לו, ביום 25.01.01 או במועד הסמוך לכך, גרם בכוונה למותו של אחר, דהיינו:

1. הנאשם הנ"ל, במועד האמור, נפגש ברמאללה עם מחמד ערחמאץ סאלם מצלח (מכונה "אבו סטוחה") ועם גיאד אברהים מוסא מעלא.
2. גיאד מעלא ומחמד מצלח ביקשו <u>מהנאשם רכב לצורך ביצוע פיגוע</u> ירי נגד יהודים. הנאשם מסר לידי גיאד מעלא ומחמד מצלח <u>רכב פולקסוֶגֶן</u> בזרה גונב בצבע כסף, נושא לוחיות רישוי ישראליות, וזאת על מנת שחברים הנ"ל יבצעו מרכב זה פיגוע ירי בכוונה לגרום למותם של אזרחים ישראליים.
3. מחמד מצלח נהג ברכב הפולקסוֶוגֶן ואילו גיאד מעלא ישב לידו כשהוא חמוש באקדח 16.
4. גיאד מעלא ומחמד מצלח נסעו ברכב הפולקסוֶוגֶן לאיזור עטרות על מנת לחפש רכב ישראלי במטרה לבצע לעברו פיגוע ירי ולגרום למותם של נוסעי הרכב.
5. סמוך לשעה 18:15, באיזור התעשיה עטרות, גיאד מעלא ומחמד מצלח הבחינו ברכב GMC ספארי, מ.ר. 7901306, (להלן: הרכב) אשר בו נהג אלעזר עקיבא פשקוס ז"ל.
6. גיאד מעלא ומחמד מצלח החלו לנסוע אחרי הרכב. הנאשם ומחמד מצלח עקבו אחרי הרכב מאיזור התעשיה עטרות עד צומת א-ראם ובחזרה.
7. כאשר הרכב חזר לאיזור התעשיה עטרות ונסע בכביש הראשי, גיאד מעלא ומחמד מצלח נסעו ברכב הפולקסוֶוגֶן בסמוך לרכב.
8. בשלב זה, גיאד מעלא פתח את החלון וירה באקדח 16 הנ"ל 6-7 כדורים לעבר הרכב בכוונה לגרום למותו של נהג הרכב. מספר קליעים, אשר נורו על-ידי גיאד מעלא, פגעו ברכב, כאשר קליע אחד פגע בצווארו ואחד בחזהו של אלעזר עקיבא פשקוס ז"ל שנהג ברכב.
9. משהבחינו גיאד מעלא ומחמד מצלח כי הרכב נעצר, השניים נמלטו ברכב הפולקסוֶוגֶן לרמאללה.

---

ת.ת. 444/02 מתוקן                                      4

10. ברמאללה, ניאד מעלא ומחמד מצלח התזירו את רכב הפולקסווגן לאנשם ודיווחו לו על
הפיגוע שביצעו.
11. לאחר יום, הנאשם מסר לגיאד מעלא כ-300 דולר ארה"ב עבור ביצוע הפיגוע הנ"ל. את הכסף
האמור הנאשם קיבל מידי עלי פרני ברגותי.
12. במעשיו המתוארים לעיל, הנאשם הנ"ל גרם בכוונה למותו של **אלעזר עקיבא פשקוס ז"ל**,
אשר נפטר כתוצאה מפגיעות הקליעים שנורו על-ידי גיאד מעלא כפי שתואר.

### ז' פרט אחד-עשר: (פ.א. 457/01 בנימין)

**מהות העבירה:** נסיונו לגרימת מוות בכוונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות ביטחון
(יהודה והשומרון) (מס' 378), תשי"ל-1970, וסעיפים 14(א) ו-19 לצו בדבר כללי האחריות לעבירה
(יהודה והשומרון) (מס' 225), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, ביום 25.02.01 או בסמוך לכך, ניסה לגרום בכוונה למותו
של אחר, דהיינו:

1. הנאשם הנ"ל, במועד האמור, נפגש ברמאללה עם מהג'ד אבו חלאווה, מחמד ערחמאן סאלם
מצלח (אבו סטחה) וטארק מלחי (א-נוף).
2. הנאשם וחבריו הנ"ל דנו במצב באיזור. הנאשם וחבריו הנ"ל טענו כי אין פעילות נגד המטרות
הישראליות. הנאשם שאל את חבריו הנ"ל מה ניתן לעשות על מנת לשפר את המצב. חבריו
הנ"ל של הנאשם ביקשו כי הנאשם ישפק להם רכב וכלי נשק. והם יבצעו פיגוע נגד האזרחים
הישראליים בכוונה לגרום למותם.
3. הנאשם הסכים להעניק הנ"ל. הנאשם מסר לידי חבריו הנ"ל את רכבו מסוג פולקסווגן בורד,
צבע אפור, מודל שנת 2001, נושא לוחיות רישוי ישראליות, וכן תמייק 5-MP עם מחסנית
וכדורים.
4. מהג'ד אבו חלאווה, מחמד מצלח (אבו סטחה) וטארק מלחי (א-נוף) נסעו ברכבו של הנאשם,
כשהם חמושים בתמייק 5-MP הנ"ל, אשר אותו קיבלו מהנאשם. חבריו הנ"ל של הנאשם
הגיעו לאיזור גשר עטארה.
5. בסמוך לשעה 13:15, חבריו חנ"ל של הנאשם הבחינו ברכב GMC ואנדורח, מ.ר. 3082518,
אשר בה נהג יוסף כהן, כשהרכב האמור יוצא מיישוב עטרת ופונה לכיוון גשר עטארה.
6. חבריו הנ"ל של הנאשם החליטו לבצע פיגוע ירי לעבר רכב ה-GMC הנ"ל בכוונה לגרום למותם
של הנוסעים בו.
7. חבריו הנ"ל של הנאשם החליטו להמתין עד שרכב הסיטרואן שנסע לפניהם יעקוף את רכב
ה-GMC ואז לעקוף את רכב ה-GMC ולבצע לעבדו את פיגוע הירי המתוכן.
8. ברכב הסיטרואן הנ"ל נסעו ווליאם קאסם פארס אלחטיב (רימאווי), דבחי זוהדי אלאסמר
(רימאווי) ואכרם עבדאללה מחמד קאסם (עזאווי), החמושים ב-2 רסיירי קלצ'ניקוב ורוסיי"ר
16-M. נוסעי רכב הסיטרואן הנ"ל פתחו באש בכלי הנשק הנ"ל לעבר רכב ה-GMC הנ"ל
בכוונה לגרום למותם של הנוסעים בו. 29 קליעים שנורו על-ידי האנשים הנ"ל פגעו ברכב
ה-GMC הנ"ל. 3 קליעים פגעו בראשו ובצוארו של יוסף כהן, אשר נהג ברכב ה-GMC הנ"ל.
כתוצאה מפגיעות הקליעים הנ"ל וכן מפגיעות הרסיסים בכל חלקי גופו, יוסף כהן נפצע
באורח קשה.
9. לאחר שחבריו הנ"ל של הנאשם הבחינו כי כתוצאה מפיגוע הירי שבוצע מרכב הסיטרואן
שנסע לפניהם, רכב ה-GMC נפגע, ירד מהכביש ונהג הרכב נפצע, חבריו הנ"ל של הנאשם
נמלטו בחזרה לרמאללה.
10. כרמאללה, חבריו הנ"ל של הנאשם החזירו לנאשם את רכב הפולקסווגן הנ"ל ואת תמייק
5-MP הנ"ל. מהג'ד אבו חלאווה, טארק מלחי (א-נוף) ומחמד מצלח (אבו סטחה) דיווחו לנאשם
כי ביצעו פיגוע ירי באמצעות הרכב וכלי הנשק הנ"ל וכי כתוצאה מכך נפצע נהג יהודי.

ת.ח. 444/02 מומקן

P 5: 179

#### פרט שניים-עשר:

**מהות העבירה:** ניסיון לגרימת מוות בכוונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות ביטחון (יהודה והשומרון) (מס' 378), תש"ל-1970 וסעיפים 14(א) ו-19 לצו בדבר כללי האחריות לעבירה (יהודה והשומרון) (מס' 225), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, בחודש יוני 2001 או בסמוך לכך, ניסה לגרום בכוונה למותו של אחר, דהיינו:

זיאד חמודה יעקב חמודה ביחד עם נאמון בסאם עבדאללה אבו-שמה, הייתם עזאת, סעיד אבראהו ואתמד אבו אלעם, במעוד האמור, החליטו לבצע פיגוע ירי לעבר היישוב פסגות במטרה לגרום למותם של אזרחים ישראליים.

האנשים הנ"ל ניגשו אל משרדו של מראון ברנותי, ראש "התנוויים" של הפת"ח. האנשים הנ"ל נפגשו עם מראון ברנותי וביקשו מהאחרון לקבל כלי נשק לצורך ביצוע פיגוע ירי נגד אזרחים ישראליים ביישוב פסגות. מראון ברנותי שמח לשמוע את התכנית הנ"ל לבצע פיגוע ירי לעבר היישוב פסגות והבטיח לספק כלי נשק לצורך ביצוע פיגוע חירי המתוכנן.

לאחר כשבוע ימים, זיאד חמודה וחבריו הנ"ל ניגשו שוב למשרדו של מראון ברנותי ברמאללה. מראון ברנותי לא היה באותה העת במשרדו והאנשים היה זה שוותחו עם זיאד חמודה וחבריו הנ"ל. האנשים הבטיחו לדבר עם מראון ברנותי בנוגע לבקשת חבריו הנ"ל לקבל כלי נשק לצורך ביצוע פיגוע ירי לעבר היישוב פסגות.

לאחר כשלושה ימים, זיאד חמודה וחבריו הנ"ל ניגשו שוב אל משרדו של מראון ברנותי ברמאללה. האנשים הנ"ל ביקשו שוב ממראון ברנותי לקבל כלי נשק לצורך ביצוע פיגוע ירי לעבר היישוב פסגות. מראון ברנותי התקשר אל מחנד אבו חלאווה, פעיל צבאי בכיר ב"תנזים" של הפת"ח. סוכם כי מחנד אבו חלאווה יפגוש את האנשים הנ"ל בכיכר מנארה ברמאללה ושם ימסור להם כלי נשק לצורך ביצוע פיגוע חירי המתוכנן.

זיאד חמודה וחבריו הנ"ל נפגשו עוד באותו היום, בכיכר מנארה ברמאללה עם מחנד אבו חלאווה. במהלך הפגישה האמורה, מחנד אבו חלאווה הבטיח להעביר לידיהם כלי נשק לצורך ביצוע פיגוע חירי המתוכנן.

בלילה של אותו היום, הנאשם הגיע לביתו של זיאד חמודה באלבירה ומסר לידי זיאד חמודה תמ"ק MP-5 וכדורים לצורך ביצוע פיגוע נגד אזרחים ישראליים.

לאחר כשעה, זיאד חמודה יצא מביתו ביחד עם נאמון אבו-שמה ברכבו של זיאד חמודה כשהם מחזיקים בתמ"ק MP-5 הנ"ל. זיאד חמודה ונאמון אבו-שמה הגיעו למקום הנמצא בסמוך ליישוב פסגות. שם השעינים ירדו מהרכב. נאמון אבו-שמה ירה את כל הכדורים שמסר הנאשם בתמ"ק MP-5 הנ"ל לעבר היישוב פסגות מתוך כוונה למותם של תושבי היישוב פסגות ושל חיילי צה"ל שהיו בישוב פסגות.

מיד לאחר הירי, זיאד חמודה ומאמון אבו-שמה חזרו ברכבם הנ"ל לרמאללה.

#### פרט שלושה-עשר:

**מהות העבירה:** ניסיון לגרימת מוות בכוונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות ביטחון (יהודה והשומרון) (מס' 378), תש"ל-1970 וסעיפים 14(א) ו-19 לצו בדבר כללי האחריות לעבירה (יהודה והשומרון) (מס' 225), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, ביום 26.06.01 או במועד הסמוך לכך, ניסה לגרום בכוונה למותו של אחר, דהיינו:

הנאשם הנ"ל, בחודש יוני 2001 או בסמוך לכך, ברמאללה, בנסיבות המתוארות בפרט האישום הקודם, מסר לידי זיאד חמודה יעקב חמודה תמ"ק MP-5 לצורך ביצוע פיגוע ירי נגד אזרחים ישראליים וחיילי צה"ל.

זיאד חמודה, במועד האמור, ביחד עם מאמון בסאם עבדאללה אבו-שמה והייתם עזאת, יצא מרמאללה לכיוון הכביש המוביל מפסגות זאב לבבוש הצרפתית שבירושלים, על מנת לבצע שם פיגוע ירי ולגרום בכוונה למותם של אזרחים ישראליים. זיאד חמודה וחבריו הנ"ל יצאו כאמור כשהם חמושים ברזנה MP-5, אשר נמסר להם למטרה זו על-ידי הנאשם כאמור לעיל, ובאקדח 9.

זיאד חמודה וחבריו יצאו לכיצוע הפיגוע הזאמור כשהם מחזיקים בשרלוט של הגבעה הצרפתית ששם תכנו לבצע את פיגוע חירי, אשר נערך על-ידי מאמון אבו-שמה.

זיאד חמודה וחבריו הנ"ל יצאו לביצוע הפיגוע האמור בנוסעם עם מחנד אבו חלאווה, ואף ביקשו מהאחרון כי יודיע למראון ברנותי, ראש "התנזים" של הפת"ח, אם מי ממבצעי הפיגוע יהרגו במהלך ביצוע פיגוע חירי המתוכנן. זיאד חמודה וחבריו לא הצליחו להגיע למקום שבו תכננו לבצע את פיגוע חירי עקב נוכחות גדולה של כוחות צה"ל באיזור חיזמא.

ת.פ. 444/02 מתוקן

6

P 5: 180

**פרט ארבעה-עשר:** (פ.א. 2159/01 בנימין)

**מהות העבירה:** גרימת מוות בכוונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות ביטחון (יהודה והשומרון (מס' 378), תשי"ל-1970 וסעיף 14(א) לצו בדבר כללי האחריות לעבירה (יהודה והשומרון), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, ביום 25.08.01 או במועד הסמוך לכך, גרם בכוונה למותו של אחר, דהיינו:

1. הנאשם הנ"ל, בחודש אוגוסט 2001, ברמאללה בסמוך לכך, נפגש עם מחמד ערחמאן סאלם מצלח (ממכאן "אבו סטוחה"). מחמד מצלח (אבו סטוחה) מסר לנאשם כי הכיר מספר **פעילי יהמוונטם**// **של הפת"ח, אשר מבצעים פיגועי** ירי לעבר אזרחים ישראליים. מחמד מצלח ביקש **לקבל את** **אישורו** של הנאשם להצטרף לתאליה הנ"ל ולבצע פיגועים נגד אזרחים ישראליים בכוונה לגרום למותם. הנאשם אישר למחמד מצלח להצטרף לפעילות האמורה.

2. מחמד מצלח נפגש עם פעילי "ההגונים" הנ"ל, שהם תוסאם עקל רגיב שתאדה, פראס צאדק מחמד עיאם (המכונה "אל חיטאווי") וטארק מלחי א-נוף. השלושה הנ"ל אמרו למחמד מצלח כי בכוונתם לבצע פיגוע ירי במטרה לגרום למותם של אזרחים ישראליים. השלושה ביקשו כי מחמד מצלח יספק להם כלי נשק לצורך ביצוע פיגוע הירי המתוכנן.

3. ביום 25.08.01, מר אל מחמד מצלח פראס עיאנם, חוסאם שחאדה וטארק א-נוף ובקשו לקבל עד באותו היום כלי נשק לצורך ביצוע פיגוע הירי המתוכנן.

4. באותו היום, מחמד מצלח פנה אל הנאשם. מחמד מצלח ביקש מהנאשם לקבל כלי נשק לצורך ביצוע פיגוע ירי נגד אזרחים ישראליים. לאחר זמן קצר, עד באותו היום, הנאשם מסר **לידי מחמד** **מצלח** תמ"יק 5-MP **עם** מחסנית המלאה בכדורים וזאת על מנת שמחמד מצלח וחבריו הנ"ל יבצעו באמצעותו פיגוע ירי וגרמו למותם של אזרחים ישראליים.

5. בשעות הערב, באותו היום, ברמאללה או בסמוך לכך, מחמד מצלח מסר את תמ"יק 5-MP והתחמושת הנ"ל לפראס עיאם וחוסאם שחאדה, אשר הגיעו ברכב איסוזו טנדר של פראס, וזאת על מנת שפראס וחוסאם יבצעו באמצעות הנשק הנ"ל פיגוע ירי וגרמו למותם של אזרחים ישראליים.

6. מיד לאחר קבלת הנשק, פראס עיאם, חוסאם שחאדה, היותם אלמותפף חמדאן ועלי עליאן יצאו מרמאללה לכיוון כביש 443 במטרה לבצע עם את פיגוע הירי המתוכנן. האנשים הנ"ל נסעו בשני כלי רכב - האחד, איסוזו טנדר של פראס עיאם והשני רכב סובארו גוב שהביא עלי עליאן לצורך ביצוע הפיגוע המתוכנן.

7. בהגיעם לכביש 443, פראס עיאם המשיך לנסוע לבדו ברכב האיסוזו, כפילומסר לפני רכב הסובארו שבו נסעו חוסאם, היותם ועלי עליאן, על מנת להודיע לחבריו הנ"ל על מחסומי צה"יל והמשטרה בדרך.

8. כל האנשים הנ"ל נסעו בכביש 443 לכיוון תל-אביב, כאשר עלי נהג ברכב הסובארו, לידו יושב היותם חמדאן, חממשו ברוסייר קלצינקוב, ובמושב האחורי יושב חוסאם שחאדה, החמוש בתמ"יק 5-MP, אשר אותו סיפק הנאשם.

9. באותו היום, 25.08.01, סמוך לשעה 22:30, ליד תחנת הדלק "דור אנרגיה", הבחינו נוטעי רכב הסובארו הנ"ל ברכב פולקסווגן פאסאט, מ.ר. 6902818, אשר בו נסעו בני הזוג הזוג ייבו ושרון בן שלום ז"יל עם שני ילדיהם חדרונו יוסף סורדו ז"יל.

10. עלי עליאן, שנהג ברכב הסובארו, עקף את רכב הפולקסווגן הנ"ל ונסע במקביל אליו. בשלב זה, היותם חמדאן וחוסאם פתחו באש אוטומטית בתמ"יק 5-MP, אשר אותו סיפק הנאשם, וברוסייר קלצ'ניקוב, לעבר רכב הפולקסווגן הנ"ל במטרה לגרום למותם של נוטעיו.

11. מספר רב של הקליעים שנורו על-ידי היותם חמדאן וחוסאם שחאדה פגעו ברכב הפולקסווגן ובנוטעיו.

12. לאחר שנוטעי רכב הסובארו הבחינו כי רכב הפולקסווגן נוסע בזיגזג, הם האיעו את המהירות ונמלטו לכבר בית לירקח. עם המנוון להם פראס עיאם. עלי עליאן, חוסאם שחאדה והיותם חמדאן עלו לרכב האיסוזו של פראס עיאם ונסעו לכבר בית סירא, שם הם הסתירו את כלי הנשק בסמוך לביתו של היותם חמדאן. לאחר מכן, חוסאם שחאדה, פראס עיאם, היותם חמדאן ועלי עליאן חזרו לרמאללה ברכב של פראס עיאם.

13. מיד לאחר חזרתם לרמאללה, מחמד מצלח נפגש בעין אום שראיינו עם פראס עיאם, אשר דיווח למחמד מצלח על הפיגוע שבוצע באמצעות הנשק שנמסר למטרה זו על-ידי הנאשם.

14. לאחר מספר ימים, פראס עיאם הביא את תמ"יק 5-MP הנ"ל מבית סירא והחזירו למחמד מצלח. מחמד מצלח העביר את כלי הנשק הנ"ל לצורך שנאשם לידי לאחרון על פיגוע הירי שבוצע בכלי הנשק הנ"ל.

15. **האשם הנ"ל קיבל בעבור** הפיגוע הנ"ל סכום של 500 דולר ארה"ב עבור ביצוע הפיגוע הנ"ל. את הכסף הנ"ל הנאשם קיבל מידי עלי פרגי ברגותי.

ת.ת. 444/02 מתוקן

16. הנאשם הנ"ל, במעשיו המתוארים לעיל, גרם בכוונה למותו של **יניב בן שלום ז"ל**, אשר נפטר
כתוצאה מפגיעות קליעים בראשו ובגבו, אשר נורו מתמ"ק MP-5 המתואר לעיל, ומרוסייר
קלצ'ניקוב על-ידי היותם חמדזו וחוטאם שחאדה.

**יפרט חמישה-עשר** :   (פ.א. 2159/01 בנימין)

**מהות העבירה**: גרימת מוות בכוונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות ביטחון (יהודה
והשומרון) (מס' 378), תשי"ל-1970 וסעיף 14(א) לצו בדבר כללי האחריות לעבירה (יהודה
והשומרון), תשכ"ח-1968.

**פרטי העבירה**: הנאשם הנ"ל, באיזור, ביום 25.08.01 או במועד הסמוך לכך, גרם בכוונה למותו
של אחר, דהיינו :
הנאשם הנ"ל, במועד האמור, במקום האמור בפרט האישום הארבעה-עשר, במעשיו המתוארים
בפרט האישום הארבעה-עשר, גרם בכוונה למותו של **שרון בן שלום ז"ל**, אשר נפטרה כתוצאה
מפגיעות קליעים בראשה ובגבה, אשר נורו מתמ"ק MP-5, אשר אותו סיפק הנאשם כמתואר בפרט
האישום הארבעה-עשר, וברוסייר קלצ'ניקוב.

**יפרט שישה-עשר** :   (פ.א. 2159/01 בנימין)

**מהות העבירה**: גרימת מוות בכוונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות ביטחון (יהודה
והשומרון) (מס' 378), תשי"ל-1970 וסעיף 14(א) לצו בדבר כללי האחריות לעבירה (יהודה
והשומרון), תשכ"ח-1968.

**פרטי העבירה**: הנאשם הנ"ל, באיזור, ביום 25.08.01 או במועד הסמוך לכך, גרם בכוונה למותו
של אחר, דהיינו :
הנאשם הנ"ל, במועד האמור, במקום האמור בפרט האישום הארבעה-עשר, במעשיו המתוארים
בפרט האישום הארבעה-עשר, גרם בכוונה למותו של **דורון יוסף סוורי ז"ל**, אשר נפטר כתוצאה
מפגיעות הקליעים, אשר נורו מתמ"ק MP-5, אשר אותו סיפק הנאשם כמתואר בפרט האישום
הארבעה-עשר, ומרוסייר קלצ'ניקוב.

**פרט שבעה-עשר** :   (פ.א. 2159/01 בנימין)

**מהות העבירה**: נסיון לגרימת מוות בכוונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות ביטחון
(יהודה והשומרון) (מס' 378), תשי"ל-1970 וסעיפים 14(א) ו-19 לצו בדבר כללי האחריות לעבירה
(יהודה והשומרון) (מס' 225), תשכ"ח-1968.

**פרטי העבירה**: הנאשם הנ"ל, באיזור, ביום 25.08.01 או במועד הסמוך לכך, ניסה לגרום בכוונה
למותו של אחר, דהיינו :
הנאשם הנ"ל, במועד האמור, במקום האמור בפרט האישום הארבעה-עשר, במעשיו המתוארים
בפרט האישום הארבעה-עשר, ניסה לגרום בכוונה למותם של נוסעי רכב פולקסווגן פאסאט,
האמור בפרט האישום הארבעה-עשר. כתוצאה מתירי שבוצע כאמור בפרט האישום הארבעה-עשר
מתמ"ק MP-5, אשר אותו סיפק הנאשם כמתואר בפרט האישום הארבעה-עשר, ומרוסייר
קלצ'ניקוב, נפצעה באורח קל מרסיסים ברגלה בתם של בני הזוג בן שלום ז"ל.

ת.ת. 02/444 מתוקן

P 5: 182

#### פרט שמונה-עשר:

**מהות העבירה:** פגיעה בביטחון האיזור, עבירה לפי סעיף 53(א)(4) לצו בדבר הוראות בטחון (יהודה והשומרון) (מס' 378), תש"ל-1970.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, בחודש ספטמבר 2001 או בסמוך לכך, עשה מעשה או מחדל שיש בהם פגיעה, היזק, הפרעה או סכנה לביטחון האיזור או לביטחון כוחות צה"ל וחייליו או לפעולותם, שימושם או ביטחונם של כל אחד מאלה: אניה, אוירון, נמל, רצוף, מזח, מעגן, שדה תעופה, מסילת ברזל, עתיב מים, דרך, דרך-עפר, קשר, כלי רכב, כלי משא או כל אמצעי אחר של תובלה ציבורית, או תקשורת ציבורית, או כל מפעל, מוסד, או ציוד המשמש או מסוגל לשמש לייצורם, הספקתם, החסנתם, העברתם, מסירתם או הפצתם של מים, דלק, גז או חשמל או כל רכוש של מדינת ישראל או של צה"ל, דהיינו:

אל הנאשם הנ"ל, במועד האמור, ברמאללה או בסמוך לכך, פנו נאצר מחמד יוסף נאגי (אבו-אחמד) - ראש יצ'דדי חלקי אלאקצאא" - הזרוע הצבאית של "התנזים" של הפתיח באיזור, טארק מלחא א-נוף ועבדאסט שוואבנקוב. האנשים הנ"ל סיפרו לנאשם כי הם יצרו מרגמה וגם רכשו פצצת מרגמה תמורת 1,500 ש"ח. האנשים הנ"ל ביקשו מהנאשם לתת להם כסף, אשר אותו שילמו תמורת פצצת המרגמה הנ"ל. האנשים הנ"ל אמרו כי בכוונתם לירות את פצצת המרגמה הנ"ל לעבר היישוב פסגות.

הנאשם טען בפני האנשים הנ"ל כי אם הם יצליחו לירות את פצצת המרגמה הנ"ל על היישוב פסגות, הוא ישלם להם את הכסף עבור הפצצה.

מאוחר יותר, באותו הלילה, האנשים הנ"ל חזרו אל הנאשם והודיעו לו כי הם אכן ירו את פצצת המרגמה הנ"ל לעבר היישוב פסגות. תאמשים הנ"ל מסרו לנאשם כי אינם יודעים איפה בדיוק נפלה פצצת המרגמה אותה ירו. לאור האמור, הנאשם סירב לשלם לאנשים הנ"ל כסף עבור פצצת המרגמה הנ"ל.

מאורח "יותר, הנאשם דיווח אודות ירי פצצת המרגמה לעבר היישוב פסגות על-ידי האנשים הנ"ל למרואן ברנאת' - ראש "התנזים" של הפתיח.

#### פרט תשעה-עשר:  (ס.א. 7915/01 ציון)

**מהות העבירה:** גרימת מוות בכוונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות ביטחון (יהודה והשומרון) (מס' 378), תש"ל-1970 וסעיף 14(א) לצו בדבר כללי האחריות לעבירה (יהודה והשומרון) (מס' 225), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, בין באיזור ובין מחוצה לו, ביום 15.09.01 או במועד הסמוך לכך, גרם בכוונה למותו של אחר, דהיינו:

1. אל הנאשם הנ"ל, במועד האמור, ברמאללה או בסמוך לכך, פנה מחמד ע'רחמאן סאלם מצלח (מכונה "אבו סטחה"), אשר מסר כי פנה אליו פראס צאדק מחמד עיאם (מכונה "אל חיטאווי") ביחד עם אדם נוסף וביקשו לקבל תמ"ק MP-5 על מנת לבצע באמצעותו פיגוע ירי במטרה לגרום למותם של אזרחים ישראליים. מחמד מצלח ביקש כי הנאשם ימסור לו את תמ"ק MP-5, אשר אותו כבר מסר למחמד מצלח לפני כן לצורך ביצוע פיגוע ירי.
2. הנאשם הסכים לספק את כלי הנשק המבוקש לצורך ביצוע פיגוע הירי המתוכנן.
3. הנאשם הפנה את מחמד מצלח אל חאלד שוויש לצורך קבלת תמ"ק MP-5 הנ"ל. מחמד מצלח פנה אל חאלד שוויש וקיבל מהאחרון תמ"ק MP-5 של הנאשם. כמו כן, הנאשם מסר לידי חוסאם עקל רביב שחאדה אקדח 14 לצורך ביצוע פיגוע הירי המתוכנן.
4. מאוחר יותר באותו היום, מחמד מצלח מסר את תמ"ק MP-5 הנ"ל לפראס עיאם בטרה שהאחרון יבצע באמצעותו פיגוע ירי ויגרום למותם של אזרחים ישראליים.
5. יותר מאוחר באותו היום, מחמד סאמי אברהים עבדאללה נפגש ברמאללה עם חוסאם עקל רביב שחאדה, פראס צאדק מחמד עיאם (המכונה "אל חיטאווי"), הייתם אלמותמף ממדאן ועלי עלינאן. חוסאם שחאדה הגיע למפגש הנ"ל כשהוא חמוש בתמ"ק MP-5 ואקדח 14, אשר אותם סיפק הנאשם כאמור לעיל לצורך ביצוע פיגוע ירי.
6. בשבובות השעה 22:00, ביום 15.09.01, האנשים הנ"ל נסעו מרמאללה לירושלים ברכב איסוזו טנדר של פראס עיאם.
7. פראס עיאם נהג ברכב האיסוזו הנ"ל ונסע ביחד עם מחמד עבדאללה וחבריו על מנת להראות להם מקום שבו יבצעו את פיגוע הירי המתוכנן וכן על מנת להראות לחברי אשר להיימלט לאחר ביצוע הפיגוע האמור. פראס עיאם הסיע את חבריו לכביש מס' 9 המחבר בין שכונת רמות לבין שכונת הגבעה הצרפתית בירושלים. פראס עיאם הראה לחברי איפה לבצע את

ת.ת. 444/02 מתוקן                         9

הפיגוע המתוכנן ואיך להימלט לאחר מכן. בסיום הסיור האמור, החבורה הנ״ל חזרה
לרמאללה.

8. בסביבות השעה 22:30, באותו היום, מחמד עבדאללה ביחד עם חוסאם שתאדה והיותם
חמדאן נסע ברכב גנוב בצבע אפור עם לוחיות רישוי ישראליות, אשר אותו סיפק להם עלי
עלואן לצורך ביצוע הפיגוע המתוכנן (להלן: הרכב). לפניהם נסע פראס עיאנם ברכב האישווו
הנ״ל וזאת על מנת להודיע באמצעות טלפון סלולרי לחבריו על מחסומי משטרה וזהו״ל.

9. נעמד עבדאללה נהג ברכב הנ״ל, ליד ישב חוסאם שתאדה, החמוש בתמ״ק MP-5, אשר אותו
סיפק הנאשם, ובמושב האחורי ישב היותם חמדאן, החמוש באקדח 14, אשר גם אותו סיפק
הנאשם.

10. החבורה הנ״ל נעברה בכביש מס׳ 9 בסמוך לצומת המוביל לשכונת רמת שלמה והמתינה לרכב
ישראלי בודד שיגיע למקום במטרה לבצע לעברו פיגוע ירי ולגרום למותם של נוסעי הרכב.

11. לאחר מספר דקות, בסמוך לשעה 23:10, הגיע למקום רכב רנו אקספרס לבן, מ.ר. 2273706,
(להלן: הרכב) אשר נסע מכיוון שכונת רמת שלמה ופנה לכביש מס׳ 9 לכיוון שכונת רמות.

12. מחמד עבדאללה החל לנסוע אחרי הרנו ועקף אותו.

13. כשהרכב נסע במקביל לרנו, חוסאם שתאדה והיותם חמדאן פתחו באש בתמ״ק MP-5
ובאקדח 14, אשר אותם סיפק הנאשם, לעבר נוסעי הרנו במטרה לגרום למותם.

14. מספר קליעים שגרו על-ידי חוסאם שתאדה והיותם חמדאן פגע ברנו ובשני נוסעי הרנו –
משה וייס ונאיר וייסברג ז״ל. לאחר מכן, מחמד עבדאללה המשיך לנסוע לכיוון שכונת רמות
ובסמוך למקום שבו בונים גשר חדש פנה ימינה לדרך עפר המובילה לגיר נבאללה.

15. לפני הכניסה לגיר נבאללה, מחמד עבדאללה וחבריו שהיו עמו ברכב נפגשו עם פראס עיאנם
שהמתין להם במקום ברכב האישווו. משם כולם ביחד המשיכו בנסיעה לגיר נבאללה ולאחר
מכן נמלטו לרמאללה.

16. במעשיו המתוארים לעיל, הנאשם גרם בכוונה למותם של מאיר וייסברוד ז״ל, אשר נפטר בבית
החולים מאוחר יותר באותו היום כתוצאה מפציעות הקליעים שגרו על-ידי חברי הנאשם
בתמ״ק MP-5 ובאקדח 14, אשר אותם סיפק הנאשם.

## פרט עשרים:  (פ.א. 7915/01 ציון)

**מהות העבירה:** נישון לגרימת מוות בכוונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות ביטחון
(יהודה והשומרון) (מס׳ 378), תש״י-1970 וסעיפים 14(א) ו-19 לצו בדבר כללי האחריות לעבירה
(יהודה והשומרון) (מס׳ 225), תשכ״ח-1968.

**פרטי העבירה:** הנאשם הנ״ל, בין באיזור ובין מחוצה לו, ביום 15.09.01 או במועד הסמוך לכך,
נישה לגרום בכוונה למותו של אחד, דהיינו:

הנאשם הנ״ל, במועד האמור, בסמוך לשעה 23:10, במקום המתואר בפרט האישום הקודם,
במעשיו האמורים בפרט האישום הקודם, נישה לגרום בכוונה למותו של משה וייס, אשר נהג
ברכב רנו אקספרס לבן, מ.ר. 2273706, המתואר בפרט האישום הקודם. אחד הקליעים שגרו
על-ידי חברי הנאשם, כפי שתואר בפרט האישום הקודם, פגע בראשו של משה וייס ופצע אותו
באורח קשה.

## פרט עשרים ואחד:  (פ.א. 681/01 ציון)

**מהות העבירה:** נישיון לגרימת מוות בכוונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות ביטחון
(יהודה והשומרון) (מס׳ 378), תש״י-1970 וסעיפים 14(א) ו-19 לצו בדבר כללי האחריות לעבירה
(יהודה והשומרון) (מס׳ 225), תשכ״ח-1968.

**פרטי העבירה:** הנאשם הנ״ל, בין באיזור ובין מחוצה לו, ביום 03.10.01 או במועד הסמוך לכך,
נישה לגרום בכוונה למותו של אחד, דהיינו:

1. הנאשם הנ״ל, בראשית חודש אוקטובר 2001, ברמאללה או בסמוך לכך, נפגש עם מחמד
ערחמאן סאלם מצלח (מכונה ״אבו סטחה״). מחמד מצלח ביקש מהנאשם לקבל תמ״ק
MP-5, ותחמושת לתמ״ק MP-5 הנ״ל וכן רכב לצורך לבצע פיגוע ירי נגד אזרחים ישראליים
בירושלים בכוונה לגרום למותם.

2. מחמד ערחמאן סאלם מצלח (מכונה ״אבו סטחה״) מסר לנאשם כי הוא מתכנן לבצע את
הפיגוע המתוכנן ביחד עם מחמד סאמי אבראהים עבדאללה, הוסאם עקל רג׳ב שהאדה ופראס
צאדק מחמד עיאנם (המכונה ״אל חיטאווי״).

ת.ס. 444/02 מתוקן

P 5: 184

3. ותחילה הנאשם אמר למחמד מצלח לבצע את הפיגוע המתוכנן מרכבו של פראס עיאנם. אך מחמד מצלח טען כי יש צורך בשני כלי רכב, כאשר ברכב אחד ייסע המתניעים והיורים ייסעו ברכב השני. לאור האמור, הנאשם מסר למחמד מצלח רכב מזדה 323 גווב, הנושא לוחיות רישוי ישראליות, אשר אותו רכש לצורך כך מידי איאד אלשאפעי תמורת 5,000 ש"ח.

4. לצורך ביצוע פיגוע הירי המתוכנן, הנאשם מסר למחמד מצלח תמ"ייק 5-MP ותחמושת לתמ"ייק MP-5 הנ"יל.

5. ביום 03.10.01, מחמד מצלח יצא מרמאללה לכיוון ירושלים במטרה לבצע שם את פיגוע הירי המתוכנן כשהוא מחזיק בתמ"ייק 5-MP הנ"ל ונוסע ברכב המזדה הנ"ל, אשר בו נהג מחמד עבדאללה.

6. פראס עיאנם וחוטאם שחאדה נסעו ברכב איסוזו טנדר של פראס עיאנם לפני רכב המזדה שבו נסע מחמד מצלח וזאת במטרה להודיע על מחסומי המשטרה וצה"ל בדרך.

7. חבריו הנ"ל של הנאשם הגיעו לבית חנינא החדשה שבירושלים. שם מחמד עבדאללה החנה את רכב המזדה וביחד עם שאר חבריו הסתתר בתוך הרכב את תמ"ייק 5-MP הנ"ל.

8. מחמד מצלח ומחמד עבדאללה עלו לרכב האיסוזו ומשם המשיכו ברכב האיסוזו ביחד עם פראס עיאנם וחוטאם שחאדה לכיוון כביש בנין.

9. חבריו הנ"ל של הנאשם הגיעו לכביש בנין. שם, פראס עיאנם הראה לשאר חבריו איפה לבצע את פיגוע הירי המתוכנן ואיך להימלט. לאחר ביצוע פיגוע הירי. חבריו הנ"ל של הנאשם החליטו לבצע את פיגוע הירי המתוכנן במנוחה הראשונה של כביש בנין מכיוון רמות וזאת על מנת שלא ישמעו את קולות הירי. לאחר מכן, כל האנשים הנ"ל חזרו לבית חנינא, למקום שבו הושאר רכב המזדה הנ"ל.

10. מחמד מצלח עלה לרכב המזדה כשהוא חמוש בתמ"ייק 5-MP הנ"ל, ואילו מחמד עבדאללה נהג ברכב המזדה האמור. מחמד מצלח ומחמד עבדאללה נסעו ברכב המזדה לכביש בנין במטרה לבצע שם את פיגוע הירי המתוכנן ולגרום למותם של אזרחים ישראליים.

11. מחמד מצלח ומחמד עבדאללה נסעו בכביש בנין הלוך ושוב מספר פעמים כשהם מחפשים רכב ישראלי בודד במטרה לבצע לעברו את פיגוע הירי המתוכנן במטרה לגרום למותם של נוסעי הרכב.

12. בסמוך לשעה 23:35, כשהם נוסעים לכיוון צפון, במנוחה האחרונה בכיוון נסיעתם, מחמד מצלח ומחמד עבדאללה הבחינו ברכב הונדה אקורד, מ.ר. 1103217, הנוסע בכביש בנין לכיוון צפון. ברכב ההונדה נסע טומי עמיאל, פייר מימון ופזית מימון.

13. מחמד עבדאללה עקף את רכב ההונדה הנ"ל. בעת שמחמד עבדאללה נסע במקביל לרכב ההונדה הנ"ל, מחמד מצלח ירה כדור אחד בתמ"ייק 5-MP, אשר אותו סיפק הנאשם, לעבר נוסעי רכב ההונדה, בכוונה לגרום למותם. הקליע שנורה על-ידי מחמד מצלח לא פגע ברכב ההונדה הנ"ל.

14. לאחר ביצוע פיגוע הירי האמור, מחמד מצלח ומחמד עבדאללה המשיכו בנסיעתם לכיוון כביש מס' 9 המחבר בין שכונת רמות לשכונת הגבעה הצרפתית.

## פרט עשירים ושניים: (נ.א. 8379/01 ציון)

מהות העבירה: נסיון לגרימת מוות בכוונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות ביטחון (יהודה והשומרון) (מס' 378), תשי"ל-1970 וסעיפים 14(א) ו-19 לצו בדבר כללי האחריות לעבירה (יהודה והשומרון) (מס' 225), תשכ"ח-1968.

פרטי העבירה: הנאשם הנ"ל, בין באיזור ובין מחוצה לו, ביום 03.10.01 או במועד הסמוך לכך, ניסח לגרום בכוונה למותו של אחר, דהיינו:

1. לאחר שמחמד ג'ראחמאן סאלם מצלח (מכונה "אבו סטאהה") ומחמד סאמי אבראהים עבדאללה ביצעו את פיגוע הירי כפי שתואר בפרט האישום הקודם, השניים המשיכו בנסיעתם ברכב המזדה, אשר אותו סיפק הנאשם כפי שתואר בפרט האישום הקודם, לכיוון כביש מס' 9, המחובר בין שכונת רמות לשכונת הגבעה הצרפתית במטרה להגיע מעם לבית חנינא ובהמשך לרמאללה.

2. במחלף הנסיעה הנ"ל, מחמד מצלח, על-פי בקשתו של מחמד עבדאללה, בדק את תקינותו של תמ"ייק 5-MP, אשר אותו מסר הנאשם, ואף ירה מספר כדורים באויר.

3. במהלך הנסיעה בכביש מס' 9 הנ"ל, בסמוך לשעה 23:45, מחמד מצלח ומחמד עבדאללה הבחינו ברכב סקודה, מ.ר. 6567709, אשר נסע בכביש מס' 9 לכיוון הגבעה הצרפתית. ברכב הסקודה הנ"ל נסעו מלכה כהן ופנחס כהן.

4. מחמד עבדאללה, אשר, כאמור, נהג ברכב המזדה, עקף את רכב הסקודה.

11

P 5: 185

5. בעת שמחמד עבדאללה נסע במקביל לרכב הסקודה הנ"ל, מחמד מצלח ירה בתמ"ק MP-5, אשר אותו סיפק להם הנאשם לצורך ביצוע פיגוע הירי כפי שתוּאר בפרט האישום הקודם, מספר יריות לעבר רכב הסקודה הנ"ל בכוונה לגרום למותם של נוסעי רכב הסקודה.

6. מספר קליעים שגרו על-ידי מחמד מצלח פגעו ברכב הסקודה. שני קליעים שגרו על-ידי מחמד מצלח פגעו בפנוּס כהן וקליע נוסף פגע במלכה כהן.

7. פנחס כהן נפצע באזור בינוני מפגיעת שני קליעים בבטנו, ואילו מלכה כהן, שהיתה בשבוע ה-28 להריון, נפצעה באזור בינוני מפגיעת קליע בראשה.

8. לאחר ביצוע פיגוע הירי האמור, מחמד מצלח ומחמד עבדאללה המשיכו בנסיעתו לכיוון הגזעה הצרפתית ומשם הגיעו לבית חניוס החדשה. שם, מחמד מצלח ומחמד עבדאללה הוזגו את רכב המזדה הנ"ל ויצרו קשר טלפוני עם חוסאם עקל רביב שתאחדה ופראס צאדק מחמד עישאם (הממונה יאל חיניאווי״), אשר הגיעו למקום ברכב האיסוזו של פראס עישאם על מנת לאסוף את מחמד מצלח ומחמד עבדאללה, וזאת לפי התכנון תאמור בפרט האישום הקודם.

9. מחמד מצלח ומחמד עבדאללה הסתירו את תמ"ק MP-5 הנ"ל ברכב האיסוזו ועלו לרכב האיסוזו.

10. כל ארבעת אנשים הנ"ל נסעו לחזור מירושלים לרמאללה, אך לא הצליחו לעשות כן בגלל מחסומו צה"ל והמשטרה. חבריו הנ"ל של הנאשם נשארו ללון אצל יאסר אבו אלחטיב, חברו של חוסאם שתאודה, בבית חניוס החדשה בירושלים.

11. יום למחרת, 04.10.01, מחמד מצלח חזר ברכבו של פראס עישאם לרמאללה.

12. לאחר חזרתו לרמאללה, מחמד מצלח דיווח לנאשם אודות הפיגועים שביצע בעזרת רכב המזדה ותמ"ק MP-5, אשר אותם קיבל מהנאשם.

## ✓ פרט עשרים ושלושה:

**מהות העבירה:** ניסיון לגרימת מוות בכוונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות ביטחון
(יהודה והשומרון) (מס׳ 378), תשי"ל-1970 וסעיפים 14(א) ו-19 לצו בדבר כללי האחריות לעבירה
(יהודה והשומרון) (מס׳ 225), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, בטווח שנת 2001 - 2001 - תחילת שנת 2002 או בסמוך לכך, ניסה לגרום בכוונה למותו של אחר, דהיינו:

הנאשם הנ"ל, בטווח שנת 2001 או בסמוך לכך, ברמאללה או בסמוך לכך, בעת שהיה עם מרואן ברנותי, ראש ״התנזים״ של הפתי"ח, נפגש עם נאצר מחמד יוסף נאג'י (אבו -חמדי) - ראש ״גדודי חללי אלאקצא״ - הוזרע הצבאית של ״התנזים״ של הפתי"ח. נאצר אבו-חמדי סיפר למרואן ברנותי על כוונותיו לרכוש מרכמה ופצצות מרכמה לצורך ביצוע ירי מרומות לעבר יישובים הישראליים בכוונה למותם של אזרחים ישראליים. נאצר אבו-חמדי ביקש ממרואן ברנותי לקבל סיוע כספי לצורך רכישת המרכמה ופצצות מרכמה. מרואן ברנותי סירב למסור את הסיוע הכספי המבוקש והפנה את נאצר אבו-חמדי אל הנאשם. הנאשם הסכיר למאצר אבו-חמדי כי אין כל צורך לשלם הרבה כסף עבור מרכמה ופצצות מרכמה שהרי ברשותו של הנאשם כבר יש מרכמה מאולתרת ופצצות מרכמה.

בתחילת שנת 2002, הנאשם המּת את נאצר אבו-חמדי ואת חברו של האחרון - מעיל צבאי בכיר ב״גדודי חללי אלאקצא״ - מהנד אבו חלאווה אל ביתו של עלי ברנותי על מנת שיקבלו שם את המרכמה ואת פצצות המרכמה הנ"ל.

נאצר אבו חמדי, מהנד אבו חלאווה ועבאבסו אבן קיבלו את המרכמה המאולתרת הנ"ל וכן 5 פצצות מרכמה.

נאצר אבו-חמדי, ביחד עם חבריו הנ"ל, ירה באמצעות המרכמה המאולתרת הנ"ל פצצת מרכמה לעבר הישוב פסגות בכוונה לגרום למותם של תושבי הישוב הנ"ל ושל חיילי צה"ל שהיו בישוב הנ"ל. פצצת המרכמה הנ"ל לא פגעה ביישוב פסגות והתפוצצה בסמוך אליו.

לאחר ביצוע הפיגוע הנ"ל, נאצר אבו-חמדי דיווח לנאשם על מה שקרה. הנאשם לקח את נאצר אבו-חמדי אל מרואן ברנותי על מנת שידווח גם למראון ברנותי אודות פיגוע ירי פצצת מרכמה שבוצע לראשונה באיזור.

ת.ת. 444/02 מטשק

P 5: 186

**פרט עשרים וארבעה: (פ.א. 39/02 בנימין)** .

**מהות העבירה:** גרימת מוות בכוונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות ביטחון (יהודה והשומרון) (מס' 378), תשי"ל-1970 וסעיף 14(א) לצו בדבר כללי האחריות לעבירה (יהודה והשומרון), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, ביום 15.01.02 או במועד הסמוך לכך, גרם בכוונה למותו של אחר, דהיינו:

1. ביום 14.01.02 נהרג ראאד כרמי אשר היה פעיל צבאי בכיר ב"תנזים" של ארגון הפתי"ח, שהוא התאחדות בלתי מותרת. בעקבות מותו של ראאד כרמי הנ"ל, ראש "התנזים" של הפתי"ח באיזור - פרואץ ברגותי פנה אותל אבלים באלבירה.

2. **התאשם הנ"ל, ביום 15.01.02,** באותל האבלים הנ"ל, **נפגש עם מחמד ע/רחמאן סאלם** מצלח ([מכונה "אבו סכותחי"), מחמד שאמר אברהה עבדאללה, פראס צאדק מחמד עיאמם הכמונה "יאל חיטאווי"), טארק מלחי א-נוף וזידאן מתארב אל בדוי.

3. הנאשם מסר לחבריו הנ"ל כי מרדאן ברגותי, ראש "התנזים" של הפתי"ת באיזור, מבקש כי הם יבצעו באופן מיידי פיגוע נקמה על מותו של ראאד כרמי הנ"ל ויגרמו למותם של אזרחים ישראליים.

4. לצורך ביצוע הפיגוע האמור, **הנאשם מסר לחבריו הנ"ל תמ"יק MP-5, אקדח 16, וכן רבק מזוד,** הנושא לוחיות רישוי ישראליות.

5. חבריו הנ"ל של הנאשם, באותל האבלים הנ"ל, החליטו כי, לאור דרישתו של הנאשם, יבצעו עוד באותו הערב פיגוע בזחתת הדלק הנבעוגים הנמצאת בכביש 443 בסמוך לכניסה לגבעת זאב וזאת בכוונה לגרום למותם של אזרחים ישראליים.

6. בשעות הערב האמור היום, 15.01.02, מחמד עבדאללה יצא מאותל האבלים הנ"ל ביחד עם פראס עיאמם. מחמד עבדאללה ופראס עיאמם נסע ברכב איסוזו סודר של פראס עיאמם לתחנת הדלק הנ"ל במטרה לבצע שם את פיגוע הירי המתוכנן. אחרי רכב האיסוזו הנ"ל נסעו מחמד מצלח, החמוש באקדח 14, וזידאן מחארב, החמוש באקדח 16 הנ"ל, וטארק א-נוף, החמוש בתמ"יק MP-5 הנ"ל. השלושה נסעו ברכב מזדה, אשר אותו קיבלו לצורך כך מהנאשם.

7. חבריו הנ"ל של הנאשם הגיעו עד ערמת עפר החוסמת את הכניסה מכפרים ביר נבאללה ואלבירה לכביש 443 במרחק של כ-100 מטר מתחנת הדלק הנבעוגים. חבריו הנ"ל של הנאשם תחנו את כלי הרכב שלהם, איסוזו ומזדה, עם הפנים לכיוון הכפר ביר נבאללה על מנת שיוכלו להימלט מהמקום מיד לאחר ביצוע הפיגוע המתוכנן.

8. מחמד מצלח, החמוש באקדח 14, וזדאן, החמוש באקדח 16, וטארק א-נוף, החמוש ב-MP-5, ירדו מכלי הרכב והלכו לתחנת הדלק הנ"ל במטרה לבצע שם את פיגוע הירי המתוכנן ולגרום למותם של אזרחים ישראליים.

9. מחמד עבדאללה ופראס עיאמם נשארו בכלי הרכב הנ"ל על מנת לשמור שלא יגיע למקום סיור של צה"ל או אנשים אחרים. מחמד עבדאללה ישב בכיסא הנהג ברכב המזדה על מנת שיוכל למלט באופן מיידי את שלושת חבריו שיצאו לבצע את הפיגוע המתוכנן מיד לאחר ביצוע הפיגוע.

10. מחמד מצלח וטארק א-נוף נעמדו בכניסה לתחנת הדלק הנ"ל.

11. לאחר מספר דקות, בסמוך לשעה 19:45, מחמד מצלח וטארק א-נוף הבחינו ברכב פיאט אונו לבן, מ.ר. 6424905, שנכנס לתחנת הדלק הנ"ל ואשר בו נהגה יואלה חן ז"ל ולידה ישבה רשל (רחל) עיני.

12. מחמד מצלח וטארק א-נוף ניגשו אל רכב הפיאט הנ"ל במטרה לבצע עבורם פיגוע ירי ולגרום למותן של נוסעות הרכב. נוסעות רכב הפיאט תברחו באקדח שם החזיק מחמד מצלח והחל לצעוק ולצפור. מחמד מצלח הכניס את האקדח למכנסיו ואמר לנוסעות הרכב שלא יפחדו.

13. בשלב זה, טארק א-נוף פתח באש אוטומטית בתמ"יק MP-5, אשר אותו סיפק הנאשם, לעבר נוסעות רכב הפיאט בכוונה לגרום למותן. אז גם מחמד מצלח שוב הוציא את אקדחו והחל לירות לעבר נוסעות הרכב בכוונה לגרום למותן.

14. מחמד מצלח וטארק א-נוף ירו מטווח קצר מאוד מספר רב של כדורים לעבר יואלה חן ז"ל ולעבר רשל (רחל) עיני שהיו ברכב הפיאט הנ"ל.

15. כ-28 קליעים, שנורו על-ידי מחמד מצלח וטארק א-נוף, פגעו בשמשות הקדמית של הרכב, מספר קליעים פגעו בצד הרכב ובשמשות חלון דלת הנהג.

16. כמהלך ביצוע פיגוע הירי המתואר, וזדאן, אשר עמד במרחק קצר מאחורי מחמד מצלח וטארק א-נוף, שימש כשומר ומתריע.

17. פראס עיאמם, מיד לאחר ששמע את קולות הירי, נסע מהמקום ברכב האיסוזו שלו על מנת להודיע לחבריו אם יש מחסומים בדרך לרמאללה.

P 5: 187

18. מחמד מצלח, טארק א-נוף וזידאן, לאחר שכמצעו את פיגוע הירי כאמור לעיל, חזרו בריצה אל רכב המזדה שבו המתינו מחמד עבדאללה. לאחר שהשלושה הנ"ל עלו לרכב, מחמד עבדאללה הסיע אותם לרמאללה.

19. ברמאללה מחמד מצלח, טארק א-נוף, מחמד עבדאללה וזידאן נפגשו עם פראס עיאט.

20. לאחר מכן, מחמד מצלח נפגש ברמאללה עם הנאשם, החזיר לו את תמ"ק MP-5 ואת רכב המזדה, וכן דיווח על הפיגוע שביצע כמתואר לעיל.

21. במעשיו המתוארים לעיל, הנאשם גרם בכוונה למותה של **יאלה חן ז"ל**, אשר נפטרה במקום כתוצאה מפגיעות הקליעים שנורו על-ידי מחמד מצלח וטארק א-נוף.

## ע **פרט עשרים וחמישה:**   (פ.א. 39/02 בנימין)

**מהות העבירה:** ניסיון לגרימת מות בכוונה, עבירה לפי סעיף 51א(א) לצו בדבר הוראות ביטחון (יהודה והשומרון) (מס' 378), תשי"ל-1970 וסעיפים 14א(א) ו-19 לצו בדבר כללי האחריות לעבירה (יהודה והשומרון) (מס' 225), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, ביום 15.01.02 או במועד הסמוך לכך, ניסה לגרום בכוונה למותו של אחר, דהיינו:

הנאשם הנ"ל, במועד האמור, במקום המתואר בפרט האישום הקודם, במעשיו האמורים בפרט האישום הקודם, ניסה לגרום בכוונה למותה של רשל (רחל) עיני, אשר נסעה ברכב פיאט אונו לבן, מ.ר. 6424905, המתואר בפרט האישום הקודם. אחד הקליעים שנורו על-ידי מחמד עיירתמאן סאלם מצלח (מכונה "אבו סטוחטי") וטארק מלהי א-נוף בכלי נשק שנמסרו להם על-ידי הנאשם לצורך ביצוע פיגוע הירי, כפי שתוואר בפרט האישום הקודם, פגע בראשה של רשל (רחל עיני) ושני קליעים נוספים פגעו בכתפה השמאלי ופצעו אותה באורח בינוני.

## ג **פרט עשרים וששה:**   (פ.א. 502/02 ציון)

**מהות העבירה:** גרימת מות בכוונה, עבירה לפי סעיף 51א(א) לצו בדבר הוראות ביטחון (יהודה והשומרון) (מס' 378), תשי"ל-1970 וסעיף 14א(א) לצו בדבר כללי האחריות לעבירה (יהודה והשומרון), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, בין באיזור ובין מחוצה לו, ביום 22.01.02 או במועד הסמוך לכך, גרם בכוונה למותו של אחר, דהיינו:

1. הנאשם הנ"ל, בחודש ינואר 2002, <u>הנאשם החליט כי ברצונו להנציא למעל פיגוע התאבדות בתוך שטחח של מדינת ישראל על מנת לגרום למותם של אזרחיים ישראליים רבים. ככל האפשר</u>.

2. הנאשם הנ"ל פנה באמצעות טלמון אל נאצר מחמוד עוויס, פעיל בכיר ב"תנזים" של הפת"ח, שהנא התאחדות בלתי מותרת, בשכם. הנאשם ביקש מנאצר שנוס לשלוח אליו אדם מוכן לבצע פיגוע התאבדות. הנאשם—מסר—לנאצר <u>עוויס כי הנא עצמו ידאג להכניס את המחבל</u> המתאבד לירושלים על מנת שיבצע שם פיגוע התאבדות.

3. לאחר מספר ימים, ביום 22.01.02, ברמאללה, הנאשם נפגש עם סעיד רמדאן, תושב כפר תל בונה שכם, אשר הודיעו לנאשם כי נשלח על-ידי נאצר עוויס לצורך ביצוע פיגוע התאבדות.

4. <u>הנאשם התקשר אל מחמד ערתמאן סאלם מצלח</u> (מכונה "אבו סטוחטי") וביקש ממחאחרון להגיע אליו.

5. מחמד מצלח נפגש <u>עם הנאשם</u> ועם סעיד רמדאן הנ"ל באותו היום ברמאללה. הנאשם ערך היכרות בין השניים. הנאשם ומחמד מצלח לקחו את סעיד רמדאן למספרה על מנת שיסתפר לפני ביצוע פיגוע התאבדות המתוכנן.

6. לאחר מכן, <u>הנאשם ומחמד מצלח התקשרו אל פראס צאדק מחמד עיאט</u> (מכונה "חיזאווי") וביקשו מהאחרון לחסיע מחבל מתאבד מרמאללה לירושלים על מנת שהמחבל המתאבד יבצע בירושלים פיגוע התאבדות ויגרום למותם של אזרחים ישראליים רבים ככל האפשר.

7. פראס עיאט הגיע לרמאללה ביחד עם מחמד סאמי אברהים עבדאללה, ואז לאחר שהאחרון הסכים להשתתף בהסעת המחבל המתאבד מרמאללה לירושלים. פראס עיאט הנא לפגישה ברכב איסוזו טנדר עם לוחית רשוי ישראליות.

8. <u>לפי הוראתו של הנאשם</u>, פראס עיאט ומחמד עבדאללה נסעו ברכב האיסוזו הנ"ל מרמאללה לירושלים על מנת למצוא דרך שאין בו מחסומי משטרה ודה"ל וזאת במטרה להסיע יותר מאוחר באותה הדרך את המחבל המתאבד שיבצע את הפיגוע המתוכנן בירושלים.

14

ת.ת. 444/02 מתוקן

9. מחמד עבדאללה ופראס עיאנם נסעו מרמאללה דרך ראפאת והגיעו לאיזור התעשייה עטרות,
שם השניים חזרו לכבוש הראשי ירושלים-רמאללה נוסעו שמאלה עד לצומת המובריל למחנה
רמה, שם הם פנו ימינה ונסעו עד לצומת אדם. בצומת אדם השניים פנו ימינה ונסעו עד
לצומת חיזמה, שם הם פנו ימינה ונכנסו לענתא. דרך ענתא, הם הגיעו לצומת הנכבה
הצרפתית, שם השניים פנו ימינה וחזרו לרמאללה. מחמד עבדאללה ופראס עיאנם ראו כי
בדרך שבה נסעו ניתן להוביל את המחבל המתאבד לירושלים מבלי להיעצר במחסומי משטרה
וצה"ל.

10. באותו הזמן, ברמאללה, <u>הנאשם ומחמד מצלח לקחו את סעיד רמדאן הנ"ל להתפלל ואף</u> קנו
עבור סעיד רמדאן הנ"ל אוכל, בגדים ונעלים חדשים. <u>הנאשם שילם בכסף שלו עבור</u> הקניות
הנ"ל סכום של 1,200 ש"ח.

11. מחמד מצלח, <u>על-פי הוראתו של הנאשם</u>, הביא רוסי"ר M-16 ו-3 מחסניות לרוסי"ר הנ"ל
מלאות בכדורים, כאשר שתי מחסניות היו מחוברות בצולבת.

12. לפי התכנון של הנאשם וחבריו הנ"ל, היה על סעיד רמדאן להגיע לירושלים ולירות שם
באזרחים ישראליים בכוונה לגרום למוותם עד שהוא עצמו ייהרג מאש כוחות הביטחון
הישראליים.

13. לאחר מכן, באותו חיום, <u>הנאשם,</u> מחמד מצלח וסעיד רמדאן נפשו עם מחמד עבדאללה
ופראס עיאנם בחיזור חמלון "סטאר אין" בבירה. הנאשם הכיר למחמד עבדאללה ולפראס
עיאנם את סעיד רמדאן.

14. <u>הנאשם הסביר למחמד עבדאללה ולפראס עיאנם כי סעיד רמדאן הנ"ל הוא המתבל המתאבד,</u>
אשר אותו הם צריכים להוביל לירושלים על מנת שיבצע שם פיגוע התאבדות כשירה לעבר
אזרחים ישראליים במטרה לגרום למוותם של אזרחים רבים ככל הניתן.

15. מחמד עבדאללה ופראס עיאנם הסתירו את רוסי"ר M-16 והמחסניות הנ"ל ברכב האישווו
הנ"ל.

16. <u>הנאשם ומחמד מצלח איחלו לסעיד רמדאן הצלחה השלחשו נסעו לירושלים. הנאשם אמר</u>
<u>למחמד עבדאללה ופראס עיאנם כי עליהם לקחת את סעיד רמדאן לבצע את פיגוע ההתאבדות</u>
בכל מקום בירושלים שהם יבחרו.

17. פראס עיאנם נהג ברכב האישווו, סעיד רמדאן ישב בכיסא שליד כיסא הנוהג ומחמד עבדאללה
תתיישב במושב האחורי.

18. מחמד עבדאללה ופראס עיאנם הסיעו את סעיד רמדאן לירושלים בדרך, אשר אותה בדקו
מקדם יותר באותו היום כפי שתוואר לעיל.

19. בירושלים, מחמד עבדאללה ופראס עיאנם נסעו לרחוב שיח' גיראח. שם הם הוציאו את רוסי"ר
M-16 והמחסניות שהיו מוסתרים בתוך הרכב ומסרו אותם לידי סעיד רמדאן. מחמד
עבדאללה עבר לשבת בכיסא שליד כיסא הנהג ואילו סעיד רמדאן עבר למושב האחורי,
כשהוא מחזיק בידיו את רוסי"ר M-16 ואת המחסניות.

20. מחמד עבדאללה ופראס עיאנם הסיעו את סעיד רמדאן לרחוב הנביאים.

21. במהלך הנסיעה, סעיד רמדאן התלונן בפני מחמד עבדאללה ופראס עיאנם כי הנעלים
החדשים, אשר אותם קנה לו הנאשם עבור הפיגוע, קטנות ולוחצות לו. מחמד עבדאללה
הוריד את נעליו "ריבוקיי" ומסר אותן לסעיד רמדאן באומרו "תעלה לך עדן עם נעלי
"ריבוקיי".

22. בהגיעם לצומת הרחובות שטראוס והנביאים, מחמד עבדאללה ופראס עיאנם עצרו את רכב
האישווו.

23. מחמד עבדאללה ופראס עיאנם אמרו לסעיד רמדאן לרדת ברגל לרחוב יפו ולהתחיל לירות
במקום שירואה בו הרבה אנשים.

24. לאחר שסעיד רמדאן ירד מהרכב עם רוסי"ר M-16 והמחסניות, מחמד עבדאללה ופראס עיאנם
נסעו ממומקום ברכב האישווו, יצאו דרך שכונת מוסררה לכביש מספר 1, ומשם נסעו דרך
הכביש הראשי לרמאללה.

25. סעיד רמדאן, מסמר דקות לאחר שירד מהרכב של מחמד עבדאללה ופראס עיאנם, הגיע לרחוב
יפו.

26. בסביבות השעה 20, ו-16, כשהוא עמד מול בית מסי 47 ברחוב יפו או בסמוך לכך, סעיד רמדאן
טען את רוסי"ר M-16 שבו החזיק, צעק "אללה הוא אכבר" ופתח בירי אוטומטי לכל עבר,
לעבר האנשים שהיו ברחוב יפו, בתחנת האוטובוס הנמצאת במקום, בתוך אוטובוס "אגד" קו
27 שהיה באותה עת בתחנה הנ"ל וכן לעבר האנשים שהיו בתוך החנויות הסמוכות בכוונה
לגרום למותם של אנשים רבים ככל הניתן. סעיד רמדאן, כשהוא ממשיך לירות, נמלט
ממתחנום לעבר החניון הנמצא ברחבו הרב קוק, שם סעיד רמדאן התחיל מחסניותיו והמשיך
לירות לעבר האזרחים בכוונה לגרום למותם. סעיד רמדאן ירה ברוסי"ר M-16, שבו החזיק,
מעל 38 כדורים. סעיד רמדאן המשיך לירות לעבר האזרחים עד שנהרג על-ידי האזרחים
והשוטרים שהגיעו למקום.

ת.ת. 444/02 מתוקן

27. במעשיו המתוארים לעיל, הנאשם הנ"ל גרם בכוונה למותה של **אורה (סבטלנה) סנדלר ז"ל**, אשר נפטרה כתוצאה מפגיעות הקליעים שנורו על-ידי סעיד רמדאן.

28. לאחר שודדו לנאשם על ביצוע הפיגוע הנ"ל, הנאשם **נ**י**נש אל על**י**י **פ**רומ**. **ברנות**י ו**קיבל מהאחרון **סכום של 1,000 דולר. **א**ר**ה**י**ב **ע**בור** ביצוע ה**פ**י**גוע** הנ"ל. הנאשם נתן לפחמד מצלח, מ**ה**מד עבדאללה ופראס עיאנם 100 דולר ארה"ב לכל אחד עבור השתתפותם בהוצאה לפועל של הפיגוע הנ"ל.

### ✓ **פרט עשרים ושבעה:** (פ.א. 502/02 ציון)

**מהות העבירה:** גרימת מוות בכוונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות ביטחון (יהודה והשומרון) (מס' 378), תשי"ל-1970 וסעיף 14(א) לצו בדבר כללי האחריות לעבירה (יהודה והשומרון), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, בין באיזור ובין מחוצה לו, ביום 22.01.02 או במועד הסמוך לכך, גרם בכוונה למותו של אחר, דהיינו:

הנאשם הנ"ל, במועד האמור, במקום האמור בפרט האישום הקודם, במעשיו המתוארים בפרט האישום הקודם, גרם בכוונה למותה של **שרה המבורגר ז"ל**, אשר נפטרה כתוצאה מפגיעות הקליעים שנורו על-ידי סעיד רמדאן, אשר נשלח לביצוע הפיגוע האמור על-ידי הנאשם.

### ✓ **פרט עשרים ושמונה:** (פ.א. 502/02 ציון)

**מהות העבירה:** ניסיון לגרימת מוות בכוונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות ביטחון (יהודה והשומרון) (מס' 378), תשי"ל-1970 וסעיפים 14(א) ו-19 לצו בדבר כללי האחריות לעבירה (יהודה והשומרון) (מס' 225), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, בין באיזור ובין מחוצה לו, ביום 22.01.02 או במועד הסמוך לכך, ניסה לגרום בכוונה למותו של אחר, דהיינו:

הנאשם הנ"ל, במועד האמור, במקום האמור בפרט האישום העשרים ושישה, במעשיו המתוארים בפרט האישום העשרים ושישה, ניסה לגרום בכוונה למותם של אזרחים רבים ככל הניתן אשר היו באותה עת ברחוב יפו ובקרבתו, כתוצאה מהירי שבוצע במקום על-ידי סעיד רמדאן, אשר נשלח לביצוע הפיגוע האמור על-ידי הנאשם, כפצוע **מעל 45 אזרחים.**

### ✓ **פרט עשרים ותשעה:** (פ.א. 502/02 ציון)

**מהות העבירה:** היזק בזדון לרכוש, עבירה לפי סעיף 53 לצו בדבר הוראות ביטחון (יהודה והשומרון) (מס' 378), תשי"ל-1970 וסעיף 14(א) לצו בדבר כללי האחריות לעבירה (יהודה והשומרון) (מס' 225), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, בין באיזור ובין מחוצה לו, ביום 22.01.02 או במועד הסמוך לכך, הרס רכוש או פגע בו במזיד ושלא כדין, דהיינו:

הנאשם הנ"ל, במועד האמור, במקום האמור בפרט האישום העשרים ושישה, במעשיו המתוארים בפרט האישום העשרים ושישה, פגע במזיד ושלא כדין ברכוש רב הכולל חנויות ברחוב יפו, תחנת אוטובוס "אגד", אוטובוס "אגד" קו 27 וכן כלי רכב רבים, אשר נפגע כתוצאה מהירי שבוצע במקום על-ידי סעיד רמדאן, אשר נשלח לביצוע הפיגוע האמור על-ידי הנאשם.

16                                                  ת.ת. 444/02 מתוקן

## ‫פרט שלושים:‬ 7

‫**מהות העבירה:** ניסיון לגרימת מוות במזונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות ביטחון‬
‫(יהודה והשומרון) (מס' 378), תשל"ל-1970 וסעיף 19 לצו בדבר כללי האחריות לעבירה (יהודה‬
‫והשומרון) (מס' 225), תשכ"ח-1968.‬

‫**פרטי העבירה:** הנאשם הנ"ל, באיזור, בסוף חודש ינואר - תחילת חודש פברואר 2002 או בסמוך‬
‫לכך, ניסה לגרום במזונה למותו של אחר, דהיינו:‬

1. ‫הנאשם הנ"ל, במועד האמור, ברמאללה או בסמוך לכך, נפגש עם זאפר עג'וואד ערהמאן‬
   ‫רימאווי.‬
2. ‫זאפר רימאווי מסר לנאשם כי בן דודו, מוג'אהד חידר רימאווי, עוכב לבצע פיגוע התאבדות.‬
3. ‫על-פי בקשתו של הנאשם, זאפר רימאווי ערך פגישה בין הנאשם לבין מוג'אהד רימאווי הנ"ל.‬
4. ‫לאחר הפגישה הנ"ל, הנאשם הסכים להצעתו של זאפר רימאווי לשלוח את מוג'אהד רימאווי‬
   ‫לבצע פיגוע התאבדות בירושלים על מנת שמוג'אהד רימאווי יגרום למותם של אזרחים‬
   ‫ישראליים רבים ככל הניתן.‬
5. ‫ותוכן כי מוג'אהד רימאווי יבצע פיגוע התאבדות באמצעות רובה, דהיינו יירה לעבר אזרחים‬
   ‫ישראליים בירושלים בכוונה לגרום למותם של אזרחים ישראליים רבים כל הניתן וימשיך‬
   ‫לירות עד שיהרג על-ידי כוחות הביטחון הישראליים.‬
6. ‫הנאשם לקח מנשר ה(לום) מתמד יוסף נאג'י אבו-חמזה) רוסיר M-16 ומספר מחסניות‬
   ‫לרוסיר הנ"ל מלאים בכדורים לצורך ביצוע פיגוע התאבדות המתוכנן.‬
7. ‫הנאשם יצר קשר עם מתמד סאמי אברהים עבדאללה, פראס צדיק מחמד עיאנס (המכונה‬
   ‫"אל חינטאווי") ומארק מלחי א-גוף. על-פי בקשתו של הנאשם השלישה הנ"ל הגיעו לרמאללה‬
   ‫ונפגשו שם עם הנאשם.‬
8. ‫הנאשם מסר לחבריו הנ"ל כי הוא מבקש מהם להכניס לירושלים מתבל נוסף, אשר יבצע‬
   ‫בירושלים פיגוע התאבדות, דוגמת הפיגוע המתוחר בפרט האישם העשרים ושישה, במטרה‬
   ‫לגרום למותם של אזרחים רבים ככל הניתן. חבריו הנ"ל של הנאשם הסכימו להשתתף‬
   ‫בהטעת המתבל המתאבד הנ"ל לירושלים.‬
9. ‫הנאשם מסר לידי מחמד עבדאללה ופראס עיאנס רכב סובארו אפור, השייך למשפחתו של‬
   ‫הנאשם. מחמד עבדאללה חזר עם רכב הסובארו לביונו לבני נבאללה, ואילו פראס עיאנס נסע‬
   ‫עם רכב איסוזו נודר שלו לביתו בכפר עקב.‬
10. ‫יום למחרת, הנאשם התקשר אל מתמד עבדאללה ואל פראס עיאנס והורה להם להניע לתחנת‬
    ‫הדלק הנמצאת ברמאללה תחתא, לאסוף משם את המתבל המתאבד ולהסיע אותו לירושלים‬
    ‫על מנת שיבצע שם את פיגוע ההתאבדות במטרה לגרום למותם של אזרחים רבים ככל הניתן.‬
11. ‫מתמד עבדאללה נסע ברכב הסובארו עד למחסום קלנדיה, שם הוא התנה את הרכב ועלה‬
    ‫לרכב האיסוזו של פראס עיאנס שהגיע למקום. משם המשיכו השניים למקום המפגש האמור.‬
12. ‫ברמאללה, בתחנת הדלק הנ"ל, מחמד עבדאללה ופראס עיאנס נפגשו עם הנאשם, אשר הגיע‬
    ‫במכונית אל מגונית רימאווי שהוא המתבל המתאבד. הנאשם מסר לידי מוג'אהד רימאווי‬
    ‫רוסיר M-16 הנ"ל ושלוש המחסניות הנ"ל מלאות בכדורים לרוסיר M-16.‬
13. ‫מחמד עבדאללה ופראס עיאנס הסתירו את רוסיר M-16 והמחסניות בתוך רכב האיסוזו.‬
14. ‫מתמד עבדאללה ופראס עיאנס נסע ביחד עם המתבל המתאבד לירושלים במטרה שהאחרון‬
    ‫יבצע שם פיגוע ירי ויגרום למותם של אזרחים רבים ככל הניתן.‬
15. ‫מתמד עבדאללה, פראס עיאנס ומוג'אהד רימאווי הגיעו למחסום קלנדיה ועקבו אותו. לאחר‬
    ‫מכן מחמד עבדאללה עבר ברכב האיסוזו, שהשאיר במקום קודם לכן ונסע לצומת א-ראם.‬
    ‫מתמד עבדאללה עבר ברכב הסובארו את מחסום א-ראם והמתין במקום לפראס עיאנס‬
    ‫ומוג'אהד רימאווי שעקפו את מחסום א-ראם ברגל. לאחר מכן, פראס עיאנס חזר, עלה לרכב‬
    ‫האיסוזו, שבו היה מוסתר הנשק, ועבר את מחסום א-ראם כשהוא נוסע לבד ברכב האיסוזו‬
    ‫עם הנשק.‬
16. ‫מתמד עבדאללה הסיע את המתבל המתאבד עד למסגד בשועפט. לשם הגיע גם פראס עיאנס‬
    ‫ברכב האיסוזו עם הנשק והתרחמשת.‬
17. ‫שם, המתבל המתאבד, מוג'אהד רימאווי, ביקש להיכנס למסגד ולהתפלל לפני שיבצע את פיגוע‬
    ‫ההתאבדות. מתמד עבדאללה ופראס עיאנס הסכימו לבקשה הנ"ל.‬
18. ‫בזמן שמוג'אהד רימאווי התפלל במסגד האמור, מתמד עבדאללה ופראס עיאנס נסע ברכב‬
    ‫הסובארו הנ"ל לנבעת שאול שבירושלים במטרה לבדוק אם יש בדרך מחסומי צה"ל או‬
    ‫משטרה. השניים התחילו להסיע את המתבל המתאבד לנבעת שאול במטרה שיבצע שם את‬
    ‫פיגוע הירי המתוכנן וזאת מכיוון שיש במקום האמור אזרחים רבים.‬
19. ‫כאשר מתמד עבדאללה ופראס עיאנס חזרו למסגד בשועפט על מנת לאסוף משם את מוג'אהד‬
    ‫רימאווי ולהסיע אותו לנבעת שאול במטרה שיבצע שם את פיגוע הירי המתוכנן, השניים לא‬
    ‫מצאו את המתבל המתאבד במסגד.‬

17

‫ת.ת. 444/02 מתוקן‬

20. מחמד עבדאללה ופראס עיאנם התקשרו אל הנאשם וזיווחו לו כי המחבל המתאבד ברח להם. הנאשם הורה למחמד עבדאללה ופראס עיאנם לחזור לרמאללה.

21. מחמד עבדאללה ופראס עיאנם חזרו לרמאללה, נפגשו שם עם הנאשם ומסרו לידיו את רכב הטובארו הנייל, את רוסייר M-16 הנייל ואת המתסניות הנייל. הנאשם החזיר את רוסייר M-16 הנייל לידי נצר (חלום) מחמד יוסף נאיף לאבו-חמדי.

22. הנאשם מסר לואפר רימאווי כי בן דודו נמלט בעת שהיה בדרכו לביצוע פיגוע ירי בירושלים.

## פרט שלושים ואחד:

נמל'/מ"שר  **מהות העבירה:** פגיעה בביטחון האיזור, עבירה לפי סעיף 53(א)(4) לצו בדבר הוראות בטחון
אמצ'...לב.  (יהודה והשומרון) (מס' 378), תש"ל-1970.

**פרטי העבירה:** הנאשם הנ"ל, באזיור, בתחילת חודש פברואר 2002 או בסמוך לכך, עשה מעשה או מחדל שיש בהם פגיעה, היזק, הפרעה או סכנה לביטחון האיזור או לביטחון כוחות צה"ל וחייליו או לפעולתם, שימושם או ביטחונם של כל אחד מאלה: אניה, אוירון, נמל, רציף, מזח, מעגן, שדה תעופה, מסילת ברזל, ונ"נ מים, דרך, דרך-עפר, קטר, כלי רכב, כלי משא או כל אמצעי אחר של הובלה ציבורית, או תקשורת ציבורית, או כל מפעל, מוסד, או ציוד ממשמש או מטוגל לשמש ליוצורם, הספקתם, התסנתם, העברתם, מסירתם או הפצתם של מים, דלק, גז או חשמל או כל רכוש של מדינת ישראל או של צהי"ל, דהיינו:

הנאשם הני"ל, במועד האמור, ברמאללה או בסמוך לכך, נפגש עם מחמד נעימה המכונה "אבו רבעי" ועם עיכרים ראתב יונס עוויס. השניים הני"ל מסרו לנאשם כי נמצא אצלם מחבל מתאבד וביקשו את עזרתו של הנאשם. הנאשם הסכים לעזור לשולח את המחבל המתאבד אל תוך מדינת ישראל על מנת שיבצע פיגוע התאבדות וגרום למות של אזרחים ישראליים רבים ככל הניתן.

הנאשם הגיע לדירה ברמאללה שבה היי "אבו רבעי", עיכרים עוויס וכן אדם שרצה לבצע פיגוע התאבדות. הנאשם שוחח עם מתנד בדר מתמוד אל-שאער (להלן: המחבל המתאבד) והתרשם כי האחרון רצוי בטוותו. המחבל המתאבד הני"ל מסר לנאשם כי גם אביו היעו "שהידי" מכיוון שהורג על-ידי חיילי צהי"ל.

הנאשם הגביר בדין אבו רבעי רוסייר M-16 ו-4 מחסניות מלאות בכדורים על מנת שימסור אותם למחבל המתאבד הני"ל לצורך ביצוע פיגוע ההתאבדות המתוכנן. יום למחרת, הנאשם חזר לדירה הני"ל עם מצולמת וידאו, עיכרים צילם באמצעות מצולמת הוידאו הני"ל את המחבל המתאבד הני"ל כשהוא מקריא כרוז, וזאת לקראת יציאתו לביצוע פיגוע ההתאבדות בתוך מדינת ישראל. הפעיל ותברין אימן את המחבל המתאבד הני"ל בשימוש ובירו ברוסייר M-16. לאחר מכן הנאשם העביר את המחבל המתאבד הני"ל לדירתו של הנאשם ברמאללה תחתא. הנאשם השאיר את המחבל המתאבד הני"ל לשון בדירתו על מנת שיצא משם ביום שלמחרת לביצוע פיגוע ההתאבדות המתוכנן. כאשר, למחרת בבוקר, הנאשם ועיכרים עוויס הגיעו לדירתו הני"ל של הנאשם, השניים גילו כי המחבל המתאבד נעלם. לאור היעלמותו של המחבל המתאבד הני"ל, התכנית הני"ל לביצוע פיגוע ההתאבדות לא יצאה אל הפועל.

## פרט שלושים ושנים:

**מהות העבירה:** פגיעה בביטחון האיזור, עבירה לפי סעיף 53(א)(4) לצו בדבר הוראות בטחון
(יהודה והשומרון) (מס' 378), תש"ל-1970.

**פרטי העבירה:** הנאשם הני"ל, באיזור, בחודש פברואר 2002 או בסמוך לכך, עשה מעשה או מחד"ל שיש בהם פגיעה, היזק, הפרעה או סכנה לביטחון האיזור או לביטחון כוחות צה"ל וחייליו או לפעולתם, שימושם או ביטחונם של כל אחד מאלה: אניה, נמל, רציף, מזח, מעגן, שדה תעופה, מסילת ברזל, ונ"נ מים, דרך, דרך-עפר, קטר, כלי רכב, כלי משא או כל אמצעי אחר של הובלה ציבורית, או תקשורת ציבורית, או כל מפעל, מוסד, או ציוד ממשמש או מטוגל לשמש ליוצורם, הספקתם, התסנתם, העברתם, מסירתם או הפצתם של מים, דלק, גז או חשמל או כל רכוש של מדינת ישראל או של צהי"ל, דהיינו:

הנאשם הני"ל, במועד האמור, שוחח באמצעות טלפון עם נאצר מחמוד עוויס, ראש יחידדי חלקי אלאקצאיי, הזרוע הצבאית של "פתהתנזים" של הטנזים, באיזור שכם. נאצר עוויס הודיע לנאשם כי הוא שולח אליו שני מחבלים מתאבדים. סוכם בין השניים לבין נאצר עוויס כי הנאשם ידאג למחבלים המתאבדים הני"ל כלי נשק ורימוני-יד וכן ידאג להכניסם אל תוך התחום המעוובי של ירושלים על מנת שיבצעו שם פיגוע התאבדות כשיירד לעבר אזרחים ישראליים, בכוונה לגרום

ת.פ 444/02 מתוקן                                                18

למותם של אזרחים ישראליים רבים ככל הניתן, וימשיכו לירות עד שייהרגו על-ידי כוחות הביטחון הישראליים.

על-פי הוראתנו של נאצר עווש הנייל, ביום 17.02.02, אחמד אבו חדר, פעיל בכיר ב"גדודי חללי אלאקצא", שלח משכם לרמאללה, אל הנאשם, את סעדי גיהאד תתמד-עלי מקבול, עלאא מחמד עלי חסן (נעמיה) (ממונה "אסוואדי", אשר אותם ליווה עולא מחמד גימעה מוצטפא. השניים היו כבר חמושים בשני רימוני-יד.

סעדי מקבול ועלאא חסן היו אמורים לבצע את פיגוע התאבדות כפי שתכנן הנאשם ונאצר עווש.

במסגרת ההכנה לפיגוע ההתאבדות הנייל, בבית של מחמוד אבו חדר, אחיו של אחמד אבו חדר הנייל, במתנה הפליטים בלאטה, אחמד אבו חדר צילם באמצעות מצלמת ווידאו את סעדי מקבול ואת עלאא חסן כשהם אוחזים ברובהיי M-16. השניים אף קראו בפני מצלמת הווידאו כרוז של "גדודי חללי אלאקצא". אחמד אבו חדר העביר לעלאא חסן ולסעדי מקבול אימון בשימוש בנשק לקראת ביצוע הפיגוע המתוכנן.

ביום 17.02.02, סעדי מקבול ועלאא חסן יצאו משכם לרמאללה ביחד עם עלא מחמד גימעה מוצטפא ואימן עלאא צאלח בדר. אחמד אבו חדר הסביר לארבעה כי עליהם לנסוע לרמאללה במונית של אימן בדר. אחמד אבו חדר הסביר כי עולא מוצטפא יהיה אחראי לכך שעלאא חסן וסעדי מקבול ייפגשו ברמאללה עם פעילי "גדודי חללי אלאקצאי", אשר יפפק להם כלי נשק ויסיעו אותם לירושלים לפי התכנון הנייל.

הארבעה הנייל לא הצליחו להגיע לרמאללה ולהיפגש עם הנאשם לצורך ההוצאה לפועל של פיגוע ההתאבדות המתוכנן. הארבעה נעצרו במחסום צהייל, בסמוך לכפר דומא שבנפת רמאללה. שני רימוני-היד שהיו במתנת הנייל, פוצצו במקום על-ידי החבלן.

## ז. פרט שלישים ועלושת:

(יר קי)
'יר
'סיר
'יס יל
ג ל'יל
יסד :

**מהות העבירה:** קשירת קשר לגרימת מוות בכוונה, עבירה לפי סעיף 22 לצו בדבר כללי האחריות לעבירה (יהודה והשומרון) (מסי 225), תשכייח-1968 וסעיף 51(א) לצו בדבר הוראות הביטחון (יהודה והשומרון) (מסי 378), תשייל-1970.

**פרטי העבירה:** הנאשם הנייל, באיזור, בזמן מוות בכוונה, עבירה לפי סעיף 22 לצו בדבר כללי האחריות עם אדם אחר לגרום בכוונה למותו של אחר, דהיינו:

הנאשם הנייל, ביום 15.02.02 או בסמוך לכך, ברמאללה או בסמוך לכך, נפגש עם מחמד סאמי אבראהים עבדאללה, חוסאם עקל רגיב שראפדו ופראסו צאדק מחמד גיאנם (המכונה "אל חינטאוויי).

במהלך הפגישה הנייל, הנאשם ביקש מהחבריו חייל להכניס לתוך ירושלים מחבל מתאבד, אשר יבצע שם פיגוע התאבדות במטרה לגרום למותם של אנשים רבים ככל הניתן. חבריו הנייל של הנאשם הסכימו להצעת הנאשם. הנאשם הבטיח לשלם לחבריו הנייל 300 דולר ארהייב בתמורה לחובלת המחבל המתאבד לירושלים. הנאשם הודיע לחבריו הנייל כי יביא אליהם את המחבל המתאבד בעוד כיום-יומיים.

הנאשם אף נתן לחבריו הנייל רכב סוברוב אמר, נושא לוחיות רשוי ישראליות, על מנת שחבריו הנייל יובילו בו את המחבל המתאבד לירושלים.

מחמד עבדאללה, פראס גיאנם וחוסאם שהאזה, תכננו להכניס את המחבל המתאבד לירושלים ברכב אישוזו נוסדר של פראס עיאנם. חבריו הנייל של הנאשם תכננו לחובל את המחבל המתאבד לאחד המקומות בירושלים שיש בו הרבה אנשים על מנת שיום המחבל המתאבד יבצע את פיגוע ההתאבדות המתוכנן. מחמד עבדאללה, פראס עיאנם וחוסאם שהאזה אף ערכו סיור בירושלים ובחרו את המקומות המתאימים לדעתם לביצוע פיגוע ירי נגד אזרחים ישראליים. בין היתר, בחרו חבריו הנייל של הנאשם במלון ירמוהיי, המנהרות של כביש בגין וצומת הגבעה הצרפתית.

תכניתם הנייל של הנאשם וחבריו הנייל לא יצאה אל הפועל מכיוון שכימים לאחר הפגישה הנייל, ביום 17.02.02, חוסאם שהאזה נעצר על-ידי כוחות הביטחון הישראליים, וכעבור יום, ביום 18.02.02, פראס עיאנם נעצר על-ידי כוחות הביטחון הישראליים.

לפי הוראתנו של הנאשם, מחמד עבדאללה, לאחר מעצרם של פראס עיאנם חוסאם שהאזה, ביום 19.02.02 או בסמוך לכך, ברמאללה, נפגש עם מחמד צאדק מחמד עיאנם, אחיו של פראס עיאנם הנייל, ועם סארק מלוי א-נוף. במהלך הפגישה האמורה, מחמד עבדאללה ומחמד עיאנם הסכימו להצעתו של סארק א-נוף להכניס מתבל מתאבד לירושלים על מנת שיבצע שם פיגוע התאבדות במטרה לגרום למותם של אנשים רבים ככל הניתן.

גם החבוגה הזו לא יצאה אל הפועל מכיוון שמחמד עבדאללה עצמו מעצר ביום למחרת, יום ה-20.02.02, על-ידי כוחות הביטחון הישראליים.

---

P 5: 193

**ע/ פרט שלושים הארבעה: (ס.א. 483/02 שם ת)**

**מהות העבירה:** גרימת מוות בכוונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות ביטחון (יהודה והשומרון) (מס' 378), תשי"ל-1970 וסעיף 14(א) לצו בדבר כללי האחריות לעבירה (יהודה והשומרון) (מס' 225), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, בין באיזור ובין מחוצה לו, ביום 25.02.02 או במועד הסמוך לכך, גרם בכוונה למותו של אחר, דהיינו :

1. הנאשם הנ"ל, באמצע חודש פברואר 2002, ברמאללה או בסמוך לכך, הנאשם תחליט לשלוח מתכל מתאבד לירושלים על מנת שיבצע פיגוע ירי לעבר אזרחים ישראליים בכוונה לגרום למותם אזרחים רבים כל היותר. הנאשם תכנן כי המתכל ממתאבד יירה לעבר אזרחים ישראליים עד שיהרוג מאש כוחות הביטחון הישראליים.

2. הנאשם יצר קשר שלמוני עם נאצר מחמוד עוויס, פעיל צבאי בכיר ביתנוזים" של הפתי"ח, שהוא התואחדות בלתי מותרת, בשכם. הנאשם ביקש מנאצר עוויס לשלוח אליו לרמאללה מתכל מתאבד לצורך ביצוע פיגוע ההתאבדות המתוכנן.

3. לאחר מספר ימים, ראמי מחמד מחמוד נור יצר קשר עם הנאשם והודיע לו כי הוא נשלח על-ידי נאצר עוויס לצורך ביצוע פיגוע ההתאבדות המתוכנן וכי הוא נמצא ברמאללה.

4. על-פי הוראתו של הנאשם, טארק מלחי א-נוף נפגש עם ראמי נור. טארק א-נוף הביא את ראמי נור אל הנאשם.

5. הנאשם שוחח עם ראמי נור ולאחר מכן לקח את ראמי נור למספרה על מנת שהאחרון יסתפר לקראת ביצוע פיגוע ההתאבדות המתוכנן.

6. הנאשם רכש עבור ראמי נור בגדים, אשר עבורם שילם מכיסו 1,000 ש"ח.

7. לאחר מכן, הנאשם הוביל את ראמי נור דירה ברמאללה, אשר בה התגוררו הנאשם, טארק א-נוף ווידאו ר'מדאן (להלן : הדירה).

8. ביום 23.02.02, לידיה הגיע גם שריף מחמד יוסף נאג'י (אבו-חמיד), אשר שהביא רוטי"ר M-16 עבור ביצוע הפיגוע המתוכנן, אשר אותו קיבל מהנאשם. שריף נאג'י (אבו-חמיד) אף הביא מחסניות לרוטי"ר M-16 הנ"ל מבית מבית של אחיו, נאצר נאג'י (אבו-חמיד).

9. בשעות הערב באותו היום, שריף נאג'י (אבו-חמיד) וווידאו ר'מדאן מסרו לראמי נור מידע על המקום שבו הוטל על ראמי נור לבצע את הפיגוע המתוכנן. הנאשם וחבריו הסבירו לראמי נור כי עליו לבצע את הפיגוע המתוכנן בשכונת נווה-יעקב בירושלים, במקום, אשר לבני שריף נאג'י הדירם ר'מדאן אספו מידע קודם לכן.

10. הנאשם, ביחד עם אחרים, צילם את ראמי נור באמצעות מצלמת וידאו במסגרת ההכנות לקראת ביצוע הפיגוע המתוכנן.

11. על-פי בקשתו של שריף נאג'י (אבו-חמיד), אחיו - נסר (חלום) נאג'י (אבו-חמיד) פנה אל כאמל עיאש וביקש מהאחרון להסיע את ראמי נור לירושלים.

12. ביום 25.02.02, בשעות הערב, ראמי נור יצא מרמאללה לכיוון ירושלים ברכבו של כאמל עיאש, כאשר ברכב מוטמר רוטי"ר M-16 הנ"ל, המחסניות וכן רימון-יד, אשר אותו מסר לראמי נור נסר (חלום) נאג'י (אבו-חמיד).

13. ראמי נור הגיע לכביש הראשי בשכונת נווה-יעקב בירושלים.

14. ראמי נור ירד מהרכב הנ"ל במקום האמור, כשהגיע חמוש ברוטי"ר M-16 הנ"ל, מחסניות ורימון-יד. ראמי נור תתקרב אל תחנת האוטובוס של קו 25 של "אגד" הנמצאת במקום ופתח באש אוטומטית ברוטי"ר M-16 הנ"ל לעבר כלי רכב שעברו במקום וכן לעבר אזרחים ישראליים שהיו במקום בכוונה לגרום למותם של אנשים רבים ככל האפשר. למקום האמור הגיעה ניידת המשטרה וראמי נור פתח באש אוטומטית לעבר שני שוטרי משטרת ישראל שהיו בניידת הנ"ל בכוונה לגרום למותם. הכדורים שנורו על-ידי ראמי נור פגעו בשני השוטרים הנ"ל שהסתערו לעבר ראמי נור וירד לעברה. כתוצאה מפגיעות הכדורים שנורו על-ידי ראמי נור, השוטרת גלית ארביב ז"ל נפצעה ונפלה על הקרקע. ראמי נור תתקרב אל השוטרת גלית ארביב ז"ל וירה לעברה צרור נוסף ממרחק קצר. כתוצאה מפגיעות הכליעים שנורו על-ידי ראמי נור, השוטרת גלית ארביב ז"ל נפטרה בעבור מספר שעות.

15. לאחר שלראמי נור נגמרה התחמושת הוא ירה את רימון-היד שהחזיק לעבר גייפ של צה"ל שהגיע למקום בכוונה לגרום למותם של חיילי צה"ל. רק לאחר שראמי נור נפצע ונגמרה לו התחמושת, השוטרים והאחרים שהיו במקום הצליחו להשתלט עליו.

16. במעשיו המתוארים לעיל, הנאשם הנ"ל גרם בכוונה למותה של השוטרת גלית ארביב ז"ל.

ת.ת. 444/02 מתוקן

20

P 5: 194

**ד מרט שלושים וחמישה: (פ.א. 483/02 שפס)**

**מהות העבירה:** נסיון לגרימת מוות בכוונה, עבירה לפי סעיף 51)א( לצו בדבר הוראות ביטחון
(יהודה והשומרון) (מסי 378), תשי"ל-1970 וסעיפים 14)א( ו-19 לצו בדבר כללי האחריות לעבירה
(יהודה והשומרון) (מסי 225), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנייל, בין באיזור ובין מחוצה לו, ביום 25.02.02 או במועד הסמוך לכך,
ניסה לגרום בכוונה למותו של אחר, דהיינו:
הנאשם הנייל, במועד האמור, במעשיו המתוארים בפרט האישום הקודם, ניסה לגרום בכוונה
למותם של אזרחים ישראליים רבים ככל האפשר. כתוצאה מפגיעות הקליעים שגרו על-ידי ראמי
מחמד מחמוד נור, אשר נשלח לביצוע הפיגוע האמור על-ידי הנאשם, נפצעו שמונה אזרחים
ושוטרים ישראליים.

**ן) מרט שלושים ושישה:   (פ.א. 483/02 שפס)**

**מחות העבירה:** היזק בזדון לרכוש, עבירה לפי סעיף 53)ג לצו בדבר הוראות ביטחון (יהודה
והשומרון) (מסי 378), תשי"ל-1970 וסעיף 14)א( לצו בדבר כללי האחריות לעבירה (יהודה
והשומרון) (מסי 225), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנייל, בין באיזור ובין מחוצה לו, ביום 25.02.02 או במועד הסמוך לכך,
הרס רכוש או פגע בו במזיד ושלא כדין, דהיינו:
הנאשם הנייל, במועד האמור, במקום האמור בפרט האישום השלושים וארבעה, במעשיו
המתוארים בפרט האישום השלושים וארבעה, גרם במזיד ושלא כדין נזק רב לתחנת האוטובוס
של קו 25 של "אגד" בבעלות יעקב, לבתים הסמוכים ולכלי רכב שהיו במקום הנייל, אשר נפגעו
כתוצאה מהיריות שגרו על-ידי ראמי מחמד מחמוד נור.

**ע) מרט שלושים ושבעה:   (פ.א. 4258/02 ירקון)**

**מחות העבירה:** גרימת מוות בכוונה, עבירה לפי סעיף 51)א( לצו בדבר הוראות ביטחון (יהודה
והשומרון) (מסי 378), תשי"ל-1970 וסעיף 14)א( לצו בדבר כללי האחריות לעבירה (יהודה
והשומרון) (מסי 225), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנייל, בין באיזור ובין מחוצה לו, ביום 05.03.02 או במועד הסמוך לכך,
גרם בכוונה למותו של אחר, דהיינו:
1. הנאשם הנייל, בתחילת חודש מרץ 2002, ברמאללה או בסמוך לכך, יצר קשר טלפוני עם נאצר
   מחמוד עווים, פעיל צבאי בכיר בייתנזיים" של הפתייח, שהוא התאחדות בלתי מותרת, בשכם.
2. נאצר עווים הודיע לנאשם כי הוא שולח אליו מחבל מתאבד נוסף על מנת שהנאשם ישלח
   אותו אל תוך מדינת ישראל לצורך ביצוע פיגוע ירי. תוכנ כי המחבל המתאבד יירה לעבר
   אזרחים ישראליים בכוונה לגרום למותם של אזרחים רבים ככל הניתן וכי ימשיך לחיות עד
   שייהרג מאש כוחות הביטחון הישראליים.
3. ביום 04.03.02, יצר עם הנאשם קשר אברהים חסונה, שוטר במשטרה היתית של הרשות
   הפלסטינית, אשר הודיע כי הגיע לרמאללה על-פי הוראתו של נאצר עווים וכי הוא המחבל
   המתאבד לצורך ביצוע פיגוע הירי המתוכנן. על-פי הוראתו של הנאשם, נפגש מחבל מתאבד
   נפגש ברמאללה עם אברהים חסונה.
4. באותו היום, ברמאללה, נארק א-נוף נפגש עם שריף מתמד יוסף נאג'י (אבו-חמדי). במהלך
   הפגישה האמורה, נאדק א-נוף הכיר לשריף נאג'י (אבו-חמדי) את אברהים חסונה.
5. נאדק א-נוף הודיע לשריף אבו-חמדי כי הנאשם הביא את אברהים חסונה הנייל משכם על
   מנת שיובצע פיגוע התאבדות בכוונה לגרום למותם של אזרחים ישראליים רבים ככל האפשר.
6. על-פי הוראתו של הנאשם, נאדק א-נוף לקח את אברהים חסונה למקברה על מנת שיסתפר
   לקראת ביצוע פיגוע התאבדות המתוכנן. כמו כן, נאדק א-נוף ושריף נאג'י (אבו-חמדי) רכשו
   עבור אברהים חסונה בגדים חדשים. עבור הבגדים הנייל נאדק א-נוף שילם 1,000 שייח, אשר
   אותם קיבל מהנאשם למטרה זו.
7. לאחר מכן, לפני הוראתו של הנאשם, נאדק א-נוף הוביל את אברהים חסונה לדירתו ברמאללה
   תחתה, אשר בה התגורר נאדק א-נוף, וירא רמדאן והנאשם (להלן: הדירה).
8. הנאשם הגיע לדירה וצילם באמצעות מצלמת וידאו את אברהים חסונה לקראת ביצוע פיגוע
   ההתאבדות המתוכנן.

ת.ת. 444/02 סומוקן

9. הנאשם הורה לטארק א-נוף להוביל את אברהים חסונה אל תוך מדינת ישראל על מנת שהאחרון יבצע שם את פיגוע ההתאבדות המתוכנן. הנאשם הורה לטארק א-נוף לחבוש נשק לאברהים חסונה לצורך ביצוע הפיגוע המתוכנן.

10. חבריו הנ"ל של הנאשם תכללו לחפש אדם אשר יכניס את אברהים חסונה אל תוך מדינת ישראל על מנת שהאחרון יבצע שם את פיגוע ההתאבדות המתוכנן ויגרום למותם של אזרחים ישראליים רבים ככל האפשר.

11. שריף נאג'י (אבו-חמדי) פנה אל מוראד נזמי ריזק עג'לוני, בעל תעודת זהות ישראלית המתגורר בירושלים, וביקש מהאחרון להגיע בדחיפות לרמאללה.

12. שריף נאג'י (אבו-חמדי) נפגש עם מוראד עג'לוני הנ"ל בבית קפה ברמאללה וביקש ממנו להסיע מחבל מתאבד אל תוך מדינת ישראל. מוראד עג'לוני הסכים להצעה זו, אך ביקש כי שריף נאג'י (אבו-חמדי) ידאג לספק למוטרה זו רכב לא גנוב בעל לוחיות רישוי ישראליות.

13. שריף נאג'י (אבו-חמדי), ויזאן רמדאן ומוראד עג'לוני פגשו ברמאללה את מוחמד יוסף נאג'י (אבו-חמדי), אשר היה ביחד עם מאזן מוחמד שמinstr אלקאדי. מאזן אלקאדי נהג ברכב פורד טרנזיט עם לוחיות רישוי ישראליות, מ.ר. 7014515 (להלן: הרכב). האנשים הנ"ל ביקשו ממאזן אלקאדי את רכב זאת והרשיונות של הרכב לצורך הסעת מחבל מתאבד אל תוך שטחה של מדינת ישראל על מנת שהמחבל המתאבד יבצע שם פיגוע התאבדות. מאזן אלקאדי מסר את הרכב לידי שריף נאג'י (אבו-חמדי) וויזאן רמדאן, אך ביקש כי הוא עצמו ינהג בו.

14. בשלב הזה, טארק א-נוף ואברהים חסונה הלכו לדירה. שם, אברהים חסונה התקלח ולבש את הבגדים החדשים, אשר נקנו עבורו על-ידי חוראת הנאשם כאמור לעיל.

15. בסביבות השעה 20:00, שריף נאג'י (אבו-חמדי), ויזאן רמדאן ומאזן אלקאדי, שנשעו ברכב, נפגשו בכיכר השעון ברמאללה עם טארק א-נוף ואברהים חסונה. טארק א-נוף ואברהים חסונה, אשר חיו חמושים ברובה"ר 16-M, 6 מחסניות מלאות בכדורים ושני רימוני-יד, עלו לרכב. לפתקום הגיע גם נסר (תלום) מוחמד יוסף נאג'י (אבו-חמדי), אשר מסר לאברהים חסונה שקץ קומוזו באורך של 25 ס"מ. נסר אבו-חמדי אמר לאברהים חסונה לדקור אזרחים ישראליים על מנת לגרום למותם לאחר שיגמר לו התחמושת.

16. כל האנשים הנ"ל נסעו ברכב לכיכר רפידיה ברמאללה, מכיוון שבמקום האמור אין הרבה עוברי אורח.

17. בכיכר רפידיה הנ"ל, נסר (תלום) נאג'י (אבו-חמדי), טארק א-נוף ואברהים חסונה פירקו את רובה"ר 16-M הנ"ל והכניסו אותו אל תוך הדלת הצדדית של הרכב.

18. שריף נאג'י (אבו-חמדי), טארק א-נוף וויזאן רמדאן, נישקו את אברהים חסונה ואיחלו לו הצלחה.

19. מוראד עג'לוני הודיע לחבריו כי הוא עובד בתל-אביב ולכן מכיר מקום בתל-אביב, אשר בו ניתן לבצע את פיגוע ההתאבדות המתוכנן.

20. הוחלט כי לאחר שמוראד עג'לוני ומאזן אלקאדי יורידו את אברהים חסונה בתל-אביב במקום הומה אדם, אברהים חסונה יתפיך מספור דקות על מנת שחבריו הנ"ל יספיקו להימלט מהמקום ברכב ולאחר מכן יפתח באש מרובה אוטומטית ברובה"ר 16-M הנ"ל לעבר אזרחים ישראליים שיהיו במקום, בכוונה לגרום למותם של אזרחים ישראליים רבים ככל האפשר ויפצע"ע לידיה עד שייהרג מאש כוחות הביטחון הישראליים שיגיעו למקום.

21. אברהים חסונה עלה לרכב, אשר בו נהג מאזן אלקאדי ולידו ישב מוראד עג'לוני, והשלושה נסעו לכיוון תל-אביב על מנת לבצע שם את פיגוע ההתאבדות המתוכנן.

22. במהלך נסיעתם של אנשים עג'לוני, מאזן אלקאדי ואברהים חסונה לתל-אביב, שריף נאג'י (אבו-חמדי) שוחח עמם באמצעות טלפון סלולרי.

23. בבוקר הלילה, לאחר שמאזן אלקאדי, מוראד עג'לוני ואברהים חסונה נכנסו לתל-אביב, בסמוך לגשר מעריב שבדרך פתח-תקווה, מוראד עג'לוני הראה לאברהים חסונה מקום הומה אדם והתחה אותו לבצע שם את הפיגוע המתוכנן.

24. אברהים חסונה הוציא את רובה"ר 16-M, מחסניות ורימוני-היד הנ"ל, שהיו מוסתרים בדלת של הרכב כאמור לעיל.

25. בסמוך לשעה 02:15, ביום 05.03.02 או בסמוך הסמוך לכך, מאזן אלקאדי ומוראד עג'לוני הורידו את אברהים חסונה מן הרכב, כשהוא חמוש ברובה"ר 16-M, רימוני-היד וסקץ קומנדו הנ"ל, בסמוך למסעירה "סי-פוד מרקט" הנמצאת בדרך פתח-תקווה בתל-אביב (להלן: המסעירה) על מנת שיבצע שם את הפיגוע המתוכנן.

26. מוראד עג'לוני ומאזן אלקאדי נסעו ברכב מהמקום לכיוון ירושלים.

27. אברהים חסונה התקרב אל המסעירה "סי-פוד מרקט" ופתח באש אוטומטית ברובה"ר 16-M לעבר יושבי המסעירה ועוברי האורח בדרך פתח-תקווה בכוונה לגרום למותם.

28. לאחר מכן, אברהים חסונה השליך את שני רימוני-היד הנ"ל לעבר המסעירה בכוונה לגרום למותם של יושבי המסעירה ועוברי אורח, אך רימוני-היד לא התפוצצו.

P 5: 196

29. לאחר שדוס"ר M-16, אשר בו החזיק אברהים חסונה הפסיק לירות עקב מעצור, אברהים
חסונה הוציא את סכין הקומנדו המ"יל והחל לדקור אזרחים ישראליים שהיו במקום בכוונה
לגרום למותם.

30. למקום המעצר, הגיע השוטר רס"ר סלים ברכאת ז"ל. רס"ר סלים ברכאת ז"יל הסתער לעבר
אברהים חסונה והשתלט עליו. רס"ר סלים ברכאת ז"ל הספיק להודיע למפקדיו על
ההשתלטות על המחבל.

31. בשלב הזה, אברהים חסונה דקר באמצעות סכין הקומנדו הנ"יל את רס"ר סלים ברכאת ז"ל
בצוארו בכוונה לגרום למותו. כתוצאה מהדקירה הנ"יל, רס"ר סלים ברכאת ז"ל נפטר
במקום.

32. במעשיו המתוארים לעיל, האשם הנ"יל גרם בכוונה למותו של רס"ר סלים ברכאת ז"ל.

33. לאחר שלשרף נאגי (אבו-חמדה) נדע משידורי הטלוויזיה על כך שהפיגוע המתוכנן בוצע
כאמור לעיל, הוא יצר קשר עם האשם ועודד את האחרון בדבר ביצוע הפיגוע האמור.

34. מיד לאחר מכן, האשם הודיע למרוואן ברגותי, ראש "התנזים" של הפתייח באיזור, ולנאצר
מחמד יוסף נאגי (אבו-חמדה), ראש "גדודי חללי אלאקצא", הזרוע הצבאית של "התנזים" של
הפתייח, על הפיגוע שבוצע. כמו כן, האשם יצר קשר עם סוכנות הידיעות "רויטרס" והודיע
על הפיגוע שבוצע כאמור לעיל.

## ✓ פרט שלושים ושמונה: (פ.א. 4258/02 ירקון)

**מהות העבירה:** גרימת מוות בכוונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות ביטחון (יהודה
והשומרון) (מס' 378), תשל"ל-1970 וסעיף 14(א) לצו בדבר כללי האחריות לעבירה (יהודה
והשומרון) (מס' 225), תשכ"ח-1968.

**פרטי העבירה:** האשם הנ"יל, בין באיזור ובין מחוצה לו, ביום 05.03.02 או במועד הסמוך לכך,
גרם בכוונה למותו של אחר, דהיינו:

האשם הנ"יל, במועד האמור, במקום האמור בפרט האשום השלושים ושבעה, במעשיו
המתוארים בפרט האישום השלושים ושבעה, גרם בכוונה למותו של יוסף הבי ז"ל, אשר נדקר
על-ידי אברהים חסונה בבית חזה.ובחלקים נוספים בגופו ונפטר כתוצאה מכך.

## ✓ פרט שלושים ותשעה: (פ.א. 4258/02 ירקון)

**מהות העבירה:** גרימת מוות בכוונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות ביטחון (יהודה
והשומרון) (מס' 378), תשל"ל-1970 וסעיף 14(א) לצו בדבר כללי האחריות לעבירה (יהודה
והשומרון) (מס' 225), תשכ"ח-1968.

**פרטי העבירה:** האשם הנ"יל, בבין איזור ובין מחוצה לו, ביום 05.03.02 או במועד הסמוך לכך,
גרם בכוונה למותו של אחר, דהיינו:

האשם הנ"יל, במועד האמור, במקום האמור בפרט האישום השלושים ושבעה, במעשיו
המתוארים בפרט האישום השלושים ושבעה, גרם בכוונה למותו של אליחו דחן ז"ל, אשר נדקר
על-ידי אברהים חסונה בבית חזה, בבטנו ובגבו ונפטר כתוצאה מכך.

## ✓ פרט ארבעים: (פ.א. 4258/02 ירקון)

**מהות העבירה:** ניסיון לגרימת מוות בכוונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות ביטחון
(יהודה והשומרון) (מס' 378), תשי"ל-1970 וסעיפים 14(א) ו-19 לצו בדבר כללי האחריות לעבירה
(יהודה והשומרון) (מס' 225), תשכ"ח-1968.

**פרטי העבירה:** האשם הנ"יל, בין באיזור ובין מחוצה לו, ביום 05.03.02 או במועד הסמוך לכך,
ניסה לגרום בכוונה למותו של אחר, דהיינו:

האשם הנ"יל, במועד האמור, במקום האמור בפרט האישום השלושים ושבעה, במעשיו
המתוארים בפרט האישום השלושים ושבעה, ניסה לגרום למותם של אזרחים רבים ככל האפשר.
כתוצאה מהירירות שנורו על-ידי אברהים חסונה נפצעו עשרות אזרחים ישראליים.

ת.ח. 444/02 כתסקן

## פרט ארבעים ואחד: (פ.א. 4258/02 ירקון) ✓

**מהות העבירה:** היזק בזדון לרכוש, עבירה לפי סעיף 333 לצו בדבר הוראות ביטחון (יהודה והשומרון) (מס' 378), תשי"ל-1970 וסעיף 14(א) לצו בדבר כללי האחריות לעבירה (יהודה והשומרון) (מס' 225), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, בין באיזור ובין מחוצה לו, ביום 05.03.02 או במועד הסמוך לכך, הרס רכוש או פגע בו במזיד ושלא כדין, דהיינו:
הנאשם הנ"ל, במועד האמור, במקום האמור בפרט האישום השלושים ושבעה, במעשיו המתוארים בפרט האישום השלושים ושבעה, גרם במזיד ושלא כדין נזק רב למטעירה יסד-פוד מרקטית, למסעירה ימצבאו הסטיניק וכן לבניינים הסמוכים וכלי הרכב שהיו באיזור, אשר נפגעו כתוצאה מהירותו שנורו על-ידי אברהים חסונה.

## פרט ארבעים ושניים: (פ.א. 568/02 שפטן) ✓

**מהות העבירה:** ניסיון לגרימת מוות בכוונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות בטחון (יהודה והשומרון) (מס' 378), תשי"ל-1970, וסעיפים 14(א) ו-19 לצו בדבר כללי האחריות לעבירה (יהודה והשומרון) (מס' 225), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, בין באיזור ובין מחוצה לו, ביום 08.03.02 או במועד הסמוך לכך, ניסה לגרום בכוונה למותו של אחר, דהיינו:

1. הנאשם הנ"ל, במועד האמור, שותף באמצעות כלכל עם מצר מחמוד עוויס, פעיל צבאי בכיר בייתנזים של הפת"ח, שהוא התאחדות בלתי מותרת, בשכם.
2. מצר עוויס ביקש מהנאשם להיפגש ברמאללה עם לואי מחמד אחמד עודה, אשר שוחרר לפני זמן קצר מהכלא של הביטחון המסכל של הרשות הפלסטינית.
3. הנאשם נפגש ברמאללה עם לואי עודה. במהלך השיחה בין השניים לואי עודה מסר לנאשם כי יש לו מחבל מתאבד וכי הוא צריך הנגרות נפי על מנת שהמחבל המתאבד יוכל לבצע באמצעותה פיגוע התאבדות בתוך שטחה של מדינת ישראל ובכך יגרום למותם של אזרחים ישראליים רבים ככל הניתן. הנאשם הסכים למסור ללואי עודה את הגרות הנפי המבקשת לצורך ביצוע פיגוע התאבדות המתוכנן. כמו כן, הסכים הנאשם להקשוע של לואי עודה לארגן מקום לינה ברמאללה עבור המחבל המתאבד.
4. קודם לכן, לואי עודה הנ"ל שוחח עם מצר עוויס הנ"ל. מצר עוויס הנ"ל הודיע כי איתור אדם אשר מוכן לבצע פיגוע התאבדות בירושלים, והוא מחמוד צלאח, תושב השומרון. מצר עוויס ביקש מלואי עודה להעביר את מחמוד צלאח לידיישלים על מנת לבצע פיגוע התאבדות בכוונה לגרום למותם של אזרחים ישראלים. לואי עודה הסכים לכך. לואי עודה נגש את מחמוד סעיד עיראפא צלאח. מחמוד צלאח סיפר ללואי עודה, כי בכוונתו לבצע פיגוע התאבדות, וזאת לאחר שארוסתו, דאריו, בישעה גם היא פיגוע התאבדות.
5. לואי עודה התקשר לחיאלד שוקי חביב חלבי, תושב בית חנינא, פעיל הארגון יהודיית העממית לשחרור פלסטין", וחודיע לו, כי בכוונתו לבצע פיגוע בירושלים וזאת על ידי שיגור מחבל מתאבד שברשותו. לואי עודה ביקש מחיאלד חלבי לאתר אנשים, אשר יכולים את המחבל המתאבד לירושלים. חיאלד חלבי הסכים לבצע את הבקשקו ממנו.
6. חיאלד חלבי התקשר לחברו עיאצדי עיסא עודה, תושב בית חנינא, פעיל הארגון יהודיית העממית לשחרור פלסטין", נוח נפגש עמו ביום 06.03.02 ברמאללה. לואי עודה הגיע לפגישה זו ונפגש עם חיאלד חלבי ועיאצדי עודה בסמוך לבית קפה "ירבסקי". לואי עודה וחיאלד חלבי הגיעו לעאצדי עודה להכניס מחבל מתאבד מרמאללה לירושלים לצורך ביצוע פיגוע. לואי עודה הדריך את עיאצדי עודה להוביל את המחבל המתאבד לגבה הצרפתית בירושלים, בדרכים עוקמת מחוסומים, על מנת שיבצע עם פיגוע וגרום בכך למותם של אזרחים ישראליים. לואי עודה וחיאלד חלבי הציעו לעאצדי עודה חלופות למקום ביצוע הפיגוע: סופרמרקט בסמוך לתחנת הדלק בשכונת רמת אשכול, מסעדת "הפיצה דומנוישי" בגבעה הצרפתית או אחת מהחנות האוטובוסים שבצומת הגבעה הצרפתית.
7. לצורך קבלת הגרות הנפי עבור המחבל המתאבד, הנאשם הפניש את לואי עודה עם חיאלד שוויש, פעיל כוח 17 של הרשות הפלסטינית, אשר הבטיח להעביר לידי לואי עודה ולידי המחבל המתאבד הגרות הנפי שברשותו והתנצרי לרשותו של לואי עודה פעיל כוח 17 של הרשות הפלסטינית בשם מזיד, אשר ילבש את הגרות הנפי על המחבל המתאבד.
8. הנאשם הוביל את המחבל המתאבד-אל-הדירה ברמאללה תחתא, אשר אותה שכר הנאשם (להלן: הדירה).

---

9. ביום 08.03.02 הגיע עיאנזי עודה, לקריאתו של חיאלד חלבי, לרמאללה. ברמאללה המתינו
   לעיאנזי עודה לואי עודה, אשר הגיע למקום המפגש ברכב, וחיאלד חלבי. לואי עודה וחיאלד
   חלבי מסרו לעיאנזי עודה כי עליו להוביל את המחבל המתאבד לתחנת האוטובוסים, שבכניון
   הנוסעת לית המלח, בצומת הגבעה הצרפתית בירושלים. לואי עודה וחיאלד חלבי וידאו כי
   עיאנזי עודה מכיר את הדרכים העוקפות למקום, ועיאנזי עודה סיפר להם, כי בכוונתו לחזבל
   את המחבל המתאבד תוך עקיפת מחסום קלנדיה בדרך המחצבות, ומשם להמשיך ולהוביל
   את המחבל למקום ביצוע הפיגוע דרך בית חנינא ושועפט, תוך עקיפת מחסום דחיית
   אל-בריח.

10. לאחר מכן, לואי עודה נסע לדירה, שם נפגש עם הנאשם ושם מזיד, אשר הביא יחד עמו חגורת
    נפץ. מזיד חלביש את תגורת הנפץ על מחמוד צלאח והסביר למחמוד צלאח כיצד להפעיל את
    חגורת הנפץ. כמו כן, מחמוד צלאח נילה את זקנו.

11. לאחר מכן, עזרו הנאשם וחברו הנייל מונית, והמחבל המתאבד, מחמוד צלאח, לבוש בתנורת
    הנפץ, עלות למונית בדרכו לביצוע פיגוע התאבדות בירושלים בכוונה לגרום למותם של
    אזרחים ישראליים. היאלד חלבי ליווה את מחמוד צלאח למקום המפגש עם עיאנזי עודה.

12. עיאנזי עודה והמחבל המתאבד, מחמוד צלאח, המשיכו לנסוע במונית, וירדו מן המונית בדרך
    עפר בסמוך למחצבות בקלנדיה. משם הוביל עיאנזי עודה את המחבל המתאבד ברגל בדרכם
    למיצוע הפיגוע המתוכנן.

13. בשיכוני נסיויות בבית חנינא בירושלים, נעצרו עיאנזי עודה ומחמוד צלאח, בסמוך לשעה
    16:00, על ידי שוטרי משמר הגבול. כאשר ניסה מחמוד צלאח להפעיל את תגורת הנפץ אותה
    לבש, נורה על ידי אנשי כוחות הביטחון ונהרג.

## ז/ פרט ארבעים ושלושה: (פ.א. 783/02 בנימין)

ל' וויר
יירה י"ר
לבי לגב.

**מהות העבירה:** נסיון לגרימת מוות בכוונה, עבירה לפי סעיף (51א) לצו בדבר הוראות ביטחון
(יהודה והשומרון) (מס' 378), תשייל-1970, וסעיפים (14)(א) ו-19 לצו בדבר כללי האחריות לעבירה
(יהודה והשומרון) (מס' 225), תשכייח-1968.

וריווגאנד.
יןק ריך
"יאר
ייפ'

**פרטי העבירה:** הנאשם הנייל, באיזור, ביום 17.03.02 או במועד הסמוך לכך, ניסה לגרום בכוונה
למותו של אחר, כדלקמן:

1. ביום 05.03.02 נהרג ברמאללה פעיל צבאי בכיר ביידידוד חללי אלאקצאי" (הזרוע הצבאית של
   "התנזיים" של הפתיית) - מהוד אבו חלאוות.

2. כעשרה ימים לאחר מכן, מנד מחמוד אחמד זיאדה החליט לנקום את מותו של מהוד אבו
   חלאוות על דרך ביצוע פיגוע קטלני.

3. לואי יוסף מנסי וראפאת צלאח הסכימו להצטרף אל מנד זיאדה לביצוע פיגוע הנקמה הנייל.

4. לואי מנסי יצר קשר עם הנאשם, וקיבל את אישורו לביצוע הפיגוע המתוכנן.

5. בעקבות האישור שניתן על-ידי הנאשם, מנד זיאדה ולואי מנסי הגיעו לביתו של הנאשם.

6. הנאשם מסר לידי השניים רובה מסוג "ברטה" וריסייר קלצ'ניקוב עם מחסניות לצורך ביצוע
   הפיגוע המתוכנן.

7. למחרת, ביום 17.03.02, מנד זיאדה נסע עם לואי מנסי וראפאת צלאח, ברכבו מסוג "מזדה"
   לכביש בית-אל-פסגות, כאשר מנד זיאדה נוהג ברכב, לואי מנסי מחזיק בידיו את הרובה
   מסוג "ברטה", וראפאת צלאח מחזיק בידיו רסייר קלצ'ניקוב.

8. האנשים הנייל הגיעו למקום הפיגוע המתוכנן סמוך לשעה 6:30 בבוקר. לואי מנסי וראפאת
   צלאח ירדו מן הרכב, בעוד שמנד זיאדה נשאר להמתין להם ברכב לצורך מילוטם בסיום
   ביצוע הפיגוע.

9. כרבע שעה לאחר מכן הגיע למקום רכב פולקסוואגן פאסאטו לבן, מ.ר. 7741115, אשר בו נהג
   סמיר קרש.

10. לואי מנסי וראפאת צלאח ירו לעבר נהג הרכב ברורות באמצעות כלי הנשק, אשר סיפק להם
    למטרה זו הנאשם, בכוונה לגרום למותו של נהג רכב הפולקסוואגן הנייל.

11. כתוצאה מן הירי, נפצע סמיר קרש בכתפו, בדרך שגרית וניתוק המקורב משמאל עם ריסוק
    וריסוסי מתכות לאורך מסלול הקליע, ונזקק לאשפוז וניתוח. כמו כן, פגעו שלושה מן הכדורים
    שנורו על ידי לואי מנסי וראפאת צלאח ברכב האמור וגרמו לו נזק.

12. לאחר סיום ביצוע הפיגוע, חזרו לואי מנסי וראפאת צלאח לרכב של מנד זיאדה והשלושה
    נמלטו ממקום הפיגוע לרמאללה.

13. לאחר מכן, לואי מנסי התקשר אל הנאשם ודיווח לו על ביצוע המוצלח של הפיגוע.

## פרט ארבעים וארבעה:

**מהות העבירה:** פגיעה בביטחון האיזור, עבירה לפי סעיף 53(א)(4) לצו בדבר הוראות בטחון (יהודה והשומרון) (מס' 378), תש"ל-1970.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, בתחילת שנת 2002 או בסמוך לכך, עשה מעשה או מחדל שיש בהם פגיעה, היזק, הפרעה או סכנה לביטחון האיזור או לביטחון כוחות צה"ל וחייליו או לפעולתם, שימושם או ביטחונם של כל אחד מאלה: אניה, אוירון, נמל, רציף, מזח, מעגן, שדה תעופה, מסילת ברזל, נתיב מים, דרך, דרך-עפר, קשר, כלי רכב, כלי משא או כל אמצעי אחר של הובלה ציבורית, או תקשורת ציבורית, או כל מפעל, מוסד, או ציוד המשמש או מסוגל לשמש לייצורם, חספקתם, החסנתם, העברתם, מסירתם או הפצתם של מים, דלק, גז או חשמל או כל רכוש של מדינת ישראל או של צה"ל, דהיינו:

הנאשם הנ"ל, בבואך האמנו, נרשאלללח או בסמוך לכך, נפגש עם נזאר שאהין, שומר ראשון של גיברול רגיב, ראש הביטחון המסכל של הרשות הפלסטינית באיזור. נזאר שאהין חודיע לנאשם כי ברצונו לבצע פיגוע ירי נגד חיילי צה"ל הנמצאים במחסום סורדא ולגרום למותם. הנאשם מסר לנזאר שאהין 2 אקדחים, רוס"ר M-16 מקוצר עם כוונת טלסקופית וכן קופסא של כדורים לצורך ביצוע הפיגוע האמור.

לאחר זמן קצר בוצע פיגוע ירי בתחסום סורדא ובמהלכו נהרג חייל צה"ל. הנאשם מיהר ליצור קשר עם נזאר שאהין, אך האחרון מסר כי זה לא הוא שביצע את הפיגוע האמור. לאחר מכן, נזאר שאהין החזיר לנאשם את כלי הנשק, אשר אותם מסר לו הנאשם קודם לכן לצורך ביצוע הפיגוע האמור.

## פרט ארבעים וחמישה:

**מהות העבירה:** פגיעה בביטחון האיזור, עבירה לפי סעיף 53(א)(4) לצו בדבר הוראות בטחון (יהודה והשומרון) (מס' 378), תש"ל-1970.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, בחודש מרץ 2002 או בסמוך לכך, עשה מעשה או מחדל שיש בהם פגיעה, היזק, הפרעה או סכנה לביטחון האיזור או לביטחון כוחות צה"ל וחייליו או לפעולתם, שימושם או ביטחונם של כל אחד מאלה: אניה, אוירון, נמל, רציף, מזח, מעגן, שדה תעופה, מסילת ברזל, נתיב מים, דרך, דרך-עפר, קשר, כלי רכב, כלי משא או כל אמצעי אחר של הובלה ציבורית, או תקשורת ציבורית, או כל מפעל, מוסד, או ציוד המשמש או מסוגל לשמש לייצורם, חספקתם, החסנתם, העברתם, מסירתם או הפצתם של מים, דלק, גז או חשמל או כל רכוש של מדינת ישראל או של צה"ל, דהיינו:

הנאשם הנ"ל, במועד האמור, שוחח באמצעות טלפון עם מחמוד אלטיטי, פעיל בכיר בייצודדי חללי אלאקצא", הזרוע הצבאית של "התנזים" של הפתייח, שהוא התאחזות בלתי מותרת.

מחמוד אלטיטי מסר לנאשם כי יש לו מחבל מתאבד המוכן לבצע פיגוע התאבדות בתוך מדינת ישראל. הנאשם הסכים לשלוח את המחבל המתאבד אל תוך שטחה של מדינת ישראל על מנת שינגרום למום של אזרחים ישראליים רבים ככל הניתן.

למחרת היום, הגיע אל הנאשם אדם בשם פאיז משכה. פאיז מסר לנאשם כי נשלח על-ידי מחמוד אלטיטי לצורך ביצוע פיגוע התאבדות בתוך ישראל.

הנאשם שוחח עם פאיז וגילה כי פאיז לא יודע לירות טוב. בעקבות כך הנאשם שב יצר קשר עם מחמוד אלטיטי. הנאשם מסר למחמוד אלטיטי כי פאיז יוכל לבצע את פיגוע ההתאבדות באמצעות חגורת נפץ שיישא על גופו. מחמוד אלטיטי הסכים להצעת הנאשם והבטיח לדאוג לשלוח אל הנאשם חגורת נפץ לצורך ביצוע פיגוע התאבדות מתוכנן.

אל-פי הוראתו של הנאשם, טרף מלחי א-נוף, רכש עבור פאיז בגדים חדשים ולאחר מכן ליווה את פאיז לירידה ברמאללה תחזא, שבה התנוררו טארק א-נוף, זידאן ומדיאן והנאשם (להלן: הדירה).

הפיגוע המתוכנן לא יצא אל הפועל לאור העובדה שמטעניי התבלת לא נשלחו לנאשם וכן מכיוון שפאיז נעצר על-ידי כוחות הביטחון הישראליים.

לאחר מעצרו של פאיז, הנאשם שוחח עם נזאר עווים תני"ל אודות מה שקרה. נזאר עווים הבטיח לנאשם לשלוח אליו מתבלים מתאבדים נוספים על מנת שהנאשם ישלח אותם אל תוך שטחה של מדינת ישראל לצורך ביצוע פיגוע התאבדות. נזאר עווים לא הספיק לשלוח אל הנאשם מתבלים מתאבדים נוספים, מכיוון שהן הנאשם והן נזאר עווים נעצרו על-ידי כוחות צה"ל במהלך המבצע "חומת מגן".

ת.פ. 444/02 מתוקן

#### פרט ארבעים ושישה:

**מהות העבירה:** ייצור חפץ אסור, עבירה לפי סעיף 53(א)(3) לצו בדבר הוראות הביטחון (יהודה
והשומרון) (מסי 378), תשל"ל-1970 וסעיף 14(א) לצו בדבר כללי האחריות לעבירה (יהודה
והשומרון) (מסי 225), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, באמצע חודש מרץ 2002 או בסמוך לכך, ייצר כלי יריה,
תחמושת פצצה, רימון יד, חפץ נפץ או מבעיר, ללא תעודות היתר שהוענקה לו על-ידי מפקד צבאי
או מטעמו, דהיינו:
הנאשם הנ"ל, במועד האמור, ברמאללה נפגש עם ללא המבור אחמד עודה, אשר ביקש מהנאשם
לקבל כסף עבור פעילות צבאית. לאור האמור, הנאשם העביר ללואי עודה סכום של 8,000 ש"ח,
אשר אותו קיבל עלי פרני ברגותי.
לואי עודה ביחד עם שריף מתמר יוסף טאגי (אבו-חמיד) רכש בכסף הנ"ל חומרים כימיים שונים.
עיכרים ראתב יונס עווים ייצר מהחומרים הכימיים הנ"ל מטען חבלה גדול.

#### פרט ארבעים ושבעה:

**מהות העבירה:** סחר בציוד מלחמתי, עביר לפי סעיף 2 לצו בדבר איסור סחר בציוד מלחמתי
(יהודה והשומרון) (מסי 243), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, בחודש מרץ 2002 או בסמוך לכך, סחר או עסק בצורה
אחרת בציוד מלחמתי, ללא היתר חתום על-ידי מפקד האיזור או מטעמו, דהיינו:
הנאשם הנ"ל, במועד האמור, ברמאללה או בסמוך לכך, מסב לידי עיכרים ראתב יונס עווים, ראש
"גדודי תלכי אלאקצאא" - הזרוע הצבאית של "התנועים" של הפתייח באיזור גיניו, אשר שהה אותה
עת ברמאללה, אקדח 14, וזאת ללא היתר חתום על-ידי מפקד האיזור או מטעמו.

#### פרט ארבעים ושמונה:

**מהות העבירה:** סחר בציוד מלחמתי, עביר לפי סעיף 2 לצו בדבר איסור סחר בציוד מלחמתי
(יהודה והשומרון) (מסי 243), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, בחודש מרץ 2002 או בסמוך לכך, סחר או עסק בצורה
אחרת בציוד מלחמתי, ללא היתר חתום על-ידי מפקד האיזור או מטעמו, דהיינו:
הנאשם הנ"ל, במועד האמור, ברמאללה או בסמוך לכך, רכש מידי נסר (חלום) מתמר יוסף טאגי
(אבו-חמיד) רובייר M-16 ארוך תמורת 4,000 דינר ירדני, וזאת ללא היתר חתום על-ידי מפקד
האיזור או מטעמו.

#### פרט ארבעים ותשעה:

**מהות העבירה:** סחר בציוד מלחמתי, עביר לפי סעיף 2 לצו בדבר איסור סחר בציוד מלחמתי
(יהודה והשומרון) (מסי 243), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, במחצית הראשונה של שנת 2001 או בסמוך לכך, סחר או
עסק בצורה אחרת בציוד מלחמתי, ללא היתר חתום על-ידי מפקד האיזור או מטעמו, דהיינו:
הנאשם הנ"ל, במועד האמור, ברמאללה או בסמוך לכך, נפגע עם אשרף חידר עלי ג'אבר (אאסינג)
וקיבל מהאחרון 1,500 כדורים לרסיר M-16. הנאשם שילם לאשרף ג'אבר הנ"ל 3,000 ש"ח עבור
הכדורים הנ"ל. הנאשם ביצע את המיוחס לו בפרט האישום הזה לפי הוראתו של מרואו ברגותי -
ראש "התנזים" של הפתייח באיזור.

27                                                         ת.פ. 444/02 מתוקן

**פרט חמישים:**

**מהות העבירה:** סחר בציוד מלחמתי, עבירה לפי סעיף 2 לצו בדבר איסור סחר בציוד מלחמתי
(יהודה והשומרון) (מסי 243), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, בחודש מאי 2001 או בסמוך לכך, סחר או עסק בצורה
אחרת בציוד מלחמתי, ללא היתר תהום על-ידי מפקד האיזור או מטעמו, דהיינו :
הנאשם הנ"ל, במועד האמור, ברמאללה או בסמוך לכך, על-פי בקשתו של אשרף חדר עלי ג'אבר,
מסר לידי האחרון רוס"ר קלצ'ניקוב עם מחסנית ו-28 כדורים. הנאשם ביצע את המיוחס לו בפרט
האישום זה לאחר שקיבל אישור לעשות כן ממרואן ברגותי, ראש "התנזים" של הפתיח באיזור.
אשרף ג'אבר השתתף בהלוכה ברמאללה, כשהוא מחזיק ברוס"ר קלצ'ניקוב הנ"ל. במהלך
התהלוכה הנ"ל אשרף ג'אבר היה רצול פנים ויוה ברוס"ר קלצ'ניקוב הנ"ל באוויר. לאחר מכן,
אשרף ג'אבר, על-פי הוראתו של הנאשם, העביר את רוס"ר קלצ'ניקוב הנ"ל לידי זיאד אבו עין.

**פרט חמישים ואחד:**

**מהות העבירה:** מתן מקלט, עבירה לפי סעיף 57 לצו בדבר הוראות ביטחון (יהודה והשומרון) (מסי
378, תש"ל-1970.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, בסוף שנת 2001 או בסמוך לכך, עזר או נתן מקלט לכל
אדם שעבר עבירה על תחיקת הביטחון או עסק או שהיה עוסק בכל פעולה שמטרתה לפגוע בשלום
הציבור, שלום כוחות צה"ל ותחיקו וקיום הסדר הציבורי או שיש יסוד סביר לחשוד כי עשה כן,
בין על-ידי מתן ידיעות, מחסה, מזון, משקה, כסף, בגדים, נשק, תחמושת, אספקה, מספוא,
אמצעי תובלה, נפט או דלק מסוג כל שהוא ובין בדרך אחרת, דהיינו :
הנאשם הנ"ל, במועד האמור, ביחד עם מרואן ברגותי, העביר את בלאל יעקוב אחמד ברנותי ואת
עבדאללה ברנותי מהכלא של הביטחון המסכל של הרשות הפלסטינית בבית עונייה לדירה, אשר
אותה שכר הנאשם ברמאללה תחתא. בלאל ברנותי ועבדאללה ברגותי הנ"ל הם פעילים בכירים
בארגון התחמאס, שהוא התאחדות בלתי מותרת, ואחראיים לביצוע מספר פיגועים נגד אזרחים
ישראלים, בעיתם פיגוע תופת במסעדה "סבארו" בירושלים ביום 09.08.01. הנאשם ומרואן
ברגותי הניו את בלאל ברנותי ואת עבדאללה ברגותי בדירה הנ"ל במשך מספר ימים.
לפני שבלאל ברנותי ועבדאללה ברנותי עזבו את דירתו הנ"ל של הנאשם, הנאשם מסר לכל אחד
מהם אקדח 14.

**פרט חמישים ושניים:**

**מהות העבירה:** סחר בציוד מלחמתי, עבירה לפי סעיף 2 לצו בדבר איסור סחר בציוד מלחמתי
(יהודה והשומרון) (מסי 243), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, בסוף שנת 2001 - תחילת שנת 2002 או בסמוך לכך, סחר
או עסק בצורה אחרת בציוד מלחמתי, ללא היתר תהום על-ידי מפקד האיזור או מטעמו, דהיינו :
הנאשם הנ"ל, במועד האמור, שוחח באמצעות טלפון עם נאצר מחמוד עוויס, פעיל צבאי בכיר
בית"נזים" של הפתי"ח, שהוא התאחדות בלתי מותרת, בשכם. נאצר עוויס אמר לנאשם כי הוא
צריך 1,000 כדורים לרוס"ר M-16. הנאשם הבטיח להביא לנאצר עוויס את הכדורים המבוקשים.
לאחר מספר ימים הגיע אל הנאשם, ברמאללה, אדם בשמו של נאצר עוויס. הנאשם מסר לאחרון
1,000 כדורים לרוס"ר M-16 על מנת שיעביר אותם לשכם לנאצר עוויס. תמורת 1,000 כדורים
הנ"ל נאצר עוויס העביר לחשבון הבנק של הנאשם סכום של 3,000 ש"ח.
הנאשם ביצע את המיוחס לו בפרט האישום הזה ללא היתר תהום על-ידי מפקד האיזור או
מטעמו.

ת.פ. 444/02 מתוקן

. **פרט חמישים ושלושה:**

**מהות העבירה:** סחר בציוד מלחמתי, עבירה לפי סעיף 2 לצו בדבר איסור סחר בציוד מלחמתי
(יהודה והשומרון) (מס' 243), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, בחודש ינואר 2002 או בסמוך לכך, סחר או עסק בצורה
אחרת בציוד מלחמתי ללא היתר חתום על-ידי מפקד האיזור או מטעמו, דהיינו:
אל הנאשם הנ"ל, במועד האמור, ברמאללה או בסמוך לכך, פנה נאור שוכרי אמין שאהין. נאור
שהתין ביקש מהנאשם לקבל שלושה אקדחים על מנת למוסרם לידי פעיל צבאי בייגדוד חללי
אלאקסאי, הזרוע הצבאית של "התנוצי" של הפתח, ואמר לעׄוואד ערחמאן רימאווי לעורך
ביצוע פיגוע ירי במחסום סורדא של צה"ל.
הנאשם הסכים לבקשתו של נאור שאהין ומסר לידי האחרון 3. אקדחים: אקדח בלגי 9 מ"מ,
אקדח סטאר 9 מ"מ ואקדח שטגו אינו יודע לתבייטר, וכך קופסאה כדורים לאקדחים הנ"ל.
המכילה 50 כדורים לאקדח בקוטר 9 מ"מ.
באותו היום, במםקדה של הביטחון המסכל של הרשות הפלסטיגית בבית וגיא או בסמוך לכך, נאור
שאהין העביר את שלושת האקדחים והכדורים הנ"ל לידי זאפר עׄיואד ערחמאן רימאווי.
הפיגוע המתוכנן לא בוצע באמצעות האקדחים הנ"ל, מכיוון שלילה לפני המועד שבו היה אמור
להתבצע הפיגוע הנ"ל, בוצע פיגוע ירי אחר במחסום סורדא.
לאחר כשלושה ימים, ברמאללה או בסמוך לכך, מאר שאהין החזיר אֶת האקדחים הנ"ל ביחד עם
קופסת הכדורים הנ"ל לידי הנאשם.
הנאשם ביצע את המיוחס לו בפרֹט אישום זה ללא היתר חתום על-ידי מפקד האיזור או מטעמו.

---

### עדי התביעה:

1. רסיר דוד מזרחי, מ.א. 94857, לח"יק יהודה. [גובה אמרות הנאשם מיום 16.04.02 ומיום 03.05.02 ומגיש כתב-ידו של הנאשם בערבית + דויח מסדר זיהוי תצלומים + לוח תצלומים]
2. רסיר יצחק יעקובוף, מ.א. 1008358, לח"יק יהודה. [גובה אמרות הנאשם מיום 21.04.02 ומיום 13.05.02 ומגיש שני כתבי-ידו של הנאשם בערבית]
3. משֹה משה, מ.א. 993725, ונשאל אמן לכיש. [גובה אמרת הנאשם מיום 05.09.02]
4. אשרף חדר עלי ג'אבר, ת.ז. 901183764. (עצור)
5. חוסאם עפל רגיב שחאדה, ת.ז. 975564733. (עצור) (ת.ת. 243/02)
6. מחמד ערחמאו סאלם מצלח, ת.ז. 902845643. (עצור) (ת.ת. 242/02)
7. מחמד סאמי אברהים עבדאללה, ת.ז. 979469954. (עצור) (ת.ת. 241/02)
8. היתם אלמוותפק המזאג, ת.ז. 906934823. (עצור) (ת.ת. 265/02)
9. ע.כרים ראתב יונס עזיז, ת.ז. 980136675. (עצור)
10. נאצר מחמד יוסף נאג'י [אבו-חמד], ת.ז. 923918882. (עצור)
11. נצר נחלום] מחמד יוסף נאג'י נאצר [אבו חמד], ת.ז. 923918890. (עצור) (ת.ת. 339/02)
12. שרׄף מחמד יוסף נאג'י [אבו חמד], ת.ז. 959770843. (עצור) (ת.ת. 355/02)
13. לואי מחמד אחמד עזה, ת.ז. 035775055. (עצור) (ת.ת. 311/02)
14. זאפר עׄיואד ערחמאן רימאווי, ת.ז. 900070020. (עצור) (ת.ת. 345/02)
15. אמיר חסן סעיד אבו רדאחה, ת.ז. 954263042. (עצור) (ת.ת. 356/02)
16. מג'ד מחמוד אחמד זיאדה, ת.ז. 914081757. (עצור) (ת.ת. 318/02)
17. נאצר מחמוד עזוז, ת.ז. 900358664. (עצור)
18. בלאל יעקוב אחמד ברגות, ת.ז. 902826262. (עצור)
19. זיאד חמודה יעקוב המודה, ת.ז. 902924117. (עצור) (ת.ת. 353/02)
20. ראמי מחמד מחמוד נור, ת.ז. 960971075. (עצור) (ת.ת. 221/02)
21. מאזו מחמוד עזמר אלקאדֹר, ת.ז. 907898134. (עצור) (ת.ת. 212/02)
22. מוראד נזמי רזק עילוני, ת.ז. 810099095. (עצור)
23. מאמון בסאם עבדאללה אבו-שמה, ת.ז. 906138409. (עצור) (ת.ת. 639/01)
24. עלֹאא מחמד עלי חסן [ע/עזיז], ת.ז. 907276406. (עצור) (ת.ת. 174/02)
25. סעדֹי גיהאד מחמֹד-עלי מקבול, ת.ז. 920101466. (עצור) (ת.ת. 173/02)
26. וילֹאם סאמח פארס אלרסֹב [רימאווי], ת.ז. 904383452. (עצור) (ת.ת. 322/02)
27. מאור שוכרי אמין שאהין, ת.ז. 902004928. (עצור) (ת.ת. 775/02)

ת.ת. 444/02 מתוקן

**פ.א. 234/01 מת"ס י"ס**

28. הרמן ספאס, מ.א. 6961290, צה"ל. (פרטים בתביעה) [עדות]
29. אריה רקח, ת.ז. 032271918. (פרטים בתביעה) [עדות]
30. יובל לב, ת.ז. 05405709. (פרטים בתביעה) [עדות]
31. רפיק ליאור נדיב, מ.א. 952127, מז"פ - תחת ציון. [מגיש דו"ח תפיסה וסימון]
32. רפיק עופר שלומ, מ.א. 916718, המעבדה הניידת, מז"פ, מטא"יר - ירושלים. [מגיש דו"ח בדיקת רכב]
33. רס"ר אבי ברקמן, מ.א. 972762, חקירות - תחת ציון. [מגיש טופס לוואי למוצגים]
34. רס"ל דניאל תורגמן, מ.א. 1013796, משרד מוצגים - מז"פ, מטא"יר - ירושלים. [מגיש תעויצ - קבלת מוצגים לבדיקה] [יזומן לפי דרישה מפורשת של הסניגוריה בלבד]
35. רפיק אורי בן-טובים, מעבדת נשק, מז"פ, מטא"יר - ירושלים. [מגיש חוו"ד מומחה מתיק מז"פ זב/07 - 555/01] [יזומן לפי דרישה מפורשת של הסניגוריה בלבד]
36. דייר דוד חזו, מ.ר. 29086, צה"ל. [עדות - קביעת מוותו של אלעזר עקיבא פשקוס ז"ל]
37. דייר דוד מורל, מ.ר. 20952, קופ"ח כללית - ירושלים. [עדות + מגיש הודעת פטירה]

**פ.א. 457/01**

38. רס"ם אלי סוטו, מ.א. 588038, תחת בנימין. [מגיש דו"ח פעולה]
39. רס"ם משה לכיא, מ.א. 903260, תחת בנימין. [מגיש זכ"ד-רכב GMC + שרטוט זירת האירוע + דו"ח תפיסה וסימון + טופס לוואי למוצגים
40. רס"ם שבי עובדיה, מ.א. 560441, מז"פ יהודה. [מגיש לוחות תצלומים + מזכר]
41. רפיק ניסים מורח, מ.א. 926998, המעבדה הניידת, מז"פ - מטא"יר, ירושלים. [מגיש לוחות תצלומים + דו"ח בדיקת רכב]
42. יוסף כהן, ת.ז. 069397198. (פרטים בתביעה) [נפצע בפיגוע הירי]
43. אבר בן-שימאל, ת.ז. 031310677. (פרטים בתביעה) [הגיע ראשון לזירת הפיגוע]
44. דייר איזבלה שוורץ, מ.ר. 28684, ביה"ח הדסה - הר-הצופים, ירושלים. [מגישה תעודת רופא - סכום בעיניים] [תזומן לפי דרישה מפורשת של הסניגוריה בלבד]

**פ.א. 2159/01 בנימין**

45. רס"ר רונן שאמר, מ.א. 956813, תחת בנימין. [מגיש דו"ח פעולה]
46. רס"ם שבי עובדיה, מ.א. 560441, מז"פ, תחת בנימין. [מגיש לוחות תצלומים + דו"ח תפיסה וסימון]
47. רפיק עופר שלומ, מ.א. 916718, המעבדה הניידת, מז"פ, מטא"יר - ירושלים. [מגיש דו"ח ביקור ראשוני בזירת האירוע - תפיסת תרמילים ושרידי קליעים]
48. רס"ר חיים טולבנ, מ.א. 1004332, תחת בנימין. [מגיש זכ"ד - שרשרת מוצג + טופס לוואי למוצגים + דו"ח ביקור בזירת העברית]
49. רס"ל דניאל תורגמן, מ.א. 1013796, משרד מוצגים - מז"פ, מטא"יר - ירושלים. [מגיש תעויצ - קבלת מוצגים לבדיקה] [יזומן לפי דרישה מפורשת של הסניגוריה בלבד]
50. רפיק אבי קופמן, מעבדת נשק, מז"פ, מטא"יר - ירושלים. [מגיש חוו"ד מומחה מתיק מז"פ זב/07 - 4238/01] [יזומן לפי דרישה מפורשת של הסניגוריה בלבד]
51. דייר ולדימיר גולר, מ.ר. 26163, מד"א - תחנת לוד. [מגיש דו"חות רפואיים מהשטח + הודעות פטירה + עדות]
52. דייר ניר אלון, ת.ז. 031849201, צה"ל. [עדות]
53. דייר ריקרדו נחמן, המכון הלאומי לרפואת משפטית. [מגיש שתי חוו"יד מומחה] [יזומן לפי דרישה מפורשת של הסניגוריה בלבד]
54. ציונ טוויירל, ת.ז. 000048850. (פרטים בתביעה) [זיהוי הרוגים]

**פ.א. 7915/01 ציונ**

55. רס"ר ציון ששון, מ.א. 957068, תחת ציון. [מגיש דו"ח פעולה]
56. רפיק ליאור נדיב, מ.א. 952127, מז"פ - תחנת ציון. [מגיש דו"ח ביקור ראשוני בזירה + לוחות תצלומים]
57. רפיק יורם סער, תחת ציון. [מוצא תרמילים בזירת האירוע - שרשרת ראיות]
58. רפיק עמי ליופר, מ.א. 959841, המעבדה הניידת, מז"פ, מטא"יר - ירושלים. [מגיש דו"ח בדיקת רכב - תפיסת שרידי קליע]
59. צוערת אדוה מלכה, מ.א. 1049089, מת"ים - תחת ציון. [מגישה טופס לוואי למוצגים]
60. רס"ג זיוה חוטר, מ.א. 512699, משרד מוצגים - מז"פ, מטא"יר - ירושלים. [מגישה תעויצ - קבלת מוצגים לבדיקה] [תזומן לפי דרישה מפורשת של הסניגוריה בלבד]

ת.ת. 444/02 מתוקן

61. רפ״ק אבי קופמן, מעבדות נשק, מז״פ, מטא״יר – ירושלים. [מגיש חוו״ד מומחה מתיק מז״פ זב/07 – 4539/01] [יזומן לפי דרישת מפורשת של הסניגוריה בלבד]
62. ד״ר אייל יצחיאק, מ.ר. 1004, ביה״ח הדסה עין-כרם, ירושלים. [מגיש תעודת שחרור של משה וייס] [יזומן לפי דרישת מפורשת של הסניגוריה בלבד]
63. ד״יר יעקב גלוברמן, ביה״ח הדסה עין-כרם, ירושלים. [מגיש הודעת פטירה של מאיר וייסברוס ז״ל] [יזומן לפי דרישת מפורשת של הסניגוריה בלבד]
64. משה וייס, ת.ז. 024001505. [פרטים בתביעה] [נפצע קשה בפיגוע)
65. יפה וקנין, ת.ז. 058857863. [פרטים בתביעה] [עדה ראיה)

**פ.א. 481/01 ציון**
66. טווי עמריאל, ת.ז. 032441040. [פרטים בתביעה] [נהגת רכב ההונדה)
67. פיני מימון, ת.ז. 025759762. [פרטים בתביעה] [נוסע רכב ההונדה)
68. פוית מימון, ת.ז. 040128084. [פרטים בתביעה] [נוסעת רכב ההונדה)

**פ.א. 8379/01 ציון**
69. רפ״ק ליאור נדיבך, מ.א. 952127, מז״פ – תחנת ציון. [מגיש דו״ח ביקור ראשוני בזירה + דו״ח תפיסה וסימון]
70. רס״ר גבריאל עבד, מ.א. 958736, מת״מ – תחנת ציון. [מגיש טופס לוואי למוצגים]
71. רפ״ק עמי ליפר, מ.א. 959841, המעבדה הניידת, מז״פ, מטא״יר – ירושלים. [מגיש דו״ח בדיקת רכב – תפיסת שריד קליע]
72. צואר דרור אברם, מ.א. 1039080, מת״מ – תחנת ציון. [מגיש טופס לוואי למוצגים]
73. ציון שדה, ת.ז. 029505724, משרד מוצגים – מז״פ, מטא״יר – ירושלים. [מגיש תעויצ – קבלת מוצגים לבדיקה] [יזומן לפי דרישת מפורשת של הסניגוריה בלבד]
74. רס״ב יוסי בן ישראל, מ.א. 44771, משרד מוצגים – מז״פ, מטא״יר – ירושלים. [מגיש תעויצ – קבלת מוצגים לבדיקה] [יזומן לפי דרישת מפורשת של הסניגוריה בלבד]
75. רפ״ק אבי קופמן, מעבדות נשק, מז״פ, מטא״יר – ירושלים. [מגיש שתי חוו״ד מומחה מתיק מז״פ זב/07 – 4723/01] [יזומן לפי דרישת מפורשת של הסניגוריה בלבד]
76. סיגל שאוז, תחנת ציון. [מצאית תרמילים בשטח – שרשרת ראיות]
77. מלכה כהן, ת.ז. 038791386. [פרטים בתביעה] [נפצעה בפיגוע)
78. פנחס כהן, ת.ז. 038348256. [פרטים בתביעה] [נפצעה בפיגוע)
79. אוהד עמי יחזאל, ת.ז. 059214320. [פרטים בתביעה] [עד ראיה – טיפל בפצועים)
80. ד״יר יאיר עדן, מ.ר. 33272, ביה״ח הדסה עין-כרם, ירושלים. [מגיש תעודות שחרור של פנחס כהן] [יזומן לפי דרישת מפורשת של הסניגוריה בלבד]
81. ד״יר מנחם גרוס, מ.ר. 30416, ביה״ח הדסה עין-כרם, ירושלים. [מגיש תעודות שחרור של מלכה כהן] [יזומן לפי דרישת מפורשת של הסניגוריה בלבד]

**פ.א. 39/02 בנימין**
82. מפקח מיכאל מלכה, מ.א. 1040320, סיור – תחנת בנימין. [מגיש דו״ח פעולה]
83. רס״מ קובני סבן, מ.א. 56494, תחנת בנימין. [מגיש זכ״ד תחקור/תפיסה וסימון]
84. רס״ב אלי קונען, מ.א. 46951, מז״פ יהודה. [מגיש לוחות תצלומים + אסף תרמילים בזירת האירוע]
85. רפ״ק עמי ליפר, מ.א. 959841, המעבדה הניידת, מז״פ, מטא״יר – ירושלים. [מגיש לוחות תצלומים + דו״ח בדיקת רכב]
86. רס״יר מאיר ועגנו, מ.א. 1018332, תחנת בנימין. [מגיש טופס לוואי למוצגים]
87. רס״ב זיוה חוטר, מ.א. 512699, משרד מוצגים – מז״פ, מטא״יר – ירושלים. [מגישת תעויצ – קבלת מוצגים לבדיקה] [תזומן לפי דרישת מפורשת של הסניגוריה בלבד]
88. סגן ד״יר ניר איזלון, מ.ר. 33216, צהי״ל. [פרטים בתביעה] [עדות – קביעת מותה של יואלה חן ז״ל + טיפול בפצועות]
89. ד״יר שאול בייט, מ.ר. 33027, ביה״ח הדסה עין-כרם, ירושלים. [מגיש תעודת רופא – סיכום מחלה של רשל (רחל) ענגל] [יזומן לפי דרישת מפורשת של הסניגוריה בלבד]
90. רחל (רשל) עיני, ת.ז. 075966614. [פרטים בתביעה] [נפצעה בפיגוע)
91. סמי ועקנין, ת.ז. 027798040. [פרטים בתביעה] [עדות + סקירצה] [עד ראיה)
92. נחשון בראשית, ת.ז. 05033235. [פרטים בתביעה] [זיהוי ההרוגה)

**פ.א. 502/02 ציון**
93. פקד דרור אסרף, מ.א. 942276, מת״מ – תחנת ציון. [מגיש דו״ח זכ״ד, תפיסה וסימון]
94. רס״ב יגאל דניאל, מת״מ – תחנת ציון. [מגיש דו״ח תפיסה וסימון]
95. צוער צביקה רייזנר, מת״מ – תחנת ציון. [מגיש דו״ח זכ״ד, תפיסה וסימון + תצלומים]

31    ת.ת. 444/02 מתוקן

P 5: 205

96. רס"ל ציון טובי, מ.א. 1043413, מת"מ - תחנת ציון. [מגיש דו"ח פעולה - מצואת צולבת]
97. רס"ב אשר לוי, מ.א. 44720, תשאול - תחנת ציון. [מגיש דו"ח תפיסה וסימון]
98. בני עזריאל, ת.ז. 30647598. [פרטים בתביעה] [עד ראיה - רדף אחרי המחבל]
99. עמאד עניזה, מ.א. 739037, מגי"ב ירושלים. [עד ראיה - רדף אחרי המחבל וירה לעבר המחבל]
100. שי כהן, מ.א. 1042043, יח"יב 2 - תחנת ציון. [עד ראיה - ירה לעבר המחבל]
101. נועם גבאי, ת.ז. 033121070, ימי"ר ירושלים. [עד ראיה - רדף אחרי המחבל וירה לעבר המחבל]
102. חנן בנעים, מ.א. 1049188, יס"מ אופנועים - תחנת שלם. [עד ראיה - רדף אחרי המחבל, הרחיק את נשקו של המחבל לאחר שהמחבל נהרג]
103. גסא"ד (נוא) מלניק, ת.ז. 309130540. [פרטים בתביעה] [עד ראיה - מאבטח שהיה במקום - ירה לעבר המחבל ומגע בו]
104. אלון חלפון, מ.א. 761775, בילוש - ימי"ר ירושלים. [עד ראיה - רדף אחרי המחבל, ירה לעבר המחבל]
105. אבי בן-עמי, מ.א. 996140, בילוש - ימי"ר ירושלים. [עד ראיה - ירה לעבר המחבל]
106. חיים צאלח, ת.ז. 033401019. [פרטים בתביעה] [עד ראיה - נהג אוטובוס "אגד" שהיה במקום הפיגוע]
107. בורים אבטוסיאו, ת.ז. 309086171. [פרטים בתביעה] [עד ראיה]
108. יקונתיאל-ישראל עלוש, ת.ז. 310101647. [פרטים בתביעה] [עד ראיה]
109. משה ממן, ת.ז. 06246911. [פרטים בתביעה] [עד ראיה]
110. טובה יצחקי , ת.ז. 051270353. [פרטים בתביעה] [עד ראיה]
111. מזל יצחקי, ת.ז. 04330150. [פרטים בתביעה] [נזכה ראיה]
112. ירון אברהמי, ת.ז. 640712770. [פרטים בתביעה] [עד ראיה]
113. מנחם בנטורה, ת.ז. 055611230. [פרטים בתביעה] [עד ראיה]
114. כפיר קדם, ת.ז. 039381249. [פרטים בתביעה] [עד ראיה - ראה את המחבל מגיע למקום הפיגוע ברגט]
115. יעקב סנדלר, ת.ז. 307750984. [פרטים בתביעה] [ויהיו גופתה של אורה (סבטולנה) סנדלר ז"ל]
116. ד"ר דפנה וילנר, מר. 29234, בית"ח הדסה עין-כרם, ירושלים. [מגישה חוו"ד פטירה של אורה (סבטולנה) סנדלר ז"ל] [נתוומן לפי דרישה מפורשת של הסניגוריה בלבד]
117. ד"ר רלנה וסולב, בית"ח הדסה עין-כרם, ירושלים. [מגישה חוו"ד פטירה של שרה המבורגר ז"ל] [נתוומן לפי דרישה מפורשת של הסניגוריה בלבד]

<u>רשימת עדים נוספת בנוגע לפצועים בפיגוע ברחוב יפו ביום 22.01.02 ותעודות רפואיות הקשורות לפצועים תימסר במהלך המשפט</u>

**פ.א. 483/02 שפט**

118. רס"ל אבי פנחסי, מת"מ ימי"ר ירושלים. [מגיש דו"ח תפיסה וסימון]
119. רס"ר עודד מאירו, מ.א. 1065937, מת"מ ימי"ר ירושלים. [מגיש לוח תצלומים + שני טפסי לוואי למוצגים]
120. רפ"ק לואור נדיבי, מ.א. 952127, זיהוי ציון. [מגיש דו"ח תפיסה וסימון + דו"ח ביקור בזירת העבירה + העברת המוצגים למז"פ - מטאיר]
121. דן אוונה, יחידת סיור 4, תחנת ציון. [מגיש דו"ח תפיסה וסימון]
122. רפ"ק אבי קופמן, מעבדת נשק, מז"פ, מטא"יר - ירושלים. [מגיש חוו"ד מוקדמת] [יזומן לפי דרישת מפורשת של הסניגוריה בלבד]
123. ד"ר אברהם ניסן, בית"ח הדסה הר-הצופים, ירושלים. [מגיש הודעת פטירה] [יזומן לפי דרישת מפורשת של הסניגוריה בלבד]
124. מאיר דהן, מ.א. 081086407. [פרטים בתביעה] [השתלט על המחבל, נפצע בפיגוע]
125. דן מור, ת.ז. 086019812. [פרטים בתביעה] [השתלט על המחבל]
126. ניר בן שמחון, ת.ז. 037670213. [פרטים בתביעה] [השתלט על המחבל]
127. עפניף חלואני, ת.ז. 023307358. [פרטים בתביעה] [עד ראיה]
128. יוסף קרדי, ת.ז. 0099752. [פרטים בתביעה] [עד ראיה]
129. סטט קריסנטסקי, ת.ז. 304389240. [פרטים בתביעה] [נפצע בפיגוע]
130. ליאור סקירוזה, ת.ז. 032087587. [פרטים בתביעה] [נפצע בפיגוע]
131. קרן קדמני, ת.ז. 032777716. [פרטים בתביעה] [נפצעה בפיגוע]
132. אדם גרמילד, ת.ז. 011935426. [פרטים בתביעה] [נפצע בפיגוע]
133. אלי אוותה, ת.ז. 033404773. [פרטים בתביעה] [נפצע בפיגוע]
134. עמיחי דהאן, ת.ז. 039243944. [פרטים בתביעה] [נפצע בפיגוע]

P 5: 206

135. תמרה ליפשיץ פיש, ת.ז. 306706318. (פרטים בתביעה) [נפצעה בפיגוע]

## ס.א. 4258/02

136. אבשלום פרידמן, ת.ז. 055594097, מתנדב ביחידת סיור ירקון. (פרטים בתביעה) [שתי עדויות, היה בודד עם סלים ברכאת זייל]
137. אפי רמין, זיהוי ירקון, משטרת ישראל.
138. מקד מירדד דניאל, קצין אחייק ירקון.
139. שמעון רחמים, צחימן ירקון.
140. יעקב עבד, ת.ז. 025714502. (פרטים בתביעה) [עד ראיה - היה בתוך המסעדה]
141. איגור קובניצקי, ת.ז. 321940751. (פרטים בתביעה) [מאבטח במסעדה, נפצע בפיגוע]
142. עדי מורגי, ת.ז. 304615230. (פרטים בתביעה) [מאבטח במסעדה]
143. יוני חייל, ת.ז. 049170392. (פרטים בתביעה) [עד ראיה]
144. אירית רחמים, ת.ז. 027293034. (פרטים בתביעה) [עדת ראיה]
145. לימור פורמת, ת.ז. 025377029. (פרטים בתביעה) [עדת ראיה]
146. שלמה דור, ת.ז. 00022280. (פרטים בתביעה) [נפצע קשה בפיגוע מדקירת סכין]
147. שרון יפרח, ת.ז. 9802115980. (פרטים בתביעה) [עדת ראיה, נפצעה בפיגוע]
148. יפתח קריתי, ת.ז. 029022902. (פרטים בתביעה) [עד ראיה, נפצע בפיגוע]
149. אליהו צדקה, ת.ז. 028804599. (פרטים בתביעה) [עד ראיה, נפצע בפיגוע]
150. אינונה ריכטמן, ת.ז. 309998540. (פרטים בתביעה) [נפצעה בפיגוע]
151. יעקב הוורבין, ת.ז. 054188644. (פרטים בתביעה) [ראה את הרכב שבו הגיע המחבל]
152. רונית אבישב-יוספוף, ת.ז. 024315632. (פרטים בתביעה) [עדת ראיה]
153. וילינסון חזן, ת.ז. 069828374. (פרטים בתביעה) [עד ראיה, נפצע בפיגוע]
154. עלא מחמוד, ת.ז. 061247623. (פרטים בתביעה) [עד ראיה - עדות + שרטוט זירת האירוע]
155. באסם אבו לחאם, ת.ז. 035704568. (פרטים בתביעה) [עד ראיה]
156. בהאא אבו לחאם, ת.ז. 049824865. (פרטים בתביעה) [עד ראיה]
157. עלא מנאהמיל, ת.ז. 061247623. (פרטים בתביעה) [עד ראיה]
158. יומי קונטונה, ת.ז. 033876954. (פרטים בתביעה) [עד ראיה]
159. אביועוס יוסף, ת.ז. 056230584. (פרטים בתביעה) [עד ראיה]
160. איגור פוסטיוניסקי, ת.ז. 311660328. (פרטים בתביעה) [עד ראיה]
161. דניאל קראדי, ת.ז. 02234597. (פרטים בתביעה) [עד ראיה - שתי עדויות - ראה את המחבל דוקר אנשים]
162. מאיר הבר, ת.ז. 5452229. (פרטים בתביעה) [זיהוי גופתו של יוסף הבי זייל]
163. נעם אספר, ת.ז. 031877665. (פרטים בתביעה) [נפצע בפיגוע]
164. יוסי אזון, ת.ז. 029416740. (פרטים בתביעה) [נפצע קשה בפיגוע]
165. מיכל גרובר, ת.ז. 043401140. (פרטים בתביעה) [נפצעה בפיגוע]
166. פרופ' יהודה היס, המכון הלאומי לרפואה משפטית, תל אביב. [מגיש חווייד מומחה] [יזומן לפי בקשת מפורשת של הסניגוריה בלבד].
167. רשומות בתי חולים - רשומה מוסדית.

<u>רשימת עדים נוספת בנוגע לפצועים והרוגים בפיגוע במסעדה 'סי-פוד מרקט' בתל-אביב ביום 05.03.02 תימסר במהלך המשפט</u>

## ס.א. 568/02 שפס

168. ניסים כהן, מ.א. 70755855, מנייב. (פרטים בתביעה) [עדות ומגיש דוייח פעולה]
169. דקל עזור, מ.א. 7015187, מנייב [הפרטים בתביעה].
170. שלומי אטון, מ.א. 70192463, מנייב [הפרטים בתביעה].
171. דרור כהן, מ.א. 1034842, זיהוי - ונתון ציין. [מגיש 2 דוייחות תפיסה וסימון + מוצגים מכרטיס לרישום מוצצים מסי 1294/02].
172. רסיים זהבה פול, מ.א. 57989, תחתון ציון - חבלה. [מגישה דוייח פעולה]
173. רפיים מרקו אלמלית, מ.א. 942979, מזיף - מעבדת חבלה, מטאייר, ירושלים. [מגיש חווייד מומחה בגיריון טספר לוואר למוצבים] [יזומן לפי בקשת מפורשת של הסניגוריה בלבד]
174. רסייל דניאל תורגמן, מ.א. 1013796, משרד מוצצים - מזייפ, מטאייר, ירושלים. [מגיש תעייצ - קבלת מוצצים לבדיקה] [יזומן לפי בקשת מפורשת של הסניגוריה בלבד]
175. פרופ' יהודה היס, המכון הלאומי לרפואה משפטית, תל אביב. [מגיש חווייד מומחה] [יזומן לפי בקשת מפורשת של הסניגוריה בלבד].

## ס.א. 783/02 בנימין

176. רסייל יצחק רוקח, מ.א. 1011626, תחנת בנימין. [מגיש דוייח פעולה]

33

177. רס"ב אלי קוגימן, מ.א. 46951, זיהוי יהודה. [מגיש דו"ח ביקור בזירת עבירה + לוח תצלומים]

178. רס"מ אבי מנחם, מ.א. 57556, תחנות בימין, [מגיש טופס לוואי למוצגים + זכ"ד + מוצגים מכרטיס מס' 106/02]

179. סמlo קרש, ת.ז. 080062771. [פרטים בתביעה] [נמצא בפינוע הירד]

180. ד"ר שאול בייס, מ.ר. 33027, בי"ח הדסה עין-כרם, ירושלים. [מגיש דו"ח רפואי] [יזומן לפי דרישה מפורשת של הסניגוריה בלבד]

181. שאילתא לאיתור והקרנת פרטי רכב ובעליו [רשומה מוסדית].

מיכאל קוקסם    סון
תובע    צבאי

תאריך : 29.09.2002
סימוכין : 02-444 מתוקן