
PLAINTIFF'S EXHIBIT 398

Date: 10 Shevat 5763
January 13, 2003

Case No.: 3159/02

## The Military Court in Beit El

## Transcript of a Hearing in a Single Judge Session

**Before Judge: Major Eli Bar-On**

**Prosecutor: Lieutenant Vladi Borodovsky – attending**

**Defense counsel: Adv. Shukri - attending**

**Defendant: Bashar Hassan Abed Barghouti Identity No. 934469768 / Megiddo – attending**

**Interpreter: Sergeant Hamad Hamadan**

**Stenographer: Corporal Sivan Harel**

The President of the Court opens the session and identifies the Defendant.

## Course of Hearing

Prosecutor: We have reached a plea bargain in the framework of which I shall ask to file an amended indictment. The Defendant shall withdraw his not guilty plea, shall plead guilty to the amended indictment and the parties will plead for sentencing freely.

Defense counsel: I confirm the statements of my colleague and ask for the Court to permit the Defendant to withdraw his not guilty plea.

## Decision

In view of the plea bargain that the parties have reached, I permit the Prosecutor to amend the indictment and for the Defendant to withdraw his not guilty plea.

**Handed down and announced today, January 13, 2003, in public and in the presence of the parties.**

[Signature]
**Judge**

Prosecutor: I file an amended indictment.

[Stamp] P 6: 357

Defense counsel: I have explained to my client the amended indictment; he understands and pleads guilty to it.

Defendant: my defense counsel has explained to me the amended indictment; I understand and plead guilty to it.

## Verdict

Based on the admission of guilt, I convict the Defendant of the offense attributed to him in the amended indictment.

**Handed down and announced today, January 13, 2003, in public and in the presence of the parties.**

    [Signature]
      **Judge**

[Stamp] P 6: 357 [continued]

Date: 10 Shevat 5763  
January 13, 2003

Case No.: 3159/02

Prosecutor: There is no evidence for the sentencing.

Defense counsel: I ask to call the father of the Defendant to give character evidence as evidence for the sentencing.

**The testimony of the father of the Defendant, Hassan Abed Khalil Barghouti**

**The witness is warned to state the truth**

**Primary examination**

Q: What work do you do?

A: I am a retired teacher.

Q: How many children do you have?

A: Four.

Q: What are their names and what do they do?

A: The youngest is Dr. Bashar, who works at Makassed Hospital in Jerusalem as a resident; the second is a pharmacist; another is a communication engineer and worked in Beit El before 1994 and he is in Australia; and the fourth has graduated from commerce studies at Middle East College and is now in America. My son Bashar was arrested all of a sudden because he hosted a person whom we did not know was wanted; I know that he was only Marwan Barghouti's driver; he left school when he studied with my son at Hashamiya School. My son was the most outstanding student of the school and was always first, and I would give him special care; and he was the one who served us. In addition, at that time, relatives from Akko and Professor Shaki, who is a lecturer at the university in Rehovot, would also visit us. One by the name of Hanukah, who was a worker in the Israeli media, an Iraqi, would host me and I hosted him, we are in touch. In Akko we have contacts with Arabs, Druze and Jews, and we have social relations with all people.

Q: Tell The Court what happened to you after Bashar's arrest.

[Stamp] P 6: 358

3

A: Bashar's arrest was a big surprise for us because we agreed to transfer him from Ramallah Hospital to Al Makassed Hospital so that he could be a resident there. After his arrest, Ahmed started to threaten us that he was Marwan's driver and he prevented me from coming to Jerusalem for a long time without knowing who he was. He would ask people to talk to us on behalf of the Shin Bet, and I am prepared to swear on the Koran and the New Testament. In addition, I would write at which time the call was made, and I even bought a device to identify the caller's number, and this was not made clear to me. If he were to hate or be tormented by my son, it is because he and my son were in the same class and my son studied and he did not, and my son graduated in medicine. He compared himself to my son, before more than five people, and he thought that making money was more important than studying, and that someone who has money is more important than one who has studied. I mentioned a bad sentence to him and he was angry and left the house, and I have not seen him since. He has not been hiding at our place and I do not think that he was in custody when they arrested Marwan, and I think that he and Marwan were not wanted by the Israeli security forces in the same period. I retired in 1994, before the [Palestinian] Authority came in, and I did not go back to work anywhere. None of my sons took office in the Palestinian Authority. I ask for democracy to work, and for my son, who has been arrested for a year already, and if the state has allowed Ahmed Tibi and Bishara to return to the Knesset after the mess that they made; and I have been through tragedies; I was run over in 1997 by a stolen vehicle, and the one who ran me over is now free; and I have not received any compensation. My wife was injured in the leg after the accident, and we still suffer from the accident that happened.

[Stamp] P 6: 358 [continued]

Date: 10 Shevat 5763  
January 13, 2003

Case No.: 3159/02

The Prosecutor summates: the military prosecution asks to impose on the Defendant a sentence that would correspond with the severity of the offense of which he has been convicted. The Defendant has been convicted according to his guilty plea, nearly at the end of his trial, of an offense of failure to prevent an offense. It is known that this offense is not unequivocal and there have been those who have criticized the inclusion of this offense into the codex. It seems that this precariousness led the legislator to prescribe a low sentence of 5 years imprisonment for this offense. It appears that during the contemplation of the considerations relevant to this offense, the Court is to take into account the degree to which the case before it justifies the disregard for or giving of reduced weight to the problematic nature of the offense, and see fit to hand down a harsh sentence to the Defendant. According to the scale of severity, alongside the current offense, a balance should be made out between the degree of guilt by the default or act of the Defendant and the degree of prejudice to the protected value. The circumstances of the case before us are elaborated well in the indictment before the Court, and one may learn of the gravity of the conduct of the Defendant in this case. Not only did suspicion hatch in the heart of the Defendant that the offense would be committed, but the wanted man Ahmed Barghouti told the Defendant explicitly what the murderous plan that he was intending to perform was and elaborately described the details of the plan. What behavior would we expect of the Defendant in this case? This question would lead us to the junction at which the said precariousness of the offense would be examined. It is well known that it is hard for a citizen to approach law enforcement authorities to denounce a relative when an offense has not yet been committed. However, the Defendant before us, not only did he not denounce the wanted man, but also did not utter a single word, even in the form of a desperate attempt to prevent the materialization of the attack. And the Defendant demonstrated apathy to the murderous conspiracy that was being devised before him. The conduct of the Defendant did not feature just passive actions. The Defendant made available to Ahmed Barghouti the telephone in his home, thus serving as a link in the planning. We would expect, after having heard the testimony of the father of the Defendant, that the Defendant would have acted according to the values that he should have learned within his normative family setting. However, this apathy of the Defendant compared to the descriptions of the atrocity that Ahmed Barghouti described to him shows like a hundred witnesses basic evilness of heart and disregard for any norm of behavior, not only legal but also moral. The Defendant has brought upon his family great pain by committing his acts.

[Stamp] P 6: 359

5

It is asked how it is possible to compare this pain with the smallest amount of suffering and despair that have been inflicted on the families of the two victims, the late Ora Sandlar and the late Sarah Hamburger, who met their deaths from the rounds fired by the rifle carried by the dastardly terrorist. How is it possible, given the low penalty for the offense, to quantify the pain of those innocent women and their families, which pain could have been prevented so easily, yet this was not done? It seems, in the circumstances of the case, that no sentence for the offense could express the tiniest share of that pain.

The defense counsel summates: the offense that is attributed to the Defendant, as my colleague has explained, is an offense that is a stranger to Israeli law in general, and in particular to the law that is in effect in the Area. This offense is taken from the continental law of Europe and from English law, and is taken from a story that appears in the New Testament of the Good Samaritan. In that story, those Samaritans in the times of Jesus were enemies of the Jews but saw fit to help a Jew who was hurt on his way to Jerusalem and Jericho, according to the story of Jesus. And then they took from the moral duty of helping somebody who has been hurt; in the continent they found a legal duty for people. Unlike that position, in Anglo-Saxon law, in the same manner, if there is something that is binding, it is binding. The question here is not on the moral plane, but on the positive legal one. We have a young man who has information about a certain attack, they are located in Al-Bira, in the middle of territory that belongs to the Palestinian Authority, and he has information that he has to report to the security authorities in Israel; so his predicament is that if he reports [sic], he will be prosecuted in Israel for failing to report an offense, but if he does it, he is likely to face a death sentence. Such a person is likely to endanger his life by reporting to the State of Israel within the Territories an offense that is supposed to be committed the day after. Legally speaking, he must abstain from reporting. Then he decided to keep his silence. My colleague has tried to contend that the Defendant not only kept his silence, but also did other things. He made available to Ahmed Barghouti that telephone. But if we inspect

[Stamp] P 6: 359 [continued]

6

Date: 10 Shevat 5763  Case No.: 3159/02
January 13, 2003

the indictment, he knew about the attack that was about to happen, after having given him the telephone for his use. From this, there was no positive act on the part of the Defendant; on the contrary, the only thing that he did was to keep his silence. I have heard once about the difference in Hebrew between a wise man and a quick-witted one. A quick witted man is one who extricates himself from trouble that a wise one would not have gotten into in the first place. I would expect the Defendant to have been wise in this case, meaning not having hosted Ahmed Barghouti in the first place. The Defendant is emerging from this wise, in my opinion, rather than quick-witted. The Defendant is emerging here with a coherent decision, that he will never host a person who is likely to be suspected of any activity against the State of Israel. This is the only lesson that we can ensure from the arrest of the Defendant. Concerning the personal circumstances of the Defendant, the Court has learned that he is not an ordinary man, but a physician who has devoted his whole life to studies. He also has a normative family and beyond this, it is trying with all its might to ensure that its children will be scholars, rather than thinking at all about money. Their sole purpose in life is for the children of the family to learn. His father has three children, but the only one who can help him is the Defendant, and another who is working as a pharmacist. The Defendant has sustained tremendous damage on the account of having been exposed to the judicial and prison systems. The Defendant has sustained further damage, and he has missed many tests that are delaying his progress. We expect and are almost certain that the Defendant will come out of here and will not be involved in any activity against the state. The Defendant has been in custody since January 23, 2002, nearly a year, and we ask the Court to make do with his remand period.

The Defendant in his last statement: In the beginning, it was true that I heard or knew from Ahmed Barghouti that there was a chance that there would be an attack, but of course, after my acquaintance with Ahmed, and my familiarity with his personality, and the way he talked that night, I thought that this was not necessarily so, because he had been drinking. I did not believe what he said, and I did not comment on it. Even if I were to take what he said seriously and believe it, I did not attempt to prevent one hundred percent the attack that he talked of, I could not prevent it, because I live in a territory that is under the rule of the Palestinian Authority, in an A area, and I cannot contact Israel's Shin Bet and inform them that Ahmed or another person knew of or intended to carry out one attack or another, because as we hear every day, this would have meant a death penalty for me from the [Palestinian] Authority or the resistance people.

[Stamp] P 6: 360

7

The Honorable Prosecutor describes me as somebody who was indifferent, and I say that it is true that I am sometimes apathetic, but I have learned all this because I am in the hospital and more than a hundred patients pass by me every day, and each one has a different story. If I were to believe all of the words of the patients, I would be crazy. Until now I have been in prison for nearly a year, of which about 50 days have been in solitary confinement cells. Of course, this is the first time that I have been arrested and punished for any offense. This period has caused me to lose my mind, particularly during the questioning period. I have lost a year of my life, and I have lost my continued studies and practice, and even after I am released from prison I shall not be able to continue my studies or practice at Al Makassed Hospital in Jerusalem, which is the only hospital that provides a residency in the West Bank. This is because of the security custody in which I am being remanded. I shall not be able to get or receive an entry permit into the territories of Israel. I shall not even be able to travel overseas such as to America or Great Britain because my name appears on the terminal and with the Israeli security forces as a terrorist. I have even stopped part of the future that is waiting for me, which I am trying to build from the distant past, and why all this? Because Ahmed Barghouti, who you now have in custody, knows with certainty about carrying out this attack, and I just overheard some of the words, which I did not believe. I have a question for the prosecutor: if you were to hear about your friend or relative talking to you about an attack on the Territories, would you tell the Palestinian Authority about it? Before I conclude, I ask the Court to release me immediately and make do with the period in which I have been in custody, so that I can come out and live with my family, who are old and sick, and have nobody to care for them, and in order to continue my studies, marry and continue my practice as a physician.

[Stamp] P 6: 360 [continued]

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARK I. SOKOLOW, *et al.*,<br><br>                              Plaintiffs,<br><br>vs.<br><br>THE PALESTINE LIBERATION<br>ORGANIZATION, *et al.*,<br><br>                              Defendants. | No. 04 Civ. 00397 (GBD) (RLE) |

### DECLARATION OF RINA NE'EMAN

Rina Ne'eman hereby certifies as follows:

1. The attached translation from Hebrew to English is an accurate representation of the document received by Rina Ne'eman Hebrew Language Services, to the best of my knowledge and belief. The document is designated as P6: 357-360.

2. I am a professional translator with a B.A. in International Relations from the Hebrew University of Jerusalem (Israel) and 30 years of translation experience. I am fluent in Hebrew and English, and I am qualified to translate accurately from Hebrew to English.

3. To the best of my knowledge and belief, the accompanying text is a true, full and accurate translation of the Hebrew-language document bearing the bates number, P6: 357-360.

_____
Rina Ne'eman

ss.: New Jersey

On the [28] day of February, 2014 before me, the undersigned, personally appeared Rina Ne'eman, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is signed to this Declaration and acknowledged to me that he executed the same in his capacity, and that by his signature on this Declaration, the individual executed the Declaration.

Sworn to me this
28 day of February, 2014

_Hala Y. Gobrial_
Notary Public

**HALA Y GOBRIAL**
Notary Public
State of New Jersey
My Commission Expires Apr. 18, 2017
I.D.# 2419990

תאריך: י' שבט, תשס"יג
13 ינואר, 2003

מספר התיק: 3159/02

בית המשפט הצבאי בבית אל

פרוטוקול הדיון של ישיבת דן יחיד

בפני השופט: רס"ן אלי בר-און

תובע: סגן ולדי בורודובסקי - נוכח
סניגור: עו"ד שוקרי - נוכח

נאשם: בשאר חסן עבד ברגותי ת.ז 934469768 / מגידו - נוכח

מתורגמן: סמל חאמד חמדאן
רשמת: רב"ט סיון הראל

------------------------------------------------

אבה"ד פותח את הישיבה ומזהה את הנאשם.

### מהלך הדיון

תובע: הגענו להסדר טיעון, במסגרתו אבקש להגיש כתב אישום מתוקן. הנאשם יחזור בו מכפירתו, יודה בכתב האישום המתוקן והצדדים יטענו לעונש באופן חופשי.

סניגור: אני מאשר את דברי חברי ומבקש מביהמ"ש כי יתיר לנאשם לחזור בו מכפירתו.

### ה ח ל ט ה

לנוכח הסדר הטיעון אליו הגיעו הצדדים, אני מתיר לתובע לתקן את כתב האישום ולנאשם לחזור בו מכפירתו.

ניתן והודע היום, 13/01/03, בפומבי ובמעמד הצדדים.

_____
שופט

תובע: אני מגיש כתב אישום מתוקן.

סניגור: הסברתי למרשי את כתב האישום המתוקן, הוא מבין אותו ומודה בו.

נאשם: סניגורי הסביר לי את כתב האישום המתוקן, אני מבין אותו ומודה בו.

### ה כ ר ע ת - ד י ן

על יסוד ההודאה באשמה, אני מרשיע את הנאשם בעבירה המיוחסת לו בכתב האישום המתוקן.

ניתן והודע היום, 13/01/03, בפומבי ובמעמד הצדדים.

_____
שופט

1

תאריך: י' שבט, תשס"יג
13 ינואר, 2003

מספר התיק: 3159/02

1 תובע: אין ראיות לעונש.
2
3 סניגור: אני מבקש להעמיד את אביו של הנאשם לעדות אופי כראיות לעונש.
4
5 **עדות אביו של הנאשם, חסן עבד חליל ברגותי**
6
7 העד מוזהר לומר את האמת
8
9 ## חקירה ראשית
10
11 ש: במה אתה עובד?
12 ת: אני מורה בפנסייה.
13 ש: כמה ילדים יש לך?
14 ת: ארבעה.
15 ש: מה הם שמותיהם ומה הם עושים?
16 ת: הצעיר הוא ד"ר, בשאר שהיה עובד בבית חולים אל מוקסד בירושלים כמתמחה,
17 השני מהם רוקח, אחר הוא מהנדס תקשורת ועבד בבית אל לפני 1994 והוא
18 באוסטרליה, והרביעי סיים לימודי מסחר במכללת המזרח התיכון ועכשיו הוא
19 נמצא באמריקה. בני בשאר נעצר בהפתעה כי הוא ארח אדם שלא ידענו שהוא
20 מבוקש, אני יודע שהוא היה רק הנהג של מרואן ברגותי, הוא עזב את בית הספר
21 כאשר למד יחד עם בני בבית ספר "האשמיייה". בני היה מצטיין בין תלמידי בית
22 הספר ותמיד היה הראשון, ואני הייתי מטפל בו טיפול מיוחד, והוא היה זה שמשרת
23 אותנו. כמו כן, בתקופה ההיא היו מתארחים אצלנו קרובי משפחה מעכו וגם
24 פרופסור שאקי, שהוא מרצה באוניברסיטה ברחובות. אחד בשם חנוכה, שהיה עובד
25 בתקשורת הישראלית, עיראקי, היה מארח אותי ואני ארחתי אותו, ויש בינינו קשר.
26 בעכו יש לנו קשר עם ערבים, דרוזים ויהודים, ויש לנו קשר חברתי עם כל האנשים.
27 ש: ספר לביהמ"ש מה עבר עליכם מאז מעצרו של בשאר.
28 ת: מעצרו של בשאר היה הפתעה גדולה בשבילנו כי אנו הסכמנו להעביר אותו מבית
29 החולים של רמאללה, לבית חולים אל מוקסד כדי שיהיה מתמחה שם. לאחר מעצרו
30 אתמד התחיל לאיים עלינו שהוא הנהג של מרואן והוא מנע ממני להגיע לירושלים
31 למשך זמן רב בלי שאדע מי הוא. הוא היה מבקש מאנשים שידברו איתנו בשם
32 השב"כ, ואני מוכן להשבע בקוראן והברית החדשה. כמו כן, הייתי רושם באיזו שעה
33 השיחה התקיימה, ואפילו קניתי מכשיר כדי לזהות את המספר ממנו מתקשרים,
34 וזה לא הובהר לי. אם הוא היה שונא או מתענה בבני זה בגלל שהוא ובני היו באותה
35 כיתה ובני למד והוא לא, ובני סיים רפואה. הוא השווה את עצמו לבני, מול יותר
36 מחמישה אנשים והוא חשב שלאסוף כסף זה יותר חשוב מללמוד, ושלמי שיש כסף
37 הוא יותר חשוב ממי שלמד. אני הזכרתי לו משפט רע ואז הוא כעס ויצא מהבית
38 ומאז לא ראיתי אותו. הוא לא הסתתר אצלנו ואני לא חושב שהוא היה עצור בזמן
39 שעצרו את מרואן, ואני חושב שהוא ומרואן לא היו מבוקשים ע"י כוחות הבטחון
40 הישראלי באותה תקופה. אני יצאתי לפנסייה בשנת 1994, לפני שהרשות נכנסה,
41 ואני לא חזרתי לעבוד בשום מקום. אף אחד מבניי לא קיבל על עצמו תפקיד ברשות
42 הפלשתינית. אני מבקש שהדמוקרטיה תצא לפועל, ושבני, שכבר שנה עצור, ואם
43 המדינה אפשרה לאחמד טיבי ולבשארה לחזור לכנסת אחרי הבלאגן שהם עשו, ואני
44 עברתי טרגדיות, נדרסתי בשנת 1997 ע"י רכב גנוב, ומי שדרס אותי עכשיו משוחרר,
45 ואני לא קיבלתי שום פיצוי. אשתי נפצעה ברגל לאחר התאונה, ואנו עדיין סובלים
46 מהתאונה שהיתה.
47
48
49

2

P 6: 358

תאריך: י' שבט, תשס"ג
13 ינואר, 2003

מספר התיק: 3159/02

1. תובע מסכם: התביעה הצבאית מבקשת להטיל על הנאשם עונש אשר יהלום את
2. חומרת העבירה בה הורשע. הנאשם הורשע ע"פ הודאתו בסיום משפטו כמעט,
3. בעבירה של אי מניעת עבירה. כידוע, עבירה זו אינה חד משמעית והיו אף כאלה אשר
4. מתחו ביקורת על הכנסתה של עבירה זו לספר החוקים. נראה כי אותה בעייתיות
5. הובילה את המחוקק לקביעת עונש נמוך של 5 שנות מאסר לצידה של העבירה.
6. נראה כי במהלך שקילת השיקולים הרלוונטים לגבי עבירה זו, יבוא ביהמ"ש
7. בחשבון באיזו מידה מצדיק המקרה שלפניו את ההתעלמות או מתן משקל נמוך
8. מבעייתיות העבירה, וימצא להחמיר עם הנאשם. לפי מדרג החומרה, לצד העבירה
9. הנוכחית מן הראוי לערוך מאזן בין מידת האשמה שבמחדל או במעשה הנאשם לבין
10. מידת הפגיעה בערך המוגן. נסיבות המקרה שבפנינו מפורטות היטב בכתב האישום
11. שבפני ביהמ"ש, וניתן להתרשם מחומרת ההתנהגות של הנאשם במקרה זה. לא זו
12. בלבד שנוצר בלבו של הנאשם חשד לביצוע העבירה, אלא שהמבוקש אחמד ברגותי
13. אמר לנאשם במפורש מה הוא התכנון הרצחני אותו מתכוון לבצע ופירט בהרחבה
14. רבה את פרטי התכנון. לאיזו התנהגות היינו מצפים מן הנאשם במקרה זה? שאלה
15. זו תביא אותנו אל הצומת בו נבחנת הבעייתיות האמורה של העבירה. ידוע כי קשה
16. לאזרח לפנות לגורמי אכיפת החוק ולהסגיר את קרובו כאשר העבירה טרם בוצעה.
17. ואולם, הנאשם שבפנינו, לא זאת בלבד שלא הסגיר את המבוקש, אלא אף לא
18. נשמעה מפיו ולו מילה אחת, אף מילה של נסיון נואש למנוע את מימוש הפיגוע,
19. והנאשם הפגין אדישות נוכח הקשר הרצחני שנרקם בפניו. לא רק במעשים
20. פאסיביים התאפיינה התנהגותו של הנאשם. הנאשם העמיד לרשותו של אחמד
21. ברגותי את הטלפון שבביתו, ובכך אף שימש חוליה במסגרת התכנון. היינו מצפים,
22. אחרי ששמענו את עדותו של אבי הנאשם, כי הנאשם יפעל ע"פ הערכים אותם אמר
23. היה לקלוט במסגרת משפחתו הנורמטיבית. ברם, אדישותו של הנאשם אל מול
24. תיאורי הזוועה אותם שטח בפניו אחמד ברגותי, מלמדת כמאה עדים על רוע לב
25. בסיסי והתעלמות מכל נורמת התנהגות, לא רק משפטית אלא גם מוסרית. הנאשם
26. הביא על משפחתו כאב רב בביצוע מעשיו. נשאלת השאלה, איך ניתן להשוות כאב
27. זה עם החלק הקטן של הסבל והייאוש אשר נגרם למשפחות שתי ההרוגות, אורה
28. סנדלר ז"ל ושרה המבורגר ז"ל, אשר מצאו את מותן מכדורי הרובה שבידי המחבל
29. המתועב. כיצד ניתן במסגרת העונש הנמוך שלצד העבירה להכמת את הכאב של אותן
30. נשים תמימות ושל משפחותיהן, כאב אותו ניתן היה למנוע בקלות כה רבה, והדבר
31. לא נעשה. נראה, בנסיבות המקרה, כי אף העונש שלצד העבירה לא יכול לבטא את
32. החלק המזערי של אותו כאב.
33.
34. סניגור מסכם: אותה עבירה המיוחסת לנאשם, כפי שהסביר חברי, עבירה זרה
35. למשפט הישראלי בכלל, ובפרט למשפט שמתנהל באזור. עבירה זו לקוחה מממשפט
36. הקונטיננט באירופה וממשפט אנגלי, והיא לקוחה מסיפור שמופיע בברית החדשה
37. של השומרוני הטוב. באותו סיפור, אותם שומרונים שבזמני ישו הנו אויבים של
38. היהודים מצאו לנכון לעזור ליהודי שנפגע בדרכו מירושלים ליריחו, כך לפי הסיפור
39. של ישו. ואז לקחו מהחובה המוסרית לעזור למישהו שנפגע, בקונטיננט מצאו חובה
40. משפטית לאנשים. בניגוד לאותה עמדה, במשפט האנגלו-סקסי, באותו אופן, אם יש
41. משהו שמחייב, אז הוא מחייב. השאלה כאן, היא לא במישור המוסרי, אלא במישור
42. משפטי הפוסטיבי. יש לנו בחור שיש לו מידע לגבי פיגוע מסויים, הם יושבים באל
43. בירה, באמצע השטח ששייך לרש"פ, ויש לו מידע שהוא צריך לדווח לרשויות
44. הבטחון בישראל, כך שהוא נמצא במצב כזה, שאם הוא ידווח, הוא יועמד בישראל
45. לדין על עבירה של אי דיווח עבירה, אך אם הוא יעשה את זה צפוי לו גזר דין מוות.
46. אדם כזה צפוי לסכן את חייו בדיווח למדינת ישראל בתוך השטחים על עבירה
47. שאמורה להתבצע מחר. מבחינה משפטית, הוא חייב באי דיווח. אז הוא החליט
48. לשבת בשקט. חברי ניסה לטעון כאילו שהנאשם לא רק ישב בשקט, אלא עשה
49. דברים נוספים. הוא העמיד לרשותו של אחמד ברגותי את אותו טלפון. אך אם אנו

3

P 6: 359

תאריך: י' שבט, תשס"ג
13 ינואר, 2003

מספר התיק: 3159/02

1 מעיינים בכתב האישום, הוא ידע על אותו פיגוע שעתיד להתבצע, לאחר שהוא נתן
2 לו את הטלפון לשימוש. מכן, שלא היה שום מעשה פוסטיבי מצד הנאשם, להיפך,
3 כל שעשה הוא רק שישב בשקט. אני שמעתי פעם מה ההבדיל בעברית בין פיקח
4 לחכם. פיקח הוא אדם שמוציא את עצמו לארוע שחכם לא היה מביא את עצמו
5 אליו. אני הייתי מצפה מהנאשם להיות חכם במקרה זה, ומכאן שלא לארח בכלל
6 את אחמד ברגותי. הנאשם יוצא מכאן לדעתי חכם, לא פיקח. הנאשם יוצא מכאן
7 בהתלטה מגובשת, שהוא לא יארח לעולם אדם שסביר להיות חשוד בפעילות כלשהי
8 נגד מדינת ישראל. זה הלקח היחידי שאנו יכולים להבטיח ממעצרו של הנאשם.
9 לגבי הנסיבות האישיות של הנאשם, ביהמ"ש נכח לדעת שלא מדובר באדם רגיל,
10 אלא מדובר ברופא שהקדיש כל חייו ללימודים, גם משפחתו נורמטיבית ואף מעבר
11 לכך, מנסה בכל כוחה להוציא את ילדה כלומדים, ולא חושבים כלל על כסף.
12 מטרתם היחידה בחיים היא שילידה של המשפחה ילמדו. לאבא יש שלושה ילדים,
13 אך היחידי שיכול לעזור לו הוא הנאשם, ועוד אחד שעובד כרוקח. לנאשם נגרם נזק
14 אדיר בכך שהוא נחשף לכל מערכת המשפט ובתי הסוהר. לנאשם נגרם נזק נוסף,
15 והוא שהוא פיספס מבחנים רבים אשר מעכבים את התקדמותו. אנו מצפים וכמעט
16 בטוחים כי הנאשם יצא מכאן ולא יהיה מעורב בכל פעילות נגד המדינה. הנאשם
17 נמצא במעצר מיום 23/01/02, כמעט שנה, ואנו מבקשים מביהמ"ש להסתפק
18 בתקופת מעצרו.
19

20 הנאשם בדברו האחרון: בהתחלה נכון ששמעתי או ידעתי מאחמד ברגותי שיש
21 סיכוי שיהיה פיגוע, אבל כמובן, לאחר היכרותי עם אחמד, והיכרותי עם אישיותו,
22 ובשיטת דיבורו באותו לילה, וחשבתי שהוא לא בהכרה כי הוא שתה. אני לא
23 האמנתי למה שהוא אמר, וגם לא התייחסתי לדבריו. אפילו אם לקחתי את דיבורו
24 ברצינות והאמנתי בו, או ניסיתי למנוע במאה אחוז את הפיגוע עליו הוא מדבר, לא
25 היה ביכולתי למנוע זאת, וזאת בגלל שאני חי בשטח שהוא תחת שלטון הרש"פ,
26 באזור A, אני לא יכול לפנות לשב"כ הישראלי ולהודיע להם שאחמד או אדם אחר
27 יודע או מתכוון לבצע פיגוע זה או אחר, כי כפי שאנו שומעים כל יום, זה יגרום לי
28 עונש של גזר דין מוות ע"י הרשות או אנשי ההתנגדות. כבוד התובע תיאר אותי כמי
29 שהיה אדיש, ואני אומר שזה נכון שאני לפעמים אדיש, אבל אני למדתי את זה בגלל
30 שאני נמצא בבית החולים ועוברים תחתי יותר ממאה חולים באופן יומי, ולכל אחד
31 מהם יש סיפור אחר. אם אני אאמין לכל דברי החולים אני יכול להיות משוגע. עד
32 עכשיו אני שוחה בכלא כמעט שנה, מתוכה בערך 50 יום בתאי הצינוק. כמובן שזו
33 הפעם הראשונה בה אני נעצר ונענש על עבירה כלשהי. התקופה הזו גרמה לי
34 להשתגע, במיוחד בתקופת החקירה. אני הפסדתי שנה מחיי, והפסדתי את המשך
35 לימודיי ועבודתי, ואפילו לאחר שאשתחרר מהכלא אני לא אוכל להמשיך את
36 לימודיי ועבודתי בבית החולים אל מוקסד בירושלים, שזה בית החולים היחיד
37 שנותן התמחות בגדה. זה בגלל המעצר הבטחוני שאני שוהה בו. אני לא אוכל להשיג
38 ולקבל אישור כניסה לשטחי ישראל. אני אפילו לא אוכל ליסוע למדינות חו"ל כמו
39 אמריקה ובריטניה בגלל שהשם שלי מופיע במסוף ואצל כוחות הבטחון הישראלי
40 כטרוריסט. אני גם הפסקתי חלק מהעתיד שמצפה לי, אותו אני מנסה לבנות מהעבר
41 הרחוק, וכל זאת למה? בגלל שאחמד ברגותי, שכרגע עצור אצלכם, יודע בוודאות על
42 ביצוע הפיגוע הזה, ואני בסך הכל שמעתי חלק מן המילים, להן לא האמנתי. יש לי
43 שאלה לתובע, אם היית שומע שחבר שלך או קרוב משפחה שלך מדבר איתך על
44 התקפה על השטחים, האם היית מודיע לרשות הפלשתינית על זה? לפני שאני
45 אסיים, אני מבקש שביהמ"ש ישחרר אותי לאלתר ויסתפק בתקופה שאני שהיתי
46 במעצר, כדי שאני אוכל לצאת לחיות עם משפחתי, שהם מבוגרים וחולים, ואין מי
47 שידאג להם, וכן על מנת להמשיך את לימודיי ולהתתחתן ולהמשיך את עבודתי בתור
48 רופא.
49

4

P 6: 360