The Courts

| In the Tel Aviv-Jaffa District Court | Serious Crime Case 1158/02 | |

**Before the panel:**

The Honorable Judge Sarah Sirota, Deputy Presiding Judge
The Honorable Judge Avraham Tal
The Honorable Judge Dr. Amiram Benyamini

The State of Israel                                          **The Prosecution**
The Department for Criminal and Security Manners and
Special Affairs in the Office of the State Attorney
Represented by Counsel, Adv. D. Chen, Adv. R. Hazan and
Adv. A. Bar-Natan

- v. -

Marwan Bin Khatib Barghouti                                 **The Defendant**
Born in 1959, Identity No. 959251745
of Ramallah (in detention since April 15, 2002)
Represented by the Office of the Public Defender

**Verdict**

[Stamp] P 7: 000371


PLAINTIFF'S EXHIBIT 451

## Table of Contents

**Part I: Introduction**                                                                    p. 2

**Part II: The Evidence**                                                                   p. 6

A.    **The Fatah, the Tanzim and the al-Aqsa Martyrs Brigade as Terrorist
      Organizations**                                                                        p.6

B.    **The Status of the Defendant and His Position in Terrorist Organizations
      and His Support for Terrorist Attacks on Israel**                                      p. 8

C.    **Testimony of Fatah Terrorism Operatives with Respect to Their
      Relationship with the Defendant, His Involvement in Terrorist Attacks
      and the Defendant's Responses to This**                                               p. 16

      (1)   Nasser Aweis .............................................................................................p. 16
      (2)   Nasser Naji Abu Hamid.............................................................................p. 20
      (3)   Ahmed Barghouti.......................................................................................p. 22
      (4)   Mohamed Maslah (Abu Satha) ...............................................................p. 27
      (5)   Jamal Ahawil ..............................................................................................p. 28
      (6)   Nasser al-Shawish......................................................................................p. 30
      (7)   Ali Aidiya ....................................................................................................p. 30
      (8)   Ismail Radaida, Muhannad Abu Halawa and Khamal Abu Wahr............p. 34
      (9)   Nasser (Haloum) Naji Abu-Hamid............................................................p. 34
      (10)  Ziyad Hamuda .............................................................................................p. 35
      (11)  Riad Amor ....................................................................................................p. 35
      (12)  Nasser Haj....................................................................................................p. 36
      (13)  Tahrir Barghouti .........................................................................................p. 37
      (14)  Ahmed Musafar............................................................................................p. 37
      (15)  Sharif Naji....................................................................................................p. 37
      (16)  Amid Abu Radaha ........................................................................................p. 37
      (17)  Ashraf Jabar.................................................................................................p. 39

[Stamp] P 7: 000372

**D.**   **Statements of the Defendant During His Interrogation and Other Evidence with Respect to His Role and Involvement in Terrorist Attacks Against Israel**                                                                              p. 40

   (1)   The liability of the Defendant for the activity of the terrorist cells and the degree of his control over them....................................................p. 40

   (2)   The Defendant's personal involvement in the terrorist attacks that have been carried out by the cells under his command ............................p. 44

        (aa)  Terrorist attack at the gas station in Givat Ze'ev......................p. 47

        (bb)  Murder of the Greek Orthodox monk in Ma'ale Adumim ........p. 48

        (cc)  Terrorist attack on the Seafood Market Restaurant in Tel Aviv ..........................................................................................p. 48

        (dd)  Attempted terrorist attack near the Malha Mall in Jerusalem....p. 49

   (3)   Provision of funds, weapons and explosives for carrying out terrorist attacks ........................................................................................................p. 49

   (4)   Assistance for wanted men and the families of the people arrested or killed .............................................................................................................p. 51

   (5)   Recruiting and training operatives for terrorist organizations.................p. 52

   (6)   The Defendant's public calls to perpetrate terrorist attacks against Israel ..............................................................................................................p. 53

[Stamp] P 7: 000372 [continued]

E.   **The Connection of the Defendant to the Terrorist Attacks that are the Subject of the Indictment** ............................................................................... p. 56

(1)   Murder of Talia and Binyamin Kahane, of blessed memory, near Ofra ............................................................................................................... p. 56

(2)   Murder of Akiva Pashkos, of blessed memory, in the Atarot industrial area ................................................................................................ p. 57

(3)   Murder of the Greek Orthodox monk Tsibouktzakis Germanos, of blessed memory, in Ma'ale Adumim ............................................................ p. 59

(4)   Murder of Yaniv and Sharon Ben-Shalom, of blessed memory, and Doron Yosef Sviri, of blessed memory, on Route 443 ................................. p. 59

(5)   Murder of Meir Weissboiz, of blessed memory, on Route No. 9 in Jerusalem ........................................................................................................ p. 61

(6)   Murder of Eliahu Cohen, of blessed memory, in the shooting terrorist attack on Route 443 near Givat Ze'ev ........................................... p. 62

(7)   Murder of Yoela Chen, of blessed memory, near the Givonim gas station on Route 443 ...................................................................................... p. 63

(8)   Murder of six people in David's Palace Banquet Hall in Hadera ............. p. 64

(9)   Murder of two women in the shooting terrorist attack at the corner of Jaffa Road and Lunz Street in Jerusalem ................................................... p. 66

(10)   Shooting terrorist attack in the Neve Ya'akov neighborhood in Jerusalem, in which police officer Galit Arbiv, of blessed memory, was killed ........................................................................................................ p. 66

(11)   Murder of Gad Rejwan, of blessed memory, in the Bashkevitz factory in Atarot .............................................................................................. p. 69

(12)   Terrorist attack in the Seafood Market restaurant in Tel Aviv ................ p. 70

(13)   Shooting terrorist attack in the Jeremy Hotel in Netanya ......................... p. 72

(14)   Murder of Constantine Danilov, of blessed memory, in Baka al-Garbiyeh ........................................................................................................ p. 73

(15)   Shooting terrorist attack between Ateret and Bir Zeit .............................. p. 74

(16)   Attempted terrorist attack in the Biancini Pub in Jerusalem .................... p. 75

(17)   Shooting terrorist attack on Route No. 9, near French Hill in Jerusalem ........................................................................................................ p. 77

(18)   Attempted suicide terrorist attack in Beit Hanina in Jerusalem ............... p. 78

(19)   Shooting terrorist attack on the Beit El-Psagot Road ............................... p. 78

(20)   Attempted terrorist attack in the Malha Mall in Jerusalem ...................... p. 79

[Stamp] P 7 :000373

**Part III: Evaluation of the Evidence and Its Significance**                    p. 81

**Part IV: Legal Analysis and Conclusions**                                      p. 92

   **1.**   <u>Activity and Membership in a Terrorist Organization</u>           p. 92

   **2.**   <u>Liability of the Joint Perpetrator, the Solicitor and the Accessory and the</u>
       <u>Differences Between Them</u>                                        p. 94

       A.   The Joint Perpetrator in Comparison to the Accessory ............................p. 96

       B.   The Crime of the Accessory ...................................................................p. 104

       C.   The Crime of Solicitation and the Distinction Between the Joint
           Perpetrator and the Solicitor ...................................................................p. 112

       D.   The Liability of the Leader of the Criminal Group as a Joint
           Perpetrator or as a Solicitor ...................................................................p. 117

   **3.**   <u>Conclusions with Respect to the Defendant's Liability as a Joint</u>
       <u>Perpetrator, Solicitor and Accessory</u>                                  p. 123

       A.   The Murderous Terrorist Attack at the Gas Station in Givat Ze'ev .......p. 135

       B.   Murder of the Greek Orthodox monk Tzibouktzakis Germanos, of
           blessed memory, in Ma'ale Adumim......................................................p. 136

       C.   Murderous Terrorist Attack in the Seafood Market Restaurant in Tel
           Aviv ........................................................................................................p. 138

       D.   The Attempted Terrorist Attack Near the Malha Mall In Jerusalem......p. 139

**Part V: Summation**                                                            p. 139

**Verdict**

**Part I:**      **Introduction**

[Stamp] P 7: 000373 [continued]

1. On August 14, 2002, an indictment was filed against Defendant, which charged him with several counts of **premeditated murder**, in accordance with Section 300 (a) (2) of the Penal Code, 5737 – 1977 **(hereinafter: "the Penal Code")**; **Accessory to murder**, in accordance with Section 300 (a) (2), together with Section 31 of the Penal Code; **Incitement to murder**, in accordance with Section 300 (a) (2), together with Section 30 of the Penal Code; **Attempted murder**, in accordance with Section 305(1) of the Penal Code; **Conspiracy to commit a crime**, in accordance with Section 499 of the Penal Code; **Activity and membership in a terrorist organization**, in accordance with Sections 2 and 3 of the Prevention of Terrorism Ordinance 5708 – 1948.

2. The indictment charges the Defendant with participation in [and] the organization and execution of acts of terrorism against Israeli targets, which commenced in September 2000, within the framework of the events that are referred to as the "al-Aqsa *Intifada*" (hereinafter – the "*intifada*"). According to that which has been alleged in the indictment, the Defendant headed terrorist organizations in the region of Judea and Samaria: the "Fatah" Organization (hereinafter – the **"Fatah"**), the "Tanzim" Organization (hereinafter – the **"Tanzim"**) that is part of Fatah, and the "al-Aqsa Martyrs Brigades" Organization, which includes the groups of Tanzim terrorism operatives that perpetrate acts of terrorism against Israeli targets (hereinafter – **"al-Aqsa Martyrs Brigades"**). The Defendant was the one who coordinated between and communicated with the senior operatives in the field in all three of these organizations (which shall jointly be called the **"Terrorist Organizations"**) that were responsible for the perpetration of acts of terrorism against Israeli targets.

   The indictment lists the names of eight senior terrorism operatives, who acted under the Defendant's leadership and who perpetrated acts of terrorism. They are Nasser Aweis (hereinafter – **"Aweis"**), Ahmed Barghouti, Nasser Abu Hamid (hereinafter – **"Abu Hamid"**), Ra'ed Karmi (hereinafter – **"Karmi"**), Muhannad Diria (Abu Halawa), (hereinafter – **"Muhannad"**) Mohamed Maslah (Abu Satha) (hereinafter – **"Abu Satha"**), Manzur Sharam (hereinafter – **"Sharam"**) and Mahmoud Titi (hereinafter – **"Titi"**).

   The Defendant and the field commanders recruited operatives for the terrorist organizations, deployed them and supplied them with weapons, explosives and money. The Defendant was also involved in training the terrorism operatives for their purpose and raising funds for terrorist organizations. In addition, the Defendant solicited and encouraged the terrorism operatives to wage offensives against the State of Israel through the media, at various conferences and by way of the distribution of inflammatory posters.

[Stamp] P 7: 000374

**Sections 8-15** of the indictment charge the Defendant with involvement in and liability for the perpetration of 37 terrorist attacks and acts of terrorism, most of which were perpetrated within the borders of the State of Israel, by the field commanders and operatives during the period of time from December 2000 through April 2002, in which many civilians and soldiers of the State of Israel lost their lives and many more were injured. Some of the acts of terrorism have been set forth in the indictment and most of them have been set forth only in the appendix to the indictment.

3.  **The Prosecution's evidence includes** the testimony of officials from the defense establishment, Israel Security Agency interrogators and police officers who were involved in the interrogation of the Defendant; testimony by civilians and other entities who were witness to the terrorist attacks that are the subject of the indictment, documents that were seized by the Israeli Defense Forces at the offices of the Fatah and at the office of the Defendant; Expert Opinions from specialists from the defense establishment with respect to the activities of the terrorist organizations and the status and the role of the Defendant in them; testimony that was given by operatives in the terrorist organizations and the information that they provided during their interrogations by the Israel Security Agency and the police; statements by the Defendant that were documented by Israel Security Agency personnel in written reports and, in some cases, were recorded and transcribed; statements that Defendant made to agents who were planted in his cell during the course of the interrogation, as well as to his close associate, Ahmed Barghouti, who was arrested with him; statements that were made by the Defendant to the media prior to his arrest and the statements of the Defendant to the police.

    The transcripts of the interrogation of the Defendant by the Israel Security Agency were submitted by the Israel Security Agency interrogators who conducted the interrogation, which was recorded, and who identified the voice of the Defendant in the recording ("Mofaz", on p. 58, "Nadav", on p. 79, "Smith", on pp. 85 – 86, and "Danny", on p. 90). The Defendant's conversation with Ahmed Barghouti was submitted by an interrogator by the name of "Robert" (on p. 65). The recordings from the interrogation of the Defendant and the interrogations of agents John Doe No. 1 and John Doe No. 3 were transcribed by Natan Basso (on p. 174).

    The Israel Security Agency interrogators who testified confirmed that the content of the transcript written during the course of the interrogation of the Defendant is accurate (Transcript Prosecution/6 – Prosecution/96). This refers to reports that were recorded in Hebrew, and which pertained to an interrogation that was conducted in Hebrew and in Arabic

[Stamp] P 7: 000374 [continued]

(the Defendant speaks Hebrew well), in which the main points of the statements that were made by the Defendant were taken down (see the interrogator by the name of "Steve", on p. 53, the interrogator by the name of "Emil", on p. 55 and the interrogator by the name of "Ron", on p. 60).

4. With respect to the statement of the Defendant to the police: indeed the Defendant declared throughout the course of his interrogations by the police, in contrast to his behavior during the course of his interrogation by the Israel Security Agency, that he denies the right of the police to interrogate him and that he therefore refused to answer the questions by interrogators (see Statements Prosecution/99 – Prosecution/109). Therefore, the statements of the Defendant include many questions that were presented to him by interrogators and which he refused to answer. In a very few cases, the Defendant briefly related to what the interrogator said to him and, on those occasions, he completely denied all of the claims that were presented to him, including those to which he had confessed while being interrogated by the Israel Security Agency. The Defendant denied that he was a leader of the al-Aqsa Martyrs Brigade or the Tanzim (Statement Prosecution/101 on p. 6, Statement Prosecution/105 on p. 2, Statement Prosecution/106 on p. 3); he denied that he was acquainted with the terrorist operatives who testified that they were in contact with him (as shall be described below) and even denied that he was acquainted with Ra'ed Karmi (Prosecution/104 on p. 8). All of these points were proven, as will be clarified below, not only by the statements by the field operatives but also by those of the Defendant himself, and the documents that were seized in his office, to which the Defendant denied any connection during the course of his interrogation, and claimed that his handwriting does not appear on any of them (see Statement Prosecution/108 – Prosecution/109).

The statements of the Defendant were submitted by interrogators by the name of David Zrihan and Rafi Nuriel (on pp. 38 and 113), who explained that the Defendant had refused to sign the warning and the statement, and that he had been questioned in Hebrew. Zrihan even testified that the Defendant refused to give fingerprints or to be photographed. In his Statement Prosecution/106, the Defendant stated in general that all of the charges against him are incorrect and that he is innocent of any guilt.

[Stamp] P 7: 000375

5.  At the outset of his trial, the Defendant set forth preliminary arguments with respect to the authority of this Court to try him, and these arguments were denied in the decision that was handed down by the Court, which was dated January 19, 2003 (on pp. 1 – 34 of the transcript). The Defendant chose not to receive the assistance of the services of a defense attorney and even strenuously and consistently rejected every attempt that was made by the Court to convince him to receive the assistance of the Office of the Public Defender or a defense attorney on his own behalf.

In spite of this, the Court did assign the Office of the Public Defender to represent the Defendant, despite its repeated requests to be released from his representation, and for practical purposes, it does represent the Defendant even today and was present at all of the Court sessions. Notwithstanding, the Office of the Public Defender did choose to accede to the request of the Defendant that it not set forth any arguments whatseover on his behalf during the trial, including legal arguments, and that it not even examine the witnesses.

The proceedings were conducted in this manner as per the wishes of the Defendant, who continues to deny the jurisdiction of this Court to try him . For this reason, the Defendant also chose not to respond to the indictment. In addition, the Defendant refrained from testifying himself or from bringing forth witnesses on his own behalf. In spite of this, the Defendant did occasionally respond to statements that were made by the witnesses or to arguments that were set forth by Counsel for the Prosecution during the course of the hearing, and his statements were recorded in the transcript verbatim. In addition, the Defendant responded orally to the summations of the Prosecution (which were filed in written form, as well), in the context of the defense speech that he delivered within the framework of the oral summations, however he did not relate in a material manner to the essence of the charges that had been set forth against him. It would be superfluous to note that the Defendant received, through the Office of the Public Defender itself, all of the evidence, transcripts and summations.

6.  The majority of the offenses that are the subject of the indictment are "domestic crimes" that pertain to terrorist attacks that have been perpetrated in Israel, and some of them are "external crimes" that have been carried out in the Region (in other words: in Judea and Samaria). However, as we have clarified in the decision that was handed down with respect to the preliminary arguments of the Defendant, Israeli Courts have the authority to hear cases of external crimes against the security of the state or against an Israeli citizen or resident, regardless of the venue where the crime may have taken place (see Section 13 (a) – (b) of the Penal Code, 5737-1977). This is the same "protective application" that was intended in order to protect Israeli citizens and residents against acts of terrorism that have been carried out with the sponsorship and support of other countries (S. Z. Feller and M. Kremnitzer, "Response to Article Condemning the Nationalist Application of a the Penal Code" in *Plilim* 5.1 (1996) 65, on p. 83, and compare with the Expert Opinion of Y. Shoham, *op cit.*, on p. 5). Further, we have ruled in the decision that was handed down in response to the preliminary arguments of the Defendant that the conditions that have been set forth within the framework of Section 14 (b) of the Penal Code do not appear to be relevant to this matter, if they apply at all to the protective jurisdiction in Section 13 of the Penal Code (in contrast with the

personal jurisdiction in Section 14) insofar as the Palestinian Authority is not a state. The offenses that have been attributed to the Defendant in the indictment are offenses against the security of the state, and against its citizens and residents, Therefore, they fall within the purview of Section 13 of the Penal Code, and this Court is competent to hear them.

## Part II:     The Evidence

### A.     The Fatah, the Tanzim and the al-Aqsa Martyrs Brigade as Terrorist Organizations

7.     During the course of his testimony (on p. 38), the head of the Research Division of the Intelligence Branch of the Israeli Defense Forces, Brigadier General Y. Cooperwasser, filed an Expert Opinion in which he addressed the operations of the Fatah, the Tanzim and the al-Aqsa Martyrs Brigade (Prosecution/1). Appended to the expert opinion were captured documents that had been seized by the Israeli Defense Forces during Operation Defensive Shield that are pertinent in this regard. Since the "Fatah" (the inverted Arabic acronym of its name "The Movement for the Liberation of Palestine") was founded by Yasser Arafat in 1959, it has espoused armed struggle against Israel, which has manifested in the form of the perpetration of terrorist attacks against Israeli targets in Israel and abroad. After the Oslo Accords were signed, the principle of "armed struggle" took on a marginal role, however it remained as an option for the achievement of the goals of the organization, in the event that negotiations with Israel were to prove unsuccessful. When the second *intifada* broke out in September 2000, the Fatah led the terrorist attacks in the territories, by way of the two Supreme Committees that manage its operations, one of them in the Judea and Samaria region and the second one in the Gaza Strip region. The Defendant headed the Supreme Committee in the Judea and Samaria region up until the day of his arrest (Sections 1 – 3 of the Expert Opinion).

The operational echelon of the Fatah included the movement's field operatives – the Tanzim ("the organization" in Arabic). The Tanzim operatives make up the forefront of the Fatah's terrorist activity against Israel. The "al-Aqsa Martyrs Brigades" is a cover name for the terrorist organizations of the Fatah, which assume public responsibility for the acts of terrorism. Members of the al-Aqsa Martyrs Brigades are actually Fatah operatives and the majority of these organizations consider the Defendant to be a central source of authority for their operations (Sections 4 – 5 of the Expert Opinion).

[Stamp] P 7: 000376

The Tanzim and the al-Aqsa Martyrs Brigades constitute, in accordance with the Expert Opinion of Brigadier General Cooperwasser, the unofficial military arm of the Fatah, which was headed by the Defendant. A captured document that is appended to the Expert Opinion of Brigadier General Cooperwasser as Appendix A is a letter that was jointly signed by both the Tanzim and the al-Aqsa Martyrs Brigades.

Other captured documents that have been appended to the Expert Opinion show that the al-Aqsa Martyrs Brigades asked Yasser Arafat for financial support (Document 2) and that the Fatah and al-Aqsa Martyrs Brigades are signatories to proclamations that were issued in praise of terrorist operations that have been carried out within the borders of Israel (Documents 3 – 5). Document 6, which was appended to the Expert Opinion, and which was sent on May 8, 2001, by the al-Aqsa Martyrs Brigades to the Defendant, lists the operations of the al-Aqsa Martyrs Brigades in the Jenin district (including a terrorist attack in Um el-Faham) and asks for assistance in the form of weapons, explosives and money, in order to continue in the perpetration of such operations. Other documents of the al-Aqsa Martyrs Brigades, which were addressed to Yasser Arafat, include requests for assisting wanted men who were being pursued by Israel and the families of operatives who had been killed (Appendix B and Documents 2 – 4 to this Appendix). Some of these documents had been written by the Defendant. It should be noted that the Defendant's nickname, based on the name of his eldest son was **"Abu Alkasam"** (Defendant's statement Prosecution/107, on p. 1, and the manner in which Aweil addresses the Defendant on p. 164).

8.  According to the Expert Opinion of Brigadier General Cooperwasser, Fatah operatives have perpetrated more than 1200 terrorist attacks against Israel (as of August 18, 2002) in which 176 Israelis have been killed and many more have been injured. These terrorist attacks included suicide [attacks] [and] the firing of mortar shells and light weapons. During the course of the *intifada,* the terrorist organizations of the Fatah moved increasingly towards the perpetration of suicide terrorist attacks within the borders of Israel (see Section 5 of the Expert Opinion). In the months that preceded Operation Defensive Shield, the al-Aqsa Martyrs Brigades perpetrated suicide terrorist attacks in Hadera, Jerusalem, Tel Aviv, Mehula, [Israeli Defense Forces Military] Base No. 80, the Maccabim roadblock, Netanya, Ashdod, Kfar Saba and Efrat. As a result, it was included in the American list of terrorist organizations that was dated March 27, 2002 (see Section 10 of the Expert Opinion and Appendix C, which lists the suicide terrorist attacks that have been perpetrated by the Fatah movement).

[Stamp] P 7: 000376 [continued]

9.  With respect to the Expert Opinion of Brigadier General Goldwasser, it should be noted that pursuant to the Rules of Evidence, we are not permitted to rely on intelligence assessments and conclusions that are based on various sources of information that have not been brought before the Court, insofar as these constitute hearsay testimony. We are allowed to rely on this Expert Opinion only to the extent that it is compatible with other admissible evidence that has been brought before us. Nevertheless, the terrorist operations of the three above mentioned organizations that are under the auspices of the Fatah, emerge clearly from a great deal of the direct evidence that has been presented in Court, including the confessions that the Defendant and other terrorist operatives have given during the course of their interrogations, as shall be set forth later on in this verdict, below.

Nasser Abu Hamid, who was one of the senior field commanders in Judea and Samaria, said in his statement to the police (Prosecution/149 (8), on pp. $2 - 3$, $7 - 8$, $13 - 17$) that the al-Aqsa Martyrs Brigades was established on January 1, 2001, in order to serve as a militia for the Fatah and to carry out terrorist attacks against settlers and soldiers in the Israel Defense Forces. In the above mentioned statement, as well as in Statement Prosecution/149 (c)), he specified the terrorist attacks that had been perpetrated by his operatives against Israeli civilian and military targets, under the leadership and with the assistance of the Defendant (as shall be set forth below).

10. It is also possible to learn about the operations of the above mentioned terrorist organizations from statements that were made by the Defendant during the course of his interrogation, as well as documents that were written in his handwriting. The Defendant explained the manner in which the cells that are called as "al-Aqsa Martyrs Brigades" operated, and which he said had carried out "military operations" (Prosecution/19 Section 14, which was filed and approved by an interrogator by the name of by the name of "Mofaz", on p. 58). In the same manner, the Defendant explained, during the course of his interrogation, the manner in which the al-Aqsa Martyrs Brigades had been formed in the Judea and Samaria region, and how it and worked in an uncentralized fashion, He claimed that the Fatah did not supervise their activity; but he also admitted that these cells approached him in order to receive money because they considered him **"the person who was in charge of the Fatah in the West Bank"** (Transcript Prosecution/98 (e), on pp. $60 - 61$). As shall be explained below, the terrorism operatives from the al-Aqsa Martyrs Brigades directed their requests for financial assistance for the purchase of weapons and the perpetration of terrorist attacks to the Defendant, who would subsequently approach the chairman of the Palestinian Authority and leader of the Fatah, Yasser Arafat, in their name and on their behalf. Hence, this makes the relationship between the al-Aqsa Martyrs Brigades and the Fatah clear, as well as the relationship between the Defendant and the al-Aqsa Martyrs Brigades.

[Stamp] P 7: 000377

**B.   The Status of the Defendant and His Position in Terrorist Organizations and His Support for Terrorist Attacks on Israel**

11.   In his testimony, Brigadier General Goldwasser presented an additional Expert Opinion, which pertained to the involvement of the Defendant in terrorism [sic] (Prosecution/2). A series of appendices are attached to this Expert Opinion, which includes interviews that were conducted with the Defendant by different media outlets, as well as documents that were written by the Defendant or that were found in his office. This Expert Opinion is also subject to the note that has been set forth in Section 9 above, with respect to the admissibility of intelligence assessments that rely on information sources that have not been specified and that have not been brought before the Court. Therefore, in this respect as well, we shall require independent, admissible evidence that has been set forth in Court.

12.   In the Expert Opinion of Brigadier General Goldwasser, Prosecution/2, it was stated that the Defendant was head of the Fatah Supreme Committee in Judea and Samaria until the time of his arrest and that he accordingly served as the leader of the Fatah in the West Bank. This can be learned from the various documents that the Defendant wrote and which were written to him, and which are appended to Expert Opinions Prosecution/1 and Prosecution/2. In the above mentioned position, the Defendant constituted a central source of authority for senior members of the Fatah and served as a conduit connecting the chairman of the Palestinian Authority, Yasser Arafat, to the movement's field echelons (Sections 1 – 2).

It was further stated in the above mentioned Expert Opinion (see Section 4) that when the *intifada* broke out in September 2000, the Defendant played an extremely central role in leading the [campaign of] terror against Israel that was carried out by members of the Fatah, as well as in a general sense. His involvement manifested in a variety of different ways: **First of all**, the Defendant constituted a source of inspiration and created the policy for the terrorist attacks through personal meetings with terrorist operatives in the Fatah movement and by way of his public statements. **Second**, the Defendant was a source of authority and funding for terrorist operatives in the Fatah movement: he was perceived by the al-Aqsa Martyrs Brigades as the main leader of their operations, who served as a conduit that connected them to the chairman of the Palestinian Authority and who transferred sums of money to them that amounted to tens of thousands of shekels, for the purpose of terrorist activity. **Third**, the Defendant issued direct orders to terrorist operatives, on both the strategic level and on the tactical level, with respect to specific terrorist attacks.

13. During the course of his interrogation by the Israel Security Agency, the Defendant did not hide his clear position whereby the Fatah movement must be the one to lead "the armed struggle against Israel" and that this is the only way to achieve the goals of the Palestinian people after the failure of the peace process and after the Defendant himself had been a peace activist for many years (Transcript Prosecution/59, Sections 2-5, that was submitted and verified by an interrogator by the name of "Wadi", on p. 96). He made it clear that when he used the term "armed struggle" he was referring to terrorist attacks (Transcript of the Interrogation Prosecution/98 (k), on pp. 2 – 3). The Defendant explained that the Fatah leaders feared a weakening of their power on the Palestinian street, in comparison to the Islamic movements and that this encouraged them to take a position that espoused terrorist attacks against Israel (Transcript Prosecution/21 Section 5, that was submitted and verified by an interrogator by the name of "Robert", on p. 63 (recorded in error in the Transcript Prosecution/41); Transcript Prosecution/23 Section 5, that was submitted and verified by an interrogator by the name of "Danny", on p. 90; Transcript Prosecution/27 Sections 10-12 and Transcript Prosecution/55 Section 3 that were submitted and verified by an interrogator by the name of "Smith", on p. 85; Transcript Prosecution/30 Sections 8-12 and Transcript Prosecution/58 Section 5 that were submitted and verified by an interrogator by the name of "Emile", on p. 54; Transcript Prosecution/40 Section 15 that was submitted and verified by an interrogator by the name of "Mofaz", on p. 58; Transcript Prosecution/70 Section 3 that was submitted and verified by an interrogator by the name of "Steve", on p. 53).

During the course of his interrogation, the Defendant said that **"his declared position is for armed struggle against the Israeli occupation and that anyone who has a weapon should perpetrate terrorist attacks, this is the general position"** (Prosecution/23 Section 5, see also Transcript Prosecution/6 Sections 11 – 12, that was submitted and verified by an interrogator by the name of "Robert", on p. 62). He explained that in accordance with his perspective, terrorist attacks that will be painful for Israel will promote peace and will cause Israelis to understand that they have something to lose (Prosecution/40 Section 15, and Prosecution/70 Section 4). The Defendant made it clear that from his point of view Israelis who live in settlements are an enemy that should be attacked (Transcript Prosecution/63, Section 16, that was submitted and verified by an interrogator by the name of "Naor", on p. 82). He also stated that terrorist attacks against settlers in Judea and Samaria are legitimate even when they involved women and children (Transcript Prosecution/6 Section 13 that was submitted and verified by an interrogator by the name of "Robert", on p. 62; Transcript Prosecution/7 Section 2 that was submitted and verified by interrogators by the names of "Tzadok" and "Ofir", on pp. 83, 87).

[Stamp] P 7: 000378 [continued]

The Defendant reiterated repeatedly during the course of his interrogation that in the debate that was taking place between the Palestinian Authority and the Fatah with respect to the type of terrorist attacks against Israel, Arafat and he espoused a policy whereby terrorist attacks should be focused against the Israeli Defense Forces and the settlers, while other leaders such as Abu Ala and Abu Mazen opposed any type of violence; only a few members of the Fatah supported terrorist attacks within Israel (Prosecution/27 Sections 12 – 13; Prosecution/30 Section 8; Prosecution/70 Section 3). Despite the opposition of Arafat and the Defendant to terrorist attacks within Israel, they lost control of the cells and field operatives during the *intifada* (Transcript Prosecution/55 Section 3 (f), that was submitted and verified by an interrogator by the name of "Smith", on p. 85).

14. The Defendant's position, as it has been set forth above, is also manifested within the framework of his statements during interrogations, which have been transcribed. The Defendant explained his position that suicide terrorist attacks should not be perpetrated within Israel, saying that terrorist attacks against the settlements are the same as terrorist attacks against the army and there was no argument on this point within Fatah. Notwithstanding, he did confess that during the period of time that immediately preceded his arrest, the Fatah did begin to perpetrate suicide terrorist attacks within Israel and even confirmed that the Fatah had been drawn into this activity in order not to leave control of the field in the hands of the Islamic organizations (Prosecution/98 (d), on pp. 27 – 29). The Defendant explained that he personally disagreed with any activity within Israel but that he supported "the armed struggle against the Israeli occupation" and did this publicly on television (Prosecution/98 (g), on pp. 7, 10).

The Defendant confirmed that during the five months that had led up to his arrest, the Fatah had assumed a central role in the escalation of violence and had led the war; the Defendant did not deny that he had taken part in this (Prosecution/98 (l), on p. 35; Prosecution/98 (d), on pp. 3 – 4).

During the course of the interrogation, the Defendant emphasized that he had supported the peace accords and worked on their behalf for 10 years but the escalation in violence was caused, he claimed, by a lack of hope that a political solution could be reached with Prime Minister Sharon (Prosecution/98 (l), on pp. 44 – 45). The Defendant even expressed his opinion that the Palestinians had made a mistake when they rejected Israel's proposal and, especially, the proposal of President Clinton at the Camp David summit, because if they had accepted those proposals, they would now have an independent state (Transcript Prosecution/95 that was submitted and verified by an interrogator by the name of "Ofir", on p. 87).

[Stamp] P 7: 000378 [continued]

15. It is also possible to learn about the position of the Defendant with respect to terrorist attacks and his role in the perpetration of terrorist attacks against Israel by the Fatah from the conversations that he had with the agents who were planted in a cell. The agent who was referred to as John Doe No. 1 introduced himself to the Defendant as a Palestinian from Nablus. He reported the things that the Defendant had told him to Israel Security Agency interrogators after the conversations had taken place, and these were recorded in the transcript that was taken down by the Israel Security Agency interrogators who had testified in the trial ("Robert", on p. 154, "Mickey", on p. 155, "Ofir", on p. 156 and "Mofaz", on p. 157). In addition, John Doe No. 1 testified himself (on pp. 101 – 107). John Doe No. 1 testified that he read all of the reports that had been recorded by Israel Security Agency agents with respect to his conversations with the Defendant, and that he had confirmed their content (on p. 105). The agent, John Doe No. 3, operated and was employed in a similar matter. He also identified the voice of the Defendant on the recording Prosecution/124 (b) (see his testimony on pp. 107 – 110 and in the exhibits Prosecution/122 – Prosecution/125).

According to the testimony of John Doe No. 1, the Defendant had told him that he was the one who had established the al-Aqsa Martyrs Brigade and that he was in charge of that organization (on p. 106). In the transcript that was written on the basis of his oral statements (Prosecution/117 that was submitted and verified by an interrogator by the name of "Robert", on p. 154), John Doe No. 1 said that the Defendant told him that the *intifada* had actually been planned because of the political situation, the expansion of the settlements, the continued occupation and pressure from Palestinians in the territories and that the visit of Ariel Sharon on the Temple Mount was only "the straw that broke the camel's back" and ignited the *intifada* that would have happened anyway (see also Transcript Prosecution/25 Section 18, that was submitted and verified by an interrogator by the name of "Mofaz", on p. 58).

[Stamp] P 7: 000379

After the incident on the Temple Mount, the Fatah security apparatus asked Arafat to order the halting of the *intifada*, but Arafat did not respond. The Defendant himself said that he left the meeting in a fury in light of the request that they had made, and that he is hated by the apparatus because he "dragged the people into an escalation of the situation." The Defendant told John Doe No. 1 that the purpose of the *intifada* was to attack soldiers and settlers in order to cause their departure, and in order to prove to the world that the Palestinians are fighting the occupation. However, after Israel had begun its policy of targeted assassinations, and especially after it targeted Ra'ed Karmi, the Fatah began to act within Israel, with the objective of harming civilians and in order to cause damage to the Israeli economy and tourism and to exert pressure on the Israeli street to pressure the government to withdraw from the territories (*op. cit.*, Sections 12 – 13, 17, 20 – 21). Similarly, the Defendant told John Doe No. 1 that, from his perspective, terrorist attacks constitute self-defense for the Palestinians, who are willing to extend a hand in peace, and that suicide terrorist attacks are an outcome of the occupation and the condition of the Palestinians in the territories (Transcript Prosecution/110 Sections 22, 27).

The position of the Defendant in support of the continuation of the *intifada* was further expressed in the letter that he had sent to Yasser Arafat on December 31, 2000 (Prosecution/5 (42a)).

[Stamp] P 7: 000379 [continued]

16. With respect to Fatah's policy on terrorist attacks, the Defendant explained, during the course of his interrogation, that when Arafat was interested in a cease fire he would take pains to convey the guideline to many different people, including the Defendant; but that when he was interested in the continuation of the activity, he would make sure that the operatives, including the Defendant, would understand this from his responses and especially from his non-responses. The Defendant said: **"If he (Arafat) for example did not want a cease fire, he would take care of matters differently. He would not say anything at all"** (Transcript Prosecution/24 Section 3 (b) that was submitted and verified by an interrogator by the name of "Smith", on p. 85, and the transcript of the interrogation of the Defendant Prosecution/98 (i), on pp. 32-33). The Defendant said that Arafat had never explicitly ordered him to carry out terrorist attacks. Notwithstanding, he did add that from the fact that Arafat only opposed the perpetration of terrorist attacks within Israel, it was possible to understand that he supported terrorist attacks in the territories and therefore he did not order that they be stopped; on several occasions, Arafat stated in the media that **"a million *shahids* [martyrs] are on their way to Jerusalem"** and the Defendant asked rhetorically whether the statement wasn't a statement of support for terrorist attacks (Transcript Prosecution/60 Section 4-7 that was submitted and verified by an interrogator by the name of "Emile", on p. 54; Transcript Prosecution/61 Sections 1 – 8 that was submitted and verified by an interrogator by the name of "Mickey", on p. 81; Transcript Prosecution/62 Sections 3-5 that was submitted and verified by an interrogator by the name of "Danny", on p. 90).

The Defendant explained that there was no need for direct orders from Arafat in order to carry out terrorist attacks since this was self-evident between the lines (Transcript Prosecution/63 Sections 11-13 that was submitted and verified by an interrogator by the name of "Naor", on p. 82). The Defendant added that even if the *intifada* had not commenced at the order of Arafat, it would not have continued if he did not support it, even though was not necessary for him to give explicit orders with respect to the perpetration of terrorist attacks (Transcript Prosecution/64 that was submitted and verified by an interrogator by the name of "Robert", on p. 62, and Prosecution/66 that was submitted and verified by an interrogator by the name of "Emile", on p.

54). It should also be noted that the Defendant understood that Arafat supported the terrorist attacks from the fact that Arafat would approve the financial requests that he submitted for the Fatah field operatives who were perpetrating the terrorist attacks (Transcript Prosecution/70 Section 17 (h) that was submitted and verified by an interrogator by the name of "Steve", on p. 53). The Defendant described his relationship with Arafat as "**personal and direct**" (Transcription of Conversation Prosecution/98 (h), on p. 55).

It became evident that the Defendant also had his own way of informing members of the cells of the cessation or renewal of terrorist attacks. During the course of his interrogation, he explained that when he wanted a cease fire he would make contact with the large cells, although it would happen that there would be people who would not obey his order; when the Defendant was interested in renewing fire, he would announce it on television by calling for an "armed struggle." When he was asked how he would announce his desire to renew attacks, the Defendant answered:

> "**I do not want fire, I talk on television if I want peace, meaning I do not call up some random person and say 'Hey, go commit a terrorist attack for us. Hey, do this or that for us.' That is not the way we work. I speak in the name of the movement and I am actually calling for an *intifada* when I call for an armed struggle**" (Prosecution/98 (h), on p. 3).

In spite of these statements on the part of the Defendant, it emerges from the testimony of the terror operative Aweis that the Defendant did instruct him to cease the perpetration of terrorist attacks during the visit of the United States emissary Anthony Zinni (see below). From the testimony of Agent John Doe No. 1 during his questioning, subsequent to his conversations with the Defendant, it transpires that the Defendant had expressed great anger about the fact that Aweis had provided this information during the course of his interrogation (Transcript Prosecution/113 (a), Sections 8-9, Transcript Prosecution/114 (a) Section 8 that were submitted and verified by an interrogator by the name of "Robert", on p. 154). In addition, evidence was set forth with respect to other situations in which the Defendant had issued direct orders to terrorist operatives who were close to him, in order to carry out terrorist attacks against Israelis (see below).

[Stamp] P 7: 000380

17. At the outset of his interrogation by the Israel Security Agency, the Defendant denied that he was a leader of the Tanzim and the al-Aqsa Martyrs Brigades, but confirmed that he was the person in charge of the military operations of the Fatah (Transcript Prosecution/17 Section 6, which was submitted and verified by an interrogator by the name of "Arbel", on p. 80, Transcript Prosecution/43 Section 6 that was submitted and verified by an interrogator by the name of "Robert", on p. 62, and a Transcript of the Interrogation Prosecution/98 (a), on pp. 43-44). The Defendant claimed that the Brigades were nothing more than scattered cells throughout the area of the West Bank and that they did not have any orderly organizational structure or central command (Transcript of Conversation Prosecution/98 (e), on pp. 60-61). The Defendant also said during the course of his interrogation that Arafat was effectively his direct commander and his superior and he defined himself as **"responsible for all of the operations of the Fatah in the West Bank itself because he was secretary general of the organization in the West Bank"** (Prosecution/24 Section 3 (b), 5).

The Defendant confirmed that he was the leader of Fatah in the "field" while Yasser Arafat held the position of the head of the Fatah (Transcript of Conversation Prosecution/98 (a), on p. 67). In this manner, the Defendant also explained during the course of his interrogation the fact that members of the cells approached him with requests for money because they considered him the **"commander"** as well as **"the person who was in charge of the Fatah in the West Bank,"** insofar as he was the political spokesperson of the movement and because he maintained a policy and a position that supported the continuation of the struggle against the occupation (Transcript of Conversation Prosecution/98 (e), on pp. 3-4, 61; Prosecution/98 (d), on pp. 33-35). The Defendant explained how he was seen in the eyes of cell members when he said: **"I am their commander and they consider me to be their symbol."** He also confirmed that there is no one else whom they consider to be their leader (Prosecution 98 (i), on pp. 6-7).

In statements that he made during the course of his trial, the Defendant claimed more than once that he was "political leader" of the Fatah and emphasized his position as secretary general of the Fatah in the West Bank, as well as the fact that he is a member of the Palestinian Parliament [Legislative Council]. He also made these claims at the outset of his interrogation by the Israel Security Agency. During the course of his interrogation by the police, the Defendant also denied that he was in charge of the Tanzim or the al-Aqsa Martyrs Brigades (Prosecution/106, on pp. 3, 6). Notwithstanding, during the course of his interrogation by the Israel Security Agency, the Defendant admitted that he was the commander of the Fatah in the West Bank and the commander of the Tanzim (Transcript Prosecution/18 Section 3 that was submitted and verified by an interrogator by the name of "Nadav", on p. 78), that he established the al-Aqsa Martyrs Brigades and was responsible for their operations; for this reason he objected to the activity of the security forces belonging to the Palestinian Authority (in accordance with statements by John Doe No. 1 in Transcript Prosecution/117 Section 15, which was submitted by an interrogator by the name of "Robert", on p. 154).

[Stamp] P 7: 000380 [continued]

The Defendant told Agent John Doe No. 3 in their conversation that he was indeed responsible for the Fatah and for the al-Aqsa Martyrs Brigades but that he was "not crazy [enough] to sign" his name on a piece of paper that would contain these written statements; when the agent asked the Defendant if he was, in spite of this, responsible for the acts of the terrorists, the Defendant responded that he was indeed responsible but "not stupid [enough] to tell this to the interrogators" (Transcript Prosecution/123, on p. 2, which was submitted by an interrogator by the name of by the name of "Ofir"). In a meeting between the Defendant and Ahmed Barghouti when they were arrested, which was recorded without their knowledge, the Defendant told Ahmed that he said during the course of his interrogation that he has no connection to the al-Aqsa Martyrs Brigades. The two laughed and Ahmed advised the Defendant to say that only he – Ahmed – had a connection to the Brigades; the Defendant responded that he had said during the course of his interrogation that he would have fired Ahmed if he knew that he had a connection to the al-Aqsa Martyrs Brigades and Ahmed laughed when he heard this (Transcription of Conversation Prosecution/127 (c) on p. 87).

The Defendant confirmed during the course of his interrogation that beyond being a political leader he was also in charge of the military aspects of the Fatah (Transcript Prosecution/59 Section 6 that was submitted and verified by an interrogator by the name of "Wadi", on p. 96). The Defendant defined himself as "**in charge of all of the operations of the Tanzim in the Fatah in his region**" (Transcription of Conversation Prosecution/98 (d) on p. 42). He even confessed that he was "**in charge of everything that was undertaken, including supplying money to the cells, purchasing weapons and carrying out terrorist attacks**" (Transcript Prosecution/29 Section 1 (c) that was submitted and verified by an interrogator by the name of "Smith", on p. 85) and that he was considered as a "**military commander**" and "**in charge of the military aspects of Fatah**," in addition to being a political leader and elected official (Transcript Prosecution/19 Section 2 and Transcript Prosecution/59 Sections 5-6, which were submitted and verified by an interrogator by the name of "Mofaz", on p. 58).

The Defendant said that in the year prior to his arrest, "**I began to find myself more involved in dealing with issues of weapons and explosives and issues of military operations**" (Transcript Prosecution/25 Section 19, which was submitted and verified by an interrogator by the name of "Mofaz", on p. 58; see also Transcript of Conversation Prosecution/98 (d) on p. 15). He explained that he was required to take part in "military operations" in order to control the Palestinian street and to push the Hamas and the Islamic Jihad aside, so that in the future, he could point to himself as someone who had taken action in favor of both peace and war (Transcript Prosecution/52, which was submitted and verified by an interrogator by the name of "Smith", on p. 85).

[Stamp] P 7: 000381

**C.   Testimony of Terrorism Operatives from the Movement for the Liberation of Palestine with Respect to Their Relationship with the Defendant, His Involvement in Terrorist Attacks and the Defendant's Responses to this Testimony**

18.   The Prosecution does not claim that the Defendant initiated or took a direct part in the perpetration of the terrorist attacks that are the subject of the indictment, since it is aware of the fact that the evidence indicates that the field commanders and field operatives were given broad authority and much room for maneuvering when carrying out terrorist attacks, and that they were not required to obtain the Defendant's approval for each terrorist attack. The Prosecution also agrees that the Defendant did not know in advance about each individual terrorist attack: he was aware of the activities of the field commanders and field operatives subordinate to him in a general way, and that they were acting in accordance with the terrorist attack policy that he had helped design; sometimes he was informed before a terrorist attack and sometimes only afterwards (on p. 47 of the Summations of the Prosecution).

As is shown by the evidence described below, the Defendant was the leader of terror cells that were part of Tanzim and al-Aqsa Martyrs Brigades. At least some members of these cells followed his orders and acted in accordance with policy that he set. In addition, it clearly emerges from the evidence that the Defendant assisted the commanders of the cells and terrorism operatives by supplying weapons, explosives and funding. In several cases, the Defendant approved terrorist attacks against Israel in advance. Therefore, this Chapter will examine who the terrorist operatives who acted under the Defendant's leadership were and the relationship of the Defendant to these operatives. The next Chapter will examine the terrorist attacks in which these terrorism operatives were involved and the degree of the Defendant's connection to them.

**(1) Nasser Aweis**

19.   Nasser Aweis (hereinafter – "Aweis"), is one of the senior terrorism operatives of the Tanzim in the Nablus region. As result of his activity, he was sentenced by this Court to 14 terms of life imprisonment and another 50 cumulative years in prison (Prosecution/172 (a) – (b)). In his testimony (on pp. 180 – 182), Aweis refused to answer questions, and after he was declared a hostile witness, his police statements were submitted in accordance with Section 10 (a) of the Rules of Evidence (Prosecution/172 – Prosecution/177). The only thing that Aweis was willing to say in his testimony was that everything that was recorded in his statement were lies on the part of the Israel Security Agency and that the handwriting that appears in his statement is also that of Israel Security Agency personnel. He claimed that he had undergone very harsh means of interrogation.

The statements that Aweis made to the police were written in his handwriting and translated into Hebrew by the interrogator who took the statements, confirmed having taken them and further testified that the statements were made by Aweis of his own free will (Advanced Staff Sergeant Ronny Amar on pp. 191 – 192). Similarly, reports prepared by the Israel Security Agency of Aweis's statements during interrogation were also submitted (Prosecution/178 (a) – (d)). These were verified by the Israel Security Agency interrogators who testified that Aweis said what he said of his own free will, even though this document is only a summary rather than a word for word transcript of his words ("Ariel", on p. 203, "Adi", on p. 204, "Yoel", on pp. 204 – 205). Transcript Prosecution/178 (c) was recorded by an interrogator by the name of "Zadok" who did not refer to it in his testimony (on pp. 83 – 84) and did not return to testify after Aweis's testimony and therefore should be ignored.

20.  Aweis stated in Statement Prosecution/172 (b) (on pp. 1 – 2), which is written in his own handwriting, that after the al-Aqsa *intifada* began in September 2000, he began to carry out terrorist attacks against Israeli targets while also serving in the Palestinian national security forces in Nablus with the rank of captain (Nakiv). He perpetrated shooting terrorist attacks and other terrorist attacks against Israeli targets in the Judea and Samaria region and also within Israel. In his Statements Prosecution/172 – Prosecution/174, he lists these attacks, which included shooting on military posts and military vehicles; transferring weapons and explosives to others in order for them to perpetrate suicide terrorist attacks in Jerusalem, Netanya and Hadera, etc.

21.  In his statement, Aweis said that he perpetrated the terrorist attacks in the name of the al-Aqsa Martyrs Brigades and explained that this organization belongs to the Fatah movement and the Tanzim Fatah (Prosecution/172 (b), on p. 3). Aweis said that funding for the terrorist attacks came from members of the Tanzim, and that the Defendant himself funded the weapons for the terrorist attacks in which

[Stamp] P 7: 000382 [continued]

he, Aweis, was involved – sometimes directly and sometimes through Majad Almitzri – knowing that Aweis carried out terrorist attacks against Israeli targets. In one case, the Defendant gave Aweis a check that had been approved by Chairman Arafat (on pp. 6 – 7). Aweis also said during the course of his interrogation that he was in contact with the Defendant for an extended period of time; when asked if the Defendant knew that he was carrying out terrorist attacks against Israeli targets, he answered (on pp. 4-5):

> **"Yes he knows and my name was also publicized in newspapers, on television and on the radio and I would speak with him occasionally and when the political situation deteriorated and was bad for us, he asked that we continue the terrorist attacks and when Shimon Peres and Omri Sharon met with leaders from the Palestinian Authority, Marwan Barghouti called me and asked us to stop the terrorist attacks... During that period, Zinni was in the area and Marwan said that it would be preferable not to carry out terrorist attacks in the name of the al-Aqsa Martyrs Brigades while General Zinni was meeting with leaders of the Palestinian Authority. It should be noted that when the talks progressed, no terrorist attacks were perpetrated."**

Speaking to Agent John Doe No. 1, the Defendant expressed anger that Aweis had confessed during the course of his interrogation, how the Defendant had behaved during General Zinni's visit to the region (Prosecution/113 (a) Sections 8 – 9, Prosecution/114 (a) Section 8, which were submitted and verified by an interrogator by the name of "Robert", on p. 154; and transcript of the interrogation of the Defendant Prosecution/98 (h), on p. 3).

22. With respect to his relationship with the Defendant, Aweis said in his Israel Security Agency interrogation that he had submitted requests for assistance from several field operatives to the Defendant and that he himself had received money from the Defendant three times (Transcript Prosecution/178 (a) Section 10). The Defendant was a supervisor in the Tanzim and sometimes transferred financial assistance to himself and to other operatives, after receiving approval from Chairman Arafat (Prosecution/178 (b) Section 10). Generally, Aweis received the money from the Defendant through the middleman Majad Almitzri but sometimes the Defendant would send him money directly; Aweis did not usually tell the Defendant the purpose of the money, but throughout the West Bank, the nature of Aweis's activity was well known (Prosecution/178 (d) Section 5 (k)).

[Stamp] P 7: 000383

Aweis said during the course of his interrogation that the terrorist attacks of the Tanzim were perpetrated with the knowledge and assistance of the Tanzim leadership. After the terrorist attack in the Hadera banquet hall and the entire time that talks were being with Israel, they would give orders to cease the terrorist attacks; however when the talks did not progress, the operatives renewed the terrorist attacks until they were given a new order by their leaders to stop them. In this framework, the Defendant gave orders to cease the terrorist attacks during the visit of General Zinni and leaders from Russia and Europe in Israel (Prosecution/170 8 (d) Section 5 (j)).

23. Aweis's description of his relationship with the Defendant, in accordance with that which has been set forth during the course of his interrogation, is supported by statements that the Defendant made during his Israel Security Agency interrogation. When the Defendant and Aweis met during the course of their interrogation (Prosecution/79 (b)) and Aweis began to read his police statement, the Defendant ordered him to say that it was a forgery, and indeed Aweis quickly said this (interrogator "Zadok", on p. 84). However, the Defendant himself confirmed during interrogation that Aweis was the most senior military operative of the Tanzim Fatah in Nablus and that he was in charge of the al-Aqsa Martyrs Brigades in Nablus (Transcript Prosecution/90 Section 7, which was submitted and verified by an interrogator by the name of "Steve", on p. 53). The Defendant admitted that he knew that Aweis was involved in extensive "military operations" and when he wanted to ensure that the terrorist attacks were halted, he would contact Aweis and instruct him to cease the terrorist attacks (Transcript Prosecution/24 Section 6, which was submitted and verified by an interrogator by the name of "Smith", on p. 85; and Transcript of Conversation Prosecution/98 (i) on pp. 2 – 3).

The Defendant admitted that he sent Aweis, through Majad Almitzri and Ahmed Barghouti, approximately 20,000 New Israeli Shekels (NIS) and possibly even NIS 50,000 – NIS 70,000 in order to finance his activities and that he had received approval for this from Chairman Arafat, but without noting the purpose of the financial aid (Transcript Prosecution/19 Section 16, which was submitted and verified by an interrogator by the name of "Mofaz", on p. 58; Transcript Prosecution/38 Section 4, which was submitted and verified by an interrogator by the name of "Smith", on p. 85; Transcripts Prosecution/40 Section 8 and Prosecution/41 Section 9, which were submitted and verified by an interrogator by the name of "Mofaz", on p. 58; Conversation Transcript Prosecution/98 (i) on pp. 3-4). The Defendant even admitted

that some of the money that he gave Aweis was intended for the purchase of 1,000 bullets for an M-16 rifle and for a Galil type rifle and even declared that he "takes responsibility for all of the money that Nasser (Aweis) had obtained for the funding of terrorist attacks in the Occupied Territories, for the purchase of weapons and ammunition" (Prosecution/41 Sections 6 – 9).

The Defendant also confirmed during the course of his interrogation that Aweis operated cells that were organized under the command of the Defendant (Transcript Prosecution/29 Section 1, which was submitted and verified by an interrogator by the name of "Smith", on p. 85). However, the Defendant emphasized that he himself did not order Aweis to carry out terrorist attacks (Transcript Prosecution/31 Section 6). In spite of this, Agent John Doe No. 1 testified that the Defendant told him that he had given Aweis orders to carry out terrorist attacks (on p. 104).

The Defendant also admitted that subsequent to the terrorist attack in Neve Ya'akov or on the Atarot Bridge (the Defendant could not remember which) Aweis sent him the poster taking responsibility and the Defendant approved it in a conversation with Aweis (Transcript Prosecution/49 Section 7, which was submitted and approved by an interrogator by the name of "Emile", on p. 54; and Transcript Prosecution/52 that was submitted and verified by an interrogator by the name of "Smith", on p. 85).

## (2) Nasser Naji Abu Hamid

24. Nasser Abu Hamid (hereinafter – "Abu Hamid") is one of the senior terrorism operatives of the Tanzim and al-Aqsa Martyrs Brigade in the Jerusalem and Ramallah and he, too, was subordinate to the Defendant and received assistance from him in order to carry out terrorist attacks against Israel. For this activity, Abu Hamid was sentenced, on the basis of his confession, to seven life sentences and another 50 consecutive years in prison (Prosecution/148 (a) – (b)). In his testimony, Abu Hamid refused to answer any questions; he was declared a hostile witness and his police statements were submitted in accordance with Section 10 (a) of the Rules of Evidence (on pp. 40 – 41). These statements (Prosecution 149 (a) – (d)) were submitted by the police interrogators Ibrahim Elkura'an, Ya'akov Barazani and Moshe Levy (on pp. 194 – 195, 207, 211) who testified that Abu Hamid gave them of his own free will and signed them. The statements were made in Hebrew, at the request of Abu Hamid, whom the interrogators said speaks Hebrew well.

[Stamp] P 7: 000384

25. In his statement, Abu Hamid listed the murderous terrorist attacks against Israelis in which he was involved, and said that he approached the Defendant for financial assistance in order to purchase ammunition, and that the Defendant had referred him to his associate, Ahmed Barghouti, who is known as "al-Fransi," who did in fact give Abu Hamid money for the purchase of weapons and ammunition on several occasions (Prosecution/149 (a), on p. 9; Prosecution/149 (c), on pp. 5 – 6). Other members of Abu Hamid's cell also approached the Defendant for money in order to purchase weapons (Prosecution/149, on p. 6). At a certain stage, Abu Hamid asked the Defendant to pay for the purchase of a machine gun, and he eventually was given money for this purpose by Ahmed Barghouti (Prosecution/149 (c), on p. 7). Abu Hamid also said that the Defendant met with a weapons dealer with respect to the purchase of hand grenades but in the end they were only shock grenades (on pp. 7 – 8).

Abu Hamid said that he established the al-Aqsa Martyrs Brigade after the beginning of the *intifada* in December 2000 (on p. 4). He explained that he received an offer to join the cell that was under the leadership of the head of the Palestinian Authority's security agency, Tawfik Tirawi, but that he preferred the Defendant's offer that he be subordinate to him and receive a salary for himself and his men, since he considered the Defendant "a political leader who would not lie" (Prosecution/149 (a), on pp. 15 – 16).

After that, Abu Hamid recruited additional operatives to support the Defendant, established the al-Aqsa Martyrs Brigades and began to carry out terrorist attacks against Israel Defense Forces roadblocks and settlers (on p. 17). With respect to the Defendant, he said that he considered him "a political leader" although he himself was a member of the military branch of the organization (on p. 17). When the commander of the cell was killed, Abu Hamid introduced the successor to the Defendant (Prosecution/149, on p. 7).

In one of his statements, Abu Hamid related an event at which he was present, together with other members of the cell, and one of them told the Defendant of his intent to perpetrate a terrorist attack in the Nablus area, and asked the Defendant for assistance in purchasing a weapon and a car. He also asked the Defendant to contact Aweis for him so that he could help him with the terrorist attack. Abu Hamid said the Defendant contacted Aweis, who did indeed help the cell perpetrate a terrorist attack; after the terrorist attack he reported to the Defendant that in an encounter with Israel Defense Forces soldiers, the members of the cell lost their weapons, and the Defendant promised to take care of the matter (Prosecution 149 (c), on p. 9).

Towards the end of 2001, when mortar shells began to be fired at Israeli settlements, Abu Hamid discussed with the Defendant the necessity of obtaining mortars with a larger range. Abu Hamid approached the Defendant for the purpose of funding the purchase of mortar shells but the Defendant answered that they were too expensive and that "he has a surprise" in this regard and that Ahmed Barghouti would explain it to him; the latter explained to Abu Hamid that they already had a mortar and shells (Prosecution/149 (c), on p. 10). Abu Hamid also reported to the Defendant that mortar shells had been fired at the settlement of Psagot and the Defendant asked him not to tell anyone about it and said that if Arafat knew he would put him in jail (on p. 11).

26. From the statements of Abu Hamid, it is possible to get the impression that he tried to prevent the Defendant from becoming directly involved in terrorist attacks and that he even told other operatives not to ensnare the Defendant in their actions, since the Defendant needed to remain "a political leader" (Prosecution/149 (c) on pp. 8 – 9, 12). In the context of Abu Hamid's attempts to cover up the involvement of the in terrorist attacks, he also tried to minimize the involvement of Ahmed Barghouti in the murder of Talia and Benyamin Kahane, of blessed memory, who were killed with the weapon that Ahmed Barghouti had given to the terrorist (Prosecution/149 (d), on p. 5; see also details of the incident in Chapter E (1) below).

27. The Defendant admitted during the course of his interrogation that he had instructed Ali Aidiya (his finance person) to purchase weapons and explosives for Tanzim activities and to transfer them to Abu Hamid. During the course of his interrogation, the Defendant also referred to the event that Abu Hamid had described in the statement, with respect to the purchase of non-functional hand grenades (Transcript Prosecution/43 Sections 2 – 5, which was submitted and verified by an interrogator by the name of "Robert", on p. 62). The Defendant admitted that the cells that had been led by Abu Hamid had received assistance from him totaling approximately NIS 40,000 (Transcript Prosecution/63 Section 20, which was submitted and verified by an interrogator by the name of "Naor", on p. 82). The Defendant said that when he made the strategic decision to carry out terrorist attacks, he established the cell, while the terrorist attacks were led by, *inter alia*, Abu Hamid (Transcript Prosecution/35 Section 1, which was submitted and verified by an interrogator by the name of "Danny", on p. 90). When the Defendant was asked during the course of his interrogation who were the people who belonged to the terrorist cells under his control, he said of Abu Hamid: "he is considered by me" [sic] (Transcription of Conversation Prosecution/98 (k), on p. 34, where it mistakenly says "Ahmed" in the Hebrew instead of Abu Hamid).

[Stamp] P 7: 000385

### (3) **Ahmed Barghouti**

28. Ahmed Barghouti (who is known as "al-Fransi") is a family member of the Defendant and was his close assistant, in addition to being the Defendant's driver and bodyguard (see his Statement Prosecution/165 (a) on p. 1; and Transcript Prosecution/165 (f), which was submitted and verified by an interrogator by the name of "Adam" and "Danny", on pp. 200-201).

   During the course of his interrogation, Ahmed Barghouti said that he had been under the complete direct control of the Defendant (Transcript Prosecution/165 (j), which was submitted and verified by an interrogator by the name of "Adam", on p. 201). It is not a coincidence that Ahmed Barghouti was arrested together with the Defendant, since his name appears in the evidence in many contexts related to the terrorist attacks perpetrated by the field operatives of the Tanzim and al-Aqsa Martyrs Brigades.

   Ahmed Barghouti refused to answer any questions during his testimony (on pp. 161-163), and after he was declared a hostile witness, his police statements were submitted in accordance with Section 10 (a) of the Rules of Evidence (Prosecution/165 (a)-(e)).

   These statements were submitted and verified by the police officers David Mizrahi, Yitzchak Ya'akoboff and Moshe Moshe (on pp. 171, 184 and 206-207). The interrogators testified that they interrogated Ahmed Barghouti in Arabic but that they wrote down his testimony in Hebrew (which is not in accordance with that which is customary and required). All of the interrogators testified that he gave all of the statements of his own free will.

   Similarly, a document was submitted that was written by Ahmed Barghouti in his own handwriting and in Arabic and was translated (Prosecution/165(c) (1 – 2)). During the course of his interrogation, he admitted that the handwriting in this document is his handwriting (Mizrahi, on p. 185). In addition, Israel Security Agency interrogators submitted the transcripts that were taken down during the interrogation of Ahmed Barghouti (Prosecution/165 (f)-(p), which were submitted and verified as follows: Prosecution/165 (f) by "Adam", on p. 201 and by "Danny", on p. 200; Prosecution/165 (j) by "Adam", on p. 201; Prosecution/165 (m) by

"Adam", on p. 201; Prosecution/165 (n) by "Danny", on p. 200). Transcripts Prosecution/165 (g) – (h), Prosecution/165 (k) – (l) and Prosecution/165 (p) were not mentioned in the testimony of any of the Israel Security Agency interrogators, "Mickey," "Arbel," "Adam" and "Dekel" and therefore they are to be ignored.

29. Ahmed Barghouti said during the course of his interrogation that he and Aweis were in charge of the al-Aqsa Martyrs Brigades during the year preceding his arrest (Statement Prosecution/165 (e)). In his statement he also related his direct and indirect involvement in terrorist attacks that have been carried out against Israel and about the weapons and the vehicle that he supplied to the field operatives who went out to carry out the various terrorist attacks in the Judea and Samaria area and also within Israel, including suicide terrorist attacks.

With respect to the terrorist attack at the **Seafood Market** Restaurant in Tel Aviv, Ahmed Barghouti said when he received the announcement that the terrorist Ibrahim Hasouna would soon depart for the terrorist attack, and when he was told that he had already departed with his escort, he called the Defendant and told him about this; the Defendant authorized the terrorist attack **before** it was carried out but gave orders that it should not be perpetrated in Israel but rather in the territories; Ahmed Barghouti told him, "It will be okay" (Transcript Prosecution/165 (m), which was submitted and verified by an interrogator by the name of "Adam", on p. 201; and Transcript Prosecution/165 (n), which was submitted and verified by an interrogator by the name of "Danny", on p. 200). Immediately after the terrorist attack at Seafood Market, in which Ahmed Barghouti himself was personally involved, he called the Defendant at 3:15 a.m. and reported to him on the perpetration of the terrorist attack; the Defendant sounded annoyed (Statement Prosecution/165 (c) on p. 1, Transcript Prosecution/165 (n)). According to Ahmed Barghouti, the Defendant told him to tell Aweis not to take responsibility for this attack before speaking with the Defendant, since the Defendant was interested in wording the announcement (Prosecution/165 (d) on p. 1, Transcript Prosecution/165 (n)) Ahmed Barghouti was asked why he reported on the terrorist attack to the Defendant and he answered: **"I reported to Marwan Barghouti in the usual manner."**

[Stamp] P 7: 000386

30. During the course of his interrogation, Ahmed Barghouti also spoke about the terrorist attack at the **gas station in Givat Ze'ev**, which was carried out as revenge for the targeted assassination of Ra'ed Karmi. He claimed that he asked that the perpetrator, Abu Satha, not inform the Defendant about it in advance. However, Abu Satha did discuss it with the Defendant and the Defendant told him not to carry out the terrorist attack, apparently because he feared for the life of Abu Satha, who was his bodyguard (Transcript Prosecution/165 (c) on p. 2 and Transcript Prosecution/165 (m) that was submitted and verified by an interrogator by the name of "Adam", on p. 201). This is one example of Ahmed Barghouti's efforts during the course of his interrogation to cover up the Defendant's actions, since the Defendant himself took responsibility for this terrorist attack during his own interrogation and it is clear from his statements that he gave orders for its perpetration (see Sections 66 (5) and Chapter E (7), below).

In another instance that Ahmed Barghouti spoke about during the course of his interrogation, the Defendant rejected the request of the young 15 year old woman to perpetrate a suicide terrorist attack, saying, "**She is too young to do this**", and instructed Ahmed Barghouti to tell her that (Prosecution/165 (c), on p. 4; and Transcript Prosecution/165 (m) Section 2 (j), which was submitted and verified by an interrogator by the name of "Adam", on p. 201). A similar version emerges from the comments of the Defendant during the course of his interrogation (Transcript Prosecution/25 Sections 6 – 7, which was submitted and verified by an interrogator by the name of "Smith"; on p. 85, and the transcript of the Interrogation Prosecution/98 (j), on pp. 8 – 9).

In an additional incident that was described by Ahmed Barghouti, Jihad Jawara called the Defendant and asked to commit a terrorist attack, and Defendant told him not to do it in Israel or in Jerusalem. However, Jawara left the car bomb that exploded the following day next to the Malha Mall in Jerusalem despite the Defendant's orders (Prosecution/165 on p. 18). This description was confirmed by the Defendant during the course of his interrogation (see Section 66 (e) and Chapter E (20), below).

31. Throughout the course of his entire interrogation, Ahmed Barghouti showed a clear tendency to minimize the Defendant's involvement in various terrorist attacks. When he referred to the Defendant by name he would usually do so in order to say that the Defendant opposed the perpetration of the terrorist attack. However, Ahmed Barghouti did confirm in the statement, which he wrote by his own hand, that a series of field operatives in the cells received money from office of the Defendant, with his knowledge, and that the money received from the Defendant was used, by himself and by others, to carry out terrorist attacks (Statement Prosecution/165 (c) (1) on p. 6, Statement Prosecution/

165 (c) on p. 2 and Statement Prosecution/165 (m) Sections 2 (c) and 2 (g) that was submitted and verified by an interrogator by the name of "Adam", on p. 201).

Similarly, it is clear from the statements that were made by Ahmed Barghouti that the Defendant would occasionally instruct him to cease or to postpone the perpetration of a terrorist attack (Transcript Prosecution/165 (m) Section 2 (g), which was submitted and verified by an interrogator by the name of "Adam", on p. 201). From this, it becomes apparent that in other cases, they were perpetrated with the Defendant's authorization, even if he did not know in advance about each and every terrorist attack.

32. At the beginning of his interrogation, the Defendant tried to protect his family member, Ahmed Barghouti, and he claimed that he had been arrested with him because he "just happened to be passing by" (Transcript Prosecution/9 Section 10 that was submitted and verified by an interrogator by the name of "Robert", on p. 62). The Defendant claimed that Ahmed Barghouti had stopped working for him as a driver eight months before his arrest and that there was no connection between them with regard to the perpetration of terrorist attacks (Transcript Prosecution/10 Section 1, which was submitted and verified by an interrogator by the name of "Danny", on p. 90; and Transcript Persecution/21 Section 23, which was submitted and verified by an interrogator by the name of "Robert", on p. 63). In his police interrogation, Defendant claimed that Ahmed Barghouti was neither his secretary nor his bodyguard (Prosecution/104 on p. 4). In a meeting between the Defendant and Ahmed Barghouti at the time they were arrested, which was recorded without their knowledge, the two coordinated their positions with respect to the interrogation, and Ahmed Barghouti told the Defendant that he had claimed during the course of his interrogation that he is not connected to the Defendant but only served as his driver; the Defendant said he told them the same thing (Transcription of Conversation Prosecution/127 (c) on pp. 2-3). Ahmed Barghouti told the Defendant at that meeting exactly what he had said during the course of his interrogation with respect to the Defendant and his relationship to the various terrorist attacks that Ahmed Barghouti mentioned during the course of his interrogation (on p. 4).

[Stamp] P 7: 000387

However, during his Israel Security Agency interrogation, the Defendant confirmed that he knew that Ahmed Barghouti was connected to several cells and the perpetration of many terrorist attacks against Israel, and that when he wanted to stop the terrorist attacks, he would also tell this to Ahmed Barghouti. He claimed that he had told Ahmed Barghouti that he "does not permit" carrying out terrorist attacks within Israel (Transcript Prosecution/98 (k) on pp. 18-20). The Defendant said that there was coordination between himself and Ahmed Barghouti, which included reporting and providing money, and that he considered Ahmed Barghouti in charge of military operations in the Ramallah region, together with Abu Hamid, and that the two would carry out terrorist attacks by using several cells (Transcript Prosecution/27 Sections 2-3 that was submitted and verified by an interrogator by the name of "Smith", on p. 85).

The Defendant admitted that he gave money to Ahmed Barghouti and supported his activity although he claimed that Ahmed Barghouti did not report to him **prior** to the perpetration of terrorist attacks (Transcript Prosecution/98 (h) on pp. 3, 17, 20-24; and Transcript/24 Section 4, which was submitted and verified by an interrogator by the name of "Smith", on p. 85).

The Defendant admitted that Ahmed Barghouti would report to him **subsequent to** carrying out terrorist attacks (Transcript Prosecution/98 (g) on pp. 19-25, 40; Transcript Prosecution 98 (k) on p. 9). In his conversation with Agent John Doe No. 1, the Defendant said that Ahmed Barghouti dispatched four suicide terrorist attacks with his approval (Testimony of the agent on p. 106). These statements are consistent with those stated by the Defendant during the course of his interrogation when he took responsibility for several terrorist attacks that he had personally authorized (see Section 66, below).

The Defendant did not hide the fact that he had given Ahmed Barghouti tens of thousand of dollars for the purchase of a variety of weapons, including assault rifles and pistols, for members of the cells that had mounted terrorist attacks against Israel. Ahmed Barghouti was responsible, on behalf of the Defendant, for the purchase of the weapons. He worked under the command of the Defendant and was in charge of "military operations" in the Ramallah region. The Defendant admitted that he knew that Ahmed Barghouti was connected to terrorist attacks against Israel, including the terrorist attacks in Jerusalem and at the Seafood Market Restaurant in Tel Aviv (with respect to all of these see: Transcript Prosecution/23 Sections 4-5 that was submitted and verified by an interrogator by the name of "Danny", on p. 90; Transcript Prosecution/25 Sections 10-11 that was submitted and verified by an interrogator by the name of "Mofaz", on p. 58; Prosecution/27 Sections 2, 4 and Prosecution/29 Section 1 that were submitted and verified by an interrogator by the name of "Smith", on p. 85; Prosecution/28 Section 4 that was submitted and verified by an interrogator by the name of "Abu Wadi", on p. 96; Prosecution/65 Section 4 and Prosecution/70 Section 9 that were submitted and verified by an interrogator by the name of "Steve", on p. 53; see also the Defendant's comments in Transcript Prosecution/98 (g) on pp. 2-6, Transcript Prosecution/98 (h) on pp. 20-24, Prosecution/98 (j) on pp. 10-11 and Prosecution/98 (k) on p. 8).

**In order to summarize the relationship between the Defendant and Ahmed Barghouti,** it can be stated that the connection of the Defendant with terrorism operatives was through his family member and close associate, Ahmed Barghouti. As the Defendant stated when he was being questioned about Ahmed: **"He makes contact with the cells, both directly and indirectly. That is to say that without him I would not have direct communication with any**

[Stamp] P 7: 000387 [continued]

cells" (Transcript Prosecution/98 (k) on p. 8). When the Defendant was asked during questioning who headed the terrorist cells that operated under his control, the Defendant said, "**Ahmed Barghouti was partially under my control and partially worked with Nassar (Aweis)**" (Transcript of Conversation Prosecution/98 (k) on p. 34).

### (4) Mohamed Maslah (Abu Satha)

33. Mohamed Maslah "Abu Satha" (hereinafter – "**Abu Satha**") was another field operative who headed a cell that perpetrated murderous terrorist attacks. He was also the Defendant's bodyguard for a time, as well as his close associate. For this activity, Abu Satha was convicted, on the basis of his confession, and sentenced to nine cumulative terms of life imprisonment (Prosecution/155 (a) – (c)). In his testimony, Abu Satha began by stating that he did not have any connection with the Defendant and the Defendant was "**a political person**" who had no connection to the "military operations." Beyond this, Abu Satha was not willing to answer any other questions and therefore was declared a hostile witness and his police statements Prosecution/156 (a) – (c) were submitted in accordance with Section 10 (a) of the Rules of Evidence (on pp. 66 – 68). The Statement Prosecution/156 (a) was not submitted by an interrogator by the name of to whom it was given (the police officer Ya'akov Barazani) and therefore should be ignored. The Statements Prosecution/156 (b) – (c) that were submitted and verified by the police officers Marco Dahan and Moshe Levi (on pp. 198, 210) who testified that the statements were given by Abu Satha of his own free will. The interrogation was conducted in Arabic but the statements were written in Hebrew (which is not in accordance with that which is customary and required).

In his statement, Abu Satha describes the terrorist attacks that he perpetrated and from his statements it becomes apparent that Ahmed Barghouti, the Defendant's close assistant, was involved in many of them in a concrete manner.

34. The Defendant confirmed during the course of his interrogation that Abu Satha worked in his office and operated under his responsibility, through Ahmed Barghouti, and that he knew that Abu Satha had carried out various terrorist attacks against civilians in Givat Ze'ev and Pisgat Ze'ev (Transcript Prosecution/30 Sections 2 – 3, which was submitted and verified by an interrogator by the name of "Emile", on p. 54, Prosecution/98 (k) on p. 35). When the Defendant was asked about the leaders of the terrorist attacks cells that operated under his control, he included Abu Satha among them, and said "**I am not running away from this**" (Transcript Prosecution/98 (k) on p. 34).

[Stamp] P 7: 000388

**(5) Jamal Ahawil**

35.  Jamal Ahawil (hereinafter – "**Ahawil**") was an additional field operative who assisted the Defendant and was his contact person in the Jenin refugee camp.

Ahawil was not willing to answer any questions during the course of his testimony; he was declared a hostile witness and his police statements were submitted in Prosecution/166, in accordance with Section 10 (a) of the Rules of Evidence (on pp. 164 – 165), by the police officer Matans Hadad to whom it was made (on p. 169). Ahawil gave his statement in his own handwriting and Hadad translated it into Hebrew.

Ahawil operated within the framework of the al-Aqsa Martyrs Brigades and stated during the course of his interrogation that he had received financial, among other, assistance from the Defendant and that he would distribute this money to other operatives, including some operatives who were wanted by the Israel Defense Forces; some of the money was used for the purchase of weapons (Prosecution/166 on p. 1). Ahawil was in continuous contact with the Defendant and would report to him about the operations of the al-Aqsa Martyrs Brigades and on offenses in the Jenin camp; sometimes operatives from these Brigades would report to the Defendant directly, as was the case with Aweis (Prosecution/166 on p. 5).

The Defendant, in his police interrogation, denied that he was acquainted with Ahawil (Prosecution/106 on p. 6). However, while being interrogated by the Israel Security Agency, the Defendant did say that Ahawil was a leader from the Jenin refugee camp and a member of the al-Aqsa Martyrs Brigades that belong to the cells of Aweis. The Defendant was well acquainted with Ahawil but claimed that he never gave him weapons or money, although

Ahawil had asked him for assistance; the Defendant explained that he worked with Aweis, and Aweis was the one who would answer Ahawil's requests (Transcript Prosecution/31 Sections 7 – 9, which was submitted and verified by an interrogator by the name of "Mofaz", on p. 58). Similarly, the Defendant confirmed that he sent requests for assistance from Ahawil to Arafat (Transcript Prosecution/67 Section 4 that was submitted and verified by an interrogator by the name of "Emile", on p. 54).

#### (6) Nasser al-Shawish

36. Nasser al-Shawish (hereinafter "Shawish") was another operative who was involved in terrorist attacks that were carried out by the al-Aqsa Martyrs Brigades. For this activity, he was convicted, on the basis of his confession, and sentenced to four cumulative life sentences (Prosecution/157 (a) – (d)). Shawish refused to answer any questions during his testimony but did claim that the Defendant was a political leader who did not have any connection to "military affairs." He was declared a hostile witness, denying the things that he said during the course of his interrogation and even claimed that he had not admitted anything (on pp. 69 – 71). Shawish's Statements Prosecution/158 (a) – (b) were submitted in accordance with Section 10 (a) of the Rules of Evidence by the police officers Matans Hadad and Awad Ataaf (on pp. 165, 168).

    Regarding his statement, he testified that it was written in Arabic in his own handwriting, of his own free will, and translated into Hebrew by the interrogators. Police officer Hadad testified that he was present at the trial of Shawish and that he verified his statement before his conviction, since he did not have a defense attorney.

37. During the course of his interrogation (Statement Prosecution/158 (a), on p. 6 and Statement Prosecution/158 (b), on pp. 2 – 4) Shawish said that he had received an explosive belt weighing approximately 18 kg from the headquarters of the Counter-intelligence Force in Ramallah in order to store it in his car. Later, he met the Defendant at the hospital where his wife was being treated and Defendant asked to speak with him privately. During the course of their conversation, he was asked by the Defendant if he was acquainted with anyone who knew how to prepare an explosive belt or any one who had an explosive belt. At that time, Shawish called the person who had given him the explosive belt (Muzid Almitzri) called him and received his agreement for giving it to the Defendant. The Defendant informed him that Ahmed Barghouti would discuss the matter with him. The next day Ahmed Barghouti called Shawish and the latter gave him the explosive belt. Shawish heard later that day that the person who was carrying the belt had been caught in Jerusalem on his way to perpetrate a suicide terrorist attack.

[Stamp] P 7: 000389

Shawish was asked during the course of his interrogation if the Defendant knew about the suicide terror attacks and military operations. He answered that the day before the suicide terrorist attack was carried out by Mohammed Hashayka, Shawish met with the Defendant and told him that a person named Abdel Kareem was supposed to be sending the suicide bomber to Israel; the Defendant told Shawish to call him if he needed anything for the terrorist attack and gave him $600 and asked to be informed of details of the terrorist attack (on pp. 6 – 7). The terrorist attack was carried out in Jerusalem, and then the Defendant called Shawish, who told him that the terrorist attack had been perpetrated by the al-Aqsa Martyrs Brigades. The Defendant asked him to bring him the videotape of the suicide [bomber] Hashayka (on pp. 6 – 7 of Statement Prosecution/158 (a)). In his second statement Prosecution/158 (b), Shawish spoke about the financial assistance that he had received from the Defendant (on p. 5).

38.  The Defendant denied in his police interrogation that he was acquainted with Shawish and in his statement he also denied the statements made by Shawish (Prosecution/106 on pp. 7 – 9). No additional evidence was presented to us with respect to the events that Shawish described during the course of his interrogation and therefore they are not supported and it is not possible to use them to support findings.

## (7) Ali Aidiya

39.  Ali Aidiya (hereinafter – "**Aidiya**") was a Tanzim operative who was primarily involved in training young people in the use of weapons, and in this matter he received orders from the Defendant. Similarly, he participated in shooting terrorist attacks aimed at soldiers. Aidiya refused to answer any questions during his testimony and claimed that the Defendant was a "man of peace" (on pp. 169 – 171). Therefore, he was declared a hostile witness and his Statement Prosecution/168 was submitted in accordance with Section 10 (a) of the Rules of Evidence by the police officer Ya'akov Barazani, who took the statement in the Arabic language and who translated it into Hebrew (on p. 208).

40. During the course of his interrogation, Aidiya spoke of the Defendant's participation in the shooting course for young people (Prosecution/168, on pp. 1 – 2) and the terrorist attacks that he himself had perpetrated. Similarly, Aidiya said: **"The head of the Tanzim, Marwan Barghouti, would know about all of the shooting incidents that have been carried out by Tanzim operatives before they had been perpetrated, and he had approved them"** (on p. 5). He noted that several months before his arrest, the Defendant asked him "to buy a weapon of any type" and to transfer it by way of Abu Hamid (Transcript Prosecution/43 Section 3, which was submitted and verified by an interrogator by the name of "Robert", on p. 92), which supports what Aidiya said during the course of his interrogation.

### (8) Ismail Radaida, Muhannad Abu Halawa and Khamal Abu Wahr

41. Ismail Radaida (hereinafter – **"Radaida"**) wanted to perpetrate a terrorist attack and approached the Defendant for that purpose. He perpetrated the shooting terrorist attack near Ma'ale Adumin, where the Greek Orthodox monk Germanos Tsibouktzakis [Translator's note: as written], of blessed memory, was murdered (see Chapter E (3), below). For his terrorist activity, Radaida was convicted, on the basis of his confession, and sentenced to life in prison and another 20 consecutive years' imprisonment. In his testimony in this case (on pp. 42 – 44), Radaida refused to answer questions; he was declared a hostile witness and his police statement was submitted on the basis of Section 10 (a) of the Rules of Evidence (Statements Prosecution/151 (a) – Prosecution/151 (c), handwritten Statement Prosecution 151 (d) that was torn, reconstructed and translated and the recording in which Radaida reenacted the murder of the monk and its transcript – Prosecution/151 (a)).

Radaida's statement was submitted by an interrogator by the name of Marco Dahan and Yitzchak Ya'akoboff who heard his statement in Arabic but recorded in Hebrew (which is not in accordance with that which is customary and required), and testified that it was given by Radaida of his own free will. Radaida wrote his Statement Prosecution/151 (d) in his own handwriting, in the presence of Ya'akoboff (on pp. 171, 198). The person who conducted the re-enactment (Marco Dahan) made no reference to this fact in his testimony and therefore the recording of the re-enactment is not to be considered, as it is an external statement of a witness that was not submitted as required by law.

[Stamp] P 7: 000390

42. In his first statement, Radaida (Prosecution/15 (a)) said that he decided to perpetrate the terrorist attack when he saw on television that a Palestinian baby girl had been killed, and therefore he went to the office of the Defendant. The conversation between them was held in private and Radaida told the Defendant that he wanted to perpetrate the terrorist attack and demanded a weapon for that purpose. The Defendant referred Radaida to a person by the name of Muhannad (Abu Halawa) who is known as "Alaa" (hereinafter – "**Muhannad**") and instructed Muhannad to obtain a weapon for Radaida. In his second statement (Prosecution/15 (b)), Radaida added that he made it clear to the Defendant that he required the weapon in order to carry out terrorist attacks against Israeli targets, and then the Defendant had referred him to Muhannad. Muhannad told Radaida that that he would obtain two Kalashnikov rifles for him and that from now on his contact would be with Muhannad and not with the Defendant. About two weeks later, Muhannad called Radaida – who had meanwhile added another person to the terrorist attack – and told him that the weapons were ready. Radaida received weapons and ammunition from Muhannad, who instructed him and his comrade in their operation.

After several days of preparation for the terrorist attack, Radaida and his comrade Yasser went to an observation point on the Ma'ale Adumin Road; they carried out the terrorist attack by shooting at the car in which the monk was traveling, and then fled. The next day, Radaida learned from the news that he had killed a Greek monk and Muhannad called him to complain about this; Radaida explained that he thought it was a settler. During the course of his interrogation, Radaida was asked why he went to the Defendant when he wanted to perpetrate a terrorist attack and he answered that he had seen the Defendant several times on television and understood "**that he is the only person who could help me to obtain a weapon**" (on p. 5).

In his third Statement (Prosecution/15 (c)), Radaida revealed that his original intent was to perpetrate a suicide terrorist attack but the Defendant told him, "**Suicide attacks are the work of Hamas and the Islamic Jihad; the Tanzim carries out attacks against the army and the settlers.**"

[Stamp] P 7: 000390 [continued]

**Radaida** continued, saying, "**Marwan Barghouti said that he was willing to give me weapons and explosives so that I could carry out attacks against soldiers and settlers**" (on p. 1). This version by Radaida also emerges from the document that he wrote in his own hand (Prosecution/15 (d)), although in a more condensed version.

43.  Radaida's story is also supported by the Defendant's version during the course of his interrogation (Transcript Prosecution/98 (k) on pp. 37-38; and Transcript Prosecution/98 (d) on pp. 2-4, 11-12, where it mistakenly reads Ismail Aldeba instead of Ismail Radaida). In his police interrogation, the Defendant denied that Muhannad worked in his office or was his deputy and said that Muhannad was not connected to the Tanzim (Statement Prosecution/102 on p. 3, Prosecution/103 on p. 5, Prosecution/105 on p. 2, Prosecution/106 on p. 1). Early during the course of his interrogation by the Israel Security Agency, the Defendant also denied that he was acquainted with Radaida and said that Muhannad worked in his office (Transcript Prosecution/9 Sections 8-9 and Transcript Prosecution/21 Section 22 that were submitted and verified by an interrogator by the name of "Robert", on pp. 62-63).

However, as the interrogation continued, the Defendant admitted that Radaida had come to him to proprose the perpetration of a suicide terrorist attack and that the Defendant told him, "**We do not work with suicide attacks.**" The Defendant referred Radaida to Muhannad and told Muhannad that Radaida "**needs training... find something for him.**" Similar the Defendant said, "**Muhannad reached an agreement with him that he would try to carry out an attack here in Ma'ale Adumim or someowhere else, I knew about it later... then they fired on a car and injured some fellow Elhouri... meaning they killed him**" ("Elhouri" means "Priest" in Arabic – A.B.). A similar confession with respect to the recruitment of Radaida by way of Muhannad emerges from points that he had made during the interrogation (see: Transcript Prosecution/22 Sections 12-16 and Transcript Prosecution/40 Section 9 that were submitted and verified by an interrogator by the name of "Mofaz", on p. 58, Transcript Prosecution/23 Section 6 that was submitted and verified by an interrogator by the name of "Danny", on p. 90; and transcript of the interrogation of the Defendant Prosecution/98 (d) on pp. 21-26; and Prosecution/98 (g), on p. 8).

The Defendant further admitted that he met with Muhannad and gave him money for the purpose of carrying out terrorist attacks, after Muhannad told him that his cell had perpetrated several terrorist attacks, including the murder of the Kahane couple, of blessed memory. The Defendant said that he gave Muhannad a sum of approximately $3,000, as well as weapons (Transcript Prosecution/43 Sections 14-16 that was submitted and verified by

[Stamp] P 7: 000391

an interrogator by the name of "Robert", on p. 62; Transcript Prosecution/59 Section 10 that was submitted and verified by an interrogator by the name of "Wadi", on p. 56; Transcript Prosecution/67 Section 6 that was submitted and verified by an interrogator by the name of "Emile", on p. 54; Transcript Prosecution/68 that was submitted and verified by an interrogator by the name of "Steve", on p. 53).

In the transcript of the interrogation of the Defendant (Prosecution/98 (d), on pp. 21-23) he said that Muhannad informed him that his cell had been caught and explained that Muhannad was referring to "**those for whom we arranged weapons.**"

44.  The relationship between the Defendant and Muhannad also emerges from remarks that Khamal Abu Wahr (hereinafter – "**Wahr**") made in his statement with respect to money that he had received from Muhannad, with the knowledge and the approval of the Defendant. In this manner, he received from the Defendant, by way of Muhannad, the sum of approximately NIS 25,000, most of which was intended for the purpose of the manufacture of mortars and the purchase of pistols. At a certain stage, the Defendant began to call Wahr directly, in order to clarify his needs. In addition, Wahr said said during the course of his interrogation that the Defendant would also transfer money to him by way of Jamal Ahawil, and that, after the terrorist attack in Meirav, the Defendant had contacted him in order to find out the names of the people who participated in that terrorist attack, in order to transfer money to them (Prosecution/181 (b), on pp. 4-5; and Transcript Prosecution/181 Section 6). Wahr stated during the course of his interrogation that he and Muhannad would decide between them what he needed and then the Defendant would send them the money; the Defendant would call Wahr to verify that the money that he had sent him by way of Muhannad had in fact arrived (Transcript Prosecution/18 (d) Section 6.1). At a certain stage, the relationship between Wahr and Muhannad was broken off and the Defendant told Wahr that he was having financial problems and that he did not have money to buy bullets. At this point, the Defendant referred Wahr to Jamal Ahawil, in order to receive money (Transcript Prosecution/181 (c) Section 15 and Prosecution/18 (d) Section 6.1).

45.  Wahr carried out several shooting terrorist attacks in the context of the operations of the al-Aqsa Martyrs Brigades, and he listed the terrorist attacks in which he participated in his police statement and during the course of his interrogation by the Israel Security Agency. During his testimony, he refused to answer questions (on pp. 181-189), and therefore his police statement (Prosecution/181 (a)-b) was submitted in accordance with Section 10 (a) of the Rules of Evidence, by an interrogator by the name of Gadir Salah who testified that Wahr gave the statement of his own free will in Arabic, but that it

[Stamp] P 7: 000391 [continued]

was written down in Hebrew (on p. 209). Similarly, the transcript from Wahr's interrogation by the Israel Security Agency was submitted (Prosecution/181 (c) – (d) which was submitted by an interrogator by the name of "Naveh", on p. 205). Although Wahr's external statements are not supported by additional evidence, there is a great deal of other evidence with respect to the assistance that the Defendant offered to people in the field for the purpose of the purchase of weapons in order to carry out terrorist attacks.

#### (9) Nasser (Haloum) Naji Abu-Hamid

46. Nasser Haloum Naji Abu-Hamid (hereinafter – "**Haloum**") is the brother of Abu Hamid and he perpetrated shooting terrorist attacks within the framework of the al-Aqsa Martyrs Brigades. Haloum was involved in the terrorist attack in which the police officer Galit Arbiv of blessed memory, was shot to death in Neve Ya'akov, Jerusalem (see Chapter E (10), below). He also participated in the preparation of the fatal terrorist attack at the Seafood Market Restaurant in Tel Aviv (see Chapter E (12), below). He was convicted, on the basis of his confession, and sentenced to five consecutive life sentences (Prosecution/161 a-b).

In his testimony, Haloum refused to answer questions (on pp. 73-76) but claimed that the Defendant was a political leader who has no connection with "military issues." Therefore his police statement (Prosecution/162 a-c) was submitted by police officers Mizrahi and Elkaua'an on pp. 184, 194). Haloum's connection was with Ahmed Barghouti, who was the Defendant's close assistant.

#### (10) Ziyad Hamuda

47. Ziyad Hamuda (hereinafter – "**Hamuda**") was an operative in the Tanzim. In his testimony, Hamuda refused to respond to questions and his police statement was submitted in accordance with Section 10 (a) of the Rules of Evidence, after he was declared a hostile witness. He claimed that he had signed his statement so that he could undergo surgery for appendicitis (on pp. 166-197). He denied that which he had set forth in his Statement Prosecution/167 (b) and claimed that the Defendant was "a man of peace." The statement by Hamuda was taken by police officer Avi Akiva, who was not brought to testify and therefore, the statement was not filed in a lawful manner and it must be ignored.

Hamuda was convicted, on the basis of his confession, for a long series of security crimes (Prosecution/167 (a)). In the indictment to which Hamuda confessed, it is claimed that he had been recruited to the Tanzim by the Defendant for the purpose of military training, and that he had been promised that the Defendant would see to financial assistance for him. In addition, in the indictment to which Hamuda confessed, it is similarly claimed that that he

[Stamp] P 7: 000392

had asked the Defendant for a weapon, in order to perpetrate a shooting terrorist attack near the settlement of Psagot and that the Defendant had referred him to Muhannad in order to receive the weapon (Items No. 5 and No. 7 of the indictment). In his Israel Security Agency interrogation, the Defendant confirmed that Hamuda had asked him for a weapon but that, to the best of his recollection, he did not receive it (Transcript Prosecution/34 Section 5 that was submitted and then verified by an interrogator by the name of "Itai", on p. 52).

On another occasion, during the course of his interrogation, the Defendant said that it was likely that Hamuda had received an MP5 rifle from him (Transcript of Interrogation Prosecution/98 (e), on p. 67). There is nothing in the evidence that incriminates the Defendant other than the confession by Hamuda to the charges in the indictment, on the basis of which he was convicted and it is not possible to substantiate any findings on the basis of a confession of this type (see Section 132 (c), below). However, a great deal of additional evidence was brought forth with respect to the assistance that the Defendant gave to people in the field in order to purchase weapons for the purpose of the perpetration of terrorist attacks.

### (11) Riad Amor

48. Riad Amor (hereinafter – "Amor") was another field operative of the Tanzim who described, during the course of his interrogation, the terrorist attacks in which he took part. During his testimony, he refused to respond to questions (on pp. 172 – 174), and claimed that he did not have any connection with the Defendant. He was declared a hostile witness and his statements Prosecution/169 (a) – (b) were submitted by police officers David Mizrahi and Ya'akov Barazani, who testified that Amor had made these statements and signed them of his own free will (on pp. 186, 208). The statements were taken in Arabic but were written down in Hebrew (which is not in accordance with that which is customary and required). Amor was convicted of perpetrating a large number of terrorist attacks, on the basis of his confession (Prosecution/169 (c) – (d)).

[Stamp] P 7: 000392 [continued]

49. During the course of his interrogation, Amor said that he met the Defendant approximately six months prior to his arrest and that the Defendant told him that he was pleased with the operations of Amor and his comrades in Bethlehem, but that he would prefer that they perpetrate terrorist attacks against the army, not against civilian targets, because "**this creates problems**" and "**it causes a headache for the Chairman**" (Prosecution/169 (a), on p. 3, Prosecution/169 (b), on p. 11). The Defendant claimed in his police interrogation that he is not acquainted with Riad Amor in any way. (Prosecution/14 on p. 9) and there is no evidence to contradict this claim other than an external statement by Amor which requires support that was not found. Notwithstanding, there is a great deal of additional evidence with respect to the general position of the Defendant favoring terrorist attacks against soldiers and settlers.

## (12) Nasser Haj

50. Nasser Haj (hereinafter – "**Haj**") also worked in the framework of the Fatah and described in his statement Prosecution/178, the terrorist attacks in which he took part. In his testimony, he refused to respond to any questions and later denied everything that he had said during the course of his interrogation (on pp. 175 – 176). Therefore, his statement was filed in accordance with Section 10 (a) of the Rules of Evidence, by an interrogator by the name of Moshe Levy, who testified that Haj gave his statement of his own free will, after he was given a warning with respect to his rights (on pp. 211 – 212).

In his above mentioned statement, Haj said that he, together with other operatives, had approached the office of the Defendant with a request to receive money and weapons. The Defendant told them to look for weapons because he would finance the purchase. Later, the Defendant gave him $1,200 in order to purchase weapons (on pp. 4-5). There is nothing in the evidence that supports this above mentioned external statement by Haj, which requires support, but there is a great deal of additional evidence of the assistance that the Defendant gave to people in the field for the purpose of the purchase of weapons in order to carry out terrorist attacks.

## (13) Tahrir Barghouti

51. Tahrir Barghouti (hereinafter – "**Tahrir**") is a family member of the Defendant who, in accordance with his statements during the course of his interrogation, carried out a large number of shooting terrorist attacks. He refused to respond to questions in Court (on pp. 177 – 178) and therefore his statements were filed in accordance with Section 10 (a) of the Rules of Evidence, (Prosecution/171 (a) – (d)) by police officer Ya'akov Barazani, who took them and testified that the statements were given by Tahrir, of his own free will, in the Arabic language, and that they were later translated into Hebrew (on p. 207).

52. During the course of his interrogation, Tahrir stated that he had asked the Defendant to help him to establish a cell. The Defendant promised to help Tahrir with money and ammunition and to help his people in the event that they were arrested. The Defendant also proposed that Tahrir be in charge of the cell, but that he distance himself from the actual operations. Tahrir explained during the course of his interrogation that he had approached the Defendant in order to receive weapons for the cell that he had established (Prosecution/171 (d), on p. 3). Later, the relationship was continued through Muhannad, who hinted to him that the Defendant was not interested in having him take part in the activity; the Defendant himself explained to Tahrir that this position derived from the fact that the members of the cell were scoundrels (Prosecution/171, on p. 4).

In his police interrogation, the Defendant denied all of the statements that had been made by Tahrir (Prosecution/104, on pp. 9 – 10). However, in his Israel Security Agency interrogation, the Defendant did admit that Tahrir had approached him with respect to the perpetration of terrorist attacks and had asked for weapons for this purpose. Yet, the Defendant claimed that he did not accede to this request (Transcript Prosecution/30 Section 1 that was submitted and verified by an interrogator by the name of "Emile", on p. 54). There is nothing in the evidence that supports this external statement by Tahrir, which requires support that was not found for the contradiction of the claim of the Defendant. However, there is a great deal of additional evidence of the assistance that the Defendant had rendered to people in the field for the purchase of weapons in order to perpetrate suicide attacks.

**(14) Ahmed Musafar**

53. Ahmed Musafar was a weapons dealer who supplied weapons to members of the Tanzim and the al-Aqsa Martyrs Brigades. In his testimony (on pp. 186 – 188), he refused to respond to questions and he denied everything that he had stated during the course of his interrogation. Musafar was declared a hostile witness and his police statements were filed in accordance with Section 10 (a) of the Rules of Evidence (Prosecution/179) by an interrogator by the name of Ya'akov Barazani, who testified that the statement had been made after Musafar had been warned about his rights and that he had signed the statement, which had been taken in Arabic but had been written down in Hebrew (on p. 208).

In his statement, Musafar spoke about his meeting and that of his comrades at the office of the Defendant, two days before Ra'ed Karmi was killed. The Defendant told them that they need to continue their operations in the village where they reside, not in Ramallah, and he promised to help them. After the death of Karmi, Musafar received orders to perpetrate a terrorist attack in revenge; the order came from Mahmoud Jabar, who worked at the office of the Defendant, and therefore Musafar understood that it came from the Defendant (Prosecution/179, on pp. 6 – 7). During the course of his police interrogation, the Defendant denied what Musafar had said (Prosecution/104, on p. 3), and there is no evidence that supports this external statement by Musafar, with the exception of the many pieces of evidence that were presented with respect to the Defendant's call to avenge the death of the Karmi in the form of a terrorist attack.

## (15) Sharif Naji

54. Sharif Naji (hereinafter – "**Sharif**") was a member of the cell that was led by his brother, Abu Hamid, which carried out terrorist attacks against Israeli citizens. He was also the bodyguard for the Defendant. Sharif was the one who escorted the suicide [terrorist] Ibrahim Hasouna, who perpetrated the terrorist attack on the Seafood Market [restaurant] in Tel Aviv. In his statement, he set forth all of his deeds.

Sharif, like all of his comrades, refused during his testimony to respond to questions other than claiming that he was acquainted with the Defendant only from television. He was declared a hostile witness and his statement Prosecution/182, to which his handwritten translation into Arabic Prosecution/182a was appended, was submitted by an interrogator by the name of Avi Ben Lulu, who testified that the statement was given by Sharif of his own free will (on p. 210).

[Stamp] P 7: 000394

55. In his statement Prosecution/182, Sharif talked about the shooting terrorist attacks that he had perpetrated against soldiers and settlers, within the framework of the Fatah Tanzim. He explained that he had perpetrated the terrorist attacks so that the *intifada* would continue, specifically because he was interested in peace and added: **"That is what Arafat, Marwan Barghouti and Hussein al-Sheikh were saying on Palestinian television and Al Jazeera... they would say that if the *intifada* were to continue, we can receive more territory and more things from Israel"** (on p. 4). During the course of his police interrogation, Defendant denied having said these things (Prosecution/103, on p. 5).

After Sharif's cell was dismantled, due to the death of Mohammed Omasi, Sharif began to serve as a bodyguard for the Defendant, for a period of approximately six months until his arrest. When interrogated about the Defendant he said: **"I would hear him telling his people that they should continue to carry out terrorist attacks and he would say this freely on Israeli and Arabic television"** (on p. 5). In the second part of his statement, Sharif spoke about his role in a terrorist attack at the Seafood Market Restaurant in Tel Aviv and the involvement of Ahmed Barghouti in the attack (on pp. 5 – 11). During the course of his interrogation, the Defendant denied having any connection at all with Sharif, although he was acquainted with him (Transcript Prosecution/34 Section 4, which was submitted and verified by an interrogator by the name of "Itai", on p. 52). However, the statements that were made by Sharif are supported by many pieces of evidence that were submitted with respect to the manner in which the Defendant would make use of the media in order to call for terrorist attacks against Israel and how he called on his people to do so, as well.

## (16) Amid Abu Radaha

56. Amid Abu Radaha (hereinafter – **"Abu Radaha"**) was another Tanzim operative who perpetrated shooting terrorist attacks that targeted soldiers and settlers, as he talked about during the course of his interrogation. During his testimony, he claimed that he did not have any connection with the Defendant or with Ahmed Barghouti and that he did not receive a weapon from the Defendant but rather from the Palestinian Authority.

[Stamp] P 7: 000394 [continued]

He claimed that the interrogators wrote things in his statement that he had not said and denied the contents of his statement (on pp. 192 – 194). Abu Radaha's statement (Prosecution/183) was submitted by an interrogator by the name of Meir Cohen, who testified that the statement was given by Abu Radaha of his own free will and that it was taken in Arabic but written down in Hebrew (which is not in accordance with that which is customary and required) and that he had signed it.

57. In his statement, Abu Radaha stated that the weapons and ammunition that he had used in order to perpetrate the terrorist attack had been received from the Defendant and Ahmed Barghouti, who also gave the members of the cell money for ongoing expenses (on pp. 2 – 6). In his police interrogation, the Defendant denied what Abu Radaha had said (Prosecution/104, on p. 3). However, his statements are supported by many pieces of evidence with respect to the Defendant's activity supplying money and weapons to members of the Tanzim in the field for the perpetration of terrorist attacks against Israel.

## (17) Ashraf Jabar

58. Ashraf Jabar (hereinafter – "Jabar") was also a Tanzim operative who carried out terrorist attacks against Israeli targets, together with others, including Abu Radaha. Jabar refused to respond to questions during his testimony (on p. 185 – 197) and therefore his statement was submitted, together with the diagram that he drew, (Prosecution/184 (a) – (b)) by an interrogator by the name of Moshe Levy, who testified that the statement was given by Jabar of his own free will; it was taken in Arabic and translated into Hebrew (on p. 212).

59. In his statement Prosecution/1848, Jabar talked about the terrorist attacks that he had perpetrated and noted that he had approached the office of the Defendant with a request for ammunition and money for members of the cell; the Defendant promised that he would pay for the ammunition and did indeed do so through Ahmed Barghouti; the bullets were given to him in exchange for NIS 3000. Jabar explained that he gave the bullets to the Defendant because he was the head of the Tanzim and that he would distribute them to Tanzim operatives (on pp. 3 – 4).

During the course of his interrogation, the Defendant confessed that Jabar had asked him for financial support and weapons, but said that he did not remember exactly what he had given him (Transcript Prosecution/48 Sections 2 – 3, that was submitted and verified by an interrogator by the name of "Robert", on p. 62).

[Stamp] P 7: 000395

**D.    Statements of the Defendant During Interrogation and Other Evidence with Respect to His Role and Involvement in Terrorist Attacks against Israel**

**(1)    The liability of the Defendant for the activity of the terrorist cells and the degree of his control over them**

60.    In accordance with that which has been set forth above, during his Israel Security Agency interrogation, the Defendant did not deny that he was the commander and leader of the Fatah field operatives on the West Bank and that he was the commander of the Fatah and the Tanzim in the West Bank, that he had established the al-Aqsa Martyrs Brigades and that he was in charge of their operations. He also confirmed that he was in charge of the supply of money, weapons and explosives to the field cells and that he was in charge of their military operations (see Section 17, above). The Defendant explained during the course of his interrogation that he found himself involved more and more with the "military cells," which would approach him with requests for various types of assistance, since people such as Ra'ed Karmi and Nassar Awis considered him to be the commander. He also said that his connection with the members of the cells was through his assistant and personal driver Ahmed Barghouti. The Defendant made a distinction between terrorist attacks in Israel, for which he refused to take responsibility, and terrorist attacks that the Fatah had carried out in the West Bank, for which he assumed full responsibility during the course of his interrogation (Transcript Prosecution/25 Section 20 that was submitted and verified by an interrogator by the name of "Mofaz", on p. 58). The Defendant emphasized that he was in charge of the operations of the Fatah on the West Bank but was not an expert on the details, such as the type of weapons that had been used, the way in which they had been purchased, the planning of terrorist attacks and their perpetration (Transcript Prosecution/27 Section 1 that was submitted and verified by an interrogator by the name of "Smith", on p. 85).

During the course of some of his interrogations, the Defendant claimed that he was not directly responsible, from the command perspective, for the operations of the field cells (Transcript Prosecution/42 Section 7, that was submitted and authorized by an interrogator by the name of Wadi, on p. 96). However, in later stages

[Stamp] P 7: 000395 [continued]

of his interrogation, the Defendant confessed that he was responsible for the operations of the cells that worked with Ahmed Barghouti and Abu Satha, because they were close to them and he funded their operations; in further detail, he noted that he considered himself to be responsible for three terrorist attacks, in Givat Ze'ev, French Hill and the Atarot Bridge (Introduction to Transcript Prosecution/38 that was submitted and verified by an interrogator by the name of "Smith", on p. 85). By his own description here, the Defendant did not consider himself responsible for terrorist attacks that have been carried out by the cells of Aweis, Manzur Sharam and others and he did not consider himself to be their commander. Of his relationship with Aweis, the Defendant said: "**I have control based upon respect over Nassar but not actual control**" (Transcription of Conversation Prosecution/98 (k) on p. 17). When speaking about the field cells that had carried out terrorist attacks against Israel during the course of his interrogation the Defendant said:

> "**These cells found themselves more than one address. What is an address? An address is someone you can turn to ask for money, to coordinate work. I am one of those addresses, I am one address among several addresses. The heads of the security forces are also addresses.**"

Based upon these statements by the Defendant, it seems that at least some of the cells coordinated their terrorist attacks with him and considered him an address for funding, as indeed emerges from much of the evidence that has been presented to us. In this regard, the Defendant said that his connection with the cells was indirect because he did not want to get involved in the military field and did not want to be involved in "destruction" (Transcription of Conversation Prosecution/90 8 (k), on p. 6). Indeed, for the most part, the Defendant's connection with the terrorist attack cells was through the contact people who were close associates of the Defendant, especially Ahmed Barghouti. As the Defendant said about Ahmed Barghouti: "**He makes contact with these cells either directly or indirectly, meaning that without him I would not have a direct connection with any cell**" (Transcription of Conversation Prosecution/98 (k), on p. 8).

The Defendant claimed that the field cells would have perpetrated terrorist attacks even in the absence of his support and even without the financial and organizational support that he gave them (Transcript Prosecution/63 Section 18 - 20 that was submitted and verified by an interrogator by the name of "Naor", on p. 82). This claim does not in any way mitigate the liability of the Defendant for the terrorist attacks that were carried out by these cells.

61. At the beginning of his Israel Security Agency interrogation, the Defendant denied that he was responsible for the provision of money and weapons for the purposes of carrying out terrorist attacks (Transcript Prosecution/14 Section 4, that was submitted and verified by an interrogator by the name of "Gabi", on p. 93, Transcript Prosecution/10 Section 1 that was submitted and verified by an interrogator by the name of "Danny", on p. 90). However, as the interrogation continued, the Defendant admitted (Transcript Prosecution/29 Section 1 (c)-(d) that was submitted and verified by an interrogator by the name of Smith, on p. 85):

> **"Within the framework of my position as secretary general of the Fatah, I was responsible for everything that was done, such as the supply of money to cells, the purchase of weapons and the perpetration of terrorist attacks. There are many cells in the field, some of them organized under my command by way of a number of people such as Ahmed Barghouti [and] Nassar Aweis. In the field, there are also cells that were not organized by the Fatah and I did not have any connection with them."**

The Defendant did not deny his ability to influence terrorist cells that he helped with money and by the provision of weapons; when speaking about these cells he said (Interrogation Transcript Prosecution/98 (d) on p. 32): **"If you buy them weapons, if you give them weapons, if you plan for them, you can influence them."** However the Defendant also added, **"Influence, you cannot control."** (*op. cit.*, on p. 37).

62. During the course of his interrogation, the Defendant said that when he made a strategic decision to carry out terrorist attacks against Israel in order to oppose the occupation, he established cells and supplied them, indirectly, with money, weapons and explosives for the purpose of carrying out terrorist attacks. He noted that the terrorist attacks were led by mainly by Abu Hamid, Ahmed Barghouti, and Aweis (Transcript Prosecution/35 Section 1, that was submitted and verified by an interrogator by the name of Danny, on p. 90). From his perspective, the people who handled the military operations in the Ramallah area were Ahmed Barghouti and Abu Hamid, who operated several cells (Transcript Prosecution/27, Section 2) that was submitted and verified by an interrogator by the name of Smith, on p. 85).

[Stamp] P 7: 000396 [continued]

The Defendant confessed that he had supported Ahmed Barghouti and had supplied him with money and that he knew that he was responsible for the perpetration of a variety of terrorist attacks (Transcript Prosecution/98 (h) on pp. 20 – 24). In addition, the Defendant confessed that he had encouraged Ra'ed Karmi to carry out "operations against the occupation," and assisted him financially, while requests for assistance were transferred to Arafat, who approved them (Transcript Prosecution/67 Section 8, that was submitted and verified by an interrogator by the name of "Emile", on p. 54). By contrast, during the course of his police interrogation, the Defendant denied any connection to Ra'ed Karmi (Prosecution/104, on p. 8) and at the beginning of his Israel Security Agency interrogation claimed that he transferred money to him without knowing for what purpose it was intended (Transcript, Prosecution/18 Section 5 that was submitted and verified by an interrogator by the name of "Nadav", on p. 78).

63. The Defendant's connections with terrorism operatives of the Fatah and the regular assistance that he provided for them emerge clearly from the documents that were seized by the Israel Defense Forces from the offices of the organizations including the office of the Defendant during Operation Protective Shield (Binder Prosecution/5).

The Prosecution submitted an Expert Opinion by an expert from the Division of Identification and Forensic Science (DIFS) of the Israel Police, stating that the Defendant had signed some of the documents and from others it is possible to draw the necessary conclusions from the very fact that they were sent to the Defendant and were found in his office. Major L., the deputy commander of the unit that deals with the collection of captured documents, testified about the capture of the documents, their marking and the manner in which they were sorted (on pp. 46 – 48). The captured documents were transferred to a Israel Security Agency interrogator by the name of "Ogen" (see his testimony on p. 48). During his testimony, he identified the documents that were appended to the transcript from the interrogation of the Defendant (on pp. 48 – 50). In the conversation between the Defendant and Ahmed Barghouti, which was recorded without their knowledge, the Defendant said that this referred to documents that had been seized in his office and the two were very concerned about the fact that the Defendant's "entire archive" had been seized. The Defendant said, **"the entire archive of the office [is] here"** (Prosecution/127 (c), on pp. 61 – 62).

The Expert Opinion of the DIFS with respect to the Defendant's handwriting (Prosecution/5) was rendered by Yair Ben Shemesh and is based on three samples of his handwriting that the Defendant confirmed during the course of his interrogation as being written in his hand (the three documents in Prosecution/5 are 94 – 96, 112 and 35, which the Defendant related to in Transcript Prosecution/28, Prosecution/28 (b), Prosecution/47,

Prosecution/85, and Prosecution/85 (a) that were submitted and verified by the Israel Security Agency interrogators "Wadi", on p. 96 and "Ofir", on p. 37). The interrogator from the DIFS divided the documents into four categories: those with respect to which there is no real doubt were written by the Defendant, those that might reasonably have been written by the Defendant, those that very likely were written by him, and those that the Defendant identified during the course of his interrogation as having been written by him. During the course of his police interrogation, the Defendant denied that his handwriting appeared on any of the documents that he had been shown (Prosecution/108-109).

64. Document Prosecution/5 (3-5) is a report that was sent to the Defendant on May 8, 2001, and which reviews the operations of the al-Aqsa Martyrs Brigades in the Jenin area. This report includes the number of people in the al-Aqsa Martyrs Brigades, their division into Brigades, details of their activities and the results of the terrorist attacks that they had perpetrated.

The activities listed in this document include shooting terrorist attacks on roads in Judea and Samaria, killing and injuring settlers, and terrorist attacks within Israeli territory (Uhm al-Fahm) in which an Israeli officer was killed and a civilian was injured. In addition, it includes a letter that requested financial assistance for the Brigades.

**(2) The Defendant's personal involvement in the terrorist attacks that have been carried out by the cells under his command**

65. Immediately subsequent to his arrest, the Defendant claimed that he was a "political person" who is not involved in military operations or in the perpetration, planning, funding or guidance of terrorist attacks against security forces or against Israelis (Transcript Prosecution/6 Section 3 and Prosecution/9 Section 2 that were submitted and verified by an interrogator by the name of "Robert", on p. 62; Transcript Prosecution/14 Section 4 that was submitted and verified by an interrogator by the name of "Gabi", on p. 93). However, as his Israel Security Agency interrogation continued, the Defendant admitted to deep involvement in "military" operations, which is a euphemism for the perpetration of murderous terrorist attacks against Israeli civilians. In certain instances, it can be understood from the Defendant's statements, he even issued specific orders for the perpetration of terrorist attacks or gave his

[Stamp] P 7: 000397 [continued]

advance approval for their perpetration.

The Defendant claimed during the course of his interrogation that he himself had never planned the details of a terrorist attack and that the cells would involve Ahmed Barghouti and not himself in carrying out terrorist attacks and he did not always agree with them (Transcript Prosecution/72 Section 3 that was submitted and verified by an interrogator by the name of "Danny", on p. 90). Thus, for example, the Defendant emphasized that he rejected all of Ahmed Barghouti's attempts introduce him to people who would perpetrate suicide terrorist attacks (Transcript Prosecution/53 Sections 11 – 13 that was submitted and verified by an interrogator by the name of "Mofaz", on p. 58). In spite of this, the Defendant confessed that "there is collective responsibility for the activity of Fatah's military members" (Transcript Prosecution/21 Section 14, which was submitted and verified by an interrogator by the name of "Robert", on p. 63). The Defendant said during the course of his interrogation: "I did not issue orders to any cells [that said] 'hey we've come, and hey we want to carry out a certain terrorist attack in a particular place, this we are leaving for it and for its atmosphere, and personal desire... (Transcript of Conversation Prosecution/98 (k) on p. 9).

According to the Defendant, after Ra'ed Karmi was killed in January 2001, the terrorist attacks were brought into Israeli territory. He tried to use his influence over the cells that followed his orders in order to moderate the terrorist attacks within Israel, but he was not always able to do so (Transcript Prosecution/70 Section 17 (g) that was submitted and verified by an interrogator by the name of "Steve", on p. 53). An example of this is the case of Manzur Sharam, who was responsible for the suicide terrorist attack in Hadera in revenge for the killing of Karmi.

The Defendant discussed this with Aweis and Mansour after the attack and reported it to Arafat (Transcript Prosecution/45 Sections 6 – 11 that was submitted and verified by an interrogator by the name of "Wadi", on p. 96). It should be noted that Manzur Sharam was Ra'ed Karmi's replacement, and this appointment had been approved by the Defendant (see the comments by Ahmed Barghouti in his Statement Prosecution/165 (m) on p. 5).

During the course of his interrogation, the Defendant said that in general he heard about the terrorist attacks after they were perpetrated, from either Aweis or Ahmed Barghouti, and that he would not go into details about how exactly the terrorist attack was carried out and by which cell; during the course of his interrogation, he listed the terrorist attacks about which he received reports after they were perpetrated (Transcript Prosecution/70 Sections 9, 12, 17 that was submitted and verified by an interrogator by the name of "Steve", on

page 53; and Transcript Prosecution/39 Section 8 that was submitted and verified by an interrogator by the name of "Wadi", on p. 96). However, throughout the course of his entire interrogation, the Defendant emphasized that with one exception he had not been personally involved in taking public responsibility for terrorist attacks that have been carried out by the al-Aqsa Martyrs Brigades. The person who issued the public statements subsequent to attacks was Aweis, in coordination with Ahmed Barghouti. Beyond this, Ahmed Barghouti served as an extension of the long arm of the Defendant, but the Defendant himself added to the above mentioned comment and said: **"I provide coverage for this issue. Politically in the media... I talk about the issue... I call for a struggle, I appraise the terrorist attacks as part of the struggle etc..."** (Transcript of Conversation Prosecution/98 (m) pages 40 – 46). In other words, the Defendant would take responsibility for the terrorist attacks through the media in an indirect and general manner without relating to a specific terrorist attack, while his subordinates would take specific responsibility for each individual attack.

What is clear from the Defendant's words is that the terrorist cell commanders considered him their leader and he supported them and assisted them by supplying weapons and explosives for the duration of their activity, although he knew that they were perpetrating murderous terrorist attacks against military and civilian targets in the Judea and Samaria region as well as within Israel, including suicide terrorist attacks, which the Defendant claims displeased him. When the Defendant continued supporting these operatives and assisting them after they reported the terrorist attacks to him, even when these were suicide terrorist attacks within Israel, the Defendant thereby expressed his support for their continued activity, including the activity that he supposedly did not support.

During the course of his interrogation, the Defendant himself said that Yasser Arafat had reprimanded him for the terrorist attacks that had been carried out within Israel (Transcript Prosecution/141 Section 10, which was submitted and verified by an interrogator by the name of "Robert", on p. 58); from this it follows that Arafat also considered the Defendant responsible for all of the terrorist attacks that have been carried out by the Tanzim and the cells of the al-Aqsa Martyrs Brigades that were under the command of the Defendant.

[Stamp] P 7: 000398 [continued]

The Defendant gave his approval, if only after the fact, to the terrorist attacks that have been carried out by the cells that accepted his authority: some he supported explicitly and some he supported by his behavior or with his silent agreement. He operated the cells under his command in an indirect manner through his subordinates and close associates such as Ahmed Barghouti, Abu Hamid, Abu Satha and Aweis, while keeping his distance from the people who actually perpetrated the attacks and intentionally avoiding getting himself personally involved with the planning and perpetration of the terrorist attacks. Even taking responsibility for the terrorist attacks was done by the Defendant in a "clean," indirect manner, not by way of a public statement issued by the al-Aqsa Martyrs Brigades, but rather in a political -- as it were -- implied manner in the media.

66. From that which has been set forth above, it becomes apparent that the Defendant confessed during the course of his interrogation to the things that also emerge from the testimony of the terrorist operatives, meaning that from a command perspective, he was responsible for the operations of the Tanzim and of the al-Aqsa Martyrs Brigade in the West Bank, which considered him their leader; he assisted terrorism operatives by providing money, weapons and explosives in order to carry out terrorist attacks; he personally led some of the terrorism cells, through his close associates; he encouraged the terrorist cells to carry out terrorist attacks against Israel; he received reports from the cells subsequent to the perpetration of terrorist -- all of this while knowing that these cells were perpetrating murderous and suicidal terrorist attacks both within Israel and against civilians.

Furthermore: during the course of his interrogation, the Defendant even confessed to **personal** involvement in specific murderous terrorist attacks of the cells that he led, as follows:

#### (aa) Terrorist attack at the gas station in Givat Ze'ev

After the killing of Ra'ed Karmi on January 14, 2002, the Defendant, speaking on Abu Dhabi television, called on the al-Aqsa Martyrs Brigades to perpetrate revenge attacks against Israel (Prosecution/3 from January 14, 2002); however, the Defendant was not satisfied with this public statement. He instructed Ahmed Barghouti to bring to fruition a terrorist attack avenging Karmi. Indeed, in the evening of January 15, 2002, Ahmed Barghouti gave a weapon to Abu Satha for the purpose of perpetrating the above mentioned terrorist attack. On the evening of that day, members of Abu Satha's cell fired at the car of Yoela Chen, of blessed memory, near Givat Ze'ev, murdered her and injured the passenger who was with her (on this terrorist attack, see Chapter E (7), below).

[Stamp] P 7: 000399

The Defendant confessed during the course of his interrogation that after the death of Karmi, he told Ahmed Barghouti that he was interested in a revenge terrorist attack, and that Ahmed and his comrades perpetrated the terrorist attack in Givat Ze'ev and reported to him later that one person was killed in the terrorist attack (Transcript Prosecution/98 (k), on pp. 44 – 45). He even confessed that this terrorist attack was carried out in accordance with his orders and took responsibility for its perpetration (Transcript Prosecution/23 Sections 8 – 10, which was submitted and verified by an interrogator by the name of "Danny", on p. 90; Transcript Prosecution/24 Section 5 and the introduction to Transcript Prosecution/38 that were submitted and verified by an interrogator by the name of "Smith", on p. 85; Transcript Prosecution/26 Sections 3 – 6, which was submitted and verified by an interrogator by the name of "Nadav", on p. 79). The Defendant said, **"I said in the mourners' tent, that we need to avenge and respond to an event like this… "**, although he claimed that he did not "command" Ahmed Barghouti. During one of his interrogations, the Defendant confessed, **"We said to Ahmed something like implement a terrorist attack"** (Conversation Transcript Prosecution/98 (g) on p. 19 and also on pp. 20 – 45).

The Defendant explained that the assassination of Karmi led him to lose control of Fatah, and therefore he **"called for a response to the targeted assassination of Ra'ed Karmi in all media outlets… and responses did begin. For the first time, Fatah crossed the red line and carried out terrorist attacks within Israel"** (Transcript of Interrogation Prosecution/98 (j) on pp. 30-31 and Prosecution/98 (k) on pp. 9-

[Stamp] P 7: 000399 [continued]

10, 12-15, 44-45). He noted during the course of his interrogation that the order that was given to perpetrate a terrorist attack in revenge for the killing of Ra'ed Karmi derived from his feeling of responsibility for the death of Karmi during a cease-fire, when the Defendant had called on all of the factions to stop the terrorist attacks because of the commitment given by the head of the Israel Security Agency that there would not be any targeted assassinations against leaders of Fatah; this was the only time when he went against Arafat who, at the time, asked that there be no terrorist attacks (Transcript Prosecution/31 Section 12, which was submitted and verified by an interrogator by the name of "Mofaz", on p. 58; Conversation Transcript Prosecution/98 (j) on pp. 29 – 31; Conversation Transcript Prosecution/98 (k) on pp. 11 – 13).

This confession of the Defendant corresponds with statements that were made by Ahmed Barghouti during the course of his interrogation (see Section 30, above), as well as with statements that were made by Abu Satha (Statement Prosecution/156 (b) on p. 5) and Masafur (see Section 53 above).

### (bb) Murder of the Greek Orthodox monk in Ma'ale Adumim

The Defendant confirmed that when Radaida proposed the perpetration of a suicide terrorist attack, he referred him to Muhannad so that he could direct him towards the type of terrorist attacks that Fatah cells carry out. The result of this was the terrorist attack in Ma'ale Adumim, in which the Greek Orthodox monk was murdered because it was thought he was a Jew (see statements by Radaida in Sections 42 – 43 above and Chapter E (3) below that deals with this terrorist attack).

### (cc) Terrorist attack on the Seafood Market Restaurant in Tel Aviv

During the course of his interrogation, the Defendant clearly connected himself to the terrorist attack at the Seafood Market Restaurant in Tel Aviv, in which three people were murdered (on this terrorist attack see Chapter E (12) below). Although at the beginning of his Israel Security Agency interrogation, the Defendant claimed that he did not have any connection to this terrorist attack, which Aweis was behind, and that Arafat was very angry about the perpetration of this terrorist attack (Transcript Prosecution/25 Section 12-13, which was submitted and verified by an interrogator by the name of "Mofaz", on p. 58). However, as his interrogation continued, the Defendant admitted that he knew about the intent to perpetrate this terrorist attack from his close associate Ahmed Barghouti, who was one of the people who planned the terrorist attack, and this was approximately one week before it was carried out ; Ahmed informed the Defendant that Ibrahim Hasouna – the terrorist – was ready to perpetrate a terrorist attack. The Defendant emphasized that he was not the one who supervised the perpetration of the terrorist attack and that he had instructed Ahmed Barghouti to perpetrate the attack in Judea and Samaria,

[Stamp] P 7: 000400

in a settlement or at a military roadblock, and not within Israel (Transcript Prosecution/44 Sections 3-7 and Prosecution/53 Section 3, which were submitted and verified by an interrogator by the name of "Mofaz", on p. 58; Transcript Prosecution/50 Section 1, which was submitted and verified by an interrogator by the name of "Wadi", on p. 96; Transcript Prosecution/52 that was submitted and verified by an interrogator by the name of "Smith" on p. 85).

These statements by the Defendant correspond with his version during the interrogation of Ahmed Barghouti [Translator's note: as written], aside from the fact that the latter said during the course of his interrogation that he reported to the Defendant not a short time prior to the terrorist attack but rather when the terrorist was already on his way, and that the Defendant was involved in wording the announcement taking responsibility after the terrorist attack was carried out (see Section 29 above). The Defendant, in contrast, said that he was not involved in wording the announcement taking responsibility for this terrorist attack although he did admit to giving his approval to the announcement taking responsibility for another terrorist attack that was carried out on the Atara Bridge (Terrorist Attack No. 18 in the appendix to the indictment) (Transcript Prosecution/52 as referenced above and Transcript Prosecution/58 Section 3, which was submitted and verified by an interrogator by the name of "Mofaz", on p. 58).

**In conclusion:** Despite what emerges from the words of Ahmed Barghouti, the Defendant admitted that he gave advance approval for perpetrating this particular terrorist attack, even if the orders were to kill other people in a different place.

**(dd) Attempted terrorist attack near the Malha Mall in Jerusalem**

During his interogation, the Defendant said that he had provided assistance, by means of Ahmed Barghouti, to the terrorism operatives who perpetrated attacks in the Hebron area. One day, Ahmed Barghouti reported that one of these operatives (Jihad Jawara) was planning a suicide terrorist attack in Jerusalem. The Defendant said that he issued orders, by means of Ahmed Barghouti, that the terrorist attack should be in the Occupied Territories and not within Israel (for more on this terrorist attack, see Chapter E (20) below). The next day, he received a report that the suicide terrorist attack

near the Malha Mall in Jerusalem had failed (Transcript Prosecution/36, which was submitted and verified by an interrogator by the name of "Smith", on p. 85). In this case, too, the Defendant approved the terrorist attack against Israel, although in a different location.

**(3) Provision of funds, weapons and explosives for carrying out terrorist attacks**

67. At the beginning of his Israel Security Agency interrogation, the Defendant claimed that he was not involved in terrorism and that he never given anyone weapons and had not shot a gun (Transcript Prosecution/10 Section 1, which was submitted and verified by an interrogator by the name of "Danny", on p. 90). However, later in the interrogation the Defendent did admit that he had been responsible for giving money, weapons and explosives to the field cells belonging to the Tanzim and al-Aqsa Martyrs Brigades and that he knew that they were using them for terrorist attacks against Israel.

As the Defendant said, **"As part of my position as Secretary General of the Fatah, I was responsible for everything that was done, including supplying money to cells, purchasing weapons and carrying out terrorist attacks."** (See the quote in Transcript Prosecution/29 Section 61 as mentioned above, and also Transcript Prosecution/59 Section 7, which was submitted and verified by an interrogator by the name of "Wadi", on p. 96).

The Defendant explained that he would transmit cells' requests for the purchase of weapons to Yasser Arafat under the heading "Personal Assistance" or "Financial Assistance" (Transcripts Prosecution/22 Section 6 and Prosecution/25 Section 14 that were submitted and verified by an interrogator by the name of "Mofaz", on p. 58). The Defendant also admitted that by purchasing weapons for cells, he acquired influence over their activities (see Section 61, above). In addition, the Defendant admitted that he gave financial assistance to Ahmed Barghoui and Ra'ed Karmi and supported them so they could perpetrate terrorist attacks (see Section 62 above).

Document Prosecution/5 (70 – 73) that was seized during Operation "Protective Shield" is a letter dated January 20, 2002, from Ra'ed Karmi to the Defendant, in which Karmi requests assistance for a list of operatives, including those who were involved in terrorists attacks in accordance with evidence presented in this case; the Defendant directed the request to Yasser Arafat in his own handwriting (in accordance with the Opinion of DIFS Prosecution/5). Another seized letter is Prosecution/5 (104) in which a wanted man named Salah Abu Hanish wrote to the Defendant asking that he return his weapons that had been confiscated; the Defendant's handwriting appears on the document (Opinion of DIFS Prosecution/5). In Letter Prosecution/5 (103), a group of operatives approached the

[Stamp] P 7: 000401

Defendant with a request to purchase weapons and noted that they have perpetrated many attacks against the army and settlers and have become wanted; the Defendant's handwriting is also found on this document (in accordance with the Expert Opinion of DIFS Prosecution/5).

68. During the course of his interrogation, the Defendant explained that the cells, as well as individual cell members, would approach him to ask for money to fund the purchase of weapons and for other reasons, and he would submit their requests to Yasser Arafat (Transcript Prosecution/19 Section 14, Transcript Prosecution/22 Section 6 and Transcript Prosecution/25 Sections 14, 19, which were submitted and verified by an interrogator by the name of "Mofaz", on p. 58; Transcript Prosecution/70 Section 10, which was submitted and verified by an interrogator by the name of "Steve", on p. 53; transcripts of the Defendant's interrogation: Prosecution/98 (d) on pp. 13 – 16, 20 – 21; Prosecution/98 (k) on pp. 7, 17 – 18, 30; and Prosecution/90 8 (j) on pp. 13 – 14). He said that his requests to Arafat would not specify that the money was intended for the purchase of weapons (Transcript Prosecution/30 Section 6, which was submitted and verified by an interrogator by the name of "Emile", on p. 54). In context of this activity, approximately 15 weapons and ammunition for them were purchased and used for terrorist attacks (Transcript Prosecution/29 Section E, which was submitted and verified by an interrogator by the name of "Smith", on p. 85; Transcript Prosecution/60 Section 5, which was submitted and verified by an interrogator by the name of "Emile", on p. 54).

The Defendant emphasized that the military operations could not have taken place without funding from Arafat (Prosecution/60, as mentioned above, Section 7). He explained the issue: **"There is someone who comes and says 'I want a thousand shekels', he might receive a thousand shekels. I do not ask him, maybe next week he will go shoot, I do not care"** (Prosecutions/98 (k) on p. 30). During the course of his interrogation, the Defendant could not remember the details of the financial assistance that he gave to Fatah field operatives and explained that hundreds of operatives would approach him with requests for financial assistance in order to fund military activities (Transcript Prosecution/49 Section 10, which was submitted and verified by an interrogator by the name of Emile on p. 54).

69. Within the framework of purchasing weapons for terrorism operatives, the Defendant agreed to purchase a mortar for the price of 1,500 dinar, and the Defendant described the operational problems involved in its operation during the course of his interrogation (Transcript Prosecution/29 Section F and Transcript Prosecution/38 Section 2, which were submitted and verified by an interrogator by the name of "Smith", on p. 85; Transcript Prosecution/42 Sections 13-15, which were submitted and verified by an interrogator by the name of "Wadi", on p. 96; Transcript of the interrogation of the Defendant Prosecution/98 (k) on pp. 7-8). The Defendant said

[Stamp] P 7: 000401 [continued]

during interrogation that he himself opposed firing mortars at Israel because it had been proven that this does not cause damage to Israelis but could cause significant damage to the Palestinians (Transcript Prosecution/38 as mentioned above). The Defendant's version corresponds with that given by Abu Hamid, who explained that the mortar was fired at the settlement of Psagot but the Defendant asked him not to talk about it with anyone (see Section 25 above).

**(4)   Assistance for wanted men and the families of the people arrested or killed**

70.   The Defendant funded not only terrorism operatives but also members of their families. He admitted during the course of his interrogation that he had transferred to Yasser Arafat requests for assistance to families of suicide terrorists, and even justified this by saying that there is no difference between someone who perpetrated a suicide attack and someone who was killed; in his eyes they were all "martyrs", meaning they had died a holy death (Transcript Prosecution/10 that was submitted and verified by an interrogator by the name of "Danny", on p. 90; Transcript Prosecution/54 Section 5, which was submitted and verified by an interrogator by the name of "Wadi", on p. 96; Conversation of the Defendant with Agent John Doe No. 3 Prosecution/124 (c) on pp. 7, 22 – 23). Similarly, the Defendant made sure to fund families of Fatah operatives who had been arrested or were wanted (Conversation of the Defendant with Agent John Doe No. 3 Prosecution/124 (c) on pp. 22 – 23).

A large number of documents that are related to this subject were seized during Operation "Protective Shield", which constitute requests for assistance that the wanted men had addressed to the Defendant, asking to purchase weapons or explosives, and in order to relieve them of the necessity of earning a living (see: Prosecution/5 (2 – 12), which the Defendant verified during the course of his interrogation and which was documented in Transcript Prosecution/47 that was submitted and verified by an interrogator by the name of "Wadi", on p. 96; Prosecution/5 (64 – 65); Prosecution/5 (87); Prosecution/5 (105); Prosecution/5 (117); Prosecution/5 (118)). Moreover, the Defendant took the trouble to arrange for job appointments or places of employment for wanted men (see, for example, the Letters Prosecution/5 (78 – 79), which, in accordance with the Expert Opinion of DIFS Prosecution/5 would be very reasonable to assume that they had been written by the Defendant.

An additional document is Prosecution/5 (133), which includes a request to the Defendant for assistance to members of the Fatah movement who carried out terrorist attacks and were arrested by Israel, and for other wanted men; the Defendant noted on this document: **"It is a priority to include them in the assistance"** and in accordance with the Expert Opinion of DIFS Prosecution/5 this comment was, leaving no real doubt, written by the Defendant.

[Stamp] P 7: 000402

Imad al-Shakir was a Tanzim operative who murdered in an Israeli in Salfit and when he became a wanted man, he asked the Defendant for assistance and even told him about the murder he had perpetrated. He explained in his testimony that he approached the Defendant because the Defendant was known as a person who would help in cases like his but he also described the Defendant as **"a political person who did not participate in military affairs"** (on pp. 182 – 184).

### (5) Recruiting and training operatives for terrorist organizations

71. During his Israel Security Agency interrogation, the Defendant confirmed the points that Abu Hamid told the Police regarding the financial assistance that the Defendant gave for constructing a military training camp for Tanzim operatives, in order to train them in guerrilla warfare and in the use of weapons (Statement of Abu Hamid Prosecution/149 (c) on pp. 1 – 2). The Defendant even confirmed that he personally interviewed the young people who were training in his office (Transcript Prosecution/28 Sections 10 – 11, which was submitted and verified by an interrogator by the name of "Wadi", on p. 96; Transcript Prosecution/34 Section 3, which was submitted and verified by an interrogator by the name of "Itai", on p. 52; and Transcript of the Defendant's interrogation Prosecution/98 (k), on p. 9). In his police interrogation, the Defendant denied any connection to the training or instruction of field operatives (Prosecution/106 on p. 3).

In his above mentioned statement (on pp. 6-7), Abu Hamid spoke about how the Defendant appointed Muhannad as the cell commander after the death of the previous commander. During the course of his interrogation, the Defendant also confirmed the statements that Radaida told the Police with respect to the process by which he was recruited by means of the Defendant's involvement (see Section 43 above). From the comments of the Defendant and Radaida, it becomes apparent that the Defendant heard from Radaida that he intended to perpetrate a shooting terrorist attack and, therefore, referred him to Muhannad, who was a senior field commander and had carried out terrorist attacks against Israeli targets. The terrorist attack in which the Greek Orthodox monk was murdered was a result of this contact.

[Stamp] P 7: 000402 [continued]

**(6)  The Defendant's public calls to carry out terrorist attacks against Israel**

72.  As already explained above, the Defendant did not deny, during the course of his
     interrogation, his support for terrorist attacks against military and civilian targets in the
     West Bank, meaning soldiers and settlers (see Sections 13 – 16 above). The Defendant also
     explained that he would sometimes instruct the cells that accepted his authority to stop the
     terrorist attacks and would then inform them to resume them anew, using public television
     broadcasts (see Section 16 above). The Defendant was aware of the influence his words
     had on people carrying out terrorist attacks and said, **"I have influence because I speak
     through the media. That is to say that I state the position using media outlets... My
     word is heard as if I were speaking in the name of the Fatah movement."** (Transcript of
     interrogation Prosecution/98 (d) on p. 33; see also pages 37-39). The Defendant did not
     deny that cell members would turn to him to ask for assistance because he appeared as a
     spokesman for Fatah in the media and took a position calling for an armed struggle
     (Transcript of interrogation Prosecution/98 (e) on p. 61). He admitted that during his public
     appearances he would encourage the operatives to carry out terrorist attacks within the
     territories against the army (Transcript of Investigation Prosecution/98 (j) on p. 25, and
     Transcript Prosecution/29 Section 1 (b), which was submitted and verified by an
     interrogator by the name of Smith, on p. 85.)

73.  The Defendant's public calls for the perpetration of terrorist attacks against Israel were
     documented by the Intelligence Branch and were submitted in Binder Prosecution/3
     (including the original cassettes, Prosecution/3 (a) – (b)) by the head of the Research
     Division of the Intelligence Branch, Brigadier General Y. Cooperwasser (on p. 38). With
     respect to this issue, the documents that have been included in Binder Prosecution/3, which
     do not document the words that the Defendant himself said on radio and television and
     were recorded, are to be ignored. Newspaper articles or other news items that attribute
     statements of one type or another to the Defendant are not admissible in accordance with
     the Rules of Evidence, due to the fact that their testimony is considered to constitute
     hearsay.

[Stamp] P 7: 000403 [continued]

In general, based on statements that were made by the Defendant in the various media outlets, it can be said that he clearly emerges as someone speaking in the name of the al-Aqsa Martyrs Brigades and the Tanzim, and as their leader. The Defendant calls in these organizations – sometimes clearly and sometimes by inference – for the contination of the perpetration of terrorist attacks against Israel. After each Israeli action, he announced on behalf of the Fatah movement and the al-Aqsa Martyrs Brigades that revenge would not be slow to follow (see, for example, the interviews on Abu Dhabi television on January 14, 2002, and August 15, 2001). Despite the Defendant's claims that he opposed terrorist attacks within Israel, in several interviews he is heard supporting terrorist attacks that have been carried out within Israel and even praised the perpetrators (see justification of the terrorist attack in Netanya in the television interview with Al Jazeera on May 18, 2001; justification for the terrorist attack in Jerusalem on Al Jazeera television on August 9, 2001; and an additional attack in Jerusalem that the Defendant justified on Watan Television on October 31, 2002.)

74. During the funeral of Emad Elanati on October 2, 2000, the Defendant said on Watan Television Ramallah, **"The days in which we just offer sacrifices are over. We must seek revenge. Israelis should be killed. Israelis should be killed. Yes. We have bullets. We have rifles and they are aimed at the occupation."**

In a telephone interview with the newspaper Asharq al-Awasat on March 1, 2001, the Defendant was asked if Palestinian resistance might evolve from rocks to weapons, and he answered, **"The armed struggle is a part of the *intifada* already and it is not limited to rocks. Since the *intifada* began, we have succeeded in killing 66 of them and injuring 416, and this is a good outcome."**

On October 29, 2001, the Defendant was interviewed on Watan Television Ramallah and he was asked his reaction to the two terrorist attacks that had been perpetrated that day in Hadera and in Baka al-Gharbiya, and he answered: **"It is the right of Palestinian people, and in essence an obligation of its fighters, to respond to aggression and to avenge the slaughter that has taken place in Beit Rima, Bethlehem and Tulkarm. Therefore, what happened today is a natural response of Palestinian fighters to Israeli acts of slaughter."**

On March 4, 2002, the Defendant was interviewed for the al-Zamam newspaper, which is published in London, and in accordance with reporter Nitzal Alliyati, the Defendant said

[Stamp] P 7: 000403 [continued]

that the two suicide terrorist attacks (in Beit Yisrael and Ofra) were "**Messages addressed to the Israelis that they should cease their support for Sharon.**"

After the death of Ra'ed Karmi on January 14, 2002, the Defendant spoke on Abu Dhabi television and called on the al-Aqsa Martyrs Brigades to carry out terrorist attacks against Israelis in revenge, (Prosecution/3 – dated January 14, 2002). The Defendant admitted this during the course of his interrogation (Transcript of Conversation Prosecution/98 (g) on p. 78).

On May 19, 2001, Watan Television Ramallah broadcast a procession that was led by the Defendant and a senior official from Hamas. During the procession, the Defendant spoke to the crowd using a loudspeaker and praised those people who had been killed during the course of the *intifada*, including the perpetrator of the terrorist attack in Netanya. In addition, the Defendant promised to continue terrorist attacks against the settlers and praised those perpetrating suicide attacks against settlers.

[Stamp] P 7: 000404

## E.   The Connection of the Defendant to the Terrorist Attacks That Are the Subject of the indictment

75.   In the indictment, the Defendant is charged with involvement in 37 terrorist attacks that were set forth in the appendix to the indictment, and which were perpetrated by field commanders and terrorism operatives who were subordinate to the Defendant.

In its summation, the Prosecution attributed to the Defendant only 21 terrorist attacks from the list that had been appended to the indictment, and therefore this verdict will relate only to those 21 terrorist attacks for which, in accordance with the Prosecution's claims, evidence was presented that connects the Defendant to the perpetration of the attacks. Discussion of these terrorist attacks will include the evidence that has been set forth with respect to the events of the terrorist attack itself, who planned and perpetrated it, and what the Defendant's relationship was to the terrorist attack or its planners or its perpetrators.

### (1)   Murder of Talia and Binyamin Kahane, of blessed memory, near Ofra

76.   On December 31, 2000, at 6:30 a.m., shots were fired from an ambush on the car of the couple, Talia and Binyamin Kahane, of blessed memory, and their five children, on Route No. 60 near the settlement Ofra. As a result of the shots, the car rolled into a ditch alongside the road. The Kahane couple were murdered in this terrorist attack (Death Certificate Prosecution/128 (a)-(b)) and their five children were injured (See the Action Report of Eli Kojman and Superintendent Ofer Chelouche Prosecution/128 (c)-(d), Photograph Boards Prosecution/128 (h)-(i) that were submitted by Kojman and Chelouche during their testimony, on pp. 121, 127; and the Statement of a Public Employee given by Superintendent Ovadya Prosecution/128 (e)). The interrogation conducted by DIFS found, on the basis of the bullet shells from a Kalashnikov rifle that were collected at the scene, that the weapon used in this terrorist attack was also used in terrorist attack No. 6 on the list appended to the indictment, in which Eliahu Cohen, of blessed memory, was murdered near Givat Ze'ev (Expert Opinion of Howard Silverwater Prosecution/128 (f)-(g)).

77.   In his police interrogation, Abu Hamid intimated that he was the one who supplied the weapon and ammunition to the terrorist who murdered the Kahane couple, of blessed memory, Ahmed Gandor (Statement by Abu Hamid Prosecution/149 (a) on pp. 4-6, which was collected by staff Sergeant Major Ibrahim Elkura'an, on the basis his testimony on p. 194). In the statement, Abu Hamid said that Gandor asked him for a weapon (Kalashnikov) and ammunition in order to perpetrate a terrorist shooting attack on an Israeli vehicle near Ramallah and the next day the murder of the Kahane couple, of blessed memory, was reported to him, as he learned from the report on the radio.

[Stamp] P 7: 000405

In this case we are permitted to consider only the testimony of Abu Hamid and commanded to ignore the things that Gandor told him about the manner in which the terrorist attack was carried out, because this is hearsay evidence. Consequently, this Court does not have admissible evidence showing that this murder was committed using the weapon that Abu Hamid gave to Gandor. Therefore, we do not have any evidence connecting the Defendant to the murder of the Kahane couple, of blessed memory (the Defendant said during the course of his interrogation that he was acquainted with Gandor, who was killed by an accidentally discharged bullet – Transcript Prosecution/68 Section 2). Indeed, a large quantity of evidence was submitted with respect to the Defendant's comprehensive and supreme responsibility for the terrorist attacks perpetrated by members of Fatah on the West Bank, as the person who led this activity, who called for its perpetration and who assisted its actualization by supplying money, weapons and explosives. However, there is no admissible evidence that this particular terrorist attack was indeed perpetrated by members of the Fatah.

The only admissible evidence in this matter is that the Defendant assisted Abu Hamid to purchase weapons and ammunition for the purpose of carrying out terrorist attacks, as Abu Hamid and the Defendant admitted during interrogation (see Chapter C (2) above) and that Abu Hamid did indeed give a weapon that he purchased with the assistance of the Defendant to Gandor for the purpose of perpetrating a terrorist attack. Beyond this, we have no evidence.

**(2)   Murder of Akiva Pashkos, of blessed memory, in the Atarot industrial area**

78.   On January 25, 2001, at 6:25 p.m., shots were fired from an ambush at the vehicle of Elazar Akiva Pashkos, of blessed memory, in the Atarot industrial area. The deceased was traveling in a GMC van and was shot with a 9 mm caliber pistol (see DIFS Opinion Prosecution/129 (c)). As a result of this shooting, the deceased died (Death Certificate Prosecution/129 (a)) and was found lifeless in his van approximately one minute after the shooting (See the testimony of Herman Sapek on p. 150, report of Superintendent Leor Nadivi, Prosecution/129 (b), and his testimony on p. 132). The event is also depicted by pictures photographed by Avinoam Alia that are appended

to the public documents that were submitted (Prosecution/129 (d)).

79. Ahmed Barghouti admitted during interrogation that he gave Abu Satha and another person a vehicle in order to perpetrate a terrorist attack, and after several hours, the two reported to him that they had shot a Jew traveling in a GMC in the Atarot area, who was injured by the shots (Statement Prosecution/165 (a) on p. 3, which was submitted by Staff Sergeant Major David Mizrahi on p. 184.)

Abu Satha admitted that he perpetrated a terrorist attack in the Atarot industrial area and shot a pistol at the driver of a gray GMC Safari (as can be seen in the pictures Prosecution/129 (d) which were photographed after the terrorist attack) and later reported this to Ahmed Barghouti, who was, in accordance with Abu Satha, the Defendant's **"driver and right-hand man"** (Statement Prosecution/156 (b), which was submitted and verified by the police officer Marco Dahan, on p. 198).

80. The Prosecution does not have any evidence that directly connects the Defendant to the above mentioned terrorist attack. However, a large quantity of general evidence has been presented showing that Ahmed Barghouti was the Defendant's close assistant and operated with his knowledge and under his sponsorship for organizing and carrying out terrorist attacks. The Defendant admitted that he funded terrorist attacks in which Ahmed Barghouti was involved, that he supported his activity and that Ahmed Barghouti would report to him after the terrorist attack was completed. The Defendant also admitted that from his perspective, Ahmed Barghouti was responsible for the military operations in the Ramallah area and that he operated in coordination with Defendant. The Defendant explained during the course of his interrogation that his connection with the terrorist cells was through Ahmed Barghouti (see Chapter C (3) above).

Abu Satha was also close to the Defendant and during one period served as his bodyguard. The Defendant confirmed during the course of his interrogation that Abu Satha worked in his office and under his responsibility, through Ahmed Barghouti, and he knew that the two were carrying out terrorist attacks against civilians in the Jerusalem area (see Chapter see C (4) above).

The Defendant also said during interrogation that he considered himself responsible for the activities of the cells that worked with Ahmed Barghouti and Abu Satha – unlike other cells – because the two were close to him and he funded their activities (see Section 60 above). The Defendant also acknowledged that he acquired influence over the cells' activities through the assistance and weapons that he gave them (see Section 61 above).

All this is in addition to the Defendant's overall responsibility as the commander and leader of all of the terrorism operatives of the Fatah on the West Bank, as he himself admitted (see Section 65 above) and in addition to the fact that the Defendant encouraged terrorism operatives, both publicly and individually, to carry out terrorist attacks.

The difficult legal question of whether this is enough to substantiate the Defendant's criminal liability for the act of murder that was committed in this case – when there is no evidence that ties him directly to the terrorist attack – will be considered in the chapter of conclusions.

### (3) Murder of the Greek Orthodox monk Tsibouktzakis Germanos, of blessed memory, in Ma'ale Adumim

81. On June 12, 2001, at 10:30 p.m., shots were fired from an ambush on the road between Jerusalem and Ma'ale Adumim, at the private car of the Greek Orthodox monk Tsibouktzakis Germanos, of blessed memory. The car, a Peugot utility-type model, had Israeli license plates. Germanos, of blessed memory, was murdered by those shots (Certificate of Death Prosecution/132 (a) and Pathology Expert Opinion of Professor Hiss Prosecution/130 (b)). Superintendent Nissim Mizrahi (on p. 131), who submitted the report of the preliminary visit to the scene and photographs (Prosecution/130 (c)-(d)), and Senior Staff Sergeant Major Avi Levi of DIFS, who submitted a Statement of a Public Employee (Prosecution/130 (f)) both testified on this terrorist attack. The bullet shells that were gathered at the scene were checked by the DIFS (see the expert opinion of Superintendent Avi Kaufman, Prosecution/130 (g)-(i)).

82. Radaida admitted during interrogation that he perpetrated the above mentioned terrorist attack and described the reasons for it. He said that he asked the Defendant about perpetrating a suicide terror attack. The Defendant referred him to Muhannad and instructed Muhannad to give a weapon to Radaida, and so he did. The Defendant also told Radaida that the Tanzim perpetrates terrorist attacks against the army and the settlers but not suicide terrorist attacks and that he had given him the weapon for this purpose. And indeed, the weapon (Kalashnikov) that Radaida received from Muhannad, in accordance with the Defendant's direct orders, was the one used to murder the monk Germanos, of blessed memory, as he described during the course of his interrogation, explaining that he erroneously thought that he was a settler (see Chapter C (8) above Sections 41-42).

83. The Defendant himself confirmed Radaida's words during the course of his interrogation and said that he had referred him to Muhannad after he asked to commit suicide, and later heard that he had erroneously killed a Greek monk (see Section 43 above). On the basis of all this, the direct personal liability of the Defendant to this terrorist attack is clear.

### (4) Murder of Yaniv and Sharon Ben-Shalom, of blessed memory, and Doron Yosef Sviri, of blessed memory, on Route 443

84. On August 5, 2001, at 10:30 p.m., the couple Yaniv and Sharon Ben-Shalom, of blessed memory, and Doron Yosef Sviri, of blessed memory (Sharon's brother) were murdered while traveling together with their two children in a Passat model car with Israeli license plates, on Route 443 by the Dor Energy gas station (see Death Certificates and Pathology Opinion Prosecution/131 (a) – (c)).

The results of the terrorist attack were described by police officers Haim Toledano and Advanced Staff Sergeant Major Shaby Ovadya (on pp. 123, 139 and their Action Report Prosecution/131 (d) – (e), accompanied by Photograph Board Prosecution/131 (f)). The bullets that were gathered at the site were sent to DIFS for study and it was found that they were fired from two weapons: an MP5 submachine gun and a Kalashnikov (Expert Opinion Prosecution/131 (f)).

[Stamp] P 7: 000407

85. Ahmed Barghouti said during the course of his interrogation that he gave his MP5 rifle to Abu Satha after Abu Satha requested it for his cell, and a short time later, he heard from Abu Satha and also on the news that a member of his cell perpetrated a terrorist attack in which three Jews were killed near Beit Ghur (Statement Prosecution/165 (a) on p. 2, which was submitted by Staff Sergeant Major Mizrahi, on p. 184). Abu Satha also said during interrogation that he received the MP5 rifle and a full cartridge of bullets from Ahmed Barghouti and gave them to two members of his cell, Hussam and Faris. The two told him that they perpetrated the terrorist attack near Beit Ghur in which three Israelis were killed (Statement Prosecution/156 (b) on p. 3, which was submitted by an interrogator by the name of Dahan on p. 198).

The terrorist who perpetrated the attack, Hussam Shahada, confirmed during interrogation that he and another person perpetrated the terrorist attack near Beit Ghur on Route 443 by the Dor Energy gas station by firing at a white Passat car (see photographs). He noted that the shots were fired with an MP5 rifle that he received from Ahmed Barghouti and that his partner in the terrorist attack was armed with a Kalashnikov. On the following day, Shahada heard that three Israelis were killed as a result of the terrorist attack and reported this to Ahmed Barghouti, who passed a report on to the Defendant (Statement Prosecution/160 (a) on pp. 4 – 5, which was submitted by Dahan on p. 198). Shahada refused to answer questions during his testimony. Consequently, he was declared a hostile witness and his statements Prosecution/160 (a) – (c) were submitted together with the indictment verdict and sentence in his case (Prosecution/159 (a) – (d)). During his testimony he said only, "**I have said what I had to say and do not want to say anything else**" (on p. 73). Shahada was convicted of perpetrating this terrorist attack.

86. No evidence was presented connecting the Defendant to this terrorist attack other than his indirect connection, in accordance with that which has been set forth above, in the cases of the terrorist attacks in which his close associates, Ahmed Barghouti and Abu Satha, were involved (see Section 80 above). The Defendant supplied money and weapons to the members of the cell, by way of Ahmed Barghouti, in order to carry out terrorist attacks and the weaponry used for this terrorist attack was supplied by Ahmed Barghouti.

The question of whether this is sufficient to substantiate the Defendant's criminal liability for the acts of murder which were perpetrated during this terrorist attack when there is no evidence connecting the Defendant directly to this terrorist attack, will be examined in the chapter of conclusions.

(5) **Murder of Meir Weissboiz, of blessed memory, on Route No. 9 in Jerusalem**

87. On September 15, 2001, at 9:15 p.m., shots were fired from an ambush on a vehicle traveling on Route No. 9 in Jerusalem, from French Hill towards Golda Meir Boulevard. The vehicle, a white Renault Express, was driven by Moshe Weiss, who testified that he was injured by a bullet that is lodged in his body – in his spine – to this day, and his cousin Meir Weissboiz, of blessed memory, was killed by the shots (on p. 138, Death Certificate Prosecution/132 (b), Action Report of Superintendent Leor Nadivi Prosecution/132 (c) and the testimony of Nadivi on p. 132, and also the Photograph Board Prosecution/132 (c)). Bullet shells were collected at the scene and sent to DIFS for examination, which determined that they were apparently fired from a pistol and an MP5 submachine gun from which the fatal shots that killed the three people mentioned in incident No. 4, above, were fired (DIFS Expert Opinion Prosecution/132 (d)).

88. Hussam Shahada said in his Statement Prosecution/160 (a) on p. 6, that was collected by Advanced Staff Sergeant Major Mark Dahan (on p. 198 of the transcript) that he received the pistol and the MP5 submachine gun from Ahmed Barghouti and traveled with two other people (Faris and Heitham) in the car until they reached Route No. 9 in the direction of Ramot and French Hill. When they saw the white utility vehicle, they began to fire at its passengers and fled to Ramallah. After the incident, Shehada asked Abu Satha, who worked in the office of the Defendant, to report to the Defendant and to Ahmed Barghouti about the shooting. The following day, he heard that one of the passengers who was injured by the shots had died of his wounds (see also Section 85 above, with respect to Shahada's testimony). Shahada's statements are supported by comments said by Ahmed Barghouti and Abu Satha in their interrogations (see Section 85 above).

89. The connection of the Defendant to this terrorist attack, like the attack in Section 4 above, which was also perpetrated by Shahada, is not direct, since no evidence was submitted with respect to the Defendant's involvement in this terrorist attack. The indirect connection of the Defendant to this terrorist attack is derived from the fact that it was executed by his close associates and assistants, Ahmed Barghouti and Abu Satha, whose activities the Defendant funded, including the purchase of weapons.

The legal question of whether this is sufficient to substantiate the criminal liability of the Defendant for the act of murder that was carried out during this terrorist attack, when there is no evidence connecting the Defendant directly to this particular terrorist attack, will be examined in the chapter of conclusions.

**(6)** **Murder of Eliahu Cohen, of blessed memory, in the shooting terrorist attack on Route 443 near Givat Ze'ev**

[Stamp] P 7: 000408

90. On December 21, 2000, at 8:30 p.m., shots were fired from an ambush at the car of Eliahu Cohen, of blessed memory, traveling on Route 443 approximately 1.5 km [0.93 miles] from the settlement Givat Ze'ev (see the Death Certificate Prosecution/133 (a), Pathology Opinion Prosecution/133 (c) and the report of the mobile DIFS Laboratory Prosecution/133 (c) about which Superintendent Chelouche testified on p. 127). Brian Malcolm Shapiro, an eyewitness to the terrorist attack, testified about it (on p. 149). Examination of the bullet shells that were gathered at the scene found that the weaponry used in this terrorist attack was apparently the Kalashnikov rifle that was also used to murder the Kahane couple, of blessed memory (see Opinion Prosecution/133 (d) and Prosecution/128 (f)).

91. During the course of his interrogation, Abu Hamid spoke about the activities of the Ahmed Gandor cell, which perpetrated this terrorist attack (Statement Prosecution/149 (a) on pp. 10 – 12, which was collected by Elkura'an: his testimony is on p. 194). Abu Hamid said during interrogation that he supplied Gandor with the Kalashnikov rifle and ammunition that he received for this purpose from Ahmed Barghouti and that he gave Gandor permission to perpetrate a shooting terrorist attack on Route 443 where Eliahu Cohen, of blessed memory, was killed. Abu Hamid also said that the terrorist attack was carried out by Muhannad and Shawish on the basis of what Muhannad told him after the terrorist act. Muhannad was not a witness in this trial, and the interrogation of Shawish, who did testifiy before us, did not relate to this event and this terrorist attack was not included in the indictment filed against Shawish (Prosecution/157 (a)).

In light of that which was mentioned above, we have before us only the testimony of Abu Hamid, in which he said that he approved a shooting terrorist attack against an Israeli vehicle on Route 443 in late 2000, and that he supplied the weapon to the perpetrators. We do not have before us any admissible evidence with respect to the identity of the person who perpetrated the terrorist attack, meaning that we do not have any admissible evidence connecting the Defendant to a terrorist attack perpetrated through Abu Hamid.

The only evidence before us is that the Defendant assisted Abu Hamid in purchasing weapons and ammunition for terrorist attacks and that Abu Hamid gave the weapon that was purchased with the assistance of the Defendant to Gandor in order to perpetrate a shooting terrorist attack (this is the same situation as in the case of the murder of the Kahane couple, of blessed memory, which was carried out using the same weapon; see Chapter E (1) above).

#### (7) Murder of Yoela Chen, of blessed memory, near the Givonim gas station on Route 443

92.  On January 15, 2002, at 7:55 p.m., Yoela Chen, of blessed memory, arrived in a Fiat Uno at the gas station near the Givonim intersection. Rochelle Eini was sitting next to her. Two terrorists approached her car and shot dozens of bullets at the two, from short range. As a result of the shooting, Yoela Chen, of blessed memory, was murdered (Death Certificate 134 (a)) and Rochelle Eini was injured in her head and shoulder. An eyewitness to the event, Sammy Vaknin, testified he saw a young man running away towards the neighboring village of al-Jib after the shooting, and he helped rescue the travelers (on p. 143). Superintendent Ami Leifer and Senior Staff Sergeant Major Eli Kojman described the incidents in similar manner (on p. 130 of the transcript and Reports Prosecution/134 (b)-(d.1), in addition to the Photograph Board Prosecution/134 (b) and Prosecution/134 (d.2)).

93.  The terrorist attack in which Yoela Chen, of blessed memory, was murdered was carried out following direct orders given by the Defendant in revenge for the killing of Ra'ed Karmi the day before the terrorist attack, as the Defendant admitted during the course of his interrogation. During the interrogation, the Defendant said that he instructed his close associate, Ahmed Barghouti, to perpetrate this revenge terrorist attack and that Ahmed reported to him that the terrorist attack had been perpetrated. The Defendant even took responsibility for perpetrating this attack and noted that this was the first time that Fatah had perpetrated an attack deep within Israel (see Section 66 (a) above.)

The Defendant's comments during the course of his interrogation are consistent with thosee of Ahmed Barghouti, Abu Satha and Musafar during their interrogations (see Sections 30 and 53 above; Abu Satha's Statement Prosecution/156 (b) on pp. 5-6 about which collection Dahan testified, on p. 198; and the Statement of Ahmed Barghouti Prosecution/165 (a) on p. 3 and Prosecution/165 (c) on pp. 1-2, about which collection Mizrahi testified, on p. 184.) They described the terrorist attack that was carried out at the gas station by shooting at a Fiat Uno car in which one woman was murdered and her companion was injured. Abu Satha, who actually fired the shots, claimed that he originally decided not to shoot at the two because they were women but after they began to shout, he shot at them, as did his comrade Tarek.

[Stamp] P 7: 000409

Abu Satha claimed that he perpetrated the terrorist attack in accordance with the orders given by Ahmed Barghouti, while the latter claimed that Abu Satha was the one who initiated the terrorist attack and therefore he gave him the MP5 rifle. Ahmed Barghouti claimed in his statement that Abu Satha told him that he had reported his intentions to perpetrate a terrorist attack before he perpetrated it and the Defendant told him not to undertake this terrorist attack.

Ahmed Barghouti explained that Abu Satha was the Defendant's bodyguard and driver and that the Defendant feared for his life. In the conversation between the Defendant and Ahmed Barghouti after they were arrested, which was recorded without their knowledge, the two coordinated versions with respect to this terrorist attack and Ahmed Barghouti told the Defendant that he emphasized during the course of his interrogation that he had given the orders to perpetrate this terrorist attack behind the Defendant's back (Transcript of Conversation Prosecution/128 (c) on pp. 14, 17). However, the Defendant, as noted above, admitted that he gave orders to perpetrate this terrorist attack and therefore it is clear that his close associate Ahmed Barghouti tried to save him from being directly involved in this terrorist attack, like other terrorist attacks.

### (8) Murder of six people in David's Palace Banquet Hall in Hadera

94. On January 17, 2002, at 10:45 p.m., a shooting terrorist attack was carried out at David's Palace Banquet Hall in Hadera. The terrorist, Abdel Salaam Hasouna, shot the security guard at the entrance to the hall, charged in, and began firing an automatic weapon at the crowd, until several people overtook him and he was shot to death (Pathologist's Opinion Prosecution/135 (j)). They were celebrating at the Bat Mitzvah party of Nina Kardashova. As a result of this shooting, six people were murdered and dozens were injured, some of them seriously. Those who were murdered are: Boris Melikhov, of blessed memory, (Death Certificate Prosecution/135 (b)); Dina Binayev, of blessed memory, (Death Certificate Prosecution/135 (c)); Anatoly Bakshayev, of blessed memory, (Death Certificate Prosecution/135 (d)); Avi Yazdi, of blessed memory, (Death Certificate Prosecution/135 (e)); Edward

Bakshayev, of blessed memory, (Death Certificate Prosecution/135 (f)); and Aharon Ben Yisrael-Ellis, of blessed memory, (Death Certificate Prosecution/135 (g)). During his testimony, eyewitness Constantine Kardashov related the course of events (on p. 125), and the incident can also be seen in the police presentation and cassettes that were recorded during the incident (Prosecution/135 (a), Prosecution/135 (k) – (l)). An M-16 assault rifle and a grenade that were used by the terrorist were seized at the scene (see Opinion Prosecution/135 (g) – (i) and the testimony of Superintendent Leifer on p. 130).

95. Nasser Aweis was responsible for the perpetration of this terrorist attack and he was the one who provided the terrorist Hasouna with the weapon for this purpose (see his statement Prosecution/172 (b), about which collection Major Amar testified on p. 191). This also emerges from the statement given by Ahmed Barghouti who said that Aweis reported to him on the terrorist attack that was carried out in the banquet hall in Hadera (Statement Prosecution/165 (d) about which collection Staff Sergeant Major Ya'akoboff testified on p. 171). Ahmed Barghouti said that he heard about perpetration of the terrorist attack on television while he was with the Defendant and immediately called Aweis, who took responsibility for perpetrating the terrorist attack.

Abdul Hamid also related to this terrorist attack during the course of his interrogation and he also explained that it was in revenge for the targeted assassination of Ra'ed Karmi and therefore the terrorist departed from Tulkarm, where Karmi had lived (Prosecution/149 (b) on pp. 14-15 about which collection Staff Sergeant Major Elkura'an testified on p. 194).

96. There is no direct evidence that the Defendant was directly involved in the planning of the above mentioned terrorist attack or knew about its perpetration in advance. The Defendant claimed that he would hear reports of terrorist attacks from Ahmed Barghouti and Aweis only after they occurred, and in his conversation with Agent John Doe No. 1 he said that he knew about this terrorist attack only after the fact (Report Prosecution/118 Section 4 that was submitted by "Robert"). The indirect connection of the Defendant to the terrorist attack in Hadera is created by the fact that he supplied Aweis with money, weapons and explosives in order to carry out terrorist attacks and that the latter considered him a leader and commander and therefore reported to him after every terrorist attack. The Defendant admitted to providing Aweis with money in order to purchase weapons and said that when he wanted to ensure that the terrorist attacks would cease he would also contact Aweis about this (see Section 23, above). In spite of this, the Defendant did not consider himself responsibile for the activities of Aweis unlike the activities of Ahmed Barghouti, Abu Satha and Abu Hamid (see Sections 60 and 65, above). During the course of his

[Stamp] P 7: 000410

interrogation, Aweis also said that he perpetrated the terrorist attacks that he initiated within the framework of Tanzim Fatah for which the Defendant was responsible, and that the Defendant helped them with funding terrorist attacks and supplying weapons. He noted that the Defendant was his superior (see Sections 21-22, above).

The legal question of whether all this is sufficient to substantiate the Defendant's criminal liability for the acts of murder that have been carried out during this terrorist attack – when there is no evidence directly connecting the Defendant to the terrorist attack – will be examined in the chapter of conclusions.

## (9) Murder of two women in the shooting terrorist attack at the corner of Jaffa Road and Lunz Street in Jerusalem

97. On January 22, 2002, at 4:20 p.m., the terrorist Sa'id Ramadan opened fire with an M-16 rifle at passersby on Jaffa Street, at the corner of Lunz, in Jerusalem until he was shot and killed. As a result of the shooting, Sarah Hamburger, of blessed memory, and Ora Sandler, of blessed memory, were murdered (Death Certificates Prosecution/136 (b) – (c)), and dozens of civilians were injured. Hanan Ben Naim, who killed the terrorist, testified regarding this incident (on p. 121). Similarly, a police presentation with respect to the incident was submitted in addition to the action report of Superintendent Nadivi, who testified during the trial (Prosecution/136 (a), Prosecution/136 (d) and testimony on p. 132). The terrorist's weapon was seized and sent to DIFS (Prosecution/136 (e) and testimony of Sergeant Major Azulai and Superintendent Leifer on pp. 130 – 134).

98. Ahmed Barghouti took responsibility for the perpetration of this terrorist attack (see Statement Prosecution/165 (a) on pp. 4 – 5, about which collection Mizrahi testified on p. 184). He said that he decided to insert a suicide terrorist bomber into Israel and for that was assisted by Aweis, who sent the terrorist Sa'id Ramadan to him. The two prepared the terrorist for the terrorist attack, took him to pray, bought him clothing and obtained an M-16 rifle and bullets for him. That day, in the afternoon, Ahmed heard about the terrorist attack that had been perpetrated in Jerusalem.

[Stamp] P 7: 000410 [continued]

There is no direct evidence that connects the Defendant to this terrorist attack and he even said during the course of his interrogation that he and Arafat were angry at Ahmed Barghouti because this terrorist attack had been perpetrated (Transcript of Conversation Prosecution/98 (k) on p. 32). The indirect involvement of the Defendant in the terrorist attacks that had been carried out by Ahmed Barghouti and Aweis, by themselves or through others, was explained above. The legal question about whether this is sufficient in order to substantiate the Defendant's criminal liability for the acts of murder that have been carried out by this terrorist attack – where there is no evidence connecting the Defendant directly to the terrorist attacks – will be examined in the chapter of conclusions.

## (10) Shooting terrorist attack in the Neve Ya'akov neighborhood in Jerusalem, in which police officer Galit Arbiv, of blessed memory, was killed

99. On February 25, 2002, at 6:25 p.m., a terrorist attack was carried out by a single terrorist armed with an M-16 rifle and a hand grenade on the main road of the Neve Ya'akov neighborhood in Jerusalem.

From the testimony of an eyewitness, police officer Adam Garfield, it becomes apparent that the terrorist opened fire on vehicles that were traveling on the road and also at civilians and police officers who were at the scene. Police officer Galit Arbiv, of blessed memory, was sitting in the police car with Garfield, and charged at the terrorist with her pistol drawn. The terrorist murdered police officer Arbiv, of blessed memory, by shooting her (Death Certificate Prosecution/137 (b)), seriously injured police officer Garfield, who remains disabled to this day, and police officer Amichai Dahan. The grenade that was thrown by the terrorist did not explode (see Garfield's testimony on p. 127, the testimony of Superintendent Leor Nadivi on p. 132 and the reports and photographs that were submitted in Prosecution/137 (c), Prosecution/137 (g) plus Presentation Prosecution/137 (a) and the Photograph Board Prosecution/137 (g)). The terrorist weapons, the hand grenade that did not explode and the spent bullet shells were collected and sent to DIFS for examination (testimony of Superintendent Ami Leifer on p. 130, Opinion of Superintendent Avi Kaufman Prosecution/137 (d) – (e) and the Opinion of Superintendent Yaniv Ron Prosecution/137 (e)).

100. The terrorist who was captured during the attack is Rami Nur, in accordance with that which has been set forth by Abu Hamid in his Statement Prosecution/149 (c) on pp. 11 – 12 (which was submitted by Sergeant Major Ya'akov Barazani on p. 207). Abu Hamid said that when he and his brother Haloum Abu Hamid saw the terrorist attack in Neve Ya'akov on television, his brother reminded him that the terrorist Rami Nur had been in their home the previous day, and Haloum said that he was the one who had given Rami Nur

the M-16 rifle and bullets and sent him to perpetrate a terrorist attack after filming a video tape, which he showed his brother Nasser after the terrorist attack. Haloum told his brother Nasser that he had received the weapon and the terrorist Rami Nur from Ahmed Barghouti. In his above mentioned statement, Abu Hamid expressed anger about this and explained that this terrorist attack might entrap the Defendant because of his close ties to Ahmed Barghouti, when it transpired that the terrorist had survived and would be interrogated by the Israel Security Agency.

In his above mentioned statement, Abu Hamid also said that Yasser Arafat summoned the Defendant and Ahmed Barghouti to his office as a result of this terrorist attack. Ahmed Barghouti fled and told Abu Hamid that it is likely that they would arrest the Defendant because of this terrorist attack. The Defendant told Abu Hamid later that he explained to Arafat that there was no instruction with respect to a cease-fire at that time and then he – the Defendant – stood behind his people as long as Arafat had not issued a presidential order to stop the terrorist attacks. Abu Hamid also said in his statement that Ahmed Barghouti admitted to him that he had given the weapon to the brother of Abu Hamid (Haloum) in order to perpetrate the terrorist attack in Neve Ya'akov.

101. From that which has been set forth above, it becomes apparent that Nasser Abu Hamid did not take part in the planning and perpetration of this terrorist attack, but that it was done by his brother Haloum and by Ahmed Barghouti, who were witnesses at the trial. Haloum Abu Hamid was convicted, on the basis of his confession, for several acts of terrorism, including responsibility for implementing the above mentioned terrorist attack in Neve Ya'akov (see item 13 in the amended Indictment Prosecution/161 (a), and Ruling Prosecution/161 (b)). Haloum told of his responsibility for the above mentioned terrorist attack, in accordance with that which has been set forth above, in his Statement Prosecution/162 (a)-(b), which was collected by Ibrahim Elkura'an (his testimony is on p. 194) and Staff Sergeant Major David Mizrahi (his testimony is on p. 184).

In his above mentioned statement (Prosecution/162 (a) on pp. 6-9, Prosecution/162 (b) on pp. 2-4), Haloum said that he prepared Rami Nur for the terrorist attack, arranged for someone to transport him, and gave him the shrapnel grenade and an M-16 rifle with bullets. While he was preparing Rami Nur for the terrorist attack, Ahmed Barghouti came to inquire about how preparations for the terrorist attack were progressing. Ahmed Barghouti wanted the terrorist attack to be perpetrated in a crowded part of Jerusalem; however, they finally agreed that it would perpetrated in northern Jerusalem

because of the roadblocks, and Ahmed Barghouti gave his approval for this.

102. During the course of his interrogation, Ahmed Barghouti confirmed his connection to the terrorist attack in Neve Ya'akov. In his statement Prosecution/165 (a), he said that Nasser Aweis sent the terrorist Rami Nur to him in order to perpetrate the terrorist attack in Neve Ya'akov, and he referred Rami Nur to Haloum Abu Hamid so that he could assist him in entering Jerusalem (Statement Prosecution/165 (a) on p. 6, which was gathered by Staff Sergeant Major Mizrahi in accordance with his testimony on p. 184). Ahmed Barghouti, like his friend Nasser Abu Hamid, said during the course of his interrogation that he was summoned, together with the Defendant, to Arafat's office as a result of this terrorist attack; the Defendant asked him if he was responsible for the terrorist attack and Ahmed Barghouti responded in the affirmative, and heard from the Defendant that Arafat was angry about the terrorist attack (Statement Prosecution/165 (c) on p. 5 that was collected by Staff Sergeant Major Mizrahi in accordance with his testimony on p. 184).

103. On the basis of the above mentioned, the terrorist attack was planned by Aweis and Ahmed Barghouti. During the meeting between Ahmed Barghouti and the Defendant after their arrests, when they were recorded without their knowledge, Ahmed repeated several times and emphasized to the Defendant that during the course of his interrogation he had said that the Defendant heard about this terrorist attack only after it was carried out (Transcript of the Conversation Prosecution/127 (c) on pp. 4, 11).

There is no evidence that connects the Defendant directly to this terrorist attack, other than the connection created by his general, indirect involvement to the terrorist attacks that were planned and perpetrated by Ahmed Barghouti and Aweis, as explained above (see Sections 80, 86 and 96 above). There is a reason that Yasser Arafat summoned Barghouti for clarification after this terrorist attack was carried out, since he also thought that the Defendant was the end-point for complaints in this matter. The legal question of whether this is sufficient in order to substantiate the Defendant's criminal liability for the act of murder that was carried out in this terrorist attack – where there is no evidence connecting the Defendant directly to this terrorist attack – will be examined in the chapter of conclusions.

#### (11) Murder of Gad Rejwan, of blessed memory, in the Bashkevitz factory in Atarot

104. On February 22, 2002, at 6:30 a.m., Gad Rejwan, of blessed memory, was murdered in the Bashkevitz factory in the Atarot industrial area by Abdel Majid Mehadi, who had been employed in the factory in the past (Death Certificate Prosecution/138 (a) and Pathologist's Opinion Prosecution/138 (b)). Zaharan Shahada, who was at the scene, said that when he

heard shots, he saw a man running from the scene and Gad Rejwan lying on the floor and asking for someone to call for help (on p. 146).

Gad Rejwan, of blessed memory, died from the shooting, and his death was pronounced at the scene (see Action Report 138 (c) and the testimony of Superintendent Leor Nadivi on p. 132, as well as the report from the mobile laboratory that was recorded by Superintendent Nissim Mizrahi Prosecution/138 (d) and his testimony on p. 131). The photographs of the scene of this event were submitted as Exhibition Prosecution/138 (d) and 138 (f) by Mizrahi and Nadivi during their testimony. The murder was carried out with a pistol (Opinion Prosecution/138 (e)); a number of the bullets fired from it caused fatal wounds in the body of the deceased (Opinion Prosecution/138 (b)).

105. Abu Hamid said in his Statement Prosecution/149 (b) (on pp. 25-28) that he was approached by Abdel Majid who said that he had worked in the Rejwan family's factory and wanted to perpetrate a terrorist attack together with a person named the Ramzi. The three met together and planned the attack; Abu Hamid gave each of them a pistol. Twenty minutes later, Ramzi reported to Abu Hamid that they had perpetrated a terrorist attack, and Abdel Majid related how he had shot Rejwan, of blessed memory, to death.

Abu Hamid called the police and took responsibility for the terrorist attack in the name of the al-Aqsa Martyrs Brigades (Statement of Abu Hamid that was submitted by Staff Sergeant Major Elkura'an on p. 194).

106. From that which has been set forth above, it becomes apparent that there is no direct evidence with respect to the identity of the perpetrators, since that which Abdel Majid, who did not testify in this Court, told Abu Hamid is inadmissible hearsay evidence.

However, on the basis of unequivocal circumstantial evidence it can be determined that the terrorist attack was carried out by al-Majid with Abu Hamid's assistance and authorization, as Abu Hamid said in his testimony. Abu Hamid said that Abdel Majid told him that he was going to perpetrate a terrorist attack in the factory of the Rejwan family, in which he had once worked, and for this purpose he equipped him

[Stamp] P 7: 000412 [continued]

with a pistol. A short time later, Abdel Majid reported to him that he had shot and killed Gad Rejwan, of blessed memory, who was indeed murdered by pistol shots.

There is no evidence that connects the Defendant directly to this terrorist attack, other than the connection created by his general, indirect involvement to the terrorist attacks that were planned and perpetrated by Abu Hamid, as explained above (see Sections 27 and 60 – 65 above). The legal question of whether this is sufficient in order to substantiate the Defendant's criminal liability for the act of murder that was carried out in this terrorist attack – where there is no evidence connecting the Defendant directly to this terrorist attack – will be examined in the chapter of conclusions.

### (12) Terrorist attack in the Seafood Market Restaurant in Tel Aviv

107. On March 5, 2002, at 2:30 a.m., a terrorist attack was carried out at the Seafood Market Restaurant in Tel Aviv by the terrorist Ibrahim Hasouna, who arrived at the scene armed with an M-16 rifle, hand grenades and a knife. The incident was described by eyewitnesses Willis Hazan (on p. 148) and Leon Gorenstein (on p. 129), who were present in the restaurant at the time the terrorist attack. With the rifle in his hands, the terrorist opened fire at the people sitting in the restaurant until the weapon jammed and the hand grenade he threw did not explode. At this stage Hasouna began to stab people, including police officer Staff Sergeant Major Salim Barakat, of blessed memory, who tried to stop the shooting spree and was stabbed to death by the terrorist. In addition to Staff Sergeant Major Barakat, Yosef Habi, of blessed memory, and Elihu Dahan, of blessed memory, were also murdered in this terrorist attack (see the Pathologist's Opinion Prosecution/139 (b) through Prosecution/139 (d)). Many others were injured. The terrorist himself was shot and killed during the terrorist attack and it was learned that he was Ibrahim Hasouna (Pathologist's Opinion Prosecution/139 (k) and the DNA Tests Prosecution/139 (g)).

The result of this terrorist attack can be seen on the Photograph Board Prosecution/139 (f) that was submitted by police officer Effi Yamin (on p. 151) and the presentation prepared by the Police (Prosecution/139 (a)). Effi Yamin also submitted the Action Report that he wrote at the time. He was the person who took the terrorist's bloodied knife, a smashed bullet, bullet shells, bullets and the M-16 rifle (Prosecution/139 (e)). The weapon that was seized and brought to the DIFS for examination (Prosecution/139 (h) and testimony of Superintendent Ami Leifer on p. 130).

108. The terrorist attack at the Seafood Market was carried out by Ibrahim Hasouna and was planned by Ahmed Barghouti, Abu Hamid and Aweis, as Ahmed Barghouti said during the course of his interrogation (see Section 29 above). Abu Hamid's brother (Sharif Naji) was

also involved in the terrorist attack, as he explained during the course of his interrogation (see Section 55 above). He also connected Ahmed Barghouti to its planning. During the course of his interrogation, Ahmed Barghouti said that the terrorist Ibrahim Hasouna had been sent to him by Aweis and he gave him money, bought him clothing and made sure that there was someone who could drive him to Israel in order to perpetrate the attack (Tarek Malahi). He reported to the Defendant by telephone that the terrorist attack was ready to go, and the Defendant said that he did not wish for the attack to be perpetrated within Israel. Ahmed Barghouti also said that that after the terrorist attack, the Defendant told him to tell Aweis not take responsibility for the terrorist attack in the media before he discussed it with the Defendant (see Section 29 above).

During the course of the conversation between the Defendant and Ahmed Barghouti after their arrests, when they were recorded without their knowledge, Ahmed made certain to emphasize to the Defendant several times that he had said that he only discussed the terrorist attack on the telephone with the Defendant **after** it had occurred and added, **"Be careful, I was not with you, I was not with you, I talked with you on the telephone"** (Transcript of Conversation Prosecution/127 (c) on pp. 4 – 5, 11). The two coordinated their versions with respect to their interrogation on this point.

During the course of his interrogation, Abu Hamid also told about his involvement in the terrorist attack (Statement Prosecution/149 (b) on p. 6 that was submitted by Staff Sergeant Major Elkura'an on p. 194). He supplied hand grenades, and bullets for an M-16 rifle for the purpose of the terrorist attack when he saw that Hasouna was equipped with an M-16 rifle, before he departed for the terrorist attack. When the terrorist attack was reported during the night, including the fact that Hasouna had stabbed a police officer to death, Abu Hamid remembered that Nasser Haloum (Abu Hamid's brother) had given the terrorist a knife and explained to him to use it if the rifle jammed.

During the course of his interrogation, Haloum Abu Hamid explained his involvement in the terrorist attack (Statement Prosecution/162 on p. 9, which was submitted by Staff Sergeant Major Elkura'an on p.

194, and Statement Prosecution/162 (b) on p. 4 that was submitted by Staff Sergeant Major Mizrahi on p. 184). Haloum said that he trained Hasouna in the use of the M-16 rifle. Sharif Naji Abu Hamid (he is Abu Hamid's brother) said during the course of his interrogation that he accompanied the terrorist to Tel Aviv and obtained a car for the terrorist attack (Statement Prosecution/182, which was submitted by Staff Sergeant Major Ben Lulu on p. 182).

109. The Defendant is indirectly connected to the terrorist attacks that were planned and perpetrated by Ahmed Barghouti, Abu Hamid and Aweis, in accordance with that which has been set forth above. However, with regard to the terrorist attack at the Seafood Market, which was planned and executed by all three of them, the Defendant is also personally responsible for its perpetration. The subject of the liability of the Defendant for this terrorist attack has been set forth above (see Sections 29, 55 and 66 (c) above). The Defendant admitted during interrogation that he gave Ahmed Barghouti his approval for this terrorist attack before it actually happened, although he did give orders that the terrorist attack should be in the Judea and Samaria region and not within Israel. This also emerges from that which Ahmed Barghouti said during the course of his interrogation.

### (13) Shooting terrorist attack in the Jeremy Hotel in Netanya

110. On March 9, 2002, at 8:25 p.m., two terrorists entered the Jeremy Hotel in Netanya armed with M-16 rifles and hand grenades. The two of them threw the hand grenades and fired at passersby and tourists. The incident was described by the eyewitness known by his initial "G", who was a squad commander in the "Almog" Border Police unit. He arrived at the hotel within 30 seconds after hearing shots fired and encountered injured people while the terrorists were still shooting. "G" began to chase the terrorists, and both of them were identified on the stairs of a shopping mall in the immediate vicinity; they were shot and killed (see Pathologist's Opinion on the terrorist Shahdi al-Najimi Prosecution/140 (h) and also the Expert Opinion with respect to the second terrorist Prosecution/140 (i)). "G" confirmed in his testimony that, most unfortunately, some of the injured were hurt by shots that had been fired by border police (on pp. 117 – 118). In this terrorist attack, the baby girl Avia Malka, of blessed memory, and Israel Yihye, of blessed memory, were murdered (see the Notification of Death Form Prosecution/140 (b)).

Cadet Rami Malka submitted the report of the DIFS technician's attendance at the scene of the terrorist attack, which describes the resultant findings of the scene (Prosecution/140 (f) and his testimony on p. 118) and photographs of the scene (Prosecution/140 (g)). The Expert

[Stamp] P 7: 000414

Opinion of the Police Bomb Disposal Department states that a hand grenade was thrown at the hotel, and it exploded (Prosecution/140 (e)). From the report of Staff Sergeant Major Malka it becomes apparent that the two M-16 rifles that were used by the terrorists were seized at the scene (see also the testimony of Superintendent Leifer on p. 130).

111. During the course of his interrogation, Nasser Aweis said that he had perpetrated this shooting terrorist attack in Netanya but that it was carried out by two people whose names he did not know. The two were sent to him by another terrorism operative (Ahmed Abu Khadr), and Aweis organized transportation for the two through Mahmoud Titi, and even gave Ahmed Abu Khadr two hand grenades and two M-16 rifles. Several hours after the two were transported to Baka el-Sharkia, from where they entered Israel on foot, Aweis heard on television that there had been a terrorist attack at a hotel in Netanya. He called media outlets and assumed responsibility for the perpetration of the terrorist attack (Aweis's Statement Prosecution/174 (b) on p. 5, which was submitted by Advanced Staff Sergeant Major Ronny Amar, on p. 119).

With regard to this terrorist attack: it is again possible to determine on the basis of unequivocal circumstantial evidence that Aweis was behind this above mentioned terrorist attack, which was carried out a short time after he equipped the terrorists with M-16 rifles and hand grenades and transported them to the point on the Green Line closest to Netanya. The terrorist attack was indeed perpetrated by two terrorists armed with M-16 rifles and hand grenades just several hours after Aweis arranged transportation for them to Netanya, and from all this it is clear that this is the terrorist attack about which Aweis talked during the course of his interrogation.

There is no evidence that directly connects the Defendant to this terrorist attack, other than the connection created by his general and indirect involvement in the terrorist attacks that were planned and perpetrated by Aweis (see Section 96 above). The legal question of whether this is sufficient