in order to substantiate the Defendant's criminal liability for the acts of murder that have been carried out during this terrorist attack – when there is no evidence connecting the Defendant directly to the terrorist attack – will be examined in the chapter of conclusions.

### (14) Murder of Constantine Danilov, of blessed memory, in Baka al-Garbiyeh

112. On March 30, 2002, at 1:00 p.m., a team of Border Police officers identified a vehicle that was traveling at very high speed in the direction of Baka al-Garbiyeh with two suspicious individuals in it. As the team followed the terrorists, the terrorists began shooting and murdered Constantine Danilov, of blessed memory, (see Death Certificate Prosecution/141 (i)). The other members of the team shot the terrorists and the explosive belt that one of them was wearing detonated. The two terrorists were killed, after they threw a hand grenade at the team (see the testimony of Chief Superintendent Farid Ghanem, who participated in the incident, on p. 122).

Photographs of the incident were submitted with the Civil Servant Certificate of Prosper Ohana (Prosecution/141 (c)). The DIFS examination determined that one of the terrorists was carrying an explosive belt that detonated on his body (Prosecution/141 (e)).

113. During the course of his interrogation, Aweis said that he sent the terrorists with Mahmoud Titi and Ahmed Abu Khadr, and that he obtained an explosive belt for one of them, for the perpetration of a terrorist attack within Israel. That same suicide [bomber] traveled, wearing the explosive belt, with another person to perpetrate a terrorist attack in Israel, but was killed with his companion in an exchange of fire with Border Police officers in Baka al-Garbiyeh, after they killed another Border Police officer (Statement Prosecution/173 (b) on pp. 9-10 that was submitted by Advanced Staff Sergeant Major Amar on p. 191). Aweis also said during the course of his interrogation that this terrorist attack was supposed to have been perpetrated in Hadera (Statement Prosecution/172 (b) on p. 3 that was submitted by Amar on p. 191).

114. There is also unequivocal circumstantial evidence that this terrorist attack was carried out by people who were dispatched by Aweis after he equipped them with an explosive belt. The legal question of whether this is sufficient in order to substantiate the Defendant's criminal liability for the acts of murder that have been carried out during this terrorist attack – when there is no evidence connecting the Defendant directly to the terrorist attack – will be examined in the chapter of conclusions.

### (15) Shooting terrorist attack between Ateret and Bir Zeit

On February 25, 2001, at 1:00 p.m., shots were fired from an ambush on Route 465 in the direction of Yosef Cohen's car (GMC), which was traveling from the direction of Ateret to Bir Zeit. The shots were fired from a passing car. Cohen was seriously injured in the terrorist attack and his car went off the road onto the shoulder (his testimony is on p. 142). Dozens of bullets were fired at his car and he was hit in the head by three [bullets] and in the neck by two [bullets], but he miraculously remained alive (see Transcript with regard to the condition of the car Prosecution/142 (c) and the Report on Seizure and Marking of the Bullet Casings Prosecution/142 (b) that was submitted by Moshe Lavie on p. 124, and also the Report of the Car Inspection Prosecution/142 (d) that was submitted by police officer Mizrahi on p. 131).

A description of the scene of the terrorist attack appears on Photograph Board Prosecution/142 that was submitted by Superintendent Mizrahi on p. 139.

116. Ahmed Barghouti explained about this terrorist attack during the course of his interrogation (Statement Prosecution/165 (a) on p. 1 that was submitted by Staff Sergeant Major Mizrahi, on p. 184; and Transcript Prosecution/165 (f) that was submitted by an interrogator by the name of "Danny" on p. 200), how he planned this terrorist attack together with Muhannad, Abu Satha and others, who asked him for weapons and a car in order to perpetrate a terrorist attack. Ahmed Barghouti gave them

an MP5 rifle and bullets, as well as his car. Several hours, later they returned the car and the gun to him and told him that they had shot at a car in the area of the Atara Bridge while passing it, and that the driver of the car had been injured. Ahmed Barghouti's description is consistent with the evidence with regard to the way in which the terrorist attack was carried out, its location and results; therefore, there is unequivocal circumstantial evidence from which it becomes apparent that the terrorist attack about which Ahmed Barghouti told is the above mentioned attack near the Atara Bridge.

There is no evidence that ties the Defendant directly to this terrorist attack other than his general indirect connection to the terrorist attacks planned by Ahmed Barghouti and Abu Satha (see Section 80 above). The legal question of whether this is sufficient in order to substantiate the Defendant's criminal liability for the acts of murder that were carried out during this terrorist attack – when there is no evidence connecting the Defendant directly to the terrorist attack – will be examined in the chapter of conclusions.

### (16) Attempted terrorist attack in the Biancini Pub in Jerusalem

117. On May 19, 2001, at 3:00 a.m., Dina Dagan, the owner of the Biancini Pub in Jerusalemm, discovered an explosive device that had been placed in the bathroom on the premises by Sa'ad A-Din Jabar, who was known to her as a Palestinian from Ramallah who occasionally sold her products for hookah water pipes. In her testimony (on pp. 139 – 142), Dagan said that Jabar sat with her in the restaurant in order to write an order for products and then went into the bathroom without anything in his hands. Several moments later, he exited the bathroom with a plastic bag that he placed in the center of the pub. When she asked him what was in the bag, he told her that it contained clothes. She approached the bag in order to check it and discovered that it was an explosive device hidden under a jacket, and at this stage Jabar disappeared.

At the time, there were approximately 150 – 170 youths in the pub. Dagan displayed praiseworthy resourcefulness and bravery: she picked up the explosive device and yelled to one of the Palestinian employees there to evacuate the young people. He also helped her to move the explosive device outside of the restaurant. The police arrived at the scene and detonated the device, in a manner that caused damage to stores in the area. This is the picture that emerges from the testimony of police sapper Eyal Albo (on p. 119, see also Expert Opinion from the Explosives Laboratory Chief Inspector Yaniv Ron Prosecution/143 (a); Expert Opinion of DIFS given by Sarah Abramowitz-Bar Prosecution/143 (b); and the Photograph Board Prosecution/143 (a)).

[Stamp] P 7: 000416



. 118. During the course of his interrogation, Abu Hamid said (Statement Prosecution/149 (b) on pp. 10 – 12, which was submitted by Staff Sergeant Major Elkura'an, on p. 194) that Sa'ad A-la-Din approached him at the beginning of May 2002, and asked him to prepare an explosive device so that he could place it in a pub on Jaffa Street in Jerusalem. He explained to Abu Hamid that the owner of the establishment was in the habit of purchasing products for hookahs from him and he drew the pub for Abu Hamid. Abu Hamid instructed him where to place the explosive device and explained to him how to connect the wires to a fire extinguisher that housed the charge. (Indeed, it emerges from Opinion Prosecution/143 (a) that the charge was housed in a fire extinguisher.)

Subsequently, Abu Hamid sent Jabar to the pub, and Jabar covered the device with a jacket. When Jabar arrived at the pub, he called Abu Hamid and used a code sentence to inform Abu Hamid that he was about to place the explosive device in the pub, which Abu Hamid authorized him to do.

Jabar called Abu Hamid and told him that the pub owner had seen him place the explosive device and that he had heard on the news that the explosive device had been detonated by the police.

119. From that which has been set forth above, it becomes apparent that the attempted terrorist attack in the pub was carried out by Jabar, with guidance and assistance from Abu Hamid. The details that Abu Hamid gave during the course of his interrogation are consistent with the testimony of Dagan, as well as the findings at the scene.

There is no evidence that ties the Defendant directly to this terrorist attack other than his general indirect connection

to the terrorist attacks planned by Abu Hamid (see Sections 27, 60-65 above). The legal question of whether this is sufficient in order to substantiate the Defendant's criminal liability for the acts of murder that have been carried out during this terrorist attack – when there is no evidence connecting the Defendant directly to the terrorist attack – will be examined in the chapter of conclusions.

### (17) Shooting terrorist attack on Route No. 9, near French Hill in Jerusalem

120. On October 3, 2001, at 11:30 p.m., shots were fired at a passing car that was traveling towards French Hill, in which Mali and Pinhas Cohen were traveling. They were wounded by the shots (see the Report of Preliminary Visit to the Scene by Superintendent Leor Nadivi and his testimony on p. 132; Seizure and Marking Report by Superintendent Nadivi Prosecution/144 (b), Report of Preliminary Visit to the Scene by Superintendent Leifer and his testimony on p. 130, and the Report of the Weapons Lab Prosecution/144 (d)).

121. During the course of his interrogation, Abu Satha (Statement Prosecution/156 (b) on pp. 4 – 5, which was submitted by Advanced Staff Sergeant Major Dahan, on p. 198) said that he had perpetrated this terrorist attack together with Mohamed Sami Abdullah when they were traveling in a Mazda car and he had with him the MP5 rifle, which he had received from Ahmed Barghouti for the purpose of shooting at Israeli targets. During the course of his interrogation, he said that after he shot at the car going into the tunnel in the direction of French Hill, he realized that it was a female driver and therefore he stopped shooting and told his companion that the gun had jammed. After this, he continued traveling in the direction of French Hill, and there he shot at another car while passing it. The next day they heard on the radio that a man and woman had been injured.

122. The evidence that has been set forth by the Prosecution with regard to this terrorist attack is very weak and includes only the reports of the police's preliminary visits to the scene, meaning that any information about the way in which the terrorist attack was carried out is hearsay evidence. Similarly, it is difficult to know if Abu Satha's statements relate to this terrorist attack since the date of the events he described and the type of car at which he shot are not clear.

The only evidence we have before us is that Abu Satha perpetrated shooting terrorist attacks against Israeli targets, using a weapon that he received from Ahmed Barghouti, who was the Defendant's assistant and close associate. Furthermore, Abu Satha himself was the Defendant's bodyguard. The Defendant himself confirmed that Abu Satha worked in his office, was subordinate to him, and that he knew that Abu Satha carried out terrorist attacks against civilians in Givat Ze'ev and Pisgat Ze'ev (see Sections 33-34 above).

[Stamp] P 7: 000417

**(18) Attempted suicide terrorist attack in Beit Hanina in Jerusalem**

123. On March 8, 2002, at 4:15 p.m., the terrorist Mahmoud Salah was captured on his way to perpetrating a suicide terrorist attack in Jerusalem, while he was wearing an explosive belt. The terrorist attempted to detonate the charge while he was lying on the ground and was then shot and killed (see the testimony of Chief Superintendent Doron Yedid on p. 133, and the Report from the Explosives Lab Prosecution/145 (d)).

124. During the course of his interrogation, Ahmed Barghouti said that Louis Ouda asked him to prepare an explosive belt for a suicide [bomber] and he referred Ouda to Nassar Shawish, who gave him an explosive belt. The suicide [bomber] stayed in an apartment that Ahmed Barghouti rented in Ramallah, and was outfitted with the explosive belt there. Later, Ahmed Barghouti learned that he had been killed by shots fired by Israel Defense Forces soldiers in the Beit Hanina area, on his way to perpetrating the terrorist attack (Statement Prosecution/165 (b) on pp. 2, 11, which was submitted by Staff Sergeant Major Ya'akoboff, on p. 171).

Aweis also related during the course of his interrogation, (Statement Prosecution/173 (b) on p. 4, which was submitted by Advanced Sergeant Major Amar, on p. 191) that Louis Ouda, whom he had recruited for the al-Aqsa Martyrs Brigades, recruited a suicide [bomber] for him but that the terrorist attack failed because the suicide [bomber] was shot by police officers before perpetrating the attack, at the entrance to Jerusalem.

125. From that which has been set forth above, it becomes apparent that Aweis and Ahmed Barghouti were involved in this attempted terrorist attack. There is no evidence tying the Defendant to this terrorist attack in a direct manner other than the connection derived from his general and indirect involvement

[Stamp] P 7: 000417 [continued]

in terrorist attacks that were prepared and perpetrated by the two, in accordance with that which has been set forth above. The legal question of whether this is sufficient in order to substantiate the Defendant's criminal liability for the acts of murder that have been carried out during this terrorist attack – when there is no evidence connecting the Defendant directly to the terrorist attack – will be examined in the chapter of conclusions.

## (19) Shooting terrorist attack on the Beit El – Psagot Road

126. On March 17, 2002, at 6:45 a.m., shots were fired from an ambush with automatic weaponry at the car (Volkswagen Passat) of Samir Kersh, and he was injured by the shooting (see the Report of Visit to the Crime Scene Prosecution/146 (a) and photographs of Senior Staff Sergeant Major Eli Kojman that were submitted during his testimony on p. 121).

The Prosecution did not submit any additional evidence about this terrorist attack and Kojman's report is only hearsay evidence with regard to the manner in which the terrorist attack was carried out .

In its summations, the Prosecution attributes responsibility for this terrorist attack to Ahmed Barghouti, and he did admit to his involvement in this terrorist attack and was convicted for this (Prosecution/165 (g) – (q), Indictment Item No. 43). Other than this, the Prosecution did not refer to any other evidence from statements by Ahmed Barghouti or things that he said during his Israel Security Agency interrogation. Therefore, no evidence was presented with regard to this terrorist attack that makes it possible to establish a clear, factual foundation for Ahmed Barghouti's connection to this terrorist attack, and the evidence with regard to the actual manner in which the terrorist attack was carried out is very weak.

## (20) Attempted terrorist attack in the Malha Mall in Jerusalem

127. On March 26, 2002, at 10:30 a.m., a Renault Express car with two sappers [Translator's note: as written; this is clearly a typo for terrorists] (Shahadi Ibrahim Hamamra and Mousa Yusuf Mohamed Haled – see Corpse Transport Report Prosecution/147b, which was submitted by Ilan Granot on p. 135, and Report Prosecution/147 (c), which was submitted by Senior Staff Sergeant Major Asaf Azulai in his testimony on p. 134) who were on their way to perpetrate a terrorist attack, exploded.

[Stamp] P 7: 000418

128. During the course of his interrogation, Ahmed Barghouti said (Statement Prosecution/165 (c) on p. 5 that was submitted by Staff Sergeant Major Ya'akoboff on p. 171, and Transcript Prosecution/165 (k) Section 15 that was submitted by Israel Security Agency interrogator "Adam", on p. 201) that Jihad Jawara had called the Defendant the day before the car was found next to the mall in Jerusalem and told him that he wanted to perpetrated a terrorist attack. The Defendant told him not to perpetrate the attack within Israel, and referred Jawara to Ahmed Barghouti to discuss it with him. Ahmed Barghouti claimed that he also told Jawara not to perpetrate the terrorist attack in Israel or Jerusalem. However, the next day Jawara called Ahmed Barghouti and told him that he had sent the car that exploded next to the mall in Jerusalem to perpetrate terrorist attack in Jerusalem.

129. The Defendant himself said during the course of his interrogation (Transcript Prosecution/36 that was submitted by Israel Security Agency interrogator "Smith", on p. 85) that Ahmed Barghouti reported to him on the plans of Jihad's men to perpetrate a suicide terrorist attack in Jerusalem. The Defendant said that he had instructed Ahmed Barghouti that the terrorist attack should not take place within Israel, but rather within the Judea and Samaria region. The Defendant said on this matter during the course of his interrogation, when talking about Ahmed Barghouti's appeal to him about Jihad's desire to perpetrate a terrorist attack (Transcript of Conversation Prosecution/198 (k) on pp. 19-20):

> **"Defendant:** ... that Jihad, he said to him that we have an action. We have terrorist attacks, etc. So I said to Ahmed, I said to him that what is important is that there should be no terrorist attack within Israel.
>
> **Investigator:** OK and when he comes officially and tells you that they want to perpetrate a suicide terrorist attack, what did you say to them?
>
> **Defendant:** I told him no, I do not allow it.
>
> **Investigator:** No. That is not what you told me. You said to him, no problem. But not 'inside' (within

[Stamp] P 7: 000418 [continued]

Israel).

**Defendant:** Yes, not in Israel... that is to say, that I do not want terrorist attacks in Israel."

The Defendant said that the next day he received a report from Ahmed Barghouti with regard to the failed attempt at a suicide terrorist attack, and that the car had exploded not far from the roadblock and two cell members were killed.

130. Based on the above, it becomes apparent that there is proof of the Defendant's involvement in approving this suicide terrorist attack, even in accordance with his version. The Defendant did give orders that the terrorist attack be perpetrated in a different place, however this is not significant for his criminal liability for this attempted terrorist attack. That Defendant's version during the course of his interrogation is supported by the version of his close associate, Ahmed Barghouti, even though the latter "renovated" the facts and claimed that the Defendant gave orders not to perpetrate a terrorist attack at all. From the statements by the Defendant, it is clear that he gave orders to perpetrate the terrorist attack in another location.

[Stamp] P 7: 000419

**Part III:      Evaluation of the Evidence and Its Significance**

131. Since the Defendant chose not to testify or bring any witnesses on his behalf and even instructed the representatives of the Office of the Public Defender that were appointed to represent him to abstain from the cross-examination of the Prosecution witnesses, the evidence against the Defendant is founded on several different layers.

**First,** comments that were made by the Defendant during the course of his Israel Security Agency interrogation. Some were summarized and written up in the transcript that had been prepared and submitted by the interrogators and some were recorded and transcribed. This category also includes those statements that were made by the Defendant in conversations that were recorded without his knowledge, with his close associate Ahmed Barghouti and with agents John Doe No. 1 and John Doe No. 3.

**Second,** incriminating testimony against the Defendant that was given by terrorism operatives from the Fatah after their arrest, meaning the statements that they gave during the course of Israel Security Agency and police interrogations, since all of them – as if in unison – refused to answer any questions in Court, when they were brought as Prosecution witnesses.

**Third,** statements that were made by the Defendant by way of the media, during the period of time prior to his arrest.

**Fourth,** documents that were seized in the office of the Defendant and at the offices of the Palestinian Authority during the course of Operation Defensive Shield.

**Fifth,** testimony that was given by victims of the terrorist attacks, eyewitnesses to the terrorist attacks that are the subject of the indictment, and witnesses involved in their interrogation.

132. With respect to the evaluation of the evidence and its significance, the following comments must be made:

[Stamp] P 7: 000420

A. The Defendant's abstention from testifying during the trial and exposing himself to cross-examination can be used to reinforce the significance of the evidence against him and even in order to support Prosecution evidence in places where support is necessary, in accordance with that which has been set forth in Section 162 (b) of the Criminal Procedures Law [Consolidated Version] 5742 – 1982 (hereinafter – "the **Criminal Procedures Law**"). Similarly, the Defendant's abstention from responding to the indictment, as he did, can be used to reinforce the significance of Prosecution evidence, in accordance with that which has been set forth in Section 152 (b) of the Criminal Procedures Law. These points were made clear to the Defendant by the Court.

This matter acquires additional significance in light of the fact that, in accordance with law, statements made by witnesses who refuse to testify in Court, or who deny the content of their statements during interrogation, require support (see Subsection C (5) below). This is in accordance with the Supreme Court's ruling that a Defendant's abstention from testifying serves as significant reinforcement of the statements given by witnesses during the trial that require reinforcement, in accordance with Section 10 (A) (d) of the Rules of Evidence [New Version] 5731 – 1971 (hereinafter: "the **Rules of Evidence**") (Criminal Appeal 1497/92 **State of Israel v. Tzubari**, PD 47 (4) 177, on p. 202). The Court explained this matter: **"The silent Defendant – differentiated from the silent witness – is acting within the framework of the Law; however, the Court is given the right to interpret his behavior on the basis of its perceptions and understanding"** (on p. 203, see also Additional Proceeding 308/91 **Kuzli v. The State of Israel**, PD 45 (4) 441, on p. 486).

Indeed, the Court is entitled not to give any weight to the silence of the Defendant when there is a reasonable explanation for it (see: Criminal Appeal 277/81 **Halevy v. The State of Israel**, PD 38 (2) 369, on p. 386). However, since the Defendant's preliminary claims with respect to be authority of this Court to try him were rejected, we did not have any reasonable and justifiable explanation for his abstention from giving evidence. It is quite clear that the Defendant, who during the course of

his interrogation was exposed to the incriminating evidence that had accumulated against him, knew full well that he was unable to contend with it on the legal level and therefore fled to the warm embrace of the political level. Several times during the course of his interrogation, the Defendant said that it was clear to him that he would be tried and convicted and that, therefore, he planned to conduct a political trial.

In this matter, is important to note that in spite of the fact that the Defendant declared that he would not conduct a defense case, as indeed he did not, he did give political speeches and sometimes even related to the evidence presented against him – but from the Defendant's bench and not from the witness stand. By law, we are unable to give any significance to statements that were made in this manner, which did not give the Prosecution the possibility of questioning the Defendant about them. With respect to the many things that the Defendant said on the diplomatic and political levels, both during the trial and during the summations, we are not permitted to relate to them since they are irrelevant to the question of the Defendant's guilt of the crimes with which he is charged. These issues were explained in the Decision with respect to the authority of the Court: a person who acts outside of the framework of legal combat, and who perpetrates acts of terrorism for the purpose of causing injury, without distinction, to the civilian population, exposes himself to the ordinary criminal sanctions of national criminal law (see the decision that was handed down by the Court in this case, dated January 19, 2003 on pp. 29 – 33). Opposition to the occupation, as claimed by the Defendant, does not serve as justification, in accordance with any law, for acts of killing that have been carried out against innocent civilians. Furthermore: The place for this claim – if any – is during sentencing claims, since it relates to the motivation for the crime as distinguished from the criminal intent required in order to prove them.

B. Since the Defendant chose not to conduct a defense case, he also did not raise any claims against the admissibility of the evidence or its significance. However, the Court considered itself obligated to consider this question of its own initiative and to ignore the inadmissible evidence that has been set forth by the Prosecution or which was used in his summation (including hearsay evidence included in witnesses' statements, transcripts and statements that were not submitted by the interrogators who recorded them, expert opinions based on intelligence information and evidence that was not submitted during the trial, and points in the transcript that relate to polygraph findings.)

[Stamp] P 7: 000421

We also examined the evidentiary material from the Defendant's perspective, not only from the perspective of the Prosecution, as described in his summations. In spite of this, we are subject to the general principle by which the Defendant who does not testify in his case is not entitled to rely on comments from external statements that he gave: these statements are valid as evidence against him but not in his favor since it was not possible to question him about those statements (see Criminal Appeal 205/75 **Krantz v. The State of Israel**, PD 30 (2) 471, on p. 474).

C. The Prosecution subpoenaed 21 field commanders and terrorism operatives who were involved in the terrorist attacks that are subject of the indictment to testify about the Defendant's connection to them, in accordance with that which has been set forth above. These witnesses -- without exception -- refused to answer the questions of the attorney for the Prosecution, and it seems that this was not a personal decision of each individual but rather an order given from above. These witnesses were not willing to testify against their commander and leader; this is clear. In a conversation conducted between the Defendant and Ahmed Barghouti after they were arrested, which was recorded without their knowledge, Ahmed warned the Defendant about the testimony that would be given by terrorism operatives who had been arrested, and the Defendant replied, with laughter in his voice, "**In Court everyone will deny everything they admit... everything will be canceled... the interrogators told me. I told them that no one will admit anything in Court**" (Transcript 127 (c) on p. 109). So the Defendant said, and so it happened.

In these circumstances, all of the terrorism operatives were declared hostile witnesses and their statements during interrogation were submitted under Section 10 (a) of the Rules of Evidence. With respect to these witnesses, we comment as follows:

(1) Most of the Prosecution witnesses testified after they themselves had been tried, and mostly convicted, on the basis of their own confessions for crimes that included their involvement in the terrorist attacks that are the subject of the indictment. In their confessions to the facts

in the indictments filed against them, these witnesses incriminated the Defendant. However, the law with respect to a Defendant's confessions of this type when they are given by a person who is a witness in Court, is that they are considered an external statement that is covered by Section 10 (a) of the Rules of Evidence, but confessions of this type are not given substantive significance. From the point of view of the witness – the confession that he gives during his trial focuses entirely on the facts that pertain to him, and it is highly doubtful that he was aware at that time of the implications that part of his confession might have on others (see: Criminal Appeal 4541/90 **Eliyahu Sela v. The State of Israel**, Supreme Court Compendium 91 (2) 2086.)

(2) In general, an external statement that is made by a witness is hearsay evidence that is disqualified as evidence on the veracity of its content. An exception to this generalization is stated in Section 10 (A) (a) of the Rules of Evidence, in accordance with which the Court is permitted to accept a statement of this kind and even rely on it and prefer it over the witness's testimony in Court, when a witness in the case refuses to testify or he denies the version that he gave during interrogation.

The purpose of this Section is to deal with the common phenomenon of witnesses who deny the version that they gave during their interrogation, in order to prevent a situation in which it is impossible to confront them in Court with the version that they gave during their interrogation. (See the explanation of the proposed legislation for amending the Rules of Evidence, 5734 – 1974.) And note: a witness who is subpoenaed to testify and has taken his place on the witness stand is considered a "witness in the trial", even if he refuses to answer questions and therefore the above mentioned Section 10 (a) (a) applies to him rather than Section 10 (a) (b), which deals with the case of a witness who it is impossible to bring to Court at all, for reasons that have been listed in that Section. (See: Additional Criminal Proceedings 4390/91 **State of Israel v. Haj Yihye**, PD 47 (3) 673; compare with the expert opinion of A. Stein, "*Section 10 (a) of the Rules of Evidence: Its Proper Interpretation and Rulings of the Supreme Court*", [the journal] Mishpatim 21, 5752 [1992], on p. 325, on pp. 336 – 338.)

(3) According to Section 10 (A) (a) of the Rules of Evidence, admission of an external statement of a witness in the trial, when that witness denies the contents of the testimony he gave during the course of his interrogation, is conditional on proving that the statement was given, that it was given by that witness in the trial, and that the parties were given an opportunity to question him. In our case, these conditions are met for the 21 terrorism operatives mentioned above.

[Stamp] P 7: 000422

(4) The Court is entitled to rely on findings from an external statement that was admitted in accordance with Section 10 (a) of the Rules of Evidence and even to prefer it to testimony given by the witness in Court **"if it sees fit to do so, considering the circumstances of the case, including the circumstances in which the statement was given, the evidence that was presented in Court, the behavior of the witness in Court and signs of the truth revealed during the trial; its reasons shall be recorded"** (see Section 10 (A) (c) of the Rules of Evidence).

(5) According to Section 10 (A) (d) of the Rules of Evidence, a person may not be convicted on the basis of external statements admitted, in accordance with this Section, unless there is something in the evidentiary material to reinforce it. The intent is additional evidence that reinforces the reliability of the external statement and dispels the concern that it not truthful (see: Y. Kedmi, **On Evidence**, on pp. 354 – 365.)

On this issue it should be noted that the external statement of one witness, which itself requires reinforcement, can serve as reinforcement for the external statement of another witness (the above mentioned by Y. Kedmi on p. 366, and the rulings cited therein). As noted above, the Defendant's silence during the trial can also serve as the reinforcement of a witness's external statements, as can abstention from cross-examination (Y. Kedmi, *op. cit.* on pp. 369 – 371, and the rulings cited therein).

The clear ruling is that the Defendant's abstention from cross-examining witnesses also reinforces the Prosecution's evidence (see Criminal Appeal 4736/91 **Patir v. The State of Israel** (Supreme Court Compendium 94 (2) 1866). The Defendant may not thereafter bring any claims based on the fact that the witnesses were not cross-examined

(see: Criminal Appeal 1632/95 **Uzi Meshulam v. The State of Israel**, PD 49 (5) 534, on p. 550, where the trial was held without the Defendant being present, at his request, and the Defense was instructed not to question the witnesses). A Defendant cannot thwart the legal proceedings being conducted against him by simply abstaining from offering a defense.

**In the case that is currently at hand,** the Defendant's conviction is supported by a broad reliable network of evidence that includes confessions that the Defendant gave during the course of his interrogation, statements that the Defendant made in the media, documents that were seized from the Defendant and the Palestinian Authority and a large amount of testimony given by the terrorism operatives during their interrogations, which supports and reinforces each other. It emerges from the evidentiary infrastructure described above that it is completely clear that the terrorism operatives decided to abstain from testifying during the trial in order to thwart the process and to avoid revealing the versions that they gave during their interrogations. The Defendant expressed anger during the course of his interrogation over the incriminating comments that field operatives said against him (see: Report of the Meeting of the Defendant with Aweis Prosecution/77 (b); comments that the Defendant said to Agent John Doe No. 3 Prosecution/123 on p. 1 and Prosecution/124 (a) Section 1; comments that the Defendant said to Agent John Doe No. 1 Prosecution/112 (a) Sections 6 – 7, Prosecution/ 114 (a) Section 7, Prosecution/115 (a) Sections 13, 14, Prosecution/116 Section 9; and the Defendant's conversation with Ahmed Barghouti Prosecution/127 (c) on pp. 3, 4, 72, 84), and this fact reinforces the conclusion that the terrorism operatives said correct things about the Defendant during their interrogation.

Under these circumstances, the statements given by the witnesses during their interrogations are to be preferred over their testimony in Court since there is much more than "reinforcement" for the statements that they gave during their interrogation. The statements that the terrorism operatives made correspond very well with each other, and together with comments that the Defendant made during the course of his interrogation as well as the documents that were seized from the Palestinian Authority, they reveal a clear picture that points to the Defendant's role and position in the terrorist attacks that are the subject of the indictment.

133. We do not find any reason to cast doubt on the reliability of the Israel Security Agency interrogators who testified that the transcript they recorded during the interrogation of the Defendant reasonably reflects the main points of the Defendant's statements. When considering the significance of these points, it is necessary to consider the guidelines that we explained at length in Serious Crimes Case 1074/02 **State of Israel v. A'asi Muhsin** (District Court Compendium 2003 (2) on p. 3553, Sections 76 – 84). These transcripts

[Stamp] P 7: 000423

are composed of the Defendant's statements, but unlike accepted practice in police interrogations, they contain only a summary of the interrogation; the person being interrogated is not always warned with respect to his rights; the person being interrogated does not read what is being recorded in the transcript and does not sign them; transcripts are not infrequently written in Hebrew even when the interrogation was conducted in Arabic despite the clear guidelines given in Court rulings. In spite of this, it is important to emphasize that these transcripts certainly constitute admissible evidence, although when considering their significance, the extent and manner in which they are recorded and documented must be considered (see: Criminal Appeal 6613/99 **Samrik v. The State of Israel**, Ruling of the Israel Supreme Court 56 (3), 529, on p. 553).

**In the current case**, many of the transcripts were backed up by transcripts of recordings made during the interrogation in which the Defendant is heard speaking his own voice, in the Hebrew language, which a language in which he knows how to express himself quite well. This removes the doubt with respect to their reliability. Similarly, the Defendant was told explicitly throughout his entire interrogation that he is not obligated to say anything, and anything that he does say can be used as evidence against him. The Defendant even met with a lawyer during the course of his interrogation (see below). Furthermore: the statements that the Defendant made during his Israel Security Agency interrogation, as they were written in the transcript and significant parts of which were recorded and transcribed, are well supported by the testimony of the terrorism operatives that have been set forth above, and sometimes also by the documents that were seized from the and the interviews that he gave to the electronic media. In this situation, we do not need to rely only on the transcripts that were recorded by the Israel Security Agency interrogators as the Defendant spoke, and not only on the comments that were said by the terrorism operatives during their interrogations (since they refused to testify in Court and denied the things that they had said during their interrogations). Rather, we are able to form a direct impression based on comments the Defendant said during his Israel Security Agency interrogation, based on the recordings and transcripts.

134. When evaluating the significance of the Defendant's words during his Israel Security Agency interrogation, we considered the fact that although the Defendant himself did not bring any claims in this regard, this was a long and exhausting interrogation. The Defendant was

[Stamp] P 7: 000423 [continued]

interrogated for very long periods of time during which he slept only a little and sat bound to the chair, which he described in a conversation with Agent John Doe No. 1 (Prosecution/112 (c) (1) on pp. 3-4) as torture.

It was made clear to the Defendant that as long as he did not cooperate with his interrogators it would be necessary to continue the interrogation. It was even hinted to him that the way to meet with members of his family would be to cooperate (Transcript Prosecution/12 Section 13). During one of the interrogations, the Defendant was told that his interrogation would not end until he told the truth, as was the case for all of the terrorism operatives who eventually admitted the role of the Defendant in the acts that had been attributed to him (Transcript Prosecution/63 Sections 9 – 10). During one of the interrogations, the Defendant refused to continue with the interrogation until he was given a reasonable amount of time to sleep and the interrogator explained that he would not be allowed to sleep until he admitted to at least the main points with respect to his activities, but the Defendant rejected this proposal (Transcript Prosecution/21 Sections 26 – 28). Similarly, moral pressure was used against the Defendant to encourage him to confess and behave like a leader who takes responsibility for the acts of his subordinates, instead of denying the things that his subordinates did and presenting them as liars (Transcripts Prosecution/16 – Prosecution/17).

When considering the fact that the Defendant had been interrogated for many long hours, it is important to note that the Defendant was arrested and interrogated during Operation Defensive Shield, during a period of time in which many terrorist attacks were being perpetrated against Israel. Under these circumstances, it is clear that it was important to complete the interrogation as quickly as possible, because it was being conducted not only in order to determine his guilt but also, and perhaps primarily, for the purpose of thwarting additional attacks. The Israel Security Agency interrogators explained how important it was to them to quickly reach the terrorism operatives and terrorist cells that were connected to the Defendant, and that the interrogation of the Defendant was primarily for purposes of intelligence (the interrogator by the name of "Itai" on p. 154 and the interrogator by the name of "Wadi", on p. 97.)

Investigation of the felonies with which the Defendant is charged and the intelligence need to obtain information from him as quickly as possible required his continuous interrogation for many hours. This does not bring about the disqualification of the statements of the Defendant, since it is clear that he said to his interrogators only those things that he wanted to say and that there were warranted, relevant reasons to use this means of interrogation, because of the security circumstances that prevailed at that time (see: Y. Kedmi, **On Evidence** [Hebrew], Part One, 5764/2003 Edition, on pp. 55 – 58).

[Stamp] P 7: 000424

135. It was clear during the course of the interrogation that the Defendant had debated a great deal, aloud, to whether he should admit his connection to the terrorist attacks with which he was charged in the indictment. He even explained that this could be an obstacle for him in his future as a leader of the Palestinian people (for example, see Transcript Prosecution/24 Section 7; Transcript Prosecution/68 Section 6). In the end, the Defendant decided to admit to some of the things that he had done, after he understood that the field operatives had confessed during their interrogation and incriminated him, and that the interrogators had solid evidence with respect to the accusations that had been made against him. Therefore, the Defendant admitted only to those things that his people had previously admitted, and this was only after their statements had been presented to him upon his demand, and he repeatedly explained and made clear that he would admit only to those things that would be presented to him and that were correct (Transcript Prosecution/22 Sections 8 – 9, which was submitted and verified by an interrogator by the name of "Mofaz", on p. 58, and Transcript Prosecution/23 Section 9, which was submitted and verified by an interrogator by the name of "Danny", on p. 90). The Defendant asked to meet with the head of the Israel Security Agency and said that he would be willing to admit to those things for which he was responsible if he could be shown that others had already admitted to them (Transcript of Interrogation Prosecution/98 (a) on pp. 16 – 18, 26 – 28).

In this context, it should be emphasized that the Defendant himself said, in his conversation with Agent John Doe No. 1, that he learned during the course of his interrogation that the field operatives who had been arrested provided a large amount of reliable information about him. When the agent asked him if the information they give about him was true, he answered, **"much of it, that is to say there is proof and accuracy"** (Transcript of Conversation Prosecution/112 (c) (1) on p. 6). Further, the Defendant told Agent John Doe No. 1 that his driver (Ahmed Barghouti) had provided a confession that connected the Defendant to eight suicide terrorist attacks in Israel, and when the Defendant was asked if Ahmed Barghouti "closed him in with his confessions" – he responded in the affirmative (Transcript Prosecution/114 (a) Section 7). Throughout all of the conversations between the Defendant and Agent John Doe No. 1, it is possible to see that the subject of the confessions that had been given by the field operatives during the course of their interrogations bothered him greatly, and he was aware of the fact that they had provided real information with respect to him (see Reports Prosecution/112 (a) (1), Prosecution/113 (a), Prosecution/.113 (c), Prosecution/114 (a), Prosecution/114 (c), Prosecution/115 (a), Prosecution/115 (g) (1) (a), Prosecution/116.)

The Defendant told John Doe No. 1 that he claimed during the course of his interrogation to be a political leader, but the confessions that had been given by others against him and the large amount of material that was seized from his office and from the offices of the Palestinian Authority would force him **"to talk**

[Stamp] P 7: 000424 [continued]

**during the interrogation**" (Report Prosecution/117 Sections 29, 32 that was submitted by an interrogator by the name of "Robert").

136. The turning point in the interrogation of the Defendant began on April 21, 2002, approximately one week after the Defendant had been arrested, when he decided to tell the facts from his perspective and at his responsibility, but he asked if first the information that his men had given during interrogation could be presented to him, and if he could be allowed to meet with the head of the Israel Security Agency or his deputy (Transcript Prosecution/19 – Prosecution/20). The Defendant accepted the interrogators' proposal to distinguish between his refusal to make incriminating statements to the police, which could be revealed in the future, and his providing details of his activity during the Israel Security Agency interrogation (Transcript Prosecution/20 Sections 10 – 12, Transcript Prosecution/24 Section 7). The Defendant based himself on the assumption that things he said to the police would be revealed to the public and obligate him, as opposed to things that he said during the Israel Security Agency interrogation, which the Defendant planned to deny, as indeed he did during his police interrogation and his trial. The Defendant said this explicitly during the course of his interrogation by the Israel Security Agency, when he was told atht the transcript recorded during the course of his interrogation would be submitted as evidence in Court as if they were police testimony (Transcript Prosecution/25 Section 23, which was submitted and verified by an interrogator by the name of "Mofaz", on p. 58).

In this regard, it should be noted that six days after his arrest, the Defendant was questioned and warned in the customary manner, that by law he is not obligated to say anything, and that anything he would say could be used as evidence against him (see Transcript Prosecution/40 Section 1, and testimony of an interrogator by the name of "Mofaz", on p. 59). The interrogator named "Mofaz" testified that these warnings were given to the Defendant during the course of all of his interrogations, and the interrogator named "Emile" also testified to this (on pp. 57, 59 and the warnings included in the Transcript Prosecution/41 Section 1; Prosecution/44, Prosecution/25; Transcript of Interrogation Prosecution/98 (j) on p. 37). Although it was sometimes hinted to the Defendant that he might not actually be brought to trial, because there was a possibility that he would be deported, the Defendant noted that he preferred the option of standing trial, even if it was clear that he would be tried and sent to jail for many years (Transcript Prosecution/10, Prosecution/11, Prosecution/14 and Prosecution/19 Section 5, and Transcript Prosecution/63 Section 25).

[Stamp] P 7: 000425

137. During the course of his interrogation, the Defendant said that he planned to conduct a political trial while ignoring the evidence that would be presented against him during the trial (Transcript Prosecution/42 Section 8 that was submitted and verified by an interrogator by the name of "Wadi", on p. 96; and Transcript Prosecution/56 Section 3 that was submitted and verified by an interrogator by the name of "Smith", on p. 85). During the Defendant's conversation with Agent John Doe No. 1, he explained to him that the tactics he would take during the interrogation – namely he would not admit to anything other than things about which the interrogators already knew and would try to buy time in order to understand what the interrogators knew, so as not to incriminate others. He also told his lawyer that he would not make any statements to the police (see Report Prosecution/118 Section 3, Prosecution/120 Section 2, and his comments to John Doe No. 3 in Report Prosecution/122 Section 1). At this point, it should be noted that the Defendant first met with his lawyer, Adv. Boulos, three days after he was arrested (Exhibit **Prosecution/164**, and Transcript **Prosecution/111** Section 14). During the course of his interrogation, the Defendant met with Adv. Boulos several times (Transcript Prosecution/90 Section 1.)

138. **In conclusion:** We have no reason to assume that the Defendant's confessions during his Israel Security Agency interrogation were given because any sort of illegitimate means had been used against him that led the Defendant to negate his free will, nor did the Defendant ever claimed that this happened. During the course of the trial, as well as at the time of his police interrogation, when statements that he had made during his Israel Security Agency interrogation were presented to the Defendant, he repeatedly claimed that they were "lies and forgeries." He did not claim that any illegitimate means had been used against him during the interrogation and our clear impression is that the interrogators treated the Defendant respectfully, as the Defendant himself said during his Israel Security Agency interrogation (Transcript Prosecution/75 Section 2, Transcript Prosecution/90 Section 1 and Transcript of the Defendant's Interrogation Prosecution/98 (f) on p. 29). At the time that testimony was given during the trial, the Defendant shook hands with some of the Israel Security Agency interrogators, and this fact also indicates that the Defendant does not harbor any negative feelings against his interrogators.

The Defendant had full control of the statements that he made to his Israel Security Agency interrogators: he decided what things he was willing to say during the course of his interrogation, that he expected were already known to the interrogators anyway, and which things he intended to hide from them. The Defendant was very cautious during the course of his interrogation and on more than one occasion he refused to answer a question that had been asked or

[Stamp] P 7: 000425 [continued]

answered in an indirect, implied manner. He chose the tactics that he used during interrogation, namely to expand on political subjects, be brief with respect to those related to acts of terrorism and, in any case not to provide any details other than those which he expected that the interrogators already knew.

As Agent John Doe No. 1 testified, the Defendant told him, **"Even if the entire Palestinian people admits to something, he will decide what to say during interrogation"** (Prosecution/110 Section 10). From all which is stated above, it is clear that the Defendant gave his statements of his own free will.

[Stamp] P 7: 000426

**Part IV:     Legal Analysis and Conclusions**

**1.     Activity and Membership in a Terrorist Organization**

139. In the indictment, the Defendant is charged with the crimes, among others, of activity and
     membership in a terrorist organization, in accordance with Sections 1 – 3 of the Prevention
     of Terrorism Ordinance, 5708 – 1948, which states:

     **"1.     Interpretation**
          'Terrorist organization' means a group of persons that uses, in its
          activities, acts of violence calculated to cause death or injury to a person
          or threats of such acts of violence; a 'member of a terrorist organization'
          means a person belonging to it and includes a person who participates in
          its activities, publishes propaganda in favor of a terrorist organization, its
          activities or aims, or collects money or goods for the benefit of a terrorist
          organization or its activities.

     **2.     Activity in a terrorist organization**
          A person fulfilling a managerial or instructional position in a terrorist
          organization or participating in the deliberations or decision-making of a
          terrorist organization or acting as a member of a tribunal of a terrorist
          organization or delivering a propaganda speech at a public meeting or on
          the radio on behalf of a terrorist organization shall be guilty of an offence
          and shall be liable, upon conviction, to imprisonment for a term not
          exceeding twenty years.

     **3.     *Membership in a terrorist organization***
          A person who is a member of a terrorist organization shall be guilty of an
          offence and be liable, upon conviction, to imprisonment for a term not
          exceeding five years."

     Section 7 of the Prevention of Terrorism Ordinance states:

     **"7.     *Proof of the existence of a terrorist organization***
          In order to prove in any legal proceeding that a particular group of
          persons is a terrorist organization, it shall be sufficient to prove that –

          **(a)     One or more of its members, on behalf of or by order of that group
                of persons, at any time after 5 Iyar 5708 (May 14, 1948), committed
                acts of violence calculated to cause death or injury to a person or
                made threats of such acts of violence; or**

[Stamp] P 7: 000427

(b) The group of persons, or one or more of its members on its behalf or by its order, has or have declared that that body of persons is responsible for acts of violence calculated to cause death or injury to a person or for threats of such acts of violence, or has or have declared that that body of persons has been involved in such acts of violence or threats, provided that the acts of violence or threats were committed or made after 5 Iyar 5708 (May 14, 1948)."

[Stamp] P 7: 000427 [continued]

140. The fact that Fatah, Tanzim and al-Aqsa Martyrs Brigades are terrorist organizations, in accordance with that which has been set forth in the Expert Opinion of Brigadier General Cooperwasser Prosecution/1, is clearly proven by the seized documents that were taken during Operation Protective Shield, which were presented as evidence in this Court, and also from the testimony of the terrorism operatives and the Defendant himself (see above, Sections 7 – 10; testimony of Aweis in Sections 21 – 23; testimony of Abu Hamid in Section 25; testimony of Ahmed Barghouti in Section 29; testimony of Ahawil in Section 35; testimony of Aidiya in Section 40; testimony of Sharif in Section 55; testimony of Abu Radaha in Section 57; and the Defendant's statements from his interrogation as described in Sections 60 – 64). The terrorist attacks that are the subject of this indictment, and many others, were executed by the field operatives of Fatah – members of the Tanzim – and by cells that were organized within the framework that is called "the al-Aqsa Martyrs Brigades". The Defendant was the leader of Fatah in the West Bank and commander of the Tanzim and al-Aqsa Martyrs Brigades, as he admitted during the course of his interrogation and as proven by much additional evidence (see Section 17 and Sections 60 – 65 above).

The Defendant's roles in leadership of the terrorist organizations were also described at length (see Part II, Chapter D above). The Defendant was the commander of terrorist organizations and terrorist cells, even if sometimes they did not follow his orders, and he made an effort to supply them with weapons, explosives and money for the purpose of their activities (see Part II, Chapter D (1) and (3) above). He was also personally involved in some of the terrorist attacks that have been carried out by the organizations that he led (see Part II, Chapter D (2) above). The Defendant also handled assistance for wanted men and the families of people who were arrested or killed, recruited operatives for the terrorist organizations and trained them (see Part II, Chapter D (4) – (5) above). He was the person who expressed the positions of the terrorist organizations in the media (see Chapter D (6) above).

In this case, therefore, we are not dealing merely with "a person fulfilling a managerial or instructional position in a terrorist organization" in accordance with that which has been set forth in Section 2 of the Prevention of Terrorism Ordinance, rather the Defendant was the person who headed these terrorist organizations, created their policy and made propaganda speeches on their behalf in the media.

Therefore, the foundations of Sections 2 and 3 of the Prevention of Terrorism Ordinance, namely membership in a terrorist organization and activity in such an organization, are proven.

[Stamp] P 7: 000428

### 2. Responsibility of the Joint Perpetrator, the Solicitor and the Accessory and the Differences Between Them

141. The indictment charges the Defendant with the direct responsibility of a "joint perpetrator" in all of the acts of murder and attempted murder that are the subject of the indictment, which lists 37 different terrorist attacks.

The indictment also charges the Defendant with the crimes of being an accessory to murder and soliciting murder, even though the Prosecution's claim in its summation is that the Defendant should be considered a joint perpetrator in these crimes, and not only an accessory or one who solicits others, because he was a leader of terrorist organizations and the main person responsible for perpetrating murderous terrorist attacks that were executed by these terrorist organizations. Therefore, it is necessary to review the degree of responsibility claimed for the Defendant in the terrorist attacks that are the subject of the indictment: first – as one who committed acts of murder as a joint perpetrator together with the field operatives and the terrorists who actually perpetrated the attacks; second – as the person who solicited others to perpetrate the attacks; third – as an accessory to acts of murder. In this framework, it is necessary to examine the traits that characterize "the joint perpetrator" and to distinguish between them and those that characterize the accessory and the one who solicits [the offense].

142. In Section 29 (b) of the Penal Code, 5737-1977, the responsibility of the joint perpetrator is defined as follows:

> "The participants in the perpetration of a crime who take action in order to commit it are joint perpetrators and it makes no difference if all of the actions are done together or if some are accomplished by one and some by

[Stamp] P 7: 000428 [continued]

another."

Section 30 of the Penal Code, 5737 – 1977, defines the responsibility of the solicitor as follows:

"Anyone who causes another to perpetrate a crime by persuasion, encouragement, demand, pleading or any other manner that exerts pressure is soliciting a crime."

Section 31 of the Penal Code, 5737 – 1977, defines the responsibility of the accessory as follows:

"Anyone who, before the commission of crime or during its commission, does anything to make commission of the crime possible, who makes it easier, secures it or prevents the capture of the perpetrator, its discovery or negation or contributes in any other manner to the creation of conditions for committing the crime, is an accessory."

143. In order for a person to be considered a joint perpetrator who commits a crime together with others, there needs to be a foundation of "taking action in order to perpetrate" the crime, as Section 29 (b) of the law instructs.

Case law has interpreted the concept "perpetrate" broadly when defining the essence of the act that it requires. Similarly, rulings have set flexible criteria with respect to the degree to which the participant needs to be close to the circle of perpetrators and for his ability to influence their deeds (Additional Criminal Hearing 1294/96 Uzi Meshulam v. The State of Israel PD 52 (5) 1, on p. 21 (the Honorable Justice A. Matza), on p. 54 – 55 (the Honorable Justice M. Cheshin) and on pp. 63 – 64 (the Honorable Justice Y. Kedmi)).

With respect to the act that is required in order for it to be possible to consider a person to be a joint perpetrator, it has been ruled that it sufficient for the act of perpetrating the crime to be beyond simple preparation (this is also the criteria for the existence of the offense of attempt), and be accompanied by the appropriate mens rea (Additional Criminal Hearing 1294/96, as above, in the case of Meshulam, on pp. 23 – 24). This act is not required to be essential for the success of the crime nor does it need to be an act that is part the basic factual foundation of the crime; it is sufficient that the act is included in the plan for the crime or the division of tasks among the participants (the above mentioned Additional Criminal Hearing 1294/96, in the case of Meshulam, on pp. 63 – 64 (the Honorable Justice Y. Kedmi)).

A.   The Joint Perpetrator in Comparison to the Accessory

144. The distinction between the "joint perpetrator" in a crime, in accordance with Section 29 (b) of the Penal Code, and the "accessory", in accordance with Section 31 of the law, has become a matter of major importance since the Penal Code (Amendment No. 39) (Preliminary Part and General Part), 5754 – 1984 went into effect because in accordance with Section 32 of the law in its new version, the punishment of an accessory is half that of a joint perpetrator, whereas in accordance with the previous law their punishment was the same. The maximum punishment for an accessory to murder is 20 years' imprisonment (see Section 32 (1) of the Penal Code) while the mandatory sentence for a joint perpetrator murderer, in the absence of circumstances for reduced responsibility, is life imprisonment.

In Criminal Appeals 8901, 8873, 8710, 8620, and 8573/96 **Mercado** *et al.* **v. The State of Israel** ("**the Discount Banker's Trial**"), PD 51 (5) 481, the Honorable Justice Goldberg wrote on p. 545:

> "**Amendment No. 39 to the Code expresses the recognition that the moral guilt and the subjective and objective danger adhering to the accessory is less than that of the joint perpetrator. This disparity is the foundation for the distinction in sentencing between the joint perpetrator and the accessory and it is what should guide us when determining the test to be used for distinguishing between a principal offender and an accessory.**"

145. The distinction between a "joint perpetrator" and an "accessory" was clarified in Criminal Appeals 4389/93 and 4497/93, **Yossi Mordecai** *et al.* **v. The State of Israel**, PD 50 (3) 239, in Criminal Appeals 2796/95, 2813/95, and 2814/95, **John Does v. The State of Israel**, PD 51 (3) 388, the above mentioned Additional Criminal Hearing 1294/96 in the matter of **Meshulam**; the above mentioned Criminal Appeal 8573/96, in the matter of **Mercado**, on pp. 543 – 550; and Criminal Appeal 2111/99 **Heyro v. The State of Israel**, PD 58 (1) 411. The distinction between a joint perpetrator and an accessory is found in both its factual basis and its mental basis. In principle, "**The quality of the accessory's contribution to perpetration of the crime is a lower one than the quality of the contribution of the principal offender**" (the above mentioned Criminal Appeal 8573/96, on p. 545).

[Stamp] P 7: 000430

se 1:04-cv-00397-GBD-RLE   Document 660-15   Filed 12/04/14   Page 29 of

With respect to the **factual basis** of the crime – the main distinction is between direct and indirect partners in perpetrating the crime. The joint perpetrators are those **"participants who take action in order to perpetrate"** the crime, but each one is not required to personally perpetrate all of the factual bases of the crime (see Section 29 (b) of the Code). In contrast, the accessory does something that in some way contributes to **"creating conditions for committing the crime"** (see Section 31 of the Code). The joint perpetrator is part of the inner circle that commits the crime while the contribution of the accessory to the commission of the crime is entirely external. Therefore, the Court examines the degree of proximity for each participant in the crime, meaning is he part of the inner circle of the criminal task (Criminal Appeal 3390/98 **Rosh v. The State of Israel**, PD 53 (5) 871,

878)? This, then, is "the proximity test" that was explained by the Honorable President Justice A. Barak in the above mentioend Criminal Appeal 4389/93, the matter of **Mordecai**, on p. 250:

> "The difference between the joint perpetrator and the accessory is expressed in that the joint perpetrators act as a single unit to commit a criminal task. They are all chief offenders... The contribution of each of the joint perpetrators is "internal"... therefore, with respect to the joint perpetrators, it may be possible to divide the work between the offenders so that they act in different places and at different times without each of them completing the crime, but each part is significant for implementing their common plan. Uniform time and place are not essential, as long as the role of each is an internal role for the criminal task."

146. In the rulings that were cited above, the Supreme Court reviewed the various distinctions that have been proposed in rulings and in legal literature in order to set boundaries between a joint perpetrator and an accessory. There are those who emphasize "the test of control" as a characteristic of the joint perpetrator: the joint perpetrator has control, together with others, over commission of the crime; he is part of a joint plan for committing a crime, and works together with others in order to carry out it. On the status of the joint perpetrator in light of the "test of control," the Honorable President Justice A. Barak wrote in the above mentioned Criminal Appeal 2796/93, in the matter of **John Does** (see Section 28):

> "The characteristic of the joint perpetrator is that he is master of the criminal activity. He has functional – substantive control, together with the other joint perpetrators, over the criminal act. He is part of the joint decision to commit the crime and he is part of the overall plan to commit the crime, and works together with the others to realize the forbidden criminal act. He works together with the other joint perpetrators so that each one of them has control – together with the others – over the entire activity. His status with regard to the decision to commit the crime is one of a person who is 'inside.' His contribution is 'internal.' He has a substantial share in completing the joint plan..."

Similarly, in the ruling that was handed down on the above mentioned Criminal Appeal 8573/96, in the matter of **Mercado**, on pp. 547 – 548. In contrast, in regard to the accessory, the Honorable Presiding Justice A. Barak wrote that the accessory "is not the father of the idea" to commit the crime and in Section 30 he wrote as follows:

[Stamp] P 7: 000431

"The accessory is an indirect secondary partner (Mordecai case, Section 14). He is found outside of the inner circle of perpetration. He is an 'external' force. He does not initiate the perpetration and he does not solicit it... He does not decide to commit the crime and he does not control it..."

(See also the above mentioned Criminal Appeal 4389/93, in the matter of <u>Mordecai</u>, Sections 13-14).

147. In contrast to the "test of control," there are those who emphasize the "**test of functionality**," in accordance with which the joint perpetrator is a person who takes a substantial role in committing the crime itself, while the share of the accessory is expressed in an act of assistance and is external to the crime.

This test finds expression in the language of Section 29 (b) of the law ("**participants in the commission of an offense while taking action in order to commit it**"). In the above mentioned Criminal Appeal 2796/93, in the case of <u>John Does</u>, (see Section 27) the Honorable President Justice A. Barak wrote with regard to joint perpetrators:

> "**They are the main partners in the commission of the crime. The partnership between them is expressed in that they have taken part in the commission of a crime as direct perpetrators. They work as a single unit to commit a criminal task... Each takes a principal part in the commission of the crime.**"

In continuation of his words (see Section 27), the Honorable President Justice A. Barak wrote:

> "**Being a joint perpetrator requires joint planning. It is based on a division of work among the perpetrators...** "

The Honorable Justice Y. Kedmi wrote clearly about the decisive importance of the "test of functionality" in Criminal Appeal 5206/98 <u>Halil Abud v. The State of Israel</u>, PD 52 (4) 185 (see Section 2):

> "'**The joint perpetrators' are not only the partners in the commission of the 'act' of the crime itself; rather, they include everyone who 'took part' in the commission of the crime, in the broadest sense of the word 'commission.' Whereas anyone who only 'contributed' to its commission, without actually taking part – which is to say without having a 'role' in its framework – remains in the 'outer circle' of those who are responsible for its commission. He is not the partner in commission; his role is limited to simple 'assistance' for the commission of the crime.**

[Stamp] P 7: 000432

> The distinction between those who are included in the 'inner circle' –
> 'the joint perpetrators' – and those who are included in the 'outer
> circle' – 'the accessories' – is to be found in the quality and character of
> their involvement in its commission: if 'they took part in its
> commission' – meaning if they have a 'role' in its commission, then they
> are 'co-conspirators'; but if they only 'contributed' to it from the
> outside – then they are merely 'accessories.'"

Further on in the ruling, the Honorable Justice Kedmi explains that the distinction between
the joint perpetrator and the accessory is **not** dependent on the question of whether the
Defendant's behavior assisted in the commission of the crime, since a joint perpetrator can
also assist its commission; the question is "if he took part – meaning: if he played a role
– in the commission of the crime."

In Additional Proceedings 1294/96, 1365 Meshulam *et al.* v. The State of Israel, PD
52 (5) 1, on p. 63, the Honorable Justice Kedmi wrote:

> "'An active partnership' need not be expressed in joint action in
> committing an 'act' that is an element of the factual basis of the crime,
> and the broad comprehensive meaning of 'act' expresses 'partnership'
> in committing the crime. In Section 29 of the Penal Code, the definition
> of 'active partnership' does not require that the 'act' be done while
> committing the factual basis of the crime but it certainly expresses
> 'partnership' in its commission. The 'partnership', as noted, can begin
> with the suggestion of the idea to the people who are designated to
> commit the crime."

The Honorable Justice M. Cheshin noted in the same manner that the law does not require
that an act of partnership in the commission of a crime be done while the crime is actually
being committed or is adjacent to it (on pp. 53 – 54).

148. In the above mentioned Additional Criminal Hearing 1294/96, in the matter of Meshulam,
the Supreme Court explained that "the test of control" is an auxiliary test that is not the sole
or exclusive test, and that it should be combined with other tests and considerations;
controlling the commission of the crime is important evidence of a person being a joint
perpetrator but the lack of control or a lack of critical physical contribution to commission
a crime does not necessarily negate this conclusion (the Honorable President Justice A.
Barak on p. 50; the Honorable Justice A. Matza on pp. 24 – 27; the Honorable Justice Y.
Kedmi on p. 65). Furthermore, even when the Court is aided by the "test of control" this is
done while emphasizing that it does not mean continuous control throughout the
commission of the entire crime but rather "control of a certain portion of the crime that was
allotted to a particular perpetrator" (the Honorable Justice Y. Kedmi on p. 64).

[Stamp] P 7: 000433

149. With respect to the **mental basis** for the crime – certainly the mental attitude of the accessory is on a lower level than that of the principal perpetrator, with respect to everything that is related to the degree of his awareness of details that are related to the commission of the crime and his desire to realize it. We would rule that for the accessory, it is sufficient if he is aware of the fact that his behavior is contributing to the conditions that are necessary for the commission of the main crime and that the principal is about to commit it. In addition, the accessory needs to have in mind the purpose of assisting the principal perpetrator in the commission of the crime or making it easier for him to carry it out. However, when the principal crime is consequential and it requires an element of haste or special intent – it is not necessary to prove that the accessory acted out of an intent of this type or that he intended that the principal perpetrator would realize his goals. For example, for a crime of murder, it is not necessary to prove that the accessory intended for the principal to murder the victim or that he desired that outcome; it is sufficient that the accessory's intent be to aid the principal perpetrator, whatever the motivations of the accessory might be (these rules were clarified in Criminal Appeal 320/99 **Jane Doe v. The State of Israel**, PD 55 (3) 22, on pp. 31 – 37).

In contrast to this, when dealing with the joint perpetrator, it must be proven that he had a high level of mental involvement and awareness of the details of the crime being committed, in addition to his desire to realize it:

> **"The co-conspirator contributes his contribution to a criminal act with multiple participants with a mental attitude of creating a crime *onimo auctoris*. He considers the commission of the crime his business and not that of someone else** (words of S. Z. Feller in his book **Foundations of Criminal Law**, quoted in Criminal Appeal 4389/93, as above, in the case **Mordecai**, on p. 251).

**In summation:** The joint perpetrator, as opposed to the accessory, needs to have a mental basis that is equal to that of the other principals in the crime and he needs to have all of the elements of the mental basis that have been determined by law for the crime in which he has taken part (the above mentioned Criminal Appeal 2796/95, in the matter of **John Does**, on p. 402).

In the above mentioned Criminal Appeal 8573/96, in the case of **Mercado**, the Honorable Justice A. Goldberg wrote, on pp. 548 – 549, that the categorization of the Defendant as a joint perpetrator or as an accessory is the result of a combined test of the mental basis and the factual basis – a test which is like a parallelogram of forces:

"The greater the mental basis (with regard to his degree of interest in its commission) of the person who committed the crime, the more it is possible to be satisfied with a lower level of the factual basis. In this spirit, it has already been said that 'when the "mental" basis is proven (the awareness – A.G.), the division of the tasks among the participants involved in the event is no longer important' (the above mentioned Criminal Appeal 4188/95, 5235, [43], on p. 550). Conversely, the greater

[Stamp] P 7: 000434 [continued]

the factual basis for the commission of the crime, from the perspective
of the quality of his contribution to its perpetration, it is possible to be
satisfied with the lower level of mental basis."

These points were confirmed in the above mentioned Additional Criminal Hearing 1294/96
in the matter of <u>Meshulam</u> (on p. 27, in accordance with that which has been set forth by
the Honorable Justice A. Matza).

150. From the rules that have been was cited above, it becomes apparent that participation in
planning a crime serves as a clear sign of a joint perpetrator. In this case, is not necessary
for him to be physically present at the scene of the crime in order to be considered a joint
perpetrator.

In the above mentioned Additional Criminal Hearing 1294/96 in matter of <u>Meshulam</u> (on
p. 64), the Honorable Justice Y. Kedmi ruled:

"'Participation', as stated, can begin with proposing the idea to the
people who are intended to commit the crime, and in any case, as far as
I am concerned, there is no doubt that planning the perpetration, giving
orders and delineating the lines of action, including assigning roles to
the participants, constitute an 'act' that expresses 'participation', as
stated."

In Criminal Appeal 3596/93 <u>Hamoud Abu Sror v. The State of Israel</u>, PD 52 (3) 481, the
Honorable Justice A. Matza wrote on p. 491:

"The practical contribution of the appellant to the commission of
murder was indeed smaller than that of his two companions. However,
his active participation in the preparations and the warning role he
played gave him control over bringing the murderous plan into being.
From the fact that he participated in the preparation for its
perpetration and acted for the success of the plan, it becomes apparent
that he had the criminal intent that is required for inclusion in liability
for the crime of premeditated murder."

[Stamp] P 7: 000435

In the above mentioned Criminal Appeal 2796/95, in the matter of **John Does**, four adolescents were convicted of premeditated murder, in spite of the fact that only one of them throw the grenade that caused the death of victim of the crime. One (Ze'ev) was convicted as a joint perpetrator because he took part in all of the stages of planning and perpetration, and was present at the scene when the crime was committed, in spite of the fact that he decided not to throw that the fatal grenade himself ("**he did not implement the act of killing. This is meaningless since a joint perpetrator is responsible even if he himself did not commit all of the foundations of the crime...** " – on p. 407). The second (Gershon) was convicted as a joint perpetrator even though he was not even present at the scene of the murder and his entire role was to report the deed to media after it had been committed, because he fulfilled the role that was assigned to him in advance, for the purpose of the perpetration of the crime (on p. 408). The third (Tal) was convicted as a joint perpetrator, in spite of the fact that he, too, was not present at the scene of the murder because

[Stamp] P 7: 000435 [continued]

he had participated in the planning of the crime, and was part of the group that decided to commit the murder and even was its leader (on pp. 408-409).

151. When the principal crime is preceded by a conspiracy to commit the crime, there is a tendency to consider each of the conspirators as a joint perpetrator in the main crime, and only if they took a genuine part in the commission thereof. The reason for this is that the conspiracy to commit a crime is evidence of the fact that each of the conspirators is interested in its commission. According to the statements that have been set forth by S. Z. Feller, which were quoted in the above mentioned Criminal Appeal 8573/96, in the matter of Mercado, on p. 550: "**Conspiracy between two or more people to commit a criminal offense includes the development of joint thought in order to realize the goal of the conspiracy – each is a future candidate to be the direct perpetrator, in the spirit of creating** *animo auctoris.*"

In the above mentioned Criminal Appeal 3390/98, in the matter of Rosh, on p. 878, the Honorable Justice A. Matza wrote:

> "**The additional test with respect to 'proximity to the act', which requires that the role of each joint perpetrator be an 'internal part of the criminal act', is intended to ensure that commission of a marginal act, which on the basis of its nature could be included in the definition of 'perpetration', will not make the person who commits it responsible as a joint perpetrator when the nature of his mental basis for committing the crime is doubtful (Additional Criminal Hearing 1294/96** *Meshulam v. The State of Israel* **(hereinafter – 'the** *Meshulam* **matter [3],' on pp. 21-22).**
>
> **It is not the same when determining the responsibility of someone who, as a matter of principle, is included as a participant in preparing the criminal plan, and no doubt arises with respect to his having the required criminal intent for inclusion in the planned crime. This type of party to a crime carries the responsibility of a 'joint perpetrator' even if his physical contribution to commission is no greater than that of an accessory (Criminal Appeal 3596/93,** *Abu Sror v. The State of Israel,* **[4], on p. 491)."**

[Stamp] P 7: 000436

152. With respect to **presence at the scene of the crime,** indeed this is not essential in order for a person to be considered a joint perpetrator, and in the language of the Honorable Presiding Justice A. Barak in the above mentioned Criminal Appeal 2796/95, in the matter of **John Does** (see Section 27): **"Being a joint perpetrator is not necessarily based on uniform place and time"** (see also the above mentioned Additional Criminal Hearing 1294/96, in the matter of **Meshulam**, on pp. 30, 38, 49, 51, 53 – 54 and 64). However, the non-random presence of a person at the scene where a crime is being committed does create an assumption, which may be contradicted, that he is a joint perpetrator in the crime (see: Criminal Appeal 3006/96 **Matias v. The State of Israel,** Supreme Court Laws, Volume 52 526).

**B.    The Crime of the Accessory**

[Stamp] P 7: 000436 [continued]

153. The factual basis and the mental basis of the crime of the accessory in general, and of the accessory to murder specifically, were recently clarified in a verdict that was written by the Honorable Presiding Justice A. Barak in Criminal Appeal 320/99 **Jane Doe v. The State of Israel**, PD 55 (3) 22, on pp. 31 – 37 (which was upheld in Criminal Appeal 11131/02 **Angelika Yosefov v. The State of Israel**, not yet published). The law, as determined by these rulings, can be summarized as follows:

a. The characteristic behavior of the accessory is that it is an indirect, secondary contribution to the commission of the main crime: the contribution of the accessory is considered indirect and secondary because he does not take part in the main commission of the crime but only makes an indirect contribution to the realization of the main crime. The accessory is an "external" force who is outside the inner circle of the crime (see also: Criminal Appeal 7085/93 **Najar et al. v. The State of Israel**, PD 51 (4) 221, on p. 238).

b. **The factual basis** for the crime of the accessory, which is a crime of behavior, is the action or lack of action which creates the conditions for realization of the factual basis of the crime that is being committed by the principal. The accessory needs to be "able" to assist in the perpetration of the main crime but there is no requirement that this assistance be effective or the condition without which the main crime could not have taken place (see also Criminal Appeal 4317/97 **Poliakov v. The State of Israel**, PD 53 (1) 289, on p. 307). Similarly, it is not necessary that the principle crime actually be committed since the crime of an accessory is not a consequential crime. In addition, it is necessary to prove as part of the factual basis of the crime of the accessory, that the circumstance relating to the criminality of this behavior is secondary and indirect.

c. The accessory must be directed towards a crime that has a concrete purpose, meaning that the action is done in order to **assist** the commission of a specific crime, rather than simply a crime (see also Criminal Appeal 426/67 **Yosef Be'eri et al. v. The State of Israel**, PD 22 (1) 477, on p. 481; the above mentioned Criminal Appeal 7085/93, in the matter of **Najar**, on pp. 238 – 239).

d. **The mental basis** of the crime of the accessory includes three cumulative conditions:

(1) Awareness of the nature of the accessory behavior, meaning: of the fact that this behavior contributes to the creation of conditions for the commission of the main crime, which has a concrete goal;

[Stamp] P 7: 000437

(2) Awareness of the existence of the relevant circumstances at the time of the accessory's behavior, meaning: awareness that the principal is committing or about to commit the crime, even though awareness of the specific details of the crime is not necessary (see also the above mentioned Criminal Appeal 7085/93, in the matter of **Najar**, on pp. 238 – 239).

(3) The accessory must be aware of having the goal of assisting the principal in committing the crime or of making it easier for him to commit the crime.

The "ability to anticipate" can be applied to this requirement, meaning: the awareness of the accessory to the fact that his behavior might almost certainly be the contribution that assists the principal is weighed against his purpose for aiding him, even if he is not at all interested in the commission of the main crime (see also the minority opinion of the Honorable Justice Y. Englard in the above mentioned Criminal Appeal 4317/97 in the matter of **Poliakov**, on pp. 320 – 323 and the expert opinion of the Honorable Justice M. Ilan in Criminal Appeal 807/97 **State of Israel v. Azizian**, PD 53 (5) 747, on pp. 757 – 758).

e. When the principal crime is consequential and it requires a mental basis of haste or special intent,

[Stamp] P 7: 000437 [continued]

it is not necessary to prove that the accessory acted out of intent of this type or that he intended that the principal perpetrator would realize his goals. For example, in the case of murder, it is not necessary to prove that the accessory intended for the principal to murder the victim or that he wanted that outcome; it is sufficient that the accessory's intent be to aid the principal criminal, whatever the accessory's motivations might be.

154. With respect to the required degree of likelihood that the principal offender will commit the crime, it is important to note that in accordance with the rule that was cited by the Honorable Presiding Justice A. Barak in the above mentioned Criminal Appeal 320/99, in the matter of **Jane Doe**, it is sufficient that the accessory is <u>aware</u> of the fact that the principal offender is going to commit a crime with a concrete goal (on pp. 31 – 32 of the ruling). The requirement for awareness at a level of a **almost certain** likelihood relates to the foundation of the purpose, meaning: the accessory's awareness that his behavior is likely almost certainly to contribute to the commission of the principal crime; this type of awareness is equivalent to the goal of assisting the principal criminal. As stated by Presiding Justice A. Barak : **"The mental basis of the goal ('in order that') is therefore directed towards the act of assisting and not towards the act of the main crime"** (on p. 35).

In this context, the question arises of when it can be said that the Defendant was "aware" that the main criminal would be committing a crime with a concrete purpose.

The rule is that "turning a blind eye", which is also referred to as "intentional blindness", is considered to be equivalent to awareness of the nature of the act and other existing circumstances. This ruling is currently expressed in Section 20 (c) (1) of the Penal Code which states as follows:

> **"A person who suspects something about the nature of his behavior or the possibility of existing circumstances is considered that he was aware of them, if he avoided clarification."**

(See: Y. Kedmi, **On Criminal Law**, updated and expanded edition (1966), Part One, on p. 37, and Criminal Appeal 3417/99 **Margalit Har-Shefi v. The State of Israel**, PD 55 (2) 735, on pp. 757 – 758).

In Y. Kedmi's above mentioned book, it is written on p. 37:

[Stamp] P 7: 000438

"a.      Section 20 (c) (1) of the amendment anchors in firm instruction
the general principle whereby: when a person actually 'suspects' that
the nature of his behavior could lead him into the bounds of forbidden
behavior, if there is a practical possibility that the circumstances exist
that are necessary for a conviction and he refrains from clarifying the
'veracity' of the suspicion, he is considered as someone who was aware
of the true nature of his behavior and the existence of the circumstance
(if it is found that it actually exists).

b.      Here, too… it seems that the level of suspicion needs to be at
least 'the level of likelihood' meaning: it is more reasonable that the
suspicion is true than that it is unfounded."

The law in this regard is clarified by Professor S. Z. Feller, **Fundamentals of Criminal
Law** (Volume 1, 5744 [1984]), on p. 519, which was also referred to by the Honorable
Justice M. Cheshin in the above mentioned Criminal Appeal 3417/99, on p. 758, stating:

"Awareness of *the possibility* of the existence of a circumstance, on
which the crime is dependent, obligates a person to check, prior to the
commission of his action, the situation that pertains to that
circumstance, in order to refrain from it, in the event that the existence
of that circumstance is confirmed.

If, in spite of the suspicion, the person did not do so, whether because he was determined to complete the act regardless of the circumstances or because it was more expedient for him not to know or based upon any other consideration, it means that he accepted the existence of that circumstance.

Therefore, *conscious* disregard of the possibility that there exists a set of circumstances is considered to be equivalent to consciousness that this does exist; since this set of circumstances was apparent to the person but he did not bother to examine the situation or to clarify the circumstances. If it turns out after the fact that the relevant circumstances did in fact exist, awareness of the possibility that they might exist, because of a suspicion, is considered to be equivalent to awareness of their very existence.

In the above mentioned book by Y. Kedmi, on p. 37, it was stated that the level of suspicion that is necessary in order to implement the law of "turning a blind eye" ranged from the level of "reasonable" prior to the amendment of 5754 [1994] to the Penal Code, to the level of "high." In this matter, Professor Feller, **Fundamentals of Criminal Law** (Volume I) stated on p. 523 of his book as follows:

"In our opinion there is no basis to the assumption that other than the rationality of the suspicion – which is, of course, subjective – or more precisely in lieu of its rationality, the suspicion needs to be of a high level to the point of being nearly certain or lacking in any real doubt in the mind of the person with respect to its veracity...

In order to compare "turning a blind eye" to awareness, it is sufficient that there be awareness of this rational suspicion with respect to the possible existence of circumstances and refraining from the clarification of the actual situation at hand."

And on p. 524 it says:

In conclusion, it is sufficient for the suspicion to be anchored in reality, in other words rational, in order to define the act as having been committed by "turning a blind eye" if, prior to the action, the person avoids checking the suspicion and assessing the actual situation. It is not necessary for there to be a high degree of objective likelihood that the suspicion is true.

[Stamp] P 7: 000439

The test for the existence of "turning a blind eye" that becomes tantamount to awareness is, as set forth above, a subjective one. In spite of this, the Courts regularly determine a Defendant's subjective awareness using the objective test of a reasonable person (see also: Criminal Appeal 15/78 **Moshe Bivas v. The State of Israel**, PD 32 (3) 64, on p. 83; Criminal Appeal 5612/92 **The State of Israel v. Be'eri** *et al.*, PD 48 (1) 302, on p. 363; compare with the application of the test of a reasonable man with respect to awareness of the Defendant of a high likelihood of damage to national security: Criminal Appeal 3116/99 **Yehuda Gil v. The State of Israel**, PD 54 (4) 193, on p. 204).

155. From the rulings that have been been set forth above, especially those that were made in the above mentioned Criminal Appeal 320/99 in the matter of **Jane Doe**, it becomes apparent that a person who suspects that another person is about to commit a certain crime but refrains from clarifying the issue and even helps that person to commit the crimes despite the awareness that he is, almost certainly, helping that person to commit the crime – if it is committed – is considered to be an accessory in accordance with Section 31 of the Penal Code. From these rulings, it becomes apparent that it is not necessary to prove that the accessory expected the commission of the main crime as a nearly certain possibility: it is sufficient that he is aware of the logical, reasonable and realistic possibility that the main crime will be committed and, in spite of this, he assists its commision, based upon an awareness that his behavior is likely, almost certainly, to assist the principal perpetrator. Similarly, it is not necessary to prove that the accessory desired the commission of the principal crime or that he acted out of an intent that the principal crime be committed.

However, in the above mentioned Criminal Appeal 11131/02, in the case of **Yosefov,** the Honorable Justice E. Rivlin ruled that the Prosecution needs to prove that the Defendant knew that his behavior would be likely, almost certainly, to assist the crime of murder committed by the

[Stamp] P 7: 000439 [continued]

principal offender and that: **"in order for the doctrine of foreseeability to apply, it is necessary to show, as stated, awareness of near absolute certainty of the possibility of the commission of the crime..."** (see Section 13 of the ruling). This statement is different in its nuances from that in the above mentioned Criminal Appeal 320/99, in the matter of **Jane Doe**, where the Honorable Justice Rivlin said in the above mentioned Criminal Appeal 11131/02, at the beginning of the ruling (see Section 9), that:

> **"The awareness – both with respect to the nature of the accessory conduct and with respect to the commission of the main crime – can be replaced by a suspicion with respect to the accessory nature of the act and awareness of the possibility that they are circumstances for the commission of a crime by the principal, in accordance with the orders of Section 20 (c) (1) of the Penal Code ('turning a blind eye')."**

156. From the rulings above it becomes apparent that it is not necessary to prove that the Defendant was aware of every detail with respect to the crime to which he is an accessory. In this regard, the Honorable Justice E. Rivlin wrote, in the above mentioned Criminal Appeal 1131/02, in the matter of **Yosefov**, the following statements, which are important to our case:

> **"The previous Court has rightly said that awareness that the principal is going to a commit a crime does not mean awareness of all of the details of the crime that he is planning (see for example: Criminal Appeal 7085/93 Najar v. The State of Israel, PD 51 (4) 221, 239). In the matter before us, the appellant knew that Zayid, whom she accompanied, was carrying explosives with him, and that he had already carried out terrorist attacks in the past, and that he was seeking revenge for the death of his brother who had been killed by an action of the security forces. Based on the appellant's testimony, the lower Court had gained the impression that she understood quite well that Zayid was planning to perpetrate a terrorist attack in the city of Tel Aviv. In this context, the question of whether or not she knew the exact location where he intended to place the explosives is of no importance."**

On the same issue, the Honorable Justice Rivlin also wrote:

[Stamp] P 7: 000440

"Indeed, as we have already noted, the accessory does not need to be aware of all of the details of the crime which the principal perpetrator intends to commit. In spite of this, he must be aware, at the time he proffers assistance to the principal, that there is a possibility that he is assisting the principal perpetrator in committing a genuine crime, and in other words – to the fact that the principal perpetrator has a 'concrete purpose' (see also: Criminal Appeal 426/67, Be'eri v. The State of Israel, PD 22 (1) 477, at 481 – 482; Criminal Appeal 5544/91, Moyal v. The State of Israel (not published)). Knowledge of the perpetrator's vague or hypothetical willingness to commit a crime is not enough to transform a person into an accessory.

Therefore it is likely, as we have noted, that the awareness of circumstances of the factual basis – which is to say awareness of the fact that the principal perpetrator is about to commit a crime – will be replaced by awareness of the possibility that he is about to commit a crime.

However, in order for it to be said that the accessory 'turned a blind eye', we must be convinced that there actually existed a rational-subjective suspicion in the accessory's mind that a crime is about to be committed (S. Z. Feller, in his above mentioned book (Volume 1) pages 521 – 524, 530).

Furthermore, the accessory must be aware of the fact that the crime may be committed when he offers the assistance. If the accessory believed, at the time that he performed the acts that were accessory to the crime, that there was no longer any substantial possibility that the principal perpetrator would commit the crime, he then cannot be considered an accessory – even if he evaluated at an earlier stage that a possibility such as

[Stamp] P 7: 000440 [continued]

this existed."

With respect to the requirement for awareness of the principal perpetrator's intentions to commit a crime with a concrete purpose, the Honorable Justice M. Landau (as his title was then) in Criminal Appeal 426/67, **Yosef Be'eri** *et al.* v. **The State of Israel**, Supreme Court PD 22 (1) 477, at 481, wrote that when the accessory supplies a tool for committing the crime, such as a vehicle or weapon – it is sufficient that the accessory supplied the tool that is used to commit the crime for the purpose of committing a crime of the same type that was committed, but not necessarily for exactly the same crime. The Honorable Justice Landau said that this ruling, which is based on English case law, applies "**at least in those cases in which the accessory leaves it to the principal offender's 'discretion' to choose the appropriate time and place for realizing their joint criminal intentions.**"

In the above mentioned case, the Honorable Justice Landau ruled that, even if the appellant (who was acquitted in the end) were to prove that he gave his car to the principal perpetrator of the robbery in order to make it easier for him to escape from the scene of the crime – it is not necessary to prove that he planned to rob the specific tourist who, in the end, was robbed.

157. The requirement that the Defendant be aware of the existence of a specific crime with a concrete purpose also consists of the "rule of transferred intent", which is expressed in Section 20 (c) (2) of the Penal Code, 5737 – 1977.

This Section states with respect to criminal intent that "**it makes no difference if the act was committed against another person or another asset than the one that was planned**" (see: Y. Kedmi, **On Criminal Law – Updated and Completed**, 1996 edition, Part One, on p. 38). On the basis of this principle it was ruled, even before Section 20 (c) (2) of the law was enacted in 5754 [1994], that, "**if he intended to murder this person and he did kill that person, he is judged as a murderer**" (Criminal Appeal 406/72, **Snir** v. **The State of Israel**, Supreme Court PD 28 (1) 234, at 242 – 243; Criminal Appeal 388/76, **Ibrahim** v. **The State of Israel**, Supreme Court PD 31 (1) 601, at 607; Criminal Appeal 6059/92, **Shibam** v. **The State of Israel**, Supreme Court Compendium 93 (4) 255; Criminal Appeal 887/96, **Biton** v. **The State of Israel**, Supreme Court Compendium 97 (1) 848). As the Honorable Justice H. Cohn wrote in the above-cited **Snir Case**, "**We do not consider that criminal intent must be directed at a particular person specifically.**" This is also a principle of English law, as is noted by the Honorable Justice H. Cohn.

[Stamp] P 7: 000441

**C.    The Crime of Solicitation and the Distinction Between the Joint Perpetrator and the Solicitor**

158. Section 34 (d) of the Penal Code, 5737 – 1977, states:

> "Unless otherwise stated in the statute or implied therein, every law that applies to the principal perpetrator of a completed crime also applies to an attempt, solicitation, attempt to solicit or aid the same crime."

This leads to the conclusion that it the liability of the solicitor is the same as that of the primary perpetrator, insofar as the solicitor is considered a main partner of the joint perpetrator – unlike the accessory, who is considered to be a secondary partner – in that he makes a material contribution to the occurrence of the crime, which is reflected in the fact that he caused another person to commit a crime (see: the statements by the Honorable Presiding Justice A. Barak in the above mentioned Criminal Appeal 2796/95, in the matter of **John Does**, on p. 404, which relates to the solicitor, despite these points, as an "indirect partner", and the statements by the Honorable Justice D. Beinisch in Criminal Appeal 8464/99, **Avigdor Eskin v. The State of Israel**, PD 55 (2) 65, on p. 82 – 83, in comparison with the statements by the Honorable Justice M. Cheshin in the above mentioned matter of **John Does** on p. 416, who expresses reservations with respect to the expression "indirect partner", insofar as in his opinion, the contribution by the solicitor is a direct contribution, just like the contribution of a primary perpetrator).

[Stamp] P 7: 000441 [continued]

The provision contained in Section 34 (d) of the Penal Code is derived from the reference to the solicitor as a primary partner to the perpetrator of the offense. Therefore, it was established in this provision, which is also emphasized in case law, that the punishment of the solicitor is identical to that of the primary perpetrator. (See: the above mentioned Civil Appeal 2796/95 in the matter of **John Does**, on p. 401 – 402, 415; the above mentioned Criminal Appeal 8464/99 in the matter of **Eskin**, on p. 82; the above mentioned Additional Criminal Hearing 1294/96 in the matter of **Meshulam**, on p. 42 – 43.)

159. In the above mentioned Criminal Appeal 2796/95, in the matter of **John Does**, the Honorable Presiding Justice A. Barak clarified (on p. 404) the liability of the solicitor for the commission of the crime and its significance, saying:

> "The contribution of the person who solicits the crime is reflected in the fact that he caused the perpetrator to decide to commit the crime (S. Z. Feller in his above mentioned book (8) on p. 228). He is the one who influenced the perpetrator – whether he is an independent (or principal) perpetrator or a joint perpetrator – to the state at which he made the decision to commit the crime and took measures to carry it out (whether an attempted or a completed crime). He is the 'spiritual father of the crime' (M. Gur-Arye 'Proposed Penal Code (preamble and general), 5752 – 1992' (13), on p. 46). In fact, society wishes to protect itself not only against one who perpetrates a crime – whether he is an independent perpetrator or a joint perpetrator – but also against a broader group of people who cause others to commit crimes...
>
> The 'proximity' of the person who solicits the crime is reflected in the fact that he is the one who planted the criminal thought of perpetrating the crime in the principal criminal's heart. He is the '*auteur intellectuel*' of the crime (see Feller in his above mentioned book (8), on pp. 225 – 226). He is the one who causes the perpetrator to develop the idea of perpetrating the crime – whether he planted the idea in advance or whether he tipped the scales when the perpetrator was hesitant."

The Honorable Justice M. Cheshin ruled in the above mentioned matter of **John Does**, on p. 415, that the act of the person who solicits is primarily reflected in the fact that, in his conversation with another, he causes him to commit a crime that, in the absence of the solicitor, would not have been committed at all.

[Stamp] P 7: 000442

These points lead to the question of the causal relationship required between the solicitation and the commission of the crime by the one who was solicited. The Honorable Presiding Justice Barak ruled, in the passage quoted above, that the solicitor is the one who influenced the perpetrator to decide to commit the crime, whether he planted the idea in advance or whether he tipped the scales when the perpetrator was hesitant (on p. 404).

In the above mentioned Criminal Appeal 8469/99 in the matter of **Eskin**, the Honorable Justice D. Beinisch ruled (on pp. 78 – 79), with regard to the nature of solicitation and the requirement for a causal relationship, that **"the main point is that the behavior of the solicitor has 'potential effectiveness' that is likely to influence the person being solicited to commit the crime which constitutes the object of the solicitation, so that there is a causal relationship between the soliciting behavior and the initial perpetration of the crime."** However – the Honorable Justice Beinisch continued (on p. 79):

> **"Within the framework of the elements of solicitation, it is not necessary, and it is not even sufficient, for the initiative or the idea for commission of the offense to be that of the 'solicitor.' The circumstantial element of the offense of soliciting – the existence of another (the 'solicitee') who needs to be mentally motivated to make a decision to perpetrate the offense – is likely to exist even in situations where the idea of the offense first arose in the thoughts of the 'solicitee'**

[Stamp] P 7: 000442 [continued]

> but did not develop into a decision to commit it. In such a case, if the
> behavior of the solicitor caused the final decision of the 'solicitee' to
> commit the offense, then the factual basis for the offense of solicitation
> has been established."

160. With respect to the mental element of the offense of solicitation, the Honorable Justice D.
Beinisch ruled in the above mentioned Criminal Appeal 8469/99, in the matter of **Eskin**, on
p. 81:

> "In general, in order to establish the mental element within the
> framework of the act of solicitation, it must be proved that two
> requirements have been met: first, the solicitor must be aware that his
> behavior is capable of bringing another (the 'solicitee') to commit the
> offense which constitutes the object of the solicitation. This requirement
> refers to awareness of the quality of the soliciting behavior and also
> aware of the existence of the other, who requires mental motivation in
> order to commit the offense which constitutes the target of the
> solicitation. Second, the solicitor intends to bring the solicitee to the
> point of committing the offense which constitutes the target of the
> solicitation. In other words, the solicitation needs to be accompanied by
> an aspiration – an objective – on the part of the solicitor, for the offense
> in question, including all of the elements thereof, to actually be
> perpetrated by the 'solicitee' (S. Z. Feller in his above mentioned book
> (Volume 2) (18), on p. 234)."

161. The case law that pertains to the liability of a solicitor – in contrast to the case law that
pertains to the liability of an accessory – does not state that the solicitation must relate to a
particular offense with a concrete purpose, perhaps because this is self-evident. However,
this requirement is built into the elements of the offense of solicitation and is *a fortiori*
obvious with regard to the solicitor, whose punishment is identical to that of the principal
perpetrator (as opposed to the accessory, whose punishment is half of that of the principal
perpetrator). In order to prove the offense of solicitation, it is necessary to show a causal
relationship between the solicitation and the commission of the main crime by the solicitee,
and, furthermore, to show the solicitor's objective and aspiration for the offense to be
committed. All of these require the solicitation to refer to a specific crime with a concrete
purpose, as has also been ruled in the case of the accessory. Thus, Prof. S. Z. Feller wrote
in his book, **Fundamentals of Criminal Law,** 5747 – 1987, Volume 2, on p. 226:

[Stamp] P 7: 000443

"It is appropriate to explain in advance that the concept of solicitation, as a form of partnership in the offense, has a meaning that is not always apparent from the ordinary use of this term. This is a meaning that reflects the relationship between one individual and another, the solicitor and the solicitee, and not the relationship between an individual and a group of persons in a situation where the individual incites, agitates, and provokes a certain group of persons, without any distinction between the individual identities of the persons in that grop, to perpetrate criminal offenses.

These actions are likely to give rise to specific offenses, and even if some form of the word "solicit" is used to define them, this is not "solicitation" as a form of partnership in the offense, which we will discuss below."

However, as has been ruled in the case of the accessory, it is not necessary to prove that the solicitor was aware of all of the details involved in the offense which constituted the object of the solicitation, and it is sufficient for him to have solicited the perpetrator to commit a crime of the same type as the crime that was finally committed (see Section 145 above). Furthermore, in the matter of solicitation as well, obviously, the principle with respect to intent is transferable: it makes no difference if the crime is eventually committed by another person.

In summation: It is not possible to convict a person for the general offense of solicitation to commit acts of murder when he calls

[Stamp] P 7: 000443 [continued]

for the perpetration of terrorist attacks against Israel; the offense which is appropriate to this purpose is that of inciting to violence or to terrorism exists for this purpose (see Section 144 (d) (2) of the Penal Code, 5737 – 1977). Similarly, it is not possible to convict a person of the general offense of being an accessory to murder when he supplies money or armaments for the perpetration of various non-specific offenses. The offense which is appropriate to this purpose is that of supplying means for the perpetration of a crime in accordance with Section 498 of the Penal Code, 5737 – 1977, that was legislated especially in order to deal with situations in which definite knowledge of the intent to perpetrate a particular offense cannot be proved, so that the person cannot be considered an accessory (see the explanatory note to the Amendment of the Penal Code Draft Law (No. 36) 5733 – 1972, Draft Laws 5733 [1972] 1021, on p. 20).

162. With respect to the line distinguishing between the solicitor and the joint perpetrator, the Honorable Presiding Justice A. Barak ruled in the above mentioned Criminal Appeal 2796/95, in the matter of **John Does**, on p. 406, that **"the contribution of the solicitor lies in the fact that he caused the creation of the mental element in the perpetrators"**, and that **"the more intensive the solicitation by the solicitor, and the more it involves, not only actions on the mental level but also actions on the factual level, the closer the solicitor comes to being a joint perpetrator."** In the above mentioned matter of **John Does**, the minor referred to as "T" was convicted of murder as a joint perpetrator and not only as a solicitor, for having thrown a grenade at Arabs, even though he refused to join the action itself – because it was ruled that he participated in planning the offense and was **"the first and foremost of them all"** (on pp. 408 – 409).

With respect to the distinction between the accessory and the solicitor, the Honorable Presiding Justice A. Barak said (on p. 406) that, when assistance is "spiritual", the accessory may become a solicitor: **"The dividing line distinguishes between assistance to someone who has already developed his own criminal thoughts (the accessory) and contributing to the development of that criminal thought (solicitor)."**

In the above mentioned Additional Criminal Hearing 1294/96 in the matter of **Meshulam**, the Honorable Justice Y. Kedmi ruled (on p. 63):

[Stamp] P 7: 000444

> "As set forth above, the liability of the 'joint perpetrator' is founded –
> in accordance with that which has been set forth in Section 29 of the
> Penal Code – on 'participation' – commission of a crime by 'taking
> action' to commit it... and in the absence of an 'act of participation' –
> in accordance with that which has been set forth – there is no basis for
> responsibility of this type... By contrast, the liability of the 'solicitor'
> for the commission of a crime by another person is founded on the
> performance of an 'act of solicitation', one of the acts listed in Section
> 30 of the Penal Code. This act does not constitute an 'act of
> participation' in the perpetration, but rather leaves the person
> performing it 'outside' of the circle of perpetration."

At 66, the Honorable Justice Y. Kedmi wrote:

> "In theory, the distinction between the solicitor and the joint
> perpetrator is founded on the fact that the contribution of the solicitor
> to the commission of the crime is the creation of the 'mental element
> which must be present in the solicitee in order for him to commit the
> offense of which he is the principal perpetrator; whereas the
> contribution of the joint perpetrator is, primarily, on the level of the
> behavior which constitutes the offense, since he is required to
> 'participate' by taking action toward the perpetration of the crime (in
> this regard, see Feller's above mentioned book (Volume 2) [20] on p.
> 196, 228). In practical terms, however, the boundary line between the
> solicitor and the joint perpetrator is drawn between a person who
> 'participates' in the perpetration – meaning someone who belongs to
> the inner core of perpetrators – and someone who is only 'involved' in
> the perpetration, meaning that he is outside the inner circle of
> perpetrators."

## D. The Responsibility of the Leader of the Criminal Group as a Joint Perpetrator or as a Solicitor

163. For the purpose of determining a defendant's liability as a joint perpetrator or a solicitor, Courts have given decisive weight to the fact that the defendant is a leader of the criminal group that perpetrated the principal offense. According to the above mentioned Criminal Appeal 2796/95 in the matter of **John Does**, the minor referred to as "T" was convicted as a joint perpetrator and not simply as a solicitor, although he did not actually join in the

—

—

—

perpetration of the offense of murder itself, because he participated in the planning and was a leader of the group, and in the language of Honorable Presiding Justice A. Barak, he was "the first and foremost of them all".

In the above mentioned Criminal Appeal 8461/99 in the matter of <u>Eskin</u>, the Defendant was convicted for soliciting the offenses of arson and unauthorized entry to a place of ritual or burial, which were committed by a person who was subordinate to the Defendant and accepted his authority; the Court emphasized the fact that the Defendant was "a leader and a guide" and the fact that the Defendant was the one who gave his "consent and authorization" for the perpetration of the offense and received a report after the perpetration was completed (on p. 77 – 81, 84, 90 – 91). In spite of this, it should be noted that the Defendant in that case took part in planning the crime and provided monetary aid for its commission. In those circumstances, the Honorable Justice D. Beinisch noted, as an *obiter dictum*, that it might have been possible to convict him as a joint perpetrator and not only as a solicitor, when she said (on p. 84):

**"Even if we were to have said that the main 'contribution' of the appellant to the perpetration of the offense was in giving his 'authorization' to the criminal plan and its realization, in these special circumstances, it is possible that 'consent' to the perpetration could be considered participation 'in the perpetration of an offense while taking action toward the perpetration thereof', in accordance with that which has been set forth in Section 29 of the Penal Code."**

In this statement, the Honorable Justice Beinisch refers to the statements by the Honorable Justice Y. Kedmi in Criminal Appeal 5589/98, <u>Bisan Sultan v. The State of Israel</u>, Supreme Court Compendium 99 (3) 98, Section 9. In that case, the appellant was convicted for premeditated murder when it was proved that he had given his consent and authorization for perpetration of the murder, and had sent the joint perpetrator to actually commit the murder and had even instructed him in the method to be used.

Judge Kedmi emphasized that, without the consent of the appellant, the murder would not have taken place, and therefore the approval he gave for the murder could be compared to **"the opening shot that starts the athlete running,"** and can be considered "an act of participation in committing the offense." Therefore, the appellant was convicted as a joint perpetrator and as a solicitor, and the Court emphasized that he was found to be "in the inner circle of perpetration", as someone who had a role in its perpetration and was "the brains of the group", whereas someone who solicits a crime is outside of the inner circle of perpetration.

[Stamp] P 7: 000445

The Honorable Justice Kedmi added that in the circumstances described above, in which the appellant had given "a green light for murder" and had provided operational guidelines for how it should be done, his behavior was at least "a full measure of solicitation by way of encouragement." Also in the above mentioned Criminal Appeal 8469/99 in the matter of **Eskin**, it was ruled that the fact that the appellant had approved setting the fire as a leader or guide was sufficient to lead to the conclusion that this approval constituted encouragement for the principal perpetrator to transform the idea of arson into action (on p. 93).

164. The question of the liability of the leader of a criminal group who did not physically participate in the offense committed by those who accepted his authority arose, with all due severity, in the above mentioned Additional Procedure 1294/96 in the matter of **Meshulam**. In a majority opinion by six justices, the Court ruled that a master criminal, who is a leader of a group of criminals that commits offenses as his agent and in accordance with his planning and his orders, is not simply a solicitor: he is considered a joint perpetrator because of the complete control that he has over the perpetration of the offense and its perpetrators. The Honorable Justice D. Dorner expressed her belief, in a minority opinion, that a person of this type should be viewed as no more than a solicitor (on pp. 42 – 47). Another opinion, in accordance with which the leader of a criminal organization should be viewed as a "perpetrator by means of another", in accordance with Section 29 (c) of the Penal Code, is expressed in the articles written by M. Kremnitzer, "**The Perpetrator in Criminal Law: Main Characteristics**" [Hebrew], *Plilim* 1 (5750 – 1990) 65, on p. 72, and M. Gur-Arye, "**Aspects of Crime – Amendment 39 to the Penal Code as Tested in Rulings**" [Hebrew], *Megamot Biflilim*, on p. 83. The article by Prof. Kremnitzer states, on p. 72:

> "It seems that we do not need to explain at length that the usual concepts of indirect participation (accessory and solicitation) are not adequate with regard to criminal phenomena such as war crimes, crimes committed

> by a criminal state (Nazi crimes) or by a criminal organization (the
> 'Mafia'). A person who is in a position of control in these types of
> systems (and not only the person at the top of the hierarchy) who gives
> the order to kill a person is not simply soliciting or an accessory to
> murder when his command is perpetrated. The special nature of this
> act is evident in the fact that,when he gives the command, he can rest
> assured that his orders will be followed without being acquainted with
> the physical perpetrator. He knows that if one of the possible
> organizations that might implement the order does not, another will.
> The main point is – the task will be done.
>
> The direct perpetrator does indeed control the act (he commits it with
> his own hands with the required mental basis and not under duress),
> although from the perspective of the one who gives the order, he is
> perceived in an entirely different manner – as an anonymous,
> replaceable figure, much like a bolt or a wheel in the operating
> mechanism of the organization, which is in the hands of the person who
> gave the orders. The fungibility of the direct perpetrator transforms the
> one who controls the organization into a perpetrator by means of
> another."

[illegible text]

> "In the new legal reality, making direct liability contingent upon
> presence means that the 'godfathers' and leaders of criminal groups
> who send 'little fish' who obey their authority to the scene in order to
> perpetrate the crimes while they direct the criminal activity from a
> distance would not be considered joint perpetrators but only people
> who solicit the crime. This possibility, which certainly does not reflect
> the desirable law, is also not required by the actual law."

The Honorable Justice A. Matza emphasized, with respect to the control the leader has over
his people, the fact that the Defendant was able to order his people to desist from
committing the crime (on p. 32, and see also the statements by the Honorable Justice
Kedmi on p. 63).

[Stamp] P 7: 000446

The Honorable Presiding Justice A. Barak joined the Expert Opinion of the Honorable
Justice A. Matza but emphasized the fact that the Defendant in that case was present at the
scene of the crime until he was arrested and that he put the criminal plan into motion (on p.
50). The Honorable Presiding Justice Barak ruled (on p. 51):

> "The status of Meshulam does not allow considering him merely as the
> solicitor of the crime. Meshulam was the head of the group. He was a
> leader. He planned the operation. This was his operation. He is not one
> with a criminal idea: he is not simply the 'spiritual father' of the crime.
> He is not an external person who is asking someone else commit a
> crime. He made an internal contribution to the commission of the
> crime... In Meshulam's hands, as the head of the group, was effective
> control of the criminal event and he had the criminal thought that was
> required in order to establish his liability as a joint perpetrator."

The Honorable Justice M. Cheshin also ruled (on p. 55): "**Master criminal John Doe, who
initiates, plans, determines**

[Stamp] P 7: 000446 [continued]

the tasks and sends his 'soldiers' to commit the crime" – is considered a joint perpetrator even if he is not present at the scene of the crime. He added that a person of this type is not considered merely a solicitor, whose responsibility is less than that of a joint perpetrator. The Honorable Justice M. Cheshin stated (on p. 59):

"From this, we know that our classification of the master criminal as a solicitor – as opposed to a as joint perpetrator – is like reducing his responsibility and making it easier for him. 'The soldiers' that the master criminal dispatched to commit the crime will bear full responsibility for the various crimes that they committed while he – the mastermind and supreme leader – will bear lesser responsibility, even though 'an ordinary person could have been aware of the possibility' that one of the various crimes was being committed. This conclusion is puzzling, strange and hard to accept."

The Honorable Justice M. Cheshin further stated (on p. 59):

"Would it be acceptable for the mastermind to be beneath the 'soldiers' who do his bidding? If indeed the mastermind is the mastermind – without whom the octopus partners to the crime could not have moved his tentacles – it is difficult for us to accept that his liability could be less than the liability of a joint perpetrator. The evil spirit of the leader pervades the entire criminal operation, his mind wound the operating spring before it was set in action and while the crime was being committed he was 'present' with the criminals as a joint perpetrator, together with them. He will continue to be 'present' with them unless or until he takes overt action to prevent the crime, nothing less."

The Honorable Justice Cheshin justified this conclusion with an analogy that he drew from Section 29 (c) of the Penal Code when he considered the leader sending his "soldiers" to commit a crime as if he were someone "committing the crime through another" when he said, "'Soldiers' will obey the orders of their leader to the point that they completely erase their will in favor of his" (on p. 60). With respect to the Defendant in that case, the Honorable Justice Cheshin emphasized that, "his liability is derived from the fact that he planned and perpetrated the 'rebellion' prior to his arrest – the planning and perpetration of the leader – that responsibility is continued even after his arrest as long as he did not do anything apparent to stop the wagon from rolling down the hill" (on p. 61).

The Honorable Justice Y. Kedmi ruled in this spirit when he wrote (on p. 66 – 67):

[Stamp] P 7: 000447

"In this situation, when the involvement of the leader of a group that has decided to commit a crime is expressed through planning, guidance and division of responsibilities, the question of whether the person before the Court is a 'joint perpetrator' or a 'solicitor' will be determined by the nature of his 'involvement': if this was 'involvement' that makes a contribution equivalent to 'participation' in the perpetration or whether it is only the external 'involvement' of solicitation.

The implementation of this distinction is not always easy but it is always possible. In any case, when considering a leader – or the head of a group – who presents his followers and minions with a concrete plan for the commission of a crime, when this includes a division of tasks and orders for the manner of its commission, there can be no doubt that this is not a 'solicitor' but rather a leader whose 'participation" is manifested in the stated 'act of planning.' The 'act of planning' – as distinguished from the 'act of solicitation' – is an act of 'participation' in the act because it is actually the first stage of bringing the criminal plan into being, in other words, of the perpetration. This is unlike 'solicitation', which is not part

[Stamp] P 7: 000447 [continued]

of the perpetration but rather an external motivation for the operation.

As was explained above, assistance in this respect can be found in the examination of the existence of a 'relationship of control.' The existence of a 'relationship of control' will confirm that the group leader is a 'joint perpetrator' with everything that derives therefrom; in an instance where there is no 'relationship of control' as explained above, this will be an indication of the possibility that is a case of involvement that gives rise solely to the liability of a 'solicitor'."

166. The Honorable Justice Y. Kedmi reiterated this approach in Criminal Appeal 4720/98, 5310/98, 5454/98, **Nahman Cohen** *et al.* **v. The State of Israel**, *Dinin Elyon*, Volume 57 366. In this case, Nahman was convicted as a joint perpetrator after it was proved that he was the one who had initiated, requested and led the murder plot and the one who confirmed the identification of the intended victim when he was presented with it. The Honorable Justice Y. Kedmi wrote (in Section 9):

> "As I see things, and as I have explained this on more than occasion in the past, 'the leader' of a group, who initiates and leads the perpetration of a crime by the group, is included among the 'perpetrators." The leader 'participates' in the commission of the crime in accordance with the meaning of this requirement in Section 29 of the Penal Code. His fate is entwined with the fate of the actual perpetrator; he bears liability as if he were 'right next to' the perpetrators while they were committing the crime. This is the legal standing of the 'leader' and this is the legal standing of 'the planners' and those who fulfill other 'essential roles' whose contribution to the act formally 'end' before it actually begins but remain an inseparable part thereof. The fate of these – the leader, the planner and their ilk – is connected to the fate of those who actually commit the act: they are one body, and all of the limbs bear responsibility for what the 'hands' do.
>
> As I see things, the leader of the 'group' whose members have committed a crime did not 'solicit' the members of the group but rather he is their leader who 'guides' them to the realization of their joint scheme. The solicitor is outside of the inner circle of 'commission'; the act of solicitation is pure solicitation, in other words: it is an independent and separate act from the overall effort of perpetration. Whoever 'participates' in the perpetration – and as I see matters, as required by that which has been set forth above, must give the concept 'participation' in this context a broad meaning – cannot be a 'solicitor.' The 'solicitor' and the perpetration of the crime are 'separated' by the perpetrator who is characterized by 'playing a role' in the perpetration, and instead of the 'solicitor' being accompanied by 'participation in a role' in accordance with that which has been set forth above – the person before us is not a 'solicitor' but rather a 'joint perpetrator'."

3.  **Conclusions with Respect to the Defendant's Liability as a Joint Perpetrator, Solicitor and Accessory**

167. Analysis of the evidence presented above leads to the following factual conclusions with respect to the share and role of the Defendant in the terrorist attacks that are the subject of the indictment:

   a.  The Defendant was the commander of the Fatah and Tanzim in the West Bank. He was a field leader of the Fatah in the West Bank and responsible for the "military operations" of the Fatah in all parts of the West Bank. The expression used by the Defendant, such as "military operations", is nothing more than a euphemism for terrorist attacks against Israel that have been carried out by the field cells of the Fatah, which were organized into the Tanzim movement and the framework of the al-Aqsa Martyrs Brigades. The Defendant established the al-Aqsa Martyrs Brigades and was responsible for their activities as the leader and commander of the members of the field cells and their commanders. For these activities, the Defendant was directly subordinate to the chairman of the Palestinian Authority, Yasser Arafat. The "military" activity of the Defendant described above continued in parallel with his political activity as Secretary General of the Fatah in the West Bank and as a member of the Palestinian Legislative Council.

   b.  The Defendant was of the opinion that Fatah was obligated to lead the "armed struggle against Israel," and therefore publicly supported terrorist attacks against soldiers and settlers. This was the declared position of the Defendant, who explained that from his perspective, women and children living in the settlements were also considered an enemy to be attacked. The Defendant was opposed, a matter of principle, to terrorist attacks within Israel, meaning over the Green Line, and also opposed suicide terrorist attacks. However, in practice he did not cease his support for his men and helped them by supplying money, weapons and explosives even after he learned time and again that they were carrying out terrorist attacks, including suicide terror attacks, inside Israel. Thus, the Defendant expressed his agreement to all types of terrorist attacks that have been carried out by people in the field who were affiliated with Fatah. This position of the Defendant was also expressed in his media appearances, in which he encouraged Fatah operatives and others to carry out terrorist attacks against Israel and also praised those who perpetrate the terrorist attacks – including those that were carried out within Israel.

c. The Defendant did not have complete control over members of the cell and their commanders. However, he did have a great degree of influence over them, because he was their leader and because of the assistance that he extended to them, including money, weapons and explosives. The influence of the Defendant on members and commanders of the cells is also evident in that he would, on occasion, instruct them to cease the terrorist attacks against Israel and then later call for them to renew the terrorist attacks – sometimes in accordance with orders that he received from Arafat. Yasser Arafat would not give his orders in an explicit manner, but would make sure that his subordinates clearly understood when he was interested in a cease-fire and when he was interested in terrorist attacks against Israel. Arafat himself also considered the Defendant to be the person who controlled people in the field and therefore he would reprimand him when a terrorist attack was carried out against the opinion of the Chairman.

d. Members of cells in the field and their commanders did have a great degree of independence when carrying out terrorist attacks. They generally did not involve the Defendant in the planning of the terrorist attacks and there is no evidence that they would report to him prior to the perpetration of a terrorist attack (other than a few solitary cases). In spite of this, the Defendant would receive a report from the commanders subsequent to each terrorist attack. This pattern of activities is an outgrowth of the Defendant's desire, and the desire of the field commanders, to protect the Defendant from Israel and to maintain him as a "political figure," who is not involved, as it were, in the murderous terrorist attacks against Israel. For this reason the Defendant did not have direct contact with those who carried out terrorist attacks, other than in exceptional cases. Thus, the Defendant also was careful not to personally assume responsibility on behalf of the Fatah or al-Aqsa Martyrs Brigades after the terrorist attacks had been perpetrated; this was done by the cell commanders. The Defendant was satisfied with taking general responsibility through the media in an indirect overall manner, without relating to any specific terrorist attack, by expressing support for the terrorist attacks that had been perpetrated.

[Stamp] P 7: 000449 [continued]

e. Other than the overall supreme liability of the Defendant for all of the members of the Tanzim and al-Aqsa Martyrs Brigades, insofar as he was the commander, he also had better control over a few cells that operated under the command of people who were his close advisors and benefited from his special assistance and support, such as Ahmed Barghouti, Aweis, Abu Hamid and Abu Satha.

The Defendant took responsibility during an interrogation for the activities of the groups that operate under the command of these people (other than Aweis), although he claimed that he was only one of the "addresses" to which these people turned in order to receive assistance and funding, and that he did not have complete control of them but rather only influence over them.

f. The Defendant generally did not have direct contact with people in the field who perpetrated the terrorist attacks; the connection was through people who were close associates of Defendant and who worked in his environs, including Ahmed Barghouti, Aweis, Abu Hamid and Abu Satha. These people worked in the Defendant's environs and with his support, planned and brought about murderous attacks, using the money, weapons and explosives which the Defendant was careful to supply them with for this purpose.

g. The Defendant was responsible for the supply of money, weapons and explosives to cells in the field through his associates, including Ahmed Barghouti, Aweis, Abu Hamid and Abu Satha. He would refer their requests to Arafat for his approval and was responsible for the purchase of weapons and supplying the cell members through his close associates. The Defendant also proffered assistance to wanted men and to the families of the terrorists.

h. In spite of the fact that the Defendant, like his men, was generally careful not to involve himself personally in the planning and the perpetration of the terrorist attacks, unequivocal evidence was submitted with respect to four terrorist attacks that had been carried out with the knowledge, approval and encouragement of the Defendant. He even initiated two of them.

The terrorist attack at the gas station in Givat Ze'ev, in which Yoela Chen, of blessed memory, was murdered, was carried out as a result of direct orders given by the Defendant to his men, in revenge for the assassination of Ra'ed Karmi, and the Defendant admitted to responsibility for this terrorist attack during the course of his interrogation.

[Stamp] P 7: 000450

Thus, too, in the case of terrorist attack in which the Greek Orthodox monk Tzibouktzakis Germanos, of blessed memory, was murdered in Ma'ale Adumim as a result of the Defendant's being contacted by the terrorist Radaida, who wished to perpetrate a suicide terrorist attack.

The Defendant referred Radaida to a person who could teach him and supply him with a weapon and instructed him to perpetrate a shooting terrorist attack rather than a suicide terrorist attack. As a result, Radaida set out to perpetrate the terrorist attack and shot a Greek Orthodox monk to death, thinking that he was a Jew.

In addition, the Defendant gave his approval for the terrorist attack at the Seafood Market Restaurant in Tel Aviv, and that was prior to the departure of the terrorist to his target. The Defendant did indeed instruct his people that the terrorist attack should take place in a settlement or near a military roadblock and not within Israel, but he did approve the terrorist attack itself.

Similarly, Defendant gave approval to his men for the perpetration of a suicide terrorist attack by way of the detonation of a car bomb, even though he did instruct them that the terrorist attack should take place in the Occupied Territories and not within Israel. This incident ended with the death of the two terrorists near the Malha Mall in Jerusalem, when they exploded in their car while they were en route to the perpetration of the terrorist attack.

[Stamp] P 7: 000450 [continued]

i. Other than the four terrorist attacks that have been set forth in subsection (h) above, no evidence was submitted that ties the Defendant personally and directly to involvement in the terrorist attacks that are the subject of the indictment. From the Defendant's conversation with his associate, Ahmed Barghouti, which was recorded without their knowledge, there emerges significant concern that the Defendant knew far more than what he and his people have revealed during the course of interrogation, but it is not possible to determine this with the degree of certainty that is required by a criminal court on the basis of the existing evidence.

One way or another: it is clear from the evidence that has been submitted that more than a few of the murderous terrorist attacks that have been set forth in the indictment were planned and executed by field commanders who operated in proximity to the Defendant and with his support, using weapons that the Defendant helped supply and which were given to the terrorists by the cell commanders who were close to the Defendant (Ahmed Barghouti, Aweis, Abu Satha and Abu Hamid). The Defendant received reports from his men with regard to these terrorist attacks after they were perpetrated and gave his consent – at least by way of his silence and behavior – to continuing the attacks.

168. The analysis of the evidentiary material in accordance with that which has been set forth above leads to the conclusion that the Defendant made a substantive contribution to the terrorist attacks that have been carried out by the Fatah cells, the Tanzim and the al-Aqsa Martyrs Brigades, even if he did not take part in the perpetration.

The assistance in the form of the provision of weapons, explosives and money to those cells, the recruitment of field operatives, the making of arrangements for their training and the assistance to their families – all of these created the necessary conditions for the perpetration of acts of murder by the terrorist cells. Without a doubt, the Defendant was aware of this fact. He also knew that the field operatives that he supported were going to continue to perpetrate murderous terrorist attacks against Israel, and he acted with the clear goal of helping them to continue in this way. This is not simply a reasonable suspicion or "turning a blind eye" on the part of the Defendant, but rather genuine knowledge that the members of the cells were perpetrating, and would continue to perpetrate, murderous terrorist attacks against Israel, using the weapons, explosives and money that the Defendant supplied to them for this specific purpose. More than that: the Defendant was not only aware of the acts of murder that some members were perpetrating but rather he gave them assistance, in accordance with that which has been set forth above, out of a goal and aspiration that they would act in this manner.

In spite of this, other than the four instances that have been set forth above, there is no evidence that the Defendant had been involved in the planning and the perpetration of the terrorist attacks or that he had known in advance about the terrorist attacks that were going to be perpetrated by the men in the field and the commanders of the cells, whom he supported and for whom he was, effectively, their commander. In fact, Ali Aidiya did say during the course of his interrogation that the Defendant knew about the events and had approved the shooting terrorist attacks that had been perpetrated by members of the Tanzim (see Section 40 above). However, other than this sole testimony, given by a person who was not close to the Defendant, there is no other evidence that the Defendant knew in advance about all of the terrorist attacks that were going to be perpetrated, and he himself denied this claim. The Prosecution also does not claim that Defendant knew in advance about all of the terrorist attacks (see page 47 of its summations).

169. Furthermore: from the evidentiary material, it becomes apparent that the Defendant did not have total control over the commanders of the cells and the men in the field. Although he was considered to be their leader and commander and he did have influence over them, they did in any case have a significant degree of independent discretion in planning the terrorist attacks and their perpetration; there is no evidence that they would consult with the Defendant in this regard. From the overall body of evidence, it becomes apparent that the al-Aqsa Martyrs Brigades were not an organized body under one leader, but rather a collection of field cells, with each one having its own commander. A fact that emerges from the evidentiary material is that the Defendant's men did indeed perpetrate suicide terrorist attacks, and terrorist attacks inside of the Green Line, in contravention of the Defendant's stated position and sometimes contrary even to the opinion of Chairman Arafat. In addition, it emerges from the evidentiary material that the men the field who were involved in the terrorist attacks made an effort to distance the Defendant and to sever him from personal involvement in those terrorist attacks, in order protect him from Israel and to maintain him as a "political figure."

[Stamp] P 7: 000451 [continued]

The Defendant himself also tried to keep as far as possible from "military" activity and any direct connection to the cells that perpetrated the terrorist attacks which were carried out by the field commanders, some of whom were close associates of the Defendant and operated under his control, with his assistance and with his encouragement (such as Ahmed Barghouti, Abu Hamid, Abu Satha and Aweis). This fact reinforces the conclusion that the Defendant generally did not know in advance about the terrorist attacks and was not personally involved in their planning or approval because this pattern of activity was intentionally chosen by him and by his people.

Therefore, the Prosecution states in its summations (on p. 47) that:

> **"Within the context of the organizational arrangement of terrorist organizations, the field commanders and operatives were given extensive powers and a great deal of room for maneuvering when carrying out terrorist attacks, and they were not required to obtain the approval of the Defendant for all of the terrorist activities that were perpetrated, in accordance with the policy that was designed by the Defendant and the organizations' leadership, in accordance with that which has been set forth above.**
>
> **The Defendant was aware of the activities conducted by the people subordinate to him and he was kept up to date about them, sometimes in advance and sometimes after the fact, in accordance with the these organizations' operational concept as mentioned above."**

170. The law, in accordance with that which has been set forth above, is that assistance must be **consciously directed to a particular crime with a concrete purpose**, and it must be proved that the accessory was aware of the fact that the principal was almost certainly going to perpetrate this crime, meaning – a crime with a concrete purpose. It is not sufficient that the accessory knows that the principal has a vague willingness to commit a crime. Although there is no need to prove that an accessory was aware of all of the details of the crime, such as its exact location (the above mentioned Criminal Appeal 11131/02, in the matter of **Yosefov**) or the identity of the victim of a crime or the time its commission (the above mentioned Criminal Appeal 426/67, the matter of **Be'eri**): it is sufficient that he was aware of the fact that the principal was going to commit a particular crime of the type that was ultimately committed and in spite of this, he assisted in its commission.

However, in the current case – with respect to most of the terrorist attacks that are the subject of the indictment, other than the four terrorist attacks in which the Defendant was personally involved – there is no evidence that the Defendant knew of the intent to commit them, in the sense of an intent to commit a **specific crime with a concrete purpose**, as required by the rulings. The Defendant had general knowledge that the men in the field who belonged to the organization that he led occasionally perpetrated murderous terrorist attacks against Israelis, using the weapons, explosives and money that he took care to provide them. However, no evidence was brought connecting the assistance provided by the Defendant to any specific terrorist attack (other than the murder of the Greek Orthodox monk, which will be discussed below). There is no evidence that the Defendant supplied weapons, explosives or money for the purpose of committing any specific terrorist attack. Indeed, in some cases it was proved that the terrorist attack was carried out using a weapon that was given to the terrorist by one of the Defendant's close associates, such as Aweis, Abu Hamid or Ahmed Barghouti.

Pursuant to the evidence that has been set forth, the assistance that the Defendant rendered to his close associates in this regard was general, and did not relate to any particular terrorist attack or any particular terrorist: in general, the Defendant made certain that men in the field were equipped with weapons, explosives and money, and this was through his close associates and the field commanders who accepted his authority, knowing that the weapons, explosives and money would be used for the purpose of terrorist attacks. However, in accordance with the case law that has been cited above, this is not sufficient in order to convict the Defendant as an accessory for each of the murderous terrorist attacks that have been carried out by the men who received his general assistance, through his associates, for the purpose of the perpetration of terrorist attacks.

171. This is a situation in which a person assists people who accept his authority with the knowledge that they are about to commit a particular

concrete crime although he does not know where, when, by what manner or by whom his people will commit the crime and who will be its victim. In this case, there is no evidence that ties the Defendant to the commission of a particular crime, with respect to either the factual basis for the crime or its mental basis, since has not been proven that the Defendant knew anything of the plans for the perpetration thereof. In these circumstances, for most of the terrorist attacks that are the subject of the indictment – it is not possible to ascribe to the Defendant the general comprehensive crime of being an accessory to premeditated murder in the cases of these terrorist attacks solely due to his general awareness that his men were carrying out terrorist attacks using the weapons, explosives and money that he took care to obtain for them.

This does not mean that the Defendant does not bear any criminal liability for his deeds that led to the terrorist attacks being perpetrated using the weapons, explosives and money that he took care to obtain for the commanders in the field. For this purpose, there is the general crime of activity in a terrorist organization, which carries a sentence of imprisonment of up to 20 years, and the general crime (for which the Defendant has not been indicted) of providing the means for committing a crime in accordance with Section 498 of the Penal Code, 5737 – 1977. This crime was intended for the case of providing means for implementing **any crime**, when is not possible to prove that the person providing the means had knowledge of the intent to commit a particular crime (see: Criminal Appeal 507/79 **State of Israel v. Eliyahu Asraf**, High Court Decision 33 (3) 620, on pp. 622 – 623). This is the case before us.

172. The above mentioned conclusions relating to the crime of being an accessory also apply to the crime of soliciting murder, with which the Defendant is charged. Just as it is not possible to convict a person in Israel for a general crime of being an accessory to an act of murder, so it is not possible to convict him for a general crime of soliciting an act of murder. Just as the assistance must relate to a particular crime with a concrete purpose, so, too, must solicitation occur between one specific person and another, and the solicitation must relate to a particular crime with a concrete purpose. This conclusion is necessary for solicitation *a fortiori*, since the punishment of one who solicits a crime, unlike the accessory, is identical to the punishment of the principal offender. When a Defendant is not aware in any way of the intent to commit a particular crime, it is not possible to prove the causal relationship, namely: that the principle perpetrator was solicited by him in order to perpetrate the crime.

In the case that is currently at hand, with regard to the group of terrorist attacks that are the subject of the indictment (other than the four terrorist attacks that will be discussed below) there is no evidence that the Defendant influenced the field commanders under his leadership or the members of the cells to perpetrate them because, there is no proof that the Defendant even knew of any intent to perpetrate these terrorist attacks. From the evidence submitted, it seems that no one needed to solicit them: the field commanders and the members of the cells acted, in general, on the basis of their independent initiative and judgment, while being careful not to involve the Defendant personally in the planning or the perpetration of the terrorist attacks. Similarly, it is not possible to convict the Defendant of a sweeping crime of the solicitation of the acts of murder that are the subject of this indictment because of what could be called "solicitation that is directed toward the public", meaning: the Defendant's words of incitement to the media, when he called on the people under his leadership and others to carry out terrorist attacks against Israel. Toward this end, there are the general offenses of incitement to violence or terrorism, activity in a terrorist organization, etc. (see Section 161 above).

173. On the basis of the legal principles and the law described above, it is also impossible to consider the Defendant as a joint perpetrator in all of the terrorist attacks that are the subject of the indictment, together with the terrorists and planners who actually perpetrated them, since there is no evidence they he was aware of the intent to perpetrate them (other than the four terrorist attacks in which he was personally involved, as will be described below). Despite the very broad interpretation that rulings have given to the words "participation in the perpetration of a crime by taking action to commit them" and the rulings relating to the liability of a leader in a criminal group – it is not possible to accept the Prosecution's claim that this Defendant should be considered a joint perpetrator in all of the terrorist attacks that are the subject of the indictment. According to the rulings explained above,

[Stamp] P 7: 000453 [continued]

the minimum requirement for assigning the liability of a co-defendant to the leader of a group who was not present at the scene of the crime, is participation in the planning of the crime or in the conspiracy to commit it; the giving of orders or approval prior to the commission of the crime; the supervision of the crimes that have been perpetrated; or the proposal of the idea for the crime, in addition to assistance or planning. Each of these might be considered in accordance with the rulings as "acting to commit the crime", which is the basis for the liability of a joint perpetrator. However, it is not sufficient that the leader controls his men and those who accept his authority, in order to assign to him the responsibility of joint perpetrator for all of the crimes committed by his men, when there is no evidence connecting the leader in any way to their planning or perpetration, and there is not even any evidence that he knew about the intentions to commit them.

The Prosecution must prove that the Defendant is connected in some way to a **particular** crime – both the factual basis of the crime and the mental basis, and this was not proven, with the exception of the four cases that shall be set forth below.

The Prosecution has chosen to stake its case upon the case law that was established in the above mentioned Additional Criminal Hearing 1294/96 in the matter of **Meshulam**, in its petition to convict the Defendant as a joint perpetrator in all of the terrorist attacks that are the subject of the indictment.

However, **Meshulam** was convicted as a joint perpetrator, together with his group of disciples who surrounded him and who committed a variety of crimes, after it was determined that he gave orders to his men, supervised their activities, had control over them and intentionally refrained from instructing them to cease committing the crimes (the Honorable Justice A. Matza on pp. 30, 32). In addition, it was determined that he was present at the scene of the crimes immediately prior to their commencement, while simultaneously propelling the criminal plan forward, and was even the one who had planned the operation (the Honorable Presiding Justice A. Barak on pp. 50 – 51); and had planned and carried out the "rebellion" prior to his arrest (the Honorable Justice Cheshin on p. 61).

The Honorable Justice Kedmi also referred in his statements to **Meshulam** as a person whose involvement in the perpetration was manifested by way of planning, guidance and assigning roles, and noted that Meshulam had refrained from instructing his men to cease from committing the crimes (on pp. 63, 66 – 67).

[Stamp] P 7: 000454

These characteristics – of total control over the perpetrators of the crime, presence alongside them at the scene of the crime up until such time as it commenced, involvement in planning the crime, the giving of orders for its perpetration and supervision over the acts of the perpetrators – do not exist in the matter that is currently at hand, where it has not been proven that the Defendant knew in advance of the intent to perpetrate most of the terrorist attacks that are the subject of the indictment.

The Defendant was not personally involved in the initiation, planning of perpetration of the terrorist attacks that are the subject of the indictment (other than the few terrorist attacks that shall be set forth below). The Defendant did not give orders or approval for the perpetration of these terrorist attacks, nor did he assist or solicit the perpetration of [these terrorist attacks] specifically, in accordance with that which has been set forth above. Thus, the issue of the control of the Defendant over the perpetrators and the planners of the terrorist attacks is not devoid of doubt, in accordance with that which has been set forth above. In spite of the fact that the Defendant had the unofficial title of Commander of the Tanzim and the al-Aqsa Martyrs Brigades, there is no proof that the Defendant had played any role in the joint decision to commit the terrorist attacks that are the subject of this indictment, or that he had taken part in the perpetration or planning thereof. In the absence of all of the above, and on basis of the principles that have been established in the case law and in the provisions of the Penal Code, it is not possible to consider the Defendant a joint perpetrator in the terrorist attacks that are the subject of the indictment, with respect to which he had no personal involvement or knowledge, simply by virtue of the fact that he was the uncrowned leader of the Tanzim and the al-Aqsa Martyrs Brigades, or because of his close relationship to the planners of the terrorist attacks and the general assistance that he had provided to them.

174. To summarize the above, the legal situation that prevails in the State of Israel does not make it possible to convict the leader of a criminal group or a terrorist organization as a joint perpetrator of crimes that were committed by members of the said group or organization, not even for being an accessory or solicitor to the perpetration thereof, when he himself was not personally involved, on an individual basis, in any part of the crimes themselves, either prior to or during the course of their commission. This is the situation, even when it is clear that this

leader has given his blessing to the perpetration of these crimes and gave his men general assistance, that was not for the purpose of the commission of any specific crime.

In the the case that is currently at hand, the Defendant encouraged and motivated the cell commanders and the men in the field to carry out terrorist attacks and he made sure that they would have the money, weapons and explosives that were needed in order to perpetrate the terrorist attacks. He was the leader of the commanders and of the men in the field, and he had a not insignificant degree of influence over them.

Many of the terrorist attacks that are the subject of the indictment were perpetrated and planned by the field commanders who were close to the Defendant and were supported by him. In spite of all of the above, it is not possible to attribute the Defendant, in accordance with Israeli law, the criminal liability of a joint perpetrator, an accessory or a solicitor – to the extent that this pertains to terrorist attacks for which there is no evidence that links the Defendant to them and with respect to which it has not been proven that he knew of the intent to perpetrate them.

Therefore, there is a discrepancy between the general and collective liability of the Defendant for the perpetration of the terrorist attacks that are the subject of this indictment, not to mention the moral responsibility for the perpetration thereof, and the legal possibility of the attribution of criminal liability for the perpetration of specific terrorist attacks to him, when it has not been proven that he knew about the plans to perpetrate them. We are unaware of any precedent for the conviction of a person for the crime of murder, or solicitation of or accessory to murder, when there is no evidence that links him to this act in a specific manner. The Defendant does indeed bear heavy and terrible responsibility for the terrorist attacks that are the subject of this indictment, in which many people have lost their lives, because he was the leader and commander of the terrorist cells that perpetrated the terrorist attacks. However, this is command responsibility that is "quasi ministerial" and not liability that can be substantiated in terms of the laws the Penal Code. We must not extend the provisions of the Penal Code beyond their natural limits, even though in the case that is currently at hand, we are faced with a problem that is difficult for the Court to resolve by way of the existing provisions of the law.

This legal outcome is far from being a satisfactory one, and is even infuriating. This is what Prof. M. Kremnitzer was referring to in his statements as cited above, whereby the accepted concepts of accessory and solicitation are not appropriate for the criminal phenomena of organized crime and terrorism, and therefore a proposal has been set forth by Prof. M. Gur-Arye to amend the Penal Code in a manner in which it would be possible to consider a leader of this type to be "perpetrating a crime by way of another person" (see Section 164 above). In the above mentioned Additional Criminal Hearing 1294/96 in the case of **Meshulam**, the Court rejected the possibility of considering the leader of a group of criminals as "perpetrating a crime by way of another person" in accordance with Section 29 (c) of the Penal Code, although Justice M. Cheshin fashioned an analogy based on the provision of the law with respect to the liability of the joint perpetrator as compared to the liability of a solicitor (on pp. 59 – 60).

175. Recently, the Legislature has made an effort to deal with this legal problem, if only partially. The Knesset [Israeli Parliament] enacted the Law on Combating Criminal Organizations, 5763 – 2003, which makes it possible to sentence the head of a criminal organization to imprisonment of up to 20 years, when the organization commits felonies for which the punishment is more than 20 years' imprisonment. This law does not apply to the crimes of the type that are the subject of this indictment, which were perpetrated prior to its enactment; however, it does extend to terrorist organizations and their leaders (see the first addendum that applies the law to crimes in accordance with Section 4 of the Prevention of Terrorism Ordinance, and the explanatory notes to the legislative bill: Legislative Bill 5762 [2002] 3155, on p. 762). From the explanatory notes to the legislative bill, it may be understood that the Legislature is aware of the legal problem that derives from the inability to convict people who head criminal organizations for the crimes that have been committed by their subordinates, due to their distance from the crime. The explanatory notes state (on p. 762):

> "The proposed Law on Combating Criminal Organizations, 5762 – 2002, is intended to address, on the legislative level, the phenomena of organized crime and the structure of criminal organizations that frequently make it difficult to prove the connection between the heads and leaders of organizations of this type and the crimes that have been committed by others, all in light of the hierarchal structure of some of these organizations,

[Stamp] P 7: 000455 [continued]

> **which creates distance between the decision makers and the policy makers and those who commit the crimes."**

The explanatory notes to the legislative bill also states (on p. 763) that Section 2 of the law that permits a sentence of up to 20 years' imprisonment for the head of a criminal organization **"is intended to address the difficulty in proving the relationship between officials in criminal organizations and the crimes that have actually been committed. It states that the very act of heading, managing or funding the organization, etc. is sufficient in order to constitute a crime..."**

It was further stated in the explanatory ntoes that with respect to members of criminal organizations at lower echelons, **"it will remain necessary to prove a tie to a specific crime."**

Hence, it is clear that the law is intended to deal with the issue that is also being decided in the case that is currently at hand, specifically, the inability, in accordance with the existing legal situation, to convict the leader of a criminal organization or a terrorist organization for the perpetration, solicitation or constituting an accessory to a specific crime that is committed by the members of the organization.

However, this law does not provide a response to the question that was posed by the Honorable Justice M. Cheshin in the above mentioned Additional Criminal Hearing 1294/96 in the matter of **Meshulam** (on p. 59), in which he asks: **"Would it be acceptable for the mastermind to be beneath the 'soldiers' who do his bidding?"** Even in accordance with this law, the punishment of the person who heads the crime organization is less than the punishment of those who obey him, when they have committed the crime of murder, which carries a sentence of life imprisonment. Furthermore, to the extent that we are dealing with a terrorist organization, this law is not necessary, insofar as in accordance with Section 2 of the Prevention of Terrorism Ordinance, the head of a terrorist organization can, in any event, be sentenced to 20 years imprisonment simply by virtue of the fact that he holds a management role in the organization (see subchapter 1, above).

176. That which has been set forth above pertains to most of the terrorist attacks that have been attributed to the Defendant in the indictment, as these have been set forth in Chapter 5 of Part II of this verdict. For these terrorist attacks, as was explained above, it is not possible to convict the Defendant for the crimes of being an accessory or for the solicitation of acts of murder, and not even for being a joint perpetrator. Notwithstanding, clear, persuasive evidence has been filed with respect to the involvement of the Defendant in three terrorist attacks that have been perpetrated by his men and an additional case attempting to perpetrate a terrorist attack, as follows:

[Stamp] P 7: 000456

**A.   The Murderous Terrorist Attack at the Gas Station in Givat Ze'ev**

In this terrorist attack, which occurred on January 15, 2002, Yoela Chen, of blessed memory, was murdered and the passenger who was traveling with her was injured. From the evidence that has been set forth, it emerges clearly that when they were in the mourners' tent that was set up subsequent to the assassination of Ra'ed Karmi on January 14, 2002, the Defendant ordered his close associate, Ahmed Barghouti, to perpetrate a terrorist attack in order to avenge him. Ahmed Barghouti gave a weapon to Abu Satha, who was also a close associate of the Defendant and obeyed his authority, and members of Abu Satha's cell perpetrated the murder, and immediately thereafter reported to the Defendant on the results thereof.

The Defendant confessed that this terrorist attack was performed upon his orders, and took responsibility for the perpetration thereof, while emphasizing that this was the first terrorist attack that Fatah had carried out within Israel. In this case, the Defendant is directly liable for the commission of murder, insofar as he himself had given the orders for the murder to be carried out.

Certainly, this type of order given by the Defendant to people who obey his authority consitutes solicitation to murder, even if the Defendant did not take specific interest in the venue and the manner in which the terrorist attack was to be carried out. When the Defendant gave orders to perpetrate a revenge terrorist attack, it was clear to him and to his people that the intent was to murder Israelis. However, the liability of the Defendant is not just that of a solicitor but rather that of a joint perpetrator, together with the other perpetrators, who are Ahmed Barghouti, Abu Satha and his men. The Defendant was part of the joint plan to

commit the terrorist attack, as the one who initiated the perpetration thereof. He had a high level of emotional involvement and knowledge of the fact that the crime was going to be committed in accordance with his orders. The Defendant not only caused others to commit a crime in this case and not only did he give his approval for the commission of the crime, but he also **ordered** them to commit the crime; and because of his standing as the leader and commander and on account of his relationship with Ahmed Barghouti and Abu Satha, this order can be compared to the pulling of the trigger that caused the murder of Yoela Chen, of blessed memory.

The Honorable Justice D. Beinisch was referring to this state of affairs in the above mentioned Criminal Appeal 8469/99 in the matter of Eskin: "**In special circumstances, it is possible that 'consent' to the commission of the crime can be considered to constitute participation 'in the commission of a crime while performing actions with respect to the perpetration thereof' in accordance with that which has been set forth in Section 29 of the Penal Code.**" The Honorable Justice Y. Kedmi also ruled in this manner in the above mentioned Criminal Appeal 5589/98 in the matter of Sultan, whereby giving the "green light to murder" is analogous to "**the firing of the opening shot that dispatches the athlete to embark upon his race**" and can be considered tantamount to "**an act of participation in the commission of the crime**" (see Section 163 above).

In the above mentioned Additional Criminal Hearing 1294/96 in the matter of the Meshulam, the Honorable Justice M. Cheshin stated (on p. 59): "**the evil spirit of the leader pervades the entire criminal operation, his mind wound the spring of the perpetrator of the crime before it was set in action and at the time when the crime was being committed he was 'present' among the criminals as a joint perpetrator with them.**" This also can be said of the Defendant who is before us and therefore he should be convicted for this murderous terrorist attack as a joint perpetrator in premeditated murder and not solely for solicitation.

**B. Murder of the Greek Orthodox monk Tzibouktzakis Germanos, of blessed memory, in Ma'ale Adumim**

This terrorist attack was also perpetrated the at the order and initiative of the Defendant, on June 12, 2001. The terrorist Radaida asked the Defendant for a weapon in order to perpetrate a suicide terrorist attack.

The Defendant instructed him not to perpetrate a suicide terrorist attack, but rather a terrorist shooting attack "as is customary for the Tanzim", and referred him to Muhannad in order to receive a weapon and training on how to shoot with it, with the clear knowledge that Radaida was about to carry out a shooting terrorist attack and would murder Israelis in accordance with his instructions. In fact, Radaida did so together with another terrorist, when they received two Kalashnikov rifles from Muhannad, as well as training on how to use them – all this at the order of the Defendant. In this terrorist attack, the Greek Orthodox monk Tzibouktzakis Germanos, of blessed memory, was murdered in Ma'ale Adumim, because the terrorists mistakenly thought that he was a Jew.

In this case, as well, the liability of the Defendant for the murder of the Greek Orthodox monk is that of a joint perpetrator, not merely that of solicitor. The Defendant not only convinced Radaida to perpetrate the murderous shooting terrorist attack but also instructed him how to do it, helped him to obtain a weapon and training for the purpose of the terrorist attack and ordered him to whom he should turn in order to carry out the terrorist attack. At the same time, the Defendant instructed his people to assist Radaida in the perpetration of the terrorist attack, and they in fact acted in accordance with the orders of the Defendant.

According to case law, solicitation, if it is accompanied by an act of perpetration such as planning or giving orders for perpetration – constitutes participation in the commission of the crime, and not merely solicitation. As the Honorable Presiding Justice A. Barak wrote in the above mentioned Criminal Appeal 2796/95 in the matter of **John Does**: **"the more intensive the solicitation of the solicitor and the more it involves only not only activities on the mental level but also on the factual level, the closer the solicitor moves to becoming a joint perpetrator."** (See Section 161 above). Therefore, in the same case of the minor known as "T", he was convicted as a joint perpetrator and not merely as a solicitor because he participated in the planning of the crime and was "the head and leader of them all".

In this case as well, the liability of the Defendant as the joint perpetrator is derived from his status as leader and commander, and from the instructions that he gave to Radaida and to his people with regard to the manner in which the terrorist attack should be perpetrated. The Defendant was not only an accessory to the terrorist attack and did not only solicit its perpetration by encouraging Radaida to act as he did, but rather the Defendant was

[Stamp] P 7: 000457 [continued]

part of the joint plan to carry out this terrorist attack and he in effect gave orders for the perpetration thereof. We have explained the significance of orders of this kind in subsection (A) above, and accordingly, the Defendant should also be convicted for this terrorist attack as a joint perpetrator in premeditated murder.

## C.   Murderous Terrorist Attack in the Seafood Market Restaurant in Tel Aviv

This terrorist attack was carried out on March 5, 2002, in the Seafood Market Restaurant in Tel Aviv by the terrorist Ibrahim Hasouna, who murdered Yosef Habi, of blessed memory; Elihu Dahan, of blessed memory; and Staff Sergeant Major Barakat, of blessed memory, during the attack. From the evidence that was set forth, it becomes apparent that this terrorist attack was planned and executed by close associates of the Defendant, Ahmed Barghouti, Abu Hamis and Aweis, and that Ahmed Barghouti reported to the Defendant before the terrorist attack was carried out that it was about to happen. The Defendant authorized the terrorist attack although he instructed that it not take place within Israel but rather in a settlement or at the military check point in the West Bank. Immediately after the terrorist attack was carried out, Ahmed Barghouti called the Defendant in order to report to him about it. The Defendant ordered Aweis not to take responsibility for the terrorist attack since it was carried out within Israel.

From the evidence in accordance with that which has been set forth above, the liability of the Defendant for this terrorist attack as a joint perpetrator is clear. The Defendant was a partner in planning the terrorist attack, gave orders with respect to the location of its execution and approved the perpetration thereof. The fact that the perpetrators did not follow the orders of the Defendant does not detract in any manner whatsoever from his criminal liability. As was explained above, the liability of the Defendant for this terrorist attack is not only in his capacity as a solicitor, because he also gave approval for the perpetration of the murderous terrorist attack, which is an act of participation in the commission of the crime. The Defendant was the part of the plan for the terrorist attack, and gave orders to the people who were perpetrating the terrorist attack with respect to its location, and also received a report from them immediately subsequent to the attack. The leader of a criminal group who authorizes an act of murder and gives orders for the commission thereof bears liability for murder as a joint perpetrator, not only for solicitation, in accordance with the case law that has been set forth above. Therefore, in this case, as well, the Defendant should be convicted for this terrorist attack for liability as a joint perpetrator for the premeditated murder of three people.

[Stamp] P 7: 000458

### D.    The Attempted Terrorist Attack Near the Malha Mall in Jerusalem

The day before this terrorist attack, the perpetrator of the attack, Jihad Jawara, informed the Defendant of his plan to detonate a car bomb, and the Defendant authorized the terrorist attack but ordered him not perpetrate it within Israel but rather on the West Bank. In fact, the two terrorists exploded with the car bomb near the Malha Mall in Jerusalem on their way to perpetrate the attack. In this terrorist attack, the Defendant was assisted by his close associate Ahmed Barghouti.

Here, too, the liability of the Defendant is not simply for solicitation but rather as a joint perpetrator who gave the "green light for murder" together with orders for perpetration. Since the terrorist attack failed, the Defendant is to be convicted, in this case, for the crime of attempted murder.

### Part V:    Summation

177. The Defendant declared during the stage of summations: **"I am opposed to the killing of innocent people, I am against the murder of children and women. We need**

to oppose the occupation of the territories, I am against military operations or suicides. It is not true that I am responsible for the fact that there were suicides" (on p. 24 of the session that took place on September 29, 2003). However, in actuality it has been proved beyond all doubt that the Defendant has taken part in and led murderous activities with the goal of hurting innocent people – both in the areas of Judea and Samaria and within the "Green Line" – including suicide terrorist attacks.

178. The Defendant chose not to defend himself against the serious charges that arise from the evidence that has accumulated against him, in accordance with that which has been set forth above. The claims that he has set forth during the course of the hearing and the statements of summation that he has made focus on the question of this Court's authority to hear this case and the justification for what he considers to be opposition to the Israeli occupation. We addressed these claims on the part of the Defendant in our Preliminary Decision that was handed down on January 19, 2003 – to the extent that this refers to claims that are not limited only to the political level. We have denied these claims and ruled as follows:

    a. Courts in Israel are authorized to hear "external crimes" against the security of the state, or against Israeli citizens or residents, wherever they may be perpetrated in accordance with Sections 13 (a) – (b) of the Penal Code, 5737 – 1977, although most of the crimes that are the subject of the indictment are "internal crimes" that relate to terrorist attacks that have been carried out within Israel.

    b. The Implementation of the Interim Agreement on the West Bank and the Gaza Strip Law (Jurisdictions and other Provisions) 5756 – 1996, which validates the Israeli-Palestinian interim agreement with respect to the West Bank and the Gaza Strip, as well as the Regulation 2 to the addendum to the Law for the Extension the Validity of Emergency Regulations (Judea and Samaria and the Gaza Strip – Jurisdiction Over Offenses and Legal Assistance), 5738 – 1977) do not negate the authority of an Israeli Court to hear the external crimes or the internal crimes that have been attributed to the Defendant. These items of legislation transferred to the Palestinian Authority the jurisdiction with respect to Palestinians who committed a crime within its territory, but not for crimes that have been perpetrated against citizens or residents of Israel in the territory of the State of Israel or in the areas of Judea and Samaria and the Gaza Strip.

    c. The Defendant does not have any immunity from the crimes with which he is charged in this indictment even though he was serving as a member of the Palestinian Legislative Council, for international law does not recognize immunity of this type.

d. The Defendant is not entitled to the status of "prisoner of war" in accordance with the Third Geneva Convention, and therefore there is no reason not to try him for the crimes that he has committed as an illegal combatant. A person who acts outside of the framework of legal combat and against the rules of war, who is involved in perpetrating acts of terrorism for the purpose of causing indiscriminate harm to the civilian population exposes himself to the ordinary criminal sanctions of international criminal law, and is not entitled to any of the protection that is provided under international law.

e. Opposition to the occupation, as this has been argued by the Defendant, does not constitute justification in accordance with any law for the perpetration of acts of killing that are directed at innocent civilians. Terrorist activity that violates the laws of war and does not distinguish between military targets and civilian targets is not considered to combat activity that is recognized in accordance with the principles of international law, even if the objective is the removal of the occupation – as is being argued by the Defendant.

179. **In conclusion**: In light of all the grounds that have been set forth in this verdict, we have not found any legal foundation for the conviction of the Defendant for the perpetration of the entire list of terrorist attacks that are the subject of this indictment, and the law requires us to convict him for the general crimes with which he has been charged in the indictment, and crimes of murder and attempted murder that pertain to four of the terrorist attacks that appear in the indictment (No. 3,

[Stamp] P 7: 000459 [continued]

No. 7, No. 12 and No. 36 in the Appendix to the indictment).

On the basis of the set of evidence and in light of the legal analysis that appears above, we [hereby] convict the Defendant of the following crimes:

a. **Premeditated murder in accordance with Section 300 (a) (2) of the Penal Code, 5737 – 1977 (for three cases in which five people were murdered);**

b. **Attempted murder in accordance with Section 305 (1) of the Penal Code, 5737 – 1977;**

c. **Activity in a terrorist organization in accordance with Section 2 of the Prevention of Terrorism Ordinance, 5708 – 1948;**

d. **Membership in a terrorist organization in accordance with Section 3 of the Prevention of Terrorism Ordinance, 5708 – 1948;**

e. Crime of **conspiracy to commit a crime in accordance with Section 499 of the Penal Code, 5737 – 1977** was also proved with regard to four terrorist attacks for which the Defendant was convicted and is subsumed within the principal crimes of premeditated murder and attempted murder.

**Handed down and announced on this day, 29 Iyar 5764 (May 20, 2004) in the presence of Counsel for the Prosecution, the Public Defender and the Defendant.**

| | | |
|---|---|---|
| **Sarah Sirota, Vice President Presiding Judge** | **Avraham Tal, Judge** | **Dr. Amiram Benyamini, Judge** |

[Stamp] P 7: 000460

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

MARK I. SOKOLOW, *et al.*,

Plaintiffs,

vs.

THE PALESTINE LIBERATION
ORGANIZATION, *et al.*,

Defendants.

No. 04 Civ. 00397 (GBD) (RLE)

## DECLARATION OF RINA NE'EMAN

Rina Ne'eman hereby certifies as follows:

1.    The attached translation from Hebrew to English is an accurate representation of the
document received by Rina Ne'eman Hebrew Language Services, to the best of my
knowledge and belief. The document is designated as P7 371-460.

2.    I am a professional translator with a B.A. in International Relations from the Hebrew
University of Jerusalem (Israel) and 30 years of translation experience. I am fluent in
Hebrew and English, and I am qualified to translate accurately from Hebrew to English.

3.    To the best of my knowledge and belief, the accompanying text is a true, full and
accurate translation of the Hebrew-language document designated bearing the bates
number P7 371-460.

Dated: March __6__, 2014

Rina Ne'eman

ss.: New Jersey

On the $\underline{6}$ day of March, 2014 before me, the undersigned, personally appeared Rina Ne'eman, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is signed to this Declaration and acknowledged to me that he executed the same in his capacity, and that by his signature on this Declaration, the individual executed the Declaration.

Sworn to me this
$\underline{6}$ day of March, 2014

Notary Public

**LEONOR TROYANO**
ID # 2365580
NOTARY PUBLIC OF NEW JERSEY
Commission Expires 7/9/2014