ℓ

בתי המשפט

| | בבית המשפט המחוזי בתל-אביב-יפו |
|---|---|
| תפ״ח 1158/02 | |

<u>בפני הרכב:</u>

כב׳ השופטת שרה סירוטה, ס.נ.- אב״ד
כב׳ השופט אברהם טל
כב׳ השופט ד״ר עמירם בנימיני

מדינת ישראל      <u>המאשימה</u>
המחלקה לעניינים פליליים, בטחוניים
ועניינים מיוחדים בפרקליטות המדינה
ע״י ב״כ עוה״ד ד. חן, ר. חזן, א. בר-
נתן

- נ ג ד -

מרואן בן חטיב ברגותי      <u>הנאשם</u>
יליד 1959, ת.ז. 959251745
מרמאללה (במעצר מיום 15.4.02)
ע״י הסניגוריה הציבורית

# <u>הכרעת – דין</u>

P 7: 000371

# תוכן – עניינים

חלק ראשון: מבוא ............................................. עמי 2

חלק שני: מסכת הראיות ........................................ עמי 6

א. **הפת"ח התנזים וגדודי חללי אלאקצא כאירגוני טרור** .......... עמי 6

ב. **מעמדו של הנאשם ותפקידו בארגוני הטרור, ותמיכתו בפיגועים**
**כנגד ישראל** ............................................. עמי 8

ג. **עדויותיהם של פעילי הטרור מהפת"ח בדבר קשריהם עם הנאשם**
מעורבותו בפיגועים שביצעו והתייחסות הנאשם בחקירתו לעדויות אלו .. עמי 16

(1) נאצר עויס ............................................... עמי 16
(2) נאצר נאגיי אבו חמיד .................................... עמי 20
(3) אחמד ברגותי ............................................ עמי 22
(4) מוחמד מצלח (אבו סטחה) .................................. עמי 27
(5) גימאל אחויל ............................................. עמי 27
(6) נאצר א-שויש ............................................. עמי 28
(7) עלי עיאדיה .............................................. עמי 30
(8) איסמעיל רדאידה, מוהנד אבו חלאות וכמאל אבו וער ........... עמי 30
(9) נאסר (חלום) נאגיי אבו חמיד .............................. עמי 34
(10) זיאד חמודה ............................................. עמי 34
(11) ריאד עמור .............................................. עמי 35
(12) נאצר חאני .............................................. עמי 35
(13) תחריר ברגותי ........................................... עמי 36
(14) אחמד מוצפר ............................................. עמי 37
(15) שריף נאגיי ............................................. עמי 37
(16) אמיר אבו רדאחה ......................................... עמי 38
(17) אשרף ג'אבר ............................................. עמי 39

ד. **דברי הנאשם בחקירתו וראיות נוספות בדבר תפקידו ומעורבותו בפיגועים**
**נגד ישראל** ............................................. עמי 40

(1) אחריותו של הנאשם לפעילות חוליות הטרור ומידת
שליטתו בהן ............................................. עמי 40
(2) מעורבותו האישית של הנאשם בפיגועי הטרור שבוצעו
חוליות שתחת פיקודו ...................................... עמי 44
(אא) הפיגוע בתחנת הדלק בגבעת זאב ......................... עמי 47
(בב) רצח חנניר חיוווי במעלה אדומים ........................ עמי 48
(גג) הפיגוע במסעדת "סי פוד מרקטי" בתל-אביב ................ עמי 48
(דד) ניסיון לפיגוע ליד קניון מלחה בירושלים ................ עמי 49
(3) אספקת כספים ואמלי"ח לשם ביצוע פיגועי טרור .............. עמי 49
(4) סיוע למבוקשים ולמשפחות העצורים והתחללים ................ עמי 51
(5) גיוס פעילים לארגוני הטרור והדרכתם ...................... עמי 52
(6) קריאותיו הפומביות של הנאשם לבצע פיגועים כנגד ישראל ...... עמי 53

**ה.** **הקשר של הנאשם לפיגועים נשוא כתב האישום** עמי 56

(1) רצח טלה ובנימין כהנא זייל ליד עפרה........................... עמי 56
(2) רצח עקיבא פשקיס זייל באזור התעשיה בעטרות...................... עמי 57
(3) רצח הנזיר היווני ציפוקטקיס גרמנס זייל במעלה אדומים........... עמי 59
(4) רצח יניב ושרון בן שלום זייל ודורון יוסף סווירי זייל בכביש 443 ..עמי 59
(5) רצח מאיר וייצבויץ זייל בכביש מסי 9 בירושלים.................... עמי 61
(6) רצח אליהו כהן זייל בפיגוע ירי בכביש 443 ליד גבעת זאב.......... עמי 62
(7)  רצח יואלה חן זייל ליד תחנת דלק גבעונים בכביש 443............. עמי 63
(8)  רצח 6 אנשים באולם השמחות ייארמון דודיי בחדרה................. עמי 64
(9)  רצח שתי נשים בפיגוע ירי ברחוב יפו פינת לונץ בירושלים........ עמי 66
(10) פיגוע ירי בשכונת נוה-יעקב בירושלים בו נהרגה השוטרת גלית
     ארביב זייל.......................................................... עמי 66
(11) רצח גד רניאן זייל במפעל בשקבין בעטרות........................... עמי 69
(12) הפיגוע במסעדת ייסי פוד מרקטיי בתל אביב.......................... עמי 70
(13) פיגוע ירי במלון ייגירמיי בנתניה.................................. עמי 72
(14) רצח קונסטנטין דנילוב זייל בבאקה אלעירביה...................... עמי 73
(15) פיגוע ירי בין עטרות לביר-זית.................................... עמי 74
(16) ניסיון פיגוע בפאב ייביאנקיניי בירושלים........................ עמי 75
(17) פיגוע ירי בכביש 9 ליד הגבעה הצרפתית בירושלים.................. עמי 77
(18) ניסיון לפיגוע התאבדות בבית תינוקא בירושלים..................... עמי 78
(19) פיגוע ירי בכביש בית אל- פסגות.................................. עמי 78
(20) ניסיון פיגוע בקניון מלחה בירושלים.............................. עמי 79

**חלק שלישי: הערכת הראיות ומשקלן** עמי 81

**חלק רביעי: ניתוח משפטי ומסקנות**
**1. פעילות וחברות בארגון טרוריסטי** עמי 92
עמי 92

**2. אחריותם של מבצע בצוותא, משדל ומסייע והאבחנה ביניהם** עמי 94
א. מבצע בצוותא לעומת מסייע............................................ עמי 96
ב. עבירת הסיוע.......................................................... עמי 104
ג. עבירת השידול והאבחנה בין מבצע בצוותא למשדל........................ עמי 112
ד. אחריותו של מנהיג חבורה עבריינית כמבצע בצוותא או כמשדל... עמי 117

**3. מסקנות בעניין אחריותו של הנאשם כמבצע בצוותא, משדל ומסייע** עמי 123
א. פיגוע הרצ אה בתחנת הדלק בגבעת זאב................................. עמי 135
ב. רצח הנזיר היווני ציפוקטקיס גרמנס זייל במעלה אדומים........... עמי 136
ג. פיגוע הרצ אה במסעדת ייסי פוד מרקטיי בתל אביב...................... עמי 138
ד. ניסיון פיגוע ליד קניון מלחה בירושלים............................. עמי 139

**חלק חמישי: סיכום** עמי 139

# הכרעת – דין

**חלק ראשון:** **מבוא**

1.    בתאריך 14.8.2002 הוגש נגד הנאשם כתב-אישום, המייחס לו מספר עבירות של **רצח בכוונה תחילה** לפי סעיף 300(א)(2) לחוק העונשין, התשל״ז-1977 **(להלן: ״חוק העונשין״)** ; **סיוע לרצח** לפי סעיף 300(א)(2) ביחד עם סעיף 31 לחוק העונשין ; **שידול לרצח** לפי סעיף 300(א)(2) יחד עם סעיף 30 לחוק העונשין ; **ניסיון לרצח** לפי סעיף 305(1) לחוק העונשין ; **קשירת קשר לביצוע פשע** לפי סעיף 499 לחוק העונשין ; **פעילות וחברות באירגון טרור** לפי סעיפים 2 ו-3 לפקודת מניעת טרור, התש״ח-1948.

2.    כתב-האישום מייחס לנאשם שותפות, אירגון וביצוע של פעולות-טרור כנד מטרות ישראליות, אשר החלו בספטמבר 2000 במסגרת אירועים המכונים ״אינתיפאדת אלאקצא״ (להלן : **״האינתיפאדה״)**. על-פי הנטען בכתב-האישום, עמד הנאשם בראש אירגוני-טרור באיזור יהודה ושומרון (איו״ש) ; אירגון ה״פתח״י (להלן : **״הפתח״חי)**, אירגון ה״תנזים״ השייך לפתח (להלן : **״התנזים״)** ואירגון ״גדודי חללי אלאקצא״, הכולל התאגנניות של פעילי טרור של התנזים שביצעו פעולות טרור כנגד מטרות ישראליות (להלן : **״גדודי חללי אלאקצא״)**. הנאשם היה זה שתיאם וקישר בין גורמי השטח הבכירים בשלושת האירגונים הנ״ל (כולם יחד יכונו להלן : **״אירגוני הטרור״)**, אשר היו אחראים לביצוען של פעולות-טרור נגד מטרות ישראליות.

כתב האישום מפרט את שמותיהם של שמונה פעילי טרור בכירים, שפעלו תחת הנהגתו של הנאשם בביצוע פעולות הטרור, והם נאסר עויס (להלן : **״עויס״)**, אחמד ברגותי, נאצר אבו חמיד (להלן : **״אבו חמידי״)**, ראא'ד כרמי (להלן : **״כרמי״)**, מחנד דירית (אבו חלאווה) (להלן : **״מחנד״)**, מחמד מצלח (אבו סטחה) (להלן : **״אבו סטחה״)**, מנצאר שריס (להלן : **״שריס״)** ומחמוד טיטי (להלן : **״טיטי״)**.

הנאשם ומפקדי השטח גייסו פעילים לאירגוני הטרור, הפעילו אותם ודאגו לספק להם אמצעי לחימה (אמל״ח) וכסף. הנאשם עסק גם בהכשרת פעילי הטרור למטרתם ובגיוס כספים לאירגוני הטרור. כמו כן שידל הנאשם ועודד את פעילי הטרור לבצע פיגועים כנגד מדינת ישראל באמצעי התקשורת, בכינוסים שונים ובאמצעות הפצת כרוזי הסתה.

כתב-האישום מייחס לנאשם ב**סעיפים 8-15** מעורבות ואחריות לבצוע 37 פיגועים ופעולות-טרור, אשר בוצעו ברובם בתחומי מדינת-ישראל על-ידי מפקדי השטח והפעילים בתקופים  דצמבר 2000 ועד אפריל 2002, ושבהם קופחו חייהם של רבים מאזרחי מדינת-ישראל וחייליה, ונפצעו רבים אחרים. חלק ממעשי הטרור מפורטים בכתב האישום, ורובם מפורטים רק בנספח לכתב האישום.

3.    **ראיות התביעה כוללות** את עדויותיהם של אנשי מערכת הביטחון, חוקרי השב״כ ואנשי המשטרה שעסקו בחקירת הנאשם ; עדויותיהם של אזרחים וגורמים אחרים שחזו עדים לפיגועים נשוא כתב האישום ; מסמכים שנתפסו על ידי צה״ל במשרדי הפת״ח ובמשרדו של הנאשם ; חוות דעת של מומחים ממערכת הביטחון בעניין פעילות ארגוני הטרור ומעמדו ותפקידו של הנאשם בהם ; עדויותיהם של פעילים בארגוני הטרור והדברים שמסרו בחקירתם בשב״כ ובמשטרה ; אמרות הנאשם שתועדו על ידי אנשי השב״כ בדו״חות כתובים, ואשר חלקם הוקלטו ותומללו ; דברים שאמר הנאשם למדובבים שהוכנסו לתאו במהלך חקירתו ולמקורבו אחמד ברגותי שנעצר עמו ; דברי הנאשם בכלי התקשורת לפני מעצרו, והודעות הנאשם במשטרה.

תמלילי חקירתו של הנאשם בשב״כ הוגשו על ידי חוקרי השב״כ שניהלו את החקירה שהוקלטה וזיהו את קולו של הנאשם בה (״מופזי״ בעמי 58, ״נדב״ בעמי 79, ״סמית״ בעמ' 86-85 ו״דני״ בעמי 90). שיחתו של הנאשם עם אחמד ברגותי הוגשה על ידי החוקר ״רוברט״ (עמי 65). הקלטות מחקירת הנאשם ומחקירת המדובבים פלוני 1 ופלוני 3 תומללו על ידי נתן בסו (עמי 174).

חוקרי השב״כ שהעידו אישרו את נכונות הכתוב בזכ״דים שרשמו במהלך חקירתו של הנאשם (זכ״דים ת/6 - ת/96). מדובר בדו״חות שנרשמו בעברית לגבי חקירה שהתנהלה בעברית ובערבית

(הנאשם דובר עברית טובה), בהם נרשמו עיקרי הדברים שנאמרו על ידי הנאשם (ראה החוקר "סטיבי" בעמי 53, החוקר "אמילי" בעמי 55 והחוקר "רון" בעמי 60).

**4.**    אשר להודעות הנאשם במשטרה, הרי שהנאשם הודיע בכל תקירותיו במשטרה - בניגוד
לדרך בה נהג בעת תקירותיו בשב"כ - כי הוא כופר בזכותה של המשטרה לחקור אותו, ולכן סירב
לענות על שאלות החוקרים (ראה הודעות ת/99-ת/109). לפיכך, הודעותיו של הנאשם כוללות
שאלות רבות שהובאו לו על ידי החוקרים, וסירובו להשיב עליהן. במקרים בודדים ביותר התייחס
הנאשם בקצרה לדברים שאמר לו החוקר, ובהזדמנויות אלו הכחיש לחלוטין את כל הטענות
שהוצגו לו - גם אלה בהם הודה בחקירתו בשב"כ. הנאשם הכחיש כי היה מנהיגם של גדודי חללי
אלאקצא והתנגזים (הודעה ת/101 עמי 6, הודעה ת/105 עמי 2, הודעה ת/106 עמי 3); הכחיש כי
הכיר את פעילי הטרור שהעידו כי היו בקשר עמו (כפי שיפורט להלן), ואפילו הכחיש כי הכיר את
ראיד כרמי (ת/104 עמי 8). כל אלו הוכחו, כפי שיבואר להלן, לא רק מפי פעילי השטח, אלא גם מפי
הנאשם עצמו,    מהמסמכים שנתפסו במשרדו, אשר הנאשם הכחיש בחקירתו כל קשר אליהם,
וטען כי כתב ידו לא מופיע עליהם (ראה הודעות ת/108-ת/109).

הודעותיו של הנאשם הוגשו על ידי החוקרים דוד זריחן ורפי נוריאל (עמי 113, 38), אשר הסבירו כי
הנאשם סירב לחתום על האזהרה ועל ההודעה, וכי הוא נחקר בעברית. זריחן אף העיד כי הנאשם
סירב למסור טביעת אצבע ולהצטלם. הנאשם אמר באופן כללי בהודעתו ת/106 כי כל ההאשמות
כנגדו אינן נכונות, וכי הוא חף מכל אשמה.

**5.**    בפתח משפטו העלה הנאשם טענות מקדמיות הנוגעות לסמכות בית משפט זה לשפוט אותו,
ואלה נדחו בהחלטת בית המשפט מיום 19.01.03 (עמי 34-1 לפרוטוקול). הנאשם בחר שלא
להסתייע בשירותי סניגור, ואף דחה נמרצות ובעקביות כל ניסיון של בית המשפט לשכנעו להיעזר
בסניגוריה הציבורית או בסניגור מטעמו.
בית המשפט הטיל אמנם על הסניגוריה הציבורית לייצג את הנאשם, חרף בקשותיה החוזרות
ונשנות להשתחרר מייצוגו, ולמעשה היא מיצגת את הנאשם גם כיום ונכחה בכל הדיונים. ואולם
הסניגוריה הציבורית בחרה להיעתר לבקשת הנאשם שלא להעלאת טענות כלשהן מטעמו במהלך
המשפט, לרבות טענות משפטיות, ואף לא לחקור את העדים.

כך התנהל ההליך על פי בחירתו של הנאשם, אשר ממשיך לכפור בסמכות בית המשפט לשפוט
אותו. בנסיבות אלו בחר הנאשם גם שלא להגיב על כתב האישום. כמו כן נמנע הנאשם מלהעיד
בעצמו או להביא עדים מטעמו. עם זאת, הנאשם הגיב מידי פעם על דברי העדים או על טענות
שטענה ב"כ המאשימה במהלך הדיון, ודבריו נרשמו בפרוטוקול כלשונם. בנוסף הגיב הנאשם על
סיכומי חתביעה בעל פה (שהוגשו גם בכתב), בנאום סניגוריה שנשא במסגרת הסיכומים בעל פה,
ואשר לא התייחס לגופן של ההאשמות שהועלו כנגדו. למותר לציין כי הנאשם קיבל בעצמו,
ובאמצעות הסניגוריה הציבורית, את כל חומר הראיות, הפרוטוקולים והסיכומים.

**6.**    העבירות נשוא כתב האישום הן ברובן "עבירות פניס" הנוגעות לפיגועים שבוצעו בישראל,
וחלקן "עבירות חוץ", שבוצעו בתחומי האיזור (קרי: יהודה ושומרון). ואולם, כפי שהבהרנו
בהחלטה שניתנה בנוגע לטענותיו המקדמיות של הנאשם, מוסמך בית משפט בישראל לדון בעבירות
חוץ כנגד בטחון חמדינה, או נגד אזרח או תושב ישראלי, יהא מקום ביצוע העבירה אשר יהא (סעיף
13(א)-(ב) לחוק העונשין, תשל"ז-1977). זו היא אותה "תחולה פרוטקטיבית", אשר נועדה להגן על
אזרחים ותושבים ישראליים כנגד פעולות טרור הנעשות בחסותן ובגיבוין של מדינות אחרות (ש"ז
פלר, מ. קרמניצר, **יהגובה לחיצור בגנות התחולה הנצינונלית של דיני העונשין'**, פלילים ה I (1996)
65, בעמ' 83, והשווה דעתו של י. שחר, שם בעמ' 5). עוד פסקנו בהחלטה שניתנה בטענותיו
המקדמיות של הנאשם, כי לא נראה שהתנאים הקבועים בסעיף 14(ב) לחוק העונשין רלבנטיים
למקרה זה, אם הם חלים כלל על הסמכות הפרוטקטיבית שבסעיף 13 לחוק (להבדיל מהסמכות

הפרסונלית שבסעיף 14), שכן הרשות הפלסטינאית איננה מדינה. העבירות המיוחסות לנאשם
בכתב האישום הן עבירות כנגד בטחון המדינה, כנגד אזרחיה ותושביה, ועל כן הן נופלות במסגרת
סעיף 13 לחוק העונשין, ובית משפט זה מוסמך לדון בהן.

## חלק שני :   מסכת הראיות

### א.    הפת"ח, התנזים וגדודי חללי אלאקצא כאירגוני טרור

7.    ראש חטיבת המחקר באגף המודיעין של צה"ל, תא"ל י. קופרווסר, הגיש במהלך עדותו
(עמ' 38) חוות דעת בה התייחס לפעילותם של חפת"ח, התנזים וגדודי חללי אלאקצא (ת/1). אל
חוות הדעת צורפו מסמכי שלל שנתפסו על ידי צה"ל במבצע "חומת מגן" הנוגעים לעניין זה.
**הפת"ח** (ראשי תיבות במהופך בערבית של "התנועה לשחרור פלסטין") דגל מאז יסודו על ידי יאסר
ערפאת בשנת 1959 במאבק מזוין כנגד ישראל, אשר התבטא בביצוע פיגועי טרור נגד יעדים
ישראליים בארץ ובחו"ל. לאחר חתימת הסכמי אוסלו נדחק עיקרון "המאבק המזוין" למקום
משני, אך נותר כאופציה להשגת מטרות הארגון במקרה שהמו"מ עם ישראל לא יצלח. עם פרוץ
האינתיפאדה השניה בחודש ספטמבר 2000, הוביל הפת"ח את פיגועי הטרור בשטחים, וזאת
באמצעות שתי ועדות עליונות המנהלות את הפעילות - האחת באזור יהודה ושומרון, והשניה
באזור רצועת עזה. בראש הועדה העליונה של אזור יהודה ושומרון עמד הנאשם עד ליום מעצרו
(סעיפים 1-3 לחוו"ד).

הדרג המבצעי של הפת"ח כלל את פעילי השטח של התנועה - **התנזים** (ארגון - בערבית). פעילי
התנזים מהווים את חוד החנית בפעילות החבלנית של הפת"ח כנגד ישראל. גדודי חללי אלאקצא
הוא שם כיסוי להתארגנויות טרור של הפת"ח, אשר נוטלות אחריות פומבית למעשי הטרור. אנשי
"ההגדודים" הם למעשה פעיליהם של הפת"ח, כאשר מרבית ההתארגנויות רואות בנאשם מקור
סמכות מרכזי לפעילותן (סעיפים 4-5 לחוו"ד).

התנזים וגדודי חללי אלאקצא מהווים, על פי חוות דעתו של תא"ל קופרווסר, את הזרוע הצבאית
הבלתי ממוסדת של הפת"ח, שבראשה עמד הנאשם. מסמך שלל המצורף כנספח ט' לחוו"ד של
תא"ל קופרווסר הוא מכתב החתום בידי הפת"ח וגדודי חללי אלאקצא גם יחד.
מסמכי שלל אחרים שצורפו לחוות הדעת מראים כי גדודי חללי אלאקצא פונים בבקשה לסיוע
כספי מיאסר ערפאת (מסמך 2), וכי הפת"ח וגדודי חללי אלאקצא חתומים על כרוזים המשבחים
פעילות טרור שבוצעה בתחומי ישראל (מסמכים 3, 5). במסמך 6 שצורף לחוו"ד, ואשר נשלח ביום
8.5.01 מאת גדודי חללי אלאקצא אל הנאשם, מופיע פירוט פעילותם של גדודי חללי אלאקצא
במחוז ג'נין (כולל פיגוע באום אלפאחם), ובקשה לסיוע באמצעי לחימה וכסף לשם המשך הביצוע
של פעילות זו. מסמכים אחרים של גדודי חללי אלאקצא שהופנו ליאסר ערפאת, כוללים בקשות
לסיוע למבוקשים הנרדפים על ידי ישראל ולמשפחות החללים (נספח ב' ומסמכים 2-4 לנספח זה).
חלק מן המסמכים נכתבו על ידי הנאשם. יצוין כי כינויו של הנאשם היה, על שם בנו הבכור, **"אבו
אלקסאם"** (הודעת הנאשם ת/107 עמי 1, והדרך בה פנה אחיו"ל אל הנאשם בעמי 164).

8.    על פי חוות דעתו של תא"ל קופרווסר ביצעו אנשי הפת"ח למעלה מ- 1,200 פיגועים כנגד
ישראל (נכון ליום 18.8.02), בהם נהרגו 176 ישראלים ונפצעו רבים אחרים. פיגועים אלו כוללים
התאבדות, נירי ממרגמות ונשק קל. במהלך האינתיפאדה עברו התארגנויות הטרור של הפת"ח
יותר ויותר לביצוע פיגועי התאבדות בתחומי ישראל (סעיף 5 לחוו"ד). בחודשים שקדמו למבצע
"חומת מגן" ביצעו גדודי חללי אלאקצא פיגועי התאבדות בחדרה, ירושלים, תל אביב, מחולה,
מתנה 80, מחסום מכבים, נתניה, אשדוד, כפר סבא ואפרת, ובעקבות כך הוכנסו לרשימה
האמריקאית של ארגוני הטרור ביום 27.3.02 (סעיף 10 לחוו"ד ונספח ג' המפרט את פיגועי
ההתאבדות שבוצעו על ידי תנועת הפת"ח).

9. לגבי חוות הדעת של תא"ל קופרווסר יש לומר, כי מבחינת דיני הראיות איננו רשאים
להסתמך על הערכות ומסקנות מודיעיניות אשר מבוססות על מקורות מידע שונים שלא הובאו בפני
בית המשפט, בהיותם עדות שמיעה. נוכל לסמוך על חוו"ד זו רק במידה שהיא תואמת ראיות
קבילות אחרות שהובאו בפנינו. אולם, פעילות הטרור בחסות הפת"ח של שלושת הארגונים הנ"ל
עולה בבירור מראיות ישירות רבות שהובאו במשפט, כולל הודאות שמסרו בחקירותיהם הנאשם
ופעילי הטרור, כפי שיפורט בהמשך הכרעת הדין.

נאצר אבו חמיד, שהיה אחד ממפקדי השטח הבכירים ביהודה ושומרון, סיפר בהודעתו במשטרה
(ת/149(א), בעמ' 3-2, 8-7, 17-13), על הקמת גדודי חללי אלאקצא ביום 1.1.01, על מנת שיהוו
מיליציה של הפת"ח, ויבצעו פיגועים כנגד מתנחלים וחיילי צה"ל. הוא מפרט בהודעתו הנ"ל (וכן
בהודעתו ת/149 (ג)) את הפניונעים שבוצעו על ידו וע"י אנשיו כנגד מטרות אזרחיות וצבאיות של
ישראל, תחת הנהגתו ובסיועו של הנאשם (כפי שיפורט בהמשך).

10. גם מדברים שאמר הנאשם בחקירתו, וממסמכים שנכתבו בכתב ידו, ניתן ללמוד על
פעילותם של ארגוני הטרור הנ"ל. הנאשם הסביר את דרך פעולתן של החוליות המכונות "גדודי
חללי אלאקצא", שלדבריו ביצעו "פעילות צבאית" (ת/19 סעיף 14, שחוגש ואושר על ידי החוקר
"מופתי" בעמ' 58). כך גם הסביר הנאשם בחקירתו את הדרך שבה נוצרו גדודי חללי אלאקצא באזור
יהודה ושומרון, ופעלו בצורה מפוזרת, וטען כי הפת"ח לא פיקח על פעילותם; אך הוא הודה כי
חוליות אלו פנו אליו לקבלת כסף, משום שראו בו "אחראי של פת"ח בגדה המערבית" (תמליל ת/
98 (ה) עמ' 61-60). כפי שיבואר בהמשך, הפנו פעילי הטרור מגדודי חללי אלאקצא את בקשותיהם
לסיוע כספי לשם רכישת נשק וביצוע פיגועים אל הנאשם, והלה היה פונה בשמם ועבורם אל יו"ר
הרשות הפלסטינאית ומנהיג הפת"ח, יאסר ערפאת. מכאן ברור הקשר של גדודי חללי אלאקצא
לארגון הפת"ח, והקשר של הנאשם לגדודים אלו.

## ב.    מעמדו של הנאשם ותפקידו בארגוני הטרור, ותמיכתו בפיגועים כנגד ישראל

11. תא"ל קופרווסר הגיש בעדותו חוו"ד נוספת, המתייחסת למעורבותו של הנאשם בטרור (ת/
2). לחוו"ד זו צורפה שורה של נספחים הכוללים ראיונות עם הנאשם באמצעי תקשורת השונים
ומסמכים שכתב הנאשם או שנמצאו במשרדו. גם חוות דעת זו כפופה להערה שפורטה בסעיף 9
לעיל, בנוגע לקבילותן של הערכות מודיעיניות הנסמכות על מקורות מידע שלא פורטו ולא הובאו
בפנינו, ולכן גם בנושא זה נזקק לראיות עצמאיות וקבילות שהובאו במשפט.

12. בחוות הדעת של תא"ל קופרווסר ת/2 נאמר כי הנאשם היה עד למעצרו ראש העודה
העליונה של הפת"ח ביהודה ושומרון, ולפיכך שימש כמנהיג הפת"ח בגדה. זאת ניתן ללמוד מן
המסמכים השונים שכתב הנאשם ושנכתבו אליו, ואשר צורפו לחוות הדעת ת/1 ות/2. בתפקידו
הנ"ל היוו הנאשם מקור סמכות מרכזי לבכירי הפת"ח, וצינור מקשר בין ראש הרשות
הפלסטינאית, יאסר ערפאת, לבכן דרגי השטח בתנועה (סעיפים 2-1).

עוד נאמר בחוות הדעת הנ"ל (סעיף 4), כי עם פרוץ האינתיפאדה בחודש ספטמבר 2000, תפס
הנאשם חלק מרכזי ביותר בהובלת הטרור נגד ישראל על ידי גורמי פתח ובכלל. מעורבותו באה
לידי ביטוי בדרכים שונות: **ראשית,** הנאשם היווה מקור השראה והתמנה את מדיניות הפיגועים,
באמצעות פגישות אישיות עם פעילי הטרור של תנועת הפת"ח והתבטאויות פומביות. **שנית,**
הנאשם היה מקור סמכות ומימון לפעילי הטרור של תנועת הפת"ח: הוא נתפס בעיני גדודי חללי
אלאקצא כמנהיג המרכזי בפעילותם, שימש כצינור קשר בינם לבין יו"ר הרשות הפלסטינאית
והעביר לרשותם סכומי כסף המתכמכים בעשרות אלפי שקלים לצורך פעילות הטרור. **שלישית,**
הנאשם העביר הנחיות ישירות לפעילי הטרור - הן במישור האסטרטגי, והן במישור הטקטי הנוגע
לפיגועים נקודתיים.

13. הנאשם לא הסתיר בחקירתו בשב"כ את עמדתו הברורה, לפיה תנועת הפתח"ח חייבת
לחובל את "המאבק המזוין נגד ישראלי", וכי זו הדרך היחידה להשגת מטרות העם הפלסטיני
לאחר כשלון תהליך השלום, ולאחר שהנאשם עצמו היה פעיל שלום במשך שנים רבות (זכ"ד ת/59
סי 5-2, שהובא ואושר על ידי החוקר "ואדי" בעמי 96). הוא הבהיר כי כאשר הוא משתמש בביטוי
"מאבק מזוין", הוא מתכוון לפיגועים (תמליל חקירה ת/98יא עמי 2-3). הנאשם הסביר כי מנהיגי
הפתח"ח חששו מהיחלשות כוחם ברתוב הפלסטיני למול התנועות האיסלאמיות, דבר שדרבן אותם
לנקוט קו של פיגועים נגד ישראל (זכ"ד ת/21 סעיף 5, שהובא ואושר על ידי החוקר "רוברטי" בעמי
63 (בטענת נרשם בפרוטוקול

ת/41); זכ"ד ת/23 סי 5, שהובא ואושר על ידי החוקר "דני" בעמי 90; זכ"ד ת/27 סי 12-10 וזכ"ד
ת/55 סי 3 שהובאו ואושרו על ידי החוקר "סמיתי" בעמי 85; זכ"ד ת/30 סי 12-8 וזכ"ד ת/58 סי 5
שהובאו ואושרו על ידי החוקר "אמילי" בעמי 54; זכ"ד ת/40 סי 15 שהובא ואושר על ידי החוקר
"מופז" בעמי 58; זכ"ד ת/70 סי 3 שהובא ואושר על ידי החוקר "סטיבי" בעמי 53).

הנאשם אמר בחקירתו כי "עמדתו המוצהרת היגה מאבק מזוין מול הכיבוש הישראלי, ומי שיש
לו נשק שיבצע פיגועים זה הקו הכללי" (ת/23 סי 5, וכן ראה זכ"ד ת/6 סי 12-11, שהובא ואושר
על ידי החוקר "רוברטי" בעמי 62). הוא הסביר כי לפי השיפטתי פיגועים שיכאיבו לישראל יקדמו
את השלום, ויגרמו לישראלים להבין שיש להם מה להפסיד (ת/40 סעיף 15, ות/70 סעיף 4).
הנאשם הבהיר כי מבחינתו אזרחים ישראליים החיים בהתנחלויות הם אויב שיש לפגוע בו (זכ"ד
ת/63 סי 16, שהובא ואושר על ידי החוקר "נאור" בעמי 82). הוא אף אמר כי פיגועים כנגד מתנחלי
יהודה ושומרון הם לגיטימיים, גם כאשר מדובר בנשים וילדים (זכ"ד ת/6 סי 13, שהובא ואושר ע"י
החוקר "רוברטי" בעמוד 62, זכ"ד ת/77 סי 2 שהובא ואושר על ידי החוקרים "צדוקי" ו"אופירי"
בעמי 83, 87).

הנאשם חזר והדגיש במהלך חקירתו כי בויכוח שהתנהל בתוך הרשות והפתח"ח והפגועים
כנגד ישראל - דגלו ערפאת והוא בקו הקובע כי יש לחתמקד בפיגועים כנגד צה"ל והמתנתלים, בעוד
שמנהיגים כמו אבו עלא ואבו מאזן התנגדו לכל סוג של אלימות; רק מעט מאנשי הפתח"ח תמכו
בפיגועים בתוך ישראל (ת/27 סעיפים 13-12; ת/30 סעיף 8;

ת/70 סעיף 3). חרף התנגדותם של ערפאת והנאשם לפיגועים בתוך ישראל, הם איבדו שליטה על
החוליות ופעילי השטח במהלך האינתיפאדה (זכ"ד ת/55 סי 3י, שהובא ואושר על ידי החוקר
"סמיתי" בעמי 85).

14. עמדתו של הנאשם כמפורט לעיל באה לידי ביטוי גם בדבריו בחקירה שתומללו. לגבי
עמדתו של הנאשם כי אין לבצע פיגועי התאבדות בתוך ישראל, הוא הסביר כי פגיעה בהתנחלויות
כמות כפגיעה בצבא, ולכן בענין זה לא היה ויכוח בתוך הפתח"ח; אך הוא הודה כי בתקופה
האחרונה שלפני מעצרו חחל הפתח"ח לבצע גם פיגועי התאבדות בתוך ישראל, ואף אישר כי הפתח"ח
נגרר לתוך פעילות זו כדי שלא להשאיר את חשילגוי בשטח לאירגונים האיסלאמים (ת/98 עמי
29-27). הנאשם הסביר כי הוא באופן אישי הסתייג מכל פעילות בתוך ישראל, אך תמך "במאבק
המזוין כנגד הכיבוש הישראלי", ואף עשה זאת בצורה פומבית בטלויזיה (ת/98 עמי 7, 10).

הנאשם אישר כי בחמשת החודשים האחרונים שקדמו למעצרו נטל הפתח"ח תפקיד מרכזי בהסלמת
רמת האלימות, והנהיג את המלחמה; הנאשם לא כיחד כי הוא נטל חלק בכך     (ת/98יב עמי 35,
ת/98ה עמי 4-3).

הנאשם הדגיש בחקירתו כי הוא תמך בהסכם השלום, ופעל למענו במשך 10 שנים, אך ההסכלמה
נבעה לדבריו מהעדר תקווה לתשגת פתרון פוליטיסי עם ראש הממשלה שרון (ת/98יב עמי 45-44).
הנאשם אף הביע דעתו כי הפלשתינאים טעו כאשר דחו את הצעות ישראל, ועד יותר מכך את
הצעת הנשיא קלינטון, בועידת "קמפ דיוויד", שכן לו קיבלו את החצעות הללו - חיתה להם היום
מדינה עצמאית (זכ"ד ת/95, שהובא ואושר על ידי החוקר "אופירי" בעמי 87).

15.    על גישתו של הנאשם בנושא הפיגועים, ועל תפקידו של הפת"ח בביצוע פיגועים כנגד ישראל, ניתן ללמוד גם משיחות שניהל הנאשם עם המדובבים שהוכנסו לתאו. המדובב שכונה "פלוני 1", הציג עצמו בפני הנאשם כפלשתינאי משכם, הוא מסר לחוקרי השב"כ את הדברים שאמר לו הנאשם לאחר קיום השיחות, ואלו נרשמו בזכ"דים של חוקרי השב"כ שהעידו במשפט (ירובר ט" בעמי 154, "מיקי" בעמי 155, "אופיר" בעמי 156 ו"ימופז" בעמי 157), וכן העיד פלוני 1 עצמו (עמי 107-101). פלוני 1 העיד כי הוא קרא את כל הדו"חות שרשמו אנשי השב"כ על שיחותיו עם הנאשם, ואישר את תוכנם (עמוד 105). בדרך דומה פעל והפעיל המדובב פלוני 3, שזיהה את קולו של הנאשם בקלטת ת/124ב (ראה עדותו בעמי 110-107, ומוצגים ת/122,ת/125).

על פי עדותו של פלוני 1, סיפר לו הנאשם שהוא היה זה שהקים את גדודי חללי אלאקצא והיה אחראי עליהם (עמי 106). בזכ"ד שנרשם מפיו (ת/117 שהוגש ואושר על ידי החוקר "ירוברט" בעמי 154), אמר פלוני 1 כי הנאשם אמר לו שהאינתיפאדה למעשה היתה מתוכננת לאור המצב המדיני, הרחבת ההתנחלויות והמשך חכיבוש והלחץ על הפלסטינאים בשטחים, וכי גיקו ל ארי אל שרון בחר הבית היה רק "יתקע ששבר את גב הגמלי", והציות את האינתיפאדה שהיתה צפויה ממילא (ראה גם זכ"ד 25/ת סי 18, שהוגש ואושר על ידי החוקר "מופז" בעמי 58).

לאחר האירוע בחר הבית, ביקשו מנגנוני הביטחון של הפת"ח מערכאת להורות על הפסקת האינתיפאדה, וערפאת לא הגיב. הנאשם עצמו סיפר כי עזב בועם את הישיבה לאור בקשת המ מגננים, וכי הוא שנוא עליהם משום ש"ימשך את העם לה סלמת המצבי". הנאשם אמר לפלוני 1 כי מטרת האינתיפאדה היי תה פגיעה בחיילים ובמתנחלים כדי לגרום לעוינבתם, ובדי להוכיח לעולם שהפלסטינאים נלחמים בכיבוש. ואולם לאחר שישראל החלה במדיניות החיסולים, ובעיקר לאחר שפגעה בראיד כרמי, עבר הפת"ח לפעול בתוך ישראל במטרה לפגוע באזרחים, על מנת לפגוע בכלכלת ישראל ובתי יירות, ולהפעיל לחץ על הרחוב הישראל שילחץ על הממשלה לסגת מהשטחים (שם, סי 12-13, 17, 21-20). כמו כן אמר הנאשם לפלוני 1 כי מבחינתו הפיגועים מהווים הגנה עצמית של הפלסטינ ים, אשר מוכנים לחתשיט יד לשלום, וכי פיגועי ההתאבדות נובעים מן הכיבוש ומן המצבכ של הפלסטינאים בשטחים (זכ"ד ת/110 סי 22, 27).

עמדתו של הנאשם התומכת בהמשך האינתיפאדה באה לידי ביטוי גם במכתב ששלח ליאסר ערפאת ביום 31.12.00 (ת/5 (ת/42אן)).

16.    באשר למדיניות הפיגועים של הפת"ח, הסביר הנאשם בחקירתו כי כאשר ערפאת היה מעונין בהפסקת אש, הוא היה דואג להעביר הנחיה זו לגורמים רבים, ובהם הנאשם; אך כאשר היה מעונין בהמשך הפעולות הוא דאג שהפעילים, כולל הנאשם, יבינו זאת מהתובות, ובעיקר אי-התנובות שלו. הנאשם אמר : **"אם הוא** (ערפאת) **למשל, לא רוצה בהפסקת אש הוא מסתדר אחרת. לא אומר שום דבר"** (זכ"ד ת/24 סי 3ב, שהוגש ואושר על ידי החוקר "סמית" בעמי 85, ותמליל חקירתו של הנאשם ת/98פט עמי 33-32). הנאשם אמר שערפאת מעולם לא הורה לו בצורה מפורשת לבצע פיגועים. אך הוא הוסיף כי מהעובדה שערפאת התנגד לביצוע פיגועים בתוך ישראל בלבד, ניתן היה לחבין שחוא תומך בפיגועים בשטחים, ולכן גם לא הורה להפסיקם; ערפאת אמר בתקשורת כמה פעמים כי **"מיליון שאהידים בדרכם לירושלים"**, והנאשם שאל באופן רטורי האם אין זו הצהרת התומכת בביצוע פיגועים (זכ"ד ת/60 סי 7-4 שהוגש ואושר על ידי החוקר "אמילי" בעמי   54; זכ"ד ת/61 סי 8-1, שהוגש ואושר על ידי החוקר "מיקי" בעמי 81; זכ"ד ת/62 סי 5-3 שהוגש ואושר על ידי החוקר "ידני" בעמי 90).

הנאשם הסביר כי לא היה צורך בהוראות ישירות של ערפאת לביצוע פיגועים, שכן הדברים היו מובנים מבין השורות (זכ"ד ת/63 סי 13-11 שהוגש ואושר על ידי החוקר "נאור" בעמי 82). הנאשם הוסיף כי גם האינתיפאדה לא פרצה בהוראתו של ערפאת, אך היא לא היתה ממשיכה להתקיים אלמלא תמיכתו בה, אף כי הוא לא היה צריך לתת הנחיה מפורשת לביצוע פיגועים (זכ"ד ת/64 שהוגש ואושר על ידי החוקר "ירוברטי" בעמי 62, ות/66 שהוגש ואושר על ידי החוקר "אמילי" בעמי

54). עוד ציין הנאשם כי הבין את תמיכתו של ערפאת בפיגועים גם לאור העובדה שערפאת היה
מאשר לו את הבקשות הכספיות שהגיש עבור פעילי השטח של הפת"ח שביצעו פיגועים (זכ"ד ת/70
סי' 17ח', שהוגש ואושר על ידי החוקר "סטיב" בעמ' 53). הנאשם תיאר את הקשר שלו עם ערפאת
כ"איאשי ו'שיר" (תמליל שיחה ת/98ח עמ' 55).

גם לנאשם, מסתבר, היתה דרך משלו להודיע לאנשי החוליות על הפסקת הפיגועים ועל חידושם.
הוא הסביר בחקירתו כי כאשר רצה בהפסקת אש היה מתקשר לחוליות הגדולות, אם כי קרה שהיו
אנשים שלא שמעו להוראתו ; כאשר הנאשם היה מעוניין בחידוש האש הוא היה מודיע על כך
בטלויזיה, כאשר קרא "למאבק מזויין". כאשר נשאל כיצד היה מודיע על רצונו בחידוש האש,
השיב הנאשם :

**"לא רוצה אש, אני מדבר בטלויזיה אם אני רוצה שלום, יעני אני לא מתקשר לפלוני ואומר**
**לו ואללה תבצע בשבילנו פיגוע. ואללה תעשה לנו לא יודע מה, אין אצלי כזה דבר, אני**
**דובר בשם התנועה בפועל קורא לאינתיפאדה אני קורא למאבק מזויין"** (ת/98ח עמ' 3).

חרף דברים אלו של הנאשם, הרי שמעידותו של פעיל הטרור עויש עולה שהנאשם הורה לו לחדול
מביצוע פיגועים בעת ביקורו של השליח האמריקאי אנתוני זיני באזור (ראה להלן). מן הדברים
שאמר המדובב פלוני 1 בחקירתו, בעקבות שיחתותיו עם הנאשם, עולה כי הנאשם חבע כעס רב על
כך שעויש מסר פרטים אלו בחקירתו (זכ"ד ת/113א1 סי' 9-8, זכ"ד ת/114א1 סי' 8 שהוגשו ואושרו על
ידי החוקר "רוברט" בעמ' 154). כמו כן הובאו ראיות על מקרים אחרים בהם הורה הנאשם באופן
ישיר לפעילי הטרור המקורבים אליו לבצע פיגועים כנגד ישראלים (ראה להלן).

17.    בתחילת חקירתו בשב"כ הכחיש הנאשם כי היה מנהיג התנזים וגדודי חללי אלאקצא, אך
אישר את אחריותו לפעילות הצבאית של הפת"ח (זכ"ד ת/17 סי' 6, שהוגש ואושר על ידי החוקר
"אורבלי" בעמ' 80, זכ"ד ת/43 סי' 6 שהוגש ואושר על ידי החוקר "רוברט" בעמ' 62, ותמליל חקירה
ת/98א' עמ' 43-44). הנאשם טען כי גדודי חללי אלאקצא אינם אלא חוליות מפוזרות בכל שטח
הגדה המערבית, ושאין להן מבנה מאורגן ומסודר ומפקדה מרכזית (תמליל שיחה ת/98ה' עמ' -60
61). עוד אמר הנאשם בחקירתו כי ערפאת היה, למעשה, מפקדו הישיר והממונה עליו, ואת עצמו
הגדיר כ"אחראי לכל פעילות פת"ח בגדה מעצם היותו מזכ"ל הארגון בגדה" (ת/24 סי' 3ב, 5).

הנאשם אישר כי הוא היה מנהיג "השטחי" של הפת"ח, בעוד שיאסר ערפאת עמד בראש הפת"ח
(תמליל שיחה ת/98א עמ' 67). כך הסביר הנאשם בחקירתו גם את העובדה שאנשי החוליות פנו
אליו לקבלת כסף, משום שראו בו "מפקדי", וכן "אחראי של פת"ח בגדה המערבית", בשל היותו
הדובר הפוליטי של התנועה, ומשום שנקט קו ועמדה התומכים בהמשך המאבק בכיבוש (תמליל ת/
98ה עמ' 4-3, 61, ת/98ד עמ' 33-35). הנאשם הסביר כיצד הוא נראה בעיני אנשי החוליות,
באומרו : "אני המפקד שלהם, הם חושבים אותי לטמל שלהם", ואף אישר כי אין אדם אחר
שנחשב כמנהיג שלהם (ת/98ט עמ' 7-6).

בדברים שהשמיע במהלך משפטו טען הנאשם לא פעם כי הוא היה "מנהיג פוליטי" בפת"ח,
בהדגישו את תפקידו כמזכ"ל הפת"ח בגדה, והותו חבר הפרלמנט הפלסטיני. כך גם טען בתחילת
חקירתו בשב"כ. גם בחקירתו במשטרה הכחיש הנאשם כי היה אחראי על התנזים או על גדודי
חללי אלאקצא (ת/106 עמ' 3, 6). ואולם במהלך חקירתו בשב"כ הודה הנאשם כי היה מפקד
הפת"ח בגדה ומפקד התנזים (זכ"ד ת/18 סי' 3 שהוגש ואושר על ידי החוקר "נדב" בעמ' 78), וכי
הקים את גדודי חללי אלאקצא והיה אחראי על פעילותם ; מטעם זה   התנגדו לפעילותו מנגנוני
הביטחון של הרשות (דברי פלוני 1 בזכ"ד ת/117 סי' 15, שהוגש על ידי החוקר "רוברטי" בעמ' 154).

הנאשם אמר למדובב "פלוני 3" בשיחתם, כי הוא אכן אחראי על הפת"ח ועל גדודי חללי אלאקצא,
אך הוא "לא משווע לחתום" את שמו על דף נייר בו הדברים ירשמו; כאשר המדובב אמר לנאשם כי
הוא בכל זאת אחראי למעשי המפגעים, השיב הנאשם כי הוא אמנם אחראי אך "הוא לא טיפש
לומר זאת לחוקרים" (זכ"ד ת/123 עמי 2, שהוגש על ידי החוקר "אופירי"). במפגש בין הנאשם לבין
אחמד ברגותי בעת מעצרם, כאשר הוקלטו ללא ידיעתם, סיפר הנאשם לאחמד כי אמר בחקירתו
שאין לו כל קשר לגדודי חללי אלאקצא. השניים צחקו, ואחמד יעץ לנאשם לומר כי רק לו - לאחמד
- יש קשר עם הגדודים; הנאשם השיב לו כי אמר בחקירתו שהיה מפטר את אחמד לו ידע שיש לו
קשר עם הגדודים, ואחמד צחק למשמע הדברים (תמליל שיחה ת/127ג עמי 87).

הנאשם אישר בחקירתו כי לבד מהיותו מנהיג פוליטי, הוא גם שימש כאחראי על העניינים
הצבאיים של הפת"ח (זכ"ד ת/59 סי 6 שהוגש ואושר על ידי החוקר "יואדי" בעמי 96). הנאשם
הגדיר עצמו כ**"אחראי על כל הפעילות של התנזים בפת"ח באזור שלו"** (תמליל
ת/98ד עמי 42). הוא אף הודה כי חיה **"אחראי לכל הנעשה כגון אספקת כספים לחוליות, רכישות
נשק וביצוע פיגועים"** (זכ"ד ת/29 סי 1ג שהוגש ואושר על ידי החוקר "סמיתי" בעמי 85), וכי הוא
נחשב כ**"ממפקד צבאי"**, וכ**"אחראי על העניינים הצבאים של הפת"ח"**, בנוסף להיותו מנהיג פוליטי
ונבחר ציבור (זכ"ד ת/19 סי 2 וזכ"ד ת/59 סי 5- 6, שהוגשו ואושרו על ידי החוקר "מופז" בעמי
58).

הנאשם אמר כי בשנה שקדמה למעצרו **"החל מוצא עצמו יותר ויותר עוסק בעניניני אמל"ח ועניניני
פעילות צבאית"** (זכ"ד ת/25 סי 19, שהוגש ואושר על ידי החוקר "מופז" בעמי 58), וכן ראה תמליל
שיחה ת/98ד עמי 15). הוא הסביר כי היה חייב ליטול חלק "בפעילות הצבאית" על מנת לשלוט
ברחוב הפלסטינאי ולדחוק את רגלי החמא"ס והג'יהאד האיסלאמי, ועל מנת שיוכל לחצביע על
עצמו בעתיד כעל מי שפעל חן למען השלום והן במלחמה (זכ"ד ת/52, שהוגש ואושר על ידי החוקר
"סמיתי" בעמי 85).

ג.   **עדויותיהם של פעילי הטרור מהפת"ח בדבר קשריהם עם הנאשם ומעורבותו**
**בפיגועים שביצעו והתייחסות הנאשם בחקירתו לעדויות אלו**

18.   התביעה איננה טוענת כי הנאשם יזם או נטל חלק ישיר בביצוע הפיגועים נשוא כתב
האישום, שכן היא ערה לכך שמחומר הראיות עולה כי למפקדי השטח ולפעילי השטח הוקנו
סמכויות רחבות ומרחב תמרון רב בביצוע הפיגועים, והם לא נדרשו לקבל אישור מהנאשם לכל
פיגוע. התביעה גם מסכימה כי הנאשם לא ידע מראש על כל פיגוע ופיגוע: הוא היה מודע באופן
כללי לפעילותם של מפקדי השטח ופעילי הטרור הכפופים לו, אשר פעלו בהתאם למדיניות
הפיגועים שהוא היה שותף לעיצובה; לעיתים עודכן לפני הפיגוע, ולעיתים עודכן בדיעבד (עמי 47
לסיכומי התביעה).

כפי שעולה מהראיות שתפורטנה להלן, היה הנאשם מנהיגם של חוליות הטרור מקרב התנזים
וגדודי חללי אלאקצא. לפחות חלק מחברי חוליות אלו סרו למרותו, ופעלו על פי המדיניות
שהתווה. בנוסף על כך, עולה בבירור מן הראיות שהנאשם סייע למפקדי החוליות ופעילי הטרור
באספקת אמצעי לחימה ומימון כספי. במספר מקרים אישר הנאשם מראש ביצוע פיגועים כנגד
ישראל. יש, אפוא, לבחון בפרק זה מי היו פעילי הטרור שפעלו תחת הנהגתו של הנאשם, ומה היו
קשריו של הנאשם עם פעילים אלו. בפרק הבא  יבחנו הפיגועים שבהם היו מעורבים פעילי טרור
אלו, ומידת הקשר של הנאשם אליהם.

(1)   **נאצר עויס**

19.   נאצר עויס (להלן: **"עויס"**) היה אחד מפעילי הטרור הבכירים של התנזים באזור שכם. בגין
פעילותו זו הוא נדון בבית משפטו זה ל - 14 מאסרי עולם ועוד 50 שנות מאסר בפועל במצטבר (ת/
172א-ב). בעדותו (עמי 180-182) סרב עויס להשיב על שאלות, ולאחר שהוכרז כעד עוין הוגשו
הודעותיו במשטרה לפי סעיף 10א. לפקודת הראיות (ת/172 --
ת/177). הדבר היחיד שהיה מוכן עויס לומר בעדותו הוא כי כל מה שנרשם בהודעותיו הם שקרים
של השב"כ, וגם כתב היד המופיע בהודעותיו הוא של אנשי השב"כ. הוא טען כי עבר אמצעי חקירה
מאוד קשים.
ההודעות שמסר עויס במשטרה נכתבו בכתב ידו ותורגמו לעברית על ידי חתוקר שגבה את ההודעות
ואישר את הנכתב, ואף העיד כי ההודעות נגבו מרצונו החופשי של עויס (רס"מ רוני עמאר בעמי
191-192). כמו כן, הוגשו דוחות שרשמו חוקרי השב"כ על דברי עויס בחקירתו (ת/178א-ד).
דברים אלו אושרו על ידי חוקרי השב"כ, שהעידו כי הדברים נאמרו על ידי עויס מרצונו החופשי,
אם כי מדובר במסמך שאינט משקף אלא את תמצית החקירה, ולא את הדברים כפי שנאמרו מילה
במילה (ויאריאלי בעמי 203, ועדיי בעמי 204, ויואלי בעמי 204-205). זכייד ת/178גי נרשם בידי
החוקר וצדוקיי, שלא התייחס אליו בעדותו (עמי 84-83), ולא חזר להעיד לאחר עדותו של עויס,
ולכן יש להתעלם ממנו.

20.   עויס סיפר בהודעתו ת/172ב (עמי 2-1), שנכתבה בכתב ידו, כי לאחר פרוץ ויאינתיפאדת
אלאקצאיי בחודש ספטמבר 2000, הוא החל לבצע פיגועים כנגד מטרות ישראליות, ובאותה עת
עבד במנגנון הביטחון הלאומי הפלסטינטי בשכם בדרגה של סרן (נקיב). הוא ביצע פיגועי ירי
ופיגועים נוספים נגד מטרות ישראליות באזור יהודה ושומרון ובתוך ישראל, ופרט בהודעותיו ת/
172-ת/174 פיגועים אלו, שכללו ירי לעבר עמדות צבאיות ורכבים צבאיים; מסירת אמצעי לחימה
לאחרים לשם ביצוע פיגועי התאבדות בירושלים, בנתניה וחדרה, ועוד.

21.   עויס אמר בהודעתיו כי ביצע את הפיגועים בשם גדודי חללי אלאקצא, בחסבירו כי גוף זה
משמשיך לתנועת הפתייח ותנזים הפתייח, וכי הנאשם היה האחראי על התנזים    (ת/172ב עמי 3).
עויס אמר כי המימון לפיגועים בא מאנשי התנזים, וכי הנאשם עצמו מימן את הנשק לפיגועים בהם

se 1:04-cv-00397-GBD-RLE   Document 660-16   Filed 12/04/14   Page 13 of

היה מעורב עויס - לעיתים באופן ישיר, ולעיתים באמצעות מאג'ד אלמצרי - ביודעו שעויס מבצע
פיגועים נגד מטרות ישראליות. במקרה אחד העביר הנאשם לעויס שיק מאושר על ידי היו"ר
ערפאת (עמ' 7-6). עוד אמר עויס בחקירתו כי היה בקשר עם הנאשם לכל אורך הזמן ; הוא נשאל
אם הנאשם ידע על כך שהוא מבצע פיגועים כנגד מטרות ישראליות, והשיב (עמ' 5-4) :

**"כן ידע ושמי אף פורסם בעיתונות ובטלוויזיה וברדיו והייתי משוחח עמו מידי פעם
וכשהמצב הפוליטי היה מתדרדר ורע לנו היה מבקש שנמשיך בפיגועים וכשנפגש שמעון
פרס ועמיר שרון עם מנהיגים ברשות התקשר אליי מרואן ברגותי וביקש שנעצור את
הפיגועים... באותה תקופה היה זיני באזור ומרואן אמר לי שעדיף מאחר והגנרל זיני נפגש
עם מנהיגים ברשות שלא נבצע פיגועים בשם חללי אלאקצא ויש לציין שהתקדמו בשיחות
לא בוצעו פיגועים".**

הנאשם הביע כעס בפני המדובב "פלוני 1" על כך שעויס הודה בחקירתו כיצד נהג הנאשם בעת
ביקורו של הגנרל זיני באזור (ת/113א סעיפים 9-8, ת/114א סעיף 8, שהוגשו ואושרו על ידי
החוקר "רוברטי" בעמ' 154, ותמליל חקירת הנאשם ת/98ח עמ' 3).

22.    אשר לקשריו עם הנאשם, אמר עויס בחקירתו בשב"כ כי הגיע לנאשם בקשת סיוע עבור
שורת של פעילי שטח, וכי הוא עצמו קיבל שלוש פעמים כסף מהנאשם (זכ"ד ת/178א סעיף 10).
הנאשם היה הממונה עליו בתנזים, והעביר לו ולפעילים אחרים סיוע כספי, לאחר קבלת אישור
מהיו"ר ערפאת (ת/178ב סעיף 10). בדרך כלל קיבל עויס את הכספים מהנאשם באמצעות המתווך
מאג'ד אלמצרי, אך לעיתים היה הנאשם שולח לו כספים בצורה ישירה ; עויס לא נהג לומר לנאשם
מה מטרת הכסף, אך ברתבי הגדה ידעו היטב מה טיב הפעילות של עויס (ת/178ד סעיף 5יא).

עויס אמר בחקירתו כי הפיגועים של התנזים בוצעו בידיעת מנהיגי התנזים ובסיועם. לאחר הפיגוע
באולם השמחות בחדרה, וכל זמן שהתנהלו שיחות עם ישראל, הם היו עודים על הפסקת
הפיגועים ; ואולם כאשר השיחות לא התקדמו, שבו הפעילים לבצע פיגועים, אך שניתנה להם
הוראה חדשה על ידי המנהיגים להפסיקם. במסגרת זו נתן הנאשם הוראה להפסיק את הפיגועים
בעת ביקורם של הגנרל זיני ומנהיגים מרוסיה ומאירופה בארץ (ת/178ד סעיף 5י).

23.    דבריו של עויס בחקירתו בכל הנוגע לקשריו עם הנאשם נתמכים בדברים שאמר הנאשם
בחקירתו בשב"כ. כאשר הופגשו הנאשם ועויס במהלך החקירה (ת/79ב), ועויס החל לקרוא את
הודעתו במשטרה, ציווה עליו הנאשם לומר כי מדובר בזיוף, ועויס אכן מיהר לומר כך (החוקר
"צדוקי" בעמ' 84). ואולם הנאשם עצמו אישר בחקירה כי עויס היה הפעיל הצבאי הבכיר ביותר של
תנזים פתי"ח בשכם, ואחראי על גדודי חללי אלאקצא בשכם (זכ"ד ת/90 סי 7, שהונש ואושר על ידי
החוקר "סטיבי" בעמ' 53). הנאשם הודה כי ידע שעויס מבצע "פעילות צבאית" ענפה, וכאשר רצה
להבטיח הפסקה של הפיגועים היה פונה גם לעויס ומורה לו על הפסקת הפיגועים (זכ"ד ת/24 סי 6,
שהונש ואושר על ידי החוקר "סמתי" בעמ' 85, ותמליל שיחה ת/98ט עמ' 3-2).

הנאשם הודה כי מסר לידי עויס באמצעות מאג'ד אלמצרי ואחמד ברגותי סכום של כ- 20,000 ₪,
ואולי אף 50,000 - 70,000 ₪, למימון פעילותו, וכי קיבל אישור לכך מהיו"ר ערפאת, בלא שציין
את מטרת הסיוע הכספי (זכ"ד ת/19 סי 16, שהונש ואושר על ידי התוקר "מופף" בעמ' 58 ; זכ"ד
ת/38 סי 4, שהונש ואושר על ידי חחוקר "סמתי" בעמ' 85 ; זכ"דים ת/40 סי 8 ו- ת/41 סי 9,
שהונשו ואושרו על ידי החוקר "מופזי" בעמ' 58 ; תמליל חקירה ת/98ט עמ' 4-3). הנאשם אף הודה

P 7: 000383

כי חלק מהכספים שהעביר לידי עויס נועדו לרכישת 1000 כדורים לרובה M-16 ולרובה מסוג "גליל", ואף הצהיר כי הוא "מקבל אחריות על כל הכסף שנאצר (עויס) קיבל עבור מימון פיגועים בשטחים הכבושים, עבור רכישת כלי נשק ותחמושת" (ת/41 סי 9-6).

עוד אישר הנאשם בחקירתו כי עויס הפעיל חוליות שהיו מאורגנות תחת פיקודו של הנאשם (זכ"ד ת/29 סי 1, שהוגש ואושר על ידי החוקר "סמית" בעמי 85). אך הנאשם הדגיש כי הוא עצמו לא הורה לעויס לבצע פיגועים (זכ"ד ת/31 סי 6). לעומת זאת, המדובב "פלוני 1" העיד כי הנאשם אמר לו כי נתן לעויס הוראות לבצע פיגועים (עמי 104).

הנאשם הודה גם כי לאחר הפיגוע בנווה יעקב או בנשר עטרה (הנאשם לא זכר איזה מהם) שלח אליו עויס את הכרזו הנוטל אחריות, והנאשם אישר זאת בשיחה עם עויס (זכ"ד ת/49 סעיף 7, שהוגש ואושר על ידי החוקר "אמילי" בעמי 54, וזכ"ד ת/52 שהוגש ואושר על ידי החוקר "סמית" בעמי 85).

**(2)   נאצר נאג'י אבו חמיד**

24.   נאצר נאג'י אבו חמיד (להלן: "**אבו חמיד**") היה אחד ממנהיגי התנזים וגדודי חללי אלאקצא באיזור ירושלים ורמאללה, ואף הוא היה כפוף לנאשם וקיבל ממנו סיוע לצורך ביצוע פיגועים כנגד ישראל. בגין פעילותו זו נדון אבו חמיד, על סמך הודאתו, לשבעה מאסרי עולם ועוד 50 שנות מאסר במצטבר (ת/148א-ב). בעדותו סרב אבו חמיד להשיב על שאלות כלשהן, הוכרז כעד עויין וחודעותיו משטרה הוגשו לפי סעיף 10א. לפקודת הראיות (עמי 41-40). הודעות אלו (ת/ 149א-ד) הוגשו באמצעות חוקרי המשטרה אברהים אלקרעאן, יעקב ברזני ומשה לוי (עמי -194 195, 207, 211), אשר העידו כי אבו חמיד מסרן מרצונו החופשי וחתם עליהן. ההודעות נמסרו בעברית לפי בקשתו של אבו חמיד, אשר לדברי החוקרים דובר עברית היטב.

25.   בהודעותיו פרט אבו חמיד את פיגועי הרצח כנגד ישראלים בהם היה מעורב, וסיפר כי פנה אל הנאשם לקבלת סיוע כספי לרכישת תחמושת, והנאשם הפנה אותו אל קרובו אחמד ברגותי המכונה "יאלפרנסי"; הלה אכן מסר כמה פעמים לאבו חמיד כסף לרכישת נשק ותחמושת (ת/149 א, עמי 9, ת/149א עמי 6-5). גם חברים אחרים בחוליה של אבו חמיד פנו לנאשם לקבלת כספים לצורך רכישת נשק (ת/149 עמי 6). בשלב מסוים פנה אבו חמיד לנאשם לשם מימון רכישת מקלע, ובסופו של דבר הכסף למטרה זו ניתן לו על ידי אחמד ברגותי (ת/149ג עמי 7). אבו חמיד אף סיפר כי הנאשם נפגש עם סוחר נשק בעניין רכישת רימוני יד, שהיו לבסוף רק רימוני הלם (עמי 8-7).

אבו חמיד אמר כי הוא הקים את גדודי חללי אלאקצא לאחר תחילת האינתיפאדה בחודש דצמבר 2000 (עמי 4). הוא הסביר כי הוצע לו לצרף את החוליה שבראשה עמד למנגנוני הביטחון של הרשות הפלשתינאית בראשות תאופיק טיראוי, אך הוא העדיף את הצעתו של הנאשם להיות כפוף לו, ולקבל ממנו משכורת לו ולאנשיו, כיוון שראה בנאשם "מנהיג פוליטי שלא ישקרי" (ת/149א עמי 16-15).

לאחר מכן גייס אבו חמיד פעילים נוספים לתמיכה בנאשם, הקים את גדודי חללי אלאקצא, והחל לבצע פיגועים כנגד מחסומי צה"ל והמתנחלים (עמי 17). הוא אמר לגבי הנאשם כי ראה בו "מנהיג פוליטי", אם כי הוא עצמו השתייך לפלג הצבאי של הארגון (עמי 17). כאשר נחרג מפקד התוליה, הכיר אבו חמיד את יורשו לנאשם (ת/149 עמי 7).

באחת מהודעותיו סיפר אבו חמיד על אירוע בו נכח יחד עם חברי חוליה אחרים, ואחד מהם סיפר לנאשם על כוונתו לבצע פיגוע באזור שכם, וביקש מהנאשם סיוע ברכישת נשק ומכונית, וכן ביקש מהנאשם ליצור קשר עם עויס על מנת שיעזור בביצוע הפיגוע. אבו חמיד אמר כי הנאשם התקשר עם עויס, שאכן סייע לחוליייה לבצע פיגוע; לאחר הפיגוע הוא דיווח לנאשם כי בהיתקלות עם חיילי צה"ל איבדו חברי החוליה את הנשק, והנאשם הבטיח לטפל בנושא (ת/149ג עמי 9).

P 7: 000384

לקראת סוף שנת 2001, כאשר החל ירי מרגמות לעבר ישובים ישראליים, שוחח אבו חמיד עם הנאשם על הצורך להשיג מרגמות בעלות טווח ירי גדול יותר. אבו חמיד פנה אל הנאשם לשם מימון רכישת פצצות המרגמה, והנאשם השיב לו כי מחירן גבוה מדי, וכי "יש לו חפתצה" בעניין זה, כפי שיסביר לו אחמד ברגותי; האחרון הסביר לאבו חמיד כי יש כבר בידיהם מרגמה ופצצות (ת/149ג עמי 10). אבו חמיד אף דיווח לנאשם על ביצוע ירי מרגמה לעבר הישוב פסגות, והנאשם ביקש שלא לספר על כך לאיש, באומרו כי אם ערפאת ידע על כך הוא יכניס אותו לכלא (עמי 11).

**26.** מהודעותיו של אבו חמיד ניתן להתרשם שהוא השתדל למנוע מן הנאשם מעורבות ישירה בפיגועים, ואף אמר לפעילים האחרים שלא לשבך את הנאשם במעשיהם, שכן הנאשם צריך להישאר "מנהיג פוליטיי" (ת/149ג עמי 8-9, 12). במסגרת ניסיונו של אבו חמיד לחפות על מעורבותו של הנאשם בפיגועים, הוא ניסה לגמד גם את חלקו של אחמד ברגותי, שהיה מקורבו ועוזרו של הנאשם; אבו חמיד הודה כי ניסה תחילה להעלים את חלקו של אחמד ברגותי ברצח טליה ובנימין כהנא זייל, אשר בוצע באמצעות נשק שמסר אחמד ברגותי למפגע (ת/149ד עמי 5, וראה פרטי האירוע בפרק ה(1) להלן).

**27.** הנאשם הודה בחקירתו כי הכחש את עלי עאידיה (איש הכספים שלו) לרכוש אמליייח עבור הפעילות של התנזים, ולהעביר את האמליייח לאבו חמיד. הנאשם אף מתייחס בחקירתו לאירוע המתואר בהודעתו של אבו חמיד, הנוגע לרכישת רימונים מקולקלים (זכייד ת/43 סי 2-5, שהונגש ואושר על ידי החוקר "ירוברטי" בעמי 62). הנאשם הודה כי החוליות של אבו חמיד זכו לסיוע מצדו בסכום של כ- 40,000 ₪ (זכייד ת/63 סי 20, שהונגש ואושר על ידי החוקר "ינאור" בעמי 82). הנאשם אמר כי כאשר קיבל החלטה אסטרטגית לבצע פיגועים הוא הקים חוליה, כאשר את חפיגועים הוביל, בין היתר, אבו חמיד (זכייד ת/35 סי 1, שהונגש ואושר על ידי החוקר "דני" בעמי 90). כאשר נשאל הנאשם בחקירתו מי מאנשי חוליות הפיגועים היו תחת שליטתו, הוא אמר על אבו חמיד: **"הוא נחשב עלי"** (תמליל שיחת ת/98יא עמי 34, שבו בטעות נרשם בעברית "אחמד" במקום אבו חמיד).

### (3) אחמד ברגותי

**28.** אחמד ברגותי (המכונה "אלפרנסיי") הוא קרוב משפחה של הנאשם, אשר היה עוזרו הקרוב, בנוסף על היותו נהג ושומר ראשו של הנאשם (ראה דבריו בחודעתו ת/165א עמי 1, וזכייד ת/165ו שהונגש ואושר על ידי החוקרים "אודם" וידניי" בעמי 201-200).
אחמד ברגותי אמר בחקירתו כי היה נתון למרותו המלאה והישירה של הנאשם (זכייד ת/165ו שהונגש ואושר על ידי החוקר "אודם" בעמי 201). אין זה מקרה שאחמד ברגותי נעצר יחד עם הנאשם, שכן שמו עולה בחומר הראיות בהקשרים רבים הנוגעים לפיגועים שביצעו פעילי השטח של התנזים וגדודי חללי אלאקצא.

אחמד ברגותי סירב להשיב על שאלות כלשהן בעת עדותו (עמי 161-163), ולאחר שהוכרו כעד עוין הוגשו הודעותיו במשטרה לפי סעיף 10א. לפקודת הראיות (ת/165א-ח).
הודעות אלו הוגשו ואושרו על ידי השוטרים דוד מזרחי, יצחק יעקובוב ומשה משה (בעמי 184, 171 ו- 207-206). החוקרים העידו כי תחקרו את אחמד ברגותי בערבית, אך רשמו את עדותו בעברית (שלא על פי המקובל והנדרש). כל החוקרים העידו כי החודעות נמסרו מרצונו החופשי של הנחקר.

כמו כן הוגש מסמך שכתב אחמד ברגותי בכתב ידו בערבית ותורגם (ת/165(ג)(1-2)), והוא הודה בחקירתו כי כתב מסמך זה בכתב ידו (מזרחי בעמי 185). בנוסף, הוגשו על ידי חוקרי השבייכ זכיידים שנרשמו במהלך חקירתו של אחמד ברגותי (ת/165ו-טו, שהונגשו ואושרו כדלקמן :ת/165ו על ידי "אודם" בעמי 201 וידניי" בעמי 200; ת/165ז על ידי "אודם" בעמי 201; ת/165יג על ידי

"אדם" בעמ' 201; ת/165יד על ידי "דני" בעמ' 200). הזכ"דים ת/165ז-ח, ת/165יא-יב ו- ת/165
טו לא זכו להתייחסות כלשהי בעדויותיהם של חוקרי השב"כ "מיקי", "ארבלי", "אדם" ו"דקלי",
ולכן יש להתעלם מהם.

**29.** אחמד ברגותי סיפר בחקירתו כי הוא ועויס היו האחראים על גדודי חללי אלאקצא בשנה
שקדמה למעצרו (תוד'עה ת/165ה). הוא סיפר בתודעותיו על מעורבותו הישירה והעקיפה בפיגועים
שבוצעו כנגד ישראל, ועל כלי הנשק והרכב לפעילי השטח שיצאו לבצע פיגועים שונים
באזור יהודה ושומרון ובתוך ישראל, כולל פיגועי התאבדות.

באשר לפיגוע במסעדת "סי פוד מרקטי" בתל-אביב, סיפר אחמד ברגותי כי כאשר קיבל הודעה
שהמפגע אברהים חסונה עומד לצאת ולבצע את הפיגוע, ונם כאשר דווח לו כי תלה כבר יצא לדרכו
עם מוביליו, הוא התקשר לנאשם והודיעו על כך; הנאשם אישר את הפיגוע **לפני** ביצועו, אך הורח
שלא יבוצע בתוך ישראל אלא בשטחים; אחמד ברגותי אמר לו: "יהיה בסדר" (זכ"ד ת/165ו"ג
שהוגש ואושר על ידי חחוקר "אדם" בעמ' 201 וזכ"ד ת/165ו"ד שהוגש ואושר על ידי החוקר "דני"
בעמ' 200). מייד לאחר ביצוע הפיגוע ב"סי פוד מרקטי", שאחמד ברגותי עצמו היה מעורב בחוצאתו
לפועל, הוא התקשר אל הנאשם בשעה 03:15 לפנות בוקר ודיווח לו על ביצוע הפיגוע; הנאשם
נשמע מרוגז (חודעה ת/165ג עמ' 1, זכ"ד ת/165ו"ד). לדברי אחמד ברגותי, אמר לו הנאשם להודיע
לעויס שלא ליטול אחריות על פיגוע זה קודם שידבר עם הנאשם, שכן הנאשם היה מעוניין לנסח את
הכרוז (ת/165ו"ד עמ' 1, וזכ"ד ת/165ו"ד). אחמד ברגותי נשאל מדוע דיווח על הפיגוע לנאשם, והוא
חשיב: "**למרואן ברגותי הודיעתי באופן רגיל**".

**30.** אחמד ברגותי סיפר בחקירתו נם על הפיגוע **בתחנת הדלק בגבעת זאב**, שנעשה כנקמה על
חיסולו של ראיד כרמי. לדבריו, הוא ביקש מתמבצע אבו סטחת שלא להודיע על כד מראש לנאשם.
אך אבו סטחת שוחח עם הנאשם על כך, והנאשם אמר לו שלא לבצע את הפיגוע, כנראה משום
שחשש לחייו של אבו סטחת שהיה שומר ראשו (זכ"ד ת/165ג עמ' 2 וזכ"ד ת/165ג שהוגש ואושר
על ידי החוקר "אדם" בעמ' 201). זו אחת הדוגמאות לניסיונו של אחמד ברגותו במהלך כל
החקירה לחפות על מעשי הנאשם, שכן הנאשם עצמו נטל בחקירתו אחריות לפיגוע זה, ובירר
מדבריו שהוא הורה על ביצועו (ראה סעיפים 66(5) ופרק ה(7) להלן).

במקרה אחר, עליו סיפר אחמד ברגותי בחקירתו, דחה הנאשם את בקשתה של צעירה בת 15 לבצע
פיגוע התאבדות, באומרו "**שהיא עוד צעירה לעשות זאת**", והורה לאחמד ברגותו לחודיע לה זאת
(ת/165ג עמ' 4, וזכ"ד ת/165יג סי' 2י, שהוגש ואושר על ידי החוקר "אדם" בעמ' 201). גרסה דומה
עולה מדברי הנאשם בחקירתו (זכ"ד ת/25 סי' 6-7, שהוגש ואושר על ידי החוקר "סמיתי" בעמ' 85,
ותמליל חקירה ת/98י עמ' 9-8).

במקרה נוסף עליו סיפר אחמד ברגותי, התקשר גייהאד גיוערה לנאשם בבקשה לבצע פיגוע,
והנאשם אמר לו שלא לעשות זאת בתוך ישראל או בירושלים; ואולם גיערה חשאיר מכונית תופת
שהתפוצצה למחרת ליד קניון מלחה בירושלים, חרף דברי הנאשם (ת/165 עמ' 18). דברים אלו
אושרו על ידי הנאשם בחקירתו (ראה סעיף 66(ה) ופרק ח(20) להלן).

**31.** לאורך כל חקירתו, ניכרת אצל אחמד ברגותי מגמה ברורה לגמד ולהעלים את מעורבותו
של הנאשם בפיגועים השונים. כאשר היה מזכיר את שמו של הנאשם, היה זה בדרך כלל על מנת
לצייין שהנאשם התנגד לביצוע הפיגוע. עם זאת, אחמד ברגותי אישר בחודעה שנכתבה בכתב ידו כי
שורה של פעילי שטח בחוליות קיבלו כספים ממשרדו של הנאשם ובידיעתו, וכי הכספים שקיבל
מהנאשם שימשו אותו לצורך ביצוע פיגועים שלו ושל אחרים (חודעה ת/165ג(1) עמ' 6, הודעה ת/

P 7: 000386

165נו עמי 2 וזכייד ת/165ניג סי 2,ג ו- 2ז שהוגש ואושר על ידי החוקר "אדם" בעמי 201).
כמו כן ברור מדברי אחמד ברגותי כי הנאשם היה מורח לו מדי פעם להפסיק או לדחות את ביצוע
הפיגועים (זכייד ת/165,יג סי 2ח, שהוגש ואושר על ידי התוקר "אדם" בעמי 201). מכאן עולה כי
במקרים אחרים הם בוצעו באישורו של הנאשם, גם אם אם לא ידע מראש על כל פיגוע ופיגוע.

32.    בתחילת חקירתו ניסה חנאשם לגונן על קרבו משפחתו אחמד ברגותי, וטען כי נעצר עמו
משום "שעצר במקרה במקום" (זכייד ת/9 סי 10 שהוגש ואושר על ידי החוקר "רוברט" בעמי 62).
הנאשם טען כי אחמד ברגותי הפסיק לעבוד אצלו כנהג כשמונה חודשים לפני מעצרו, ואין שום
קשר ביניהם בנוגע לביצוע פיגועים (זכייד ת/10 סי 1, שהוגש ואושר על ידי החוקר "דני" בעמי 90,
וזכייד ת/21 סי 23, שהוגש ואושר על ידי החוקר "רוברט" בעמי 63). בחקירתו במשטרה טען
הנאשם כי אחמד ברגותי לא היה מוכיר או או שומר ראש שלו (ת/104 עמי 4). בפגישה שהיתה בין
הנאשם לאחמד ברגותי בעת מעצרם, ושהוקלטה ללא ידיעתם, תיאמו השניים עמדות לגבי
החקירה, ואחמד ברגותי אמר לנאשם כי טען בחקירה שהוא איננו קשור לנאשם, אלא רק שימש
כנהגו; הנאשם אמר כי גם הוא אמר כך (תמליל שיחה ת/127,ג עמי 3-2). אחמד ברגותו סיפר
לנאשם באותה פגישה מה בדיוק אמר בחקירותיו לגבי הנאשם, כשהם מתייחסים לפיגועים
השונים אליהם התייחס אחמד ברגותי בחקירתו (עמי 4).

ואולם, בהמשך בחקירתו בשבייכ אישר הנאשם כי ידע שאחמד ברגותי קשור למספר חוליות
ולביצוע פיגועים רבים כנגד ישראל, וכי כאשר ביקש להפסיק את הפיגועים היה מודיע ואת גם
לאחמד ברגותי. לדבריו, אמר לאחמד ברגותי שהוא "לא מרשה" לבצע פיגועים בתוך ישראל
(תמליל ת/98יא עמי 20-18). הנאשם אמר כי היה תיאום בינו לבין אחמד ברגותי, שכלל דיווח
ומתן כספים, וכי מבחינתו אחמד ברגותי היה אחראי על הפעילות הצבאית באזור רמאללה ביחד
עם אבו חמיד, וכי השניים היו מבצעים פיגועים באמצעות מספר חוליות (זכייד ת/27 סי 3-2 שהוגש
ואושר על ידי החוקר "סמית" עמי 85).
הנאשם הודה כי היה נותן כסף לאחמד ברגותי, ותמך בפעולותיו, אף כי טען שאחמד ברגותי לא
היה מדווח לו לפני ביצוע פיגועים (תמליל ת/98ח עמי 3, 17, 24-20, וזכייד ת/24 סי 4, שהוגש
ואושר על ידי החוקר "סמית" בעמי 85).
הנאשם הודה כי אחמד ברגותי היה מדווח לו לאחר ביצוע פיגועים (תמליל ת/98ז עמי 25-19, 40,
ותמליל ת/98יא עמי 9). בשיחתו עם המדובב "פלוני 1", אמר הנאשם כי אחמד ברגותי שילח
ארבעה פיגועי התאבדות באישורו (עדות המדובב בעמי 106). דברים אלו תואמים דברים שאמר
הנאשם בחקירתו, כאשר נטל אחריות על כמה פיגועים אותם אישר אישית (ראה סעיף 66 להלן).

הנאשם לא הסתיר כי מסר לאחמד ברגותי עשרות אלפי דולרים לרכישת כלי נשק שונים, כגון רובי
סער ואקדחים, עבור אנשי החוליות שביצעו פיגועים כנגד ישראל. אחמד ברגותי היה האחראי
מטעם הנאשם על רכישת הנשק. הוא פעל תחת פיקודו של הנאשם, והיה אחראי על "הפעילות
הצבאית" באזור רמאללה. הנאשם הודה כי ידע שאחמד ברגותי קשור לפיגועים כנגד ישראל,
ובניהים פיגועים בירושלים ובי"סי-פוד מרקט" בתל אביב (לכל אלה ראה: זכייד ת/23 סי 4-5
שהוגש ואושר על ידי החוקר "דני" בעמי 90; זכייד ת/25 סי 10-11 שהוגש ואושר על ידי החוקר
"מופז" בעמי 58; ת/27 סי 2, 4 ו- ת/29 סי 1 שהוגש ואושר על ידי החוקר "סמית" בעמי 85; ת/28
סי 4 שהוגש ואושר על ידי החוקר "אבו ואדי" בעמי 96; ת/65 סי 4 ו- ת/70 סי 9 שהוגשו ואושרו
על ידי החוקר "סטיבי" בעמי 53; וכן ראה דברי הנאשם בתמלילים ת/98ז עמי 6-2, ת/98ח עמי -20
24, ת/98י עמי 10-11 ו-
ת/98יא עמי 8).

**לסיכום קשרי הנאשם עם אחמד ברגותי**, ניתן לומר כי הקשר של הנאשם עם פעילי הטרור היה
באמצעות קרובו ומקורבו אחמד ברגותי. כפי שאמר הנאשם בחקירתו על אחמד: **"הוא יוצר קשר
עם החוליות האלה. באופן ישיר איתם ישירות. יעני בלעדיו לא היתה לי התקשרות ישירה עם אף**

**חוליה"** (תמליל ת/98יא עמ' 8). כאשר נשאל הנאשם בחקירתו מי הם ראשי חוליות הפיגועים שפעלה תחת שליטתו, השיב הנאשם כי אחמד ברגותי היה **"חלקית תחת שליטתי וחלקית עבד עם נאצר (עויס)"** (תמליל שיחה ת/98יא עמ' 34).

### (4) מוחמד מצלח (אבו סטחה)

33.    מוחמד מצלח המכונה "אבו סטחה" (להלן: **"אבו סטחה"**) היה פעיל שטח נוסף, שעמד בראש חוליה אשר ביצעה פיגועי רצח. הוא גם היה שומר ראשו של הנאשם בתקופה מסוימת, ומקורב אליו. בגין פעילותו זו הורשע אבו סטחה על פי הודאתו ונדון לעונש של 9 מאסרי עולם במצטבר (ת/155א-ג). בעדותו פתח אבו סטחה בהצהרה כי לא היה לו שום קשר עם הנאשם, וכי הנאשם הוא **"אדם פוליטי"** שאין לו קשר עם הייפעולות חבצאיותי". מעבר לכך לא היה מוכן אבו סטחה להשיב על שאלה כלשהי, ולפיכך הוכרז כעד עוין והוגשו הודעותיו במשטרה ת/156א-ג לפי סעיף 10א. לפקודת הראיות (עמ' 68-66).

ההודעה ת/156א לא הוגשה באמצעות מי שגבה אותה (השוטר יעקב ברזאני), ולפיכך יש להתעלם ממנה. ההודעות ת/156ב-ג הוגשו ואושרו על ידי השוטרים מרקו דהאן ומשה לוי (בעמ' 198, 210), אשר העידו כי ההודעות נמסרו מרצונו החופשי של אבו סטחה. החקירה התנהלה בשפה הערבית אך ההודעות נרשמו בעברית (שלא על פי המקובל והנדרש).

בהודעותיו מפרט אבו סטחה את הפיגועים שביצע, ומדבריו עולה שאחמד ברגותי, עזורו הקרוב של הנאשם, היה מעורב ברבים מהם בצורה ממשית.

34.    הנאשם אישר בחקירתו כי אבו סטחה עבד במשרדו ופעל תחת אחריותו, באמצעות אחמד ברגותי, וכי הוא ידע שאבו סטחה ביצע פיגועים שונים כנגד אזרחים בגבעת זאב ובפסגת זאב (זכ"ד ת/30 ס' 3-2, שהוגש ואושר על ידי החוקר "אמיל" בעמ' 54, תמליל ת/98יא עמ' 35). כאשר נשאל הנאשם מי הם ראשי חוליות הפיגועים שפעלו תחת שליטתו, הוא כלל בהם את אבו סטחה, באומרו: **"אני לא בורח מזה"** (תמליל ת/98יא עמ' 34).

### (5) ג'מאל אחויל

35.    ג'מאל אחויל (להלן: **"אחויל"**) היה פעיל שטח נוסף שקיבל סיוע מהנאשם, והיה איש הקשר שלו במחנה הפליטים בג'נין.

אחויל סירב להשיב על שאלות בעת עדותו, הוכרז כעד עוין והוגשה הודעתו במשטרה ת/166 לפי סעיף 10א. לפקודת הראיות (עמ' 164-165), באמצעות השוטר מטאנס חדאד שגבה אותה (עמ' 169). אחויל כתב את הודעתו בכתב ידו, וחדאד תרגם אותה לעברית.

אחויל פעל במסגרת גדודי חללי אלאקצא, ואמר בחקירתו כי קיבל סיוע כספי, בין היתר, מהנאשם, והיה מחלק כסף זה לפעילים אחרים, וביניהם מבוקשים על ידי צה"ל; חלק מהכסף שימש לרכישת נשק (ת/166 עמ' 1). אחויל היה בקשר רצוף עם הנאשם, והיה מדווח לו על פעילות גדודי חללי אלאקצא, ועל המתרחש במחנה ג'נין; לעיתים היו הפעילים בגדודים אלו מדווחים לנאשם באופן ישיר, כפי שהיה עושה עויס (ת/166 עמ' 5).

הנאשם הכחיש בחקירתו במשטרה כי הכיר את אחויל (ת/106 עמ' 6). אך בחקירתו בשב"כ אמר הנאשם כי אחויל היה מנהיג מחנה הפליטים בג'נין, וחבר בגדודי חללי אלאקצא, אשר השתייך לחוליית של עויס. הנאשם הכיר היטב את אחויל, אך טען שמעולם לא מסר לידיו נשק או כסף, אם

כי אחויל פנה אליו בבקשות סיוע; הנאשם הסביר כי היה פועל מול עויס, ועויס היה זה שהיה
ממלא את בקשותיו של אחויל (זכ"יד ת/31 ס' 9-7, שהוגש ואושר על ידי החוקר "מופזי" בעמ' 58).
כמו כן אישר הנאשם כי העביר לערפאת את בקשותיו של אחויל לקבלת סיוע (זכ"יד ת/67 ס' 4
שהוגש ואושר על ידי החוקר "אמילי" בעמ' 54).

### (6) נאצר א-שויש

‫36.‬ נאצר א-שויש (להלן: "שויש") היה אף הוא פעיל בפינועים שביצעו גדודי חללי אלאקצא.
בגין פעילות זו הורשע על פי הודאתו, ונדון ל- 4 מאסרי עולם במצטבר (ת/157א-ד). שויש סירב
לענות על שאלות בעדותו, אך טען כי הנאשם הוא מנהיג פוליטי שאין לו קשר ל"ענייניים צבאיים".
הוא הוכרז כעד עוין, הכחיש את הדברים שאמר בחקירתו, ואף טען כי לא הודה בכלום (עמ' -69
71). הודעותיו של שויש ת/158א-ב הוגשו לפי סעיף 10א. לפקודת הראיות, באמצעות השוטרים
מטאנס חדאד ועוואד עטאף (עמ' 165, 168).

גובי ההודעות העידו כי ההודעות נרשמו בערבית בכתב ידו של הנחקר מרצונו החופשי, ותורגמו
לעברית על ידי החוקרים. השוטר חדאד העיד כי נכח במשפטו של שויש, והלה אישר שם את
הודעתו בטרם הורשע, שכן לא היה לו סניגור.

‫37.‬ בחקירתו (הודעה ת/158א, עמ' 6 והודעה ת/158ב, עמ' 4-2) סיפר שויש כי קיבל חגורת נפץ
במשקל של כ- 18 ק"ג במפקדת המודיעין המסכל ברמאללה על מנת לשמור אותה ברכבו. לאחר
מכן פגש את הנאשם בבית החולים בו טופלה אשתו, והנאשם ביקש לשוחח אתו בנפרד. בשיחתם
שאל אותו הנאשם האם הוא מכיר אנשים אשר יודעים כיצד להכין חגורת נפץ, או כאלה שיש להם
חגורת נפץ. באותו מעמד התקשר שויש לאדם שמסר לו את חגורת הנפץ (מוּיד אלמצרי), וקיבל
את הסכמתו למסור אותה לנאשם, והנאשם הודיע לו שאחמד ברגותי ישוחח איתו בעניין. למחרת
התקשר אחמד ברגותי אל שויש, והאחרון מסר לו את חגורת הנפץ. שויש שמע באותו יום כי האדם
שהחזיק את החגורה נתפס בירושלים בדרכו לביצוע פיגוע התאבדות.

שויש נשאל בחקירתו האם הנאשם ידע על פיגועי התאבדות ופעילות צבאית, והשיב כי יום לפני
ביצוע פיגוע ההתאבדות על ידי מותמד תשאיכה נפגש שויש עם הנאשם, וסיפר לו כי אדם בשם עבד
אלכרים אמור לשלוח מתאבד לישראל; הנאשם אמר לשויש להתקשר אליו אם יזקקו לדבר מה
בקשר לפיגוע, נתן לו סכום של 600 דולר, וביקש לעדכן אותו בפרטי הפיגוע (עמ' 6-7). הפיגוע בוצע
בירושלים, ואז התקשר הנאשם אל שויש, אשר אמר לו כי הפיגוע בוצע על ידי גדודי חללי
אלאקצא. הנאשם ביקש ממנו להביא לו את הקלטת המצולמת של המתאבד תשאיכה (עמ' 7-6
להודעה ת/158א). בהודעתו השנייה ת/158ב סיפר שויש על הסיוע הכספי שקיבל מהנאשם (עמ' 5).

‫38.‬ הנאשם הכחיש בחקירתו במשטרה כי הכיר את שויש, וכן הכחיש בהודעתו את דבריו של
שויש (ת/106 עמ' 9-7). לא הובאו בפניו ראיות נוספות על האירועים הנ"ל אליהם התייחס שויש
בחקירתו, ולכן אין כל חיזוק לדבריו אלו, ולא ניתן לסמוך ממצאים עליהם.

### (7) עלי עיאדיה

‫39.‬ עלי עיאדיה (להלן: "עיאדיה") היה פעיל בתנזים שעסק בעיקר בהדרכת צעירים בשימוש
בנשק, ובעניין זה פעל בהנחיית הנאשם. כמו כן השתתף בביצוע פיגועי ירי לעבר חיילים. בעדותו
סרב להתיב על שאלות שנשאל, וטען כי הנאשם הוא "איש שלום" (עמ' 171-169). למיכך הוכרז עד
עוין, והודעתו ת/168 הוגשה לפי סעיף 10א לפקודת הראיות, באמצעות השוטר יעקב ברזני, שגבה
אותה בשפה הערבית ותרגמה לעברית (עמ' 208).

**40.** עיאדיה סיפר בחקירתו על מעורבותו של הנאשם בקורס הירי לצעירים (ת/168, עמי 1-2), ועל הפגנועים שהוא עצמו ביצע. כמו כן אמר עיאדיה: **"ראש התנזים מרואן ברגותי היה יודע מכל אירועי הירי אותם ביצעו פעילי התנזים עוד לפני שעשו אותם והוא הסכים להם"** (עמי 5). הוא ציין כי כמה חודשים לפני מעצרו ביקש ממנו הנאשם "לקנות נשק מכל סוג", ולהעבירו דרך אבו חמיד (עמי 5).

הנאשם הכחיש בחקירתו במשטרה את הדברים שאמר עיאדיה בחקירתו (ת/106 עמי 7). ואולם באחת מחקירותיו חודה הנאשם כי הורה לעיאדיה לרכוש אמלייח ולמסרם לאבו חמיד (זכ"ד ת/43 סי 3, שהוגש ואושר על ידי החוקר "רוברטי" בעמי 92), דבר שמחזק את דברי עיאדיה בחקירתו.

### (8)   איסמעיל רדאידה, מוהנד אבו חלאוה וכמאל אבו ועד

**41.** איסמעיל רדאידה (להלן: **"רדאידה"**) ביקש לבצע פיגוע, ופנה בעניין זה לנאשם. הוא ביצע את את פיגוע הירי במעלה אדומים שבו נרצח תנזיר היווני גרמנוס ציפוקטקיס ז"ל (ראה פרק ה(3) להלן). בגין פעילותו החבלנית הורשע רדאידה על פי הודאתו, ונדון למאסר עולם ועוד 20 שנות מאסר במצטבר. בעדותו בתיק זה (עמי 42-44) סירב רדאידה להשיב על שאלות, הוכרו כעד עוין וחודעותיו במשטרה הוגשו מכוח סעיף 10א. לפקירת הראיות (הודעות ת/151א-ת/151ג, הודעה בכתב יד ת/151ד שנקרעה, שוחזרה ותורגמה, וקלטת בה שיחזר רדאידה את רצח הנזיר ותומללה - ת/151א).

הודעותיו של רדאידה הוגשו על ידי החוקרים מרקו דהאן ויצחק יעקוב, שגבו את ההודעות בערבית, אך רשמו אותן בעברית (בניגוד למקובל ולנדרש), והעידו כי הן נמסרו מרצונו החופשי של רדאידה. הודעתו של רדאידה ת/151ד נרשמה בכתב ידו בנוכחות יעקובוב (עמי 171, 198). עורך השיחזור (מרקו דהאן) לא התייחס לכך בעדותו, ועל כן יש להתעלם מקלטת השיחזור, בהיותה אמרת חוץ של עד שלא הוגשה כדין.

**42.** בהודעתו הראשונה (ת/151א) סיפר רדאידה כי החליט לבצע פיגוע כאשר ראה בטלוויזיה שתינוקת פלסטינאית נהרגה, ועל כן ניגש למשרדו של הנאשם. השיחה ביניהם התנהלה ביחידות, ורדאידה אמר לנאשם כי הוא רוצה לבצע פיגוע ודרוש לו נשק לשם כך. הנאשם הפנה את רדאידה אל אדם בשם מוהנד (אבו חלאוה) שכינויו "ילאאי" (להלן: **"מוהנדי"**), והורה למהנד להשיג נשק לרדאידה. בהודעתו השניה (ת/151ב) הוסיף רדאידה כי הוא הבחיר לנאשם שהנשק דרוש לו על מנת לבצע פיגועים נגד מטרות ישראליות, ואז הפנה אותו הנאשם אל מוהנד. מוהנד אמר לרדאידה כי ישיג לו שני רובי קלצ'ניקוב, וכי מעתה ואילך הקשר שלו יהיה עם מוהנד ולא עם הנאשם. כעבור כשבועיים התקשר מוהנד אל רדאידה, אשר בינתיים צירף אדם נוסף לפיגוע, והודיע כי הנשקים מוכנים. רדאידה קיבל את הנשקים והתחמושת ממוהנד, אשר תדרך את רדאידה ואת חברו כיצד לחפעילם.

לאחר כמה ימים בהם הכינו רדאידה וחברו יאסר את הפיגוע, ותיצפתו לעבר כביש מעלה אדומים, הם ביצעו את הפיגוע, כאשר פתחו בירי לעבר הרכב שבו נסע הנזיר ונמלטו. למחרת התברר לרדאידה בחדשות כי הרג נזיר יווני, ומוהנד התקשר אליו ובא אליו בטענות על כך; רדאידה הסביר כי חשב שמדובר במתנחל. רדאידה נשאל בחקירתו מדוע פנה לנאשם כאשר החליט לבצע פיגוע, והשיב כי ראה את הנאשם כמה פעמים בטלוויזיה והבין **"שהוא האדם היחיד שיכול לעזור לי בהשגת הנשק"** (עמי 5).

בהודעתו השלישית (ת/151ג), גילה רדאידה כי כוונתו המקורית היתה לעשות פיגוע התאבדות, אך הנאשם אמר לו: **"פיגועי התאבדות זה העבודה של החמאס והג'יהאד האיסלמי ושהתנזים עושה פיגועים נגד הצבא והמתנחלים"**.

**רדאידה** הוסיף ואמר: **"מרואן ברגותי אמר שהוא מוכן לתת לי אמל"ח כדי שאני אעשה פיגועים נגד חיילים ונגד מתנחלים"** (עמ' 1). גרסתו הני"ל של רדאידה עולה גם מן המסמך שכתב בכתב ידו (ת/151ד), אם כי בצורה מתומצתת יותר.

43.     דבריו של רדאידה נתמכים בדברי הנאשם בחקירתו (תמליל ת/98יא עמי 37-38, ותמליל ת/98ד עמי 4-2, 12-11 שבהם נרשם בטעות השם איסמעיל אלדבע במקום איסמעיל רדאידה). בחקירתו במשטרה הכחיש הנאשם כי מוהנד עבד במשרדו או היה סגנו, ואמר כי מוהנד לא קשור לתנזים (הודעה ת/102 עמי 3, ת/103 עמי 5, ת/105 עמי 2, ת/106 עמי 1). גם בתחילת חקירתו בשב"ח הכחיש הנאשם כי הכיר את רדאידה, וכי מוהנד עבד במשרדו (זכי"ד ת/9 סי 9-8 וזכי"ד ת/21 סי 22 שהוגשו ואושרו עייי החוקר "רוברטי" בעמי 63-62).

ואולם בהמשך חקירתו הודה הנאשם כי רדאידה בא אליו בהצעה לבצע פיגוע התאבדות, והנאשם אמר לו: **"אנחנו לא עובדים בפיגועי התאבדות"**. הנאשם הפנה אותו אל מוהנד, ואמר למהנד שרדאידה **"צריך אימון...תמצא לו מישהו"**. כמו כן אמר הנאשם: **"סיכם איתו מוהנד וניסו לעשות פיגוע פה במעלה אדומים או במקום אחר, אני ידעתי יותר מאוחר... אז הם ירו על הרכב ונפצע מישהו אלחורי... נהרג יעני"** [י"אלחורי" משמעותו "כומר" בערבית - ע.ב.]. הודאה דומה של הנאשם בגירסו של רדאידה לשם ביצוע פיגועים באמצעות מוהנד עולה מדברים שאמר בחקירותיו (ראה: זכי"ד ת/22 סי 12-16 וזכי"ד ת/40 סי 9 שהוגש ואושרו על ידי החוקר "מופז" בעמי 58, זכי"ד ת/23 סי 6 שהוגש ואושר על ידי החוקר "דני" בעמי 90, ותמליל חקירתו של הנאשם ת/98די עמי 26-21, ות/98ז' עמי 8).

עוד הודה הנאשם בחקירתו כי נפגש עם מוהנד, והעביר לו כספים לצורך ביצוע פיגועים, לאחר שמוהנד סיפר לו כי החוליה שלו ביצעה מספר פיגועים, כולל רצח בני הזוג כהנא ז"ל. הנאשם אמר כי נתן למוהנד סך של כ- 3,000 דולר ואף נשק (זכי"ד ת/43 סי 16-14 שהוגש ואושר על ידי החוקר "רוברטי" בעמי 62; זכי"ד ת/59 סי 10 שהוגש ואושר על ידי החוקר "יואדי" בעמי 56; זכי"ד ת/67 סי 6 שהוגש ואושר על ידי החוקר "אמילי" בעמי 54; זכי"ד ת/68 שהוגש ואושר על ידי החוקר "סטיבי" בעי 53).

בתמליל חקירתו של הנאשם (ת/98ד עמי 21-23), הוא מספר על כך שמוהנד הודיע לו שהחוליה שלו נתפסה, והסביר שמוהנד התייחס **"לאלה שאנחנו סידרנו להם נשק".**

44.     קשריו של הנאשם עם מוהנד עולים גם מדברים שאמר בהודעתו כמאל אבו ועד (להלן: "ועד"), לפיהם הוא היה מקבל כסף ממוהנד בידיעתו ובהוראתו של הנאשם. בדרך זו הוא קיבל מהנאשם, באמצעות מוהנד, סכום של כ- 25,000 ₪, שרובו יועד לייצור מרגמה וקניית אקדחים. בשלב מסוים תחל הנאשם להתקשר ישירות אל ועד, ולברר מהם צרכיו. כמו כן אמר ועד בחקירתו כי הנאשם היה מעביר לו כספים גם דרך גימאל אחויל, וכי לאחר ביצוע הפיגוע במירב התקשר אליו הנאשם כדי לברר שמות האנשים שתשתתפו בפיגוע, על מנת להעביר לחם כספים (ת/181ב עמי 5-4 , וזכי"ד ת/181ד סעי 6). ועד אמר בחקירתו כי הוא ומהנד היו מחוליטים בנירתם למה הוא זקוק, ואז הנאשם היה שולח לחם את הכסף; הנאשם נתג לחתקשר לועד ולברר שהכסף ששלח לו עם מוהנד אכן הגיע (זכי"ד ת/181ד סעי 6.1). בשלב מסוים ניתק הקשר בין ועד לבין מוהנד, והנאשם אמר לועד כי יש לו בעיות כלכליות, ואין לו כסף לקנות כדורים; בשלב זה הפנה הנאשם את ועד לגימאל אחויל לצורך קבלת כספים (זכי"דים ת/181ג סעי 15 ו- ת/181ד סעי 6.1).

45.     ועד ביצע מספר פיגועי ירי במסגרת פעילותם של גדודי חללי אלאקצא, והוא פרט את הפיגועים בהם השתתף בהודעותיו במשטרה ובחקירתו בשב"כ. בעדותו סרב להשיב על שאלות (עמי 189-188), ולפיכך הוגשה הודעתו במשטרה (ת/181א-ב) לפי סעיף 10א. לפקודת הראיות, באמצעות החוקר גדיר סאלח, שהעיד כי היא נמסרה מרצונו החופשי של ועד בשפה הערבית, אך

נרשמה בעברית (עמי 209). כמו כן הוגשו שני זכ״דים מחקירתו של וער בשב״ב (ת/181ג-ד, שהוגשו באמצעות החוקר ״נ וורה״ בעמ׳ 205). אמרות החוקר של וער אמנם אינן נתמכות בראיות נוספות, אך הובאו ראיות רבות על הסיוע שהגיש הנאשם לאנשי השטח לצורך רכישת נשק לביצוע פיגועים.

### (9)   נאסר (חלום) נאגיי אבו חמיד

46.   נאסר חלום נאגיי אבו חמיד (להלן: "חלום") הוא אחיו של אבו חמיד, והוא ביצע פיגועי ירי מסגרת גדודי חללי אל-אקצא. חלום היה מעורב בפיגוע בו נורתה למוות השוטרת גלית ארביב ז״ל בנווה יעקב ירושלים (ראה פרק ה(10) להלן). הוא גם השתתף בחבלת הפיגוע הקטלני במוסעדת "סי פוד מרקט" בתל אביב (ראה פרק ה(12) להלן). הוא הורשע על פי הודאתו ונדון לעונש של חמישה מאסרי עולם מצטברים (ת/161אי-בי).

בעדותו סרב חלום להשיב על שאלות (עמי 76-73), וטען כי הנאשם הוא מנהיג פוליטי שאין לו קשר עם "ענייניו צבאיים". לפיכך הוגשו חודעותיו במשטרה (ת/162אי-גי על ידי השוטרים מזרחי ואלקרעאן בעמ׳ 184, 194). הקשר של חלום היה עם אחמד ברגותי, שהיה עוזרו הקרוב של הנאשם.

### (10)   זיאד חמודה

47.   זיאד חמודה (להלן: "חמודה") היה פעיל בתנזים. בעדותו סרב חמודה להשיב על שאלות, ולאחר שהוגשה הודעתו לפי סעיף 10א. לפקודת הראיות, כאשר הוכרז כעד עוין, הוא טען כי חתם על הודעתו על מנת שיעשו לו ניתוח אפנדיציט (עמי 166-197). הוא הכחיש את הדברים שאמר בהודעתו ת/167ב, וטען כי הנאשם הוא "איש שלום". הודעתו של חמודה נגבתה על ידי השוטר אבי עקיבא, אשר לא הובא לעדות, ולפיכך היא לא הוגשה כדין ויש להתעלם ממנה.

חמודה הורשע על פי הודאתו בשורה ארוכה של עבירות ביטחוניות (ת/167א). בכתב האישום בו הודה חמודה, נטען כי הוא גויס לתנזים על ידי הנאשם, לצורך הכשרה צבאית, והוסכם לו כי הנאשם ידאג לו לסיוע כספי. כמו כן נטען בכתב האישום בו הודה חמודה כי הוא פנה אל הנאשם לקבלת נשק לצורך ביצוע פיגוע ירי לעבר הישוב פסגות, והנאשם הפנה אותו אל מותנד לצורך קבלת נשק (פרט חמישי ופרט שביעי לכתב האישום). בחקירתו בשב״כ אישר הנאשם כי חמודה ביקש ממנו נשק, ולמיטב זכרונו לא קיבל זאת (זכ״ד ת/34 ס׳ 5 שהוגש ואושר על ידי החוקר ״אתי״ בעמ׳ 52).

במקום אחר בחקירתו אמר הנאשם כי ייתכן שחמודה קיבל ממנו רובה MP-5 (תמליל חקירה ת/ 98הי עמי 67). אין ברומר הראיות דבר המפליל את הנאשם זולת הודאתו של חמודה בעובדות כתב האישום לפיו הורשע, ולא ניתן לבסס ממצאי כלשהו על סמך הודאה שכזו (ראה סעיף 132(ג) להלן). אך הובאו ראיות רבות אחרות בדבר הסיוע שהגיש הנאשם לאנשי השטח לצורך רכישת נשק לביצוע פיגועים.

### (11)   ריאד עמור

48.   ריאד עמור (להלן: "עמור") היה פעיל שטח נוסף של התנזים, שפרט בחקירתו את הפיגועים בהם נטל חלק. בעדותו סרב להשיב על שאלות (עמי 174-172), וטען כי לא היה לו קשר עם הנאשם. הוא הוכרז כעד עוין, והודעותיו ת/169אי-בי הוגשו באמצעות השוטרים דוד מזרחי ויעקב ברזאני, שהעידו כי עמור מסר אותן וחתם עליהם מרצונו החופשי (עמי 186,208). ההודעות נגבו בערבית אך נרשמו בעברית (שלא על פי המקובל והדרוש). עמור הורשע עפ״י הודאתו בביצוע פיגועים רבים (ת/169גי-די).

**49.** עמור סיפר בחקירתו כי פגש את הנאשם כחצי שנה לפני מעצרו, והנאשם אמר לו כי הוא מרוצה מהפעילות של עמור וחבריו בבית לחם, וכי עדיף שיעשו פיגועים כנגד הצבא ולא כנגד מטרות אזרחיות, כי **״זה עושה בעיות״,** ו**״גורם כאב ראש ליו״ר״** (ת/169אי עמי 3, ת/169בי עמי 11). הנאשם טען בחקירתו במשטרה כי איננו מכיר כלל את ריאד עמור (ת/104 עמי 9), ואין כל ראיה לסתור טענה זו זולת אמרת החוץ של עמור הטעונה חיזוק, שלא נמצא לה. אך הובאו ראיות רבות אחרות בדבר עמדתו הכללית של הנאשם בעד ביצוע פיגועים כנגד חיילים ומתנחלים.

### (12) נאצר חאגי

**50.** נאצר חאגי (להלן: **״חאגי״**) פעל אף הוא במסגרת הפתייח, ופרט בהודעתו ת/170אי את הפיגועים בהם נטל חלק. בעדותו סרב תחילה להשיב על שאלות, ולאחר מכן הכחיש את כל מה שאמר בחקירתו (עמי 176-175).

לפיכך הוגשה הודעתו לפי סעי 10א. לפקודת הראיות, באמצעות החוקר משה לוי, שהעיד כי חאגי מסר את ההודעה מרצונו החופשי לאחר שהוזהר בדבר זכויותיו (עמי 212-211).

בהודעתו הנייל אמר חאגי כי פנה יחד עם פעילים אחרים למשרדו של הנאשם בבקשה לקבל כספים ונשק. הנאשם אמר להם לחפש נשק, וכי הוא יממן את רכישתו. מאוחר יותר נתן לו הנאשם 1,200 דולר לצורך רכישת נשק (עמי 5-4). אין בחומר הראיות דבר לחיזוק אמרת החוץ הנייל של חאגי הטעונה חיזוק, אך הובאו ראיות רבות לסיוע שהגיש הנאשם לאנשי השטח ברכישת נשק לצורך ביצוע פיגועים.

### (13) תחריר ברגותי

**51.** תחריר ברגותי (להלן: **״תחריר״**), שהוא קרוב משפחה של הנאשם, ביצע על פי מה שמסר בחקירתו פיגועי ירי רבים. הוא סרב להשיב על שאלות בבית משפט (עמי 178-177), ולפיכך הוגשו הודעותיו במשטרה לפי סעי 10א. לפקודת הראיות (ת/171אי-די), באמצעות השוטר יעקב ברזאני שגבה אותן, והעיד כי ההודעות נמסרו מרצונו החופשי של תחריר בשפה הערבית, ותורגמו לעברית לאחר מכן (עמי 207).

**52.** תחריר אמר בחקירתו כי פנה אל הנאשם בבקשה לסייע לו להקים חוליה. הנאשם הבטיח לעזור לתחריר בכסף ובתחמושת, ולסייע לאנשיו אם ייעצרו. הנאשם אף הציע לתחריר להיות אחראי על החוליה, ולהתרחק מפעילות בעצמו. תחריר הסביר בחקירתו כי פנה אל הנאשם על מנת לקבל נשק לחוליה שהקים (ת/171די עמי 3). לאחר מכן נמשך הקשר באמצעות מוחנד, שרמז לו כי הנאשם אינו מעונין שהוא יקח חלק בפעילות; הנאשם עצמו הסביר לתחריר כי עמדתו זו נובעת מכך שחברי החוליה שלו הם נוכלים (ת/171 עמי 4).

הנאשם הכחיש בחקירתו במשטרה את כל דבריו של תחריר (ת/104 עמי 10-9). ואולם בחקירתו בשבייכ הודה הנאשם כי תחריר פנה אליו על מנת לבצע פיגועים, וביקש נשק לצורך כך. אלא שלטענת הנאשם הוא לא נענה לבקשה (זכייד ת/30 סי 1, שהוגש ואושר על ידי החוקר ״אמילי״ בעמי 54). אין בחומר הראיות דבר זולת אמרת החוץ של תחריר, הטעונה חיזוק שלא נמצא, לסתירת טענתו של הנאשם. אך הובאו ראיות רבות לכך שחנאשם סייע לאנשי הטרור לרכוש נשק לצורך ביצוע פיגועים.

### (14) אחמד מוצפר

53. אתמצ מוצפר היה סוחר נשק שסיפק כלי נשק לאנשי התנזים ולגדודי חללי אלאקצא. בעדותו (עמי 188-186) סרב להשיב על שאלות, והתכחש לכל מה שאמר בחקירתו. מוצפר הוכרז כעד עוין והוגשה במשטרה הוגשה לפי סעיף 10א. לפקודת הראיות (ת/179), באמצעות החוקר יעקב ברזאני, שהעיד כי ההודעה נמסרה לאחר שמוצפר קיבל אזהרה לגבי זכויותיו, וחתם על ההודעה שנגבתה בערבית, אך נרשמה בעברית (עמי 208).

בהודעתו סיפר מוצפר על פגישתו שלו ושל חבריו במשרדו של הנאשם, יומיים לפני הריגתו של ראיד כרמי. הנאשם אמר להם כי הם צריכים להמשיך בפעילות בכפר מגוריהם, ולא ברמאללה, והבטיח לעזור להם. לאחר מותו של כרמי קיבל מוצפר הוראה לבצע פיגוע נקמה; ההוראה הגיעה ממחמוד גיאבר, שעבד במשרדו של הנאשם, ולכן הבין מוצפר שמדובר בהנחיה של הנאשם (ת/179 עמי 7-6). הנאשם הכחיש בחקירתו במשטרה את דבריו של מוצפר (ת/104 עמי 3), ואין ראיה לחיזוק אמרת החוץ של מוצפר, זולת הראיות הרבות שהובאו בדבר קריאתו של הנאשם לנקום בדרך פיגוע את מותו של כרמי.

### (15) שריף נאגיי

54. שריף נאגיי (להלן : "שריף"), היה חבר בחולייה של אחיו אבו חמידי, שביצעה פיגועים כנגד אזרחים ישראלים, והוא גם היה שומר ראשו של הנאשם. שריף היה זה שליווה את המתאבד אברהים חסונה, אשר ביצע את הפיגוע בייסי פוד מרקטיי בתל-אביב, הוא פירט בהודעתו את כל מעלליו.

שריף, כמו יתר חבריו, סרב בעדותו להשיב על שאלות, פרט לכך שטען כי הכיר את הנאשם רק מהטלויזיה. הוא הוכרז כעד עוין והודעתו ת/182, אליה צורף כתב יד המתורגם בערבית ת/182א, הוגשה באמצעות החוקר אבי בן לולו, שהעיד כי ההודעה נמסרה מרצונו החופשי של שריף (עמי 210).

55. בהודעתו ת/182 מספר שריף על פיגועי הירי שביצע לעבר חיילים ומתנחלים במסגרת ארגון התנזים של פתייח. הוא הסביר כי ביצע את הפיגועים על מנת שהאינתיפאדהה תימשך דווקא משום שהוא מעונין בשלום, והוסיף: **"כך היו אומרים לנו ערפאת ומרואן ברגותי וחוסין אשיך היו אומרים בטלויזיה הפלשתינאית ובאלגיזירה... הם היו אומרים שאם האינתיפאדהה תימשך אז אנחנו נקבל יותר שטחים ויותר דברים מישראל"** (עמי 4). הנאשם הכחיש בחקירתו במשטרה אמירת דברים אלו (ת/103 עמי 5).

לאחר שהחולייה של שריף התפרקה בשל מותו של מוחמד עומסי, החל שריף לשמש כשומר ראשו של הנאשם במשך כחצי שנה עד למעצרו. הוא אמר בחקירתו על הנאשם : **"הייתי שומע אותו אומר לאנשים שלו שימשיכו בפיגועים והיה מכנה את בטלוזיזיה הישראלית והערבית באופן חופשי"** (עמי 5). בחלקה השני של ההודעה סיפר שריף על חלקו בפיגוע במסעדת "סי פוד מרקטיי בתל-אביב, ועל מעורבותו של אחמד ברגותי בפיגוע (עמי 11-5). הנאשם הכחיש בחקירתו כי היה לו קשר כלשהו עם שריף, אם כי הכיר אותו (זכייד ת/34 סי 4, שהוגש ואושר על ידי החוקר "איתיי" בעמי 52). ואולם הדברים שאמר שריף נתמכים בראיות רבות שהובאו על כך שהנאשם היה קורא באמצעי התקשורת לבצע פיגועים כנגד ישראל, וכך אף הורה לאנשיו לעשות.

### (16) אמיד אבו רדאחה

56. אמיד אבו רדאחה (להלן: "אבו רדאחה") היה פעיל נוסף בתנזים שביצע פיגועי ירי לעבר חיילים ומתנחלים, כפי שסיפר בחקירתו. בעדותו טען שלא היה לו שום קשר עם הנאשם ועם אחמד ברגותי, וכי לא קיבל נשק מהנאשם אלא מהרשות הפלשתינאית.

הוא טען שהחוקרים כתבו בהודעתו דברים שלא אמר, והכחיש את הדברים המופיעים בהודעתו
(עמי 192-194). הודעתו של אבו רדאחה (ת/183) הוגשה באמצעות החוקר מאיר כהן, אשר העיד כי
ההודעה נמסרה מרצונו החופשי של אבו רדאחה, נגבתה בערבית אך נרשמה בעברית (שלא על פי
המקובל והנדרש), והנחקר חתם עליה (עמי 209).

57. אבו רדאחה סיפר בהודעתו כי את הנשק והתחמושת לביצוע פיגועים קיבל מהנאשם
ומאחמד ברגותי, שאף נתנו לאנשי החוליה כסף להוצאות שוטפות (עמי 2, 6). הנאשם הכחיש
בחקירתו במשטרה את דבריו של אבו רדאחה (ת/104 עמי 3). ואולם הובאו ראיות רבות על כך
שהנאשם עסק באספקת כספים ונשק לאנשי השטח של התנזים לצורך ביצוע פיגועים כנגד ישראל.

### (17) אשרף גיאבר

58. אשרף גיאבר (להלן: "גיאברי") היה אף הוא פעיל שטח בתנזים, שביצע פיגועים כנגד מטרות
ישראליות יחד עם אחרים, וביניהם אבו רדאחה. גיאבר סרב להשיב על שאלות בעדותו (עמי -195
197), ולפיכך הוגשה הודעתו בצרוף שרטוט שערך (ת/184א-ב) באמצעות החוקר משה לוי, אשר
העיד כי החודעה נמסרה מרצונו הטוב של הנחקר, נגבתה בערבית ותורגמה לעברית (עמי 212).

59. בהודעתו ת/184א סיפר גיאבר על הפיגועים שביצע, וציין כי פנה עם חבריו למשרדו של
הנאשם בבקשה לקבל תחמושת וכספים לחברי החוליה; הנאשם הבטיח כי הוא ישלם עבור
התחמושת, ואכן עשה כן באמצעות אחמד ברגותי, שהדרורים נמסרו לו תמורת סך של 3,000 ₪.
גיאבר הסביר כי מסר את הכדורים לנאשם, משום שהוא ראש התנזים והוא מחלק את הכדורים
לפעילי התנזים (עמי 4-3).

הנאשם הודה בחקירתו כי גיאבר ביקש ממנו סיוע כספי ונשק, אך אמר שאיננו זוכר מה בדיוק נתן
לו (זכ"ד ת/48 סי 3-2, שהוגש ואושר על ידי החוקר "רוברטי" בעמי 62).

## ד. דברי הנאשם בחקירתו וראיות נוספות בדבר תפקידו ומעורבותו בפיגועים נגד ישראל

### (1) אחריותו הכוללת של הנאשם לפעילות חוליות הטרור ומידת שליטתו בהן

60. הנאשם, כאמור לעיל, לא הכחיש בחקירתו בשב"כ כי היה מפקדם ומנהיגם של פעילי
השטח של הפתייח בגדה, היה מפקד הפתייח והתנזים בגדה, הקים את גדודי חללי אלאקצא והיה
אחראי על פעילותם. הוא גם אישר כי היה אחראי על אספקת כספים ואמל"ח לחוליות חשטח, וכן
היה אחראי על פעילותו הצבאית (ראה סעיף 17 לעיל). הנאשם הסביר בחקירתו כי מצא עצמו
מעורב יותר ויותר בקשר עם "החוליות הצבאיות", אשר היו פונות אליו בבקשות סיוע שונות, שכן
אנשים כמו ראיד ברקמי ונאצר עויס ראו בו את מפקדם. הוא גם אמר כי הקשר שלו עם אנשי
החוליות בוצע באמצעות עוזרו ונהגו האישי אחמד ברגותי. הנאשם עשה אבחנה בין פיגועים בתוך
ישראל, שעליהם סרב לקחת אחריות, לבין פיגועים שביצע הפתייח בגדה המערבית, עליהם הוא
לוקח בחקירתו אחריות מלאה (זכ"ד ת/25 סי 20, שהוגש ואושר על ידי החוקר "מופזי" בעמי 58).
הנאשם הדגיש כי הוא אחראי לפעילות של הפתייח בגדה, אך איננו בקיא בפרטים, כגון סוג הנשק,
אופן רכישתו, תכנון הפיגועים וביצועם (זכ"ד ת/27 סי 1, שהוגש ואושר על ידי חחוקר "סמית"
בעמי 85).

בחלק מחקירותיו טען הנאשם כי הוא איננו אחראי באופן ישיר מבחינה פיקודית לפעילותן של
חוליות השטח (זכ"ד ת/42 סי 7, שהוגש ואושר על ידי החוקר "ואדיי" בעמי 96). ואולם בשלבים

אחרים של חקירתו הודה חנאשם כי הוא אחראי לפעילותן של החוליות שפעלו עם אחמד ברגותי ואבו סטחה, משום שאלה היו קרובים אליו והוא מימן את פעילותם; ביתר פירוט הוא ציין כי הוא רואה עצמו אחראי לשלושה פיגועים, בגבעת זאב, בגבעה הצרפתית, ובנוער עטרה (המבוא לזכ״ד ת/ 38 שהוגש ואושר על ידי החוקר ״סמית״ בעמ׳ 85). הנאשם לא ראה עצמו אחראי, בדבריו אלה, לפיגועים שביצעו החוליות של עויס, מנצור שרם ואחרים שצויין, ולא ראה עצמו כמפקדם. הנאשם אמר על יחסיו עם עויס: **״אני יש לי שליטת כבוד על נצר, לא שליטה בפועל״** (תמליל שיחה ת/ 98יא עמ׳ 17). הנאשם הסביר בחקירתו, בהתייחסו לחוליות השטח שביצעו פיגועים כנגד ישראל (תמליל שיחה ת/98יא עמ׳ 4):

**״החוליות האלה מצאה לעצמה יותר מכתובת אחת. מה זאת אומרת כתובת. כתובת שהיא פונה אליו ומבקשת מימון. לתאם איתו את העבודה שלה, אני אחד מהכתובות האלה, אני כתובת מכמה כתובות. ראשי מנגנוני הביטחון הם גם כתובות״.**

מכאן נובע כי לדברי הנאשם לפחות חלק מהחוליות תיאמו עמו את הפיגועים, וראו בו כתובת למימונם, כפי שאכן עולה מראיות רבות שהובאו בפנינו. הנאשם אמר בעניין זה כי חקשר שלו עם החוליות לא היה ישיר, משום שהוא לא רצה להיכנס לתחום הצבאי, ולא רצה לעסוק ״בהרס״ (תמליל שיחה ת/98יא עמ׳ 6). אכן, בעיקרו של דבר, הקשר של הנאשם עם חוליות הפיגוע התקיים באמצעות אנשי קשר שהיו מקורבים אל הנאשם, ובעיקר אחמד ברגותי. כפי שאמר הנאשם על אחמד ברגותי: **״הוא יוצר קשר עם החוליות האלה. באומן ישיר איתם ישירות. יעני בלעדיו לא היתה לי התקשרות ישירה עם שום חוליה״** (תמליל שיחה ת/98יא עמ׳ 8).

הנאשם טען אמנם כי חוליות השטח היו מבצעות פיגועים גם אלמלא תמיכתו בהן, וגם אלמלא הסיוע הכספי והארגוני שהעניק להן (זכ״ד ת/63 סי 20-18 שהוגש ואושר על ידי החוקר ״נאורי״ בעמ׳ 82). טענה זו איננה מפחיתה במאומה מאחריותו של הנאשם לפיגועים שביצעו חוליות אלו.

61.   בתחילת חקירתו בשב״כ הכחיש הנאשם כי היה אחראי למתן כספים ונשק לשם ביצוע פיגועים (זכ״ד ת/14 סי 4 שהוגש ואושר על ידי החוקר ״יגבי״ בעמ׳ 93, זכ״ד ת/10 סי 1, שהוגש ואושר על ידי החוקר ״דני״ בעמ׳ 90). ואולם בהמשך חקירתו הודה הנאשם (זכ״ד ת/29 סי 1ג-ד שהוגש ואושר על ידי החוקר ״סמית״ בעמ׳ 85):

**״במסגרת תפקידי כמזכיר הפת״ח אני אחראי לכל הנעשה כגון אספקת כספים לחוליות, רכישות נשק וביצוע פיגועים. יש חוליות רבות בשטח, חלקן מאורגנת תחת פיקודי באמצעות מס׳ אנשים כגון אחמד ברגותי, נאצר עויס, ויש בשטח גם חוליות לא מאורגנת מטעם הפת״ח שאליהן ועימן אין לי קשר״.**

הנאשם לא התכחש ליכולת ההשפעה שלו על חוליות הטרור שלהן סייע בכסף ובמתן נשק, ואמר בהתייחסו לחולים שכזו (תמליל בחקירתו ת/98 עמ׳ 32): **״אם אתה קנית לה נשק, אם אתה נותן לה את הנשק, אם אתה ממנן אותה ואתה מתכנן בשבילה. על זו אתה יכול להשפיע״.** ואולם הנאשם הוסיף: **״משפיע, אתה לא יכול לשלוט״** (שם, עמ׳ 37).

62.   הנאשם סיפר בחקירתו כי כאשר קיבל החלטה אסטרטגית לבצע פיגועים כנגד ישראל על מנת להתנגד לכיבוש, הוא הקים חוליה, וסיפק לה באופן לא ישיר כספים ואמל״ח לצורך ביצוע פיגועים. הוא ציין כי את הפיגועים חובילו בעיקר אבו חמיד, אחמד ברגותי ועויס (זכ״ד ת/35 סי 1, שהוגש ואושר על ידי החוקר ״דני״ בעמ׳ 90). מבחינתו, מי שהיה מטופל בפעילות הצבאית באזור רמאללה היו אחמד ברגותי ואבו חמיד, שהפעילו כמה חוליות (זכ״ד ת/27 סי 2, שהוגש ואושר על ידי החוקר ״סמית״ בעמ׳ 85).

הנאשם הודה כי תמך באחמד ברגותי וסייע לו בכספים, וכי ידע שהוא אחראי לביצוע פיגועים שונים (תמליל ת/98ח עמי 24-20). כמו כן, הודה הנאשם כי היה מעודד את ראיד כרמי לבצע ״פעילות כנגד הכיבוש״, וסייע לו מבחינה כספית, כאשר בקשות הסיוע הועברו לערפאת שאישר אותם (זכ״ד ת/67 סי 8, שהוגש ואושר על ידי החוקר ״אמילי״ בעמי 54). בחקירתו במשטרה, לעומת זאת, הכחיש הנאשם כל קשר עם ראיד כרמי (ת/104 עמי 8), ובתחילת חקירתו בשב״כ טען כי העביר לו כספים בלא שידע לאיזו מטרה נועדו (זכ״ד ת/18 סי 5, שהוגש ואושר על ידי החוקר ״נדבי״ בעמי 78).

63. קשריו של הנאשם עם פעילי הטרור של הפת״ח, והסיוע השותף שהגיש להם, עולים בבירור מן המסמכים שנתפסו על ידי צה״ל במבצע ״חומת מגן״ במשרדי הארגונים, כולל משרדו של הנאשם (קלסר ת/5).

התביעה הגישה חוות דעת של מומחה מז״פ המוכיחה כי הנאשם חתום על חלק מהמסמכים, ולגבי חלקם האחר ניתן להסיק מסקנות מתחייבות מעצם העובדה שהם נשלחו אל הנאשם, או נמצאו במשרדו. רסי״נ לי, סגן מפקד היחידה העוסקת באיסוף מסמכי שלל, העיד על תפיסת המסמכים, סימונם ומיונם (בעמי 48-46). המסמכים שנתפסו הועברו לחוקר השב״כ ״יעוגן״ (ראה עדותו בעמי 48), אשר זיהה בעדותו את המסמכים שצורפו לזכד״ים מחקירתו של הנאשם (עמי 50-48). הנאשם אמר בשיחתו עם אחמד ברגותי, שהוקלטה בלא ידיעתם של שניים, כי מדובר במסמכים שנתפסו במשרדו, והשניים היו מותרדים מאוד מכך שתפסו את ״כל הארכיון״ של הנאשם; הנאשם אמר ״כל הארכיון המשרד, כאן״ (ת/127ג עמי 62-61).

חוות דעת מז״פ לגבי כתב ידו של הנאשם (ת/5), ניתנה על ידי יאיר בן שמש, והיא התבססה על שלושה כתבי יד של הנאשם, שלגביהם הוא אישר בחקירתו כי הם נכתבו בכתב ידו (שלושת המסמכים בת/5 הם 12, 96-94 ו- 35, והנאשם מתייחס אליהם בזכד״ים ת/28, ת/28ב, ת/47, ת/ 85 ות/85א, שהוגש ואושר על ידי חוקרי השב״כ ״ואדי״ בעמי 96 ו״אופר״ בעמי 87). חוקר מז״פ חילק את המסמכים לארבעה קטגוריות: אלה שנכתבו על ידי הנאשם ללא ספק של ממש; אלה שקיימת אפשרות סבירה שנכתבו על ידו; אלה שסביר מאוד שנכתבו על ידו; ואלה שהנאשם זיהה בחקירתו כי הם נכתבו על ידו. בחקירתו במשטרה הכחיש הנאשם לגבי כל מסמך שהוצג לו כי כתב ידו מופיע עליו (ת/109-108).

64. מסמך ת/5 (3-5) הוא דו״ח שנשלח לנאשם ביום 8.5.01, וסוקר את פעילות גדודי חללי אלאקצא באזור גיני. בדו״ח מופיעים מספר חתברים והמבוקשים בקרב גדודי חללי אלאקצא, חלוקתם של הגדודים, פירוט פעילותם ותוצאות הפיגועים שביצעו.

בין הפעילות שביצעו הגדודים לפי מסמך זה מנויים פיגועי ירי בכביש יהודה ושומרון, הריגתם ופציעתם של מתנחלים, ופיגוע בתוך שטח ישראל (אום אלפאחם), שבו נהרג קצין ישראלי ונפצעה אזרחית. בנוסף כולל המכתב בקשה לסייע לגדודים מבחינה כספית.

### (2) מעורבותו האישית של הנאשם בפיגועי הטרור שביצעו תוליות שתחת פיקודו

65. מייד עם מעצרו טען הנאשם כי הוא ״איש פוליטי״, אשר אינו מעורב בפעילות צבאית ובביצוע, תכנון, מימון או הנחיה של פיגועים נגד כוחות הביטחון או כנגד ישראלים (זכ״דים ת/6 סי 3 ות/9 סי 2 שהוגשו ואושרו ע״י החוקר ״רוברטי״ בעמי 62, זכ״ד ת/14 סי 4 שהוגש ואושר על ידי החוקר ״גבי״ בעמי 93). ואולם, בהמשך חקירתו בשב״כ הודה הנאשם במעורבות עמוקה בפעילות ״הצבאית״, שהיא שפה נקיה לביצוע פיגועי רצח כנגד אזרחים ישראליים. במקרים מסוימים, כך מסתבר מדברי הנאשם, הוא אף הורה על ביצוע פיגועים באופן ספציפי, או נתן את אישורו

המוקדם לביצועם.

הנאשם טען בחקירתו כי הוא עצמו מעולם לא תכנן פיגוע לפרטיו, וכי החוליות היו מערבות את אחמד ברג׳ותי, ולא אותו, בביצוע הפיגועים שלא תמיד היו על דעתו (זכ״ד ת/72 סי 3, שהוגש ואושר על ידי החוקר ״דני״ בעמ׳ 90). כך למשל הדגיש הנאשם כי הוא דחה את כל ניסיונותיו של אחמד ברג׳ותי לחבוא אליו אנשים שיבצעו פיגועי התאבדות (זכ״ד ת/53 סי -11 13, שהוגש ואושר על ידי החוקר ״מופז״ בעמ׳ 58). עם זאת, הנאשם הודה כי הוא **״נושא באחריות קולקטיבית על הפעילות של אנשי חפת״ח הצבאיים**״ (זכ״ד ת/21 סי 14, שהוגש ואושר על ידי החוקר ״רוברט״ בעמ׳ 63). הנאשם אמר בחקירתו: **״אני לא הוצאתי פקודות לשום חוליה שואלה באנו ואמרנו ואלה אנו רוצים את הפיגוע פלוני במקום מסויים כזה, או זה אנחנו משאירים בשבילה ובשביל האווירה שלה, ולרצון האישי שלה...״** (תמליל שיחה ת/98יא עמ׳ 9).

לדברי הנאשם, לאחר הריגתו של ראיד כרמי בתודB ינואר 2001, עברו הפיגועים לתוך שטח ישראל. הוא ניסה להפעיל את השפעתו על החוליות שסרו למרותו על מנת למתן את הפיגועים בתוך ישראל, אך לא תמיד הצליח בכך (זכ״ד ת/70 סי 17ז, שהוגש ואושר על ידי החוקר ״סטיבי״ בעמ׳ 53). כך למשל אירע בעניינו של מנצור שרם, שהיה אחראי לפיגוע ההתאבדות בחדרה כנקמה על הריגתו של כרמי.

הנאשם שוחח על כך לאחר הפיגוע עם עויס ומנצור ודיווח על כך לערפאת (זכ״ד ת/45 סי 11-6, שהוגש ואושר על ידי החוקר ״ואדי״ בעמ׳ 96). יצויין כי מנצור שרם היה מחלופו של ראיד כרמי, ומינוי זה אושר על ידי הנאשם (ראה דברי אחמד ברג׳ותי בהודעתו ת/165יג עמ׳ 5).

הנאשם אמר בחקירתו כי בדרך כלל היה שומע על הפיגועים לאחר ביצועם מעויס או מאחמד ברג׳ותי, וכי לא היה יורד לפרטים כיצד בוצע הפיגוע ועל ידי איזו חוליה; הוא פירט בחקירתו את הפיגועים שלגביהם קיבל דיווח לאחר ביצועם (זכ״ד ת/70 סי 9, 12, 17, שהוגש ואושר על ידי החוקר ״סטיבי״ בעמ׳ 53, וזכ״ד ת/39 סי 8 שהוגש ואושר על ידי החוקר ״ואדי״ בעמ׳ 96). הנאשם הדגיש אמנם לכל אורך חקירתו כי פרט למקרה אחד הוא לא היה מעורב בעצמו בנטילת האחריות הפומבית על הפיגועים שביצעו גדודי חללי אלאקצא. מי שהיה מוציא את גילוי הדעת לאחר הפיגוע היה עויס בתיאום עם אחמד ברג׳ותי. ואולם לא זו בלבד שאחמד ברג׳ותי פעל כזרועו הארוכה של הנאשם, אלא שהנאשם עצמו הוסיף על הדברים דלעיל ואמר: **״אני נתן כיסוי לעניין הזה, פוליטי תקשורתי... אני מדבר על העניין הזה... אני קורא למאבק, אני מעריך את הפיגועים האלה במאבק וכו׳...״** (תמליל שיחה ת/98יא עמ׳ 40-46). במילים אחרות: הנאשם היה נוטל אחריות על הפיגועים באמצעי התקשורת, בצורה עקיפה וכוללנית מבלי להתייחס לפיגוע ספציפי, ואילו פקודיו היו נוטלים את האחריות הספציפית לכל פיגוע ופיגוע.

מה שברור מדברי הנאשם הוא שמפקדי חוליות הטרור ראו בו את מנהיגם, וכי הוא תמך בהם וסייע להם באספקת אמל״ח לאורך כל פעילותם, ביודעו שהם מבצעים פיגועי רצח כנגד מטרות צבאיות ומטרות אזרחיות בשטחי יהודה ושומרון ובתוך ישראל, כולל פיגועי התאבדות - שלטענת הנאשם היו למורת רוחו. העובדה שפעילי הטרור חבו חובת דיווח לנאשם, מוכיחה שהם הבינו כי הם כפופים לנאשם וכי הם סרו למרותו. כאשר המשיך הנאשם לתמוך בפעיליים אלו ולסייע להם לאחר שדיווחו לו על פיגועים - גם כשהיו אלה פיגועי התאבדות בתוך ישראל - הביע הנאשם בכך את תמיכתו בהמשך פעילותם, כולל פעילות שהוא כביכול לא תמך בה.

הנאשם עצמו סיפר בחקירתו כי יאסר ערפאת נזף בו על הפיגועים שבוצעו בתוך ישראל (זכ״ד ת/ 141 סי 10, שהוגש ואושר על ידי החוקר ״רוברט״ בעמ׳ 58); מכאן נובע שגם ערפאת ראה בנאשם אחראי לכל הפיגועים שבוצעו על ידי חוליות התנזים וגדודי חללי אלאקצא שתחת פיקודו של הנאשם.

se 1:04-cv-00397-GBD-RLE   Document 660-16   Filed 12/04/14   Page 29 of

הנאשם נתן אישור, ולו בדיעבד, לפיגועים שביצעו החוליות שסרו למרותו; בתלקם תמך במפורש, ובחלקם האחר תמך בהתנהגות או בהסכמה שבשתיקה. הוא הפעיל את החוליות שתחת פיקודו בצורה עקיפה, באמצעות הכפופים והמקורבים לו, כגון אחמד ברגותי, אבו חמידי, אבו סטחה ועויס, תוך שמירה על ריחוק מן המפגעים עצמם, והימנעות מכוונת מלערב עצמו באופן אישי בתכנון הפיגועים וביצועם. גם נטילת האחריות על הפיגועים נעשתה על ידי הנאשם בצורה "נקיה" ועקיפה - לא באמצעות גילוי דעת של גדודי חללי אלאקצא, אלא בצורה פוליטית, כביכול, ומרומזת בתקשורת.

66.     מן האמור לעיל עולה כי הנאשם הודה בחקירתו בדברים אשר עולים בבירור גם מעדותיהם של פעילי הטרור, דהיינו, כי מבחינה פיקודית הוא היה אחראי על פעילות התנזים וגדודי חללי אלאקצא בגזה המערבית, שראו בנאשם את מנהיגם; סייע לפעילי הטרור במתן כספים ואמל"ח לצורך ביצוע הפיגועים; הנחיג באופן אישי חלק מחוליות הטרור, באמצעות מקורביו; עודד את חוליות הטרור לבצע פיגועים כנגד ישראל; קיבל דיווחים מן החוליות לאחר ביצוע הפיגועים - וכל זאת ביודעו כי חוליות אלו מבצעות פיגועי רצח והתאבדות גם בתוך ישראל, וגם כנגד אזרחים.

זאת ועוד: הנאשם אף הודה בחקירתו במעורבות אישית הנוגעת לפיגועי רצח ספציפיים של חוליות שבהנהגתו, כדלקמן:

## (אא) הפיגוע בתחנת הדלק בגבעת זאב

לאחר הריגתו של ראיד כרמי ביום 14.1.02, קרא הנאשם בטלוויזיה של אבו דאבי לגדודי חללי אלאקצא לבצע פיגועי נקמה כנגד ישראל (ת/3 מיום 14.1.02). ואולם הנאשם לא הסתפק בקריאה פומבית זו. הוא הורה לאחמד ברגותי להוציא לפועל פיגוע נקמה על מותו של כרמי. ואכן, ביום 15.1.02 בערב נתן אחמד ברגותי נשק לאבו סטחה על מנת לבצע את הפיגוע כאמור. בערב יום זה ירו חברי החוליות של אבו סטחה לעבר מכוניתה של יואלה חן ז"ל ליד גבעת זאב, רצחו אותה ופצעו את הנוסעת שהיתה עמה (על פיגוע זה ראה פרק ה(7) להלן).

הנאשם הודה בחקירתו כי לאחר מותו של כרמי הוא אמר לאחמד ברגותי כי הוא מעונין בפיגוע נקם, ואחמד וחבריו ביצעו את הפיגוע בגבעת זאב, ודיווחו לו לאחר מכן כי היתה תרוגה אחת בפיגוע (תמליל ת/98יא, עמי 44-45). הוא אף הודה כי פיגוע זה בוצע על פי הוראתו, ונטל אחריות לביצועו (זכ"ד ת/23 סי 10-8, שהוגש ואושר על ידי החוקר "זדני" בעמי 90; זכ"ד ת/24 סי 5 והמבוא לז'ד ת/38 שהוגשו ואושרו על ידי החוקר "סמותי" בעמי 85; זכ"ד ת/26 סי 6-3, שהוגש ואושר על ידי החוקר "נדבי" בעמי 79). הנאשם אמר: "אני דיברתי בסוכת האבלים, שצריך לנקום ולהשיב על המעשה הזה...", אם כי לטענתו לא היה מדובר ב"פקודה" שהוא נתן לאחמד ברגותי. באחד מחקירותיו הודה הנאשם: "אמרנו לאחמד שיעני יבצע פיגוע" (תמליל שיחה ת/98 עמי 19, וכן עמי 45-20).

הנאשם הסביר כי חיסולו של כרמי הביא לאובדן השליטה בפת"ח, ולכן "קרא לתשובה על חיסול של ראיד כרמי בכל אמצעי התקשורת... ובאמת החלו התגובות. ובפעם הראשונה פת"ח חוצה את חקו האדום בביצוע פיגועים בתוך ישראל" (תמלילי חקירה ת/98 עמי 31-30, ו- ת/98יא עמי -9

P 7: 000399

10, 12-15, 44-45). הוא ציין בחקירתו כי ההוראה שנתן לבצע פיגוע נקמה בעקבות הריגתו של כרמני נבעה מכך שהוא חש אחריות למותו של כרמי בעיצומה של הפסקת אש, שבה קרא הנאשם לכל הפלגים להפסיק את הפיגועים על סמך התחייבות של ראש השב"כ שלא לבצע פעולות חיסול כנגד אנשי הפת"ח;

היתה זו הפעם היחידה בה הימרה את פיו של ערפאת, אשר דרש באותה עת שלא לבצע פיגועים (זכ"ד ת/31 סי 12, שהוגש ואושר על ידי החוקר "מופזי" בעמי 58, תמליל שיחח ת/98י עמי 29-31, תמליל שיחח ת/98יאי עמי 13-11). הודאה זו של הנאשם תואמת את הדברים שאמר בחקירתו אחמד ברגותי (ראה סעיף 30 לעיל), וכן חדברים שאמרו אבו סטחח (הודעה ת/156ב עמי 5) ומוצפר (סעיף 53 לעיל).

## (בב)   רצח הנזיר היווני במעלה אדומים

הנאשם אישר כי כאשר הציע לו רדאידה לבצע פיגוע התאבדות, הוא הפנה אותו אל מוהנד על מנת שיכוון אותו לביצוע פיגועים מחסוג שחוליות הפת"ח מבצעות; בעקבות כך בוצע הפיגוע במעלה אדומים בו נרצח נזיר יווני, מתוך מחשבה כי מדובר ביהודי (ראה דברי רדאידה בסעיפים 42-43 להלן, ופרק ה(3) להלן הדן בפיגוע זה).

## (גג)   הפיגוע במסעדת "סי פוד מרקט" בתל-אביב

הנאשם קשר עצמו בחקירתו בצורה ברורה לפיגוע במסעדת "סי פוד מרקט" בתל-אביב, שבו נרצחו שלושה אנשים (על פיגוע זה ראה פרק ה(12) להלן). אמנם בתחילת חקירתו בשב"כ טען הנאשם כי אין לו קשר לפיגוע זה, שעותו עומד מאחוריו, וכי ערפאת כעס מאוד על ביצוע פיגוע זה (זכ"ד ת/25 סי 12-13, שהוגש ואושר על ידי החוקר "מופזי" בעמי 58). ואולם, בחמשך חקירתו הודה הנאשם כי ידע מפי מקורבו אחמד ברגותי, שהיה אחד ממתכנני הפיגוע, על הכוונה לבצע את הפיגוע, וזאת כשבוע לפני ביצועו; אחמד הודיע לנאשם כי אברהים חסונה - הממגע - מוכן לביצוע הפיגוע. הנאשם הדגיש כי הוא לא ליווה את ביצוע הפיגוע, ואף הנחה את אחמד ברגותי שהפגיוע יבוצע ביהודה ושומרון, בהתגחלות או במחסום צבאי, ולא בתוך ישראל (זכ"דים ת/44 סעיפים 3-7 ו- ת/ 53 סי 3, שהוגשו ואושרו על ידי החוקר "מופזי" בעמי 58; זכ"ד ת/50 סי 1, שהוגש ואושר על ידי החוקר "ואדי" בעמי 96; זכ"ד ת/52 שהוגש ואושר על ידי החוקר "סמית" בעמי 85).

דבריו אלו של הנאשם תואמים את גרסתו בחקירה של אחמד ברגותי, פרט לכך שהאחרון אמר בחקירתו כי דיווח לנאשם לא רק זמן מה לפני הפיגוע, אלא גם ממש בשעה שבה יצא הממפגע לדרך, וכי הנאשם היה מעורב בניסוח הכרוז הנוטל אחריות לאחר ביצוע הפיגוע (ראה סי 29 לעיל). הנאשם, לעומת זאת, אמר בחקירתו כי לא היה מעורב בניסוח הכרוז שקיבל אחריות על הפיגוע הנ"ל, אם כי הודה שנתן אישור לפרסם כרוז הנוטל אחריות על פיגוע אחר שהתבצע בגשר עטרה (פיגוע מסי 18 בנספח לכתב האישום) (זכ"ד ת/52 הנ"ל וזכ"ד ת/58 סי 3, שהוגש ואושר על ידי החוקר "מופזי" בעמי 58).

**סיכומו של דבר:** הנאשם הודה, כפי שאף עולה מדברי אחמד ברגותי, כי הוא אישר מראש את ביצוע הפיגוע הנ"ל, אם כי ההוראה היתה להרוג אנשים אחרים במקום אחר.

## (דד)   ניסיון לפיגוע ליד קניון מלחה בירושלים

הנאשם סיפר בחקירתו כי העניק סיוע, באמצעות אחמד ברגותי, לפעילים שביצעו פיגועים באזור חברון. באחד הימים דיווח לו אחמד ברגותי כי אחד מפעיליהם אלה (גיהאד גיועארה) מתכנן פיגוע התאבדות בירושלים. הנאשם אמר כי נתן הנחיה באמצעות אחמד ברגותי שהפיגוע יבוצע בשטחים הכבושים ולא בתוך ישראל (על פיגוע זה ראה פרק ה(20) להלן). למחרת דווח לו כי פיגוע

se 1:04-cv-00397-GBD-RLE    Document 660-16    Filed 12/04/14    Page 31 of

ההתאבדות ליד קניון מלחה בירושלים  נכשל (זכ״ד ת/36, שהוגש ואושר על ידי החוקר ״סמית״ בעמ׳ 85). גם כאן אישר הנאשם לבצע פיגוע כנגד ישראל, אם כי במקום אחר.

### (3)   אספקת כספים ואמל״ח לשם ביצוע פיגועי טרור

**67.**   בתחילת חקירתו בשב״כ טען הנאשם כי איננו עוסק בטרור, וכי מעולם לא מסר לאף אדם נשק ולא ירה בנשק (זכ״ד ת/10 סי 1, שהוגש ואושר על ידי החוקר ״דני״ בעמ׳ 90). ואולם בהמשך חקירתו הודה הנאשם כי היה אחראי על מתן כספים ואמצעי לחימה לחוליות השטח של התנזים וגדודי חללי אלאקצא, וכי ידע כי אלה משמשים לביצוע פיגועים כנגד ישראל. כפי שאמר הנאשם: **״במסגרת תפקידי כמזכיר הפתח אני אחראי לכל הנעשה כגון אספקת כספים לחוליות, רכישות נשק וביצוע פיגועים״** (ראה הציטוט מזכ״ד ת/29 בסי 61 לעיל, וכן ראה זכ״ד ת/59 ס׳ 7, שהוגש ואושר על ידי החוקר ״ואדי״״ בעמ׳ 96).
הנאשם הסביר כי היה מעביר את בקשות הפעילים לרכישת אמל״ח ליאסר ערפאת תחת חכותרת ״סיוע אישי״, או ״סיוע כלכלי״ (זכ״יים ת/22 סי 6, 1-ת/25 סי 14 שהוגשו ואושרו על ידי החוקר ״מופז״ בעמ׳ 58). הנאשם אף הודה כי בכך שרכש נשק לחוליות, הוא השיג השפעה על פעילותן (סי 61 לעיל). עוד הודה הנאשם כי סייע מבחינה כספית לאחמד ברגותי ולראיד כרמי, ותמך בהם לצורך ביצוע פיגועים (ראה סי 62 לעיל).

מסמך ת/5 (73-70) שנתפס במבצע ״חומת מגן״, הוא מכתב של ראיד כרמי אל הנאשם מיום 20.1.02, בו מבקש כרמי סיוע לרשימה של פעילים, ובהם כאלו שהני מעורבים בפיגועי טרור על פי הראיות שהובאו בתיק זה; הנאשם הפנה את הבקשה ליאסר ערפאת בכתב ידו (לפי חוות דעת מזייף ת/5). מכתב נוסף שנתפס הוא ת/5(140), שבו פנה מבוקש בשם סאמח אבו חניש לנאשם בבקשה להחזיר לו נשק שחורחדם; כתב ידו של הנאשם נמצא על המכתב (חוות דעת מזייף ת/5). במכתב ת/5(103) פנתה אל הנאשם קבוצת פעילים בבקשה לרכישת כלי נשק, וציינו כי הם ביצעו התקפות רבות כנגד הצבא ומתנחלים, והפכו למבוקשים; גם על מכתב זה מצוי כתב ידו של הנאשם (לפי חוות דעת מזייף ת/5).

**68.**   הנאשם הסביר בחקירתו כי הן החוליות, והן בודדים מן החוליות, היו פונים אליו לקבלת כספים לשם מימון רכישת נשק ולמטרות אחרות, והוא היה מעביר בקשות אלו ליאסר ערפאת (זכ״ד ת/19 סי 14, זכ״ד ת/22 סי 6 וזכ״ד ת/25 סי 14, 19, שהוגשו ואושרו על ידי החוקר ״מופז״ בעמ׳ 58; זכ״ד ת/70 סי 10, שהוגש ואושר על ידי החוקר ״סטיבן״ בעמ׳ 53; תמלילי חקירתו של הנאשם: ת/98יא בעמ׳ 16-13, 21-20, ת/98יא עמ׳ 7, 18-17, 30, ת/98ף עמ׳ 14-13). לדבריו הוא לא היה מציין בפנייתו לערפאת כי הכסף מיועד לרכישת נשק (זכ״ד ת/30 סי 6, שהוגש ואושר על ידי החוקר ״אמילי״ בעמ׳ 54). במסגרת פעילות זו נרכשו כ- 15 כלי נשק ותחמושת בהם בוצעו פיגועים (זכ״ד ת/29 סי ח׳, שהוגש ואושר על ידי החוקר ״סמית״ בעמ׳ 85, זכ״ד ת/60 סי 5, שהוגש ואושר על ידי החוקר ״אמילי״ בעמ׳ 54).
הנאשם הדגיש כי הפעילות הצבאית לא היתה יכולה להתקיים בלא מימון של ערפאת (ת/60 תני״ל סי 7). הוא אמר בעניין זה: **״יש מישהו שבא ואומר לי אני רוצה אלף שקל, אולי הוא מקבל אלף שקל, אני לא שואל אותו, אולי אחרי שבוע הוא ילך לירות, לא אבקת לי״** (ת/98יא עמ׳ 30). הנאשם לא יכול היה לזכור בחקירתו את פרטי הסיוע הכספי שהגיש לפעילי השטח של הפת״ח, והסביר כי מאות פעילים היו פונים אליו בבקשת סיוע כספי לשם מימון הפעילות הצבאית (זכ״ד ת/49 סי 10, שהוגש ואושר על ידי החוקר ״אמילי״ בעמ׳ 54).

**69.**   במסגרת רכישות הנשק עבור פעילי הטרור, הסכים הנאשם לממן רכישת מרגמה בסך של 1,500 דינר, וחנאשם  פירט בחקירתו את הבעיות המבצעיות שבהפעלתה (זכ״ד ת/29 סי י׳ וזכ״ד ת/38 סי 2, שהוגשו ואושרו על ידי החוקר ״סמית״ בעמ׳ 85; זכ״ד ת/42 סי 15-13, שהוגש ואושר על ידי החוקר ״ואדי״, בעמ׳ 96; תמליל חקירתו של הנאשם ת/98יא עמ׳ 8-7). הנאשם ציין

P 7: 000401

בחקירתו כי הוא עצמו התנגד לירי ממרגמה לעבר ישראל, משום שהוכח שהירי איננו גורם נזק לישראלים, אך עלול לגרום נזק רב לפלשתינאים (זכ"ד ת/38 הנ"ל). גרסתו של הנאשם בעניין זה תואמת את גרסתו של אבו-חמזה, אשר הסביר כי הירי במרגמה בוצע לעבר הישוב פסגות, וכי הנאשם ביקש שלא לדבר על כך עם איש (ראה סעיף 25 לעיל).

#### (4)   סיוע למבוקשים ולמשפחות העצורים והחללים

‎70.   הנאשם מימן בפעילותו לא רק את פעילי הטרור, אלא גם את בני משפחותיהם. הוא הודה בחקירתו כי העביר לערפאת בקשות לסייע למשפחות המתאבדים, ואף הצדיק זאת בכך שאין הבדל בין מתאבד לבין אדם שנהרג; כולם בעיניו "שהידים", קרי: מי שמת מות קדושים (זכ"ד ת/ 10 שהוגש ואושר על ידי החוקר "דני" בעמ' 90; זכ"ד ת/54 ס' 5, שהוגש ואושר על ידי החוקר "ואדי" בעמ' 96; שיחת הנאשם עם המדובב "פלוני 3" ת/124ג עמ' 7, 23-22). כמו כן דאג הנאשם למימון משפחות העצורים והמבוקשים מקרב פעילי הפת"ח (שיחת הנאשם עם "פלוני 3" ת/124ג עמ' 23-22).

בנושא זה נתפסו כמה וכמה מסמכים במבצע "חומת מגן", אשר מהווים בקשות סיוע שהפנו המבוקשים לנאשם לצורך רכישת אמל"ח, ועל מנת להסיר מעליהם את עול הפרנסה (ראה: ת/5 ( 12-2) שהנאשם אישר בעת חקירתו אשר תועדה בזכ"ד ת/47 שהוגש ואושר על ידי החוקר "ואדי" בעמ' 96; ת/5 (65-64), ת/5 (87), ת/5 (105), ת/5 (117), ת/5 (118)). כמו כן דאג הנאשם להסדיר מינויים או מקומות עבודה למבוקשים (ראה למשל המכתבים ת/5 (79-78), שלפי חוות דעת מז"פ ת/5 סביר מאוד להניח כי נכתבו על ידי הנאשם).

מסמך נוסף הוא ת/5 (133), הכולל פניח לנאשם לסייע לאנשים בתנועת הפת"ח שביצעו פיגועים ונעצרו על ידי ישראל, ולמבוקשים אחרים; הנאשם העיר על מסמך זה: **"יש עדיפות להכללתם בסיוע"**, ולפי חוות דעת מז"פ ת/5 הערה זו נכתבה, במידה שאינה מותירה ספק של ממש, בידי הנאשם.

עימאד אלשקיר הוא פעיל תנזים שרצח ישראלי בסלפית, וכאשר הפך להיות מבוקש פנה  לנאשם בבקשה לקבלת עזרה, ואף סיפר לו על מעשה הרצח שביצע. הוא הסביר בעדותו כי פנה אל הנאשם, משום שהיה ידוע שהנאשם מסייע במקרים שכאלו, אך תיאר את הנאשם **"כאיש פוליטי שלא משתתף בדברים צבאיים"** (עמ' 184-182).

#### (5)   גיוס פעילים לאירגוני הטרור והדרכתם

‎71.   הנאשם אישר בחקירתו בשב"כ את הדברים שמסר במשטרה אבו חמיד, לפיהם העניק הנאשם סיוע כספי לשם הקמת מחנה אימונים צבאי לפעילי התנזים, על מנת להכשירם ללוחמת גרילה ושימוש בנשק (הודעת אבו חמיד ת/149ג עמ' 2-1). הנאשם אף אישר כי ראיון בעצמו את הצעירים המתאמנים במשרדו (זכ"ד ת/28 סעיפים 11-10, שהוגש ואושר על ידי החוקר "ואדי" בעמ' 96, זכ"ד ת/34 ס' 3, שהוגש ואושר על ידי החוקר "איתי" בעמ' 52, ותמליל חקירת הנאשם ת/98יא עמ' 9). בחקירתו במשטרה הכחיש הנאשם כל קשר לאימונים או הדרכה של פעילי השטח (ת/106 עמ' 3).

אבו חמיד סיפר בהודעתו הנ"ל (עמ' 7-6) כיצד מינה הנאשם את מוהנד כמפקד חוליות לאתר מותו של המפקד הקודם. הנאשם גם אישר בחקירתו את הדברים שאמר במשטרה רדאידה, בנוגע לתהליך גיוסו באמצעות הנאשם (ראה ס' 43 לעיל). מדברי הנאשם ורדאידה עולה כי הנאשם שמע מרדאידה על כוונתו לבצע פיגוע ירי, והפנה אותו למטרה זו אל מוהנד, שהיה מפקד שטח בכיר שביצע פיגועים כנגד מטרות ישראליות. כתוצאה מהפנייה זו בוצע הפיגוע שבו נרצח הנזיר היווני.

**(6) קריאותיו הפומביות של הנאשם לבצע פיגועים כנגד ישראל**

72. כפי שכבר בואר לעיל, לא הסתיר הנאשם בחקירתו את תמיכתו בביצוע פיגועים כנגד מטרות צבאיות ואזרחיות בגדה המערבית, קרי: חיוליים ומתנחלים (ראה סי 16-13 לעיל). הנאשם גם הסביר כי מידו פעם חיה מורה לחוליות שסרו למרותו להפסיק את הפיגועים, ולאחר מכן היה מודיע על חידושם, וזאת באמצעות הופעות פומביות בטלוויזיה (ראה סי 16 לעיל). הנאשם היה ער **להשפעה שיש לדבריו על מבצעי הפיגועים, ואמר: "אני משפיע כי אני מדבר באמצעי התקשורת. יעני אני אומר את העמדה באמצעי התקשורת... המילה שלי נשמעת וכאילו אני דובר בשם תנועת הפת"ח"** (תמליל חקירה ת/98ד עמי 33, וכן ראת עמי 39-37). הנאשם אף לא הכחיש כי אנשי החוליות היו פונים אליו לקבלת סיוע, משום שהיה מופיע כדובר הפת"ח בתקשורת, ונקט עמדה הקוראת למאבק מזוין (תמליל חקירה ת/98ח עמי 61). הוא הודה כי עודד בהופעותיו הפומביות את הפעילים לבצע פיגועים בתוך השטחים כנגד הצבא (תמליל חקירה ת/98י עמי 25, וזכ"ד ת/29 סי 1ב, שהוגש ואושר על ידי החוקר "סמיתיי" בעמי 85).

73. קריאותיו הפומביות של הנאשם לביצוע פיגועים כנגד ישראל תועדו בידי אמי"ן, והוגשו בקלסר ת/3 (כולל הקלטות המקוריות ת/3א-ב) על ידי ראש חטיבת המחקר באמי"ן, תא"ל י. קופרווסר (עמי 38). בעניין זה יש להתעלם ממסמכים הכלולים בקלסר

ת/3, אשר אינם תיעוד של דברים שאמר הנאשם עצמו ברדיו או בטלוויזיה, ושאף הוקלטו. כתבה עיתונאית או ידיעה אחרת המייחסת לנאשם אמירת דברים כאלה או אחרים איננה קבילה לפי דיני הראיות, בהיותה עדות שמיעה.

באופף כללי ניתן לומר כי מעיון בדברים שאמר הנאשם לכלי התקשורת השונים, עולה בבירור כי הוא מדבר בשם גדודי תלילי אלאקצא ותהנגוים, ועומד בראשם. הנאשם קורא לנגפים אלה - לעיתים בצורה ברורה ולעיתים בצורה משתמעת - להמשיך ולבצע פיגועים כנגד ישראל. לאחר כל פעולה של ישראל, הוא הודיע בשם תנועת הפת"ח וגדודי תלילי אלאקצא כי חנקמה לא תאחר לבוא (ראה למשל ראיונות בטלוויזיה של אבו דאבי בימים 14.1.02, ו- 15.8.01). למרות טענתו של הנאשם כי התנגד לפיגועים בתוך ישראל, הוא נשמע כראיונות השונים תומך בפיגועים שבוצעו בתוך ישראל, ואף משבח את מבצעיהם (ראה הצדקת הפיגוע בנתניה בראיון לטלוויזיה של אלגזיירה ביום 18.5.01, הצדקת הפיגוע בירושלים בטלוויזיה של אלגזיירה ביום 9.8.01, ופיגוע נוסף בירושלים אותו הצדיק הנאשם בטלוויזיה "יוטן" ביום 31.10.02).

74. במהלך הלוויתו של עמאד אלענאתי ביום 2.10.00, אמר הנאשם בטלוויזת "יוטן" רמאללה: **"חלפו הימים בהם רק אנו מקריבים קורבנות. עלינו לנקום. יש להרוג ישראלים. יש להרוג ישראלים. כן. יש לנו כדורים. יש לנו רובים והם יופגנו לעבר הכיבוש"**.

בראיון טלפוני לעיתון "אלשרק אלאוסט" ביום 1.3.01 נשאל הנאשם האם התתנגדות של הפלסטינאים עלולה לההפתח מאבנים לכללי נשק, והשיב: **"המאבק המזויין הוא חלק מהאינתיפאדה כעת ואין מסתמכים רק על אבנים. מאז החלה האינתיפאדה הצלחנו להרוג מתוכם 66 ופצענו 416 וזוהי תוצאה טובה"**.

ביום 29.10.01 התראיין הנאשם לטלוויזית "יוטן" רמאללה, ונשאל מהי תגובתו לשני פיגועים שהתבצעו באותו יום בחדרה ובבאקה אלעירביה, והשיב: **"זכותו של העם הפלסטיני, ולמעשה חובה על לוחמיו, להגיב על התוקפנות כנגדם על מעשי הטבח שהתבצעו בבית רימא, בית לחם וטול כרם. לפיכך מה שארע היום הינו תגובה טבעית של הלוחמים הפלסטיניים למעשי הטבח הישראליים"**.

ביום 4.3.02 התראיין הנאשם לעיתון "אלזמאן" היוצא בלונדון, ולדברי הכתב נצ'אל אלליתי אמר

הנאשם כי שני פיגועי ההתאבדות (בבית ישראל וליד עפרה) הינם "**מסר המופנה לישראלים כדי שיחדלו מתמיכתם בשרון**".

לאחר מותו של ראיד כרמי ביום 14.1.02 קרא הנאשם לגדודי חללי אלאקצא לבצע פיגועי נקמה כנגד ישראל, וזאת בטלוויזיה של אבו דאבי (ת/3 - מיום 14.1.02). כך הודה הנאשם בחקירתו (תמליל שיחה ת/98; עמי 78).

ביום 19.5.01 שודרה בטלוויזיה של "יוטן" רמאללה תהלוכה שבראשה עמדו הנאשם ובכיר בחמאס. במהלך התהלוכה דיבר הנאשם ברמקול אל ההמון, והילל את הרוגי האינתפיאדה, וביניהם מבצע הפיגוע בנתניה. כמו כן הבטיח הנאשם להמשיך ולפגוע במתנחלים, ובירך את הפוגעים במתנחלים.

## ה.   הקשר של הנאשם לפיגועים נשוא כתב האישום

75.   בכתב האישום מיוחסת לנאשם מעורבות ב- 37 פיגועים שפורטו בנספח לכתב האישום,
ואשר בוצעו על ידי מפקדי השטח ופעילי הטרור שהיו כפופים לנאשם.
בסיכומיה התייחסה התביעה אך ורק ל- 21 פיגועים מתוך תנספח שצורף לכתב האישום, ולפיכך
גם הכרעת הדין תתייחס אך ורק לאותם 21 פיגועים, שבעניינם הובאו ראיות שלטענת התביעה
קושרות את הנאשם לבצועם. ההתייחסות לפיגועים אלה תכלול את הראיות שהובאו לגבי
התרחשות הפיגוע עצמו, מי היו מתכנניו ומבצעיו ומה היה הקשר של הנאשם לפיגועים או למתכננים
או המבצעים.

### (1)   רצח טליה ובנימין כהנא ז"ל ליד עפרה

76.   ביום 31.12.00 בשעה 06.30, בוצע ירי מן המארב בכביש מספר 60 ליד הישוב עפרה, לעבר
מכוניתם של בני הזוג טליה ובנימין כהנא ז"ל וחמשת ילדיהם. כתוצאה מן הירי התדרדרה
המכונית לתעלה בצד הכביש. בפיגוע נרצחו בני הזוג כהנא (תעודת פטירה ת/128אי-בי), ונפצעו
חמשת ילדיהם (ראה דוחו"ת פעולה של אלי קוגימן ורפייק עפר שלוש ת/128גי-די, לוחות
התצלומים ת/128ח'- טי שהוגשו ע"י קוגימן ושלוש בעדויותיהם בעמי 121, 127, ותעו"צ של רפי"ק
עובדיה ת/128ה'). בבדיקת מזי"פ התברר על פי התרמילים של רובה הקלצ'ינקוב שנתפסו בזירה כי
הנשק ששימש בפיגוע זה, שימש גם בפיגוע מספר 6 בנספח לכתב האישום, שבו נרצח אליהו כהן
ז"ל ליד גבעת זאב (חווי"ד המומחה האוורד סילברווטר ת/128ו'-זי).

77.   בחקירתו במשטרה הודה אבו חמיד כי הוא היה זה שסיפק את הנשק והתחמושת למפגע
שרצח את בני הזוג כהנא ז"ל, אחמד עינדור (הודיעתו של אבו תמיד ת/149(א) עמי 6-4, שנגבתה ע"י
רסי"ר אברהים אלקורּעאן, על פי עדותו בעמי 194). בחוראעתו הנ"ל סיפר אבו חמיד כי עינדור ביקש
ממנו את הנשק (קלצ'ניקוב) והתחמושת לצורך ביצוע ירי לעבר רכב ישראלי ליד רמאללה, ולמחרת
דיווח לו על ביצוע רצח בני הזוג כהנא ז"ל, כפי שהסתבר לו מן הדיווח ברדיו.

בעניין זה רשאים אנו להתייחס אך ורק לעדותו של אבו חמיד, ומצווים אנו להתעלם מן חדברים
שאמר לו עינדור לגבי ביצוע הפיגוע, בהיותם עדות שמיעה. לפיכך, אין בפני בית המשפט ראיה
קבילה על ביצוע הרצח בנשק שמסר אבו חמיד לעינדור. לכן, גם אין ראיה הקושרת את הנאשם
לרצח בני הזוג כהנא ז"ל (הנאשם סיפר בחקירתו כי הכיר את עינדור, שנהרג מפליטת כדור - זכי"ד
ת/68 סי 2). אמנם הובאו ראיות למכבירר בדבר אחריותו הכוללת והעליונה של הנאשם לפיגועים
שנעשו על ידי אנשי הפתי"ח בגדה המערבית, בהיותו מי שהנהיג פעילות זו, קרא לביצועה וסייע
לחוצאתה לפועל באספקת כספים ואמלי"ח. ואולם אין ראיה קבילה על כך שהפיגוע הנ"ל אכן בוצע
בידי אנשי הפתי"ח.

הראיה הקבילה היחידה שיש בעניין זה היא שהנאשם סייע לאבו חמיד לרכוש נשק ותחמושת
לצורך ביצוע פיגועים, כפי שהוזו בחקירתם אבו חמיד והנאשם (ראה פרק ג/2) לעיל), וכי אבו חמיד
אכן מסר את הנשק שרכש בסיועו של הנאשם לעינדור למטרת ביצוע פיגוע ירי. מעבר לכך אין
בפנינו ראיות.

### (2)   רצח עקיבא פשקוס ז"ל באזור התעשיה בעטרות

78.   ביום 25.1.01 בשעה 18:25 בוצע ירי מן המארב לעבר רכבו של אלעזר עקיבא פשקוס ז"ל
באזור התעשייה בעטרות. המנוח נסע ברכב .G.M.C, ונורה באקדח קליבר 9 מי"מ (ראה חווי"ד
מזי"פ ת/129ג). כתוצאה מן הירי נפטר המנוח (תעודת פטירה ת/129א), והוא נמצא במכוניתו ללא
רוח חיים כדקה לאחר הירי (ראה עדותו של הרמן ספאק בעמי 150, דו"ח של רפי"ק ליאור נדיבי ת/
129ב, ועדותו בעמי 132). הארוע מתואר גם בתמונות שצולמו על ידי אבינועם אליה, שצורפו

לתעודת ציבור שהגיש (ת/129ד).

79. אחמד ברגותי הודה בחקירתו כי הוא מסר לאבו סטחה ולאדם אחר רכב לצורך ביצוע פיגוע, ולאחר כמה שעות, השניים דיווחו לו כי ירו על יהודי שנסע ברכב G.M.C באיזור עטרות, וכי הוא נפגע מהירי (הודעה ת/165אי עמי 3, שהוגשה עייי רסייר דוד מזרחי בעמי 184).

אבו סטחה הודה בחקירתו כי ביצע את הפיגוע באיזור התעשיה בעטרות, וירה באקדח אל עבר נהג שנסע ברכב G.M.C ספארי בצבע אפור (כפי שנראה בתמונות ת/129ד׳ שצולמו לאחר הפיגוע), ולאחר מכן דיווח על כך לאחמד ברגותי, שהוא - כפי שאמר אבו סטחה - "**נהגו ויד ימינו**" של הנאשם (הודעה ת/156ב׳, שהוגשה עייי השוטר מרקו דהן בעמי 198).

80. אין בידי חתביעה ראיה כלשהי הקושרת את הנאשם בצורה ישירה לפיגוע הנייל. עם זאת, הובאו ראיות כלליות למכביר לפיהן היה אחמד ברגותי עוזרו הקרוב של הנאשם, ופעל בידיעתו ותחת חסותו בארגון וביצוע פיגועים. הנאשם הודה כי מימן פיגועים שאחמד ברגותי היה מעורב בהם ותמך בפעולותיו, וכי אחמד ברגותי היה מדווח לו לאחר ביצוע הפיגועים. הנאשם גם הודה כי מבחינתו אחמד ברגותי היה האחראי על הפעילות הצבאית באיזור רמאללה, וכי הוא פעל בתיאום עם הנאשם. הנאשם אף הבהיר בחקירתו כי הקשר שלו עם חוליות הטרור נעשה באמצעות אחמד ברגותי (ראה פרק 3(ג) לעיל).

גם אבו סטחה היה מקורב לנאשם, ובתקופה מסויימת אף שימש כשומר ראשו. הנאשם אישר בחקירתו כי אבו סטחה עבד במשרדו והיה תחת אחריותו, באמצעות אחמד ברגותי, והוא ידע שהשניים מבצעים פיגועים כנגד אזרחים באיזור ירושלים (ראה פרק ג׳(4) לעיל).

גם הנאשם אמר בחקירתו כי הוא רואה עצמו אחראי לפעילותן של החוליות שפעלו עם אחמד ברגותי ואבו סטחה - להבדיל מחוליות אחרות - משום ששניים אלו היו קרובים אליו, והוא מימן את פעילותם (ראה סעיף 60 לעיל). הנאשם אף הכיר בכך שבאמצעות הסיוע והנשק שנתן לחוליות אלו הוא רכש השפעה על פעילותן (ראה סעיף 61 לעיל).

כל אלה באים בנוסף לאחריות העל של הנאשם כמפקדים ומנהיגם של כל פעילי הטרור של הפתייח בגדה המערבית, כפי שהוא עצמו הודה (ראה סעיף 65 לעיל), ובנוסף לעובדה שהנאשם עודד ואופן פומבי ופרטני את פעילי הטרור לבצע פיגועים.

השאלה המשפטית הקשה, האם די בכל אלה כדי לבסס אחריות פלילית של הנאשם למעשה הרצח שבוצע בפיגוע זה - כאשר אין כל ראיה הקושרת את הנאשם ישירות לפיגוע - תבחן בפרק המסקנות.

### (3)   רצח הנגיר היווני ציפוקטקיס גרמנוס ז"ל במעלה אדומים

81. ביום 12.6.01 בשעה 22.30 בוצע ירי מן המארב בכביש ירושלים מעלה אדומים, לעבר רכבו הפרטי של הנגיר היווני ציפוקטקיס גרמנוס זייל מסוג טנדר פגיו, שנשא לוחית זיהוי ישראלית. מן הירי נרצח גרמנוס זייל (תעודת פטירה ת/132אי וחוו"ד פתולוגית של פרופי היס ת/ 130בי). על פיגוע זה העידו רפ"ק ניסים מזרחי (עמי 131), שהגיש את דו"ח הביקור הראשוני בזירה ותצלומים (ת/130ג׳-ד׳), וכן הוגשה תעייצ (ת/130וי) על ידי רס"ב אבי לוי ממז"יפ. התרמילים שנתפסו בזירה נבדקו במז"פ (ראה חוו"ד מומחה של רפ"ק אבי קופמן, ת/130ז׳-ט׳).

**82.** רדאיידה הודה בחקירתו כי הוא ביצע את הפיגוע הנ״ל, ותאר את נסיבות ביצועו. הוא סיפר כי פנה אל הנאשם על מנת לבצע פיגוע התאבדות. הנאשם הפנה אותו אל מוהנד, והורה למוהנד לתת נשק לרדאיידה, וכך היה. הנאשם אמר לרדאיידה כי התנועה עושה פיגועים נגד הצבא והמתנחלים, ולא פיגועי התאבדות, וכי הוא נותן לו נשק למטרה זו. ואכן, בנשק (קלצ׳ניקוב) שקיבל רדאיידה ממוהנד, על פי הוראתו הישירה של הנאשם, הוא ביצע את רצח הנזיר גרמנוס ז״ל כפי שתאר בחקירתו, בהסבירו כי סבר בטעות שמדובר במתנחל (ראה פרק ג8) לעיל סעי 42-41).

**83.** הנאשם עצמו אישר בחקירתו את דבריו של רדאיידה, ואמר כי הפנה אותו אל מוהנד לאחר שביקש להתאבד, ולאחר מכן שמע כי הוא הרג בטעות את הנזיר היוונני (סעיף 43 לעיל). לאור כל אלה ברורה אחריותו הישירה והאישית של הנאשם לפיגוע זה.

#### (4) רצח יניב ושרון בן שלום ז״ל ודורון יוסף סוורי ז״ל בכביש 443

**84.** ביום 25.8.01 בשעה 22.30 נרצחו בני הזוג יניב ושרון בן שלום ז״ל, וכן יוסף סוורי ז״ל (אחיה של שרון), שנסעו יחד עם שני ילדיהם במכונית מסוג ״פאסאט״ בעלת לוחית זיהוי ישראלית, וזאת שעה שנסעו בכביש 443 ליד תחנת דלק ״דור אנרגיה״ (ראה העודות פטירה וחוו״ד פתולוגיות ת/131א׳-ג׳).

את תוצאות הפיגוע תארו השוטרים חיים טולדנו ורס״מ שבי עובדיה (עמי 123, 139, ודוח״יות הפעולה שלהם ת/131ד׳-ה׳, בליווי לוח תצלומים ת/131ו׳). הקליעים שנתפסו נשלחו לבדיקת מז״פ, ונמצא שהם נורו משני כלי נשק: תת מקלע MP5 וקלצ׳ניקוב (חוו״ד מומחה ת/131ז׳).

**85.** אחמד ברגותי סיפר בחקירתו כי מסר את רובה ה- MP5 שלו לאבו סטחה, לאחר שאבו סטחה ביקש זאת עבור החוליה שלו, וכעבור זמן מה, שמע מאבו סטחה, וגם בחדשות, כי חברי החוליה שלו ביצעו פיגוע בו הרגו 3 יהודים ליד בית עור (הודעה ת/165א׳ עמי 2, שהונגש על ידי רס״ר מזרחי בעמי 184). גם אבו סטחה סיפר בחקירתו, כי קיבל מאחמד ברגותי את רובה ה- MP5 ומחסנית מלאה כדורים, ומסר אותם לשניים מהחוליה שלו: חוסאם ופיראס. השניים סיפרו לו כי ביצעו את הפיגוע ליד בית עור, בו נהרגו 3 ישראלים (הודעה ת/156ב׳ עמי 3, שהונגשה על ידי החוקר דהן בעמי 198).

מבצע הפיגוע, חוסאם שחאדה, אישר בחקירתו כי הוא ואחר ביצעו את הפיגוע ליד בית עור בכביש 443, בסמוך לתחנת הדלק ״דורי״, כאשר ירה במכונית לבנה מסוג ״פאסאט״ (ראה התצלומים). הוא ציין כי את הירי ביצע ברובה ה- MP5 שקיבל מאחמד ברגותי, ושותפו לפיגוע היה מצוייד בקלצ׳ניקוב. למחרת שמע שחאדה בחדשות כי נהרגו 3 ישראלים כתוצאה מהפיגוע, ודיווח על כך לאחמד ברגותי, שהעביר את הדיווח לנאשם (הודעה ת/160א׳ עמי 5-4, שהונגשה על ידי דהאן בעמי 198). שחאדה סירב להשיב על שאלות בעדותו. לפיכך הוכרו כעד עוין והוגשו הודעותיו ת/160א׳- ג׳. כמו כן הוגשו כתב האישום, הכרעת הדין וגזר הדין שניתנו בעניינו (ת/159א׳-ד׳). הוא אמר בעדותו אך ורק: ״אני **סיפרתי מה שהיה ולא רוצה להגיד כלום**״ (עמי 73). שחאדה הורשע בביצוע פיגוע זה.

**86.** לא הובאה ראיה הקושרת את הנאשם לפיגוע זה, זולת הקשר העקיף של הנאשם, כאמור לעיל, לפיגועים בהם היו מעורבים מקורביו, אחמד ברגותי ואבו סטחה (ראה סעיף 80 לעיל). הנאשם סיפק כספים ונשק לחברי החוליות, באמצעות אחמד ברגותי, לשם ביצוע פיגועים, והנשק ששימש בפיגוע זה סופק על ידי אחמד ברגותי.

השאלה האם די בכל אלה כדי לבסס אחריות פלילית של הנאשם למעשי הרצח שבוצעו בפיגוע זה, כאשר אין ראיה הקושרת את הנאשם ישירות לפיגוע, תבחן בפרק המסקנות.

#### (5) רצח מאיר ויז׳בוייז ז״ל בכביש מסי 9 בירושלים

87.   ביום 15.9.01 בשעה 23:15 נורה מן המארב רכב שנסע בכביש מסי 9 בירושלים, מהגבעה
הצרפתית לשדרות גולדה מאיר. ברכב מסוג רנו אקספרס בצבע לבן נהג משה וייס, אשר העיד כי
נפגע מכדור חנמצא בגופו עד היום בעמוד השדרה, ואילו בן דודו מאיר וייזבורייז ז"ל נהרג מן הירי
(עמי 138, תעודת פטירה ת/132ב, דו"ח פעולה של רפ"ק ליאור נדיבי ת/132א ועדותו של נדיבי
בעמי 132, וכן לוח התצלומים ת/132ג). בזירה נתפסו תרמילי רובה שנשלחו לבדיקת מז"פ, ונקבע
כי הם נורו, כפי הנראה, מאקדח ומתת-מקלע 5 - MP, שממנו נורו גם היריות הקטלניות שרצחו
שלושה אנשים באירוע מסי 4 הנ"ל (חוו"ד מז"פ ת/132ד).

88.   חוסאם שחאדה אמר בהודעתו ת/160א עמי 6, שנגבתה על ידי רס"מ מרק דהן (עמי 198
לפרוטוקול), כי קיבל מאחמד ברגותי אקדח ותת-מקלע 5-MP, ונסע עם שניים אחרים (פיראס
והייתם) ברכב עד שהגיע לכביש מסי 9 לכיוון רמות והגבעה הצרפתית. כאשר הבחינו ברכב טנדר
מסחרי בצבע לבן, הם פתחו באש לעבר נוסעי הרכב ונמלטו לרמאללה. לאחר האירוע ביקש
שחאדה מאבו סטחח, שעבד במשרדו של הנאשם, לדווח לנאשם ולאחמד ברגותי על ביצוע הירי.
למחרת הוא שמע כי אחד הנוסעים שנפגע מן היריות מת מפצעיו (ראה גם סעיף 85 לעיל בנוגע
לעדותו של שחאדה). דבריו של שחאדה נתמכים בדברים שאמרו אחמד ברגותי ואבו סטחח
בחקירותיהם (ראה סעיף 85 לעיל).

89.   הקשר של הנאשם לפיגוע זה, כמו לפיגוע מסי 4 הנ"ל שבוצע אף הוא על ידי שחאדה, איננו
ישיר, שכן לא הובאו ראיות למעורבותו של הנאשם בפיגוע זה.
הקשר העקיף של הנאשם לפיגוע נובע מכך שהוא הוצא לפועל על ידי מקורביו ועוזריו של הנאשם,
אחמד ברגותי ואבו סטחח, שהנאשם אף מימן את פעולותיהם, כולל רכישת כלי נשק.
השאלה המשפטית האם די בכל אלה כדי לבסס אחריות פלילית של הנאשם למעשה הרצח שבוצע
בפיגוע זה - כאשר אין כל ראיה הקושרת את הנאשם ישירות לפיגוע - תבחן בפרק המסקנות.

### (6)   רצח אליהו כהן ז"ל בפיגוע ירי בכביש 443 ליד גבעת זאב

90.   ביום 21.12.00 בשעה 20:30 נורה מן המארב רכבו של אליהו כהן ז"ל, בנוסעו בכביש 443
כקולומטר וחצי מהחשוב גבעת זאב (ראה תעודת פטירה ת/133א, חוו"ד פתולוגית ת/133ב, ודו"ח
מעבדה ניידת מז"פ ת/133ג שעליו העיד רפ"ק שלום בעמי 127). על פיגוע זה העיד בריאן מלקולם
שפריא, שהיה עד ראיה לפיגוע (עמי 149). בבדיקת התרמילים שנתפסו בזירה נמצא כי כלי הנשק
ששימש לפיגוע היה כפי הנראה רובה קלצ'יניקוב, ששימש גם לביצוע רצח בני הזוג כהנא ז"ל (ראה
חוו"ד ת/133ד ו- ת/128ן).

91.   אבו חמיד סיפר בחקירתו על פעילותה של חולית אחמד עינדור, שביצעה פיגוע זה (הודעה
ת/149א עמי 10-12, שנגבתה על ידי אלקירעאטו : עדותו בעמי 194). אבו חמיד אמר בחקירתו כי
סיפק לעינדור רובה קלצ'יניקוב ותחמושת שקיבל למטרה זו מאחמד ברגותי, וכי אישר לעינדור
לבצע את הירי בכביש 443 שבו נהרג אליהו כהן ז"ל. עוד סיפר אבו חמיד כי את הפיגוע ביצעו
מוחנד ושוויש, וזאת על פי מה שסיפר לו מוהנד לאחר ביצוע הפיגוע. מוהנד לא היה עד במשפט,
ואילו חקירתו של שוויש, שגם העיד בפנינו, איננה מתייחסת לאירוע זה, והפיגוע הנ"ל לא נכלל
בכתב האישום שהוגש כנגד שוויש (ת/157א).

לאור האמור לעיל, יש בידינו אך ורק את עדותו של אבו חמיד, לפיה אישר לבצע פיגוע ירי כנגד רכב
ישראלי בסוף שנת 2000 בכביש 443 וסיפק נשק לביצועו. אין בפנינו ראיה קבילה לגבי זהות מבצע
הפיגוע, ולכן גם אין ראיה קבילה הקושרת את הנאשם לפיגוע באמצעות אבו חמיד.

כל שיש בפנינו הן ראיות לפיהן הנאשם סייע לאבו חמיד לרכוש נשק ותחמושת לצורך ביצוע פיגועים, וכי אבו חמיד מסר את הנשק שרכש בסיוע הנאשם לעינדור למטרת ביצוע פיגועי ירי (זה המובב גם לגבי רצח בני הזוג כהנא ז"ל, שבוצע באותו כלי נשק: ראה פרק ה(1) לעיל).

### (7) רצח יואלה חן ז"ל ליד תחנת דלק גבעונים בכביש 443

**92.** ביום 15.1.02 בשעה 19:55 הגיעה יואלה חן ז"ל ברכב "פיאט אונו" לתחנת הדלק בצומת גבעונים, ולידה ישבה רשל עיני. שני מחבלים התקרבו לעבר רכבה, וירו בשתיים מטווח קצר עשרות כדורים. כתוצאה מן הירי נרצחה יואלה חן ז"ל (תעודת פטירה 134א), ורשל עיני נפצעה בראשה ובכתפה. עד ראיה לאירוע, סמי וקנין, העיד כי ראה שני בחורים נמלטים בריצה לעבר הכפר השכן אלג'יב לאחר ביצוע הירי, והוא סייע בחילוץ הנוסעות (עמי 143). כמו כן תיארו את האירוע רפ"ק עמי לייפר ורס"ב אלי קויגמן (בעמי 130 לפרוטוקול ודו"חות ת/134ב-ד1, בנוסף ללוח תצלומים ת/134ב ות- ת/134ד).

**93.** הפיגוע בו נרצחת יואלה חן ז"ל בוצע בהוראתו חשירה של הנאשם, כנקמה על הריגתו של ראיד כרמי יום לפני הפיגוע, ובכך הודה הנאשם בחקירתו. הנאשם סיפר בחקירתו כי הורה למקורבו אחמד ברגותי לבצע פיגוע נקמה זה, וכי אחמד דיווח לו על ביצוע הפיגוע. הנאשם אף נטל אחריות לביצוע פיגוע זה, וציין כי זו היתה הפעם הראשונה בה ביצע הפת"ח פיגוע בתוככי ישראל (ראה סעיף 66א) לעיל).

דבריו של הנאשם בחקירתו מתיישבים עם הדברים שאמרו בחקירתם אחמד ברגותי, אבו סטחה ומואפר (ראה סעיפים 30 ו- 53 לעיל, הודעת אבו סטחה ת/156ב עמי 5-6 שעל גביית העיד דהן בעמי 198, והודעת אחמד ברגותי ת/165א עמי 3 ת/165ג עמי 1-2 שעל גביית העיד מזרחי בעמי 184). הם תיארו את הפיגוע שבוצע בתחנת הדלק באמצעות ירי לעבר מכונית "פיאט אונו", שבו נרצחה אישה אחת ונפצעה חברתה. אבו סטחה, שביצע את הירי, טען כי תחילה החליט שלא לירות בשתיים בהיותן נשים, אך לאחר שהחלו לצעוק ירה עליהן יחד עם חברו טארק.

אבו סטחה טען כי ביצע את הפיגוע לפי הוראת אחמד ברגותי, בעוד שהאחרון טען כי אבו סטחה היה יוזם הפיגוע, ולשם כך מסר לו רובה 5 - MP. אחמד ברגותי טען בהודעתו כי אבו סטחה אמר לו כי דיווח על כוונתו לבצע את הפיגוע לנאשם לפני הביצוע, וכי הנאשם אמר לו שלא יצא לפיגוע זה.

אחמד ברגותי הסביר כי אבו סטחה היה שומר ראשו ונהג של הנאשם, ולכן הנאשם חשש לחייו. בשיחה שהתקיימה בין הנאשם לבין אחמד ברגותי במהלך מעצרם, כאשר הוקלטו ללא ידיעתם, תיאמו השניים גרסאות לגבי פיגוע זה, ואחמד ברגותי אמר לנאשם כי הדגיש בחקירתו שהוא הורה על ביצוע הפיגוע מאתורי גבו של הנאשם (תמליל שיחה ת/128א עמי 14, 17). ואולם הנאשם, כאמור לעיל, הודה כי הורה לבצע את הפיגוע, ומכאן ברור כי מקורבו אחמד ברגותי ניסה לחלצו מן המעורבות הישירה בפיגוע זה, כמו גם בפיגועים אחרים.

### (8) רצח 6 אנשים באולם השמחות "ארמון דוד" בחדרה

**94.** ביום 17.1.02 בשעה 22:45 בוצע פיגוע ירי באולמי "ארמון דוד" בחדרה. המחבל עבד אלסאלם חסונה ירה במאבטח בכניסה לאולם, פרץ פנימה ופתח באש מנשק אוטומטי לעבר קהל החוגגים באירוע בת-המצווה של נינה קרדשוב, עד שכמה מחם השתלטו עליו, והוא נורה למוות (חוו"ד פתולוגיה ת/135ו). כתוצאה מן הירי נרצחו 6 אנשים ועשרות נפצעו, חלקם באורח קשה. הנרצחים הם: בוריס מליחוב ז"ל (תעודת פטירה ת/135ב), דינה בינייב ז"ל (תעודת פטירה ת/135 ג), אנטולי בקשייב ז"ל (תעודת פטירה ת/135ד), אבי יזדי ז"ל (תעודת פטירה ת/135ה), אדוארד

בקשייב זייל (חוו״ד פתולוגית ת/135ו) ואהרון בן ישראל אליס זייל (חוו״ד פתולוגית ת/135ז). עד
הראיה קונסטנטין קרדשוב סיפר בעדותו על התרחשות האירוע (עמי 125), וניתן לראות את
האירוע גם במצגת של המשטרה וקלטות שצולמו בעת האירוע (ת/135וא, ת/135יא-יב). בזירה
נתפס רובה סער אם-16 ורימון ששימשו את המחבל (ראה חוו״ד ת/135וח-ט ועדותו של רפ״ק לייפר
בעמי 130).

95.    נאסר עויס היח אחראי על ביצוע הפיגוע הנ״ל, והוא זה שמסר את הנשק לצורך ביצועו
למחבל חסונה (הודעתו ת/172ב, שעל גבייתה העיד רס״ץ עאמר בעמי 191). כך עולה גם מהודעתו
של אחמד ברגותי, שסיפר כי עויס דיווח לו על ביצוע הפיגוע באולם השמחות בחדרה (הודעה ת/
165ד שעל גבייתה העיד רס״ר יעקובוף מעמי 171). אחמד ברגותי סיפר כי שמע על ביצוע הפיגוע
בטלויזיה בהיותו עם הנאשם, ומיד התקשר לעויס שנטל אחריות על ביצוע הפיגוע.

גם אבו תמיד התייחס בחקירתו לפיגוע זה, והסביר כי אף הוא היה נקמה על חיסולו של ראיד
כרמי, ולכן המפגע יצא מטול-כרם, שבה התגורר כרמי (ת/149ב עמי 14-15, שעל גבייתה העיד
רס״ר אלקורעאן בעמי 194).

96.    אין כל ראיה ישירה לכך שהנאשם היה מעורב באופן ישיר בתכנון הפיגוע הנ״ל, או ידע על
ביצועו מראש. הנאשם טען כי היה שומע דיווח על חפיגועים מאחמד ברגותי ומעויס רק לאחר
ביצועם, ובשיחתו עם המדובב ״פלוני 1״ אמר כי ידע על הפיגוע רק בדיעבד (דו״ח ת/118 סי 4
שהוגש על ידי ״רוברטי״). הקשר העקיף של הנאשם לפיגוע בחדרה נובע מכך שסיפק לעויס כספים
ואמל״ח לצורך ביצוע הפיגועים, הלה ראה בו מנחיג ומפקד, ולכן גם דיווח לו לאחר כל פיגוע.
הנאשם הודה באספקת כספים לעויס לצורך רכישת נשק, ואמר כי כאשר רצה להבטיח הפסקה של
הפיגועים היה פונה בעניין זה גם לעויס (ראה סעיף 23 לעיל). עם זאת, הנאשם לא ראה עצמו
אחראי לפעולותיו של עויס, בניגוד לפעולותיהם של אחמד ברגותי, אבו סטחח ואבו חמיד (ראה
סעיפים 60 ו- 65 לעיל). גם עויס סיפר בחקירתו כי ביצע את הפיגועים שהוציא לפועל במסגרת
תנזים פת״ח, שעליו היה אחראי הנאשם, וכי הנאשם סייע לו במימון הפיגועים ואספקת נשק. הוא
ציין כי הנאשם היה ממונה עליו (ראה סעיפים 22-21 לעיל).

השאלה המשפטית האם די בכל אלה כדי לבסס אחריות פלילית של הנאשם למעשי הרצח שבוצעו
בפיגוע זה - כאשר אין כל ראיה הקושרת את הנאשם ישירות לפיגוע - תבחן בפרק המסקנות.

### (9)    רצח שתי נשים בפיגוע ירי ברחוב יפו פינת לונץ בירושלים

97.    ביום 22.1.02 בשעה 16:20 פתח המחבל סעיד רמדאן באש מרובה 16-M לעבר עוברים
ושבים ברחוב יפו פינת לונץ בירושלים, עד אשר נורה ונהרג. כתוצאה מן הירי נרצחו שרה המבורגר
ז״ל ואורח סנדלר ז״ל (תעודות פטירה ת/136ב-ג), ונפצעו עשרות אזרחים. על האירוע העיד חנן בן
נעים, שחרג את המחבל (עמי 121). כמו כן הוגשה מצגת של המשטרה לגבי האירוע, והוגש דו״ח
פעולה של רפ״ק נדיבי שהעיד במשעיד (ת/136וא, ת/136ד והעדות בעמי 132). נשקו של המחבל
נתפס ונשלח למז״פ (ת/136וה ועדותם של רס״מ אזולאי ורפ״ק לייפר בעמי 130-134).

98.    אחמד ברגותי נטל בחקירתו אחריות על הוצאתו לפועל של הפיגוע הנ״ל (ראה הודעח ת/
165א עמי 4-5, שעל גבייתה העיד מזרחי בעמי 184). הוא סיפר כי התליט להחדיר מחבל מתאבד
לתוך ישראל, ולשם כך נעזר בעויס, אשר עלה אליו את המפגע סעיד רמאדן. השניים הכינו את
המפגע לפיגוע, לקחו אותו להתפלל, קנו לו בגדים והשיגו עבורו רובה 16-M וכדורים. באותו יום
אחר הצהריים שמע אחמד על ביצוע הפיגוע בירושלים.

אין ראיה ישירה הקושרת את הנאשם לפיגוע הנ"ל, והוא אף סיפר בחקירתו כי הוא וערפאת כעסו
על אחמד ברגותי בשל ביצוע הפיגוע (תמליל שיחה ת/98יא עמ' 32). מעורבותו העקיפה של הנאשם
בפיגועים שביצעו אחמד ברגותי ועוזיו, בעצמם או באמצעות אחרים, בוארה לעיל. השאלה
המשפטית האם די בכל אלה כדי לבסס אחריות פלילית של הנאשם הרצח שבוצע בפיגוע זה
- כאשר אין כל ראיה הקושרת את הנאשם ישירות לפיגוע - תבחן בפרק המסקנות.

**(10)   פיגוע ירי בשכונת נוה-יעקב בירושלים בו נהרגה השוטרת גלית ארביב ז"ל**

99.   ביום 25.2.02 בשעה 18:25 בוצע פיגוע ירי על ידי מפגע בודד תמוש ברובה 16-M ורימון יד
בכביש הראשי של שכונת נוה-יעקב בירושלים.
מעדותו של עד הראיה, השוטר אדם גרפילד, עולה כי המחבל פתח באש לעבר כלי רכב שנעו בכביש,
וכן לעבר אזרחים ושוטרים שהגיעו למקום. בניידת המשטרה של גרפילד ישבה גם השוטרת גלית
ארביב ז"ל, אשר הסתערה על המחבל באקדח שלוף. המחבל רצח בירייה את השוטרת ארביב ז"ל
(תעודת פטירה ת/137ב), פצע קשות את השוטר גרפילד, שנותר נכה עד חיום, ואת השוטר עמיחי
דתן. רימון שהשליך המחבל לא התפוצץ (ראה עדותו של גרפילד בעמ' 127, עדותו של רפ"ק ליאור
נדיבי בעמ' 132 והדו"חות והצילומים שהגניע ת/137ג, ת/137ז, וכן המצ*את ת/137א ולוח
התצלומים ת/137ז). נשקו של המחבל, הרימון שלא התפוצץ ותרמילי הכדורים שירה נתפסו
והועברו לבדיקה מז"פ (עדות רפ"ק עמי לייפר בעמ' 130, חוו"ד של רפ"ק אבי קאופמן ת/137ד-ה
וחוו"ד של פק"ד יניב רון ת/137ו).

100.   המחבל שנתפס במהלך הפיגוע הוא ראמי נור, כפי שאמר נאסר אבו חמיד בהודעתו ת/149ג
בעמ' 11-12 (שהונשה על ידי רס"מ יעקב בראזני בעמ' 207). אבו חמיד סיפר כי בעת שהוא ואחיו,
חלום אבו חמיד, צפו בפיגוע הנ"ל בנוה-יעקב בטלוויזיה, הזכיר לו אחיו כי המפגע ראמי נור היה
בכיתם יום לפני כן, וחלום אמר כי הוא זה שמסר לראמי נור רובה 16-M וכדורים, ושילח אותו
לפיגוע לאחר שציינם קלטות וידיאו שתרצם לאחיו נאסר לאחר הפיגוע. חלום אמר לאחיו נאסר כי
קיבל את הנשק ואת המפגע ראמי נור מאחמד ברגותי. אבו חמיד הביע בהודעתו הנ"ל כעס על כך,
בהסבירו שפיגוע זה עלול לסבך את הנאשם, בשל קרבתו לאחמד ברגותי, כאשר הסתבר שהמפגע
נותר בחיים ויחקר בידי השב"כ.

עוד סיפר אבו חמיד בהודעתו הנ"ל, כי יאסר ערפאת הזמין למשרדו את הנאשם ואת אחמד ברגותי
בעקבות הפיגוע; אחמד ברגותי ברח, והודיע לאבו חמיד שיתכן שעומדים לעצור את הנאשם בגלל
הפיגוע הנ"ל. הנאשם אמר לאבו חמיד לאחר מכן, כי הסביר לערפאת שבאותו שלב לא היתה
הוראה על הפסקת אש, וכי הוא - הנאשם - עמד מאחורי אנשיו כל עוד ערפאת לא יוציא הוראה
נשיאותית להפסקת הפיגועים. אבו חמיד גם סיפר בהודעתו כי אחמד ברגותי הודה בפניו כי מסר
את הנשק לאחיו של אבו חמיד (חלום), לצורך ביצוע הפיגוע בנוה-יעקב.

101.   מן הדברים האמורים לעיל עולה כי נאסר אבו חמיד לא נטל חלק בתכנון ובהוצאה לפועל
של הפיגוע הנ"ל, ומי שעשו זאת היו אחיו חלום ואחמד ברגותי, שהיו עדים במשפט. חלום אבו
חמיד הורשע על פי חודאתו בשורה של מעשי טרור, כולל אחריותו לביצוע הפיגוע הנ"ל בנוה-יעקב
(ראה פרט 13 בכתב האישום המתוקן ת/161א, ופסק הדין ת/161ב). חלום סיפר על אחריותו
לפיגוע הנ"ל, כמפורט לעיל, בחודעותיו ת/162א-ב, שנגבו על ידי אברהים אלקורעאן (עדותו בעמ'
194) ורס"ר דוד מזרחי (עדותו בעמ' 184).

חלום סיפר בהודעותיו הנ"ל (ת/162א עמ' 6-9, ת/162ב עמ' 2-4) כי הכין את ראמי נור לביצוע
הפיגוע, ארגן לו מסיע ומסר לו רימון רסס ורובה 16-M עם כדורים. בעת שהכין את ראמי נור
לפיגוע, הגיע אחמד ברגותי ובירר כיצד מתקדמים העניינים בעניין תכנון הפיגוע; אחמד ברגותי
רצה שהפיגוע יעשה במקום הומה אדם בירושלים, אך לבסוף סוכם שהוא יבוצע בצפון ירושלים

בשל המהסומים, ואחמד ברגותי אישר זאת.

**102.** אחמד ברגותי אישר בחקירתו את הקשר שלו לפיגוע בנוה-יעקב. בהודעתו ת/165א סיפר כי נאסר עויס שלח אליו את המפגע ראמי נור לצורך ביצוע הפיגוע בנוה-יעקב, ואז הפנה את ראמי נור אל חלום אבו חמיד כדי שיסייע לו להיכנס לירושלים (הודעה ת/165א עמי 6, שנגבתה על ידי רס"ר מזרחי לפי עדותו בעמי 184). גם אחמד ברגותי, כמו חברו נאסר אבו חמיד, סיפר בחקירתו על כך שבעקבות הפיגוע זומן יחד עם הנאשם למשרדו של ערפאת; הנאשם שאל אותו אם חוא אחראי לפיגוע, אחמד ברגותי השיב בחיוב, ושמע מחנאשם שערפאת כעס על ביצוע הפיגוע (הודעה ת/165ג עמי 5 שנגבתה על ידי רס"ר מזרחי לפי עדותו בעמי 184).

**103.** לאור האמור לעיל מתכנני הפיגוע היו עויס ואחמד ברגותי. בעת פגישתם של אחמד ברגותי והנאשם בחקירה, כאשר הוקלטו ללא ידיעתם, חזר אחמד כמה פעמים והדגיש כי הנאשם כי סיפר בחקירתו שהנאשם שמע על הפיגוע הני"ל רק לאחר הביצוע (תמליל שיחה ת/127ג עמי 4, 11).

אין ראיות הקושרות את הנאשם לפיגוע זה בצורה ישירה, זולת חקשר הנובע ממעורבותו הכוללת והעקיפה בפיגועים שתכננו וביצעו אחמד ברגותי ועויס, כמבואר לעיל (ראה סעיפים 80, 86 ו- 96 לעיל). לא לחינם זימן יאסר ערפאת את ברגותי לבירור לאחר ביצוע הפיגוע הני"ל, שכן גם הוא סבר שהנאשם הוא הכתובת לטענות בענין. השאלה המשפטית האם די בכל אלה כדי לבסס אחריות פלילית של הנאשם למעשה הרצח שבוצע בפיגוע זה – כאשר אין כל ראיה הקושרת את הנאשם ישירות לפיגוע – תבחן בפרק המסקנות.

### (11) רצח גד רג'ואן ז"ל במפעל בשקביץ בעטרות

**104.** ביום 27.2.02 בשעה 06:30 נרצח גד רג'ואן ז"ל במפעל "קפה בשקביץ" באיזור התעשיה בעטרות, על ידי עבד אלמגיד מחדי שהועסק בעבר במפעל (תעודת פטירת ת/138א וחווי"ד פתולוגית ת/138ב). זהרן שחאדה שהיה במקום סיפר כי כאשר שמע את היריות ראה אדם נמלט מן המקום, וגד רג'ואן שכב על הרצפה ובויקש להזעיק עזרה (עמי 146).

גד רג'ואן ז"ל נפטר כתוצאה מן חירי, ומותו נקבע במקום (ראה דו"ח פעולה ת/138ג ועדותו של רפ"ק ליאור נדיבי בעמי 132, וכן דו"ח המעבדה הנידדה ת/138ד ועדותו רפ"ק ניסים מזרחי בעמי 131). תצלומי זירת האירוע הוגשו כמוצגים ת/138ד ו- 138ו, על ידי מזרחי ונדיבי בעדויותיהם. הרצח בוצע באמצעות אקדח (חווי"ד ת/138ה), שכמה קליעים שנורו ממנו פגעו פגיעות קטלניות בגופו של המנוח (חווי"ד ת/138ב).

**105.** אבו חמיד סיפר בהודעתו ת/149ב (עמי 25-28) כי פנה אליו עבד אלמגיד שסיפר לו כי עבד במפעל של משפחת רג'ואן, וביקש לבצע פיגוע יחד עם אדם בשם רמזי. השלושה ישבו ותכננו את הפיגוע, ואבו חמיד נתן לכל אחד מן השניים אקדח. כעבור 20 דקות דיווח רמזי לאבו חמיד על ביצוע הפיגוע, ועבד אלמגיד סיפר כיצד ירה למוות ברג'ואן ז"ל.

אבו חמיד התקשר למשטרה ונטל אחריות על ביצוע הפיגוע בשם גדודי חללי אלאקצא (הודעתו של אבו חמיד הוגשה על ידי רס"ר אלקוראען בעמי 194).

**106.** מן האמור לעיל עולה כי לגבי פיגוע זה אין ראיה ישירה לגבי זהות מבצעו, שכן הדברים שנאמרו לאבו חמיד על ידי עבד אלמגיד שלא העיד בפנינו הם בבחינת עדות שמיעה לא קבילה.

ואולם, ניתן לקבוע על פי ראיות נסיבתיות חד-משמעיות כי הפיגוע בוצע על ידי עבד אלמגיד, בסיועו ובאישורו של אבו חמיד, כפי שסיפר אבו חמיד בעדותו. אבו חמיד סיפר כי עבד אלמגיד הודיע לו שהוא יוצא לבצע פיגוע במפעל של משפחת רג'ואן בו עבד בעבר, ולצורך כך הוא צייד

אותו באקדח; זמן קצר לאחר מכן דיווח לו עבד אלמגיד על כך שירה למוות בגד רגיואן ז"ל, והוא
אכן נרצח ביריות אקדח.

אין ראיות הקושרות את הנאשם לפיגוע זה בצורה ישירה, זולת הקשר הנובע ממעורבותו הכוללת
והעקיפה בפיגועים שתכנן וביצע אבו חמיד, כמבואר לעיל (ראה סעיפים 27, 65-60 לעיל). השאלה
המשפטית האם די בכל אלה כדי לבסס אחריות פלילית של הנאשם למעשה הרצח שבוצע בפיגוע זה
- כאשר אין כל ראיה הקושרת את הנאשם ישירות לפיגוע - תבחן בפרק המסקנות.

## (12) הפיגוע במסעדת "סי פוד מרקט" בתל אביב

107.   ביום 5.3.02 בשעה 02:30 בוצע פיגוע במסעדת "סי פוד מרקט" בתל אביב על ידי המחבל
אברהים חסונה, שהגיע למקום המוש ברובה M-16, רימוני יד וסכין. את האירוע תיארו עדי
הראיה וילים חזן (עמי 148) וליאון גורנשטיין (עמי 129) שנכחו במסעדה בעת הפיגוע. המחבל פתח
באש עם הרובה שבידו לעבר היושבים במסעדה, עד אשר ארע מעצור בנשק, ורימוני היד שהשליך
לא התפוצצו. בשלב זה החל חסונה לדקור אנשים, כולל השוטר רס"ר סלים בריכאת ז"ל שניסה
להפסיק את מסע הירי ונדקר למוות בידי המחבל. בפיגוע נרצחו פרט לרס"ר בריכאת גם יוסף הבי
ז"ל ואליהו דהן ז"ל (ראה חוו"ד פתולוגיות ת/139ב-עד ת/139ד). רבים אחרים נפצעו. המחבל
עצמו נורה ונהרג בפיגוע, וחתברר כי מדובר באברהים חסונה (חוו"ד פתולוגית ת/139יא, ובדיקת
ד.נ.א. ת/139ז).

תוצאות הפיגוע נראות בלוח התצלומים ת/139ו שהוגש על ידי השוטר אפי ימין (עמי 151), וכן
במצבת שהכינה המשטרה (ת/139א). אפי ימין הגיש גם דו"ח פעולה שרשם במקום, והוא זה שתפס
את סכינו של המחבל המוצאלת בדם, קליע מרוסק, תרמילים, כדורים ורובה M-16 (ת/139ה).
הנשק נתפס והובא לבדיקת מז"פ (ת/139ח, ועדותו של רפ"ק עמי ליפפר בעמי 130).

108.   הפיגוע ב"סי פוד מרקט" בוצע על ידי אברחים חסונה, והוא תוכנן על ידי אחמד ברגותי,
אבו חמיד נעויס, כפי שסיפר אחמד ברגותי בחקירתו (ראה סעיף 29 לעיל). גם אחוי של אבו חמיד
(שריף נאגי) היה מעורב בפיגוע, כפי שסיפר בחקירתו (ראה סעיף 55 לעיל), ואף הוא קושר את
אחמד ברגותי לתכנונו. אחמד ברגותי סיפר בחקירתו כי המפגע חסונה נשלח אליו על ידי עויס,
והוא נתן לו כסף, קנה לו בגדים ודאג לכך שיהיה מי שיסיע אותו לישראל לצורך ביצוע הפיגוע
(טארק מלחי). הוא דיווח לנאשם בטלפון כי הפיגוע יוצא לדרך, והנאשם אמר כי איננו מעוניין
שהפיגוע יתבצע בתוך ישראל. עוד סיפר אחמד ברגותי כי לאחר הפיגוע אמר לו הנאשם להודיע
לעויס שלא ליטול אחריות על הפיגוע בתקשורת קודם שישוחח על כך עם הנאשם (ראה סעיף 29
לעיל).

במהלך שיחה שהתקיימה בין הנאשם לבין אחמד ברגותי בעת מעצרם, כאשר הם הוקלטו ללא
ידיעתם, טרח אחמד להדגיש בפני הנאשם כמה פעמים כי הוא אמר שרק שוחח עם הנאשם בטלפון
**לאחר** הפיגוע, והוסיף: **"תזהר, אני לא הייתי איתך, אני לא הייתי איתך, דיברתי איתך
בטלפון"** (תמליל שיחה ת/127ג עמי 5-4, 11). השניים תיאמו עמדות לגבי חקירתם בנקודה זו.

גם אבו חמיד סיפר בחקירתו על מעורבותו בפיגוע (הודעה ת/149ב עמי 6 שהוגשה על ידי רס"ר
אלקוראען בעמי 194). הוא סיפק לצורך הפיגוע רימוני יד וכדורים לרובה M-16, כאשר ראה את
חסונה מצויד ברובה M-16 לפני צאתו לפיגוע. כאשר דווח בלילה על הפיגוע, ועל כך שחסונה דקר
למוות שוטר, נזכר אבו חמיד כי נאסר חלום (אחיו של אבו חמיד) נתן למפגע את הסכין, והסביר לו
להשתמש בו אם יהיה לו מעצור בנשק.

כך גם אמר בחקירתו חלום אבו חמיד (הודעתו ת/162 עמי 9, שהוגשה על ידי רס"ר קוראען בעמי

194, וחודעה ת/162ב עמי 4 שחוגשה על ידי רסייר מזרחי בעמי 184). חלום סיפר כי הוא אמן את חסוונה בשימוש ברובה M-16. שריף נאגיי אבו חמידי (אף הוא אח של אבו חמיד) סיפר בחקירתו על כך שלוווה את המפגע לתל אביב, והשיג רכב עבור הפיגוע (הודעתו ת/182, שחוגשה על ידי רסייר בן לולו בעמי 182).

**109.** הנאשם קשור בצורה עקיפה לפיגועים שתכננו והוציאו לפועל אחמד ברגותי, אבו חמיד ועויס, כפי שפורט לעיל. ואולם, ככל שמדובר בפיגוע במסגרת ייסי פוד מרקטיי, שתוכנן והוצא לפועל על ידי חשלושה, אחראי הנאשם גם באופן אישי לביצועו. נושא אחריותו של הנאשם לפיגוע זה פורטה לעיל (ראה סעיפים 29, 55 ו- 66(א) לעיל). הנאשם הודה בחקירתו כי אישר לאחמד ברגותי את ביצוע הפיגוע הנייל לפני הוצאתו לפועל, אם כי נתן הנחיה שהפיגוע יבוצע בשטחי יהודה ושומרון ולא בתוך ישראל. כך גם עולה מן חדברים שאמר אחמד ברגותי בחקירתו.

### (13) פיגוע ירי במלון ייגירמיי בנתניה

**110.** ביום 9.3.02 בשעה 20:25 נכנסו שני מחבלים למלון ייגירמיי בנתניה, כשהם חמושים ברובי M-16 ורימוני יד. השניים חשליכו רימוני יד וירו על עוברי אורח ותיירים. את האירוע תיאר עד ראיית שכונה יגי, שהיה מפקד צוות ביחידת ייאלמוגיי של מגייב. כאשר שמע את הירירות הוא הגיע למלון בתוך 30 שניות, נתקל בפצועים בשעת שעדיין נמשכו הירירות. יגי פתח במרדף אחרי המחבלים, וטניהם אותרו במדרגות של קניון הנמצא בסביבה, גורו ונהרגו (ראה חוויד פתולוגית של המחבל שאדי נגימו ת/140ח, וכן חוויד של המחבל חשני ת/140ט). יגי אישר בעדותו כי למרבה הצער חלק מן הנפגעים היו מאש אנשי מגייב (עמי 117-118). בפיגוע נרצחו התינוקת אביה מלכה זייל וישראל יחיא זייל (ראה טופס הודעה על פטירת ת/140ב).

צוער רמי מלכה הגיע דוייח ביקור טכנאי מזייפ בזירת הפיגוע, המתאר את תוצאותיו ואת הממצאים בזירה (ת/140ו ועדותו בעמי 118), ותצלומים מהזירה (ת/140ז). חוויד של מחלקת החבלה של המשטרה קבעה כי למלון חושלך רימון יד שהתפוצץ (ת/140ה). מהדוייח של רסייר מלכה עולה כי במקום נתפסו שני רובי M-16 ששימשו את המחבלים (ראה גם עדותו של רפייק לייפר בעמי 130).

**111.** נאסר עויס סיפר בחקירתו כי הוא הוציא לפועל את פיגוע הירי הנייל בנתניה, שבוצע על ידי שני אנשים ששמותיהם לא היו ידועים לו. השניים נשלחו אליו על ידי פעיל טרור אחר (אחמד אבו הדיר), ועויס ארגן את הסעתם של השניים באמצעות מחמוד טיטי, ואף מסר לאחמד אבו חדיר שני רימונים ושני רובי M-16. כמה שעות לאחר שחשניים חוסעו לבאקה אל שרקיה, משם נכנסו לישראל ברגל, שמע עויס בטלויזיה על הפיגוע במלון בנתניה. הוא התקשר לכלי התקשורת ונטל אחריות על ביצוע הפיגוע (הודעתו של עויס ת/174ב עמי 5, שהוגשה על ידי רסיימ רוני עמר בעמי 191).

גם בפיגוע זה ניתן לקבוע על פי ראיות נסיבתיות חד-משמעיות כי עויס עומד מאחורי הפיגוע הנייל, אשר בוצע זמן קצר לאחר שגייד את המחבלים ברובי M-16 ורימונים, והסיעם לנקודה על הקו הירוק הקרובה לנתניה. הפיגוע אכן בוצע על ידי שני מחבלים שהיו מצוידים ברובי M-16 וברימונים, כמה שעות לאחר שעויס ארגן את הסעתם לנתניה, ומכאן שזה הפיגוע עליו דיבר עויס בחקירתו.

אין ראיות הקושרות את הנאשם לפיגוע זה בצורה ישירה, זולת הקשר הנובע ממעורבותו הכוללת והעקיפה בפיגועים שתכנן וביצע עויס (ראה סעיף 96 לעיל). חשאלה המשפטית האם די בכל אלה

P 7: 000414

כדי לבסס אחריות פלילית של הנאשם למעשה הרצח שבוצע בפיגוע זה - כאשר אין כל ראיה
הקושרת את הנאשם ישירות לפיגוע - תבחן בפרק המסקנות.

### (14) רצח קונסטנטין דנילוב ז״ל בבאקה אלע/רביה

**112.** ביום 30.3.02 בשעה 13:00 זיהה צוות של מג״ב רכב שנסע במהירות מופרזת לכיוון באקה
אלעירביה, ובו שני חשודים. בעת שהצוות עקב אחר המחבלים, הם פתחו באש ורצחו את
קונסטנטין דנילוב ז״ל (ראה תעודת פטירה ת/141ט). שאר אנשי הצוות ירו על המחבלים, וחגורת
הנפץ שהיתה על אחד מהם התפוצצה. שני המחבלים נהרגו, לאחר שקודם לכן השליכו רימונים
לעבר חצות (ראה עדותו של סנ״צ פריד גיאנם בעמ׳ 122, שהשתתף באירוע).

צילומי האירוע הוגשו עם תעודת עובד ציבור של פרוספר אוהנה (ת/141ג). בבדיקת מז״פ נקבע כי
אחד המחבלים החזיק חגורת נפץ מאולתרת שהתפוצצה על גופו (ת/141ה).

**113.** עויס אמר בחקירתו כי שלח מתאבדים יחד עם מחמוד אל טיטי ואחמד אבו חד׳ר, וכי
השיג לאחד מהם חגורת נפץ כדי לבצע פיגוע בתוך ישראל. אותו מתאבד נסע עם אדם נוסף כשעליו
חגורת נפץ לשם ביצוע פיגוע בישראל, אך נהרג עם חברו בחילופי ירי עם שוטרי משמר הגבול
בבאקה אלע׳רביה, לאחר שהרגו שוטר מג״ב (הודעה ת/173ב עמי 9-10 שהוגשה על ידי רס״מ עמר
בעמי 191). עוד סיפר עויס בחקירתו כי הפיגוע הנ״ל היה אמור להתבצע בחדרה (הודעה ת/172ב
עמי 3 שהוגשה על ידי עמר בעמי 191).

**114.** גם בפיגוע זה ניתן לקבוע על פי ראיות נסיבתיות חד-משמעעיות כי הפיגוע בוצע על ידי
אנשים שנשלחו על ידי עויס, וצוידו על ידו בחגורת נפץ. ברור מחקירתו של עויס כי הפיגוע אלוי
התייחס בחקירתו הוא הפיגוע הנדון.

אין ראיות הקושרות את הנאשם לפיגוע זה בעדרה ישירה, זולת הקשר הנובע ממעורבותו הכוללת
והעקיפה בפיגועים שתכנן וביצע עויס (ראה סעיף 96 לעיל). השאלה המשפטית האם די בכל אלה
כדי לבסס אחריות פלילית של הנאשם למעשה הרצח שבוצע בפיגוע זה - כאשר אין כל ראיה
הקושרת את הנאשם ישירות לפיגוע - תבחן בפרק המסקנות.

### (15) פיגוע ירי בין עטרת לבירר-זית

**115.** ביום 25.2.01 בשעה 13:00 בוצע ירי מן המארב בכביש 465 לכיוון רכבו של יוסף כהן (
G.M.C., שנע מכוונון עטרת אל ביר-זית. הירי בוצע מרכב עוקף. כהן נפצע קשה בפיגוע, ורכבו
הדרדר לשוליים (עדותו בעמי 142). עשרות כדורים נורו לעבר רכבו, והוא נפגע משלושה כדורים
בראש ושניים בצוואר, ובדרך נס נותר בחיים (ראה מזכר לגבי מצב הרכב ת/142ג ודו״ח תפיסה
וסימון של תרמילי הכדורים ת/142ב שהוגשו על ידי משה לביא בעמי 124, וכן דו״ח בדיקת הרכב
ת/142ד שהוגש על ידי השוטר מזרחי בעמי 131).

תיאור של זירת הפיגוע מופיע בלוח התצלומים ת/142 שהוגש על ידי רפ״ק מזרחי בעמי 139).

**116.** אחמד ברגותי סיפר בחקירתו על פיגוע זה (הודעתו ת/165א עמי 1 שהוגשה על ידי רס״ר
מזרחי בעמי 184, וכו״יד ת/165ו שהוגש על ידי החוקר ״דבני״ בעמי 200) כיצד תכנן את הפיגוע יחד
עם מוהנד, אבו סטחה ואחרים, שביקשו ממנו נשק ורכב כדי לבצע פיגוע. אחמד ברגותי מסר להם

רובה MP-5 וכדורים, וכן נתן להם את רכבו. כעבור כמה שעות הם החזירו לו את הרכב והנשק, וסיפרו לו כי ירו על רכב באיזור גשר עטרה תוך כדי עקיפתו, וכי הנהג של הרכב נפצע. דבריו של אחמד ברגותי מתייישבים עם הראיות לגבי דרך ביצוע הפיגוע, מקום ביצועו ותוצאותיו, ולפיכך יש ראיות נסיבתיות חד-משמעיות מהן עולה כי הפיגוע עליו סיפר אחמד ברגותי הוא הפיגוע הנ״ל בגשר עטרה.

אין ראיות הקושרות את הנאשם לפיגוע זה בצורה ישירה, זולת הקשר הנובע ממעורבותו הכוללת ותעקיפה בפיגועים שתכננו וביצעו אחמד ברגותי ואבו סטחה (ראה סעיף 80 לעיל). השאלה המשפטית האם די בכל אלו כדי לבסס אחריות פלילית של הנאשם למעשה הרצח שבוצע בפיגוע זה - כאשר אין כל ראיה הקושרת את הנאשם ישירות לפיגוע - תבחן בפרק המסקנות.

### (16) ניסיון פיגוע בפאב "ביאנקיני" בירושלים

117.    ביום 19.05.01 בשעה 03:00 גילתה דינה דגן, בעלת פאב "ביאנקיני" בירושלים, מטען חבלה שהונח בשירותים של המקום על ידי סאעד ג'אבר, שהיה מוכר לה כפלסטינאי מרמאללה שמכר לה מידי פעם מוצרים לנרגילה. בעדותה (עמ' 139-142) סיפרה דגן כי ג'אבר ישב איתה במסעדה כדי לרשום הזמנת למוצרים, ואז נכנס לשירותים כשאין בידיו דבר. כעבור כמה דקות יצא מהשירותים עם שקית ניילון, הניח אותה במרכז הפאב, וכאשר שאלה אותו מה יש בשקית הוא אמר לה כי היא מכילה בגדים. היא ניגשה לבדוק את השקית, גילתה כי מדובר במטען חבלה מוסתר מתחת למעיל, ובשלב זה ג'אבר נעלם.

במקום ישבו באותה עת כ- 150-170 בני נוער. דגן גילתה תושיה ואומץ לב ראויים לשבח: היא נטלה את המטען בידיה, צעקה לאחד העובדים הפלסטינאים במקום לפנות את הצעירים, והוא היה גם זה שעזר לה להרחיק את המטען מחוץ למסעדה. המשטרה שהגיעה למקום פוצצה את המטען, באופן שגרם נזק לחניויות באזור. כך עולה מעדותו של חבלן המשטרה אייל אלבו (עמ' 119, וכן ראה חוו״ד מומחה במעבדת החבלה, פקד יניב רון, ת/143א, חוו״ד מומחה של מז״פ שניתנה על ידי שרה אברמוביץ-בר, ת/143ב, ולוח תצלומים ת/143א).

118.    אבו חמיד סיפר בחקירתו (תודעה ת/149ב עמי 10-12, שהוגשה על ידי רס״ר אלקורעאן בעמ' 194), כי סאעד אלדין פנה אליו בתחילת חודש מאי 2002, וביקש ממנו להכין עבורו מטען חבלה, על מנת להניחו בירושלים בפאב ברחוב יפו. הלה הסביר לאבו חמיד כי בעלת המקום נוהגת לקנות ממנו מוצרים לנרגילה, וצייר לאבו חמיד את הפאב. אבו חמיד הכנה אותו היכן להטמין את המטען, והסביר לו כיצד לחבר את החוטים למטף כיבוי אש שהכיל את המטען (אכן המטען היה בתוך מטף כעולה מחוו״ד ת/143א).

לאחר מכן שלח אבו חמיד את ג'אבר לפאב, וג'אבר כיסה את המטען במעיל. כאשר הגיע ג'אבר לפאב הוא התקשר לאבו חמיד, אמר לו משפט קוד ממנו הבין אבו חמיד שהוא עומד להניח את הפצצה בפאב, ואבו חמיד אישר זאת.
ג'אבר התקשר לאבו חמיד וסיפר לו שבעלת המקום ראתה אותו מניח את המטען, והוא שמע בחדשות כי המטען פוצץ על ידי המשטרה.

119.    מן האמור לעיל עולה כי הוכח בבירור שניסיון הפיגוע בפאב בוצע על ידי ג'אבר בהנחייתו ובסיועו של אבו חמיד. הפרטים שמסר אבו חמיד בחקירתו תואמים את עדותה של דגן ואת הממצאים בשטח.

אין ראיות הקושרות את הנאשם לפיגוע זה בצורה ישירה, זולת הקשר הנובע ממעורבותו הכוללת

והעקיפה בפיגועים שתכנן וביצע אבו חמיד, כמבואר לעיל (ראה סעיפים 27, 65-60 לעיל). השאלה
המשפטית האם די בכל אלה כדי לבסס אחריות פלילית של חנאשם למעשה הרצח שבוצע בפיגוע זה
- כאשר אין כל ראיה הקושרת את הנאשם ישירות לפיגוע - תבחן בפרק המסקנות.

### (17)   פיגוע ירי בכביש 9 ליד הגבעה הצרפתית בירושלים

**120.**   ביום 3.10.01 בשעה 23:30 בוצע ירי לעבר רכב חולף שנע לכיוון הגבעה הצרפתית, בו נסעו
מלי ופנחס כהן שנפגעו מן הירי (ראה דו"ח ביקור ראשוני בזירה של רפ"ק ליאור נדיבי, ועדותו
בעמ' 132, דו"ח תפיסה וסימון של רפ"ק נדיבי ת/144ב, דו"ח ביקור ראשוני בזירה של רפ"ק עמי
לייפר ועדותו בעמ' 130, וחוו"ד של מעבדת נשק ת/144ד).

**121.**   אבו סטחה אמר בחקירתו (הודעה ת/156ב עמ' 5-4, שהוגשה על ידי רס"מ דהן בעמ' 198),
כי הוא ביצע פיגוע זה יחד עם מוחמד סמי עבדאללה, כשהם נוסעים במכונית מאזדה וברשותו
רובה MP-5, אותו קיבל מאחמד ברגותי לצורך ירי לעבר מטרות ישראליות. הוא סיפר בחקירתו כי
לאחר שירה לעבר רכב הנוסע במנהרה בכיוון הגבעה הצרפתית הוא חבחestablish כי מדובר בנהגת, ולכן
הפסיק לירות ואמר לחברו שיש מעצור בנשק. לאחר מכן הוא המשיך לנסוע לכיוון הגבעה
הצרפתית, ושם ירה לעבר רכב תוך כדי עקיפתו. למחרת שמע ברדיו כי בפיגוע נפצעו גבר ואישה.

**122.**   הראיות שהובאו על ידי התביעה לגבי פיגוע זה דלות ביותר, וכוללות אך ורק דו"ח ביקור
ראשוני בזירה של המשטרה, באופן שכל מידע לגבי דרך ביצוע הפיגוע הוא כבחינת עדות שמיעה.
כמו כן קשה לדעת מעדותו של אבו סטחה אם דבריו מתייחסים לפיגוע הנדון, שכן לא ברור מה
מועד הפיגוע אליו מתייחס אבו סטחה, ובאיזה רכב ירה.

כל שיש בפנינו הוא ראיה על כך שאבו סטחה ביצע פיגועי ירי כנגד מטרות ישראליות, תוך שימוש
בנשק שקיבל מאחמד ברגותי, שהיה עוזרו ומקורבו של הנאשם. זאת ועוד, אבו סטחה עצמו היה
שומר ראשו של הנאשם, והנאשם עצמו אישר כי אבו סטחה עבד במשרדו והיה תחת אחריותו, וכי
הוא ידע שאבו סטחה מבצע פיגועים כנגד אזרחים בגבעת זאב ובפסגת זאב (ראה סעיפים 34-33
לעיל).

### (18)   ניסיון לפיגוע התאבדות בבית חנינא בירושלים

**123.**   ביום 8.03.02 בשעה 16:15 נלכד המחבל מחמוד סאלח בדרכו לביצוע פיגוע התאבדות
בירושלים, כשהוא נושא על גופו חגורת נפץ. המחבל ניסה להפעיל את המטען כאשר שכב על
הרצפה, ואז נורה ונהרג (ראה עדותו של סני"צ דורון ידיד בעמ' 133, ודו"ח מעבדת חבלה ת/145ד).

**124.**   אחמד ברגותי סיפר בחקירתו כי לואי עודה ביקש ממנו להכין חגורת נפץ למתאבד, והוא
הפנה את עודה אל נאצר שוויש שנתן לו חגורת נפץ. המתאבד שוכן בדירה ששכר אחמד ברגותי
ברמאללה, ושם הלבישו עליו את חגורת הנפץ. מאוחר יותר נודע לאחמד ברגותי כי הוא נהרג מירי
כוחות צה"ל באיזור בית חנינא בדרכו לביצוע הפיגוע (הודעה ת/165ב עמי 2, 11, שהוגשה על ידי
רס"ר יעקובוף בעמי 171).

**125.**   גם עויס סיפר בחקירתו (הודעה ת/173ב בעמי 4, שהוגשה על ידי רס"מ עמאר בעמי 191), כי לואי
עודה, שגויס על ידו לגדודי חללי אלאקצא, איתר עבורו מתאבד, אך הפיגוע נכשל מכיוון שהמתאבד
נורה על ידי שוטרים לפני הביצוע בכניסה לירושלים.

**125.**   מן האמור לעיל עולה כי עויס ואחמד ברגותי היה מעורבים בניסיון הפיגוע הנ"ל. אין
ראיות הקושרות את הנאשם לפיגוע זה בצורה ישירה, זולת הקשר הנובע ממעורבותו הכוללת

והעקיפה בפיגועים שתכננו וביצעו השניים, כמפורט לעיל. השאלה המשפטית האם די בכל אלו כדי
לבסס אחריות פלילית של הנאשם למעשה הרצח שבוצע בפיגוע זה - כאשר אין כל ראיה הקושרת
את הנאשם ישירות לפיגוע - תבחן בפרק המסקנות.

### (19)    פיגוע ירי בכביש בית אל - פסגות

126.    ביום 17.03.02 בשעה 06:45 בוצע ירי מן המארב מנשק מנשק אוטומטי לעבר רכבו של סמיר
קרש (פולסווג פסאט), והוא נפצע מן הירי (ראה דו"ח ביקור בזירת העבירה ת/146א ותצלומים
של רס"ב אלי קוג'מן שהוגשו בעדותו בעמ' 121).

התביעה לא הגישה ראיות נוספות לגבי פיגוע זה, והדו"ח של קוג'מן הינו בבחינת עדות שמיעה בכל
הנוגע לדרך ביצוע הפיגוע.

התביעה מייחסת בסיכומיה את האחריות לפיגוע זה לאחמד ברגותי, והוא אכן הודה במעורבותו
בפיגוע זה והורשע בכך (ת/165! ת/ז-יז פרט אישום 43). פרט לכך לא הפנתה התביעה לכל ראיה
אחרת מבין הודעותיו של אחמד ברגותי, או הדברים שמסר בחקירתו בשב"כ. לאור האמור לעיל
לא הובאו לגבי פיגוע זה ראיות המאפשרות לקבוע ממצא עובדתי ברור בדבר הקשר של אחמד
ברגותי לפיגוע חני"ל, וגם הראיות לגבי עצם ביצוע הפיגוע דלות ביותר.

### (20)    ניסיון פיגוע בקניון מלחה בירושלים

127.    ביום 26.03.02 בשעה 10:30 התפוצץ רכב מסוג "רנו אקספרס" ובו שני חבלנים שהיו
בדרכם לביצוע פיגוע (שאדי אברהים המאמרה ומוסא יוסף מוחמד האלל - ראה דו"ח הובלת גופות
ת/147ב, שהוגש על ידי אילן גרנות בעמ' 135, ודו"ח פעולה ת/147ג שהוגש על ידי רס"מ אסף
אזולאי בעדותו בעמ' 134).

128.    אחמד ברגותי סיפר בחקירתו (חודעה ת/165ג עמ' 5 שהוגשה על ידי רס"ר יעקובוף בעמ'
171, וכי"ד ת/165יא סעיף 15 שהוגש על ידי חוקר השב"כ "אדס" בעמ' 201), כי גייהאד גיוערה
התקשר אל הנאשם יום לפני שמצאו את המכונית ליד הקניון בירושלים, ואמר לו שתוא רוצה
לבצע פיגוע. הנאשם אמר לו שלא יבצע פיגוע בתוך ישראל, והעביר את גיוערה אל אחמד ברגותי על
מנת שישוחח איתו. אחמד ברגותי טען כי גם הוא אמר לגיוערה שלא לבצע פיגוע בישראל או
בירושלים. ואולם, למחרת התקשר גיוערה אל אחמד ברגותי, ואמר לו כי המכונית שהתפוצצה ליד
הקניון בירושלים נשלחה על ידו לביצוע פיגוע בירושלים.

129.    הנאשם עצמו אמר בחקירתו (זכ"ד ת/36 שהוגש על ידי חוקר השב"כ "סמיית" בעמ' 85), כי
אחמד ברגותי דיווח לו על כוונת אנשיו של גייהאד לבצע פיגוע התאבדות בירושלים. הנאשם אמר
כי הוא הורה לאחמד ברגותי שהפיגוע לא יבוצע בתחומי ישראל, אלא בשטחי יהודה ושומרון.
הנאשם אמר בחקירתו בעניין זה, כשהוא מסופר על פגישתו של אחמד ברגותי אליו בעניין רצונו של
גייהאד לבצע פיגוע (תמליל שיחה ת/98יא עמ' 19-20):

| "הנאשם: | ... שג'יהאד, הוא אמר לו שאנחנו יש לנו פעילות. ויש לנו פיגועים וכו'. אז |
| | אני אמרתי לאחמד, אמרתי לו מה שחשוב זה שלא יעשו שום פיגוע בתוך |
| | ישראל. |
| החוקר: | או.קי וכשבא רשמית ואמר לך שהם רוצים לבצע פיגוע התאבדות, מה |
| | אתה אמרת לו? |
| הנאשם: | אמרתי לו לא, אני לא מרשה. |
| החוקר: | לא. זה לא כמו שסיפרת לי. אמרת לו, אין בעיה. אבל לא 'בפנים' (בתוך |

ישראל.
הנאשם:    כן, לא בישראל... זאת אומרת שאני לא רוצה פיגועים בישראל".

הנאשם סיפר כי למחרת קיבל דיווח מאחמד ברגותי שפיגוע ההתאבדות נכשל, וכי הרכב התפוצץ
לא רחוק מהמחסום, ושני חברי החוליה נהרגו.

130.    מן האמור לעיל עולה כי הוכחה מעורבותו של הנאשם באישורֹ פיגוע ההתאבדות הנ״ל,
וזאת גם על פי גרסתו. הנאשם אמנם הורה שהפיגוע יתבצע במקום אחר, אך לכך אין כל משמעות
מבחינת אחריותו הפלילית לניסיון הפיגוע. דברי הנאשם בחקירתו נתמכים בגרסת מקורבו אחמד
ברגותי, אם כי הלה ״שיפצ״ את העובדות, וטען כי הנאשם הורה שלא לבצע את הפיגוע כלל. מדברי
הנאשם ברור כי הוא הורה לבצע את הפיגוע במקום אחר.

## חלק שלישי:   הערכת הראיות ומשקלן

131.   הואיל והנאשם בחר שלא להעיד ולא להביא עדים מטעמו, ואף הורה לנציגי הסנגוריה
הציבורית שמונו לייצגו לחמנע מחקירתם הנגדית של עדי התביעה - מבוססות הראיות כנגד
הנאשם על כמה נדבכים שונים.

**ראשית,** דברים שאמר הנאשם בחקירתו בשב״כ, אשר חלקם הועלו על הכתב בתמצית בזכ״דים
שרשמו החוקרים, ואשר הוגשו על ידם, וחלקם הוקלטו ותומללו. במסגרת זו כלולים גם דברים
שאמר הנאשם בשיחות שהוקלטו ללא ידיעתו עם מקורבו אחמד ברגותי, ועם המדובבים ״פלוני 1״
ו-״פלוני 3״.

**שנית,** עדויות המפלילות את הנאשם, שמסרו פעילי הטרור מקרב חפת״ח לאחר מעצרם. הכוונה
להודעות שמסרו בחקירותיהם בשב״כ ובמשטרה, שכן כולם - כאיש אחד - סרבו להשיב על שאלות
כלשהן בבית המשפט, כאשר הובאו כעדים מטעם התביעה.

**שלישית,** דברים שאמר הנאשם בכלי התקשורת בתקופה שקדמה למעצרו.

**רביעית,** מסמכים שנתפסו במשרדו של הנאשם ובמשרדי הרשות הפלסטינאית במבצע ״חומת
מגן״.

**חמישית,** עדויותיהם של נפגעי הטרור, עדי הראיה לפיגועים נשוא כתב האישום והעדים שעסקו
בחקירתם.

132.   לעניין הערכת הראיות ומשקלן יש להעיר את ההערות הבאות:

א.   המנעותו של הנאשם מלהעיד במשפט ולחשוף עצמו לחקירה נגדית עשויים לשמש חיזוק
למשקל הראיות כנגדו, ואף להוות סיוע לראיות התביעה מקום שדרוש להן סיוע, כקבוע
בסעיף 162(ב) לחוק סדר הדין הפלילי [נוסח משולב], התשמ״ב-1982 (להלן: **״החסד״פי״**).
כמו-כן, המנעותו של הנאשם מלהשיב על כתב האישום, כפי שעשה, עשויה לשמש חיזוק
למשקל ראיות התביעה, כקבוע בסעיף 152(ב) לחסד״פ. דברים אלו הובהרו לנאשם על ידי
בית המשפט.

עניין זה מקובל משנה חשיבות לאור העובדה שעל פי הדין נדרש חיזוק להודעות של עדים
שסרבו להעיד במשפט, או התכחשו לתוכן הדברים שמסרו בחקירותיהם  (ראה ס״ק ג5(5)
לחלן). כך פסק בית המשפט העליון כי הימנעות נאשם ממתן עדות מהווה חיזוק משמעותי
להודעות בחקירה שמסרו עדים במשפט, ואשר טעונות חיזוק לפי סעיף 10א(ד) לפקודת
הראיות [נוסח חדש], התשל״א-1971 (להלן: **״פקודת הראיות״**) (ע״פ 1497/92 **מדינת
ישראל נ׳ צוברי**, פ״ד מז(4) 177, בעמ׳  202). בית המשפט הבהיר באותו ענין: **״הנאשם
השותק - להבדיל מן העד השותק - פועל במסגרת הדין; אולם לבית המשפט נתונה
הרשות לפרש את התנהגותו לפי התרשמותו והבנתו״** (בעמ׳ 203, וראה גם ד״נ 308/91
**קוזלי נ׳ מדינת ישראל**, פ״ד מה(4) 441, בעמ׳ 486).

אמנם, בית המשפט רשאי  שלא ליתן משקל לשתיקת הנאשם כאשר יש לה הסבר סביר
(ראה: ע״פ 277/81 **חלוי נ׳ מדינת ישראל**, פ״ד לח(2) 369, בעמ׳ 386). אולם, משנדחו
הטענות המקדמיות של הנאשם בעניין סמכות בית המשפט לשפוט אותו - לא היה בידיו כל
הסבר סביר ומוצדק להימנעותו ממתן עדות. ברור למדי כי הנאשם, אשר נחשף במהלך

חקירתו לראיות המפלילות שנצברו כנגדו, ידע היטב כי הוא איננו יכול להתמודד איתן במישור המשפטי, ולכן נמלט אל חיקו החם של המישור הפוליטי. כך אמר הנאשם מספר פעמים בחקירתו, כי ברור לו שהוא יועמד לדין ויורשע, וכי הוא מתכוון לנהל משפט פוליטי.

בענין זה חשוב לציין כי למרות שהנאשם הצחיר שהוא איננו מנהל פרשת הגנה, כפי שאכן נהג, הוא נשא נאומים פוליטיים, ולעתים אף התייחס לראיות שהוגגו כנגדו - אך זאת מספסל הנאשמים, ולא מדוכן העדים. על פי הדין, איננו יכולים ליתן משקל לדברים שנאמרו בצורה זו, באופן שלא ניתנה לתביעה אפשרות לחקור את הנאשם עליהם. אשר לדברים הרבים שהשמיע הנאשם במישור המדיני והפוליטי, חן במהלך המשפט וחן בסיכומיו, איננו רשאים להתייחס אליהם, בהיותם בלתי רלבנטיים לשאלת אשמתו של הנאשם בעבירות המיוחסות לו. דברים אלו הובחרו בחחלטה הנוגעת לענין סמכות בית המשפט : אדם הפועל מחוץ למסגרת של לחימה תוקית, ואשר מבצע פעולות טרור שמטרתן לפגוע ללא אבחנה באוכלוסיה אזרחית, חושף עצמו לסנקציות הפליליות הרגילות של המשפט הפלילי הלאומי (ראה החלטה של בית המשפט בתיק זה מיום 19.1.03 בעמ' 29-33). התנגדות לכיבוש, כפי שטוען הנאשם, איננה מהווה צידוק על פי דין כלשהו לביצוע מעשי הרג כנגד אזרחים חפים מפשע. זאת ועוד : מקומה של טענה זו - אם בכלל - הוא בטיעונים לעונש, שכן היא נוגעת למניע לביצוע העבירות, להבדיל מן הכוונה הפלילית הדרושה לשם הוכחתן.

ב.  הואיל והנאשם בחר שלא לנהל פרשת הגנה, הוא גם לא העלה טענות כלשהן כנגד קבילות הראיות או משקלן. ואולם בית המשפט ראה עצמו מחויב לבחון שאלח זו ביוזמתו, ולהתעלם מראיות בלתי קבילות שהתבערה הגישה או הסתמכה עליהן בסיכומיה (כגון, עדויות שמיעה הכלולות בהודעות העדים, זכ׳׳דים והודעות שלא הוגשו על ידי החוקרים שרשמו אותם, חוות דעת חנסמכות על ידיעות מודיעיניות וראיות שלא הוגשו במשפט, והתייחסות בזכד׳׳יס לממצאי פוליגרף).

בחנו את חומר הראיות גם מזוית הראיה של הנאשם, ולא רק מנקודת מבטה של החביעה כפי שפורטה בסיכומיה. עם זאת, כפופים אנו לכלל לפיו נאשם שלא העיד במשפטו איננו רשאי להסתמך על דברים הכלולים באמרות חוץ שמסר : אמרות אלו כשרות כראיות כנגדו, אך לא לטובתו, שהרי לא ניתן היה לחקור אותו על אמרותיו (ראה ע׳׳פ 205/75 **קרנץ נ׳ מדינת ישראל**, פ׳׳ד ל(2) 471, בעמ' 474).

ג.  התבעה זימנה לעדות 21 מפקדי שטח ופעילי טרור הקשורים לפיגועים נשוא כתב האישום, וחקשר של הנאשם איתם פורט לעיל. עדים אלו, בלא יוצא מן הכלל, סרבו להשיב על שאלות ב׳׳כ התבעיה, ונראה כי אין מדובר בהחלטה אישית של כל אחד מהם, אלא בהנחיה מגבוה. עדים אלו לא היו מוכנים להעיד כנגד מפקדם ומנהיגם, והדברים ברורים. בשיחח שהתנחלה בין הנאשם לבין אחמד ברגותי בעת מעצרם, ואשר הוקלטה ללא ידיעתם, הזהיר אחמד מפני העדויות שימסרו פעילי הטרור שנעצרו, והנאשם השיב לו, כשהוא נשמע צוחק : **״כולם בבית המשפט יכחישו את מה שהזדו בו... כולם יבטלו... אמרו לי החוקרים. אמרתי להם שאיש לא יזדה בבית משפט״** (תמליל 127ג׳ עמ' 109). כך אמר הנאשם, וכך אכן אירע.

בנסיבות אלו הוכרזו כל אותם פעילי טרור כעדים עוינים, והודעותיהם בחקירה הוגשו לפי סעיף 10א. לפקודת הראיות. לגבי עדים אלו יש להעיר כדלקמן :

(1)  חלק מעדי התביעה העידו לאחר סיום משפטם, ורובם הורשעו, בין היתר, במעורבותם בפיגועים נשוא כתב אישום זה על פי הודאתם. בהודאותיהם בעובדות

P 7: 000421

כתבי האישום שהוגשו כנגדם, מפלילים עדים אלו את הנאשם. אולם, ההלכה בעניין זה כי
הודאת נאשם שכזו, מפי אדם שהוא עד במשפט, נחשבת אמנם כאמרת חוץ שחל
עליה סעיף 10א. לפקודת הראיות, אך אין ליתן להודאה זו משקל של ממש.
מבחינתו של העד - ההודאה שהוא מוסר במשפטו מרוכזת כל כולה בעובדות
הנוגעות אליו, וספק רב אם הוא מודע אותה שעה להשלכות שיש לחלקים בהודאתו
על אחרים (ראה: ע"פ 4541/90 **אליהו סלע נ' מדינת ישראל**, תק-על 91(2) 2086).

(2)    ככלל, אמרת חוץ של עד היא עדות שמיעה הפסולה כראיה לאמיתות תוכנה. החריג
לכלל נקבע בסעיף 10א(א) לפקודת הראיות ולפיו בית המשפט רשאי לקבל אמירה
שכזו, ואף להתמודד עליה ולהעדיפה על עדות העד בבית המשפט, כאשר העד
במשפט מסרב להעיד, או שהוא מתכחש לגרסה שמסר בחקירתו.
מטרתו של סעיף זה לחתמודד עם התופעה הנפוצה של עדים המתכחשים לגרסה
שמסרו בחקירתם, ועל מנת למנוע מצב שבו לא ניתן יהיה לעמת אותם במשפט עם
הגרסה שמסרו בחקירתם (ראה: דברי ההסבר להצעת החוק לתיקון פקודת
הראיות, תשל"ד-1974). ודוק: עד אשר הוזמן להעיד והתייצב על דוכן העדים
נחשב כ"עד במשפט", גם אם סרב להשיב על שאלות, ולפיכך חל עליו סעיף 10א(א)
הנ"ל, ולא סעיף 10א(ב) המתייחס למקרה בו לא ניתן כלל להביא עד לבית המשפט
מהטעמים המפורטים בסעיף (ראה: דנ"פ 4390/91 **מדינת ישראל נ' אגי' יחיא,**
פ"ד מו(3) 673; והשווה דעתו של א. שטיין, **"סעיף 10א. לפקודת הראיות:
פרשנותו הראויה ופסיקתו של בית המשפט העליון"**, משפטים כ"א תשנ"יב, עמ'
325, בעמ' 336-338).

(3)    על פי סעיף 10א(א) לפקודת הראיות, קבלת אמרת חוץ של עד במשפט, אשר
מכחיש את תוכן העדות שמסר בחקירתו, מותנת בכך שמתן האמרה הוכח, שנותן
האמרה הוא עד במשפט ושניתנה לצדדים הזדמנות לחקרו. תנאים אלה מתקיימים
בעניינו לגבי 21 פעילי הטרור הנ"ל.

(4)    בית המשפט רשאי לסמוך ממצאיו על אמרת חוץ שהתקבלה לפי סעיף    10א.
לפקודת הראיות, ואף להעדיפה על פני עדות העד במשפט, **"אם ראה לעשות כן
לנוכח נסיבות העניין, לרבות נסיבות מתן האמרה, הראיות שהובאו במשפט,
התנהגות העד במשפט ואותות האמת שנתגלו במהלך המשפט, והטעמים
ירשמו"** (סעיף 10א(ג) לפקודת הראיות).

(5)    על פי סעיף 10א(ד) לפקודת הראיות, לא יורשע אדם על סמך אמרת חוץ שהתקבלה
לפי סעיף זה, אלא אם יש בחומר הראיות דבר לחיזוקה. הכוונה היא לתוספת
ראייתית המנחזקת את אמינותה של אמרת החוץ, ומפיגה את החשש כי אין בה
אמת (ראה: י. קדמי, **על הראיות,** בעמ' 354-365).

בעניין זה יש לציין כי אמרת חוץ של עד אחד, שהיא עצמה טעונה חיזוק, יכולה
לשמש כחיזוק לאמרת חוץ של עד אחר (ספרו הנ"ל י. קדמי בעמ' 366, והפסיקה
המצוטטת שם). כאמור לעיל, גם שתיקת הנאשם במשפטו עשויה להוות חיזוק
לאמרת חוץ של עד, וכך גם הימנעותו מלחקור עד זה בחקירה נגדית (י. קדמי הנ"ל
בעמ' 369-371, והפסיקה המצוטטת שם).

ההלכה הפסוקה היא כי הימנעות נאשם מחקירת עדי התביעה - מחזקת אף היא
את ראיות התביעה (ראה: ע"פ 4736/91 **פטאיר נ' מדינת ישראל,** תק-על 94(2)
1866). הנאשם לא ישמע לאחר מכן בטענה שהעדים לא נחקרו בחקירה נגדית

(ראה: ע"פ 1632/95 **עוזי משולם נ' מדינת ישראל**, פ"ד מט(5) 534, בעמ' 550, שבו התנהל המשפט ללא נוכחות הנאשם, על פי רצונו, והסניגור הונחה שלא לחקור את העדים). נאשם איננו יכול לסכל את ההליך המשפטי המתנהל נגדו בעצם הימנעותו מלהתגונן.

**במקרה דנא**, הרשעתו של הנאשם נסמכת על מארג רחב ואמין של ראיות, הכוללות הודאות שמסר הנאשם בחקירתו, דברים שאמר הנאשם בכלי התקשורת, ממסמכים שנתפסו אצל הנאשם וברשות הפלסטינאית, ועדויות רבות של פעילי הטרור שנמסרו בחקירתם, ואשר תומכות זו בזו ומהוות חיזוק האחת לרעותה. כפי שעולה מן התשתית הראייתית שפורטה לעיל. ברור לחלוטין כי פעילי הטרור החליטו להימנע ממתן עדויות במשפטו של מנת לסכל את ההליך, ולהימנע מחשיפת הגרסה שמסרו בחקירותיהם. הנאשם הביע כעס בחקירתו על הדברים המפלילים שמסרו פעילי השטח נגדו (ראה: דוייח הפגשה של הנאשם עם עויס ת/77ב; דברים שאמר הנאשם למדובב "פלוני 3" ת/123 עמ' 1 ות/124וא סי' 1; דברים שאמר הנאשם למדובב "פלוני 1" ת/112וא סי' 7-6, ת/114וא סי' 7, ת/115וא סי' 13, 14, ת/ 116 סי' 9, ושיחות של הנאשם עם אחמד ברגותי ת/127וג עמ' 3, 4, 72, 84), ועובדה זו מחזקת את המסקנה שפעילי הטרור אמרו בחקירתם דברים נכונים לגבי הנאשם.

בנסיבות אלו, יש להעדיף את האמרות שמסרו עדים אלו בחקירותיהם על פני עדויותיהם במשפט, כאשר נמצא הרבה יותר מאשר "חיזוק" לאמרות החוץ שמסרו בחקירות. ההודעות שמסרו פעילי הטרור משתלבות כדבעי האחת ברעותה, ויחד עם הדברים שאמר הנאשם בחקירתו, והממסמכים שנתפסו ברשות הפלסטינאית, נחשפה תמונה ברורה המבציעה על חלקו של הנאשם ותפקידו בפיגועים נשוא כתב האישום.

133.   לא מצאנו כל סיבה להטיל ספק במהימנותם של חוקרי חשב"כ, אשר העידו כי הזכ"דים שרשמו בחקירותיו של הנאשם משקפים בצורה הולמת את עיקרי הדברים שאמר. ככל שמדובר במשקל הדברים, יש להביא בחשבון את הכללים שביארנו בהרחבה בתפייח 1074/02 **מדינת ישראל נ' עאצי מוחסין** (תק-מח 2003 (2) עמ' 3553, סי' 84-76). זכ"דים אלה מהווים אמרות של הנאשם, אך בניגוד למקובל בחקירה משטרתית הם כוללים רק תמצות של החקירה; לא תמיד ניתנת לנחקר אזהרה בדבר זכויותיו; הנחקר איננו יכול לקרוא את הדברים הנרשמים בזכ"ד, ואיננו חותם עליו; הזכ"ד נרשם לא פעם בשפה העברית היא כאשר החקירה היא בערבית, בניגוד להנחיה חבורה בפסיקה. עם זאת, חשוב להדגיש כי, זכ"דים אלו בהחלט מהווים ראיות קבילות, כאשר לעניין משקלם יש להביא בחשבון את היקף וצורת הרישום והתיעוד שלהם (ראה: ע"פ 6613/99 **סמירק נ' מדינת ישראל**, פד"יי נו(3), 529, בעמ' 553).

**במקרה דנא**, גובו זכ"דים רבים בתמלילי הקלטות מחחקירה, בהם נשמע הנאשם מדבר בקולו, בשפה העברית בה הוא מיטיב להתבטא, דבר המסיר חשש לגבי מהימנותם. כמו כן, נאמר לנאשם במפורש לאורך כל חקירתו כי אינו חייב לומר דבר, וכי הדברים שיאמר עשויים לשמש כראייה נגדו, והנאשם אף נפגש עם עו"ד במהלך חקירתו (ראה להלן). זאת ועוד: הדברים שאמר הנאשם בחקירתו בשב"כ, כפי שנרשמו בזכ"דים והוקלטו ותומללו בחלקים ניכרים מהם, ותמכים היטב בעדויותיהם של פעילי הטרור שפורטו לעיל, ולעיתים גם במסמכים שנתפסו אצל הנאשם, ובראיונות שנתן באמצעי התקשורת האלקטרוניים. במצב דברים זה, אין עלינו לסמוך אך ורק על הזכ"דים שרשמו חוקרי השב"כ מפי הנאשם, ואף לא רק על הדברים שאמרו פעילי הטרור בחקירותיהם (שהרי אלה סירבו להעיד במשפט, או שהתכחשו לדברים שאמרו בחקירותיהם). אלא יכולים אנו להתרשם מדברי הנאשם בחקירתו בשב"כ, בצורה בלתי אמצעית, כפי שאלה הוקלטו ותומללו.

134.   בענין הערכת משקל דבריו של הנאשם בחקירתו בשב"כ, הבאנו בחשבון - הגם שהנאשם עצמו לא העלה טענות כלשהן בנושא זה - כי מדובר בחקירה ארוכה ומתישה. הנאשם היה נתון

לחקירות ארוכות ביותר במהלכן ישן שינה מועטה, כשהוא יושב כבול על כסא, והוא הגדיר זאת בשיחתו עם המדובב ״פלוני 1״ (ת/12| ו1 (1) עמי 3-4) – כעינוי.

לנאשם הובהר כי כל עוד לא ישתף פעולה בחקירה יהיה צורך להמשיכה, ואף נרמז לו כי הדרך לפגוש את בני משפחתו היא לשתף פעולה (זכ״יד ת/12 סי 13). באחת החקירות נאמר לנאשם כי חקירתו לא תסתיים עד אשר ימסור את האמת, כפי שהיה הדבר לגבי פעילי הטרור שהודו בסופו של דבר בחלקן של הנאשם במעשים המיוחסים לו (זכ״יד ת/63 סי 9-10). באחת החקירות סרב הנאשם להמשיך בחקירה כל עוד לא יינתן לו פרק זמן סביר לישון, והחוקר הבהיר לו כי לא יתואפשר לו לישון עד אשר יודה לפחות בראשי פרקים לגבי פעילותו, אך הנאשם דחה הצעה זו (זכ״יד ת/21 סי 28-26). כמו כן, הופעל על הנאשם לחץ מוסרי לחודות ולהתנחא כמנהיג הנוטל אחריות על מעשיו פקודיו, במקום להתכחש לדברים שעשו פקודיו, ולהציג אותם כשקרנים (זכ״דים ת/16-ת/17).

בענין חקירתו של הנאשם במשך שעות ארוכות, חשוב לציין כי הנאשם נעצר ונחקר במהלך מבצע ״חומת מגן״, בתקופה של בצוע פיגועי טרור רבים כנגד ישראל. בנסיבות אלו ברור כי היתה חשיבות רבה לחשלים את חקירתו במהירות האפשרית, שכן חקירתו התנהלה לא רק לצורך בירור אשמתו, אלא גם, ואולי בעיקר, לצורך סיכול פיגועים נוספים. חוקרי השב״כ הסבירו עד כמה היה חשוב לחם להגיע במהרה לפעילי טרור ולחוליות טרור שהיו קשורות לנאשם, וכי חקירת הנאשם היתה בעיקרה מודיעינית (החוקר ״איתי״ בעמי 154 והחוקר ״יואדי״ בעמי 97).

תקירת הפשעים תחמורים בהם הואשם הנאשם, והצורך המודיעיני בקבלת מידע מפיו מחר ככל האפשר, חייבו את חקירתו הרצופה במשך שעות רבות. אין בכך לחביא לפסילת הודעותיו של הנאשם, כאשר ברור שהוא מסר לחוקריו רק את הדברים שרצה לומר, וכאשר היתה הצדקה עניינית לדרך חקירה זו בנסיבות הביטחוניות ששררו אז (ראה: י. קדמי, **על הראיות**, חלק ראשון, מהד׳ תשס״יד-2003 בעמי 58-55).

**135.** ברור ממהלך התחירה כי הנאשם התלבט רבות, ובקול רם, אם לחודות בקשר שלו לפיגועים נשוא כתב האישום, והוא אף הסביר כי הדבר עלול לחשילו בעתיד כמנהיג העם הפלסטינאי (ראה למשל, זכ״יד ת/24 סי 7, זכ״יד ת/68 סי 6). בסופו של דבר החליט הנאשם להודות בחלק מהדברים שעשה, לאחר שחבין שפעילי השטח הודו בחקירותיהם והפלילו אותו, וכי יש בידי החוקרים ראיות מוצקות בנוגע לאשמות שייחסו לו. לכן הודה הנאשם רק בדברים שאנשיו הודו בהם קודם לכן, ורק לאחר שדבריהם הוצגו לו על פי דרישתו, והוא אף הבחיר חזור והבהר כי יודה אך רק בדברים שיוצגו בפניו, ואשר חינם נכונים (זכ״יד ת/22 סי 9-8, שהוגש ואושר על ידי החוקר ״מופד״י בעמי 58, וזכ״יד ת/23 סי 9, שהוגש ואושר על ידי החוקר ״זני״י בעמי 90). הנאשם ביקש להיפגש עם ראש השב״כ, ואמר כי הוא מוכן לחודות בדברים שיש לו אחריות עליהם, אם יראו לו שאחרים כבר הודו בהם (תמליל חקירה ת/98אי עמי 16-18, 26-28).

יש להדגיש בתקשר זה כי הנאשם עצמו אמר בשיחתו עם המדובב ״פלוני 1״, כי הסתבר לו בחקירתו שפעילי השטח שנעצרו מסרו ידיעות רבות ומהימנות לגבין. כאשר נשאל על ידי המדובב אם הידיעות שמסרו לגבי הן אמיתיות השיב: **״רבות, יעני יש הוכחה ודיוק״** (תמליל שיחח ת/112 ג (1) עמי 6). עוד אמר הנאשם למדובב ״פלוני 1״ כי הנהג שלו (אחמד ברגותי) מסר הודאה הקושרת את הנאשם ל- 8 פיגועי התאבדות בישראל, וכאשר נשאל הנאשם האם אחמד ברגותי ״יסגר אותו בהודאות״ - הוא השיב בחיוב (זכ״יד ת/114א סעיף 7). לכל אורך שיחותיו של הנאשם עם ״פלוני 1״ ניתן לראות כי נושא ההודאות שמסרו פעילי השטח בחקירותיהם הטריד אותו מאוד, והוא היה מודע לכך שהם מסרו מידע אמיתי לגבין (ראה דו״חות ת/112אן(1), ת/113א, ת/113ג, ת/114א, ת/114ג, ת/115א, ת/115ג)(1)אן, ת/116א).

הנאשם אמר לי״פלוני 1״ כי הוא אמנם טוען בחקירתו שהוא מנהיג פוליטי, אך ההודאות שמסרו אחרים כנגדו, וחתומר הרב שנתפס במשרדו ובמשרדי הרשות הפלסטינאית יאלצו אותו **״לדבר**

**בחקירה"** (דו"ח ת/117 סי 29, 32 שהוגש על ידי החוקר "רוברטי").

זה היה הרקע שהביא את הנאשם להודות בדברים שממילא כבר היו ידועים לחוקרים ממקורות
אחרים.

136. המפגה בחקירת הנאשם חל ביום 21.4.02, כשבוע לאחר מעצרו של הנאשם, כאשר הוא
החליט לספר את העובדות מנקודות ראותו ואחריותו, אך דרש כי קודם לכן יוצגו בפניו הדברים
שאמרו אנשיו בחקירה, ושיתאפשר לו להיפגש עם ראש השב"כ או סגנו (זכ"דים ת/19-ת/20).
הנאשם קיבל את הצעת החוקרים לעשות אבחנה בין סירובו למסור הודעה מפלילת במשטרה,
שתניחשף בעתיד, לבין מסירת פרטים על פעילותו בחקירתו בשב"כ (זכ"ד ת/20 סי 12-10, זכ"ד ת/
24 סי 7). הנאשם יצא מתוך הנחה שדברים שיאמר במשטרה יחשפו בציבור ויחייבו אותו, וזאת
בניגוד לדברים שיאמר בחקירתו בשב"כ - שאותם תכנן הנאשם להכחיש, כפי שאכן עשה בחקירתו
במשטרה ובמשפטו. כך אמר הנאשם במפורש בחקירתו בשב"כ, כאשר נאמר לו כי הזכ"דיים
הנרשמים במהלך חקירתו יוגשו כראיה בבית המשפט כאילו היו עדות משטרתית (זכ"ד ת/25 סי
23, שהוגש ואושר על ידי החוקר "מופז" בעמי 58).

בעניין זה יש לציין כי שישה ימים לאחר מעצרו נחקר הנאשם, והוזהר בדרך המקובלת כי איננו חייב
לומר דבר על פי החוק, וכי הדברים שיאמר עשויים לשמש ראיה כנגדו (ראה זכ"ד ת/40 סי 1,
ועדותו של החוקר "מופז" בעמי 59). החוקר "מופז" העיד כי אזהרות כאלה ניתנו לנאשם במהלך
כל חקירתו, וכך גם העיד החוקר "אמלי" (עמי 57, 59, ואזהרות הכלולות בזכ"דיים ת/41 סי 1, ת/
44, ת/25, תמליל חקירה ת/98 עמי 37). לעיתים אמנם נרמז לנאשם כי לא בהכרח יועמד לדין,
שכן קיימת אפשרות שהוא יגורש, אך הנאשם ציין כי הוא מעדיף את האפשרות של העמדה לדין,
ואף אמר כי ברור לו שהוא יועמד לדין ויישלח לכלא לשנים רבות (זכד"יים ת/10, ת/11, ת/14 ו-
ת/19 סי 5, וזכ"ד ת/63 סי 25).

137. הנאשם אמר בחקירתו כי הוא מתכוון לנהל משפט פוליטי, תוך התעלמות מהראיות
שהונחשנה נגדו במשפטו (זכ"ד ת/42 סי 8 שהוגש ואושר על ידי החוקר "יואדיי" בעמי 96, וזכ"ד ת/56
סי 3 שהוגש ואושר על ידי החוקר "סמית" בעמי 85). בשיחותיו של הנאשם עם המדובב "פלוני 1",
הוא הסביר לו את הטקטיקה בה הוא נוקט בחקירה, לפיה הוא איננו מודה אלא בדברים
שהחוקרים יודעים עליו, ומנסה למשוך זמן ולהבין מה החוקרים יודעים עליו, כדי לא להפליל
אחרים.

הוא גם אמר לעורך-דינו כי לא ימסור כל הודעה במשטרה (ראה דו"יחות ת/118 סי 3, ת/120 סי 2,
ודבריו לייפלוני 3" בדו"ח ת/122 סי 1). יש לציין בחקשר זה כי הנאשם נפגש לראשונה עם
פרקליטו, עו"ד בולוס, שלושה ימים לאחר מעצרו (מוצג ת/164, וזכ"ד ת/111 סעיף 14). במהלך
חקירתו נפגש הנאשם עם עו"ד בולוס כמה פעמים (זכ"ד ת/90 סי 1).

138. **סיכומו של דבר**: אין לנו סיבה לספוק שהודאתו של הנאשם בחקירתו בשב"כ ניתנה עקב
אמצעים פסולים כלשהם שהופעלו כנגדו, אשר הביאו לשלילת רצונו החופשי של הנאשם, והנאשם
גם לא טען זאת. במהלך המשפט, וכן בעת חקירתו במשטרה, כאשר הוצגו לנאשם הדברים שאמר
בחקירתו בשב"כ, הוא חזר וטען כי מדובר "בשקר וזיוף". הוא לא טען כי הופעלו כנגדו אמצעים
פסולים בחקירה, והתרשמנו בבירור שהחוקרים נהגו בנאשם בכבוד, כפי שגם אמר הנאשם
בחקירתו בשב"כ (זכ"ד ת/75 סי 2, זכ"ד ת/90 סי 1 ותמליל חקירת הנאשם ת/98 עמי 29). בעת
מתן עדויותיהם במשפט, לחץ הנאשם את ידם של חלק מחוקרי השב"כ, וגם עובדה זו מעידה כי
אין בלבו של הנאשם תחושות כלשהן כנגד חוקריו.

לנאשם היתה שליטה מלאה על הדברים שאמר לחוקרי השב"כ: הוא החליט אלה דברים חיה מוכן
לומר בחקירתו, ואשר להעריכתו כבר היו ידועים לחוקרים ממילא, ואלה דברים הוא מתכוון
להסתיר מהם. הנאשם היה זהיר ביותר בחקירתו, ולא פעם סירב לענות על שאלות שנשאל, או

שעה בצורה עקיפה ומרומזת. הוא בחר לעצמו טקטיקה במהלך החקירה, לפיה ירחיב בעניינים פוליטיים ויקמץ בעניינים הקשורים לפעולות הטרור, ובכל מקרה לא ימסור אלא פרטים שלהערכתו כבר נמצאים בידיעת החוקרים.

כפי שהעיד המדובב "פלוני 1", אמר לו הנאשם: **"גם אם כל העם הפלסטיני מודה עליו, הוא יקבע מה יאמר בחקירה"** (ת/110 סי 10). מכל האמור לעיל, ברור שהנאשם מסר את חודעותיו מרצון חופשי.

חלק רביעי:   **ניתוח משפטי ומסקנות**

1. **פעילות וחברות בארגון טרוריסטי**

139. בכתב האישום מיוחסות לנאשם, בין היתר, העבירות של פעילות וחברות בארגון
טרוריסטי. סעיפים 1-3 לפקודת מניעת טרור, התש״ח-1948 קובעים לאמור:

### **1. "פירושים**

"ארגון טרוריסטי" פירושו חבר אנשים המשתמש בפעולותיו במעשי
אלימות העלולים לגרום למותו של אדם או לחבלתו, או באיומים במעשי
אלימות כאלה;
"חבר בארגון טרוריסטי" פירושו אדם הנמנה עליו, וכולל אדם המשתתף
בפעולותיו, המפרסם דברי תעמולה לטובת ארגון טרוריסטי, פעולותיו או
מטרותיו, או אוסף כספים או חפצים לטובת ארגון טרוריסטי או
פעולותיו".

### **2. פעילות בארגון טרוריסטי**

אדם הממלא תפקיד בהנהלה או בהדרכה של ארגון טרוריסטי, או משתתף
בדיוניו או בקבלת החלטותיו של ארגון טרוריסטי, או משמש חבר בבית-
דין של ארגון טרוריסטי, או נואם נאום תעמולה באסיפה פומבית או ברדיו
מטעם ארגון טרוריסטי, ייאשם בעבירה, ובצאתו חייב בדין, יהא צפוי
לעונש מאסר עד עשרים שנה.

3. **חברות בארגון טרוריסטי**

אדם שהוא חבר בארגון טרוריסטי, ייאשם בעבירה, ובצאתו חייב בדין,
יהא צפוי לעונש מאסר עד חמש שנים".

סעיף 7 לפקודת מניעת טרור קובע כי:

7. **"הוכחה על קיום ארגון טרוריסטי**
כדי להוכיח בכל דיון משפטי, שחבר אנשים מסויים הוא ארגון טרוריסטי, יספיק
להוכיח כי –

(א) מטעם אותו חבר אנשים או בפקודתו ביצע אחד או יותר מחבריו בכל זמן
שהוא לאחר ה' באייר תש״ח (14 במאי 1948) מעשי אלימות העלולים
לגרום למותו של אדם או לחבלתו, או איומים במעשי אלימות כאלה; או

(ב) חבר אנשים, או אחד או יותר מחבריו מטעמו או בפקודתו, הכריז שאותו
חבר אנשים אחראי למעשי אלימות העלולים לגרום למותו של אדם או
לחבלתו, או איומים במעשי אלימות כאלה, או שהכריז שחבר האנשים
היה מעורב במעשי אלימות או איומים כאלה, בתנאי שמעשה האלימות או
האיומים נעשו אחרי ה' באייר תש״ח (14 במאי 1948)".

140. עובדת היותם של חפתייח, התנגוים וגדודי חללי אלאקצא ארגונים טרוריסטיים, כפי שנאמר בחוות דעתו של תאייל קופרווסר ת/1, הוכחה בבירור ממסמכי השלל שנתפסו במבצע "חומת מגן" והוגשו כראיות בפנינו, כמו גם מעדויותניהם של פעילי הטרור והנאשם עצמו (ראה לעיל: סעיפים 7-10; עדותו של עויס בסעיפים 23-21; עדותו של אבו חמיד בסעיף 25; עדותו של אחמד ברגותי בסעיף 29; עדותו של אחויל בסעיף 35; עדותו של עיאדיה בסעיף 40; עדותו של שריף בסעיף 55; עדותו של אבו רדאחח בסעיף 57; ודברי הנאשם בחקירתו כמפורט בסעיפים 60-64). הפוגעים נשוא כתב האישום, ורבים אחרים, בוצעו על ידי פעילי השטח של חפתייח – אנשי התנגוים – ועל ידי תוליות שהתאגדו במסגרת חמכונה "גדודי חללי אלאקצא". הנאשם היה מנהיג הפתייח בגדה, ומפקד התנגוים וגדודי חללי אלאקצא, כפי שהודח בחקירתו, וכפי שהוכח בראיות נוספות רבות (ראה סעיף 17 וסעיפים 60-65 לעיל).

תפקידיו של הנאשם בהנהגת ארגוני הטרור פורטו בהרחבה אף הם (ראה חלק שני, פרק די לעיל). הנאשם היה מפקדים של ארגוני הטרור וחוליות הטרור, גם אם לעיתים אלה חרגו מהנחיותיו, והוא דאג לספק להם אמצעי לחימה וכספים לצורך פעילותם (ראה חלק שני פרק ד(1) ו-(3) לעיל). הוא אף היה מעורב באופן אישי בחלק מן חפיגועים שביצעו הארגונים שבהנהגתו (ראה חלק שני פרק ד( 2) לעיל). הנאשם אף טיפל בסיוע למבוקשים ולמשפחות העצורים וחתללים, ובגיוס פעילים לארגוני הטרור והדרכתם (ראה חלק שני פרק ד(4)-(5) לעיל). הוא היה האדם אשר ביטא את עמדותם של ארגוני הטרור באמצעי התקשורת (ראה פרק ד(6) לעיל).

אין מדובר, איפוא, אך ורק "באדם הממלא תפקיד בחנהלה או בהדרכה של ארגון טרוריסטי", כלשון סעיף 2 לפקודת מניעת טרור, אלא הנאשם הוא מי שעמד בראש ארגוני הטרור הנייל, התווה את מדיניותם ונשא נאומי תעמולה מטעמם באמצעי התקשורת.

בכך הוכחו יסודות סעיפים 2 ו- 3 לפקודת מניעת טרור, קרי חברות בארגון טרוריסטי ופעילות בארגון שכזה.

## 2. אחריותם של מבצע בצוותא, משדל ומסייע והאבחנה ביניהם

141. כתב האישום מייחס לנאשם אחריות ישירה של "מבצע בצוותא" לגבי כל מעשי הרצח וניסיון הרצח נשוא כתב האישום, כאשר מדובר ב- 37 פיגועים שונים. כתב האישום מייחס לנאשם גם את העבירות של סיוע ושידול לרצח, אם כי טענת המאשימה בסיכומיה היא, כי יש לראות בנאשם מבצע בצוותא של עבירות אלו, ולא רק מסייע או משדל לביצוע, וזאת עקב היותו מנהיג ארגוני טרור, והאחראי העיקרי לביצוע פיגועי הרצח שהוציאו ארגונים אלה לפועל. יש לסקור, איפוא, את מידת אחריותו הנטענת של הנאשם לפיגועי הטרור נשוא כתב האישום: ראשית - כמי שביצע את מעשי הרצח בצוותא חדא עם פעילי השטח והמפגעים; שנית – כמי ששידל לביצוע מעשים אלה; שלישית – כמי שסייע לביצוע מעשי הרצח. במסגרת זו יש לבחון מה הקווים המאפיינים את "המבצע בצוותא", תוך הבחנתם מן המאפיינים את המסייע והמשדל.

142. סעיף 29(ב) לחוק העונשין, התשלייז-1977 קובע את אחריותו של המבצע בצוותא, כדלקמן:

"**המשתתפים בביצוע עבירה תוך עשיית מעשים לביצועה, הם מבצעים בצוותא, ואין נפקה מינה אם כל המעשים נעשו ביחד, או אם נעשו מקצתם בידי אחד ומקצתם בידי**

אחרי".

סעיף 30 לחוק העונשין, התשל"ז-1997 קובע את אחריותו של המשדל כדלקמן :

"המביא אחר לידי עשיית עבירה בשכנוע, בעידוד, בדרישה, בהפצרה או בכל דרך שיש בה משום הפעלת לחץ, הוא משדל לדבר עבירה".

סעיף 31 לחוק העונשין, התשל"ז-1977 קובע את אחריותו של המסייע כדלקמן :

"מי אשר, לפני עשיית העבירה או בשעת עשייתה, עשה מעשה כדי לאפשר את הביצוע, להקל עליו או לאבטח אותו, או למנוע את תפיסת המבצע, גילוי העבירה או שללה, או כדי לתרום בדרך אחרת ליצירת תנאים לשם עשיית העבירה, הוא מסייע".

143. על מנת שאדם יחשב כמבצע העבירה בצוותא עם אחרים, צריך להתקיים התנאי הבסיסי של "עשיית מעשים לביצועה" של העבירה, כפי שמורה סעיף 29(ב) לחוק.

הפסיקה נתנה פירוש רחב למושג "ביצועי", כשהיא מגדירה בצורה רחבה את מהות המעשה הנדרש לצורך כך. באופן דומה קבעה הפסיקה אמות מידה גמישות בנוגע למידת הקירבה הנדרשת של המשתתף למעגל המבצעים, וליכולתו להשפיע על הביצוע (דנ"פ 1294/96, 1365/96 **עוזי משולם ואח' נ' מדינת ישראל**, פ"ד נב(5) 1, בעמי 21 (כב' השופט א. מצא), בעמ' 55-54 (כב' השופט מ. חשין), ובעמ' 64-63 (כב' השופט י.קדמי)).

אשר למעשה הנדרש על מנת שניתן יהיה לראות באדם מבצע בצוותא, נפסק כי די במעשה לביצוע העבירה החורג מהכנה גרידא (זה אף המבחן לקיומה של עבירת ניסיון), ואשר מלווה ביסוד הנפשי המתאים (דנ"פ 1294/96 הנ"ל בענין **משולם**, בעמי 24-23). מעשה זה איננו חייב להיות חיוני להצלחת העבירה, ואף איננו חייב להיות מעשה הנמנה עם רכיבי היסוד העובדתי שבעבירה ; די בכך שהמעשה משולב בתוכנית העבירה, ומהווה השתתפות בביצועה, כמו למשל תכנון העבירה, מתן הנחיות לביצועה או חלוקת התפקידים בין המשתתפים (דנ"פ 1294/96 הנ"ל בענין **משולם**, בעמי 64-63 (כב' השופט י. קדמי).

א. **מבצע בצוותא לעומת מסייע**

144. ההבחנה בין "מבצע בצוותא" של העבירה לפי סעיף 29(ב) לחוק העונשין, לבין "מסייע" לפי סעיף 31 לחוק, הפכה להיות בעלת חשיבות מעשית רבה לאחר שנכנס לתוקף חוק העונשין (תיקון מס' 39) (חלק מקדמי וחלק כללי), התשנ"ד-1984, שכן על-פי סעיף 32 לחוק כנוסחו היום - עונשו של המסייע הוא מחצית מעונשו של המבצע בצוותא, בעוד שעל-פי הדין הקודם עונשם היה זהה. עונשו המירבי של המסייע לרצח הוא 20 שנות מאסר (סעיף 32(1) לחוק), בעוד שהמבצע עבירת רצח בצוותא עם אחר, בהעדר נסיבות של אחריות מופחתת, דינו מאסר-עולם חובה.

בע"פ 8573/96, 8620, 8710, 8873, 8901 **מרקדו ואח' נ. מדינת ישראל** ("משפט **הדיסקונטאים"),** פ"ד נא(5) 481, אמר כבוד השופט א. גולדברג בעמ' 545:

"תיקון מס' 39 לחוק מבטא את ההכרה שהאשמה המוסרית, והמסוכנות הסוציקטיבית והאובייקטיבית שבסיוע פחותות מאלה שבביצוע בצוותא. פער זה הוא שעומד ביסוד ההבחנה בתוצאות העונשיות בין מבצע בצוותא למסייע, והוא זה שגם צריך להנחות אותנו בקביעת המבחנים המשמשים להבחנה בין מבצע עיקרי למסייע".

145. ההבחנה בין "מבצע בצוותא" לבין "מסייע" הובהרה בע"פ 4389/93, 4497/93 **יוסי מרדכי ואח' נ. מדינת ישראל,** פ"ד נ(3) 239, בע"פ 2796/95, 2813/95, 2814/95 **פלוים נ. מדינת ישראל,** פ"ד נא(3) 388, דנ"פ 1294/96 הנ"ל בענין **משולם**; ע"פ 8573/96 הנ"ל בעניין **מרקדו,** בעמ' 543-550; וע"פ 2111/99 **חיירו נ' מדינת ישראל,** פ"ד נה(1) 411 ההבחנה בין מבצע בצוותא לבין מסייע מצויה הן ביסוד העובדתי של העבירה, והן ביסוד הנפשי שלה. בעיקרון, **"איכות תרומתו של המסייע לביצוע העבירה פחותה מאיכות תרומתו של המבצע העיקרי"** (ע"פ 8573/96 הנ"ל, בעמ' 545).

אשר **ליסוד העובדתי** של העבירה - ההבחנה העיקרית היא בין שותף ישיר לביצוע העבירה לבין שותף עקיף לביצועה. המבצעים בצוותא הם **"משתתפים בביצוע העבירה תוך עשיית מעשים לביצועה",** אך לא נדרש כי כל אחד מהם יבצע בעצמו את כל היסודות העובדתיים של העבירה (סעיף 29(ב) לחוק). לעומת זאת, המסייע עושה מעשה שיש בו כדי לתרום בדרך כלשהי **"ליצירת תנאים לשם עשיית העבירה"** (סעיף 31 לחוק). המבצע בצוותא הוא חלק מן המעגל הפנימי של ביצוע העבירה, בעוד שתרומתו של המסייע לביצוע העבירה היא חיצונית בלבד. לכן, בוחן בית-המשפט את מידת הקירבה של כל אחד מן המשתתפים לביצוע העבירה, קרי: האם הוא מהווה חלק מן המעגל הפנימי של המשימה העבריינית (ע"פ 3390/98 **רוש נ. מדינת ישראל,** פ"ד נג(5) 871

P 7: 000430

878 , זהו, איפוא, **"מבחן הקירבה"**, שהוגדר על ידי כב' הנשיא א. ברק בעייפ 4389/93 תנ"ל בענין **מרדכי**, בעמ' 250:

"השוני בין המבצע בצוותא לבין המסייע מתבטא בכך שהמבצעים בצוותא משמשים גוף אחד לביצוע המשימה העבריינית. כולם עבריינים ראשיים... תרומתו של כל אחד מהמבצעים בצוותא היא 'פנימית'... אכן, לעניין הביצוע בצוותא תיתכן חלוקת עבודה בין העבריינים, באופן שהם יפעלו במקומות שונים ובזמנים שונים, ובלי שכל אחד מהם מיצה את העבירה, ובלבד שחלקו הוא מהותי להגשמת התכנית המשותפת. אחדות המקום והזמן אינה חיונית, ובלבד שחלקו של כל אחד מהם הוא חלק פנימי של המשימה העבריינית".

146. בפסקי הדין שצוטטו לעיל, סקר בית-המשפט העליון את המבחנים השונים שהוצעו בפסיקה ובספרות המשפטית לשם תיחום הגבולות בין מבצע בצוותא לבין מסייע.           יש אשר שמים דגש על **"מבחן השליטה"**, כמאפיין של המבצע בצוותא: למבצע בצוותא יש שליטה, יחד עם האחרים, על ביצוע העבירה; הוא מהווה חלק מן התוכנית המשותפת לביצוע העבירה, ופועל יחד עם האחרים להגשמתה. על מעמדו של המבצע בצוותא לאור "מבחן השליטה", אמר כבוד הנשיא א. ברק בעייפ 2796/93 הנ"ל בענין **פלונים** (פסקה 28):

"המאפיין את המבצע בצוותא שהוא אדון לפעילות העבריינית. בידיו השליטה הפונקציונאלית-מהותית, יחד עם המבצעים בצוותא האחרים, על העשיה העבריינית. הוא חלק מהחלטה משותפת לביצוע העבירה. הוא חלק מהתוכנית הכוללת להגשמת הפעולה העבריינית האסורה. הוא פועל יחד עם המבצעים בצוותא האחרים, כך שכל אחד מהם שולט - יחד עם האחרים – על הפעילות כולה. מעמדו ביחס להחלטה לביצוע העבירה הוא של איש 'פנים'. תרומתו היא 'פנימית'. חלקו הוא מהותי להגשמת התוכנית המשותפת...".

כך גם נפסק בעייפ 8573/96 הנ"ל בעניין **מרקדו**, בעמ' 547-548. לעומת זאת, בהתייחסו למסייע אמר כבוד הנשיא ברק כי המסייע **"אינו אבי הרעיון"** לביצוע העבירה, ובפסקה 30 אמר כדלקמן:

"המסייע הוא שותף עקיף ומשני (פרשת **מרדכי**, פסקה 14). הוא מצוי מחוץ למעגל הפנימי של הביצוע. הוא גורם "חיצוני". אין הוא יוזם הביצוע ואף לא משדל לביצועו... אין הוא המחליט על הביצוע ואין הוא שולט על הביצוע...".

(ראה גם ע"פ 4389/93 הנ"ל בענין **מרדכי**, פסקאות 14-13).

**147.** לעומת "מבחן השליטה", יש המדגישים את ה"**מבחן הפונקציונאלי**", לפיו מבצע בצוותא הוא מי שנטל חלק מהותי בביצוע העבירה גופה, בעוד שחלקו של המסייע מתבטא בפעולות עזר החיצוניות לעבירה.

מבחן זה מוצא את ביטויו בלשון סעיף 29(ב) לחוק ("**משתתפים בביצוע העבירה תוך עשיית מעשים לביצועה"**). בע"פ 2796/93 הנ"ל בענין **פלוני**ם (פסקה 27), אמר כבוד הנשיא א. ברק בהתייחסו למבצעים בצוותא :

"הם השותפים הראשיים בביצוע העבירה. השותפות ביניהם מתבטאת בכך שהם נטלו חלק בביצוע העבירה כמבצעים ישירים. הם משמשים גוף אחד לביצוע המשימה העבריינית... כל אחד מהם נוטל חלק בביצוע העיקרי של העבירה".

ובהמשך דבריו (פסקה 27) אמר כבוד הנשיא ברק :

"ביצוע בצוותא מחייב תיכנון משותף. הוא מבוסס על חלוקת עבודה בין המבצעים...".

דברים ברורים באשר לחשיבותו המכרעת של ה"מבחן הפונקציונאלי" אמר כבוד השופט י. קדמי בע"פ 5206/98 **חליל עבוד נ. מדינת ישראל**, פ"ד נב(4) 185 (פסקה 2) :

"'המבצעים בצוותא' אינם רק אלה המשתתפים בעשית 'מעשה' העבירה גופו; אלא – נמנה עליהם כל מי ש'עוטל חלק' בביצועה של העבירה, במובן הרחב של המושג 'ביצוע'. ואילו כל מי שרק 'תורם' לביצוע, מבלי לקחת בו חלק – לאמור: מבלי למלא 'תפקיד' במסגרתו – נותר ב'מעגל החיצוני' של האחראים לביצוע. הוא אינו משתתף בביצוע; וחלקו מצטמצם ל'סיוע' גרידא למימושו של הביצוע.

**ההבחנה בין הנמנים עם ה'מעגל הפנימי' – 'המבצעים בצוותא' – לבין הנמנים עם**
**ה'מעגל החיצוני' – 'המסייעים', נעוצה, איפוא, בטיב ואופי מעורבותם בביצוע: אם**
**'נטלו-חלק-בביצוע' – קרי: אם היה להם 'תפקיד' בביצוע הריהם 'מבצעים בצוותא';**
**ואילו אם אך 'תרמו' לו מבחוץ – הריהם 'מסייעים' בלבד".**

בהמשך דבריו מבהיר כבוד השופט קדמי כי ההבחנה בין מבצע בצוותא למסייע **איננה** תלויה
בשאלה האם היה בהתנהגותו של הנאשם משום סיוע לביצוע העבירה, שכן גם מבצע בצוותא
מסייע לביצועה; השאלה היא "אם נטל חלק – קרי: אם מילא תפקיד – בביצוע העבירה".

בדנ"פ 1294/96, 1365 **משולם ואח' נגד מדינת ישראל**, פ"ד נב(5)1, בעמ' 63, אמר כבוד השופט י.
קדמי:

**"'מעשה-של-השתתפות' אינו חייב לבטא פעילות המשולבת בביצוע ה'מעשה', הנמנה**
**עם רכיבי היסוד העובדתי שבעבירה, ומשמעותו רחבה ומקיפה כל 'מעשה' המבטא**
**'השתתפות' בביצועה של העבירה. סעיף 29 לחוק העונשין, המגדיר 'מעשה-של**
**השתתפות', אינו דורש ש'המעשה' ייעשה תוך כדי ביצוע היסוד העובדתי של העבירה,**
**ודי שיהא בו לבטא 'השתתפות' בביצוע. 'השתתפות', כאמור, יכול שתתחיל בהעלאת**
**הרעיון בפני המיועדים לבצע את העבירה..."**

כבוד השופט מ. חשין ציין באותו עניין כי החוק איננו דורש שמעשה ההשתתפות בביצוע העבירה
ייעשה תוך כדי ביצועה בפועל, או בסמוך לכך (עמ' 54-53).

148.    בדנ"פ 1294/96 הנ"ל בעניין **משולם**, הבהיר בית-המשפט העליון כי "מבחן השליטה" הינו
מבחן עזר, שאיננו מבחן יחיד ובלעדי, ויש לשלבו עם מבחנים ושיקולים אחרים; שליטה בביצוע
מהווה אמנם ראיה חשובה להיותו של אדם מבצע בצוותא, אך היעדר שליטה, או העדר תרומה
פיזית חיונית לביצוע העבירה, אינם שוללים בהכרח  מסקנה זו (כבוד הנשיא א. ברק בעמ' 50;
כבוד השופט א. מצא בעמ' 27-24; כבוד השופט י. קדמי בעמ' 65). זאת ועוד; גם כאשר בית-
המשפט נעזר ב"מבחן השליטה", נעשה הדבר תוך הדגשה כי אין מדובר ביכולת שליטה רצופה
במהלך ביצוע העבירה כולה, אלא מדובר ב"שליטה במשבצת **הביצוע שהוקנתה למבצע**

המסוים" (כבוד השופט י. קדמי בעמ' 64).

‏**149.** אשר **ליסוד הנפשי** של העבירה – הרי שיחסו הנפשי של המסייע נמצא בדרגה נמוכה יותר
מזו של המבצע העיקרי, בכל הנוגע למידת מודעותו לפרטים הנוגעים לביצוע העבירה, ורצונו
להגשימה. לגבי מסייע, נפסק כי די בכך שהוא מודע לכך שהתנהגותו תורמת ליצירת התנאים
הדרושים לשם ביצוע העבירה העיקרית, ושהמבצע העיקרי עומד לבצעה. בנוסף, לגנד עיני המסייע
צריכה לעמוד המטרה לסייע למבצע העיקרי לעבור את העבירה, או להקל עליו את ביצועה. ואולם,
כאשר העבירה העיקרית היא תוצאתית, ונדרש בה יסוד של פזיזות אז כוונה מיוחדת -- אין צורך
להוכיח שגם המסייע פעל מתוך כוונה שכזו, או שהוא התכוון לכך שהמבצע העיקרי יגשים את
מטרתו. כך למשל, בעבירת רצח אין צורך להוכיח שהמסייע התכוון שהמבצע העיקרי ירצח את
הקורבן, או שהוא חפץ בכך: די בכך שהמסייע שם לנגד עיניו את המטרה לסייע לעבריין העיקרי,
יהיו מניעיו של המסייע אשר יהיו (הלכות אלו הובהרו בע"פ 320/99 **פלונית נ' מדינת ישראל**, פ"ד
נה(3) 22, בעמ' 31-37).

לעומת זאת, כאשר במבצע בצוותא עסקינן, יש להוכיח מעורבות נפשית גבוהה ומודעות מצידו
לפרטי העבירה המתבצעת, בנוסף על רצונו להגשימה:

‏"**המבצע בצוותא תורם את תרומתו לאירוע עבריייני רב-משתתפים מתוך יחס נפשי של
יוצר העבירה** auctoris **onimo. הוא רואה את עשיית העבירה כעניינו הוא, ולא של
אחר**" (דברי ש"ז פלר, בספרו **יסודות בדיני עונשין**, שצוטטו בע"פ 4389/93 הנ"ל בעניין
**מרדכי**, בעמ' 251).

‏**כללו של דבר:** המבצע בצוותא, בניגוד למסייע, צריך להיות בעל יסוד נפשי זהה לזה של מבצעי
העבירה האחרים, וצריכים להתקיים לגביו כל מרכיבי היסוד הנפשי שנקבעו בחוק לגבי העבירה
שהוא נוטל חלק בביצועה (ע"פ 2796/95 הנ"ל בעניין **פלוניס**, בעמ' 402).

בע"פ 8573/96 הנ"ל בעניין **מרקדו**, אמר כבוד השופט א. גולדברג, בעמ' 549-548, כי סיווגו של
הנאשם כמבצע בצוותא או כמסייע מתקבל כתוצאה ממבחן משולב של היסוד הנפשי והיסוד
העובדתי – מבחן אשר כמוהו כמקבילית כוחות:

‏"**ככל שהיסוד הנפשי של עושה העבירה (מבחינת מידת העניין שלו בביצועה) רב יותר,
יש מקום להתפתף בדרגה נמוכה יותר של היסוד העובדתי. ברוח זו כבר נאמר כי
'משהוכח יסוד 'נפשי' זה (המודעות – א' ג'), אין עוד חשיבות לחלוקת התפקידים בין
המעורבים באירוע' (ע"פ 4188/95, 5235 הנ"ל [43], בעמ' 550). ולהפך, ככל שמידתו של**

**היסוד העובדתי אצל עושה העבירה, מבחינת איכות תרומתו לביצועה, רבה יותר, כן ניתן**
**להסתפק בדרגה נמוכה יותר של היסוד הנפשי".**

דברים אלו אושרו בדנ"פ 1294/96 בענין **משולם** הנ"ל (בעמ' 27, מפי כב' השופט א. מצא).

150. מן ההלכות שצוטטו לעיל עולה, כי השתתפות בתכנון העבירה מחווה סממן מובהק של
מבצע בצוותא, ובמקרה שכזה אין צורך בנוכחות פיזית בזירת העבירה על מנת לחיחשב כמבצע
בצוותא.

בדנ"פ 1294/96 הנ"ל בענין **משולם**, בעמ' 64, פסק כב' השופט י. קדמי:

**"השתתפות', כאמור, יכול שתתחיל בהעלאת הרעיון בפני המיועדים לבצע את העבירה,**
**ומכל מקום, לשיטתי, אין ספק, שתכנון הביצוע, מתן הנחיות והתווויית קווי הפעולה,**
**לרבות חלוקת תפקידים בין המשתתפים, מהווים 'מעשה' המבטא 'השתתפות' כאמור".**

בע"פ 3596/93 **חמוד אבו סרור נ. מדינת ישראל**, פ"ד נ'(3) 481, אמר כבוד השופט א' מצא בעמ'
491:

**"תרומתו המעשית של המערער לביצוע הרצח אכן היתה קטנה משל שני מרעיו. ואולם**
**השתתפותו בפעילות המכינה, ותפקיד המתריע אותו מילא, היקנו לו שליטה על הוצאתה**
**לפועל של התוכנית הרצחנית. מכך שהשתתף בהכנות לביצוע ופעל להצלחת התוכנית**
**עולה, כי היה בעל המחשבה הפלילית הנדרשת לשכלול אחריותו בגין עבירת רצח בכוונה**
**תחילה".**

בע"פ 2796/95 הנ"ל בעניין **פלונים**, הורשעו ארבעה נערים בביצוע רצח בכוונה תחילה, למרות
שרק אחד מהם השליך את הרימון שגרם למותו של קורבן העבירה. האחד (זאב) הורשע כמבצע
בצוותא משום שנטל חלק בכל שלבי התכנון והביצוע, ונכח בזירת ביצוע העבירה, למרות שהחליט
שלא לזרוק את הרימון הקטלני בעצמו (**"הוא לא ביצע את אקט הקטילה. אין בכך כלום, שכן**
**מבצע בצוותא אחראי גם אם לא ביצע בעצמו את כל יסודות העבירה..."** – עמ' 407). השני (גרשון)
הורשע כמבצע בצוותא, אף כי לא נכח כלל בזירת הרצח, וכל תפקידו היה לדווח לתקשורת על
חמעשה לאחר ביצועו, משום שביצע את התפקיד שהוקצה לו מראש לשם הגשמת העבירה (עמי
408). השלישי (טל) הורשע כמבצע בצוותא, למרות שגם הוא לא נכח בזירת ביצוע הרצח, משום

שהשתתף בתכנון העבירה, היווה חלק מן החבורה שהחליטה לבצע את הרצח, ואף עמד בראשה
(עמי 408-409).

151.   כאשר לעבירה העיקרית קדמה קשירת קשר לביצועה, תהא הנטיה לראות בכל אחד מן
הקושרים מבצע בצוותא של העבירה העיקרית, ובלבד שנטל חלק ממשי בביצועה. הטעם לכך הוא
שקשירת קשר לביצוע עבירה מעידה על עניין שיש לכל אחד מהקושרים בביצועה. כדברי שייז פלר,
שצוטטו בעייפ 8573/96 הנייל בענין **מרקדו**, בעמי 550: **"קשירת קשר בין שני אנשים, או יותר,
לביצוע עבירה פלילית, טומנת בחובה גיבוש מחשבה משותפת למימוש מטרת הקשר – כל אחד
במעמד עתידי של מבצע ישיר, ברוח יצירת animo auctoris".**

בעייפ 3390/98 הנייל בענין **רוש**, בעמי 878, אמר כבוד השופט אי מצא:

**"המבחן הנוסף בדבר 'קירבת המעשה', שעל-פיו נדרש שחלקו של כל אחד מהמבצעים
בצוותא יהיה 'חלק פנימי של המשימה העבריינית', נועד אך להבטיח שעשיית מעשה
גבולי, שלפי טיבו עשוי לחיכנס להגדרה של 'ביצוע', לא תטיל על העושה אחריות כמבצע
בצוותא כאשר טיב יחסו הנפשי לביצוע העבירה מוטל בספק (דנ"פ 1294/96 משולם ני
מדינת ישראל (להלן – פרשת משולם [3]), בעמי 21-22).**

**לא כן הדבר ביחס לקביעת אחריותו של מי אשר מעיקרה נימנה עם המשתתפים בהכנת
התוכנית העבריינית, ואין מתעורר כל ספק ביחס להיותו בעל המחשבה הפלילית
הנדרשת לשכלולה של העבירה המתוכננת. צד כזה לעבירה נושא באחריות כ'מבצע
בצוותא', אפילו אם תרומתו הפיזית לביצועה אינה גדולה מתרומתו של מסייע (ע"פ
3596/93 אבו סדור ני מדינת ישראל [4], בעמי 491)".**

152.   אשר **לנוכחות בזירת ביצוע העבירה**, הרי שזו איננה הכרחית על מנת לראות באדם מבצע
בצוותא, ובלשונו של כבוד הנשיא א. ברק בעייפ 2796/95 הנייל בענין **פלונים** (פסקה 27): **"ביצוע
בצוותא אינו מבוסס בהכרח על אחידות המקום והזמן"** (ראה גם דנ"פ 1294/96 הנייל בעניין
**משולם**, בעמי 30, 38, 49, 51, 54-53 ו-64). עם זאת, נוכחות שאינה אקראית של אדם בזירה בה
מתבצעת עבירה, יוצרת חזקה הניתנת לסתירה להיותו מבצע בצוותא של העבירה (ראה: ע"פ
3006/96 **מטיאס נ. מדינת ישראל**, דינים עליון, כרך נב 526).

**ב.   עבירת הסיוע**

153.    היסוד העובדתי והנפשי של עבירת הסיוע בכלל, והסיוע לרצח בפרט, הובהרו לאחרונה
בפסק דינו של כבוד הנשיא א' ברק בע"פ 320/99 **פלונית נגד מדינת ישראל**, פ"ד נה(3) 22, בעמ'
37-31 (אושר בע"פ 1131/02 **אנג'ליקה יוסופוב נ' מדינת ישראל**, טרם פורסם). ניתן לסכם את
ההלכות שנפסקו בפסק דין זה כדלקמן:

א.    המאפיין את ההתנהגות המסייעת הוא, שהיא מהווה תרומה עקיפה ומשנית לביצועה של
העבירה העיקרית: התרומה של המסייע נחשבת עקיפה ומשנית, משום שהוא איננו נוטל
חלק בביצוע העיקרי של העבירה, אלא רק תורם בעקיפין להגשמתה של העבירה העיקרית.
המסייע הוא גורם "חיצוני", אשר מצוי מחוץ למעגל הפנימי של ביצוע העבירה (ראה גם:
ע"פ 7085/93 **נג'אר ואח' נ' מדינת ישראל**, פ"ד נא(4) 221, בעמי 238).

ב.    **היסוד העובדתי** של עבירת הסיוע, שהיא עבירת התנהגות, הוא מעשה או מחדל שיש בו כדי
ליצור את התנאים להגשמתו של היסוד העובדתי בעבירה המבוצעת על ידי המבצע העיקרי.
הסיוע צריך להיות "מסוגל" לסייע להגשמת העבירה העיקרית, אך אין דרישה שהסיוע
יהיה אפקטיבי, או תנאי שבלעדיו העבירה העיקרית לא היתה מתגבשת (ראה גם ע"פ
4317/97 **פולאיקוב נ' מדינת ישראל**, פ"ד נג(1) 289, בעמי 307). כמו כן אין דרישה
שהעבירה העיקרית תתבצע בפועל, שכן עבירת הסיוע איננה עבירה תוצאתית. בנוסף, יש
צורך להוכיח, כחלק מהיסוד העובדתי של עבירת הסיוע, את הנסיבה הנוגעת לפליליותה
של ההתנהגות שהסיוע מהווה לה גורם משני ועקיף.

ג.    הסיוע צריך שיופנה כלפי עבירה בעלת ייעוד מוחשי, דהיינו, פעולה הנעשית על מנת לסייע
לביצועה של עבירה **מסוימת**, להבדיל מעבירה סתם (ראה גם ע"פ 426/67 **יוסף בארי ואח'
נ' מדינת ישראל**, פ"ד כב(1) 477, בעמ' 481; ע"פ 7085/93 הנ"ל בעניין **נג'אר**, בעמי -238
239).

ד.    **היסוד הנפשי** של עבירת הסיוע כולל שלושה תנאים מצטברים:

(1)    מודעות לטיב ההתנהגות המסייעת, קרי: לכך שההתנהגות תורמת ליצירת
התנאים לשם עשיית עבירה עיקרית בעלת ייעוד מוחשי;

(2)    מודעות לקיום הנסיבות הרלבנטיות בעת ההתנהגות המסייעת, דהיינו: מודעות לכ
שהמבצע העיקרי מבצע, או עומד לבצע עבירה, הגם שלא נדרשת מודעות לכל פר
מפרטי העבירה (ראה גם ע"פ 7085/93 הנ"ל בעניין **נג'אר**, בעמי 239-238).

(3)    לנגד עיניו של המסייע צריכה לעמוד המטרה לסייע למבצע העיקרי לבצע את
העבירה, או להקל עליו את הביצוע.

על דרישה זו ניתן להחיל את "הילכת הצפיות", דהיינו: מודעותו של המסייע לכך
שהתנהגותו עשויה, קרוב לוודאי, להוות תרומה מסייעת למבצע העיקרי – שקולה
כנגד המטרה לסייע לו, גם אם הוא לא חפץ כלל בביצוע העבירה העיקרית (ראה גם
דעת המיעוט של כבוד השופט י' אנגלרד בע"פ 4317/97 הנ"ל בעניין **פולאיקוב**,
בעמי 320- 323, ודעתו של כבוד השופט מי אילן בע"פ 807/99 **מדינת ישראל נ'
עזיזיאן**, פ"ד נג(5) 747, בעמי 757-758).

ה.    כאשר העבירה העיקרית היא תוצאתית, ונדרש בה יסוד נפשי של פזיזות או כוונה מיוחדת –

אין צורך להוכיח שגם המסייע פעל מתוך פזיזות או כוונה שכזו, או שהוא התכוון לכך שהמבצע העיקרי יגשים את מטרתו. כאשר מדובר בסיוע לרצח, פירוש הדבר הוא שאין צורך להוכיח שהמסייע התכוון שהמבצע העיקרי ירצה את הקורבן, או אפילו שהוא חפץ בכך. המחשבה הפלילית של המסייע איננה צריכה להיות זהה למחשבתו של העבריין העיקרי: די בכך שהמסייע שם לנגד עיניו את המטרה לסייע לעבריין העיקרי, יהיו מניעיו של המסייע אשר יהיו.

**154.** לעניין דרגת ההסתברות כי העבריין העיקרי יבצע את העבירה, חשוב לציין כי על פי ההלכה שנפסקה מפי כבוד הנשיא א' ברק בע"פ 320/99 חנ"ל בעניין **פלונית**, די בכך שהמסייע **מודע** לכך שהמבצע העיקרי עומד לבצע עבירה בעלת ייעוד מותאי (עמ' 32-31 לפסק הדין). הדרישה למודעות בדרגת הסתברות **קרובה לוודאי**, נוגעת ליסוד המטרה, קרי: מודעותו של המסייע לכך שהתנהגותו עשויה, קרוב לודאי, לתרום לביצוע העבירה העיקרית; מודעות שכזו, שקולה כנגד המטרה לסייע לעבריין העיקרי. כפי שאמר הנשיא א' ברק: **"היסוד הנפשי של מטרה (יכדי') מכוון איפוא כלפי פעולת הסיוע ולא כלפי פעולתו של העבריין העיקרי"** (עמ' 35).

בהקשר זה מתעוררת השאלה מתי נאמר כי לנאשם היתה "מודעות" לכך שהעבריין העיקרי עומד לבצע עבירה בעלת יעוד מוחשי.

ההלכה היא כי "עצימת עיניים", המכונה אף "יעוורון מכוון", שקולה כנגד מודעות לטיב המעשה ולקיום הנסיבות. הלכה זו, מוצאת כיום את ביטויה **בסעיף 20(ג)(1) לחוק העונשין**, אשר קובע כדלקמן:

> **"רואים אדם שחשד בדבר טיב ההתנהגות או בדבר אפשרות קיום הנסיבות**
> **כמי שהיה מודע להם, אם נמנע מלבררם".**

(וראה: י' קדמי, **על הדין בפלילים**, עדכון והשלמה {1996}, חלק ראשון, בעמ' 37, וע"פ 3417/99 **מרגלית הר-שפי ג' מדינת ישראל**, פ"ד נה(2) 735, בעמ' 758-757).

בספרו הנ"ל של י' קדמי נאמר, בעמ' 37:

**"א.        סעיף 20(ג)(1) לתיקון, מעגן בהוראה חקוקה, את הכלל שלפיו: מקום שאדם** **'חשד', בפועל, שטיב התנהגותו מביא אותה בגדרה של התנהגות אסורה או שיש** **אפשרות, מעשית, שמתקיימים הנסיבות הדרושות להרשעה, והוא נמנע מלברר את** **'אמיתותו' של החשד, רואים אותו כמי שהיה מודע לטיבה האמיתי של ההתנהגות** **ולקיומה של הנסיבה (אם מתברר כי נתקיימה בפועל).**

**ב.        גם כאן... נראה כי רמת החשד צריכה להיות לפחות 'רמה מסתברת', לאמור: כי** **סביר יותר שהחשד אמיתי מאשר שאין לו אחיזה".**

ההלכה בעניין זה מבוארת בספרו של פרופ' ש"ז פלר, **יסודות בדיני עונשין** (כרך א', תשמ"ד), בעמ' 519, כפי שאף הפנה אליה כבוד השופט מ' חשין בע"פ 3417/99 הנ"ל, בעמ' 758, לאמור:

**"מודעות *לאפשרות* קיום הנסיבה, בה *תלויה* העבירה, מחייבת את האדם לבדוק, עובר** **לביצוע מעשהו, את המצב בכל הנוגע לאותה נסיבה, כדי להימנע ממנו, במקרה שקיום** **הנסיבה מתאושש.**

אם חרף החשד, לא עשה האדם כן, בין משום שבכל תנאי היה מנוי וגמור עמו לעשות את המעשה, ובין משום שהיה לו נוח יותר שלא לדעת או מכל שיקול אחר, פירוש הדבר שהשלים עם דבר קיומה של הנסיבה.

לכן, שקולה ההתעלמות *המודעת* מאפשרות הקיום של מערכת נסיבות כנגד *מודעות* לעצם קיום זה; שהרי מערכת נסיבות זו עמדה לנגד עיני האדם, אלא שלא טרח לבדוק את מצב הדברים כדי לברום. אם מתברר בדיעבד כי הנסיבות הרלוואנטיות אכן התקיימו, שקולה המודעות לאפשרות קיומן עקב החשד בכך, כנגד המודעות לעצם קיומן״.

בספרו הנ״ל של י׳ קדמי, בעמ׳ 37, נאמר באשר לרמת החשד הדרושה לצורך יישום ההלכה בדבר ״עצימת עיניים״, כי לפני תיקון התשנ״ד לחוק העונשין נעה ההלכה הפסוקה בין רמה ״סבירה״ לבין רמה ״גבוהה״. בעניין זה נאמר בספרו של פרופי פלר, *דיני עונשין*, כרך אי, עמי 523, כדלקמן :

״אין לדעתנו כל יסוד לסברה כי, מלבד רציונאליות החשד – הסובייקטיבית כמובן – או, ביתר דיוק, במקום הרציונאליות שלו, צריך החשד להיות גם בדרגה גבוהה, עד כדי הסתברות קרובה לוודאי, או עד כדי העדר ספק של ממש בלבו של אדם בדבר אמיתותו... לשם השתוות *׳עצימת עיניים׳* למודעות, די במודעות לחשד רציונאלי בדבר אפשרות קיומן של הנסיבות ובהמנעות מלברר את הדבר לאשורו״.

ובעמי 524 נאמר:

״לסיכום, די בהיות החשד מעוגן במציאות, כלומר רציונאלי, כדי להגדיר את המעשה כמבוצע תוך *׳עצימת עיניים׳*, אם, עובר למעשה, נמנע העושה מלבדוק את החשד ומלעמוד על מצב הדברים לאשורו. אין צורך במידה גבוהה של הסתברות אובייקטיבית של אמיתות החשד״.

המבחן לקיומה של ״עצימת עיניים״ העולה כדי מודעות הוא, כאמור לעיל, סובייקטיבי. עם זאת, בתי המשפט נוהגים להוכיח לצורך קביעת רמת מודעותו וחסובייקטיביות של הנאשם גם במבחן האובייקטיבי של האדם הסביר (וראה: ע״פ 15/78 *משה ביבס נ. מדינת ישראל*, פ״ד לב(3) 64, בעמי 83 ; ע״פ 5612/92 *מדינת ישראל נ. בארי ואחי*, פ״ד מח(1) 302, בעמי 363 ; והשווה לחתלת מבחן האדם הסביר בנוגע למודעות הנאשם להסתברות גבוהה של פגיעה בבטחון המדינה: ע״פ 3116/99 *יהודה גיל נ. מדינת ישראל*, פ״ד נד (4) 193, בעמי 204).

**155.** מן ההלכות שפורטו לעיל, ובעיקר אלו שנפסקו בע״פ 320/99 הנ״ל בעניין **פלונית**, עולה כי אדם אשר תושד כי חברו עומד לבצע עבירה מסוימת, אך נמנע מלברר את העניין, ואף מסייע לחברו לבצע את העבירה מתוך מודעות לכך שמעשהו יסייע, קרוב לוודאי, לביצוע העבירה בידי חברו - אם תבוצע - נחשב כמסייע על פי סעיף 31 לחוק העונשין. מהלכות אלו עולה כי אין צורך להוכיח שהמסייע צפה את ביצוע העבירה העיקרית כאפשרות קרובה לוודאי: די בכך שהיה מודע לאפשרות החגיונית, הסבירה והמנמשית של ביצוע העבירה העיקרית, וחרף כך סייע לביצועה, מתוך מודעות לכך שהתנהגותו עשויה, קרוב לוודאי, לסייע למבצע העיקרי. כמו כן אין צורך להוכיח שהמסייע חפץ בביצוע העבירה העיקרית, או כי פעל מתוך כוונה שהעבירה העיקרית תבוצע.

ואולם, בע״פ 11131/02 הנ״ל בעניין **יוספוב** נפסק מפי כבי השופט א. ריבלין כי התביעה צריכה להוכיח שהנאשם ידע שהתנהגותו עשויה לסייע, קרוב לוודאי, לביצוע עבירת רצח על ידי העבריין

P 7: 000439

העיקרי וכי: "על מנת שתוחל הלכת הצפיות, יש להראות, כאמור, מודעות בדרגה של קרוב לוודאי **לאפשרות ביצוע העבירה...**" (פסקה 19 לפסק הדין). דברים אלו שונים בניסוחם מאלה שנאמרו בע"פ 320/99 הנ"ל בעניין **פלונית**, כאשר גם כב' השופט ריבלין אמר בע"פ 11131/02 הנ"ל בתחילת פסק הדין (פסקה 9), כי:

"**המודעות – הן לטיב ההתנהגות המסייעת והן לנסיבה של ביצוע העבירה העיקרית –
יכול שתתייח מוחלפת בחשד באשר לטיבה המסייע של ההתנהגות, ובמודעות לאפשרות
התקיימות הנסיבה של ביצוע העבירה על ידי העבריין העיקרי, בהתאם להוראת סעיף 20
(ג)(1) לחוק העונשין ("עצימת עיניים")**".

**156.** מן ההלכות דלעיל עולה כי לא נדרשת הוכחה לכך שהנאשם היה מודע לכל פרט מפרטי העבירה שלביצועה הוא מסייע. בעניין זה נאמרו בע"פ 11131/02 הנ"ל בענין **יוסופוב**, מפי כב' השופט א. ריבלין, דברים בעיל חשיבות לענייננו:

"**בצדק ציין בית המשפט קמא, כי מודעות לכך שהמבצע העיקרי עומד לבצע עבירה אין
משמעה מודעות לכל פרט מפרטי העבירה אותה הוא מתכנן (ראו למשל: ע"פ 7085/93
נג'אר נ' מדינת ישראל, פ"ד נא(4) 221, 239). בענייננו, המערערת ידעה כי זייד, אלוי
תתלוותה, נושא עימו חומר נפץ, כי הוא ביצע כבר פיגוע בעבר, וכי הוא מבקש לנקום את
מות אחיו, אשר נהרג בפעולה של כוחות הביטחון. בית המשפט קמא התרשם מעדותה
של המערערת, כי זו הבינה היטב שזייד עומד לבצע פיגוע בעיר תל אביב. אין חשיבות,
בהקשר זה, לשאלה אם ידעה באיזה מיקום מדויק מתכוון הוא להניח את חומר הנפץ**".

עוד נפסק מפי כב' השופט ריבלין באותו עניין:

"**אכן, כפי שכבר ציינו, אין המסייע נדרש להיות מודע לכל הפרטים של העבירה
אותה עומד לבצע המבצע העיקרי. יחד עם זאת, עליו להיות מודע, בעת שהוא
מגיש את הסיוע למבצע העיקרי, לכך שקיימת אפשרות כי בעולתו תסייע למבצע
העיקרי בביצועה של עבירה ממשית, ובמגילים אחרות – לכך שלמבצע העבירה
היה "ייעוד מוחשי" (ראו גם: ע"פ 426/67 באריר ג' מדינת ישראל, פ"ד כב(1) 477
, 482-481; ע"פ 5544/91 מואל ג' מדינת ישראל (לא פורסם). אין די ביידעה על
נכונות ערטילאית והיפותטית של המבצע לבצע עבירה, כדי להפוך אדם למסייע**.

**ייתכן אמנם, כפי שכבר ציינו, כי המודעות לקיום הנסיבה שביסוד העובדתי –
כלומר מודעות לכך שהמבצע העיקרי עומד לבצע עבירה – תוחלף במודעות
לאפשרות שהוא עומד לבצע עבירה.**

אך על מנת שנאמר כי המסייע "עצם את עיניו" עלינו להשתכנע כי התקיים,
בפועל, חשד רציונאלי-סובייקטיבי בעיני רוחו של המסייע, לפיו עומדת להתבצע
עבירה (ש"ז פלר בספרו הנ"ל (כרך א') 524-521, 530).

זאת ועוד, על המסייע להיות ער לאפשרות שהעבירה תבוצע, בעת שהוא מושיט
את הסיוע. אם סבור המסייע, בעת שהוא מבצע את הפעולות העולות לכדי סיוע,
כי לא מתקיימת עוד אפשרות ממשית שהמבצע העיקרי עומד לבצע את העבירה,
הרי שאין לראות בו מסייע – אף אם העריך, בשלב קודם, כי התקיימה אפשרות

שכזו".

בעניני הדרישה למודעות לגבי כוונת המבצע העיקרי לבצע עבירה בעלת יעוד מוחשי, פסק כבי
השופט מ. לנדוי (כתוארו אז) בעייפ 426/67 **יוסף באריו ואחי ני מדינת ישראל**, פדייד כב
(1) 477, בעמי 481, כי כאשר הסיוע מתבטא באספקת כלי לביצוע העבירה, כגון רכב או נשק – די
בכך שהמסייע מספק את הכלי ששימש לביצוע העבירה לטרח ביצוע עבירה מאותו סוג שבוצע,
ולאו דווקא אותה עבירה ממש. כבי השופט לנדוי אמר שהלכה זו, הנסמכת על פסיקה אנגלית,
תחול "לפאחות לגבי אותם מקרים, בהם משאיר המסייע 'שיקול דעת' לעבריין העיקרי, לבחירת
שעת הכושר ומקום הכושר להגשמת הכוונה הפלילית המשותפת לשניהם".

כך פסק כבי השופט לנדוי, במקרה הנייל, כי אילו הוכח שהמערער (אשר זוכה לבסוף) מסר את
מכוניתו למבצע העיקרי של מעשה השוד על מנת לחקל על הסתלקותו ממקום הפשע - לא היה
צורך להוכיח שהוא התכוון דווקא לשוד התיירת שנשדדה לבסוף.

**157.**   הדרישה למודעות הנאשם לקיומה של עבירה ספציפית בעלת יעוד מוחשי, מרוככת גם על
ידי "הכלל בדבר כוונה מועברת", המוצא את ביטויו בסעיף 20(ג)(2) לחוק העונשין, התשלייז-1977.

סעיף זה קובע לגבי הכוונה הפלילית כי: "אין נפקה מינה אם נעשה מעשה באדם אחר או בנכס
אחר, מזה שלגביו אמור היה המעשה להיעשות" (וראה: י. קדמי, על הדין בפלילים – עדכון
**והשלמה**, מהד' 1966, חלק ראשון, בעמ' 38). על יסוד כלל זה נפסק עוד לפני שחוקק סעיף 20(ג)(ג)
(2) לחוק בשנת תשנייד, כי: "המתכוון לרצוח את זה והרג את זה, דינו דין רוצח" (עייפ 406/72 **שניר**
**ני מדינת ישראל**, פדייי כחn(1) 234, בעמי 243-242; עייפ 388/76 **אברהים ני מדינת ישראל**, פדייי
לאn(1) 601, בעמי 607; עייפ 6059/92 **שיבאם ני מדינת ישראל**, תקי-על 593(4) 255; עייפ 887/96
**בטוו ני מדינת ישראל**, תקי-על 97(1) 848). כפי שאמר כבי השופט ח. כהן בענין **שניר** הנייל: "אין
רואים כוונה פלילית כאילו מכוונת היא לאדם מסוים דוקא". זהו אף הכלל במשפט האנגלי, כפי
שציין כבי השופט ח. כהן.

### ג.   עבירת השידול וההאבחנה בין מבצע בצוותא למשדל

**158.**   סעיף 34ד. לחוק העונשין, תשלייז-1977 קובע:

"מלבד אם נאמר בחיקוק או משתמע ממנו אחרת, כל דין החל על הביצוע העיקרי של
העבירה המושלמת חל גם על ניסיון, שידול, ניסיון לשידול או סיוע, לאותה עבירה".

מכאן נובע כי חבותו של המשדל היא כחבותו של המבצע העיקרי, שכן המשדל נחשב כשותף ראשי
של המבצע בצוותא – שלא כמו המסייע הנחשב כשותף משני – בשל תרומתו המהותית להתרחשות
העבירה, המתבטאת בכך שהוא מביא אדם אחר לידי ביצוע עבירה (ראה: דברי כבי הנשיא א. ברק
בעייפ 2796/95 הנייל בענין **פלונים**, בעמי 404, אשר מתייחס אל המשדל, חרף הדברים הללו, כאל
"שותף עקיף", ודברי כבי השופטת ד. ביניש בעייפ 8464/99 **אביגדור אסקין נ. מדינת ישראל**, פייד
נהn(2) 65, בעמי 83-82, למול דברי כבי השופט מ. חשין בענין **פלונים** הנייל, בעמי 416, המסתייגג מן
הביטוי "שותף עקיף", שכן לדעתו תרומתו של משדל הינה תרומה ישירה, ממש כתרומתו של
המבצע העיקרי).

ההוראה הכלולה בסעיף 34ד. לחוק העונשין, נגזרת מן ההתייחסות אל המשדל כאל שותף ראשי לביצוע העבירה: לכן נקבע בהוראה זו, דבר שחודרש אף בפסיקה, כי עונשו של המשדל זהה לעונשו של המבצע העיקרי (ראה: עייפ 2796/95 הנייל בענין **פלוניס**, בעמי 402-401, 415; עייפ 8469/99 הנייל בענין **אסקין**, בעמי 82; דנייפ 1294/96 הנייל בענין **משולם**, בעמי 42-43).

**159.**    בעייפ 2796/95 הנייל בענין **פלוניס**, הבהיר כבי הנשיא א. ברק (בעמי 404) את אחריותו של המשדל לביצוע העבירה ומהותה, לאמור:

‏‎"תרומתו של המשדל מתבטאת בכך שהוא הביא את המבצע לידי קבלת ההחלטה לבצע את העבירה (ראה פלר, בספרו הנייל (8), בעמי 228). הוא זה שהשפיע על המבצע – אם המבצע העצמני (או העיקרי) ואם המבצע בצוותא – והביא לידי כך שהתגבשה בו ההחלטה לבצע העבירה, ונעשו צעדים להגשמתה (בגדרי ניסיון או ביצוע מושלם). הוא 'האב הרוחני' של העבירה' (מ. גור אריה "הצעת חוק העונשין (חלק מקדמי וחלק כללי), התשני–ב–1992" (13), בעמי 46). אכן, החברה מבקשת להגן על עצמה לא רק כלפי מי שמבצע עבירה – אם כמבצע עצמו ואם כמבצע בצוותא – אלא גם כלפי חוג רחב יותר של אנשים המביאים לידי כך שאחרים מבצעים עבירות...**

‏‎'קירבתו' של המשדל מתבטאת בכך שהוא זה שנטע בלב העבריין העיקרי את המחשבה הפלילית לביצוע עבירה. הוא 'המבצע האינטלקטואלי' –
'auteur intellectuel' של העבירה' (ראה פלר, בספרו הנייל (8), בעמי 226-225).
הוא זה שהביא לידי כך שאצל המבצע נתגבש הרעיון לבצע את העבירה – אם בכך שהוא נטע בו את הרעיון מראש, ואם על ידי כך שהטה את הכף במקום בו המבצע היסס".**

כבי השופט מ. חשין פסק בענין **פלוניס** הנייל בעמי 415, כי פעילותו של המשדל מתבטאת בעיקרה בכך שבשיחו עם אחר הוא גורם לו לבצע עבירה, אשר לולא המשדל אפשר שלא היתה מתבצעת כלל.

דברים אלו מובילים לשאלת קשר הסיבתי הנדרש בין השידול לבין ביצוע העבירה בידי המשודל. כבי הנשיא ברק פסק, בקטע המצוטט לעיל, כי המשדל הוא זה שהשפיע על המבצע להחליט לבצע את העבירה, בין אם נטע בראשו את הרעיון, ובין אם הטה את הכף במקום בו המבצע היסס (עמי 404).

בעייפ 8469/99 הנייל בענין **אסקין**, פסקה כבי השופטת ד. ביניש (בעמי 79-78), לגבי מהות השידול ודרישת הקשר הסיבתי, כי: **"העיקר הוא כי התנהגות המשדל תהא בעלת 'אפקטיביות פוטנציאלית' העשויה להשפיע על המשודל לבצע את העבירה נשוא השידול, כך שמתקיים קשר סיבתי בין ההתנהגות המשדלת לתחילת ביצוע העבירה".** ואולם – הוסיפה כבי השופטת ביניש (בעמי 79):

‏‎"במסגרת יסודות השידול, אין זה הכרחי, ואף אין זה מספיק, כי היוזמה או הרעיון לביצוע העבירה יהיו של 'המשדל'. הרכיב הנסיבתי בעבירת השידול – קיומו של אחר ('משודל') הטעון הענה מנטלית לצורך קבלת ההחלטה לבצע את העבירה – עשוי להתקיים גם במצבים שבהם הרעיון העברייני עלה לראשונה במחשבתו של 'המשודל',**

P 7: 000442

אך טרם גובשה אצלו החלטה לבצעו. במקרה כאמור, אם התהוונדגות המשטדלת הביאה
להחלטתו הסופית של 'המשודל' לבצע את העבירה, הרי נתקיים היסוד העובדתי הנדרש
בעבירת השידול".

160.   לעניין היסוד הנפשי של עבירת השידול פסקה כב' השופטת ד. ביניש בע"פ 8469/99 הנ"ל
בעניין **אטקין**, בעמ' 81:

"ככלל, לצורך התקיימות היסוד הנפשי במסגרת פעולת השידול יש להוכיח התקיימומתן
של שתי דרישות: ראשית, על המשודל לחיות מודע לכך שיש בהתנהגותו כדי להביא את
האחר (ה'משודל') לידי ביצוע העבירה נושא השידול. דרישה זו עניינה מודעות לטיב
ההתנהגות המשודל וכן מודעות לקיומו של אחר חזקוק להנעה מנטלית על מנת לבצע את
העבירה נושא השידול. שנית, על המשדל להתכוון להביא את המשודל לידי ביצוע
העבירה יעד השידול. לשון אחר, השידול צריך להיות מלווה בשאיפה – מטרה – מצד
המשדל כי העבירה נושא השידול אכן תבוצע, על כל יסודותיה, על ידי ה"משודל" (ראו
פלר בספרו חנ"ל (כרך ב) (18), בעמ' 234)".

161.   בפסיקת הנוגעת לאחריותו של משדל – לחבדיל מן הפסיקה הנוגעת לאחריותו של מסייע –
לא צוין שהשידול צריך להתייחס לעבירה מסוימת בעלה ייעוד מוחשי, אולי משום שהדבר ברור
מאליו. אך דרישה זו מובנית ביסודות עבירת השידול, ומתבקשת מקל וחומר בעניינו של המשדל,
שעונשו זהה לעונשו של המבצע העיקרי (לעומת המסייע שעונשו הוא מחצית מעונשו של המבצע
העיקרי). לצורך הוכחת עבירת השידול יש להראות קשר סיבתי בין השידול לבין ביצוע העבירה
העיקרית בידי המשודל, ואף מטרה ושאיפה מצד המשדל שהעבירה אכן תבוצע. כל אלו מתייבים
שהשידול יתייחס לעבירה ספציפית בעלת ייעוד מוחשי, כפי שנפסק אף לגבי עבירת הסיוע. וכך
נאמר בספרו של ש"ז פלר, **יסודות בדיני עונשין**, תשמ"ז – 1987, כרך ב' בעמ' 226:

"ראוי להבהיר מראש כי מושג השידול, כצורת שותפות לדבר עבירה, הוא בעל משמעות
שאינה תמיד הולמת את המשמעות הרגילה של מטבע לשון זה.  המדובר במשמעות
הנוגעת ביטוי ליחס בין **פרט לפרט**, משדל למשודל, ולא גם ליחס בין פרט לבין קהל
מקום שהפרט מסית, מדיח, מתסיס, קהל מסוויים או קהל בלתי מוגדר, ללא הבדל הזהות
הפרטית של הנמנים על אותו קהל, לבצע עבירה פלילית.

פעולות כאלה עשויות להצמיח עבירות ספציפיות, ואפילו משתמשים בו בתבה "שדל"
לשם הגדרתן, אין זה אותו "שידול", כצורה של שותפות לדבר עבירה, בו נדון בהמשך".

עם זאת, כפי שנפסק לגבי סיוע, אין צורך להוכיח שהמשדל היה מודע לכל פרט מפרטי העבירה
נשוא השידול, ודי בכך שהוא שידל את המבצע לעבור עבירה מאותו סוג של העבירה שבוצעה
לבסוף  (ראה סעיף 156 לעיל). זאת ועוד, גם לעניין השידול, כמובן, חל הכלל בדבר כוונה מועברת:
אין נפקה מינה שהעבירה נשוא השידול נעשתה לבסוף לגבי אדם אחר.

כללו של דבר: לא ניתן להרשיע אדם בעבירת שידול כללית לביצוע מעשי רצח, כאשר הוא קורא

לביצוע פיגועים כנגד ישראל; לכך קיימת העבירה של הסתה לאלימות או לטרור (סעיף 144ד2.
לחוק העונשין, התשל"ז-1977]. כך גם לא ניתן לחרשיע אדם בעבירה כללית של סיוע למעשי רצח,
כאשר הוא מספק כספים או אמצעי לחימה לשם ביצוע עבירות שונות שאינן מסוימות. לכך קיימת
העבירה של מתן אמצעים לביצוע פשע לפי סעיף 498 לחוק העונשין, התשל"ז-1977, שחוקקה
במיוחד על מנת להתמודד עם מצבים בהם לא ניתן להוכיח ידיעה ודאית של מוסר האמצעים על
כוונת מקבלם לבצע עבירה מסוימת, באופן שלא ניתן לראות בו מסייע לעבירה (ראה דברי החתבר להצעת
תוק לתיקון פקודת החוק הפלילי (מסי 36), תשל"ג-1972, הי"ח תשל"ג 1021, בעמ' 20).

**162.** אשר לקו המבחין בין משדל לבין מבצע בצוותא, פסק כב' הנשיא א. ברק בע"פ 2796/95
הנ"ל בעניין **פלונים** בעמ' 406, כי: **"תרומתו של המשדל היא בכך שהוא גרם ליצירת חיסוד הנפשי**
**של המבצעים", וכי: "כבל שהשידול של המשדל אינטנטיבי יותר וכבל שמתלות אליו לא רק**
**פעולות במישור הנפשי אלא גם פעולות במישור העובדתי, כך מתקרב המשדל למבצע בצוותא".**
בעניין **פלונים** הנ"ל הורשע הקטין ט. בעבירת רצח, כמבצע בצוותא ולא רק כמשדל, בשל זריקת
רימון לעבר ערבים, אף שהוא סרב להצטרף לפעולה עצמה, משום שנפסק כי הוא השתתף בתכנון
העבירה, והיה **"ראש וראשון לכולם"** (עמ' 409-408).

בנוגע לאבחנה בין מסייע לבין משדל, אמר כב' הנשיא ברק (בעמ' 406), כי כאשר הסיוע הוא
**"רוחני" – עשוי המסייע להפוך למשדל: "קו הגבול עובר באבחנה בין עזרה למי שבבר גיבש לעצמו**
**מחשבה פלילית (המסייע) לבין תרומה לגיבוש עצם המחשבה הפלילית (המשדל)".**

בדנ"פ 1294/96 הנ"ל בעניין **משולם**, פסק כב' השופט י. קדמי (בעמ' 63) :

**"כאמור, אחריותו של ה'מבצע בצוותא' נעוצה – כאמור בסעיף 29 לחוק העונשין –**
**ב'השתתפות' – בביצוע של עבירה תוך 'עשיית מעשים' לביצוע... ובהיעדרו של 'מעשה**
**השתתפות' – כאמור – אין בסיס לאחריות בתור שבזה... לעומת זאת, אחריותו של**
**'משדל' לביצוע של עבירה על-ידי אחר נעוצה בעשיית 'מעשה-של-שידול', מן המעשים**
**המפורטים בסעיף 30 לחוק העונשין. מעשה כזה אינו מהווה 'מעשה-של-השתתפות'**
**בביצוע, אלא מותיר את העושה 'מחוץ' למסגרת הביצוע".**

בעמ' 66 אמר כב' השופט י. קדמי :

**"עיונית, המבחין בין המשדל לבין המבצע בצוותא נעוץ בכך שתרומתו של המשדל**
**לביצועה של העבירה היא ביצירת ה'יסוד הנפשי' הדרוש לביצוע העבירה אצל המשודל,**
**שהוא המבצע העיקרי; בעוד שתרומתו של המבצע בצוותא היא, בעיקרה, במישור**
**התתנהגותי של הביצוע, שהרי נדרשת ממנו 'השתתפות' תוך עשיית מעשים לביצועה של**
**העבירה (ראה בעניין זה פלר בספרו הנ"ל (כרך ב)      [20], בעמ' 196, 228). ואילו מן**
**ההיבט המעשי, קו הגבול בין המשדל למבצע בצוותא מתוח בין מי ש'משתתף' בביצוע –**
**דהיינו נמצא על הגרעין הפנימי של המבצעים – לבין מי ש'מעורב' בביצוע בלבד, דהיינו**
**מצוי מחוץ למעגל הפנימי של המבצעים".**

### ד.   **אחריותו של מנהיג חבורה עבריינית כמבצע בצוותא או כמשדל**

**163.** לעניין קביעת אחריותו של נאשם כמבצע בצוותא או כמשדל, העניקו בתי המשפט משקל
מכריע לעובדת היותו של הנאשם מנהיג החבורה העבריינית שביצעה את העבירה העיקרית. בע"פ
2796/95 הנ"ל בעניין **פלונים** הורשע הקטין ט. כמבצע בצוותא, ולא רק כמשדל, בלא שהצטרף

לביצוע עבירת הרצח עצמה, משום שהשתתף בתכנון והיה מנהיג החבורה, ובלשונו של כב׳ הנשיא
א. ברק ״ראש וראשון לכולם״.

בע״פ 8469/99 הנ״ל בענין **אסקין**, חורשע הנאשם כמשדל לביצוע עבירות של הצתה וכניסה ללא
רשות למקום פולחן או קבורה, שבוצעו על ידי אדם שהיה כפוף לנאשם וסר למרותו ; בית המשפט
הדגיש את היותו של הנאשם ״מנהיג ומוביל״, וכן את העובדה שהנאשם היה זה שנתן את
״הסכמתו ואישורו״ לביצוע העבירות, וקיבל דיווח לאחר השלמת הביצוע (עמ׳ 77-81, 84, 91-90).
עם זאת, יש לציין כי הנאשם באותו מקרה נטל חלק בתכנון העבירה, וסייע בכסף לביצועה.
בנסיבות אלו, העירה כב׳ השופטת ד. ביניש, אגב אורחא, כי ייתכן שהיה מקום להרשיעו כמבצע
בצוותא, ולא רק כמשדל, באומרה (בעמ׳ 84) :

**״אף לו היינו אומרים כי עיקר ׳תרומתו׳ של המערער לביצוע העבירה היה במתן ׳אישורו׳
לתוכנית העבריינית ולמימושה, הרי שבנסיבות מיוחדות אפשר ש׳הסכמה׳ לביצוע תהווה
השתתפות ׳בביצוע עבירה תוך עשיית מעשים לביצועה׳, כאמור בסעיף 29 לחוק
העונשין״.**

בדבריה אלו הפנתה כב׳ השופטת ביניש לדברי כב׳ השופט י. קדמי בע״פ 5589/98 **ביסאן סולטאן
נ. מדינת ישראל**, תק-על (3)99, פסקה 9. באותו ענין הורשע המערער בעבירת רצח בכוונת
תחילה, כאשר הוכח שנתן את הסכמתו ואישורו לביצוע הרצח, ושלח את המבצע העיקרי להוציא
לפועל את הרצח, ואף הנחה אותו לגבי שיטת הביצוע.

השופט קדמי הדגיש שלולא הסכמתו של המערער לא היה הרצח מתבצע, ולכן מתן האישור לבצע
את הרצח היה משול **״לליריית החזקה המשלחת סמרוטאי למרוץ״**, והוא עולה כדי ״מעשה של
השתתפות בביצוע העבירה״. לכן הורשע המערער כמבצע בצוותא ולא כמשדל, ובית המשפט הדגיש
כי הוא היה מצוי ״במעגל הפנימי של הביצוע״, כמו שהיה לו תפקיד בביצוע, והיה ״המוח של
החבורה״, בעוד שמשדל מצוי מחוץ למעגל הפנימי של הביצוע.

כב׳ השופט קדמי הוסיף ואמר כי בנסיבות המתוארות לעיל, כאשר המערער נתן ״אור ירוק לרצח״
והנחיות אופרטיביות בדבר דרך הביצוע, היה בהתנהגותו לפחות ״**מנה גדושה של שידול על דרך
העידוד**״. גם בע״פ 8469/99 הנ״ל בענין **אסקין**, נפסק כי די היה בכך שהמערער אישר את ביצוע
ההצתה, בחיותו המנהיג והמוביל, כדי להגיע למסקנה שהיה במתן אישור זה משום עידוד למבצע
העיקרי להוציא את רעיון ההצתה מן הכוח אל הפועל (בעמ׳ 93).

164.    שאלת אחריותו של מנהיג קבוצת עבריינים, אשר איננו משתתף באופן פיזי בביצוע העבירה
בידי אלו הסרים למרותו, התעוררה במלוא חריפותה בדנ״פ 1294/96 הנ״ל בענין **משולם**. בית
המשפט פסק בדעת רוב של ששה שופטים, כי רב-עבריינים אשר מנהיג קבוצת עבריינים המבצעת
עבירות בשליחותו ועל-פי תכנונו והנחיותיו, איננו רק משדל : הוא נחשב כמבצע בצוותא בשל
השליטה המלאה שיש לו על ביצוע העבירה ועל מבצעיה. כב׳ השופטת ד. דורנר סברה בדעת מיעוט
כי יש לראות באדם שכזה משדל בלבד (עמ׳ 47-42). דעה אחרת, לפיה יש לראות במנהיג ארגון פשע
כ״מבצע באמצעות אחר״ לפי סעיף (2)29 לחוק העונשין, מובעת במאמריהם של מ. קרמניצר
**״המבצע בדיני העונשין קווים לדמותו״**, פלילים-א׳ (תשמ״ן-1990) 65, בעמ׳ 72, ומ. גור-אריה,
**״צדדים לעבירה-תיקון 39 לחוק העונשין במבחן הפסיקה״**, מגמות בפלילים, עמ׳ 83. במאמרו של
פרופ׳ קרמניצר נאמר בעמ׳ 72 :

**״דומה כי לא צריך להכביר מילים על כך שהמושגים הרגילים של השתתפות עקיפה
(סיוע ושידול) אינם הולמים תופעות עברייניות, כגון פשעי מלחמה, פשעים המתבצעים**

על ידי מדינה פושעת (פשעי הנאצים) או על ידי ארגון פשע ('המאפיה'). מי שנמצא
בעמדת שליטה במערכת כזו (ולא רק ראש ההיררכיה) הנותן פקודה להמית אדם, איננו
סתם משודל או מסייע לרצח כאשר פקודתו מתבצעת. האופי המיוחד של מעשהו מתבטא
בכך שבעת מתן הפקודה הוא יכול לסמוך על כך שהוראתו תבוצע, מבלי שיהיה עליו
להכיר את המבצע הפיזי. הוא

יודע שאם אחד האורגנים הבאים בחשבון לביצוע לא ימלא את המשימה, יבוא אחר
במקומו, והעיקר – המשימה תבוצע.

המבצע הישיר שולט אמנם על המעשה (הוא מבצע במו-ידיו את המעשה, מתוך היסוד
הנפשי הנדרש, וללא כפייה), ואולם מבחינתו של נותן ההוראה הוא נתפס לגמרי אחרת –
כפיגורה אנונימית וניתנת להחלפה, כבורג או גלגל בתוך מנגנון הפעולה של הארגון הנתון
בידיו של נותן ההוראה. הפונגיביליות של המבצע הישיר הופכת את השליט בארגון
למבצע באמצעות אחר".

165.   בדנ"פ 1294/96 הנ"ל בעניין **משולם**, פסק כב' השופט א. מצא כי: "יש לראות במשתתף
בזה – שבידו שליטה מלאה על הביצוע ושעשייתו כוללת לא רק פעולות שידול והכנה, אלא גם
הנחיית העבריינים הפועלים ופיקוח על פעילותם - מבצע בצוותא לכל דבר" (עמ' 27). הוא הדגיש
כי נוכחות בזירת העבירה איננה יסוד חיוני להיותו של אדם מבצע בצוותא, ואמר (בעמ' 30):

"במציאות המשפטית החדשה, התניית האחריות הישירה בנוכחות, פרושה ש'סנדיקים'
ומנהיגי קבוצות עברייניים, המשלחים לזירת הביצוע את 'דגי הרקק' הסרים למרותם,
בעוד הם מנהיגים את הפעילות הפלילית מרחוק, יראו או כמבצעים בצוותא אלא רק
כמשדלים. ואפשרות זו, שבוודאי איננה משקפת את הדין הרצוי, איננה מתחייבת אף מן
הדין המצוי".

כב' השופט א. מצא הדגיש לענין השליטה של המנהיג באנשיו, את העובדה שהנאשם יכול היה
להורות לאנשיו לחדול מביצוע העבירה (עמ' 32, וראה גם דברי כב' השופט קדמי בעמ' 63).

כב' הנשיא ברק הצטרף לדעתו של כב' השופט א. מצא, אך הדגיש גם את העובדה שהנאשם באותו
מקרה היה נוכח בזירת העבירה עד למעצרו, ובאותה עת הניע את תוכנית העבירה (עמ' 50).
כב' הנשיא ברק פסק (בעמ' 51):

"מעמדו של משולם אינו מאפשר לראות בו משדל בלבד. משולם הוא ראש הקבוצה. הוא
המנהיג. הוא תכנן את המבצע. זהו מבצע שלו. הוא איננו בעל רעיון עברייני; הוא איננו רק
'אב רוחני' של העבירה. הוא איננו אדם חיצוני המבקש כי מישהו אחר יבצע עבירה. הוא
בעל תרומה פנימית לביצוע העבירייני... בידיו של משולם, כראש הקבוצה, השליטה
האפקטיבית על הארוע העברייני, ואצלו המחשבה הפלילית הנדרשת לגיבוש אחריותו
כמבצע בצוותא".

כב' השופט מ. חשין פסק (בעמ' 55) אף הוא כי: "רב-עבריינים פלוני, היוזם, המתכנן, קובע

משימות והשולח את 'חייליו' לביצוע העבירה" – נחשב כמבצע בצוותא הגם שאינו נוכח בזירת ביצוע העבירה. הוא הוסיף כי אדם שכזה, שהוא "הרוח הרעה **בכל מעשה העבריינות**" איננו יכול להחשב כמשדל בלבד, שאחריותו תהיה פחותה מאחריותו של המבצע בצוותא. וכך אמר כב' השופט חשין (בעמ' 59) :

"נדע מכאן, כי בסוווגנו את רב-העבריינים כמשדל – להבדילו ממבצע-בצוותא – כמו הפחתנו באחריותו והקלנו עימו. 'חיילים' ששלח רב-העבריינים לביצוע מעשה פשע, אלה יישאו באחריות מלאה לעבירה שונה ונוספת שביצעו, ואילו הוא – הרב-מוח והמנהיג העליון – ישא באחריות פחותה, אף כש'אדם מן הישוב יכול היה להיות מודע לאפשרות עשייתה' של אותה עבירה שונה ונוספת. מסקנה זו תמוהה ומוזרה ויקשה עלי לקבלה".

ועוד אמר כב' השופט חשין (בעמי 59) :

"הנקבל כי הרב-מוח יהא זוטר ל'חייליו' עושי-דברו? אכן, אם הרב-מוח אכן רב-מוח הוא – שבלעדיו לא יוכל תמנון-השותפות-לעבירה להניע את זרועותיו – יקשה עלינו לקבל כי אחריותו תהא פחותה מאחריות המבצע בצוותא. רוח הרעה של המנהיג שורה על כל המבצע העברייני, מוחו מילא את הקפיץ מפעיל-העבירה קודם תחילתה, ולעת עשייתה של העבירה הוא 'נמצא' עם העבריינים כמבצע – בצוותא עימהם. הוא ימשיך ו'יימצא' בינות עד אם יעשה מעשה גלוי לעין למניעת העבירה, לא פחות".

כב' השופט חשין נימק מסקנה זו גם באנלוגיה שהקיש מסעיף 29(ג) לחוק העונשין, בראותו את המנהיג המשלח את "חייליו" לביצוע העבירה כמעין "מבצע באמצעות אחרי", ובאומרו : "'חיילים' ישמעו להוראות מנהיגם עד שיבטלו את רצונם לחלוטין מפני רצונו" (בעמי 60). לגבי הנאשם באותו מקרה, הדגיש כב' השופט חשין כי : "אחריותו נגזרת מתוך תכנון וביצוע 'המרד' קודם מעצרו – תכנון וביצוע של מנהיג – ואותה אחריות נמשכה והלכה גם לאחר מעצרו וכל-עוד לא עשה מעשה גלוי לעין לעצור את העגלה המתדרדרת במדרון" (עמי 61).

כב' השופט י. קדמי פסק ברות דברים אלו (בעמי 66-67), באומרו :

"במצב דברים זה, במקום שמעורבותו של מנהיג של חבורה, שהחליטה על ביצועה של עבירה, באה לכלל ביטוי בתכנון, בהנחיה ובחלוקת תפקידים, השאלה אם בפנינו 'מבצע בצוותא' או 'משדל', תוכרע על-פי אופייה של ה'מעורבות': אם היתה זו 'מעורבות' שיש בה תרומה של 'השתתפות' בביצוע; או שמא 'מעורבות' חיצונית של שידול בלבד.

יישומה של ההבחנה האמורה אינו תמיד קל, אך תמיד אפשרי. מכל מקום, כאשר מדובר במנהיג – או בראש חבורה – המציג לנוהים אחריו ולעושי דברו תכנית קונקרטית לביצועה של עבירה, כאשר זו כוללת חלוקת תפקידים ומתן הנחיות בדבר אורח הביצוע, לא יכול להיות ספק כי לא ב'משדל' המדובר, אלא במנהיג ש'השתתפותו' בביצוע באה לכלל ביטוי ב'מעשה התכנון' האמור. 'מעשה של תכנון' – להבדיל מ'מעשה-של-שידול' – מהווה מעשה של 'השתתפות' בביצוע, משום שבפועל יש בו משום שלב ראשון של הוצאה לפועל של התכנית העבריינית, קרי: של הביצוע. זאת, להבדיל מן ה'שידול', שאינו חלק

מן הביצוע, אלא גורם חיצוני המניע את המבצע.

כפי שהוסבר לעיל, ניתן להסתייע בעניין זה, בבחינת קיומה של 'זיקת שליטה'. קיומה של 'זיקת שליטה' תאשר, כי ראש החבורה הינו 'מבצע בצוותא' על כל הנובע מכך; כאשר במקום שבו אין מתקיימת 'זיקת שליטה' כמוסבר לעיל, תהיה אינדיקציה לאפשרות שהמדובר במעורבות המקימה אחריות של 'מסדל' בלבד".

166.    על גישתו דלעיל, חזר כב' השופט י. קדמי בע"פ 4720/98, 5310/98, 5454/98 <u>נחמן כהן</u> <u>ואח' נגד מדינת ישראל</u>, דינים עליון, כרך נ"ז 366. במקרה זה הורשע נחמן כמבצע בצוותא, לאחר שהוכח כי היה היוזם, הממומן והמוביל של מזימת הרצח, ומי שאישר את זהות המתנקש המיועד שהוצג בפניו. כב' השופט י. קדמי אמר (בפסקה 9):

"לשיטתי, אותה הצגתי לא פעם בעבר, 'מנהיגה' של חבורה, היוזם ומוביל ביצועה של עבירה ע"י חבורתו, נמנה בין 'מבצעיה'. המנהיג, 'משתתף' בביצוע העבירה במשמעות שיש לדרישה זו בסעיף 29 לחוק העונשין. גורלו קשור בגורלם של המבצעים בפועל; והוא נושא באחריות לביצוע כאילו היה 'לצידם' של המבצעים בשעת הביצוע. זה דינו של 'המנהיג' וזה דינם של ה'מתכננים' וממלאי 'תפקידים חיוניים' אחרים, שתרומתם לביצוע 'מסתיימת' אמנם פורמלית לפני תחילתו, אך היא נותרת חלק בלתי נפרד ממנו. גורלם של אלה – המנהיג, המתכנן ודומיהם – קשור בגורלם של המבצעים בפועל: הם מהווים גוף אחד, שכל איבריו נושאים באחריות למעשים שעושות 'ידיו'.

לשיטתי, מנהיגו של 'חבורה' שחברה לביצועה של עבירה, אינו 'מסדל' של חבריו לחבורה, אלא מי שעומד בראשם ו'מוביל' אותם להגשמת מזימתם המשותפת. המסדל מצוי מחוץ למעגל הפנימי של ה'ביצוע'; ומעשה השידול הינו שידול 'גיטו', לאמור: מעשה עצמאי ונפרד מן המאמץ הכולל של הביצוע. מי ש'משתתף' בביצוע – ולשיטתי, כמתחייב מן האמור לעיל, יש ליתן למושג 'השתתפות' בהקשר זה משמעות רחבה – אינו יכול להיות 'מסדל'. בין ה'מסדל' לבין ביצוע העבירה 'חוצץ' המבצע שסימנו 'מילוי תפקיד' בביצוע; ובמקום ש'שידול' מלווה ב'מילוי תפקיד' כאמור – לא 'מסדל' ניצב בפנינו, אלא 'מבצע בצוותא'".

**3.    מסקנות בעניין אחריותו של הנאשם כמבצע בצוותא, משדל ומסייע**

**167.**    ניתוח חומר הראיות כמפורט לעיל, מביא למסקנות **העובדתיות** הבאות לגבי חלקו
ותפקידו של הנאשם בפיגועים נשוא כתב האישום:

א.    הנאשם היה מפקד הפתייח והתנגים בגדה המערבית. הוא היה מנהיג השטח של הפתייח
בגדה, ואחראי על הייפעילות הצבאית" של הפתייח בכל שטחי הגדה. הביטוי בו השתמש
הנאשם, קרי: "הפעילות הצבאית", אינגו אלא שפה נקיה לפיגולי טרור כנגד ישראל,
שבוצעו על ידי חוליות השטח של הפתייח, שהתארגנו בתנועת התנגים ובמסגרת גדודי חללי
אלאקצא. הנאשם הקים את גדודי חללי אלאקצא, והיה אחראי על פעילותם, בהיותו
מנהיגם ומפקדם של אנשי חוליות השטח ומפקדיהם. בפעילותו זו היה הנאשם כפוף באופן
ישר לוויייר חרשות הפלסטינאית יאסר ערפאת. בפעילותו "הצבאית" של הנאשם כמתואר
לעיל, נעשתה במקביל לפעילותו הפוליטית כמזכ"ל הפתייח בגדה, והיותו חבר הפרלמנט
הפלסטינאי.

ב.    הנאשם החזיק בדעה כי תנועת הפתייח חייבת להוביל את "המאבק המזוין כנגד ישראלי",
ולכן תמך בגלוי בביצוע פיגועים כנגד חיילים ומתנחלים. זו היתה עמדתו המוצהרת של
הנאשם, אשר הבהיר כי מבחינתו גם נשים וילדים המתגוררים בהתנחלויות נחשבים כאויב
שיש לפגוע בו. הנאשם תתנגד באופן עקרוני לפיגועים בתוך ישראל, קרי: מעבר לקו הירוק,
וכן היה נגד פיגועי התאבדות. ואולם בפועל, הוא לא חדל מלתמוך באנשיו, ולסייע להם
באספקת כספים ואמצעי לחימה, גם כאשר נוכח שוב ושוב שהם מבצעים פיגועים, כולל
פיגועי התאבדות, בתוך ישראל. בכך הביע הנאשם את הסכמתו לכל סוגי הפיגועים שביצעו
אנשי השטח של הפתייח. עמדתו של הנאשם כמותואר לעיל, באה לידי ביטוי גם בהופעותיו
באמצעי התקשורת, בהן עודד את פעילי הפתייח לבצע פיגועים כנגד ישראל, ואף שיבח את
מבצעי הפיגועים – כולל אלו שבוצעו בתוך ישראל.

ג.    לנאשם לא היתה שליטה מוחלטת באנשי התוליות ומפקדיהם. אך היתה לו מידה רבה של
השפעה עליהם, מכוח חיותו מנהיגם, ובשל הסיוע שהגיש להם, אשר התבטא באספקת
כספים ואמצעי לחימה. השפעתו של הנאשם על אנשי החוליות ומפקדיהם באה לידי ביטוי
בכך שמידי פעם היה מורח להם להפסיק את הפיגועים כנגד ישראל, ולאחר מכן היה קורא
לחידוש הפיגועים – בין היתר על פי הנחיות שקיבל מערפאת. יאסר ערפאת לא היה נותן
את הנחיותיו בצורה מפורשת, אך דאג שהכפופים לו יבינו היטב מתי הוא מעוניין בהפסקת
אש, ומתי הוא מעוניין בפיגועים כנגד ישראל. גם ערפאת עצמו ראה בנאשם כמי ששולט
באנשי השטח, ולכן היה נוזף בו כאשר בוצע פיגוע שלא על דעתו של היו"ר.

ד.    לאנשי חוליות השטח ולמפקדיהם היתה מידה רבה של עצמאות בביצוע הפיגועים. הם לא
נהגו בדרך כלל לערב את הנאשם בתכנון הפיגועים, ואין גם ראיות כי נהגו לדווח לו לפני
ביצוע הפיגועים (למעט מקרים בודדים). עם זאת, הנאשם היה מקבל מהמפקדים דיווח
לאחר כל פיגוע. מתכונת פעילות זו נבעה מרצונו של הנאשם, כמו גם רצונם של מפקדי
החוליות, לחגן על הנאשם מפני ישראל, ולשמר אותו כ"דמות פוליטית", שאיננה מעורבת,
כביכול, בפיגועי הרצח כנגד ישראל. מטעם זה לא היה לנאשם קשר ישיר עם מבצעי
הפיגועים, למעט מקרים חריגים. כך גם נזהר הנאשם שלא ליטול בעצמו אחריות בשם
הפתייח או גדודי חללי אלאקצא לאחר ביצוע הפיגועים, דבר שנעשה על ידי מפקדי
החוליות. הנאשם הסתפק בנטילת אחריות באמצעי התקשורת בצורה עקיפה וכוללנית,
מבלי להתייחס לפיגוע ספציפי, וזאת על ידי הבעת תמיכה בפיגועים שבוצעו.

ה. לבד מאחריותו הכוללת והעליונה של הנאשם על כל אנשי התנזים וגדודי חללי אלאקצא,
בהיותו מפקדם, הוא שלט בצורה טובה יותר בכמה מן החוליות שהתנהלו תחת פיקודם של
אנשים שהיו עוזרי הקרובים, ונחנו מסייע ותמיכה מיוחדת שלו, כמו אחמד ברגותי, עויס,
אבו חמיד ואבו סטחה.

הנאשם נטל אחריות בחקירתו לפעילותן של החוליות שפעלו בפיקודם של אנשים אלה
(למעט עויס, אם כי טען שהוא היה רק אחת מן "הכתובתי" אליהן) פנו אנשים אלה לשם
קבלת סיוע ומימון, וכי לא היתה לו שליטה מלאה בהם, אלא רק השפעה עליהם.

ו. לנאשם לא היה בדרך כלל קשר ישיר עם אנשי השטח שביצעו את הפיגועים : הקשר היה
באמצעות המקורבים לנאשם, שפעלו בסביבתו, ובהם : אחמד ברגותי, עויס, אבו חמיד
ואבו סטחה. אנשים אלו, שפעלו בסביבתו של הנאשם ובתמיכתו, תכננו והוציאו לפועל
פיגועי רצח, כשהם משתמשים בכספים ובאמצעי הלחימה שהנאשם דאג לספק להם לצורך
כך.

ז. הנאשם היה אחראי על אספקת כספים ואמצעי לחימה לחוליות השטח, באמצעות
המקורבים אליו, כגון אחמד ברגותי, עויס, אבו חמיד ואבו סטחה. הוא היה מפנה את
הבקשות לאישורו של ערפאת, והיה אחראי על רכישת הנשק ואספקתו לאנשי החוליות
באמצעות מקורביו. הנאשם גם הגיש סיוע למבוקשים ולמשפחות המפגעים.

ח. למרות שהנאשם, כמו גם אנשיו, נזהרו בדרך כלל שלא לערב אותו באופן אישי בתכנון
והוצאה לפועל של פיגועים, חרי שחובאו ראיות חד-משמעיות לגבי ארבעה פיגועים שבוצעו
בידיעתו, באישורו ובעידודו של הנאשם, ושניים מהם אף ביוזמתו.

הפיגוע בתחנת הדלק בגבעת זאב, בו נרצחה יואלה חן ז"ל, בוצע על פי הוראתו חישירה של
הנאשם לאנשיו, כנקמה על חיסולו של ראיד כרמי, והנאשם הודה בחקירתו באחריות
לפיגוע זה.

כך גם בוצע הפיגוע בו נרצח הנזיר היווני ציפוקטקיס גרמנוס ז"ל במעלה אדומים, בעקבות
פניה של המפגע רדאידה אל הנאשם לשם ביצוע פיגוע התאבדות.

הנאשם הפנה את רדאידה אל האדם שידריך אותו ויספק לו נשק, והנחה אותו לבצע פיגוע
ירי ולא פיגוע התאבדות. כתוצאה מכך יצא רדאידה לביצוע הפיגוע, וירה בנזיר היווני
למוות מתוך מחשבה שהוא יהודי.

בנוסף, נתן הנאשם את אישורו לביצוע הפיגוע במסעדת "סי פוד מרקט" בתל אביב, וזאת
בטרם יצא המפגע לדרכו. הנאשם אמנם הורה לאנשיו שהפיגוע יבוצע בהתנחלות או
במחסום צבאי, ולא בתוך ישראל, אך הוא אישר את הפיגוע עצמו.

כמו כן, אישר הנאשם לאנשיו לבצע פיגוע התאבדות באמצעות פיצוץ מכונית תופת, אם כי
הנחה את אנשיו שהפיגוע יבוצע בשטחים הכבושים ולא בתוך ישראל. הפיגוע הסתיים
במוות של שני המחבלים ליד קניון מלחה בירושלים, אשר התפוצצו ברכב בדרכם לביצוע
הפיגוע.

ט.   זולת ארבעת הפיגועים שפורטו בסייק חי לעיל, לא הובאו ראיות הקושרות את הנאשם
באופן אישי וישיר למעורבות בפיגועים נשוא כתב האישום. משיחתו של הנאשם עם
מקורבו אחמד ברגותי, שהוקלטה ללא ידיעתם, עולה חשש ממשי כי הנאשם ידע הרבה
יותר ממה שהוא ואנשיו חשפו בחקירותיהם, אך לא ניתן לקבוע זאת במידת הוודאות
הנדרשת במשפט פלילי על סמך הראיות הקיימות.
כך או כך: ברור מן הראיות שהובאו, כי פיגועי רצח לא מעטים מאלו שפורטו בכתב
האישום תוכננו והוצאו לפועל על ידי מפקדי השטח שפעלו בקרבת הנאשם ובתמיכתו, תוך
שימוש בנשק שהנאשם סייע ברכישתו, ואשר נמסר למפqעים על ידי מפקדי החוליות
המקורבים אל הנאשם (אחמד ברגותי, עויס, אבו סטאחה ואבו חמיד). הנאשם קיבל מאנשיו
דיווחים על פיגועים אלה לאחר ביצועם, ונתן את הסכמתו - לפחות בשתיקה ובהתנהגות -
להמשך ביצועם.

**168.**   ניתוח חומר הראיות כמפורט לעיל, מביא למסקנה הברורה שהנאשם תרם תרומה ממשית
לפיגועי הטרור שבוצעו על ידי חוליות הפתייח, התנזים וגדודי חללי אלאקצא, גם כאשר לא נטל
חלק בביצועם.

הסיוע במתן אמצעי לחימה וכספים לאותן חוליות, גיוס פעילי השטח, הטיפול בהדרכתם והסיוע
למשפחותיהם - כל אלה יצרו את התנאים שנדרשו לביצוע מעשי הרצח של חוליות הטרור. הנאשם
היה מודע, ללא ספק, לעובדה זו, וגם ידע שאנשי השטח הנתמכים על ידו עומדים להמשיך ולבצע
פיגועי רצח כנגד ישראל, והוא פעל מתוך מטרה ברורה לסייע להם לפעול בדרך זו. אין מדובר רק
בחשד סביר או בייעצימת עיניים" מצד הנאשם, אלא בידיעה ממשית שאנשי החוליות מבצעים,
ועתידים להמשיך לבצע, פיגועי רצח כנגד ישראל, תוך שימוש באמצעי הלחימה והכספים שהעמיד
לרשותם למטרה ספציפית זו. יתר על כן: הנאשם לא רק היה מודע למעשי הרצח שמבצעים אנשי
החוליות, אלא שהוא העניק להם סיוע, כמפורט לעיל, מתוך מטרה ושאיפה שהם יפעלו בדרך זו.

עם זאת, למעט ארבעה מקרים שיפורטו בהמשך, אין ראיות שהנאשם היה מעורב בתכנון ובביצוע
הפיגועים, או כי ידע מראש על הפיגועים העומדים להתבצע על ידי אנשי השטח ומפקדי החוליות
שנתמכו על ידו, ושהוא למעשה היה מפקדם. אמנם עלי עיאדיה סיפר בחקירתו כי הנאשם ידע
ואישר מראש את כל פיגועי הירי של אנשי חתנזים (ראה סעיף 40 לעיל). אך פרט לעדות בודדת זו,
מפי אדם שלא היה מקורב לנאשם, אין ראיות אחרות על כך שהנאשם ידע מראש על כל פיגוע
העומד להתבצע, והוא עצמו הכחיש טענה זו. גם התביעה אינה טוענת כי הנאשם ידע מראש על כל
הפיגועים (ראה עמי 47 לסיכומיה).

**169.**   זאת ועוד: מחומר הראיות עולה כי לנאשם לא היתה שליטה מוחלטת במפקדי החוליות
ואנשי השטח. אמנם הוא נחשב למנהיגם ומפקדם, וחיזה לו השפעה עליהם, אך בכל זאת היתה
להם מידה לא מבוטלת של שיקול דעת עצמאי בתכנון הפיגועים וביצועם, ואין כל ראיה שהם היו
מתייעצים עם הנאשם בעניין זה. ממכלול הראיות עולה כי גדודי חללי אלאקצא אינם גוף המאורגן
תחת הנהגה אחת, אלא מקבץ של חוליות שטח, שלכל אחת מהן יש מפקד משלה. עובדה העולה
מחומר הראיות, היא כי אנשיו של הנאשם ביצעו פיגועי התאבדות, ופיגועים בתחומי הקו הירוק,
בניגוד לעמדתו המוצהרת של הנאשם, ולעיתים גם בניגוד לדעתו של היוייר ערפאת. בנוסף, מחומר
הראיות עולה שאנשי השטח שהיו מעורבים בביצוע הפיגועים השתדלו להרחיק את הנאשם ולנתקו
ממעורבות אישית בפיגועים על מנת להגן עליו מפני ישראל, ולשמרו כיידמות פוליטיתיי.

גם הנאשם עצמו ביקש להתרחק ככל האפשר מפעילות "צבאיתי", ומקשר ישיר עם החוליות
שביצעו פיגועים, ואלו הופעלו למעשה על ידי מפקדי השטח, שחלקם היו מקורבים של הנאשם,
ופעלו תחת שליטתו, בסיועו ובעידודו (כגון, אחמד ברגותי, אבו-תמיד אבו סטאחה ועויס). עובדה זו
מחזקת את המסקנה שהנאשם לא ידע מראש בדרך כלל על ביצוע הפיגועים, ולא היה מעורב באופן
אישי בתכנונם או באישורם, שכן זו היתה מתכונת הפעילות שנבחרה על ידו ועל ידי אנשיו
במתכוון.

אכן, התביעה מסכימה בסיכומיה (עמ' 47), כי:

**"במסגרת ההיערכות הארגונית של הארגונים הטרוריסטים, הוקנו למפקדים ולפעילי
השטח סמכויות נרחבות ומרחב תמרון רב בביצוע פעולות הטרור, והם לא נדרשו לקבל
אישור מהנאשם לכל פעילות טרור, שבוצעה בהתאם למדיניותו שעיצבו הנאשם והנהגת
הארגונים, כאמור לעיל.**

**לנאשם היתה מודעות לפעילותם של הכפופים לו והוא עודכן בעניין זה, בחלק מהמקרים
מראש ולעיתים בדיעבד, וזאת בהתאם לתפיסה על פיה התנהלה הפעילות של הארגונים
הנ"ל".**

**170.** ההלכה, כאמור לעיל, היא שהסיוע צריך שיופנה במודע כלפי **עבירה מסוימת בעלת יעוד
מוחשי**, ויש להוכיח כי המסייע היה מודע לכך שהמבצע העיקרי עומד לבצע, קרוב לוודאי, עבירה
שכזו, קרי: עבירה בעלת יעוד מוחשי; אין די בידיעה של המסייע על נכונות ערטילאית של המבצע
העיקרי לבצע עבירה. אמנם אין צורך להוכיח כי המסייע היה מודע לכל פרט מפרטי העבירה, כגון
המיקום המדויק של העבירה (ע"פ 11131/02 הנ"ל בעניין **יוסופוב**), או זהותו של קורבן העבירה
וזמן הביצוע (ע"פ 426/67 הנ"ל בעניין **בארי**): די בכך שהוא ֹ מודע לכך שהמבצע העיקרי עומד
לבצע עבירה מסוימת מן הסוג שבוצע לבסוף, וחרף כך מסייע לביצועה.


ואולם במקרה דנא – ככל שהדבר נוגע למרבית הפיגועים נשוא כתב האישום, ולמעט ארבעה
פיגועים בהם היה הנאשם מעורב אישית - אין כל ראיה שהנאשם ידע עת הכוונה לבצעם, במובן של
מודעות לכוונה לבצע **עבירה מסוימת בעלת יעוד מוחשי**, כפי שנדרש בפסיקה. היתה לנאשם ידיעה
כללית שאנשי השטח המשתייכים לארגון שבהנהגתו מבצעים מעת לעת פיגועי רצח כנגד ישראלים,
תוך שימוש באמצעי לחימה וכספים שהוא דאג לאספקתם. אך לא הובאו ראיות כלשהן הקושרות
סיוע מצד הנאשם באופן ספציפי לפיגוע זה או אחר (למעט רצח הנזיר חיווני שידון בהמשך). אין כל
ראיה כי הנאשם סיפק אמצעי לחימה או כספים לצורך ביצוע פיגוע מסוים. אמנם בחלק מן
המקרים הוכח שהפיגוע בוצע באמצעות כלי נשק שנמסר למפגע על ידי אחד ממקורבי הנאשם, כמו
עויס, אבו תמיד או אחמד ברגותי.


אך על פי הראיות שהובאו, הסיוע שהגיש הנאשם למקורביו בעניין זה היה כללי, ולא התייחס
לפיגוע זה או אחר, או למפגע זה או אחר: הנאשם דאג באופן כללי לכך שאנשי השטח יהיו
מצויידים באמצעי לחימה ובכספים, וזאת באמצעות מקורביו ומפקדי השטח שסרו למרותו,
וביודעו שאמצעי הלחימה והכספים משמשים אותם למטרות פיגועים. ואולם על פי ההלכות
שבוארו לעיל, אין די בכל אלו על מנת להרשיע את הנאשם בסיוע לכל אחת מעבירות הרצח שבוצעו
על ידי אנשים שנעזרו בסיוע כללי זה, באמצעות מקורביו של הנאשם, לצורך ביצוע פיגועים.


**171.** אין זה המקרה בו אדם מסייע לאנשים הסרים למרותו, ביודעו כי הם עומדים לבצע עבירה

מסוימת ומוחשית, אלא שהוא רק אינו יודע היכן, מתי, באיזה אופן ועל ידי מי מאנשיו תבוצע
העבירה, ומי יהיה קורבנה. מדובר במקרה בו אין כל ראיה הקושרת את הנאשם לביצועה של
עבירה מסוימת, הן מבחינת היסוד העובדתי של העבירה, והן מבחינת חיסוד הנפשי שלה, שכן לא
הוכח שהנאשם ידע כלל על התוכנית לבצעה. בנסיבות אלו, וככל שהדבר נוגע למרבית הפגיעים
נשוא כתב האישום, לא ניתן לייחס לנאשם עבירה כוללנית וגורפת של סיוע לרצח בכוונה תחילה
בגין כל פיגוע ופיגוע, רק בשל מודעותו הכללית לכך שאנשיו מבצעים פיגועים תוך שימוש בנשק
ובכספים שהוא דאג להשיג עבורם.

אין זאת אומרת שהנאשם איננו נושא כלל באחריות פלילית למעשיו, שהביאו לפגיעים שבוצעו תוך
שימוש באמצעי הלחימה והכספים שדאג להעביר למפקדי השטח. לשם כך קיימת העבירה הכללית
של פעילות בארגון טרוריסטי, שדינה מאסר עד 20 שנה, וכן העבירה הכללית (בה לא הואשם
הנאשם), של מתן אמצעים לביצוע פשע לפי סעיף 498 לחוק העונשין תשל"ז-1977. עבירה זו
נועדה למקרה של מסירת אמצעים לביצוע פשע **כלשהו**, כאשר לא ניתן להוכיח ידיעה של המוסר
על כוונה לבצע עבירה מסוימת (ראה: ע"פ 507/79 **מדינת ישראל נ' אליהו אסרף**, פד"יי לג(3) 620,
בעמ' 623-622). זה המקרה שבפנינו.

172.   המסקנות דלעיל הנוגעות לעבירת הסיוע, ישימות גם לגבי העבירה של שידול למעשי רצח
המיוחסת לנאשם. כשם שלא ניתן להרשיע אדם בישראל בעבירה כללית של סיוע למעשי רצח, כך
גם לא ניתן להרשיעו בעבירה כללית של שידול למעשי רצח. כשם שהסיוע חייב להתייחס לעבירה
מסוימת בעלת יעוד מוחשי, כך גם חייב השידול להיות בין פרט לפרט, ולהתייחס לשידול לבצע
עבירה מסוימת בעלת יעוד מוחשי. מסקנה זו מתבקשת לגבי שידול מקל וחומר, שהרי עונשו של
המשדל, שלא כמו המסייע, זהה לעונשו של העבריין העיקרי. כאשר נאשם איננו מודע כלל לכוונה
לבצע עבירה מסוימת, לא ניתן להוכיח את גורם הקשר הסיבתי, דהיינו : שהמבצע העיקרי שודל על
ידו לבצע את העבירה.

במקרה דנא, וככל שהדבר נוגע למכלול הפגיעים נשוא כתב האישום (פרט לארבעה פיגועים שידונו
בהמשך), אין כל ראיה כי הנאשם תשפיע על מפקדי השטח שבהנהגתו, או על אנשי החוליות,
לבצעם, שהרי אין הוכחה שהנאשם ידע כלל על הכוונה לבצע פיגועים אלו. מן הראיות שהובאו
נראה כי איש לא היה צריך לשדל אותם לכך : מפקדי השטח ואנשי החוליות פעלו, בדרך כלל, על פי
יוזמה ושיקול דעת עצמאיים, כשהם מקפידים שלא לערב את הנאשם באופן אישי בתכנון או ביצוע
הפגיעים. כמו כן, לא ניתן להרשיע את הנאשם בעבירה גורפת של שידול למעשי הרצח נשוא כתב
האישום בשל מה שניתן לכנות "שידול המונפה אל הכלל", קרי : דברי ההסתה של הנאשם באמצעי
התקשורת, בהם קרא לאנשיו שתחת תנהגתו, ולאחרים, לבצע פיגועים כנגד ישראל. לשם כך
קיימות העבירות הכלליות של הסתה לאלימות או לטרור, פעילות בארגון טרור, וכו' (ראה סעיף
161 לעיל).

173.   על פי העקרונות המשפטיים וההלכות שפורטו לעיל, גם לא ניתן לראות בנאשם מבצע
בצוותא של כל הפגיעים נשוא כתב האישום, יחד עם המפגעים והמתכננים שהוציאו אותם אל
הפועל, שכן אין כל ראיה לכך שהוא היה מודע לכוונה לבצעם (פרט לארבעת הפיגועים בהם היה
מעורב אישית, כפי שיפורטו בהמשך). חרף הפרשנות הרחבה מאוד שניתנה בפסיקה למילים
"המשתתפים בביצוע עבירה תוך עשיית מעשים לביצועה", וההלכות הנוגעות לאחריותו של מנהיג
חבורת פשע – לא ניתן לקבל את טענת התביעה, לפיה יש לראות בנאשם מבצע בצוותא של כל
הפגיעים נשוא כתב האישום. המינימום הנדרש על פי הפסיקה שבוארה לעיל, לצורך הטלת

P 7: 000453

אחריות של מבצע בצוותא על מנהיג חבורה שאיננו נוכח בזירת העבירה, הוא השתתפות בתכנון
העבירה או קשירת קשר לביצועה; מתן הנחיות או אישור לביצוע העבירה; פיקוח על ביצוע
העבירה; או העלאת הרעיון לביצוע העבירה בצירוף סיוע או תכנון. כל אחד מאלו עשוי להיחשב על
פי הפסיקה כ"עשיית מעשים לביצוע העבירה", אשר מבססת אחריות של מבצע בצוותא. אך אין די
בכך שהמנהיג שולט באנשיו, ואלה סרים למרותו, כדי להטיל עליו אחריות של מבצע בצוותא
למכלול העבירות שביצעו אנשיו, כאשר אין כל ראיה הקושרת את המנהיג בדרך כלשהי לתכנון או
לביצוע, ואף אין כל ראיה כי ידע על הכוונה לבצען.
    התביעה חייבת להוכיח שהנאשם קשור בדרך זו או אחרת לעבירה **מסוימת** – הן ביסוד העובדתי
של העבירה, והן ביסוד הנפשי שלה, וזאת לא הוכיחה פרט לארבעת הפיגועים שיפורטו להלן.

    התביעה משליכה את יהבה על ההלכה שנפסקה בדנ"פ 1294/96 הנ"ל בעניין **משולם**, בעתירתה
להרשיע את הנאשם כמבצע בצוותא בכל הפיגועים נשוא כתב האישום.
    ואולם, **משולם** הורשע כמבצע בצוותא, יחד עם חברות החסידים שהקיפה אותו ושביצעה עבירות
שונות, לאחר שנקבע לגביו כי הוא נתן הנחיות לאנשיו, פיקח על פעילותם, היה בעל שליטה עליהם
ונמנע במתכוון מלהורות להם לחדול מביצוע העבירות (כב' השופט מצא בעמ' 30, 32). כן נקבע כי
היה נוכח בזירת ביצוע העבירות בסמוך לפני תחילתן, ובאוותה עת הניע את תוכנית העבירה, והוא
אף היה מי שתכנן את המבצע (כב' הנשיא א. ברק בעמ' 51-50); ותכנן וביצע את ה"מרד" קודם
למעצרו (כב' השופט חשין בעמ' 61).


    גם כב' השופט קדמי, התייחס בדבריו בעניין **משולם** למי שמעורבותו בביצוע באה לידי ביטוי
בתכנון, בהנחיה ובחלוקת תפקידים, וציין כי משולם נמנע מלהורות לאנשיו לחדול מביצוע
העבירות (עמ' 63, 67-66).

    מאפיינים אלה של שליטה מלאה במבצעי העבירה, נוכחות לצד המבצעים בזירת האירועים עד
לתחילתם, מעורבות בתכנון העבירות, מתן הנחיות לביצוען ופיקוח על מעשי המבצעים - אינם
מתקיימים בעניננו, כאשר לא הוכח שהנאשם ידע מראש על הכוונה לבצע את מרבית הפיגועים
נשוא כתב האישום.

    הנאשם לא היה מעורב אישית ביזום, תכנון או ביצוע של הפיגועים נשוא כתב האישום (פרט
לפיגועים בודדים שיפורטו בהמשך). הנאשם גם לא נתן הנחיות או אישור לביצוע פיגועים אלה,
והוא גם לא סייע או שידל באופן ספציפי לביצועם, כאמור לעיל. כך גם נושא השליטה של הנאשם
במבצעי הפיגועים ומתכנניהם איננו נקי מספקות, כפי שפורט לעיל. על אף חיותו של הנאשם נושא
בתואר הלא-רשמי של מפקד התנזים וגדוד חללי אלאקצא. אין כל ראיה שהנאשם היה חלק מן
החחלטה המשותפת לביצוע הפיגועים נשוא כתב האישום, או כי פעל יחד עם האחרים למען
הגשמת פיגועים אלה, או כי נטל חלק בביצועם או בתכנונם. בהעדר כל אלת, ועל פי הכללים
שנקבעו בפסיקה לאור הוראות חוק העונשין, לא ניתן לראות בנאשם מבצע בצוותא של הפיגועים
נשוא כתב האישום, שלגביהם לא היתה לו כל מעורבות וידיעה אישית, רק מכוח היותו המנהיג
הלא מוכתר של התנזים וגדודי חללי אלאקצא, או בשל קרבתו למתכנני חפיגועים והסיוע הכללי
שהגיש להם.

174.    לסיכום כל האמור לעיל, המצב חתיקך השורר במדינת ישראל איננו מאפשר לחרשיע מנהיג
של חבורה עבריינית או ארגון טרור כמבצע בצוותא של עבירות שנעשו על ידי חברי אותה חבורה או
אותו ארגון, ואף לא בסיוע או בשידול לביצוען, כאשר הוא עצמו איננו מעורב אישית ובצורה
פרטנית בשום אופן בעבירות עצמן, לא לפני ולא בעת ביצוען. כזה הוא המצב, חגם שברור כי אותו

מנהיג נותן את ברכתו לביצוע העבירות, ומעניק לאנשיו סיוע כללי שלא לצורך ביצוע עבירה זו או אחרת.

הנאשם, במקרה דנא, עודד והמריץ את מפקדי החוליות ואנשי השטח לבצע פיגועים, ודאג שיהיו בידיהם כספים ואמצעי לחימה לצורך ביצוע הפיגועים. הוא היה מנהיגם של המפקדים ואנשי השטח, והיתה לו מידה לא מבוטלת של השפעה עליהם.

רבים מן הפיגועים נשוא כתב האישום הוצאו לפועל ותוכננו בידי מפקדי השטח שהיו מקורבים אל הנאשם, ונתמכו על ידו. חרף כל אלה, לא ניתן לייחס לנאשם על פי הדין הישראלי אחריות פלילית של מבצע בצוותא, מסייע או משדל - ככל שהדבר נוגע לפיגועים שאין כל ראיה הקושרת את הנאשם אליהם, וכאשר לא הוכח כי ידע על הכוונה לבצעם.

אכן, קיים פער בין אחריותו הכללית והקולקטיבית של הנאשם לביצוע הפיגועים נשוא כתב האישום, שלא לדבר על האחריות המוסרית לביצועם, לבין האפשרות המשפטית לייחס לו אחריות פלילית לביצועם של פיגועים ספציפיים שלא הוכח כי ידע על התוכנית לבצעם. לא מוכר לנו תקדים להרשעת אדם בעבירת רצח, או בשידול או סיוע לרצח, כאשר אין כל ראיה הקושרת אותו למעשה זה באופן ספציפי. הנאשם נושא אמנם באחריות הכבדה והנוראית לפיגועים נשוא כתב האישום, בהם קפדו את חייהם אנשים רבים, בהיותו מנהיג ומפקד חוליות הטרור שביצעו את הפיגועים. אך זוהי אחריות פיקודית "מעין מיניסטריאלית", ולא אחריות שניתן לבססה מבחינת דיני העונשין. אל לנו למתוח את הוראות חוק העונשין אל מעבר לגבולותיו הטבעיים, הגם שבמקרה זה ניצבת בפנינו בעיה שקשה לפתרה באמצעות הוראות החוק הקיימות.

תוצאת משפטית זו רחוקה מלהשביע רצון, ואף מקוממת. לכך כוונו דבריו של פרופ' מ. קרמניצר שצוטטו לעיל, כי המושגים המקובלים של סיוע ושידול אינם הולמים תופעות עבריניות של ארגוני פשע וטרור, ולכן גם הועלתה הצעתה של פרופ' מ. גור-אריה לתקן את החוק באופן שניתן יהיה לראות במנהיג שכזה "מבצע באמצעות אחר" (ראה סעיף 164 לעיל). בדני"פ 1294/96 הני"ל בעניין **משולם**, דחה בית המשפט את האפשרות לראות במנהיג חבורת עבריינים "מבצע באמצעות אחר" לפי סעיף 29(ג) לחוק העונשין, אף שהשופט מ. חשין גזר מהוראת חוק זו אנלוגיה לעניין אחריותו של מבצע בצוותא לעוומת אחריותו של משדל (עמ' 60-59).

175.   לאחרונה נעשה ניסיון של המחוקק להתמודד, ולו בצורה חלקית, עם בעיה משפטית זו. הכנסת חוקקה חוק מאבק בארגוני פשיעה, התשס"ג-2003, המאפשר להטיל על העומד בראש ארגון פשיעה עונש של עד 20 שנות מאסר, כאשר הארגון מבצע עבירות מסוג פשע שעונשו עולה על 20 שנות מאסר. חוק זה אמנו חל על העבירות נשוא כתב האישום, שבוצעו קודם לחקיקתו. אך הוא משתרע גם על ארגוני טרור ומנהיגיהם (ראה התוספת הראשונה המחילה את החוק על עבירות לפי סעיף 4 לפקודת מניעת טרור, ודברי ההסבר להצעת החוק: הייח תשס"ב 3155, בעמ' 762). מדברי ההסבר להצעת החוק ניתן להבין כי המחוקק היה ער לבעיה המשפטית הנובעת מהעדר היכולת להרשיע את העומדים בראש ארגוני פשע בביצוע עבירות הנעשות על ידי חכופפים להם, בשל ריתוקם מן העבירות. וכך נאמר בדברי ההסבר (עמ' 762):

"הצעת חוק מאבק בארגוני פשיעה, התשס"ב-2002, באה להתמודד במישור החקיקתי עם התופעות של פשיעה מאורגנת ועם המבנה של ארגוני פשיעה, הגורם לעתים קרובות קושי בהוכחת הקשר בין ראשיהם ומגשיליהם של ארגונים מסוג זה לבין ביצועו של עבירות שנעברו על ידי אחרים; זאת לאור המבנה התירדרכי של אחדים מארגונים אלו,

היוצר מרחק בין מקבלי ההחלטות ומתווי המדיניות לבין מבצעי העבירות".

כך גם נאמר בדברי ההסבר להצעת החוק (עמ' 763), כי סעיף 2 לחוק המאפשר להטיל עונש עד 20
שנות מאסר על העומד בראש ארגון פשיעה **"בא להתמודד עם הקושי להוכיח את הקשר בין נושאי
תפקידים בארגוני פשיעה לבין עבירות שנעברו בפועל, והוא קובע, כי די בעצם העמידה בראש
הארגון, ניהולו, מימונו וכד' כדי שהדבר יהווה עבירה...".**
עוד נאמר בהמשך לדברים אלה כי לגבי חברי ארגון פשיעה בדרג נמוך יותר, **"יוותר הצורך להוכיח
קשר לעבירה מסוימת".**

מכאן ברור שהחוק בא להתמודד עם הבעיה העומדת להכרעה גם בתיק זה, דהיינו, העדר היכולת,
על פי המצב החוקי חקיים, לחרשיע מנהיג של ארגון פשיעה או ארגון טרור בביצוע, בשידול או
בסיוע לעבירות ספציפיות המבוצעות על ידי אנשי הארגון.

ואולם, אין בחוק זה מענה לשאלה שהציב כב׳ השופט מ. חשין בדנ״פ 1294/96 הנ״ל בעניין **משולם**
(בעמ׳ 59), לאמור: **"הנקבל כי חרב-מוח יהא זוטר ל/חיילי/ עושי דברו?".** גם לפי חוק זה יהא
עונשו של העומד בראש ארגון פשיעה קל מעונשם של הסרים למרותו, כאשר אלו ביצעו עבירח של
רצח שדינה מאסר עולם. זאת ועוד, ככל שמדובר בארגון טרור אין צורך בחוק זה, שכן על פי סעיף
2 לפקודת מניעת טרור צפוי מנהיג בארגון טרור, ממילא, לעונש מאסר עד 20 שנה בשל עצם היותו
ממלא תפקיד ניהולי בארגון (ראה תת-פרק (ן) לעיל).

176.   הדברים האמורים לעיל נוגעים למרבית הפיגועים המיוחסים לנאשם בכתב האישום, כפי
שפורטו בפרק ח׳ לחלק השני של הכרעת הדין. בפיגועים אלה, כפי שבואר לעיל, לא ניתן לחרשיע
את הנאשם בעבירות של סיוע או שידול למעשי רצח, ואף לא כמבצע בצוותא. יחד עם זאת, הובאו
ראיות ברורות ומשכנעות למעורבותו של הנאשם בשלושה פיגועי רצח שבוצעו על ידי אנשיו,
ובניסיון לבצע פיגוע רצח נוסף, ואלה הם:

### א.   פיגוע הרצח בתחנת הדלק בגבעת זאב

בפיגוע זה, שבוצע ביום 15.1.02, נרצחה יואלה חן ז״ל, ונפצעה נוסעת שהיתה עמה. מן
הראיות שהובאו עולה בבירור כי בעת היותם בסוכה האבלים שהוקמה לאחר חיסולו של
ראיד כרמי ביום 14.1.02, הורה הנאשם למקורבו אחמד ברגותי לבצע פיגוע נקם. אחמד
ברגותי מסר נשק לאבו סטחה, אף הוא מקורב של הנאשם הסר למרותו, ואנשי החוליה של
אבו סטחה ביצעו את הרצח, ומיד לאחר מכן דיווחו לנאשם על תוצאותיו.

הנאשם הודה כי פיגוע זה בוצע בהוראתו, ונטל אחריות לביצועו, כשהוא מדגיש כי זה
הפיגוע הראשון של הפת״יח שבוצע בתוך ישראל. במקרה זה אחראי הנאשם באופן ישיר
לביצוע הרצח, משום שהוא עצמו הורה על ביצועו.

בוודאי שהוראה שכזו של הנאשם לאנשים הסרים למרותו מהווה שידול לרצח, גם אם
הנאשם לא התעניין באופן ספציפי באיזה מקום ובאיזה אופן יבוצע הפיגוע. כאשר הנאשם
הורה לבצע פיגוע נקם, היה ברור לו ולאנשיו שהכוונה היא לרצוח ישראלים. אולם
אחריותו של הנאשם אינה רק כשל משדל, אלא כמבצע בצוותא יחד עם המבצעים
האחרים, שהם אחמד ברגותי, אבו סטחה ואנשיו. הנאשם היה חלק מן התוכנית המשותפת

לביצוע הפיגוע, כמי שיזם את ביצועו. היתה לו מעורבות נפשית גבוהה וידיעה על כך
שהעבירה עומדת להתבצע על פי הוראתו. הנאשם לא רק הביא אחרים לידי ביצוע העבירה
במקרה זה, ולא רק נתן את אישורו לביצוע העבירה, אלא הוא **הורה** לבצע את העבירה,
ובשל מעמדו כמנהיג ומפקד, ומערכת יחסיו עם אחמד ברגותי ואבו סטחה, היתה הוראה זו
משולה ללחיצה על ההדק שהביאה לרציחתה של יואלה חן ז״ל.

למצב דברים כגון זה כוונו דבריה של כב׳ השופטת ד. בינניש בע״פ 8469/99 חנ״ל בעניין
**אסקין**, כי: **״בנסיבות מיוחדות אפשר ש׳הסכמה׳ לביצוע תהווה השתתפות ׳בביצוע
עבירה תוך עשיית מעשים לביצועה׳ כאמור בסעיף 29 לחוק העונשין״.** כך גם פסק כב׳
השופט י. קדמי בע״פ 5589/98 חנ״ל בעניין **סולטאן**, כי מתן **״אור ירוק לרצח״** משול
ל**״ירית ההזנקה המשלחת ספורטאי למרוץ״,** והוא עולה כדי **״מעשה של השתתפות
בביצוע העבירה״** (ראה סעיף 163 לעיל).

בדנ״פ 1294/96 חנ״ל בעניין **משולם** אמר כב׳ השופט מ. חשין (בעמ׳ 59): **״רוחו הרעה של
המנהיג שורה על כל המבצע העבריינ, מוחו מילא את הקפיץ מפעיל-העבירה קודם
תחילתה, ולעת עשייתה של העבירה הוא ׳נמצא׳ עם העבריינים כמבצע – בצוותא
עימהם״.** כך יש לומר על הנאשם שבפנינו, ולפיכך יש להרשיעו לגבי פיגוע רצח זה כמבצע
בצוותא של רצח בכוונה תחילה, ולא רק כמשדל.

ב.   <u>**רצח הנזיר היווני ציפוקטקיס גרמנוס ז״ל במעלה אדומים**</u>

גם פיגוע זה בוצע בהוראת הנאשם וביוזמתו ביום 12.6.01. המפגע רדאידה פנה אל הנאשם
על מנת לקבל נשק ולבצע פיגוע התאבדות.

הנאשם הנחה אותו שלא לבצע פיגוע התאבדות, אלא פיגוע ירי **״כמקובל בתנזים״,** והפנה
אותו אל מוהנד לצורך קבלת נשק והדרכה בירי, בידיעה ברורה שרדאידה עומד לבצע פיגוע
ירי ולרצוח ישראלים על פי הנחיתו. כך אכן עשה רדאידה יחד עם מפגע נוסף, כאשר קיבלו
שני רובי קלצ׳ניקוב ממוהנד, ואף קיבלו ממנו הדרכה כיצד להשתמש בהם - כל זאת על פי
הוראת הנאשם. בפיגוע נרצח הנזיר היווני ציפוקטקיס גרמנוס ז״ל במעלה אדומים, כאשר
המפגעים חשבו אותו בטעות ליהודי.

גם במקרה זה אחריותו של הנאשם לרצח הנזיר היווני היא כשל מבצע בצוותא, ולא רק
כמשדל. הנאשם לא רק שכנע את רדאידה לבצע פיגוע ירי רצחני אלא הוא הנחה אותו כיצד
לבצע את הפיגוע, סייע לו בהשגת נשק והדרכה לצורך הפיגוע, וחזרה לו לפני עליה לפנות על
מנת להוציא לפועל את הפיגוע. במקביל הורה הנאשם לאנשיו לסייע לרדאידה לבצע את
הפיגוע, ואלה אכן פעלו על פי הוראת הנאשם.

על פי ההלכה, שידול שמתלווה אליו מעשה לביצוע, כגון: תכנון או מתן הוראות ביצוע -
מהווה השתתפות בביצוע, ולא רק שידול. כפי שאמר כב׳ הנשיא א. ברק בע״פ 2796/95
חנ״ל בעניין **פלונים**: **״בכל שהשידול של המשדל אינטנסיבי יותר, וככל שמתלווה אליו לא
רק פעולות במישור הנפשי אלא גם פעולות במישור העובדתי, כך מתקרב המשדל למבצע
בצוותא״** (ראה סעיף 161 לעיל). לכן הורשע באותו מקרה הקטין ט׳ כמבצע בצוותא, ולא
רק כמשדל, משום שהשתתף בתכנון העבירה, והיה **״ראש וראשון לכולם״.**

גם במקרה דנא, אחריותו של הנאשם כמבצע בצוותא נגזרת ממעמדו כמנהיג ומפקד, ומן
ההנחיות שנתן לרדאידה ולאנשיו לגבי דרך ביצוע הפיגוע. הנאשם לא רק סייע לביצוע
הפיגוע, ולא רק שידל לביצועו על ידי עידודו של רדאידה לפעול כפי שפעל, אלא הנאשם היה

חלק מן התוכנית המשותפת לביצוע פיגוע זה, ולמעשה הורה על ביצועו. על משמעותה של הוראה שכזו עמדנו בסי'יק אי לעיל, ולפיכך יש להרשיע את הנאשם גם לגבי פיגוע זה בעבירה של רצח בכוונה תחילה.

ג.   <u>פיגוע הרצח במסעדת "סי פוד מרקט" בתל אביב</u>

פיגוע זה בוצע ביום 5.3.02 במסעדת "סי פוד מרקט" בתל אביב על ידי המפגע אברהים חסונה, שרצח במהלכו את יוסף הבי ז"ל, אליהו דהן ז"ל והשוטר רסייר סלים בריכאת ז"ל. מן הראיות שהובאו עולה כי הפיגוע תוכנן והוצא לפועל על ידי מקורביו של הנאשם אחמד ברגותי, אבו חמיד ועויס, וכי אחמד ברגותי דיווח לנאשם לפני שהפיגוע יצא לדרך על כך שהוא עומד להתבצע. הנאשם אישר את ביצוע הפיגוע, ורק הורה לבצעו שלא בתוך ישראל, אלא בהתנחלות או במחסום צבאי בגדה המערבית. מיד לאחר ביצוע הפיגוע התקשר אחמד ברגותי לנאשם על מנת לדווח לו על כך, והנאשם הורה לעויס שלא ליטול אחריות על הפיגוע, כיוון שבוצע בתוך ישראל.

מן הראיות שפורטו לעיל, ברורה אחריותו של הנאשם לפיגוע זה כמבצע בצוותא. הנאשם היה שותף לתוכנית הפיגוע, נתן הנחיות לגבי מקום ביצועו ואישר לבצעו. העובדה שהמבצעים סטו מהנחחיות שנתן להם הנאשם, אינה מעלה ואינה מורידה דבר לעניין אחריותו הפלילית. כפי שבואר לעיל, אחריותו של הנאשם לפיגוע זה איננה רק כשל משדל, שכן הוא נתן את אישורו לביצוע פיגוע רצח, דבר שמהווה מעשה של השתתפות בביצוע העבירה. הנאשם היה חלק מתוכנית הפיגוע, ונתן למתכנן הפיגוע הנחיות לגבי מקום הביצוע, ולכן גם קיבל ממנו דיווח מייד לאחר על הביצוע. מנחיג חבורה עבריינית המאשר ביצוע רצח, ונותן הנחיות לביצועו, נשא באחריות לרצח כמבצע בצוותא, ולא רק כמשדל, על פי החלכות שבוארו לעיל. לפיכך יש להרשיע את הנאשם גם בגין פיגוע זה באחריות של מבצע בצוותא לעבירה של רצח בכוונה תחילה של שלושה אנשים.

ד.   <u>ניסיון פיגוע ליד קניון מלחה בירושלים</u>

מתכנן הפיגוע, ג'יהאד ג'יערה, הודיע לנאשם יום לפני הפיגוע על הכוונה לפוצץ מכונית תופת, והנאשם אישר את הפיגוע, אך הורה לבצעו שלא בתוך ישראל, אלא בגדה המערבית. בפועל התפוצצו שני המחבלים עם מכונית התופת ליד קניון מלחה בירושלים, בדרכם לבצע את הפיגוע. גם בפיגוע זה נעזר הנאשם במקורבו אחמד ברגותי.

גם כאן אחריותו של הנאשם אינה רק כמשדל, אלא כמבצע בצוותא אשר נתן "אור ירוק לרצח", בצירוף הנחיות ביצוע. הואיל והפיגוע נכשל, יש להרשיע את הנאשם במקרה זה בעבירה של ניסיון לרצח.

<h2 style="text-align:center">חלק חמישי:   <u>סיכום</u></h2>

177.   הנאשם הצחיר בשלב הסיכומים: **"אני נגד הרג חפים מפשע, נגד רצח ילדים ונשים. צריך**

**להתנגד לכיבוש בשטחים, אני נגד פעולה צבאית או התאבדות. לא נכון שהייתי אחראי לכך שהיו
התאבדויות"** (עמ' 24 לישיבה מיום 29.9.03). אולם בפועל הוכח מעבר לכל ספק שהנאשם נטל
חלק, ועמד בראש, פעילות רצחנית שמטרתה פגיעה בחפים מפשע - הן בשטחי יהודה ושומרון והן
בתחומי "הקו הירוק" - כולל פיגועי התאבדות.

178.   הנאשם בחר שלא להתגונן כנגד האשמות התמורות העולות מחומר הראיות שנצבר כנגדו,
כפי שפורט לעיל. טענותיו שהועלו במהלך הדיון ובדברי הסיכום שנשא התמקדו בשאלת סמכותו
של בית משפט זה לדון בענייננו, ובהצדקת מה שהוא רואה כהתנגדות לכיבוש הישראלי. לטענות
אלו של הנאשם התייחסנו בהחלטתנו המקדמית שניתנה ביום 19.01.03 - ככל שמדובר בטענות
שאינן במישור הפוליטי בלבד. דחינו טענות אלו, ופסקנו כדלקמן:

א.     בית משפט בישראל מוסמך לדון ב"עבירות חוץ" כנגד בטחון המדינה, או כנגד אזרח או
תושב ישראלי, יהא מקום ביצוע העבירה אשר יהא, על פי סעיף 13(א)-(ב) לחוק העונשין,
התשל"ז-1977, אם כי רוב העבירות נשוא כתב האישום הן "עבירות פנים" הנוגעות
לפיגועים שבוצעו בישראל.

ב.     חוק יישום הסכם הביניים בדבר הגדה המערבית ורצועת עזה (סמכויות שיפוט והוראות
אחרות), התשנ"ו-1996, הנותן תוקף להסכם הביניים ישראלי-פלסטיני בדבר הגדה
המערבית ורצועת עזה, כמו גם תקנה 2 לתוספת לחוק להארכת  תוקפן של תקנות שעת
חירום (יהודה והשומרון וחבל עזה – שיפוט בעבירות ועזרה משפטית), התשל"ח-1977 –
אינם שוללים את סמכותו של בית משפט בישראל לדון בעבירות חוץ או בעבירות פנים
המיוחסות לנאשם. חיקוקים אלו העניקו לרשות הפלסטינאית את סמכות השיפוט לגבי
פלסטינאים שביצעו עבירות  בשטחה, אך לא בגין עבירות שבוצעו כנגד אזרחי או תושבי
ישראל בשטח מדינת ישראל או בשטחי יהודה ושומרון ורצועת עזה.

ג.     לנאשם לא עומדת חסינות כלשהי בגין העבירות שיוחסו לו בכתב האישום, גם אם כיהן
כחבר הפרלמנט הפלסטיניא, שכן המשפט הבינלאומי אינו מכיר בחסינות שכזו.

ד.     הנאשם איננו זכאי למעמד של "שבוי מלחמה" על פי אמנת ז'נבה השלישית, ועל כן אין
מניעה להעמידו לדין על מעשים שביצע כלוחם בלתי חוקי. אדם הפועל מחוץ למסגרת
הלחימה החוקית, ובניגוד לדיני המלחמה, ואשר מעורב בביצוע פעולות טרור שמטרתן
לפגוע ללא אבחנה באוכלוסיה אזרחית, חושף עצמו לסנקציות הפליליות הרגילות של
המשפט הפלילי הבינלאומי, ואיננו זכאי להגנה הניתנת במשפט הבינלאומי.

ה.     התנגדות לכיבוש, כפי שטוען הנאשם, איננה מהווה צידוק על פי דין כלשהו לביצוע מעשי
הרג של אזרחים חפים מפשע. פעילות טרור שמפרה את דיני המלחמה, ואיננה מבחינה בין
מטרות צבאיות לבין מטרות אזרחיות, איננה נחשבת כפעילות לוחמתית המוכרת על פי
כללי המשפט הבינלאומי, גם אם מטרתה היא הסרת הכיבוש – כפי שטוען הנאשם.

179.   **לסיכום**: לאור כל הטעמים שפורטו בהכרעת הדין לא מצאנו בסיס משפטי להרשעת
הנאשם בביצוע מכלול הפיגועים נשוא כתב האישום, ומן הדין להרשיעו בעבירות הכלליות שיוחסו
לו בכתב האישום, ובעבירות הרצח ונסיון הרצח הנוגעות לארבעה פיגועים שבכתב האישום (מסי 3

P 7: 000459

, 7, 12 ו- 36 בנספח לכתב האישום).

על סמך התשתית הראייתית, ולאור הניתוח המשפטי דלעיל, אנו מרשיעים את הנאשם בביצוע
העבירות הבאות :

א.    רצח בכוונה תחילה לפי סעיף 300(א)(2) לחוק העונשין, התשל"ז-1977 (בשלושה
       מקרים בהם נרצחו חמישה בני אדם);

ב.    ניסיון לרצח לפי סעיף 305(1) לחוק העונשין, התשל"ז-1977;

ג.    פעילות בארגון טרור לפי סעיף 2 לפקודת מניעת טרור, התש"ח-1948;

ד.    חברות בארגון טרור לפי סעיף 3 לפקודת מניעת טרור, התש"ח-1948.

ה.    העבירה של קשירת קשר לביצוע פשע לפי סעיף 499 לחוק העונשין, תשל"ז-1977 הוכחה
       אף היא, ככל שהדבר נוגע לארבעת הפיגועים בהם הורשע הנאשם, והיא נבלעת בעבירה
       העיקרית של רצח בכוונה תחילה וניסיון רצח.

ניתן והודע היום כ"ט באייר תשס"ד (20 במאי, 2004) בנוכחות ב"כ התביעה, הסניגוריה
הציבורית והנאשם.

| ד"ר עמירם בנימיני, שופט | אברהם טל, שופט | שרה סירוטה, ס"נ
אב"ד |
|---|---|---|