

**Israel Defense Forces**

Before the Military Court
in Samaria
before a panel

| | |
|---|---|
| Court Case: | 6446/02 |
| Prosecution case: | 756/02 |
| Detailed incident case: | 4968/02 Petach Tikva |
| | 4258/02 Yarkon |
| | 502/02 Zion |
| | 4685/02 Petach Tikva Station |

[Stamp]
The Military Court in Samaria
June 23, 2002
[illegible]

In the trial between:

**The military prosecutor**

**- The Prosecutor -**

**- v. -**

**Ibrahim Adnan Najib Abdel Hai**

(detained since June 3, 2002)

Identity No. 411124423, born on August 20, 1979, from the village Burin

**- The Defendant -**

**Indictment (Amended)**

The above mentioned Defendant is hereby accused of committing the following offenses:

**First count**:

**Nature of the offense:** Membership in an illegal organization, an offense pursuant to Regulations 84(1)(A) and 85(1)(A) of the Defense Regulations (Time of Emergency), 1945.

**Details of the offense**: The above mentioned Defendant, in the Area, during the course of the month of December 2000 or thereabouts, was a member of a military cell belonging to the Al Aqsa Martyrs Brigades, which is an illegal organization;

[Stamp] P 5: 218

Prosecution Case 444/02 Amended

1

In other words: the above mentioned Defendant, at the time that was set forth above, decided to join a military cell in order to engage in military activity against Israeli targets within the framework thereof.

For this purpose, the Defendant approached his colleague, Mohamed Ahmad Mustafa Alqassam (hereinafter – **Mohamed**), and informed him of his wish to engage in military activity. The above mentioned Mohamed told the Defendant that there was a military cell belonging to the Al Aqsa Martyrs Brigades, which carried out shooting and explosive device laying attacks against Israeli targets. Mohamed suggested that the Defendant join this cell, and the Defendant agreed to do so.

[Stamp] P 5: 218 [continued]

Prosecution Case 444/02 Amended

In addition to the Defendant, the members of this cell, which was known as the "Old City" cell, were: Mahdi Abu Gajala, Basel Albizra, Saad Jawabra, Kamal Shihab and Mueid Jamil.

The Defendant, three months from the day when he joined up with the above mentioned military cell, decided following a personal conflict that he had with one of the members of the cell, to discontinue his membership in this cell.

After the Defendant left the above mentioned cell, in March 2001 he encountered the military operative Raed al-Karmi. The Defendant asked Raed al-Karmi to engage in military activity with him.

Raed al-Karmi consented to the request of the Defendant and introduced to him a military operative of the Al Aqsa Martyrs Brigades, Nasser Aweis.

When the military operatives Mohamed Alqassam, Kamal Yusef Shihab, Assad Jawabra knew that the Defendant was working with Nasser Aweis, they asked him to join the cell to which the Defendant belonged. Nasser Aweis consented to their enrollment into the cell.

The membership of the Defendant in the military cell continued until the day of his arrest.

**Second count**:

**Nature of the offense**: Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 19-20, 14 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense**: The above mentioned Defendant, in the Area, during October 2001 or thereabouts, attempted with another person to cause the intentional death of another person;

In other words, the above mentioned Defendant, at the time that was set forth above, in the evening hours, departed with his fellow cell members, Mohamed Alqasam, Kamal Yusef Shihab and Saad Jawabra, towards the Dir-Sharaf checkpoint in order to carry out a terrorist attack.

Nasser Aweis gave the Defendant approval to carry out the attack, and provided him with an M-16 rifle with two magazines.

The Defendant and his above mentioned colleagues traveled to the site of the checkpoint using a stolen Volkswagen type vehicle.

[Stamp] P 5: 219

Prosecution Case 444/02 Amended

When they arrived close to the checkpoint, 15 meters away from it, they turned their vehicle in the opposite direction, the Defendant and Mohamed Alqassam opened the rear doors and fired the rifles at the three soldiers who were standing at the checkpoint, while the vehicle in which he was sitting was heading towards Nablus.

The Defendant fired all of the cartridges that were inside the magazine towards the soldiers, and Mohamed Alqassam also fired all of the cartridges that were inside the magazine towards the soldiers.

The soldiers did not shoot back at first; but after the vehicle in which the Defendant was traveling was 300 meters away, the Defendant and his colleagues heard gunshots.

[Stamp] P 5: 219 [continued]

Prosecution Case 444/02 Amended

4

**Third count**:

**Nature of the offense**: Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 19-20, 14 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense**: The above mentioned Defendant, in the Area, during 2001 or thereabouts, was an accomplice in an attempt to cause the intentional death of another person;

In other words, the above mentioned Defendant, at the above mentioned time, was requested by Mahmoud A-Titi, a military operative of the Al Aqsa Martyrs Brigades, organization, to participate in the execution of a shooting attack against an Israeli vehicle.

Mahmoud Titi told the Defendant that he had tracked the movement of a Subaru type vehicle that was being driven by an Israeli officer.

The Defendant agreed to the suggestion of Mahmoud Titi.

Accordingly, the Defendant, along with Mahmoud Titi, Kamal Shihab and Nasser Alhatib, waited in hiding near Rujeib Junction for the vehicle that was traveling from the Elon Moreh area towards Hawara.

The Defendant was armed with an M-16 type rifle, Nasser Alhatib was armed with a Kalashnikov, and Mahmoud Titi was armed with a machine gun, and Kamal Shihab was armed with an M-16 type rifle.

When the vehicle approached to a distance of approximately 200 meters from the site at which the Defendant and the fellow squad members were waiting, the Defendant fired about two rounds at it, Nasser Alhatib fired about 11 rounds and Mahmoud Titi fired about 10 rounds at it.

**Fourth count**:

**Nature of the offense**: Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 19-20, 14 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense**: The above mentioned Defendant, in the Area, during January 2002 or thereabouts, participated in an attempt to cause the intentional death of another person;

[Stamp] P 5: 220

Prosecution Case 444/02 Amended

In other words, at the above mentioned time, Kamal Shihab and Mohamed Alqassam conducted surveillance of a mobile home in the Israeli settlement of Yitzhar. Kamal Shihab and Mohamed Alqassam learned from their surveillance that a person would come to the mobile home every day.

After conducting the surveillance, the Defendant conspired with Kamal Hatib , Kamal Shihab, Iad Hamdan, Mohamed Alqassam to carry out a shooting attack at the mobile home.

The Defendant devised the attack execution plan, and according to the plan, he was in charge of the cell during the execution of the attack.

The Defendant departed with the above mentioned gang, whose members were armed with M-16 type rifles, and English rifle, a Kalashnikov, towards the area of the settlement of Yitzhar.

[Stamp] P 5: 220 [continued]

Prosecution Case 444/02 Amended

When they arrived at the site, they waited on a hill that was approximately 300 meters away, overlooking the area.

After an hour, an open pickup type vehicle arrived at the mobile home, and three people alighted from it.

When the people approached the mobile home, the Defendant and his colleagues fired at them using the weapons in their possession. The Defendant fired approximately 10 rounds.

After the gunfire, the Defendant and his colleagues fled from the site.

**Fifth count**:

**Nature of the offense**: Causing intentional death, an offense under Sections 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense**: The above mentioned Defendant, in the Area, in late February 2002, together with others, caused the intentional death of another person, as follows:

1.  The above mentioned Defendant, at the above mentioned time, when he participated in the funeral of Mohamed Ahmed Mustafa Alqassam, attended Rafidia Hospital in Nablus, and during his stay there, Mohamed Burhan said that the late Zahir Turabi (hereinafter – **the Deceased**) was at the hospital. The Defendant told Mahmoud A-Titi about this.

2.  After Mahmoud A-Titi heard about this, he abducted the Deceased from the hospital. Thereafter, Mahmoud A-Titi told the Defendant that he had questioned the Deceased about suspicions of collaboration with the State of Israel, and the Deceased confessed to this, and therefore [he] decided to murder the Deceased.

3.  The Defendant asked Mahmoud A-Titi to meet him in the evening hours in order for him to take them to a suitable place at which he would murder the Deceased. The Defendant met again Mahmoud A-Titi, Mueid Jamil, Yasser Abu Bakhar, and the Deceased was with them. The Defendant and his colleagues drove, using a Volkswagen type vehicle, to the Engineers neighborhood near Jenid.

[Stamp] P 5: 221

Prosecution Case 444/02 Amended

4.  At the above mentioned site, they took the Deceased out of the vehicle. The Defendant asked the Deceased to pray before they murdered him, but the Deceased refused. The Defendant asked him whether he would be prepared to murder the handler from the General Security Service who was responsible for him, but the Deceased refused to do so.

5.  And then Mahmoud A-Titi and Mueid Jamil fired at the Deceased approximately 15 rounds, with the intent of causing his death. Thereafter, the Defendant approached the Deceased and fired one round into his head, in order to make sure that he was dead.

6.  As a result of this, the death of the Deceased was caused.

[Stamp] P 5: 221 [continued]

Prosecution Case 444/02 Amended

7. The Defendant and his colleagues placed the "confession" of the deceased and a leaflet of the Al Aqsa Martyrs Brigades organization on his body.

**Sixth count: (Detailed Incident 502/02 Zion)**

**Nature of the offense:** Causing intentional death, an offense under Sections 51(A) and 7(C) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Sections 14 and 2 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in the Area, on January 22, 2002 or thereabouts, was an accomplice in causing the intentional death of another person, as follows:

1. During the course of his work in the Palestinian Naval Police, the Defendant met Sa'id Ibrahim Ramadan (hereinafter – **"Sa'id"**). During one of their meetings, Sa'id told the Defendant that he wanted to carry out a suicide attack, and the Defendant asked Sa'id to give him an opportunity to check out the matter.

2. The Defendant contacted Nasser Aweis and informed him of the intentions of Sa'id; and the former referred him to Mahmoud A-Titi. The Defendant met Mahmoud A-Titi and informed him of Sa'id's intentions. Mahmoud Titi asked the Defendant to check the sincerity of Sa'id's intentions.

3. The Defendant, with the aim of testing Sa'id, put a "dummy" explosive belt on him and gave him an imaginary telephone number, sent him from the Zawata area to the Tulkarm area, and asked him to call him when he arrived in the Tulkarm area. Said put on the explosive belt and started towards Tulkarm. The Defendant, who found that Sa'id was steadfast, asked him to return, on the pretext that the attack time had changed due to military checkpoints on the way. Sa'id was angry with the Defendant, who asked him to be prepared to carry out the attack at any time.

4. Accordingly, the Defendant contact Mahmoud A-Titi and told him that Sa'id was prepared to carry out the attack, and he asked the Defendant to have him meet Sa'id.

5. During that period, Ahmed Taleb Mustafa Barghouti (hereinafter – **Ahmed**) had contacted Nasser Aweis and asked him to send him a person who was prepared to carry out a suicide attack. Ahmed told Nasser Aweis that he himself would see to driving the suicide terrorist to Jerusalem in order for him to carry out the suicide attack.

[Stamp] P 5: 222

Prosecution Case 444/02 Amended

9

6.  The Defendant brought Sa'id to the home of Mahmoud A-Titi, and in Mahmoud's home was a person called Yasser Abu Bakhar, and another person called Majed al-Masri. Mahmoud and Majed filmed Sa'id, and Yasser wrote Sa'id's will. Sa'id was filmed while holding an M-16 type rifle, a Koran and reading out his will.

7.  Thereafter, the Defendant took Sa'id to his family, where he parted from them without informing them of his intentions of committing suicide.

8.  Thereafter, the Defendant asked Sa'id to depart to Ramallah on the following day.

[Stamp] P 5: 222 [continued]

Prosecution Case 444/02 Amended

And in the morning of the following day, the Defendant noticed that Sa'id was departing for Ramallah.

9.      On January 22, 2002, the above mentioned Sa'id met the above mentioned Ahmed in Ramallah and informed him that he had been sent by Nasser Aweis for the purpose of carrying out a suicide attack.

10.     The above mentioned Ahmed called Mohamed Abed Rahman Salam Maslah (alias "Abu Satha") and asked him to come to him. Mohamed Maslah met Ahmed and Sa'id in Ramallah. Ahmed and Mohamed Maslah took Sa'id to a barber shop in order for him to have his hair cut before performing the planned suicide attack.

11.     Thereafter, the above mentioned Ahmed and Mohamed Maslah called Fares Sadeq Mohamed Ghanem (alias "Hitawi") and asked him to drive a suicide bomber, referring to Sa'id, from Ramallah to Jerusalem in order for the suicide bomber to carry out a suicide attack there and cause the death of as many Israeli civilians as possible.

12.     Fares Ghanem arrived in Ramallah along with Mohamed Sami Ibrahim Abdullah (hereinafter – **Mohamed Abdullah**), after the latter had agreed to participate in driving the suicide terrorist from Ramallah to Jerusalem. Fares Ghanem arrived at the meeting in an Isuzu pickup vehicle with Israeli license plates.

13.     At the instruction of the above mentioned Ahmed, Fares Ghanem and Mohamed Abdullah traveled in the Isuzu vehicle from Ramallah to Jerusalem in order to find a route that had no police or IDF checkpoints, with the aim of driving the suicide terrorists later on the same route, to carry out the planned attack in Jerusalem.

14.     Mohamed Abdullah and Fares Ghanem traveled from Ramallah through Rafat and arrived at the Atarot Industrial Zone; there the two returned to the main Jerusalem – Ramallah road and took a left to the junction leading to Rama Junction, where they turned right and drove to Adam Junction. At Adam Junction the two turned right and traveled to Hizma junction, where they turned right and entered Anta. Through Anta, they arrived at the French Hill junction, where the two turned right and returned to Ramallah.

[Stamp] P 5: 223

Prosecution Case 444/02 Amended

Mohamed Abdullah and Fares Ghanem saw that via the route that they had traveled, they could drive the suicide terrorist to Jerusalem without being stopped at police or IDF checkpoints.

15. Mohamed Maslah, at the instruction of Ahmed, brought an M-16 assault rifle and 3 magazines for the above mentioned assault rifle, filled with cartridges, two of the magazines being connected by a magazine coupler ("jungle clip").

16. On the same day, Ahmed, Mohamed Maslah and Sa'id met Mohamed Abdullah and Fares Ghanem in the area of the City Inn Hotel in Al Bira. Ahmed introduced Mohamed Abdullah and Fares Ghanem to the above mentioned Sa'id.

17. Ahmed explained to Mohamed Abdullah and to Fares Ghanem that Sa'id was the suicide terrorist, whom they had to drive to Jerusalem in order for him to carry out the suicide attack there by shooting at Israeli civilians with the aim of causing the death

[Stamp] P 5: 223 [continued]

Prosecution Case 444/02 Amended

12

of as many civilians as possible.

18. Mohamed Abdullah and Fares Ghanem hid the above mentioned M-16 assault rifle and magazines in the above mentioned Isuzu vehicle.

19. Mohamed Abdullah and Fares Ghanem drove Sa'id to Jerusalem via the route that they had checked out earlier that day, as described above.

20. In Jerusalem, Mohamed Abdullah and Fares Ghanem traveled to Sheikh Jarah Street. There, they took out the M-16 assault rifle and the magazines that were hidden inside the vehicle and handed them over to Sa'id, and continued driving towards Hanevi'im Street. Upon reaching the junction of Strauss and Hanevi'im Streets, the two stopped the Isuzu vehicle.

21. Mohamed Abdullah and Fares Ghanem told Sa'id to alight on foot to Jaffa Street and start shooting wherever he would see many people.

22. After Sa'id alighted from the vehicle, at the above mentioned site, with the M-16 and the ammunition, Mohamed Abdullah and Fares Ghanem drove away in the Isuzu vehicle, through the Musrara neighborhood to Highway No. 1, and from there traveled through the main road to Ramallah. At the same time, a few minutes later, Sa'id arrived at Jaffa Street, armed with the M-16 assault rifle and the ammunition.

23. At about 4:20 p.m., while standing opposite Building No. 47 in Jaffa Street or thereabouts, Sa'id Ramadan loaded the M-16 assault rifle that he was carrying, shouted "Allahu Akbar" and discharged automatic gunfire indiscriminately at the people who were on Jaffa Street, at the bus stop at the site, aboard the No. 27 Egged bus that was at this stop at the time and at the people who were within the stores nearby with the aim of causing the death of as many people as possible. Sa'id Ramadan, while continuing to fire, fled from the site towards the parking lot on Harav Kook Street. There, Sa'id Ramadan changed magazines and continued to shoot at civilians with the aim of causing their death. Sa'id Ramadan fired through the M-16 assault rifle that he carried more than 38 cartridges. Sa'id Ramadan continued to shoot at civilians until he was killed by civilians and policemen who arrived at the site.

24. By his acts as described above, the above mentioned Defendant caused the intentional death of **the late Ora (Svetlana) Sandlar**, who died as a result of gunshot wounds caused by the bullets that were fired by the aforementioned Sa'id.

[Stamp] P 5: 224

Prosecution Case 444/02 Amended

13

**Seventh count**: **(Detailed Incident 502/02 Zion)**

**Nature of the offense**: Causing intentional death, an offense under Sections 51(A) and 7(C) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Sections 14 and 2 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense**: The above mentioned Defendant, in and outside of the Area, on January 22, 2002 or thereabouts, was an accomplice in causing the intentional deaths of other persons;

[Stamp] P 5: 224 [continued]

Prosecution Case 444/02 Amended

In other words, by the actions of the Defendant described in the previous count of the indictment, **the late Sarah Hamburger** died, having succumbed to the gunshot wounds from the bullets that were fired by Sa'id Ramadan.

**Eighth count: (Detailed Incident 502/02 Zion)**

**Nature of the offense**: Attempt to cause intentional death, an offense pursuant to Sections 51(A) and 7(C) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 19-20, 14 and 2 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense**: The above mentioned Defendant, in and outside of the Area, on January 22, 2002 or thereabouts, was an accomplice in attempting to cause the intentional death of others.

In other words, as a result of the attack described in the previous count of the indictment, the Defendant attempted to cause the death of others. As a result of the attack, more than 45 civilians who were at the site were slightly to severely injured.

**Ninth count: (Detailed Incident 4258/02 Yarkon)**

**Nature of the offense**: Causing intentional death, an offense under Sections 51(A) and 7(C) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Sections 14 and 2 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense**: The above mentioned Defendant, in and outside of the Area, on March 5, 2002 or thereabouts, was an accomplice in causing the intentional death of others, as follows:

1.  At the above mentioned time, Ibrahim Hasouna approached the Defendant and informed him of his wish to carry out a suicide attack. The Defendant, with the aim of examining the sincerity of the intentions of Ibrahim Hasouna, sent him with a "dummy" explosive belt, took him to the Zawata area, gave him a telephone number and told him to call to let him know when he would reach the Tulkarm area.

2.  After the Defendant made sure of the sincerity of the intentions of Ibrahim, they asked him to return and told him that the time of the attack had been deferred. The Defendant took Ibrahim Hasouna to the home of Mahmoud A-Titi, where they filmed him with a video camera.

[Stamp] P 5: 225

Prosecution Case 444/02 Amended

Ibrahim Hasouna read out a will in which he said that the attack was revenge for the death of Mohamed Alqassam and Raed al-Karmi.

3.   During that period, Ahmed Taleb Mustafa Barghouti (hereinafter – **Ahmed**) called Nasser Mahmoud Aweis by telephone, and during the call Nasser Aweis informed the above mentioned Ahmed that he was sending him an additional suicide terrorist in order for Ahmed to send him into the State of Israel for carrying out a shooting attack.

4.   The Defendant took Ibrahim Hasouna to a place in which he often slept in the Almahfia area. On the following day, on March 4, 2002, he sent him to Ramallah, gave him a telephone number, and asked him to call him once he arrived in Ramallah. Ibrahim Hasouna did so, when he arrived in Ramallah.

[Stamp] P 5: 225 [continued]

Prosecution Case 444/02 Amended

16

5. Ibrahim Hasouna contacted the above mentioned Ahmed, and told him that he had arrived in Ramallah according to the instruction of Nasser Aweis and that he was the suicide attacker for the purpose of carrying out the planned suicide attack.

6. Ibrahim Hasouna boarded the vehicle, which Mazen Alkadi was driving, with Murad Ajluni sitting beside him, and the three drove towards Tel Aviv, in order to carry out the planned suicide attack there.

7. On that night, after Mazen Alkadi, Murad Ajluni and Ibrahim Hasouna arrived in Tel Aviv, near Ma'ariv Bridge on Petach Tikva Road, Murad Ajluni showed Ibrahim Hasouna a crowded place and instructed him to carry out the planned attack there.

8. Ibrahim Hasouna took out the above mentioned M-16 assault rifle, magazines and hand grenades, which were concealed in the door of the vehicle.

9. At about 2:15 a.m., on March 5, 2002 or thereabouts, Ibrahim Hasouna, who was armed with the above mentioned M-16 assault rifle, hand grenades and commando knife, alighted from the vehicle near the Seafood Market restaurant (hereinafter – **the Restaurant**) in order for him to carry out the planned attack. At the same time, Murad Ajluni and Mazen Alkadi drove away from the site in the vehicle towards Jerusalem.

10. Ibrahim Hasouna approached the Restaurant and discharged automatic gunfire from the M-16 assault rifle at the occupants of the Restaurant and passersby in Petach Tikva Road with the intent of causing their death.

11. Thereafter, Ibrahim Hasouna threw the two hand grenades at the Restaurant with the intent of causing the death of the occupants of the Restaurant and passersby, but the hand grenades did not detonate.

12. After the M-16 assault rifle, which Ibrahim Hasouna carried, stopped firing due to a stoppage, Ibrahim Hasouna took out the above mentioned commando knife that he was carrying and started to stab Israeli civilians who were at the site with the intent of causing their death.

[Stamp] P 5: 226

Prosecution Case 444/02 Amended

13.    The late policeman Master Sergeant Salim Barikat arrived at the said site, rushed at Ibrahim Hasouna and overpowered him. The late Master Sergeant Salim Barikat had the chance to inform his commanders that he had overpowered the terrorist.

14.    At this stage, Ibrahim Hasouna stabbed the late Master Sergeant Salim Barikat using the above mentioned commando knife with the intent of causing his death. As a result of the stab wound, the late Master Sergeant Salim Barikat died at the site.

15.    By his acts described above, the above mentioned Defendant caused the intentional death of **the late Master Sergeant Salim Barikat.**

[Stamp] P 5: 226 [continued]

Prosecution Case 444/02 Amended

**Tenth count**: **(Detailed Incident 4258/02 Yarkon)**

**Nature of the offense**: Causing intentional death, an offense under Sections 51(A) and 7(C) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Sections 14 and 2 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense**: The above mentioned Defendant, in and outside of the Area, on March 5, 2002 or thereabouts, was an accomplice in causing the intentional death of others.

In other words, by his acts described in the previous count of the indictment, **the late Yosef Habi**, who was stabbed by Ibrahim Hasouna in the chest and other parts of his body, died.

**Eleventh count**: **(Detailed Incident 4258/02 Yarkon)**

**Nature of the offense**: Causing intentional death, an offense under Sections 51(A) and 7(C) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Sections 14 and 2 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense**: The above mentioned Defendant, in and outside of the Area, on March 5, 2002 or thereabouts, was an accomplice in causing the intentional death of others.

In other words, by his acts described in the previous count of the indictment, **the late Eliyahu Dahan**, who was stabbed by Ibrahim Hasouna in the chest and other parts of his body, died.

**Twelfth count**: **(Detailed Incident 4258/02 Yarkon)**

**Nature of the offense**: Attempt to cause intentional death, an offense pursuant to Sections 51(A) and 7(C) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 19-20, 14 and 2 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense**: The above mentioned Defendant, in and outside of the Area, on March 5, 2002 or thereabouts, was an accomplice in attempting to cause the intentional death of others.

In other words, the above mentioned Defendant, by his acts described in the previous count of the indictment, attempted to cause the death of as many civilians as possible.

[Stamp] P 5: 227

Prosecution Case 444/02 Amended

19

As a result of the rounds that were fired by Ibrahim Hasouna, dozens of Israeli civilians were slightly to severely injured.

**Thirteenth count**:

**Nature of the offense:** Possession of war materiel, an offense pursuant to Section 53(A)(1) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970.

**Details of the offense**: The aforesaid Defendant, in the Area, during March 2002 or thereabouts, possessed a firearm, ammunition, hand grenade, tool, object or thing designed or capable of causing death

[Stamp] P 5: 227 [continued]

Prosecution Case 444/02 Amended

20

or severe injury, without a permit certificate issued by or for a military commander;

In other words, the above mentioned Defendant, at the above mentioned time, received from the coordinator of naval security in Nablus, Azam Balidi, 6 magazines for a Kalashnikov rifle, 30 detonators for explosive devices, 2 kg of gunpowder and a grenade launcher.

The Defendant received that which has been set forth above at a frequency of three times a month.

**Fourteenth count**:

**Nature of the offense**: Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 19-20, 14 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense**: The above mentioned Defendant, in the Area, during April 2002 or thereabouts, attempted with others to cause the intentional death of others, as follows:

1.  At the above mentioned time, the Defendant along with Al Aqsa Martyrs Brigades operatives, Kamal Hatib, Mahmoud A-Titi, Iad Hamdan, Ahmed Sawalma and Mohamed A-Titi, fired at IDF forces when they entered the Balata Camp.

2.  The Defendant and his above mentioned colleagues, who anticipated the entry of IDF forces into the camp, placed many explosive devices at the entrance to the camp. When IDF forces entered, the Defendant and his fellow cell members detonated the explosive devices against the military forces and fired at them using weapons.

3.  The Defendant and his fellow cell members acted as set forth for eight days.

4.  After the army departed from the camp. The Defendant and his fellow squad members started to prepare a large number of explosive devices, to use them against the military forces if they reentered the camp.

**Fifteenth count**: (Detailed Incident 4685/02, Petach Tikva Station)

**Nature of the offense**: Causing intentional death, an offense under Sections 51(A) and 7(C) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Sections 2 and 14 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

[Stamp] P 5: 228

Prosecution Case 444/02 Amended

21

**Details of the offense**: The above mentioned Defendant, in and outside of the Area, On May 27, 2002, with others, caused the intentional death of another person, as follows:

1.  The above mentioned Defendant, at about the time set forth above, was contacted by Jihad Ibrahim A-Titi (hereinafter – **Jihad**) and asked him to prepare him to carry out a suicide attack in Petach Tikva. Jihad told the Defendant that he had worked at the shopping mall in Petach Tikva, and was very familiar with the site.

2.  The Defendant told Abu Ramush and Nihad Sabah that Jihad wanted to carry out a suicide attack in revenge for the death of Mahmoud A-Titi.

[Stamp] P 5: 228 [continued]

Prosecution Case 444/02 Amended

3. The day before the execution of the attack, with Nihad Sabah, the Defendant brought Jihad to his home in the Balata camp, where they filmed him that a video camera while he was holding an M-16 type rifle.

4. After the Defendant finished filming Jihad, he asked Wadah Ali Amin Bazra (hereinafter – **Wadah**) to drive him and Jihad to Rafidia. When they arrived at the site, the Defendant called [unidentified abbreviation] and informed him that he had arrived at the café.

   Wadah called Nihad Subah and Diaa Altakrouri and checked with them whether they had transferred an explosive belt to Raed Alashkar (hereinafter – **Raed**).

   About five minutes later, Raed arrived, carrying a black package, which contained an explosive belt for carrying out the attack. Raed transferred the package to the Defendant. The Defendant transferred the package to Wadah, and asked Raed to join the taxi in which Jihad was traveling. The Defendant asked Jihad [sic] to drive behind the taxi in which Jihad was traveling.

5. Wadah drove after the taxi in which Jihad was traveling, and when they reached the town Azoun Alatma, at about 1:30 p.m., Wadah transferred the package to Jihad and Raed. Wadah called the Defendant and updated him that he had transferred the package as set forth. Thereafter, Wadah returned to Nablus.

6. After Jihad arrived with Raed in Kfar Kassem and boarded the taxi, Raed called the Defendant and informed him that Jihad had boarded the taxi en route to carrying out the attack.

7. At about 6:30 p.m., the above mentioned Jihad arrived at the Em Hamoshavot Shopping Mall in Petach Tikva, as mentioned, near the place at which he had worked previously, while wearing an explosive belt. Jihad approached a crowded place near a patisserie at 1 Rishon le Zion Street and detonated the explosive belt that he was wearing, with the intent of causing the death of other persons.

8. As a result of the execution of the attack, **the late Ruth Peled** died.

[Stamp] P 5: 229

**Sixteenth count**: **(Detailed Incident 4685/02, Petach Tikva Station)**

**Nature of the offense**: Causing intentional death, an offense under Sections 51(A) and 7(C) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Sections 2 and 14 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense**: The above mentioned Defendant, in and outside of the Area, on May 27, 2002, with others, caused the intentional death of another person;

In other words, as a result of the suicide attack described in the previous account of the indictment that was carried out by Jihad, the **late infant Sinai Keinan** died.

[Stamp] P 5: 229 [continued]

Prosecution Case 444/02 Amended

24

**Seventeenth count**: **(Detailed Incident 4685/02, Petach Tikva Station)**

**Nature of the offense**: Attempting to cause intentional death, an offense under Sections 51(A) and 7(C) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Sections 19-20, 2 and 14 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense**: The above mentioned Defendant, in and outside of the Area, on May 27, 2002, attempted with others to cause the intentional death of others;

In other words, in the circumstances described in the previous count of the indictment, the Defendant attempted to cause the death of others. As a result of the execution of the attack by Jihad as set forth above, dozens of civilians were injured to varying degrees of severity.

**Eighteenth count**:

**Nature of the offense**: Conspiring to cause intentional death, an offense pursuant to Section 22 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968 and Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970.

**Details of the offense:** The above mentioned Defendant, in the Area, at the time set forth above, met Abu Ramush, who told him that he was planning to carry out a suicide attack in the Israeli settlement Shavei Shomron, for which purpose he was planning to send "Muhannad Abu Zir" to carry out the attack.

The Defendant expressed his consent to the plan of Abu Ramush.

The Defendant provided Abu Ramush three Magazines for a Kalashnikov type rifle, in order for him to use them in the commission of the attack.

**Nineteenth count**:

**Nature of the offense**: Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 19-20, 14 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense**: The above mentioned Defendant, in the Area, on several occasions, attempted with others to cause the intentional death of others, as follows:

[Stamp] P 5: 230

Prosecution Case 444/02 Amended

25

1.  In early 2001 or thereabouts, the Defendant departed with his fellow cell members, Basel Albizra, Mahdi Abu Gazala, Saed Jawabra, Kamal Yusef Shihab, armed with M-16 type rifles, and the Defendant carried a Kalashnikov type rifle, and together they fired at a military jeep that was near Tzara Junction. The Defendant fired approximately 16 rounds at the military jeep, and his colleagues fired the rifles that they were carrying.

    After the gunfire, the Defendant and his fellow cell members fled to the Beit Alma Camp.

[Stamp] P 5: 230 [continued]

Prosecution Case 444/02 Amended

2.  After a few days, from that which has been stated above, the Defendant departed, **on several occasions**, along with his fellow cell members, towards a military point located near Har Grizim Junction, armed with rifles, and the Defendant was armed with an M-16 type rifle. The Defendant fired at the military point along with his colleagues.

3.  After early 2002, the Defendant, who was armed with a Kalashnikov type rifle, fired with Mohamed Alqassam, Kamal Shahib and Mueid Jamil at a military point located between Tel and Burin.

**Twentieth count:**

**Nature of the offense:** Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 19-20, 14 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in the Area, on several occasions, attempted with others to cause the intentional death of others, as follows:

1.  In early 2001 or thereabouts, the Defendant, armed with a Kalashnikov type rifle, with Saed Jawabra and Kamal Yusef Shihab, who were armed with M-16 type rifles, laid two explosive devices, then connected a battery and 300 meter long wires to them. On that day, in the evening, a military jeep passed on the road leading to the settlement Bracha, and the above mentioned Kamal detonated the two charges, as a result of which the two explosive devices exploded.

    Thereafter, the Defendant and his colleagues fled to Nablus.

2.  About a week later, the Defendant and his fellow cell members, who were armed with firearms, laid an explosive device weighing 50 kg, at Iba Junction. The Defendant and his colleagues concealed the explosive devices in weeds. The Defendant and his colleagues connected 200 meter long wires to the explosive device.

    When a military jeep and a tank passed by the site, Kamal detonated the explosive device, after the tank stopped.

3.  During October 2001 or thereabouts, the Defendant, with his fellow cell members, Ahmed Sawalma, Kamal Alhatib, Mohamed Qassam, Iad Hamdan, laid two explosive devices on the bypass road overlooking the "Ein Almaa" area in Zawata.

[Stamp] P 5: 231

Prosecution Case 444/02 Amended

When they noticed a military jeep and a tank passing by, the Defendant and his colleagues detonated the explosive devices.

4.   During October 2001 or thereabouts, the Defendant and his fellow cell members laid an explosive on the bypass road leading to Asira Alashmalia. When IDF soldiers noticed the explosive device, they shot at them, and 20 minutes later, the Defendant activated the explosive device, which exploded as a result.

[Stamp] P 5: 231 [continued]

Prosecution Case 444/02 Amended

After the detonation of the explosive device, the Defendant and his fellow squad members fled to the Balata Camp.

**Twenty first count:**

**Nature of the offense:** Conspiring to cause intentional death, an offense pursuant to Section 22 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968 and Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970.

**Details of the offense:** The above mentioned Defendant, in the Area, on several occasions, conspired with others to cause the intentional death of another person, as follows:

1. During the period after March 2002 or thereabouts, the Defendant asked Ali Zahir Asad Alhalu (hereinafter – **Ali**) to send to Mohamed Burhan Abdu Abdullah (hereinafter – **Mohamed Burhan**) and Murad Sami Ahmed Ghanem (hereafter – **Murad**) and asked them to find a person who was prepared to carry out a suicide attack in the Israeli settlement Kedumim. Ali approached Mohamed Burhan and Murad and informed them of the plan of the Defendant, they agreed to his request and said that they would try to find a person who was prepared to carry out the attack.

   Mohamed Burhan carried out surveillance of the above mentioned settlement and informed the Defendant that there were no weak points in the above mentioned settlement, and it would be possible to bring in a suicide terrorist to a point only 100 meters away from the settlement.

   The Defendant told Mohamed Burhan that this distance was unsuitable and as a result the attack did not go ahead.

2. In 2002 or thereabouts, the above mentioned Defendant, planned with Mahmoud A-Titi to carry out an attack in the Hawara Camp. Mahmoud A-Titi told the Defendant that there were two people: A. Ibrahim Abu Zour; B. Mohamed Titi, who were prepared to carry out the suicide attack.

   The planning was for one of the attackers to drive a white jeep that looked like a Red Cross vehicle, and for this vehicle to be used as a car bomb. Then the attacker driving the jeep would reach the Hawara checkpoint, he would detonate the vehicle at the checkpoint.

[Stamp] P 5: 232

Prosecution Case 444/02 Amended

After the detonation of the vehicle, two cells of terrorists armed with Kalashnikov rifles and hand grenades would penetrate the camp from two different points: 1. from the direction of Awarta; 2. from the direction of Rujeib.

The 'm and Abu Ramush conducted surveillance of the sector of the camp. However, this attack was not executed.

_____[Signature]_____
**Naji Amar, Lieutenant**
**Military Prosecutor**

[Stamp] P 5: 232 [continued]

Prosecution Case 444/02 Amended

30

**List of witnesses for the prosecution**:

Detailed Incident 4968/02:

1. 911305 First Sergeant Jamil Shakour (taker of the confession of the Defendant dated June 5, 2002).

2. 927384  First Sergeant Jamil Hadad (taker of the confession of the Defendant on June 10, 2002 and June 11, 2002).

3. 100049 Master Sergeant Ataf Awida (taker of the confession of the Defendant on July 9, 2002 and July 11, 2002).

4. 928308 First Sergeant Hadi Halabi (taker of the confession of the Defendant dated August 20, 2002).

5. 93972 Master Sergeant Fuad Maadi (performer of identity parade for witnesses: Murad Ghanem, Ali Alhalu and Abdullah Mohamed).

6. 905631719 Murad Sami Ahmed Ghanem (detained in Prosecution Case 773/02). *Megiddo*

7. 911758365 Ali Zahir Asad Alhalu (detained in Prosecution Case 775/02). *Megiddo*

8. 907129670 Mohamed Burhan Abdu Abdullah (detained in Prosecution Case 774/02). *Megiddo*

9. 907569024 Wadah Ali Amin Bazra (detained in Prosecution Case 906/02). *Sharon*

10. 979469954 Mohamed Sami Ibrahim Abdullah (detained). *Hadarim*

11. 902845643 Mohamed Abed Rahman Salam Maslah (detained).

12. 994466860 Ahmed Taleb Barghouti (detained, Prosecution Case 444/02 Beit-El).

13. 81099095 Murad Nazmi-Razek Ajlouni (detained).

14. 907898134 Mazen Mahmoud Omar Alkadi (detained).

15. 900358664 Nasser Mahmoud Aweis (detailed).

[Stamp] P 5: 233

Prosecution Case 444/02 Amended

31

16. Remand hearing transcripts dated: June 17, 2002, July 10, 2002 and August 12, 2002.

## Detailed Incident 502/02 Zion

17. 942276 Chief Inspector Dror Asraf (submitter of memorandum, seizure and marking report).

18. Sergeant Major Yigal Daniel (submitter of seizure and marking report).

19. Cadet Zvika Reisner([submitter of memorandum, seizure and marking report + photographs).

20. 1043413 Sergeant First Class Zion Tabadi (submitter of action report – finding of magazine coupler).

21. 47720 Sergeant Major Asher Levi (submitter of seizure and marking report).

22. 303647598 Benny Azriel, (eyewitness – pursued the terrorist)

23. 739037 Amad Anidat (eyewitness)

24. 1042043 Shai Cohen (eyewitness).

25. 33121070 Noam Gabai (eyewitness)

26. 1049188 Chanan Benaim (eyewitness – pursued the terrorist)

27. 309130540 Genadi (Guy) Melik, (eyewitness)

28. 761775 Alon Halfon (eyewitness)

29. 996140 Avi Ben-Ami (eyewitness)

30. 33401019 Chaim Salah (eyewitness)

31. 309086171 Boris Abtisian (eyewitness)

32. 310101647 Yekutiel-Israel Alouche (eyewitness)

33. 6246911 Moshe Maman (eyewitness)

34. 51270353 Tova Yitzhaki (eyewitness)

[Stamp] P 5: 233 [continued]

Prosecution Case 444/02 Amended

32

35. 4330150 Mazal Yitzhaki (eyewitness)

36. 640712770 Yaron Avrahami (eyewitness)

37. 55611230 Pinchas Bentura (eyewitness)

38. 39381249 Kfir Kedem (eyewitness)

39. 307750984 Yaakov Sandlar, (identification of the body of the late Ora (Svetlana) Sandlar).

40. Dafna Wilner, M.D., License No. 29234, Hadassah Ein Kerem Hospital, Jerusalem.
(submitter of death notice of the late Ora (Svetlana) Sandlar).

41. Elena Vaslov, M.D., Hadassah Ein Kerem Hospital, Jerusalem. (submitter of death notice of
the late Sarah Hamburger).

### Detailed Incident Case 5858/02

42. 55594097 Avshalom Friedman.

43. Efi Yamin, Yarkon Identification, Israel Police.

44. Chief Inspector Mirod Daniel, Yarkon Investigations Branch Officer.

45. Shimon Rachamim, Yarkon Special Investigations Team.

46. 25714502 Yaakov Abed (eyewitness)

47. 321940751 Igor Kotbitzky (eyewitness).

48. 304615230 Adi Moriz, (security guard at the restaurant)

49. 49170392 Yoni Chayal (eyewitness)

50. 27293034 Irit Rachamim (eyewitness)

51. 25377029 Limor Forma (eyewitness)

52. 22280 Shlomo David (injured in the attack)

53. 9802115980 Sharon Yifrach (eyewitness)

[Stamp] P 5: 234

Prosecution Case 444/02 Amended

54. 029022902 Yiftach Kariti (eyewitness)

55. 28804599 Eliyahu Tzedaka(eyewitness)

56. 309998540 Ivana Richtman (injured in the attack)

57. 54188644 Yaakov Horovitz (eyewitness)

58. 24315632 Ravit Avishag-Yosefi, (eyewitness)

59. 69828374 William Hazan (eyewitness)

60. 61247623 Ala Mahmoud (eyewitness)

61. 35704568 Bassam Abu Laham (eyewitness)

62. 49824865 Baha Abu Laham (eyewitness)

63. 61247623 Al Mahamid (eyewitness)

64. 33876954 Yomi Kontanta (eyewitness)

65. 56230584 Avinoam Yosef (eyewitness)

66. 311660328 Igor Postinensky (eyewitness)

67. 2234597 Daniel Kradi (eyewitness)

68. 5452229 Meir Habi (identification of the body of the late Yosef Habi)

69. 31877665 Noam Asafi (injured in the attack)

70. 29416740 Yossi Azuz (injured in the attack)

[Stamp] P 5: 234 [continued]

Prosecution Case 444/02 Amended

34

71. 43401140 Michael Gruber, Identity No. (injured in the attack).

72. Prof. Yehuda Hiss, the National Institution of Forensic Medicine, Tel Aviv.

73. Hospital records – institutional record.

**Detailed Incident 4685/02 Petach Tikva Station**

74.  58634114 Nava Seri (details in the prosecution).

75. 59760520 Yigal Cohen (details in the prosecution).

76. 23880032 Avi Porat (details in the prosecution).

77. 58330671 Pollack Mandy (details in the prosecution).

78. 52079019 Levi David (details in the prosecution).

79. 945931 Shoshani Arnon (bomb disposal laboratory – exhibit cover form)

80. Laboratory expert opinion (will be forwarded later).

81. Prof. Y. Hiss, the Institution of Forensic Medicine (expert opinion – unidentified body).

82. Prof. Y. Hiss, the Institution of Forensic Medicine (expert opinion – the late Ruth Peled).

83. Prof. Y. Hiss, the Institution of Forensic Medicine (expert opinion – the late Sinai Keinan).

84. 1024769 Sergeant First Class Reznik Evgeny (action report).

85. 7122948 Corporal Yesha Hati (action report).

86. 310905773 Pasiev Yuri (memorandum – severely injured).

87. 1082544 Corporal Kfir Hadasi (action report).

88. 57795221 Yigal Shachar (details in prosecution).

89. 27826866 Habibi Hanna (details in prosecution).

90. 43259043 Violet Maslosh (details in prosecution).

[Stamp] P 5: 235

Prosecution Case 444/02 Amended

91. 41862426 Yael Avraham (details in prosecution).

92. Betzalel Maslosh (details in prosecution).

93. 28932382 Menachem Maslosh (details in prosecution).

94. 53392171 Skolnik Natanel (details in prosecution).

95. 5922307 Vered Barel (details in prosecution).

96. 39170196 Baadani Niv (details in prosecution).

97. Oshri Mizrachi (details in prosecution).

98. 22313597 Iva Rachamim (details in prosecution).

99. 28984615 Boaz Lavi (details in prosecution).

100. 38717227 Yaron Magen (details in prosecution).

101. 52079019 David Levi (details in prosecution).

102. 58330671 Mandy Pollack (details in prosecution).

103. 59753822 Shuli Ran Moshe (details in prosecution).

104. 27406081 Lior Keinan (details in prosecution).

105. 23730691 Orly Hacham (details in prosecution).

106. 904631 First Sergeant Shlomi Kurzbert (scene visit report – seizure of exhibits + composer of photograph report).

[Stamp] P 5: 235 [continued]

Prosecution Case 444/02 Amended

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

MARK I. SOKOLOW, *et al.*,

Plaintiffs,

vs.

THE PALESTINE LIBERATION
ORGANIZATION, *et al.*,

Defendants.

No. 04 Civ. 00397 (GBD) (RLE)

## DECLARATION OF RINA NE'EMAN

Rina Ne'eman hereby certifies as follows:

1.    The attached translation from Hebrew to English is an accurate representation of the document received by Rina Ne'eman Hebrew Language Services, to the best of my knowledge and belief. The document is designated as P 5:218-35.

2.    I am a professional translator with a B.A. in International Relations from the Hebrew University of Jerusalem (Israel) and 30 years of translation experience. I am fluent in Hebrew and English, and I am qualified to translate accurately from Hebrew to English.

3.    To the best of my knowledge and belief, the accompanying text is a true, full and accurate translation of the Hebrew-language document designated bearing the bates number P 5:218-35.

Dated: March _6_, 2014

_____
Rina Ne'eman

ss.: New Jersey

On the _6_ day of March, 2014 before me, the undersigned, personally appeared Rina Ne'eman, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is signed to this Declaration and acknowledged to me that he executed the same in his capacity, and that by his signature on this Declaration, the individual executed the Declaration.

Sworn to me this
_6_ day of March, 2014

_Leonor Troyano_
Notary Public

LEONOR TROYANO
ID # 2385380
NOTARY PUBLIC OF NEW JERSEY
Commission Expires 7/2014

צבא        הגנה        לישראל

בית המשפט הצבאי                   תיק בימ"ש 6446/02
ב ש ו מ ר ו ן                      תיק תביעה 756/02
בפני        הרכב           תיק פ.א. 4968/02 פתח-תקווה
                            4258/02 ירקון
                                502/02 ציון
                           4685/02 תחנת פ"ת

במשפט שבין :

התובע הצבאי

- המאשים -

- נ ג ד -



אבראהים עדנאן נג'יב עבד-אלחי

(עצור מיום 3/6/02)

ת.ז. 411124423 יליד 20/8/79 מכפר בורין

- הנאשם -

<u>כתב אישום (מתוקן)</u>

הנאשם הנ"ל מואשם בזאת, בביצוע העבירות הבאות :

<u>פרט ראשון :</u>

<u>מהות העבירה :</u> חברות בהתאחדות בלתי מותרת, עבירה לפי תקנה 84(1)(א) ו- 85(1)(א) לתקנות
ההגנה (שעת חירום), 1945.

<u>פרטי העבירה :</u> הנאשם הנ"ל, באזור, במהלך חודש דצמבר 00' או בסמוך לכך, היה חבר בחוליה
צבאית השייכת לארגון "כתאאב שוהדאא אלאקצא", שהינה התאחדות בלתי
מותרת;

דהיינו, הנאשם הנ"ל, במועד הנ"ל, החליט להצטרף לחוליה צבאית על מנת לפעול
במסגרתה בפעילות צבאית נגד מטרות ישראליות.

לשם כך, פנה הנאשם אל חברו מחמד אחמד מוצטפא אלקאסם (להלן- מחמד),
והודיע לו על רצונו לפעול בפעילות צבאית. מחמד הנ"ל אמר לנאשם כי ישנה
חוליה צבאית השייכת ל"כתאאב שוהדאא אלאקצא", שמבצעת פיגועי ירי והנחת
מטעני חבלה נגד מטרות ישראליות. מחמד הציע לנאשם להצטרף לחוליה זו,
והנאשם הסכים לכך.

C:\WINDOWS\שולחן עבודה\תיקיה חדשה\7560.doc

2

חברי חוליה זו, שמכונה חוליית "העיר העתיקה", מלבד הנאשם היו: מהדי אבו גזילה, באסל אלבזורה, סאאד ג'ועאברה, כמאל שהאב, ומואייד ג'מיל.

הנאשם, כעבור שלושה חודשים מיום הצטרפותו לחוליה הצבאית הנ"ל, החליט בעקבות סכסוך אישי שהיה לו עם אחד מחברי החוליה, להפסיק חברותו בחוליה זו.

לאחר שהנאשם עזב את החוליה הנ"ל, נפגש במהלך חודש מרץ 01', בפעיל הצבאי ראיד אלכרמי. הנאשם ביקש מראיד אלכרמי כי יפעל עימו בפעילות צבאית.

ראיד אלכרמי הסכים לבקשתו של הנאשם, והכיר לו פעיל הצבאי של "כתאיב שוהדאא אלאקצא", נאצר עוויס.

כאשר הפעילים הצבאיים מוחמד אלקאסם, כמאל יוסף שהאב, סאאד ג'ועאברה ידעו כי הנאשם עובד עם נאצר עוויס ביקשו ממנו כי יצטרפו לחוליה שאליה משתייך הנאשם. נאצר עוויס הסכים לצירופם לחוליה.

חברותו של הנאשם בחוליה הצבאית נמשכה עד יום מעצרו.

<u>פרט שני:</u>

<u>מהות העבירה:</u> ניסיון גרימת מוות בכוונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות ביטחון (נוסח) (מס' 378), תשל"ל- 1970; וסעיפים 20-19, 14 לצו בדבר כללי האחריות לעבירה (נוסח) (מס' 225), תשכ"ח- 1968.

<u>פרטי העבירה:</u> הנאשם הנ"ל, באזור, במהלך חודש אוקטובר 01' או בסמוך לכך, ניסה ביחד עם אחר לגרום למותו של אחר בכוונה;

דהיינו, הנאשם הנ"ל, במועד הנ"ל בסמוך לשעות הערב, יצא ביחד עם חברי חוליתו מחמד אלקאסם, כמאל יוסף שהאב וסאאד ג'ועאברה, לכיוון מחסום דיר-שרף על מנת לבצע פיגוע חבלני.

נאצר עוויס אישר לנאשם לבצע את הפיגוע, ומסר לו רובה 16 M עם שתי מחסניות.

הנאשם וחבריו הנ"ל נסעו למקום המחסום באמצעות רכב מסוג פולקסווגן גנובה.

כשהגיעו בסמוך למקום המחסום במרחק 15 מטר מהמחסום, הפנו את כיוון הרכב לכיוון הגדר, הנאשם ומחמד אלקאסם פתחו את הדלתות האחוריות וירו באמצעות הרובים לעבר שלושת החיילים שעמדו במחסום, כאשר הרכב בו ישב היה במגמת נסיעה לכיוון שכם.

הנאשם ירה את כל הכדורים שהיו במחסנית לכיוון החיילים, ומחמד אלקאסם גם הוא ירה את כל הכדורים שבמחסנית לעבר החיילים.

החיילים ירה בהתחלה לא הגיבו בירי; אולם, לאחר שהרכב בו נסע הנאשם, היה במרחק 300 מטר, שמעו הנאשם וחבריו קולות ירי.

3

**פרט שלישי:**

**מהות העבירה:** ניסיון גרימת מוות בכוונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות ביטחון (יו"ש) (מס' 378), תש"ל- 1970; וסעיפים 20-19, 14 לצו בדבר כללי האחריות לעבירה (יו"ש) (מס' 225), תשכ"ח - 1968.

**פרטי העבירה:** הנאשם הנ"ל, באזור, בסוף שנת 01' או בסמוך לכך, היה שותף לניסיון גרימת מותו של אדם אחר בכוונה;

דהיינו, הנאשם הנ"ל, במועד הנ"ל, נתבקש ע"י מחמוד א-טיטי, פעיל צבאי של ארגון "שוהדאא אלאקצא", להשתתף בביצוע פיגוע ירי לעבר כלי רכב ישראלי.

מחמוד טיטי אמר לנאשם כי ביצע מעקב אחרי תנועת כלי רכב מסוג סובארו שנהוג ע"י קצין ישראלי.

הנאשם הסכים להצעתו של מחמוד טיטי.

בהתאם, ארב הנאשם ביחד עם מחמוד טיטי, כמאל שהאב, נאצר אלח'טיב בסמוך צומת רוג'יב, לכלי הרכב שנסע מאיזור אלון מורה לכיוון חווארה.

הנאשם היה חמוש ברובה מסוג 16 – M, נאצר אלח'טיב היה חמוש בקלצ'ניקוב, ומחמוד טיטי היה חמוש במקלע, וכמאל שהאב היה חמוש ברובה מסוג 16 – M.

כשהתקרב הרכב למרחק כ- 200 מטר מהמקום שבו ארבו הנאשם וחבריו החוליה, ירה הנאשם לעברו כ- 2 כדורים, נאצר אלח'טיב ירה כ- 11 כדורים, ומחמוד טיטי ירה לעברו כ- 10 כדורים.

**פרט רביעי:**

**מהות העבירה:** ניסיון גרימת מוות בכוונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות ביטחון (יו"ש) (מס' 378), תש"ל- 1970; וסעיפים 20-19, 14 לצו בדבר כללי האחריות לעבירה (יו"ש) (מס' 225), תשכ"ח- 1968.

**פרטי העבירה:** הנאשם הנ"ל, באזור, במהלך חודש ינואר 02' או בסמוך לכך, היה שותף לניסיון גרימת מותו של אדם אחר בכוונה;

דהיינו, במועד הנ"ל, ביצע כמאל שהאב ומחמד אלקאסם תצפית על קרוואן שנמצא ביישוב הישראלי יצהר. כמאל שהאב ומחמד אלקאסם למדו מהתצפית כי בכל יום מגיע לקרוואן בן-אדם.

לאחר ביצוע התצפית קשר הנאשם ביחד עם כמאל ח'טיב, כמאל שהאב, איאד חמדאן, מוחמד אלקאסם, קשר לבצע ירי לעבר הקרוואן.

הנאשם תיכנן את תוכנית ביצוע הפיגוע, ולפי התוכנית שימש כאחראי על החוליה במהלך ביצוע הפיגוע.

הנאשם יצא ביחד עם החבורה הנ"ל, כשהם חמושים ברובים מסוג 16 – M, רובה אנגלי, קלצ'ניקוב, לכיוון איזור היישוב יצהר.

4

כשהגיעו למקום, ארבו על גבעה שנמצאת במרחק כ- 300 מטר מהמקום, ושמשקיפה על האיזור.

כעבור שעה הגיע לקרוואן כלי רכב מסוג טנדר פתוח, ושממנו ירדו שלושה אנשים.

כאשר התקרבו האנשים לקרוואן, ירו הנאשם וחבריו לעברם באמצעות כלי הירייה שברשותם. הנאשם ירה כ- 10 כדורים.

לאחר הירי, נמלטו הנאשם וחבריו מהמקום.

<u>פרט חמישי</u>:

<u>מהות העבירה</u>: גרימת מוות בכוונה, עבירה לפי סעיפים 51(א) לצו בדבר הוראות ביטחון (יו"ש) (מס' 378), תשי"ל- 1970, וסעיף 14 לצו בדבר כללי האחריות לעבירה (יו"ש) (מס' 225), תשכ"ח- 1968.

<u>פרטי העבירה</u>: הנאשם הנ"ל, באיזור, בסוף חודש פברואר 02', ביחד עם אחרים גרם למותו של אדם אחד בכוונה, דהיינו:

1. הנאשם הנ"ל, במועד הנ"ל, כאשר השתתף בהלווייתו של מחמד אחמד מוצטפא אלקאסם נכח בביה"ח רפידיה בשכם, ובמהלך שהותו שם סיפר לו מוחמד בורהאן כי בביה"ח נמצא זאהר תוראבי ז"יל (להלן – המנוח). הנאשם סיפר למחמוד א-טיטי אודות כך.

2. לאחר שמחמוד א-טיטי שמע על כך, חטף את המנוח מביה"ח. ולאחר-מכן, מחמוד א-טיטי סיפר לנאשם כי חקר את המנוח אודות חשדות לשיתוף פעולה לטובת מדינת ישראל, והמנוח הודה בכך, ולכן החליט לרצוח את המנוח.

3. הנאשם ביקש ממחמוד א-טיטי כי יפגש עימו בשעות הערב על מנת שיקח אותם למקום מתאים שבו ירצח המנוח. הנאשם נפגש שוב עם מחמוד א-טיטי, מואייד ג'מאל, יאסר אבו בכר, והיה עימם המנוח. הנאשם וחבריו נסעו, באמצעות כלי רכב מסוג פולקסווגן, לשכונת המהנדסים שנמצאת בסמוך לג'נייד.

4. במקום הנ"ל הוציאו את המנוח מהרכב. הנאשם ביקש מהמנוח כי יתפלל לפני שירצחו אותו, אולם המנוח סירב. הנאשם שאל אותו אם יהיה מוכן לרצות את הגורם משירותו הביטחוני הכללי שאחראי עליו, אולם המנוח סירב לכך.

5. ואז ירו מחמוד א-טיטי ומואייד ג'מאל על המנוח כ- 15 כדורים. בכוונה לגרום למותו. לאחר-מכן, התקרב הנאשם אל המנוח, וירה כדור אחד בראשו וזאת כדי לוודא את מותו.

6. כתוצאה מכך, נגרם מותו של המנוח.

P 5: 221

5

7. הנאשם וחבריו הניחו על גופתו של המנוח את "ההדאתוו", וכרוז של ארגון "שוהדאא אלאקצא".

<u>פרט שישי</u> : (פ.א. 502/02 ציון)

<u>מהות העבירה</u> : גרימת מוות בכוונה, עבירה לפי סעיפים 51(א), ו- 7(א) לצו בדבר הוראות ביטחון (נוייש) (מסי 378), תשי"ל- 1970; וסעיפים 14, ו- 2 לצו בדבר כללי האחריות לעבירה (נוייש) (מסי 225), תשכ"ח- 1968.

<u>פרטי העבירה</u> : הנאשם הנ"ל, באיזור ומחוץ לאיזור, ביום 22/01/02 או בסמוך לכך, היה שותף לגרימת מותם של אחרים בכוונה, דהיינו :

1. במהלך עבודתו במשטרה הימית הפלסטינית, הכיר הנאשם את סעיד אברהים רמדאן (להלן – סעיד). במהלך אחת הפגישות סיפר סעיד לנאשם כי ברצונו לבצע פיגוע התאבדות, והנאשם ביקש מסעיד כי יתן הזדמנות לבדוק את העניין.

2. הנאשם פנה לסאצר עוויס והודיע לו אודות כוונות סעיד ; והלה הפנה אותו למחמוד א-טיטי. הנאשם נפגש עם מחמוד א-טיטי, והודיע לו אודות כוונות סעיד. מחמוד טיטי ביקש מהנאשם כי יבדוק את כנות כוונות סעיד.

3. הנאשם, במטרה לבחון את סעיד, הלבישו אותו בחגורת נפץ "דמה" ונתן לו מספר טלפון דמיוני, שלח אותו מאיזור זוואתא לאיזור טול-כרם, וביקש ממנו כי יתקשר אליו בעת הגעתו לאיזור טול-כרם. סעיד לבש את חגורת הנפץ והחל בדרכו לטול-כרם. הנאשם, שמצא שסעיד איתן בדעתו, ביקש ממנו לחזור, ובאמתלה כי מועד הפיגוע השתנה בשל מחסומי צבא בדרך. סעיד כעס על הנאשם, והלה ביקש ממנו כי יהיה מוכן לבצע את הפיגוע בכל עת.

4. בהתאם, פנה הנאשם למחמוד א-טיטי וסיפר לו כי סעיד מוכן לביצוע הפיגוע, והלה ביקש מהנאשם כי יפגישם עם סעיד.

5. במהלך אותה תקופה, פנה אחמד טאלב מוצטפא ברגותי (להלן – אחמד) אל נאצר עוויס וביקש ממנו כי ישלח אליו אדם המוכן לבצע פיגוע התאבדות. אחמד מסר לנאצר עוויס כי עצמו ידאג להכניס את המחבל המתאבד לירושלים על מנת שיבצע שם פיגוע התאבדות.

6. הנאשם הביא את סעיד לביתו של מחמוד א-טיטי, ובביתו של מחמוד נכח אדם בשם יאסר אבו בקר ואחר בשם מאגד אלמצרי. מחמוד ומאגד צילמו את סעיד, ויאסר כתב את צוואתו של סעיד. סעיד הצטלם כשהוא מחזיק עליו רובה מסוג 16 – M, ספר קוראן, ומקריא את צוואתו.

7. לאחר-מכן, לקח הנאשם את סעיד למשפחתו, שם נפרד מהם בלי להודיע להם על כוונותיו להתאבד.

8. לאחר-מכן ביקש הנאשם מסעיד כי ביום שלמחרת יצא לרמאללה. וביום

6

שלמחרת בשעות הבוקר, הבחין הנאשם כי סעיד יוצא לרמאללה.

9. בתאריך 22/1/02, נפגש סעיד הנ"יל עם אחמד הנ"יל ברמאללה והודיע לו כי נשלח ע"יי נאצר עוויס לצורך ביצוע פיגוע התאבדות.

10. אחמד הנ"יל התקשר אל מחמד ע"יא רחמאן סאלם מצלח (מכונה "אבו סטאח") וביקש ממנו להגיע אליו. מחמד מצלח נפגש עם אחמד ועם סעיד ברמאללה. אחמד ומחמד מצלח לקחו את סעיד למספרה על מנת שישתפר לפני ביצוע פיגוע ההתאבדות המתוכנן.

11. לאחר-מכן, התקשרו אחמד הנ"יל ומחמד מצלח אל פראס צאדק מחמד עיאנם (מכונה "חוטאווי") וביקשו ממנו להסיע מחבל מתאבד, בהתכוונם לסעיד, מרמאללה לירושלים על מנת שהמחבל המתאבד יבצע שם פיגוע התאבדות ויגרום למותם של אזרחים ישראליים רבים ככל האפשר.

12. פראס עיאנם הגיע לרמאללה ביחד עם מחמד סאמי אברהים עבדאללה (להלן – מחמד עבדאללה), וזאת לאחר שהאחרון הסכים להשתתף בהסעת המחבל המתאבד מרמאללה לירושלים. פראס עיאנם הגיע לפגישה ברכב איסוזו טנדר עם לוחיות רישוי ישראליות.

13. לפי הוראתו של אחמד הנ"יל, נסעו פראס עיאנם ומחמד עבדאללה ברכב האיסוזו הנ"יל מרמאללה לירושלים על מנת למצוא דרך שאין בה מחסומי משטרה וצה"ל וזאת במטרה להסיע יותר מאוחר באותה הדרך את המחבל המתאבד שיבצע את הפיגוע המתוכנן בירושלים.

14. מחמד עבדאללה ופראס עיאנם נסעו מרמאללה דרך "ראפאתי" והגיעו לאיזור התעשייה עטרות; שם חזרו השניים לכביש הראשי ירושלים-רמאללה ונסעו שמאלה עד לצומת המוביל למחנה רמה, שם הם פנו ימינה ונסעו לצומת אדם. בצומת אדם השניים פנו ימינה ונסעו עד צומת חיזמא, שם הם פנו ימינה ונכנסו לענתא. דרך ענתא, הם הגיעו לצומת הגבעה הצרפתית, שם השניים פנו ימינה וחזרו לרמאללה. מחמד עבדאללה ופראס עיאנם ראו כי בדרך שבה נסעו ניתן להבריח את המחבל המתאבד לירושלים מבלי להיעצר במחסומי משטרה וצה"ל.

15. מחמד מצלח, על פי הוראתו של אחמד, הביא רובה M – 16 ו- 3 מחסניות לרסי"ר הנ"יל מלאות בכדורים, כאשר שתי מחסניות היו מחוברות בצולבת.

16. באותו היום, נפגשו אחמד, מחמד מצלח וסעיד עם מחמד עבדאללה ופראס עיאנם באיזור המלון "סיטי אין" באלבירה. אחמד הכיר למחמד עבדאללה ולפראס עיאנם את סעיד הנ"יל.

17. אחמד הסביר למחמד עבדאללה ולפראס עיאנם כי סעיד הוא המחבל המתאבד, אשר אותו הם צריכים להוביל לירושלים על מנת שיבצע שם פיגוע התאבדות כשיירה לעבר אזרחים ישראליים במטרה לגרום לגרום למותם של

7

אורחים רבים ככל האפשר.

18. מחמד עבדאללה ופראס עיאנם הסתירו את רוסי"ר ה־ 16 – M והמחסניות
הנ"ל ברכב האיסוזו הנ"ל.

19. מחמד עבדאללה ופראס עיאנם הסיעו את סעיד לירושלים בדרך, אשר אותה
בדקו מוקדם יותר באותו היום כפי שתואר לעיל.

20. בירושלים, נסעו מחמד עבדאללה ופראס עיאנם לרחוב שיח' ג'יראח. שם הם
הוציאו את רוסי"ר ה־ 16 ־ M והמחסניות שהיו מוסתרים בתוך הרכב
ומסרו אותם לידי סעיד, והמשיכו בנסיעה לכיוון רח' הנביאים. בהגיעם
לצומת הרחובות שטראוס-הנביאים, השניים עצרו את רכב האיסוזו.

21. מחמד עבדאללה ופראס עיאנם אמרו לסעיד לרדת ברגל לרחוב יפו ולהתחיל
לירות במקום שיראה בו הרבה אנשים.

22. לאחר שסעיד ירד מהרכב, במקום הנ"ל, עם רוסי"ר 16 – M והתחמושת,
נסעו מחמד עבדאללה ופראס עיאנם מהמקום ברכב האיסוזו, דרך שכונת
"מוסררה" לכביש מספר 1, ומשם נסעו דרך הכביש הראשי לרמאללה.
במקביל, ולאחר מספר דקות הגיע סעיד לרחוב יפו, כשהוא חמוש ברוסר 16
M– והתחמושת.

23. בסביבות השעה 16:20, כשהוא עומד מול בית מסי 47 ברחוב יפו או בסמוך
לכך, טען סעיד את רוסי"ר 16 – M שבו החזיק, צעק "אללה הוא אכבר"'
ופתח בירי אוטומטי לכל עבר, לעבר האנשים שהיו ברחוב יפו, בתחנת
האוטובוס הנמצאת במקום, בתוך אוטובוס "אגד" קו 27 שהיה באותה עת
בתחנה הנ"ל וכן לעבר האנשים שהיו בתוך התנועות הסמוכות בכוונה לגרום
למותם של אזרחים, רבים ככל הניתן. תוך כדי כך שהוא ממשיך לירות,
נמלט סעיד מהמקום לעבר החניון שנמצא ברחוב הרב קוק. שם החליף
סעיד מחסניות והמשיך לירות לעבר האזרחים בכוונה לגרום למותם. סעיד
ירה ברוסי"ר 16 – M, שבו החזיק מעל ל־ 38 כדורים. סעיד המשיך לירות
לעבר האזרחים עד שנהרג ע"י האזרחים והשוטרים שהגיעו למקום.

24. במעשיו המתוארים לעיל, גרם הנאשם בכוונה למותם של אורה (סבטלנה)
סנדלר ז"ל, אשר נפטרה כתוצאה מפגיעות הקליעים שנורו ע"י סעיד הנ"ל.

<u>פרט שביעי:</u> (פ"א 502/02 ציון)

<u>מהות העבירה:</u> גרימת מוות בכוונה, עבירה לפי סעיפים 51(א), ו־7(ג) לצו בדבר הוראות ביטחון
(יו"ש) (מסי 378), תש"י־ 1970; וסעיפים 14, ו־ 2 לצו בדבר כללי האחריות
לעבירה (יו"ש) (מסי 225), תשכ"ח- 1968.

<u>פרטי העבירה:</u> חטאשם הנ"ל, באיזור ומחוץ לאיזור, בתאריך 22/1/02 או בסמוך לכך, היה שותף
לגרימת מותם של אחרים בכוונה;

8

דהיינו, במעשיו של הנאשם המתוארים בפרט האישום הקודם נפטרה שרה
**המבורגר ז"ל**, אשר נפטרה כתוצאה מפגיעות הקלעים שנורו ע"י סעיד הנ"ל.

**פרט שמיני:** (פ"א 502/02 ציון)

**מהות העבירה:** ניסיון גרימת מוות בכוונה, עבירה לפי סעיפים 51(א), ו-(ג)-71 לצו בדבר הוראות
בטחון (יו"ש) (מס' 378), תש"ל- 1970 ;. וסעיפים 20-19, 14, ו- 2 לצו בדבר כללי
האחריות לעבירה (יו"ש) (מס' 225), תשכ"ח- 1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור ומחוץ לאיזור, בתאריך 22/1/02 או בסמוך לכך, היה שותף
לניסיון גרימת מותם של אחרים בכוונה.

דהיינו, כתוצאה מהפיגוע המתואר בפרט האישום הקודם, ניסה הנאשם לגרום
למותם של אחרים. כתוצאה מהפיגוע נפצעו מעל 45 אזרחים שהיו במקום,
ברמות פציעה קלות וקשות.

**פרט תשיעי: (פ"א 4258/02 ירקון)**

**מהות העבירה:** גרימת מוות בכוונה, עבירה לפי סעיפים 51(א), ו-71-(ג) לצו בדבר הוראות בטחון
(יו"ש) (מס' 378), תש"ל- 1970 ; וסעיפים 14, ו- 2 לצו בדבר כללי האחריות
לעבירה (יו"ש) (מס' 225), תשכ"ח- 1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור ומחוץ לאיזור, בתאריך 5/3/02 או בסמוך לכך, היה שותף
לגרימת מותם של אחרים בכוונה, דהיינו:

1. במועד הנ"ל פנה אל הנאשם אבראהים חסונה והודיע לו על רצונו לבצע
פיגוע התאבדות. הנאשם במטרה לבחון את כנות כוונותיו של אבראהים
חסונה שלח אותו עם חגורת נפץ "דמה", לקח אותו לאיזור זוותא, מסר לו
מספר טלפון, ואמר לו לכשיגיע לאיזור טול-כרם שיתקשר ויודיע לו.

2. לאחר שוידא הנאשם את כנות כוונות אברהים, ביקש לחזור ואמר לו כי
מועד הפיגוע נדחה. הנאשם לקח את אבראהים חסונה לביתו של מחמוד
א-טיטי, שם צילמו אותו במצלמת וידאו. אבראהים חסונה הקריא צוואה
שבה אמר כי הפיגוע הוא נקמה על מותם של מחמד אלקאסם וראאד
אלכרמי.

3. באותה תקופה יצר אחמד טאלב מוצטפא ברגותי (להלן – אחמד) קשר
טלפוני עם נאצר מחמוד עוויס, ובמהלך השיחה הודיע נאצר עוויס לאחמד
הנ"ל כי הוא שולח אליו מחבל מתאבד נוסף על מנת שאחמד ישלח אותו אל
תוך מדינת ישראל לצורך ביצוע פיגוע ירי.

4. הנאשם לקח את אבראהים חסונה למקום שבו נהג ללון באיזור אלמחיפיה.
ביום שלמחרת, בתאריך 4/3/02 שלח אותו לרמאללה, מסר לו מספר טלפון,
וביקש ממנו כי יתקשר אליו לכשיגיע לרמאללה. אבראהים חסונה עשה כן,
כשהגיע לרמאללה.

9

5. אבראהים חסונה יצר קשר עם אחמד הנ"ל ואמר לו כי הגיע לרמאללה עפ"יי הוראתו של נאצר עוויס וכי הוא המחבל המתאבד לצורך ביצוע פיגוע חירי המתוכנן.

6. אבראהים חסונה עלה לרכב, אשר בו נהג מאזן אלקאדי ולידו ישב מוראד עגילוני, והשלושה נסעו לכיוון תל-אביב על מנת לבצע שם את פיגוע ההתאבדות המתוכנן.

7. באותו הלילה, לאחר שמאזן אלקאדי, מוראד עגילוני ואבראהים חסונה הגיעו לתל-אביב, בסמוך לגשר מעריב שבדרך פתח-תקווה, הראה מוראד עגילוני לאבראהים חסונה מקום הומה אדם והנחה אותו לבצע שם את הפיגוע המתוכנן.

8. אבראהים חסונה הוציא רוס"ר 16 – M, מחסניות ורימוני יד, שהיו מוסתרים בדלת של הרכב.

9. בסמוך לשעה 15:2, בתאריך 5/3/02 או במועד הסמוך לכך, ירד אבראהים חסונה מן הרכב, כשהוא חמוש ברוס"ר 16 - M, רימוני יד, וסכין קומנדו, בסמוך למסעדת "סי-פוד מרקטי" (להלן – המסעדה) על מנת שיבצע את הפיגוע המתוכנן. במקביל, נסעו מוראד עגילוני ומאזן אלקאדי ברכב מהמקום לכיוון ירושלים.

10. אבראהים חסונה התקרב אל המסעדה ופתח באש אוטומטית ברוס"ר 16 – M לעבר יושבי המסעדה ועוברי האורח בדרך פתח-תקווה בכוונה לגרום למותם.

11. לאחר-מכן, השליך אבראהים חסונה את שני רימוני היד לעבר המסעדה בכוונה לגרום למותם של יושבי המסעדה ועוברי אורח, אך רימוני היד לא התפוצצו.

12. לאחר שרוס"ר ה- 16 – M, אשר בו החזיק אבראהים חסונה הפסיק לירות, עקב מעצור, הוציא אבראהים סכין הקומנדו שהחזיק והחל לדקור אזרחים ישראליים שהיו במקום בכוונה לגרום למותם.

13. למקום האמור הגיע השוטר רס"ר סלים ברכאת ז"ל, אשר הסתער לעבר אבראהים חסונה והשתלט עליו. רס"ר סלים ברכאת ז"ל הספיק להודיע למפקדיו על ההשתלטות על המחבל.

14. בשלב זה, דקר אבראהים חסונה באמצעות סכין הקומנדו הנ"ל את רס"ר סלים ברכאת ז"ל בצווארו בכוונה לגרום למותו. כתוצאה מהדקירה, נפטר רס"ר סלים ברכאת ז"ל במקום.

15. במעשיו המתוארים לעיל, הנאשם הנ"ל, גרם בכוונה למותו של רס"ר סלים ברכאת ז"ל.

10

<u>פרט עשירי</u>: (פ״א 4258/02 ירקון)

<u>מהות העבירה</u>: גרימת מוות בכוונה, עבירה לפי סעיפים 51(א), ו-7(ג) לצו בדבר הוראות ביטחון (יו״ש) (מס׳ 378), תש״ל- 1970; וסעיפים 14, ו- 2 לצו בדבר כללי האחריות לעבירה (יו״ש) (מס׳ 225), תשכ״ח- 1968.

<u>פרטי העבירה</u>: הנאשם הנ״ל, באיזור ומחוץ לאיזור, בתאריך 5/3/02 או בסמוך לכך, היה שותף לגרימת מותם של אחרים בכוונה.

דהיינו, במעשיו המתוארים בפרט האישום הקודם של הנאשם, נפטר <u>יוסף הבי</u> <u>ז״ל</u>, אשר נדקר על-ידי אבראהים חסונה בבית החזה ובחלקים נוספים בגופו ונפטר כתוצאה מכך.

<u>פרט אחד-עשר</u>: (פ״א 4258/02 ירקון)

<u>מהות העבירה</u>: גרימת מוות בכוונה, עבירה לפי סעיפים 51(א), ו-7(ג) לצו בדבר הוראות ביטחון (יו״ש) (מס׳ 378), תש״ל- 1970; וסעיפים 14, ו- 2 לצו בדבר כללי האחריות לעבירה (יו״ש) (מס׳ 225), תשכ״ח- 1968.

<u>פרטי העבירה</u>: הנאשם הנ״ל, באיזור ומחוץ לאיזור, בתאריך 5/3/02 או בסמוך לכך, היה שותף לגרימת מותם של אחרים בכוונה.

דהיינו, במעשיו המתוארים בפרט האישום הקודם של הנאשם, נפטר <u>אליהו דהן</u> <u>ז״ל</u>, אשר נדקר על-ידי אבראהים חסונה בבית החזה ובחלקים נוספים בגופו ונפטר כתוצאה מכך.

<u>פרט שנים-עשר</u>: (פ״א 4258/02 ירקון)

<u>מהות העבירה</u>: ניסיון גרימת מוות בכוונה, עבירה לפי סעיפים 51(א), ו- 7(ג) לצו בדבר הוראות ביטחון (יו״ש) (מס׳ 378), תש״ל- 1970; וסעיפים 20-19, 14, ו- 2 לצו בדבר כללי האחריות לעבירה (יו״ש) (מס׳ 225), תשכ״ח- 1968.

<u>פרטי העבירה</u>: הנאשם הנ״ל, באיזור ומחוץ לאיזור, בתאריך 5/3/02 או בסמוך לכך, היה שותף לניסיון גרימת מותם של אחרים בכוונה.

דהיינו, הנאשם הנ״ל, במעשיו המתוארים בפרט האישום הקודם, ניסה לגרום למותם של אזרחים רבים ככל האפשר.

כתוצאה מהירויות שנורו ע״י אבראהים חסונה נפצעו עשרות אזרחים ישראליים בדרגות פציעה קלות וקשות.

<u>פרט שלושה-עשר</u>:

<u>מהות העבירה</u>: החזקת אמל״ח, עבירה לפי סעיף 53(א)(1) לצו בדבר הוראות ביטחון (יו״ש) (מס׳ 378), תש״ל- 1970.

<u>פרטי העבירה</u>: הנאשם הנ״ל, באזור, במהלך חודש מרץ 02׳ או בסמוך לכך, החזיק ברשותו כלי יריה, תחמושת, רימון יד, כלי או חפץ או דבר המותכנן או המסוגל לגרום מוות

P 5: 227

: ן

או חבלה חמורה, מבלי שהיתה ברשותו תעודת היתר שהוענקה ע"י מפקד צבאי
או מטעמו ;

דהיינו, הנאשם הנ"ל, במועד הנ"ל, קיבל מהאחראי על הביטחון הימי בשכב
עצבא בלידי, 6 מחסניות לרובה כלצ'ניקוב, 30 נפצים למוקשי חבלה, 2 ד"ג אבק
שריפה, מטול רימונים.

הנאשם קיבל את האמור לעיל, בתדירות של שלוש פעמים בחודש

<u>פרט ארבעה-עשר :</u>

<u>מהות העבירה :</u> ניסיון גרימת מוות בכוונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות ביטחון
(יו"ש) (מס' 378), תש"ל - 1970 , וסעיפים 20,19-14 , לצו בדבר כללי האחריות
לעבירה (יו"ש) (מס' 225), תשכ"ח - 1968 ;

<u>פרטי העבירה :</u> הנאשם הנ"ל, באיזור, במהלך חודש אפריל 2003 או בסמוך לכך, ניסה ביחד עם
אחרים לגרום למותם של אחרים בכוונה, דהיינו :

1. במועד הנ"ל, הנאשם ביחד עם פעילי כתאב "שוהדאא אלאקצא", כאמל
חיטיב, מחמוד א-טיטי, איאד תמדאן, אחמד סוואלמה, ומחמד א-טיטי ירה
לעבר כוחות צה"ל בעת כניסתם למחנה בלאטה

2. הנאשם וחבריו הנ"ל, שציפו לכניסת כוחות צה"ל למחנה, הניחו מטעני
חבלה רבים בכניסה למחנה. בעת כניסת כוחות צה"ל, הנאשם וחברי
חולייתו הפעילו את המטענים נגד כוחות הצבא, וירו לעברם באמצעות כלי
נשק.

3. הנאשם וחברי חולייתו, פעלו כאמור במשך שעונה ימים.

4. אחרי יציאת הצבא מהמחנה החל הנאשם וחברי חולייתו הכין מספר רב
של מטעני חבלה, כדי להשתמש בהם נגד כוחות הצבא במידה ויכנסו שניה
למחנה.

<u>פרט חמישה-עשר : (פ.א. 4685/02 תחנת פ"ת)</u>

<u>מהות העבירה :</u> גרימת מוות בכוונה, עבירה לפי סעיפים 51(א), ו- 2(ג) לצו בדבר הוראה ביטחון
(יו"ש) (מס' 378), תש"ל - 1970 ; וסעיפים 14 , ו- 2 לצו בדבר כללי האחריות
לעבירה (יו"ש) (מס' 225), תשכ"ח - 1968 .

<u>פרטי העבירה :</u> הנאשם הנ"ל, באזור ומחוץ לאיזור, בתאריך 5.6.02 ביחד עם אחרים גרם
למותו של אדם אחר בכוונה, דהיינו :

1. הנאשם הנ"ל, בסמוך למועד הנ"ל, פנה אליו גיהאד אברגותים א-טיטי וחד-
~ גיהאד), וביקש ממנו כי יכין אותו לביצוע פיגוע התאבדות בג'ת. גיהאד
סיפר לנאשם כי הוא עבד בקניון בפ"ת, ומכיר את רכיבוב ח'טינ

2. הנאשם סיפר לאבו רמוש וניהאד צבאר כי יהיה דרוש ציוד לבצע את
התאבדות כנקמה על מותי של מחמוד א-טיטי

12

3. יום לפני ביצוע הפיגוע, הביא הנאשם, ביחד עם ג'יהאד צבאח את ג'יהאד לביתו במחנה בלאטה, שם ציממו אותו במעולמת וידאו כשהוא מחזיק ברובה מסוג 16 – M.

4. אחרי שהנאשם סיים לצלם את ג'יהאד, ביקש מו4דאח עלי אמין בזרה (ההלן – ואדאח) כי יסיע הוא וג'יהאד לרפידיה, וראאח הסביב ג'חסיע אותם לבית קפה אלמדיאפה ברפידיה. כשהגיעו למקום, התקשר הנאשם לבלנ"י והודיע לו כי הגיעו לבית הקפה.

ואדאח התקשר לג'יהאד צובאח ודיאגא אלתכרווי ובירר עימם אם העבירו לראאח אלאשקר (להלן - ראאח) חגורת נפץ

כעבור כחמש דקות הגיע הגיע ראאח נושא עליו חבילה בצבע שחור, ושהכילה חגורת נפץ לביצוע הפיגוע. ראאח העביר לנאשם את החבילה. הנאשם העביר את החבילה לודאח, וביקש מראאח כי יצטרף אל המונית שנוסע בה ג'יהאד הנאשם ביקש מג'יהאד כי יסע אחרי המונית שנוסע בה ג'יהאד.

5. ודאח נסע אחרי המונית שנסע בה ג'יהאד, וכשהגיעו לכ'ישוב עזון אלעתמה, בסמוך לשעה 13:30 העביר ודאח את החבילה לג'יהאד וראאח. ודאח התקשר לנאשם ועידכן אותו כי העביר את החבילה כאמור. לאחר-מכן חזר ודאח אל שכם.

6. לאחר שהגיע ג'יהאד עם ראאח לכפר קאסם ועלה על מונית, התקשר ראאח אל הנאשם ומסר לו כי ג'יהאד עלה למונית בדרכו לביצוע הפיגוע.

7. סמוך לשעה 18:30 הגיע ג'יהאד הנ"ל לקניון אם-המושבות בפ"ת. כאמור בסמוך למקום שבו הוא עבד בעבר. כשעליו חגורת הנפץ. ג'יהאד התקרב אל מקום הומה אדם בסמוך לקונדיטוריה ברח' ראשל"צ 1, ופוצץ את חגורת הנפץ שהיתה עליו, בכוונה לגרום למותם של בני אדם אחרים.

8. כתוצאה מביצוע הפיגוע נפטרה רות פלד ז"ל.

<u>פרט שישה-עשר</u> : (פ.א. 4685/02 תחנת פ"ת)

<u>מהות העבירה</u> : גרימת מוות בכוונה, עבירה לפי סעיפים 51(א), 7(ג) לצו בדבר הוראות ביטחוו (ויו"ש) (מס' 378), תשי"ל- 1970; וסעיפים 2, ו- 14 לצו בדבר כללי האחריות לעבירה (ויו"ש) (מס' 225), תשכ"ח- 1968.

<u>פרטי העבירה</u> : הנאשם הנ"ל, באזור ומחוץ לאיזור, בתאריך 27/5/02, ביחד עם אחרים גרב למותו של אדם אחר בכוונה ;

דהיינו, כתוצאה מפיגוע ההתאבדות המתואר בפרט האישום ההודם שביצע ע"י ג'יהאד, נפטרה התינוקת סיני קינן ז"ל.

13

**פרט שבעה-עשר:** (פ.א. 4685/02 תחנת פ"ת)

**מהות העבירה:** ניסיון גרימת מוות בכוונה, עבירה לפי סעיפים 51(א), ו- 7(ג) לצו בדבר הוראות ביטחון (יו"ש) (מס' 378), תש"ל- 1970; וסעיפים 19-20, 2, 14 לצו בדבר כללי האחריות לעבירה (יו"ש) (מס' 225), תשכ"ח- 1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור ומחוץ לאיזור, בתאריך 27/5/02, ניסה ביחד עם אחרים לגרום למותם של אחרים בכוונה;

דהיינו, בנסיבות המתוארות בפרט האישום הקודם, ניסה הנאשם לגרום למותם של אחרים. כתוצאה מביצוע הפיגוע ע"י ייהאד הנ"ל, נפצעו עשרות אזרחים בדרגות פציעה חמורות וקלות.

**פרט שמונה עשר:**

**מהות העבירה:** קשירת קשר לגרימת מוות בכוונה, עבירה לפי סעיף 22 לצו בדבר כללי האחריות לעבירה (יו"ש) (מס' 225), תשכ"ח- 1968; וסעיף 51(א) לצו בדבר הוראות ביטחון (יו"ש) (מס' 378), תש"ל- 1970.

**פרטי העבירה:** הנאשם הנ"ל, באזור, במהלך חודש מאי 02' או בסמוך לכך, קשר קשר עם אדם אחר לגרום למותם של אחר בכוונה;

דהיינו, הנאשם הנ"ל, במועד הנ"ל, נפגש עם אבו רמוש שאמר לו כי הינו מתכנן לבצע פיגוע התאבדות בישוב הישראלי שבי שומרון, ולשם כך מתכנן לשלוח את "מוהנד אבו זירי" לבצע את הפיגוע.

הנאשם הביע את הסכמתו לתוכניתו של אבו רמוש.

הנאשם מסר לאבו רמוש שלוש מחסניות לרובה מסוג קלצ'ניקוב, על מנת שישמשו בביצוע הפיגוע.

**פרט תשעה-עשר:**

**מהות העבירה:** ניסיון גרימת מוות בכוונה, עבירה לפי סעיפים 51(א) לצו בדבר הוראות ביטחון (יו"ש) (מס' 378), תש"ל- 1970; וסעיפים 19-20, 14 לצו בדבר כללי האחריות לעבירה (יו"ש) (מס' 225), תשכ"ח- 1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, במספר רב הזדמנויות ניסה ביחד עם אחרים לגרום למותם של אחרים בכוונה, דהיינו:

1.  בתחילת שנת 01' או בסמוך לכך, יצא הנאשם עם חברי חולייתו. באסל אלבזיורה, מחדי אבו גזאלה, סאאד ג'והברה, כמאל יוסף שהאב. כשהיו חמושים ברובים מסוג 16 - M, והנאשם החזיק ברשותו רובה מסוג קלצ'ניקוב, וביחד ירו לעבר ג'יפ צבאי שהיה בסמוך לצומת צרה. הנאשם ירה כ- 16 כדורים לעבר הג'יפ הצבאי, וחבריו ירו ברובים שהיו ברשותם.

    אחרי הירי נמלטו הנאשם וחבריו חוליתו למחנה בית-אלמא.

14

2. כעבור מספר ימים, מהאמור לעיל, יצא הנאשם, בנוסף הזדמנויות, יחד עם חברי חולייתו לכיוון נקודה צבאית שנמצאת בסמוך להר גריזים, כשהיו חמושים ברובים, ותנאשם היה חמוש ברובה מסוג 16 – M. הנאשם ירה יחד עם חבריו לעבר הנקודה הצבאית.

3. לאחר תחילת שנת 02', ירה הנאשם שהיה חמוש ברובה מסוג קלצ'ניקוב, ביחד עם מחמד אלקאסם, כמאל שהאב, וומאיד גימיל לעבר נקודה צבאית שנמצאת בין תלבוריו.

**פרט עשרים:**

**מהות העבירה:** ניסיון גרימת מוות בכוונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות ביטחון (וו״ש) (מס׳ 378), תש״ל- 1970; וסעיפים 20-19, 14 לצו בדבר כללי האחריות לעבירה (וו״ש) (מס׳ 225), תשכ״ח- 1968 ;

**פרטי העבירה:** הנאשם הנ״ל, באזור, במספר רב של הזדמנויות, ניסה ביחד עם אחרים לגרום למותם של אחרים, דהיינו :

1. בתחילת שנת 01' או בסמוך לכך, הנאשם הנ״ל, שהיה חמוש ברובה מסוג קלצ'ניקוב, ביחד עם סאאד גיוואברה וכמאל יוסף שהאב שהיו חמושים ברובים מסוג 16 – M, הניחו שני מטעני חבלה שאליהם חיברו סוללה וחוטים באורך 300 מטרים. באותו יום בשעות הערב עבר ג'יפ צבאי על הכביש המוביל לישוב ברכה, וכמאל הנ״ל הפעיל את שני המטענים, וכתוצאה מכך התפוצצו שני מטעני החבלה.

לאחר-מכן נמלטו הנאשם וחבריו לשכם.

2. כעבור שבוע מהאמור לעיל, הניח הנאשם ביחד עם חברי חולייתו שהיו חמושים בכלי יריה, מטען חבלה במשקל 50 ק״ג, בצומת איבא. הנאשם וחבריו הסתירו את המטענים בשביה. אל מטען החבלה חיברו הנאשם וחבריו חוטים באורך 200 מטר.

משעובר במקום ג'יפ צבאי וטנק, ופוצץ כמאל את מטען החבלה, לאחר שעבר הטנק.

3. במהלך חודש אוקטובר 01' או בסמוך לכך, הניח הנאשם ביחד עם חברי חולייתו, אחמד סואלמה. כמאל אלחיטיב, מחמד קאסם, איאד חמודאן, שני מטעני חבלה על הכביש העוקף שמשקיף על האיזור ״עין אלמאצ׳״ בזוואתא. כשהבחינו בג'יפ צבאי וטנק עובר במקום, פוצצו הנאשם וחבריו את המטענים.

4. במהלך חודש אוקטובר 01' או בסמוך לכך, הניחו הנאשם יחד עם חברי חולייתו מטען חבלה על הכביש העוקף שמוביל לעצירה אלשצ׳ואליה כשהבחינו חיילי צה״ל בטיבון החבלה ירו לעברם. וכעבור 13 דקות הפעיל הנאשם את מטען החבלה. שהתפוצץ כתוצאה מכך

15

לאחר פיצוץ מטען החבלה, נמלטו הנאשם וחברי חוליותו למחנה בלאטה.

**פרט עשרים ואחד:**

**מהות העבירה:** קשירת קשר לגרימת מוות בכוונה, עבירה לפי סעיף 22 לצו בדבר כללי האחריות לעבירה (יו"ש) (מס' 225) (מס' 225), תשכ"ח- 1968 ; וסעיף 51(א) לצו בדבר הוראות ביטחון (יו"ש) (מס' 378), תש"יל- 1970.

**פרטי העבירה:** הנאשם הנ"ל, באזור, במספר הזדמנויות, קשר קשר עם אחרים לגרום למותו של אחר בכוונה, דהיינו :

1. במהלך התקופה שלאחר חודש מרץ 02' או בסמוך לכך, ביקש הנאשם מעלי ואהר אסעד אלתאל (להלן – עלי) כי יפנה למוחמד בורהאן עבדו עבאללה (להלן – **מוחמד בורהאן**) ומוראד סאמי אחמד ג'אנם (להלן – **מוראד**) ויבקש מהם כי יאתרו אדם המוכן לבצע פיגוע התאבדות ביישוב הישראלי קדומים. עלי פנה למוחמד בורהאן ומוראד והודיע להם אודות תוכניתו של הנאשם, הם הסכימו לבקשתו, ואמרו לו כי יוסו לאתר אדם המוכן לבצע את הפיגוע.

   מוחמד בורהאן ביצע מספר ביצע תצפית על היישוב הנ"ל, והודיע לנאשם כי אין נקודות תורפה ביישוב הנ"ל, ותהיה אפשרות להביא את האדם המתאבד רק למרחק של 100 מטר מהיישוב.

   הנאשם, אמר למוחמד בורהאן כי המרחק הנ"ל אינו מתאים, ומשכך הפיגוע לא יצא אל הפועל.

2. במהלך שנת 02' או בסמוך לכך, הנאשם הנ"ל, תיכנן עם מחמוד א-טיטי לבצע פיגוע במחנה חווארה. מחמוד א-טיטי אמר לנאשם כי ישנם שני אנשים : א. אברהים אבו זור   ב. מוחמד טיטי   שמוכנים לבצע את ההתאבדות.

   התכונית היה שאחד המפגעים יסע בג'יפ בצבע לבן שנראה כמו רכב של הצלב האדום, והרכב הזה ישמש כמכונית תופת. כאשר המפגע הנוהג בג'יפ יגיע למחסום חווארה, יפוצץ את הרכב במחסום. לאחר פיצוץ הרכב, שתי חוליות של מחבלים כשהם חמושים ברובי קלצ'ניקוב ורימוני יד יחדרו למחנה משתי נקודות שונות : 1. מכיוון עוארתא 2. מכיוון רוג'יב.

   הנאשם ואבו רמוש ביצעו ביצעו תצפיות על גזרת המחנה. אולם, פיגוע זה לא יצא אל הפועל.

נאג'י עאמר, סגן
תובע/צבאי

P 5: 232

16

רשימת עדי התביעה:

מ"ת 4968/02:

1. 911305 רס"מ גימאל שקור (גובה הודאת הנאשם מיום 5/6/02).

2. 927384 רס"מ מטאנס חדאד (גובה הודאת הנאשם מימים 10/6/02 ו- 11/6/02).

3. 100049 רס"ר עאטף עווידה (גובה הודאת הנאשם מיום 9/7/02 ומיום 11/7/02).

4. 928305 רס"מ האדי חלבי (גובה הודאת הנאשם מיום 20/8/02).

5. 93972 רס"ר פואד מעדי (ערך מסדר זיהוי לעדים: מוראד ג'אנם, עלי אלחלו, ועבדאללה מחמוד).

6. 905631719 מוראד סאמי אחמד ג'אנם (עצור בת.ת. 773/02). יצ'ת

7. 911758365 עלי זאהר אסעד אלחלו (עצור בת.ת. 775/02). N א ל'

8. 907129670 מחמוד בורהאן עבדו עבדאללה (עצור בת.ת. 774/02). N ל

9. 907569024 ודאח עלי אמין בזרה (עצור בת.ת. 906/02). ל-ר-י

10. 979469954 מוחמד סאמי אברהים עבדאללה (עצור). — הגרי פ

11. 902845643 מחמוד עיא רחמאן סאלם מצלח (עצור).

12. 994466860 אחמד טאלב ברגותי (עצור ת.ת. 444/02 בית-אל).

13. 81099095 מוראד נומי –רוק עילוני (עצור).

14. 907898134 מאזן מחמוד עומר אלקאדי (עצור).

15. 900358664 נאצר מחמוד עוויס (עצור).

16. פרוטוקולי הארכת מעצר מימים: 17/6/02 ו- 10/7/02 ו- 12/8/02.

פ.א. 502/02 ציון

17. 942276 פקד דרור אסרף (מגיש דו"ח זכ"ד, תפיסה וסימון).

18. רס"ב יגאל דניאל (מגיש דו"ח תפיסה וסימון).

19. צוער צביקה רייזנר (מגיש דו"ח זכ"ד, תפיסה וסימון + תצלומים).

20. 1043413 רס"ל ציון טבדי (מגיש דו"ח פעולה – מציאת צולבת).

21. 47720 רס"ב אשר לוי (מגיש דו"ח תפיס וסימון).

22. 303647598 בני עזריאל (עד ראיה – רדף אחרי המחבל).

23. 739037 עמאד עניידת (עד ראיה).

24. 1042043 שי כהן (עד ראיה).

25. 33121070 נועם גבאי (עד ראיה).

26. 1049188 חנן דעים (עד ראיה).

27. 309130540 גאזי (ג'אא) מליק (עד ראיה).

28. 761775 אלון חלפון (עד ראיה).

29. 996140 אבי בן-עמי (עד ראיה).

30. 33401019 חיים צאלח (עד ראיה).

31. 309086171 בוריס אבטיסיאן (עד ראיה).

32. 310101647 יקותיאל-ישראל עלוש (עד ראיה).

33. 6246911 משה ממן (עד ראיה).

34. 51270353 טובה יצחקי (עד ראיה).

17

35. ‏4330150 מזל יצחקי (עד ראיה).
36. ‏640712770 ירון אברהמי (עד ראיה).
37. ‏55611230 פנחס בנטורה (עד ראיה).
38. ‏39381249 כפיר קדם (עד ראיה).
39. ‏307750984 יעקב סנדלר (זיהוי גופתה של אורה (סבטלנה) סנדלר ז"ל).
40. ד"ר דפנה וילנה, מ.ר. ‏29234, ביה"ח הדסה עין-כרם, ירושלים (מגישה הודעת פטירה של אורה (סבטלנה) סנדלר ז"ל).
41. ד"ר ילנה וסלוב, ביה"ח הדסה עין-כרם, ירושלים (מגישה הודעת פטירה של שרה המבורגר ז"ל).

## תיק פ.א. ‏5258/02

42. ‏55594097 אבשלום פרידמן.
43. אפי ימין, זיהוי ירקון, משטרת ישראל.
44. פקד מירוד דניאל, קצין אח"ק ירקון.
45. שמעון רחמים, צח"מ ירקון.
46. ‏25714502 יעקב עבד (עד ראיה).
47. ‏321940751 איגור קוטבינצקי (עד ראיה).
48. ‏304615230 עדי מורויו (מאבטח במסעדה).
49. ‏49170392 יוני חייל (עד ראיה).
50. ‏27293034 אירית רחמים (עד ראיה).
51. ‏25377029 לימור פורמה (עד ראיה).
52. ‏22280 שלמה דוד (נפצע בפיגוע).
53. ‏9802115980 שרון יפרח (עד ראיה).
54. ‏29022902 יפתח קריתי (עד ראיה).
55. ‏28804599 אליהו צדקה (עד ראיה).
56. ‏309998540 איוונה ריכטמן (נפצעה בפיגוע).
57. ‏54188644 יעקב הורוביץ (עד ראיה).
58. ‏24315632 רוית אבישג-יוספי (עדת ראיה).
59. ‏69828374 ויליאם חון (עד ראיה).
60. ‏61247623 עלא מחמוד (עד ראיה).
61. ‏35704568 באסם אבו לחאם (עד ראיה).
62. ‏49824865 בהאא אבו לחאם (עד ראיה).
63. ‏61247623 על מחאמיד (עד ראיה).
64. ‏33876954 יומי קונטנטה (עד ראיה).
65. ‏56230584 אבמועם יוסף (עד ראיה).
66. ‏311660328 איגור פוסטיננסקי (עד ראיה).
67. ‏2234597 דניאל קראאדי (עד ראיה).
68. ‏5452229 מאיר הבי (זיהוי גופתו של יוסף הבי ז"ל).
69. ‏31877665 נעם אספי (נפצע בפיגוע).
70. ‏29416740 יוסי אזוז (נפצע בפיגוע).

18

71. ‏43401140 מיכאל גרובר (נפצע בפיגוע).
72. ‏פרופ' יהודה היס, המכון הלאומי לרפואה משפטית, תל-אביב.
73. ‏רשומות בתי חולים – רשומה מוסדית.

**פ.א. ‏4685/02 תחנת פ"ת**

74. ‏58634114 נאוה סרי (פרטים בתביעה).
75. ‏59760520 יגאל כהן (פרטים בתביעה).
76. ‏23880032 אבי פורת (פרטים בתביעה).
77. ‏58330671 פולק מנדי (פרטים בתביעה).
78. ‏52079019 לוי דוד (פרטים בתביעה).
79. ‏945931 שושני ארנון (מעבדת חבלה – טופס לוואי מוצגים).
80. ‏חווי"ד מעבדה (תוער בהמשך).
81. ‏פרופ' י. חיס המכון לרפואה משפטית (חווי"ד מומחה –גופת אלמוני).
82. ‏פרופ' י. חיס המכון לרפואה משפטית (חווי"ד מומחה – רות פלד ז"ל).
83. ‏פרופ' י. חיס המכון לרפואה משפטית (חווי"ד מומחה –סיני קינן ז"ל).
84. ‏1024769 רס"ל רוניק יבגני (דו"ח פעולה).
85. ‏7122948 רש"ט ישע האטו (דו"ח פעולה).
86. ‏310905773 פאשיינג יורי (מזכר- פצוע קשה).
87. ‏1082544 רש"ט כפיר הדסי (דו"ח פעולה).
88. ‏57795221 יגאל שחר (פרטים בתביעה).
89. ‏27826866 חביבי חנה (פרטים בתביעה).
90. ‏43259043 ויזלט מסלוש (פרטים בתביעה).
91. ‏41862426 יעל אברהם (פרטים בתביעה).
92. ‏בצלאל מסלוש (פרטים בתביעה).
93. ‏28932382 מנחם מסלוש (פרטים בתביעה).
94. ‏53392171 סקולניק נתנאל (פרטים בתביעה).
95. ‏5922307 ורד בראל (פרטים בתביעה).
96. ‏39170196 בעדני ניב (פרטים בתביעה).
97. ‏אושרי מזרחי (פרטים בתביעה).
98. ‏22313597 איוה רחמים (פרטים בתביעה).
99. ‏28984615 בועז לביא (פרטים בתביעה).
100. ‏38717227 ירון מגן (פרטים בתביעה).
101. ‏52079019 דוד לוי (פרטים בתביעה).
102. ‏58330671 מנדי פולק (פרטים בתביעה).
103. ‏59753822 שולי רן משה (פרטים בתביעה).
104. ‏27406081 ליאור קינן (פרטים בתביעה).
105. ‏23730691 אורלי חכם (פרטים בתביעה).
106. ‏904631 רס"מ שלומי קורצברט (דו"ח ביקור בזירה – תפיסת מוצגים+ עורך דו"ח תצלומים).