
PLAINTIFF'S
EXHIBIT
889

Date: July 29, 2009                                    File No.: 3052/06

### Military Court of Judea

**Before the Honorable President of the Court: Lieutenant Colonel Zvi Lekach**
       **Judge: Lieutenant Colonel Ronen Atzmon**
       **Judge: Lieutenant Colonel Tal Band**

**The Military Prosecution**
(represented by First Lieutenant Andrei Varshchegin)

— v. —

**The Defendant: Fuad Hejazi Shubaki, Identity No. 410026173 / Prison Service**
(represented by Counsel, Adv. Avigdor Feldman)

---

### Verdict

### The Honorable President of the Court: Lieutenant Colonel Zvi Lekach:

The Defendant before us is charged with four [indictment] counts which concern the transfer of monies for the purpose of the purchase of materiel, in accordance with that which shall be set forth below.

**First count – Trading in war materiel**: The Defendant is accused of having traded in war materiel, starting in the year 2000 and up to the end of January 2002. It is argued that the Defendant took part in a meeting, at which Yasser Arafat instructed him and the heads of the security organizations to purchase any amount of weapons from any possible place. The Defendant, starting on the date of that meeting, acted together with others toward the purchase of large quantities of materiel. The Defendant, who headed the Palestinian Finance Office, coordinated the requisitions of members of the various organizations, which were transferred to him in the form of paperwork. In order to ascertain that the materiel for which he was paying actually existed, the Defendant required the people who applied to him to bring the weapons to his office, and for that purpose, he maintained a storeroom of materiel in Ramallah and an additional storeroom in the Gaza Strip. After the materiel was transferred to his possession, the Defendant would submit the paperwork to Yasser Arafat for approval, and after he approved it, the Defendant would also sign the requisition and would instruct his staff to transfer the money to the applicant by means of a bank transfer. During the period in question, approximately 1,000 tons of materiel were purchased for $7-10 million. The Defendant arranged for

1

the transfer of the materiel to the Palestinian security organizations, knowing that a considerable part of the staff of those organizations consisted of members of the military arm of the Fatah organization, which was conducting many terrorist attacks at the time.

**Second count – Performance of a service for a prohibited organization**: It is argued that during the period set forth in the first charge of the indictment, the Defendant transferred a monthly salary in the amount of NIS 500 to members of the military squads of the al-Aqsa Martyrs Brigades in the Bethlehem area. At that time, members of the squads in question were conducting many terrorist attacks. In the month of October 2001, the Defendant received a request for the payment of 25,000 dinars from Marwan Barghouti for the purpose of purchasing materiel and materials for the production of explosive charges, and for the purpose of paying salaries to 268 members of the al-Aqsa Martyrs Brigades. The Defendant forwarded this request to Yasser Arafat, who instructed him to pay the money through the Ministry of Finance.

**Third count – Trading in war materiel**: This count sets forth the Defendant's ostensible role in the funding and organization of the arms ship *Karine A*, which was seized on January 3, 2002, carrying large quantities of materiel of various types, including rockets, mortars and machine guns. It is argued that in September 2001 the Defendant met with Fathi Ghazem, who updated him with regard to his contacts with the Iranians, with regard to the financing of the arms ship. Fathi Ghazem informed the Defendant that the Palestinian Authority would have to bear expenses in the amount of $125,000. The Defendant agreed to this, and even agreed to approach Yasser Arafat in order to obtain the financing required. At a later stage, the Defendant forwarded the demand for payment to Yasser Arafat, who signed it. The Defendant transferred Yasser Arafat's instructions by messenger to the office of Harbi Sarsur, who was in charge of fuel for the Palestinian Authority. The ship, carrying the war materiel, anchored in Yemen. The Defendant, who was in Yemen at the time, was informed of the arrival of the ship and received a report on the intention to prepare passports for two of the ship's crew. After the ship had sailed from Yemen to the Suez Canal, it was seized by Israel Defense Forces troops on January 3, 2002, in accordance with that which has been set forth above.

**Fourth count – Contact with a hostile organization outside the Area**: This Count concerns contacts which the Defendant maintained with Iranian entities, with a view to coordinating the military cooperation between Iran and the Palestinian Authority. Among other things, possibilities were discussed for setting up ammunition factories within the borders of the Palestinian Authority, transferring materiel from Lebanon via Hezbollah, and military training for members of the Palestinian Authority in Lebanon and in Iran. In addition, a document summarizing the meeting was drawn up, and was later presented by the Defendant to Yasser Arafat.

Date: July 29, 2009                                                                                    File No.: 3052/06

### The scope of the "Not guilty" plea

It has not been denied that the Defendant was in charge of the financial affairs of the security organizations in the Palestinian Authority, during the period of time relevant to the indictment. However, it has been claimed that he acted with permission and with authority. It has further been claimed that some of the facts that have been set forth in the indictment are not accurate. In addition, it has been claimed that the Defendant's statements, which substantiate the overwhelming majority of the indictment, were taken from him unlawfully.

### Conducting the trial

In the early stages of this case, preliminary arguments were made but were denied in a decision which was handed down on December 4, 2006. After that decision, and following the entry of a "not guilty" plea by the Defendant, the submission of evidence began. The majority of the evidentiary material was filed by consent; that consent, however, referred only to the evidentiary material which did not directly refer to the Defendant. Thus, for example, there was no dispute that the arms ship *Karine A* was seized.

In accordance with that which has been set forth above, the indictment is principally based on the statements of the Defendant. Because the admissibility of those statements was disputed, a preliminary trial was held. The parties agreed that the decision in the preliminary trial would be handed down within the framework of the verdict in the entire case. Within the principal case, we were required to hear only one witness on behalf of the prosecution, Mahmoud Abiyat; all of the rest of the evidentiary material, with the exception of the Defendant's statements, was filed by consent. The Defendant testified for the defense.

The prosecution filed its summation in writing, and the defense, at the end of the process, delivered its summation orally – and, moreover, after a considerable delay of four months.

### The preliminary trial

### General

In accordance with that which has been set forth above, in light of an argument that has been set forth by the defense, to the effect that the Defendant's statements were taken in a manner which was not of his own free will, a preliminary trial was held. In the preliminary trial, and in light of the preliminary arguments which were raised, the three police interrogators who had taken the Defendant's statements were heard, along with three interrogators from the Israel Security Agency who had conducted most of the Defendant's interrogation. Testifying for the defense in

3

the preliminary trial were the Defendant and Mr. Mohamed Hijazi, who was in the same cell with the Defendant during part of the period during which he was interrogated.

## The preliminary arguments

a.   It was argued that the Defendant had been interrogated throughout two months of protracted interrogations, during most of the hours of the day and night, and had been deprived of sleep.

b.   It was argued that the Defendant is a sick man, who requires medication for chronic diseases, and that his medications were not given to him, nor was he provided with an adequate substitute.

c.   It was argued that the Defendant was handcuffed and shackled throughout the interrogation, which caused him severe pain and a feeling of severe humiliation. It was further argued that, at times, his interrogators would leave him alone in a room, cuffed, for four to seven hours, which caused the Defendant to be in a state of profound pain, fear and anxiety.

d.   During the time he spent under interrogation, IDF troops destroyed the Defendant's house, uprooted many citrus trees and olive trees in his fields and destroyed a ton and a half of honey. The knowledge of the destruction caused the Defendant to experience anxiety and fear for his family's fate. The interrogators exploited this and told the Defendant that if he confessed, he would be allowed to go free and to assist his family members.

e.   It was argued that the Defendant had been told that, due to the fact that he was a sick old man and did not have many years to live, his interrogators did not wish to continue interrogating him and keeping him under detention for a long period of time. Accordingly, if he confessed, he would immediately go free. His confessions were issued subject to those promises and as a result of that act of enticement.

f.   It was argued that the Defendant's interrogators made false accusations against him and repeatedly told him that he was lying to them. The interrogators adopted methods of physical and emotional exhaustion. The Defendant, who is an elderly man and well respected in his community, felt humiliated as a result of the young interrogators' behavior toward him, and, in light of his grave physical condition as well, he longed for his death and for the moment that the interrogations would be over.

g.   It was argued that the Defendant signed his confessions in order to please his interrogators and without knowing what was written in the statements, which were taken down in the

4

Hebrew language, which he cannot read. The police interrogators relied on the transcripts that were recorded by the Israel Security Agency, and when he pointed out the inaccuracies and the errors in the transcripts, the police interrogators led him to understand that "chaos" would break out if he repudiated his confessions.

Let us first state that, in light of the testimony given at the preliminary trial by the Defendant himself, who did not bring up a considerable portion of the preliminary arguments, the defense, in its summation, reduced its arguments to the preliminary arguments which concerned the humiliation of the Defendant.

## The evidence at the preliminary trial

### The testimony of policeman David Mizrahi

This witness stated that he is a speaker of Arabic, which he learned at home, in his studies and at work. When he testified before us, he stated that he remembered the Defendant's facial features, but did not remember the details of the interrogation with total accuracy. The witness stated that he customarily first identifies the subject before him and afterwards identifies himself as a policeman. He reads the content of the warning out to him, and after the suspect understands the content thereof and signs it, the testimony is taken in the form of questions and answers. The testimony is taken in Arabic and is written down by him in Hebrew. At the end of each page, he reads it out to the suspect, who signs it. According to that which has been set forth in the statement, he gave the Defendant a cigarette and allowed him to smoke. The witness stated that he had gained the impression that the suspect's condition was "OK" and that he was capable of giving testimony; otherwise, he would have written a memorandum on the matter or would have noted it in the statement, and would have refrained from continuing to collect the testimony. The same applies to exceptional events in the course of the testimony. When he was asked to state examples of special events which he would have written down, had they occurred, he stated that some examples could be that the suspect complained of headaches, that he felt unwell, or that he was not capable of giving the testimony. He stated that, while taking down the statement, he notes events such as giving the suspect a drink, a cigarette and the like.

The witness stated that, in the course of the interrogation which he conducted, the atmosphere was relaxed, and the Defendant did not bring up any problem. When the Defendant asked to smoke, he was given the opportunity to do so, and nothing else exceptional happened. He further stated that, in the course of the interrogation, the Defendant sat opposite him with his legs shackled. The witness stated that he could not possibly have left the Defendant alone in a room for a long period of time, because the room in question is an interrogation room, in which there were other files, including his own personal file, and so he could not possibly have left the room.

5

The witness was asked about the argument to the effect that he had told the Defendant that his house had been destroyed, olive and citrus trees had been uprooted and a ton and a half of honey had been destroyed. He answered that, up to the date of his testimony in Court, he had not even known that the Defendant had citrus trees and honey, and that he (the interrogator), in any event, had said no such thing.

The witness argued that he had never told the Defendant that he had only a few years to live and that, if he confessed, he would immediately be released. He said that this was forbidden, and that he does not use such means.

The witness stated that he had read the transcripts of the Israel Security Agency before taking the testimony and that, on the basis of the transcripts, he had read out the suspicion against him to the Defendant, and that this also constituted a guideline for the testimony which was taken.

The witness denied the argument according to which he had told the Defendant that, if he repudiated his statements to the Israel Security Agency, "chaos" would break out.

The witness was asked whether the Israel Security Agency interrogation and the police interrogation were performed in the same place, and he stated that even though they were performed in the same facility, the testimony was taken in the police interrogators' room. He stated that he did not go into the Israel Security Agency interrogation rooms, and they (the Israel Security Agency) did not go into the police interrogation rooms. He also stated that the police interrogation room looks different from the Israel Security Agency interrogation rooms.

The witness stated that he does not know how to write in Arabic, and therefore, he wrote down the statement in Hebrew, while translating to the Defendant what he had written down; he further stated that he had cautioned the Defendant in Arabic. The witness noted that he did not know how many hours the Defendant had slept before the testimony was taken, nor did he know how many days he had previously been interrogated by the Israel Security Agency and the police. The witness stated that he had before him a memorandum of the things which had been said during the Israel Security Agency interrogation before the statement was taken, but not the chain of events of the entire interrogation or all of the events which preceded it. He stated that he generally had one memorandum before him, but that he did not remember with regard to this case.

**The testimony of policeman Moshe Levi**

This witness stated, in his testimony before us, that he remembered the interrogation in a general way, but not in detail. He stated that he taken the Defendant's confessions at the Ashkelon facility, after having warned him as required by law. The interrogation was conducted in Arabic

6

and the statements were written in Hebrew. Afterward, he read the confessions to the Defendant in Arabic, and [the Defendant] confirmed them with his signature.

The witness stated that he documents exceptional events which take place in the course of an interrogation, in the statements themselves or in a separate memorandum. In the case of the Defendant, he noted in the body of the statements the fact that he gave the Defendant food and drink. He stated that the atmosphere at the interrogation was relaxed. He remembered the Defendant as a handsome, smiling man who cooperated and answered the questions which he was asked.

He remembered that the Defendant needed medication due to the state of his health – and that the medicines were supplied to him by the prison infirmary. He remembered that, on one occasion, a medic entered the room and asked to give the Defendant his daily medication. He stated that after clarifying the matter, he allowed the Defendant to take his medicine, and he documented this in the body of the statement (Confession No. 7, dated April 2, 2006, page 3, line 62).

The witness stated that, to the best of his memory, the Defendant, when he sat opposite him at the interrogation, was not in cuffs. He denied that he had told the Defendant that his house had been destroyed or that trees had been uprooted and honey had been destroyed, and he further denied that he had told the Defendant that if he confessed, he would be released, due to the state of his health and his age, or that if he repudiated things which he had stated in the Israel Security Agency interrogation, "chaos" would break out.

The witness noted that the different fonts in the printed statements resulted from the fact that a structured form was used and denied that anything had been copied from another place. He stated that, in the opening passage of the statement dated March 19, 2006, he had asked the Defendant how he was, and the Defendant had answered, "Thank God, I am all right", and this was written down. He claimed that, because the Defendant is an elderly man, he asked in order to be certain of his condition, and he documented this in the body of the statement. He stated that generally speaking, he knew about the state of the Defendant's health, but he did not exactly remember when he had found out about it. The witness noted that he did not remember that he had read anything exceptional in the Israel Security Agency transcripts prior to the interrogation. The witness insisted that, in the interrogation which he conducted, the Defendant understood that he had the right to remain silent or to tell everything. He added that at the outset of the interrogation, he introduces himself and explains to the subject where he is, and that he reads the warning after that. He always does this, for every suspect, and accordingly he did not document it in the statement, except for his personal particulars, which were recorded. He claimed that he reads everything out to the suspect, including the suspect's personal particulars, in order to ascertain that those are his particulars, as well as the warning.

7

Date: July 29, 2009                                                    File No.: 3052/06

The witness confirmed that the interrogation took place in the police interrogation room, which is located within the Israel Security Agency interrogation facility in Ashkelon.

The witness noted that he does not remember any comment on the Defendant's medical condition in the Israel Security Agency transcripts which he read, and added that, had there been a medical problem, it would have come up. Because the statement was indeed taken, this means that the Defendant was fit to be interrogated. He did not remember an exceptional event with regard to the Defendant's medical condition, but remembered that he had given the Defendant hot and cold beverages and cigarettes, and that the Defendant had smoked a great deal.

The witness noted that the seventh statement was taken, not on February 4, 2006, as written in the statement, but on April 2, 2006, and that this was a clerical error.

### The testimony of policeman Yaakov Barazani

This witness stated that he remembered the Defendant, but that he was relying on the written text of the statements which he had taken. He stated that he taken the statements in Arabic, wrote them down in Hebrew, and then translated them again verbally into Arabic for the Defendant. In the testimony of March 26, 2006, he accused the Defendant of things which others had said about him, and the Defendant commented on them. The witness did not find, from reading the statement, that there were unusual events in the course of the interrogation; otherwise, according to his statement, they would have been written down. In the testimony of May 14, 2006, he showed the Defendant documents and the Defendant commented on each one of them. He stated that the atmosphere in the interrogation was good, and he noted that the subject was an elderly man. The witness stated that the Defendant remembered details of the documents which were shown to him and that, in his opinion, the Defendant has a good memory.

The witness stated that had the Defendant asked to be examined by a doctor, he would have written it down in the statement and would have stopped taking the statement, because he is aware of the significance of a statement which is taken from a subject who is not in a condition which enables him to give good testimony. He noted that subjects who are brought before him are not cuffed unless it is to be feared that they are dangerous and likely to be wild. In the case of the Defendant, who was an elderly man, there was no need for this.

The witness was asked whether he told the Defendant that they had destroyed his house, uprooted trees and destroyed honey, and answered that this was the first time that he had heard that the Defendant's house had been destroyed. The witness also denied that he had told the Defendant that if he confessed, he would be released immediately because of his advanced age and medical condition. The witness noted that he had not used any means of physical or verbal pressure and emphatically denied that he had led the Defendant to understand that if he

8

Date: July 29, 2009                                                                                    File No.: 3052/06

repudiated the confessions which he had made to the Israel Security Agency, "chaos" would break out. The witness argued that there was no need to exert force or pressure and that everything had taken place in a pleasant atmosphere.

In his cross-examination, the witness stated that he did not know how long the Defendant had been under interrogation before he interrogated him, but that there had been cases in which continuous interrogation had previously taken place, and in such cases, the interrogators waited in order to allow the subject to have rest time as provided by law. He confirmed that he relied on transcripts of the Israel Security Agency, which are written in Hebrew, and he stated that he had translated part of the memorandum for the Defendant, in which he was accused of smuggling weapons. The witness confirmed that he was the one who had asked for an extension of the detention in some cases, but he did not remember which interrogation operations were necessary, and stated that, for that purpose, it would be necessary to examine the reports which were presented to the judge who deliberated on the detention. The witness stated that he did not know who seized the documents which were shown to the Defendant within the framework of the statement of May 14, 2006, or who translated them. He stated that he himself does not read Arabic and accordingly relied on the translation, but that the Defendant was shown the original in Arabic. He further stated that he had translated the testimony by another person, which he had shown to the Defendant, into Arabic, because it was written in Hebrew and the Defendant does not read Hebrew.

#### The testimony of the person known as "Yuri"

This witness was the person in charge of the interrogation of the Defendant on behalf of the Israel Security Agency. The witness stated that he remembered the interrogation and the Defendant. He claimed that this was a complex interrogation, but that, all in all, the atmosphere was very relaxed, with a great deal of mutual respect. The witness added that the Defendant was held in a detention cell like any other detainee, but that, in the interrogation, he was treated very respectfully in accordance with his status. He stated that, throughout almost the entire period of the interrogation, the Defendant was supplied with food from the interrogators' kitchen, smoked cigarettes, and also received a response to special requests such as boxer shorts and a Koran, and there were even cases in which he asked to remain under interrogation because he was bored.

The witness rejected the argument to the effect that the Defendant had not received medical treatment, and stated that, due to the Defendant's age and his complaints, he was examined by a Prison Service doctor and was under close monitoring by the Prison Service infirmary. He added that he personally contacted the Prison Service infirmary and ensured that the Defendant was examined and his medical problems were treated at the professional discretion of the doctors. The witness stated that he had told the Defendant that there was no possibility of bringing in his

9

Date: July 29, 2009                                                                    File No.: 3052/06

medications, but that his attorney could supply a detailed list of the medications which the Defendant uses. At the same time, the witness stated that the responsibility for medical treatment rests with the prison doctor.

The witness was asked to give his impression of the Defendant's condition and stated that he did not have the impression that the Defendant was not capable of being interrogated. He remembered one case in which the Defendant was very tired when he left the cell and a medic was accordingly brought into the interrogation room, and the Defendant explained that it was related to his mental state and not to his physical state on that day. The witness repeatedly pointed out that there were cases in which the Defendant had actually asked to remain in the interrogation room.

The witness was asked to comment on the question of the cuffing of the Defendant during the interrogation. He stated that as a general rule, throughout most of the interrogation, the Defendant was not in cuffs. At the same time, there were cases in which the Defendant became upset and hit himself. Against that background, he was handcuffed so as not to harm himself, and immediately after he calmed down, the cuffs were taken off. He added that, in cases in which he left the interrogation room for a few minutes, the Defendant was handcuffed to the chair, but that the handcuffs concerned were attached to a long chain which allowed his hands to move freely, including smoking. He emphasized that he never left for periods of four to seven hours, as was stated in the preliminary arguments, and that, generally speaking, the intervals in question were of a few minutes, half an hour at the most. He added that the Defendant had not complained to him about this. In answer to a question by the Court, the witness replied that the Defendant did not have a watch.

The witness was asked to comment on the argument to the effect that the Defendant was told that his house had been destroyed, trees had been uprooted and honey had been destroyed. The witness answered that this was the first time that he had heard that the Defendant had honey, nothing was said to the Defendant about his house, and the interrogation had not even touched on this subject. The witness denied that he had told the Defendant that, if he confessed, he could be released to help his family, or that he could be released due to his age and medical condition.

The witness confirmed that, in the course of the interrogation, the Defendant had been subjected to accusations on the basis of the suspicions which the interrogators had, and there were cases in which he was told that he was lying, but there had been no intention of humiliating him. According to his statement, the interrogation was conducted with a great deal of mutual respect, and on a number of occasions during the interrogation, the Defendant even commented favorably on the attitude which had been displayed toward him by the witness. The witness insisted that no use of threats or force was made, that the interrogation was conducted by means of a protracted

10

Date: July 29, 2009                                                          File No.: 3052/06

dialogue, and that he remembered the atmosphere in this interrogation as being exceptionally good, relative to other interrogations which he had conducted. The Defendant cooperated in extensive portions of the interrogation, and there were days in which the very mention of the topic of a subject to the Defendant sufficed for the Defendant himself to provide a detailed version of the matter.

In his cross-examination, the witness stated that he had heard about the Defendant's detention from the media, approximately an hour before he met him at the interrogation facility. The witness further stated that the initial interrogation of the Defendant had been conducted by the interrogator known as "Hadi", and that he was not aware of it at the time, but only retroactively.

The witness stated that the size of the cell in which the Defendant was kept was standard; that there was a window, but it was closed; and that the ventilation was based on a central air conditioning system.

The witness was asked why the Defendant was interrogated continuously on March 15, 2006, starting at 10:55 a.m. and until after midnight, when the Defendant had already been interrogated toward morning, from 2:40 a.m. to 5:45 a.m. The witness answered that this was the initial stage of the interrogation; the Defendant asked to set forth his actions in chronological order, and this took time. The Defendant did not express a desire to stop the interrogation or to go to sleep; in the course of the interrogation, he ate, drank and smoked for his pleasure.

The witness was asked to comment on the statements which appear in the transcripts which were drawn up by the interrogator known as "Gino", such as "You are behaving like a little child, sitting there and lying through your teeth", and whether they preserved the subject's dignity. The witness answered that, in every interrogation, there are points of conflict and disagreement, and still, the dignity of the subject is preserved.

The witness stated that the Defendant was not prevented from meeting with an attorney, but that the entire subject of the contact with the attorney was under the responsibility of the police. To the best of his knowledge, the police notified the attorney of the Defendant's detention; however, the witness did not check this.

The defense attorney referred the witness to the memorandum dated March 19, 2006 at 4:35 p.m., in which the Defendant stated that they were laying trumped-up charges against him, and that they would do better to bring a sword and cut off his head, and asked him whether this sounded like a calm and quiet person. The witness answered that he did not have the impression that the Defendant was a calm and quiet person, but rather, a person who tended toward outbursts of anger. He added that this behavior and similar behaviors on the Defendant's part were at times

11

characteristic of him, although most of the interrogation was conducted in a very positive atmosphere with a great deal of mutual respect.

The witness was asked to explain what a "persuasion talk" is, and stated that it is a conversation in which the suspect is offered a chance to reach an understanding and to confess to the charges attributed to him, and receives an explanation of the nature of the information in the possession of the interrogators. The nature of the talk depends on the subject and his nature. In the case of the Defendant, most of the talk was focused on important current events and general topics, because the Defendant was a person who had traveled to a lot of places; nonetheless, at the end, the conversation always went back to the subject of the interrogation. The witness did not exactly remember what had been said at the talk in question, which was unfruitful from the standpoint of the interrogation; nonetheless, he pointed out that, among other things, the Defendant had been told that it would be better for him to confess.

The witness was asked whether telling the Defendant "to reach an understanding with his interrogators" referred to an agreement in which the Defendant would confess and would then go home, because he was an old man. The witness stated that the Defendant was not told that he would go home, or that he was an old man. The witness stated that nothing would happen if the Defendant did not confess, but that a confession would be in his favor, because then the interrogation would be over.

The witness was asked whether great pressure was not exerted on the Defendant, in such a way as to cause him to want to harm himself, as appears in the memorandum of March 21, 2006. The witness stated that the Defendant had had a fit of rage at the beginning of the interrogation, and that afterwards he had calmed down and had gone on to hold a long, detailed and relaxed conversation.

The witness denied that he had promised the Defendant that, if it was found that the polygraph indicated he was speaking the truth, they would not continue to ask him about things in which he was shown to have been speaking the truth. It is correct that, after the examination, the focus was on other subjects; nonetheless, there was no impediment against returning to the same subjects. According to his statement, the agreement and the understanding with the Defendant only concerned cases in which he was found to be lying.

The witness denied that he had told the Defendant that, if he finished the interrogation, he would be transferred to the prison, where the conditions were better, and accordingly, it would be better for him to finish the interrogation. When he was referred to the memorandum dated April 9, 2006 at 1:30 p.m., Section 8, which says that the Defendant was asked if he did not want to finish his interrogation and to be transferred to the prison, where he could be visited by his

12

family, the witness answered that the question which the Defendant was asked was primarily a way of telling him to finish the interrogation. The witness added that the interrogation did not focus only on the subject of the ship *Karine A*, but also on the subject of his sources of funds and his contacts with the Tanzim / Fatah. The "understanding" in question was that the Defendant would provide information, and not necessarily such that would lead to his incrimination.

### The testimony by the person known as "Hadi"

This witness is the Israel Security Agency interrogator who interrogated the Defendant on the day of his arrival at the interrogation facility, and another time at a later stage.

The witness stated that the Defendant had been asked how he was and answered that he felt well, although he said that he was suffering from cancer. The Defendant did not complain of pain, and had he done so, [the witness] would have called a doctor or a medic. The witness stated that he had not been given medications by the Defendant's attorney, and that he did not remember that the Defendant had asked for medications. The witness was asked about the time of the first interrogation, 2:40 a.m., and answered that his team leader had demanded that he begin the interrogation, and that is what he did. He also noted that, to the best of his memory, he had not interrogated the Defendant when the latter was handcuffed or shackled, and even if he had been wearing cuffs – which, in his estimation, he had not been – he had not been wearing shackles. The witness denied that he had left the Defendant in the interrogation room for periods of four to seven hours, alone and handcuffed. The witness further denied that he had said, or that he knew that anyone had said, to the Defendant that his house had been destroyed, trees had been uprooted and honey had been destroyed. He denied that he had promised the Defendant that he would be released if he confessed.

The witness confirmed that the Defendant had been told that he was lying, and claimed that this was a legitimate contention on the part of an interrogator. He stated that there had been no use of threats or force in the interrogation and that, if the Defendant had been afraid, this was a subjective matter, but that he had not intentionally frightened him.

In his cross-examination, the witness stated that he knew who the Defendant was and he knew that he had been active in Fatah for a very long time, and was in charge of the procurement and financial system within that organization.

The witness stated that he had given the Defendant a piece of paper, written in Arabic, which set forth his rights as a detainee and an interrogation subject, but that he had not read it out to him himself. He confirmed that the first sentence which he had written in the memorandum was the first sentence which the Defendant had spoken to him, which was: "The Defendant is fed up with the story of *Karine A*."

13

Date: July 29, 2009                                                                           File No.: 3052/06

The witness was asked to describe his impression of the Defendant's condition at the first interrogation, which had taken place toward morning, and stated that he remembered that an elderly man had come in, who was relatively tired, in accordance with the time at which he arrived. They had an ordinary conversation, and he remembered that the Defendant was a heavy smoker, was given a lot of cigarettes, and that the conversation had been conducted in a positive atmosphere. He did not remember whether the Defendant was agitated or depressed, and did not remember anything else unusual. According to his statement, to the best of his understanding, the Defendant's statement that he was "fed up" is consistent with the fact that he had been under protective or preventive detention following the *Karine A* affair.

The witness insisted that his role was to seek out the truth and that, if the Defendant had given him a reasonable theory in line with the intelligence information, he would have accepted it.

The witness repeatedly stated that he did not remember whether the Defendant was wearing cuffs in the interrogations which he had conducted. However, if there was any use of cuffs, it was only if the witness felt threatened. He added that he did not remember any such thing, and that if the Defendant had shouted or acted wildly, he would have written it down.

The witness repeatedly emphasized that he had given the Defendant the piece of paper with his rights and duties, and that his rights were listed in it. He himself did not tell the Defendant that he had the right to remain silent or to be represented by an attorney.

The witness insisted that, had the Defendant complained to him about not being allowed to bring his medications into the detention facility, or that he felt unwell and was not getting assistance from the prison doctor, he would have written it down. At the same time, he stated that he knew the Defendant was a sick man. He personally was never asked about bringing medications in.

The witness repeatedly emphasized that the search for truth is "sacred" and that it was the objective. Accordingly, when the Defendant told him that he was willing "to confess everything", he explained to him that there was no point in talking that way, and that he should tell [his story] himself, without adding to it or detracting from it. He had the impression that the Defendant was not willing to confess everything and was capable of holding his own in the interrogation. The witness stated that the interrogation of the Defendant was protracted because there were subjects which required elucidation and clarification, and there were other items which he chose to deny or not to explain.

14

Date: July 29, 2009                                                                    File No.: 3052/06

**The testimony of the person known as "Gino"**

This witness was an interrogator for the Israel Security Agency who participated in the Defendant's interrogation, and stated at the very outset that, because two years had gone by since the date of the interrogation, he did not remember part of it.

The witness was confronted with the preliminary arguments and stated that the Defendant had received medical treatment from the prison infirmary. He remembered that, in one of the transcripts, the Defendant had stated that he had polyps in his stomach, and within a short time, he was taken for examination and medical treatment. The witness stated that, as an interrogator, he is not the authority with regard to the transfer of medications to the Defendant, and that the decisions on that subject are made by the prison doctor. He further stated that he did not remember any case in which the Defendant called his attention to the fact that he needed medication.

The witness denied that the Defendant's feet were shackled in the interrogations at which he was present, and added that the Defendant was handcuffed after he hit himself and after he was warned that, if he continued to hit himself, he would be handcuffed, so that he could not harm himself.

The witness claimed that there was no case in which the Defendant was left handcuffed and alone in the room for four to seven hours, and claimed that he had not told the Defendant that IDF troops had destroyed his house and had destroyed trees and honey. The witness added that he had also not told the Defendant that, if he confessed, he would go free in light of his age.

The witness stated that he had told the Defendant more than once that he was concealing information and refusing to give it to his interrogators, but he had not used violence, threats or attempts at intimidation.

In his cross-examination, the witness was asked about the meaning of the statement to the Defendant that "he had been brought to the interrogation in order to confess with honor". The witness stated that confessing really was an honor, and his objective as an interrogator was to have the subject make a true confession.

The witness stated that the subject of the interrogation was the Defendant's involvement in the matter of the ship *Karine A*, his connection to the financing and smuggling of materiel, and his connections with Iranians and others in Arab countries whose intention it was to carry out hostile terrorist activity against Israel.

15

Date: July 29, 2009                                                    File No.: 3052/06

The witness stated that he had recorded in a memorandum that the Defendant "was behaving like a little child", because, notwithstanding his advanced age, he sometimes behaved childishly in the interrogation. When he was asked to explain what he meant, he answered that childish behavior is when a person is being interrogated on information and gives a cover version which exempts him from liability, even though he knows that his interrogators know what they are talking about with him.

The witness stated that the Defendant had been told that he should not "behave like a rascal", and that his meaning for the word "rascal" was a person who shouts, lies, acts dishonorably and does anything he can to save his skin.

The witness stated that he apparently knew at the time that the Defendant had been interrogated toward morning by the interrogator known as "Hadi", but that he had not seen any impediment to interrogating the Defendant until 6:00 p.m.

The witness was asked about a statement which he had made in the interrogation, which was documented in the memorandum dated March 20, 2006, in which it was written that he had told the Defendant that it was not by chance that his detention had been extended by 18 days, in light of the large amount of information which he was concealing from his interrogators. The argument was raised to him that, in this way, he was actually saying to the Defendant that the more information he concealed, the longer his detention would be. The witness answered that it was understandable that the Court had decided to extend the detention, on the basis of the information which it had before it. The witness was asked about an additional expression which he had used toward the subject, which was documented in the memorandum dated March 27, 2006, in which it was written that he had told the Defendant that "in the end, he would confess". The argument was raised to the witness that, according to common sense, this meant that until the witness confessed, the interrogation would not be over. The witness answered that that was not what was written, and eventually, the Defendant did, in fact, provide a great deal of information.

The witness was asked about the cases in which the Defendant hit himself, and said that he remembered that the Defendant had hit himself with his hands a number of times, and that they had succeeded in calming him down a number of times by asking him to stop it. The witness further stated that, in his opinion, this was childish behavior. The witness was asked whether this was not behavior which attests to the Defendant's desperation, and answered that, in his estimation, it was all a show, because, in fact, after that, the Defendant went on to provide a great deal of information.

16

Date: July 29, 2009                                                                                      File No.: 3052/06

**The testimony by the witnesses for the prosecution at the preliminary trial – interim summary**

The testimony which was heard may be divided into testimony by members of the police and testimony by Israel Security Agency personnel. The policemen stated that the interrogation was conducted in a relaxed manner, with no problems whatsoever, and that the Defendant gave information of his own good and free will. It was further stated that the Defendant had been given food and beverages in the course of the interrogations, had not been left alone, and had not been subjected to any threats or promises in the context of his interrogation.

The witnesses on behalf of the Israel Security Agency noted that the Defendant had been treated with respect, in accordance with his status. They did not deny that, in his interrogation, there were moments of "confrontation", in which they accused the Defendant of lying and concealing information; however, they claimed that this is a natural part of an interrogation. The interrogators denied that the Defendant had been left alone in the interrogation room for long periods of time. According to their statements, there were a number of cases in which the subject have been left alone, but for brief periods of time, during which he was placed in handcuffs which were attached to a long chain. It was further stated that the Defendant was not handcuffed in the course of the interrogations, except for cases in which he hit himself and attempted to harm himself. Even in those cases, after the Defendant calmed down, the handcuffs were taken off.

The Israel Security Agency interrogators also denied that they had uttered threats against the Defendant, or that they had told him that his house had been destroyed and the like, or that anyone had promised him that, if he confessed, he would be released due to his age.

With regard to his medical condition, the Israel Security Agency interrogators stated that the Defendant had been treated in the prison infirmary and that, in light of his age, they even ensured that he would receive treatment, at the discretion of the medical personnel, of whom they were not in charge.

**The testimony by the Defendant at the preliminary trial – direct examination**

The Defendant began by stating that he suffers from high blood pressure, hemorrhoids, an ulcer and back pain.

The Defendant described that he was in prison in Jericho under American and British supervision and that, on March 14, 2006, at 8:00 a.m., the IDF instituted a siege on the Muqata in Jericho, until a bulldozer came and destroyed the building. He and others were taken to the Jericho Coordination and Liaison Facility; that evening, he was transferred to the "Russian Compound"

17

Date: July 29, 2009                                                            File No.: 3052/06

[a police facility in Jerusalem]. The Defendant told them that he was cold, because he was wearing only his pajamas. From the "Russian Compound", he was transferred to Ashkelon, and he was in handcuffs throughout that entire time.

His interrogation by the Israel Security Agency began that same night, and he was told that he had to confess everything. The Defendant stated that he had told his interrogator that there was nothing against him, that he was a person who was doing his work and following orders.

According to his argument, he was handcuffed and shackled during the interrogation, and noted that his hands were cuffed in front of him. The Defendant stated that he did not receive the medications which he takes on a regular basis, and even though he asked to see a doctor, he was told that he would only see him the next day. The Defendant claimed that he was taken to the doctor only after he pleaded many times to be taken for examination. Following the doctor's examination, he was only given medicine for his blood pressure, but no one took care of his other problems.

The Defendant pointed out that he was kept in a cell 1.5 m x 2 m in size, and that he would fall asleep quickly because he was exhausted, but woke up often because of the pain from which he suffered.

The Defendant said that he did not remember much of his interrogation. He remembered that his interrogators wanted him to confess that he had purchased the *Karine A*, but he had no connection to this. According to his argument, his interrogators spoke to him impertinently; they sometimes addressed him violently and sometimes calmly.

The Defendant claimed that his interrogators told him that they were interested in obtaining an explicit and detailed confession of everything he knew about the *Karine A* affair, and that, if he confessed, he would be able to go home. The Defendant claimed that he had told his interrogators that he was prepared to confess, but not to lie.

The Defendant stated that his attorney had told him that they had destroyed his house, uprooted trees and smashed beehives. According to his statement, the interrogators told him that they had heard about this, and this had a negative effect on him.

The Defendant was asked about his visits to the prison doctor, and stated that, even when he complained, he was given only acetaminophen. When he was told that, after he complained of digestive problems in his interrogation, he was given a medicine called "Gastro", he said that he did not remember that. In another case, the Defendant remembered that he had been given paraffin for his constipation, but said that this only happened once. According to his statement, although he received medication for his blood pressure, he felt that it was of no help to him. The

18

Defendant was asked whether he told the doctor about his chronic diseases, and stated that he told him everything, and also that he had asthma, that he had difficulty breathing properly and that he suffered from tachycardia.

He also stated that the policeman who taken his statement sat with the Israel Security Agency report and asked him about it, but that he did not know what the policeman wrote, because the interrogation took place in Arabic and the record was written down in Hebrew.

The defendant was asked if he believed that he would be released if he told the interrogators what they wanted to hear, and he answered "Yes". According to his statement, his interrogators told him about another subject who had been expected to get four life sentences, but that Mohamed Dahlan had intervened in his case and they released him.

The Defendant stated that he did not ask the interrogators to call an attorney, and that his family were the ones who called the attorney on his behalf. The Defendant added that he asked his interrogators if he could see an attorney, and their answer was that if an attorney came and asked about him, they would let him see him.

### The testimony by the Defendant at the preliminary trial – cross-examination

The Defendant stated that he had felt humiliated during his interrogation. He further stated that he had told his interrogators everything they wanted to hear. The Defendant was then asked at which stage of the interrogation he had "broken". The Defendant did not answer directly; instead, he claimed that, from the very beginning, he had told his interrogators that he would tell them whatever he had to say, and he had in fact told them what he knew. When he was asked if the things that he had said on the first day of his interrogation were said under pressure, he answered that he had said those things because that was what happened and because it was not a secret matter. He further stated that, in his interrogation, he had not lied at any stage, and that he had told what he knew, but that he did not know what had been written down in Hebrew.

According to his statement, his interrogators humiliated him, told him he was a liar and used "dirty" language to him. He further stated that they used to leave him alone in an empty room, in cuffs, and come back only several hours later.

The Defendant stated that, in his interrogation, he acted according to the interrogators' instructions, and that he certainly did not dictate any demands or the terms of the interrogation. When he was asked how he found the strength to tell his interrogators that "the State of Israel owed him money", he did not answer directly. The Defendant confirmed that he smoked during his interrogation and stated that he had taken cigarettes from his interrogators whenever he asked for them. The Defendant was asked what else he had been given and replied "Nothing". When he

19

Date: July 29, 2009                                                    File No.: 3052/06

was asked specifically whether he had received a Koran, coffee, tea and underwear, he answered that he had. According to his statement, he had not asked for them; rather, his interrogators had brought them to him.

The Defendant repeated that he had been under pressure from the very first day, but emphasized that, in his interrogation, he had spoken only the truth. He further stated that he had denied any relationship to the ship *Karine A* and had insisted on that point.

In answer to questions by the Court, he stated that the things which were written down in his statements were translated for him, but that he did not know what was actually written down. The Defendant further stated that, at times, he would get upset in his interrogation ("from all that talking, a person goes crazy"), but that his irritation had only manifested as "exploding inside" and he had not shown it to his interrogators.

### The testimony by Mohamed Hijazi

This witness stated that he was with the Defendant, in the same cell, at Ashkelon Prison in April 2006, for some two weeks. He stated that the Defendant was sick and weak and had difficulty breathing, walking or standing up. He claimed that, on many occasions, he and his cellmates had knocked on the cell door and asked for a doctor for the Defendant, because "he was going to die", and the guards had given the Defendant "at the very most, acetaminophen". He stated that a doctor had never come to the cell.

In his cross-examination, the witness stated that he was in the cell with the Defendant, to the best of his memory, starting on April 12, 2006. He claimed that, over a two-week period during which he was with the Defendant in the cell, the Defendant had only gone out to the toilet or the shower, and then added that he had also gone out to interrogations. When he was asked to comment on the fact that there were many documents by medics and doctors who had seen the Defendant during that time, he stated that, during the period when they were together, this did not happen. He went on to add that, each time the Defendant came back from an interrogation, he told them (his cellmates) about it. The witness was asked to give the names of other persons who were in prison with him at the time and answered that there were people whose names he remembered, but did not state a single name.

The witness stated that the Defendant had told him that the interrogation made him feel pressured, that he was chained to the chair all the time and treated badly. The Defendant also told him that he was suffering from cancer and he needed medications. The witness said that the Defendant had not told him about the things which he received from his interrogators, such as fruit, cigarettes and underwear.

20

Date: July 29, 2009                                                                    File No.: 3052/06

#### The decision in the preliminary trial

It may be said that the preliminary arguments raised claims that had to do with "humiliation", the use of an unfair method of interrogation by creating unfair emotional pressure, as well as enticement and persuasion. The decision in this case is a decision which is based on fact, which is derived from our direct impression of the statements which were made before us.

#### Evaluation of the testimony in the preliminary trial – credibility and weight

#### Credibility of the witnesses for the prosecution

We did not find that the witnesses for the prosecution were lacking credibility, as the defense attempted to argue. In fact, there can be no doubt that the Defendant was under interrogation, in the course of which the interrogators sought to obtain as much information as possible with regard to his activity in the financing of Palestinian terrorism.

Like any interrogation, it was not always conducted under pleasant and comfortable conditions. The Defendant was imprisoned in an interrogation facility, where he was interrogated over a protracted period of time. However, there is a discrepancy between the discomfort which is inherent in the holding of an interrogation and the use of means which are capable of depriving him of his free will and his ability to choose whether to give information which incriminates him.

As may be seen from that which has been set forth in the statements, and the Defendant did not dispute this in his testimony, in the course of his interrogation by the police, he received cigarettes and could smoke as he liked, and was given beverages and food in the course of the interrogation. Thus, for example, in the statement dated March 19, 2006, page 5, line 132, the following sentence appears: "At this stage, the suspect asked to pray, and the suspect's confession was interrupted for that purpose." Further, on page 6, line 164: "In the course of his confession, the suspect was given hot and cold beverages and cookies." In a statement dated March 20, 2006, page 1, line 18, the following sentence appears: "The suspect was given a cigarette and smoked." Further (page 2, line 19), it is written that: "The suspect was given water at his request in order to take a pill." The statement dated March 22, 2006, page 5, line 118, states that he was given hot and cold beverages and cigarettes; a similar sentence appears in the statement dated March 30, 2006, page 6, line 144. The statements which were taken on April 2, 2006 (Prosecution Exhibit No. 9 and Prosecution Exhibit No. 10) state that he was given refreshments. It is difficult to imagine a situation in which an interrogation was conducted in a heavy-handed and cruel manner, according to the arguments that have been set forth by the defense, while at the same time the Defendant was given the opportunity to pray, to smoke as much as he wanted, to eat and drink, and of course, to take medications.

21

Date: July 29, 2009                                                    File No.: 3052/06

It should be stated that refreshments such as food, beverages and cigarettes were also given to the Defendant in the course of his interrogations by the Israel Security Agency. As early as his first interrogation (memorandum dated March 15, 2006, 2:40 a.m.), he was given coffee, and in the following interrogation (memorandum dated March 15, 2006, 10:55 a.m.), he was given lunch, cigarettes and coffee. It can be seen that this treatment continued throughout all of his interrogations, and almost every memorandum states that the Defendant received food, beverages and cigarettes. He was even given a Koran (memorandum dated March 16, 2006, 10:00 a.m.; memorandum dated March 21, 2006, 12:00 noon); he was allowed to go to the toilet (memorandum dated March 20, 2006, 11:40 a.m.) and was given the possibility of discussing with his interrogators problems which concerned the conditions of his imprisonment (memorandum dated April 3, 2006, 11:00 a.m., Section 1). The Defendant did not dispute these statements which appear in the transcripts. This treatment is not typically given to someone whose free will [his interrogators] are trying to crush and whom they are trying to humiliate and hurt.

Over and above the subject of the refreshments which were given to the Defendant, the transcripts from the Israel Security Agency interrogation do not indicate that the subject was "broken" and humiliated, in view of the fact that the Defendant commented many times on topics which are not related to the interrogation, such as general political and diplomatic topics (memorandum dated March 16, 2006, 10:00 a.m., Sections 24-25; memorandum dated March 27, 2006, 4:30 p.m., Section 1; memorandum dated April 11, 2006, 10:00 a.m., Section 12), and even told his interrogators that the State of Israel owed him $275,000 which it had taken from a closet in the Muqata (memorandum dated March 19, 2009, 4:35 p.m., Section 18). Such behavior is not typical of a person who has been broken in his interrogation and is willing to appease his interrogators and to say anything they want him to, only in order for the interrogation to end; rather, it is characteristic of a person who feels sufficiently self-confident to say what is on his mind.

It is important to emphasize that the witnesses for the prosecution did not attempt to embellish the conditions of the interrogation. They did not deny that there were short periods of time when he was left alone in the room, and that he was cuffed at those times; it was, however, argued that those intervals of time were brief. Nor did they deny that the Defendant had been cuffed after he hit himself and began to act wildly (memorandum dated March 21, 2006, 12:00 noon, Sections 2-3). Furthermore, the interrogators did not claim that the Defendant was a relaxed, calm person; rather, they said that the Defendant was a person who was quick to anger, and that he would turn his rage against himself, and accordingly, they were required to handcuff him at times. Nor did they deny that, from time to time, they addressed the Defendant in a manner which was not pleasant for him to hear – for example, they told the Defendant that he was lying, was behaving

22

like a child or a rascal – but it was not proved that they adopted humiliation as a method of interrogation.

This description by the interrogators appears credible to us. We have not found that it contains inconsistencies or contradictions, and it is in line with the statements written down in the transcripts and, to a certain degree, with the testimony by the Defendant in Court. More precisely: there is a significant discrepancy between the testimony by the Defendant in Court and the preliminary arguments which were initially raised by the defense – arguments which they abandoned at the stage of the summations following the Defendant's testimony. It may be said, even at this stage, that the impression which arises from the Defendant's testimony did not match the preliminary arguments which he raised.

### The credibility of the testimony by Mohamed Hijazi

Before we discuss the credibility of the Defendant's testimony, we shall first state that Mohamed Hijazi's credibility, as we perceived it, was quite poor. We have difficulty understanding how the witness remembered "well" everything which had happened to the Defendant, and how "they pleaded" for medical treatment for him which was not provided, but he could not say who else was imprisoned with him in the cell at the time. Nor can his statements be reconciled with the Defendant's medical file, which shows that, even during the period concerning which the witness Mohamed Hijazi testified, the Defendant was treated a number of times by the prison infirmary. It *prima facie* appears that the testimony by Mohamed Hijazi is testimony which was entirely intended to assist the Defendant at his trial, and which accordingly, at the very least, painted quite an extreme picture of the Defendant's medical condition. It should further be stated that Mohamed Hijazi said that the Defendant complained to him of having been chained to the chair – an argument which the Defendant himself did not repeat. Accordingly, we have not seen fit to attribute any weight whatsoever to the testimony by Mohamed Hijazi.

### The credibility of the Defendant – general

The Defendant unequivocally stated that, in his interrogation, he did not say anything which was not true. Notwithstanding the Prosecutor's attempt to understand at which stage the Defendant "broke" and began to tell his interrogators things which they ostensibly wanted to hear, the Defendant insisted that he provided all of the information which he had, with no problem whatsoever. The Defendant denied having linked himself to the ship *Karine A*, in contrast with that which has been set forth in the police statements.

It appears that, even though the Defendant claimed that he felt humiliated, this feeling – according to his own argument – did not influence him to say anything which he did not want to

say. We shall emphasize that the Defendant did not claim that he had initially refused to tell his interrogators the truthful things which he told them, or that they had been extracted from him against his own free will. The Defendant, throughout his testimony before us, claimed that he had spoken the truth, and that he had done so willingly, because he was not ashamed of the matters involved and they did not contain any secrets.

In accordance with that which has been set forth above, the only thing which the Defendant was . not willing to accept were the things which were written down in his statements; according to his argument, those things did not reflect what he had actually said, and because he cannot read Hebrew, he could not know if that is what was written. The Defendant appears to have abandoned the preliminary argument, according to which the police interrogators had threatened him with "chaos" if he did not repeat what was written down in the transcripts by the Israel Security Agency interrogators, as he did not mention this matter at all in his testimony before us.

We shall further state that the direct impression gained from the Defendant's testimony is of someone who exaggerated the strength of the humiliation which he felt and the arguments concerning the treatment which he was given, in accordance with the line of argumentation in the preliminary trial. In any event, even if he subjectively felt humiliated in the situation in which he found himself, we shall emphasize that he was not willing to confirm or to state that he had said anything which was not true, or that he had been broken in his interrogation. Our impression is that the Defendant adopted a line which was "independent" of the defense line in the trial, with regard to things which he thought it was important to tell the Court. The Defendant wanted to say that he had told only true and correct things, of his own free will, but at the same time, to say that he had suffered during his interrogation. This cannot be reconciled with the argument that his statements were taken other than of his own free will. Obviously, a situation of interrogation is not comfortable and is not pleasant, and certainly not for an elderly person who previously held a senior position. At the same time, we did not gain the impression that the Defendant, at any stage of his interrogation, felt distress which prevented him from making demands or which led him to say things other than of his own free will.

### The credibility of the Defendant – the medical treatment

The Defendant's arguments with regard to medical treatment, or the absence thereof, are not at all in line with what appears in his medical file. Thus, for example, in a document which records his examination before his intake at the incarceration facility on March 14, 2006, a statement appears in which the Defendant "notes chronic diarrhea, takes Colatal as necessary, rules out heart disease, [high blood] sugar, high blood pressure or other problems." On March 15, 2006 at 2:19 p.m., he was examined again at Shikma Prison. In that case as well, even though he was examined by a different doctor, the section in which he was asked about past diseases states the

words "Rules out"; in addition, it was noted that he uses only one medication, Colatal for his stomach. These records are not in any way in line with his statements to the effect that he suffers from many problems and that he gave that information to the prison doctors. On March 15, 2006 at 6:15 p.m., he was again brought before a doctor, where the record states that the Defendant complained of constipation and heartburn and was given medication. As we can see, as soon as the Defendant complained of any problem whatsoever, not only was he not deprived of access to a doctor; he was, in fact, examined by a doctor only four hours after his previous examination by a doctor. In addition, the Defendant saw a doctor on March 19, 2006, and was given medications in that case as well. It is not superfluous to state that the medications were not "acetaminophen", as he claimed, but other medications (of three different kinds).

The Defendant was examined by a doctor and received treatment for his constipation problem on March 20, 2006 and March 21, 2006 as well. On March 22, 2006, the Defendant was brought for examination at the initiative of the prison authorities, and not at his own request; on the basis of his complaints, it was determined that his blood pressure would be monitored, and medications were prescribed for him. On the same day, at 7:00 p.m., the record states that he was again examined by a doctor "**at the request of an interrogator**".

Not only were different medications of various kinds prescribed for him; his argument, to the effect that he was given paraffin oil only once, is not in line with the medical records, which show that he was given paraffin on a number of occasions, on March 20, 2006, March 21, 2006, March 30, 2006, April 1, 2006, April 3, 2006, April 4, 2006 and April 17, 2006.

Accordingly, it appears that the Defendant's arguments with regard to the lack of medical treatment are unfounded. The Defendant received various medications as required, in accordance with his condition; he saw a doctor many times – once even at the initiative of his interrogator – and received treatment at the discretion of his doctors. It appears that his arguments with regard to medical treatment were intended to intensify the preliminary arguments and are not in any way founded on reality, and this has implications on his poor credibility before us.

### The credibility of the Defendant – the interrogation stage

Aside from the subject of medical treatment which we have discussed above, the Defendant's attempt to state that he did not receive anything from his interrogators can be pointed out as an additional example of the Defendant's lack of credibility – an argument which was intended to provide an exaggerated portrayal of his difficult state during the interrogation. As soon as he was confronted with the things which he had received (meals, time for prayer, cigarettes, coffee, tea, a Koran, underwear), he "suddenly recalled" and confirmed that these things were indeed given to him; he added, however, that he had not asked for them to be given to him. In addition, the

25

Defendant himself stated that everything which happened during his interrogation caused him "to explode inside", and that he had not shown this to his interrogators – in contrast with the explicit statements which were written in the transcripts, and to which the interrogators testified, to the effect that the Defendant lost his calm from time to time, and that they were accordingly forced to handcuff him. It is not logical to believe that the interrogators would invent and record a story whereby the Defendant hit himself, and that they were forced to handcuff him as a result, if this did not happen. The Defendant's argument, to the effect that he had only "exploded inside", is not in line with the records kept by the interrogators, nor with their testimony before us, and represents part of the line which he adopted in order to show that, on one hand, they had humiliated him, but, on the other, he had not given into his interrogators. In this matter, we preferred the testimony by the interrogators.

It should be stated that the impression gained from the Defendant's testimony is that of a person who is well aware of the things which were said by him, both in Court and in his interrogation by the Israel Security Agency and the police, but who nonetheless sticks to his story and maintains that injustice was done to him. That injustice, as he sees it, was not caused by the things which he said in his interrogation, but by the humiliation which was practiced upon him, as an independent factor, and not as one which affected him in his interrogation. Another factor in the "injustice" results from the statements which were written down in Hebrew, without his approval, and which were not in line with what he said. More precisely: the Defendant confirmed, in his testimony before us, that the words in his statements, which were ostensibly written down on the basis of what he had said, were translated to him, as the police interrogators had stated; nonetheless, the Defendant claimed that he does not know what was really written, because he does not know Hebrew.

We have not seen fit to believe the Defendant on this point. We did not gain the impression that the Israel Security Agency and police interrogators recorded things which were not told to them by the Defendant, or that they distorted the statements which been written down in Hebrew when they translated them to him, or that they exerted pressure on him which negated his ability to choose whether to tell his interrogators certain things. It appears that the Defendant was well aware of why he was under interrogation, and was well aware of what his interrogators were looking for, and that he behaved accordingly during his interrogation. The Defendant is aware of the fact that he made statements with regard to his activity in the context of *Karine A* – statements which are not in line with his present version, which holds that there is no relationship between him and the arms ship.

Moreover, the statements which are written down in the transcripts of the interrogation indicate that the Defendant gave a great number of details, as he testified before us, as early as the first day of the interrogation. At the same time, the Defendant did not immediately say everything he

26

knew, because his interrogation was a "developing interrogation", to which, over the course of time, various items concerning his activity were added. As may be seen from the transcripts, in the beginning, when they raised accusations against him, he customarily denied them; however, when they showed him evidence which refuted his denial, he began to tell what he knew. Such conduct is actually characteristic of a person who acts in a calculated manner and is willing to tell things only when he knows that, in any event, his interrogators have the information already, without volunteering additional information. Even if there had been any possibility of raising an argument, to the effect that the additional details which he gave, following the evidence which was presented to him, were given as a result of the pressure which was exerted during the interrogation, the Defendant himself has contradicted and refuted that argument.

### The credibility of the Defendant – summary

In contrast with the credible impression made by the interrogators from the police and the Israel Security Agency, we can state that the testimony by the Defendant was not especially credible. In accordance with that which has been set forth above, according to the testimony by the Defendant himself, his "humiliation" and his "medical condition" did not in any way detract from his ability to say the things he wished to say, [and did not] cause him to say things which he did not want to say. There was no stage in which the pressure of the interrogation led him to confess anything against his will, and there was no stage at which he "broke".

On the basis of all of the evidence in the preliminary trial, we are convinced that his statements to the police interrogators were taken in a relaxed way and with no improper pressure. In contrast with the arguments raised in the preliminary argumentation, he did not attempt to make the police interrogators aware of errors which appeared in the transcripts, and none of them told him that "chaos" would break out if he did not confess. We are convinced that his interrogators made him no promises that, if he confessed, he would be released; they told him nothing about the destruction of his house (a fact which some of the interrogators had not even known until the date of the hearing before us); and accordingly, we have no choice but to reject his arguments concerning any "humiliation" or enticement and promises which caused him to say things other than of his own free will. The Defendant received full medical treatment as required, and his medical state did not change his ability to say what he had to say, of his own free will.

### Preliminary trial – The ruling

In light of our factual conclusions with regard to the credibility of the witnesses for the prosecution, on one hand, and the lack of credibility of the witnesses for the defense, on the other, we hereby rule that the statements by the Defendant were taken of his own free will and are admissible in this trial.

27

Date: July 29, 2009                                                                File No.: 3052/06

### The principal trial

#### The testimony by Mahmoud Abiyat

This witness stated that he was a member of a military squad which was led by Ataf Abiyat and was tried for offenses of murder which he committed. The witness stated that he and his fellow squad members were soldiers and they received a monthly salary at the end of each month. The witness claimed that he did not know who transferred the salary to them. The witness was confronted with a memorandum from his interrogation by the Israel Security Agency, which stated that the salaries were transferred by Fuad Shubaki. The witness claimed that he did not know Fuad Shubaki and that he had never heard that name. The witness claimed that the person who transferred the salaries to them was named Fuad Shumali, who was a clerk in the Finance Office. In his cross-examination, he stated that he had never seen the Defendant and had not received money from him, and that he did not even know who was responsible for finances in the Palestinian Authority.

#### The statements by the Defendant to the police

The Defendant made eight statements to the police, aside from the many memoranda which were taken from him by the Israel Security Agency. We shall now provide a chronological survey of the statements which were taken from him and the things which he said in them – things which, as a general rule, are in line with the statements which he made in his interrogation by the Israel Security Agency.

Prosecution Exhibit No. 5 – statement by the Defendant dated March 19, 2009: In the statement in question, the Defendant spoke of his activity within the framework of the Palestine Liberation Organization (PLO) prior to the year 2000. He subsequently stated that, in 2000, there was a meeting in Yasser Arafat's office, in the presence of Abdel Razeq Majaida, Hajj Ismail Jaber, Ghazi Jibali, Salim Burdani, Mohamed Dahlan, Rashid Abu Shabak, Amin al-Hindi, Musa Arafat and Mahmoud Abu Marzuk. Yasser Arafat told them to buy any weapons which came into Gaza or the West Bank, and any of those senior officials who received an offer (to purchase weapons – Z.L.) would come to the Defendant with paperwork; the Defendant would transfer it to Yasser Arafat, and after Arafat signed, the Defendant would instruct his staff to transfer money to the senior official in question. The Defendant gave detailed examples as to the quantities and types of weapons which were purchased and the amounts of money which were paid for them.

The Defendant added that in July 2001, Fathi Ghazem and Adel Mughrabi smuggled a container from Lebanon with RPG bombs and launchers which came from Hezbollah, with the approval of Yasser Arafat, and the naval forces took them. He paid $50,000 with Arafat's approval.

28

The Defendant added that he had met with Fathi Ghazem in Jordan, and that Ghazem had told him that he had met with Hezbollah operatives and with an Iranian, and had agreed with them that they would transfer three containers of weapons, loaded on a ship. He asked the Defendant to speak with Yasser Arafat about it, so that Arafat would give money. The Defendant spoke with Arafat about it, and Arafat instructed Harbi Sarsur to give money for that purpose. The Defendant also stated that he had gone to Yemen and met Taysir Ajina, who had told him that Adel Mughrabi wanted passports to be prepared for him and for Omar Akawi, and that he (Adel) had come to see the ship *Karine A*, which had arrived in Yemen with the arms.

Prosecution Exhibit No. 1 – statement by the Defendant dated March 20, 2006: In this statement, the Defendant stated that he had met with Fathi Ghazem in Jordan in 2001, and that Ghazem had told him about the contacts with the Iranians, according to which the latter were willing to pay for an arms ship. Fathi told the Defendant that he (the Defendant) would be meeting the Iranian representative in Dubai. The Defendant stated that he came to Dubai and there, together with Adel Mughrabi, he met two Iranian representatives – Abu Mohamed and Ahmed Salem. The Iranians told the Defendant and Adel that they were willing to finance the training of Palestinians in Lebanon and Iran, and that they were willing to help with money and armaments. The Defendant added that Adel wrote up a report for Arafat, and that they told the Iranians that, once they had a reply from Arafat, they would let the Iranians know. According to his argument, when Arafat saw the report, he responded angrily and said that the Iranians were liars. The Defendant, in that statement, provided further details of his contacts with the Iraqis and their consent to donate two million barrels of oil to the Palestinians as a gift.

Prosecution Exhibit No. 6 – statement by the Defendant dated March 22, 2006: In the statement in question, the Defendant provided additional details about the meeting with the Iranians. He stated that the one who made the initial contact with them was Abu Hassan al-Zeinab. The Defendant set up a meeting between him and Fathi Ghazem, and the two of them went to meet the Iranians in Dubai. Following that meeting, Fathi Ghazem told the Defendant that the Iranians wanted to meet him. The Defendant went to Dubai to buy cars and told Fathi that he would meet the Iranians afterward. The Defendant was asked why he had not told Yasser Arafat that he went to meet the Iranians, and answered: "Because Arafat liked me to bring him results, and not just chatter." The Defendant went to Dubai, and after his meeting about the cars, he went to meet the Iranians with Adel Mughrabi. Because he was tired, it was agreed that they would meet again that evening. The Defendant did meet the Iranians again that evening and asked them if they wanted to work with him and cooperate with him, and the Iranians said that they did. Adel spoke with them about military subjects, such as the need for advanced training in the manufacture of hand grenades and grenade launchers, and that they also wanted ammunition and weapons. After that, they (including the Defendant) talked about how to set up an ammunition factory within the Palestinian Authority, and the Defendant even told them that they would need money, and they

agreed to that as well. The Iranians even stated that they would transfer weapons and ammunition from materiel storehouses which they maintained in Lebanon. One of the Iranians asked to be sent a daily summary of the Israeli media. They agreed to continue meeting, and the Defendant stated that he would ask permission from Yasser Arafat to come to the meetings. Adel wrote up the contents of the meeting and he and the Defendant signed it. When he returned to the Area, the Defendant gave the document to Yasser Arafat, who said the people in question were swindlers who wanted to kill him.

The Defendant stated that, in 2002, he heard that the *Karine A* had been seized. He understood that Yasser Arafat wanted him to "take the matter upon himself", and accordingly, he told the Board of Inquiry that Yasser Arafat had given the instructions and that he had been the contact person between Fathi Ghazem and Adel Mughrabi and Arafat. The Defendant added that he had heard from Fathi about the plan to bring in the ship as early as August 2001, two months before the meeting with the Iranians, and that the meeting with Arafat, at which they agreed on the transfer of $125,000 to Fathi for the ship project, took place after Fathi had been in Syria and Lebanon. The meeting with the Iranians in Dubai was intended to set up Palestinian-Iranian contacts and to put Fathi and Adel in contact with the [Iranian] Revolutionary Guards in Lebanon, and he and Adel had not talked about the ship with the Iranians.

Prosecutor's Exhibit No. 11 – statement by the Defendant dated March 26, 2006: In this statement, the Defendant provided details about various arms deals in which he was involved. He initially stated that a person had come to him and told him that they had found barrels with RPG rockets in the sea and that he wanted $7,000 for them. The Defendant gave an order to pay the price. The Defendant stated that he had received an offer to purchase 10 RPG rockets for $45,000, and that he had transferred the money to the party making the offer. The Defendant went on to state that this was better than having the weapons fall into the hands of Hamas or other organizations. The Defendant stated that, in 2002, Rashid Abu Shabak stole all of the arms which he had purchased, and which were in their storerooms. The Defendant went on to state that Mahmoud Abu Marzuk had contacted him in 2001 and asked for $20,000 to set up a factory for the manufacture of materiel and hand grenades, and that Arafat had instructed the Defendant to give him the money. The Defendant transferred the money and later heard that there had been an explosion in an apartment which was rented by Mahmoud Abu Marzuk.

The Defendant was asked about the purchase of boats for Fathi Ghazem and stated that Arafat had instructed him, in 2000, to transfer $150,000 for the purchase of two fishing boats. The Defendant noted that the money in question was transferred even before he transferred $125,000 to Fathi for the *Karine A*.

Date: July 29, 2009                                                    File No.: 3052/06

The Defendant talked about money which he transferred for the purpose of purchasing ammunition in Bethlehem, and that he had financed the salaries of Mahmoud Abiyat's men. According to his argument, some of the money which he transferred was used for salaries (NIS 500 per person) and some was used to purchase ammunition.

Prosecution Exhibit No. 7 – statement by the Defendant dated March 30, 2006: The Defendant was asked about his acquaintance with Mahmoud Zuheiri and stated that the latter was in charge of purchasing materiel in the West Bank, and that he had purchased 1000 Kalashnikov rifles. The Defendant noted that he had transferred the money for the purchase to Mahmoud Zuheiri, in the amount of approximately \$2 million.

The Defendant stated that he had paid Jumaa Abu Shukri \$570,000 for seven Sagger missiles and 18 rifles; the rifles were defective and they returned them. According to his statement, the missiles were kept in the *diwan* near his home in Gaza, and he later transferred them to Abdel Razeq Majaida. The Defendant went on to provide details about various people who had brought materiel and stated that he used to transfer the money, and that they used to keep the arms in a storeroom within his office. According to his argument, Yasser Arafat would tell him to whom he should transfer the materiel, and he would instruct his deputy to issue arms according to Arafat's instructions.

The Defendant stated that Mahmoud Abu Marzuk manufactured explosive charges for Abdel Razeq Majaida, and that he had transferred the money to Majaida so that it would be transferred to Mahmoud Abu Marzuk. The Defendant also gave information concerning additional arms deals.

The Defendant, in the course of the examination, was shown a document (Prosecution Exhibit No. 8) and stated that it was a paper written by Mahmoud Abu Marzuk, which contained price quotations for arms, and that he had settled accounts with him according to the prices listed.

Prosecution Exhibit No. 9 – statement by the Defendant dated April 2, 2006, 9:50 a.m.: At the beginning of his interrogation, the Defendant was referred to his statement of March 19, 2006, in which he had stated that he smuggled arms in the ship, and he confirmed that he had said that. The Defendant was asked about the involvement of others in smuggling the arms and spoke about it. Among other things, the Defendant stated that, in July 2001, he had given Fathi Ghazem \$50,000, on Arafat's instructions, to smuggle bombs and RPG launchers. The Defendant stated that he paid the money for the smuggling and not for the weapons, because the weapons had been given to them free of charge by Hezbollah.

The Defendant was asked to tell about the *Karine A* again, and stated that he had met with Fathi Ghazem in Jordan, and that Ghazem told him that he had met in Lebanon with representatives of

31

Date: July 29, 2009                                                           File No.: 3052/06

Hezbollah and of Iran. The latter had agreed to transfer three containers full of materiel to them, financed by the Iranians, and they (the Palestinians – Z.L.) would only have to pay the expenses for the ship. The Defendant stated that they were offered the opportunity to take weapons from Ahmed Jibril, but that they did not do this. When he was asked why, he said: "Because we have arms free of charge from Hezbollah and from the Iranians, so why should we take from him?" He stated that the plan was to bring ships with arms to the Ali Port, and that he and Fathi had spoken with Arafat and told him that $125,000 was needed. Yasser Arafat told the Defendant to give the money, and the Defendant said that he did not have it. Yasser Arafat told Fathi to write a requisition asking for the money, and after Fathi did so, the Defendant took the requisition to Ramallah and transferred it to Arafat, who wrote to Harbi Sarsur and told him to pay the money. Harbi transferred the money to Fathi.

The Defendant was asked to tell about the meeting with the Iranians again. According to his statement, he met with two representatives; he believed the senior representative was a man named Ahmed Salem.

Prosecution Exhibit No. 10 – statement by the Defendant dated April 2, 2006, 2:01 p.m.: (As a parenthetical note, I shall state that the date on this statement was February 4, 2006. This is an error which is clarified in Prosecution Exhibit No. 13, and the correct date is April 2, 2006. Let us not forget that the Defendant could not have been interrogated on February 4, 2006, because he was arrested only a month and a half later.)

The Defendant stated that he had set up a Procurement Committee, which had set up an armaments storeroom, in which everything the Committee purchased was stored. The Defendant was asked about the Scientific Committee and stated that the activity of that committee consisted of teaching courses in the manufacture of materiel. The role of the Committee in the West Bank was to check that the arms purchased were serviceable. The Defendant was shown a document and he stated that this was a document by the Scientific Committee, in which they asked for soldering machines and lathes. The Defendant forwarded the requisition to Arafat, and he did not know what happened to it. The Defendant stated that the Scientific Committee belonged to the Fatah, the al-Aqsa Martyrs Brigades were Fatah operatives, and Yasser Arafat used to give the al-Aqsa Martyrs Brigades money for activities "under the table".

The Defendant stated that people from his office transferred $150,000 to Fathi Ghazem in order for him to purchase two fishing boats. Even before that, the Defendant had transferred $50,000, so that [Ghazem] would give them to the Lebanese to cover the expenses of smuggling barrels of weapons, about which he had spoken previously (in the previous statement).

32

Date: July 29, 2009                                                                    File No.: 3052/06

The Defendant stated that Fathi Ghazem met in Lebanon with Adel Mughrabi, Hezbollah and the
Revolutionary Guards of the Iranians. The Defendant asked him if he had told Arafat about it,
and Fathi said that he had told him about the plan to smuggle the ship and about his meetings in
that context. Fathi told the Defendant that he wanted him to talk to Arafat, because Fathi
needed $125,000 for the expenses of the ship. The Defendant talked about it with Yasser Arafat,
at the airport in Jordan. Yasser Arafat told the Defendant that Fathi should prepare a
requisition to receive the funds. Fathi did so and, three days later, the Defendant gave Arafat the
document. Arafat gave the Defendant written instructions to transfer the money to Fathi via
Harbi Sarsur, and the Defendant forwarded the requisition to Harbi Sarsur by messenger
and told Fathi about it.

The Defendant stated that he had transferred money to Mahmoud Zuheiri for him to buy arms
"from outside" (that is, from outside the Palestinian Authority). The Defendant stated that he had
a storeroom in Ramallah, in which they put all of the arms which they purchased from Mahmoud
Zuheiri, and they would distribute the arms on the instructions of Yasser Arafat.

The Defendant stated that in August 2001, he purchased seven missiles from Jumaa Abu Shukri,
for which he paid $75,000, and which he transferred to Abdel Razeq Majaida.

The Defendant stated that, in 2001, he was approached by an emissary from Marwan Barghouti
with two papers. One of them was a requisition for the purchase of ammunition for the al-Aqsa
Martyrs Brigades, in the amount of 25,000 dinars, and the second set forth the names of the
fighters in each area, in order for them to be paid their monthly salary. The Defendant forwarded
the papers to Yasser Arafat, for him to decide in the matter, and Yasser Arafat gave him an
instruction to give Marwan Barghouti the money which he asked for. The Defendant said that he
had no money, and then Arafat instructed the Ministry of Finance to transfer the money.

The Defendant stated that, when he came to Yemen, he was greeted by Taysir Ajina, who told
him that Adel's and Fathi's ship had arrived. Taysir told the Defendant that they had prepared a
passport for Adel Mughrabi and they also wanted to prepare a passport for Omar Akawi, the
captain of the ship.

The Defendant went on to state that he transferred money to Ali Mahsin, a senior official in the
Yemenite Army, as part of a partnership which was intended for the sale of tracer bullets for a
profit. In the end, however, the transaction was not carried out and he got the money back.

Prosecution Exhibit No. 12 – statement by the Defendant dated May 14, 2006: At the outset of
the interrogation, the Defendant was shown a document, and the Defendant stated that the
document had to do with a requisition which he had received for the purchase of a lathe and
cutting blades. The document had been transferred to him by Marwan Barghouti, and the

33

Date: July 29, 2009                                                    File No.: 3052/06

Defendant had forwarded the document to Arafat. The document did not come back to him with a payment order. The Defendant remembered that the document had been accompanied by two additional papers. One of them was a requisition for the purchase of arms, and the other was a requisition for the payment of salaries to members of the al-Aqsa Martyrs Brigades, but their names did not appear on his list and so he could not pay them.

The Defendant was asked what he had to add with regard to the Sagger missiles which they purchased, and he said that an instruction had come from Arafat to pay for the missiles, because he was afraid that [other] people would buy them and use them.

### The testimony by the Defendant at the principal trial – direct examination

The Defendant began his testimony by stating that he was the head of the Finance Department in the Palestinian Authority, and that his powers were those of a clerk who received his instructions from the *Ra'is* ["Boss"], Yasser Arafat, and the deputy *Ra'is*, Abdel Razeq Majaida. According to his statement, he had no authority to make decisions on his own; rather, he only acted according to written instructions.

The Defendant confirmed that, in fact, a meeting of all those in charge of the security organizations had taken place in Yasser Arafat's office in Gaza in 2000. He stated that all of those present at the meeting, except for him, customarily met with Israeli commanders. He claimed that what was said at that meeting was that it would be necessary to collect the weapons which were held by the public and by civilians and, if necessary, they should pay for them. According to his argument, his role was to ascertain who the owners of the weapons were and what the price was and to obtain approval from the *Ra'is*, who would sign the payment order. Only after receipt of an instruction would he release the money for payment.

According to the Defendant, the weapons were taken so that they would not be used by entities such as Hamas and the Islamic Jihad, which did not recognize the Oslo agreements. The Defendant claimed that no weapons were purchased outside the confines of the Authority. The Defendant also claimed that the weapons reached a storeroom in the National Security building, where his offices were also located, but that he was not in charge of the storeroom. To the best of his knowledge, the campaign to collect weapons was known to the public. The Defendant further stated that he did not know how many weapons were purchased or how much money was paid for them. He repeated that every expenditure was approved by Yasser Arafat. The Defendant stated that he was not the one who transferred the weapons and he did not know whether they were transferred to the Tanzim.

The Defendant confirmed that he knew the people whose names appear in the first count of the indictment, including Mahmoud Zuheiri. According to his statement, the latter was

34

Date: July 29, 2009                                                    File No.: 3052/06

seconded to his office from Ghazi Jibali, and his job was to bring the signed documents from Yasser Arafat. The Defendant claimed that he did not know whether Zuheiri's position included the purchase of the arms, and, in any event, the Defendant did not have a storeroom under his responsibility. According to his statement, the payments were made by check or in cash, and each amount was written down. The Defendant claimed that he did not see, did not buy and did not issue weapons. He only worked with the documents, and he himself was afraid of weapons. The Defendant again emphasized that he did not know how much money was paid or which weapons were purchased. The only thing he did was receive documents from the various security entities and give payment orders to people. The Defendant denied that he had purchased and distributed pistols or that he knew anything about it.

The Defendant denied having made payment to members of Fatah and denied that he had paid people in the Bethlehem area. According to his argument, there was an instruction from Yasser Arafat to pay NIS 500, but he did not know what they were being paid for. No one told him that those people belonged to the al-Aqsa Martyrs Brigades. The Defendant denied that an emissary had come to him from Marwan Barghouti or that he had seen a financial report which included expenses for the purchase of chemical materials for the production of explosives. He also denied that he had paid other financial expenses of the al-Aqsa Martyrs Brigades, or that he had received an instruction from Yasser Arafat to pay Marwan Barghouti 25,000 dinars, and in any event, he did not have such an amount to transfer.

The Defendant denied any relationship to the arms ship *Karine A*. According to his argument, he only heard about it after he was arrested in Jericho. The Defendant confirmed that he knows Fathi Ghazem, the Deputy Commander of the Palestinian Navy, and confirmed that Fathi Ghazem had given him a document from Yasser Arafat, according to which the Defendant was supposed to pay Fathi $125,000. According to the Defendant, he did not know what the payment was for and he refused to pay, because he did not have such an amount in the budget.

The Defendant confirmed that, when he was in Dubai for the purpose of purchasing vehicles, he was approached by Adel Mughrabi, who asked him to transfer a letter to Yasser Arafat. He met Adel Mughrabi together with other people and received a letter from them. He transferred it to Yasser Arafat and later found out that the content of the letter had to do with the Iranian proposal to help the Palestinian Authority, but he did not know and did not say anything about an arms ship.

The Defendant confirmed that, while he was in Yemen, he met Taysir Ajina at the Palestinian Embassy there, but he was not aware of the fact that, at that time, an arms ship had come into Hudeida Port in Yemen. He confirmed that Taysir told him that they were preparing a Yemenite passport for Adel Mughrabi, but he did not know why.

35

Date: July 29, 2009                                                                    File No.: 3052/06

The Defendant stated that the Palestinian Authority had received a gift of two million barrels of crude oil from Iraq, and that he had been given a proposal to make contact with the Iranians, so that they could sell the barrels for the Palestinians and divide the consideration. For this purpose, he met with the Iranian Commercial-Economic Attaché. The Defendant denied any relationship or any knowledge, on his part, with regard to any offer on behalf of the Iranians to help the Palestinians by providing training and weapons, and denied having been present at a meeting at which such a proposal was raised. The Defendant denied that he had signed the minutes of such a meeting. According to his argument, he had only transferred a letter from Adel Mughrabi to Yasser Arafat, and the latter had refused any contact with the Iranians.

## The testimony by the Defendant at the principal trial – cross-examination

In his cross-examination, the Defendant was asked if he was familiar with the al-Aqsa Martyrs Brigades organization. He answered in the negative and said that he had only heard about them in the media. He claimed that he had also stated in his interrogation that there was no such thing as the al-Aqsa Martyrs Brigades. The Defendant was confronted with two documents which had been presented to him at his interrogation of May 14, 2006, when he had stated that he knew nothing about those documents. When he was told that he had said to the police that one of the documents was a requisition to set up a lathe shop and the second was a requisition for salaries for the al-Aqsa Martyrs Brigades, he claimed that he did not know and had not said those things.

He claimed that he was at a meeting with Yasser Arafat, at which it was decided to purchase armaments. [He attended the meeting] by virtue of his position as a finance person, and the objective was to collect weapons from civilians. According to his statement, the only thing he did was to follow the instructions issued by Yasser Arafat, who approved the purchase of each armament individually.

The Defendant was asked about RPG bombs which arrived on a ship in June 2001, and stated that he had been given an instruction to pay the fishermen who found the bombs, as a monetary reward. The Defendant stated that he did not know where the ship with the bombs had come from, and when he was told that he had said to the police that it had come from Tripoli, he claimed that he had not said that. The same thing happened when he was confronted with the claim that he had told the police and the Israel Security Agency that arms had been purchased from Lebanon and Egypt. According to his statement, the arms which were purchased by him were only purchased from civilians, so that they would not fall into the hands of Hamas, and he did not know what was written in his statements.

36

Date: July 29, 2009

File No.: 3052/06

The Defendant confirmed that he had transferred $20,000 to Mahmoud Abu Marzuk, on the instructions of Yasser Arafat. He claims that he did not know what the reason was for this. When he was told that he had said to the police that it was intended for setting up a factory for the manufacture of materiel and hand grenades, he claimed that Mahmoud Abu Marzuk's house had exploded, and that he had learned afterwards that it had been used for manufacturing explosive charges.

The Defendant claimed that he did not know who Mahmoud Abiyat or Ataf Abiyat were. The Defendant was confronted with his statement to the police, according to which he transferred money to them so that they would not go to Hamas, and he claimed that he said that he had received an instruction from Yasser Arafat to transfer NIS 500 to Ataf Abiyat (the reference is to a monthly salary – Z.L.), whom he does not know personally, but whose name he knows, in contrast to his earlier statement.

The Defendant was confronted with an additional document, which had been presented to him in his interrogation, and which he claimed that he did not recognize. When he was told that, in his interrogation, he had stated that this was a document written by Mahmoud Zuheiri containing quotations for armaments, he said that he had not said that.

The Defendant stated that he was responsible for monies of the Palestinian security organizations, and that he was responsible for paying in accordance with written instructions which were given by Yasser Arafat.

The Defendant was asked by us whether he was familiar with the budget and its items, and confirmed that he was familiar with it, and that a payment order had to match an item which appeared in the budget. Accordingly, they would ask the recipients of the payments to state the purpose for which the requested money was required. If the payment order did not have an appropriate budget item, or if they refused to state the objective of the payment – the Defendant would refuse to pay, or would pass the requisition on to Yasser Arafat. He claimed that the budget item for the purchase of the arms was called "Payment for arms taken from civilians from within the State". The Defendant stated that, if he had received an exceptional instruction – for example, to pay money to a Hamas operative or to purchase textbooks for a school – he would not have performed the operation. In addition, the Defendant stated that he had a good relationship with Arafat and that there had been cases in which he had argued with Yasser Arafat about certain expenses and, in the end, Arafat had told him that he was right. He further stated that he had been praised for his methods of financial management. Only afterwards did he state that, if he had not implemented a payment order, he would have been put on trial. In a redirect examination by the defense attorney, the Defendant stated that any amount which had

37

Date: July 29, 2009                                                                                    File No.: 3052/06

to be withdrawn from the account of the Palestinian authority required the signature of the three signatories for the account, and he alone could not withdraw "even a penny".

## Evaluation of the testimony – credibility and weight

### The testimony by the Defendant – credibility and weight

The Defendant's testimony did not make a credible impression on us. He was obviously sticking to a story, according to which he had nothing to do with the arms ship *Karine A*, he had nothing to do with the contacts with the Iranians which concerned the coordination of training and the purchase of arms by the Palestinian Authority, and with regard to the purchase of arms, he was present at a meeting, the objective of which was to purchase arms from civilians so that they would not be used by organizations such as Hamas.

When the Defendant was confronted with things which had been recorded or presented to him in his interrogation, including documents which indicated that he recognized and knew why a certain payment was made, in a way which could not be reconciled with his version in Court, he stated that he had not said what was attributed to him in the interrogation. We cannot accept this. It is puzzling that things which are recorded in his statements, and which are in line with his version in Court, were in fact said by him to the police and were written down, whereas things which are not in line with his version in Court were not said by him, but were written down by the interrogators without his knowledge. This simplistic explanation with regard to the records kept by the interrogators does not sound in any way credible.

Furthermore: some of his arguments are *prima facie* not credible – for example, his statement that he was not familiar with the al-Aqsa Martyrs Brigades and that he did not know what they were, or his argument that he did not know who Ataf Abiyat was, especially when, immediately thereafter, he stated that money had been paid to the person in question by the office in Bethlehem. When he recognized his mistake, he claimed that he did not know Ataf Abiyat personally.

As we have already pointed out with regard to the preliminary trial, we are convinced that the things which are recorded in the Defendant's statements to the police were based on his own words and reflect things which he himself said. Accordingly, we must rule that his argument to the effect that those things were not said by him is mendacious.

Furthermore, the Defendant's arguments to the effect that he was only following orders, and that he did not know why some of the money was being transferred, are not in line with what he stated at the end of his interrogation – that he always ascertained that the payment matched a budget item, which means that he knew what the payment was intended for. His version to the

38

Date: July 29, 2009

File No.: 3052/06

effect that he was only following orders is not reconcilable with his statement that, if he had received an exceptional or strange payment order, he would have refused to carry it out, or with his statement in his interrogation, to the effect that he took action (with regard to the meeting with the Iranians) even before Yasser Arafat told him anything about the matter, because Arafat "wants to see results".

## The testimony by Mahmoud Abiyat – credibility and weight

The testimony given by Mahmoud Abiyat in Court, as we see it, was devoid of any credibility whatsoever, and accordingly is devoid of any weight. His argument to the effect that he had spoken, in his interrogation, of a person named Shumali and not Shubaki is an argument which was clearly intended to divert the guilt from the Defendant. We are not convinced that there is even a grain of truth in that argument. It should be stated that the Defendant said in his interrogation that he transferred money to Mahmoud Abiyat, and this is in line with Mahmoud's statement to the police. Accordingly, we prefer to accept Mahmoud Abiyat's statements to the police, rather than his testimony in Court.

## The factual infrastructure – summary

We have seen fit to prefer the content of the Defendant's statements to the police, rather than his testimony before us. Wherever there is a contradiction between the two versions, we have believed that the content of the statements to the police is preferable. The same applies to Mahmoud Abiyat's statements to the police. In light of this factual infrastructure, we must now examine the sections of the indictment which were attributed to the Defendant and to see whether his guilt arises from the evidentiary material before us.

Even before we perform an individual examination of each of the sections of the indictment, in view of the fact that the majority of the indictment is based on the Defendant's own statements, we must determine whether there is any evidentiary supplement, in the nature of an "additional item", to those statements.

In the case that is before us, we did not believe that there would be any real difficulty in this regard. An evidentiary supplement to the Defendant's statements can be found in the statement made by Mahmoud Abiyat, who confirmed the transfer of the salaries to him and to his men in Bethlehem, as the Defendant had stated. In addition, we have before us Prosecution Exhibit No. 8, which is a document which sets forth requisitions for the purchase of weapons and their price, as the Defendant stated.

39

Date: July 29, 2009

File No.: 3052/06

In Leave for Criminal Appeal 4142/04, **Millstein v. Chief Military Prosecutor,** Supreme Court Compendium 2006 (4), 4022, the Honorable Justice Levi considered the nature of the evidentiary supplement of the "additional item" type and ruled as follows (in paragraph 20 of his judgment):

*"The requirement for the 'additional item' is flexible and open in structure. The type of matters that are likely to satisfy that requirement varies from case to case, and also depends upon the credibility of the confession itself. The greater the weight which is ascribed to the confession in question – the smaller the weight of the 'item' which is required in order to verify the confession; on the other hand, the smaller the weight which is ascribed to the confession – the greater the weight of the 'item'. Accordingly, it has also been ruled that cases are likely to arise in which it is possible to accept an 'item' with a weight which is 'as light as a feather'."*

And as the Honorable Justice Arbel stated in the same ruling (in paragraph 20 of her judgment):

*"The requirement for an 'additional item' – similar to the 'item of reinforcement' and in contrast to 'corroboration'– is a requirement for an evidentiary supplement 'for verification'. Accordingly, and in contrast to 'corroboration', the 'additional item' does not have to point to the guilt of the Defendant; rather, it is enough to have an item of direct or circumstantial evidence, which is external to the Defendant's confession, which is capable of confirming, to a certain degree, the content of the confession and to indicate the veracity thereof... The requirement for an 'additional item' is intended to remove any suspicion that the Defendant is taking upon himself the responsibility for an action which was committed by another person or which was not committed at all, and therefore, in principle, a very small item of evidence is sufficient to comply with that requirement... Accordingly, case law has stated on more than one occasion that the weight of this item of evidence 'can be extremely light' and can even be 'as light as a feather'. This is enough for the Court to be satisfied that the confession is not 'a mere fiction' and will convince the Court that the story which the Defendant told in his confession is indeed a possible story."*

In the case that is before us, we have a confession by the Defendant, which extends over a large number of statements, both to the police and to the Israel Security Agency. His confession includes great detail with regard to various arms deals, including names, weapons and their prices, and detailed comments on his negotiations with various entities in the Palestinian Authority and with entities outside it (such as the Iranians). The inherent weight of these statements is very high. Both the content thereof and the way in which the statements were made indicate a high degree of credibility which should be given to them (cf. Criminal Appeal 6613/99, **Smirek v. State of Israel,** PD 56 (3) 529, in paragraph 12 of the judgment handed down by the Honorable Justice (as her title was then) Beinisch).

40

Date: July 29, 2009

File No.: 3052/06

But not only the test of the numerous items indicate the credibility which should be ascribed to the Defendant's statements. Rather, in accordance with that which has been set forth above, these statements have external verifying supplements, in the form of the statement given by Mahmoud Abiyat and in the form of Prosecution Exhibit No. 8. Moreover, the seizure of the arms ship *Karine A* is also in line with the statements which were made by the Defendant. Let us not forget that the Defendant himself did not deny, in his testimony before us, many details which appear in his statements, including a meeting with the Iranians.

In accordance with that which has been set forth above, the independent weight of the statements is high. The additional item, in this case, points to the Defendant's involvement in at least some of the offenses, and verifies all of the Defendant's statements. More precisely: the matters which are set forth in the Defendant's statements are all related to his position and his status as the head of the Finance Department of the Palestinian Security Services. When there is an internal affinity and a pertinent relationship between the various offenses, the evidentiary supplement which exists for one offense may also extend to another offense (see Criminal Appeal 241/87, **Cohen v. State of Israel,** PD 42 (1) 743; Criminal Appeal 7758/04, **al-Qadr v. State of Israel,** Supreme Court Compendium 2007 (3) 710; Criminal Appeal 378/03, **John Doe v. State of Israel,** Supreme Court Compendium 2005 (2) 1128). Accordingly, in the case that is before us, even though an evidentiary supplement exists with regard to only some of the statements made by the Defendant, in view of the pertinent relationship of the actions which are described in the indictment to those which are set forth in his statements, the evidentiary supplements should be considered as verifying all of the things which were stated by the Defendant in his interrogations. Accordingly, even if there is no external evidentiary supplement for a specific section of the indictment, in view of the affinity among all of the charges in this case, the statements made by the Defendant are sufficient to substantiate the conviction, insofar as it arises from the statements.

Now that we have clarified the evidentiary infrastructure before us, we shall address each of the counts of the indictment.

## Count 1 of the indictment:

The arguments that have been set forth by the defense with regard to this count of the indictment are arguments both in fact and in law. First of all, as to the factual aspect, the defense did not deny that the Defendant took part in the purchase of the materiel as set forth in this count of the indictment; however, it claims that this was a purchase of material which was aimed at taking weapons from residents of the Authority so that they would be in the hands of the Palestinian Authority forces. This argument was raised by the Defendant both in Court and during his interrogation. Second, it was argued that the Defendant was entitled to

41

Date: July 29, 2009

File No.: 3052/06

benefit from the defense of "act of state" because all that he did was to act with no independent discretion, but rather, in accordance with the instructions of the chairman of the Authority, Arafat, who approved the transfer of monies from the Authority for the purpose of purchasing the arms. The Defendant's role in this case was to sign documents which approved payment. It was argued that this act is not a war crime or a crime against humanity, because it has not been proved that the Defendant knew that the arms would reach the al-Aqsa Martyrs Brigades organization, which would use them for terrorism.

It was further argued that the Defendant could avail himself of the defense of justification, because obeying the instruction by the Authority, which was aimed at taking weapons from irresponsible entities and transferring them to the responsible control of the Authority, is a legitimate act, which is governed by the defense of justification.

It appears that the arguments that have been set forth by the defense cannot be accepted, even if only on factual grounds.

In order for the defense of "act of state" to be allowed, it is necessary to show that the entity on behalf of which the Defendant operated was a state. As set forth in the ruling on the preliminary arguments, which was handed down by my colleague, the Deputy President, the Palestinian Authority is not a state, and certainly, during the period which is relevant to the indictment, it was much farther from the status of an independent authority. Accordingly, the · Deputy President of the Court stated that: "This being the case, I believe that it should be ruled that the Defendant's actions pursuant to the indictment were not acts of state, as they were not committed on behalf of an entity which is a state; rather, at the very most, they were personal actions in the guise of state actions, through the use of resources of an unformed diplomatic entity."

No further support or additional evidence, which could have modified our conclusion with regard to the status of the Palestinian Authority, has been brought before us.

Secondly: the argument to the effect that the collection of the arms was intended to transfer weapons from residents, who were likely to use them for partisan purposes, to responsible entities, is unfounded. The Defendant raised this argument on a number of occasions, including in his interrogation, however, we do not have the impression that this argument is substantiated in any way whatsoever. In accordance with that which has been set forth above, we have already pointed out that our impression of the Defendant is that he is a sophisticated person, who is trying to shrug off the burden of responsibility and liability. Concurrently with the argument that the collection of the arms was intended to prevent irresponsible entities from using them, it appears that the Defendant approved the financing of actions which have absolutely nothing to do with the collection of weapons from

42

Date: July 29, 2009

File No.: 3052/06

irresponsible entities. Thus, for example, the subject of the financing of the setup of a factory for the production of explosives by people belonging to the Palestinian Authority itself, the financing of lathe shops, the financing of arms smuggling by outside entities such as Hezbollah and the Iranians, and so forth. If the entire objective had been the collection of "partisan" weapons, why is it necessary to finance the bringing of additional weapons which originate outside the confines of the Palestinian Authority – especially when the weapons in question are of a specifically offensive nature, such as rockets and missiles of various types? If the matter in question concerns only the purchase of weapons from civilians, why did the Defendant act to finance the costs of smuggling the weapons from Hezbollah into the hands of entities within the Palestinian Authority?

The answer to these questions is clear. The collection of weapons has nothing to do with the desire to prevent those "irresponsible" entities from using them for terrorist purposes. The objective of the collection of the weapons was to transfer them to entities within the Palestinian Authority which obeyed Arafat and which made it possible to engage in warfare against Israel, its forces and its civilians. As the Defendant himself stated, in the memorandum dated March 15, 2006, 6:15 p.m., in Section 30: "**Yasser Arafat gave an instruction that all of the weapons would be purchased by the Palestinian Authority, and not by Hamas or other organizations, so that he himself would be able to control everything that happened. In this way, Yasser Arafat would be able to control the strength of the intifada.**"

As we have seen, this is no innocent and "responsible" objective; rather, it is a clear objective which was intended to enable entities of the Palestinian Authority, headed by Yasser Arafat, to use offensive firepower to control the strength of the intifada – that is: the strength of Palestinian terrorism.

It should further be stated that the argument to the effect that the Defendant did not know that the weapons had been transferred to the al-Aqsa Martyrs Brigades organization, which used it for the purposes of terrorism, is an argument which is not in line with the evidentiary material. Thus, for example, in the memorandum dated March 15, 2006, 6:15 p.m., in Section 36, the following appears: "**The subject explained that each of the security organizations purchased materiel in large quantities and the subject approved the payment. All of the al-Aqsa Martyrs organizations used the weapons which were supplied by the security forces, which carried out the massive procurement.**"

As we have seen, the Defendant knew very well that the materiel which was purchased was transferred to the al-Aqsa Martyrs Brigades, which used those weapons. Obviously, the Defendant knew what the al-Aqsa Martyrs Brigades organization was and what its activities were. His attempt to tell us that he did not know what the organization was is an untenable

43

attempt to represent himself as an innocent person. We do not believe this argument. It is clear to us that the Defendant – who held a senior position in Fatah for decades and was close to Yasser Arafat – knew very well what the al-Aqsa Martyrs Brigades organization was, what its activities were, and knew very well that the organization in question was a tool in the hands of the Palestinian Authority for directing terrorism against the State of Israel and its residents.

It should further be stated that we did not gain the impression that the Defendant was a clerk who followed instructions with no discretion of his own. This results both from the senior nature of his position and from the facts which were brought before us, as well as from the statements which were made by the Defendant in Court. Thus, for example, on no small number of occasions, it transpired that the Defendant acted on his own initiative, with no approval whatsoever – and certainly with no explicit instructions – from Yasser Arafat, in the context of monetary expenditures. This was the case with regard to the "business initiatives" which were intended to make a profit for Fatah; his contacts with the Iranians, which were not known in advance by Yasser Arafat (but only retroactively); and the Defendant's own words to the effect that Yasser Arafat liked to see and to get results, and was not involved in the entire process itself from the outset. We shall also recall that the Defendant, in his own words in his testimony before us, confirmed that he did not transfer money if he did not have the appropriate amount, or if the purpose of the expenditure did not match a recognized item in the budget. This is not in line with a person who merely fulfilled every instruction by Arafat. Moreover, the Defendant stated, in his testimony before us on November 18, 2008, that if he were to receive an instruction which appeared strange to him, he would not carry out the action, and added that: "I had many disputes with the *Ra'is* on such things, and in the end, he came and told me that I was right." These words, which appeared to have been uttered with great pride on the Defendant's part, indicate that the Defendant was not merely a rubber stamp. When he thought there was a problem with this or that instruction by Arafat, he would tell him so, and would even argue with him.

In the case that is before us, and with regard to the action set forth in the indictment, the Defendant did not see fit to argue, even though we know that, had he seen fit to do so, he would have done so. The obvious conclusion is that the Defendant – by virtue of his position, *de facto* in his relationship with Yasser Arafat, and in light of his own actions, as those actions arise from the evidentiary material before us – had the discretion to approve, or not to approve, the transfer of funds. The Defendant knew very well what the purpose of the transfer of funds was, and he knew very well that the arms which were purchased with the monies in question were intended for the purposes of a terrorist organization – the al-Aqsa Martyrs Brigades.

Date: July 29, 2009                                                    File No.: 3052/06

**Summary:**

From the factual standpoint, no infrastructure has been laid which enables support of the arguments that have been set forth by the defense with regard to the availability of the defense of justification, or the defense of "act of state", for the Defendant. It has been proved that the Defendant knew very well that the purchases in question were of weapons which were to be transferred to the use of a terrorist organization – the al-Aqsa Martyrs Brigades. This was not a case of the purchase of weapons with a view to taking weapons out of the hands of residents and transferring them to "responsible hands", as has been argued by the defense.

The Palestinian Authority is not a state, and in any event, the transfer of weapons for the purposes of terrorism against the citizens and residents of the State of Israel cannot take shelter under the defense of "act of state", even if a state were involved.

Second: with regard to the defense of justification, even if we were to adopt the method advanced by my colleague, the Deputy President of the Court, who is prepared to recognize the defense of justification for entities in the Palestinian Authority under certain conditions, the act in question is not a legitimate act on the part of the Authority, and the purchase of weapons which are intended for the purposes of the terrorist organization is clearly an illegal act.

Because the Defendant was a partner to the purchase of weapons as set forth in Section 1 of the indictment, we convict him with regard to that which has been set forth in this section of the indictment.

**Count 2 of the indictment:**

This count concerns the transfer of salaries to operatives in the al-Aqsa Martyrs Brigades, as well as the transfer of a requisition by Marwan Barghouti for the payment of money for materiel.

The basis for this count lies in the statements by the Defendant, but also in the statements which were made by Mahmoud Abiyat to the police. The Defendant, in fact, confessed in his interrogation that he had transferred salaries to Mahmoud Abiyat's men, and the latter confirms this matter in his statement. Accordingly, the opening passage of this Count of the indictment is based on statements by the Defendant and has been given a significant evidentiary supplement in the statement by Mahmoud Abiyat. Accordingly, and in light of the factual analysis set forth above, there is a solid basis for convicting the Defendant of that which has been set forth in the opening passage of Count 2 of the indictment, because it involved the transfer of monies to terrorist operatives.

45

Date: July 29, 2009                                                          File No.: 3052/06

The closing passage of Count 2 of the indictment – the subject of the materiel sought by Marwan Barghouti – also appears, in detail, in the Defendant's statements, and, in essence, constitutes part of the general series of offenses which is described in Count 1 of the indictment, which involves the Defendant's share in financing various items of materiel for persons in the Palestinian Authority and for the al-Aqsa Martyrs Brigades.

With regard to the closing passage of this count of the indictment, the defense argued that the Defendant did not commit any offense, because all that he did was to forward the document to Arafat. The Defendant did not pay the amount requested, because his office did not have the budget to do so, and the payment for the requisition came from the budget of the Palestinian Ministry of Finance.

I cannot accept the argument that this was not an offense. The charge which is attributed to the Defendant is "Performance of a service for a prohibited organization". The service which the Defendant performed for the al-Aqsa Martyrs Brigades organization admittedly did not involve the transfer of money from his office; nevertheless, he did perform a service. This service included accepting the requisition and forwarding it to Arafat. The Defendant was the channel through which the requisition was handled and carried out. In accordance with that which has been set forth above, and as we have seen in the analysis of the facts in Count 1 of the indictment, the Defendant was a significant link in all of the acts of procurement and finances. Furthermore, he was also the channel through which all of the financial requisitions reached Yasser Arafat. The same holds true in this case as well. This act is a service for a proscribed organization, and accordingly, it is necessary to convict him of the charges which are attributed to him in the closing passage of this Count of the indictment as well.

It should further be stated that the statements set forth above with regard to the defenses of "act of state" and justification, which were raised by the defense, apply even more forcefully to this count of the indictment, because, in this case, the Defendant granted assistance and a direct service to the terrorist organization known as the al-Aqsa Martyrs Brigades.

## Count 3 of the indictment:

This count concerns the Defendant's part in the procurement of the ship *Karine A*.

According to an argument that has been set forth by the Defense, the Defendant did not commit any offense whatsoever. The money for the purchase of the ship did not come from his budget, but rather, from the budget of another office, which was headed by Harbi Sarsur. The Defendant did not initiate the bringing of the arms ship, and, at most, had indirect and not concrete knowledge of the fact that the ship would be carrying weapons. All that he did was to pass on the information about the ship to Yasser Arafat, who thought it was a plot to murder him.

46

Date: July 29, 2009

File No.: 3052/06

After examining the evidentiary material, we have found that the facts which are attributed to the Defendant in this count of the indictment have been proved as required. In actual fact, not even the defense disputed the fact that the facts set forth in the indictment were proven by the Defendant's statements. I shall comment that, with regard to the purchase of the ship, nothing bears out the allegation that Yasser Arafat refused this matter or thought that it was a plot. What was said by the Defendant referred to his meetings with the Iranians, which are set forth in Count 4 of the indictment, and not to the purchase of the *Karine A*, which Arafat approved with no problems whatsoever, according to the Defendant's own statements.

The central question which the defense raised is whether these acts constitute the offense of trading in war materiel.

The definition of the word "trading" in the Prohibition on Trading in War Materiel Order is as follows: "Purchase, sale, mediation, delivery, storage, transport, transfer, dispatch or repair".

This means that trading in war materiel does not only include acts of purchase and sale, but also mediation and transport of arms.

In the case that is before us, the Defendant took part in the following actions: he accepted the request by Fathi Ghazem for financing an arms ship which would come from the Iranians; it was explained to the Defendant that the weapons which would be on board the ship would be financed by the Iranians, and that the Palestinian Authority would have to finance only the ship and its expenses; the Defendant handled the request and passed it on to Yasser Arafat, who approved the conspiracy and agreed to the purchase; the Defendant was the one who transferred the requisition for payment to Arafat, who approved the transfer of the funds; when the Defendant announced that his office did not have an appropriate budget, Arafat gave an instruction for the payment to be made from the office of Harbi Sarsur, and the Defendant transferred that instruction by means of a messenger from his office; Fathi Ghazem was in contact with the Defendant for the purpose of receiving the information as to whether the order for the transfer of the funds had been issued.

These facts indicate that the Defendant was involved in the mediation and the financing of the arms deal. Even if his office did not pay the money directly, the Defendant was the one who made contact with Arafat and brought the subject of the arms deal before him for his consideration, study and decision. The Defendant was the entity which mediated between Fathi Ghazem, the Iranians and others and Yasser Arafat. The Defendant's role is accordingly not minor, but significant. It may be said that the Defendant was a significant factor in concluding the transaction, because his contacts with Arafat were of supreme importance for the purpose of executing the transaction.

Date: July 29, 2009                                                                    File No.: 3052/06

Even if the Defendant's office did not finance the transaction from the current budget, it should still be stated that the Defendant was involved "up to his neck" in this transaction, and that he constitutes an entity which took real and material action for the purpose of obtaining the financing for the purchase of the ship. Accordingly, he should be considered as having been involved in the purchase of the weapons, in the negotiations which he conducted with the Iranians from the beginning, in the purchase of means of transport of the weapons, and at the very least, in actions which constitute mediation for the purchase of the weapons.

In this case as well, it is obvious that the defenses of "act of state" and justification do not apply. In this case, the initial contact began even before Arafat knew about the subject of the arms ship, so that the Defendant certainly cannot say that his actions merely consisted of following orders.

Accordingly, the Defendant should be convicted of that which is attributed to him in this count of the indictment.

### Count 4 of the indictment:

This count concerns negotiations which the Defendant conducted with Iranian representatives outside the Area.

The defense did not dispute, with regard to this count, that the Defendant held a meeting with people who represented themselves as Iranians, and held a general conversation with regard to possibilities for Iran's assistance to the Palestinian Authority. The defense argued that the prosecution would have to produce an evidentiary supplement of the "additional item" type in order to prove that such a meeting took place, and that the persons with whom the Defendant spoke were actually Iranians. It was further argued that, as far as the Defendant was concerned, those meetings were full of suspicion and caution and were not based on a desire to cooperate, and that, in fact, Arafat, upon receipt of a document which described the meeting, rejected the idea set forth therein.

First of all, with regard to the required evidentiary supplement, we believe that, in this case, even in the absence of any evidentiary supplement with regard to this count itself, the existence of an evidentiary supplement for other counts constitutes an evidentiary supplement for this count of the indictment as well.

As we pointed out above, a supplement of the "additional item" type is a supplement which is intended to verify the Defendant's statements. Because it is a supplement for the purposes of verification and not of embroilment, there is no necessity for the evidentiary supplement to refer to each and every one of these counts of the indictment separately, provided that there is a relationship between the various counts of the indictment in question.

48

Date: July 29, 2009

File No.: 3052/06

In accordance with that which has been set forth above, in the case that is before us, there is an affinity between the Defendant's actions as set forth in this count of the indictment and his actions as set forth in the previous counts of the indictment. All of them concern his work and his status as the Finance Officer in the Palestinian Authority and as a person close to Arafat. Accordingly, the evidentiary supplements which were found with regard to Counts 1 and 2 of the indictment (Prosecution Exhibit No. 8 and the statement by Mahmoud Abiyat) also constitute an evidentiary supplement with regard to this count.

Furthermore, it is necessary to reject the argument that has been set forth by the defense, to the effect that these were only contacts with no real intention. While these were apparently initial contacts, nevertheless, by the very nature and quality of initial contacts of this type, they are at times accompanied by suspicion. This does not mean that the Defendant did not want to promote the contacts thereafter; in fact, he even brought the subject of the contacts before Yasser Arafat for decision.

Let us not forget that the elements of the offense in question require only the existence of the contact between the Defendant and another entity which is part of a hostile organization. In the case that is before us, it appears, on the basis of the proven facts, that not only did the Defendant actually meet and hold contacts with operatives of an enemy country; the Defendant acted on the basis of a desire to bring about what had been agreed upon with the Iranians and "to get results" for Arafat. Accordingly, we believe that all of the elements of the offense, in this case, were fulfilled by the Defendant.

I shall further state that, in this case as well, it is obvious that the defenses of justification and "act of state" do not apply, because the Defendant did not receive any order or instruction to carry out that which is attributed to him in this Count; rather, he acted on his own initiative and on his own recognizance, and only retroactively brought the results of the meeting to Arafat for his approval.

This being the case, the Defendant should be convicted of that which is attributed to him in Count 4 of the indictment.

## Conclusion

We have not seen fit to accept the preliminary argumentation that has been set forth on the part of the Defendant. We have seen fit to attribute full weight to his statements to the police and to the transcripts of his interrogations by the Israel Security Agency, and to prefer his statements, wherever the Defendant argued otherwise before us. In light of the content of the Defendant's statements, we believe that there is a complete factual infrastructure for proving the charges that have been attributed to the Defendant.

49

Date: July 29, 2009

File No.: 3052/06

The Defendant cannot avail himself of any defense in this case. In the case that is before us, the defense of "act of state" does not apply, *inter alia*, because the Palestinian Authority is not a state and, during the relevant period of time, its status was even farther from statehood than it is today. Even if this defense had existed under law in the Area, the Defendant could not have taken shelter under it, in light of the fact that he transferred weapons, knowing that the weapons were meant to be used by a terrorist organization such as the al-Aqsa Martyrs Brigades.

The Defendant cannot avail himself of the defense of justification, because, even in accordance with the broadest interpretation of this defense (which, in accordance with that which has been set forth above, appears in the ruling which was handed down by my colleague, the Deputy President of the Court, with regard to the preliminary arguments), the Defendant took part in actions which are not legitimate, in a way which is not in accordance with the powers which were granted to the Palestinian Authority in the interim agreements; he acted many times on his own initiative, and not as a follower of orders; and even if there were cases in which he followed orders, the acts in question are clearly illegal, since, in accordance with that which has been set forth above, they have to do with the transfer of weapons and resources to terrorist organizations.

In light of that which has been set forth above, we have decided to convict the Defendant of all of the charges which have been attributed to him in the indictment.

**Judge Lieutenant Colonel Ronen Atzmon:**

I concur.

**Judge Lieutenant Colonel Tal Band:**

I concur.

Handed down and notified this day, July 29, 2009, in public and in the presence of the parties.

|  Judge  |  President of the Court  |  Judge  |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

MARK I. SOKOLOW, *et al.*,

        Plaintiffs,

vs.

No. 04 Civ. 00397 (GBD) (RLE)

THE PALESTINE LIBERATION
ORGANIZATION, *et al.*,

        Defendants.

### DECLARATION OF RINA NE'EMAN

Rina Ne'eman hereby certifies as follows:

1.  The attached translation from Hebrew to English is an accurate representation of the document received by Rina Ne'eman Hebrew Language Services, to the best of my knowledge and belief. The document is designated as "Israeli Military Court Case File No. 3052/06 The Military Prosecution v. Fuad Hejazi Shubaki, Verdict dated July 29, 2009."

2.  I am a professional translator with a B.A. in International Relations from the Hebrew University of Jerusalem (Israel) and 30 years of translation experience. I am fluent in Hebrew and English, and I am qualified to translate accurately from Hebrew to English.

3.  To the best of my knowledge and belief, the accompanying text is a true, full and accurate translation of the Hebrew-language document designated as "Israeli Military Court Case File No. 3052/06 The Military Prosecution v. Fuad Hejazi Shubaki, Verdict dated July 29, 2009."

Dated: March 7, 2014

Rina Ne'eman

ss.: New Jersey

On the _7_ day of March, 2014 before me, the undersigned, personally appeared Rina Ne'eman, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is signed to this Declaration and acknowledged to me that he executed the same in his capacity, and that by his signature on this Declaration, the individual executed the Declaration.

Sworn to me this
_7_ day of March, 2014

Notary Public

> SHELLY TESSEIN
> Notary Public
> State of New Jersey
> My Commission Expires Nov. 16, 2017
> I.D.# 2427073

תיק מס׳: 3052/06    תאריך: 29/07/09

1
**בית המשפט הצבאי יהודה**    
2

בפני כב׳ הנשיא: סא״ל צבי לקח    3
השופט: סא״ל רונן עצמון    4
השופט: סא״ל טל בנד    5

6

**התביעה הצבאית** .    7
(באמצעות סגן אנדריי ורשצ׳גין )    8

9

**נגד**    10

11

הנאשם: פואד חג׳אזי שובכי ת.ז. 410026173/שב״ס    12
(באמצעות ב״כ עו״ד אביגדור פלדמן)    13

14

15

16

**הכרעת דין**    17

18

**הנשיא סא״ל צבי לקח:**    19

20

הנאשם שלפנינו מואשם בארבעה פרטי אישום שעניינם העברת כספים לצרכי רכישת אמצעי    21
לחימה כפי שיפורט להלן.    22

23

**פרט ראשון — סחר בציוד מלחמתי**: מיוחס לנאשם כי החל משנת 2000 ועד לסוף ינואר 2002 עסק    24
בסחר בציוד מלחמתי. נטען כי הנאשם נטל חלק בישיבה בה הורה הורה יאסר ערפאת לו ולראשי    25
מנגנוני הביטחון לרכוש כל כמות של נשק מכל מקום אפשרי. הנאשם פעל ממועד פגישה זו יחד עם    26
אחרים לרכוש כמויות גדולות של אמצעי לחימה. הנאשם שעמד בראש משרד הכספים הפלסטיני    27
ריכז את בקשות אנשי המנגנונים השונים ואלו הועברו אליו כנירות עבודה. על מנת לוודא    28
שאמצעי הלחימה עליהם הוא משלם אכן קיימים, דרש הנאשם מתפונים אליו להביא את כלי    29
הנשק למשרדו ולצורך כך החזיק מחסן אמצעי לחימה ברמאללה וכן מחסן נוסף ברצועת עזה.    30
לאחר שאמצעי הלחימה הועברו לרשותו, היה הנאשם מגיש את נייר העבודה לאישורו של יאסר    31
ערפאת, ולאחר אישורו של זה, היה הנאשם חותם עליו אף הוא על הבקשה ומאשר לאנשיו להעביר את    32
הכסף לפונה באמצעות העברה בנקאית. במהלך התקופה הנ״ל נרכשו כ- 1000 טונות של אמצעי    33
לחימה תמורת 10-7 מיליון דולר. את אמצעי הלחימה דאג הנאשם להעביר למנגנוני הביטחון    34
הפלסטיניים בידעו כי חלק ניכר מאנשיהם הינם חברים בזרוע הצבאית של ארגון הפתיח    35
שביצעה פיגועים רבים אותה עת.    36

37

-1-

תאריך: 29/07/09.                                                                    תיק מס': 3052/06

1  **פרט שני – ביצוע שירותים עבור התאחדות בלתי מותרת**: נטען כי בתקופה האמורה בפרט האישום
2  הראשון העביר הנאשם הנאשם לחברי החוליות הצבאיות של ארגון גדודי חללי אלאקצא באזור בית לחם
3  משכורת חודשית בסך 500 ₪. באותה עת ביצעו חברי חוליות אלה פיגועים רבים. בחודש
4  אוקטובר 2001 קיבל הנאשם בקשה לתשלום של 25,000 דינר מידי מרואן ברגותי לצורך רכישת
5  אמצעי לחימה וחומרים לייצור מטענים, ולצורך תשלום משכורות ל-268 חברים בגדודי חללי
6  אלאקצא. הנאשם העביר בקשה זו לידי יאסר ערפאת, אשר הורה לו לשלם את הכסף באמצעות
7  משרד האוצר.
8
9  **פרט שלישי - סחר בציוד מלחמתי**: פרט זה מפרט את חלקו לכאורה של הנאשם במימון וארגון
10 ספינת הנשק קארין A, שנתפסה בתאריך 3.1.02 כשעליה כמויות גדולות של אמצעי לחימה
11 מסוגים שונים, ובכלל זה רקטות, מרגמות ומוקשים. נטען כי בחודש ספטמבר 2001 נפגש הנאשם
12 עם פתחי ראזם, וזה עדכן אותו בדבר מגעיו עם האירנאים בכל הנוגע למימון ספינת הנשק. פתחי
13 ראזם הודיע לנאשם כי על הרש"פ לשאת בעלות של 125,000 דולר. הנאשם הסכים לכך ואף
14 הסכים לפנות ליאסר ערפאת לקבלת המימון הדרוש לכך. בשלב מאוחר יותר העביר הנאשם
15 ליאסר ערפאת את דרישת התשלום וזה חתם עליה. הנאשם העביר את ההוראה של יאסר ערפאת
16 באמצעות שליח למשרדו של חרבי צרצור, אחראי על הדלק ברש"פ. הספינה ועליה הציוד
17 המלחמתי עוגנה בתימן. הנאשם, שהיה בתימן אותה עת, עודכן בדבר הגעת הספינה וקיבל דיווח
18 על הכוונה להכין דרכונים לשניים מאנשי הספינה. לאחר שהספינה הפליגה מתימן לתעלת סואץ,
19 נתפסה בידי כוחות צה"ל ביום 3.1.02, כאמור.
20
21 **פרט רביעי – מגע עם ארגון עוין מחוץ לאזור**: פרט זה עניינו מגעים שקיים הנאשם עם גורמים
22 איראניים, במטרה לתאם את שיתוף הפעולה הצבאי בין איראן לבין הרש"פ. בין היתר עלו
23 אפשרויות להקמת מפעלי תחמושת בתחומי הרש"פ, העברת אמצעי לחימה מלבנון דרך
24 החיזבאללה, ואימונים צבאיים לאנשי הרש"פ בלבנון ובאיראן. כמו כן נערך מסמך סיכום המפגש,
25 וזה הוצג לאחר מכן על ידי הנאשם ליאסר ערפאת.
26
27          <u>גדר הכפירה</u>
28
29 לא הוכחש כי הנאשם היה אחראי על ענייני הכספים של מנגנוני הביטחון ברשות הפלסטינית,
30 בתקופה הרלוונטית לכתב האישום. עם זאת נטען כי הוא פעל ברשות ובסמכות. עוד נטען, כי חלק
31 מהעובדות המפורטות בכתב האישום אינן נכונות. בנוסף, נטען כי אמרותיו של הנאשם,
32 המבססות את עיקרה המכריע של כתב האישום, נגבו ממנו שלא כדין.
33
34          <u>ניהול המשפט</u>
35
36 בראשיתו של ניהול התיק הועלו טענות מקדמיות אולם אלה נדחו בהחלטה שניתנה ביום
37 04.12.06. לאחר החלטה זו, ובעקבות כפירת הנאשם באשמה, החלה פרשת הבאת הראיות.
38 מרבית חומר הראיות הוגש בהסכמה, אולם הסכמה זו התייחסה אך ורק לחומר הראייתי שלא
39 התייחס באופן ישיר לנאשם. כך, למשל, לא הייתה מחלוקת כי נתפסה ספינת הנשק קארין A.

-2-

תיק מס': 3052/06

תאריך: 29/07/09

1    כאמור, כותב האישום מבוסס בעיקרו על אמרות הנאשם. מאחר והייתה מחלוקת על קבילותן של
2    אמרות אלה, נוהל משפט זוטא. הוסכם על ידי הצדדים כי ההכרעה במשפט הזוטא תינתן
3    במסגרת הכרעת הדין בתיק כולל. במסגרת תתינ העיקרי נדרשנו לשמוע עד אחד בלבד מטעם
4    התביעה, מחמוד עביאת, וכל יתר חומר הראיות, למעט אמרות הנאשם, הוגש בהסכמה. במסגרת
5    פרשת ההגנה העיד הנאשם.
6
7    התביעה הגישה סיכומיה בכתב, והסניגוריה השמיעה לבסוף את סיכומיה בעל פה, הגם שבאיחור
8    ניכר של 4 חודשים.
9
10   <u>משפט הזוטא</u>
11
12   <u>כללי</u>
13
14   כאמור, לאור טענת ההגנה כי אמרות הנאשם נגבו באופן שאינו חופשי ומרצון, נוהל משפט זוטא.
15   במסגרתו, ולאור טיעוני הזוטא שהועלו, נשמעו שלושת חוקרי המשטרה שגבו את אמרותיו של
16   הנאשם, וכן שלושה חוקרים של שירות הביטחון הכללי שניהלו את עיקר חקירתו של הנאשם.
17   במסגרת פרשת ההגנה במשפט הזוטא העיד הנאשם וכן העיד מר מחמד חיג'אזי, אשר היה עם
18   הנאשם באותו תא בחלק מהתקופה בה נחקר.
19
20   <u>טיעוני הזוטא</u>
21
22   א. נטען כי הנאשם נחקר לאורך חודשיים חקירות ממושכות במשך רוב שעות היממה תוך
23       שנמנעת ממנו שינה.
24   ב. נטען כי הנאשם הינו אדם חולה, שנזקק לטיפול תרופתי במחלות כרוניות, ותרופותיו לא
25       ניתנו לו ואף לא סופק לו תחליף הולם.
26   ג. נטען כי הנאשם היה אזוק בידיו וברגליו במהלך החקירה, דבר שגרם לו לכאבים עזים
27       ולתחושת השפלה קשה. עוד נטען שלעתים היו חוקריו משאירים אותו לבד בחדר כשהוא
28       אזוק, למשך ארבע עד שבע שעות, דבר שהביא את הנאשם למצב של כאב, פחד וחרדה
29       עמוקים.
30   ד. במהלך שהותו בחקירה, הורסו כוחות צה"ל את ביתו של הנאשם, עקרו עצי הדר ועצי זית
31       רבים בתלקתו והשמידו טון וחצי דבש. הידיעה אודות ההרס הבזאה את הנאשם לחרדה
32       ופחד ביחס לגורל בני משפחתו. החוקרים ניצלו זאת כדי לומר לנאשם שאם יודה יוכל
33       לצאת לחופשי ולסייע לבני משפחתו.
34   ה. נטען כי נאמר לנאשם שבשל העובדה שהוא אדם זקן וחולה ולא נותרו לו שנים רבות
35       לחיות, חוקריו אינם מעוניינים לחקור ולהחזיק אותו במעצר זמן ממושך. על כן, אם יודה
36       יצא מייד לחופשי. הודאותיו ניתנו בכפוף להבטחות אלה ובשל פעולת פיתוי זו.
37   ו. נטען כי חוקריו של הנאשם הטיחו בו האשמות שווא, וחזרו ואמרו לו שהוא משקר להם.
38       החוקרים נקטו בשיטות של התשה פיזית ונפשית. הנאשם שהיונו אדם מבוגר ומכובד

-3-

בקהילתו חש מושפל מהתנהגות החוקרים הצעירים כלפיו, ובצירוף מצבו חפויי הקשה, 1
ייחל למותו ולרגע שבו יסיים את החקירות. 2

ז. נטען כי הנאשם חתם על הודאותיו על מנת לרצות את חוקריו, ומבלי שידע מה כתוב 3
באמרות שנכתבו בשפה העברית, אותה אינו קורא. חוקרי המשטרה הסתמכו על זכ״דים 4
של השב״כ וכשעמד על אי הדיוקים והטעויות המנויים בזכ״דים נתנו לו חוקרי המשטרה 5
להבין כי ״יתוחו ובוחו״ יתרחש אם יחזור בו מהודאותיו. 6

7

נקדים ונאמר, כי לאור עדותו של הנאשם עצמו במשפט הזוטא, אשר לא עמד על חלק ניכר 8
מטיעוני הזוטא, צמצמה ההגנה בסיכומיה את טיעוניה לטענות זוטא שעניינן יחס משפיל כלפי 9
הנאשם. 10

11

<u>הראיות במשפט הזוטא</u> 12

13

עדותו של השוטר דוד מזרחי 14

15

עד זה מסר כי הוא דובר ערבית מהבית, מלימודיו ומהֶעבודה. בעת שהעיד בפנינו ציין כי הוא זוכר 16
את תווי פניו של הנאשם, אך לא זכר את פרטי החקירה במאת האחוזים. העד מסר שהוא נוהג 17
לזהות את החשוד שבפניו, ולאחר מכן הוא מזדהה כשוטר. הוא מקריא לו את התוכן האזהרה, 18
ולאחר שהחשוד מבין את תוכנה ותוהה עליה, נגבית העדות בצורה של שאלות ותשובות. העדות 19
נגבית בשפה הערבית, ונכתבת על ידו בשפה העברית. בתום כל עמוד הוא מקריא אותו לחשוד 20
בשפתו, וזה חותם עליו. לפי הרשום באמרת הוא כיבד את הנאשם בסיגריה ואיפשר לו לעשן. העד 21
ציין כי התרשם שמצבו של החשוד היה ״בסדר״ ושחתַצ מסוגל למסור עדות, שלולא כן היה רושם 22
זכ״ד בעניין, או מציין זאת באמרה, ונמנע מהמשך גביית העדות. כך הדבר גם לגבי אירועים 23
חריגים במהלך העדות. כשהתבקש לציין דוגמאות לאירועים מיוחדים שהיה רושם לו התרחשו, 24
מסר כי הדבר יכול להיות למשל, שחשוד מתלונן על כאבי ראש, כי אינו חש בטוב, או כי אינו 25
מסוגל למסור את העדות. הוא ציין כי תוך כדי גביית האמרה הוא מציין אירועים כגון כיבוד 26
החשוד בשתייה, או מתן סיגריה וכדומה. 27

28

העד מסר כי במהלך החקירה שניהל האווירה הייתה נינוחה, ותנאשם לא ציין בעיה כלשהי. 29
כשהנאשם ביקש לָעשן ניתנה לו האפשרות לעשות כן, ולא היה דבר חריג מעבר לכך. עוד ציין כי 30
במהלך החקירה הנאשם ישב מולו כשרגליו כבולות. העד מסר כי לא יכול להיות שהשאיר את 31
הנאשם בחדר לבד למשך זמן רב, שכן המדובר בחדר חקירה בו נמצאים תיקים נוספים, ובכלל זה 32
תיקו האישי, כך שלא יכול להיות שעזב את החדר. 33

34

העד נשאל לגבי הטענה כי נאמר לנאשם שביתו נהרס, שנעקרו עצי זית והדר והושמדו טון וחצי 35
דבש. הוא השיב כי עד למועד מתן העדות בבית המשפט כלל לא ידע שלנאשם עצי הדר ודבש, ותוא 36
(החוקר) בכל מקרה לא אמר דבר כזה. 37

38

-4-

תיק מסי : 3052/06                                                תאריך : 29/07/09

1   העד טען שמעולם לא אמר לנאשם כי נותרו לו שנים מעטות לחיות וכי אם יודה ישוחרר מייד,
2   ומסר כי הדבר אסור, והוא אינו נוקט אמצעים כאלה.
3
4   העד ציין כי עיין בזכ״דים של השב״כ לפני גביית העדות, וכי על סמך הזכ״ד הקריא לנאשם את
5   החשד נגדו, וזה היווה גם קו מנחה לעדות שנגבתה.
6
7   העד הכחיש את הטענה לפיה אמר לנאשם שאם יחזור בו מדבריו בשב״כ יקרה "יתוהו ובוהו".
8
9   העד נשאל האם חקירת השב״כ והמשטרה התנהלו באותו מקום, ומסר כי אף שמדובר באותו
10  מתקן, העדות נגבתה בחדר החוקרים של המשטרה. הוא ציין כי הוא לא נכנס לחדרי חקירות של
11  השב״כ, והם (השב״כ) לא נכנסים לחדרי חקירות של המשטרה. הוא אף ציין שחדר החקירות
12  של המשטרה נראה שונה מחדרי החקירות של השב״כ.
13
14  העד מסר כי אינו יודע לכתוב בערבית ולכן כתב את האמרה בעברית, חזר על כך שאת מה שכתב
15  תרגם לנאשם, וכן ציין כי הזהיר את הנאשם בערבית. העד ציין כי לא ידע כמה שעות ישן הנאשם
16  לפני העדות שנגבה, וגם לא ידע כמה יממות נחקר קודם לכן על ידי השב״כ והמשטרה. העד ציין כי
17  היה בפניו זכ״ד של הדברים שנאמרו במהלך החקירה בשב״כ טרם גביית ההודעה, אך לא
18  השתלשלות של כל החקירה או כל האירועים שקדמו לה. הוא מסר כי בדרך כלל נמצא בפניו זכ״ד
19  אחד, אך הוא אינו זוכר לגבי מקרה זה.
20
21                                    עדותו של השוטר משה לוי
22
23  עד זה ציין בעדותו בפנינו כי הוא זוכר את החקירה באופן כללי, אך לא לפרטי פרטים. הוא מסר
24  כי את הודעותיו של הנאשם גבה במתקן אשקלון, לאחר שהזהירו כחוק. החקירה התנהלה בשפה
25  הערבית והאמרות נכתבו בשפה העברית. לאחר מכן הקריא את ההודעות לנאשם בערבית והוא
26  אישר אותן בחתימת ידו.
27
28  העד מסר כי הוא מתעד אירועים חריגים המתרחשים במהלך חקירה באמרות עצמן וכן בזכ״ד
29  נפרד. במקרה של הנאשם הוא ציין בגוף האמרות את העובדה שנתן לנאשם לאכול ולשתות. הוא
30  מסר כי האווירה בחקירה הייתה נינוחה. הוא זכר את הנאשם כאדם בעל סבר פנים יפות, חייכן,
31  ששיתף פעולה וענה לשאלות שנשאל.
32
33  הוא זכר שהנאשם נזקק לטיפול תרופתי עקב מצבו הבריאותי – וכי תרופות סופקו לו על ידי
34  מרפאת הכלא. הוא זכר כי פעם אחת נכנס תובש לחדר וביקש לתת לנאשם את התרופה היומית
35  שלו. הוא מסר כי לאחר בירור שעשה, איפשר לנאשם ליטול את תרופתו, והוא תיעד זאת בגוף
36  האמרה (הודעה מסי 7 מיום 2.4.06 גיליון 3 שי 62).
37
38  העד מסר כי עד כמה שהוא זוכר הנאשם ישב מולו בחקירה לא אזוק. הוא הכחיש שאמר לנאשם
39  כי ביתו נהרס או כי עצים נעקרו ודבש חושמד, ואף הכחיש כי אמר לנאשם שאם יודה הוא

-5-

תיק מס': 3052/06

1  ישוחרר בשל מצבו הבריאותי וגילו, או כי אם יחזור בו מדברים שמסר בחקירת השב"כ יקרה
2  "תוחו ובוזהו".

3

4  העד ציין כי הגופנים (FONT) השונים באמרות המודפסות נובעים מכך שהמדובר בטופס מובנה,
5  והכחיש כי דובר בהעתקה ממקום אחר. הוא ציין כי בפתח הדברים באמרה מיום 19.3.06 שאל
6  את הנאשם לשלומו, והנאשם ענה "ברוך השם בסדר" והדבר נרשם. הוא טען כי כיוון שהנאשם
7  אדם מבוגר הוא שאל כדי להיות בטוח לגבי מצבו, ותיעד זאת בגוף האמרה. הוא מסר כי באופן
8  כללי ידע על מצבו הבריאותי של הנאשם, אך לא זכר בדיוק מתי נודע לו עניין זה. העד ציין כי הוא
9  לא זכר שקרא משהו יוצא דופן בזכ"דים של השב"כ לפני החקירה. העד עמד על כך שבחקירה
10 שהוא ערך, הנאשם הבין כי יש לו זכות לשתוק או לספר כל דבר. הוא הוסיף כי בפתח החקירה
11 הוא מציג את עצמו ומסביר לנחקר היכן הוא נמצא ולאחר מכן מקריא את האזהרת. עניין זה הוא
12 מבצע תמיד לכל חשוד ולכן הוא לא תיעד זאת באמרה, למעט פרטיו האישיים הרשומים. הוא טען
13 כי הוא מקריא כל דבר, גם את פרטיו האישיים של החשוד בפניו כדי לוודא שאכן אלו פרטיו, וגם
14 את האזהרה.

15

16 העד אישר כי חקירות בוצעה בחדר חקירות של המשטרה, המצוי במתחם חקירות של השב"כ
17 באשקלון.

18

19 העד ציין כי אינו זוכר התייחסות למצבו הרפואי של הנאשם בזכ"דים של השב"כ אותם קרא,
20 והוסיף כי אם הייתה בעיה רפואית הדבר היה עולה. מכיוון שהאמרה אכן נגבתה, משמעות הדבר
21 הינה שהנאשם היה כשיר לחקירה. הוא לא זכר אירוע יוצא דופן לגבי מצבו הרפואי של הנאשם
22 אבל זכר שהוא כיבד את הנאשם בשתייה חמה וקרה ובסיגריות, ושהנאשם עישן הרבה.

23

24 העד ציין כי ההודעה השביעית נגבתה לא בתאריך 4.2.06 כפי שרשום באמרה, אלא בתאריך
25 2.4.06, והמדובר בטעות סופר.

26

27      **עדותו של השוטר יעקב ברזני**

28

29 עד זה מסר כי הוא זוכר את הנאשם אך הוא מסתמך על הכתוב באמרות שגבה. הוא ציין כי הוא
30 גבה את האמרות בשפה הערבית, רשם אותן בערבית, ולאחר מכן תרגם אותן שוב בעל פה לעברית
31 עבור הנאשם. בעדות מיום 26.3.06 הוא הטיח בנאשם דברים שאמרו עליו אחרים, והנאשם
32 התייחס אליהם. העד לא מצא מעניין באמרה כי חיו אירועים חריגים במהלך החקירה, אחרת,
33 לדבריו, חיו אלה נרשמים. בעדות מיום 14.5.06 הוא הציג לנאשם מסמכים וזה התייחס לכל אחד
34 מתם. הוא ציין כי האווירה בחקירה הייתה טובה, וציין כי מדובר באדם מבוגר. העד מסר כי
35 הנאשם זכר פרטים מתוך המסמכים שהוצגו לו, ולהערכתו יש לנאשם זיכרון טוב.

36

37 העד מסר כי אם הנאשם היה מבקש להיבדק על ידי רופא, הוא היה רושם זאת באמרה ואף
38 מפסיק את גבייתה, שכן ידועה לו משמעותה של אמרה שנגבתה מנחקר שאינו במצב המאפשר
39 למסור עדות בצורה טובה. הוא ציין כי נתקרים המובאים בפניו אינם אזוקים אלא אם כן ישנו

תשש כי הם מסוכנים ועלולים להתפרע. במקרה של הנאשם דובר באדם מבוגר ולא היה בכך   1
צורך.   2

  3

העד נשאל האם אמר לנאשם כי הרסו את ביתו, עקרו עצים ותשמידו דבש, וענה כי זאת הפעם   4
הראשונה שהוא שומע על כך שנהרס ביתו של הנאשם. העד אף הכחיש כי אמר לנאשם שאם יודה   5
אזי בשל גילו המבוגר ומצבו הרפואי ישוחרר מיד. העד ציין כי לא השתמש באמצעי לחץ פיזי או   6
מילולי כלשהו, והכחיש בתוקף כי נתן לנאשם להבין שאם יתזור בו מהודאותיו בשב״כ יקרה   7
״תנהו ובוהוי״. העד טען כי לא היה צורך להפעיל כוח או לחץ, והכל התרחש באווירה טובה.   8

  9

בחקירתו הנגדית ציין העד כי אינו יודע כמה זמן נחקר הנאשם לפני שהוא חקר אותו, אך היו   10
מקרים שבהם היתה תקירה רצופה לפני כן, ואז המתינו התוקרים על מנת לאפשר לנחקר זמן   11
מנוחה. הוא אישר כי הוא מסתמך על זכ״דים של השב״כ, וכתוצאה מהם כתב את האמרת מעצר   12
לנאשם חלק מהזכ״ד בו נוחסה לו הברחת נשקים. העד אישר. כי הוא זה שביקש הארכת מעצר   13
בחלק מהמקרים, אולם לא זכר מהן פעולות החקירה שהתבקשו, ואמר כי לצורך כך יש לבחון את   14
הדו״חות שהוצגו לשופט שדן במעצר. העד ציין כי לא ידע מי תפס את המסמכים שהוצגו לנאשם   15
במסגרת האמרת מיום 14.5.06, או מי תרגם אותם. הוא ציין כי הוא עצמו אינו קורא ערבית, ולכן   16
הסתמך על התרגום, אולם לנאשם הציג את המקור בערבית. עוד ציין כי את העדות של אחר   17
אותה הציג לנאשם תרגם לו לערבית כיוון שזו היתה כתובה בעברית והנאשם אינו קורא עברית.   18

  19

**עדותו של המכונה ״יורי״**   20

  21

עד זה היה הממונה על חקירת הנאשם מטעם שירות הביטחון הכללי. העד מסר כי הוא זוכר את   22
החקירה ואת הנאשם. הוא טען כי דובר בחקירה מורכבת כשבסך כשבסך הכל האווירה הייתה מאוד   23
נינוחה, עם הרבה מאוד כבוד הדדי. העד הוסיף שהנאשם הוחזק בתא מעצר ככל העצורים, אולם   24
זכה בחקירה ליחס מאוד מכובד בהתאם למעמדו. הוא ציין כי כמעט בכל תקופת החקירה   25
הנאשם כובד באוכל ממטבח התוקרים, עישן סיגריות, וקיבל מענה גם לבקשות מיוחדות כגון   26
לבנים מסוג ״בוקסר״, ספר קוראן, ואפילו חיו מקרים שהוא ביקש להישאר בחקירה כי שיעמם   27
לו.   28

  29

העד דחה את הטענה כאילו הנאשם לא זכה לטיפול רפואי, ואמר כי מפאת גילו של הנאשם ועקב   30
תלונותיו נבדק על ד׳י רופא שב״ס והיה במעקב צמוד של מרפאת שב״ס. הוא הוסיף שהוא אישית   31
היה בקשר עם מרפאת שב״ס ווידא שהנאשם נבדק ובעיותיו הרפואיות טופלו בהתאם לשיקול   32
דעתם המקצועי של הרופאים. העד ציין כי מסר לנאשם שאין אפשרות להעניר לו תרופות, אולם   33
ערכר דינו יכול לתעביר פירוט של התרופות בהן הנאשם עושה שימוש. יחד עם זאת, העד מסר   34
שהאחריות על הטיפול הרפואי נתונה בידי רופא הכלא.   35

  36

העד התבקש לומר את התרשמותו ממצבו של הנאשם, ומסר כי לא התרשם שהנאשם לא יכול   37
היה להיחקר. הוא זכר מקרה אחד בו הנאשם יצא מהתא עיף מאוד ולכן הובא חובש לחדר   38

1    התחקירה, והנאשם הסביר כי הדבר קשור למצבו הנפשי ולא הפיזי באותו חיום. העד חזר וציין כי

2    היו מקרים בהם הנאשם ביקש להישאר בחדר החקירות דווקא.

3

4    העד התבקש להתייחס לשאלת אזיקתו של הנאשם בחקירה. הוא מסר כי ככלל, במרבית התחקירה

5    לא היה הנאשם אזוק כלל. יחד עם זאת, היו מקרים בהם הנאשם התעצבן וסטור לעצמו. על רקע

6    זה נאזק כדי לא לפגוע בעצמו, ומיד לאחר שנרגע הוסרה האזיקה. הוא ציין כי במקרים בהם יצא

7    מחדר החקירה למספר דקות היה הנאשם אזוק לכסא, אולם מדובר באזיקים עם שרשרת ארוכה

8    המאפשרת תנועת ידיים חופשית כולל עישון. הוא הדגיש כי מעולם לא יצא לפרקי זמן של 4-7

9    שעות כפי שנטען בטיעוני הווטא, ובדרך כלל דובר במספר דקות ולכל היותר לחצי שעה. הוא

10   הוסיף כי הנאשם לא התלונן על כך בפניו. לשאלת בית המשפט ענה העד כי לנאשם לא היה שעון.

11

12   העד התבקש להתייחס לטענה כי נאמר לנאשם שביתו נהרס, עציים נעקרו ודבש הושמד. העד ענה

13   כי זו הפעם הראשונה שהוא שומע על כך שלנאשם היה דבש, לא נאמר לנאשם דבר הנוגע לביתו

14   והחקירה כלל לא הגיעה לנושא זה. העד הכחיש כי נאמר לנאשם שאם יודה יוכל להשתחרר לעזור

15   למשפחתו או כי יוכל לחשתחרר בשל גילו ומצבו הרפואי.

16

17   העד אישר כי במהלך החקירה הוטחו בנאשם האשמות על בסיס החשדות שהיו בידי החוקרים,

18   והיו מקרים בהם נאמר לו שהוא משקר, אולם לא הייתה כוונה להשפילו. לדבריו, החקירה נוהלה

19   בחרבה כבוד הדדי ובמספר פעמים בתקירה אף ציין לנאשם לחיוב את היחס שקיבל מהעד. העד

20   עמד על כך שלא נעשה שימוש באיומים או בכוח, כי התחקירה התנהלה בשיג ושיח ארוך, וכי הוא

21   זוכר את האווירה בחקירה זו כיוצאת דופן לטובה ביחס לחקירות אחרות שניהל. הנאשם שיתף

22   פעולה בחלקים נרחבים של החקירה, והיו ימים בהם די היה לומר לנאשם כותרת של נושא

23   והנאשם מסר גרסה מפורטת בעניין.

24

25   בחקירתו הנגדית מסר העד כי נדע לו על מעצרו של הנאשם מכלי התקשורת כשעה לפני שפגש

26   אותו במתקן החקירה. עוד ציין העד כי את חקירתו הראשונה של הנאשם ניהל החוקר המכונה

27   "תאדיי", ואילו הוא לא היה מודע לה באותו זמן, אלא רק בדיעבד.

28

29   העד מסר כי גודלו של התא בו שהה הנאשם הוא סטנדרטי, יש בו חלון אולם זה סגור והאוורור

30   מובבסט על מערכת מיזוג מרכזית.

31

32   העד נשאל מדוע הנאשם נחקר ברצף ביום 15.3.06 החל משעה 10:55 ועד לאחר חצות, וזאת

33   כאשר הנאשם כבר נחקר לפנות בוקר משעה 02:40 ועד 05:45. העד ענה כי דובר בתחילת

34   החקירה, הנאשם ביקש לפרט את פעולותיו באופן כרונולוגי וזה לקח זמן. הנאשם לא הביע רצון

35   להפסיק את החקירה או ללכת לישון, ובמהלכה הוא אכל, שתה ועישן להנאתו.

36

37   העד התבקש להתייחס לאמירות המופיעות בכ"דינ'ט שערך החוקר המכונה "גיני", כמו "אתה

38   מתנהג כמו ילד קטן, יושב ומשקר במצא נתושה" וחאם תן שומרות על כבודו של הנחקר. העד

39   ענה כי בכל חקירה יש נקודות של עימות ואי הסכמה, ועדיין כבודו של הנחקר נשמר.

1

העד ציין כי הנאשם לא היה מנוע מפגש עם עו"ד, אך כל נושא הקשר עם עו"ד הוא באחריות    2
המשטרה. למיטב ידיעתו זו הודיעה לעו"ד על מעצרו של הנאשם, אולם הוא לא בדק זאת.    3

4

הסניגור הפנה את העד לזכ"ד מיום 19.3.06 בשעה 16:35, בו אמר הנאשם שמלבישים לו האשמות    5
ועדיף שיביאו חרב ויקטעו את ראשו, ושאל האם זה מצביע על אדם שקט ושלו. העד השיב כי    6
הוא לא התרשם שהנאשם הוא אדם שקט ושליו, אלא אדם שנוטה להתפרצויות חימה. הוא    7
הוסיף כי התנהגות זו ודוגמות לה של הנאשם אפיינו אותו לעיתים, למרות שרוב החקירה נוהלה    8
באווירה חיובית מאוד עם הרבה כבוד הדדי.    9

10

העד התבקש להסביר מהי "שיחת שכנוע" ומסר כי זו שיחה במהלכה מוצע לנחקר להגיע להבנה,    11
לתודדות במיוחס לו ומוסבר לו אופי המידע שברשות החוקרים. אופי השיחה תלוי בנחקר ובאופיו.    12
במקרה של הנאשם, עיקר השיחה עסק ברומו של עולם ובנושאים כלליים, כיוון שהנאשם הינו    13
אדם שהסתובב בהרבה מאוד מקומות, אך בסוף השיחה תמיד חוזרת לנושא החקירה. העד לא    14
זכר בדיוק מה נאמר באותה שיחה שלא הניבה פירות חקירתיים, אולם ציין שבין היתר נאמר    15
שעדיף לנאשם להודות.    16

17

העד נשאל האם אמירה לנאשם ש"יגיע להבנה עם חוקריו" פירושה הסכם שהנאשם יודה ואחר    18
כך ילך הביתה כי הוא זקן. העד ציין כי לא נאמר לנאשם שילך הביתה או כי הוא זקן. העד אמר    19
שלא קרה דבר כשהנאשם לא הודה, אולם הודאה היא לטובתו שכן כך תסתיים החקירה.    20

21

העד נשאל האם לא הופעל לחץ גדול על הנאשם באופן שגרם לו לרצות לפגוע בעצמו, כפי שמופיע    22
בזכ"ד מיום 21.3.06. העד אמר כי דובר בהתקף זעם של הנאשם בתחילת החקירת, ולאחר מכן    23
הוא נרגע וחזר לשיחת נינוחה, ארוכה ומפורטת.    24

25

העד הכחיש שהבטיח לנאשם שאם יימצא דובר אמת בפוליגרף לא ימשיכו לשאול אותו על אותם    26
דברים בהם יצא דובר אמת. נכון הוא שלאחר הבדיקה התמקדו בנושאים אחרים, אך אין מניעה    27
לחזור לאותם נושאים. לדבריו, הסיכום וההבנה עם הנאשם היו רק למקרה בו יצא דובר שקר.    28

29

העד הכחיש כי אמר לנאשם שאם יסיים את החקירת יעבור לבית הסוהר, שם התנאים טובים    30
יותר ולכן עדיף לו לסיים את חתקירה. כשהופנה לזכ"ד מיום 9.4.06 שעה 13:30 סעיף 8 בו נכתב    31
שהנאשם נשאל אם אינו רוצה לסיים את חקירתו ולעבור לכלא, שם יזכה לביקורי משפחותו, ענה    32
העד כי השאלה שהוצגה לנאשם הייתה בעניקר דרך לומר לו לגמור את החקירה. העד הוסיף כי    33
החקירה לא התמקדה רק בנושא הספינה "קארין A"_אלא גם בנושא מקורותיו הכספיים וקשריו    34
לתנזים פת"ח. ה"חבנה" בה מדובר היא שהנאשם ימסור מידע, לאו דווקא זה המוביל להפללתו.    35

36
37
38
39

1 **עדותו של המכונה "האדיי"**

2

3 עד זה הוא חוקר השב"כ שחקר את הנאשם ביום בו הגיע למתקן החקירה, ופעם נוספת בשלב

4 מאוחר יותר.

5

6 העד מסר שהנאשם נשאל לשלומו ונענה כי הוא חש בטוב אם כי אמר לו שהוא סובל מסרטן.

7 הנאשם לא התלונן על כאבים, ואם היה עושה זאת הוא היה מזמין רופא או חובש. העד אמר כי

8 לא נמסרו לידיו תרופות מעורך דינו של הנאשם, וכלל לא זכר לו שהנאשם ביקש תרופות. העד

9 נשאל לגבי שעת התקירה הראשונה, 02:40 וענה כי נדרש להתחיל בחקירה על ידי ראש הצוות וכך

10 עשה. עוד ציין כי למיטב זכרונו לא חקר את הנאשם כשזה אזוק, וגם אם היה זה עם אזיקים,

11 ולהערכתו לא היה, לא דובר באזיקי רגליים. העד הכחיש כי הוא השאיר את הנאשם פרקי זמן של

12 7-4 שעות בחדר תחקירות לבדו כשהוא אזוק. העד אף הכחיש שאמר או כי הכיר אמירה לנאשם

13 שביתו נהרס, עצים נעקרו והושמד דבש. הוא הכחיש כי הבטיח לנאשם כי ישוחרר אם יודה.

14

15 העד אישר כי נאמר לנאשם שהוא משקר, וטען כי המדובר בטענה לגיטימית מצדו של חוקר. הוא

16 מסר כי לא היה שימוש באיומים או בכוח בחקירה, ואם הנאשם פחד זה עניין סובייקטיבי אך

17 הוא לא הפחיד אותו בכוונה.

18

19 בחקירותו הנגדית מסר העד כי הוא ידע מיהו הנאשם וידע שהוא פעיל ותיק מאוד בפתח"ת, והיה

20 אחראי על מנגנון הרכש והכספים בארגון זה.

21

22 העד ציין כי מסר לנאשם דף המפרט בשפה הערבית את זכויותיו כעצור וכנחקר, אך הוא לא

23 הקריא לו אותו בעצמו. הוא אישר כי תמשפט הראשון שרשם בזכ"יד היה המשפט הראשון שאמר

24 לו הנאשם, והוא כי "נמאס לנאשם מהסיפור של קארין A".

25

26 העד התבקש לתאר את התרשמותו ממצבו של הנאשם בחקירה הראשונה שהתנהלה לפנות בוקר,

27 ואמר כי הוא זכר שנכנס איש מבוגר, עייף יחסית, בחתאם לשעה בה הגיע. הם שוחחו כרגיל, והוא

28 זכר כי הנאשם היה מעשן כבד, קיבל הרבה סיגריות, וכי השיחה התנהלה באווירה חיובית. הוא

29 לא זכר אם הנאשם חיה נסער או מדוכא, ולא זכר דבר חריג אחר. לדבריו, למיטב הבנתו, האמירה

30 של הנאשם ש"נמאס לו" מתייישבת עם העובדה שהיה במעצר הגנתי או מניעתי בעקבות פרשת

31 קארין A.

32

33 העד עמד על כך שתפקידו להגיע לחקר האמת, ואם הנאשם היה מוסר תזה הגיונית שהייתה

34 מתייישבת עם המידע המודיעיני, הוא היה מקבל אותה.

35

36 העד חזר ואמר כי הוא לא זוכר אם הנאשם היה אזוק בחקירות שערך, אבל אם היה שימוש

37 באזיקים הרי זה רק אם העד הרגיש מאויים. הוא חוסיף כי הוא לא זוכר דבר כזה, ואם הנאשם

38 היה צועק או משתולל הוא היה רושם זאת.

39

-10-

תיק מס': 3052/06

1    העד חזר והדגיש כי מסר את דף הזכויות והחובות לנאשם, ושם רשומות זכויותיו. הוא עצמו לא
2    אמר לנאשם כי זכותו לשמור על זכות השתיקה או להיות מיוצג בידי עו"ד.
3
4    העד עמד על כך שאם הנאשם היה מתלונן בפניו על שלא נותנים לו להכניס למתקן המעצר את
5    תרופותיו, או כי הוא מרגיש רע ואינו מקבל עזרה מרופא הכלא, הוא היה רושם זאת. עם זאת,
6    ציין כי ידע שהנאשם חוא אדם חולה. הוא אישית לא קיבל כל פנייה על הכנסת תרופות.
7
8    העד חזר והדגיש כי חקר האמת הוא "קדוש" והוא המטרה, ולכן כאשר הנאשם אמר לו שהוא
9    מוכן "להודות בכל דבר", הסביר לו כי אין מקום לדיבורים אלה ועליו לספר בעצמו מבלי לחוסיף
10   או לגרוע. הוא התרשם שהנאשם לא מוכן להודות בכל דבר, וידע לעמוד על שלו בחקירה. העד
11   אמר כי חקירת הנאשם נמשכה מאחר שהיו נושאים שדרשו ליבון והבהרה, והיו ידיעות אחרות
12   שהוא בחר להכחיש או לא להסביר אותן.
13
14            עדותו של המכונה "ג'יני"
15
16   עד זה היה חוקר שב"כ שנטל חלק בתקירוזו של הנאשם, וציין בפתח דבריו כי מאחר שחלפו
17   שנתיים ממועד החקירה, חלק ממנה הוא לא זכר.
18
19   העד עומת עם טיעוני הזוטא, ומסר כי הנאשם קיבל טיפול רפואי ממרפאת הכלא. הוא זכר
20   שבאחד הזכ"דים מסר הנאשם שיש לו פוליפים בקיבה, ותוך זמן קצר הוצא לבדיקה ולטיפול
21   רפואי. העד מסר כי כתוקר הוא אינו הסמכות בנוגע להעברת תרופות לנאשם, וכי החתלטות
22   בנושא זה הן הן של רופא הכלא. עוד ציין כי לא זכר לו מקרה בו הנאשם הסב את תשומת ליבו לכך
23   שהוא זקוק לטיפול תרופתי.
24
25   העד הכחיש כי הנאשם היה אזוק ברגליו בחקירות בהן נכח, והוסיף כי הנאשם נאזק בידיו לאחר
26   שחבט בעצמו ולאחר שהוזהר כי אם ימשיך לחבוט בעצמו ייאזק, על מנת שלא יוכל לפגוע בעצמו.
27
28   העד טען כי לא היה מקרה בו הושאר הנאשם אזוק לבדו בתדר למשך 7-4 שעות, וטען כי לא אמר
29   לנאשם שכוחות צה"ל הרסו את ביתו והשמידו עצים ודבש. העד הוסיף כי אף לא נאמר על ידו
30   לנאשם שאם יודה הוא יצא לחופשי לאור גילו.
31
32   העד ציין כי לא פעם אמר לנאשם שהוא מסתיר מידע ומסרב לתיתו לחוקריו, אולם לא השתמש
33   באלימות, איומים או ניסיונות הפחדה.
34
35   בחקירתו הנגדית נשאל העד ביחס למשמעות האמירה לנאשם כי "חובה לתקירה על מנת להוזדות
36   בכבוד". העד מסר כי להוזדות באמת זה כבוד, ומטרתו כחוקר היא שהנתקר יודה הודאת אמת.
37
38   העד ציין כי נושא החקירה היה מעורבותו של הנאשם בנושא הספינה קארין A, קשריו למימון
39   והברחת אמל"ח, וקשריו לאיראנים ולאחרים ממדינות ערב, שמטרתם ביצוע פח"ע נגד ישראל.

תאריך: 29/07/09

תיק מס': 3052/06

1  העד מסר כי רשם בוכ"יד שהנאשם "התנוהג כילד קטן", שכן חרף גילו המבוגר התנהג לפעמים
2  בחקירה בצורה ילדותית. כשהתנבקש להסביר למה הכוונה ענה, שהתנהגות ילדותית היא כשאדם
3  נתקף על מידע ומוסר גרסות כיסוי חפוטרת אותו מאחריות, אף שהוא יודע שהוקריו יודעים על מה
4  חם מדברים איתו.
5
6  העד ציין שנואמר לנאשם כי אל לו "להתנהג כמו פרחח", ובמילה "פרחח" כוונתו הייתה לאדם
7  שצעק, משקר, חסר כבוד שעושה הכול כדי להציל את עורו.
8
9  העד ציין כי ככל הנראה ידע באותה עת על כך שהנאשם נחקר לפנות בוקר על ידי החוקר המכונה
10  "האדיי, אולם לא מצא כל מניעה מלחקור את הנאשם עד השעה 18:00.
11
12  העד נשאל על דבריו מחקירה שתועדה בזכ"יד מיום 20.3.06, בה נרשם שאמר לנאשם שאין זה
13  מקרה שמעצרו הוארך ב-18 ימים לאור המידע הרב שהוא מסתיר מחוקריו. נטען בפניו כי בכך
14  הוא אמר לנאשם למעשה, כי ככל שיסתיר מידע מעצרו יתמשך. העד השיב על כך שניתן להבין
15  שבית המשפט החליט להאריך את המעצר בהסתמך על המידע שהיה בפניו. העד נשאל על
16  התבטאותו נוספת שלו כלפי הנחקר שתועדה בזכ"יד מיום 27.3.06. שם נרשם כי אמר לנאשם
17  ש"בסופו של דבר יודה". נטען בפני העד כי חהגיון אומר שהמשמעות הינה שעד שהנאשם לא יודה
18  – החקירה לא תסתיים. העד השיב כי זה לא מה שנכתב, ובסופו של דבר הנאשם אכן העביר הרבה
19  מידע.
20
21  העד נשאל על המקרים בהם הנאשם היכה את עצמו ואמר כי הוא זוכר שהנאשם היכה את עצמו
22  מספר פעמים בכפות ידיו, ומספר פעמים הצליחו להרגיע אותו על ידי בקשות שיפסיק זאת. עוד
23  ציין העד כי לדעתו זו התנהגות ילדותית. העד נשאל אם אין התנהגות זו מעידה על יאוש של
24  הנאשם, והשיב כי להערכתו זו הייתה הצגה, שכן עובדה שלאחר מכן הנאשם מסר עוד הרבה
25  מידע.
26
27  **עדויות עדי התביעה במשפט הזוטא – סיכום ביניים**
28
29  ניתן לחלק את העדויות שנשמעו לעדויות אנשי המשטרה ולעדויות אנשי השב"כ. אנשי המשטרה
30  מסרו כי תחקירה נוהלה בניחותה, ללא בעיה כלשהי, וכי הנאשם מסר דברים מרצונו הטוב
31  והחופשי. עוד נמסר כי הנאשם כובד במהלך החקירות במזון ובמשקה, לא הושאר לבדו, ולא
32  הושמעו כלפיו איומים כלשחם, או הבטחות בהקשר לחקירתו.
33
34  עדי השב"כ ציינו כי הנאשם קיבל יחס של כבוד בחתאם למעמדו. הם לא הכחישו כי היו בחקירתו
35  מקרים של "עימותי" במסגרתם חטיחו בנאשם כי הוא משקר וכי הוא מסתיר מידע, אולם טענו כי
36  הדבר הינו טבעי כחלק מחקירה. החוקרים הכחישו כי הנאשם הושאר פרקי זמן ארוכים לבדו
37  בחדר החקירות. לדבריחם, אמנם היו מספר מקרים בחם הושאר הנחקר לבדו, אולם דובר בפרקי
38  זמן קצרים, במהלכם היה אזוק בידיו באזיקים עם שרשרת ארוכה. עוד צויין כי הנאשם לא היה

-12-

1  אזוק במהלך החקירות, למעט במקרים בהם סטר לעצמו וניסה לפגוע בעצמו. גם במקרים אלה,

2  לאחר שהנאשם נרגע, הוסרו האזיקים.

3

4  גם חוקרי השב"כ הכחישו כי השמיעו כלפי הנאשם איומים, או כי מסרו לו שביתו נהרס וכיו"ב,

5  או כי הובטחו לו הבטחות שאם יודה ישוחרר מפאת גילו.

6

7  בכל הנוגע למצבו הרפואי, ציינו חוקרי השב"כ כי חסינפול בנאשם היה על ידי מרפאות הכלא,

8  ולאור גילו אף דאגו לכך שיקבל טיפול בהתאם לשיקול הדעת של גורמי הרפואה, עליהם אינם

9  אחראים.

10

11      **עדות הנאשם במשפט הזוטא – החקירה הראשית**

12

13  הנאשם פתח וציין כי הוא סובל מיתר לחץ דם, טחורים, אולקוס וכאבי גב.

14

15  הנאשם תיאר כי היה בכלא יריחו תחת פיקוח אמריקאי ובריטי, וכיצד ביום 14.3.06 בשמונה

16  בבוקר תחל מצור של צה"ל על המוקטעה ביריחו, עד אשר הגיע דחפור והרס את המבנה. הוא

17  ואחרים נלקחו למח"יק יריחו ובשעות הערב הועבר למגרש הרוסים. הנאשם ציין כי היה לו קר

18  כיוון שהיה לבוש בפיגימה בלבד. ממגרש הרוסים הועבר לאשקלון, וכל אותו זמן היה נתון

19  באזיקים.

20

21  חקירתו בשב"כ החלה באותו הלילה ונאמר לו כי הוא חייב להודות בכל דבר. הנאשם ציין כי אמר

22  לחוקרו שאין נגדו דבר, והוא אדם שמבצע את עבודתו וממלא הוראות.

23

24  לטענתו, היה אזוק במהלך החקירה בידיו וברגליו, וציין כי ידיו היו מלפנים. הנאשם אמר כי לא

25  קיבל את התרופות שהוא נוטל דרך קבע, ואף שביקש לראות רופא נאמר לו כי יראה אותו רק

26  למחרת. הנאשם טען כי נלקח לרופא רק לאחר שהתחנן פעמים רבות שיועבר לבדיקה. לאחר

27  בדיקת הרופא ניתנה לו תרופה רק נגד לחץ דם, אולם לא טיפלו בבעיותיו האחרות.

28

29  הנאשם ציין כי הוחזק בתא שגודלו מטר וחצי על שני מטר, והוא היה נרדם מחר מרוב עייפות,

30  אולם עקב הכאבים מהם סבל התעורר הרבה.

31

32  הנאשם אמר כי אינו זוכר רבות מחקירתו. הוא זכר שחוקריו רצו שהוא יודה שהוא קנה את

33  קאריץ A, אולם אין לו קשר לכך. לטענתו, חוקריו דיברו אליו בחוצפה, פעמים התייחסו אליו

34  בצורה אלימה ופעמים בצורה רגועה.

35

36  הנאשם טען כי חוקריו אמרו לו שהם מעוניינים בהודאה מפורשת ומפורטת על כך שהוא יודע על

37  הפרשייה של קאריץ A, ושאם יודה"- יוכל ללכת הביתה. הנאשם טען כי אמר לחוקריו שהוא מוכן

38  להודות אך לא לשקר.

39

-13-

1   הנאשם מסר כי עורך דינו אמר לו שהרסו את ביתו, וגרפו עצים וכוורות. לדבריו, החוקרים אמרו
2   לו שהם שמעו על כך, והעניין השפיע עליו באופן שלילי.
3
4   הנאשם נשאל על ביקוריו אצל רופא הכלא, ואמר כי גם כשהיה מתלונן היה מקבל רק אקמול.
5   כשנאמר לו שלאחר שהתלונן בחקירתו על בעיות עיכול קיבל תרופה בשם "גסטרו" ענה כי אינו
6   זוכר זאת. במקרה אחר זכר הנאשם שקיבל פראפין לבעיית העצירות שלו, אולם טען כי זה היה
7   חד פעמי. לדבריו, אף שקיבל תרופות ללחץ דם, הרגיש כי זה לא עזר לו. הנאשם נשאל אם סיפר
8   לרופא על תמותלות וכרוניות שלו, ואמר כי סיפר הכל וגם כי יש לו אסטמה, כי הוא מתקשה
9   לנשום בצורה טובה וכי הוא סובל מפעימות לב מואצות.
10
11  עוד ציין כי השוטר שגבה את אמרתו ישב עם דו״ח השב״כ ושאל אותו לגביו, אולם הוא אינו יודע
12  מה כתב השוטר, שכן החקירה התנהלה בערבית והדברים נרשמו בעברית.
13
14  הנאשם נשאל אם האמין שישוחרר אם ימסור את מה שחוקריו רצו לשמוע וענה כן. לדבריו,
15  חוקריו סיפרו לו על נחקר אחר שהיה צפוי לקבל 4 מאסרי עולם, אולם מוחמד דחלאן התערב
16  בעניינו והם שחוררו אותו.
17
18  הנאשם מסר כי לא ביקש מהחוקרים שיתקשרו לעו״ד, ומשפחתו היא זו שהתקשרה לעו״ד עבורו.
19  הנאשם הוסיף כי ביקש מחוקריו לראות עו״ד ותשובתם הייתה שאם יבוא עו״ד וישאל עליו הם
20  יתנו לו לראות אותו.
21
22  **עדות הנאשם במשפט הזוטא – החקירה הנגדית**
23
24  הנאשם מסר כי הרגיש מושפל בחקירתו. עוד מסר כי אמר לחוקריו את כל מה שהם רצו לשמוע.
25  לאחר מכן נשאל הנאשם באיזה שלב של התקירה "נשבר". הנאשם לא השיב על כך ישירות ותחת
26  זאת טען כי מההתחלה אמר לחוקריו שמה שיש לו לומר הוא יספר, ואת מה שהוא ידע הוא אכן
27  סיפר. כשנשאל אם הדברים שמסר ביום הראשון לתקירתו נאמרו לאחר לחץ, ענה כי סיפר את
28  הדברים כי זה מה שקרה וכיון שלא דובר בעניין סודי. עוד טען כי בחקירתו לא שיקר בשום שלב,
29  וסיפר את מה שהוא ידע, אולם אינו יודע מה נרשם בעברית.
30
31  לטענתו, חוקריו השפילו אותו, אמרו לו שהוא שקרן ודיברו אליו בצורה "מלוכלכת". עוד טען כי
32  היו עוזבים אותו בחדר ריק לבד כשהוא אזוק, ותוזרים רק כעבור כמה שעות.
33
34  הנאשם אמר כי בחקירתו פעל לפי הוראות החוקרים ובודאי לא הכתיב דרישות או את תנאי
35  החקירה. כשנשאל כיצד מצא את הכוח לומר לחוקריו כי "מדינת ישראל חייבת לו כסף", לא
36  השיב תשובה ישירה. הנאשם אישר כי עישן בחקירתו ואמר כי לקח סיגריות מחוקריו בההתאם
37  לבקשתו. הנאשם נשאל מה עוד קיבל והשיב "כלום". כשנשאל באופן ספציפי, אם קיבל קוראן,
38  קפה, תה ולבנים, ענה שקיבל. לדבריו הוא לא ביקש זאת אלא חוקריו הביאו לו.
39

                                        -14-

1  הנאשם חזר על כך שהיה נתון בלחץ מהיום הראשון, אולם הדגיש כי בחקירתו מסר רק את
2  האמת. עוד ציין כי הכחיש כל קשר לספינה קארין A וכי התעקש על כך.
3
4  לשאלות בית המשפט ענה כי הדברים חרשומים באמרותיו תורגמו לו, אולם הוא לא ידע מה
5  נרשם בפועל. עוד ציין כי הנאשם כי חיה מתעצבן לעיתים בחקירתו (״מרוב הדיבורים הבן אדם
6  משתגע״) אולם עצביו התבטאו בכך שהוא ״התפרוץ מבפנים״ ולא הראה זאת לחוקריו.
7
8  עדותו של מוחמד חיג׳אזי
9
10  עד זה מסר כי היה עם הנאשם באותו תא בכלא אשקלון באפריל 2006, למשך כשבועיים. הוא
11  מסר כי הנאשם היה חולה ותלש והיה קשה לו לנשום, ללכת או לעמוד על רגליו. הוא טען כי
12  פעמים רבות הוא וחבריו לתא דפקו על דלת התא וביקשו רופא עבור הנאשם, כי ״הוא הולך
13  למות״ וחסוהרים נתנו לנאשם ״מקסימום אקמול״. הוא ציין כי מעולם לא הגיע רופא לתא.
14
15  בחקירתו הנגדית ציין העד כי היה עם הנאשם בתא החל מ־12/04/06 למיטב זכרונו. הוא טען כי
16  בתקופה של השבועיים שהיה יחד עם הנאשם בתא יצא זה רק לשירותים ולמקלחת, ולאחר מכן
17  הוסיף כי יצא גם לחקירות. כשנשאל לתגובתו לכך שישנם מסמכים רבים של חובשים ורופאים כי
18  ראו את הנאשם באותה תקופה, ענה כי בתקופה שהיו ביחד זה לא קרה. עוד הוסיף כי כל פעם
19  שהנאשם חזר מחקירה הוא סיפר להם (לחבריו לתא) על כך. העד התבקש לומר שמות אנשים
20  נוספים איתם ישב באותה תקופה וענה כי יש אנשים שהוא זוכר את שמותיהם, אך לא נקב בשם
21  כלשהו.
22
23  העד ציין כי הנאשם אמר לו שהחקירה גורמת לו ללחץ נפשי, שהוא כל הזמן היה כפות לכיסא
24  ושהוא קיבל יחס רע. עוד אמר לו הנאשם שהוא סובל מסרטן וחווא צריך תרופות. העד אמר כי
25  הנאשם לא סיפר על הדברים שקיבל מחוקריו, כגון פירות, סיגריות ותחתונים.
26
27  הכרעה במשפט הזוטא
28
29  ניתן לומר שטיעוני הזוטא מעלים טיעונים בתחום ה״השפלה״, נקיטה בשיטות חקירה בלתי הוגנת
30  על ידי יצירת לחץ נפשי בלתי הוגן כמו גם פיתוי והשאה. ההכרעה במקרה זה הינה הכרעה
31  עובדתית, הנובעת מהתרשמותנו הבלתי אמצעית מהדברים שנאמרו בפנינו.
32
33

<u>הערכת העדויות במשפט הזוטא – מהימנות ומשקל</u>   1

2

**מהימנות עדי התביעה**   3

4

לא מצאנו כי עדי התביעה היו הסרי אמינות, כפי שביקשה לטעון ההגנה. אכן, אין ספק כי הנאשם   5

היה נתון בחקירה במהלכה ביקשו החוקרים לקבל מידע רב ככל האפשר מהנאשם בנוגע לפעילותו   6

במימון הטרור הפלסטיני.   7

8

ככל חקירה, היא לא התנהלה בתנאים נוחים ונעימים. הנאשם היה כלוא במתקן חקירות, ונחקר   9

תקופה ממושכת. יחד עם זאת, ישנו פער בין חוסר הנוחות האינהרנטי לקיומה של חקירה, לבין   10

נקיטה אמצעים שיכולים לשלול את רצונו החופשי ואת יכולתו לבחור אם למסור מידע מפליל על   11

עצמו.   12

13

כעולה מהכתוב באמרות, ועל כך לא חלק הנאשם בעדותו, במהלך חקירתו במשטרה הוא קיבל   14

סיגריות לעישון כאוות נפשו, וכובד בשתייה ובמזון במהלך התחקירה. כך למשל, באמרה מיום   15

19.3.06 גליון 5 שי 132 נרשם "בשלב זה התשוד מבקש להתפלל והודאת התשוד מופסקת לעניין   16

זהי", וכן נרשם בגליון 6 שי 164 במהלך הדיאתו כובד התשוד בשתייה חמה, שתייה קרה ועוגיות".   17

באמרה מיום 20.3.06 עמי 1 שי 18 נכתב "החשוד מקבל סיגריה ומעושן" ובהמשך (עמי 2 שי 19)   18

נרשם כי "התשוד מקבל מים לבקשתו כדי לבלוע כדורי". באמרה מיום 22.3.06 גליון 5 שי 118   19

נרשם כי כובד בשתייה חמה, שתיה קרה וסיגריות, ובאמרה מיום 30.3.06 גליון 6 שי 144 נרשם   20

דבר דומה. גם באמרות שנגבו ביום 2.4.06 (ת/9 ות/10) נרשם כי קיבל כיבוד. קשה לתאר מצב בו   21

חקירה מתנהלת באופן דורסני ואכזרי, כטענת ההגנה, ואגב כך ניתנת לנאשם האפשרות להתפלל,   22

לעשן כרצונו, לאכול ולשתות, וכמובן ליטול תרופות.   23

24

יש לומר כי כיבוד כגון אוכל שתיית וסיגריות ניתן לנאשם גם במהלך חקירותיו בשבייכ. כבר   25

בחקירתו הראשונה (זכייד מיום 15.3.06 שעה 02:40) כובד בקפה, ובחקירה שלאחר מכן (זכייד   26

מיום 15.3.06 שעה 10:55) כובד בארוחות צהריים, סיגריות וקפה. ניתן לראות כי יחס זה נמשך   27

לאורך כל חקירותיו, וכמובן בכל זכייד מופיע כי הנאשם קיבל אוכל, האפשרות לצאת לשירותים   28

קוראן (זכייד 16.1.06 שעה 10:00, זכייד מיום 21.3.06 שעה 12:00), האפשרות לצאת לשירותים   29

(זכייד מיום 20.3.06 שעה 11:40) והאפשרות להעלות בעיות הנוגעות לתנאי כליאתו בפני חוקריו   30

(זכייד מיום 3.4.06 שעה 11:00, סעיף 1). הנאשם לא חלק על קביעות אלה שבזכיידים. יחס זה אינו   31

אופייני למי שמבקשים לרמוס את רצונו החופשי, לחשפילו ולפגוע בו.   32

33

מעבר לנושא התקרובת שהוגשה לנאשם, מהזכייזים מחקירת השבייכ לא עולה כי דובר בנחקר   34

"שבורי" ומושפל, שכן הנאשם התייחס פעמים רבות לנושאים שאינם קשורים לחקירה, כנושאים   35

פוליטיים ומדיניים כלליים (זכייד מיום 16.3.06 שעה 10:00 סעיפים 25-24, זכייד מיום 27.3.06   36

שעה 16:30 סעיף 1, זכייד מיום 11.4.06 שעה 10:00 סעיף 12), ואף אמר לחוקריו כי מדינת ישראל   37

חייבת לו 275 אלף דולר שלקחח מארון במוקטעאה (זכייד מיום 19.3.09 שעה 16:35, סעיף 18).   38

התנהגות כזו אינה אופיינית למי שנשבר בתחירתו ומוכן לרצות את חוקריו ולומר כל דברֿ שהם   39

-16-

1 רוצים רק על מנת שהחקירה תסתיים, אלא למי שמרגיש מספיק בטוח בעצמו כדי לומר את אשר
2 על ליבו.

3

4 חשוב להדגיש כי עדי התביעה לא ניסו ליפות את תנאי החקירה. הם לא הכחישו כי היו תקופות
5 קצרות בהן הושאר לבדו בחדר, ואז נותר אזוק, אולם נטען כי דובר בפרקי זמן קצרים. הם אף לא
6 הכחישו כי הנאשם נאזק לאחר שסטר לעצמו והחל להשתולל (ראו"יד מיום 21.3.06 שעה 12:00
7 סעיפים 3-2), החוקרים אף לא טענו כי הנאשם היה אדם נינוח ושליו, אלא אמרו כי הנאשם היו
8 אדם מחיר חימה, ואת עצמו היה מפנה כלפי עצמו, ולכן נדרשו לאזקו לעתים. הם גם לא הכחישו
9 כי מדי פעם פנו לנאשם במילים שלא נעמו לאוזנו – כגון אמירה שהנאשם משקר, מתנהג
10 בילדותיות או כפרחח – אך לא הוכח כי נקטו השפלה כשיטת חקירה.

11

12 תיאור זה של החוקרים נראה לנו אמין. לא מצאנו כי יש בו פירכות או סתירות, והוא תואם את
13 הדברים הרשומים בזכ"דים, ובמידה מסוימת את עדותו של הנאשם בבית המשפט. (דוק: ישנו
14 פער משמעותי בין עדות הנאשם בבית המשפט, לבין טיעוני הזוטא שהעלתה ההגנה בתחילה –
15 טיעונים שנזנחו בשלב הסיכומים לאור עדות הנאשם. כבר עתה ניתן לומר שהחרושה העולה
16 מעדותו של הנאשם לא תאם את טיעוני הזוטא שמסר.

17

### אמינות עדותו של מוחמד חיג'אזי

18

19

20 בטרם נדון במהימנותו של הנאשם נקדים ונאמר כי אמינותו של מוחמד חיג'אזי בעניינינו הייתה
21 נמוכה מאוד. תמוה בעינינו כיצד העד זכר "יהוטבי" את כל שקרת לנאשם, וכיצד "התבהגנו" לטיפול
22 רפואי עבורו שלא ניתן, אולם לא ידע לומר מי עוד היה כלוא אינתו בתקופה זו. דבריו אף
23 אינם מתיישבים עם תיקו הרפואי של הנאשם, ממנו עולה כי גם במהלך התקופה עליה העיד
24 מוחמד חיג'אזי, טופל הנאשם מספר פעמים על ידי מרפאת הכלא. על פניו נראה היה כי עדותו של
25 מוחמד חיג'אזי הינה עדות שכל מטרתה לסייע לנאשם במשפטו, וכך, לכל הפחות, הוקצן עד מאוד
26 מצבו הרפואי של הנאשם. עוד יש לומר כי מוחמד חיג'אזי אמר שהנאשם התלונן בפניו על כך
27 שהוחזק כפות לכיסא – טענה שהנאשם עצמו לא חזר עליה. לפיכך, לא מצאנו לנכון להעניק
28 לעדותו של מוחמד חיג'אזי משקל כלשהו.

29

### מהימנות הנאשם – כללי

30

31

32 הנאשם טען, באופן חד משמעי, כי לא מסר בחקירתו דבר שאינו אמת. למרות ניסיונו של התובע
33 להבין באיזיה שלב "נשברו" הנאשם והחל למסור לחוקריו דברים בהתאם לרצונם כביכול, עמד
34 הנאשם על כך כי מסר את כל הידוע לו בלא בעיה כלשהי. הנאשם הכחיש כי קשר עצמו לספינה
35 קארין A, בניגוד למופיע באמרות המשטרתיות.

36

37 נראה כי הגם שהנאשם טען כי חש מושפל, לא היה בכך, בהתאם לטענתו, כדי להשפיע עליו לומר
38 דבר שלא היה ברצונו לומר. נדגיש כי הנאשם לא טען שגם את דברי האמנת שמסר סירב למסור
39 לחוקריו, וזו הוצאה ממנו שלא באופן חופשי ומרצונו. הנאשם טען לאורך עדותו בפנינו כי מסר

דברי אמת, כי דברים אלה נמסרו מרצונו כיוון שלא התביישו בהם וכיוון שלא היה בהם משום סוד    1
כלשהו.    2

   3

כאמור, הדבר היחיד שהנאשם לא היה מוכן לקבל היו הדברים הרשומים באמרותיו, ולטענתו    4
הנודוגבר בדבברים שלא נרשמו מפיו, ומכיוון שאינו יודע לקרוא עברית, לא יכול היה לדעת כי אלה    5
נכתבו. נראה כי הנאשם זנח את טיעון הזוטא לפני חוקרי המשטרה איימו עליו בייתורו ובוחוי אם    6
לא יתזור על הרשום בזכי״דים של חוקרי חשב״ק, שכן לא הזכיר זאת בעדותו בפניו כלל.    7

   8

עוד נצויין כי הרושם הבלתי אמצעי מעדות הנאשם היה של מי שהגזים בעוצמת התשפלה שחש    9
ובטענות בנוגע ליחס שקיבל, בתהאם לקו הנטעון במשפט הזוטא. מכל מקום, גם אם סובייקטיבית    10
חש חשפלה במצב אלו נקלע, נדגיש כי הוא לא היה מוכן לאשר ולומר כי מסר דבר שאינו נכון, או    11
כי נשבר בחקירתו. הרושם שלנו הוא כי הנאשם נקט קו ״עצמאיי״ מפו התהגגה במשפט, ביחס    12
לדברים שהוא חשב שצריך להשמיע לבית המשפט. הנאשם רצה לומר שמסר רק דברים נכונים    13
ואמיתיים מרצונו, אך באותה עת לומר שסבל בחקירתו. הדברים אינם יכולים להתיישב עם    14
הטענה כי אמרותיו נגבו שלא מרצונו החופשי. ברור שסיטואציה של חקירה אינה נוחה ואינה    15
נעימה, ודאי לא לאדם מבוגר שהחזיק בעבר בעמדה בכירה. עם זאת, לא התרשמנו כי הנאשם חש    16
בשלב כלשהו בחקירה מצוקה שמנעה ממנו לבוא בדרישות או שהובילה אותו לומר דברים שלא    17
מרצונו הטוב והחופשי.    18

   19

מהימנות הנאשם – הטיפול הרפואי    20

   21

טענותיו של הנאשם בנוגע לטיפול רפואי או העדרו אינן מתיישבות כלל עם המצוי בתיקו הרפואי.    22
כן, למשל, במסמך המתעד את בדיקתו לפני קליטתו במתקן הכליאה ביום 14.3.06 נכתב מפיו של    23
הנאשם כי ״מצוין שששול כרוני, נוטל COLATAL לפי הצורך, שולל מחלת לב, סוכר, ילי״ד או    24
בעיות אחרותי״. ביום 15.3.06 בשעה 14:19 נבדק שוב בכלא שקמה. גם במקרה זה, ואף שנבדק על    25
ידי רופא אחר, הרי בתלון בו נשאל על מחלות בעבר נרשם ״שוללי״, וכן נרשם כי הוא משתמש    26
בתרופה אחת והיא COLATAL לקיבה. רישומים אלה אינם מתיישבים כלל עם דבריו כי הוא סבל    27
מבעיות רבות וכי מסר את הדברים לרופאי הכלא. ביום 15.3.06 בשעה 18:15 שוב הובא בפני    28
רופא, ושם נרשם כי הנאשם התלונן על עצירות וצרבת וניתן לו טיפול תרופתי. עינינו הראאות, כי    29
ברגע בו התלונן הנאשם על בעיה כלשהי, לא רק שלא נמנעה ממנו גישה לרופא, אלא הוא נבדק על    30
ידי רופא ארבע שעות בלבד לאחר פעם הקודמת בה נבדק על ידי רופא. כמו כן ראה הנאשם רופא    31
ביום 19.3.06, וגם במקרה זה ניתנו לו תרופות. לא למותר לציין כי התרופות אינן ״אקמולי״ כפי    32
שנטען, אלא תרופות אחרות (משלושה סוגים שונים).    33

   34

הנאשם נבדק על ידי רופא וקיבל טיפול לבעיית העצירות גם בימים 20.3.06, ו־21.3.06. ביום    35
22.3.06 הובא הנאשם לבדיקה יזומה, היינו ביוזמת רשויות הכליאה ולא לבקשתו, ובעקבות    36
תלונותיו נקבע כי ייערך לו מעקב לחץ דם יומי ואף נרשמו לו תרופות. באותו יום בשעה 19:00    37
נרשם כי נבדק שוב על ידי רופא ״על פי בקשה של חוקר״.    38

   39

לא רק שנרשמו לו תרופות שונות ומסוגים שונים, אלא גם טענתו כי קיבל רק פעם אחת שמן   1
פראפין אינה תואמת את הרישומים הרפואיים, מהם עולה כי קיבל פראפין במספר הזדמנויות,   2
בתאריכים 20.3.06, 21.3.06, 30.3.06, 1.4.06, 3.4.06, 4.4.06 ו-17.4.06.   3

לפיכך, נראה כי טענותיו של הנאשם בכל הנוגע להעדר טיפול רפואי - אין להן על מה לסמוך.   5
הנאשם קיבל תרופות שונות כנדרש בהתאם למצבו, ראה רופא פעמים רבות - אחת מהן אפילו   6
ביוזמת חוקרו - וזכה לטיפול בהתאם לשיקול דעת רופאיו. נראה כי טענותיו בנוגע לטיפול   7
הרפואי נועדו להעציים את טיעוני הזוטא, בלא שיש להן בסיס כלשהו במציאות, והדבר משליך על   8
חוסר אמינותו בפנינו.   9

**מהימנות הנאשם – שלב החקירה**   11

מלבד הנושא הרפואי, עליו עמדנו לעיל, ניתן להצביע על ניסיון של הנאשם לומר כי לא קיבל דבר   13
מחוקריו כדוגמא נוספת לחוסר האמינות של הנאשם– טענה שנועדה לתפארן בתיאור מצבו הקשה   14
בחקירה. מרגע שעומם עם הדברים שקיבל (ארוחות, ומן לתפילה, סיגריות, קפה, תה, קוראן,   15
ותחתונים), "יפתאום נזכר" ואישר כי אלה אכן ניתנו לו, אולם הוסיף כי ניתנו לו שלא לבקשתו.   16
בנוסף, הנאשם עצמו ציין כי כל מה שחיה בתקירתו גרם לו "לחתפוצץ מבפנים", והוא כלל לא   17
הראה זאת לחוקריו – בניגוד לדברים מפורשים שנכתבו בכי"דים ועליהם העידו החוקרים, כי   18
הנאשם איבד את שלוותו מפעם לפעם, ועל כן נאלצו לאזוק אותו. אין זה הגיוני.כי החוקרים   19
ימציאו וירשמו כי הנאשם סטר לעצמו וכי נאלצו לאזוק אותו בעקבות כך, אם נדבר לא התרחש.   20
טענת הנאשם כי הוא רק "התפוצץ מבפנים" אינה מתיישבת עם רישומי החוקרים ועדויותיהם   21
בפנינו, והיא חלק מהתו בו נקט על מנת להראות כי השפילו אותו מצד אחד, אולם הוא לא נכנע   22
לחוקריו מצד שני. אנו העדפנו את עדותם של החוקרים בעניין זה.   23

יש לומר כי הרושם מעדותו של הנאשם היה של אדם המודע היטב לדברים שנאמרו על ידו הן   25
בבית המשפט והן בחקירתו בשב"כ ובמשטרה, אולם הוא דבק בגרסה שנעשה לו עוול. עוול זה,   26
לשיטתו, לא נגרם מהדברים שהוא אמר בחקירתו, אלא כתוצאה מהתשפלה שננקטה כלפיו   27
כעומדת בפני עצמה, ולא כבזו שהשפיעה עליו בחקירה. עוד גורם ליעוולי זה נובע מדברים שנרשמו   28
בעברית לֹא אישורו ושלא בהתאם לדברים שאמר. ודוק: הנאשם אישר בעדותו בפנינו כי   29
הדברים הרשומים לכאוֹרה מפיו באמרותיו תורגמו לו, כפי שציינו חוקרי המשטרה, אולם טען כי   30
אינו יודע מה נכתב כיוון שאינו יודע עברית.   31

לא מצאנו להאמין לנאשם בנקודה זו. לא התרשמנו כי חוקרי השב"כ והמשטרה רשמו דברים   33
אחרים מאלה שמסר להם הנאשם, או כי סילפו את הדברים שנרשמו בעבורים עת תרגמו לו אותם,   34
או כי הפעילו עליו לחץ ששלל את יכולתו לבחור אם למסור דברים לחוקריו. נראה כי הנאשם ידע   35
היטב מדוע הוא נמצא בחקירה, ידע היטב מה מחפשים חוקריו, ובהתאם לכך חתנהל בחקירתו.   36
הנאשם מודע לכך שמסר דברים בנוגע לפעילותו ביחס לקארין A – דברים שאינם מתיישבים עם   37
גרסתו הנוכחית כי אינו קשור לספינות הנשק.   38

1     יתר על כן, הדברים הרשומים בזכ"די החקירה מצביעים על כך שהנאשם מסר פרטים רבים, כפי

2     שהעיד בפנינו, כבר ביומו הראשון בתקירה. יחד עם זאת, הנאשם לא מסר מיד את כל הידוע לו,

3     שכן חקירתו הייתה "חקירה מתפתחתי", ונוספו בה עם הזמן פרטים שונים בנוגע לפעילותו. כעולה

4     מתזכ"דים, בתחילה כשתוסוח בו טענות נתו להכחיש, אולם כשהצגנו לו ראיות המפריכות את

5     הכחשתו החל לספר את הידוע לו. התנהלות כזו מלמדת דווקא על אדם המתנהל באופן מחושב,

6     ומוכן לספר דברים רק כאשר הוא יודע שממנילא יש לחוקריו את המידע על כך, מבלי שהוא מנדב

7     מידע נוסף. אם הייתה יכולה לעלות טענה כאילו הפרטים הנוספים שמסר בעקבות הראיות

8     שהוצגו לו נמסרו בעקבות הלחץ שהופעל בחקירה, אזל הנאשם עצמו סתר והפריך טענה זו.

9

10     **מהימנות הנאשם ; סיכום**

11

12     אל מול הרושם האמין של חוקרי המשטרח והשבי"כ, אנו יכולים לומר כי עדותו של הנאשם לא

13     היתה אמינה במיוחד. כאמור, על פי עדותו של הנאשם עצמו, "השפלתוי" ו"מצבו הרפואיי" לא

14     שינו דבר מיכולתו לומר את הדברים שרצה לומר, אז לגרום לו לומר דברים שלא רצה. לא היה

15     שלב בו הלחץ בחקירה הוביל אותו להודות בדבר כלשהו בניגוד לרצונו, ולא היה שום שלב בו

16     "נשברו".

17

18     מכלל הראיות במשפט הזוטא שוכנענו כי אמרותיו בפני חוקרי המשטרה נגבו באופן נינוח ולללא כל

19     לחץ פסול. בניגוד למה שנטען בטיעוני הזוטא הוא לא ניסה להעמיד את חוקרי המשטרה על

20     טעויות שנפלו בזכ"דים, ואף אחד מהם לא אמר לו כ'ל יקרה "תוהו ובוהו" אם לא יודה. שוכנענו

21     כי חוקרו לא מסרו לו הבטחות כי אם יודה ישוחרר, לא אמרו לו דבר בכל הנוגע לחרט ביתו (דבר

22     אותו חלק מהחוקרים בכל לא ידעו עד מועד הדיון בפנינו) ולפיכך, אין לנו אלא לדחות את

23     טענותיו בדבר "תשפלה" כלשהי או פיתוי והבטחות כלשהן שגרמו לו לומר דברים שלא מרצונו

24     החופשי. הנאשם קיבל טיפול רפואי מלא וכמדרש, בניגוד לדבריו, ולא חיה במצבו הרפואי כדי

25     לשנות את יכולתו לומר את דבריו באופן חופשי ומרצון.

26

27     **משפט הזוטא - הכרעה**

28

29     לאור מסקנותינו העובדתיות בכל הנוגע לאמינות עדי התביעה מחד גיסא, ולהעדר האמינות של

30     עדי ההגנה מאידך גיסא, אנו קובעים כי אמרותיו של הנאשם נגבו באופן חופשי ומרצון והינן

31     קבילות במשפט זה.

32

33     <u>המשפט העיקרי</u>

34

35     **עדותו של מחמוד עביאת**

36

37     עד זה מסר כי היה חבר בחוליה צבאית שעליה היה אחראי עאטף עביאת, ונשפט על עבירות רצח

38     אותן ביצע. העד מסר כי הוא וחבריו לחוליה היו חיילים, והם קיבלו משכורת חודשית בסוף כל

39     חודש. העד טען כי הוא לא יודע מי העביר להם את המשכורות. העד עומת עם זכ"ד מחקירתו

-20-

1   בשב"כ בו נרשם כי את המשכורות העביר פואד שובכי. העד טען כי אינו מכיר את פואד שובכי,
2   ומעולם לא שמע את השם הזה. העד טען כי מי שהעביר להם את המשכורות היה אדם בשם פואד
3   שומאלי, שהיה פקיד במשרד הכספים. בתקירתו הנגדית ציין כי מעולם לא ראה את הנאשם ולא
4   קיבל ממנו כסף, וכלל אינו יודע מי אחראי הכספים ברש"יפ.

5

6   **אמרות הנאשם במשטרה**

7

8   הנאשם מסר שמונה אמרות משטרתיות, מלבד הזכ"דים הרבים שנגבו ממנו בשב"כ. לחקן נסקור
9   כרונולוגית את האמרות שנגבו ממנו ואת הדברים שמסר בהן -- דברים התואמים ככלל את
10  הדברים שמסר בחקירדתו בשב"כ.

11

12  **ת/5 -- אמרת הנאשם מיום 19.3.09:** באמרה זו מסר הנאשם אודות פעילותו במסגרת הארגון
13  לשחרור פלסטין (אש"ף) לפני שנת 2000. בהמשך האמרה מסר כי בשנת 2000 היתה פגישה
14  במשרדי יאסר ערפאת בנוכחות ע/ראזק מגיאנידה, חאג' אסמעיל גיאבר, עאזי גיבאלי, סלים
15  בורדני, מחמד דחלאן, רשיד אבו שבאכ, אמין אל הינדי, מוסא ערפאת ומחמוד אבו מרזוק. יאסר
16  ערפאת אמר להם לקנות כל נשק שיוכנס לעזה או לגדה וכל אחד מהבכירים הללו שהייתה לו
17  הצעה (לרכישת נשק – צ.ל.), היה מגיע אל הנאשם עם נייר עבודה, הנאשם היה מעבירו ליאסר
18  ערפאת, ולאחר שזה חתם היה הנאשם מאשר לאנשיו להעביר כסף לאותו בכיר. הנאשם מפרט
19  דוגמאות לכמויות וסוגי הנשק שניקנו וסכומי הכסף ששולמו תמורתם.

20

21  הנאשם הוסיף כי ביולי 2001, פתחי ראזם ועאדל מוגרבי הבריחו מלבנון מיכל עם פצצות אר.פי.גי
22  ומטולים שהגיעו מהחיזבאללה, באישורו של יאסר ערפאת, והכות הימי לקח אותם. הוא שילם
23  לפתחי ראזם 50,000 דולר באישור ערפאת.

24

25  הנאשם הוסיף כי פגש בירדן את פתחי ראזם, שמסר לו כי נפגש עם פעילי חיזבאללה ועם איראני
26  וסיכם איתם כי הם יעבירו שלושה מיכלים עם נשק על גבי ספינה. הוא ביקש מהנאשם לדבר על
27  כך עם יאסר ערפאת, כדי שייתן כסף. הנאשם מסר על כך לערפאת וזה נתן הוראאה לחרצור צרצור
28  שיתן לכך כסף. הנאשם גם מסר כי פגש בתימן את תיסיר עג'ינה שסיפר לו שעאדל מוגרבי ביקש
29  שיכנו לו ולעומר עכאווי דרכון, וכי הוא (עאדל) בא לראות את הספינה קארין A שהגיעה לתימן
30  עם הנשק.

31

32  **ת/1 – אמרת הנאשם מיום 20.3.06:** באמרה זו מסר הנאשם כי פגש בשנת 2001 בירדן בפתחי
33  ראזם וזה מסר לו אודות מגעים עם האיראנים, לפיהם האחרונים מוכנים לשלם עבור ספינת נשק.
34  פתחי אמר לנאשם כי צריך שהוא (הנאשם) יפגוש בנצעי האיראאי בדובאי. הנאשם מסר כי הגיע
35  לדובאי ושם יחד עם עאדל מוגרבי פגש שני נצעגים איראנים – אבו מתמד ואחמד סאלם.
36  האיראנים מסרו לנאשם ולעאדל כי הם מוכנים לממן אימונים של פלסטינים בלבנון ובאירן וכי
37  הם מוכנים לעזור בכסף ובנשק. הנאשם הוסיף כי עאדל כתב דו"ח לערפאת והם אמרו לאיראנים
38  כי לאחר שתהיה תשובה מערפאת הם יודיעו על כך לאיראנים. לטענתו, כשערפאת ראה את

תיק מס': 3052/06    תאריך: 29/07/09

1   הדו"ח הוא הגיע בכעס ואמר כי האיראנים שקרנים. עוד מסר הנאשם באמרה זו על מגעיו עם
2   העיראקים ועל הסכמתם לחעניק במתנה שני מיליון חביות נפט לפלסטינים.
3
4   ת/6 – אמרת הנאשם מיום 22.3.06: באמרה זו מסר הנאשם פרטים נוספים אודות הפגישה עם
5   האיראנים. הוא מסר כי מי שיצר קשר ראשוני עמם היה אבו חסן אל זיבב. הנאשם הפגישו עם
6   פתחי ראזם והשניים יצאו לפגוש את האיראנים בדובאי. לאחר מפגש זה מסר פתחי ראזם לנאשם
7   כי האיראנים מבקשים לפגוש אותו. הנאשם יצא לדובאי לקנות מכוניות ואמר לפתחי שלאחר מכן
8   יפגוש את האיראנים. הנאשם נשאל מדוע לא סיפר ליאסר ערפאת כי יצא לפגוש באיראנים, וענה
9   "כי יאסר ערפאת אהב שאני מביא לו תוצאות ולא דיבורים". הנאשם יצא לדובאי, ולאחר פגישתו
10  בנוגע למכוניות יצא לפגוש את האיראנים עם עאדל מוגרבי. מאחר שהיה עיף סובב שייזכם שוב
11  בערב. הנאשם אכן פגש שוב באיראנים בערב, שאל אותם אם הם רוצים לעבוד יחדיו בשיתוף
12  פעולה, והאיראנים מסרו שכן. עאדל דיבר עמם על נושאים צבאיים כעל תצורך באימונים
13  מתקדמים לייצור רימוני יד ומטולים, וכי הם רוצים גם תחמושת ונשק. אחרי כן הם (ובכלל זה
14  הנאשם) שוחחו על כיצד מקימים מפעל לייצור תחמושת בשטחי הרש"פ, והנאשם אף אמר להם
15  כי צריך כסף, וחם הסכימו גם לכך. האיראנים אף. מסרו כי יעברירו נשק ותחמושת ממחסני
16  אמל"ח שיש להם בלבנון. אחד האיראנים ביקש כי ישלחו לו סיכום יומי של התקשורת
17  הישראלית. הם סיכמו להמשיך ולהיפגש והנאשם אמר כי הוא יבקש רשות מיאסר ערפאת לבוא
18  לפגישות. עאדל כתב את תוכן הפגישה והוא והנאשם חתמו על כך. כשחזר לאזור מסר הנאשם את
19  המסמך ליאסר ערפאת, שאמר כי המדובר באנשים רמאים שרוצים להרוג אותו.
20
21  הנאשם מסר כי בשנת 2002 שמע על תפיסת קארץ A.,הוא הבין שיאסר ערפאת רוצה שהוא "ייקח
22  את הנושא עליו" ולכן מסר בועדת החקירה כי יאסר ערפאת נתן את החוראות והוא היה איש
23  קשר בין פתחי ראזם ועאדל מוגרבי לערפאת. הנאשם הוסיף כי שמע מפתחי על התכנון לחביא את
24  הספינה עוד באוגוסט 2001, חודשיים לפני המפגש עם האיראנים, וכי הפגישה עם ערפאת, בה
25  סוכם על העברת 125,000 דולר לפתחי לפרוייקט הספינה, הייתה אחרי שפתחי היה בסוריה
26  ובלבנון. הפגישה עם האיראנים בדובאי נועדה ליצור קשר פלסטיני-איראני וקשר של פתחי ועאדל
27  מול משמרות המהפכה בלבנון, והוא ועאדל לא דיברו על הספינה עם האיראנים.
28
29  ת/11 – אמרת הנאשם מיום 26.3.06: באמרה זו מסר הנאשם אודות פרטי עסקאות נשק שונות
30  להן היה שותף. בתחילה מסר כי הגיע אליו אדם וסיפר לו שמצאו בים תבוית עם טילי אר.פי.ג'י
31  וביקש עבור זה 7,000 דולר. הנאשם חורה לשלם את הסכום. הנאשם סיפר כי קיבל פניות לרכישת
32  10 טילי אר.פי.ג'י תמורת 45,000 דולר, והוא העביר את הכסף לפונה. הנאשם הוסיף ומסר כי
33  הדבר עדיף על כך שהנשק יגיע לחמאס או לארגונים אחרים. הנאשם סיפר כי בשנת 2002 גנב
34  רשיד אבו שבאב את כל הנשק שרכש ושהיה במחסנים שלהם. הנאשם הוסיף וסיפר כי מחמוד
35  אבו מרזוק פנה אליו בשנת 2001, ביקש 20,000 דולר כדי להקים מפעל לייצור אמל"ח ורימוני יד,
36  וערפאת חורה לנאשם לתת לו את הכסף. הנאשם העביר את הכסף ושמע מאוחר יותר כי היה
37  פיצוץ בדירה ששכר מחמוד אבו מרזוק.
38

1 הנאשם נשאל לגבי רכישות של סיגרות עבור פתחי ראזם ומסר כי ערפאת חורג לו בשנת 2000
2 להעביר 150,000 דולר לרכישת 2 סיגרות דייגים. הנאשם ציין כי כסף זה העביר עוד לפני שהעביר
3 לפתחי 125,000 דולר עבור הקאריץ A.

4
5 הנאשם סיפר על כספים שהעביר לצורך רכישת תחמושת בבית לתם וכן כי מימון משכורות לאנשי
6 מחמוד עבאת. לטענתו, חלק מהכספים שהעביר שימשו למשכורות (500 ש"ח לאדם) וחלק שימש
7 לריכישת תחמושת.

8
9 ת/7 – אמרת הנאשם מיום 30.3.06: הנאשם נשאל אודות היכרותו עם מחמוד זוהירי ומסר כי זה
10 היה אחראי על רכישת אמל"ח בגדה וכי הוא רכש 1000 רובי קלצ'ינקוב. הנאשם ציין כי הוא
11 העביר למחמוד זוהירי את הכסף לרכישה בסך של 2-כ מיליון דולר.

12
13 הנאשם מסר כי שילם לג'ומעה אבו שכרי 70,000 דולר תמורת 7 טילי סאגר 1-18 רובים
14 מקולקלים אותם החזירו. לדבריו, את הטילים התזיק ב'דיוואן' ליד ביתו בעזה ומאוחר יותר
15 העבירם לע'ראזק מג'אידה. הנאשם הוסיף ומסר פרטים אודות אנשים שונים אשר הביאו
16 אמל"ח, וציין כי הוא היה מעביר את הכסף, ואת הנשק היו מחזיקים במחסן בתוך המשרד שלו.
17 לטענתו, יאסר ערפאת היה נותן לו הוראה למי להעביר את האמל"ח, והוא היה מורה לסגנו לתת
18 נשקים בהתאם להוראותיו של ערפאת.

19
20 הנאשם מסר כי מחמוד אבו מרזוק ייצר מטעני ע'ראזק מג'אידה, והוא העביר למג'אידה את
21 הכסף על מנת שיועבר למחמוד אבו מרזוק. הנאשם מסר מידע גם אודות עסקאות נשק נוספות.

22
23 לנאשם הוצג במהלך חקירת מסמך (ת/8) וחוא ציין כי המדובר בניירר של מחמוד אבו מרזוק עליו
24 רשומות הצעות מחירים של נשקים, ובהתאם למחירים שצויינו הותנשבן איתו על הכסף.

25
26 ת/9 – אמרת הנאשם מיום 2.4.06 שעה 09:50: בראשית חקירתו הופנה הנאשם לאמרתו מיום
27 19.3.06, בה מסר שהבריח נשקים בספינה, והוא אישר כי סיפר זאת. הנאשם נשאל על מעורבותם
28 של אחרים בחברות הנשקים וסיפר על כך. בין היתר מסר הנאשם כי בידי 2001 מסר לפתחי
29 ראזם 50,000 דולר בהוראת ערפאת עבור הברחת פצצות ומטולי אר.פי.ג'י. הנאשם ציין כי את
30 הכסף העביר עבור החברחה ולא עבור האמל"ח, שכן זה ניתן להם בתינם מהחיזבאללה.

31
32 הנאשם התבקש לספר שוב אודות הקאריץ A ומסר כי פגש את פתחי ראזם בירדן, שסיפר לו כי
33 נפגש בלבנון עם נציגי חיזבאללה ואיראן. אלה הסכימו להעביר להם 3 מיכלים עם אמל"ח במימון
34 האיראנים, והם (הפלסטינים – צ.ל.) יצטרכו לשלם רק עבור הוצאות הספינה. הנאשם מסר כי
35 הוצע להם לקחת נשק מאחמד ג'יבריל אולם הם לא עשו זאת. כשנשאל למה, ענה "כי יש לנו נשק
36 בחינם מהחיזבאללה ומהאיראנים אז למה לקחת ממנו". הוא מסר כי התכנון היה להביא ספינות
37 עם נשק לגמול עלי, והוא ופתחי שוחחו עם ערפאת ואמרו לו שצריך 125,000 דולר. יאסר ערפאת
38 אמר לנאשם לתת את הכסף והנאשם אמר כי אין לו. יאסר ערפאת אמר לפתחי לכתוב נייר בקשה

-23-

תאריך: 29/07/09

תיק מס': 3052/06

עם הדרישה לכסף, ולאחר שפתחי עשה זאת, הנאשם לקח את הבקשה לרמאללה, העבירה 1
לערפאת וזה כתב לחרבי צרצור שישלם את הכסף. חרבי העביר את הכסף לפתחי. 2
3
הנאשם התבקש לחזור ולספר על המפגש עם האיראנים. לדבריו, פגש בשני נציגים, שלחזרכתו 4
הכביר בהם היה אחד בשם אחמד סאלם. 5
6
ת/10 – אמרת הנאשם מיום 2.4.06 שעה 14:01 : (במאמר מוסגר אציין כי התאריך הרשום על גבי 7
אמרה זו הינו 4.2.06. המדובר בטעות שהובהרה בת/13, והתאריך הנכון הוא 2.4.06. בל נשכח כי 8
לא ייתכן שביום 4.2.06 הנאשם נחקר, כיוון שנעצר רק כחודש וחצי לאחר מכן). 9
10
הנאשם מסר כי הקים ועדת רכש, שהקימה מתחן נשק בו שמו כל מה שחוערה קנתה. הנאשם 11
נשאל על הועדה המדעית ואמר כי פעילותו ועדה זו הינה העברת קורסים בייצור אמלייה. תפקיד 12
הועדה בגדה היה לבדוק שתנשק שנרכש היה תקין. הוצג לנאשם מסמך והוא ציין כי המדובר 13
במסמך של הועדה המדעית בו הם מבקשים מכונות הלחמה ומחרטות. הנאשם העביר את 14
הבקשה לערפאת והוא לא יודע מה נעשה איתה. הנאשם מסר כי הועדה המדעית היא של הפתייח, 15
גדודי חללי אל אקצא הם פעילי פתייח, ואסר ערפאת היה נותן לגדודי חללי אלאקצא כסף 16
לפעילות "מתחת לשולחן". 17
18
הנאשם ציין כי אנשי משרדו העבירו לפתחי ראום 150,000 דולר על מנת שיקנה שתי סירות דייג, 19
ועוד לפני כן העביר הנאשם 50,000 דולר, כדי שיותן אותם ללבנונים לכיסוי הוצאות הברחת 20
חביות נשק עליהן סיפר קודם לכן (באמרה קודמת). 21
22
הנאשם מסר כי פתחי ראום פגש בלבנון את סאדל את סאדל מוזרבי, את החזיבאללה ואת משמרות 23
המהפכה של האיראנים. הנאשם שאל אותו אם הוא סיפר זאת לערפאת ופתחי אמר לו שהוא 24
סיפר לו על תכנון חברתת הספינה ועל פגישותיו בחקשר זה. פתחי אמר לנאשם כי הוא רוצה 25
שידבר עם ערפאת.בי פתחי צריך 125,000 דולר להוצאות הספינה. הנאשם דיבר על כך עם יאסר 26
ערפאת בשדה התעופה בירדן. יאסר ערפאת אמר לנאשם שפתחי יכין נייר בקשה לקבלת הכסף. 27
פתחי עשה זאת ולאחר 3 ימים נתן הנאשם לערפאת את המסמך. ערפאת כתב לנאשם שצריך 28
להעביר את הכסף לפתחי דרך חרבי צרצור והנאשם העביר את הנייר דרך שליח לחרבי צרצור 29
ומסר על כך לפתחי. 30
31
הנאשם מסר כי העביר כסף למחמוד זוחירי, כדי שיקנה נשק "מבחוץ" (היינו: מחוץ לשטחי 32
הרשיייפ). הנאשם מסר כי היה לו מחסן ברמאללה, בו שמו את כל הנשקים שקנו ממחמוד זוחירי, 33
והם היו מחלקים את הנשקים בהתאם להוראות יאסר.ערפאת. 34
35
הנאשם מסר כי בחודש אוגוסט 2001 קנה מגיומעה אבו זכרי 7 טילים, תמורתם שילם 75,000 36
דולר, והעבירם לערואזק מגיאידה. 37
38

-24-

L

הנאשם מסר כי בשנת 2001 הגיע אליו שליח ממרואן ברגותי עם שני ניירות – באחד בקשה לקנות    1
תרומושת לפעילי גדודי חללי אלקצא ב-25,000 דינר, והנייר השני פירט את מספר. הלוחמלם בכל    2
איזור על מנת שתועבר להם משכורת חודשית. הנאשם העביר את תכיירות.לאהר עראפאת שיחלעט    3
בעניין, ואהר עראפאת נתן לו הוראה לתת הוראה למרואן ברגותי את הכסף שביקש, הנאשם הודיע כי אין    4
לו כסף, ואז נתן עראפאת הוראה למשהרד האוצר להעביר את הכסף.    5
    6

הנאשם מסר כי כשהגיע לתימן, קיבל את פניו תיז'יסיר' עג'ינה, ומסר לו שהספינה של עאדל ופתחי    7
הגיעה אליהם. תיי'סיר' אמר לנאשם כי הכינו לעצאדל מזג'רבי זרכון והם רצו להכין דרכון גם לעצומר    8
עבאווי, הקפטן של הספינה.    9
    10

הנאשם הוסיף וסיפר כי העביר כסף לעלי מחסין, בכיר בצבא תימן, במסגרת שותפות שמטרתה    11
מכירת תחמושת של כדוריים נותכים תמורת רווח, אולם לבסוף לא התבצעה עיסקה והוא קיבל    12
את הכסף שלהם בחזרה.    13
    14

ת/12 – אמרת הנאשם מיום 14.5.06: בפתח החקירה הוצג לנאשם מסמך, והנאשם מסר כי מסמך    15
זה עוסק בבקשה שקיבל לקנות מחרטה וסכינים. את המסמך הזה העביר מרואן ברגותי, והנאשם    16
שלח את המסמך לעראפאת. המסמך לא חזר אליו עם הוראה תשלום. הנאשם זכר כי צורף למסמך    17
זה שני ניירות נוספים, באחד מהם בקשה לרכישת נשק, ובשני בקשה לתשלום משכורת לאנשי    18
"שוחדא אל אקצא", אולם שמותיהם לא הופיעו אצלן' ברשימה ולכן לא יכול היה לשלם להם.    19
    20

הנאשם נשאל מה יש לו להוסיף לגבי טילי הסאגר שקנו, ואמר כי הגיעה הוראה מעראפאת לשלם    21
עבור הטילים, כיוון שפחדו שאנשים יקנו אותם וישתמשו בהם.    22
    23

### עדות הנאשם בתיק העיקרי – חקירה ראשית    24
    25

הנאשם פתח עדותו בכך שהוא מנהל-מחלקת הכספים ברשות הפלסטינית וסמכויותיו היו. של    26
פקיד שקיבל את הוראותיו מהראיס, יאסר עראפאת, ומסגן הראיס, ערראזק מגיאידה. לדבריו, לא    27
היתה לו כל סמכות לקבל התלטות בעצמו, אלא הוא פעל רק על פי הוראות כתובות.    28
    29

הנאשם אישר כי אבן חתקיימה פגישה בשנת 2000 של כל האחראים על גופי הבטחון במשרדו של    30
יאסר עראפאת בעזה. הוא ציין כי כל הנוכחים בפגישה מלבדו חיו נוחגים להיפגש עם מפקדים    31
ישראלים. לטעינתו, מה שנאמר במפגש זה היה כי יש לאסוף את כלי הנשק שבידי הציבור    32
והאזרחים, ואם צריך אף יש לשלם עליהם. לטענתו, תפקידו היה לברר מי הבעלים של כלי הנשק,    33
מה מחירם, ולקבל אישור מהראיס שיחתום על התשלום. רק לאחר קבלת הוראה הוא שחרר את    34
הכסף לתשלום.    35
    36

לטעינת הנאשם, הנשק נאסף כדי שלא ישמש בידי גורמים כחמאס וכג'יהאד האיסלמי, שאינם    37
מכירים בהסכמי אוסלו. הנאשם טען כי לא נרכש נשק מחוץ לתחומי הרשות. עוד טען הנאשם כי    38
הנשק הגיע למחסן בבניין של הביטחון הלאומי, בו היו גם משרדיו, אולם הוא לא היה אחראי על    39

-25-

1    המחסן. למיטב ידיעתו, מבצע איסוף הנשק היה דבר ידוע בציבור. עוד טען הנאשם כי אינו יודע

2    כמה נשק נרכש וכמה כסף שולם עבורו, וחזר על כך שכל הוצאה אושרה על ידי יאסר ערפאת.

3    הנאשם טען כי לא הוא העביר את כלי הנשק, והוא אינו יודע אם הועברו לארגון התנזים.

4

5    הנאשם אישר כי הוא מכיר את האנשים אשר שמותיהם מופיעים בפרט האישום הראשון, ובכלל

6    זה מחמוד זוהרי. לטענתו, האחרון היה מושאל למשרדו מראשי גיבאלי, ותפקידו היה להביא את

7    המסמכים החתומים מיאסר ערפאת. הנאשם טען כי לא ידע אם תפקידו של זוהרי כלל את

8    רכישת הנשק, ובכל מקרה לא היה לנאשם מחסן תחת אחריותו. לדבריו, התשלומים היו נערכים

9    בצ׳יקים או במזומן, וכל סכום היה נרשם. הנאשם טען כי הוא לא ראה נשק, לא קנה ולא נתן נשק.

10   הוא רק עבד עם המסמכים, והוא עצמו מפחד מנשקים. הנאשם שב והדגיש, כי הוא לא יודע כמה

11   כסף שולם, ואיזה נשק נרכש. כל שעשה היה לקבל מסמכים מגורמי חבטחון השונים, ולתת

12   הוראות תשלום לאנשים. הנאשם הכחיש כי רכש וחילק אקדחים או כי ידוע לו על כך.

13

14   הנאשם הכחיש תשלום לאנשי הפת״ח והכחיש כי שילם לאנשים באזור בית לחם. לטענתו, הייתה

15   הוראה מיאסר ערפאת לשלם 500 ש״ח אבל הוא לא ידע עבור מה שילמו. אף אחד לא אמר לו כי

16   האנשים הללו שייכים לגדודי חללי אלאקצא. הנאשם הכחיש כי הגיע אליו שליח ממרואן ברגותי,

17   או כי ראה זוויה בכספי שכלל הוצאות רכישת חומרים-כימיים לייצור חומרי נפץ. הוא אף הכחיש

18   כי שילם הוצאות כספיות אחרות של גדודי חללי אלאקצא או כי קיבל הוראה מיאסר ערפאת

19   לשלם למרואן ברגותי 25,000 דינר, ובכל מקרה לא היה לו סכום כזה להעביר.

20

21   הנאשם הכחיש כל קשר לספינת הנשק קארין A. לטענתו, שמע עליה רק לאחר שנעצר בירחו.

22   הנאשם אישר כי הוא מכיר את פתחי ראזם, סגן מפקד חיל הים הפלסטיני, ואישר כי פתחי ראזם

23   העביר לו מסמך מיאסר ערפאת לפיו על הנאשם לשלם לפתחי 125,000 דולר. לטענת הנאשם, לא

24   ידע עבור מה נדרש התשלום, והוא סירב לשלם כי לא היה בתקציב סכום כזה.

25

26   הנאשם אישר כי כשהיה בדובאי למטרות רכש כלי רכב פנה אליו עאדל מוגרבי, וביקש ממנו

27   להעביר מכתב ליאסר ערפאת. הוא פגש את עאדל מוגרבי עם אנשים נוספים, וקיבל מהם מכתב.

28   הוא העבירו ליאסר ערפאת, ובדיעבד נודע לו כי תוכן המכתב בנוגע לעסק בהצעת של האיראנים לסייע

29   לרשות הפלסטינית, אולם הוא לא ידע ולא מסר דבר בנוגע לספינת נשק.

30

31   הנאשם אישר כי פגש בתימן את תיימור עגיינה בשגרירות הפלסטינית שם, אולם לא היה מודע

32   לכך שבזמן הזה הגיעה ספינת נשק לנמל חודיידה בתימן. הוא אישר כי תיימור סיפר לו שמכוונים

33   דרכו תימני לעאדל מוגרבי, אך לא ידע מדוע.

34

35   הנאשם מסר כי הרשות הפלסטינית קיבלה מעירק מתנה של שני מיליון חביות נפט גולמי, והוצע

36   לו ליצור קשר עם האיראנים על מנת שהם ימכרו את החביות עבור הפלסטינים ויתחלקו בתמורה.

37   לצורך כך נפגש עם הנספח המסחרי-כלכלי האיראני. הנאשם הכחיש כל קשר מצידו או ידיעה

38   מצידו בנוגע להצעה מטעם האיראנים לסייע לפלסטינים באימונים ובנשק, או כי היה נוכח

-26-

1   בישיבה בה הועלתה הצעה כזו. הנאשם הכחיש כי חתם על פרוטוקול של ישיבה כזו. לטענתו, רק

2   העביר מכתב מעאד״ל מוגרבי ליאסר ערפאת, וזה סירב לקשר עם האירואנים.

3

4   **עדות הנאשם בתיק העיקרי – חקירה נגדית**

5

6   בחקירתו הנגדית נשאל הנאשם אם הוא מכיר את ארגון גדודי חללי אלאקצא, השיב בשלילה,

7   ואמר כי רק שמע עליהם בתקשורת. לטענתו, גם בחקירתו אמר כי אין דבר שקוראים לו "גדודי

8   חללי אלאקצא". הנאשם עומת עם שני מסמכים אשר הוצגו לו בחקירתו ביום 14.5.06, וטען כי

9   אינו יודע דבר על המסמכים הללו. כשנמסר לו כי במשטרה אמר שאחד המסמכים הוא בקשה

10  להקמת מחרטה, והשני בקשה למשכורות של גדודי חללי אלאקצא, טען כי אינו יודע ולא אמר את

11  הדברים הללו.

12

13  לטענתו, הוא היה בישיבה עם יאסר ערפאת בה חולק על רכש כלי נשק מתוקף תפקידו כאיש

14  כספים, והמטרה הייתה איסוף נשק מידי אזרחים. לדבריו, כל שהוא עשה היה למלא אחר

15  הוראותיו של יאסר ערפאת, אשר אישר באופן פרטני רכישה של כל נשק.

16

17  הנאשם נשאל לגבי פצצות אר.פי.בי׳ שהגיעו בספינה ביוני 2001, ואמר כי קיבל הוראה לשלם

18  לדייגים שמצאו את הפצצות, כפרס כספי. הנאשם אמר כי אינו יודע מהיכן הגיעה הספינה של

19  הפצצות וכאשר נמסר לו כי במשטרה אמר שזו הגיעה מטריפולי, טען כי לא אמר זאת. כך גם

20  כאשר עומת עם הטענה שנמסר במשטרה ובשב״כ שנקנה נשק מלבנון וממצרים. לדבריו, הנשק

21  שנרכש על ידו נרכש רק מאזרחים, על מנת שלא יגיע לחמאס, והוא אינו יודע מה נכתב באמרותיו.

22

23  הנאשם אישר כי העביר למחמוד אבו מרזוק 20,000 דולר בהוראתו של יאסר ערפאת. לטענתו לא

24  ידע מה הסיבה לכך. כשנאמר לו שבמשטרה מסר כי הדבר נועד לשם הקמת מפעל לייצור אמל״ח

25  ורימוני יד, טען שאמר כי תבית של מחמוד אבו מרזוק התפוצץ, ולאחר מכן נודע כי השתמשו בו

26  לייצוץ מטענים.

27

28  הנאשם טען כי אינו יודע מחמוד מיהם עביאת או עאטף עביאת. הנאשם עומת עם דבריו במשטרה

29  לפיהם העביר להם כספים כדי שלא ילכו לחמאס, וטען כי אמר שקיבל הוראה מיאסר ערפאת

30  להעביר 500 ש״ח לעאטף עביאת (הכוונה כמשכורות חודשית – צ.ל.), אותו הוא לא מכיר באופן

31  אישי, אך הוא מכיר אותו בשם, בניגוד לדבריו קודם לכן.

32

33  הנאשם עומת עם מסמך נוסף שהוצג לו בחקירתו וטען כי אינו מכיר אותו. כשנאמר לו שבחקירתו

34  מסר כי המדובר במסמך של מחמוד זהירי בו ישנן הצעות מחיר של נשקים אמר כי לא סיפר זאת.

35

36  הנאשם מסר כי היה אחראי על כספים של מנגנוני הבטחון הפלסטיניים, וכי הוא אחראי לשלם

37  בהתאם להוראות בכתב שניתנו על ידי יאסר ערפאת.

38

-27-

תאריך: 29/07/09

תיק מס': 3052/06

1. האשם נשאל על ידינו האם הכיר את התכתציב וסעיפין, ואישר כי הכיר אותו, וכי הוראות תשלום
2. צריכה להיות מתאימה לסעיף המצוליין בתקציב. משום כך נהגו לשאול את מבקשי התשלום
3. לצורך מח נדרש הכסף שהם מבקשים. אם להוראת תשלום לא היה סעיף תקציבי מתאים, או אם
4. סרבו לומר מח מטרת התשלום – נהג האשם לסרב לשלם או מפנה את המבקש ליאסר ערפאת.
5. לטענתנו, סעיף רכישת הנשק נקרא "תשלום על הנשקים אשר נאספים מידי האזרחים מתוך
6. המדינה". האשם מסר כי אם היה מקבל הוראה חריגה לשלם, למשל, כסף לפעיל חמאס או
7. לקטות ספרי לימוד לבית ספר הוא לא היה מבצע את הפעולה. יתר על כן, האשם ציין כי היו לו
8. קשרים טובים עם ערפאת, וכי היו מקרים שבהם התווכח עם יאסר ערפאת על הוצאות מסוימות,
9. ובסופו של דבר אמר לו ערפאת כי הוא צודק. עוד ציין כי הוא זכה לשבחים על דרכו בניהול
10. הכספים. רק לאחר מכן ציין, כי אם לא היה מבצע הוראת תשלום – היו מעמידים אותו לדין.
11. בתקירה התוזרת בידי הסנגור מסר האשם, כי כל סכום שצריך היה להוציא מחשבון הרשות
12. הפלסטינית חייב חתימה של שלושת בעלי זכות החתימה בחשבון, והוא לבדו לא יכול היה להוציא
13. "אפילו לא גרוש".
14.
15. **הערכת העדויות – מהימנות ומשקל**
16.
17. עדות הנאשם – מהימנות ומשקל
18.
19. עדות הנאשם לא עשתה עלינו רושם אמין. ניכר היה כי הוא דבק בגרסה לפיה אין הוא קשור
20. לספינת הנשק קארין A, אין הוא קשור למגעים עם האיראנים שנגעו לתיאום אימונים ורכשת
21. נשק על ידי הרשות הפלסטינית, ובכל הנוגע לרכישת נשק הוא היה שותף לישיבה שמטרתה
22. רכישת נשק מאזרחים על מנת שלא ישמשו ארגונים כגון החמאס.
23.
24. כאשר הנאשם עומת עם דברים שנרשמו או הוצגו לו בחקירה, ובכלל זה מסמכים מהם עולה כי
25. הכיר וידע למה בוצע תשלום כלשהו, באופן שאינו תואם את גרסתו במשפט, טען כי לא אמר את
26. מה שמיוחס לו בחקירה. אין בידינו לקבל זאת. תמוה כי דברים הרשומים באמרותיו והתואמים
27. את גרסתו במשפט נאמרו על ידו במשטרה ונרשמו, ואילו דברים שאינם תואמים את גרסתו
28. במשפט לא נאמרו על ידו אלא נרשמו על ידי החוקרים ללא ידיעתו. הסבר פשטני זה בדבר
29. הרישום על ידי החוקרים אינו מעורר אמון כלשהו.
30.
31. יתר על כן, חלק מטיעוניו חינם חסרי אמינות על פניהם – כך למשל, טענתו כי אינו מכיר ואינו
32. יודע מהו ארגון נדודי תללי אלקצא, או למשל טענתו כי אינו יודע מיהו עאטף עביאת, כשמיד
33. לאחר מכן הוא ציין כי שולם לאותו אדם כסף על ידי המשרד בבית לחם. כשהבין את טענתו זו,
34. טען כי אינו מכיר את עאטף עביאת באופן אישי.
35.
36. כפי שכבר ציינו ביהס למשפט הזוטא, שוכנענו כי הדברים הרשומים באמרותיו של הנאשם
37. במשטרה נרשמו מפיו וחם משקפים דברים שהוא עצמו אמר. לפיכך, יש לקבוע כי טענתו
38. שהדברים לא נאמרו על ידו - הינה שקרית.
39.

-28-

תאריך: 29/07/09

1 כמו כן, טענותיו של הנאשם כי רק מילא הוראות וכי לא ידע בנין מה הוזעברו חלק מהכספים אינה
2 תואמת את הדברים שמסר בסוף חקירתו, כי הוא תמיד וידא שהתשלום תואם סעיף תקציבי,
3 ופירושו של דבר כי ידע למה נועד התשלום. גרסתו כי הוא רק ממלא הוראות, אינה מתיישבת עם
4 דבריו כי אם היה מקבל הוראה חריגה או מוזרה לתשלום היה מסרב לבצע אותה, או עם דבריו
5 שלו בחקירה כי פעל (בכל הנוגע למפגש עם האירואנים) עד לפני שיאסר ערפאת אמר לו דבר
6 בעניין, כיוון שהאחרון "ירצה לראות ותוצאות".
7

8 עדותו של מחמוד עביאת – מהימנות ומשקל
9

10 עדותו בבית המשפט של מחמוד עביאת הייתה חסרת מהימנות בעינינו ולפיכך חסרת משקל.
11 טענותו כי מסר בחקירתו אודות אדם ששמו שומאלי ולא שובאכי, חינה טוענה שנועדה בבירור
12 להרחיק את האשמה מעל הנאשם. לא שוכנענו כי יש בטענה זו שמץ של אמת. יש לומר כי הנאשם
13 מסר בחקירתו כי הוא העביר כספים למחמוד עביאת, דבר התואם את אמרתו המשטרתית של
14 מחמוד. לפיכך, אנו מעדיפים את אמרותיו המשטרתיות של מחמוד עביאת על פני עדותו בבית
15 המשפט.
16

17 **התשתית העובדתית – סיכום**
18

19 מצאנו לנכון להעדיף את המצוי באמרותיו המשטרתיות של הנאשם על פני עדותו בפנינו. בכל
20 מקום בו ישנה סתירה בין השניים, סברנו כי הדברים המופיעים באמרות המשטרתיות הינם
21 עדיפים. כך הדבר גם ביחס לאמרותיו המשטרתיות של מחמוד עביאת. לאור תשתית עובדתית זו,
22 עלינו לבדוק כעת את פרטי האישום שיוחסו לנאשם, ולראות האם אשמתו עולה מחומר הראיות
23 שלפנינו.
24

25 עוד קודם לבחינה פרטנית של כל אחד ואחד מפרטי האישום, מאחר שעיקרו של כתב האישום
26 מבוסס על אמרותיו של הנאשם, עלינו לבדוק אם קיימות תוספת ראייתית מסוג "דבר מה נוסף"
27 לאמרות אלה.
28

29 במקרה שלפנינו לא סברנו כי קיים קושי ממשי כלשהו בעניין זה. תוספת ראייתית לאמרותיו של
30 הנאשם מצויה הן באמרות של מחמוד עביאת, שאישר את העברת המשכורות לו ולאנשיו בבית
31 לחם, כפי שמסר הנאשם, ובנוסף בפניה ת/8, שהינו מסמך בו פורטו בקשות לרכישת כלי נשק
32 ומחירים, כפי שמסר הנאשם.
33

34 ברע"פ 4142/04 מילשטיין נ' התובע הצבאי הראשי, תק-על 2006(4), 4022, התייחס כב' השופט
35 לוי למהותה של התוספת הראייתית מסוג דבר מה וקבע כדלקמן (בפסקה 20):
36

37 "דרישת ה"דבר מה נוסף" היא גמישה ובעלת רקמה פתוחה. סוג העניינים
38 שעשויים להביא לסיפוקה משתנה ממקרה למקרה, ותלוי גם במהימנות
39 ההודאה גופה. ככל שהודאה זו זוכה למשקל גדול יותר – כך יקטן משקלו

תאריך: 29/07/09

תיק מס': 3052/06

של היידבר מהיי הדרוש לאימות ההודאה, ולחפך, ככל שהוודאת זוכה 1
למשקל מועט – כך יגדל משקלו של היידבר מהיי. על כן גם נקבע כי אפשר 2
שיתעורר מקרים שבהם ניתן יהיה להתחפק בייידבר מהיי שמשקלו ייקל 3
כנוצחיי 4

5

וכפי שציינה כבי השופטת ארבל באותו פסק דין (בפסקה 20 לפסק דינה): 6

7

"הדרישה לייידבר מה נוספיי, הינה – בדומה יילדבר לחיזוקיי. ובשונה מן 8
הייסיועיי – דרישה לתוספת ראייתית יימאמתתי. לפיכך, בשונה מן הייסיועיי, 9
היידבר מה הנוספיי אינו צריך לחצביע על אשמת הנאשם, אלא די בראיה 10
ישירה או נסיבתית, חיצונית להוודאת הנאשם, אשר יש לאשר במידת מה 11
את תוכן ההוודאה ולהצביע על אמיתותה .... דרישת היידבר מה הנוספיי באה 12
להסיר חשש שמא הנאשם נוטל על עצמו אחריות למעשה שנעשה על-ידי 13
אדם אחר או שלא נעשה כלל, ולפיכך, עקרונית, מספיקה ראיה קלה מאוד 14
כדי לענות עליה... בהתאם לכך ציונה הפסיקה לא פעם כי ראיה זו ייכולה 15
להיות קלה שבקלוניי.. ואף בעלת משקל ייקל כנוצחיי. די בכך שתניח את 16
דעתו של בית המשפט שהוודאה אינה יבדותא בעלמאי, ותשכנע זי הסיפור 17
שסיפר הנאשם בהוודאתו אמנם סיפור אמשרי הנאי 18

19

במקרה שלפנינו עניין לנו בהוודאה של הנאשם המתפרשת על פני אמרות רבות, הן במשטרה והן 20
בביייכ. הודאתו כוללת פרטי פרטים של עסקקאות נשק שונות, ובכלל זה שמות, כלי נשק ומחירים, 21
כמו גם התייחסות מפורטות למצוין עם גורמים שונים של חרשות הפלסטינית ועם גורמים מחוצה 22
לה (כאירואנים). המשקל העצמי של אמרות אלה הינו גבוה מאוד. הן תוכנו והן הדרך בה חדברים 23
נאמרו מלמדים על המהזמנות הגבוהה שיש לחענין להם (השוות עייפ 6613/99 סמירק ני מדינות 24
ישראל, פייד נו(3) 529, בפסקה 12 לפסק דינה של כבי השופטת דאון בייניש, כתואורה דאזו) בייניש). 25

26

אך לא רק מבחן הפרטים חרבים מלמד על האמינות שיש לייחס לאמרות הנאשם, אלא כאמור 27
לעיל, לאמרות אלה ישנן תוספות מאמתות חיצוניות בדמות אמרתו של מחנוד עביאת ובדמות 28
ת/8. לא כל שכן, שתפיסת ספינת הנשק ייקארין Aיי תואמת אף היא את הדברים שמסר הנאשם. 29
בל נשכח כי הנאשם עצמו לא הכחיש בעדותו בפנינו פרטים רבים מהמופיעי באמרותיו, ובכלל זה 30
מפגש עם האירואנים. 31

32

כאמור, משקלן העצמי של האמרות הינו גבוה. הדבר מה הנוסף במקרה זה מצביע על מעורבותו 33
של הנאשם לכל דפחות במקצת העבירות, ומאמת את כלל אמרותיו של הנאשם. ודוק: הדברים 34
המפורטים באמרותיו של הנאשם כולם קשורים לתפקידו כאתראי על מחלקת הכספים 35
של שירותי חביטחון הפלסטיניים. כאשר קיימת זיקה פנימית וקרבה עניינית בין העבירות 36
השונות, התוספת הראייתית הקיימת לעבירה אחת יכולה להתפרש גם על עבירה אחרת (ראו עייפ 37
241/87 כחן ני מדינת ישראל, פייד מכ(1) 743, עייפ 7758/04 אלקאדר ני מדינת ישראל, תק-על 38
2007(3) 710, עייפ 378/03 פלוני ני מדינת ישראל, תק-על 2005(2) 1128). לפיכך, במקרה שלפנינו, 39

-30-

תאריך : 29/07/09

וקיק מס׳ : 3052/06

1   הגם שקיומת תוספות ראייתיות אך למקצת הדברים שמסר הנאשם, הרי לנוכח הקרבה העניינית
2   של המעשים המתוארים בכתב האישום והמפורטים באמרותיו, יש לראות את התוספות
3   הראייתיות כמאמתות את כלל הדברים שמסר הנאשם בחקירותיו. על כן, גם אם לפריט אישום
4   מסויים לא תמצא תוספת ראייתית חיצונית, הרי שלנוכח הזיקה בין כלל האישומים במקרה זה,
5   די יהיה באמרות הנאשם כדי לבסס את לנבסס את ההרשעה, ככל שזו עולה מהאמרות.
6

7   כעת, ומשחברנו את התשתית הראייתית העומדת לפנינו, נפנה לכל אחד ואחד מפרטי האישום.
8

9   פרט אישום ראשון:
10

11   טענת ההגנה באשר לפרט אישום זה הינן עובדתיות ומשפטיות כאחת. ראשית, מן הפן העובדתי,
12   לא כפרה ההגנה בכך שהנאשם נטל חלק ברכישת האמלׁ״ח כאמור, אלא לטענתה דובר ברכישת
13   אמלׁ״ח שמטרתה איסוף נשק מתושבי הרשות על מנת שיהיה בידי כוחות הרשות הפלסטינית.
14   טענה זו העלה הנאשם הן בבית המשפט והן במהלך חקירתו. שנית, נטען כי הנאשם זכאי להנות
15   מהגנת ״מעשה מדינה״ כיוון שכל מה שעשה היה לפעול ללא שיקול דעת עצמאי, אלא בהתאם
16   להוראות יוׁ״ר הרשות ערפאת, שאישר העברת כספי הרשות לצורך רכישת הנשק. תפקידו של
17   הנאשם במקרה זה היה חתימה על מסמכים שאישרו תשלום. נטען כי מעשה זה אינו פשע מלחמה
18   או פשע נגד האנושות, שכן לא הוכח שהנאשם ידע שהנשק ינוע לארגון גדודי חללי אלאקצא,
19   שעשה בו שימוש לטרור.
20

21   עוד נטען כי עומדת לנאשם הגנת הצידוק, שכן ציות להוראת הרשות שמטרתה איסוף נשק
22   מגורמים לא אחראיים והעברתו לידי שליטה אחראית של הרשות הינה מעשה לגיטימי החוסה
23   תחת הגנת הצידוק.
24

25   דומה כי אין לקבל את טענות ההגנה, ולו מהטעם העובדתי.
26

27   על מנת שתתקבל הגנה של ״מעשה מדינה״ יש צורך להראות כי הגוף מטעמו פעל הנאשם היה
28   מדינה. כפי שנקבע בחלחקיבע בטענת המקדמיות מפי חברי סגן הנשיא, הרשות הפלסטינית אינה
29   מדינה, ובודאי שבתקופה הרלוונטית לכתב האישום היתה רחוקה הרבה יותר ממעמד של רשות
30   עצמאית. על כן ציון סגן הנשיא כי ״לפיכך, אני סבור שיש לקבוע, שמעשיו של הנאשם לפי כתב
31   האישום לא היו פעולות ממשל (ACT OF STATE), שכן לא נעשו מטעם גוף שהוא מדינה, אלא לכל
32   היותר פעולות אישיות בכסות ממשלית, תוך שימעט במשאבים של יישות מדינית בלתי מגובשת״.
33

34   לא הובאו כל תימוכין נוספים או ראיות נוספות שיש בהם כדי לשנות ממסקנתנו זו בנוגע למעמדה
35   של הרשות הפלסטינית.
36

37   שנית, הטענה כי איסוף ותנשק נועד להעברת כלי נשק מתושבים העלולים לעשות בהם שימוש
38   פרטיזאני לידי גורמים אחראיים, אין לה על על מה שתסמוך. אמנם, הנאשם טען זאת במספר
39   הזדמנויות, ובכלל זה בחקירתו, אולם לא התרשמנו כי לטענה זו יש בסיס כלשהו. כאמור, כבר

-31-

1    ציינו לעיל כי התרשמותנו מהנאשם הינה כי המדובר באדם מתוחכם, המנוסה להעביר מעליו את
2    נטל האחריות. בד בבד עם חטענה כי איסוף חנשק נועד למנוע מגורמים לא אחראיים את השימוש
3    בו, עולה כי הנאשם אישר מימון פעולות אשר אין בינן ולבין איסוף נשק מגורמים לא אחראיים
4    ולא כלום. כך למשל, נושא מימון הקמת מפעל לייצור חומרי נפץ בידי אנשי חרשות הפלסטינית
5    עצמה, מימון מחניטוות, מימון הברחות.נשק מגורמי חוץ כחזובאללה והאירואנים וכדומה. אם כל
6    המטרה הינה איסוף נשק "פרטיזואני", מדוע יש צורך לממן הבאת נשק נוסף שמקורו מחוץ
7    לשטחי חרשות הפלסטינית, לא כל שכן כשמדובר בנשק התקפי מובהק, כרקטות וטילים מסוגים
8    שונים? אם מדובר רק ברכישת נשק מאזרחים, מדוע פעל הנאשם למימון עלויות הברחת הנשק
9    מהחיזבאללה בידיגורמים של הרשות הפלסטינית?
10
11   התשובה לשאלות האמזורות הינה ברורה. אין בין איסוף הנשק לבין הרצון למנוע אותו מגורמים
12   "לא אחראיים" העלולים לעשות בו שימוש טרוריסטי ולא כלום. מטרת איסוף הנשק היא העברתו
13   לידי גורמים ברשות הפלסטינית המצייתים לערפאת ואשר מאפשרים לחימה בישראל, בכוחותיה
14   ובאזרחיה. כפי שצוין הנאשם עצמו בזכ"ד מיום 15.3.06 שעה 15:18 בסעיף 30: "יאסר ערפאת
15   נתן הוראה שכל הנשק יירכש על ידי חרש"פ ולא על ידי החמאס או ארגונים אחרים וזאת על
16   מנת שהוא עצמו יוכל לשלוט בכל מה שקורה. באמן זה יאסר ערפאת יוכל לשלוט בעוצמת
17   האינתיפאדה".
18
19   עניינו הרואות כי אין המדובר במטרה תמימה "ואחראית", אלא במטרה ברורה שנועדה לאפשר
20   לגורמים של הרשות הפלסטינית, ובראשם יאסר ערפאת, לשלוט באמצעות נשק חם והתקפי
21   בעוצמת "האינתיפאדה"י, היינו: בעוצמת הטרור הפלסטיני.
22
23   עוד יש לומר כי הטענה שהנאשם לא ידע שהנשק חועבר לארגון גדודי חללי אלאקצא, שעשה בו
24   שימוש לצרכי טרור, הינה טענה שאינה תואמת את חומר הראיות. כך למשל, בזכ"ד מיום 15.3.06
25   שעה 15:18 בסעיף 36 נרשם: "הנחקר הסביר כי כל אחד ממגגנוני חבטחון רכשו אמל"ח במביות
26   גדולות והנחקר אישר התשלום. כל ארגוני שהדא אל אקצא חשתמשו בכלי חנשק שסופקו על
27   ידי מנגנוני הבטחון שביצעו את הרכש המאסיבי".
28
29   עניינו הרואות כי הנאשם ידע חיטב שהאמל"ח שנרכש הועבר לידי גדודי חללי אלאקצא שעשו
30   שימוש בנשק זה. ברור כי הנאשם ידע מהו ארגון גדודי חללי אלאקצא ומהם פעילויותיו. ניסיונו
31   לומר בפנינו כי אינו יודע מהו ארגון זה הינו ניסיון מופרך להצגנו כאדם תמים. אינט מאמינים
32   לטענון זה. ברור לנו כי הנאשם – שהיה בעל משרה בכירה בפת"ח במשך עשרות שנים והיה מקורב
33   ליאסר ערפאת - ידע חיטב מהו ארגון גדודי חללי אלקצא, מהן פעילויותיו, והוא ידע חיטב כי
34   ארגון זה הוא כלי בידי הרשות הפלסטינית להפעיל טרור נגד מדינת ישראל ותושביה.
35
36   עוד יש לצייו כי כא התרשמנו כי הנאשם היה פקיד שמילא הוראות ללא שהיה לו שיקול דעת
37   כלשהו. הדבר נובע הן מאופיו חבכיר של תפקידו, אך גם מהעובדות שעלו בפנינו כמו גם הדברים
38   שמסר הנאשם בבית המשפט. כך למשל, במקרים לא-מעטים עולה כי הנאשם פעל מיוזמתו חוא,
39   בלא אישור כלשהו – ובוודאי בלא הוראה מפורשת - של יאסר ערפאת בהוצאת כספים. כך

1    "ביוזמתם וצעקיותם" שנועדו להשיג ריווחים לארגון הפתי"ח, מגעין עם הארגונים שהיו ללא דיעה

2    מראש של יאסר ערפאת (אלא רק בדיעבד), ודבריו של הנאשם כי יאסר ערפאת אהב לראות ולקבל

3    תוצאות ולא היה מעורב בכל התהליך עצמו מלכתחילה. עוד נזכיר, כי הנאשם אישר במו פיו

4    בעדותו בפנינו כי לא העביר כסף אם לא היה בידו הסכום המתאים או שמטולח החוצאה לא

5    התאימה לסעיף מוכר בתקציב. דבר זה אינו מתיישב עם מי שרק ממלא כל הוראה של ערפאת,

6    ויתר על כן, הנאשם אמר בעדותו בפנינו ביום 18.11.08 כי אם היה מקבל הוראה שבעיניו היא

7    מוזרה הוא לא היה מבצע את הפעולה, והוסיף כי "היו לי הרבה מחלוקות עם הראיס על דברים

8    כאלה ובסופו של דבר הוא בא ואמר לי שאני צודק". מדברים אלה, שנראה כי נאמרו באווירה רבה

9    מצידו של הנאשם, עולה כי הנאשם לא היה חותמת גומי. כאשר סבר שישנה בעיה עם הוראה כזו

10   או אחרת של ערפאת הוא היה אומר לו זאת ואף מתווכח איתו.

11

12   במקרה שלפנינו, ובכל הנוגע למעשים המפורטים בכתב האישום, לא מצא הנאשם לנכון להתווכח,

13   אף שאנו יודעים כן לו היה הושב לנכון לעשות כן היה עושה זאת. המסקנה המתבקשת הינה כי

14   לנאשם, הן מתוקף מעמדו, הן דה פקטו ביחסיו מול יאסר ערפאת, והן לאור מעשיו שלו כעולה

15   מחומר הראיות בפנינו, היה שיקול דעת אם לאשר העברת כספים אם לאו. הנאשם ידע היטב מה

16   מטרת העברת הכספים, וידע היטב כי הנשק שנרכש באמצעות אותם הכספים נועד לצורכי ארגון

17   טרור – גדודי חללי אלאקצא.

18

19   **סיכום:**

20

21   לא הונחה מבחינה עובדתית כל תשתית המאפשרת לתמוך בטענת ההגנה באשר להנגנת הצידוק

22   העומדת לנאשם או להגנת "מעשה מדינה". חובה כי הנאשם ידע היטב כי המדובר ברכישת נשק

23   לצורכי העברתו לשימוש ארגון טרור – גדודי חללי אלאקצא. לא דובר במקרה זה ברכש נשק

24   שמטרתו הוצאת נשק מתושבים והעברתו ל"ידיים אחראיות" כטענת ההגנה.

25

26   הרשות הפלסטינית אינה מדינה, ובכל מקרה, העברת נשק לצורכי טרור נגד אזרחי ותושבי מדינת

27   ישראל אינה יכולה לחסות תחת הגנת "מעשה מדינה", אף לו דובר במדינה.

28

29   שנית, גם בנוגע להגנת הצידוק, אף אם נלך לשיטתו של חברי סגן הנשיא, אשר מוכן להכיר בהגנת

30   הצידוק לגורמים של חרשות הפלסטינית בתנאים מסויימים, אין המדובר במעשה לגיטימי מצידה

31   של הרשות, ורכישת נשק שנועד לצורכי ארגון טרור, הינה בבירור מעשה בלתי חוקי.

32

33   מאחר שהנאשם היה שותף לרכישת נשק כמפורט בפרט האישום הראשון, אנו מרשיעים אותו

34   במיוחס לו בפרט אישום זה.

35

36   **פרט אישום שני:**

37

38   פרט זה ענינו בהעברת משכורות לפעילי גדודי חללי אלאקצא, וכן בהעברות בקשה של מרואן

39   ברגותי לתשלום כסף עבור אמצעי לחימה.

-13-

הבסיס לפרט זה מצוי באמרותיו של הנאשם, אך גם בדברים שמסר מחמוד עביאת במשטרה. 2

הנאשם הודה למעשה בחקירתו כי העביר משכורות-לאנשיו של מחמוד עביאת, ואילו האחרון 3

אישר ענייו זה באמרתיו. לפיכך, הריישא של פרט אישום זה מבוססת על אמרות הנאשם וזוכה 4

לתוקפת ראייתית משמעותית באמרתו של מחמוד עביאת. לפיכך, ולאור הנחתות העובדתי דלעיל, 5

יש בסיס מוצק להרשעת הנאשם בריישא של פרט האישום השני, שכן המדובר בהעברת כספים 6

לפעילי טרור. 7

8

מסיפא של פרט האישום השני – נושא האמצעים שביקש מרואן ברגותי, אף הוא מופיע באמרותיו 9

של הנאשם ומפורט שם, והיו במהותו חלק מאותה מסכת כללית המתוארת בפרט האישום 10

הראשון, הנוגעת לחלקן של הנאשם במימון אמצעי לחימה שונים של אנשי הרשות הפלסטינית 11

ושל גדודי חללי אלאקצא. 12

13

בכל הנוגע לסיפא של פרט אישום זה טענה ההגנה כי הנאשם לא ביצע כל עבירה, שכן כל שעשה 14

היה להעביר לערפאת את המסמך. הנאשם לא שילם את הסכום המבוקש בהעדר תקציב במשרדו, 15

והבקשה שולמה בכלל מתקציב משרד האוצר הפלסטיני. 16

17

אין בידי לקבל את הטענה שאין המדובר בעבירה. האישום המיוחס לנאשם הינו ביצוע שירות 18

עבור התאחדות בלתי מותרת. השירות שהנעזיק הנאשם לארגון גדודי חללי אלאקצא אמנם לא 19

התבצע בכך שהעביר כסף ממשרדו, אך שירות עדיין נעשה מצידו. שירות זה כלל קבלת הבקשה 20

והעברתה לערפאת. הנאשם היה הצינור באמצעותו טופלה ומומשה חבקשה. כאמור לעיל, וכפי 21

שהראינו בנתחון העובדות בפרט האישום הראשון, הנאשם היה חוליה משמעותית בכל מעשי 22

הרכש והכספים. לא זו אף זו, אלא הוא היה הצינור דרכו עברו כל הבקשות הכספיות לאיסר 23

ערפאת. כך גם במקרה זה. מעשה זה היו שירות עבור התאחדות בלתי מותרת, ועל כן יש 24

להרשיעו במיוחס לו גם בסיפא של פרט אישום זה. 25

26

עוד יש לומר כי הדברים האמורים ביחס להגנות ״מעשה מדינה״ וצידוק שהועלו על ידי ההגנה, 27

נכונים גם ביחס לפרט אישום זה ובייתר שאת, תואיל ובמקרה זה מדובר בסיוע ושירות ישיר 28

שתעניק הנאשם לארגון הטרור גדודי חללי אלאקצא. 29

30

### פרט אישום שלישי: 31

32

פרט זה עניינו חלקו של הנאשם ברכש הספינה קארין א. 33

34

לטענת ההגנה הנאשם לא ביצע עבירה כלשהי. חכסף לרכישת הספינה לא הגיע מתקציבו אלא 35

מתקציב משרד אחר, עליו היה אחראי חרבי צרצור. הנאשם לא יזם את הבאת ספינת הנשק, 36

והייתה לו לכל היותר ידיעה עקיפה ולא קונקרטית שהספינה תוביל נשק, כל שעשה היה להעביר 37

את המידע בדבר הספינה ליאסר ערפאת, שחשב שמדובר במזימה לרצוח אותו. 38

39

תיק מס': 3052/06

1   לאחר שבחנו את חומר הראיות, מצאנו כי העובדות המיוחסות לנאשם בפרט אישום זה הוכחו

2   כנדרש. למעשה, גם ההגנה לא חלקה על כך שהעובדות המפורטות בכתב האישום הוכחו

3   באמרותיו של הנאשם. אמיר כי בכל הנוגע לרכש הספינה לא עלה כלל כי יאסר ערפאת סירב

4   לנושא או חשב כי המדובר במזימה. דברים אלה שנאמרו על ידי הנאשם, התייחסו למפגשים שלו

5   עם האיראנים המפורטים בפרט האישום הרביעי, ולא לנושא רכש הקאריין A, אותו אישר ערפאת

6   ללא בעיות כלשהן, בהתואם לאמרות הנאשם.

7

8   השאלה המרכזית אותה העלתה ההגנה הינה האם מעשים אלה מהווים עבירה של סחר בציוד

9   מלחמתי.

10

11   הגדרת המילה "סחר" בצו בדבר איסור סחר בציוד מלחמתי הינה כדלקמן: "קניה, מכירה, תיווך,

12   מסירה, איחסון, הובלה, העברה, משלוח או תיקון" .

13

14   פירושו של דבר, שסחר בציוד מלחמתי כולל לא רק פעולות של רכישה ומכירה, אלא גם תיווך

15   והובלה של נשק.

16

17   במקרה שלפנינו, הנאשם נטל חלק במעשים הבאים: הוא קיבל את פנייתו של פתחי ראזם למימון

18   ספינת נשק שתגיע מהאיראנים; הובהר לנאשם כי השבח שיחיה על הספינה יהיה במימון איראני

19   ואילן על הוושות הפסלטיניית למבון רק את הספינה והוצאאותיה; הנאשם טיפל בפנינה, הוא העביר

20   את הדברים ליאסר ערפאת אשר אישר את הקשר והסכום לרכישה; הנאשם הוא זה שהעביר את

21   בקשת התשלום לערפאת, וזה אישר את העברת הכסף; כאשר הנאשם הודיע כי אין למשרדו

22   תקציב מתאים, הורה ערפאת כי התשלום יבוצע ממשרדו של חרבי צרצור והנאשם העביר גם

23   הוראה זו באמצעות שליח ממשרדו; פתחי ראזם עמד בקשר עם הנאשם לצורך קבלת חידיעה

24   האם ניתנה ההוראה להעברת הכסף.

25

26   מעובדות אלה עולה כי הנאשם היה מעורב בתיווך ובמימון של עסקת הנשק. גם אם משרדו לא

27   שילם את הכסף באופן ישיר, הנאשם הוא זה שיצר את הקשר עם ערפאת והעלה לשיקולו, לעיונו

28   ולהכרעתו את נושא עסקת הנשק. הנאשם היה הגורם המתווך בין פתחי ראזם, האיראנים

29   ואחרים לבין יאסר ערפאת. חלקו של הנאשם, לפיכך, אינו מינזורי, אלא משמעותי. ניתן לומר כי

30   הנאשם היה גורם משמעותי בקיומה של העסקה, שכן קשריו עם ערפאת היו בעלי חשיבות עליונה

31   לצורך הוצאתה לפועל של העיסקה.

32

33   גם אם משרדו של הנאשם לא מימן את העסקה מתקציבו השוטף, עדיין יש לומר כי הנאשם היה

34   מעורב בעסקה זו עד צוואר, והוא מהווה גורם אשר פעל באופן מהותי וממשי לצורך השגת

35   המימון לרכישת הספינה. לפיכך, יש לראות כמי שהיה מעורב בקניית של הנשק במנעים שנדחל

36   מלכתחילה עם האיראנים, ברכישת ואמצעי להובלת הנשק, ולכל הפחות במעשים המהווים תיווך

37   לרכישת הנשק.

38

1 גם במקרה זה, ברור כי לא חלות ההגנות של מעשה מדינה וצידוק. במקרה זה הקשר הראשוני
2 החל עוד בטרם ידע ערפאת על נושא ספינת הנשק, כך שהנאשם ודאי אינו יכול לומר כי פעל מתוך
3 מילוי הוראות בלבד.

4

5 על כן יש לחרשיע את הנאשם במיוחס לו בפרט אישום זה.

6

7 **פרט אישום רביעי:**

8

9 פרט זה עניינו מגעים שניהל הנאשם עם נציגים איראנים מתוץ לאזור.

10

11 ההגנה לא חלקה בכל חנוגע לפרט זה כי הנאשם קיים פגישה עם מי שהציגו עצמם כאיראנים,
12 וניתן שיתף כללית בדבר אפשרויות שאירן תסייע לרשות הפלסטינית. ההגנה טענה כי על התבועה
13 להביא תוספת ראייתית מסוג דבר מה על מנת להוכיח כי התקיימה פגישה כזו, וכי בני שיחו של
14 הנאשם היו אכן איראנים. עוד נטען כי מבחינתו של הנאשם היו פגישות אלה רוונית חשדנות
15 וזהירות ולא היו מתוך רצון לשתף פעולה, ועובדה כי ערפאת, שהועבר אליו מסמך המתאר את
16 הפגישה, דחה את הרעיון שעלה בה.

17

18 ראשית, בכל הנוגע לתוספת תראייתית הנדרשת, אנו סבורים כי במקרה זה, גם בהיעדר תוספת
19 ראייתית לפרט זה כשלעצמו, קיומה של תוספת ראייתית לפרטים האחרים, מהווה תוספת
20 ראייתית גם ביחס לפרט אישום זה.

21

22 כפי שציינו לעיל, תוספת מסוג "דבר מה" הינה תוספת שנועדה לאמת את אמרות הנאשם. מכיוון
23 שמדובר בתוספת מאמתת ולא בתוספת מסבכת, אין הכרח כי התוספת תתייחס לכל אחד ואחד
24 מפרטי האישום בנפרד, ובתנאי כי ישנו קשר בין פרטי האישום השונים בהם מדובר.

25

26 כאמור, קיימת במקרה שלפנינו זיקה בין מעשיו של הנאשם המפורטים בפרט אישום זה, למעשיו
27 המפורטים בפרטי האישום הקודמים. כולם נוגעים לעבודתו ומעמדו כאחראי הכספים ברשות
28 הפלסטינית וכאדם המקורב לערפאת. לפיכך, החוספת הראייתיות שנמצאו ביחס לפרטי האישום
29 הראשון והשני (נ/8 ואמרתו של מחמוד עביאת) מחווות גם תוספת ראייתית לפרט זה.

30

31 עוד יש לדחות את טענת ההגנה כי המדובר במגעים ללא כוונה ממשית. אמנם, נראה כי המדובר
32 במגעים ראשוניים, אולם מעצם טיבם וטבעם של מגעים ראשוניים מסוג זה, הם מלווים, לעתים,
33 בזהירות. אין פירושו של דבר שהנאשם לא רצה לקדם את המגעים לאחר מכן, ותוא אף העביר
34 את נושא המגעים לחחלטתו של יאסר ערפאת.

35

36 בל נשכח כי יסודות העבירה בה מדובר דורשים אך את קיומו של מגע, בין הנאשם לבין גורם אחר
37 שהיגו חלק מארגון עוין. במקרה שלפנינו נראה מהעובדות שהוכחו כי לא זו בלבד שהנאשם אכן
38 נפגש וקיים מגעים עם פעילי מדינת אויב, אלא שהנאשם פעל מתוך רצון לממש את הסיכום עם

-36-

תיק מס': 3052/06

1   האירגונים ו"לחביא תוצאוות" לערפאת. לפיכך, אנו. סבורים כי כל יסודות העבירה התקיימו
2   במקרה זה בנאשם.
3
4   עוד אצין כי גם במקרה זה ברור כי לא חלות ההגנות של צידוק ו"מעשה מדינתי", כיוון שהנאשם
5   לא קיבל כל הוראה או הנחייה לבצע את המיוחס לו בפרט זה, אלא פעל מיוזמתו ועל דעתו, ורק
6   בדיעבד העביר את תוצאות המפגש לאישורו של ערפאת.
7
8   לפיכך יש לחרשיע את הנאשם במיוחס לו בפרט האישום הרביעי.
9
10              **סוף דבר**
11
12   לא מצאנו לנכון לקבל את טיעוני הזוטא של הנאשם. מצאנו לנכון להעניק לאמרותיו המשטרתיות
13   ולוכ"דיים מחקירותיו בשב"כ משקל מלא, ולהעדיף את אמרותיו בכל מקום בו טען הנאשם אחרת
14   בפנינו. לאור המצוי באמרות הנאשם, סברנו כי קיימת תשתית עובדתית מלאה לחוכחת
15   האישומים המיוחסים לנאשם.
16
17   לא עומדת לנאשם כל הגנה במקרה זה. לא חלה במקרה שלפנינו הגנת מעשה מדינה, בין היתר
18   כיוון שהרשות הפלסטינית אינה מדינה, ובתקופה הרלוונטית מעמדה היה רחוק עוד יותר ממדינה
19   מאשר כיום. אף אם הייתה קיימת הגנה זו במשפט האזור, לא היה הנאשם יכול לחסות בצילה,
20   לאור העובדה כי העביר נשק בידיעה כי זה עתיד לשמש ארגון טרור, כגזודי חללי אלאקצא.
21
22   לא עומדת לנאשם הגנת הצידוק, שכן גם בהתאם לפרשנות המרחיבה ביותר של הגנה זו (כאמור
23   בהחלטת חברי סגן הנשיא באשר לטענות המוקדמיות), הנאשם נטל. חלק במעשים שאינם
24   לגיטימיים, שלא בהתאם לסמכויות שניתנו לרשות הפלסטינית בהסכמי הביניים, פעל פעמים
25   רבות מיוזמתו, ולאו דווקא כממלא הוראות, ואף אם חיו מקרים בהם מילא הוראות, דובר
26   במעשים שהנגם בכירור בלתי חוקיים שכן כאמור, דובר בהעברת נשק ואמצעים לגורמי טרור.
27
28   אשר על כן החלטנו להרשיע את הנאשם בכל המיוחס לו בכתב האישום.
29
30              **השופט סא"ל רוני עצמון:**
31   אני מסכים.
32
33              **השופט סא"ל טל בנד:**
34   אני מסכים.
35
36   ניתן והודע היום, 29/07/09, בפומבי ובמעמד הצדדים.
37
38
39

| שופט | נשיא | שופט |
|------|------|------|

-37-