69



**בתי המשפט**

בית המשפט המחוזי בתל-אביב-יפו                    תפ"ח 1158/02

106.    מן האמור לעיל עולה כי לגבי פיגוע זה אין ראיה ישירה לגבי זהות מבצעו, שכן הדברים שנאמרו לאבו חמיד על ידי עבד אלמגיד שלא העיד בפנינו הם בבחינת עדות שמיעה לא קבילה.

ואולם, ניתן לקבוע על פי ראיות נסיבתיות חד-משמעיות כי הפיגוע בוצע על ידי עבד אלמגיד, בסיועו ובאישורו של אבו חמיד, כפי שסיפר אבו חמיד בעדותו. אבו חמיד סיפר כי עבד אלמגיד הודיע לו שהוא יוצא לבצע פיגוע במפעל של משפחת רגיואן בו עבד בעבר, ולצורך כך הוא צייד אותו באקדח; זמן קצר לאחר מכן דיווח לו עבד אלמגיד על כך שירה למוות בגד רגיואן ז"ל, והוא אכן נרצח ביריות אקדח.

אין ראיות הקושרות את הנאשם לפיגוע זה בצורה ישירה, זולת הקשר הנובע ממעורבותו הכוללת והעקיפה בפיגועים שתכנן וביצע אבו חמיד, כמבואר לעיל (ראה סעיפים 27, 60-65 לעיל). השאלה המשפטית האם די בכל אלה כדי לבסס אחריות פלילית של הנאשם למעשה הרצח שבוצע בפיגוע זה - כאשר אין כל ראיה הקושרת את הנאשם ישירות לפיגוע - תבחן בפרק המסקנות.

(12)    **הפיגוע במסעדת "סי פוד מרקט" בתל אביב**

107.    ביום 5.3.02 בשעה 30 :02 בוצע פיגוע במסעדת "סי פוד מרקט" בתל אביב על ידי המחבל אברהים חסונה, שהגיע למקום חמוש ברובה M-16, רימוני יד וסכין. את האירוע תיארו עדי הראיה ויליס חזן (עמ' 148) וליאון גורנשטיין (עמ' 129) שנכחו במסעדה בעת הפיגוע. המחבל פתח באש עם הרובה שבידיו לעבר היושבים במסעדה, עד אשר ארע מעצור בנשק, ורימוני היד שהשליך לא התפוצצו. בשלב זה החל חסונה לדקור אנשים, כולל השוטר רס"ר סלים בריכאת ז"ל שניסה להפסיק את מסע הירי ונדקר למוות בידי המחבל. בפיגוע נרצחו פרט לרס"ר בריכאת גם יוסף הבי ז"ל ואליהו דהן ז"ל (ראה חוו"ד פתולוגיות ת/139ב-עד ת/139ד). רבים אחרים נפצעו. המחבל עצמו נורה ונהרג בפיגוע, והתברר כי מדובר באברהים חסונה (חוו"ד פתולוגית ת/139יא, ובדיקת ד.נ.א. ת/139ז).

70



בתי המשפט

תפ״ח 1158/02    בית המשפט המחוזי בתל-אביב-יפו

תוצאות הפיגוע נראות בלוח התצלומים ת/139ו שהוגש על ידי השוטר אפי ימין (עמ' 151), וכן במצגת שהכינה המשטרה (ת/139א). אפי ימין הגיש גם דו״ח פעולה שרשם במקום, והוא זה שתפס את סכינו של המחבל המגואלת בדם, קליע מרוסק, תרמילים, כדורים ורובה 16-M (ת/139ה). הנשק נתפס והובא לבדיקת מז״פ (ת/139ח, ועדותו של רפ״קי עמי לייפר בעמ' 130).

108.   הפיגוע ב״סי פוד מרקט״ בוצע על ידי אברהים חסונה, והוא תוכנן על ידי אחמד ברגותי, אבו חמיד ועויס, כפי שסיפר אחמד ברגותי בחקירתו (ראה סעיף 29 לעיל). גם אחיו של אבו חמיד (שריף נאג'י) היה מעורב בפיגוע, כפי שסיפר ברגותי בחקירתו (ראה סעיף 55 לעיל), ואף הוא קושר את אחמד ברגותי לתכנונו. אחמד ברגותי סיפר בחקירתו כי המפגע חסונה נשלח אליו על ידי עויס, קנה לו בגדים ודאג לכך שיהיה מי שיסיע אותו לישראל לצורך ביצוע הפיגוע (טארק מלחי). הוא דיווח לנאשם בטלפון כי הפיגוע יוצא לדרך, והנאשם אמר כי איננו מעוניין שהפיגוע יתבצע בתוך ישראל. עוד סיפר אחמד ברגותי כי לאחר הפיגוע אמר לו הנאשם להודיע לעויס שלא ליטול אחריות על הפיגוע בתקשורת קודם שישוחח על כך עם הנאשם (ראה סעיף 29 לעיל).

במהלך שיחה שהתקיימה בין הנאשם לבין אחמד ברגותי בעת מעצרם, כאשר הם הוקלטו ללא ידיעתם, טרח אחמד להדגיש בפני הנאשם כמה פעמים כי הוא אמר שרק שוחח עם הנאשם בטלפון **לאחר** הפיגוע, והוסיף: **״תזהר, אני לא הייתי איתך, אני לא הייתי איתך, דיברתי איתך בטלפון״** (תמליל שיחה ת/127ג עמי 5-4, 11). השניים תיאמו עמדות לגבי חקירתם בנקודה זו.

גם אבו חמיד סיפר בחקירתו על מעורבותו בפיגוע (הודעה ת/149ב עמי 6 שהוגשה על ידי רס״ר אלקוראען בעמי 194). הוא סיפק לצורך הפיגוע רימוני יד וכדורים לרובה 16-M, כאשר ראה את חסונה מצויד ברובה 16-M לפני צאתו לפיגוע. כאשר דווח בלילה על הפיגוע, ועל כך שחסונה דקר למוות שוטר, נזכר אבו חמיד כי נאסר חלום (אחיו של אבו חמיד) נתן למפגע את הסכין, והסביר לו להשתמש בו אם יהיה לו מעצור בנשק.

71



## בתי המשפט

תפ"ח 1158/02                                    ת המשפט המחוזי בתל-אביב-יפו

גם אמר בחקירתו חלום אבו חמיד (הודעתו ת/162 עמ' 9, שהוגשה על ידי רס"ר קוראען
עמ' 194, והודעה ת/162ב עמ' 4 שהוגשה על ידי רס"ר מזרחי בעמ' 184). חלום סיפר כי
א אמן את חסונה בשימוש ברובה M-16. שריף נאגי אבו חמיד (אף הוא אח של אבו
מיד) סיפר בחקירתו על כך שליווה את המפגע לתל אביב, והשיג רכב עבור הפיגוע
הודעתו ת/182, שהוגשה על ידי רס"ר בן לולו בעמ' 182).

109. הנאשם קשור בצורה עקיפה לפיגועים שתכננו והוציאו לפועל אחמד ברגותי, אבו
חמיד ועויס, כפי שפורט לעיל. ואולם, ככל שמדובר בפיגוע במסעדת "סי פוד מרקט",
שתוכנן והוצא לפועל על ידי השלושה, אחראי הנאשם גם באופן אישי לביצועו. נושא
אחריותו של הנאשם לפיגוע זה פורטה לעיל (ראה סעיפים 29, 55 ו- 66(ג) לעיל). הנאשם
הודה בחקירתו כי אישר לאחמד ברגותי את ביצוע הפיגוע הנ"ל **לפני** הוצאתו לפועל, אם
כי נתן הנחיה שהפיגוע יבוצע בשטחי יהודה ושומרון ולא בתוך ישראל. כך גם עולה מן
הדברים שאמר אחמד ברגותי בחקירתו.

### (13) פיגוע ירי במלון "ג'רמי" בנתניה

110. ביום 9.3.02 בשעה 20:25 נכנסו שני מחבלים למלון "ג'רמי" בנתניה, כשהם
חמושים ברובי M-16 ורימוני יד. השניים השליכו רימוני יד וירו על עוברי אורח ותיירים.
את האירוע תיאר עד ראייה שכונה 'ג', שהיה מפקד צוות ביחידת "אלמוג" של מג"ב.
כאשר שמע את היריות הוא הגיע למלון בתוך 30 שניות, נתקל בפצועים בשעה שעדיין
נמשכו היריות. 'ג' פתח במרדף אחרי המחבלים, ושניהם אותרו במדרגות של קניון הנמצא
בסביבה, נורו ונהרגו (ראה חוו"ד פתולוגית של המחבל שאדי נג'מי ת/140ח, וכן חוו"ד של
המחבל השני ת/140ט). 'ג' אישר בעדותו כי למרבה הצער חלק מן הנפגעים היו מאש אנשי
מג"ב (עמ' 117-118). בפיגוע נרצחו התינוקת אביה מלכה ז"ל וישראל יחיא ז"ל (ראה
טופס הודעה על פטירה ת/140ב).

72



בתי המשפט

בית המשפט המחוזי בתל-אביב-יפו                              תפ"ח 02/1158

בדוּח רמי מלכה הגיש דו"ח ביקור טכנאי מז"פ בזירת הפיגוע, המתאר את תוצאותיו ואת הממצאים בזירה (ת/140ו ועדותו בעמ' 118), ותצלומים מהזירה (ת/140ז). חוו"ד של מחלקת החבלה של המשטרה קבעה כי למלון הושלך רימון יד שהתפוצץ (ת/140ה). מהדו"ח של רס"ר מלכה עולה כי במקום נתפסו שני רובי 16-M ששימשו את המחבלים (ראה גם עדותו של רפ"ק לייפר בעמ' 130).

111.    נאסר עויס סיפר בחקירתו כי הוא הוציא לפועל את פיגוע הירי הנ"ל בנתניה, שבוצע על ידי שני אנשים ששמותיהם לא היו ידועים לו. השניים נשלחו אליו על ידי פעיל טרור אחר (אחמד אבו חדיר), ועויס ארגן את הסעתם של השניים באמצעות מחמוד טיטי, ואף מסר לאחמד אבו חדיר שני רימונים ושני רובי 16-M. כמה שעות לאחר שהשניים הוסיעו לבאקה אל שרקיה, משם נכנסו לישראל ברגל, שמע עויס בטלוויזיה על הפיגוע במלון בנתניה. הוא התקשר לכלי התקשורת ונטל אחריות על ביצוע הפיגוע (הודעתו של עויס ת/174ב עמ' 5, שהוגשה על ידי רס"מ רוני עמר בעמ' 191).

גם בפיגוע זה ניתן לקבוע על פי ראיות נסיבתיות חד-משמעיות כי עויס עומד מאחורי הפיגוע הנ"ל, אשר בוצע זמן קצר לאחר שצויד את המחבלים ברובי 16-M ורימונים, והסיעם לנקודה על הקו הירוק הקרובה לנתניה. הפיגוע אכן בוצע על ידי שני מחבלים שהיו מצוידים ברובי 16-M וברימונים, כמה שעות לאחר שעויס ארגן את הסעתם לנתניה, ומכאן ברור שזה הפיגוע עליו דיבר עויס בחקירתו.

אין ראיות הקושרות את הנאשם לפיגוע זה בצורה ישירה, זולת הקשר הנובע ממעורבותו הכוללת והעקיפה בפיגועים שתכנן וביצע עויס (ראה סעיף 96 לעיל). השאלה המשפטית האם די בכל אלה כדי לבסס אחריות פלילית של הנאשם למעשה הרצח שבוצע בפיגוע זה – כאשר אין כל ראיה הקושרת את הנאשם ישירות לפיגוע - תבחן בפרק המסקנות.

73



**בתי המשפט**

<u>בית המשפט המחוזי בתל-אביב-יפו</u>                    תפ"ח 1158/02

<u>(14)    רצח קונסטנטין דנילוב ז"ל בבאקה אלע'רביה</u>

112.    ביום 30.3.02 בשעה 13:00 זיהה צוות של מג"ב רכב שנסע במהירות מופרזת לכיוון באקה אלע'רביה, ובו שני חשודים. בעת שהצוות עקב אחר המחבלים, הם פתחו באש ורצחו את קונסטנטין דנילוב ז"ל (ראה תעודת פטירה ת/141ט). שאר אנשי הצוות ירו על המחבלים, וחגורת הנפץ שהיתה על אחד מהם התפוצצה. שני המחבלים נהרגו, לאחר שקודם לכן השליכו רימונים לעבר הצוות (ראה עדותו של סנ"צ פריד ג'יאנם בעמ' 122, שהשתתף באירוע).

צילומי האירוע הוגשו עם תעודת עובד ציבור של פרוספר אוחנה (ת/141ג). בבדיקת מז"פ נקבע כי אחד המחבלים החזיק חגורת נפץ מאולתרת שהתפוצצה על גופו (ת/141ה).

113.    עויס אמר בחקירתו כי שלח מתאבדים יחד עם מחמוד אל טיטי ואחמד אבו חדיר, וכי השיג לאחד מהם חגורת נפץ כדי לבצע פיגוע בתוך ישראל. אותו מתאבד נסע עם אדם נוסף כשעליו חגורת נפץ לשם ביצוע פיגוע בישראל, אך נהרג עם חברו בחילופי ירי עם שוטרי משמר הגבול בבאקה אלע'רביה, לאחר שהרגו שוטר מג"ב (הודעה ת/173ב עמ' 9-10 שהוגשה על ידי רס"מ עמר בעמ' 191). עוד סיפר עויס בחקירתו כי הפיגוע הנ"ל היה אמור להתבצע בחדרה (הודעה ת/172ב עמ' 3 שהוגשה על ידי עמר בעמ' 191).

114.    גם בפיגוע זה ניתן לקבוע על פי ראיות נסיבתיות חד-משמעיות כי הפיגוע בוצע על ידי אנשים שנשלחו על ידי עויס, וצוידו על ידו בחגורת נפץ. ברור מחקירתו של עויס כי הפיגוע אליו התייחס בחקירתו הוא הפיגוע הנדון.

אין ראיות הקושרות את הנאשם לפיגוע זה בצורה ישירה, זולת הקשר הנובע ממעורבותו הכוללת והעקיפה בפיגועים שתכנן וביצע עויס (ראה סעיף 96 לעיל). השאלה המשפטית האם די בכל אלה כדי לבסס אחריות פלילית של הנאשם למעשה הרצח שבוצע בפיגוע זה - כאשר אין כל ראיה הקושרת את הנאשם ישירות לפיגוע - תיבחן בפרק המסקנות.

74



בתי המשפט

(15) **פיגוע ירי בין עטרת לביר-זית**

115.    ביום 25.2.01 בשעה 13:00 בוצע ירי מן המארב בכביש 465 לכיוון רכבו של יוסף
כהן (.G.M.C), שנע מכיוון עטרת אל ביר-זית. הירי בוצע מרכב עוקף. כהן נפצע קשה
בפיגוע, ורכבו הדרדר לשוליים (עדותו בעמ' 142). עשרות כדורים נורו לעבר רכבו, והוא
נפגע משלושה כדורים בראש ושניים בצוואר, ובדרך נס נותר בחיים (ראה מזכר לגבי מצב
הרכב ת/142ג ודו"ח תפיסה וסימון של תרמילי הכדורים ת/142ב שהונשו על ידי משה
לביא בעמ' 124, וכן דו"ח בדיקת הרכב ת/142ד שהונש על ידי השוטר מזרחי בעמ' 131).

תיאור של זירת הפיגוע מופיע בלוח התצלומים ת/142 שהונש על ידי רפ"ק מזרחי בעמ'
139).

116.    אחמד ברגותי סיפר בחקירתו על פיגוע זה (הודעתו ת/165א עמ' 1 שהונשה על ידי
רס"ר מזרחי בעמ' 184, וזכ"ד ת/165ו שהונש על ידי החוקר "דני" בעמ' 200) כיצד תכנן
את הפיגוע יחד עם מוהנד, אבו סטחה ואחרים, שביקשו ממנו נשק ורכב כדי לבצע פיגוע.
אחמד ברגותי מסר להם רובה MP-5 וכדורים, וכן נתן להם את רכבו. כעבור כמה שעות
הם החזירו לו את הרכב והנשק, וסיפרו לו כי ירו על רכב באיזור גשר עטרה תוך כדי
עקיפתו, וכי הנהג של הרכב נפצע. דבריו של אחמד ברגותי מתיישבים עם הראיות לגבי
דרך ביצוע הפיגוע, מקום ביצועו ותוצאותיו, ולפיכך יש ראיות נסיבתיות חד-משמעיות
מהן עולה כי הפיגוע עליו סיפר אחמד ברגותי הוא הפיגוע הנ"ל בגשר עטרה.

אין ראיות הקושרות את הנאשם לפיגוע זה בצורה ישירה, זולת הקשר הנובע ממעורבותו
הכוללת והעקיפה בפיגועים שתכננו וביצעו אחמד ברגותי ואבו סטחה (ראה סעיף 80 לעיל).
השאלה המשפטית האם די בכל אלו כדי לבסס אחריות פלילית של הנאשם למעשה הרצח
שבוצע בפיגוע זה - כאשר אין כל ראיה הקושרת את הנאשם ישירות לפיגוע - תבחן בפרק
המסקנות.

75



בתי המשפט

**בית המשפט המחוזי בתל-אביב-יפו**                          תפ"ח 02/1158

**(16)    ניסיון פיגוע בפאב "ביאנקיני" בירושלים**

117.    ביום 19.05.01 בשעה 03:00 גילתה דינה דגן, בעלת פאב "ביאנקיני" בירושלים,
מטען חבלה שהונח בשירותים של המקום על ידי סאעד ג'אבר, שהיה מוכר לה כפלסטינאי
מרמאללה שמכר לה מידי פעם מוצרים לנרגילה. בעדותה (עמי 142-139) סיפרה דגן כי
ג'אבר ישב איתה במסעדה כדי לרשום הזמנה למוצרים, ואז נכנס לשירותים כשאין בידיו
דבר. כעבור כמה דקות יצא מהשירותים עם שקית ניילון, הניח אותה במרכז הפאב,
וכאשר שאלה אותו מה יש בשקית הוא אמר לה כי היא מכילה בגדים. היא ניגשה לבדוק
את השקית, גילתה כי מדובר במטען חבלה מוסתר מתחת למעיל, ובשלב זה ג'אבר נעלם.

במקום ישבו באותה עת כ- 150-170 בני נוער. דגן גילתה תושיה ואומץ לב ראויים לשבח:
היא נטלה את המטען בידיה, צעקה לאחד העובדים הפלסטינאים במקום לפנות את
הצעירים, והוא היה זה שניזר לה להרחיק את המטען מחוץ למסעדה. המשטרה
שהגיעה למקום פוצצה את המטען, באופן שגרם נזק לחנויות באזור. כך עולה מעדותו של
חבלן המשטרה אייל אלבו (עמי 119, וכן ראה חווי"ד מומחה במעבדת החבלה, פקד יניב
רון, ת/143א, חווי"ד מומחה של מז"פ שניתנה על ידי שרה אברמוביץ-בר, ת/143ב, ולוח
תצלומים ת/143א).

118.    אבו חמיד סיפר בחקירתו (הודעה ת/149ב עמי 10-12, שהוגשה על ידי רס"ר
אלקוראן בעמי 194), כי סאעד אלדין פנה אליו בתחילת חודש מאי 2002, וביקש ממנו
להכין עבורו מטען חבלה, על מנת להניחו בפאב בירושלים בפאב ברחוב יפו. הלה הסביר לאבו
חמיד כי בעלת המקום נוהגת לקנות ממנו מוצרים לנרגילה, וצייר לאבו חמיד את הפאב.
אבו חמיד הנחה אותו היכן להטמין את המטען, והסביר לו כיצד לחבר את החוטים למטף
כיבוי אש שהכיל את המטען (אכן המטען היה בתוך מטף כעולה מחווי"ד ת/143א).

לאחר מכן שלח אבו חמיד את ג'אבר לפאב, וג'אבר כיסה את המטען במעיל. כאשר הגיע
ג'אבר לפאב הוא התקשר לאבו חמיד, אמר לו משפט קוד ממנו הבין אבו חמיד שהוא עומד
להניח את הפצצה בפאב, ואבו חמיד אישר זאת.

76



בתי המשפט

<u>בית המשפט המחוזי בתל-אביב-יפו</u>                תפ"ח 1158/02

ג'אבר התקשר לאבו חמיד וסיפר לו שבעלת המקום ראתה אותו מניח את המטען, והוא שמע בחדשות כי המטען פוצץ על ידי המשטרה.

119.    מן האמור לעיל עולה כי הוכח בבירור שניסיון הפיגוע בפאב בוצע על ידי ג'אבר בהנחייתו ובסיועו של אבו חמיד. הפרטים שמסר אבו חמיד בחקירתו תואמים את עדותה של דגן ואת הממצאים בשטח.

אין ראיות הקושרות את הנאשם לפיגוע זה בצורה ישירה, זולת הקשר הנובע ממעורבותו הכוללת והעקיפה בפיגועים שתכנן וביצע אבו חמיד, כמבואר לעיל (ראה סעיפים 27, 60-65 לעיל). השאלה המשפטית האם די בכל אלה כדי לבסס אחריות פלילית של הנאשם למעשה הרצח שבוצע בפיגוע זה - כאשר אין כל ראיה הקושרת את הנאשם ישירות לפיגוע - תבחן בפרק המסקנות.

(17)    <u>פיגוע ירי בכביש 9 ליד הגבעה הצרפתית בירושלים</u>

120.    ביום 3.10.01 בשעה 23:30 בוצע ירי לעבר רכב חולף שנע לכיוון הגבעה הצרפתית, בו נסעו מלי ופנחס כהן שנפגעו מן הירי (ראה דו"ח ביקור ראשוני בזירה של רפ"ק ליאור נדיבי, ועדותו בעמ' 132, דו"ח תפיסה וסימון של רפ"ק נדיבי ת/144ב, דו"ח ביקור ראשוני בזירה של רפ"ק עמי לייפר ועדותו בעמ' 130, וחוו"ד של מעבדת נשק ת/144ד).

121.    אבו סטחה אמר בחקירתו (הודעה ת/156ב עמי 4-5, שהוגשה על ידי רס"מ דהן בעמי 198), כי הוא ביצע פיגוע זה יחד עם מוחמד סמי עבדאללה, כשהם נוסעים במכונית מאזדה וברשותו רובה MP-5, אותו קיבל מאחמד ברנותי לצורך ירי לעבר מטרות ישראליות. הוא סיפר בחקירתו כי לאחר שירה לעבר רכב הנוסע במנהרה בכיוון הגבעה הצרפתית הוא הבחין כי מדובר בנהגת, ולכן הפסיק לירות ואמר לחברו שיש מעצור בנשק. לאחר מכן הוא המשיך לנסוע לכיוון הגבעה הצרפתית, ושם ירה לעבר רכב תוך כדי עקיפתו. למחרת שמע ברדיו כי בפיגוע נפגעו גבר ואישה.

77



בתי המשפט

<u>בית המשפט המחוזי בתל-אביב-יפו</u>                תפ"ח 1158/02

122. הראיות שהובאו על ידי התביעה לגבי פיגוע זה דלות ביותר, וכוללות אך ורק דו"ח ביקור ראשוני בזירה של המשטרה, באופן שכל מידע לגבי ביצוע הפיגוע הוא בבחינת עדות שמיעה. כמו כן קשה לדעת מעדותו של אבו סטחה אם דבריו מתייחסים לפיגוע הנדון, שכן לא ברור מה מועד הפיגוע אליו מתייחס אבו סטחה, ובאיזה רכב ירה.

כל שיש בפנינו הוא ראיה על כך שאבו סטחה ביצע פיגועי ירי כנגד מטרות ישראליות, תוך שימוש בנשק שקיבל מאחמד ברגותי, שהיה עוזרו ומקורבו של הנאשם. זאת ועוד, אבו סטחה עצמו היה שומר ראשו של הנאשם, והנאשם עצמו אישר כי אבו סטחה עבד במשרדו והיה תחת אחריותו, וכי הוא ידע שאבו סטחה מבצע פיגועים כנגד אזרחים בגבעת זאב ובפסגת זאב (ראה סעיפים 33-34 לעיל).

<u>(18) ניסיון לפיגוע התאבדות בבית חנינא בירושלים</u>

123. ביום 8.03.02 בשעה 16:15 נלכד המחבל מחמוד סאלח בדרכו לביצוע פיגוע התאבדות בירושלים, כשהוא נושא על גופו חגורת נפץ. המחבל ניסה להפעיל את המטען כאשר שכב על הרצפה, ואז נורה ונהרג (ראה עדותו של סנ"צ דורון ידיד בעמ' 133, ודו"ח מעבדת חבלה ת/145ד).

124. אחמד ברגותי סיפר בחקירתו כי לואי עודה ביקש ממנו להכין חגורת נפץ למתאבד, והוא הפנה את עודה אל נאצר שוויש שנתן לו חגורת נפץ. המתאבד שוכן בדירה ששכר אחמד ברגותי ברמאללה, ושם הלבישו עליו את חגורת הנפץ. מאוחר יותר נודע לאחמד ברגותי כי הוא נהרג מירי כוחות צה"ל באיזור בית חנינא בדרכו לביצוע הפיגוע (הודעה ת/165ב עמ' 2, 11, שהוגשה על ידי רס"ר יעקובוף בעמ' 171).

גם עויס סיפר בחקירתו (הודעה ת/173ב בעמ' 4, שהוגשה על ידי רס"מ עמאר בעמ' 191), כי לואי עודה, שגויס על ידו לגדודי חללי אלאקצא, איתר עבורו מתאבד, אך הפיגוע נכשל מכיוון שהמתאבד נורה על ידי שוטרים לפני הביצוע בכניסה לירושלים.

78



בתי המשפט

בית המשפט המחוזי בתל-אביב-יפו                    תפ"ח 1158/02

125.   מן האמור לעיל עולה כי עויס ואחמד ברגותי היה מעורבים בניסיון הפיגוע הנ"ל. אין ראיות הקושרות את הנאשם לפיגוע זה בצורה ישירה, זולת הקשר הנובע ממעורבותו הכוללת והעקיפה בפיגועים שתכננו וביצעו השניים, כמפורט לעיל. השאלה המשפטית האם די בכל אלו כדי לבסס אחריות פלילית של הנאשם למעשה הרצח שבוצע בפיגוע זה - כאשר אין כל ראיה הקושרת את הנאשם ישירות לפיגוע - תבחן בפרק המסקנות.

(19)   פיגוע ירי בכביש בית אל - פסגות

126.   ביום 17.03.02 בשעה 06:45 בוצע ירי מן המארב מנשק אוטומטי לעבר רכבו של סמיר קרש (פולסוווגן פסאט), והוא נפצע מן הירי (ראה דו"ח ביקור בזירת העבירה ת/146א ותצלומים של רס"ב אלי קוג'מן שהוגשו בעדותו בעמ' 121).

התביעה לא הגישה ראיות נוספות לגבי פיגוע זה, והדו"ח של קוג'מן הינו בבחינת עדות שמיעה בכל הנוגע לדרך ביצוע הפיגוע.

התביעה מייחסת בסיכומיה את האחריות לפיגוע זה לאחמד ברגותי, והוא אכן הודה במעורבותו בפיגוע זה והורשע בכך (ת/165 ת/ז-יז פרט אישום 43). פרט לכך לא הפנתה התביעה לכל ראיה אחרת מבין הודעותיו של אחמד ברגותי, או הדברים שמסר בחקירתו בשב"כ. לאור האמור לעיל לא הובאו לגבי פיגוע זה ראיות המאפשרות לקבוע ממצא עובדתי ברור בדבר הקשר של אחמד ברגותי לפיגוע הנ"ל, וגם הראיות לגבי עצם ביצוע הפיגוע דלות ביותר.

(20)   ניסיון פיגוע בקניון מלחה בירושלים

127.   ביום 26.03.02 בשעה 10:30 התפוצץ רכב מסוג "רנו אקספרס" ובו שני חבלנים שהיו בדרכם לביצוע פיגוע (שאדי אברהים חמאמרה ומוסא יוסף מוחמד חאלד - ראה דו"ח הובלת גופות ת/147ב, שהוגש על ידי אילן גרנות בעמ' 135, ודו"ח פעולה ת/147ג שהוגש על ידי רס"מ אסף אזולאי בעדותו בעמ' 134).



79

**בתי המשפט**

בית המשפט המחוזי בתל-אביב-יפו      תפ"ח 1158/02

128. אחמד ברגותי סיפר בחקירתו (הודעה ת/165גג עמ' 5 שהוגשה על ידי רס"ר יעקובוף
בעמ' 171, וזכ"ד ת/165יא סעיף 15 שהוגש על ידי חוקר השב"כ "אדם" בעמ' 201), כי
ג'יהאד גיוערה התקשר אל הנאשם יום לפני שמצאו את המכונית ליד הקניון בירושלים,
ואמר לו שהוא רוצה לבצע פיגוע. הנאשם אמר לו שלא יבצע פיגוע בתוך ישראל, והעביר
את גיוערה אל אחמד ברגותי על מנת שישוחח איתו. אחמד ברגותי טען כי גם הוא אמר
לגיוערה שלא לבצע פיגוע בישראל או בירושלים. ואולם, למחרת התקשר גיוערה אל אחמד
ברגותי, ואמר לו כי המכונית שהתפוצצה ליד הקניון בירושלים נשלחה על ידו לביצוע פיגוע
בירושלים.

129. הנאשם עצמו אמר בחקירתו (זכ"ד ת/36 שהוגש על ידי חוקר השב"כ "סמית"
בעמ' 85), כי אחמד ברגותי דיווח לו על כוונת אנשיו של ג'יהאד לבצע פיגוע התאבדות
בירושלים. הנאשם אמר כי הוא הורה לאחמד ברגותי שהפיגוע לא יבוצע בתחומי ישראל,
אלא בשטחי יהודה ושומרון. הנאשם אמר בחקירתו בעניין זה, כשהוא מוסר על פנייתו של
אחמד ברגותי אליו בעניין רצונו של ג'יהאד לבצע פיגוע (תמליל שיחה ת/98יא עמ' 19-20):

| "הנאשם: | ... שג'יהאד, הוא אמר לו שאנחנו יש לנו פעילות. ויש לנו פיגועים וכו'. אז אני אמרתי לאחמד, אמרתי לו מה שחשוב זה שלא יעשו שום פיגוע בתוך ישראל. |
| החוקר: | או.קי וכשבא רשמית ואמר לך שהם רוצים לבצע פיגוע התאבדות, מה אתה אמרת לו?! |
| הנאשם: | אמרתי לו לא, אני לא מרשה. |
| החוקר: | לא. זה לא כמו שסיפרת לי. אמרת לו, אין בעיה. אבל לא 'בפנים' (בתוך ישראל). |
| הנאשם: | כן, לא בישראל... זאת אומרת שאני לא רוצה פיגועים בישראל". |

הנאשם סיפר כי למחרת קיבל דיווח מאחמד ברגותי שפיגוע ההתאבדות נכשל, וכי הרכב
התפוצץ לא רחוק מהמחסום, ושני חברי החוליה נהרגו.

80



בתי המשפט

<u>בית המשפט המחוזי בתל-אביב-יפו</u>                    תפ"ח 1158/02

130.   מן האמור לעיל עולה כי הוכחה מעורבותו של הנאשם באישור פיגוע ההתאבדות הנ"ל, וזאת גם על פי גרסתו. הנאשם אמנם הורה שהפיגוע יתבצע במקום אחר, אך לכך אין כל משמעות מבחינת אחריותו הפלילית לניסיון הפיגוע. דברי הנאשם בחקירתו נתמכים בגרסת מקורבו אחמד ברגותי, אם כי הלה "שיפץ" את העובדות, וטען כי הנאשם הורה שלא לבצע את הפיגוע כלל. מדברי הנאשם ברור כי הוא הורה לבצע את הפיגוע במקום אחר.



81



**בתי המשפט**

בית המשפט המחוזי בתל-אביב-יפו                    תפ"ח 1158/02

חלק שלישי:        **הערכת הראיות ומשקלן**

131.    הואיל והנאשם בחר שלא להעיד ולא להביא עדים מטעמו, ואף הורה לנציגי
הסנגוריה הציבורית שמונו לייצגו להמנע מחקירתם הנגדית של עדי התביעה - מבוססות
הראיות כנגד הנאשם על כמה נדבכים שונים.

**ראשית,** דברים שאמר הנאשם בחקירתו בשב"כ, אשר חלקם הועלו על הכתב בתמצית
בזכ"דים שרשמו החוקרים, ואשר הוגשו על ידם, וחלקם הוקלטו ותומללו. במסגרת זו
כלולים גם דברים שאמר הנאשם בשיחות שהוקלטו ללא ידיעתו עם מקורבו אחמד
ברגותי, ועם המדובבים "פלוני 1" ו-"פלוני 3".

**שנית,** עדויות המפלילות את הנאשם, שמסרו פעילי הטרור מקרב הפת"ח לאחר מעצרם
הכוונה להודעות שמסרו בחקירותיהם בשב"כ ובמשטרה, שכן כולם - כאיש אחד - סרבו
להשיב על שאלות כלשהן בבית המשפט, כאשר הובאו כעדים מטעם התביעה.

**שלישית,** דברים שאמר הנאשם בכלי התקשורת בתקופה שקדמה למעצרו.

**רביעית,** מסמכים שנתפסו במשרדו של הנאשם ובמשרדי הרשות הפלסטינאית במבצע
"חומת מגן".

**חמישית,** עדויותיהם של נפגעי הטרור, עדי הראיה לפיגועים נשוא כתב האישום והעדים
שעסקו בחקירתם.

132.    לענין הערכת הראיות ומשקלן יש להעיר את ההערות הבאות:

82



בתי המשפט

בית המשפט המחוזי בתל-אביב-יפו       תפ"ח 1158/02

א.  המנעותו של הנאשם מלהעיד במשפט ולחשוף עצמו לחקירה נגדית עשויים לשמש
חיזוק למשקל הראיות כנגדו, ואף להוות סיוע לראיות התביעה מקום שדרוש להן
סיוע, כקבוע בסעיף 162(ב) לחוק סדר הדין הפלילי [נוסח משולב], התשמ"ב-1982
(להלן: "החסד"פ"). כמו-כן, המנעותו של הנאשם מלהשיב על כתב האישום, כפי
שעשה, עשויה לשמש חיזוק למשקל ראיות התביעה, כקבוע בסעיף 152(ב)
לחסד"פ. דברים אלו הובהרו לנאשם על ידי בית המשפט.

ענין זה מקבל משנה חשיבות לאור העובדה שעל פי הדין נדרש חיזוק להודעות של
עדים שסרבו להעיד במשפט, או התכחשו לתוכן הדברים שמסרו בחקירותיהם
(ראה ס"ק ג)5) להלן). כך פסק בית המשפט העליון כי הימנעות נאשם ממתן עדות
מהווה חיזוק משמעותי להודעות בחקירה שמסרו עדים במשפט, ואשר טעונות
חיזוק לפי סעיף 10א(ד) לפקודת הראיות [נוסח חדש], התשל"א-1971 (להלן:
"פקודת הראיות") (ע"פ 1497/92 **מדינת ישראל נ' צובֱרי**, פ"ד מז(4) 177, בעמ'
202). בית המשפט הבהיר באותו ענין: "**הנאשם השותק - להבדיל מן העד השותק
- פועל במסגרת הדין; אולם לבית המשפט נתונה הרשות לפרש את התנהגותו
לפי התרשמותה והבנתו**" (בעמ' 203, וראה גם ד"נ 308/91 **קוזלי נ' מדינת ישראל**,
פ"ד מה(4) 441, בעמ' 486).

אמנם, בית המשפט רשאי שלא ליתן משקל לשתיקת הנאשם כאשר יש לה הסבר
סביר (ראה: ע"פ 277/81 **הלוי נ' מדינת ישראל**, פ"ד לח(2) 369, בעמ' 386). אולם,
משנדחו הטענות המקדמיות של הנאשם בעניני סמכות בית המשפט לשפוט אותו -
לא היה בידיו כל הסבר סביר ומוצדק להימנעותו ממתן עדות. ברור למדי כי
הנאשם, אשר נחשף במהלך חקירתו לראיות המפלילות שנצברו כנגדו, ידע היטב
כי הוא איננו יכול להתמודד איתן במישור המשפטי, ולכן נמלט אל חיקו החם של
המישור הפוליטי. כך אמר הנאשם מספר פעמים בחקירתו, כי ברור לו שהוא
יועמד לדין ויורשע, וכי הוא מתכוון לנהל משפט פוליטי.

83



בתי המשפט

בבית המשפט המחוזי בתל-אביב-יפו                          תפ"ח 1158/02

בענין זה חשוב לציין כי למרות שהנאשם הצהיר שהוא אינו מנהל פרשת הגנה,
כפי שאכן נהג, הוא נשא נאומים פוליטיים, ולעתים אף התייחס לראיות שהוצגו
כנגדו - אך זאת מספסל הנאשמים, ולא מדוכן העדים. על פי הדין, אינwatches יכולים
ליתן משקל לדברים שנאמרו בצורה זו, באופן שלא ניתנה לתביעה אפשרות לחקור
את הנאשם עליהם. אשר לדברים הרבים שהשמיע הנאשם במישור המדיני
והפוליטי, הן במהלך המשפט והן בסיכומיו, אינ Wallסו רשאים להתייחס אליהם,
בהיותם בלתי רלבנטיים לשאלת אשמתו של הנאשם בעבירות המיוחסות לו.
דברים אלו הובהרו בהחלטה הנוגעת לענין סמכות בית המשפט : אדם הפועל מחוץ
למסגרת של לחימה חוקית, ואשר מבצע פעולות טרור שמטרתן לפגוע ללא אבחנה
באוכלוסיה אזרחית, חושף עצמו לסנקציות הפליליות הרגילות של המשפט הפלילי
הלאומי (ראה החלטה של בית המשפט בתיק זה מיום 19.1.03 בעמ' 29-33).
התנגדותו לכיבוש, כפי שטוען הנאשם, אינ Orhan מהווה צידוק על פי דין כלשהו לביצוע
מעשי הרג כנגד אזרחים חפים מפשע. זאת ועוד : מקומה של טענה זו - אם בכלל -
הוא בטיעונים לעונש, שכן היא נוגעת למניע לביצוע העבירות, להבדיל מן הכוונה
הפלילית הדרושה לשם הוכחתן.

ב.      הואיל והנאשם בחר שלא לנהל פרשת הגנה, הוא גם לא העלה טענות כלשהן כנגד
קבילות הראיות או משקלן. ואולם בית המשפט ראה עצמו מחויב לבחון שאלה זו
ביוזמתו, ולהתעלם מראיות בלתי קבילות שהתביעה הגישה או הסתמכה עליהן
בסיכומיה (כגון, עדויות שמיעה הכלולות בהודעות העדים, זכ"דים והודעות שלא
הוגשו על ידי החוקרים שרשמו אותם, חוות דעת הנסמכות על ידיעות מודיעיניות
וראיות שלא הוגשו במשפט, והתייחסות בזכד"ים לממצאי פוליגרף).

        בחנו את חומר הראיות גם מזווית הראיה של הנאשם, ולא רק מנקודת מבטה של
התביעה כפי שפורטה בסיכומיה. עם זאת, כפופים אנו לכלל לפיו נאשם שלא העיד
במשפטו אינ ossature רשאי להסתמך על דברים הכלולים באמרות חוץ שמסר : אמרות
אלו כשרות כראיות כנגדו, אך לא לטובתו, שהרי לא ניתן היה לחקור אותו על
אמרותיו (ראה ע"פ 205/75 **קרנץ נ' מדינת ישראל**, פ"ד ל(2) 471, בעמ' 474).

84



**בתי המשפט**

<div dir="rtl">

בבית המשפט המחוזי בתל-אביב-יפו      תפ"ח 1158/02

התביעה זימנה לעדות 21 מפקדי שטח ופעילי טרור הקשורים לפיגועים נשוא כתב
האישום, והקשר של הנאשם איתם פורט לעיל. עדים אלו, בלא יוצא מן הכלל,
סרבו להשיב על שאלות ב"כ התביעה, ונראה כי אין מדובר בהחלטה אישית של כל
אחד מהם, אלא בהנחיה מגבוה. עדים אלו לא היו מוכנים להעיד כנגד מפקדם
ומנהיגם, והדברים ברורים. בשיחה שהתנהלה בין הנאשם לבין אחמד ברגותי בעת
מעצרם, ואשר הוקלטה ללא ידיעתם, הזהיר אחמד מפני העדויות שימסרו פעילי
הטרור שנעצרו, והנאשם השיב לו, כשהוא נשמע צוחק: **"כולם בבית המשפט
יכחישו את מה שהודו בו... כולם יבטלו... אמרו לי החוקרים. אמרתי להם שאיש
לא יודה בבית משפט"** (תמליל 127ג' עמ' 109). כך אמר הנאשם, וכך אכן אירע.

בנסיבות אלו הוכרזו כל אותם פעילי טרור כעדים עוינים, והודעותיהם בחקירה
הוגשו לפי סעיף 10א. לפקודת הראיות. לגבי עדים אלו יש להעיר כדלקמן:

(1)    חלק מעדי התביעה העידו לאחר סיום משפטם, ורובם הורשעו, בין היתר,
במעורבותם בפיגועים נשוא כתב אישום זה על פי הודאתם. בהודאותיהם
בעובדות כתבי האישום שהוגשו כנגדם, מפלילים עדים אלו את הנאשם.
אולם, ההלכה בענין זה כי הודאת נאשם שכזו, מפי אדם שהוא עד במשפט,
נחשבת אמנם כאמרת חוץ שחל עליה סעיף 10א. לפקודת הראיות, אך אין
ליתן להודאה זו משקל של ממש. מבחינתו של העד - ההודאה שהוא מוסר
במשפטו מרוכזת כל כולה בעובדות הנוגעות אליו, וספק רב אם הוא מודע
אותה שעה להשלכות שיש לחלקים בהודאתו על אחרים (ראה: ע"פ
4541/90 **אליהו סלע נ' מדינת ישראל**, תק-על 91(2) 2086).

(2)    ככלל, אמרת חוץ של עד היא עדות שמיעה הפסולה כראיה לאמיתות
תוכנה. החריג לכלל נקבע בסעיף 10א(א) לפקודת הראיות ולפיו בית
המשפט רשאי לקבל אמירה שכזו, ואף להסתמך עליה ולהעדיפה על עדות
העד בבית המשפט, כאשר העד במשפט מסרב להעיד, או שהוא מתכחש
לגרסה שמסר בחקירתו.

</div>

85



בתי המשפט

תפ"ח 1158/02

בבית המשפט המחוזי בתל-אביב-יפו

מטרתו של סעיף זה להתמודד עם התופעה הנפוצה של עדים המתכחשים לגרסה שמסרו בחקירתם, ועל מנת למנוע מצב שבו לא ניתן יהיה לעמת אותם במשפט עם הגרסה שמסרו בחקירתם (ראה: דברי ההסבר להצעת החוק לתיקון פקודת הראיות, תשל"ד-1974). ודוק: עד אשר הוזמן להעיד והתייצב על דוכן העדים נחשב כ"עד במשפט", גם אם סרב להשיב על שאלות, ולפיכך חל עליו סעיף 10א(א) הנ"ל, ולא סעיף 10א(ב) המתייחס למקרה בו לא ניתן כלל להביא עד לבית המשפט מהטעמים המפורטים בסעיף (ראה: דנ"פ 4390/91 **מדינת ישראל נ. חאג' יחיא,** פ"ד מז(3) 673; והשווה דעתו של א. שטיין, **"סעיף 10א. לפקודת הראיות: פרשנותו הראויה ופסיקתו של בית המשפט העליון",** משפטים כ"א תשנ"ב, עמ' 325, בעמ' 338-336).

(3)     על פי סעיף 10א(א) לפקודת הראיות, קבלת אמרת חוץ של עד במשפט, אשר מכחיש את תוכן העדות שמסר בחקירתו, מותנת בכך שמתן האמרה הוכח, שנותן האמרה הוא עד במשפט ושניתנה לצדדים הזדמנות לחקרו. תנאים אלה מתקיימים בעניינו לגבי 21 פעילי הטרור הנ"ל.

(4)     בית המשפט רשאי לסמוך על ממצאיו על אמרת חוץ שהתקבלה לפי סעיף 10א. לפקודת הראיות, ואף להעדיפה על פני עדותו של העד במשפט, **"אם ראה הראיות לעשות כן לנוכח נסיבות העניין, לרבות נסיבות מתן האמרה, הראיות שהובאו במשפט, התנהגות העד במשפט ואותות האמת שנתגלו במהלך המשפט, והטעמים ירשמו"** (סעיף 10א(ג) לפקודת הראיות).

(5)     על פי סעיף 10א(ד) לפקודת הראיות, לא יורשע אדם על סמך אמרת חוץ שהתקבלה לפי סעיף זה, אלא אם יש בחומר הראיות דבר לחיזוקה. הכוונה היא לתוספת ראייתית המחזקת את אמינותה של אמרת החוץ, ומפיגה את החשש כי אין בה אמת (ראה: י. קדמי, **על הראיות,** בעמ' 354- 365).

86



בתי המשפט

בבית המשפט המחוזי בתל-אביב-יפו                    תפ"ח 1158/02

בעניין זה יש לציין כי אמרת חוץ של עד אחד, שהיא עצמה טעונה חיזוק,
יכולה לשמש כחיזוק לאמרת חוץ של עד אחר (ספרו הנ"ל י. קדמי בעמ'
366, והפסיקה המצוטטת שם). כאמור לעיל, גם שתיקת הנאשם במשפט
עשויה להוות חיזוק לאמרת חוץ של עד, וכך גם הימנעותו מלחקור עד זה
בחקירה נגדית (י. קדמי הנ"ל בעמ' 369-371, והפסיקה המצוטטת שם).

ההלכה הפסוקה היא כי הימנעות נאשם מחקירת עדי התביעה - מחזקת
את היא את ראיות התביעה (ראה: ע"פ 4736/91 **פטאיר נ' מדינת ישראל**,
תק-על 94(2) 1866). הנאשם לא ישמע לאחר מכן בטענה שהעדים לא
נחקרו בחקירה נגדית (ראה: ע"פ 1632/95 **עוזי משולם נ' מדינת ישראל**,
פ"ד מט(5)534, בעמ' 550, שבו התנהל המשפט ללא נוכחות הנאשם, על פי
רצונו, והסניגור הונחה שלא לחקור את העדים). נאשם איננו יכול לטכל את
ההליך המשפטי המתנהל נגדו בעצם הימנעותו מלהתגונן.

**במקרה דנא,** הרשעתו של הנאשם נסמכת על מארג רחב ואמין של ראיות,
הכוללות הודאות שמסר הנאשם בחקירתו, דברים שאמר הנאשם בכל התקשורת,
מסמכים שנתפסו אצל הנאשם וברשות הפלסטינאית, ועדויות רבות של פעילי
הטרור שנמסרו בחקירתם, ואשר תומכת זו בזו ומהוות חיזוק האחת לרעותה.
כפי שעולה מן התשתית הראייתית שפורטה לעיל, ברור לחלוטין כי פעילי הטרור
החליטו להימנע ממתן עדויות במשפט על מנת לטכל את ההליך, ולהימנע מחשיפת
הגרסה שמסרו בחקירותיהם. הנאשם הביע כעס בחקירתו על הדברים המפלילים
שמסרו פעילי השטח נגדו (ראה: דו"ח הפגשה של הנאשם עם עויס ת/77בב; דברים
שאמר הנאשם למדובב "פלוני 3" ת/123 עמ' 1 ות/124א ס' 1; דברים שאמר
הנאשם למדובב "פלוני 1" ת/112א ס' 6-7, ת/114א ס' 7, ת/115א ס' 13, 14, ת/116
ס' 9, ושיחתו של הנאשם עם אחמד ברגותי ת/127א עמ' 3, 4, 72, 84), ועובדה זו
מחזקת את המסקנה שפעילי הטרור אמרו בחקירתם דברים נכונים לגבי הנאשם.

87



בתי המשפט

בית המשפט המחוזי בתל-אביב-יפו

תפ"ח 1158/02

בנסיבות אלו, יש להעדיף את האמרות שמסרו עדים אלו בחקירותיהם על פני
עדויותיהם במשפט, כאשר נמצא הרבה יותר מאשר "חיזוק" לאמרות החוץ
שמסרו בחקירות. ההודעות שמסרו פעילי הטרור משתלבות כדבעי האחת ברעותה,
ויחד עם הדברים שאמר הנאשם בחקירתו, והמסמכים שנתפסו ברשות
הפלסטינאית, נחשפה תמונה ברורה המצביעה על חלקו של הנאשם ותפקידו
בפיגועים נשוא כתב האישום.

133.    לא מצאנו כל סיבה להטיל ספק במהימנותם של חוקרי השב"כ, אשר העידו כי
הזכ"דים שרשמו בחקירותיו של הנאשם משקפים בצורה הולמת את עיקרי הדברים
שאמר. ככל שמדובר במשקל הדברים, יש להביא בחשבון את הכללים שביארנו בהרחבה
בתפ"ח 1074/02 **מדינת ישראל נ' עאצי מוחסין** (תק-מח 2003 (2) עמי 3553, סי 76-84).
זכ"דים אלה מהווים אמרות של הנאשם, אך בניגוד למקובל בחקירה משטרתית הם
כוללים רק תמצית של החקירה; לא תמיד ניתנו לנחקר אזהרה בדבר זכויותיו; הנחקר
איננו יכול לקרוא את הדברים הנרשמים בזכ"ד, ואיננו חותם עליו; הזכ"ד נרשם לא פעם
בשפה העברית גם כאשר החקירה היא בערבית, בניגוד להנחיה הברורה בפסיקה. עם זאת,
חשוב להדגיש גם כי, זכ"דים אלו בהחלט מהווים ראיות קבילות, כאשר לעניין משקלם יש
להביא בחשבון את היקף וצורת הרישום והתיעוד שלהם (ראה : ע"פ 6613/99 **סמירק נ'**
**מדינת ישראל**, פד"י נו(3), 529, בעמי 553).

במקרה דנא, גובו זכ"דים רבים בתמלילי הקלטות מהחקירה, בהם נשמע הנאשם מדבר
בקולו, בשפה העברית בה הוא מיטיב להתבטא, דבר המסיר חשש לגבי מהימנותם. כמו כן,
נאמר לנאשם במפורש לאורך כל חקירתו כי אינו חייב לומר דבר, וכי הדברים שיאמר
עשויים לשמש כראייה נגדו, והנאשם אף נפגש עם עו"ד במהלך חקירתו (ראה להלן). זאת
ועוד : הדברים שאמר הנאשם בחקירותיו בשב"כ, כפי שנרשמו בזכ"דים והוקלטו ותומללו
בחלקים ניכרים מהם, נתמכים היטב בעדויותיהם של פעילי הטרור שפורטו לעיל, ולעיתים
גם במסמכים שנתפסו אצל הנאשם, ובראיונות שנתן באמצעי התקשורת האלקטרוניים.
במצב דברים זה, אין עלינו לסמוך אך ורק על הזכ"דים שרשמו חוקרי השב"כ מפי
הנאשם, ואף לא רק על הדברים שאמרו פעילי הטרור בחקירותיהם (שהרי אלה סירבו
להעיד במשפט, או שהתכחשו לדברים שאמרו בחקירותיהם). אלא יכולים אנו להתרשם
מדברי הנאשם בחקירתו בשב"כ, בצורה בלתי אמצעית, כפי שאלה הוקלטו ותומללו.

88



בתי המשפט

תפ"ח 1158/02

בבית המשפט המחוזי בתל-אביב-יפו

134. בעניין הערכת משקל דבריו של הנאשם בחקירתו בשב"כ, הבאנו בחשבון - הגם שהנאשם עצמו לא העלה טענות כלשהן בנושא זה - כי מדובר בחקירה ארוכה ומתישה. הנאשם היה נתון לחקירות ארוכות ביותר במהלכן ישן שינה מועטה, כשהוא יושב כבול על כסא, והוא הגדיר זאת בשיחתו עם המדובב "פלוני 1" (ת/112ג (1) עמ' 3-4) - כעינוי. לנאשם הובהר כי כל עוד לא ישתף פעולה בחקירה יהיה צורך להמשיכה, ואף נרמז לו כי הדרך לפגוש את בני משפחתו היא לשתף פעולה (זכ"ד ת/12 ס' 13). באחת החקירות נאמר לנאשם כי חקירתו לא תסתיים עד אשר ימסור את האמת, כפי שהיה הדבר לגבי פעילי הטרור שהודו בסופו של דבר בחלקו של הנאשם במעשים המיוחסים לו (זכ"ד ת/63 ס' 9-10). באחת החקירות סרב הנאשם להמשיך בחקירה כל עוד לא יינתן לו פרק זמן סביר לגבי לישון, והחוקר הבהיר לו כי לא יתאפשר לו לישון (זכ"ד ת/21 ס' 28-26). כמו כן, הופעל על הנאשם לחץ בעניין פעילותו, אך הנאשם דחה הצעה זו (זכ"ד ת/21 ס' 28-26). כמו כן, הופעל על הנאשם לחץ בעניין פעילותו, אך הנאשם דחה הצעה זו, במקום להתכחש לדברים מוסרי להודות ולהתנהג כמנהיג הנוטל אחריות על מעשי פקודיו, במקום להתכחש לדברים שעשו פקודיו, ולהציג אותם כשקרנים (זכ"דים ת/16-ת/17).

בעניין חקירתו של הנאשם במשך שעות ארוכות, חשוב לציין כי הנאשם נעצר ונחקר במהלך מבצע "חומת מגן", בתקופה של ביצוע פיגועי טרור רבים כנגד ישראל. בנסיבות אלו ברור כי היתה חשיבות רבה להשלים את חקירתו במהירות האפשרית, שכן חקירתו התנהלה לא רק לצורך בירור אשמתו, אלא גם, ואולי בעיקר, לצורך סיכול פיגועים נוספים. חוקרי השב"כ הסבירו עד כמה היה חשוב להם להגיע במהרה לפעילי טרור ולחוליות טרור שהיו קשורות לנאשם, וכי חקירת הנאשם היתה בעיקרה בחקירה מודיעינית (החוקר "איתי" בעמ' 154 והחוקר "ואדי" בעמ' 97).

חקירת הפשעים החמורים בהם הואשם הנאשם, והצורך המודיעיני בקבלת מידע מפיו ........... האפשר, חייבו את חקירתו הרצופה במשך שעות רבות. אין בכך להביא לפסילת ......... של הנאשם, כאשר ברור שהוא מסר לחוקריו רק את הדברים שרצה לומר, ......... היתה הצדקה עניינית לדרך חקירה זו ובנסיבות הביטחוניות ששררו אז (ראה: י' ......... על הראיות, חלק ראשון, מהד' תשס"ד-2003 בעמ' 55-58).

89



בתי המשפט

בבית המשפט המחוזי בתל-אביב-יפו                    תפ"ח 1158/02

135.    ברור ממהלך החקירה כי הנאשם התלבט רבות, ובקול רם, אם להוודות בקשר שלו
לפיגועים נשוא כתב האישום, והוא אף הסביר כי הדבר עלול להכשילו בעתיד כמנהיג העם
הפלסטינאי (ראה למשל, זכ"ד ת/24 ס' 7, זכ"ד ת/68 ס' 6). בסופו של דבר החליט הנאשם
להוודות בחלק מהדברים שעשה, לאחר שהבין שפעילי השטח הודו בחקירותיהם והפלילו
אותו, וכי יש בידי החוקרים ראיות מוצקות בנוגע לאשמות שייחסו לו. לכן הודה הנאשם
רק בדברים שנעשיו הודו בהם קודם לכן, ורק לאחר שדבריהם הוצגו לו על פי דרישתו,
והוא אף הבהיר חזור והבהר כי יודה אך רק בדברים שיוצגו בפניו, ואשר הינם נכונים
(זכ"ד ת/22 ס' 8-9, שהוגש ואושר על ידי החוקר "מופזי" בעמ' 58, וזכ"ד ת/23 ס' 9, שהוגש
ואושר על ידי החוקר "ידני" בעמ' 90). הנאשם ביקש להיפגש עם ראש השב"כ, ואמר כי
הוא מוכן להוודות בדברים שיש לו אחריות עליהם, אם יראו לו שאחרים כבר הודו בהם
(תמליל חקירה ת/98א' עמי 16-18, 26-28).

יש להדגיש בהקשר זה כי הנאשם עצמו אמר בשיחתו עם המדובב "פלוני 1", כי הסתבר לו
בחקירתו שפעילי השטח שנעצרו מסרו ידיעות רבות ומהימנות לגביו. כאשר נשאל על ידי
המדובב אם הידיעות שמסרו לגביו הן אמיתיות השיב: **"רבות, יעני יש הוכחה ודיוק"**
(תמליל שיחה ת/112גג (1) עמי 6). עוד אמר הנאשם למדובב "פלוני 1" כי הנהג שלו (אחמד
ברגותי) מסר הודאה הקושרת את הנאשם ל- 8 פיגועי התאבדות בישראל, וכאשר נשאל
הנאשם האם אחמד ברגותי "סגר אותו בהודאות" - הוא השיב בחיוב (זכ"ד ת/114א סעיף
7). לכל אורך שיחותיו של הנאשם עם "פלוני 1" ניתן לראות כי נושא ההודאות שמסרו
פעילי השטח בחקירותיהם הטריד אותו מאוד, והוא היה מודע לכך שהם מסרו מידע
אמיתי לגביו (ראה דו"חות ת/112א(1), ת/113א, ת/113גג, ת/114א, ת/114גג, ת/115א, ת/
115גג(1)(א), ת/116א).

הנאשם אמר ל"פלוני 1" כי הוא אמנם טוען בחקירתו שהוא מנהיג פוליטי, אך ההודאות
שמסרו אחרים כנגדו, והחומר הרב שנתפס במשרדו ובמשרדי הרשות הפלסטינאית יאלצו
אותו **"לדבר בחקירה"** (דו"ח ת/117א ס' 29, 32 שהוגש על ידי החוקר "רוברט").
זה היה הרקע שהביא את הנאשם להוודות בדברים שממילא כבר היו ידועים לחוקרים
ממקורות אחרים.

90



בתי המשפט

בבית המשפט המחוזי בתל-אביב-יפו                    תפ"ח 1158/02

136.    המפנה בחקירת הנאשם חל ביום 21.4.02, כשבוע לאחר מעצרו של הנאשם, כאשר
הוא החליט לספר את העובדות מנקודות ראותו ואחריותו, אך דרש כי קודם לכן יוצגו
בפניו הדברים שאמרו אנשיו בחקירה, ושיתאפשר לו להיפגש עם ראש השב"כ או סגנו
(זכ"דים ת/19-ת/20). הנאשם קיבל את הצעת החוקרים לעשות אבחנה בין סירובו למסור
הודעה מפלילה במשטרה, שתיחשף בעתיד, לבין מסירת פרטים על פעילותו בחקירתו
בשב"כ (זכ"ד ת/20 ס' 10-12, זכ"ד ת/24 ס' 7). הנאשם יצא מתוך הנחה שדברים שיאמר
במשטרה יחשפו בציבור ויחייבו אותו, וזאת בניגוד לדברים שיאמר בחקירתו בשב"כ -
שאותם תכנן הנאשם להכחיש, כפי שאכן עשה בחקירתו במשטרה ובמשפטו. כך אמר
הנאשם במפורש בחקירתו בשב"כ, כאשר נאמר לו כי הזכ"דים הנרשמים במהלך חקירתו
יוגשו כראיה בבית המשפט כאילו היו עדות משטרתית (זכ"ד ת/25 ס' 23, שהוגש ואושר
על ידי החוקר "מופז" בעמ' 58).

בעניין זה יש לציין כי שישה ימים לאחר מעצרו נחקר הנאשם, והוזהר בדרך המקובלת כי
איננו חייב לומר דבר על פי החוק, וכי הדברים שיאמר עשויים לשמש ראיה כנגדו (ראה
זכ"ד ת/40 ס' 1, ועדותו של החוקר "מופז" בעמ' 59). החוקר "מופז" העיד כי אזהרות
כאלה ניתנו לנאשם במהלך כל חקירתו, וכך גם העיד החוקר "אמילי" (עמ' 57, 59,
ואזהרות הכלולות בזכ"דיים ת/41 ס' 1, ת/44, ת/25, תמליל חקירה ת/98 עמ' 37). לעיתים
אמנם נרמז לנאשם כי לא בהכרח יועמד לדין, שכן קיימת אפשרות שהוא יגורש, אך
הנאשם ציין כי הוא מעדיף את האפשרות של העמדה לדין, ואף אמר כי ברור לו שהוא
יועמד לדין ויישלח לכלא לשנים רבות  (זכ"דיים ת/10, ת/11, ת/14 ו- ת/19 ס' 5, וזכ"ד
ת/63 ס' 25).

137.    הנאשם אמר בחקירתו כי הוא מתכוון לנהל משפט פוליטי, תוך התעלמות
מהראיות שתוגשנה נגדו במשפטו (זכ"ד ת/42 ס' 8 שהוגש ואושר על ידי החוקר "ואדי"
בעמ' 96, וזכ"ד ת/56 ס' 3 שהוגש ואושר על ידי החוקר "סמית'" בעמ' 85). בשיחותיו של
הנאשם עם המדובב "פלוני 1", הוא הסביר לו את הטקטיקה בה הוא נוקט בחקירה, לפיה
הוא איננו מודה אלא בדברים שהחוקרים יודעים עליו, ומנסה למשוך זמן ולהבין מה
החוקרים יודעים עליו, כדי לא להפליל אחרים.

91



בתי המשפט

תפ"ח 1158/02

בבית המשפט המחוזי בתל-אביב-יפו

הוא גם אמר לעורך-דינו כי לא ימסור כל הודעה במשטרה (ראה דו"חות ת/118 ס' 3, ת/
120 ס' 2, ודבריו ל"פלוני 3" בדו"ח ת/122 ס' 1). יש לציין בהקשר זה כי הנאשם נפגש
לראשונה עם פרקליטו, עו"ד בולוס, שלושה ימים לאחר מעצרו (מוצג ת/164, וזכ"ד ת/111
סעיף 14). במהלך חקירתו נפגש הנאשם עם עו"ד בולוס כמה פעמים (זכ"ד ת/90 ס' 1).

138.   **סיכומו של דבר** : אין לנו סיבה לסבור שהודעתו של הנאשם בחקירתו בשב"כ
ניתנה עקב אמצעים פסולים כלשהם שהופעלו כנגדו, אשר הביאו לשלילת רצונו החופשי
של הנאשם, והנאשם גם לא טען זאת. במהלך המשפט, וכן בעת חקירתו במשטרה, כאשר
הוצגו לנאשם הדברים שאמר בחקירתו בשב"כ, הוא חזר וטען כי מדובר ב"שקר וזיוף".
הוא לא טען כי הופעלו כנגדו אמצעים פסולים בחקירה, והתרשמנו בבירור שהחוקרים
נהגו בנאשם בכבוד, כפי שגם אמר הנאשם בחקירתו בשב"כ (זכ"ד ת/75 ס' 2, זכ"ד ת/90
ס' 1 ותמליל חקירת הנאשם ת/98 עמ' 29). בעת מתן עדויותיהם במשפט, לחץ הנאשם את
ידם של חלק מחוקרי השב"כ, וגם עובדה זו מעידה כי אין בלבו של הנאשם תחושות
כלשהן כנגד חוקריו.

לנאשם היתה שליטה מלאה על הדברים שאמר לחוקרי השב"כ: הוא החליט אלה דברים
היה מוכן לומר בחקירתו, ואשר להערכתו כבר היו ידועים לחוקרים ממילא, ואלה דברים
הוא מתכוון להסתיר מהם. הנאשם היה זהיר ביותר בחקירתו, ולא פעם סירב לענות על
שאלות שנשאל, או שענה בצורה עקיפה ומרומזת. הוא בחר לעצמו טקטיקה במהלך
החקירה, לפיה ירחיב בעניינים פוליטיים ויקמץ בעניינים הקשורים לפעולות הטרור, ובכל
מקרה לא ימסור אלא פרטים שלהערכתו כבר נמצאים בידיעת החוקרים.

כפי שהעיד המדובב "פלוני 1", אמר לו הנאשם : "גם אם כל העם הפלסטינאי מודה עליו,
**הוא יקבע מה יאמר בחקירה"** (ת/110 ס' 10). מכל האמור לעיל, ברור שהנאשם מסר את
הודעותיו מרצון חופשי.

92



בתי המשפט

תפ"ח 1158/02

בבית המשפט המחוזי בתל-אביב-יפו

חלק רביעי:     ניתוח משפטי ומסקנות

1.     פעילות וחברות בארגון טרוריסטי

139.    בכתב האישום מיוחסות לנאשם, בין היתר, העבירות של פעילות וחברות בארגון
טרוריסטי. סעיפים 1-3 לפקודת מניעת טרור, התש"ח-1948 קובעים לאמור :

"1.    פירושים

"ארגון טרוריסטי" פירושו חבר אנשים המשתמש בפעולותיו
במעשי אלימות העלולים לגרום למותו של אדם או לחבלתו, או
באיומים במעשי אלימות כאלה;
"חבר בארגון טרוריסטי" פירושו אדם הנמנה עליו, וכולל אדם
המשתתף בפעולותיו, המפרסם דברי תעמולה לטובת ארגון
טרוריסטי, פעולותיו או מטרותיו, או אוסף כספים או חפצים
לטובת ארגון טרוריסטי או פעולותיו".

2.    פעילות בארגון טרוריסטי

אדם הממלא תפקיד בהנהלה או בהדרכה של ארגון טרוריסטי, או
משתתף בדיוניו או בקבלת החלטותיו של ארגון טרוריסטי, או
משמש חבר בבית-דין של ארגון טרוריסטי, או נואם נאום
תעמולה באסיפה פומבית או ברדיו מטעם ארגון טרוריסטי,
ייאשם בעבירה, ובצאתו חייב בדין, יהא צפוי לעונש מאסר עד
עשרים שנה.

3.    חברות בארגון טרוריסטי

אדם שהוא חבר בארגון טרוריסטי, ייאשם בעבירה, ובצאתו חייב
בדין, יהא צפוי לעונש מאסר עד חמש שנים".

93



**בתי המשפט**

בית המשפט המחוזי בתל-אביב-יפו                           תפ"ח 1158/02

סעיף 7 לפקודת מניעת טרור קובע כי:

"7.     **הוכחה על קיום ארגון טרוריסטי**

כדי להוכיח בכל דיון משפטי, שחבר אנשים מסויים הוא ארגון
טרוריסטי, יספיק להוכיח כי –

(א)     מטעם אותו חבר אנשים או בפקודתו ביצע אחד או יותר מחבריו
בכל זמן שהוא לאחר ה' באייר תש"ח (14 במאי 1948) מעשי
אלימות העלולים לגרום למותו של אדם או לחבלתו, או איומים
במעשי אלימות כאלה; או

(ב)     חבר אנשים, או אחד או יותר מחבריו מטעמו או בפקודתו, הכריז
שאותו חבר אנשים אחראי למעשי אלימות העלולים לגרום למותו
של אדם או לחבלתו, או איומים במעשי אלימות כאלה, או
שהכריז שחבר האנשים היה מעורב במעשי אלימות או איומים
כאלה, בתנאי שמעשה האלימות או האיומים נעשו אחרי ה'
באייר תש"ח (14 במאי 1948)."

140.    עובדת היותם של הפת"ח, התנזים וגדודי חללי אלאקצא ארגונים טרוריסטיים,
כפי שנאמר בחוות דעתו של תא"ל קופרווסר ת/1, הוכחה בבירור ממסמכי השלל שנתפסו
במבצע "חומת מגן" והוגשו כראיות בפנינו, כמו גם מעדויותיהם של פעילי הטרור והנאשם
עצמו (ראה לעיל: סעיפים 7-10; עדותו של עויס בסעיפים 23-21; עדותו של אבו חמיד
בסעיף 25; עדותו של אחמד ברגותי בסעיף 29; עדותו של אחויל בסעיף 35; עדותו של
עיאדיה בסעיף 40; עדותו של שריף בסעיף 55; עדותו של אבו רדאחה בסעיף 57; ודברי
הנאשם בחקירתו כמפורט בסעיפים 64-60). הפיגועים נשוא כתב האישום, ורבים אחרים,
בוצעו על ידי פעילי השטח של הפת"ח – אנשי התנזים – ועל ידי חוליות שהתאגדו במסגרת
המכונה "גדודי חללי אלאקצא". הנאשם היה מנהיג הפת"ח בגדה, ומפקד התנזים וגדודי
חללי אלאקצא, כפי שהודה בחקירתו, וכפי שהוכח בראיות נוספות רבות (ראה סעיף 17
וסעיפים 65-60 לעיל).

94



בתי המשפט

בבית המשפט המחוזי בתל-אביב-יפו                    תפ"ח 1158/02

תפקידיו של הנאשם בהנהגת ארגוני הטרור פורטו בהרחבה אף הם (ראה חלק שני, פרק ד'
לעיל). הנאשם היה מפקדם של ארגוני הטרור וחוליות הטרור, גם אם לעיתים אלה חרגו
מהנחיותיו, והוא דאג לספק להם אמצעי לחימה וכספים לצורך פעילותם (ראה חלק שני
מהנחיותיו, והוא אף היה מעורב באופן אישי בחלק מן הפיגועים שביצעו
פרק ד(1) ו-(3) לעיל). הוא אף היה מעורב באופן אישי בחלק מן הפיגועים שביצעו
הארגונים שבהנהגתו (ראה חלק שני פרק ד(2) לעיל). הנאשם אף טיפל בסיוע למבוקשים
ולמשפחות העצורים והחללים, ובגיוס פעילים לארגוני הטרור והדרכתם (ראה חלק שני
פרק ד(4)-(5) לעיל). הוא היה האדם אשר ביטא את עמדתם של ארגוני הטרור באמצעי
התקשורת (ראה פרק ד(6) לעיל).

אין מדובר, איפוא, אך ורק "באדם הממלא תפקיד בהנהלה או בהדרכה של ארגון
טרוריסטי", כלשון סעיף 2 לפקודת מניעת טרור, אלא הנאשם הוא מי שעמד בראש ארגוני
הטרור הנ"ל, התווה את מדיניותם ונשא נאומי תעמולה מטעמם באמצעי התקשורת.
בכך הוכחו יסודות סעיפים 2 ו- 3 לפקודת מניעת טרור, קרי חברות בארגון טרוריסטי
ופעילות בארגון שכזה.

## 2.   אחריותם של מבצע בצוותא, משדל ומסייע והאבחנה ביניהם

141.    כתב האישום מייחס לנאשם אחריות ישירה של "מבצע בצוותא" לגבי כל מעשי
הרצח וניסיון הרצח נשוא כתב האישום, כאשר מדובר ב- 37 פיגועים שונים.
כתב האישום מייחס לנאשם גם את העבירות של סיוע ושידול לרצח, אם כי טענת
המאשימה בסיכומיה היא, כי יש לראות בנאשם מבצע בצוותא של עבירות אלו, ולא רק
מסייע או משדל לביצוען, וזאת עקב היותו מנהיג ארגוני טרור, והאחראי העיקרי לביצוע
פיגועי הרצח שהוציאו ארגונים אלה לפועל. יש לסקור, איפוא, את מידת אחריותו הנטענת
של הנאשם לפיגועי הטרור נשוא כתב האישום: ראשית - כמו שביצע את מעשי הרצח
בצוותא חדא עם פעילי השטח והמפגעים; שנית – כמו ששידל לביצוע מעשים אלה;
ושלישית – כמו שסייע לביצוע מעשי הרצח. במסגרת זו יש לבחון מה הקווים המאפיינים
את "המבצע בצוותא", תוך הבחנתם מן המאפיינים את המסייע והמשדל.



בתי המשפט

תפ״ח 1158/02

בבית המשפט המחוזי בתל-אביב-יפו

142. סעיף 29(ב) לחוק העונשין, התשל״ז-1977 קובע את אחריותו של המבצע בצוותא,
כדלקמן :

‏"המשתתפים בביצוע עבירה תוך עשיית מעשים לביצועה, הם מבצעים בצוותא,
ואין נפקה מינה אם כל המעשים נעשו ביחד, או אם נעשו מקצתם בידי אחד
ומקצתם בידי אחר״".

סעיף 30 לחוק העונשין, התשל״ז-1997 קובע את אחריותו של המשדל כדלקמן :

‏"המביא אחר לידי עשיית עבירה בשכנוע, בעידוד, בדרישה, בהפצרה, או בכל דרך
שיש בה משום הפעלת לחץ, הוא משדל לדבר עבירה״".

סעיף 31 לחוק העונשין, התשל״ז-1977 קובע את אחריותו של המסייע כדלקמן :

‏"מי אשר, לפני עשיית העבירה או בשעת עשייתה, עשה מעשה כדי לאפשר את
הביצוע, להקל עליו או לאבטח אותו, או למנוע את תפיסת המבצע, גילוי העבירה, הוא
או שללה, או כדי לתרום בדרך אחרת ליצירת תנאים לשם עשיית העבירה, הוא
מסייע״".

143. על מנת שאדם יחשב כמבצע העבירה בצוותא עם אחרים, צריך להתקיים התנאי
הבסיסי של "עשיית מעשים לביצועה" של העבירה, כפי שמורה סעיף 29(ב) לחוק.
הפסיקה נתנה פירוש רחב למושג "ביצוע", כשהיא מגדירה בצורה רחבה את מהות המעשה
הנדרש לצורך כך. באופן דומה קבעה הפסיקה אמות מידה גמישות בנוגע למידת הקירבה
הנדרשת של המשתתף למעגל המבצעים, ויכולתו להשפיע על הביצוע (דנ״פ 1294/96,
1365/96 <u>עוזי משולם ואח' נ' מדינת ישראל</u>, פ״ד נב(5) 1, בעמ' 21 (כב' השופט א. מצא),
בעמ' 54-55 (כב' השופט מ. חשין), ובעמ' 63-64 (כב' השופט י.קדמי)).

96



בתי המשפט

תפ״ח 1158/02

בבית המשפט המחוזי בתל-אביב-יפו

אשר למעשה הנדרש על מנת שניתן יהיה לראות באדם מבצע בצוותא, נפסק כי די במעשה
מהכנה גרידא (זה אף המבחן לקיומה של עבירת ניסיון), ואשר
לביצוע העבירה החורג מהכנה גרידא (זה אף המבחן לקיומה של עבירת ניסיון), ואשר
מלווה ביסוד הנפשי המתאים (דנ״פ 1294/96 הנ״ל בעניין **משולם**, בעמ׳ 23-24). מעשה זה
איננו חייב להיות חיוני להצלחת העבירה, ואף איננו חייב להיות מעשה הנמנה עם רכיבי
היסוד העובדתי שבעבירה; די בכך שהמעשה משולב בתוכנית העבירה, ומהווה השתתפות
בביצועה, כמו למשל תכנון העבירה, מתן הנחיות לביצועה או חלוקת התפקידים בין
המשתתפים (דנ״פ 1294/96 הנ״ל בעניין **משולם**, בעמ׳ 63-64 (כב׳ השופט י. קדמי).

## א.    מבצע בצוותא לעומת מסייע

144.    ההבחנה בין ״מבצע בצוותא״ של העבירה לפי סעיף 29(ב) לחוק העונשין, לבין
״מסייע״ לפי סעיף 31 לחוק, הפכה להיות בעלת חשיבות מעשית רבה לאחר שנכנס לתוקף
חוק העונשין (תיקון מס׳ 39) (חלק מקדמי וחלק כללי), התשנ״ד-1984, שכן על-פי סעיף 32
לחוק כנוסחו היום - עונשו של המסייע הוא מחצית מעונשו של המבצע בצוותא, בעוד
שעל-פי הדין הקודם עונשם היה זהה. עונשו המירבי של המסייע לרצח הוא 20 שנות מאסר
(סעיף 32(1) לחוק), בעוד שהמבצע עבירת רצח בצוותא עם אחר, בהעדר נסיבות של
אחריות מופחתת, דינו מאסר-עולם חובה.

בע״פ 8573/96, 8620, 8710, 8873, 8901 **מרקדו ואח׳ נ. מדינת ישראל** (״משפט
הדיסקונטאים״), פ״ד נ[54](5) 481, אמר כבוד השופט א. גולדברג בעמ׳ 545:

״תיקון מס׳ 39 לחוק מבטא את ההכרה שהאשמה המוסרית, והמסוכנות
הסובייקטיבית והאובייקטיבית שבסיוע פחותות מאלה שבביצוע בצוותא. פער
זה הוא שעומד ביסוד ההבחנה בתוצאות העונשיות בין מבצע בצוותא למסייע,
והוא זה שגם צריך להנחות אותנו בקביעת המבחנים המשמשים להבחנה בין
מבצע עיקרי למסייע״.

97



בתי המשפט

תפ"ח 1158/02

בבית המשפט המחוזי בתל-אביב-יפו

145.   ההבחנה בין "מבצע בצוותא" לבין "מסייע" הובהרה בע"פ 4389/93, 4497/93 **יוסי פלונים נ'**
**מרדכי ואח' נ. מדינת ישראל**, פ"ד נ(3) 239, בע"פ 2796/95, 2813/95, 2814/95 בעניין **משולם**; ע"פ 8573/96 הנ"ל
**מדינת ישראל**, פ"ד נא(3) 388, דנ"פ 1294/96 הנ"ל בעניין **חיירו נ' מדינת ישראל**, פ"ד נח(1) 411
בעניין **מרקדו**, בעמ' 543-550; וע"פ 2111/99 ביסוד ההבחנה בין מבצע בצוותא לבין מסייע מצויה הן ביסוד העובדתי של העבירה, והן ביסוד
מאיכות פחותה העבירה לביצוע המסייע של תרומתו "איכות בעיקרון, שלה. הנפשי
ל.ל. הנ"ל 8573/96 (ע"פ העיקרי" המבצע של תרומתו 545. בעמ'

אשר ליסוד העובדתי של העבירה - ההבחנה העיקרית היא בין שותף ישיר לביצוע העבירה
לבין שותף עקיף לביצועה. המבצעים בצוותא הם "משתתפים בביצוע העבירה תוך עשיית
מעשים לביצועה", אך לא נדרש כי כל אחד מהם יבצע בעצמו את כל היסודות העובדתיים
של העבירה (סעיף 29(ב) לחוק). לעומת זאת, המסייע עושה מעשה שיש בו כדי לתרום
בדרך כלשהי "ליצירת תנאים לשם עשיית העבירה" (סעיף 31 לחוק). המבצע בצוותא הוא
חלק מן המעגל הפנימי של ביצוע העבירה, בעוד שתרומתו של המסייע לביצוע העבירה היא
חיצונית בלבד. לכן, בוחן בית-המשפט את מידת הקירבה של כל אחד מן המשתתפים
לביצוע העבירה, קרי: האם הוא מהווה חלק מן המעגל הפנימי של המשימה העבריינית
(ע"פ 3390/98 **רוש נ. מדינת ישראל**, פ"ד נג(5) 871, 878). זהו, איפוא, "מבחן הקירבה",
שהובהר על ידי כב' הנשיא א. ברק בע"פ 4389/93 הנ"ל בעניין **מרדכי**, בעמ' 250:

"השוני בין המבצע בצוותא לבין המסייע מתבטא בכך שהמבצעים בצוותא
משמשים גוף אחד לביצוע המשימה העבריינית. כולם עבריינים ראשיים...
תרומתם של כל אחד מהמבצעים בצוותא היא 'פנימית'... אכן, לעניין הביצוע
בצוותא תיתכן חלוקת עבודה בין העבריינים, באופן שהם יפעלו במקומות שונים
ובזמנים שונים, ובלי שכל אחד מהם מיצה את העבירה, ובלבד שחלקו הוא
מהותי להגשמת התכנית המשותפת. אחדות המקום והזמן אינה חיונית, ובלבד
שחלקו של כל אחד מהם הוא חלק פנימי של המשימה העבריינית".

98



בתי המשפט

תפ"ח 1158/02

בבית המשפט המחוזי בתל-אביב-יפו

146.    בפסקי הדין שצוטטו לעיל, סקר בית-המשפט העליון את המבחנים השונים
שהוצעו בפסיקה ובספרות המשפטית לשם תיחום הגבולות בין מבצע בצוותא לבין מסייע.
יש אשר שמים דגש על "מבחן השליטה", כמאפיין של המבצע בצוותא: למבצע בצוותא יש
שליטה, יחד עם המבצעים~~בצוותא~~ על ביצוע העבירה; הוא מהווה חלק מן התוכנית המשותפת
לביצוע העבירה, ופועל יחד עם האחרים להגשמה. על מעמדו של המבצע בצדדים ~~~~ לאור
"מבחן השליטה", אמר כבוד הנשיא א. ברק בע"פ 2796/93 הנ"ל בענין <u>פלונים</u> (פסקה 28):

"המאפיין את המבצע בצוותא שהוא אדון לפעילות העבריינית. בידיו השליטה
הפונקציונאלית-מהותית, יחד עם המבצעים בצוותא האחרים, על העשיה
הפונקציונלית. הוא חלק מהתוכנית משותפת לביצוע העבירה. הוא חלק מהתוכנית
העבריינית. הוא חלק מהחלטה משותפת לביצוע העבירה. הוא חלק מהמבצעים
הכוללת להגשמת הפעולה העבריינית האסורה. הוא פועל יחד עם המבצעים
בצוותא האחרים, כך שכל אחד מהם שולט - יחד עם האחרים – על הפעילות
בצוותא האחרים, כך שכל אחד מהם שולט - יחד עם האחרים – על הפעילות
כולה. מעמדו ביחס להחלטה לביצוע העבירה הוא של איש של 'פנים'. תרומתו היא
'פנימית'. חלקו הוא מהותי להגשמת התוכנית המשותפת...".

כך גם נפסק בע"פ 8573/96 הנ"ל בענין מרקדו, בעמ' 547-548. לעומת זאת, בהתייחסו
למסייע אמר כבוד הנשיא ברק כי המסייע "אינו אבי הרעיון" לביצוע העבירה, ובפסקה 30
אמר כדלקמן:

"המסייע הוא שותף עקיף ומשני (פרשת <i>מרדכי</i>, פסקה 14). הוא מצוי מחוץ
למעגל הפנימי של הביצוע. הוא גורם "חיצוני". אין הוא יוזם הביצוע ואף לא
משדל לביצועו... אין הוא המחליט על הביצוע ואין הוא שולט על הביצוע...".

(ראה גם ע"פ 4389/93 הנ"ל בענין <u>מרדכי</u>, פסקאות 13-14).

147.    לעומת "מבחן השליטה", יש המדגישים את ה"מבחן הפונקציונאלי", לפיו מבצע
בצוותא הוא מי שנטל חלק מהותי בביצוע העבירה גופה, בעוד שחלקו של המסייע מתבטא
בפעולות עזר החיצוניות לעבירה.

99



בתי המשפט

בבית המשפט המחוזי בתל-אביב-יפו                תפ"ח 1158/02

מבחן זה מוצא את ביטויו בלשון סעיף 29(ב) לחוק ("משתתפים בביצוע העבירה תוך
עשיית מעשים לביצועה"). בע"פ 2796/93 הנ"ל בעניין **פלונים** (פסקה 27), אמר כבוד
הנשיא א. ברק בהתייחסו למבצעים בצוותא:

"הם השותפים הראשיים בביצוע העבירה. השותפות ביניהם מתבטאת בכך
שהם נטלו חלק בביצוע העבירה כמבצעים ישירים. הם משמשים גוף אחד
לביצוע המשימה העבריינית... כל אחד מהם נוטל חלק בביצוע העיקרי של
העבירה".

ובהמשך דבריו (פסקה 27) אמר כבוד הנשיא ברק:

"ביצוע בצוותא מחייב תיכנון משותף. הוא מבוסס על חלוקת עבודה בין
המבצעים...".

דברים ברורים באשר לחשיבותו המכרעת של ה"מבחן הפונקציונאלי" אמר כבוד השופט י.
קדמי בע"פ 5206/98 **חליל עבוד נ. מדינת ישראל**, פ"ד נב(4) 185 (פסקה 2):

"'המבצעים בצוותא' אינם רק אלה המשתתפים בעשיית 'מעשה' העבירה גופו;
אלא – נמנה עליהם כל מי ש'נוטל חלק' בביצועה של העבירה, במובן הרחב של
המושג 'ביצוע'. ואילו כל מי שרק 'תורם' לביצוע, מבלי לקחת בו חלק – לאמור:
מבלי למלא 'תפקיד' במסגרתו – נותר ב'מעגל החיצוני' של האחראים לביצוע.
הוא אינו משתתף בביצוע; וחלקו מצטמצם ל'סיוע' גרידא למימושו של הביצוע.

ההבחנה בין הנמנים עם ה'מעגל הפנימי' – 'המבצעים בצוותא' – לבין הנמנים
עם ה'מעגל החיצוני' – 'המסייעים', נעוצה, איפוא, בטיב ואופי מעורבותם
בביצוע: אם 'נטלו-חלק-בביצוע' – קרי: אם היה להם 'תפקיד' בביצוע הריהם
'מבצעים בצוותא'; ואילו אם אך 'תרמו' לו מבחוץ – הריהם 'מסייעים' בלבד".

100



בתי המשפט

תפ"ח 1158/02

בבית המשפט המחוזי בתל-אביב-יפו

בהמשך דבריו מבהיר כבוד השופט קדמי כי ההבחנה בין מבצע בצוותא למסייע איננה תלויה בשאלה האם היה בהתנהגותו של הנאשם משום סיוע לביצוע העבירה, שכן גם תלויה בשאלה האם היה בהתנהגותו של הנאשם משום סיוע לביצוע העבירה, שכן גם מבצע בצוותא מסייע לביצועה; השאלה היא "אם נטל חלק – קרי: אם מילא תפקיד – בביצוע העבירה".

בדנ"פ 1294/96, 1365 **משולם ואח' נגד מדינת ישראל**, פ"ד נב(5)1, בעמ' 63, אמר כבוד השופט י. קדמי:

"'מעשה-של-השתתפות' אינו חייב לבטא פעילות המשולבת בביצוע ה'מעשה', 'מעשה-של-השתתפות' אינו חייב לבטא פעילות המשולבת בביצוע ה'מעשה', הנמנה עם רכיבי היסוד העובדתי שבעבירה, ומשמעותו רחבה ומקיפה כל הנמנה עם רכיבי היסוד העובדתי שבעבירה. סעיף 29 לחוק העונשין, 'מעשה' המבטא 'השתתפות' בביצועה של העבירה. סעיף 29 לחוק העונשין, המגדיר 'מעשה-של השתתפות', אינו דורש ש'המעשה' ייעשה *תוך כדי ביצוע* המגדיר 'מעשה-של השתתפות', אינו דורש ש'המעשה' ייעשה תוך כדי ביצוע היסוד העובדתי של העבירה, ודי שיהא בו לבטא 'השתתפות' בביצוע. 'השתתפות', כאמור, יכול שתתחיל בהעלאת הרעיון בפני המיועדים לבצע את העבירה...".

כבוד השופט מ. חשין ציין באותו עניין כי החוק איננו דורש שמעשה ההשתתפות בביצוע העבירה ייעשה תוך כדי ביצועה בפועל, או בסמוך לכך (עמ' 53-54).

148. בדנ"פ 1294/96 הנ"ל בעניין **משולם**, הבהיר בית-המשפט העליון כי "מבחן השליטה" הינו מבחן עזר, שאינו מבחן יחיד ובלעדי, ויש לשלבו עם מבחנים ושיקולים אחרים; שליטה בביצוע מהווה אמנם ראיה חשובה להיותו של אדם מבצע בצוותא, אך בהעדר שליטה, או העדר תרומה פיזית חיונית לביצוע העבירה, אינם שוללים בהכרח מסקנה זו (כבוד הנשיא א. ברק בעמ' 50; כבוד השופט א. מצא בעמ' 24-27; כבוד השופט י. קדמי בעמ' 65). זאת ועוד; גם כאשר בית-המשפט נעזר ב"מבחן השליטה", נעשה הדבר תוך הדגשה כי אין מדובר ביכולת שליטה רצופה במהלך ביצוע העבירה כולה, אלא מדובר ב**"שליטה במשבצת הביצוע שהוקנתה למבצע המסוים"** (כבוד השופט י. קדמי בעמ' 64).

101



בתי המשפט

בבית המשפט המחוזי בתל-אביב-יפו

תפ"ח 1158/02

149. אשר ל**יסוד הנפשי** של העבירה – הרי שיחסו הנפשי של המסייע נמצא בדרגה
נמוכה יותר מזו של המבצע העיקרי, בכל הנוגע למידת מודעותו לפרטים הנוגעים לביצוע
העבירה, ורצונו להגשימה. לגבי מסייע, נפסק כי די בכך שהוא מודע לכך שהתנהגותו
תורמת ליצירת התנאים הדרושים לשם ביצוע העבירה העיקרית, ושהמבצע העיקרי עומד
לבצעה. בנוסף, לנגד עיני המסייע צריכה לעמוד המטרה לסייע למבצע העיקרי לעבור את
העבירה, או להקל עליו את ביצועה. ואולם, כאשר העבירה העיקרית היא תוצאתית,
ונדרש בה יסוד של פזיזות או כוונה מיוחדת – אין צורך להוכיח שגם המסייע פעל מתוך
כוונה שכזו, או שהוא התכוון לכך שהמבצע העיקרי יגשים את מטרתו. כך למשל, בעבירת
רצח אין צורך להוכיח שהמסייע התכוון שהמבצע העיקרי ירצח את הקורבן, או שהוא חפץ
בכך: די בכך שהמסייע שם לנגד עיניו את המטרה לסייע לעבריין העיקרי, יהיו מניעיו של
המסייע אשר יהיו (הלכות אלו הובהרו בע"פ 320/99 **פלונית נ' מדינת ישראל**, פ"ד נה(3)
22, בעמ' 37-31).

לעומת זאת, כאשר במבצע בצוותא עסקינן, יש להוכיח מעורבות נפשית גבוהה ומודעות
מצידו לפרטי העבירה המתבצעת, בנוסף על רצונו להגשימה:

"המבצע בצוותא תורם את תרומתו לאירוע עבריייני רב-משתתפים מתוך יחס
נפשי של יוצר העבירה animo auctoris. הוא רואה את עשיית העבירה כעניינו
הוא, ולא של אחר" (דברי ש"ז פלר, בספרו **יסודות בדיני עונשין**, שצוטטו בע"פ
4389/93 הנ"ל בעניין **מרדכי**, בעמ' 251).

**כללו של דבר**: המבצע בצוותא, בניגוד למסייע, צריך להיות בעל יסוד נפשי זהה לזה של
מבצעי העבירה האחרים, וצריכים להתקיים לגביו כל מרכיבי היסוד הנפשי שנקבעו בחוק
לגבי העבירה שהוא נוטל חלק בביצועה (ע"פ 2796/95 הנ"ל בעניין **פלונים**, בעמ' 402)

בע"פ 8573/96 הנ"ל בעניין **מרקדו**, אמר כבוד השופט א. גולדברג, בעמ' 549-548, כי סיווגו
של הנאשם כמבצע בצוותא או כמסייע מתקבל כתוצאה ממבחן משולב של היסוד הנפשי
והיסוד העובדתי – מבחן אשר כמוהו כמקבילית כוחות:



102



בתי המשפט

בית המשפט המחוזי בתל-אביב-יפו      תפ"ח 1158/02

"ככל שהיסוד הנפשי של עושה העבירה (מבחינת מידת העניין שלו בביצועה) רב
יותר, יש מקום להסתפק בדרגה נמוכה יותר של היסוד העובדתי. ברוח זו כבר
נאמר כי 'משהוכח יסוד 'נפשי' זה (המודעות – א' ג'), אין עוד חשיבות לחלוקת
התפקידים בין המעורבים באירוע' (ע"פ 4188/95, 5235 הנ"ל [43], בעמ' 550).
ולהפך, ככל שמידתו של היסוד העובדתי אצל עושה העבירה, מבחינת איכות
תרומתו לביצועה, רבה יותר, כן ניתן להסתפק בדרגה נמוכה יותר של היסוד
הנפשי'".

דברים אלו אושרו בדנ"פ 1294/96 בעניין <u>משולם</u> הנ"ל (בעמ' 27, מפי כב' השופט א. מצא).

150.    מן ההלכות שצוטטו לעיל עולה, כי השתתפות בתכנון העבירה מהווה סממן
מובהק של מבצע בצוותא, ובמקרה שכזה אין צורך בנוכחות פיזית בזירת העבירה על מנת
להיחשב כמבצע בצוותא.
בדנ"פ 1294/96 הנ"ל בעניין <u>משולם</u>, בעמ' 64, פסק כב' השופט י. קדמי:

"'השתתפות', כאמור, יכול שתתחיל בהעלאת הרעיון בפני המיועדים לבצע את
העבירה, ומכל מקום, לשיתתי, אין ספק, שתכנון הביצוע, מתן הנחיות והתוויית
קווי הפעולה, לרבות חלוקת תפקידים בין המשתתפים, מהווים 'מעשה' המבטא
'השתתפות' כאמור".

בע"פ 3596/93 <u>חמוד אבו סרור נ. מדינת ישראל</u>, פ"ד נב(3) 481, אמר כבוד השופט א' מצא
בעמ' 491:

"תרומתו המעשית של המערער לביצוע הרצח אכן היתה קטנה משל שני מרעיו.
ואולם השתתפותו בפעילות המכינה, ותפקיד המתריע אותו מילא, היקנו לו
שליטה על הוצאתה לפועל של התוכנית הרצחנית. מכך שהשתתף בהכנות לביצוע
ופעל להצלחת התוכנית עולה, כי היה בעל המחשבה הפלילית הנדרשת לשכלול
אחריותו בגין עבירת רצח בכוונה תחילה".

103



**בתי המשפט**

בבית המשפט המחוזי בתל-אביב-יפו                    תפ"ח 1158/02

בע"פ 2796/95 הנ"ל בעניין **פלונים**, הורשעו ארבעה נערים בביצוע רצח בכוונה תחילה, למרות שרק אחד מהם השליך את הרימון שגרם למותו של קורבן העבירה. האחד (זאב) הורשע כמבצע בצוותא משום שנטל חלק בכל שלבי התכנון והביצוע, ונכח בזירת ביצוע העבירה, למרות שהחליט שלא לזרוק את הרימון הקטלני בעצמו (**"הוא לא ביצע את אקט הקטילה. אין בכך ולא כלום, שכן מבצע בצוותא אחראי גם אם לא ביצע בעצמו את כל יסודות העבירה..."** – עמ' 407). השני (גרשון) הורשע כמבצע בצוותא, אף כי לא נכח כלל בזירת הרצח, וכל תפקידו היה לדווח לתקשורת על המעשה לאחר ביצועו, משום שביצע את התפקיד שהוקצה לו מראש לשם הגשמת העבירה (עמ' 408). השלישי (טל) הורשע כמבצע בצוותא, למרות שגם הוא לא נכח בזירת ביצוע הרצח, משום שהשתתף בתכנון העבירה, היווה חלק מן החבורה שהחליטה לבצע את הרצח, ואף עמד בראשה (עמ' 408-409).

151.    כאשר לעבירה העיקרית קדמה קשירת קשר לביצועה, תהא הנטיה לראות בכל אחד מן הקושרים מבצע בצוותא של העבירה העיקרית, ובלבד שנטל חלק ממשי בביצועה. הטעם לכך הוא שקשירת קשר לביצוע עבירה מעידה על עניין לכל אחד מהקושרים בביצועה. כדברי שי"ז פלר, שצוטטו בע"פ 8573/96 הנ"ל בעניין **מרקדו**, בעמ' 550: **"קשירת קשר בין שני אנשים, או יותר, לביצוע עבירה פלילית, טומנת בחובה גיבוש מחשבה משותפת למימוש מטרת הקשר** – כל אחד במעמד עתידי של מבצע ישיר, ברוח יצירת **animo auctoris."**

בע"פ 3390/98 הנ"ל בעניין **רוש**, בעמ' 878, אמר כבוד השופט א' מצא:

**"המבחן הנוסף בדבר 'קירבת המעשה', שעל-פיו נדרש שחלקו של כל אחד מהמבצעים בצוותא יהיה 'חלק פנימי של המשימה העבריינית', נועד אך להבטיח שעשיית מעשה גבולי, שלפי טיבו עשוי להיכנס להגדרה של 'ביצוע', לא תטיל על העושה אחריות כמבצע בצוותא כאשר טיב יחסו הנפשי לביצוע העבירה מוטל בספק (דנ"פ 1294/96 משולם נ' מדינת ישראל (להלן – פרשת משולם [3]), בעמ' 21-22.**

104



בתי המשפט

בבית המשפט המחוזי בתל-אביב-יפו          תפ״ח 1158/02

לא כן הדבר ביחס לקביעת אחריותו של מי אשר מעיקרה נימנה עם המשתתפים
בהכנת התוכנית העבריינית, ואין מתעורר כל ספק ביחס להיותו בעל המחשבה
הפלילית הנדרשת לשכלולה של העבירה המתוכננת. צד כזה לעבירה נושא
באחריות כ׳מבצע בצוותא׳, אפילו אם תרומתו הפיזית לביצועה אינה גדולה
מתרומתו של מסייע (ע״פ 3596/93 *אבו סרור נ׳ מדינת ישראל* [4], בעמ׳ 491)״.

152. אשר **לנוכחות בזירת ביצוע העבירה**, הרי שזו איננה הכרחית על מנת לראות באדם
מבצע בצוותא, ובלשונו של כבוד הנשיא א. ברק בע״פ 2796/95 הנ״ל בענין **פלונים** (פסקה
27): ״**ביצוע בצוותא אינו מבוסס בהכרח על אחידות המקום והזמן**״ (ראה גם דנ״פ
1294/96 הנ״ל בענין **משולם**, בעמ׳ 30, 38, 49, 51, 53-54 ו-64). עם זאת, נוכחות שאינה
אקראית של אדם בזירה בה מתבצעת עבירה, יוצרת חזקה הניתנת לסתירה להיותו מבצע
בצוותא של העבירה (ראה: ע״פ 3006/96 **מטיאס נ. מדינת ישראל**, דינים עליון, כרך נב
526).

ב.    **עבירת הסיוע**

153. היסוד העובדתי והנפשי של עבירת הסיוע בכלל, והסיוע לרצח בפרט, הובהרו
לאחרונה בפסק דינו של כבוד הנשיא א׳ ברק בע״פ 320/99 **פלונית נגד מדינת ישראל**, פ״ד
נה(3) 22, בעמ׳ 31-37 (אושר בע״פ 11131/02 **אנג׳ליקה יוסופוב נ׳ מדינת ישראל**, טרם
פורסם). ניתן לסכם את ההלכות שנפסקו בפסק דין זה כדלקמן :

א.    המאפיין את ההתנהגות המסייעת הוא, שהיא מהווה תרומה עקיפה ומשנית
לביצועה של העבירה העיקרית : התרומה של המסייע נחשבת עקיפה ומשנית,
משום שהוא אינו נוטל חלק בביצוע העיקרי של העבירה, אלא רק תורם בעקיפין
להגשמתה של העבירה העיקרית. המסייע הוא גורם ״חיצוני״, אשר מצוי מחוץ
למעגל הפנימי של ביצוע העבירה (ראה גם: ע״פ 7085/93 **נג׳אר ואח׳ נ׳ מדינת
ישראל**, פ״ד נא(4) 221, בעמ׳ 238).



**בתי המשפט**

בבית המשפט המחוזי בתל-אביב-יפו                                   תפ״ח 02/1158

ב.    **היסוד העובדתי** של עבירת הסיוע, שהיא עבירת התנהגות, הוא מעשה או מחדל שיש בו כדי ליצור את התנאים להגשמתו של היסוד העובדתי בעבירה המבוצעת על ידי המבצע העיקרי. הסיוע צריך להיות "מסוגל" לסייע להגשמת העבירה העיקרית, אך אין דרישה שהסיוע יהיה אפקטיבי, או תנאי שבלעדיו העבירה העיקרית לא היתה מתגבשת (ראה גם ע״פ 4317/97 **פולאיקוב נ׳ מדינת ישראל**, פ״ד נג(1) 289, בעמ׳ 307). כמו כן אין דרישה שהעבירה העיקרית תתבצע בפועל, שכן עבירת הסיוע איננה עבירה תוצאתית. בנוסף, יש צורך להוכיח, כחלק מהיסוד העובדתי של עבירת הסיוע, את הנסיבה הנוגעת לפליליותה של ההתנהגות שהסיוע מהווה לה גורם משני ועקיף.

ג.    הסיוע צריך שיופנה כלפי עבירה בעלת ייעוד מוחשי, דהיינו, פעולה הנעשית על מנת לסייע לביצועה של עבירה **מסוימת**, להבדיל מעבירה סתם (ראה גם ע״פ 426/67 **יוסף בארי ואח׳ נ׳ מדינת ישראל**, פ״ד כב(1) 477, בעמ׳ 481; ע״פ 7085/93 הנ״ל בעניין **נג׳אר**, בעמ׳ 239-238).

ד.    **היסוד הנפשי** של עבירת הסיוע כולל שלושה תנאים מצטברים:

(1)    מודעות לטיב ההתנהגות המסייעת, קרי: לכך שההתנהגות תורמת ליצירת התנאים לשם עשיית עבירה עיקרית בעלת ייעוד מוחשי;

(2)    מודעות לקיום הנסיבות הרלבנטיות בעת ההתנהגות המסייעת, דהיינו: מודעות לכך שהמבצע העיקרי מבצע, או עומד לבצע עבירה, הגם שלא נדרשת מודעות לכל פרט מפרטי העבירה (ראה גם ע״פ 7085/93 הנ״ל בעניין **נג׳אר**, בעמ׳ 239-238).

(3)    לנגד עיניו של המסייע צריכה לעמוד המטרה לסייע למבצע העיקרי לבצע את העבירה, או להקל עליו את הביצוע.