מס. No. 078/14

## CERTIFICATION OF COPY

אישור העתק

I the undersigned Yitzhak Weinberg, a Notary in 33 Soreq Street, Beit Shemesh, Israel
Hereby certify that the attached document marked **"A"** is a correct copy of the original document which is drawn up in the Hebrew language and has been produced to me.

אני החח״מ יצחק וויינברג נוטריון בירושלים ברחוב נחל שורק 33 בית שמש

מאשר כי המסמך המצורף והמסומן באות ״A״ הינו העתק מדויק של המסמך המקורי שנערך בשפה העברית ושהוצג בפני.

In witness whereof I certify the correctness of the copy and I hereto set my signature and seal,

ולראיה הנני מאשר את דיוק ההעתק הנ״ל, בחתימת ידי ובחותמי,

This day 24th December 2013

24/12/2013 היום

Paid 294.00 shekels (including VAT)

שולם סך של 294.00 ש״ח (כולל מע״מ)

SIGNATURE _____     חתימה

NOTARY'S SEAL    חותם הנוטריון



# APOSTILLE

(Convention de la Haye du 5 Octobre 1961)

| | |
|---|---|
| **1. STATE OF ISRAEL** | **1. מדינת ישראל** |
| This public document | מסמך ציבורי זה |
| 2. Has been signed by | 2. נחתם בידי |
| Advocate YITZHAK VEINBERG | עו"ד יצ' ווינברג |
| 3. Acting in capacity of Notary | 3. המכהן בתור נוטריון. |
| 4. Bears the seal/stamp of | 4. נושא את החותם/החותמת |
| the above Notary | של הנוטריון הנ"ל |
| **Certified** | **אושר** |
| 5. At the Magistrates Court of Jerusalem | 5. בבית משפט השלום בירושלים |
| 6. Date _____ 3 - 03- 2014 | 6. ביום _____ |
| 7. By an official appointed by | 7. על ידי מי שמונה בידי שר |
| Minister of Justice under the | המשפטים לפי חוק הנוטריונים, |
| Notaries Law, 1976. | התשל"ו - 1976 |
| 8. Serial number _____ | 8. מס' סידורי _____ |
| 9. Seal/Stamp _____ | 9. החותם / החותמת _____ |
| 10. Signature _____ | 10. חתימה _____ |

## בית המשפט הצבאי יהודה

בפני כב׳ הנשיא: סא״ל צבי לקח

השופט: סא״ל רונן עצמון

השופט: סא״ל טל בנד

התביעה הצבאית .

(באמצעות סגן אנדריי ורשצ׳גין )

נגד

הנאשם: פואד חג׳אזי שובכי ת.ז. 410026173/שב״ס

(באמצעות ב״כ עו״ד אביגדור פלדמן)

## הכרעת דין

### הנשיא סא״ל צבי לקח:

הנאשם שלפנינו מואשם בארבעה פרטי אישום שעניינם העברת כספים לצרכי רכישת אמצעי לחימה כפי שיפורט להלן.

פרט ראשון – סחר בציוד מלחמתי: מיוחס לנאשם כי־החל משנת 2000 ועד לסוף ינואר 2002 עסק בסחר בציוד מלחמתי. נטען כי הנאשם נטל חלק בישיבה בה הורה יאסר ערפאת לו ולראשי מנגנוני הביטחון לרכוש כל כמות של נשק מכל מקום אפשרי. הנאשם פעל ממועד פגישה זו יחד עם אחרים לרכוש כמויות גדולות של אמצעי לחימה. הנאשם שעמד בראש משרד הכספים הפלסטיני ריכז את בקשות אנשי המנגנונים השונים ואלו הועברו אליו כנגירות עבודה. על מנת לוודא שאמצעי הלחימה עליהם הוא משלם אכן קיימים, דרש הנאשם מהמפונים אליו להביא את כלי הנשק למשרדיו ולצורך כך החזיק מחסן אמצעי לחימה ברמאללה וכן מחסן נוסף ברצועת עזה. לאחר שאמצעי הלחימה הועברו לרשותו, היה הנאשם מגיש את נייר העבודה לאישורו של יאסר ערפאת, ולאחר אישורו של זה, היה הנאשם חותם אף הוא על הבקשה ומאשר לאנשיו להעביר את הכסף לפונה באמצעות העברה בנקאית. במהלך התקופה הנ״ל נרכשו כ- 1000 טונות של אמצעי לחימה תמורת 10-7 מיליון דולר. את אמצעי הלחימה דאג הנאשם להעביר למנגנוני הביטחון הפלסטיניים ביודעו כי חלק ניכר מאנשיהם הינם חברים בזרוע הצבאית של ארגון הפת״ח שביצעה פיגועים רבים אותה עת.

תאריך: 29/07/09                                              תיק מס': 3052/06

1   **פרט שני – ביצוע שירות עבור התאחדות בלתי מותרת**: נטען כי בתקופה האמורה בפרט האישום
2   הראשון העביר הנאשם לחברי החוליות הצבאיות של ארגונו גדודי חללי אלאקצא באזור בית לחם
3   משכורת חודשית בסך 500 ₪. באותה עת ביצעו חברי חוליות אלה פיגועים רבים. בחודש
4   אוקטובר 2001 קיבל הנאשם בקשה לתשלום של 25,000 דינר מידי מרואן ברנותי לצורך רכישת
5   אמצעי לחימה וחומרים ליצור מטעינים, ולצורך תשלום משכורות ל-268 חברים בגדודי חללי
6   אלאקצא. הנאשם העביר בקשה זו לידי יאסר ערפאת, אשר הורה לו לשלם את הכסף באמצעות
7   משרד האוצר.
8
9   **פרט שלישי – סחר בציוד מלחמתי**: פרט זה מפרט את חלקו לכאורה של הנאשם במימון וארגון
10  ספינת הנשק קארין A, שנתפסה בתאריך 3.1.02 כשעליה כמויות גדולות של אמצעי לחימה
11  מסוגים שונים, ובכלל זה רקטות, מרגמות ומקלעים. נטען כי בחודש ספטמבר 2001 נפגש הנאשם
12  עם פתחי ראזם, וזה עדכן אותו בדבר מגעיו עם האיראנים בכל הנוגע למימון ספינת הנשק. פתחי
13  ראזם הודיע לנאשם כי על החרש״פ לשאת בעלות של 125,000 דולר. הנאשם הסכים לכך ואף
14  הסכים לפנות ליאסר ערפאת לקבלת חמימון הדרוש לכך. בשלב מאוחר יותר העביר הנאשם
15  ליאסר ערפאת את דרישת התשלום וזה חתם עליה. הנאשם העביר את הוראתו של יאסר ערפאת
16  באמצעות שליח למשרדו של חרבי צרצור, אחראי על הדלק ברש״פ. הספינה ועליה הציוד
17  המלחמתי עגנה בתימן. הנאשם, שהיה בתימן אותה עת, עודכן בדבר הגעת הספינה וקיבל דיווח
18  על הכוונה להכין דרכונים לשניים מאנשי הספינה. לאחר שחספינה הפליגה מתימן לעבלת סואץ,
19  נתפסה בידי כוחות צה״ל ביום 3.1.02, כאמור.
20
21  **פרט רביעי – מגע עם ארגון עוין מחוץ לאזור**: פרט זה עניינו מגעים שקיים הנאשם עם גורמים
22  איראניים, במטרה לתאם את שיתוף הפעולה הצבאי בין איראן לבין הרש״פ. בין היתר עלו
23  אפשרויות להקמת מפעלי תחמושת בתחומי הרש״פ, העברת אמצעי לחימה מלבנון דרך
24  החיזבאללה, ואימונים צבאיים לאנשי הרש״פ בלבנון ובאיראן. כמו כן נערך מסמך סיכום המפגש,
25  וזה הוצג לאחר מכן על ידי הנאשם ליאסר ערפאת.
26
27  <u>גדר הכפירה</u>
28
29  לא הוכחש כי הנאשם היה אחראי על ענייני הכספים של מנגנוני חביטחון ברשות הפלסטינית,
30  בתקופה הרלוונטית לכתב האישום. עם זאת נטען כי הוא פעל ברשות ובסמכות. עוד נטען, כי חלק
31  מהעובדות המפורטות בכתב האישום אינן נכונות. בנוסף, נטען כי אמרותיו של הנאשם,
32  המבססות את עיקרו המכריע של כתב האישום, נגבו ממנו שלא כדין.
33
34  <u>ניהול המשפט</u>
35
36  בראשיתו של ניהול התיק הועלו טענות מקדמיות אולם אלה נדחו בהחלטה שניתנה ביום
37  04.12.06. לאחר החלטה זו, ובעקבות כפירת הנאשם באשמה, החלה פרשת הבאת הראיות.
38  מרבית חומר הראיות הוגש בהסכמה, אולם הסכמה זו התייחסה אך ורק לחומר הראייתי שלא
39  התייחס באופן ישיר לנאשם. כך, למשל, לא היית מחלוקת כי נתפסה ספינת הנשק קארין A

-2-

תיק מס': 3052/06

כאמור, כתב האישום מבוסס בעיקרו על אמרות הנאשם. מאחר והייתה מחלוקת על קבילותן של    1
אמרות אלה, נוהל משפט זוטא. הוסכם על ידי הצדדים כי ההכרעה במשפט הזוטא תינתן    2
במסגרת הכרעת הדין בתיק כולו. במסגרת התיק העיקרי נדרשנו לשמוע עד אחד בלבד מטעם    3
התביעה, מחמת עבir,，וכל יתר חומר הראיות, למעט אמרות הנאשם, הוגש בהסכמה. במסגרת    4
פרשת חהגנה העיד הנאשם.    5
    6
התביעה הגישה סיכומיה בכתב, והסניגוריה השמיעה ‏לבסוף את סיכומיה בעל פה, הגם שבאיחור    7
ניכר של 4 חודשים.    8
    9

## משפט הזוטא    10
    11

## כללי    12
    13

כאמור, לאור טענת ההגנה כי אמרות הנאשם נגבו באופן שאינו חופשי ומרצון, נוהל משפט זוטא.    14
במסגרתו, ולאור טיעוני הזוטא שהועלו, נשמעו שלושת חוקרי המשטרה שגבו את אמרותיו של    15
הנאשם, וכן שלושה חוקרים של שירות הביטחון הכללי שניהלו את עיקר חקירתו של הנאשם.    16
במסגרת פרשת ההגנה במשפט הזוטא העיד הנאשם וכן העיד מר מחמד חיניאזי, אשר היה עם    17
הנאשם באותו תא בחלק מהתקופה בה נחקר.    18
    19

## טיעוני הזוטא    20
    21

א. נטען כי הנאשם נחקר לאורך חודשיים חקירות ממושכות במשך רוב שעות הימצה תוך    22
שנמנעת ממנו שינה.    23

ב. נטען כי הנאשם הינו אדם חולה, שנזקק לטיפול תרופתי במחלות כרוניות, ותרופותיו לא    24
ניתנו לו ואף לא סופק לו תחליף הולם.    25

ג. נטען כי הנאשם היה אזוק בידיו וברגליו במהלך החקירה, דבר שגרם לו לכאבים עזים    26
ולתחושת השפלה קשה. עוד נטען שלעתים היו חוקריו משאירים אותו לבד בחדר כשהוא    27
אזוק, למשך ארבע עד שבע שעות, דבר שהביא את הנאשם למצב של כאב, פחד וחרדה    28
עמוקים.    29

ד. במהלך שהותו בחקירה, חרסו כוחות צה"ל את ביתו של הנאשם, עקרו עצי הדר ועצי זית    30
רבים בחלקתו והשמידו טון וחצי דבש. הידיעה אודות ההרס הביאה את הנאשם לחרדה    31
ופחד ביחס לגורל בני משפחתו. החוקרים ניצלו זאת כדי לומר לנאשם שאם יודה יוכל    32
לצאת לחופשי ולסייע לבני משפחתו.    33

ה. נטען כי נאמר לנאשם שבשל העובדה שהוא אדם זקן וחולה ולא נותרו לו שנים רבות    34
לחיות, חוקריו אינם מעוניינים לחקור ולהחזיק אותו במעצר זמן ממושך. על כן, אם יודה    35
יצא מייד לחופשי. חודאותיו ניתנו בכפוף להבטחות אלה ובשל פעולת פיתוי זו.    36

ו. נטען כי חוקריו של הנאשם הטיחו בו האשמות שווא, וחזרו ואמרו לו שהוא משקר להם.    37
החוקרים נקטו בשיטות של התנשה פיזית ונפשית. הנאשם שהינו אדם מבוגר ומכובד    38

-3-

תיק מס׳: 3052/06                                                      תאריך: 29/07/09

בקהילתו חש מושפל מהתנהגות החוקרים הצעירים כלפיו, ובצירוף מצבו חפיזי הקשה,            1
ייחל למותו ולרגע שבו יסיים את החקירות.                                              2

ז.   נטען כי הנאשם חתם על הודאותיו על מנת לרצות את חוקריו, ומבלי שידע מה כתוב        3
     באמרות שנכתבו בשפה העברית, אותה אינו קורא. חוקרי המשטרה הסתמכו על זכ״דים        4
     של השב״כ  וכשעמד על אי הדיוקים והטעיות המנויים בזכ״דים נתנו לו חוקרי המשטרה     5
     להבין כי ״תוהו ובוהו״ יתרחש אם יחזור בו מהודאותיו.                             6
                                                                                    7

נקדים ונאמר, כי לאור עדותו של הנאשם עצמו במשפט הזוטא, אשר לא עמד על חלק ניכר         8
מטיעוני הזוטא, צמצמה ההגנה בסיכומיה את טיעוניה לטענות זוטא שעניינן יחס משפיל כלפי    9
הנאשם.                                                                             10
                                                                                   11

<u>הראיות במשפט הזוטא</u>                                                           12
                                                                                   13

<u>עדותו של השוטר דוד מזרחי</u>                                                     14
                                                                                   15

עד זה מסר כי הוא דובר ערבית מהבית, מלימודיו ומהעבודה. בעת שהעיד בפנינו ציין כי הוא זוכר   16
את תווי פניו של הנאשם, אך לא זכר את פרטי החקירה במאת האחוזים. העד מסר שהוא נוהג        17
לוהות את החשוד שבפניו, ולאחר מכן הוא מזדהה כשוטר. הוא מקריא לו את תוכן האזהרה,          18
ולאחר שהחשוד מבין את תוכנה וחותם עליה, נגבית העדות בצורה של שאלות ותשובות. העדות       19
נגבית בשפה הערבית, ונכתבת על ידו בשפה העברית. בתום כל עמוד הוא מקריא אותו לחשוד        20
בשפתו, וזה חותם עליו. לפי הרשום באמרה הוא כיבד את הנאשם בסיגריה ואיפשר לו לעשן. העד     21
ציין כי חתרשם שמצבו של החשוד היה ״בסדר״ ושהוא מסוגל למסור עדות, שלולא כן היה רושם       22
וכי״ד בעניין, או מציין זאת באמרה, ונמנע מהמשך גביית העדות. כך חדבר גם לגבי אירועים       23
חריגים במהלך העדות. כשהתבקש לציין דוגמאות לאירועים מיוחדים שחיח רושם לו התורחש,         24
מסר כי הדבר יכול להיות למשל, שחשוד מתלונן על כאבי ראש, כי אינו חש בטוב, או כי אינו      25
מסוגל למסור את העדות. הוא ציין כי תוך כי כדי גביית האמרה הוא מציין אירועים כגון כיבוד    26
החשוד בשתייה, או מתן סיגריה וכדומה.                                                 27
                                                                                   28

העד מסר כי במהלך החקירה שניהל האווירה הייתה ניגוחה, והנאשם לא ציין בעיה כלשהי.        29
כשהנאשם ביקש לעשן ניתנה לו האפשרות לעשות כן, ולא היה דבר חריג מעבר לכך. עד ציין כי     30
במהלך החקירה הנאשם ישב מולו כשרגליו כבולות. העד מסר כי לא יכול להיות שהשאיר את          31
הנאשם בחדר לבד למשך זמן רב, שכן המדובר בחדר חקירה בו נמצאים תיקים נוספים, ובכלל זה     32
תיקו האישי, כך שלא יכול להיות שעזב את החדר.                                          33
                                                                                   34

העד נשאל לגבי הטענה כי נאמר לנאשם שבתיתו נחרס, שנעקרו עצי זית וזהד והושמדו טון וחצי    35
דבש. הוא השיב כי עד למועד מתן עדות בבית המשפט כלל לא ידע שלנאשם עצי הדר ודבש, והוא     36
(החוקר) בכל מקרה לא אמר דבר כזה.                                                    37
                                                                                   38

-4-

תאריך : 29/07/09                                                    תיק מס׳ : 3052/06

1    העד טען שמעולם לא אמר לנאשם כי נותרו לו שנים מעטות לחיות וכי אם יודה ישוחרר מייד,
2    ומסר כי הד׳בר אסור, והוא אינו נוקט אמצעים כאלה.

3
4    העד ציין כי עיין בזכ״דים של חשב׳׳כ לפני גביית העדות, וכי על סמך הזכ״יד הקריא לנאשם את
5    החשד נגדו, וזה היוזון גם קו מנחה לעדות שנגבתה.
6
7    העד הכחיש את הטענה לפיה אמר לנאשם שאם יחזור בו מדבריו בשב׳׳כ יקרח "תוהו ובוהו".
8
9    העד נשאל האם חקירת השב׳׳כ והמשטרה התנהלו באותו מקום, ומסר כי אף שמדובר באותו
10   מתקן, העדות נגבתה בחדר החוקרים של המשטרה. הוא ציין כי הוא לא נכנס לחדרי חקירות של
11   השב׳׳כ, והם (השב׳׳כ) לא נכנסים לחדרי החקירות של המשטרה. הוא אף ציין שחדר החקירות
12   של המשטרה נראה שונה מחדרי החקירות של השב׳׳כ.
13
14   העד מסר כי אינו יודע לכתוב בערבית ולכן כתב את האמרה בעברית, חזר על כך שאת מה שכתב
15   תרגם לנאשם, וכן ציין כי הזהיר את הנאשם בערבית. העד ציין כי לא ידע כמה שעות ישן הנאשם
16   לפני העדות שנגבה, וגם לא ידע כמה יממות נחקר קודם לכן על ידי חשב׳׳כ והמשטרה. העד ציין כי
17   היה בפניו זכ׳׳יד של הדברים שנאמרו במהלך החקירה בשב׳׳כ טרם גביית החודעה, אך לא
18   השתלשלות של כל החקירה או כל האירועים שקדמו לה. הוא מסר כי בדרך כלל נמצא בפניו זכ׳׳יד
19   אחד, אך הוא אינו זוכר לגבי מקרה זה.
20

21   **עדותו של השוטר משה לוי**
22

23   עד זה ציין בעדותו בפנינו כי הוא זוכר את החקירה באופן כללי, אך לא לפרטי פרטים. הוא מסר
24   כי את הודעתיו של הנאשם גבה במתקן אשקלון, לאחר שהוזחירו כחוק. החקירה התנהלה בשפה
25   הערבית והאמרות נכתבו בשפה העברית. לאחר מכן הקריא את החודעות לנאשם בערבית והוא
26   אישר אותן בחתימת ידו.
27

28   העד מסר כי הוא מתעד אירועים חריגים המתרחשים במהלך חקירה באמרות עצמן או בזכ׳׳יד
29   נפרד. במקרה של הנאשם הוא ציין בגוף האמרות את העובדה שנתן לנאשם לאכול ולשתות. הוא
30   מסר כי האווירה בחקירה הייתה נינוחה. הוא זכר את הנאשם כאדם בעל סבר פנים יפות, חייכן,
31   ששיתף פעולה וענה לשאלות שנשאל.
32

33   הוא זכר שהנאשם נזקק לטיפול תרופתי עקב מצבו הבריאותי – וכי תרופות סופקו לו על ידי
34   מרפאת הכלא. הוא זכר כי פעם אחת נכנס חובש לחדר וביקש לתת לנאשם את התרופה היומית
35   שלו. הוא מסר כי לאחר בירור שעשה, איפשר לנאשם ליטול את תרופתו, והוא תיעד זאת בגוף
36   האמרה (הודעה מס׳ 7 מיום 2.4.06 גיליון 3 ש׳ 62).
37

38   העד מסר כי עד כמה שהוא זוכר הנאשם ישב מולו בחקירה לא אזוק. הוא הכחיש שאמר לנאשם
39   כי ביתו נהרס או כי עצים נעקרו ודבש חושמד, ואף הכחיש כי אמר לנאשם שאם יודה הוא

-5-

1    ישוחרר בשל מצבו חבריאותי וגילו, או כי אם יחזור בו מדברים שמסר בחקירת השב"כ יקרה

2    "תוהו ובוהו".

3

4    העד ציין כי הגופנים (FONT) השונים באמרות המודפסות נובעים מכך שהמדובר בטופס מובנה,

5    והכחיש כי דובר בהעתקתה ממקום אחר. הוא ציין כי בפתח הדברים באמרה מיום 19.3.06 שאל

6    את הנאשם לשלומו, והנאשם ענה "ברוך השם בסדר" וחדבר נרשם. הוא טען כי כיוון שהנאשם

7    אדם מבוגר הוא שאל כדי להיות בטוח לגבי מצבו, ותעיד זאת בגוף האמרה. הוא מסר כי באופן

8    כללי ידע על מצבו חבריאותי של הנאשם, אך לא זכר בדיוק מתי נודע לו עניין זה. הוא ציין כי הוא

9    לא זכר שקרא משהו יוצא דופן בזכ"דים של השב"כ לפני החקירה. העד עמד על כך שבחקירה

10    שהוא ערך, הנאשם הבין כי יש לו זכות לשתוק או לספר כל דבר. הוא הוסיף כי בפתח החקירה

11    הוא מציג את עצמו ומסביר לנחקר חיכן הוא נמצא ולאחר מכן מקריא את האזחרה. עניין זה הוא

12    מבצע תמיד לכל חשוד ולכן הוא לא תיעד זאת באמרה, למעט פרטיו האישיים הרשומים. הוא טען

13    כי הוא מקריא כל דבר, גם את פרטיו האישיים של החשוד בפניו כדי לוודא שאכן אלו פרטיו, וגם

14    את האזחרה.

15

16    העד אישר כי החקירה בוצעה בחדר חקירות של המשטרה, המצוי במתחם חקירות של השב"כ

17    באשקלון.

18

19    העד ציין כי אינו זוכר התייחסות למצבו הרפואי של הנאשם בזכ"דים של חשב"כ אותם קרא,

20    והוסיף כי אם היתה בעיה רפואית הדבר היה עולה. מכיוון שהאמרה אכן נגבתה, משמעות הדבר

21    הינה שהנאשם היה כשיר לחקירה. הוא לא זכר אירוע יוצא דופן לגבי מצבו הרפואי של הנאשם

22    אבל זכר שהוא כיבד את הנאשם בשתייה חמה וקרה ובסיגריות, ושהנאשם עישן הרבה.

23

24    העד ציין כי ההודעה השביעית נגבתה לא בתאריך 4.2.06 כפי שרשום באמרה, אלא בתאריך

25    2.4.06, וחמדובר בטעות סופר.

26

27    **עדותו של השוטר יעקב ברזני**

28

29    עד זה מסר כי הוא זוכר את הנאשם אך הוא מסתמך על הכתוב באמרות שגבה. הוא ציין כי הוא

30    גבה את האמרות בשפה הערבית, רשם אותן בערבית, ולאחר מכן תרגם אותן שוב בעל פה לערבית

31    עבור הנאשם. בעדות מיום 26.3.06 הוא הטיח בנאשם דברים שאמרו עליו אחרים, והנאשם

32    התייחס אליהם. העד לא מצא מעיון באמרה כי היו אירועים חריגים במהלך החקירה, אחרת,

33    לדבריו, היו אלה נרשמים. בעדות מיום 14.5.06 הוא הציג לנאשם מסמכים וזה התייחס לכל אחד

34    מהם. הוא ציין כי האווירה בחקירה היתה טובה, וציין כי מדובר באדם מבוגר. העד מסר כי

35    הנאשם זכר פרטים מתוך המסמכים שחוצגו לו, ולהערכתו יש לנאשם זיכרון טוב.

36

37    העד מסר כי אם הנאשם היה מבקש להיבדק על ידי רופא, הוא היה רושם זאת באמרה ואף

38    מפסיק את גבייתה, שכן ידועה לו משמעותה של אמרה שנגבתה מנחקר שאינו במצב המאפשר

39    למסור עדות בצורה טובה. הוא ציין כי נחקרים המובאים בפניו אינם אזוקים אלא אם כן ישנו

-6-

חשש כי הם מסוכנים ועלולים להתפרע. במקרה של הנאשם דובר באדם מבוגר ולא היה בכך
צורך.

העד נשאל האם אמר לנאשם כי הרסו את ביתו, עקרו עצים והשמידו דבש, וענה כי זאת הפעם
הראשונה שהוא שומע על כך שנהרס ביתו של הנאשם. העד אף הכחיש כי אמר לנאשם שאם יודה
אזי בשל גילו המבוגר ומצבו הרפואי ישוחרר מיד. העד ציין כי לא השתמש באמצעי לחץ פיזי או
מילולי כלשהו, והכחיש בתוקף כי נתן לנאשם להבין שאם יחזור בו מהודאותיו בשב״כ יקרה
יתוחו ובוחיי. העד טען כי לא היה צורך להפעיל כוח או לחץ, והכל התרחש באווירה טובה.

בחקירתו הנגדית ציין העד כי אינו יודע כמה זמן נחקר הנאשם לפני שהוא חקר אותו, אך היו
מקרים שבהם היתתה חקירה רצופה לפני כן, ואז המתינו החוקרים על מנת לאפשר לחקור זמן
מנוחה כחוק. הוא אישר כי הוא מסתמך על זכ״ידים של השב״כ, הכתובים עברית, וציין כי תרגם
לנאשם חלק מהזכ״ד בו יוחסה לו הברחת נשקים. העד אישר כי הוא זה שביקש הארכת מעצר
בחלק מהמקרים, אולם לא זכר מהן פעולות חקירה שהתבקשו, ואמר כי לצורך כך יש לבחון את
הדיויחות שהוצגו לשופט שדן במעצר. העד ציין כי לא ידע מי תפס את המסמכים שהוצגו לנאשם
במסגרת האמרה מיום 14.5.06, או מי תרגם אותם. הוא ציין כי הוא עצמו אינו קורא ערבית, ולכן
הסתמך על התרגום, אולם לנאשם הציג את המקור בערבית. עוד ציין כי את העדות של אחר
אותה הציג לנאשם תרגם לו לערבית כיוון שזו היתתה כתובה בעברית והנאשם אינו קורא עברית.

עדותו של המכונה ״יורי״

עד זה היה הממונה על חקירת הנאשם מטעם שירות הביטחון הכללי. העד מסר כי הוא זוכר את
החקירה ואת הנאשם. הוא טען כי דובר בחקירה מורכבת כשבסך הכל האווירה היתתה מאוד
מינוחה, עם חרבה מאוד כבוד הדדי. העד הוסיף שהנאשם הוחזק בתא מעצר ככל העצורים, אולם
וכה בחקירה ליחס מאוד מכובד בהתאם למעמדו. הוא ציין כי כמעט בכל תקופת החקירה
הנאשם כובד באוכל ממטבח החוקרים, עישן סיגריות, וקיבל מענה גם לבקשות מיוחדות כגון
לבנים מסוג ״בוקסרי״, ספר קוראן, ואפילו היו מקרים שהוא ביקש להישאר בחקירה כי שיעמם
ם.

העד דחה את הטענה כאילו הנאשם לא זכה לטיפול רפואי, ואמר כי מפאת גילו של הנאשם ועקב
תלונותיו נבדק על ידי רופא שב״ס רופא שב״ס והיה במעצב צמוד של מרפאת שב״ס. הוא הוסיף שהוא אישית
היה בקשר עם מרפאת שב״ס וידא שהנאשם נבדק ובעיותיו הרפואיות טופלו בהתאם לשיקול
דעתם המקצועי של הרופאים. העד ציין כי מסר לנאשם שאין אפשרות להעביר לו תרופות, אולם
ערך דינו יכול להעביר פירוט של התרופות בהן הנאשם עושה שימוש. יחד עם זאת, העד מסר
שהאחריות על הטיפול הרפואי נתונה בידי רופא הכלא.

העד התבקש לומר את התרשמותו ממצבו של הנאשם, ומסר כי לא התרשם שהנאשם לא יכול
היה להיחקר. הוא זכר מקרה אחד בו הנאשם יצא מהתא עייף מאוד ולכן הובא חובש לחדר

-7-

תיק מס': 3052/06                                          תאריך : 29/07/09

1    החקירה, והנאשם הסביר כי הדבר קשור למצבו הנפשי ולא הפויי באותו היום. העד חזר וציין כי
2    היו מקרים בהם הנאשם ביקש להישאר בחדר החקירות דווקא.
3
4    העד התבקש להתייחס לשאלת אזיקונו של הנאשם בחקירה. הוא מסר כי ככלל, במרבית החקירה
5    לא היה הנאשם אזוק כלל. יחד עם זאת, היו מקרים בהם הנאשם התעצבן וסטר לעצמו. על רקע
6    זה נאזק כדי לא לפגוע בעצמו, ומיד לאחר שנרגע הוסרה האזיקה. הוא ציין כי במקרים בהם יצא
7    מחדר החקירות למספר דקות היה הנאשם אזוק לכסא, אולם מדובר באזיקים עם שרשרת ארוכה
8    המאפשרת תנועת ידיים חופשית כולל עישון. הוא הדגיש כי מעולם לא יצא לפרקי זמן של 4-7
9    שעות כפי שנטען בטיעוני הגנה, ובדרך כלל דובר במספר דקות ולכל היותר לחצי שעה. הוא
10   הוסיף כי הנאשם לא התלונן על כך בפניו. לשאלת בית המשפט ענה העד כי לנאשם לא היה שעון.
11
12   העד התבקש להתייחס לטענה כי נאמר לנאשם שביתו נהרס, עצים נעקרו ודבש תושמד. העד ענה
13   כי זו הפעם הראשונה שהוא שומע על כך שלנאשם היה דבש, לא נאמר לנאשם דבר הנוגע לביתו
14   והחקירה כלל לא הגיעה לנושא זה. העד הכחיש כי נאמר לנאשם שאם יודה יוכל להשתחרר לעזור
15   למשפחתו או כי יוכל להשתחרר בשל גילו ומצבו הרפואי.
16
17   העד אישר כי במהלך החקירה הוטחו בנאשם האשמות על בסיס החשדות שהיו בידי החוקרים,
18   והיו מקרים בהם נאמר לו שהוא משקר, אולם לא הייתה כוונה להשפילו. לדבריו, החקירה נוהלה
19   בהרבה כבוד הדדי ובמספר פעמים בחקירה אף ציין הנאשם לחיוב את היחס שקיבל מהעד. העד
20   עמד על כך שלא נעשה שימוש באיומים או בכוח, כי החקירה התנהלה בשיג ושיח ארוך, וכי הוא
21   זוכר את האווירה בחקירה זו כיוצאת דופן לטובה ביחס לחקירות אחרות שניהל. הנאשם שיתף
22   פעולה בחלקים נרחבים של החקירה, והיו ימים בהם די היה לומר לנאשם כותרת של נושא
23   והנאשם מסר גרסה מפורטת בעניין.
24
25   בחקירתו הנגדית מסר העד כי נודע לו על מעצרו של הנאשם מכלי התקשורת כשעה לפני שפגש
26   אותו במהלך החקירה. עוד ציין העד כי את חקירתו הראשונה של הנאשם ניהל החוקר המכונה
27   "האדיי", ואילו הוא לא היה מודע לה באותו זמן, אלא רק בדיעבד.
28
29   העד מסר כי גודלו של התא בו שחה הנאשם הוא סטנדרטי, יש בו חלון אולם זה סגור והאוורור
30   מותבסס על מערכת מיזוג מיזוג מרכזית.
31
32   העד נשאל מדוע הנאשם נחקר ברצף ביום 15.3.06 החל משעה 10:55 ועד לאחר חצות, וזאת
33   כאשר הנאשם כבר נחקר לפנות בוקר משעה 02:40 ועד 05:45. העד ענה כי דובר בתחילת
34   החקירה, הנאשם ביקש לפרט את פעולותיו באופן כרונולוגי וזה לקח זמן. הנאשם לא הביע רצון
35   להפסיק את החקירה או ללכת לישון, ובמהלכה הוא אכל, שתה ועישן להנאתו.
36
37   העד התבקש להתייחס לאמירות המופיעות בזכ"דים שערך החוקר המכונה "ג'יני", כמו "אתה
38   מתנהג כמו ילד קטן, יושב ומשקר במצח נחושה" והאם הן שומרות על כבודו של הנחקר. העד
39   ענה כי בכל חקירה יש נקודות של עימות ואי הסכמה, ועדיין כבודו של הנחקר נשמר.

-8-

תיק מסי: 3052/06                                      תאריך: 29/07/09

העד ציין כי הנאשם לא היה מנוע מפגש עם עו"ד, אך כל נושא הקשר עם עו"ד הוא באחריות
המשטרה. למיטב ידיעתו הוא הודיעה לעו"ד על מעצרו של הנאשם, אולם הוא לא בדק זאת.

הסניגור הפנה את העד לזכ"ד מיום 19.3.06 בשעה 16:35, בו אמר הנאשם שמלבישים לו האשמות
ועדיין שיביאו חרב ויקטעו את ראשו, ושאל האם זה מצביע על אדם שקט ושלו. העד השיב כי
הוא לא חתרשם שהנאשם הוא אדם שקט ושלו, אלא אדם שנוטה להתפרצויות חימה. הוא
הוסיף כי התנהגות זו ודומות לח של הנאשם אפיינו אותו לעיתים, למרות שרוב החקירה נוהלה
באווירה חיובית מאוד עם הרבה כבוד הדדי.

העד התבקש להסביר מהי "שיחת שכנוע" ומסר כי זו שיחה במהלכה מוצע לנחקר להגיע להבנה,
להודות במיוחס לו ומוסבר לו אופי חמידע שברשות החוקרים. אופי השיחה תלוי בנחקר ובאופיו.
במקרה של הנאשם, עיקר השיחה עסק ברומו של עולם ובנושאים כלליים, כיוון שהנאשם הינו
אדם שחסתובב בהרבה מאוד מקומות, אך בסוף השיחה תמיד חוזרת לנושא החקירה. העד לא
זכר בדיוק מה נאמר באותה שיחה שלא הניבה פירות חקירתיים, אולם ציין שבין היתר נאמר
שעדיף לנאשם להודות.

העד נשאל האם אמירה לנאשם ש"יגיע להבנה עם חוקריו" פירושה הסכם שהנאשם יודה ואחר
כך ילך הביתה כי הוא זקן. העד ציין כי לא נאמר לנאשם שילך הביתה או כי הוא זקן. העד אמר
שלא קרה דבר כשהנאשם לא הודה, אולם הודאה היא לטובתו שכן כך תסתיים החקירה.

העד נשאל האם לא הופעל לחץ גדול על הנאשם באופן שגרם לו לרצות לפגוע בעצמו, כפי שמופיע
בזכ"ד מיום 21.3.06. העד אמר כי דובר בהתקף זעם של הנאשם בתחילת החקירה, ולאחר מכן
הוא נרגע וחזר לשיחה ניווחה, ארוכה ומפורטת.

העד הכחיש שהבטיח לנאשם שאם יימצא דובר אמת בפוליגרף לא ימשיכו לשאול אותו על אותם
דברים בהם יצא דובר אמת. נכון הוא שלאחר הבדיקה התמקדו בנושאים אחרים, אך מניעה
לחזור לאותם נושאים. לדבריו, חסיכום וחתבנה עם הנאשם היו רק למקרה בו יצא דובר שקר.

העד הכחיש כי אמר לנאשם שאם יסיים את החקירה יעבור לבית הסוהר, שם התנאים טובים
יותר ולכן עדיף לו לסיים את החקירה. כשהוכמנה לזכ"ד מיום 9.4.06 שעה 13:30 סעיף 8 בו נכתב
שהנאשם נשאל אם אינו רוצה לסיים את חקירתו ולעבור לכלא, שם יוכה לביקורי משפחתו, ענה
העד כי השאלה שהוצגה לנאשם הייתה בעיקר דרך לומר לו לגמור את החקירה. העד הוסיף כי
החקירה לא התמקדה רק בנושא הספינה "קארין A" אלא גם בנושא מקורותיו הכספיים וקשריו
לבנוים פתי"ח. ה"הבנה" בה מדובר היא שהנאשם ימסור מידע, לאו דוקא זה המוביל להפללתו.

-9-

תאריך: 29/07/09                                           תיק מס': 3052/06

עדותו של המכונה "האדי"                                              1
                                                                     2
עד זה הוא חוקר השב"כ שחקר את הנאשם ביום בו הגיע למתקן החקירה, ופעם נוספת בשלב      3
מאוחר יותר.                                                         4
                                                                     5
העד מסר שהנאשם נשאל לשלומו וענה כי הוא חש בטוב אם כי אמר לו שהוא סובל מסרטן.       6
הנאשם לא התלונן על כאבים, ואם היה עושה זאת הוא היה מזמין רופא או חובש. העד אמר כי      7
לא נמסרו לידיו תרופות מערוך דינו של הנאשם, וכלל לא זכור לו שהנאשם ביקש תרופות. העד      8
נשאל לגבי שעת החקירה הראשונה, 40:02 וענה כי נדרש לחתחיל בחקירה על ידי ראש הצוות וכך      9
עשה. עד ציין כי למיטב זכרונו לא חקר את הנאשם כשזה אזוק, וגם אם היה עם אוזקים,      10
ולהערכתו לא היה, לא דובר באזיקי רגליים. העד הכחיש כי הוא השאיר את הנאשם פרקי זמן של      11
4-7 שעות בחדר החקירות לבדו כשהוא אזוק. העד אף הכחיש שאמר או כי הכיר אמירה לנאשם      12
שביתו נהרס, עצים נעקרו והושמד דבש. הוא הכחיש כי הבטיח לנאשם כי ישוחרר אם יודה.      13
                                                                    14
העד אישר כי נאמר לנאשם שהוא שחוא משקר, וטען כי המדובר בטענה לגיטימית מצדו של חוקר. הוא      15
מסר כי לא היה שימוש באיומים או בכוח בחקירה, ואם הנאשם פחד זה עניין סובייקטיבי אך      16
הוא לא הפחיד אותו בכוונה.                                           17
                                                                    18
בחקירתו הנגדית מסר העד כי הוא ידע מיהו הנאשם וידע שהוא פעיל ותיק מאוד בפת"ח, והיה      19
אחראי על מנגנון הרכש והכספים בארגון זה.                             20
                                                                    21
העד ציין כי מסר לנאשם דף המפרט בשפה הערבית את זכויותיו כעצור וכנחקר, אך הוא לא      22
הקריא לו אותו בעצמו. הוא אישר כי המשפט הראשון שרשם בזכ"יד היה המשפט הראשון שאמר      23
לו הנאשם, והוא כי "ינאמס לנאשם מהסיפור של קארין A".                 24
                                                                    25
העד התבקש לתאר את התרשמותו ממצבו של הנאשם בחקירה הראשונה שהתנהלה לפנות בוקר,      26
ואמר כי הוא זכר שנכנס איש מבוגר, עייף יחסית, בהתאם לשעה בה הגיע. הם שוחחו כרגיל, והוא      27
זכר כי הנאשם היה מעושן כבד, קיבל הרבה סיגריות, וכי חשיחחה התנהלה באווירה חיובית. הוא      28
לא זכר אם הנאשם היה נסער או מדוכא, ולא זכר דבר חריג אחר. לדבריו, למיטב הבנתו, האמירה      29
של הנאשם ש"ינמאס לו" מתייישבת עם העובדה שהיה במעצר הנגתי או מניעתי בעקבות פרשת      30
קארין A.                                                           31
                                                                    32
העד עמד על כך שתפקידו להגיע לחגיע לחקר האמת, ואם הנאשם היה מוסר תזה הגיונית שהיתה      33
מתייישבת עם המידע חמודיעיני, הוא היה מקבל אותה.                      34
                                                                    35
העד חזר ואמר כי הוא לא זוכר אם הנאשם היה אזוק בחקירות שערך, אבל אם היה שימוש      36
באזיקים הרי זה רק אם העד הרגיש מאויים. הוא הוסיף כי הוא לא זוכר דבר כזה, ואם הנאשם      37
היה צועק או משתולל הוא היה רושם זאת.                                38
                                                                    39

-10-

1   העד חזר והדגיש כי מסר את דף הזכויות והחובות לנאשם, ושם רשומות זכויותיו. הוא עצמו לא
2   אמר לנאשם כי זכותו לשמור על זכות השתיקה או להיות מיוצג בידי עו״ד.
3

4   העד עמד על כך שאם הנאשם היה מתלונן בפניו על שלא נותנים לו להכניס למתקן המעצר את
5   תרופותיו, או כי הוא מרגיש רע ואינו מקבל עזרה מרופא הכלא, הוא היה רושם זאת. עם זאת,
6   ציין כי ידע שהנאשם הוא אדם חולה. הוא אישית לא קיבל כל פנייה על הכנסת תרופות.
7

8   העד חזר והדגיש כי חקר האמת הוא ״קדוש״ והוא המטרה, ולכן כאשר הנאשם אמר לו שהוא
9   מוכן ״להעיד בכל דבר״, הסביר לו כי אין מקום לדיבורים אלה ועליו לספר בעצמו מבלי לחוסיף
10  או לגרוע. הוא התרשם שהנאשם לא מוכן להעיד בכל דבר, וידע לעמוד על שלו בחקירה. העד
11  אמר כי חקירת הנאשם נמשכה מאחר שהיו נושאים שדרשו ליבון והבהרה, והיו ידיעות אחרות
12  שהוא בחר להכחיש או לא להסביר אותן.
13

14  **עדותו של המכונה ״ג׳וני״**
15

16  עד זה היה חוקר שב״כ שנטל חלק בחקירתו של הנאשם, וציין בפתח דבריו כי מאחר שחלפו
17  שנתיים ממועד החקירה, חלק ממנה הוא לא זכר.
18

19  העד עומת עם טיעוני הזוטא, ומסר כי הנאשם קיבל טיפול רפואי ממרפאת הכלא. הוא זכר
20  שבאחד הזכ״דים מסר הנאשם שיש לו פוליפים בקיבה, ותוך זמן קצר הוצא לבדיקה ולטיפול
21  רפואי. העד מסר כי כחוקר הוא אינו הסמכות בנוגע להעברת תרופות לנאשם, וכי ההחלטות
22  בנושא זה הן הן של רופא הכלא. עוד ציין כי לא זכר לו מקרה בו הנאשם הסב את תשומת ליבו לכך
23  שהוא זקוק לטיפול תרופתי.
24

25  העד הכחיש כי הנאשם היה אזוק ברגליו בחקירות בהן נכח, והוסיף כי הנאשם נאזק בידיו לאחר
26  שחבט בעצמו ולאחר שהוזהר כי אם ימשיך לחבוט בעצמו ייאזק, על מנת שלא יוכל לפגוע בעצמו.
27

28  העד טען כי לא היה מקרה בו הושאר הנאשם אזוק לבדו בחדר למשך 7-4 שעות, וטען כי לא אמר
29  לנאשם שכוחות צה״ל חרסו את ביתו והשמידו עצים ודבש. העד הוסיף כי אף לא נאמר על ידו
30  לנאשם שאם יודה הוא יצא לחופשי לאור גילו.
31

32  העד ציין כי לא פעם אמר לנאשם שהוא מסתיר מידע ומסרב לתיתו לחוקריו, אולם לא השתמש
33  באלימות, איומים או ניסיונות הפחדה.
34

35  בחקירתו הנגדית נשאל העד ביחס למשמעות האמירה לנאשם כי ״הובא לחקירה על מנת להודות
36  בכבוד״. העד מסר כי להודות באמת זה כבוד, ומטרתו כחוקר היא שהנחקר יודה הודאת אמת.
37

38  העד ציין כי נושא החקירה היה מעורבותו של הנאשם בנושא הספינה קארין A, קשריו למימון
39  והברחת אמל״ח, וקשריו לאיראנים ולאחרים ממדינות ערב, שמטרתם ביצוע פח״ע נגד ישראל.

תאריך : 29/07/09

תיק מסי : 3052/06

1   העד מסר כי רשם בזכ"ד שהנאשם "התנהג כילד קטן", שכן חרף גילו המבוגר התנהג לפעמים
2   בחקירה בצורה ילדותית. כשהתבקש להסביר למה הכוונה ענה, שהתנהגות ילדותית היא כשאדם
3   נחקר על מידע ומוסר גרס't כיסוי הפוטרת אותו מאחריות, אף שהוא יודע שחוקריו יודעים על מה
4   הם מדברים איתו.
5
6   העד ציין שנאמר לנאשם כי אל לו "להתנהג כמו פרחח", ובמילה "פרחח" כוונתו הייתה לאדם
7   שצועק, משקר, חסר כבוד שעושה הכול כדי להציל את עורו.
8
9   העד ציין כי כבל הנראה ידע באותה עת על כך שהנאשם נחקר לפנות בוקר על ידי החוקר המכונה
10  'האדי, אולם לא מצא כל מניעה מלחקור את הנאשם עד השעה 18:00.
11
12  העד נשאל על דבריו מחקירה שתועדה בזכ"ד מיום 20.3.06, בה נרשם שאמר לנאשם שאין זה
13  מקרה שממעצרו הוארך ב-18 ימים לאור המידע הרב שהוא מסתיר מחוקריו. נטען בפניו כי בכך
14  הוא אמר לנאשם למעשה, כי ככל שיסתיר מידע מעצרו יתמשך. העד חשיב על כך שניתן להבין
15  שבית המשפט החליט להאריך את המעצר בהסתמך על המידע שהיה בפניו. העד נשאל על
16  התבטאותו נוספת שלו כלפי הנחקר שתועדה בזכ"ד מיום 27.3.06. שם נרשם כי אמר לנאשם
17  ש"בסופו של דבר יודה". נטען בפני העד כי הגיון אומר שמשמעות הינה שעד שהנאשם לא יודה
18  – החקירה לא תסתיים. העד חשיב כי זה לא מה שנכתב, ובסופו של דבר הנאשם אכן העביר הרבה
19  מידע.
20
21  העד נשאל על המקרים בהם הנאשם היכה את עצמו ואמר כי הוא זוכר שהנאשם היכה את עצמו
22  מספר פעמים בכפות ידיו, ומספר פעמים הצליחה להרגיע אותו על ידי בקשות שיפסיק זאת. עוד
23  ציין העד כי לדעתו זו התנהגות ילדותית. העד נשאל אם אין התנהגות זו מעידה על ייאושו של
24  הנאשם, והשיב כי להערכתו זו הייתה הצגה, שכן עובדה שלאחר מכן הנאשם מסר עוד הרבה
25  מידע.
26
27  עדויות עדי התביעה במשפט הזוטא – סיכום ביניים
28
29  ניתן לחלק את העדויות שנשמעו לעדויות אנשי המשטרה ולעדויות אנשי השב"כ. אנשי המשטרה
30  מסרו כי החקירה נוהלה בניחותא, ללא בעיה כלשהי, וכי הנאשם מסר דברים מרצונו הטוב
31  והחופשי. עוד נמסר כי הנאשם כובד במהלך החקירות במזון ובמשקה, לא הושאר לבדו, ולא
32  הושמעו כלפיו איומים כלשהם, או הבטחות בהקשר לחקירתו.
33
34  עדי השב"כ ציינו כי הנאשם קיבל יחס של כבוד בהתאם למעמדו. הם לא הכחישו כי היו בחקירתו
35  מקרים של "עימות" במסגרת הטיחו בפניו כי הוא משקר וכי הוא מסתיר מידע, אולם טענו כי
36  הדבר הינו טבעי כחלק מכלל מחקירה. החוקרים הכחישו כי הנאשם הושאר פרק זמן ארוכים לבדו
37  בחדר החקירות. לדבריהם, אמנם היו מספר מקרים בהם הושאר הנחקר הנחקר לבדו, אולם דובר בפרקי
38  זמן קצרים, במהלכם היה אזוק בידיו באזיקים עם שרשרת ארוכה. עוד צויין כי הנאשם לא היה

-12-

1    אזוק במהלך חקירות, למעט במקרים בהם סתר לעצמו וניסה לפגוע בעצמו. גם במקרים אלה,
2    לאחר שהנאשם נרגע, הוסרו האזיקים.
3

4    גם חוקרי השב"כ הכחישו כי השמיעו כלפי הנאשם איומים, או כי מסרו לו שביתו נחרס וכיו"ב,
5    או כי הובטחו לו הבטחות שאם יודה ישוחרר מפאת גילו.
6

7    בכל הנוגע למצבו הרפואי, ציינו חוקרי השב"כ כי חטיפתו בנאשם היה על ידי מרפאת הכלא,
8    ולאור גילו אף דאגו לכך שיקבל טיפול בהתאם לשיקול דעת של גורמי הרפואה, עליהם אינם
9    אחראים.
10

11                            עדות הנאשם במשפט הזוטא – החקירה הראשית
12

13    הנאשם פתח וציין כי הוא סובל מיתר לחץ דם, טחורים, אולקוס וכאבי גב.
14

15    הנאשם תיאר כי היה בכלא יריחו תחת פיקוח אמריקאי ובריטי, וכיצד ביום 14.3.06 בשמונה
16    בבוקר החל מצור של צה"ל על המוקטעה ביריחו, עד אשר הגיע דחפור והרס את המבנה. הוא
17    ואחרים נלקחו למת"ק יריחו ובשעות הערב הועבר למגרש הרוסים. הנאשם ציין כי היה לו קר
18    כיוון שהיה לבוש בפנימה בלבד. ממגרש הרוסים הועבר לאשקלון, וכל אותו זמן היה נתון
19    באזיקים.                                    ‑
20

21    חקירתו בשב"כ החלה באותו הלילה ונאמר לו כי הוא חייב להודות בכל דבר. הנאשם ציין כי אמר
22    לחוקרי שאין נגדו דבר, והוא אדם שמבצע את עבודתו וממלא הוראות.
23

24    לטענתו, היה אזוק במהלך החקירה בידיו וברגליו, וציין כי ידיו היו מלפנים. הנאשם אמר כי לא
25    קיבל את התרופות שהוא נוטל דרך קבע, ואף שביקש לראות רופא נאמר לו כי יראה אותו רק
26    למחרת. הנאשם טען כי נלקח לרופא רק לאחר שהתחנן פעמים רבות שיועבר לבדיקה. לאחר
27    בדיקת הרופא ניתנה לו תרופה רק נגד לחץ דם, אולם לא טיפלו בבעיותיו האחרות.
28

29    הנאשם ציין כי הוחזק בתא שגודלו מטר וחצי על שני מטר, והוא היה נרדם מחר מרוב עייפות,
30    אולם עקב הכאבים ממח סבל מתעורר הרבה.
31                                ‑

32    הנאשם אמר כי אינו זוכר רבות מחקירתו. הוא זכר שחוקריו רצו שהוא יודה שהוא קנה את
33    קארין A, אולם אין לו קשר לכך. לטענתו, חוקריו דיברו אליו בחוצפה, פעמים התייחסו אליו
34    בצורה אלימה ופעמים בצורה רגועה.
35

36    הנאשם טען כי חוקריו אמרו לו שהם מעוניינים בהודאה מפורשת ומפורטת על כך שהוא יודע על
37    הפרשייה של קארין A, ושאם יודה – יוכל ללכת הביתה. הנאשם טען כי אמר לחוקריו שהוא מוכן
38    להודות אך לא לשקר.
39

-13-

1 הנאשם מסר כי ערך דינו אמר לו שהרסו את ביתו, ונרפו עצים וכוורות. לדבריו, החוקרים אמרו
2 לו שהם שמעו על כך, והעניין השפיע עליו באופן שלילי.
3
4 הנאשם נשאל על ביקוריו אצל רופא הכלא, ואמר כי גם כשהיה מתלונן היה מקבל רק אקמול.
5 כשנאמר לו שלאחר שהתלונן בחקירתו על בעיות עיכול קיבל תרופה בשם "גסטרו" ענה כי אינו
6 זוכר זאת. במקרה אחר זכר הנאשם שקיבל פרפין לבעיית העצירות שלו, אולם טען כי זה היה
7 חד פעמי. לדבריו, אף שקיבל תרופות ללחץ דם, הרגיש כי זה לא עזר לו. הנאשם נשאל אם סיפר
8 לרופא על המחלות הכרוניות שלו, ואמר כי סיפר הכל וגם כי יש לו אסטמה, כי הוא מתקשה
9 לנשום בצורה טובה וכי הוא סובל מפעימות לב מואצות.
10
11 עוד ציין כי השוטר שגבה את אמרתו ישב עם דוי"ח השבוי"כ ושאל אותו לגביו, אולם הוא אינו יודע
12 מה כתב השוטר, שכן החקירה התנהלה בערבית והדברים נרשמו בערבית.
13
14 הנאשם נשאל אם האמין שישוחרר אם ימסור את מה שחוקריו רצו לשמוע ועה שכן. לדבריו,
15 חוקריו סיפרו לו על נחקר אחר שהיה צפוי לקבל 4 מאסרי עולם, אולם מוחמד דחלאן התערב
16 בעניינו והם שחררו אותו.
17
18 הנאשם מסר כי לא ביקש מחוקרים שיתקשרו לעו"ד, ומשפחתו היא זו שהתקשרה לעו"ד עבורו.
19 הנאשם הוסיף כי ביקש מחוקריו לראות עו"ד ותשובתם היתה יבוא עו"ד וישאל עליו הם
20 יתנו לו לראות אותו.
21

22 **עדות הנאשם במשפט הזוטא – החקירה הנגדית**
23

24 הנאשם מסר כי הרגיש מושפל בחקירתו. עוד מסר כי אמר לחוקריו את כל מה שהם רצו לשמוע.
25 לאחר מכן נשאל הנאשם באיזה שלב של החקירה "נשבר". הנאשם לא השיב על כך ישירות ותחת
26 זאת טען כי מהתחלה אמר לחוקריו שמה שיש לו לומר הוא יספר, ואת מה שהוא ידע הוא אכן
27 סיפר. כשנשאל אם הדברים שמסר ביום הראשון לחקירתו נאמרו לאחר לחץ, ענה כי סיפר את
28 הדברים כי זה מה שקרה וכיון שלא דובר בעניין סודי. עוד טען כי בחקירתו לא שיקר בשום שלב,
29 וסיפר את מה שהוא ידע, אולם מה שאינו יודע מה נרשם בערבית.
30

31 לטענתו, חוקריו השפילו אותו, אמרו לו שהוא שקרן ודיברו אליו בצורה "מלוכלכת". עוד טען כי
32 היו עוזבים אותו בחדר ריק לבד כשהוא אזוק, וחוזרים רק כעבור כמה שעות.
33

34 הנאשם אמר כי בחקירתו פעל לפי הוראות החוקרים ובודאי לא הכתיב דרישות או את תנאי
35 החקירה. כשנשאל כיצד מצא את הכוח לומר לחוקריו כי "מדינת ישראל חייבת לו כסף", לא
36 השיב תשובה ישירה. הנאשם אישר כי עישן בחקירתו ואמר כי לקח סיגריות מחוקריו בהתאם
37 לבקשתו. הנאשם נשאל עוד מה קיבל והשיב "כלום". כשנשאל באופן ספציפי, אם קיבל קורואן,
38 קפה, תה ולבנים, ענה שקיבל. לדבריו הוא לא ביקש זאת אלא חוקריו הביאו לו.
39

1   הנאשם חזר על כך שהיה נתון בלחץ כבר מתחום הראשון, אולם הדגיש כי בחקירתו מסר רק את
2   האמת. עוד ציין כי הכחיש כל קשר לספינת קארין A וכי התעקש על כך.
3
4   לשאלות בית המשפט ענה כי הדברים הרשומים באמרותיו נורגמו לו, אולם הוא לא ידע מה
5   נרשם בפועל. עוד ציין הנאשם כי היה מתעצבן לעיתים בחקירתו ("מרוב הדיבורים הבן אדם
6   משתגעי") אולם עצבני התבטאו בכך שהוא "התפוצץ מבפנים" ולא הראה זאת לחוקריו.
7
8   **עדותו של מוחמד חיג'אזי**
9
10  עד זה מסר כי היה הנאשם באותו תא בכלא אשקלון באפריל 2006, למשך כשבועיים. הוא
11  מסר כי הנאשם היה חולה וחלש והיה קשה לו לנשום, ללכת או לעמוד על רגליו. הוא טען כי
12  פעמים רבות הוא וחבריו לתא דפקו על דלת התא וביקשו רופא עבור הנאשם, כי "הוא הולך
13  למות" והסוהרים נתנו לנאשם "מקסימום אקמולי". הוא ציין כי מעולם לא הגיע רופא לתא.
14
15  בחקירתו הנגדית ציין העד כי היה כי היה הנאשם בתא החל מ-12/04/06 למיטב זכרונו. הוא טען כי
16  בתקופה של חשבועיים שהיה יחד עם הנאשם בתא יצא זה רק לשירותים ולמקלחת, ולאחר מכן
17  הוסיף כי יצא גם לחקירות. כשנשאל לתגובתו לכך שישנם מסמכים רבים של חובשים ורופאים כי
18  ראו את הנאשם באותה תקופה, ענה כי בתקופה שהיו ביחד זה לא קרה. עוד הוסיף כי כל פעם
19  שהנאשם חזר מחקירות הוא סיפר להם (לחבריו לתא) על כך. העד התבקש לומר שמות אנשים
20  נוספים איתם ישב באותה תקופה וענה כי יש אנשים שהוא זוכר את שמותיהם, אך לא נקב בשם
21  כלשהו.
22
23  העד ציין כי הנאשם אמר לו שהחקירה גורמת לו ללחץ נפשי, שהוא כל הזמן היה כפות לכיסא
24  ושהוא קיבל יחס רע. עוד אמר לו הנאשם שהוא סובל מסרטן והוא צריך תרפות. העד אמר כי
25  הנאשם לא סיפר על הדברים שקיבל מחוקריו, כגון פירות, סיגריות ותחתונים.
26
27  **הכרעה במשפט הזוטא**
28
29  ניתן לומר שטיעוני הזוטא מעלים טיעונים בתחום ה"השפלה", נקיטה בשיטות חקירה בלתי הוגנת
30  על ידי יצירת לחץ נפשי בלתי הוגן כמו גם פיתוי והשאה. ההכרעה במקרה זה הינה הכרעה
31  עובדתית, הנובעת מהתרשמותנו חבלתי אמצעית מהדברים שנאמרו בפנינו.
32
33

תיק מס׳: 3052/06                                              תאריך: 29/07/09

הערכת העדויות במשפט הזוטא – מהימנות ומשקל                                    1

2

מהימנות עדי התביעה                                                          3

4

לא מצאנו כי עדי התביעה היו חסרי אמינות, כפי שביקשה לטעון ההגנה. אכן, אין ספק כי הנאשם      5
היה נתון בחקירה במהלכה ביקשו החוקרים לקבל מידע רב ככל האפשר מהנאשם בנוגע לפעילותו          6
במימון הטרור הפלסטיני.                                                      7

8

ככל חקירה, היא לא התנהלה בתנאים נוחים ונעימים. הנאשם היה כלוא במתקן חקירות, ונחקר          9
תקופה ממושכת. יחד עם זאת, ישנו פער בין חוסר הנוחות האינהרנטי לקיומה של חקירה, לבין           10
נקיטת אמצעים שיכולים לשלול את רצונו החופשי ואת יכולתו לבחור אם למסור מידע מפליל על          11
עצמו.                                                                      12

13

כעולה מהכתוב באמרות, ועל כך לא חלק הנאשם בעדותו, במהלך חקירתו במשטרה הוא קיבל              14
סיגריות לעשיית כאוות נפשו, וכובד בשתייה ובמזון במהלך החקירות. כך למשל, באמרה מיום          15
19.3.06 גליון 5 ש׳ 132 נרשם ״בשלב זה החשוד מבקש להתפלל והודאת החשוד מופסקת לעניין          16
זה״, וכן נרשם בגליון 6 ש׳ 164 במהלך חודאתו כובד החשוד בשתייה חמה, שתייה קרה ועוגיות״.        17
באמרה מיום 20.3.06 עמ׳ 1 ש׳ 18 נכתב ״החשוד מקבל סיגריות ומעשן״ ובהמשך (עמ׳ 2 ש׳ 19)         18
נרשם כי ״החשוד מקבל מים לבקשתו כדי לבלוע כדור״. באמרה מיום 22.3.06 גליון 5 ש׳ 118          19
נרשם כי כובד בשתייה חמה, שתייה קרה וסיגריות, ובאמרה מיום 30.3.06 גליון 6 ש׳ 144 נרשם       20
דבר דומה. גם באמרות שנגבו ביום 2.4.06 (ת/9 ות/10) נרשם כי קיבל כיבוד. קשה לתאר מצב בו         21
חקירה מתנהלת באופן דורסני ואכזרי, כטענת ההגנה, ואגב כך ניתנת לנאשם האפשרות להתפלל,            22
לעשן כרצונו, לאכול ולשתות, וכמובן ליטול תרופות.                             23

24

יש לומר כי כיבוד זה כגון אוכל שתייה וסיגריות ניתן לנאשם גם במהלך חקירותיו בשב״כ. כבר          25
בחקירתו הראשונה (זכ״ד מיום 15.3.06 שעה 02:40) כובד בקפה, ובחקירה שלאחר מכן (זכ״ד          26
מיום 15.3.06 שעה 10:55) כובד בארוחת צהריים, סיגריות וקפה. ניתן לראות כי יחס זה נמשך        27
לאורך כל חקירותיו, וכמפ)ת בכל זכ״ד מופיע כי הנאשם קיבל אוכל, שתייה וסיגריות. אף ניתנו לו      28
קוראן (זכ״ד 16.3.06 שעה 10:00, זכ״ד מיום 21.3.06 שעה 12:00), האפשרות לצאת לשירותים          29
(זכ״ד מיום 20.3.06 שעה 11:40) והאפשרות להעלות בעיות הנוגעות לתנאי כליאתו בפני חוקריו         30
(זכ״ד מיום 3.4.06 שעה 11:00, סעיף 1). הנאשם לא חלק על קביעות אלה שבזכ״דים. יחס זה אינו      31
אופייני למי שמבקשים לרמוס את רצונו החופשי, לחשפילו ולפגוע בו.                  32

33

מעבר לנושא התקרבות שהוגשה לנאשם, מחזכ״דים מחקירת השב״כ א עולה כי דובר בנחקר                34
״שבורי״ ומושפל, שכן הנאשם התייחס פעמים רבות לנושאים שאינם קשורים לחקירה, כנושאים           35
פוליטיים ומדיניים כלליים (זכ״ד מיום 16.3.06 שעה 10:00 סעיפים 24-25, זכ״ד מיום 27.3.06        36
שעה 16:30 סעיף 1, זכ״ד מיום 11.4.06 שעה 10:00 סעיף 12), ואף אמר לחוקריו כי מדינת ישראל       37
חייבת לו 275 אלף דולר שלקחה מארון במוקטעה (זכ״ד מיום 19.3.09 שעה 16:35, סעיף 18).           38
התנהגות כזו אינה אופיינית למי שנשבר בחקירתו ומוכן לרצות את חוקריו ולומר כל דבר שהם          39

-16-

תאריך : 29/07/09                                          תיק מס׳ : 3052/06

רוצים רק על מנת שהחקירה תסתיים, אלא למי שמרגיש מספיק בטוח בעצמו כדי לומר את  אשר       1
על ליבו.                                                                                                        2

3

חשוב להדגיש כי עדי התביעה לא ניסו לייפות את תנאי החקירה. הם לא הכחישו כי היו תקופות       4
קצרות בהן הושאר לבדו בחדר, ואז נותר אזוק, אולם נטען כי דובר בפרקי זמן קצרים. הם אף לא       5
הכחישו כי הנאשם נאזק לאחר שסטר לעצמו והחל להשתולל )זכ״יד מיום 21.3.06 שעה 12:00       6
סעיפים 2-3(. החוקרים אף לא טענו כי הנאשם היה אדם נינוח ושליו, אלא אמרו כי הנאשם הינו       7
אדם מהיר חימה, ואת זעמו היה מפנה כלפי עצמו, ולכן נדרש לאזקו לעתים. הם גם לא הכחישו       8
כי מדי פעם פנו לנאשם במילים שלא נעמו לאוזנו – כגון אמירה שהנאשם שיקר, מתנהג       9
בילדותיות או כפרחח – אך לא הוכח כי נקטו השפלה כשיטת חקירה.                                      10

11

תיאור זה של החוקרים נראה לנו אמין. לא מצאנו כי יש בו פירכות או סתירות, והוא תואם את       12
הדברים הרשומים בזכ״דים, ובמידה מסוימת את עדותו של הנאשם בבית המשפט. ודוק: ישנו       13
פער משמעותי בין עדות הנאשם בבית המשפט, לבין טיעוני הזוטא שהעלתה ההגנה בתחילה –       14
טיעונים שנזנחו בשלב הסיכומים לאור עדות הנאשם. כבר עתה ניתן לומר שהרושם העולה       15
מעדותו של הנאשם לא תאם את טיעוני הזוטא שמסר.                                                       16

17

### אמינות עדותו של מוחמד חיג׳אזי

18

19

בטרם נדון במהימנותו של הנאשם נקדים ונאמר כי אמינותו של מוחמד חיג׳אזי בעניינו הייתה       20
נמוכה מאוד. תמוה בעינינו כיצד העד זכר "היטיב" את כל שקרה לנאשם, וכיצד "התחננו" לטיפול       21
רפואי עבורו שלא ניתן, אולם לא ידע לומר מי עוד היה כלוא איתו בתא בתקופה זו. דבריו אף       22
אינם מתיישבים עם תיקו הרפואי של הנאשם, ממנו עולה כי גם במהלך התקופה עליה העיד       23
מוחמד חיג׳אזי, טופל הנאשם מספר פעמים על ידי מרפאות הכלא. על פניו נראה היה כי עדותו של       24
מוחמד חיג׳אזי הינה עדות שכל מטרתה לסייע לנאשם במשפטו, וכך, לכל הפחות, הוקעו עד מאוד       25
מצבו הרפואי של הנאשם. עוד יש לומר כי מוחמד חיג׳אזי אמר שהנאשם התלונן בפניו על כך       26
שהוחזק כפות לכיסא – טענה שהנאשם עצמו לא חזר עליה. לפיכך, לא מצאנו לנכון לחעניק       27
לעדותו של מוחמד חיג׳אזי משקל כלשהו.                                                                    28

29

### מהימנות הנאשם – כללי

30

31

הנאשם טען, באופן חד משמעי, כי לא מסר בחקירתו דבר שאינו אמת. למרות ניסיונו של התובע       32
להבין באיזה שלב "נשבר" הנאשם והחל למסור לחוקריו דברים בהתאם לרצונם כביכול, עמד       33
הנאשם על כך כי מסר את כל הידוע לו בלא בעיה כלשהי. הנאשם הכחיש כי קשר עצמו לספינה       34
קארין A, בניגוד למופיע באמרות המשטרתיות.                                                              35

36

נראה כי הגם שהנאשם טען עם חש מושפל, לא היה בכך, בהתאם לטענתו, כדי להשפיע עליו לומר       37
דבר שלא היה ברצונו לומר. נדגיש כי הנאשם לא טען שגם את דברי האמת שמסר סירב למסור       38
לחוקריו, וזו הוצאה ממנו שלא באופן חופשי ומרצון. הנאשם טען לאורך עדותו בפניו כי מסר       39

-17-

1    דברי אמת, כי דברים אלה נמסרו מרצונו כיוון שלא התביישו בהם וכיוון שלא היה בהם משום סוד
2    כלשהו.

3

4    כאמור, הדבר היחיד שהנאשם לא היה מוכן לקבל היו הדברים הרשומים באמרותיו, ולטענתו
5    המדובר בדברים שלא נרשמו מפיו, ומכיוון שאינו יודע לקרוא עברית, לא יכול היה לדעת כי אלה
6    נכתבו. נראה כי הנאשם זנח את טיעון הזוטא לפני חוקרי המשטרה איימו עליו בי"תוהו ובוהו" אם
7    לא יחזור על הרשום בזכ"דים של חוקרי השב"כ, שכן לא הזכיר זאת בעדותו בפנינו כלל.

8

9    עוד נציין כי חרושה הבלתי אמצעי מעדות הנאשם היה של מי שהנגים בעוצמת ההשפלה שחש
10   ובטענות בנוגע ליחס שקיבל, בהתאם לקו חנטעו במשפט הזוטא. מכל מקום, גם אם סוביקטיבית
11   חש השפלה במצבו אליו נקלע, נדניים כי הוא לא היה מוכן לאשר ולומר כי מסר דבר שאינו נכון, או
12   כי נשבר בחקירתו. הרושם שלנו הוא כי הנאשם נקט קו "עצמאי" מקן ההגנה במשפט, ביחס
13   לדברים שהוא חשב שצריך להשמיע לבית המשפט. הנאשם רצה לומר שמסר רק דברים נכונים
14   ואמיתיים מרצונו, אך באותה עת לומר שסבל בחקירתו. הדברים אינם יכולים להתיישב עם
15   הטענה כי אמרותיו נגבו שלא מרצונו החופשי. ברור שסיטואציות של חקירת אינה נוחה ואינה
16   נעימה, ודאי לא לאדם מבוגר שהחזיק בעבר בעמדוה בכירה. עם זאת, לא התרשמנו כי הנאשם חש
17   בשלב כלשהו בחקירה מצוקה שמנעה ממנו לבוא בדרישות או שהובילה את שהובלה את לומר דברים שלא
18   מרצונו הטוב והחופשי.

19

20   **מהימנות הנאשם – הטיפול הרפואי**

21

22   טענותיו של הנאשם בנוגע לטיפול רפואי או העדרו אינן מתיישבות כלל עם המצוי בתיקו הרפואי.
23   כך, למשל, במסמך המתעד את בדיקתו לפני קליטתו במתקן הכליאה ביום 14.3.06 נכתב מפיו של
24   הנאשם כי "מציין שלשול כרוני, נוטל COLATAL לפי הצורך, שולל מחלות לב, סוכר, יל"ד או
25   בעיות אחרות". ביום 15.3.06 בשעה 14:19 נבדק שוב בכלא שקמה. גם במקרה זה, ואף שנבדק על
26   ידי רופא אחר, הרי בחלק בו נשאל על מחלות בעבר נרשם "שולל", וכן נרשם כי הוא משתמש
27   בתרופה אחת והיא COLATAL לקיבה. רישומים אלה אינם מתיישבים כלל עם דבריו כי הוא סבל
28   מבעיות רבות וכי מסר את הדברים לרופאי הכלא. ביום 15.3.06 בשעה 18:15 שוב הובא בפני
29   רופא, ושם נרשם כי הנאשם התלונן על עצירות וצרבת וניתנן לו טיפול תרופתי. עיניינו הראות, כי
30   ברגע בו התלונן הנאשם על בעיה כלשהי, לא רק שלא נמנעה ממנו גישה לרופא, אלא הוא נבדק על
31   ידי רופא ארבע שעות בלבד לאחר פעם הקודמת בה נבדק על ידי רופא. כמו כן ראה הנאשם רופא
32   ביום 19.3.06, וגם במקרה זה ניתנו לו תרופות. לא למותר לצייין כי התרופות אינן "אקמולי" כפי
33   שנטען, אלא תרופות אחרות (משלושה סוגים שונים).

34

35   הנאשם נבדק על ידי רופא וקיבל טיפול לבעיית העצירות גם בימים 20.3.06, ו-21.3.06. ביום
36   22.3.06 הובא הנאשם לבדיקה יזומה, היינו ביוזמת רשויות הכליאה ולא לבקשתו, ובעקבות
37   תלונותיו נקבע כי ייערך לו מעקב לחץ דם יומי ואף נרשמו לו תרופות. באותו יום בשעה 19:00
38   נרשם כי נבדק שוב על ידי רופא **"על פי בקשה של חוקר".**

39

-18-

סוד

1  לא רק שנרשמו לו תרופות שונות ומסוגים שונים, אלא גם טענתו כי קיבל רק פעם אחת שמן

2  פראפין אינה תואמת את הרישומים הרפואיים, מהם עולה כי קיבל פראפין במספר הזדמנויות,

3  בתאריכים 20.3.06, 21.3.06, 30.3.06, 1.4.06, 3.4.06, 4.4.06 ו-17.4.06.

4

תו

5  לפיכך, נראה כי טענותיו של הנאשם בכל חונגע להעדר טיפול רפואי - אין להן על מה לסמוך.

:ח

6  הנאשם קיבל תרופות שונות כנדרש בהתאם למצבו, ראה רופא פעמים רבות - אחת מהן אפילו

ם

7  ביוזמת חוקרו - וזכה לטיפול בהתאם לשיקול דעת רופאיו. נראה כי טענותיו בנוגע לטיפול

8  הרפואי נועדו לחעציים את טיעוני הזוטא, בלא שיש לחן בסיס כלשחו במציאות, וחדבר משליך על

9  חוסר אמינותו בפנינו.

10

11  מהימנות הנאשם -- שלב החקירה

12

13  מלבד הנשא הרפואי, עליו עמדנו לעיל, ניתן להצביע על ניסיונו של הנאשם לומר כי לא קיבל דבר

14  מחוקריו כדוגמא נוספת לחוסר האמינות של הנאשם- טענה שנועדה לחפריז בתיאור מצבו הקשה

15  בחקירה. מרצע שעומת עם הדברים שקיבל (ארוחות, זמן לתפילה, סיגריות, קפה, תה, קוראן,

16  תחתונים), ״פתאום נזכר״ ואישר כי אלה אכן ניתנו לו, אולם הוסיף כי ניתנו לו שלא לבקשתו.

17  בנוסף, הנאשם עצמו ציין כי כל מה שהיה בחקירתו גרם לו ״להתפוצץ מבפנים״, וחוא כלל לא

18  הראה זאת לחוקריו - בניגוד לדברים מפורשים שנכתבו בזכ״דים ועליהם העידו החוקרים, כי

19  הנאשם איבד את שלוותו מפעם לפעם, ועל כן נאלצו לאזוק אותו. אין זה הגיוני כי החוקרים

20  ימציאו וירשמו כי הנאשם סטר לעצמו וכי נאלצו לאזוק אותו בעקבות כך, אם הדבר לא התרחש.

21  טענת הנאשם כי הוא רק ״התפוצץ מפנים״ אינה מתיישבת עם רישומי החוקרים ועדויותיהם

22  בפנינו, והיא חלק מחקו בו נקטו על מנת להרא ות כי השפילו אותו מצד אחד, אולם הוא לא נכנע

23  לחוקריו מצד שני. אנו העדפנו את עדותם של החוקרים בעניין זה.

24

25  יש לומר כי הרושם מעדותו של הנאשם היה של אדם המודע היטב לדברים שנאמרו על ידו הן

26  בבית המשפט וחן בחקירתו בשב״כ ובמשטרה, אולם הוא דבק בגרסה שנעשה לו עוול. עוול זה,

27  לשיטתו, לא נגרם מהדברים שחוא אמר בחקירתו, אלא כתוצאה מהחשפלה שנעקטה כלפיו

28  כעומדת בפני עצמה, ולא ככוו שהשפיעה עליו בחקירה. עוד גורם ליעווד זה נובע מדברים שנרשמו

29  בעברית ללא אישור ושלא בהתאם לדברים שאמר. ודוק: הנאשם אישר בעדותו בפנינו כי

30  הדברים הרשומים לכאורה מפיו באמרותיו תורגמו לו, כפי שציינו חוקרי המשטרה, אולם טען כי

31  אינו יודע מה נכתב כיוון שאינו יודע עברית.

32

33  לא מצאנו להאמין לנאשם בנקודה זו. לא התרשמנו כי חוקרי השב״כ וחמשטרח רשמו דברים

34  אחרים מאלה שמסר לחם תנאשם, או כי סילפו את חדברים שנרשמו בעברית עת תרגמו לו אותם,

35  או כי הפעילו עליו לחץ שישלל את יכולתו לבחור את מחשבים דברים לחוקריו. נראה כי הנאשם ידע

36  היטב מדעו הוא נמצא בחקירה, ידע היטב מה מחפשים חוקריו, ובהתאם לכך התנהל בחקירתו.

37  הנאשם מודע לכך שמסר דברים בנוגע לפעילותו ביחס לקרין A – דברים שאינם מתיישבים עם

38  גרסתו הנוכחית כי אינו קשור לספינת הנשק.

39

תיק מס׳: 3052/06

תאריך: 29/07/09

1    יתר על כן, הדברים הרשומים בזכ״די החקירה מצביעים על כך שהנאשם מסר פרטים רבים, כפי
2    שהעיד בפנינו, כבר ביומו הראשון בחקירה. יחד עם זאת, הנאשם לא מסר מיד את כל הידוע לו,
3    שכן חקירתו חייתה ״חקירה מתפתחת״, ונוספו בה עם הזמן פרטים שונים בנוגע לפעילותו. כעולה
4    מהזכ״דים, בתחילה בשחוטחו בו טענות נתג להכחיש, אולם כשחציגו לו ראיות המפריכות את
5    הכחשתו החל לספר את הידוע לו. התנהלות כזו מלמדת דוקא על אדם המתנהל באופן מחושב,
6    ומוכן לספר דברים רק כאשר הוא ידע שממילא יש לחוקריו את המידע על כך, מבלי שהוא מנדב
7    מידע נוסף. אם חייתה יכולה לעלות טענה כאילו הפרטים הנוספים שמסר בעקבות הראיות
8    שהוצגו לו נמסרו בעקבות לחץ שהופעל בחקירה, אזל הנאשם עצמו סתר וחפריך טענה זו.
9
10    **מהימנות הנאשם – סיכום**
11
12    אל מול הרושם האמין של חוקרי המשטרה והשב״כ, אנו יכולים לומר כי עדותו של הנאשם לא
13    חייתה אמינה במיוחד. כאמור, על פי עדותו של הנאשם עצמו, ״השפלתאו״ ו״מצבו הרפואי״ לא
14    שינו דבר מיכולתו לומר את הדברים שרצה לומר, אז לגרום לו לומר דברים שלא רצה. לא היה
15    שלב בו הלחץ בחקירה הוביל אותו להודיית בדבר כלשהו בניגוד לרצונו, ולא היה שום שלב בו
16    ״נשבר״.
17
18    מכלל הראיות במשפט הזוטא שוכנענו כי אמרותיו בפני חוקרי המשטרה נגבו באופן ניתנה וללא כל
19    לחץ פסול. בניגוד למה שנטען בטיעוני הזוטא הוא לא ניסה להעמיד את חוקרי המשטרה על
20    טעויות שנפלו בזכ״דים, ואף אחד מהם לא אמר לו כי ״קרה ״תוהו ובוהו״ אם לא יודה. שוכנענו
21    כי חוקריו לא מסרו לו הבטחות כי אם יודה ישוחרר, לא אמרו לו דבר בכל הנוגע לחרס ביתו (דבר
22    אותו חלק מחחוקרים כלל לא ידעו עד מועד הדיון בפנינו) ולפיכך, אין לנו אלא לדחות את
23    טענותיו בדבר ״השפלתה״ כלשהי או פיתוי והבטחות כלשהו שגרמו לו לומר דברים שלא מרצונו
24    החופשי. הנאשם קיבל טיפול רפואי מלא וכנדרש, בניגוד לדבריו, ולא היה במצבו הרפואי כדי
25    לשנות את יכולתו לומר את דבריו באופן חופשי ומרצון.
26
27    <u>משפט הזוטא – הכרעה</u>
28
29    לאור מסקנותינו העובדתיות בכל הנוגע לאמינות עדי התביעה מחד גיסא, ולהעדר האמינות של
30    עדי ההגנה מאידך גיסא, אנו קובעים כי אמרותיו של הנאשם נגבו באופן חופשי ומרצון וחינן
31    קבילות במשפט זה.
32
33    <u>המשפט העיקרי</u>
34
35    **עדותו של מחמוד עביאת**
36
37    עד זה מסר כי היה חבר בחוליה צבאית עליה היה אחראי טאטף עביאת, ונשפט על עבירות רצח
38    אותו ביצע. העד מסר כי הוא וחבריו לחולייה היו חיילים, והם קיבלו משכורת חודשית בסוף כל
39    חודש. העד טען כי הוא לא ידע מי העביר להם את המשכורות. העד עומת עם זכ״ד מחקירותו

-20-

תאריך: 29/07/09

1   בשב״כ בו נרשם כי את המשכורות העביר פואד שובכי. העד טען כי אינו מכיר את פואד שובכי,
2   ומעולם לא שמע את השם הזה. העד טען כי מי שהעביר להם את המשכורות היה אדם בשם פואד
3   שומאלי, שהיה פקיד במשרד הכספים. בחקירתו הנגדית ציין כי מעולם לא ראה את הנאשם ולא
4   קיבל ממנו כסף, וכלל אינו יודע מי אחראי הכספים ברש״פ.

5

6   **אמרות הנאשם במשטרה**

7
8   הנאשם מסר שמונה אמרות משטרתיות, מלבד הזכ״דים הרבים שנגבו ממנו בשב״כ. לחלן נסקור
9   כרונולוגית את האמרות שנגבו ממנו ואת הדברים שמסר בהן – דברים התואמים ככלל את
10  הדברים שמסר בחקירתו בשב״כ.

11
12  **ת/5 – אמרת הנאשם מיום 19.3.09**: באמרה זו מסר הנאשם אודות פעילותו במסגרת הארגון
13  בשנת 2000 היתה פגישה לשחרור פלסטין (אש״ף) לפני שנת 2000. בהמשך האמרה מסר כי
14  במשרדי יאסר ערפאת בנוכחות ע/ראזק מג׳אידה, חאג׳ אסמעיל ג׳אבר, עיאזי ג׳באלי, סלים
15  בורדני, מחמד דחלאן, רשיד אבו שבאכ, אמין אל הינדי, מוסא ערפאת ומחמוד אבו מרזוק. יאסר
16  ערפאת אמר להם לקנות כל נשק שייכנס לעזה או לגדה וכל אחד מהבכירים הללו שהייתה לו
17  הצעה (לרכישת נשק – צ.ל.), היה מגיש אל הנאשם עם נייר עבודה, הנאשם היה מעבירו ליאסר
18  ערפאת, ולאחר שזה חתם היה הנאשם מאשר לאנשיו להעביר כסף לאותו בכיר. הנאשם מפרט
19  דוגמאות לכמויות וסוגי הנשק שניקנו וסכומי הכסף ששולמו תמורתם.

20
21  הנאשם הוסיף כי ביולי 2001, פתחי ראזם ועאדל מוגרבי הבריחו מלבנון מיכל עם פצצות אר.פי.ג׳י
22  ומטולים שהגיעו מחיזבאללה, באישורו של יאסר ערפאת, והכוח הימי לקח אותם. הוא שילם
23  לפתחי ראזם 50,000 דולר באישור ערפאת.

24
25  הנאשם הוסיף כי פגש בירדן את פתחי ראזם, שמסר לו כי נפגש עם פעילי חיזבאללה ועם איראני
26  וסיכם איתם כי הם יעבירו שלושה מיכלים עם נשק על גבי ספינה. הוא ביקש מהנאשם לדבר על
27  כן עם יאסר ערפאת, כדי שיינתן כסף. הנאשם מסר על כך לערפאת וזה נתן הוראה לחרבי צרצור
28  שיתן לכך כסף. הנאשם גם מסר כי פגש בתימן את תייסיר עינייה שסיפר לו שעאדל מוגרבי ביקש
29  שיכינו לו ולעומר עכאווי דרכון, וכי הוא (עאדל) בא לראות את הספינה קארין A שהגיעה לתימן
30  עם הנשק.

31
32  **ת/1 – אמרת הנאשם מיום 20.3.06**: באמרה זו מסר הנאשם כי פגש בשנת 2001 בירדן בפתחי
33  ראזם וזה מסר לו אודות מגעים עם האיראנים, לפיהם האחרונים מוכנים לשלם עבור ספינת נשק.
34  פתחי אמר לנאשם כי צריך שהוא (הנאשם) יפגוש בנצע האיראני בדובאי. הנאשם מסר כי חגיע
35  לדובאי ושם יחד עם עאדל מוגרבי פגש שני נציגים איראנים – אבו מחמד ואחמד סאלם.
36  האיראנים מסרו לנאשם ולעאדל כי הם מוכנים לממן אימונים של פלסטינים בלבנון ובאיראן וכי
37  הם מוכנים לעזור בכסף ובנשק. הנאשם הוסיף כי עאדל כתב דו״ח לערפאת והם אמרו לאיראנים
38  כי לאחר שתהייה תשובה מערפאת הם יודיעו על כך לאיראנים. לטענתו, כשערפאת ראה את

תאריך: 29/07/09                                                                תיק מס': 3052/06

1  הדו"ח הוא הגיב בכעס ואמר כי האיראנים שקרנים. עוד מסר הנאשם באמרה זו על מגעיו עם
2  העיראקים ועל הסכמתם להעניק במסגרת שני מיליון חביות נפט לפלסטינים.
3
4  ת/6 – אמרת הנאשם מיום 22.3.06: באמרה זו מסר הנאשם פרטים נוספים אודות הפגישה עם
5  האיראנים. הוא מסר כי מי שיצר קשר ראשוני עמם היה אבו חסן אל זינב. הנאשם הפגישו עם
6  פתחי ראזם והשניים יצאו לפגוש את האיראנים בדובאי. לאחר מפגש זה מסר פתחי ראזם לנאשם
7  כי האיראנים מבקשים לפגוש אותו. הנאשם יצא לדובאי כדי לפגוש את יאסר ערפאת ואמר לפתחי שלאחר מכן
8  יפגוש את האיראנים. הנאשם נשאל מדוע לא סיפר ליאסר ערפאת כי יצא לפגוש באיראנים, וענה
9  "כי יאסר ערפאת אהב שאני מביא לו תוצאות ולא דיבורים". הנאשם יצא לדובאי, ולאחר פגישתו
10 בנוגע למכוניות יצא לפגוש את האיראנים עם עבדל מוגרבי. מאחר שהיה עייף סוכם שייפגשו שוב
11 בערב. הנאשם אכן פגש שוב באיראנים בערב, שאל אותם אם הם רוצים לעבוד יחדיו בשיתוף
12 פעולה, והאיראנים מסרו שכן. עבדל דיבר עמם על נשואים צבאיים כעל הצורך באימונים
13 מתקדמים לגייסו רימונו יד ומטולים, וכי הם רוצים גם תחמושת ונשק. אחרי כן הם (ובכלל זה
14 הנאשם) שוחחו על כיצד מקומות מפעל לייצור תחמושת בשטחי הרש"פ, והנאשם אף אמר להם
15 כי צריך כסף, והם הסכימו גם לכך. האיראנים אף מסרו כי יעבירו נשק ותחמושת ממחסני
16 אמל"ח שיש להם בלבנון. אחד האיראנים ביקש כי ישלחו לו סיכום יומי של התקשורת
17 החישראלית. הם סיכמו להמשיך ולהיפגש והנאשם אמר כי הוא יבקש רשות מיאסר ערפאת לבוא
18 לפגישות. עבדל כתב את תוכן הפגישה וחוא והנאשם חתמו על כך. כשחזר לאזור מסר הנאשם את
19 המסמך ליאסר ערפאת, שאמר כי המדובר באנשים רמאים שרוצים לחרוג אותו.
20
21 הנאשם מסר כי בשנת 2002 שמע על תפיסת קארין A. הוא הבין כי שיאסר ערפאת רוצה שהוא "ייקח
22 את הנושא עליו" ולכן מסר בועדת החקירה כי יאסר ערפאת נתן את החוראות והוא היה איש
23 קשר בין פתחי ראזם ועבדל מוגרבי לערפאת. הנאשם הוסיף כי שמע מפתחי על התבכנל להביא את
24 הספינה עוד באוגוסט 2001, חודשיים לפני המפגש עם האיראנים, וכי הפגישה עם ערפאת, בה
25 סוכם על העברת 125,000 דולר לפתוח לפרוייקט הספינה, הייתה אחרי שפתחי היה בסוריה
26 ובלבנון. הפגישה עם האיראנים בדובאי נועדה ליצור קשר פלסטיני-איראני וקשר של פתחי ועבדל
27 מול משמרות המהפכה בלבנון, והוא ועבדל לא דיברו על הספינה עם האיראנים.
28
29 ת/11 – אמרת הנאשם מיום 26.3.06: באמרה זו מסר הנאשם אודות פרטי עסקאות נשק שונות
30 להן היה שותף. בתחילה מסר כי הגיע אליו אדם וסיפר לו שמצאו בים חבית עם טילי אר.פי.ג'י
31 וביקש עבור זה 7,000 דולר. הנאשם הורה לשלם את הסכום. הנאשם סיפר כי קיבל פנייה לרכישת
32 10 טילי אר.פי.ג'י תמורת 45,000 דולר, והוא העביר את הכסף לפנוג. הנאשם הוסיף ומסר כי
33 חדבר עדיף על כך שהנשק יגיע לחמאס או לארגונים אחרים. הנאשם סיפר כי בשנת 2002 גנב
34 רשיד אבו שבאכ את כל הנשק שרכש ושהיה במחסניו שלהם. הנאשם הוסיף וסיפר כי מחמוד
35 אבו מרזוק פנה אליו בשנת 2001, ביקש 20,000 דולר כדי להקים מפעל לייצור אמל"ח וריימוני יד,
36 וערפאת הורה לנאשם לתת לו את הכסף. הנאשם העביר את הכסף ושמע מאוחר יותר כי היה
37 פיצוץ בדירה ששכר מחמוד אבו מרזוק.
38

<div dir="rtl">

תיק מס׳: 3052/06                                    תאריך: 29/07/09

הנאשם נשאל לגבי רכישות של סירות עבור פתחי ראזם ומסר כי ערפאת הורה לו בשנת 2000
להעביר 150,000 דולר לרכישת 2 סירות דייגים. הנאשם ציין כי כסף זה העביר עוד לפני שהעביר
את 125,000 דולר עבור הקאריון A.

הנאשם סיפר על כספים שהעביר לצורך רכישת תחמושת בבית לחם וכן כי מימן משכורות לאנשי
שמורה עבאסה. לטענתו, חלק מהכספים שהעביר למשכורות (500 ש״ח לאדם) וחלק שימש
לרכישת תחמושת.

ת/7 – אמרת הנאשם מיום 30.3.06: הנאשם נשאל אודות היכרותו עם מחמוד זוהירי ומסר כי זה
היה אחראי על רכישת אמל״ח בגדה וכי הוא רכש 1000 רובי קלצ׳יניקוב. הנאשם ציין כי הוא
העביר למחמוד זוהירי את הכסף לרכישה בסך של כ-2 מיליון דולר.

הנאשם מסר כי שילם לג׳ומעה אבו שכרי 70,000 דולר תמורת 7 טילי סאגר ו-18 רובים
מקולקלים אותם החזירו. לדבריו, את הטילים החזיק בג׳דיוואן ליד ביתו בעזה ומאוחר יותר
העבירם לעג׳ראזק מג׳אעידה. הנאשם הוסיף ומסר פרטים אודות אנשים שונים אשר הביאו
אמל״ח, וציין כי חוא היה מעביר את הכסף, ואת ונשק היו מחזיקים במחסן בתוך המשרד שלו.
לטענתו, יאסר ערפאת היה נותן לו הוראה למי להעביר את האמל״ח, והוא היה מורה לסגנו לתת
שקים בהתאם להוראותיו של ערפאת.

הנאשם מסר כי מחמוד אבו מרזוק ייצר מטענים לעג׳ראזק מג׳אעידה, והוא העביר למג׳אעידה את
הכסף על מנת שיעבר למחמוד אבו מרזוק. הנאשם מסר מידע גם אודות עסקאות נשק נוספות.

לנאשם הוצג במהלך החקירה מסמך (ת/8) והוא ציין כי המדובר בנייר של מחמוד אבו מרזוק עליו
רשומות הצעות מחירים של נשקים, ובהתאם למחירים שצויינו התחשבן איתו על הכסף.

ת/9 – אמרת הנאשם מיום 2.4.06 שעה 09:50: בראשית חקירתו הופנה הנאשם לאמרתו מיום
19.3.06, בה מסר שהתברית נשקים בספינה, והוא אישר כי סיפר זאת. הנאשם נשאל על מעורבותם
של אחרים בחברתה הנשקים וסיפר על כך. בין היתר מסר הנאשם כי ביולי 2001 מסר לפתחי
ראום 50,000 דולר בהוראת ערפאת עבור הברחת פצצות ומטולי אר.פי.ג׳י. הנאשם ציין כי את
הכסף העביר עבור ההברחה ולא עבור האמל״ח, שכן זה ניתן להם בחינם מהחיזבאללה.

הנאשם התבקש לספר שוב אודות קארין A ומסר כי פגש את פתחי ראום בירדן, שסיפר לו כי
נפגש בלבנון עם נציגי חיזבאללה ואיראן. אלה הסכימו להעביר להם 3 מיכלים עם אמל״ח במימון
האיראנים, והם (הפלסטינים – צ.ל.) יצטרכו לשלם רק עבור הוצאות הספינה. הנאשם מסר כי
הוצע להם לקחת נשק מאחמד ג׳יבריל אולם הם לא עשו זאת. כשנשאל למה, ענה ״כי יש לנו נשק
בחינם מהחיזבאללה ומהאיראנים אז למה לקחת ממנו״. הוא מסר כי התכנון היה להביא ספינות
עם נשק לנמל עלי, והוא פתחי שוחחו עם ערפאת ואמרו לו שצריך 125,000 דולר. יאסר ערפאת
אמר לנאשם לתת את הכסף והנאשם אמר כי אין לו. יאסר ערפאת אמר לפתחי לכתוב נייר בקשה

</div>

תאריך: 29/07/09

תיק מסי: 3052/06

עם הדרישה לכסף, ולאחר שפתחי עשה זאת, הנאשם לקח את הבקשה לרמאללה, העבירה 1
לערפאת וזה כתב לחרבי צרצור שישלם את הכסף. חרבי העביר את הכסף לפתחי. 2
3

הנאשם התבקש לחזור ולספר על המפגש עם האיראנים. לדבריו, פגש בשני נציגים, שלהערכתו 4
הכיר בהם היה אחד בשם אחמד סאלם. 5
6

**ת/10 – אמרת הנאשם מיום 2.4.06 שעת 14:01:** [במאמר מוסגר אציין כי התאריך הרשום על גבי 7
אמרה זו הינו 4.2.06. המדובר בטעות שהובהרה בת/13, והתאריך הנכון הוא 2.4.06. בל נשכח כי 8
לא ייתכן שביום 4.2.06 הנאשם נחקר, כיוון שנעצר רק כחודש וחצי לאחר מכן]. 9
10

הנאשם מסר כי חקים ועדת רכש, שהקימה מחסן נשק בו שמו כל מה שהועדה קנתה. הנאשם 11
נשאל על הועדה המדעית ואמר כי פעילות ועדה זו הינה העברת קורסים בייצור אמלי"ח. ותפקיד 12
במסמך של הועדה המדעית היה לבדוק שהנשק שנרכש היה תקין. הוצג לנאשם מסמך והוא ציין כי המדובר 13
בבקשה לערפאת והוא לא יודע מה נעשה איתה. הנאשם מסר כי הועדה המדעית היא של הפתי"ח, 14
גדודי חללי אל אקצא הם פעילי פתי"ח, ויאסר ערפאת היה נותן לגדודי חללי אלאקצא כסף 15
לפעילות "מתחת לשולחן". 16
17
18

הנאשם ציין כי אנשי משרדו העבירו לפתחי ראזם 150,000 דולר על מנת שיקנה שתי סירות דייג, 19
ועוד לפני כן העביר הנאשם 50,000 דולר, כדי שייתן אותם ללבנונים לכיסוי הוצאות חבריהת 20
חבית נשק עליהם סיפר קודם לכן (באמרה קודמה). 21
22

הנאשם מסר כי פתחי ראזם פגש בלבנון את סאדל מוגרבי, את החיזבאללה ואת משמרות 23
המהפכה של האיראנים. הנאשם שאל אותו אם הוא סיפר זאת לערפאת ופתחי אמר לי שהוא 24
סיפר לו על תוכנ הברחת הספינה ועל פגישותיו בהקשר זה. פתחי אמר לנאשם כי הוא רוצה 25
שידבר עם ערפאת כי פתחי צריך 125,000 דולר להוצאות הספינה. הנאשם דיבר על כך עם יאסר 26
ערפאת בשדה התעופה בירדן. יאסר ערפאת אמר לנאשם שפתחי יכין נייר בקשה לקבלת הכסף. 27
פתחי עשה זאת ולאחר 3 ימים נתן הנאשם לערפאת את המסמך. ערפאת כתב לנאשם שצריך 28
להעביר את הכסף לפתחי דרך חרבי צרצור והנאשם העביר את הנייר דרך שליח לחרבי צרצור 29
ומסר על כך לפתחי. 30
31

הנאשם מסר כי העביר כסף למחמוד זוהירי, כדי שיקנה נשק "מבחוץ" (היינו: מחוץ לשטחי 32
הרש"פ). הנאשם מסר כי היה לו מחסן ברמאללה, בו שמו את כל הנשקים שקנו ממחמוד זוהירי, 33
והם היו מחלקים את הנשקים בהתאם להוראות יאסר-ערפאת. 34
35

הנאשם מסר כי בחודש אוגוסט 2001 קנה מגיומעה אבו זכרי 7 טילים, תמורתם שילם 75,000 36
דולר, והעבירם לעג'ראזק מג'אידה. 37
38

-24-

תאריך: 29/07/09                                                                      תיק מסי: 3052/06

1   הנאשם מסר כי בשנת 2001 הגיע אליו שליח ממרואן ברגותי עם שני ניירות – באחד בקשה לקנות
2   תחמושת לפעילי גדודי חללי אלקצא ב-25,000 דינר, והנייר השני פירט את מספר הלוחמים בכל
3   איזור על מנת שתועבר להם משכורת חודשית. הנאשם העביר את הנייירות ליאסר ערפאת שיחליט
4   בעניין, ויאסר ערפאת נתן לו הוראה לתת למרואן ברגותי את הכסף שביקש. הנאשם הודיע כי אין
5   לו כסף, ואז נתן ערפאת הוראה למשרד האוצר להעביר את הכסף.
6
7   הנאשם מסר כי כשהגיע לתימן, קיבל את פניו תייסיר עגינה, ומסר לו שחספינה של עאדל ופתחי
8   הגיעה אליהם. תייסיר אמר לנאשם כי הכינו לעאדל מוגרבי דרכון והם רצו להכין דרכון גם לעומר
9   עכאווי, הקפטן של הספינה.
10
11  הנאשם הוסיף וסיפר כי העביר כסף לעלי מחסין, בכיר בצבא תימן, במסגרת שותפות שמטרתה
12  מכירת תחמושות של כדורים נותבים תמורת רווח, אולם לבסוף לא התבצעה עיסקה והוא קיבל
13  את הכסף שלהם בחזרה.
14
15  ת/12 – אמרת הנאשם מיום 14.5.06: בפתח החקירה הוצג לנאשם מסמך, והנאשם מסר כי מסמך
16  זה עוסק בבקשה שקיבל לקניות מחרטות וסכינים. את המסמך הזה העביר מרואן ברגותי, והנאשם
17  שלח את המסמך לערפאת. המסמך לא חזר אליו עם הוראת תשלום. הנאשם זכר כי צורפו למסמך
18  זה שני ניירות נוספים, באחד מהם בקשה לרכישת נשק, ובשני בקשה לתשלום משכורות לאנשי
19  "שוהדא אל אקצא", אולם שמותיהם לא הופיעו אצלו ברשימה ולכן לא יכול היה לשלם להם.
20
21  הנאשם נשאל מה יש לו להוסיף לגבי טילי הסאגר שקנו, ואמר כי הגיעה הוראה מערפאת לשלם
22  עבור הטילים, כיוון שפחדו שאנשים יקנו אותם וישתמשו בהם.
23
24  עדות הנאשם בתיק העיקרי – חקירה ראשית
25
26  הנאשם פתח עדותו בכך שהוא מנהל מחלקת הכספים ברשות הפלסטינית וסמכויותיו היו של
27  פקיד שקיבל את הוראותניו מהראיס, יאסר ערפאת, ומסגן הראיס, ע/ראזק מגّאידה. לדבריו, לא
28  הייתה לו כל סמכות לקבל החלטות בעצמו, אלא הוא פעל רק על פי הוראות כתובות.
29
30  הנאשם אישר כי אבן התקיימה פגישה בשנת 2000 של כל האחראים על גופי הבטחון במשרדו של
31  יאסר ערפאת בעזה. הוא ציין כי כל הנוכחים בפגישّه מלבדו היו נוהגים להיפגש עם מפקדים
32  ישראלים. לטענתו, מה שנאמר במפגש זה היה כי יש לאסוף את כלי הנשק שבידי שבידי חבירבו
33  והאזרחים, ואם צריך אף יש לשלם עליהם. לטענתו, תפקידו היה לברר מי הבעלים של כלי הנשק,
34  מה מחירם, ולקבל אישור מהראיס שיחתום על התשלום. רק לאחר קבלת הוראה הוא שחרר את
35  הכסף לתשלום.
36
37  לטענת הנאשם, הנשק נאסף כדי שלא ישמש בידי גורמים כחמאס וכג'יהאד האיסלמי, שאינם
38  מכירים בהסכמי אוסלו. הנאשם טען כי לא נרכש נשק מחוץ לתחומי הרשות. עוד טען הנאשם כי
39  הנשק הגיע למוחסן בבניין של הביטחון הלאומי, בו היו גם משרדיו, אולם הוא לא היה אחראי על

-25-

תאריך: 29/07/09                                      תיק מס': 3052/06

1   המחסן. למיטב ידיעתו, מבצע איסוף הנשק היה דבר ידוע בציבור. עוד טען הנאשם כי אינו יודע

2   כמה נשק נרכש וכמה כסף שולם עבורו, וחזר על כך שכל הוצאה אושרה על ידי יאסר ערפאת.

3   הנאשם טען כי לא הוא העביר את כלי הנשק, והוא אינו יודע אם הועברו לארגון התנזים.

4

5   הנאשם אישר כי הוא מכיר את האנשים אשר שמותיהם מופיעים בפרט האישום הראשון, ובכלל

6   זה מחמוד זוהרי. לטענתו, האחרון היה מושאל למשרדו מראזי גיבאלי, ותפקידו היה להביא את

7   המסמכים החתומים מיאסר ערפאת. הנאשם טען כי לא ידע אם תפקידו של זוהרי כלל את

8   רכישת הנשק, ובכל מקרה לא היה לנאשם מחסן תחת אחריותו. לדבריו, התשלומים היו נערכים

9   בצ'קים או במזומן, וכל סכום היה נרשם. הנאשם טען כי הוא לא ראה נשק, לא קנה ולא נשק.

10  הוא רק עבד עם המסמכים, והוא עצמו מפחד מנשקים. הנאשם שב והודיעש, כי הוא לא ידע כמה

11  כסף שולם, ואיזה נשק נרכש. כל שעשה היה לקבל מסמכים מגורמי הבטחון השונים, ולתת

12  הוראות תשלום לאנשים. הנאשם הכחיש כי רכש וחילק אקדחים או כי ידוע לו על כך.

13

14  הנאשם הכחיש תשלום לאנשי הפתייח והכחיש כי שילם לאנשים באזור בית לחם. לטענתו, הייתה

15  הוראה מיאסר ערפאת לשלם 500 ש"ח אבל הוא לא ידע עבור מה שילמו. אף אחד לא אמר לו כי

16  האנשים הללו שייכים לגדודי חללי אלאקצא. הנאשם הכחיש כי הגיע אליו שליח ממוראן ברגותי,

17  או כי ראה דו"ית כספי שבכל הוצאות ורכישת חומרים-חומרים-כימיים לייצור חומרי נפץ. הוא אף הכחיש

18  כי שילם הוצאות כספיות אחרות או בגדודי חללי אלאקצא או כי קיבל הוראה מיאסר ערפאת

19  לשלם למוראן ברגותי 25,000 דינר, ובכל מקרה לא היה לו סכום כזה להעביר.

20

21  הנאשם הכחיש כל קשר לספינת הנשק קארין A. לטענתו, שמע עליה רק לאחר שנעצר בירחיו.

22  הנאשם אישר כי הוא מכיר את פתחי ראזם, סגן מפקד חיל הים הפלסטיני, ואישר כי פתחי ראזם

23  העביר לו מסמך מיאסר ערפאת לפיו על הנאשם לשלם לפתחי 125,000 דולר. לטענת הנאשם, לא

24  ידע עבור מה נדרש התשלום, והוא סירב לשלם כי לא היה בתקציב סכום כזה.

25

26  הנאשם אישר כי כשהיה בדובאי למטרות רכש כלי רכב פנה אליו עאדל מוגרבי, וביקש ממנו

27  להעביר מכתב ליאסר ערפאת. הוא פגש את עאדל מוגרבי עם אנשים נוספים, וקיבל מהם מכתב.

28  הוא העבירו ליאסר ערפאת, ובדיעבד נודע לו כי תוכן המכתב עוסק בהצעה של האיראנים לסייע

29  לרשות הפלסטינית, אולם הוא לא ידע ולא מסר דבר בנוגע לספינות נשק.

30

31  הנאשם אישר כי פגש בתימן את תייסיר עג'ינה בשגרירות הפלסטינית שם, אולם לא היה מודע

32  לכך שבזמן הזה הגיעה ספינת נשק לנמל חודיידה בתימן. הוא אישר כי תייסיר סיפר לו שמכינים

33  דרכון תימני לעאדל מוגרבי, אך לא ידע מדוע.

34

35  הנאשם מסר כי הרשות הפלסטינית קיבלה מעירק מתנה של שני מיליון חביות נפט גולמי, וחוצע

36  לו ליצור קשר עם האיראנים על מנת שהם ימכרו את החביות עבור הפלסטינים ויתחלקו בתמורה.

37  לצורך כך נפגש עם הנספח המסחרי-כלכלי האיראני. הנאשם הכחיש כל קשר מצידו או ידיעה

38  מצידו בנוגע להצעה מטעם האיראנים לסייע לפלסטינים באימונים ובנשק, או כי היה נוכח

-26-

תיק מס׳ : 3052/06                              תאריך : 29/07/09

בישיבה בה הועלתה הצעה כזו. הנאשם הכחיש כי חתם על פרוטוקול של ישיבה כזו. לטענתו, רק   1
העביר מכתב מעאד׳ל מוגרבי ליאסר עראפאת, וזה סירב לקשר עם האיראנים.   2

   3

### עדות הנאשם בתיק העיקרי – חקירה נגדית   4

   5

בחקירתו הנגדית נשאל הנאשם אם הוא מכיר את ארגון גדודי חללי אלאקצא, השיב בשלילה,   6
ואמר כי רק שמע עליהם בתקשורת. לטענתו, גם בחקירתו אמר כי אין דבר שקוראים לו "גדודי   7
חללי אלאקצא". הנאשם עומת עם שני מסמכים אשר הוצגו לו בחקירתו ביום 14.5.06, וטען כי   8
אינו יודע דבר על המסמכים הללו. כשנמסר לו כי במשטרה אמר שאחד המסמכים הוא בקשה   9
להקמת מחרטה, והשני בקשה למשכורות של גדודי חללי אלאקצא, טען כי אינו יודע ולא אמר את  10
הדברים הללו.  11

  12

לטענתו, הוא היה בישיבה עם יאסר עראפאת בה הוחלט על הוחלט על רכש כלי נשק מתוקף תפקידו כאיש  13
כספים, והמטרה הייתה איסוף נשק מידי אזרחים. לדבריו, כל שהוא עשה היה למלא אחר  14
הוראותיו של יאסר עראפאת, אשר אישר באופן פרטני רכישה של כל נשק.  15

  16

הנאשם נשאל לגבי פצצות אר.פי.גי שהגיעו בספינה ביוני 2001, ואמר כי קיבל הוראה לשלם  17
לדייגים שמצאו את הפצצות, כפרס כספי. הנאשם אמר כי אינו יודע מהיכן הגיעה הספינה של  18
הפצצות וכאשר נמסר לו כי במשטרה אמר שזו הגיעה מטורפולי, טען כי לא אמר זאת. כך גם  19
כאשר עומת עם הטענה שמסר במשטרה ובשבי"כ שנקנה נשק מלבנון וממצרים. לדבריו, הנשק  20
שנרכש על ידו נרכש רק מאזרחים, על מנת שלא יגיע לחמאס, והוא אינו יודע מה נכתב באמרותיו.  21

  22

הנאשם אישר כי העביר למחמוד אבו מרזוק 20,000 דולר בהוראתו של יאסר עראפאת. לטענתו לא  23
ידע מה הסיבה לכך. כשנאמר לו שבמשטרה מסר כי הדבר נועד לשם הקמת מפעל לייצור אמל"ח  24
ורימונ׳י יד, טען שאמר כי חבית של מחמוד אבו מרזוק התפוצץ, ולאחר מכן נודע כי השתמשו בו  25
לייצור מטעינים.  26

  27

הנאשם טען כי אינו יודע מיהם מחמוד עביאת או עאטף עביאת. הנאשם עומת עם דבריו במשטרה  28
לפיהם העביר להם כספים כדי שלא ילכו לחמאס, וטען כי אמר שקיבל הוראה מיאסר עראפאת  29
להעביר 500 ש"ח לאאסוף עביאת (הכוונה כמשכורת חודשית – צ.כ.), אותו הוא לא מכיר באופן  30
אישי, אך הוא מכיר אותו בשם, בניגוד לדבריו קודם לכן.  31

  32

הנאשם עומת עם מסמך נוסף שהוצג לו בחקירתו וטען כי אינו מכיר אותו. כשנאמר לו שבחקירתו  33
מסר כי המדובר במסמך של מחמוד וזהירי בו ישנן הצעות מחיר של נשקים אמר כי לא סיפר זאת.  34

  35

הנאשם מסר כי היה אחראי על כספים של מנגנוני הבטחון הפלסטיניים, וכי הוא אחראי לשלם  36
בהתאם להוראות בכתב שניתנו על ידי יאסר עראפאת.  37

  38

-27-

תיק מס': 3052/06

1  הנאשם נשאל על ידינו האם הכיר את התקציב וסעיפיו, ואישר כי הכיר אותו, וכי הורתה תשלום
2  צריכה להיות מתאימה לסעיף המצויין בתקציב. משום כך נהגו לשאול את מבקשי התשלום
3  לצורך מתן דרוש הכסף שהם מבקשים. אם להורתת תשלום לא היה סעיף תקציבי מתאים, או אם
4  סרבו לומר מה מטרת התשלום – נהג הנאשם לסרב לשלם או מפנה את המבקש ליאסר ערפאת.
5  לטענונ, סעיף רכישת הנשק נקרא "תשלום על הנשקים אשר נאספים מידי האזרחים מתוך
6  המדינה". הנאשם מסר כי אם היה מקבל הורות חריגה לשלם, למשל, כסף לפעיל חמאס או
7  לקנות ספרי לימוד לבית ספר הוא לא היה מבצע את הפעולה. יתר על כן, הנאשם ציין כי היו לו
8  קשרים טובים עם ערפאת, וכי היו מקרים שבהם התווכח עם יאסר ערפאת על הוצאות מסויימות,
9  ובסופו של דבר אמר לו ערפאת כי ערפאת הוא צודק. עוד ציין כי הוא זכה לשבחים על דרכו בניהול
10 הכספים. רק לאחר מכן ציין, כי אם לא היה מבצע הורות תשלום – היו מעמידים אותו לדין.
11 בחקירה החוזרת בידי הסניגור מסר הנאשם, כי כל סכום שצריך היה להוציא מחשבון הרשות
12 הפלסטינית חייב חתימה של שלושת בעלי זכות החתימה בחשבון, והוא לבדו לא יכול היה להוציא
13 "אפילו לא גרוש".
14
15  <u>הערכת העדויות – מהימנות ומשקל</u>
16
17  עדות הנאשם – מהימנות ומשקל
18
19  עדות הנאשם לא עשתה עלינו רושם אמין. ניכר היה כי הוא דבק בגרסה לפיה אין הוא קשור
20  לספינת הנשק קארין A, אין הוא קשור למגעים עם האירואנים שנגעו לתיאום אימונים ורכישת
21  נשק על ידי הרשות הפלסטיניית, ובכל הנוגע לרכישת נשק הוא היה שותף לישיבה שמטרתה
22  רכישת נשק מאזרחים על מנת שלא ישמשו ארגונים כגון החמאס.
23
24  כאשר הנאשם עומת עם דברים שנרשמו או הוצגו לו בחקירה, ובכלל זה מסמכים מהם עולה כי
25  הכיר וידע למה בוצע תשלום כלשהו, באופן שאינו תואם את גרסתו במשפט, טען כי לא אמר את
26  מה שמיוחס לו בחקירה. אין בידינו לקבל זאת. תמוה כי דברים הרשומים באמרותיו ותתואמים
27  את גרסתו במשפט נאמרו על ידו במשטרה ונרשמו, ואילו דברים שאינם תואמים את גרסתו
28  במשפט לא נאמרו על ידו אלא נרשמו על ידי החוקרים ללא ידיעתו. הסבר פשטני זה בדבר
29  הרישום על ידי החוקרים אינו מעורר אמון כלשהו.
30
31  יתר על כן, חלק מטיעוניו הינם חסרי אמינות על פניהם – כך למשל, טענתנו כי אינו מכיר ואינו
32  יודע מהו ארגון גדודי חללי אלקצא, או למשל טענתנו כי אינו יודע מיהו עאטף עביאת, כשמיד
33  לאחר מכן הוא ציין כי שולם לאותו אדם כסף על ידי המשרד בבית לחם. כשהבין את טעותו זו,
34  טען כי אינו מכיר את עאטף עביאת באופן אישי.
35
36  כפי שכבר ציינו ביחס למשפט הזוטא, שוכנענו כי הדברים הרשומים באמרותיו של הנאשם
37  במשטרה נרשמו מפיו והם משקפים דברים שהוא עצמו אמר. לפיכך, יש לקבוע כי טענתנו
38  שהדברים לא נאמרו על ידו - הינה שקרית.
39

תיק מס׳ : 3052/06                                   תאריך: 29/07/09

1   כמו כן, טענותיו של הנאשם כי רק מילא הוראות וכי לא ידע בגין מה הועברו חלק מהכספים אינה

2   תואמת את הדברים שמסר בסוף חקירתו, כי הוא תמיד וידא שהתשלום תואם סעיף תקציבי,

3   ופירושו של דבר כי ידע למה נועד התשלום. גרסתו כי הוא רק ממלא הוראות, אינה מתיישבת עם

4   דבריו כי אם היה מקבל הוראה חריגה או מוזרה לתשלום היה מסרב לבצע אותה, או עם דבריו

5   שלו בחקירה כי פעל (בכל הנוגע למפגש עם האיראנים) עוד לפני שיאסר ערפאת אמר לו דבר

6   בעניין, כיוון שהאחרון "רוצה לראות תוצאות".

7

8   ## עדותו של מחמוד עביאת – מהימנות ומשקל

9

10  עדותו בבית המשפט של מחמוד עביאת הייתה חסרה מהימנות בעיניינו ולפיכך חסרת משקל.

11  טענות כי מסר בחקירתו אודות אדם ששמו שומאלי ולא שובאכי, הינה טענה שנועדה בבירור

12  להרחיק את האשמה מעל הנאשם. לא שוכנענו כי זו בטענה זו שמץ של אמת. יש לומר כי הנאשם

13  מסר בחקירתו כי הוא העביר כספים למחמוד עביאת, דבר התואם את הנתונים המשטרתיים של

14  מחמוד. לפיכך, אנו מעדיפים את אמרותיו המשטרתיות של מחמוד עביאת על פני עדותו בבית

15  המשפט.

16

17  ## התשתית העובדתית – סיכום

18

19  מצאנו לנכון להעדיף את המצוי באמרותיו המשטרתיות של הנאשם על פני עדותו בפנינו. בכל

20  מקום בו ישנה סתירה בין חשיים, סברנו כי הדברים המופיעים באמרות המשטרתיות הינם

21  עדיפים. כך הדבר גם ביחס לאמרותיו המשטרתיות שֶל מחמוד עביאת. לאור תשתית עובדתית זו,

22  עלינו לבדוק כעת את פרטי האישום שיוחסו לנאשם, ולראות האם אשמתו עולה מחומר הראיות

23  שלפנינו.

24

25  עוד קודם לבחינה פרטנית של כל אחד ואחד מפרטי האישום, מאחר שעיקרו של כתב האישום

26  מבוסס על אמרותיו של הנאשם, עלינו לבדוק אם קיימת תוספת ראייתית מסוג "דבר מה נוסף"

27  לאמרות אלה.

28

29  במקרה שלפנינו לא סברנו כי קיים קושי ממשי כלשהו בעניין זה. תוספת ראייתית לאמרותיו של

30  הנאשם מצויה הן באמרתו של מחמוד עביאת, שאישר את העברת המשטרות לו ולאנשיו בבית

31  לחם, כפי שמסר הנאשם, ובנוסף בפנינו ת/8, שחנו מסמך בו פורטו בקשות לרכישת כלי נשק

32  ומחירים, כפי שמסר הנאשם.

33

34  ברע"פ 4142/04 מילשטיין נ׳ התובע הצבאי הראשי, תק-על 2006(4), 4022, התייחס כב׳ השופט

35  לוי למהותה של התוספת הראייתית מסוג דבר מה ובקבע כדלקמן (בפסקה 20):

36

37      "דרישת ה'דבר מה נוסף" היא נמישה ובעלת רקמה פתוחה. סוג העניינים

38      שעשויים להביא לסיפוקה משתנה ממקרה למקרה, ותלוי גם במהימנות

39      ההודאה גופה. ככל שהודאה זו זוכה למשקל גדול יותר – כך יקטן משקלו

-29-

תאריך: 29/07/09

תיק מס': 3052/06

1  של הייֵדבר מהיי הדרוש לאימות ההודאה, ולהפך, ככל שהוֵדאה זוכה
2  למשקל מועט – כך ינֵדל משקלו של הייֵדבר מהיי. על כן גם נקבע כי אפשר
3  שיֵתעורר מקרים שבהם ניֵתן יהיה לֵהֵסֵתֵפֵק בייֵדבר מהיי שֵמשקֵלו ייקל
4  כנֵוֵצֵהיי.
5
6  וכֵפי שֵצֵיֵֵינה כבי השופֵטת אֵרֵבל באותו פֵסק ֵדין (בפֵסֵקה 20 לֵפֵסֵק ֵדינה):
7
8  ייהֵֵדרֵישה לייֵדבר מה נוסֵֵפיי, הינה – בֵֵדֵומה ייֵלֵדבר לֵחֵיֵזֵוקיי וֵבֵשֵונה מן
9  הֵֵֵֵסֵיֵֵֵֵֵֵֵוֵֵֵֵֵֵֵעֵֵֵי – ֵדֵרֵישֵת לֵתֵֵֵֵוֵֵֵֵֵסֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵ
10  הייֵדבר מה הנוסֵֵף אֵֵֵינֵו צֵֵֵרֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵ, אֵלֵא ֵדֵֵי בֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵ
11  יֵשֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵ
12  אֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵ .... ֵדֵרֵישֵת הייֵדבר מה הנוסֵֵֵףיי בֵאה
13  לֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵ שֵנֵֵֵֵֵֵֵֵֵֵֵֵֵֵ עֵל-יֵֵֵֵ
14  אֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵ, מֵֵֵֵֵֵֵֵֵֵֵ רֵֵֵֵֵֵֵֵ קֵלֵה מֵֵֵֵ
15  כֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵ הֵֵֵֵֵֵֵֵֵ לא פֵעם כֵֵֵֵֵֵֵֵֵ ייֵכֵֵֵֵֵֵ
16  לֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵֵ.. וֵֵֵֵ בֵֵֵֵֵֵֵ מֵשֵֵֵֵֵֵ ייֵקֵל כֵֵֵֵֵֵֵֵֵֵֵ. ֵדֵי בֵכֵך שֵֵֵֵֵֵֵ אֵת
17  ֵדֵֵֵֵֵֵֵ של בֵֵֵֵֵֵֵֵֵֵֵ שֵֵֵֵֵֵֵֵֵֵֵֵֵֵ אֵֵֵֵֵֵ ייֵֵֵֵֵֵֵֵֵֵ בֵֵֵֵֵֵֵֵֵיי, וֵֵֵֵֵֵֵֵֵ כֵי הֵֵֵֵֵֵ
18  שֵֵֵֵֵֵֵֵ הֵֵֵֵֵֵֵ בֵֵֵֵֵֵֵֵֵֵֵ אֵֵֵֵֵֵ סֵֵֵֵֵֵֵ אֵֵֵֵֵֵֵ חֵֵֵֵֵיי
19
20  בֵמֵקֵֵֵֵֵֵ שֵלֵֵֵֵֵֵֵ עֵֵֵֵֵֵ לֵֵֵ בֵהֵֵֵֵֵֵֵ של הנֵֵֵֵֵ הֵמֵֵֵֵֵֵֵֵֵֵ עֵל פֵֵֵ אֵֵֵֵֵֵ רֵבֵֵֵֵ, הֵן בֵמֵֵֵֵֵֵֵ וֵהֵן
21  בֵֵשֵבֵֵֵֵֵֵ. הֵֵֵֵֵֵֵ כֵֵֵֵֵֵֵ פֵֵֵֵֵ פֵֵֵֵֵֵ של עֵֵֵֵֵֵֵֵ נֵֵֵֵ שֵֵֵֵֵֵ, וֵבֵֵֵֵֵ זֵה שֵֵֵֵֵ, כֵֵֵ נֵֵֵ וֵמֵֵֵֵֵֵ,
22  כֵֵֵֵ גֵם הֵתֵֵֵֵֵֵֵֵֵֵ מֵֵֵֵֵֵֵֵ לֵמֵֵֵֵֵֵ עֵם גֵֵֵֵֵֵ שֵֵֵֵֵ של הֵֵֵֵֵֵ הֵֵֵֵֵֵֵֵֵֵ וֵעֵם גֵֵֵֵֵ מֵֵֵֵֵ
23  לֵֵֵ (כֵֵֵֵֵֵֵֵֵ). הֵמֵֵֵֵֵ הֵֵֵֵֵֵֵ של אֵֵֵֵֵ אֵֵֵֵ הֵֵֵֵ גֵֵֵֵ מֵֵֵֵ. הֵן תֵֵֵֵֵ וֵֵֵ ֵדֵֵֵ בֵה הֵֵֵֵֵֵֵ
24  נֵֵֵֵֵֵ מֵֵֵֵֵֵֵ עֵל הֵמֵֵֵֵֵֵֵ וֵגֵֵֵֵֵֵ שֵֵֵ לֵֵֵֵֵֵ לֵֵֵֵֵֵֵ לֵֵֵ (הֵֵֵֵֵֵ עֵֵֵֵ 6613/99 סֵמֵֵֵֵֵ נֵי מֵֵֵֵֵ
25  יֵשֵרֵֵֵֵֵ, פֵֵֵ נֵֵֵ(3) 529, בֵפֵֵֵֵֵ 12 לֵפֵֵֵֵ ֵדֵֵֵֵ של כֵֵֵ הֵשֵֵֵֵֵֵ (כֵֵֵֵֵֵֵ ֵדֵֵ) בֵֵֵֵֵֵ).
26
27  אֵך לא רֵק מֵבֵֵֵֵ חֵֵֵֵֵֵֵֵ הֵרֵבֵֵֵ מֵלֵֵֵ עֵל הֵאֵֵֵֵֵֵ שֵֵֵ לֵֵֵֵֵ לֵאֵֵֵֵֵ הֵֵֵֵֵֵ, אֵלֵא כֵאֵֵֵֵ
28  לֵֵֵֵֵ, לֵאֵֵֵֵֵ אֵלֵה יֵֵֵֵֵ תֵֵֵֵֵֵ מֵֵֵֵֵֵֵ חֵֵֵֵֵֵֵֵ בֵֵֵֵֵֵ אֵֵֵֵֵ של מֵֵֵֵֵֵ עֵֵֵֵֵ וֵבֵֵֵֵֵ
29  תֵ.8. לא כֵל שֵֵֵ, שֵתֵֵֵֵֵֵֵ סֵֵֵֵֵֵ תֵֵֵֵ ייֵֵֵֵֵֵ Aיי תֵֵֵֵֵ אֵף הֵֵֵ אֵת הֵֵֵֵֵֵ שֵמֵֵֵֵ הֵֵֵֵֵֵ.
30  בֵל נֵֵֵֵ כֵי הֵֵֵֵֵ עֵֵֵֵ לא הֵֵֵֵ בֵעֵֵֵֵ בֵֵֵֵֵ פֵֵֵֵֵ רֵבֵֵֵ מֵהֵֵֵֵֵֵ בֵאֵֵֵֵֵֵֵ, וֵבֵֵֵֵ זֵה
31  מֵֵֵֵֵ עֵם הֵאֵֵֵֵֵֵ.
32
33  כֵאֵֵֵֵֵ, מֵֵֵֵֵ הֵעֵֵֵֵ של הֵאֵֵֵֵֵ הֵֵֵֵ גֵֵֵֵ. הֵֵֵֵֵ מֵה נֵֵֵֵֵ בֵמֵֵֵֵ זֵה מֵֵֵֵֵֵ עֵל מֵעֵֵֵֵֵֵ
34  של הֵנֵֵֵֵ לֵֵֵ הֵפֵֵֵֵ בֵמֵֵֵֵֵ הֵעֵֵֵֵֵֵ, וֵמֵֵֵֵֵ אֵת כֵֵֵ אֵמֵֵֵֵֵֵ של הֵנֵֵֵֵ. וֵֵֵֵֵ: הֵֵֵֵֵֵ
35  הֵמֵֵֵֵֵֵ בֵאֵֵֵֵֵֵ של הֵנֵֵֵֵ כֵֵֵֵ קֵֵֵֵֵ לֵתֵֵֵֵֵ וֵמֵֵֵֵ כֵאֵֵֵֵ עֵל מֵֵֵֵֵ הֵכֵֵֵֵֵ
36  של שֵֵֵֵֵ וֵבֵֵֵֵֵֵ פֵֵֵֵֵֵֵֵֵ. כֵאֵֵֵ קֵֵֵֵ זֵֵֵֵ פֵֵֵֵֵ וֵקֵֵֵֵ עֵֵֵֵֵ בֵֵֵ הֵעֵֵֵֵֵ
37  הֵֵֵֵֵ, וֵתֵֵֵֵֵֵֵ הֵרֵאֵֵֵֵֵֵ הֵקֵֵֵֵֵ לֵעֵֵֵֵ אֵחֵת יֵֵֵֵ לֵֵֵֵֵֵ גֵם עֵל עֵֵֵֵ אֵֵֵֵ עֵֵֵֵ (רֵֵֵ עֵֵֵֵ
38  241/87 כֵהֵן נֵי מֵֵֵֵֵ יֵשֵֵֵֵֵ, פֵֵֵ מֵֵֵ(1) 743, עֵֵֵֵ 7758/04 אֵלֵקֵֵֵֵ נֵי מֵֵֵֵֵ יֵשֵֵֵֵֵ, תֵֵֵֵֵ
39  2007(3) 710, עֵֵֵֵ 378/03 פֵֵֵֵ נֵי מֵֵֵֵֵ יֵשֵֵֵֵֵ, תֵֵֵֵ 2005(2) 1128). לֵֵֵֵ, בֵמֵֵֵ שֵלֵֵֵֵֵ,

-30-

תאריך: 29/07/09

תיק מס': 3052/06

1 חגם שקיימות תוספות ראייתיות אך למקצת הדברים שמסר הנאשם, הרי לנוכח הקרבה הענייניית
2 של המעשים המתוארים בכתב האישום והמפורטים באמרותיו, יש לראות את התוספות
3 הראייתיות כמאמנות את כלל הדברים שמסר הנאשם בחקירותיו. על כן, גם אם לפרט אישום
4 מסויים לא תמצא תוספת ראייתית חיצונית, הרי שלנוכח הזיקה בין כלל האישומים במקרה זה,
5 די יהיה באמרות הנאשם כדי לבסס את הרשעה, ככל שזו עולה מהאמרות.
6
7 כעת, ומשהתבחרנו את התונשתית הראייתית העומדת לפנינו, נפנה לכל אחד ואחד מפרטי האישום.
8
9 **פרט אישום ראשון:**
10
11 טענת ההגנה באשר לפרט אישום זה חינן עובדתיות ומשפטיות כאחת. ראשית, מן חפן ה; עובדתי,
12 לא כפרה ההגנה בכך שהנאשם נטל חלק ברכישת האמל"ח כאמור, אלא לטענתה דובר ברכישת
13 אמל"ח שמטרתה איסוף נשק מתושבי הרשות על מנת שיהיה בידי כוחות הרשות הפלסטינית.
14 טענה זו העלה הנאשם הן בבית המשפט והן במהלך חקירתו. שנית, נטען כי הנאשם זכאי להנות
15 מהגנת "מעשה מדינה" כיוון שכל מה שעשה היה לפעול ללא שיקול דעת עצמאי, אלא בהתאם
16 להוראות ונ"ר הרשות ערפאת, שאישר העברת כספם² הרשות לצורך רכישת הנשק. תפקידו של
17 הנאשם במקרה זה: היה חתימה על מסמכים שאישרו תשלום. נטען כי מעשה זה אינו פשע מלחמה
18 או פשע נגד האנושות, שכן לא הוכח שהנאשם ידע שהנשק יגיע לארגון גדודי חללי אלאקצא,
19 שיעשה בו שימוש לטרור.
20
21 עוד נטען כי עומדת לנאשם הגנת הצידוק, שכן ציות להוראת הרשות שמטרתח איסוף נשק
22 מנורמים לא אחראיים והעברתו לידי שליטה אחראית של הרשות הינה מעשה לגיטימי החוסה
23 תחת הגנת הצידוק.
24
25 דומה כי אין לקבל את טענות ההגנה, ולו מהטעם העובדתי.
26
27 על מנת שתתקבל הגנת של "מעשה מדינה" יש צורך להראות כי הגוף מטעמו פעל הנאשם היה
28 מדינה. כפי שנקבע בחלטה בטענות המקדמיות מפי-חברי סגן הנשיא, הרשות הפלסטינית אינה
29 מדינה, ובודאי שבתקופה הרלוונטית לכתב האישום היתה רחוקה הרבה יותר ממעמד של רשות
30 עצמאית. על כן ציין סגן הנשיא כי "לפיכך, אני סבור שיש לקבוע, שמעשיו של הנאשם לפי כתב
31 האישום לא היו פעולות ממשל (ACT OF STATE), שכן לא נעשו מטעם גוף שהוא מדינה, אלא לכל
32 היותר פעולות אישיות בכסות ממשלית, תוך שימוש במשאבים של ישות מדינית בלתי מגובשת".
33
34 לא הובאו כל תימוכין נוספים או ראיות נוספות שיש בהם כדי לשנות ממסקנתנו זו בנוגע למעמדה
35 של הרשות הפלסטינית.
36
37 שנית, הטענה כי איסוף הנשק הנשק נועד להעברת כלי נשק מתושבים העלולים לעשות בהם שימוש
38 פרטיזאני לידי גורמים אחראיים, אין לה על מה שתסמוך. אמנם, הנאשם טען זאת במספר
39 הזדמנויות, ובכלל זה בחקירתו, אולם לא התרשמנו כי לטענה זה יש בסיס כלשהו. כאמור, כבר

-31-

ציינו לעיל כי התרשמותנו מהנאשם הינה כי המדובר באדם מתוחכם, המנסה להעביר מעליו את 1
נטל האחריות. בד בבד עם הטענה כי איסוף הנשק נועד למנוע מגורמים לא אחראיים את השימוש 2
בו, עולה כי הנאשם אישר מימון פעולות אשר אין בינן ובין איסוף נשק מגורמים לא אחראיים 3
ולא כלום. כך למשל, נשא מימון הקמת מפעל לייצור חומרי נפץ בידי אנשי חרושת הפלסטיניות 4
עצמה, מימון מחרוזות, מימון הברחות נשק מגורמי חוץ כחיזבאללה והאיראנים וכדומה. אם כל 5
המטרה הינה איסוף נשק "פרטיזאני", מדוע יש צורך לממן הבאת נשק נוסף שמקורו מחוץ 6
לשטחי חרושת הפלסטיניות, לא כל שכן כשמדובר בנשק התקפי מובהק, כרקטות וטילים מסוגים 7
שונים? אם מדובר רק ברכישת נשק מאורחים, מדוע פעל הנאשם למימון עלויות הברחת הנשק 8
מחחיובאללה בידי-גורמים של חרושת הפלסטיינית? 9
10
התשובה לשאלות האמורות הינה ברורה. אין בין איסוף הנשק לבין הרצון למנוע אותו מגורמים 11
"לא אחראיים" העלולים לעשות בו שימוש טרוריסטי ולא כלום. מטרת איסוף הנשק היא הברחתו 12
לידי גורמים ברשות הפלסטיינית המצויתים המצויתיים לערפאת ואשר מאפשרים לחימה בישראל, בכוחותיה 13
וראורחיה. כפי שצוין הנאשם עצמו בכ"ד מיום 15.3.06 שעה 18:15 בסעיף 30: **"יאסר ערפאת 14
נתן הוראה שכל הנשק יירכש על ידי הרש"פ ולא על ידי החמאס או ארגונים אחרים וזאת על 15
מנת שהוא עצמו יוכל לשלוט בכל מה שקורה. באופן זה יאסר ערפאת יוכל לשלוט בעוצמת 16
האינתיפאדה".** 17
18
עינינו הרואות כי אין המדובר במטרה תמימה "ואחראיית", אלא במטרה ברורה שנועדה לאפשר 19
לגורמים של הרשות הפלסטיינית, ובראשם יאסר ערפאת, לשלוט באמצעות נשק חם והתקפי 20
בעוצמת "האינתיפאדה", היינו: בעוצמת הטרור הפלסטיני. 21
22
עוד יש לומר כי הטענה שהנאשם לא ידע שהנשק הועבר לארגון גדודי חללי אלאקצא, שעשה בו 23
שימוש לצרכי טרור, הינה טענה שאינה תואמת את חומר הראיות. כך למשל, בכ"ד מיום 15.3.06 24
שעה 18:15 בסעיף 36 נרשם: **"הנחקר הסביר כי כל אחד ממונגנוני הבטחון רכשו אמל"ח בכמויות 25
גדולות והנחקר אישר שהתשלום. כל ארגוני שהדא אל אקצא השתמשו בכלי הנשק שסופקו על 26
ידי מנגנוני הבטחון שביצעו את הרכש המאסיבי".** 27
28
עינינו הרואות כי הנאשם ידע היטב שהאמל"ח שנרכש הועבר לידי גדודי חללי אלאקצא, שעשו 29
שימוש בנשק זה. ברור כי הנאשם ידע מהו ארגון גדודי חללי אלאקאא ומהם פעילויותיו. ניסיונו 30
לומר בפנינו כי אינו יודע מהו ארגון זה הינו ניסיון מופרך להציגו כאדם תמים. איננו מאמינים 31
לטיעון זה. ברור לנו כי הנאשם – שהיה בעל משרה בכירה בפתח"ח במשך עשרות שנים והיה מקורב 32
ליאסר ערפאת - ידע היטב מהו ארגון גדודי חללי אלקצא, מהן פעילויותיו, וחזא ידע היטב כי 33
ארגון זה הוא כלי בידי חרושת הפלסטיינית להפעיל טרור נגד מדינת ישראל ותושביה. 34
35
עוד יש לציין כי כי לא התרשמנו כי הנאשם היה פקד שמילא הוראות ללא שהיה לו שיקול דעת 36
כלשהו. הדבר נובע גם מאופיו הבכיר של תפקידו, אך גם מהעובדות שעלו בפנינו כמו גם הדברים 37
שמסר הנאשם בבית המשפט. כך למשל, במקרים לא-מעטים עולה כי הנאשם פעל מיוזמתו הוא, 38
בלא אישור כלשהו – ובודאי בלא הוראה מפורשת - של יאסר ערפאת להוצאת כספים. כך 39

-32-

<div dir="rtl">

תאריך : 29/07/09                                    תיק מס׳ : 3052/06

1    "ביוזמות חעסקיות" שנועדו להשיג רווחים לארגון הפת"ח, מגעיו עם האירגאנים שהיו ללא ידיעה

2    מראש של יאסר ערפאת (אלא רק בדיעבד), ודבריו של הנאשם כי יאסר ערפאת אהב לראות ולקבל

3    תוצאות ולא היה מעורב בכל התהליך עצמו מלכתחילה. עוד נזכיר, כי הנאשם אישר במו פיו

4    בעדותו בפנינו כי לא העביר כסף אם לא היה בידו חסכום המתאים או שמטרת החוצאה לא

5    תתאימה לסעיף מוכר בתקציב. דבר זה אינו מתיישב עם מי שרק ממלא כל הוראה של ערפאת,

6    ויתר על כן, הנאשם אמר בעדותו בפנינו ביום 18.11.08 כי אם היה מקבל הוראה שבעיניו היא

7    מוזרה הוא לא היה מבצע את הפעולה, וחוסיף כי "חיו לי הרבה מחלוקות עם הראיס על דברים

8    כאלה ובטופו של דבר הוא בא ואמר לי שאני צודק". מדברים אלה, שנראה כי נאמרו בגאווה רבה

9    מצידו של הנאשם, עולה כי הנאשם לא היה חותמת גומי. כאשר סבר שישנה בעיה עם הוראה כזו

10   או אחרת של ערפאת הוא היה אומר לו זאת ואף מתווכח איתו.

11

12   במקרה שלפנינו, ובכל הנוגע למעשים המפורטים בכתב האישום, לא מצא הנאשם לנכון להתווכח,

13   אף שאנו יודעים כן לו היה חושב לנכון לעשות כן היה עושה זאת. המסקנה המתבקשת הינה כי

14   לנאשם, הן מתוקף מעמדו, הן דח פקטו ביחסיו מול יאסר ערפאת, והן לאור מעשיו שלו כעולה

15   מחומר הראיות בפנינו, היח שיקול דעת אם לאשר העברת כספים אם לאו. הנאשם ידע היטב מה

16   מטרת חעברת חכספים, וידע היטב כי חנשק שנרכש באמצעות אותם הכספים נועד לצורכי ארגון

17   טרור – גדוד חללי אלאקצא.

18

19   <u>סיכום:</u>

20

21   לא הונחה מבחינה עובדתית כל תשתית המאפשרת לתמוך בטענת החגנה באשר להגנת הציידון

22   העומדת לנאשם או להגנת "מעשה מדינח". הוכח כי הנאשם ידע היטב כי המדובר ברכישת נשק

23   לצורכי העברתו לשימוש ארגון טרור – גדודי חללי אלאקצא. לא דובר במקרה זה ברכש נשק

24   שמטרתו הוצאת נשק מתושבים והעברתו ל"ידיים אחראיות" כטענת ההגנה.

25

26   והרשות הפלסטינית אינה מדינה, ובכל מקרה, העברת נשק לצורכי טרור נגד אזרחי ותושבי מדינת

27   ישראל אינה יכולה לחסות תחת הגנת "מעשה מדינה", אף לו דובר במדינה.

28

29   שנית, גם בנוגע להגנת הצידוק, אף אם נלך לשיטתו של חברי סגן הנשיא, אשר מוכן להכיר בהגנת

30   הצידוק לנודמים של חרשות הפלסטינית בתנאים מסוויימים, אין המדובר במעשה לגיטימי מצידה

31   של הרשות, ורכישת נשק שנועד לצורכי ארגון טרור, הינה ביירור מעשה בלתי חוקי.

32

33   מאחר שהנאשם חיה שותף לרכישת נשק כמפורט בפרט האישום הראשון, אנו מרשיעים אותו

34   במיוחס לו בפרט אישום זה.

35

36   <u>פרט אישום שני:</u>

37

38   פרט זה עניינו בהעברת משכורות לפעילי גדודי חללי אלאקצא, וכן בהעברת בקשה של מרואן

39   ברגותי לתשלום כסף עבור אמצעי לחימה.

-33-

</div>

1  הבטיס לפרט זה מצוי באמרותיו של הנאשם, אך גם בדברים שמסר מחמוד עביאת במשטרה.
2  הנאשם הודה למעשה בחקירתו כי העביר משכורות-לאנשיו של מחמוד עביאת, ואילו האחרון
3  אישר עניין זה באמרותו. לפיכך, הרישא של פרט אישום זה מבוססת על אמרות הנאשם וזוכה
4  לתוספת ראייתית משמעותית באמרותו של מחמוד עביאת. לפיכך, ולאור הנחתנו העובדתי דלעיל,
5  יש בסיס מוצק להרשעת הנאשם ברישא של פרט האישום השני, שכן המדובר בהעברת כספים
6  לפעילי טרור.
7
8
9  חסיפא של פרט האישום השני -- נושא האמצעים שביקש מוראן ברגותי, אף הוא מופיע באמרותיו
10 של הנאשם וממקור שם, והינו במהותו חלק מאותה מסכת כללית המתוארת בפרט האישום
11 הראשון, הנוגעת לחלקו של הנאשם במימון אמצעי לחימה שונים של אנשי הרשות הפלסטינית
12 ושל גדודי חללי אלאקצא.
13
14 בכל הנוגע לסיפא של פרט אישום זה טענה ההגנה כי הנאשם לא ביצע כל עבירה, שכן כל שעשה
15 היה להעביר לערפאת את המסמך. הנאשם לא שילם את הסכום המבוקש בהעדר תקציב במשרדו,
16 והבקשה שולמה בכלל מתקציב משרד האוצר הפלסטיני.
17
18 אין בידי לקבל את הטענה שאין המדובר בעבירה. האישום המיוחס לנאשם הינו ביצוע שירות
19 עבור התאחדות בלתי מותרת. השירות שהעניק הנאשם לארגון גדודי חללי אלאקצא אמנם לא
20 התבטא בכך שהעביר כסף ממשרדו, אך שירות עדיין נעשה מצידו. שירות זה כלל קבלת הבקשה
21 והעברתה לערפאת. הנאשם היה הצינור באמצעותו סופלה ומומשה הבקשה. כאמור לעיל, וכפי
22 שהראינו בניתוח העובדות בפרט האישום הראשון, הנאשם היה חוליה משמעותית בכל מעשי
23 הרכש והכספים. לא זו אף זו, אלא הוא היה הצינור דרכו עברו כל הבקשות הכספיות ליאסר
24 ערפאת. כך גם במקרה זה. מעשה זה הינו שירות עבור התאחדות בלתי מותרת, ועל כן יש
25 להרשיעו במיוחס לו גם בסיפא של פרט אישום זה.
26
27 עוד יש לומר כי הדברים והאמנורים ביחס להגנת "מעשה מדינה" וצידוק שהועלו על ידי ההגנה,
28 נכונים גם ביחס לפרט אישום זה וביתר שאת, הואיל ובמקרה זה מדובר בסיווע ושירות ישיר
29 שהעניק הנאשם לארגון הטרור גדודי חללי אלאקצא.
30
31 **פרט אישום שלישי:**
32
33 פרט זה עניינו חלקו של הנאשם ברכש הספינה קארין א.
34
35 לטענת ההגנה הנאשם לא ביצע עבירה כלשהי. הכסף לרכישת הספינה לא הגיע מתקציבו אלא
36 מתקציב משרד אחר, עליו היה אחראי חרבי צרצור. הנאשם לא יום את הבאת ספינת הנשק,
37 והייתה לו לכל היותר ידיעה עקיפה ולא קונקרטית שהספינה תוביל נשק. כל שעשה היה להעביר
38 את המידע בדבר הספינה ליאסר ערפאת, שחשב שמדובר במזימה לרצוח אותו.
39

-34-

תיק מס׳ 3052/06    תאריך: 29/07/09

1  לאחר שבחנו את חומר הראיות, מצאנו כי העובדות המיוחסות לנאשם בפרט אישום זה הוכחו
2  כדרוש. למעשה, גם הנוגה לא חלקה על כך שהעובדות המפורטות בכתב האישום הוכחו
3  באמרותיו של הנאשם. אציין כי בכל הנוגע לרכש הספינה לא עלה כלל כי יאסר ערפאת סירב
4  לנושא או חשב כי המדובר במזימה. דברים אלה שנאמרו על ידי הנאשם, התייחסו למפגשים שלו
5  עם האירואנים המפורטים בפרט האישום הרביעי, ולא לנושא רכש הקארין A, אותו אישר ערפאת
6  ללא בעיות כלשהן, בהתאם לאמרות הנאשם.
7

8  השאלה המרכזית אותה העלתה ההגנה הינה האם מעשים אלה מהווים עבירה של סחר בציוד
9  מלחמתי.
10

11  הגדרת המילה "סחר" בצו בדבר איסור סחר בציוד מלחמתי הינה כדלקמן: "קניה, מכירה, תיווך,
12  מסירה, איחסון, חובלה, העברה, משלוח או תיקון"  .
13

14  פירושו של דבר, שסחר בציוד מלחמתי כולל לא רק פעולות של רכישה ומכירה, אלא גם תיווך
15  והובלה של נשק.
16

17  במקרה שלפנינו, הנאשם נטל חלק במעשים הבאים: הוא קיבל את פנייתו של פתחי ראזם למימון
18  ספינת נשק שתגיע מהאירואנים; הובהר לנאשם כי הקשר שיחיה על הספינה יהיה במימון איראני
19  ואילו על הרשות הפלסטינית לממן רק את הספינה והוצאותיה; הנאשם טיפל בפנייה, הוא העביר
20  את הדברים ליאסר ערפאת אשר אישר את הקשר והסכים לרכישה; כאשר הנאשם הוא זה שהעביר את
21  בקשת התשלום לערפאת, וזה אישר את העברת הכסף; כאשר הנאשם הודיע כי אין למשרדו
22  תקציב מותאם, הורה ערפאת כי התשלום יבוצע ממשרדו של חרבי צרצור והנאשם העביר גם
23  הוראה זו באמצעות שליח ממשרדו; פתחי ראזם עמד בקשר עם הנאשם לצורך קבלת הידיעה
24  האם ניתנה החוראה לחעברת הכסף.
25

26  מעובדות אלה עולה כי הנאשם היה מעורב בתיווך ובמימון של עסקת הנשק. גם אם משרדו לא
27  שילם את הכסף באופן ישיר, הנאשם הוא זה שיצר את הקשר עם ערפאת לשיקולו, לעיונו
28  ולהכרעתו את נושא עסקת הנשק. הנאשם היה הגורם המתווך בין פתחי ראזם, האיראנים
29  ואחרים לבין יאסר ערפאת. חלקו של הנאשם, לפיכך, אינו מינורי, אלא משמעותי. ניתן לומר כי
30  הנאשם היה גורם משמעותי בקידומה של העסקה, שכן קשריו עם ערפאת היו בעלי חשיבות עליונה
31  לצורך הוצאתה לפועל של חעיסקה.
32

33  גם אם משרדו של הנאשם לא מימן את העסקה מתקציבו השוטף, עדיין יש לומר כי הנאשם היה
34  מעורב בעסקה זו עד צוואר, והוא מהווה גורם אשר פעל באופן מהותי וממשי לצורך השגת
35  המימון לרכישת הספינה. לפיכך, יש לראותו כמי שהיה מעורב בקניה של הנשק במבצעים שניהל
36  מלכתחילה עם האיראנים, ברכישת האמצעי להובלת הנשק, ולכל הפחות במעשים המהווים תיווך
37  לרכישת הנשק.
38

תאריך : 29/07/09

תיק מסי : 3052/06

1   גם במקרה זה, ברור כי לא חלות ההגנות של מעשה מדינה וצידוק. במקרה זה הקשר חראשוני
2   החל עוד בטרם ידע ערפאת על נושא ספינת הנשק, כך שהנאשם ודאי אינו יכול לומר כי פעל מתוך
3   מילוי הוראות בלבד.

4

5   על כן יש לחרשיע את הנאשם במיוחס לו בפרט אישום זה.

6

7   פרט אישום רביעי:

8

9   פרט זה עניינו מגעים שניהל הנאשם עם נציגים אירלנדים מחוץ לאזור.

10

11   ההגנה לא חלקה בכל חנוגע לפרט זה כי הנאשם קיים פגישות עם מי שהציגו עצמם כאירלנדים,
12   וניהל שיחה כללית בדבר אפשרויות שאירן תסייע לרשות הפלסטינית. ההגנה טענה כי על התביעה
13   להביא תוספת ראייתית מסוג דבר מה על מנת להוכיח כי התקיימה פגישה כזו, וכי בני שיחו של
14   הנאשם היו אבן אירלנדים. עוד נטען כי מבחינתו של הנאשם היו פגישות אלה רוויות חשדנות
15   וזהירות ולא היו היו מתוך רצון לשתף פעולה, ועובדה כי ערפאת, שחתעבר אליו מסמך המתאר את
16   הפגישה, דחה את הרעיון שעלה בה.

17

18   ראשית, בכל הנוגע לתוספת הראייתית הנדרשת, אנו סבורים כי במקרה זה, גם בחיעדר תוספת
19   ראייתית לפרט זה כשלעצמו, קיומה של תוספת ראייתית לפרטים האחרים, מהווה תוספת
20   ראייתית גם ביחס לפרט אישום זה.

21

22   כפי שציינו לעיל, תוספת מסוג "דבר מה" הינה תוספת שנועדה לאמת את אמרות הנאשם. מכיוון
23   שמדובר בתוספת מאמתת ולא בתוספת מסבכת, אין הכרח כי חתוספת תתייחס לכל אחד ואחד
24   מפרטי האישום בנפרד, ובתנאי כי ישנו קשר בין פרטי האישום השונים בהם מדובר.

25

26   כאמור, קיימת במקרה שלפנינו זיקה בין מעשיו של הנאשם המפורטים בפרט אישום זה, למעשיו
27   המפורטים בפרטי האישום הקודמים. כולם נוגעים לעבודתו ומעמדו כאחראי הכספים ברשות
28   הפלסטינית וכאדם המקורב לערפאת. לפיכך, התוספת הראייתית שנמצאו ביחס לפרטי האישום
29   הראשון והשני (ת/8 ואמרתו של מתמוד עביאת) מהוות גם תוספת ראייתית לפרט זה.

30

31   עוד יש לדחות את טענת ההגנה כי המדובר במגעים ללא כוונה ממשית. אמנם, נראה כי המדובר
32   במגעים ראשוניים, אולם מעצם טיבם וטבעם של מגעים ראשוניים מסוג זה, הם מלווים, לעתים,
33   בחשדנות. אין פירושו של דבר כי הנאשם לא רצה לקדם את המגעים לאחר מכן, וחוא אף העביר
34   את נושא המגעים להחלטתו של יאסר ערפאת.

35

36   בל נשכח כי יסודות העבירה בה מדובר דורשים אך את קיומו של מגע, בין הנאשם לבין גורם אחר
37   שהינו חלק מארגון עויין. במקרה שלפנינו נראה מהעובדות שהוכחו כי לא זו בלבד שהנאשם אבן
38   נפגש וקיים מגעים עם פעילי מדינת אויב, אלא שהנאשם פעל מתוך רצון לממש את הסיכום עם

-36-

תיק מס׳: 3052/06                                      התאריך: 29/07/09

1  האיראנים ו״לחביא תוצאות״ לערפאת. לפיכך, אנו סבורים כי יסודות העבירה התקיימו
2  במקרה זה בנאשם.
3
4  עוד אציין כי גם במקרה זה ברור כי לא חלות החזנות של צידוק ו״ימעשה מדינה״, כיוון שהנאשם
5  לא קיבל כל הוראה או הנחייה לבצע את המיוחס לו בפרט זה, אלא פעל מיוזמתו ועל דעתו, ורק
6  בדיעבד העביר את תוצאות המפגש לאישורו של ערפאת.
7
8  לפיכך יש להרשיע את הנאשם במיוחס לו בפרט האישום הרביעי.
9
10  **סוף דבר**
11
12  לא מצאנו לנכון לקבל את טיעוני הזוטא של הנאשם. מצאנו לנכון לחעניק לאמרותיו המשטרתיות
13  ולזכ״דים מחקירותיו בשב״כ משקל מלא, ולהעדיף אב אמרותיו בכל מקום בו טען הנאשם אחרת
14  בפנינו. לאור המצווי באמרות חנאשם, סברנו כי קיימת תשתית עובדתית מלאה להוכחת
15  האישומים המיוחסים לנאשם.
16
17  לא עומדת לנאשם כל הגנה במקרה וו. לא חלה במקרה שלפנינו הגנת מעשה מדינה, בין היתר
18  כיוון שהרשות הפלסטינית אינה מדינה, ובתקופה הרלוונטית מעמדה היה רחוק עד יותר ממדינה
19  מאשר כיום. אף אם היתה קיימת הגנה זו במשפט האזור, לא היה חנאשם יכול לחסות בצילה,
20  לאור העובדה כי העביר נשק בידיעה כי זה עתיד לשמש ארגון טרור, כגדודי חללי אלאקצא.
21
22  לא עומדת לנאשם הגנת הצידוק, שכן גם בהתאם לפרשנות המרחיבה ביותר של הגנה זו (כאמור
23  בהחלטת חברי סגן הנשיא כאשר לטענות המקדמיות), הנאשם נטל חלק במעשים שאינם
24  לגיטימיים, שלא בהתאם לסמכויות שניתנו לרשות הפלסטינית בהסכמי הביניים, פעל פעמים
25  רבות מיוזמתו, ול05 דווקא כממלא הוראות, ואף אם חיו מקרים בהם מילא הוראות, דובר
26  במעשים שהנם בבירור בלתי חוקיים שכן כאמור, דובר בהעברת נשק ואמצעים לגורמי טרור.
27
28  אשר על כן החלטנו לחרשיע את הנאשם בכל המיוחס לו בכתב האישום.
29
30  **השופט סא״ל רונן עצמון:**
31  אני מסכים.
32
33  **השופט סא״ל טל בנד:**
34  אני מסכים.
35
36  ניתן והודע היום, 29/07/09, בפומבי ובמעמד הצדדים.
37
38
39

_____         _____         _____
    שופט                    נשיא                    שופט

-37-