# EXHIBIT 4

**[NOT YET SCHEDULED FOR ORAL ARGUMENT]**

No. 13-5312

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

RACHEL BERNSTEIN, et al.,

Plaintiffs-Appellants,

v.

JOHN F. KERRY, et al.,

Defendants-Appellees.

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**BRIEF FOR APPELLEES**

STUART F. DELERY
  *Assistant Attorney General*

RONALD C. MACHEN, JR.
  *United States Attorney*

DOUGLAS N. LETTER
SHARON SWINGLE
JAYNIE LILLEY
  *(202) 514-3542*
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7321*
  *U.S. Department of Justice*
  *950 Pennsylvania Ave., N.W.*
  *Washington, D.C. 20530*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES PURSUANT TO CIR. R. 28(a)(1)

### A.    Parties and Amici

Listed as plaintiffs-appellants on this Court's docket are Rachel Bernstein, Stuart Hersh, Ron Moritz, Joel Bailey, Moshe Fuld, Haim Barad, Louis Murray Lipsky, Ira Hartman, Keren Eizenberg, Chanie Geller, Greg Geller, Rachel Stern, Martha Lev-Zion, Norman Meskin, Cheryl Meskin, William Werblowsky, Mark Rebacz, Avi Penkower, Monty Pernkower, Susan Ireland, Brian Norin, and Nathan Lamm.

Defendants-appellees are John Kerry, United States Secretary of State; Thomas R. Nides, Deputy Secretary of State for Management and Resources; John Doe, Director, Office of U.S. Foreign Assistance Resources; Rajiv Shah, Administrator for the United States Agency for International Development; the United States Department of State; the United States Agency for International Development; and the Office of U.S. Foreign Assistance Resources.

There have been no amici curiae in this case.

**B.     Rulings Under Review**

Appellants seek review of the final order dismissing plaintiffs'

complaint for lack of jurisdiction entered on August 26, 2013 (Huvelle, J.).

The order is published at 962 F. Supp. 2d 122 (D.D.C. 2013) and JA 74-85.

**C.     Related Cases**

This case was not previously before this Court. We are not aware of

any related cases within the meaning of Rule 28(a)(1)(C).


                                        _s/ Jaynie Lilley_____
                                        Jaynie Lilley
                                        Counsel for Appellees

# TABLE OF CONTENTS

**Page**

GLOSSARY

INTRODUCTION ...................................................................................1

STATEMENT OF JURISDICTION ......................................................2

STATEMENT OF THE ISSUES ..........................................................2

PERTINENT STATUTES .....................................................................2

STATEMENT OF THE CASE ...............................................................3

A.  U.S. FOREIGN ASSISTANCE TO THE PALESTINIAN
    AUTHORITY ..............................................................................3

B.  FACTUAL BACKGROUND AND PRIOR PROCEEDINGS ...........9

SUMMARY OF ARGUMENT ..............................................................12

STANDARD OF REVIEW ...................................................................13

ARGUMENT..........................................................................................14

I.  PLAINTIFFS LACK ARTICLE III STANDING TO
    CHALLENGE THE UNITED STATES' PROVISION
    OF FOREIGN ASSISTANCE TO THE PALESTINIAN
    AUTHORITY, THE U.N. RELIEF AND WORKS AGENCY,
    AND OTHER ENTITIES IN THE WEST BANK AND GAZA ...........14

    A.  Plaintiffs' speculative assertions are insufficient to
        demonstrate traceability or redressability ....................................14

       B.     Plaintiffs also have failed to show a concrete and
             actual or imminent injury-in-fact that supports
             Article III standing .......................................................................29

II.    THE COURT DID NOT ERR IN REFUSING TO GRANT
      PLAINTIFFS' REQUEST FOR ARGUMENT OR DECLINING
      TO PERMIT PLAINTIFFS TO AMEND THEIR COMPLAINT ..........32

CONCLUSION .......................................................................................34

CERTIFICATE OF COMPLIANCE WITH
FEDERAL RULE OF APPELLATE PROCEDURE 32(A)

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                              **Page**

*Aerotrade, Inc. v. Agency for Int'l Dev.,*
   387 F. Supp. 974 (D.D.C. 1974) ................................................................28

*American Jewish Congress v. Vance,*
   575 F.2d 939 (D.C. Cir. 1978) ................................................................30

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ........................................................ 17, 18, 27

*Block v. Meese,*
   793 F.2d 1303 (D.C. Cir. 1986) ................................................................24

*Bryant v. Yellen,*
   447 U.S. 352 (1980) ................................................................28

*Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.,*
   333 U.S. 103 (1948) ................................................................12

*City of Los Angeles v. Lyons,*
   461 U.S. 95 (1983) ................................................................31

*Clapper v. Amnesty Int'l USA,*
   133 S. Ct. 1138 (2013) ........................................ 13, 24, 26, 30, 31

*Clinton v. City of New York,*
   524 U.S. 417 (1998) ................................................................28

*Communities for a Better Environment v. EPA,*
   __F.3d __, 2014 WL 1394655 (D.C. Cir. Apr. 11, 2014) ................................18

* Authorities chiefly relied upon are marked with an asterisk.

*Confederate Memorial Ass'n, Inc. v. Hines,*
    995 F.2d 295 (D.C. Cir. 1993) .......................................................33

*Foman v. Davis,*
    371 U.S. 178 (1962) ........................................................................33

*\*Kowal v. MCI Communications Corp.,*
    16 F.3d 1271 (D.C. Cir. 1994) ................................................ 14, 33

*\*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) .................................................................. 27, 30

*Mahorner v. Bush,*
    224 F. Supp. 2d 48 (D.D.C. 2002) ...............................................31

*Monsanto Co. v. Geertson Seed Farms,*
    130 S. Ct. 2743 (2010) ...................................................................14

*National Black Police Association v. Velde,*
    631 F.2d 784 (D.C. Cir. 1980) ......................................................28

*Piersall v. Winter,*
    435 F.3d 319 (D.C. Cir. 2006) ......................................................13

*\*Rothstein v. UBS AG,*
    708 F.3d 82 (2d Cir. 2013) ....................................................... 21, 22

*Simon v. Eastern Kentucky Welfare Rights Org.,*
    426 U.S. 26 (1976) .........................................................................24

*Talenti v. Clinton,*
    102 F.3d 573 (D.C. Cir. 1996) ......................................................27

* Authorities chiefly relied upon are marked with an asterisk.

*Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,*
 454 U.S. 464 (1982) ...................................................................29

*\*Warth v. Seldin,*
 422 U.S. 490 (1975) ............................................................. 17, 32

*\*Yates v. Municipal Mortgage & Equity, LLC,*
 744 F.3d 874 (4th Cir. 2014)............................................... 17, 27

**Statutes:**

18 U.S.C. § 2339A ......................................................................10

18 U.S.C. § 2339B ......................................................................10

22 U.S.C. § 2221.....................................................................3, 10

22 U.S.C. § 2227........................................................................10

22 U.S.C. § 2291..........................................................................5

22 U.S.C. § 2346......................................................................5, 6

22 U.S.C. § 2349aa..................................................................5, 23

22 U.S.C. § 2349aa-7 ................................................................23

22 U.S.C. § 2378b...................................................................6, 10

22 U.S.C. § 2378c...................................................................6, 10

---

\* Authorities chiefly relied upon are marked with an asterisk.

v

22 U.S.C. § 2381 .................................................................5

22 U.S.C. § 2395 ..............................................................5, 10

22 U.S.C. § 5202 ............................................................. 10, 11

28 U.S.C. § 1291 .................................................................2

28 U.S.C. § 1331 .................................................................2

28 U.S.C. § 1346 .................................................................2

28 U.S.C. § 1361 ..............................................................2, 12

Department of State, Foreign Operations, and Related Programs
   Appropriations Act of 2012 ,
   Pub. L. No. 112-74, 125 Stat. 786 ................................... 6, 7, 25


**Executive Orders, Presidential Determinations, and Other:**

Exec. Order No. 12,163,
   44 Fed. Reg. 56,673 (Sept. 29, 1979) .................................5, 6

Pres. Determ. No. 2012-0777,
   77 Fed. Reg. 33,947 (Apr. 25, 2012) ...................................7

77 Fed. Reg. 44,307 (July 27, 2012) ....................................19

**Rules:**

Federal Rule of Civil Procedure 8 .......................................16

---

* Authorities chiefly relied upon are marked with an asterisk.

**Legislative Materials:**

Hearing of the Middle East and South Asia Subcommittee of the
    House Foreign Affairs Committee, *Promoting Peace? Reexamining
    U.S. Aid to the Palestinian Authority* (July 12, 2011) .....................................4, 7

Hearing of the Middle East and North Africa Subcommittee of the
    House Foreign Affairs Committee, *The Administration's
    FY 2015 MENA (Middle East and North Africa) Budget Request: Priorities,
    Objectives and Challenges*, Fed. News Serv., (Apr. 29, 2014)..........................9

**Other Authorities:**

Department of State, Congressional Budget Justification App.
    Vol. 2: Foreign Operations (FY 2015), *available at*
    http://www.state.gov/documents/organization/ 224069.pdf ..... 8, 18, 27

Department of State, Country Reports on Terrorism 2013 *available at*
    http://www.state.gov/ documents/organization/225886.pdf ............8, 20

Interim Agreement on the West Bank and Gaza Strip,
    Isr.-Palestine Lib. Org., Sept. 28, 1995, 36 I.L.M. 551 ......................................3

Jim Zanotti, Cong. Res. Serv., RS 22967,
    *U.S. Foreign Aid to the Palestinians* (2013) available at
    http://www.fas.org/sgp/crs/mideast/RS22967.pdf..................................4

Office of the Spokesman, Department of State, U.S.
    Commitment to the Palestinian People (July 16, 2007),
    available at http://2001-2009.state.gov/r/pa/prs/ps/2007/
    88514.htm .................................................................................................20

S. Stotsky, *Does Foreign Aid Fuel Palestinian Violence?*, 15 Middle East
    Quarterly 23 (2008), available at http://www.meforum.org/1926/

* Authorities chiefly relied upon are marked with an asterisk.

does-foreign-aid-fuel-palestinian-violence ......................................... 3, 17, 18

Statement of Sec. Condoleezza Rice, *Statement on Palestinian
    Assistance* (Apr. 7, 2006), *available at* http://2001-
    2009.state.gov/secretary/rm/2006/64237.htm ........................................... 20

---

\* Authorities chiefly relied upon are marked with an asterisk.

viii

# GLOSSARY

| | |
|---|---|
| Compl. | Complaint |
| JA | Joint Appendix |
| Pl. Br. | Plaintiffs' Brief |
| SA | Supplemental Appendix |
| State Appropriations Act | Department of State, Foreign Operations, and Related Programs Appropriations Act of 2012, Pub. L. No. 112-74, 125 Stat. 786 |
| U.N. Relief and Works Agency | United Nations Relief and Works Agency for Palestine Refugees in the Near East |
| USAID | U.S. Agency for International Development |

## INTRODUCTION

Plaintiffs are United States citizens living in Israel, who allege that the U.S. Government has failed to comply with certain conditions on the provision of foreign assistance to the Palestinian Authority and other entities and organizations in the Middle East and has thereby funded terrorism against civilians in Israel. The United States deplores acts of international terrorism and strives to disrupt terrorism financing and to promote peace in the Middle East. The U.S. Government does not provide funding to terrorists. The U.S. Government's policy of providing assistance to the Palestinian Authority and other organizations in the region promotes stability and reduces acts of terrorism in the region.

This case was properly dismissed by the district court because plaintiffs' speculative and conclusory assertions that the United States is funding Palestinian terrorism fail to establish Article III standing. Plaintiffs have not established that the United States' provision of foreign assistance for the avowed purpose of promoting civil society and enhancing regional security is instead facilitating terrorism. Nor have plaintiffs shown that disrupting U.S. assistance in the region — or compelling compliance with

certain certification or reporting requirements — would reduce the terrorist threat.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. §§ 1331, 1346(a)(2), and 1361. JA 15. The district court dismissed plaintiffs' claims for lack of standing on August 26, 2013. JA 85. Plaintiffs filed a timely notice of appeal on October 16, 2013. JA 86-87. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether American citizens in Israel threatened by Palestinian terrorism have sufficiently alleged Article III standing to challenge alleged non-compliance with various statutes that limit, condition, or prohibit U.S. foreign assistance to certain individuals and entities.

2. Whether the district court abused its discretion in dismissing plaintiffs' complaint without oral argument and without *sua sponte* providing the opportunity to plaintiffs to amend their complaint.

## PERTINENT STATUTES

Pertinent statutes are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

Plaintiffs are American citizens who reside in Israel and are "fearful of terrorist attacks." SA 2 (Compl. ¶1). Plaintiffs seek to challenge the U.S. Government's decisions to provide foreign assistance to the Palestinian Authority and to certain nongovernment and other organizations operating in the West Bank and Gaza. SA 2 (Compl. ¶1). The plaintiffs request "mandamus relief compelling the government officers and agencies of the United States . . . to seek recovery of [these] funds." SA 57 (Compl. at 57).

## A.   U.S. FOREIGN ASSISTANCE TO THE PALESTINIAN AUTHORITY

The United States, through coordinated actions of the Executive Branch and Congress, provides foreign assistance to the Palestinian Authority as well as to organizations working in the West Bank and Gaza. The Palestinian Authority is an entity created by agreement between Israel and the Palestine Liberation Organization, *see* Interim Agreement on the West Bank and Gaza Strip, Isr.-Palestine Lib. Org., Sept. 28, 1995, 36 I.L.M. 551, and receives funding from numerous foreign countries. *See, e.g.*, S. Stotsky, *Does Foreign Aid Fuel Palestinian Violence?*, 15 Middle East Quarterly 23 (2008), available at http://www.meforum.org/1926/does-foreign-aid-fuel-palestinian-violence (cited at JA 67). The United States

3

provides funding to the Palestinian Authority and organizations in the

region in furtherance of our foreign policy to "achieve a two-state solution

as part of a comprehensive regional peace" in the Middle East. JA 49. The

United States has provided financial assistance across multiple

administrations and Congresses to the Palestinian Authority and other

organizations working in the Middle East, including the United Nations

Relief and Works Agency for Palestine Refugees in the Near East (U.N.

Relief and Works Agency).[1]  U.S. Government support for the Palestinian

---

[1] *See* Hearing of the Middle East and South Asia Subcommittee of the House Foreign Affairs Committee, *Promoting Peace? Reexamining U.S. Aid to the Palestinian Authority*, at 9-10 (July 12, 2011) (Prepared Statement of Deputy Assistant Secretary for Near Eastern Affairs Jacob Walles) (Walles Testimony) ("Our assistance to the Palestinians dates back many decades and has long enjoyed bipartisan support. . . . In the Administration of President George H.W. Bush, our assistance supported the Palestinian people as we first began direct negotiations after the Madrid Middle East Peace Conference in 1991.  Under the Administration of President Clinton, we began to support the Palestinian Authority that was set up after the first Israeli-Palestinian agreements were signed in the 1990s.  Under President George W. Bush, we began a program to provide security assistance to the Palestinian Authority. . . .  President Bush also authorized the largest aid package to the Palestinian Authority in U.S. history.  President Obama has continued this effort in strong support for this security assistance program and for extensive development and humanitarian programs for the Palestinians."); *see also* Jim Zanotti, Cong. Res. Serv., RS 22967, *U.S. Foreign Aid to the Palestinians* App. A at 26, (2013) (Zanotti Report), available at

*Continued on next page.*

Authority and the Palestinian people is intended to promote the

Palestinian Authority's fiscal viability, strengthen public institutions,

develop the Authority's capacity to provide security, foster private-sector

economic growth, and meet humanitarian needs. JA 49.

Through the Foreign Assistance Act, related statutes, and the annual

appropriation of foreign assistance funds, Congress has authorized the

provision of various forms of foreign assistance to countries and

organizations. *See, e.g.*, 22 U.S.C. § 2346 (economic and political support);

22 U.S.C. § 2291 (counternarcotic and anticrime assistance); 22 U.S.C.

§ 2349aa (antiterrorism assistance). The Act authorizes the President to

formulate and implement activities under the Act. *E.g.*, 22 U.S.C. § 2395(a)

(assistance may be furnished "on such terms . . . as may be determined to

be best suited to the achievement of the purposes of [the Act]"); 22 U.S.C. §

2346(a) (authorizing the President "to furnish assistance to countries and

organizations, on such terms and conditions as he may determine, in order

to promote economic or political stability"). Many of the authorities of the

Act have been delegated to the Secretary of State. *See* Exec. Order No.

---

http://www.fas.org/sgp/crs/mideast/RS22967.pdf; *see also id.* at 12, tbl. 2
(discussing U.N. Relief and Works Agency).

5

12,163, 44 Fed. Reg. 56,673 (Sept. 29, 1979) (reprinted as amended at 22

U.S.C. § 2381 note).  The Act further states that "[t]he Secretary of State

shall be responsible for policy decisions and justifications for economic

support programs under this part," including Economic Support Funds.  22

U.S.C. § 2346(b).  The Secretary "exercise[s] this responsibility in

cooperation with the Administrator" of the U.S. Agency for International

Development (USAID).  *Id.*

In both permanent law and annual appropriations acts, Congress has

enacted a number of statutory conditions relating to foreign assistance to

the Palestinian Authority and for the West Bank and Gaza.  *See, e.g.*, 22

U.S.C. § 2378b ("Limitation on Assistance to the Palestinian Authority"); 22

U.S.C. § 2378c ("Limitation on Assistance for the West Bank and Gaza");

Department of State, Foreign Operations, and Related Programs

Appropriations Act of 2012 (State Appropriations Act), Pub. L. No. 112-74,

§§ 7035-40, 125 Stat. 786.  One such condition states that the Secretary of

State "shall take all appropriate steps to ensure that such assistance is not

provided to or through any individual, private or government entity, or

educational institution that the Secretary knows or has reason to believe

advocates, plans, sponsors, engages in, or has engaged in, terrorist

6

activity . . . . " State Appropriations Act, § 7039(b). The Secretary is

directed to establish procedures to implement these restrictions and to

"terminate assistance to any individual, entity, or educational institution

which the Secretary has determined to be involved in or advocating

terrorist activity." *Id.* The Secretary is prohibited from providing certain

appropriated funds for the West Bank and Gaza "for the purpose of

recognizing or otherwise honoring individuals who commit, or have

committed acts of terrorism." *Id.* § 7039(c)(1).

Other statutory conditions on foreign assistance for the West Bank

and Gaza allow for the provision of assistance upon a waiver by the

President or the Secretary of State. For example, section 7040 of the State

Appropriations Act prohibits the provision of certain appropriated funds

to the Palestinian Authority. However, the prohibition does not apply "if

the President certifies in writing [to Congress] that waiving such

prohibition is important to the national security interests of the United

States." *Id* § 7040(b). The President has made that certification. *See, e.g.*,

Pres. Determ. No. 2012-0777, 77 Fed. Reg. 33,947 (Apr. 25, 2012).

As the State Department has explained, U.S. government assistance

in the region "creates an atmosphere that supports negotiations,

7

encourages broad-based economic growth, promotes democratic

governance, and improves the everyday lives of Palestinians, thereby

creating an environment supportive of a peace agreement and contributing

to the overall stability and security of the region." Department of State,

Congressional Budget Justification App. Vol. 2: Foreign Operations, 127

(FY 2015), *available at* http://www.state.gov/documents/organization/

224069.pdf. Recent reports from the region indicate that the Palestinian

Authority "continued to detain terrorists in the West Bank, and [Palestinian

Authority] authorities tried some detainees in civilian and military courts."

*See* Department of State, Country Reports on Terrorism 2013, 146-49

(Country Reports on Terrorism), *available at* http://www.state.gov/

documents/organization/225886.pdf. In addition, the Palestinian

Authority "continued to detain Hamas elements, operations often

protested by Hamas officials." *Id.* The U.N. Relief and Works Agency

"plays a stabilizing role in the Middle East through its assistance programs,

serving as an important counterweight to extremist elements."

Department of State, Congressional Budget Justification App. Vol. 2:

Foreign Operations, 134 (FY 2015), *available at* http://www.state.gov/

documents/organization/ 224069.pdf. The State Department's public

comments have made clear that the U.S. Government does not fund

terrorist groups, including Hamas.  *See, e.g.,* Hearing of the Middle East

and North Africa Subcommittee of the House Foreign Affairs Committee,

*The Administration's FY 2015 MENA (Middle East and North Africa) Budget*

*Request: Priorities, Objectives and Challenges,* Fed. News Serv., 13 (Apr. 29,

2014) (Statement of Anne Patterson, Assistant Secretary of State, Bureau of

Near Eastern Affairs) ("But let me be utterly clear about our policy towards

Hamas.  No U.S. governmental money will go into any government that

includes Hamas until Hamas accepts the Quartet conditions.  And that's

renouncing violence, recognizing previous agreements and most explicitly

recognizing Israel's right to exist."); *see also id.* at 27 (describing auditing

and review process for funds provided to the Palestinian Authority as the

"most extensive reviewed foreign-assistance program that we have on the

planet").

## B.    FACTUAL BACKGROUND AND PRIOR PROCEEDINGS

Plaintiffs filed suit in the district court for the District of Columbia,

asserting that the Secretary of State and other government officials violated

9

various civil and criminal statutes[2] in providing financial assistance to the

Palestinian Authority and other entities and organizations in the West

Bank and Gaza, including the U.N. Relief and Works Agency.  They further

allege that the foreign aid to the Palestinian Authority has flowed "into the

hands of Hamas" and other recognized terrorist organizations, thereby

endangering the plaintiffs.  SA 2-3 (Compl. ¶¶2-3).  Invoking the district

court's mandamus jurisdiction, plaintiffs seek to compel the Secretary of

State and other government officials to comply with statutory conditions,

to take measures to prevent the use of federal funds to support terrorism,

and to seek recovery of funds previously provided.  SA 57 (Compl. at 57).

They also seek to enjoin the same officials from funding the Palestinian

Authority, the U.N. Relief and Works Agency, and other organizations in

---

[2] Plaintiffs claim violations of the State Appropriations Act, *see* SA 44-51 (Compl. ¶¶259-299); criminal statutes prohibiting the provision of material support to terrorist organizations, 18 U.S.C. §§ 2339A, 2339B, *see* SA55-56 (Compl. ¶¶327-337); and laws prohibiting the provision of funds to the Palestinian Authority, the Palestinian Liberation Organization, and the United Nations Relief Works Agency for Palestine Refugees without a Presidential waiver and/or congressional certification by the Secretary of State, 22 U.S.C. §§ 2221(c), 2227, 2378b, 2378c, 5202, *see* SA 51-55(Compl. ¶¶300-326).

10

the West Bank and Gaza, "until those actors are ready and able to fully comply with federal prohibitions against the support for terrorism." *Id.*

The district court granted the government's motion to dismiss for lack of jurisdiction, holding that plaintiffs fail to establish any of the three elements for Article III standing. Plaintiffs fail to show injury-in-fact, because their subjective fears of future terrorist attacks and fears "arising from a foreign policy" are "too speculative to satisfy the well-established requirement that the threatened injury must be certainly impending to create standing." JA 79-80 (internal quotation marks and citations omitted). Nor can they show an injury based on their interests as citizens in the government's compliance with the law. JA 80-81.

The district court also held that plaintiffs fail to show that their asserted injuries are traceable to the provision of U.S. foreign assistance in alleged violation of funding restrictions. JA 82. The district court noted that plaintiffs' theory of standing is premised on mere speculation about "whether defendants' funding policies were in fact aiding terrorists" or causing a greater likelihood of a "'certainly impending' injury for plaintiffs." JA 82.

11

Finally, the district court held that plaintiffs have not shown redressability because "[i]t is nothing more than conjecture to argue that changing U.S. funding policies will reduce terrorism or plaintiffs' subjective fears." JA 83.

Having held that plaintiffs lack standing, the district court declined to reach the government's additional arguments that the political question doctrine bars this action and that the court lacks jurisdiction under the Mandamus Act, 28 U.S.C. § 1361. The court suggested, however, that plaintiffs' allegations are "far beyond the [c]ourt's jurisdiction." JA 83 (citing *Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948)).

## SUMMARY OF ARGUMENT

Based on their disagreement with the conduct of U.S. foreign policy, plaintiffs seek to involve this Court in reviewing sensitive foreign policy judgments by Executive Branch officials. Plaintiffs' claims fail at the threshold, because they fail to establish Article III standing to challenge U.S. foreign policy and provision of financial assistance to the Palestinian Authority, the U.N. Relief and Works Agency, and other organizations in the West Bank and Gaza.

12

First, plaintiffs cannot base standing on speculative and conclusory allegations that the United States provides financial assistance that is used to fund terrorist attacks. They provide no detailed factual allegations to support a causal connection between the provision of U.S. assistance and terrorism. Plaintiffs also cannot show that any terrorism would decrease if the U.S. Government ceased providing foreign assistance in the region or that their injuries would otherwise be redressed by compliance with certification and waiver requirements or by disrupting U.S. financial assistance. Second, standing based on injury arising from plaintiffs' present fears and reactions to the possibility of future attacks is foreclosed by *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138 (2013) (holding that subjective fears of possible future surveillance and the costs and burdens associated with those fears could not establish standing). Nor is plaintiffs' general interest in forcing the U.S. Government to comply with the law a cognizable injury.

## STANDARD OF REVIEW

This Court reviews the district court's grant of a motion to dismiss *de novo. See Piersall v. Winter*, 435 F.3d 319, 321 (D.C. Cir. 2006). The district court's dismissal with prejudice, without *sua sponte* offering plaintiffs leave

13

to amend their complaint, is reviewed for abuse of discretion.  *See Kowal v.*

*MCI Communications Corp.*, 16 F.3d 1271, 1280 (D.C. Cir. 1994).

## ARGUMENT

I. **PLAINTIFFS LACK ARTICLE III STANDING TO CHALLENGE THE UNITED STATES' PROVISION OF FOREIGN ASSISTANCE TO THE PALESTINIAN AUTHORITY, THE U.N. RELIEF AND WORKS AGENCY, AND OTHER ENTITIES IN THE WEST BANK AND GAZA.**

The district court correctly held that plaintiffs lack standing to

challenge the U.S. Government's provision of foreign assistance to the

Palestinian Authority, the U.N. Relief and Works Agency, and other

entities and organizations operating in the West Bank and Gaza.  To satisfy

the minimum requirements of Article III, plaintiffs must demonstrate an

injury-in-fact that is (1) "concrete, particularized, and actual or imminent";

(2) "fairly traceable to the challenged action"; and (3) "redressable by a

favorable ruling." *Monsanto Co. v. Geertson Seed Farms,* 130 S. Ct. 2743, 2752

(2010).  Neither of plaintiffs' theories of standing meets these standards.

### A. Plaintiffs' speculative assertions are insufficient to demonstrate traceability or redressability.

Plaintiffs' primary argument is that they have standing, because the

U.S. Government's challenged provision of foreign assistance increases the

risk that plaintiffs will be injured by terrorist attacks in Israel.  Plaintiffs

assert that they suffer present and threatened future injury as a result of Palestinian terrorist attacks.

In order for the plaintiffs to establish standing in this case, plaintiffs' alleged injuries, which are claimed to result from ongoing Palestinian terrorist attacks in Israel, must be traceable to the U.S. Government's provision of foreign assistance in alleged contravention of various funding conditions. Those alleged injuries must also be redressable if funding is discontinued or provided only under different conditions. Plaintiffs' allegations are plainly insufficient in both respects.

1.    Plaintiffs offer virtually no support for their contention that, when the U.S. Government provides foreign aid to the West Bank and Gaza for the explicit purpose of enhancing security, developing the economy, and strengthening the capacity of the Palestinian Authority and other public institutions, it increases the incidence of terrorist attacks in Israel.

Plaintiffs make conclusory allegations "[u]pon information and belief" that "USAID routinely gives money to actors in the West Bank and Gaza who support terrorist or are themselves terrorists," and that USAID funds "routinely wind up in the hands of Hamas [] or other terrorist

15

organizations." SA 9 (Compl. ¶¶57-58). Plaintiffs similarly assert that "[a]t

least some of the direct aid given to the Palestinian Authority is used to

finance terrorism," and that the "Palestinian Authority pays the salaries of

terrorists" and supports organizations with "a terrorist component." *Id.* at

39-40 (Compl. ¶¶222, 227-28). But plaintiffs' allegations supply no details

about the identity of entities or individuals to which financial assistance is

allegedly given, the basis for concluding that the recipients of financing are

terrorists, or factual allegations sufficient to derive a causal connection

between that asserted financing and terrorist attacks against plaintiffs.

Their failure to allege "specific, concrete facts demonstrating that the

challenged practices harm [them] and that [they] personally would benefit

in a tangible way from the court's intervention," defeats Article III

standing. *Warth v. Seldin*, 422 U.S. 490, 508 (1975).

Plaintiffs assert that the Court must accept as true their generalized

assertions that U.S. foreign assistance to the Palestinian Authority, the U.N.

Relief and Works Agency, and other organizations has led to a material

increase in Palestinian terrorism. Pl. Br. 33-34. Under Federal Rule of Civil

Procedure 8(a), however, conclusory assertions are only entitled to be

credited if they are plausible and supported by particularized factual

16

allegations. *See, e.g., Yates v. Municipal Mortgage & Equity, LLC,* 744 F.3d

874, 899 (4th Cir. 2014) (citing and analyzing *Ashcroft v. Iqbal ,* 556 U.S. 662,

678 (2009)). Here, U.S. foreign assistance was provided for the specific

purpose of strengthening the Palestinian Authority's capacity to safeguard

national and regional security as well as to promote economic growth. *See,*

*e.g.,* JA 49, 54. Plaintiffs do not assert that the Palestinian Authority itself

carries out terrorist activities, nor do they dispute that the Palestinian

Authority carries out a broad range of governmental and humanitarian

activities. Plaintiffs' assertions that the Palestinian Authority funds

terrorism are entirely conclusory and generalized and are not entitled to be

taken as true. *See, e.g.,* SA 40 (Compl. ¶220, 227) (alleging without

elaboration that many members of the Palestinian Authority "are

themselves terrorists or have ties to terrorism"). Plaintiffs' allegations

provide no basis for concluding that it is plausible to infer that U.S. foreign

assistance has increased, rather than decreased, terrorist activity.

Plaintiffs rely on statistics that purportedly demonstrate a

relationship between the amount of foreign aid provided to the Palestinian

Authority between 1999 and approximately 2007 and an increase in the

incidence of terrorist attacks. *See* Pl. Br. 34; JA 66-68 (citing S. Stotsky,

17

*supra*).  At most, however, those figures demonstrate a correlation—not a

causal connection—between the amount of aid provided to the Palestinian

Authority by approximately 87 different foreign countries and

organizations and terrorist attacks in the region during a time of extreme

political and social upheaval.  *Id.*  It is equally plausible that discontinuance

or diminution of foreign aid would have led to even greater destabilization

and deterioration of the security situation in the region.  *Cf. Communities for

a Better Environment v. EPA*, __F.3d __, 2014 WL 1394655, at *5 (D.C. Cir.

Apr. 11, 2014) (Plaintiffs' theory of causation was a "bridge too far" where

they could not show that a carbon monoxide standard they preferred

would worsen carbon monoxide levels as compared to the EPA standard).

The State Department's considered judgment is that provision of financial

assistance to the Palestinian Authority and to other organizations in the

region "creates an atmosphere that supports negotiations, encourages

broad-based economic growth, promotes democratic governance, and

improves the everyday lives of Palestinians, thereby creating an

environment supportive of a peace agreement and contributing to the

overall stability and security of the region."  Department of State,

Congressional Budget Justification App. Vol. 2: Foreign Operations, 127

(FY 2015), *available at* http://www.state.gov/documents/organization/
224069.pdf.

Plaintiffs also allege that Hamas won majority control of the seats in
the Palestinian parliament in 2006 and has had control at least at some
point of "portions of the Palestinian Authority." SA 10, 11, 13-14 (Compl.
¶¶61-63, 66, 84-85). Hamas has been designated a terrorist organization
under the specially designated global terrorist regime under Executive
Order No. 13224 and the Immigration and Nationality Act's foreign
terrorist organization scheme. *See* SA 9 (Compl. ¶55); 77 Fed. Reg. 44,307
(July 27, 2012). Plaintiffs allege that funds provided to the Palestinian
Authority "regularly wind up in the hands of" Hamas or other terrorist
organizations or their agents. SA 15 (Compl. ¶94). Again, however, the
complaint provides no detailed allegations about U.S. Government funding
that is assertedly transferred to Hamas, the quantity of funding transferred,
the specific nature of control over "portions of the Palestinian Authority"
held by Hamas, or the mechanism by which members of parliament
affiliated with Hamas use their alleged control over the Palestinian
Authority to transfer funds to Hamas. They offer no details about when
these transactions may have occurred. Nor do plaintiffs offer any basis to

19

support their assumption that discontinuing U.S. foreign assistance to the

Palestinian Authority would cut off funding to Hamas. To the contrary,

recent State Department reports indicate that the Palestinian Authority is

taking steps to detain members of Hamas. *See* Country Reports on

Terrorism, at 146-49. Plaintiffs also fail to acknowledge that the United

States suspended assistance to the Palestinian government's cabinet and

ministries in April 2006 after the Hamas-led government failed to accept

the Quartet principles of non-violence, recognition of Israel and respect for

previous agreements between the parties. Such assistance only resumed in

June 2007 after a new Palestinian government committed to the Quartet

principles was formed. *See* Statement of Sec. Condoleezza Rice, *Statement*

*on Palestinian Assistance* (Apr. 7, 2006), *available at* http://2001-

2009.state.gov/secretary/rm/ 2006/64237.htm; Office of the Spokesman,

Department of State, *U.S. Commitment to the Palestinian People* (July 16,

2007), *available at* http://2001-2009.state.gov/r/pa/prs/ps/2007/

88514.htm.[3] Plaintiffs' conclusory and factually unsupported allegations

---

[3] While the Palestinian Authority and Hamas have been engaged in reconciliation discussions since 2011, the discussions have not to date yielded a new government. The U.S. Government has been clear that, "[i]f

*Continued on next page.*

are insufficient to show that the U.S. Government funds Hamas for the purposes of establishing standing.

Finally, plaintiffs challenge the provision of U.S. foreign assistance to the U.N. Relief and Works Agency, but they provide nothing beyond conclusory and generalized allegations tying that foreign assistance to terrorism. Plaintiffs allege, for example, that U.S. funding provided to the U.N. Relief and Works Agency "facilitates violence against Israeli citizens by creating a climate of hostility in the West Bank and Gaza," and that "much of the aid that [U.N. Relief and Works Agency] provides winds up being diverted to terrorism and is used to harm civilians." SA 43-44 (Compl. ¶¶247-252). Those generalized, unsupported assertions are inadequate to establish that the alleged wrongdoing that is the basis of plaintiffs' claims is traceable to terrorist attacks that threaten plaintiffs.

In arguing that they have standing, plaintiffs rely on *Rothstein v. UBS AG*, 708 F.3d 82, 92 (2d Cir. 2013). In that case, however, the defendant bank had transferred hundreds of millions of dollars in cash to Iran, during a period that Iran was designated as a state sponsor of terrorism and

a new government emerges, we will evaluate it carefully, and our assistance will be guided by all relevant U.S. law." Walles testimony, at 11.

21

served as a *de facto* "central banker for terrorism around the world." *Id.* at 86 (internal quotation marks omitted). Iran, in turn, was alleged to have provided hundreds of millions of dollars to terrorist organizations Hamas, Hizbollah, and Palestinian Islamic Jihad, for the specific and mutually-agreed-upon purpose of funding widespread terrorist attacks against the Jewish civilian population in Israel. In that case, plaintiffs had themselves been injured by terrorist attacks and were seeking financial damages as redress for their injuries. The court of appeals held that these allegations were sufficient to show standing under the Anti-Terrorism Act, *id.* at 92-93.

In the view of the U.S. government, an individual injured by a terrorist attack might have Article III standing to sue an individual or entity that provided financial assistance to the terrorist. The government has previously explained, in addressing the standard for substantive liability under the Anti-Terrorism Act, that a plaintiff injured by an act of terrorism has a valid claim against a defendant that provided financial assistance to the terrorist organization, knowing that the organization engaged in terrorism, so long as the act of terrorism that injured the plaintiff was reasonably foreseeable to the defendant at the time it provided assistance. *See* Government Amicus Brief, *Boim v. Quranic*

*Literacy Institute*, Nos. 01-1969, 01-1970 (7th Cir. Nov. 15, 2001);

Government Amicus Brief, *Boim v. Holy Land Foundation*, Nos. 05-1815, 05-1816, 05-1821, 05-1822 (7th Cir. Aug. 22, 2008).[4]  In the government's view, such a plaintiff would also have Article III standing.  We therefore urge the Court not to adopt a view of standing in this case that would preclude a suit brought by a plaintiff injured by a terrorist attack against those who fund terrorism, if the plaintiff adequately alleges facts sufficient to show proximate cause.

But here, and in contrast to *Rothstein*, plaintiffs have not sufficiently pled that U.S. government funds were provided to terrorist groups, or that the funds were provided with knowledge or the intent that they would facilitate terrorist attacks.  Nor could they.  Plaintiffs' own complaint makes clear that U.S. foreign assistance is intended in part to enhance the ability of the Palestinian Authority "'to deter terrorists and terrorist groups from engaging in international terrorist acts'" and to detect, deter, and prevent

---

[4] A petition for certiorari concerning the legal standard for establishing liability under the Anti-Terrorism Act for providing material support to a terrorist is also presently before the Supreme Court in *In re Terrorist Attacks of 9/11 [O'Neill v. Al-Rahji Bank]*, No. 13-318 (S. Ct. petition for certiorari filed Sep. 9, 2013).  The Supreme Court has invited the views of the Solicitor General on the pending petition.

acts of terrorism. SA 7 (Compl. ¶¶43-44 (citing and quoting 22 U.S.C.

§§ 2349aa & 2349aa-7)). Speculative and conclusory allegations that U.S.

foreign assistance furthers terrorist activity are insufficient to establish

Article III standing. *See Block v. Meese*, 793 F.2d 1303, 1308 (D.C. Cir. 1986);

*see also Clapper*, 133 S.Ct. at 1150 n.5 ("[P]laintiffs bear the burden of

pleading and proving concrete facts showing that the defendant's actual

action has caused the substantial risk of harm"); *Simon v. Eastern Kentucky*

*Welfare Rights Org.*, 426 U.S. 26, 44 (1976) ("[D]ecisions of this Court

establish that unadorned speculation will not suffice to invoke the federal

judicial power."). [5]

Plaintiffs also allege "[u]pon information and belief" that the

Palestinian Authority "pays monthly salaries to approximately 5,500

prisoners in Israeli prisons, including convicted terrorists." SA 40 (Compl.

¶229). Plaintiffs' own allegations suggest that prisoners receive similar

treatment without regard to the nature of their crime, undermining an

inference that these funds contribute to increased terrorism. Furthermore,

---

[5] Furthermore, and unlike *Rothstein*, the present action is a suit
against the United States. The plaintiffs have neither identified an
applicable waiver of sovereign immunity nor identified a statute creating a
valid cause of action.

plaintiffs do not allege that U.S. foreign assistance is used for this purpose,

and their complaint suggests the opposite. *See* SA 41 (Compl. ¶232

(alleging that funding for this purpose is drawn from the Palestinian

Authority's "general budget, much of which is derived from U.S. foreign

aid"), 17-18 (Compl. ¶¶106-110 (quoting Section 7039 of the State

Appropriations Act, which prohibits certain appropriate funds from being

"made available for the purpose of recognizing or otherwise honoring

individuals who commit, or have committed acts of terrorism")).

Plaintiffs' failure to allege sufficient facts demonstrating a causal

connection between the asserted injury and the U.S. Government's

provision of foreign aid is particularly problematic because many of the

statutory conditions alleged to have been violated do not categorically bar

foreign assistance but merely require that certain findings or congressional

certifications be made before assistance is provided. *See e.g.*, State

Appropriations Act, §§ 7039, 7040(d).  In order for plaintiffs to establish

standing to challenge the Secretary's alleged failure to make the requisite

certifications, they would need to show why their alleged injuries would be

remedied if the Secretary made such a certification to Congress before

providing funding.  They do not even attempt to make such a showing.

25

Plaintiffs' alleged injuries are claimed to result from terrorist attacks committed in Israel by a host of individual terrorists and terrorist organizations, in a violent campaign dating back to at least 1976. *See* Pl. Br. 15-16; SA 3, 10-15 (Compl. ¶¶10-11, 60-95). Their own complaint identifies a score of terrorist organizations operating in the region, none of which is claimed to receive funding directly from the United States. *See* SA 10-13 (Compl. ¶¶60-79). Their district court papers relied on an academic study that, in turn, described a 2007 agreement by 87 countries and international organizations to provide $7.4 billion over three years to the Palestinian Authority. *See* JA 67 (citing and discussing S. Stotsky, *supra*). In these circumstances, it is purely speculative whether U.S. foreign assistance to the Palestinian Authority has any measurable impact on the daily life of the plaintiffs or the security precautions taken in Israel to guard against injury from terrorist attacks. *Cf. Clapper*, 133 S. Ct. at 1153 (reasoning that plaintiffs' precautions to avoid surveillance did not establish standing where, *inter alia*, the plaintiffs had "a similar incentive to engage in many of the countermeasures" even without the challenged government conduct).

2. For similar reasons, plaintiffs have failed to demonstrate that any injuries arising from the threat of Palestinian terrorism in Israel will be

26

redressed if they are successful on their claims. Even if plaintiffs were able

to enjoin U.S. foreign assistance to the Palestinian Authority and

organizations in the West Bank and Gaza, "[i]t is nothing more than

conjecture to argue that changing U.S. funding policies will reduce

terrorism or plaintiffs' subjective fears," as the district court correctly

recognized. JA 83-84. It is more plausible, based on the facts alleged and

the circumstances of this case, that the United States' foreign assistance

prevents terrorist activity. *See Yates*, 744 F.3d at 899; *Iqbal*, 556 U.S. at 678.

The U.S. Government has consistently maintained across administrations

that U.S. foreign assistance serves to improve regional security, contribute

to the economy, and deter terrorism. *See, e.g.*, Congressional Budget

Justification Vol. 2: Foreign Operations, 134 (FY 2015), *available at*

http://www.state.gov/documents/ organization/224069.pdf; *see also* JA

49. Plaintiffs' speculative assertions of redressability are inadequate to

establish standing. *See, e.g., Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561

(1992); *accord Talenti v. Clinton*, 102 F.3d 573, 575-78 (D.C. Cir. 1996)

(plaintiff lacked standing to require the government to withhold assistance

from Italy under statute prohibiting assistance to governments that had

expropriated U.S. persons' property because President could waive the

prohibition and "[e]ven the improbable scenario of a decision to withhold assistance from Italy does not redress Talenti's injury" due to uncertainty about how Italy would react); *see also Aerotrade, Inc. v. Agency for Int'l Dev.*, 387 F. Supp. 974, 975-76 (D.D.C. 1974) (plaintiff lacked standing to direct that all assistance to Haiti be terminated pursuant to a provision that prohibited assistance to any government that repudiates a contract with a U.S. citizen because President could waive the prohibition and there was "considerable uncertainty as to whether [an assistance cutoff] would aid plaintiff in collecting its debt or would tend to drive Haiti into even greater intransigence").

Plaintiffs argue that their theory of redressability is not unduly conjectural under *Bryant v. Yellen*, 447 U.S. 352, 366-8, n.17 (1980). Pl. Br. 43. In that case, however, the plaintiffs wished to buy land and, if they won on their claim, land in the relevant area would be sold at a price to be determined by the government based on a different, lower formula. *Id.* at 367; *see also Clinton v. City of New York*, 524 U.S. 417, 433 & n.22 (1998) (recognizing that "a denial of a benefit in the bargaining process can itself create an Article III injury, irrespective of the end result"). Plaintiffs also rely on *National Black Police Association v. Velde*, 631 F.2d 784 (D.C. Cir.

28

1980).  Apart from the fact that holding has been vacated by the Supreme

Court, *see* 458 U.S. 591 (1982), it involved a challenge to federal funding of

state and local law enforcement agencies that had engaged in unlawful

discrimination against the plaintiffs.  No similarly direct relationship

between U.S. foreign assistance and harm to the plaintiffs has been

identified here, nor can plaintiffs point to any tangible benefit that would

necessarily accrue from a change in the U.S. financial assistance in the

region.

### B.    Plaintiffs also have failed to show a concrete and actual or imminent injury-in-fact that supports Article III standing.

Plaintiffs also lack Article III standing because they have failed to

establish any concrete and actual or imminent injury-in-fact.

1.    To the extent plaintiffs' standing argument is premised on a

generalized interest in compelling Executive Branch compliance with

"statutory limitations, conditions, oversight and restrictions on U.S. aid to

the West Bank and Gaza," Pl. Br. 28, it is clearly inadequate.  As the

Supreme Court has repeatedly explained, a plaintiff does not have Article

III standing based on a generalized interest in having the government act in

accordance with law.  *See, e.g., Valley Forge Christian College v. Americans*

*United for Separation of Church and State, Inc.*, 454 U.S. 464, 482-83 (1982);

*Defenders of Wildlife*, 504 U.S. at 563 (holding that plaintiffs' "special interest

in the subject" of government action does not confer standing); *see also*

*American Jewish Congress v. Vance*, 575 F.2d 939, 943 (D.C. Cir. 1978)

("[S]heer motivation and commitment to the subject matter of a suit, no

matter how strong, cannot substitute for judicially cognizable injury.").

    2.    Plaintiffs also claim that they satisfy Article III's injury-in-fact

requirement because they previously have been and continue to be injured

by ongoing Palestinian terrorist attacks in Israel. They allege that they

suffer "intensified fear . . . [and] emotional and psychological pain"

associated from ongoing terrorism, Pl. Br. 22, and that they also suffer

disruptions in their daily lives attributable to frequent terrorist attacks in

Israel.

    Plaintiffs' subjective fear of future terrorist attacks is insufficient to

establish standing under *Clapper v. Amnesty International USA*, 133 S. Ct.

1138 (2013). In *Clapper*, the Supreme Court considered a challenge brought

by journalists and attorneys to the Foreign Intelligence Surveillance Act,

which permits the government to seek authorization to survey

electronically the communications of non-U.S. persons located abroad. *Id.*

at 1156. The *Clapper* plaintiffs alleged that they were injured because they reasonably feared that the government would survey their communications with non-U.S. persons and that they incurred costs and burdens to protect against surveillance. The Court held that neither the plaintiffs' fear of surveillance nor the "present costs and burdens" they experienced were sufficient for standing, even assuming that the plaintiffs' fear of being subject to the challenged action was objectively reasonable. 133 S. Ct. at 1151, 1153; *see also City of Los Angeles v. Lyons,* 461 U.S. 95, 107 n.8 (1983) ("It is the *reality* of the threat of repeated injury that is relevant to the standing injury, not the plaintiff's subjective apprehensions."); *see also Mahorner v. Bush,* 224 F. Supp. 2d 48, 50 (D.D.C. 2002), *aff'd,* 2003 WL 349713, at *1 (D.C. Cir. 2003) ("[P]laintiff's allegation that he will suffer an increased chance of losing his life if President Bush initiates a military conflict with Iraq, amounts to nothing more than speculation about future events that may or may not occur.").

In any event, even if present-day burdens associated with protecting against the risk of future terrorist attacks could establish constitutional injury-in-fact, plaintiffs would still lack Article III standing because, as we have shown, any injury would not be traceable to the challenged provision

31

of foreign assistance by the U.S. Government or redressable by an injunction barring foreign assistance except in accordance with applicable conditions.

Because the district court correctly ruled in the government's favor on standing, it did not need to address whether adjudication of plaintiffs' claims is also barred by the political question doctrine and whether the court had mandamus jurisdiction. JA 77 n.6. Should the Court reverse on the question of standing, however, the case should be remanded for the district court to consider those issues in the first instance.

## II.    THE COURT DID NOT ERR IN REFUSING TO GRANT PLAINTIFFS' REQUEST FOR ARGUMENT OR DECLINING TO PERMIT PLAINTIFFS TO AMEND THEIR COMPLAINT.

Having determined that plaintiffs lacked standing, the court properly dismissed their complaint. As plaintiffs concede, Pl. Br. 46, they did not seek leave to amend, but they now complain that the court should have permitted them leave to amend *sua sponte*. None of the cases cited in plaintiffs' brief supports the proposition that the district court was required to permit them leave to amend their complaint where none was sought. *See e.g., Warth v. Seldin*, 422 U.S. 490, 501 (1975) (A district court may "allow

or require" amendment to show standing.); *Foman v. Davis*, 371 U.S. 178,

182 (1962) (Leave to amend is within district court's "discretion," but

"outright refusal" without justification is an abuse of discretion.). Rather,

this Court has held that, where plaintiffs failed to move to amend their

complaint and only included a bare request in an opposition to a motion to

dismiss, it "'could hardly have been an abuse of discretion for the District

Court not to have afforded [plaintiffs] such leave *sua sponte*.'" *Kowal v. MCI

Communications Corp.*, 16 F.3d 1271, 1280 (D.C. Cir. 1994) (alteration in

original) (quoting *Confederate Memorial Ass'n, Inc. v. Hines*, 995 F.2d 295, 299

(D.C. Cir. 1993). Similarly, plaintiffs have cited no authority to establish a

right to oral argument, nor have they made any proffer as to how oral

argument might have aided resolution of the motion to dismiss.

Accordingly, the district court's dismissal of the complaint without

permitting amendment or oral argument was correct.

## CONCLUSION

The judgment of the district court should be affirmed.

Respectfully submitted,

STUART F. DELERY
*Assistant Attorney General*

RONALD C. MACHEN, JR.
*United States Attorney*

DOUGLAS N. LETTER
SHARON SWINGLE
JAYNIE LILLEY
 s/Jaynie Lilley

JAYNIE LILLEY
*(202) 514-3542*
*Attorneys, Appellate Staff*
*Civil Division, Room 7321*
*U.S. Department of Justice*
*950 Pennsylvania Ave., N.W.*
*Washington, D.C.  20530*

MAY 2014

## CERTIFICATE OF COMPLIANCE WITH
## FEDERAL RULE OF APPELLATE PROCEDURE 32(A)

I hereby certify that this brief complies with the requirements of Fed.

R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Book

Antiqua, a proportionally spaced font.

I further certify that this brief complies with the type-volume

limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,606 words,

excluding the parts of the brief exempted under Rule 32(a)(7)(B)(iii),

according to the count of Microsoft Word.


_s/ Jaynie Lilley_
Jaynie Lilley
Counsel for Appellees

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of May 2014, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system. I further certify that I will cause eight paper copies to be delivered to the Court by hand delivery within two business days.

The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.


_s/ Jaynie Lilley_
Jaynie Lilley
Counsel for Appellees