# EXHIBIT A


PLAINTIFF'S
EXHIBIT
261

**Israel**             **Defense**            **Forces**

Before the Military Court        Court Case:    *2270*/04
in Judea                 Prosecution Case:    1247/04
Before a panel          Detailed Incident Case:    1329/04 Hebron
                                         9891/04 Jerusalem Special
                                            Duties Department
                                            178694/04 Moria

In the trial between

### The Military Prosecutor

- The Prosecutor -

- v. -

### Ahmed Salah Ahmed Salah

(detained since March 8, 2004)

Identity No. 901739656, born January 23, 1977, from Bethlehem

-The Defendant-

[Stamp] This indictment received _____
on date: *May 20, 2004*
and entered into the log in case _____
by the court officer *Irit Goren*

### Indictment

The above mentioned Defendant is accused hereby of committing the following offenses:

**First count:**

**Nature of the offense:** Manufacturing a bomb, an offense pursuant to Regulation 53 (A) (3) of the Security Provision Order (Judea and Samaria) (No. 378), 5730-1970.

**Details of the offense:** The above mentioned Defendant, in the Area, during March 2002 or thereabouts, manufactured a bomb without possessing a permit from or for a military commander.

To wit: at the above mentioned time, Abdul Rahman (Zahir) Yousef Abdul Rahman Maqdad (hereinafter: "**Abdul Rahman Maqdad**") approached the military operative Ahmed Mujrabi and asked him for explosive devices.

[Stamp] P 2: 149

Ahmed Mujrabi referred Abdul Rahman Maqdad to the Defendant and told him that the Defendant would provide him with explosives of the Um Al Abed type for making explosive devices.

Abdul Rahman Maqdad met the Defendant and received 4 kilograms of Um Al Abed explosive from him. Abdul Rahman Maqdad made four pipe bombs using part of the quantity that he received, and kept the remaining quantity.

[Stamp] P 2: 149 [continued]

2

**Second count:**

**Nature of the offense:** Membership in an illegal organization, an offense pursuant to Regulations 85 (1) (A) and 84 (1) (A) of the Defense Regulations (Time of Emergency), 1945.

**Details of the offense:** The above mentioned Defendant, in the Area, from early 2004 or thereabouts, was a member of an illegal organization, as follows:

At the above mentioned time, the above mentioned Defendant was a member of a military cell of the Al Aqsa Martyrs Brigades organization.

The Defendant's membership in the organization continued until the day of his arrest.

**Third count:**

**Nature of the offense:** Shooting at a person or a place in which persons may be, an offense pursuant to Regulation 58 (A) of the Defense Regulations (Time of Emergency), 1945; and Section 14 of the Rules of Liability for an Offense Order (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in the Area, in early 2004 or thereabouts, was an accomplice in shooting at a person or a place in which people may be, as follows:

At the above mentioned time, the above mentioned Defendant left with fellow members of his military cell – Ahmed Tawfik Taya, Wail Khalil Faraj and Hilmi Abdel Karim Mohamed Hamash (hereinafter: "**Hilmi Hamash**"), who was armed with a Kalashnikov rifle and a hand grenade – in order to carry out a shooting attack against IDF forces in the DCO military base. When they arrived at the site, the Defendant and Ahmed Taya got out of the vehicle while in possession of the weapons in order to carry out the shooting attack, while Hilmi Hamash and his accomplice Wail Faraj remained in the vehicle.

After a few minutes, the Defendant and his accomplice fired at a vehicle; thereafter Hilmi Hamash and his accomplice fled from the site towards the home of the Defendant.

[Stamp] P 2: 150

There, they waited for the Defendant to return.

**Fourth count:**

**Nature of the offense:** Attempt to cause intentional death, an offense pursuant to Section 51 (A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Sections 19-20, 14 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in the Area, in late 2003 or thereabouts, was an accomplice in an attempt to cause the intentional death of others, as follows:

1.    At the above mentioned time, the above mentioned Defendant suggested to Abdul Rahman Maqdad to depart with […]

[Stamp] P 2: 150 [continued]

[...] him to carry out a shooting attack at Israeli vehicles. The latter answered positively, and departed with the Defendant and conducted a preliminary visit of the site that the Defendant had found. The Defendant and Abdul Rahman Maqdad arrived at the area of the Talita Kumi School and found that this was a good site for carrying out the attack. The Defendant instructed Abdul Rahman Maqdad to carry out a shooting attack at the site with additional operatives.

2.  Shortly thereafter, Abdul Rahman Maqdad asked military operative Ahmed Hamed Abu Haliel (hereinafter: "**Ali Abu Haliel**") to leave and carry out a preliminary visit of the Talita Kumi School area, because a shooting attack in the area had been planned. Ali Abu Haliel agreed to this and departed at about 2:00 a.m. for the site, to make sure that there were no obstacles on the way. In addition, Abdul Rahman Maqdad enlisted Izz A-Din Khaled Hussein Hamamra (known as Izz A-Din Alian) (hereinafter: "**Izz A-Din Alian**") and military operative Ismail Abdul Rahman Mohamed Alfarajin (hereinafter: "**Ismail Alfarajin**") to carry out the shooting attack with them.

3.  At about 3:00 a.m., Ali Abu Haliel called Abdul Rahman Maqdad and updated him that there was no impediment to carrying out the planned attack.

4.  Accordingly, Abdul Rahman Maqdad departed, armed with a Kalashnikov rifle, with Izz A-Din Alian, who was armed with an M-16 rifle and with Ismail Alfarajin, who was armed with an M-16 rifle, towards the area in order to carry out the attack; Ismail Alfarajin transported them in a vehicle that he had brought.

5.  When they arrived in the planned area, Abdul Rahman instructed Ali Abu Haliel to return to his home, and Abdul Rahman Maqdad and Izz A-Din Alian waited in hiding 20 meters from the road for Israeli vehicles that would pass by. Ismail Alfarajin remained in the vehicle.

6.  At about 3:30 a.m., a military jeep passed by; then Abdul Rahman Maqdad and his accomplice opened fire at the jeep.

7.    The jeep continued on its journey; Abdul Rahman Maqdad and his accomplice fled towards the vehicle in which Ismail Alfarajin was waiting, and together they escaped from the site.

**Fifth count:**    **(Detailed Incident 09891/04 Jerusalem Special Duties Department)**

**Nature of the offense:** Causing intentional death, an offense pursuant to Section 51 (A) and 7 (C) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Section 14 and 2 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, within the Area or elsewhere, on January 29, 2004, or thereabouts, was an accomplice in causing the intentional death of another person, as follows:

[Stamp] P 2: 151 [continued]

4

1.  In early January 2004 or thereabouts, Abdul Rahman Maqdad (hereinafter: "**Abdul Rahman Maqdad**") contacted military operative Ahmed Mujrabi and asked him to introduce to him military operatives who would help him produce explosives and explosive devices in order to carry out attacks against Israeli targets, and to find suicide terrorists for carrying out suicide attacks. Accordingly, Ahmed Mujrabi contacted military operative Ali Abu Haliel and asked him to meet a particular person (referring to Abdul Rahman Maqdad) in order to help him in his military activity. Ali Abu Haliel met Abdul Rahman Maqdad in accordance with the direction of Ahmed Mujrabi. During the meeting, Abdul Rahman Maqdad asked him to help him in the making of explosives. He agreed to this.

2.  Shortly thereafter, the military operative Hilmi Abdel Karim Mohamed Hamash (hereinafter: "**Hilmi Hamash**") contacted Ali Ja'ara and offered him a meeting with the military operative to send him to carry out a suicide attack. Ali Ja'ara (hereinafter: the "**Suicide Terrorist**") expressed willingness to do so.

    Accordingly, Hilmi Hamash introduced **the above mentioned Defendant** to the Suicide Terrorist. During the meeting, the Defendant checked the degree of willingness of the Suicide Terrorist to carry out a suicide attack.

    During the meeting, the Suicide Terrorist expressed willingness to carry out the attack. Accordingly, the Defendant asked the Suicide Terrorist to prepare to carry out the suicide attack.

3.  Shortly thereafter, Ali Abu Haliel contacted Abdul Rahman Maqdad and updated him that he had succeeded in obtaining two kilograms of Um Al Abed explosive and a chemical of acetone type. On this occasion, Ali Abu Haliel transferred the Um Al Abed explosive to Abdul Maqdad, and Abdul Rahman Maqdad  asked him to transfer the acetone to him and in addition the chemical hydrogen peroxide, [both of] which are used for making explosives.

[Stamp] P 2: 152

4.  On the following day, Abdul Rahman Maqdad met Abu Haliel and obtained 36 liters of acetone and 10 liters of hydrogen peroxide from him; Abdul Rahman Maqdad told Ali Abu Haliel that he intended to use these materials to produce explosives that would be used by a suicide terrorist in carrying out a suicide attack; on this occasion, Ali Abu Haliel explained to Abdul Rahman Maqdad how to mix the substances to create the explosives. Abdul Rahman Maqdad hid the substances in his home.

5.  A few days later, the Defendant came to the home of Abdul Rahman Maqdad and told him that he had found a person who was prepared to carry out a suicide attack.

    On January 28, 2004, or thereabouts, the Defendant again approached Abdul Rahman Maqdad and asked him urgently to prepare an explosive bag using the explosives in his possession, because he intended to send the Suicide Terrorist to carry out the suicide attack.

    At that time, Abdul Rahman Maqdad asked the Defendant to buy him materials for making an explosive bag [which included, *inter alia*, a bag, batteries and a switch]. The Defendant agreed […]

[Stamp] P 2: 152 [continued]

[...] and with Hilmi Hamash, purchased everything requested for Abdul Rahman Maqdad so that he could make the explosive bag as soon as possible. In addition, the Defendant and Hilmi Hamash tried to find a video camera to film the Suicide Terrorist before carrying out the attack, but were unable to do so, and therefore they decided to dispatch the Suicide Terrorist to carry out the attack without filming him using a video camera.

6.   Shortly thereafter, the Defendant approached the military operative Mohamed Issa Mohamed Ma'ali (hereinafter: "**Mohamed Ma'ali**") and asked him to transport a suicide terrorist armed with an explosive belt to carry out a suicide attack within the territory of the State of Israel. Mohamed Ma'ali expressed willingness to do so.

Accordingly, the Defendant had Mohamed Ma'ali meet the Suicide Terrorist.

7.   At the time of the foregoing, Abdul Rahman Maqdad made an additional quantity of Um Al Abed explosive weighing 12 kilograms, and made an explosive bag using it for carrying out a suicide attack.

Abdul Rahman Maqdad asked the Defendant to come to take the explosive bag.

8.   A few minutes later, the Defendant arrived, with the Suicide Terrorist and Mohamed Ma'ali, at the home of Abdul Rahman Maqdad; Mohamed Ma'ali waited outside, while the Suicide Terrorist and the Defendant entered Abdul Rahman Maqdad's home. Abdul Rahman Maqdad explained to the Defendant and to the Suicide Terrorist how to activate the explosive bag and gave the explosive bag for use in a suicide attack to them, with the aim of causing the deaths of Israeli civilians.

9.   Shortly thereafter, the Defendant, Mohamed Ma'ali and the Suicide Terrorist departed towards the university in Bethlehem; there, the Defendant deactivated the safety mechanism of the explosive device in order to prepare it for use. After that, the Defendant left Mohamed Ma'ali with the Suicide Terrorist.

10. Thereafter, at about 6:30 a.m., Mohamed Ma'ali transported the Suicide Terrorist in the direction of Jerusalem through the village of Walaja until they arrived near the Malha Mall in Jerusalem. There, Mohamed Ma'ali parted from the Suicide Terrorist and returned to the Area.

11. Shortly thereafter, the Suicide Terrorist boarded Egged Bus No. 19, which was driving towards Paris Square; when the bus reached the corner of Arlozorov and Aza Streets, at about 8:45 a.m., the Suicide Terrorist activated the explosive bag that was in his possession, with the aim of causing the deaths of a large number of individuals. As a result of this, the explosive bag detonated aboard the bus (hereinafter: the "**Suicide Attack**").

12. As a result of the Suicide Attack, the death of **the late Mr. Avraham Balhasan** was caused.

[Stamp] P 2: 153 [continued]

6

**Sixth count:    (Detailed Incident 09891/04 Jerusalem Special Duties Department)**

**Nature of the offense:** Causing intentional death, an offense pursuant to Section 51 (A) and 7 (C) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and pursuant to Section 14 and 2 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in and outside the Area, on January 29, 2004, was an accomplice in causing the intentional deaths of others, as follows:

As a result of the Suicide Attack that the Suicide Terrorist Ali Ja'ara carried out with the intent to cause the deaths of Israeli civilians, in which the Defendant was an accomplice as set forth in the fourth [sic] count of the indictment – the death of **the late Ms. Hannah Bonder** was caused.

**Seventh count:    (Detailed Incident 09891/04 Jerusalem Special Duties Department)**

**Nature of the offense:** Causing intentional death, an offense pursuant to Section 51 (A) and 7 (C) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and pursuant to Section 14 and 2 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in and outside the Area, on January 29, 2004, was an accomplice in causing the intentional deaths of others, as follows:

As a result of the Suicide Attack that the Suicide Terrorist Ali Ja'ara carried out with the intent to cause the deaths of Israeli civilians, in which the Defendant was an accomplice as set forth in the fourth [sic] count of the indictment – the death of **the late Ms. Anat Darom** was caused.

**Eighth count:    (Detailed Incident 09891/04 Jerusalem Special Duties Department)**

[Stamp] P 2: 154

**Nature of the offense:** Causing intentional death, an offense pursuant to Section 51 (A) and 7 (C) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and pursuant to Section 14 and 2 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in and outside the Area, on January 29, 2004, was an accomplice in causing the intentional deaths of others, as follows:

As a result of the Suicide Attack that the Suicide Terrorist Ali Ja'ara carried out with the intent to cause the deaths of Israeli civilians, in which the Defendant was an accomplice as set forth in the fourth [sic] count of the indictment – the death of **the late Mr. Yehezkel Goldberg** was caused.

[Stamp] P 2: 154 [continued]

7

**Ninth count:**        **(Detailed Incident 09891/04 Jerusalem Special Duties Department)**

**Nature of the offense:** Causing intentional death, an offense pursuant to Section 51 (A) and 7 (C) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and pursuant to Section 14 and 2 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in and outside the Area, on January 29, 2004, was an accomplice in causing the intentional deaths of others, as follows:

As a result of the Suicide Attack that the Suicide Terrorist Ali Ja'ara carried out with the intent to cause the deaths of Israeli civilians, in which the Defendant was an accomplice as set forth in the fourth [sic] count of the indictment – the death of **the late Mr. Vladi Tzadik Manbara** was caused.


**Tenth count:**        **(Detailed Incident 09891/04 Jerusalem Special Duties Department)**

**Nature of the offense:** Causing intentional death, an offense pursuant to Section 51 (A) and 7 (C) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and pursuant to Section 14 and 2 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in and outside the Area, on January 29, 2004, was an accomplice in causing the intentional deaths of others, as follows:

As a result of the Suicide Attack that the Suicide Terrorist Ali Ja'ara carried out with the intent to cause the deaths of Israeli civilians, in which the Defendant was an accomplice as set forth in the fourth [sic] count of the indictment – the death of **the late Mr. Viorel Octavian Florescu** was caused.

[Stamp] P 2: 155

**Eleventh count:    (Detailed Incident 09891/04 Jerusalem Special Duties Department)**

**Nature of the offense:** Causing intentional death, an offense pursuant to Section 51 (A) and 7 (C) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and pursuant to Section 14 and 2 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in and outside the Area, on January 29, 2004, was an accomplice in causing the intentional deaths of others, as follows:

As a result of the Suicide Attack that the Suicide Terrorist Ali Ja'ara carried out with the intent to cause the deaths of Israeli civilians, in which the Defendant was an accomplice as set forth in the fourth [sic] count of the indictment – the death of **the late Ms. Rose Boneh** was caused.

[Stamp] P 2: 155 [continued]

8

**Twelfth count:**     (Detailed Incident 09891/04 Jerusalem Special Duties Department)

**Nature of the offense:** Causing intentional death, an offense pursuant to Section 51 (A) and 7 (C) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and pursuant to Section 14 and 2 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in and outside the Area, on January 29, 2004, was an accomplice in causing the intentional deaths of others, as follows:

As a result of the Suicide Attack that the Suicide Terrorist Ali Ja'ara carried out with the intent to cause the deaths of Israeli civilians, in which the Defendant was an accomplice as set forth in the fourth [sic] count of the indictment – the death of **the late Ms. Dana Itach** was caused.

**Thirteenth count:**     (Detailed Incident 09891/04 Jerusalem Special Duties Department)

**Nature of the offense:** Causing intentional death, an offense pursuant to Section 51 (A) and 7 (C) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and pursuant to Section 14 and 2 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in and outside the Area, on January 29, 2004, was an accomplice in causing the intentional deaths of others, as follows:

As a result of the Suicide Attack that the Suicide Terrorist Ali Ja'ara carried out with the intent to cause the deaths of Israeli civilians, in which the Defendant was an accomplice as set forth in the fourth [sic] count of the indictment – the death of **the late Mr. Roman Hondiashvili** was caused.

[Stamp] P 2: 156

**Fourteenth count:**    **(Detailed Incident 09891/04 Jerusalem Special Duties Department)**

**Nature of the offense:** Causing intentional death, an offense pursuant to Section 51 (A) and 7 (C) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and pursuant to Section 14 and 2 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in and outside the Area, on January 29, 2004, was an accomplice in causing the intentional deaths of others, as follows:

As a result of the Suicide Attack that the Suicide Terrorist Ali Ja'ara carried out with the intent to cause the deaths of Israeli civilians, in which the Defendant was an accomplice as set forth in the fourth [sic] count of the indictment – the death of **the late Mr. Eli Zfira** was caused.

[Stamp] P 2: 156 [continued]

9

**Fifteenth count:   (Detailed Incident 09891/04 Jerusalem Special Duties Department)**

**Nature of the offense:** Causing intentional death, an offense pursuant to Section 51 (A) and 7 (C) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and pursuant to Section 14 and 2 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in and outside the Area, on January 29, 2004, was an accomplice in causing the intentional deaths of others, as follows:

As a result of the Suicide Attack that the Suicide Terrorist Ali Ja'ara carried out with the intent to cause the deaths of Israeli civilians, in which the Defendant was an accomplice as set forth in the fourth [sic] count of the indictment – the death of **the late Ms. Natalia Gamril** was caused.


**Sixteenth count:   (Detailed Incident 09891/04 Jerusalem Special Duties Department)**

**Nature of the offense:** Attempt to cause intentional death, an offense pursuant to Section 51 (A) and 7 (C) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and pursuant to Sections 19-20, 14 and 2 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in and outside the Area, on January 29, 2004, was an accomplice in attempting to cause the intentional deaths of others, as follows:

As a result of the Suicide Attack that the Suicide Terrorist Ali Ja'ara carried out with the intent to cause the deaths of Israeli civilians, in which the Defendant was an accomplice as set forth in the fourth [sic] count of the indictment – more than 50 civilians were injured from severe to slight degrees of injury; and the Suicide Terrorist died.

[Stamp] P 2: 157

<u>Seventeenth count:</u>    <u>(Detailed Incident 17869/04 Moria Station)</u>

<u>Nature of the offense</u>: Causing intentional death, an offense pursuant to Section 51 (A) and 7 (C) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and pursuant to Section 14 and 2 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

<u>Details of the offense</u>: The above mentioned Defendant, in and outside the Area, on February 22, 2004, was an accomplice in causing the intentional deaths of others, as follows:

1.    A few days before the above mentioned date, Abdul Rahman Maqdad and the military operative Izz A-Din Alian planned to carry out a suicide attack with the aim of causing the deaths of Israeli civilians.

    Izz A-Din Alian informed Abdul Rahman Maqdad that he had found a person by the name of Mohamed Zaoul (hereinafter: the "**Suicide Terrorist**") who was prepared to carry out a suicide attack.

[Stamp] P 2: 157 [continued]

10

2. On February 17, 2004, or thereabouts, Izz A-Din Alian met the Suicide Terrorist in the village of Hussan; during the meeting, the Suicide Terrorist agreed to carry out the planned suicide attack. At its end, Izz A-Din Alian concluded with the Suicide Terrorist that they would meet him near the Nativity Church in Bethlehem on February 21, 2004, at 4:00 p.m.

3. Izz A-Din Alian updated Abdul Rahman Maqdad regarding the content of the meeting and the consent of the Suicide Terrorist to carry out the suicide attack; accordingly, Abdul Rahman Maqdad contacted his brother, the military operative Maher Maqdad who lived in Gaza, updated him of the plan to carry out the suicide attack, and asked him for NIS 3,000 in order to prepare the explosive bag for the suicide attack and to purchase a video camera for filming the Suicide Terrorist (in accordance with the request of Maher Maqdad to film the Suicide Terrorist before carrying out the suicide attack).

Maher Maqdad agreed to the request of Abdul Rahman Maqdad and transferred the amount of NIS 3,000 to the account in the Arab Bank in Bethlehem, which is registered to the title of Abdul Rahman Maqdad, for financing the suicide attack, as was agreed with Abdul Rahman Maqdad.

4. On February 18, 2004, or thereabouts, Abdul Rahman Maqdad went to the Arab Bank in Bethlehem and withdrew the amount of money that had been transferred to him from Maher Maqdad.

Abdul Rahman Maqdad used some of the amount of money to purchase a video camera and an ordinary camera for filming and photographing the Suicide Terrorist. In addition, Abdul Rahman Maqdad transferred to Ali Abu Haliel and **to the Defendant** an amount of money for them to purchase materials for preparing the explosive bag for the suicide attack.

5. Accordingly, Ali Abu Haliel received four liters of hydrogen peroxide from the military operative Hatam Zakaria Mahmoud Ala'arj (hereinafter: **"Hatam Ala'arj"**) and from the military operative Ahmed Ouda, 40 liters of acetone; Ali Abu Haliel transferred to Abdul Rahman Maqdad 12 liters of hydrogen peroxide and 12 liters of acetone.

[Stamp] P 2: 158

6.    On February 20, 2004, Abdul Rahman Maqdad made the Um Al Abed explosive that was intended for carrying out the suicide attack, with Ali Abu Haliel and Izz A-Din Alian, in the home of Abdul Rahman Maqdad. Abdul Rahman Maqdad explained to Ali Abu Haliel how to prepare a wooden box for the explosive bag, and he made the box as Abdul Rahman Maqdad explained to him.

7.    Shortly thereafter, Abdul Rahman Maqdad asked the Defendant to check with Mohamed Ma'ali whether he was prepared to transport the Suicide Terrorist for carrying out the suicide attack. Accordingly, the Defendant met Mohamed Ma'ali and asked him to transport an additional suicide terrorist to carry out a suicide attack within the territory of the State of Israel. Mohamed Ma'ali agreed to this.

[Stamp] P 2: 158 [continued]

11

That evening, the Defendant came to the home of Abdul Rahman Maqdad with a leaflet called "The Aiman Juda Cell of the Al Aqsa Martyrs Brigades Organization" in his possession; the Defendant passed the leaflet along to Abdul Rahman Maqdad, in order to serve as a background picture when filming the Suicide Terrorist – and also updated Abdul Rahman Maqdad that Mohamed Ma'ali was prepared to transport the Suicide Terrorist.

8.    On the following morning, the Defendant gave Abdul Rahman Maqdad iron nails in order for the latter to attach them to the explosive bag, in order to increase and worsen the injuries at the time of the detonation of the explosive bag. Abdul Rahman Maqdad accepted the iron nails and attached them to the explosive bag.

On that same day, at about 4:10 p.m., Izz A-Din Alian came, accompanied by the Suicide Terrorist, to the home of Abdul Rahman Maqdad in order to prepare him for departing on the attack.

In addition, the Defendant brought a Kalashnikov rifle and a hand grenade to Abdul Rahman Maqdad in order for Abdul Rahman Maqdad to film the Suicide Terrorist holding these weapons.

9.    Abdul Rahman Maqdad and Izz A-Din Alian gave the Suicide Terrorist food and new clothes. After they had dinner with the Suicide Terrorist, Izz A-Din Alian wrote a will for the Suicide Terrorist; Abdul Rahman Maqdad and Izz A-Din Alian filmed the Suicide Terrorist reading out his will. When they finished filming the Suicide Terrorist, Abdul Rahman Maqdad started to make the explosive belt that would be used in the execution of the suicide attack. At about 5:30 a.m. on the following day, Abdul Rahman Maqdad finished making the explosive belt.

10.   When he finished making the explosive belt, as set forth on ~~April~~ *February* 22, 2004, Abdul Rahman Maqdad called the Defendant, informed him that everything was ready and asked him to come to take the Suicide Terrorist out to carry out the suicide attack.

[Stamp] P 2: 159

Accordingly, the Defendant contacted Mohamed Ma'ali and asked him to meet him. They both met and together they traveled towards the home of Abdul Rahman Maqdad, where the Suicide Terrorist was hiding. The Defendant asked Mohamed Ma'ali to wait near a place in the center of Bethlehem.

11. At about 6:00 a.m., the Defendant came to the home of Abdul Rahman Maqdad, took the explosive bag from Abdul Rahman Maqdad and departed with the Suicide Terrorist toward the center of Bethlehem; there, he had the Suicide Terrorist meet Mohamed Ma'ali. From there, the Suicide Terrorist departed with Mohamed Ma'ali towards Jerusalem, passing through the village of Walaja, in order to carry out the planned suicide attack.

12. At about 6:15 a.m., the Defendant met Abdul Rahman Maqdad and updated him that the Suicide Terrorist had gone out with the transporter to carry out the suicide attack. Accordingly, Abdul Rahman Maqdad updated [...]

[Stamp] P 2: 159 [continued]

12

[…] his brother Maher Maqdad of the departure of the Suicide Terrorist to carry out the suicide attack.

13.  Mohamed Ma'ali transported the Suicide Terrorist to a place that was near Malha Mall in Jerusalem; there, he parted from him and returned to the Area.

14.  Shortly thereafter, the Suicide Terrorist boarded bus no. 14, which was traveling from the direction of Denia toward Liberty Bell Park, while in possession of the explosive bag. When the bus stopped at one of the traffic lights, the Suicide Terrorist detonated the explosive bag with the intent of causing the deaths of a large number of people. As a result of this, the explosive bag exploded aboard the bus (hereinafter: the "**Suicide Attack**").

15.  As a result of the Suicide Attack, the death of **the late Ms. Yaffa Ben-Shimol** was caused.

**Eighteenth count:**   (**Detailed Incident 17869/04 Moria Station**)

**Nature of the offense:** Causing intentional death, an offense pursuant to Section 51 (A) and 7 (C) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and pursuant to Section 14 and 2 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in and outside the Area, on February 22, 2004, was an accomplice in causing the intentional deaths of others, as follows:

As a result of the Suicide Attack that Mohamed Zaoul carried out with the intent of causing the deaths of Israeli civilians, in which the Defendant was an accomplice as set forth in the seventeenth count of the indictment – the death of **the late Mr. Yuval Ozana** was caused.

[Stamp] P 2: 160

**Nineteenth count:**     **(Detailed Incident 17869/04 Moria Station)**

**Nature of the offense:** Causing intentional death, an offense pursuant to Section 51 (A) and 7 (C) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and pursuant to Section 14 and 2 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in and outside the Area, on February 22, 2004, was an accomplice in causing the intentional deaths of others, as follows:

As a result of the Suicide Attack that Mohamed Zaoul carried out with the intent of causing the deaths of Israeli civilians, in which the Defendant was an accomplice as set forth in the seventeenth count of the indictment – the death of **the late Mr. Rahamim Doga** was caused.

[Stamp] P 2: 160 [continued]

13

**Twentieth count:**    (Detailed Incident 17869/04 Moria Station)

**Nature of the offense:** Causing intentional death, an offense pursuant to Section 51 (A) and 7 (C) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and pursuant to Section 14 and 2 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in and outside the Area, on February 22, 2004, was an accomplice in causing the intentional deaths of others, as follows:

As a result of the Suicide Attack that Mohamed Zaoul carried out with the intent of causing the deaths of Israeli civilians, in which the Defendant was an accomplice as set forth in the seventeenth count of the indictment – the death of **the late Mr. Yehuda Haim** was caused.

**Twenty first count:**    (Detailed Incident 17869/04 Moria Station)

**Nature of the offense:** Causing intentional death, an offense pursuant to Section 51 (A) and 7 (C) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and pursuant to Section 14 and 2 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in and outside the Area, on February 22, 2004, was an accomplice in causing the intentional deaths of others, as follows:

As a result of the Suicide Attack that Mohamed Zaoul performed with the intent of causing the deaths of Israeli civilians, in which the Defendant was an accomplice as set forth in the seventeenth count of the indictment – the death of **the late Mr. Ilan Avisidris** was caused.

[Stamp] P 2: 161

**Twenty second count:**          **(Detailed Incident 17869/04 Moria Station)**

**Nature of the offense:** Causing intentional death, an offense pursuant to Section 51 (A) and 7 (C) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and pursuant to Section 14 and 2 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in and outside the Area, on February 22, 2004, was an accomplice in causing the intentional death of others, as follows:

As a result of the Suicide Attack that Mohamed Zaoul carried out with the intent of causing the deaths of Israeli civilians, in which the Defendant was an accomplice as set forth in the seventeenth count of the indictment – the death of **the late Mr. Benia Yonatan Zuckerman** was caused.

[Stamp] P 2: 161 [continued]

あ

14

**Twenty third count:**        **(Detailed Incident 17869/04 Moria Station)**

**Nature of the offense:** Causing intentional death, an offense pursuant to Section 51 (A) and
7 (C) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970,
and pursuant to Section 14 and 2 of the Rules of Liability for an Offense Order
(Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in and outside the Area, on February
22, 2004, was an accomplice in causing the intentional deaths of others, as
follows:

As a result of the Suicide Attack that Mohamed Zaoul carried out with the intent
of causing the deaths of Israeli civilians, in which the Defendant was an
accomplice as set forth in the seventeenth count of the indictment – the death of
**the late Mr. Lior Azulai** was caused.

**Twenty fourth count:**        **(Detailed Incident 17869/04 Moria Station)**

**Nature of the offense:** Causing intentional death, an offense pursuant to Section 51 (A) and
7 (C) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970,
and pursuant to Section 14 and 2 of the Rules of Liability for an Offense Order
(Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in and outside the Area, on February
22, 2004, was an accomplice in causing the intentional deaths of others, as
follows:

As a result of the Suicide Attack that Mohamed Zaoul carried out with the intent
of causing the deaths of Israeli civilians, in which the Defendant was an
accomplice as set forth in the seventeenth count of the indictment – the death of
**the late Mr. Natanel Havshush** was caused.

[Stamp] P 2: 162

**Twenty fifth count:**     **(Detailed Incident 17869/04 Moria Station)**

**Nature of the offense:** Attempt to cause intentional death, an offense pursuant to Section 51 (A) and 7 (C) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and pursuant to Sections 19-20, 14 and 2 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in and outside the Area, on February 22, 2004, was an accomplice in attempting to cause the intentional deaths of others, as follows:

As a result of the Suicide Attack that the Suicide Terrorist Mohamed Zaoul carried out with the intent of causing the deaths of Israeli civilians, in which the Defendant was an accomplice as set forth in the seventeenth count of the indictment – more than 50 civilians were injured from severe to slight degrees of injury; in addition, the Suicide Terrorist died.

[Stamp] P 2: 162 [continued]

15

_____

[Signature]

**Naji Amar,    Captain**
**Military      Prosecutor**

**List of witnesses for the Prosecution:**

1.   95311-7 Master Sergeant Moshe Levi (took the confession of the Defendant on March 10, 2004; March 16, 2004; and March 17, 2004, seizure of the handwriting of the Defendant + maker of photograph lineup).

2.   99106 First Sergeant Yaakov Barazani (took the confession of the Defendant on March 17, 2004).

3.   907377113 Mohamed Issa Mohamed Ma'ali (detained in Prosecution Case 1338/04).

4.   901415984 Hilmi Abdel Karim Mohamed Hamash (detained in Prosecution Case 1300/04).

5.   906194063 Izz A-Din Khaled Hussein Hamamra (detained in Prosecution Case 1246.04).

6.   920629276 Ali Mohamed Hamed Abu Haliel (detained in Prosecution Case 1216/04).

7.   410066624 Abdul Rahman (Zahir) Yousef Rahman Maqdad (detained in Prosecution Case 1332/04).

**Detailed Incident 09891/04 Special Duties Department, Jerusalem:** (suicide attack aboard Bus No. 19)

8.   43438654 Nir Azulai (details held by the Prosecution).

9.   80408453 Adnan Saida (details held by the Prosecution).

10.  Risha Kariz (details held by the Prosecution).

11.  Svetlana Milniker (details held by the Prosecution).

12.  Olana Skripa (details held by the Prosecution).

13.  055661458 Doria Shalev (details held by the Prosecution).

14.  07788383 Yosef Hadad (details held by the Prosecution).

[Stamp] P 2: 163

15.  0300679925 Moshe Benita (details held by the Prosecution).

16.  038583837 Carmel Shrier (details held by the Prosecution).

17.  053927372 Aliza Eliyahu (details held by the Prosecution).

18.  0307353110 Lilia Shriga (details held by the Prosecution).

19.  307207332 Irena Potiomkin (details held by the Prosecution).

20.  058123977 Gad Listenberg (details held by the Prosecution).

21.  002379493 Miriam Deri (details held by the Prosecution).

22.  056521644 Vered Luzon (details held by the Prosecution).

23.  035816180 David Bar Sela (details held by the Prosecution).

24.  034325944 Yael Rubinstein (details held by the Prosecution).

[Stamp] P 2: 163 [continued]

16

25.  071666614 Naim Barzawi (details held by the Prosecution).

26.  001909134 Sarah Keisar (details held by the Prosecution).

27.  321135394 Lidia Weiner (details held by the Prosecution).

28.  054584362 Bahira Saadu (details held by the Prosecution).

29.  License No. 73774 Dr. Kumber (medical documents related to Mr. Naim Barzawi).

30.  License No. 24151 Dr. Michlevsky (medical documents related to Ms. Sarah Keisar).

31.  License No. 25068 Dr. Yutkin (medical documents related to Ms. Bahira Saadu).

32.  Dr. A. Wolf (medical documents related to Ms. Bahira Saadu).

33.  Expert opinion of bomb disposal laboratory (to be forwarded later).

34.  Medical documents.

35.  List of casualties (institutional record).

**(Detailed Incident 17869/04 Moria Station):** (suicide attack aboard bus No. 14)

36.  7449502 Amotz Nili (details held by the Prosecution).

37.  9797523 Avraham David (details held by the Prosecution).

38.  31464167 Binyamin Ben Lulu (details held by the Prosecution).

39.  7633634 Azulai Shoshana (details held by the Prosecution).

40.  03083175 David Ben Hemo (details held by the Prosecution).

41.  024942724 Yaniv Levi (details held by the Prosecution).

42.  303717631 Boris Piskara (details held by the Prosecution).

43.  0304050040 Victoria Tetrik (details held by the Prosecution).

44.  311825574 Maya Melinitzer (details held by the Prosecution).

45.  003416716 Dov Goldflam (details held by the Prosecution).

46.  040182115 Asaf Cohen (details held by the Prosecution).

47.  Dr. A. Deutsch (medical documents).

[Stamp] P 2: 164

48.  324605005 Ella Lazarenko (details held by the Prosecution).

49.  Dr. Flor (medical documents).

50.  321868663 Natalia Surfin (details held by the Prosecution).

51.  Dr. Flor Sharon (medical documents)

52.  065322471 Avraham Pur (details held by the Prosecution).

53.  0801523812 Isa Abid (details held by the Prosecution).

54.  039276126 Eliyahu Mizrachi (details held by the Prosecution).

55.  075775239 Meir Aharon (details held by the Prosecution).

56.  039195862 Efrat Sivan Simon (details held by the Prosecution).

[Stamp] P 2: 164 [continued]

17

57. 200713410 Gal-Or Shemesh (details held by the Prosecution).

58. 34985 Dr. Hamra Jarbi (medical documents)

59. 009797523 David Avraham (details held by the Prosecution).

60. 21503 Dr. Shalom Friedman (medical documents).

61. 043553338 Liran Ben Siman-Tov (details held by the Prosecution).

62. 22674 Dr. Parson Binyamin (medical documents).

63. 066079948 Yosef Salbosky (details held by the Prosecution).

64. 024947242 Yaniv Levi (details held by the Prosecution).

65. 009797523 David Avraham (details held by the Prosecution).

66. 034441659 Noa Diatlovitzky (details held by the Prosecution).

67. 34911 Dr. Micky Avital (medical documents).

68. 030803175 David Ben Hemo (details held by the Prosecution).

69. 054973698 Shimon Shushan (details held by the Prosecution).

70. 0300302668 May Shirizli (details held by the Prosecution).

71. 35035 Dr. Goldman (medical documents).

72. 025300955 Yehuda Meloul (details held by the Prosecution).

73. 031503105 Oded Havshush (details held by the Prosecution).

74. Medical documents (institutional record).

75. 307048298 Limor Batriev (seizure report).

76. 969480516 Issa Zaoul (genetic specimens).

77. 969480524 Badia Zaoul (genetic specimens).

78. Staff Sergeant Shadi Rabah (memorandum).

79. 4668654 Eli Malka (memorandum).

80. Bomb laboratory expert opinion (to be forwarded later).

[Stamp] P 2: 165

81.  73160-4 Chief Inspector Igor Peckerman (seizure and marking report).

82.  Prof. Y. Hiss (pathology expert opinion).

83.  Dr. V. Keresin

84.  Dr. Kenneth Frank Gerston (pathology expert opinion).

85.  Dr. Z. Kahane

86.  Dr. R. Nachman (pathology expert opinion).

87.  Dr. K. Zaitzev

88.  Dr. Chen Kugel (expert opinion of the National Institution of Forensic Medicine).

89.  Dr. Birtulon Levi (pathology expert opinion).

90.  Dr. Kenneth Frank Gerston (pathology expert opinion).

[Stamp] P 2: 165 [continued]

18

91. Death certificates.

[Stamp] P 2: 166

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

MARK I. SOKOLOW, *et al.*,

                Plaintiffs,

    vs.

THE PALESTINE LIBERATION
ORGANIZATION, *et al.*,

                Defendants.

No. 04 Civ. 00397 (GBD) (RLE)

### DECLARATION OF RINA NE'EMAN

Rina Ne'eman hereby certifies as follows:

1.    The attached translation from Hebrew to English is an accurate representation of the document received by Rina Ne'eman Hebrew Language Services, to the best of my knowledge and belief. The document is designated as P2: 149-166.

2.    I am a professional translator with a B.A. in International Relations from the Hebrew University of Jerusalem (Israel) and 30 years of translation experience. I am fluent in Hebrew and English, and I am qualified to translate accurately from Hebrew to English.

3.    To the best of my knowledge and belief, the accompanying text is a true, full and accurate translation of the Hebrew-language document bearing the bates number, P2: 149-166.

Rina Ne'eman

ss.: New Jersey

On the 28 day of February, 2014 before me, the undersigned, personally appeared Rina Ne'eman, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is signed to this Declaration and acknowledged to me that he executed the same in his capacity, and that by his signature on this Declaration, the individual executed the Declaration.

Sworn to me this
28 day of February, 2014

_____
Notary Public

HIRUT J MHRETE
NOTARY PUBLIC
STATE    NEW JERSEY
MY COMM.    XPIRES SEPT. 7, 2015
            2332704

<div dir="rtl">

צבא    הגנה    לישראל

| | |
|---|---|
| בבית המשפט הצבאי | תיק בימ"ש 04/ 2270 |
| ב י ה ו ד ה | תיק תביעה 1247/04 |
| בפני    הרכב | תיק פ.א. 1329/04 חברון |
| | 9891/04 מתי"מ י-ם |
| | 178694/04 מוריה |

במשפט שבין :

התובע הצבאי

- המאשים -

- נ ג ד -

אחמד צלאח אחמד צלאח

(עצור מיום 8/3/04)

ת.ז. 901739656 יליד 23/1/77 מבית-לחם

- הנאשם -

## כתב אישום

הנאשם הנ"ל מואשם בזאת, בביצוע העבירות הבאות :

### פרט ראשון

מהות העבירה : ייצור פצצה, עבירה לפי סעיף 53(א)(3) לצו בדבר הוראות ביטחון (יו"ש) (מס' 378), תשל"ל – 1970.

פרטי העבירה : הנאשם הנ"ל, באזור, במהלך חודש מרץ 02' או בסמוך לכך, ייצר פצצה מבלי שהיה ברשותו היתר ממפקד צבאי או מטעמו.

דהיינו, במועד הנ"ל, פנה ע"א-רחמאן (זאהר) יוסף ע"א-רחמאן מקדאד (להלן – **ע"א-רחמאן מקדאד**) אל הפעיל הצבאי אחמד מוג'רבי וביקש ממנו מטעני חבלה. אחמד מוג'רבי היפנה את ע"א-רחמאן מקדאד אל הנאשם ואמר לו כי הנאשם ימסור לו חומר נפץ מסוג "אום-אלעבד" לייצור מטעני החבלה.

ע"א-רחמאן מקדאד נפגש עם הנאשם וקיבל ממנו 4 ק"ג חומר נפץ מסוג "אום- אלעבד". ע"א-רחמאן מקדאד ייצר באמצעות חלק מהכמות שקיבל 4 מטעני ציגנור, ואת יתר הכמות שמר.

</div>

2

<u>פרט שני</u>:

<u>מהות העבירה</u>: חברות בהתאחדות בלתי מותרת, עבירה לפי תקנה 85(1)(א) ו- 84(1)(א) לתקנות ההגנה (שעת חירום), 1945.

<u>פרטי העבירה</u>: הנאשם הנ"ל, באזור, החל מתחילת שנת 04' או בסמוך לכך, היה חבר בהתאחדות בלתי מותרת, דהיינו:

במועד הנ"ל, היה הנאשם הנ"ל חבר בחוליה צבאית של ארגון גדודי חללי "אלאקצא".

חברותו של הנאשם בארגון נמשכה עד יום מעצרו.


<u>פרט שלישי</u>:

<u>מהות העבירה</u>: ירי לעבר אדם או מקום שבני אדם עשויים להימצא בו, עבירה לפי תקנה 58(א) לתקנות ההגנה (שעת חירום), 1945; וסעיף 14 לצו בדבר כללי האחריות לעבירה (יו"ש) (מס' 225), תשכ"ח – 1968.

<u>פרטי העבירה</u>: הנאשם הנ"ל, באזור, בתחילת שנת 04' או בסמוך לכך, היה שותף לירי לעבר אדם או מקום שבני אדם עשויים להימצא בו, דהיינו:

במועד הנ"ל, יצא הנאשם הנ"ל יחד עם חבריו חוליייתו הצבאית אחמד תאופיק תאיה, ואיל חיליל פרג' וחלמי עי"א-כרים מוחמד המאש (להלן – **חלמי המאש**) שהיה חמוש ברובה קלצ'ניקוב ורימון יד זאת ע"מ לבצע פיגוע ירי כנגד כוחות צה"ל בבסיס הצבאי של ה- D.C.O. כשהגיעו למקום ירדו הנאשם ואחמד תאיה מהרכב כשברשותם האמל"ח ע"מ לבצע את פיגוע הירי ואילו חלמי המאש וחברו ואיל פרג' נותרו ברכב.

כעבור מספר דקות ירו הנאשם וחברו לעבר כלי רכב; ואו-אז נמלטו חלמי המאש וחברו מהמקום לכיוון ביתו של הנאשם.

שם המתינו לחזרתו של הנאשם.


<u>פרט רביעי</u>:

<u>מהות העבירה</u>: ניסיון גרימת מוות בכוונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות ביטחון (יו"ש) (מס' 378), תש"ל – 1970; וסעיפים 20-19, 14 לצו בדבר כללי האחריות לעבירה (יו"ש) (מס' 225), תשכ"ח- 1968.

<u>פרטי העבירה</u>: הנאשם הנ"ל, באזור, בסוף שנת 03' או בסמוך לכך, היה שותף לניסיון גרימת מותם של אחרים בכוונה, דהיינו:

1.  במועד הנ"ל, הציע הנאשם הנ"ל לעא"א-רחמאן מקדאד לצאת עימו לבצע פיגוע ירי לעבר כלי רכב ישראליים. האחרון נענה בחיוב, ויצא יחד עם

3

הנאשם וערך סיור מקדים במקום שאותו איתר הנאשם. הנאשם וע"א-
רחמאן מקדאד הגיעו לאיזור בית-הספר "תליתא קומי" ומצאו כי מקום זה
טוב לביצוע הפיגוע. הנאשם הורה לע"א-רחמאן מקדאד לבצע במקום פיגוע
ירי יחד עם פעילים נוספים.

2. בסמוך לכך, ביקש ע"א-רחמאן מקדאד מהפעיל הצבאי עלי מחמד חמאד
אבו-הלאיל (להלן – **עלי אבו-הלאיל**) לצאת ולבצע סיור מקדים באיזור
בית-הספר "תליתא קומי" וזאת מכיוון שמתוכנן פיגוע ירי באזור. עלי אבו-
הלאיל נענה בחיוב, ויצא בסמוך לשעה 2:00 למקום וזאת כדי לוודא שאין
מכשולים בדרך. בנוסף גייס ע"א-רחמאן מקדאד את עז-אלדין חיאלד חסין
חמאמרה (המכונה עז-אלדין עליאן) (להלן – **עז-אלדין עליאן**) והפעיל
הצבאי אסמאעיל ע"א-רחמאן מחמד אלפראג'ין (להלן – **אסמאעיל
אלפראג'ין**) לביצוע יחד עימם את פיגוע הירי.

3. בסמוך לשעה 3:00, התקשר עלי אבו-הלאיל לע"א-רחמאן מקדאד ועידכן
אותו כי אין מניעה לבצע את הפיגוע המתוכנן.

4. בהתאם לכך, יצא ע"א-רחמאן מקדאד כשהוא חמוש ברובה קלצ'ניקוב יחד
עם עז-אלדין עליאן שהיה חמוש ברובה M-16 ואסמאעיל אלפראג'ין
כשהוא חמוש ברובה 16 – M לכיוון האיזור ע"מ לבצע את הפיגוע;
אסמאעיל אלפראג'ין הסיע אותם ברכב שהביא.

5. כשהגיעו לאיזור המתוכנן, הורה ע"א-רחמאן לעלי אבו-הלאיל לחזור
לביתו, וע"א-רחמאן מקדאד ועז-אלדין עליאן ארבו בסמוך למקום במרחק
20 מטר מהכביש לכלי רכב ישראליים שיעברו במקום. אסמאעיל
אלפראג'ין נותר ברכב.

6. בסמוך לשעה 3:30, עבר במקום ג'יפ צבאי; או-אז פתחו ע"א-רחמאן
מקדאד וחברו באש לעבר הג'יפ.

7. הג'יפ המשיך בנסיעה, ע"א-רחמאן מקדאד וחברו נמלטו לכיוון הרכב בו
המתין להם אסמאעיל אלפראג'ין, וביחד נמלטו מהמקום.


<u>**פרט חמישי**</u> **:(פ"א 09891/04 מת"מ ירושלים)**

<u>**מהות העבירה**</u> : גרימת מוות בכוונה, עבירה לפי סעיף 51(א) ו- 7(ג) לצו בדבר הוראות ביטחון
(יו"ש) (מס' 378), תש"ל – 1970; וסעיף 14 ו- 2 לצו בדבר כללי האחריות לעבירה
(יו"ש) (מס' 225), תשכ"ח – 1968.

<u>**פרטי העבירה**</u> : הנאשם הנ"ל, באוויר ומחוץ לאיזור, בתאריך 29/1/04, היה שותף לגרימת מותם
של אחרים בכוונה, דהיינו :

4

1. בתחילת חודש ינואר 04' או בסמוך לכך, יצר עי"א-רחמאן מקדאד קשר עם הפעיל הצבאי אחמד מוג'רבי וביקש ממנו כי יכיר לו פעילים צבאיים שיעזרו לו בייצור חומרי נפץ ומטעני חבלה וזאת עי"מ לבצע פיגועים נגד מטרות ישראליות, וכן איתור מתאבדים לצורך ביצוע פיגועי התאבדות. בהתאם לכך, יצר אחמד מוג'רבי קשר עם הפעיל הצבאי עלי אבו-הלאיל וביקש ממנו כי ייפגש עם פלוני (בכוונו לעי"א-רחמאן מקדאד) עי"מ לעזור לו בפעילותו הצבאית. עלי אבו-הלאיל נפגש עם עי"א-רחמאן מקדאד בהתאם להנחיותיו של אחמד מוג'רבי, בפגישה ביקש ממנו עי"א-רחמאן מקדאד כי יעזור לו בייצור חומרי נפץ. הלה הסכים לכך.

2. בסמוך לכך פנה הפעיל הצבאי חלמי עי"א-כרים מחמוד המנאש (להלן – **חלמי המנאש**) אל עלי ג'יעארה והציע לו להפגישו עם פעיל צבאי שישלח אותו לביצוע פיגוע התאבדות. עלי ג'יעאראה (להלן – **המתאבד**) הביע נכונות לכך.

   בהתאם לכך, הפגיש חלמי המאש את **הנאשם הנ"ל** עם המתאבד בפגישה שבמהלכה בירר הנאשם עם המתאבד את מידת נכונותו לבצע פיגוע התאבדות.

   במהלך הפגישה הביע המתאבד נכונות לבצע את הפיגוע. בהתאם ביקש הנאשם מהמתאבד להתכונן לביצוע פיגוע ההתאבדות.

3. בסמוך לכך, פנה עלי אבו-הלאיל לעי"א-רחמאן מקדאד ועידכן אותו כי הצליח להשיג שני ק"ג חומר נפץ מסוג אום-אלעבד וכן חומר כימי מסוג אצטון. בהזדמנות זו העביר עלי אבו-הלאיל לעי"א-רחמאן מקדאד את חומר הנפץ מסוג אום-אלעבד, ועי"א-רחמאן מקדאד ביקש ממנו כי יעביר אליו את האצטון ובנוסף חומר כימי מסוג מי-חמצן המשמשים לייצור חומר נפץ.

4. ביום שלמחרת, נפגש עי"א-רחמאן מקדאד עם עלי אבו-הלאיל וקיבל ממנו 36 ליטר של אצטון וכן 10 ליטר של מי-חמצן; עי"א-רחמאן מקדאד סיפר לעלי אבו-הלאיל כי בכוונתו להשתמש בחומרים אלה עי"מ לייצר חומר נפץ שישמש מתאבד בביצוע פיגוע התאבדות; בהזדמנות זו הסביר עלי אבו-הלאיל לעי"א-רחמאן מקדאד כיצד יש לערבב את החומרים כדי ליצור את חומר הנפץ. עי"א-רחמאן מקדאד הסתיר את החומרים בביתו.

5. כעבור מספר ימים הגיע הנאשם לביתו של עי"א-רחמאן וסיפר לו כי איתר אדם המוכן לבצע פיגוע התאבדות.

   ביום 28/1/04 או בסמוך לכך, פנה שוב הנאשם לעי"א-רחמאן מקדאד, וביקש ממנו כי יכין בדחיפות תיק נפץ באמצעות חומר הנפץ שברשותו וזאת מאחר ובכוונתו לשלוח את המתאבד לפיגוע ההתאבדות.

   או-אז, ביקש עי"א-רחמאן מקדאד מהנאשם כי יקנה עבורו חומרים לייצור תיק הנפץ [שכללו בין היתר: תיק, סוללות, מפסק וכו'...]. הנאשם נענה

5

בחיוב וקנה ביחד עם חלמי המאש עבור עייא-רחמאן מקדאד את כל
שנתבקשו וזאת כדי שיוכל להכין את תיק הנפץ בהקדם האפשרי. בנוסף,
ניסו הנאשם וחלמי המאש למצוא מצלמת וידאו עיימ לצלם את המתאבד
בטרם ביצוע הפיגוע, אולם לא הצליחו בכך – ולפיכך החליטו להוציא את
המתאבד לביצוע הפיגוע מבלי לצלמו במצלמת וידאו.

6.  בסמוך לכך, פנה הנאשם אל הפעיל הצבאי מוחמד עיסא מחמד מעאלי
(להלן – **מוחמד מעאלי**) וביקש ממנו להוביל מתאבד בחגורת נפץ
לביצוע פיגוע התאבדות בתוך שטח מדינת ישראל. מוחמד מעאלי הביע
נכונות לכך.

בהתאם לכך, הפגיש הנאשם את מוחמד מעאלי עם המתאבד.

7.  במקביל לאמור לעיל, ייצר עייא-רחמאן מקדאד כמות נוספת של חומר הנפץ
"אום אלעבד" במשקל 12 קייג, וייצר באמצעותו תיק נפץ לביצוע פיגוע
התאבדות.

עייא-רחמאן מקדאד ביקש מהנאשם לבוא עיימ לקחת את תיק הנפץ.

8.  כעבור מספר דקות הגיע הנאשם יחד עם המתאבד ומוחמד מעאלי לביתו
של עייא-רחמאן מקדאד; מוחמד מעאלי המתין בחוץ ואילו המתאבד
והנאשם נכנסו לביתו של עייא-רחמאן מקדאד. עייא-רחמאן מקדאד הסביר
לנאשם ולמתאבד כיצד להפעיל את תיק הנפץ והעביר להם את תיק הנפץ
עיימ שזה ישמש בפיגוע התאבדות וזאת בכוונה לגרום למותם של אזרחים
ישראליים.

9.  בסמוך לכך, יצאו הנאשם, מוחמד מעאלי והמתאבד לכיוון האוניברסיטה
בבית-לחם; שם נטרל הנאשם את מנגנון האבטחה של מטען החבלה עיימ
להכין אותו לפעולה. לאחר-מכן עזב הנאשם את מוחמד מעאלי עם
המתאבד.

10.  לאחר-מכן בסמוך לשעה 6:30, הוביל מוחמד מעאלי את המתאבד לכיוון
ירושלים דרך כפר וולגיה עד שהגיעו סמוך לקניון מלחה בירושלים. שם
נפרד מוחמד מעאלי מהמתאבד וחזר לאיזור.

11.  בסמוך לכך, עלה המתאבד לאוטובוס אגד בקו 19 שנסע לכיוון כיכר פריז;
כשהגיע האוטובוס לפינת רחובות ארלוזורוב ועזה, סמוך לשעה 8:45,
הפעיל המתאבד את תיק הנפץ שהחזיק עליו בכוונה לגרום למותם של
מספר רב של בני אדם. כתוצאה מכך, התפוצץ תיק הנפץ בתוך האוטובוס
(להלן – **פיגוע ההתאבדות**).

12.  כתוצאה מפיגוע ההתאבדות נגרם מותו של <u>**אברהם בלחסן זייל**</u>.

6

<u>פרט שישי: (פ"א 09891/04 מת"מ ירושלים)</u>

<u>מהות העבירה:</u> גרימת מוות בכוונה, עבירה לפי סעיף 51(א) ו- 7(ג) לצו בדבר הוראות ביטחון (יו"ש) (מס' 378), תש"ל – 1970; וסעיף 14 ו- 2 לצו בדבר כללי האחריות לעבירה (יו"ש) (מס' 225), תשכ"ח – 1968.

<u>פרטי העבירה:</u> הנאשם הנ"ל, באזור ומחוץ לאזור, בתאריך 29/1/04, היה שותף לגרימת מותם של אחרים בכוונה, דהיינו:

כתוצאה מפיגוע ההתאבדות שאותו ביצע המתאבד עלי ג'יערה בכוונה לגרום למותם של אזרחים ישראליים ושהנאשם היה שותף לו כאמור בפרט האישום הרביעי – נגרם מותה של <u>גב' חנה בונדר ז"ל.</u>

<u>פרט שביעי: (פ"א 09891/04 מת"מ ירושלים)</u>

<u>מהות העבירה:</u> גרימת מוות בכוונה, עבירה לפי סעיף 51(א) ו- 7(ג) לצו בדבר הוראות ביטחון (יו"ש) (מס' 378), תש"ל – 1970; וסעיף 14 ו- 2 לצו בדבר כללי האחריות לעבירה (יו"ש) (מס' 225), תשכ"ח – 1968.

<u>פרטי העבירה:</u> הנאשם הנ"ל, באזור ומחוץ לאזור, בתאריך 29/1/04, היה שותף לגרימת מותם של אחרים בכוונה, דהיינו:

כתוצאה מפיגוע ההתאבדות שאותו ביצע המתאבד עלי ג'יערה בכוונה לגרום למותם של אזרחים ישראליים ושהנאשם היה שותף לו כאמור בפרט האישום הרביעי – נגרם מותה של <u>גב' ענת דרום ז"ל.</u>

<u>פרט שמיני: (פ"א 09891/04 מת"מ ירושלים)</u>

<u>מהות העבירה:</u> גרימת מוות בכוונה, עבירה לפי סעיף 51(א) ו- 7(ג) לצו בדבר הוראות ביטחון (יו"ש) (מס' 378), תש"ל – 1970; וסעיף 14 ו- 2 לצו בדבר כללי האחריות לעבירה (יו"ש) (מס' 225), תשכ"ח – 1968.

<u>פרטי העבירה:</u> הנאשם הנ"ל, באזור ומחוץ לאזור, בתאריך 29/1/04, היה שותף לגרימת מותם של אחרים בכוונה, דהיינו:

כתוצאה מפיגוע ההתאבדות שאותו ביצע המתאבד עלי ג'יערה בכוונה לגרום למותם של אזרחים ישראליים ושהנאשם היה שותף לו כאמור בפרט האישום הרביעי – נגרם מותו של <u>מר יחזקאל גולדברג ז"ל.</u>

7

<u>**פרט תשיעי**</u> :(פ"א 09891/04 מת"מ ירושלים)

<u>**מהות העבירה**</u> : גרימת מוות בכוונה, עבירה לפי סעיף 51(א) ו- 7(ג) לצו בדבר הוראות ביטחון
(יו"ש) (מס' 378), תש"ל – 1970 ; וסעיף 14 ו- 2 לצו בדבר כללי האחריות לעבירה
(יו"ש) (מס' 225), תשכ"ח – 1968.

<u>**פרטי העבירה**</u> : הנאשם הנ"ל, באזור ומחוץ לאזור, בתאריך 29/1/04, היה שותף לגרימת מותם
של אחרים בכוונה, דהיינו :

כתוצאה מפיגוע ההתאבדות שאותו ביצע המתאבד עלי גיאארה בכוונה לגרום
למוות של אזרחים ישראליים ושהנאשם היה שותף לו כאמור בפרט האישום
הרביעי – נגרם מותו של <u>מר ולדי צדיק מנברה ז"ל</u>.

<u>**פרט עשירי**</u> :(פ"א 09891/04 מת"מ ירושלים)

<u>**מהות העבירה**</u> : גרימת מוות בכוונה, עבירה לפי סעיף 51(א) ו- 7(ג) לצו בדבר הוראות ביטחון
(יו"ש) (מס' 378), תש"ל – 1970 ; וסעיף 14 ו- 2 לצו בדבר כללי האחריות לעבירה
(יו"ש) (מס' 225), תשכ"ח – 1968.

<u>**פרטי העבירה**</u> : הנאשם הנ"ל, באזור ומחוץ לאזור, בתאריך 29/1/04, היה שותף לגרימת מותם
של אחרים בכוונה, דהיינו :

כתוצאה מפיגוע ההתאבדות שאותו ביצע המתאבד עלי גיאארה בכוונה לגרום
למוות של אזרחים ישראליים ושהנאשם היה שותף לו כאמור בפרט האישום
הרביעי – נגרם מותו של <u>מר ויורל אוקטביא פלורסקו ז"ל</u>.

<u>**פרט אחד עשר**</u> : (פ"א 09891/04 מת"מ ירושלים)

<u>**מהות העבירה**</u> : גרימת מוות בכוונה, עבירה לפי סעיף 51(א) ו- 7(ג) לצו בדבר הוראות ביטחון
(יו"ש) (מס' 378), תש"ל – 1970 ; וסעיף 14 ו- 2 לצו בדבר כללי האחריות לעבירה
(יו"ש) (מס' 225), תשכ"ח – 1968.

<u>**פרטי העבירה**</u> : הנאשם הנ"ל, באזור ומחוץ לאזור, בתאריך 29/1/04, היה שותף לגרימת מותם
של אחרים בכוונה, דהיינו :

כתוצאה מפיגוע ההתאבדות שאותו ביצע המתאבד עלי גיאארה בכוונה לגרום
למוות של אזרחים ישראליים ושהנאשם היה שותף לו כאמור בפרט האישום הרביעי –
נגרם מותה של <u>גב' רוזה בונה ז"ל</u>.

8

<u>פרט שנים עשר</u> (פ"א 09891/04 מת"מ ירושלים):

<u>מהות העבירה</u>: גרימת מוות בכוונה, עבירה לפי סעיף 51(א) ו- 7(ג) לצו בדבר הוראות ביטחון (יו"ש) (מס' 378), תש"ל – 1970 ; וסעיף 14 ו- 2 לצו בדבר כללי האחריות לעבירה (יו"ש) (מס' 225), תשכ"ח – 1968.

<u>פרטי העבירה</u>: הנאשם הנ"ל, באזור ומחוץ לאזור, בתאריך 29/1/04, היה שותף לגרימת מותם של אחרים בכוונה, דהיינו:

כתוצאה מפיגוע ההתאבדות שאותו ביצע המתאבד עלי ג'יעארה בכוונה לגרום למותם של אזרחים ישראליים ושהנאשם היה שותף לו כאמור בפרט האישום הרביעי – נגרם מותה של <u>גב' דנה איטח ז"ל</u>.

<u>פרט שלושה עשר</u> (פ"א 09891/04 מת"מ ירושלים):

<u>מהות העבירה</u>: גרימת מוות בכוונה, עבירה לפי סעיף 51(א) ו- 7(ג) לצו בדבר הוראות ביטחון (יו"ש) (מס' 378), תש"ל – 1970 ; וסעיף 14 ו- 2 לצו בדבר כללי האחריות לעבירה (יו"ש) (מס' 225), תשכ"ח – 1968.

<u>פרטי העבירה</u>: הנאשם הנ"ל, באזור ומחוץ לאזור, בתאריך 29/1/04, היה שותף לגרימת מותם של אחרים בכוונה, דהיינו:

כתוצאה מפיגוע ההתאבדות שאותו ביצע המתאבד עלי ג'יעארה בכוונה לגרום למותם של אזרחים ישראליים ושהנאשם היה שותף לו כאמור בפרט האישום הרביעי – נגרם מותו של <u>מר רומן חונדיאשוויילי ז"ל</u>.

<u>פרט ארבעה עשר</u> (פ"א 09891/04 מת"מ ירושלים):

<u>מהות העבירה</u>: גרימת מוות בכוונה, עבירה לפי סעיף 51(א) ו- 7(ג) לצו בדבר הוראות ביטחון (יו"ש) (מס' 378), תש"ל – 1970 ; וסעיף 14 ו- 2 לצו בדבר כללי האחריות לעבירה (יו"ש) (מס' 225), תשכ"ח – 1968.

<u>פרטי העבירה</u>: הנאשם הנ"ל, באזור ומחוץ לאזור, בתאריך 29/1/04, היה שותף לגרימת מותם של אחרים בכוונה, דהיינו:

כתוצאה מפיגוע ההתאבדות שאותו ביצע המתאבד עלי ג'יעארה בכוונה לגרום למותם של אזרחים ישראליים ושהנאשם היה שותף לו כאמור בפרט האישום הרביעי – נגרם מותו של <u>מר אלי צפורה ז"ל</u>.

9

<u>**פרט חמישה עשר :(פ"א 09891/04 מת"מ ירושלים)**</u>

<u>מהות העבירה</u> : גרימת מוות בכוונה, עבירה לפי סעיף 51(א) ו- 7(ג) לצו בדבר הוראות ביטחון (יו"ש) (מס' 378), תש"ל – 1970 ; וסעיף 14 ו- 2 לצו בדבר כללי האחריות לעבירה (יו"ש) (מס' 225), תשכ"ח – 1968.

<u>פרטי העבירה</u> : הנאשם הנ"ל, באזור ומחוץ לאזור, בתאריך 29/1/04, היה שותף לגרימת מותם של אחרים בכוונה, דהיינו :

כתוצאה מפיגוע ההתאבדות שאותו ביצע המתאבד עלי ג'יעארה בכוונה לגרום למוות של אזרחים ישראליים ושהנאשם היה שותף לו כאמור בפרט האישום הרביעי – נגרם מותה של <u>גב' נטליה גמריאל ז"ל.</u>

<u>**פרט שישה עשר :(פ"א 09891/04 מת"מ ירושלים)**</u>

<u>מהות העבירה</u> : ניסיון גרימת מוות בכוונה, עבירה לפי סעיף 51(א) ו- 7(ג) לצו בדבר הוראות ביטחון (יו"ש) (מס' 378), תש"ל – 1970 ; וסעיפים 20-19, 14 ו- 2 לצו בדבר כללי האחריות לעבירה (יו"ש) (מס' 225), תשכ"ח – 1968.

<u>פרטי העבירה</u> : הנאשם הנ"ל, באזור ומחוץ לאזור, בתאריך 29/1/04, היה שותף לניסיון גרימת מותם של אחרים בכוונה, דהיינו :

כתוצאה מפיגוע ההתאבדות שאותו ביצע המתאבד עלי ג'יעארה בכוונה לגרום למוות של אזרחים ישראליים ושהנאשם היה שותף לו כאמור בפרט האישום הרביעי – נפצעו יותר מ-50 אזרחים בדרגות פציעה קשות וקלות, וכן מת המחבל המתאבד.

<u>**פרט שבעה עשר :(פ"א 17869/04 תחנת מוריה)**</u>

<u>מהות העבירה</u> : גרימת מוות בכוונה, עבירה לפי סעיף 51(א) ו- 7(ג) לצו בדבר הוראות ביטחון (יו"ש) (מס' 378), תש"ל – 1970 ; וסעיף 14 ו- 2 לצו בדבר כללי האחריות לעבירה (יו"ש) (מס' 225), תשכ"ח – 1968.

<u>פרטי העבירה</u> : הנאשם הנ"ל, באזור ומחוץ לאזור, בתאריך 22/2/04, היה שותף לגרימת מותם של אחרים בכוונה, דהיינו :

1. מספר ימים לפני המועד הנ"ל, תיכננו ע"א-רחמאן מקדאד והפעיל הצבאי עז-אלדין עליאן לבצע פיגוע התאבדות וזאת במטרה לגרום למוות של אזרחים ישראליים.

עז-אלדין עליאן הודיע לע"א-רחמאן מקדאד כי איתר אדם בשם מוחמד זעול (להלן – <u>המתאבד</u>) המוכן לבצע פיגוע התאבדות.

10

2. ביום 17/2/04 או בסמוך לכך, נפגש עז-אלדין עלייאן עם המתאבד בכפר
   חוסאן, במהלך הפגישה הסכים המתאבד לבצע את פיגוע ההתאבדות
   המתוכנן. בסיומה סיכם עז-אלדין עלייאן עם המתאבד להיפגש עימו בסמוך
   לכניסיית המולד בבית-לחם ביום 21/2/04 בשעה 16:00.

3. עז-אלדין עלייאן עידכן את עיא-רחמאן מקדאד בדבר תוכן הפגישה ובדבר
   הסכמתו של המתאבד לבצע את פיגוע ההתאבדות; בהתאם לכך, יצר עיא-
   רחמאן מקדאד קשר עם אחיו הפעיל הצבאי מאהר מקדאד שגר בעזה,
   עידכן אותו בדבר התכנון לבצע פיגוע ההתאבדות, וביקש ממנו סכום של
   3,000 ₪ עיימ להכין את תיק הנפץ לפיגוע ההתאבדות וכן לקנות מצלמת
   וידאו לצורך צילום המתאבד (וזאת בהתאם לבקשתו של מאהר מקדאד
   לצלם את המתאבד בטרם ביצוע פיגוע ההתאבדות).

   מאהר מקדאד נענה בחיוב לבקשתו של עיא-רחמאן מקדאד והעביר
   לחשבון בבנק הערבי בבית-לחם, שרשום על שמו של עיא-רחמאן מקדאד,
   סכום של 3,000 ₪ לצורך מימון פיגוע ההתאבדות, וזאת כפי שסוכם עם
   עיא-רחמאן מקדאד.

4. ביום 18/2/04 או בסמוך לכך, ניגש עיא-רחמאן מקדאד לבנק הערבי בבית-
   לחם ומשך את סכום הכסף שהועבר אליו ממאהר מקדאד.

   עיא-רחמאן מקדאד רכש באמצעות חלק מסכום הכסף מצלמת וידאו
   ומצלמה רגילה לצורך צילום המתאבד. כמו-כן העביר עיא-רחמאן מקדאד
   לעלי אבו-הלאיל **ולנאשם** סכום כסף וזאת עיימ שירכשו חומרים לצורך
   הכנת תיק הנפץ לפיגוע ההתאבדות.

5. בהתאם, עלי אבו-הלאיל מהפעיל הצבאי חאתם זכריא מוחמוד
   אלאעריגי (להלן – **חאתם אלאעריג**׳) ארבעה ליטר של חומר כימי מסוג מי-
   חמצן ומהפעיל הצבאי אחמד עודה 40 ליטר חומר כימי מסוג אצטון; עלי
   אבו-הלאיל העביר לעיא-רחמאן מקדאד 12 ליטר חומר כימי מסוג מי-
   חמצן ו- 12 ליטר חומר כימי מסוג אצטון.

6. ביום 20/2/04 ייצר עיא-רחמאן מקדאד יחד עם עלי אבו-הלאיל ועז-אלדין
   עלייאן בביתו של עיא-רחמאן מקדאד את חומר הנפץ מסוג ״אום-אלעבד״
   המיועד לביצוע פיגוע ההתאבדות. עיא-רחמאן מקדאד הסביר לעלי אבו-
   הלאיל כיצד להכין קופסא מעץ לתיק הנפץ, וזה הכין את הקופסה כפי
   שהסביר לו עיא-רחמאן מקדאד.

7. בסמוך לכך, ביקש עיא-רחמאן מקדאד מהנאשם לבדוק עם מוחמד מעאלי
   אם הוא מוכן להוביל את המתאבד לביצוע פיגוע ההתאבדות. בהתאם לכך,
   נפגש הנאשם עם מוחמד מעאלי וביקש ממנו כי יוביל מתאבד נוסף לביצוע
   פיגוע התאבדות בתוך שטח מדינת ישראל. מוחמד מעאלי נענה בחיוב לכך.

11

באותו יום בשעות הערב, הגיע הנאשם לביתו של עי׳א-רחמאן מקדאד
כאשר ברשותו כרוז שעליו כתוב "חוליית אימן ג׳ודה של ארגון גדודי חללי
אלאקצא"; הנאשם העביר את הכרוז לעי׳א-רחמאן מקדאד וזאת כדי
שישמש כתמונת רקע בעת צילומו של המתאבד – וכמו-כן עידכן את עי׳א-
רחמאן מקדאד כי מוחמד מעאלי מוכן להוביל את המתאבד.

8. למחרת בבוקר, העביר הנאשם ל עי׳א-רחמאן מקדאד מסמרי ברזל, וזאת
ע׳׳מ שהאחרון ידביק אותם לתיק הנפץ וזאת כדי להגביר ולהחמיר את
הפגיעות בעת פיצוץ מטען הנפץ. עי׳א-רחמאן מקדאד קיבל את מסמרי
הברזל והדביק אותם לתיק הנפץ.

באותו יום, בסמוך לשעה 16:10, הגיע עז-אלדין עליאן מלווה במתאבד
לביתו של עי׳א-רחמאן מקדאד ע׳׳מ להכין אותו לקראת היציאה לפיגוע.

בנוסף, הביא <u>הנאשם</u> לעי׳א-רחמאן מקדאד רובה קלצ׳ניקוב ורימון יד ע׳׳מ
שעי׳א-רחמאן מקדאד יצלם את המתאבד כשהוא מחזיק ברשותו אמלי׳׳ח
זה.

9. עי׳א-רחמאן מקדאד ועז-אלדין עליאן נתנו למתאבד אוכל ובגדים חדשים.
לאחר שסעדו ביחד עם המתאבד את ארוחת הערב כתב עז-אלדין עליאן
צוואה עבור המתאבד; עי׳א-רחמאן מקדאד ועז-אלדין עליאן צילמו את
המתאבד כשהוא מקריא את הצוואה שלו. כשסיימו לצלם את המתאבד
החל עי׳א-רחמאן מקדאד לייצר את תיק הנפץ שישמש בביצוע פיגוע
ההתאבדות. סמוך לשעה 5:30 בבוקר של היום שלמחרת סיים עי׳א-רחמאן
מקדאד לייצר את תיק הנפץ.

10. כשסיים לייצר את תיק הנפץ, כאמור ביום 22/9/04, התקשר עי׳א-רחמאן
מקדאד אל הנאשם, הודיע לו כי הכל מוכן וביקש ממנו לבוא ע׳׳מ להוציא
את המתאבד לביצוע פיגוע ההתאבדות.

בהתאם לכך, יצר הנאשם קשר עם מוחמד מעאלי וביקש ממנו כי ייפגש
עימו. שניהם נפגשו וביחד נסעו לכיוון ביתו של עי׳א-רחמאן מקדאד שבו
הסתתר המתאבד. הנאשם ביקש ממומחמד מעאלי כי ימתין בסמוך למקום
הנמצא במרכז בית-לחם.

11. בסמוך לשעה 6:00 הגיע הנאשם לביתו של עי׳א-רחמאן מקדאד, לקח
מעי׳׳א-רחמאן מקדאד את תיק הנפץ ויצא ביחד עם המתאבד לכיוון מרכז
בית-לחם; שם הפגיש את המתאבד עם מוחמד מעאלי. משם יצא המתאבד
יחד עם מוחמד מעאלי לכיוון ירושלים כאשר הם עוברים דרך כפר הוולוג׳ה
וזאת ע׳׳מ לבצע את פיגוע ההתאבדות המתוכנן.

12. סמוך לשעה 6:15 נפגש הנאשם עם עי׳א-רחמאן מקדאד ועידכן אותו כי
המתאבד יצא עם המוביל לביצוע פיגוע ההתאבדות. בהתאם לכך, עידכן