"A.     On an unspecified date after the outbreak of the al-Aqsa intifada, the Defendant entered into a conspiracy with additional activists in the Terrorist Organization, for the perpetration of shooting attacks directed against an IDF guard post which was manned with Israeli soldiers, in the vicinity of Joseph's Tomb in Nablus.

On unknown dates during the subsequent period of time, the Defendant, together with additional activists in the Terrorist Organization, perpetrated shooting attacks against an IDF position which was located in the vicinity of Joseph's Tomb.

B.     Shortly before the month of May 2001, the Defendant entered into a conspiracy with additional activists in the Terrorist Organization, for the perpetration of shooting attacks directed against an IDF guard post which was manned with Israeli soldiers, on Mt. Gerizim, and against additional IDF positions in adjacent areas.

For the purpose of promoting the objectives of the conspiracy, the Defendant supplied the additional activists who had joined the conspiracy with M-16 rifles.

During the month of May 2001, on a number of occasions, on unknown dates, the Defendant, together with additional activists in the Terrorist Organization, perpetrated shooting attacks.

The shooting attacks were perpetrated by the Defendant and the additional activists, armed with M-16 rifles, against the military position on Mt. Gerizim, against the Ein Beit camp and against army patrols which were patrolling in the area of the Balata camp, as well as against military targets in the area of the Hawara camp.

C.     On an unknown date, after the outbreak of the al-Aqsa intifada, the Defendant entered into a conspiracy with additional activists in the Terrorist Organization, for the perpetration of terrorist attacks against Israeli citizens and IDF soldiers.

Within the framework of the conspiracy and for the purpose of promotion thereof, the Defendant supplied weapons to the activists in the Terrorist Organization for the purpose of carrying out the terrorist attacks.

The activists in the Terrorist Organization, who joined forces in order to carry out the conspiracy, made use of weapons which were supplied to them by the Defendant, in the terrorist attacks set forth below:

1.     The shooting attack on the settlement of Homesh.

2.     Placing an explosive charge on the Zuata-Asira bypass road.

[Stamp] P 5: 273

Felony Case (Tel Aviv) 1137/02          State of Israel v. Nasser Mahmoud Ahmad Aweis

   3.   A shooting attack with an M-16 rifle against a military patrol in Deir Sharaf.

   4.   Placing an explosive charge in Sarah."

The State goes on to claim that, in these actions, the Defendant was unlawfully attempting to cause the death of many persons, and that these actions, *inter alia*, are in the nature of a conspiracy to commit a crime, attempted murder, and unlawfully carrying a weapon.

The admission by the Defendant is as follows:

P/5A: "2.   I carried out a shooting attack directed against a military position on Mt. Gerizim in Nablus …

3.   I carried out a shooting attack directed against military vehicles in the vicinity of the Hawara camp, near Nablus.

4.   I carried out a shooting attack directed against military vehicles in the vicinity of Nablus, on the west side, near Zuata …"

"13.   I supplied Abd al-Rahman Abdallah with two explosive charges plus a Kalashnikov, which he placed near Kafr Sara, Nablus.

14.   I supplied Majdi Halus with an explosive charge, which he placed on the road to Dir Sharan, against an Israeli patrol."

[Stamp] P 5: 273 [continued]

71

P/6A: "yes, he participated once, together with me, in carrying out a shooting attack directed against an Israeli military position on Mt. Gerizim …"

Q.     Which terrorist attacks did you speak about with Munir Maqadah?

"A.     I spoke with him about many terrorist attacks, and I remember that I spoke with him about a shooting attack which I had carried out along with Muayad Jamil and Mahmoud al-Titi and Qahid Abu Mustafa near the Hawara camp, directed against a military vehicle. I also spoke with him about placing explosive charges in the vicinity of Zuata; I had participated in those terrorist attacks along with Muayad Jamil and Muhammad Yadak and Mahmoud al-Titi and Ahmad Abu Khadr …"

"Q.     Do you remember all of the terrorist attacks in which you participated directly?

A.     I remember. 1. A shooting attack directed against a military position on Mt. Gerizim. 2. A shooting attack directed against a military vehicle in the vicinity of the Hawara camp. 3. A shooting attack directed at members of the armed forces at Joseph's Tomb. 4. A terrorist attack at Dir Sharan. 5. A shooting attack directed at military vehicles … 7. A shooting attack directed at vehicles.

Q.     Can you give details about the shooting attack directed against the military position on Mt. Gerizim?

A.     Yes, about seven months ago, I participated, together with Majed al-Masri and Yasir al-Bami, in shooting about three times at a military position on Mt. Gerizim …"

"Q.     Do you have any additional details about the shooting attack directed against a military vehicle in the area of the Hawara camp?

A.     About six months ago, I participated, together with Yasir al-Badu, in a shooting attack directed at a jeep in the Hawara camp, and each of us fired about half a clip of bullets, and the soldiers fired back at us.

Q.     Can you give details about the shooting attack directed against a car, which you mentioned above?

A.     Yes, I participated, together with Yasir al-Badu and Muayad Jamil and Qaid Abu Mustafa, in a shooting attack, and we shot at a tank in the area of Hawara (the camp). We were shooting from Kafr Kalil. That day, the attack was carried out at about 4:00 p.m., and each of us fired a clip of bullets at the tank."

[Stamp] P 5: 274

72

" … And I took two old [anti-] tank missiles from Abu Sharar in order to take the explosives out of them and to use the explosives to make explosive charges, and I used the explosive charges on the bypass road at Zuata-Asira against military vehicles.

Q.     How many charges did you make out of the missiles which Abu Sharar gave you, and how di d you use them?

A.     After I took the missiles from Abu Sharar, I gave them to Mahmoud Titi from the Balata camp, and Mahmoud made a charge out of them, and he was the one who placed the charge on the bypass road.

Q.     Do you remember when he placed the charge and whether people were hurt when the charge exploded?

A.     The charge was placed sometime during the al-Aqsa intifada; I do not remember a date, and according to the information which I received, the army blew up the charge before it exploded."

"I sent Mahdi Marqa to transport Muhammad Qassem and Muayad Jamil and Qaid Abu Mustafa, so that they could place a charge on the road, near Kafr Sara, west of Nablus.  In the end, however, they did not place the charge, because it was far away.  The brought the charge back and they used it in the area of Zuata against a military vehicle, and I do not know if anyone was hurt in that terrorist attack."

Q.     Did you have any contact with Majdi Halus?

[Stamp] P 5: 274 [continued]

Nevo Publishing Ltd.          nevo.co.il        The Israeli Legal Database

A.    Yes.  About 10 months ago, we took a charge from them, and he placed it on the road in Dir Sharan, and he set off the charge against a military patrol."

" … And I gave him an M-16 weapon, and Yasir carried out a shooting attack with the weapon which I gave him.  The shooting attack was directed at an Israeli vehicle on the bypass road east of Nablus, and according to Yasir, the vehicle was not hit."

"Q.    Can you explain to me about the terrorist attack in Dir Sharan which you mentioned above?

A.    Yes.  About eight months ago, Majdi Samir Hulus [sic] from the Balata camp, who was living in Dir Sharan, came to me and asked me for an explosive charge to carry out at terrorist attack, and I gave him a charge that weighed 15 kg which I had received from Muayad Jamil, and the detonation was with wires.  According to what I know, Majdi placed the charge on the main road at Dir Sharan, and set off the charge at a military patrol, and caused damage to a jeep, and I do not know if people were hurt."

"A.    Yes.  A few months ago, Abd al-Rahman Abdallah, a resident of Sara, suggested to me, while he was studying at al-Najah University, that we carry out a terrorist attack in the area of Sarah, and he [sic] agreed to this.  I gave him two explosive charges and a Kalashnikov, and when I gave him the charges and the weapon, there was a person with him, named Lutfi Abdallah, a resident of Sara, and they set off the charges at a tank in the area of Hawara, and one charge exploded, and after that, they fired at the tank, and after the terrorist attack, they gave me back the weapon."

P/8:    " … And another man from Dir Sharan was with him, and Majdi asked me for an explosive charge, so as to carry out a terrorist attack on an Israeli military patrol, and I agreed, and I gave him an explosive charge which I had received from Muayad Jamil Sansur, and according to the information in my possession, Majdi carried out the terrorist attack against a military patrol in the area of Dir Sharan."

"A.    Yes.  About five months ago, Muayad Jamil introduced me to a man named Iyad who knew how to make explosives and charges, and I took five charges from him, and Mahmoud Titi and Muayad Jamil placed the charges near Zuata, and once Muayad and I went out to place a charge.  The soldiers identified us, and we ran away, and Qaid Abu Mustafa was with us, and we left the charge behind when we ran away."

The "additional item" is as follows:

Ahmad Abu Khadr (Witness No. 6 for the prosecution), P/12:

"A.    I confess that, during the month of May in the year 2001, I went out with all those persons to carry out a shooting attack directed against a military position which is located in Mt.

[Stamp] P 5: 275

74

Gerizim.  On that day, Nasser Aweis gave me an M-16 weapon, and we all set out for the position.  We took up a position in the Dahiya area, in Nablus, from where we fired on the [illegible, probably "military"] position, toward Mt. Gerizim.  I personally fired [illegible, probably "about 20"] bullets, and each of the other people fired the weapon in his possession, at the position.  This was about 10:00 p.m.  And then the army started firing at us, and we fled the scene.

Q.    Did you participate in additional shooting attacks against that military position or against other positions?

A.    I confess that I participated, about six more times, in shooting attacks directed against that position on Mt. Gerizim, with the same people.  In addition, I participated, about four times, in shooting attacks directed against an IDF position which is located in Jabal Shamali, above the Ein Beit Alma camp.  Also, of course, I participated in shooting attacks directed against army patrols which were patrolling in the area of the Balata camp.  All those times, I fired the M-16 that Nasser Aweis had given me."

[Stamp] P 5: 275 [continued]

P/13:

" ... And on that day, Amar told me that he intended to carry out a terrorist attack, and accordingly, he asked me to get hold of two explosive charges for him, for the benefit of the terrorist attack. I told Amar that I know [sic] how to manufacture explosive charges, and therefore I took him to Nasser Aweis, in the Balata camp, and I asked Nasser to obtain two charges for me. Then Nasser called Mahmoud Titi and asked him for two charges, and an hour later, Mahmoud Titi came and brought two charges with him, made out of a pipe 30 cm long and 40 cm wide [sic]. Each charge was closed on both sides, and there were white electric [wires] coming out of one side. After that, Amar received the charges, and each of us went home, and three days later, I heard from Amar that a terrorist attack had been carried out against a military jeep in Silat al-Dhaher, during the night, and they had set off the charges against the jeep, but nothing had happened to it."

P/18:

"A.    In my second testimony, I confessed that I – together with my friends, Fadi Abu Ali and Yasir Rakhal – we carried out two shooting attacks against the settlement of Homesh, and this ... is all true, that the three of us perpetrated shooting attacks, on four or five occasions, against the settlement of Homesh. The fire was directed against the watchtower, at the edge of Homesh, from the direction of Silat al-Ladha, and against the houses in the settlement. This took place in the course of the first three months, at the beginning of the al-Aqsa intifada. In all of those cases, we would arrive in the late hours of the night, after 10:00 p.m., and I remember that, in all of those cases, the soldiers fired back from the watchtower. I confess that I was the one who supplied them with weapons in all of the attacks mentioned above, I fired an M-16, and I gave Fadi a Kalashnikov, and I gave Yasir a Glock. I would take those weapons from Nasser Aweis, before going out on each of the terrorist attacks.

Q.    From what distance did you fire at the settlement of Homesh?

A.    From about 1 km away.

Q.    Which other shooting attacks did you participate in?

A.    Approximately in the beginning of 2001, Fadi Abu Ali and Yasir Rakhal and I fired on a security jeep in the settlement of Homesh, from about 500 meters away. This was during the late hours of the night, after 10:00 p.m. I fired an M-16, Fadi fired a Kalashnikov, and Yasir fired a Carlo – the same weapons which we had used in the previous shooting attack against Homesh, the same weapons which I had taken from Nasser Awiss. After he fired, the soldiers fired back, and we fled the scene ... A. He and I did not do anything except what I have already mentioned, but I would like to state that Hakim Jizari asked me for a weapon, three

[Stamp] P 5: 276

76

months ago, and claimed that he wanted to carry out shooting attacks against IDF soldiers. I agreed to his request and I gave him a Kalashnikov which I had taken from Nasser Aweis, and a week later, Hakim gave me back the weapon, and I do not know if he used it."

Witness No. 25 for the prosecution, Yasir Abu Bakr, P/47B:

"Mahmoud Fares, about 25 years old, a resident of Nablus, and Asad Ismail, about 27 years old, a resident of Beit Iba – we carried out a terrorist attack involving an explosive charge and shooting, on the bypass road near Beit Iba. When we came to the entrance to Beit Iba, I called Nasser Aweis, and he told me that he was sending us people and weapons for the terrorist attack. Half an hour later, Mahmoud Titi and Ahmad Abu Khadr came to the scene. They arrived in a white car. Each of them had an M-16 rifle, and in addition, there was a 250 machine gun in the car, as well as an explosive charge within a fire extinguisher [*atfaya*]. At about 11:30 p.m., we all went out in the white car to carry out the terrorist attack on the bypass road near Beit Iba. Asad Ismail and Ahad Mahmoud Fares placed the explosive charge on the road and connected a wire

[Stamp] P 5: 276 [continued]

77

to the explosive charge. This was a charge which was activated by wires and a battery. As soon as they had connected the wires, suddenly IDF soldiers who were staked out there opened fire on them. Ahad was killed and Asad was wounded in the leg. Mahmoud Titi and Muhammad [sic] Abu Khadr fired at the IDF soldiers. After that, Mahmoud Titi and Muhammad [sic] Abu Khadr and I fled the scene."

Witness 21 for the prosecution, Muhammad Yadak, P/40A:

"A.     In the beginning of the al-Aqsa intifada, [illegible, probably "I participated" or "they participated"] in stone-throwing activity directed at Joseph's Tomb in Nablus, and at the [illegible, probably "military"] forces in Nablus. In June [20]02, Mahmoud Titi contacted me and said that he was planning to set up a military squad belonging to Tanzim Fatah. He suggested that I enlist in the military squad, and Mahmoud said that the purpose of setting up the squad was to carry out terrorist attacks against the Israeli army in the Nablus area. I agreed to this and, within the framework of the military squad, I participated in 10 shooting attacks directed against the army in the Nablus area. Participating in the shooting attacks along with me were (1) Mahmoud Titi, (2) Ahmad Abu Khadr, (3) Nasser Aweis, about 35 years old, from the Balata camp, who was in charge of the Tanzim in Nablus ...

Q.     Who used to plan and prepare for the perpetration of the terrorist attacks in which you participated?

A.     Nasser Aweis was the one who used to plan for the perpetration of the terrorist attacks, and he was the one who used to supply us with the weapons.

[Q.]     Which Israeli military positions did you shoot at?

A.     We carried out shooting attacks directed against a military position on Mt. Alana. We also fired at the settlement of Elon Moreh, and we also fired at the Saqen roadblock near Hawara ...

The second terrorist attack, in August 2001: Nasser Aweis contacted me [and] Mahmoud Titi and told us that young men from the Tanzim wanted to place an explosive charge on the bypass road in the area of Beit Ira, and he asked me and Mahmoud Titi to participate in the terrorist attack and to place the charge along with the young men ... The tenth terrorist attack was a shooting attack directed against the funeral ... The funeral [procession] went from Hawara to Yitzhar, and when they got to the entry to the Hawara camp, Nasser Aweis and Yasir al-Kadawi and Mahmoud Titi and I fired at the participants in the funeral. The army fired back, and Nasser and Mahmoud and Yasir and I fled the scene and headed toward the camp ..."

The facts contained in the charges were proven.

[Stamp] P 5: 277

78

### The offenses of murder, attempted murder, causing severe bodily harm and attempt to cause severe bodily harm

The State ascribes to the Defendant offenses of murder with malice aforethought in the first five counts; offenses of attempted murder in all of the accounts; offenses of causing bodily harm with aggravated intent in the first five counts; the offenses of attempt to cause severe bodily harm in Counts No. 6 and No. 7.

With regard to these offenses, a question arises as to the status of the Defendant.

Section 29 (a) of the Penal Code, 5737 – 1977, tells us that a person who perpetrates an offense together with or through another person shall also be considered as the perpetrator of the offense.

[Stamp] P 5: 277 [continued]

It has been proven to us that the Defendant's mental attitude to these offenses is beyond all doubt. The Defendant wanted and desired to achieve the results of the criminal actions, with every fiber of his being, and was the motivating force in the implementation of a joint plan, carried out together, to intentionally cause the death and injury of his victims, as has been proven.

There cannot be even the slightest doubt that he is the perpetrator of the offenses (see Criminal Appeal 4389/93, Mordechai Vabudi v. the State of Israel, PD 50 (3) 239 and the rulings mentioned there; see also Criminal Appeal 2796/95, John Doe v. the State of Israel, PD 51 (3) 388).

The factual infrastructure which has been revealed to us attests to the fact that the acts of murder were carried out, from beginning to end, with malicious intent, based on the decision and the purpose of causing death, founded on cold blooded thought, controlled behavior and settled mind, and following precise and scrupulous preparation.

We do not have even the slightest doubt that the fundamental elements for the offenses of murder with malice aforethought have been fulfilled, the offenses have been proven, and – as set forth above – the Defendant carried them out.

Obviously, the fundamental elements for the offenses of attempted murder have also been properly proven.

The Defendant's plan of intentionally causing the death of many civilians, and the implementation of that plan as described above, as it has been proven, substantiates the fundamental elements of the less severe offenses of causing bodily harm with aggravated intent and attempt to cause bodily harm with aggravated intent. These offenses as well have been properly proven.

<u>Unlawfully carrying a weapon</u>

The State also ascribes to the Defendant offenses of unlawfully carrying a weapon, in Counts No. 2, 3 and 8.

It has been proven that the Defendant carried, without a permit under any law, M-16 rifles, ammunition and hand grenades, which are in the nature of "weapons," as this term is defined in Section 144 (c) of the Penal Code, 5737 – 1977. The Defendant has confessed to this, as set forth above, and has also confessed that he used the weapons. It is enough for us to mention that which has been set forth in his statements, as follows:

[Stamp] P 5: 278

80

"I supplied Said Ramadan with weapons for the perpetration of a suicide attack within Jerusalem ... I supplied Abd al-Salaam Hasuna with weapons for the perpetration of a suicide attack within Hadera." (See P/5)

See also the Defendant's confession to the shooting attacks described in detail in Count No. 3, as set forth above.

Because the terrorists Said Ramadan and Abd al Salaam made use of the weapons inside Israel, as has been proven above, and because the facts of Count No. 8 have also been proven, it appears that the fundamental elements of the offenses of possession of weapons have also been proven as required.

[Stamp] P 5: 278 [continued]

81

Felony Case (Tel Aviv) 1137/02                State of Israel v. Nasser Mahmoud Ahmad Aweis

### Summary

Having found that the State has proven all of the actions that have been attributed to the Defendant in the indictment, according to the burden of proof that is incumbent upon it to do so beyond all reasonable doubt, we hereby convict the Defendant of the following offenses:

Membership and activity in a terrorist organization, in contravention of Sections 2 and 3 of the Prevention of Terrorism Ordinance, 5708 – 1948.

Conspiracy to commit a crime, in contravention of Section 499 of the Penal Code, 5737 – 1977.

Premeditated murder, in contravention of Section 300 (a) (2) of the Penal Code, 5737 – 1977.

Attempted murder, an offense in contravention of Section 305 (1) of the Penal Code, 5737 – 1977.

Causing bodily harm with aggravated intent, in contravention of Section 329 (1) of the Penal Code, 5737 – 1977.

Attempt to cause severe bodily harm, an offense in contravention of Sections 329 (1) of the Penal Code, 5737 – 1977.

Unlawfully carrying a weapon, an offense in contravention of Section 144 of the Penal Code, 5737 – 1977.

**O. Salomon-Czerniak**
**Judge**

### Judge S. Timan, Presiding Judge, and Judge N. Achituv:

We have read the detailed and well-founded opinion by our colleague, the Honorable Judge Czerniak, and we concur with the conclusion that has been reached by her.

**S. Timan**          **N. Achituv**
**Presiding Judge**   **Judge**

[Stamp] P 5: 279

82

Felony Case (Tel Aviv) 1137/02          State of Israel v. Nasser Mahmoud Ahmad Aweis

It has accordingly been decided to convict the Defendant of all of the offenses ascribed to him in the indictment, as set forth in the opinion by the Honorable Judge Czerniak.

S. Timan, Presiding Judge    N. Achituv, Judge    O. Czerniak, Judge

Handed down and notified on this day, 29 Nisan 5763, May 01, 2003, in the presence of Counsel for the parties and the Defendant.

This version is subject to changes in editing and phrasing.

[Stamp] P 5: 280

83

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

MARK I. SOKOLOW, *et al.*,

                                    Plaintiffs,

                                                            No. 04 Civ. 00397 (GBD) (RLE)

vs.

THE PALESTINE LIBERATION
ORGANIZATION, *et al.*,

                                    Defendants.

**DECLARATION OF RINA NE'EMAN**

Rina Ne'eman hereby certifies as follows:

1.      The attached translation from Hebrew to English is an accurate representation of the
        document received by Rina Ne'eman Hebrew Language Services, to the best of my
        knowledge and belief. The document is designated as P 5:237-280.

2.      I am a professional translator with a B.A. in International Relations from the Hebrew
        University of Jerusalem (Israel) and 30 years of translation experience. I am fluent in
        Hebrew and English, and I am qualified to translate accurately from Hebrew to English.

3.      To the best of my knowledge and belief, the accompanying text is a true, full and
        accurate translation of the Hebrew-language document designated bearing the bates
        number P 5:237-280.

Dated: March __6__, 2014

                                                            _____
                                                            Rina Ne'eman

ss.: New Jersey

On the  6  day of March, 2014 before me, the undersigned, personally appeared Rina Ne'eman, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is signed to this Declaration and acknowledged to me that he executed the same in his capacity, and that by his signature on this Declaration, the individual executed the Declaration.

Sworn to me this
 6  day of March, 2014


Notary Public

LEONOR TROYANO
ID # 2365500
NOTARY PUBLIC OF NEW JERSEY
Commission Expires 6/10/20 4

פח (ת"א) 1137/02                    מדינת ישראל נ׳ נאסר מחמוד אחמד עוויס

בתי המשפט

| בית משפט מחוזי תל אביב-יפו | | פח 001137/02 |
|---|---|---|
| כב׳ השופט ש׳ טימן - אב״ד | | 01/05/03 |
| כב׳ השופטת נ׳ אחיטוב | | |
| כב׳ השופטת ע׳ סלומון-צ׳רניאק | | |

בעניין :    מדינת ישראל

ע״י ב״כ עוה״ד     דבורה חן ותמר אניס

נ ג ד

הנאשם     נאסר מחמוד אחמד עוויס

ע״י ב״כ עו״ד     בולוס

---

המדינה טוענת כי ארגונים אלה הם ארגוני טרור על פי הגדרתם בפקודה למניעת טרור והנאשם אשר מילא בהם
תפקיד בכיר כמתואר, יזם, ארגן והפעיל מעשי פיגוע רצחניים כנגד מטרות ישראליות ובאיו״ש ופעילותו
כללה בין השאר גם רכישה וייצור של אמצעי לחימה מסוגים שונים והעברתם בין במישרין ובין בעקיפין לידי
המחבלים שביצעו בפועל את הפיגועים מטעם הארגון הטרוריסטי.

---

הכרעת דין

השופטת ע׳ סלומון-צ׳רניאק:

האישום

המדינה טוענת כי בתקופה הרלבנטית לאירועים המתוארים בכתב האישום, היה הנאשם מפקד אזור
שכם וצפון השומרון של ארגון תנזים-פתח וכן מפקד ארגון ״כתאבב שהדאא אלאקצא״ (גדודי חללי אל
אקצא) באזור זה.

המדינה טוענת כי ארגונים אלה הם ארגוני טרור על פי הגדרתם בפקודה למניעת טרור התש״ח-1948
והנאשם אשר מילא בהם תפקיד בכיר כמתואר, יזם, ארגן והפעיל מעשי פיגוע רצחניים כנגד מטרות
ישראליות ובאיו״ש ופעילותו כללה בין השאר גם רכישה וייצור של אמצעי לחימה מסוגים שונים
והעברתם בין במישרין ובין בעקיפין לידי המחבלים שביצעו בפועל את הפיגועים מטעם הארגון
הטרוריסטי.

נבו הוצאה לאור בע"מ nevo.co.il     המאגר המשפטי הישראלי

C:\Users\Owner\Desktop\tto bates stamp\Nasser Aweis Conviction.doc

המדינה טוענת כי כתוצאה ממעשיו של הנאשם נרצחו נפצעו ונפגעו אזרחים רבים  והיא מבקשת להרשיעו כמפורט בשמונת האישומים הכלולים בכתב האישום בעבירות המיוחסות לו והן : חברות ופעילות בארגון טרוריסטי עבירות בניגוד לסעיפים 2 ו- 3 לפקודת מניעת טרור התש"ח-1948.

מעשי קשירת קשר לביצוע פשע, עבירות בניגוד לסעיף 499 לחוק העונשין תשל"ז-1977.

מעשי רצח ונסיונות למעשים כאלה עבירות בניגוד לסעיפים 300(א)(2) ו- 305(1)) לחוק העונשין התשל"ז-1977.

מעשי גרימת חבלה בכוונה מחמירה ונסיונות למעשים כאלה, עבירות בניגוד לסעיפים 329(1) ו-329(1) ביחד עם סעיף 25 לחוק העונשין התשל"ז-1977.

נשיאת נשק שלא כדין, עבירות בניגוד לסעיף 144(ב) לחוק העונשין תשל"ז-1977.

### קו ההגנה של הנאשם

בתחילת הדרך שכר הנאשם את שרותיו של ע"ד בולוס ושיתף עמו פעולה.

הסנגור קיבל לידיו את מלוא חומר החקירה ואף הודיע כי יטען בשמו של הנאשם טענות מקדמיות כאלה ואחרות ובהן טענת חוסר סמכות.

ניצן לקו ההגנה העתידי של הנאשם נמצא בפרוטוקול ישיבת 10.9.02. בישיבה זו טען הסנגור (בפני הרכב אחר) בין השאר "אחרי שהסברתי לו את הענין, הוא אומר שהוא לא רוצה עורך דין, שהוא מיצג את עצמו אנחנו מקיום שתוך זמן קצר נוכל לדחוף קדימה את הדיון, זמן של לפחות שבועיים".

באותה ישיבה – כעולה מהפרוטוקול – אמר הנאשם לעורך דינו ובאמצעות המתורגמן "אל תדבר בשמי אני עורך הדין של עצמי, אני מיצג את עצמי" וכבר אז החליט אז החליט ביהמ"ש כי "משרדו של עו"ד בולוס ימשיך ליצג את הנאשם גם אם האחרון יחליט לנהל את הדיון בעצמו".

בישיבת 22.1.03  (בפני ההרכב האחר) הודיע הסנגור את הדברים הבאים "אנחנו חוזרים בנו מהטענה של חוסר סמכות. אני מסכים שהיתה החלטה להגיש סיכומים תוך 30 יום לגבי טענת חוסר הסמכות, אבל לאור ההתפתחויות שהיו בנושא של ברגותי ולאור החלטת בית המשפט המחוזי לדחות את הטענה הזאת, החלטנו לחזור מהטענה לחוסר סמכות בתיק זה."

לאחר מכן הגיש הסנגור בקשה לפטור אותו מהיצוג והבקשה נדחתה בהחלטתינו מיום 2.3.03.

המשפט החל נמשך ונסתיים בנוכחות הנאשם וסנגורו ובתרגום מלא לשפה הערבית. הנאשם והסנגור שתקו לאורך כל הדרך. הם לא השיבו לכתב האישום (ראינו בכך כפירה גורפת) הם לא טענו טענות מקדמיות, לא חקרו עדים בחקירה נגדית ולא העלו טענות משפטיות. הנאשם לא העיד  ולא הובאו עדים מטעמו. השניים אף בחרו שלא לסכם.

עמדה זו תבחן על רקע הודעתו בכתב של הסנגור לאמור :

2

"4... החי"מ שוחח עם הנאשם בכמה הזדמנויות ונסה לשכנע אותו לקבל ייצוג במשפט ע"י עו"ד, אולם הנאשם בחר שלא להיות מיוצג ע"י עו"ד.

5. החי"מ הסביר לנאשם כי הוא אמור לייצג את האינטרסים שלו במשפט, בתשובה הבהיר הנאשם כי החליט שלא לקחת חלק פעיל בהליך המשפטי, זכותו לבחור ולנקוט בדרכים שהוא בוחר לעצמו לרבות באמצעות קו הגנה פסיבי של שתיקה במהלך משפטו.

6. הנאשם ביקש שאם ביהמ"ש יכפה עלינו הופעה בדיונים עלינו אך ורק לשתוק.

7. ביום 11.3.03 ולאחר החלטת כב' ביהמ"ש שוב הסביר החי"מ לנאשם את החלטת כבוד ואת הסיטואציה שהוא נמצא בה וכי במידה וישנה טענה משפטית במהלך הדיון מן הראוי שהחי"מ יתייחס אליה, אולם הנאשם שלל אפשרות זו וחזר על דבריו שאינו מעונין לשתף פעולה ואינו רוצה אותנו כסנגורים שלו ושוב ביקש שעלינו לשתוק...

10. הנאשם מודע היטב למשמעות הדברים, והוא אינו פסול דין ויש לו היכולת השכלית והאינטלקטואלית לבחור כיצד לנהל את המשפט...

13. בהעדר שתוף פעולה עם הנאשם והוראותיו לסנגור לשתוק במהלך המשפט לא לחקור עדים ו/או לטעון טענות משפטיות ו/או אחרות ולא לדבר בשמו ו/או לטעון טענות עובדתיות ו/או משפטיות לא נותר לחי"מ אלא למלות את פיו מים ויהיה מנוע מלעשות אחרת וזאת גם מטעמים מובנים שמקורם בכללי האתיקה המחייבים כל עו"ד...".

שוכנענו מהנאמר בהודעה, מדברים שנאמרו לנו בענין זה בעל פה ומהתנהגות הנאשם וסניגורו ערב המשפט ובכל עת מהלכו, כי הנאשם נוקט עמדה המבטאת קו הגנה אותו בחר ביודעין ברצון מלא וחופשי ובשיקול דעת.

לפנינו בחירה שהיא פרי מהלך מחושב מכוון מודע מושכל ומניפולטיבי אשר נעשתה על ידי נאשם המבין היטב ועד לכל השלכותיה.

לנאשם ניתנה בכל עת האפשרות המלאה ליטול חלק פעיל בדיון אף ניסינו לדרבן את סנגורו לעשות מלאכתו ככל שיוכל גם בהעדר שיתוף פעולה מצדו של הנאשם ולכל הפחות כאשר מדובר בטיעון משפטי גרידא.

הסנגור הנכבד שב והסביר כי אין הוא מתערב בדיון גם שמדובר בטיעון משפטי מן הטעם שחזקה עליו מצוות קו ההגנה של הלקוח.

במילים אחרות, לא במחדל עסקינן או באדישות לתוצאה אלא בקו הגנה ברור והחלטי.

חזקה על הנאשם וסניגורו שהם מודעים מראשית הדברים לנפקות המשפטית שנושא עמו קו הגנה זה.

### הודאות הנאשם

הנאשם הודה בעבירות המיוחסות לו בכתב האישום במסגרת הודעותיו במשטרה.

3

ההודעה ת/5 מיום 21.4.02, ת/6 מיום 28.4.02 ת/7 מיום 30.4.02 ת/8 מיום 1.5.02 ו- ת/9 מיום 14.5.02 נכתבו על פי עדותו של ע"ת 5 חוקר בחולית פח"ע רוני עמאר בערבית בכתב ידו של הנאשם ולאחר שהסביר לנאשם בערבית את החשדות המיוחסים לו והזהירו כדת וכדין. על פי עדות החוקר, לאחר שהנאשם אישר בפניו כי הוא מבין כן את החשדות והן את מהות האזהרה, ביקש הוא לכתוב את הדברים בכתב ידו ועשה כן מרצונו הטוב והחופשי.

על פי עדות החוקר הנאשם חתם בפניו על ההודעות. החוקר תרגם את ההודעות מערבית לעברית (לכל הודעה צמוד תרגומה לעברית ת/5א' עד ת/9א' כולל בהתאם).

ההודעה ת/22 מיום 27.6.02 נגבתה על ידי ע"ת מס' 7 החוקר האדי חלבי אשר הסביר כי גבה את העדות בשפה הערבית השגורה על פיו לאחר שהנאשם הוזהר כדין, הבין את מהות החקירה ואת האזהרה ומסר דבריו מרצון טוב וחופשי. הנאשם חתם על ההודעה שהחוקר רשם אותה בערבית. גם חוקר זה תרגם את ההודעה לערבית והתרגום צמוד להודעה (ת/22א).

נסיבות גביית ההודעות באופן המתואר לעיל, העובדה שברובן המכריע (חמש מתוך שש הודעות) נכתבו על ידי הנאשם בכתב ידו והעובדה שהנאשם שב ואישר בפני שופט צבאי (ראה פרוטוקול מישיבת הארכת מעצר ת/23 ועדות ע"ת מס' 5 ) כי "אני מאשר כאמיתיות ונכונות האימרות והודאות שמסרתי בחקירתי בערבית קראתי אותם וחתמתי עליהם. נכון שהייתי מעורב בכל המעשים והפיגועים שהודיתי עליהם. "כל אחד והתפקיד שלי" אינני מתנגד להארכת המעצר המבוקשתי", הן הנותנות שראיות אלה קבילות ואין חשש כי הופעל על הנאשם לחץ חיצוני אשר הביאו להודות בביצוע מעשים שאין לו חלק ונחלה בהם.

בחינת תוכן של ההודעות ובכללן ההודאות אכן מעלה שלפנינו דבר דבור על אופניו סיפור דברים כהווייתם מתוך מחשבה בחינה ברורה והגיונית בדעה צלולה ומיושבת והן בעלות משקל עצמי פנימי גבוה אשר מצביע לכשעצמו על אמיתותו.

ברי שהודעת הנאשם בפני שופט המעצרים ובפיקוחו נעשתה ללא לחץ או השפעה ובחזינה נושאת עמה תוצאות חמורות לנאשם, מהווה ראיה מאמתת מהותית ובעלת משקל מיוחד המעצימה את כוחן של הודיעותיו הקודמות מלבד היותה עומדת כראיה עצמאית (עיין ד"נ 3081/91 קזולי נ' מ"י פ"ד מה(4) 441 וכן ע"פ 6613/99 סטויבן סמירק נ' מ"י, פ"ד נו(3) 529 ועי"פ 3338/99 פד נד(5) 667).

הדרישה ל"דבר-מה" נוסף אשר מפיג חשש שמא לחף פנימי הוא שהביא את הנאשם להודות, נמלאה עד תום, באימרות בכתב שנתנו עדים אחרים מחוץ לכותלי בית המשפט אותן אנו מקבלים כראיות קבילות ומהימנות כפי שנפרט להלן.

## השותפים

עדי התביעה אחמד אבו חדר (ע"ת מס' 6), מחמד ידכ (ע"ת מס' 21), אחמד ברגותי (ע"ת מס' 23) ויאסר אבו באכר (ע"ת מס' 25) הם שותפיו לעבירות של הנאשם (להלן הארבעה). להוציא ע"ת מס' 6 אחמד אבו חדר אשר דינו הוכרע ונגזר בטרם העיד (עיין כ"א פרוטוקול הכרעת דין וגזר דין אשר סומנו יחדיו ת/11) שלוש האחרים נקראו להעיד בטרם נסתיים משפטם ונתעוררה השאלה אם עדותם קבילה אל נוכח הלכת

4

קינוי (ע"פ 194/75 מנחם קינוי נ' מ"י פ"ד ל(2) 477), הלכה אשר כבליה לא נתגמשה עדיין (עיון ע"פ 1774/02
שמעון קדוש נ' מ"י) והיא מורה לנו ''שאין להעיד נאשם אחד נגד נאשם שני, אפילו הונשו נגדם כתבי
אישום נפרדים, כל זמן שיש חשש, כי העד עלול לצפות לטובת הנאה על ידי המתקת דינו במשפט התלוי
ועומד נגד. דבר זה אפשר למנוע בין על ידי כך שמשפטו יתברר לפני מתן העדות ובין על ידי הפיכתו לעד
מלך ועיכוב ההליכים או הצהרה מטעם התביעה שהמשפט נגדו יבוטל עם סיום העדות...".

המדינה ניווטה דרכה בהתאם למה שנקבע בע"פ 579/88 סוויסה נגד מדינת ישראל פ"ד מד (1 ) 529.
לטענה, הנאשם לא התנגד להעדת עדים אלה אף שידע היטב כפי שידע מנגורו שמשפטם לא נסתיים, הוא
לא הציב מחסום - שעמד לרשותו מן הבחינה הדיונית – בדרכם של שותפיו אל דוכן העדים, בכך ויתר
בידיעין על זכותו להתנגד להשמעתם ואין הוא יכול יותר לתק:ין את קבילותן של ראיות אלה, אשר
מלכתחילה בגדר עדויות כשרות על פי דין הן (ס. 2 לפקודת הראיות (נ"ח) תשל"א-1971) ונותרה שאלת
משקלן בלבד.

אכן זוהי תוצאה צפויה על פי קו ההגנה שהנאשם בחר בו ואין לבוא בטרוניה על ב"כ המדינה הנכבדה.

הואיל וזו תוצאה צפויה ומסתברת של קו ההגנה אשר ננקט על ידי הנאשם במחשבה תחילה, צודקת
היא שהאחריות עליה רובצת על הנאשם.

שאלנו את ב"כ המדינה בעניין זה משום שסברנו שאפשר היתה מעלה הנושא בגדר את ''פתח לו'' אך
נזכור כי המדינה הצהירה בראשית כל עדות כי לא הובטחה לאיש מעדים אלה טובת הנאה  כלשהי וכי אין
בדעתה להפנות עדויות אלה כנגדם בכל דרך שהיא.

בין כה וכה כל אחד  מהארבעה הוכרז כעד עין ולגבי העדויות של כל אחד מעדים אלה נתבקשנו לנהוג
לפי הוראת סעיף א10 לפקודת הראיות (נוסח חדש), תשל"א-1971 (להלן פקודת הראיות) ולהעדיף אמרתו
בכתב על פני עדותו בעל פה.

ספק איפוא אם הלכת קינוי חלה בנסיבות אלה כשהסכנות אלה שבסוד ההלכה אינן מתקיימות.

הדרך בה העידו הארבעה בבית המשפט כפי שיתוארר להלן, היתה  עוינת למדינה.

ע"ת מס' 6 – אחמד אבו חאדר נכנס לאולם החליף חיוכים עם הנאשם והצדיע לו. מכאן ואילך גילה
דעתו במילים ובהתנהגות שלא ישתף פעולה ולא יענה לשאלות.

כך נהג אם כי פנה אלינו פעם אחת מיוזמתו ואמר ''אני מכיר את הנאשם שכאן ואני שם אותו מעל
ראשי למעלה''. הוא אף ענה לשאלת ב"כ המדינה ''ש. ב 23.12.02 היית בבית המשפט הצבאי יהודה (צ"ל
הודית) בכתב האישום הזה שהגשתי עכשיו לביהמ"ש כולל המעורבות שלך בפגוע בחדרה ת. אנחנו רצינו
לעצור את הפעולות הצבאיות והם רצחו את המנהיג ראעד אל כאמל ורצאו ילדים פלשתינאים וזה שדחף
אותי לעשות את הדבר הזה'' לאחר שלפני כן טען כי טען כי כתב האישום נגדו מזוייף.

נבו הוצאה לאור בע"מ   nevo.co.il   המאגר המשפטי הישראלי

C:\Users\Owner\Desktop\to bates stamp\Nasser Aweis Conviction.doc

מדינת ישראל נ׳ נאסר מחמוד אחמד עוויס    פח (ת״א) 1137/02

ע״ת מס׳ 21 מוחמד ידכ פתח את דבריו במילים ״אני לא רוצה לדבר, אני לא רוצה להעיד״ לאחר מכן
ענה על שאלות הנוגעות לעניינים שוליים אך בכל הנוגע לפרטים מהותיים לא שיתף פעולה. כך למשל ענה
לשאלות מתי הכרת את הנאשם או באיזה פעילות צבאית השתתפת יחד עם הנאשם או לשאלות מי היה
חבר בחוליה הצבאית שבה היה גם הוא חבר, בתשובה ״זה דבר פרטי שלי ולא עניני של ביהמ״ש״.  עם
זאת, לאחר שהוכרז כעד עוין כך ענה על השאלות הבאות :

״ש. היית חבר מתחילת האינתיפדה בחוליה שעשתה פיגועים ובין היתר מי שהיה אחראי על החוליה
הזאת זה הנאשם פה נאסר עוויס.

ת. מה הטענת בדברים האלה? מה אסור בדברים האלה?

ש. סיפרת במשטרה שנאסר עוויס הוא זה שהיה מתכנן את ביצוע הפיגועים והוא זה שהיה מספק לכל
חברי החוליה את הנשק

ת. אין לי תשובה

ש. סיפרת במשטרה שהשתתפת בלפחות עשרה פיגועי ירי לעבר הצבא באזור שכם

ת. זו זכותי

ש. סיפרת גם לאן בדיוק היו פיגועי הירי, לעבר התנחלות אלון מורה, לעבר מחסום צהל סמוך לתאורערה

ת. אני מסרב לעמוד לדין בבימ״ש זה אין לי על מה לעמוד לדין, אם עשיתי או לא עשיתי אפילו אם
עשיתי את הדברים האלה, אין בזה שום פגם

ש. אתה לא עומד פה לדין אתה כאן מעיד וצריך לתת תשובות

ת. אני מסרב שנאסר יעמוד לדין על הדברים האלה

ש. על איזה דברים

ת. על מאבקנו נגד הכבוש

ש. אתה בהוראת נאסר עוויס תכננתם לעשות פגוע של הנחת מטען חבלה בשטחים ליד שכם.

ת. זה לא מעניין אף אחד.

ש. סיפרת במשטרה שהיית עוזר לנאסר עוויס להעביר כלי נשק מפעיל כזה לפעיל כזה

ת. אני לא אמרתי את הדברים האלה כדי לעמוד לדין עליהם

ש. לאיזה צורך אמרת אותם

ת. ככה שאלו אותי ואני סיפרתי״.

מכאן ואילך שתק או סרב לענות


ע״ת מס׳ 23 אחמד ברגותי אף הוא הבהיר מיד עם עלותו לדוכן העדים כי ״הבנתי מה שאמר המתורגמן
ואני לא אגיד כלום״ גם הוא הבהיר במהלך החקירה הן במילים והן בהתנהגות שלא ישתף פעולה וכך עשה.


ע״ת מס׳ 25 יאסר אבו בכר לא שינה ממנהגם של האחרים ועל כל שאלה הפנה את ב״כ המדינה לעורך
דינו אך הוסיף וטען כי כל הדברים שנאמרו על ידי הוצאו בלחץ אנשי השב״כ לאחר ששפכו עליו תה, ירקו
עליו, סטרו לו וקשרו אותו למספר ימים.


נוכחנו אם כן לדעת כי עדות הארבעה מקיימת את התנאי הקבוע בסעיף 10א(א)(3) לפקודת הראיות.

נבו הוצאה לאור בע"מ  nevo.co.il  המאגר המשפטי הישראלי

C:\Users\Owner\Desktop\to bates stamp\Nasser Aweis Conviction.doc

P 5: 242

הארבעה היו עדים במשפט וניתנה לצדדים ההזדמנות לחקרם על כן נתקיים התנאי הקבוע בסעיף 10א(א)(2) לפקודת הראיות (עיין דנ"פ 4390/91 מדינת ישראל נ' חאג' יחיא, פ"ד מז (3) 679).

על הנסיבות בהן נגבו עדויות הארבעה העידו השוטרים גובי ההודעות.

ההודעות ת/12 ות/13 נגבו מהעד אבו חאדר על ידי ע"ת מס' 28 לוטוף מרעי, על פי עדות האחרון הוא חקר את אבו חאדר בשפה הערבית תוך שהוא כותב את הדברים בערבית ולאחר שהזהיר את אבו חאדר כדין והסביר לו את מהות החשדות נגדו. על פי עדות מרעי הוא הציע לאבו חאדר לרשום בעצמו את הודעתו בערבית אך זה הסביר כי זה אינו טוב בקריאה ובכתיבה ואין הוא מתנגד שהודעתו תרשם בערבית. על פי עדות מרעי הודעתו של אבו חאדר ניתנה מרצון טוב וחופשי.

ההודעות ת/14 ות/15 נגבו מהעד אבו חאדר על ידי ע"ת מס' 34 עאטוי מטר. על פי עדות מטר הוא הציג עצמו בפני אבו חאדר כאיש משטרה גם הוא כמו העד לוטוף מרעי חקר את העד בערבית ותרגם את העדות לעברית באופן סימולטני ולאחר שהזהיר את אבו חאדר והסביר לו מהות העבירות המיוחסות לו ניתנו הודעותיו של האחרון מרצון טוב וחופשי.

גובה ההודעה ת/16 לא נמנה על עדי התביעה נתייחס לכך בהמשך.

ההודעות ת/17 ת/18 ות/19 נגבו מאבו חאדר ע"י ע"ת מס' 29 גמאל שאקור גם עד זה הציג עצמו בפני אבו חאדר כאיש משטרה הסביר לו את זכויותיו ואת מהות החשדות נגדו הזהירו כדין והודיע לו על זכותו לרשום בעצמו את ההודעה בערבית. גם עד זה העיד כי אבו חאדר הציהיר שאינו יודע לכתוב ערבית וכי אין לו בעיה שהעדות תכתב בשפה הערבית.

את ההודעה ת/20 גבה מאבו חאדר ע"ת מס' 33 חרב מאדי, מאדי הסביר כי העדות נגבתה לאחר "שהאשים" את אבו חאדר בחשדות המיוחסים לו,הזהירו,תרגם לו את תוכן האזהרה, הודיע לו כי הוא זכאי לרשמה בכתב ידו בערבית אך מאחר ואבו חאדר טען שאינו יודע לכתוב הוא גבה את העדות בערבית ושב ותרגם את שכתב לערבית.

מאחר ואבו חאדר טען על פי כל העדויות שאינו יודע לקרוא ולכתוב בשפה הערבית העובדה שההודעות נרשמו בערבית אינה מעלה ואינה מורידה משום שגם לו היו נרשמות בערבית היה אבו חאדר חותם עליהן בהסתמך על דברי גובי ההודעות.

אנו נותנים אמון בעדויות השוטרים גובי ההודעות ת/12 עד ת/20 כולל וקובעים כי נגבו מהעד אבו חאדר כדת וכדין תוך שמירה על זכויותיו וכי אבו חאדר מסר הודעותיו מרצון טוב וחופשי.

ודוק, אבו חאדר עצמו אינו טוען כי נפל פגם במהלך חקירתו. תשובתו לתובעת על שאלתה "אני אגיד לך על כל הפעילות שפעלת עם נאסר עוויס על פי הוראות של עוויס במסגרת האינתיפאדה" לאמור "כל הדברים שאת אומרת אלה דברים מזויפים" נדמית על רקע כלל התנהגותו והתבטאויותיו לפנינו כהתרסה בעלמא

7

העומדת בניגוד קוטבי להודעתו המלאה בכל פרטי האישום שיוחסו לו בכתב האישום המתוקן מיום 7.8.02 בפני שלושת שופטי ההרכב של בית המשפט הצבאי (ראה ת/11).

לכך נוסיף את הימנעות הנאשם מחקירתם הנגדית של עדים אלה הימנעות המחזקת את משקל עדותם.

אנו קובעים כי מתן האימרות הכלליות בהודעות הללו הוכח כנדרש על פי סעיף 10א(א)(1) לפקודת הראיות.

משנתקיימו כל התנאים הנדרשים בסעיף 10א(א) לפקודת הראיות, אנו קובעים כי אימרותיו של אבו חאדר הן ראיות קבילות.

נסיבות גביית ההודעה ת/16 לא הוכחו. גובה ההודעה לא נמנה על עדי התביעה. למרות זאת, בצעד לא מובן לנו לא נמנעה ב"כ המדינה מלכלול אותה בין ההודעות הקבילות לטענתה (עיין ע' 81-80 ל" סיכומי התביעה-ראשי פרקים" שנמסרו לנו בכתב). אנו מתעלמים מראיה זו (ת/16) אשר קבילותה לא הוכחה ומוציאים אנו אותה מכלל הראיות שנלקחו על ידנו בחשבון.

ראשים אנו להניח במידת ודאות גבוהה שהודעתו המלאה של אבו חאדר בעבירות שיוחסו לו בפני הרכב של שלושה שופטים מבססת את אמיתות אימרותיו במשטרה, כפי שהצביעה על קבילותן של האימרות מבחינת נסיבות גבייתן.

במהלך עדותו בבית המשפט ועד כמה שניסה להרחיק עצמו מאימרותיו בכתב בדרכים שונות לא היתה משתנתו של אבו חאדר עקבית. מדי פעם לרגע קט הבליחה האמת, כך למשל מיד עם תחילת העדות ענה בתשובה לשאלת התובעת "הדברים שאני עשיתי אותם ומה שדחף אותי לעשות אותם אלה בגלל פושעי המלחמה שרון ומופז" ולאחר מכן "אנחנו רצינו לעצור את הפעולות הצבאיות והם רצחו את המנהיג ראער אל כאמל ורצאו ילדים מזויפים, תלכי תשאלי אותי שדחף לעשות את הדבר הזה" ואח"כ "כל הדברים שאת אומרת אלה דברים מזויפים, תלכי תשאלי את הסיבות לדברים האלה" וכן "עד רגע זה העם היחידי שהוא תחת כיבוש זה העם הפלשתינים וכל החוקים הבינלאומים מרשים לי להיאבק בכיבוש, אל תעזיפי את עצמך אל תשאלי אותי שום שאלה" וכן "את חסונה אני מכיר אותו הוא חבר שלי ושירת איתי ברשות והכיבוש הוא שדחף את חסונה לעשות מה שעשה".

גם הצדעתו של אבו חאדר לנאשם עם הכניסה לאולם והצהרתו כי הוא מכיר את הנאשם ושם אותו מעל לראשו למעלה, סימנים הם לאמיתות אימרותיו של הנאשם על הקשר ההיראפרכי ביניהם כמתואר בין השאר בת/12 "נאצר עוויס הינו תושב מחנה בלאטה... המכונה אל חג' רווק והוא אחד האחראים בכתאאב שוהדא אל אקצא ושימש כאחראי שלי בארגון ונאצר עובד בבטחון הלאומי בשכם ומשתייך לתנגים פתח...".

אנו מעדיפים אימרותיו של אבו חאדר אשר ניתנו בכתב מחוץ לכתלי ביהמ"ש הכלולות בהודעותיו דלעיל על פני עדותו במשפט.

8

הודעות העד מחמwatt ידכ ת/40אי בי גי נגבו על ידי ע"ת מסי 7 האדי חלבי. על פי עדותו של חלבי ההודעות נגבו ונרשמו בערבית לאחר שהסביר לידכ את החשדות המיוחסים לו והזהירו כדין. לדבריו, העד מסר את הדברים ברצון טוב וחופשי וחתם בפניו בסוף כל עמוד של כל אחת מההודעות. על פי עדותו של חלבי את ההודעות תרגם לעברית אך ידכ נתבקש לחתום וחתם על המקור בלבד.

את ת/40די גבה ממחמד ידכ ע"ת מסי 35 עאטף אווידה גם עד זה העיד כי גבה את ההודעה באותה דרך בה עשה זאת חלבי.

אנו מאמינים לשניים כי גבו את הודעות ידכ בדרך נאותה וכי האימרות הכלולות בהן נמסרו מרצונו הטוב והחופשי של ידכ.

לפנינו לא הועלה ידכ טענה כי הדרך בה נגבו הודעותיו פסולה. על השאלה אם מזהה הוא את חתימתו לא רצה לענות, לא רצה להסתכל אך לא הכחיש ומענהו בשלילה לשאלה אם הזהירו אותו כדין אינו משכנע. גם כאן הימנעות הנאשם מחקירת גובי ההודעות מחזקת את עדותם ואנו קובעים כי מתן האימרות הוכח במשפט כנדרש בסעיף 10א(א)(1) לפקודת הראיות.

אימרותיו של ידכ שניתנו מחוץ לכותלי בית המשפט קבילות כראיה בהליך דנן משנתקיימו תנאי סעיף 10א(א) לפקודת הראיות במלואם.

אנו מעדיפים את אימרותיו של ידכ כפי שקיבלו ביטוי בהודעותיו ת/40אי עד די על פני עדותו בבית המשפט. מתשובותיו של ידכ לשאלות שנשאל ניתן להבחין על נקלה כי התנהגותו בבית המשפט משקפת את החלטתו שלא להראות כמשתף פעולה וברוב מרמזות הן עצמו על כך שאימרותיו במשטרה אמיתיות.

לא למותר לשוב ולצטטן:

"ש. מתי הכרת את נאסר עוויס

ת. זה דבר פרטי שלי ולא ענינו של בית המשפט

ש. באיזו פעילות צבאית השתתפת יחד עם נאסר עוויס

ת. זה דבר פרטי שלי ולא ענינו של ביהמש

ש. מי היה חבר בחוליה הצבאים שבה היית חבר גם?...

ת. זה לא ענינו של ביהמש

ש. היית חבר מתחילת האינתיפדה בחוליה שעשתה פיגועים, ובין היתר מי שהיה אחראי על החוליה הזאת זה הנאשם פה נאסר עוויס

ת. מה הטעות בדברים האלה? מה אסור בדברים האלה

ש. סיפרת במשטרה שנאסר עוויס הוא זה שהיה מתכנן את בצוע הפיגועים והוא זה שהיה מספק לכל חברי החוליה את הנוק

ת. אין לי תשובה

ש. סיפרת במשטרה שהשתתפת בלפחות עשרה פיגועי ירי לעבר הצבא באזור שכם

ת. זו זכותי

ש. אותם עשרה פיגועי ירי שסיפרת עליהם היו בתכנונו של נאסר עוויס והוא זה שסיפק את הנשק לירי

9

ת. אני לא רוצה לענות

ש. סיפרת גם לאן בדיוק היו פיגועי היריד לעבר התנחלות אלון מורה לעבר מחסום צה"ל לחא'ערה

ת. אני מסרב לעמוד לדין בבימש זה. אין לי על מה לעמוד לדין. אם עשיתי או לא עשיתי. אפילו אם עשיתי את הדברים האלה, אין בזה שום פגם.

ש. אתה לא עומד פה לדין. את כאן מעיד וצריך לענות תשובות

ת. אני מסרב שנאסר יעמוד לדין על הדברים האלה.

ש. על איזה דברים

ת. על מאבקו נגד הכבוש

ש. אתה בהוראת נאסר עוויס תכננתם לעשות פגוע של הנחת מטען חבלה במשטחים ליד שכן

ת. זה לא מעניין אף אחד

ש. סיפרת במשטרה שהיית עוזר לנאסר עוויס להעביר כלי נשק מפעיל כזה לפעיל כזה

ת. אני לא אמרתי את הדברים האלה כדי לעמוד לדין עליהם.

ש. לאיזה צורך אמרת אותם

ת. ככה שאלו אותי ואני סיפרתי

ש. כל הנשקים הרובים ה- M16 שהעבירו שמשו לפגועי ירי כנגד אזרחים וחיילים

ת. אני לא רוצה לדבר ואל תמשיכי..."

הודעותיו של ע"ת 23 אחמד ברגותי ת/43א ות/43 ג' נגבו ע"יי ע"ת מס' 32 דוד מזרחי.

על פי עדותו של מזרחי הוא הזדהה בפני ברגותי כשוטר, הזהירו ווידא שהלה הבין את תוכן האזהרה. ת/43א נגבתה בדרך של שאלות ותשובות ונרשמה (כמו גם ת/43ג') בעברית משום שהעד מזרחי אינו כותב ערבית. ברגותי סרב לחתום על ת/43א' מבלי לתת לכך הסבר ואילו על ת/43ג' חתם. מזרחי הסביר כי במהלך גביית שתי ההודעות לא היו כל אירועים חריגים הוא לא הבחין שברגותי פצוע חולה או עייף כי אם כך היה הדבר הוא היה מציין עובדות אלה. אם היה משהו חריג מאוד העדות לא היתה נגבית והיה על כך מזכר. במהלך גביית ת/43ג' הציג מזרחי בפני ברגותי כתב יד בן שמונה עמודים בערבית והאחרון אישר שזה היה כתב ידו לאחר שעיין במסמך.

ההודעות ת/43ב' ת/43ד' נגבו מברגותי ע"יי ע"ת מס' 31 יצחק יעקובוף. עפ"יי עדות יעקובוף השניים דיברו ערבית אך העדות נרשמה בעברית ברגותי הוזהר כדין אך סרב לחתום על האזהרה או על ההודעה ת/43ב' אך על ת/43ד' חתם. על פי עדות יעקובוף במהלך גביית שתי ההודעות הוצגו לברגותי כתבי יד אותם זיהה ככתבי יד שלו, כתבי היד הגיעו ליעקובוף מאחד מחוקרי השב"כ. ברגותי מסר את הדברים מרצונו הטוב וחתמפשי ולגבי כתב היד שהוצג לו עם גבית ת/43 ד' אף השיב "כן, זה כתב היד שלי וכתבתי את מה שסיפרתי לך עכשיו בעדותי".

ההודעה ת/43אה' נגבתה מברגותי על ידי ע"ת מס' 36 משה משה.

עפ"יי עדות האחרון הוא הזדהה בפני ברגותי כאיש משטרה הסביר לו כי הוא עומד לחקור אותו ובמה הוא חשוד. ברגותי מסר את הדברים בצורה מסודרת ואחר כך חתם על העדות לאחר שהדברים תורגמו לו. על פי עדותו של משה הוא חקר את ברגותי כשלעניין רקע כללי בדמות זכרון דברים מהשב"כ אך בעדות מסר לו ברגותי פרטים רבים שלא יכול היה לדעת מזכרון הדברים ובלשונו "אם זה בנושא נסיבות הקשר

נבו הוצאה לאור בע"מ    nevo.co.il    המאגר המשפטי הישראלי

C:\Users\Owner\Desktop\to bates stamp\Nasser Aweis Conviction.doc

איך הדברים התנהלו וזו, אלה דברים שניתן בעדות שלו. אם הם הלכו לחנות גילידה ומה היה הקוד ומי קבע זה לא מופיע בזכ"די".

מהימנים עלינו דברי העדים מזרחי יעקובוף ומשה על אופן ניהול החקירה ונסיבות גביית אימרותיו של ברגותי, אשר מצדו איננו טוען שאלה נגבו בדרך פסולה. גם כאן הימנעות הנאשם מחקירה נגדית מחזקת את הדברים שנשמעו מפי גובי ההודעות ומתן האימרות הוכח במשפט כדבעי.

משנתקיימו תנאי סעיף 10א(א) לפקודת הראיות אנו קובעים כי האימרות בכתב שניתנו ברגותי והכלולות בהודעותיו ת/43א עד ה' הן קבילות כראיה בהליך דנן.

אנו מעדיפים אימרותיו של ברגותי על פני עדותו במשפט. מרבית תשובותיו כוונו להעברת המסר שאין הוא מכיר בסמכותו של בית המשפט ("אני לא מכיר בביהמ"ש, אתם לא מבינים?... אני לא מכיר בביהמ"ש ולא בישראל... איננו מכיר בביהמ"שי") ולא בהכחשת אימרותיו.

בכל זאת, מדי פעם פרצו ונתגלו הסימנים המעידים על כך שהאימרות אמיתיות:

"ש. מתי התחלת את הפעילות הצבאית שלך

ת. זה לא עניינך...

ש. מרואן ברגותי קרוב משפחה שלך

ת. זה לא עניינך למה אתה שואלת אותי שאלות אישיות

ש. אתה היית הנהג ושומר הראש של מרואן ברגותי משנת 96 ועד היום שנעצרת

ת. נו, מה את רוצה

ש. האם זה נכון

ת. איך את שואלת שאלות כאלה? אני לא מכיר בך

ש. אלה דברים שאתה סיפרת

ת. הדבר הזה הוא לא שלי

ש. אתה סיפרת גם שנעצרת יחד עם מרואן ברגותי

ת. אין לי תשובות בכלל יותר טוב שלא תשאלי...

ש. אתה דאגת להכין את סעיד לפני הפגוע דאגת לזה שיהיה לו שיסיע אותו לירושלים למקום קניתם לו בגדים ונעליים לקחתם אותו להסתפר ואתה בתנחיית נאסר עוויס שהיה מתכנן והמארגן אתה גם דאגת להשיג לסעיד רמצדן נשק רובה M16 ומחסניות עם כדורים

ת. (העד שותק ואיננו משיב)

ש. אתה סיפרת בעצמך את כל הפרטים האלה בהודעה שלך

ת. אני אומר מה שאני רוצה מה שבא לי אני אומר

ש. זה מה שאו בא לך להגיד

ת. זה לא ממני זה לא הכתב שלי. אם באמת נאסר עשה את כל הדברים האלה הוא רק רצה לשחרר לנו את פלסטין זה דבר מרומם את הראש...

ש. לא רק שסיפרת בהודעות שלך על הרבה מקרים של פיגועי ירי התאבדות ובהתיחס לכל הפיגועים שעשית אתה מצטער על מה שעשית

11

ת. אם שרון מצטער על מה שהוא עשה אז אני מצטער על מה שעשיתי.

ש. אתה לא מצטער על ששלחת מחבלים להתפוצץ פה בארץ ולהרוג?

ת. אני רוצה לשחרר את ארצי זו שאתם כובשים...

ש. מציגה לך את ההודעה מס' 5 מ 5.9 גם בהודעה זו אני מראה לך את האזהרה את החתימה על האזהרה והחתימה על כל עמ' בהודעה ואת החתימה בסוף ההודעה

ת. מה שאני רוצה אני עושה. אין אף אחד שימנע בעדי, אני אכתוב ואגיד מה שאני רוצה..."

אמת ניתנה להאמר שהתשובה "אני רוצה לשחרר את ארצי זו שאתם כובשים" היא בגדר ראשית הודייה.

יפים לעניננו הדברים שנאמרו בע"פ 735/80 אברהם כהן נ' מ"י, פ"ד לה(3) 94, "משקובע עתה סעיף 10א שבית המשפט יכול להעדיף את האמנה על העדות בבית המשפט, יכול היה הסנגור לנסות ולחזק מצידו את גירסת העד בחקירתו הראשית, עד ידי חקירה נגדית שמטרתה להסביר שהאימרה למשטרה היתה אימרה כוזבת, אך הסנגור לא חקר את העד כללי".

הודעות העד יאסר אבו בכר ת/47א' עד ג' נגבו על ידי עד התביעה מס' 31 יצחק יעקבוביף. העד לא זכר את מעמד גביית העדות ורענן זכרונו מהאימרות. על פי עדותו הוא הזהרה בפני אבו בכר כשוטר, ניהל את השיחה עם אבו בכר בערבית ותרגם לו את הדברים. על פי עדותו של יעקבוביף כאשר תרגם לערבית את שכתב בהודעות יכול היה אבו בכר להשיב על כך לתקן או לסרב לחתום. על פי עדותו הוא רשם רק את מה שאבו בכר אמר לו ואבו בכר אישר בפניו את כתב היד שנעשה בפני חוקרי שב"כ בכתב ידו. על פי עדותו לו היו נסיבות חריגות היה מציין זאת ולו נשמעו תלונות היה רושם אותן כמו שהיה מציין אם היה רואה סימנים ויזואלים. יעקבוביף הבהיר שכאשר חשוד מגיע לחקירה משטרתית הוא אדם חופשי "וזו ההזדמנות שלו למסור או לא למסור את גירסתו וזאת מבלי למה שקדם לכך בשב"כ. אם היתה איזה שהיא בעיה הייתי רושם כי זו חובתי כל מה שרשום בעדות זו נאמר מפי החשוד". יעקבוביף הבהיר כי "גם בעדויות הקודמות וגם בעדות הזאת, הצגתי עצמי כשוטר, זה הדבר הראשון מעבר לכך הם (הכוונה לנחקרים מסוגו של העד ) עושים את האבנהט מי שוטר ומי חוקר שב"כ, הם נתקלים איתנו בהארכות המעצר והם לא יכולים לטעות בענין הזה...".

ההודעה ת/47ד' נגבתה מאבו בכר על ידי עד תביעה מס' 30 משה לוי לדבריו גבה ההודעה לאחר שהחשוד הוזהר כדין העדות נכתבה בעברית אך החקירה התנהלה בערבית. בתום ההודעה הוא קרא בפני אבו בכר את הדברים וזה חתם בפניו. על פי עדותו של לוי שלא זכר ספציפית את המקרה הרי אם היה אבו בכר מתלונן בפניו הדבר היה נרשם. עוד הבהיר לוי כי אין לו צורך להזכר אם הזהרתה כשוטר משום שזו חובתו והוא עושה את זה עם כל חשוד. בהתיחס לקשר שבין החקירתו שלו כשוטר לזכרונות המוגשים לו מהשב"כ הסביר כי חקירותו עצמאית והוא מתיחס לזכ"יד "רק כעקרני דברים ואם חשוד אומר שלא היו דברים מעולם זה מה שירשם בסופו של דבר כלומר מה שהוא אומר זה מה שירשם".

ההודעות ת/47הי ות/47וי נגבו ע"י עד מס' 36 משה משה. היות שאבו בכר טען לפנינו בין השאר כי הודעותיו נגבו בלחץ אנשי השב"כ הרחיב משה דבריו (לאחר שהתבנועה המלומדת ואף אנו הפנינו תשומת לבו לטענותיו של אבו בכר) לא רק על הדרך בה גבה ההודעות אלא גם על אופן חקירתו את אבו בכר אל נוכח חקירה קודמת שנערכה לו ונערכה גם לאחרים על ידי השב"כ, חקירה הנעשית לצורך סיכול וכדבריו "כשאני מקבל לידי זכ"יד חקירה שמגיע מאנשי השב"כ אני בודק את הנקודות שעלות בו מה החשדות שיש נגד אותו חשוד ולאחר מכן אנחנו כותבים את תוכן האזהרה תוכן החשדות מקריאים ומסבירים ודואגים

12

מדינת ישראל נ' נאסר מחמוד אחמד עוויס                                    1137/02 (ת"א) פח

לראות שאכן מבין את תוכן האזהרה וידוע על מה הוא נחקר וזה בשפה הערבית, אני דובר את השפה הערבית על בוריה, אינני כותב ואינני קורא אבל דובר את השפה הערבית, חלק מתהליך שבו אנו מקריאים, אני מודיע לו שאני איש משטרה, והוא מודע לכך שאני איש משטרה והוא עומד לתת עדות משטרתית. לאחר שאני בודק באיזה נקודות התייחסות היתה אליו בשב"כ, ועל מה דיבר אני בונה את החשדות נגדו, אם זה השתייכות לארגון או החזקת אמל"ח או לחלופין סיוע למבוקשים או כל עבירה אחרת, ובהתאם לכך אני ערוך גם מבחינת החקירה עצמה.

השב"כ חוקר את נושא הסיכול, הוא עוסק בתחום שעליו לסכל את הדבר העתידי, כלומר את הפגוע העתידי. תפקידי כחוקר משטרה הוא לעסוק זה ורק בנושא החקירה המתייחסת לאיסוף הראיות כנגד החשוד דאז, זאת אומרת שאם אני חוקר אדם אני חייב לעבוד על פי דיני הראיות ולהבין את החוק...".

כאשר עימתה התובעת את אבו בכר עם העובדה שההודעות נגבו ממנו על ידי שוטר ולא על ידי אנשי השב"כ ענה "לא ראיתי שוטר שאני אדבר איתו כולם קציני שב"כ".

התרשמותנו היא שהשוטר משה משה אכן הזדהה בפני אבו בכר כשוטר כפי שנהגו השוטרים האחרים והדברים שנמסרו בהודעות שגבו משה והשוטרים האחרים (יעקובוף ולוי) נאמרו להם מפיו של אבו-בכר מרצונו הטוב והחופשי ואין הם תוצאת התנהגותם של חוקרי השב"כ כלפיו.

הנאשם ובא כוחו לא חקרו את השוטרים בחקירה נגדית גם לא ביקשו לזמן את אנשי השב"כ עורכי זכרונות הדברים לחקירה. הנאשם ובא כוחו לא חקרו את העד אבו בכר במטרה לחזק גירסתו כי ההודעות נגבו ממנו באמצעים פסולים.

המנעות זו אמנם אינה יוצרת חזקה לפיה גירסת השוטרים היא הנכונה אולם היא מוסיפה ומחזקת את התרשמותנו בדבר מהימנות עדותם של לוי יעקובוף ומשה. בנסיבות דנן, קרי המנעות מכוונת ומגמתית של הנאשם ובא כוחו – כפי שהדגישה בפנינו לא אחת – מחקירה נגדית או מזימונם של עדים רלבנטיים, אשר לא ניתן לשכלח על רקע עדויות סותרות אחרות שממילא לא הובאו. אנו מעדיפים עדותם על הדרך בה ניתנו אימרות החוץ של אבו בכר על פני גירסתו של הנאשם (עיון ע"פ 38/61 משה נ דוד יצחק נ. היוהמ"ש פד טז 514 וע"פ 639/79 אסלן נ' מ"י פד לד(3) 561 ע"פ 2603/90 אלפאר נ. מ"י פד מה(3) 799).

בכל מקרה כמו שנקבע בע"פ 242/85 חזן נ' מדינת ישראל, פ"ד מא(1), עצם העובדה כי אימרת נאשם במשטרה אינה קבילה במשפטו שלו אין בה כדי להביא לידי כך שאותה אימרה לא תהא קבילה במשפט אחר נן נדון ענינו של שותף על פי הוראת סעיף 10 (נדרש, לא קבענו שנתעוררה אפשרות כזו.)

אמרותיו של אבו בכר שניתנו במסגרת ההודעות ת/47א עד ו' הוכחו במשפט ומשנתקיימו כל תנאי הסעיף 10א(א) לפקודה אנו מקבלים אותן כראויות קבילות.

אנו מעדיפים את אימרותיו של אבו בכר על פני עדותו בבית משפט. בהתייחס למרבית השאלות המפורטות את מעשיו של אבו בכר יחד עם הנאשם הפנה אבו בכר את התובעת הנכבדה לאשם היושב מולו, נאשם אשר בחר כאמור שלא לחקור בחקירה נגדית את אבו בכר או כל עד אחר. וכך אבו בכר

"יש. מפנה להוראד מסי 3... שם שאלו אותך מתי תתחלת את הפעילות הצבאים שלך ומי גייס אותך לפעילות הצבאים ואמרת שבתחילת שנת 2001 היית בביתו של נאסר עוויס במחנה הפליטים בלטה ואז נאסר עוויס הציע לך להתגייס לגדודי חללי אל אקצא לפעילות צבאים והסכמת.

13

נבו הוצאה לאור בע"מ  nevo.co.il  המאגר המשפטי הישראלי

ת. הדברים האלה לא נכונים ואתם יכולים לשאול אותו הנה הוא פה...

ש. מפנה להודעה מס' 4... אתה הצעת לנאסר עוויס במהלך הפעילות שלכם לעשות פגוע בבית חולים תל השומר בישראל

ת. אין דבר כזה תשאלי אותו

ש. תכננתם את כל הפרטים ואפילו השיגו מפה של האזור, ובסופו של דבר נאסר אמר שצריך לחכות קצת, שזה עוד לא הזמן המתאים

ת. אין דבר כזה. את יכולה לשאול אותו

ש. מפנה לעמוד ב... עוד אחד מהתפקידים שלך היה לסייע לנאסר עוויס לגייס עוד פעילים מחבלים לפעילות הצבאית שיעזור להוציא אל הפועל פיגועים

ת. לא היו דברי כאלה הנה הוא תשאלי אותו...

ש. היית מדווח לנאסר עוויס כל פעם על מחבל שנודע לך שרוצה לעשות פגוע

ת. פעם ראשונה אני שומע את הדברים האלה בנוסף לכך הדברים האלה הם של השבכ נאסר נמצא פה תשאלו אותו".

אל מול השאלות האלה שהופנתה התובעת לאבו בכר וזה הפנה אותן מצידו לנאשם, לא הציב הנאשם גירסה מטעמו ונותרנו עם אותן הודיות אשר בהודעתיו ועם הודאתו לעניין הפקוחה של

שופט המעצרים שראוי לחזור עליה כאן "אני מאשר כאמיתיות ונכונות האימרות וההודאות שמסרתי בחקירתי בערבית קראתי אותם וחתמתי עליהם. נכון שהייתי מעורב בכל המעשים והפגועים שהודיתי עליהם "כל אחד והתפקיד שלי" אינני מתנגד להארכת המעצר המבוקשתי".

נציין כי הנאשם עצמו מסֵפר ביחס ליאסר אבו בכר בין השאר את הדברים הבאים (עיין הודעת הנאשם ת/8) "אחרי פרוץ אינתיפדת אלאקצה התגייס יאסר אבו בכר לכתאב שוהדאא אל אקצה וביקשתי מיאסר שישתתף עימנו בפיגועים ויאסר הסכים לחצעו ומסרתי לו נשק מסוג M-16     ויאסר ביצע פיגוע ירי מהנשק שמסרתי לו הפיגוע היה לעבר רכב ישראלי בכביש העוקף מזרחית לשכם ועל פי דברי יאסר לא פגע ברכב" ובתשובה לשאלה באיזה פיגועים נוספים היה יאסר מעורב בשם כתאבא שוהדאא אלאקצה "פיגוע חדרה שבוצע על ידי סעיד רמדאן...פיגועים שבוצעו באיזור שכם...".

עובדות אלה לכשעצמן סימן מובהק לאמיתות האימרות שניתנו במשטרה ולכך שיש להענייק להן משקל ניכר.

סימן נוסף לאמיתות אימרותיו מצאנו בגירסאות הסותרות של העד אבו בכר שנמסרו בבית המשפט לגבי אימרה אחרת אשר על פי אימרותיו נעשתה בכתב ידו.

המדובר בכתב יד בערבית לגביו נשאל אבו בכר בהודעתו ת/47 א' גיליון מס' 4 את השאלה "אני מציג בפניך כתב יד בערבית (סה"כ עשרה עמודים בצבע צהוב אותם קיבלתי מהמכונה "בסאם") האם זה כתב ידך?

ת. כן זה כתב ידי ואני כתבתי את מה שספרתי לך עכשיו בעדות"

בעדר לשאלה שנשאל ע"י התובעת "ש. אני מציגה לך הודעה שצמודה להודעה מ 15.4 שזו הודעה בכתב ידך 10 עמודים". ענה "הם מכתיבים לאנשים לכתוב בעל כורחם. תעמידו אותם לדין לא אותנו" הרי

14

לשאלה "ש. זה לא כתב היד שלך" ענה "זה הכתב של קציני השב"כ הם כתבו את הדברים האלה" ובדרך אף ענה על שאלות דומות "ש. אלה דברים שאתה כתבת בעצמך ת. כשנשפך עליך תה זו כשאתה ארבעה חמישה ימים ללא אוכל וללא שינה אז אתה אומר את הדברים כדי להתפטר, ש. אתה את הדברים האלה כתבת ת. יש לי עו"ד אתם צריכים לראות איך השב"כ נוהג עם אנשים ש. אתה מזהה את כתב היד ת. אני לא רוצה לענות לך את מתנהגת כמוהם וצועקת עלי (עונה גם בעברית וגם באנגלית)"

## סיכום ביניים

חזרנו ובררנו שכל הכללים החייבים להתקיים בטרם יוכשרו כראיה אימרות ארבעת שותפי הנאשם מחוץ לכותלי ביהמ"ש בנסיבתו של סעיף 10א לפקודת הראיות נתקיימו (ובכללם הוכחת האימרות במשפט מתן ההזדמנות לנאשם לחקור את העדים, השאלה אם העדויות בבית המשפט שונות באופן מהותי מהדברים שנרשמו בהודעות)

שקלנו בדבר בזהירות המתחייבת ואנו מעדיפים את אימרותיהם של ארבעת העדים שותפיו של הנאשם המצויות בהודעותיהם במשטרה על פני עדותם במשפט.

עדות הטעונה תוספת כלשהי תוכל לשמש כשלעצמה תוספת מכל סוג שהוא לעדות אחרת הטעונה תוספת. על כן, אימרות ארבעת השותפים יכולות להוות "דבר מה" נוסף להודיות הנאשם מחוץ לכותלי בית המשפט.

(עיין, קדמי על ראיות חלק ראשון וכן ע"פ 6147/92 מ"יי נ' יוסף כהן, פ"ד מח(1) 62 ; ע"פ 6214/94 נ' פלוני דינים עליון כרך לח 665 ; ע"פ 5249/98 מ"יי נ' מירילאשווילי, פ"ד נג(3) 550).

על כל אחת מהאימרות ובכללן אימרות שניתנו על ידי חלק מהארבעה בכתב יד – עליהן יש להשקיף כחלק אינטגרלי מאותן הודעות בהתאם (עיין ע"פ 6411/98 מובר נ' מדינת ישראל, פ"ד נה(2) 150) – ניתן להסתמך כראיה תומכת בדמות "דבר מה" נוסף לראיות אחרות שהובאו כנגד הנאשם בדמות הודיותיו הוא.

כשותפים לנאשם ובהתאם להוראות סעיף 54א(א) לפקודת הראיות נדרשנו למצוא "דבר לחיזוקה" של עדותם.

נדרש לנו דבר לחיזוק אף בהתאם להוראת סעיף 10א(ד) לפקודת הראיות המורה לנו כי לא יורשע אדם על סמך אימרה שנתקבלה לפי סעיף 10א לפקודת הראיות "אלא אם יש בחומר הראיות דבר לחיזוקה".

מבחינת אופיה של דרישת הדבר לחיזוק (המוצא זהה בהקשר לשני הסעיפים דלעיל) מדובר בתוספת ראיה מאמתת להבדיל מראיה מסבכת. הדבר לחיזוק אינו חייב להיות ראיה עצמאית ויכול הוא לעלות מן העדות הטעונה חיזוק.

דבר לחיזוק זה נמצא לנו מעל ומעבר לדרוש בראיות מסבכות שבאו ממקור עצמאי ונפרד והן :

הודאתו המלאה של הנאשם בפני שופט המעצרים

אימרות כל אחד מארבעת השותפים בהתייחס לאימרות רעהו ובהתאם.

מדינת ישראל נ׳ נאסר מחמוד אחמד עוויס                    פ״ח (ת״א) 1137/02

שתיקת הנאשם והימנעותו מלהעיד במשפט  שבאה על רקע האמור לעיל ועל רקע קו ההגנה שבחר הנאשם (עליו עמדנו בפתח הדברים) שהיא כשעצמה ראיה המגיעה לכדי ראית מסייע על פי סעיף 162 לחוק סדר הדין הפלילי תשמ״ב-1982 המשמיענו כי ״המנעות הנאשם מלהעיד עשויה לשמש חיזוק למשקל הראיות של התביעה וכן סיוע לראיות התביעה במקום שדרוש להן סיוע״.

מאחר ונמצא לנו קורפוס דליקטי (ראה עדויות ע״ת מס׳ 1  תנ״צ משה ולדמן, ע״ת מס׳ 2 תנ״צ אהרון פרנקו, ע״ת מס׳ 3 נצ״מ חגי דותן, ע״ת מס׳ 4 תנ״צ אורי ברלב, ע״ת מס׳ 8  אוריאל אליהו, ע״ת מס׳ 9 סמ״ר שי כהן, ע״ת מס׳ 10 ג.מ, ע״ת מס׳ 11 ליאון גורנשטיין, ע״ת מס׳ 12 קונסטנטין קרדשוף, ע״ת מס׳ 13 עדי מרוז, ע״ת מס׳ 14 בן נעים חנן, ע״ת מס׳ 15 נעם גבאי, ע״ת מס׳ 16 רס״ר רמי מלכה, ע״ת מס׳ 17 אפי ימין, ע״ת מס׳ 18 סנ״צ פריד גאנם, ע״ת מס׳ 19 טל ורמוט, ע״ת מס׳ 20 רפ״ק יהודה פרץ, ע״ת מס׳ 22 אבי בן עמי, ע״ת מס׳ 24 שמעון לוגאסי, ע״ת מס׳ 26 אסף אזולאי, ע״ת מס׳ 27 עמיר שר והמוצגים ת1\1 עד ת4\1 כולל, ת21\1, ת21A\1, ת4\24 עד ת3\17 כולל, ת48\1, ת49\1, ת52\1 עד ת9\17 כולל), מאחר והנאשם לא הכחיש את עצם מסירת ההודיות בפני גובי הודעותיו או בפני שופט המעצרים הנכבד .  מאחר והנאשם אף חזר והודה בפה מלא ובנפש חפצה בפני שופט המעצרים בכל המעשים שיוחסו לו תוך הבנת מעשהו זה ומאחר ומצאנו כי משקלן הפנימי של הודאותיו גבוה,קטן בהתאם המשקל הנדרש לי״דבר מה״ הנוסף לשם אימותן.

והנה, גם בענין דבר המה הנוסף (אשר מבחינת מטרתו לא בא אלא להראות שהנאשם לא בדה דברים מלבו ועל כן לא נדרש הוא להיות בגדר ראיה מסייעת המסבכת את הנאשם דווקא ודי בראיה מאשרת), מצאנו כי הוא בעל משקל של ממש ועונה בנקל לדרישה מובצרת ומחמירה בחיותו מסבך את הנאשם בביצוע העבירות המיוחסות לו, בא ממקור נפרד ועצמאי ומתייחס לנקודות ממשית השנויה במחלוקת.

<u>עבירות בניגוד לפקודת מניעת טרור וקשירת קשר</u>

בהתאם להכרזה לפי סעיף 8 לפקודת מניעת טרור, התש״ח-1948, נקבע כי התנזים הוא ״ארגון טרוריסטי״ כהגדרת סעיף 1 לפקודה (ילקוט הפרסומים (תשס״ב), עמ׳ 800 מ-06.12.2001.

עפ״י חוות דעת מומחים אשר הוגשו ללא התנגדות הנאשם וסנגורו (ת/50 51/ת) הרי (בן השאר) ״למן ראשית הארועים האלימים ב״שטחים״ שהחלו בספטמבר 2000 נטל ה״תנזים״ תפקיד מרכזי ומוביל בבצוע פעילות טרור. פעילי הארגון ביצעו פיגועים במתונים שונים לרבות פיגועי הרג המוני בשטח ישראל ובאיו״ש... התארגנויות הטרור של התנזים ברצועת עזה ואיו״ש (שלעיתים חברו אליהם גורמים נוספים בשטח) החלו להשתמש (נובמבר 2000) בכינוי ״גדודי חללי אל אקצא (״כתאאב שהדאא אלאקצא״) במיוחד לצורך קבלת אחריות על פיגועים ביעדים ישראליים...

במהלך העימותים האלימים קיבלו ״הגדודים״ אחריות על פיגועים רבים שבוצעו במתווים שונים ב״שטחים״ ובתחומי ה״קו הירוק״ בכללם פיגועים קטלניים. התארגנויות הטרור של ה״גדודים״ אחראיות לאלפי פיגועי ירי ומטעו בצירים העוקפים באיו״ש ולשיגורת פיגועי הרג המוני בשטח ישראל בהם נהרגו עשרות ישראלים... המאפיינים המרכזיים של פיגועי החרג ההמוני כוללים התמקדות המפגעים במקומות הומי אדם (מרכזי ערים ומתחמים ציבוריים המתונים מקור משיכה לציבור הרחב דוגמת בתי קפה ומסעדות, תחנות אוטובוס ומרכזים מסחריים וכו׳) והוצאת לפועל של פיגועי התאבדות (באמצעות חגורת נפץ, או מטעו שנושאות המפגעים עם הגיעם ליעד) ופיגועי הקרבה (פיגועי ממנו סיכויי המפגע להמלט קלושים במרבית הפגועים במתווה זה עושים מבצעיו שימוש ברו״סרים מסוגים שונים) בהם נהרגו עשרות רבות של ישראלים...״.

16

נבו הוצאה לאור בע״מ nevo.co.il   המאגר המשפטי הישראלי
C:\Users\Owner\Desktop\to bates stamp\Nasser Aweis Conviction.doc
P 5: 252

הנאשם סיפר בהודעותיו כי "אחרי פרוץ אינתיפאדת אלאקצא התחלתי בביצוע פיגועים נגד מטרות ישראליות מפאת הכיבוש לאדמה הפלסטינית... לאחר מכן החלטתי לבצע פיגועי ירי ופיגועים נוספים נגד מטרות ישראליות בגדה ובתוך הקו הירוק, הפיגועים שביצעתי אותם הם כדלקמן :-

"1. ביצעתי פיגוע ירי לעבר עמדת שמירה על הצבא הישראלי ליד קבר יוסף בשכם וזה היה לפני יציאת הצבא מהקבר בשבועיים לערך

2. ביצעתי ירי לעבר עמדה צבאית בהר גריזים בשכם...

3. ביצעתי ירי לעבר רכבים צבאיים בקרבת מחנה חוארה ליד שכם

4. ביצעתי ירי לעבר רכבים צבאיים בקרבת שכם מהצד המערבי בקרבת זואתה

5. מסרתי לשני אנשים רימוני יד על מנת לבצע פיגוע בירושלים

6. מסרתי נשקים לביצוע פיגוע בנתניה...

9. אני מסרתי נשק לביצוע פיגוע בחדרה

10. אני מסרתי נשק לביצוע פיגוע ירי פיגוע הקרבה שהיתה אמורה להתבצע בחדרה אך הפיגוע לא הצליח והאנשים נהרגו בקרבת באקה אלגרביה

11. סיפקתי לסעיד רמדאן נשק לביצוע פיגוע התאבדות בתוך ירושלים

12. סיפקתי לעבד אלסלאם חסונה נשק לביצוע פיגוע התאבדות בתוך חדרה

13. סיפקתי לעבד אל רחמאן עבדאללה שני מטענים + קלצ'ניקוב...

14. סיפקתי למג'די חלוס מטען נפץ שהניח אותה בדרך... לעבר סיור ישראלי".

הנאשם ענה לשאלות הבאות כדלקמן :

"ש. בשם מי היית מבצע את הפגועים שצויינת לעיל

ת. בשם כתאאב שוהדאא אלאקצה שהוא משתייך לפת"ח.

ש. מי אחראי על תנועת הפתח

ת. יאסר ערפאת האחראי ויור תנועת פתח

ש. מי אחראי על תנזים פתח

ת. מזכיר תנועת פתח בגדה המערבית מרואן ברגותי...

ש. למי משתייכים שוהדאא אל אקצא

ת. שוהדאא אל אקצא משתייכים לתנועת פתח ולתנזים פתח

ש. מה הקשר שלך למזכיר תנועת פתח בגדה המערבית מרואן ברגותי

ת. הקשר שלי למרואן ברגותי מזכיר תנועת פתח התחיל בשנת 1992 כשהתגוררנו באותה שכונה באמאן בעת שגורשנו על ידי השלטונות הישראלים ומרואן חזר לגדה בשנת 1994 לערך ואני חזרתי בשנת 1995 וכשחזרתי לגדה התחדשו הקשרים עם מרואן והייתי נפגש עם מרואן במשרד תנזים בשכם. וכן הייתי נפגש עמו במשרד ברמאללה ואחרי פרוץ האינתיפדה אלאקצה המשכתי להיות בקשר עם מרואן ברגותי והיינו מארגנים הפגנות בשם תנזים פתח והכרוזים היינו מפיצים בשם ועדת התיאום (הארגונית) (אלפסאלי) והאחראים בועדה יוסף חרב מטעם פתח וגימאל סלים מטעם חמאס ואחרי מותו קיבל את התפקיד אדם אחר ויור הועדה היה יוסף חרב ומרואן ברגותי חבר בועדת התיאום העליונה והמ...ודה העליונה היו מנחים ועדת התיאום הארגונית (אלפסאלי)...

נבו הוצאה לאור בע"מ   nevo.co.il   המאגר המשפטי הישראלי

C:\Users\Owner\Desktop\to bates stamp\Nasser Aweis Conviction.doc

ש. מי היה ממומן את הכסף לביצוע פיגועים נגד מטרות ישראליות

ת. היה ממומן אותי בכסף אנשים מתנגים פתח בגדה ובלבנון

ש. מי הם האנשים שמימנו אותך בכסף לקניית נשק על מנת לבצע פיגועים נגד מטרות ישראליות

ת. לקחתי ממאגד אלמיצרי 12,000 שקלים וכן לקחתי מעצאם אבו בכר 8000 שקלים כהוצאות וקיבלתי ממוניר מקדח בלבנון קיבלתי 50,000 דולר

ש. במה עוסק מאג'ד אל מצרי

ת. קצין במשטרה הפלסטינאית בשכם וחבר בפתח

ש. במה עוסק עאצם אבו בכר

ת. אחראי תנועת פתח בשכם ומשתייך למרואן ברגותי

ש. במה עוסק מוניר מקדח

ת. אחראי פתח בלבנון ומשתייך ליאסר ערפאת

ש. האם היה קשר בינך לבין מרואן ברגותי

ת. הייתי בקשר עם מרואן ברגותי כל הזמן

ש. האם מרואן ברגותי היה יודע שאתה מבצע פיגועים נגד מטרות ישראליות

ת. כן ידע ושמי אף פורסם בעתונות ובטלביזיה וברדיו והייתי משוחח עימו מידי פעם וכשהמצב הפוליטי היה מדרדר ורע לנו היה מבקש שנמשיך שנמנע בפיגועים וכשנפגש שמעון פרס ועומאר שרון עם מנהיגים ברשות התקשר אליי מרואן ברגותי וביקש שנעצור את הפיגועים ואני חשבתי לו שאעשה זאת ובאותה תקופה היה זיני באיזור ומרואן אמר לי שעדיין מאחר והנגרל זיני נפגש עם מנהיגים ברשות שלא נבצע פיגועים בשם שוהדאא אלאקצה ויש לציין כשהתקדמו בשיחות לא בוצעו פיגועים

ש. מי היה ממומן את עאצם אבו בכר שהיה ממומן אותך בכסף לקניית נשק

ת. עאצם אבו בכר היה לוקח כסף מתנועת פתח מהתקציב שהיה מאשר יור תנועת פתח יאסר ערפאת

ש. מי היה ממומן את מאג'ד אל מצרי שהיה ממומן אותך לקניית נשק על מנת לבצע פיגועים נגד מטרות ישראליות

ת. מאג'ד אל מצרי סיפר לי שהוא לוקח כסף ממרואן ברגותי ומאג'ד היה מודע לכך והשתתף עמי במספר פיגועי ירי רגד מטרות ישראליות...

ש. האם מרואן ממומן אותך בכסף באופן ישיר

ת. כן ממומן אותי מרואן ברגותי פעמים באופן ישיר בפעם הראשונה העביר לי באמצעות הפקדה בבנק 3,000 ₪ ובפעם השניה העביר לי דרך הפקדה בבנק 5,000 ₪

ש. האם מרואן ברגותי ידע שאתה מבצע פיגועים נגד מטרות ישראליות

ת. כן ידע וכפי שציינתי לעיל שמי אף פורסם בעיתונות והשלטונות הישראלים מסרו לרשות הפלסטינאית שאני מבוקש בגין פיגועים ושמי גם פורסם בעיתונות העברית ובעיתונות המקומית בגדה וברצועה

ש. האם מרואן ברגותי סייע לך במימון כסף פרט למה שהזכרת לעיל

ת. כן פעם קיבלתי ממנו שיק על סך 2,300 ₪ מאושר על ידי היור ערפאת...". (עיין הודעת הנאשם ת/5).

עוד ענה לשאלות (עיין הודעה ת/6) כדלקמן :

נבו הוצאה לאור בע"מ nevo.co.il המאגר המשפטי הישראלי

C:\Users\Owner\Desktop\to bates stamp\Nasser Aweis Conviction.doc