# ARNOLD & PORTER LLP

**Kent A. Yalowitz**

Kent.Yalowitz@aporter.com
+1 212.715.1113
+1 212.715.1399 Fax
399 Park Avenue
New York, NY 10022-4690

December 29, 2014

**VIA ECF AND HAND DELIVERY**

Hon. George B. Daniels
United States District Judge
United States District Court
   for the Southern District of New York
500 Pearl Street
New York, New York 10007-1312

      Re:    *Sokolow, et al. v. Palestine Liberation Organization, et al.*
              Docket No. 04-CV-397 (GBD)(RLE)

Dear Judge Daniels:

      Plaintiffs request clarification of the Court's orders that the names of accomplices and witnesses be redacted from custodial statements and convictions. DE 671, 672. For the vast majority of relevant exhibits, plaintiffs do not object to redacting the names of third parties. However, as set forth below, there are certain important statements in which the names of witnesses and accomplices are integral to the inculpatory nature of the statement and should not be redacted. In these cases, the statements—including the names of the accomplices and witnesses—fall squarely within Fed. R. Evid. 804(b)(3), and as such, should be submitted to the jury without redactions.

      Defendants' "renewed motion for summary judgment" is based almost entirely on the Court's rulings on redactions (DE 682), which underscores the importance of this issue and the need for a case-by-case evaluation by the Court. (Remarkably, defendants have nothing to say in their 17-page motion about why any of these statements are allegedly hearsay or, even if they were, why plaintiffs' experts could not rely on them.)

      Courts routinely find that statements inculpating third parties are admissible under Rule 804(b)(3) where those statements also inculpate the declarant. *See, e.g., Williamson v. United States*, 512 U.S. 594, 604 (1994); *United States v. Williams*, 506 F.3d 151, 155 (2d Cir. 2007); *United States v. Saget*, 377 F.3d 223, 231 (2d Cir. 2004). For example, in *Williamson*, the Supreme Court noted that the statement "'Sam and I went to Joe's house'" is a self-inculpatory statement where "a reasonable person in the declarant's shoes would realize that being linked to Joe and Sam would implicate the declarant in Joe and Sam's conspiracy." 512 U.S. at 604. This is particularly true where "the context of the[ ] statements shows that [the confessor] was not attempting to minimize his own

# ARNOLD & PORTER LLP

Hon. George B. Daniels
December 29, 2014
Page 2

culpability, shift blame onto [his co-conspirator], or curry favor with authorities." *Williams*, 506 F.3d at 155.  Indeed, in *Saget*, the Second Circuit found that even statements in which a confessor describes acts that his co-conspirator committed *alone* can be "self-inculpatory in context, . . . because the statements reflected . . . how [the two] operated and why their scheme worked." *Saget*, 377 F.3d at 231.

In a criminal case, including the names of accomplices and witnesses may implicate the Sixth Amendment Confrontation Clause, and redaction—or "Bruton-izing"—names is sometimes needed.  *Cf. Bruton v. United States*, 391 U.S. 123 (1968).  But this is a civil case, not a criminal case.  No redactions of third-party names would be justified under *Bruton*.

"The question under Rule 804(b)(3) is always whether the statement was sufficiently against the declarant's penal interest 'that a reasonable person in the declarant's position would not have made the statement unless believing it to be true,' and this question can only be answered in light of all the surrounding circumstances." *Williamson*, 512 U.S. at 604.  Here, the particular statements detailed below should be presented to the jury without redactions because the names of third parties are not only part of the self-inculpatory statements, but the names *themselves* also demonstrate the guilt of the declarant.

1. **Names of Suicide Terrorists**.  As an initial matter, the names of suicide terrorists should remain un-redacted because there is no genuine dispute as to their roles in the attacks at issue.  There is a wealth of admissible evidence, including defendants' own documents and admissions, confirming that Said Ramadan, Wafa Idris, Mohamed Hashaika, Said Awada, and Ali Ja'ara were the suicide terrorists in this case.  *See, e.g.,* Ex. 60 (Ramadan), 17, 233 (Idris), 23, 148 (Hashaika), 19, 139 (Awada), 22, 132 (Ja'ara).

   Moreover, with respect to Rule 804(b)(3), statements in which declarants describe—and link themselves to—the conduct of known suicide terrorists are clearly self-inculpatory.  Indeed, the name of the suicide terrorist itself is what makes the statement self-inculpatory in most instances.  This is consistent with the Supreme Court's "Joe and Sam" example, as a "reasonable person in the declarant's shoes would realize that being linked to [a suicide terrorist] would implicate the declarant in [a terrorist attack]." *Williamson*, 512 U.S. at 604.  Defendants should not be allowed to get away with minimizing the declarant's guilt by obscuring the names of the suicide terrorists, when the very names

# ARNOLD & PORTER LLP

Hon. George B. Daniels
December 29, 2014
Page 3

      demonstrate the guilt of the declarant, and the statement in its un-redacted form falls well within the bounds of Rule 804(b)(3).

2. **Exhibits 322, 465, 467, 469**. Munzar Noor was convicted of planning the January 29, 2002 Jaffa Street bombing that injured the Sokolow family. Ex. 322. Noor's conviction contains the following explanation of his role in the attack: "In these statements the Defendant admits that he sat together with the individual known as Abu Talal and the terrorist Wafa Idris when they planned to execute a terrorist attack in Jerusalem." Ex. 322 at P 3: 41; *see also* Exs. 465, 467, 469 (Noor statements also admitting to conspiracy with Abu Talal and Wafa Idris). Noor's admission that he and two co-conspirators met and agreed to plan a suicide terror attack is indisputably a statement against penal interest under Rule 804(b)(3). The names of his accomplices—Abu Talal and Wafa Idris—are part of that non-hearsay statement and should remain visible to the jury.

3. **Exhibit 357**. Ahmed Barghouti was convicted of masterminding the January 22, 2002 shooting that injured the Gould and Waldman plaintiffs. Exs. 357, 358. He was also convicted of providing material support to known Hamas bomb-maker, Abdullah Barghouti, in 2001. Ex. 357 at P 5: 202. (Abdullah Barghouti went out to manufacture the bomb that killed the family members of the Blutstein, Carter, Coulter, and Gritz plaintiffs in 2002. Exs. 452, 431.) Count 51 of Ahmed Barghouti's indictment reads: "The above mentioned Defendant, at the time set forth, with Marwan Barghouti, transferred Bilal Yaakub Ahmed Barghouti and Abdullah Barghouti from the prison of the Preventive Security of the Palestinian Authority in Bitunia to an apartment, which the Defendant had rented in downtown Ramallah." *Id.* Ahmed Barghouti pled guilty to this count, thereby accepting the statement as true.

      As in the Second Circuit's *Williams* case, "the context of these statements shows that [Ahmed Barghouti] was not attempting to minimize his own culpability, shift blame onto [his co-conspirators], or curry favor with authorities." *Williams*, 506 F.3d at 155. To the contrary, he pled guilty; and at his sentencing, said that he "does not regret his actions." Ex. 359 at P 5: 212. The names of the accomplices are integrated into to the inculpatory nature of this statement.

4. **Exhibit 362**. Along with Ahmed Barghouti, Nasser Aweis was also convicted of masterminding the January 22, 2002 shooting that injured the Gould and Waldman plaintiffs. Ex. 362. During his trial, the Court relied on (and quoted) a

ARNOLD & PORTER LLP

Hon. George B. Daniels
December 29, 2014
Page 4

number of Nasser Aweis's self-inculpatory statements, some of which also mentioned third parties, including Yasser Arafat, Marwan Barghouti, and Majed al-Masri.  Ex. 362 at P 5: 253–54.  Specifically, Aweis describes his participation in an organized terror apparatus, as well as the funding he accepted in order to carry out terror operations.  *Id.*  The statements "reflected . . . how [Aweis and his co-conspirators] operated and why their scheme worked."  *Saget*, 377 F.3d at 231.  Moreover, these confessions were admitted at a trial in which Nasser Aweis elected not to mount a defense of any kind.  Ex. 362 at 3–4.  Thus, "the context of these statements shows that [Nasser Aweis] was not attempting to minimize his own culpability, shift blame onto [his co-conspirators], or curry favor with authorities."  *Williams*, 506 F.3d at 155.

A selection of these statements are provided below, but Plaintiffs request that all of the third-party names detailed on pages P 5: 253–54 of Exhibit 362 remain un-redacted:

- Q.  On whose behalf did you carry out the terrorist attacks which you noted above?

    A.  On behalf of Kitaab Shuhadaa al-Aqsa [al-Aqsa Martyrs' Brigades], which belongs to the Fatah.

    Q.  Who is in charge of the Fatah?

    A.  Yasser Arafat is in charge, and he is the chairman of the Fatah movement.

    Q.  Who is in charge of the Tanzim Fatah?

    A.  The secretary of the Fatah movement in the West Bank, Marwan Barghouti.

- Q.  Did Marwan Barghouti provide you with money directly?

    A.  Yes, Marwan Barghouti finances [sic] me twice.  The first time, he transferred NIS 3,000 to me by means of a deposit in the bank, and the second time, he transferred NIS 5,000 to me by means of a deposit.

**ARNOLD & PORTER** LLP

Hon. George B. Daniels
December 29, 2014
Page 5

> Q. Did Marwan Barghouti know that you were carrying out terrorist attacks against Israeli targets?
>
> A. Yes, he knew, and as I have already stated, my name was even published in the press, and the Israeli authorities told the Palestinian Authority that I was wanted for terrorist attacks, and my name was also published in the Hebrew press and in the local press in the West Bank and the Gaza Strip.
>
> Q. Did Marwan Barghouti assist you in providing money, aside from what you have already stated?
>
> A. Yes. Once I received a check for NIS 2,300 from him, authorized by Chairman Arafat . . . .

Ex. 357 at P 5: 253–54 (further self-inculpatory statements discussing Nasser Aweis' terror financiers, including financing by Marwan Barghouti and "Chairman Arafat"). The names of Arafat and Marwan Barghouti render the statement even more inculpatory, as they are being described as Nasser Aweis' terror financiers. The names should remain un-redacted.

5. **Exhibit 606**. In a custodial statement, Al-Aqsa Martyrs Brigade ("AAMB") operative Hiri Salemeh told Israeli police that Naef Abu Sharkh—who was found culpable of the June 19, 2002 French Hill suicide bombing in a Asset Forfeiture Investigation conducted by Israel—provided financial support to AAMB operatives. Ex. 606 at 13. AAMB was a designated terrorist organization as of March 2002. Ex. 537. Specifically, Salameh's statement contains the following exchange:

> Question - Did you receive money from Naif Abu Sharah for your activity?
>
> Answer - Naif Abu Sharah, alias "Abu Fathi" gave me at first 100 shekels, and he had a page on which he wrote the names of the operatives to whom he gave money, and Naif always had a lot of money, and he is responsible for the Tanzim in the old city of Nablus. After that I received from Naif 1000 shekels after recruiting Mohamed Aliwi for an

**ARNOLD & PORTER** LLP

Hon. George B. Daniels
December 29, 2014
Page 6

> attack, and after that I received from Naif 800 shekels per
> month as a salary for my activity. I know that Naif gives
> financing of 1000 shekels to Bassal Bizri from Nablus,
> aged 26, married, wanted, and he has been arrested now,
> and to Amar Samhan, and to Mazen Fraitakh and to Amad
> Ashabi from Nablus, aged 30, wanted, short, with a large
> build, and to Bassam Abu Sharia, and that is it, and I have
> nothing more to add.

Ex. 606 at 13.  Salameh's statements, which admit to being compensated on a regular basis for terrorist activity, are self-inculpatory and admissible under Rule 804(b)(3).  The inclusion of Abu Sharkh's name in that statement renders it even more inculpatory, as Abu Sharkh was being described as Salameh's terror financier.  The name should remain un-redacted.

6. **Exhibits 427, 428, 1111**. Abdullah Barghouti—who was convicted of 66 counts of murder and 12 counts of attempted murder, including for his role in the July 31, 2002 Hebrew University bombing at issue in this case—gave statements to Israeli police after his 2003 arrest. *See, e.g.*, Exs. 427, 428, 1111.  In those statements, Abdullah Barghouti gave information about his hideout following his premature release from PA prison in 2001; his bomb-making laboratory and activity; and his involvement in terror activity even during his brief stint in PA prison.  These statements are all self-inculpatory and admissible under Rule 804(b)(3), and the names of third parties who are also inculpated in the same statements should remain visible to the jury:

   - "Jibril Rajoub delivered me and Bilal Barghouti to Marwan
     Barghouti and we stayed in Marwan Barghouti's home for
     about three weeks.  Marwan Barghouti's home is in
     Ramallah, it is next to the Arab Bank." Ex. 427 at P 7: 127.

     This statement is almost exactly like the "'Sam and I went
     to Joe's house'" example. *Williamson*, 512 U.S. at 604.  In
     the context of an identified and dangerous bomb-maker
     admitting he was let out of prison, the names are self-
     inculpatory.  Further, Abdullah Barghouti was not trying to
     shift blame or curry favor with the authorities.  To the
     contrary, he too pled guilty and said at his sentencing:  "I

# ARNOLD & PORTER LLP

Hon. George B. Daniels
December 29, 2014
Page 7

>  do not regret any of the acts that I have carried out, and the Court knows that I have taught dozens of engineers to do the work better than me. In the future you will see cases that are ten times greater than my case. I promise that." Ex. 435 at P 7: 19.

- "Question - Tell me about the $H_2O_2$ material that Mohamed Taher Barghouti transferred to you while you were in hiding, you and Bilal Barghouti, in Marwan Barghouti's home.

  "Answer - I told Ahmed Faransi that my storeroom in Beit Rima had $H_2O_2$, from which one prepares the Ul Al Abed explosive, in it. I told Ahmed Alfaransi that Mohamed Taher Barghouti knew where this material was kept and that he should ask him to transfer this material to me Ahmed Alfaransi met Mohamed Taher Barghouti. Mohamed Taher Barghouti gave Ahmed Alfaransi the gallon containing 20 liters of $H_2O_2$. Ahmed Alfaransi arrived to Marwan Barghouti's home with this gallon, and I traveled in Ahmed Alfaransi's vehicle and transferred the gallon with the $H_2O_2$ material to the home of Bilal Barghouti in the Ein Misbah neighborhood. In addition, on that day, Ahmed Al-faransi bought me a Joule mobile phone, whose number I do not remember." Ex. 427 at P 7: 127–28.

  In the context of admitting that the declarant had bomb-making materiel—and asking others to retrieve it for him—the names of his accomplices are *inculpatory*, not *exculpatory*, and therefore should not be redacted.

- "Question- Tell me about the explosive devices that you manufactured for Marwan Barghouti.

  "Answer - In the period in which we were hiding, I and Bilal Barghouti, in the home of Marwan Barghouti, he, Marwan, asked me to prepare explosive devices in order for

# ARNOLD & PORTER LLP

Hon. George B. Daniels
December 29, 2014
Page 8

> him to use these explosive devices in case IDF forces would enter Ramallah." Ex. 427 at P 7: 128-29.
>
> In the context of admitting that the declarant made bombs, the name of his "customer" is inculpatory and should not be redacted.

- "Question - Tell me about all the money that you received from the Hamas from the day you started your activity in Hamas.

  "Answer - . . . Marwan Barghouti gave me 500 dollars…" Ex. 428 at P 7: 144.

  Admitting that the declarant received money for terror activities is self-inculpatory, and the name of the financier does not make it exculpatory.[1]

- "On the day that Aiman Halawa sent the weapons I was arrested by the Preventive Security in Ramallah. After a few days, an officer of the Preventive Security called Abu Ali Tarifi gave me a new mobile phone in the presence of Marwan Barghouti and Hasan Yosef and I called Aiman Halawa and told him that I was in prison and I told him 'that the tomatoes that he sent me to Ramallah are bad and that he should come back to take them. Aiman Halawa understood that I wanted him to take the weapons that he had sent me and I know this because after I left the prison of the Palestinian Authority, Aiman Halawa told me that he had taken the weapons.'" Ex. 1111 at 1-2.

  In the context of this statement, it cannot be said that Abdullah Barghouti was trying to exculpate himself or

---

[1] This same self-inculpatory statement that Marwan Barghouti gave $500 to Abdullah Barghouti also appears in Count 2 of Abdullah Barghouti's Indictment, to which he pled guilty. Ex. 452 at P 7: 30. Marwan Barghouti's name should also appear in that document for the same reasons.

# ARNOLD & PORTER LLP

Hon. George B. Daniels
December 29, 2014
Page 9

>curry favor with the authorities. To the contrary, given his guilty plea and sentencing statement, he was simply inculpating himself.

\* \* \*

The names of the witnesses and accomplices in the statements described above are integral parts of the self-inculpatory statements—many of them are extremely close to the Supreme Court's "'Sam and I went to Joe's house'" example. They reflect how the scheme operated and why it worked. *Saget*, 377 F.3d at 231. They do not reflect an attempt to minimize the confessor's "own culpability, shift blame onto [his co-conspirator], or curry favor with authorities." *Williams*, 506 F.3d at 155 (2d Cir. 2007).

Plaintiffs therefore request that the entirety of these statements—including the names of the witnesses and accomplices—be submitted to the jury without redactions.

                                          Respectfully,

                                          Kent A. Yalowitz

cc:    All ECF Counsel