# Exhibit A



**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------x
**COURTNEY LINDE, et al.,**

          **Plaintiffs,**

  - against -

**ARAB BANK, PLC,**

          **Defendant.**
------------------------------------------------------------x

<u>**OPINION & ORDER**</u>

**04-CV-2799 (NG) (VVP)**
**and related cases[1]**

NINA GERSHON, United States District Judge:

    The parties in this case have brought fifteen motions to exclude expert testimony pursuant to Rule 702 of the Federal Rules of Evidence. This Opinion and Order will address eleven of those motions. The remaining four motions directed to banking experts are pending. Prior rulings regarding expert testimony were made in a written order of December 6, 2011, *see Linde v. Arab Bank, PLC*, ___ F. Supp. 2d ___ (E.D.N.Y. 2011), 2011 WL 9974899, and orally on December 19, 2011.

    Federal Rule of Evidence 702 allows testimony by an expert witness when the witness "is qualified as an expert by knowledge, skill, experience, training, or education" and (1) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;" (2) the "testimony is based on sufficient facts or data;" (3) the "testimony is the product of reliable principles and methods"; and (4) the expert "has reliably applied the principles and methods to the facts of the case." *Id.*; *see Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

---

[1] The following related cases have been consolidated with this case for the purposes of discovery and other pretrial proceedings: *Philip Litle, et al. v. Arab Bank, PLC*, 04-CV-5449; *Oran Almog, et al. v. Arab Bank, PLC*, 04-CV-5564; *Robert L. Coulter, Sr., et al. v. Arab Bank, PLC*, 05-CV-365; *Gila Afriat-Kurtzer, et al. v. Arab Bank, PLC*, 05-CV-388; *Michael Bennett, et al. v. Arab Bank, PLC*, 05-CV-3183; *Arnold Roth, et al. v. Arab Bank, PLC*, 05-CV-0378; *Stewart Weiss, et al. v. Arab Bank, PLC*, 06-CV-1623; *Joseph Jesner, et al. v. Arab Bank, PLC*, 06-CV-3869; *Yaffa Lev, et al. v. Arab Bank, PLC*, 08-CV-3251; and *Viktoria Agurenko, et al. v. Arab Bank, PLC*, 10-CV-626.

The district court has a "gatekeeping" function under Rule 702 to ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. In performing its gatekeeping role, the trial court should use Federal Rule of Evidence 401 to determine whether proffered expert testimony is relevant, that is, whether it "'has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 184 (2d Cir. 2001) (quoting Fed. R. Evid. 401). Rule 403 of the Federal Rules of Evidence instructs that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." *Id.*

The inquiry as to reliability is "a flexible one." *Daubert*, 509 U.S. at 594; *see Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150-53 (1999). The district court may exercise its discretion in evaluating the reliability of an expert's methods. *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997). In conducting the evaluation, the district court may determine the appropriate criteria for evaluating reliability. *Id.*; *see Kumho Tire Co.*, 526 U.S. at 152. The district court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152. The district court must focus "not on the substance of the expert's conclusions, but on whether those conclusions were generated by a reliable methodology." *Amorgianos v. Nat'l Railroad Passenger Corp.*, 137 F. Supp. 2d 147, 162 (E.D.N.Y. 2001), *aff'd*, 303 F.3d 256 (2d Cir. 2002). When, however, the expert opinion is inadequately supported by data, methodology, or studies,

2

"[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered," and thus may exclude the expert testimony. *Joiner*, 522 U.S. at 146.

Rule 702 does not require that published studies or similar authority unequivocally support the expert's conclusions. *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995). Similarly, an expert need not have formal training in her area of expertise; an expert's background and practical experience may "qualify as specialized knowledge gained through experience, training, or education . . . ." *Id.* at 1043 (internal quotation marks omitted). Lack of textual authority in support of an expert's opinion goes to the weight, not the admissibility, of the testimony. *Amorgianos*, 303 F.3d at 267. "'The judge should only exclude the evidence if the [methodological] flaw is large enough that the expert lacks good grounds for his or her conclusions." *Id.* (internal quotation marks omitted). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

**A. Hamas and Charitable Organization Experts**

Plaintiffs claim that defendant Arab Bank provided material support not only to Hamas or Hamas leadership but also to twelve charitable organizations that were fronts for Hamas, and that its provision of banking and administrative services to the Saudi Committee provide further evidence of the Bank's material support to terrorists. The experts addressed below are proffered on one or more of these subjects.

3

### 1.  Mr. Arieh Dan Spitzen

Defendant moves to exclude the expert testimony of Arieh Dan Spitzen.  Mr. Spitzen formerly headed the Palestinian Affairs Department ("PAD") of the Israel Ministry of Defense's Coordinator of Governmental Activities in the Palestinian Territories.  He has also conducted independent research and provided expert testimony in Israeli criminal terrorism prosecutions. He is fluent in Arabic.

Before addressing defendant's objections to Mr. Spitzen's proposed testimony, it is important to note that defendant does not challenge Mr. Spitzen's opinions regarding payments from the Bank to senior Hamas leaders; his Arabic naming methodology used to determine whether Bank accountholders and wire transfer beneficiaries were in fact identifiable terrorists; and the identification of individual terrorists or their relatives who received funds through Arab Bank.

What defendant does challenge are those portions of Mr. Spitzen's report which opine on the establishment and organization of Hamas; whether certain charities were under the control of Hamas between 2000 and 2004; or whether certain individuals named on transactions processed by Arab Bank on behalf of Yousef Al-Hayek and others are leaders, members, or relatives of leaders or members, of Hamas.  It also challenges Mr. Spitzen's expert opinions as to the Saudi Committee, the Al-Shahid Foundation, and the Al Ansar Society.

Mr. Spitzen's professional experience and independent research qualify him to offer the opinions he provides in this case.  Defendant argues that Mr. Spitzen lacks the specialized knowledge to opine on all of the topics in his report, including the Saudi Committee, whether particular organizations were controlled by Hamas during the relevant time period, and the establishment and organizational structure of Hamas.  In particular, defendant notes the principle

4

that, even if "a witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields." *See Nimely v. City of New York*, 414 F.3d 381, 399 n.13 (2d Cir. 2005). Plaintiffs have established Mr. Spitzen's expertise in all of the areas on which he proposes to testify. In this regard, it is significant that an expert may rely on data collected by others. *Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 86, 94 (2d Cir. 2000). While at PAD, Mr. Spitzen authored, reviewed, and approved documents on the Saudi Committee. Furthermore, his report demonstrates that he has sufficient expertise and a reliable methodology to support his opinions both about Hamas and the charitable organizations at issue here.

Despite the Bank's argument that Mr. Spitzen's methodology was developed for the purposes of this litigation and has not been tested or used by other experts, careful review of Mr. Spitzen's report supports the reliability of his analysis. Mr. Spitzen describes his methodology as "the collection of information from many sources, which included primary and secondary sources, and cross-referencing them, as well as the examination of new information that supports or contradicts previous assumptions that have been made in the course of the research." EXPERT REPORT OF ARIEH DAN SPITZEN 3 ("SPITZEN"). He describes eighteen criteria, derived from his professional experience, academic studies, and other documents, including materials published by Hamas and its sympathizers, that he used when evaluating the level of Hamas's control of a specific organization. This resembles other experts' methodologies. *See United States v. Paracha*, 2006 WL 12768, at *22-23 (S.D.N.Y. 2006) (approving the expert opinion of Evan Kohlmann—also proffered by plaintiffs here—where Mr. Kohlmann "relied on multiple sources of information that he gathered and vetted through his process of cross-referencing and peer review, and explained that he has been gathering information relevant to [his subject] for several

5

years"). The eighteen factors simply help him to make plain and transparent the considerations he evaluated in reaching his conclusions. *See Joiner*, 522 U.S. at 146; 3 MUELLER & KIRKPATRICK, FEDERAL EVIDENCE 807 (3d ed. 2007) (When conventional measures of reliability, such as error rates and proficiency tests, are unavailable, a court "should inquire into the factual basis underlying the proposed testimony, the methods and logic that lead to the interpretation that [the expert] offers, and [the expert's] care in applying the analytical framework to what he has seen.").

Nor is Mr. Spitzen a mere conduit for inadmissible evidence. He has applied his expertise and methodology to evidence that might otherwise be excludable hearsay. (Plaintiffs assert that many of Mr. Spitzen's source materials would be independently admissible; that issue need not be determined now.) Federal Rule of Evidence 703 allows an expert to base an opinion on facts or data that would otherwise be inadmissible if "experts in the field reasonably rely on such evidence in forming their opinions." *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008) (internal quotation marks and citations omitted). However, an expert may not simply transmit hearsay to the jury. *Id.* "'[T]he expert must form his own opinions by applying his extensive experience and a reliable methodology to the inadmissible materials.'" *Id.* (quoting *United States v. Dukagjini*, 326 F.3d 45, 54 (2d Cir. 2003). In *Mejia*, where the Second Circuit faulted the district court's admission of expert testimony, the expert did not "explain how he had pieced together bits of information from different sources and reached a studied conclusion that he then gave to the jury." *Id.* at 198. Here, in contrast, Mr. Spitzen's report demonstrates that he has applied his expertise to analyze the underlying evidence. He pulls together information from discrete sources, including sources that may be independently admissible, and cross-references it against other supportive or contradictory information in reaching his conclusions. *See United*

6

States v. Johnson, 587 F.3d 625, 635-36 (4th Cir. 2009); *see also Paracha*, 2006 WL 12768, at *22-23.

Moreover, the type of material Mr. Spitzen relies upon reasonably forms the basis for the opinions of other experts in the field. For example, Judge Posner, writing for an *en banc* majority in *Boim v. Holy Land Foundation for Relief & Develop.*, 549 F.3d 685, 704 (7th Cir. 2008), explained that "the websites of Islamic movements and Islamic terrorist organizations have long been accepted by security experts as valid, important, and indeed indispensable sources of information." *See also United States v. Damrah*, 412 F.3d 618, 625 (6th Cir. 2005) ("Given the secretive nature of terrorists, the Court can think of few other materials [other than books, press releases, newspaper articles, and government publications] that experts in the field of terrorism would rely upon." (internal quotation marks omitted)). Indeed, Mr. Spitzen's report answers the concerns Judge Posner identified, *see Boim*, 549 F.3d at 703, by relying on far more than only web postings.

Defendant argues that Mr. Spitzen should be precluded for bias because his research assistant has a relationship with one of the plaintiffs' counsel in this case. This argument is rejected. Mr. Spitzen states that he wrote every word of his report, that the assistant did not draft any portion of it, and that he independently reviewed all the material she provided to him. Cross-examination is sufficient to address the issue of bias.

Defendant argues that the time span covered in Mr. Spitzen's report is too broad—going both forward and backward in time—and irrelevant, relying in part on the Order of December 6, 2011. The Order stated that the trial "cannot be burdened with extraneous issues such as . . . the lengthy history of social, political, economic, and diplomatic factors relating to a conflict that goes well beyond the issues of this case." *Linde*, 2011 WL 9974899, at *3. However, the

history excluded in the December 6, 2011 Order is different in kind from what Mr. Spitzen proffers. Mr. Spitzen relies in part on historical materials to explain how Hamas developed and made attractive its own civilian infrastructure using the *da'wa* framework and how "these institutions constitute a civilian framework for Hamas's terror apparatus." SPITZEN 31. Similarly, Mr. Spitzen's testimony about a charity's relationship with Hamas in 2006 or 2007, or a government designation of a charity in 2006 may be relevant to illustrate the nature of the charity during the period between 2000 and 2004.

Finally, in contrast to appropriate references to things such as the explicit, stated objectives or mission statement of an organization referenced in Mr. Spitzen's overall analysis, Mr. Spitzen, in the course of his 279 page report, expresses a handful of inadmissible opinions as to the state of mind of an organization. The December 6, 2011 Order stated that "[i]nsofar as many of the expert reports submitted by the defendant express opinions as to the state of mind, intent, or motive of a government, a charitable entity, or a person, they do not contain relevant expert evidence." *Linde*, 2011 WL 9974899, at *3; *see In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004); *Marvel Worldwide, Inc. v. Kirby*, 777 F. Supp. 2d 720, 730 (S.D.N.Y. 2011). To the extent that Mr. Spitzen attempts to express an opinion at trial as to the state of mind of a charitable entity or any other organization, this testimony will be excluded.

Defendant's motion to exclude the expert testimony of Mr. Spitzen is denied in part and granted in part.

### 2. Dr. Matthew Levitt

Defendant seeks to exclude the expert opinion of Dr. Matthew Levitt. Dr. Levitt is a Senior Fellow and Director of the Stein Program on Counterterrorism and Intelligence at The Washington Institute for Near East Policy. He has served in terrorism-related positions at the

United States Departments of State and the Treasury and has worked as an intelligence research specialist at the FBI. He has taught graduate-level courses on terrorism at Johns Hopkins University and holds a Ph.D. in International Relations (Terrorism and Conflict Resolution). He has produced a number of books published by university presses, including *Hamas: Politics, Charity and Terrorism in the Service of Jihad* (Yale University Press, 2006).

Dr. Levitt is clearly qualified to testify as an expert in terrorist organizations, including Hamas, its history and organization, and the structure of the social wing of Hamas (including zakat committees), which are precisely the subjects at issue here. His methodology has been recognized as the "gold standard in the field of international terrorism." *Damrah*, 412 F.3d at 625 (quoting the district court); *cf. Estate of Parsons v. Palestinian Authority*, 715 F. Supp. 2d 27, 32-33 (D.D.C. 2010) (finding Dr. Levitt's report in that case insufficient to establish an organization's responsibility for an attack because it did no more than say that the attack was claimed by the organization and had been "attributed to" the organization, but did not include Dr. Levitt's own opinion on the subject), *aff'd in part, rev'd in part on other grounds*, 651 F.3d 118 (D.C. Cir. 2011). Although the Bank argues that much of his expert testimony in other cases was directed to terrorist organizations other than Hamas, that has no impact on his qualifications to offer his opinions in this case.

In seeking to exclude Dr. Levitt, defendant repeats many of the same arguments already rejected regarding Mr. Spitzen's testimony. These arguments will not be repeated. While defendant argues that Dr. Levitt's lack of field research demonstrates the unreliability of his methodology, his report is highly documented. *See Boim*, 549 F.3d at 703. That he has not done substantial field work in the Palestinian Territories and reads, but does not speak, Arabic are not

sound arguments for excluding his testimony as they go only to the weight of the testimony, and may be addressed through cross-examination.

Finally, as with Mr. Spitzen, to the extent that Dr. Levitt expresses an occasional statement about the state of mind of an entity, any such testimony is tangential to his expert opinion and inadmissible, but this is not a sufficient basis on which to reject the whole of his testimony.

Defendant's motion to exclude the expert testimony of Dr. Levitt is denied in part and granted in part.

### 3. Dr. Beverly Milton-Edwards

Defendants have designated Dr. Beverly Milton-Edwards as an expert, offering both her case-in-chief expert report and a rebuttal report to Mr. Spitzen and Dr. Levitt.  Plaintiffs move to exclude both reports.

Dr. Milton-Edwards is Professor of Politics in the School of Politics, International Studies and Philosophy at Queen's University in Belfast, Northern Ireland.  She holds a Ph.D. from the University of Exeter and has written books published by university presses, including *Hamas: The Islamic Resistance Movement* (Polity, 2010).  Her academic research is concentrated on contemporary Islamism and issues of violence, terrorism, and security.  She has conducted field studies in the Gaza Strip, the West Bank, and East Jerusalem in 1987-1991, 1994-1995, and 2004-2007.  She has served as an advisor for the Office of the European Union's Special Representative for the Middle East Peace Process and the European Union High Representative for Common Foreign and Security Policy.  Her qualifications have been established.

Dr. Milton-Edwards will be permitted to testify generally as to the nature of zakat committees and other local charitable organizations and their historical origins, as well as the

10

types of activities zakat committees and other local charitable organizations conducted in the West Bank and Gaza during the period 1995-2005. This testimony is relevant and would be helpful to the jury's understanding of the general nature and work of zakat committees and other local charitable organizations. As discussed above regarding Mr. Spitzen, her historical references may provide context for her opinions.

Dr. Milton-Edwards' testimony as it relates to the specific twelve zakat committees or charitable organizations at issue in this lawsuit is also admissible. For example, Dr. Milton-Edwards may testify as to whether a specific zakat committee or charitable organization was perceived by the community as a front for Hamas if she demonstrates that she has specific information as to that organization. Dr. Milton-Edwards' report does not detail whether her opinion encompasses all of the relevant organizations, although her deposition testimony suggests that it does. Accordingly, at trial, defendant must establish a sufficient foundation regarding Dr. Milton-Edwards' knowledge of these specific organizations and demonstrate that the purpose of her testimony is appropriate and relevant. If defendant establishes the proper foundation, Dr. Milton-Edwards' testimony on this point will be helpful to the jury, and its probative value will outweigh any prejudice.

Insofar as Dr. Milton-Edwards proposes to testify regarding charitable organizations that are not at issue, her testimony would be irrelevant and potentially prejudicial as well. For example, Dr. Milton-Edwards' report states that "zakat committees and local charitable organizations enjoy such widespread community approval precisely because they are not perceived to be affiliated with organizations like Hamas, but rather are considered by the Palestinian public as more politically and ideologically neutral than Hamas. . . . Nor during the period from 1995 to 2005 did I ever observe any zakat committee operating in the West Bank or

11

Gaza disclose or advertise any such affiliation with Hamas, or indeed, with any political organization." EXPERT REPORT OF DR. BEVERLY MILTON-EDWARDS ¶ 21. Such broad testimony about zakat committees or charitable organizations in general is more prejudicial than probative because it may lead the jury to conclude that Dr. Milton-Edwards is testifying as to a relevant organization when in fact she is not. The same is true for generalized testimony about zakat committees and other local charitable organizations disbursing benefits regardless of political affiliation; the extent to which the Israeli authorities oversaw zakat committees and other charitable organizations; and how directors of the zakat committees and other local charitable organizations were selected during the period 1995-2005.

Dr. Milton-Edwards was asked to, and does, opine on whether zakat committees and other local charitable organizations operating in the West Bank and Gaza Strip were perceived during the period 1995-2005 as "front organizations" for Hamas. The Bank argues that "[i]f these entities appeared to the world *and to the Bank* to be legitimate charitable organizations, but secretly acted as agents of Hamas," the Bank is not liable under the ATA. Def.'s Br. in Opp. to Mot. to Exclude Milton-Edwards 8 (emphasis added). Although, as noted above, with the proper foundation, Dr. Milton-Edwards may testify as to the standing of a relevant zakat committee or other charitable organization in the community, Dr. Milton-Edwards may not testify as to how the Bank perceived the organization. She has no expertise in banking or knowledge of the Bank's transactions. She does not—indeed, she could not, *see Linde*, 2011 WL 9974899, at *3—opine about the Bank's perception of the zakat committees or other local charitable organizations. Expert testimony about the Bank's perception of an organization is as improper as expert testimony about the Bank's intent. Furthermore, the prejudice arising from this

"perception" testimony would greatly outweigh its probative value on the issue of the Bank's knowledge and intent.

Dr. Milton-Edwards also offers opinions on whether the State of Israel would have permitted zakat committees to operate if they were known to be Hamas fronts, or whether the Palestinians involved in the work of the committees would have permitted the committees to support terrorism. This type of testimony is inadmissible and will be excluded at trial both because it is speculative and because it is an expert opinion as to the state of mind or intention of a government or organization. *See Linde*, 2011 WL 9974899, at *3.

Plaintiffs also seek to exclude Dr. Milton-Edwards' rebuttal report to the opinions of Mr. Spitzen and Dr. Levitt. This report contains relevant material because it challenges their contentions regarding the connections of the zakat committees and other charitable organizations to Hamas. Plaintiffs' complaint that she did not review the source material upon which Mr. Spitzen and Dr. Levitt relied is misplaced; she stated that she reviewed their reports and her rebuttal is based on her rejection of their opinions in light of her experience. Plaintiff will have the opportunity to cross-examine Dr. Milton-Edwards on her review of Mr. Spitzen's and Dr. Levitt's work.

For these reasons, plaintiffs' motion to exclude Dr. Milton-Edwards' expert opinion is denied in part and granted in part.

### 4. Mr. Jonathan Benthall

Plaintiffs move to exclude the expert testimony of Jonathan Benthall. Mr. Benthall is the Honorary Fellow in the Department of Anthropology, University College, London. He also works independently as a social researcher. He co-authored a book entitled *The Charitable Crescent, Politics of Aid in the Muslim World* (London: I.B. Tauris, 2003), contributed to

13

*Understanding Islamic Charities* (Ctr. for Strategic and Int'l Studies, 2007), and has written many articles on aid, charity, and development in the Islamic world. He has a Master of Arts degree in English from the University of Cambridge, England and was elected a Member of the Association of Social Anthropologists of the Commonwealth in 1983. He has a reading knowledge of Standard Arabic.

Mr. Benthall may opine on the role of charitable and non-governmental aid organizations in the Palestinian Territories, including their origins, their organization, governance, operations, and the needs to which they typically respond. He may also offer his assessment of the standing and achievements of any *relevant* zakat committees or other local charitable organization operating in the Palestinian Territories during the period from 2000 to 2004. This testimony will be helpful to the jury and is more probative than prejudicial.

Mr. Benthall will not be permitted to testify as to whether any of the relevant charities were connected to Hamas. Nor may he testify "that a foreign aid agency desiring to make donations to help the most vulnerable Palestinians as effectively as possible, at a time of acute crisis, and with a view to minimizing the risk of financial irregularities, would have been justified, on the best evidence available, in donating funds to zakat committees, and that a financial institution providing banking services to such committees might have reached the same conclusion." EXPERT REPORT OF JONATHAN BENTHALL ¶ 49. A close review of Mr. Benthall's report shows that Mr. Benthall has no expertise whatsoever in "financial irregularities," the provision of "banking services" by "financial institutions," or whether the charitable organizations at issue here are or are not Hamas fronts. Moreover, he has no reliable basis or methodology to reach the conclusions he reached on these issues. *See Joiner*, 522 U.S. at 146.

14

In addition, an opinion as to the state of mind of an organization is inadmissible. *See Linde*, 2011 WL 9974899, at *3.

For these reasons, plaintiffs' motion to exclude Mr. Benthall is denied in part and granted in part.

### 5. Mr. Robert Lacey

Plaintiffs move to exclude the expert testimony of Robert Lacey as both a case-in-chief and rebuttal witness.  Mr. Lacey is an author and historian who has written extensively on "different aspects of modern and contemporary history, ranging from the British monarchy to the Henry Ford automotive dynasty."  EXPERT REPORT OF ROBERT LACEY ¶ 2.  He describes his research as focusing on urgent issues of current affairs and on the dynamics of large and powerful families, noting that he has written two books on Saudi Arabia, *The Kingdom: Arabia and the House of Saud* (Harcourt Brace Jovanovich, 1981) and *Inside the Kingdom: Kings, Clerics, Modernists, Terrorists and the Struggle for Saudi Arabia* (Viking Penguin, 2009).  In addition to living in Saudi Arabia for five years, he states that he has briefed the staffs of Presidents George W. Bush and Barack Obama on Saudi issues.

Defendant proffers Mr. Lacey's opinion on: 1) the Saudi Committee, and its operations, purpose, and objectives; 2) any evidence that the Saudi Committee was formed in order to encourage terrorism; 3) the attitude and policy of the Saudi government and the senior Saudi religious authorities towards terrorism in general, and towards suicide bombers in particular; and 4) why the payments by the Saudi Committee were directed towards individuals rather than paid to the Palestinian Authority.

To begin with, I have already held as follows:

> Expert opinions regarding . . . the charitable intentions of the Saudi Committee . . . . fall into [the] category [of irrelevant expert evidence].  Narrative histories of

> economic and humanitarian assistance in the Palestinian Territories aimed at proving intent also fall into this category. For example, the opinion that the Kingdom of Saudi Arabia had a humanitarian purpose in giving aid and economic assistance generally to Palestinians during the Second Intifada, as described by Prof. Avi Shlaim, is fundamentally an attempt to paint a picture for the jury regarding the intent of the Saudi Committee and the motivations of Saudi Arabia and Jordan. Such expert opinions amount to an attempt to "tell the jury the defendant's intentions through the mouths of witnesses other than [itself.]" *United States v. Rahman*, 189 F.3d 88, 136 (2d Cir. 1999). Expert witnesses are not competent to testify to Arab Bank's intentions or beliefs or to those of the Saudi Committee. *Id.*

*Linde*, 2011 WL 9974899, at *3. Mr. Lacey's opinions are the same in sum and substance to those I have already excluded.

In addition, the Bank has not established Mr. Lacey's expertise in the subjects on which he seeks to opine. *See Nimely*, 414 F.3d at 399 n.13. Although Mr. Lacey has written two books about Saudi Arabia, he offers no basis for concluding that these books or his other professional experiences establish any background of expertise on the Saudi Committee. He acknowledged that he had never heard of the Saudi Committee before his assignment in this case. While this alone might not be disqualifying, *see McCullock*, 61 F.3d at 1043, Mr. Lacey identifies no scholarly work or experience that he engaged in to develop expertise on the subject of his report after his assignment; he reviewed only a limited number of documents before reaching his conclusions, and he performed at best a minimal amount of additional work to reach his current level of knowledge. He acknowledged that he is not an expert in terrorism,[2] nor does he understand how the recipients of Saudi Committee funds were selected. Mr. Lacey's lack of expertise to offer the opinions he expresses in his report are far more than a mere "quibble with . . . academic training," *id.*; he is wholly unqualified to proffer these opinions.

---

[2] Although Mr. Lacey states that he has provided briefing to Executive Branch staff, including the White House and the CIA, neither defendant's brief nor Mr. Lacey's deposition demonstrate that Mr. Lacey is an expert on terrorism or terrorism financing.

16

With respect to his proposed testimony about the banking transactions involved in this case, he admittedly has no expertise whatsoever. There is simply no basis for him to opine that Arab Bank was engaged in only "routine" banking practices when it handled Saudi Committee transactions. In sum, defendant has not established Mr. Lacey's qualifications to express the opinions he offers nor the reliability of his methodology in reaching those opinions.

Plaintiffs' motion to exclude Mr. Lacey's case-in-chief and rebuttal opinions is granted.

### 6. Mr. Pinhas Shmilovitch

Plaintiffs' earlier motion to exclude the expert testimony of Pinhas Shmilovitch, except as to the meaning and use of the word "shahid," discussed at paragraphs 31-33 of his report, was granted in the December 6, 2011 Order. *See Linde*, 2011 WL 9974899, at *4. Plaintiffs now move to exclude this testimony as well as Mr. Shmilovitch's rebuttal report to Dr. Levitt and Mr. Spitzen.

Mr. Shmilovitch served in the Highly Classified Information Unit of Israeli Military Intelligence in the Israel Defense Forces ("IDF") from 1977 to 1984. He worked in various positions in the Israel Security Agency ("ISA") from 1984 until 2004, ultimately achieving the rank equivalent to Brigadier General in the IDF. His work at the ISA included domestic and cross-border terror and counterterrorism issues, and he established the ISA's Counter-Terrorist Funding Branch to prevent the flow of funds to terrorist organizations. He holds a Master's Degree in Social Science from Haifa University.

Considered against the background of the December 6, 2011 Order, Mr. Shmilovitch's expert testimony on the meaning and use of the word "shahid" is relevant and would be helpful to the jury's understanding of the word. The Bank acknowledges that Mr. Shmilovitch will not

17

opine on how Arab Bank or its employees used or understood the term, as such testimony would be improper.

Mr. Shmilovitch is also qualified to offer a rebuttal opinion to Mr. Spitzen and Dr. Levitt. He has sufficient professional experience to offer the rebuttal opinion he presents in this case, which is relevant and would be helpful to the jury. Insofar as plaintiffs complain that his methodology is insufficiently reliable or that his opinions do not respond to Dr. Levitt or Mr. Spitzen, their arguments go to the weight to be given his testimony, not to its admissibility; they may cross-examine him or make such arguments to the jury at trial.[3]

For these reasons, plaintiffs' motion to exclude Mr. Shmilovitch's testimony on the word "shahid" as well as his rebuttal opinion is denied.

### 7.  Dr. Timur Kuran

Defendant moves to exclude the expert opinion of Timur Kuran, who is proffered in rebuttal to Dr. Milton-Edwards and Mr. Benthall. Dr. Kuran is a professor of Economics and Political Science and Gorter Family Professor of Islamic Studies at Duke University, where he specializes in economics, political science, Islam, and the Middle East with a focus on contemporary attempts to restructure economies and political systems according to Islamic teachings. He holds a Ph.D. from Stanford University. He has published a number of academic articles on zakat and related issues and has conducted field studies in Egypt, Malaysia, Pakistan, and Turkey on zakat practices and, in two of these countries, on government-run zakat programs.

---

[3] Mr. Shmilovitch expressly states that "the content of my response, including information, assessments and conclusions contained herein, is based on open source unclassified information and does not rely on, or reveal, any privileged classified information to which I was exposed as part of my ISA job." EXPERT REBUTTAL REPORT OF PINHAS SHMILOVITCH ¶ 4. Therefore, plaintiffs' concern that they will not be able to cross-examine him is misplaced; since the information upon which Mr. Shmilovitch drew his conclusions is not classified, he may be cross-examined on it.

Dr. Kuran is qualified to offer his expert rebuttal opinion. He opines on whether the reports by Mr. Benthall and Dr. Milton-Edwards provide an accurate and complete definition and explanation of the term, concept, and practice of zakat. He also opines on whether Mr. Benthall's and Dr. Milton-Edwards' reports reflect the application of a discernible, appropriate, and thorough methodology regarding zakat and Islamic charitable practices. He is highly credentialed and experienced in this area, and his rebuttal opinion would be helpful to the jury. Defendant has not shown that Dr. Kuran's testimony would be, as it claims, more prejudicial than probative.

Defendant's motion to exclude the expert rebuttal opinion of Dr. Kuran is denied.

## B. Attribution Experts

Plaintiffs offer the following experts in support of their claim that the twenty four attacks, which are to be the subject of the first trial in this case, are attributable to Hamas.

### 1. Mr. Ronni Shaked

Defendant moves to exclude the expert testimony of Ronni Shaked. Mr. Shaked worked for the ISA between 1969 and 1982, rising to the rank of Commander of the Jerusalem Sector and Commander of the Ramallah Sector. While at the ISA, Mr. Shaked handled agents who operated within terrorist organizations; he conducted interrogations of terrorist operatives; and he commanded operations against terrorist organizations. He is an author of two books, including *Hamas: From Belief in Allah to the Road of Terror* (co-author Aviva Shabi) (Keter Pub. House, Jerusalem, 1994). Since 1982, Mr. Shaked has worked as a commentator and analyst for the newspaper *Yedioth Ahronoth*, where he writes about Palestinian affairs, terrorism, and security-related subjects. He reads and speaks Arabic fluently. He has a Master's degree in Middle Eastern Studies from the Hebrew University in Jerusalem, where he is pursuing a Ph.D. He has

served as an expert in seven civil cases in United States district courts and has consulted with the FBI and the Department of Justice.

Mr. Shaked is qualified to offer his opinions regarding the attribution of terror attacks to Hamas in this case, and defendant has not demonstrated, as it claims, that Mr. Shaked's opinions must be precluded for bias.

The Bank relies on *United States v. Mejia*, 545 F.3d at 197, to argue that Mr. Shaked's testimony (and that of Mr. Kohlmann, whose expert opinion is discussed below) is simply a vehicle for introducing improper hearsay to the jury. Rather than supporting the Bank's position, however, *Mejia* expressly approved the type of expert attribution evidence that Mr. Shaked (and Mr. Kohlmann) proffer: "An appropriate (admissible) example of such expertise would have been an expert's explanation of how the graffiti near a body indicated that the murderer was a member of [a gang] . . . ." *Id.* at 195. Mr. Shaked (and Mr. Kohlmann) properly apply their expertise to what would otherwise be inadmissible hearsay to analyze evidence in a manner contemplated by Rule 703.

While Mr. Shaked acknowledges that he cannot identify any authority which uses the precise methodology that he uses, defendant's suggestion that the methodology is unreliable is unfounded. Mr. Shaked's method involves interviews with senior Hamas leaders as well as Palestinian and Israeli security experts; substantial review of publicly accessible documents and websites related to Hamas; examination of terrorist confessions, prerecorded videotaped "wills" from suicide bombers, and Hamas posters and leaflets; attendance at Hamas funerals and public meetings; and jailhouse interviews with convicted Hamas operatives, including would-be suicide bombers who had either been arrested pre-attack, or who were wounded but not killed in the attack. *See Boim*, 549 F.3d at 704 (expert opinion, based heavily on web postings, attributing

terrorism victim's murder to Hamas is admissible). Mr. Shaked specifically explains how he distinguished between Hamas's credible claims of responsibility and claims by other organizations that, in his view, lacked credibility; indeed, where a claim of responsibility was made for "purposes of false boastfulness," he explained that he did not address it in his report at all. In the same manner as Mr. Spitzen, Mr. Shaked's report makes transparent the methodology he used to create it. Defendant's arguments as to the unreliability of Mr. Shaked's opinions go only to the weight, not the admissibility, of the evidence.

Defendant's motion to exclude the expert testimony of Mr. Shaked is denied.

## 2. Mr. Evan Kohlmann

Defendant moves to exclude the expert testimony of Evan Kohlmann. Mr. Kohlmann is a private international terrorism consultant who specializes in tracking Al-Qaeda and other terrorist movements. He holds a J.D. from the University of Pennsylvania Law School and a certificate of Islamic studies from the Prince Alweleed bin Talal Center for Muslim-Christian Understanding at Georgetown University. He is the author of the book *Al-Qaida's Jihad in Europe: the Afghan-Bosnian Network* (Berg/Oxford International Press, London, 2004). He has interviewed known terrorist recruiters and organizers, attended what he terms "underground conferences and rallies," and has "amassed one of the largest digital collections of terrorist multimedia and propaganda in the world." EXPERT REPORT OF EVAN F. KOHLMANN 3. He has been qualified as an expert in two civil cases in United States federal courts and in sixteen criminal cases in United States federal and military courts.

Mr. Kohlmann is qualified to offer his opinions regarding the attribution of terror attacks to Hamas in this case. It is not fatal to his testimony that his research was conducted solely on the Internet. *See Boim*, 549 F.3d at 704; *Damrah*, 412 F.3d at 625. Mr. Kohlmann has

21

demonstrated the reliability of his methodology: he reviews videos, recordings, or published writings of terrorists; terrorist organizations' official websites; newspaper articles, television news reports, and reputable books and magazines. He synthesizes this material and pulls together common themes in reaching his conclusions. Any challenges to his methodology are more appropriately raised on cross-examination, as the evidence meets the tests of admissibility. Mr. Kohlmann's testimony, including his expert analysis of materials that might otherwise be inadmissible hearsay, will help the jury understand the terror attacks at issue in this case.

Defendant's motion to exclude the expert testimony of Mr. Kohlmann is denied.

### C. Terrorist Designation Expert: Mr. Jimmy Gurulé

Defendant challenges the expert testimony of Jimmy Gurulé, whose proposed testimony would address the methods, significance, and processes regarding official terrorism designations by the United States, including Specially Designated Terrorist ("SDT") designations, Foreign Terrorist Organizations ("FTO") designations, and Specially Designated Global Terrorist ("SDGT") designations. Mr. Gurulé served as the Under Secretary (Enforcement) at the United States Department of the Treasury from 2001-2003, where he had oversight responsibility for several major federal law enforcement agencies, including the Financial Crimes Enforcement Network and the Office of Foreign Assets Control. He is an author of numerous publications relating to terrorist financing, including *Unfunding Terror: The Legal Response to the Financing of Global Terrorism* (Edward Elgar, 2008). Mr. Gurulé is a professor at Notre Dame Law School, teaching, among other things, a course on the law of terrorism.

Plaintiffs withdrew Mr. Gurulé's proposed testimony on the obligations of financial institutions in light of terrorism designations of the United States following the December 19, 2011 bench ruling. Ltr. from Joshua Glatter 2 (Mar. 30, 2012).

22

Mr. Gurulé's proposed testimony will be precluded. The Bank does not dispute that Hamas, the subject of the first trial in this case, was designated by the United States government as an SDT, SDGT, and FTO, and plaintiffs have failed to show the relevance Mr. Gurulé's proposed testimony would have to this case. Contrary to plaintiffs' suggestion, understanding the process used by the government in determining an entity's terrorist status does not make it more or less likely that the Bank provided material support to terrorist organizations, nor would the proposed testimony help the jury decide that question of fact. Moreover, Mr. Gurulé's report is replete with inadmissible legal opinions or explanations of the law. *See* Status Conf. Tr. 7-9 (Dec. 19, 2011); *United States v. Stewart*, 433 F.3d 273, 311 (2d Cir. 2006) (expert testimony concerning legal principles invades the trial judge's exclusive authority to explain the law to the jury).

Defendant's motion to exclude the expert opinion of Mr. Gurulé is granted.

### D. Summary Witness: Mr. Wayne Geisser

Defendant also moves to exclude the report and testimony of Wayne Geisser. Mr. Geisser is a CPA and former Branch Chief in the Securities and Exchange Commission's Division of Enforcement. He has conducted or supervised hundreds of financial investigations that have involved the analysis of banking/financial transactions. He was hired by the plaintiffs to review and analyze bank records, including Arab Bank's New York branch transactions (approximately 3,100 transactions in total) and a subset of transactions involving the Saudi Committee (approximately 16,000 of a total of approximately 200,000 transactions). The New York branch transactions include transactions from Yousef El Hayek to individuals that plaintiffs allege are known Hamas activists or to Hamas front organizations.

23

Defendant argues, and plaintiffs acknowledge, that Mr. Geisser is more appropriately described as a summary witness than an expert witness. Indeed, Mr. Geisser offers no expert opinions whatsoever. Pursuant to Rule 1006 of the Federal Rules of Evidence, "[t]he contents of voluminous writings . . . which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation." Where, as here, a party introduces summary charts, "the court must ascertain with certainty that they are based upon and fairly represent competent evidence already before the jury." *United States v. Conlin*, 551 F.2d 534, 538 (2d Cir. 1977) (internal quotation marks omitted).

Defendant argues that Mr. Geisser's proposed testimony will be misleading and confusing because plaintiffs have cherry-picked a subset of transactions that will show a skewed picture of the Saudi Committee's transactions. But "[a] summary may include only evidence favoring one party, so long as the witness does not represent to the jury that he is summarizing all the evidence in the case." *United States v. Bishop III*, 264 F.3d 535, 547 (7th Cir. 2001); *see also Fagiola v. National Gypsum Co. AC & S., Inc.*, 906 F.2d 53, 57-58 (2d Cir. 1990). The parties agree that Mr. Geisser need not summarize the entire universe of transactions made by the Saudi Committee, and plaintiffs acknowledge that Mr. Geisser's summary excludes payments under $300 processed by Arab Bank on behalf of the Saudi Committee. They represent, however, that his summary includes every transaction in excess of $300, regardless of the recipient, and defendant does not challenge that representation. So long as Mr. Geisser's testimony accurately describes the limits of his analysis, defendant will be able to explore the scope of his work on cross-examination, present its own summary of the evidence it considers relevant, and direct the jury's attention to other evidence in the record.

Moreover, although defendant moves to strike the entirety of Mr. Geisser's report and testimony, it makes no argument with respect to his summary of the New York branch transactions, including the Yousef El Hayek transactions, nor does it argue that any of the summaries, including the Saudi Committee transactions, are inaccurate. In addition, I will instruct the jury on the appropriate use of summary evidence. *See Fagiola*, 906 F.2d at 58.

Defendant's reliance on *Consorti v. Armstrong World Industries, Inc.*, 72 F.3d 1003 (2d Cir. 1995), *vacated on other grounds*, 518 U.S. 1031 (1996), is misplaced. Although the district court held in that case that summary evidence could not be introduced because it "may not have comprised the universe of [relevant] documents," the Second Circuit did not rule that summary evidence must summarize all of the documents at issue. *Consorti*, 72 F.3d at 1016-17. Rather, the evidence was excluded because no information about the preparation of the summary evidence was either introduced or made available in court or to opposing counsel. *Id*. There are no such concerns in this case, where each side has full access to all of the documents being summarized and the opportunity to evaluate the information underlying the summary.

Plaintiffs state that they have no intention of introducing the portion of Mr. Geisser's report which summarizes the allegations in the complaint. That summary is obviously inadmissible. In all other respects, defendant's motion is denied.

SO ORDERED.

s/Nina Gershon

**NINA GERSHON**
**United States District Judge**

Dated: February 5 , 2013
       Brooklyn, New York

25