# Exhibit B

943

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

COURTNEY LINDE, ET AL.,          )
                                 )    04CV02799 (BMC)
                Plaintiffs,      )    And all related cases:
                                 )    04CV05449 (Litle)
                                 )    04CV05564 (Almog)
                                 )    04CV00365 (Coulter)
                                 )    05CV00388 (Afrait-Kurtzer)
                                 )    05CV03183 (Bennett)
                                 )    05CV03768 (Roth)
     -against-                   )    06CV01623 (Weiss)
                                 )
                                 )    United States Courthouse
                                 )    Brooklyn, New York
                                 )
ARAB BANK, PLC,                  )    MONDAY, AUGUST 25, 2014
                                 )
                Defendant.       )
_____ )

TRANSCRIPT OF CIVIL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE BRIAN M. COGAN
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR PLAINTIFFS LINDE      OSEN, LLC
AND COULTER:              BY:  GARY M. OSEN, ESQ.

                          TURNER & ASSOCIATES, PLLC
                          BY:  CLYDE T. TURNER, ESQ.

FOR PLAINTIFFS LITLE,     SAYLES WERBNER
BENNETT AND ROTH:         BY:  MARK S. WERBNER, ESQ.

FOR PLAINTIFFS ALMOG:     STONE BONNER & ROCCO, LLP
                          BY:  JAMES P. BONNER, ESQ.

                          MOTLEY RICE, LLC
                          BY:  MICHAEL E. ELSNER, ESQ.
                          BY:  JODI FLOWERS, ESQ.

982

1    and nothing but the truth?

2            THE WITNESS:  Yes, I so affirm.

3            THE CLERK:  Okay.  May he please spell his name for

4    the reporter.

5            THE WITNESS:  Ronnie Shaked, R-o-n-n-i, S-h-a-k-e-d.

6                    RONNI SHAKED,

7    called as a witness, by and on behalf of the plaintiffs,

8    having been first duly sworn, was examined and testified as

9    follows:

10           THE CLERK:  Thank you.  You may be seated.

11           THE COURT:  Let me ask the interpreters how are you

12   going to work it between the two of you?

13           THE INTERPRETER:  Switch every 20 minutes.

14           THE COURT:  So whoever is talking will talk into the

15   mike.

16           You may proceed.

17           MR. TURNER:  I was going to make one point.  And I

18   presume this is the way the Court proceeds in these kinds of

19   circumstances.  The witness himself does not have a

20   microphone, and I presume that's okay with you.

21           THE COURT:  I think that's okay.

22           MR. TURNER:  Okay.  I'll try to make sure he speaks

23   up, as we move through.

24           THE COURT:  Since we won't understand the words he's

25   saying, I'm not sure we have to hear them well.

Shaked - Direct - Turner                    983

1            MR. TURNER:  I agree.  Secondly, by way of

2    introduction, this is the language of Hebrew.  May I proceed?

3            THE COURT:  You may.

4    DIRECT EXAMINATION

5    BY MR. TURNER:

6    Q    Give us your name, please.

7    A    Ronni Shaked.

8    Q    And where are you from, Dr. Shaked?

9    A    I'm from Jerusalem.  I live in a suburb near Jerusalem.

10   Q    What do you do for a living?

11   A    I'm currently working in a Hebrew University in

12   Jerusalem.  My profession is academic researcher and

13   journalist.

14   Q    Do you speak English?

15   A    Yes, I can speak English.

16   Q    What other languages do you speak?

17   A    I speak Arabic, and English and Hebrew.

18   Q    We're going to be communicating today in Hebrew.  Why is

19   that?

20   A    Because it is easier for me to discuss the professional

21   subjects that will be the subject of this trial and easier for

22   me to express myself in Hebrew.

23   Q    Now, by way of introduction for the remainder of today,

24   and throughout probably most of tomorrow, we're going to be

25   talking about who was responsible for the 24 attacks, terror

Shaked - Direct - Turner                                   984

1  attacks, that are at issue in this lawsuit.  Do you understand

2  that?

3  A    Yes, I understand that.

4  Q    Let's back up for a minute.  Do you have a family?

5  A    Yes, I have a family.

6  Q    Tell us about your family very briefly.

7  A    I have three kids.  Sadly, one of them died four years

8  ago this week.  The two older girls are officers in the prison

9  service, in Israel.  My wife is a nurse.  I have seven

10 grandchildren.  And I live, as I said, in a suburb of

11 Jerusalem.

12 Q    Does all of your family live in Israel?

13 A    Yes.

14 Q    Tell us a little bit about your educational background?

15 A    I went to high school in Jerusalem, a high schooled

16 called, Leyada Hauniversita, L-e-y-a-d-a

17 H-a-u-n-i-v-e-r-s-i-t-a.  After that, I went to Hebrew

18 University and completed my BA.  I took a break for a few

19 years.  In 2004, I returned to the university to complete my

20 MA.  I finished my MA Summa cum laude.  I finished my Ph.D.,

21 finish writing my Ph.D., about four months ago.  In about a

22 month I should get the final approval of my Ph.D., which will

23 be my third degree.

24 Q    Let's back up to after you graduated from high school.

25 Did you go into the military service in Israel?

Shaked - Direct - Turner                    985

1   A    Yes, I did.  I joined the military.

2   Q    What field did you initially begin in, in the military?

3   A    In the first half of my military service, I served as a

4   paratrooper.  I was a combat soldier.  And in a second half of

5   my service, I served in the Intelligence Unit.

6   Q    Let's focus a little bit on the Intelligence Unit.  Tell

7   us about the Intelligence Unit that you were trained in.  What

8   kind of things did you do?

9   A    I served in the Intelligence Unit in the year 1965, when

10  the city of Jerusalem was still divided.  The purpose of the

11  unit I served in was to check out and assess the intelligence

12  related to the Jordanian Army, which was posted, positioned

13  right opposite us, and to discover intelligence about the

14  beginning of the terrorism that was going on at that time,

15  Palestinian terrorism.

16  Q    What was your specific role when you began in the

17  intelligence community, in the military, in Israel back in the

18  60s?

19  A    My role was to analyze the intelligence that came from

20  the field and, based on that analysis, to determine what

21  needed to be done; either to prevent terror attacks or other

22  activities taken by the military, by the Jordanian military,

23  at that time.

24  Q    Did you receive training in the intelligence community

25  back in the 60s?

Shaked - Direct - Turner                                986

1    A    Yes, I took courses.  I was given courses when I was in

2    the intelligence forces.

3    Q    Tell us a little bit about the period of time that you

4    worked in intelligence.  Did you get promoted?  Did you

5    graduate up to different jobs?

6    A    When I was serving in the military intelligence, I was,

7    indeed, promoted, and I was made responsible for collecting

8    intelligence for a particular part of Jerusalem.  After I

9    completed my military service, I served in other areas of

10   intelligence, after I completed my BA in university.

11   Q    Now, when you were in -- that first period of time that

12   you were working in the intelligence area, did you have the

13   opportunity to communicate with the Palestinian territories,

14   the Palestinian communities that surrounded Jerusalem?

15   A    During the first period, when I served in intelligence,

16   Jerusalem was still divided, and so I had no ability to

17   community with the Arab community.  During the second period,

18   certainly, yes.

19   Q    Let's go to the second period.  At some point in time,

20   did you leave the military?

21   A    Yes, I completed my military service late 1966.

22   Q    What did you do then?

23   A    I went to study in the Hebrew university in Jerusalem.  I

24   studied Middle Eastern Studies.

25   Q    What does that mean, Middle Eastern Studies?

1  A    Middle Eastern Studies involves the study of societies of

2  the Middle East, the culture of the Middle East, the Islamic

3  religion; the various developments in the Middle East relative

4  to other places in the world, and most especially involves

5  understanding the Middle East as it existed at that time.

6  Q    Where was Hebrew University at the time?

7  A    It was in Jerusalem, in what is today known as the

8  western part of the city.

9  Q    At some point, did you reenter government service?

10  A    During the third year of my studies, towards the end, I

11  joined the ISA, the Israeli Security Agency.

12  Q    So the ladies and gentlemen can sort of get an idea, what

13  at that time was the Israeli Security Agency?

14  A    The Israeli Security Agency is an intelligence

15  organization that is aimed at preventing terror attacks from

16  occurring.  It also works to prevent subversive political

17  activity in order to defend the security of the state of

18  Israel.  During those years, the main activity was preventing

19  Palestinian terror attacks perpetrated against Israeli

20  citizens.  And if I may add, it can be compared to the work of

21  the FBI in the United States.

22  Q    Now, when you reentered government service, can you sort

23  of, first of all, describe for us the time period; when did

24  you reenter and how long did you stay?

25  A    In the end of 1968, I returned to my work in the ISA.  I

Shaked - Direct - Turner                     988

1   worked in the ISA until the end of the Lebanon War in 1982.  I

2   worked a total of about 12 and a half to 13 years in the

3   field.

4   Q    Let's talk about that 12-and-a-half to 13-year period for

5   a moment.  First of all, when you reentered the ISA, the

6   Israeli Security Agency, what was your job within the

7   intelligence community?

8   A    I studied very intensively the Arabic language, and I

9   became a handler of agents.  Just to explain to you what the

10  role means, I can say that that meant recruiting agents from

11  the Palestinian society, aiming at detecting and preventing

12  terrorist acts.  To recruit means to actually win the trust of

13  people and then to handle them as agents, and that is in their

14  society in enemy territory, as my commanders have instructed

15  me and according to the instructions I received.

16  Q    When you say handler, does that mean you were actually

17  working with Palestinians?

18  A    When I say that I worked with them, I meant that I worked

19  with the Palestinians, together with the Palestinians, in the

20  midst of Palestinians.  I maintained a daily and an hourly

21  contact with Palestinians, in their society, with the agents I

22  handled and the interrogees I interrogated.

23  Q    Now, as part of your job as a handler, was it important

24  for you to understand the Palestinian society, the

25  communities, how they operated and how they thought?

Shaked - Direct - Turner                    989

1   A    Without understanding the Palestinian society, the

2   various social codes of the society, their language, their

3   symbols, their religion; their culture, their mindset, their

4   political concepts of a particular society, there's no way to

5   understand the society, and this is what I did, I did all I

6   could in order to decipher their codes, to understand their

7   language thoroughly, to study their culture, to study their

8   moral ethics of the Palestinian society, in order to swim like

9   fish in the water of the Palestinian society.

10  Q    Now, during the period of time you were working in the

11  ISA, at some point were you promoted?

12  A    Yes, indeed, I have been promoted.

13  Q    Tell us about that promotion.

14  A    My first role was the commander of the (sic) Jerusalem,

15  and that meant that I was responsible for other handlers and

16  other agents.  I was the one who had to direct various

17  operations, to set the conditions on the ground, in order to

18  prepare for operations of thwarting terrorism by gathering

19  intelligence.  I had to advance my employees, other employees,

20  so they reach full and comprehensive understanding that which

21  would give them better control and more clarity with respect

22  to the field.  For that purpose, I had to maintain ties with

23  other organizations of the Israeli government and other law

24  enforcement or other intelligence agencies.

25          In my second period, I was promoted to be the

Shaked - Direct - Turner                    990

1  commander of the Ramallah agent, where I did the same things

2  like I did in Jerusalem, but, there, the scope of my work was

3  far larger than that of the city.

4  Q    At some point in time, did your geographic area that you

5  were responsible for expand?

6  A    Even very much so.

7  Q    How did it expand?

8  A    When we talk about the area of Jerusalem, you can see

9  that there's a very particular kind of a population.  But in

10  Ramallah, the population is more diverse.  You have city

11  dwellers, you have rural population; I have the Palestinian

12  refugee camps; I have areas where there are people who are

13  wanted, and one has to cope with them in order to apprehend

14  them.  There's also very extensive military activity taking

15  place in the area, unlike the city of Jerusalem that is

16  totally under civilian control.

17  Q    During the period of time that you were working in

18  intelligence, and specifically working with terror, was it

19  important to your job to know and understand where the terror

20  cells were developing, who communicated with whom, and who was

21  in charge?

22            MR. INGERMAN:  Objection.

23            THE COURT:  Sustained.

24  Q    During the period of time that you worked for the ISA,

25  working in the context of terror, was it important for you to

NICOLE CANALES, CSR, RPR

1    go into the communities?

2    A    Of course, it was very, very important for me to be in

3    touch with the population, not just to study about them but to

4    also know who from among them could be recruited as agents

5    that would later be serving me for my security ends.  It is

6    very important to get to the community, to get to know it, to

7    know who I was up against, to know exactly who the elite was,

8    what people -- what economic status, to know the academics

9    around them, to know what social influence they had and also

10   to know the rank and file who live their daily lives; I had

11   connections and ties with them too.  And also to know the

12   political segmentation of the population, to understand its

13   structure, to understand the aspiration of the population, to

14   know how it exists, how the Palestinian society exists in the

15   conditions that prevailed back then.

16   Q    At some point in time did you leave the ISA for the

17   public sector?

18   A    Yes, in 1988, in 1982 late 1982, I left the ISA and I

19   became a journalist.

20   Q    Where did you go to work?

21   A    I was very happy, but I immediately joined the largest,

22   the most distributed, newspaper in Israel

23   named "Yedothahronoth," Y-e-d-o-t-h-a-h-r-o-n-o-t-h.

24   Q    Did you have an area within the paper that you

25   specialized in?

Shaked - Direct - Turner                    992

1   A    Already the beginning of my way there, I became the

2   correspondent for Palestinian affairs, terror affairs, Arab

3   affairs, Palestinian affairs, and those Palestinians residing

4   within the state of Israel; and that had to do with every

5   issue pertaining to Palestinians, which is called the

6   Palestinian desk.  All that was under my responsibility.  In

7   addition to their various political connections, not only to

8   Israel, but also as to other Arabs in the Islamist world.

9   Q    Over the years that you worked in -- let me just strike

10  that and ask this question.  How many years total did you work

11  for the newspaper?

12  A    Thirty years.

13  Q    And during that 30-year period, was your focus pretty

14  much on terrorism?

15  A    This was actually to me the most important topic, as it

16  was to my editor.  It was the topic in the state of Israel.

17  Q    During that 30-year period, did you investigate, and

18  study and analyze terrorism only in Israel, the West Bank and

19  Gaza, or did you do it in other places as well?

20          MR. INGERMAN:  Objection.

21          THE COURT:  Overruled.

22  A    Terrorism is terrorism is terrorism, and there are

23  various influences coming from Israel to the world and from

24  the world to Israel.  This is why I studied terrorism in the

25  entire Middle East and around the world as well.

NICOLE CANALES, CSR, RPR

1    Q    Are you also an author of books on terrorism?

2    A    Yes, I did write two books on terrorism.  In addition to

3    two others that only marginally touch upon terrorism.

4    Q    When did you first become aware of a terror group called

5    "Hamas"?

6    A    Actually, a few days after Hamas was founded, on the 14th

7    of December 1987 --

8              THE INTERPRETER:  December?

9              THE WITNESS:  December.

10   A    1987.  I had already become aware of the existence of

11   Hamas organization.

12   Q    When did you first become aware of someone named Sheikh

13   Yassin?

14   A    Well, I learned about him a long time before Hamas.  I

15   wrote about him already in 1982.  And in 1983, when I covered

16   his trial, he was tried in Israel, in court.

17   Q    Over the years, did you personally have an opportunity to

18   be in the same room with Sheikh Yassin?

19   A    Many, many times I would say, without exaggerating.

20   Q    Did you actually have interviews and communications

21   directly with Sheikh Yassin over the years?

22   A    When Sheikh Yassin was in prison, in 1993, I was writing

23   my book about Hamas, and I sat with him for many long hours,

24   and I interviewed him for the purpose of writing my book.

25   This was the first book that was written about Hamas, and the

Shaked - Direct - Turner                           994

1   help that I received from Sheikh Yassin was very, very

2   welcome.  When he was released in 1997 and returned to the

3   Gaza Strip, I visited him in his home a number of times, and I

4   also visited him in the Islamic center in Gaza.  We also had

5   telephone calls as part of my journalistic work.

6   Q    Now, there's been a statement made during the course of

7   this trial that Hamas was a secretive organization.  How many

8   years have you been both investigating, following and

9   reporting on Hamas?

10          MR. INGERMAN:  Your Honor, before we have the

11  answer, may we approach quickly?

12          THE COURT:  Sure.

13          (Sidebar - Outside the presence of the jury.)

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR                                            995

1         MR. INGERMAN:  Thank you, your Honor.  I'm somewhat

2    challenged because of the translation, but the question was

3    how many years have you been investigating Hamas?  The answer

4    went on for almost 45, 50 seconds.  It seems to me that the

5    witness is offering more than the answer, more than an answer

6    to the question.

7         THE COURT:  Well, he is an expert, and it cuts off

8    some of the questioning and makes it a faster exchange.  I'm

9    going to allow it.  You can't really object on the ground that

10   the answer is not responsive until you hear the answer.  I

11   would urge you not to make those objections, because he is the

12   expert.

13                       (Sidebar concluded.)

14

15

16

17

18

19

20

21

22

23

24

25

Shaked - Direct Turner                              996

1              (In the presence of the jury.)

2         THE COURT:  Go ahead.

3    Q    He may go ahead and finish his answers.

4         THE COURT:  Well, she has to translate the question.

5    I don't think she did that yet.

6         THE WITNESS:  Since Hamas was founded, to this very

7    day, and I emphasize this very day, I have been investigating

8    and researching with Hamas.  If I may add one comment that was

9    said early on, Hamas was a secretive organization but also to

10   the Palestinian society, Israeli society and to the

11   international community.  This was no secret organization.

12   Everyone knew exactly what the Hamas structure was.  Everyone

13   knew who the individuals in Hamas were, everyone, and I

14   mean -- not everyone, but everyone who's engaged with the

15   subject of Hamas knows the Hamas operatives.  And as a

16   journalist, for sure, I have known many of the Hamas members.

17   I knew their telephone numbers that I received from their

18   leadership, because they gave me those numbers for me to be

19   able to contact their operatives, to interview them,

20   especially in those areas where we operated.

21   Q    During the relevant time frame here, between 1999 and

22   2005, on this topic of secrecy, did Hamas have their own

23   websites?

24   A    Yes, it did.

25   Q    Did Hamas have its own TV station?

Shaked - Direct Turner                                997

1    A    Yes.

2    Q    Did Hamas have its own radio stations?

3    A    Yes, it had radio stations.  It had one central station

4    and a number of regional stations.

5    Q    Did Hamas have its own newspaper, where they published --

6    actually published information for the various communities

7    across the West Bank and Gaza?

8    A    Yes, not just one newspaper.

9    Q    Did they also have public ceremonies, where Hamas would

10   invite the public to come to the Hamas ceremonies?

11   A    Yes, they held many such ceremonies.

12   Q    Now, over your lifetime of experience involving terror

13   and including Hamas, have you from time to time been consulted

14   by the FBI?

15   A    Yes, a number of times during my career I was consulted

16   by the FBI, to discuss various issues related to terror.

17            (Proceedings continued on the next page.)

18

19

20

21

22

23

24

25



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SHAKED - DIRECT - TURNER                    999

1    Q    And in the context of your consultations with the FBI,

2    did you come to the United States?

3    A    Yes, in USA, too.

4    Q    And did you have an opportunity to collaborate with the

5    FBI, share information, in other words, with the FBI, about

6    terror, including Hamas?

7    A    It wasn't exactly a collaboration.  They wanted to hear

8    my expert opinion about Islamic terror.

9    Q    Now, over the years, have you also participated in the

10   creation of documentaries about terror and Hamas?

11   A    Yes.  I was involved over the years in the production

12   of a number of films about Hamas and especially the main

13   film I was involved in in 2006.

14          MR. TURNER:  Your Honor, at this point, I would

15   like to put something on the screen.  Can we have the

16   screen; is that possible?

17          THE COURT:  I thought we were just asked to raise

18   the screen.  We'll lower it again.  It's fine.

19          MR. INGERMAN:  Your Honor, before it's shown to

20   the jury, can we have some idea what it is?

21          THE COURT:  Yes.  Show it to counsel first.

22          MR. TURNER:  Thank you.

23   BY MR. TURNER:

24   Q    Now, as part of your work in this particular case,

25   Mr. Shaked, have you had an opportunity to help prepare a

SHAKED - DIRECT - TURNER                    1000

1  map of Israel, the West Bank and Gaza that specifically

2  identifies the 24 attacks that we're here to talk about?

3  A    Yes, sir.

4        MR. TURNER:  And can you put it on the screen.

5        THE COURT:  Witness only.  Go ahead.

6  BY MR. TURNER:

7  Q    It should be on your screen at some point in time,

8  Mr. Shaked.

9  A    It's on my screen.

10 Q    Do you recognize that particular map?

11 A    Of course I am familiar with this map.

12 Q    And will that help illustrate what we're about to begin

13 talking about?

14 A    Yes, it will indeed help to illustrate the subject we

15 are about to talk about.

16       MR. TURNER:  May I put it up there now?

17       MR. STEPHENS:  No objection, your Honor.

18       THE COURT:  All right.

19 BY MR. TURNER:

20 Q    Now, we've listed on this particular map all 24 terror

21 attacks that are at issue in this litigation.

22       Do you understand that, sir?

23 A    Yes, I do.

24 Q    Okay.  Just so we can sort of get our coordinates

25 correct, first of all, can you identify the West Bank on

1  this particular map in this segment that we've blown up?

2  A    Yes, I can.

3  Q    All right.  And I believe you can actually draw on that

4  screen.

5       Okay.  Now, can you back out of that, Mr. Miller, if

6  you will, and go down to Gaza for a minute just so we orient

7  ourselves to where these particular locations are.

8       Can you circle the Gaza Strip for us.

9  A    (Indicating.)

10 Q    And you live in Jerusalem; is that correct?  And you

11 circled Jerusalem.

12      All right.  Now, have you had an opportunity to

13 investigate these 24 attacks?

14 A    Yes, I did have such an opportunity.

15 Q    And have you been able to complete an investigation to

16 the point where you feel comfortable concluding who or what

17 terror group was responsible for these 24 attacks?

18 A    Yes, I am able to make that conclusion.

19 Q    And what is your conclusion?

20 A    My conclusion is that for 21 of the terror attacks,

21 there is a very high degree of probability that they were

22 indeed carried out by Hamas.  For the others, there is a

23 high probability that they were carried out by Hamas.

24      I say this because different types of terror attacks

25 were involved.  There is a difference between a terror

1   attack carried out by a suicide bomber, in which case it is

2   easier, almost definite, I say almost certain that we could

3   determine who carried it out, compared to other terror

4   attacks such as shooting, the shooting of mortars, or terror

5   attacks carried out by two organizations collaborating

6   together.

7        Therefore, I say that in 21 of the cases, there is a

8   very high assessment that they were carried out by Hamas and

9   the other three, there is a high probability but slightly

10  less so.

11  Q    Now, during the course of your investigation -- can we

12  have the lights back up.

13       During the course of your investigation, I want to

14  focus on the sources of information that you had available

15  to you in order to reach these conclusions, okay?

16  A    All right.

17  Q    First of all, did you have access to something called

18  official claims of responsibility by Hamas for these

19  attacks?

20            MR. INGERMAN:  Objection.

21            THE COURT:  Overruled.

22  A    Yes.

23  BY MR. TURNER:

24  Q    Did you have access to ISA, Israeli Security Agency,

25  reports for some of these attacks?

SHAKED - DIRECT - TURNER                    1003

1    A    Yes.

2    Q    Did you have access to other forms of government

3    investigation records such as police reports, ballistics

4    reports, forensics reports, photographs, things of that

5    nature?

6    A    Yes, I did, of course.

7    Q    And did you have access in some of these cases to

8    actual court records of arrests, convictions, and

9    confessions by Hamas?

10   A    Yes, I did.

11   Q    And did you have a personal opportunity to actually

12   attend some of these court proceedings where these

13   individuals from Hamas were pleading guilty?

14   A    Yes, I was present in the court.

15   Q    Now, there's also another source of information called

16   wills.

17        Have you had an opportunity in many of these 24 attacks

18   to actually watch video wills that were prepared by Hamas

19   before these suicide bombings were undertaken?

20   A    Yes, I had the opportunity to view those wills.

21   Q    And have you also had an opportunity in some of these

22   24 attacks to review written wills as opposed to video wills

23   that were actually prepared and published by Hamas for these

24   killers?

25             MR. INGERMAN:  Objection.

SHAKED - DIRECT - TURNER                    1004

1          THE COURT:  Overruled.

2   A    Yes, I did read them.

3   BY MR. TURNER:

4   Q    Now, there's another category of evidence called

5   memorializations.  Can you describe to the ladies and

6   gentlemen of the jury what a memorialization of these

7   horrific events means.

8   A    Sadly, Hamas does not view the suicide bombers as

9   criminals who have carried out terrible acts.  On the

10  contrary, they view them as heroes who should be glorified

11  and turned into role models and praised.  And that is why

12  Hamas decides to commemorate these suicide bombers in

13  various ways which I will describe before you.

14         The first stage is a funeral.  It could be a real

15  funeral or a symbolic funeral held in honor, and I say in

16  honor in quotation marks, of the suicide bomber.  This is

17  usually held with participation of many of the people who

18  live in the city or village, and it involves the waving of

19  flags, the chanting of slogans, the singing of songs, in

20  honor of the suicide bomber.

21         Another example involves the establishment of a

22  mourners' tent.  I say mourners in quotes because they

23  actually call this a wedding.  And people come to visit the

24  mother and the father to congratulate the mother and the

25  father on the terror attacks, what we would say murderous

SHAKED - DIRECT - TURNER                1005

1    terror attacks, that were carried out or terror attack

2    carried out by their son.

3        Another example of this memorialization are posters,

4    large posters, with pictures, portraits of suicide bombers,

5    that are hung throughout the cities and villages.  And

6    another example are graffiti or murals.

7        Further examples involve the naming of streets,

8    schools, and buildings after those suicide bombers.  For

9    example, the central square in the city of Jenin is named

10   after Yahya Ayyash who was the first engineer of Hamas.

11       In addition to this, there are various memorialization

12   acts that are done at the universities in the Palestinian

13   territories.  And in the Palestinian territories there are

14   many universities.  Only in the West Bank alone, there are

15   13 universities.  And this is one of those places where

16   ceremonies are held and gatherings and assemblies in memory

17   of those suicide bombers.  And in the newspapers, mostly the

18   Hamas newspapers, large sections are devoted to them,

19   starting not just with the obituaries but also the story of

20   their lives.  Mostly in *Al-Risala* and *Al-Qassam Yun*, which

21   are the Hamas newspapers.  But not only in those, in other

22   dailies as well.

23       In addition to these, there are special television

24   programs that are devoted to the suicide bomber and these

25   are broadcast not only by the television channels of Hamas,

1    they do have two large television channels, but they are

2    also given by others in memory of those suicide bombers.

3    They are done also by the satellite stations such as Al

4    Jazeera or other countries.

5        And also the television stations of Palestinians.  A

6    well-known program is -- there was a word in Arabic,

7    laajilkum, which means for you or for your sake, in which

8    they actually glorify and praise the life and the deeds of

9    the suicide bomber.

10        With your permission, I'd just give one last example.

11    Poets and authors write books and poems including an author

12    such as Mahmoud Darwish who writes poems of hymns of praise

13    in honor of the suicide bombers.  And he's the Palestinian

14    national poet.  These poems are composed and are sung in the

15    Arab world including by well-known popular singers such as

16    Fayruz.  If I am going to compare her, then I would compare

17    her to Tina Turner.  She is that famous, and she is singing

18    those poems of praise in honor of the suicide bombers.

19    Q    In these 24 attacks or at least many of them, have you

20    had access to actual posters published by Hamas?

21    A    Concerning most of them, I manage to collect most of

22    the posters that actually relate to those suicide bombers.

23    These posters were disseminated by the Palestinian Society

24    mostly by Hamas.  These are large posters in which they

25    actually praise and sanctify the suicide bomber.

SHAKED - DIRECT - TURNER                    1007

1   Q    Have you personally attended some of these funerals or

2   weddings?

3   A    I did attend a number of those funerals, and there were

4   many more cases in which I visited the mourners' tents in

5   order to see those weddings, quote/unquote, of those

6   shahids.

7   Q    Now, in addition to these sources of information, have

8   you also had an opportunity on occasion to personally

9   interview some of the terrorists who committed some of these

10  24 attacks in prison?

11  A    Yes.  I did interview some of those terrorists that are

12  held in prison and those terrorists that carry down the

13  terror attacks about which we are talking here in court.

14  Q    For instance, we're going to be talking today and

15  tomorrow about somebody by the name of Abdullah Barghouti.

16       Who is Abdullah Barghouti in the context of what we're

17  here to talk about?

18  A    Abdullah Barghouti is considered to be the arch

19  terrorist.  He is the engineer, the explosive engineer, that

20  caused the death of more Israelis than any other

21  Palestinian.  We are talking about a terrorist that grew up

22  in Kuwait, studied in South Korea, moved to Ramallah.  In

23  the course of two years built bombs that brought about the

24  death of 67 Jews and the injury of many hundreds.

25       Abdullah Barghouti was a person I met in prison.  He

SHAKED - DIRECT - TURNER                    1008

1  agreed to meet and talk so that I -- and I tried to talk to

2  him in order to understand what actually drove him to that

3  killing.

4  Q    Did you actually have an opportunity to videotape the

5  interview with Barghouti?

6  A    Of course.

7  Q    And during the course of this interview with Barghouti,

8  did you learn precisely how he would go about making these

9  bombs?

10             MR. INGERMAN:  Objection.

11             THE COURT:  Leading?

12             MR. INGERMAN:  Objection.

13             THE COURT:  Leading?  Is the objection that it's

14  leading?

15             MR. INGERMAN:  And 801.

16             THE COURT:  Overruled.

17  A    Barghouti was all too happy to describe to me how he

18  actually built those explosive vests, how he fitted them on

19  the suicide bombers, how he prepared those explosive charges

20  that he dispatched along with the terrorists into Israel

21  including those -- to those 24 terror attacks.

22        He was also delighted to describe to me how he prepared

23  the booby-trap cars that he dispatched to Israel in the aim,

24  as he declared it, and his aim was in his words was to kill

25  as many Israelis as possible.

SHAKED - DIRECT - TURNER                    1009

1  Q    I want to circle back for a minute and talk about more

2  globally all of these various sources of information.

3          THE COURT:  Before you do that, is this a good

4  time to take a break?

5          MR. TURNER:  Sure.

6          THE COURT:  All right.  Let's take our afternoon

7  break, ladies and gentlemen.  We'll be back here at 3:15.

8          Please do not talk about the case amongst

9  yourselves.  See you shortly.

10          (Jurors exit the courtroom.)

11          THE COURT:  All right.  Be seated.  Just so the

12  witness doesn't hear what I have to say to the lawyers, let

13  me have you over at sidebar for a minute.

14          (Sidebar conference.)

15          (Continued on the next page.)

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                    1010

1          THE COURT:  Just for the record, I overruled the

2    hearsay objection on the ground that I understood this to be

3    one of the bases for the expert's opinion.  And I think it's

4    highly reliable in that context.

5          I do think, Mr. Turner, it would be better if you

6    make it clear that, in fact, various things he testified to

7    which might draw a hearsay objection are part of the

8    information he's relying on in reaching his opinion so that

9    the jury has the proper context under Rule 703.

10          MR. TURNER:  Yes, sir.

11          THE COURT:  All right.  3:15.

12          (End sidebar conference.)

13          (Continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

SHAKED - DIRECT - TURNER                    1011

1        THE COURT:  Please bring in the jury.

2        (Jurors enter the courtroom.)

3        THE COURT:  All right.  Be seated, please.

4        Mr. Turner, before you begin, ladies and

5    gentlemen, I just wanted to mention to you, you're doing

6    really well focusing on the testimony, but I wanted to

7    caution you that sometimes in the late afternoon after

8    you've had lunch, you get a little sluggish, a little harder

9    to stay awake, so please give it your all and really keep

10   the focus that you've had throughout the trial.

11       Please continue.

12       MR. TURNER:  Thank you.

13   BY MR. TURNER:

14   Q    When we broke, Mr. Shaked, what we were beginning to

15   talk about was taking all of these various sources of

16   information and looking at them more globally.

17       And my question for you is, is there one type of

18   evidence that is more important than another type of

19   evidence?

20   A    No, for me every piece of evidence is important.  This

21   is why I collect all the evidence that I can collect from

22   different sources from different places and only then do I

23   weigh all of it together in order to build the entire

24   picture.  It is not one piece of evidence alone, not at all.

25   Q    Well, let's focus for a minute on claims of

SHAKED - DIRECT - TURNER                1012

1  responsibility.

2      Is there a difference between an official claim of

3  responsibility and an unofficial or one just simply

4  published in the media, for instance?

5              MR. INGERMAN:  Objection.

6              THE COURT:  Overruled.

7              Hang on one second.  You mean, difference in the

8  weight he gives it?

9              MR. TURNER:  Pardon me?

10             THE COURT:  Do you mean difference in the weight

11 that he gives it?

12             MR. TURNER:  No.  Technically, is there a

13 difference between -- in what he does, between an official

14 claim of responsibility and an unofficial?

15             THE COURT:  And how he views those two kinds of

16 claims?

17             MR. TURNER:  Yes, sir.

18             THE COURT:  All right.  Go ahead.

19             MR. TURNER:  Do you want the translator to make

20 the distinction?

21             THE COURT:  If she can, yes.

22 A    Indeed, there are official claims of responsibility

23 there are actually determined by the leadership of the

24 organization.  And these appeared in the official tools of

25 the organization by the form of a communique.

SHAKED - DIRECT - TURNER                1013

1        In contrast to this, there are other announcements that
2   are made in an unofficial way.  And these have to be
3   thoroughly examined in order to clarify the veracity before
4   issuing any conclusion, such as radio announcements or
5   anonymous announcements that are made to various news
6   agencies and other publications in unofficial tools that are
7   made in an unofficial way.
8   BY MR. TURNER:
9   Q    In the course of your investigation, have you acquired
10  materials off of something called the Al-Qassam's Web site?
11  A    Yes.
12  Q    Is that Web site or those Web sites something that you
13  use in your profession and have used over the years in order
14  to gain information on whatever subject you were
15  researching, studying or analyzing?
16  A    Yes.
17  Q    And how is it that you can determine what is and what
18  is not an authentic Web site of the Al-Qassam brigade?
19            MR. INGERMAN:  Objection, your Honor.
20            THE COURT:  Overruled.
21            MR. INGERMAN:  May we have a brief sidebar?
22            THE COURT:  Sure.
23            (Sidebar conference.)
24            (Continued on the next page.)
25

SIDEBAR CONFERENCE                    1014

1          MR. INGERMAN:  Your Honor, this witness has

2   testified in his deposition that he is not an Internet

3   expert.  They had Mr. Kohlmann on for this.  And he is not

4   qualified to testify about whether or not a particular Web

5   site is authentic or not authentic.

6          THE COURT:  He has not been asked that yet.  He

7   has been asked do you use information from that Web site in

8   reaching your opinions.  And he's going to say yes.

9          If you want to cross-examine him on the fact that

10  he's not an Internet expert, that's fine.

11         MR. INGERMAN:  That's actually not the pending

12  question, your Honor.  And I can go back and look at the

13  real tone.

14         THE COURT:  Well, let me look.

15         (Brief pause.)

16         THE COURT:  He was asked how is it that you

17  determine what's authentic and what's not on the Web site.

18         Now, the answer to the question is the basis of

19  how he forms his opinion.  It's subject to attack by you,

20  but it's just going into his process of expert evaluation.

21  That's why I overruled it.

22         MR. INGERMAN:  Thank you.

23         (End sidebar conference.)

24         (Continued on the next page.)

25

1          MR. TURNER:  May I proceed?

2          THE COURT:  Yes.

3          MR. TURNER:  Do you want to read him back the

4     question.

5          (Record read as requested.)

6     A    The Al-Qassam Web sites are well known and also the

7     Hamas Web sites are well known.  Indeed, I am not an expert

8     on the Internet, but based on the reading of articles and

9     other materials written by other experts, I know that at

10    least the Web sites that I'm using have a very, very high

11    probability of being authentic Web sites of Hamas.

12    BY MR. TURNER:

13    Q    And do you routinely in your profession rely upon the

14    information that you've gained from those Web sites in order

15    to reach conclusions?

16    A    I am using these Web sites and the materials that are

17    in them, yes.

18    Q    Now, in the context of these 24 attacks, have you had

19    an opportunity to prepare 24 slides that help illustrate

20    what your findings are with respect to each attack?

21    A    Yes.

22    Q    And do these slides have -- in fact, I think all of

23    them do -- photographs of the involved terrorists or at

24    least some of the involved terrorists?

25    A    I made an effort to include the key terrorists that

SHAKED - DIRECT - TURNER                1016

1   participated in every attack.

2   Q    And did you select the photographs, the images that you

3   placed on these slides, as fair and accurate representations

4   of the person identified on the slide?

5   A    Yes.

6   Q    Did you, in fact, take some of the photographs of the

7   people on the slides?

8   A    Yes, I personally did this, shot some of the pictures.

9   Q    And can you identify as fair and accurate

10  representations all of these photographs we're about to

11  begin to look at as the individuals whose name you put under

12  each photograph.

13  A    I will do that.

14         MR. TURNER:  Okay.  Your Honor, at this point I

15  would like to go ahead and begin going through the

16  individual attacks.  The first slide will be the Neve Yamin.

17         THE COURT:  All right.  You may.

18  BY MR. TURNER:

19  Q    Have you had an opportunity to investigate the March

20  28, 2001, gas station bombing at Never Yamin that resulted

21  in two deaths and four reported injuries?

22  A    Yes.

23  Q    Were you able to identify the suicide bomber?

24  A    Yes.

25  Q    Who was the suicide bomber?

SHAKED - DIRECT - TURNER                    1017

1  A    The suicide bomber was Fadi Amer, resident of Qalqilya,

2  who we see at the bottom part of the slide.

3  Q    Now, based on your investigation, did Fadi Amer carry

4  out this bombing solely and on his own or as part of Hamas?

5  A    Fadi Amer carried out the attack on behalf of Hamas as

6  member of Hamas and for the organization Hamas.

7        (Continued on the next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

R. SHAKED - DIRECT/MR. TURNER                1018

1   DIRECT EXAMINATION (Continued)

2   BY MR. TURNER:

3   Q    Where is Neve Yamin?

4   A    Neve Yamin is a slow gas station, but it is also called

5   the Peace Gas Station.  It is not too far from Qalqilya,

6   which is an Arab town in the center of Israel.

7   Q    What is the significance, if any, of this gas station?

8   A    This gas station was a transportation station for

9   students who come from the center of Israel towards the

10  east, they come in the morning either driven by their

11  parents' cars or in buses; and from there, they are taken by

12  buses to their respective schools.

13  Q    What did your investigation reveal about Fadi Amer's

14  background?

15  A    Fadi Amer was a student in the university branch of

16  Qalqilya.  He studied Islamic sciences and wanted to serve

17  Islam in the mosque of the -- as an Imam in the mosque of

18  the city.

19         He was a veteran Hamas operative.  And judging by

20  testimonies given by Hamas, he was an officer in the

21  organization in Izz ad-Din al-Qassam, which is the military

22  wing of Hamas.

23  Q    How did you identify Ayman Halawah in the upper

24  left-hand corner as the Hamas commander who was in charge of

25  Nablus who built the bomb?

R. SHAKED - DIRECT/MR. TURNER            1019

1  A    Ayman Halawah was known from other sources and other

2  cases and other terror acts, and from the studies that I

3  conducted as a journalist and also in my studies at the

4  university, he was known to be the commander of Hamas in the

5  area of Nablus.  He was the one who built the bomb, and I

6  learned this from testimonies given by Hamas and other legal

7  sources, Israel legal sources and also the ISA records.

8  Q    The terrorist in the middle, Ra'ed Houtari, how were

9  you able to determine that he oversaw the attack and what

10  does that mean?

11  A    Ra'ed Houtari was Hamas operative in Qalqilya.  His

12  name became known after he was arrested.  And that included

13  -- Hamas actually published a description of his deeds.  He

14  was also arrested by the ISA and gave in his testimony

15  details about the terror, the bombing and what happened.

16  And judging by this and also other testimonies given by

17  other operatives who have linked him directly to the bombing

18  and the way by which he oversaw the terror act.

19          MR. INGERMAN:  Your Honor, may I have a continuing

20  objection on the hearsay issue with respect to this witness?

21          THE COURT:  As far as I'm concerned you do, yes.

22          I will advise the jury when the witness talks

23  about the things he relied upon in reaching his opinion,

24  those facts may or may not be before you through other

25  evidence.  For now, he's just telling you how he got to his

R. SHAKED - DIRECT/MR. TURNER                    1020

1  opinion so that you can determine how to evaluate his

2  opinion.

3  BY MR. TURNER:

4  Q    The final terrorist shown on this particular slide is

5  Abd al-Rahman Hamdan.  What role did Hamdan play in this

6  terrorist attack?

7  A    Abd al-Rahman Hamdan was the commander of Hamas in

8  Qalqilya.  He was the one who planned the attack, and he

9  dispatched the bomber to Neve Yamin.

10 Q    What source of information or sources of information

11 did you use to acquire that fact?

12 A    The various sources I used were, for example,

13 testimonies given in Israel court by other terrorists about

14 him.  One example is Ra'ed Houtari himself, the

15 memorialization ceremonies held in Qalqilya after he was

16 killed, including large posters carrying pictures of him

17 with descriptions of the various operations that he

18 commanded.  And most especially, I used materials from Hamas

19 itself that describe his various deeds in detail and the

20 various activities he carried out in the organization and

21 his involvement in the terror attack in Neve Yamin.

22          MR. TURNER:  Could you show the witness only 3222?

23 Tell me when he's ready.

24          THE COURT:  When you can see it, he can see it.

25          MR. TURNER:  Mine comes up the same time as his?

R. SHAKED - DIRECT/MR. TURNER                1021

1              THE COURT:  Yes, it does.

2    Q    Can you identify what 3222 is, Mr. Shaked?

3    A    Yes, I can.

4    Q    And what is 3222?

5    A    This is an official claim of responsibility from Hamas

6    in which it takes responsibility for the terror attack

7    carried out in Neve Yamin gas station.

8    Q    What is the source of 3222?

9    A    The source of the document is the site, the website of

10   the military wing of Hamas, which is called is Izz ad-Din

11   al-Qassam.

12   Q    Is that the same website that you described earlier

13   that you use on a routine basis?

14   A    Yes, indeed.

15   Q    And is this a fair and accurate image of what was drawn

16   from the Al-Qassam's brigade's website?

17   A    Yes.

18              MR. TURNER:  We offer 3222 into evidence.

19              MR. INGERMAN:  Objection.

20              THE COURT:  Can I see counsel at sidebar for a

21   minute.

22              (Continued on the next page for sidebar.)

23

24

25

SIDEBAR CONFERENCE                    1022

1          (Sidebar conference begins.)

2          THE COURT:  Isn't this the same website that

3    Coleman testified to and got into evidence over objection?

4          MR. OSEN:  Yes.

5          THE COURT:  So it's the same objection you made in

6    Coleman, right?

7          MR. INGERMAN:  It is, with the added testimony

8    from Mr. Shaked that these are not statements against penal

9    interest.  I mean, he spent five or six minutes talking

10   about how this is a glorification and they do this for the

11   owner --

12         THE COURT:  I reject the argument that because

13   it's a glorification and cannot be against penal interest,

14   it can be both.  It frequently is.  People usually have a

15   motive for saying something that is against their penal

16   interest, besides wanting to go to jail.  So they have some

17   other purpose.  If inherently the declaration is against

18   their penal interest, the fact that they have some other

19   motive for making that declaration does not rob it of its

20   probative force.

21         MR. STEPHENS:  I don't think that's right, your

22   Honor.  If I may --

23         THE COURT:  Okay.  We have a disagreement on that.

24   That's my ruling.

25         But in any event, this objection was passed

SIDEBAR CONFERENCE                    1023

1    essentially because I admitted the website.

2           MR. INGERMAN:  I agree with that, I'm trying to

3    develop the record.  If your Honor will give me a continuing

4    objection, I won't jump up --

5           THE COURT:  I'm happy to give you a continuing

6    objection.

7           MR. INGERMAN:  That's fine.

8           (End of sidebar conference.)

9           (Continued on the next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        THE COURT:  All right.  The document is received

2   over objection.

3        MR. TURNER:  May we display it, please.

4        (Plaintiff Exhibit 3222 was admitted into

5   evidence.)

6   BY MR. TURNER:

7   Q    Okay.  First of all, blow up the upper one-third all

8   the way to the end.

9        Now, first of all, do you recognize the logo,

10  Mr. Shaked?

11  A    Yes, I can identify the logo.

12  Q    And whose logo is that?

13  A    The logo -- is the logo of the Izz ad-Din Al-Qassam

14  Brigade, the military wing of Hamas.

15  Q    Can you identify the person shown in the photograph?

16  A    Yes, I could.

17  Q    Who is it?

18  A    His name is Fadi Amer, he is the suicide bomber who

19  carried out the Neve Yamin suicide bombing.

20  Q    Are there sometimes in some of these attacks what's

21  called competing claims of responsibility by other

22  organizations?

23  A    Yes, indeed there are.

24  Q    And how does someone like you go about evaluating the

25  authenticity of the competing claims of responsibility?

R. SHAKED - DIRECT/MR. TURNER                1025

1   A    First of all, I don't -- I'm not in competition with

2   time, I'm only in competition with authentic material and

3   myself.  I examine the material based on a perspective of

4   time, and especially by comparing, examining, crosschecking

5   the same material with other material.  Because ultimately,

6   what we have here is just one piece out of a whole complex

7   puzzle.  And in order to build a true picture, I have to

8   base myself on various sources of information.

9   Q    Now, during the course of your investigation, were you

10  able to determine whether there were any competing claims

11  for the bombing at Neve Yamin?

12  A    I don't recall if in the case of Neve Yamin there were

13  indeed competing claims of responsibility.  But in the case

14  of Neve Yamin, Hamas only took responsibility two weeks

15  after the bombing, and there were certainly during that

16  period, various anonymous claims of responsibility.

17  Q    Now, as we go through these claims of responsibility in

18  each of these 24 attacks, including in some instances

19  special reports, as you had last, are all the details in

20  these claims of responsibilities always 100 percent

21  accurate?

22  A    Based on my experience, my research and my examination,

23  I have concluded that the official claims are generally

24  true, as well as other unofficial claims, they are also very

25  often true.  The claims received from competing

R. SHAKED - DIRECT/MR. TURNER          1026

1  organizations or from just anyone; ultimately, in most

2  cases, turn out to be false.

3  Q    Now, from a factual standpoint, does -- at least based

4  on your experience, does Hamas operate like a formal

5  military in that they are in constant communication with one

6  another about every detail at every moment?

7          MR. INGERMAN:  Objection your Honor, form.

8          THE COURT:  Sustained.

9  Q    Based on your experience -- you might want to tell him

10  I'm going to does him a question.

11          Based on your experience in dealing with Hamas,

12  does Hamas communicate with one another, at least based on

13  your experience in reporting these attacks, on a

14  moment-by-moment basis?

15          MR. INGERMAN:  Objection, same question.

16          THE COURT:  Sustained.

17  Q    You might want to tell him again.

18          Mr. Shaked, have you had an opportunity to read

19  3222, the claim of responsibility in this particular attack,

20  the Neve Yamin attack?

21  A    Yes, I would have that opportunity.

22  Q    And would you summarize for us what you learned from

23  this claim of responsibility in terms of this particular

24  attack?

25  A    Firstly, I concluded that Hamas made an official

R. SHAKED - DIRECT/MR. TURNER          1027

1   statement in which it claimed responsibility for the attack,

2   and also published the name of the suicide bomber correctly.

3          I also learned from the statement about the way

4   the suicide bombing was carried out, because Hamas gave

5   details in this statement.  I also learned that Hamas spoke

6   about the suicide bomber Fadi Amer as being the third in a

7   series of terror attacks that it sought to carry out, and I

8   learned this after the fact, based on this piece of

9   information.

10  Q    Could you show the witness please only 3811.  Can you

11  identify 3811?

12  A    Yes, I can.

13  Q    What is 3811?

14  A    This is an ISA report in Israel summing up the actions

15  of suicide bombers from September of 2000 to September of

16  2007.

17  Q    And does this ISA report include a section on Neve

18  Yamin, the attack on Neve Yamin?

19  A    Yes.

20  Q    And did you rely upon this particular government record

21  in reaching your findings in this particular attack?

22  A    Yes, I relied on this piece of information as well in

23  addition to other testimonies.

24  Q    Are these the kinds of reports that you've seen in your

25  over 40-year career at the ISA?

R. SHAKED - DIRECT/MR. TURNER            1028

1  A    Yes.  Indeed, this report, which sums up certain period

2  of time is typical of the types of reports that I have seen.

3  Q    And does 3811, the ISA report confirm your conclusions

4  that Hamas was responsible for this attack in Neve Yamin?

5  A    Yes, it does.

6             MR. TURNER:  We would offer 3811 into evidence.

7             MR. INGERMAN:  Your Honor, we had a prior

8  objection to that, and I think it was sustained in part and

9  ruled in part as to this document.

10            THE COURT:  Oh, which part was sustained?

11            MR. INGERMAN:  Do you want me to say it?

12            MR. TURNER:  It is redacted further.

13            THE COURT:  It's been redacted?

14            MR. TURNER:  It's been redacted.

15            THE COURT:  Okay.  Anything else?

16            MR. INGERMAN:  No.

17            THE COURT:  The document is received.

18            (Plaintiff Exhibit 3811 was admitted into

19  evidence.)

20  Q    Would you put up 3216.

21            Do you recognize 3216, Mr. Shaked?

22  A    Yes, I do.

23  Q    And what is 3216?

24  A    This is a police report by a police explosives expert

25  describing the explosives charge as being a charge that is

R. SHAKED - DIRECT/MR. TURNER                1029

1    usually used by terrorist groups.

2    Q    Sometimes referred to as a ballistics report?

3    A    It may be called a ballistics report or an explosives

4    report, I'm not an expert on police reports, so I can't

5    really answer that question.

6    Q    Is 3216 the type of police report that you've seen over

7    the years emanating from the police forces within Israel?

8    A    Yes, I have indeed reviewed many such reports.

9    Q    And does this particular report relate to the attack at

10   Neve Yamin?

11   A    Yes, the report indeed discusses the attack at Neve

12   Yamin.

13   Q    And is the information contained in 3216 consistent

14   with the other information leading you to the findings you

15   made about who carried out the terrorist attack in Neve

16   Yamin?

17              MR. INGERMAN:  Objection.

18              THE COURT:  Overruled.

19   A    This finding helped me to reach that conclusion.

20              MR. TURNER:  We offer 3216 into evidence in its

21   redacted form.

22              MR. INGERMAN:  Objection, your Honor.

23              THE COURT:  Same one?

24              MR. INGERMAN:  Yes.

25              THE COURT:  I'm not sure we're speaking the same

R. SHAKED - DIRECT/MR. TURNER          1030

1   language.  It's been redacted?

2          MR. INGERMAN:  I'm sorry, this is on 801.

3          THE COURT:  That's what I'm asking.  Overruled.

4          (Plaintiff Exhibit 3216 was admitted into

5   evidence.)

6   Q    Now, in addition this information, Mr. Shaked, did you

7   also have an opportunity to investigate -- to see whether

8   there are any posters or memorialization type activities

9   that Hamas carried out on behalf of Fadi Amer?

10  A    Yes, a number of things.  I saw the posters in

11  Qalqilya, and that includes the posters that were hung in

12  central places in the city, and also a symbolic funeral that

13  was held in the city attended by the residents of the city,

14  and also a ceremony that was held by students and a

15  memorial, an official memorial ceremony of Hamas, in which

16  Khaled Mashal himself, the head of the political bureau of

17  Hamas, gave a speech on telephone from the mosque of

18  Qalqilya, the city in which the terrorist was born and

19  operated.  And the Khaled Mashal called others to follow his

20  path, the path of Fadi Amer, the suicide bomber.

21  Q    Did you also have an opportunity to investigate the

22  June 1, 2001, suicide bombing at the Dolphinarium in Tel

23  Aviv that resulted in 21 deaths and 100 plus injured?

24  A    Yes.

25  Q    Were you able to determine who the suicide bomber was

R. SHAKED - DIRECT/MR. TURNER          1031

1    in the Dolphinarium attack?

2    A    Yes.

3    Q    Who was it?

4    A    Sa'id Houtari, also a resident of Qalqilya.

5    Q    Was this young man also the roommate of the previous

6    suicide bomber?

7    A    Indeed, sir.

8    Q    Now, what was the Dolphinarium in June of 2001, so

9    everyone can understand the setting of where this attack

10   took place?

11   A    The Dolphinarium was the center of entertainment in

12   Israel for young men and women.  There were restaurants

13   there and entertainment centers.  There was a very big

14   discotech in which many young people danced, including my

15   own son, who visited the Dolphinarium to dance and have fun.

16   The clubs served mostly young people from high schools and

17   students who would come and attend the club during the

18   weekends.  They would crowd the club and just came there in

19   order to release their tension.

20   Q    Did that particular attack occur during the day or

21   nighttime?

22   A    This attack happened late at night, this was a Friday

23   night and many, many young people were on their way to dance

24   and have fun during the weekend.

25   Q    And you prepared a slide for this particular attack as

R. SHAKED - DIRECT/MR. TURNER                1032

1   well; is that correct?

2   A    Yes, I did pick out a slide.

3   Q    Mr. Shaked, the top three individuals on this

4   particular slide are the same three individuals involved in

5   the Neve Yamin attack, are they not?

6   A    Indeed, it is exactly the same terrorist cell that

7   perpetrated the attack in Neve Yamin.

8   Q    And were you able to review a claim, an official claim

9   of responsibility by Hamas for this particular attack?

10  A    Yes.

11  Q    Could you put 3252 in front of just the witness,

12  please.

13       Can you identify 3252?

14  A    Yes.

15  Q    What is 3252?

16  A    This is an official document.  It is Izz ad-Din

17  al-Qassam Brigade that announces, and I read the third line

18  from the top, the hero Sa'id -- Houtari who carried out the

19  attack at the Dolphinarium, and this is an official

20  statement, an official claim of responsibility.

21  Q    And was this particular exhibit taken directly off the

22  Al-Qassam Brigade's website, much like the previous one?

23  A    Yes.

24       MR. TURNER:  We offer 3252.

25       THE COURT:  All right.  Same objection?

1          MR. INGERMAN:  Yes, your Honor.

2          THE COURT:  Admitted over objection.

3          (Plaintiff Exhibit 3252 was admitted into

4   evidence.)

5   Q    Let's go to the slide, if you would, Mr. Miller, in the

6   translated version.  If we could blow up the top half so we

7   put some of this into context.

8          First of all, the claim of responsibility, can you

9   identify the photograph on this particular exhibit,

10  Mr. Shaked?

11  A    Yes, I do.

12  Q    And is the date of attack likewise shown?

13  A    Indeed.  We do see the date.

14  Q    And the logo that the red line is pointing to, can you

15  identify that logo?

16  A    Indeed, I can identify the logo of the Izz ad-Din

17  Al-Qassam Brigade, the military wing of Hamas.

18  Q    Now, Mr. Miller, focus on the bottom where it has the

19  attack in the translated version and it reads, "The tenth

20  messenger the hero martyr, Sa'id Hassan Hussein al-Hutari,

21  20 years old, approached the intended target calmly on

22  Blessed Friday 6/1/2001 at 11:30 p.m. according to the plan

23  and carried out his distinguished suicide attack at the

24  heart of the enemy's territory.  He went to Allah's favor

25  and to his paradise to meet the profits, the martyrs, and

R. SHAKED - DIRECT/MR. TURNER            1034

1  the righteous."

2         Is that consistent, that description consistent

3  with the facts that you were able to put together as part of

4  your investigation?

5  A    Yes.

6  Q    Now, were there any competing claims of responsibility

7  by other -- responsibility by other terror groups for the

8  attack at the Dolphinarium?

9  A    Yes.  Shortly after, there were a few claims of

10 responsibility.  If I'm not mistaken in this case, it was

11 the Palestinian Islamic Jihad, but they said very, very

12 quickly after the Hamas official claim of responsibility was

13 published, which ruled out every other.

14 Q    Now, in addition to that material, did you also have

15 access to an Israel security agency report, again, that

16 included this particular attack?

17 A    I did have the opportunity to peruse the ISA report

18 along with other records, other legal records.

19 Q    We're going to look at 3811, which is already in

20 evidence.  This is the ISA report that we discussed in the

21 context of Neve Yamin.

22 A    Yes, it is the very same report that details many other

23 terror attacks, including the Neve Yamin and the

24 Dolphinarium.

25 Q    And is the Dolphinarium attack specifically discussed

R. SHAKED - DIRECT/MR. TURNER                1035

1   in Exhibit 3811?

2   A    Yes.

3   Q    And are the results consistent with your findings?

4   A    Yes.

5   Q    Now, in addition that, there was a will prepared by

6   Mr. Houtari.

7   A    Indeed, the terrorist Houtari prepared a will before

8   embarking upon his terror attack.

9   Q    Did you have at some point in time access to that will?

10  A    Yes.

11  Q    And where did you see that particular will?

12  A    Yes, I did see this will in the website of Hamas.  And

13  for proper disclosure I can say that even before that, I

14  could see this in newspapers, because Hamas published it.

15  And I also read many other publications, Hamas wished to

16  make this public shortly after the attack.

17  Q    With respect to memorializations, could you put 3226 on

18  the witness' screen only.

19  A    Yes.

20  Q    Do you recognize this particular image?

21  A    Yes, I can see the picture of Houtari.  And it says

22  that he is the one who perpetrated the attack in Tel Aviv on

23  this Blessed Friday, and the date appears as well.

24  Q    What is the source of this particular exhibit?

25  A    This is a part of a series of posters that were

R. SHAKED - DIRECT/MR. TURNER                1036

1    published in Qalqilya in various mosques in the West Bank.

2    In this case the poster was taken from the official website

3    of the Izz ad-Din al-Qassam because of the good quality and

4    the ability to present it here.

5    Q    Is that the same website we've been discussing thus

6    far?

7    A    Indeed, it is the same website the Izz ad-Din al-Qassam

8    Brigade turn we over.

9             MR. INGERMAN:  Same objection.

10            THE COURT:  All right.  It's overruled.

11            MR. TURNER:  Would you please display that?

12            THE COURT:  Mr. Turner, as you know, I have sole

13   control of what gets displayed and not displayed.

14            MR. TURNER:  I'm sorry.  I though it was put into

15   evidence already.  May I display 3226?

16            THE COURT:  Yes, you may.  You may ask me or you

17   may ask Ms. Clarke, but it's got to be one or the two of us.

18            MR. TURNER:  Thank you.

19   Q    Could you blow up the top.

20            There is some writing on this poster, is there

21   not, Mr. Shaked?

22   A    Indeed so.

23   Q    What does that say?

24   A    It says, so in Arabic al-Shaheed al-qassami, which

25   means the shaheed, the martyr, the person who perpetrated

R. SHAKED - DIRECT/MR. TURNER          1037

1   the attack, the person who died is a member of Izz ad-Din

2   al-Qassam.

3   Q    When you say Izz ad-Din al-Qassam, is that the military

4   wing or so-called military wing of Hamas?

5   A    Yes.

6   Q    Okay.  Could you back out of that now.  And could you

7   go to the bottom where the writing is.

8            Could you read that, please sir?

9   A    Yes.  It does say after reading what it in Arabic,

10  "That this is the perpetrator of the terror attack in

11  Tel Aviv on the Blessed Friday, dated June 1st, 2001."

12  Q    Is that the same date as the Dolphinarium?

13  A    It was the same date.

14  Q    Is that consistent with your conclusion Hamas was

15  responsible for this attack?

16  A    Yes.  It helps me in determining the fact that Hamas is

17  responsible for the terror attack.

18  Q    Did you likewise have an opportunity to investigate the

19  August 9, 2001, bombing in Sbarro Pizzeria in Jerusalem that

20  resulted in 15 people being killed and 132 reported injured?

21           MR. INGERMAN:  Your Honor, I'm going to object to

22  the form of the question.

23           THE COURT:  What's wrong with the form?

24           MR. INGERMAN:  I think it's loaded up with facts

25  that are not in evidence.

R. SHAKED - DIRECT/MR. TURNER                1038

1          THE COURT:  Well, why don't you answer whether

2    you've had an opportunity to investigate the Sbarro bombing

3    on August 9, 2001.

4    A    Yes.

5    Q    How many people were killed?

6    A    15 people.

7    Q    And how many people were reported injured?

8    A    About 170 injured people.

9    Q    Were you able to determine who the suicide bomber was?

10   A    Yes, I could determine who the suicide bomber was.

11   Q    And who was the suicide bomber?

12   A    Yes.  The suicide bomber was called Izz ad-Din

13   al-Masri, a resident of the village near Janin who was 20 or

14   21 years old.

15   Q    Were you able to determine whether or not al-Masri

16   acted alone in this attack or whether he was acting on

17   behalf of Hamas?

18   A    Yes.

19   Q    What was your conclusion?

20   A    That al-Masri on operated on behalf of Hamas as a

21   member of Hamas and for Hamas in every stage of this

22   operation.

23          THE COURT:  Mr. Turner, can you finish the Sbarro

24   attack in ten minutes or do you need more?

25          MR. TURNER:  I can't finish it in ten minutes.

1        THE COURT:  All right.  If this is convenient

2   before he goes into the basis of his conclusion, let's break

3   up the day.

4        MR. TURNER:  Yes, sir.

5        THE COURT:  Ladies and gentlemen, again, I need to

6   remind you, do not discuss the case amongst yourself or

7   anyone else, stay away from any media coverage on the case,

8   do not do any research on the case, do not communicate on

9   the internet about the case, no Facebook postings or Google

10  searches of anything like that.  Keep an open mind.  I know

11  this is hard work, but we appreciate the fact that you're

12  doing it.  Get a good night's sleep and we'll see you

13  tomorrow morning at 9:30.

14          (Jury is out of the courtroom at 4:20 p.m.)

15        THE COURT:  All right.  Anything else we need to

16  cover?

17        MR. OSEN:  Two things, your Honor.

18        THE COURT:  All right.  Everyone have a seat.  The

19  witness may step down.

20        THE WITNESS:  Thank you.

21          (Witness leaves the witness stand.)

22        THE COURT:  Mr. Osen, what do you got?  And the

23  interpreters may step down, too.

24        MR. OSEN:  Your Honor, first, we would request

25  that the defendant file with the Court his proposed list of

PROCEEDINGS                          1040

1    order of witnesses that we discussed last Thursday.

2           THE COURT:  When did you anticipate resting,

3    Wednesday?

4           MR. OSEN:  I think the way things are going, the

5    end of Thursday or the beginning of Tuesday.

6           THE COURT:  Okay.  So when is the defendant in a

7    position to get us that list?

8           MR. STEPHENS:  I sent them a list, your Honor.  I

9    wasn't aware that I was supposed to be filing it with you.

10          THE COURT:  That's okay, but apparently Mr. Osen

11   doesn't know he's got it.

12          MR. OSEN:  No.  We got three versions of the list

13   yesterday, which has been amended and re-amended, and I

14   think it's -- it would be beneficial for both us and the

15   Court to have one actual list.

16          THE COURT:  Well, let's file the last -- I assume

17   the last one is the current, good faith effort, so let's

18   file that and then I'll have it, too.

19          MR. STEPHENS:  All right.

20          THE COURT:  You had something else, because I

21   thought of one.

22          MR. OSEN:  Sorry, your Honor.  With respect to

23   excerpt seven through nine, which have been now been

24   submitted and counter designated, we have some significant

25   issues with it apart from the rule of completeness issue

PROCEEDINGS                          1041

1   that have terminated this, and I don't know if it would be

2   most effective if we just filed a letter this evening on it.

3   Obviously, it won't get played until Wednesday at the

4   earliest, but we'd like to be able to address certain issues

5   that impact the Rule 37 issues and the like.

6            THE COURT:  Well, I'd like to see the letter early

7   this evening, as early as possible.  I understand it's

8   already 4:30, do the best you can.

9            MR. OSEN:  Okay.

10           THE COURT:  Now, I have one other thing which may

11  bear on what you're talking about.  Did have you something

12  else, Mr. Stephens?

13           MR. STEPHENS:  No, your Honor, I'm just standing.

14           THE COURT:  Here's where I am ruling on compliance

15  and industry standard evidence that the defendant wants to

16  put in.  I am inclined to allow that evidence in reasonable

17  form, not in exhaustive exploration of every compliance

18  technique that the bank has.  However, if the bank does

19  that, then I think consistent with the sanctions order, I

20  would instruct the jury that they may only consider such

21  evidence with regard to the Hamdan account.  Because as I

22  understand, and maybe the parties will tell me something

23  differently, that is the only account in which the bank has

24  produced full documentation.

25           My concern, and I think there is no point in

PROCEEDINGS                    1042

1   obscuring what I think the bank strategy is here, is that

2   the bank is introducing all this compliance and industry

3   standards so that there will be an unspoken inference that

4   the jury may be permitted to draw that, in fact, the bank

5   didn't know that these were terrorist accounts.  And I think

6   the bank cannot do that.  I understand the line that it's

7   trying to walk to say well, we won't argue that to the jury,

8   because the sanction order precludes us from doing it.  But

9   unrestricted compliance and industry standard evidence, in

10  my view, would allow that inference to be drawn by the jury

11  on its own and really serves no function other than to obey

12  the sanctions order, except as to the Hamdan account, in

13  which records have been produced.

14          So if the defendant wants to go down that road, I

15  will allow it, but I will also make it clear to the jury

16  that it does not apply to any of the accounts for which

17  documentation and testimony was not produced.  Am I clear?

18          MR. OSEN:  Yes, your Honor.  I would just point

19  out that part of the issue that comes up in these

20  designations for seven, eight, and nine is that it addresses

21  policies and procedures in counts and areas where we don't

22  have the records, and I think it's very hard for the jury at

23  this point to be able to figure out what was produced and

24  what wasn't produced and so on.

25          So, for example, your Honor, they have made a

PROCEEDINGS                    1043

1   great deal about the fact that they filtered transactions

2   through OFAC in New York.  The jury has no way of knowing

3   that they only produced New York records and not the records

4   of the account holders in Gaza.

5           THE COURT:  Yeah.  If the defendant cannot tie

6   those compliance procedures strictly to the Hamdan account,

7   which I don't see how they could in New York, then I won't

8   admit that evidence.  That's the only account as to which

9   I'm letting in compliance evidence.  Okay?

10          MR. STEPHENS:  I'm sorry, maybe I'm -- what is

11  compliance evidence?

12          THE COURT:  Testimony from an expert or fact

13  witness that the bank had certain procedures to help it

14  detect the existence of terrorist accounts.  I think you

15  know what that is.

16          MR. STEPHENS:  What's that?

17          THE COURT:  I think you knew what that was.  It's

18  what we've been discussing in the earlier point of the case;

19  evidence with compliance with internal procedures and the

20  meaning of industry standards in the banking industry

21  internationally in order to show that the bank would have

22  picked up unauthorized accounts.  I will not allow that

23  except as to the Hamdan account.

24          MR. STEPHENS:  I think the order by Judge Gershon

25  allowed testimony as to international banking standards.

PROCEEDINGS                              1044

1     THE COURT:  It allowed it.  To the extent it was

2    allowed by the sanctions ordered, and now what I've got to

3    do is make them mesh.  And the way they mesh is you can't

4    use the compliance industry standard evidence to show or

5    suggest or even allow the jury to infer that, in fact, these

6    procedures would have identified accounts other than the

7    Hamdan accounts as unauthorized or improper accounts.  I'm

8    not going to allow that.  If you want to put in evidence

9    related to the Hamdan account, that's fine.  I am correct,

10    am I not, that the defendant did not produce documentation

11    for any of the subject accounts other than the Hamdan

12    account, right?

13     MR. OSEN:  Bits and pieces, your Honor, but not

14    full records, so...

15     THE COURT:  Anything for which an exemption from

16    production was claimed cannot be the subject of compliance

17    or industry standard testimony.

18     MR. OSEN:  Your Honor, one more corollary to that

19    is designated testimony.  And it could be, I guess in their

20    case in chief, where they testify about the financial

21    neediness of beneficiaries without the benefit of either

22    knowing or having the records or even of the witnesses

23    knowing the underlying information.

24     THE COURT:  Well, I'll think about that.  I've not

25    considered that at this stage.  There is something to what

PROCEEDINGS                                    1045

1   you say, and I'll think about that overnight and I'll let

2   you know in the morning.

3            MR. OSEN:  Okay.  It will be in our letter as

4   well.

5            THE COURT:  All right.  Anything else?

6            MR. INGERMAN:  We'd like an opportunity to respond

7   to whatever they write, your Honor.

8            THE COURT:  Of course.  The sooner you do it, the

9   sooner I will consider both responses.  They have their's to

10  me by eight and get yours to me by ten, I'll be up on it by

11  tomorrow morning.  I think it's not necessarily a today

12  issue, I think it's mostly an issue for the defendant's

13  case; although, I don't know what is going to be designated

14  in the cross designation.  As I said, this ruling may

15  overlap the issue, so...

16           MR. OSEN:  The reason we raise it now is obviously

17  we put a lot of strain on our IT people to cut the tapes for

18  the actual presentation.  Obviously, they have counter

19  designated enormous counties of materials again on these

20  subjects, so we'll get in our letter as soon as we can, once

21  we leave here.  Hopefully, the defendant can get it in today

22  and hopefully we'll have time to cut it for Wednesday or

23  early Thursday.

24           THE COURT:  All right.  Everyone is doing the best

25  they can.

PROCEEDINGS                          1046

1          Okay.  Thank you very much.  See you in the

2      morning.  Mr. Osen, I need your exhibits like now, okay.

3          MR. OSEN:  Yes, your Honor.

4          (Proceedings adjourned at 4:30 p.m.)

5

6

7                          *  *  *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1049

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
2

3   COURTNEY LINDE, ET AL.,          )
                                     )    04CV02799 (BMC)
4                   Plaintiffs,      )    And all related cases:
                                     )    04CV05449 (Litle)
5                                    )    04CV05564 (Almog)
                                     )    04CV00365 (Coulter)
6                                    )    05CV00388 (Afrait-Kurtzer)
                                     )    05CV03183 (Bennett)
7        -against-                   )    05CV03768 (Roth)
                                     )    06CV01623 (Weiss)
8                                    )
                                     )    United States Courthouse
9                                    )    Brooklyn, New York
                                     )
10  ARAB BANK, PLC,                  )    TUESDAY, AUGUST 26, 2014
                                     )
11                  Defendant.       )
    ─────────────────────────────────)
12

13            TRANSCRIPT OF CIVIL CAUSE FOR JURY TRIAL
              BEFORE THE HONORABLE BRIAN M. COGAN
14                 UNITED STATES DISTRICT JUDGE

15
    APPEARANCES:
16
    FOR PLAINTIFFS LINDE      OSEN, LLC
17  AND COULTER:              BY:  GARY M. OSEN, ESQ.

18                            TURNER & ASSOCIATES, PLLC
                              BY:  CLYDE T. TURNER, ESQ.
19

20  FOR PLAINTIFFS LITLE,     SAYLES WERBNER
    BENNETT AND ROTH:         BY:  MARK S. WERBNER, ESQ.
21

22
    FOR PLAINTIFFS ALMOG:     STONE BONNER & ROCCO, LLP
23                            BY:  JAMES P. BONNER, ESQ.

24                            MOTLEY RICE, LLC
                              BY:  MICHAEL E. ELSNER, ESQ.
25                            BY:  JODI FLOWERS, ESQ.

1050

1

2    (APPEARANCES CONT.)

3    FOR THE DEFENDANT:        DLA PIPER US, LLP
                               BY:  SHAND STEPHENS, ESQ.
4                              BY:  ANTHONY PAUL COLES, ESQ.
                               BY:  BRETT INGERMAN, ESQ.
5                              BY:  MARGARET CIVETTA, ESQ.

6

7    INTERPRETED BY:           NERI SEVENIER, MICHAL MARIN
                               RACHELLE AVITAL AND VARDA YAARI
8

9    THE COURT REPORTER:       NICOLE CANALES, CSR, RPR
                               225 Cadman Plaza East
10                             Brooklyn, New York 11201
                               cnlsnic@aol.com
11

12   Proceedings recorded by mechanical stenography, transcript
     produced by computer-assisted transcript.
13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                                    1051

1              (Outside the presence of the jury.)

2          THE COURT:  Let's have the jury, please.

3                  (In the presence of the jury.)

4          THE COURT:  All right.  Be seated.  Good morning,

5   ladies and gentlemen.

6          THE JURORS COLLECTIVELY:  Good morning.

7          THE COURT:  I want to express my appreciation to

8   both the lawyers and the jury for being so prompt in this

9   case.  I will tell you, many, if not most, cases, when I say

10  we're going to start at a certain time, either the lawyers, or

11  the jury or both think, well, the judge really means 10 or

12  15 minutes later, and I really don't.  And I have to patiently

13  explain that to everyone, and I haven't had that in this case,

14  so thank you all for moving things along as quickly as

15  possible.  Let's resume examination.  We'll have the witness

16  back.

17          MR. TURNER:  May the translators come up?

18          THE COURT:  Sure.  These translators look different.

19  I say that because I think they need to be sworn.

20          Have a seat, Mr. Shaked.

21          THE CLERK:  Raise your right hand.  Do you solemnly

22  swear or affirm that you will well and truly interpret the

23  proceedings before this Court in this case.

24          THE INTERPRETER 1:  I do.

25          THE INTERPRETER 2:  I do.

Proceedings                                              1052

1          THE CLERK:  Please state and spell your name for the

2   reporter.

3          THE INTERPRETER 1:  Neri Sevenier, N-e-r-i,

4   S-e-v-e-n-i-e-r.

5          THE INTERPRETER 2:  Michal, Marin, M-i-c-h-a-l,

6   M-a-r-i-n.

7          THE CLERK:  Thank you.  Be seated.

8          THE COURT:  All right.  Mr. Turner, you may inquire.

9          MR. TURNER:  Thank you, your Honor.

10                        RONNI SHAKED,

11  having been previously duly sworn, was examined, and testified

12  further as follows:

13  DIRECT EXAMINATION (CONTINUED)

14  BY MR. TURNER:

15  Q    Where we left off yesterday, we were beginning to talk

16  about the Sbarro Pizzeria bombing, in August of 2001.

17         MR. TURNER:  Is it permissible to put the slide up,

18  your Honor?

19         THE COURT:  Sure.  Do you want the lights dim?

20         MR. TURNER:  No, sir.  We're fine.

21  Q    Mr. Shaked, did you have an opportunity to conclude who

22  was the suicide bomber at the Sbarro Pizzeria in Jerusalem, in

23  August of 2001?

24  A    Yes.

25  Q    What was the suicide bomber's name?

SHAKED - DIRECT - TURNER                    1053

1   A    Az a din Masri.

2   Q    Were you able to determine whether he acted alone or

3   whether he was acting for and on behalf of Hamas?

4   A    On behalf of Hamas.

5   Q    Now, before we talk about the other individuals that you

6   concluded were involved in this particular attack, can you

7   give us not idea of where Sbarro Pizzeria in Jerusalem is?

8   A    This pizzeria is at the center of the city of Jerusalem,

9   the heart of the city, in a junction between two main streets.

10  And if I could compare it on a smaller scale, it might be

11  compared to Times Square in New York.

12  Q    Where is your office -- or where was your office in

13  relation to Sbarro Pizzeria, at the time, in Jerusalem?

14  A    About 200 meters away.

15  Q    Were you at the office at the time of this bombing?

16  A    I was.

17  Q    Did you hear the bombing?

18  A    I heard it.

19  Q    Did you see smoke from the bomb?

20  A    I seen the smoke that came out from that place.

21  Q    Did you feel the bomb?

22  A    I felt the tremor in the building.

23  Q    Did you go to the scene?

24  A    I went there as fast as I could.

25  Q    Approximately how long did it take you to get there after

1  you heard, felt and saw the smoke from the bomb?

2  A    It took a very short time; perhaps two or three minutes.

3  Q    Now, going back to your chart just a moment, again, the

4  third attack in a row, Ayman Halawa was involved in this

5  attack, according to your chart.  What role did Ayman Halawa

6  play?

7  A    Ayman Halawa was the Hamas commander Nablus, and he was

8  the one who authorized the bombing.

9  Q    And on the upper right, you have somebody named Adwan.

10 What role did Adwan play in this particular attack?

11 A    Qeis Adwan was the Hamas commander in the Jenin area, and

12 he was the man who recruited the suicide bomber.

13 Q    And this Abdullah Barghouti is shown in the middle.  Is

14 that the same Barghouti we talked about earlier yesterday?

15 A    It is the same Barghouti.

16 Q    And what was his role in this particular attack?

17 A    Barghouti was a Hamas engineer, and he built the bomb

18 that exploded.

19 Q    Is Abdullah Barghouti the one you interviewed personally

20 in prison?

21 A    Yes, I interviewed him.

22 Q    This particular bomb at Sbarro Pizzeria, were you able to

23 determine how the bomb was delivered to the sight?  In other

24 words, was it a belt?  Was it a vest?  Was it a briefcase?

25 What was it?

SHAKED - DIRECT - TURNER                1055

1    A    No, it was not a belt.  It was not a suitcase.  One was

2    put inside a guitar to camouflage it.

3    Q    How do you know that?

4    A    I determined this on the basis of different findings,

5    testimonies from Hamas, testimonies of organizations within

6    the state of Israel; findings in the scene, and in particular

7    the personal interview awarded to me by the participants.

8    Q    Were you able to cross-check the various sources of

9    information in order to confirm the delivery system for the

10   bomb?

11   A    Of course, I did.

12   Q    Is cross-checking important when you're doing the type of

13   thing you were doing in this particular instance?

14   A    Cross-referencing is extremely important, to make sure

15   that all the details are known accurately and all the way.

16   Q    Now, on the right-hand side of your slide, there's a lady

17   shown, Ahlan Tamini.  Am I pronouncing that correctly?

18   A    There is a picture of a lady, and her name is Ahlan

19   Tamini.

20   Q    What role did Tamini play in this particular terrorist

21   attack?

22   A    Tamini led the suicide bomber.  She found the place where

23   he was supposed to explode, she accompanied him to that place

24   and pointed it out for him.

25   Q    Now, based upon your investigation, was Tamini's role in

SHAKED - DIRECT - TURNER                    1056

1   this particular attack, the fact that a woman was involved,

2   was that significant in your investigation?

3   A    Yes, it was important role.

4   Q    Why?

5   A    Because in order to hide the suicide bomber, and to get

6   into the western part of Jerusalem, it was necessary to create

7   a sort of image of the couple getting strong (phonetic) in

8   Jerusalem.  Tamini did dress in a free way, with a

9   short-sleeved shirt and led the suicide bomber as if he was

10  her spouse.

11  Q    Now, there's an individual in the middle of the slide,

12  Muhammad Daghlas.  What role did Daghlas play?

13  A    Muhammad Daghlas supplied means; for example, renting an

14  apartment and also created the contact with whom Tamini, whom

15  he had recruited.

16  Q    And, finally, Bilal Barghouti.  Was Bilal Barghouti

17  related to Abdullah Barghouti?

18  A    Yes, he is his uncle.

19  Q    And what role did Bilal Barghouti play in this particular

20  attack?

21  A    He -- Bilal is a senior Hamas operative, and he put the

22  bomb inside the guitar and gave it to the suicide bomber.  He

23  adapted the guitar to the suicide bomber.

24          MR. TURNER:  Now, let's take a look -- if you could

25  show the witness only, 3324.

SHAKED - DIRECT - TURNER                    1057

1  Q    We're going to talk for a minute, Mr. Shaked, about the

2  sources of information you had available for this particular

3  attack.  First of all, do you recognize 3324?

4  A    Yes.

5  Q    Is this the official claim of responsibility by Hamas for

6  the attack in Sbarro Pizzeria in Jerusalem?

7  A    Yes, this is the official claim of responsibility by

8  Hamas.

9  Q    What is the source of this official claim of

10 responsibility?

11 A    This is from the official site of ad-Din al-Qassam

12 Brigade, the military arm of Hamas.

13         MR. TURNER:  We offer 3324 into evidence.

14         THE COURT:  Same objection?

15         MR. INGERMAN:  Yes, your Honor.

16         THE COURT:  Received over objection.

17         (Plaintiffs' Exhibit 3324  was received in

18 evidence.)

19         MR. TURNER:  Let's put that up.

20         THE COURT:  Okay.

21         MR. TURNER:  I believe we have a slide.  Mr. Miller,

22 can you focus in on the English translation on the right-hand

23 side, please, and primarily the description.

24 Q    Now, this indicates a military proclamation by the Martyr

25 Izz ad-Din al-Qassam Brigades.  Is that Hamas?

NICOLE CANALES, CSR, RPR

SHAKED - DIRECT - TURNER                          1058

1   A    Indeed, it is Hamas.  It is the military arm of Hamas.

2   Q    There's a sentence that says by the grace of Allah and

3   his assistance, the holy warrior of al-Qassam:  Izz ad-Din

4   Shuhayl Ahmad al-Masri from the village of Aqabah in the

5   al-Qassam Governorate of Jenin has carried out today;

6   Thursday, August 9, 2001, 19th of Jumada al-Ula, 1422 Hijri -

7   at noon, an act of martyrdom in the middle of -- it says

8   Sbarro Restaurant, in the heart of occupied Jerusalem.

9            What does that tell you about whether or not the

10  suicide bomber was acting for and on behalf of Hamas,

11  Mr. Shaked.

12  A    For me, this is an official announcement, a claim of

13  responsibility by Hamas for the Sbarro bombing.

14  Q    Is the picture of al-Masri on the official claim of

15  responsibility the same photograph that you have shown on your

16  slide?

17  A    Yes, indeed, this is a suicide bomber.

18  Q    So the two photographs are the same person?

19  A    Yes.

20  Q    Now, did you have access to an Israeli Security Agency

21  report that summarized this attack as well?

22  A    Yes.

23            MR. TURNER:  Your Honor, this is already in

24  evidence.  May we display 3811?

25            THE COURT:  You are.

NICOLE CANALES, CSR, RPR

SHAKED - DIRECT - TURNER                    1059

1        MR. TURNER:  Now, this is a particular section out

2  of Exhibit 3811 that pertains to the Sbarro Pizzeria attack.

3  Can you blow that up at all for us?

4  Q    Now, did the ISA, the Israeli Security Agency, identify

5  the same suicide bomber as you?

6  A    Yes.

7  Q    And did the Israeli Security Agency also identify Bilal

8  Barghouti and Muhammad Daghlas as participants in this

9  particular attack?

10  A    Yes, sir.

11  Q    And how about Abdulla Barghouti?

12  A    He was also identified.

13  Q    Now, in this particular attack, did you also have access

14  to actual conviction records in the court system within

15  Israel, where the participants were convicted of these crimes?

16  A    Yes.

17        MR. TURNER:  May we show Mr. Shaked only 3301,

18  please.

19  Q    Can you identify 3301?

20  A    I do identify it.

21  Q    And what is 3301?

22  A    This is actually the verdict regarding Ahlan Tamini and

23  her involvement in the terror attack, in the cafe.

24        MR. TURNER:  We offer 3301 as a possible conviction

25  of Tamini for this particular attack.

NICOLE CANALES, CSR, RPR

SHAKED - DIRECT - TURNER                    1060

1          MR. INGERMAN:  Same objection.

2          THE COURT:  All right.  Overruled.  It is received.

3          (Plaintiffs' Exhibit 3301  was received in

4     evidence.)

5     Q    Would you show Mr. Shaked 3300.  Do you recognize 3300?

6     A    Yes.

7     Q    What is 3300?

8     A    This is a decision regarding Muhammad Daghlas by the

9     court which issued his sentencing.

10         MR. TURNER:  We offer 3300 as conviction of Daghlas

11    for his role in the bombing.

12         THE COURT:  Just so the record is clear, you're

13    objecting to the Apostille documents as well?

14         MR. INGERMAN:  Yes, your Honor.

15         THE COURT:  That's overruled as received.

16         (Plaintiffs' Exhibit 3300  was received in

17    evidence.)

18         MR. TURNER:  Put up 3205, please.

19    Q    Do you recognize 3205?

20    A    Yes.

21    Q    What is 3205?

22    A    This is also the sentencing that was issued by the court

23    to the terrorists who had perpetrated the attack at Sbarro.

24         MR. TURNER:  We offer 3205 as an Apostille

25    conviction of Bilal Barghouti.

1       THE COURT:  That's received over objection.

2           (Plaintiffs' Exhibit 3205  was received in

3   evidence.)

4   Q    I would you show the witness 3336, please.  Do you

5   recognize 3336?

6   A    Yes.

7   Q    What is 3336?

8   A    This is the sentencing that was issued to Abdulla

9   Barghouti.

10  Q    This particular document is not Apostille.  Were you in

11  attendance at the trial, Mr. Shaked?

12  A    Yes, I did attend the trial, and I was also there when

13  the sentencing was read out.

14  Q    So you were personally present in the room at the time of

15  the sentencing?

16          MR. INGERMAN:  Objection.

17          THE COURT:  Overruled.

18          THE WITNESS:  Yes.

19  Q    And was Abdulla Barghouti required to allocute or explain

20  his role in the terrorist attack?

21  A    Abdulla Barghouti did speak up, and said what he had to

22  say and gave his excuses for perpetrating this attack before

23  the sentencing was read.

24  Q    After the sentencing, did you obtain a copy of 3336,

25  which you're looking at on the screen?

SHAKED - DIRECT - TURNER                    1062

1   A    Yes, I did receive.

2   Q    And is 3336 a fair and accurate representation of what

3   you heard in the courtroom and also received from the court on

4   the day of Abdulla Barghouti's sentencing?

5   A    Yes.

6            MR. TURNER:  We offer 3336.

7            THE COURT:  Same objection?

8            MR. INGERMAN:  Yes, your Honor.

9            THE COURT:  It's overruled.  The document is

10  received.

11           (Plaintiffs' Exhibit 3336  was received in

12  evidence.)

13  Q    Now, let's move to memorialization.  Did you have an

14  opportunity to examine any evidence indicating that Hamas

15  actually put on the ceremony for this particular suicide

16  bomber, Mr. Shaked?

17  A    Yes.

18           MR. TURNER:  Would you show the witness 3306,

19  please?

20  Q    Do you recognize 3306, Mr. Shaked?

21  A    Yes, I do.

22  Q    What is 3306?

23  A    Yes, this was an ad or some kind of announcement in the

24  newspaper issued by the Hamas which invites --

25           MR. INGERMAN:  Objection, your Honor.

1          THE COURT:  Just describe it generically.

2          THE WITNESS:  This is an ad from a newspaper that

3    invites the public to attend a ceremony in memory of the

4    suicide bomber.

5    Q    Did you use this particular piece of information in

6    trying to answer the question of what evidence exists

7    connecting Hamas to the suicide bomber?

8    A    Yes.

9    Q    Is this one of the types of information you used to

10   cross-check your sources in your methodology?

11         MR. INGERMAN:  Objection.  Form.

12         THE COURT:  Overruled.

13         THE WITNESS:  Yes.

14   Q    Is the word "Hamas" in the invitation?

15   A    The word "Hamas," indeed, appears there, as well as the

16   emblem of the Hamas appear on the publication.

17   Q    Does the suicide bomber's name appear on the invitation?

18   A    Yes, the name of the suicide bomber also appears there.

19   Q    And what is the source of the newspaper?

20         MR. TURNER:  We offer 3306.

21         THE WITNESS:  This is a paper, a Palestinian

22   newspaper, an ordinary one, which is circulated regularly

23   within the Palestinian society.  It is called El Ayaam.

24         MR. TURNER:  Excuse me.  I apologize.  We offer

25   3306.

1        MR. INGERMAN:  Objection.

2        THE COURT:  Let me see counsel at sidebar.

3     (Sidebar held outside the presence of the jury.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sidebar                                              1065

1                        (Sidebar)

2            THE COURT:  I think I'm going to admit the document

3    with a limine instruction that the jury is not to consider it

4    for the truth of what it asserts, but only as one of the

5    sources of information that the expert considered in reaching

6    his opinion so that it can determine how much weight to give

7    to his opinion.  In doing that, I'm not inclined to send it

8    into the jury room with the other exhibits when they

9    deliberate, although I might give it to them if they ask for

10   it during deliberations.  I take it that does not satisfy your

11   objection?

12           MR. INGERMAN:  It does not, your Honor.

13           THE COURT:  That's my ruling.

14                    (Sidebar concluded.)

15

16

17

18

19

20

21

22

23

24

25

1        (In the presence of the jury.)

2        THE COURT:  We have a technical timeout.

3        Ladies and gentlemen, I'm going to receive this

4   exhibit for the limited purpose of helping you evaluate this

5   witness' opinion.  You are not to take the matters stated in

6   this newspaper article as true, but they are something that he

7   relied upon in reaching his opinion, and it's his opinion that

8   you're going to have to evaluate.

9        You may proceed.

10       MR. TURNER:  May we put the translated version on

11  the screen?

12       THE COURT:  You may.

13  Q   Mr. Shaked, take a moment, if you would, and read through

14  that to yourself.  And what I need for you to tell us is why

15  is this significant if you're evaluating the relationship

16  between Hamas and the suicide bomber at the Sbarro Pizzeria,

17  in terms of their relationship?

18       Now, this word has referenced several times in there

19  called ishdishotti (phonetic).  What does that mean,

20  ishdishotti (phonetic)?

21       THE INTERPRETER:  I didn't translate the answer.

22       MR. TURNER:  I'm sorry.

23       THE WITNESS:  The way I read it, this is not just --

24  this is not about the death of a person, but, rather, this is

25  a wedding, and it is also emphasized that the entity which

1  invites to this wedding is Hamas movement in Jenin, the Qassam

2  brigade, which are the military arm, and this shows us a

3  direct link between the person, Izz ad-Din Masri, and the

4  announcement and the ceremony.

5  Q    Now, going back to the question I asked a moment ago,

6  this word ishdishotti (phonetic), what does this mean?

7  A    In Arabic this means the person who dies for the sake of

8  Allah.  This is somebody that it is no coincidence, his death.

9  He dies during the perpetration of a terror attack for the

10  sanctity of Allah.  In this case, this was a suicide bombing.

11  He's not just -- he doesn't just die, he's actually looking

12  for death.

13  Q    Now, finally, in addition to the other sources of

14  information, is this one of those attacks where you had an

15  opportunity to actually interview some of the people involved

16  in this particular attack?

17  A    Yes, I did have a chance to interview some of the people;

18  Abdulla Barghouti, Bilal Barghouti, Muhammad Daghlas and Ahlan

19  Tamini.

20  Q    Now, in communicating with these individuals, did they

21  openly communicate with you about the details associated with

22  this bombing and their interaction with one other?

23  A    Yes, they spoke very openly, and I would even say that

24  they were happy and willing to discuss it.

25  Q    And in your communications with Abdullah Barghouti, did

SHAKED - DIRECT - TURNER                1068

1    he provide you with details about the bomb itself that you

2    were able to cross-check through other sources to confirm?

3              MR. INGERMAN:  Objection, your Honor.

4              THE COURT:  Overruled.

5              THE WITNESS:  Yes, Abdulla did provide details to

6    me.

7    Q    Were you able to also interview the mother of the suicide

8    bomber?

9    A    Yes, I did interview both the mother and the father of

10   the suicide bomber.

11   Q    And did you videotape that particular interview?

12   A    Of course, I did.

13   Q    And that particular video is marked as 3285.  Mr. Shaked,

14   during the course of that interview, did you receive

15   information that helped you cross-check some of the details

16   about the relationship between Hamas and the suicide bomber?

17   A    Yes.

18   Q    And did that information further lead you to conclude

19   that your analysis was correct?

20   A    Yes.

21   Q    Did you also have an opportunity to investigate the

22   bombing at Ben Yehuda in December of 2001, at approximately

23   11:30 at night?

24   A    Yes.

25   Q    How many people were killed in this particular attack?

SHAKED - DIRECT - TURNER                    1069

1          MR. TURNER:  May we put the slide up by the way,

2  your Honor?

3          THE WITNESS:  Eleven people were killed.

4  Q    And how many were reported to be injured in this

5  particular terrorist attack?

6  A    One hundred and fifty-eight people.

7  Q    Were you able to identify during the course of your

8  investigation who the suicide bombers were in this particular

9  attack?

10  A    Yes.

11  Q    And who were the suicide bombers?

12  A    Two suicides bombers were in Nabil Halabiya and Osama

13  Bahar.

14  Q    Were you able to determine whether they were acting alone

15  or whether they were acting for Hamas in this attack?

16  A    Both of them acted on behalf of Hamas, for Hamas and as

17  members of Hamas.

18  Q    First of all, just to sort of place the setting as a

19  background, where's Ben Yehuda in Jerusalem?

20  A    Ben Yehuda is a strip in the center of Jerusalem, a

21  pedestrian street, with coffee houses, with restaurants and a

22  large shopping center.

23  Q    Where in relation to your office is Ben Yehuda?

24  A    Like 50 meters.  A few step.

25  Q    Were you at the office at 11:30 at night, on

1   December 1, 2001, at the time of the Ben Yehuda bombing?

2   A    No, it was towards midnight.  I was not there.

3   Q    How quickly after the attack did you learn of the attack?

4   A    A few minutes after the bombing, I was already on my way

5   there.

6   Q    Can you give us an estimate of approximately how long it

7   took you to get to the scene of the terrorist attack at

8   Ben Yehuda?

9   A    I would say 15 to 20 minutes, at the most.

10  Q    Now, your chart indicates that Abdullah Barghouti again

11  was involved in this particular attack.  Were you able to

12  confirm that in your interview with Barghouti?

13  A    Yes, I could confirm that in an interview.

14  Q    You have a terrorist on here named Jamal Al-Tawil.  What

15  was his role in this particular attack and who was he?

16  A    Jamal Al-Tawil is, in fact, a Hamas leader.  He was

17  responsible for Al-Islah, the charity of Ramallah, of Hamas in

18  Ramallah; and he was the one who connected between the suicide

19  bombers and the senior commander of Hamas, Ibrahim Hamel.

20  Q    So the jury understands sort of understands where

21  Ramallah is in relation to Jerusalem, how far is Jerusalem

22  from Ramallah?

23  A    Ramallah is north of Jerusalem, at a distance of,

24  perhaps, 15 or 20 kilometers, which is 12 or 13 miles.

25  Q    At the time, was Ramallah considered to be part of the

1  West Bank?

2  A    Yes, Ramallah is part of the West Bank.

3  Q    Your slide indicates that Al-Tawil was the chairman of

4  Al-Islah Charitable Society.  What was the Al-Islah Charitable

5  Society at the time of this attack?

6  A    This society was established in order to create dowa

7  (phonetic), which means to help Hamas economically,

8  financially, Hamas, with all its arms and parts.

9          MR. INGERMAN:  Your Honor, may we approach?

10         THE COURT:  Yes.

11      (Sidebar held outside the presence of the jury.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sidebar                                      1072

1              (Sidebar)

2         MR. INGERMAN:  Your Honor, I think this is beyond

3    the scope of his opinion and expert report.  Al-Islah is not

4    mentioned anywhere in his expert report.  Now, he's going

5    beyond that, into whether or not sekot (phonetic) is part of

6    Hamas.  And they're trying to bootstrap into his testimony

7    something that's beyond the scope and was not presented, and I

8    would move to strike the testimony.

9         MR. OSEN:  Jamal Tawil is in the report.  He's

10   always been there.  He's been identified both in Mr. Levitt's

11   testimony and in Mr. Shaked's.  I don't think Mr. Turner

12   intends to go beyond the question he offered, but he's

13   entitled to identify who the cutout between the bombers and

14   Mr. Hamed was.

15        THE COURT:  I think it's within his opinion so far.

16   If you were to go where counsel says he doesn't want you to

17   go, then I agree it would exceed the bounds of his opinion,

18   but we're not there yet.  Please be sensitive to that.

19              (Sidebar concluded.)

20

21

22

23

24

25

1    (In the presence of the jury.)

2        MR. TURNER:  May I proceed?

3        THE COURT:  You may.

4        MR. TURNER:  Were you through reading back his

5    answer?

6        THE INTERPRETER:  I'm sorry?

7        MR. TURNER:  Were you through reading back his

8    answer?

9        THE INTERPRETER:  Yes.

10   Q    Now, on the opposite side of your slide is terrorist by

11   the name of Sayd Qasem.  What was his role in this particular

12   attack?

13   A    Sayd Qasem is the deputy commander of Hamas in Ramallah,

14   and he was the one who transferred the bomb to the hands of

15   the bombers.

16   Q    At the top of the screen is a person by the name of

17   Ibrahim Hamed.  Who was Ibrahim Hamed?

18   A    At that time, Ibrahim Hamed was the commander of Hamas in

19   Ramallah, the senior commander, and he was the one who planned

20   the attack.

21       MR. TURNER:  Would you put before the witness 3366,

22   please.

23   Q    Can you identify 3366?

24   A    Yes, I can.

25   Q    What is 3366?

SHAKED - DIRECT - TURNER                    1074

1  A    This is an official claim of responsibility by Hamas for

2  the suicide bombing in Ben Yehuda.

3  Q    What is the source of 3366?

4  A    The official site of the military arm of Hamas.

5  Q    By site, are you referring to website, as we referred to

6  earlier?

7  A    Yes.

8            MR. TURNER:  We offer 3366.

9            THE COURT:  Same objection?

10           MR. INGERMAN:  Yes, sir.

11           THE COURT:  Overruled.  It is received.

12           (Plaintiffs' Exhibit 3366  was received in

13  evidence.)

14           MR. TURNER:  May we place it on the screen?

15           THE COURT:  You may.

16           MR. TURNER:  Can you blow up the picture, please?

17  Q    Can you identify that photograph that's in the official

18  claim of responsibility on Hamas' al-Qassam website?

19  A    Yes.

20  Q    Which one of the suicide bombers is that a picture of?

21  A    We see the picture of Ibrahim Hamel in here.

22           MR. TURNER:  If you can back out, please, and go

23  down to the script.  We have a translated version.  Can you go

24  to the English version, please.  And if you could, blow up the

25  description in the bottom.

SHAKED - DIRECT - TURNER                    1075

1  Q    If you can take a moment and read through that,

2  Mr. Shaked, what I would like for you to do is confirm for us

3  the facts that you were able to learn from this official claim

4  of responsibility, with respect to the question of whether

5  Hamas was responsible for this attack.

6  A    Indeed, yes.

7  Q    All right.  If you could --

8         MR. TURNER:  Your Honor, may we display 3811 again?

9  This is the Israeli Security Agency report that's already in

10 evidence.

11        THE COURT:  Yes.

12        MR. TURNER:  And if you can go to the page that

13 makes reference to the Ben Yehuda bombing.  Now, if you could

14 blow up maybe the first half of that.

15 Q    Now, first of all, did the ISA confirm the identity of

16 the two suicide bombers, as you have described?

17 A    Yes, it did.

18 Q    Did the ISA also confirm the involvement of Hamas in this

19 particular attack?

20 A    Yes.

21 Q    Were you able to use this as a method of cross-checking

22 your other sources to confirm that Hamas was, in fact,

23 responsible for this attack?

24 A    Yes.

25 Q    Now, in addition to the ISA report, did you also have

SHAKED - DIRECT - TURNER                1076

1   access to other government investigatory records related to

2   the Ben Yehuda attack?

3   A    Yes.

4   Q    Now, in this particular attack, Mr. Shaked, was there one

5   bomb, or were there more than one bomb?

6   A    In this particular attack, there were three bombs.

7   Q    And can you explain what you learned during the course of

8   your investigation about how this bombing was planned in this

9   central location?

10  A    The two terrorists came in a car, which they parked near

11  the site of the bombing.  They stepped down.  One of them put

12  on an explosive vest; the other one was carrying a big

13  computer inside, which there was an explosive charge, one of

14  them doing so far first.  Two minutes afterwards, the other

15  one blew himself up.  And 11 minutes later, the booby-trapped

16  car exploded.  The intention was to cause a maximum number of

17  casualties.

18  Q    During the course of your investigation of this

19  particular attack, were you able to determine why the delay in

20  the third bomb going off was planned the way it was?

21  A    Yes, it turned out that Hamas asked them to wait a few

22  minutes, until the first responders arrived, until people

23  gathered in that place, and then the explosion could cause

24  many more casualties.

25          MR. TURNER:  Put in front of the witness 3457,

1   please.

2   Q    Can you identify 3457?

3   A    Yes.

4   Q    What is 3357?

5   A    This is an expert opinion on behalf of the police about

6   explosives.

7   Q    Explosives involved in this particular attack or another

8   attack?

9   A    In the Ben Yehuda explosion, about which we are talking.

10  Q    Is this an official record pertaining to the

11  investigation similar to those you've seen before?

12  A    Yes.

13  Q    And does this particular record help you with regard to

14  what the government investigation was saying and finding with

15  respect to one of the bombs?

16  A    Yes.

17            MR. TURNER:  We offer 3357.

18            MR. INGERMAN:  Your Honor, may we approach briefly?

19            THE COURT:  Sure.

20       (Sidebar held outside the presence of the jury.)

21

22

23

24

25

```
                        Sidebar                      1078

1                       (Sidebar)

2          THE COURT:  Your Honor, this is an Israeli police

3    report, ballistics report, for lack of a better term.  Doesn't

4    mention Hamas.  Doesn't mention anything having to do with

5    attribution.  We think it's irrelevant and unduly prejudicial.

6          THE COURT:  What's prejudicial about it?

7          MR. INGERMAN:  Well, it's got pictures of the bomb,

8    got descriptions of the explosive device.  His testimony is as

9    to attribution.  If it mentioned Hamas, I could understand it,

10   but there's no mention of Hamas anywhere.

11         MR. OSEN:  Your Honor, the witness testified that he

12   discussed the building of the bombs with Mr. Barghouti.  We

13   had originally had video as to Barghouti's actual statements

14   on this, but he's now described them.  He's corroborating that

15   against the ballistics report and the description

16   Mr. Barghouti gave of how he packed the bomb.

17         THE COURT:  I'll overrule the objection in support

18   of his opinion.

19                  (Sidebar concluded.)

20

21

22

23

24

25
```

SHAKED - DIRECT - TURNER                  1079

1              (In presence of the jury.)

2          MR. TURNER:  May we proceed?

3          THE COURT:  Yes.  357 is admitted.

4          (Plaintiffs' Exhibit 357 was received in evidence.)

5          MR. TURNER:  Could you put before the witness 3358,

6    please?

7    Q    Can you identify 3358?

8    A    Yes.

9    Q    Is this an identical report, except for one of the other

10   bombings?

11   A    Indeed so.

12         MR. TURNER:  We offer 3358.

13         THE COURT:  Same objection?

14         MR. INGERMAN:  Yes, your Honor.

15         THE COURT:  Received over objection.

16         (Plaintiffs' Exhibit 3358  was received in

17   evidence.)

18         MR. TURNER:  Could you put before the witness 3359,

19   please.

20   Q    Do you recognize 3359?

21   A    I do recognize.

22   Q    Is this, in fact, the same report, except for the third

23   bombing?

24   A    Yes.

25         MR. TURNER:  We offer 3359.

SHAKED - DIRECT - TURNER                    1080

1          THE COURT:  All right.  Received over objection.

2          (Plaintiffs' Exhibit 3359  was received in

3    evidence.)

4          MR. TURNER:  Now, if you could go to page 8 of 9 on

5    3359, the one with the photographs.

6          May we display this, your Honor?

7          THE COURT:  Well, let's have a sidebar about that.

8        (Sidebar held outside the presence of the jury.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sidebar                                    1081

1                    (Sidebar)

2          THE COURT:  Why?

3          MR. TURNER:  This just shows the computer bomb that

4    confirmed his opinion, Barghouti's interview, confirmed by

5    cross-checking various different sources that it was, in fact,

6    a computer bomb.

7          THE COURT:  I don't think you need the picture for

8    that; you've already got the police report forming the basis

9    of his opinion or contributing to his opinion, and I think the

10   picture is really unnecessary to do that.

11         MR. OSEN:  Your Honor, the picture's in the report

12   itself.

13         THE COURT:  I understand, and I'm not saying I won't

14   give it to the jury for their deliberations.  I will cross

15   that bridge when I come to it, but right now I think, under

16   Rule 403, I'm not going to let you show the picture.

17                    (Sidebar concluded.)

18

19

20

21

22

23

24

25

SHAKED - DIRECT - TURNER                    1082

1           (In the presence of the jury.)

2               MR. TURNER:  May I proceed?

3               THE COURT:  You may.

4               MR. TURNER:  Mr. Miller, if you would show the

5    witness only page 8 of 9 of 3359?

6    Q    Mr. Shaked, were you able to confirm through the

7    photographs and other materials in these exhibits, these

8    police investigation files, that by cross-checking these

9    sources that the information you learned from Mr. Barghouti's

10   interview about the computer bomb was, in fact, accurate?

11   A    Yes.

12              MR. TURNER:  Now, if you could place before the

13   witness only the beginning of 3284.  It should be a video.

14   Q    Do you recognize the person on the first clip of this

15   particular videotape, Mr. Shaked?

16   A    Yes, of course.

17   Q    And who is that individual?

18   A    Abdulla Barghouti.

19   Q    Now, is this particular video clip taken from your own

20   interview of Barghouti about this particular bombing and how

21   he created or made this particular bomb while he was in

22   prison?

23   A    Yes.

24              MR. TURNER:  Your Honor, under 703, may we show this

25   short clip?

NICOLE CANALES, CSR, RPR

SHAKED - DIRECT - TURNER                    1083

1          THE COURT:  No.

2   Q    Did you also have an opportunity to review the sentencing

3   record for Barghouti that we referred to earlier in the prior

4   bombing, wherein he specifically discusses this particular

5   attack at Ben Yehuda?

6   A    Yes, I did have the opportunity to do that.

7          MR. TURNER:  Your Honor, we would like to display

8   page 2 of 2, in the English translation.  We've got a slide

9   prepared.  It has an excerpt.  And this is already in

10  evidence, Plaintiffs' Exhibit 3336.

11         THE COURT:  Can I see it first?

12         MR. TURNER:  Sure.

13         THE COURT:  Any objection?

14         MR. INGERMAN:  No, your Honor.

15         THE COURT:  All right.  You may proceed.

16         MR. TURNER:  Okay.  If you could display this,

17  please.  Can we get the lights down just a tiny bit?  Thank

18  you.

19  Q    Now, this particular excerpt comes from the sentencing of

20  Barghouti; is that correct, Mr. Shaked?

21  A    Yes.

22  Q    Now, it begins in blue.  The defendant is directly

23  responsible for the murder of dozens of innocent human beings

24  and the injury of hundreds more.  We fail to understand how

25  the defendant could put to the use the scientific knowledge he

SHAKED - DIRECT - TURNER                1084

1   acquired, which was intended from the outset to improve human

2   life, for so much destruction and carnage.  And then in white,

3   we found a partial answer to this question, in the words of

4   the defendant, within the pleas for sentencing in this case,

5   from which one could sense, with no difficulty whatsoever, the

6   inexhaustible patriot that has consumed all his humanity.

7         The defendant expressed no remorse but was instead

8   proud of having trained dozens of engineers whom he hoped

9   would cause attacks that are more severe than he himself had

10  caused.  The defendant concluded his address by promising that

11  the Hamas organization would cause the destruction of the

12  state of Israel, in accordance with the vision of Ahmed Yasin.

13        Were you present when those words, or similar words,

14  were stated in court, Mr. Shaked?

15  A   Yes, I was indeed present in the court while these words

16  were said.

17        MR. TURNER:  You may turn the lights back up,

18  please.  Thank you.

19  Q   Now, was this piece of information that you learned at

20  sentencing important information in cross-checking the various

21  sources to ensure accuracy in determining that Hamas was

22  responsible for this attack?

23  A   Indeed so.

24  Q   Did you also have an opportunity to investigate the

25  bombing and shooting of bus 189 near Emmanuel on

SHAKED - DIRECT - TURNER                    1085

1    December 12, 2001?

2    A    Yes.

3         MR. TURNER:  May we place the slide up there,

4    your Honor?

5         THE COURT:  Yes.

6    Q    Were you able to determine who the Hamas shooters were in

7    this particular attack?

8    A    Yes, I did manage to determine.

9    Q    And what were the names of the terrorists involved in

10   this particular attack near Emmanuel?

11   A    Names of the terrorists are apparent on the bottom line.

12   These are three names; Muhammad Aziz Haj Ali, Assem Rihan and

13   Anan Kadusi.  In the top part, you can see their commander

14   Nasr al-Din Assida.

15   Q    Were you able to determine whether these people acted

16   alone or whether they were acting for and on behalf of Hamas

17   in caring out these attacks?

18   A    These terrorists did operate on behalf of the Hamas, for

19   the Hamas and as Hamas operatives.

20   Q    So we get sort of a feel for where this place is, tell us

21   the significance of bus 189 and in the Emmanuel community as

22   it is geographically located in Israel.

23   A    Emmanuel is located at the northern and central part of

24   Samaria.  This is a locality where approximately 4,000 people

25   live.  It is a religious community.  Most of the people who

SHAKED - DIRECT - TURNER                    1086

1  live there work in Tel Aviv, so every morning they travel

2  there and then come back home.  Most of them use that bus to

3  come back home, because the general social status in that is

4  people of middle class and beneath.

5  Q    Was this a commercial bus?

6  A    It was a bus from the public transportation system.

7  Q    How many people were killed in this particular terrorist

8  attack?

9  A    Ten people were killed in this bombing.

10  Q    And how many were injured?

11  A    Thirty people were injured.

12  Q    What time of day did this attack occur?

13  A    It occurred during the late afternoon hours.  I think it

14  was approximately at 7:30 -- excuse me.  17:30, which is

15  5:30 p.m., something like that.

16  Q    During the course of your investigation, were you able to

17  determine whether the type of terror attack that occurred at

18  Emmanuel was a new kind of attack, or was this similar to what

19  had transpired before?

20  A    So far, we have not discussed any attack that was similar

21  to this or of this kind, because this attack combined shooting

22  with throwing a bomb, and then once again shooting at the bus

23  and storming it, a bus with people inside.  This was something

24  new compared to previous attacks.

25            MR. TURNER:  Would you show the witness, please,

```
                         Sidebar                    1087
```

1    only 3385?

2    Q    Do you recognize 3385?

3    A    Yes, I do.

4    Q    What is 3385?

5    A    This is a claim of responsibility by the Qassam Brigades,

6    the military arm of Hamas for the Emmanuel bombing.

7    Q    And what is the source of 3385?

8              MR. INGERMAN:  Your Honor, may we approach just

9    briefly?

10             THE COURT:  Sure.

11          (Sidebar held outside the presence of the jury.)

12

13

14

15

16

17

18

19

20

21

22

23

24                        (Sidebar)

25             MR. INGERMAN:  Your Honor, this exhibit is not

Sidebar                                        1088

1    mentioned anywhere in Mr. Shaked's report.  We never had an

2    opportunity to ask him about it at his depositions or inquire

3    with him.  They're showing him this document for the first

4    time, and it's unfair.

5           THE COURT:  Was it on the plaintiffs' list?

6           MR. INGERMAN:  It's on the plaintiffs' exhibit list,

7    of course, but this witness never cited it, that he relied on

8    it for purposes of the report, so we were never able to

9    inquire of him at pretrial.

10          MR. OSEN:  I don't know whether that's accurate or

11   not.  I do believe Mr. Shaked is referenced the Qassam

12   Brigade's claim of responsibility.  I don't know whether the

13   question here is whether this particular version of the URL is

14   not cited or whether they're saying he never cited al-Qassam's

15   claim of responsibility.  I don't think that's correct.

16          MR. INGERMAN:  With respect to the Emmanuel, he has

17   a section in his report on each of the attacks, with

18   respect -- on the Emmanuel section, we did not see any

19   reference to this al-Qassam claim of responsibility.

20          THE COURT:  If you had, since it's been on the

21   plaintiffs' list, would you have asked him?

22          MR. INGERMAN:  Well, we could have inquired with him

23   about how he relied on it, why he relied on it, what was in

24   it?  I mean, it's trial by ambush, really.

25          THE COURT:  I would agree with you if I saw any

NICOLE CANALES, CSR, RPR

Sidebar                                                    1089

1  prejudice to the non-listing earlier, but I'm not seeing any.

2  It's just one more document supporting his opinion, and I

3  don't see any great cross-examination you could have done at

4  his deposition that would have impeached this particular

5  document.  It's of the same general, as all the other ones he

6  relied on, so I'm going to overrule the objection.  I do want

7  plaintiffs' attorneys to check this carefully.  Obviously this

8  one is fine, but a bunch of them would not --

9           MR. INGERMAN:  We do have others that we've

10  identified that I think are coming up that we did not find

11  anywhere in his reports, so --

12           MR. OSEN:  They've had the documents.  They've had

13  the report.  You could reach out to us at any point if you

14  have a question about any one.  Some of these are simply an

15  issue, your Honor, of which resolution version of the same WW

16  al-Qassam.  If there's one that isn't, we're happy to discuss

17  it.  But we would prefer to have had that discussion days ago.

18           THE COURT:  Yes, I think it was clear as to which

19  documents this one would be testifying on.  Right?  I mean,

20  this is not a surprise to you now that they pull this document

21  out with this witness, is it?

22           MR. INGERMAN:  No, but we didn't realize until

23  yesterday, when going through the exhibit.  There's hundreds

24  of exhibits to try to figure out in a 200-plus report whether

25  or not a particular exhibit had been cited.

```
                          Sidebar                    1090

 1          THE COURT:  But I've got to have a feel of quantity.

 2   Like I say, if it's an isolated instance or one or two others,

 3   it's a problem.  If there's 20 of these exhibits, it's a

 4   problem.

 5          MR. INGERMAN:  I mean, I would say, your Honor, just

 6   estimating, we're looking at somewhere in the 10 to 12 range,

 7   I would say.  And I'm happy to discuss them with Mr. Osen on

 8   the break.  If we're wrong, the objection's no good, but --

 9          THE COURT:  Let's take a break now, and you all try

10   to work this out.  And at least if you can't work it out, give

11   a better feel for what these documents are, why they were not

12   identified in the report -- maybe, as Mr. Osen's suggesting,

13   they're simply other versions of documents that were

14   referenced in his report that are not materially different.

15   If that's the case, it's not a problem.  But we'll take our

16   break now so you can try to work it out.

17          MR. OSEN:  Thank you.

18          MR. INGERMAN:  Thank you.

19                     (Sidebar concluded.)

20

21

22

23

24

25
```

Proceedings                          1091

1           (In the presence of the jury.)

2           THE COURT:  Ladies and gentlemen, there's a small

3    issue we need to work out, so we'll take a little bit early of

4    a morning break.  We'll come back here at 11:05.  Please do

5    not discuss the case among yourselves.  See you in 15 minutes.

6           (Outside the presence of the jury.)

7           THE COURT:  Let's reconvene a couple minutes after

8    11:00, so you have a chance to talk.

9                  (Recess in proceedings.)

10          (Proceedings continued on following page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS                    1092

1          (Honorable Brian M. Cogan takes the bench.)

2          THE COURT:  All right.  Be seated, please.  Where

3     do we stand on this?

4          MR. SHAND:  Mr. Ingerman will be right back.

5          THE COURT:  I said 11:02.  I just congratulated

6     everyone for being prompt.  Is the exhibit we were talking

7     about before the break 3385?

8          MR. OSEN:  3385.

9          THE COURT:  Are you sure that goes with this

10    attack?

11         MR. OSEN:  As far as I know.  I can confirm it

12    again, your Honor.

13         MR. INGERMAN:  Sorry, your Honor.

14         THE COURT:  Okay.

15         MR. OSEN:  Yes, your Honor.

16         MR. TURNER:  Do you have the translated version?

17         THE COURT:  I'm sorry.  Are we on the December 12,

18    2001, attack?

19         MR. OSEN:  Yes, the Emmanuel bombing.

20         THE COURT:  Right.  And this document takes

21    responsibility for the attack on the 6th of Jumada al-Awwal

22    which is translated as July 16, 2002; hence, my question.

23         MR. OSEN:  Reasonable question, your Honor.

24         MR. TURNER:  It does say "Emmanuel".

25         THE COURT:  Well, I take it aside from this

PROCEEDINGS                          1093

1   question as to whether it's even the right document, I take

2   it the parties have not reached a resolution on this issue

3   of documents that the witness is using, but are not

4   contained in his report, allegedly, defendant's contention?

5           MR. OSEN:  Right.  Your Honor, I think we have

6   largely resolved it.  There are a couple of documents

7   towards the back end of the presentation which we were just

8   going to work on now.  But I think with respect to the ones

9   that are upcoming before lunch, it shouldn't be an issue,

10  and we're just going to advise Mr. Turner as to which ones

11  we've worked out.

12          THE COURT:  Is that right?

13          MR. INGERMAN:  It is, yes.

14          THE COURT:  So let's get the jury in and proceed.

15          MR. INGERMAN:  So with respect to this exhibit,

16  your Honor, this obviously is not the same attack?

17          THE COURT:  Well, that's what I said; the

18  plaintiffs are not there yet.

19          MR. OSEN:  Your Honor is correct, the actual

20  translation here has a different date, but it does refer to

21  the Emmanuel attack.

22          THE COURT:  All right.  I'm going to leave this to

23  be worked out in the direct and cross-examination process,

24  okay.  However you want to deal with that is fine.

25          (Jury is in the courtroom at 11:10 a.m.)

R. SHAKED - DIRECT/MR. TURNER                1094

1          THE COURT:  All right.  Be seated, please.

2          Mr. Turner, you may continue.

3          MR. TURNER:  Thank you, your Honor.

4    DIRECT EXAMINATION (Continued)

5    BY MR. TURNER:

6    Q    When we broke, we were talking about the Emmanuel

7    shooting and bombing.  Do you recall that, sir?

8    A    Yes.

9    Q    Now, as one of the sources of information, in addition

10   to what we've already talked about, did you have access to

11   government records from the Ministry of Foreign Affairs?

12   A    Yes.

13         MR. TURNER:  Could you show the witness only,

14   please, 3392.

15         MR. INGERMAN:  Your Honor, I think you've already

16   ruled on 3392.

17         THE COURT:  I don't think I have.  Oh, you're

18   saying in the prior order?

19         MR. INGERMAN:  Yes.

20         THE COURT:  Mr. Turner, I did enter an order on

21   this document.

22         MR. TURNER:  Yes, sir.  It's only being shown to

23   the witness.

24         THE COURT:  Okay, but I entered an order as to --

25         MR. TURNER:  The admissibility.

R. SHAKED - DIRECT/MR. TURNER                1095

1       THE COURT:  The admissibility and what the witness

2   will be able to say about this.

3       MR. TURNER:  Yes, sir, I understand.  I fully

4   intend to comply with the order.

5       THE COURT:  All right.  Please proceed.

6       MR. TURNER:  May I proceed?

7       THE COURT:  Yes.

8   BY MR. TURNER:

9   Q    Do you recognize 3392?

10  A    Yes, I do.

11  Q    Now, is this one of the pieces of information that you

12  collected from the various sources that assisted you in

13  reaching the conclusion that Hamas was responsible for this

14  particular attack?

15  A    Yes.

16  Q    Now, in addition to this, did you also have access to a

17  video will of, I believe his name is Assem Rihan, that was

18  taken before this particular attack occurred, but talked

19  about this attack that was about to occur?

20  A    Yes, I did see this video.

21      MR. TURNER:  Mr. Miller, can you show the witness

22  only the first of the video marked 3398.

23  Q    Do you recognize this particular video, Mr. Shaked?

24  A    Yes.

25  Q    Can you identify the person in the video?

R. SHAKED - DIRECT/MR. TURNER                1096

1    A    Yes, this is the picture of Assem Rihan.

2    Q    Is this the same Assem Rihan that carried out the

3    attack on the bus in Emmanuel?

4    A    Yes.

5    Q    What is the source of this will?  Where did it come

6    from?

7    A    The source of this video is a website of Izz ad-Din

8    al-Qassam Brigade, the military wing of the Hamas.

9    Q    The same website we've been talking about?

10   A    Yes.

11   Q    And did this will help you reach your conclusion that

12   Assem Rihan was one of the shooters and bombers involved in

13   this particular attack and responsible for these deaths and

14   injuries?

15   A    Yes, it helped me.

16              MR. TURNER:  We would offer 3398.

17              MR. INGERMAN:  Your Honor, we renew our objections

18   on 403 grounds.

19              THE COURT:  All right.  The objection is overruled

20   and the exhibit is received.

21              (Plaintiff Exhibit 3398 was admitted into

22   evidence.)

23              MR. TURNER:  May we have the lights, your Honor,

24   and play this?

25              THE COURT:  Yes.

R. SHAKED - DIRECT/MR. TURNER                1097

 1              (Video of Assem Rihan being played.)

 2              MR. TURNER:  May we have the lights?

 3   Q    Mr. Shaked, did that videotape that was taken prior to

 4   this attack assist you in concluding that Rihan and these

 5   others were associated with Hamas in carrying out this

 6   terrorist attack on behalf of Hamas?

 7   A    Yes.

 8   Q    In addition to these sources of information, did you

 9   also have access to a memorialization poster that was

10   created of Rihan and published throughout the areas?

11   A    Yes, I had access to these posters.

12              MR. TURNER:  Can you show the witness only please,

13   1090, and go to page nine.

14   Q    Do you recognize Exhibit 1090, page nine?

15   A    I do.

16   Q    Who is that individual?

17   A    This is a terrorist who participated in the Emmanuel

18   attack and was killed during the attack.

19   Q    Can you read -- I recognize it's in Arabic at the top

20   of your screen, can you read that for us in Arabic?

21              MR. INGERMAN:  Objection, your Honor.

22              THE COURT:  Sustained.  You need it in first.

23              MR. TURNER:  Your Honor, we would offer 1090, page

24   nine.

25              MR. INGERMAN:  We object, in addition to 801 for

R. SHAKED - DIRECT/MR. TURNER          1098

1   reasons we discussed before the break, we're not seeing the

2   picture anywhere.

3           THE COURT:  I thought we had resolved that, at

4   least at this point.

5           MR. OSEN:  I thought so too, your Honor.  If we

6   can do a quick sidebar.

7           (Continued on the next page for sidebar.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (Sidebar conference begins.)

2        MR. OSEN:  I think we indicated to you that the

3   poster didn't come as mentioned in this report, but not in

4   the form that is on the screen presented, because we took

5   the same one that is used from -- it's the same poster, just

6   a different version of the same poster.

7        THE COURT:  All right.  Here is my feeling about

8   this:  Look, you've got an expert report, you take his

9   deposition, you go through all the things the expert relied

10  on in his report.  At the end of the report, at the end of

11  the examination you say, is there anything else you relied

12  on.  If he says "no" then you've got good cross-examination,

13  okay.  You've got -- you can say to him on cross-examination

14  you didn't tell us about this during your deposition, did

15  you.  I asked you everything you relied on and you didn't

16  mention this, did you.  This wasn't in your report, was it.

17  And that's where I'm going to leave it right now.

18        MR. INGERMAN:  I understand, your Honor, but the

19  prejudicial value of moving this stuff in outweighs the

20  probative value of the cost here.

21        THE COURT:  I think it really has very little

22  prejudicial value.  It is a picture and an assumption of

23  responsibility by a guy who he's got other sources that show

24  that, so I think the prejudicial impact is really quite

25  limited, so I'm going to relegate it to cross-examination on

SIDEBAR CONFERENCE                    1100

1  that.

2            (End of sidebar conference.)

3            (Continued on the next page.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

R. SHAKED - DIRECT/MR. TURNER                1101

1       THE COURT:  All right.  The document is admitted

2   over objection.

3           (Plaintiff Exhibit 1090 was admitted into

4   evidence.)

5           MR. TURNER:  May we put it up on the screen, your

6   Honor?

7           THE COURT:  You may.

8           MR. TURNER:  Mr. Miller, if you can enlarge the

9   upper half.

10  BY MR. TURNER:

11  Q    First of all, do you recognize the logo?

12  A    Yes, I recognize it.

13  Q    What is the logo?

14  A    This is the logo of Izz ad-Din al-Qassam Brigade.

15  Q    Can you read for us the Arabic that's written on the

16  document above the logo?

17  A    It says that there -- I have read this phrase first in

18  Arabic.  It says the heroic Assem Rihan who acted out the

19  blessed action of Nablus.

20  Q    Nablus is what?

21  A    They mean the Emmanuel attack.  Nablus appears because

22  Nablus is the central city of that area.

23          MR. INGERMAN:  Objection, your Honor, move to

24  strike.

25          THE COURT:  Sustained.  Ladies and gentlemen, the

R. SHAKED - DIRECT/MR. TURNER          1102

1  words in this document are, again, not to be taken as true

2  by you.  The document is only used to help you evaluate

3  whether you should accept this witness' opinion.

4  Q   Mr. Shaked, where is Nablus in relation to Emmanuel?

5  A   Emmanuel is a couple of kilometers, a few miles

6  northwest of Nablus.

7          MR. TURNER:  If you can go out and focus on the

8  bottom.

9  Q   Who is in the photograph?

10  A   This is a picture of Assem Rihan.

11  Q   What does the Arabic say at the bottom?

12  A   This is an Islamic concept which expresses the heroism

13  of a person who gives his live for others.

14  Q   Did you have an opportunity to investigate the shooting

15  attack in Atzmona in March of 2002?

16  A   Yes.

17          MR. TURNER:  May we demonstrate the slide, your

18  Honor?

19          THE COURT:  Sure.

20  Q   Were you able to determine who the shooter was?

21  A   Yes.

22  Q   Who was the terrorist that carried out the shooting?

23  A   The shooter is Muhammad Farhat, a member of the Hamas

24  organization.

25  Q   Were you able to determine or reach a conclusion as to

R. SHAKED - DIRECT/MR. TURNER                1103

1    whether or not Muhammad Farhat did this on his own or

2    whether he was acting before and on behalf of Hamas?

3    A    Muhammad Farhat acted on behalf of Hamas with the

4    knowledge of Hamas and his commanding officers.

5    Q    How many people were killed in this particular terror

6    attack in Atzmona?

7    A    Five people were killed in Atzmona.

8    Q    And how many were injured?

9    A    23 were injured.

10   Q    Did your investigation reveal how old Muhammad Farhat

11   was?

12   A    Yes, he was 17 years old.

13   Q    Did your investigation find anything unique about

14   Muhammad Farhat's role in this particular attack in terms of

15   his age?

16   A    Yes.  I will tell you about it briefly.  Muhammad

17   Farhat wanted to do the suicide bombing.  He turned to his

18   mother, Marriam Farhat, who is also an activist of Hamas,

19   and she went directly to the commander, senior commander of

20   al-Qassam Brigade to get his permission.  And he allowed her

21   son to go and do this.  And only after receiving permission

22   did he go and perpetrate the attack.

23   Q    Is Shehada shown as the top photograph?

24   A    Yes, Salah Shehada is the top of the slide.

25   Q    Did Salah Shehada have any special or unique role in

R. SHAKED - DIRECT/MR. TURNER                1104

1   the investigation of the founding of Hamas?

2   A    Yes.  Salah Shehada was one of the founders of the

3   Hamas and the commander of the military wing of Hamas.

4   Q    What was unique about this particular attack that

5   required that this 17 year old's mother go to Shehada, one

6   of the high executive leaders of Hamas, in order to, as you

7   put it, get permission to do this attack?

8            MR. INGERMAN:  Objection.

9            THE COURT:  Sustained as to form.

10  Q    Can you explain to us why Shehada was required to

11  approve this particular attack, at least based on your

12  investigation?

13  A    Farhat was 17 years old.  He was a member of the Hamas

14  youth movement, and Hamas did not want children for these

15  kinds of attacks.  And he was also -- children are also

16  inexperienced.  This is why permission was required from the

17  commander both from an operational perspective and with

18  respect to the age.

19  Q    What did your investigation reveal about Farhat's

20  mother's role in Hamas?

21  A    The mother of Muhammad Farhat, Marriam, escorted him on

22  his way and wished him good luck.  That means this was the a

23  mother who sent a young son to die for the cause for which

24  she felt was important.

25            MR. TURNER:  Would you show the witness only 3429,

R. SHAKED - DIRECT/MR. TURNER                1105

1  please.

2  Q    Do you recognize 3429?

3  A    Yes, I do.

4  Q    And what is 3429?

5  A    Yes, this is the claim of responsibility issued by

6  al-Qassam Brigade of the military wing of Hamas regarding

7  the attack that was carried out in Atzmona by the heroic

8  Muhammad Farhat.

9  Q    What is the source of 3429?

10 A    It is the official website of the Qassam Brigade, the

11 military wing of Hamas.

12            MR. TURNER:  We offer 3429.

13            THE COURT:  Same objection?

14            MR. INGERMAN:  Yes.

15            THE COURT:  Received over objection.

16            (Plaintiff Exhibit 3429 was admitted into

17 evidence.)

18            MR. TURNER:  May we post it on the screen?

19            THE COURT:  Yes.

20            MR. TURNER:  Please use the English version.  If

21 you can blow up the upper half.

22 BY MR. TURNER:

23 Q    Now, did this official claim of responsibility help you

24 confirm that Muhammad Farhat carried out this terrorist

25 attack on behalf of Hamas at Atzmona?

R. SHAKED - DIRECT/MR. TURNER          1106

1   A    Yes, sir.

2   Q    Now, in addition to this official claim of

3   responsibility, were you also able to access a will of the

4   young boy that was posted on the Hamas al-Qassam website?

5   A    Yes, I did have access.

6   Q    Now, you've listed Wa'el Nasar as one of the

7   participants or operatives in this particular terrorist

8   attack.  Who was Wa'el Nasar?

9   A    He was -- Wa'el Nasar was senior commander in the

10  military wing of Hamas.  He was one of the deputies of Salah

11  Shehada, and he was the one who was responsible and

12  confirmed directly this terror attack.  He was the one who

13  dispatched the suicide bomber to carry out this attack.

14  Q    From a memorialization standpoint, was there a funeral

15  or as they described it "a wedding ceremony" by Hamas on

16  behalf of this young boy?

17  A    Yes, indeed there was a large funeral.

18  Q    Was there anything unique in terms of who attended this

19  particular funeral that was significant in terms of

20  connecting Hamas to this particular attack?

21  A    Yes.  Sheikh Yassin himself was present in the funeral.

22  And along with him there were other senior members, senior

23  leaders of Hamas, such Abd al-Aziz al-Rantisi, Isma'il Abu

24  Shanab and Isma'il Haniya.

25  Q    And who were these; you mentioned Rantisi and Haniya,

1    who were those individuals in terms of leadership of Hamas

2    at the time?

3    A    Rantisi was number two in the Hamas, that meant he was

4    the deputy of Ahmed Yassin.  And Haniya at the time was

5    Sheikh Ahmed Yassin's chief of staff.

6    Q    Did you also have an opportunity as part of your work

7    to investigate the bombing at Cafe Moment in Jerusalem that

8    occurred on March 9, 2002?

9    A    Yes, I did investigate.

10              MR. TURNER:  May we display the slide, your Honor?

11              THE COURT:  Yes.

12   Q    Were you able to determine who the suicide bomber was

13   in the Cafe Moment attack?

14   A    Yes.  At the bottom of the picture of this slide we can

15   see the photo of Fuad Hurani, he was the suicide bomber.

16   Q    And was Abdullah Barghouti the bomb maker we talked

17   about earlier involved in this attack as well?

18   A    Yes.  Barghouti prepared the explosives belt.

19   Q    In order to understand this particular attack, can you

20   describe what, at the time, Cafe Moment was and where it was

21   located within Jerusalem?

22   A    Yes.  Cafe Moment was at the center of this

23   neighborhood and perhaps I could call it this yuppy

24   neighborhood in Jerusalem, a lot of academics live in that

25   area, intellectuals, students.  And these are the people

R. SHAKED - DIRECT/MR. TURNER          1108

1  that went to this cafe.  These are the people that live next

2  to this cafe.  If I liken it to something in New York, I

3  would say that neighborhood is a bit similar to the Village.

4  And people would simply love to go to that cafe and hang out

5  and drink their coffee, and mainly people would go there

6  late at night.

7  Q    Where was the cafe in relation to the prime minister of

8  Israel's home?

9  A    I would say it's about 150 to 200 yards, the distance

10  from the prime minister's home.

11  Q    Where is Cafe Moment in relation to your office?

12  A    I'd say no more than about half a mile.

13  Q    Were you at the office at the time of this particular

14  attack?

15  A    No, I wasn't in my office.  It occurred at a late hour

16  at night.

17  Q    Did you go to the scene of this particular attack?

18  A    Yes.

19  Q    Can you give us an estimate approximately how long it

20  took you to get to the scene following the attack?

21  A    I would say it's approximately -- it took me

22  approximately, 20 minutes, half hour tops, not more than

23  that.

24  Q    Let's work on your slide for just a minute and identify

25  some of these individuals that you determined were involved

1   in this particular terror attack on behalf of Hamas.

2            First of all, was Wisam Abbasi, what role did

3   Abbasi play in this attack?

4   A    He is at the right hand of the picture and he was a

5   member of the simple.  His role was to locate the cafe in

6   Jerusalem where they will carry out the attack.

7   Q    And what was the role of Walid Anjas?

8   A    Walid Anjas.  Yes, he was an operative a Hamas

9   operative from he was the person who dispatched the suicide

10  bomber from Ramallah to Jerusalem.  And he was the person

11  who authorized, who actually attended the decision regarding

12  the location of the attack.

13  Q    And going back over to the right-hand side of the

14  screen, Wa'el Qassam, what was Qassam's role in this

15  particular terrorist attack?

16  A    Wa'el Qassam was a military leader of Hamas in

17  Jerusalem at that time of the Hamas military wing.  He was

18  the person who choose the place where to perpetrate the

19  attack.  He was the person who had dispatched the suicide

20  bomber and even led him very close to the cafe, just a few

21  yards, and then he pointed at the place where he should

22  explode himself.

23  Q    Moving across to the center, Abdullah Barghouti.  In

24  your interview with Barghouti did you have an opportunity to

25  talk face-to-face with him about the terrorist attack at

1   Cafe Moment?

2   A    Yes.

3   Q    And during the course of your investigation were you

4   able to determine from the various sources that you

5   cross-referenced what the source of the bomb was; in other

6   words, was it in a guitar, a computer like the other ones or

7   how was it delivered?

8   A    This time the bomb was in explosive belt that was on

9   the body of the suicide bomber.

10  Q    Moving across to the left again, Muhammad Arman.  What

11  role was Muhammad Arman in this particular terrorist attack?

12  A    Muhammad Arman who was an operations officer, a key

13  operative of Hamas in Ramallah.  He was the person who had

14  fitted the explosive belt on the body of the suicide bomber.

15  Q    And finally up at the top, Ibrahim Hamed.  We've seen

16  his picture before.  You told us who he was in general.

17  What role did you find that he played in the Cafe Moment

18  terrorist attack?

19  A    Yes.  In this case he was very much involved in the

20  recruiting of the suicide bomber, not just the recruiting,

21  but he was the one who coordinated this activity between the

22  different cells, and he was the person who provided

23  instruction and direction on how to carry out this attack.

24  Q    On this particular attack did you have access to

25  information from the Israel Security Agency, the ISA report

1   describing this attack?

2   A    Yes, I did have access.

3            MR. TURNER:  Your Honor, 3811 is already in

4   evidence.  May we post the page pertaining to this attack?

5            THE COURT:  You may.

6   Q    Did the ISA identify the same suicide bomber that you

7   were able to identify?

8   A    Indeed so.

9   Q    Now, the ISA indicated that this young man that carried

10  out the suicide attack was a resident of a refugee camp born

11  originally in Bethlehem.  Was that consistent with your

12  investigation?

13  A    Yes, this is in line with -- these details are in line

14  with my investigation.

15  Q    And did the ISA likewise identify individuals that you

16  likewise identified as operatives in this particular attack?

17  A    Indeed, yes.

18  Q    Was this piece of information from the government

19  important to you in reaching your conclusion?

20  A    Yes, it is important to me.

21            MR. TURNER:  Can you please show the witness only

22  3511.

23  Q    Do you recognize 3511?

24  A    Yes.

25  Q    Does this come from an agency or branch of the

R. SHAKED - DIRECT/MR. TURNER          1112

1   Government?

2   A    Yes, it is from prime minister's office.

3   Q    Is this one of the pieces or sources of information

4   that you were able to use as a crosscheck method to ensure

5   your information was accurate?

6   A    Yes.

7        MR. TURNER:  Can you show the witness 3484,

8   please.

9   Q    Do you recognize this from the Israel Ministry of

10  Foreign Affairs?

11  A    I recognize it.

12  Q    Is this again one of those sources that you used to

13  crosscheck the accuracy of your investigation?

14  A    Yes, this is an additional cross-referencing source.

15       MR. TURNER:  Would you please show the witness

16  3485, please.

17  Q    Do you recognize 3485?

18  A    I do.

19  Q    What is 3485?

20  A    This is an expert opinion by a police expert who

21  checked the findings found in the scene after the attack.

22       MR. INGERMAN:  Objection, your Honor.

23       THE COURT:  Overruled.

24  Q    And is this similar to the police investigation reports

25  carried out in the ordinary course of business that you

R. SHAKED - DIRECT/MR. TURNER            1113

1  referred to earlier?

2  A    Yes, it is like other police reports.

3  Q    And were you able to use the information you found in

4  this police report to crosscheck other information you

5  learned from Barghouti and from the claim of responsibility

6  in the other investigation sources to confirm your

7  conclusions?

8            MR. INGERMAN:  Objection to form.

9            THE COURT:  Overruled.

10 A    Yes.

11           MR. TURNER:  We offer 3485.

12           THE COURT:  Where did you get this document?

13           THE WITNESS:  Within the framework of my

14 journalistic work, I used to receive different documents

15 from the police, from the ISA, from the Ministry of Foreign

16 Affairs, from the prime minister's office, among others.

17 There were also documents from the police that were open

18 sources.

19           THE COURT:  All right.  Same objection?

20           MR. INGERMAN:  Yes, your Honor.

21           THE COURT:  All right.  It's overruled.  The

22 document is received.

23           (Plaintiff Exhibit 3485 was admitted into

24 evidence.)

25 Q    And finally, with respect to the Cafe Moment terrorist

R. SHAKED - DIRECT/MR. TURNER          1114

1    attack, 3336 is already in evidence.  That is the sentencing

2    record of Abdullah Barghouti.  Were you present in the

3    courtroom that day?

4    A    Yes, I was present at the court during the reading of

5    the sentence.

6    Q    And did the conviction records as well as what you

7    heard in the courtroom that day help you confirm the facts

8    surrounding the bombing attack at Cafe Moment in Jerusalem?

9    A    Yes, they helped me.

10   Q    Did you have an opportunity to investigate the Park

11   Hotel suicide bombing that occurred on March 27, 2002?

12   A    Yes.

13   Q    Were you able to determine who the suicide bomber was

14   responsible for the terrorist attack at the Park Hotel?

15   A    Yes, I did.

16        MR. TURNER:  Can you put the slide up?  Is that

17   okay, your Honor?

18        THE COURT:  Yes.

19   Q    Who was the suicide bomber responsible for the

20   terrorist attack at the Park Hotel in 2002?

21   A    The name of the suicide bomber was Abd al-Baset Oden

22   and he was a resident of Tulkarem.

23   Q    Where is Tulkarem?

24   A    If you remember the map of Israel, Tulkarem is in the

25   center of Israel, about a 11 miles, perhaps a little more,

R. SHAKED - DIRECT/MR. TURNER          1115

1    from the seashore.

2    Q    Where was the Park Hotel located?

3    A    Park Hotel, it is in the center.  The hotel is in the

4    center of the city of Netanya, which is very close to

5    Tulkarem.

6    Q    Now, in order to understand the background of this

7    particular bombing, can you describe the Park Hotel and the

8    events that were going on at the time of the Park Hotel

9    attack?

10   A    As I said, it happened in the resort town called

11   Netanya.  This is a relatively large hotel.  And that

12   evening, many Israelis gathered there to celebrate Passover,

13   which is a festive dinner.  This is one of the most

14   important events in the Jewish calendar in which people

15   gather together to eat and celebrate.

16         At that night, many of the people in the hotel

17   were elderly people Holocaust survivors who did not have

18   families, and they came together to celebrate the Passover

19   with friends or with other people like them.

20         Dinner started at 7:30.  Everybody was of course

21   well-dressed, festive dresses, and the dinner was also

22   festive, the kind of food was also festive.

23         MR. SHAND:  Your Honor, may we approach for a

24   moment?

25         THE COURT:  Yes.

1116

1      (Continued on the next page for sidebar.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                    1117

1          MR. STEPHENS:  This testimony is being given as if

2     he has personal knowledge of all of this.

3          THE COURT:  I didn't get an objection to the

4     question.

5          MR. STEPHENS:  I'm actually trying to talk about

6     the whole procedure here where instead of the question being

7     in your opinion or something like that, he is just telling

8     about everybody was well dressed at a hotel he wasn't even

9     at.

10          THE COURT:  Mr. Stephens, I can't really respond

11     to that.  I can sustain or overrule questions to

12     objections -- sustain or overrule objections to questions.

13     I can't operate thematically.  So if there's a problem with

14     a question, let me know.  If an answer is not responsive to

15     a question, let me know.  Other than that, I can't help you.

16          I will say -- no, I won't say.  Let's go and

17     continue with the questioning.

18               (End sidebar conference.)

19               (Continued on the next page.)

20

21

22

23

24

25

SHAKED - DIRECT - TURNER                    1118

1           MR. TURNER:  May I continue?

2           THE COURT:  You may.  Let's get on to more

3    particulars.

4           MR. TURNER:  Did you finish interpreting the

5    answer?

6           THE INTERPRETER:  I did.

7    BY MR. TURNER:

8    Q    Now, before we go into the sources of information for

9    this particular suicide attack, I want to talk about your

10   slide and some of the people that you were able to identify

11   as part of your investigation that were involved in this

12   terror attack.

13          But before we do that, were you able to determine

14   whether Odeh, the suicide bomber, was acting alone or

15   whether he was acting for Hamas in carrying out this attack?

16   A    Abdel-Basset Odeh acted on behalf of Hamas in the name

17   of Hamas and as a member of Hamas.

18   Q    Now, on the right of your slide, Muhanad Sharim.  What

19   was his role in this particular attack?

20   A    Muhanad Sharim was a Hamas activist in Tulkarem.  And

21   he provided logistic support for this operation.

22   Q    How about Fathi Khasib?

23   A    Fathi Khasib was a Hamas operative, and he was a driver

24   who took the suicide bomber to the site of the attack.

25   Q    And during the course of your investigation, were you

SHAKED - DIRECT - TURNER                    1119

1  able to determine how Odeh, the suicide bomber, managed to

2  get into the hotel and in the midst of the crowd that was

3  celebrating the Passover?

4           MR. INGERMAN:  Objection, your Honor.

5           THE COURT:  Sustained.

6  BY MR. TURNER:

7  Q    During the course of your investigation, were you able

8  to determine facts that demonstrated how Odeh was disguised?

9  A    Yes.

10  Q    What did you learn?

11  A    Yes.  Odeh was disguised as a woman.  He wore blue

12  tight jeans, women's jeans, high-heeled shoes, a brown shirt

13  and a brown woman's jacket.  He wore a wig.  He shaved and

14  he made up as a woman.  He had makeup.  And he carried a

15  woman's bag on his shoulder.

16  Q    And were you able to determine as part of your

17  investigation what the delivery method of the bomb was?

18  A    Yes.

19  Q    And what did you learn?

20  A    Odeh was wearing an explosive belt.  It was sort of a

21  vest hidden under the brown jacket he was wearing.

22  Q    Were you able to determine who built the bomb as part

23  of your investigation?

24  A    Yes, I managed to do that.

25  Q    And what was that terrorist's name?

SHAKED - DIRECT - TURNER                1120

1  A    His name was Muhanad Taher.  He was the commander of

2  Hamas in Nablus.  And he was the one who built the bomb.

3  Q    And were you able to determine who was the terrorist in

4  charge of planning and supervising the attack on Passover at

5  the Park Hotel?

6  A    Yes.

7  Q    And who was that person?

8  A    His name is Abbas Sayed.

9  Q    Were you able as part of your investigation to look

10  into the background of Abbas al-Sayed?

11  A    I did.

12  Q    And what did you learn about Abbas al-Sayed in terms of

13  his relationship to Hamas?

14  A    Yes.  Abbas al-Sayed joined when he was a high school

15  student, the Muslim Brotherhood.  And when he was studying

16  in Jordan, he joined Hamas.  In the beginning, he was in a

17  political role, a spokesperson.  He also used to preach in

18  mosques.  But when the Intifada started, he became the

19  military commander of Hamas in Tulkarem.

20  Q    Based on your investigation, were you able to determine

21  whether Abbas al-Sayed was a secretive operative of Hamas or

22  whether he was a public figure?

23  A    As a spokesperson for Hamas, it couldn't be secretive.

24  In Tulkarem people knew him.  I would say that many of the

25  residents of Tulkarem knew him.  They heard him preaching in

SHAKED - DIRECT - TURNER                    1121

1    mosques.  He appeared in many ceremonies with a green Hamas

2    bandana on his forehead.  So it was absolutely clear that he

3    was from Hamas.

4            MR. TURNER:  Would you show the witness 3544,

5    please.

6    BY MR. TURNER:

7    Q    Can you identify 3544?

8    A    Yes, I do.

9    Q    What is 3544?

10   A    This is an official announcement by Hamas, an official

11   claim of responsibility declaring that that explosion at

12   Park Hotel in Netanya was their act.

13   Q    And what is the source of 3544?

14   A    The source is the Internet Web site of the Hamas

15   Brigade, the military wave of Hamas.

16   Q    Is that the same Web site we've been referencing

17   throughout today?

18   A    Yes, indeed.

19           MR. TURNER:  We offer 3544.

20           THE COURT:  Same objection?

21           MR. STEPHENS:  Yes.

22           THE COURT:  Received over objection.

23           (Plaintiffs' Exhibit 3544 received in evidence.)

24           MR. TURNER:  Would you please put the English

25   translation over the screen.

SHAKED - DIRECT - TURNER                1122

1          Is that okay, your Honor?

2          THE COURT:  Yes.

3          MR. TURNER:  Can you blow up the picture for us,

4    please.

5    BY MR. TURNER:

6    Q    Do you recognize that individual?

7    A    Yes, I do.

8    Q    Who is that individual?

9    A    This is Abdel-Basset Odeh, the terrorist who exploded

10   himself at the Park Hotel in Netanya.

11   Q    Were you able during the course of your investigation

12   to determine any background information about Odeh?

13   A    Indeed, I found.

14   Q    What did you learn?

15   A    Yes.  What I learned was that as a young man, he was an

16   Hamas operative, perhaps for two years and maybe even a bit

17   more than that before the attack.  He had volunteered to

18   carry out the suicide bombing and he was wanted by the

19   Israeli authorities.  And everything which I learned was

20   that he had worked for a while in hotels in Netanya.

21          MR. TURNER:  Okay.  Could you back out of that,

22   please.

23   BY MR. TURNER:

24   Q    Now, were you able to crosscheck the validity of the

25   official claim of responsibility with the Israeli Security

SHAKED - DIRECT - TURNER                    1123

1   Agency investigation report?

2   A    Yes.

3            MR. TURNER:  Your Honor, may we display the

4   portion of 3811 already in evidence?

5            THE COURT:  Yes.

6   BY MR. TURNER:

7   Q    Did the ISA report relating to the investigation and

8   conclusions for the Park Hotel bombing confirm what you

9   found?

10  A    Yes.

11  Q    Now, did it also confirm -- and by "it," I'm referring

12  to the ISA report -- did it also confirm Muhanad Taher's

13  role in this particular attack?

14  A    Yes, indeed the report does mention the name of Muhanad

15  Taher and his role.

16  Q    And does it likewise mention Abbas al-Sayed?

17  A    Yes.  Abbas al-Sayed is also mentioned.

18  Q    I want to focus in on this one sentence for a minute.

19       Do you see where I'm reading?  I can't read it.

20       "The attack was directed by the Hamas military networks

21  in Tulkarem and Nablus, headed by Abbas al-Sayed and Muhanad

22  Taher.  Abbas al-Sayed, responsible for the attack from

23  Tulkarem, served as the Hamas military leader in the area.

24  Abbas al-Sayed admitted in his interrogation that he had

25  planned to execute the attack many months earlier, but his

SHAKED - DIRECT - TURNER                1124

1   plans were postponed."

2       Was that consistent, Mr. Shaked, with your

3   cross-reference sources of information?

4   A    Yes, indeed, this is a cross-reference for all the

5   other materials I have in which I have reached.

6   Q    Now, in addition to these sources of information

7   confirming Hamas' role in the Park Hotel attack, did you

8   likewise have access to a videotaped interviewed of one

9   Osama Hamden, a spokesperson from Lebanon on behalf of

10  Hamas?

11          MR. STEPHENS:  Objection.

12          THE COURT:  Just answer as to Osama Hamdan.

13  A    Yes, I did have access to watch it.

14          MR. TURNER:  Your Honor, at this point we'd like

15  to dim the lights and watch 3580, which is already in

16  evidence.

17          THE COURT:  Haven't we already seen it?  Do we

18  need to see it again?

19          MR. TURNER:  I'd kind of like to.

20          THE COURT:  I don't think that's a good enough

21  reason.

22          MR. TURNER:  I didn't think it would be, but I

23  thought I would try.

24          Can you show the witness only 3524, please.

25  BY MR. TURNER:

SHAKED - DIRECT - TURNER                1125

1   Q    Do you recognize 3524, Mr. Shaked?

2   A    Yes, I do.

3   Q    What is 3524, in general?

4   A    This is the admission in which Abbas al-Sayed gave to a

5   police interrogator.  Parts of it are written in Hebrew and

6   other parts are in Arabic.

7   Q    And are you able to read both the Hebrew and the

8   Arabic?

9   A    The Arabic handwriting it would be a bit difficult for

10  me, but with a little bit of effort I will manage to do it.

11  Q    Now, is this one of the sources of information that you

12  had access to from the police files in reaching your

13  conclusions about Abbas al-Sayed in both Hamas and the Park

14  Hotel attack?

15  A    Yes, indeed so.

16       MR. TURNER:  Now, would you please show the

17  witness only 3553.

18  BY MR. TURNER:

19  Q    Can you identify 3553?

20  A    Yes, I do recognize.

21  Q    What is 3553?

22  A    Yes.  This is the ruling regarding four members, four

23  senior members, of the cell who participated in that terror

24  attack in the Park Hotel.

25       MR. TURNER:  Your Honor, we would offer 3553 as

SHAKED - DIRECT - TURNER                    1126

1    apostille convictions of these individuals.

2              THE COURT:  That's received over objection.

3              (Plaintiffs' Exhibit 3553 received in evidence.)

4              MR. TURNER:  May I have one moment?

5              THE COURT:  Yes.

6              (Brief pause.)

7              MR. TURNER:  Can we see you for one second?

8              THE COURT:  Yes.

9              (Sidebar conference.)

10             (Continued on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                    1127

1           MR. OSEN:  Your Honor ruled that the confession of

2    Abbas al-Sayed was admissible.

3           THE COURT:  I can't hear you.

4           MR. OSEN:  Mr. Ingerman may have put it on the

5    list.  We just wanted to make sure we didn't run afoul of

6    anything that he had raised.

7           THE COURT:  I see.

8           MR. OSEN:  So I just wanted to confirm before we

9    actually --

10          THE COURT:  Is this one of the documents you don't

11   think was in the expert report?

12          MR. INGERMAN:  I don't know what exhibit number

13   he's talking about.

14          MR. TURNER:  3511.  No, 3511.  3511 is the ISA

15   report.  3554.

16          MR. INGERMAN:  3554?

17          THE COURT:  Yes.

18          MR. INGERMAN:  That is one that I put on the list.

19          MR. OSEN:  Right.

20          THE COURT:  Okay.  So the objection is that

21   the -- the objection will be that the witness did not refer

22   to this document in his expert reports.  That a document

23   nevertheless has been ruled admissible, and I think it's for

24   cross-examination to say that the witness' only relying on

25   it for the first time today.

SIDEBAR CONFERENCE                    1128

1          So I will overrule that objection when it comes,

2     but I will note it.

3          MR. INGERMAN:  Okay.  We have our other objection

4     to these documents as well.

5          THE COURT:  Yes, of course.

6          MR. INGERMAN:  Thank you.

7          (End sidebar conference.)

8          (Continued on the next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SHAKED - DIRECT - TURNER                    1129

1          MR. TURNER:  May I proceed?

2          THE COURT:  You may.

3   BY MR. TURNER:

4   Q    Do you recognize 3554 which is before you?

5   A    Yes, I do.

6   Q    And what is 3554?

7   A    This is the sentencing that was issued by the district

8   court in Tel Aviv against Abbas Sayed.

9          MR. TURNER:  Your Honor, we offer 3554.

10         THE COURT:  All right.  That's received over

11  objection.

12         (Plaintiffs' Exhibit 3554 received in evidence.)

13         MR. TURNER:  First of all, may we go to the

14  document on the screen.

15         This particular part --

16         MR. INGERMAN:  Your Honor, objection.  It's not

17  the same exhibit.

18         THE COURT:  Oh.  Let's take it off the screen.

19         MR. TURNER:  Sorry.

20         THE COURT:  Right.  It's not the same exhibit.

21         MR. TURNER:  Do you not have that on the slide?

22  Just go back to the document.

23         THE COURT:  It may be the same exhibit.  Are you

24  sure it's not the same exhibit?

25         MR. INGERMAN:  It's not, your Honor.

SHAKED - DIRECT - TURNER                1130

1      THE COURT:  It's not just the English translation

2  of the conviction?

3      MR. OSEN:  It's not on the conviction.  It's the

4  interrogation, police report, which Mr. Shaked testified to

5  a few moments ago.

6      THE COURT:  You have to clean this up.  It's

7  confusing.

8      MR. TURNER:  I'll go back and start over.

9  BY MR. TURNER:

10 Q    All right.  Let's go back to 3554, which you should

11 have on your screen.

12     THE COURT:  I think you mean 3524.  That's the

13 confusion.

14     MR. TURNER:  I think we have 3554 on the screen.

15     THE COURT:  I think you do, but I think you want

16 3524.

17     MR. TURNER:  No, sir.  I think going to 3524 was a

18 mistake on the slide.  So I'm going back to start at 3554.

19     THE COURT:  Okay.  Go ahead.

20 BY MR. TURNER:

21 Q    Do you recognize 3554?

22 A    Yes, I do.

23 Q    And what is 3554?

24 A    This is the sentencing given to Abbas Sayed.

25 Q    Now, during the course of the sentencing records, were

SHAKED - DIRECT - TURNER                1131

1  you able to -- as part of your investigation, were you able

2  to determine whether Abbas al-Sayed confessed as part of the

3  sentencing?

4  A    Abbas Sayed said that he does admit to all the details,

5  but he does not admit his guilt.  And from what I understand

6  from all the documents, indeed Abbas Sayed did plead guilty.

7  Q    Now we want to go back to 3524 -- if you'll put that in

8  front of you -- which is the police interrogation that we

9  looked at a moment ago.

10       Now, did you have an opportunity as part of your

11  investigation to compare al-Sayed's interrogation

12  investigation with the sentencing confession that he made?

13            MR. INGERMAN:  Objection.

14            THE COURT:  Overruled.

15  A    Yes, I did.

16  BY MR. TURNER:

17  Q    And were they consistent with one another?

18  A    Yes, they are consistent with each other.

19  Q    Including insofar as his role with Hamas was concerned?

20  A    Yes.

21  Q    And the Park Hotel?

22  A    Regarding Park Hotel as well.

23  Q    Now, 3524, which is the interrogation document in front

24  of you, have you seen these type government documents

25  before?

SHAKED - DIRECT - TURNER                1132

1   A    Yes.

2   Q    Approximately, how many years have you been evaluating

3   these kinds of documents in your profession?

4   A    I can only tell you that I've been looking over these

5   kinds of documents since my very first years working in the

6   ISA.  And I still go over such documents today.  That means

7   I'm talking about 40 years and more than that.

8   Q    And do you recognize the government form?

9   A    Of course.

10  Q    Including the names included on 3524?

11  A    Yes.

12  Q    And the reference to the Park Hotel attack?

13  A    Yes.

14           MR. TURNER:  We offer 3524.

15           THE COURT:  That's received over objection.

16           (Plaintiffs' Exhibit 3524 received in evidence.)

17           MR. INGERMAN:  May we have a sidebar?

18           THE COURT:  Are you almost done with Park Hotel?

19           MR. TURNER:  Yes, sir.

20           THE COURT:  After I rule on this at sidebar, how

21  much more do you have on Park Hotel?

22           MR. TURNER:  One postcard.

23           THE COURT:  All right.  Let's have a sidebar.

24           (Sidebar conference.)

25           (Continued on the next page.)

SIDEBAR CONFERENCE                    1133

1        MR. INGERMAN:  Your Honor, this is an unapostilled

2   interrogation report for Mr. al-Sayed.  It doesn't mention

3   the Park Hotel by name.  It mentions some of the players.

4   And Mr. Shaked testified that he actually -- that Mr. Sayed

5   denied his guilt in the confession.

6        And it's hugely prejudicial because they are going

7   to point out in the slides that are coming that he

8   referenced money that he got in an Arab Bank account which

9   is in connection with a different operation other than the

10  Park Hotel.  We think it would be misleading, confusing to

11  the jury, and unfairly prejudicial among the other

12  objections of 801 and 901.

13       THE COURT:  Well, first of all, as to the 801,

14  I've held it's a declaration against interest.  As to the

15  901, I think the witness has testified that this document is

16  typical of the kinds of documents he's reviewed and has been

17  reviewing for over 40 years.

18       If it helps, you should ask him this question,

19  although I'm loathe to require it as we're spending a lot of

20  time on technicalities that are not furthering the search

21  for truth, but go ahead and ask him how do you know this is

22  real.  Ask him that question.  Then if you ask him that

23  question and I get a satisfactory answer, I will overrule

24  the 901 objection.

25       On the 403 objection, I do not think it's unduly

SIDEBAR CONFERENCE                      1134

1   prejudicial.  I think it is highly probative and because of

2   its probative value, I think the prejudicial impact is

3   outweighed.

4           So the objections are overruled.

5           (End sidebar conference.)

6           (Continued on the next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SHAKED - DIRECT - TURNER                1135

1           MR. TURNER:  May I proceed?

2           THE COURT:  You may.

3    BY MR. TURNER:

4    Q    Going back to 3524, Mr. Shaked, looking at this

5    document, how do you know this document is real or

6    authentic?

7    A    It includes all the necessary details starting with the

8    identity card number of the terrorist, Abbas Sayed, the

9    personal details of the officer who took the testimony, the

10   date, the place of the questioning, the format -- I

11   recognize the format of such documents, and of course the

12   reference to activities in which Abbas Sayed is accused.

13        In addition to that, there is a handwriting which you

14   can compare to other handwritten documents written by Abbas

15   Sayed.

16           THE COURT:  You maintain your offer?

17           MR. TURNER:  Yes, sir.

18           THE COURT:  It is admitted over objection.

19           MR. TURNER:  If we can move to the first slide.

20   May we use the presenter?

21           THE COURT:  Yes.

22           MR. TURNER:  This is the translated version.

23   BY MR. TURNER:

24   Q    Were you able to use this portion, Mr. Shaked, to

25   confirm Mr. al-Sayed's history with Hamas?

1  A    Yes.

2  Q    And do you recognize the name Jamal Mansur?

3  A    Yes.

4  Q    And who was Jamal Mansur at the time?

5  A    Jamal Mansur was one of the heads of the Hamas

6  movement, one of its commanders in Nablus, and a member of

7  his senior leadership.

8  Q    And who was Khaled Mashal?

9  A    Khaled Mashal at the time was the head of the Political

10 Bureau of Hamas.  He was, in fact, the leader of the Hamas

11 movement.  And he dwelled in Damascus at the time.

12 Q    And of course Osama Hamdan we referenced earlier about

13 the CNN video, correct?

14 A    True.

15 Q    And the last two, al-Rantisi and Yusuf Ramallah, do you

16 recognize those two names?

17 A    Yes, I recognize the names.

18 Q    And were they involved with Hamas?

19 A    Both of them were top activists, very senior activists,

20 of Hamas.  One of them acted in the Gaza Strip and the other

21 one was in the West Bank.

22 Q    And is this another example of cross-referencing

23 information to confirm that al-Sayed was appointed as

24 representative of Hamas in Tulkarem?

25 A    Yes.

SHAKED - DIRECT - TURNER                    1137

1    Q    Let's go to the next slide, continuing on with this

2    same document, 3524.  There is a quote, "The money that I

3    paid for the weapons was transferred to my private bank

4    account in Arab Bank in Tulkarem.  This money was sent from

5    the USA to my account," end quote.

6         Did I read that correctly?

7    A    Yes.

8    Q    At the time of these events, approximately, what was

9    the population of Tulkarem?

10   A    I would estimate it at 22,000 to 26,000 residents.

11             MR. TURNER:  Now, if we could go to the next

12   slide, same document.  We should have one more slide.

13   That's okay.  All right.

14             Now, finally if you would, put before the witness

15   1090, page 25.

16   BY MR. TURNER:

17   Q    And I want to ask you a second about memorializations

18   and then we're done with the Park Hotel.

19        Do you recognize Exhibit 1090, page 25?

20   A    Yes, I do.

21   Q    Do you recognize the image?  If so, who is it?

22   A    I recognize the picture.  It says shahid al-Qassam,

23   which means the material member of the al-Qassam,

24   Abdel-Basset Odeh.

25             MR. TURNER:  We offer 1090, page 25.

SHAKED - DIRECT - TURNER                    1138

1     MR. INGERMAN:  Same objection with respect to the

2  report, your Honor.

3     THE COURT:  I'm not going to admit the exhibit.  I

4  will allow it to be shown to the jury for demonstrative

5  purposes as part of the expert's opinion.

6     MR. TURNER:  Thank you, your Honor.  May we put it

7  up on the slide?

8     THE COURT:  Yes.

9     MR. TURNER:  This is 1090, page 25, for

10 demonstrative only.

11 BY MR. TURNER:

12 Q   Mr. Shaked, do you recognize the individual in the

13 photograph as the suicide bomber responsible for the Park

14 Hotel attack?

15 A   Yes, I recognize him.

16 Q   And can you interpret the Arabic?

17 A   It says first quoted in Arabic, "The shahid member of

18 al-Qassam, Abdel-Basset Odeh, who did the operation in

19 Netanya, the sacrifice operation of Netanya."

20 Q   And finally, did you also in addition to all of these

21 other sources of information, have an opportunity to

22 personally interview Abbas al-Sayed in prison?

23 A   Yes, did I interview him in jail.

24     MR. TURNER:  This is a good stopping point, your

25 Honor.

SHAKED - DIRECT - TURNER                1139

1          THE COURT:  All right.  Ladies and gentlemen,

2    we'll take our lunch break.  We'll reconvene at 1:45.  Have

3    a good lunch.  Don't talk about the case.  Stay away from

4    any press coverage.  See you in an hour and five minutes.

5          (Jurors exit the courtroom.)

6          THE COURT:  Okay.  Recess till 1:45.

7          (Luncheon recess taken.)

8          (Continued on the next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (Outside the presence of the jury.)

2      THE COURT:  Please bring in the jury.

3          (In the presence of the jury.)

4      THE COURT:  Be seated, please.

5              Continue, Mr. Turner.

6      MR. TURNER:  Thank you, your Honor.

7  Q    Mr. Shaked, have you also had the opportunity to

8  investigate the suicide bombing at a place called the

9  Sheffield Club in Rishon, on May 7th, 2002?

10 A    Yes.

11      MR. TURNER:  Can we post the slide?

12      THE COURT:  You may.

13 Q    Were you able to identify the suicide bomber?

14 A    Yes.

15 Q    Who was the suicide bomber?

16 A    At the bottom of the picture, there's the picture of the

17 suicide bomber, Muhammad Muammar.

18 Q    Were you able to determine whether Muammar acted alone or

19 whether he was acting for Hamas?

20 A    Muammar acted for the Hamas, as member of Hamas, on

21 behalf of Hamas.

22 Q    Can you briefly tell us where the Sheffield Club was at

23 the time and what it was?

24 A    The Sheffield Club is located in a city called Rishon,

25 south of Tel Aviv, in an industrial zone.  It is a club to

SHAKED - DIRECT - TURNER                    1141

1  which different people come to spend some time in the wee

2  hours of night.  They drink there.  They play cards, different

3  table games.  They also play billiards, for example.  It is a

4  place to come, and have fun and enjoy one's self.

5  Q    Were you able to determine from your investigation how

6  many people were killed and how many reported injuries there

7  were in this suicide attack?

8  A    Yes.  Fifteen people got killed and about fifty injured.

9  Q    And based on your investigation, who built the bomb?

10 A    The bomb was built by the same terrorist we discussed by

11 the name of Abdulla Barghouti.

12 Q    The one you interviewed?

13 A    Yes, I interviewed him.

14 Q    And did you personally talk with him about this terrorist

15 attack as well?

16 A    Yes, I discussed the suicide bombing with him.

17 Q    In this particular attack, based upon your investigation,

18 how was the bomb disguised?

19 A    In this case, it was a relatively large explosive charge.

20 Some of it was hidden in a bag in which there were shampoo

21 bottles that the explosives were inserted into to; the other

22 part was in an explosive built in like other cases of

23 terrorist attacks.

24 Q    In discussions, including your conversation with

25 Barghouti, did you learn information about ball bearings and

SHAKED - DIRECT - TURNER                    1142

1  screws, things of that nature, in these bombs?

2  A    Yes.

3  Q    What did you learn?

4            MR. INGERMAN:  Objection, your Honor.

5            THE COURT:  Overruled.  Well, I'm going to sustain

6  that objection.

7            MR. TURNER:  So you understand that he cannot

8  answer?

9            THE INTERPRETER:  Yes.

10 Q    Mr. Shaked, during the course of your investigation of

11 these 24 attacks, and especially in the multiple attacks that

12 Barghouti, the bomb maker, was involved in, in your

13 interviews, were you able to determine a course, or pattern or

14 practice of Barghouti, including certain items in bombs for

15 maximum effect?

16           MR. INGERMAN:  Objection.

17           THE COURT:  Sustained as to form.

18 Q    Were you able to learn any information during your

19 investigation from Barghouti or any other source information

20 about the contents of bombs?

21           MR. INGERMAN:  Objection.

22           THE COURT:  Sustained.

23 Q    Now, you have two individuals on your chart, both by the

24 name of Abbasi.  Do you see those individuals in the lower

25 right-hand corner?

SHAKED - DIRECT - TURNER                    1143

1    A    Yes, I can see them.

2    Q    What role did each play in the attack in Rishon?

3    A    The first one was Wisam Abbasi.  He is a member in Hamas

4    organization.  He was the one to choose the Sheffield club as

5    the sight for the terror attack, whereas Ala Abbasi, on the

6    right-hand side of the picture, was an active member of Hamas.

7    He collected information about the target, which is the

8    Sheffield Club in Rishon.

9    Q    To the right and left of Abdulla Barghouti, on the right

10   side, there's Wael Qassam and Muhammad Arman.  Are those the

11   same two individuals we've seen previously in some of the

12   attacks?

13   A    Indeed, these are the same two that were involved in

14   previous terrorist attacks.

15   Q    Likewise, have we previously seen Ibrahim Hamed?

16   A    Yes, we did see Ibrahim Hamed was the senior commander of

17   Hamas in Ramallah.

18           MR. TURNER:  If you would only show the witness,

19   please, 3598.

20   Q    Do you recognize 3598?

21   A    Yes, I do.

22   Q    What is 3598?

23   A    This is the official claim of responsibility by Hamas for

24   the perpetration of the terror attack at the Sheffield Club.

25   Q    What is the source of 3598, please?

SHAKED - DIRECT - TURNER                    1144

1   A    The source is the Internet website of Qassam Brigade, the
2   military wing of Hamas.
3           MR. TURNER:  We would offer that into evidence,
4   your Honor.
5           THE COURT:  Same objection?
6           MR. INGERMAN:  Yes, your Honor.
7           THE COURT:  Received over that objection.
8           (Plaintiffs' Exhibit 3598 was received.)
9           MR. TURNER:  Let's go to the slide, if you would,
10  Mr. Miller, with the English version on it.
11          Is that all right, your Honor?
12          THE COURT:  Yes.  We're putting it up.
13  Q    Now, there are a couple of things that I would like to
14  talk to you about very briefly first off.
15          MR. TURNER:  First of all, if you could blow up the
16  lower paragraph, and let's talk about the description of the
17  attack for a moment.
18  Q    Take a moment and read that to yourself, if you would,
19  Mr. Shaked.  My question is, is that consistent with the other
20  information you were able to find during your investigation of
21  this terrorist attack?
22  A    Yes.
23          MR. TURNER:  Now, if you could back out of that,
24  Mr. Miller, and enlarge the first paragraph.  Starts
25  without -- no, go back to the exit right up there.

SHAKED - DIRECT - TURNER                    1145

1    Q    Now, this particular part of the official claim of

2    responsibility indicates that, without revealing their names,

3    in addition, some of their valiant brothers of al-Qassam

4    carried out many operations for which we did not claim

5    responsibility, at the time, due to difficult security

6    conditions.

7              Based on your investigation, can you explain what

8    that means in terms of security in Israel?

9              MR. INGERMAN:  Objection.

10             THE COURT:  The witness can state his understanding

11   of what it means.

12             THE WITNESS:  I understand there are cases in which

13   Hamas would not claim official responsibility as quickly as it

14   does in other cases, and that is for security reasons.  They

15   might not want to harm the family, or other perpetrators or

16   other people who are still alive and related to the case, to

17   this specific terror attack, and have not been arrested yet.

18   And this is why, for security reasons, they would delay the

19   publicity or the publication of this claim of responsibility.

20   Q    Now, the second sentence in this particular excerpt

21   indicates this official claim of responsibility was delayed

22   for five years.  Was that something that you saw from time to

23   time in investigating these 24 attacks, this type of delay?

24   A    Yes, I have seen something like that, but not five years.

25             MR. TURNER:  Now, your Honor, may I display 3811,

SHAKED - DIRECT - TURNER                    1146

1    which is in evidence, but only the portion that pertains to

2    the Rishon terrorist attack?

3            THE COURT:  Yes.

4    Q    Now, this is the ISA report or at least the portion of

5    the Israeli Security Agency report that provides information

6    about the Rishon terrorist attack; is that correct?

7    A    Yes.

8    Q    And did this information published by the ISA help you

9    cross-check the information you were finding from the other

10   sources, in terms of the identity of not only the suicide

11   bomber but some of the other participants in the attack?

12   A    Yes, it was of help to me.

13           MR. TURNER:  If you could show the witness only

14   3513, please.

15   Q    Do you recognize 3513?

16   A    Yes, I do.

17   Q    And what in general is 3513?

18   A    This is a statement, a document published by the

19   Premier's Office, in which it brings the statement made by the

20   ISA, exposing the terror infrastructure that carried out the

21   terror attacks in Rishon and also another place, and that was

22   on a street in Tel Aviv.

23   Q    Did 3513, likewise, assist you in cross-checking the

24   accuracy of the information you were finding?

25   A    Indeed, it is another source to cross-check reference.

SHAKED - DIRECT - TURNER                      1147

1   Q    Although we've already seen these and will not look at

2   them again, 3356 and 3658 are both already in evidence as

3   Apostille convictions of Barghouti and Muhammad Arman.  Did

4   those, likewise, assist you in your investigation, in trying

5   to determine whether Hamas was responsible for this terrorist

6   attack?

7   A    Indeed, so.

8   Q    Now, in addition to Barghouti, did you also have an

9   opportunity to personally interview Wael Qassam?

10  A    Yes, I interviewed Wael Qassam as well.

11  Q    In interviewing Wael Qassam, was that in prison?

12  A    Yes, I interviewed him when he was in prison.

13  Q    And did that interview, likewise, assist you in

14  confirming your conclusions?

15  A    Yes, it did help me confirm that evidence in the

16  materials that I already had.

17  Q    Now, in terms of memorialization, did you also have an

18  opportunity to review any information indicating that a

19  mourners' tent, a ceremonial mourners' tent, was prepared by

20  Hamas for this particular terrorist suicide bomber?

21  A    Yes, a mourners' tint was put up in memory of the suicide

22  bomber.

23  Q    Did you also have an opportunity to investigate the

24  bombing of Bus 32-A, near a place called Pat Junction, in

25  Jerusalem that occurred in June of 2002?

SHAKED - DIRECT - TURNER                1148

1   A    Yes, I did.

2   Q    Were you able to determine who the suicide bomber was in

3   the Pat Junction Bus 32-A terrorist attack?

4   A    Yes.

5            MR. TURNER:  May we display the slide?

6            THE COURT:  Yes.

7   Q    Would you tell the ladies and gentlemen who the suicide

8   bomber was of Bus 32-A, near Pat Junction, in Jerusalem?

9   A    The suicide bomber was Muhammad al Ghoul, an MA student

10  at the University in Nablus.

11  Q    Were you able to determine whether al Ghoul was acting on

12  his own or whether he was acting for Hamas in carrying out

13  this terrorist attack?

14  A    Muhammad al Ghoul acted for Hamas, on behalf of Hamas, in

15  the name of Hamas.

16  Q    What role did Fahmi Mashahrah play in this particular

17  attack?

18  A    Fahmi Mashahrah lived in east Jerusalem, was an

19  operative, planned the attack and dispatched the bomber to the

20  bus stop where it was carried out.

21  Q    What role did Ramadan Mashahrah play?

22  A    Ramadan is Fahmi's brother.  They planned this attack

23  together as a family.  They're both members -- were both

24  members of Hamas.  They planned it together.  They decided

25  where it would be carried out.  They dispatched the suicide

1  bomber together to the bus stop.

2  Q    What about Muhamad al-Taher?  What role did al-Taher play

3  in this particular attack?

4  A    Muhamad al-Taher is a senior commander of Hamas in

5  Nablus.  He was the one who recruited the suicide bomber to

6  carry out this attack.

7  Q    And, finally, Ali Anan?

8  A    Ali Anan is the Hamas commander in southern West Bank.

9  He is the person who actually put the explosive belt on the

10  suicide bomber, Muhamad al Ghoul, and coordinated the attack.

11  Q    So we understand where Pat Junction is, can you describe

12  for us very briefly where Pat Junction is within Jerusalem and

13  the significance of Bus 32-A?

14  A    It's -- Pat Junction is located between the center of

15  Jerusalem and a neighborhood called Gilo, which is populated

16  by middle to lower class people who are in need of public

17  transportation in order to go to work and especially students

18  and pupils going to school.

19  Q    During the course of your investigation, were you able to

20  determine anything about the suicide bomber, al Ghoul, in

21  terms of his relationship to Hamas and his prior activity

22  within Hamas?

23  A    Muhamad al Ghoul was an operative in Hamas, in the

24  University in Nablus.  Based on the details I was able to

25  gather, he had tried twice before to carry out the suicide

SHAKED - DIRECT - TURNER                    1150

1    bombing but had been unsuccessful, and he succeeded the third

2    time.

3              MR. TURNER:  Show the witness only, please, 33611.

4    Q    Can you identify 3611?

5    A    Yes, I can.

6    Q    What is 3611, please?

7    A    This is the official claim of responsibility taken by Izz

8    al-Din al-Qassam.  They're taking responsibility for the bus

9    attack at Pat Junction in Jerusalem.

10   Q    What is the source of 3611?

11   A    It is the official Internet site of Izz al-Din al-Qassam,

12   the military wing of Hamas.

13   Q    Did this particular Exhibit, 3611, the official claim of

14   responsibility for this terrorist attack by Hamas, assist you

15   in concluding that Hamas was responsible?

16   A    Yes, it did help me to determine that Hamas is

17   responsible -- was responsible for the attack.

18             MR. TURNER:  We offer 3611.

19             THE COURT:  That's received over objection.

20             (Plaintiffs' Exhibit 3611 was received.)

21   Q    With respect to the ISA, were you able to review the

22   section of the ISA report pertaining to this particular

23   terrorist attack, which is previously been marked as 3811?

24   A    Yes, I reviewed that part of the ISA report regarding the

25   role of the suicide bomber in this attack.

SHAKED - DIRECT - TURNER                    1151

1  Q    Did that assist you in reaching your conclusion?

2  A    Yes, it helped me to draw my conclusions and to

3  cross-check my information.

4  Q    In addition the ISA report, did you also have access to

5  other government records, for instance, the conviction records

6  of the Mashahrah brothers?

7  A    Yes, I read the legal reports, and I followed the trial

8  of these two people.

9         MR. TURNER:  Could you show the witness only,

10 please, 3617?

11 Q    Do you recognize 3617?

12 A    Yes, I do.

13 Q    What is 3617?

14 A    Yes, this is the verdict of the military court that tried

15 Fahmi Mashahrah, one of the brothers.

16        MR. TURNER:  We offer 3617 as Apostille conviction

17 record of Fahmi Mushahrah.

18        THE COURT:  Received over objection.

19        (Plaintiffs' Exhibit 3617  was received in

20 evidence.)

21        MR. TURNER:  Show the witness, please 3647.

22 Q    Can you identify 3647?

23 A    Yes, I can.

24 Q    What is 3647?

25 A    This is a conviction of the other brother, whose name is

SHAKED - DIRECT - TURNER                    1152

1  Ramadan Mashahrah.

2  Q    And have you had an opportunity to review this conviction

3  record?

4  A    Yes.

5  Q    Were you actually in the courtroom the day of Ramadan

6  Mashahrah sentencing?

7  A    Yes, I was present in the courtroom.

8  Q    And was the terrorist required to allocute or stand up in

9  court and announce what he was guilty of?

10 A    Yes, he was -- the terrorist was asked to allocate and

11 confess to his crimes.

12 Q    Were you present to hear that confession?

13 A    I was present at the confession.

14 Q    And after the sentencing, did you obtain a copy of those

15 conviction records?

16 A    Yes, I got it from the clerk in the court.

17 Q    And was what you heard in the courtroom, what you heard

18 Ramadan Mashahrah say in the courtroom consistent with the

19 record you're now looking at on the screen?

20 A    Yes.

21       MR. TURNER:  We would offer 3647 as a non-Apostille

22 conviction record of Ramadan Mushahrah for this attack.

23       THE COURT:  Received over objection.

24       (Plaintiffs' Exhibit 3647  was received in

25 evidence.)

SHAKED - DIRECT - TURNER                    1153

1          MR. TURNER:  Show the witness, please, only 3645.

2   Q    Can you identify this Israel Ministry of Foreign Affairs

3   document?

4   A    Yes, I can identify it.

5   Q    Does this relate to the terrorist attack at Pat Junction

6   in Jerusalem?

7   A    It is, indeed.

8   Q    And in cross-checking the various sources of information

9   available, did this assist you in confirming that Hamas was,

10  in fact, responsible for this attack?

11  A    It did, indeed.

12         MR. TURNER:  Show the witness only, please, 3625.

13  Q    Can you identify 3625?

14  A    Yes, I can identify it.

15  Q    What is 3625?

16  A    This is the expert opinion of a police explosives' expert

17  who examined the findings at the site of the terror attack,

18  and this is the report on what he found.

19  Q    Is this the type of report that you've seen over the past

20  30 years?

21  A    Yes, this document is very similar to other documents

22  that I have seen.

23  Q    What is the source of this particular document?

24  A    The source is the Israel police.

25  Q    Did this document assist you in cross-referencing the

SHAKED - DIRECT - TURNER                    1154

1  various factual pieces of information you found during the

2  course of your investigation, linking Hamas to this terrorist

3  attack?

4  A    Yes, it did help me.

5  Q    Is this sometimes referred to in Israel as a SAPA

6  (phonetic) report?

7  A    Yes, it is.

8            MR. TURNER:  We offer 3625.

9            THE COURT:  All right.  Received over objection.

10           (Plaintiffs' 3625 was received in evidence.)

11           MR. TURNER:  Show the witness only, please, 3613.

12  Q    In addition to these other sources of information, did

13  you, likewise, in this particular case, have access to a will

14  of the suicide bomber prepared prior to the terrorist attack?

15  A    Yes, I saw and read the will of the suicide bomber.

16  Q    And in the will itself, there is an image.  Were you able

17  to identify the image?

18  A    Yes, I can identify that image.

19  Q    Who is the photograph of?

20  A    It is a picture of the suicide bomber Muhammad al Ghoul.

21  Q    What is the source of the will?  Where did you get it?

22  A    The will was published on the official site of Hamas on

23  the Internet.

24  Q    Did this information assist you in determining that

25  al Ghoul was, in fact, the suicide bomber responsible for the

NICOLE CANALES, CSR, RPR

SHAKED - DIRECT - TURNER                    1155

1   deaths and injury at this particular terrorist attack?

2   A    Yes, it did help me.

3            MR. TURNER:  We offer 3613.

4            MR. INGERMAN:  You've already excluded that,

5   your Honor.

6            THE COURT:  I think I did.

7            MR. TURNER:  Show the witness only, please, 3636.

8   Q    Can you identify 3636 as specifically the person in the

9   image?

10  A    Yes, I can, and I can identify the person who appears in

11  the picture.

12  Q    And does this relate to the Bus 32-A bombing at Pat

13  Junction?

14  A    Yes, it was related to the bus at the Pat Junction.

15  Q    And does this relate in any way to Hamas, and, if so, how

16  do you know that?

17  A    This is a picture of Muhammad al-Taher, the commander of

18  Hamas, in Nablus, whom I'm familiar with.  It says it also on

19  the picture.  Around him are pictures of terrorists for whom

20  he built bombs, and this is in order to glorify his name, as

21  it were.  And there's also a picture of the terrorist who blew

22  up the bus at the Pat Junction.

23  Q    Is this one of the memorialization-type materials or

24  sources of information that assisted you?

25  A    Yes, this is, indeed, a memorialization material related

NICOLE CANALES, CSR, RPR

SHAKED - DIRECT - TURNER                1156

1    to Hamas.

2    Q    Did you have an opportunity to investigate the bombing

3    that took place at Hebrew University in July of 2002, at

4    something called the Frank Sinatra student cafeteria in

5    Jerusalem?

6    A    Yes, I did investigate the terror attack that was carried

7    out in the Frank Sinatra cafeteria at Hebrew University in

8    Jerusalem.

9    Q    Were you able to determine the responsible party or at

10   least some of the responsible parties involved in this

11   terrorist attack?

12   A    Yes, Hamas was responsible for this terror attack, and

13   based on my finding, there were a number of people who were

14   connected with this terror attack.

15            MR. TURNER:  May we display the side?

16   Q    How many people were killed in this particular terror

17   attack at Hebrew University?

18   A    Nine students and university faculty were killed in this

19   terror attack.

20   Q    And how many were reported to be injured?

21   A    There were about 70 people injured as a result of the

22   explosion.

23   Q    Now, your slide has three individuals at the bottom.

24   First of all, the two Abassi names, what roles did they play

25   in this particular attack?

SHAKED - DIRECT - TURNER                    1157

1    A    If we go from left to right, we have Muhammad Abassi.  He

2    worked in the university, and he was a Hamas operative, and he

3    chose the place where the terror attack would be carried out.

4              THE INTERPRETER:  Excuse me.  I would like to

5    correct.  He chose the place where to place the bomb.

6              THE WITNESS:  In the middle of the picture, we have

7    Allah Abbasi.  He was Hamas operative.  He collected the

8    intelligence on the target for the attack.

9    Q    What about Muhammad Odeh?

10   A    I mentioned Muhammad Odeh earlier.  I think you may be

11   referring to Wisam Abbasi --

12   Q    I'm sorry.

13   A    He was also among those who collected intelligence and

14   various details on the place where to place the bomb,

15   regarding the cafeteria.

16   Q    The three in the middle row we've seen on some of the

17   other attacks; Wael Qassam, Abdulla Barghouti, and Muhammad

18   Arman.  Were you able to determine during the course of your

19   investigation that these individuals were, in fact, involved

20   in this particular attack?

21   A    Yes, I could determine that those three were directly

22   related to the terror attack.

23   Q    Did -- your personal interviews of Barghouti and Qassam,

24   while they were in jail, did those assist you in reaching

25   conclusions about the perpetrators of this particular

1   terrorist attack and Hamas' role?

2   A    Yes, in the interviews I conducted with them, they told

3   me about it, and that was a great help to me when I came to

4   cross-check it and to reach my conclusions.

5           MR. TURNER:  You might pull that microphone a little

6   bit closer.

7           THE INTERPRETER:  Sorry.

8   Q    Tell us a little bit about Hebrew University and the

9   Frank Sinatra cafeteria.  Where is that located, and why is

10  this particular place significant in terms of attacks like

11  this?

12  A    The cafeteria -- the Frank Sinatra cafeteria is in a very

13  central place at the University of Jerusalem.  It is the

14  central cafeteria where I myself have been dining daily for

15  the past four years.  There are many students who go there not

16  only to eat but also to meet one another and spend time.  It

17  is a relatively large place that is always crowded around

18  lunchtime, which is the time they go and have their lunch, not

19  just students but also teachers and professors.  This is also

20  a central meeting point for students.

21          MR. TURNER:  Would you show the witness only, please

22  3676.

23  Q    Can you identify 3676?

24  A    Yes.

25  Q    What is 3676, please?

SHAKED - DIRECT - TURNER                    1159

1    A    This is the written official claim of responsibility made

2    by Hamas for the terror attack at the Hebrew University in

3    Jerusalem.

4    Q    How do you know this is from Hamas?

5    A    Because it has the insignia of Hamas.  It has the

6    official logo of Hamas.  It has the special language used by

7    Hamas, including slogans of Hamas.  And according to my

8    experience and what I read in other statements and claims of

9    responsibility, Hamas documents I conclude that this is,

10   indeed, Hamas.

11   Q    How did you first personally receive this particular

12   claim of responsibility?

13   A    I think it was three-and-a-half hours after the attack.

14   When I returned from the Hebrew University to my office in the

15   center of town, my secretary handed it over, this document

16   that arrived by fax.

17   Q    And were you able to identify the fax number that it came

18   from?

19   A    No, I couldn't.

20   Q    And did you subsequently learn any additional information

21   confirming Hamas' role in this particular attack?

22   A    Indeed, I did receive many more documents and testimonies

23   that prove that this was an act done by Hamas.

24   Q    One of the sources of information would be conviction

25   records.  Did you have access in this particular case to

NICOLE CANALES, CSR, RPR

```
                        Sidebar                       1160
```

1  conviction records relating to the Sil Won (phonetic) cell for

2  this particular attack?

3           MR. INGERMAN:  Your Honor, may we approach?

4           THE COURT:  Sure.

5           THE WITNESS:  Your Honor, may I go to the bathroom

6  for a minute?

7           THE COURT:  The answer is yes.  I guess you can't

8  wait 20 minutes.

9           THE WITNESS:  I'll wait.  Thank you.

10        (Sidebar held outside the presence of the jury.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sidebar                                          1161

1        MR. INGERMAN:  Your Honor, with respect to 3676, I

2   think they put the cart before the horse there.  I thought he

3   was going to be able to authenticate it in some way.  He

4   couldn't.  The testimony to the jury was that he saw an

5   official claim of Hamas, and I'd ask that that testimony be

6   struck.

7        THE COURT:  Well, they haven't moved the exhibit in.

8        MR. INGERMAN:  I agree with that, which is why it

9   shouldn't have been read in before authentication.

10       THE COURT:  I don't think he read it in.  He

11  described it generically as official claim of responsibility

12  by Hamas.  I don't think he read a part.

13       MR. INGERMAN:  No, but -- the description was

14  official that he provided, left the jury with the

15  understanding that it was an official claim of responsibility

16  by Hamas.

17       THE COURT:  I think the jury understands that he is

18  basing his opinion on something that he considers to be an

19  official statement of responsibility from Hamas, that has not

20  been moved into evidence.  It's been testified to as part of

21  the basis for his opinion, and I think it's okay for an expert

22  to do that, so I'll overrule the objection.

23            (Sidebar concluded.)

24

25

NICOLE CANALES, CSR, RPR

1162

1        (In the presence of the jury.)

2        THE COURT:  All right.  Ladies and gentlemen, we're

3    going to take our afternoon break now.  We will reconvene at

4    five minutes to 3:00.  You know not what to talk about.  So

5    we'll see you in 15 minutes.  Thank you very much.

6            (Outside the presence of the jury.)

7        THE COURT:  Five to 3:00.

8            (Recess in proceedings.)

9        (Proceedings continued on the following page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

R. SHAKED - DIRECT/MR. TURNER          1163

1       (Honorable Brian M. Cogan takes the bench.)

2       THE COURT:  Jury please.

3       (Jury is in the courtroom at 2:57 p.m.)

4       THE COURT:  Be seated.  Continue, Mr. Turner.

5       MR. TURNER:  Thank you, your Honor.

6  DIRECT EXAMINATION (Continued)

7  BY MR. TURNER:

8  Q    I believe when we broke, Mr. Shaked, we were talking

9  about Exhibit 3592, which is already in evidence.  It is the

10 conviction records of associated with the Silwad cell which

11 included the Hebrew University bombing.  Are you familiar

12 with that fact?

13 A    Yes.

14 Q    And did those conviction records affirm for you your

15 conclusions that Hamas was responsible for the terrorist

16 attack at Hebrew University in the Frank Sinatra Cafe?

17 A    Yes, they do assist me in making this determination.

18 Q    Did you have an opportunity to investigate the bombing

19 on Bus Number 4 Allenby in Tel Aviv that occurred on

20 September 19, 2002?

21 A    Yes.

22 Q    And were you able to identify the suicide bomber on

23 Bus 4?

24 A    Yes.

25       MR. TURNER:  May we display the slide?

R. SHAKED - DIRECT/MR. TURNER                1164

1       THE COURT:  Yes.

2   Q    Who was the suicide bomber?

3   A    Hi name is Iyad Raddad.

4   Q    Were you able to determine whether or not Raddad was

5   acting on his own or working for Hamas when he carried out

6   the terrorist attack Bus Number 4 Allenby Street?

7   A    No, he was not on his own, he operated on behalf of

8   Hamas, for Hamas, as a member of Hamas.

9   Q    So that we have an understanding of Allenby Street, can

10  you please describe for us back in 2002 what Allenby Street

11  was in Tel Aviv and the significance of Bus Number 4?

12  A    Allenby Street is the center street in Tel Aviv leading

13  from north to south.  It is an extremely crowded street.  It

14  is a center for shopping, restaurants and entertainment.

15  Right next to where the explosion took place, there is also

16  a synagogue.  The attack took place in the junction of

17  Voltribe (phonetic) Boulevard and Allenby Street.  This is a

18  very, very central junction in Tel Aviv.  I could compare it

19  to the 5th Avenue and 42nd Street of New York, it is the

20  very hub of Tel Aviv.

21  Q    Now, you've got four individuals shown on the slide

22  depicting the terrorists involved in this particular attack.

23  Again, beginning at the top, we already talked about the

24  suicide bomber at the bottom, beginning at the top, Ibrahim

25  Hamed.  Is that the same gentleman that we've seen in a

R. SHAKED - DIRECT/MR. TURNER                1165

1  number of other attacks?

2  A    Indeed, it is the same Ibrahim Hamed, a senior Hamas

3  commander in the West Bank in Ramallah.

4  Q    And what about Hasnin Rumana, what role did he play in

5  Hamas?

6  A    Hasnin Rumana was a senior Hamas member.  He was the

7  military commander of Hamas.  He was the liaison between

8  Mahmoud Sharitah, the third one that appears in the slide,

9  and he was the one that connected between the higher

10 headquarters of Hamas and had a key role in this terror

11 attack.

12 Q    And what was Sharitah's role in this terror attack?

13 A    He was a senior member of Hamas.  He was a student in

14 the largest university of the West Bank.  He did not reside

15 in Ramallah, which is located south of West Bank.  He was

16 the one who recruited and dispatched the suicide bomber to

17 perpetrate the attack in Tel Aviv.

18         MR. TURNER:  Show the witness only, please, 3694.

19 Q    Can you identify 3694, sir?

20 A    Yes, I do.

21 Q    What is 3694?

22 A    This is the official claim of responsibility by Hamas

23 for the terror attack on Allenby Street in Tel Aviv.

24 Q    What is the source of 3694?

25 A    It is the official internet website of Hamas.

R. SHAKED - DIRECT/MR. TURNER                 1166

1          MR. TURNER:  We offer 3694.

2          THE COURT:  All right.  Received over objection.

3          (Plaintiff Exhibits 3694 was admitted into

4    evidence.)

5    Q    In addition to the official claim of responsibility,

6    did you have access to the Israel Security Agency report

7    reporting the details of the investigation surrounding this

8    particular attack in Tel Aviv?

9    A    Yes, I did have access to that.

10          MR. TURNER:  May we display 3811, which is in

11    evidence, but only the portion pertaining to the Allenby

12    Attack?

13          THE COURT:  Yes.

14    Q    The ISA report, Mr. Shaked, indicates that Raddad was,

15    in fact, the suicide bomber.  Is that, in fact, consistent

16    with your findings?

17    A    Yes, this is consistent with my findings.

18    Q    It also indicate that Raddad was originally from Jordan

19    and was the age 23.  Is that consistent with what you found?

20    A    Yes, I did confirm that.

21    Q    The terrorist Sharitah's name is also referenced in

22    this particular report.  Is that consistent with your

23    findings?

24    A    Indeed, sir.

25    Q    Now, let's go to --

R. SHAKED - DIRECT/MR. TURNER          1167

1        MR. TURNER:  Show the witness only, please, 3692.

2   Q    Can you identify 3692?

3   A    Yes, I can.

4   Q    Can you generally describe what 3692 is, please, sir?

5   A    This document is a document issued by the police

6   laboratory, which examined the findings in the scene and

7   brought those findings that actually informed them about the

8   materials used by the terrorist in order to build the bomb.

9   Q    Did 3692 assist you in reaching your conclusions that

10  Hamas was, in fact, responsible for this particular attack?

11  A    Yes, the findings did assist me.

12  Q    And what is the source of 3692, what agency does that

13  come from in the government in Israel?

14  A    The entity examining such cases is the Israel police.

15  It came from the forensic department of the Israel Police.

16       MR. TURNER:  We offer 3692.

17       THE COURT:  All right.  Received over objection.

18       (Plaintiff Exhibit 3692 was admitted into

19  evidence.)

20       MR. TURNER:  Would you show the witness, please,

21  3513.

22  Q    Can you identify 3513?

23  A    Yes, I can.

24  Q    What is 3513?

25  A    This is a report issued by the prime minister's office

R. SHAKED - DIRECT/MR. TURNER          1168

1    which described two terrorist attack after they were

2    uncovered and after the cell that perpetrated them was

3    uncovered.  One of them was the attack on Allenby Street in

4    Tel Aviv.

5    Q    Did this likewise assist you in confirming and

6    crosschecking the information to make sure that it was

7    accurate?

8    A    Yes, it did help me crosscheck the information.

9    Q    Now, in addition to these other sources, did you also

10   have available to you conviction records for people

11   associated with the Allenby attack?

12   A    Yes, I did.

13         MR. TURNER:  Can you please show the witness 3686.

14   Q    Can you identify 3686?

15   A    Yes, I can.

16   Q    What is 3686?

17   A    This is Mahmoud Sharitah.  He is the person who

18   dispatched the suicide bomber to the attack.  I'm sorry,

19   this is the verdict.  Sorry.  This is the verdict of Mahmoud

20   Sharitah, the person who dispatched the suicide bomber to

21   the attack.

22   Q    With Sharitah, did he confess, according to these

23   records, or did he plead guilty, what happened in this court

24   proceeding?

25   A    Sharitah indeed confessed to his action and it was

R. SHAKED - DIRECT/MR. TURNER                1169

1    based on that confession that he was convicted.

2         MR. TURNER:  Your Honor, we offer 3686, which is

3    the Apostilled conviction record of Sharitah.

4         THE COURT:  All right.  It's received over

5    objection.

6         (Plaintiff Exhibit 3686 was admitted into

7    evidence.)

8    Q    Now, in addition to -- let me back up one second.  We

9    were looking at the ISA report and there was a reference to

10   the fact that Raddad was originally from Jordan.  Is that

11   significant in terms of timing of the reporting of this

12   particular attack by Hamas?

13   A    Yes, because the claim of responsibility by Hamas,

14   which included the name of Raddad, was issued five years

15   after the Allenby bombing.

16   Q    Now, in addition to conviction records, did you also

17   have access to conviction records of Ibrahim Hamed at some

18   point in time?

19   A    Yes, I did have access.

20   Q    Did those records likewise assist you in either way,

21   either confirming or rejecting the notion that Hamas was

22   responsible for the Allenby attack?

23   A    Yes, it helped me.

24   Q    Now, did you also have an opportunity to investigate a

25   shooting attack on Route 60 that occurred in January of

R. SHAKED - DIRECT/MR. TURNER          1170

1   2003, that resulted in two people being injured?

2   A    Yes, I did investigate that.

3   Q    And were you able to, through the course of your

4   investigation, identify the terrorist involved in this

5   particular ambush?

6   A    Yes, I was able to identify the two shooters.

7           MR. TURNER:  May we display the slide?

8   Q    During the course of your investigation, Mr. Shaked,

9   who did you identify as the shooters involved in this

10  particular attack?

11  A    At the bottom of the page we can see the pictures and

12  names of Yasser Hamad and Farah Hamad, who were shooters,

13  and they're both members of the Silwad cell.

14  Q    And during the course of this investigation, were you

15  able to determine whether the shooters carried out this

16  ambush or attack on their own or by and for Hamas?

17  A    The attack was carried out for Hamas, by Hamas

18  operatives and directed by Hamas headquarters.

19  Q    Would you describe for us Route 60, where it's located

20  and what route or route that particular road provides access

21  to within the West Bank and Jerusalem area?

22  A    Highway 60 is the main longitudinal artery in the West

23  Bank.  It goes from north to south and branches off in

24  various places in the east and to the west.  It leads to

25  various village, towns and cities.  It is also the road that

R. SHAKED - DIRECT/MR. TURNER          1171

1  the settlers mainly use when travelling from Jerusalem to

2  the north or to the south.

3  Q    Let's go back to your slide for a minute and let's

4  focus on the lower group of photographs and the two people

5  on the end.  We've talked about the shooters.  What role did

6  Hamdan and Omar play in this particular attack?

7  A    We have to bear in mind that a shooting attack is

8  different than a suicide bombing; in such a case, more

9  people are involved, there are the shooters and other people

10  as well.  And so we have here on the right, Muayad Hamad,

11  and he was the get away driver.  He is the one that drove

12  the car away from the site of the attack and Khaled Omar on

13  the right, he was the commander, the planner of the

14  operation as it was carried out.

15  Q    What role did Hisham Hijazi play?

16  A    He was the commander that coordinated between the

17  headquarters and the cell.  He was the one that provided the

18  money and the weapons, and he also helped to plan the

19  operation.

20  Q    And how about Jesser Barghouti?

21  A    He was also senior commander in Ramallah.  He was a

22  field commander.  He obtained, supplied and transferred the

23  money and arms as well, and gave orders on how and what to

24  do.

25  Q    Now, Sayd Qasem and Ibrahim Hamed, who are shown at the

1  top two levels, are those individuals that we already

2  discussed?

3  A    Yes, we've already discussed Ibrahim Hamed.  He was the

4  commander of the military wing of Hamas in the Ramallah

5  area.  And Sayd Qasem, who was his deputy, and he was his

6  operational officer as it were and oversaw the attack.

7  Q    And finally, Murad Barghouti.  What role did Murad

8  Barghouti play?

9  A    There were a number of terror cells operating in this

10  area the role of Barghouti, Murad Barghouti was to be the

11  liaison between the various cells, in order to -- in the

12  Ramallah area in order to advance terror.

13         MR. TURNER:  Would you please show the witness

14  3719.

15  Q    Can you identify 3719?

16  A    Yes, I did.

17  Q    What is 3719?

18  A    This is a document that tells the history of the cell

19  in the Ramallah area.  It is taken from the official website

20  of Hamas.

21  Q    And is the source of the document indicated on the

22  document?

23  A    Yes.  As you can see here on the source it says here

24  Izz ad-Din al-Qassam, the source appears in both English and

25  in Arabic.

R. SHAKED - DIRECT/MR. TURNER          1173

1  Q    And did 3719 provide any information about the attack,

2  the shooting attack on Route 60 that occurred in January of

3  2003?

4  A    Yes, it does.

5  Q    Is this sometimes referred to as a special report?

6  A    Yes, this is indeed a special report.  That is,

7  dissimilar, unlike other reports, we're talking about a

8  different type of terror attack.  Unlike the suicide

9  bombers, in this case, the perpetrators were apprehended and

10 were in prison in Israel.  So this -- this is a special

11 report and it is longer than most of the others.

12          MR. TURNER:  We offer 3719.

13          MR. INGERMAN:  You've already excluded it, your

14 Honor.

15          THE COURT:  I did.

16          MR. TURNER:  Can I have the witness look at 3744,

17 please.

18 Q    Can you identify 3744?

19 A    Yes, I do.

20 Q    And what is 3744?

21 A    This is taken from the official website of Hamas.  It

22 is the opening page.  It gives detailed history of the

23 terror cell, but not only this particular cell that did the

24 shooting, but three others as well.

25 Q    Now, we've talked thus far about the al-Qassam website,

R. SHAKED - DIRECT/MR. TURNER          1174

1  which is part of Hamas.  Did Hamas also have a different

2  website?

3  A    Hamas, in fact, had two official websites.  One was the

4  political part of the political bureau, and the other

5  represented the military wing, but they were both official

6  sites.

7  Q    What was the political wing's website called or

8  referred to?

9  A    The political wing's website is called "Palestine Info"

10  and it represents the special information unit of Hamas.

11  Q    And is 3744 from the Palestinian Information Center?

12  A    Yes, it does.

13  Q    Did it assist you in crosschecking the facts

14  surrounding the Route 60 shooting?

15  A    Yes, it did.  As I noted, a lot of details were given

16  in it.

17          MR. TURNER:  We offer 3744 as redacted.

18          THE COURT:  Okay.  Consistent with my earlier

19  ruling, it's admitted over objection.

20          (Plaintiff Exhibit 3744 was admitted into

21  evidence.)

22          MR. TURNER:  Could you also put before the

23  witness, 3893.

24          MR. INGERMAN:  Your Honor, can we have a quick

25  sidebar on this?

R. SHAKED - DIRECT/MR. TURNER                1175

1        THE COURT:  Sure.

2        (Continued on the next page for sidebar.)

SIDEBAR CONFERENCE                    1176

1              (Sidebar conference begins.)

2          THE COURT:  What's the problem?  Everything is out

3    except the picture and the end.

4          MR. INGERMAN:  Well, let me just show you, your

5    Honor.

6          THE COURT:  Everything was out below the picture

7    and starting -- picking up here right.

8          MR. INGERMAN:  Above the picture it says, the

9    imprisoned --

10         THE COURT:  I took it out.

11         MR. INGERMAN:  But why?

12         THE COURT:  You want it in?

13         MR. INGERMAN:  Yes.

14         THE COURT:  But you didn't tell me that before.

15         MR. INGERMAN:  Well, you said everything below the

16   picture was going to be redacted.

17         THE COURT:  I see.  I see.  Do you have any

18   objection by the plaintiff in unredacting those two lines?

19         MR. OSEN:  No.  If the jury doesn't have it yet,

20   we'll make it.

21         THE COURT:  We'll give it to the jury.

22         MR. INGERMAN:  Thank you.

23             (End of sidebar conference.)

24             (Continued on the next page.)

25

R. SHAKED - DIRECT/MR. TURNER                1177

1    THE COURT:  All right.  Let's proceed.

2    MR. TURNER:  Please show the witness 3893.

3  Q   Can you identify 3893?

4  A   Yes.

5  Q   What is 3893?

6  A   It is a document of the Izz ad-Din al-Qassam Martyrs

7  Brigade taken from the official website of Hamas in which it

8  details the earlier attacks that we are discussing here.

9  Q   And did 3893 assist you in reaching the conclusions

10 that you did about Hamas' role in the attack on Route 60 in

11 January of 2003?

12 A   Indeed, it is another document that helped me

13 crosscheck the material and to determine my opinion.

14    MR. TURNER:  We offer 3893.

15    THE COURT:  Mr. Turner, how come you're offering

16 documents that I've excluded?

17    MR. TURNER:  My note didn't say that.  I

18 apologize.

19    THE COURT:  All right.  Well, check again tonight,

20 but that's excluded.

21    MR. TURNER:  Show the witness 3741, please.

22 Q   Can you identify 3741?

23 A   Yes, I do.

24 Q   What is 3741?

25 A   It is the verdict that was handed down against Muayad

R. SHAKED - DIRECT/MR. TURNER                1178

1   Hamad, a member of the shooters cell living in Silwad.

2   Q    And what was the result of the conviction?

3   A    He pled guilty and was sentenced to life sentence.

4           MR. TURNER:  We offer 3741 as Apostilled.

5           THE COURT:  All right.  That's received over

6   objection.

7           (Plaintiff Exhibit 3741 was admitted into

8   evidence.)

9   Q    Did you also have an opportunity to investigate the

10  bombing of Bus 37 in Haifa in March of 2003?

11  A    Indeed.

12  Q    Were you able to conclude who was responsible for that

13  particular bombing?

14  A    Yes.

15          MR. TURNER:  May we display the slide?

16          THE COURT:  Yes.

17  Q    Could you please identify who you determined was the

18  suicide bomber involved in this particular attack on Bus 37?

19  A    At the very bottom center of the slide you can see the

20  picture of Mahmoud Qawasmeh who carried out the attack on

21  Bus 37 in Haifa.

22  Q    And what did your investigation reveal about Qawasmeh?

23  A    Qawasmeh was a Hamas operative, a student at the

24  University of Hebron.  He studied computers and was

25  recruited to Hamas.  And on behalf of Hamas, went out and

R. SHAKED - DIRECT/MR. TURNER          1179

1   carried out the attack in Haifa.

2   Q    And were you able to determine whether or not Qawasmeh

3   was acting on his own or was he acting for Hamas in carrying

4   out the suicide attack on Bus 37?

5   A    Qawasmeh carried out the attack on behalf of Hamas, as

6   Hamas, member for Hamas.

7   Q    Back in 2003 where was Haifa and what was Bus 37?

8   A    Haifa is a port city in Israel.  It is located in the

9   northern part of the country.  It is located on the slopes

10  of a mountain.  And in trying to compare it to anything

11  here, then you can envision San Francisco, you can see the

12  mountain and the port.  And Bus 37 was one of the most

13  central bus lines commuting from downtown Haifa all the way

14  up to the University of Haifa, which is a very large

15  university.  So many students would commute by this

16  particular bus line.

17  Q    How many people were killed and injured in this

18  particular attack?

19  A    17 people were murdered in this terror attack and 53

20  were injured.

21  Q    What role did Ali Alan play in this attack?

22  A    Ali Alan was the commander of Hamas organization in the

23  southern area of the West Bank.  He was the one to command

24  that terror attack.  He was the one who built the explosive

25  charge that was assembled on the explosive belt that was

R. SHAKED - DIRECT/MR. TURNER                1180

1    fitted on the suicide bomber.

2              MR. TURNER:  Would you show the witness 3755,

3    please.

4    Q    Can you identify 3755?

5    A    Yes, I can identify it.

6    Q    What is 3755?

7    A    It is the official claim of responsibility by Izz

8    ad-Din al-Qassam brigade -- al-Qassam Martyrs Brigade, the

9    military wing of Hamas, claiming responsibility for the

10   attack carried out in Bus 37 Haifa, including the name of

11   the suicide bomber.

12             MR. TURNER:  We offer 3755.

13             THE COURT:  I'm confused on the number.  Let's

14   have a sidebar.

15             (Continued on the next page for sidebar.)

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                    1181

1          (Sidebar conference begins.)

2          THE COURT:  3775.  I think so.  What's ambiguous

3   is that you asked him about a claim of responsibility, but

4   you showed him the conviction document in Hebrew.  He

5   answered with what you wanted to show him, not what he was

6   looking at.  So you -- I don't know where you are, but what

7   you were showing him was the conviction document, not the

8   claim of responsibility.

9          MR. OSEN:  I think that popped up after the

10  question.

11         THE COURT:  Really?

12         MR. TURNER:  Yeah, there were two.

13         THE COURT:  So he looked at it and then looked

14  away and then another document came in.

15         MR. TURNER:  I had the number wrong, it was 3775.

16         THE COURT:  Yeah, it's 3775.  Okay.  So I think

17  what happened is I think he heard the wrong number and

18  switched it to the wrong document when he heard the wrong

19  number.  Straighten it out.

20         MR. OSEN:  Okay.

21         (End of sidebar conference.)

22         (Continued on the next page.)

23

24

25

R. SHAKED - DIRECT/MR. TURNER          1182

1        MR. TURNER:  Okay let's back up.  May I proceed?

2        THE COURT:  Yes.

3   BY MR. TURNER:

4   Q    Let's back up let's put up 3775.  Can you identify

5   3775?

6   A    Yes, I can.

7   Q    And what is 3775?

8   A    It is the official claim of responsibility by Izz

9   ad-Din al-Qassam Brigade, the military wing of Hamas

10  concerning the terror attack on Haifa Bus 37, which includes

11  the name of the suicide bomber, Mahmoud Qawasmeh.

12       MR. TURNER:  We offer 3775.

13       THE COURT:  That's received over objection.

14       (Plaintiff Exhibit 3775 was admitted into

15  evidence.)

16  Q    Were you also able to access the Israel Security Agency

17  report reporting on the investigation of this particular

18  attack on Bus 37?

19  A    Yes.

20       MR. TURNER:  May we display 3811, which is in

21  evidence, at least the portion related to Bus 37.

22  Q    Was Qawasmeh identified by the Israel Security Agency

23  as the suicide bomber?

24  A    Yes, indeed so.

25  Q    And did this assist you in reaching your conclusions?

R. SHAKED - DIRECT/MR. TURNER          1183

1   A    Of course it did help me crosscheck the information I

2   had.

3   Q    Now, in addition to those two pieces of information,

4   did you also have access to court records, convictions of

5   some of the individuals involved in this terror attack?

6   A    Yes.

7        MR. TURNER:  Put 3755 up this time, please.

8   Q    Can you identify 3755?  What is 3755?

9   A    This is the verdict against one of the terrorist that

10  was involved in the terror attack on Bus 37, and he was

11  sentenced to 17 life sentences.

12  Q    And what was his name?

13  A    Can you please move it up or down a bit, so I can see.

14  I do not want to be mistaken about the name.  The other

15  side.  As I told you, it was Fadi al-Ja'aba.

16       MR. TURNER:  We offer 3755.

17       THE COURT:  Received over objection.

18       (Plaintiff Exhibit 3755 was admitted into

19  evidence.)

20       MR. TURNER:  Show the witness 3756, please.

21  Q    Can you identify 3756?

22  A    Yes, I can.

23  Q    What is 3756?

24  A    This is the verdict against Munir Rajbi, member of

25  Hamas cell who participated in preparing the terror attack

R. SHAKED - DIRECT/MR. TURNER                1184

1    on Bus 37.

2              MR. TURNER:  We offer 3756.

3              THE COURT:  That's the Apostilled document?

4              MR. TURNER:  Yes, sir.

5              THE COURT:  All right.  That's received over

6    objection.

7              (Plaintiff Exhibit 3756 was admitted into

8    evidence.)

9              MR. TURNER:  And 3754, please.

10   Q    Can you identify 3754?

11   A    Yes.

12   Q    What is 3754?

13   A    This is the verdict against another terrorist whose

14   name is Mu'az Abu Sharakh, who also participated in

15   preparing the terror attack.

16              (Continued on the next page.)

17

18

19

20

21

22

23

24

25

SHAKED - DIRECT - TURNER                    1185

1       MR. TURNER:  We offer 3754

2       THE COURT:  All right.  Received over objection.

3       (Plaintiffs' Exhibit 3754 received in evidence.)

4   BY MR. TURNER:

5   Q    In addition to those sources of information,

6   Mr. Shaked, did you likewise have available to you a will

7   from Qawasmeh that was prepared prior to the attack?

8   A    To the best of my recollection, Mr. Mahmoud Qawasmeh

9   wrote a will, but I did not see it.

10  Q    Did you have access to any memorialization materials

11  created by Hamas memorializing Qawasmeh's act in bombing bus

12  37 in Haifa?

13  A    Yes, indeed.

14  Q    Did you have an opportunity to investigate the shooting

15  attack that occurred in Kiryat Arba in March of 2003?

16  A    Yes.

17  Q    Were you able to determine during the course of your

18  investigation who was involved in that terror attack?

19  A    Yes.  Two members of Hamas were involved in this terror

20  attack, Hazem al-Qawasmeh and Muhsin al-Qawasmeh.

21      MR. TURNER:  May we display the slide.

22  BY MR. TURNER:

23  Q    Where is or was Kiryat Arba at the time of this terror

24  attack?

25  A    Kiryat Arba is a settlement bordering with Hebron.

SHAKED - DIRECT - TURNER                    1186

1   Q    Was this a significant area in terms of the attack

2   geographically?

3   A    Yes.  Because the access from the sea of Hebron to

4   Kiryat Arba, despite the security means used, is very easy.

5   Q    Did your investigation determine how many shooters were

6   involved in this particular attack?

7   A    Yes, I did reach a conclusion.

8   Q    And was there one location -- okay.  Go ahead and give

9   us your conclusion.

10  A    My conclusion was that two Hamas members, whose names I

11  mentioned, carried out the attack in Kiryat Arba.

12  Q    And was there one location for the shooting or two?

13  A    On that very same evening, at the very same time, at

14  the very same hour, in exactly the same timing, Hamas

15  carried out two attacks.  One was in Kiryat Arba east of

16  Hebron and the second one was in a place called Negohot,

17  west of Kiryat Arba.  In other words, two attacks that

18  happened simultaneously by four terrorists.

19  Q    Now, in the context of this particular attack, you have

20  two other individuals listed on here:  Basel al-Qawasmeh and

21  Abdallah abu Seif.

22       What was their roles in this attack?

23  A    Basel al-Qaawasmeh was one of the senior commanders of

24  Hamas from the military wing in Hebron.  He was a senior

25  commander, and he was the one to bring the explosive vest to

SHAKED - DIRECT - TURNER          1187

1   one of the terrorists in this attack to instruct and guide

2   and issue the instructions for the execution of the attack.

3       Abdallah abu Seif, on the other hand, was another

4   senior member of Hamas in Hebron.  He was the one leading

5   the two terrorists toward their target in Kiryat Arba.

6           MR. TURNER:  Show the witness 3781.

7           THE COURT:  Before you do that, can you go back to

8   the slide for a minute.  I just want to ask the witness.

9           Why is there no picture of Seif?

10          THE WITNESS:  We were unable to obtain a clear

11  picture that wasn't blurred.

12          THE COURT:  Thank you.

13          MR. TURNER:  3781.  Witness only, please.

14  BY MR. TURNER:

15  Q    Can you identify 3781, Mr. Shaked?

16  A    Yes, I can.

17  Q    And what is 3781?

18  A    This is the official claim of responsibility taken by

19  or made by Hamas' Izz al-Din Al-Qassam Martyrs Brigade,

20  which is its military wing for the attack in Kiryat Arba.

21          MR. TURNER:  We offer 3781.

22          THE COURT:  All right.  That's received over

23  objection.

24          (Plaintiffs' Exhibit 3781 received in evidence.)

25  BY MR. TURNER:

1  Q    Did 3781 help you conclude who was responsible for this

2  terror attack on behalf of Hamas?

3  A    Yes.  I'd like to note that it did indeed help me.

4            MR. TURNER:  Show the witness 3797, please.

5  BY MR. TURNER:

6  Q    Can you identify 3797?

7  A    Yes, I do.

8  Q    And can you generally describe what 3797 is?

9            THE COURT:  Generally.

10           This didn't sound general.  Let's see.

11 A    This is a document issued by the Prime Minister's

12 office that describes the terror attack that was held in

13 Kiryat Arba.  It describes the attack, how it was carried

14 out, and who was hurt.

15           THE COURT:  Okay.

16 BY MR. TURNER:

17 Q    Did that information assist you in crosschecking what

18 you already knew from the claim of responsibility?

19 A    Yes, it did.

20           MR. TURNER:  Would you show the witness 4777,

21 please.

22 BY MR. TURNER:

23 Q    Can you identify 4777?

24 A    Yes, I do.

25 Q    What is 4777?

SHAKED - DIRECT - TURNER                1189

1  A    This is the verdict and sentence regarding the deeds of

2  Muhammad Abu Seif.

3  Q    Did this conviction relate to this attack?

4  A    Excuse me.  Abdallah Abu Seif.

5  Q    Does this conviction relate to this attack?

6  A    Yes.  It relates to one of the terrorists involved

7  whose name I just mentioned, Abdallah Abu Seif.

8  Q    Is Abdallah Abu Seif the one that we did not have a

9  photograph for?

10  A    Yes, indeed, that's the man.

11          MR. TURNER:  Show the witness 3789 as well,

12  please.

13  BY MR. TURNER:

14  Q    Do you recognize 3789?

15  A    Yes, I can identify this document.

16  Q    And what is 3789?

17  A    Yes.  This is a page from the Web site of Izz al-Din

18  Al-Qassam Martyrs Brigade, the military wing of the Hamas.

19  And it is devoted to one of the terrorists involved in the

20  terror attack in Kiryat Arba.  It tells his life story and

21  the story of the terror attack as told by Hamas.

22  Q    And in addition to these sources of information, did

23  you likewise have available any memorializations prepared by

24  Hamas glorifying this conduct?

25  A    Yes, I did.  I had a number of posters that were

SHAKED - DIRECT - TURNER                1190

1  distributed throughout the city of Hebron.

2  Q    Did you have an opportunity to investigate the suicide

3  bombing that occurred at a place called Mike's Place in Tel

4  Aviv in April of 2003?

5  A    Yes, I did.

6  Q    And were you able to identify the suicide bombers

7  involved in this particular attack?

8  A    Yes, I was able.

9         MR. TURNER:  May we display the slide?

10 BY MR. TURNER:

11 Q    Who were the suicide bombers involved in carrying out

12 the attack at Mike's Place that resulted in three deaths and

13 50-plus reported injuries?

14 A    The two suicide bombers were British citizens of

15 Pakistani origin.  One was named Asif Hanif and the other

16 was named Khan Sharif.  And they both arrived in Israel and

17 were sent to carry out the terrorist attack.

18 Q    Tell us a little bit about Mike's Place.  What was

19 Mike's Place back in 2003 in Tel Aviv and where was it

20 located?

21 A    Mike's Place was one of the more popular jazz clubs

22 located in Tel Aviv.  It's located near the main promenade

23 of the Tel Aviv beach just meters away or yards away from

24 the American Embassy in Israel.  It's located in a very busy

25 place, and at night many young people come to the club to

SHAKED - DIRECT - TURNER                1191

1    hear live jazz music being played.

2    Q    Did your investigation give you any background

3    information on how Hanif and Khan, the two terrorists, made

4    it into Israel?

5    A    Yes, they did.

6    Q    What did you learn during the course of your

7    investigation about these two terrorists?

8    A    These were two members of the British mujahideen

9    organization.  They had decided to come to the Middle East

10   to help the Islamic organizations fighting in it, especially

11   Al-Qaeda.  They arrived in Syria and after they were unable

12   to reach Iraq, they made contact with Islamic operatives in

13   Damascus, and they received a new target in the territories.

14       They were equipped with very sophisticated plastic

15   explosives which they hid between the pages of a Koran book.

16   They arrived in Israel via the Allenby Bridge.  They visited

17   in Jerusalem and in Tel Aviv.  They arrived in Gaza where

18   they met with members of Hamas.  And there they received the

19   orders or the authorization from the headquarters to carry

20   out the terror attack.

21       They returned to Tel Aviv and late at night they

22   entered the Mike's Place jazz club.  One of them blew

23   himself up in it.  The other escaped and later his body was

24   retrieved from the ocean.

25   Q    Were you able to determine during the course of your

SHAKED - DIRECT - TURNER                1192

1  investigation whether both terrorists were equipped with

2  bombs or whether only one of them had a bomb?

3  A    One of the terrorists was equipped with the explosive

4  materials that I described earlier that was hidden within

5  the pages of a Koran book and the other had an explosive

6  belt.

7  Q    And during the course of your investigation, were you

8  able to determine one way or the other whether the bomb that

9  did not detonate failed to detonate by mistake or did the

10 terrorist change his mind and run away?

11           MR. INGERMAN:  Objection, your Honor.

12           THE COURT:  Sustained.

13 BY MR. TURNER:

14 Q    Were you able to determine -- you can't answer that.

15      Were you able to determine during the course of your

16 investigation why the second bomb did not detonate?

17 A    Yes.  In my assessment and based on information I

18 collected, the second bomb did not blow up for technical

19 reasons.  That was the reason it did not blow up.

20 Q    Now, in looking at the photograph, do you recognize

21 this photograph from other sources?

22 A    I've seen this photograph in many places, not only on

23 the Web site of Hamas.

24 Q    Now, there's a reference to a poster of Ibrahim

25 al-Maqadma.  Do you know who Ibrahim al-Maqadma was back in

SHAKED - DIRECT - TURNER                    1193

1  2002, 2003?

2  A    Yes, I know who Ibrahim al-Maqadma is.

3  Q    Who?

4  A    Ibrahim al-Maqadma was one of the founders of Hamas

5  together with Sheikh Yassin.  He was responsible for Hamas'

6  military -- for the connection between the military wing and

7  the political wing of Hamas.  Because of his activities in

8  Hamas, he was eliminated by Israel in 2002.  We see him here

9  in the poster that was issued in his memory by Hamas.

10     I would like to add that in the poster, we can see that

11 the terror attack that these two men are about to carry out

12 is going to be held in honor of the memory of.

13 Ibrahim al-Maqadma.

14 Q    How can you tell that?

15 A    I know this based on a statement issued by Hamas a year

16 after the terror attack carried out by these two men at

17 Mike's Place.

18 Q    And was that statement made on a particular

19 anniversary?

20 A    Yes.

21 Q    And what was the anniversary of?

22 A    It was on the anniversary of Maqadma's death.

23 Q    Now, is there any significance in trying to determine

24 Hamas' role in this particular attack at Mike's Place to the

25 green banner these two gentlemen are standing in front of?

SHAKED - DIRECT - TURNER                1194

1   A    Of course.  It's the green, the green color of the

2   Hamas flag.  That is the main symbol of Hamas, the color

3   green.  We can see it in the flag.  We can see it in the

4   headband they are wearing on their forehead.  And we can see

5   it also in the background of the picture of Maqadma.

6   Q    And what are these two terrorists holding, in addition

7   to the rifles?

8   A    In addition to the rifle each is holding, they are

9   holding a book of the Koran.

10            MR. TURNER:  Show the witness 3807, please.

11  BY MR. TURNER:

12  Q    Can you identify 3807?

13  A    Yes, I do.

14  Q    What is 3807?

15  A    This is an official claim of responsibility made by

16  Hamas' Izz al-Din Al-Qassam Martyrs Brigade.  It's a

17  military statement from Izz al-Din Al-Qassam regarding the

18  terror attack at Mike's Place.

19            MR. TURNER:  We offer 3807.

20            THE COURT:  In light of the objection, do a better

21  foundation for it.

22  BY MR. TURNER:

23  Q    What is the source of 3807?

24  A    The source is the official Internet Web site of Izz

25  al-Din Al-Qassam Brigade, which is the military wing of

SHAKED - DIRECT - TURNER                    1195

1   Hamas.

2           MR. TURNER:  We offer 3807.

3           THE COURT:  All right.  It's received over

4   objection.

5           (Plaintiffs' Exhibit 3807 received in evidence.)

6   BY MR. TURNER:

7   Q   Did 3807 help you reach the conclusion that Hamas was,

8   in fact, responsible for the bombing at Mike's Place?

9   A   Indeed, it was.

10          MR. TURNER:  Show the witness 3812, please.

11  BY MR. TURNER:

12  Q   Do you recognize 3812?

13  A   If you can blow it up a bit.

14      Yes, I can identify it.

15  Q   What is 3812?

16  A   It is the claim or announcement made by Izz al-Din

17  Al-Qassam Brigade concerning the terror attack in Mike's

18  Place, including the names of the two perpetrators of the

19  attack.

20  Q   Is this the same document that you were referring to

21  earlier that was issued on the anniversary of Maqadma's

22  death?

23  A   If you can put it up a bit.

24      No, it is not the same document.

25  Q   Did this one come -- what was the source of 3812?

SHAKED - DIRECT - TURNER                1196

1   A    Is this the document that I'm seeing here (indicating)?

2   Q    Yes, I'm sorry.

3   A    The official Web site of Izz al-Din Al-Qassam.  This is

4   the official Web site of Hamas.

5   Q    And did 3812 assist you in crosschecking information

6   that you were provided and made available in determining

7   Hamas' role in this particular attack?

8   A    Yes, it did help me determine the role of Hamas in this

9   terror attack.

10           MR. TURNER:  We offer 3812.

11           MR. INGERMAN:  Same objection.

12           THE COURT:  Well, let's have a sidebar.

13           In fact, it's probably a good breaking time.  So

14   rather than keeping the jury for our sidebar and breaking,

15   let me send them home.

16           Ladies and gentlemen, don't discuss the case

17   amongst yourselves or with anyone else.  Don't do any

18   research.  Don't look on Google or any other site.  Keep it

19   to yourself.  Don't even think about it till you get back

20   here tomorrow morning.  Stay away from any news reports.

21           Have a good night.

22           (Jurors exit the courtroom.)

23           THE COURT:  Okay.  Be seated.

24           I'm not as familiar with this document as I am

25   with the other one so I'm going to look at it overnight.

PROCEEDINGS                    1197

1          MR. TURNER:  May he be excused?

2          THE COURT:  Sorry.  You may all step down.

3          (Witness exits the courtroom.)

4          THE COURT:  So I'll look at it overnight.  It's

5     probably going to be admitted over the objections that have

6     been previously made.  But it caught me a little off guard

7     and it was time to break in the day anyway.

8          Anything else we need to take up?

9          MR. WERBNER:  Your Honor, are we going to be in

10    session on Friday, September 5th?  You had mentioned that

11    possibility.

12         THE COURT:  I hope to be.  I was going to poll the

13    jury on Thursday and see if they had any real problems with

14    it.  If not, then my intention is to do that, especially

15    since this witness is taking longer than I anticipated.

16         Does that pose a hardship for anyone?

17         MR. WERBNER:  No.  I'd like to be in session.  But

18    if we are, I was going to try to -- I need to make some

19    travel plans.  So if I know Thursday, that's fine.  Sooner

20    would be good as well.

21         THE COURT:  All right.  Why don't I instead of

22    waiting till Thursday, we'll talk to the jurors.  I'll have

23    Ms. Clarke talk to the jurors tomorrow morning and see if

24    any of them have a problem on September 5th.  If they don't,

25    then we'll sit on that day.

```
                    PROCEEDINGS                    1198
```

1            MR. WERBNER:  Thank you.

2            THE COURT:  Have a good night.

3            MR. OSEN:  Your Honor, as you may recall, we filed

4    our letter last night.

5            THE COURT:  Yes.

6            MR. OSEN:  The defendant has not yet responded to

7    it.

8            THE COURT:  I thought -- on 7, 8 and 9?

9            MR. OSEN:  Yes.  They filed a letter saying that

10   they would respond --

11           THE COURT:  Oh.

12           MR. OSEN:  -- sometime today or whenever, but not

13   last night.  And I only asked about it because the folks

14   from IT who have to cut the tapes are then put under a lot

15   of pressure.  And we'd like it to be as smooth as possible.

16           THE COURT:  What time will we have the objections?

17           MR. OSEN:  It's not the objections, your Honor.

18   It's their response.

19           THE COURT:  Counter-designation?

20           MR. OSEN:  I'm sorry.  Let me back up a second.

21           THE COURT:  Okay.

22           MR. OSEN:  They filed their counters.  We objected

23   yesterday and filed a letter itemizing, detailing our

24   objections to the counters.  And they have not responded yet

25   to that letter about our objections.

PROCEEDINGS                          1199

1         THE COURT:  To their counters?

2         MR. OSEN:  Correct.

3         THE COURT:  I understand.

4         MR. INGERMAN:  Your Honor, we had a letter ready

5    to go and then you issued an order this morning.  That order

6    impacts some of the issues that the plaintiffs raised in

7    their letter.  So we're just reworking the letter to take

8    that into consideration.

9         We can get it on file by 7:00, if that's okay.

10        THE COURT:  That's great.

11        MR. INGERMAN:  Thank you.

12        THE COURT:  Thank you all.  See you tomorrow.

13        MR. WERBNER:  Good night.

14        (Time noted:  4:19 p.m.)

15        (Proceedings adjourned until Wednesday, August 27,

16   2014, at 9:30 a.m.)

17

18

19

20

21

22

23

24

25

1200

1    **I N D E X**

2

3    **WITNESS**                                              **PAGE**

4

5

6        RONNI SHAKED

7        DIRECT EXAMINATION (CONTINUED) BY

8        MR. TURNER                                      1052

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1204

```
 1                  UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF NEW YORK
 2

 3   COURTNEY LINDE, ET AL.,        )
                                    )   04CV02799 (BMC)
 4                 Plaintiffs,      )   And all related cases:
                                    )   04CV05449 (Litle)
 5                                  )   04CV05564 (Almog)
                                    )   04CV00365 (Coulter)
 6                                  )   05CV00388 (Afrait-Kurtzer)
                                    )   05CV03183 (Bennett)
 7        -against-                 )   05CV03768 (Roth)
                                    )   06CV01623 (Weiss)
 8                                  )
                                    )   United States Courthouse
 9                                  )   Brooklyn, New York
                                    )
10   ARAB BANK, PLC,                )   WEDNESDAY, AUGUST 27, 2014
                                    )
11                 Defendant.       )
     _____)

12

13           TRANSCRIPT OF CIVIL CAUSE FOR JURY TRIAL
               BEFORE THE HONORABLE BRIAN M. COGAN
14                UNITED STATES DISTRICT JUDGE

15
     APPEARANCES:
16
     FOR PLAINTIFFS LINDE      OSEN, LLC
17   AND COULTER:              BY:  GARY M. OSEN, ESQ.

18                            TURNER & ASSOCIATES, PLLC
                              BY:  CLYDE T. TURNER, ESQ.
19

20   FOR PLAINTIFFS LITLE,     SAYLES WERBNER
     BENNETT AND ROTH:         BY:  MARK S. WERBNER, ESQ.
21

22
     FOR PLAINTIFFS ALMOG:     STONE BONNER & ROCCO, LLP
23                             BY:  JAMES P. BONNER, ESQ.

24                            MOTLEY RICE, LLC
                              BY:  MICHAEL E. ELSNER, ESQ.
25                            BY:  JODI FLOWERS, ESQ.
```

1205

1

2  (APPEARANCES CONT.)

3  FOR THE DEFENDANT:          DLA PIPER US, LLP
                               BY:  SHAND STEPHENS, ESQ.
4                              BY:  ANTHONY PAUL COLES, ESQ.
                               BY:  BRETT INGERMAN, ESQ.
5                              BY:  MARGARET CIVETTA, ESQ.

6

7  INTERPRETED BY:             VARDA YAARI, RACHELLE AVITAL,
                               MICHAL MARIN AND NERI SEVENIER
8

9  THE COURT REPORTER:         NICOLE CANALES, CSR, RPR
                               225 Cadman Plaza East
10                             Brooklyn, New York 11201
                               cnlsnic@aol.com
11

12  Proceedings recorded by mechanical stenography, transcript
    produced by computer-assisted transcript.
13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                          1206

1          (Outside the presence of the jury.)

2          THE COURT:  With regard to the letter I received

3    yesterday, concerning the witness scheduling issue, there's

4    not a lot I can do to help here.  I've got a really full

5    calendar tonight, so I can't get rid of that; that includes a

6    sentencing tonight.  I think we're just going to have to see

7    what happens.  I'm sure the defendant will do what they can to

8    not inconvenience the witness or the plaintiffs, consistent

9    with their obligation to represent the client, so we'll just

10   have to see.  There was one other thing.  Yes, I need to have

11   specific and exhibits by Friday.  Okay.  Yes.

12         MR. OSEN:  Your Honor, depending on what happens

13   here today, we'll either have it by Friday or even have it

14   today, depending on how things go, so they're more or less

15   ready, subject to the schedule.

16         THE COURT:  Okay.  Anything else we need to cover?

17   All right.  We'll have the jury, please.  You should sit.

18   Might take a while.  We are off to an early start.  That's

19   good.  We're checking on the jurors' schedules for a week from

20   Friday, so we should know that this morning.

21         MR. OSEN:  Your Honor, one other question.

22         THE COURT:  Yes.

23         MR. OSEN:  The deposition designations are still

24   pending.  Presumably we'll play them tomorrow.

25              (In the presence of the jury.)

Shaked - Direct - Turner                   1207

1          THE COURT:  We're working on that.

2          Be seated, please.  Good morning, ladies and

3     gentlemen.

4          THE JURORS COLLECTIVELY:  Good morning.

5          THE COURT:  We'll continue with direct examination.

6     I think where we left off was the proffer of Exhibit 3812,

7     which was received over objection.

8          MR. TURNER:  Thank you, your Honor.

9                    RONNI SHAKED,

10    recalled as a witness, by and on behalf of the plaintiffs,

11    having been first duly sworn, was examined, and testified

12    further as follows:

13    DIRECT EXAMINATION (CONTINUED)

14    BY MR. TURNER:

15    Q    And just for purposes of putting it into context, 3812

16    was one of the claims of responsibility by Hamas; is that

17    correct, sir?

18    A    I need to know exactly what terror attack this is.

19    Q    Mike's Place?

20    A    Yes, indeed so.

21    Q    Now, in addition to the claims of responsibility, and I

22    believe yesterday it was established that there were two

23    separate ones; one a short time after the attack, and then

24    another one, I think, over a year later.

25          Were there other claims of responsibilities made by

Shaked - Direct - Turner                    1208

1   any other terror organizations for the Mike's Place attack?

2   A    Yes, there were other organizations, sir.

3   Q    Who else claimed responsibility for that attack, other

4   than Hamas?

5   A    Because this whole thing was very vague, there were

6   various organizations that try to piggyback.  This particular

7   one, it was the Hamas the, PIJ, and I myself admit that I

8   thought there were even traces of Al-Qaeda there.  There were

9   others who argued it was the Hezbollah.  It was very vague.

10  It wasn't clear.  The various organizations tried to claim

11  responsibility for this one.

12  Q    Over a period of time, did responsibility for the Mike's

13  Place attack clarify itself?

14  A    Yes.

15           MR. TURNER:  Your Honor, may we go back and display

16  the slide, your Honor?

17           THE COURT:  Yes.

18  Q    Now, yesterday -- we won't go back through all this, but

19  yesterday we talked about the banner, Hamas banner; we talked

20  about the Hamas headbands; we talked about the photograph, and

21  the one thing we didn't talk about, which is already in

22  evidence, is did Hamas at some point in time release a video

23  of these two terrorist prior to the attack?

24  A    Indeed, the Hamas released a videotape of these two

25  terrorists who perpetrated the terror attack.

Shaked - Direct - Turner                          1209

1    Q    And, the video, was it made prior to the attack by Hamas?

2    A    Yes.

3    Q    And can you give us a time perspective; when was the

4    video released of these two terrorists after the attack?

5    A    This videotape was released by Hamas a year after the

6    terror attack.

7              MR. TURNER:  May we display 3811, which is already

8    in evidence.  This is the ISA report.  This will be pertaining

9    to a section pertaining to Mike's Place.

10   Q    Did the ISA, the Israeli Security Agency, report that was

11   ultimately issued about the Mike's Place attack, identify the

12   same two suicide bombers as you were able to identify them?

13   A    Yes, they were identified by the ISA report.

14   Q    In addition to the ISA report, were you given access to

15   other government agency reports and announcements that further

16   clarified that Hamas was, in fact, responsible for this

17   attack?

18   A    Yes, there were.

19   Q    As part of the other sources of information, did you at

20   any point in time have access to Hamas-created memorials of

21   this particular attack, glorifying the terrorists?

22   A    Yes, I did have access to the posters or what we've seen

23   here, which was the beginning of a videotape.

24   Q    Did that further help you cross-check your sources of

25   information for accuracy?

Shaked - Direct - Turner                    1210

1   A    Yes, it did.

2   Q    Did you have an opportunity to investigate the Bus 6

3   bombing in Jerusalem, at a place called French Hill that

4   occurred May 18th, 2003?

5   A    Yes, I examined this terror attack, too.

6   Q    Now, the jury has already had an opportunity to see the

7   videotaped deposition of Mr. Averbach, at the first of the

8   trial; and I realize you were not here, but were you able to,

9   as part of your investigation, identify who the suicide bomber

10  was in this particular attack?

11  A    Yes.

12         MR. TURNER:  May we display the slide for Bus 6

13  bombing?

14         THE COURT:  You may.

15  Q    Who was the suicide bomber that blew up Bus 6?

16  A    At the bottom part of the slide, you can see the picture

17  of Basem Takruri, a very young man, perhaps, 19 or 20, or even

18  younger than that.  He blew himself up on Bus 6 on French

19  Hill.

20  Q    Were you able to determine whether he was acting alone or

21  acting for Hamas?

22  A    He acted on behalf of Hamas.  If I may tell you, this

23  young man wore the clothes of a religious Jewish man.  He wore

24  a yamika, a skull cap, and a black coat to camouflage his

25  identity, and he did this because Hamas demanded him and

Shaked - Direct - Turner                    1211

1    requested him to do this.  So he did this for Hamas, and he

2    saw himself as a member of Hamas.

3              MR. TURNER:  Show the witness 3830, please.

4    Q    Do you recognize 3838?

5    A    Yes, I do.

6    Q    What is 3838?

7    A    This is an official claim of responsibility for the

8    bombing of Bus 6 in Jerusalem that was published by Hamas.

9              MR. TURNER:  We offer 3838.

10             THE COURT:  Need a little nor foundation, please.

11   Q    What is the source of 3838?

12   A    The source for this document is the official Internet

13   website of the Qassam Brigades, the military wing of Hamas.

14             THE COURT:  All right.  The document is admitted

15   over objection.

16             (Plaintiffs' Exhibit 3838  was received in

17   evidence.)

18   Q    In addition to the official claim of responsibility by

19   Hamas for the bombing of Bus 6, did you have access to the

20   Israeli Security Agency report previously marked as 3811,

21   which confirmed your findings with regard to claim of

22   responsibility?

23   A    Yes, I did have the opportunity to examine official

24   documents.

25             MR. TURNER:  May we briefly display the portion of

Shaked - Direct - Turner                    1212

1   the ISA report pertaining to this attack?

2          THE COURT:  You may.

3   Q    Did the Israeli Security Agency report help you confirm

4   both the identity of the suicide bomber and Hamas' role in

5   this attack?

6   A    Yes, it was with the help of this report that I could

7   cross-check the information that I had.

8   Q    Did you also have access to other government agency

9   information, such as Prime Minister releases of the ISA

10  report, relating to this particular attack?

11  A    Yes, I did.

12         MR. TURNER:  Would you show the witness 3852,

13  please.

14  Q    Can you identify 3852, sir?

15  A    Yes.

16  Q    What is 3852?

17  A    Yes, this is the sentencing that was given against Omar

18  Sharif, member of Hamas, who fitted the belt and dispatched

19  the suicide bomber who perpetrated the attack on busses.

20         MR. TURNER:  Your Honor, we offer 3852 as Apostilled

21  or certified.

22         THE COURT:  It is received over objection.

23         (Plaintiffs' Exhibit 3852  was received in

24  evidence.)

25  Q    Did you -- in addition to these other sources of

NICOLE CANALES, CSR, RPR

1   information we've talked about, did you at some point in time

2   come into possession of a will, a video will, of one of the

3   perpetrators of this attack?

4   A    Yes, I did have access to the long will of the suicide

5   bomber.

6   Q    And what was the source of the video will of the suicide

7   bomber?

8   A    The will was published by the Qassam Brigades, the

9   military wing of a Hamas, after the execution of the attack by

10  Basem Takruri.

11  Q    Did this will, and particularly the words of the suicide

12  bomber himself, help assist you in identifying Hamas as the

13  responsible organization for this attack?

14  A    Indeed, these words helped me.  In particular, the

15  personal words uttered by the terrorists who said I, the

16  living, Shaheed, operate on behalf of Hamas organization in

17  the execution of this attack.

18          MR. TURNER:  Your Honor, we would offer 3863 into

19  evidence and ask that we show the video.

20          THE COURT:  All right.  That is received over

21  objection.

22          (Plaintiffs' Exhibit 3863  was received in

23  evidence.)

24          MR. TURNER:  May we have the lights?

25              (Video played for the jury.)

Shaked - Direct - Turner                          1214

1          THE COURT:  Can you pause it a minute.

2          Do you need more?

3          MR. TURNER:  Pardon?

4          THE COURT:  Do you need more?

5          MR. TURNER:  No, sir.

6          THE COURT:  Please continue.

7          MR. TURNER:  There's not much more of it.  That's

8    fine.  Could we have the lights?

9    Q    And, finally, as sources of information for the Bus 6

10   suicide bombing on French Hill, did you have access to

11   memorializations, glorifying this particular terrorist that

12   were published by Hamas after the attack?

13   A    Yes, I did receive such materials.

14         MR. TURNER:  Your Honor, we would also offer into

15   evidence 3853, which is the conviction record of Basel

16   Qawasmeh, and it's Exhibit 3853.  It's Apostilled.

17         MR. INGERMAN:  Your Honor, this is one of the ones I

18   think Mr. Osen and I spoke about; they were not going to offer

19   it because it was not in the expert's report.

20         MR. TURNER:  We're not offering it through the

21   witness, I'm just offering the Apostille conviction of Basel

22   Qawasmeh into evidence as a certified copy of the conviction

23   record.

24         THE COURT:  Okay.  Let's have a sidebar, please.

25         (Sidebar held outside the presence of the jury.)

1                          (Sidebar.)

2          THE COURT:  Is it not on a particular exhibit list?

3          MR. INGERMAN:  No, it's on the exhibit list, but it

4    wasn't in the expert's report.

5          THE COURT:  What if they finish this expert, and

6    then offered it not through the expert?  It's an Apostille

7    document.

8          MR. INGERMAN:  I think it's got to come in through a

9    witness.

10          THE COURT:  No, it's self-authenticating.  It

11    doesn't.

12          MR. INGERMAN:  We would object to it.

13          THE COURT:  Overrule the objection.

14                     (Sidebar concluded.)

15

16

17

18

19

20

21

22

23

24

25

Shaked - Direct - Turner                    1216

1              (In presence of the jury.)

2              THE COURT:  All right.  That document is received.

3              Continue.

4              (Plaintiffs' Exhibit 3853  was received in

5    evidence.)

6    Q    Mr. Shaked, have you also had the opportunity to

7    investigate the Bus 14A bombing, the suicide bombing that

8    occurred in Jerusalem on Jaffa Road, on June 11, 2003?

9    A    Yes.

10   Q    Were you able to identify the suicide bomber in this

11   attack?

12   A    Yes, I did identify him.

13              MR. TURNER:  May we display the slide?

14              THE COURT:  Yes.

15   Q    Who was the suicide bomber that carried out the attack on

16   Bus 14A, resulting in 17 deaths and 100-plus injuries?

17   A    At the bottom of the slide, you see the picture of Abd el

18   Muati Shabana.  He was a Hamas operative.  He committed the

19   bombing at the bus and committed suicide in it.  You can also

20   identify him by the green bandana he's wearing on his head.

21   Q    Were you able to determine whether Shabana acted alone or

22   whether Shabana was acting for Hamas in carrying out this

23   suicide attack?

24   A    Shabana was member of Hamas, a member of Hamas, and he

25   committed this act in the name of Hamas, on behalf of Hamas,

Shaked - Direct - Turner                    1217

1    in the name of Hamas.

2           MR. TURNER:  Show the witness 3866, please.

3    Q    Can you identify 3866?

4    A    Yes, I can identify this document.

5    Q    What is 3866?

6    A    This is a document by the al-Qassam Brigades from the

7    website of Hamas, in which they claim responsibility for the

8    line 14 bombing and tell the story of the suicide bomber.

9           MR. TURNER:  We would offer 3866.

10          THE COURT:  All right.  That's received over

11   objection.

12          (Plaintiffs' Exhibit 3866  was received in

13   evidence.)

14          MR. TURNER:  May we display 3866 very briefly?

15          THE COURT:  You may.

16   Q    Mr. Shaked, when the exhibit comes onto the scene, can

17   you identify for us whether or not the suicide bomber

18   photographed in the Hamas official claim of responsibility is

19   the same individual you identified as the suicide bomber of

20   Bus 14A in Jerusalem?

21   A    Yes, indeed, this is the same picture of Abd el Muati

22   Shabana.

23   Q    Did you, likewise, have access to the Israeli Security

24   Agency report from the investigation of this particular

25   attack, which has been previously marked as 3811?

Shaked - Direct - Turner                    1218

1    A    Yes, I had access to the accident report.

2            MR. TURNER:  May we briefly display the section of

3    the ISA report relating to the Bus 14A bombing?

4            THE COURT:  Yes.

5    Q    Did the ISA report identify the same suicide bomber?

6    A    Yes, indeed, it identified the same suicide bomber,

7    Abd el-Muati Shabana.

8            MR. TURNER:  Go back to the original slide, if you

9    will, slide of the attack.

10   Q    The center photograph on the slide, once it pops up, will

11   be of Basel al-Qawasmeh.  We previously marked as and

12   introduced 3853, which was the conviction record of Basel

13   al-Qawasmeh.  Is that the same Basel al-Qawasmeh that

14   participated in this attack as well?

15   A    Yes, the Basel al-Qawasmeh that we see -- whose picture

16   we see in the middle of the slide, with the white head (sic)

17   on his head, is the same Basel al-Qawasmeh who committed the

18   attack and commanded it.

19           MR. TURNER:  Show the witness 3881, please.

20   Q    Can you identify 3881?

21           MR. TURNER:  That's not 3881.  Exhibit 3881.

22   Q    Can you identify 3881?

23   A    Yes, I can.

24   Q    What is 3881?

25   A    Yes, this is the sentencing of Omar Mohammed Sharif, the

Shaked - Direct - Turner                     1219

1   man who fitted the explosive belt on the body of the suicide

2   bomber and dispatched him to bomb Bus Number 14.

3          MR. TURNER:  We offer 3881 as Apostilled version or

4   certified version of the conviction records for Omar Sharif.

5          THE COURT:  That's received over objection.

6          (Plaintiffs' Exhibit 3881  was received in

7   evidence.)

8   Q    In addition to these other sources of information, did

9   you have an opportunity to locate a will for the suicide

10  bomber in your research?

11  A    Yes.

12  Q    And did you, likewise, have access to any memorialization

13  prepared by Hamas glorifying the suicide bomber for this

14  attack?

15  A    Yes, Hamas did several memorializations for the glory of

16  this attack.

17  Q    Did you also have an opportunity to investigate another

18  shooting attack on Route 60 that occurred on June 20, 2003?

19  A    Yes, I did investigate that.

20  Q    Were you able to determine whether or not Hamas was

21  responsible for this second attack on Route 60?

22  A    Yes, I determined that it was a terrorist from Hamas who

23  perpetrated the shooting on Route 60.

24          MR. TURNER:  May we display the side related to this

25  attack?

Shaked - Direct - Turner                    1220

1     THE COURT:  Yes.

2  Q    Were you able to identify some of the key individuals

3  involved in this attack through your investigation?

4  A    Yes, I did.

5  Q    Now, there's a group of five individuals across the

6  bottom.  Can you very briefly tell us about this particular

7  attack and the role of these five individuals in the attack?

8  A    This is a group, a squad, of shooters.  They had divided

9  roles between them.  In the center of the picture we see two

10  shooters, Back med al Najab (phonetic/Hebrew) and

11  Faha Sual (phonetic/Hebrew).  The driver was Ahmed Mohammed.

12  He's on the right-hand side on the photograph.  And Yasser

13  Hamed, on the right-hand side, was a lookout and recognizance

14  man.  The commander of this attack was Hide Oma

15  (phonetic/Hebrew), on the left-hand side of the picture.

16  Q    And at the very top, Ibrahim Hamed, we've seen him in a

17  number of the attacks in the last day or so.  What role did

18  Ibrahim Hamed play in this particular Hamas attack?

19  A    Ibrahim Hamed was the commander of Hamas, of -- rather

20  the military wing of Hamas in Ramallah, and he had both to

21  authorize this action and also to give the instruction to

22  execute it.

23     MR. TURNER:  Show the witness 3744, please.

24  Q    Can you identify 3744?

25  A    Yes, I can.

NICOLE CANALES, CSR, RPR

Shaked - Direct - Turner                    1221

1           MR. TURNER:  I believe this may already be in

2      evidence, your Honor.

3           THE COURT:  It is, but you were going to unredact

4      the top two lines.

5           MR. TURNER:  Say that again.  I apologize.

6           THE COURT:  You have part of it blacked out above

7      the picture, and I thought we had agreed you were going to

8      submit it, as the defense requested, without those lines in

9      it.

10          MR. TURNER:  That's no problem.  We have no

11     objection to doing that.  We're not going to display it.  I'm

12     just showing this as part of the source of the information he

13     relied on.

14          THE COURT:  That's fine.

15     Q    What is 3744, Mr. Shaked, and how did that help you

16     identify Hamas as responsible for this particular shooting

17     attack?

18     A    This was taken from the official website of Hamas, from

19     their public diplomacy department.  It tells the story of the

20     squad, as Hamas tells it, according to the Hamas narrative,

21     and this was published after the members of the squad were

22     arrested.  And this story, this narrative, as it appeared on

23     the website did help me in checking and making -- very fine

24     (sic) who exited the shooting on Route 60.

25          MR. TURNER:  Your Honor, we would offer into

NICOLE CANALES, CSR, RPR

Shaked - Direct - Turner                1222

1   evidence the following conviction records for four of these

2   individuals, relating to the Route 60 attack on June 20, 2003,

3   Exhibit 4007 of the Hijaz, H-i-j-a-z; 4008, the conviction

4   records of Omar, Route 60 attack; 4009, the conviction records

5   of Hamed, and 4010 Khaled.  The conviction records, all

6   Apolstilled, were certified.

7           THE COURT:  They are received over objection.

8           (Plaintiffs' Exhibit 4007, 4008, 4009, 4010  were

9   received in evidence.)

10  Q    Did you, likewise, have an opportunity to investigate the

11  Bus 2 suicide bombing that occurred in Jerusalem on

12  August 19, 2003?

13  A    Yes, I did.

14          MR. TURNER:  May we display the side?

15          THE COURT:  Yes.

16  Q    Were you able to determine the name or identity of the

17  suicide bomber of Bus 2 that resulted in 23 deaths and a

18  hundred thirty-plus injuries?

19  A    Yes.

20  Q    And before we talk about each of these participants and

21  their role in this attack, can you describe for us the

22  significance of bomb -- of Bus 2 and the route of Bus 2 in

23  Jerusalem at the time of this particular attack?

24  A    Bus Line Number 2 is mostly intended to serve the

25  religious population in Jerusalem.  The aim of this particular

Shaked - Direct - Turner                    1223

1    bus line is to transport people from the Wailing Wall.  This

2    is the holy place for the Jewish people that is located right

3    next to the temple, as it is seen, according to the tradition.

4    And, from there, to transport these people to their homes, in

5    a relatively not so well-to-do neighborhood of religious

6    people in Jerusalem.  It is a very large bus, carrying people,

7    men, woman and children, who go back to their homes from the

8    evening prayer at the Wailing Wall.

9    Q    What did your investigation reveal about Raed Misk, the

10   suicide bomber?

11   A    Raed Misk is a very, very special type of suicide bomber.

12   He was extremely educated.  He was at the very last stages of

13   writing his Ph.D. dissertation at the University of Nablus.

14   After finishing graduating his academic studies, he did his

15   BA/MA at the University of Hebron.  He was a married man.  He

16   had young children.  However, he was extremely religious.  You

17   might even call him fundamentalist.  And he was prepared to

18   carry out the attack in a way that is very hard to describe.

19   He did it with great joy, almost elated.  He was so happy to

20   carry out the murder of people.

21   Q    Now, as part of your investigation, did you have access

22   to video will that was prepared as part of Hamas and

23   distributed by Hamas of Raed Misk?

24            MR. INGERMAN:  Objection, your Honor.

25            MR. TURNER:  It's in evidence, your Honor, as 3912.

NICOLE CANALES, CSR, RPR

Shaked - Direct - Turner                    1224

1      THE COURT:  Well, the objection, I assume, is to the

2  question.  I'm not seeing what's wrong with the question.  Did

3  he have access to it?

4      MR. INGERMAN:  Its leading.

5      THE COURT:  It's preliminary.  Overruled.

6      THE WITNESS:  Yes, I did have access to this will.

7      MR. TURNER:  Your Honor, at this point, we'd like to

8  show a clip of 3912.  Its different than the clip previously

9  seen, and this goes directly to the part that Mr. Shaked was

10  referencing.

11      THE COURT:  All right.  You may proceed.

12      MR. TURNER:  May we have the lights?

13      THE COURT:  Yes.

14      MR. TURNER:  This is clip two of Exhibit 39.

15          (Video played for the jury.)

16      MR. TURNER:  Can you stop the video for a moment and

17  let me ask a question.

18  Q    Does the headband have any significance, Mr. Shaked, for

19  purposes of relating this gentleman, this terrorist, to Hamas?

20  A    Indeed so.  In the Palestinian society, there are signs

21  and there are symbols for every organization.  This is not a

22  monolithic society, so Hamas or the military wing of Hamas

23  would wear on their heads green headband.  If it was the

24  Fatah, that would be a yellow headband.  If it is the PIJ,

25  Palestinian Islamist Jihad, they would be wearing a black

Shaked - Direct - Turner                    1225

1  bandana.  In the Popular Front for the Liberation of

2  Palestine, which is the more Marxist organization, would wear

3  a red headband.  In other words, the headband is the symbol

4  that identifies and links the individual to the organization

5  he belongs to.

6           MR. TURNER:  Okay.  Mr. Miller.

7              (Video played for the jury.)

8           MR. TURNER:  That's sufficient.  Could we have the

9  lights.

10 Q    Did that video assist you in connecting the relationship

11 between the terrorists and Hamas?

12 A    Yes.

13 Q    Did your investigation reveal how the terrorist was

14 disguised as he climbed aboard Bus 2 in Jerusalem?

15 A    Yes.

16 Q    How was he disguised?

17 A    Yes.  In order to match the appearance of other people

18 who would board this bus, he made himself look like a

19 religious man.  He had black skull cap like the other

20 residents of the neighborhood who mounted that bus.  They

21 would all have such on their heads.  He was wearing a black

22 coat.  And because he was a heavy man, he could conceal

23 underneath his black coat the explosive belt.  When he boarded

24 the bus, everyone thought that that was yet another resident

25 of the neighborhood, another passenger.  It was late at night,

Shaked - Direct - Turner                    1226

1    so it was easy for him to disguise himself.

2              MR. TURNER:  Show the witness 3952, please.

3    Q    Do you recognize 3952?

4    A    I do.

5    Q    What is 3952.

6    A    This is an official claim of responsibility by Hamas

7    organization, or the military wing of Hamas organization, for

8    the perpetration of the attack on Bus Number 2 in Jerusalem by

9    the suicide bomber Rael Misk.

10   Q    What is the source of 3952?

11   A    The source is the official website of Hamas, the military

12   wing of Hamas.

13             MR. TURNER:  We offer 3952 into evidence.

14             THE COURT:  I thought this already came in through

15   Coleman.  Am I wrong?

16             MR. TURNER:  Did I do this earlier?

17             THE COURT:  Not you.  I thought it came in through

18   Coleman.

19             MR. TURNER:  My note doesn't show that.  If it's

20   already in evidence, that's fine.

21             THE COURT:  If it's not, I'll admit it over

22   objection, but I think it's already in.

23             (Plaintiffs' Exhibit 3952  was received in

24   evidence.)

25   Q    Now, in addition to the claim of responsibility, the

Shaked - Direct - Turner                    1227

1    official claim of responsibility by Hamas, did you also have

2    access to Exhibit 1248, which is in evidence, which is a

3    United States Government designation of terrorism that

4    specifically references the Bus 2 bombing in Jerusalem.

5    A    Yes, indeed, this designation was published in the

6    Israeli media, in a very prominent way.

7    Q    How did this particular piece of evidence assist you in

8    not only investigating this bombing but identifying Hamas as

9    one of the -- as the terror group responsible for this attack?

10   A    This piece of evidence is but one piece of a whole

11   picture of many details that I collected.  All together they

12   form the picture which led me to the conclusion that, indeed,

13   Hamas was behind this terror attack.

14   Q    Did you also have access to conviction records of four of

15   the individuals on the slide we were previously looking at?

16   A    Yes.

17           MR. TURNER:  Your Honor, we would offer into

18   evidence the Apostille or certified versions of 3947, which is

19   Nisim Zatari; 3944, the conviction of Majdi Zatari; 3946, the

20   conviction records of Abdallah Sharif Barghouti; and 3945,

21   which are the conviction records of Jalil Ynghmur,

22   Y-n-g-h-m-u-r.

23           THE COURT:  Those are received over objection.

24           (Plaintiffs' Exhibit 3947, 3944, 3946, 3945  were

25   received in evidence.)

NICOLE CANALES, CSR, RPR

Shaked - Direct - Turner                    1228

1   Q    Did those conviction records further inform you about

2   Hamas' role in this attack?

3   A    Yes, this piece of information helped me cross-check the

4   information I had.

5   Q    Did you also have the opportunity to investigate the

6   suicide bombing at a place called Cafe Hillel, in Jerusalem,

7   that occurred September 9, 2003?

8   A    Yes, I did investigate this attack.

9             MR. TURNER:  May we display the slide?

10            THE COURT:  Yes.

11  Q    Were you able to determine the identity of the suicide

12  bomber who carried out the attack on Cafe Hillel, in 2003?

13  A    Yes.

14  Q    Were you able to determine whether he acted alone or

15  whether he was acting for and on behalf of Hamas in carrying

16  out this terrorist attack?

17  A    Ramed abu Saleem (phonetic/Hebrew) was the terrorist of

18  Hamas, a member of Hamas who operated on behalf of Hamas, in

19  the framework of the cell of Hamas, and on behalf of Hamas

20  perpetrated this attack.

21  Q    By way of background, can you tell us what was, back in

22  2003, Cafe Hillel in Jerusalem, and where was it generally

23  located?

24  A    Cafe Hillel is located in a southern neighborhood in

25  Jerusalem, in the German colony.  It is some sort of a yuppie

Shaked - Direct - Turner                    1229

1  neighborhood, where many traditional and young academics live.

2  This neighborhood has many cafes, and in the evenings, many

3  young people and many families attend those cafes, like in any

4  other place.  This specific cafe became very popular even

5  before the attack.  It was very popular among academics and

6  very young people.

7  Q    How far was Cafe Hillel from your office in 2003?

8  A    Two or two-and-a half kilometers away.

9  Q    Did you go to the scene of this attack on the night of

10 the attack?

11 A    Yes, I was in my home, and I rushed over there while

12 still in my slippers.

13 Q    Can you give us an idea of approximately how long it took

14 you to get to the scene after the attack occurred?

15 A    Not more than 15 to 20 minutes, I believe.

16 Q    Were you able to determine who prepared the bomb for this

17 attack?

18 A    Yes.

19 Q    Who prepared the bomb?

20 A    This man is called Baheesh Balel (phonetic), Hamas

21 operative, and he was the man who built the bomb.

22 Q    At some point in time, did you actually have the

23 opportunity to sit down and interview the bomb-maker?

24 A    Yes, I did have this opportunity, and I interviewed him.

25 Q    And during the course of that interview, did you have the

Shaked - Direct - Turner                    1230

1  opportunity to talk with him about this particular attack in

2  Cafe Hillel and how he made the bomb?

3  A    Yes, we did talk about the terror attack in Cafe Hillel

4  and the way he built the bomb.

5  Q    Did you videotape the interview?

6  A    Yes, I did.

7          MR. TURNER:  Show the witness 3993, if you would.

8  Q    Can you identify 3993, please?

9  A    Yes, I can identify it.

10 Q    What is 3993?

11 A    Yes, this is a document of the Qassam Brigades, the

12 military wing of Hamas, taking responsibility for the Cafe

13 Hillel bombing.  And in addition to another attack that

14 happened at the same time, but for our matter, Cafe Hillel is

15 what is important.

16 Q    What is the source of 3993?

17 A    The official website of al-Qassam Brigades, the military

18 wing of Hamas.

19          MR. TURNER:  Offer 3993.

20          THE COURT:  That's received over objection.

21   (Plaintiffs' Exhibit 3993 was received in evidence.)

22 Q    Now, as part of following-up and cross-checking your

23 investigation, did you have access to the ISA report,

24 reporting on the investigation findings of the Israeli

25 Security Agency regarding the Cafe Hillel terrorist attack?

Shaked - Direct - Turner                    1231

1   A    Yes, I did check ISA reports regarding the Cafe Hillel.

2         MR. TURNER:  May we display 3811, which is already

3   in evidence?

4         THE COURT:  Yes.

5   Q    Did the ISA report assist you in identifying the suicide

6   bomber and some of the participants from Hamas in this attack?

7   A    Yes, indeed, it happened.

8   Q    Did you, likewise, have access to other government

9   records, such as the Prime Minister's records, relating to

10  this particular Cafe Hillel attack?

11  A    Yes, I did.

12  Q    Did those, likewise, confirm your conclusions?

13  A    Every piece of such information is part of the general

14  picture, which later generates my conclusions.

15  Q    Did you also have access to conviction records for some

16  of the participants in this attack?

17  A    Yes.

18        MR. TURNER:  We offer into evidence 3742 and 3987,

19  which are conviction records for Salah Musa, both Apostilled.

20        (Plaintiffs' Exhibits 3742 and 3987 were received in

21                          evidence.)

22        THE COURT:  They are received over objection.

23  Q    Did you also have access to a will prepared by the

24  suicide bomber that was shown through Al Jazerra?

25  A    Yes, I did.

Shaked - Direct - Turner                    1232

1   Q    Did you have access to any memorializations prepared by

2   Hamas, glorifying the suicide bomber and attack on Cafe

3   Hillel?

4   A    Yes, there were many.

5   Q    Did you also have the opportunity to investigate a

6   shooting attack at a place called Tal Romeda, in October of

7   2003, near Hebron?

8   A    Yes, I had this opportunity.

9   Q    Were you able to identify the shooter in this particular

10  attack?

11  A    Yes, I did.

12         MR. TURNER:  May we display the slide for the Tal

13  Romeda?

14         THE COURT:  You may.

15  Q    Who was the shooter?

16  A    The shooter is a resident of Hebron, a member of Hamas,

17  Rifiq Aqanibi.

18  Q    During the course of your investigation, were you able to

19  determine whether Aqanibi acted by himself or whether he was

20  acting for Hamas in carrying out this attack?

21  A    According to my investigation, Rifiq Aqanibi acted on

22  behalf of Hamas, as member of Hamas and for Hamas.

23  Q    Tell us a little bit about the background of Tal Romeda,

24  where that is, and what is Tal Romeda?

25  A    Tal Romeda is a Jewish settlement in the city of Hebron,

Shaked - Direct - Turner                1233

1    not far from an area that is populated by Palestinians.  This

2    is an area very accessible.  It's easy to get to it.  Normally

3    it is secured by the military, and there are several dozens of

4    families that live in it.

5    Q    What did your investigation reveal about Aqanibi?

6    A    My investigation Aqanibi found that he perpetrated the

7    attack as a member of Hamas, and I'm basing this on the data

8    that I collected, Hamas proclamations, other announcements and

9    the no-how that I have in identifying such people.

10            MR. TURNER:  Can you show the witness 4030, please?

11   Q    Mr. Shaked, can you identify 4030?

12   A    Yes, I can.

13   Q    What is 4030?

14   A    Yes, this is an official announcement by al-Qassam

15   Brigades, claiming responsibility for the Tal Romeda attack.

16   In addition, this report includes details about the suicide

17   bomber, including his will and personal details about him.

18   Q    What is the source of 4030?

19   A    This is from the official site, website, of al-Qassam

20   Brigades, the military wing of Hamas.

21            MR. TURNER:  We offer 4030.

22            THE COURT:  I think I ruled it should be redacted.

23            MR. TURNER:  I think there's portions of it

24   redacted.  We're not going to show the document.  We're just

25   offering it now, subject to your redactions.

NICOLE CANALES, CSR, RPR

Shaked - Direct - Turner                          1234

1           THE COURT:  But you will redact it as previously

2    discussed?

3           MR. TURNER:  Yes.

4           THE COURT:  It's admitted over objection.

5           (Plaintiffs' Exhibit 4030  was received in

6    evidence.)

7    Q    Were you at the scene of this particular attack?

8    A    No, I wasn't in this scene.

9    Q    And have you seen video of this scene?

10   A    Yes, I did.

11          MR. TURNER:  Can you show the witness 4017, please,

12   just the very first part of the news clip?

13   Q    Do you recognize this video as a video that you've seen

14   previously?

15   A    Yes.

16   Q    And can you very generally describe for us what this

17   video shows?

18          MR. INGERMAN:  Your Honor, may we approach?

19          THE COURT:  Yes.

20          (Sidebar held outside the presence of the jury.)

21

22

23

24

25

NICOLE CANALES, CSR, RPR

1              (Sidebar.)

2         MR. INGERMAN:  Your Honor, my notes from your

3    overruling our objection to this video indicate that you had

4    admitted it, because there was a proffer from the plaintiffs

5    that Mr. Shaked was there and, therefore, can authenticate the

6    video.

7         THE COURT:  That's my recollection.

8         MR. TURNER:  That's coming.  He said he wasn't there

9    at the night of the attack, he was there subsequently.

10        THE COURT:  Let's let it get developed.

11             (Sidebar concluded.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Shaked - Direct - Turner                1236

1       (In the presence of the jury.)

2           MR. TURNER:  May I proceed?

3           THE COURT:  You may.

4   Q    Do you recognize the video?

5   A    Yes, I can only see the beginning.

6           MR. TURNER:  Can we show him just a little clip of

7   it, him only, with no voice, no noise?

8           THE WITNESS:  Yes, I recognize it.

9   Q    I couldn't hear you.  I'm sorry.

10  A    Yes, I recognize it.

11  Q    Very generally describe for us what this video relates

12  to.  Don't get into details.  Just very generally what are you

13  seeing on this videotape?

14  A    This shows the impact of shooting on a car, and at the

15  end of the video, we also see a terrorist with a green bandana

16  of Hamas on his head and an AKA-40A (sic) rifle.

17  Q    Have you ever been to the scene of this attack?

18  A    Many times.

19  Q    When?  When was the -- let me ask the question this way.

20  Were you at the scene of this attack on the day of the attack?

21  A    No, I wasn't.

22  Q    When were you at the scene of the attack after the

23  attack?

24  A    About a week later and then several more times.

25  Q    Now, from what you see on this video, can you personally

Shaked - Direct - Turner                    1237

1   identify the scene of this attack?

2   A    Yes, I can identify the street or the alley, which is

3   adjacent to Tal Romeda.

4   Q    Can you identify Yashef (phonetic) news for us?

5   A    Yes, I know this news agency.

6   Q    What is that news agency?

7   A    Yes, this is a news agency that belongs to the settlers

8   in Samaria.  It covers security events in the West Bank.

9   Q    Given your investigation of this particular attack,

10  including the fact that you've been to the scene and that you

11  know this particular alleyway, can you identify with accuracy

12  that the person on the videotape is the suicide bomber on --

13  suicide shooter you had previously identified on your slide?

14  A    I was not at the scene, at the time, but I can evaluate

15  through the video that this is the same man who committed the

16  attack.

17           MR. TURNER:  May we show this brief clip?

18           THE COURT:  No.

19  Q    Have you, likewise, seen memorializations by -- published

20  by Hamas, glorifying this suicide shooting?

21  A    Yes, I did.

22  Q    And did that help inform your ultimate conclusions about

23  Hamas' role in this particular attack?

24  A    Yes, it assisted me in reaching this conclusion.

25  Q    Have you likewise had the opportunity to investigate the

Shaked - Direct - Turner                    1238

1    Bus 19 suicide bombing that occurred in Jerusalem, in January

2    of 2004.

3    A    Yes, I did.

4             MR. TURNER:  May we display the slide?

5             THE WITNESS:  It was in January 2004.

6             MR. TURNER:  May we display the slide?

7             THE COURT:  Yes.

8    Q    Were you able to identify the suicide bomber in the Bus

9    19 attack?

10   A    Yes, I did identify him.

11   Q    And were you able to determine whether or not the suicide

12   bomber acted alone, or whether the suicide bomber was acting

13   by or on behalf of Hamas?

14   A    This terrorist did not act alone, and, in this case, he

15   was not only acting on behalf of Hamas, but also on behalf of

16   the al-Qassam Brigades that belong to Fatah.

17   Q    On your slide, you've got a division, on the left-hand

18   side with the green, Hamas' role, and on the right-hand side,

19   al-Aqsa Martyrs Brigade (AAMB) role.

20            Can you explain to us when you found about Hamas'

21   role in this particular attack.

22   A    With your permission, I would like to explain something.

23   I will begin with the suicide bomber.  He volunteered to

24   Hamas, asked to be part of Hamas.  He prepared for that

25   bombing within the Hamas organization, including preparing a

Shaked - Direct - Turner                    1239

1  video will, which he had read, including fitting him with an

2  explosive vest, and then he was transferred to the Israel

3  territory, but he was stopped at the roadblock.  The two

4  people in the left-hand side of the slide are members of

5  Hamas, Nufal Adawin and Muhammad Nashash.  Nashash was the one

6  who prepared the explosive belt, and Adawin prepared the

7  suicide bomber toward this Hamas attack, which, as I

8  explained, was not -- the end was not carried out.  He was

9  stopped at the very last moment, when he was already with the

10  explosive belt on his body.

11  Q   So did the bombing not occur?

12  A   This terror attack, as it was planned by Hamas, was not

13  carried out.

14  Q   So there was no bombing that occurred?

15  A   There was a bombing, but it was carried out by another

16  organization.

17  Q   Is that the al-Aqsa Martyrs Brigade shown on the other

18  slide?

19  A   Yes, it was carried out by al-Aqsa Martyrs Brigade

20  people.

21  Q   Now, explain how these two organizations, given your

22  investigation, how this suicide bombing was carried out?

23  A   I would like to first of all emphasize that this is not a

24  joint venture of those two organizations.  It's only a shared

25  claim of responsibility.  Because after the planning of the

Shaked - Direct - Turner                    1240

1    attack and after the fact that it was intercepted for security

2    reasons that I have mentioned earlier, the Fatah people have

3    located this Jaara and saw him as the potential suicide

4    bomber.  It was very, very easy, therefore, to mobilize him

5    for the mission, because he had already undergone the

6    preparations in Hamas.  Ali Jaara was the ripe fruit in the

7    hands of the al-Aqsa Martyr Brigade; therefore, from the

8    minute he was found, and, therefore, later dispatched, they

9    didn't need too much preparation.  They simply found the right

10   moment, they fitted him with explosive belt, transported him

11   to Jerusalem to carry out the attack.

12           This is why I see here a double responsibility, a

13   shared, a joint responsibility, both Fatah, a joint

14   responsibility for this attack, because without this basic

15   important preparation carried out by Hamas, I doubt whether

16   this terror attack would have been executed.  And it was

17   executed because the suicide bomber was already prepared to

18   carry out the attack.  I cannot determine whether he did this

19   with the fate of Hamas in his heart, because he is no longer

20   here; he is elsewhere.

21           The picture we can see, the bottom of the slide, the

22   way he was dressed in the Hamas clothes; behind him there's a

23   Hamas flag, and in his hand, the way I know the picture and

24   the video, he's holding the book of Quran, and the will was

25   written in his name as a member of Hamas.

Shaked - Direct - Turner                    1241

1   Q    Now, were -- the two Hamas operatives shown on your

2   slide, Adawin and Nashash, were they ultimately convicted?

3   A    Yes, they were both convicted by the Israeli court.

4           MR. TURNER:  Your Honor, we would offer 4044 and

5   4045 as the Apostille or certified copies of convictions of

6   Adawin and Nashash.

7           THE COURT:  Received over objection.

8           (Plaintiffs' Exhibit 4044, 4045  was received in

9   evidence.)

10          MR. TURNER:  Show the witness 4049, please.

11  Q    Can you identify 4049?

12  A    Yes, I do.

13  Q    What is 4049?

14  A    This document is the official claim of responsibility by

15  Hamas organization for the bombing of Bus 19 by the suicide

16  bomber Ali Jaara.

17  Q    And what is the source of 4049?

18  A    The source is the official website of Hamas organization,

19  its military wing Qassam Brigade.

20          MR. TURNER:  We offer 4049.

21          THE COURT:  That's received over objection.

22          (Plaintiffs' Exhibit 4049  was received in

23  evidence.)

24  Q    Did you likewise have access to an ISA report, confirming

25  your assessment Hamas did, in fact, play a role in carrying

Shaked - Direct - Turner                    1242

1   out this attack?

2   A    Yes.

3   Q    And did you likewise have access to other government

4   agency records, including from the Ministry of Foreign

5   Affairs, and also the Prime Minister's Office that further

6   confirmed Hamas' role in carrying out this terrorist attack?

7   A    Yes, I did have the opportunity to see these documents

8   that confirmed the part Hamas played in this terrorist attack.

9   Q    Did you likewise have access to a will of Ali Jaara

10  prepared by Hamas prior to this attack?

11  A    Yes.

12  Q    And did you likewise have any access to any

13  memorializations glorifying Ali Jaara, prepared by Hamas, as a

14  result of this attack?

15  A    Yes, indeed, Hamas published various memorialization

16  materials in memory of Ali Jaara, being a member of Hamas.

17         MR. TURNER:  Would you like to take a morning break,

18  or would you like me to move into the 24th attack?

19         THE COURT:  And then you'll ender that?

20         MR. TURNER:  Yes, sir.

21         THE COURT:  Let's go ahead.

22  Q    Did you have an opportunity to investigate the mortar

23  attack on September 24, 2004, at a place called Neve Dekalim?

24  A    Yes, I did investigate it.

25  Q    Now, first of all, tell us where Neve Dekalim is and the

Shaked - Direct - Turner                    1243

1   significance of that city.

2   A     Neve Dekalim is a settlement in the Gaza Strip.  It is a

3   relatively medium-sized locality that is at the distance of

4   sometimes dozens or hundreds of meters away from Palestinian

5   homes in the Gaza Strip.  This place no longer exists because

6   it was evacuated, by the way.

7               MR. TURNER:  May we display the slide for this

8   attack?

9               THE COURT:  Yes.

10  Q     First of all, can you describe for us -- in the context

11  of your investigation, were you able to identify specifically

12  who, the persons, in other words, that launched the mortars

13  into Neve Dekalim?

14  A     One must remember that this particular terror attack,

15  that firing of mortars, is very different from all the others

16  that we have discussed so far; from the shooting attacks, from

17  laying bombs, and definitely, most certainly, from attacks

18  carried out by suicide bombers.  Such an attack is carried out

19  from a distance.  They launch the mortars, and in most cases

20  we cannot see who exactly launched that fire.  It is hard to

21  determine who, specifically, the names of those people who

22  carried out the attack.  Such details, if at all, can be

23  obtained not in every case by intel operations.

24  Q     Now, in this particular attack, did you have access to

25  any government records relating to the investigation, for

Shaked - Direct - Turner                    1244

1   instance, the ISA report?

2   A    In this case, I have to mention that I did see another

3   report that was published by the Prime Minister's Office.  It

4   was not attached to my report because I only discovered it

5   after completing writing my report.  In this report, they

6   disclose the killing of a terrorist.

7          MR. INGERMAN:  Objection, your Honor.  Move to

8   strike.

9          MR. TURNER:  That's not in evidence.  Let me -- I

10  have to ask the question first.

11         THE COURT:  For the record, the objection is

12  sustained.

13         MR. TURNER:  Explain to him that he can't answer

14  that question.

15  Q    Now, during the course of your investigation, Mr. Shaked,

16  were you able to conclude that Hamas played a role in this

17  particular mortar attack?

18  A    Yes.

19  Q    And what is your conclusion?

20  A    Hamas published his official claim of responsibility for

21  this terror attack carried out in Neve Dekalim.  The claim of

22  responsibility was on the very same day that the terror attack

23  was conducted.

24         MR. TURNER:  Show the witness 4073, please.

25  Q    Can you identify 4073?

Shaked - Direct - Turner                    1245

1   A    Yes, I can recognize it.

2   Q    And what is 4073?

3   A    In the upper part of this slide, you can see the official

4   claim of responsibility made by Hamas organization, stating

5   that it carried out the mortar fire attack on 24th September

6   2004 at 10:50 in the morning, and that was the Friday morning.

7           MR. TURNER:  Okay.  If we can offer that into

8   evidence, 4073.

9           THE COURT:  Need a better foundation.

10  Q    What is the source of 4037, sir?

11  A    The official website of Qassam Brigade, the military wing

12  of Hamas.

13          THE COURT:  That is received over objection.

14          (Plaintiffs' Exhibit 4037  was received in

15  evidence.)

16          MR. TURNER:  May we display 473, the translated

17  investigation?

18          THE COURT:  Yes.

19          MR. TURNER:  If you can blow up the description once

20  it gets up on the screen, please.  That's fine for right now.

21  Q    First of all, Mr. Shaked, do you recognize the logo, the

22  emblem?

23  A    I recognize the logo, yes.

24  Q    And of what organization does that logo or emblem belong?

25  A    This logo belongs to Qassam Brigades, military wing of

Shaked - Direct - Turner                    1246

1  Hamas.

2  Q    The date 9/24/2004, is that the date of the mortar attack

3  at Neve Dekalim?

4  A    Indeed so.

5  Q    Now, are the facts that are described in the first

6  sentence -- specifically the Qassam Brigades claims full

7  responsibility for an operation of firing three 100-millimeter

8  mortar shells in the direction of the Neve Dekalim settlement,

9  at exactly 10:30 a.m. today, is that consistent with what your

10 investigation found, in terms of what transpired?

11 A    Yes, it is consistent with my findings.

12 Q    The sentence -- two sentences down from that, the

13 al-Qassam Brigades have already announced the mortar shells

14 were fired at the aforementioned settlement in proclamation

15 number 107/0409, which was issued at exactly 10:50 on Friday

16 morning, 10th of Shabon 1425, Hitiri 92404.  Did you have

17 access to that proclamation?

18 A    Yes, I did have such access.

19 Q    And did that likewise confirm that Hamas played a role in

20 this particular attack?

21 A    Yes.

22         MR. TURNER:  Could you show the witness 4034,

23 please.

24 Q    Can you identify 4074?

25 A    Yes.

Shaked - Direct - Turner                1247

1    Q    What is 4074?

2    A    This is the claim of responsibility for the terror attack

3    carried out at 10:30 on Friday, on the date of

4    September 24th, 2004.

5    Q    What is the source of 4074?

6    A    The official website of Qassam Brigades, the military of

7    Hamas.

8         MR. TURNER:  We offer 4074.

9         THE COURT:  That is received over objection.

10        (Plaintiffs' Exhibit 4074  was received in

11   evidence.)

12   Q    Now, based upon your investigation, did you have anything

13   in terms of conviction or other government records, other than

14   what you've already mentioned, or memorializations for this

15   particular attack available for you to review?

16   A    No, I didn't have any other terms of Hamas.

17   Q    Now, based upon the information that you did have access

18   to, were you able to conclude what with a reasonable degree of

19   probability whether Hamas played a role in the mortar attack

20   at Neve Dekalim?

21   A    We were talking about standard mortar bombs that were put

22   into use right at that time by Hamas.  Hamas was the

23   organization, the only one that smuggled them into the Gaza

24   Strip, and was the only organization to use such bombs.  So

25   this is yet another indication linking Hamas with the attack,

Shaked - Direct - Turner                1248

1  along with the official claim of responsibility it issued.

2  Q    As a result of your work on these 24 attacks -- it's

3  been, what, a day and a half almost two days since we began

4  going through all 24 attacks.  Have you had an opportunity to

5  prepare charts that summarized the sources of information that

6  you had access to for each of the 24 attacks?

7  A    Yes, I have.

8          MR. TURNER:  Could you put the first chart in front

9  of the witness?

10  Q    Can you identify these charts?

11  A    Yes, I recognize what I have on my screen.

12  Q    Were you able to put check marks in each of the

13  categories, running from left to right, across the top?

14          MR. TURNER:  You can go ahead and put the check

15  marks in for him.

16          THE WITNESS:  The sources that I have used, yes.

17  Q    And do -- these sources that you have checked off, do

18  they constitute a summary of all the sources you had available

19  for each of the given attacks?

20  A    I do hope that I have used all the sources that were

21  available to me and that I could reach in the period when I

22  wrote the report.

23  Q    You've done this for each of the 24 attacks?

24  A    For each of the attacks.

25          MR. TURNER:  Your Honor, we would like to offer

NICOLE CANALES, CSR, RPR

Shaked - Direct - Turner                1249

1  these three charts with the check marks, pursuant to Rule

2  1006, as summary charts.

3          THE COURT:  All right.  It's admitted over objection

4  as a summary.

5          (Plaintiffs' Exhibit 1006  was received in

6  evidence.)

7          MR. TURNER:  And one moment, please.

8                  (Pause in proceedings.)

9          MR. TURNER:  The next in line number is 4790.  And

10 may we display this very quickly?

11         THE COURT:  Yes.

12 Q   Display the first page, if you would, with the check

13 marks.  And we have one of these pages for each attack; is

14 that correct, sir.

15 A   That is correct.

16         MR. TURNER:  Your Honor, with that, I pass the

17 witness -- there is one thing that -- I was given a note a

18 while ago.  We offer into evidence as Exhibit 37-E3, and this

19 is from the Kiryat Arba attack, the conviction records for

20 al-Din Misk, which are Apostille.

21         THE COURT:  Those are received over objection.

22         MR. TURNER:  And with that, I pass the witness.

23         THE COURT:  Ladies and gentlemen, let's take our

24 morning break.  Please don't talk about the case amongst

25 yourselves or anyone else.  We will reconvene at 11:30.  See

Shaked - Direct - Turner                1250

1  you in just a few minutes.

2          (Outside the presence of the jury.)

3          THE COURT:  The witness may step down, and everyone

4  can sit.

5          One thing I want to raise with the parties, we had

6  talked about sitting on September 9th, and we had agreed that

7  Ms. Clark would approach the jury and see if they had any

8  problems with that.

9          MR. WERBNER:  Was the 5th, wasn't it?

10         THE CLERK:  The 5th.

11         THE COURT:  Friday, I'm sorry.  Juror Number 9 has a

12  problem.  We don't know the nature of the problem.  I'd like

13  the parties' permission to talk to her privately and see if I

14  can persuade her to reschedule whatever she has that day.  Is

15  that okay?

16         MR. WERBNER:  Yes, sir.

17         MR. STEPHENS:  Okay.

18         THE COURT:  Let's see what I can do.

19              (Recess in proceedings.)

20        (Proceedings continued on the following page.)

21

22

23

24

25

PROCEEDINGS                    1251

1    (Honorable Brian M. Cogan takes the bench.)

2    THE COURT:  All right.  Be seated.  What's up?

3    MR. TURNER:  I just have one process issue, I

4    wanted to make sure I understood.  It goes back when

5    Mr. Geisser was here.  I can't remember who was

6    cross-examining, but they were -- began to display things in

7    front of the jury without laying the foundation for them or

8    sharing them.

9    THE COURT:  Okay.  If it's not in evidence, they

10   can't do that, okay?  You can show it to the witness first

11   and then offer it.  And then if accepted, testify about it.

12   Only generic descriptions from the witness as to what the

13   witness is looking at if it's not in evidence.

14   MR. INGERMAN:  I understand.

15   THE COURT:  I spoke to juror number nine, and

16   she's going to rearrange her schedule so she we can sit next

17   Friday.

18   MR. WERBNER:  Can I renew my motion regarding the

19   temperature?  I mean, it's, like, really, really cold.

20   THE COURT:  I will say when I walked in just now,

21   it seemed, to me, quite cold.  But let me ask.  I'll do it.

22   Again, don't be shy if people think it's too cold in here.

23   MR. WERBNER:  I want to note this, one of the

24   jurors has a blanket covering her almost completely.  I've

25   heard -- now they're whimping out now, but I've heard a lot

R. SHAKED - CROSS/MR. INGERMAN                1252

1   of people.

2            THE COURT:  Okay.  We will turn up the temperature

3   somewhat and see if that alleviates it.

4            MR. WERBNER:  Thank you.

5            (Jury is in the courtroom at 11:35 a.m.)

6            THE COURT:  All right.  Be seated, please.

7   Cross-examination.

8            MR. INGERMAN:  Thank you, your Honor.

9   CROSS-EXAMINATION

10  BY MR. INGERMAN:

11  Q    Good morning, Mr. Shaked.

12  A    Good morning.

13  Q    We haven't met before.  My name is Brett Ingerman.  I

14  represent the bank in this case.

15  A    I am --

16  Q    Now, in the last two days we've heard a lot from you

17  about Hamas.  And we can agree that Hamas is a criminal

18  terrorist organization, right?

19  A    Yes.

20  Q    And we can agree that Hamas commits horrible crimes

21  where they maim and kill innocent people; is that right?

22  A    Yes.

23  Q    In fact, it's hard to get our minds around how an

24  terrorist organization commits those acts; is that right?

25  A    Yes.

R. SHAKED - CROSS/MR. INGERMAN          1253

1   Q    And you understand, do you not, that Hamas is not the

2   defendant that is on trial in this case?

3   A    Yes.

4   Q    Now, you speak English, correct?

5   A    Not at the legal level.

6   Q    Okay.  But you speak some English?

7   A    Yes.

8   Q    And you read some English?

9   A    Yes.

10  Q    And you understand English?

11  A    Yes.

12  Q    But you're more comfortable having an interpreter in

13  court; is that right?

14  A    Yes, and I said why.

15  Q    Now, I want to talk a little bit about your testimony

16  with respect to Hamas not being a secretive organization.

17         Now, you testified, if my notes are correct, that

18  Hamas was not a secret organization, right?

19  A    That is correct.

20  Q    And that everyone knew what the Hamas structure was?

21  A    I didn't say "everyone" I said those who needed to

22  know.

23  Q    Okay.  Who were those that need to know?

24  A    We start with the general public, media people,

25  government people, people who live in a neighborhood where

R. SHAKED - CROSS/MR. INGERMAN          1254

1  there are Hamas people, people who need services from Hamas,

2  or any other contact with Hamas, people who want to join

3  Hamas, et cetera.

4  Q    Would you agree with me, Mr. Shaked, that during the

5  2000 to 2004 time period, that Hamas members -- most Hamas

6  members want to keep their membership secret?

7  A    No, only the people of the military wing of Hamas

8  wanted to keep their identity secret.

9           MR. INGERMAN:  Sean, can we pull up, Mr. Shaked's,

10 deposition page 59, lines 17 to 22.

11 Q    Now, Mr. Shaked, you remember you had your deposition

12 taken in this case, right?

13 A    Yes.

14 Q    And you were asked a number of questions and gave a

15 number of answers under oath, correct?

16 A    Yes.

17 Q    Then you had an opportunity to review the deposition

18 transcript and make any corrections, right?

19 A    Yes.

20           MR. SHAND:  Okay.  Sean, can we put up on the

21 screen page 59 line 17 to 22.  Your Honor, I'd like to

22 display this to the jury as well.

23           THE COURT:  Okay.

24 Q    Now, Mr. Shaked, do you remember being asked the

25 question at line 17:  "In your experience, do most Hamas

R. SHAKED - CROSS/MR. INGERMAN                1255

1    members want to keep their membership secret?"

2           And would you please read the answer for me, and

3    we'll have the translator -- can you read English?

4           THE COURT:  I don't think this is the way to

5    proceed.  I think what you have to do is you have to read

6    him the question and the answer and then say to him, were

7    you asked this question and did you give this answer.

8           MR. INGERMAN:  That's where I was headed with the

9    translation.  Thank you, your Honor.

10   Q    So, Mr. Shaked, you were asked the question:  "In your

11   experience, do most Hamas members want to keep their

12   membership secret?"  And you gave the following answer:  "In

13   the period we're talking about, many of them wanted to keep

14   it a secret, because they were afraid of being arrested."

15          Is that the answer you gave at your deposition?

16   A    Yes, this is what I said.

17   Q    Okay.  Now, the Israel Security Agency puts a lot of

18   money -- strike that.

19          In the 2000 to 2004 time period, the Israel

20   Security Agency put a lot of time and money and effort into

21   trying to stop terrorist attacks in Israel, isn't that

22   right?

23   A    Correct.

24   Q    And it wasn't only the Israel Security Agency that was

25   trying to prevent terrorist attacks during this time period,

R. SHAKED - CROSS/MR. INGERMAN                1256

1    it was also the Israel defense forces as well, correct?

2    A    Yes.

3    Q    But it was also the Israel Police, correct?

4    A    Correct.

5    Q    And there was a secret police called the Mossad that

6    was trying to prevent terrorist attacks during this time

7    period; is that right?

8    A    That is correct.

9    Q    And all of those organizations within Israel were

10   trying to figure out who the Hamas military members were who

11   were going to be carrying out suicide bombings and other

12   terrorist attacks, correct?

13   A    That's right.

14   Q    And notwithstanding all of these resources as part of

15   Israel government, the Israel government wasn't able to stop

16   any of these 24 attacks that we're here about; is that

17   right?

18   A    Correct.

19   Q    And if the Israel government knew who these Hamas

20   operatives were that were going to carry out these attacks,

21   what would they have done?

22   A    It would thwarted their activity.

23   Q    They would have been arrested?

24   A    Of course.

25   Q    Or they would have been killed?

R. SHAKED - CROSS/MR. INGERMAN                1257

1    A    I can't say that, but they would have stopped them,

2    taken steps against them.

3    Q    Now, during your direct examination you were shown by

4    Mr. Turner a document that was a designation by the United

5    States government of certain terrorists.  Do you recall

6    that?

7    A    Yes.

8    Q    And they were designated on what is known as the OFAC

9    list, right?

10   A    I'm not a legal man.  I know that they were designated

11   in this list without a real understanding the meaning of the

12   designation.

13   Q    You don't understand the meaning of the designation

14   that Mr. Turner showed you during your direct examination?

15   A    Yes, I do.

16   Q    Okay.  And you understand that countries around the

17   world have these lists that are called blacklists where

18   terrorists and other criminals are designated?

19   A    That's right.

20   Q    And it's true, is it not, that not a single person, not

21   a single picture of a single person in any of the slides

22   that you presented to this jury for any of the attacks is

23   designated on any list anywhere in the world?

24   A    I am not familiar with all of those lists, but in the

25   slides, as far as I know, they're not the same people.

R. SHAKED - CROSS/MR. INGERMAN          1258

1   Q    Now, Mr. Shaked, I want to talk a little bit about your

2   qualifications.

3   A    Yes.

4   Q    I apologize, what is it that you do right now,

5   presently?

6   A    I am a researcher at the Truman Institute, Hebrew

7   University of Jerusalem at the Middle Eastern Desk.

8   Q    When did you start that job?

9   A    In 2012.

10  Q    Okay.  And prior to 2012, you were a newspaper reporter

11  at the newspaper Yediot Ahronot, correct?

12  A    Correct.

13  Q    And you started at Yediot Ahronot in 1982?

14  A    Yes, at the end of 1982.

15  Q    So from 1983 to 2012, your principle employment was

16  being a newspaper reporter; is that correct?

17  A    Yes, that was my principle occupation, but not the only

18  one.

19  Q    You have no professional training in determining which

20  terrorist organization is responsible for committing a

21  particular attack, isn't that true?

22  A    That is correct.

23  Q    And you've never been a prosecutor, correct?

24  A    No.

25  Q    You have no legal training?

R. SHAKED - CROSS/MR. INGERMAN                    1259

1    A    No.

2    Q    You're not a lawyer?

3    A    No.

4    Q    You've never been a member of the Israel Police,

5    correct?

6    A    No.

7    Q    And you left the Israel Security Agency in 1982, right?

8    A    Correct.

9    Q    And that was five years before Hamas was even formed,

10   correct?

11   A    Correct.

12   Q    Now, during the time that you were a newspaper reporter

13   at Yediot Ahronot, it's true, is it not, that you were

14   suspended in 1999 for publishing incorrect facts in one of

15   your newspaper articles?

16   A    Yes, that is correct, I was suspended.

17   Q    Now, let's talk a little bit about the methodology by

18   which you arrived at your opinions offered to the jury in

19   this case.

20        The methodology that you use to offer your

21   opinions to the ladies and gentlemen of the jury is very

22   important, is it not?

23   A    Yes.

24   Q    And you developed this methodology that you use all by

25   yourself, right?

1   A    Almost all of it, yes.

2   Q    And you developed it for purposes of these cases, this

3   litigation; is that right?

4   A    Among other things, yes.

5   Q    And you named the methodology the Ronni Shaked

6   Methodology; is that right?

7   A    In the deposition they named it like this, but you can

8   call it anyway you like.

9   Q    You named it that way, didn't you?

10  A    I repeated laughing what the respectable lawyer had

11  said.

12  Q    Okay.  The lawyer asked you, does your methodology have

13  a name, and you called it the Ronni Shaked Methodology,

14  right?

15  A    Yes, but that was when we were talking on both sides

16  and they came from him.  He was the one who wanted to

17  emphasize it.

18  Q    Now, Mr. Shaked, you've been hired by the same

19  plaintiffs lawyers not only in this case, but in other

20  cases, isn't that right?

21  A    Yes, correct.

22  Q    How many other cases are you working for these

23  plaintiffs lawyers in?

24  A    Two other cases.

25  Q    And how much have you been paid by the plaintiffs

R. SHAKED - CROSS/MR. INGERMAN                1261

1    lawyers for your work in all of these cases?

2    A    About $96,000.  I don't know the exact amount, but

3    about that.

4    Q    Okay.  And are you owed any money by them?

5    A    Yes, for the last period.

6    Q    Which is how much?

7    A    I think it's 20 to $22,000, if I'm not mistaken.

8    Q    So about $120,000 all in?

9    A    I imagine so.

10   Q    Other than the cases you've been hired by these

11   plaintiffs lawyers, have you used your Ronni Shaked

12   Methodology in any other cases?

13   A    I was not asked to use it.

14   Q    And you're not aware of anyone else that uses the

15   methodology that you've employed as you've presented it here

16   to the ladies and gentlemen of the jury, isn't that right?

17   A    I recently read an article by Lila Rose, a

18   distinguished professor from the United States, who used

19   very similar methods to mine to diagnosis Hamas and other

20   types of organizations.

21   Q    Do you remember when you had your deposition taken?

22        MR. INGERMAN:  Sean, if we can pull up page 27,

23   lines nine through 16, please.  Your Honor, if we can

24   publish that to the jury?

25        THE COURT:  Okay.

R. SHAKED - CROSS/MR. INGERMAN                1262

1  Q    Now, Mr. Shaked, at your deposition you were asked the

2  following question:  "Has anyone else other than you, used

3  the Shaked Methodology?"  And your answer was:  "As far as I

4  remember.  And to the best my knowledge I didn't find anyone

5  else who dealt with this specific subject; therefore, I

6  didn't find any use of it."

7       Do you see that?  You gave that answer to that

8  question at your deposition, did you not?

9  A    Yes, I did give such an answer before I read Professor

10  Rose's book.

11  Q    Now, am I right that the Israel Security Agency doesn't

12  use the Ronni Shaked Methodology, am I right?

13  A    I don't know, I am no longer there.

14  Q    Do you know whether judges use the Shaked Methodology?

15  A    I cannot recall a case in which this methodology had to

16  be used.

17  Q    Now, during the course of your work, you have

18  personally received -- strike that.

19       During the time that you were at the newspaper

20  Yediot, you personally received E-mail claims of

21  responsibility during the time that you were there, isn't

22  that right?

23  A    Yes, this is correct.

24  Q    And sometimes they were true and sometimes they were

25  not true?

R. SHAKED - CROSS/MR. INGERMAN          1263

1  A    This is correct.

2  Q    Now, as part of your methodology, you rely on, among

3  other things, newspaper articles, right?

4  A    Yes.

5  Q    And you agree with me that sources like CNN, the Cable

6  News Network are a reliable source of information?

7  A    Yes, one can rely on them with respect to the time that

8  the broadcasts are being made.

9  Q    Now, you told the ladies and gentlemen of the jury

10 about certain interviews of certain terrorists that you

11 relied on in developing your opinions, right?

12 A    Yes, I did rely on interviews.

13 Q    And when you conducted those interviews, am I right

14 that those terrorists were not under oath as you are here

15 today before the jury, right?

16 A    No, but the terrorists that I interviewed in prison

17 gave me declaration or statement that they made that they

18 were giving the interview out of their own free will, not

19 under any duress.

20 Q    And you believe that what these terrorists told you was

21 true?

22 A    I believe that what they said was the truth.

23 Q    Now, you also rely on -- and I think you've shown the

24 ladies and gentlemen of the jury a number of materials from

25 the internet, am I right?

R. SHAKED - CROSS/MR. INGERMAN                    1264

1   A    That is correct.

2   Q    And you'd agree with me that when it comes to the

3   internet, anyone can write anything on the internet?

4   A    I'm not an internet expert.  I do not know how one

5   writes on the internet, but I do know there are websites

6   where people can write what they want.  I don't know if that

7   applies to official websites of organizations or groups.

8           MR. INGERMAN:  Sean, can we take a look at

9   Mr. Shaked's deposition testimony, page 94, lines five

10  through ten.

11          Your Honor, I'd like to display that to the jury.

12          THE COURT:  Okay.

13  Q    Now, at your deposition, Mr. Shaked, when you were

14  under oath, you were asked the question:  "Do you agree that

15  when it comes to relying on the internet, anybody can write

16  anything on the internet?"  And you gave the answer:  "Yes."

17          Correct?

18  A    Yes.

19  Q    Now, can we also agree that Hamas websites on the

20  internet exaggerate?

21  A    Yes.  And I also found exaggerations on internet

22  websites of Hamas.

23  Q    In fact, on the internet website for Hamas al-Qassam,

24  you found that Hamas makes great exaggerations on that

25  website, didn't you?

1   A    I did not know if I actually said great exaggerations,

2   but I can give you examples with the type of exaggerations I

3   related.  That pertains to the number of people they killed,

4   which is not in line with the actual number of people, and

5   also the number of injured people, or the way the operation

6   was carried out.  Such exaggerations portray the

7   perpetrators of the attack, but it's not the kind of

8   exaggerations that relates to things that never happened.

9           MR. INGERMAN:  If we can take a look, Sean, at

10  page 150 of Mr. Shaked's deposition, lines four through 14.

11          And I'd like to display that to the jury.

12  Q    Now, at your deposition, Mr. Shaked, you were asked the

13  following question:  "Does www.alqassam.ps make mistakes?"

14  And your answer was:  "I can estimate that they were trying

15  to do reliable, but of course they view reality through

16  their own spectacles."

17          Did you give that answer?

18  A    Yes, that was my answer.

19  Q    And then you were asked:  "Do they make factual

20  mistakes on important facts?"  And your answer was:

21  "Sometimes there are great exaggerations, yes."

22          That was your answer, correct?

23  A    Yes.  What I meant was the number of fatalities or the

24  number of injured people, these are the many exaggerations

25  that I meant.

R. SHAKED - CROSS/MR. INGERMAN                1266

1          MR. INGERMAN:  Okay.  We can take that down, Sean.

2    Thank you.

3    Q    Now, Mr. Shaked, you testified that over the years

4    you've come to know personally some of the Hamas leaders,

5    isn't that right?

6    A    Yes, this is correct.  I know many of Hamas leaders.

7    Q    You mentioned Rantisi being one, correct?

8    A    Yes, I did mention the name of Abd al-Aziz al-Rantisi.

9    Q    And Sheikh Ahmed Yassin?

10   A    Yes, Sheikh Ahmed Yassin, too.

11   Q    And you'd agree with me that Hamas leaders on occasion

12   have provided you with false information?

13   A    Perhaps in any conversations with them they provided me

14   with false information, but I did know how to see through it

15   to figure it and to glean the truth from it.

16   Q    So you were able to figure out when the terrorist

17   leaders were telling you the truth and when they were lying;

18   is that your testimony?

19   A    I cannot say that I always know to distinguish truth or

20   lies, but I can say that based on many years of experience

21   both in the ISA and in my work in the newspaper, I learned

22   how to make the distinction and to compare those reports

23   with the reality, the existing reality, and to evaluate

24   whether that was an exaggeration or truth telling.

25          And I must add one more thing.  That even when I

R. SHAKED - CROSS/MR. INGERMAN                 1267

1   received this information in those interviews, I would

2   always crosscheck them with other sources to confirm.  And

3   so I know that, indeed, because I know that the people who

4   gave me and provided me with this information had certain

5   intentions to convey, certain messages.

6   Q    And that's because sometimes the terrorist leaders have

7   an incentive to lie, right?

8   A    Such senior leaders of such stature, they know that

9   lies do not live very long, they are very short-lived.  So I

10  do hope they did not mean to lie when they talked with me.

11  Q    Now, can we agree, Mr. Shaked, that terrorist groups

12  operating in Israel and the Palestinian Territories between

13  the years of 2000 and 2009 had an incentive to claim

14  responsibility for terrorist attacks?

15  A    Of course they did.

16  Q    And would you agree with me that it is or it was in the

17  terrorist group's best interest to actually claim

18  responsibility for a terrorist attack?

19  A    Yes.  They did want to claim responsibility for the

20  terror attack that they perpetrated.

21  Q    Because it was in their interest to do so, right?

22  A    Yes, it was within their interest.  It's the nature of

23  terror.

24  Q    And that's important because there is fierce

25  competition between the terrorist groups in Israel during

R. SHAKED - CROSS/MR. INGERMAN            1268

1   this timeframe, isn't that right?

2   A    There was competition among organizations, yes.

3   Q    And by claiming responsibility for a terrorist attack,

4   a particular terrorist group gains political clout, correct?

5   A    That is correct.

6   Q    It increases their popularity?

7   A    If the population understands that this is a truthful

8   report, then it increases their popularity; if not, it

9   damages them.

10  Q    It helps them raise money, right?

11  A    This is one of the ways that assists them.

12  Q    And they can use it for propaganda purposes?

13  A    Yes, but with the permission of the distinguished

14  lawyer I would like to mention that here we are talking not

15  about separate organizations, this organizations are

16  embedded in identifying who is who and what is what.  Lies

17  are discovered very, very quickly.  This is a traditional

18  society with very, very dense social network where it is

19  very, very easy to detect lies, extremely fast.

20           I'll give you an example, with your permission.

21  If, for example, a certain individual gets killed by

22  perpetrating an attack, it is extremely easy to identify the

23  organization he belonged to judging by the symbols and the

24  speeches made and very same standards that I used in the

25  criteria in my methodology.  It is very, very easy and the

1   public knows that.

2   Q    Now, let's talk about some of the terrorist groups that

3   were claiming responsibility for attacks in Israel between

4   2000 and 2004.

5   A    Please.

6   Q    One of those organizations was of course the al-Qassam

7   Brigade, which is Hamas, right?

8   A    Yes, this is the military wing of the Hamas

9   organization.

10  Q    Another terrorist organization that was active, for

11  lack of a better term, during this time period was the

12  al-Aqsa Martyrs Brigade?

13  A    Yes.  The military wing of the Fatah organization.

14  Q    And Fatah is different than Hamas, right?

15  A    Definitely so.

16  Q    And another organization that was active in Israel and

17  the Palestinian Terrorists that was promoting terror was the

18  al-Quds Brigade, correct?

19  A    The Jerusalem Brigade, correct.

20  Q    And that's part the Palestinian Islamic Jihad, correct?

21  A    Yes, it is the military wing of the Islamic Jihad.

22  Q    And yet, there was another terrorist organization at

23  the time in the Israel and Palestinian Territories and that

24  was called Hezbollah, correct?

25  A    In this particular timeframe this activity in the

R. SHAKED - CROSS/MR. INGERMAN          1270

1   territories was extremely limited, but it was somewhat

2   active, yes.

3   Q    And Hezbollah is a Lebanese terrorist group founded by

4   Iran, correct?

5   A    This is correct.

6              MR. INGERMAN:  Your Honor, if I may approach, I

7   have a demonstrative that just lists out the four groups

8   that we just talked about that I'd like to put up on the

9   stand here.

10             THE COURT:  Have you shown it to the plaintiffs?

11             MR. INGERMAN:  I will do that right now.

12             MR. TURNER:  No problem.

13             THE COURT:  Okay.

14             MR. INGERMAN:  Thank you.  Mr. Shaked, I've put up

15  on the stand here -- you can't see this, let me show you.

16  It's a board that's entitled, "Claims of Responsibility,"

17  and it lists the four groups we just talked about; al-Aqsa

18  Martyrs Brigade from Fatah, al-Quds Brigades from the

19  Palestinian Islamic Jihad, Hezbollah and Hamas, okay?

20  A    Yes, these are some of the Palestinian groups.

21  Q    Okay.  I'm going to leave that up there for some of the

22  examination here, because we're going to refer to some of

23  the different groups.

24             Now, the plaintiffs lawyers in this case asked you

25  to look at these 24 attacks to determine whether or not they

R. SHAKED - CROSS/MR. INGERMAN          1271

1  were the responsibility of Hamas, right?

2  A    Correct.

3  Q    And you were paid about $120,000 to do that, right?

4  A    Yes.

5  Q    And low and behold, you claimed that all 24 attacks

6  were the responsibility of Hamas, right?

7  A    Yes.

8  Q    Let's take a look at the Bus 19 bombing, if we could.

9        Now, the Bus 19 bombing occurred on January 29,

10 2004, right?

11 A    Correct.

12 Q    And you were aware, were you not, that there were a

13 number of claims of responsibility for this attack from

14 groups other than Hamas?

15 A    Correct.

16 Q    And you knew, for instance, on the day of the bombing,

17 a newspaper by the name of "Israel Insider" reported that

18 Fatah's al-Aqsa Martyrs Brigade claimed responsibility,

19 isn't that right?

20 A    Yes, I knew this.

21        MR. INGERMAN:  And if we could put up just for the

22 witness, Sean, Defense Exhibit 1016.

23 Q    You recognize this as a claim of responsibility in the

24 Israel Insider, yes?

25 A    Yes, this is what the paper reported.

R. SHAKED - CROSS/MR. INGERMAN          1272

1    MR. INGERMAN:  Your Honor, I move admission for

2  Defense Exhibit 1016.

3    MR. TURNER:  No objection.

4    THE COURT:  It is received.

5    (Defense Exhibit 1016 was admitted into evidence.)

6  Q    Now, you also knew that on the same day as the Bus 19

7  bomber, that the Israeli Prime Minister's Office came out

8  and said that the bomber, Jaara, is a member of the military

9  arm of Fatah, correct?

10 A    Yes, I know that.

11   MR. INGERMAN:  If we could put before the witness,

12 Sean, Defense Exhibit 10:30.

13 Q    You recognize that to be the Israeli Prime Minister's

14 Office release?

15 A    Yes, this is the prime minister's office release.

16   MR. INGERMAN:  Your Honor, I move defense

17 Exhibit 10:30.

18   MR. TURNER:  I thought you already ruled on the

19 prime minister exhibits.  I object.

20   THE COURT:  I did.  Sustained.

21 BY MR. INGERMAN:

22 Q    But you knew, did you not, that the Israeli Prime

23 Minister's Office had identified the bomber on Bus 19,

24 Jaara, as a member of the al-Aqsa Martyr Brigade, military

25 arm of Fatah?

R. SHAKED - CROSS/MR. INGERMAN                1273

1   A    Yes.  On the day of the bombing he was identified as a

2   member of the al-Aqsa Brigade.

3   Q    Now, you also knew, did you not, that a day later on

4   January 30, 2004, a day after the Bus 19 bombing, the New

5   York Times reported that the al-Aqsa Martyr Brigade claimed

6   responsibility for the attack, right?

7   A    That is correct.

8            MR. INGERMAN:  And if we could put before just the

9   witness, Defense Exhibit 1019, Sean.

10  Q    That is the New York Times article we were just

11  referring to, correct?

12  A    Yes.

13           MR. INGERMAN:  Your Honor, I'd move DX 1019.

14           THE COURT:  Let's have a sidebar, please.

15           Unless the plaintiff is going to tell me they

16  don't object.

17           MR. TURNER:  I do object.

18           MR. INGERMAN:  I didn't hear what he said, did he

19  say that he has no objection?

20           THE COURT:  No, he objects.

21           (Continued on the next page for sidebar.)

22

23

24

25

1      (Sidebar conference begins.)

2      THE COURT:  I'm not sure I understand the

3   defendant's position on this.  The plaintiff had offered a

4   number of newspaper articles and prime minister press

5   releases, which I excluded on the ground of hearsay.  I

6   don't see how your newspaper articles and prime minister

7   press releases are any less hearsay.

8      MR. INGERMAN:  Well, for starters, we're not

9   offering them for the truth of the matter asserted.  We are

10   offering them to impeach the witness.

11      THE COURT:  No.  They impeach the witness by

12   showing that, in fact, somebody else did it, that's what it

13   says.  That's how they impeach the witness.  You can

14   question him about them, but the article don't come in.  You

15   can say, are you familiar with those?  Did you know that

16   prime minister said so and so claimed responsibility?  But

17   if the article were to come in, I can't think of a reason

18   that you would be offering it other than to impeach him by

19   showing that what he's saying is wrong that somebody else

20   committed the crime, someone who he has not identified.

21      MR. INGERMAN:  Well, if it's quoting a terrorist

22   group claiming responsibility, then it's a declaration

23   against interest.

24      THE COURT:  Well, yeah, but that's the first level

25   of hearsay.  I mean, that's the second level of hearsay.

SIDEBAR CONFERENCE                    1275

1    The first is that it's a newspaper article, it's not the

2    group.  That's why I didn't let them put in the newspaper

3    articles when you objected.  All right?

4           If you have some primary source as they did of a

5    terrorist group taking responsibility, then yes, I'll admit

6    those, but not newspaper articles.  Okay?

7                (End of sidebar conference.)

8                (Continued on the next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

R. SHAKED - CROSS/MR. INGERMAN          1276

1    MR. INGERMAN:  May I proceed, your Honor?

2    THE COURT:  You may.  As soon as the reporter is

3  ready.

4    MR. INGERMAN:  She's the second most important

5  person in the room.

6  BY MR. INGERMAN:

7  Q   When we broke we were talking about DX 1019; that is

8  the New York Times article that you had seen before that

9  refers to the claim by the al-Aqsa Martyrs Brigade for the

10  Bus 19 bombing; is that correct?

11  A   Correct.

12  Q   Now, you also knew that on January 30, 2004, the day

13  after the Bus 19 bombing, that the Israeli newspaper Haaretz

14  also published a claim of responsibility by Fatah for the

15  Bus 19 bombing, correct?

16  A   Correct.

17  Q   And then on that same day, January 30, 2009, one day

18  after the Bus 19 bombing, you, yourself, wrote an article

19  about the bombing, didn't you?

20  A   That is correct, I did.

21  Q   And you didn't tell the ladies and gentlemen of the

22  jury about that during your description of the Bus 19

23  bombing, correct?

24  A   If I may explain in actual; according to my

25  methodology, I do not make any statements in a perspective

1    one day after the attack.  I do an in-depth check of all the

2    events and all the facts that I have.  So one day after the

3    attack, it was possible that all the journalists, including

4    myself, said that it was the al-Aqsa Martyrs Brigade that

5    was responsible.

6              But I am not here as a journalist, and I am not

7    here as an ISA researcher to provide immediate answers

8    within an hour, I am here as an expert witness, and I do my

9    work with a prospective of time, and this is why I answered

10   the way I did.

11             MR. INGERMAN:  Sean, if we could put before the

12   witness, Defense Exhibit 1038, please.

13   Q    Is this the newspaper article that you wrote in the

14   Yediot Ahronot newspaper on January 30, 2004, about the

15   Bus 19 bombing?

16   A    Yes, I did write this article.

17             MR. INGERMAN:  Your Honor, I move defense

18   Exhibit 1038 in.

19             THE COURT:  Any objection?

20             MR. TURNER:  No objection to that.

21             THE COURT:  It is received.

22             (Defense Exhibit 1038 was admitted into evidence.)

23             MR. INGERMAN:  Your Honor, may I publish it to the

24   jury?

25             THE COURT:  You may.

R. SHAKED - CROSS/MR. INGERMAN            1278

1     MR. INGERMAN:  If we could go to the English

2  translation, Sean, please.  And blow up the title for a

3  moment.

4  Q    The article that you wrote, Mr. Shaked, on January 30,

5  2004, the title was, "The Promises That Nasralla Made."  And

6  then it says, "Hezbollah easily penetrated the anarchy

7  existing in the territories."

8         Do you see that?

9  A    Yes.

10     MR. INGERMAN:  And then in the first -- I'm sorry,

11  the second paragraph, Sean, the first two sentences.

12  Q    You say Ali Jara.  Now, Ali Jara was the person who you

13  told the ladies and gentlemen of the jury was the bomber for

14  Bus 19, right?

15  A    Correct.

16  Q    And what you wrote in the newspaper on January 30th is,

17  "Ali Jara of Daheyshe, the terrorist who committed suicide

18  in Jerusalem yesterday was a member of the al-Aqsa Martyrs

19  Brigade, the military arm of the Fatah."

20         Do you see that?

21  A    Correct.

22              (Continued on the next page.)

23

24

25

SHAKED - CROSS - INGERMAN            1279

1  Q    Now, if we can go down to the fourth paragraph, the

2  first sentence.  You also wrote about the bus 19 bombing,

3  "The attack yesterday had the Hezbollah's prints on it."

4       Do you see that?

5  A    That is correct.

6  Q    And am I right that you never even to this day issued a

7  retraction of this article in any way?

8  A    Yes.  There was never a retraction, but it was not my

9  fault.  It was the paper's fault, because on the annual

10 report that I prepared for -- about all the attacks, the

11 editor decided not to publish this.

12 Q    Now, when you wrote this article on January 30th, 2004,

13 were you hired by the plaintiffs' lawyers yet?

14 A    No, of course not.  And I published this article one

15 day after the attack.  And I had the perspective of maybe

16 less than ten hours.

17 Q    Now, do you also know what the Intelligence and

18 Terrorism Information Center at the Center for Special

19 Studies is?

20 A    Yes.

21 Q    And you also know that on January 1st of 2006, two

22 years after the bus 19 bombing, the Intelligence and

23 Terrorism Information Center at the Center for special

24 Studies concluded that the organization responsible for the

25 bus 19 bombing was the Fatah al-Aqsa Martyrs Brigade,

SHAKED - CROSS - INGERMAN                1280

1  correct?

2  A    Yes.

3  Q    Now, you also knew, did you not, that the National

4  Counter Terrorism Center in 2010 attributed the bus 19

5  bombing to Fatah al-Aqsa Martyrs Brigade, correct?

6  A    I don't remember such a publication, but if you say so,

7  I believe you.

8  Q    Well, I appreciate that, but I don't want you to take

9  my word for it.

10        MR. INGERMAN:  Let's show just the witness,

11  please, Sean, DX1036.

12  BY MR. INGERMAN:

13  Q    Have you seen that before, sir?

14  A    Yes.

15        MR. INGERMAN:  Okay.  And if we can go to the next

16  page of it, Sean.

17        Can we go to January 21st.  I'm sorry, January

18  29th.  Blow that up for the witness.  Hopefully he'll be

19  able to see it, as will I.

20  BY MR. INGERMAN:

21  Q    Does that refresh your recollection, Mr. Shaked, that

22  in 2010 the National Terrorism Center concluded that the

23  Israel al-Aqsa -- the al-Aqsa Martyrs Brigade bus bomb in

24  Jerusalem -- I'm sorry.  Start over again.

25        That the bus 19 bus bombing was carried out by the

SHAKED - CROSS - INGERMAN                    1281

1   al-Aqsa Martyrs Brigade?

2   A    Yes.

3            MR. INGERMAN:  Now, if we can show just the

4   witness Defense Exhibit 1040.

5   BY MR. INGERMAN:

6   Q    This is called a RAND Homeland Security Report.  You

7   are aware, were you not, that the RAND Homeland Security

8   Report also concluded that the al-Aqsa Martyrs Brigade was

9   responsible for the bus 19 bombing?

10  A    Correct.

11           MR. INGERMAN:  This would be a good point for a

12  lunch break if you'd like.

13           THE COURT:  Okay.  We can break now.

14           Ladies and gentlemen, please don't talk about the

15  case amongst yourselves or with anyone else.  We'll see you

16  back here at 1:40.  Have a good lunch.

17           (Jurors exit the courtroom.)

18           THE COURT:  Recess till 1:40.

19           (Continued on the next page.)

20

21

22

23

24

25

Shaked - Cross- Ingerman                1282

1           (In the presence of the jury.)

2           THE COURT:  Be seated, please.  Welcome back, ladies

3   and gentlemen.  Let's continue with cross-examination

4           MR. INGERMAN:  Thank you, your Honor.

5   Q    Now, Mr. Shaked, before we broke for lunch, we were

6   talking about the Bus 19 bombing, on January 29th, 2004,

7   correct?

8   A    Yes.

9   Q    And I had asked you about a document from the National

10  Counterterrorism Center, in which there was a recognition that

11  Fatah, the al-Aqsa Martyrs Brigade, was responsible for the

12  Bus 19 bombing; do you remember that?  And that document was

13  dated 2010?

14          THE COURT:  Wait.  You didn't get the answer in yet.

15  Q    And that was in 2010, right?

16  A    Yes.

17  Q    And you know, do you not, that the National

18  Counterterrorism Center is a United States Government

19  organization responsible for national and international

20  terrorism effort, right?  And we also looked at, in connection

21  with the Bus 19 bombing, a document that you had seen before,

22  put out by the RAND Corporation; do you remember that?

23  A    Yes.

24  Q    And the RAND Corporation document also explained that the

25  al-Aqsa Martyrs Brigade from Fatah was responsible for the Bus

Shaked - Cross- Ingerman                    1283

1   19 bombing, right?

2   A     Yes.

3   Q     And you know that the RAND Corporation report that I

4   showed you was commissioned by the United States Department of

5   Homeland Security, correct?

6   A     That's correct.

7   Q     Okay.  Now, I want to talk a little bit with you about

8   what exactly happened in connection with the Bus 19 bombing.

9   And what I'm going to do is -- I'm actually going to put up

10  your slide, shown on, I think it's, Plaintiffs' slide 51.

11          MR. INGERMAN:  Your Honor, may I display that to the

12  jury?

13          THE COURT:  You may.

14  Q     Now, this is the slide that you went through with

15  Mr. Turner about what happened in connection with the Bus 19

16  bombing, on January 29, 2004, right?

17  A     Yes.

18  Q     And you created this slide, correct?

19  A     Yes.

20  Q     Okay.  Now, I want to take a look for a moment.  In the

21  upper left-hand corner there's a man by the name of Nufal

22  Adawin; do you see that?

23  A     Yes.

24  Q     And I think Mr. Turner showed you and put into evidence

25  the verdict and sentencing for Mr. Adawin, correct?

1    A    Yes.

2    Q    And that conviction of Mr. Adawin, Nufal -- I call him

3    Nufal, if that's okay with you?

4        THE INTERPRETER:  Was that a question?  I'm sorry.

5    I didn't get the question.

6    Q    I will call him Nufal so we understand each other, if

7    that's okay with you?

8    A    That's fine.

9    Q    Thank you.  Now, Nufal was convicted based on a

10   confession that he gave; isn't that correct?

11   A    Yes, that's correct.

12       MR. INGERMAN:  And if we could put before just the

13   witness shown on Defense Exhibit 1039.

14   Q    Do you recognize that to be Nufal's confession?

15   A    This is his confession in the police, yes.

16   Q    And this is something that you looked at in connection

17   with your work in this case, right?

18   A    Yes, that's correct; I have looked at it.

19       MR. INGERMAN:  Your Honor, I move admission of

20   Defense Exhibit 1039.

21       THE COURT:  Any objection?

22       MR. TURNER:  Is this the conviction?

23       THE COURT:  No, this is the confession.

24       MR. TURNER:  I think that's part of it, but we have

25   no objection.

NICOLE CANALES, CSR, RPR

Shaked - Cross- Ingerman                1285

1          THE COURT:  It's admitted.

2          (Defense Exhibit 1039  was received in evidence.)

3    Q    Now, Nufal's confession was read to him and signed by

4    him, correct?

5    A    Yes.

6    Q    And what -- and in this confession, Nufal explains in

7    detail what happened in connection with the Bus 19 bombing;

8    isn't that correct?

9    A    He tells about all his connections with Ali Jaara,

10   because he didn't carry out the Bus 19 bombing.

11   Q    Okay.  So Mr. -- or Nufal, in his confession, says that

12   in the beginning of 2004, he had a friend named Muhammad

13   Nashash come to him, correct?

14   A    Yes, that's correct.

15   Q    And in your report and in your slide -- if we can put

16   back up slide 51 -- you identify Muhammad Nashash as a member

17   of Hamas, correct?

18   A    Yes, that's correct.

19   Q    Now, you know, do you not, Mr. Shaked, that in

20   Mr. Muhammad Nashash's sentencing, in connection with the Bus

21   19 bombing, he's actually identified and convicted as being a

22   member in an unauthorized association called al-Aqsa Martyrs

23   Brigade Fatah; isn't that right?

24   A    With your permission, may I see the paper you're talking

25   about?

Shaked - Cross- Ingerman                    1286

1      MR. INGERMAN:  Please can we show the witness

2  Plaintiffs' Exhibit 4045.  Just the witness, please.

3  Q    Before using Plaintiffs' Exhibit 4045, which is Muhammad

4  Nashash's conviction and sentencing in connection with the Bus

5  19 bombing, you've seen that document before, sir?

6  A    I've seen it, but if you could raise it a bit, pull it up

7  so I can see the names.

8  Q    Whatever you like.

9      MR. INGERMAN:  Shawn, can we make it a little bigger

10 for Mr. Shaked?

11     THE WITNESS:  Not bigger.  Scroll it.

12 Q    Scroll down.  I'm sorry.  To the first page?

13 A    To the other page.

14 Q    One more page?

15 A    Now, I can see it.

16 Q    Okay.  And this is the verdict and sentencing for

17 Muhammad Nashash, the person you claim is a part of Hamas, in

18 connection with the Bus 19 bombing, correct?

19 A    Yes.

20     MR. INGERMAN:  Your Honor, I would move Plaintiffs'

21 Exhibit 4045.

22     THE COURT:  Any objection?

23     MR. TURNER:  This is already in evidence.

24     MR. INGERMAN:  Then I don't need to move it.

25     THE COURT:  Okay.

Shaked - Cross- Ingerman                    1287

1   A    Could you scroll it, please, one page forward.

2            MR. INGERMAN:  Please, Shawn, scroll it one page

3   forward.

4            THE WITNESS:  Could I explain something small, if I

5   may?

6   Q    You'll have an opportunity to explain when your lawyer

7   asks the questions.  Let me ask you a couple questions,

8   please.  Thank you.  On page -- page 11 of the translation of

9   Mr. Nashash's sentencing, the Israeli court says --

10           MR. INGERMAN:  Your Honor, I would like to show this

11   to the jury, please.

12   Q    It says the defendant, which is Mr. Nashash, was

13   convicted of the crime of membership in an unlawful

14   association, and that since the end of March, 2003, and

15   through the time of his arrest, he was a member of the al-Aqsa

16   Martyrs Brigade.

17           Do you see that, sir?

18   A    I see that.

19   Q    And you understand, do you not, that Muhammad Nashash,

20   who was involved in the Bus 19 bombing, January 24th, 2004, is

21   a member of the al-Aqsa Martyrs Brigade from Fatah and not

22   Hamas.  You understand that, don't you?

23   A    From this document, I do understand that.

24           MR. INGERMAN:  Let's go back to slide 51, Shawn, if

25   we can.

NICOLE CANALES, CSR, RPR

Shaked - Cross- Ingerman                    1288

1   Q    You have, on the slide that you demonstrated to the jury,

2   Muhammad Nashash as a Hamas operative; is that right?

3   A    That's correct.

4   Q    And he was convicted by the Israeli courts of being a

5   member of the al-Aqsa Martyrs Brigade, correct?

6   A    As I saw in the conviction, that is, indeed, correct.

7   Q    So there's a mistake in your slide, right?

8   A    May I explain?

9   Q    Was Mr. Nashash convicted of being a member of the

10  al-Aqsa Martyrs Brigade?

11  A    Yes.  According to the conviction papers, yes.

12  Q    Okay.  Now, when Muhammad came to Nufal, in connection

13  with this attack, Muhammad told Nufal, that he, Muhammad, had

14  a friend called Jaara, who wanted to commit a suicide bombing;

15  is that right?

16  A    Yes, that's correct.

17  Q    And Jaara came to Muhammad, who is al-Aqsa Martyrs

18  Brigade, right?

19  A    I'm not familiar with whether he came to him as a member

20  of Allah or some other organization; he came to him because he

21  wanted to carry out a suicide bombing.

22  Q    When Jaara came to Muhammad, Jaara was not affiliated

23  with any organization; is that right?

24  A    Jaara was not affiliated with any organization; he simply

25  wanted to commit suicide.

Shaked - Cross- Ingerman                    1289

1   Q    So he came to his friend Muhammad, and Muhammad was a

2   part of the al-Aqsa Martyrs Brigade, right?

3   A    According to that description, that's apparently how it

4   occurred.

5   Q    Okay.  So I'm going to write on your slide AAMB, for

6   al-Aqsa Martyrs Brigade, over Mr. Nashash.  Now, it is

7   Muhammad --

8   A    You can write that.

9   Q    Thank you.  It is Muhammad who then introduces Jaara to

10  Nufal, correct?

11  A    Yes, indeed.

12  Q    And the money to buy the weapons, the explosive device

13  that they were going to use, came from Muhammad; isn't that

14  true?

15  A    Also from Muhammad.

16  Q    Now, then what happened was Muhammad and Nufal hung a

17  Hamas banner in Nufal's room; isn't that right?

18  A    I don't know if one of them hung it up, two of them hung

19  it up.  I'm familiar with the picture of the banner in their

20  house.

21          MR. INGERMAN:  Okay.  Let's pull up PX4045, Shawn,

22  if you could.  And I think it's page 10 translation.  4045 is

23  the sentencing.  I'm sorry.  I meant the confession.  1035.

24  Defense Exhibit 1039.  And page 12, please.

25  Q    So this is Nufal's confession.  That's in evidence.

Shaked - Cross- Ingerman                    1290

1          MR. INGERMAN:  And I would like to show that to the

2     jury, your Honor, please.

3     Q    And what Nufal says is we hung a Hamas banner in my room,

4     and I gave Ali Jaara the charge to hold.  Do you see that?

5     A    Yes, I see it.

6     Q    Okay.  And then it says Muhammad and I also prepared an

7     explosive belt, with nothing but wires and pipe bombs, right?

8     A    Yes.

9     Q    And then Nufal says we filmed Jaara with the explosive

10    belt, the charge and a black toy plastic pistol.  Do you see

11    that?

12    A    Yes.

13    Q    And that's the film that you say you saw, right?

14    A    I'm familiar with that picture.

15    Q    Okay.  And the picture that is actually on the Hamas

16    claim of responsibility is taken at the time that Nufal and

17    Muhammad put a Hamas flag up in front of Jaara before

18    anything -- any attackers?

19          THE INTERPRETER:  In front of Jaara?

20          MR. INGERMAN:  Behind Jaara.  I'm sorry.

21          THE WITNESS:  Yes.

22    Q    Now, you don't have any idea, do you, Mr. Shaked, how

23    many hours or days that Jaara spent with Nufal, do you?

24    A    I can assume that he spent at least a few hours.

25    Q    But you don't know, do you?

Shaked - Cross- Ingerman                1291

1   A    No.

2   Q    Okay.  And then what it says is, however, a few days went

3   by, and we did not send him because I, Nufal, did not know

4   exactly how to perform a suicide attack.  That's what Nufal

5   said in his confession, right?

6   A    Indeed, this is what it said here, yes.

7   Q    And what happens next is really important, Mr. Shaked,

8   because what happens next is Jaara goes and talks to Tanseem

9   Fatah.  Do you see that?

10  A    Yes, but some time elapsed between the time they were

11  together and until he went to the Tanseem.  A few days had

12  past.  Certain actions were taken.  There were preparation.

13  He didn't go straight from one place to the other.  In the

14  meanwhile, he did try to do something, to carry out something,

15  and only there did he go to speak with the Tanseem.

16  Q    Tanseem Fatah is al-Aqsa Martyrs Brigade right?

17  A    That's right.

18  Q    The same group that his friend Muhammed Nashash belonged

19  to, right?

20  A    Yes.

21  Q    Now, it goes on to say Jaara told me he spoke to Fatah,

22  and that they, Fatah, will send him to a suicide attack.  Do

23  you see that?

24  A    I see this in this testimony, but we need to remember

25  exactly the chronology of this confession.  It doesn't mention

Shaked - Cross- Ingerman                    1292

1  any days or anything, but rather this is a story, a narrative,

2  a narrative provided by my fall, and under this context, he

3  wanted to kind of make it easier for himself to try to get a

4  lesser punishment as possible.  This is why it was easy for

5  him to explain it this way, but we need to remember the

6  reality as it occurred.  So, indeed, there was the issue that

7  he did want to carry out this attack, and only after that

8  attempt had failed, only then he approached Fatah in order to

9  try to do it another time in a different way.

10  Q    And he approached Fatah, the al-Aqsa Martyrs Brigade, to

11  do a different attack in a different way, right?

12  A    He wanted to do it in the same way, through a suicide

13  bombing, as it was customary in those days, to board a bus and

14  then explode yourself.

15  Q    We can agree, though, that when Jaara went out the first

16  time to commit his attack, Bus 19 was not his target, was it?

17  A    Bus Number 19 wasn't the defined target, not in the first

18  time and not at the second time.

19  Q    Okay.  So Bus 19 is not the target the first time around,

20  when Jaara thinks about committing a suicide attack, but the

21  second time around he's successful, correct?

22  A    Yes, he did manage to board the first bus, which stopped

23  at the station, which he managed to reach, the bus stop.  But

24  it happened to be Bus Number 19.  It could have been just the

25  same as number nine or bus number seven.

Shaked - Cross- Ingerman                    1293

1   Q    But it wasn't, it was Bus Number 19, right.

2   A    Yes.  Regretfully, he did manage to board Bus Number 19,

3   which was packed with passengers.

4   Q    Now, let's see if there are a couple things we can agree

5   on, focussing on the attack that Jaara actually carried out on

6   Bus 19.  Can we agree that the al-Aqsa Martyrs Brigade

7   operatives are the ones who actually constructed the explosive

8   device that Jaara used to blow up Bus 19?

9   A    Yes, we do agree on that.

10  Q    Okay.  And we also agree that whatever explosive device

11  Nufal, from Hamas, and Muhammad made for him for the first

12  attack that didn't occur was not the explosive device that was

13  used on Bus 19?

14  A    That's right.

15  Q    And it was an al-Aqsa Martyrs Brigade member who drove

16  Jaara to the site of the bombing, right?

17  A    That is, indeed, true.

18  Q    Okay.  Now, I want to talk a little bit about the video

19  picture that was taken of Jaara with the Hamas flag behind it.

20  Can we agree that -- actually, it says it in here, in the

21  confession, in Plaintiffs' exhibit -- Defense Exhibit 1039 --

22  if we can high light that Shawn.

23         It says I gave the pictures of Jaara -- this is

24  Nufal talking.  I gave the pictures of Jaara with the charges,

25  the pistol, and the Hamas banners to the Bethlehem television

1    station, and they reported that Hamas claimed responsibility

2    for the suicide attack.

3           Do you see that?

4    A    Yes, I can see that.

5    Q    And then after Nufal gave the video to the Bethlehem

6    television station, claiming that Hamas had perpetrated the

7    attack on Bus 19, Fatah then says, but, actually, Fatah was

8    responsible for the attack in Nala (phonetic); isn't that what

9    he says?

10   A    Indeed, this is what he says in this document.

11   Q    Okay.  Now, after this horrible attack on Bus 19, there

12   are actually four al-Aqsa Martyrs Brigade members that are

13   convicted for this attack; isn't that true?

14   A    Yes.

15   Q    Let me show you --

16          MR. INGERMAN:  Just the witness, slide six, Shawn.

17   Q    Now, slide six identifies the four al-Aqsa Martyrs

18   Brigade members that were convicted in the Bus 19 attack;

19   isn't that right?

20   A    Is it right.  I'm not -- I'm not saying otherwise, and I

21   did not say the al-Aqsa Martyrs Brigade had no responsibility

22   over this attack.

23   Q    Let me try my question again.  Maybe it got lost in

24   translation.  Are -- these four folks listed on the left-hand

25   side, are they all al-Aqsa Martyrs Brigades operative

Shaked - Cross- Ingerman                    1295

1  convicted in connection with the Bus 19 attack?

2  A    Yes, they were convicted.

3         MR. INGERMAN:  Your Honor, permission to show this

4  to the jury.  I've shown it to Mr. Turner.

5         MR. TURNER:  No objection.

6         THE COURT:  That's fine.

7  Q    Now, we've already talked about Muhammad Nashash, Abde

8  Madah (phonetic) was an al-Aqsa Martyrs Brigade operative who

9  was convicted for preparing the explosive device used on the

10 Bus 19 bombing, right?

11 A    Indeed so.

12        THE COURT:  Mr. Ingerman, do you have a lot more on

13 this line, about this attack, I mean?

14        MR. INGERMAN:  No, I think I'm pretty close to being

15 finished.

16        THE COURT:  Okay.  Then go ahead.

17 Q    Now, you also mentioned in connection with Bus 19 that

18 you had viewed Jaara's will, correct?

19 A    Yes.

20        MR. INGERMAN:  If we may show the witness only

21 Defense Exhibit 1042.

22 Q    Do you recognize this to be Jaara's will that you viewed

23 in connection with your work in this case?

24 A    Yes, he reads a few words in Arabic and says this is

25 indeed the will.

Shaked - Cross- Ingerman                    1296

1    Q    Okay.  And at the bottom of the will, Jaara says, does he

2    not, that he's part of the al-Aqsa Martyrs troops?

3    A    Okay.  Simply need to read this paragraph, and it's

4    handwritten, and the focus of these slides is not very good.

5    Q    Please, if it's easier, I can put the certified English

6    translation up for you.

7    A    If it's bigger, if it's easier to read, then of course.

8         MR. INGERMAN:  Sure.  Shawn, can we do that, please?

9    And if we can blow that up for Mr. Shaked so he can read it

10   more clearly.

11   Q    How's that?

12   A    Now, I can read it.  Thank you.  This is the will

13   prepared by the al-Aqsa Martyrs Brigade before Jaara went out

14   to perpetrate the attack on Bus Number 19.

15   Q    And it says that Jaara is part of the al-Aqsa Martyrs

16   Brigade, correct?

17   A    This will does say that Jaara is a member of the al-Aqsa

18   Martyrs Brigade.

19         MR. INGERMAN:  Your Honor, I move in Defense

20   Exhibit 1042.

21         MR. TURNER:  No objection.

22         THE COURT:  It is received.

23         (Defense Exhibit 1042  was received in evidence.)

24   Q    Just to wrap this up, I hope, Mr. Shaked, am I right that

25   in your expert report that you wrote, you claimed Fatah

Shaked - Cross- Ingerman                1297

1  eventually made a clear withdrawal from responsibility for the

2  Bus 19 bombing and denied any responsibility for it?  Didn't

3  you say that in your report?

4  A    Indeed, following the very fierce debate between Fatah

5  and Hamas regarding the responsibility, indeed Fatah

6  ultimately did withdraw their responsibility for the attack.

7  Hamas demanded of Fatah to cancel and withdraw their claim of

8  responsibility.  Therefore, within the year after the attack,

9  Fatah, under pressure from Hamas, did withdraw its

10 responsibility for the attack.  I did not say that the al-Aqsa

11 Martyrs Brigade do not have responsibility for the attack;

12 they bear responsibility just as Hamas does.  Both of them are

13 responsible for this attack, and this is what I was trying to

14 explain.  I was not trying to avoid the fact that al-Aqsa

15 Martyrs Brigade also bore responsibility for the perpetration

16 of this attack.

17           I'd like to add one last word.  We need to remember

18 that the suicide bomber, in this case it was Ali Jaara, is not

19 an educated person.  He's not a special person.  All he is, is

20 a pawn in the hands of the organizations.  That's what he is.

21 His position, his role, is merely to push the button.  He is

22 just a simple pawn in their hands.

23           MR. INGERMAN:  Your Honor, I move to strike.

24           THE COURT:  Hang on one second.  I'll grant the

25 motion and strike that last statement.  Plaintiffs' counsel

Shaked - Cross- Ingerman                    1298

1   can inquire on redirect if they want.

2          Are you done in this area?

3          MR. INGERMAN:  Almost.

4          THE COURT:  You said that before.  Let me see

5   counsel at sidebar.

6          (Sidebar outside the presence of the jury.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sidebar                                          1299

1                         (Sidebar)

2          THE COURT:  Mr. Ingerman, that was really

3    inefficient.  All right?  Remember the witness' story that he

4    started out with on direct was that this was what he called a

5    joint operation?  There was no controversy that Fatah al-Aqsa

6    Martyrs Brigade wasn't the ones who actually triggered the

7    explosion.  He said that, and you spent the last 25 minutes

8    getting him to say that again.  You achieved one thing, which

9    was to get him to move one of the people on his chart into

10   al-Aqsa Martyrs Brigade, and that's fine.  But, you know, this

11   could have been done in three questions.

12          The questions you have that said we agree that

13   al-Aqsa Martyrs Brigade supplied the belt, they put him up to

14   it, you could have done that in literally three minutes.  I'm

15   going to ask you to move on and go to something else, because

16   I think the jury understands what's happened, and you've

17   scored all the points you can on cross in this area.

18          MR. INGERMAN:  Your Honor, he specifically testified

19   it was not a joint operation.

20          THE COURT:  No, he said it was not a shared

21   operation, he said it was a joint operation.  I listened to

22   that very carefully.  There is no contradiction between what

23   was brought out in the last 25 minutes and what the witness

24   said on direct, other than the one member that he attributed

25   to one fax being moved to the other fax, so, please, let's not

NICOLE CANALES, CSR, RPR

Sidebar                                    1300

1    beat a horse to death.

2         MR. INGERMAN:  I disagree, your Honor, but I have

3    one more exhibit that I think is important to show the

4    witness, and then I will move on.

5         THE COURT:  Okay.  But, then, please don't do this

6    again with any other areas.  Okay?  This was just really a

7    large amount of time that could have been done -- it's an

8    important point.  I'm not saying you shouldn't have done it,

9    but could have been done in a lot more efficient way.  Please

10   try to do that in the future.

11              (Sidebar concluded.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In the presence of the jury.)

2              MR. INGERMAN:  May I proceed, your Honor?

3              THE COURT:  You may.

4    Q    The last thing on this attack, Bus 19, Mr. Shaked, I want

5    to ask you about, because Mr. Turner asked you on direct

6    whether or not there was an Israeli Security Agency statement

7    about Bus 19, but we didn't show it.  And since he had showed

8    you a number of Israeli Security Agency reports in connection

9    with some of the other attacks, I wanted to show to you the

10   one from the very same exhibit that the Plaintiffs were to

11   show you.

12             MR. INGERMAN:  Shawn -- and if this is the Israeli

13   Security Agency report just for -- it's in evidence.

14             So, your Honor, may I show it to the jury?

15             THE COURT:  You may.

16   Q    This is the Israeli Security Agency report Mr. Turner

17   showed you over and over again, in connection with some of the

18   other attacks.  And I was curious that you didn't mention this

19   or wasn't shown to the jury on direct, because there is an

20   excerpt in here for the Bus 19 bombing; you knew that, right?

21   A    I was not trying to evade stating that fact, that the 19

22   bus bombing was carried out by the al-Aqsa Martyrs Brigade,

23   but -- and I say again a very big but -- it was just a hair's

24   breath away from Hamas actually having carried it out.

25   Therefore, the responsibility for the bombing is shared, it's

Shaked - Cross - Ingerman                    1302

1   joint, for both organizations.  I tried to explain that in my

2   expert opinion.  And without evading any responsibility,

3   al-Aqsa Martyrs Brigade ultimately was the one to carry out

4   that attack.

5   Q    Mr. Shaked, the Israeli Security Agency says it was the

6   al-Aqsa Martyrs Brigade, and there's no mention of Hamas

7   anywhere in there, is it?

8   A    I mentioned earlier in my testimony that I do not base

9   myself only on one report or a single fact.  I look at the

10  continuum of the entire picture that is created, and in this

11  case I had to mention subject of Hamas.  Moreover, the Israeli

12  court that judge these people from Hamas, they also discuss

13  this matter, and they stated that Hamas also had

14  responsibility for this attack.  They said that it was Hamas

15  that actually loaded the bullet into the barrel of the gun and

16  that the trigger was pulled by a member of al-Aqsa Martyr

17  Brigade.  There's no evasion.  I'm stating the truth here;

18  al-Aqsa Martyrs Brigade carried out this attack, but Hamas

19  also bears responsibility for this attack.

20          MR. INGERMAN:  Your Honor, I move to strike.

21          THE COURT:  No, I'm going to overrule the objection

22  and direct you to move on to something else.

23  Q    Now, let's talk about the Bus Number 2 bombing for a

24  moment.  Now, you were aware, were you not, Mr. Shaked, that

25  Reuters -- by the way, Bus Number 2 bombing occurred on

Shaked - Cross - Ingerman                1303

1    August 19, 2003, right?

2    A    That is correct.

3    Q    Do you know that Reuters is a news agency that puts out

4    news reports?

5    A    Of course.

6    Q    And the day offer the Bus Number 2 bombing, you knew, did

7    you not, that Reuters reported that Islamist Jihad from the

8    al-Aqsa Brigade had claimed responsibility for the Bus Number

9    2 bombing?

10   A    That is correct.

11   Q    And you also knew that on August 20th, the Israeli

12   newspaper, Harres (phonetic), reported that Islamist Jihad had

13   claimed responsibility for this attack, Bus Number 2, right?

14   A    Yes, indeed, that's what it said.

15   Q    And you also knew, did you not, that Rantiqi, one of the

16   Hamas leaders, denied that Hamas was responsible for or

17   involved in any way with Bus Number 2 bomb; is that right?

18   A    Yes.

19   Q    And you also know, do you not, that the Guardian, an

20   English newspaper, also reported that Islamist Jihad claimed

21   responsibility for this attack?

22   A    Yes, and I'm very happy that the distinguished attorney

23   has presented all this material, all these things that were

24   made public or published one day, perhaps two, at most, after

25   the attack, after the attack on Bus Number 2.  Because this

Shaked - Cross - Ingerman                1304

1   was a very, very sensitive time for Hamas.  There was a cease

2   fire at the time between Israel and Hamas, which Hamas had

3   broken, and so it didn't want to take -- it didn't want to

4   make official claim of responsibility, and it was happy to let

5   Islamic Jihad take responsibility, because it cleared Hamas of

6   responsibility.  And Islamist Jihad, perhaps, took advantage

7   of the fact, because it was not part of the cease fire at that

8   time, and I don't deny those facts.

9           As I said, my test of the reality is not one day or

10  one hour after the attack, but rather through a perspective of

11  time.  And as it turned out, Rael Al Misk, the one whose will

12  I saw, and I personally visited in his home and spoke to his

13  wife, he was the one who carried out the terror attack and not

14  the Islamist Jihad or any of the other organizations that may

15  have claimed responsibility a day or two after it was carried

16  out.

17  Q    I understand that's your opinion, but I'm asking you a

18  very simple question.  Do you know -- you know, don't you,

19  that also on August 20th, 2003, the New York Daily News, here

20  in New York, also reported that the Islamist Jihad had claimed

21  responsibility, don't you?

22  A    I believe the distinguished attorney that that is what

23  was, indeed, reported in the newspaper the next day.  But if

24  we look at the difference in time between -- in the hours

25  between the time zones, between United States and Israel,

1   we'll see that that is, in fact, just a few hours after the

2   attack was carried out.  That's when it was reported, so they

3   didn't yet have any perspective in time to see what the real

4   situation was.

5   Q    Okay.  Let --

6   A    Only afterwards was it discovered who actually carried it

7   out.

8            THE COURT:  Let me say this, I'm going to ask the

9   witness to confine himself a little more closely to the

10  question being asked of him.  I know he has more to say about

11  a lot of the questions, but it's up to the Plaintiffs' lawyers

12  to bring out that information when they examine him again.

13           THE WITNESS:  Thank you very much, your Honor.  I'll

14  do that.

15           THE COURT:  Okay.

16           MR. INGERMAN:  Thank you.

17           THE COURT:  Next question.

18  Q    Now, with respect to the Dolphinarium attack that

19  occurred on June 1st, 2001, we agree that Hamas did not claim

20  responsibility until three days after that attack, right?

21  A    I'll accept what you say.  I don't recall if it was

22  exactly a day or two, but I accept that that's indeed the

23  situation.

24  Q    When you had your sworn testimony taken at your

25  deposition, you did not, at that time, remember whether there

1   were any other claims of responsibility for the Dolphinarium;

2   isn't that right?

3   A    I'll try to keep my answer brief, as the judge instructed

4   me.  In my expert opinion, I did not relate to every single

5   claim of responsibility, especially those I did not consider

6   significant, or which were incorrect, or were no more than

7   boasting and self-glorification.  In some cases, I did relate

8   to those claims of responsibility, when I thought they were

9   significant.

10  Q    Sir, that's not my question.  My question is, during your

11  deposition, your sworn statement that -- your sworn testimony

12  you gave in this case, isn't it true that you said, at that

13  time, you were not aware of any competing claims for the

14  Dolphinarium attack?

15  A    That is, indeed, correct.

16  Q    And you know now, don't you, that there were alternative

17  claims of responsibility for the Dolphinarium attack.

18  A    Yes, I do indeed know that, and I hear it from you as

19  well.

20  Q    On June 1st, the day of the attack, you were aware, are

21  you not, that CNN reported that Islamist Jihad claimed

22  responsibility for the Dolphinarium attack?

23  A    Yes, I know that.

24  Q    And on that same day, the Israeli Ministry of Foreign

25  Affairs also reported that the Palestinian Hezbollah claimed

Shaked - Cross - Ingerman                1307

1  responsibility for the attack, right?

2  A    Yes, the Ministry of Foreign Affairs reported just a few

3  hours after the attack Hezbollah had taken responsibility for

4  the attack.

5  Q    On the next day, June 2nd, 2001, the British

6  Broadcasting -- the BBC, the British Broadcasting Company,

7  reported also that Islamist Jihad claimed responsibility,

8  correct?

9  A    That's correct.

10 Q    And on June 3rd, two days later, the Jerusalem Post --

11 I'm sorry.  Strike that.

12        Now, are you also aware, Mr. Shaked, that Fatah

13 actually sent money to the bomber's family?

14 A    Yes, I know that.

15 Q    Okay.  And are you aware, sir, that as recently as June

16 of this year, the Jerusalem Post reported that the Islamist

17 Jihad claimed responsibility for the attack?

18 A    Wow, I didn't know that.

19 Q    Okay.  So we have four different claims with respect to

20 the Dolphinarium bombing, right?

21 A    What can you do?  Reporters sometimes get it wrong, too.

22 Q    And you're a reporter, right?

23 A    I've also made mistakes in my life as a journalist.

24 Q    Haven't we all?  So let's talk about the Sbarro bombing

25 for a moment.  That happened on August 9th, 2001, in

Shaked - Cross - Ingerman                1308

1   Jerusalem, right?

2   A    Yes.

3   Q    And you're aware that on that same day the Israeli

4   Ministry of Foreign Affairs reported that Islamist Jihad

5   claimed responsibility for the attack, right?

6   A    Yes, I'm aware of the fact that two hours after the

7   attack occurred the MFA rushed to say that.

8   Q    And also on August 9th, 2001, the British newspaper the

9   Guardian also reported that Islamist Jihad claimed

10  responsibility for the Sbarro bombing, right?

11  A    I do know that.

12  Q    And you also know that on August 9th, 2001, our New York

13  Daily News, here in New York, also reported that the Islamist

14  Jihad claimed responsibility for the Sbarro bombing?

15  A    Yes.

16  Q    And you also know that the British newspaper the

17  Telegraph also reported, on August 9th, 2001, that the

18  Islamist Jihad had claimed responsibility for the Sbarro

19  bombing?

20  A    Yes.

21  Q    And on the next day, August 10th, 2001, the Denver Post

22  reported that Islamist Jihad claimed responsibility, correct?

23  A    Yes.

24  Q    And about six months later, on March 22nd, 2002, there

25  was a Daily News report that reported that the al-Aqsa Martyrs

1  Brigade of Fatah took credit for the attack for the Sbarro

2  bombing; isn't that right?

3  A    Regretfully, the Daily News did not follow after the

4  occurrences in Israel, and did not follow up the investigation

5  regarding the Sbarro attack and also regarding the

6  responsibility.  As for the other newspapers, these were

7  claims that were published three or four hours after the

8  attack occurred that were provided by various anonymous phone

9  calls.  This is what had happened.  And the truth is that the

10 official claim by the Hamas was actually issued a few hours

11 later after the attack, on that very same evening.

12 Q    The Daily News report -- I'm sorry.

13 A    And by the time the report appeared six months later, the

14 people had been arrested, the members of the cell, and it was

15 pretty clear who perpetrated this attack.  It was hardly

16 necessary to have any further investigations, and I am sorry

17 for mistakes made by my fellow journalists.

18 Q    Now, let's talk about the December 1, 2001, Ben Yehuda

19 bombing.  Now this involved two suicide bombers, and one car

20 explosion, as you've testified, right?

21 A    Right.

22 Q    Now, I want to focus on the car bombing for a minute.  We

23 agreed, do we not, that the car bomb that exploded belonged to

24 an operative of Islamist Jihad?

25 A    Indeed, that's true.

Shaked - Cross - Ingerman                1310

1   Q    And, interestingly, when you were asked in your

2   deposition, your sworn testimony about this, about the owner

3   of the car, you said that there's not a person in the

4   Palestinian streets that is not recognized with an

5   organization.  Do you remember saying that?

6   A    I did say that, and I do not retract from that.

7   Q    What organizations are you talking about?

8   A    I'm talking about all organizations, the ones that are

9   members of the PLO, and the ones that are not members of the

10  PLO.  And if you would like me to, I can list the names of all

11  these organizations, and I am referring to the Palestinian

12  organizations.

13  Q    Is it your opinion, Mr. Shaked, that all Palestinians in

14  the streets are members of some sort of terrorist

15  organization?

16  A    I'm not saying that all these organizations are terrorist

17  organizations.  I clearly said that these were Palestinian

18  organizations.

19  Q    The Palestinian territories are occupied territories by

20  the Israeli military, are they not?

21  A    Yes, that's right.

22  Q    And based on -- I think you testified on direct that

23  based on your work, you've been able to understand the

24  Palestinian society.  Is it your understanding that the

25  Palestinians consider the Israeli army an enemy?

Shaked - Cross - Ingerman                    1311

1            MR. TURNER:  Your Honor, I object to this on the

2      basis of relevance.

3            THE COURT:  Sustained.

4            MR. INGERMAN:  May we have a brief sidebar,

5      your Honor?

6            THE COURT:  Sure.

7         (Sidebar heard outside the presence of the jury.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sidebar                                              1312

1                          (Sidebar)

2          MR. INGERMAN:  Your Honor, we've had lots of

3    testimony and argument about the bank's annual reports,

4    talking about the occupied enemy, and I think he's testified

5    on direct that he understands -- understood the Palestinian

6    society as part of his work, and I think I'm entitled to

7    inquire into that.

8          THE COURT:  You have him say that, in fact, certain

9    regions are occupied territories.  That ties it into the

10   report.  The rest of it runs an undue risk of having us try

11   the Israeli Palestinian conflict, and I'm, therefore,

12   excluding the question and this line of inquiry on Rule 403.

13                     (Sidebar concluded.)

14

15

16

17

18

19

20

21

22

23

24

25

Shaked - Cross - Ingerman                1313

1              (In the presence of the jury.)

2   Q    Mr. Shaked --

3              MR. INGERMAN:  May I proceed, your Honor?

4              THE COURT:  You may.

5   Q    The occupiers of the Palestinian territories are the

6   Israeli Army, right?

7              MR. TURNER:  Your Honor, again, I object.

8              MR. INGERMAN:  That's my last question.

9              THE COURT:  I'll allow that one question.

10             THE WITNESS:  That's correct.

11  Q    Now, we were talking about the December 1st, 2001,

12  Ben Yehuda attack, and we had already established that the

13  owner of the car bomb was Islamist Jihad.  You're aware, are

14  you not, Mr. Shaked, on December 2nd, 2001, the day after the

15  attack, the British Broadcasting Company reported a claim by

16  Islamist Jihad for Ben Yehuda?

17  A    Yes, I did know that.

18  Q    And you also knew that our New York Daily News reported,

19  on December 2nd, 2001, also that Islamist Jihad had claimed

20  responsibility for the Ben Yehuda attack?

21  A    Yes.

22  Q    Now, I want to move to the September 19, 2002, Bus Number

23  4 attack, and I think you mentioned this on direct,

24  Mr. Shaked, but Hamas' claim of responsibility for the Bus

25  Number 4 attack came six years later; isn't that true?

Shaked - Cross - Ingerman                    1314

1    A    Indeed, that's true.

2    Q    And at your deposition, when your sworn testimony was

3    taken, you couldn't remember any other claims of

4    responsibility for the Bus Number 4 attack; isn't that right?

5    A    Could be.  I'm also a human being.

6    Q    But you know now, do you not, sir, that the next day,

7    September 20th, 2002, CNN reported that Islamist Jihad had

8    claimed responsibility for Bus Number 3?

9    A    That's indeed true.

10   Q    Reuters, the news organization, reported the same thing,

11   right?

12   A    Yes.

13   Q    Now, are you aware of a publication called the Friends of

14   the Israel Gospel Ministry?

15   A    I've learned about it because of the attack.

16   Q    Okay.  And they, too, reported, did they not, on

17   September 19th, 2002, that although Hamas had first claimed

18   responsibility, the Islamist Jihad later claimed

19   responsibility for the Bus 4 attack?

20   A    Yes.

21   Q    Now, let's move to the Mike's Place attack, if we could.

22   And that occurred on April 30th, 2003.  Am I correct with

23   respect to Mike's Place that Hamas did not take responsibility

24   for the attack until March of 2004, almost a year later?

25   A    That's right.

NICOLE CANALES, CSR, RPR

Shaked - Cross - Ingerman                    1315

1   Q    And I think you said this on direct, but you agree with

2   me that the attack that occurred at Mike's Place was totally

3   different than the other 23 attacks that we're here about in

4   this trial?

5   A    I do agree.

6   Q    And the two attackers in the Mike's Place attack were

7   British citizens who had trained with Al-Qaeda, right?

8   A    Yes, they were British citizens, trained by Al-Qaeda.

9   Q    And after the Mike's Place attack, Israeli Prime

10  Minister's Office announced that Hamas decided not to take

11  responsibility for this attack; isn't that right?

12  A    That's right.

13  Q    And later that day, CNN reported that the al-Aqsa Martyrs

14  Brigade, the Fatah group, had claimed responsibility for

15  Mike's Place, right?

16  A    That's right.

17  Q    And on April 30th, 2003, the United States Government

18  agency International Institute for Counterterrorism indicated

19  Fatah had claimed responsibility for Mike's Place.  You knew

20  that, right?

21  A    That's right.

22  Q    And you also know that on the day of the attack, the

23  Israeli Ministry of Foreign Affairs also said that al-Aqsa

24  Martyrs Brigades had claimed responsibility for the attack?

25  A    Indeed so, and the list is long, and the distinguished

Shaked - Cross - Ingerman                1316

1  lawyer can also add my name to this list, because I had also

2  made a mistake, and I also reported and it was a mistaken

3  report back then, regarding the attack at Mike's Place.  And

4  there were various conjectures and theories regarding Al-Qaeda

5  or Hezbollah and their involvement.

6  Q    Am I the distinguished lawyer?

7            THE COURT:  You are.

8            MR. INGERMAN:  Thank you, your Honor.

9            THE WITNESS:  Yes, indeed, you are a distinguished

10 lawyer.

11           THE COURT:  Don't tell us that's the first time

12 everyone's said that.

13           MR. INGERMAN:  Am I under oath?

14 Q    Now, Mr. Shaked, we can also agree that the Washington

15 Post and Time Magazine also reported that Fatah and Hezbollah

16 claimed responsibility for these attacks on April 30th, 2003,

17 the Mike's Place?

18 A    Yes.

19 Q    Now, I want to show you again, with respect to Mike's

20 Place, the slide that Mr. Turner showed you regarding the ISA

21 report for the Mike's Place attack.  And it was --

22           MR. TURNER:  3811.

23           MR. INGERMAN:  The slide number?  Slide four.

24           MR. TURNER:  I thought you were talking about the

25 exhibit.

1          MR. INGERMAN:  The slide to use.  Thank you.

2          May I show that to the jury, your Honor?

3          THE COURT:  Yes.

4    Q    Now, this is the excerpt from the ISA report that you

5    showed to the jury from Mike's Place, and I was interested to

6    see two things.  At the bottom -- first of all, in the middle,

7    it says is the Hamas organization claimed responsibility for

8    the attack, right?

9    A    Indeed it does say so.

10   Q    And then at the end of the report, it says the terrorist

11   pair was assisted by a number of foreign left-wing operatives

12   staying in the area.  Do you see that?

13   A    I would like to explain regarding British citizens who

14   enter Israel through the Allen Bee (phonetic) Bridge, who

15   cross into the territories through Jordan, and they are

16   considered suspect.  And usually along with them there are

17   various NGOs, and left-wing organizations which operate within

18   the territories in order to receive coverage.  And it is no

19   secret that these left-wing organizations don't really like

20   Israel.  So for these two British citizens, it was quite

21   natural for them to receive help from other organizations,

22   such help as driving them or finding a place for them to stay.

23   But I don't think that these activists really knew what their

24   intention was, that it was to carry out a suicide bomb.

25   Q    Who were the foreign left-wing operatives that helped the

Shaked - Cross - Ingerman                    1318

1  two terrorists from Mike's Place?

2  A    If I recall correctly, their name -- the name of the

3  organization is ISA.  It is called International Solidarity

4  something, and this organization is active both in Gaza and

5  the West Bank.  And these two British people received

6  assistance from them mainly in Gaza.

7  Q    Now, the last thing I want to look at, with respect to

8  Mike's Place, Mr. Shaked, is the official -- what you claim to

9  be the official claim of responsibility by Hamas.

10            MR. INGERMAN:  And Mr. Turner didn't put it up on

11  the screen.  I believe it is in evidence -- just to make sure

12  on the right, Shawn, let's show just the witness PX3807, the

13  official claim of responsibility is that PX10 --

14            MR. TURNER:  For Mike's Place, it's 3807.

15            MR. INGERMAN:  3807.  Thank you.  That's in

16  evidence, your Honor.  May I show it to the jury?

17            THE COURT:  You may, but you probably want the

18  English.

19            MR. INGERMAN:  Arabic's not going to help me.

20            THE COURT:  More importantly, it's not going to help

21  the jury.

22  Q    So we go to the English part.  The second paragraph,

23  Mr. Shaked, says, as the martyr Izz al-Din al-Qassam Brigade's

24  claimed joint responsibility with the al-Aqsa Martyrs

25  Brigades.  Do you see that, Mr. Shaked?

1    A    Yes, I do.

2    Q    You did not tell the jury you believed this to be a joint

3    claim of responsibility with al-Aqsa Martyrs Brigade, did you?

4    A    I suggest we look at the date of the claim of

5    responsibility by Hamas to understand why Hamas published

6    their claim of responsibility at that particular time,

7    together with the al-Aqsa Martyrs Brigade.

8    Q    So is it your testimony that Hamas is not telling the

9    truth in this official communication, when it says that

10    there's a joint claim of responsibility with al-Aqsa Martyrs

11    Brigade?

12    A    I'm testifying that it is true Hamas wrote it to kind of

13    dispel the clarity, the fog, as it were, and pressure being

14    excerpted on Hamas.  They were in a very great state of

15    confusion after the terror attack, after a suicide bombing was

16    carried out by foreigners who were affiliated with Al-Qaeda,

17    and there was a great deal of anger at that time.  And somehow

18    to dispel the confusion, that is what they tried to do.  And

19    when I look at it with the perspective of time, and I look at

20    the fact that in March, afterwards, they published a full and

21    precise claim of responsibility, including the will by the two

22    suicide bombers and a very detailed report by Hamas, which was

23    reported by the whole world, including the BBC.

24    Q    You said including the BBC?

25    A    The BBC made a long, detailed documentary film about the

1   two suicide bombers and about the bombing at Mike's Place.

2   Q    Let's talk about the September 4th --

3              THE COURT:  Before you go on, let's take our

4   afternoon break.

5              MR. INGERMAN:  Sure.

6              THE COURT:  Ladies and gentlemen, we'll come back in

7   15 minutes.  See you at 3:30.  Remember, don't talk about the

8   case.  See you soon.

9                 (Outside the presence of the jury.)

10             THE COURT:  How are you doing time wise.

11             MR. INGERMAN:  Pretty good.

12             THE COURT:  Can you be more specific?  Not totally

13  specific.  Just a little more.

14             MR. INGERMAN:  Part of it depends on whether he says

15  yes, and then he says yes and 27 more sentences.

16             THE COURT:  Yes, I do appreciate that.  I'm trying

17  to help you there.

18             THE WITNESS:  I'll try.

19             MR. INGERMAN:  I appreciate that, too.  If we come

20  back at 3:30, I'm hoping 4:00 o'clock, 4:15 at the latest.

21             THE COURT:  Okay.  Good.  See you then.

22                 (Recess in proceedings.)

23

24

25

SHAKED - CROSS - INGERMAN                 1321

1    THE COURT:  Please bring in the jury.

2        (Jurors enter the courtroom.)

3    THE COURT:  Be seated.  Mr. Ingerman, you may

4  continue.

5    MR. INGERMAN:  Thank you, your Honor.

6  BY MR. INGERMAN:

7  Q    Mr. Shaked, I want to talk to you about the September

8  24th, 2004, Neve Dekalim attack.  That was a mortar attack

9  on a neighborhood in the Gaza strip called Neve Dekalim?

10  A    Yes.

11  Q    And the attackers in that case escaped and were never

12  identified, right?

13  A    That's indeed right.

14  Q    And on the day of the attack, ABC News reported that

15  Islamic Jihad took responsibility for the attack; isn't that

16  right?

17  A    Yes.

18  Q    And the only thing that you cite for your opinion that

19  it was Hamas is the Hamas claim of responsibility on the Web

20  site, right?

21  A    The claim of responsibility, as well as my professional

22  responsibility -- experience regarding everything that had

23  existed during that period with respect to mortars.

24  Q    And what you said on your direct examination, because I

25  wrote it down here, was that Hamas is the only terrorist

SHAKED - CROSS - INGERMAN                    1322

1  organization that was using mortars in Gaza at that time,

2  right?

3  A    Yes.  And I did add proper or standard mortars.

4         MR. INGERMAN:  Okay.  If we could put up for just

5  the witness, Sean, Defense Exhibit 1040.

6  BY MR. INGERMAN:

7  Q    And Mr. Shaked, I'll represent to you that this is the

8  RAND report that we had looked at earlier that was

9  commissioned by the United States Department of Homeland

10 Security.  And if we could look at page 42, Sean.

11        And this was a document that you said you had looked

12 at, Mr. Shaked.  Isn't it true that the RAND Corporation

13 commissioned by the United States Department of Homeland

14 Security concluded that in September of '04, members of

15 al-Aqsa Martyrs Brigade fired two mortars on a settlement in

16 Gaza?

17 A    September is a long month.  I guess they probably fired

18 even more than that.

19 Q    Al-Aqsa Martyrs Brigade, you're talking about?

20 A    Yes, the al-Aqsa Martyrs Brigade.  During that period,

21 many mortars were fired.

22        MR. INGERMAN:  Okay.  Now, we can take that down,

23 Sean.  Thanks.

24 BY MR. INGERMAN:

25 Q    Now, throughout your testimony, Mr. Shaked, you

SHAKED - CROSS - INGERMAN                1323

1   testified on a number of occasions in connection with a

2   number of attacks that part of your support for your opinion

3   are Israeli court documents, right?

4   A    Indeed, that's right.

5   Q    And you testified, did you not, that these court

6   documents are the ones that you find most reliable and most

7   significant?

8   A    Let me repeat once again what I've already said at the

9   beginning of my testimony.  I find all documents to be

10  important, but what's also very important is the

11  cross-referencing, the corroboration, the verification.  And

12  that gives me the general picture.  And this is the picture

13  which I provide.

14      I don't think that any one document is more important

15  than another one.  This is not mathematics we're talking

16  about.  I don't necessarily have a situation always -- I

17  don't necessarily have a situation that two plus two are

18  always four.  I always need to weigh in what's more

19  important, what's less important.

20  Q    Okay.  So you do rely, though, on Israeli court

21  documents, right?

22  A    Yes.

23  Q    And in Israel, it's Israeli judges that determine who

24  is responsible ultimately for a particular attack; isn't

25  that right?

SHAKED - CROSS - INGERMAN          1324

1  A    Yes.  This is the judicial system.

2  Q    And in the West Bank and Gaza, that role is fulfilled

3  by military judges in military courts; isn't that right?

4  A    That is, indeed, true.

5  Q    Now, you know, do you not, that Colonel Netanel Benishu

6  is the president of the military courts.

7       You know that name?

8  A    During which period?

9  Q    Today.

10  A    I am not very much up to date at what's been going on

11  in the courts during this past year due to personal

12  circumstances.

13  Q    Okay.  Let's talk about during the 2000 and 2004 time

14  frame, okay?

15       You know, do you not, that there were claims that the

16  military prosecutions in the military courts don't meet the

17  legal requirements to provide Palestinian defendants with a

18  fair trial?

19  A    I am no legal expert.  And if, indeed, there is some

20  criticism, I cannot comment on it because I'm no expert on

21  various laws or their rules of prosecution in the

22  territories.

23  Q    Did you know that the conviction rate in Israeli

24  military courts --

25            MR. TURNER:  Your Honor, excuse me.  I object to

SHAKED - CROSS - INGERMAN                1325

1   this on the basis of relevance.

2           THE COURT:  Sustained.

3           MR. INGERMAN:  Your Honor, may we have a sidebar?

4           THE COURT:  Sure.

5           (Sidebar conference.)

6           (Continued on the next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                    1326

1        MR. INGERMAN:  Your Honor, plaintiffs have

2    introduced verdict and sentencings one after another, and

3    we're entitled to impeach the credibility of those through

4    this witness who relied on them.

5        THE COURT:  Yes, but you don't have anything to

6    say that they're not reliable.  You're asking him a

7    question, and he hasn't said the process is good.  He said

8    he's relying on those.

9            Are you going to call an expert who is going to

10    say they are suspect?

11        MR. INGERMAN:  No.  But I can cite to a document

12    and see if he's seen it.

13        THE COURT:  Is it a learned treatise?

14        MR. INGERMAN:  One is a U.N. report.  I mean, I

15    think I'm entitled to inquire what he looked at with respect

16    to the, you know --

17        THE COURT:  You are.  And you're even entitled to

18    make a case that what he looked at is not reliable.  What

19    you're not entitled to do is introduce extraneous evidence

20    through this witness to show that what he looked at is not

21    reliable, evidence that he has not necessarily seen or

22    considered in forming his opinion.  I think your point is

23    that he didn't consider if these courts are reliable or not.

24    That's an argument point.

25            If you want to introduce evidence in your case

SIDEBAR CONFERENCE                    1327

1    that's properly listed to that effect, you can do that as

2    part of an expert coming up with a contrary opinion.  But I

3    think it would be a complete sideshow to start grilling him

4    on the adequacy of the legal process in the foreign courts.

5    So I'm not going to allow that.

6              MR. TURNER:  I just want to make sure for the

7    record that we don't go back and have a question framed in

8    such a way that interjects all of this into the process.

9              THE COURT:  Well, that's what I'm saying.  I don't

10   think there's a basis for the questioning, but I can't

11   prejudge any question until I hear it.

12             (End sidebar conference.)

13             (Continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

SHAKED - CROSS - INGERMAN                1328

1   BY MR. INGERMAN:

2   Q    Mr. Shaked, did you know that there was a United

3   Nations report --

4              MR. TURNER:  Objection.

5              THE COURT:  Sustained.

6              MR. INGERMAN:  Okay.

7   BY MR. INGERMAN:

8   Q    Now, one of the things that you relied on in connection

9   with your opinion as to the Park Hotel bombing was the

10  confession of someone by the name of al-Sayed, right?

11  A    Abbas al-Sayed, yes.

12  Q    Now, al-Sayed claims that he was tortured before he

13  gave his confession, doesn't he?

14  A    I do recall that, and I know of that.

15  Q    Now, I want to ask you a question, Mr. Shaked, about

16  something you said in your direct testimony.

17             MR. INGERMAN:  And Sean, if we can pull up -- bear

18  with me here a moment -- page 988 of Mr. Shaked's trial

19  testimony, lines 12 through 14.

20             Your Honor, may I show this to the jury?

21             THE COURT:  Yes.

22  BY MR. INGERMAN:

23  Q    Now, Mr. Shaked, when you were testifying on direct

24  examination, you said to the ladies and gentlemen of the

25  jury, to recruit means to actually win the trust of the

SHAKED - CROSS - INGERMAN                1329

1   people and then to handle them as agents, and that is in

2   their society in enemy territory, as my commanders have

3   instructed.

4        Do you see that?

5   A    Yes, I do see that.

6   Q    And by "enemy territory," you went the West Bank and

7   Gaza, right?

8   A    Yes.

9   Q    Now --

10           MR. INGERMAN:  Thank you, Sean.  You can take that

11   down.

12           Your Honor, if I may approach the witness to hand

13   him what was marked as Plaintiffs' 4790, which was the

14   charts.

15           THE COURT:  You can do that or you can show it on

16   the projector right there.

17           MR. INGERMAN:  I'm going to show him something

18   else on the projector so I'd like him to have it.

19           THE COURT:  Okay.

20   BY MR. INGERMAN:

21   Q    Now, Mr. Shaked, I've handed you the summary charts

22   that you've prepared in connection with these attacks.  And

23   I want to ask you a few questions about them.

24   A    Go ahead.

25   Q    Am I right that for the following attacks, you do not

SHAKED - CROSS - INGERMAN                    1330

1   have any type of Hamas conviction:  The March 28, 2001, gas

2   station bombing near Kfar Saba, right?

3            THE INTERPRETER:  Can I repeat the question?

4            MR. INGERMAN:  Sure.  Can we put up slide 3, Sean.

5   A    Now, I understand.  The attack at Neve Yamin.

6   BY MR. INGERMAN:

7   Q    Looking at the summary chart that you prepared, and

8   looking at the screen in front of you, which is slide 3.

9        Do you agree with me that you do not have Hamas

10  convictions for any of the seven attacks that are shown on

11  slide 3 on the screen in front of you?

12  A    I can tell you in general that there were convictions

13  that I didn't always include, and the slides do not always

14  contain all of these.  And actually, I can tell you about

15  some of these that there were convictions, but I didn't

16  include them in the report for various reasons.

17       For example, in Neve Yamin, in the Dolphinarium and

18  Emmanual, there were convictions which I didn't include.  In

19  Atzmona, there weren't any convictions.

20  Q    Sir, looking at the summary chart that you prepared

21  that has been put in evidence to provide to the jury, there

22  is a column that says "Hamas Convictions."

23       Do you see that?

24  A    Yes.

25  Q    And there's no check next to Neve Yamin for Hamas

SHAKED - CROSS - INGERMAN          1331

1   convictions, right?

2   A    That's correct.

3   Q    And there's no check next to Dolphinarium for Hamas

4   convictions, right?

5   A    That's right.

6   Q    And there's no check next to the Emmanual bombing for

7   Hamas convictions, right?

8   A    That's right.

9   Q    And there's no check next to Atzmona for Hamas

10  convictions, right?

11  A    That's right.

12  Q    And there's no check next to Mike's Place for Hamas

13  convictions, right?

14  A    That's right.

15  Q    And there's no check next to Tel Romeda for Hamas

16  convictions, right?

17  A    That's right.

18  Q    And there's no check next to the Neve Dekalim column

19  for Hamas convictions, right?

20  A    That's right.

21       MR. INGERMAN:  Your Honor, I'd like to display the

22  slide to the jury, please.

23       THE COURT:  Okay.

24  BY MR. INGERMAN:

25  Q    So Mr. Shaked, the slide that we've displayed at slide

SHAKED - CROSS - INGERMAN                1332

1  number 3, lists all of the attacks that we just went through

2  for which you do not have a check on your summary chart for

3  Hamas convictions, right?

4  A    We have to bear in mind that for the terror attack at

5  Atzmona, no one was investigated and no one was arrested.

6  For the terror attack at Mike's Place, no one was

7  investigated and no one was arrested or interrogated rather.

8  At the Tel Romeda attack, for that attack no one was

9  interrogated and no one was arrested.  For the terror attack

10  at Neve Dekalim, the mortar attack, no one was interrogated

11  or arrested.  For Neve Yamin, the Dolphinarium and Emmanual,

12  if I were to do the report again, I would probably include

13  the testimonies.

14  Q    But they weren't included in your report that you were

15  paid $120,000 to do this case, were they?

16  A    I'm only human.

17  Q    So let me try my question again.

18       Am I right that slide 3 represents the seven attacks

19  for which there is no check under the column "Hamas

20  Convictions" in your summary chart; isn't that right?

21  A    Yes.  But I would like to reiterate that for four of

22  the attacks, no one was arrested and, consequently, no

23  one -- this column could not be filled in.  For three of

24  them, I would today include the convictions.

25            MR. INGERMAN:  I'll pass the witness, your Honor.

SHAKED - REDIRECT - TURNER                1333

1          THE COURT:  All right.

2          MR. TURNER:  A little follow-up, your Honor.

3          THE COURT:  Could you take down that poster.  It's

4    blocking my view.

5          MR. INGERMAN:  Yes.

6          THE COURT:  Thank you.

7          MR. TURNER:  Can we put up the Neve Yamin slide.

8    That's the first attack.

9          THE COURT:  You're looking at me.  You have to

10   look at him.

11   REDIRECT EXAMINATION

12   BY MR. TURNER:

13   Q    Mr. Shaked, I would like to start where the bank

14   finished and sort of work through four or five different

15   points.  First of all, with respect to the issue of

16   convictions, I've put up on the screen your chart and your

17   slide from the Neve Yamin attack.

18        Do you see that?

19   A    Yes.

20   Q    Now, let's begin at the bottom with the suicide bomber.

21   We know he was obviously not convicted because he blew

22   himself up, but let's go to the upper left and go to that

23   one, Ayman Halawah.

24        Do you know who Ayman Halawah was back at the time?

25   A    Yes.

SHAKED - REDIRECT - TURNER                1334

1    Q    Is he dead or alive today?

2    A    He's dead.

3    Q    Now, let's move over to the right, Abd al-Rahma Hamad.

4         Is he dead or alive today?

5    A    He's dead.

6    Q    Let's move to the middle, Ra'ed Houtari.  Is he dead or

7    alive today?

8    A    He's alive.

9    Q    And where is he?

10   A    He's in prison.

11   Q    Now, in some of these and, for instance, Ayman Halawah,

12   was involved in the first, I believe, four attacks we talked

13   about a day and a half, two days ago, was he not?

14        Now, in some of these 24 attacks --

15             THE COURT:  Wait.  We didn't get the yes.

16   A    Yes.

17             MR. TURNER:  I heard "ken."  I was just a little

18   slower on the up there.

19   BY MR. TURNER:

20   Q    Now, in some of these 24 attacks, did you learn during

21   the course of your investigation of these that there were

22   not convictions in some because the terrorists were, in

23   fact, killed?

24             MR. INGERMAN:  Objection.

25             THE COURT:  Oh, all right.  Why did you learn

SHAKED - REDIRECT - TURNER                1335

1    there were no convictions?

2         THE WITNESS:  In some cases, the terrorists were

3    killed either at the time of the terrorist attack or

4    afterwards.  And in other places, the terrorists weren't

5    arrested at all so there were no testimonies.

6    BY MR. TURNER:

7    Q    Now, you were asked some questions at the beginning

8    about a brief period of time in your long journalistic

9    career where you were suspended for a short period of time.

10        Do you recall that question?

11   A    Yes.  And I'd be very happy to tell why I was

12   suspended.

13        MR. TURNER:  Before he goes, let me ask the

14   question.  I know he's anxious to answer it.

15   BY MR. TURNER:

16   Q    Would you take a moment to explain the circumstances

17   surrounding that suspension and what happened.

18   A    In 1999, I published an item in the newspaper which was

19   a very, very sensitive -- on a very, very sensitive subject.

20   It was a scoop, in fact, about the Prime Minister at the

21   time, Prime Minister Ehud Barak, about his plans to divide

22   Jerusalem which he had been planning together with President

23   Clinton from the United States.

24        The item reverberated very, very loudly on the public

25   scene and caused a great deal of criticism of the Prime

SHAKED - REDIRECT - TURNER                1336

1    Minister.

2        The Prime Minister himself called the editor of the

3    newspaper and demanded an apology from him and also demanded

4    that he take disciplinary steps against me.

5            MR. INGERMAN:  Objection, your Honor.  Move to

6    strike.

7            MR. TURNER:  I don't think it's being offered for

8    the truth of the matter asserted.  But I'll wait till I come

9    up there.

10           THE COURT:  I understand what you're saying.

11   Better come up here.

12           (Sidebar conference.)

13           (Continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                    1337

1          THE COURT:  Well, if it's not being

2   asserted -- offered for the truth of what it asserts, what's

3   it being offered for?

4          MR. TURNER:  The circumstances surrounding the

5   suspension that they brought up, the fact that those events

6   transpired.

7          THE COURT:  Do those circumstances matter if they

8   are not true?

9          MR. OSEN:  I think the difference is not whether

10  the scoop was true, but the circumstances in which he was

11  suspended.

12         THE COURT:  They're objecting to the words that he

13  was told.  I agree.  It seems unfair that they should be

14  able to bring out that he was suspended without letting him

15  explain why.  But I can't really say it's not hearsay the

16  way he's saying it now.

17         MR. TURNER:  Can I ask him without telling us

18  anything you were told, what were the circumstances

19  surrounding your suspension?

20         THE COURT:  If he can answer it that way.

21         MR. TURNER:  Sure.  And if he says he can't,

22  that's fine.

23         THE COURT:  Right.  I think you can also ask him

24  what his understanding was -- you can get that -- of the

25  circumstances.

SIDEBAR CONFERENCE                    1338

1          MR. TURNER:  Okay.

2          THE COURT:  Let's stay away from quotations of

3     what he was told by anyone.

4          MR. INGERMAN:  Can we strike the testimony?

5          THE COURT:  Yes.

6          MR. INGERMAN:  Thank you.

7          (End sidebar conference.)

8          (Continued on the next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SHAKED - REDIRECT - TURNER                1339

1      THE COURT:  All right.  The last answer is

2   stricken.  We're going to put another question.

3   BY MR. TURNER:

4   Q   Without telling us what somebody else told you, why

5   don't you start with that preamble.  Would you please

6   explain the circumstances surrounding the suspension.

7   A   I published a big scoop about the division of Jerusalem

8   as that was being planned by the Prime Minister together

9   with President Clinton and the story was confirmed in

10  Jerusalem.  This caused some anger, a great deal of anger,

11  and reverberated very widely.  The paper that I worked for

12  published a correction -- what's called a correction -- of

13  the item and I was suspended.

14      Three days later when the item was ultimately confirmed

15  both in the United States and in Jerusalem, I received a

16  carload of flowers with letters of thanks and gratitude.

17          MR. TURNER:  May we display the bus 19 bombing

18  slide?

19          THE COURT:  Yes.

20  BY MR. TURNER:

21  Q   This is the one that you talked to the bank about where

22  something was written across this person, Nashash, and you

23  asked to explain.

24      Do you recall that dialogue back and forth?

25  A   I recall that.

1  Q    And the bank told you to wait until I was up here, so

2  what was your explanation as to putting Hamas associated

3  with Nashash?

4  A    Because Nashash was the person who made the connection

5  between Ali Ja'ara and Nufal who was from Hamas because

6  Nashash acted on behalf of Hamas with Nufal to dispatch

7  Ja'ara to carry out the attacks in Jerusalem.  Nashash was

8  the one who prepared the vest.  Nashash and together with

9  Nufal Adawin prepared Ali Ja'ara to be dispatched to

10  Jerusalem for a bombing attack that was unsuccessful.  I

11  have no doubt that if the IDF had not erected a barrier, Ali

12  Ja'ara would have indeed blown himself up on a bus for

13  Hamas.

14  Q    Now, let's go to the actual record for a minute and

15  make sure that we are clear on it.

16          MR. TURNER:  Could you put up slide number 1,

17  which is Exhibit 4044.  This is the conviction that's in

18  evidence as Adawin.

19          May we present this, your Honor?

20          THE COURT:  Yes.

21  BY MR. TURNER:

22  Q    This is Adawin.  And are you familiar with the fact

23  that the first thing that Adawin, who is on the chart, was

24  convicted of was being a member in the Hamas organization?

25          Are you aware of that?

SHAKED - REDIRECT - TURNER                    1341

1    A    Yes.  That was the first count he was convicted of.

2    Q    Now, he was also convicted of some other crimes that

3    were unrelated to bus 19, was he not?

4    A    Yes.  Yes, he was convicted of other terrorist attacks

5    that were unrelated to the dispatching of the suicide

6    bomber.

7    Q    Now, let's go to slide 2, which is still Exhibit 4044

8    in evidence.  And this is one of the other counts he was

9    convicted of, conspiracy to intentionally cause death.

10        He was convicted in that in January 2004, together with

11   his fellow accomplices in the cell, he recruited a man that

12   was designated to carry out the suicide attack.  He planned

13   the attack in detail and prepared an improvised explosive

14   device for the purposes of carrying out the attack.  The

15   defendant put the explosive belt on the suicide bomber.  He

16   filmed and recorded him reading aloud his last will.  The

17   rest of those preparations were deleted from the indictment,

18   and as mentioned, this attack, too, was not carried out.

19        Are you familiar with that?

20   A    Yes, I am familiar with it.

21   Q    Now, go to the next slide, please.  This is still 4044.

22        Was Adawin, likewise, convicted of failing to prevent a

23   crime, referencing the bus 19 attack that resulted in the

24   death of 11 Israelis and more than 50 being wounded?

25   A    Yes, I am familiar with it.

SHAKED - REDIRECT - TURNER                1342

1    Q    Now, let's go to the next slide.  This is 4045.  This
2    is the conviction of Nashash.
3         Now, in this particular document, in this excerpt from
4    the conviction record, let's go through this and focus for a
5    minute.  First of all, the defendant, that would be Nashash,
6    introduced Ali Ja'ara.
7         Was that the suicide bomber?
8    A    Yes.  Ali Ja'ara is the suicide bomber.
9    Q    And this is telling us that Nashash actually introduced
10   the suicide bomber to Adawin, the Hamas representative.
11        Is that how you read it?
12   A    Yes, I also read it like this.
13   Q    And does this, likewise, indicate that the suicide
14   bomber specifically asked to be allowed to carry out the
15   attack in the name of Hamas?
16   A    Yes, indeed, this is what it says in the second line;
17   that the terrorist Ali Ja'ara had asked to carry out the
18   attack on behalf of Hamas.
19   Q    Now go to the next slide, please.  This is continuing
20   in Exhibit 4045.  This is an excerpt that I have underlined.
21        It states, It should also be recalled that the
22   attacker, that would be the suicide bomber, whom Nashash
23   agreed to connect with the terrorists who sent him to the
24   attack, did, indeed, carry out an attack two weeks later.
25        Did I read that correctly?

SHAKED - REDIRECT - TURNER                1343

1  A    Yes, indeed, that's right.

2  Q    Now, finally, with respect to your slide -- we won't go

3  back to it for the sake of time -- but with respect to your

4  slide, are you still of the opinion that your slide, at

5  least in terms of your entire investigation, is 100 percent

6  completely accurate?

7  A    I do confirm that.

8  Q    Now, I want to ask you -- and I'm not going to go

9  through each of these attacks.  I'm going to do it in one

10 bundle as an example, and I want to focus on the Sbarro

11 Pizza.

12      For several hours, you were asked questions about

13 newspapers -- the *Denver Post*, the *New York Daily*, the *New*

14 *York Times* -- all sorts of other newspapers that from time

15 to time printed claims of responsibility based upon

16 information they had heard.

17      Do you recall that series of questions?

18 A    Of course.

19 Q    Now, choosing Sbarro Pizzeria as that example, in that

20 example there were four different sources, four different

21 news organizations that reported other organizations having

22 claimed responsibility.

23      Did you have an official claim of responsibility from

24 Hamas for the Sbarro Pizzeria?

25 A    Yes, there was an official claiming of responsibility.

SHAKED - REDIRECT - TURNER                    1344

1    And I had already mentioned it here.  There was one official

2    communique by the Qassam Brigade and another communique that

3    claimed a claim of responsibility which I personally

4    received on my fax on that very same day at 7:00 p.m.

5    Q    Did you, likewise, have access to the ISA, the Israeli

6    Security Agency, report identifying Hamas as the responsible

7    party for that attack?

8    A    Yes, I did.

9    Q    And there were four convictions for that particular

10   attack, Exhibits 3336, 3301, 3300, and 3205, all Hamas

11   operatives.

12        Did you have any convictions for the Sbarro Pizzeria on

13   for any terror organization other than Hamas?

14   A    There was no conviction of any other organization

15   except for Hamas.

16   Q    And in both of -- in the Sbarro Pizzeria, did you have

17   the opportunity to both interview the bomb maker Barghouti

18   face-to-face, but also the parents of the suicide bomber?

19   A    Yes, I did interview Barghouti.  And I also interviewed

20   the parents of the terrorists.  And if I may, I also

21   interviewed the three additional operatives that were

22   connected to this suicide bombing, Bilal Barghouti, Muhammad

23   Daghlas and Ahlam Tamimi.  She was the woman who led the

24   terrorists to the sea.

25   Q    Now, is this a good example, this particular attack, a

1    good example of why, if you're in the search for the truth,

2    it's more important to look at the actual evidence rather

3    than a newspaper article from Denver, Colorado?

4              MR. INGERMAN:  Objection.

5              THE COURT:  Well, I'll sustain the objection.

6    Save it for closing.

7    BY MR. TURNER:

8    Q    Why is this important to you as an investigator to look

9    at the evidence?

10   A    The materials, the testimonials that I used, are based

11   on facts, on solid facts, things that come from first

12   source.  And it is not like the newspaper.  The newspaper

13   perhaps gives you the impression of the first hour or

14   something that is pertinent to the moment of printing the

15   newspaper.  It does not wait for a thorough investigation

16   and research.  It only suffices with a short one.  And

17   perhaps sometimes it relies on a phone call.  Another time

18   on an anonymous tip-off.

19        But these aren't any facts.  I regret the fact that

20   this is the nature of the media.

21             MR. TURNER:  That's all the questions I have.

22             THE COURT:  All right.  You may step down.  Thank

23   you.

24             (Witness exits the courtroom.)

25             THE COURT:  Ladies and gentlemen, we will adjourn

PROCEEDINGS                          1346

1   for the evening.  I know you know the instructions very

2   well, but I can't drive them home too forcefully.

3         Please, no communications with anyone about the

4   case in any way.  No Internet searches, no twittering, no

5   tweeting, no Myspacing, my Facebooking, no Google searching,

6   nothing like that.  Keep an open mind.  Stay away from any

7   media coverage of the case.  And we'll see you tomorrow at

8   9:30.  We are doing well.

9         (Jurors exit the courtroom.)

10        THE COURT:  All right.  Anything further we need

11  to cover?

12        MR. STEPHENS:  No, your Honor.

13        THE COURT:  I know I owe you stuff.  I'm going to

14  get you stuff.

15        MR. OSEN:  Thank you, your Honor.

16        THE COURT:  You owe me stuff, too.

17        MR. OSEN:  Depending on -- I know your Honor has a

18  busy calendar tonight.  So I think the likely scenario is

19  that we'll start with Mr. Spitzen tomorrow and have to play

20  the video when his testimony is completed.  So we will --

21        THE COURT:  We're going to get you something

22  tonight.

23        MR. OSEN:  Okay.  Well, then, we'll still see if

24  the IT folks can cut it in time.

25        In any event, what we'll do is submit the exhibit

PROCEEDINGS                1347

1   list probably in the next hour or two as soon as we get back

2   from court.  I think probably we'll have the first 50 slides

3   or so, which we'll give to both the Court and the defendant

4   this evening.  So I think that will cover most of the day.

5            THE COURT:  Please make them not argumentative.

6            MR. OSEN:  Do our best.

7            THE COURT:  No Hamas symbols.

8            MR. OSEN:  The first one has the Hamas symbol

9   because the witness will explain what it means, but in the

10  context of that.

11           THE COURT:  That, of course, is fine.

12           MR. INGERMAN:  Your Honor, can we get some sense

13  of how long they think Mr. Spitzen might be on direct?

14           THE COURT:  Well, they were really off about this

15  last one.

16           MR. INGERMAN:  That's why I ask.

17           THE COURT:  What do you think?

18           MR. TURNER:  I shared with you yesterday that I

19  thought a day.

20           THE COURT:  But he wants you to tell me so that

21  you're on the record.

22           MR. TURNER:  I don't think there's any change in

23  that.  It's a day.  I hope to be finished in a day.

24           MR. INGERMAN:  Well, I thought Mr. Osen said we

25  would get the first 50 slides which would cover just

PROCEEDINGS                    1348

1    tomorrow so I interpreted that to mean it might go more than

2    a day.

3           MR. OSEN:  It's a fair inference, your Honor.  I

4    think it's possible he will go more than a day, but

5    Mr. Turner I think is perfecting the art of moving this

6    along.

7           THE COURT:  It's going to be a day to a day and a

8    half.

9           Hebrew or English?

10           MR. OSEN:  Hebrew.

11           THE COURT:  Too bad.  By the way, the translators

12    have been great.  Really, this is a very good service you're

13    using.

14           One more thing.  Hang on.

15           (Brief pause.)

16           THE COURT:  About how many exhibits do you imagine

17    for Spitzen?  Three, four?

18           MR. TURNER:  Well, there's a lot of exhibits, but

19    a lot of them are collections, bank wire transfers, for

20    instance.  Instead of standing there identifying one after

21    another, there will be like 40 in a group.

22           THE COURT:  Collective groups?

23           MR. TURNER:  Sounds like a lot of exhibits, but

24    most of them are collective.

25           THE COURT:  How many collective exhibits?

PROCEEDINGS                    1349

1          MR. TURNER:  I haven't looked at the list.

2          THE COURT:  I don't need a precise number.  Are we

3    talking dozens or hundreds?

4          MR. OSEN:  Hundreds.

5          THE COURT:  Hundreds of collective exhibits?

6          MR. TURNER:  Hundreds in total.

7          MR. OSEN:  There are about 20 senior Hamas

8    leaders, each of which would have received multiple

9    payments.  There are five suicide bombers from the 24

10   attacks, plus other, I think, 12 attacks that have multiple

11   payments to various people.

12         So it's really a question of how much foundation

13   has to be laid for bank records in the process.

14         THE COURT:  Not much if they're bank records,

15   okay.  If they're bank records, they really should be

16   stipulated into evidence.

17         MR. INGERMAN:  I actually thought, in response to

18   Mr. Werbner's letter, we pre-admitted a tremendous number.

19         THE COURT:  I heard there was an agreement, but I

20   don't think I've been told of the agreement.

21         MR. INGERMAN:  Actually, I think Mr. Werbner gave

22   the letter, my letter, to the Court.  So I think your Honor

23   has the letter.

24         THE COURT:  So we don't need to lay a foundation.

25         MR. OSEN:  I think for the vast majority of them

PROCEEDINGS                    1350

1   we shouldn't have to.

2          MR. STEPHENS:  We don't know what it's going to be

3   yet so I'm not ready to say that.  When I see them, I can

4   respond intelligently to that inquiry.

5          THE COURT:  Okay.  We'll see what we can do.

6          See you tomorrow.  Please exit quietly because I'm

7   going to start my next calendar.

8          (Time noted:  4:31 p.m.)

9          (Proceedings adjourned until Thursday, August 28,

10  2014, at 9:30 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25