# Exhibit C

1354

```
1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
2

3    COURTNEY LINDE, ET AL.,        )
                                    )   04CV02799 (BMC)
4                   Plaintiffs,     )   And all related cases:
                                    )   04CV05449 (Litle)
5                                   )   04CV05564 (Almog)
                                    )   04CV00365 (Coulter)
6                                   )   05CV00388 (Afrait-Kurtzer)
                                    )   05CV03183 (Bennett)
7         -against-                 )   05CV03768 (Roth)
                                    )   06CV01623 (Weiss)
8                                   )
                                    )   United States Courthouse
9                                   )   Brooklyn, New York
                                    )
10   ARAB BANK, PLC,                )   THURSDAY, AUGUST 28, 2014
                                    )
11                  Defendant.      )
     ───────────────────────────────)
12

13           TRANSCRIPT OF CIVIL CAUSE FOR JURY TRIAL
              BEFORE THE HONORABLE BRIAN M. COGAN
14               UNITED STATES DISTRICT JUDGE

15
     APPEARANCES:
16
     FOR PLAINTIFFS LINDE      OSEN, LLC
17   AND COULTER:              BY:  GARY M. OSEN, ESQ.

18                             TURNER & ASSOCIATES, PLLC
                               BY:  CLYDE T. TURNER, ESQ.
19

20   FOR PLAINTIFFS LITLE,     SAYLES WERBNER
     BENNETT AND ROTH:         BY:  MARK S. WERBNER, ESQ.
21

22
     FOR PLAINTIFFS ALMOG:     STONE BONNER & ROCCO, LLP
23                             BY:  JAMES P. BONNER, ESQ.

24                             MOTLEY RICE, LLC
                               BY:  MICHAEL E. ELSNER, ESQ.
25                             BY:  JODI FLOWERS, ESQ.
```

Spitzen - Direct - Turner                    1390

1     (In the presence of the jury.)

2          THE COURT:  Let's swear the witness.

3          THE CLERK:  Please stand.  Raise your right hand.

4  Do you solemnly state or affirm that the testimony you shall

5  give to the Court shall be the truth, the whole truth and

6  nothing but the truth?

7          THE WITNESS:  I affirm.

8          THE CLERK:  Please state and spell your name for the

9  reporter.

10          THE WITNESS:  Spitzen, S-p-i-t-z-e-n, Arieh,

11  A-r-i-e-h, Dan, D-a-n.

12                    ARIEH DAN SPITZEN,

13  called as a witness, by and on behalf of the plaintiff, having

14  been first duly sworn, was examined, and testified as follows:

15          THE CLERK:  Thank you.  You may be seated.

16          THE COURT:  I'll note the interpreters have been

17  previously sworn.

18          You may inquire.

19          MR. TURNER:  Thank you, your Honor.

20  DIRECT EXAMINATION

21  BY MR. TURNER:

22  Q     Give us your name, please.

23  A     Arieh Spitzen.

24  Q     Where do you live, Mr. Spitzen?

25  A     Jerusalem, sir.

Spitzen - Direct - Turner                    1391

1  Q    Were you born and raised in Israel?

2  A    Yes, sir, in Jerusalem.

3  Q    Do you speak English?

4  A    I speak English.  I understand English.  I read and write

5  English.

6  Q    And do you speak Arabic?

7  A    Yes, I do speak Arabic.

8  Q    Now, you've chosen to testify in Hebrew today; why is

9  that?

10  A    I chose to give my testimony in Hebrew and because I'm

11  actually giving testimony under oath, and my ability to

12  express myself in Hebrew is the best one, especially since I'm

13  talking about technical and legal matters.

14  Q    Now, between 2001 and 2009, where were you employed?

15  A    In the IDF.

16  Q    And what is the IDF?

17  A    It is the Israeli Defense Force, and this is the military

18  of the state of Israel, and this is where I serve.

19  Q    What department or division within the IDF did you work?

20  A    In COGAT.

21  Q    What was COGAT?

22  A    COGAT, or the Coordinator Of Government Activities in the

23  Territories is a body that belongs both to the military, the

24  IDF and the Ministry of Defense, and is responsible for the

25  implementation of the policy of the government of the state of

Spitzen - Direct - Turner                    1392

1  Israel in the Palestinian Territories.

2  Q    And during that period of time, 2001 through 2009, what

3  was your job responsibility within COGAT?

4  A    I was the head of the Palestinian Affairs Department and

5  the adviser of the head of COGAT on Palestinian matters.

6  Q    What were your day-to-day responsibilities in that job?

7  A    My job was to actually give a certain picture, a civilian

8  picture, concerning what was happening in the West Bank in

9  Gaza, to describe what was happening from every possible

10 perspective; the civilian, the economic, the cultural, the

11 education, in order to allow the decision-makers in Israel to

12 make their decisions concerning the territories.

13 Q    Were you involved in intelligence work, in working with

14 the COGAT?

15 A    Yes, sir.

16 Q    Were you responsible for research as well?

17 A    Yes, I did direct the research and collection as head of

18 the PAD.

19 Q    And did people working for you likewise have

20 responsibility for collecting intelligence from the

21 Palestinian territories?

22 A    Yes.  Definitely.

23 Q    Now, let's back up for a second.  What is your

24 educational experience?

25 A    I'm a graduate of Hebrew University in Jerusalem, Cum

Spitzen - Direct - Turner                    1393

1  Laude, specializing in Middle East, Arabic and the history --

2  the Jewish history or the history of the Jewish people.  This

3  is as far as my academic education is concerned.

4  Q    When did you first join the IDF?  What year?

5  A    In 1970.

6  Q    And when you first joined the IDF, what branch were you

7  in?  What area did you concentrate in, in the military?

8  A    I joined the navy, and I was what is called a "frog man."

9  Q    Is that similar to the Navy SEALs?

10  A    Yes, this is the unit.

11  Q    Now, at some point in time, did you transfer into the

12  intelligence side of the IDF, between 1970 and 1974?

13  A    Yes, I was transferred to the Intelligence in 1972.

14  Q    And did you attend college between 1974 and 1976?

15  A    This is correct.

16  Q    Did you return to Military Intelligence in 1976?

17  A    Not to the Intelligence but to the Palestinian Affairs

18  Department in the West Bank.

19  Q    And how long did you stay in that position?

20  A    I served there for two years, and then I returned in 1980

21  to the very same department, where I continued to serve for

22  30 years.

23  Q    Now, during the period of time, this 30-year period, did

24  you have an opportunity to participate in, conduct in, review

25  intelligence from the West Bank and Gaza?

1   A    Yes.  Definitely.  I founded the research department for

2   the Adviser on Arab Matters in the West Bank, and I wrote many

3   papers in this research field.

4   Q    Now, at our request, have you had an opportunity to

5   evaluate certain charitable institutions or societies and also

6   some Zakats, what's referred to as Zakat, that operated in the

7   West Bank and Gaza during the 1999 through 2005 time frame?

8   A    Yes, definitely.

9   Q    And at our request, have you, likewise, had an

10  opportunity to evaluate some money transfers that took place

11  during that same period of time at the Arab Bank?

12  A    Yes.  Definitely.

13  Q    And, likewise, have you had an opportunity at our request

14  to evaluate a program called the Saudi Committee, in support

15  of the Intifada al Quze?

16  A    Yes, sir.

17  Q    Now, during that process, can you give us sort of an idea

18  of how many years have you been working on this project?

19  A    I have been working on this project of Arab Bank since

20  2010, almost to this very day.

21  Q    So almost four years' worth of work on this particular

22  project?

23  A    Yes, sir.

24  Q    And can you give us an approximation of how many hours

25  you personally and your research assistant have spent on this

1   particular issue or group of issues?

2   A    Yes, sir.

3   Q    Now, during the course of your work -- go ahead and tell

4   us the number of hours, please.

5   A    It's a bit over 3,000 hours, but 3,100 hours.

6   Q    And during the course of your work on this particular

7   project, have you run into some difficulty from time to time,

8   due to the lack of having access to some records?

9   A    Not here and there, but right from the start.

10  Q    Now, has that created any complications for you in your

11  analysis of the issues you were asked to address?

12  A    Yes, that created difficult problems, especially when it

13  came to identifying names.

14  Q    Now, as a result of those complications, did you have to

15  expend extra hours and efforts in order to try to piece

16  information together?

17  A    Yes.  Definitely.  I believe it required twice or three

18  times more effort than had I had all those papers in front of

19  me.

20  Q    Now, how many years have you been aware of a terrorist

21  group called Hamas?

22  A    From 1987, the year it was founded in.

23  Q    And how many years has -- at least the department you

24  were working in for the last 30 years, how many years has your

25  department and the people working for you considered Hamas to

Spitzen - Direct - Turner                    1396

1  be a terrorist organization?

2  A    Right from the very first moment it was founded.

3  Q    During the relevant time frame, did Hamas have access to

4  a TV station?

5  A    At a certain point in time, they start having a

6  television station, but I cannot recall the exact date.

7  Q    How about radio stations?

8  A    Radio stations, they did have them.  From the 1990s from

9  1996, they had local radio stations, as well as Radio Alaqsa,

10 which was their main radio station.

11 Q    How about newspapers?

12 A    Yes, they did have newspapers, different kinds of

13 newspapers.  But in this particular time frame, they had two

14 main ones, El Musla (phonetic), and the other one was Al

15 Esella (phonetic).

16 Q    During the course of your experience in the IDF, did you

17 become aware of the original, what they call, cofounders of

18 Hamas back in the 1980s?

19 A    In 1987, yes.  Definitely.

20 Q    Now, have you prepared a slide to illustrate the

21 individuals who were considered to be the cofounders of Hamas?

22 A    Yes, sir.

23 Q    And would it help you illustrate those individuals?

24 A    Yes, sir.

25 Q    And your slide has some photographs on it.  Do you

Spitzen - Direct - Turner                1397

1  personally know those people, and are the images accurate

2  depictions of those individuals?

3  A    Yes, of course.  These are well-known people.  They

4  appear in dozens of media outlets, on various opportunities

5  (sic).  I know them well, and there's no problem in

6  identifying them.

7            MR. TURNER:  Your Honor, may I display Slide Number

8  2?

9            THE COURT:  You may.

10 Q    Now, Mr. Spitzen, first of all, beginning at the top,

11 Sheikh Yassin -- we've already had a lot of testimony about

12 Sheikh Yassin.  He deceased; is that correct?

13 A    No, Sheikh Yassin was killed by the IDF in March, 2004.

14 Q    Who is Salah Shehadeh?

15 A    Salah Shehadeh was one of the senior leaders of Hamas.

16 He was one of the founders of Hamas.  He founded the military

17 wing of the Qassam Brigades of Hamas.  He, too, was killed in

18 2002 by the IDF.

19 Q    Was he a secret individual, or was he well known in the

20 public or in the media?

21 A    Salah Shehadeh was a well-known person to the public.  He

22 served in advanced area of positions, also at the University

23 of Gaza.  When he was released from prison in 2002, Gaza

24 celebrated.  He was a well-known person, both by the local and

25 foreign media.  Yes, he was very popular.

1    Q    The bottom row -- I'm sorry.

2         THE INTERPRETER:  He corrects the date.  It was in

3    2000 that he was released from prison.

4    Q    Looking across the bottom at the six individuals'

5    photographs that we're looking at, were all those individuals

6    located in one particular part of the Palestinian Territories,

7    or were they each responsible for different areas?

8    A    No, they were all from the Gaza Strip, every one of them,

9    but on top of the fact that they founded Hamas, each one of

10   them was also appointed as a military commander of their

11   residential area where they live.

12   Q    Now, have you been able to determine from the few records

13   you do have access to whether or not any of the seven

14   individuals shown on the screen were customers of Arab Bank,

15   had bank accounts at Arab Bank during the relevant time frame?

16        MR. STEPHENS:  Objection, your Honor.

17        THE COURT:  Overruled.

18        THE WITNESS:  Yes, several people on the slide had a

19   bank account at Arab Bank.

20   Q    Have you had an opportunity to review the full set of

21   Arab Bank customer files and account files for the individuals

22   shown on this slide that were customers of Arab Bank during

23   the Intifada?

24   A    Unfortunately, no.

25   Q    Why?

Spitzen - Direct - Turner                    1399

1           MR. STEPHENS:  Objection, your Honor.

2           THE COURT:  Overruled.  You may answer.

3           THE WITNESS:  Because Arab Bank had refused to

4    transfer to me the bank records, the account records of these

5    individuals.

6    Q    Now, let's begin with Sheikh Yassin.  Was he a customer

7    of Arab Bank in the 2003 and 2004 time frame?

8    A    Yes, sir.

9    Q    When was he known and recognized as a terrorist in

10   Israel?

11   A    He was recognized in Israel as a terrorist already back

12   in 1983.  He was arrested for being involved in a terror

13   organization, which he had founded.

14   Q    Now, when was he formally -- Sheikh Yassin, formally

15   designated by the United States Government as a foreign

16   terrorist?

17   A    As far as I know, it was in 1995.

18           (Proceedings continued on the following page.)

19

20

21

22

23

24

25

1          MR. TURNER:  Would you please show the witness

2     only Exhibit 1353.

3     Q     Do you recognize Exhibit 1353?

4     A     Yes, sir.

5     Q     And what is Exhibit 1353?

6     A     This is designation by the United States Treasury from

7     2003, and it also mentions the fact that Sheikh Yassin had

8     already been recognized or designated as a terrorist back in

9     '95.

10          MR. TURNER:  We offer 1353.

11          THE COURT:  Any objection?

12          MR. SHAND:  No objection.

13          THE COURT:  Received.

14          (Plaintiff Exhibit 1353 was admitted into

15     evidence.)

16          MR. TURNER:  May we display page two?  Go down to

17     the very bottom -- I'm sorry, three, to the footnote.  Blow

18     the footnote up for us.

19     Q     Can you see that okay, Mr. Spitzen?

20     A     Yes, I can see it.

21     Q     Now, this particular footnote says, "Yassin was

22     previously designated and therefore is already subject to

23     sanctions pursuant to executive order 12947 of January 23,

24     1995, prohibiting transactions with terrorists who threaten

25     the middle east peace process.  He is being designated

A. SPITZEN - DIRECT/MR. TURNER          1401

1    pursuant to EO 13224 based on his continued support for

2    terrorism."

3           Is that the reference you made earlier to 1995?

4    A    Indeed so, sir.

5    Q    Now, out of the limited information you did have access

6    to, were you able to find any wire transfers to Sheikh

7    Yassin in 2001 that went through the Arab Bank?

8    A    Yes, sir.

9           MR. TURNER:  Your Honor, we may display 2080, one

10   of the previously admitted exhibits as the wire transfer to

11   Sheikh Yassin?

12          THE COURT:  Yes.

13          MR. TURNER:  Show the wire transfer first and then

14   we'll show the slide.

15   Q    What is the date of this wire transfer, Mr. Spitzen?

16   A    This is a say bank transfer from May 30, 2001.

17   Q    And who is the beneficiary of this transfer of $60,000?

18   A    Ahmad Ismail Yasine.

19   Q    What the account number shown for Ahmad Ismail Yasine

20   at Arab Bank?

21   A    36444.

22   Q    Now, have you been able to confirm through other

23   sources that account number 36444 in 2001 was, in fact, the

24   account at Arab Bank for Sheikh Ahmad Yassin, leader of

25   Hamas.

A. SPITZEN - DIRECT/MR. TURNER                1402

1    A    Yes, sir.

2    Q    How were you able to confirm that?

3              MR. SHAND:  Your Honor, may we approach?

4              THE COURT:  Yes.

5              (Continued on the next page for sidebar.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Sidebar conference begins.)

2          MR. SHAND:  I'm not quite sure what he said, but

3     my guess is this website.

4          THE COURT:  Yeah, that's what I said he could do.

5     He could say what he relied on, they cannot show the

6     interview.  It's part of the basis for his opinion.

7          MR. OSEN:  I'm sorry to interrupt, I don't think

8     there is any white noise on for the jury.

9          THE COURT:  I mean, that's perfectly consistent

10    with my ruling.  I said, don't use the slide, don't use the

11    interview, but he can say the basis of his opinion.

12          (End of sidebar conference.)

13          (Continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

A. SPITZEN - DIRECT/MR. TURNER            1404

1  BY MR. TURNER:

2  A    This account was actually shown on the internet.  It

3  was part of an interview with Abd al-Aziz al-Rantisi.  We

4  saw his picture previously.  And it was conducted in a forum

5  that's called a bahrain (phonetic) forum.  In this interview

6  Rantisi called people to donate to Hamas through the bank

7  account of Sheikh Yassin, and he gives the number of the

8  bank account in that interview 36444.

9  Q    So the two bank accounts; the one seeking donations and

10  the bank account for this wire transfer, both in the name of

11  Ahmad Yassin are one in the same?

12          MR. SHAND:  Objection, your Honor.

13          THE COURT:  Sustained as to form.

14  Q    Are the account numbers different or the same?

15  A    This is the same bank account number and also the same

16  branch of the bank.

17          MR. TURNER:  Now, if we can go to slide number

18  four.  May we display slide number four?

19          THE COURT:  Wait one second.  Let me set up.

20  Okay.  You're going directly to slide four, right?

21          MR. TURNER:  Yes, sir.

22  Q    Mr. Spitzen, were you able to determine who sent Sheikh

23  Yassin the $60,000 based on the wire transfer?

24  A    Yes.  The transfer was wired from Lebanon by Yousef

25  al-Hayek.

A. SPITZEN - DIRECT/MR. TURNER          1405

1   Q    Who is Yousef al-Hayek?

2   A    Unfortunately, I don't know exactly who Mr. al-Hayek

3   is, but I do have several assumptions regarding his

4   identify.

5   Q    Were you able to receive the bank account records from

6   Arab Bank for Yousef al-Hayek?

7   A    No, sir.

8   Q    Why?

9   A    Because the bank had refused to hand it over.

10  Q    Were you to be able conduct any investigation to see if

11  you could determine who Yousef al-Hayek was?

12  A    Yes, I did manage to conduct an investigation and

13  indeed reach certain conclusions, but these conclusions are

14  highly probable; yet, they are not 100 percent certain.

15  Q    What did your investigation reveal about Yousef

16  al-Hayek?

17  A    I tried to find out who he was based on his name, based

18  on the geographic location where he was situated or

19  according to the kinds of activities he was involved in.

20  Q    And what did you learn?

21  A    I found out that al-Hayek probably operates from

22  Lebanon, that he's connected to Hamas leaders, that he wired

23  funds to Hamas leaders, that he is somehow connected to

24  them.  I also learned that there is a person with a similar

25  name who heads a certain institution or organization which

A. SPITZEN - DIRECT/MR. TURNER                1406

1   transfers funds to people, to individuals from Hezbollah and

2   to Palestinians; that is, he transfers funds to families of

3   Hezbollah operatives and also transfers funds to families of

4   Palestinians in the Territory.

5           MR. TURNER:  Would you show the witness only,

6   please, Exhibit Number 90.

7   Q    Do you recognize Exhibit Number 90, Mr. Spitzen?

8   A    Yes, sir.

9   Q    And what is Exhibit Number 90?

10  A    This is the check that's for $10,000 written to Yousef

11  al-Hayek, and it is given from the account of Osama Hamdan

12  from the bank branch in Mazraa, Beirut.

13  Q    Which bank?

14  A    The Arab Bank in Mazraa, Beirut.

15          MR. TURNER:  We offer Exhibit 90.

16          THE COURT:  I think there was no objection to this

17  one?

18          MR. SHAND:  No objection.

19          THE COURT:  All right.  It's received.

20          (Plaintiff Exhibit 90 was admitted into evidence.)

21          MR. TURNER:  May we put Exhibit 90 on the screen?

22  Q    Is this the check you were referencing, Mr. Spitzen?

23  A    Yes, sir.

24  Q    Now, let's go back to slide number 90, if we could,

25  please.

A. SPITZEN - DIRECT/MR. TURNER          1407

1      Now, there has already been some testimony about

2  Osama Hamdan, but very briefly, can you tell us who Osama

3  Hamdan was at the time of this check?

4  A    Okay.  Yes, sir.

5  Q    Now, there is three other exhibits that are in evidence

6  and we won't spend a whole lot of time on these exhibits,

7  but they are Exhibits 136, 140 and 106.  And just for

8  purposes of brevity, could you put 136 on the screen --

9           MR. TURNER:  Or may we do so, your Honor?

10          THE COURT:  These are all pre-admitted, right?

11          MR. TURNER:  These were admitted earlier with

12  another witness.  They are in evidence.

13          INTERPRETER:  The witness would like to add

14  something.

15          MR. TURNER:  I'm sorry.  Did I interrupt?

16          THE WITNESS:  I just said I could say who he was

17  at the time, but I didn't say yet who he was, Osama Hamdan.

18  Q    Okay.  Go ahead.

19  A    Osama Hamdan was a representative, a delegate of Hamas

20  in Lebanon.  Hamas had delegations and missions in many

21  countries, and the one in Lebanon was considered a very

22  important, very senior delegation.

23  Q    Now, did you have access to three wire transfers marked

24  as Exhibits 136, 140 and 106 referencing Osama Hamdan's

25  account at the Arab Bank?

A. SPITZEN - DIRECT/MR. TURNER          1408

1  A    Yes, sir, I did have access to these three transfers.

2         MR. TURNER:  May I have slide 11, please.

3  Q    Now, just for purposes of very briefly going back over

4  this, this wire transfer -- whose account did this wire

5  transfer go to?

6  A    This wire transfer deposited in Osama Hamdan's account.

7  Q    Who was the beneficiary of these funds?

8  A    The beneficiary, as it's stated, it states there is

9  Harakat al-Muqawama al-Islamiyah; in other words, the

10 Islamic Resistance Movement Hamas.

11        MR. TURNER:  May we have Exhibit 4766 displayed,

12 your Honor?  That's in evidence.

13        THE COURT:  Yes.

14 Q    Are you familiar with this chart from Mr. Geisser,

15 based upon his summary of certain transfer information,

16 specifically relating to Yousef al-Hayek wire transfers via

17 Arab Bank New York?

18        THE COURT:  I don't think you displayed it yet.

19 A    Yes, sir.

20 Q    How many transfers were found in those limited group of

21 records from Yousef al-Hayek?

22 A    282 transfers by Yousef al-Hayek.

23 Q    For what dollar amounts?

24 A    $4,228,193.

25        MR. TURNER:  Now, there was also an exhibit

A. SPITZEN - DIRECT/MR. TURNER          1409

1   admitted, 4764, in Mr. Geisser's testimony.  May we display

2   that.

3          THE COURT:  Yes.

4   Q    Now, this particular chart was labeled, "Arab Bank New

5   York Branch Transactions.  Summary of Transactions

6   Identified Individual Yousef al-Hayek With a List of Those

7   Receiving Money From al-Hayek."  Now this particular exhibit

8   has checkmarks at the side.  Did you place those checkmarks

9   on this exhibit?

10  A    Yes, sir.

11  Q    And what do those checks represent, Mr. Spitzen?

12  A    Those checks represent the transfers that I could

13  identify as aimed at leaders or operatives of Hamas.

14  Q    And there is 27 if I counted correctly.  Is that your

15  count?

16  A    I trust your counting.

17  Q    Now, in the process of going through the al-Hayek

18  transfers, did you have an opportunity to prepare a summary

19  sheet, an illustration of the transfers that were designated

20  from al-Hayek to various Hamas leaders and operatives?

21  A    Yes, sir.

22         MR. TURNER:  May we display his chart, your Honor.

23         THE COURT:  Yes.

24         MR. TURNER:  This is slide 16.

25  Q    Now, first of all, there is a category for sender; is

A. SPITZEN - DIRECT/MR. TURNER          1410

1   that correct?

2   A    Yes, sir.

3   Q    And then one for the number of transfers that you

4   found?

5   A    Yes, sir.

6   Q    And then one category for amount; is that correct?

7   A    This is correct, sir.

8   Q    Now, reading across the first line, "Hayek," can you

9   explain what you mean by 223 and then the dollar value?

10  A    Yes, sir.

11  Q    Go ahead.

12  A    The 223 are people that I managed to identify as being

13  senior officials or leaders or family members of Hamas to

14  whom the money was transferred of the 282 names mentioned

15  earlier.

16  Q    And just so we put a timeframe on this, what is the

17  timeframe we're talking about in this chart?

18  A    Between 2000 to 2001.

19  Q    So over that one-year period of time that much money

20  was transferred through what bank?

21  A    Arab Bank.

22  Q    Now, go to the second line.  The "others" with the two

23  asterisks.  Explain to us that particular line and the

24  meaning of that line.

25  A    Yes, I can.

A. SPITZEN - DIRECT/MR. TURNER          1411

1   Q    Go ahead.

2   A    I examined beyond those transfers made by Hayek,

3   additional wire transfers, mostly from Lebanon through Arab

4   Bank New York to the Palestinian Territories, and I found

5   another 32 wire transfers, these were not done by Hayek, but

6   rather, by different other peoples.  Those wire transfers

7   were for Hamas leaders and their family members.  And these

8   are the ones that I could identify that were done through

9   Arab Bank.

10  Q    Now, during the course of your investigation, given the

11  limited records that you had access to, were you still,

12  despite the limitations, able to identify a significant

13  group of Hamas leaders during the period of 2000 through

14  2002 that had actual bank accounts at Arab Bank in the

15  Palestinian Territories?

16  A    With a high degree of probability, yes.

17  Q    And have you been able to crosscheck the names to

18  ensure the accuracy of the information that you were able to

19  glean from the limited amount of records you did have access

20  to?

21  A    I did the best I could and I invested by best

22  professional efforts in doing my work while comparing these

23  names and the way they are written in many places, that I

24  could not reach absolute accuracy.

25          MR. TURNER:  May we display slide 18?

A. SPITZEN - DIRECT/MR. TURNER                    1412

1          THE COURT:  Yes.

2    Q    Now, there are ten individuals shown on this first

3    slide.  And the label on slide is "Transfers Through Arab

4    Bank New York to Arab Bank Accounts of Hamas Leaders and

5    Operatives in Gaza 2000 through 2002."

6          Of course, the first photograph is Sheikh Yassin;

7    is that correct?

8          MR. SHAND:  Objection, your Honor.

9          THE COURT:  One word?

10         MR. SHAND:  May we approach?

11         THE COURT:  Really?  Is it worth it?

12         MR. SHAND:  I'm not sure.

13         THE COURT:  Okay.

14         (Continued on the next page for sidebar.)

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                    1413

1       (Sidebar conference begins.)

2       THE COURT:  I just didn't see what could be

3  objectionable about that question, it's just preparatory to

4  what's coming next.

5       MR. SHAND:  But it's not preparatory because

6  Mr. Turner is saying this is transfers to 16 Hamas leaders,

7  not "in your opinion" or "who are they" or anything like

8  that, he's making the designations.

9       THE COURT:  Is it the objection that the question

10 was leading?

11      MR. SHAND:  It's misleading, actually.  And it is

12 leading and --

13      THE COURT:  I'll ask him to refrain from leading

14 questions, but these are the expert's conclusions.  These

15 are his opinions, which he's plainly said.  And so the slide

16 simply presents his conclusions.

17      MR. SHAND:  I'm not arguing about the slide, your

18 Honor.  I'm arguing about the phraseology of the questions

19 and --

20      THE COURT:  Okay.  I will ask Mr. Turner to phrase

21 the question in a more neutral manner to draw the answer out

22 rather than suggesting it.  Oh, Mr. Turner, what do you want

23 to do about timing?

24      MR. TURNER:  Let's just stop.  This is a good

25 stopping point.  Oh, can I do one thing in about 30 seconds?

SIDEBAR CONFERENCE                    1414

1        THE COURT:  Yeah.

2        (End of sidebar conference.)

3        (Continued on the next page.)

A. SPITZEN - DIRECT/MR. TURNER          1415

1          MR. TURNER:  May I proceed?

2          THE COURT:  Yes.

3          MR. TURNER:  I don't remember the --

4          INTERPRETER:  I do.  Shall I interpret the

5    question?

6          MR. TURNER:  Yes.

7          THE WITNESS:  Indeed.

8    BY MR. TURNER:

9    Q    Now, based upon the work that you've done and the

10   investigation that you've done, and we're going to go into

11   this in much more detail on Tuesday, of course, individually

12   account-by-account; how confident are you that these Hamas

13   leaders and operatives maintain a bank account were

14   customers of Arab Bank during the period of 2000 through

15   2002?

16   A    With a high degree of probability.

17         MR. TURNER:  That's a good stopping point, your

18   Honor.

19         THE COURT:  All right.  Ladies and gentlemen,

20   we're going to send you home early to prepare for the

21   holiday weekend.

22         Because it's a long weekend, I want to give you a

23   full reminder; bear with me as I do that.  You have been

24   fantastic.  I'm really proud of you, the way you have

25   discharged your responsibilities.  I check jurors all the

A. SPITZEN - DIRECT/MR. TURNER            1416

1    time to make sure everyone is paying attention, and I

2    haven't had to say anything to anybody, because you all are

3    paying attention.

4           Please, for that reason, it's very important that

5    we not do anything to jeopardize this trial going into this

6    long break.  So, please, do not look at any radio or TV

7    reports, turn the page, flip the channel, do something to

8    stay away from any information.  Do not talk to anyone about

9    the case, even though you may be tempted to do that.  You

10   may also be tempted to go on to Google and do some research

11   or something.  Please, it would violate your oath to do

12   that.  Don't post anything on any website about the case.

13   Don't say anything to anyone.

14          Those of you who are not vegetarian, have a good

15   barbecue this weekend and get some sleep, and we're really

16   making good progress and we'll see you next Tuesday at

17   9:30 a.m.

18          Remember, we're sitting next Friday as well.

19          (Jury is out of the courtroom at 3:31 p.m.)

20          THE COURT:  All right, everyone, have a very good

21   holiday.  See you on Tuesday morning.

22          ALL COUNSEL:  You too, your Honor.  Thank you.

23          (Proceedings adjourned at 3:32 p.m.)

24                           * * *

25

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X
COURTNEY LINDE et al,                :
                                     :   04-CV-2799 (BMC)
          Plaintiffs,                :   And all related cases:
                                     :   04-CV-5449 (Litle)
      -against-                      :   04-CV-5564 (Almog)
                                     :   05-CV-365  (Coulter)
                                     :   05-CV-388  (Afriat-Kurtzer)
                                     :   05-CV-3183 (Bennett)
                                     :   05-CV-3738 (Roth)
ARAB BANK, PLC,                      :   06-CV-1623 (Weiss)
                                     :
          Defendant.                 :   United States Courthouse
                                     :   Brooklyn, New York
                                     :
                                     :   Tuesday, September 2, 2014
                                     :   9:30 a.m.
                                     :
                                     :
- - - - - - - - - - - - - - - - X

TRANSCRIPT OF CIVIL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE BRIAN M. COGAN
UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S:

For the Linde and        OSEN, LLC
Coulter Plaintiffs:      BY: **GARY M. OSEN, ESQ.**

                         TURNER and ASSOCIATES
                         BY: **CLYDE T. TURNER, ESQ.**

For the Litle,           SAYLES WERBNER
Bennett and Roth         BY: **MARK S. WERBNER, ESQ.**
Plaintiffs:

                         STONE BONNER & ROCCO, LLP
                         BY: **JAMES P. BONNER, ESQ.**

For the Almog            MOTLEY RICE LAW FIRM
Plaintiffs:              BY: **MICHAEL ELSNER, ESQ.**

For the Defendant:       DLA PIPER, PLC
                         BY: **SHAND S. STEPHENS, ESQ.**
                             **ANTHONY PAUL COLES, ESQ.**
                             **BRETT INGERMAN, ESQ.**

* * * * *

1420

Courtroom Deputy:  Melonie Clarke

Court Reporter:  Frederick Guerino, CSR
                 Official Court Reporter
                 Telephone: (718) 613-2503
                 E-mail: Frederickguerino@aol.com


Proceedings recorded by computerized stenography.  Transcript
produced by Computer-aided Transcription.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

8                    (In open court.)

9              (Judge Cogan enters the courtroom at 9:10 a.m..)

10             THE COURT:  Okay.  I don't expect the jury to be

11   here for about 15 minutes, which is fine, because I received

12   a number of letters over the weekend, many of which I dealt

13   with in a lengthy order, but some of which I will deal with

14   now.

15             Let me start with the last letter I received, that

16   was the letter from Mr. Stephens suggesting that I

17   demonstrated a lack of impartiality to the jury by asking

18   him when he objected to a leading question at table, and

19   then asked for a side bar when I overruled it.  I said,

20   really, is it worth it?

21             First of all, there's some factual inaccuracies in

22   your letter, Mr. Stephens.  I do not laugh, and the jury was

23   not taken aback, as you state to me in your letter.  The

24   jury viewed it as I think a neutral comment.

25             It may be that you are losing a little perspective

1   on this.  All I asked you was whether it was worth it to

2   take more time for the jury on another sidebar, and we had a

3   number of sidebars whenever any party has asked me for them

4   to make a record on a leading question, which I have the

5   discretion to allow anyway, even if it is leading.  Is it

6   worth taking the jury's time?  It seemed to me that your

7   objection was possibly reflexive, and I just wanted to make

8   sure, before we took more time from the jury, that you

9   wanted a side bar on that.

10          So, that's fine, we had the sidebar, and I

11   sustained the objection.  And if you think that that

12   demonstrates a lack of impartiality, then you have your

13   remedies.  I will note that cases that you cite in terms of

14   the need for a judge to remain impartial have considerably

15   more egregious conduct than that which you are complaining

16   about.  So I don't mean to defer you from asking for a

17   sidebar, if you really thingk you need a side bar.  If you

18   need a side bar on a question that you think was leading,

19   you should feel free to do that.  I reject the suggestion

20   that I have been anything less than impartial either in that

21   instance or throughout this trial.

22          Now, next, as to other issues raised in the

23   letters.  On plaintiff's request to admit supplemental

24   interrogatories, I will not allow that.  I think the whole

25   thing is just too confusing.  The theory of reasoning that

1   the plaintiff's have presented would not make the balancing

2   test under Rule 403. I don't think that that is sufficiently

3   cured by a limiting instruction, although it is fairly

4   close, but still I think it is not necessary for the case.

5           Next.  As regards plaintiff's proposed revisions

6   to the adverse inference instruction, which I previously

7   stated I would give at their request during the trial, the

8   only substantive change that the plaintiffs want is to

9   replace FTO with Hamas, and also to add explicit mention

10  that the plaintiffs must provide evidence to support the

11  inference.  That's fine.  I will allow that.

12          Next.  On the website exhibits, I want to know

13  that in a lengthy order that I entered yesterday there was a

14  typo.  What I wanted to do was permit the use of Plaintiff's

15  Exhibit 565 for Rule 703 purposes, not Plaintiff's

16  Exhibit 566.  565 is The Union of Good website.

17          In addition, in permitting Plaintiff's Exhibit 468

18  to be used for Rule 703 purposes, I didn't mean to allow the

19  whole website, only the portion featuring the beneficiary.

20  The list of beneficiaries may be disclosed to the jury.

21          Finally, in case it wasn't clear from that order,

22  all the other websites not listed in that order should be

23  removed from plaintiff's slides.  I think plaintiffs know

24  that, but I just wanted to be sure.

25          Next.  Concerning other Hamas attacks and other

1423

1    terrorists, I understand the defendant continues to object

2    to certain documents on the basis that individuals in those

3    documents referenced are either what the defendants say are

4    either "not alleged to be affiliated with Hamas or the

5    attacks at issue."   I'm not sure exactly what the defendant

6    means by either/or, but I'm clear what I want to do on this.

7    Payments to individuals affiliated with Hamas are relevant,

8    regardless of whether those individuals are alleged to be

9    associated with the attacks at issue here.   Payments to

10   individuals associated with other terrorist groups are not

11   relevant.   The only thing I might consider those for is to

12   show the defendant's knowledge, if they support that, of how

13   the Saudi Committees Program worked, rather than defendant's

14   knowledge, not Hamas terrorist payments.   I don't think

15   that's a distinction the plaintiffs can make; therefore, I'm

16   inclined not to allow it.   The plaintiffs, therefore, cannot

17   use slides stating that an individual is responsible for a

18   terrorist attack, without providing some independent proof

19   that that individual is responsible for that terrorist

20   attack.

21           So I don't see, for example, and I will hear from

22   the plaintiff's on this, how are the plaintiffs going to

23   prove that Hamed Abu Hijla, that slides 113 to 121, actually

24   carried out a suicide bombing?   What's the proof on that?

25           MR. OSEN:   Your Honor, two things.   I don't think

1424

1  it's actually being offered substantively for whether or not

2  he committed an attack, but the documents that are actually

3  referenced in the slides state that he was the perpetrator

4  of the attack, and I can go through them individually.

5          So, for example -- let me just bring it up for a

6  moment, your Honor.  For example, your Honor, I think it is

7  Slide 15.  I apologize if the numbering is off a lit bit,

8  because we pulled slides based on your Honor's order, but

9  it's PX-1115.

10          THE COURT:  Yes.

11          MR. OSEN:  The postcard itself describes Mr. Abu

12  Hijla as the perpetrator of the bombing of Netanya

13  January 1, 2001.

14          THE COURT:  But it is in Arabic.

15          MR. OSEN:  Yes, but, I mean, the witness can read

16  Arabic, and we have an English translation of the document

17  as well.

18          Moreover, just jumping ahead, the actual martyr

19  list, which was in the possession of Arab Bank, references

20  only the actual document.  Let me get the right slide.  Yes,

21  it is the one before PX-327.

22          THE COURT:  Right.

23          MR. OSEN:  Lists Abu Hijla martyr operation, and

24  gives the same date, January 1, 2001.  So we are not

25  offering it, obviously, to prove an attack in this case, but

1425

1    simply the representation, both in documents represented in

2    the bank, and extrinsic materials in which Hamas itself

3    identified him as a bomber who perpetrated a particular

4    attack.

5            THE COURT:  I see.

6            MR. OSEN:  Mr. Spitzen will also testify to the

7    symbolism reflected in PX-1115, which is to say the sashes

8    and other indicia of the postcard which was found at the

9    Nablus Committee as part of their propaganda material.

10           THE COURT:  And where is the postcard from?

11           MR. OSEN:  That was seized from the Nablus

12   Committee, one of the charities at issue in this case.

13           MR. STEPHENS:  Your Honor, may we be heard on

14   this?

15           THE COURT:  Sure.

16           MR. STEPHENS:  Well, this is exactly what your

17   Honor tried to prevent.  Are we going to have a mini trial

18   now, if this guy committed the attack on Nablus?  It is

19   clearly unfairly and unduly prejudicial to the defendant to

20   put in documents and have Mr. Spitzen talk about Mr. Hijla

21   committing another terrorist attack.  If Mr. Spitzen wants

22   to say that Mr. Hijla was part of Hamas, he can do that, but

23   to infuse another terrorist attack in this, do we have to go

24   and prove that it wasn't Hamas, that this attack -- this guy

25   wasn't involved in the attack?  We'll have to have another

1426

1    mini trial.  That is not in issue in this case.

2           THE COURT:  Do you have any evidence that it

3    wasn't Hamas?

4           MR. STEPHENS:  We haven't developed this at all,

5    your Honor.  It's not one of the 24 attacks in the case.

6           THE COURT:  I thought it was in his expert report?

7           MR. STEPHENS:  Well, that doesn't mean it's

8    relevant in this case, and admissible in this case.  There's

9    a lot of stuff in his expert report, but it doesn't make it

10   admissible in this case.  This is going to be confusing to

11   the jury, and it's going to be unduly prejudicial.  A lot of

12   this stuff is unauthenticated hearsay.

13          THE COURT:  Well, I'm certainly not admitting the

14   postcard, I can tell you that.  The question becomes whether

15   the expert can rely on it as part of the basis for his

16   opinion, and for that limited purpose I think he can.

17          MR. OSEN:  Your Honor, just to be clear, from our

18   standpoint, Mr. Spitzen's opinion as to whether Abu Hijla

19   actually committed a particular suicide bombing, as opposed

20   to another, is not the point of the proposed testimony.

21   It's to show that the lists that the bank had in their

22   possession, the funeral in which Hamas leaders attended to

23   celebrate the martyrdom, and so forth, is part of a process

24   that is intrinsic to Hamas' martyr industry and in their

25   attempts to create icons out of their operatives.

                                                                    1427

1        MR. STEPHENS:  May I be heard for a moment?

2        THE COURT:  You may, but let me ask Mr. Osen a

3   question first.

4        I just said I thought I recall this from the

5   expert report.  Now, looking at the expert report, I'm not

6   sure it is in there.

7        MR. OSEN:  Yes, Mr. Spitzen has various appendices

8   to his report in which he lists out all of the bombers he

9   identified from Hamas.  There are 24 of them, of which

10  Mr. Hijla is one.

11       THE COURT:  All right.  Mr. Stephens?

12       MR. STEPHENS:  This series of slides is exactly

13  the problem with this particular witness, which is whether

14  he relied on something or not to form his opinion, does not

15  open a gate to allow him to describe in detail each and

16  every piece of hearsay to the jury that he considered, and

17  that's what they are trying to do.  This is a conduit for

18  inadmissible hearsay.  The detail is not admissible.  He

19  relied on things, but he can't say here's every single piece

20  of evidence.

21       THE COURT:  You know, the problem is you are going

22  to be attacking his opinion as not having a sufficient

23  basis.  So I suppose I can put this off until after you have

24  done that.  But at some point when you raise that inference,

25  he has the right to say no, I had a sufficient basis, hear

1428

1    itis.  Whether we do that during his direct or redirect, I'm

2    not sure it makes much difference.

3         MR. STEPHENS:  Well, let's see what I do. Before

4    we decide that this can get displayed to the jury and

5    described to the jury in detail.

6         MR. OSEN:  Your Honor, it is not being offered for

7    the truth of the matter asserted.  It's not hearsay. These

8    materials, for example, the next slide, which is the

9    photograph from the funeral celebration of Abu Hijla.

10   Again, they are not offered for the truth.  We are not

11   offering it for the fact that he is a sacred martyr of

12   Hamas, et cetera, but simply for the fact that these things

13   actually occur, and that they are generated as part of their

14   what Mr. Shaket (ph) described as the memorialization

15   process.

16        MR. STEPHENS:  It is not being offered for the

17   truth, your Honor.  It's irrelevant or so marginal that the

18   relevant -- that the prejudicial effect cannot possibly be

19   outweighed.  Every time we have this conversation, that's

20   what they say.

21        THE COURT:  That's what people do, they shift the

22   basis for the proffer to make it a non-hearsay basis, and

23   then that raises the question is the shift, leaving us with

24   relevant information or not.

25        Tell me again, Mr. Osen, what is it that -- well,

1429

1   let me ask Mr. Stephens first, what is the statement that

2   you contend is being offered to prove the truth of, for

3   example, the postcard on 115, or the picture on 116?  What

4   is the statement?

5           MR. STEPHENS:  I can't read the postcard. I must

6   say, I'm having a little trouble with exactly what it says.

7   But I believe that this postcard, which is seized from

8   somewhere, I don't know where it came from.  Was it in the

9   trash?  Was it in someone's desk drawer?

10          THE COURT:  If you require the witness to testify

11   where it was seized from, I will have him to testify to

12   that.

13          MR. STEPHENS:  The statement here is apparently

14   that he did whatever he did.  In fact, it's actually not his

15   statement.  It is someone else's statement that he did what

16   he did, and they, whoever wrote this up, thinks that he did

17   what he did, whatever it is.  Classic hearsay.  Don't even

18   know who the author is.

19          THE COURT:  And you say, Mr. Osen, it's not

20   hearsay because you're not offering it to prove that he did

21   what the postcard says he did.  Why is it that you are

22   offering it?

23          MR. OSEN:  This was found in the offices of the

24   Nablus Committee, the charity that Mr. Stephens contends and

25   the defendant contends is not affiliated with Hamas.

1430

1    THE COURT:  I see.

2    MR. OSEN:  Among other things, and Mr. Hijla has,

3    as your Honor knows, a file of data collected, Mr. Stephens

4    objects to the term martyr file, a file collected from the

5    Tadamun Society, which is another charity they contend is

6    not Hamas; and Mr. Bitawi, who is the subject of much

7    discussion here, is the chairman of the Tadamun Society and

8    vice-chairman of the Nablus Committee.  Mr. Hijla is on Arab

9    Bank's martyr list with the cause of death being martyr

10   operation.  I think it's perfectly appropriate for the

11   plaintiffs to tie all of these data points together.

12   THE COURT:  Last words, Mr. Stephens, anything

13   else?

14   MR. STEPHENS:  There's no mention of bank in any

15   of this.

16   THE COURT:  I understand.  But listen, there's no

17   mention of the bank in many of the Hamas attacks.  But for

18   its own reasons, the bank has chosen to make the plaintiffs

19   prove that all of the attacks were Hamas attacks, and in

20   this instance to make the plaintiffs prove that the Nablus

21   Zakat Committee had a connection to Hamas, and the bank has

22   a right to make them prove that.  But I think the expert's

23   opinion will be helpful to the jury in answering that

24   question, and there's a basis for him to rely on this

25   information.  So I am going to allow it.  Okay.

1     Next.  Plaintiff's 306, 327, and 345. Those are

2  admissible martyr lists, subject to my earlier rulings

3  regarding non-Hamas names.  345 is admissible Saudi

4  Committee's correspondence to show defendant's knowledge of

5  how that program worked.  346 and 348 I readily see are not

6  being offered for their truth, but to show the type of

7  documents that were submitted to the bank to prove

8  eligibility for prisoner statements, and they are

9  admissible.

10     Now, with regard to 1078, that's the 2007 Black

11  List.  Why are the plaintiffs using 2007 instead of 2005?

12     MR. OSEN:  Your Honor, we simply took one version,

13  which was submitted in the Holyland Foundation case that had

14  the ribbons and other accoutrements of its authenticity.  We

15  have actually on our exhibit list three or four different

16  versions of the list, one which was partially submitted to

17  this court in 2005, one that came off of the Justice

18  Ministry website.  We just figured we weren't going to

19  submit them all.

20     THE COURT:  But isn't 2005 more probative, since

21  it's closer in time to the attacks here?

22     MR. OSEN:  I don't think so, your Honor, because

23  the only relevant issue is the date of the designations.  In

24  the list, obviously all of these lists build up over time.

25  So the only ones that will be actually shown to the jury are

1432

1    the ones designated in relevant time.  We are redacting both

2    the non-Hamas designees, and anything that is outside the

3    time frame.

4        THE COURT:  I see.  Okay.  I will permit it, then,

5    on that basis.

6        On 1415, The Union of Good designation, I think

7    it's relevant.  I'm overruling the objection, the defense

8    objection on that.  There's been testimony that the OFAC

9    designations are retrospective; therefore, the jury can

10   reasonably find this to be relevant evidence that the Union

11   of Good was aiding Hamas before it was designated in 2008.

12       I will give a limiting instruction that the list

13   is not to be used for defendant's knowledge similar to the

14   one that I will give for the Israeli Black List.

15       Now, 1404, those are the bank's own account

16   records that were seized by the IDF.  The hearsay objection

17   has no merit, because they are the bank's own documents.

18   They may be admitted against it.  If the defendant really

19   wants to challenge authenticity, which is another objection

20   it has raised, then it, of course, may.  But I'm not seeing

21   how plaintiffs are going to prove that these documents are

22   authentic without bringing up the IDF raid.  So I want the

23   defendant to fully understand that if it demands

24   authentication and it stands on that objection, then I'm

25   going to have to let Mr. Spitzen talk about how these

1433

1    documents came to be in his possession.

2           You know, my 403 rule was to protect the bank from

3    the prejudice it would suffer if it was revealed that it was

4    raided by the IDF.  But if the bank requires that in order

5    to show a foundation for the admission of the document, then

6    that evidence is going to come in.

7           What does the bank want to do?

8           MR. STEPHENS:  May I have a moment?

9           THE COURT:  Sure.

10          (Pause).

11          MR. INGERMAN:  In light of your order, we will

12   waive the authenticity challenge.

13          THE COURT:  Okay.

14          Then, I think last, I got at 10:00 o'clock last

15   night the defendant's objections to plaintiff's Slides on

16   Spitzedn. I really don't know who is at fault for the letter

17   being at 10:00 o'clock at night.  I can't entirely blame the

18   defendants, because they didn't get the slides until Friday,

19   you know, right before the holiday weekend, and I don't know

20   why I'm continually in this position where I get these very

21   last minute, very substantive objections.  I may have to deal

22   with them one slide at a time, because there just hasn't been

23   enough time to review them, but I will make the following

24   observations:

25          First of all, the plaintiffs have to remove the

1434

1  Arab Bank and Saudi Committee and Union of Good logos, just

2  the way I said they had to remove the Hamas logos.  It struck

3  me that a number of these slides are argumentative and

4  appropriate for closing, but not appropriate for

5  cross-examination of a witness.

6          The witness can state his conclusion, but you don't

7  have to give your closing argument through the witnesses.

8  Headings like Financing Terrorism on Slides 80 to 81, or Arab

9  Bank Procedures on 93, or the Money Trail on Slide 101, I can

10 tell you right now, those are going to have to come out.

11         As I say, the rest of the objections I will rule on

12 as they come up, and I will ask the plaintiffs to - and I

13 will tell Ms. Clark - don't show the jury any slides until I

14 have cleared them and defendant has had an opportunity to

15 either insist on or waive its objection to that slide.

16         Okay.  That's all I got.  Anything else?

17         MR. OSEN:  Just one thing, your Honor.

18         On the Interrogatories, there were a group of

19 them, and I'm not sure if your ruling applies to all of the

20 ones or just the ones that involve the exhibits, the

21 interrogatory.

22         THE COURT:  I don't recall that distinction, but I

23 believe I wanted to exclude all of them, because they all

24 raise the same risk.

25         MR. OSEN:  If I may just briefly, your Honor?

1    THE COURT:  Go ahead.

2    MR. OSEN:  Because we wouldn't be using it today,

3   obviously, but the first grouping was the follow-up

4   interrogatory to the one that your Honor admitted

5   previously, which set the time frame in 2005 to 2007 for the

6   same questions that were in the previously admitted

7   interrogatory.  So this to some degree cures one of the

8   objections the defendant had in terms of being able to parse

9   the answer from up to 2005 and the part after 2005.  So,

10  that is one where obviously at the end it is going to be

11  reduced to whatever the actual number is in presentation,

12  but it clarifies the issue of which amounts were paid later

13  in time.

14    THE COURT:  I don't think it does.  I think it

15  makes it too confusing, rather than less confusing, so I

16  will exclude it.

17    MR. OSEN:  Thank you, your Honor.

18    THE COURT:  Anything else?

19    MR. TURNER:  One housekeeping from Thursday.

20    THE COURT:  Yes?

21    MR. TURNER:  Excerpt seven shown to the jury, it's

22  marked as 4791; excerpt eight is 4792; excerpt nine is 4793;

23  and the following exhibits were used in those three

24  excerpts:  306, 327, 302, 437, 4769, 4770, 380, 617, 4721.

25  Then excerpt eight:  362, 345, 400, 382, 402, 1768, 1770,

A. Spitzen - Direct/Turner                1436

1  405.  Excerpt nine:  1970 and 1917.  We would offer those

2  into evidence.

3            THE COURT:  All right.  Any objection?

4            MR. INGERMAN:  We renew our prior objection.

5            THE COURT:  Admitted over those prior objections.

6            (Whereupon, the above Plaintiff's exhibits were

7  received and marked into evidence.)

8            THE COURT:  All right.  Let's have the jury,

9  please.

10            I do recommend that people not rise until Ms.

11  Clark knocks on the door.  But in the morning when we are

12  going to talk, they are still in the room and invariably it

13  takes a little while to get organized.

14            (The jury enters the courtroom at 9:40 a.m..)

15            THE COURT:  Good morning, ladies and gentlemen.  I

16  hope you had a nice holiday.

17            Let's continue with direct examination by Mr.

18  Spitzen.

19            MR. TURNER: Thank you, your Honor.

20            When we broke, we had slide 18 on the screen.  May

21  we put that back up?

22            THE COURT:  Yes.

23  A R I Y E H    S P I T Z E N,

24            Previously sworn, resumes the stand.

25  DIRECT EXAMINATION (Cont'd.)

A. Spitzen - Direct/Turner                1437

1   BY MR. TURNER:

2   Q    Mr. Spitzen, on Thursday when we broke, we were

3   beginning to talk about Slide No. 18, which is captioned

4   Transfers Through Arab Bank New York to Arab Bank Accounts

5   of Hamas Leaders and Operatives in Gaza 2000 through 2002.

6             Now, first of all, with respect to Sheikh Yasin,

7   his account number is listed 36444.

8             Now, did you have access to Arab Bank's account

9   records for account 36444?

10  A    No, sir.

11  Q    Why?

12  A    Because the Arab Bank had refused to transfer to me the

13  records for this bank account.

14  Q    There's been an issue about the spelling of Sheikh

15  Yasin's name.

16            Based upon your investigation, what were you able

17  to determine with respect to the spelling of Sheikh Yasin's

18  name?

19            MR. STEPHENS:  Objection, your Honor.

20            THE COURT:  Overruled.

21  A    Well, the issue of transcribing Arab names into Latin

22  is quite a complicated problem, and I'm not going to get

23  into all the details of this problem here.  It is partially

24  an academic problem.  Anyhow, there's a proper standard way

25  for transcribing names.  The name gentleman seen in the

1  transfer is not identical to the standard of proper way that

2  it should be written in English letters, and this is not how

3  the name appears in the records.  The way it appears in the

4  records is the way it is usually written in French or Latin,

5  languages, sometimes in the internet you can find the name

6  Yasin spelled that way, and there's an issue in general

7  regarding the transcription of all of the names in this

8  case.  There are various ways to write the names.

9  Q    If we could, your Honor, we would like to display slide

10 five.

11          For purposes of introduction, Mr. Spitzen, we are

12 going back to the actual $60,000 wire transfer that was made

13 to shake Yasin's account in 2001 at Arab Bank.

14          MR. STEPHENS:  Objection, your Honor.

15          THE COURT:  All right. Hang on a second.

16          Mr. Stephens, this was the on /SKWREBGZ previously

17 raised with regard to the scope of this /WEULT?

18          MR. STEPHENS:  Well, that, your Honor, and that

19 wasn't even a question.  It was a statement.

20          THE COURT:  Hang on a second.

21          Right.  The reason I asked is because all he asked

22 for was to show the slide.  He can ask the question.  So I

23 thought you may have a problem with the slide.

24          MR. STEPHENS:  I actually have a problem with

25 that, too.

A. Spitzen - Direct/Turner                1439

1          THE COURT:  That's what I want to know right now,

2     is it the one previously stated with respect to the scope?

3          MR. STEPHENS:  Yes.

4          THE COURT:  That's overruled.

5     BY MR. TURNER:

6     Q    For the record, this is Exhibit 2080, which is

7     preadmitted.

8     A    Yes, I see that.

9     Q    Mr. Spitzen, were you able to determine from

10    Exhibit 2080, which is the wire transfer, whether Sheikh

11    Yasin's name was correctly spelled in the wire transfer that

12    came to Arab Bank?

13         MR. STEPHENS:  Your Honor, I'm sorry, your Honor,

14    may we approach?

15         THE COURT:  Sure.

16

17

18

19

20

21

22

23

24

25

1                    (SIDE BAR)

2          THE COURT:  All right.

3          MR. STEPHENS:  They don't spell the name the same

4   as the transcript.  I can't cross-examine him on 185 slides

5   just about all of this detail.  And, so, the question is

6   misleading in the extreme.  I mean, if that's the name,

7   that's not the name, isn't that the bottom line, this needs

8   to come out or he has to say this name isn't the same.

9          THE COURT:  I think that's what he's about to do.

10  I don't really understand the objection.  He asked him is

11  that the correct spelling of the name, and I presume he's

12  going to say "no," making the very point that you just said.

13         MR. STEPHENS:  I guess we'll see.  He just

14  testified apparently that he's an expert on spellings in

15  romance languages like Latin and Arabic.

16         THE COURT:  I don't think he said that.  I will

17  overrule the objection.

18              (Sidebar ends)

19

20

21

22

23

24

25

A. Spitzen - Direct/Turner                    1441

1    BY MR. TURNER:

2    Q    He may answer the question.

3    A    The name Yasin here is written in a way that somebody

4    with a French background would have written it this way, and

5    I found this kind of writing in many places, even in the old

6    fact list, the name Yasin is spelled with double "s," which

7    is not the standard way to do it.  Because of the

8    transcription for Arabic, it's supposed to be with only one

9    "s." Actually, it doesn't matter, because this is the

10   account number of Yasin, which is also found in other

11   places.  Therefore, the identification has a very high level

12   of probability.

13   Q    Now, were you able to determine from account records

14   from the bank how the bank itself spelled Sheikh Yasin's

15   name when it opened his account at Arab Bank, after he was

16   designated as a terrorist?

17   A    Unfortunately, no.

18   Q    Why is that?

19   A    Because the bank had refused to transfer to me the

20   records of Yasin's bank account, and one of these records,

21   one of these documents are documents of the opening of the

22   account.

23   Q    Now, setting aside whether the spelling of Yasin with

24   one s or two s's, settling aside which is important, were

25   these funds, the $60,000, based upon your investigation

A. Spitzen - Direct/Turner                1442

1   actually credited or deposited into Sheikh Yasin's account

2   at Arab Bank?

3              MR. STEPHENS:  Objection.

4              THE COURT:  Overruled.

5   A    The sum that deposited was transferred by Yusef el

6   Hayek from Lebanon on May 30 of 2001.  Yusef el Hayek is the

7   same person who transferred large sums of money to the

8   terrorist leaders and/or their families.

9   Q    Now, if we can go back to Slide 18.

10             Looking across next to Sheikh Yasin is Halima

11  Hassan Yasin.

12             Who was Halima Hassan Yasin?

13  A    Halima Hassan Yasin has been Sheikh Yasin's wife since

14  1963, and she became his widow in March 2004.

15             MR. TURNER:  May we go to Slide 20, your Honor?

16             THE COURT:  Yes.

17  Q    How many wire transfers were you able to locate, given

18  the limited number of records you had access to, that went

19  into Halima Yasin's bank account at Arab Bank?

20             THE COURT:  I need a slight sidebar before he

21  answers the question.

22

23

24

25

SIDE BAR                    1443

1          (SIDE BAR)

2          THE COURT:  Having difficulty with the term in the

3    question, which is because he doesn't have the account

4    records, he can't -- I guess he could infer, he could draw

5    the inference that it went in, but what he knows is that

6    there was a SWIFT sending it to.  He can't really say - I

7    think this is Mr. Stephens' objection - that it went in,

8    because he doesn't have the account records to say that.  So

9    I think you need to phrase the question in terms of was the

10   money sent to.

11         Does that obviate your objection, Mr. Stephens?

12         MR. STEPHENS:  Only partially, your Honor.

13         THE COURT:  What is the rest that it doesn't?

14         MR. STEPHENS:  Let me give you an example, which

15   is, they have all of the Hamdan account records, and if you

16   look at the transfers, some of the beneficiaries are

17   Palestein Information Center.  Some of them are Hamdan.

18   Some of them are somebody else.  The beneficiary doesn't

19   tell you who the account holder is.

20         THE COURT:  It's enough for threshold of

21   admissibility, given that you haven't given the records to

22   check out whether the inference he's drawing is true.  This

23   is the best that the plaintiffs can do, given the limited

24   access to records that they have.

25         MR. STEPHENS:  Well, I believe this subject has

SIDE BAR                          1444

1    several different components.

2            The first component is, as I tried to express on a

3    couple of occasions, maybe we just fundamentally disagree on

4    it, your Honor, he's not an expert in any of this, and the

5    idea of he can take a look at the records, has no experience

6    analyzing and telling the jury what it means.  His expert

7    testimony is beyond his ken.

8            THE COURT:  I will defer to Judge Gershon's order

9    in which she explicitly ruled he did not raise that

10   objection, and he can testify.  And the reason she reached

11   that ruling - and I adopt it as well - anybody can read a

12   SWIFT to see if money was sent from one place to another

13   place, and that's essentially what he's saying.

14           MR. STEPHENS:  He's not, your Honor.  He's taking

15   the name of a beneficiary, assuming the beneficiary has the

16   account, that's exactly what he's doing.

17           THE COURT:  You are free to put in evidence, if

18   you produce the account records to show that's not what

19   happened, but certainly there's enough there for

20   admissibility purposes to get in.  So I'm overruling the

21   objection.

22           (Side bar ends)

23

24

25

A. Spitzen - Direct/Turner                    1445

1      THE COURT:  Continue.  I think they've taken down

2  the question.  I don't know if you translated it for the

3  witness.  Let's back up.  Put another question.

4      MR. TURNER:  I will ask the question again.

5  Q    Mr. Spitzen, how many transfers were you able to locate

6  in the limited number of records you had access to that went

7  to an account at Arab Bank for Halima Hassan Yasin from

8  November 2000 through May 2, 0001?

9  A    I managed to find six such transfers.

10  Q    And for what amount of money?

11  A    The sum was $153,435.

12  Q    What was the account number?

13  A    The number was 244139510.

14  Q    And did your investigation confirm or reject the notion

15  that this account number belonged to Halima Hassan Yasin?

16      MR. STEPHENS:  Objection.

17      THE COURT:  Overruled.

18  A    All six transfers were indeed into this bank account

19  number, and the beneficiary of this bank account number was

20  Halima Hassan Yasin.

21  Q    And were you given access to the account records, the

22  full account records, from Arab Bank for account number

23  2441?

24  A    No.

25  Q    Why is that?

A. Spitzen - Direct/Turner                1446

1   A    Because the bank had refused to transfer these records

2   to me.

3          MR. TURNER:  Your Honor, these SWIFT records or

4   wire transfers are marked 2061, 2114, 2117, 2144, 2162, and

5   2169, and these are preadmitted.

6          THE COURT:  All right.

7          MR. TURNER:  May we go to Slide 21, please?

8          THE COURT:  Yes.

9   Q    Mr. Spitzen, who was Salah Shehade?

10  A    Salah Shehade was one of the senior leaders of Hamas

11  organization.  He was actually one of the founders, one of

12  the seven founders.  He's also considered to be the person

13  who found the ^^^in /KAS /SAPB Brigade, that is the military

14  operative wing of Hamas.  On top of that, he was Dean of

15  Students at University of Gaza, and he was also the founder

16  of El Nur, while he was there.  He's considered to be number

17  two in Hamas.

18  Q    Based upon your experience in your investigation, was

19  Salah Shehade a secretive operative and leader of Hamas or

20  was he a public figure?

21  A    Salah Shehade was a very famous person.  There were

22  many interviews with him and various media outlets.  He was

23  interviewed by in an /TER era, as well as by Hamas media.

24  And I remember the great celebrations that occurred when he

25  was released from prison in May of 2000.  It seemed

A. Spitzen - Direct/Turner                1447

1  difficult to describe, massive people, hundreds of thousands

2  of people went out to the streets to celebrate.  He was a

3  very famous figure, and remained famous after he died.

4  Q    Were you able to determine whether Salah Shehade had a

5  role in the El Nur Prisoners Society?

6  A    Yes.  Salah Shehade was one of the founders certainly

7  the bylaws of this association were found, were seized, and

8  his name appears there.  He was the one of the founders,

9  along with Ahmed Jabry, as well as other Hamas operatives.

10  Q    Were you able to determine whether shall /HRA is a /HA

11  /TA AA bank account in Arab bank between February 2000 and

12  February 2000 ^ 1 ^ one?

13           MR. STEPHENS:  Your Honor, may I approach for a

14  moment?

15           THE COURT:  Sure.

16

17

18

19

20

21

22

23

24

25

SIDE BAR                                    1448

1           (Sidebar)

2           MR. STEPHENS:  I just would like to have a

3  continuing objection to the questions of to the question of

4  whether or not someone had an account and this witness

5  testified to them, otherwise I will stand up each time.

6           THE COURT:  I have no problem with giving you a

7  continuing objection.  I just want to understand what it is.

8  It's not a banking objection.

9           MR. STEPHENS:  He's not entitled to testify

10  someone had an account at the bank.

11           THE COURT:  Yes.  What is the basis for him

12  knowing that it was an account at the bank, since they

13  haven't turned over records.  He's drawing that inference

14  from the SWIFT transfers.

15           MR. TURNER:  From the SWIFT transfers the names

16  and the cross-checking of those names where he's listed with

17  other sources of information, so he can pin down whether or

18  not the same person is identified as the same person with

19  the bank account.

20           THE COURT:  How did he know, other than the SWIFT,

21  that this is the bank account of that person?  Is that based

22  wholly on the SWIFT?

23           MR. TURNER:  Yes.

24           THE COURT:  As we discussed the last time we were

25  at sidebar, I think you ought to phrase the questions in

SIDE BAR                                1449

1    terms of the SWIFT, were you a able to ascertain whether

2    money -- whether there's a transfer record of money to this

3    individual to an account at Arab Bank, rather than saying

4    had the individual had an account at Arab Bank.  You can

5    argue the conclusion, but since the records were blocked, we

6    don't know for sure whether that's the case.

7            Now, it's a really close question, because if the

8    SWIFT shows an account at the bank, and it has the

9    transferee's name on it, it doesn't take an expert to draw

10   the inference that that is the account at the bank, in the

11   absence of any records showing otherwise.  But I still think

12   it doesn't cost the plaintiffs anything to argue the

13   inference, instead of having this witness draw the

14   inference.

15           MR. TURNER:  Sure, no problem.

16           MR. STEPHENS:  Thank you, your Honor.

17           (Sidebar ends)

18

19

20

21

22

23

24

25

1           THE COURT:  Ask another question, please.

2    BY MR. TURNER:

3    Q    Were you able to determine -- let's strike that

4    question and we'll ask another question.

5           Were you able to determine whether there were any

6    wire transfers to Salah Shehade that went to Arab Bank

7    during the period of time November 2000 through

8    February 2001?

9    A    Yes, sir, I identified seven.

10   Q    For the record, those are preadmitted exhibits 1920,

11   1938, 1939, 1940, 1941, 2145, and 2163.

12   A    I would like to add that the name Salah Shehade appears

13   in different forms, spelled differently, but everything was

14   deposited in the same account that I mentioned before.

15   Q    And what was that account number?

16   A    349321510.

17   Q    And did you have access to the full account records

18   from Arab Bank for that account number?

19   A    No, I had no access to the records of this account.

20   Q    And why?

21   A    Because the bank refused to give me these records as

22   well.

23   Q    What was the total amount of those transfers?

24   A    The total amount $109,500.

25           MR. TURNER:  May we go to Slide 22, please.

A. Spitzen - Direct/Turner                1451

1              THE COURT:  Yes.

2    Q    Mr. Spitzen, who was Ismail Haniyeh?

3    A    Ismail Haniyeh was one of the most prominent figures in

4    Hamas. He was very well known.  From 1997, he served as the

5    Bureau Chief of Sheikh Yassin's Bureau.  He was the person

6    that controlled this bureau.  He was head of foreign

7    relations for the Islamic University of Gaza, which is also

8    an Hamas institution.  At the time he also participated in

9    the establishment of a terrorist organization called Majd.

10   Q    Were you able to determine whether Ismail Haniyeh or

11   Haniyeh, excuse me, ever served as prime minister of Hamas?

12   A    Yes.  Ismail, he served as prime minister of Hamas

13   since the elections of 2006 until 2014, just recently, when

14   the national unit government was established by the

15   Palestinians just a couple of months ago.

16   Q    Were you able to find any SWIFT transfers, wire

17   transfers, to anyone by the name of Ismail Haniyeh at Arab

18   Bank between July 2000 and September 2001?

19   A    Yes, sir.

20   Q    How many?

21   A    There were 19 transfers which I could identify between

22   these dates.

23   Q    And what bank account number at Arab Bank did those 19

24   transfers go into?

25   A    All of these transfers were deposited in account number

A. Spitzen - Direct/Turner                1452

1   63517500.

2   Q    And for what amount of money during that time frame,

3   July 2000 through September 2001?

4   A    Amount for the 19 transfers $420,100, total amount.

5   Q    For the record, these were preadmitted as well, and

6   reads as follows:  2118, 2199, 1916, 1917, 1924, 1928, 1929,

7   1930, 1931, 1933, 1934, 1935, 2039, 2074, 2170, 2174, 2185,

8   2203, 2204, and 2029.

9           May we go to Slide 23, please.

10          THE COURT:  Yes.

11  Q    During the August 2000 through August 2001 time frame,

12  who was Ismail Abu Shanab?

13  A    Ismail Abu Shanab is also considered as one of the

14  founding fathers of Hamas, although he's not among the seven

15  people I had mentioned.  For a certain time when there was a

16  large wave of arrests in 1988 by Israel, the Hamas people,

17  he became number two in the organization, and for some

18  period or amount of time, even number one in Hamas.  He is

19  so famous that in the American designation for the Al-Salah

20  Islamic Society, he's quoted in an article that he wrote for

21  the general Al Wattan as someone who provides a review of

22  the civilian arm of Hamas, the civilian wing of Hamas.

23  Q    Based upon your investigation, was Ismail a public

24  figure in the sense of not being secretive or giving

25  interviews and that type of thing?

A. Spitzen - Direct/Turner                    1453

1    A    Yes.  I mentioned one important interview that he gave,

2    which was quoted by the American administration, but that

3    was not the only interview.  He was very famous until the

4    day he died.  He gave interviews.  He appeared in public, in

5    large rallies.  He wrote for Al Rissalah.  He was a public

6    figure.

7    Q    Now, given the information that he did have access to,

8    were you able to find any wire transfers to a bank account

9    at Arab Bank in the name of Ismail Abu Shanab?

10   A    Yes, sir.

11   Q    What was the account number that was listed on those

12   wire transfers for Ismail Abu Shanab?

13   A    The number for Ismail in the Arab Bank as it was

14   written on the transfers was 236519510.

15   Q    Now, were you given access to either the account of

16   Ismal Haniyeh or Ismail Abu Shanab, the full account records

17   from Arab Bank?

18   A    No, sir.

19   Q    And, again, why not?

20   A    I requested them, but the bank refused to transfer

21   them.

22   Q    Now, did either Haniyeh or Shanab or both have any role

23   in Islamic societies or charitable societies that were part

24   of Hamas?

25   A    Yes.  Ismail Abu Shanab was a member of what is

A. Spitzen - Direct/Turner          1454

1  translated as the Islamic Center of Islamiya in Gaza, and

2  Ismail was a member of the Al Jamaiya al Islamiya, the Gaza

3  charitable society, Islamic charitable society.  He was a

4  member of the Board, and also chairman of the Sports Club.

5  Q    For the record, the wire transfers to the account of

6  Ismail Abu Shanab were 1912, 1919, and 1936, 1937, 2060,

7  2111, 2146, 2168, and 2187.

8           Mr. Spitzen, how much money was transferred to

9  Ismail Abu Shanab at the Arab Bank, according to those nine

10  transfers?

11  A    These nine transfers amounted to $173,172.

12  Q    Now, were you able to, let's go to slide 24, please.

13           Were you able to determine who Muhammad Hassan

14  Shama was?

15  A    Yes.  Muhammad Hassan Shama was one of the seven

16  founders of Hamas.  We saw him in one of the first slides.

17  He was very senior.  He died a natural death in 2011.  He

18  established the Oar El Aksam, which is an educational

19  institution, was very, very active.

20  Q    Was he considered to be a secret member of Hamas or

21  public figure in Hamas, based upon your experience?

22  A    Oh, Muhammad Hasan Shama was one of the senior Hamas

23  leaders, very popular, very well-known, is in the media, at

24  public rallies.  He was quoted in several media channels,

25  both Hamas and others.  He was very famous as an Hamas

A. Spitzen - Direct/Turner                1455

1   leader.

2   Q    Did you find any wire transfers to Muhammad Hasan Shama

3   during 2001 to Arab Bank?

4   A    Yes, I managed to identify four such transfers.

5   Q    For how much during 2001?

6   A    $144,000.

7   Q    And, for the record, those transfers are 1918, 2034,

8   2038, and 2147.

9        What was the the account number, Mr. Spitzen, for

10  Muhammad Hassan Shama that you located on the wire

11  transfers?

12        MR. STEPHENS:  Objection.

13        THE COURT:  Overruled.

14  A    The account was 513636510.

15  Q    Were you given access to the full account records for

16  that account number at Arab Bank?

17  A    No, sir.

18  Q    Again why?

19  A    The same reason, the bank refused to produce them.

20  Q    Let's go to Slide 25, please.

21        Who was Abd el Hakim Ali al-Manaameh?

22  A    Abd el Hakim Ali al-Manaameh was a bodyguard for Sheikh

23  Ahmed Yasin. He was one of his bodyguards.  He was also a

24  member of the military part of Hamas, or rather an operative

25  in the military of the Al Qassam Brigade.  He was killed

A. Spitzen - Direct/Turner                    1456

1    while firing mortars at Israel in May 2001.

2    Q    Did you find any wire transfers to Abd el Hakim Ali

3    al-Manaameh?

4    A    Yes, sir.

5    Q    How many transfers did you find for the one-year period

6    of August 2000 to August 2001?

7    A    I managed to detect seven such transfers.

8    Q    For what amount of money?

9    A    $119,435.

10   Q    What account number was listed at Arab Bank for Abd el

11   Hakim Ali al-Manaamed on those wire transfers?

12   A    262390510.

13   Q    Did you have access to the full account records from

14   Arab Bank for that account number?

15   A    No, sir.

16   Q    And for the record -- well, why?

17   A    For the same reason, the bank had refused to transfer

18   to me the bank records for this account as well.

19   Q    For the record, these transfers are 2087, 2112, 2167,

20   2184, 2189, 2196, and 2202.

21          May we have Slide 26.

22          Who was Ghazi Ahmad Hammad?

23   A    Ghazi Ahmad Hamad was a spokesperson for Hamas. He was

24   a leader in the Hamas, one of the Hamas leaders. He was a

25   spokesperson for Hamas between the years 2006 to 2007, but

A. Spitzen - Direct/Turner          1457

1   even before that he was quite, quite prominent.  He was an

2   editor of a newspaper, an Hamas newspaper that was published

3   during the 1990s.  It's called Al Watan.  And later on he

4   also became an editor of Al Rissalah, is the gazette to this

5   very day.  He was quite famous.

6   Q    Did you find any wire transfers to Ghazi Ahmad Hamad

7   going to Arab Bank?

8   A    Yes, during the years July 2000 to January 2002, 15

9   transfers were found, or rather I found 15 transfers.

10  Q    For what amount of money?

11  A    $152,986.

12  Q    And according to the wire transfers that you had access

13  to, what were the account numbers associated with those wire

14  transfers?

15  A    There was one bank account, and the number of that

16  account was 1170465510, and another account and the number

17  was 706785.

18  Q    And were you able to access the full account records at

19  Arab Bank for either one of those accounts?

20          MR. STEPHENS:  Objection, your Honor.

21          THE COURT:  I will overrule the objection but let

22  me have a short sidebar.^^^

23

24

25

1                    (Side-bar)

2          THE COURT:  Just to expedite the examination, but

3    also to stop beating a dead horse, why don't you either ask

4    him up front if he had any records of the accounts you are

5    talking about, if not, why not, or all of the accounts, or

6    just wait until you did all of the accounts, or ask him

7    once, did he have records for any of these accounts, instead

8    of doing that for every single account number.

9          MR. STEPHENS:  My objection, your Honor, was that

10   his question assumed both those bank accounts were Arab Bank

11   accounts, and the slide shows they are not.

12         MR. TURNER:  But my question also included Arab

13   Bank, so.

14         THE COURT:  That's his objection, but that to me

15   is for cross-examination.

16         (Sidebar ends)

17

18

19

20

21

22

23

24

25

A. Spitzen - Direct/Turner                    1459

1       THE WITNESS:  Two accounts which appear here, one

2  is indeed for that person in the Arab Bank.  This is the

3  account that starts with the numbers 117 and ends with 510.

4  While the second bank account - and it was a bit strange for

5  me -- and this is why I looked into it once again, it's

6  actually an account number for an account at the Cairo Amman

7  Bank, but the transfer was from the Arab Bank to the Arab

8  Cairo Bank to his personal account.  This is why I couldn't

9  receive -- actually, the records for that second account --

10  for the first one for the Arab Bank I did not receive, and

11  for the second one I did.

12  Q    For the record, these 15 transfers are 1969, 1970,

13  1971, 1972, 1973, 1974, 1975, 1976, 1977, 1978, 1979, 1980,

14  1981, 1982, 1983, and 2183.

15       May I have Slide 27, please.

16  Q    Who was Riyad Husain Abu Zaid?

17  A    Riyad Husain Abu Zaid was also a senior Hamas

18  operative.  He was actually more connected to more

19  operational aspects of Hamas.  He was incarcerated by Israel

20  several times.  He was the chairperson, and also one of the

21  founders of the El Nur Association.  This is an Hamas

22  association.  He was killed by Israel.

23  Q    Did you find any wire transfers in the materials that

24  you had access to for Riyad Husain Abu Zaid at Arab Bank?

25  A    Yes, sir.

A. Spitzen - Direct/Turner                    1460

1  Q    How many and for what amount of money?

2  A    I found one transfer, and the sum was $25,000.

3  Q    And what account number was associated with that

4  transfer?

5  A    300136510.

6  Q    For the record, that transfer is 2017.

7         May I have Slide 28.

8         Who was Baha al-Din al-Madhun?

9  A    Baha al-Din al-Madhun in recent years was actually

10 Deputy Minister of Prisoners in the Hamas government, and

11 for many years he served as a General Director of the

12 Ministry for Prisoners, the Hamas Ministry for Prisoners.

13 He was very much involved in the affairs and matters of

14 prisoners.  He was a well-known figure.  He was a public

15 figure.

16 Q    Were you able to find any wire transfers to this person

17 at Arab Bank?

18 A    Yes, sir.

19 Q    How many and for what amount of money?

20 A    There were two transfers for the total sum of $19,500.

21 Q    During what time frame?

22 A    Between December of 2000 and April of 2001.

23 Q    What account number at Arab Bank is associated with

24 this person?

25 A    301531510.

A. Spitzen - Direct/Turner          1461

1   Q    And, for the record, those two transfers are 2088 and

2   4794.

3            May I have Slide 29.

4            THE COURT:  47?

5            MR. TURNER:  4794, that's next in line.

6            THE COURT:  I'm only questioning it because the

7   slide says something different.

8            MR. TURNER:  Oh, 4785.  I must have written the

9   wrong number down, my apologies, 4785.

10           Slide 29.

11           Who was Abbas al-Sayed?

12  A    Abbas al-Sayed was also a famous figure.  He was

13  actually the person behind the attack at the Park Hotel in

14  2002. He was very much involved with the military wing, the

15  military part of Hamas.  He was the head of that wing in

16  Tulkarem.  For a long period he was a Hamas spokesperson in

17  the Tulkarem region.  He's a famous well-known figure to the

18  public.  He was involved with a lot of public activities,

19  and that's a long list.

20  Q    Were you able to find any wire transfers for the

21  account of Abbas al-Sayed at Arab Bank?

22  A    Yes, sir.

23  Q    How many transfers and for what amount of money?

24  A    Nine transfers, and the total sum was $123,000.

25  Q    And what period of time was this $123,000 transferred

A. Spitzen - Direct/Turner                1462

1    to Abbas al-Sayed at Arab Bank?

2    A    It was between February of 2001 until May 2, 0001.

3    Q    And what was the Arab Bank account number associated

4    with the wire transfers?

5    A    Well, the wire transfers were through the Arab Bank to

6    two banks.  One was the Arab Bank branch in Tulkarem, and

7    the number of that account is 150027961600.  And there were

8    also transfers from the Arab Bank into an additional bank

9    account at the Cairo Bank in Tulkarem, and the number of

10   this account is 90705094240.

11   Q    For the record, these are preadmitted as 1990 through

12   1998.

13            May I have Slide 30.

14            Who was Salah al-Din Darwazah?

15   A    Salah al-Din Darwazah was one of the leaders of Hamas

16   in Nablus.  He was considered one of the leaders of the

17   operative wing, the military wing of Hamas in /TPHU

18   remember.  For a certain period he was a Hamas operative.

19   He was very famous.  And he was also involved in activities

20   relating to his civilian infrastructure of Hamas.  He found

21   Islamic block at the university.

22   Q    Did Darwazah spend time in prison?

23   A    Darwazah also spent time in prison, Darwazah yes.

24   Q    During what periods of time was he in prison and by

25   whom?

1    A    For a period of about two years, a bit more than that,

2    two years and 3 months, he was in an Israeli prison.  That

3    was from 1994.  That was for his activities in Hamas.  Later

4    on between the years '97 to '99 he was in prison for short

5    periods of time by the Palestinian authority, because they

6    knew he was dangerous, so they sent him to prison for

7    periods of times.  He would go in and out during that time

8    frame.

9    Q    Did you find any wire transfers in the materials that

10   you had access to Darwazah at Arab Bank?

11   A    I found 20 wire transfers to Darwazah's wife, whose

12   Huda Ahmad Darwazah.  She was Darwazah's wife.

13   Q    And during what period of time were those 20 transfers?

14   A    It was between July of 2000 and July of 2001.

15   Q    During that one-year period --

16        THE INTERPRETER:  I haven't finished yet.

17   Q    I'm sorry.

18   A    Let me just mention that on July 25, 2001, Darwazah was

19   killed by the IDF, Israel Defense Forces.

20   Q    What amount of money was transferred to Darwazah's wife

21   at this Arab Bank account over that one-year period?

22   A    $302,000, sir.

23   Q    And what account number was associated with that

24   $302,000 worth of transfers?

25   A    They were transferred to the Arab Bank branch in Nablus

1    to a bank account, and the number of that account was

2    4286871510

3    Q    And, for the record, these 20 transfers preadmitted are

4    2055, 2070, 2086, 2110, 2124, 2135, 2140, 2149, 2160, 2165,

5    2172, 2175, 2180, 2186, 2190, 2194, 2206, 2208, and 09, and

6    2224.

7              May I have slide 31, please.

8              Who was Jamal Salim?

9    A    Jamal Salim was one of the more prominent leaders of

10   Hamas.  He was a public figure in Nablus, and actually his

11   influence ranged all over the West Bank.  He was also a

12   member of the alpha today /PHAOS society, which is an

13   organization we'll discuss later.  He was also a member of

14   various other Hamas institutions.

15   Q    Did you find any wire transfers to Jamal Salim during

16   the period of time December 2000 through March 2001 to Arab

17   Bank?

18   A    I managed to detect three such transfers, sir.

19   Q    For how much during that four-month period?

20   A    The sum was $13,500.

21   Q    What was the account number associated with those

22   transfers?

23   A    4033906500.

24   Q    For the record,those are 1921, 22, and also 2116.

25             May I have Slide 32.

A. Spitzen - Direct/Turner                1465

1            Who were Jamal and Muna Mansur?

2   A    Jamal and Muna Mansur, they are senior people in Hamas.

3   I will begin with Jamal.  He was a senior leader at the

4   level of all of the West Bank.  He was spokesperson for

5   Hamas in certain areas, very famous.  He also had a research

6   bureau that was considered a Hamas office, was sort of a

7   media bureau from which he spoke on behalf of Hamas.  He was

8   killed in 2001 by Israel.

9   Q    Did Jamal Mansur spend time in prison?

10  A    Jamal Mansur, yes, was arrested by the Palestinian

11  authorities between 1997 and 2000, and imprisoned in Israel

12  between 1985 until 1991.

13            (Continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

A. SPITZEN - DIRECT/MR. TURNER          1466

1  Q    Was Muna Mansur likewise involved with Hamas publicly?

2  A    Yes, of course.  Muna Mansur is, first of all, a

3  parliament member on behalf of Hamas.  She was on behalf of

4  the reform and change -- and she is also known as a public

5  figure of Hamas, a leader of women.  She was also a member

6  of the board of directors of the al-Tadamun Charitable

7  Society, which we will discuss later.

8  Q    Did you find any wire transfers to either Jamal or Muna

9  Mansur through the Arab Bank during the period of time

10  December of 2000 to September of 2001?

11  A    I managed to locate four such transfers; the total of

12  amount of $85,000.

13  Q    And what account number was associated with those

14  transfers?

15  A    The account number in the Nablus Arab Bank on behalf of

16  Muna Salim Saleh Munsur was 4064788500.

17  Q    And for the record, those Swiss transfers are 2019,

18  2121, 2154, and 2158.

19        MR. TURNER:  May I have slide 33, please.

20  Q    Who was Abd al-Khaleq al-Natsheh?

21  A    Abd al-Khaleq al-Natsheh was a senior Hamas leader in

22  Hebron.  He was considered head of Hamas in Hebron until

23  2002, when he was arrested by Israel.  He was also a

24  spokesperson for Hamas in Hebron until 2002.  According to

25  different publications he was a member of the political

A. SPITZEN - DIRECT/MR. TURNER                1467

1   bureau of Hamas where there were also members of the West

2   Bank, and he was published -- he became famous in public as

3   a member of that bureau.

4          Beyond his activities as director general of

5   Islamic Charitable Society of Hebron, he was also involved

6   in operative terror activities, military kind of terror

7   activities, and he was jailed for this for a long period of

8   time.

9   Q    Now, was al-Natsheh someone who publicly in the media

10  exposed himself as a member of Hamas and a leader of Hamas?

11  A    Yes, of course, sir.  First of all, he was the official

12  spokesman of the Hamas in Hebron?

13         MR. TURNER:  Show the witness only slide 34,

14  please.

15  Q    Can you identify 1206, Mr. Spitzen?

16  A    Yes, sir.

17  Q    Is this something that you relied upon in helping reach

18  the conclusion about Mr. Al-Natsheh and his role in Hamas?

19  A    Yes.  Among many other documents, this too has helped

20  me.

21  Q    How did it help you?

22         MR. STEPHENS:  I'm going to object, your Honor,

23  this has been --

24         THE COURT:  To the question or to the answer?

25         MR. STEPHENS:  Since I don't know what he's going

A. SPITZEN - DIRECT/MR. TURNER            1468

1   to say, but it sounds like a long one.

2            THE COURT:  I want to see the court reporter and

3   the interpreter at sidebar and I'll hear the answer first.

4            (Continued on the next page for sidebar.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A. SPITZEN - DIRECT/MR. TURNER                    1469

1            (Sidebar conference begins.)

2            THE COURT:  All right.  For the record, I have

3    directed the plaintiffs not to show the slide, the newspaper

4    article in question.  The only question to the witness was

5    how did this help you, and now I'd like to hear the answer

6    in English at sidebar.

7            INTERPRETER:  Okay.  So the answer was according

8    to an official publication at the newspaper al-Hayat

9    al-Jadia from November 13th, 2001, in the symposium that was

10   held in Hebron, this is where it is officially and publicly

11   mentioned that Abd al-Khaleq al-Natsheh was a member of the

12   Hamas political bureau.  This is the most senior institution

13   of the organization.  And it says there are people there

14   from the West Bank and from Gaza, even though mostly people

15   from outside the territories are members of this

16   organization.

17           THE COURT:  Okay.  I'm going to sustain the

18   objection and strike the answer.

19           MR. TURNER:  Just for clarification, you don't

20   want me to have him explain, I don't know how to do it other

21   than he doesn't speak any English, other than to say how did

22   this help you.

23           THE COURT:  Well, you can ask him what it is.

24   I'll accept his answer it's a newspaper article.  And you're

25   going to ask him how did it help you.  What you can't do is

A. SPITZEN - DIRECT/MR. TURNER          1470

1    have him repeat the substance of the article, especially in

2    as much detail as he gave it here.  He can generally allude

3    to the fact that there is a newspaper article that he relied

4    on which supported his view of the public nature of the

5    individual.

6              MR. TURNER:  Got you.

7              (End of sidebar conference.)

8              (Continued on the next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A. SPITZEN - DIRECT/MR. TURNER          1471

1  Q    Mr. Spitzen, without going into detail on the contents

2  of the article that you're looking at on the screen, can you

3  very generally tell us why this helped you and how this

4  helped you?

5  A    It helped me because I could defined the level of

6  seniority of the Hamas organization, and then it was

7  published in public.

8            MR. TURNER:  Now, can we go back to slide 33,

9  please.

10 Q    Were you able to find any wire transfers to al-Natsheh

11 in 2001 at Arab Bank?

12 A    Yes, sir, I found one transfer.

13 Q    For how much money?

14 A    $15,000.

15 Q    And what month?

16 A    July 2001.

17 Q    In what account number at Arab Bank was associated with

18 that transfer?

19 A    75678475510.

20           MR. TURNER:  For the record, that transfer is

21 1915.  May I have slide 35.

22 Q    Who is Mahdi Shaker al-Hanbali?

23 A    Mahdi Shaker al-Hanbali was also known as Hamas

24 personality.  He was a member of the same party, the reform

25 and change party of Hamas that went for elections in Nablus.

A. SPITZEN - DIRECT/MR. TURNER          1472

1   He was elected deputy mayor of Nablus.  And obviously, you

2   don't run for elections if nobody knows you.  He was very

3   known before that.  He was the secretary of the al-Tadamun

4   Sports Club, which we will also discuss later, that belonged

5   to the al-Tadamun Society.

6   Q    Did you find any money wire transfers for the one and a

7   half year period from July of 2000 to February of 2002 at

8   Arab Bank for al-Hanbali?

9   A    Yes.  I managed to identify 28 such transfers between

10  July 2000 and February 2002.

11  Q    For what amount of money?

12  A    $397,450.

13  Q    What account number at Arab Bank was associated with

14  these wire transfers to al-Hanbali?

15  A    4026306510.

16          MR. TURNER:  And for the record, these are pre

17  admitted as 1942 through 1968 and also 2084.  May I have

18  slide 36?

19  Q    Who was Khaled Muhammad Amin al-Haj?

20  A    Khaled Muhammad al-Haj was a senior Hamas leader in the

21  Jenin area.  He was a spokesman for the Jenin area, so he

22  was known in public.  He was arrested several times by

23  Israel, by the Palestinian authority, and then by Israel

24  again for different periods of time, and he was connected to

25  military terrorist activity of Hamas.

1  Q    Was he a well-known figure in the Jenin area?

2           INTERPRETER:  Can you repeat that, please?

3  Q    Was he a well-known figure in the Jenin area?

4  A    Of course he was the spokesman of Hamas, so he was an

5  official representative of Hamas, he spoke on their behalf.

6  Journalists would go to him if necessary, et cetera.

7  Q    Did you find any wire transfers to Khaled Muhammad Amin

8  al-Haj between November 2000 and February of 2002 at the

9  Arab Bank?

10 A    Yes, I found 17 such transfers.

11 Q    For what amount of money?

12 A    The total amount is $177,500.

13 Q    And what account numbers were associated with those

14 transfers at Arab Bank?

15 A    Khaled Muhammad Amin al-Haj had an account in Arab

16 Bank, another account, if I remember correctly, in the

17 Chtaura Arab Bank.  I can check it with the transfers, if

18 you would like.  His bank account at the Arab Bank was

19 5678110510, and the account in the other bank, which I must

20 make sure is really the other bank was 567811500.

21          MR. TURNER:  And for the record, those transfers

22 are 1984 through 1989, and then 2064, 2069, 2093, 2101,

23 2107, 2127, 2132, 2137, 2142 and 2178.

24          (The witness is answering in Arabic.)

25          MR. STEPHENS:  I didn't hear the question.

A. SPITZEN - DIRECT/MR. TURNER                    1474

1     THE COURT:  Sustained.  Ask another question.

2   Q    Were you able to find the Swiss record you were looking

3   for?

4   A    Yes, sir.

5   Q    What did you learn?

6   A    Both accounts are in the Arab Bank, the Arab Bank

7   branch of Jenin.  There is simply a difference in numbers, I

8   don't know if these are different accounts or the same

9   accounts with two numbers, there are two different numbers;

10  one with 500 and the other with 510, but they both belong to

11  the same person.

12  Q    At Arab Bank?

13  A    At Arab Bank in Jenin.

14       MR. TURNER:  And finally, may I have 37.

15  Q    Who was Nada Jamal al-Jayousi?

16  A    Nada Jamal al-Jayousi is a serial Hamas personality.

17  She is married to a senior Hamas leader, but she is also a

18  personality in her own right, a leader of women.  For a time

19  she was chairman of the al-Huda Society, which we're going

20  to discuss later.  Originally, she came from Tulkarem.  I

21  think that's it.

22  Q    Were you able to find any wire transfers to Nada Jamal

23  al-Jayousi at Arab Bank?

24  A    Yes, sir.

25  Q    How many transfers during the period July 2000 to

A. SPITZEN - DIRECT/MR. TURNER          1475

1   December 2001?

2   A    37 such transfers.

3   Q    And what amount of money?

4   A    $610,000.

5   Q    Now, we've been through all after the accounts shown on

6   the two slides that we showed earlier, and just sort of a

7   collective question:  Did you have access to any of those

8   bank account records, the full records from Arab Bank for

9   any of those accounts?

10  A    No, sir, I had no access to the Arab Bank records

11  collected with the accounts that were discussed so far.

12  Q    And why not?

13  A    Because the Arab Bank had refused to transfer the bank

14  records for these people.

15          MR. TURNER:  Your Honor, this is a good breaking

16  point, and I've got to read these 37 numbers in for the

17  transfers for al-Jayousi, but I'll save everybody the time

18  and do that on the break.

19          THE COURT:  All right.  Let's let the jury take

20  their break.  We'll reconvene, ladies and gentlemen, at 20

21  to 12:00.  Please don't talk about the case amongst

22  yourselves.  Thank you for your attention and we'll see you

23  shortly.

24          (Jury is out of the courtroom at 11:23 a.m.)

25          THE COURT:  All right.  Do you want to read those

PROCEEDINGS                    1476

1    in?

2            MR. TURNER:  I just gave her the sheet and she can

3    just type them in.

4            THE COURT:  Okay.  Any problem with doing it that

5    way?

6            MR. STEPHENS:  No.

7            THE COURT:  Okay.  Recess until 20 of 12.

8            (The Exhibits for the deposits are noted as 2003,

9    2006, 2009, 2022, 2030, 2042, 2043, 2045, 2054, 2057, 2062,

10   2068, 2078, 2082, 2095, 2102, 2104, 2109, 2122, 2126 2136,

11   2139, 2150, 2156, 2164, 2171, 2176, 2181, 2191, 2193, 2197,

12   2207, 2212, 2216, 2222, 2225, 4768 and 4789.)

13           (Proceedings were recessed and recalled.)

14           (Honorable Brian M. Cogan takes the bench.)

15           THE COURT:  All right.  Be seated for just a

16   minute.

17           Just in anticipation of what's coming, there will

18   be some particular issues with slides 56 and 57, that's an

19   Apostilled conviction document, that's 56, and the other is

20   a PA document.  Now, I don't know, Mr. Turner, if you're

21   going to be able to have this witness lay a foundation for

22   those documents.  It may be that we have to treat them

23   similarly the way we treated exhibit -- slide number, I

24   think it was 34.  So please keep that in mind.  That's my

25   leaning at the moment, depending on what I hear.

PROCEEDINGS                              1477

1          MR. TURNER:  I believe the Falah Nada conviction

2    is Apostilled.

3          THE COURT:  Is that right?  That will solve that.

4          MR. OSEN:  I think that one was resolved.  It may

5    be the earlier copy that the Court has, but we've

6    subsequently spoken.

7          THE COURT:  Okay.  That's fine.  All right.  Let's

8    get the jury.

9          MR. STEPHENS:  Your Honor, may I ask a question?

10          THE COURT:  Sure.

11          MR. STEPHENS:  I take it that the other side and

12    us, having sent you all these slides as the trial

13    progresses, means they're actually part of the record.  And

14    if they're not, I would actually request that they be made

15    part of court exhibits so that they can refer to it later

16    on.

17          THE COURT:  I'm not sure I understand what you

18    mean.  They're not part of the trial record unless I admit

19    them into evidence.  When they are used for demonstrative

20    purposes in front of the jury, they're not part of the trial

21    record, they're just demonstratives.  If you mean you want

22    them in the record for purposes of preserving the record,

23    well, they have been filed with the Court, so the filing is

24    of public record, just not part of the trial record.  Does

25    that answer your question?

A. SPITZEN - DIRECT/MR. TURNER                 1478

1          MR. STEPHENS:  All right.  Yes, it does.  Thank
2    you.
3          MR. TURNER:  About how long do you want me to go
4    before I stop for lunch?
5          THE COURT:  You're not going to finish before
6    lunch?
7          MR. TURNER:  No, sir.
8          THE COURT:  Okay.  Let's go for about an hour,
9    maybe an hour and 15 minutes.  See how you feel, somewhere
10   between an hour and an hour and 15 minutes.
11         MR. TURNER:  Yes, sir.
12         (Jury is in the courtroom at 11:44 a.m.)
13         THE COURT:  Be seated, please.  Please continue,
14   Mr. Turner.
15         MR. TURNER:  Thank you, your Honor.
16   BY MR. TURNER:
17   Q    Okay.  Let's change directions, Mr. Spitzen.  I would
18   like to focus some time now on the Hamas network of social
19   organizations.  What is Da'wa?
20   A    First of all, Da'wa is a word in Arabic, and what it
21   means literally is this call to return to religion; that is
22   the original meaning of the word.  We, that is the
23   enforcement agencies in Israel, and that includes COGAT,
24   that we use the word Da'wa to refer to the network, to the
25   civil infrastructure of the Hamas, the network of

A. SPITZEN - DIRECT/MR. TURNER              1479

1    organizations.  This is the civilian organization

2    infrastructure of Hamas.

3    Q    Have you had an opportunity to prepare a slide that

4    will help you discuss the key factors to look at when

5    evaluating the role of these charitable institutions in

6    zakat?

7    A    Yes, I did prepare a slide that looks or examines the

8    criteria that are needed in order to evaluate the level of

9    control over these organizations.

10                MR. TURNER:  May I have slide 38, please.

11   Q    Let's look at the first criteria; the organization's

12   history, leadership and key employees.  Why is that

13   important if you're trying to evaluate the relationship

14   between Hamas and the social network or society?

15   A    Okay.  The first criteria is important because you look

16   into the history of the organization.  You see its ties with

17   Hamas throughout the years, because some of these

18   organizations, actually, Hamas developed from them and

19   others became Hamas over the years, others were founded by

20   Hamas.  This is why it's very important.

21                The leadership of the organization, the people who

22   run the organization, whom are involved in its daily

23   operation, they're the ones who give the tone, so this is

24   why this is an important criteria.  Of course, it's the

25   leaders, the director general, the members of the board; if

1    these are Hamas operatives or prominent Hamas operatives,

2    then they manage that association according to their

3    ideology, to their beliefs, this is why this is important.

4    Q    The second criteria has to do with both ideology and

5    also activities and the self identification of the

6    organization by Hamas.  Why is that criteria important in

7    evaluating these charitable institutions?

8    A    This is also an important criteria or rather an

9    important guideline.  Actually, if such line covers more

10   than one criteria, but we chose to somehow group them

11   together for the benefit of the court to make things

12   clearer.  I don't think we need to add much regarding

13   ideology, because if an organization is managed by Hamas

14   ideology or according to Hamas' guidelines, then it means

15   that this is what it gives its supporters or its followers,

16   this is why it's very important.

17            And as for the activity of the organization, this

18   is the life and soul of the organization, it has to do with

19   everything it does with all its activities.  And, for

20   example, if the organization gives money to Hamas prisoners

21   or to the families of suicide bombers in which areas the

22   activities does it focus, this gives you an immediate view

23   regarding by whom it is controlled and what are the

24   objectives of the organization.

25            The identification of an organization is also very

A. SPITZEN - DIRECT/MR. TURNER          1481

1  important.  And some of the organizations were actually

2  identified by Hamas as Hamas organizations.  In some cases

3  they even used the expression "it is ours", therefore -- and

4  there is also great importance to how the public views the

5  organization, how the media views it as well, how the media

6  views whom it is controlled by, if the media views it as a

7  Hamas organization.

8          And if the organization itself supports that, this

9  is another criteria that re-emphasizes this -- reinforces

10  this identity.

11  Q    The third criteria has to do with ties with other parts

12  of Hamas, but also funding.  Why is funding important?

13  A    Financing is very important for terrorism, it is the

14  essence of its existence.  Without that, it cannot exist.

15  And in our case, it's also very important to know who

16  supports it or what supports it, because some of the

17  foundations that we will discuss later support Hamas.  Other

18  foundations were actually founded by Hamas or it is their

19  mission to support and help Hamas, this is why it's

20  important to see who is behind the funds.

21  Q    The fourth criteria; evidence recovered from searches

22  of the organization's offices.  What did you mean by

23  searches?

24  A    Well, during defensive shield; that is, that wave of

25  terrorism that had swept Israel between the years 2000 into

A. SPITZEN - DIRECT/MR. TURNER          1482

1   2004, in order to fight this terrorism, searches were

2   conducted in the offices of these Hamas societies and

3   associations.  Most of them were actually outlawed by Israel

4   as Hamas organizations.  These searches led to findings, and

5   these findings reinforce the suspicion or the apprehension

6   that indeed -- or the fear that these organizations are

7   indeed Hamas organizations.

8   Q    Were all of the charitable associations searched or

9   just some of them?

10  A    Only some of them.

11  Q    Can you give us an idea of approximately what

12  percentage of the charitable associations were searched

13  during the relevant timeframe?

14           MR. STEPHENS:  Excuse me, your Honor, foundation.

15           THE COURT:  No, I think that's for cross.

16  Overruled.

17           THE WITNESS:  It's a bit difficult to talk about

18  any specific percentage, but I would say that it's no more

19  than 20 percent of these associations, perhaps 20 to

20  25 percent which were searched.

21  Q    And finally, the fifth criteria, the government actions

22  against the organizations.  What do you mean by that?

23  A    With your permission, I'd like to go back to the

24  previous question, because perhaps it wasn't completely

25  clear to me.

A. SPITZEN - DIRECT/MR. TURNER          1483

1          Did you mean the percentage of organizations

2     mentioned in this case or out of the general number of

3     associations?  Because the number, the percentage which I

4     provided was regarding the general number of associations.

5     Q    The general number was what I was seeking.

6     A    Okay.

7     Q    We'll talk about the specific ones shortly.

8          Going back to my question on criteria five?

9     A    The organizations which were suspect of being Hamas

10    organizations, they were identified by various means.  It

11    has to do with -- by various different measures were taken

12    against them by different governments.  It is related to the

13    interests and their types of activities.

14         Some of the Hamas organizations were shut down,

15    others were outlawed, others were shut down temporarily;

16    sometimes funds were confiscated.

17         Every government operated differently.  Israel

18    conducted searches, shut down offices, prosecuted the

19    operatives, sometimes simply warned them.  It didn't always

20    take drastic measures.  Sometimes simply the management was

21    summoned or forewarned.  The Palestinian government

22    confiscated funds.  It also shut down associations for brief

23    periods of time.  There was also surveillance conducted

24    against some of the organizations, every once in awhile they

25    would work the operatives.

1         The US, as far as I know, outlawed the al-Salah

2    Association in Gaza, and it also dealt with various

3    foundations such as the HLF, the Holy Land Foundation, which

4    it transferred funds for terrorism.

5    Q    When between 2000 to 2005 did Israel outlaw some of

6    these associations?

7              MR. STEPHENS:  Your Honor.

8              THE COURT:  Yes?

9              MR. STEPHENS:  Can we approach for a moment,

10   please?

11             THE COURT:  Sure.

12             (Continued on the next page for sidebar.)

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                    1485

1          (Sidebar conference begins.)

2          MR. STEPHENS:  The Court has the instruction on

3  this, the organizations, I think it's an appropriate time to

4  give it now, because he's about to --

5          THE COURT:  I thought the appropriate time to give

6  it would be when he introduced the list into evidence and

7  it's received in evidence.  If I do it now, I don't think

8  the jury will know what I'm talking about.

9          MR. STEPHENS:  Is that next?

10         MR. TURNER:  Yes.

11         MR. OSEN:  And, your Honor, we do have objection

12  in part to at least the way the defendant phrased that.

13         THE COURT:  Well, here is what I intend to do,

14  which is kind of an edit of defendants.  I'm going to say

15  they're to consider it solely as evidence tending to show

16  that the charities mentioned therein were connected to

17  Hamas.  They are not to consider it as evidence that the

18  defendant had any knowledge of this list, as there is no

19  evidence that this list was made publicly available until

20  after the attacks.

21         MR. OSEN:  We would object to that last part, your

22  Honor.  The witness doesn't offer any opinion on what the

23  bank knew about the lists, so that part is fine.  But as to

24  what is publicly available or not, Mr. Turner can walk him

25  through the evidence of that, but this is not a secret list

SIDEBAR CONFERENCE                    1486

1   so that --

2           THE COURT:  No, but it didn't exist at the time of

3   the attacks.

4           MR. OSEN:  Oh, it did, of course.

5           THE COURT:  This is the 2007 list you're putting

6   in.

7           MR. OSEN:  The version that is in evidence is from

8   2007, but the actual list and the parts we're discussing

9   were issued in February of 2002.

10          THE COURT:  How does the jury know that?

11          MR. TURNER:  The document says it.

12          THE COURT:  I see.  All right.  I'll delete the

13  last clause.

14          MR. STEPHENS:  But, your Honor, it wasn't publicly

15  available, unless they can draw that out of the witness.

16  The way this worked --

17          THE COURT:  Well, they'll have to do that.  I

18  assume they'll have to do that.  If they don't do that, then

19  I'll put back in that language.

20              (End of sidebar conference.)

21              (Continued on the next page.)

22

23

24

25

A. SPITZEN - DIRECT/MR. TURNER                1487

1          MR. TURNER:  May I proceed?

2          You can go ahead and ask him the question.  Do you

3    want me to ask it again?

4          INTERPRETER:  Yes, please.

5    BY MR. TURNER:

6    Q    When between 2000 to 2005 were some of these charitable

7    organizations we're going to be discusses outlawed by

8    Israel?

9    A    Yes, sir.  Yes, there was one incident of outlawing

10   many organizations in February of 2002, and then later --

11   February 22nd, 2002, and then later there were others.  The

12   last one to be outlawed was in 2006 in Nablus.

13         MR. TURNER:  Show the witness only, please, 1078.

14   Q    Do you recognize 1078?

15   A    Yes, sir.

16   Q    And what is 1078?

17   A    This is the opening statement of the designation of

18   these organizations on behalf of the Israeli Ministry of

19   Justice.

20         MR. TURNER:  We offer 1078.

21         THE COURT:  This is Apostille, is it not?

22         MR. TURNER:  Yes, sir.

23         THE COURT:  All right.  Any objection beyond

24   authenticity that wasn't previously raised?  That big ribbon

25   on the front is I think Apostilled.

1          MR. OSEN:  May we have a sidebar for a moment?

2          THE COURT:  Okay.

3          (Continued on the next page for sidebar.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                1489

1              (Sidebar conference begins.)

2              THE COURT:  Doesn't the ribbon mean Apostilled?

3              MR. OSEN:  No.

4              THE COURT:  Oh, it doesn't?

5              MR. TURNER:  It's first place, your Honor.

6              MR. OSEN:  No.  This --

7              THE COURT:  Then you have to lay a better

8    foundation for it.

9              MR. OSEN:  Correct.

10             THE COURT:  How does he know what it is?

11             MR. OSEN:  That's fine.

12             THE COURT:  Okay.

13             MR. STEPHENS:  As long as we're here?

14             THE COURT:  Something else?

15             MR. STEPHENS:  Yes.  Aside from laying a

16   foundation for the document, we continue to object to the

17   subject matter of the document, which is --

18             THE COURT:  Yes, that objection has been

19   overruled.

20             (End of sidebar conference.)

21             (Continued on the next page.)

22

23

24

25

A. SPITZEN - DIRECT/MR. TURNER          1490

1  BY MR. TURNER:

2  Q    What department within the Israeli government is

3  responsible for publishing this list?

4  A    The publication of this list is done by two

5  departments; one of them is the Ministry of Defense and

6  later also by the Ministry of Justice.

7  Q    And did you participate personally in the process that

8  was undertaken in order to result in the creation of this

9  document?

10 A    Yes.  Generally speaking, yes, we participated in this

11 process because we, COGAT, has just fed many documents and

12 materials towards a designation, but the designation itself

13 was not done by COGAT.

14 Q    And does this particular document that's created and

15 authorized by the Government of Israel, is this something

16 that was created and published in the equivalent of our

17 federal register within Israel?

18            MR. STEPHENS:  Objection, your Honor.

19            THE COURT:  Overruled.  Well, I'll sustain it as

20 to form.

21            MR. TURNER:  As to form?

22            THE COURT:  Yes.

23 Q    Where was this document published within Israel?

24 A    These outlying documents of the charitable organization

25 were published in more than one place.  First of all, the

A. SPITZEN - DIRECT/MR. TURNER          1491

1   legal advisors of the ministry of defense published it in

2   the site of the ministry of the defense under the heading

3   "Declarations."

4           Later, it was published by the legal advisor of

5   the central command of the army, because the head of the

6   central command is the sovereign in this territory, and it

7   took several months until he provided or Apostilled to give

8   the official approval for these declarations.  And his

9   designations were published in the chief the MAG, the chief

10  military advocacy.

11          And later, like any bylaw or any kind of

12  legislation in Israel, it was published in the official

13  gazette of Israel.

14  Q   What was the purpose or what was the purpose of

15  publishing this list publicly?

16          MR. STEPHENS:  Objection, your Honor.

17          THE COURT:  Overruled.

18  A   The publication is aimed at having people in the field

19  made aware that no contact can be maintained with this

20  organization, no money can be transferred to it, no support

21  to be given to it, because, in effect, this is an illegal

22  organization.

23          I'm not a legal advisor, so I'm not very familiar

24  with the finer points of what is allowed and what is

25  permitted, but in my opinion nothing is permitted.  I don't

A. SPITZEN - DIRECT/MR. TURNER          1492

1    want to go into it.

2              MR. STEPHENS:  Objection, your Honor.

3              THE COURT:  Strike the last sentence of the

4    answer.

5    BY MR. TURNER:

6    Q    From the standpoint of the publication of this

7    document, was this document kept secret within the Israeli

8    government or was this something made available to anybody

9    that was interested in knowing about who was on this list?

10             MR. STEPHENS:  Objection, your Honor.

11             THE COURT:  Overruled.

12   A    The publication was aimed at announcing to the public,

13   the general public, that a certain association was illegal.

14   Each such act in Israel is public.

15   Q    And in reviewing this particular item, have you been

16   able to verify that this is an authentic copy of the

17   original?

18   A    Yes.  I'm familiar with these declarations and I

19   examined them one after the other, and they are identical.

20             MR. TURNER:  1078 is offered.

21             THE COURT:  All right.  I need a sidebar.

22             (Continued on the next page for sidebar.)

23

24

25

SIDEBAR CONFERENCE                    1493

1          (Sidebar conference begins.)

2          THE COURT:  Okay.  Based on what I've heard, I

3    would grant plaintiff's request to strike the last clause of

4    the last sentence a limiting instruction; it seems to me the

5    witness has testified that the document was publicly

6    available.

7          I guess what I'm not understanding is why I should

8    be giving any limiting instruction at all since it was

9    publicly available and since its purpose was to put the

10   public on notice, why would it not be evidence from which

11   the jury could infer that the defendant had knowledge of

12   this list?

13         MR. OSEN:  Your Honor, the witnesses has testified

14   from the bank, including ones we've played, that they

15   considered the Israeli list important and something they

16   would have considered.

17         According to the bank, they had no copies of the

18   list in their possession.  But, of course, we don't know

19   whether there are any communications about that list in

20   their possession, since they won't turn over their files.

21         So the only thing the bank can say about this is

22   that they didn't have physical copies of the list that were

23   produced to us.  So we agree that they're free to cross

24   examine a witness about this, but he's not offering on

25   opinion about whether Arab Bank knew anything about these

SIDEBAR CONFERENCE                    1494

1   accountholders or these parties.

2          THE COURT:  So the answer to my question is the

3   plaintiffs now oppose any limiting instruction; is that

4   correct?

5          MR. OSEN:  Correct.

6          MR. STEPHENS:  If he were asked, he would say that

7   the list -- first of all, he doesn't know anything about the

8   list, he doesn't know what criteria went into it, he didn't

9   make a recommendation about it.  All he did was hear about

10  it and make informal recommendations.  He doesn't know why

11  it was published or on what basis --

12         THE COURT:  He did say why it was published, to

13  put the public on notice of condemnation so they wouldn't

14  deal with these organizations, he said that.

15         MR. STEPHENS:  He doesn't know that either, if you

16  look at his depositions.

17         THE COURT:  I don't have that in front of me.  I

18  have the testimony here which suggests it's a matter of

19  cross-examination.

20         MR. OSEN:  Your Honor, Mr. Spitzen --

21         MR. STEPHENS:  Can I finish my -- please?

22         THE COURT:  Yes.

23         MR. OSEN:  Sorry.

24         MR. STEPHENS:  The designation by the ministry of

25  defense applies only in Israel.  And then you've got the

SIDEBAR CONFERENCE                    1495

1    central command, which is a military, it's, you know, the

2    generals, and they do something else with it.  And the

3    application of the list to the West Bank and Gaza is not

4    something that he can establish or can be established.

5              MR. OSEN:  I don't think that's correct either,

6    your Honor, as a matter or law, but I don't think the jury

7    needs to hear a dissertation on military government law.

8              THE COURT:  Well, look, as I said, it seems to me

9    the fact that the list was out there suggests that the jury

10   could draw an inference that the bank knew or was reckless

11   in not knowing about that list.

12             The defendant is free to say we didn't know and we

13   were not unreasonable in not knowing about that list,

14   because these are operations in the Gaza or whatever else

15   they want, but I don't see the basis for giving a limiting

16   instruction that says they can't consider it as evidence

17   that the defendant had any knowledge, because it is at least

18   circumstantial evidence, from which an inference could be

19   drawn.

20             So I'm going to deny the request for a limiting

21   instruction and receive the exhibit without qualification.

22             (End of sidebar conference.)

23             (Continued on the next page.)

24

25

A. SPITZEN - DIRECT/MR. TURNER          1496

1           THE COURT:  All right.  The exhibit is received

2    over objection.

3           (Plaintiff Exhibit 1078 was admitted into

4    evidence.)

5           MR. TURNER:  Thank you, your Honor.  May we

6    display?

7           THE COURT:  You may.

8           MR. TURNER:  Please go to page three at the

9    bottom.  If you could, blow that up, please.

10   BY MR. TURNER:

11   Q    Now, we're looking at page three of 1078, Mr. Spitzen.

12   Would you tell us why this list is important for purposes of

13   the public being placed on notice about the illegal nature

14   of these charitable associations listed?

15          MR. STEPHENS:  Objection, your Honor, no

16   foundation.

17          THE COURT:  I'm going to sustain the objection

18   without a better foundation.

19   Q    Would you explain the significance of paragraph 17,

20   Mr. Spitzen?

21          MR. STEPHENS:  I'm sorry, your Honor, may we

22   discuss this for a moment?

23          THE COURT:  Sure.

24          (Continued on the next page for sidebar.)

25

SIDEBAR CONFERENCE                    1497

1          (Sidebar conference begins.)

2          MR. STEPHENS:  The witness testified that he's not

3    a legal advisor, he doesn't know, you know, all of the

4    material.  He doesn't know exactly how the list is supposed

5    to be applied, he thinks he knows how it's supposed to be

6    applied.  And now they're actually asking him, you know,

7    what's the policy behind the list and what's the list

8    supposed to do; he's disqualified himself for talking about

9    that.

10          THE COURT:  Well, I don't know about that.  But

11    the question he was asked is why is this important.  And

12    what I'd like to know from the plaintiffs is in qualifying

13    him as an expert earlier in his testimony, what does he say

14    that permits him to have special expertise about why this

15    list is important?

16          MR. OSEN:  Well, your Honor, first of all, its

17    listed as, amongst the criteria that he uses in determining

18    whether an organization is or is not controlled by Hamas.

19          THE COURT:  You could ask him why that's important

20    to you.

21          MR. OSEN:  Yes, that's number one.

22          Number two, Mr. Spitzen testified that as the

23    Palestinian affairs department senior person, he

24    participated in the process of designating these

25    institutions, so...

SIDEBAR CONFERENCE                    1498

1      THE COURT:  That's true.

2      MR. OSEN:  So while he's not the legal person,

3  it's not, you know, the legal counsel of treasury, he is

4  Mr. -- Dr. Levitt's counterpart, if you will, in presenting

5  the materials that lead to the designation.

6      THE COURT:  All right.

7      MR. STEPHENS:  Look it --

8      THE COURT:  Go ahead.

9      MR. STEPHENS:  He's going to testify about it's

10  important to the government of Israel or the public in

11  general or to the United States of America?  He's not

12  qualified to do any of that, your Honor.  If he's -- why was

13  it important to you in reaching your opinion, that he

14  certainly can say.

15      THE COURT:  Well, he can clearly do that.  But I

16  also think based on his prior employment and participation

17  in the collection of data that goes into building these

18  lists, he can also testify why the government Israel

19  prepares these lists, I think he is qualified to do that.

20      It's not a legal opinion, I reject that, it is a

21  practical opinion in the nonlegal world as to what's

22  supposed to happen, so I will allow a modified form of the

23  question that has to be put -- it has to be narrower than

24  the question that was put.

25      MR. OSEN:  Thank you.

SIDEBAR CONFERENCE                1499

1          (End of sidebar conference.)

2          (Continued on the next page.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. TURNER:  May I proceed?

2          THE COURT:  You may.

3    BY MR. TURNER:

4    Q    Again, Mr. Spitzen, explain to us the significance to

5    you of paragraph 17, and it's going to spill over to the

6    next page as well, in the context of evaluating these

7    charitable institutions during the 2000 to 2004 timeframe?

8    A    I took into account as one of the criteria for

9    evaluating the level of control of Hamas and the

10   identification of these organizations.  So one of the

11   criteria was the activities of states, and one of these

12   states is the State of Israel.

13          So outlawing these organizations is important in

14   evaluating whether they are Hamas organizations or not Hamas

15   organizations.  Most of the organizations that appear here

16   are included in this designation of February 25, 2002, and

17   the language that's these organizations are other, the same

18   as Hamas or support Hamas, this is why it was important to

19   me.

20   Q    Let's go to page four.  This is the rest of the list.

21   Now, Mr. Spitzen, was the Islamic Center of Gaza part of

22   this list?

23   A    Yes, sir.

24   Q    And the Islamic Society of Gaza, was it part of the

25   list?

1    A    Yes, sir.

2    Q    And what about the al-Salah Islamic Society?

3    A    It also appears in the records and actually they appear

4    right at the beginning the Islamic Society, the Salah

5    Association, as well as Mujama, all appear at the beginning.

6    Q    And what about the al-Nur Prisoner Society?

7    A    The al-Nur Association also appears there, it appears

8    on the second page under the numeric code of "I".

9    Q    And what about the Islamic Charitable Society of

10   Hebron?

11   A    It also appears here.

12   Q    What about the al-Islah Charitable Society Ramallah?

13   A    Al-Islah also appears here.

14   Q    What about the al-Tadamun Charitable Society Nablus?

15   A    It also appears here.  It is the Tadamun Solidarity

16   Society.

17   Q    And what about the zakat committees from Nablus,

18   Tulkarem and Jenin?

19   A    The zakat committees of Tulkarem, Nablus and Jenin also

20   appears on this list.

21   Q    Now, have you had an opportunity to prepare a slide

22   that will help us discuss four of these societies that were

23   located in the Gaza Strip?

24   A    Yes, sir.

25         MR. TURNER:  May I show 40?

A. SPITZEN - DIRECT/MR. TURNER        1502

1            THE COURT:  Yes.

2   Q    Have you formed an opinion, Mr. Spitzen, as to whether

3   each of those organizations shown were controlled by Hamas

4   during the period of 2000 through 2005?

5   A    Yes, sir.

6   Q    And were these four institutions that are shown on this

7   particular chart, were these included on the Israel

8   designation from 2002 that we just looked at?

9   A    Yes, sir.

10  Q    Was this information made available during that

11  timeframe to the public, in general, including businesses?

12           MR. STEPHENS:  Objection, your Honor.

13           THE COURT:  Overruled.  Do you need a sidebar?

14           MR. STEPHENS:  Probably not necessary, I don't

15  know the information the question refers to.

16           THE COURT:  Okay.  Hang on one second.  Overruled.

17           THE WITNESS:  This information was known to the

18  general public.  Like I said, it was published in various

19  places.

20           MR. TURNER:  Let's go to slide 41.  May I display

21  41, your Honor?

22  Q    Let's focus on these six charitable organizations

23  located in the West Bank.  Do you have an opinion as to

24  whether each of these organizations were controlled by Hamas

25  during the period of 2000 through 2005?

A. SPITZEN - DIRECT/MR. TURNER          1503

1    A    Yes.  Yes, sir.

2    Q    What is your opinion?

3    A    According to my professional judgment, all of these six

4    organizations were controlled during the relevant period,

5    which is the period that you mentioned, they were controlled

6    by Hamas.

7    Q    And were these six organizations likewise listed on the

8    Israel designation from 2002 that we looked at a moment ago?

9    A    Five of them, yes, and one was designated at a later

10   period.

11   Q    Which one was designated at a later period?

12   A    The Nablus Zakat Committee was outlawed.  It was

13   designated in 2006, as far as I recall.

14            MR. TURNER:  May I have slide 42.

15   Q    Let's focus for a minute on the Islamic Center of Gaza

16   or it's formal name al Mujama al Islami.

17            Who established the Islamic Center of Gaza and

18   when was it established?

19   A    The Islamic Center of al Mujama al Islami was

20   established in 1973 by Sheikh Ahmad Yassin.

21   Q    Was it created before the creation of Hamas?

22   A    Yes.  The fact that I stated that it was established in

23   1973 means that indeed it was founded before Hamas was

24   founded.  It was founded by the Muslim Brotherhood in Gaza.

25   Q    And who took control of this society after Hamas became

A. SPITZEN - DIRECT/MR. TURNER          1504

1   an organization?

2   A    This organization, this society has been part of the

3   Hamas since its establishment.  There is no issue here of

4   taking control or assuming control, because they're the same

5   thing.  This is the organization from which Hamas had

6   developed.

7   Q    What factors led you to conclude that Hamas controlled

8   this particular organization?

9   A    Then actually, you would have to go over all the

10  criteria that we've discussed.  And all of them, perhaps

11  except the criteria regarding the findings can be applied

12  here.  The reason there were no findings is that there were

13  no searches in this organization.  But the most important

14  thing is that six out of the seven Hamas founders came from

15  this organization.  They had key roles in this organization

16  since its establishment, and also with the exception of

17  Hamas.

18  Q    Approximately how many branches did the Islamic Center

19  of Gaza have throughout Gaza?

20  A    The Islamic Center in Gaza actually had branches I

21  think in all the districts of Gaza, between seven to ten

22  branches, depending on the period.  I can look into it, but

23  I cannot recall it from just memory.

24       MR. TURNER:  May I have slide 43.

25  Q    Let's focus on the Islamic Center of Gaza for a moment.

A. SPITZEN - DIRECT/MR. TURNER          1505

1  What was the Islamic Center of Gaza during the 2000 to 2005

2  timeframe?

3  A    First of all, in the slide you can see five out of the

4  founders of the Hamas.  And also, the sixth one, Dukhan, he

5  doesn't appear here on the slide, but he was the head of the

6  branch in his own right, the branch of Islamiya.

7            Now, as with the question itself, this

8  organization actually includes many things.  There are

9  mosques which belong to this organization, clinics,

10 kindergartens, schools, various clubs from Society of Koran.

11 This is a large establishment, it's not just an office, it

12 has vast activities in all areas of life.  It has to do with

13 civilian life.

14 Q    Were you able to determine through your review of any

15 records in this case whether or not the Islamic Center of

16 Gaza had a bank account at Arab Bank?

17 A    The Islamic Center in Gaza, according to the transfers

18 that I saw, had a bank account in Arab Bank in Gaza.

19 Q    And did you have access to those account records to

20 review?

21 A    No, unfortunately, no.

22 Q    Why not?

23 A    Because the bank refused to produce the records of the

24 Majama account.

25            MR. TURNER:  Would you please show the witness

A. SPITZEN - DIRECT/MR. TURNER                1506

1    only Exhibit 813.

2    Q    Can you identify Exhibit 813, Mr. Spitzen?

3    A    Yes, sir.

4    Q    Does this document have anything to do with the Islamic

5    Center of Gaza?

6    A    Yes.  This is a brochure found in the cite of the Gaza

7    Islamic Center.  It says in English, it also says in Arabic.

8    There is a picture of Sheikh Ahmad Yassin as the founder of

9    the society, there is a logo of the society, yes.

10   Q    When you say this is a brochure, brochure for what?

11            MR. STEPHENS:  Objection, your Honor.

12            THE COURT:  Sustained.

13   Q    Do you know what this brochure is for?

14            MR. STEPHENS:  Objection.

15            THE COURT:  Well, let me just ask him to answer

16   the question yes or no.

17            THE WITNESS:  Yes.

18            THE COURT:  How do you know?

19   Q    How do you know?

20   A    Out of this brochure, the character of this brochure,

21   you can see that it provides details, the members of the

22   management, the address, identifying who is behind the

23   organization.  It's sort of an identity card.  It provides

24   all the basic important information about the organizations,

25   including telephone number, et cetera.

A. SPITZEN - DIRECT/MR. TURNER                1507

1           THE COURT:  All right.  I'll sustain the

2    objection.

3    Q    What is the source of this particular brochure?

4    A    It was taken from the website of the Islamic Center in

5    Gaza.

6    Q    And is this a piece of information that helped you make

7    the connection between Sheikh Yassin and the Islamic Center

8    of Gaza?

9    A    Yes, of course.  In 2006 after Sheikh Yassin died, the

10   Islamic Center still continues to publish it as the founder

11   and as the spiritual authority it relies on.  I think it

12   says a lot.

13   Q    Does it also mention the names of the board of

14   directors for this particular organization?

15   A    Yes, sir.

16           MR. TURNER:  Your Honor, may we display this for

17   703 purposes only?

18           MR. STEPHENS:  I'll withdraw my objection.

19           THE COURT:  All right.  Yes, you may.

20   Q    Now, Mr. Spitzen, there are two red circles over the

21   two photographs.  Can you identify those two individuals?

22   A    Yes, I can.

23   Q    And who are the images in those two circles?

24   A    These are the pictures of Sheikh Ahmad Yassin, founder

25   of Hamas.

A. SPITZEN - DIRECT/MR. TURNER          1508

1  Q    And down at the bottom can you tell us how the

2  information located down at the bottom assisted you in

3  reaching your conclusions in this case?

4  A    When you look at the list of the board of directors,

5  you see that in 2006 it was the same list, the same as the

6  beginning of this organization, and you find senior Hamas

7  people there from Gaza at that period.

8           MR. TURNER:  Okay.  We're going to next go to the

9  Islamic Society of Gaza.  So this is a good exchange point.

10  I can either move through that slide or I can break for

11  lunch, whatever you feel.

12           THE COURT:  How do you feel, ladies and gentlemen,

13  do you want lunch now or ten or 15 minutes?  All right,

14  we'll have lunch now.

15           Please don't talk about the case, stay away from

16  publicity, keep an open mind.  We'll see you back here at

17  five to 2:00.

18           (Jury is out of the courtroom at 12:48 p.m.)

19           THE COURT:  Okay.  We're in recess.

20           (Proceedings were recessed for lunch and

21  recalled.)

22           (Continued on the next page.)

23

24

25

A. SPITZEN - DIRECT/MR. TURNER          1509

1          **AFTERNOON SESSION**

2          (Honorable Brian M. Cogan takes the bench.)

3          THE COURT:  Please bring in the jury.

4          (Jury is in the courtroom at 2:01 p.m.)

5          THE COURT:  All right.  Be seated.  Mr. Turner,

6    please continue.

7          MR. TURNER:  May we display 43, slide 43?

8          THE COURT:  Yes.

9    BY MR. TURNER:

10   Q    Mr. Spitzen, I want to go back to wrap up the Islamic

11   Center of Gaza for a minute.

12          When we broke for lunch we were talking about the

13   board of directors or administrators of the Islamic Center

14   of Gaza from the poster.

15          First of all, how many of the six individuals

16   shown as original founders of the Islamic Center of Gaza is

17   still alive?

18   A    Two.

19   Q    And going back to the poster, which is Exhibit 813, you

20   don't have to display this, I just want to ask two quick

21   questions.  Of the administration council, there are two

22   names I want to ask you about.  The first one is Saqer

23   Hassan Abu Heen.  Who is that?

24   A    Saqer Hassan Abu Heen is the deputy administer of labor

25   in the Hamas government in Gaza.  He is a well-known senior

A. SPITZEN - DIRECT/MR. TURNER          1510

1   Hamas member.

2   Q    And the other one I wanted to ask you about was Dr.

3   Khalil Ismail El Haya.  Who is he?

4             INTERPRETER:  He would like to see it.

5   A    Yes.  Yes.  Ismail Haya is one of the -- Ismail el Haya

6   is one of the most prominent leaders -- initially I didn't

7   quite get the name.  But actually, he's the member of the

8   political bureau of Hamas and he was himself involved in the

9   abduction of Gilad Shalit.  He is considered one of the most

10  prominent senior Hamas members in Gaza.

11  Q    Let's move to slide 45.

12            MR. TURNER:  May we display?

13            THE COURT:  Yes.

14  Q    Now we're going to transition to the Islamic Society

15  Gaza, al Jam'iya al Islamiya.

16            First of all, where did this society operate in

17  the 2000 to 2005 timeframe?

18  A    Al Jam'iya al Islamiya operated all around Gaza, it had

19  many chapters in the Gaza Strip.

20  Q    When was it founded?

21  A    In 1976.

22  Q    Who founded it?

23  A    It was founded by Sheikh Ahmad Yassin.

24  Q    Now, after Hamas was founded in 1987, did this

25  organization continue as a Hamas organization?

1  A    Yes, sir, it was controlled by Hamas.  It was part of

2  Hamas, just as the Islamic Center was.

3  Q    You have four photographs on this particular slide.

4  Who are these people?  Of course we know Sheikh Yassin, but

5  who are these other individuals and what role did they play

6  in the organization?

7  A    He is chairperson of the organization.  The chairperson

8  of the organization is Ahmad Bahar.  He is a senior

9  operative.  He is well known amongst the Palestinians.  He

10  is the chairperson, chairperson or speaker of the Parliment

11  and has served in this position since 2006.  He served in

12  prison, in the Israeli prison, he joined -- in 1994 and

13  established the Mujahideen terror organization.

14  Q    And what evidence did you find indicating that this

15  organization was controlled by Hamas during the 2000 through

16  2005 timeframe?

17  A    First of all, I haven't finished discussing the two

18  others; Ismail Shanab and Ismail Haniyeh, but we already

19  discussed these, so perhaps it's not necessary.

20  Q    It's not.

21  A    As for the question, this organization too meets most

22  of the criteria according to which I determined whether a

23  certain organization is controlled by Hamas.

24         The first point is its history.  It was founded by

25  Hamas members and is still controlled by them to this very

1    day.  It is controlled by senior members of Hamas.  As far

2    as the financing, it receives money from foundations that

3    declared themselves to be the Hamas Foundation and they

4    operate in order to advance the Hamas ends.  It does not

5    deny its identity with Hamas.

6    Q    Based on the limited information that you had access to

7    from Arab Bank, can you tell us whether that Islamic Society

8    of Gaza received money transfers at Arab Bank during the

9    2000 through 2005 timeframe?

10   A    Yes, definitely.  There were bank transfers done

11   through Arab Bank to this society in those relevant years.

12   Q    And were you able to access the bank account full of

13   records for the Islamic Society of Gaza based upon the

14   account information you received from the wire transfers?

15   A    No, sadly not.

16   Q    And why?

17   A    Because the bank refused to hand over the records of

18   these particular bank accounts.

19   Q    Now, for purpose of sort of short cutting this, as we

20   move through all of these charitable societies, is that

21   question and answer applicable to all of these charities

22   that we're going to be discussing?  In other words, you did

23   not see bank account records because the bank refused to

24   produce them?

25   A    This is correct.

A. SPITZEN - DIRECT/MR. TURNER            1513

1  Q    What type of charity activity did these charitable

2  associations like the Islamic Society of Gaza actually

3  provide, if any?

4  A    The Islamic charitable societies or those societies

5  that are related to the Hamas provided services in almost

6  every field of life.  When it comes to the civilian

7  services, they provided education for every level, including

8  complementary education, like teens in the summer and

9  various activities near mosques.  When it comes to health

10  care, they provided clinics and hospitals.  Financially,

11  they helped different strata of the population.  They also

12  provided employment in the society themselves, especially

13  given to Hamas operatives in the various projects that they

14  worked on.

15        As a matter of fact, Hamas and its associations

16  and societies provided services for almost every field of

17  life, including religion, of course, in the various mosques.

18  Q    From the standpoint of understanding how Hamas

19  networked with these charitable organizations, is it

20  important to understand why these charities had a function

21  of providing assistance to the needy?

22  A    Yes, definitely.  The societies, their very activity

23  brought two things.  First of all, it created a massive

24  support among the public.  We could see this in the

25  elections to the municipalities and also later on to the

A. SPITZEN - DIRECT/MR. TURNER          1514

1  Parliment.  The second one was providing a safety net and

2  assistance for the operative side of Hamas in the form of

3  suicide bombers, their families, and the like.  And also,

4  the training of cadres or supporters.

5          MR. TURNER:  Would you show the witness only 1074.

6  Q    And I want to focus for a moment on the relationship

7  and role that Sheikh Yassin played in the Islamic Society of

8  Gaza during the period of 2000 to 2005.

9          Can you identify 1074?

10 A    Yes, sir.

11 Q    What is -- generally speaking, what is 1074?

12 A    Yes.  This is a signed document by Yassin.  It is a

13 recommendation for a person who needs to do a fundraising

14 for the society in Gaza.

15 Q    Who is the letter from?

16 A    This letter is from Sheikh Ahmad Yassin as part of his

17 capacity as founder of the Hamas organization.

18 Q    Who is it to?

19 A    To whom it may concern.

20 Q    And what is the date?

21 A    It is December 22nd, 2000.

22 Q    What is the source of this particular letter?

23 A    This document was presented to the general government

24 by the State of Israel in a lawsuit against the al Aqsa

25 Foundation.  And it was also provided to the US

A. SPITZEN - DIRECT/MR. TURNER          1515

1   administration against the Holy Land Foundation.

2   Q    And you recognize the signature of Sheikh Yassin on

3   1074?

4           MR. STEPHENS:  Objection, your Honor.

5           THE WITNESS:  Yes, sir.

6           THE COURT:  He's asking if he recognizes the

7   signature.  Do you or do you not recognize the signature?

8           THE WITNESS:  Yes.

9   Q    Is this letter important to your analysis of the role

10  and relationship of Hamas over the Islamic Society of Gaza?

11  A    Yes, of course, because this letter is different.  The

12  head of the society in the Gaza branch, in the branch of the

13  City of Gaza who he -- who, himself is a senior Hamas

14  operative, Abu Mohamed Shibab.  And the person who is

15  actually giving this letter is Sheikh Yassin, and he is

16  giving this as the founder of Hamas, not as the head of

17  their society in Gaza.  And that indicates the connection

18  between the society and the Hamas organization.

19          MR. TURNER:  We offer 1074.

20          MR. STEPHENS:  Objection, your Honor.

21          THE COURT:  Sustain the objection.

22          MR. TURNER:  May we display under 703?

23          THE COURT:  I don't think it's necessary.  The

24  witness testified how he relied on the document.

25          MR. TURNER:  4756, may we display?  This is

A. SPITZEN - DIRECT/MR. TURNER          1516

1   already in evidence from Mr. Geisser.

2          THE COURT:  Yes.

3   Q    Do you recognize this chart, which is labeled as 4756

4   and it's already in evidence?

5   A    Yes, sir.

6   Q    How did this particular chart assist you in reaching

7   some of your conclusions about the relationship between the

8   Islamic Society of Gaza and Hamas during the relevant

9   timeframe?

10         THE COURT:  Okay.  Hold the answer a moment.

11         MR. STEPHENS:  Objection.  There is no foundation

12  that he saw this.

13         THE COURT:  Okay.  Stop.  Stop.  Stop.  I need a

14  sidebar.

15         (Continued on the next page for sidebar.)

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                    1517

1           (Sidebar conference begins.)

2           THE COURT:  First of all, Mr. Stephens, you can't

3   wait until after the translator has translated the question

4   before you object to it.  You need to object to the question

5   after its made, okay, so your objection is too late.

6           Having said that, I can forget about that.  But I

7   think Mr. Turner is trying to save some time, so he said to

8   him, why does this support your decision.  Now, you're

9   right, there is no foundation for that question.  He can go

10  back and say to him, have you seen this document before?  In

11  what context did you see it?  Did you, in fact, rely on it,

12  and then get to the question that he's about to ask.

13          MR. STEPHENS:  That's what he ought to do.

14          THE COURT:  That's what you want him to do?

15          MR. STEPHENS:  Well, look, he read the report as

16  2011, it's now 2014.  Those charts were not produced to us

17  until 2014.  I don't think he had them back --

18          THE COURT:  I think he just gave away some great

19  cross-examination, but we'll do it your way and take the

20  additional time for him to explain how he got this document

21  and how he used it, so the objection is sustained.

22          (End of sidebar conference.)

23          (Continued on the next page.)

24

25

A. SPITZEN - DIRECT/MR. TURNER                1518

1        MR. TURNER:  May I proceed?

2        THE COURT:  You may.

3  BY MR. TURNER:

4  Q    Do you recognize 4756?

5  A    Yes, sir.

6  Q    When did you see 4756 and the information contained in

7  4756?

8  A    I don't remember the exact date, but it was during my

9  preparation of my expert opinion for this trial.

10  Q    And during the course of preparing for your opinions in

11  this case, was one of the criteria that was significant for

12  you to consider funding of the charitable organizations?

13  A    Yes, as I noted earlier.

14  Q    Now, did you play any role in actually calculating the

15  numbers on 4756?

16  A    No, sir.  I received it as given from the accountants.

17  Q    How did this piece of information -- how important was

18  this piece of information in your analysis of the issue of

19  the relationship between the Islamic Society of Gaza and

20  Hamas?

21  A    It showed who is doing the funding and why this

22  particular society was being funded.

23  Q    What did it show you that helped you reach your

24  opinion?

25  A    It shows that those very societies, such as the Union

1    of the Good, which we'll discuss later, and others, those

2    are the societies that Hamas choose; some were actually

3    founded by Hamas, and those were the societies, those were

4    the Islamic societies that supported Hamas.

5    Q    Did you also have an opportunity to evaluate the

6    al-Salah Islamic Society?

7    A    Yes, sir.

8    Q    Where was the al-Salah Islamic Society founded?

9    A    Al-Salah was also founded in Gaza.  It was one of the

10   three important societies founded by Hamas in Gaza.

11   Q    When was it founded?

12   A    It was founded in 1978.

13   Q    During the period of 2000 to 2005, who was Ahmad

14   al-Kurd?

15   A    Ahmad al-Kurd was, to the best of my knowledge, still

16   is, the head of al-Salah Society in Gaza.

17   Q    Was al-Kurd also affiliated with the Union of the Good?

18   A    Yes, he was the delegate or representative of the Gaza

19   region in the Coalition of the Good.

20   Q    And although we're going to talk about it in more

21   detail in a bit, very briefly, explain to us what the Union

22   of the Good was?

23   A    The Coalition of the Good was -- the Union of the Good

24   was an umbrella organization that was established in the

25   year 2000 to raise funds for Hamas.  It was made up of about

A. SPITZEN - DIRECT/MR. TURNER          1520

1   50 organizations.  It serves as a kind of umbrella for those

2   50 organizations, and it was established by Hamas supporters

3   to help Hamas during the Intifada.

4         MR. TURNER:  May we display slide 48?

5         THE COURT:  Yes.

6   Q    Is this Ahmad al-Kurd?

7   A    Yes, sir.

8   Q    Now, the designation on the right-hand side, US

9   Specially Designated Global Terrorist is already in evidence

10  as Exhibit 1293.  It includes the quote from the August 2007

11  designation as follows, quote, the al-Salah Society as

12  directed by Ahmad al-Kurd, a recognized high-ranking Hamas

13  leader in Gaza.  Al-Kurd's affiliation with Hamas goes back

14  over a decade, end quote.

15        Is that consistent with what you found about the

16  period of 2000 and 2005?

17  A    Yes.  Indeed, this designation is quite precise.

18  Q    Is this one of the societies that you were able to

19  locate money transfers through the Arab Bank to this society

20  during the Intifada?

21  A    Yes, sir.

22        MR. TURNER:  May we display 4757 which is in

23  evidence?

24        THE COURT:  Yes.

25  Q    Do you recognize 4757?

A. SPITZEN - DIRECT/MR. TURNER          1521

1   A    Yes, sir.

2   Q    How do you recognize 4757?

3   A    This is a slide that was prepared by the accountants

4   and I used it in my preparation of my expert opinion.

5   Q    Why was it important to you?

6   A    As I noted earlier about the previous society, the

7   transfer of funds, the financial assistance was a very

8   important criteria in my analysis.

9   Q    And did you also have an opportunity to evaluate the

10  al-Nur Prisoner Society?

11  A    Yes, sir.

12  Q    What was the society's purpose?

13  A    The purpose of this society was mainly to provide

14  support for Hamas prisoners.

15  Q    Who formed or participated in forming this

16  organization?

17  A    Salal Shehada, who you mentioned earlier, participated

18  in the establishment, and also Ahmad al-Ja'bari, who was the

19  head of the Qassam Brigades, he was, in fact, known as the

20  chief of staff for Hamas, and the organization was

21  established in the year 2000.

22            MR. TURNER:  May we display 50.

23  Q    Do you recognize individuals on slide 50?

24  A    Yes, I do.

25  Q    Were those publicly known Hamas representatives at the

A. SPITZEN - DIRECT/MR. TURNER          1522

1   time of the organization -- of this organization?

2           MR. STEPHENS:  Objection.

3           THE COURT:  Ask him if he know whether.

4   Q   Mr. Spitzen, do you know whether or not these four

5   individuals were publicly profiled Hamas leaders and

6   operatives in 2000 when this organization was formed?

7           MR. STEPHENS:  Objection.

8           THE COURT:  Overruled.

9   A   Yes.

10  Q   Now, we talked about some of these individuals earlier

11  and about their accounts or transfers, money transfers into

12  accounts in their name at Arab Bank.  Do you recall that

13  conversation?

14  A   Yes.  We mentioned Salah Shehada and we mentioned Abu

15  Zayd, and we will soon see that Ahmad al-Ja'bari also

16  received money through the Arab Bank.

17  Q   Did the Al Nur Prisoner Society, based upon the limited

18  records that you had access to, did it receive money

19  transfers through the Arab Bank?

20  A   Yes, definitely.

21  Q   Now, what led you to conclude that the al-Nur Prisoner

22  Society was controlled by Hamas during the relevant

23  timeframe?

24  A   First of all, the leadership of the society are all

25  senior level Hamas leaders.  We talk about Salah Shehada and

A. SPITZEN - DIRECT/MR. TURNER          1523

1  al-Ja'bari, and there is also about Abu Zayd and there is

2  also Mushir al-Habi al-Masri, he was a member of Parliment

3  for Hamas and he established al-Kutla Islamiya Gaza.  The

4  Islamic block in universities.  Secondly, the statutes of

5  the organization were seized and we could see that it was

6  established especially with the intension to help Hamas

7  prisoners during the Intifada and it was established soon

8  after the start of the Intifada.

9  Q    Now, you mentioned seized.  I want to talk about the

10 seizures of information from these organizations very

11 briefly.  What triggered these raids or searches?

12         MR. STEPHENS:  Objection, your Honor.

13         THE COURT:  Sustained.

14 Q    Do you have personal knowledge of what actually

15 triggered the need to search a charitable organization

16 during the period 2000 to 2005 timeframe?

17         MR. STEPHENS:  Objection.

18         THE COURT:  Overruled.

19 A    Yes, I do.

20         THE COURT:  How did you obtain that knowledge?

21         THE WITNESS:  I was part of the COGAT, the

22 coordinator of government affairs and territories, and COGAT

23 via the civil administration was the one that, in fact,

24 initiated these activities, and I -- and approved them and I

25 analyzed the findings.

A. SPITZEN - DIRECT/MR. TURNER          1524

1   Q    Mr. Spitzen, as part of COGAT, did you, from
2   time-to-time, have the job responsibility of actually
3   receiving items that had been seized from these charitable
4   organizations as either information or contraband?
5   A    Yes, definitely.  After every such search, we had
6   instructions to make an itemized index of everything that
7   had been seized and found, and I was in charge of that desk,
8   and those materials reached my desk.  There was a
9   distribution list, and I was on that list, and I would send
10  any findings that I considered to be important either to
11  COGAT or to the variance intelligent branches.  And I would
12  either ask for that to be sent to me or I would actually go
13  and take it.
14  Q    Now, Mr. Spitzen, during the course of receiving
15  materials during these searches from these charitable
16  organizations, was Hamas propaganda information collected?
17  A    Yes.  In many of the organizations or in the lion's
18  share of those organizations in which searches were
19  conducted, a lot of propaganda material of the Hamas was
20  found; sometimes in such quantities, that it became apparent
21  that actually the associations themselves were the ones
22  handing out this material.
23  Q    And did the searches likewise find evidence of records
24  of the business of the charitable organization indicating
25  the kinds of things it was involved in, including terrorism?

A. SPITZEN - DIRECT/MR. TURNER                1525

1        MR. STEPHENS:  Objection, your Honor.

2        THE COURT:  Overruled.

3   A    Yes, definitely.  We did find records that indicated

4   those monies, where they came from and who they were handed

5   down to inter alia to terrorists and their family members.

6   Q    During the course of these searches, did you actually

7   -- did the government actually find lists showing martyr

8   payments to families of suicide bombers and other

9   terrorists?

10  A    Yes, definitely.  We did find those lists, both in the

11  form of hard copies and also in the computers.  Once these

12  computers were opened, we found many lists of names of

13  suicide bombers, their family members, Hamas operatives, who

14  all received money from the societies.

15  Q    And in addition to the materials we've already talked

16  about, did you also find something called martyr files?

17  A    Yes, definitely.  The role of the societies was to

18  collect, among other things, information and data from the

19  population in order to transfer the aid given by those

20  foundations.  We did find martyr files particularly in

21  Hezmadone (phonetic), but also from other societies.

22  Q    Would you please explain to us what a martyr file is,

23  what does that mean?

24  A    A martyr file is the file that is opened by the

25  society; in this case we're discussing the Hezmadone

A. SPITZEN - DIRECT/MR. TURNER                1526

1    (phonetic), in which it describes the martyr, the

2    circumstances of his death, his socioeconomic background of

3    his family, mother, the number of the bank account to which

4    the money has to be transferred if he receives that money.

5    It is very similar to any Social Security file of any

6    individual and it contains its social background.

7    Q    Now, was all of this material that was seized, was this

8    important information in order to evaluate and properly

9    characterize the true nature of these charitable

10   organizations?

11            MR. STEPHENS:  Your Honor.

12            THE COURT:  Sustained.

13   Q    Can you describe, Mr. Spitzen, the significance of

14   these files in your investigation?

15            MR. STEPHENS:  Your Honor, may we approach,

16   please?

17            THE COURT:  Sure.

18            (Continued on the next page for sidebar.)

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                    1527

1          (Sidebar conference begins.)

2          MR. STEPHENS:  There is a February 13, 2000 --

3          MR. INGERMAN:  February 6th.

4          MR. STEPHENS:  Sorry, February 6, 2013, order that

5    prohibits general discussion.  And I've been waiting to hear

6    any of this testimony for the last ten minutes get tied into

7    any one of the zakats at issue here.  It's all been general,

8    you know, Hamas institutions, you know, does the

9    institutions in the West Bank and Gaza, and I want to move

10   to strike all the testimony, because it has nothing to do

11   with the ten charities that he now says he's actually

12   opining about.

13         THE COURT:  Okay.  The motion to strike the

14   testimony is denied.  I know a number of these questions

15   came in without objections; some of them were objected to,

16   some of them I sustained, some of them I did not.  Right now

17   there is no question pending, so there is nothing to object

18   to.

19         (End of sidebar conference.)

20         (Continued on the next page.)

21

22

23

24

25

A. SPITZEN - DIRECT/MR. TURNER                1528

1      MR. TURNER:  May I proceed?

2      THE COURT:  Let's try to tie it specifically,

3   Mr. Turner.

4      MR. TURNER:  I don't remember, was there a

5   question pending or I do need to ask one?

6      THE COURT:  There is no question.

7   BY MR. TURNER:

8   Q   Was the information that you were able to see from the

9   seizures that were undertaken at the zakats and the

10  committees that you focused on for purpose of this lawsuit

11  important to you?

12  A   Yes, sir.

13  Q   Why?

14  A   Yes, because this assisted to the character of the

15  society, its ties and links that indicates its political

16  direction, who it belongs to.  The propaganda material of

17  Hamas were disseminated by the associations, the martyr

18  files -- apparently the martyr files, in which included

19  suicide bombers that belonged to Hamas, posters of terrorist

20  of Hamas, all of those teach us who it belonged to and who

21  it was controlled by.

22  Q   Did you also have an opportunity to evaluate the

23  Islamic Charitable Society of Hebron?

24  A   Yes, sir.

25  Q   And were you able to identify the Hamas representatives

1   who organized and controlled that organization?

2   A    Yes.

3        MR. TURNER:  May we show slide 52.

4   Q    Now, first of all, at the top right al-Natsheh, we

5   talked about him earlier in the money transfers through the

6   Arab Bank.  Do you recall that?

7   A    Yes, sir.

8   Q    At the top left, Adel Salim al-Junaydi or Juneeda?

9   A    Adel Salim.

10  Q    June-a-da?

11  A    Junaydi.

12  Q    I'll leave it up to you.  That's the best I can do.

13  A    Yes, I do recognize him.  It was chairperson of the

14  society at that time.

15  Q    And was he affiliated with Hamas?

16  A    Yes, he was affiliated with Hamas.  He was convicted

17  and sentenced because of his membership in Hamas, not just

18  because of the Mujama activity, that is the civilian

19  activity, but also the military activity for which he served

20  in prison.

21       MR. STEPHENS:  Objection, your Honor, move to

22  strike.

23       THE COURT:  Overruled.

24  Q    Top center, al-Tamimi, who was he?

25  A    Azam Nu'man al-Salhab al-Tamimi is a senior Hamas

A. SPITZEN - DIRECT/MR. TURNER          1530

1  member in the West Bank, the representative of Hamas in the

2  Union of the Good.  He too is a terrorist and was a member

3  in the higher terror entity or body in the West Bank for

4  which he was sentenced and served in Israeli prison.

5  Q    And what about the lower left, Muhammad Misk?

6  A    Was he affiliated with Hamas.  Misk was a Hamas

7  operative well known in Hebron.

8  Q    And what about Mustafa Shawar?

9  A    Mr. Shawar was also a senior Hamas operative.  He was

10 convicted for his ties with the Hamas headquarters, oversees

11 the military connections with it.

12        By the way, with respect to other Hamas

13 identities, well, Shawar, al-Natsheh and Misk were all

14 defined by the head of the political bureau of Hamas, in an

15 interview that he gave, as senior members of Hamas.

16 Q    And were these people secretive members of Hamas or

17 were they public figures in terms of Hamas in the Hebron

18 area?

19        MR. STEPHENS:  Objection.

20        THE COURT:  Hang on.  One second.  I'll sustain

21 the objection to form.  You may ask him whether he knows if

22 they were and, if so, how he knows if they were.

23 Q    Do you know how -- well, let me back up.

24        Do you know whether these individuals were

25 secretive members of Hamas or public figures of Hamas in the

A. SPITZEN - DIRECT/MR. TURNER          1531

1   Hebron area?

2   A    Well, these people -- first of all, concerning

3   al-Natsheh, I already said he was well known and I showed

4   how.  With respect to the four others, they were all senior

5   leaders of Hamas, they were known as senior leaders of

6   Hamas, and they were defined as senior leaders of Hamas in

7   2003 by Khaled Mashal.

8   Q    Who was chairman of this organization during the

9   relevant timeframe?

10  A    (Unintelligible) was chairperson of the organization.

11  Q    And who ran or operated the society or the organization

12  on a day-to-day basis?

13  A    The person who ran the association on a day-to-day

14  basis was Abd al-Khaleq al-Natsheh.  He was the general.  He

15  was the dominate Hamas figure and he was very dominant

16  persona in society.

17  Q    As with the other organizations we've talked about,

18  were you able to locate money transfers through the Arab

19  Bank to this organization?

20  A    Yes, sir.

21  Q    And is this another one of those accounts that you were

22  not provided records for?

23  A    Indeed so, sir.

24  Q    Now, if you could --

25                THE COURT:  At a convenient time?

A. SPITZEN - DIRECT/MR. TURNER          1532

1          MR. TURNER:  Sure.

2          THE COURT:  Let's take our midafternoon break,

3   ladies and gentlemen.  We'll take 15 minutes.  Come back at

4   3:15.  Please talk about things other than the case.  See

5   you shortly.

6              (Jury is out of the courtroom at 3:00 p.m.)

7          THE COURT:  Recess until 3:15.

8              (Proceedings were recessed and recalled.)

9              (Continued on the next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A. Spitzen - Direct/Turner                    1533

1          (Judge Cogan enters the courtroom at 3:15 p.m.)

2          THE COURT:  Please bring in the jury.

3          (The jury enters the courtroom at 3:15 p.m.)

4          THE COURT:  Be seated, please.

5          You may proceed.

6          MR. TURNER:  Your Honor, may we have 4758, that is

7    already in evidence?

8          THE COURT:  Yes.

9    BY MR. TURNER:

10   Q    Mr. Spitzen, this particular exhibit, what Mr. Geisser

11   has captioned Annual Total in Chart Transactions for Islamic

12   category 32 as beneficiary.

13         Now, as with the other Geisser charts that we

14   looked at thus far, did you at some point in time have

15   access to Mr. Geisser's report where this data was included?

16   A    Yes, sir.

17   Q    And is the underlying data for this particular chart

18   was, that information that was helpful to you in evaluating

19   the funding of the Islamic charitable society Hebron as

20   beneficiary?

21   A    Yes, sir, both the sources of the funding and the

22   scope.

23   Q    And was Mr. Geisser's data helpful to you in reaching

24   your conclusions?

25   A    Mr. Geisser's data gave me the scope and exact figures

1   as to identifying where the money came from and where it

2   went to that, that was my job essentially to figure out

3   those things.

4   Q    Yes, sir.

5             Now, we are going to talk about the Al Islah

6   Charitable Society Ramallah next.  Before we do that, to put

7   a little bit of context into the charitable organization

8   from the West Bank during the relevant time frame, can you

9   give us a general idea of how many charitable organizations

10  existed in the West Bank during the 2000 to 2005 time frame?

11  A    During the relevant years, in the years 2000 to 2005,

12  in the West Bank in Gaza, there are were hundreds of

13  different kinds of organizations or Zakat organizations in

14  the West Bank.  In the relevant period, there were 110 that

15  I know of.  And there were also hundreds of local charitable

16  societies, as well as foreign charitable societies,

17  international organizations.

18  Q    Now, were all hundred plus of those charitable

19  associations in your opinion controlled by Hamas or only

20  those we are talking about?

21  A    The answer is no.  The answer is that some of the

22  charitable societies were indeed controlled by Hamas, and

23  not all of those that were controlled by Hamas are being

24  discussed here.  But some, in fact a large part, had no

25  connection with Hamas.

1 Q    Now, let's focus on Al Islah Charitable Society

2 Ramallah for a moment.

3         Was this one of the societies that you found

4 controlled by Hamas during the relevant time frame?

5 A    Yes.  This society was not only controlled by Hamas,

6 but according to the testimony of the very founder, it was

7 founded by Hamas and inspired by Hamas.

8 Q    May we have Slide 54, your Honor.

9         Do you recognize the four individuals on Slide 54?

10 A    Yes, sir.

11 Q    Were these four individuals involved with the Al Islah

12 Charitable Society in Ramallah?

13 A    Yes, three of them are members of the Board of

14 Directors of these societies, and one is a high-level

15 employee.

16 Q    Which one is the high-level employee?

17 A    Falah Nada.

18 Q    Now, let's first start with Jamal al-Tawil.

19         Who was Jamal al-Tawil during the relevant time

20 frame?

21 A    Jamal al-Tawil was a senior Hamas operative in

22 Ramallah, before the establishment of the society.  He was

23 involved in the transfer of money to Hamas operatives and

24 prisoners in Ramallah.  And after he established the Al

25 Islah Charitable Society in Ramallah, he also engaged in

A. Spitzen - Direct/Turner                1536

1    terrorist activities, and was tried and convicted of those

2    activities.

3    Q    Who was Omar Hamdan?

4    A    Omar Hamdan was the head of the society after al-Tawil

5    was convicted.  He was also an Hamas operative, and he also

6    engaged in terrorist activities.  He was also convicted, and

7    he spent two years in prison for those activities.

8              MR. STEPHENS:  Objection, move to strike.

9              THE COURT:  Overruled.

10   BY MR. TURNER:

11   Q    Who was Falah Hamdan?

12             THE COURT:  Do you want a side bar?

13             MR. STEPHENS:  Yes, please.

14

15

16

17

18

19

20

21

22

23

24

25

SIDE BAR                                1537

1              (SIDE BAR)

2          MR. STEPHENS:  Your Honor, the witness is

3   testifying that people were tried and convicted of crimes

4   without the document that the court has required to be

5   presented to demonstrate that that is in fact true.  He's

6   testifying that so and so is arrested, and so and so was

7   this and that, as if he has personal knowledge of this,

8   which he does not.

9          THE COURT:  Let me ask you about that. It seems to

10  me that he does.  I really feel that's the whole question.

11  But based on his position in ^^^could got, he knows these

12  people.  He knows when they were arrested.  He knows when

13  they were convicted.  He knows these things, not even in

14  connection with this case.  Based on the qualifications that

15  I heard, he knows of his own personal knowledge.  Why can't

16  he say his own personal knowledge?

17         MR. STEPHENS:  If your Honor he was a bureaucrat

18  down in a small department in COGAT, which actually had

19  people gathering open source information to send onto the

20  coordinator -- just a minute, let me finish.

21         THE COURT:  I won't stop you from finishing.

22         MR. STEPHENS:  Good.  He can't possibly from his

23  own personal knowledge know that a hundred people were

24  arrested, or when they were arrested, or what they were

25  convicted of.  He can't possibly.  He wasn't the policeman

SIDE BAR                          1538

1    who arrested them.  He wasn't the prosecutor who prosecuted

2    them. He wasn't the judge at the trial, if there was one.

3              THE COURT:  He was an intelligence gatherer.

4    Sometimes people have personal knowledge, and it's subject

5    to attack, because what they think is true based on the

6    things they experienced and the things they learned may not

7    be true, and that's for cross-examination to show he's

8    wrong.

9              Let me ask you a question.  These people, do you

10   have any evidence that he's wrong?

11             MR. STEPHENS:  I don't have --

12             THE COURT:  Are we fighting over angles on the

13   head of the pin?

14             MR. STEPHENS:  He's not a percipient witness, your

15   Honor.

16             THE COURT:  I kind of think he is.  Let me ask the

17   plaintiffs.

18             Is he a percipient witness?

19             MR. OSEN:  He has percipient knowledge of these

20   events, but it so happens that in the case of Jamal

21   al-Tawil, he still has conviction.  I don't know if Mr.

22   Turner plans to introduce it or not.  Many of these people

23   apostilled, let alone --

24             MR. TURNER:  They are actually coming in the next

25   two slides.

SIDE BAR                          1539

1          THE COURT:  I don't know what to tell you,

2    Mr. Stephens.  It seems to me that you are trying to dispute

3    facts that aren't really in dispute.  I understand that you

4    have a right to put the plaintiffs to their proof, but as

5    the plaintiff just told me, you do have a number of

6    convictions of these people.  I do recognize a number of the

7    convictions entered.  What you are telling me, the answer to

8    the last question there is no conviction, then I will strike

9    that testimony, assuming it is not going to be in the next

10   slide, which I think it is, then we are just wasting time.

11   But if you think it's really not just the wrong order put in

12   the conviction first, then have him testify.  But if in fact

13   there's substantial reason to doubt, or any reason to doubt

14   that this defendant or this party was in fact convicted, I

15   will sustain the objection, that's fine.  But I just want to

16   make sure we are not wasting time.

17          Do you know that this guy was not convicted or

18   that the plaintiffs are not going to on the next slide put

19   in a conviction record that will move this whole discussion?

20          MR. STEPHENS:  With the last one, I don't think

21   there is an apostilled conviction.

22          MR. TURNER: From Mr. Al-Tawil there is.  It's just

23   cited in his report.

24          THE COURT:  Here's what we'll do, I will strike

25   the testimony of the arresting conviction of Omar Hamdan.

SIDE BAR                        1540

1    When you ask him questions about who these people are, you

2    have to ask him the question, did you know who they are, and

3    how do you know who they are, and you are going to need a

4    pretty specific answer.

5              MR. TURNER:  Okay.

6              THE COURT:  Okay.

7              MR. STEPHENS:  Thank you, your Honor.

8              (Side Bar ends)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      THE COURT:  All right.  The witness' statements

2  that Omar Hamdan was convicted and spent two years in prison

3  is stricken from the record.

4      Please continue, Mr. Turner.

5  BY MR. TURNER:

6  A    Mr. Turner, I think I omitted one phrase from the

7  witness' testimony about the previous gentleman, Jamal

8  al-Tawil, that he transferred money from abroad -- may I

9  edit, your Honor?

10      MR. TURNER:  Probably should ask you.

11      THE COURT:  Well, first he has to ask you if you

12  want the answer.

13      MR. TURNER:  I would like the answer.

14      THE COURT:  Okay.  I'm not going to let you have

15  it.  Go on and put another question.

16      MR. TURNER:  Okay.

17  BY MR. TURNER:

18  Q    Let's go to Falah Nada.

19      Do you know who Falah Nada was?

20  A    Yes, sir.

21  Q    How do you know that?

22  A    I know him from the indictment against him  in which he

23  was convicted, and I know him from the records of the

24  charitable society.  He was an employee in the charitable

25  society.

A. Spitzen - Direct/Turner                1542

1        MR. TURNER:  Your Honor, we would offer 3476,

2   which is apostilled conviction records of the Islam leader

3   of Falah Nada.

4        THE COURT:  All right.  That's received over

5   objection.

6   BY MR. TURNER:

7   Q    Who was the chairman of the Al Islah Charitable Society

8   - Ramallah during the relevant time frame?

9   A    Jamal al-Tawil, and after he was convicted, Omar

10  Hamdan.

11  Q    Who ran the society or the organization on a day-to-day

12  basis?

13       MR. STEPHENS:  Objection.

14       THE COURT:  Sustained.

15  BY MR. TURNER:

16  Q    Do you know who ran the organization on a day-to-day

17  basis during the relevant time frame?

18  A    Omar Hamdan ran it as the head.

19       THE COURT:  Stop.  The question is, do you know,

20  yes or no?

21       THE WITNESS:  Yes.

22       THE COURT:  How do you know?

23       THE WITNESS:  I know it from records of the

24  charitable society that we found and from various

25  publications.

A. Spitzen - Direct/Turner            1543

1     THE COURT:  All right.  Now you may ask the

2  question.

3  BY R. TURNER:

4  Q    Who ran the society on a day-to-day basis?

5  A    Omar Hamdan.

6  Q    Now, if we could, your Honor, I would like to go to

7  Slide 56, the conviction record of Mr. Nada which is in

8  evidence.  This is 3476.  I want to focus on some of the

9  language in this, if you could take a moment and read to

10  yourself, Mr. Spitzen. The first highlighted sentence says

11  the defendant was convicted of being a member of the Al

12  Islah Organization from June 2001 until his arrest.

13          Is that consistent with the information that you

14  were able to piece together about the Al Islah Organization?

15  A    Yes, sir.

16  Q    Exhibit 3476, that states he was convicted of being a

17  member of the Hamas Organization from late 2001 until the

18  time of his arrest.

19          Was that consistent with the other pieces of

20  information you were able to cross-reference, do you know?

21  A    Yes, sir.

22  Q    Do you know who Muhammad Arman was?

23  A    Yes, sir.

24  Q    How do you know that?

25  A    I know it from the time it was -- the cell that he

A. Spitzen - Direct/Turner          1544

1   participated in was uncovered, and he participated in the

2   terror attacks of that cell.  He was quite a terrorist.

3   Q    Do you know who Ibrahim Ahmed was?

4   A    Ibrahim Ahmed is also a well-known personality.  He's

5   also a terrorist.  He participated in one of the terror

6   attacks, the victims of which are victims in this case.

7   Q    Now, the second highlight paragraph of Exhibit 3476

8   apostilled conviction records of Nada indicates that at the

9   end of 2001, Nada transferred a letter to a person by the

10  name of Muhammad Arman, in which Arman was instructed to

11  meet with Ibrahim Ahmed.  In that meeting, Arman was

12  recruitedc into the El Kasan Brigade, and in this framework

13  acted to carry out suicide attacks within the territory of

14  the State of Israel, which led to the deaths of 35 civilians

15  and wounding of over 200 additional civilians.

16        Now, you want to go ahead and read that before I

17  ask the question.

18  A    Okay.

19  Q    My question is, was this piece of information from the

20  conviction record important to you in evaluating the

21  relationship between Nada, this organization Al Islah, and

22  Hamas in carrying out record attacks?

23  A    Yes, sir.

24  Q    Now, the final sentence of this particular series or

25  sequence of sentences indicates that Nada was also involved

1   in the transfer of monies.

2          Was that important in evaluating the role of Al

3   Islah in the Hamas terror attacks?

4   A    Yes, sir.

5   Q    Would you please show the witness only Exhibit 1224.

6   You can just show him the slide.

7          Do you recognize 1224?

8   A    Yes, sir.

9   Q    What is the source of 1224?

10  A    This is the military court records of a hearing that

11  was conducted against Jamal al-Tawil, and it provides the

12  verdict and the sentencing of Jamal al-Tawil.

13  Q    And Jamal al-Tawil held what position in the Al Islah

14  Organization?

15  A    Jamal al-Tawil served as Chairperson of Hamas.  He was

16  the founder, the first Chairperson, and served in this

17  position until he was imprisoned.

18  Q    I believe 1224 is in evidence.  If the not, I will

19  offer it.

20          THE COURT:  Any objection?

21          MR. STEPHENS:  No.

22          THE COURT:  It's received.

23          (Whereupon, Plaintiff's Exhibit 1224 is received

24  and marked into evidence, as of this date.)

25  BY MR. TURNER:

A. Spitzen - Direct/Turner                1546

1   Q    Would you show the witness only 781, please, which

2   would be Slide 57.

3            Could you identify 781, Mr. Spitzen?

4   A    Yes, sir.

5   Q    And what, generally speaking, is 781.

6   A    781 is a document that was published by the Palestinian

7   General Intelligence.  Actually, it was describing the

8   chosing of the Hamas Organization in December of 2001.

9   Q    Do you recognize the name Col. Ibrahim al-Masri?

10  A    Yes, I do.

11  Q    Do you know who he was?

12  A    Yes.  He was the head of the General Intelligence in

13  that region of Ramallah.

14  Q    Did you personally meet Col. Ibrahim al-Masri in your

15  work with COGAT?

16  A    Yes, I did meet with him.

17  Q    And did you from time to time in your job at COGAT

18  receive general security service memorandums, such as this

19  providing intelligence from the Palestinian side of the

20  border?

21  A    Well, I personally or the department I worked in did

22  not receive any security information from the Palestinian

23  side.  We didn't receive any documents by that way.  That

24  came through a different conduit.  But every now and then we

25  would get such information from our own side.

A. Spitzen - Direct/Turner                1547

1   Q    Do you recognize the signature on this document of Col.
2   Ibrahim al-Masri?
3   A    Yes, sir.
4   Q    And do you recognize the Palestinian national authority
5   lieutenant head on this document?
6   A    Yes, sir.
7   Q    And the date of this document is what?
8   A    It is December 16, 2001.
9          MR. TURNER:  We offer 781.
10         MR. STEPHENS:  Objection, your Honor.
11         THE COURT:  Sustained.
12         MR. TURNER:  May we illustrate it or display it
13  for 703 purposes?
14         THE COURT:  No.  I think the witness has generally
15  testified what it was and that he relied only it, but I
16  don't think the jury needs to see it,if it is not in
17  evidence.
18         MR. TURNER:  Okay.
19  BY MR. TURNER:
20  Q    Let's go to the Al Tadamun Terrorist Society.
21         Did you have an opportunity to evaluate Hamas'
22  control over the Al Tadamun Society in Nablus?
23  A    Yes, sir.
24  Q    Was this one of the societies or organizations that you
25  found was controlled by Hamas in the relevant time frame?

A. Spitzen - Direct/Turner                1548

1  A    Yes, sir.

2  Q    And did you have an opportunity to prepare a chart or

3  slide illustrating those leaders of the Al Tadamun

4  Charitable Society in Nablus?

5  A     Yes, sir.

6  Q    Do you know the names of the six individuals on the

7  slide, can you identify, in other words?

8  A    Yes, sir.

9         MR. TURNER:  Your Honor, may we display 58?

10        THE COURT:  Yes.

11  Q    Let's start at the top left.  It appears -- I would

12  like for you to tell us who was Sheikh Hamed al-Bitawi?

13  A    Shake Hamed al-Bitawi was a very prominent Hamas leader

14  in Nablus, and in general in the West Bank.  He was a member

15  and also the founder of the Council of Clergymen in

16  Palestein.  It was a society that provided religious low

17  aspects of the activities of Hamas in the West Bank.  He was

18  a member of the Parliament on behalf of Hamas, and was

19  identified by the Hamas leader, the Chairperson of the

20  political bureau, as a Hamas member in 2003.

21  Q    What factors led you to conclude that the Al Tadamun

22  Charitable Society Nablus was controlled by Hamas during the

23  relevant time name?

24  A    The leadership of the organization that is comprised of

25  Hamas leaders, some of them assumed positions in the

A. Spitzen - Direct/Turner          1549

1   establishment of Hamas.  The association itself was

2   responsible for giving out monies on behalf of the Union of

3   Good in the northern region of the West Bank, and also

4   finding that we found such as martyr files, and one might

5   say it meets most of the criteria of society or organization

6   that is controlled by Hamas.

7            One more thing.  The facilities of the

8   organization served as morning homes for suicides bombers or

9   other senior operatives who were killed.

10  Q    Can you give us an example?

11  A    Yes.  For example, a senior Hamas operative that we

12  mentioned earlier in Sumariaam, when he got killed by the

13  idea the association published that the mourners home would

14  be located or would be facilitated by the premises of the

15  society itself.

16  Q    Now, Sheikh Bitawi, do you know whether he was a secret

17  member of Hamas or was he a public figure or Hamas?

18            MR. STEPHENS:  Objection.

19            THE COURT:  Sustained as to form.

20  BY MR. TURNER:

21  Q    Mr. Spitzen, do you know whether or not Sheikh Bitawi

22  was a secret member of Hamas?

23  A    Yes, I do know.

24  Q    How do you know that?

25  A    Yes, I do know because Sheikh Hamed Bitawi was a

A. Spitzen - Direct/Turner          1550

1   prominent figure.  He appeared in dozens of assemblies and

2   rallies, and gave speeches of hate against Israel and

3   actually had to pay for the public expression of him by

4   actually serving time in prison.  Most of the time those

5   imprisonments were conducted by the Palestinian Authority,

6   was a very popular and very colorful and well-known

7   individual.

8   Q    Now, were any of the six individuals shown on Slide No.

9   58 to your knowledge involved in terror activities?

10  A    Isn't the have broad definition of terror, yes.

11  Q    Who?

12  A    Each and everyone of those people was somehow related

13  to transfer of funds to the terrorists.  Each of them was

14  related to transferring funds to families of terrorists.

15  Each and everyone of them, all six were related to the

16  activity that actually facilitated terror and allowed it to

17  thrive and prosper in the West Bank and the Gaza Strip

18  during this relevant time frame?

19          MR. STEPHENS:  Motion to strike.

20          THE COURT:  Hang on.

21          I will grant that motion, unless I get a better

22  basis for how the witness knows all of this.

23  BY MR. TURNER:

24  Q    Mr. Spitzen, can you first, without telling us your

25  knowledge, can you first tell us what is the source of your

A. Spitzen - Direct/Turner          1551

1   knowledge of these individuals involved in terrorism.

2   A

3          THE COURT:  I will ask the interpreter to talk

4   slowly.

5          THE WITNESS:  These sources of information

6   concerning the civilian activities of these individuals that

7   relates to what we call interloping activity that allowed

8   and facilitated terror activity.  It provided support to

9   terror acts, and includes different and diverse types of

10  information.

11         For example, there are files that were found in a

12  charitable association Tadamun such as files and other

13  documents that we, IDF, found during those searches.

14  Another source was publications of the society, and the

15  expression is voiced by the leaders.  These leaders had

16  senior positions in Hamas, such as, for example, Al Gaotali

17  (ph) who served as a member of Parliament as a member of

18  Hamas, and Yaish, who was the mayor on behalf of Hamas in

19  Nablus.  And Mide oblique (ph) was the deputy mayor of

20  Nablus.  All of these lead me to the conclusion that this

21  group of people were engaged in civilian activities that

22  facilitated and supported the terror activity of Hamas.

23         THE COURT:  I will overrulev the objection.

24  BY MR. TURNER:

25  Q    Do you know who was the chairman of the Al Tadamun

A. Spitzen - Direct/Turner                    1552

1   Chartitable Society Nablus during the relevant time frame?

2   A    Yes.

3   Q    And how do you know that?

4   A    I do know it, first of all, by those documents that we

5   seized in Al Tadamun, where it states very explicitly who

6   the Chairperson is, but it wasn't just asked, the public at

7   large knew it.  It was no secret.

8   Q    Was the Al Tadamun Charitable Society Nablus one of the

9   societies or organizations where the government was able to

10  seize the kinds of evidence that we talked about earlier

11  today?

12  A    Yes, a search was conducted in Al Tadamun Society in

13  2002.  I do not recall the exact date, but in that search,

14  many documents were found, including some documents that are

15  presented in this case, for example, the martyr files.

16  Q    Now, were you able to determine from the limited

17  records that you saw, whether or not the he will Tata moon

18  charitable society Nablus received money transfers from the

19  Arab Bank during the relevant time frame?

20  A    Yes, sir.

21  Q    Now, in addition to the martyr files that you had, did

22  you have access to the bank account records from Arab Bank

23  for the account for Al Tadamun Charitable Society Nablus.

24  A    Sadly not.

25  Q    Why?

A. Spitzen - Direct/Turner          1553

1    A    Because the bank refused to hand over these records to

2    me, sir.

3    Q    Was there also a Nablus Zakat Committee during the

4    relevant time frame?

5    A    Yes, sir.

6    Q    Could you very briefly explain to us what a Zakat

7    committee was?

8    A    Yes, and I do this very briefly.  One of the five

9    commandments of Islam is the giving of charity in Arabic

10   Zakat, which describes a certain percentage of one's income,

11   in order to collect this money and to give it out, to hand

12   it out properly, first of all, under the Jordanian rule, and

13   later on under Palestinian rule in the West Bank.  The Zakat

14   committees were established that, first of all, reported to

15   the Jordanian Authorities, then to the Palestinian

16   Authorities, and their role was to collect money and to give

17   it out to the needy.

18   Q    Were you able to determine who the leaders of the

19   Nablus Zakat Committee were, during the relevant time frame?

20   A    Yes, sir.

21   Q    Were you able to determine whether four of the same

22   members of the Tadamun Charitable Society Nablus, likewise

23   controlled and operated the Nablus Zakat Committee?

24   A    Yes, sir.

25        MR. TURNER:  May we display Slides 59.

A. Spitzen - Direct/Turner                1554

1    THE COURT:  Yes.

2    MR. TURNER:  We will not,  or the sake of brevity,

3  go through every one of these.

4  Q    Were four of these six individuals that we looked at of

5  the same Nablus Committee?

6  A    Yes, indeed.

7  Q    And is this one of the committees that you were able to

8  determine whether or not it was controlled by Hamas during

9  the relevant time frame?

10  A    Yes, sir.

11  Q    And your conclusion was?

12  A    My conclusion was based on the leadership of the

13  society that it was controlled by Hamas.

14  Q    Did you also have an opportunity to investigate the

15  Tulkarem Zakat Committee?

16  A    Yes, sir.

17  Q    Was it one of the societies controlled by Hamas during

18  the relevant time frame?

19  A    Yes, indeed, sir.

20  Q    And what factors weighed in favor of that conclusion?

21  A    Based on the leadership and based on many of the

22  searches that were conducted in the Zakat committee in

23  Tulkarem and the findings that were found in the nature of

24  the activities that were carried out, who the money came

25  from, where the money was sent to, and who it was sent to,

A. Spitzen - Direct/Turner                1555

1  the employees of the society were found to be members of

2  Hamas.  In short, a large number of the criteria were found

3  to be consistent with the fact that this committee was

4  controlled by Hamas.

5  Q    Is this another organization where funds were

6  transferred through the Arab Bank?

7  A    Yes, sir.

8            MR. TURNER:  May we display Slide 60.

9            THE COURT:  I don't remember.  Let me see it,

10  first.

11            (Pause)

12            Yes.

13  Q    Very quickly, who was Sheikh Safira?

14  A    Sheikh Safira was a Hamas operative.  He was quite

15  known as an Hamas operative in the area of Tulkarem.  He was

16  a well-known Hamas operative.

17  Q    What about Sheikh Bitawi?

18  A    Sheikhshake Omar Bitawi was a senior ranking Hamas

19  operative in the area of Tulkarem.  He was arrested and put

20  in jail.

21  Q    Did you have an opportunity to evaluate the Jenin Zakat

22  Committee?

23  A    Yes, sir.

24            MR. TURNER:  And may we display Slide 61, your

25  Honor.

A. Spitzen - Direct/Turner                1556

1            THE COURT:  Let me see it first, please.

2            (Pause)

3            Yes.

4    BY  MR. TURNER:

5    Q    Do you recognize the five indivcduals shown on Slide

6    61, Mr. Spitzen?

7    A    Yes, sir.

8    Q    Was this one of the organizations that you found to be

9    controlled by Hamas during the relevant time frame?

10   A    Yes, indeed.

11   Q    Who was Ahmed Sal latter ^ 93 ^ knee ^  '93 Sal /HRAT

12   /TPHAEU was the direct general of the society.  He was a key

13   figure.  He ran it together with Sekani, and he ran the

14   day-to-day operations.

15   Q    At some point in time was Ahmed Salate convicted of

16   being both a Hamas leader and a head of the Jenin Zakat

17   Committee?

18            MR. STEPHENS:  Objection, your Honor.

19            THE COURT:  Sustained.

20            MR. TURNER:  Could you show the witness only

21   please, 4749.

22            Can you identify 4749.

23   A    Yes, sir.

24   Q    What is 4749?

25   A    This is the verdict and sentencing of Ahmed Salame,

A. Spitzen - Direct/Turner                1557

1  also known as Sakoni (ph).

2          MR. TURNER:  We would offer 4714 as apostilled

3  conviction of Ahmed Salakni

4          THE COURT:  Can you give it to me in one word or

5  sidebar?

6          MR. STEPHENS:  Time frame.

7          THE COURT:  All right.  That's overruled.  The

8  document is received.

9  BY MR. TURNER:

10 Q    Can you show the witness 1055, please.

11        Do you recognize 1055?

12 A    I haven't received it yet.  Oh yes, yes. Yes.

13 Q    And what is 1055?

14 A    This is the verdict of Seligme, whose also known as

15 Sedcane

16 Q    We would offer 1055 as the apostilled conviction record

17 for sucarne

18        THE COURT:  Any objection?

19        MR. STEPHENS:  Yes, Your Honor.

20        THE COURT:  On the same basis, it is overruled.

21        MR. STEPHENS:  May we approach for a moment?

22        THE COURT:  Sure.

23

24

25

SIDE BAR A. Spitzen - Direct/Turner          1558

1          MR. STEPHENS:  The conviction is someone named

2     Salame.

3          THE COURT:  Yes, he explained that.

4          MR. STEPHENS:  He just said he was known by a

5     different name.  How does he know that.

6          THE COURT:  I think you can do that on cross.  I

7     don't think it's a prerequisite for the admission of the

8     document.  The witness has given a foundation that this is

9     the same person known under a different name.  You can ask

10    him how he knows that.  You can show him that's not the

11    case.  You can do anything, but he's done enough to lay a

12    foundation for apostilled document.

13         MR. OSEN:  He has a four-part name, and they

14    listed three of them.

15         THE COURT:  I'm sure there's a complete

16    explanation.  The objection is overruled.

17         (Side bar ends)

18

19

20

21

22

23

24

25

A. Spitzen - Direct/Turner                1559

1        THE COURT:  The document is received.

2        MR. TURNER:  Let's go back to Slide 61, if that's

3   okay, your Honor.

4        THE COURT:  All right.

5   BY MR. TURNER:

6   Q    Let's focus on the top left.

7        Sheikh Zakarneh, he was convicted of what?

8   A    He was convicted of belonging to an unlawful

9   association that is the Zakat Committee of Jenin, stated

10  explicitly that his membership extended from the year 2001.

11  That's it.

12  Q    And were you able to determine from your work and

13  investigation, whether money transfers to the gentleman 19

14  Zakat Committee were made through Arab Bank during the

15  relevant time frame?

16  A    Yes, sir.

17  Q    And just another one of those committees where you did

18  not get access to the full bank account records from Arab

19  Bank?

20  A    Yes, sir.

21       MR. TURNER:  Your Honor, we are transitioning now

22  into the next phase, so if you want to break now.

23       THE COURT:  This would be a good time.

24       Ladies and gentlemen, don't talk about the case

25  with anyone else, nor among yourselves.  Stay away from any

1560

1    media coverage of the case.  Do not do any research on the

2    internet.  Do not communicate about the case on the internet

3    or otherwise.  Please keep an open mind, and we'll see you

4    tomorrow morning at 9:30.

5              Thank you again for your attention.

6              (The jury leaves the courtroom for the evening at

7    420 p.m..)

8              THE COURT:  Be seated please.

9              I will try to get an order out in the next couple

10   of hours, a few hours, on the objections that I received at

11   ten last night, the remainder of the slides that the

12   plaintiff intends to use tomorrow.  So, to the extent that

13   you got to edit some of them, and I suggested this morning I

14   think you will, I will get that to you as soon as I can.

15             MR. OSEN:  That's fine, your Honor.  We went

16   through that obviously late last night, and I think almost

17   without exception they are already covered by Your Honor's

18   prior order.  So we adjusted pretty much to that.

19             MR. STEPHENS:  If we can see them, that might

20   shore things up for you, your Honor.

21             THE COURT:  Well, it might, it might not.  It

22   might just mean that I got --

23             MR. STEPHENS:  More objections.

24             THE COURT:  Until I see them, I don't know.

25             MR. OSEN:  They are the same slides, so they are

1561

1   no different slides.

2        MR. TURNER:  I think the point being made is we

3   went through lunch.  We took out all of the logos and

4   language you told us to take out, and we corrected them

5   consistent with what you told us today.  We have no problem

6   giving them to the bank.

7        THE COURT:  All right.  I think that's fine.  I

8   think that obviates the need for me to do that order.  If

9   there's anything remaining in dispute, after the defendant

10  has reviewed the revised slides, we'll take them up one at a

11  time as they come up.

12        Anything else we need to cover?

13        MR. STEPHENS:  No,  your Honor.

14        MR. OSEN:  There's one issue, your Honor.  In your

15  order Sunday, you directed the defendant to give us the

16  order of their witnesses tomorrow, and we have some pretty

17  grave concerns about that in terms of the fact that we'll

18  probably rest tomorrow in our case in chief, and that would

19  give us 24 hours, less than 24 hours, to be prepared for

20  some subset of 21 witnesses.

21        THE COURT:  How long -- how much longer on direct

22  do you anticipate with this witness?

23        MR. TURNER:  I think as with Mr. Shaked, I will

24  probably finish right around the mid-morning break.

25        THE COURT:  Okay.  Based on that, Mr. Stephens,

1562

1    how long do you anticipate on cross?

2            MR. STEPHENS:  It will go into Thursday.

3            THE COURT:  Okay.  Well, then --

4            MR. STEPHENS:  I don't have a problem with giving

5    them a witness list.

6            THE COURT:  The question is when?

7            MR. STEPHENS:  I will probably do it tonight.

8            THE COURT:  Okay.  See you tomorrow.

9            (The trial is adjourned for the evening at

10   4:25 p.m..)

11

12                            ***

13

14

15

16

17

18

19

20

21

22

23

24

25

1564

```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X
  COURTNEY LINDE et al,         :
                                :  04-CV-2799 (BMC)
           Plaintiffs,          :  And all related cases:
                                :  04-CV-5449 (Litle)
       -against-                :  04-CV-5564 (Almog)
                                :  05-CV-365  (Coulter)
                                :  05-CV-388  (Afriat-Kurtzer)
                                :  05-CV-3183 (Bennett)
                                :  05-CV-3738 (Roth)
  ARAB BANK, PLC,               :  06-CV-1623 (Weiss)
                                :
           Defendant.           :  United States Courthouse
                                :  Brooklyn, New York
                                :
                                :  Wednesday,
                                :  September 3, 2014
                                :  9:30 a.m.
                                :
- - - - - - - - - - - - - - - X
```

```
           TRANSCRIPT OF CIVIL CAUSE FOR JURY TRIAL
            BEFORE THE HONORABLE BRIAN M. COGAN
            UNITED STATES DISTRICT COURT JUDGE
```

A P P E A R A N C E S:

| | |
|---|---|
| For the Linde and<br>Coulter Plaintiffs: | OSEN, LLC<br>BY: **GARY M. OSEN, ESQ.** |
| | TURNER and ASSOCIATES<br>BY: **CLYDE T. TURNER, ESQ.** |
| For the Litle,<br>Bennett and Roth<br>Plaintiffs: | SAYLES WERBNER<br>BY: **MARK S. WERBNER, ESQ.** |
| | STONE BONNER & ROCCO, LLP<br>BY: **JAMES P. BONNER, ESQ.** |
| For the Almog<br>Plaintiffs: | MOTLEY RICE LAW FIRM<br>BY: **MICHAEL ELSNER, ESQ.** |
| For the Defendant: | DLA PIPER, PLC<br>BY: **SHAND S. STEPHENS, ESQ.**<br>**ANTHONY PAUL COLES, ESQ.**<br>**BRETT INGERMAN, ESQ.** |

* * * * *

PROCEEDINGS                    1565

Courtroom Deputy:  Melonie Clarke

Court Reporter:  Frederick Guerino, CSR
                 Official Court Reporter
                 Telephone: (718) 613-2503
                 E-mail:  Frederickguerino@aol.com


Proceedings recorded by computerized stenography.  Transcript
produced by Computer-aided Transcription.

*****************************************************************

8               (In open court.)

9          (Honorable Brian M. Cogan takes the bench.)

10          THE COURT:  Be seated, please.  Does anyone mind

11    that the witness stays there while we address some

12    preliminary matters?

13          MR. STEPHENS:  I don't mind.

14          THE COURT:  First of all, we have a problem with a

15    juror, the same juror that we had to take a day off for last

16    week.  She sits on the Board of Elections, she's been called

17    to do that, I think all of next week I think, Melonie?  One

18    day of next week, Tuesday of next week.  She receives $400 a

19    day for that and she wants that day off.  What would the

20    parties like me to do?

21          MR. TURNER:  What day is it?

22          THE COURT:  Tuesday.

23          MR. STEPHENS:  I'm okay with that.

24          THE COURT:  Take Tuesday off?

25          MR. TURNER:  That's fine.

PROCEEDINGS                          1566

1      MR. WERBNER:  Well, can we confer a little bit and

2  get back to you?

3      THE COURT:  Yeah, that's fine.  Okay.  Where are

4  you on the slides; I take it you've reached agreement on

5  everything?

6      MR. OSEN:  We haven't heard further objection, but

7  that's the best I can say, your Honor.

8      THE COURT:  Well, how are we going to handle this,

9  Mr. Stephens, having seen the revised slides, do you have

10  any that still give you a problem?

11      MR. STEPHENS:  Hang on just a minute, your Honor.

12  I don't think we need to take your time right now.  We have

13  pending objection to some of these, but that I don't believe

14  have been ruled on.

15      THE COURT:  Well, yeah, they haven't, because I

16  was about to, and then the parties told me last night they

17  wanted to see if they could work it out.

18      MR. STEPHENS:  But it's only two or three.  If

19  they come up and if in fact they show them, we can do it

20  then.

21      THE COURT:  All right.  That's fine.  We'll recess

22  for just a moment.  One of the jurors was late and should be

23  here momentarily, I'm sure, so we'll reconvene as soon as

24  they get here.

25          (Proceedings were recessed and recalled.)

PROCEEDINGS                    1567

1        (Honorable Brian M. Cogan takes the bench.)

2        THE COURT:  Be seated for just a minute.  There is

3   one portion of the order that I've entered that I want to

4   change, I don't want the plaintiffs to use with this witness

5   all of the websites that I approved in my last order.  I

6   only want them to display one of those websites, not the

7   Union of Good website on Exhibit 565, I think displaying one

8   example will be helpful for the jury in considering this

9   witness' opinion and it's helpfulness outweighs its

10  prejudicial effect.  I'm not changing my ruling as to what's

11  been referred to as the martyr files, the plaintiffs can use

12  two examples of those.  If the defendant wants me to, I'll

13  give a limited instruction that those are to be considered

14  only for Rule 703 purposes.

15       So let's not go through all the websites.  The

16  witness can testify generally that he relied on others like

17  the one that you can pick to show the jury.

18       All right.  Let's have the jury, please.

19       MR. COLES:  Your Honor, just on the charts is --

20  most of the substantive objections that we have are

21  unauthenticated websites or unauthenticated web chapters.  I

22  don't see how those can be resolved without a ruling from

23  your Honor.  They took out the Arab Bank logos and things

24  like that, but the substantive objections and the hearsay

25  objections are still there.

PROCEEDINGS                        1568

1    THE COURT:  As I just said, they can't use any of

2    the websites besides one as an example.

3    (Jury is in the courtroom at 9:45 a.m.)

4    THE COURT:  All right.  Be seated, please.

5    Mr. Turner, you may continue.

6    MR. TURNER:  Thank you, your Honor.

7    May we display slide number seven, please?

8    THE COURT:  Yes.

9    **ARIYEH SPITZEN**, being recalled by the Plaintiffs, having been

10   previously duly sworn, was examined and testified as follows:

11   DIRECT EXAMINATION

12   BY MR. TURNER:

13   Q    Let's begin this morning, Mr. Spitzen, talking about

14   direct fund transfers to Hamas through the Arab Bank.

15   Now, we've got a slide on the screen at the

16   moment, and I want to talk about the top row of boxes above

17   the Arab Bank with the blue arrows pointing to the Arab

18   Bank.  Can you generally describe for us what those four

19   boxes represent?

20   A    When we check transfer of funds to terror, we check the

21   sources and the uses.  The upper part deals with the sources

22   where the money comes from to the terrorists.

23   Q    Now, let's begin with the top left, "Hamas' Worldwide

24   Fundraising and we're going to talk in detail about that in

25   just a moment, but very generally speaking, what is the

PROCEEDINGS                          1569

1   worldwide fundraising as you're referring to?

2   A    Hamas has a number of foundations, some of which no

3   longer exist as of now, which are earmarked designated for

4   fundraising.  For example, the Holy Land Foundation, which

5   no longer exists, and the al Aqsa Foundation in Germany,

6   which no longer exists, but existed at the time of the

7   relevant period that we are talking about and the Coalition

8   of Good -- the Union of Good, excuse me, which still exists,

9   which was established with the special purpose by Hamas

10  leaders to transfer funds to Hamas.

11  Q    Now, let's focus on bottom four boxes.  The first

12  three, the Da'wa organizations, the Hamas leaders and

13  al-Qassam Brigade; we spent a lot of time talking about them

14  thus far.  This morning will we be talking about families of

15  Hamas suicide bombers and prisoners receiving funds.

16  A    What's the question?

17  Q    Will we be discussing the families of Hamas suicide

18  bombers and prisoners in the up coming series of questions

19  about the Saudi Committee and others?

20  A    Yes, indeed.  The Saudi Committee transferred funds to

21  the families of Hamas suicide bombers, to Hamas prisoners

22  and operatives.

23  Q    And did those funds go through the Arab Bank?

24  A    Yes, sir.

25          MR. TURNER:  May we have slide 63.

PROCEEDINGS                    1570

1    Q     Now, would you very briefly explain to us, Mr. Spitzen,

2    what we're looking at on this global chart of Hamas

3    worldwide fundraising networks?

4    A     Yes.  What we see here are the countries in which money

5    is collected for Hamas by various foundations that collect

6    money for Hamas, perhaps for others, but especially for

7    Hamas, and the transfer into the field of that money.

8    Q     I want to focus on two, because we're going to be

9    talking about them in some detail.  First of all, the Union

10   of Good.  Did your investigation reveal any relationship

11   between Hamas and the Union of Good?

12   A     Yes.  The Union of Good was established in the year

13   2000 by Hamas leaders.

14   Q     The other one I want to focus on is at the bottom, the

15   Saudi Committee in Support of the Intifada al Quds.  Did you

16   find any relationship between the Union of Good and the

17   Saudi Committee in Support of the Intifada al Quds?

18   A     Yes.  I will preference my remarks and say the Union of

19   Good is an umbrella organization for 50 different

20   organizations, and one of the member organizations is the

21   Saudi Committee for the Support of Intifada al Quds.

22            MR. TURNER:  May I have Exhibit 4754 on the

23   screen?  That's already in evidence.

24   Q     Do you recognize this exhibit for the data from

25   Mr. Geisser?

PROCEEDINGS                    1571

1    A    Yes, sir.

2    Q    Now, on this chart, just for purpose of orientation,

3    this group of entities running across the top are the

4    originators of the funds, and this group running up and down

5    or north and south on the page are the recipients of funds.

6              Now, did you have an opportunity in your work to

7    review the data in Mr. Geisser's report relating to these

8    transactions?

9    A    Yes.  I didn't check the actual figures, because I'm

10   not a bookkeeper or accountant, but I did check that indeed

11   all of the societies that are listed at the top did indeed

12   get money from the above entities.

13   Q    Looking at these 12 entities running up and down on the

14   page, these organizations, were you able to determine

15   whether those 12 organizations during the relevant timeframe

16   were all controlled by Hamas?

17   A    Yes, sir.

18   Q    And were you able to determine whether all 12 of these

19   entities based upon the SWIFT transfers that you had access

20   to, were you able to determine whether these 12 entities

21   likewise maintained bank accounts at Arab Bank during the

22   period of time?

23             MR. STEPHENS:  Objection, your Honor.

24             THE COURT:  Overruled.

25   A    Yes.  These societies or organizations had accounts in

PROCEEDINGS                    1572

1    the Arab Bank.

2    Q    And given Mr. Geisser's data were you able to determine

3    approximately how much money was transferred to these 12

4    entities during the relevant timeframe through Arab Bank?

5              MR. STEPHENS:  Objection, your Honor.

6              THE COURT:  Hang on one second.  I'll sustain that

7    as to the form.

8    Q    Were you able to -- given Mr. Geisser's figures, were

9    you able to tell from this chart how much money during the

10   relevant timeframe was transferred through Arab Bank to

11   these 12 entities?

12   A    According to Mr. Geisser's figures $32,312,170 was

13   transferred to all of these entities.

14             MR. TURNER:  Now, may we have slide 65, please.

15   Q    Let's focus on the Union of Good.  First of all,

16   Mr. Spitzen, explain to us, if you would, the history behind

17   the Union of Good, very briefly.

18   A    At the beginning of the Second Intifada, al Quds

19   Intifada, a number of organizations were established to

20   raise funds to support the Intifada.  One of the main

21   organizations was the Union of Good, which was an umbrella

22   organization that included some 50 plus foundations.  At

23   first it was established as an organization intended to

24   survive for 101 days, and it was called 100 Days of Grace.

25   But its success left it alive for many years, as we can see

PROCEEDINGS                    1573

1    today.  It was established by the leadership of Hamas.

2    Q    What year was it established?

3    A    As I noted, in late 2000.

4    Q    Were you able to find during the course of your

5    investigation any evidence of designations in governmental

6    actions taken against the Union of Good?

7    A    Yes, definitely.

8    Q    What did you find?

9    A    First of all, in the large scale designation by the

10   State of Israel on February 25, 2002, the Union of Good was

11   included in that designation.  Further designation was in

12   2008 by the US government when it was designated as a global

13   terrorist.

14   Q    Now, as much as we discussed in the context of

15   charities yesterday, was the designation in 2002 in Israel,

16   was that public information?

17             MR. STEPHENS:  Objection, your Honor.

18             THE COURT:  Ask him whether he knows and if so how

19   he knows.

20   Q    Mr. Spitzen, do you know whether or not the Union of

21   Good's designation by Israel in February of 2002 as an

22   unlawful association was public information?

23   A    Yes.  As I noted yesterday, an action of this type is

24   akin to a form of legislation ordinance, and it is made

25   public in a number of different ways.

PROCEEDINGS                    1574

1   Q    Now, let's focus on the three individuals.  Do you

2   recognize the photograph, the three photographs on slide 65?

3   A    Yes, sir.

4   Q    Let's start on the left-hand side.  Can you tell us,

5   please, sir, who was Sheikh Qaradawi?

6   A    Yes.  Yousef Qaradawi is one of the most important

7   leaders of the Muslim Brotherhood in the world.  He is

8   considered a religious authority of the Muslim Brotherhood

9   of which Hamas is a part.  He has given many expert opinions

10  on religious matters justifying suicide bombings and suicide

11  attacks.  He's very extreme in his views related to terror,

12  and he justifies the use of terror.  Hamas considers him

13  their supreme spiritual authority.

14  Q    Do you know whether Sheikh Qaradawi during the relevant

15  period of time was publicly holding himself out as related

16  to Hamas?

17  A    Yes, definitely.  Sheikh Qaradawi expressed himself in

18  public frequently, for example, on al Jazeera Television,

19  which is a television station that quotes him a lot and he

20  has expressed his support for Hamas in public, there is no

21  doubt about it.

22  Q    Let's move to the middle.  Who was Mustafa Yousef

23  during the timeframe?

24  A    Yes, he is Essam Salah Mustafa Yousef is a known Hamas

25  member.  He lives in the United Kingdom.  He is known there

PROCEEDINGS                    1575

1   as a person of Hamas.  He is the head of an organization

2   called Interpal, which is a foundation that supports Hamas.

3   He was -- he originally comes from the territories, but he

4   now resides in the UK where he is known to be a member of

5   Hamas.

6   Q    And the last one on the left-hand side, Sheikh Bitawi.

7   Is that the same Sheikh Bitawi that we discussed yesterday?

8   A    Yes, sir.

9   Q    If we could go back to slide 58 for a moment, please.

10  Is this the same Sheikh Bitawi that was involved with the

11  al-Tadamun Charitable Society in Nablus?

12  A    Yes, it is the same Bitawi who was the chairperson of

13  the al Tadamun in Nablus.

14  Q    Now, I want to talk about one other person whose

15  photograph is not shown on slide number 65.

16       MR. TURNER:  Could we please have slide 48.

17  Q    Mr. Spitzen, yesterday in the context of the discussion

18  about the al-Salah Islamic Society we talked about Ahmad

19  al-Kurd.  What relationship did you find that he had with

20  the Union of Good during the relevant timeframe?

21  A    Ahmad al-Kurd was the representative of the Gaza Strip

22  in the Union of Good.

23  Q    Now, during the course of your work, Mr. Spitzen, were

24  you able to determine whether or not the Union of Good

25  facilitated the transfer of tens of millions of dollars into

PROCEEDINGS                    1576

1    the Hamas managed organization and charitable associations?

2              MR. STEPHENS:  Objection, your Honor.

3              THE COURT:  Sustained as to form.

4    Q    Mr. Spitzen, were you able to investigate the

5    relationship between the Union of Good and the transfer of

6    funds to Hamas managed associations in the West Bank?

7              MR. STEPHENS:  Objection, your Honor.

8              THE COURT:  Overruled.

9    A    Yes, definitely.  The Union of Good was a central

10   source for the transfer of funds to the associations and

11   committees that were controlled by Hamas in this particular

12   timeframe.

13   Q    And did your investigation indicate whether the ones we

14   discussed yesterday were included?

15   A    Yes.  To the best of my recollection all the committees

16   and associations mentioned yesterday received funds from the

17   Union of Good.

18             MR. TURNER:  May we have Exhibit 1415, which is

19   already in evidence, on the screen?  This is slide 66.

20   Q    This is the United States Treasury Department press

21   release on the designation on the Union of Good as a

22   specifically designated Global terrorist, and I would like

23   to focus on the yellow writing at the very bottom.

24             The sentence reads, quote, the Union of Good

25   facilitates the transfer of tens of millions of dollars a

PROCEEDINGS                    1577

1   year to Hamas managed associations in the West Bank and Gaza

2   Strip."

3           Did that excerpt from the United States

4   designation confirm for you any of your findings?

5   A    Yes, indeed so.

6   Q    Now, if you look up at the top in the first excerpt in

7   yellow it says, "The leadership of Hamas created the Union

8   of Good in late 2000, shortly after the start of the Second

9   Intifada in order to facilitate the transfer of funds to

10  Hamas."

11          Was that consistent with your findings?

12  A    Indeed, the American designation is accurate.

13  Q    The next sentence, "Including a finding that the Union

14  of Good acts as a broker for Hamas by facilitating financial

15  transfers between a web of charitable organizations,

16  including several previously designated under Executive

17  Order 13224 for providing support to Hamas."

18          Was that consistent with your findings?

19  A    Yes, sir.

20  Q    It also includes a statement that, "The primary purpose

21  of the Union of Good activity is to divert charitable

22  donations to support Hamas members and the families of

23  terrorists operatives."

24          Was that consistent with your findings?

25  A    Yes, sir.

PROCEEDINGS                    1578

1           MR. TURNER:  Now, if you could show the witness

2    only please the still photograph from the video 1244, which

3    is already in evidence.

4    Q    Now, do you recognize this particular still photograph

5    from the videotape that is in evidence, Mr. Spitzen?

6    A    Yes.

7           MR. TURNER:  May we display this, your Honor?

8           THE COURT:  Yes.

9           MR. TURNER:  Your Honor, we're not going to ask to

10   play the video yet again, but I would like to be permitted

11   to ask some questions about this particular meeting.

12           THE COURT:  Yes.

13   Q    Now, have you had an opportunity to watch the video,

14   Mr. Spitzen?

15   A    Yes, sir.

16   Q    And can you explain to us the significance of this

17   video in confirming any of your findings?

18   A    Yes, sir.

19   Q    Please do.

20   A    There are, I believe, two extremely important points.

21   First of all, the way Qaradawi himself is related to Hamas.

22   During the video he expresses his opinion about Khaled

23   Mashal, the chairperson of the political bureau of Hamas,

24   and even jokes about the fact that he's called terrorist,

25   and he states his support of him.

PROCEEDINGS                    1579

1    And the second point is the very tight connection

2  between the Union of Good and Hamas, which is expressed in

3  this videotape.

4  Q    And did this videotape help confirm your conclusions

5  about the relationship between Qaradawi, Hamas and the Union

6  of Good?

7  A    Yes, sir.

8  Q    Now, let's talk about the Saudi Committee for a moment.

9          MR. TURNER:  Can we have slide 68, your Honor?

10         THE COURT:  Has that been shown?  Has that slide

11  been shown?

12         MR. TURNER:  No, sir.

13         THE COURT:  Let me see it first.

14         (Pause.)

15         THE COURT:  Yes, that's fine.

16  Q    Mr. Spitzen, very briefly introduce the Saudi Committee

17  in Support of the Intifada al Quds, what is it, when it was

18  created and for what stated purpose?

19  A    Yes.  The Saudi Committee for the Support of the al

20  Quds Intifada was founded on October 16, 2000 by a war

21  decree issued by the Saudi royalty under the auspices of

22  ministry of the interior Nayef Bin Sultan and its role was

23  to support the al Quds Intifada, this is its name.  In order

24  to do this, it did its fundraising activity and transfers

25  the funds to the fields to the Palestinian authority.

PROCEEDINGS                          1580

1  Q    And these stated goals that are shown on slide 68,

2  where did these goals come from, what was the source of

3  these goals?

4  A    These goals were published on the internet website of

5  the Saudi Committee immediately after its establishment.

6  Q    Do you know whether there was a relationship between

7  the Saudi Committee and the Union of Good?

8  A    Yes.  The Saudi Committee was one of those 50

9  foundations that the Union of Good served as an umbrella

10 organization for.

11            MR. TURNER:  Can we show the witness only

12 Exhibit 468, please.  That's slide 69.

13 Q    Do you recognize Exhibit 468?

14 A    Yes.  Yes, sir.

15 Q    What is Exhibit 468, generally?

16 A    This is a page from the internet website of the Saudi

17 Committee.

18 Q    And did this particular web page extraction help you in

19 reaching any conclusions about the relationship between the

20 Saudi Committee and the Union of Good?

21 A    Yes, sir.

22 Q    And what was your conclusion?

23 A    These things speak for themselves.  It is the visit of

24 the chairperson of the Union of Good Dr. Yousef al-Qaradawi

25 in the Saudi Kingdom.  He came there in order to thank them

PROCEEDINGS                          1581

1   for the support that the Union of Good received from the

2   Saudis.

3           MR. TURNER:  Now, if you can show the witness

4   only, please, slide number 70.

5   Q   Now, did you find during the course of your

6   investigation, Mr. Spitzen, whether there came a time where

7   there was coordination between the Saudi Committee and

8   Sheikh Qaradawi and the Union of Good with respect to the

9   operation of the Saudi Committee?

10  A   Yes.  You can see this -- or you actually cannot see

11  this, but I found this on the internet website of the Saudi

12  Committee in which it covers the visit and the implication.

13          And I would like to correct the name that I

14  mentioned earlier, it's Nayef Bin Abd al-Aziz.

15          So there on the internet website we can see that

16  it states the sum of $1.3 million that were raised in Saudi

17  Arabia for the purposes of Union of Good.

18          MR. STEPHENS:  Move to strike, your Honor.

19          THE COURT:  All right.  I'm going to grant the

20  motion to strike.  I'm going to ask the witness not to read

21  the contents of these websites, but only to testify

22  generally what conclusions they caused him to draw and how

23  they helped him in reaching those conclusions.

24  Q   Now, with respect to Exhibit 566, which is slide 70 and

25  the excerpt, how did this particular website excerpt assist

PROCEEDINGS                          1582

1    you in reaching your conclusions?

2    A    This excerpt again attests to the connection between

3    the Saudi Committee and the Union of Good between the

4    royalty -- Royal House and the Union of Good.

5              MR. TURNER:  Now, if you could show the witness

6    only, please, Exhibit 565, which is slide 71.

7    Q    Do you recognize 565, Mr. Spitzen?

8    A    Yes, sir.

9    Q    Is this likewise from a website?

10   A    Yes, but this time it is from the Union of Good's

11   internet website.

12   Q    And are you familiar with this website in your

13   profession?

14   A    Yes, sir.

15   Q    And in your experience is this website relied upon in

16   the intelligence community as an authentic website?

17             MR. STEPHENS:  Objection, your Honor.

18             THE COURT:  Overruled.

19   A    Yes, sir.  The intelligence community relies and uses

20   this website and this open source of communication above

21   this website.

22   Q    Now, how was this particular website able to help you

23   reach conclusions about the coordination efforts between the

24   Union of Good and the Saudi Committee?

25   A    This website lists the various entities that are part

PROCEEDINGS                    1583

1   of the Union of Good of which is listed the Saudi Committee

2   in Support of the Intifada al Quds.

3           MR. TURNER:  Now, could you show the witness only,

4   please, slide 72, which is Exhibit 454.

5   Q    Can you identify 454?

6   A    Yes, sir.

7   Q    And very generally, what is 454?

8   A    This is an internet page from the website of the Saudi

9   Committee taken from the web archive.

10  Q    Now, during the course of your investigation, were you

11  able to determine whether two charitable societies in the

12  Palestinian Territories were chosen by the Saudi Committee

13  to assist in and coordinate with respect to the transfer of

14  monies?

15  A    Yes, sir.

16  Q    And what two charities were you able to determine, what

17  two charitable organizations were chosen to coordinate with

18  the Saudi Committee for the distribution of funds?

19          MR. STEPHENS:  Objection, your Honor.

20          THE COURT:  Overruled.

21          THE WITNESS:  Yes.  The two committees, which are

22  listed on the website that I also saw in other documents

23  that I received, were the committee -- the Islamic

24  Charitable Society for the West Bank, which collected money

25  for the West Bank and the al-Salah Gaza Society for Gaza.

PROCEEDINGS                          1584

1    Q    Now, if we can --

2    A    I'm sorry, the first one is in Hebron, the Charitable

3    Society Committee in Hebron which collected money for the

4    West Bank and the second is the al-Salah Gaza Society which

5    collected money for Gaza.

6              MR. TURNER:  Okay.  Mr. Miller -- or, your Honor,

7    may we go to slide 48 very quickly?

8              THE COURT:  That's already been shown, right?

9              MR. TURNER:  Yes, sir.

10             THE COURT:  Yes.

11   Q    Just to put this into context, is this what we're

12   looking at on slide 48 the al-Salah Islamic Society with the

13   photograph of Ahmad al-Kurd, is that one of the societies

14   chosen by the Saudi Committee to help coordinate the Saudi

15   funds flowing into the Palestinian Territories?

16   A    Yes, that is the society I was mentioning.

17   Q    And if we could please go to slide 52 from yesterday as

18   well, this is one -- is the Islamic Charitable Society of

19   Hebron.  Is this the other society chosen by the Saudi

20   committee to help coordinate the control of funds?

21   A    Yes.  And the representative is in the center, Azam

22   Salhab.

23             MR. TURNER:  Now, could you please show the

24   witness only slide 73, which is also Exhibit 480.

25   Q    Can you identify Exhibit 480 very generally?

PROCEEDINGS                              1585

1    A    Yes, sir.

2    Q    What is 480?

3    A    This is a letter of complaints from --

4              MR. STEPHENS:  Objection, your Honor.

5              THE COURT:  Sustained.  It's not general enough.

6    Q    Who is this letter from?

7              MR. STEPHENS:  Objection, your Honor, there is no

8    foundation for that.

9              MR. TURNER:  I'm trying to be general.

10             THE COURT:  Well, you can ask him who does the

11   letter purport to be from.

12   Q    Who does the letter purport to be from?

13   A    The letter is signed by the Palestinian --

14             MR. STEPHENS:  Objection, your Honor, move to

15   strike.

16             THE COURT:  Overruled.

17             THE WITNESS:  -- Palestinian delegate

18   representative in Saudi Arabia.

19   Q    And who does the letter purport to be to?

20   A    It was supposed to be sent to the Prince, Prince Salman

21   Bin Abd Aziz.

22   Q    Now, in investigating the issue of the Saudi Committee

23   sending funds into the West Bank and Gaza as part of the

24   Saudi Committee program, were you able to determine whether

25   or not these funds were for legitimate needs as opposed to

1    going to Hamas for terrorist activities?

2              MR. STEPHENS:  Objection, your Honor.

3              THE COURT:  Sustained as to form.

4    Q    How did this particular letter, Mr. Spitzen, assist you

5    in this investigating the Saudi Committee program?

6              THE COURT:  Without describing the substance of

7    the letter.

8    A    The letter, in general terms, and I won't go into

9    details because I've been instructed, the letter generally

10   states that the Saudi Committee transfers money to Hamas

11   rather than to other organizations -- other purposes.

12   Excuse me.

13   Q    How was that helpful now reaching your conclusions in

14   this case?

15   A    This claim is consistent with the conclusions that I

16   drew regarding the relationship between the contribution

17   made by the Saudi Committee to Hamas.

18   Q    And were these contributions flowing through Arab Bank?

19             MR. STEPHENS:  Objection, your Honor.

20             THE COURT:  Overruled.

21             THE WITNESS:  Yes.  Money from the Saudi Committee

22   came through the Arab Bank.

23             MR. TURNER:  Now, if we could go to slide 74,

24   please.  This is in evidence as Exhibit 4759.

25   Q    Do you recognize this chart from Mr. Geisser,

PROCEEDINGS                    1587

1   Mr. Spitzen?

2            MR. TURNER:  May we display this, your Honor?

3            THE COURT:  Yeah, you are.

4            THE WITNESS:  Yes, sir.

5   Q    And how did this particular chart, which is captioned

6   "Saudi Committee in Support of the Intifada al Quds Funds

7   Transferred to Nine Identified Organizations" assist you in

8   reaching your conclusions, and I'm talking about the actual

9   data from Mr. Geisser's report?

10  A    This chart sheds light on the scope of the support

11  provided by the Saudi Committee to the nine societies that I

12  identified as being controlled by Hamas.

13  Q    Now, are these nine societies the same societies we've

14  already discussed where you were not given access to the

15  account records at Arab Bank?

16  A    Yes.  These are nine societies for which the bank

17  refused to produce documents and records regarding them.

18            MR. TURNER:  Now, if we could put up slide 75,

19  which is plaintiff's Exhibit 4760, which is already in

20  evidence from Mr. Geisser.

21  Q    This is a bar chart captioned, "Saudi Committee in

22  Support of Intifada al Quds Funds Transfers to Nine

23  Identified Organizations by Year," similar to the previous

24  chart, just a bar chart.  How did the data from

25  Mr. Geisser's report assist you in reaching your conclusions

PROCEEDINGS                    1588

1   about the scope of this program?

2   A    Again, if you add up the numbers, it will show that

3   some 15 million plus dollars was transferred by the Saudi

4   Committee to the nine societies that we just discussed.

5            MR. TURNER:  Now, if you could show the witness

6   only 4761, which is slide 76.

7   Q    Do you recognize the data from Mr. Geisser's report in

8   this particular chart where it's broken down by various

9   payment groups?

10  A    Yes, sir.

11  Q    And did Mr. Geisser's data likewise assist you at all

12  with respect to evaluating the scope of the money flowing to

13  these various groups during the relevant timeframe?

14  A    Yes, sir.

15           MR. TURNER:  May with display slide 76, please?

16           THE COURT:  Yes.

17  Q    Mr. Spitzen, what was the total scope of the payments,

18  both the total payments and those in cash that you were able

19  to determine from Mr. Geisser's data?

20  A    Okay.  The scope of the money in these three projects

21  was $35,501,068 and in cash the payments in cash were

22  $32,840,331.

23           MR. TURNER:  Now, may we display slide 78?

24  Q    Now, Mr. Spitzen, we're going to turn for a moment and

25  talk about just for purposes of context, the standard of

PROCEEDINGS                    1589

1  living in the Palestinian Territories during the relevant

2  timeframe of the Second Intifada.

3          While you were working for the COGAT, was part of

4  your -- did you have any responsibility for evaluating the

5  living standards within the Palestinian Territories?

6  A    The actual standard of living assessment in dollar

7  amount or in figures was done by a separate department,

8  which was the economic branch.  But where assessing the

9  actual standard of living on the day-to-day basis, the

10  situation of the poverty of the people of the various

11  groups, that was the responsibility of the Palestinian

12  Affairs Department.

13  Q    Now, would you explain slide 78, please?

14          MR. TURNER:  May we display 78?

15          THE COURT:  Yes.

16  Q    Now, first of all, very generally explain to us what

17  we're looking at here and the source of the information.

18  A    The first source of the data is the World Bank.  These

19  are accepted figures by the COGAT, Coordinator the

20  Government Affairs in the Territories, as well as by other

21  entities in the region, most of the other entities in the

22  region.  The figures in general terms show -- conclude that

23  the standard of living in the -- they show the standard of

24  living in the Palestinian Territories in the year 1999

25  compared to Israel.  And you can see clearly that the

PROCEEDINGS                          1590

1   standard of living in Israel is higher, considerably higher.

2   And it also shows the standard of living in the Palestinian

3   Territories compared to neighboring Arab countries, and here

4   we can see the standard of living with the Palestinians is

5   relatively better than all the other countries surrounding

6   is the other Arab countries.

7                  (Continued on the next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A. SPITZEN - DIRECT/MR. TURNER          1591

1  Q    Now, did you also have an opportunity to evaluate a

2  payment in comparison between the Saudi payment and these

3  figures we are looking at on slide 78?

4  A    I didn't understand the question.

5  Q    The question is:  Did you also have an opportunity to

6  compare -- to do a comparison of the funds sent through the

7  Saudi Committee versus the funds we are looking at, the

8  income status we are looking at on slide 78?

9  A    Yes.

10  Q    In order to understand the significance of the Saudi

11  payments, I compared the payments to the average annual

12  income in that material.

13           MR. TURNER:  Your Honor, may we display slide 79,

14  this is a bar chart? We are looking at two yellow boxes and

15  then looking at different colored boxes on the other side of

16  the slide.

17  Q    First of all, what is represented on the yellow boxes?

18           (Continued on the next page.)

19

20

21

22

23

24

25

A. SPITZEN - DIRECT/MR. TURNER          1592

1  A    The yellow bars represent the income per capita in the

2  Palestinian Territories in 1999 and 2003.  And you can see

3  that during the Intifada there was a very sharp drop.

4  Q    Now, what about the multicolored boxes on the

5  right-hand side, those bars, what do they represent, what

6  conclusions did they lead you to?

7  A    What it shows during this particular relevant time

8  period for this purpose, 1999 is not as relevant, because

9  the Saudi Committee was founded in the beginning of 2000 --

10  at the end of 2000.  It shows that the payments made by the

11  Saudi Committee to the injured individuals of Intifada to

12  the prisoners and to the martyrs of the Intifada are

13  extremely significant.

14  Q    And how did that assist you in evaluating the issues

15  you were asked to evaluate?

16  A    It enabled me to see that the payments by the Saudi

17  Committee to different prisoners of Hamas suicide bombers

18  and to injured operatives of Hamas were extremely

19  significant to them.  And if we talk about suicide bombers,

20  they were extremely significant to their families, with

21  respect to the suicide bombers and the families of suicide

22  bombers, they received five times more than the income per

23  capita the average income per capita at that time.

24          MR. STEPHENS:  Objection, your Honor, move to

25  strike.

A. SPITZEN - DIRECT/MR. TURNER          1593

1          THE COURT:  Let's have a sidebar.

2          (Continued on the next page for sidebar.)

SIDEBAR CONFERENCE                    1594

1           (Sidebar conference begins.)

2           THE COURT:  All he did was compare one set of

3    numbers to another set of the numbers and say that they were

4    five times higher.  What's wrong with that?

5           MR. STEPHENS:  Then he said, you know, the

6    families of suicide bombers are getting, you know, et

7    cetera, et cetera, et cetera.  So he's limiting it to, you

8    know, one class of people who are a tiny little fraction of

9    what that chart shows.  And the other thing that's

10   misleading about that chart is it's income per person, and a

11   family of four would have a $6,000.

12          MR. OSEN:  Actually, it's not income per person.

13   If you read the report --

14          MR. STEPHENS:  It says per capita.

15          MR. OSEN:  You have to read the report.

16          THE COURT:  A perfect illustration of why this is

17   for cross-examination.  Overruled.

18          (End of sidebar conference.)

19          (Continued on the next page.)

20

21

22

23

24

25

A. SPITZEN - DIRECT/MR. TURNER                    1595

1      MR. TURNER:  May I proceed?

2      THE COURT:  You may.

3  BY MR. TURNER:

4  Q    Now, in the context of evaluating this comparison,

5  Mr. Spitzen, were you able to access actual data from martyr

6  files?

7  A    I would like to understand the question.  Did I have

8  before me those martyr files?

9  Q    Did you have some of the martyr files?

10  A    Yes, I did have some of those martyr files.

11  Q    The ones that were seized as we talked about yesterday?

12  A    Yes, the ones that were seized in the al-Tadamun

13  Society in Nablus, these were before me as well as other

14  data taken from other committees or associations.

15  Q    Now, later on we're going to be talking about examples

16  of the income from one of those martyr files.  But, in

17  general, I'm going to ask you, was that information helpful

18  to you in evaluating and putting together these charts?

19  A    Yes.  It did give me the option of seeing to what

20  extent the ones that that received the money were in true

21  need of that money, and that is whether I had the material

22  before me.

23  Q    Now, let's transition and talk about the Saudi

24  Committee process and how the funds were actually processed.

25  Did you have an opportunity to evaluate that based upon the

A. SPITZEN - DIRECT/MR. TURNER          1596

1  information you had access to?

2                  (Continued on the next page.)

A. Spitzen - Direct/Turner                    1597

1    DIRECT EXAMINATION (Cont'd.)

2    BY MR. TURNER:

3    A    In my expert opinion, which is not here right now, I

4    definitely described the different stages in the operation

5    of the Saudi Committee from the stage of collection or fund

6    raising and their transfer to their destination.

7    Q    And did you prepare a series of slides that would help

8    you illustrate the Saudi Committee process?

9    A    Yes, sir.

10            MR. TURNER:  Your Honor, may we display Slide 80?

11            THE COURT:  Yes.

12            MR. STEPHENS:  Your Honor, I have an objection to

13   that slide.

14            THE COURT:  Yes, let's have a sidebar, please.

15

16

17

18

19

20

21

22

23

24

25

SIDE BAR                                1598

1              (Side Bar)

2         THE COURT:  What is the objection?

3         MR. STEPHENS:  It is just argument, your Honor.

4    It has nothing to do with the Saudi Committee process that

5    money raised and then collection of names, then both makers,

6    that's the not part of the Saudi process.

7         THE COURT:  I think he's going beyond his

8    expertise and these are argumentative.  I'll leave this

9    whole area, Slides 80 to 82, for closing argument.

10        MR. TURNER:  All the next slides detail the

11   specific examples, each of the things we are talking about

12   here.

13        THE COURT:  That's why I'm excluding 80 to 82.

14        MR. TURNER:  Okay.

15        Can we cover this without using the slides?

16        THE COURT:  I don't think so.  I will take it one

17   question at a time, but I think he's drawing conclusions

18   that are --

19        MR. OSEN:  Your Honor, I don't think that's the

20   case, if I could be heard for just a moment?

21        THE COURT:  Sure.  Go ahead.

22        MR. OSEN:  First of all, the Saudi Committee, it's

23   a matter of public record, raised the money.

24        THE COURT:  Right.  That part is okay.

25        MR. OSEN:  Secondly, it's a matter of public

SIDE BAR                    1599

1   record, and it's in Arab Bank's own documents, some of which

2   has been shown to the witness, that the committees in the

3   territories directly name and provide the names.  That's in

4   the testimony that the jury has heard.  They are going to

5   hear names of the individuals who received the money.

6            THE COURT:  You have enough in the record to make

7   this argument to the jury, I don't deny that.  What I'm

8   questioning is this witness's ability to serve as an

9   additional lawyer effectively in putting it altogether to

10  make that argument for you, and I don't think he can.  Take

11  it one question at a time.

12           MR. OSEN:  That's fair, your Honor.  So that the

13  record is clear, this is all material that is in his report

14  and painstakingly detailed.

15           THE COURT:  I don't think all of the clip art here

16  .

17           MR. OSEN:  Not the clip art.

18           THE COURT:  Take one question at a time.

19           MR. OSEN:  Thank you.

20           (Side Bar ends).

21

22

23

24

25

A. Spitzen - Direct/Turner                1600

1  BY MR. TURNER:

2  Q    Now, Mr. Spitzen, let's talk about Step one in the

3  process, at least based upon your investigation.

4        What were you able to determine about how the

5  Saudi Committee operated that led you to conclude that there

6  was a first step and what it was?

7  A    Well, the first stage, like in any foundation that

8  wishes to transfer funds for particular goals, the first

9  stage pertained to the collection of money, and here the

10 Saudi Committee exerted great effort.  He also had an

11 advertisement on television and the telephone -- the

12 telephone and on television and the press, and I have

13 described these at great length.  I'm not going into details

14 now, but there was an ongoing effort in order to collect

15 those such funds, and received the official support of the

16 royal house.

17 Q    As part of Step two, were you able to determine who was

18 responsible for collecting names and background information

19 for recipients of the monies?

20 A    Yes, indeed so.

21 Q    And who was responsible?

22 A    Yes, the ones who were responsible first and foremost

23 were the two societies the already mentioned the Islamic

24 charitable society in Hebron and Islah they collected data

25 in the field in order to transfer them to the Saudi

A. Spitzen - Direct/Turner                1601

1  Committee for them to be able to transfer the funds, but

2  they were the representatives.  The actual collection of

3  data was done by most of the Da'wa Committees of Hamas,

4  though they actually sent the data to these two societies,

5  who transferred the data to the Saudi Committee.  That was

6  how it was done most of the time.

7          MR. TURNER:  Now, may we show Slide 79, which is

8  the prior chart?

9          THE COURT:  Yes.

10 BY MR. TURNER:

11 Q   Let's go back to the 79.  I want to ask you about the

12 categorization of groups, and I want to focus on the red,

13 the pink, and the brown bar, or orange bar, on the

14 right-hand side.

15         Were you able to determine whether, in the process

16 of identifying potential recipients of monies, whether there

17 were groups created?

18 A   The Saudi Committee had its project of transferring

19 funds to different groups in the population.  These three

20 groups were the three projects of the Saudi Committee, and

21 they were aimed at providing funds to injured individuals,

22 providing funds to prisoners, and also to Shaheed, who were

23 called martyrs, or in Arabic Suhada.

24 Q   Now in the context of what we are talking about,

25 terrorism, and specifically suicide bombers and the families

A. Spitzen - Direct/Turner                    1602

1    of suicide bombers, which of those three categories did

2    those individuals and families fall within?

3    A    Those suicide bombers obviously received the martyr

4    payments or the Shaheed payments posthumously.  There were a

5    few, however, that received payments prior to that, and that

6    was in the form of prisoner payments, and that was before

7    they billed themselves.

8            MR. STEPHENS:  Move to strike, your Honor.  Dead

9    people don't receive money.

10           THE COURT:  That's what he just said.  Overruled.

11   BY MR. TURNER:

12   Q    Now, during the course of your investigation, Mr,

13   Spitzen, were you able to actually review some of the martyr

14   files for families of suicide bombers who were processed

15   through this program in the funds distributed by Arab Bank?

16   A    Yes.

17   Q    Now, let's go to the next step.

18           Were you able to determine, from your review of

19   the Saudi Committee program, how these recipients -- you

20   want me to stop?

21           MR. STEPHENS:  You have to finish, then I will

22   object.

23           THE COURT:  He's right about you that.

24   Q    Were you able to determine from the records how the

25   recipients would know to go to Arab Bank for their money?

A. Spitzen - Direct/Turner          1603

1    A    Yes.

2    Q    And what did you learn, during the course of your

3    investigation, about how people would learn that their money

4    was in Arab Bank?

5    A    The Saudi Committee itself publicized in various forms

6    through various media, including its own website, a list of

7    the recipients who were entitled to receive benefits, a list

8    of potential beneficiaries, in different ways, and this was

9    also published.  There were various rounds of publications.

10   And it was also published in newspapers by other societies

11   that made payments.  The list appeared in -- was also

12   published by other societies, and we also found records that

13   were seized in searches showing the lists in the Arab Bank.

14   Q    Now, would you show the witness only, please,

15   Exhibit 502?

16        THE COURT:  Mr. Turner, is this a convenient time

17   or do you want more?

18        MR. TURNER:  No, this is fine.

19        THE COURT:  Let's take our mid-morning break,

20   ladies and gentlemen.  We'll reconvene at 11:25.  Please

21   don't talk about the case, We'll see you in a few minutes.

22        (The jury leaves the courtroom for a recess.

23        THE COURT:  Before we recess, have the parties had

24   a further opportunity to consider the problem with juror

25   number seven?

A. Spitzen - Direct/Turner                1604

1          MR. TURNER:  We had a question.  What is the

2    possibility of accommodating her on Tuesday and working

3    Friday; is that a possibility?

4          THE COURT:  It's a possibility.  Let me check my

5    calendar.  Let me see what I can move on that Friday and I

6    will get back to you on that.

7          All right, 11:25.

8          (A recess is taken at this time.)

9          (Continued on the next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A. Spitzen - Direct/Turner                1605

1           (Judge Cogan enters the courtroom at 11:25 p.m.)

2           THE COURT:

3           MR. STEPHENS:

4           MR. OSEN:  I don't know if you implied that or not

5      if someone paid the 400 is that an option or.

6           THE COURT:  I am just relating what I was told.

7      I'm not suggesting what could be done.

8           (The jury enters the courtroom.)

9           THE COURT:  All right, be seated, please.

10          Please continue, Mr. Turner.

11          MR. TURNER:  Thank you, your Honor.

12     BY MR. TURNER:

13     Q    I think when we broke we were showing the witness only

14     Exhibit 502.

15          Do you recognize Exhibit 502?

16     A    Yes.

17     Q    And what is the source of Exhibit 502?

18     A    This is from the daily newspaper of Al Hayat,

19     February 13, 2002.

20     Q    Is this an example of what you were talking about with

21     respect to the listing in the newspaper?

22     A    Yes, this is one of the examples.

23     Q    And what is the significance of this document, in the

24     process of going through and understanding how the Saudi

25     Committee Program operated?

A. Spitzen - Direct/Turner                1606

1  A    It simply shows how after the Saudi Committee chose the

2  names based on the list it received from various societies.

3  It published them, or the societies published the list in

4  the newspapers, so the people would know to come to the bank

5  to get their money.

6  Q    Which bank is specifically represented in this

7  advertisement?

8  A    The Arab Bank, of course.

9  Q    And what was the name of this particular newspaper?

10  A    Al Hayat al Jadida.

11  Q    Are you familiar with that newspaper?

12  A    Yes.  It is a daily newspaper -- considered the daily

13  newspaper of the Palestinian Authority, and it's widely

14  distributed.

15  Q    And was this particular advertisement published during

16  the Second Intifada in September 2002?

17  A    Yes, it was published in the edition of the newspaper

18  of February 18, 2002.

19        MR. TURNER:  Your Honor, we would offer this under

20  703 for purposes of demonstrating it.

21        MR. STEPHENS:  Objection, your Honor.

22        THE COURT:  All right.  I'm not going to admit it

23  into evidence.  I will allow it to be displayed to the jury.

24        Does the defendant want a limiting instruction on

25  it?

A. Spitzen - Direct/Turner                1607

1          MR. STEPHENS:  Yes, your Honor.

2          THE COURT:  All right.

3          Ladies and gentlemen, I'm letting you see this

4    exhibit for a limited purpose.  It's being admitted only to

5    show that the defendant may have had notice of the

6    statements contained in the advertisement.  It's not being

7    offered for the truth of those statements.  In other words,

8    the statements contained in it should not be perceived by

9    you as true just because they are contained in it.

10         All right.  You may show it to the witness.

11         MR. OSEN:  One question.

12         May we come up here for a second?

13         THE COURT:  Yes.

14

15

16

17

18

19

20

21

22

23

24

25

1          (SIDE BAR)

2          MR. OSEN:  Your Honor, we just wanted to be clear,

3   because our understanding of your prior order was that this

4   exhibit, and one other one that is on the slide

5   presentation, were actually going to be admitted.

6          THE COURT:  These are the samples?

7          MR. OSEN:  These are the samples.

8          THE COURT:  Yes, you are right.  I announced I'm

9   allowing it for the limited purpose.

10          MR. STEPHENS:  I have a little bit of a problem.

11   There's no showing of a bank.  It is notice to the

12   beneficiaries, not to the bank.

13          THE COURT:  It could be notice to the bank, if

14   it's a widely enough circulated newspaper, so that people

15   working at the bank's branch would read it and see it and

16   not like it.

17          Now, we agree with you, there's no direct evidence

18   of that, but relevant evidence is evidence which tends to

19   prove another fact. So based upon the witness's testimony

20   that this newspaper is public and widely distributed, the

21   jury could draw an inference, if it is so inclined, that the

22   bank knew about this, especially in conjunction with other

23   evidence that has been introduced into the record.  So I

24   will allow it as a sample on that basis only.

25          MR. OSEN:  Your Honor, just one more point for the

A. Spitzen - Direct/Turner                1609

1    record.

2          We played testimony from the bank's witnesses that

3    explicitly stated that they had saw these types of

4    advertisements, collected them, and that they had

5    difficulties resulting from the advertisements.  So that's

6    in the record.

7          MR. STEPHENS:  Which I totally agree.  So I don't

8    see what this adds to the evidentiary posture of the case.

9          THE COURT:  This is what they were talking about.

10   They said generally we saw newspapers that say this is it,

11   so I will allow this one in.

12         MR. TURNER:  Okay.

13         (Side bar ends)

14

15

16

17

18

19

20

21

22

23

24

25

A. Spitzen - Direct/Turner                1610

1          THE COURT:  I'm allowing the exhibit into evidence

2     contrary to what I said before.  The limiting instruction

3     that I gave the jury still controls.  It is still a valid

4     instruction.  I think the only thing I need additionally to

5     say about it, Mr. Turner, is that you had offered it for

6     purposes of 703.  That's not how I'm receiving it.  I'm

7     receiving it in evidence --

8          MR. TURNER:  Yes, sir?

9          THE COURT:  For the limited purpose that I advised

10    the jury.  All right, continue.

11         MR. TURNER:  May we put the translated version up,

12    and you also got bullet sizes down here.

13         THE COURT:  Yes.

14         (Pause).

15    BY MR. TURNER:

16    Q    Okay.

17         Before we talk about the details of this again,

18    Mr. Spitzen, would you briefly explain the significance of

19    this advertisement in the context of the Saudi program?

20    A    Yes, this ad shows how the project of the Saudi

21    Committee for the support of the wounded worked. It shows

22    the payments made by the Saudi Committee by means of the

23    Arab Bank, and how the people were sent to the Arab Bank to

24    get their payments.

25    Q    Now, it specifically says the relatives of the martyrs

A. Spitzen - Direct/Turner          1611

1   whose named here are requested to head for the Arab Bank

2   branches in their places of residence, in order to receive

3   the 10th payment from the Honorable Saudi Committee the sum

4   of $5,316.06.

5           Now, who, during this time frame, was Iman Halawa?

6   A   Iman Halawa was a terrorist, a senior operative in the

7   al-Qassam Brigade.  He was known as "Engineer Number Three."

8   He was a bomb maker. He used to make the bombs, the suicide

9   bombs, for the suicide bombers, and he was killed by Israel.

10          He was responsible for building the bombs that

11  were involved in at least three of the terror attacks in

12  which plaintiffs in this case are involved.  We are talking

13  about the bombing at Neve Yamin, and the Dolphinarium, and

14  Sbarro Pizzeria.

15  Q   We are going to the translated version of 502, and we

16  are going to focus on number seven, and somebody has

17  highlighted it.  I have not, because I don't read Arabic,

18  but somebody has highlighted on the Arabic version the name

19  on both of these charts.  And I know you can't see that from

20  where you are, but have you confirmed that this is one and

21  the same Iman Hawala that was involved in one of the

22  terrorist attacks you had referenced?

23  A   Yes, this is Iman Anadi Muhammad Hawala, he's

24  identified by all four of his names, and his wife's name

25  appears also with all four of her names.  So this

A. Spitzen - Direct/Turner                    1612

1   identification is to a high degree of certainty.

2   Q    Now, have you seen similar items as Exhibit 502,

3   similar advertisements listing other terrorists involved in

4   suicide attacks?

5   A    Yes, definitely.  From time to time, whenever there was

6   a round of payments, these ads would appear in the local

7   press, either published by the Saudi Committee for the

8   support of Intifada Al Quds or by various societies.

9   Q    Now, are these newspapers that you have seen these

10  advertisements from, are these newspapers distributed in

11  only one city in the West Bank, or throughout the West Bank,

12  at least based upon your experience?

13             MR. STEPHENS:  Objection.

14             THE COURT:  I will sustain the objection.  You can

15  ask him if he knows and how he knows.

16  Q    Do you know whether or not in the 2002 time frame this

17  newspaper was distributed throughout the West Bank?

18  A    Yes.

19  Q    And how do you know that?

20  A    These newspapers, as well as others, were one of my

21  main work tools in my work as a special advisor in COGAT in

22  the coordinator of government affairs in the territories.  I

23  used them as part of my field experience, as well as on the

24  ground.  I actually saw them being distributed throughout

25  the West Bank.

A. Spitzen - Direct/Turner                 1613

1   Q    And do you know whether or not the distribution

2   included cities that Arab Bank had branches of their bank

3   in?

4   A    Yes.  I don't know of any cities in which the Arab Bank

5   did not have a branch.

6   Q    Let's go to, witness only, 465, please.

7        Do you recognize 465?

8   A    Yes, sir.

9   Q    Is this another example of one of the advertisements?

10  A    Yes.  This is an ad by the Saudi Committee this time.

11       (Continued on the next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A. SPITZEN - DIRECT - TURNER                1614

1   CONTINUED DIRECT EXAMINATION

2   BY MR. TURNER:

3   Q    And what newspaper was this, or publication was this

4   published in?

5   A    This appeared in the Al Quds newspaper.

6   Q    And tell us about the distribution of the Al Quds

7   newspaper, if you know.

8   A    Al Quds is the more popular and more widely distributed

9   of the three major newspapers at that time in the West Bank.

10  It was distributed throughout the West Bank and also in Gaza,

11  when that was possible, and then it became not possible.

12  Q    And, again, does 465 include the specific name of the

13  bank where these people are supposed to go to get their money?

14  A    Yes, it notes the specific branch of the bank in the area

15  to which they need to go.

16             MR. TURNER:  Now, show the witness only, please,

17  3286.

18  Q    Do you recognize 3286?

19  A    Yes, sir.

20  Q    And what is the publication that 3286 comes from?

21  A    It was published in the newspaper Al-Hayat Al-Jadida on

22  August 13th, 2001.

23  Q    Now, rather than an advertisement for people to come get

24  their money from Arab Bank, can you very generally describe

25  what this particular publication is?

A. SPITZEN - DIRECT - TURNER                1615

1  A    This is not a call for people to come get money from the

2  bank.  It is a call on the public to come and participate in a

3  memorial ceremony or a celebration in honor of Iz A Din

4  Shahid -- Shuheil Masri, the suicide bomber from Sbarro

5  Pizzeria.

6  Q    Did this particular publication have anything to do with

7  Hamas?

8  A    Of course.  This was done by the Hamas, on behalf of

9  Hamas.

10  Q    Now, did you find in your research and investigation that

11  this was yet another one of the steps or the processes for the

12  Saudi Committee Program?

13            MR. STEPHENS:  Objection, Your Honor.

14            THE COURT:  Overruled.

15            MR. STEPHENS:  Your Honor, may we approach?

16            THE COURT:  Yes, I'm going to reverse myself on that

17  and sustain the objection.

18  Q    Why was this particular item significant to you or

19  helpful to you in evaluating the Saudi Committee Program?

20  A    Because this publication shows that the people who

21  received the money from the Saudi Committee, like the suicide

22  bomber who exploded himself at the Sbarro Pizzeria were famous

23  and well-known and were recognized as Hamas people, both by

24  the movement itself and the masses that were called to

25  celebrate this deed.  What is important for me here is that

A. SPITZEN - DIRECT - TURNER                1616

1   this was advertised in public.

2          MR. TURNER:  Now, Your Honor, we would like to

3   display Exhibit 1090.  This is already in evidence.

4          THE COURT:  Okay.

5   Q    Mr. Spitzen, do you recognize Exhibit 1090?

6   A    Yes, sir.

7   Q    And what was the significance, or what is the

8   significance of Exhibit 1090 in your evaluation of the Saudi

9   Committee Program?

10  A    One of the senior terrorists, like Ayman Halawah, was the

11  engineer.  Muhanad Taher, who also received money from the

12  Saudi Committee, this particular individual was responsible

13  for a number of bombings that people who are plaintiffs in

14  this lawsuit were hurt by.

15  Q    Now, in the context of these suicide attacks, did you

16  find in your investigation that from time to time there were

17  public ceremonies following the attacks honoring any of these

18  individuals?

19         MR. STEPHENS:  Objection, Your Honor.  It's

20  cumulative.

21         MR. TURNER:  I'll rephrase.

22         THE COURT:  No, it's not a rephrasing question.

23  It's has the jury already heard this.  And I think --

24         MR. TURNER:  It's foundational, because the next --

25         THE COURT:  I'm going to overrule the objection.  Go

A. SPITZEN - DIRECT - TURNER                    1617

1   ahead.

2   A    Yes.  We showed this in this advertising for the ceremony

3   held in honor of Iz-A-Din Shuheil Al Masri, and there are

4   many, many others.

5            MR. TURNER:  Would you show the witness only,

6   please, the first part of the still photograph from the video

7   that is marked as 4712.

8   Q    Are you familiar with this video?

9   A    Yes, I am familiar with this video.

10  Q    And what is the source of this video?

11  A    The source for this video is the website of Alqassam or

12  alqassam.ps, which shows the funeral of Muhanad Taher.

13  Q    And have you actually seen this video on the website

14  itself?

15  A    Yes, sir.

16  Q    Do you recognize the key people that are depicted or

17  shown in this video?

18  A    Yes, sir.

19  Q    And for purposes of identification, can you tell us who

20  are some of the key or more key individuals that we're going

21  to see in this video?

22  A    We will see Hamed Bitawi, the individual that we have

23  discussed from al-Tadamun, and we will see the father of Salah

24  Darwazah, Nur A-Din Darwazah.  And I mentioned Salah Darwazah,

25  and I mentioned that the wife of Salah Darwazah received money

A. SPITZEN - DIRECT - TURNER                    1618

1    from Al-Hayaq.  He was the senior official in the

2    infrastructure of Hamas in the Samaria region.

3    Q    Now, do you know these individuals personally or just

4    through your intelligence work and research?

5    A    One of them I met more than once.  This is Nur A-Din

6    Darwazah, whereas Hamed Bitawi and Salah A-Din Darwazah, I

7    have not met them.

8    Q    Where was this particular ceremony held?

9    A    To the best of my ability to identify the location, it

10   was in the town square of Nablus.

11   Q    And how large a city was Nablus at the time?

12   A    Well, Nablus is not a very, very large city.  I cannot

13   quite tell you what is the square kilometer, in square

14   kilometers, what is the size of the city, but its center is

15   very, very limited.  It's not large.  It's not a city.  It's a

16   town.

17   Q    And can you tell us approximately how far in distance it

18   was from where the ceremony was held to the Arab Bank branch

19   at the time?

20   A    If I did identify this correctly, then the distance would

21   not have been more than one mile or a mile and a half.  Not

22   more than that.

23            MR. TURNER:  We offer 4712, and the clip is 10 to 20

24   seconds, Your Honor.

25            THE COURT:  All right.  That's received over

A. SPITZEN - DIRECT - TURNER                1619

1    objection.

2            MR. TURNER:  Can we dim the lights and show this

3    clip very quickly?  And before we do that -- can you hold,

4    Mr. Miller, one second.

5    Q    Let me ask one background contextual question for you,

6    Mr. Spitzen.  Can you very briefly describe what it is that

7    we're going to be watching in this very brief clip?

8    A    Yes.  This is a funeral ceremony for Muhanad al-Taher,

9    but also for Imad Al-Din Darwazah, the brother of Salah

10   Darwazah.  And this is why the father is at the center.  Both

11   his sons were killed by an operation of the Israeli defense

12   forces.

13           You can see in the ceremony the enthusiasm, even I

14   would say the heated spirits of those present.  And you can

15   see Hamed Bitawi, the head of al-Tadamun, and others speaking

16   hatefully against the state of Israel, in praise of the

17   suicide bombers and the Hamas.  This is broad, more or less in

18   general strokes.

19   Q    Now, is Muhanad al-Taher, is that the same --

20           MR. STEPHENS:  May I approach, please?

21           THE COURT:  Sure.

22           (Continued on the next page.)

23

24

25

SIDEBAR                    1620

1           (Sidebar conference.)

2           MR. STEPHENS:  In your order of September 1, there

3    was only going to be stills.

4           THE COURT:  No.  I will agree with you that the

5    order was slightly ambiguous, because I said stills in one

6    place and I said stills or 10 to 20 seconds in another place.

7    I cut them down from the two minutes that they wanted, but I

8    did say 10 to 20 seconds in one place, and the place where I

9    only said stills, I didn't say stills or 10 to 20 seconds.

10   That was just an omission.  So I'm giving them 10 to 20

11   seconds.

12          MR. OSEN:  Just so we're clear, Your Honor, because

13   there's one other video.  Both of them are 20 seconds or less.

14   But we do have some stills that cover the parts that are not

15   in the 20 seconds.

16          THE COURT:  That's okay.  I just didn't want the

17   whole two minutes.  I found the two minutes unduly

18   prejudicial, but I did not find excerpts for the purpose of

19   identifying what was going on and who the participants were to

20   be unwarranted.  And for that same reason, I don't have a

21   problem with showing additional stills for those same

22   purposes.

23          MR. STEPHENS:  Have you given us actually what it is

24   you intend to play?

25          MR. OSEN:  I don't think so.

```
                          SIDEBAR                    1621
```

1          MR. STEPHENS:  No, I don't think so.  So I'd like to

2     see it.

3          MR. OSEN:  I don't have any objection, but it's just

4     20 -- in this case, it's the first 20 seconds.

5          THE COURT:  All right.  We will take an early lunch

6     and the defendant can review the portions.

7          MR. STEPHENS:  Thank you.

8          (End of sidebar conference.)

9          (Continued on the next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                        PROCEEDINGS                    1622
```

1          THE COURT:  Ladies and gentlemen, we're going to

2    take a slightly early lunch today.  The advantage to that is

3    you'll find the restaurants deserted at this time.  Let's come

4    back at 1:00.  Please don't discuss the case amongst

5    yourselves or with anyone else.  Don't pay any attention to

6    any media coverage.  Don't communicate about the case.  We'll

7    see you in just a few minutes.

8          (Jury exits courtroom.)

9          THE COURT:  Recess until 1:00.  Please show the

10   defendant the excerpts that the plaintiff intend to show.

11         MR. OSEN:  Your Honor, since it's a total of 40

12   seconds, would you like to see it as well so that we can

13   address any objections?

14         THE COURT:  I guess that makes sense.  Be seated,

15   please.

16         (Videotape played.)

17         MR. OSEN:  That's the first one, Your Honor.

18         THE COURT:  You're not waiting for me, are you?

19         MR. OSEN:  Yes, Your Honor.

20         THE COURT:  I'm waiting for the defendant.  Other

21   than objections previously made, any problem with this

22   particular excerpt?

23         MR. STEPHENS:  I don't know how it gets narrated and

24   now comes in, because we don't know who's speaking.

25         THE COURT:  Well, the narration was available to you

PROCEEDINGS                              1623

1   earlier, so that's not new.  So, to the extent you raised that

2   before, it's been overruled and if it wasn't raised then

3   you've waived it.  Anything else?

4            MR. STEPHENS:  No, Your Honor.  It was raised.

5            THE COURT:  I frankly don't recall if it was or not,

6   but I ruled on the objection that was previously made.

7            (Videotape played.)

8            THE COURT:  Okay.  Anything about that excerpt?

9            MR. STEPHENS:  It is simply a propaganda film, Your

10  Honor, showing a ranting fanatic, which is designed to

11  prejudice the jury, and it has nothing to do with the bank.

12           THE COURT:  What's the purpose of that clip?

13           MR. OSEN:  Your Honor, Mr. Bitawi is the head of one

14  of the Charitable Societies, the vice-chairman of the other

15  Charitable Society.  The people being honored whose deaths are

16  being celebrated in the parts we can't show that are stills

17  are Arab Bank accountholders that Mr. Spitzen testified about

18  yesterday:  Mr. Salim, Mr. Darwaza and Mr. Mansur, who are the

19  subject of our remaining slides.

20           THE COURT:  I'd like you to cut out the little girl.

21           MR. OSEN:  We can -- okay.  That's fine.

22           THE COURT:  Other than that, I will overrule the

23  objection as stated here and for the reasons previously

24  stated.  Okay, see you at 1.

25           (Luncheon recess.)

SHERRY BRYANT, RMR, CRR

A. SPITZEN - DIRECT - TURNER                1624

1           AFTERNOON SESSION

2           THE COURT:  Let's have the jury.  Everyone have a

3    seat.  We're going to be a minute.

4           (Jury enters courtroom.)

5           THE COURT:  All right.  You may continue, Mr.

6    Turner.

7           MR. TURNER:  Your Honor, I think for purposes of

8    context, we were about to watch the clip of the video from

9    4712.

10          THE COURT:  Right, the clip that the witness has

11   described.  Let's go ahead and do that.

12          (Video played.)

13   Q   Mr. Spitzen, how was that video clip -- and recognizing

14   we only watched about 20 seconds of it -- how was that helpful

15   to you in reaching some of your conclusions?

16   A   It has several important elements.  First, we see on this

17   video the person was head of the Al Tadamun Society and deputy

18   chairman of the Zakat Committee in Nablus, Sheikh Hamid

19   Bitawi.  Later in this video we see him speaking with

20   inflammatory terms and Hamas opinions.  And his mere

21   participation in the funeral of someone who is called in the

22   territory as an engineer, in fact, a bomb maker.

23          MR. TURNER:  Can we just play 4712A, which is a

24   still photograph?

25          THE COURT:  Yes.

SHERRY BRYANT, RMR, CRR

A. SPITZEN - DIRECT - TURNER                1625

1   A    The second guest of honor that we see is Nur A-Din

2   al-Darwazah, a rich merchant from Nablus.  He was a member of

3   the Chamber of Commerce, but this is not the important thing

4   about him.  He was the father of Salah A-Din Darwazah, a

5   terrorist, one of the heads of the military infrastructure of

6   Hamas in Samaria.

7           And he appears here because his second son, Imad

8   al-Darwazah, was killed, too, helping Muhanad Taher.  And this

9   man gets a -- praised, honored by the audience and by the

10  keynote speaker, who praises the deeds of the sons, both of

11  them terrorists.

12          MR. TURNER:  May we show 4712B, which is the still

13  photo from the video?

14          THE COURT:  Yes.

15  Q    What is the significance of 4712B, Mr. Spitzen?

16  A    Another important element that was important to me when I

17  watched this funeral is the vast publicity awarded to the

18  suicide bomber on behalf of Hamas.  This is no anonymous

19  person.  The public in Nablus and not only in Nablus knew who

20  he was.

21  Q    Now, as a final step in the Saudi program, did you have a

22  chance to prepare a slide that summarizes the Saudi Committee

23  payments to families of Hamas bombers and operatives?

24  A    Yes, sir.

25          MR. TURNER:  May we display slide 90?

A. SPITZEN - DIRECT - TURNER                1626

1        THE COURT:  Let me see it first.  Any objection

2   beyond those previously raised?

3        MR. STEPHENS:  No, Your Honor.

4        THE COURT:  All right.  It's received over

5   objection.

6   Q    Now, this particular slide is labeled Saudi Committee in

7   support of the Intifada Al Quds payments to the families of

8   Hamas operatives via Arab Bank 2000 through 2002.

9             Now, were you able to determine, from the

10  information that you had access to, how many payments were

11  made to families of Hamas suicide bombers during the relevant

12  time frame?

13  A    I managed to identify 24 such payments made to the

14  families of suicide bombers from Hamas.

15  Q    And how many payments were you able to identify to

16  families of Hamas operatives that came from the Saudi

17  Committee through Arab Bank?

18  A    I managed to identify 145 families of Hamas operatives

19  who received payments.

20        THE COURT:  Just so the -- I'm sorry, are you

21  finished?

22  A    Yes.

23        THE COURT:  Just so the record is clear, I said it's

24  received.  I didn't mean received in evidence.  I meant it

25  could be shown to the jury to demonstrate the witness's

A. SPITZEN - DIRECT - TURNER                1627

1    testimony.

2             MR. TURNER:  Yes, Your Honor.

3             THE COURT:  Continue.

4    Q    Finally, how many payments were you able to identify that

5    were to Hamas operatives directly?

6    A    I managed to identify 11 such payments.

7    Q    Now, let's switch to prisoner payments for a moment.

8             MR. TURNER:  Show the witness only, please, 468.

9    Q    Do you recognize 468?

10   A    Yes, sir.

11   Q    Is this a prisoner payment list?

12   A    Yes, this is a list of payments for prisoners out of the

13   website of the Saudi Committee.

14   Q    And did you find a prisoner payment for Jamal Mansur?

15   A    Yes, he appears on this list.  We can't see him, but he

16   is number 162 in the list, and he received such a payment.

17   Q    And the payment was through what bank?

18            MR. STEPHENS:  Objection, Your Honor.

19            THE COURT:  I'll sustain as to form.

20   Q    Where was the payment transferred through?

21   A    It was transferred through the Arab Bank.

22   Q    And did you also find a payment to a family member on

23   behalf of Jamal Al-Hija?

24   A    Yes, I found a payment for the wife of Jamal Abu Al-Hija

25   from Jenin.

A. SPITZEN - DIRECT - TURNER                1628

1   Q    And where was that payment processed through?

2   A    Through the Arab Bank.  And I would like to add one more

3   thing.  To the best of my knowledge -- and I checked it --

4   these two people were not in jail while they received the

5   payments.

6   Q    And how do you know that?  What is the source of the

7   information you used in order to reach that conclusion?

8   A    I checked each of these people when I built their

9   profiles, and there is a variety of cross-references regarding

10  their periods of incarceration.  When that payment was made,

11  according to what I checked, they were no longer in prison.

12  They received this money for former periods of imprisonment.

13  Q    We already talked briefly about Jamal Mansur and Muna

14  Mansur, but this is the first time we've seen the name Jamal

15  Abu Al-Hija.  Can you briefly tell us who Al-Hija was, with an

16  understanding we're going to be discussing him a little bit

17  more later.

18  A    Jamal Abu Al-Hija was head of the military Hamas in

19  Jenin.  He was also a city worker in the Zakat Committee of

20  Jenin.  He was a city of Hamas operative.  His education he

21  received with Abdallah Azam in Jordan.  Abdallah Azam was the

22  spiritual father of Bin Laden and his teacher.  He has been

23  sentenced to nine life sentences.

24  Q    Now, let's switch from prisoner payment list to martyr

25  payment list.  Did you also have access to martyr payment

A. SPITZEN - DIRECT - TURNER                1629

1   lists?

2   A    Yes, sir.

3            MR. TURNER:  Can you show the witness, please, 573

4   only.  That's slide 92 as well.

5   Q    Can you identify 573?

6   A    Yes, this is a list of payments for martyrs from the

7   Saudi Committee site.

8   Q    And I want to talk about two individuals that are shown

9   on this particular martyr list.  First of all, do you find the

10  name Ibrahim Awda?

11  A    I identified Ibrahim Bani Awda.

12  Q    And who was he?

13  A    Ibrahim Bani Awda was a senior terrorist.  He did not --

14  he was not called an engineer, but he did work on the

15  preparation of bombs.  He was killed right at the beginning of

16  the Intifada by the Israel defense forces.  He was responsible

17  for a large number of acts of terror, and he had time to serve

18  in the Jordanian Army before that.  Before that, he had been

19  with Abdallah Azam in Afghanistan.

20  Q    Now, do you also recognize the name Nizar Rayan on the

21  list?

22  A    Yes, sir.  I identified Nizar Rayan in this list.

23  Q    Who was he?

24  A    Nizar Rayan was a senior Hamas operative.  He was also

25  a -- considered to be one of the people of Al-Quassam Brigade,

A. SPITZEN - DIRECT - TURNER                1630

1   but also a spiritual authority for his people.  Here, he

2   received money for his son who had been killed, and later he

3   himself was killed by Israel.

4   Q    Now, moving away from the Saudi Committee website for a

5   minute, did you also have an opportunity to review a martyr

6   list that came from files at the Arab Bank?

7   A    Yes.  Among the documents of the Arab Bank which I

8   received for reading were lists of rounds of payments by the

9   Saudi Committee.

10          MR. TURNER:  May we display slide 93, which

11  incorporates Exhibit 306, which is already in evidence?

12          THE COURT:  Yes.

13  Q    Now, Mr. Spitzen, do you recognize Exhibit 306, which is

14  shown on the slide?

15  A    Yes, sir.

16  Q    Do you recognize the name Ayman Halawah?

17  A    Yes, I do recognize the name.

18  Q    Is that the same bomb maker that we talked about earlier?

19  A    Yes.  He is what the Palestinians call or refer to as

20  engineer number three, or the third ranking engineer.

21          MR. TURNER:  Your Honor, I've got a blowup of this

22  one.  May I use the blowup for a minute?

23          THE COURT:  You may.

24          MR. TURNER:  And may I have the witness step down?

25          THE COURT:  You may.

A. SPITZEN - DIRECT - TURNER                1631

1   Q    Mr. Spitzen --

2         MR. TURNER:  Could you ask him to please step down

3   for a minute?

4   Q    Now, can you identify Ayman Halawah on this particular --

5   A    (Indicating.)

6   Q    Just circle or put a square around, if you would.

7   A    (Witness complies.)

8   Q    Now, is this -- if you'd back up just a little bit.

9         Mr. Spitzen, can you just sort of orient us to the

10  various categories of information that came from this martyr

11  payment list that came from Arab Bank's files?

12  A    (Answering in English)  Yes.  It gives the name and then

13  the --

14        MR. STEPHENS:  Objection, Your Honor.

15  A    -- ID number.  (End of answer in English.)

16        THE COURT:  Yes, we've got to do it in Hebrew.

17  Q    You'll have to do it in Hebrew.

18        THE COURT:  But we need the question translated

19  first.

20  Q    We took you out of that, so you might want to turn

21  around.  Do you remember the question?

22  A    Yes, sir.

23  Q    Okay, go ahead.

24  A    This is the name, first of all, the ID number, if it

25  exists, the region the person comes from, the district, the

SHERRY BRYANT, RMR, CRR

A. SPITZEN - DIRECT - TURNER                1632

1  date of death, cause of death, and the beneficiary who

2  receives payment for that person, and the round.  The Saudi

3  Committee had several rounds of payment.  This is the eighth

4  round.

5  Q    You may take a seat.

6         MR. TURNER:  Now, if you could show the witness only

7  for a minute 345.  And this is slide 94.  And this is already

8  in evidence as well, Your Honor.

9  Q    Now, do you recognize 345, Mr. Spitzen?

10 A    Yes.  This is the letter which I received with the other

11 documents from the Arab Bank.

12 Q    And who is the letter to and who is the letter from?

13 A    The letter is signed by the regional manager of the Arab

14 Bank, and the signature is there.  Perhaps if you could blow

15 it up a little bit, then I can see the name.  It's difficult

16 for me to read like that.

17        Well, I can't exactly read the signature, but I

18 would like to know to whom it was written, so if you could

19 blow up that part, please.

20        The letter is for the National Arab Bank in Saudi

21 Arabia.

22        MR. TURNER:  May we display slide 94?

23        THE COURT:  It's in evidence, you say.

24        MR. TURNER:  Yes.

25        THE COURT:  Or did I overrule objections and say you

A. SPITZEN - DIRECT - TURNER                1633

1    could move it into evidence?

2            MR. TURNER:  34 -- 345 is in evidence, according to

3    my notes.

4            THE COURT:  Okay.  Does the defendant have anything

5    to the contrary?

6            MR. STEPHENS:  No, Your Honor.

7            THE COURT:  All right.  You may display it.

8    Q    Now, Mr. Spitzen, can you explain to us how this letter

9    helped you in your evaluation of the Saudi program and Arab

10   Bank's involvement in the Saudi program?

11   A    Okay.  This is a letter that talks about this one case

12   that a woman came to the bank, and she was supposed to receive

13   two prisoner payments.  And you see the Arab Bank's

14   intervening here, the Arab Bank in the actual place.

15           MR. TURNER:  Now, could you show the witness 346,

16   please, and 347.  Both of them are on slide 95, I believe,

17   just for the purposes of expediting.

18   Q    Do you recognize 346 and 347?

19   A    Yes, sir.

20   Q    And what is this an example of?

21   A    This is an example of a document which were brought by a

22   private individual to the bank in order to prove that he

23   should receive more than one payment.  This is a specific --

24   in this case, it was a woman.  And in this case, this is a

25   letter, a letter written by the Palestinian Force 17, and it

A. SPITZEN - DIRECT - TURNER               1634

1   is about her son and the fact that he should receive a

2   prisoner's payment.

3   Q    May we -- I'm sorry.

4   A    He was in Palestinian prison.  And you see here the

5   involvement of the bank and the fact that there's

6   documentation of transfer of payments.

7             MR. TURNER:  May we display 95, slide 95?

8             THE COURT:  Well, are you admitting it?  Are you

9   moving to admit it?

10            MR. TURNER:  My notes show that 346 and 347 are

11   already admitted by way of the video depositions.  I can

12   double-check that if you would like.

13            THE COURT:  Let's double-check.  I don't have that.

14            MR. TURNER:  345 is the only one.  346 and 347 are

15   not yet in, so we would offer those.

16            THE COURT:  All right.  Any objections other than

17   those previously raised?

18            MR. STEPHENS:  Your Honor, it hasn't been

19   authenticated.

20            THE COURT:  It's from the bank's records.  Is there

21   a dispute about that?

22            MR. STEPHENS:  I don't know that it's in the bank's

23   records.  Is there a Bates stamp on the bottom?

24            THE COURT:  All right, let's have a sidebar.

25            (Continued on the next page.)

```
                           SIDEBAR                        1635

 1             (Sidebar conference.)

 2             THE COURT:  Maybe I misheard, but I thought the

 3   witness testified that this was a document he received along

 4   with those documents he got from the bank.  Is there any

 5   ambiguity about that?

 6             MR. STEPHENS:  I don't know.  If I could see if

 7   there's a Bates stamp on it then I'll just sit down.  I don't

 8   know.  I don't have all these things.

 9             MR. OSEN:  They've had the exhibit list since last

10   week.  It's pretty straightforward.  I mean, we can try it --

11             MR. TURNER:  We can have him look at it on the

12   screen, if he would like.

13             MR. OSEN:  It seems like --

14             THE COURT:  Are you very confident that this is a

15   document that was produced by the bank in this litigation?

16             MR. OSEN:  Yes, Your Honor.

17             MR. TURNER:  Yes, Your Honor.

18             THE COURT:  All right.  Well, then I'm going to

19   overrule the objection, subject to the defendant's ability to

20   check and make sure that's the case.

21             (End of sidebar conference.)

22             (Continued on the next page.)

23

24

25
```

A. SPITZEN - DIRECT - TURNER                1636

1    THE COURT:  All right.  The objection is overruled.
2    The document is received.
3    MR. TURNER:  May we display 95, please?
4    THE COURT:  You may.  Two documents are received.
5    Is it two documents?  No, it's the --
6    MR. TURNER:  Yes, it's two.  It's 346 and 347.
7    THE COURT:  All right, they are received.
8    (Plaintiff Exhibits 346 and 347 received in
9    evidence.)
10   Q    Now, Mr. Spitzen, is this an example of some of the
11   documentation submitted to the bank in order for people to get
12   payment?
13   A    Yes, sir.
14   MR. TURNER:  Now, could you show the witness only,
15   please, 348.
16   Q    Can you identify 348?
17   A    Yes, sir.
18   Q    Generally describe for us what category of information
19   does 348 fall into and the source of the information.
20   A    This is the -- this is the ID of the person who's
21   supposed to receive payment for the prisoner.  It is for the
22   person for whom he receives the payment or he requests the
23   payment for.  In this case, it is the wife.
24   Q    And what is the source of the documentation?  In other
25   words, where did you get this material?

A. SPITZEN - DIRECT - TURNER          1637

1  A    All the documents related to this case -- and this was

2  this inquiry done in the Arab Bank in Jenin -- as far as I

3  recall, the documents were received from the Arab Bank.

4            MR. TURNER:  We offer 348.

5            THE COURT:  All right.  Any objection?

6            MR. STEPHENS:  No objection.

7            THE COURT:  It is received.

8            (Plaintiff Exhibit 348 received in evidence.)

9            MR. TURNER:  May we display 96, slide 96?

10           THE COURT:  You may.

11 Q    Mr. Spitzen, is this a further example of the kind of

12 documentation provided by the charitable organizations to the

13 bank?

14 A    This is the kind of document that was requested in order

15 to approve the transfers of the Saudi Committee.

16 Q    Now, did you have an opportunity to evaluate payments to

17 the families of five of the Hamas suicide bombers?

18 A    Yes, sir.

19 Q    And did you have an opportunity to prepare a slide that

20 helps you illustrate and discuss what you found?

21 A    Yes, sir.

22           MR. TURNER:  May we display slide 97?

23           THE COURT:  Yes, you may.

24 Q    Now, these, for the record, are reflected in Exhibits

25 625, 624, 627, 667 and 663.  We would offer all five of those

A. SPITZEN - DIRECT - TURNER                1638

1   payments into evidence.

2           THE COURT:  Any objection?

3           MR. STEPHENS:  No objection.

4           THE COURT:  Received.

5           (Plaintiff Exhibits 625, 624, 627, 667 and 663

6   received in evidence.)

7   Q    Now, let's look at this chart for a minute and begin on

8   the left.  Who was Fadi Amer?

9   A    Fadi Amer was a suicide bomber who perpetrated the attack

10  in Neve Yamin.  This act of terror occurred on March 28th,

11  2001.

12  Q    Did his family receive payment through the Arab Bank?

13  A    Yes, sir.

14  Q    And the Dolphinarium bombing, who was Sa'id Houtari?

15  A    Sa'id Houtari was a suicide bomber who perpetrated the

16  attack at the Dolphinarium on June 1st, 2001.

17  Q    And did his family likewise receive a payment through the

18  Arab Bank?

19  A    Yes, his father received payment through the Arab Bank.

20  Q    Now, let's go to the Sbarro bombing.  Who was al-Masri?

21  A    Masri -- we've already mentioned him -- was a suicide

22  bomber at the terror attack at the Sbarro Pizza, which

23  occurred on August 9th, 2001.

24  Q    And with respect to all three of these, in order to save

25  a little time, al-Masri, Halabiya and Rihan, did each of their

A. SPITZEN - DIRECT - TURNER                1639

1  families receive payments as a result of their suicide attacks

2  at the Sbarro, Ben Yehuda and Emmanuel?

3          MR. STEPHENS:  Objection, Your Honor.

4          THE COURT:  Sustained.

5  Q    Let's talk about the Ben Yehuda bombings.  Who was

6  Yehuda?

7  A    Nabil Halabiya, he was a suicide bomber, one out of two

8  suicide bombers who had exploded at Ben Yehuda at the bombing

9  that occurred on December 1st, 2001.

10 Q    And were you able to find a payment transfer through the

11 Arab Bank to his family?

12 A    Yes.  The Halabiya family received a lot of money.  They

13 received a prisoner's payment on April 30th, 2001.  And for

14 some reason, they received two martyr grants:  One on February

15 18th, 2002 and another one on June 16th, 2002.  And it's not

16 clear to me why, why they received two payments.

17 Q    Now, finally, with respect to the bombing in Emmanuel,

18 who was Assem Rihan?

19 A    Assem Rihan was a suicide bomber who perpetrated the

20 attack in Emmanuel which occurred on December 12th, 2001.

21 Q    And were you able to determine whether or not Rihan's

22 family received payment through the Arab Bank?

23 A    Yes, Rihan's family also received money from the Saudi

24 Committee through the Arab Bank.

25 Q    Did you likewise have an opportunity to see payments to

A. SPITZEN - DIRECT - TURNER                1640

1  the families of Hamas operatives who were responsible for 12

2  of the attacks in this particular lawsuit?

3  A    Yes, sir.

4            MR. TURNER:  Now, could we display slide 98, please?

5            THE COURT:  What is 98?

6            MR. TURNER:  98 is a listing of the 12 operatives

7  who received payments along with the nine SWIFT payment.

8            THE COURT:  Let me see that.

9            MR. TURNER:  Payment records.  And just for purposes

10 of the record, we offer into evidence, with respect to the

11 Neve Yamin attack, Exhibits 625, 635 and 694.

12           THE COURT:  All right.  Those are received.

13           (Plaintiff Exhibits 625, 635 and 694 received in

14 evidence.)

15           MR. TURNER:  And with respect to the Dolphinarium

16 attack, Exhibits 624, 635 and 694.

17           THE COURT:  Received.

18           (Plaintiff Exhibits 624, 635 and 694 received in

19 evidence.)

20           MR. TURNER:  And with respect to the Sbarro Pizzeria

21 attack, Exhibits 627, 635 and 687.

22           THE COURT:  Received.

23           (Plaintiff Exhibits 627, 635 and 687 received in

24 evidence.)

25 Q    Now, without going through each of these names who we've

A. SPITZEN - DIRECT - TURNER                1641

1   discussed previously at one point or another during the course

2   of the trial, were you able to confirm that each of these

3   individuals shown on this particular slide's families received

4   payments through the Arab Bank?

5   A    Yes, sir.

6           MR. TURNER:  And may I display slide 99, which is a

7   continuation?

8           THE COURT:  Just let me see it.  Yes.

9           MR. TURNER:  We would offer in evidence, with

10  respect to the Ben Yehuda attack, Exhibit 667; with respect to

11  the Emmanuel attack, Exhibit 663 and Exhibit 713; and with

12  respect to the Park Hotel attack, Exhibits 710, 614, and 615.

13          THE COURT:  Received.

14          (Plaintiff Exhibits 667, 663, 713, 710, 614 and 615

15  received in evidence.)

16  Q    Mr. Spitzen, were you able to determine or confirm that

17  payments to the families of these Hamas operatives were, in

18  fact, made?

19  A    Yes, sir.

20          MR. TURNER:  And may I display slide 100, which is a

21  continuation?

22          THE COURT:  Yes.

23          MR. TURNER:  And for the record, we offer in

24  evidence with respect to the Bus 32A attack payment 7 -- I

25  mean Exhibit 710; with respect to the Route 60 attack, Exhibit

A. SPITZEN - DIRECT - TURNER                1642

1   716; and with respect to the Kiryat Arba attack, payment -- I

2   mean Exhibit 685.

3            THE COURT:  Received.

4            (Plaintiff Exhibits 710, 716 and 685 received in

5   evidence.)

6   Q    Were you able to determine that the families of these

7   three individuals did, in fact, receive payment through the

8   Arab Bank?

9   A    Yes, sir.

10            MR. TURNER:  And 101 is a continuation.  May I

11   display?

12            THE COURT:  Yes.

13            MR. TURNER:  And with respect to Bus 14A, we offer

14   into evidence Exhibit 685; with respect to Route 60, Exhibits

15   716 and 692; and with respect to the Bus 2 attack, Exhibit

16   685.

17            THE COURT:  Received.

18            (Plaintiff Exhibits 685, 716, 692 and 685 received

19   in evidence.)

20   Q    Were you able to confirm that the families of these four

21   terrorists received payments through the Arab Bank?

22   A    Yes, indeed.

23   Q    Now, let's go back to the Park Hotel for a moment, and I

24   want to talk about that specific attack.  Have you had an

25   opportunity to evaluate the trail of money relating to the

A. SPITZEN - DIRECT - TURNER                1643

1  Park Hotel events?

2  A    Yes, sir.

3           MR. TURNER:  And, Your Honor, we offer into evidence

4  the following, which are money transfers through the Arab

5  Bank: 1990, 1991, 1992, 1993, 1994, 1995, all the way through

6  1998, and then 710, 614, 615 and Exhibit 9.

7           THE COURT:  All right.  Those are received.

8           (Plaintiff Exhibits 1990, 1991, 1992, 1993, 1994,

9  1995 through 1998, 710, 614, 615 and 9 received in evidence.)

10          MR. TURNER:  And may we display slide 102?

11          MR. STEPHENS:  I have an objection to that, Your

12  Honor.

13          THE COURT:  Yes, hang on one second.  Let me see

14  just 102.  Let's have a sidebar on that.

15          (Continued on the next page.)

16

17

18

19

20

21

22

23

24

25

```
                         SIDEBAR                        1644
```

1           (Sidebar conference.)

2           THE COURT:  What's the objection?

3           MR. STEPHENS:  It's closing argument, Your Honor,

4   and there's no connection --

5           THE COURT:  Stop.  I agree.  It's closing argument.

6           MR. OSEN:  I'm sorry?

7           THE COURT:  It's closing argument.  It's an

8   argument.  It's great for closing.  Use it at closing.  Don't

9   use it with this witness.

10          MR. OSEN:  Fair enough, Your Honor, but can the

11  witness testify that Mr. Abbas al-Sayed got however much money

12  immediately before the bombing and that these individuals got

13  money before the bombing?  I mean, it's a fact.  It's in the

14  record.

15          THE COURT:  Well, it's a fact based on the money

16  transfer items, right?

17          MR. OSEN:  Right.  Sure.

18          THE COURT:  Right.  So I can't -- why not?

19          MR. STEPHENS:  First of all, they're all -- those

20  transfers were gone over yesterday.  And second of all,

21  there's no connection between --

22          THE COURT:  He's not asking about the connection.

23  He's asking about did they receive.  Right?

24          MR. OSEN:  I'm sorry?  Yes.  In other words, the

25  actual facts that are on the slide, without respect to the

SIDEBAR                                      1645

1    rest of it.

2              THE COURT:  I really can't pass on all the facts in

3    the slide because they've been presented in such an

4    argumentative fashion.  It seems to me there may be some this

5    witness can testify to and some that he can't.  So let's do it

6    like we did the last slide I excluded.  One step at a time.

7              I will note Mr. Turner did an excellent job last

8    time of skipping the steps that this witness could not testify

9    to, and if there are such steps in this slide, he should do

10   the same thing.

11             MR. STEPHENS:  Yes, sir.

12             MR. OSEN:  Fair enough.

13             (End of sidebar conference.)

14             (Continued on the following page.)

15

16

17

18

19

20

21

22

23

24

25

A. SPITZEN - DIRECT - TURNER                1646

1    MR. TURNER:  May I have permission to use the marker

2  and chart?

3    THE COURT:  Sure.

4  Q    Okay, Mr. Spitzen, can you give us the date of the

5  bombing at the Park Hotel?

6  A    The Park Hotel bombing was on March 27, 2002.

7  Q    March 27, 2002?

8  A    Yes.

9  Q    Do you know who Abbas al-Sayed is?

10  A    Yes.  I've already mentioned to you that he was head of

11  the military Hamas in Tulkarem and also at the same time the

12  spokesperson for Hamas.  And he was behind the attack on the

13  Park Hotel as well as other attacks.

14  Q    And have you had access to Exhibit 3524, which is already

15  in evidence, which is the confession or interrogation of Abbas

16  al-Sayed following the Park Hotel bombing?

17  A    Yes.  I saw his confession at the police concerning the

18  Park bombing.

19  Q    And do you recall the section of the statement of Abbas

20  al-Sayed where he discusses having received moneys through his

21  account at Arab Bank before the attack?

22  A    Yes, I remember what he said.

23  Q    And were you able to piece together the transfers, at

24  least the transfers you could locate given the limited

25  information you were given, to Abbas al-Sayed through the Arab

A. SPITZEN - DIRECT - TURNER                1647

1   Bank?

2   A    Yes, indeed.

3   Q    And how many transfers did you find?

4   A    Abbas al-Sayed received, according to what I could

5   locate, nine transfers from Yousef al-Hayek in Lebanon, for a

6   total sum of $123,000.

7   Q    And were you able to define for us the time period that

8   Abbas al-Sayed received these money transfers through the Arab

9   Bank from Al-Hayek in Lebanon?

10  A    Yes.  The first transfer was on February 14th, 2001, and

11  the last one was on May 11th, 2001.

12  Q    What was the last date, May what?

13  A    The last one was May 11, 2001.  Correction.  On the 15th.

14  The first one was on the 15th of February 2001.

15  Q    Okay.  My error.  Is al-Sayed...

16       Okay.  Were you able to determine whether there were

17  any payments made through Arab Bank to Muhanad Taher, one of

18  the bomb makers in the Park Hotel bombing?

19  A    Yes, I located one payment to Muhanad Taher through the

20  Arab Bank.

21  Q    For how much money?

22  A    Yes, it was a prisoner payment from the Saudi Committee,

23  to the amount of 2,655.78 dollars.

24  Q    And what was the date of that payment?

25  A    January 8, 2001, sir.

A. SPITZEN - DIRECT - TURNER                    1648

1    Q    And did that go through the Arab Bank?

2    A    Yes, sir.

3    Q    And were you able to find any payments to Muhanad Sharim,

4    who provided logistical support for the Park Hotel bombing?

5    A    Yes, sir.

6    Q    How many payments and the date of the payment?

7    A    One payment, which was defined as an injured person

8    grant, for 1,325.64 dollars on April 4, 2001.

9    Q    Did that go through Arab Bank?

10   A    Yes, through the Arab Bank.

11   Q    And finally, did you find any payments to Nasser Yataima,

12   who helped transport the explosives for the Park Hotel

13   bombing?

14   A    Yes, sir.

15   Q    And how much was that payment for?

16   A    The payment for Nasser Yataima was for 1,325.64 dollars,

17   probably also a grant for an injured person, and it was paid

18   through the Arab Bank on April 4, 2001.

19            (Continued on the next page.)

20

21

22

23

24

25

A. Spitzen - Direct/Turner                1649

1    BY MR. TURNER:

2    Q    Now, are you familiar with someone named Osama Hamdan?

3              MR. STEPHENS:  Objection, your Honor.

4              I will wait for the next one.

5              THE COURT:  I will overrule that objection.

6              MR. TURNER:  I'm sorry, I didn't hear it.

7              THE COURT:  There was an objection.  It's

8    overruled.

9              MR. TURNER:  Then I will keep going.

10   Q    Who was Osama Hamdan?

11   A    This Osama Hamdan was the representative of Hamas in

12   Lebanon, a member of the Political Bureau of Hamas, a senior

13   person.

14   Q    Are you familiar with a transfer of funds from Osama

15   Hamdan to Yousef al-Hayek?

16             MR. STEPHENS:  Objection, your Honor.

17             MR. TURNER:  It is already in evidence.

18             THE COURT:  I thought it was.

19             MR. STEPHENS:  Objection.

20             THE COURT:  Side bar, please.

21

22

23

24

25

```
                          SIDE BAR                        1650
```

1              (Side bar)

2         THE COURT:  What is the objection?

3         MR. STEPHENS:  It is getting into argument now.

4    He has all of this under the Park Hotel and payment coming

5    from Osama Hamdan in December of 2000.  It's back into

6    argument.

7         THE COURT:  The question is not argument.  It was

8    any evidence of the payment from '02.

9         MR. STEPHENS:  The argument, your Honor, is going

10   on on the chart he's busy putting up.

11        THE COURT:  Is the objection to the question or

12   the chart?

13        MR. STEPHENS:  Both.

14        THE COURT:  The objection to the question is

15   overruled.  I can see the chart from here.  It lists what

16   the witness testified to.  So I don't see any argument in

17   the chart either.  So I will overruled that objection as

18   well.

19             (Side bar ends)

20

21

22

23

24

25

A. Spitzen - Direct/Turner                1651

1      MR. TURNER:  I don't remember if there was a

2  question pending or not.

3      THE INTERPRETER:  There was.  May I translate?

4      THE COURT:  Yes.

5  A    Yes, sir.

6  Q    And what was the date of the transfer from Osama Hamdan

7  to Yousef al Hayek in Lebanon?

8  A    I am familiar with one payment by check from Osama

9  Hamdan on December 18, 2000.

10  Q    How much was that for?

11  A    $10,000.

12  Q    Were you able to determine - and I want to focus on the

13  Abbas al-Sayed payments made on February 15 of '01 and

14  May 11 of '01 - were you able to determine from the transfer

15  information who sent that money to al-Sayed?

16  A    Yes.  The payments were sent by Yousef al Hayek and add

17  I said in the beginning of my testimony I don't know exactly

18  who is.

19  Q    Now, I want to read you a sentence from exhibit 3524,

20  which is in evidence, al Sayed's confession, wherein he

21  said:  The money that I paid for the weapons was transferred

22  to my private bank account in Arab Bank in Tulkarem.  This

23  money was sent from the U.S.A. to my account, and this was

24  coordinated with Abu al Amwar in Syria.

25      Now, do you know who Abu al Amwar is or was?

A. Spitzen - Direct/Turner                    1652

1  A    No, I do not know who that Abu al Amwar from Syria is,

2  but I did run --

3  Q    You might need to pull that microphone towards you.

4  A    No, I do not know who Abu al Amwar from Hamas Syria is,

5  the headquarters in Syria is, but I did come across this

6  name under different circumstances, other circumstances of

7  transfer of Hamas funds, but these are not related to this

8  case.

9           MR. TURNER:  May I display 3524, your Honor?

10          THE COURT:  Yes, you may.

11 Q    I want to ask you briefly about Abbas al-Sayed, because

12 there's a section on 3524 I want to talk about.

13          What area was he from in the West Bank?

14 A    Abbas al Sayed, like I said, was the military commander

15 of Hamas in Tulkarem, and he is from Tulkarem.

16 Q    And I want to focus on the issue of whether he was a

17 secret person in Tulkarem or whether he was a public figure

18 for Hamas.

19          In that context you had you had an opportunity to

20 read his confession about what activities he participated in

21 for Hamas in the Tulkarem and the West Bank?

22          MR. STEPHENS:  Objection, your Honor.

23          THE COURT:  No, it's predicate.  Overruled.

24 A    Yes, I am familiar with the activities of Abbas

25 al-Sayed, both from his confession and also from the time I

A. Spitzen - Direct/Turner                1653

1   had served in that area.

2   Q    Now, in order for us to sort of put some of this into

3   context in terms of the size of the community in Tulkarem,

4   can you tell us how large a town or city Tulkarem was at

5   this point in time?

6   A    Okay.  Tulkarem, I think a more adequate name for it

7   would be a town or even a small town located at the north of

8   the West Bank at Sumaria, and I think at that time there

9   were no more than a 100,000 people living there.

10  Q    Now, let's take a look at the confession, which is on

11  the screen, for a minute.  We highlighted a section.  My

12  responsibilities included participating in activities

13  relating to that Intifada, delivering speeches at the

14  festivals, participating in seminars, lecturing, conducting

15  phone interviews with various satellite channels, and

16  representing Hamas movement in front of popular and official

17  parties. I was in touch with Hamas leaders in literally the

18  inside, meaning the West Bank and Gaza Strip, and I don't

19  know how to pronounce that literally, the outside measuring,

20  meaning the diaspora.

21  A    I would say in Arabic it's dahe, which is the internal,

22  and harej means outside.

23  Q    I also admit that at the beginning of the current

24  Intifada I met with my friend Salah Darwazah.

25          Two questions about what we just read.

A. Spitzen - Direct/Turner                1654

1      First of all, are those kinds of public activities
2  described in the confession in the Tulkarem area in the West
3  Bank consistent with what you knew while you were working in
4  that area COGAT?
5  A   Yes, sir.  I said that -- I already mentioned that he
6  was an Hamas spokesperson, and he says that himself when he
7  talks about the interviews that he gave to the media.  He
8  was also coordinator of all public and civilian activities
9  in the Intifada in that area, and this is why it is very
10  much that I know.
11  Q   And, secondly, is this the same Salah al Din Darwazah
12  that was shown in the funeral on Exhibit 4712, the
13  videotape?
14          MR. STEPHENS:  Objection, your Honor.
15          THE COURT:  Overruled -- well --
16          MR. TURNER:  Well, he technically was his family.
17          THE COURT:  Put another question.
18  BY MR. TURNER:
19  Q   Is that the same Salah al Din Darwazah referenced in
20  4712, the videotape?
21  A   Yes, sir, it is the same Salah al Din Darwazah, who is
22  also senior commander of the military wing of Hamas in
23  Samaria.
24  Q   Did you also have an opportunity to evaluate payments
25  via Arab Bank in the '02 time frame directly to senior Hamas

A. Spitzen - Direct/Turner                1655

1  terrorists?

2  A    Yes, sir.

3           MR. TURNER:  Your Honor, we offer into evidence

4  722, 720, 721, and 648.

5           THE COURT:  Those are transfers?

6           MR. TURNER:  Yes, sir.

7           THE COURT:  Those are received.

8           (Whereupon, Plaintiff's Exhibits 722, 720, 721 and

9  648 are received and marked into evidence, as of this date.)

10           MR. TURNER:  May we show Slide 103.

11           THE COURT:  Let me see it.

12           (Pause)

13           THE COURT:  Okay.

14  BY MR. TURNER:

15  Q    Do you recognize Slide 103, including the four

16  individuals in the photographs?

17  A    Yes, sir.

18  Q    Now, we already talked about Nizar Rayan; is that

19  correct?

20  A    Yes, we mentioned him.

21  Q    We mentioned Ahmad al-Ja'bari earlier as well; is that

22  correct?

23  A    Yes, we mentioned Ahmad al-Ja'bari.  That's the one

24  that was called Chief of General Staff of Hamas.

25  Q    Who was Ibrahim al-Muqodama?

A. Spitzen - Direct/Turner                1656

1  A    Ibrahim al-Muqodama is a senior officer, well-known,

2  famous.  He wrote quite a few books, and he's considered

3  both a spiritual authority and military commander in the

4  Qassam Brigade.

5  Q    Who is Abd al-Fatah Dukham?

6  A    We mentioned him among the seven founders of Hamas at

7  the beginning of my testimony, so he's one of the seven

8  founder of Hamas.  He is a close friend of Ahmed Yasin and

9  served under him.

10 Q    Now, did you also have an opportunity to find transfers

11 via the Arab Bank to the wives of several senior Hamas

12 terrorists?

13 A    Yes, sir.

14      MR. TURNER:  We offer into evidence 622, 688, 708,

15 687, 711, 635, and 617.  Those are transfers.

16      THE COURT:  Those are received.

17      (Whereupon, Plaintiff's Exhibits 622, 688, 708,

18 687, 711, 635 and 617 were received and marked into

19 evidence, as of this date.)

20      MR. TURNER:  May we display 104?

21      THE COURT:  Yes.

22      MR. TURNER:  Slide 104, please.

23 Q    There are six individuals.  I want to ask you, we

24 previously discussed Iman Halawa and Jabry and Mansur, and

25 some of these others, but I specifically want to ask you

A. Spitzen - Direct/Turner                1657

1  about Boni Awda, because these are transfers to these

2  individuals' wives.

3           Were you able to determine whether the transfer

4  was to Boni Awda's wife or not?

5  A    Regarding Boni Awda, it said "family," not wife, so

6  I cannot be sure.  It may have been his wife.

7  Q    Were you able to go to a martyr file from the Tadamun

8  Charitable Society seizure to confirm one way or the other

9  whether that payment, or at least whether there was a martyr

10 file, for the wife of Boni Awda?

11 A    Yes, Boni Awda had a Shaheed file, a martyr file, and

12 his wife appears there as the beneficiary for the martyr.

13 But regarding payments the Saudi Committee, I did not manage

14 to tie the two.

15 Q    Did you have access to the bank account records from

16 Arab Bank for Boni Awda or his wife?

17 A    No, sir.

18 Q    Why not?

19 A    Because the bank refused to produce these records, the

20 records of these accounts, for me.

21 Q    Now, let's go to -- may we display Slide 105?

22          We offer into evidence Exhibit 648, which is a

23 payment to Nazar Rayan.

24          THE COURT:  That is received.

25          (Whereupon, Plaintiff's Exhibit 648 was received

A. Spitzen - Direct/Turner                    1658

1    and marked into evidence, as of this date.)

2    BY MR. TURNER:

3    Q    Were you able to confirm a martyr payment for the son

4    of Nizar Rayan through the Arab Bank?

5    A    Yes, sir.

6            MR. TURNER:  Slide 106, please.

7            We offer into evidence 721 and 708 answer

8    transfers.

9            THE COURT:  Received.

10           (Whereupon, Plaintiff's Exhibits 721 and 708 were

11   received and marked into evidence, as of this date.)

12   BY. MR. TURNER:

13   Q    With respect to Jabry.  Were you able to confirm

14   prisoner payments made to Jabry, marked as 721 and 708?

15   A    Regarding Jabry, there were two prisoner payments, one

16   received by his wife, and one that he received himself, both

17   of them were in cash.  He was out of prison when they were

18   paid.

19           MR. TURNER:  May we display 107?

20           THE COURT:  Yes.

21   BY MR. TURNER:

22   Q    Were you able to confirm a payment, Exhibit 687, a

23   prisoner payment to Jamal Abu al-Hija, who was involved in

24   the Sbarro Pizzeria bombing, and the Bus 16 bombing?

25           MR. STEPHENS:  Objection, your Honor.

A. Spitzen - Direct/Turner                1659

1          THE COURT:  Sustained as to form.

2    BY MR. TURNER:

3    Q    Were you able to find any prisoner payment transfers to

4    Jamal Abu al-Hija or his wife?

5    A    Yes, sir.

6    Q    And did you find any evidence that al-Hija was involved

7    in any of the terrorist attacks involved in this particular

8    case?

9    A    Yes.  Al-Hija had a certain involvement in the Sbarro

10   attack, and also Bus No. 16, Haifa.

11          MR. TURNER:  We offer 687 as prisoner payment.

12          THE COURT:  Received.

13          (Whereupon, Plaintiff's Exhibit 687 was received

14   and marked into evidence, as of this date.)

15          MR. TURNER:  May we see Slide 108.

16   BY MR. TURNER:

17   Q    Were you able to find a payment for Boni Awda, the

18   family of Boni Awda in the amount $5,316.06?

19          MR. STEPHENS:  Your Honor, I have an objection to

20   this line.

21          THE COURT:  Okay.  Let's hear it at sidebar.

22

23

24

25

```
                          SIDE BAR                      1660
```

1                          (Side bar)

2              MR. STEPHENS:  This is not one of the attacks that

3       is at issue in the case.

4              THE COURT:  And therefore?

5              MR. STEPHENS:  We haven't had any attribution

6       evidence with respect to that attack.

7              THE COURT:  I see.  So until the witness -- is it

8       right that there's no other evidence that ties this attack

9       as an Hamas attack?

10             MR. OSEN:  Well, in his appendicies.

11             THE COURT:  Whose appendicies?

12             MR. OSEN:  Sorry, the witness's appendicies.  He

13      provides biographical datas, which is usually from the Hamas

14      website, the same material you've seen in the case before.

15      Frankly, we don't care, except to establish he was an Hamas

16      operative and gives the background of why he was actually

17      killed.

18             MR. TURNER:  We can move on -- I can move to the

19      next line.

20             THE COURT:  Okay.  Let's go ahead.

21                          (Side bar ends)

22

23

24

25

A. Spitzen - Direct/Turner                    1661

1              MR. TURNER:  May we display 109?

2              THE COURT:  Any objection?

3              MR. STEPHENS:  No,  your Honor.

4              MR. TURNER:  We were we 635, which is the martyr

5     payment to Iman Halawa.

6              THE COURT:  The wife.

7              MR. TURNER:  Wife of Iman Halawa.

8              THE COURT:  Okay.  That's admitted.

9              (Whereupon, Plaintiff's Exhibit 635 was received

10    and marked into evidence, as of this date.)

11    BY MR. TURNER:

12    Q    Were you able to find a martyr payment to the wife of

13    Iman Halawa in the amount of $5,311.56?

14    A    Yes, sir.

15    Q    Now, we previously identified Halawa.

16             Do you recall which attacks he was involved in

17    that are at issue in this lawsuit?

18    A    The attack at Neve Yamin on March 28, 2001, and the

19    attack at Sbarro Pizzeria on August 9, 2001.

20    Q    And is that the same Iman Halawa that we previously

21    circled on the martyr payment list that came from the files

22    at Arab Bank?

23    A    Yes, sir.

24             MR. TURNER:  May we display 110, please?

25             THE COURT:  Any objection?

A. Spitzen - Direct/Turner                1662

1          MR. STEPHENS:  It is the same issue as we were

2    discussing before.

3          MR. TURNER:  We can do it without the slide, your

4    Honor.

5          THE COURT:  Go ahead, please.

6          MR. TURNER:  We offer into evidence 711, which is

7    a payment in the amount of $2,655.78 to the Saudi Committee

8    in the Arab Bank to Yusef al Surakji's wife.

9          THE COURT:  That's received.

10         (Whereupon, Plaintiff's Exhibit 711 was received

11   and marked into evidence, as of this date.)

12         THE COURT:  How many more of these do you have?

13         MR. TURNER:  I've got three more and then quit

14   working.

15         THE COURT:  Go ahead.

16         MR. TURNER:  I will move through them fast, your

17   Honor.

18         Slide 111, please.

19         Were you able to find a prisoner payment, which we

20   marked as Exhibit 720, to Ibrahim al Muqadama in the amount

21   of $2,655.78?

22   A    Yes, sir.

23         MR. TURNER:  And Slide 112, please.

24   BY MR. TURNER:

25   Q    Were you able to find a prisoner payment to the family

A. Spitzen - Direct/Turner                1663

1   of Abd Al Fatah Dukan in the amount of $2,655.78 marked as

2   Exhibit 722?

3   A    I found payment that was given to Abu Dukan directly

4   for him for the father, that his son Bilal was sent to

5   prison.

6           MR. TURNER:  We offer 720 and 722 into evidence.

7           THE COURT:  Received.

8           (Whereupon, Plaintiff's Exhibits 720 and 722 were

9   received and marked into evidence, as of this date.)

10          MR. TURNER:  This is a good breaking point.

11          THE COURT:  All right.  Ladies and gentlemen,

12  we'll take 15 minutes, coming back at ten to three.  So the

13  price of a short morning and a long afternoon.  So take a

14  walk, stretch your legs, don't talk about the case.  See you

15  in a few minutes.

16          (The jury leaves the courtroom at 2:32 for a

17  recess.)

18          THE COURT:  All right.  We're recessed until ten

19  to three.

20          (A recess is taken at this time.)

21          (Continued on the next page.)

22

23

24

25

A. Spitzen - Direct/Turner                1664

1         (Judge Cogan enters the courtroom.)

2         THE COURT:  Let's have the jury, please.

3         (The jury enters the courtroom.)

4         THE COURT:  All right.  Be seated.

5         Continue, Mr. Turner.

6         MR. TURNER:  Your Honor, we don't have a witness

7         THE COURT: Okay.

8         (Pause)

9         (Whereupon, the witness enters the courtroom and

10   resumes the witness stand.)

11        THE COURT:  Please continue.

12   BY MR. TURNER:

13   Q    Mr. Spitzen, I would like to focus a bit of time on

14   this concept of martyr files in the context of the issue of

15   needs and the Saudi Committee payments on the issue of

16   needs.

17        You might want to go ahead and interpret that.

18   A    I understand.

19        MR. TURNER:  Okay.  First of all, I would offer

20   into evidence 622, 688, 2019, 2121, 2154, and 2158, and

21   these are transfers to Jamal and Muna Mansur.

22        THE COURT:  Those are received.

23        (Whereupon, Plaintiff's Exhibits 622, 688, 2019,

24   2121, 2154 and 2158 were received and marked into evidence,

25   as of this date.)

A. Spitzen - Direct/Turner                1665

1   BY MR. TURNER:

2   Q    Have you had an opportunity, Mr. Spitzen, to find in

3   the materials that you had available to you transfers

4   through the Arab Bank to either Jamal or Muna Mansur?

5   A    Yes, sir.

6   Q    And how many transfers were you able to locate?

7   A    A total of six transfers, two from the Saudi Committee

8   and four from Yousef al-Hayek.

9   Q    Did you also have an opportunity to have access to the

10  so-called Martyr File that was seized from the Tadamun

11  Charitable Society?

12  A    Yes, sir.

13  Q    From that martyr file, were you able to identify the

14  photograph and other identifying one and the same Jamal

15  Mansur and Muna Mansur, who we have been talking about?

16  A    Yes, sir.

17          MR. TURNER:  Your Honor, we would offer into

18  evidence 1231, which is the Tadamun Charitable Society

19  martyr file on Jamal Mansur.

20          THE COURT:  Okay.  Any objection?  Objection

21  previously raised?

22          MR. STEPHENS:  Yes, Your Honor.

23          THE COURT:  I will receive it for the limited

24  purpose of helping the jury to understand the expert's

25  opinion.  It's not being moved into evidence.

A. Spitzen - Direct/Turner                1666

1        Ladies and gentlemen, the exhibit you are about to

2    be shown is not being admitted. Its only purpose is so that

3    you can consider it as part of evaluating Mr. Spitzen's

4    opinion, in determining what weight to give to his opinion.

5    The document has no independent weight, and the statements

6    contained in it should be taken as true just because they

7    are contained in it.

8        You may show it to the jury.

9        MR. TURNER:  I would like to display Slide 113.

10       MR. STEPHENS:  I have objection to the slides,

11    your Honor.

12       THE COURT:  We need a side bar.

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDE BAR                                     1667

1              (SIDE BAR)

2          THE COURT:  Okay.  What's wrong?

3          MR. STEPHENS:  I see problems.  Related payments,

4     I don't know what -- they are not related.  That's an

5     argument.  If they just take "related out," they can do

6     whatever they like with it.

7          MR. TURNER:  We can do that real quick.

8          THE COURT:  Okay.  I mean, I'm not sure you need

9     to.  I assume the witness is going to give his view as to

10    why they are related, and all this is doing is illustrating

11    the witness's testimony.  You can bring out why it's

12    related.

13         MR. TURNER:  Sure.  I can do it either way.

14         THE COURT:  I want to do whatever is easiest, and

15    I think it is easier to do that, than try to redact the

16    slide now, because I'm not sure what we would redact it to

17    say, other payments?  Would you prefer that?

18         MR. STEPHENS:  Yes.

19         THE COURT:  Okay.  I don't think that's worth it.

20    I will let the witness explain why he thinks the payments

21    are related, so I will overrule the objection.

22         MR. STEPHENS:  Thank you, your Honor.

23         (Side bar ends)

24

25

A. Spitzen - Direct/Turner                    1668

1    THE COURT:  The slide can be displayed.

2    BY MR. TURNER:

3    Q    Do you recognize this slide, Mr. Spitzen?

4    A    Yes, sir.

5    Q    Now, there are two categories shown on this particular

6    slide.  One is Saudi Committee payment details.

7         Do you see that?

8    A    Yes, sir.

9    Q    Aand what is the source of the Saudi Committee payments

10   details?

11   A    These are documents which I had received from the Arab

12   Bank.

13   Q    And then there's a second category called Related

14   Payments listing four wire transfers from Yousef al-Hayek;

15        What is related payments and why is that column

16   present?

17   A    Because this woman, this Muna Mansur, she received

18   money from both sources.  She received money from an Yousef

19   al-Hayek, $85,000, and she also received a prisoner's

20   payment, a martyr's payment, from the Saudi Committee for a

21   total sum of $8,100.

22   A    But the details are there.

23   Q    We already have gone into some detail previously in the

24   trial about Jamal and Muna Mansur.  We'll skip over that

25   part of it.

A. Spitzen - Direct/Turner                 1669

1          But were you able to confirm that all of these

2    payments in fact came through the Arab Bank?

3    A    Yes, according to the transfers, yes.

4    Q    Now, were you given access to the full account records

5    for Jamal and Muna Mansur at the Arab Bank?

6    A    No, sir.

7    Q    And again, why not?

8    A    Because the bank had refused to transfer the documents

9    for me to look over them.

10   Q    Now, let's focus on martyr files for a moment.  We

11   already introduced the concept, but can you explain to us

12   what a martyr file is and how it was used in the context of

13   the Saudi Committee Program?

14   A    A martyr file is a file which includes various personal

15   details regarding the Shaheed, and the family of the

16   Shaheed, that would include, number one, a kind of social

17   welfare report regarding the income of the family, et

18   cetera.

19          Also, it would include the documentation from

20   various sources that do indeed prove that that person is

21   deceased, cause of death, et cetera.  It also includes

22   documentation regarding all of the benefits the

23   beneficiaries, in this case it is the wife who was the

24   beneficiary, who they are, what their bank account number

25   is, their ID number, et cetera.  All of these were

A. Spitzen - Direct/Turner          1670

1   transferred to the Saudi Committee in order to help them to

2   decide regarding the transfer of funds to these people.

3             MR. TURNER:  Now, may we display the first page of

4   1231, the martyr file?

5             THE COURT:  Yes.

6   Q    Now, first of all, do you recognize the photograph?

7   A    Yes, sir.

8   Q    And what does date of martyrdom mean?

9   A    On that date, in this case the date was July 31, 2001,

10  that person was killed.

11  Q    Then it also indicates a phone number at the bottom?

12  A    Yes, sir.

13  Q    Now, if we can go to Slide 115.

14            Can you identify what this particular page is of

15  the martyr files, what kind of information it is providing

16  to us?

17  A    This is the ID card of Mrs. Muna Mansur.  In this case

18  she's the beneficiary who is supposed to receive the money.

19  This says that the money is received for Jamal Mansur, who

20  is a martyr, and then there's details of her and the

21  children.

22  Q    If we can go to Slide 116, which is the Martyr Family

23  form.

24            What is the Martyr Family Form and what

25  information did it contain?

A. Spitzen - Direct/Turner          1671

1  A    This form, a Martyr Family Form, is actually a social

2  welfare report.  It indicates the monthly income of such a

3  family and how many people are supposed to live off that

4  sum.

5  Q    And what was the monthly income for this family at the

6  time?

7  A    Thirteen hundred Israeli sheckles, and that meant at

8  that time 350- to $400.

9  Q    Per month?

10 A    Per month.

11 Q    So that translates into over a year period of what,

12 about $3600 a year?

13            MR. STEPHENS:  Objection.

14            THE COURT:  Sustained.

15 BY MR. TURNER:

16 Q    What is 300 times 12?

17 A    According to what I was taught at school, it is $3600.

18 Q    Let's go to the next Slide 117.

19            Now, this is financial data.  What kind of

20 information was provided here that was important to know

21 about the martyr file?

22 A    This is the bank account of the beneficiary who is

23 supposed to receive the money.  In this case it was a female

24 beneficiary, and it provides the detail, the name of the

25 person, the number of the account, and also the branch in

A. Spitzen - Direct/Turner                1672

1   which this account is maintained.

2   Q    Now, with respect to the financial details, $3600 a

3   year.  We talked previously about the standard of living in

4   the Palestinian territories that was earlier today.

5            In that context, could you give us an idea of

6   where this family stood in terms of the average income for

7   Palestinian residents in the West Bank during this period of

8   time?

9   A    It is about three times the average.

10  Q    In fact, just to go back and make sure we are being

11  accurate about it. Can you jump back to Slide 78, very

12  quickly.

13           Now, $3600 would have been -- would have stood

14  where in relation to what you have highlighted in yellow

15  under the Palestinian Authority?

16  A    Had this been in 1999, then, it would have been twice

17  as much.  But this is after 2001, and by then the average

18  had gone to about 1000, so it is times three.

19  Q    Now, if we can go back to Slide 113 for a moment.  I

20  want to talk about these payments in comparison to the $3600

21  a year in income.

22           First of all, were you able to determine during

23  what period of time this family received $85,000 from this

24  Yousef al-Hayek?

25  A    Yes, if it had happened between December of 2000 to

A. Spitzen - Direct/Turner                1673

1    September of 2001, approximately one year.

2            (Continued on the next page.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A. SPITZEN - DIRECT/MR. TURNER          1674

1   DIRECT EXAMINATION (Continued)

2   BY MR. TURNER:

3   Q    Now, with respect to Saudi Committee payments.  Let's

4   focus on the prisoner payment for just a moment.  An amount

5   of $2,655.78 was transferred as a prisoner payment on what

6   date?

7   A    It was transferred on December 19, 2000.

8   Q    Were you able to determine from your investigation

9   whether any member of the family was in prison on

10  December 19, 2000?

11  A    According to my investigation, during this period it's

12  difficult to decide regarding Jamal Mansur, but back then he

13  wasn't in prison, it's difficult to decide, because during

14  that period he would be, for short periods of time, in the

15  prison by the Palestinians authority, he would maybe be

16  there a week or two weeks here and there, but according what

17  I checked, he wasn't.

18  Q    Now, the final payment was made in the amount of

19  $5,316.06 on what date?

20  A    On October 22, 2001.

21  Q    Now, by September of 2002, the date of final transfer

22  from Yousef al-Hayek, Muna Mansur had received almost

23  $88,000.  Now, at the time of the payment in October 22,

24  2001, did that payment come through the Saudi Committee and

25  Arab Bank.

A. SPITZEN - DIRECT/MR. TURNER          1675

1  A    Yes, sir.

2  Q    Now, looking at these figures compared to the $3,600

3  annual income, based on your all research into the Saudi

4  Committee program, were you able to reach a conclusion as to

5  whether or not the Saudi Committee program included payments

6  only to needy people?

7              MR. STEPHENS:  Objection, your Honor.

8              THE COURT:  Let's have a sidebar.

9              (Continued on the next page for sidebar.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                    1676

1          (Sidebar conference begins.)

2          THE COURT:  I think it's too broad a question.

3   The most you can do with that topic is direct him to a

4   specific examples of payments made to martyrs or martyrs'

5   families that exceed the $1,000 or $1,600 average income.  I

6   think the conclusion is just it encompasses too much.  No

7   one, I don't think anyone could answer that question with

8   the degree certainty required to give an expert opinion.  So

9   if you have specific examples of the martyrs who were

10  greatly in excess, bring those out, but I'm not going to let

11  him answer.

12               (End of sidebar conference.)

13               (Continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

A. SPITZEN - DIRECT/MR. TURNER                1677

1        MR. TURNER:  May I proceed?

2        THE COURT:  You may.

3   BY MR. TURNER:

4   Q    Now, Mr. Spitzen, during the course of your work, were

5   you able to determine whether there were payments made

6   through the Saudi Committee to those for needy people,

7   people that, for instance, have property damage to either

8   their car or their home or their land, things of that

9   nature?

10  A    Regarding damages to property such as houses, car,

11  land, I did see in the Saudi Committee's website that they

12  wrote there they were going to pay money for that, but I

13  have not seen any transfers.

14  Q    Now, were you able to find any transfers such as to

15  Jamal and Muna Mansur where the amount transfers to those

16  individuals from the Saudi Committee during that time

17  exceeded their average income?

18  A    Yes, certainly.  Most of the sums paid to martyrs, the

19  sum was $5,316 and also the sums paid as a prisoners grant

20  exceed the average income at that time.

21  Q    Now, who was Abu Hijla?

22  A    Mustafa Abu Hijla was a suicide bomber.  He was killed

23  on January 1st, 2001.  He exploded with his car in Netanya.

24  Q    Was he affiliated with or a member of Hamas during the

25  relevant time periods?

A. SPITZEN - DIRECT/MR. TURNER          1678

1  A    He was a very active Hamas operative in the Kutla al

2  Islamiya, which is the Islamic block in the student body of

3  the al Najah University in Nablus where he studied in Jenin.

4            MR. TURNER:  Show the witness only, please,

5  Exhibit 327.

6  Q    Do you recognize Exhibit 327 as one of the martyr

7  lists, in fact, the 6th installment that came from the files

8  of the Arab Bank?

9  A    Yes, sir, it's a translation, of course.

10           MR. TURNER:  We offer 327.

11           THE COURT:  I have it as in.  You don't have it as

12  in?

13           MR. TURNER:  Well, if it's in, I'll withdraw my

14  request and if it's not, I request that it be in.

15           MR. STEPHENS:  I don't believe it is in, but I'm

16  not sure to be honest with you.

17           THE COURT:  It is an Arab Bank document, isn't it?

18           MR. STEPHENS:  Yes, it is.

19           THE COURT:  If there is an objection I'll overrule

20  it, but it's in.

21           (Plaintiff Exhibit 327 was admitted into

22  evidence.)

23           MR. TURNER:  May we display 327?

24           THE COURT:  Yes.

25  Q    I want to focus for a minute once it comes up on the

A. SPITZEN - DIRECT/MR. TURNER          1679

1   screen, Mr. Spitzen, the issue of Abu Hijla, and this martyr

2   payment list and, specifically, I want to focus in on the

3   cause of death.  So if you could focus in on that in front

4   of you?

5   A    Yes, sir.

6   Q    Now, do you recognize the cause of death that's listed

7   for Abu Hijla in the martyr list that came in the files from

8   Arab Bank?

9   A    Yes, sir.

10  Q    And what is the actual -- and I know we're looking at a

11  translated version, but what is the actual Arabic language

12  on the Arabic document?

13  A    In the Arabian text it says "amaliyah ishtishadiya".

14  Q    And what does that translate into?

15  A    The suicide action.

16  Q    Now, were you able to likewise --

17          MR. TURNER:  If you could show the witness only

18  the Exhibit 1115.

19  Q    Were you likewise able to review this particular item?

20  A    Yes, I can identify that.

21  Q    What is the source of this particular postcard?

22  A    It is taken from the Nablus charitable, the Zakat

23  Committee of Nablus, a search that was conducted there.

24  Q    When did you first see this poster or postcard?

25  A    I take it two days after the findings were taken from

A. SPITZEN - DIRECT/MR. TURNER          1680

1  there.  I cannot remember by heart the date of the search,

2  but this was one of the principle findings there.

3  Q    Did you see it in the context of your work with COGAT

4  and the government?

5  A    Yes, I saw it several times while working in COGAT.

6  Q    And is Abu Hijla referenced in this postcard?

7  A    Yes.  And there is a photograph of two suicide bombers.

8  Hamed Abu Hijla on the left side.  And on the right side,

9  Hashem al-Najjar, another suicide bomber.

10 Q    Does this particular postcard indicate or assist you at

11 all in the relationship or determining the relationship

12 between these suicide bombers and Hamas?

13 A    Yes.  There are several aspects.  First of all, on the

14 reverse side of the postcard, not from the side where the

15 photographs appear, it says -- (Spoken in Arabic.)

16 Q    Before we get to that.  Let me interrupt you.  Before

17 we get to that, ask him:  Does he recognize this as

18 something that assisted him in reaching his opinions?

19 A    Yes, certainly.

20         MR. TURNER:  Your Honor, may we show these for 703

21 purposes?

22         THE COURT:  Any objection.

23         MR. STEPHENS:  Yes.

24         THE COURT:  For those purposes?

25         MR. STEPHENS:  Yes, I have an objection for that,

A. SPITZEN - DIRECT/MR. TURNER          1681

1  too.

2          THE COURT:  Do you need a sidebar, because I'm

3  inclined to overrule it?

4          MR. STEPHENS:  Yes, briefly.

5          (Continued on the next page for sidebar.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                    1682

1        (Sidebar conference begins.)

2        MR. STEPHENS:  This is not about one of the

3   attacks that's at issue in this case, your Honor.  I'm not

4   sure what the relevance at all is.

5        MR. OSEN:  It ties the Nablus Zakat Committee to

6   where it was found to Mr. Hijla, who in the next slide we

7   will see the funeral at which Mr. Bitawi, the vice chairman

8   of the Nablus Zakat Committee attended.  And further, the

9   video that your Honor is going to allow in, 20 seconds of

10  which, with Mr. Bitawi again, linking the charitable

11  committees, the suicide bombers, the materials that are

12  found in their files that are part of the expert's opinion.

13       THE COURT:  Okay.  I'm going to allow it for 703

14  purposes.  Would you like a limiting instruction?

15       MR. STEPHENS:  Yes, please.

16       (End of sidebar conference.)

17       (Continued on the next page.)

18

19

20

21

22

23

24

25

A. SPITZEN - DIRECT/MR. TURNER          1683

1      THE COURT:  All right.  I'm not admitting it into

2  evidence, that's not being requested.  I am allowing the

3  jury to see it for the limited purpose of evaluating this

4  witness' opinion.

5          Again, ladies and gentlemen, like I said recently

6  with another exhibit, you are not to take as true anything

7  asserted in this document, you are simply to consider the

8  opinion of the witness and decide if there is a valid basis

9  for you to accept that opinion.

10          All right.  You may show it.

11          MR. TURNER:  This is, for the record, 1115 for 703

12  purposes only.

13  BY MR. TURNER:

14  Q    Mr. Spitzen, have you circled Abu Hijla?

15  A    Yes.

16  Q    Now, would you explain to us -- first of all, what is

17  on this postcard that is important for purposes of

18  understanding the relationship between Hamas and this

19  particular suicide bomber?

20  A    On the reverse side of the postcard it says explicitly

21  the Islamic resistance movement of Hamas, as I said before,

22  there is a description of his life story as someone who

23  belongs to Hamas, in the Islamic block of Hamas in the

24  institution where he studied in Najah, and it is an explicit

25  statement.

1  Q    What is it about this particular postcard that is

2  important if you're trying to evaluate the relationship

3  between the charitable organization, Hamas and terrorism?

4  A    This postcard was found at the Nablus charitable

5  society with a large number of other items.  Some of them

6  were in large quantities for distribution.  And they

7  testified to the direction or the orientation of that

8  committee, what it does beyond charity.  I think that the

9  personal identification of the suicide -- of the terrorist

10 with Hamas and with the committee says it all.  You don't

11 need to go into details.

12 Q    Now, finally, if you're interested in evaluating the

13 relationship between Hamas, the charitable organization,

14 terror attacks and what information Arab Bank had in its own

15 files, what about this postcard is important for us to know?

16 A    The important thing is what it says in the documents of

17 Arab Bank; that this man was a suicide bomber of Hamas.  The

18 -- in the documents of the Arab Bank it says that he is a

19 suicide bomber.  The rest we can know from other -- the fact

20 that he belongs to Hamas can belong from other sources.

21          MR. TURNER:  Now, show the witness only, please,

22 slide 121.

23 Q    Do you recognize the people in this photograph?

24 A    Some of them, yes, three of them.

25 Q    Which ones do you recognize from the photograph?

1   A   On the left-hand corner we can see Sheikh Hamed

2   al-Bitawi, we know him from the al-Tadamun and from the

3   Zakat Committee of Nablus.  And with him is Jamal Mansur,

4   next to him, and on the right-hand side we see Jamal Salim,

5   also a member of the al-Tadamun.

6   Q   Now, what is the source of this particular photograph,

7   where did it come from?

8   A   It's taken from a video clip from the Al-Qassam

9   Brigades, al-Qassam --

10  Q   What is the event that's going on in this photograph?

11  A   This is the funeral, probably a symbolic funeral for

12  Hamed Abu Hijla, which we just discussed.

13          MR. TURNER:  Your Honor, may we display 121 for

14  demonstrative only?

15          THE COURT:  Any objection?

16          MR. STEPHENS:  No, your Honor.

17          THE COURT:  Okay.

18  Q   When it comes up, Mr. Spitzen, I would like for you --

19  of course it's self-explanatory, because there are some

20  labels and arrows pointing to some individuals.  First of

21  all, is this the same Abu Hijla that we were just talking

22  about, the suicide bomber?

23  A   Yes, sir.

24  Q   Now, what is significant or at least what did you find

25  significant about the attendance of Sheikh Bitwai, Jamal

A. SPITZEN - DIRECT/MR. TURNER            1686

1  Mansur and Jamal Salim at this particular funeral or

2  ceremony for a suicide bomber?

3  A    First of all, the fact that this was a public

4  appearance of these people that were well known in the

5  public at large.  And the second thing is their

6  identification, the way that they stood behind a Hamas

7  terrorist attack and that identifies them as Hamas people.

8           MR. TURNER:  Now, show the witness only, please,

9  485.

10 Q    Mr. Spitzen, do you recognize 485?

11 A    Yes, sir.

12 Q    What is 485, generally speaking?

13 A    This is yet another martyr file taken from al-Tadamun

14 Society.

15 Q    And who is the subject of this martyr file?

16 A    Hamed Abu Hijla.

17 Q    Was this one of the martyr files taken from the

18 al-Tadamun Society in 2002?

19 A    Yes, this is one of the files that was seized in this

20 search to the al-Tadamun Society in 2002.

21 Q    Now, have you had an opportunity to review this

22 particular file?

23 A    Yes, sir.

24           MR. TURNER:  Your Honor, may we display parts of

25 this under 703?

A. SPITZEN - DIRECT/MR. TURNER          1687

1      THE COURT:  Again, ladies and gentlemen, I'm going

2  to allow you to see this, but you're not to assume anything

3  stated in this exhibit is true.  It's going to help you to

4  understand the opinion of the expert.

5      MR. TURNER:  May we display slide 122?

6      THE COURT:  Yeah.

7      MR. TURNER:  Which is the first page, just to

8  identify.

9  Q    Is this Abu Hijla?

10 A    Yes, this is his picture.

11 Q    Okay.

12     MR. TURNER:  Can you go to 123, please.  And this

13 is the family form.

14 Q    Can you identify for us the monthly income for this

15 particular family form?

16 A    Yes.  These are 1,000 dinars.  That is equal, I think,

17 to about one British pound, so that would translate into

18 $1,500 per month.

19 Q    If you can go to slide 124.  This is some of the other

20 information that was in the martyr file; the death

21 certificate; is that correct?

22 A    Yes, sir, that's true.

23 Q    And then 125, this is the photograph identification of

24 Abu Hijla's mother; is that accurate?

25 A    That's true.  This is the ID card of Zahirah Abu Hijla,

A. SPITZEN - DIRECT/MR. TURNER          1688

1   who is the mother of Abu Hijla, the suicide bomber.

2          MR. TURNER:  Can you show the witness, please,

3   623.

4   Q    Can you identify 623?

5   A    Yes, sir.

6   Q    And what is 623?

7   A    This is a bank transfer that was done through the Arab

8   Bank to the mother of Hamed Abu Hijla.  Her name is Zahirah

9   Abu Hijla in Nablus.  This was transferred from the Saudi

10  Committee in support of the al Aqsa.  The sum is $5,316.06

11  and this was paid in cash.

12         MR. TURNER:  We offer 623.

13         THE COURT:  Any objection?

14         MR. STEPHENS:  No objection.

15         THE COURT:  All right, it is received.

16         (Plaintiffs Exhibit 623 was admitted into

17  evidence.)

18  Q    Now, I want to focus on two other individuals very

19  quickly.  One was Jamal Salim.  Were you able to find any

20  transfers to Jamal Salim?

21  A    Yes, there were transfers to Jamal Salim.  I remember

22  transfers from al-Hayek to Jamal Salim.

23         MR. TURNER:  Just for purpose of context, can you

24  go back to slide 121, please, Mr. Miller.

25  Q    Is that Jamal Salim, the same who received the

A. SPITZEN - DIRECT/MR. TURNER          1689

1   transfers?

2   A    Yes, this is the same Jamal Salim who is also a member

3   of the board of al-Tadamun Society in Nablus.

4        MR. TURNER:  We would offer 1922, 2116 and 1921 as

5   the transfers to Jamal Salim.

6        THE COURT:  Those are received.

7        (Plaintiffs Exhibits 1921, 1922 and 2116 were

8   admitted into evidence.)

9   Q    Now, we talked earlier about Salah al-Din Darwazah.  Do

10  you remember that brief conversation?

11  A    Yes, I do remember that we did mention him.

12  Q    I believe he came up in the -- one of the paragraphs we

13  were reading from Abbas Sayyid's confession following the

14  Park Hotel terrorist attack.  Were you able to find

15  transfers from Yousef al-Hayek to the wife of Salah al-Din

16  Darwazah?

17  A    Yes.  He was the person providing the weapons to Abbas

18  al-Sayyid.  And, yes, I did manage to find 20 transfers to

19  Huda (ph) Darwazah, the wife of Salah Darwazah from Yousef

20  al-Hayek.

21  Q    In what period of time was were those transfers carried

22  out through the Arab Bank?

23  A    They were done between July of 2000 to July of 2001.

24  Q    How much money was transferred from the Arab Bank to

25  Darwazah's family?

A. SPITZEN - DIRECT/MR. TURNER          1690

1   A      $302,000.

2           MR. TURNER:  I'm sorry, what was the amount?

3   A      $302,000.

4           MR. TURNER:  We offer into evidence the following

5   20 transfers 2055, 2149, 2190, 2070, 2160, 2196, 2086, 2165,

6   2206, 2110, 2172, 2208, 2124, 2175, 2209, 2135, 2180, 2224,

7   2140 and 2186.

8           THE COURT:  All right.  Those are received.

9           (Plaintiffs Exhibits 2055, 2149, 2190, 2070, 2160,

10  2196, 2086, 2165, 2206, 2110, 2172, 2208, 2124, 2175, 2209,

11  2135, 2180, 2224, 2140 and 2186 were admitted into

12  evidence.)

13          MR. TURNER:  Now, if you could show the witness

14  only 1061, and just the photograph of 1061.  This is slide

15  133, I believe.

16  Q      Do you recognize this photograph taken from a video?

17  A      Yes, sir.

18  Q      And what is the source of the video?

19  A      This video is taken from the Jamals funeral, Jamal

20  Mansur and Jamal Salim.  The source of this video is from a

21  movie from an Australian TV channel and it was taken during

22  this big funeral that was held in Nablus.  I think it was

23  either the end of July or beginning of August of 2001.

24  Q      Did you become aware of it in the course of your work

25  with the government?

A. SPITZEN - DIRECT/MR. TURNER          1691

1    A    To the event itself, yes.  This was a very big event

2    and reports were received regarding it through the military

3    channels.  This was a mass funeral, a really big one.

4    Q    And was this video helpful to you in your work in this

5    case?

6    A    Yes, sir.

7    Q    And who are some of the key individuals that we're

8    going to see on this video?

9    A    Once again, you will see here Hamed Bishari (ph) as far

10   as I recall.

11   Q    How was this video helpful to you?  In other words,

12   what issue did this vehicle, this particular video help you

13   put together your opinions?

14   A    Yes.  What we see in this clip, and Bitawi appears

15   there, and he's the chairperson of the Tadamun Society, and

16   he is deputy chair of the Nablus Zakat Committee, and you

17   see him waiving weapons in the funeral of these two

18   terrorists or the who were killed by the IDA as Hamas

19   operatives.  This says it all regarding the relationships,

20   the connection, the ties between these societies and Hamas.

21   It tells you much about how much of public figures these

22   people were, how famous they were.  It's something that

23   everybody knew -- well, perhaps not everybody, but

24   definitely the general public in Nablus, they knew about

25   this.  It was difficult not to know.  So all these things

A. SPITZEN - DIRECT/MR. TURNER            1692

1  together gave me several things or rather several insights

2  and answers regarding this relationship and upon which I had

3  established.

4           MR. TURNER:  May we run through the still

5  photographs of 1061 for purposes of identification.

6           THE COURT:  Yes?

7           MR. TURNER:  Let's put up 1061-A.

8           MR. STEPHENS:  These continue over our objections,

9  yes?

10           THE COURT:  Yes.

11           MR. TURNER:  May we turn the lights down just a

12  little bit.

13  Q    Now, why is this particular still photograph from the

14  video significant or important to us?

15  A    I think that it shows the masses, the amount of people

16  who had packed the central squares of Nablus during this

17  funeral.

18  Q    Could you go to 1061-B.  What does Abu Hijla -- what

19  does he have to do with this particular funeral?

20  A    His picture was also carried high in this funeral.  The

21  funeral of the Jamals, Jamal Mansur and Jamal Salim.

22  Q    And is this the same Abu Hijla we talked about earlier,

23  the suicide bomber?

24  A    Yes, this is the same Abu Hijla whose funeral we saw

25  previously and Jamal Mansur and Jamal Salim attended his

A. SPITZEN - DIRECT/MR. TURNER          1693

1   funeral, they were present there, and only then they were

2   alive.

3   Q    Now, let's go to 1061-C.  What do we see on 1061-C?

4   A    We see here a poster of Jamal Mansur and Jamal Salim as

5   well as other Hamas operatives.  And this poster was hoisted

6   during the funeral.  It is important to mention also

7   Darwazah, Salah Darwazah, who we already mentioned, and to

8   be frank, Jamal Mansur and Jamal Salim were killed on

9   July 31st, 2001, and Darwazah he was killed five days before

10  that and this poster or rather one similar to it, but not

11  the exact same one was found in the Nablus Zakat Committee.

12  It wasn't exactly this one, but it's also amongst one of the

13  exhibits.

14  Q    Okay.  Could you go to 1061-E, please.  What about this

15  one?

16  A    This adorned the stage from which speeches were given

17  during the funeral or the memorial service for Jamal Mansur

18  and Jamal Salim.  And once again, we see the three pictures,

19  the three images of Jamal Mansur, Jamal Salim and Salah

20  al-Din Darwazah.

21  Q    And can you go to 1061-F?

22          THE COURT:  Mr. Turner, it's getting a little

23  cumulative.

24          MR. TURNER:  Pardon me?

25          THE COURT:  It getting a little cumulative.

A. SPITZEN - DIRECT/MR. TURNER                    1694

1        MR. TURNER:  I think this is the last one.

2   Q    The significance of this photo?

3   A    We see here Hamed Bitawi, who we've already seen

4   several times.  And like I already said, he was the

5   chairperson of the al-Tadamun Society and the committee

6   chairperson of the Nablus Zakat Committee.  And here he is

7   hoisting a weapon during this demonstration and exciting the

8   masses.

9        MR. TURNER:  May we show the 20-second clip?

10       THE COURT:  You may show it over objection.

11       (Video being played.)

12       MR. TURNER:  That concludes 1061.  May we have the

13  lights back on.  Would you put before the witness only

14  1125, please.

15  Q    Do you recognize 1125, Mr. Spitzen?

16  A    Yes, I'll identify it.  This is the poster I mentioned,

17  I made mention before, now it appears.

18  Q    And what is the source of this particular poster?

19  A    This was found, this poster was found among other

20  things in a search conducted on the Zakat Committee of

21  Nablus.

22  Q    And who is shown on the poster?

23  A    These are Jamal Mansur, Jamal Salim and Salah al-Din

24  Darwazah.  Their names are written there as well as the

25  dates of their death.

A. SPITZEN - DIRECT/MR. TURNER                1695

1  Q    And what was the significance to you of finding -- the

2  government finding this particular poster at a charitable

3  organization or the zakat in Nablus?

4  A    Again, these are findings from the zakat societies.  As

5  I mentioned before, these findings are one criterion

6  regarding the evaluation of the level of control of Hamas in

7  these societies.  This is very clear and a clear indication

8  showing connection to Hamas.  It is not just one indication

9  or two, there are dozens of such findings in every society

10 that was searched and it shows the correlation and the

11 connection to Hamas in addition to other things.

12            MR. STEPHENS:  Move to strike, your Honor.

13            THE COURT:  I don't really see why.  Do you want a

14 sidebar?

15            MR. STEPHENS:  Yes, your Honor.

16            THE COURT:  Okay.

17            (Continued on the next page for sidebar.)

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                    1696

1          (Sidebar conference begins.)

2          THE COURT:  He was asked why it was significant to

3    him and he explained why it's significant to him.

4          MR. STEPHENS:  The last part I heard was, you

5    know, there were dozens of such findings in dozens of

6    societies all over the West Bank or whatever he said, which

7    is --

8          THE COURT:  What's wrong with that?

9          MR. STEPHENS:  I don't think that's what he's

10   testified to and he's here to testify to actually these

11   specific zakats that are at issue in the case.

12         THE COURT:  Well, but he's also talked, and I

13   think given opinions about public awareness and how broadly

14   this information was disseminated, and that's where this

15   fits in.

16         MR. OSEN:  And, your Honor, we're happy to put in

17   all of the posters into evidence that are on our exhibit

18   list from the various --

19         THE COURT:  Yeah, I think this is a much better

20   way for everyone to do it, so I'll overrule the objection.

21         (End of sidebar conference.)

22         (Continued on the next page.)

23

24

25

A. SPITZEN - DIRECT/MR. TURNER          1697

1          THE COURT:  Okay.  You may continue.

2     BY MR. TURNER:

3     Q    Lastly, let's talk about the al Shahid Foundation and

4     the al-Ansar Society Gaza.

5          First of all, what was the al Shahid Foundation

6     Lebanon?

7     A    .  The Shahid Foundation was a monitoring fund

8     transferring money from Iran and from Hezbollah to

9     charitable.  It's the charitable associations of the

10    association of al-Ansar in Gaza and also to institutions in

11    Lebanon.

12    Q    So al Shahid Foundation was located in what country?

13    A    In Lebanon.

14    Q    And where was the al-Ansar located?

15    A    Al-Ansar associated was located in Gaza.

16    Q    Now, were you able to access from Arab Bank the account

17    records for the al-Ansar Society?

18         MR. STEPHENS:  Your Honor, objection.  I'm sorry,

19    may we approach?

20         THE COURT:  Sure.

21         (Continued on the next page for sidebar.)

22

23

24

25

SIDEBAR CONFERENCE                    1698

1           (Sidebar conference begins.)

2           MR. STEPHENS:  I still don't see the relevance of

3    this.  He just testified that this is a Hezbollah --

4           THE COURT:  No.  No.  I think you missed a

5    question.  He's talking about al-Ansar.

6           MR. STEPHENS:  The Shahid Foundation is sending

7    money down to al-Ansar.

8           THE COURT:  He was testifying about two zakats;

9    one in Lebanon, he's past that, you didn't object to that.

10   He's now on al-Ansar in Gaza, as I understand it.  Is that

11   where we were?

12          MR. TURNER:  Yes, sir.

13          THE COURT:  That's where we are.

14          MR. STEPHENS:  It's all irrelevant, because he is

15   saying that money came from the one in Lebanon and went down

16   there.  And his conclusion is that the one down there is not

17   controlled by Hamas.

18          THE COURT:  The only question pending and

19   therefore the only one you can object to is:  Did he get

20   records from the bank as to al-Ansar.  That's all that's

21   pending.  That's a fine question, so I'm going to overrule

22   the objection.

23          (End of sidebar conference.)

24          (Continued on the next page.)

25

A. SPITZEN - DIRECT/MR. TURNER              1699

1    BY MR. TURNER:

2    Q    The question again is:  Did you get the full account

3    records from Arab Bank for the al-Ansar Society?

4    A    Unfortunately, no.

5    Q    Why not?

6    A    Because the bank refused to hand over to me the bank

7    accounts for this society, too.

8    Q    Do you know whether or not the al-Ansar Society in Gaza

9    was designated an unlawful association by Israel?

10   A    Yes, it was declared an unlawful association in Israel.

11   Q    When?

12   A    In October 24, 2003.

13   Q    Have you had access to any materials indicating whether

14   or not al-Ansar distributed martyr payments through its Arab

15   Bank accounts?

16   A    Yes, sir, there were such ads in the newspapers that it

17   was distributing money through the Arab Bank.

18   Q    Do you know whether or not the Shahid Foundation was

19   likewise designated an unlawful association by Israel?

20   A    Yes, sir.

21   Q    And do you know whether or not the Shahid Foundation

22   was designated a specially designated global terrorist by

23   the United States of America?

24   A    Yes, on July 24th, 2007.

25         MR. TURNER:  Now, put in front of the witness

A. SPITZEN - DIRECT/MR. TURNER          1700

1   only, please, 1045.

2   Q    Do you recognize slide 143, which is Exhibit 1045?

3   A    Yes, sir.

4   Q    Now, is this an example for one of the advertisements

5   for the al-Ansar Society martyr payments?

6   A    Yes, sir.

7        MR. TURNER:  May we display this for 703 purposes?

8   This is slide 143.  I can just ask the question if you

9   prefer.

10        THE COURT:  Just let me think.  Hang on a second.

11        (Pause.)

12        THE COURT:  Just do the questions.

13  Q    Okay.  Does this particular advertisement in the

14  newspaper make reference to any bank whose going to be

15  distributing the money to the martyrs?

16  A    Yes, sir.

17  Q    And what bank?

18  A    The branches of the Arab Bank on the West Bank.

19        MR. TURNER:  Show the witness, please, 764.  This

20  is also marked Exhibit 764.

21  Q    Do you recognize Exhibit 764?

22  A    Yes, sir.

23  Q    What is 764, generally, not the contents?

24  A    This is a page out of the website of the al Shahid

25  Institution.

A. SPITZEN - DIRECT/MR. TURNER               1701

1  Q    How do you know the website belonged to the al Shahid

2  Foundation.

3  A    It identifies itself as a Shahid Foundation website and

4  provides information about this fund.

5  Q    And listed on the martyr list, did you find Bani Awda?

6              MR. STEPHENS:  Objection, your Honor.

7              THE COURT:  No, I will overrule the objection, but

8  I'll advise the jury again, just because it's on the list

9  doesn't mean it's true, it's just something for you to take

10 into account in evaluating the expert's opinion.

11 A    Yes.  You see that there is a transfer of payment into

12 Ibrahim Abd al-Karim Bani Awda from Nablus.

13 Q    Why was this particular item important to you in

14 evaluating the Arab Bank's role in the distribution of

15 monies to martyrs?

16 A    First of all, because Bani Awda is from Nablus and it

17 says in the various ads that al-Ansar transferred martyr

18 funds to people in the West Bank, and then these people will

19 receive their money at the bank in Nablus or throughout the

20 West Bank.  Therefore, it is probable that Bani Awda

21 received money from the Shahid foundation through the

22 al-Ansar Society at the Arab Bank branch at his area of

23 residence in the West Bank.

24              MR. TURNER:  May we show the witness only slide

25 146, slide 146, please?

A. SPITZEN - DIRECT/MR. TURNER                1702

1   Q    Now were you also able, Mr. Spitzen, to go to the

2   al-Ansar Society website to investigate the role of Arab

3   Bank in the distribution of funds to the suicide bombers?

4   A    Yes, I did look into the al-Ansar website as well.  It

5   is another thing which I checked in order to clarify the

6   activities of al-Ansar regarding this matter.

7   Q    Now, were you able to find anything that assisted you

8   in reaching the conclusion about the relationship between

9   Arab Bank and the distribution of these funds from the

10  al-Ansar website?

11  A    Okay.  Yes, it says on the --

12          THE COURT:  All right.  Stop.  I don't want him

13  giving the contents of the websites.

14          MR. TURNER:  Okay.  That's fine.  Let me ask a

15  more general question.

16  Q    Did you find anything of assistance on the website

17  linking Arab Bank to the distribution of funds for al-Ansar?

18          MR. STEPHENS:  Objection.

19          THE COURT:  Well, he can answer that question yes

20  or -- well, no he can't answer that question.

21          MR. TURNER:  I'll move to the next one.  Put in

22  front of the witness 4735, please.

23          THE COURT:  If there are other websites like this?

24          MR. TURNER:  Yes, sir.

25          THE COURT:  I'm not going allow it, okay?

A. SPITZEN - DIRECT/MR. TURNER          1703

1          MR. OSEN:  Your Honor, can we have a brief sidebar

2    on that?

3          THE COURT:  Yes.

4          (Continued on the next page for sidebar.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                    1704

1        (Sidebar conference begins.)

2        THE COURT:  I do think it's the conduit problem.

3   Look, an expert can rely on hearsay.  You haven't

4   authenticated these websites.  But there is a point at which

5   he's bringing outs facts that you couldn't introduce through

6   any other source that are hearsay that are offered for the

7   truth, and they tend to overshadow his opinion, because,

8   quite frankly, they are very prejudicial, they show contact

9   between these organizations and the bank.  And I think

10  you've got to have something other than back-dooring it in

11  through the expert's opinion to do that.

12       MR. OSEN:  The reason I asked for the sidebar,

13  your Honor, is that --

14       THE COURT:  One of the jurors is sleeping and you

15  want to go home?

16       MR. OSEN:  Well, that's the second reason.  But

17  the first one, your Honor, is I believe it was this morning

18  you ruled that we were permitted to show one such list from

19  a website.

20       THE COURT:  The list?

21       MR. OSEN:  Correct.  And so up until now we've

22  stricken all the other ones and there is one remaining in

23  the slide presentation, so that's why I asked about it.

24       THE COURT:  So you're going to show him next one

25  list from the website?

SIDEBAR CONFERENCE                    1705

1          MR. OSEN:  From the website.

2          THE COURT:  That's okay.  But that list, unlike

3     the excerpt you just tried to have him testify to or he took

4     it upon himself to testify to, that does not say something

5     like, "please send your money to Arab Bank"?

6          MR. OSEN:  No, it just lists the beneficiaries of

7     the program.

8          THE COURT:  Okay.  That's -- if that's your one,

9     that one you can do with the list only.

10         MR. OSEN:  All right.  Thank you.

11         (End of sidebar conference.)

12         (Continued on the next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1           MR. TURNER:  May we show the witness only 4735?

2           THE COURT:  Yes.

3    BY MR. TURNER:

4    Q    Mr. Spitzen, do you recognize 4735, the martyr list?

5    A    Yes, sir.

6           MR. TURNER:  May we show slide 147 for 703

7    purposes only?

8           MR. STEPHENS:  Objection, your Honor.

9           THE COURT:  Previously stated.

10          MR. STEPHENS:  It's not the list.

11          THE COURT:  It is the list.

12          MR. STEPHENS:  The photographs are not on the

13   list, your Honor, and none of the information on the slide

14   is on the list.

15          MR. TURNER:  I can lay a foundation for the

16   photos.

17          THE COURT:  Yeah, let's do that.

18   Q    There are two photographs on slide 147.  Do you

19   recognize those two individuals?

20   A    Yes, sir.

21   Q    Who is Basel al-Qawasmeh?

22   A    This is Basel al-Qawasmeh, a pretty well known

23   terrorist from Hebron.  He was responsible for several acts

24   of terror.  And as a result of this, people who are

25   prosecuting in this trial case were hurt in these acts of

A. SPITZEN - DIRECT/MR. TURNER          1707

1    terror.  And he's responsible to the shooting incident in

2    Kiryat Arba from March 7, 2003.  He was also involved or

3    collaborator in the explosion of Bus 14A from June 11, 2003,

4    as well as attack on Bus Number Two from August 19, 2003.

5    Q    And the second individual shown in the photograph,

6    Takruri.  Who was he?

7    A    Basem Takruri is the suicide bomber who exploded on the

8    May 18, 2003.

9           MR. TURNER:  Now, may we show 4734 for?

10          THE COURT:  Yes.  I will again advise the jury

11   that this exhibit, like the expert's testimony, is only

12   being offered to show how he reached his conclusion that

13   there is a connection between al-Ansar and the terrorists.

14   It's not for you to take it as true anything that the

15   al-Ansar group says on its website.  You may show it.

16   Q    Now, were you able to determine, Mr. Spitzen, from the

17   martyr list referenced on the al-Ansar website whether or

18   not these two terrorists received payments through the Arab

19   Bank by way of the al-Ansar website?  I mean, al-Ansar

20   Society?

21          MR. STEPHENS:  Objection, your Honor, right back

22   where we are.

23          THE COURT:  I think we are.

24          MR. TURNER:  I'll re-ask.

25          THE COURT:  You can try it.

A. SPITZEN - DIRECT/MR. TURNER          1708

1  Q    Okay.  We're looking at slide 147.  Can you tell us the

2  significance of what you found on slide 147 with regard to

3  some of the terror attacks involved in this particular

4  lawsuit?

5  A    What I found out is that Basel al-Qawasmeh and Basem

6  Takruri probably received funds and support from the

7  al-Ansar Society, they appear on the society's list.

8  Q    Now, were you able to confirm through records produced

9  by Arab Bank that the al-Ansar Society did, in fact, have a

10 bank account during the relevant timeframe at Arab Bank?

11 A    Yes, I did receive the document that indicated the

12 transfer made.

13            MR. TURNER:  Would you show the witness, please,

14 1404.

15            THE COURT:  How much more Mr. Turner?

16            MR. TURNER:  This is it.

17            THE COURT:  Okay.

18 Q    Do you recognize 1404?

19 A    Yes, sir.

20 Q    Were you given access to the al-Ansar Society accounts

21 listed on 1404?

22 A    No, sir.

23 Q    Why?

24 A    Because the Arab Bank had refused to transfer the

25 records of this society -- or rather, these accounts.

A. SPITZEN - DIRECT/MR. TURNER          1709

1              MR. TURNER:  We offer 1404.

2              THE COURT:  Any objection?

3              MR. STEPHENS:  Yes.  I don't know where it came

4     from.

5              THE COURT:  All right.  I guess I jumped to the

6     conclusion that it's from -- a bank document.

7              MR. STEPHENS:  It's not.

8              THE COURT:  Why don't you lay a better foundation.

9              MR. OSEN:  Your Honor, can we do a sidebar.  I'm

10    sorry for the jury, but...

11             THE COURT:  Okay.

12             (Continued on the next page for sidebar.)

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                    1710

1           (Sidebar conference begins.)

2           THE COURT:  Now I remember, this is one of the

3     ones seized in the raid.  If you're challenging the

4     authenticity, he will be able to testify there was a raid on

5     the bank.  Do you remember we talked about this?

6           MR. STEPHENS:  That's this document?

7           THE COURT:  That's this document.

8           MR. STEPHENS:  Which raid?

9           MR. OSEN:  February 12th --

10          THE COURT:  We'll find out if he asks the

11    questions.

12          MR. STEPHENS:  All right.

13          MR. TURNER:  Can I ask one question while we're up

14    here, so we're done for the day.  We would like for the

15    adverse inference instruction when I pass the witness.

16          THE COURT:  Okay.  We'll do that first thing

17    tomorrow morning.

18          MR. TURNER:  Okay.

19          (End of sidebar conference.)

20          (Continued on the next page.)

21

22

23

24

25

A. SPITZEN - DIRECT/MR. TURNER                1711

1          THE COURT:  All right.  The objection has been

2     withdrawn, the exhibit is received into evidence.

3               (Plaintiffs Exhibit 1404 was admitted into

4     evidence.)

5          THE COURT:  Did you want to display it?

6          MR. TURNER:  Yes, sir, if you don't mind, real

7     quick.

8     BY MR. TURNER:

9     Q    Is this 1404 that you relied upon, Mr. Spitzen?

10    A    Yes, sir.

11         MR. TURNER:  Your Honor, with that, plus on

12    reservation, we conclude and pass the witness.

13         THE COURT:  All right.  Ladies and gentlemen,

14    we're going to send you home tonight.  I want you to come in

15    just a little bit later tomorrow, 9:45, I have something I

16    have to finish in the morning.  I'll probably be ready at

17    9:30, but I don't want to keep you waiting unnecessarily, so

18    I'll say 9:45 and I'll be ready for sure.

19              Please do not pay any attention to any media

20    coverage of the case, turn the page, flip the channel, don't

21    talk to anyone, don't post anything, don't do any research.

22    We'll see you at 9:45 tomorrow morning.  Have a restful

23    night.

24              (Jury is out of the courtroom at 4:36 p.m.)

25         THE COURT:  All right.  The witness may step down.

PROCEEDINGS                1712

1    Thank you.  Everyone be seated.

2              (Witness leaves the witness stand.)

3              THE COURT:  Just a couple of things I wanted to

4    raise with you.  First, did the plaintiffs get the

5    defendant's witness list, are we okay on that?

6              MR. WERBNER:  Well, we got it, but there is 21

7    witnesses.  And if I'm understanding it correctly, they are

8    all supposed to be presented live.  So we received it, but I

9    kind of see a problem if they really have 21 live witnesses.

10             THE COURT:  Mr. Stephens, is that a real list?

11             MR. STEPHENS:  Yes, your Honor.

12             THE COURT:  You're going to call 21 people?

13             MR. STEPHENS:  They're bank managers and employees

14   from the chairman down to the people they say, you know,

15   were supporting terrorism, and then our experts, and then a

16   10006 witness.

17             THE COURT:  It's hard for me to believe the

18   defendant has 21 witnesses.

19             MR. STEPHENS:  Well, we do.

20             THE COURT:  Okay.  Well, if you don't call them or

21   I exclude a substantial number because they are cumulative

22   or irrelevant, there is going to be a substantial sanction

23   imposed, all right?

24             MR. STEPHENS:  Your Honor, I have bank employees

25   from the various branches who worked there during the

PROCEEDINGS                        1713

1    Intifada, many of whom you saw in those video clips.  Those

2    bank employees plus others are the people they say were

3    supporting terrorism.

4            THE COURT:  I'm not telling you, you can't call

5    them.  I'm telling you, it's hard for me to believe that

6    there are 21 witnesses that have relevant, admissible and

7    noncumulative evidence.  If that is the case, by all means,

8    call them.  If that proves to be grossly off, there will be

9    a consequence to that.  That's all I'm telling you.  Okay?

10           MR. STEPHENS:  I heard you.

11           THE COURT:  Okay.  Next, I don't want anymore

12   exhibit lists the night before the witness is called.  What

13   is your anticipated cross-examination of this witness, how

14   long?

15           MR. STEPHENS:  A day for sure.

16           THE COURT:  A day for sure.  Okay.  Then by

17   tomorrow morning I want all the exhibits you're going to use

18   with the witnesses you're going to call Friday.  And by the

19   next day, I want all the exhibits in the morning that you're

20   going to call on whatever witnesses you plan to call Monday,

21   okay?

22           Anything else we need to cover?

23           MR. OSEN:  On that subject, we just received a new

24   supplemental list of exhibits for defendant's expert witness

25   that were not previously on the exhibit list.  We've asked

PROCEEDINGS                    1714

1    -- I'm not sure, but we've asked for a translations, if they

2    haven't already been provided, since they weren't on the

3    defendant's witness list.  And needless to say, there are

4    many exhibits there that are self-evident problematic just

5    on their face.

6              THE COURT:  I can't imagine the justification for

7    adding exhibits at this stage of the case after what we've

8    been through pretrial for the last ten years.  How do you

9    get around the requirement that the exhibits, upon which the

10   experts relied and are going to use can't be disclosed

11   during discovery?

12             MR. OSEN:  Well, they were disclosed as far as

13   Milton-Edward's supplemental report.  But to give the Court

14   some idea of what we're talking about, they now served upon

15   us a notice that they're going to present photographs taken

16   in 2013 of those zakat committees and so forth, the precise

17   materials that your Honor struck from the supplemental

18   report months ago.

19             MR. INGERMAN:  Your Honor, may I be heard on that?

20             THE COURT:  Sure.

21             MR. INGERMAN:  First of all, we've gotten a series

22   of supplemental exhibit lists from the plaintiffs throughout

23   the plaintiffs case of additional exhibits that they added

24   to their exhibit list that they were going to use with their

25   exhibits, with their witnesses, so that's number one.  All

PROCEEDINGS                    1715

 1  of these documents were produced in discovery.  Number two,

 2  for the majority of these exhibits, we're simply going to

 3  use them -- we gave them DX numbers so we can refer them for

 4  703 purposes.  Professor Milton-Edwards may or we may ask

 5  the Court to show the jury a picture of what one of the

 6  zakats looks like.  She will simply say that that is a fair

 7  and accurate representation of what it looks like back in

 8  2001 and 2002 when she was there.  We don't anticipate

 9  offering them into evidence.

10          THE COURT:  The question is, can you use them at

11  all at this stage.  The fact that the plaintiffs added one

12  or two exhibits is a lot different.

13          MR. INGERMAN:  It was not one or two exhibits.

14          THE COURT:  Was it as many as you're offering?

15          MR. INGERMAN:  All in?  Yes.

16          THE COURT:  Okay.  Did you object?

17          MR. INGERMAN:  No, because they were produced in

18  discovery, so we dealt with it.

19          THE COURT:  Okay.  They're objecting.  There is no

20  goose and gander rule in the Federal Rules of Evidence.

21  They're objecting.  If they are too late, I'm not going to

22  hear them.  Okay?

23          Anything else?  Have a good night.  See you

24  tomorrow.

25          (Proceedings adjourned at 4:42 p.m.)

1718

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X
COURTNEY LINDE et al,               :
                                    :   04-CV-2799 (BMC)
          Plaintiffs,               :   And all related cases:
                                    :   04-CV-5449 (Litle)
     -against-                      :   04-CV-5564 (Almog)
                                    :   05-CV-365  (Coulter)
                                    :   05-CV-388  (Afriat-Kurtzer)
                                    :   05-CV-3183 (Bennett)
                                    :   05-CV-3738 (Roth)
ARAB BANK, PLC,                     :   06-CV-1623 (Weiss)
                                    :
          Defendant.                :   United States Courthouse
                                    :   Brooklyn, New York
                                    :
                                    :   Thursday, September 4, 2014
                                    :   9:45 a.m.
                                    :
                                    :
- - - - - - - - - - - - - - - - X

TRANSCRIPT OF CIVIL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE BRIAN M. COGAN
UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S:
For the Linde and       OSEN, LLC
Coulter Plaintiffs:     BY: **GARY M. OSEN, ESQ.**

                        TURNER and ASSOCIATES
                        BY: **CLYDE T. TURNER, ESQ.**

For the Litle,          SAYLES WERBNER
Bennett and Roth        BY: **MARK S. WERBNER, ESQ.**
Plaintiffs:

                        STONE BONNER & ROCCO, LLP
                        BY: **JAMES P. BONNER, ESQ.**

For the Almog           MOTLEY RICE LAW FIRM
Plaintiffs:             BY: **MICHAEL ELSNER, ESQ.**

For the Defendant:      DLA PIPER, PLC
                        BY: **SHAND S. STEPHENS, ESQ.**
                            **ANTHONY PAUL COLES, ESQ.**
                            **BRETT INGERMAN, ESQ.**

* * * * *

Frederick Guerino, CSR
Official Court Reporter

```
                    PROCEEDINGS                    1719

Courtroom Deputy:  Melonie Clarke

Court Reporter:  Frederick Guerino, CSR
                 Official Court Reporter
                 Telephone: (718) 613-2503
                 E-mail: Frederickguerino@aol.com


Proceedings recorded by computerized stenography.  Transcript
produced by Computer-aided Transcription.

****************************************************************
*
```

(In open court.)

9

10          (Honorable Brian M. Cogan takes the bench.)

11          THE COURT:  Good morning.  Be seated, please.

12   Okay.  I got a bunch of letters from 10:00 on last night.

13   We're going to have to take those up.  We're not going to do

14   it now, because I don't want to delay the jury.  When the

15   plaintiffs rest this morning and we finish the

16   cross-examination and the defendants are ready to --

17   defendant is ready to proceed, we'll talk about those

18   issues.  And by "those issues" I mean the late disclosed

19   exhibits to the expert's report.  And I also just got

20   plaintiffs -- plaintiffs probably haven't seen the Al-Masri

21   exhibits.  Have you seen those yet.

22          MR. OSEN:  They just came in.

23          THE COURT:  Okay.  So we'll take those up before

24   the defendant's case.

25          I will say to the extent the plaintiffs are

1  thinking I issued a binding ruling that none of those

2  exhibits come in yesterday, I can see why they think that.

3  That's not what I meant.  What I meant was in light of the

4  late identification of those particular exhibits, the

5  defendant is going to have to show me how the plaintiffs are

6  not unduly prejudiced by that, and maybe they will and maybe

7  they won't, we'll take them up one exhibit at a time.

8          I also had late last night a proposal for revision

9  on the adverse inference instruction that I said I would

10  give.  I haven't had a response from the plaintiffs as to

11  that proposal.

12          MR. OSEN:  I'm happy to address that, your Honor.

13          THE COURT:  Okay.

14          MR. OSEN:  With respect to the additional language

15  that the defendant wants, and I'll go back to their

16  objection to one part of what we submitted a few days ago.

17  They have two additional paragraphs they want added; we

18  object to both of them.

19          The first one is the additional language intended

20  to water down the instruction by renewing the Court's sort

21  of general instruction to the jury to keep an open mind,

22  et cetera, et cetera.  We believe the language proposed and

23  initially accepted by your Honor specifies that instruction

24  about -- further instructions will be given to the jury at

25  the close before the jury is charged, and I think that's

PROCEEDINGS                          1721

1    more than sufficient on that issue.

2         With respect to the second paragraph, the mere

3    existence of inference, et cetera.

4         THE COURT:  You are saying "paragraph", but you

5    mean "sentence" don't you?

6         MR. OSEN:  Well, sorry, no, it is a paragraph.

7    I'm sorry, your Honor, it's on page three of their letter.

8         THE COURT:  I don't have their letter.

9         MR. OSEN:  Okay.

10        THE COURT:  Just read me what you're -- I'm happy

11   with that.

12        MR. OSEN:  So they have two paragraphs that they

13   propose adding.  One begins, "Please do not make up your

14   mind about the verdict or any inferences should be -- or any

15   inference should be until after you have heard all of the

16   evidence.  After I have instructed you on the law at the end

17   of the case and after you deliberated with your fellow

18   jurors, please keep an open mind until then.  All parties

19   deserve and the law requires that you give them an

20   opportunity to be fully heard, and that you cannot make up

21   your mind until you and your fellow jurors have heard all

22   the evidence and instruction and you've completed your

23   deliberations."

24        So that's the first of two insertions.

25        THE COURT:  Go ahead.

PROCEEDINGS                    1722

1          MR. OSEN:  The second one, which we believe simply

2     misstates the law, is "The mere existence of an inference

3     against the defendant does not relieve the plaintiff of the

4     burden of establishing a case by a preponderance of the

5     evidence.  The plaintiffs are able -- to obtain a verdict,

6     you must believe from the credible evidence that they have

7     sustained the burden cast upon them."

8               Now, your Honor, adverse inference is part of the

9     evidence.  It's not sufficient by itself to establish

10    liability, but it is evidence affirmatively.  And I don't

11    think the jury can pars that language or understand what

12    that means in the way that the actual law requires.  So we

13    would suggest that both of those are not only gratuitous,

14    but in the latter case, confuses what the law actually is.

15              THE COURT:  Okay.  Anything further from

16    defendant?

17              MR. COLES:  Your Honor, we obviously disagree with

18    that.  The instruction he just read to you just establishes

19    the rule that plaintiffs have to meet their burden of proof.

20    The changes they propose would make it appear as though

21    their obligation to show by a preponderance of the evidence

22    has been relived, and that's not what -- that's not what was

23    presented to us.

24              We presented a fair instruction incorporating the

25    instruction that you gave at the start of your case, and

PROCEEDINGS                    1723

1   then properly reflecting the preponderance of the evidence

2   standard.

3          THE COURT:  All right.  I'm rejecting the

4   defendant's proposed changes.  First of all, I've told this

5   jury both at the beginning of the case and every day of the

6   trial that they have to keep an open mind.  If they don't

7   know that, giving them that instruction with regard to this

8   particular piece of evidence, this adverse inference

9   instruction would not do them any good.

10          Second, this is not the time, because I haven't

11  done it with any other piece of evidence, to reinstruct the

12  jury on the burden of proof.  I outlined the burden of proof

13  for them at the beginning of the case.  I'm going to do it

14  again at the end of the case.  There is no reason to

15  highlight this particular piece of evidence to again

16  instruct on the burden of proof.  I haven't done that with

17  anything else that the plaintiffs have presented, and I'm

18  not going to do it with anything that the defendant

19  presents.

20          So the defendant's proposed additions to the

21  adverse inference instruction are rejected.  Okay.

22          MR. OSEN:  I'm sorry, one more thing, your Honor.

23          THE COURT:  Yes.

24          MR. OSEN:  Because they also objected to the

25  language that we had proposed being inserted with respect to

PROCEEDINGS                          1724

1    some credible evidence.  For the record, your Honor, we

2    don't -- we put that in because we actually thought that

3    that's legally appropriate, because the inference is based

4    on what the defendant has -- the documents that have been

5    withheld, not based on the act of refusing to produce them.

6            However, if the defendant insists on the original

7    language that your Honor proposed, we don't object to that.

8    We actually think that's appropriate as well.  We were

9    actually trying to clarify the limits of what the inference

10   is for, but if the defendant wants that language out, we

11   wouldn't object to it.

12           MR. COLES:  Under those circumstances, your Honor,

13   we would go back to your original instruction.

14           THE COURT:  That's what I'm sticking with.  So

15   just so we're all on the same page, what I am reading is

16   this:  "Before a case goes to trial, the litigants go

17   through a process called "discovery".  In that process each

18   party is required to turn over documents in their possession

19   that are relevant to other side's case, as well as have

20   witnesses answer questions posed by the other party.

21   Nevertheless, the defendant refused to provide certain

22   documents that the plaintiffs requested, and to permit their

23   witnesses to answer questions during depositions.

24   Accordingly, based on this refusal, if you find that

25   plaintiffs have come forward with credible evidence to

PROCEEDINGS                    1725

1   support the following statements, you may, but are not

2   required to infer; one, that defendant provided financial

3   services to Hamas and to individuals affiliated with Hamas.

4   Two, that defendant processed and distributed payments on

5   behalf of the Saudi Committee to terrorists, including those

6   affiliated with Hamas, their relatives or representatives.

7   And three, the defendants did these acts knowingly."

8             That's what I'm reading over all objections that

9   have previously been raised.  Anything else?

10            MR. TURNER:  We just have one housekeeping issue

11   from yesterday.  In reviewing the transcript, we realize

12   that a couple of the still photographs from one of the

13   depositions, although we marked the exhibits and referred to

14   them with the exhibit numbers, we never offered them.  So we

15   would offer 4712-A and 4712-B and 1061-A, B, C, E, and F.

16            THE COURT:  Okay.  Those are received over

17   previous objections made.

18            (Plaintiffs Exhibits 4712-A and B and 1061-A, B,

19   C, E and F are admitted into evidence.)

20            I think when I read the instruction, did I insert

21   the word "some" before credible?

22            MR. OSEN:  No.

23            THE COURT:  Okay.  I didn't think so.  Anything

24   else?  All right.  Let's have the jury, please.

25

PROCEEDINGS                    1726

1    **ARIYEH SPITZEN**, called by the Plaintiffs, having been already

2    duly sworn, was examined and testified as follows:

3

4              (Jury is in the courtroom at 9:54 a.m.)

5              THE COURT:  All right, everyone, be seated.

6              Mr. Turner, you've passed the witness; is that

7    right?

8              MR. TURNER:  Yes, sir.

9              THE COURT:  All right.  Ladies and gentlemen, I

10   have an instruction to give you.

11             Before a case goes to trial, the litigants go

12   through a process called "discovery".  In that process, each

13   party is required to turn over documents in their possession

14   that are relevant to the other side's case, as well as have

15   witnesses answer questions posed by the other party.

16             Nevertheless, the defendant in this case refused

17   to provide certain documents that the plaintiffs requested

18   and refused to permit their witnesses to answer certain

19   questions during depositions.

20             Accordingly, based on this refusal, if you find

21   the plaintiffs have come forward with credible evidence to

22   support the following statements, you may, but are not

23   required to infer:  First, that defendant provided financial

24   services to Hamas and to individuals affiliated with Hamas.

25   Second, that the defendant processed and distributed

A. SPITZEN - CROSS/MR. STEPHENS            1727

1   payments on behalf of the Saudi Committee to terrorists,

2   including those affiliated with Hamas, their relatives or

3   representatives.  And three, that defendant did these acts

4   knowingly and purposefully.

5          Again, ladies and gentlemen, that's permissive for

6   you to infer, you are not required to infer that.  You have

7   to consider the case based on all of the evidence that's

8   presented to you when it comes time to deliberate.

9          All right.  Cross-examination.

10  CROSS-EXAMINATION

11  BY MR. STEPHENS:

12  Q    Good morning, Mr. Spitzen.

13  A    Good morning, sir.

14  Q    My name is Shand Stephens and I represent Arab Bank.

15  A    Thank you.

16  Q    Now, you're actually working on three different cases

17  for these same plaintiffs attorneys, are you not?

18  A    This is correct, sir.

19  Q    And they involve the same 24 attacks or some of the 24

20  attacks in this case, right?

21          MR. TURNER:  Objection.

22          THE COURT:  Sustained.

23  Q    The cases involve the same -- some of the same attacks

24  that are issue in this case, do they not?

25          MR. TURNER:  Same objection.

A. SPITZEN - CROSS/MR. STEPHENS          1728

1        THE COURT:  Sustained.

2   Q    In all three of those cases, since 2009, you've been

3   paid $1,500,000 for your work, haven't you?

4   A    According to my calculation, $1.4 million.

5   Q    Oh, okay, $1.4 million.  And you wrote your report in

6   this case in May 2011, did you not?

7   A    The report was submitted in May 2011.

8   Q    Right.  And you worked on that report between

9   April 2010 and May 2011 and spent 2,045 hours doing it,

10  right?

11  A    Yes, sir.

12  Q    And since then you've spent another thousand hours on

13  this case, haven't you?

14  A    This is correct.

15  Q    And your testimony in the last few days is based upon

16  all 3,100 hours of your work; the 2,000 that led up to your

17  report and the 1,000 afterwards; is that right?

18  A    Yes, it is based on this and also my experience of

19  30 years.

20  Q    Now, you testified repeatedly during your direct

21  examination that you didn't get records from Arab Bank

22  because Arab Bank refused turn them over to you, didn't you?

23  A    This is correct.

24  Q    You know who Mr. Wayne Geisser is?

25  A    I know his work.

A. SPITZEN - CROSS/MR. STEPHENS          1729

1    Q    Right.  Mr. Geisser is another expert in this case for

2    the plaintiffs, right?

3    A    Yes, sir.

4    Q    He's the accountant who added up all the numbers that

5    we saw on those graphs, right?

6    A    To the best of my knowledge, yes.

7    Q    Now, Mr. Geisser testified that you have 20,000 records

8    from Arab Bank, didn't he?

9    A    Yes, definitely.

10   Q    And all of those transfers that you testified to going

11   to those various people that you say are Hamas operatives,

12   they all came from Arab Bank, didn't they?

13   A    This is correct.

14        MR. STEPHENS:  Could we look at PX 2061, which I

15   believe is in evidence.

16        THE COURT:  Sure.

17   Q    This is one of the transfers that you testified about

18   in the last few days, isn't it?

19   A    Yes, that is correct?

20   Q    And as you can see at the bottom of it has a date stamp

21   down at the bottom, do you see that?

22   A    Bates number.

23   Q    Bates number, yes?

24   A    Okay.

25   Q    Every one of these documents that's stamped ABPLC came

338 of 620

1   from the bank, didn't it?

2   A    To the best of my knowledge, that is correct.

3   Q    In addition to those 20,000 records you had from Arab

4   Bank, you also had 176,000 records from the bank reflecting

5   every payment made by the Saudi Committee that was processed

6   by Arab Bank, didn't you?

7   A    I did not count them, but I accept what you say.

8   Q    So altogether you had over 195,000 Arab Bank records

9   that Arab Bank supplied to you?

10  A    I accept the data.

11  Q    And according to Mr. Geisser, you also had 20,000 more

12  records from another bank involving transfers by Arab Bank,

13  did you not?

14  A    That is correct, sir.

15  Q    And another 10,000 records from yet a third bank

16  involving Arab Bank transfers, correct?

17  A    Again, I did not count them, but I accept your figures

18  as correct.

19  Q    So altogether you had about 225,000 Arab Bank records

20  that you used in your analysis, did you not?

21  A    That I could use, yes.

22  Q    This is a ream of paper you use in your work, do you

23  not?

24  A    Yes.

25  Q    There are 500 sheets in a ream of paper, is there not?

A. SPITZEN - CROSS/MR. STEPHENS          1731

1    A    Again, I accept what you say.

2    Q    One ream of paper is two inches high, right?

3    A    I don't have a ruler to measure, but I trust the

4    figures that you gave me.

5    Q    I have a ruler over there, if you would like to take a

6    look at it.

7    A    I trust you.  I trust you to provide accurate data

8    before the Court.

9    Q    Well, you're one of the few people in America that

10   trust lawyers.

11   A    I trust people until I am proved otherwise.

12   Q    Good.  Well, hopefully I won't do that for you.

13            THE COURT:  All right.  Let's go on to some

14   questions.

15   Q    So a ream of paper is two inches think.  So 450 reams

16   is about 900 inches?

17   A    Yes, that's true, but I don't know what "inches" mean

18   as I'm using the metric system.

19   Q    Inches.  Let's see, 900 inches would be about

20   800 centimeters?

21   A    No about --

22   Q    I'm sorry, 1,000 centimeters, 800 centimeters?

23            THE COURT:  All right.  We know it's many

24   centimeters.

25   Q    So that many centimeters is about 75 feet, which is the

A. SPITZEN - CROSS/MR. STEPHENS          1732

1  height of more than a seven-story building, right?

2  A    Again, I'm not a constructor, but I accept the figures.

3  Q    So you had documents from Arab Bank that really, if

4  they were stacked up on one another of a seven-story

5  building, right?

6  A    Well, I cannot say that, because I did not measure it.

7  I'm using computers, but I'm not using that quantity of

8  paper, it's not good for the environment.

9  Q    Do you know why Arab Bank refused to give you all the

10  records that you wanted?

11          MR. TURNER:  Excuse me, your Honor.

12          THE COURT:  Sustained.

13  Q    I want to take a look with you for a moment -- in fact,

14  first of all, you agree, do you not, that between 2000 and

15  2004, there was no publicly available list of membership in

16  Hamas?

17  A    No, I do not know of any official list of Hamas.

18  Q    Let's take a look at your slide 18 that you were shown

19  yesterday in your direct.  Did you prepare this slide?

20  A    Yes, sir.

21  Q    And did you put the title on it?

22  A    Yes, sir.

23  Q    So these people are Hamas leaders and operatives in

24  Gaza?

25  A    Or their family relative.

A. SPITZEN - CROSS/MR. STEPHENS          1733

1   Q    It doesn't say that, does it?

2   A    It is true it doesn't say that, but we do see here a

3   relative, a female relative of a Hamas leader.

4   Q    Right.  Let's look at your slide 20 that you were

5   showed yesterday.  That's a slide that you talked to about

6   the jury concerning who you say is Ahmad Yassin's wife

7   Halima Yassin, right?

8   A    Yes, this is Ahmed Yassin's wife.

9   Q    And you say concerning her terrorist activity, not

10  applicable.  Imprisonment, not applicable, Hamas/Da'wa

11  activity, not applicable, don't you?

12           MR. STEPHENS:  Go back to slide 18, please.

13           THE COURT:  Do you want an answer to the question?

14           MR. STEPHENS:  I'm sorry, I thought I heard it.

15           THE COURT:  I didn't hear it.

16           THE WITNESS:  It is true.  She appears on the

17  slide not for this particular reasons.  She's there because

18  she's the wife of Ahmad Yassin.  And in the case of the

19  traditional family, a traditional Muslim family, it would

20  not make sense that a wife would have an account of her own,

21  and this is more probable that the husband would be

22  receiving funds through this account.

23  Q    Your slide 18 says that Halima Yassin is a Hamas

24  leader, doesn't it?

25  A    I already said that I should have added to the title,

A. SPITZEN - CROSS/MR. STEPHENS          1734

1    and their relatives or relative.

2    Q    So the only reason she's on this slide is because she's

3    Ahmad Yassin's wife.  Do you think everyone who is married

4    to someone who is a criminal is also a criminal?

5    A    No.  The reason why she's on the slide is because of

6    the modus operandi of senior leaders of Hamas to use bank

7    accounts of the relatives.  And I have seen evidence of that

8    in many reports of investigations.  I do not think that the

9    wife of a criminal would necessarily be a criminal, but to

10   use the bank accounts of relatives of Hamas leader who is a

11   traditional patriarchal husband or husband who controls his

12   wife is very, very probable mode of transferring fund to him

13   rather than to her.

14   Q    So you think Halima Yassin was conspiring with her

15   husband, is that what you're saying?

16   A    I do not think that it's -- that conspiring has

17   anything to do with this.  We are talking here about a

18   Muslim traditional family.  We're talking about Sheikh

19   Yassin here, the Muslim Brotherhood and Hamas.  There is no

20   issue of conspiring.  It goes without saying, it is very

21   clear that he would be using the account of his wife for his

22   own purposes.

23   Q    Actually, we're not talking about the Muslim

24   Brotherhood of Hamas, we're talking about something that you

25   can't identify any terrorist activity for, aren't we?

1    A    This is correct.  And I did not attribute and I'm not

2    attributing any of this to her, I merely gave accurate

3    figures.  But she, as well as others, not all women receive

4    money to their bank accounts that actually were aimed at

5    their husbands or relatives.

6    Q    The first transfer you have listed here -- you have

7    one, two, three, four, five, six transfers listed.  The

8    first one is PX 2061.  Do you see that?

9    A    I can see the number.

10   Q    Right.  And Halima Yassin is not designated by the

11   United States of America as a terrorist, is she?

12   A    To the best of my knowledge that is correct.

13   Q    She's not designated by the United Nations or the

14   European Union as a terrorist, is she?

15   A    To the best of my knowledge, that is correct.

16   Q    All right.  Let's take a look at this transfer that's

17   marked as 2061.  This is one of the transfers you had listed

18   that went to her, is it not?

19   A    Yes, that's correct.

20   Q    And it's from May 2001, is it not?

21   A    No, it's from -- okay.  I'm not sure if it's March 5th

22   or May 3rd, because the dates go in a different direction in

23   the United States and the way I'm used to, so I'm not sure

24   what it says here.

25   Q    Well, we can certainly agree it's 2001, can't we?

A. SPITZEN - CROSS/MR. STEPHENS          1736

1  A    Absolutely 2001, but I'm not willing to sign on as to

2  whether it's March or May.

3  Q    Okay.  Now, you actually have -- you're not a banking

4  expert, are you?

5  A    No, sir, I am not a banking expert.

6  Q    And you have no expertise in banking compliance, do

7  you?

8  A    I have very little familiarity with that subject.

9  Q    Do you see this notation right here?

10 A    Yes, I do.

11 Q    That means that this transaction was checked against

12 the United States designated terrorist list, doesn't it?

13 A    I see that it says "OFAC", which is the official

14 treasury list or American government list of terrorist.  I

15 see that it says -- I can see that it says OFAC, colon,

16 parentheses, but I don't see that it actually means that she

17 was checked against the list.

18 Q    So you don't know whether she was checked against the

19 list or not, is that your testimony?

20 A    I'm not saying that.  I'm just saying that I don't know

21 what the meaning of these double parenthesis after the word

22 OFAC is, it seems to be some kind of a bank procedure, I

23 don't know what it is.  If I'm not told what it is, I don't

24 know.

25 Q    Well, in that case, I don't suppose you know that what

A. SPITZEN - CROSS/MR. STEPHENS          1737

1   the bank is supposed to do with these electronic transfers

2   is check them against the list, and then make a notation on

3   that form as to whether or not they pass or didn't, would

4   you?

5   A    That, actually, I do know.

6   Q    Oh, you do know.

7   A    I know that banks are supposed to check transfers

8   against the OFAC list, against the UN list.  I know they're

9   supposed to do that, among other things.  There may be other

10  things that they're supposed to do as well.

11  Q    You know, they are supposed to do that, but you can't

12  read the form to figure out all of these transfers you

13  looked at whether they did or didn't go through the OFAC

14  list?

15  A    What I checked regarding these transfers was the names,

16  the beneficiaries, who sent the money, to which branch of

17  the bank they were sent, that is what I checked.  Therefore,

18  whether or not these were checked against the OFAC list,

19  that was not part of my responsibility.  I know how to read

20  the data.  I know how to check what I was supposed to check.

21  Q    One more thing about this.  All of these transfers that

22  you cite down here, these six transfers, that was paper

23  documents given to you by Arab Bank, wasn't it?

24  A    All the six transfers as noted in ABPLC, as well as the

25  others were received from the Arab Bank.

A. SPITZEN - CROSS/MR. STEPHENS          1738

1        MR. STEPHENS:  Go back, if you would, Sean, to

2   slide 18.

3   Q    Now, in your testimony on direct you testified that

4   these Hamas leaders and operatives were all famous or well

5   known or very famous or quite famous, didn't you?

6   A    Yes.

7   Q    Let's take a look at the first person you say is a

8   famous terrorist; Salah Shehada, right?

9   A    Yes, that's correct.

10  Q    In fact, you say he's very famous, do you remember

11  that?

12  A    Yes, I do.

13  Q    And he was so famous a terrorist that the United States

14  of America never designated him on the OFAC list, did it?

15  A    Why a state includes on its designated list certain

16  people and doesn't include others, there can be many, many

17  reasons for that, that I can't get into now.  The fact that

18  he was not on the list does not mean he was not famous.

19  Q    Well, he wasn't famous enough for the United States to

20  put him on the OFAC list, was he?

21  A    Yes, but Khaled Mashal was only put on the list in 2003

22  and he was very, very famous, and there was even an

23  assassination attempt on his life.  He was the head of the

24  Hamas political bureau and the US only put him on the list

25  in 2003.

A. SPITZEN - CROSS/MR. STEPHENS          1739

1   Q    I'm not asking about Khaled Mashal, I'm asking about

2   Salah Shehada which is --

3   A    Yes, but you presented him as an example of someone who

4   is not on the designated list.  He was designated on the

5   OFAC list, and I can't tell you why he's not on the list, I

6   can only give you examples of other famous terrorists who

7   are not on the list.

8   Q    Who is it, in your view, that's entitled to decide

9   somebody should be labeled as a terrorist so the Arab Bank

10  accounts are blocked, they can't travel internationally,

11  their assets are frozen, who is supposed to do that?  It's

12  the government, isn't it?

13  A    You asked about a number of different things.  So where

14  you asked about assets, about bank accounts, and other

15  things, so I'm willing to address these things.  In my

16  opinion, and I'm not an expert on banking compliance, I

17  think that a bank should get to know its clients, they need

18  to -- they need to know who it is that they are dealing

19  with.  So if someone is a terrorist and is transferring

20  money to other terrorists, and whether or not they are on

21  the list, they should know that.  And as far as freezing

22  assets is concerned, that's a legal issue and I would assume

23  that's the matter for the state to decide.

24  Q    It's governments who decide who belongs on the terror

25  list, isn't that right?

1   A    Yes.  Lists of terrorists are compiled by governments

2   or international institutions.

3   Q    Not you, right?

4   A    I don't compile lists.

5   Q    Let's get back to Salah Shehada.

6         Can we look at -- one of the transfers that you

7   identify is PX 1920.  Do you see that?

8   A    Yes, that's correct.

9   Q    You say that Shehada got seven transfers and they're

10  all listed here at the bottom of the screen, right?

11  A    I say that I identified seven transfers.

12  Q    All right.  All of these documents you got from Arab

13  Bank, didn't you?

14  A    Yes.

15  Q    And can we look at PX 1920.  That's one of the

16  transfers, this is a transfer from 2001, is it not?

17  A    Yes.

18  Q    It's going to Salah Mustafa Muhammad Shehada, right?

19  A    Yes, that is to Salah Mustafa Muhammad Shehada.

20  Q    And as you can see it went through the OFAC list -- or

21  do you know that by looking at that?

22  A    Yes, I can see it.

23  Q    Do you know what the initials "MUM" inside of the

24  parenthesis means?

25  A    I don't know what that refers to.  As I said, I'm not

A. SPITZEN - CROSS/MR. STEPHENS          1741

1  familiar with the filter that the bank uses where OFAC is

2  concerned.  I don't know that acronym.  I was involved in

3  identifying the transfers, what branch was involved, where

4  it came from, who it went to and when, what the date was.

5  Q    So you wouldn't know that actually the initials there

6  are an Arab Bank New York employee who took a look at this

7  transaction because somehow the computer said it might be a

8  match?

9              MR. TURNER:  Object to the question.

10             THE COURT:  Overruled.

11             THE WITNESS:  Now I know.

12 Q    Oh, good.  Let's look one more time at the slide you

13 prepared on Salah Shehada.  According to you, he was in

14 prison from 1988 to 2000 in Israel; is that right?

15 A    According to my sources, that is correct.

16 Q    All right.  And so he was so famous a senior terrorist,

17 that the Israelis let him out of jail in 2000; is that

18 right?

19 A    Israel made every effort to keep him in jail as long as

20 it could.  According to the Israeli legal system, the

21 Israeli courts could not imprison anyone without a trial

22 until 1998.  And after that, they could continue with

23 administrative arrests for two years each.  So in 2000 they

24 were forced to let him go and, unfortunately, he returned to

25 Gaza where he unfortunately continued to engage in terrorist

A. SPITZEN - CROSS/MR. STEPHENS          1742

1    actions and murder.

2    Q    You just mentioned something called "administrative

3    detention," didn't you?

4    A    Yes.  I believe after serving ten years in prison, I

5    believe he served another two years of administrative

6    detention.

7    Q    And administrative detention means that the Israeli

8    military could pick somebody up and stick him in jail and

9    hold him there without bail or trial, doesn't it?

10   A    No, this is not at all accurate.

11   Q    You just said a moment ago there was no trial, right?

12   A    But that does not mean there aren't any procedures

13   behind an administrative detention.  If it is important for

14   this case, then I can go into the details of it.

15   Q    But you do agree with me there is no trial for someone

16   in administrative detention, correct?

17   A    No.  There was no trial, but there was definitely a

18   ruling of the Judge.  The Judge receives material, usually

19   it is confidential from various law enforcement agencies in

20   Israel, and the Judge decides whether to leave him in

21   administrative detention or not and for how long.  It is

22   true that there is no trial, but definitely there is

23   judicial review and it is up to the Judge to decide that to

24   the Supreme Court.  If a certain individual feels that a

25   certain injustice was done to him, he can approach the

A. SPITZEN - CROSS/MR. STEPHENS          1743

1  Supreme Court -- he can approach the Supreme Court and

2  present his petition.  There were different rulings and

3  decisions made by the court; sometimes the court accepts

4  those and sometimes it rejects them.

5  Q    All right.  One more thing about Salah Shehada, which

6  is --

7           MR. STEPHENS:  Could we take a look at SAJ 92,

8  please.

9  Q    You have a section in your report on Salah Shehada,

10 don't you?

11 A    Yes.

12 Q    And Salah Shehada was killed on July 22, 2002, was he

13 not?

14 A    That is correct.

15 Q    And every single citation in your report is dated after

16 he died, isn't it?

17 A    I cannot possibly give you either a positive or

18 negative answer to this, because I have to check exactly

19 where Salah Shehada appears in my report and where he does

20 not appear in my report.  And for this purpose, I need the

21 report and I need the computer.  I cannot confirm this or

22 not confirm this.  But even if we take the assumption that

23 this is correct, I would have to look up every citation and

24 to see exactly what it refers to.

25 Q    Well, they're all listed there for you, so maybe you

1   can do it at lunch, all right?

2   A    You say that they are all there, but I do not know

3   that.

4   Q    Well, you do know is that I think you would agree, you

5   cited to a book called the "Green Revolutions," didn't you

6   in your report, your expert report?

7   A    Yes, definitely, this is a very important seminal book.

8   Q    "Seminal" meaning what?

9   A    Because this is, to the best of my knowledge, and I do

10  not want to say that is the only book, because I have not

11  perhaps read all the scientific material, but it is the

12  first -- rather, the very first analysis of Hamas; seeing it

13  as a social movement, not only as a terrorist movement.  It

14  analyzes the roots of Hamas from the social aspects of it,

15  and it is actually breakthrough in research.  It provides an

16  aspect, a very interesting aspect of Hamas, seeing it not

17  only as a terrorist movement, but a social movement that

18  impacts the entire Palestinian Society.

19  Q    And that book, the "Green Revolution" was written in

20  2007 or published in 2007, right?

21  A    It was published in 2007.  And for the purpose of

22  proper disclosure, I have to say I have seen its draft and I

23  provided peer review for it.

24  Q    The bank couldn't possibly have read that between 2000

25  and 2004, could it?

A. SPITZEN - CROSS/MR. STEPHENS          1745

1   A    I assume so.

2   Q    You assume not, right?

3   A    I assume it didn't read it.

4   Q    You also cite to another book "Lexicon of the Hamas

5   Movement," do you not?

6   A    That is correct.

7   Q    That book was written in 2008, wasn't it?

8   A    Yes.

9   Q    That book was published in 2008?

10  A    That is correct.

11  Q    You also have citations to material from the United

12  States versus the Holy Land Foundation trial, right?

13  A    That is correct.

14  Q    And that helped in 2008, didn't it?

15  A    Well, not entirely.  There are different parts during

16  that period of time.  If you say that this particular

17  citation was from 2008, that is fine, but there were others

18  that were from before that date.

19  Q    All right.  How many times was Holy Land tried?

20  A    With respect to the Holy Land Foundation, there were

21  criminal trials against individuals, and then there was a

22  larger trial against the foundation itself.  It was a very

23  prolonged process.

24  Q    Okay.  I want to move on now to Ismail Haniyeh, which

25  is your slide 22 that you showed the jury yesterday.  Now,

A. SPITZEN - CROSS/MR. STEPHENS          1746

1   you put this slide together, did you not?

2   A    Yes.

3   Q    And according to you, his terrorist activity is he is a

4   Hamas leader and he was the head of Sheikh Yassin's bureau

5   since 1997, right?

6   A    This is a very succinct way of putting it.

7   Q    You testified yesterday that he is very well-known,

8   right?

9   A    Definitely.

10  Q    And he's so well-known in 2000 to 2004, that he wasn't

11  designated by the United States as a terrorist, was he?

12  A    Yes.  And I think even the very same answer I gave

13  about Salah Shehada and other terrorists that the United

14  States has not designated as terrorist.

15  Q    Or the United Nations or the European Union, correct?

16  A    That's correct.  Regretfully, that is correct.

17  Q    You say he has 19 transfers into the account that you

18  identify, right?

19  A    I identified 19 transfers.

20  Q    And they are all listed here at the bottom of the slide

21  under his picture, aren't they?

22  A    Yes, sir.

23  Q    And every single one of those 19 documents you got from

24  Arab Bank, didn't you?

25  A    Yes, that is correct.

A. SPITZEN - CROSS/MR. STEPHENS          1747

1  Q    Can we look at the first one you have listed there as

2  Plaintiff's Exhibit 2188.

3          MR. STEPHENS:  Could we take a look at that

4  please, Sean.

5          (Continued on the next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A. Spitzen - Cross/Stephens                1748

1    CROSS-EXAMINATION (Cont'd.)

2    BY MR. STEPHENS:

3    Q    This is a transfer document, one of, that you looked

4    at, is it not?

5    A    Yes.

6    Q    And it shows that it happened in the year 2000, right?

7    A    And that also explains the date itself.  The first

8    number, the first digit, applies to the month, the second

9    one to the date.

10   Q    Now that we have that cleared up, it shows it went

11   through the OFAC, doesn't it?

12   A    According to what you are saying, I accept that.

13   Q    Can we go back to Slide 22.

            Your slide shows that Ismail Haniyeh was prime

     minister of Gaza from 2006 to 2014.  That's the result of

     the fact that there was an election in 2006; is that right?

     A    That IS correct.

     Q    And in order to run in this election, people who wanted

     to be a candidate had to come out and say, I'm going to

     change to the Reform Party, which is the name of the party

     for Hamas, right?

     A    That is correct.

     Q    And that wouldn't have anything to do with what anyone

     would have known about them between 2000 and 2004, would it?

     A    Yes, definitely, but political figures do not grow out

A. Spitzen - Cross/Stephens                    1749

of nothing.  In 2006, this particular individual, or any

such individual who is an Hamas operative, would have done a

thing or two, and not necessarily good deeds, rather bad

deeds, according to the way I see.  These people had

terrorist records behind them, and a person who is elected

in 2006 has earned this, the fact that he was elected.  As

far as I'm concerned, he had a skeleton or skeletons in his

closet.  Perhaps to an Hamas member, that would be something

to be praised of, but not the way I see it.

Q    Do you think Arab Bank had the keys to Ismail Haniyeh's

closet where the skeletons were?

A    I cannot possibly enter the mindset of the bank, and

I'm not allowed, according to the instruction of the judge,

but I do think that the Arab Bank could have known that

Ismail Haniyeh was a terrorist, and I base my assumption on

the fact that Arab Bank had branches and officers and

directors and managers in the field.  They could know, and

they should have known, they should have known who these

people were.  There's a reasonable of a state of mind here.

Q    Move to strike.

        THE COURT:  Denied.

Q    You say here under Mr. Haniyeh he has two arrests for

short periods.

        Do you think being arrested makes you guilty?

A    Not always.

A. Spitzen - Cross/Stephens                1750

Q    And according to you, he was in prison in Israel from
1989 to '92; is that right?

A    Yes, that's correct.

Q    And then he was let out of jail?

A    He was tried and he was sentenced.  And in Israel
there's a method, there's a legal system, organized orderly
legal system, and when the person is sentenced to a  certain
sentence, he actually serves his sentence, and that when
he's released, he goes home, and if he perpetrates anything
else and is apprehended, he can be, once again, sent to
prison, yes.

Q    One of the things that you looked at in your analysis
to do your expert report in this case was police reports and
conviction records; isn't that right?

A    Yes, sir, right.

Q    And we saw conviction records, which you looked at and
displayed to the jury, that showed people being convicted of
being a member of Hamas, don't we?

A    This is the wording of the court.  It's a membership
hostile organization.

Q    So it's a crime to be a member of Hamas in the West
Bank in Israel, right?

A    In the West Bank, in Gaza, and within the State of
Israel, Hamas was designated in Israel in 1989, and it was
recognized as a terrorist organization.  Every activity on

A. Spitzen - Cross/Stephens                1751

behalf of Hamas, as far as the State of Israel is concerned, means an offense.  It means to violate the law.  If it's a crime or isn't a crime?  Well, I'm not a legal expert, not a jurist, and I can't possibly say that.

Q    So, Ismail Haniyeh was such a well-known Hamas terrorist that from 1992 until today he hasn't been arrested by Israel for being a member of Hamas, has he?

A    I think we need to understand something very important. Since 1994, since the Oslo Agreement, Gaza, where Ismail Haniyeh lives, has been under the absolute security and civil control of the Palestinian Authority.  I believe, it is my opinion, if Ismail Haniyeh were to dare to leave Gaza in the direction of the real, he would immediately be arrested, tried, and sentenced.

        Furthermore, for many years he would be tried and arrested and sentenced for many years.

Q    It hasn't happened yet, has it?

A    To the best of my knowledge, he hasn't yet tried to leave Gaza for Israel.

Q    You know where Ismail Haniyeh goes every week?

A    Until 2009, I had access to certain channels of information, and since then I don't.

Q    Let's take a look at your Slide 23.

A    Okay.

Q    This is the slide that you displayed to the jury I

A. Spitzen - Cross/Stephens                    1752

think it was yesterday about Ismail Abu Shanab, is it not?

A    Yes, this is the slide of Ismail Abu Shanab.

Q    Right.  And he was killed by Israel in August of 2003,
right, according to you?

A    That is correct.

Q    And in your testimony, you said he was very famous, did
you not?

A    Not only was he famous, but the United States
authorities cited him in an interview or quoted him in an
interview given in 2001.

Q    Despite the fact that you say he was a very famous
Hamas terrorist, he's never been designated by the United
States, the United Nations, or the European Union, has he?

A    Yes, He belongs to a large group, a dishonorable group,
not a very respectable group of well-known terrorists  for
some reason were not designated by institutions that you
mentioned.

Q    All of the transfers, you say there were nine
transfers, to Shanab, and you got them all listed here at
the bottom of this slide, don't you?

A    Yes.  I identified these nine transfers.

Q    You got all of those documents from Arab Bank, did you
not?

A    Yes, I received all of these documents from the Arab
Bank.  They are stamped ABPLC.

Q    Can we look at the first one in the list, 1912.

        This is another transfer.  This one is dated March 21, 2001, is it not?

A    That is correct, sir.

Q    All right.

        The name is actually listed on this transfer as S-h-a-n-a-b, is it not?

A    I'm sorry, could you repeat that?

Q    Yes see S-h-a -- let me do it one more time.

        The name on the transfer is S-h-a-n-a-b, is it not?

A    Yes.  This is very typical of these transfers, the transfers that came from Lebanon.  We saw also the Shanab name was also spelled with a C-h. This is apparently due to the French spelling rules where the Sh sound -- is represented by Ch.

Q    Well, assuming this is actually the same person, it went through the OFAC list and there was no match, right?

A    If that's what you say.

Q    Can we go back it slide 23.

        According to you, Shanab was in jail from 1989 to 1997 in Israel, yes?

A    That's correct.

Q    And then he was released from Israel in 1997, is that right?

A. Spitzen - Cross/Stephens                1754

A    I don't recall if he served out his full sentence or
whether he was released as part of some kind of deal, I
can't say.

          MR. STEPHENS:  Your Honor, if you would like to
take the morning break, I'm at the end of Mr. Shanab.

          THE COURT:  Can you do one more?

          MR. STEPHENS:  Yes.

          THE COURT:  I would like to wait until 11:15 or so
because we started late.

          MR. STEPHENS:  Yes, all right.

BY MR. STEPHENS:

Q    Let's take a look at your Slide 24, which is Hasan
Shama.

          This is another slide that you showed to the jury
on your direct examination, right?

A    That's correct.

Q    All right.

          Another "very famous" Hamas terrorist, right?

A    That's absolutely accurate.

Q    Right.  He's so very famous that he's not been
designated by the United States of America as a terrorist,
or by the United Nations as a terrorist, or by the European
nations of the European Union as a terrorist, has he?

A    I can just give the same answer and give the same
example, such as Hasan Shama and other terrorists.  I don't

A. Spitzen - Cross/Stephens                    1755

know the reasons why a country designates some people and
doesn't designate others, I don't know what those reasons
are.

Q    We have four transfers to Mr. Shama listed down here on
your slide, do you not?

A    Those are the transfers that I identified.

Q    You got all of those transfer records from Arab Bank,
didn't you?

A    Yes.  Unfortunately, I did not receive their bank
account records or their bank account opening records, and
that made it difficult for me.

Q    Do you think you as a private citizen are entitled to
get into private banking records that you suspect to be a
terrorist?

         MR. TURNER:  Objection.

         THE COURT:  Sustained.

BY MR. STEPHENS:

Q    Let's take a look at one of the transfers, 1918.

         That transfer is dated September 27, 2001, is it
not?

A    Yes.

Q    And it's to Muhammad Shama, is it not?

A    That's correct.

Q    His name -- his last name is spelled a little
differently than you did on your slide, isn't it?

A    Yes, I spoke about this in my direct examination, and I
don't want to bore the court again with a discussion of the
problems of the transcription of Arabic into other
languages.

Q    You told us about that before?

A    Yes, I did.

Q    This transfer went through the OFAC system; is that
right?

A    Based on the notations that you taught me in the past
hour, I see that is true.

Q    Can we take a look at your Slide 25.

        This is another slide that you showed the jury on
your direct, is it not?

A    That's correct.

Q    And it's for a Mr. Manameh, is that how you pronounce
that?

A    Abd Hakim Manameh.

Q    According to you he's a Hamas leader, is he not?

A    He's not an Hamas leader.  He was Ismail Haniyeh's
bodyguard, was an operative of the Qassam Brigade, not in
the same league as the other people we discussed earlier.

Q    As a matter of fact, in your report you didn't say it
was Sheikh Yasin's bodyguard, which is what you say here in
your export report.  You actually said a person named
similar to the name in the transfers was Yasin's bodyguard,

A. Spitzen - Cross/Stephens                1757

didn't you?

A    As I said, this is true for all of the names that I
mentioned so far.  My identification I said was to high
degree of probability, but was not absolute, because the
bank refused to hand over the bank opening documents.  It
refused -- I have no pictures.  I didn't have their official
identification numbers.  And my examination was based on the
names, on the locations, and, therefore, I cannot state that
they are hundred percent accurate.  I said before, and I say
now, I say that they are to a high degree of probability,
but they are not 100 percent absolute, because the bank
refused to produce those documents.

Q    So, assuming that this person may or may not be Sheikh
Yasin's bodyguard, he's not designated on the United States
Terrorist List, the U.N. Terrorist List, or the E.U.
Terrorist List, is he?

A    Under the assumption in my opinion to a very high
degree of probability that he was indeed the bodyguard of
Sheikh Yasin was not designated by the institutions that you
noted.

        THE COURT:  Is this a good time?

        MR. STEPHENS:  Two or three more questions yes.
The transfers that identified you have seven, and they are
listed down here at the bottom of your slide, are they not?

A    That indeed correct, sir.

A. Spitzen - Cross/Stephens                1758

Q    And you got all of those seven records from Arab Bank,
did you not?

A    That is correct, sir.

Q    If we can look at the first one, 2087, that transfer is
dated April 30, 2001, is it not -- I'm sorry, April 3, 2001?

A    Yes.

Q    And the spelling of the last name is not exactly the
same, is it?

A    Yes, there were different spellings on various
transfers, but they are all from the same account.

Q    Look at the OFAC list.  It went through the OFAC list
and it wasn't a match?

A    Based on the parenthesis, I see that's correct.

Q    Can we go back to slide 25.

         Now, under imprisonment, you say that he was
arrested by Israel and the Palestinian Authority, do you see
that?

A    That's correct.

Q    Is it your testimony that being arrested means you're
guilty?

A    No.  The very fact that he was arrested both by Israel
and the Palestinian Authority does shed some suspicion on
the individual, and we can see it is not difficult to
understand from the fact that he was killed while trying to
shoot the mortar rockets at Israel, I think it's pretty

A. Spitzen - Cross/Stephens                    1759

clear.

Q    So your testimony just now is the fact that he's been arrested twice, once by Israel and once by the Palestinian Authority, that makes him suspicious?

A    No.  What I say casts suspicion for me as a person who looked into this person, investigated him without having sufficient background material, without receiving the records that the bank refused to hand over, to me it is an indication that this is the same person who was the bodyguard of Ahmad Yasin, and in order to determine the background for this individual.

          MR. STEPHENS:  We can stop now, your Honor.

          THE COURT:  All right.  Let's take 15 minutes, ladies and gentlemen, and we'll reconvene at 11:35.

          Please don't talk about the case.  See you in a few minutes.

          (The jury leaves the courtroom for a recess at 11:18 a.m..)

          THE COURT:  All right, be seated, please.

          Mr. Stephens, you asked the following question during the examination: "Do you think as a private citizen you are entitled to get into private banking records of someone that you suspect to be a terrorist," and sustained an objection to that question, because that question suggests that the witness is not entitled to get into the

1760

banking records.  But the court has held that he is as an
expert retained by the plaintiffs.  That was not the only
time that you suggested obliquely to the jury that there was
justification for the non-production.  Please don't do that
anymore.

           MR. STEPHENS:  All right.

           THE COURT:  See you at 11:35.

           (A recess is taken at this time.)

           (Continued on the next page.)

1761

          (Judge Cogan enters the courtroom.)

          THE COURT:  Let's have the jury, please.

          (The jury enters the courtroom at 11:35 p.m..)

          THE COURT:  Be seated.

          Please continue, Mr. Stephens.

          MR. STEPHENS:  Thank you, your Honor.

BY MR. STEPHENS:

Q     Showing the witness the Slide 26, please.

          Slide 26 is the one you showed on direct
examination to the jury, is it not?

A     That is correct, sir.

Q     It concerns Ghazi Hamad?

A     Ghazi Hamad.

Q     And in your testimony you described him as quite
famous, did you not?

A     That is correct.

Q     Sufficiently famous that he's not been designated as a
terrorist by the United States as a terrorist, by the United
Nations as a terrorist, or the European Union as a
terrorist; is that right?

A     Yes, like the others that were mentioned, and my answer
remains the same.

Q     You identified 15 transfers to Ghazi Hamad, did you
not?

A     This is correct.

1762

Q    And you have them all listed at the bottom of the
slide, the transfer documents, do you not?

A    That is correct.

Q    And all of those documents came to you from Arab Bank,
didn't they?

A    That is correct.

Q    If we take a look, please, at Exhibit 1969, the first
transfer on the list.

         This transfer is from January 2, 2002, is it not?

A    That is correct.

Q    And it shows a transfer to Ghazi Hamad check by OFAC
and no match; is that right?

A    According to the signs that you pointed out, that is
correct.

Q    Could we go back, please, to Slide 26.

         You say here that he is imprisoned in Israel from
1995 to 2000.

         Do you see that?

A    That is correct.

Q    And then he was released by Israel in 2000, and hasn't
gone back to jail since; is that right?

A    That is correct.

Q    You also say here that he has a veterinary degree from
the University of Khartoum.

         Do you see that?

1763

A    That is correct, yes, to the best of my knowledge.

Q    Is he a veterinarian?

A    No, he's not a veterinarian.  He actually earned another degree afterwards in political science, and to the best of my knowledge, he's not a practicing veterinarian.

Q    Let's take a look at Slide 27.

        This is another slide that you showed to the jury during your direct examination, is it not?

A    Yes, sir.

Q    And it concerns Riyad Zaid?

A    Riyad Husain Abu Zaid.

Q    You didn't say that he was famous in your testimony, I don't think.  I think what you said is he is a senior Hamas operative, correct?

A    Yes, that's correct, but he was also involved in and served as a chairperson, the chairman of the Al Nur Prisoners Society, which was a very well-known one in Gaza.

Q    All right.

        The Al Nur Society is a charitable society, is it not?

A    It is a society that supports prisoners, yes.

Q    And Mr. Abu Zaid is not designated by the United States, or the United Nations, or the European Union as a terrorist, is he?

A    Not until 2003, no, but then it was too late.

1764

Q    He was dead by 2003; is that right?

A    Yes, that is true, like others.

Q    You have one transfer to Abu Zaid, right?

A    I identified one transfer to Abu Zaid.  I did identify
another bank transfer from someone receiving money from the
Saudi Committee, but I wasn't sure about this, and this is
why I did not include this.  It was actually transferred to
the ^^^career Bank.

Q    This transfer document that you saw is Exhibit 2017, is
it not?

A    That is correct, sir.

Q    That's a document that you got from Arab Bank, isn't
it?

A    Yes, sir.

Q    And as you can see, that transfer is from October 23,
2001, correct.

A    That is correct, sir.

Q    The recipient is Abu Zaid; is that correct?

A    Abu Zaid.

Q    I will get it right, although we'll leave this subject
soon, it went to the OFAC list, did it not?

A    Yes, sir.

Q    And all of your citations in your report - if we can
look at SAG-110 - are after his death in February 2003,
aren't they?

1765

A    Well, once again, I have to rely on figures that are
not yet examined, and can't confirm if that's correct, but I
have to look up to see if there are more citations.

Q    What we do know is that again you cited the Green
Revolution, which, as you said, was the first book that took
some scientific look at Hamas, right?

A    That is correct.  But, again, the question is what is
exactly science. Sometimes science is various resources that
were available during the relevant time periods.  And you
can see even quotes or citations from designations.  Even
though those designations were made in 2007, they do cite
from 2001.  I would not do this here, it is very time
consuming.  We have to see what the topic was that led is
what the context is.

        I'm not saying here that things are not
relevant -- sorry.  What I'm saying to you is the fact that
designations or citations are taken from a later period of
time does not mean that that particular individual was not
known or famous prior to that.

        With respect to Abu Zaid, he became known for very
cruel and horrific deeds that he did.  That was the stoning
to death of a soldier that just happened to walk in a
refugee camp in Gaza.  The trial of the individual and the
individual himself were very well-known, at least in Gaza,
in Israel, and in the West Bank.

1766

Q    He was famous in Israel for being convicted of this
crime, what you say, but he was released from prison in 1998
by the Israelis; is that right?

A    As I said, he was sentenced to eight years of prison or
how many years that was, he served his imprisonment, and he
was then released from jail.  This is a part of the legal
system in a civilized country.

Q    Whatever it was that happened, happened before 1990,
because, as you say, he was in prison from 1994 forward,
right?

A    He was in prison since 1990, and what happened it
happened from the first Intifada .

Q    So sometime, and that could take place anywhere from
1987 to 1990?

Q    Right.  And Arab Bank didn't even start operations in
the West Bank until 1994, did it?

A    To the best of my knowledge it did not operate in the
territories before 1994, however the officers at the Arab
Bank did not arrive with the Arab Bank to the territories,
neither did the directors or managers.

Q    The testimony is, you know the identity of every
officer and director of Arab Bank starting in 1994?

A    No, no. I wish I did know them.  I know some of them.
I did know them in my work.  I knew actually many of them,
and I know with respect to the local branches, I'm not

talking about chief management, I do know that the officers
and the managers were local.  They did not come from other
countries to work in the bank as tellers.

Q    As tellers?

A    Yes.

Q    The head of the bank in the West Bank for Arab Bank
came from France, didn't he?

A    It depends on the time period.  At a certain point in
time it was Shukri Bshara.  He could have come from France.
And another time it was Mazen Hamdan.  He, too, came from
another country.  I don't know where from.

Q    Let's take a look at Slide 28.

          Your Slide 28 was shown to you during your direct
examination, and it concerns Baha al-Madhan, does it not?

A    Baha al-Din Al-Madhan, yes.

Q    And according to you, he's a well-known figure, is he
not?

A    That is correct.

Q    He's not well-known enough to be designated by the
United States, the United Nations, or the European Union as
a terrorist, is he?

A    Like the others that you mentioned.

Q    According to you he got two transfers, did he not?

A    That is correct.

Q    And both of those transfer documents you got from Arab

1768

Bank, correct?

A    Indeed so.

Q    Let's take a look at Exhibit 2088, please.

        This is one of the transfer documents that you looked at, and it's dated April 3, 2001, is it not?

A    Yes, that is correct.

Q    All right.

        It shows that the transaction went through the OFAC and was cleared, does it not?

A    Yes, that is correct.

Q    Can we go back to Slide 28, please.

        All of the information you have here about current status is from 2011, '12, '14, do you see that?

A    Except for the last line that relates to him as coordinator of the Higher National Committee for Support of Prisoners.

Q    When did he have that position?  Did I interrupt you? I said, when did he have that position?

A    He served in this position for many long years, and I cannot say right now exactly when that started.

Q    What you say is terrorist activity Social Security you P are AN this, don't you, you mean this paragraph right here?

A    Yes.  What I mean, these many long years of serving in this position, treating or offering support to the prisoners

1769

upon us.

Q    Do you think supporting the prisoners while in jail makes the person a terrorist?

A    Those who help terrorists are in prison, and their family members definitely assist terror, and as far as I'm concerned those that assist terror are terrorists.

Q    Do you know how many -- let me ask you the question differently.

It is true, is it not, that during the second Intifada there were between 28,000 and 30,000 Palestinians put in prison by Israel?

A    I cannot confirm any precise figures, but there were thousands in prison.

Q    They were in prison from everything from throwing stones to violating a curfew, to committing murder, weren't they?

A    That's true.

Q    Do you think somebody who throws a stone is entitled to support while he's in prison?

MR. TURNER:  Objection.

THE COURT:  Sustained.

Q    Do you think, no matter what the offense is that a person is in prison for, he's not entitled to support while he's in prison?

MR. TURNER:  Objection.

THE COURT:  Sustained.

BY MR. STEPHENS:

Q    Let's take a look at slide 29.

       Slide 29 you showed to the jury during your

direct, and it concerns Abbas al-Sayed, does it not?

A    Yes, this is a slide that deals with Abbas al-Sayed.

Q    According to you, he was also a famous figure, right?

A    Yes.  He was the spokesperson of Hamas in Tulkarem.

       (Continued on the next page.)

A. SPITZEN - CROSS - STEPHENS                1771

CONTINUED CROSS-EXAMINATION

BY MR. STEPHENS:

Q    But he's not so famous that he's been designated as a terrorist by the United States, the United Nations or the European Union, is he?

A    Yes, apparently that's true.  But it doesn't change the fact that this man is a terrorist, that he had blood on his hands, that he carried out abhorrent acts of terror during the time when he was not designated as a terrorist.  So I'm not quite sure what it means to be designated as a terrorist.

Q    It means that's the list of people the bank's checking against to see if transactions are prohibited, doesn't it?

A    Yes, but he was a terrorist commander.  And it doesn't change the fact that I said that a bank should be familiar with its clients, and he was well known, at least in Tulkarem, as a terrorist.  He was the head of the military wing, he was the spokesperson, and he received money through the Arab Bank, which, according to his testimony, he said it helped him carry out his terrorist attacks.

Q    We'll take a look at that a little bit later.  Actually, what he said was that he bought a rifle and some pistols and some ammunition with money he took out of his Arab Bank account; isn't that right?  Not a suicide vest.

A    He said that he bought rifles and ammunition and that he received a number of dispatches of rifles and ammunition.  And

he also complained that one dispatch did not arrive because

Darwazah was killed and he was looking for -- the terrorist

Darwazah was killed, and he was looking for how to return the

money and the arms.  And I don't know if the cell that carried

out the Park Hotel bombing, if they weren't armed with rifles

and guns as well, and they may have been.

        So I suggest that if you want to get into it, we can

re-read his testimony.  In any case, if you read his

testimony, it does not clear him of guilt.

Q    You know who Ronni Shaked is, don't you?

A    Yes, I've known Ronni Shaked for many years.

Q    And you know he testified in this trial, do you not?

A    Yes, I know.

Q    And Mr. Shaked has Mr. Al-Sayed connected up to a number

of attacks, he says.  Are you aware of that?

A    I would assume so.  I know that Abbas al-Sayed was

connected to a number of terror attacks.

Q    Okay.  So he was so famous that he managed to pull off

terrorist attacks over some extended period of time without

getting arrested or assassinated by Israel?

A    The fact that a person was well known in the field for a

long time -- and I'm not only talking about Abbas al-Sayed,

there were others as well -- it doesn't mean that -- it

doesn't mean that the Israeli security authorities were able

to get their hands on him.

A. SPITZEN - CROSS - STEPHENS                    1773

People lived in the Palestinian authority.  Their names were well known.  They often spoke publicly, but from secret places, and they were wanted by Israel for long periods of time.  But Israel was not always able to catch them or to catch them before they carried out their terror attacks.  And that does not prove that their names or identities were not known.

Israel on more than one occasion asked the U.S. for help in transferring names to the PA, but it was not always successful.  The fact that a person was not arrested before he carried out a terrorist attack is not necessarily an indication that he was not famous or not known.

Q    You list nine transfers to al-Sayed, do you not?

A    Yes, sir.

Q    And all those transfer documents you got from Arab Bank, did you not?

A    Indeed.

Q    Let's take a look at the first one that you listed, which is 1990.  The date on this is March 1st, 2001, is it not?

A    Yes, sir.

Q    And as you can see, it went through the OFAC listing and didn't get stopped, did it?

A    That is correct.

Q    Could we take a look at SAG 111.  This is the date of the last attack in this case, September 24th, 2004.  Are you aware

A. SPITZEN - CROSS - STEPHENS                    1774

of that?

A    Yes, sir.

Q    And all of your citations about al-Sayed are also after the date of the last attack, aren't they?

A    You yourself list here, I can count seven citations which you yourself write are undated, and I can check from when they were cited.  That does not mean that they came later.

        And secondly -- as I said, I could check each of the citations and it doesn't necessarily mean that they were later.  The fact that things happened later doesn't mean that things weren't known in realtime, when they happened.

        And I don't want to take up too much time.  We can look into it, but I understand it would take a lot of the jury's time to do that here in court, and I don't believe that that's the purpose of our discussion.

        Furthermore -- that's all.

Q    The sentence that you mention here was rendered in 2006, wasn't it?

A    I don't recall when the verdict was handed down in Abbas al-Sayed's trial.

Q    Let's take a look at slide 32.  This is another slide that you showed the jury on direct, and it concerns Jamal and Muna Mansur, does it not?

A    That is correct.

Q    And they're husband and wife; is that right?

A     To the best of my knowledge, yes, they were husband and
wife.

Q     And your testimony was that Jamal Mansur was very famous,
but that his wife Muna actually received the transfers that
you looked at; right?

A     No.  I testified -- and if I was misunderstood then I
will go back and state it again -- that both Jamal and Muna --
excuse me, that Muna Mansur was a member of Hamas.  She had
been -- they were both members -- I'm sorry.

           They were both members of Hamas.  Muna Mansur had
been elected as a member of the Palestinian Parliament for the
Reform and Change Party, and that Jamal Mansur was a very
well-known leader, he was a legendary figure and the
spokesperson of Hamas.

Q     Muna Mansur was elected to Parliament in 2006, right, two
years after the Second Intifada ended?

A     Yes, that is correct.  But I will repeat again what I
said.  Muna -- a person is not elected to the Parliament out
of the blue, as it were.  They're elected because of the
activities they're carrying out, because they're known to the
public, and only then are they elected to the Parliament.

           And, therefore, I have to point out that Muna was a
women's activist in Hamas.  She was also known as the wife of,
but she was also known in her own right before 2006.

Q     What we do know is that neither Jamal or Muna Mansur were

designated as terrorists by the United States of America, by
the United Nations or by the European Union, do we not?

A     To the best of my knowledge, they were not.

Q     We also know that you say Jamal Mansur was killed by
Israel in July 2001, and the transfers went up to September
2001, don't we?

A     Which further bolsters the fact that Mrs. Mansur was a
Hamas operative in her own right.

Q     Because she received the money transfer?

A     No.  She received the money because she was a Hamas
operative.  I assume that she received the money from Yousef
al-Hayek just as dozens of terrorist operatives received money
transfers, because she belonged to this group of operatives.
And she -- she received -- she received it like the other
operatives.

Q     Okay.  You say that Muna Mansur received four transfers,
down at the bottom of the screen; right?

A     Yes, sir.

Q     And one of them is 2019.  Can we take a look at that?
And that shows September 6, 2001; is that right?

A     Yes, sir.

Q     And it shows it went through the OFAC list and it wasn't
a match; doesn't it?

A     I don't know.  According to what you explained earlier,
this is the acronym of a clerk -- or the initials, sorry, of a

A. SPITZEN - CROSS - STEPHENS                1777

clerk who saw something suspicious, so I do not know.

Q    Let's take a look at SAG 112.  Jamal Mansur is another
one of those persons identified as a terrorist who was killed
on July 31, 2001, but all of the citations in your report are
after the date of his death; isn't that right?

A    First of all, I must rely on your date.  I cannot check
this with what I have.  And I suspect that if I look into
this, I'll find a number of interesting things.

        But even if I take your word for it, your word for
it, then you are enumerating six such transfers that you say
that they're undated.  You cannot -- I cannot possibly give
the date for them, but had you asked me to, I would probably
be able to help you and show to you that perhaps they are
taken from the relevant time period.  I'm not sure.  I have to
look at them one by one.

        And this does not -- on the one hand, you say that
they're after the period, but, on the other hand, you say that
they're undated.  So I do not see how you can say this.  I
cannot see how you can say that they are not applying to the
relevant time period.

Q    Well, I'm simply trying to let you know that, as far as
we can tell, those are all the citations in your report that
concern Jamal and Muna Mansur.  And what we certainly know is
that you cited two books that were written in 2007 and the
other in 2008, and exhibits from the Holy Land trial which

A. SPITZEN - CROSS - STEPHENS                1778

also happened in 2008, do we not?

A    I can only say that I cannot accept this chart the way
you have actually drew it.  It is impossible to say that on
the one hand, there aren't any citations from before the date
of death, and to put all the rest of it under the undated.

        I do remember that I received from my -- from the
plaintiffs' attorneys dozens of questions during the writing
of my report, and these dozens of questions pertained to
citations taken from Internet websites.  And I definitely
attempted and tried to answer these questions, and whenever
there was the need, I would request a .pdf that pertained to
this.

        So it seems to me improper to, on the one hand,
place them as prior to the death, and, on the other hand, to
place them under undated and to yet not ask for any help to
figure out what the exact date was.  Hence, I cannot possibly
accept what you're saying this way.

Q    My question to you, Mr. Spitzen, was, if you just took
all this out, since you don't have any date on it, we do know
that you cited a book written in 2007, a book written in 2008,
and exhibits from the Holy Land trial which happened in 2008.

        THE COURT:  Mr. Stephens, I'm going to ask you to
move on.  I think the jury has seen that what you just said is
correct, so let's go to something else.

        MR. STEPHENS:  Okay.

A. SPITZEN - CROSS - STEPHENS                1779

Q    Let's turn to your slide 33.  This is another slide you showed the jury during your direct concerning al-Natsheh, is it not?

A    Al-Natsheh.

Q    Natsheh.  According to you, he had one transfer; right?

A    I identified one transfer.

Q    And you testified he was famous as well, did you not?

A    Yes, definitely.

Q    But not famous enough to be designated as a terrorist by the United States of America or the United Nations or the European Union, isn't that true?

A    To the best of my knowledge, that is correct.

Q    The transfer document that you cited, since there's only one, you got from Arab Bank, did you not?

A    It is.

Q    Can we take a look at that?  As you can see, it's dated July 27, 2001.

A    That is correct, sir.

Q    And it was checked and cleared through the OFAC list, was it not?

A    I understand that it was checked against the list as the bank had it at that time.

Q    Can we turn to your slide 35.  This is a slide that you looked at on your direct concerning Mahdi Hanbali, is it not?

A    Mahdi al-Hanbali.

A. SPITZEN - CROSS - STEPHENS                1780

Q    And Mr. Al-Hanbali you said was famous as well; right?

A    Yes, he was a well-known figure, at least in Nablus.

Q    He's not been designated by the United States of America

or the European Union or the United Nations as a terrorist,

has he?

A    To the best of my knowledge, he hasn't been designated.

Q    You have 28 transfers to him, do you not?

A    What I managed to identify amounted to 28 transfers.

Q    All those documents of those transfers you got from Arab

Bank, didn't you?

A    Yes, that is correct.

         MR. STEPHENS:  And could we look, please, at the

first one, Shawn, which is 1942.

Q    That's a transfer from February 2002, is it not?

A    It's February 14th, 2002, yes.

Q    And it shows the transfer was checked through the OFAC

list and it did not match, doesn't it?

A    That is correct.

Q    Can we go back to slide 35, please.  You say here that

Mr. Hanbali was arrested briefly by Israel in 2001.  Do you

see that?

A    Yes.

Q    Was he then released by Israel in 2001?

A    I believe if he was arrested, he was also released.

Q    And then you say he was in prison in Israel in 2009; is

that right?

A    This is correct.

Q    And that's five years after the end of the Second
Intifada; right?

A    Yes.

Q    Let's turn to your slide 36.  This is a slide you showed
to the jury on your direct concerning Amin al-Haj, is it not?

A    No, Khaled Amin al-Haj.

Q    I'll refer to him as al-Haj.  Is that all right with you?

A    Yes.  This is his last name.  That's okay.

Q    So Mr. Al-Haj you say is known in public, too; right?

A    Yes, he was the spokesman of Hamas in the Jenin region.

Q    You indicate here that -- well, let's go to the other one
first, which is he's not sufficiently well known to be
designated as a terrorist by the United States, the United
Nations or the European Union, is he?

A    You keep repeating a certain phrase, the sufficient --
sufficiently famous.  And I do not know what this phrase
"sufficiently famous" means.  I can only say that he was not
designated by those entities that you mentioned, and I do not
know when they decide to designate.

Q    You mentioned that he got 17 transfers, do you not?

A    Yes, indeed so.

Q    All those transfer documents that you examined you got
from Arab Bank, did you not?

A. SPITZEN - CROSS - STEPHENS                1782

A    Yes, sir.

Q    All right.  And the first one, if we take a look at it,
is Exhibit 1984.  The date is February 2002.

A    Yes.

Q    And it shows that it went through the OFAC list and it
was not a match; right?

A    This is correct.

Q    Let's go back to slide 36, please.  You have Mr. Al-Haj
in prison during the First Intifada all the way up to the
mid-1990s in Israel; is that right?

A    This is correct.

Q    And then you say he was imprisoned again by Israel in
2002?

A    Correct.

Q    And then the Israelis released him?

A    Yes, but I did not manage to determine exactly when he
was released and how many years he served in prison.

Q    Well, according to you, he got picked up again in 2007
and stuck back in jail; right?

A    Yes, I did find a record of his imprisonment from 2007 to
2010.

Q    So this known terrorist was arrested and let out of jail,
arrested and let out of jail, rearrested and let out of jail;
am I right?

A    Yes.  It happened with many of them.  This is the Israeli

A. SPITZEN - CROSS - STEPHENS                    1783

legal system.  The judge hands down his verdict, and if
there's no any release deal -- that happens, too -- then the
person serves his sentence and then he's released from prison.
This is the legal procedure in Israel, and I believe it is so
in any other civilized country.

Q    Well, you'll be pleased to know we've only got one more
to go, and that is slide 37.

A    Thank you.

Q    You showed this slide to the jury during your direct, and
it concerns Nada al-Jayousi, does it not?

A    Al-Jayousi.

Q    According to you, she is -- how do you put it? -- a Hamas
personality; right?

A    I believe I wrote a Hamas operative.

Q    Oh, yes, I see that here.  In your testimony, did you
refer to her as a Hamas personality?

A    I do not remember exactly the words and how they were
translated.  I usually refer to these people as operatives,
not as personalities.  It sounds strange that I have said
that, and I apologize if I do -- if I did say this.  There's a
problem here both of the Hebrew and the English and, you know,
I normally relate to these people as operatives.

Q    You identified 37 transfers, and you got all of those
transfer records from Arab Bank, didn't you?

A    Yes, that is correct.

A. SPITZEN - CROSS - STEPHENS                1784

Q    Let's take a look at Exhibit 2003, which is the first
transfer.  That shows the date of October 11th, 2001, does it
not?

A    That is correct.

Q    And it shows that the transfer went through the OFAC
system and was cleared, doesn't it?

A    That is correct.

Q    And al-Jayousi, Nada al-Jayousi is not designated by the
United States of America, the United Nations or the European
Union as a terrorist, is she?

A    To the best of my knowledge, that is, indeed, correct.

Q    Could we go back to the slide?  You say here that she was
imprisoned by Israel in 2007, do you not?

A    Yes.

Q    And that's three years after the last attack in this
case, is it not?

A    That is correct.

          MR. STEPHENS:  I'd like to look now, please, Shawn,
at SAG 121.

Q    This, again, is what you showed the jury on your direct
examination, is it not?  And aside from Sheikh Yassin right
here, none of those people have been designated by the United
States, the United Nations or the European Union as a
terrorist, have they?

A    All of these terrorists have not been designated by the

A. SPITZEN - CROSS - STEPHENS                1785

U.S., the U.N. and all the other institutions that you
mentioned as terrorists.  For some of them, it's no longer
relevant, because they're no longer alive.  But it's true.

Q    You showed one more slide to the jury with the rest of
them on it, which is your slide 19.  And none of those people
are on the United States, the United Nations or the European
Union list either, are they?

A    My answer is the same as before.

          MR. STEPHENS:  Your Honor, I'm at a break in the
subject matter, if you would like to go to lunch.

          THE COURT:  Let's have lunch, ladies and gentlemen.
Please don't talk about the case and stay away from media
during lunch.  We'll reconvene at 10 to 2.  Have a good lunch.

          (Jury exits courtroom.)

          (Continued on the next page.)

PROCEEDING                                    1786

THE COURT:  The witness can step down.

(The witness steps down from the witness stand.)

THE COURT:  Please be seated.  Mr. Stephens, I'm going to ask you if there's a way to try to expedite the examination a little bit.  I understand the utility in making the points you made as to at least the first few of the individuals identified, but after you established the points for four or five of them, you might ask a group question, for example, that said, and that's true of all of them, none of them are included on these lists, instead of doing every one. I just want you to think about that, to save a little time.

MR. STEPHENS:  When it's possible, I certainly will do that.  Most of these had some fact in there that I needed to point out as well.

THE COURT:  Well, you might ask some group questions and then go back to the individual ones.  And I recognize what you're saying, there were some that were specific as to the individuals, but there were some group questions who once you established they were true as to the first three or four, you could have asked as a group as to the rest as well.  So try to expedite it, if you can.

Okay.  Have a good lunch.

MR. COLES:  Your Honor, can we get an instruction that the witness not confer with counsel during the course of his testimony?

PROCEEDING                                1787

        THE COURT:  I'll instruct plaintiffs' counsel not to

confer with the witness during his testimony.

        (Luncheon recess.)

        (Continued on the next page.)

A F T E R N O O N    S E S S I O N

(Judge Cogan enters the courtroom at 1:55 p.m..)

THE COURT:  Please bring in the jury.

We checked with the jurors and they are okay a
week from tomorrow.  We'll take off next Tuesday and work
that Friday.  Ms. Clark checked with the jurors.

(The jury enters the courtroom at 1:55 p.m.)

THE COURT:  All right.  Be seated, please.

Please continue, Mr. Stephens.

MR. STEPHENS:  Thank you, your Honor.

BY MR. STEPHENS:

Q    Mr. Spitzen, I want to talk to you a little bit now
about what you are not doing, and talk to you about what you
did do.

You were engaged by plaintiffs' attorneys to give
an opinion as to whether 12 different Palestinian charitable
entities, zakats, were controlled by Hamas from 2000 to
2004, were you not?

A    Yes, sir.

Q    And you are not offering an opinion that any
Palestinian charity civil entity you studied participated in
any of the attacks at issue in this litigation, are you?

A    The entities as entities, no.

Q    You actually have no proof that any Palestinian Zakat
civil entity that you studied participated in any of the

A. Spitzen - Cross/Stephens                    1789

attacks, do you?

A     Like I said the entities themselves, no.

Q     And you are not offering an opinion that the activities
of any of the Zakats you studied involved planning any of
the attacks at issue in this case, are you?

A     Here the answer is more complex.  That is not accurate.

Q     You remember giving your deposition in this case?

A     Yes, sir.

Q     You were sworn under oath to tell the truth, were you
not?

A     Yes.

Q     All right.

      Could we take a look at the Spitzen transcript
page 231 at line 20 through 232, line 3?

      You were asked in your deposition while you were
under oath:  Were any of the activities in the entity you
researched, did any of those activities deal with planning
the attacks?

      "THE WITNESS:  Are you talking about the
activities of the entities, the organizations?

      "Yes.

      The answer is "no."

      That's true, isn't it?

A     May I see what is going on in --

      THE COURT:  You need to speak Hebrew.

A. Spitzen - Cross/Stephens                1790

A     May I see the rest of the answer to this question and
what exactly I did answer there?

Q     That is the answer to the question, Mr. Spitzen, "no."

A     Ask him if I could see two questions before that and
two questions afterwards, because I think I had elaborated
more.

Q     Well, okay.  Let's go back to page 231.

          So, here's your question.  You are not offering an
opinion -- in fact, go back to 230.

          THE COURT:  Mr. Stephens, when you read it, you
need to read it more slowly.

          MR. STEPHENS:  Oh, sure.

Q     So you were asked a question on line 11:

          "Question:  Am I correct, too, in this case, Mr.
Spitzen, you are offering no opinion that any of the
entities that you researched participated in any of the
specific attacks at issue in this case?

          "The entity as an entity, the Zakat committee as a
Zakat committee, or a charity association as a charity
association, it is difficult for me to say something
specific.  There is in the sense of participating in -- and
I don't have any proof regarding participation in a specific
act of terrorism."

          Next question -- I'm sorry, you got to go back.  I
didn't get the first part of it.

A. Spitzen - Cross/Stephens                1791

And, Mr. Spitzen, you're not offering an opinion
in this case that any of the entities that you studied
planned any of the specific attacks at issue in this
litigation?

"Somebody from the entities or the entities
themselves?

"Question:  Either one?

"Answer:  People from within the entities did plan
terror attacks.  And they even sat in prison. You need to
look at the case of Al-Islah in Ramallah.  And there's Mr.
Nada that his indictment is attached here. And thered's also
Jamal Tawil, who was also convicted for terrorism and sat in
prison.  And he transferred funds through the terror --
terror prisoner's association.

Nada was involved in terrorism that -- that some of
the victims here, but I need to check.  Also, Fadel Hamdan
was in prison for a terror attack and for recruiting
terrorists.  And these are only some examples.

"Were any of the activities of the entities you
researched, did any of those activities entail planning the
attacks at issue in this litigation?

"Answer:  Are you talking about the activities of
the entities, the organizations themselves?

"Question:  Yes?

"Answer:  No."

A. Spitzen - Cross/Stephens                1792

That sworn testimony is accurate, is it not, or do
you want to change it?

A    No, I stand behind what I said.

THE COURT:  Mr. Stephens, you turned that monitor
towards us.  I can't see it.  I'm sure the witness can't see
it.  It is really for the galley, not for --

MR. STEPHENS:  I'm sorry. I should stop drinking.

THE COURT:  You mean the water you have there?

What I want to tell you, you have it I believe on
the monitor right in front of you at the podium. The jurors
have it on all of their monitors.

MR. STEPHENS:  It is actually easier for me to see
it, your Honor.

THE COURT:  It's you or the galley.  I'm you are
more important.

BY MR. STEPHENS:

Q    You are not offering an opinion that the Zakats
entities that you studied funded any of the attacks at issue
in this litigation, are you?

A    That is not completely accurate.  I do remember what I
said about that, and I said that people from these entities
did receive money in order to carry out terror attacks,
before these terror acts were committed.  Therefore, it's
very difficult to say, because I didn't have all of the
material on this matter.  For example, I didn't have the

A. Spitzen - Cross/Stephens                    1793

bank accounts of these societies, because the bank had
refused to submit them to me.  This is why it is not clear
where the money went to.

Q    Okay.

        Let's take a look at your sworn testimony from
three years ago. Page 233, starting at line 3 through 10.

        Three years ago you swore:

        "Question:  But you can't pinpoint to any money
that went through these entities for any terrorist for the
commission of the acts involved in this case; is that right?

        "Answer:  If you are meaning -- and we call this
in our profession jargon to earmark this money, then, no, I
cannot."

        So my question to you, Mr. Spitzen, is, is that
sworn testimony true?

A    That is true, but what you didn't read to the jury
here is what I said several sentences before that regarding
people from the organizations who did receive money for acts
of terrorism, and if you are going to read, you need to read
everything.

Q    But your lawyer can read to you whatever he wants on
your redirect.

        Was there something that you didn't understand
about that question?

A    No, I did understand exactly what the question was.

A. Spitzen - Cross/Stephens                    1794

The previous question, the way I understood it, and correct
me if I'm wrong, is whether there's any kind of proof that
these associations or entities received money for terrorism.
And I asked, for transfer money for terrorism, and I
answered what I did answer regarding people from the
entities, and regarding the records that I did not have.

        Now, as for the second question, that was clearly
the issue of earmarking specific funds and transferring them
for terrorism.

        Now, regarding that specific earmarking, I didn't
have, because I couldn't point at that, because I didn't
have the bank accounts of the society; therefore, both
answers are correct.

        One, the first answer answered a broader question
the way I understood it; while the second question answered
-- for the second answer answered something more specific.

Q    When you answered that question three years ago under
oath, you didn't say if you are meaning -- and we call this
in our professional jargon to earmark this money, then, no,
I cannot, you didn't say, because I didn't have the bank
records, did you?

A    The way I see it, the answer was regarding something
specific.  But regarding this specific question, this is not
what I answered perhaps regarding the records.  But if you
look throughout the deposition, I did mention this fact more

A. Spitzen - Cross/Stephens                    1795

than once and more than twice, the fact that the absence

from the document -- from the bank makes it very difficult

for me to establish a very clearcut opinion in my expert

report. The fact that some of the bank accounts were

missing, and here -- and that I even had arguments with the

lawyers.  Perhaps it wasn't argument, but these were

discussions, exchanges, that because they had wanted to know

what I could have deduced, if I did have these records in

front of me.  And we are not going to go over the entire

deposition to see that, but I did argue that the fact that I

did not have the bank's documents did interfere with my

ability to determine regarding the difference societies,

individuals, and their involvement in terrorism.  I did

state that several times throughout the deposition.

Q     You understand that you are not here to argue.  You are

here to testify, right?

          MR. TURNER:  Your Honor, I object to that.

          THE COURT:  Sustained.

          Mr. Stephens, you are not here to argue with him,

either.

          MR. STEPHENS:  I know that.

          THE COURT:  No one is here to argue now.  We'll

argue later.  Let's go on to questions about the witness's

testimony.

BY MR. STEPHENS:

A. Spitzen - Cross/Stephens                    1796

Q    You are not offering an opinion that any of the Zakats
you researched persons who committed the attacks at issue in
this litigation, are you?

A    The societies themselves did not recruit people, but
people who were members of the societies did recruit.

Q    You are not --

A    -- from the premises of the society.

Q    You are not offering an opinion that Arab Bank knew any
of the 12 Zakats were controlled by Hamas, are you?

A    No, I cannot provide such an opinion, and I'm also not
allowed to, according to the ruling of the Judge, I cannot
say what the Arab Bank knew or did not know, and I also
cannot know that.

Q    You are not offering an opinion to the jury that Arab
Bank should have known anyone of these Zakats was control by
Hamas, are you?

A    Supposed to, I don't really understand the words, but
it could have known and I already said that.

Q    Well, let's take a look at what you swore to three
years ago, page 235, lines 21 through 24.

         "Question:  And you are not rendering an opinion
in this case that Arab Bank should have known that any
entity was controlled by Hamas, specifically about the Arab
Bank?

         "Answer:  No.  But there's some sort of implicit

A. Spitzen - Cross/Stephens                 1797

understanding, because some of the activity was overly
well-known, but not specifically about Arab Bank."

          Now, you are nodding.  Do you agree with that
testimony now today?

A     Yes, with the reservation, yes.

Q     And you have no opinion in the way Arab Bank handled
the Saudi Committee transactions complied with international
banking laws, regulations, or industry standards, right?

A     No, I do not know that. I couldn't know that.  I'm not
a banker.  I'm not that familiar with all of the
international standards and regulations, so I could not know
that.

Q     Mr. Spitzen, I want to show you SAG-1, please.  This is
to give us an idea of what the geography is.

          Israel is this slice of the Middle East right
here, is it not?

A     Yes, indeed.

          MR. TURNER:  Your Honor, can we approach for a
moment?

          THE COURT:  Yes, you may.

```
                    SIDE BAR                        1798

                 (Side Bar)
          MR. TURNER:  If this is just going to be
   geography, I have no problem with it.  But if this is
   beginning to talk about regulatory body and things of that
   nature, that's clearly been excluded.
          THE COURT:  I'm sure Mr. Stephens knows that.  I'm
   not sure where this is going.
          While we are up here?  Let me mention,
   Mr. Stephens, you are not using the deposition properly.
   What you got to do, if you want to impeach him, you got to
   say to him, were you asked the following question and did
   you give the following answer, and then read the question
   and the answer.  You have to say Q or question or A or
   answer, before answer, and then when you read it, you say to
   him, did you ask that question and did you give that answer?
   You can't argue with him about what it means.  And I can
   tell you, frankly, having listened to it, I don't think he
   said anything inconsistent with what you are saying.  I know
   you do, that's okay.  You can say that to the jury.  But you
   can't argue over it with him what it means.  You can
   establish what he said, and you can argue to the jury it is
   inconsistent, when you close.  Okay?
          MR. STEPHENS:  Okay ill that's the way to do it
          THE COURT:  Okay.
          MR. TURNER:  I have one more process issue.  This
```

```
                        SIDE BAR                      1799
```

map and some of the other things sort have been displayed

without asking for the court's permission.

        THE COURT:  You got to show it to counsel, first.

        MR. STEPHENS:  I think you have all of this.

        MR. OSEN:  We haven't got testimony.  All of the

--

        MR. TURNER:  As long as you show it to me before

you display it to the jury, so that we can address any

issues.

        THE COURT:  Okay.

        (Side bar ends)

A. Spitz en - Cross/Stephens                1800

BY MR. STEPHENS:

Q    And Jordan is right next to, and to the east, of Israel, is it not?

A    That's correct.

Q    Right.

        Saudi Arabia is down here, (indicating?)

A    I think not here, on the other side.  The arrow is in reverse.

Q    Oh, it's over here, yes?

A    Yes.  Somebody might be angry that you put Saudi Arabia into their territory.

        MR. STEPHENS:  They probably would. I don't think there's a pointer on any of these, but be that as it may, we agree that is Saudi Arabia?

A    Yes.

Q    Now, if we can see SAG-002.

        MR. TURNER:  I don't have that one.

        THE COURT:  Let me know, Mr. Turner, if there's any difficulty showing this slide.

        MR. TURNER:  That's okay.

BY MR. STEPHENS:

Q    This is a map of the West Bank and Gaza, is it not?

A    Yes, sir.

Q    And the cities that we have been talking about or you have been talking about on your direct examination include

A. Spitz en - Cross/Stephens                    1801

Ramallah, which is right here, yes?

A    Correct.

Q    And and Nablus, which is up in the north?

A    Yes.

Q    Hebron, which is down in the south?

A    Yes.

Q    And Jerusalem, which is this large metropolitan area
there, right?

A    Yes, and a couple of more cities that I mentioned.

Q    Now, the West Bank is conquered territory, is it not?

A    This is a question that is both legal and political.
If you ask Allan Dershowitz, or others, they would agree
with you, but I don't think I should answer such questions.

          THE COURT:  Let's have a side bar, please.

SIDE BAR                                    1802

(Side Bar)

THE COURT:  I'm not getting any scope objections.
Nevertheless, I do have a responsibility to move this trial
along and unduly waste the jury's time.  I don't see how any
of this could possibly be within the scope of his direct
testimony, and I don't know where you are going with it.

MR. STEPHENS:  All I'm trying to do, it is a
military occupation, your Honor, and I want to talk about
the fact that they run it, they run that area.

THE COURT:  That's not for this witness.

How is that for this witness?

MR. STEPHENS:  He's part of the government of
Israel.  He testified that he searched things.

THE COURT:  He didn't talk about the military
operation.

MR. STEPHENS:  He's a part of it.

THE COURT:  He can't talk about it.  It's not who
he is.  It's what his direct testimony was.

MR. STEPHENS:  He talked about IDF raids into
businesses on the West Bank, and talked about information
that has been gotten and passed through the ISA and the
Minister of Defense.  He talked about all of that.

THE COURT:  I will give you a little leeway.  I'm
seeing no connection in this to the witness' direct
testimony, and we are not, as I said repeatedly, going to

SIDE BAR                                1803

fight the Arab/Israeli war in this courtroom.

          MR. STEPHENS:  I'm not planning to do that.

          THE COURT:  I don't know what you are planning to

do.  I candidly tell you, I don't know where you are going,

but where you are going so far, I don't see the connection,

but try to get it to that point to so I can see the

connection.

          MR. STEPHENS:  Two questions away.

          (Side bar ends)

A. Spitzen - Cross/Stephens                    1804

BY MR. STEPHENS:

Q    Can we see, please, have page 138 --

          THE COURT:  Wait, wait

          Have you shown the plaintiff?

          MR. STEPHENS:  It's his deposition testimony, your

Honor.

          MR. TURNER:  Your Honor --

          THE COURT:  They still get to see it, first.

          They are seeing it.  Is it on your screen?  Take a

look.

          (Pause)

          MR. STEPHENS:  May I proceed, your Honor?

          THE COURT:  Any objection to him showing his

testimony?

          MR. TURNER:  All I'm seeing are two pages from the

deposition, and I don't know how that is admissible.  I

mean, if he's going to ask a question --

          THE COURT:  Is this being offered for impeachment?

          MR. STEPHENS:  Yes.

          THE COURT:  I will allow it.

BY MR. STEPHENS:

Q    Take a look at page 138, line 25.

A    Yes.

Q    You were asked way back here -- you have to go to page

137.

A. Spitzen - Cross/Stephens                1805

          MR. TURNER:  Can we see this first.

          THE COURT:  By this point you should have the

deposition before you, so you should look up page 127, when

he says 127.

Q    Do all Israelis refer to it as Judea and Samaria?

          MR. TURNER:  Objection.

          THE COURT:  Sustained.

BY MR. STEPHENS:

Q    Let's go to page 139.

          You say -- question is held territories, and the

interpreter says, there is in Hebrew.  The interpreter would

like to point out in English, the term in English.

          "Question:  I just want to hear his response.

          "The Interpreter: --

          MR. TURNER:  Your Honor, I object.  This is not

impeachment.

          THE COURT:  Stop.  Don't talk in front of the

jury, please.  Sustained.

BY MR. STEPHENS:

Q    The population of the West Bank and Gaza is about four

and half million people, is it not?

A    According to the Palestinian count, yes.

Q    And are you aware that that is about the same size as

the population of Manhattan and Brooklyn combined?

A    Unfortunately, I'm not familiar with the population of

A. Spitzen - Cross/Stephens                1806

Manhattan and Brooklyn.

Q    Do you think out of the four and half million people on the West Bank and Gaza, that everyone else knows what everyone else are doing?

A    No, this isn't an accurate description of the way things are.  The West Bank is divided into towns, villages, families, and clans.  The reality in the West Bank and the Gaza Strip is completely different than the reality in Brooklyn or Manhattan.  So it would not be right to compare them.  These are different societies.

         Now, I cannot speak about Brooklyn or Manhattan, but I can speak about the West Bank and Gaza.  If you take matters, for example, there are 150,000 people there and they know each other, when a foreigner walks into a street in Nablus they know he's not in Nablus.  When a Nablus walks into the street, they know he's in Nablus.  So the behavior of what is called a city in the West Bank and Gaza is like a village, like the behavior of the village and not the behavior of a big city.  I'm assuming there are such places in the United States, too.  I'm not familiar with the geography in America, but it would not be right to compare the two.

Q    I'm interested in your experience and background, and I would like to ask you a few questions about it.

         The first one being, you spent about 29 years

A. Spitzen - Cross/Stephens                1807

working in various capacities for the government of Israel,
did you not?

A    More, almost 31 years.

Q    I put together an organization chart, which I would
like you to tell me if in fact the organization on it is
correct.  That's SAG-5.

        THE COURT:  Have the plaintiffs reviewed this?

        MR. TURNER:  I'm reviewing it right now.

        THE COURT:  Any objection to showing it?

        MR. TURNER:  Once a foundation is laid, no, sir.

        THE COURT:  Well, I don't know how he is going to
lay a foundation, since it is his document, not the
witness'.

        MR. TURNER:  Well --

        THE COURT:  Ask a few questions, before you show
it to the jury.

        MR. STEPHENS:  All right.

        THE COURT:  Have him identify that it accurately
depicts what you intended to depict.

BY MR. STEPHENS:

Q    The Palestinian Affairs Department where you worked
from 2000 to 2009 is part of the coordinator of government
activities in the territories COGAT, is it not?

A    That's correct, but the the chart is not correct.

Q    How is there chart not correct?

A     The coordinator of the government activities in the
territories is a military man, and he's a member of the
general staff in IDF, and he answers both to the chief of
general staff, not only to its Minister of Defense.  He has
two hats.  So he reports both to the minister and to the
general staff, and I don't see the relationship here.  He's
a member of the general staff.

Q     The head of COGAT, is that what you are talking about?

A     Yes.  He's a major general and a member of the firm of
the general staff.

Q     He reports to the Minister of Defense and to IDF, is
that what you are saying?

A     That's correct, yes.

Q     So if we draw a line from the COGAT to IDF, then the
chart is correct?

A     This is one thing.

Q     Anything else?

A     Yes. COGAT is responsible for not only reporting to the
Civil Administration in the Jordanian/Samaria region, and
also in charge of the Gaza Strip.  The coordination and
liaison and management of the Gaza Strip is commanded by a
colonel.  The attempt to draw an arrow as if the Civil
Administration only reports to COGAT is factually incorrect.
The heads of the Civil Administration in Jordanian Samaria
has legal authority regarding the sea regions in particular,

A. Spitzen - Cross/Stephens                    1809

which it takes from the commander of the central region --
the central command,  who is the sovereign in this
territory.  On the other hand, as far as what he does
vis-a-vis of the population and regarding the implementation
of the decisions of the government of Israel towards that
population, the head of COGAT is the commanding officer, the
heads of the civil administration, and of the liaison and
management.  So, it might be if somebody wants to sit like
that, but formally it is not correct.

Q    You will agree with me, will you not, that the
coordinator in the government activities in the territories
COGAT, and it's responsible for monitoring civilian affairs
in Gaza on behalf of the Israeli government?

A    That is correct.

Q    And the Palestinian Affairs Department where you worked
was responsible for giving a description to COGAT of the
situation in the Palestinian society, as far as
socioeconomic conditions in the civilian social and economic
areas was concerned, right?

A    That is correct.

Q    And you in your position you were responsible for
giving advice and consulting with the heads of COGAT as to
what was happening in the Palestinian arena, right?

A    To describe and provide recommendations.

Q    The Civil Administration in the West Bank had several

A. Spitzen - Cross/Stephens                1810

district liaison officers reporting to it with information

collected on Palestinian Society; is that right?

A    Yes, that's correct.

Q    And that information would be passed on to the

Palestinian Affairs Department, where you worked?

A    That's correct.

Q    The information that was being collected by the

district liaison officers was open source, meaning

information from television, radio, media, newspapers,

pamphlets, rumors on the streets, things like that, right?

A    To a great extent, yes, but there was one exception.

There was this large group of what we called ^^^interlock

tours.  These are because the COGAT was not allowed to

operate any -- to handle any agents or sources, yet there

were hundreds of people, we are talking from very -- it

could be very common, ordinary people, all the way up to

public figures, people who share public opinion with whom we

would talk.

        Now, the content of these conversations was open,

but the identity of these people was classified, in order

not to harm these people who would talk with us.

Q    The Palestinian Affairs Department was not part of the

intelligence community, was it?

A    That is correct.

Q    And you were not part of Israeli Intelligence, were

A. Spitzen - Cross/Stephens                1811

you?

A    No, I wasn't involved in the intelligence community, as
far as my capacity as head of the PAD, but there were other
capacities, other roles that I had throughout my
professional life that was part of the intelligence
community.

         Anyhow, as part of my capacity as head of the PAD,
I was a regular participant in various intelligence forums.
These included meetings with the ISA, and the Mossad, as
well as with the Foreign Ministry, with the Intelligence
Military Directorate, and Research Director, and also the
National Security Council.

Q    You did not have any power to make formal
recommendations to those agencies, did you?

A    I don't know exactly know what you mean by official
responsibility or authority, but as a member of the team, I
did provide communications to some of the enforcement
entities.  The COGAT is not an enforcement agency, unlike
the CA.  It does not enforce, but I did provide
recommendations to COGAT, and these recommendations went on
from COGAT to all of the agencies which I just listed.  And,
more than that, I was also part of various teams, task
forces, and special teams.

Q    I want to turn to the Zakats again with you, Mr.
Spitzen, and ask you, first of all, I think you testified

A. Spitzen - Cross/Stephens                    1812

yesterday that in the period of 2000 to 2004, there were 110

Zakats in the West Bank?

A    As far as I recall, yes.

Q    And the plaintiff's attorneys in this case did not ask

you to look at all of those 110 Zakats, did they?

A    No, I received a very specific list, which I was to

examine.

Q    And that's the 12 that you testified about in your

deposition, and the ten you testified about here in the

courtroom, right?

A    Yes, sir.

Q    And you concluded that each one of the Zakats that you

examined from the list provided to you was controlled by

Hamas, right?

        (Continued on the next page.)

A. SPITZEN - CROSS/MR. STEPHENS          1813

A    Yes, but I think perhaps we have a mistake in
terminology or perhaps it is I who is mistaken, but are we
talking about the only the three zakat committees of Nablus,
Jenin and Tulkarem.  If we're talking about them, then it's
three.  Or are we just talking in general?  That means the
three zakat committees and all the other charitable
societies.  What exactly are we talking about?
Q    All the charitable societies you looked, the dozen, you
concluded that each one of them was controlled by Hamas,
didn't you?
A    That's true, but three of the zakat committees are
charitable societies, but now I do understand the question.
Q    Very well.  Between 2000 and 2009, when you worked at
the Palestinian Affairs Department, and that's call the PAD,
isn't it?
A    Yes.  Yes, PAD.
          THE COURT:  Ken.
          MR. STEPHENS:  Ken.  Yes.
Q    The PAD was responsible for writing and updating an
annual review about civilian infrastructure of Hamas in the
West Bank and Gaza, wasn't it?
A    That's correct.  There was this report which we call
the Da'wa Book, and it was about the civilian infrastructure
of the Hamas and it was written every year, but it wasn't
just about the civilian infrastructure of Hamas, it also

A. SPITZEN - CROSS/MR. STEPHENS              1814

described the various fundamentalist institutions, for
example, those of the Islamic Jihad.

Q    And the Da'wa Book, as you call it, I believe I'm using
your phraseology correctly, followed civilian activities of
Islamic Civilian Organizations to evaluate their influence
over the civilian situation in the Palestinian Territories,
am I right?

A    Yes.  The civilian aspect, as well as their support for
the entire terrorism envelope.  That was part of our
required information.

Q    Civilian activities of Islamic terror organizations
included in looking at zakat in terrorism societies, did it
not?

A    Yes, that's correct certainly.

Q    And while you worked at the Palestinian Affairs
Department from 2000 to 2009, you thought you knew that the
12 zakats and charitable societies that you're testifying
about here were related to Hamas, but during that period of
time you never concluded whether they were controlled by
Hamas, did you?

A    I think that the answer to this question, at least
regarding most of these organizations, was solved on
February 25, 2002, when they were outlawed in Israel as
belonging to Hamas or as part of Hamas; that is
content-wise.  But if we speak about the matter itself, the

A. SPITZEN - CROSS/MR. STEPHENS          1815

Da'wa Book is not a legal document.  Here, I had to provide

a legal opinion and expert opinion -- when I was required to

provide an expert opinion at court, I knew to explain this

and that to show that they are part of the Hamas.

          For example, when there was the trial of Riydh

Salah.  So this question is not very relevant, because the

Da'wa Book is a collection of the information, which we had.

It wasn't about recommendations, recommendations were given

elsewhere.

          MR. STEPHENS:  Can we take a look at Mr. Spitzen's

deposition transcript starting at page 24, line 22.

          THE COURT:  At this point the plaintiffs should

have the deposition transcript in front of them.  Once they

are cited to the reference, they should be able to look at

it and it can be shown to the jury.

          MR. STEPHENS:  We're going to 25, line eight.

Q    So you were asked three years ago --

          THE COURT.  Do it this way: "Question." Go ahead.

          "QUESTION:  Did you understand going into the

process that these entities you were being asked to research

were controlled by Hamas?"

          MR. STEPHENS:  The next page, please.

          The entities in number five of the letter or

number 12 in the report?  The 12.

          "ANSWER:  When I entered the process I had known

A. SPITZEN - CROSS/MR. STEPHENS                1816

that these entities were related to Hamas, but the question
whether they were controlled by the Hamas or to what extent
they were controlled, that, I learned during the research."

          That's the sworn testimony you gave three years
ago, is it not?

A    That is true, but it's also what I said here.  When I
was requested to check this matter legally, well perhaps not
check legally, but to try to check this for a Court of Law
whether they were controlled by Hamas or not, then I did
this examination.  In the Da'wa Book, such examination was
not made, that was only compilation of information.  And
this is what I did for the Riydh Salah case as well, which
took place in Israel in 2003.

          There, I was also asked to clarify in the Court
regarding the connection between the entities which appear
in that case and some of them also are included in this case
and some are not.

          This is why what I said here and what I said in
deposition is actually the same thing.

Q    I'm not asking you about the Da'wa Book.  Do you
understand that?

A    I understood the basis is the Da'wa Book and how come
it says and doesn't say whether they are controlled.

Q    Well, let me ask the question in a different way:  Is
it your testimony that when you entered the process, that

A. SPITZEN - CROSS/MR. STEPHENS          1817

means, the process of doing your work on this case, does it
not?

A    Okay.

Q    You said I had known that these entities were related
to the Hamas, but the question whether they were controlled
by the Hamas or to what extent they were controlled; that, I
learned during the research.  By "that" you mean in the
analysis you did between 2009 and 2011, right?

A    And what's the question?

          MR. STEPHENS:  Can you read the question back?

          THE COURT:  Go ahead.

          THE WITNESS:  I understand what you're saying, but
I don't understand what the question here is.

          (The last question was read back by the reporter.)

A    Oh, that's what you mean.  Whether it means -- yes,
that's exactly it.  During my analysis, yes, I did check it
according to the criteria, the criteria which is acceptable
amongst enforcement agencies, I examined each and every one
of them.  And then I managed to reach a conclusion for the
court.  And this is different from some kind of intelligence
overview.

Q    All right.  We'll get to your methodology and the
methods used a little bit later.  Now, let's turn to look at
the list of the 12 zakat committee that you examined.

          THE COURT:  Is this a good time for a break,

```
              A. SPITZEN - CROSS/MR. STEPHENS              1818
```

Mr. Stephens.

        MR. STEPHENS:  Oh, sure.

        THE COURT:  If you want, I don't want to --

        MR. STEPHENS:  No, that's fine.

        THE COURT:  All right.  Let's come back, ladies
and gentlemen, at 3:25.  Please don't talk about the case
amongst yourselves or anyone else.  See you in a few
minutes.

        (Jury is out of the courtroom at 3:08 p.m.)

        THE COURT:  All right.  We're in recess.  Let me
just see counsel at sidebar for a moment with the reporter.

        (Continued on the next page for sidebar.)

SIDEBAR CONFERENCE                    1819

            (Sidebar conference begins.)

            THE COURT:  Mr. Stephens, the reason I want you to

quote the deposition exactly is because the deposition, even

though we have good court reporters, you're going to have a

messed up transcript.  They're not going to know where you

are talking and where you are quoting and transcribed.  I

want to disclose that.

            MR. STEPHENS:  Yes, I know.

            THE COURT:  You didn't do it the last time, so I'm

telling you again, so -- please, so we have a readable

transcript.  Thanks.  See you in a few minutes.

            (End of sidebar conference.)

            (Continued on the next page.)

A. SPITZEN - CROSS - STEPHENS                1820

THE COURT:  Let's have the jury, please.  How are you doing time-wise, Mr. Stephens?

MR. STEPHENS:  I'm doing well.

THE COURT:  Can you be more --

MR. STEPHENS:  I mean, I have easily another I think three or four hours.

(Jury enters courtroom.)

THE COURT:  Be seated, please.  Please continue, Mr. Stephens.

MR. STEPHENS:  Thank you, Your Honor.

CROSS-EXAMINATION CONTINUED

BY MR. STEPHENS:

Q   When we left off --

MR. STEPHENS:  Oops, I don't have my thing anymore.

THE COURT:  Referring to your microphone.

MR. STEPHENS:  Yes.

BY MR. STEPHENS:

Q   When we left off, we had -- we were talking about your research from 2009 to 2011.  Remember that?

A   Yes, sir.

Q   And actually, between 2009 and 2014, we established earlier that you spent 3100 hours on the Arab Bank case; right?

A   That's right, sir.

Q   And in those 3100 hours, you concluded that these 12

Zakats and Charitable Societies were controlled by Hamas, did
you not?

A     Not just that, but among other things, yes.

Q     All right.  Let's take a look at the 12 Zakats and
Charitable Societies.  That's SAG 6, please.  This is the list
of charities that you examined, is it not?

A     Yes, but also Al Ansar.

Q     Right.  But the 12 that we've been speaking of doesn't
include Al Ansar, it's these 12; right?

A     That is correct.

Q     And actually, you testified here at trial to only about
ten of these, am I right?

A     Yes, sir.

Q     Which two did you leave off?

A     I don't remember.  I see Al Nur is here.  I have to look.
(Reviewing.)  Yes, the Zakat Committee of Ramallah and El
Bireh and the al-Huda Society, they were left out.

Q     And why did you leave out the al-Huda Society?

A     The -- in the PowerPoint presentation, as I was told, I
was supposed to provide examples.  And it seemed to me that if
I explained ten societies, al-Huda will not make any
difference.  So I chose ten organizations.  If you'd like, I
can give you testimony about al-Huda.

          MR. STEPHENS:  Did we lose the signal?

          THE COURT:  Did we?  Oh, I thought it was you.

PROCEEDINGS                            1822

That's bad.  You know, it could be that your laptop -- check
the connections over there.  Everything tight?  It's not your
laptop.  Can you do it the old-fashioned way before we
invented all this wonderful technology?

        MR. STEPHENS:  No.  All of the papers, the paper --

        THE COURT:  Melonie, the system is down.

        COURTROOM DEPUTY:  The minute I walked out.

        THE COURT:  I really don't want to lose the time we
have left today.  Let's take another short recess, see if we
can get it fixed in the next 10 to 15 minutes.  If we can't,
then we're going to lose the rest of the day.

        MR. STEPHENS:  Thank you, Your Honor.

        THE COURT:  We'll stand in recess.

        (Jury exits courtroom.)

        THE COURT:  Okay, we'll do what we can.  We'll be in
recess.

        MR. TURNER:  Your Honor, will the overhead work or
is that part of the whole system?

        THE COURT:  Everything is.  It's all part of one
signal, so nothing will project.

        (Recess.)

        THE COURT:  Mr. Spitzen, you can stand down, because
we're going home.

        Okay, we'll have the jury in.  We can't fix it yet.
Hopefully, we'll get it fixed overnight.  If we don't, we'll

PROCEEDINGS                              1823

be in the courtroom next door tomorrow, but you'll all have to
hook up to there.  So I'm not going to keep them, because
there's no projection as to when it's going to be fixed.  A
brand new system, brand new.

              MR. STEPHENS:  A beta site?

              THE COURT:  I wasn't told if that's the case.

              (Jury enters courtroom.)

              THE COURT:  All right, be seated, please.  Ladies
and gentlemen, we can't get the system working for some time.
We don't know how long and so I don't want to keep you,
because we might end up with ten minutes of testimony or no
testimony by the time it gets fixed, so I'm going to send you
home now.

              I called you back in here just to give you my usual
admonitions.  Please don't talk about the case, no research on
the case.  Stay away from newspaper articles, TV reports,
anything at all having to do with the case.  Don't think about
it.  Keep an open mind, as always, and we'll see you tomorrow
morning at 9:30.  Thank you.

              (Jury exits courtroom.)

              THE COURT:  All right, be seated.  I suppose we
ought to use this opportunity for me to hear from plaintiffs
on their objections to the submissions late last night from
the defendant, and then maybe we'll meet at 9:15 tomorrow and
I'll rule on those.  So what do you want to tell me?

PROCEEDINGS                    1824

MR. OSEN:  Your Honor, do you want to address the exhibits first or the slides?

THE COURT:  I'll address whatever you want.

MR. OSEN:  Okay.  So with respect to the exhibits, Your Honor, the exhibit list they provided last night are the same universal exhibits they served on us yesterday.  There's nothing else, just stuff that they first put on their exhibit list yesterday.

And those documents are specifically as noted in our letter, things that were provided in connection with the supplemental report of Professor Milton-Edwards.  We asked in May of this year whether these would be added to their exhibit list.  We got a response that they would not be, subject to the usual reservations.  And the next time we heard about them was yesterday.

So we objected to it yesterday, as Your Honor knows. We object to it again.  Not only is it untimely, to put it mildly, but obviously, since they haven't been on the exhibit list the entire time, it's not something that we've had fair notice of and ability to prepare for.  So that's sort of the first point.

THE COURT:  The exhibits are just licenses and photos; right?

MR. OSEN:  Well, I don't know the full universe, Your Honor, but --

THE COURT:  I just glanced at them, but that's what it appeared to be.

MR. OSEN:  -- that's certainly a substantial part of them.

THE COURT:  I mean, I guess if the photos were taken after the report, they're probably not usable for a lot of reasons.  I'll rule on it tomorrow.  I want to think about it some more.  All right.

MR. INGERMAN:  Your Honor, may I address that?

THE COURT:  You may.

MR. INGERMAN:  Actually, some of the photos were taken back in 2008 and were provided to the plaintiffs way back when with Professor Milton-Edwards' initial report.  We laid that out in our letter which photos those are.  With respect to the other photos that were taken in 2013, and it's reflected in our exhibit list, let me back up by saying we actually don't intend to offer most of these exhibits into evidence.  We gave them DX numbers so that, to the extent necessary, we could show them to Professor Milton-Edwards for 703 purposes.  And the only ones right now, there are only a few of the slides.  There's some photos and some representative licenses.

I would point out to the Court that Ms. -- Professor Edwards, Milton-Edwards in her original report back in 2011, with her original report and her rebuttal report, identified

PROCEEDINGS                            1826

that all of these Zakats had been licensed by the Palestinian
authority, in most cases by Israel, by Jordan.  All she was
able to do in 2013 was actually get copies of the actual
licenses.  And so --

          THE COURT:  Why do you need to show the jury the
licenses?

          MR. INGERMAN:  Just so they can get a sense of what
it looks like.

          THE COURT:  Why do they need that?  It's a license.
It looks like a New York City Department of Consumer Affairs
license.

          MR. INGERMAN:  I mean, it lends credibility to her
testimony.  I mean, that's why you always show 703 information
with an expert is to give some credibility to what she's
saying.  You know, we don't spend -- we don't plan to dwell on
it.  We just plan to show representative examples.

          With respect to the photographs, what Milton-Edwards
would say is that the photographs, albeit taken in 2013,
fairly and accurately represents what she saw when she was
there in '99, 2000, '01, '02, '03, whatever the case may be
for a particular Zakat.  You know, we've had lots of
photographs of the alleged bad things that these people in
Zakats do, and we think we should be able to present to the
jury the other side of the story here.

          THE COURT:  But these are photos of the subject

PROCEEDINGS                                    1827

Zakats, I'll describe it?

          MR. INGERMAN:  Correct.

          THE COURT:  That were taken last year?

          MR. INGERMAN:  They were taken when she went back in
October of 2013, I think it was.

          THE COURT:  How can she testify that they looked the
same as they did in the 2001 to 2005 range?

          MR. INGERMAN:  Because she was there then.

          THE COURT:  Well, yeah, but what we're talking about
are details in the photo.  I mean, it's kind of like the video
the plaintiffs tried to show and I wouldn't let them, because
the witness said, oh, yes, I was there, I recognize the
street.  But there was this body in the street and he hadn't
seen the body in the street.  So I didn't let them use that
video.

          MR. INGERMAN:  Well, I think to the extent it's the
outside of an orphanage or the outside of a school, she would
testify that that looks the same as it did when I was there
in 2000 --

          THE COURT:  But sometimes they have posters and
sometimes they don't.  And 2013 is a long time after these
little accoutrements make a difference might have been there.
Is she really prepared to testify there were no posters?

          MR. INGERMAN:  Yes, absolutely, she's prepared to
testify there were no posters.  I mean, that's part of her

opinion, actually.

THE COURT:  I'll think about that.

MR. OSEN:  Your Honor, two quick points about that.
I don't want to belabor the point, but first of all, it's not
just pictures of the buildings.  When we get to the slides,
she has pictures she took in 2013 of children smiling for a
camera and other things.

THE COURT:  Yes, smiling children pictures -- I
glanced at those -- those are out.  Those are really out.

MR. INGERMAN:  I mean, those were for demonstrative
purposes.

THE COURT:  I know what they're demonstrating.

MR. INGERMAN:  I succeeded, I guess.

THE COURT:  You succeeded with me, but there's a
jury and I don't matter.

MR. OSEN:  Your Honor, also, the licenses, just for
a moment, we don't contest the fact that the committees were
licensed at any particular point in time.

THE COURT:  I might let them show one or two
samples.

MR. OSEN:  But can I just one point?

THE COURT:  I interrupt, but I always let you
finish.  I never say that's all I want to hear.

MR. OSEN:  Your Honor, the licenses and the slides
which we'll get to are from 1970, 1984, and so forth that have

zero probative value except to confuse the jury that somehow
Israel was still approving committees that they licensed 20
years before the events in this case.  But we can address that
when we get to the slides.

THE COURT:  Well, I thought -- I thought some of the
licenses predated the applicable period, but I thought by a
few years.  You're saying these go back to the '70s?

MR. OSEN:  1973, et cetera.  We'll take them one by
one if Your Honor wishes.  But we don't have an objection to
them stating that they were initially licensed.  The witness
can testify to that.  She can testify that her expert opinion
is that they were licensed by the PA during the relevant time
period.

But these are materials that we haven't had an
opportunity to authenticate.  We don't know what else is in
those files.  We don't -- Your Honor, if you recall, didn't
let us actually show the jury the general intelligence service
report on the al-Islah Charitable Society.  Mr. Spitzen was
allowed to testify about it, but we didn't get to show their
actual evaluation of the al-Islah charity.

I think it's far less relevant, frankly, whether
they were licensed by the PA, because obviously, every charity
is licensed by someone, including the Holy Land Foundation was
licensed by the state of Texas, I assume.  It doesn't really
bear on whether they're Hamas or not.

But that being said, she can, in our view, testify about it, but showing the licenses is certainly, from our standpoint, just there to sow confusion under 403.

MR. INGERMAN:  Your Honor, I think the testimony would be that for certain licenses, they get renewed every year and they have to get renewed typically from the PA each year.  So the fact that they may be older, we can find a more recent one.  We have a number of them on our exhibit list.

This is different than a report because, you know, this is not -- these are not hearsay.  I mean, these are -- you know, these are -- well, they're government documents.  They'd be an exception to the hearsay rule, so they would come in, anyway, under that exception.  So if Your Honor would like, we can find ones that are more recent to use, but it's just for demonstrative purposes at this point.

THE COURT:  I understand.  Okay.  So now do you want to go through the slides?  How do we do that since our projector's not working?

MR. STEPHENS:  Your Honor, may I be excused?

THE COURT:  Of course.

MR. STEPHENS:  Thank you.

MR. OSEN:  Your Honor, we can provide the Court with a copy.

THE COURT:  Thank you.  Gentlemen, let me tell you right now, consistent with my ruling that we're not retrying

PROCEEDINGS                              1831

the Arab -- or we're not trying the Arab-Israeli war, 2 to 13
are out.

        MR. INGERMAN:  I'm sorry?

        THE COURT:  Slides 2 to 13 are out.  Out.

        MR. INGERMAN:  Your Honor, I'd just like to be heard
on that briefly.

        THE COURT:  Go ahead.

        MR. INGERMAN:  I think it was Judge Gershon's ruling
from February of 2013 in which she did say expressly that
Professor Milton-Edwards would be able to talk generally about
the history of the Zakats and the history of the need for the
Zakats, to put them in context.  And that's the purpose of
slides 2 through 13.

        THE COURT:  You're trying to make a mouse hole into
an airplane hangar.  Two through 13 are incredibly detailed
information about the origins of the conflict.  I'm not going
to let you do that.  I'm not.  There can be an occasional
reference in her talking about whether these Zakats are
Hamas-controlled.  She can do that.  But she cannot give a
lecture on -- it is a she?

        MR. INGERMAN:  It is.

        THE COURT:  It's a British Beverly, right, so you
never know.  But she's not going to give a lecture like this
on this kind of background.  Occasional references only as
necessary to support work applicable during the period.

SHERRY BRYANT, RMR, CRR

PROCEEDINGS                              1832

          MR. INGERMAN:  It wasn't intended to be a lecture,
but let me just point out, Your Honor, slides 11 and 12 --
actually, 10, 11 and 12 are particularly relevant.  Ten deals
with the evolution of Hamas coming out of the First Intifada
and into the relevant time period of 2000; and then slide 11
is the Second Intifada, and that's certainly relevant.  I
mean, that's our relevant time period.

          And then slide 12 is the -- going to be her
description of the elections in Gaza when Hamas becomes public
in Gaza.  And part of the problem with the plaintiffs' case,
in our view, Your Honor, is that they conflate the time frames
and they put up Mr. Spitzen and Mr. Levitt to say, ah, this
person's a well-known Hamas leader without any reference to a
time period.  And while they may be a well-known Hamas leader
in 2007, when they run for election, it will be Professor
Milton-Edwards' opinion in certain circumstances that that's
not true during the relevant time period.

          THE COURT:  I think there was plenty on the time
period in the plaintiffs' case, both on direct examination of
the witnesses and the cross, and I'm not going to allow 1
through 13 -- 2 through 13.  Okay.  What's next?

          MR. OSEN:  14, Your Honor.  There are a variety of
issues here.

          THE COURT:  Look, she's not allowed to testify,
under Judge Gershon's order, about what a wonderful group of

PROCEEDINGS                                    1833

organizations Zakats are.  She can't give that.

          MR. INGERMAN:  That's not --

          THE COURT:  That's what the slide is.  It's talking
about how the Palestinian population needs Zakats because
things there are so bad.  Hundreds of Zakat committees fill
these needs, that's what it says.  That's directly contrary to
what Judge Gershon held.

          MR. INGERMAN:  Your Honor, respectfully, I disagree.
Judge Gershon said in her order that Professor Milton-Edwards
can talk about she will be permitted -- this is at page 10.
"Dr. Milton-Edwards will be permitted to testify generally as
to the nature of Zakat Committees and other local charitable
organizations and their historical origins."

          THE COURT:  This is not general.  This is very
specific.

          MR. INGERMAN:  I'm confused how you said she can't
be general and she can't be specific.

          THE COURT:  I don't think I said that.  She's got to
talk about the Zakats at issue here.

          MR. INGERMAN:  Well, she's going to do that, but
specifically, Judge Gershon ruled that she may talk generally
as to the nature of Zakat Committees and other local
charitable organizations and their historical origins as well
as the types of activities Zakat Committees and other local
charitable organizations conducted in the West Bank and Gaza

PROCEEDINGS                                    1834

during the period 1995 to 2005.

        MR. OSEN:  Your Honor, if I may, there's also
another order from Judge Gershon that covers this.  It's from
February of 2011 -- I'm sorry, December of 2011, which the
judge said:  "The trial, anticipated to be lengthy, cannot be
burdened with extraneous issues, such as whether Arab Bank is
widely regarded as good character in the Middle East or the
lengthy history of social, political, economic and diplomatic
factors relating to a conflict that goes well beyond the
issues in this case."

        THE COURT:  Well, that's 2 to 13.

        MR. OSEN:  And she also says -- this is page 4 of
the same order:  "Narrative histories of economic and
humanitarian assistance in the Palestinian territories aimed
at proving intent also fall into this category.  For example,
opinion that the Kingdom of Saudi Arabia had a humanitarian
purpose in giving aid and economic assistance generally to
Palestinians during the Second Intifada is fundamentally an
attempt to paint a picture for the jury as to the intent of
the Saudi Committee," et cetera.  And that's the same issue
here.

        We don't object to the defendant saying this Zakat
Committee was established on so and so date, this Zakat
Committee did the following things, et cetera.  But, as you
point out, Your Honor, hundreds of Zakat committees fill these

PROCEEDINGS                                    1835

needs.  It's not about the 12 committees at issue and it's
certainly not in response to anything in this case.

          MR. INGERMAN:  Your Honor, I'm happy to take the
last bullet point out.  Judge Gershon specifically ruled that
Professor Milton-Edwards could testify to exactly this.  It's
one slide.

          THE COURT:  Well, I'll think about that as a
compromise.  Okay, what else?

          MR. OSEN:  We don't object to 15, Your Honor.  16,
we have the same issue with, especially the third bullet
point.

          THE COURT:  I'm not going to rule now.  I said I'm
not going to rule so I'm not going to.  I'm going to look at
it again and think about what you're saying, but my
inclination at this point is that this falls within the
prohibition.

          MR. OSEN:  17, Your Honor?

          THE COURT:  Go ahead.

          MR. OSEN:  Certainly, this isn't the subject of any
of Professor Milton-Edwards's testimony and there's no
evidence in the record from the defendants' exhibit list with
respect to Israeli intelligence services, quote, unquote,
regulation of these charities.

          I'm sure they undertook surveillance of them and
other things, but this seems to me to put it in a, quote,

PROCEEDINGS                                    1836

unquote, regulatory framework that can only be confusing to
the jury as they've heard banking regulators and things of the
like.

So we don't object to her testifying that the Zakat
committees were surveilled or under the jurisdiction of the
Israeli military, but, in terms of framing it as regulation, I
don't think that's accurate and I don't think -- frankly, it's
also confusing as to time frame, because, as Mr. Spitzen
testified and I think Professor Milton-Edwards as well,
sometimes the PA was in supervisory authority and sometimes
the Israelis were in the prior period.  So --

THE COURT:  Well, this slide doesn't particularly
upset me.  Regulation is her description.  You can bring out
on cross what it means.  I don't think it should mean much
more than licensing.

MR. INGERMAN:  Well, Your Honor, let me just -- Mr.
Osen said it has not been the subject of her testimony.  Her
expert report of January 31st, 2011, paragraph 14, 16, 17, 18
and 21, and then the rebuttal report, paragraphs 13, 24, 33,
34 and 35, all deal with Israeli and Palestinian authority and
regulation of the Zakats.

THE COURT:  I understand that.

MR. INGERMAN:  Okay.

MR. OSEN:  But, again, time frame is the key
question, Your Honor.

PROCEEDINGS                                    1837

          THE COURT:  Okay.

          MR. OSEN:  I think the next one that we have an

issue with is in 23.  This brings up, Your Honor, a variety of

issues with Professor Milton-Edwards.  Part of it is things

that were excluded in prior court orders.  Part of it is stuff

that simply lacks foundation of any kind in the record.  We

can take them in any order, but to go from the bottom,

partnerships with paid organizations and so forth.  Your Honor

explicitly ruled on this in motion in limine in July of 2013.

          THE COURT:  Yes, Mr. Ingerman, I did.

          MR. INGERMAN:  My understanding of Your Honor's

order was that we're not to allow substantive exhibits to go

into evidence in our case.  This has been disclosed as at

least part of the basis for Professor Milton-Edwards's --

remember, she's opining, in part, on the perception of whether

or not these Zakats were controlled by Hamas, Zakats and

Charitable Societies.  And she disclosed in her expert report

and in her three days of deposition that when USAID and ANERA

and other types of NGOs were visibly working with these

specific Zakats that that was a factor that she considered in

whether or not the Zakats were perceived to be controlled by

Hamas.

          We are not putting any exhibits -- Your Honor, as

Your Honor knows, we had a number of exhibits originally on

our exhibit list related to USAID and ANERA.  My understanding

SHERRY BRYANT, RMR, CRR

PROCEEDINGS                          1838

of Your Honor's orders is that those exhibits do not come into

evidence.  But this has always been a basis for her opinion.

          And if I misunderstood the scope of Your Honor's

order, then we'd ask you to reconsider it since Matthew Levitt

has testified on cross-examination he was aware that USAID and

ANERA worked with several of the Zakats.

          THE COURT:  You cannot -- you cannot open your own

door.  If he said it on direct, that would be one thing.  If

he said it on cross because you asked him, you can't then say,

oh, well, I asked him and he answered and, therefore, now I

can go into it.

          MR. INGERMAN:  That's not -- that wasn't the

argument I was making, Your Honor.  What I was suggesting is

that there is now evidence in the case through Mr. Levitt's

cross-examination that USAID and ANERA did work with several

of these Zakats.  This has been part of Professor

Milton-Edwards's -- one of the factors she's relied on for a

long time.

          THE COURT:  I know that.  I just have to go back and

think about why I excluded the evidence of their

participation, because I don't recall as I sit here, but I

will do that.  Okay.

          MR. OSEN:  And, Your Honor, if I may, just one more

point on that, Mr. Ingerman just referred to this as an issue

of public perception, the testimony relating to her perception

PROCEEDINGS                                     1839

of what the public perception was, based on these eight
organizations.  You'll note that the heading of the slide
isn't about perception; it's about affiliation.

        THE COURT:  I know.  But this is to illustrate her
testimony.

        MR. OSEN:  About affiliation of these organizations.

        THE COURT:  But it's for her determination --

        MR. OSEN:  Right.

        THE COURT:  -- of affiliation.  And I assume her
testimony would tie that in.  I mean, look, you can't have
precise titles on everything.

        MR. OSEN:  No, I'm just saying, Your Honor, that
it's not a question of the title.  It's a question of what
it's being offered for.

        THE COURT:  Right.

        MR. OSEN:  There's a fundamental problem that goes
throughout the rest of these slides in that the testimony
that's being proffered through these slides has no foundation
in the record and -- well, setting aside Your Honor's ruling
about ANERA, where you specifically said, Your Honor, that as
far as USAID was concerned, they could ask a question on
cross-examination, but you would not allow the affirmative
documentation into evidence.  And I think that's exactly
what's being done through the back door here.

        But if I may, I'll just -- Your Honor can review

that, but I want to go through some of the other issues with
the slide, because it's a recurring theme that you'll see
throughout most of them, so we won't have to repeat it over
and over.

        Professor Milton-Edwards, if we can go to bullet
point 4 -- I'm sorry, bullet point 3, identification of Zakat
board members and officers.  Dr. Milton-Edwards was asked in
her deposition what lists she reviewed in order to reach her
conclusions about this.  And her response at the time was that
she didn't recall specifically.

        We then wrote a letter to defense counsel after the
deposition seeking them to identify the list that Professor
Milton-Edwards reviewed, and that correspondence and exchange
led to a response from defense counsel that said that -- I'm
quoting now.  It's a letter from November 17th, 2011.

        Point 2, with respect to your question 2, which was
the source of her list:  "In addition to the material
Professor Milton-Edwards has already provided" --

        THE COURT:  Slow down.

        MR. OSEN:  I'm sorry.  "In addition to the material
she already provided, she consulted the Watson memorandum and
the documents located at," and there's a website for the Texas
Board and HLF, "which include materials referenced in the
expert reports of Ariyeh Dan Spitzen and Dr. Matthew Levitt,
and she otherwise did not rely upon any additional published

PROCEEDINGS                                    1841

materials in her possession."  That's 2011.

        In connection with the supplemental report
purportedly on the subject of perceptions by the community of
the Zakat Committees, they then provided a document which is
the subject of the exhibit dispute we have now, which
contained amongst their materials new materials in which there
are newspaper articles and other materials that contain lists
of Zakat Committee individuals.

        Obviously, Milton-Edwards could not have relied upon
those materials, in light of the representation they made,
until now.  So what we have here is unauthenticated materials
that they produced in April of this year which were not relied
upon for her expert report, which they want to now offer to
establish that she has reviewed lists of various Zakat
Committee members, et cetera.

        THE COURT:  It wasn't in the rebuttal report either?

        MR. OSEN:  Not in the rebuttal report either.  So,
from our standpoint, this is a situation where after the fact
and the barn doors are closed, they want to establish that
she's actually reviewed stuff that wasn't part of her report.
It's not part of the exhibit list until yesterday.  And so it,
frankly, doesn't have any foundation.  There's not going to be
a document that she can authenticate and get into evidence
that actually supports any of those statements.

        MR. INGERMAN:  Your Honor, this doesn't say anything

about a list.  This is identification of Zakat board members
and officers.  She was examined at her deposition about who
she knew was on the board of the various Zakats -- actually,
she wasn't asked about all of them, but a few of them in her
deposition.  And she answered those questions, and that's
going to be her testimony.

She understands and I've instructed her and she has
read Your Honor's order that she is not to testify about
things, fieldwork that she did in 2013.  She understands that
restriction.  What Mr. Osen is talking about is
cross-examination.  But certainly, she relied on the
identification of who the board members and the officers are.

THE COURT:  That she did in connection with her
initial and supplemental -- and rebuttal reports; right?

MR. INGERMAN:  Yes.

MR. OSEN:  How is that possible, Your Honor?

THE COURT:  I don't know enough to know if it is or
not.

MR. OSEN:  The point is that when asked directly
about that subject, the representation we got was that she
relied upon the Watson memorandum and the exhibits from the
HLF trial.  We have no objection to them offering any of those
materials, not in evidence, but to have her discuss that.  But
for her to then come into court and make representations about
lists that she -- at least we have been represented --

PROCEEDINGS                                           1843

            THE COURT:  Well, if I hear Mr. Ingerman correctly,
he's not saying she's going to do that.  In fact, she is not
going to do that.  She's going to say that one of the things
that she considered is the identification of Zakat board
members and officers contained in the Watson memo and your
expert's reports.  That's what she's going to say and that's
all she's going to say.

            MR. INGERMAN:  I don't know about the Watson memo.
I mean --

            THE COURT:  Well, that's what you identified to
them.

            MR. INGERMAN:  I'm not -- I don't have the letter to
which this is responding, the November 17th, 2000 --

            THE COURT:  It was filed at 12:08 this morning.

            MR. INGERMAN:  No, he's talking about something from
2011.

            THE COURT:  I know.  But I thought it was annexed.

            MR. OSEN:  No, what was annexed to that --

            THE COURT:  The e-mail exchange.

            MR. OSEN:  That was about the exhibits, Your Honor.

            MR. INGERMAN:  Your Honor, my understanding is that
she has knowledge about leaders and officers of these Zakats
from her research prior to October of 2013.

            THE COURT:  Why didn't she disclose that at her
deposition, or why didn't you disclose it in the filed-off

response?

        MR. INGERMAN:  She wasn't asked about it at her
deposition with respect to a lot of these Zakats.  The ones
that she was asked about, she testified about what she knew
and what she didn't know.  She said, some of these I know were
on the board, some -- for instance, let me give you an
example.

        Mujama is one of the Zakats.  Her testimony in her
deposition was the folks that the plaintiffs claim were the
founders, Sheikh Yassin, Abd Rantisi, were not on the board
during the relevant time period.  They had an opportunity to
inquire as to the basis for that view.  They can do it here in
front of the jury.  But that's part of what she relied upon.
We're not relying --

        THE COURT:  But then, then, since she said, I don't
remember everything, here's what I remember, they sent you a
letter and they said, what else did she rely on?  And then you
identified certain things, consisting primarily of their
expert's documents.

        MR. INGERMAN:  I understand that.  I'm -- I just
wanted to be clear, when Your Honor said she's going to say
the Holy Land Foundation and the plaintiffs' expert reports
and nothing else, that's not right, because she did testify,
based on her own personal experience and fieldwork prior to
giving the expert report in her deposition about things that

PROCEEDINGS                                1845

she knew about the leaders.

          THE COURT:  So what I'm hearing is there's a dispute
about what she said at her deposition.

          MR. OSEN:  No, Your Honor.  We don't object to
Professor Milton-Edwards testifying that she knows X, Y or Z.
That's a separate issue.  The question is, they had exhibits
that they produced to us yesterday which constitute lists,
some lists, which they had not provided to us in connection
with her original report and rebuttal report.

          And what we're saying is, to the extent they want to
offer, even for 703, lists that were not part of what she
relied upon, that's separate from the question of whether she
testifies that in 2000 I knew this person was on a board or
not.

          MR. INGERMAN:  That's fine.  We won't refer to the
two documents that are on the exhibit list that are lists.  I
mean, she won't refer to those.

          THE COURT:  Or other material gathered after the
date of her rebuttal report.

          MR. INGERMAN:  She understands that clearly.

          THE COURT:  She understands not to testify.  You
can't offer.

          MR. INGERMAN:  I understand that.

          THE COURT:  Okay.

          MR. INGERMAN:  Yes.

PROCEEDINGS                              1846

          THE COURT:  Then I think we are on the same page.

          MR. INGERMAN:  Okay, great.

          MR. OSEN:  Next, Your Honor, is the issue of
interviews and meetings with Zakat leaders, interviews and
meetings with various groups in the Palestinian territories,
and international intelligence agencies.

          Now, normally, Your Honor, an expert can rely upon
hearsay, even if they don't communicate the hearsay itself to
the jury.  But here we have a very special situation.  The
witness's testimony in deposition is that she -- and you can
see it actually in her supplemental report as well.  She uses
the negative hearsay inference, which I know is going to sound
strange.

          THE COURT:  No, I know what you mean.

          MR. OSEN:  She says, I've talked to all these
people.

          THE COURT:  And they didn't tell me that they were.

          MR. OSEN:  Right.  Then the follow-up question was,
did you ask, and the answer is no.  So what they want her to
be offered for is the fact that there's an absence of
affirmation from various people.  And we think that's
incredibly problematic and prejudicial.

          THE COURT:  I don't know.  I mean, sometimes in this
case I feel like the parties are asking me to remove their
best avenues of cross-examination.  Right?  I mean, why

wouldn't you completely rip her apart if that's what she did?
She went and she asked these questions and got negative
answers, but didn't ask about the questions that mattered, and
now she says, based on what I didn't ask, here's my opinion.
I used to be a trial attorney.  I would have enjoyed doing
that.

         MR. OSEN:  That's option two, Your Honor, for us.
But from our standpoint, the jury is burdened with enough.
They've just been through essentially Mr. Spitzen's expert
report twice.  And it's -- we could go systematically
committee by committee with her and testimony by testimony,
but we think the prejudicial and nonprobative effect of all
this is just not worth it.  I mean, there's plenty --

         THE COURT:  I just can't make a judgment on that in
advance.

         MR. OSEN:  No.  Well, Your Honor, if I may, I'll
give a copy to counsel as well.  This is the sort of highlight
reel from Professor Milton-Edwards' deposition on the subject.
Our concern -- our concern, Your Honor, is that this is not
even a hearsay delivery vehicle, but --

         THE COURT:  You're basically making what sounds to
me like a Daubert motion.

         MR. OSEN:  Correct, Your Honor.

         THE COURT:  But it's kind of late, right?

         MR. OSEN:  We don't think so, Your Honor, because

PROCEEDINGS                                    1848

when you allowed them to retain parts of the supplemental
report, you then ordered -- permitted us to depose Dr. Milton
Edwards again, and we did it.  And that is essentially a
pre-Daubert question, because the issue being offered is
always about foundation.  She could testify if there was
sufficient foundation.

        And that foundation would only be established on
cross-examination, the absence thereof.  So rather than have
the jury have to sit through what is essentially a very long
proffer of the lack of foundation, we bring it to your
attention at this point.

        MR. INGERMAN:  Your Honor, Professor Milton-Edwards
is going to testify differently as to different classes of
interviews that she conducted.  So, for instance, with respect
to Zakat board members and people who were at the Zakats, she
will say, I didn't ask them if they're Hamas, what do you
think they would have said if I did?  Yes, I'm Hamas?  So with
respect to that, her testimony will be it wouldn't have made
any difference to ask them if they were Hamas.

        With respect to the intelligence officials, which is
all over her report, by the way -- this can't be new, because
this is -- just for the record, Your Honor, in the original
report filed in 2011 with respect to interviews of
Palestinian/Israel military intelligence services, you've got
paragraph 40 and 43; Zakat members and directors, paragraph 44

and 49; Palestinian intelligence, paragraph 46 --

THE COURT:  I take your point.

MR. INGERMAN:  So the fact that this is new is outrageous.  And what she will say is that she visited many of these Zakats with the intelligence officials.  They never suggested to her that they were Hamas.  This is in 2000-2004. She wasn't hired as an expert in this case, so she wasn't going around asking are they Hamas.

But as one of the factors, when she's there with either British intelligence or Israeli intelligence or Palestinian authority intelligence and they're walking around and they don't see any evidence of Hamas, nobody suggests to her it's Hamas, that's one piece of information that she considered in reaching her opinion.

THE COURT:  When was her deposition taken, pursuant to my order?

MR. OSEN:  I believe it was right at the end of July, before the trial.

THE COURT:  Believe.  I just -- I'm handicapped in ruling on what is essentially a Daubert motion now.  And I'm not sure I can just say, okay, you're right, Mr. Osen, that portion is excluded of her testimony.  I just don't know that.

MR. OSEN:  I understand, Your Honor, but I just want to remind the Court that just, I believe it was yesterday or the day before, we had an issue with Mr. Spitzen testifying

PROCEEDINGS                                    1850

about somebody being convicted.  I think it was Mr. Hamdan

from the al-Islah, and Mr. Stephens objected that the

conviction wasn't in evidence, and Your Honor struck the last

question to Mr. Hamdan and then we showed Apostilled

convictions for the others.

It seems to me that this is so far removed from the

question of whether someone is convicted, this is -- would be

allowing the jury to hear that someone was walking around

Nablus and a British intelligence officer didn't say, hey,

that's the Hamas headquarters in Nablus.

THE COURT:  I understand the stakes.  I just don't

see the mechanism for me to dispose of the issue you're

raising other than to say, Mr. Osen, I take your word for it;

therefore, she's excluded.

MR. OSEN:  No, no, no, we're not trying to exclude

her, Your Honor.

THE COURT:  I understand.

MR. OSEN:  But in any event, the point is that as

far as the slide goes, to the extent that they're offering the

identification of Zakat -- I'm sorry, interviews and meetings

with Zakat leaders and employees, if the point is that she

interviewed them and they didn't tell her that they were Hamas

and that's the basis of putting that on the slide, we think

that's, you know, a major 403 issue.

THE COURT:  What I might do is when the plaintiffs

PROCEEDINGS                                    1851

think that the examination is going in a way that's
problematic, in terms of having a basis to testify as to the
opinion, I might excuse the jury and just hear the testimony
and hear voir dire from the plaintiffs and then make a ruling
as to that information.  I might do that.  It's really
cumbersome and I hate to make a jury cool its heels while
we're doing things that really should have been done pretrial.
But --

          MR. INGERMAN:  Your Honor, I'll just point out this
is one of 18 factors --

          THE COURT:  I understand.

          MR. INGERMAN:  -- that she considered.

          THE COURT:  But they've got problems with 11 of
them.  Okay.  What else?

          MR. OSEN:  Well, the same thing, Your Honor, review
of -- it's the last bullet point on 23.  Review of financial
records and audited accounts of Zakats.  None of those audits
or financial records are in evidence.  We asked Professor
Milton-Edwards at her deposition whether she reviewed any of
the, I believe Mr. Stephens said seven stories of Arab Bank
records on the matter, and she said she wasn't familiar with
that.

          So, again, this is just testifying that presumably
she saw something that's not in evidence, not before the Court
in any form.

THE COURT:  So basically, you're saying her whole opinion doesn't have a sufficient basis under Rule 703.

MR. OSEN:  Well, I won't go that far.  I'll say, Your Honor, that to the extent that she testifies about her fieldwork and she testifies about her consultations with governments about that and the material she reviewed generally, that's fine; but to the extent that they want to channel documents or evidence or suggest that there is evidence that's just not being shown, they had ten years to compile evidence and materials that she could rely upon.  They chose not to do that.  We shouldn't be prejudiced by that fact.

MR. INGERMAN:  I mean, for the plaintiffs to stand up and say, we're trying to show hearsay through 703 of an expert is unbelievable to me.  But, Your Honor, what she says --

THE COURT:  Everybody does that.

MR. INGERMAN:  I'm sorry?

THE COURT:  Everybody does that.  Every person tries to get in some hearsay through an expert.  It's not uncommon.  The question is the balance that has to be struck between an opinion that's reasonably based on the kind of hearsay that an expert would rely on, and the jury understands it's the opinion that matters, not the hearsay, as opposed to an expert who just puts hearsay in front of the jury.

PROCEEDINGS                              1853

          MR. INGERMAN:  Your Honor --

          THE COURT:  But you can't criticize them for it.
Some of the things -- much of what they relied on was, I
found, thoroughly admissible.  Some things were not.  Some
things I let them show the jury, some things I didn't.  And
I'm sure your expert is also going to have to have that
balance struck.

          MR. INGERMAN:  Your Honor, first of all, they filed
a Daubert motion against Professor Milton-Edwards.  All of
this was in her rebuttal and original report and was fully
vetted by Judge Gershon.

          So just for the record, in paragraph 13 of her
expert rebuttal report, she says specifically:  "As I noted in
my initial report, these charitable organizations have for
many years been required to submit annual audit and other
financial account records, and have also been subject to the
scrutiny of both the Palestinian and Israeli authorities,
whose intelligence officials and military and civil commanders
have regularly examined, investigated and conducted raids of
the Zakat Committees and their members."

          So that's been in this case since 2011.  Why we're
fighting over this now is beyond me.  We've already had
Daubert.

          THE COURT:  That's something I have to look at.  Let
me tell you what I am inclined to do with this, because, as I

PROCEEDINGS                              1854

say, getting a ruling out on this now without hearing from
her, without having papers to thoroughly consider it, will be
difficult.  I'm inclined to tell the defendants, the defendant
not to call her until next Wednesday.  And then on Tuesday, we
will have a Daubert hearing and I'll hear --

          MR. INGERMAN:  I don't think that's going to work,
Your Honor.

          THE COURT:  You have 21 witnesses.  Fill the day.

          MR. INGERMAN:  I think we're entitled to present our
case in the way we want to present the case.

          THE COURT:  Yes, but I have to take measures to make
sure that substantial justice is done, and one of those can be
a slight reordering of the witnesses.  So instead of calling
her on Monday, since we're taking off Tuesday anyway, you'll
call her on Wednesday.  That much I think I have the authority
to do to streamline the trial.

          MR. INGERMAN:  Well, let me be clear that we object
to that, Your Honor.  This has all been through Daubert
already.  And so the fact that the plaintiffs are trying to do
this now at the 11th hour and it's causing Your Honor to
disrupt our trial and the presentation of our case is a
problem.

          THE COURT:  You've got 21 witnesses.  You were going
to call your first witness -- I don't think Mr. Stephens is
going to finish tomorrow.  If he is, it's going to be on the

PROCEEDINGS                                    1855

late side.  You were going to call your first witness on

Monday morning.  That witness was going to go for several

days.  We're off Tuesday.  Instead of Monday, you call her on

Wednesday.  You call some other of the 21 witnesses you

designated on Monday.

          MR. INGERMAN:  Your Honor, it's not the number of

witnesses.  It's the way in which the defendant wants to

present its case.

          THE COURT:  The number of witnesses suggests the

degree of flexibility that the defendant ought to have to do a

slight rearrangement, especially since they are all defendant

employees, to my knowledge, or at least a large number of

them.

          MR. INGERMAN:  Former defendant employees.

          THE COURT:  Okay.  Apparently enough within your

control to get them to come.

          MR. INGERMAN:  But we -- the trial presentation that

the defendant wants to put on is to put on Milton-Edwards

first.

          THE COURT:  I understand.  But I think if we get

down to 18 witnesses because you call three on Monday, it has

not disrupted your plan in a significant way.

          MR. INGERMAN:  Well, we disagree.

          THE COURT:  I'm not saying I'll do that, because I'm

going to look at these issues tonight and I'm going to decide

PROCEEDINGS                                    1856

if this is something that the plaintiffs could have and should

have raised in connection with the earlier Daubert litigation

that we already had over this expert.

        Tell me again, Mr. Osen, why this wasn't part of

that.

        MR. OSEN:  Well, Your Honor, to the extent that

they're relying upon -- and you'll have the opportunity, Your

Honor, to go through the rest of the slides, but you'll see

that a lot of this material is predicated on the materials

that they just added to the exhibit list yesterday.  And so to

the extent that this is --

        THE COURT:  But isn't that solved just by not

letting them have exhibits that you didn't and could not have

known about?

        MR. OSEN:  Well, that largely cures the problem as

far as much of this, although you'll see, Your Honor, when you

go through it, if you have the endurance for it, that it's

littered with other materials that cover exclusions by the

Court on other issues.

        So I mean, I'm happy to go through it at the Court's

convenience, but it's not just this.  It permeates well beyond

the immediate issue we were just talking about.

        MR. INGERMAN:  Your Honor, we disagree, and we put

this back together carefully, keeping in mind Your Honor's

orders.  She is not going to testify about any fieldwork she

did after her original reports.  Frankly, we'd rather have you go through it and rule than disrupt our trial presentation.

THE COURT:  Yes, I know, but I don't have enough time to do that.  I mean, I've stayed up all night on this case enough nights.

MR. INGERMAN:  We're with you on that one, Your Honor.

THE COURT:  Well, that's true, but this is your trial.  All right.  Well, I'll look at it tonight and I'll tell you tomorrow morning at 9:15 what we're going to do.

MR. INGERMAN:  Thank you, Your Honor.

THE COURT:  Is there anything else specific you need to tell me, Mr. Osen?

MR. OSEN:  I'm sure I could, but...

THE COURT:  Okay.  I'll see you tomorrow morning.

MR. TURNER:  I've got one housekeeping.  This is the FinCEN, which will be the final thing we do, the FinCEN reading.

THE COURT:  I thought you had changed your mind on that.

MR. TURNER:  And this is the -- you asked for the redacted versions of the exhibits and so we made you a copy so that everybody had a copy.

THE COURT:  Mr. Turner, with regard to the FinCEN settlement, did you anticipate just you reading it or me

PROCEEDINGS                                          1858

reading it or how did you intend to do that?

       MR. TURNER:  Well, I just thought I was going to
read it, but I don't have any problem --

       THE COURT:  No, I think you need a witness.  I've
always assumed you were going to have somebody that could
authenticate it.  How does it come in that way?  I mean, it's
admissible if authenticated, but how does it come in out of
the blue?

       MR. OSEN:  I think, Your Honor, it's
self-authenticating under 901.  It's a government record of
the United States.  It's on the website of FinCEN and the
Court can take judicial notice of it.

       THE COURT:  Okay.  If it's self-authenticating, it's
probably okay.  Is it?  Are you sure?

       MR. INGERMAN:  I'd like to take a look at that issue
because he raised it before.  We assumed their case was
closed, that that was the end of it, and they hadn't made it
as part of their case.

       MR. TURNER:  We haven't closed our case yet.

       THE COURT:  They have not closed.  They said they
have an intention to close, but they have not closed.  Okay.
Well, make sure it's self-authenticating.

       MR. TURNER:  Sure.

       MR. OSEN:  Thank you.

       THE COURT:  Thank you all.

PROCEEDINGS                              1859

        (Whereupon, the trial was adjourned at 4:46 p.m.

until September 5th, 2014 at 9:15 a.m.)

1861

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X
COURTNEY LINDE et al,              :
                                  :  04-CV-2799 (BMC)
          Plaintiffs,             :  And all related cases:
                                  :  04-CV-5449 (Litle)
      -against-                   :  04-CV-5564 (Almog)
                                  :  05-CV-365  (Coulter)
                                  :  05-CV-388  (Afriat-Kurtzer)
                                  :  05-CV-3183 (Bennett)
                                  :  05-CV-3738 (Roth)
ARAB BANK, PLC,                   :  06-CV-1623 (Weiss)
                                  :
          Defendant.              :  United States Courthouse
                                  :  Brooklyn, New York
                                  :
                                  :  Friday, September 5, 2014
                                  :  9:30 a.m.
                                  :
                                  :
- - - - - - - - - - - - - - - - X

TRANSCRIPT OF CIVIL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE BRIAN M. COGAN
UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S:

For the Linde and        OSEN, LLC
Coulter Plaintiffs:      BY: **GARY M. OSEN, ESQ.**

                         TURNER and ASSOCIATES
                         BY: **CLYDE T. TURNER, ESQ.**

For the Litle,           SAYLES WERBNER
Bennett and Roth         BY: **MARK S. WERBNER, ESQ.**
Plaintiffs:

                         STONE BONNER & ROCCO, LLP
                         BY: **JAMES P. BONNER, ESQ.**

For the Almog            MOTLEY RICE LAW FIRM
Plaintiffs:              BY: **MICHAEL ELSNER, ESQ.**

For the Defendant:       DLA PIPER, PLC
                         BY: **SHAND S. STEPHENS, ESQ.**
                             **ANTHONY PAUL COLES, ESQ.**
                             **BRETT INGERMAN, ESQ.**

* * * * *

1862

Courtroom Deputy:  Melonie Clarke

Court Reporter:  Frederick Guerino, CSR
                 Official Court Reporter
                 Telephone: (718) 613-2503
                 E-mail: Frederickguerino@aol.com


Proceedings recorded by computerized stenography.  Transcript
produced by Computer-aided Transcription.

*****************************************************************

8                    (In open court.)

9            (Judge Cogan enters the courtroom at 9:25 a.m.)

10           THE COURT:  Good morning.  Be seated please.

11           Just a couple of points, before we bring the jury

12   in.  I know everyone has seen my order from last night.

13               First, with regard to the FinCEN settlement,

14   Mr. Turner, the settlement -- the excerpt we are going to use

15   may be self-authenticating by the narrative explaining what

16   the settlement is and the background of it^^^ you that is not

17   self-authenticating.  You can't say that, okay.  You are not

18   a witness.

19               MR. TURNER:  I understand, and we were just trying

20   to figure out a way to do it without reading from the actual

21   document itself, because you had given us one excerpt to

22   read, and that excerpt, of course, makes no sense, unless you

23   read something from the report itself to introduce that

24   particular paragraph.  So we were trying to make an argument

25   neutral, introductory paragraph, that would accommodate what

1863

1    the court was trying to do with making sure that the jury

2    had some reasonable explanation of what this meant.

3              THE COURT:  I see what you were trying to do, and

4    that's perfectly logical, but it's still factual, and I

5    assumed, and I guess I was wrong, that you would have

6    someone testify to those facts to introduce it, some expert

7    or something.  If you can't do that, I don't really see how

8    you can use it.  Okay.

9              All right.  The only other thing I wanted to

10   mention this morning is, I reconsidered my ruling on P

11   Exhibit 781, that's the PA Intelligence Report.  I

12   reconsidered it, because I'm now looking at what the

13   defendant is going to do with the expert, and I think the

14   plaintiffs need that exhibit to rebut what the defendant's

15   expert is going to say.  It was authenticated, to my

16   satisfaction, there's no question about that.  But I think

17   the Rule 403 analysis is now different than I saw it

18   yesterday.  So what I will do, I want to put the defendant

19   on notice of this, in case they want to include it in their

20   cross that is going on.  So I will permit the plaintiffs to

21   introduce 781 through this witness on redirect testimony.

22             Okay.  That's all I have.

23             Are we ready for the jury?  Let's have the jury.

24             It will take a good two or three minutes to get

25   them lined up, so I suggest everyone sits until the door

A. Spitzen - Cross/Stephens                1864

1  knocks.

2          (The jury enters the courtroom at 9:30 a.m.)

3          THE COURT:  Be seated, please.

4          Good morning, ladies and gentlemen.

5          THE JURY:  Good morning.

6          THE COURT:  We'll continue with cross-examination

7  by Mr. Stephens.

8  A R I E H   D A N   S P I T Z E N,

9          Previously sworn, resumes the witness stand.

10 CROSS-EXAMINATION (Cont'd.)

11 BY MR. STEPHENS:

12 Q    Mr. Spitzen, good morning.

13 A    Good morning, sir.

14 Q    Before the lights went out yesterday, we were looking

15 at slide number 120, which is the list of the 12 Zakats and

16 charity societies that you analyzed in your report on the

17 West Bank in Gaza; is that right?

18 A    Yes, sir.

19 Q    If we can take a look at SAG-006.

20        Ten of the 12 that you looked at are also on Dr.

21 Levitt's list of charitable societies and Zakats that he

22 examined and analyzed; is that right?

23 A    Yes, sir.

24 Q    Now, between 2000 and 2004, the Islamic Center - Gaza

25 was not designated as a terrorist organization by the United

A. Spitzen - Cross/Stephens          1865

1    States of America, was it?

2         THE COURT:  Mr. Stephens, to save time, can we say

3    in fact none of these were designated as terrorist

4    organizations by the United States Government?

5         MR. STEPHENS:  I'm getting there, that's the next

6    question.

7         THE WITNESS:  Can answer?

8         THE COURT:  You can answer the question.

9    A    I'm not that familiar with the American laws.  But in

10   Israel, certain organizations are designated.  For example,

11   when Hamas was designated by the State of Israel, any other

12   organizations that is affiliated with it is immediately

13   designated as unlawful association.  So, I didn't know if by

14   the very name of Mujama al Islami it was registered.  But in

15   1995, when Hamas was designated by the United States as a

16   terrorist organization, I would think that all of those that

17   are affiliated with Hamas would be included as well.

18   However, I'm not familiar with the American law.  I know it

19   would apply according to the Israeli law.

20   Q    The answer is that none of these 12 Zakats and

21   charitable societies are designated by the United States of

22   America as terrorist organizations between 2000 and 2004;

23   isn't that right?

24   A    With the very same reservation that I mentioned

25   earlier, not by any other name, no.

A. Spitzen - Cross/Stephens                1866

1  Q    In addition to that fact, between 2000 and 2004, none

2  of those 12 charitable societies and Zakats were designated

3  as terrorists by the U.N., were they?

4  A    With the very same reservation, because they all belong

5  to Hamas and they are included in Hamas, but they were not

6  designated by their name.

7  Q    In addition to not being designated by the United

8  States -- by the United States of America or the United

9  Nations, none of these 12 were designated as terrorist

10 organizations by the European Union between 2000 and 2004;

11 isn't that right?

12 A    My same answer.

13 Q    In fact, the only one of those organizations that was

14 designated after 2004 by the United States of America is

15 al-Salah; isn't that right?

16 A    To the best of my knowledge, again with the very same

17 reservation, yes.

18 Q    And that designation happened in 2007 - may we have a

19 copy of PX-1293 up, please - which is the designation or

20 press release about it.

21        You were asked about this designation in your

22 direct examination, were you not?

23 A    Yes, sir, parts of it.

24 Q    All right.

25        And this is the 2007 designation of al-Salah, and

1   in the release concerning that designation by the Treasury

2   Department, it says, does it not, today's action alerts the

3   world to the true nature of al-Salah and cuts it off from

4   the U.S. financial system.

5           Do you see that?

6   A   Yes, I can see the sentence.  Yes, but I believe it

7   would be more proper to show the entire designation, which

8   states, for example, that Ahmed al-Kurd has been known for

9   ten years, in other words for a decade, as a person who

10  operated for Hamas.  So you have both things here.

11  Q   This sentence from the United States Treasury

12  Department does not say today 2007 an action designating

13  al-Salah alerts the world to what it already knew, does it?

14  A   Well, that's correct quite naturally a law applies from

15  the minute -- from the day it's published, not

16  retrospectively.

17  Q   Can we see SAG-10.

18          According to you, the "hard-core of Hamas welfare"

19  is the Islamic Center - Gaza, the Islamic Society - Gaza,

20  and Al-Salah Islamic Society, right?

21  A   These are the three top, well-established societies in

22  Gaza.  Many others can be added to them.  And, of course,

23  University of Gaza, which is part of this infrastrucure.

24  Q   According to your testimony in your deposition, these

25  are the hard-core of Hamas; isn't that right?

A. Spitzen - Cross/Stephens                1868

1   A    This is correct.  I do not deny it here either.

2   Q    And none of those three hard-core Islamic charities

3   that you say are Hamas have been designated by the United

4   States, the United Nations, or European Union between 2000

5   and 2004; isn't that right?

6   A    Unless the interpretation would mean that because they

7   are Hamas, they would be also designated as a result of

8   that.

9   Q    You agree that these Palestinian charities and Zakats

10  maintain bank accounts at a number of different banks, don't

11  you?

12  A    I have to see them one by one, but in principle that's

13  correct, the charitable society and Zakat Committee had bank

14  accounts or something, had bank accounts in more than one

15  bank.

16  Q    For example, number eight here on your list, the

17  Tulkarem Zakat Committee, Arab Bank, Gulf Jordan Bank

18  Jordanian Islamic Bank, and Cairo Amman Bank, didn't it?

19  A    Yes, we know more about the Zakat Committee because of

20  the searches that we conducted there, and the documents that

21  we confiscated.  These allow us to know more, that's at

22  least what I think the source is.

23  Q    Al Shaeed or a martyr is used by the Palestinian

24  population to describe innocent victims of violence; isn't

25  that right?

A. Spitzen - Cross/Stephens                1869

1  A    I do not accept this definition.  The Palestinians

2  would be referring to the white Shaheed or martyrs, also for

3  people who are not involved in infitada, or not involved in

4  terror.  But the word Shaheed would necessarily indicate an

5  innocent person, it's both.  It's used assigned to both.

6  Q    To both people who are innocent of any terrorism, as

7  well as some people who aren't; is that right?

8  A    Well, the word "innocent" I have not examined this, but

9  it's people who are engaged in terrorism and those who are

10  not.

11  Q    Well, let's look at your deposition, page 223, lines 17

12  to 22.  You were asked:

13          "Question:  Is it correct that the Palestinian

14  population would use the term "martyr" or "Shaheed" to

15  describe innocent victims of violence, for example, children

16  who were killed by Israeli bombs?

17          "Answer:  Yes, there are such cases."

18          You gave that testimony, did you not?

19  A    Yes, but this is exactly what I'm saying now.  But

20  the word "innocent," I did not know exactly who was killed.

21  The example you are quoting here was referring to children,

22  and these indeed are innocent.  I would rather use the word

23  uninvolved.  But actually what we mean the same.  This is

24  just the example that you gave here of children that were

25  killed by the IDF.

A. Spitzen - Cross/Stephens                1870

1   Q    They are martyrs killed by the IDF, right?

2   A    They are called martyrs by the Palestinians.

3   Q    A martyr file, you talked about martyr files in your

4   direct testimony, did you not?

5   A    That's correct.

6   Q    And what you said was "a martyr file is very similar to

7   any social security file of any individual and it contains

8   the social background," that's what you think, isn't it?

9   A    I said that the martyr file would include social

10  report, various documents, and I detailed them, but, yes,

11  that's correct.

12  Q    There's nothing suspicious about a martyr file, is

13  there?

14  A    Well, that depends who the file is actually compiled

15  for.  What do you mean by not suspicious?  If it is actually

16  written for suicide bomber, and we found many of them in the

17  societies of Hamas, then there's obviously something

18  suspicious about this.

19  Q    Martyr files, as you use the term, simply mean

20  information about dead people, right?

21  A    Yes, but very often it would include the circumstances

22  that led to their death.  It is not only the fact they died,

23  but how they found their death.

24  Q    We'll get to that in a minute.

25          But, in the meantime, the charities that you

A. Spitzen - Cross/Stephens          1871

1   researched, the 12, gave assistance to a variety of people,

2   including Shaheed who were uninvolved in terrorism; isn't

3   that right?

4   A    Yes, they did offer assistance to uninvolved and to

5   people who are in need in general.  I did not conceal that.

6   Q    You actually can't identify any Palestinian charity

7   that provided financial support only to the families of

8   terrorists, can you?

9   A    Yes, but also pertains to the idealogy, the basic

10  idealogy of Hamas' modus operandi to offer help where others

11  fail to offer this help, to do this to win the hearts, to

12  gain the support of the people.  It actually worked well in

13  the elections of 2005, as it did in the elections of 2006.

14  Definitely this is their declared way by which the Hamas

15  enters and penetrates the hearts of people and expand the

16  influence and clout, the influence of these terrorists

17  movements, the elections for the municipalities in 2005.

18              MR. STEPHENS:  I move to strike.

19              THE COURT: I will strike everything after the word

20  "yes."

21              MR. STEPHENS:  Thank you.

22  BY MR. STEPHENS:

23  Q    I want to talk a little bit about control of these

24  organizations.

25              You say that to be under the control of Hamas

A. Spitzen - Cross/Stephens          1872

1  means that one of these charities is an inseparable part of

2  Hamas, don't you?

3  A    I did make that definition regarding these

4  organizations.  There's the issue of those who are

5  inseparable part of Hamas and those controlled by Hamas.

6  The three organizations in Gaza are inseparable part of

7  Hamas.  Al-Islah was established and founded by Hamas in

8  Ramallah.  The Al-Nur Society was established by Hamas in

9  Nablus.  The others are controlled by Hamas, but are not

10 inseparable part of it, merely controlled by it.

11 Q    Could we see Spitzen 146, please, Shawn.

12        You gave your deposition in 2010, about four years

13 ago, and you were asked -- and my question to you is --

14        THE COURT:  Hang on. You can't show the deposition

15 to the jury before you have given a page and line number.

16        MR. STEPHENS:  I'm sorry.

17        Page 146, 7 through 9.

18        THE COURT:  Plaintiffs have it?

19        MR. STEPHENS:  Then 16 through 19 is where the

20 answer appears.

21        THE COURT:  Okay. Proceed.

22 BY MR. STEPHENS:

23 Q    You want to put that up, please.

24        My question to you is:  "What do you mean when you

25 say under the control of Hamas?

A. Spitzen - Cross/Stephens                1873

1          Your answer is:  "To be under the control of Hamas

2    means that an organization is an inseparable and integral

3    part of the Hamas and identified with it."

4          That was your sworn testimony four years ago, was

5    it not?

6    A    Yes, that's true, but there's three organizations which

7    actually Hamas developed from them.  It was somehow an

8    offspring of them.  And there's the two organizations that

9    we have proof or that we have testimony that were founded by

10   the Hamas.  The situation with the other organizations is

11   different, but still all of them are controlled by Hamas and

12   affiliated with Hamas.

13   Q    You agree that there is a difference between an entity

14   being controlled by Hamas and an entity that is related to

15   or affiliated with Hamas, don't you?

16   A    You mean affiliated with or identifies with.

17   Q    I will ask the question again.

18          You agree that there is a difference between an

19   entity being controlled by Hamas and an entity that is

20   related to Hamas?

21   A    I did not define things this way, but it is also

22   possible to define it this way.

23   Q    Could we look at Mr. Spitzen's sworn testimony from his

24   deposition on page 25, line 17.

25          "Question:  Do you -- please, if you would, sir,

A. Spitzen - Cross/Stephens                1874

1   elaborate for me on the record what is the difference

2   between an entity that is related to Hamas and an entity

3   that is controlled by Hamas?

4          "Answer:  Okay.  The difference for an entity that

5   is controlled by Hamas, usually the leadership, the

6   management or board of directors, the people that manage it

7   on a daily basis, are Hamas people.  And at least with

8   relevance to five, two were - can we go to the next page,

9   please - established by the Hamas, after the Hamas was

10  already in existence, and Hamas grew out of three of these

11  other organizations.  So definitely regarding these five,

12  that's it, that means the relationship is a very, very tight

13  relationship.

14         Now, I should think -- I mean, since I didn't

15  examine, it is a bit difficult to do so because I couldn't

16  find one organization or entity that is related, but not

17  controlled.  So it is difficult to see the difference - and

18  go a little further, please - maybe there's an entity where

19  some of the people are Hamas people and others are not, it's

20  less distinguished, less differentiated.  But I didn't find

21  any examples of that.  And since I didn't find any examples,

22  I did have certain criteria, and I got a quantity of

23  criteria and a quality of criteria, and it's difficult to

24  give an example."

25         There is in your mind a difference between simply

1    related to Hamas and controlled by Hamas; isn't that right?

2    A      I think actually that this answer speaks for itself.

3    This was a hypothetical question that I was asked in the

4    deposition, and my answer was that I could not find an

5    example.  There were lots of questions in the deposition,

6    and this question was a hypothetical one, and I could not

7    find an example for it.  And, actually, I still cannot find

8    an organization which is only related, at least not part of

9    the research which I conducted for the purposes of this

10   trial.  I could not find an example of these examples that

11   they tried to show me.  Maybe somewhere there is such a

12   society that is merely related to Hamas, but not controlled

13   by Hamas.  But amongst the 12 societies we are discussing

14   here, this doesn't apply to any one of them.  I still answer

15   that I couldn't find an example.

16   Q    Let's try it a different way.

17          You agree that there is a difference between

18   identified with Hamas and controlled by Hamas, don't you?

19   A    Identified with - and I hope I understand the words -

20   it means the same in Hebrew, as it does in English, because

21   I think there were some issues with that.  But the way I

22   understand it, this is something more tacid.  It means that

23   others identify it as an Hamas organization.  And, yes, this

24   is indeed one of the criteria which I used, and according to

25   what you said, will discuss these criteria as well, that is

1   the identification of the society with Hamas.  Then, yes,

2   there is something that is merely identified, but not

3   controlled.

4   Q    As you say, "identified" means passive; whereas,

5   controlled by is more definitive, right?

6   A    Identified means it's identified by other people or by

7   other entities.  Is that what you mean?  If that's what you

8   mean, yes.  When I said passive in Hebrew, I meant that it

9   is identified by others as Hamas, that's what I meant, and

10  this is the difference.  Perhaps it's a linguistic

11  difference, if that's what you mean.

12  Q    Did you have trouble understanding the word

13  "identified" during your deposition?

14  A    No, there wasn't a problem, but there is a difference.

15  According to the interpreters, there is a difference between

16  the two meanings of the words "identified with" in Hebrew,

17  identifying with, or identifying as and identifying with,

18  and it's difficult to explain.  And this issue did come up

19  during the deposition with the interpretation.  For me it

20  wasn't difficult, because I know in Hebrew what it means to

21  be identified with Hamas.

22  Q    Okay.

23           And between 2000 and 2004, there were entities

24  identified with Hamas, but not a part of it, weren't there?

25  A    Yes, I think that I did provide some examples in the

A. Spitzen - Cross/Stephens          1877

1  deposition, at least one example.

2  Q    And to figure out definitively in your opinion whether

3  an entity is just identified with Hamas or controlled by

4  Hamas took you hundreds of hours of research in this case,

5  didn't it?

6  A    The main reason for the hours that I devoted in

7  research work were, the gist of it wasn't devoted to this.

8  I don't know how much exactly I devoted to this, whether it

9  was dozens or hundreds of hours, but the gist of the hours

10  were devoted for other reasons.

11  Q    Could we look at Mr. Spitzen's deposition at page 89,

12  starting at line 24.

13          In your deposition you testified as follows:

14          "Question:  And to figure out definitively in your

15  opinion that most of the entities you researched were

16  actually controlled by Hamas, as opposed to just identified

17  with Hamas or identifying with Hamas, involved your

18  conducting hundreds of hours of research into those

19  entities; is that correct?

20          "Answer:  Yes."

21          Is that sworn testimony true?

22  A    Yes, this is why I am grateful for the fact that we

23  have the testimony in front of us, because you did forget

24  one small detail.  Indeed, it does say about hundreds of

25  hours of research work, but these hundreds of hours were

A. Spitzen - Cross/Stephens                1878

1   also devoted to the Credit Lyonnais case, as well as for

2   this case, and the Nat West case.  All of them together did

3   take up hundreds of hours.  But most of the hours devoted in

4   the research for the Arab Bank were devoted -- so many hours

5   were devoted for other reasons.

6   Q    Regardless of what case it was on, it took you hundreds

7   of hours, didn't it?

8   A    Yes, if it was asked this way, the answer would have

9   been positive.

10  Q    Now, it is very difficult to determine the level of

11  control over this kind of a civilian organization, isn't it?

12  A    If we are talking about a statement that is made for a

13  legal opinion that necessitates going down to the finest of

14  details, that would take many long hours.

15  Q    And control of an organization can change over time, it

16  is a process, isn't it?

17  A    It can change.

18  Q    And there's no single process by which Hamas took

19  control of these societies, in your opinion; isn't that

20  right?

21  A    I would put it this way concerning some of them, it

22  grew out of them, certainly others were founded by it,

23  others were taken over by it over the years either through

24  elections or other ways.

25  Q    And, according to you, a certain charity and a certain

A. Spitzen - Cross/Stephens                    1879

1   period of time might not belong to Hamas, but later become

2   affiliated with Hamas, and still later may become

3   unaffiliated with Hamas; isn't that right?

4   A    Yes, this is correct, and the example concerns the

5   Zakat committees.  The Zakat committees that were founded

6   before Hamas was founded, and then later on were controlled

7   by Hamas.  In 2007, the Palestinian Authority took over

8   them, when they saw what they actually were doing to the

9   Palestinian Authority, they decided to actually dismantle

10  them and then appointed knew Zakat committees.  So, yes,

11  this is correct.

12  Q    You didn't visit any of the 12 Zakats or charitable

13  societies yourself between 2000 and 2004, did you?

14  A    I believe perhaps one exception would be the Hebron

15  committees where it held meetings with heads at the time.

16  So, apart from this one, I believe it would hold true, to

17  the best of my knowledge, and I do not remember if in Hebron

18  it was before 2000 or after, I could not commit to that.

19  Q    Hamas never publicized any board members of any Zakat

20  or charitable society members of Hamas, did it?

21  A    Well, an official publication that says that in these

22  and these Zakat Committees, these and these were Hamas

23  members, no.  So what you are saying is right.  But in the

24  press there were interviews.  For example, the interview

25  with Khaled Mashal in 2003 in which he identified in a very,

A. Spitzen - Cross/Stephens          1880

1  very elaborate way who of the Hamas members served in those

2  positions.  So, he actually gave a very distinct definition

3  of who were members of the Zakat committees and who of them

4  were Hamas members.  This was done in a very public and open

5  and official way.

6  Q    According to you --

7         THE COURT:  Wait, I think he hasn't finished his

8  answer.

9  A    There's a small correction or clarification.  It's

10  not that he talked about the Zakat committees in general and

11  then pointed at the Hamas members, but rather related to

12  those senior Hamas members who served in those Zakat

13  committees.

14  Q    According to you, Hamas did not publicize its

15  association with Palestinian humanitarian societies at all,

16  because otherwise they would have been shut down the next

17  day; isn't that right?

18  A    Yes, I do remember that I said this in my deposition,

19  but there are two parts to it.

20         The first part relates to the official and the

21  formal publication, and they said that had Hamas inserted

22  its logo on the names of those societies or organizations,

23  it would have been left with no choice for either the State

24  of Israel or the Palestinian Authority in certain periods to

25  shut it down, so it wouldn't do it.  But that's another

A. Spitzen - Cross/Stephens          1881

1  aspect to it, which is the unofficial or informal aspect.

2  These societies were known to be societies of Hamas.  So if

3  you want to relate to this issue, you must look at the two

4  aspects of it.

5  Q    Could we take a look at Mr. Spitzen's deposition

6  testimony starting at page 96, lines 4 through 10.

7          You were asked four years ago:

8          "Question:  As a matter of fact, isn't it true,

9  Mr. Spitzen, that Hamas didn't publicize the association

10 with Palestinian humanitarians at all?

11         "THE WITNESS:  Of course that's true, otherwise

12 they would have been shutdown the next day."

13         That was your sworn testimony four years ago,

14 wasn't it?

15 A    Yes, this is very true, and this is what I just said.

16 Now, I do recommend reading off for the jury to see exactly

17 what the other aspect is as well, and this is the

18 continuation of these things.

19 Q    Now, you agree that it's a very tough question to

20 answer when an organization falls into the hands of Hamas,

21 right?

22 A    It's true, but I do insist that the second part would

23 be shown to the jury, because we are talking about only half

24 of the topic, and it creates the wrong impression.

25 Q    Mr. Spitzen --

A. Spitzen - Cross/Stephens          1882

1          THE COURT:  Mr. Spitzen, if the plaintiff's

2     lawyers want to show that portion to complete your answer,

3     they will do that when they come up to examine you again.

4          THE WITNESS: I understand, your Honor.

5     BY MR. STEPHENS:

6     Q    No society that was formed before 1987 was associated

7     with Hamas, when it was formed, because Hamas hadn't been

8     formed; isn't that right?

9     A    This is correct.

10    Q    Can we look at SAG-11, please.

11         This is a list of the 12 charities and Zakats from

12    your report, and the pages in your report where they are

13    discussed, and the dates on which they were formed according

14    to your report.  Nine of the 12 were formed before 1987,

15    were they not?

16    A    That is correct.

17    Q    And in the West Bank in Gaza, out of those 110 Zakats

18    and charitable societies that you identified, many of them

19    continued in assistance after 1987 without any affiliation

20    with Hamas, didn't they?

21    A    First of all, there is a recurring mistake here and I

22    would like to correct this factually.

23         Those 110 entities that I talked about were all

24    Zakat committees, not charitable societies.  Charitable

25    societies were many more, but they are not related to this,

A. Spitzen - Cross/Stephens                1883

1  so this is a mistake that I want to correct.  It is 110

2  Zakat committees.  So this is one thing concerning your

3  question.  Yes, definitely there are Zakat committees and

4  charitable societies that over the years conducted their

5  business as respectable societies, which are not related to

6  Hamas.

7  Q    And according to you, the takeover of these 12

8  charitable societies and Zakats by Hamas was a slow process;

9  isn't that right?

10 A    This is not actually accurate or precise, and I'm sorry

11 that I need to repeat this, but you keep talking about those

12 12, and I will refer to this.

13 A    So, the first three, actually Hamas grew from them, and

14 the people who headed them are the people who founded Hamas.

15 It didn't need to take over those organizations.  It didn't

16 need to do anything with these organizations.  These simply

17 belonged to the Muslim brotherhood.  Hamas grew and was part

18 of the Muslim brotherhood, so this is one point.

19          And with respect to two or three others, you,

20 yourself, say that al-Salah and Islah were founded by Hamas.

21 So with respect to six out of the 12, we do know that they

22 are Hamas organizations. One was founded before the

23 establishment of Hamas, and others after.  With respect to

24 the six others, it's true what you are saying, and the

25 process was long.

A. Spitzen - Cross/Stephens          1884

1  Q    Could we look at Mr. Spitzen's deposition at page 157,

2  lines 16 to 21.

3         You do agree that there's no clear point in time

4  when these Zakats become controlled, and it is a process and

5  a long one, right?

6  A    It's true, it is very hard to point to the particular

7  point in time, and I think an example to this is, it's just

8  like seeing a neighborhood.  When does a neighborhood turn

9  into a bad neighborhood?  There isn't a specific point in

10 time.  What happens is a gradual process about which another

11 neighbor enters, another neighbor enters the neighborhood

12 that is related to crime, and another one and another one

13 and another one, and all of a sudden it is a bad

14 neighborhood.  It becomes a neighborhood in which there's

15 crime.  So the same applies to those organizations.  So,

16 with respect -- however, with respect to this particular

17 relevant period between 2000 and 2004, all those societies

18 were already Hamas societies.

19 Q    In your opinion?

20 A    That is my opinion.

21        And also on February 25, 2002, this was the

22 opinion of the Israeli government and the various

23 enforcement agencies.

24 Q    You obviously don't think that's dispositive, do you,

25 because you spent hundreds of hours, despite that

A. Spitzen - Cross/Stephens                1885

1    designation that you keep citing, doing research to really

2    figure whether they were controlled, didn't you?

3    A    .  Excuse me.  What does dispositive mean?

4    Q    It settles the issue, final word.

5    A    The last word on what?  I'm sorry, I really don't

6    understand.  I don't understand the question.

7    Q    You don't -- could you read the question back, please,

8    to the witness?

9         THE COURT:  Mr. Stephens, "dispositive" is a word

10   that lawyers use a lot, but I don't think the public does.

11   Why don't you rephrase the question to use a different word.

12        MR. STEPHENS:  Sure.

13   BY MR. STEPHENS:

14   Q    You mentioned in the answer right before I asked you

15   that question that these 12 Zakats and charitable societies

16   were controlled by Hamas, part of Hamas, because you said,

17   the Israeli government has a designation of them as unlawful

18   organizations in February 2002, that's what you said, isn't

19   it?

20   A    No, this is not what I said.

21        Okay.  This is what I said, and I would like us to

22   restructure exactly what occurred here. 2000 to 2004, that

23   is the relevant period, all of those societies were indeed

24   societies controlled by Hamas, this is what I said, in

25   answer to the question.

A. Spitzen - Cross/Stephens                1886

1        And then you, the attorney, you said in your

2    opinion, and I said in my opinion.  And, in addition to

3    that, it was also the opinion of the Israeli government in

4    2002 -- skins do thousand two. This was the sequence of

5    events.  I did not say anywhere that I was only basing

6    /PAOEUS on this designation from 2002.  Of course it's one

7    of the criterions I used.  It's an important one, especially

8    I can understand that somebody who is very familiar with

9    these processes, but all right in the year 2000, these

10   organizations were controlled by Hamas.

11   Q    And my question to you is, the opinion of the Israeli

12   government that you just mentioned, doesn't settle the

13   matter in your mind, obviously, as to whether or not these

14   societies were controlled because, A, you did hundreds of

15   hours of research to figure it out in 2009; and, B, you

16   couldn't figure it out back in 2000-2004 by your own sworn

17   testimony, isn't that right?

18   A    I have to say that I really don't understand the

19   rationale that is behind these statements but I am going to

20   answer them.

21        I did devote hundreds of hours in 2001 -- 2009,

22   excuse me, in order to come up with my expert opinion that

23   the purpose of it was to be submitted to a court in the

24   U.S., and in this expert opinion, I did bring together and

25   compiled all of the criteria which I could find which showed

A. Spitzen - Cross/Stephens          1887

1   that these societies were controlled by Hamas.  It's not the

2   case -- it's not true that I somehow underestimated or

3   disrespected the designation or thought that the Israeli

4   designation was not sufficient proof.  But definitely the

5   designation that says that these societies are part of

6   Hamas, they support Hamas, the State of Israel, definitely

7   for purposes of Israeli law this was sufficient and people

8   were indeed sent to prison, but I was supposed to appear in

9   an American court, and for that purpose I needed to show the

10  general picture, the general situation.  This is why I

11  devoted so many hours. The two things are not exactly

12  connected, because this was not an Israeli court that I was

13  supposed to appear in.  In an Israeli court, it would

14  definitely have been sufficient, the designation of Minister

15  of Defense.  But in  U.S. court, I did not think that the

16  Minister of Defense designation would be sufficient, and

17  rightfully so.

18  Q    Well, let's see what we can agree on here, and we'll

19  get back to your report.

20          If Hamas had one member on the Board of Directors,

21  you would have to do additional research to determine

22  whether Hamas controlled that society or Zakat, wouldn't

23  you?

24  A    Certainly.

25  Q    And, in fact, if there were two members associated with

A. Spitzen - Cross/Stephens          1888

1  Hamas on the board, you would still have to do additional

2  research, wouldn't you?

3  A    Certainly.

4  Q    Your expert report does not specify how many board

5  members there actually were for each one of these 12

6  societies and Zakats, does it?

7  A    As far as I recall, that's correct.

8  Q    All right.

9         You say, you have 18 factors that you considered

10 in figuring out whether or not a society or Zakat was

11 controlled by Hamas; is that right?

12 A    That's correct.

13 Q    And the first factor out of those 18 is leadership,

14 isn't it?

15 A    Yes, leadership and members of the boards.

16 Q    Right.

17        Now, in your report as to each one of these

18 societies and Zakats, the 12 you have a section on

19 leadership, don't you?

20 A    That's right.

21 Q    All right. Can we see is a good 12, please.

22        So taken from your report, Mr. Spitzen, we've got

23 each one of the societies and Zakats that you say are

24 controlled by Hamas, and then underneath that the names that

25 appear in your report as to the leadership of those

A. Spitzen - Cross/Stephens                    1889

1  societies and Zakats who you say are associated with Hamas?

2  A    No, I think that the work that was done here is

3  incorrect and inaccurate regarding what's written in my

4  report.  This is only at first glance, before I even started

5  reading the names.

6  Q    All right.

7          Well, let's take a look at a couple of examples to

8  test that out, and I would like you to say why as well.

9          MR. STEPHENS:  Your Honor --

10         THE COURT:  We'll wait for the plaintiff's lawyers

11 on redirect, Mr. Spitzen.

12         Put another question.

13         Hold it.  We need to get the translation.

14         MR. STEPHENS:  I'm sorry.

15 A    This is factually incorrect.  No, it's merely a

16 technical issue.  There are names here with suicide bombers

17 who were affiliated with the society.  It is not really the

18 leadership or board of directors.

19 Q    Let's take a look at an example or test that out.

20         Your report on al-Salah starts on page 79.  And in

21 your leadership section -- do you have your report there in

22 front of you?

23 A    No, I do not have it in front of me.  I need the

24 report.

25         MR. STEPHENS:  Show him page 79, would you, Shawn.

A. Spitzen - Cross/Stephens                1890

1          THE INTERPRETER:  He said he would like to see it

2     in Hebrew.

3          MR. TURNER:  This witness only.

4          THE COURT:  Do you have it in Hebrew, Mr.

5     Stephens?

6          MR. STEPHENS:  I do not.

7     Q    Let's look at page 78.

8          (Continued on the next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  CROSS-EXAMINATION (Continued)

2  BY MR. STEPHENS:

3  A    I wrote the report in Hebrew.

4  Q    Yes, I understand that.  And you had it translated in

5  English, didn't you?

6  A    No, the original was written in Hebrew, and I like to

7  see what's written in Hebrew, because sometimes there are

8  also translation issues.

9          MR. STEPHENS:  Well, we can do that later, but not

10  right now.  In the meantime, my question to you is on page

11  78 of your report, there is a heading of the Islamic Society

12  of Gaza.  Do you see that?

13          THE COURT:  Okay.  Look, the witness has expressed

14  he is not comfortable testifying in English of his report;

15  he's a foreign-speaking witness.  If you want to ask him his

16  recollection, you can ask him his recollection, but you

17  can't show him, as you are now, the English and expect him

18  to answer your questions based on that.

19  Q    Do you remember that you have a section in your report

20  about the al-Salah Islamic Society?

21  A    Of course.

22          MR. STEPHENS:  Could you put the other chart back

23  up, please, Shawn.

24          THE COURT:  Is this chart in his report or is it

25  something you compiled?

A. SPITZEN - CROSS/MR. STEPHENS          1892

1      MR. STEPHENS:  No, we've just taken the names out

2  of his report, your Honor.

3  Q    Under the Islamic Society you have a section on

4  leadership in your report, do you not?

5  A    Please tell me which one you are referring to, because

6  I'm kind of lost.  Which society are you talking about?

7  Q    Al-Salah?

8  A    Al-Salah in Gaza.

9  Q    Right here, right, the al-Salah Islamic Society?

10  A    Okay.  Yes, down beneath.

11  Q    You have a section on leadership in that, in your

12  report, do you not?

13  A    Yes, that's correct.

14  Q    And the leadership that you identify are the four names

15  they have listed here which is, Abu Osama, Osama al-Mazini,

16  Salem Salama and Mansur Abu Hamid, isn't that right?

17  A    Mansur abu Hamid.

18  Q    Those are the four leaders you identified in your

19  report of the al-Salah Islamic Society that you say is

20  associated with Hamas, isn't that right?

21  A    These are the four leaders which I had identified as

22  the leaders who manage and run this association on a daily

23  basis, on an on-going basis.

24  Q    And your opinion is that they're associated with Hamas,

25  isn't it?

A. SPITZEN - CROSS/MR. STEPHENS          1893

1   A    Well, I'm basing this opinion, at least regarding one

2   of them.  The fact my opinion is supported by the US

3   Government designation which outlawed this association, as

4   well as outlawing al-Kurd.  And also mentioning that since

5   2007, if you take a decade back, since then, he's been a

6   Hamas leader.

7   Q    The 2007 designation wasn't available in 2001, '2, '3

8   or '4, was it?

9   A    No, I didn't give this as an example of something that

10  was available.  Merely as an example to the fact that indeed

11  Osama al-Kurd was Hamas operative in 2001, 2002, 2003 he was

12  extremely famous they didn't really need to look for him.

13  Q    All right.  Of these 100 names in your report that are

14  people that lead these societies or zakats or who were

15  involved with them, do you know how many are designated by

16  the United States of America as terrorists?

17  A    To the best of my knowledge, and again, I'm not that

18  familiar with the American material, but at least Sheikh

19  Ahmed Yassin was involved in two of them as chairperson of

20  them and was designated as a terrorist.  With respect to the

21  others, I'm not that familiar with the American designation.

22  Q    All right.  Well, the United States, the United Nations

23  and the EU, between 2000 and 2004, had designated none of

24  these people that you mention in your report except Ahmed

25  Yassin, Mr. Rantisi, and that's it.  Isn't that right?

A. SPITZEN - CROSS/MR. STEPHENS          1894

1  A    Well, I thank you for adding Mr. Rantisi, because I

2  didn't remember exactly when the US designated him, so I do

3  accept what you say and this is correct.

4  Q    You also agree, do you not, that Rantisi was designated

5  in 2003, not before?

6  A    I accept -- I accept what you say.  I have no reason to

7  think otherwise.

8            MR. STEPHENS:  Your Honor, this is a convenient

9  place to take the morning break, if you'd like.

10            THE COURT:  Okay.  Ladies and gentlemen, we'll

11  reconvene at 11:10.  Please, you know what not to talk

12  about.  See you in just a few minutes.

13            (Jury is out of the courtroom at 10:57 a.m.)

14            THE COURT:  Recess until 11:10.

15            (Recess and recalled.)

16            (Honorable Brian M. Cogan takes the bench.)

17            THE COURT:  Please bring in the jury.

18            MR. STEPHENS:  Your Honor, may I -- would you

19  please remind the witness that he is to be responsive to the

20  questions I'm asking as opposed to the long explanations

21  that we're getting because --

22            THE COURT:  It's lengthening the examination.

23            I will say some of your questions in fairness

24  require more of an explanation.  So while I might have

25  granted a motion to strike on some of them, there were

A. SPITZEN - CROSS/MR. STEPHENS                    1895

1    others that I thought your questions were not really fair,

2    even in the context of cross, and I would not have granted

3    them.

4              But I will say to the witness this:  Generally

5    speaking, if you can answer a question reasonably yes or no,

6    on cross-examination, you should do that.  If you feel in

7    fairness that that's not adequate to answer the question,

8    then you can add more.  But do keep in mind that plaintiffs'

9    attorneys would have the chance to bring out such additional

10   information as they think is necessary to make your answer

11   complete and that counsel for the defendant is entitled to

12   elicit just that portion of the facts that he thinks helps

13   his case.

14             Translate that, please.

15             (Being translated to the witness.)

16             THE WITNESS:  I understand, your Honor, I'll try

17   to stick to this rule.

18             MR. TURNER:  Can we again ask when he's displaying

19   depositions, for instance, the last one he displayed only

20   line 16 through 21; instead of doing the question and the

21   full answer, like you said.  That just makes it very

22   difficult, because I'm having to pull pages out that now I'm

23   going to have to go back because he didn't follow the proper

24   process.

25             THE COURT:  Mr. Stephens, you do have to quote

A. SPITZEN - CROSS/MR. STEPHENS          1896

1  verbatim the entire question and answer that you're putting

2  to the witness.

3          MR. STEPHENS:  I will.

4          THE COURT:  Okay.  Let's have the jury.

5          (Jury is in the courtroom at 11:16 a.m.)

6          THE COURT:  All right.  Be seated.  Please

7  continue, Mr. Stephens.

8          MR. STEPHENS:  Thank you, your Honor.

9  CROSS-EXAMINATION (Continued)

10 BY MR. STEPHENS:

11 Q    Mr. Spitzen, the charities that you cited in your

12 report were actually providing the social services that they

13 said they were providing, were they not?

14 A    Yes, they did.

15 Q    The charities ran hospitals, did they not?

16 A    Not all of them, but some of them did.

17 Q    They provided health care to the Palestinian

18 population, did they not?

19 A    Indeed so.

20 Q    Okay.  And the United States of America actually

21 provided financial support to some of these charities

22 between 2000 and 2004, didn't it?

23 A    Yes, that is correct, but some of these things were

24 done by mistake because when the USAID provided help to

25 certain charities, which we thought were Hamas charities, we

A. SPITZEN - CROSS/MR. STEPHENS          1897

1    did call them on it.

2    Q    And USAID, you mean the United States Agency for

3    International Development, do you not?

4              MR. TURNER:  Objection, your Honor.

5              THE COURT:  Sustained.

6              MR. STEPHENS:  I'm sorry, your Honor, I don't

7    understand the --

8              THE COURT:  Let's have a sidebar.

9              (Continued on the next page for sidebar.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                    1898

1          (Sidebar conference begins.)

2          THE COURT:  State the basis of the objection.

3          MR. TURNER:  The objection, this is going into an

4    area we've already discussed, it's been excluded and it is

5    an inappropriate question.

6          THE COURT:  Oh...

7          MR. STEPHENS:  That's not true, your Honor, your

8    order says I can cross-examine about this subject

9    specifically.

10          THE COURT:  I think he can to a limited extent.

11   I'm going to change my ruling on this and allow the

12   question.

13          MR. STEPHENS:  Thank you.

14          (End of sidebar conference.)

15          (Continued on the next page.)

16

17

18

19

20

21

22

23

24

25

S. SPITZEN - CROSS/MR. STEPHENS          1899

1    THE COURT:  All right.  The witness may answer the

2    question.

3    THE WITNESS:  Yes, this is the US agency for

4    assistance.

5    BY MR. STEPHENS:

6    Q    That's part of the United States government, right?

7    A    That's right.

8    Q    And are you aware that the USAID provided grants to the

9    Nablus Zakat Committee, one of the ones on your list between

10   2000 and 2005?

11   A    Yes.  And for that, there were -- they were summoned,

12   their representatives were summoned to the Foreign Ministry

13   of Israel, as well as to COGAT, and they were warned not to

14   repeat that, and they promised that they would not do it

15   again.

16   Q    You're also aware that USAID gave grants in 2002 to the

17   Jenin Zakat Committee, which is on your list, are you not?

18   A    Yes.  We discovered that in our searches that were

19   conducted there and they were summoned to provide

20   explanations for as well.

21   Q    And USAID provided grants in 2002 to the Tulkarem Zakat

22   Committee, as well as the al-Tadamun Zakat Committee, did it

23   not?

24   A    Yes, indeed.  And for that, they were summoned and

25   asked not to do that again, and they were warned not to do

S. SPITZEN - CROSS/MR. STEPHENS            1900

1   that again.  And, indeed, after 2002, they didn't do it

2   after we discovered it -- I believe that they stopped doing

3   it after we discovered the connection.

4   Q    I'd like to talk to you about your slide 43.

5          MR. STEPHENS:  Can we take a look at that, Shawn.

6   Q    This is a slide that you showed to the jury during your

7   direct, is it not?

8   A    Yes, sir.

9   Q    And this slide -- in this slide you identified people

10  you say are key Hamas leaders in the Gaza Strip charity

11  committees; and there are five of them, right?

12  A    Yes, sir.

13  Q    And these five you say are related to the Islamic

14  Center Gaza, do you not?

15  A    Yes, sir.

16  Q    Your slide 44, you can see that that was another slide

17  that you showed to the jury, is it not?

18  A    That is correct.

19  Q    And this is a brochure from the Islamic Center Gaza,

20  isn't it?

21  A    That's very true.

22          MR. STEPHENS:  If we can actually expand the lower

23  part there, the administration council, please, Shawn.

24  Q    This says that between 2000 -- oops, 2003 and 2006 the

25  administration council consisted of the people listed there,

1   does it not?

2   A    Yes, that's also very much correct.

3   Q    And if we could go back to the slide 43.  Not one of

4   these five people that you say were key Hamas leaders in

5   that charity is mentioned as being members of the board, are

6   they?

7   A    Yes, that's true, because they were no longer in that

8   position before 2003.  But before that, they were, and they

9   also founded this organization.

10  Q    These charities, as you said, alluded to, actually,

11  mentioned in your direct, some of them have a lot of

12  branches around the West Bank, don't they?

13  A    I was talking about branches in Gaza, not in the West

14  Bank.

15  Q    Oh, all right, then I'll stick with that, but I'll ask

16  you a different question, which is:  The Islamic Charitable

17  Society in Hebron, that's in the West Bank, isn't it?

18  A    Yes, the Islamic Charitable Society of Hebron indeed

19  has branches in the area of Hebron.

20  Q    Right.  In fact, it has 11 branches and almost 1,000

21  employees, doesn't it?

22  A    I don't know the number of employees, so I cannot

23  confirm this, but, yes, okay.

24  Q    All right.  In your slide 120, which was displayed to

25  the jury during your direct, you identified this as a

1    postcard that was seized by the Israeli Army, did you not?

2    A    Yes, it was a kind of a postcard.

3    Q    Right.  And the slide has this orange rectangle in it,

4    do you see that, with no writing in it?

5    A    Yes, sir.

6    Q    All right.  The actual exhibit which is PX 1115, if we

7    could see that.  It actually has writing on it, doesn't it?

8    A    Yes, I'm familiar with it.

9    Q    And it shows it actually was an exhibit in the Holy

10   Land Foundation trial in 2008, right?

11   A    Yes, that is correct.  It is one of the exhibits I

12   helped the ISA prepare this for the testimony for the 2008

13   trial.  We had this postcard with us at COGAT, and then I

14   had it in the administration and it was used for the

15   purposes of that prosecution.

16   Q    Now, could we go back to slide 120 for a minute.  Do

17   you know who took the writing off of slide 120 in the orange

18   square?

19           MR. OSEN:  Your Honor, can we have a brief

20   sidebar?

21           THE COURT:  Yes.

22           (Continued on the next page for sidebar.)

23

24

25

SIDEBAR CONFERENCE                    1903

 1              (Sidebar conference begins.)

 2         MR. OSEN:  Your Honor, the plaintiffs blocked out

 3    on our initiative the writing, because we didn't want it to

 4    be unduly prejudicial as a government exhibit.  We don't

 5    object to Mr. Stephens pointing out that it was used as part

 6    of the prosecution, that's his prerogative, but the witness

 7    doesn't know anything about that except that we felt that it

 8    would be -- because it is centered in the document, we

 9    didn't want it to be unduly prejudicial.  So I don't think

10    there is much profit in asking the witness except to say

11    that the lawyers did it.

12         MR. STEPHENS:  It's a predicate to the next couple

13    of questions, your Honor.

14         THE COURT:  What are they, since we're here?

15         MR. STEPHENS:  They have to do with whether or not

16    that particular postcard has been doctored.

17         THE COURT:  Well, okay.  I'm going to sustain an

18    objection to this question.  What you can ask him is was it

19    the plaintiffs' lawyers who took out this legend here, do

20    you know that.

21         MR. STEPHENS:  All right.  I'm fine with that.

22         THE COURT:  Or I can say to the parties -- I can

23    say to the jury, ladies and gentlemen, the parties have

24    stipulated the plaintiffs' attorneys removed that legend,

25    because they didn't want to introduce the name of another

SIDEBAR CONFERENCE                    1904

1   trial into this case.

2          MR. STEPHENS:  That's fine.  That's fine.  I am

3   not suggesting that he did it.

4          THE COURT:  They were afraid that you were.

5          MR. STEPHENS:  I wanted to point out there were

6   differences, right?

7          MR. OSEN:  He doesn't know if redactions were

8   made, and so.

9          (End of sidebar conference.)

10          (Continued on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A. SPITZEN - CROSS/MR. STEPHENS                1905

1     THE COURT:  Ladies and gentlemen, it was the

2  plaintiffs' attorneys who took out the writing on the

3  sticker from the Holy Land trial, just because; although,

4  you've heard something about the Holy Land trial, they

5  didn't want to introduce the name of that trial into these

6  proceedings without being told it was okay.

7     All right.  Please continue, Mr. Stephens.

8     MR. STEPHENS:  Okay.  Thank you.

9  BY MR. STEPHENS:

10  Q    If you go back to SAG 25, please.  If we zoom in on

11  these figures, these two men.  You can see that those two

12  banners look very much the same, don't they?

13  A    I'm not an expert in analyzing images, but it does seem

14  similar.

15  Q    And one of the things that you relied on in your

16  determination that these were Hamas members was the fact

17  they were wearing these banners, wasn't it?

18  A    No.  Definitely, this is not the thing upon which I

19  relied in my statement that these were Hamas members.  In

20  the description of this picture I merely explained that they

21  were wearing on their chest this sash that says or reads

22  "Kutla Palestinian Islamiya," which means the Islamic Bloc.

23     The fact these were Hamas members was known to me

24  from other sources, but moreover, the other side of the

25  postcard defines Hamas -- or Hamas on the other side of the

A. SPITZEN - CROSS/MR. STEPHENS            1906

1  postcard defines these people as being members of the

2  organization as belonging to the organization.

3  Q    All right.  Well, let's take a look at the sashes with

4  SAG 126.  If you eliminate the people, they look identical,

5  don't they?

6  A    Once again, the question that you are asking requires a

7  person with forensic experience, a person who can look at

8  the picture and forensically examine it and determine it, so

9  it's hard for me to decide.  But if you mean that the sashes

10 were added to the picture later and they weren't actually

11 wearing them while alive, I can accept this.  The fact is

12 this picture was prepared by Hamas.  Hamas printed it and

13 gave it out, and such postcards were found in the Zakat

14 Committee of Nablus.  Perhaps they did add the sash to the

15 picture, it doesn't mean anything though.

16 Q    Okay.  I want to talk to you for a moment about the

17 work you did on your report, and then the methodology that

18 you used.  And the first matter I'd like to discuss with you

19 is on SAG 013.  You, in fact, worked at -- you can see in

20 the top blue, you worked at the Palestinian Affairs

21 Department from 2000 to 2009, did you not?

22 A    You're mixing a few things here.  No, it's okay, I made

23 a mistake.  It's fine.

24 Q    You worked at the Palestinian Affairs Department from

25 2000 to 2009, right?

A. SPITZEN - CROSS/MR. STEPHENS          1907

1   A    Yes, this is correct.

2   Q    And the attacks in issue in this case happened between

3   2001 and 2004, right?

4   A    To the best of my recollection, yes.

5   Q    And then you began your research into this case and

6   your testimony for this case in 2009, right?

7   A    This is correct.

8   Q    And you issued your report --

9   A    With respect to Arab Bank, I believe it was 2010; with

10  respect to the other banks, perhaps 2009.  That's what I

11  remember.

12  Q    And then you issued your report in this case in 2011,

13  right?

14  A    This is correct.

15  Q    And you did not make any effort in writing up your

16  report and in doing your analysis to limit your analysis to

17  what was actually known in 2000 to 2004, did you?

18  A    Quite the contrary, I added to the knowledge that which

19  over the years turned out to be true.  It's not that I

20  intentionally did not expert any effort, I merely added

21  criteria that attested to the fact that all we thought and

22  all that we knew in the years 2001 and 2004 was later

23  exposed.

24  Q    You did not limit your analysis to material that was

25  available from 2000 to 2004, did you?

A. SPITZEN - CROSS/MR. STEPHENS          1908

1   A    This is correct.

2   Q    In fact, as you testified, you used quite a lot of the

3   book the "Green Revolution" which was published in 2007.

4            MR. STEPHENS:  Can we see that, Shawn.

5   A    It among other things, yes.

6   Q    Do you know you actually cited the "Green Revolution"

7   the 2007 book, 87 times in your report?

8   A    This is only a small percentage.  I didn't know that,

9   by the way, but it's only a small percentage of the 1,400

10  footnotes.

11  Q    Well, we'll get to that in a minute.  You also used

12  quite a bit of the other book called the "Hamas Lexicon"

13  that was published in 2008, didn't you?

14  A    This is correct.

15  Q    Are you aware that you cited the "Hamas Lexicon" from

16  2008, 90 times in your report?

17  A    And still according to my calculation, it's less than

18  one percent of the footnotes.

19  Q    Well, let's do that calculation.  87 cites to the

20  "Green Revolution", 90 cites to the "Hamas Lexicon" is 177

21  sites altogether to those two books, right?

22  A    I don't see why we should add them up.

23  Q    Because then we can see that 177 of your cites out of

24  the 1,418 in your report is 12 percent of what you relied on

25  is those two books alone written three or four years after

A. SPITZEN - CROSS/MR. STEPHENS              1909

1   the last terror attack?

2   A    Yes.  But this doesn't mean a thing, because these two

3   books refer to events and incidents which happened earlier.

4   And actually, they group together the profiles of people.

5   My use of them and the fact that I refer to them is mostly

6   focused on the biography of these individuals.  It is that

7   place where they group them together, and this is only for

8   the purpose of the comfort or the ease with which the reader

9   or the person reviewing them can use them.  However, a large

10  or very extensive work was conducted and it was based in

11  books in Arabic and English and preliminary sources and

12  websites, so I don't see how that is relevant.

13  Q    Your method of figuring out whether or not one of the

14  charitable societies was controlled by Hamas was to use 18

15  criteria, wasn't it?

16  A    This is correct.

17          MR. STEPHENS:  Can we see SAG 38, please.

18  Q    There's your 18 criteria, am I right?

19  A    Again, it is very hard for me to relate to things

20  written in English.  I would like to see this in Hebrew.

21  Q    You'd like to see the slide in Hebrew?

22  A    I want the criteria in Hebrew.

23          MR. STEPHENS:  Let him have it in his report.  We

24  have them for you in Hebrew.  May I approach the witness,

25  your Honor?

A. SPITZEN - CROSS/MR. STEPHENS          1910

1          THE COURT:  Sure.

2          (Document handed.)

3          THE WITNESS:  Thank you, sir.

4          MR. STEPHENS:  You're welcome.

5   Q    Have you had a chance to read it?

6   A    No.  It's in front of me, it's okay, you can ask.

7   Q    Oh, good.  These are the 18 criteria, aren't they?

8   A    Yes, sir.

9   Q    Right.  And if you look at number 13, its involvement

10  of the organization or its leadership, that means charity or

11  the leaders of the charity in the Hamas election campaign in

12  2006.  That's number 13, isn't it?

13  A    This is correct.

14  Q    Arab Bank couldn't have known who was going to be

15  involved in the election campaign in 2006 between 2000 and

16  2004, could it?

17  A    I don't think anyone could know, that is correct.

18  Q    And then number 14, criteria number 14 is the

19  cessation, stopping of the flow of funds to the organization

20  charity as a result of replacement of its administrative

21  board in 2007.  Is that right?

22  A    This is correct.

23  Q    Arab Bank couldn't know who was going to be replaced on

24  the board or how the funding would change between 2000 and

25  2004 before it happened in 2007, could it?

A. SPITZEN - CROSS/MR. STEPHENS                1911

1        THE COURT:  Let's have a sidebar, please.

2        (Continued on the next page for sidebar.)

SIDEBAR CONFERENCE                1912

1      (Sidebar conference begins.)

2      THE COURT:  You know, I'm not getting any

3  objections, so I'm going to permit this line of questioning,

4  but it does seem to me that it may, in this violation of

5  preclusion order, which said that the bank may not argue

6  that it didn't know that particular accounts were terrorist

7  accounts.

8      MR. STEPHENS:  Well, I don't think so.  Actually,

9  I'm not going to go over the other ones.  The point is that

10  the election in 2006 is after the date, and the point is the

11  2007, you know, seizing of funding is after the dates of

12  these attacks.  It has nothing to do with bank accounts,

13  nothing.

14      THE COURT:  Why does that matter?

15      MR. STEPHENS:  Because it has to do with what the

16  bank would know, could know in 2001, 2002, '3 and '4.

17      THE COURT:  What about?

18      MR. STEPHENS:  About what he uses his criteria to

19  figure out whether they are controlled by Hamas or

20  societies, that's all he's doing here, it's not about the

21  bank accounts.

22      THE COURT:  Can I ask the reporter to read me the

23  question?  Actually, let me just look at it.

24      "Arab Bank couldn't know who was going to be

25  replaced on the board or how the funding would change

SIDEBAR CONFERENCE                    1913

1   between 2000, 2004 before it happened in 2007, could it?"

2        MR. OSEN:  It's close, your Honor, but we didn't

3   object, because the objective fact, to the extent that's

4   being elicited that something in 2007 couldn't be known

5   without a time machine before then, is not, in that narrow

6   sense, objectionable.  But the inference that is being

7   sought to be drawn here is absolutely objectionable to the

8   extent that it's trying suggest that the bank didn't know

9   who their accountholders were or their identity.

10       MR. STEPHENS:  You see, it has nothing to do with

11  that.  Nothing to do with that.

12       THE COURT:  Tell me again then what does it have

13  to do with?

14       MR. STEPHENS:  Because he's analyzing these 18

15  criteria, whether or not these Hamas charities, these

16  charities were controlled by Hamas between 2000 and 2004.

17  Many of his 18 criteria are facts no one could have known

18  until 2006 or '7.

19       THE COURT:  But you point out that the bank

20  couldn't have known.

21       MR. STEPHENS:  No one would know.  You want me to

22  say "no one" instead of "the bank"?

23       MR. OSEN:  Well, your Honor, the problem is he's

24  not offering it for knowledge, he's offering it as an

25  objective data point as to whether or not they are or are

SIDEBAR CONFERENCE                    1914

1    not controlled.

2            THE COURT:  Okay.  Look, I've had no objection to

3    the question, and I won't require you to modify it in any

4    way.  Obviously with regard to the preclusions and the

5    sanction order, the Court has an interest of enforcement as

6    well as the plaintiffs.  But I agree with, Mr. Osen that

7    it's close, but it's not there, so I'm going to permit this

8    question as phrased and this line of questioning as

9    Mr. Stephens has articulated it.  I just -- I guess the only

10   point of this sidebar is to say I had a warning flag, which

11   I'm now going to disregard, because I'm convinced there is

12   no -- certainly no express eviction of the preclusion order,

13   so I'm going to say that my concern has been put to rest for

14   the present.  Okay.

15            (End of sidebar conference.)

16            (Continued on the next page.)

17

18

19

20

21

22

23

24

25

A. SPITZEN - CROSS/MR. STEPHENS          1915

1     MR. STEPHENS:  May I proceed, your Honor?

2     THE COURT:  Yes.

3     MR. STEPHENS:  Do you have the question?

4     INTERPRETER:  It would be in 2007 would be --

5     MR. STEPHENS:  Yes.

6     (Questions translated again.)

7     THE WITNESS:  That's right.

8   BY MR. STEPHENS:

9   Q    Okay.  Now, the first time you used these 18 criteria

10  as an expert was just for the three lawsuits that you are an

11  expert in concerning these attacks, right?

12  A    The 18 as they are written here, yes.

13  Q    And you can't identify anyone else who uses these 18

14  criteria, can you?

15  A    No, that's not true.

16  Q    Let's take a look at your deposition at 431, lines

17  seven through 19.  Four years ago, three years ago when you

18  were under oath you were asked:

19        "QUESTION:  Can you identify anyone else who uses

20  the same 18 criteria that you do or is this something unique

21  that you are bringing to the exercise?"

22        (Interpreted.)

23        MR. STEPHENS:  And your answer was:

24        "ANSWER:  These 18 criteria as they appear in a

25  list of one criterion coming after another, the way I wrote

1   this, then it's only me or it's me that is using them.  But

2   with respect to the criteria in general, all of them or some

3   of them, they are used extensively."

4          That was your answer, was it not?

5   A    I can repeat this question and this was also my

6   reservations here.

7   Q    But you haven't published any paper outlining your 18

8   criteria and how to apply them, have you?

9   A    No, I did not publish such an article.

10  Q    And so your 18 criteria have not been subject to review

11  by other experts to determine if they agree that the method

12  is appropriate; is that right?

13  A    If what you are referring to is academic examination,

14  then the answer is no.  But if the question is regarding how

15  enforcement agencies in Israel and other places in the world

16  use them, these criteria are or similar criteria; then, yes,

17  they are used.  And if you would like, I could provide

18  examples.

19  Q    You can have that done with Mr. Turner, if you'd like.

20  Your 18 criteria method is not a mathematical formula, is

21  it?

22  A    No, and I also said that.

23  Q    Right.  And there is no minimum number of these

24  criteria that have to be satisfied in order for you to

25  decide that a charitable society is controlled by Hamas?

A. SPITZEN - CROSS/MR. STEPHENS          1917

1   A    I've also explained that the criteria are examined

2   according to their quality and not their quantity.

3   Q    Right.  So there is no minimum number that have to

4   apply?

5   A    Yes, that's true, there is common sense and nobody is

6   banded from being used.

7   Q    The two most important of the criteria are leadership

8   and history, are they not?

9   A    These are important criteria.

10  Q    And it would be very difficult to quantify in every

11  criteria, the 18, exactly what percentage should be assigned

12  to the leadership or what percentage should be assigned to

13  the history, right?

14  A    Yes, that's true.  Like I said, it's a matter of

15  quality and not of quantity.

16  Q    You have not provided a checklist as to which of these

17  18 criteria are met by any one of the charities you

18  examined, have you?

19  A    A proper list is a compilation and that brings together

20  each and every society and the criteria that apply to it, I

21  had not provided such a chart.  But for each and every

22  society, I examine according to the relevant criteria,

23  because there are certain criteria that are not applicable

24  to all of the societies.

25  Q    And you don't have a particular weight that you

A. SPITZEN - CROSS/MR. STEPHENS            1918

1    assigned to each of the criteria for each of the charities?

2    A    Yes, I've already explained this is not something

3    mathematical, it has to do with more issues of values.  This

4    is not assembling something which is chemical or

5    mathematical.

6    Q    So not every factor has the weight, but the weight

7    given to any factor depends on the charity that you're

8    looking at; is that right?

9    A    This description is not completely accurate.  We're not

10   talking about -- the weight is not according to the specific

11   society.  The weight is attributed according to the

12   influence, the activities it has on the activities of this

13   charity and its identity.  It's not because it is a certain

14   society something weighing less.  Let's say one of the

15   criteria, do you mean if certain criteria is most important.

16   If that's the intention, then it's not how it was done.

17           MR. STEPHENS:  Could we take a look at the sealed

18   deposition, page 258 lines 13 through 23, please.

19           THE COURT:  Are the plaintiffs ready?  Do you have

20   it?

21           MR. STEPHENS:  13 through 23.  Four years ago you

22   were asked under oath:

23           "QUESTION:  Mr. Spitzen, you told me they have

24   different weights and I'm asking you to tell me which ones

25   you weighed more heavily than the others in the order in

A. SPITZEN - CROSS/MR. STEPHENS                1919

1   which you weighed them so I have an understanding how much

2   weight you ascribed to each.

3              ANSWER:  I am able to do it only in the context of

4   each and every organization.  I can tell you in which

5   organization history is more important in which organization

6   the identification of the leadership is more important and

7   in what organization actually the identification -- the

8   unequivocal identification with Hamas is more important."

9              That's the end of the answer.  Isn't it so?  It

10  is, in fact, the case that this testimony is true, is it

11  not?

12  A   Yes, that's true and it's completely identical to what

13  I just said now.

14  Q   Which is the weight assigned to each one of these

15  factors varies from entity to entity, right?

16  A   Yes.

17  Q   Every society there are certain factors which are more

18  dominant.  I wouldn't want to get into examples, but I can

19  give you one example.  In the Mujama, for example, it is

20  obvious that the history factor is the most important one,

21  because Hamas actually developed from it.

22             MR. STEPHENS:  Your Honor, I'm going to turn to a

23  very lengthy subject now and we'd like to take an early

24  lunch, then I can do it all at once.  Or if you prefer,

25  obviously, I will do it however you please.  But I

1   personally would rather do it all at once.

2          THE COURT:  I appreciate that, but it's easier to

3   keep people's attention in the morning than the afternoon

4   after they have had lunch, so I'd rather have a longer

5   morning and a shorter afternoon, if we can.  So try to do

6   another 15 to 20 minutes, if it doesn't disrupt you too

7   much.

8          MR. STEPHENS:  All right.  I'll try to make it

9   entertaining.

10         THE COURT:  Save that for the late afternoon.

11         MR. STEPHENS:  Okay.  I want to turn to the Saudi

12  Committee.

13         INTERPRETER:  He wants this to be interpreted,

14  what transpired here, okay?

15         THE COURT:  I think the witness is entitled to

16  that.

17         (Interpretation given.)

18         THE WITNESS:  Thank you.

19  BY MR. STEPHENS:

20  Q    So I'd like to turn to the Saudi Committee with you,

21  Mr. Spitzen.  You were asked by the plaintiffs' attorneys to

22  examine whether the Saudi Committee was controlled by Hamas

23  between 2000 and 2003, were you not?

24  A    That's right, sir.

25  Q    And after billing $1.4 million and spending 3,100 hours

A. SPITZEN - CROSS/MR. STEPHENS          1921

1   you said yes to that too, right?

2   A    No.  Actually, the answer is no.  First of all,

3   regarding the money for the Saudi Committee, that

4   organization didn't appear in the Credit Lyonnais case

5   neither in the Nat West case, so we shouldn't connect the

6   fees that I received for that, for these cases and the bank.

7   And if the conclusion is regarding the Saudi Committee for

8   my work for Arab Bank, I had received $860,000.  And I also

9   invested a lot of time, and all that time that I had to

10  actually waste just because I didn't have materials from the

11  bank.

12          Now, regarding the Saudi Committee, if I remember

13  correctly -- and actually, I could quote from the report if

14  I would agree to that, but I also remember it by heart.  I

15  did say explicitly that the Saudi Committee was not

16  controlled by Hamas.  I did say that certain projects it had

17  were then under instruction of Hamas and for Hamas, but I

18  would rather read out my answer, because there is such a

19  question, it was asked by the defendants, and I think it's

20  important to properly read the answer.

21  Q    Okay.  So your conclusion is that the Saudi Committee

22  was not controlled by Hamas; but rather, coordinated with

23  Hamas on certain projects; is that right?

24  A    I don't remember the exact wording of my answer, but it

25  does exist inside my report, something which answers exactly

A. SPITZEN - CROSS/MR. STEPHENS          1922

1   this question, but I do think that my answer is definitely

2   compatible with what you just said.

3   Q    Now, it is certainly not your opinion that all Islamic

4   people are terrorists or support terrorism, isn't that

5   right?

6   A    Of course.

7   Q    And everyone who supports the Palestinian people and

8   their wish for a homeland are certainly not all supporters

9   of terrorism, are they?

10  A    Of course not; otherwise, I would have to define myself

11  as a terrorist.

12  Q    The Saudi Committee was formed in October of 2000, was

13  it not?

14  A    That's right.

15  Q    And you say it's been known by three different names?

16  A    Throughout the years, yes.  At the beginning it was

17  initially -- it was called the Saudi Committee for Support

18  of the al Quds Intifada.  And then in 2002, after pressures

19  from America regarding its conduct, they changed the name

20  into Saudi Committee for Support of the Palestinian People.

21  Q    So you and I together, as you did in your report, can

22  refer to the Saudi Committee as "the Saudi Committee," can

23  we not?

24  A    Yes.  If it is for purposes of brevity, yes, but the

25  full name was the Saudi Committee for Support of al Quds

A. SPITZEN - CROSS/MR. STEPHENS          1923

1   Intifada.  This is how its goals were defined.

2   Q    And -- yes.  And then later Saudi Committee for the

3   Relief of Palestinian People, right?

4   A    Yes, after 2002.

5   Q    Now, the United States of America never designated the

6   Saudi Committee as a terrorist organization, did it?

7   A    To the best of my knowledge it hasn't.

8            MR. STEPHENS:  And if we could look at SAG 17.

9            MR. TURNER:  Before we do that, your Honor, may we

10   approach a moment?

11            THE COURT:  Yes.

12            (Continued on the next page for sidebar.)

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                    1924

1          (Sidebar conference begins.)

2          MR. TURNER:  Which one of those is 17?

3          MR. STEPHENS:  None, I'm not there yet.

4          MR. TURNER:  Well, they gave me these three.

5          THE COURT:  Let's see 17, please.

6          MR. STEPHENS:  SAG 17.

7          MR. INGERMAN:  I've given you this one, it's this

8    one.

9          THE COURT:  Oh, okay.  Good time for lunch.

10          (End of sidebar conference.)

11          (Continued on the next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS                          1925

1        THE COURT:  All right.  Ladies and gentlemen,

2   we'll now take our lunch break.  We'll start at 1:25.

3   Please do not discuss the case amongst yourselves or anyone

4   else.  Keep an open mind.  We'll see you in an hour and five

5   minutes.

6            (Jury is out of the courtroom at 12:19 p.m.)

7        THE COURT:  Okay.  The parties obviously need to

8   confer on this.  Do that and let Ms. Clarke know if we need

9   to meet five minutes early at 1:20 and we will, if we need

10  to, go over any issues.  Have a good lunch.

11       MR. STEPHENS:  Thank you, your Honor.

12           (Proceedings were recessed at 12:19 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS                          1926

1        **AFTERNOON SESSION**

2

3            (In open court.)

4            (Parties present.)

5            (Honorable Brian M. Cogan takes the bench.)

6            THE COURT:  First, let me note that whose ever

7    using slides, you've got to get a set to the reporters at

8    the end of the day, okay.  Otherwise, the transcript is

9    going to suffer badly, so have a set for the reporters and

10   give it to the reporters.  Okay.  Now, what's the problem?

11           MR. TURNER:  We've got three slides we had an

12   issue with; 17, 18 and 20, which were the ones we've been

13   given.  I think 17 was agreed upon in that they're going to

14   remove the circled paragraph.

15           THE COURT:  Okay.

16           MR. STEPHENS:  That's done.  We don't need to

17   waste time with that.

18           THE COURT:  I'm sorry, Mr. Stephens?

19           MR. STEPHENS:  That's done.

20           MR. TURNER:  The next one is --

21           THE COURT:  Mr. Stephens, it's fine for you to

22   have your coat off.

23           MR. STEPHENS:  I'm sorry.  I forgot.  I totally

24   forgot.  It was hot.

25           THE COURT:  Yeah, I understand.

PROCEEDINGS                    1927

1      MR. TURNER:  The next one is a website capture

2  from the Saudi Committee website, and they objected to us

3  showing the Saudi Committee website, and we likewise object.

4      THE COURT:  What's the basis of your objection?

5      MR. TURNER:  Hearsay, unauthenticated.

6      THE COURT:  Okay.  Mr. Stephens?

7      MR. STEPHENS:  Yes, your Honor has addressed this

8  twice in this very exhibit, which is 468.  And on the 1st of

9  September you indicated that 468 plus three others could be

10  exhibited for 703 purposes.  And then the next day you said

11  to us all that the list of beneficiaries could be disclosed

12  to the jury, which is actually what that particular one is.

13      I just want to use it in order to, you know,

14  illustrate for the jury's understanding, you know, what

15  we're talking about.

16      THE COURT:  But 703 purposes does not include this

17  witness, because he's not your expert.  If this is

18  authenticated by your expert, you can use it there, maybe.

19      MR. STEPHENS:  Well...

20      THE COURT:  I'm not crossing that bridge yet, but

21  I don't see how you can cross-examine him on an

22  unauthenticated hearsay document.  It forms -- the

23  information on this document gives you a good faith basis

24  for asking him questions, okay.

25      MR. STEPHENS:  Yeah, about the Saudi Committee,

PROCEEDINGS                          1928

1   not about the website.

2        I don't want to -- I don't want to ask him about

3   the website, I want to illustrate actually what's on the

4   website, because he relied on it in his report extensively;

5   I might add, not just a little.

6        THE COURT:  Mr. Turner, was this used by this

7   witness on direct?

8        MR. TURNER:  No, sir, it was not used.

9        MR. STEPHENS:  Actually, I have a page right here,

10  the answer is "yes".

11       THE COURT:  Okay.

12       MR. OSEN:  Your Honor, maybe I can clear this up.

13       THE COURT:  Yeah.

14       MR. OSEN:  Save us a little time.  Mr. Spitzen did

15  rely upon the Saudi Committee website, which has thousands

16  of pages in it for his report.  He testified about it.  Your

17  Honor limited plaintiffs' ability to show examples from the

18  Saudi Committee, I believe one or two slides, and told us

19  that we could show one list from either the Saudi Committee

20  or one of the other in our slide deck, which we did from

21  another charity.

22       Now, they want to introduce and show a page which

23  the witness has not specifically seen or testified about,

24  and they want to use that I take it for 703 purposes, which

25  I'm not sure what that means exactly, but...

PROCEEDINGS                    1929

1     THE COURT:  Okay.  It's not for 703 purposes.  If

2  it's for anything, it's for impeachment purposes.  It is a

3  website upon which the witness relied in the generation of

4  his report and his testimony.  I have circumscribed the

5  plaintiffs in using that because Rule 703 doesn't let you

6  bring in a lot of hearsay, so I've let them have a little

7  for illustrative purposes anyway.  That does not mean the

8  expert cannot be impeached with material that he had access

9  to and, in fact, used in developing his opinion.

10     So I will allow it for that purpose.  It may open

11  the door on re-direct to the use of more of the Saudi

12  website for this expert that I was willing to allow before,

13  but that's a risk the defendant has to decide if it wants to

14  take or not.

15     I will also say defendant's argument is the right

16  margin, that's got to come out, that's for closing, that's

17  not for cross-examination of a witness.

18     MR. STEPHENS:  Right.  That's easy to do, your

19  Honor.

20     THE COURT:  Okay.  Let's do that.  What's the next

21  slide?

22     MR. TURNER:  The same issue.  That is a website

23  capture that is sourced from the witness' report, but the

24  website capture itself comes from the website.

25     MR. STEPHENS:  But he --

```
                      PROCEEDINGS                      1930
```

1        THE COURT:  Okay.  Stop.  You're going to win.
2   It's okay.
3        MR. STEPHENS:  Can I sit down now?
4        MR. COLES:  Take off your jacket.
5        THE COURT:  Again, he used the website in the
6   development of his report, he cited it, he referred to it,
7   he may not have referred to it in this case.
8        MR. OSEN:  Actually, he did.  We had a slide for
9   it, which we weren't able to use.
10       THE COURT:  Okay.  And now you will be able to.
11       MR. OSEN:  Fair enough, your Honor.
12       THE COURT:  And just so the defendant is clear;
13  the fact that you have chosen to impeach him with two slides
14  from the Saudi website does not mean the plaintiff is
15  limited to these two slides to rehabilitate him.  You may be
16  opening the door to more of this website when you use these,
17  just so you know that.
18       MR. STEPHENS:  Yes.  And I want the Court to
19  understand that the second one you're looking at is not a
20  web capture, it is actually out of his report.
21       THE COURT:  It doesn't matter.  It doesn't matter.
22  He used the website in his report and, to a degree, in his
23  testimony, so he can be impeached with it.
24       MR. STEPHENS:  All right.
25       THE COURT:  Okay.  Let's have the jury.  But be

A. SPITZEN - CROSS/MR. STEPHENS            1931

1   seated, because they're not lined up.

2           It occurs to me that the technology, the use of

3   PowerPoint slides, which is supposed to make things easier

4   and clearer for the jury, but it's introduced a whole new

5   level of analysis for judges, because you not only have to

6   rule on the testimony, you have to rule on the slides.  It's

7   like having two witnesses there.

8           (Jury is in the courtroom at 1:32 p.m.)

9           THE COURT:  All right.  Be seated, please.

10  Mr. Turner, please continue.  Sorry.  Mr. Stephens, please

11  continue.

12          MR. STEPHENS:  May I proceed, your Honor?

13          THE COURT:  You may; both of you may.

14  BY MR. STEPHENS:

15  Q    When we left off, we were talking about the Saudi

16  Committee, were we not?

17  A    Yes.

18  Q    And I had just asked you that the United States of

19  America never designated the Saudi Committee as a terrorist

20  organization, did it?

21  A    To the best of my knowledge, that's correct.

22          MR. STEPHENS:  Could we see SAG 17, please.

23  Q    During the period of 2000 to 2004, in fact, no

24  government in the world said the Saudi Committee was a

25  prohibited organization, did it?

A. SPITZEN - CROSS/MR. STEPHENS          1932

1    A    That's correct.

2    Q    Now, the Saudi Committee had a website, did it not, on

3    the internet?

4    A    That's correct.

5    Q    And during your direct examination you showed a couple

6    of versions of the website to the jury, did you not?

7              MR. STEPHENS:  Can you show the witness only,

8    please, slide 72.

9    A    That's correct.

10   Q    I'm sorry.  You were shown this website during your

11   direct, were you not?

12   A    I recall that, yes.

13   Q    Right.  And actually, and testified about the fact that

14   the Islamic Charitable Society in the West Bank and the

15   al-Salah Islamic Association were coordinating the activity

16   in the West Bank and Gaza, did you not?

17   A    Yes, that's correct.  And I also added that I have a

18   letter from the bank confirming that.

19   Q    Well, in fact, what the website shows is that there

20   were more than 33 societies who currently carry out the

21   Saudi Committee's activities, isn't that right?

22   A    No.  What it says is that there were 33 societies that

23   participate in the activity at the same time, but that it's

24   representatives are the Charitable Society of Hebron and the

25   al-Salah Society of Gaza, they represent the Saudi

A. SPITZEN - CROSS/MR. STEPHENS          1933

1   Committee, but there were other societies that participated

2   in the activities.

3   Q    I see.  What it says -- there are two societies and

4   that's the Islamic Charitable Society in Gaza and the

5   al-Salah Society, which are among the largest in Palestine,

6   these societies have been appointed to monitor the

7   operations during the giving of relief.  In doing so,

8   through a coordinative committee made up of more than 33

9   societies who currently carry out the activities.  Isn't

10  that what it says?

11  A    Yes, that's correct.  In actual fact, the committee in

12  Hebron and the al-Salah Committee in Gaza, they collected

13  all the data and coordinated it and transferred it in actual

14  fact.

15  Q    Neither the Islamic Charitable Associate in Hebron or

16  the al-Salah Islamic Association in Gaza were designated by

17  the United States of America as terrorist organizations

18  between 2000 and 2004, isn't that right?

19  A    That's correct.  We mentioned al-Salah in connection

20  with 2007, but in 2004 they were not yet designated.

21  Q    Right.  And the Saudi Committee website was rich with

22  material about the committee, was it not?

23  A    Yes.

24  Q    And, in fact, the business relationship among the Saudi

25  Committee, Arab National Bank, and Arab Bank was on the

A. SPITZEN - CROSS/MR. STEPHENS                1934

1  website, wasn't it?

2  A    It was on the site, too, and I relied on the site as

3  well.

4  Q    The website also contained lists of the beneficiaries

5  of the committees various payments, right?

6  A    I don't know if all the lists of all the projects were

7  on the website, but there were lists of beneficiaries.

8  Q    If you'd take a look please at your slide 92 that you

9  used on your direct examination.  I believe this was

10  displayed to the jury during the direct and I'd like to do

11  to now please --

12  A    Okay.

13  Q    On the left-hand side of the screen is actually a list

14  of the beneficiaries from the Saudi Committee website, isn't

15  that right?

16  A    That's correct.

17  Q    Right.  But what you've got here, these two pictures,

18  they're not on the website cell commander in Nablus is not

19  on the website or the Qassam Brigade is not on the website

20  for either of these people, is it?

21          THE COURT:  I need to interrupt.  Are we all sure

22  this was shown to the jury on his direct?

23          MR. TURNER:  Your Honor, it was not shown to the

24  jury, but I have no objection if he wants to.

25          THE COURT:  Right.  I understand.  I just don't

A. SPITZEN - CROSS/MR. STEPHENS          1935

1  want Mr. Stephens going down a road that isn't paved.  Do

2  you understand what I mean, Mr. Stephens?

3          MR. STEPHENS:  Yes.  And I thought it had been

4  displayed, actually, as I mentioned to you.

5          THE COURT:  You did, and I thought so too, and I

6  checked and it was not.  So any questions you have about it

7  should be phrased in that light, if that helps you.  You can

8  phrase them however you want, there is no objection, but I

9  knew you were operating on a wrong assumption and I didn't

10  want that to happen.

11          MR. STEPHENS:  Right.  Okay.  So I'm happy to

12  display it.

13          THE COURT:  Okay.

14          INTERPRETER:  Do you want me to interpret the

15  question you asked earlier?

16          MR. STEPHENS:  Yes, please.

17          (Interpreting.)

18          THE WITNESS:  Of course the pictures are

19  demonstrative to show who was on the list.

20  BY MR. STEPHENS:

21  Q    The pictures have labels of these people as being

22  Qassam Brigade operatives that are not on the list, isn't

23  that right?

24  A    No, it doesn't.

25  Q    All right.  Now, if you take a look at SAG 18, that's

1  actually what one of the list of beneficiaries looks like,

2  isn't it?

3  A    There is nothing uniform about it.  We can see on this

4  list, it doesn't appear on all the lists, but on this

5  particular list, we can see the reason for death, the cause

6  of death.

7  Q    Right.  The recipient's name is there; 20,000 Saudi

8  riyals is the payment for -- to the family for the death,

9  and that this particular person died from wounds from a tank

10 attack, right?

11 A    Yes, that's what it says here.

12 Q    All right.  Now, you do not have any evidence that Arab

13 Bank was involved in any way in the selection of the

14 beneficiaries for the Saudi Committee, do you?

15 A    In the selection, no.

16 Q    You have no evidence that Arab Bank was involved in any

17 way in setting the criteria to determine if someone was

18 entitled to money from the Saudi Committee?

19 A    That's correct.

20 Q    And you have no evidence that Arab Bank was involved in

21 how much money a beneficiary would be entitled to from the

22 Saudi Committee, do you?

23 A    No.  Those were decisions made by the Saudi Committee.

24 Q    The Saudi Committee is involved in many projects, was

25 it not?

A. SPITZEN - CROSS/MR. STEPHENS                1937

1   A    Yes, that is at least what it maintained that it did.

2   Q    Right.

3        MR. STEPHENS:  If we can look at SAG 20, please.

4   Q    In your expert report, you list nine different Saudi

5   Committee programs, do you not?

6   A    I accept what you say.  I don't have it before me, so I

7   can't count, but if that's what you say, I believe you.

8   Q    Your expert report is still I think on the desk there.

9   A    I'll have to take your word for it that you didn't say

10  something that isn't there.

11  Q    Okay.  The first program that you listed as a Saudi

12  Committee project was Support for the Martyrs and Families.

13  Each family was allocated 20,000 riyals, which is about

14  $5,300; is that right?

15  A    That's correct.

16  Q    And the second one is Support For Those Who Were

17  Wounded During the Conflict, participation and the cost of

18  treatment, and the benefit was 5,000 riyals, which is about

19  $1,300, right?

20  A    That's correct.

21  Q    And the third program you cite is Support For Those Who

22  Are Crippled During the Conflict Support For Invalids Whose

23  Work Capacities Were Impaired, and the benefit of that is

24  20,000 riyals, which is about $5,300, right?

25  A    That is what it said on the website.  I myself found no

A. SPITZEN - CROSS/MR. STEPHENS          1938

1   actual proof that that was the case.  I can't state with

2   certainty that was indeed the case, because I have no proof

3   for it.

4   Q    Okay.  We're going to get to that proof in a minute.

5   The benefit for families of dead people, of martyrs; 20,000

6   riyals is exactly the same as the benefit to support people

7   who are crippled, isn't it?

8   A    I checked all the lists one-by-one, every single name,

9   and I was unable to confirm which people were dead, and so

10  on, and under what circumstances.  I didn't find any cases

11  of people who were crippled or became handicapped, maybe

12  there were, but I personally didn't find any.  Lists are

13  generally very orderly and are classified by martyrs,

14  prisoners, wounded, first round, second round, and tenth

15  round and so on, and I checked every single one

16  name-by-name, thousands of names.

17           MR. STEPHENS:  Move to strike, your Honor.  The

18  question was:  "Is the benefit the same?"

19           (Continued on the next page.)

20

21

22

23

24

25

A. Spitzen - Cross/Stephens                    1939

1      THE COURT:  I will grant the motion that the jury

2  is to disregard the answer.

3  CROSS-EXAMINATION (Cont'd.)

4  BY MR. STEPHENS:

5  Q    Let me ask it again.  The benefit for families and

6  martyrs is 20,000 riyals, about $5300, and is precisely the

7  same as the benefit to support those who are crippled during

8  the conflict, 20,000 riyals, about $5300; isn't that right?

9  A    Yes, that's correct.

10 Q    And the fourth program that you have listed here in

11 your report is Support for Families of Prisoners, and that

12 benefit is 10,000 riyals, which is about $600, right?

13 A    Yes, that's correct.

14 Q    And the sixth program that you cite, Support for

15 Palestinians whose houses were ruined or whose fields were

16 damaged, and that's 10,000 riyals, about $2600, isn't it?

17 A    Yes, that's correct.

18 Q    So, the amount for the support of families of

19 prisoners, 10,000 riyals, $2600, is the same as support for

20 Palestinians whose houses were ruined or fields damaged, is

21 it not?

22 A    The compensation is the same, yes.

23 Q    Right.

24      And, number two, support for those who are wounded

25 during the conflict is a benefit of 5,000 riyals or about

A. Spitzen - Cross/Stephens                1940

1   $1300, right?

2   A    That's correct.

3           MR. STEPHENS:  Give me a moment, your Honor.

4           THE COURT:  Yes.

5           MR. STEPHENS:  Thank you.

6           (Pause)

7           Could we show the witness, please, SAG-41.

8           MR. TURNER:  I don't have 41.

9           THE COURT:  Shouldn't have these been provided

10  earlier?

11          MR. STEPHENS:  Or at least put it in an order.

12          THE COURT:  Yes, at least.

13  BY MR. STEPHENS:

14  Q    This is a part of the website that you accessed in

15  writing your report, isn't it?

16  A    Yes, sir.

17  Q    Right.

18          What it shows is the Saudi Committee programs,

19  does it not?

20  A    It claims that the Saudi Committee performs these

21  programs, yes.

22  Q    Right.

23          And one of the programs is called Cash Supports

24  Program, isn't it?

25  A    Yes, that's what it says.  I can't see the other, but I

A. Spitzen - Cross/Stephens                1941

1  have to count on the translation.

2  Q    Now, let's show the witness SAG-42, the Cash Supports

3  Program --

4  A    I have to ask a question.

5          What I'm seeing here is the original cited in

6  English or translation of the Arabic?

7  Q    It's a translation of the Arabic.

8  A    Okay.  Thank you.

9  Q    And the Cash Supports Program lists programs to help

10 the families who lost the provider, and that's martyrs, is

11 it not?

12 A    I need to see what is written here.

13         (Pause)

14         Yes, this is what it claims.

15 Q    Right.

16         Then if we can see SAG-43?  Display it to the,

17 witness, please.

18         On this page, there's the Injuries Help Program,

19 Disabled Program, the Prisoner Program, did you see that?

20 A    Yes, I see the translation.

21 Q    Right.  And you know under the Disabled Help Program,

22 there's a point you can chick on that says "beneficiaries,"

23 right?

24 A    That's what it says.

25 Q    Okay.

A. Spitzen - Cross/Stephens                1942

1      THE COURT:  Mr. Stephens, can we pick this up a

2  little.

3      MR. STEPHENS:  Yes.  I'm actually cutting things

4  out, your Honor.

5      THE COURT:  Sometimes it takes time to do that.

6      MR. STEPHENS:  That's what I'm doing.

7      THE COURT:  Okay.

8  BY MR. STEPHENS:

9  Q    Now, if we can take a look at SAG-56, please, together.

10     If we click on beneficiaries, there's a whole list

11  of names.

12     Do you see that?

13  A    Yes, I do.

14  Q    Right.  On this page alone there's about two dozen

15  names of disabled people, isn't there?

16  A    It says a list of people which the Saudi Committee

17  claims they are handicapped and that he transferred money to

18  them.  This is contrary to other lists that I checked.  But

19  if you are referring to what is just written there, yes,

20  that's what it says.

21  Q    And the list of disabled people includes an ID number,

22  right?

23  A    Yes.

24  Q    And a name and the date of injury and the injury type,

25  103, which is disability, and the amount of 20,000 riyals,

A. Spitzen - Cross/Stephens          1943

1   right?

2   A    Yes, yes, sir.

3   Q    So, in fact we are looking at a list of beneficiaries

4   of the cripple person, disabled person program, aren't we?

5   A    According to the claim of the Saudi Committee.

6   Q    Right.  So can we go back, please, to SAG-20.

7            Please display it to the jury.  It's already been

8   up.

9            By looking at a payment of 20,000 riyals by

10  itself, a person can't tell if that's a payment for the

11  family of a martyr or a payment for someone who is crippled,

12  can you?

13  A    No.  You need to check, as I did, for each and every

14  one of them.

15  Q    Right.  And the same is true with respect to the

16  families of prisoners and Palestinians whose houses were

17  ruined, it is the same amount, 10,000 riyals, and you can't

18  tell what the 10,000 is paid for just by looking at the

19  number, can you?

20  A    Assuming there is such a list of people who received

21  money for the destruction of their homes and fields - I have

22  just seen the list of the handicapped people - if you have

23  another list for those whose houses and lands were

24  destroyed, then the answer is yes.

25  Q    Okay.

A. Spitzen - Cross/Stephens                    1944

1        Let's show the witness, please, SAG-69.

2        This is a list of beneficiaries of Type 106, which

3    is losing your house or fields, and, as you can see, there

4    are a couple of dozen names on this list.  I did number

5    injury type 106, and a payment of 10,000 riyals.  So that's

6    a list of people who received a 10,000 riyal benefit for

7    having had their house or field damaged; isn't that right?

8    A    I need to see where it says that 106 is really an item

9    about the loss of houses and fields.  If it is, then the

10   answer is yes.

11   Q    Go back to the program the original.  There we go.

12        Program 6, see it there?

13   A    Six, program, yes, yes.

14   Q    If you click on beneficiaries, where you go is right

15   there; isn't that right?

16   A    If that's what you say, I believe you.  I haven't done

17   it.

18   Q    Okay.

19        Now, it is not the case that the Saudi Committee

20   was giving more monies to the families of suicide bombers

21   who died or other terrorists, right?

22   A    More than other people to be the same criteria?

23   Q    Yes.

24   A    I did not find this inconsistent.  I did find a case or

25   two of people who received a double grant.  For example,

A. Spitzen - Cross/Stephens                1945

1    Nabil Halablya, the terrorist who exploded the bomb on Ben

2    Yehuda Street, for some reason his mother received the

3    Shaheed grant twice.

4    Q    All right.

5            Generally, with one or two exceptions, it's your

6    understanding, based upon your review of the records

7    relating to the Saudi Committee, that the same amount was

8    paid by the committee to the families of martyrs, dead

9    people, regardless of the cause of death; is that true?

10   A    That is correct, without consideration of the cause of

11   death.

12   Q    Now, the Saudi Committee was the subject of a lot of

13   media presentation in 2001 and '02, was it not?

14   A    Many appearances in the media?

15   Q    No, no.  Let me ask the question a different way.

16           Did the Saudi Committee know its benefits were

17   being discussed in news publications and interviews in late

18   2001 and early 2002; isn't that right?

19   A    That's correct.

20   Q    Right.

21           In fact, if you take a look at your report, you

22   have about five pages devoted to the fact that the Saudi

23   Committee was using a lot of media and advertising as a

24   component of its work, do you not?

25   A    Correct.

A. Spitzen - Cross/Stephens                1946

1  Q    In his testimony here in this court last week, Dr.

2  Levitt, another one of the plaintiff's experts --

3          MR. TURNER:  Excuse me, your Honor.  May we

4  approach?

5          THE COURT:  Yes.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDE BAR                              1947

1              (Sided Bar)

2         MR. TURNER:  I'm not positive, but I am

3    anticipating we are about to get into the Colin Powell

4    issue.

5         MR. STEPHENS:  We are not.

6              (Sides bar ends)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A. Spitzen - Cross/Stephens                    1948

1   BY MR. STEPHENS:

2   Q    I will start the question again.

3        The plaintiff's expert, Dr. Matthew Levitt, who

4   testified here last week, acknowledged while he was

5   testifying that the State of Israel complained to the

6   President of the United States that it thought that the

7   payments to the families of those who had been killed in

8   terrorist attacks was a problem, isn't that right, or do you

9   know that?

10  A    Yes, I'm familiar with that.

11  Q    Right.

12       Dr. Levitt also testified that the Israelis

13  "complained to a lot of people about it."  Would you agree

14  with that?

15  A    I don't really understand this, this expression many

16  people.  I know that Israel complained to official bodies

17  around the world, not just people, but official bodies, that

18  the Saudi Committee in its activities reinforces Hamas and

19  terrorism, and damages the peace, both on the Israeli side

20  and the Palestinian side.

21  Q    And the Saudi Committee actually responded to those

22  criticisms in several different newspapers and interviews,

23  did it not, and the Saudi Committee obviously denied it?

24  A    Yes.

25  Q    In fact, the Saudi Committee stated publicly that money

A. Spitzen - Cross/Stephens          1949

1   that was --

2          MR. TURNER:  Objection.

3   Q    -- going to the Palestinian families was not a reward

4   for their sons and daughters committing suicide.  It was

5   rather a benefit.

6          THE COURT:  Stop.  It's sustained?

7          MR. STEPHENS:  Sorry?

8          THE COURT:  It's sustained.

9          MR. STEPHENS:  I didn't hear the objection.

10          THE COURT:  There was an objection.

11          MR. STEPHENS:  I didn't hear it.

12          THE COURT:  It happens.

13  BY MR. STEPHENS:

14  Q    You do agree -- one more thing.

15          During his testimony, Dr. Levitt, plaintiff's

16  expert, also said that if an organization makes it clear

17  that it is providing money to the families of dead people,

18  not because of how or when or in what situation they died,

19  but just because someone died and the bread-maker is gone,

20  that's not a problem.

21          Do you agree with that?

22  A    I don't know whether or not this is an accurate quote

23  of what Dr. Levitt said.  I would be happy to see in what

24  context he said it.  But to me, what is very important is

25  who is behind these funds.  Of course I have no problem with

A. Spitzen - Cross/Stephens                1950

1  charity and giving help to the needy.  The question is who

2  is giving the money and who benefits from this donation.

3  Q    All right.  Can we look at SAG-27, please.  It's a

4  quote of the trial transcript 784, lines 4 through 18.

5           MR. TURNER:  You said this was what?

6           MR. STEPHENS:  27.

7           May we display that to the jury, your Honor?

8           THE COURT:  Any objection?

9           MR. TURNER:  No, sir.

10           THE COURT:  All right.

11  BY MR. STEPHENS:

12  Q    You asked me a moment ago, Mr. Spitzen, to actually see

13  what it was that Dr. Levitt said in his testimony, and so

14  there it is.  I'm not going to read it all, but he said:  If

15  there is an organization which makes it clear that it is

16  providing money to families of dead people, not because

17  how --

18           THE COURT:  You did read it, before you showed it

19  to him.  Now everyone is seeing it, so let's just ask the

20  question and not read it again.

21           MR. STEPHENS:  All right.

22  Q    Do you agree with Dr. Levitt's testimony here that it

23  is not a problem?

24  A    I agree, with one reservation.  It depends who is

25  behind this money.  If it is done by Hamas, or somebody

A. Spitzen - Cross/Stephens                1951

1   guided by Hamas or another terror organization, it is

2   unacceptable to me, obviously.  It is acceptable, if an

3   organization gives the money to people who lost their

4   breadwinners, without checking how they lost them, and who

5   does it as a charity.  If it's not credited to a terror

6   organization, I am less disturbed by this.

7   Q    So, in other words, if the organization that gives the

8   death benefit to the family of a suicide bomber is not

9   connected to Hamas, then you think that's acceptable; is

10  that right?

11  A    That's not accurate and not exactly what I said.  What

12  it says here is that if it's a breadwinner, if he's just the

13  one who supports the family.  When a suicide bomber is

14  involved, in most cases he's not the breadwinner of the

15  family, far from it, in fact.  So you have to take a much

16  deeper look into things and examine it more closely.

17  Q    All right.

18        Well, then, let's assume that the organization

19  paying the death benefit is not connected to Hamas, and that

20  the suicide bomber was in fact the breadwinner in the

21  family.  You think that the payment of a death payment to a

22  family is acceptable, do you not?

23  A    Here, too, it depends.  A much more in-depth

24  examination needs to be carried out.  For example, regarding

25  the behavior of the family.  What it says, did it support

A. Spitzen - Cross/Stephens            1952

1    the actions of the terrorist?  There are many things that

2    need to be looked into regarding the irresponsible manner in

3    which the money was handed out to families of suicide

4    bombers by the Saudi Committee via the Arab Bank.

5            THE COURT:  Mr. Stephens, can we go on to

6    something else.

7            MR. STEPHENS:  I'm going to.

8    BY MR. STEPHENS:

9    Q    Can we see the list of Zakats again.

10           Once again, just to orient the jury, these are the

11   charitable societies and Zakats that you identified as being

12   connected to Hamas, right?

13   A    Yes, sir.

14   Q    And, in your view, is it wrong for these charities to

15   actually provide charity to the Palestinian population

16   because those charities are connected to Hamas?

17   A    It is wrong that these charity societies even exist.

18   These are entities that are controlled by Hamas.  They serve

19   a terror organization, at least in the area in which they

20   are active.  They were outlawed by the sovereign, which is

21   the State of Israel; therefore, it is not a question here of

22   charity or not charity.  They have no right to exist.

23   Q    Do you think it is wrong for one of these charities

24   that you've identified as controlled by Hamas, to give

25   medical help to the ill who are not connected to Hamas?

A. Spitzen - Cross/Stephens                    1953

1      THE COURT:  I will ask you to move on.  I think we

2  all know the witness' answer, based on what he just said.

3      MR. STEPHENS:  All right.

4  BY MR. STEPHENS:

5  Q    Can we take a look at your Slide 74 from your direct?

6      We are back to the Saudi Committee now.  And your

7  Slide 74 shows that the amount transferred to the al-Salah

8  Islamic association - Gaza by the Saudi Committee was

9  $9,730,000, right?

10  A    And $813.  Yes, I based myself on Geisser's figures,

11  and that's correct.

12  Q    Rights.

13      And in your report at page 238, in your footnote

14  1238, you describe, do you not, how the Saudi Committee

15  distributed about roughly $8 million of that money through

16  al-Salah?

17  A    So what's the question?

18  Q    You show that in your report, do you not?

19  A    I haven't found it in the report, but, yes, if you say

20  so, I believe you.

21  Q    Footnote 1238, if like to find it.  Can you show the

22  witness, please, the footnote?  I don't have it on a slide

23  in Hebrew, I'm sorry, but I do have it in English.

24      THE COURT:  You have given him the number.  He

25  should be able to find it.

A. Spitzen - Cross/Stephens                 1954

1          THE WITNESS:  I will find it in a moment.

2          (Pause)

3          I see it, okay.

4          MR. STEPHENS:  Your Honor, I would like to display

5    that to the jury?

6          THE COURT:  Okay.

7    BY MR. STEPHENS:

8    Q    So this is footnote 1238 in your report, and what it

9    shows is these five transfers to al-Salah from the Saudi

10   Committee on the dates that are indicated, right?

11   A    Yes.

12   Q    And the number at the end of each one of those, the

13   ABPLC number, is the transfer from Arab Bank that you were

14   looking at when you drew this conclusion, right?

15   A    Yes.

16   Q    Okay.

17         Let's look together - the witness only - at the

18   first of those transfers, which is Plaintiff's Exhibit 1766.

19         Mr. TURNER:  Can we have an English translation of

20   that?

21         THE COURT: Yes.

22         MR. STEPHENS:  I don't know whether this is in

23   evidence or not.  If it's not, I would like to offer it.

24         MR. TURNER:  We have no objection.  I don't know

25   offhand, either.

A. Spitzen - Cross/Stephens          1955

1     THE COURT:  All right.  No one knows, so let's --
2  hang on one second.
3     If you are going to offer it as a defendant's
4  exhibit, you need to give it a number.
5     MR. STEPHENS:  Gayle, can you give us a number for
6  this?
7     MR. COLES:  It was a preadmitted exhibit.
8     THE COURT:  As what?
9     MR. COLES:  1766.
10     MR. STEPHENS:  Could we please show that to the
11  jury?
12     THE COURT:  Yes.
13  Q    This was the transfer you were looking at, first one in
14  your footnote, that's for $999,990.50, which is the value of
15  the transfers that occurred?
16  A    Yes, I see that.
17  Q    Right.  And the date on the transfer is December 7,
18  2000, is it not?
19  A    Yes.
20  Q    And the transfer is going from the Saudi Committee to
21  al-Salah, is it not?
22  A    Yes.
23  Q    Right.
24     And it says that that million dollars is for the
25  purchase of 25,000 food for the Gaza affected?

A. Spitzen - Cross/Stephens                1956

1    A    25,000 food?

2    Q    That's what it says.

3    A    Yes, I can see that.

4    Q    You don't have any reason to believe that's not true,

5    do you?

6    A    No, I believe it is true.

7    Q    All right.

8              Now, let's look at -- let's go back to his

9    footnote.

10   A    I just like to add that if it were in 2007, they

11   wouldn't be allowed to touch it at all.  The committee

12   behaved exactly as it did in 2007.

13   Q    That transfer was in 2000, wasn't it?

14   A    The goal isn't what is important here.  What's

15   important is who is distributing the money.

16   Q    Your footnote, can we display this, your Honor?

17              The second transfer in your footnote from the

18   Saudi Committee to al-Salah is January 24th, and it's for $2

19   million, right?

20   A    Yes.

21   Q    Right.  If we can look, please, at Plaintiff's

22   Exhibit 1770.

23              Is that preadmitted?

24              MR. COLES:  Preadmitted.

25   Q    That's the transfer of that $2 million from the Saudi

A. Spitzen - Cross/Stephens          1957

1    Committee to al-Salah, is it not?

2    A    Yes, that's correct.

3    Q    And it says down in the bottom of it, it is for 50,000

4    food baskets for affected families in Gaza/Gaza branch, does

5    it not?

6    A    Yes, it says that the Saudi Committee for the support

7    of Infitada al Quds transferred money for the purchase of

8    50,000 food baskets.  Once again I reiterate, it's not the

9    goal that is important, but rather who is sending the money.

10   The same support could have been provided through ANERA of

11   the United Nations or 1001 other charitable societies.

12   Q    You pointed out in your Slide 78 on your direct - can

13   we see that, please - that in 1999 the GNI per capita in the

14   West Bank in Gaza was $1730 per year, right?

15   A    Yes, I'm citing here data from the World Bank.

16   Q    Right.

17              And GNI means Gross National Income; is that

18   right?

19   A    GNI, yes.

20   Q    And per capita means for each individual living there,

21   right?

22   A    That's correct.

23   Q    Right.  So it's actually $1730 a person is the gross

24   national income of the West Bank in Gaza in 1999, right?

25   A    Yes.  It is slightly lower, and it's lower in Gaza.

A. Spitzen - Cross/Stephens                1958

1  This is an average.

2  Q    Right.  If we can look at your Slide 79 that you were

3  shown on direct.  We see that between 1999 and 2003, the

4  income per person in the West Bank in Gaza declined from

5  $1,730 to $1,070, which is about 40 percent, isn't it?

6  A    Yes, and that was an average.  It is even lower in

7  Gaza.

8  Q    Right.

9          $1,070 per year is about $3 a day, isn't it?

10 A    But if you want to understand, we have to ad yet

11 another item, and that is the PPP, which is the purchasing

12 power of the dollar.

13 Q    Well, I am just asking you about your slide.

14         The difference between $1730 per person in 1999

15 and a $1,070 in 2003, is a drop of about 40 percent, isn't

16 it?

17 A    That is correct.

18 Q    Right.

19         So, then, you compared the wounded payments and

20 prisoner payments and the martyr payments to this $1,070 per

21 person per year number, didn't you?

22 A    Yes, that is correct.  The GNI is normally the basis in

23 comparison to other payments.  What does it mean to get

24 $5,000.

25         (Continued on the next page.)

A. SPITZEN - CROSS - STEPHENS            1959

1    CONTINUED CROSS-EXAMINATION

2    BY MR. STEPHENS:

3    Q    All right.  Now, the $1,070 that you got there for 2003,

4    it's per person, so if that was a family of four, the income

5    would actually be $4,200, wouldn't it?

6    A    Yes.  For four people, yes.

7    Q    Right.  And the Palestinians tend to have large families,

8    don't they?

9    A    Yes, the average number per family is large.

10   Q    Right.  So a $5,000 death payment for a family even of

11   just four which is making $4,200 a year is only about one

12   year's income, isn't it?

13   A    Yes, but it is a very high income.  To get the income of

14   an entire year at one, one payment is a lot of money,

15   especially in the West Bank, because we've seen their salaries

16   of 300 and 400 dollars.  So at the time, it was a lot of

17   money.

18   Q    In your slide 123, we can see that, which you displayed

19   to the jury yesterday on your direct, the person you were

20   talking about was Hamed Hijla had a monthly income of a

21   thousand dinars, did he not?

22   A    Yes.  This is a high income, because in this case, the

23   breadwinner was his brother, who was a pharmacist.  So he got

24   a lot of money, in West Bank terms.

25   Q    Right.  That's -- a thousand dinars a month is 12,000

A. SPITZEN - CROSS - STEPHENS                1960

1   dinars a year, which, as you testified, is about $18,000 a

2   year, isn't it?

3   A    Yes.

4   Q    Right.  And so a $5,300 death benefit for losing income

5   of $18,000 a year doesn't sound all that large, does it?

6   A    I don't understand how this calculation was made.  There

7   is no proof here regarding the amount of money that Mr. Hamed

8   Hijla earned for the family.  According to the social report,

9   the family did not -- the social welfare report, the family

10  did not lose its breadwinner at all.

11       So I don't know what to say about this.  Why a

12  family that can earn a living well and whose son is a suicide

13  bomber should get $5,300, what is the reason for that?  It

14  does not respond to any social criterion.

15       MR. STEPHENS:  Your Honor, if you'd like to take the

16  15-minute break now, I've actually been cutting things out of

17  my outline, and in order for me to actually get reoriented, I

18  could use about five minutes.

19       THE COURT:  Okay.  Well, let's take 15 then.  We'll

20  come back at 3:00, ladies and gentlemen.  Don't talk about the

21  case amongst yourselves nor with anyone else.

22       (Jury exits courtroom.)

23       (Continued on the next page.)

24

25

PROCEEDINGS                                          1961

1        THE COURT:  All right.  Be seated.  Mr. Stephens, I

2   appreciate that you're trying to cut out.  You had given me an

3   estimate, just an estimate, nonbinding, yesterday of mid to

4   late morning today, and obviously, you're beyond that.  Would

5   it be unfair of me to tell you you really need to wrap this up

6   by the end of the day?

7        MR. STEPHENS:  I would never accuse you of being

8   unfair.

9        THE COURT:  You already have.  I'm asking you if

10  this would cause you to.

11       MR. STEPHENS:  I think I can get finished by the end

12  of the day.

13       THE COURT:  Please do.  I'm not saying I won't give

14  you five or ten minutes more if we get to that, but I really

15  don't think you should need it.  Use the time to redact what

16  you can.

17       MR. STEPHENS:  All right.

18       (Recess.)

19       THE COURT:  Please bring in the jury.

20       (Jury enters courtroom.)

21       (Continued on the next page.)

22

23

24

25

A. SPITZEN - CROSS - STEPHENS                1962

1       THE COURT:  Be seated.  Mr. Stephens.

2   Q    Mr. Spitzen, I want to talk to you a little bit more

3   about the Saudi Committee.  Now, in 2001, as part of your job

4   at the Palestinian Affairs Department, you personally

5   conducted research into the Saudi Committee, did you not?

6   A    Correct.

7   Q    Right.  And after you conducted this research into the

8   Saudi Committee, you wrote a report that identified different

9   organizations that transferred donations to the West Bank and

10  Gaza that were suspected of assisting Hamas, didn't you?

11  A    Supporting terror organizations, not just Hamas.

12  Palestinian Islamic Jihad, yes.

13  Q    And the organizations that you wrote the report to -- I'm

14  sorry, do that again.

15       The organizations about which you wrote the report

16  included the Saudi Committee and the donations being

17  transferred to the West Bank and Gaza by the Saudi Committee,

18  didn't it?

19  A    Correct.

20  Q    And this document that you -- this report that you wrote

21  up, you coordinated with the Intelligence Directorate and the

22  Israeli Security Agency, the ISA, did you not?

23  A    Yes.  The intelligence community and the ISA provided the

24  external aspect of the activities of the Saudi Committee in

25  Saudi Arabia.

A. SPITZEN - CROSS - STEPHENS                1963

1   Q    And you coordinated with the Intelligence Directorate and

2   the Israeli Security Agency because the document, the report

3   you were writing up was, as you termed it, operational; right?

4   A    Yes.  It was an operational report, because it had

5   operational recommendations in it.

6   Q    In other words, you were recommending that certain things

7   happen; is that right?

8   A    Yes, sir.

9   Q    Right.  And, in fact, there was weekly monitoring of the

10  donations coming in from the Saudi Committee, weren't there?

11  A    Yes, but I -- it is difficult for me to testify about

12  this, because it was no longer my field.  There was

13  supervision of the committees.  The head of COGAT was

14  responsible for supervising donations from different

15  organizations.

16  Q    Right.  And as a matter of fact, as you put it, we,

17  COGAT, needed to approve what donations could be transferred

18  and what donations could not be transferred; is that right?

19  A    Yes.  I confirmed that COGAT had to approve which

20  donations to transfer and which not to transfer.

21  Q    Right.  Including those of the Saudi Committee; correct?

22  A    Including all the donations.

23  Q    Now, COGAT was considering denying tax exemptions to the

24  Saudi Committee payments, was it not?

25  A    It was one of the recommendations.

A. SPITZEN - CROSS - STEPHENS                1964

1  Q    But it didn't stop the donations, did it?

2  A    No, I don't remember exactly, because, again, I was no

3  longer responsible for this part of the activity.  So I could

4  not confirm that it stopped any donations.  But, in general,

5  stopping donations from foreign countries was a recommendation

6  COGAT made, but the decision was made in the political

7  echelons, because when you stop donations from foreign

8  countries, it has implications, diplomatic/political

9  implications.

10          So it was not just COGAT, but also the Minister of

11 Defense and the Minister of Foreign Affairs together decided

12 about this, and they had different considerations, some of

13 which I know, but I cannot really talk about.  Even if I knew

14 them, I would not be able to talk about them.

15 Q    So there was discussion among the Israel Ministry of

16 Defense and the Israel Ministry of Foreign Affairs about

17 whether to stop these donations; is that right?

18 A    Regarding every stoppage -- I'm not talking about the

19 Saudi Committee in particular.  Any stoppage of donations in

20 the civilian area from foreign countries, there would be a

21 discussion, except for enemy territories, like Iran and any

22 countries like Iran, which was completely banned, and the

23 decisions were made according to political considerations.

24 Q    And just to make it clear, your report included donations

25 coming from the Saudi Committee, didn't it?

A. SPITZEN - CROSS - STEPHENS                1965

1  A    Correct.

2  Q    And the Israeli government, through COGAT, where you

3  worked, actually knew that Arab Bank was processing the Saudi

4  Committee donations, didn't it?

5              MR. TURNER:  Your Honor, may we approach?

6              THE COURT:  Yes.  Hang on before the answer.

7  Sidebar.

8              (Continued on the next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR                                    1966

1        (Sidebar conference.)

2        MR. OSEN:  Your Honor, the Court has excluded

3    reference to Israeli government action or inaction with

4    respect to Arab Bank, largely to protect the defendant from

5    inferences from raids on the bank, particularly in 2003-2004.

6        If Mr. Stephens wants to go down this road, then I

7    think it's fair game for us to re-open the raids and the

8    accounts that they held, et cetera, et cetera.  That wasn't

9    our intention, but I think this goes to a question of Israeli

10   action against the bank as opposed to third-parties.

11       THE COURT:  Mr. Stephens, it does seem that it would

12   be a one-sided presentation to suggest that what the bank was

13   doing was okay with the Israeli government when, in fact, the

14   Israeli government was raiding the bank to find out what was

15   going on and potentially stop it.

16       MR. STEPHENS:  I don't think that's right, actually,

17   because --

18       THE COURT:  The question isn't whether it's right.

19   The question is, should I let you have your side without

20   giving them the opportunity to argue their side and let the

21   jury decide what's right.  It seems to me like a fair rebuttal

22   argument.

23       MR. STEPHENS:  I'll withdraw the question.

24       (End of sidebar conference.)

25       (Continued on the next page.)

A. SPITZEN - CROSS - STEPHENS                1967

1    THE COURT:  We'll have another question.

2  Q    I want to talk a little bit about the prisoner payments

3  that were coming from the Saudi Committee.  Those were a

4  one-time payment of $2,600; correct?

5  A    It wasn't always one time.  Some got a lot more.  There

6  were some who for different arrests received different sums.

7  There were some we saw on the slides, Ja'abri, for example.

8  Q    The benefit for being in prison or arrested once was

9  $2,600, was it not?

10 A    For one imprisonment, yes.

11 Q    Now, the Israel Prison Service is where the prisoners,

12 security prisoners are held; right?

13 A    Yes, they are held by the Israel Prison Service.

14 Q    And you in your job at the Palestinian Affairs Department

15 received regular reports from the Israel Prison Service, did

16 you not?

17 A    Correct.

18 Q    And those reports showed that the Palestinian Authority

19 was transferring a monthly allowance to each security

20 prisoner, did it not, or did they not?

21 A    Yes.  I hope I have an opportunity to go into detail on

22 that issue.

23 Q    The Palestinian Authority to prisoners serving life

24 sentences was actually sending a thousand dollars a month to

25 the families of those prisoners, was it not?

A. SPITZEN - CROSS - STEPHENS            1968

1   A    I'm sorry, but you're mixing up two different areas.
2   There are canteen payments for -- there are canteen payments
3   for food and immediate needs, such as toothpaste and so on.

4        They received the money through the Postal Bank.  It
5   went directly into their canteen account.  It didn't go into
6   their pocket.  It was for their immediate needs and for their
7   personal use.  That's one part of the payments.

8        Without going into what my opinion is of that, that
9   was a decision by the State of Israel.  That was intended, as
10  I said, for their own personal needs.  And there is another
11  form of money, and that is -- and this is something that is
12  very controversial, it is something about which there are
13  arguments and disagreements.

14       The Palestinian Authority transfers money to the
15  families of security prisoners, and, as I said, it's something
16  that the State of Israel doesn't like.  There is controversy,
17  because European governments give part of this money, but
18  that's a completely different story.

19       And just to be precise, in some cases, it was the
20  Palestinian authorities and in others it was the PLO, the
21  Palestine Liberation Organization.  It depended which
22  institution was in charge at any particular time.

23  Q    And those monthly allowances from the Palestinian
24  Authority or the PLO given to the families amounted to, in
25  some cases, several hundred dollars a month, didn't they?

A. SPITZEN - CROSS - STEPHENS                    1969

1  A    Yes.  The Palestinian Authority has a kind of like a

2  salary scale, how much a woman should receive or a wife, how

3  much a child, and for what type of prisoner.  This is a social

4  support provided by the Palestinian Authority and it's very

5  controversial.

6  Q    That amount of money, several hundred dollars a month, is

7  far more significant, is it not, than a one-time $2,600

8  payment from the Saudi Committee?

9  A    I can't state an opinion on that.  We're talking about

10 different periods of time.  There were periods when the PA,

11 the Palestinian Authority, had difficulties in transferring

12 money.

13        So the $2,600 from the Saudi Committee, which was

14 received as a grant, could have been help to a needy family at

15 a particular time or it could be a sum that turned a family

16 into a wealthy family.

17 Q    Your testimony is that getting $2,600 turns a family into

18 a wealthy family?

19 A    I'm sorry.  I said middle class, not wealthy, says the

20 witness.  Okay, I don't want to get into the circumstances.

21 The $2,600 in the West Bank is a lot of money.  I can't get

22 into the issue of the PPP that I mentioned earlier.  I don't

23 know how much falafel costs in New York.  I would imagine

24 five, maybe ten dollars.  In Gaza, it costs half a shekel,

25 which is about ten cents.

A. SPITZEN - CROSS - STEPHENS                1970

1  Q    I want to look, please, with you at SAG 29.  I'm not
2  going to go over all of this in detail.  The Saudi Committee
3  had as its monitoring charities al-Islah and the Islamic
4  Charitable Society Hebron, did it not?
5  A    Yes, that is correct.  Yes, these were the two societies
6  that you mentioned, but there were two additional committees
7  that helped the Saudi Committee in Saudi Arabia.  They were
8  among the worst Islamic societies.  One is al-Haramain, and
9  the other is called WAMY.
10         Al-Haramain was outlawed or designated, designated
11 in the United States in 2000 to 2004.  It had 13 branches.
12 The head of it was the -- was a supporter of al-Qaeda, his
13 name was Aqeel, and they sponsored -- and they provided
14 guidance in Saudi Arabia.
15 Q    So the charities recommended the beneficiaries, did they
16 not?
17 A    Yes.
18 Q    And then the Saudi Committee chose who to pay, did it
19 not?
20 A    That's true.
21 Q    And then the Saudi Committee instructed Arab National
22 Bank to make payments to the chosen beneficiaries, did it not?
23 A    That is correct.
24 Q    And then Arab National Bank used Arab Bank as its
25 correspondent bank to distribute the funds in the West Bank

A. SPITZEN - CROSS - STEPHENS          1971

1   and Gaza, did it not?

2   A    That is correct.

3   Q    And during 2000 to 2004, when this was going on, the

4   Saudi Committee was not a U.S., U.N. or E.U. designated

5   terrorist, was it?

6   A    The Saudi Committee, no.

7   Q    And al-Islah and the Islamic Charitable Society Hebron

8   between 2000 and 2004 were not United States, United Nations

9   or E.U. designated terrorists or terrorist organizations

10  either, were they?

11  A    No, they weren't designated by those institutions, but

12  they were designated by Israel already at that time.

13  Q    I do want to ask you then one more thing, and that's

14  about my slide SAG 30.  These are people that you identified

15  in your direct examination as terrorists who participated in

16  the Sbarro Pizza bombing, Park Hotel, the Dolphinarium, Ben

17  Yehuda, Emmanuel and Neve Yamin, are they not?

18  A    That is correct.  I had different pictures, but the same

19  people.

20  Q    And these seven people that you talked about in your

21  direct, there's not a single one of them that was on some

22  terrorist list before they went out and committed their

23  murders; isn't that right?

24  A    That is correct.  They do not appear.

25  Q    Okay.  Now, I want to talk to you, please, about Yousef

A. SPITZEN - CROSS - STEPHENS          1972

1   Al-Hayaq.  Your report concerns or contains an analysis of

2   transfers from someone named Yousef Al-Hayaq, does it not?

3   A     That is correct.

4   Q     And you actually don't know who Yousef Al-Hayaq is, do

5   you?

6   A     I would be very happy if the Arab Bank would tell me who

7   he is.

8   Q     You don't know, do you?

9   A     To this day, not yet.

10  Q     Could we see SAG 32.  In total, you analyzed the names of

11  43 people and one charity who you have determined received

12  payments from Yousef Al-Hayaq; isn't that right?

13  A     That I received documentation from the bank that they

14  received transfers from Yousef Al-Hayaq.

15  Q     Right.  That was actually going to be my next question.

16  Arab Bank produced the documents that show transfers went to

17  the people who were listed on this slide; right?

18  A     I got them with documentation from the Arab Bank.

19        MR. STEPHENS:  Your Honor, may I display this to the

20  jury?

21        THE COURT:  Yes.

22  Q     Now, Yousef Al-Hayaq is not designated by the United

23  States, the United Nations or the European Union as a

24  terrorist, is he?

25  A     That is correct.  There's no such name on the designated

A. SPITZEN - CROSS - STEPHENS          1973

1  list.

2  Q    And you actually don't know who 15 of these people are,

3  do you?

4  A    I think it's 14, because I did identify who Tahrir

5  Shaaban is.

6  Q    I stand corrected.  It's 14 you don't know.  And out of

7  all those people, 43 people and one charity, there's only one

8  of them on the United States list, and that's Ahmed Yasine;

9  right?

10 A    That is correct.

11 Q    Now I want to look with you, please, at the transfer from

12 Yousef Al-Hayaq to Ahmad Yassin, which is Plaintiff's Exhibit

13 2080.  This transfer is dated May 30th, 2001, is it not?

14 A    Yes.

15 Q    And it shows that it actually went through, was checked

16 by the OFAC system, wasn't it?

17 A    Yes.

18 Q    Right.  And the name didn't match, did it?

19 A    Yes, that is correct.  I think this is the second or

20 third time I'm being asked about this point.

21 Q    I don't think by me.  If we could look at Plaintiff's

22 Exhibit 4114, which I believe is in evidence.  That's the 1995

23 designation of Shaykh Yasine, is it not?

24 A    Yes.

25 Q    And if we look at SAG 34, we see that the designation was

A. SPITZEN - CROSS - STEPHENS                1974

1   Shaykh, S-h-a-y-k-h, Ahmad with an A, Yasin, one S and no E on

2   the end; right?

3   A    Yes, that is correct.

4   Q    And then if we could look at SAG 35, please.  The

5   transfer document shows Ahmad with an A, Ismail Yasine, not

6   Shaykh Ahmad Yasin or Yasine, does it?

7   A    Yes.  We're talking about a different spelling of the

8   name.  I won't repeat my earlier testimony during my direct

9   testimony regarding the problem of spelling when transcribing

10  Arabic into English.

11          It happens to be the name spelled correctly here,

12  Y-a-s-i-n-e.  There is a problem in transcribing Arabic into

13  other languages.  There is a colloquial Arabic, a classical

14  Arabic, and there are many different issues involved and I

15  won't get into them.  But what's important here is that we see

16  the account number which was made public as the account of

17  Hamas.

18          And I would be very happy if the Arab Bank would

19  allow me to see the bank records of this account.  I think we

20  should see -- we would be able to see some very interesting

21  things about the donations made into it.

22  Q    Let's take a look at SAG 36.

23          MR. TURNER:  Your Honor, we need to approach about

24  36 and 37.

25          THE COURT:  Okay.  Sidebar.

```
                        SIDEBAR                    1975
```

1          (Sidebar conference.)

2          MR. TURNER:  We would object to 36 and 37 as

3    argument.

4          THE COURT:  No, the slides are not argument.  The

5    questions may be argument.  I'll take the questions one at a

6    time.  But the slides themselves just summarize evidence in

7    the record.

8          MR. COLES:  PX 4114, the 1995 designation, is not

9    actually in evidence yet.

10          MR. TURNER:  Go ahead.

11          MR. COLES:  So the record is clear.

12          THE COURT:  I don't understand what you're asking

13    me.  What are you asking me?

14          MR. STEPHENS:  I thought that Federal Register that

15    I showed had been actually admitted in, and apparently I was

16    wrong.

17          MR. COLES:  It's their exhibits.  I assume there's

18    no objection.

19          THE COURT:  Is someone moving it in?

20          MR. STEPHENS:  We'll move it in and we'll give it a

21    number.

22          THE COURT:  It's received.

23          MR. STEPHENS:  Thank you.

24          (Plaintiff Exhibit 4114 received in evidence.)

25          (End of sidebar conference.)

A. SPITZEN - CROSS - STEPHENS                1976

1  Q    If you look, please, at SAG 36.  In your report, you

2  spell Sheikh Ahmed Yassin one way on page 70 and then on page

3  175, you spell it a different way, don't you?

4  A    If you say so, yes.  I can have a look.  It is absolutely

5  possible.  Ahmed is in colloquial Arabic.  Ahmad is in

6  literary Arabic.  I may have quoted different sources.  In any

7  case, it can be fixed, because it shouldn't be written with a

8  double S.

9  Q    Do you want to check your report?

10 A    I don't think it's very important.

11 Q    Okay.  And if you take a look at the OFAC listing, as of

12 2001, when the transfer happened, it's not like either of the

13 spellings in your report, is it?

14 A    Ahmad is identical.  They write Shaykh differently and

15 they write Yasin without the double S, but I wonder about all

16 these mechanical automatic systems, because I work with

17 computers and with Arabic names, and the computer normally,

18 most of the possibilities for transcription appear and then it

19 can identify the right transcription.  I am not familiar with

20 the way OFAC does it, but this seems strange to me.

21 Q    Okay.  We're going to move on to another topic with you.

22 That is starting with 39.

23         THE COURT:  Do the plaintiffs have any problem with

24 this?

25         MR. TURNER:  No, sir.

A. SPITZEN - CROSS - STEPHENS                1977

1          MR. STEPHENS:  All right.  Can we show it to the

2     jury, please?

3     Q    This is a slide that was actually prepared by the

4     plaintiffs' attorneys, was it not, or did you do it?

5     A    It is a slide that was prepared at my request.

6     Q    Okay.  And what it purports to show is Hamas's worldwide

7     fundraising network; right?

8     A    It shows a considerable part of the fundraising array of

9     Hamas.  Unfortunately, not all of it.

10    Q    And what it purports to show is that all of these

11    organizations were sending money to, you say, the various

12    charities and things that you've identified as controlled by

13    Hamas; right?

14    A    Not -- it is not all the organizations and all the

15    societies.  In each society noted in my report, I wrote which

16    organizations I found sent it money.  It doesn't mean that

17    it's everything, it's just what I could find.  In many cases,

18    the -- my report was based on findings collected by the Israel

19    defense forces in the societies themselves.

20    Q    Hamas doesn't have some central treasury where money gets

21    sent; rather, your opinion is that Hamas is receiving money

22    from these various sources through the charitable societies

23    that you identified; right?

24    A    This is inaccurate.  It's too late to go right now into

25    the -- too late in hour to get right now into all the channels

A. SPITZEN - CROSS - STEPHENS          1978

1  of -- through which money is funneled to Hamas.  Hamas had a

2  headquarters in Damascus.  Today, it is in Qatar.  They have

3  people in charge of funds.  Funds are allocated to charity

4  societies, to terrorism, and also to operatives and senior

5  people.  We saw this in the Sayed admission.  They do

6  everything.  Sorry, the Sayed confession.  They do everything.

7  They do this and they do that.  They also get money from

8  charitable associations, Islamic ones around the world.

9  Q    All right.  We can agree that you're saying that all

10 these organizations on this chart are raising money for Hamas;

11 right?

12 A    Certainly.

13 Q    Okay.  So let's start on the left.  The first one you've

14 got is IRFAN in Canada, is it not?

15 A    Yes, sir.

16 Q    Right.  And in 2000 to 2004, IRFAN was not designated in

17 Canada as a terrorist organization or by the U.S., the U.N. or

18 the E.U., was it?

19 A    Yes, it was designated later.

20 Q    And the next one over here is Interpal in the United

21 Kingdom, England.  That wasn't designated by the U.K., the

22 United Nations or the E.U. ever; right?

23 A    But I think it was designated by the United States, which

24 you have not noted.

25 Q    I'm about to get to that.  The United States designated

A. SPITZEN - CROSS - STEPHENS                1979

1   Interpal in August of 2003, did it not?

2   A    To the best of my recollection.

3   Q    And then the United Kingdom Charity Commission conducted

4   an investigation two more times in Interpal and concluded that

5   Interpal was not involved in terrorist funding; isn't that

6   right?

7   A    I think it did three, not just two inquiries.  And still

8   there is a third decision which I'm less familiar with, but I

9   know that following the third investigation, Essam Yussef, who

10  was at the head of Interpal and was a Hamas operative, was

11  forced to resign from the Union of Good and other places.  It

12  had other ramifications.  I don't understand what this has to

13  do with the United States, which never canceled the

14  designation.

15  Q    The three investigations that you just referred to of

16  Interpal were in 1996, 2003 and in 2009, were they not?

17  A    To the best of my recollection, yes.  Again, this is not

18  something I'm very familiar with.  I just have general

19  knowledge about it.

20  Q    You do know that each one of those investigations

21  concluded that Interpal was not involved in terrorist funding,

22  don't you?

23  A    I'm not familiar with the phrasing of the decisions

24  regarding Interpal, but I know that the final result was that

25  it was not closed.

A. SPITZEN - CROSS - STEPHENS                    1980

1  Q    Another organization you identify as providing Hamas

2  funding is CBSP in France, is it not?

3            THE COURT:  Mr. Stephens, are you going to go

4  through each one of these?

5            MR. STEPHENS:  Briefly.  Most of them don't take

6  much time.

7            THE COURT:  Okay.

8  A    Yes.

9            THE COURT:  The reason I ask is because we have the

10  chart and you have marked on the chart exactly what's

11  designated and what's not.  So I don't know it's necessary to

12  take the time to separately say what the chart shows.

13            MR. STEPHENS:  Let me ask him a broader question

14  then.

15            THE COURT:  Okay.

16  Q    As you can see, we have the absence of designations of

17  all of these various entities listed on this chart.  It's a

18  fact, is it not, that the entities you have listed there were

19  not designated by the entities that I'm -- the countries that

20  I'm showing on my version of this chart?

21  A    I estimate this is correct.  This is a correct version.

22  But what bothers me is that the organizations that were

23  designated by the United States, such as Interpal, CBSP and

24  ASP are not noted here.  This is American court.  They were

25  designated by the United States.

A. SPITZEN - CROSS - STEPHENS                1981

1  Q    I agree with you that both Interpal and CBSP were

2  designated by the United States in August of 2003.  What I'm

3  trying to suggest to you is that the French government

4  disagrees with that designation and the English government

5  disagrees with the Interpal designation; isn't that right?

6            MR. TURNER:  Objection.

7            THE COURT:  He's trying to speed it up.  I'm going

8  to let him do it that way.  Let's see if the witness can

9  answer the question as phrased.  Go ahead.

10 A    What can we do?  Governments do not always agree with

11 each other.  They sometimes don't agree with the designations

12 made by the Israeli government regarding Zakat Committees and

13 Charitable Societies that are part of Hamas.

14            What bothers me here is that the United States

15 designations in the relevant period are missing from this map.

16 You chose to write it this way, to note it this way.

17 Q    I do want to discuss one of these supposed Hamas

18 fundraising entities, and that's WAMY, down there on the

19 bottom right there.  That's the World Assembly of Muslim

20 Youth, is it not?

21            THE COURT:  You have to say yes or no.

22 A    Correct.  I'd be happy to talk about them.

23 Q    And according to you, the WAMY Foundation is Wahhabi, a

24 different branch of Islam, is it not?

25 A    It's identified with the Wahhabi, yes.

A. SPITZEN - CROSS - STEPHENS          1982

1  Q    And the WAMY Foundation doesn't belong to the Muslim

2  brotherhood, does it?

3  A    No, it doesn't.

4  Q    And the WAMY Foundation, you agree, is actually not

5  Hamas, is it?

6  A    WAMY is not Hamas.

7  Q    And, in fact, according to you, the WAMY Foundation and

8  the people in it would be offended if they were called Hamas;

9  isn't that right?

10 A    I don't think this is the way I expressed myself, but I

11 do know that WAMY gives Hamas a big hug.  Khaled Meshaal

12 visited the Ninth Conference of WAMY in Saudi Arabia.  It

13 appears in my footnotes.

14        The fact that the basic ideology of Wahhabi and the

15 Muslim brotherhood are contradictory has nothing to do with

16 the fact that they can create ad hoc political alliances.

17 Mr. Saleh Bin Suleiman al-Wahaibi and Dr. Abd al-Wahab

18 al-Mawadi, both of them heads of WAMY, are members of the

19 Union of Good, which we know is Hamas and which was designated

20 by the United States.

21        I'm not going to tire the jury with historic --

22 historical examples, but there have been examples of

23 partnership between communist countries and royalist

24 countries, monarchies for political purposes.  The CIA found

25 connections between WAMY and al-Qaeda.  So I'm very happy that

A. SPITZEN - CROSS - STEPHENS                1983

1   the WAMY issue and its connection to the Saudi Committee and

2   Hamas came up here, because it really does reveal a very

3   difficult aspect of these relationships.

4   Q    Could we look, please, at your deposition testimony at

5   page 82, line 2 through 11.  We don't see the question so

6   we're going to have to start earlier.  Yes, on line 16, page

7   81.  You were asked in your deposition:

8              Question:  "And can you explain that difference in

9   your own mind, that is, an entity that's controlled by Hamas

10  versus one that identifies with Hamas?"

11             Answer:  "Definitely.  I will explain, and I will

12  give examples.  For example, the Islamic movement in Israel,

13  this is not Hamas.  They belong to the Muslim brotherhood, but

14  they identify with the Hamas.  The person heading this

15  movement supports the Hamas and identifies with the Hamas, but

16  he's not being controlled by the Hamas.  He's not identified

17  as Hamas.  WAMY Foundation, for example, they are Wahhabi.

18  They belong to the Muslim brotherhood -- they don't belong to

19  the Muslim brotherhood."

20             THE COURT:  It was a mistranslation.

21  Q    Yes.  "But they meet with the leaders of the Hamas.  They

22  receive leaders of the Hamas who visit them.  They make

23  declarations which are favorable to the Hamas.  But they are

24  not Hamas, and they would even be offended if they are called

25  Hamas.  They belong to a different faction of the Islam."

A. SPITZEN - CROSS - STEPHENS                1984

1           That's your testimony, is it not?

2    A    So I understand, the question is whether they would be

3    offended or not?

4    Q    Yes.

5    A    Yes, I think a Wahhabi who would be called a Muslim

6    brother might be offended.  But that does not change the fact

7    that WAMY is an extremist Islamic organization.  At a certain

8    period, they probably had connections with al-Qaeda.  And even

9    though they're not Muslim brothers, they do support Hamas.

10   They -- they meet people with Hamas.  They declare

11   declarations for Hamas, sympathetic to Hamas.

12           I did not even mention in the position Khaled

13   Meshaal, which I mentioned here.  They are people sitting in

14   the Union of Good.  It is an unholy -- members of the Union of

15   Good.  It is an unholy pact -- alliance.  They send them money

16   and they cooperate with them.

17   Q    During your direct testimony, you offered some testimony

18   about Osama Hamdan and his account, did you not?

19   A    Yes, if I remember correctly.

20           MR. STEPHENS:  So could we please look at SAG 94.

21   Just show it to the witness.  I think Mr. Turner is just

22   getting it there.

23           THE COURT:  Any objection to showing the slide?

24           MR. TURNER:  Yes.  We probably need to come up a

25   second.

SHERRY BRYANT, RMR, CRR

```
                          SIDEBAR                     1985
```

1          (Sidebar conference.)

2          MR. TURNER:  This slide is a summary of or purport

3    to be a summary of the Hamdan account, and it leaves out that

4    the Hamdan was paid the funds in 2005.

5          MR. STEPHENS:  I'm getting there.  I'm just

6    building --

7          MR. TURNER:  I don't have that.  I'm sorry.

8          THE COURT:  Can't we start with that one, the

9    complete summary instead of the partial?

10          MR. STEPHENS:  Absolutely.

11          (End of sidebar conference.)

12          (Continued on the next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

A. SPITZEN - CROSS - STEPHENS                1986

1          MR. STEPHENS:  Can you show the whole thing, please,

2     Shawn?  All the way to the end.  There you go.  And then 104

3     goes -- right.  Keep going.  There we go.

4     Q    Okay.  It's true, is it not, based on your review, that

5     Osama Hamdan, Abdul-Latif Hamdan opened an account at Arab

6     Bank in Lebanon in 1998?

7     A    Yes, it's true.

8     Q    And it's also true that the last deposit into this

9     account was on June 23rd, 2003, is it not, based on your

10    review?

11    A    To the best of my recollection, this is correct.

12    Q    And the last withdrawal from this account was actually

13    much earlier than that, sometime in 2001, was it not?

14    A    I think so, to the best of my recollection.

15    Q    Now, at the time that Osama Hamdan, Abdul-Latif Hamdan

16    opened this account, he was not a U.S., U.N. or E.U.

17    designated person, was he?

18    A    I assume he wasn't.

19    Q    And at the last banking activity, which was the deposit,

20    he wasn't designated on the U.S., U.N. or E.U. list either,

21    was he?

22    A    If you say so, I accept it.

23    Q    Did you learn that in your review?

24    A    I'm sorry?

25    Q    Did you learn that in your review?  I'm sorry.

A. SPITZEN - CROSS - STEPHENS          1987

1  A    I simply don't remember when Hamdan was designated.

2  Q    All right.  Well, it's right here on the chart.

3         THE COURT:  He said he's not challenging it.  He's

4  taking your word for it.

5  Q    He was designated in August of 2003; right?  Or Osama

6  Hamdan was designated; right?

7  A    I remember the year 2003.  I didn't recall the month

8  August.

9  Q    And in this entire period of time, the account processed

10 47 transactions, which amounted to about $79,000; isn't that

11 true?

12 A    Okay.  All right.

13 Q    And out of those, there were four transfers which

14 identified Hamas as a beneficiary, the total dollar amount of

15 all four being about $730; isn't that right?

16 A    That were identified as Hamas, that Hamas was the

17 beneficiary.  In one, there was a mistake in the name, but,

18 nevertheless, the Arab Bank -- in the number of the account,

19 but despite this, the Arab Bank deposited it in Hamdan --

20 rather, not in Hamdan's account, in Hamas' account.

21         It said Hamas, and despite that, it was deposited in

22 Hamdan's account.

23 Q    Hamdan's account.

24 A    Regarding the amounts, it's actually quite interesting.

25 We can see that the three of the transfers, two were from the

A. SPITZEN - CROSS - STEPHENS          1988

1   Gulf, I think Abu Dhabi and another country I can't recall

2   right now, and one from Holland, in small amounts.  And this

3   raises the suspicion that these accounts were used to funnel

4   donations to Hamas, because this was the modus operandi of

5   Hamas.

6          They would publish the names of high-ranking Hamas

7   operatives and officials, just as we saw earlier with Ahmad

8   Yasin, and they would make public calls to put in -- to send

9   in donations.  And that's why we see small amounts, like $150

10  and $300 from different places all over the world.  It's a

11  very, very interesting phenomenon.

12  Q    Okay.  You do agree that the four transfers that have

13  Hamas written on them going into Hamdan's account were

14  actually for $128 and $128 and $135 and then about $340, do

15  you not?

16  A    I agree.  I spoke about three transfers and you were

17  discussing four, so that makes it even more suspicious.

18  Q    Just to put an end on this, after Osama Hamdan was

19  designated on the OFAC list, the Special Investigation

20  Committee in Lebanon asked Arab Bank about a number of

21  accounts, one of those being for Osama Hamdan, and the bank

22  wrote back, you know from your investigation, do you not, that

23  it needed a little more information than just those two names

24  to try to do the search?

25  A    I'm familiar with this correspondence and I understand

A. SPITZEN - CROSS - STEPHENS                1989

1   that by the time the search was actually carried out, there

2   was no more money left in the account.

3   Q    Well, so I guess it's not your testimony that the Special

4   Investigation Committee didn't answer Arab Bank and its

5   inquiry about more names for Osama Hamdan in order to do the

6   search?

7   A    I didn't say that.

8   Q    Well, then do you agree that the Special Investigation

9   Commission did not answer Arab Bank's letter back asking about

10  more names?

11  A    I don't know about this.  I don't have an opinion on the

12  subject.  I see that the Arab Bank -- I see on the slide that

13  the Arab Bank wanted to know more about the subject and it

14  froze the account and waited for instructions and it didn't

15  receive any instructions.  And if that's the case, then okay.

16          THE COURT:  How are we doing, Mr. Stephens,

17  time-wise?

18          MR. STEPHENS:  We're doing very well.  I think I may

19  have two questions.

20          THE COURT:  I'll give you three.

21          MR. STEPHENS:  That's a 50 percent increase.

22          THE COURT:  Exactly.  How generous can I be?

23  Q    And then in -- when the Arab Bank received no

24  instructions from the Special Investigation Commission, the

25  money actually got returned to Hamdan, is that right, based on

A. SPITZEN - CROSS - STEPHENS                1990

1  your investigation, or do you know?

2  A    No, I accept that.

3          MR. STEPHENS:  Your Honor, that's all I have for

4  cross-examination.

5          THE COURT:  All right.  Thank you very much.  How

6  long do you anticipate on redirect, Mr. Turner?

7          MR. TURNER:  Probably 20 minutes.  That would be a

8  guess, depending on sidebars.

9          THE COURT:  I'm not going to hold the jury.  Well, I

10 hate to make the witness come back.

11         MR. OSEN:  Not just the witnesses, Your Honor.  I

12 can see the interpreters sighing.

13         THE COURT:  They don't want to come back, either.

14 Sorry, say that again.

15         MR. TURNER:  I think they have flight arrangements.

16 Those can always be changed, of course.

17         THE COURT:  Ladies and gentlemen of the jury, if we

18 had to stay here till 5, would you do it?  They're a very nice

19 jury.  They don't want to inconvenience these people.  Let's

20 go ahead and finish him now.

21         MR. TURNER:  The with the Court's permission, I

22 would like to start with going back to the Levitt testimony

23 and read the rest of it that was not read.

24         THE COURT:  All right.

25         MR. TURNER:  If you could, Mr. Miller, put up pages

A. SPITZEN - REDIRECT - TURNER                1991

1   784 and 7 -- start with 784, and blow up beginning with the

2   line 10 through 18, which was what was read earlier.

3   REDIRECT EXAMINATION

4   BY MR. TURNER:

5   Q    And in order to save just a little bit of time, it says

6   in your hypothetical, and I'll try to do this slow for the

7   court reporters:  "If there is an organization which makes it

8   clear that it's providing money to the families of dead people

9   not because of how or when or in what situation they died but

10  just because someone died and the bread maker is gone, that --

11  that's not a problem?  Is that my understanding?"

12          Question:  "Yes."

13          Answer:  "Correct."

14          Now, do you recall that question and answer earlier

15  today?

16  A    I don't recall being asked about the hypothetical.  I was

17  asked about -- I was asked if I agree with what Levitt said,

18  that if an organization gives money to dead people without

19  consideration of the circumstances of that person's death, if

20  it was okay.  And I added, and I stand behind what I said,

21  that it's only -- that what's important is the identification

22  or the identity of the organization who gives the money and to

23  whom thanks is owed.

24  Q    All right.  Now, let's go to the next, 19 through 25, and

25  let's see what the next questions and answers are.

A. SPITZEN - REDIRECT - TURNER                1992

1        "You also agree that if someone carries out a

2   criminal act and they have children, that it's appropriate to

3   give those children humanitarian support and not punish the

4   children for the actions of the parent?"

5        Answer:  "Well, I'm not saying you meant it this way

6   but I think that's a loaded question.  On the one hand,

7   children are innocent.  You have to -- it makes sense to try

8   and find some mechanism through which aid can be provided that

9   will not further the goals of the criminal enterprise.

10       The problem here is that providing these funds

11   through Hamas helps build Hamas, helps build grass root

12   support for Hamas.  Hamas is able to tell its operatives,

13   don't worry, if something happens to you, you don't need to

14   worry about being gone as the breadwinner.  We will take care

15   of you.

16       I have interviewed Hamas people in Israeli jails who

17   have volunteered without my pressing that this was their

18   calculation, one person, 14 children, said to him father to

19   father, aren't you worried about who is taking care of your

20   children?  I don't have to worry about that.  I don't know

21   exactly what person or what entity but I know that they are

22   being -- all being taken care of.  That's not a problem."

23       And the question is this:  Do you now, having that

24   for context, agree with Dr. Levitt?

25   A    I not only agree with Dr. Levitt, I salute him.  I was

A. SPITZEN - REDIRECT - TURNER          1993

1   not familiar with -- I didn't know him before, but I think he

2   explained it better than I did.

3           I would like to add further that there were -- there

4   was a concern that the Hamas, via the various societies and

5   via the Saudi Committee, was getting involved and getting into

6   every single niche and exerting influence throughout the West

7   Bank and Gaza.

8           Israel and the Palestinian Authority were concerned

9   during my period of service about this and, together with the

10  United States, we even tried to build up some kind of national

11  insurance social security mechanism to take care of people,

12  these poor people at their time of need, and -- but

13  unsuccessfully, I'm sorry to say.

14          But even without such a kind of social security

15  mechanism, there are enough charity organizations in the world

16  to take care of these people without having a terrorist

17  organization like Hamas having to do it.

18          MR. STEPHENS:  Move to strike the last part of all

19  that.

20          THE COURT:  Yes, the comments about the social

21  security system I will order stricken from the record.

22  Q    Now, I want to move to the Saudi Committee very briefly.

23  Now, one of the organizations, one of the charities

24  responsible for working with the Saudi Committee in support of

25  the Intifada Al Quds was Al-Salah; is that accurate?

1  A    Yes, it was responsible for the Gaza region.

2  Q    And I want to focus on the bank's questions to you about

3  Al-Salah having been designated by the U.S. as a terrorist

4  organization in 2007.

5           And my questions are going to be directed to looking

6  at some of the factual basis for why the U.S. designated

7  Al-Salah as a terrorist organization in 2007.

8           MR. TURNER:  And can we put up 1293?  It's in

9  evidence.

10  Q    Now, first of all, let's go to the second paragraph, blow

11  up the second paragraph.  This is the paragraph that the bank

12  read about:  "Today's action alerts the world to the true

13  nature of Al-Salah and cuts it off from the U.S. financial

14  system."  Do you recall that statement?

15  A    Yes, I recall.  It was also on the slide I prepared.

16  Q    Now, let's go down to the second-to-last paragraph that

17  begins with "the Al-Salah Society," and let's see what the

18  United States Government said factually about what had

19  transpired in the Middle East, and specifically in the

20  Palestinian territories, during the period that is relevant to

21  this lawsuit.

22           First of all, it says:  "The Al-Salah Society has

23  employed a number of Hamas military wing members."  Do you see

24  that?

25  A    Yes, I am familiar with that fact.

A. SPITZEN - REDIRECT - TURNER                    1995

1  Q    Then it makes reference to the fact that in late 2002,

2  during this period of time, an official of the Al-Salah

3  Society in Gaza was the principal leader of a Hamas military

4  wing structure.  Do you know who that person was?

5  A    I have to take a look at it.  It's in my opinion, but I

6  have to look at it.

7  Q    That's fine.  We don't need to take the time to do that.

8  Let me ask a different question.  Do you agree, based upon

9  your work, that as of 2002, it was known that a key Hamas

10 military leader was the leader of Al-Salah?

11 A    Yes, certainly.

12 Q    Now, let's talk about one other factual event that

13 everybody in the Palestinian territories knew about Al-Salah

14 during 2001 through 2004.  Go to the last paragraph.

15         MR. STEPHENS:  Objection, Your Honor.

16         THE COURT:  Yes, you got to rephrase that.

17         MR. TURNER:  Just go to the last paragraph.  I'll

18 ask another question.

19 Q    Let's read this paragraph.  "The Al-Salah Society was

20 included on a list of suspected Hamas and Palestinian Islamic

21 Jihad-affiliated NGOs whose accounts were frozen by the

22 Palestinian Authority as of late August 2003."

23         MR. TURNER:  Go ahead and then I'll ask the

24 question.

25 Q    And my question is, is that consistent with the

A. SPITZEN - REDIRECT - TURNER                1996

1   information that was available to Arab companies like Arab

2   Bank in 2003, in the Palestinian territories?

3   A    Yes.  This was official.  This was done officially.  The

4   accounts were frozen officially by the Palestinian Authority

5   Treasury, or Finance Ministry, by an official order.  And, in

6   fact, a senior official, the senior official who said that

7   Al-Salah was a Hamas front organization was Muhammad Dakhlan,

8   who was the Minister of the Interior of the Palestinian

9   Authority at that time.  And this was all made public and it

10  was all done by official government orders, and it was

11  impossible not to know it.

12  Q    All right.  Now, let's go to the martyr -- the payments

13  to the martyr operations people.  Go to slide 92 real quick,

14  please.  This slide was shown to you earlier today.

15            Do you recall that these kinds of lists were

16  actually found in the possession of Arab Bank?

17            MR. STEPHENS:  Objection, Your Honor.

18            THE COURT:  We need a sidebar on this.

19            (Continued on the next page.)

20

21

22

23

24

25

```
                          SIDEBAR                    1997

 1          (Sidebar conference.)

 2          THE COURT:  There are two problems with the

 3   question.  First, "these kinds of lists."  You need to be more

 4   specific.

 5          MR. TURNER:  Okay.

 6          THE COURT:  Second, I'm very concerned, because this

 7   witness is -- what's the word? -- loquacious, that he's going

 8   to describe exactly how they were found in the possession of

 9   Arab Bank.  And I don't want that to happen.

10          MR. TURNER:  I'll try to move it along, and limit

11   your answer to yes or no.

12          THE COURT:  Good.

13          MR. TURNER:  Is that okay?

14          THE COURT:  Yes.

15          MR. TURNER:  Okay.

16          (End of sidebar conference.)

17          (Continued on the next page.)

18

19

20

21

22

23

24

25
```

A. SPITZEN - REDIRECT - TURNER          1998

1        MR. TURNER:  May I proceed?

2        THE COURT:  Go ahead.

3        MR. TURNER:  Do you have the question down?  Do you

4   need me to ask it?  Excuse you one second.  Tell him that's a

5   yes or no yes.

6        MR. STEPHENS:  Objection, Your Honor.

7        THE COURT:  Hang on.  You cured the second part, but

8   not the first part.  You've got to ask a new question that

9   gives more definition to these kind of lists.

10  Q    Do you -- yes or no, do you recall that martyr lists such

11  as we're seeing on the screen were, in fact, found in the

12  possession of Arab Bank?

13       MR. STEPHENS:  Same objection.

14       THE COURT:  Overruled.

15  A    Yes.

16  Q    Now, you were asked a question comparing you with some of

17  Dr. Levitt's testimony, which we looked at a moment ago, and I

18  have a question for you.  The comparison was whether you

19  agreed with Dr. Levitt about payment to families of deceased

20  people, without reference to cause, was appropriate or

21  routine.  Do you recall generally that topic earlier today?

22  A    Yes, I recall that I was asked and I recall what I

23  answered.

24       MR. TURNER:  Okay.  Now, Your Honor, with your

25  permission, I would like to show clip five, which is a brief,

A. SPITZEN - REDIRECT - TURNER                1999

1   about seven- or eight-second clip from one of the deposition

2   testimony pieces that the jury has watched throughout the

3   trial, and I have a question about it for this witness?

4           THE COURT:  They have already seen it?

5           MR. TURNER:  Yes, sir.

6           THE COURT:  All right.

7           MR. TURNER:  Play clip five, please.

8           (Audio-video clip played.)

9           MR. TURNER:  Now, do you want to interpret that for

10  him, or was he able to follow it?

11          THE INTERPRETER:  He was able to follow it.

12  Q    My question to you is this:  Given all of the work that

13  you have done with respect to the Saudi Committee tracing the

14  funds, did you, in fact, find in your investigation whether or

15  not Arab Bank actually distributed funds to the families of

16  suicide bombers?

17  A    Yes.  The Arab Bank distributed funds to the families of

18  suicide bombers, based on this, which the bank had transferred

19  to me, too, where it was written that they died in an act of

20  suicide.

21          MR. TURNER:  Now, if we could have Exhibit 1078,

22  which is in evidence.  That's slide 39, if that's easier for

23  you, Mr. Miller.

24  Q    Very briefly, the question for you is, do you recall

25  during the testimony talking about the Israeli designation of

A. SPITZEN - REDIRECT - TURNER                2000

1   certain charities as unlawful back in 2002?

2   A    Yes, sir.

3   Q    And you were asked some questions also about whether or

4   not that was publicly available information.  Was it?

5   A    Yes, sir, it was.

6   Q    Now, if you could show the witness only Exhibit 1234,

7   which was referenced during cross-examination by the bank.

8   It's called the Book of Da'wa.  Do you recognize 1234?

9   A    Yes, I do.  I know it.

10            THE COURT:  This is in evidence?

11            MR. TURNER:  No, sir.

12   Q    And were you part of the government that created this

13   document, or at least participated in creating this document?

14   A    I instructed its writing.  I checked it.  And then I

15   approved dissemination.

16   Q    And was this an official document, this Book of Da'wa,

17   that was disseminated throughout the government in Israel back

18   in December of 2004?

19   A    It did, yes.

20            MR. TURNER:  Your Honor, we would offer 1234 into

21   evidence?

22            THE COURT:  Any objection?

23            MR. STEPHENS:  Yes.  Objection, Your Honor.

24            THE COURT:  Do you need a sidebar?

25            MR. STEPHENS:  Yes.

A. SPITZEN - REDIRECT - TURNER                    2001

1      THE COURT:  Because you did refer to it on cross.

2      MR. STEPHENS:  I know.

3      THE COURT:  Okay, sidebar.

4      (Continued on the next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                        SIDEBAR                      2002
```

 1              (Sidebar conference.)

 2              MR. STEPHENS:  This was withdrawn as an exhibit.

 3              THE COURT:  It was, but then you asked about it.

 4              MR. STEPHENS:  I simply asked about the book and

 5      what they did with it.  I didn't go into any of the content.

 6              MR. OSEN:  If you'd like the transcript, I happen to

 7      have it available (handing).

 8              THE COURT:  What questions do you intend to ask

 9      about it?

10              MR. TURNER:  I've got four questions.

11              THE COURT:  Can you summarize them?

12              MR. TURNER:  Can I go get my notes, because they're

13      from specific pages?

14              THE COURT:  Okay.

15              MR. WERBNER:  May I be excused to get a last flight

16      to my daughter's engagement party?

17              THE COURT:  I don't want you in trouble.

18              MR. TURNER:  The pages I'm going to be referencing

19      are page 13, paragraph 4, which is one question about the

20      intent of the charities; page 14, paragraph 10, talks about

21      how the operation of the charities themselves helps Hamas

22      expand their pool of recruits; page 15, paragraph 13, talks

23      about how they provide charitable services, but it serves as a

24      cover for also their terroristic activities; and page 16,

25      paragraph C, talks about the fact that it is a primary source

SIDEBAR                                        2003

1    of recruiting suicide bombers through their educational

2    program.

3              THE COURT:  He didn't open the door enough.

4              MR. TURNER:  As opposed to the document, can I just

5    ask him about it, just like he did?

6              THE COURT:  Yes.

7              MR. TURNER:  Okay, that's fine.

8              MR. OSEN:  Thank you, Your Honor.

9              (End of sidebar conference.)

10             (Continued on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A. SPITZEN - REDIRECT - TURNER            2004

1           MR. TURNER:  May I proceed?

2           THE COURT:  You may.

3           MR. TURNER:  Okay.  Mr. Miller, go to page 13,

4  paragraph 4, but only for the witness, and blow it up for him

5  so that he can read it.  There's 350 --

6           THE COURT:  Mr. Turner, that's not what I had in

7  mind.

8           MR. TURNER:  For the witness only.

9           THE COURT:  I did not mean you could use it that

10 way.  No, I'm not going to let you use it that way.

11          MR. TURNER:  Well, I just want him to read the

12 paragraph to himself.

13          THE COURT:  To himself?

14          MR. TURNER:  Yes, and then I'm going to ask him the

15 question.

16          THE COURT:  Take it a step at a time.  He can read

17 the paragraph to himself, then we'll hear the question.

18          MR. TURNER:  And it should be on paragraph 4.  And

19 is there any way for you to give him the Hebrew version and me

20 the English version or is that impossible?  Because the Hebrew

21 version is not going to help me.

22 A    I have the Hebrew version, says the witness.

23          MR. TURNER:  Yes, so do I.

24          THE COURT:  That's the problem.

25 Q    Okay.  Read paragraph 4 to yourself, please.

A. SPITZEN - REDIRECT - TURNER          2005

1          MR. STEPHENS:  Your Honor --

2          THE COURT:  Wait.  To himself.

3    A    I have paragraph 13 in Hebrew.

4    Q    There you go.

5    A    (Witness complies.)

6    Q    Now, my question for you is, back during that time frame,

7    I want you to explain to us the -- how the -- how Hamas used

8    the infrastructure of these charitable organizations as a

9    tool, in your own words.

10   A    Hamas used Charitable Societies as an instrument that

11   embraced all walks of life, all the areas of individuals' life

12   in Palestinian society, all the civilian areas.

13          First of all, they prepared the hearts and minds of

14   people from kindergarten through school, through

15   extracurricular activities in the mosques, through the block,

16   the Hamas bloc at universities, to walk the path of Jihad, the

17   path of Hamas -- Jihad in the Hamas sense of the word.  That

18   is as far as education is concerned.

19   Q    Now, let's go to page 16, paragraph C.

20          THE COURT:  Can you finish up, Mr. Turner?  You need

21   to finish up.

22          MR. TURNER:  Oh, I thought he was through.  I'm

23   sorry.

24          THE COURT:  No.  He may be through, but my point is

25   you need to be through, okay?  You need to finish your

A. SPITZEN - REDIRECT - TURNER            2006

1    examination promptly.

2              MR. TURNER:  I'm trying, Your Honor.  I promise.

3              THE COURT:  Go ahead.

4              MR. TURNER:  I had two sidebars, so that gives me

5    two points.

6              THE COURT:  Okay.

7              (Witness giving answer to interpreter.)

8              MR. STEPHENS:  I'm sorry, Your Honor.  I don't mean

9    to interrupt, but there's no question pending.  I don't even

10   know what he's talking about.

11             THE COURT:  I thought there was a question pending.

12   You're right.  There's no question.  The answer is stricken.

13   Put a question, please.

14             MR. TURNER:  Was he finished answering the previous

15   question or did I interrupt him?

16   A    You interrupted.  I had two or three sentences more.

17             THE COURT:  Go ahead.

18   A    I'm not going to go into details, because we are short on

19   time, but the same activity done in education was done also in

20   other areas.  Hamas used its control in the field.  So it was

21   done in mosques, through religious preaching.  It was done in

22   welfare.  It was done in health.

23             Hamas used its civilian infrastructure in order to

24   attract the masses to Jihad and the liberation of all of

25   Palestine, as he regarded it, as they regarded it.

A. SPITZEN - REDIRECT - TURNER          2007

1  Q     Now, you should have in font of you now page 16, and

2  focus on paragraph C.  And my question is, tell us the

3  information available as of the writing of this during the

4  relevant time frame about the financial support for the

5  families of suicide bombers, in the context of the charities?

6          MR. STEPHENS:  Objection, Your Honor.  He's not even

7  refreshing his recollection.

8          THE COURT:  I agree with that.  I'm going to sustain

9  the objection.

10  Q     Read paragraph C to yourself, please.

11          MR. STEPHENS:  Your Honor, that's improper.

12          THE COURT:  Stop.  Stop.  You can't do it that way.

13  He knows the answer to the question, I think, without looking

14  at the document, so he doesn't need to read the document.

15          MR. TURNER:  I'm just trying to move things along,

16  but I'll ask the question.

17  Q     Set aside the document for a second, Mr. Spitzen.  And

18  tell us the financial impact on the families of suicide

19  bombers, in the context of the charities and how that worked

20  back in the relevant time frame, based upon your work.

21  A     The Charitable Societies served as fronts for Hamas, to

22  support the families of suicide bombers and their dispatchers.

23  A suicide bomber who knew that he was going to die knew also

24  that somebody would take care of his family.

25          The terrorist was a Hamas operative and knew that he

A. SPITZEN - REDIRECT - TURNER                2008

1  could be arrested after he did something, an act of terror,

2  knew that these societies would support him.  We found, I

3  found in quite a few wills of suicide bombers, on the one

4  hand, a request for forgiveness of the parents or the family,

5  and, on the other hand, a statement said there is somebody who

6  will look after you after I'm gone.

7          When questioning suicide bombers who failed to

8  perform the suicide, it came up the issue that before they

9  agreed to take upon themselves the suicidal act, they asked,

10  what will happen to my family after I'm gone?  Who will take

11  care of my parents?  And they were told, do not worry, Hamas

12  has Charitable Societies, they will take care of you.

13          And, indeed, people who were arrested, people who

14  committed suicide, we saw that all the data about them was in

15  the Charitable Societies.  We saw the Shaheed -- the Shaheed

16  files, martyr files that were there, and the family did get

17  support and did not have financial worries afterwards.

18          MR. STEPHENS:  Move to strike.

19          THE COURT:  All right.  Well, we'll strike one

20  sentence of that, two sentences, the ones that generally

21  describe, because I don't want to repeat them because I'm

22  striking them, what suicide bombers in general knew what would

23  happen.

24          I'm not going to strike the specific cases that the

25  witness referred to, but I will tell the jury that that is

A. SPITZEN - REDIRECT - TURNER                2009

1   only to be considered in the context of evaluating his

2   opinion, not because any of those things actually happened.

3   There's no proof they actually happened other than the

4   expert's opinion, who says he heard them.

5           MR. TURNER:  And the final exhibit, Your Honor, is

6   4144, which -- 4114, which is already in evidence.  This is

7   the designation, U.S. designation of Hamas back in January of

8   1995.  Can we display this real quick?

9           THE COURT:  Yes.

10          MR. TURNER:  Display the first slide.

11  Q   Do you recall the designation in 1995 of Hamas as a

12  terror organization?

13  A   Yes, sir.

14  Q   And go to the next slide.  I want to focus on one thing.

15  There's a paragraph, it's taken out of this, that says:  "In

16  addition, the order blocks all property and interests in

17  property subject to U.S. jurisdiction in which there is any

18  interest of persons determined to be owned or controlled by,

19  or to act for or on behalf of, any specially designated

20  terrorist group."

21          And my questions are going to be focused on those

22  acting by or for Hamas.  That's the predicate.

23          MR. STEPHENS:  Objection, Your Honor.  He testified

24  he doesn't know about American law on several different

25  occasions.

A. SPITZEN - REDIRECT - TURNER                2010

1          THE COURT:  I don't think that's what he's asking

2     him.  He's using this as a predicate, and now he's going to

3     ask him specific facts that he does know about, I think.

4          MR. STEPHENS:  Your Honor, I'm sorry, but --

5          THE COURT:  I'm going to strike the last question.

6     Let's have another question.

7          MR. TURNER:  I don't remember the last question.

8          THE COURT:  Well, first you read him --

9          MR. TURNER:  The predicate?

10         THE COURT:  -- the part from the Register, and I'm

11    striking that, because I think what you intend to ask him is

12    simply -- I don't know what you intend to ask him, but I don't

13    think you need this to do it.

14         MR. TURNER:  Okay.  I can do it a different way.

15    That's fine.

16         THE COURT:  Okay.  I think Mr. Stephens raises a

17    good point.  He's not a legal expert so he can't interpret

18    this language.

19         MR. TURNER:  Yes, sir.  I wasn't going to ask him to

20    interpret the language.  I was going to ask him specifically.

21    Q    And my question to you is, do you recall the questions

22    about Ismail Haniyeh?

23    A    I was asked many questions.  I don't know which -- to

24    which you refer.

25    Q    Do you remember the cross-examination questions by the

A. SPITZEN - REDIRECT - TURNER          2011

1    bank about how well Ismail Haniyeh was known during the

2    relevant time frame as being a representative of Hamas?

3    A    Yes.  I recall the questions and I remember that I said

4    it was famous -- that he was -- I'm sorry, that he was famous.

5    Q    And my question, my predicate for my question is I'm

6    focusing on Ismail Haniyeh as an example only.

7              MR. TURNER:  Now, Your Honor, at this point I'd like

8    to show clip 9, which is already in evidence.  It's a brief

9    question and answer of a bank employee about Ismail Haniyeh.

10             MR. STEPHENS:  20 minutes has turned into 40.

11             THE COURT:  It has.  You have five minutes and then

12   you must end.

13             MR. TURNER:  I'm done after this.

14             THE COURT:  Go ahead.

15             MR. TURNER:  Clip nine.

16             (Audio-video clip played.)

17   Q    Now, Mr. Spitzen, is the testimony we just heard

18   consistent with your experience during the relevant time frame

19   with Ismail Haniyeh?

20             MR. STEPHENS:  Objection, Your Honor.  That clip

21   goes on.  There's more completeness to that.

22             THE COURT:  I'll give you recross.

23             MR. STEPHENS:  I don't want to keep the jury, Your

24   Honor.

25             THE COURT:  I don't, either.  I don't, either.

A. SPITZEN - REDIRECT - TURNER          2012

1          MR. TURNER:  Your Honor, there is nothing else after
2     "no."  There are other questions, but not relating to Ismail
3     Haniyeh.
4          THE COURT:  I'm going to give you recross to play
5     more of the clip as it relates to Ismail Haniyeh.  You may
6     answer the question.
7     A    Yes, Ismail Haniyeh was a very famous and well-known
8     figure in the years 2000 to 2004.
9          MR. TURNER:  One housekeeping issue.  We offer into
10    evidence 781.  It's the general security service memorandum
11    that you told us go ahead and offer at the end of the day, and
12    I'm doing that now and then I'm done.
13         THE COURT:  You're maintaining your objection to
14    that; right?
15         MR. STEPHENS:  Yes, Your Honor.  Thank you.
16         THE COURT:  That's received over objection.
17         (Plaintiff Exhibit 781 received in evidence.)
18         THE COURT:  Anything else?
19         MR. STEPHENS:  No, Your Honor.
20         THE COURT:  Okay.  You may step down.  Thank you
21    very much.  Okay, ladies and gentlemen, thank you for your
22    patience today.  I know it was a long day.  I just remind you
23    of the schedule next week.  We are working Monday, Wednesday,
24    Thursday and Friday, not Tuesday.
25         Let me ask you this:  Are plaintiffs resting now?

PROCEEDINGS                    2013

1          MR. TURNER:  We've got one housekeeping matter.

2          THE COURT:  We'll do it first thing Monday morning,

3    but we will move to the defendant's case on Monday morning,

4    very early.  So we're making progress in the case.

5          I need to remind you, because it's a weekend, please

6    remember your oath.  It's very important that you adhere to it

7    in all respects.  No research about the case, no communication

8    on the Internet.  Stay away from any media coverage.  Do not

9    do a Google search or anything like that.  The only thing you

10   need to remember is to keep an open mind.  Do that and we'll

11   see you again Monday morning.  Thank you again for your

12   patience.

13              (Jury exits courtroom.)

14          THE COURT:  I do have to say in the Eastern District

15   of New York, we have translation services and it seems like

16   every third case, and I have never had skilled translators

17   like I've seen here.  So I really want to thank the

18   interpreters for the job that they did.

19              THE INTERPRETERS:  Thank you, Your Honor.

20              THE COURT:  All right.  We'll see you on Monday

21   morning.

22              MR. STEPHENS:  Thank you, Your Honor.

23              THE COURT:  Okay, see you Monday morning.

24              (Whereupon, the proceedings were adjourned at 5:14

25   p.m. until September 8, 2014, 9:30 a.m.)