ECGKSOKM

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

MARK I. SOKOLOW, et al.,

Plaintiffs,

v.                    04 CV 397 (GBD)

PALESTINE LIBERATION

ORGANIZATION, et al.,

Defendants.

------------------------------x
                                        New York, N.Y.
December 16, 2014
                                        11:00 a.m.
Before:

                        HON. GEORGE B. DANIELS,

                                        District Judge

APPEARANCES

ARNOLD & PORTER LLP
Attorneys for Plaintiffs
BY:  KENT A. YALOWITZ
PHILIP W. HORTON
          TAL MACHNES
SARA PILDIS
          CARMELA T. ROMEO
MILLER & CHEVALIER, CHARTERED
Attorneys for Defendants
BY:  LAURA G. FERGUSON
BRIAN A. HILL
          MICHAEL SATIN

ECGKSOKM

1          THE LAW CLERK:  Mark Sokolow, et al., versus the

2     Palestinine Liberation Organization, et al., 04 CV 00397.

3          Will the parties please rise and make their

4     appearances, beginning with the plaintiff.

5          MR. YALOWITZ:  Good morning, Your Honor.  Kent

6     Yalowitz, Arnold & Porter, on behalf of the plaintiffs.  With

7     me are my colleagues, Phil Horton, Sara Pildis, Carmela Romeo

8     and Tal Machnes.

9          THE COURT:  Good morning.

10          MS. FERGUSON:  Good morning, Your Honor.  Laura

11     Ferguson, on behalf of the Palestinian Authority and PLO.  I'm

12     here with my colleagues, Brian Hill and Michael Satin.

13          And our colleague, Mark Rochon, sends his very sincere

14     apologies.  He was called away on an urgent matter recently,

15     and he didn't want to delay the hearing.  He sends his

16     apologies.

17          THE COURT:  Sure.

18          There are a number of issues outstanding that I wanted

19     to address today.  I guess our first is if you wanted to update

20     me.  I think I'm pretty much up to date, but if you wanted to

21     update me on any recent developments in the circuit.  I know

22     that the circuit has granted an extension till tomorrow for the

23     plaintiffs to respond, and I've looked at all the papers, I

24     believe, that were available to me that were submitted.

25          Mr. Yalowitz?

1          MR. YALOWITZ:  Right.  So at my request, the circuit

2     gave me until tomorrow to put in my answer to the mandamus

3     petition.  I will give the Court a copy of it, a courtesy copy,

4     so you can see it.

5          In fact, I have one logistical issue with that, we

6     don't have to do it right now, but at some point today, I just

7     need to raise one logistical issue that I would like your help

8     with in connection with the answer.

9          THE COURT:  Okay.  Is that something you want to raise

10    now?

11         MR. YALOWITZ:  It's in your discretion, Your Honor.

12         THE COURT:  Why don't you tell me what it is, and

13    we'll see whether we can discuss it now.

14         MR. YALOWITZ:  Sure.  So if Your Honor -- I'm sure

15    Your Honor read the petition.  The allegation of irreparable

16    harm, why we can't have a trial, why we can't wait until final

17    judgment, is because these GIS documents are super secret and

18    privileged, and so I just want the Court to see one of them, so

19    that they can understand what it is that the defendants are

20    claiming is so privileged.  Those documents are, by virtue of

21    the sort of winding path that we took, being treated as subject

22    to Your Honor's confidentiality order.  And I'd like to just

23    show you the one I'm going to give to the appeals court and see

24    if we can get it dedesignated, so my people don't have to file

25    a motion to file the whole answer under seal and go through

1    that business.

2              THE COURT:  Okay.

3              MS. FERGUSON:  And, Your Honor --

4              THE COURT:  Have you discussed that issue,

5    Ms. Ferguson?

6              MS. FERGUSON:  Your Honor, if I could be heard on our

7    stay motion and also just update the Court on the appeal?

8              THE COURT:  Sure.

9              MS. FERGUSON:  As Your Honor noted, the Court of

10   Appeals has drafted the plaintiffs to file their response to

11   the mandamus petition tomorrow, and it is our position that we

12   are entitled to a stay at this point.  This is an issue of

13   incredible importance to our clients.  In terms of the stay

14   factors, we need only show a substantial possibility of success

15   on the merits.  And I know it's dangerous to read tealeaves,

16   but the fact that the Court of Appeals has drafted the

17   plaintiffs to respond is some indication that they take our

18   petition seriously.  They, as you know, could summarily deny a

19   petition without directing a response.

20             Similarly, they see the urgency of our petition

21   because they granted our motion for expedited relief.

22             In addition, I know Your Honor does not view the

23   Palestinian Authority as a state, it hasn't been recognized as

24   such by the United States, but it is a foreign government that

25   provides important security services, important safety services

1    to 4.4 million Palestinians.  This case is a huge distraction,

2    and the potential liability is staggering, and, in fact,

3    creates sort of an existential crisis for the Palestinian

4    Authority.  It depends, as set forth in the United States brief

5    in Bernstein versus Carey, which was another suit challenging

6    foreign aid provided to the PA, it set forth the fact that the

7    PA is an important partner for peace in the Middle East, the PA

8    is an important ingredient in the two-state solution and the

9    stability that would flow from that, and that it's dependent on

10   foreign aid.  It cannot sustain itself with its own revenue,

11   and for this trial to go forward with there being so much

12   uncertainty about whether the Court has jurisdiction, and I

13   mean so much uncertainty about what witnesses will be called,

14   which evidence can come in, that would create a lot of burden

15   to have a 12-week trial coming up within three weeks for an

16   ordinary department, but this is a government that is spread

17   very thin, has limited resources, and has huge uncertainty

18   about who will be called, when they will be needed, and more

19   fundamentally, about whether this Court should even have the

20   case.

21          And I think this creates an extraordinary situation

22   where it merits caution, it merits letting the Second Circuit

23   rule on jurisdiction before we move forward.  I cannot

24   overstate the significance of this to our clients.

25          THE COURT:  Well, I understand your position, I've

1    read your papers thoroughly.  As they say, some of that will be

2    addressed -- let's put it this way:  If your client is

3    exonerated, then those aren't issues.  If your client is found

4    to be liable, then it's not a particularly compelling argument

5    that your client, the plaintiff, should not recover from your

6    client if they are, in fact, liable on their theories because

7    of the arguments that you've read, and --

8         MS. FERGUSON:  Just to be clear, Your Honor, the

9    financial stakes really go to the issue of whether the

10   Palestinian Authority could appeal a general personal

11   jurisdiction ruling after a trial on the merits.

12        THE COURT:  Well, what makes you think that they would

13   not have the right to do so?

14        MS. FERGUSON:  Well, this goes to the Second Circuit

15   case, Abelesz versus OTP, which involved this claim against the

16   Hungarian banks, which created this huge potential exposure,

17   and in granting a petition for writ of mandamus on personal

18   jurisdiction, the seventh circuit cited to the potential

19   irreparable harm of having a trial that flows from the fact

20   that the huge liability stake created this intense pressure to

21   settle without getting a final judgment.

22        Similarly, we have the issue here where a potentially

23   large judgment -- although we, of course, think the PA is not

24   liable -- but in the event a jury imposes a large judgment, the

25   cost of the bond would be prohibitive for the Palestinian

1    Authority.

2            THE COURT:  That either can or can't be addressed at

3    the time.

4            MS. FERGUSON:  Potentially a jurisdictional issue.

5    This isn't some discovery ruling we're challenging.  We're

6    challenging the Court's very jurisdiction to hear a case

7    involving the Palestinian Authority based on the assumption

8    that it's at home in the United States.

9            THE COURT:  But this case has been scheduled for trial

10   for months.  All of those issues were looming for months, if

11   not years, and it's the inevitability of, as they say, the

12   certainty of a trial date.  So those independent arguments

13   aren't any more compelling than they would have been had they

14   been raised months ago or argued that months ago or years ago.

15   We all knew that the end result of this was going to be that

16   there was going to be a trial in which these issues were going

17   to be resolved.  Now, to say, well, now a trial is so

18   burdensome, that this alone should compel me to delay the

19   trial, I think that those are -- my attitude is that those are

20   issues that go before the circuit, and the circuit -- I'm not

21   going to guess what the circuit wants to do with this, I'm not

22   even sure if the circuit knows what it wants to do with this,

23   and whether I can say it's a monolithic view on whether or not

24   this is a substantial issue, it is an issue that they have an

25   idea of how they would likely come out or an issue that they

1  feel is ripe for them to try to determine pretrial as opposed

2  to posttrial.

3          Those are decisions that are more informed to be made

4  by the circuit, particularly on the posture in which you put

5  the case before the circuit asking them to mandamus the trial

6  date.  If they think it's compelling, I'm sure that they will,

7  but I think that my inclination at this point on the motion --

8  the subsequent motion before me to stay the proceedings is that

9  I was going to -- while I didn't know whether or not the

10 plaintiff was going to respond to your motion, they haven't yet

11 responded to your motion, or I think technically the time to

12 respond has expired, but I didn't really anticipate -- I

13 anticipated discussing with them whether they intended to

14 submit something, but my inclination would be to wait until I

15 received whatever their response is in the circuit and take

16 that into consideration with regard to the outstanding

17 application for a stay, if that's what they wanted to, or for

18 some reason, independently submit something different, but

19 obviously you would not be surprised if the scenario has not

20 changed from when you requested prior to the filing before the

21 circuit to delay the trial, that I'm not compelled that it's

22 the appropriate thing to do under these circumstances, and

23 those are compelling reasons, nor are they irreparable injury

24 that would occur simply because you had to defend a trial,

25 which is a case you've been defending for the last decade.

1          So it's a little less compelling than somehow that

2     because you want to argue that a change in law should prevent

3     the trial and give you an opportunity to have the circuit

4     determine whether or not to dismiss this case on jurisdictional

5     ground prior to trial.  You're in no worse situation than every

6     other plaintiff who have had to try a case under these

7     circumstances and litigate a case in which you've been a

8     litigator for a decade, and now, as you say, until Daimler and

9     Gucci, everyone else found themselves in the same situation as

10    you find yourself, and the only question is whether or not the

11    circuit is going to feel that this is such a compelling issue,

12    whether they -- whichever they resolve the ultimate substantive

13    issue is such a compelling issue, that it warrants an

14    interlocutory appeal prior to trial or it's something that they

15    feel is more appropriate for them to review after a trial, and

16    for the record, and possibly greater development of the law in

17    this area, in this circuit, or elsewhere.

18         As you're probably not surprised, my inclination is

19    not to grant a stay based on the arguments that you've made,

20    because these are all the arguments that were available and

21    were made prior to your application to the circuit and when we

22    all anticipated that there was going to be a trial in this

23    case.

24         MS. FERGUSON:  Your Honor, I would just like to

25    clarify that when the Court set the January 12th trial date, it

1    was with the assumption that we would have rulings on a number

2    of these key issues, and --

3              THE COURT:  I gave you specific dates when you would

4    have rulings, and I've stuck to every one of those dates.

5              MS. FERGUSON:  But, Your Honor, even as to the motion

6    for summary judgment, you assumed admissibility of evidence, so

7    in some sense, we didn't get the true benefit of a ruling on a

8    motion for summary judgment because you assumed there was a

9    tribal issue of fact based on --

10             THE COURT:  That's not true.  That's the way you

11   characterized it, but that's not what I did.  I said that there

12   are issues of admissibility to be resolved, that the posture in

13   which you made the motion, that motion itself, you should -- I

14   don't even know if I said it in the context of the motion, but

15   that the issues that are outstanding with regard to motions in

16   limine, that you should proceed, as most parties proceed in

17   most cases, until your motion is granted, then you should

18   assume to exclude evidence -- both sides should assume what

19   evidence is in.

20             I'm ready, prepared to move forward on the same

21   schedule as I indicated with regard to what can be resolved

22   today, and the rulings that I'm making and intend to make

23   today, even contemplating -- and we can discuss further motions

24   in limine -- would have any effect on my decision with regard

25   to the summary judgment motion.  So that would not change my

1  ruling with regard to the summary judgment.

2          MS. FERGUSON:  So, Your Honor, just to then respond to

3  Mr. Yalowitz's proposal, we very much would object to

4  plaintiffs' counsel cherrypicking a particular GIS file, and

5  sort of having a unilateral exchange with the Court on what

6  should be unsealed and then submitting that to the Second

7  Circuit as somehow representative of the GIS files.  This is

8  the first I've heard of it, but I strongly object to that

9  process.

10         THE COURT:  Why don't we discuss -- I want to discuss

11  your -- particularly I want to discuss the 177 trial exhibits,

12  which I know a number of GIS files are included in, so I am

13  prepared to make some rulings today.  As I indicated, once we

14  do that, then we can see whether or not it makes sense for me

15  to weigh in on any particular documents.  There might not even

16  be a document necessarily admissible.

17         MS. FERGUSON:  My colleague, Brian Hill, is prepared

18  to address the 177 documents.

19         THE COURT:  Okay.  Well, let me do this first.

20         Mr. Yalowitz, did you want to add anything to that?

21  And then I'm going to start with some basic procedural stuff,

22  jury questionnaire and some other things, that I want to try to

23  give you some indication today before we move forward on the

24  12th.

25         MR. YALOWITZ:  That's great.  I really don't think I

1    need to be heard on this stay application, Your Honor.  We'll

2    give you the answer tomorrow or -- I don't know how late we'll

3    get it in, but we'll give it to you, and you can consider that,

4    if you want to reflect on it for a day, but I think the stay

5    application is meritless, and we really don't need to wallow in

6    this.  So let's proceed with your agenda.

7              THE COURT:  All right.  Then let's do this.  Let me

8    first address -- see how much we can accomplish today.  Let me

9    first address the jury selection.

10             What I propose at this point is:  I've gone through

11   the questionnaire and modified the questionnaire.  I'm still

12   working on it, I've taken some things out and added a few

13   things.  What you should do is you should look it over, and if

14   you want to submit to me a letter either urging that I put

15   something else back in or I take something out, you can do

16   that, but I think that having reviewed the proposed

17   questionnaire and the objections by each side, I think that, in

18   substance, what I have proposed here and the process that I

19   have been attempting to work out with a jury selection will be

20   a process to obtain a fair and impartial jury.

21             I'm going to give you a copy of what I am still

22   working on, as I say, fashioning as a jury questionnaire and

23   another form that I will explain to you what I'd like to do

24   with.

25             First of all, this is the timing for what I anticipate

1    doing:  We have a conference, I believe, a pretrial conference,

2    scheduled for January 6th.  Hopefully, by that time, at least

3    most of the substantive issues can be finalized, and rulings

4    can be finalized.  There are some things that I can give you

5    some guidance on, but might not necessarily have to be totally

6    finalized prior to trial, but we can address that on the 6th

7    and see what else I need to resolve before the 6th.

8              What I have worked out with our jury panel section is

9    that on the 7th, because we can -- the 12th, there are a lot of

10   trials going to be tried on the 12th, I want to set the panel

11   for this case.  We're going to bring in a panel on the 7th

12   that's just for this case.  It is probably going to be at least

13   200 -- two to three hundred, it's probably going to be 200.

14   They're going to be in the jury room.

15             The way I propose proceeding with regard to the

16   introduction of the jury questionnaire is, I intend to hold a

17   brief court session in the jury room.  I will introduce the

18   parties, I will give my preliminary instructions that I

19   standardly do, introduce the parties indicating what this case

20   is about who the parties are, introducing both sides, and

21   telling the jury that we are going to have them fill out the

22   questionnaires and explain to them what the process is going to

23   be.  I'm still working on that, but it's consistent with my

24   standard voir dire of jurors, and it's consistent with some of

25   the instructions that you had in the jury questionnaire, which

1    I'm lifting out because I'm going to tell the jurors personally

2    what we expect them to do.

3            After I explain to them the case, and what the time

4    period would be, and what the issues are in the case, I will

5    tell them that we have assigned them numbers.  Those numbers

6    were randomly generated.  I found out the clerk's office

7    randomly generates those numbers rather than putting it in the

8    old-fashioned wheel.  So they will be assigned numbers at

9    random, one through two hundred, if we have 200 jurors.  What I

10   will do is we will call each juror, they will be assigned the

11   numbers and told what their numbers are.

12           After I give them the preliminary introductions, the

13   clerk's office will call the numbers from one to two hundred,

14   and jurors will come up and get their questionnaire.  So you

15   will have an opportunity to see who that juror is, even though

16   that juror will not be identified by a name or address, and I

17   will explain to them that the primary reason for that is to

18   ensure, when we give them the questionnaire, that they should

19   be totally candid in answering the questions on the

20   questionnaire.  It's not unusual to proceed in that manner.

21           So we will give the jurors the questionnaires.  You

22   will see who the jurors are, one through two hundred, on the

23   7th.  We will then let them fill out the questionnaires the

24   rest of the day.  Hopefully, by the end of the day, we will

25   have all the questionnaires, and we'll have them -- you should

1    talk with each other.  It may be more efficient for me to just

2    provide the questionnaires to the parties and then for you to

3    agree upon a process and go ahead and copy, and start working

4    on them yourself rather than the Court doing that.  Find a

5    vendor who's accepted, who can get you copies, and start

6    dealing with it.

7           I think it should be enough time to go through that in

8    one day and get back to me by the end of the day Thursday or

9    the beginning of Friday.  The preference is the end of the day

10   Thursday.  Let me remind myself.

11          (Pause)

12          THE COURT:  What we're going to do is by the end of

13   the day Thursday, if you got back to me, I would then notify

14   the jury who to call in for voir dire.  My intent would be to

15   get at least 25 to 40 jurors who can be voir dired, maybe 50 or

16   60 to bring in the next day, for Monday, the 12th, and so we

17   would seat those jurors in order, and if there are any more

18   basic questions, and just assure ourselves that they can be

19   fair and impartial jurors and weed out anybody else who there

20   may be a reason why they cannot sit, if there are any other

21   particular specific challenges for cause, and then have 22

22   jurors who are eligible to sit, and have the parties exercise

23   their three peremptory challenges, if they wish, up to three.

24          My process would be to have each side give me three

25   peremptory challenges on a piece of paper simultaneously.  If

 1  you pick the same person, then you pick the same person, but

 2  what I intend to do is to start this trial with 16 jurors.  So

 3  if we use all three peremptory challenges after we have 22 who

 4  are qualified to sit, and there are no peremptory challenges as

 5  to those individuals, then I will -- we will seat those 16, we

 6  will start the trial with 16.  We will -- ten jurors will, at

 7  most, deliberate.  The rule is in civil cases, no less than

 8  six, no more than ten, so I will send the first ten in to

 9  deliberate -- who are left of the 16 to deliberate at the end

10  of the case.

11          Yes, Mr. Yalowitz?

12          MR. YALOWITZ:  May I just raise one issue with the

13  Court on that?  I apologize for interrupting.

14          THE COURT:  That's all right.

15          MR. YALOWITZ:  I had sort of a vague memory that there

16  was a change in the rules, and I went back and looked at Rule

17  48, and Rule 48 says six to twelve, and if they sit, they have

18  to deliberate.  The Court's proposal of 16 and 10, so you're

19  going to excuse six at the end of the trial, I don't have a

20  problem with it.  I don't know whether -- I just want to make

21  sure that we have a conversation in which everybody looks at

22  the rule, and I don't hear in the Court of Appeals, oh, the

23  judge made a fatal error because --

24          THE COURT:  That's fine.

25          MR. YALOWITZ:  So if the defendants have a problem

1    with the way the Court is proposing to do it because of the

2    amendments to Rule 48, I think they need to say that, and the

3    Court can consider it, and we can all consider it.  If

4    everybody's in agreement that this is the right way to proceed

5    for this case in these circumstances, and the defendants are

6    explicitly waiving any objections they have based on Rule 48, I

7    certainly don't have a problem with proceeding the way the

8    Court has proposed.

9              THE COURT:  Well, I'll look back at the amendments to

10   the rule and see if it has really changed --

11             MR. YALOWITZ:  It was after I went to law school, and

12   so I -- but anyway, it's -- we can look at it, and they can

13   look at it, but I don't want --

14             THE COURT:  If you have a different proposal or you

15   have an objection, I'd like to hear it before we --

16             MR. YALOWITZ:  Right.  I just don't want to hear about

17   it across the street.

18             THE COURT:  I understand.

19             MR. HILL:  A couple of points.  I haven't looked at

20   Rule 48 lately, but obviously we want the Court to sit the

21   maximum number of jurors allowed by the rule.

22             With respect to the timing, a couple of points.  24

23   hours is an extremely short period of time to review 200,

24   16-page questionnaires with 54 questions each.  Is it possible

25   to call the jurors in instead of on Wednesday, the 7th, on

1   Monday, the 5th --

2          THE COURT:  The answer is no.  I've explored all of

3   that with the jury panel, and the best that we can get out of

4   them is Wednesday the -- that Wednesday.

5          MR. HILL:  It wouldn't be possible to do them on

6   Tuesday, the 6th, and do the pretrial --

7          THE COURT:  I tried that.  I forget what the reason

8   was.  We just physically can't accommodate those jurors on

9   those other days because of other cases.

10          MR. HILL:  In that case, could we start with jury

11   selection on a date other than the 12th, the 13th or the 14th,

12   to give people adequate time?  We're talking about a one-day

13   delay.  It really is going to jam people to review that stuff

14   in that short period of time.

15          THE COURT:  We can talk about it.  Let me finish up

16   and tell you what I'm going to ask you to do, and then we can

17   see why it can't be done in 24 hours.  But what I'm going to

18   ask you to do is:  I am going to ask you to go through the

19   questionnaires.  If they're 200 questionnaires, and this is no

20   different -- I think there were more questionnaires that were

21   done in Judge Koeltl's case in a shorter period of time, but

22   I've given you a form.  What I want to know is, I want to

23   know -- and it will probably be fairly obvious -- I want to

24   know, based on the questionnaire, if you think there's a

25   challenge for cause that this person is not qualified to sit.

1   If you believe so, then just check that off.

2        And then the two other things I'm looking for:  If you

3   think that this person is acceptable for voir dire, that you

4   have no problems with this person, and if this person turns out

5   to be one of the jurors, depending on what you do with your

6   peremptory challenges, then check off the box that it's

7   acceptable for voir dire.  It doesn't mean you're accepting the

8   juror for the trial, but there's no challenge for cause.  All

9   things being equal, if you had to find somebody worse than

10  this, you would take this person.  If you don't have that

11  positive reaction to that person, then don't check either box.

12       My intent would be to do this:  My intent would be to

13  look first for the people that both sides said were acceptable.

14  So if, number one, one of the parties checked there's an

15  objection for cause, and it appears to me -- I'm sure it would

16  be fairly obvious, it's on a piece of paper, I mean it's on the

17  questionnaire, it's got to jump out at some point; or in number

18  2, both sides leave blank or one side says it's acceptable, the

19  other side left it blank; and number 3, both sides checked off

20  the box acceptable, that's the first person I'm putting in the

21  box for voir dire.  I'm going to look for 20 to 30 of those

22  people, in that order, the people that both sides have checked

23  off saying this is an acceptable person for voir dire.  So in

24  the order in which they -- the questionnaires are numbered, if

25  I can find 30, 40 of those people, those are the people, in

1   that order, that are going to be seated in the box, and then we

2   will see whether or not we have to have any more -- if there

3   are any more questions that we need to ask before an individual

4   juror -- before we select them.

5           To the extent that I don't have enough people that I

6   am comfortable with that are checked off acceptable to both

7   sides, then I will go to people who are acceptable to one side,

8   but not checked off objection for cause.  And I will alternate,

9   okay?  The first one the plaintiff says, if I have 20 people

10  that you both say is acceptable for voir dire, that's the first

11  20, and then for Juror No. 21, I will take the first person

12  that I see that the plaintiffs said was acceptable and the

13  defendants didn't check off any box.  And then for 22, I'm

14  going to take the first person the defendants said was

15  acceptable and that the plaintiff didn't check off the box.

16          I think that's the fairest way that, in going through

17  a number of different ways, to get jurors that are acceptable

18  to both parties.

19          Now, obviously, if it turns out when you exercise your

20  peremptory challenge based on who's seated in the box and where

21  they're seated, you decided you still want to exercise your

22  peremptory challenge, then you're able to do that, or to the

23  extent the person says something when we seat them in the box

24  that gives us an indication that there's a challenge for cause

25  or any other legitimate reason why we should excuse that juror,

if there's a real conflict in time or family illness that's

happened over the weekend, that the person just can't do, or

something that both sides agree that we should just go ahead,

we have plenty of people, we don't need to put this burden on

this person who says it's much too burdensome for them to do

it.  But if they had to do it, they know that that's their

responsibility, then we can address those.  But that's what I'm

looking for back from you.

         And I'd like you to take a day to do that.  I don't

want you to take two, three days to do that.  The problem is

that we cannot even bring back the two to three hundred jurors

on Monday.  We just can't physically handle that.  So in

negotiating with the jury to be able to get to them sometime

Friday, maybe I can push them off till Friday mid-day, but they

need to contact the jurors to tell them which ones have to be

here on Monday, and I only have a limited amount of space and

time to be able to notify people that they are to be here

Monday to be further examined in voir dire and selected for

this trial.  So I think by Monday, we're going to proceed with

the opening statement and at least hear the first witness on

Monday, as I usually do in a trial, if we can.

         Look at the questionnaire, figure out whatever

strategy that you want to have in terms of how you want to do

this, but that's what I am expecting back from you.  I'm sure

you want as much time as possible to do that, but unless you

1    can give me a real compelling reason that both sides really

2    can't do that --

3        MR. HILL:  I can try, Your Honor.  Let me make a

4    couple of points in response to what you have said, which has

5    been very helpful to understand the process.

6        To a certain degree, you're asking the parties,

7    without waiving their peremptory challenges, to indicate a

8    favorable view of certain jurors by indicating they're

9    acceptable for voir dire.  Obviously that's going to involve us

10   looking at the 200 and coming up with some sort of -- sort for

11   who we would prefer, who we would not prefer, and so on and so

12   forth, the sort of things lawyers do all the time.

13       Given the amount of data here, we're talking about 50

14   data points on each juror for 200 people, I'm not very good at

15   math, but that's several thousand data points, and to analyze

16   that in 24 hours, I really do think it's not an adequate amount

17   of time.

18       The other point is even if we were to do that and get

19   you something on that Friday morning, and you're hoping to tell

20   the clerk's office by noon which ones you're going to select,

21   even Your Honor's process of going through the 200 in the

22   fashion you've indicated of if everybody agrees, they're

23   acceptable, they're on the list, but after that, I've got to

24   make some judgments, three hours on Friday morning may not be

25   enough time for Your Honor to reasonably do that.

1    THE COURT:  I'm going to be doing it in the same time

2  period you're doing it in.

3    MR. HILL:  Your Honor --

4    THE COURT:  My task is simpler than yours because I'm

5  only looking to see if there's somebody who is -- I think

6  that's clearly unqualified to sit.  If I think that I see

7  somebody, I assume that you're going to identify the same

8  person from this questionnaire, and I'm not looking to who's

9  acceptable and who's not, you're going to tell me that.  My

10 task after that is going to be fairly simple.

11    But when you say 50 data points, they're not

12 particularly 50 or so relevant data points.  Your first two

13 points as to age and whether the person is a male or female,

14 that doesn't take a whole lot of thought on your behalf to try

15 to evaluate that.

16    MR. HILL:  Right.

17    THE COURT:  You can evaluate that even before you get

18 the questionnaires.  You can get that if somehow that's a

19 factor in who you're going to pick.

20    MR. HILL:  Some are narratives, some are substantive,

21 and some are free form, so it is going to take time, so I just

22 urge the Court to give us more than 24 hours.  I understand

23 you'll take that into consideration.

24    THE COURT:  Well, again, you've got to give me a

25 reasonable -- I'm not sure what it is you're asking for in

1    terms of time.

2              MR. HILL:  Just for me to read the 200 questionnaires,

3    it may take more than 24 hours.

4              MR. YALOWITZ:  We must be faster readers than the

5    defendants, Your Honor.  We don't have any problem with the

6    schedule that you're proposing.

7              MR. HILL:  I think it is a burden on the parties.  I

8    think we should have more time.

9              THE COURT:  It's definitely a burden on the parties.

10   It's a burden on me.

11             MR. HILL:  I think we should have -- frankly, there's

12   no reason we couldn't have more time.  Your Honor --

13             THE COURT:  There is a reason.  As I say, if we're

14   going to pick the jury on Tuesday and begin the trial on

15   Tuesday, I need to know by Friday --

16             MR. YALOWITZ:  Monday.

17             THE COURT:  I mean Monday.  Excuse me, Monday, the

18   12th.

19             -- I need to know by Friday which jurors we're

20   bringing in here, and I need -- and juries have told me they

21   need to know early in the morning, so they can reach out to

22   those jurors and tell all of those jurors which ones need to

23   come in and which ones don't.  And the ones that need to come

24   in will be in the range of 30 to 50.

25             MR. HILL:  My point is that there's no reason we

1   couldn't start on Tuesday or Wednesday as opposed to Monday and

2   give ourselves that extra time, get you that information Sunday

3   evening, so you can look at it Monday morning, so the clerk's

4   office can call Monday afternoon.  It's a one-day delay in the

5   period, but it gives the parties substantially more time to

6   work with the data and make more informed choices.  So that's

7   what I am requesting, is essentially a one-day delay to start

8   that.

9           Your Honor has indicated you don't think we're going

10  to use all the time anyway.  I can't imagine that we will, and

11  nobody's going to be prejudiced by a one-day delay with that

12  additional time to evaluate the jurors.

13          THE COURT:  What are you suggesting that we --

14          MR. HILL:  I'm suggesting we give you the stuff Monday

15  morning, you look at it Monday morning, you tell the clerk's

16  office Monday at noon, they make the phone calls, tell people

17  to come in on Tuesday, we start Tuesday instead of Monday.  Or

18  we can give it to you Saturday or Sunday, if Your Honor wants

19  to see it over the weekend.  We can even give it to you on

20  Friday, and Your Honor --

21          THE COURT:  I'm not sure that it can go beyond Friday.

22  I can consider whether or not you could have until sometime

23  Friday, but I don't think that -- I have to get back with the

24  jury.  I don't think we can wait till Monday, and then contact

25  them and have them here Tuesday.

ECGKSOKM

1      As I say, I don't really see that you're going to make

2  a more informed judgment about this in 48 hours as opposed to

3  24 hours.  There's only so much information to go through.

4      MR. HILL:  Your Honor, I do have one other point on

5  jury selection, if I could make it now.  We reflected on what

6  was said at the last hearing of Your Honor's order on the

7  anonymous jury.  We would request that the lawyers be allowed

8  to see the key for the jurors.  There's no reason --

9      MR. YALOWITZ:  We object to that, Your Honor.  We

10  object to that.  Your Honor's already made a ruling.

11      THE COURT:  Let him finish, Mr. Yalowitz.  One at a

12  time.  I hear everyone.

13      MR. HILL:  Your Honor has indicated that there's no

14  reason to believe that the jurors are endangered from the

15  defendants.  There's certainly no reason to believe they would

16  be endangered from the lawyers, and I would ask that the

17  lawyers be allowed to see that list, and you can make it

18  confidential, make it attorneys' eyes only, we will return it

19  to the Court after selection.

20      THE COURT:  For what purpose?

21      MR. HILL:  It's information lawyers always get.

22      THE COURT:  It's not information lawyers always get.

23      MR. HILL:  Unless there's an anonymous jury, the

24  lawyers and the public are entitled to know the identity of the

25  people that are serving --

1          THE COURT:  Well, I intend to keep these jurors

2    anonymous by name until the resolution of this trial, so

3    they're not influenced -- unduly influenced by outside factors

4    that should not affect their determination in this case.

5          MR. HILL:  But there's no danger that the lawyers for

6    the parties are going to unduly influence the jurors outside

7    the case.  That's something that we're all officers of the

8    court, none of us are going to behave improperly, and I am

9    concerned that if you do tell the jury that either of the

10   lawyers don't know who you are, even though it may not be the

11   Court's intention, that's going to inure to the prejudice of my

12   clients.

13         My clients are the ones that are accused of acts of

14   violence against civilians, and I am concerned that the jurors

15   are going to feel that they are in danger from our clients

16   because even the lawyers for the defendants can't know who they

17   are.  I think the jurors should be told that only the lawyers

18   will have their name and contact information, they will not use

19   it for any purpose other than jury selection, and that it will

20   be destroyed after jury selection is completed.

21         THE COURT:  Well, that's an argument from a lawyer's

22   perspective, that's not an argument from a juror's perspective.

23   The juror isn't going to think about the lawyers if I tell them

24   that they are going to fill out these questionnaires

25   anonymously, and that we're going to proceed anonymously and

1    not have their names and addresses disclosed, so we can assure

2    that they can be candid with regard to the questionnaire and

3    that there be no chance that there will be any outside

4    influences by any side who might have interest in the trial not

5    related to the parties that would -- that might interfere with

6    their evaluation of this case and deliberation.

7            I don't think they're going to think about, well, does

8    that mean the lawyers. That's not the way jurors think.

9            MR. HILL: My point is that restricting the

10   information from the lawyers doesn't address the harm Your

11   Honor is concerned about. You're concerned about outsiders

12   outside of the courtroom affecting the jury, as I understand

13   the basis for Your Honor's ruling.

14           THE COURT: I'm also concerned about getting for you

15   as candid a response to your questionnaire as you possibly can

16   so you can evaluate it.

17           MR. HILL: I'm not sure anonymizing the jury will

18   increase candor. I think it may actually decrease candor

19   because when people are not -- they don't sign their name to

20   something, I think there's less accountability there for what

21   they're saying, and I think there's actually a danger that

22   jurors will be less honest if they really do think nobody knows

23   who they are, and they can never be held to account for --

24           THE COURT: Well, that's not what they're going to

25   think. I know who they are, and if you want me to make it real

1    clear to them that besides this Court, that I'm not disclosing

2    their names or addresses, and I have assigned them numbers, I

3    can indicate that, but I don't think that -- I'm not sure I

4    understand your -- that makes it less candid than as opposed to

5    more candid.

6              MR. HILL:  As officers of the Court, we should have

7    access to the same information.  I think it's going to

8    prejudice our clients if the jurors are told that only Your

9    Honor knows, because even if Your Honor suggests that there's

10   no danger or difficulty, the jurors are going to be concerned

11   about why only the Court can know who they are.

12             THE COURT:  And I am going to tell them why, and I am

13   going to tell them it hasn't -- it's not going to be an

14   explanation about any dangers to the jurors, because that's not

15   why I'm --

16             MR. HILL:  I guess the record reflects my request that

17   we receive that information, Your Honor.

18             THE COURT:  You had something else you wanted to say,

19   Mr. Yalowitz?

20             MR. YALOWITZ:  No, Your Honor.  Thank you.

21             THE COURT:  All right.  Well, as I've said, we

22   discussed this before, I think particularly -- I don't think

23   that the lawyers are necessarily entitled to that.  I have

24   indicated that I would bring the jurors in, and rather than

25   having them fill out questionnaires prior to your seeing the

1  jurors, that you will be able to at least eyeball the juror,

2  and know what they look like, and use it to factor that in in

3  any way you want to factor it in.  The only information that I

4  am keeping anonymous here is the jurors' names and their

5  addresses, and I think that's appropriate to get candid

6  responses from the questionnaire, and it's appropriate to

7  maintain that so that no one who might have an interest in this

8  trial can attempt to improperly influence any of the jurors

9  during the presentation of evidence and during the

10  deliberations or at any point in time prior.

11      Since I'm not going to sequester the jury, I'm still

12  thinking about ways to get the jurors in and get them out in an

13  efficient way, so that someone who has their own personal

14  agenda in the hallway doesn't get a chance to confront a juror,

15  or follow a juror home, or research information about jurors

16  and confront jurors outside of this courtroom.

17      We can discuss it further, or if you have suggestions,

18  you can send me a letter once you look this over, but that's my

19  suggestion with regard to how we proceed on the jury

20  questionnaire and jury selection.  And I will look at the rules

21  and see if the rules affect the number of jurors and how we

22  proceed if somebody has an objection.  If I don't hear an

23  objection, I assume there is no objection to that portion of

24  the jury selection and how juries will deliberate, but I want

25  enough jurors so that if we lose jurors over the course of the

1  trial, we will still have -- hopefully anticipate we will still

2  have ten jurors that can deliberate. But I'll hear from the

3  parties.

4          Let's go to the Israeli military court convictions.

5  First of all, I find that the military court convictions are

6  not inadmissible for the reasons that the defendants argue that

7  they're inadmissible. I think judgments of conviction are

8  admissible under the rule, and I see no exception to draw with

9  regard to foreign convictions or with regard to military

10  convictions.

11          The question really is as to what form it will be

12  admitted. I'm going to address two different circumstances,

13  one, the guilty plea; and two, a trial verdict.

14          With regard to the guilty pleas involving the attacks

15  at issue in this case, those portions of the hearing transcript

16  that include the guilty plea, the decision, the verdict, along

17  with the indictment to which the defendant pled is admissible.

18  The names and addresses of accomplices and witnesses must be

19  redacted. It is not admissible for that purpose. It is not

20  admissible for the truth that a defendant has accused another

21  of participating in the crime, it's not relevant with regard to

22  naming the individual witnesses. So to the extent that a

23  person was presented with an indictment, that person pled to

24  that indictment, the decision, and transcript, and verdict in

25  which the person pled to that indictment with the names of

accomplices and witnesses being redacted from the guilty plea

documents or the indictment that were served as the judgment of

conviction for a guilty plea.

With regard to trial verdicts, the trial verdicts

themselves -- the bench and trial verdicts are admissible, not

the indictments.  It is not an instrument that the defendant in

that criminal case admitted to the accuracy, or the

truthfulness, or admitted guilt to that indictment.  What is

relevant is what the court determined that individual was found

and the evidence supported, the conviction from the court.

Again, the names of accomplices and witnesses are to be

redacted from all trial documents.

The sentencing records are not admissible.  It is not

either necessary, nor do I consider it to be an integral part

of the judgment itself.  The legitimate purpose is to

demonstrate that a particular individual was convicted or pled

guilty with regard to the attacks at issue, then it is

admissible for that relevant purpose, but it is not admissible

for the purpose of some accusation against third parties,

whether that is someone who plaintiffs want you to contend is

an employee or agent of the defendants or some other person.

And I think it is not relevant to, and I think it's still

important to protect the identity of witnesses who may

otherwise be named, and there's no relevant purpose for

identifying those witnesses at this trial.

1    That's my view of that after reviewing -- I reviewed

2   all of the judgments, and all of the indictments, and all of

3   the pleas, and all of the trial transcripts, and that's the

4   conclusion I've reached with regard to this case.

5        Mr. Yalowitz, did you have a question?

6        MR. YALOWITZ:  I did, Your Honor.  I apologize for my

7   oversight, but in reviewing my submission to you yesterday, I

8   noticed that there was one category of convictions that I

9   didn't quite correctly submit to the Court, which is, there are

10  a couple of cases where the defendant says, I admit that the

11  facts alleged against me in the indictment are true, but I

12  don't admit I'm guilty, I just say I did what you said I did,

13  and I am not admitting that I'm guilty.

14       THE COURT:  Okay.

15       MR. YALOWITZ:  I noticed two of those, and I didn't

16  submit to the Court the indictments, which I think support and

17  explain what the defendant is admitting to.  And so I'd like,

18  with the Court's permission, to just supplement our list with

19  those two items.

20       THE COURT:  Well, I don't remember whether or not the

21  list that I had, that there was, in fact, an indictment

22  corresponding to the list, but I know I looked at all the

23  indictments that you provided.  And I know that my intent in my

24  ruling was to categorically deal with those types of

25  convictions in the same manner.

1      MR. YALOWITZ:  Right.  That's my --

2      THE COURT:  So I can look at the indictment, but it

3 wouldn't change my ruling that to the extent that that

4 defendant is pleading guilty to that indictment, admitting

5 those facts that have been presented to them or saying -- and I

6 think most of the language is, they don't challenge, they know

7 what they're charged with, they read the indictment, they're

8 not challenging the allegations in that indictment.  To the

9 extent that that defendant is making any such statement, and

10 every defendant made such a statement who pled guilty to an

11 indictment, to the extent that they made that statement, I

12 believe that the trier of fact has the right to see what it is

13 that this person has reviewed, understands that he's charged

14 with, is admitting and pleading guilty to.

15      MR. YALOWITZ:  I agree with that a hundred percent.  I

16 just screwed up on what I submitted to the Court.  So I'll send

17 a letter --

18      THE COURT:  That's fine.

19      Does the other side already have it?

20      MR. YALOWITZ:  No, no.  I just discovered this

21 yesterday, so I will send a letter to the other side, see if

22 they have a response --

23      THE COURT:  Can you tell me who those defendants are?

24      MR. YALOWITZ:  I'm not sure.

25      THE COURT:  Because I have the list.  I went off of

 1    the list that was -- the documents evidencing conviction list.

 2    I went through all of those documents.

 3         MR. YALOWITZ:  I have to send the Court a letter.  I

 4    just don't remember.  There were two individuals off the top of

 5    my head, and then there was a third where there was a summary,

 6    and we gave the wrong -- there are three documents.  I don't

 7    think it's --

 8         THE COURT:  Make sure the defense knows what it is, so

 9    I can see if there's some other dispute, but this list tells me

10    who pled guilty and who was convicted by a bench trial, by what

11    is characterized as a trial verdict, and what's characterized

12    as a bench verdict.  So I went off this list, and as I said, I

13    can't say that when I went through the documents themselves,

14    that I noticed -- I clearly did not notice whether or not there

15    was somebody on the list that I didn't see the indictment, but

16    every indictment that I looked at had the same pattern.  And my

17    position was, as I say, if the purpose for which you want the

18    document is because they're accusing some third party, I'm not

19    going to give it to you for that purpose.

20         MR. YALOWITZ:  Agreed.

21         THE COURT:  For the purpose for which you want the

22    document is to indicate that that person pled guilty to an

23    attack that's at issue in this case, and that he either

24    acknowledged it or there was a judgment of conviction after a

25    proceeding in which the Court determined that this person was

guilty of that offense, I think that that is admissible for

those purposes.  Now, whether there's some other issues or

objections to be lodged with regard to the documents

themselves, or authenticity, or foundation, or something like

that, that's a different question, but with regard to what you

want beyond, as I say, I think -- in thinking about what is

usually the kind of information that is available in a judgment

of conviction, even in a state or federal court in the United

States, there is no greater information that is usually

provided by a judgment of conviction, and I think the

sentencing itself is beyond -- particularly the nature of the

sentencing proceedings in many of these cases, is beyond what

is the factual determination by the court and is beyond what is

the admission of the defendant who pled guilty to the

indictment.

MR. YALOWITZ:  Right.  You and I discussed that issue

some time ago, and we reflected on it and did not put the

sentencing decisions -- we didn't request admission of those,

and we accept the Court's views on that.

What I'll do is, after consulting with Mr. Hill, there

are three documents that we need to add or substitute to my

December 4th list, and we will send you a letter, and the Court

can memo endorse it or whatever.

THE COURT:  Unless there's some other specific

objection raised independent with regard to those, the same

1  rule is going to apply.

2          MR. YALOWITZ:  Okay.

3          THE COURT:  It's an indictment, and he pled guilty to

4  it, it's admissible redacted.

5          MR. YALOWITZ:  Thank you.

6          THE COURT:  If it's not a plea of guilty, then it's

7  the verdict itself proceedings, and those also should be

8  redacted with regard to indications about other individuals not

9  the defendant.

10          MR. YALOWITZ:  Okay.  Thank you, Your Honor.

11          MR. HILL:  Your Honor, just two points, one

12  substantive and one procedural.  I think this should be clear

13  from the discussions here, but as you know, a number of the

14  indictments involve multiple crimes, only one of which is at

15  issue in this case.  I'm assuming the other crimes will be part

16  of what's redacted.

17          MR. YALOWITZ:  No, no, no.

18          MR. HILL:  There's no reason for the jury to know that

19  a person was convicted in something unrelated, right?

20          MR. YALOWITZ:  It goes to the state of mind of the

21  defendants, Your Honor.

22          THE COURT:  Well, I'm not sure I agree with the

23  plaintiff that it necessarily goes to the state of mind of the

24  defendant, but I don't see any reason to redact -- if the

25  defendant pled guilty to multiple offenses at the time he or

she pled guilty to the attack at issue, I don't see any reason

to further redact it beyond redacting the names of accomplices

and witnesses.

          MR. HILL:  Right.  Well, if nothing else, it would be

a 403 redaction.  Why would we give the jury hundreds of pages

of material about crimes that are not at issue in these cases?

          THE COURT:  Well, I don't know.  At this point, I

really don't know.  The jury might be able to appropriately

evaluate it if there's generally an issue as to whether or not

this person, in fact, committed this act or committed several

acts.  I don't know at this point, but I think the probative

value of it is not outweighed by any potential prejudice to the

defendants.

          The question is whether the defendants are going to be

tied to the acts that were committed by this individual, and if

they're going to be tied to those acts, then it's going to be

probative.  If they're not tried to those acts, then you have

what you would independently have, the person pled guilty to

committing acts of violence, and that person is off on his own

committing those acts of violence, but --

          MR. HILL:  Yes, Your Honor, but just to make my point

clear, I think there's no probative value to someone pleading

guilty to a crime that did not injure one of the plaintiffs in

this lawsuit.  It doesn't add anything to the plaintiffs' claim

that the defendants are responsible for the crimes that injured

1    them.  All it will do is prejudice potentially the defendants

2    and confuse the jury with a bunch of irrelevant stuff.

3            THE COURT:  Well, you would have to identify -- I was

4    not able -- that didn't jump out at me, so I was not able to

5    evaluate that independently.

6            So if you have a number of those circumstances, and

7    you want to specifically say to me this person was charged with

8    this that has nothing to do with this case, and so we don't

9    think it should be admitted, I'll consider that, but I think

10   that the -- I have a greater fear that a greater redaction

11   might potentially prejudice you or the other side than having

12   the jury -- it's going to be clearly obvious what is being --

13   is redacted is simply names and addresses -- I mean names of

14   other people who are not the persons at issue here.  I have to

15   look specifically at what specific unrelated acts that you say

16   that the person pled guilty to at the same time.

17           And I assume -- are you talking about just pleas, or

18   are you talking about verdicts?

19           MR. HILL:  Well, it would be both.  Some --

20           THE COURT:  How many do you think exist in that

21   category?

22           MR. HILL:  I think with the exception of, perhaps, two

23   people, everyone was convicted of more than one crime and

24   involving crimes other than the ones at issue in this case.  So

25   I think this is going to be an issue with most of them, and as

1  you know from reviewing, some of them go on for dozens and

2  dozens of pages.

3          THE COURT:  No, I understand that.  But that wasn't

4  the way the issue was presented to me, so I didn't focus on

5  that.  I don't know if you even made an objection on that

6  basis.

7          MR. HILL:  We did make a relevance objection.

8          THE COURT:  No, but I don't think you identified that

9  specifically as the relevance objection that you made, that

10  they were convicted or accused of other crimes that you wanted

11  to keep out.  I don't remember that as being part of --

12          MR. HILL:  Well, it is part of our objections, and we

13  would like a ruling on it.  We can send Your Honor a letter

14  identifying those portions we think would need to be excluded

15  under this rationale, and Your Honor can adjudicate that.

16          THE COURT:  You should send me a quick letter, and I

17  will review that, or you can discuss it with Mr. Yalowitz and

18  his team first, and if they can agree, then you can just tell

19  me you've agreed, but otherwise I'll look at it carefully.

20          MR. HILL:  Maybe I should start with the procedure.  I

21  think we ought to get from the plaintiffs a proposed redacted

22  set that we can look at, and react to and see if we can reach

23  an agreement.  If we can't, we can submit to Your Honor our

24  additional issues with what would need to be redacted

25  consistent --

1    THE COURT:  No, I think you better send me right away

2    what it is you want out if you can't agree with them.  You

3    should talk to them.

4        MR. HILL:  May I independently see what they propose

5    to offer as a redaction?

6        THE COURT:  Or you can offer redactions yourself.

7        MR. HILL:  I don't intend to offer the documents into

8    evidence, Your Honor.

9        THE COURT:  That's true.  But, look, you want an

10   efficient process for doing that, the efficient process, from

11   my point of view, is for the two of you to talk, okay, that's

12   the efficient process, and to see if you can agree or not

13   agree.  I think the rule that I've laid out is fairly simple,

14   even you could do that redaction, all right.  The names of

15   witnesses -- you know what you want out, okay?

16       MR. HILL:  Yes, Your Honor.

17       THE COURT:  So if they don't want to give you the

18   redaction, then I'll take your redaction.  But I expect the two

19   of you to try to work this out and make it simple for me and

20   not more complicated.  If they want to do that and wanted to

21   give that to you right up front, so you can raise it with me

22   again, but you're entitled to see it before this trial begins,

23   and they should do the redactions and have those ready --

24   redacted before the trial begins.  If you want further

25   redaction, you better raise that as early as possible, so I can

1    rule on it.

2              MR. HILL:  I will raise it as soon as I have a chance

3    to look at what the plaintiffs are proposing.  So we will try

4    to come up with a schedule to do that.

5              THE COURT:  No, I don't agree with it.  If you have

6    further redactions that you know now should be made, then raise

7    it with me, tell me what those redactions are, and show them to

8    me, so I can rule on those right away, so you can know whether

9    or not, if you haven't agreed with the other side, that I'm

10   going to give you additional redactions.

11             MR. HILL:  Yes, Your Honor.

12             THE COURT:  Because I don't intend to give you

13   additional redactions at this point in time.  If you want to

14   submit something to me and convince me to do so, the only

15   redactions that you can expect that they're going to make is

16   redactions of the names of accomplices and witnesses, all

17   right?  That's the only redaction that I am ordering at this

18   point in time.  If you want some more redaction, then you

19   better tell me specifically, and show me what that redaction

20   looks like, and be able to say to me that you asked them to

21   redact it in that manner, and they have refused.

22             MR. HILL:  The other category that occurs to me

23   immediately is the conduct of accomplices.  Some of these

24   indictments, as you know, will say Mr. A did A, B, C, D, E, F

25   and G, and that's the whole paragraph, and then the next

1    paragraph is the defendant did something.  So I would think in

2    my hypothetical, that first paragraph about what the accomplice

3    did should come out as well as the accomplice's name.

4            THE COURT:  No.

5            MR. HILL:  But we can raise that with Your Honor --

6            THE COURT:  You can raise it, but I'm not going to

7    grant that application because --

8            MR. HILL:  The defendant --

9            THE COURT:  -- because the defendants are responsible

10   for what coconspirators do and say in furtherance of that

11   conspiracy.  So you would not convince me that just because he

12   says I robbed a bank, but Mr. X was the getaway driver, that

13   I'm supposed to both eliminate Mr. X's name and the fact that

14   he had a getaway driver.

15           MR. HILL:  These were not conspiracy convictions, Your

16   Honor.

17           THE COURT:  It doesn't matter whether they were

18   conspiracy convictions.  Even if it's not a conviction, the

19   question is if he is committing the crime with others, and he

20   is admitting that this is the manner in which the crimes were

21   committed, that there's no reason to do a further redaction and

22   make it sound like, unfairly and inaccurately, that he's

23   committing the crime by himself when he's admitted that he's

24   committed the crime with others.  So I'm not likely to grant

25   that application, but if you think you have a compelling

1    argument to make that somehow he's supposed -- I'm supposed to

2    take out when he adopts the manner in which the crime was

3    committed, I'll hear it, but it's not likely to convince me.

4         MR. HILL:  Well, we will include that in the letter.

5    Thank you, Your Honor.

6         THE COURT:  So that's the nature -- I just want to

7    make sure you understand the nature of my ruling with regard to

8    that.

9         Let me go specifically to the custodial statements.

10   I'm going to rule that any self-inculpatory statement of an

11   unavailable witness is admissible under 804.  Statements of

12   unavailable witnesses inculpating third parties consistent with

13   the ruling I already gave you is inadmissible.  It is not a

14   statement against interest accusing a third party.  So to the

15   extent that you have -- consistent with my other rulings, to

16   the extent that you have custodial statements made by

17   individuals who are admitting their participation or their

18   responsibility for the acts at issue, those statements can be

19   admitted at this trial as statements against that person's

20   interests, but I will not allow statements accusing third

21   parties in those -- in interrogations or in those admissions by

22   the witness accusing third parties of committing an offense.

23   It doesn't -- a person doesn't have the same incentive to

24   report the same rationale that applies to the reliability of

25   the person saying something against their own appeal interests

1    or other criminal interests.  The same rationale does not apply

2    to accusing a third party because it doesn't have that same

3    degree of reliability.

4              MR. HILL:  Your Honor, this type of document will have

5    the same issue with respect to other crimes, and so we'll

6    submit a letter to Your Honor on that as well.

7              THE COURT:  As I said, the only issue that I think is

8    appropriate to keep out is accusing a third party of

9    committing -- naming a third party that -- I assume the only

10   relevance would be is to try to name a third party that the

11   plaintiff is going to try to say is either engaged in or an

12   agent or an employee of the defendants.  To the extent that the

13   guy says I did it with ten other people, I don't think that

14   that's inadmissible.  To the extent they say I did it with ten

15   other PLO people, I think it's inadmissible.  It doesn't -- the

16   rule -- it's not a statement against his interests, that's a

17   statement against their interests.

18             I don't know of any analysis that would say to me that

19   the fact that a witness says he committed a crime with other

20   people or he describes activity that he didn't personally do,

21   but that his accomplices did, that somehow that activity is

22   somehow inadmissible, I don't know what would be the rationale

23   for that, the legal basis for that kind of ruling.  That's

24   not -- as I say, a person's confession is robbing a bank, and

25   he says, you know, I had a guy outside waiting in a getaway

1    car, I don't know why it's inadmissible for him to say that he

2    had an accomplice within the getaway car or why it necessarily

3    would be prejudicial to the defendant unless they can tie the

4    person in the getaway car to the defendant.  So my ruling is

5    limited in that manner, and I will consider whether the

6    application you have with regard to that, but I've considered

7    those issues already.

8           MR. HILL:  Your Honor, one more note.  I think with

9    that ruling, it may have triggered what your Honor referenced

10   in the summary judgment order, which is if certain evidence is

11   not admissible, certain claims may not proceed to trial.  We'll

12   go back and look at that, and we'll send you a letter if we

13   think that's the case.

14          THE COURT:  No, I understand that.

15          Yes, sir?

16          MR. YALOWITZ:  So in that regard, Your Honor, as I

17   understand it, I think really what we're dealing with here is

18   the Hebrew University bombing and Abdullah Barghouti, who was

19   the bomb maker, and his -- so that's four decedent plaintiffs.

20   His confessions say stuff like, Jibril Rajoub released me from

21   prison, and it doesn't really matter that it's Jibril Rajoub

22   instead of some other jailer who's a PA employee --

23          THE COURT:  Well, why is that a statement against his

24   interests?

25          MR. YALOWITZ:  Because he's -- okay.  Well, that's a

1    bad example.

2         THE COURT:  Yes, it is.  That's not admissible or

3    relevant for any purpose.

4         MR. YALOWITZ:  Fair enough.

5         Marwin Barghouti kept me in a safe house.  So he's

6    saying I was kept in a safe house, I was harbored by this guy,

7    and he asked me to give him bombs, and I gave him bombs.  So

8    he's incriminating himself, but he's also incriminating a key

9    employee of the defendants.

10        THE COURT:  He can't do that.  If he wants to do that,

11   he should be sitting in this jury box under oath.  If you don't

12   have him, if he's an unavailable witness, you can put in

13   whatever statements are against his interests.  They're not

14   admissible to put against someone else.  That's the rule.

15   That's the rule, and I'm sticking with that rule.  He cannot

16   accuse -- he has no -- it has no degree of reliability for him

17   to accuse a third party.  He could have accused you just to

18   deflect -- because they say during the interrogation, well, we

19   know you did it with others.  It does not fall under the rule

20   that you're offering it under as a statement against interest.

21   He can say that I was kept at a safe house and your statement,

22   if your document says he confessed to being kept at a safe

23   house by John Doe, then you redact the John Doe, and he's

24   confessed to that crime.  He says I committed it, I got away

25   with it, that he was helped by others.  It is not admissible,

1  an out-of-court statement accusing any defendant in this case

2  or any person associated with the defendant.

3       MR. YALOWITZ:  I understand the Court's ruling.  I

4  want to reflect on it.

5       THE COURT:  Sure.

6       MR. YALOWITZ:  If I think it matters -- I just want to

7  reflect on it.  If I think it matters --

8       THE COURT:  I'm sure it does matter, but whether it's

9  admissible is a different question.  You'd rather have it,

10 they'd rather you not.  The question is do the rules allow it.

11      MR. YALOWITZ:  Right.  Look, if I think I have enough

12 to go to the jury, and -- then fine, we'll just move on, but if

13 I think it's really important, and I have a good reason to ask

14 you to review it, we'll come back to it.

15      THE COURT:  Then we will review it, and if you say to

16 me that's your only evidence rather than being the issue of

17 summary judgment, it's an issue of proof at trial, and I am

18 going to enter a directed verdict for the defendant because you

19 don't have that proof to offer at the trial.  That's your only

20 proof tying him to the event.

21      MR. HILL:  Your Honor, we will send a letter, and I

22 think we actually would be entitled to judgment in that

23 instance before trial.  We would obviously be prejudiced if the

24 jury hears in opening about events that they're never going to

25 have to rule on, so --

1          THE COURT:  As I say, sometimes the prejudice is to

2     the other side when that happens.

3          MR. YALOWITZ:  Yeah, that's for sure.

4          MR. HILL:  I know --

5          THE COURT:  So it makes it easier for you to win when

6     a party gets up and promises some things that they can't

7     deliver.  So you should evaluate it.  If it's clear to you --

8     and, again, that's why there's no way I could have resolved

9     summary judgment this way, doing this kind of analysis, even

10    though I know what the general rule is.  If you think that this

11    ruling means that there is going to be no evidence going to be

12    presented at this trial, and they agree that there's going to

13    be no other evidence presented at this trial, then I'm not

14    going to waste anybody's time.  But if they say they have some

15    other evidence that they think, either circumstantially or

16    otherwise, that the jury should still hear the case, then

17    that's a different question.  But that's my ruling, and you

18    have to evaluate how it affects whether or not there is going

19    to be other evidence that is going to meet all of the elements

20    of the claim.

21         MR. YALOWITZ:  Understood, okay.  I am just putting it

22    out there because we have to think about it and look at it.

23         THE COURT:  All right.

24         I'm not sure -- just to briefly touch on this, and

25    then I want to go to 177 trial exhibits.  I wasn't quite sure

1   how you intended to handle what you characterized as

2   defendants' objections to plaintiffs' English language

3   translations.  And before you even respond, let me tell you

4   what my basic view always is:  If you don't like their

5   translation, then you should get your own.  That's the way the

6   rule works.  If you think their translation is wrong, then you

7   should provide your own translation.  That's the way it happens

8   in any case.  It happens in a criminal drug case where two

9   people are talking on the telephone, and there's a transcript

10  of the phone conversation, and an interpreter says it means one

11  thing, and the other side says, no, it doesn't mean that.  Or

12  even if it's in English, that you say the person said X, and

13  you heard X, but somebody else listened to it and heard Y, then

14  you get your own transcript, and you proceed, you say that's

15  not what was said, they didn't say X, they said Y, and the jury

16  makes their own determination that either the evidence as it

17  was presented to them or the reliability of the experts who say

18  they're going to testify about they're making accurate

19  translations.  I don't know whether the translations are

20  accurate, I don't speak either language.

21          And also with regard -- the only thing that I thought

22  was a legitimate objection by the defense was, to the extent

23  that there were -- I'll call them parenthetical commentary

24  about what was being translated, I agree with you that to the

25  extent that that is not what the person said, but to the extent

1  that that is the expert's explanation about what the person

2  meant, it's not -- it's out, it's out.  You give us the word,

3  you give us -- your translation, give us the closest

4  translation of what would be the statement.

5       You can't say the guy said I went to my house, but in

6  parentheses say, well, when he said house, he really was

7  referring to home, and he really meant home instead of house.

8  No, you give a translation of what the -- not necessarily the

9  word-for-word translation is, but the meaning of the substance

10 of the phrases that are used by the witness, so that I can put

11 the words in another language that were uttered by the witness,

12 I can put the translation in the witness' mouth.

13      So if I can't put the translation word for word in the

14 witness' mouth, then I'm not going to accept some sort of

15 description that's parenthetically within the translation.

16 It's got to be what you would say is an accurate translation of

17 what the person would be saying if they were talking in

18 English, word for word, all right?  That's what you have to do.

19      So to the extent that you don't have that, then you

20 better either redact it or you better redo the translation or

21 the document without it.  But to the extent that the defense is

22 simply going to argue that this interpreter is not giving an

23 accurate translation, that's dueling interpreters, as far as

24 I'm concerned.  There's nothing else I can do about that.

25      MS. FERGUSON:  Your Honor, just to be clear, for the

1  roughly 177 documents that we produced, we have gone through

2  that exercise and have provided the plaintiffs with

3  particularized objections that say our translators say it

4  should be this, the date's wrong, the name is wrong, the number

5  is wrong.  So we've done that exercise.

6          THE COURT:  Okay.

7          MS. FERGUSON:  Our problem is that there is about --

8  there's hundreds, and hundreds, and hundreds of other exhibits

9  that they've produced that are foreign language newspaper

10  articles, and hours and hours of videotape, and numerous

11  exhibits that are in a foreign language, and we have no idea --

12  our position is they're rank hearsay, they shouldn't come in,

13  we have no way to authenticate them.

14          THE COURT:  But that's a different issue.  I'm just

15  dealing with the translation issue.  It still doesn't change

16  the rule about the translation.  If you think it's an

17  inaccurate translation, I assume that's not because you've

18  translated it, I assume that's because you've gotten an expert

19  who understands the language and translates it differently, and

20  therefore, you should present that to the jury and let them

21  make their own determination of the reliability and

22  acceptability, just like any expert, whether they should accept

23  your expert's opinion or their opinion.

24          MS. FERGUSON:  I understand, Your Honor.  I'm just

25  talking about the process moving forward for particularizing

objections to exhibits that the plaintiffs have produced in the

absence of any certainty about what exhibits are actually

coming in.  It's hugely expensive to engage in this exercise.

We just got new exhibits the other day from the plaintiffs, and

I had an estimate run, it was $12,000 to get just a small

subset of their foreign language exhibits translated.

So we need some sort of guidance on what's coming in

before I incur a substantial expense of the client to --

THE COURT:  Well, then, you don't have a current

objection.  I'm only dealing with your current objection.  I'm

giving you as many rulings as I can early on, so you can make a

judgment.  And you're right, some documents are not going to be

admissible, and others are, but if you have an objection now to

the translation, and you think that that translation is of

import to the jury's determination in this case, then I assume

you presented that to me.  I'm not sympathetic to the fact that

you don't know if there's something that's mistranslated that

you've had for months or years that you now want to try to

figure out if you're going to try to object to because somehow

the translation is inaccurate and prejudicial to you.  If it's

inaccurate, and it's important to you, I assume that you

already have an expert who has said that and told you, you

better not let the other side say that this is what it means

because it's going to hurt you, and it doesn't mean that.

Now, if the person said, you know, I own a cat, and

you say the translation should be I own a dog, that's your

decision whether or not that's important to you or not in this

case, and you want to raise that with the Court.  But you know

this case much more intimately than I, so you know what is

important to keep out, that you don't want before the jury, and

what's important -- not what's unimportant.  So I can't give

you any further guidance than that, than to say I will give you

rulings with regard to -- as I'm consistently doing, with

regard to the nature of the exhibits.  But it's unreasonable

for you to think that I'm supposed to give you a ruling as to

every single exhibit that you or the plaintiff might want to

offer at trial, prior to trial, so then you can make a decision

whether or not you want to object to it or you want to do the

work to find out what it really says.  I'm doing the best I

can, so -- if you give me another two years, it's going to be

better than this.

          MR. HILL:  Your Honor, in that regard, I had another

request, and it's the following:  If we are going to proceed to

trial in early January, we should get a list of the order of

the witnesses that the plaintiffs are going to call.  Obviously

the plaintiffs' lawyers know what that's going to be.  At the

same time, we should get a list of what exhibits they

anticipate offering with each witness.

          THE COURT:  And you should provide them the same

thing.

1    MR. HILL:  Absolutely.  The reality is the lawyers are

2    preparing for trial, the lawyers know, and it's going to be

3    most efficient at trial if the other side --

4    THE COURT:  If you want to agree to a time that both

5    of you are going to exchange that, then you should do it that

6    way.

7    MR. HILL:  If we did it soon, that would help, Your

8    Honor, in terms of prioritizing pretrial rulings on the

9    admissibility of documents.

10    THE COURT:  Not particularly.  No, I mean I only got

11    so much time here.  I'm working every day on this case.

12    MR. HILL:  And that's -- frankly, to return to the

13    theme we started with, that's why we ought not to proceed on

14    this date.  When you set the date in March, you indicated that

15    you would rule --

16    THE COURT:  Why am I not surprised that you used that

17    as the excuse?  Look, I told you what we were going to do, and

18    everybody said that that was a perfectly appropriate time

19    frame.  And I knew it would demand a great deal of my time and

20    a great deal of concentration from you.  I'm doing my part.

21    MR. HILL:  I'm sure you are, Your Honor.

22    THE COURT:  If the circuit wants to stop the trial,

23    that's fine, but, no, you're not laying your record to make it

24    appear that somehow you're getting late rulings that are making

25    it difficult for you to prepare for trial.  No, I reject that

1    out of hand, so don't try to lay that kind of a record here.

2              MR. HILL:  Well, Your Honor, I do want to, just for

3    the record, make the following statement:  At the hearing in

4    March, when you set January 12th as the trial date, you

5    indicated that by the last pretrial hearing, November 20th,

6    which was originally to be the final pretrial hearing, that we

7    would have rulings on evidentiary issues, so we could prepare

8    in an orderly fashion for the trial to commence on January the

9    12th.  That schedule has slipped, and that has been, in my

10   view, to the prejudice of the defendants.

11             THE COURT:  Absolutely not.  There's no record that

12   indicates that you were promised that you would have some kind

13   of ruling that would put you in some sort of unprejudicial

14   position, to be prepared for trial, that we didn't discuss and

15   this schedule isn't me.  I'm not going to let you lay that

16   record.  You can try that in the circuit, if you want, but the

17   fact is, we set trial back in March, all right.  All of these

18   issues were going to be resolved, and, quite frankly, some of

19   these issues, you're not even entitled to a resolution prior to

20   trial.  I'm giving you as early a decision on these issues as

21   possible.  If you're not ready for trial, that's your fault.

22             Now, if you want to delay the trial because of

23   jurisdictional issues, I can accept that argument, but if

24   you're going to try to now word it on the record that somehow

25   you're not ready for trial because of something that either the

1    other side did or something this Court did, that's a false

2    impression to try to put into this record.  There is no basis

3    for you to make that argument, that somehow you should not have

4    been prepared for trial on January 12th, and you didn't have a

5    full opportunity to be prepared for trial for January 12th when

6    this trial was set back in March.  You can save that discussion

7    for the circuit, because that's not persuasive here.

8            You never laid any objection to this schedule.  Not a

9    single objection.

10           MR. HILL:  Your Honor, we did object before the last

11   hearing.

12           THE COURT:  No, you did not.  You did not object to

13   the schedule as I told you that we were going to lay out for

14   you to be ready for the January 12th date.  You did not -- you

15   never objected to that schedule.

16           MR. HILL:  Before the last hearing, we filed a letter

17   suggesting the case was not ready for trial because the

18   schedule in March had had final evidentiary rulings by the last

19   hearing November the 20th, which was originally supposed to be

20   the final pretrial conference.  We're still not to the final

21   pretrial conference.

22           THE COURT:  Is it your recollection in that letter

23   that you asked that this trial be put off because --

24           MR. HILL:  Yes, Your Honor.

25           THE COURT:  -- you were not prepared for trial?

1          MR. HILL:  Yes, Your Honor, we did.

2          THE COURT:  Okay.  Well, I suggest that you look at

3     the letter, and then you can quote me that language in that

4     letter.

5          MR. HILL:  Let's see if we can get it for Your Honor.

6          THE COURT:  Because that's not my recollection of the

7     way you fashioned artfully that letter, and that's the only way

8     I can describe it.

9          You said a lot of things needed to be done before

10    trial.

11         MR. HILL:  Yes, Your Honor.  The November 14th letter

12    says, "As the Court forecasted at the December 16th status

13    hearing, the January 12th trial date has proven overly

14    ambitious in light of the sheer volume of pretrial issues

15    pending before the Court, including the following," and then we

16    listed them.

17         And then on the last page of the letter, which is

18    record number 639 at page 3, it says, "At the March 4th status

19    hearing, the Court preliminarily set the trial to begin

20    January 12th because that was the first opening in the Court's

21    calendar for a ten-to twelve-week trial that did not have time

22    over the holidays.  The Court made clear that the January 12th

23    date was contingent on the resolution of pretrial issues,

24    including motions for summary judgments and motions in limine."

25         Defendants recognize the Court is working diligently

to resolve the numerous merits and objections.  As the Court

noted the most recent status hearing setting the case

preliminarily for January 12th, 2015, was an ambitious schedule

because the Court has a significant amount of paper to go

through before it can give the parties final decisions on most

of these motions."

Then the next paragraph says, "When, at the March 4th

status conference, the Court set November 20th as the date for

the pretrial conference, the Court anticipated that all

pretrial matters would be resolved by November 20th, which

would give the parties," and now this is a quote from the

transcript, quote, "enough time to finalize their preparations

for trial, even given the holidays in between.

"The trial is now tentatively set to begin in about

two months, and through no fault of the Court, numerous

important issues remain unresolved, including the claims and

defenses that will be tried, what instructions will be given to

the jury, how many trials there will be, what witnesses will be

permitted to testify, and which exhibits and deposition

testimony will be admissible.  Added to this uncertainty is the

substantial logistical hurdle associated with the fact that

most of the witnesses are located overseas, and substantially

lead time is needed to arrange for their appearance in

New York."

And then the letter back from Mr. Yalowitz --

1      THE COURT:  Okay.  So where in there did you ask me to

2  put off the trial?

3      MR. HILL:  Mr. Yalowitz said, "I write in response to

4  defendants' letter earlier today asking that the Court postpone

5  the commencement of the trial in this action."

6      THE COURT:  Say again?

7      MR. HILL:  This is from Mr. Yalowitz the same day.  "I

8  write in response to defendants' letter earlier today asking

9  that the Court postpone the commencement of trial in this

10  action."

11      THE COURT:  Where in that letter did you ask me to

12  postpone a commencement of the trial?

13      MR. HILL:  We said we wanted to discuss with you at

14  the November 20th hearing whether or not we could proceed on

15  that hearing.  Your Honor took the bench and indicated we would

16  proceed.

17      THE COURT:  Right.  So nowhere in that letter did you

18  ask me to postpone the trial.

19      MR. HILL:  I believe we did, Your Honor.  The

20  plaintiffs had that understanding as well.  I'm --

21      THE COURT:  Is it your position that you're not

22  prepared for trial?

23      MR. HILL:  Your Honor, we don't know what witnesses --

24      THE COURT:  Is it your position you're not prepared

25  for trial?

1    MR. HILL:  Yes, Your Honor, we cannot prepare for

2  trial not knowing what witnesses are going to be admitted, what

3  exhibits are going to be admitted, if they're going to be

4  redacted in what form they're going to be admitted, and we're

5  now less than a month from the trial date.

6    THE COURT:  Okay.  Well, as I say, I've been working

7  diligently at it.  I assume you have, too.  So let's move

8  forward, so you can make sure that you are ready.  There's

9  nothing in that letter or in what you said now that would be

10  any legitimate reason that I should adjourn this trial because

11  you're not prepared for trial.  To say you're not prepared for

12  trial is disingenuous.

13    The next thing is that -- so that's how I'm going to

14  deal -- I don't have any issue with regard to translations.  If

15  you have a different translation, then you should provide that

16  different translation and argue to the jury, convince the jury,

17  that your translation is relevant and is more accurate than

18  their translation.

19    Now, the admissibility, I don't know what the issue is

20  with regard to admissibility of plaintiffs' chart summarizing

21  evidence.  To the extent that those charts become -- accurately

22  reflect the evidence before the jury, a summary witness can

23  always testify to those charts.  The only chart that I have

24  before me is a chart about -- let me just address the chart

25  dealing with media material.

1    I don't see why this chart is admissible at all.  It's

2    not likely it's going to get in.  It has absolutely no -- it

3    does not make it more likely than not or go to circumstantial

4    evidence that the defendants were involved in the terrorist

5    activities at issue.  We know what the rhetoric is, and we know

6    what the heightened rhetoric is in the region with regard

7    depending what political view one may have with regard to the

8    circumstances, what you characterize as the Israeli-Palestinian

9    conflict.  The fact that people have heightened rhetoric about

10   it or cite it -- and I am not even sure who you're supposed to

11   be citing in most of these articles -- has absolutely no

12   probative value with regard to the issues that the jury has to

13   decide here and is not likely that I am going to admit

14   simply -- I'll just take one example.  Fox News, where it is

15   quoted that -- and I am not even sure who is supposed to be

16   making the quote, it doesn't matter -- you get the Israelis out

17   of the West Bank in Gaza, and you will have a peace agreement.

18   It has absolutely no probative value as to whether or not they

19   were involved in the terrorist acts at issue.  A person

20   involved in the terrorist act or a person not involved in the

21   terrorist act are just as likely to have made that statement.

22   That's the only way I can characterize it.

23       So to the extent that that really -- now, those are

24   two different issues, though, because there are other charts,

25   too.  To the extent the charts do reflect evidence that was

admitted before the jury, and if there's a summary chart,

summary charts are admissible.  If you have someone who wants

to come in and say I made this summary chart, and it's based on

this evidence, and this is the evidence that's before the jury,

that's fine, I have no problems with that.  But to the extent

that it does not accurately represent evidence that is

independently before this jury or that -- as I say, with regard

to the first chart, simply a chart of statements being made

about the Palestinian-Israeli conflict in general, no, that is

not admissible to even prove circumstantially that it involved

terrorist acts.

The summary of defendants' payments to convicted

nonemployee terrorists, I agree that unless -- I think the

major objection is just the type more than anything else.

Obviously if the evidence comes in that through the payment,

water payments and other payments in a climate that these are

payments that were made, and those exhibits would be

admissible, then somebody can summarize that and indicate that

at the trial before the jury that those documents summarized

this, and this is an accurate summary of those documents that's

reflected in evidence.

Now, whether or not it's appropriate to title it

"Summary of Defendants' Payments To Convicted Nonemployee

Terrorists," I don't know -- you can probably pick a more

neutral accurate statement as to what this really represents.

ECGKSOKM

1    MR. YALOWITZ:  I assume the objection is to the word

2    "terrorists."  It's accurate, but we can find a different word.

3    That's what these people are convicted of.  I don't know

4    there's a --

5          THE COURT:  But that's argument.  That's not --

6          MR. YALOWITZ:  Understood.  But I don't think there's

7    a genuine dispute that's what they did, but I can pick a

8    different word.

9          THE COURT:  Is there any other objection?

10         MR. HILL:  There is.  It also meshes the defendants

11   together.  We have two separate defendants here, so it doesn't

12   accurately summarize or allow the jury to distinguish between

13   which defendant is engaged in the conduct that's at issue.

14         THE COURT:  Well, I don't have a real problem with

15   that because it doesn't say -- it just says these are payments

16   that were made, it doesn't say who made the payments.  The

17   evidence said who made the payments.  But if they want to say

18   if these are payments being made by the PA, then they can put

19   it in the title.

20         MR. HILL:  That's my point, it should accurately

21   reflect, if the evidence comes in, which defendant.

22         THE COURT:  Is it your position that to accurately

23   reflect that, it would need to say that these are payments made

24   by the PA as opposed to the PLO?

25         MR. HILL:  I would have to go back and check.  I think

1   that's right.

2          THE COURT:  I don't know if you have a big issue with

3   that.

4          MR. YALOWITZ:  I think that is correct.  I think the

5   money flow comes from the PA, and we prepared those charts

6   before Your Honor issued the summary judgment.  Obviously, the

7   alterego issues and agency issues are going to be for the jury

8   in the trial, but I don't have a problem saying payments from

9   the PA to nonemployee --

10         THE COURT:  Convicted nonemployees.

11         MR. YALOWITZ:  Yeah, I don't have a problem with that.

12         THE COURT:  That's accurate.  Then you can argue what

13  you will.  If you want to use the word terrorist ten times,

14  that's up to you in your argument, but that's --

15         MR. YALOWITZ:  Right.

16         THE COURT:  It's a sensitive issue.

17         And then the same thing with the pay and promotion

18  to -- and you say defendants' employee terrorists, obviously

19  they believe that that is a charged phrase, and if you want to

20  say PA employees, then that will be an accurate statement of

21  what that chart is.

22         MR. HILL:  Again, there's an issue about whether

23  someone in prison is or is not an employee.

24         THE COURT:  Well, if the evidence comes in that they

25  were employed by the PA at a particular period of time, then

1    the chart accurately reflects the evidence that they have put

2    before the jury.  Now, whether you want to dispute it or not is

3    a different question, but it seems to me that as I went through

4    the 177 documents, you don't really -- most of your argument is

5    not that you're denying that the evidence reflects that

6    these -- these documents reflect that these people were

7    employed at some point by the PA.  Most of this -- I don't

8    understand that you are even attempting to legitimately dispute

9    that.

10             MR. HILL:  Well, there are instances where the

11   documents are incorrect.

12             THE COURT:  But that wasn't my issue.  My issue is

13   that I sought employment at Rikers that you produced.  I assume

14   you're not taking the position that those employment records

15   are false.

16             MR. HILL:  Some of them are incorrect.

17             THE COURT:  You have identified no document that you

18   say that you produced that falsely indicates that the person is

19   employed by the PA when you say that the true fact was that

20   they were not employed by the PA.

21             MR. HILL:  Some of them do, Your Honor.

22             THE COURT:  Okay.  Well, you have not identified any

23   of those to me.

24             MR. HILL:  Well, we can do that very easily.

25             THE COURT:  Well, if you want to, but I'm ruling on

ECGKSOKM

1    what you presented to me, and you say -- and I will get to that

2    in a second, and maybe we can just go ahead and segue into

3    that.  I think we really don't need to say much more about the

4    chart at this point in time.  Let me get through the 177

5    documents.

6            With regard to the 177 documents, it seems to me that

7    you were talking about an objection on foundation grounds to 46

8    of those.  Am I accurate?

9            MR. HILL:  I think the objection by foundation, you

10   mean authenticity in the sense that either it's a document we

11   didn't produce for which there is no witness that will say what

12   it is or it's a document where multiple --

13           THE COURT:  Well, there were three of those.

14           MR. HILL:  Yes, Your Honor.

15           THE COURT:  There are three documents you didn't

16   produce?

17           MR. HILL:  Correct.

18           THE COURT:  I understand that.  That's a separate

19   category.

20           MR. HILL:  Right.

21           THE COURT:  But my understanding is that you

22   identified 46 documents that you said that you had an objection

23   to foundation.

24           MR. HILL:  Yes, Your Honor.

25           THE COURT:  Okay.  I went through the 177 documents.

My position is this:  To the extent that the plaintiffs

requested certain documents, and in response to that, you

produced those documents, that that authenticates the

documents, meaning the documents are what they purport to be.

If they asked you for employment records, and this is what you

produced in response to that, then that is a sufficient

foundation for its admissibility as employment records.

Now, if you want to dispute whether or not, in fact,

any particular document is an employment record, that's fine,

but that goes to its weight, not its admissibility at this

point.  These are the documents that you produced, and you

produced these in a manner in which it was represented that it

was responsive to a request, and to the extent that that's the

case, that is a sufficient foundation to admit the documents.

Now, you can try to figure out whether or not you can

come to some understanding or you just want to -- if you want

me to have them go through the process of demonstrating that

you, in fact, produced the documents in response to certain

requests and put that before the jury or we can agree to some

other way that you can -- if you want to, you can stipulate

that the documents come in, or I can just note your objection

for the record, and then go ahead, and admit the documents on

that basis.  But I find that to the extent that you have

produced these documents, there is no foundation objection.

Those documents are what you represented them to be.

1          Now, whether or not they're accurate, that's not what

2     they're purported to be.  They want to argue that they're

3     accurate, you may want to argue that they're inaccurate, but

4     that's not a foundation issue, that's a weight issue.  And what

5     the jury -- the question is, are these GIS documents, are these

6     employment documents, are these -- there were four or five

7     categories -- they were martyr documents, martyr files, and

8     there were --

9          MR. YALOWITZ:  Administrative prisoners.

10         THE COURT:  I have employment records, I have ministry

11    of detainee records, I have martyr files, I have GIS documents,

12    and I have military or finance accounting statements.  These

13    were requested by the plaintiff, and were produced, and

14    represented to be these kinds of documents.

15         MR. HILL:  Actually, Your Honor, they were not

16    represented to be those kinds of documents.

17         THE COURT:  Well, they were produced in response to

18    those requests.

19         MR. HILL:  The request was any document with Mr. X's

20    name on it, including, but not limited to, several categories

21    of documents, and we --

22         THE COURT:  So what are you disputing with regard --

23    are you disputing that these are employment records of the PA?

24         MR. HILL:  Well, it depends on the jury, obviously,

25    but --

1            THE COURT:  Are you denying that these employment

2       records that were kept by the PA?

3            MR. HILL:  No, these are documents kept by the

4       defendants.  Some came from different defendants, some came

5       from the PA, some came from the PLO, and the objection on

6       foundation with respect to authenticity is the assembly of the

7       documents.  We've got document A and document B put together

8       into a single exhibit, and they don't go together.  That's the

9       authenticity objection to that particular exhibit.

10           THE COURT:  Okay, I didn't understand that.  That's

11      fine and dandy.  If they are separate documents, and it's clear

12      that they are separate documents, then they can be marked as

13      separate exhibits, but that's not a foundation objection.  If

14      you want to say that that's -- the question is, is it what it

15      purports to be?  It's supposed to purport to be a record that

16      reflects the employment of certain individuals by the PA or

17      PLO.  If you say that that's not reliably what it is, then

18      you're going to have to explain why you produced it, but I

19      don't understand that to be your objection.  Your objection is

20      that somehow, you have two separate documents, it's not the

21      same document?

22           MR. HILL:  Yes, that's the authenticity objection.

23      It's not very complicated.

24           THE COURT:  Well, then, it's not an authenticity

25      objection, you just want them designated as separate exhibits.

1      MR. HILL:  Well, to put it as a single exhibit, as a

2  single document, is inauthentic because it is, in fact,

3  separate documents.

4      THE COURT:  So you have no other objection other than

5  you want the documents to be admitted separately because

6  they're not, in fact, one document.

7      MR. HILL:  Well, then there's the category of

8  materials that we have that didn't come from us.  So we object

9  to the authenticity of third-party documents that our client --

10     THE COURT:  I'm not sure what that is because I don't

11 think you represented to the plaintiff, when you produced any

12 of these documents, that these are documents that you have that

13 you got from third parties.  Did you?

14     MR. HILL:  Well, it's apparent on the face that

15 they're documents from third parties.

16     THE COURT:  Like what?

17     MR. HILL:  Like the Israeli Military Corp., the

18 International Red Cross or newspapers.

19     THE COURT:  Okay.  But when you say "newspapers,"

20 what --

21     MR. HILL:  Newspapers.

22     THE COURT:  In what files?

23     MR. HILL:  In the files of the General Intelligence

24 Service.

25     THE COURT:  But why is that an authenticity -- that's

1    not an authenticity.

2            MR. HILL:  It is because they're --

3            THE COURT:  No, listen.  If it is represented to be a

4    collection of newspaper articles collected by the GIS of the

5    PA, that is what it is, but that's what it's offered to be.

6    Now, that may not deal with whether or not what purpose it's

7    being used for, but that doesn't make it not what it purports

8    to be.  That's all it purports to be.  Nobody purports to say

9    that the GIS wrote these articles.

10            MR. HILL:  No, no one purports that.  But whether or

11    not that is, in fact, a newspaper article is if the plaintiffs

12    want to offer it to prove that it is a newspaper article, they

13    would need to lay a foundation.

14            THE COURT:  Are you denying that it's a newspaper

15    article that was gathered by the GIS and contained in the GIS

16    file?

17            MR. HILL:  Yeah, we object that --

18            THE COURT:  You deny it's a newspaper article?  You

19    have proof that it is not what --

20            MR. HILL:  That's not the burden, Your Honor.  The

21    burden --

22            THE COURT:  No, I'm asking you -- sir, listen to my

23    question.  I want to know whether or not there's a genuine

24    dispute about the authenticity of this document.

25            MR. HILL:  Yes.

1    THE COURT:  If your argument is simply, I'm making a

2  technical argument that I want to hide behind, I understand

3  that, but I'm asking you:  Is there a genuine dispute that this

4  document is what it purports to be?

5    MR. HILL:  Yes.

6    THE COURT:  And it purports to be a newspaper article

7  that was gathered by the GIS and collected in the GIS file.

8  It's not offered to be anything more than that.  You deny that

9  that's the case?

10    MR. HILL:  We deny there's a foundation for that to

11  be --

12    THE COURT:  Are you going to listen to my question and

13  answer it?  If you're not going to answer my question, then

14  just tell me, I won't waste my time.

15    You deny that this is a newspaper article that was

16  gathered by the GIS and put in the GIS files even though it was

17  not written by the GIS?  Do you deny that?  Yes or no.

18    MR. HILL:  It's a compilation --

19    THE COURT:  Yes or no?

20    MR. HILL:  I deny part of it.

21    THE COURT:  Which part do you deny?

22    MR. HILL:  I don't deny it's in our file, I deny it is

23  a newspaper article.

24    THE COURT:  You deny -- you have reason to believe

25  it's not a newspaper article?

1       MR. HILL:  Your Honor, it's their burden --

2       THE COURT:  I didn't ask you that.  I didn't ask you

3   that.  I'm trying to figure out whether you have a genuine

4   dispute as to its authenticity.

5       MR. HILL:  Yes, Your Honor.

6       THE COURT:  Because you have evidence that this is not

7   what it purports to be?

8       MR. HILL:  No, Your Honor, I don't have that evidence.

9       THE COURT:  Okay.  Then you have no way to dispute

10  that.  You're just saying it's their burden.  Is that your

11  argument?

12      MR. HILL:  I'm making an objection that they haven't

13  satisfied the burden for a different --

14      THE COURT:  You're not disputing -- you don't have any

15  reason to believe that it is something other than what they're

16  representing it to be?

17      MR. HILL:  Not with respect to the newspaper article.

18  With respect to the Red Cross materials, there is an indication

19  in the documents, and we cited it in the letter we sent to you

20  in August, that those sorts of materials had been faked in the

21  past.  And our client is not in a position to verify that this

22  is, in fact, what it purports to be when it comes purportedly

23  from a third party.  So we object --

24      THE COURT:  But you're not in a position to either

25  deny or admit it?

1          MR. HILL:  Yes, Your Honor.

2          THE COURT:  It's not as if you genuinely have evidence

3   that disputes that.  That's what I'm trying to understand.  You

4   don't have any evidence that would dispute whether or not it is

5   what they say it is, okay?

6          MR. HILL:  Correct.

7          THE COURT:  All they say it is is it's something that

8   was kept in your file, and you don't disagree with that?

9          MR. HILL:  They're offering it into evidence.  They're

10  presumably offering it as what it purports to be.  If they're

11  not offering it as what it purports to be, that's --

12         THE COURT:  Then I'm trying to understand when you're

13  saying it's not what it purports to be.

14         MR. HILL:  Yes, Your Honor.  They are indications in

15  the record that these sorts of things have been faked in the

16  past.

17         THE COURT:  Okay.  So because these sorts of what kind

18  of things?

19         MR. HILL:  These Red Cross certifications of

20  incarceration.

21         THE COURT:  And you believe that it doesn't

22  accurately -- is it your position it doesn't accurately reflect

23  the incarceration of the individuals that it indicates?

24         MR. HILL:  In one instance, we have that evidence.  In

25  other instances, we don't know.

1          THE COURT:  Well, you do know, you would know whether

2     these people were incarcerated or not and when they were

3     incarcerated, that's in other files.

4          MR. HILL:  Well, I don't know, Your Honor.  I don't

5     know whether someone within the client knows or not.  They're

6     not incarcerated by us.

7          THE COURT:  Well, there's evidence in the record

8     indicating when they were incarcerated, written reports written

9     by the GIS about whether they were incarcerated.

10         MR. HILL:  And that's hearsay, Your Honor.  That's

11    based on a third-party's statements or --

12         THE COURT:  No, it's an admission.  The GIS is part of

13    the PA.

14         MR. HILL:  Not when it writes down what other people

15    tell them.  That's not an admission, that's hearsay.

16         THE COURT:  So you're not denying that it's

17    accurate -- the information that they recorded in their reports

18    about who was incarcerated, you're not denying that information

19    is accurate, you're just saying that -- your argument is they

20    must have gotten that from a third-party hearsay, that's your

21    hearsay argument?

22         MR. HILL:  That's a hearsay argument.

23         THE COURT:  That's not a foundation argument?

24         MR. HILL:  Right.  There is a foundational

25    authenticity objection.  The third party --

1          THE COURT:  What is the foundational -- I don't

2     understand your -- and I'm getting to understand it, because

3     it's not any more significant than what the superficial

4     argument you're making.  I'm starting to understand, but what

5     is your argument that if the GIS wrote a report, and the report

6     says that this person was incarcerated for this period of time,

7     and it's a GIS report, what is your argument that the

8     foundation is not laid that it's a GIS report if you produced

9     the document, and you have no reason and no logical reason to

10    argue to the jury that somebody snuck into the GIS, and faked

11    this document and put it in the GIS?

12          MR. HILL:  That's not what I'm arguing.  I'm arguing

13    with respect to documents that are third-party documents that

14    there's a failure to demonstrate --

15          THE COURT:  Okay.  But that's why I want to separate

16    your arguments, because your arguments were not clear in that

17    regard.

18          MR. HILL:  It's not that complicated of an argument.

19          THE COURT:  Then you're not objecting on foundation

20    grounds to exhibits that you produced that appeared to be

21    prepared by your clients, or an agency, or agents of your

22    clients?  You're not objecting on foundation grounds that it's

23    not what it purports to be even though you produced it as that?

24          MR. HILL:  Correct.

25          THE COURT:  Okay.  So --

1         MR. HILL:  And there's a different issue, but that's

2  the authenticity issue.

3         THE COURT:  You have a hearsay issue?

4         MR. HILL:  Yes, Your Honor.

5         THE COURT:  But you don't have a foundation

6  authenticity issue?

7         MR. HILL:  As to documents that appear on their face

8  to have been prepared by either of my clients, I'm not claiming

9  those are fakes.  Sometimes they're incorrect, but they're

10  not --

11         THE COURT:  Whether they're incorrect or not is a

12  different question.

13         MR. HILL:  My clients have not faked any documents.

14  We've got documents from third parties that may or may not be

15  fake, so --

16         THE COURT:  The issue is not whether they faked the

17  documents, the issue is whether there's a genuine dispute as to

18  whether the documents are what they purport to be, and the

19  documents purport to be employment records of the PA, they

20  purport to be ministry of detainee files of the PA, they

21  purport to be martyr files of the PA.

22         MR. HILL:  Actually, the Martyrs Institute is the PLO.

23         THE COURT:  The PLO, I'm sorry.

24         The GIS files of the PA and the military finance

25  account statements of the PLO.

1    MR. HILL:  I'm not sure what the last category is.

2    That would be the PA, I believe.

3    MR. YALOWITZ:  I think it's Ministry of Finance, PA

4    Ministry of Finance.

5    THE COURT:  Ministry of Finance, not military.

6    MR. HILL:  The Ministry of Finance is part of the PA.

7    THE COURT:  To the extent that you produced those

8    documents, you're not arguing that they can't offer those

9    documents simply because they can't prove that they're what

10   they purport to be?  That's not your argument?

11   MR. HILL:  With the exception of the two documents,

12   the misassembled documents, more than one thing put together,

13   and documents we got from third parties, we're not in a

14   position to authenticate those documents because we didn't

15   create them.

16   THE COURT:  So to the extent that you have

17   misassembled documents, to the extent that they give you a list

18   of saying that they want to present these documents, you

19   identified to them which ones are misassembled?

20   MR. HILL:  We did that.

21   THE COURT:  Then they should have -- unless they have

22   a basis to demonstrate that they're part of one document, they

23   will have to designate those documents as separate exhibits.

24   That would be the rule.

25   MR. YALOWITZ:  Your Honor, I apologize.  We just

1    don't -- I'm sure Mr. Hill believes that he identified them to

2    me, and perhaps he did, but if we could ask the Court to just

3    instruct him to do it again, it would be helpful because nobody

4    sitting at this table remembers it.

5              THE COURT:  Well, if you can get your hands on a

6    document --

7              MR. HILL:  We sent it Friday, but we'll talk.

8              THE COURT:  Just last Friday?

9              MR. HILL:  Yes, Your Honor.

10             THE COURT:  Oh, okay.  Then that's not so hard to

11   find.  Maybe they haven't gotten it yet, I don't know.

12             But why don't you direct their attention to that, to

13   the extent that those documents are not part of the same

14   document, that they can identify them separately, the pages or

15   the number of pages that you say are separate documents as

16   separate exhibits, so that part of it is dealt with.  If they

17   want to argue somehow it is, and they have some evidence to

18   present, then that's their burden to try to demonstrate it's

19   part of the same document.

20             And with regard to documents that were produced from

21   other sources, the real question is -- and it's a question of

22   admissibility, a purpose that is being used at trial.  If it is

23   simply being used to demonstrate that the PA or the PLO had

24   certain information at the time, then it may be admissible for

25   that purpose, that's not a hearsay purpose.  But if it goes to

something other than just knowledge, if they want to offer it

as proof that something in the document is true, I agree with

you, it would be inadmissible, it's not admissible for that

purpose just because they accumulated it in their files.  If

I'm interested in what kind of cases that you're dealing with,

just because I accumulate some newspaper articles to say that

you were the lawyer in a certain case doesn't prove that you

were the lawyer in that case.  I agree with that.

So that's the issue, but what's been awkward for me is

that your objections have been so broad, and, quite frankly, I

haven't found anything yet that you haven't objected to on a

broad basis, so that's the guidance that I need from you.  So

it is not an authenticity problem except to the extent that

they want to offer a document to be something other than what

you claim it is.

Now, with regard to the three other documents that

they say they got from other sources, the same rule applies,

except they've got an independent obligation to prove that it

is what it is.  And I don't know if they can demonstrate that

it is what it is.  I don't know in what way -- they have to lay

the foundation, and it is not self-authenticating.  You can't

just simply say because it's in the same format as other

documents that were produced.

Now, you have to tell me genuinely -- it begs the

question why -- two questions:  One, why it wasn't produced by

you if it is something that really was generated by you and in

your files; and two, if it was -- are you denying that the

document is what it purports to be?  Again, you can say that

that's their burden, but I need to know if there's a genuine

dispute about it.  If there's not a genuine dispute about it,

then the burden is a little lighter, you can't simply hide

behind their burden if you know the document is what it

purports to be, because otherwise I'll put your people on the

stand and let them say under oath whether or not this is a

legitimate document or not.  They can do that if you genuinely

tell me you're not disputing the document, and you're just

saying it's their burden.

And there was a third document --

MR. YALOWITZ:  So, Your Honor, I'm thinking of two off

the top of my head.  We're checking to see on the third.

THE COURT:  Right.  Your argument is that simply

because it's got a PA heading is not good enough to say that

it's --

MR. YALOWITZ:  No, no, no.  The one that most comes to

mind, I think, is 233, which is this letter that the IDF

seized, and we gave it to them in an interrogatory and said,

whose signature is this, whose handwriting is this, and they

said, well, you know, here are the guys whose handwriting it

is.  And we say, okay, you've identified the guys whose

handwriting it is, you must know if it's authentic or not.  I

mean, if we give you an interrogatory that says whose

handwriting is this, and you answer it, and you don't say, wait

a minute, this whole thing is a forgery, that's a tipoff that

it's an authentic document.

So that's why we included that --

THE COURT:  That's why I say, I can't just go on

burden-shifting here.  I've got to know whether or not there's

a genuine -- is it your position that the person whose

handwriting on the document, that you're denying that that

person prepared that document?  I don't know what position

you're taking with regard to whether it is or isn't an

authentic document.

MR. HILL:  I'm going to insist on the foundation being

laid.  I'm not going to reveal attorney-client communications

about these issues.  Discovery is over.  There was a chance to

take that discovery, the plaintiffs took what they took, and if

they don't have the record now --

THE COURT:  That's not a very compelling argument.

You can understand that.

MR. HILL:  It's the objection I'm making, Your Honor.

THE COURT:  I know.

MR. HILL:  It's a document they found somewhere --

THE COURT:  I'm trying to be fair to you, fair to both

sides.  You know what, technically, I can just let them throw

one of your guys on the stand and force them to admit whether

1    or not this is an authentic document.

2         MR. HILL:  Discovery is closed --

3         THE COURT:  It's not discovery.  They have a document.

4    You have the document.  The question is, who's going to lay the

5    foundation for the document.  If you know that your person has

6    to acknowledge that this is a true document, you can't say to

7    me that they can't lay the foundation, because otherwise I will

8    let them give you an interrogatory today, and either you deny

9    or admit that that's a legitimate document.

10         MR. HILL:  Well, I would urge Your Honor not to reopen

11   discovery --

12         THE COURT:  I understand that, but, look, I'm trying

13   to be fair to you about this.  I'm trying to figure out what

14   genuinely is in dispute and what's not in dispute.  You can't

15   play a shell game with this.  If this is in dispute, tell me,

16   and I will protect you from any undue prejudice, but if this is

17   just, I want to outsmart the other guy, I'm not particularly

18   persuaded by that.  If you know that this is a genuine

19   document, but you're objecting even though you know that you

20   have no legitimate basis to contend that this isn't what it

21   purports to be, that's just -- I'm not compelled by that.  You

22   can understand that, can't you?

23         MR. HILL:  I hear Your Honor.  My position is, as I've

24   stated it, the plaintiffs can't lay the foundation, and Your

25   Honor should require them.

1    THE COURT:  Well, you have to make up your mind.

2  Either I'm going to -- with regard to those documents, that

3  you're going to take that position, I'm either going to allow

4  them to put the document in as it -- unless you have a

5  legitimate argument to make that it's not what it purports to

6  be, or if you don't want them to do that, I'm going to allow

7  them to give you a request to admit, and you're going to have

8  to either admit or deny, that will go before the jury, whether

9  or not that's a legitimate document.  That's your choice.

10    MR. HILL:  Your Honor, I would need to consult with my

11  clients.

12    THE COURT:  All right.  Well, you can make your

13  decision, whatever you want, but if it's genuinely unfair to

14  your client, then I will genuinely protect you from it, but if

15  it's just the gamesmanship of it, I'm not going to protect you.

16    MR. HILL:  Your Honor, it's not gamesmanship, it's

17  discovery.  There was 18 months when the plaintiffs produced

18  this document to us when they could have taken whatever

19  discovery they wanted about it.  They have twice asked to

20  reopen discovery on this particular document, and Judge Ellis

21  twice found there was not good cause to do so, and you twice

22  overruled their objections to those rulings.  And for us to be

23  less than a month for trial, for you to be reopening discovery,

24  I will say --

25    THE COURT:  Yes, but for you to now object to the

1    document on foundation grounds, even though you know it's what

2    it purports to be, is not a legitimate way to proceed.

3         MR. HILL:  Your Honor, we're entitled to put the

4    plaintiffs to their proof, we're entitled to the plaintiffs

5    complying with the rules of evidence, and that's what I'm

6    asking the Court to do, is enforce the rules and put them to

7    their proof.

8         THE COURT:  I'm going to tell you this, I'm going to

9    allow them -- unless you tell me, make an affirmative statement

10   that you are contending that it is not what it purports to be,

11   I am going to allow them to admit.  I'm not going to be used

12   that way.  Unless you're going to make the representation it's

13   not what it purports to be, I am not going to hold that the

14   document is inadmissible on foundation grounds.  I think it is

15   sufficient that it appears to be the same kind of document that

16   you produced, and you are unwilling to say that it's not -- not

17   an authentic document.  That alone compels me to allow them to

18   do that, unless you tell me there's a genuine dispute about the

19   authenticity of the document.

20        That's going to be my position.  So you have to decide

21   what you want to do with regard to that.

22        Now, with regard to the third document, I remember now

23   the third document was a document that they contend was

24   produced in another litigation by --

25        MR. HILL:  I'm not lodging an authenticity objection

1    to that document.

2            THE COURT:  Okay, but that's one of the three.

3            MR. HILL:  You're testing my memory, but I think Your

4    Honor is correct.

5            THE COURT:  So you are lodging -- you're withdrawing

6    that objection?

7            MR. HILL:  I don't think I made it.  To the extent my

8    law firm produced the document, I don't think I've --

9            THE COURT:  No, but you didn't produce it in this

10   litigation.  I thought there were two documents that they found

11   independent -- no, three documents they found independently,

12   and one of those three documents, you had produced not in this

13   litigation, but in a third.

14           MR. HILL:  I know, but the one I produced in another

15   case, I don't dispute the authenticity.

16           THE COURT:  So there are really only two documents at

17   issue that you have that weren't produced by them, all right.

18           Now, if you want to genuinely tell me that you dispute

19   that there's a reason that a trier of fact should conclude that

20   this is not what it purports to be, then I want to hear it, but

21   if you know it is what it purports to be, no, I'm not going to

22   allow you to simply say, even though we've known they had this

23   document all along, we know they intended to offer this

24   document all along, there's a possibility they might offer this

25   document, we didn't produce it to them, but we know that that's

really a legitimate document.  If that's the case, I'm not
going to grant your application that they should be precluded
on foundation grounds.  That's my position.  I think that's a
fair position.

        So if you genuinely think that you will be prejudiced
by their offering something that you know or believe it is not
what it purports to be, then tell me and make an affirmative
representation that that is what you're complaining about.  If
that's not what you're complaining about, I understand the
nature of your objection, and I find that that is not a
sufficient basis to object on foundation grounds.  And if it
was, I would at least -- and I think it's more unfair for me to
allow them to give you a subpoena and make you put somebody on
the stand to authenticate the document against your will, so I
will suggest that I'm going to at least not try to do that to
you, but I think it wouldn't be reopening discovery.  They have
a right to subpoena a witness to say whether or not this is
authentic or not, genuinely if that's what the witness is going
to say.  Whether that witness is employed by you or not
employed by you, or show them that document in front of one of
your witness's faces and say this is a real document, isn't it,
and making them admit it, okay?

        And if you want to object to it on some other basis,
that's fine, but it seems to me they have a basis to do that,
and if you want me to force them to do that to one of your

witnesses, I'll consider that, but if you genuinely know and

don't want to say that you know that this is a legitimate

document, and you're just trying to outmaneuver them on this

issue by saying, well, you can't prove it, I'm not sympathetic

to that argument.

So let me do this: I see no basis to exclude any of

these exhibits on foundation grounds. I don't. Now, if you

guys want to go through the time-consuming process of going

through each document and laying the proper foundation, I will

consider that, but I think the proper foundation is,

particularly with most of these documents, that these

documents -- that we made requests of the defense, and they

produced these documents, and these documents were produced by

the defendants. And I think that, in itself, is a legitimate

basis for a jury to conclude that the documents are what they

purport to be. Otherwise it wouldn't make a whole lot of sense

for you to produce them if you thought they were fakes and

forgeries, and you -- and they were asking for employment

records.

Now, to the extent that you want to fight about that

in front of the jury, let's put it this way, I assume our jury

is going to be a very reasonable jury, and they will see

through that, but if there's a genuine dispute about it, then

I'd suggest you concentrate on that and identify that for me so

that I can protect you from undue prejudice that might be

1    inappropriate because the jury may think a document is

2    something that it really is not.  So with regard to that,

3    that's what I rule.

4           With regard to the -- give me five more minutes, and

5    then we will decide whether we're going to come back this

6    afternoon and continue.

7           I've identified -- I guess the plaintiffs put together

8    a chart that laid out the separate charts with regard to the

9    information that has been requested with regard to the

10   documents.  Let me remember what I did.

11          Now, the first thing I did is, to the extent that the

12   defendants have identified portions that they want redacted --

13   and that's a question of the redactions the Court issued with

14   regard to hearsay and any other objections to the substance of

15   the document -- to the extent that you've made certain

16   objections, and that's not the portion that the plaintiffs said

17   was the relevant portion that they wanted to admit, I'm going

18   to give you a default position, I'm going to tell them to

19   redact it in that regard.

20          Now, there may be some portions that both sides may

21   want to identify because you can do it simultaneously that

22   somehow that doesn't work with regard to certain documents, but

23   I ask you both to -- I ask the plaintiffs to identify to me

24   what is the relevant portion of the document they want to

25   admit, and I ask the defense to identify for me what portion of

that document they objected to.  To the extent that they don't

overlap, the plaintiff can offer that portion of the document

that says what they want it to say, the defendant can redact

and have the plaintiffs redact that portion of the document

that they objected to that wasn't the portion that the

plaintiffs said they want to admit.  Okay, that's my default

position.

Now, with regard to several other exhibits, I went

through all of the exhibits, and with regard to where there is

overlap -- let me see if I can -- I have it in a proposed

order.  Let me look at it over lunch, but let me quickly go

through.  I have Exhibit 17.  All the objected-to statements

with regard to Exhibit 17 should be redacted, other than the

sentence that begins with, "She is considered" and ends with

"shekels a month."

MR. YALOWITZ:  Your Honor, can you bear with me just a

minute.  This is the Wafa Idris martyr file, right?

THE COURT:  Yes.

MR. YALOWITZ:  I'm just trying to find it in my chart,

which is a little challenging.

THE COURT:  I just don't have a clear recollection.

Page 83.

MR. YALOWITZ:  Okay, great.  Thank you.

So I'm sorry, Your Honor, I just was looking for the

document when you were speaking.  I apologize.

ECGKSOKM

1          THE COURT:  All right.

2          Yes, the portion at the top of 84.

3          MR. YALOWITZ:  So you want us to redact, "The martyr

4     is one of the Al-Aqsa Intafada martyrs"?

5          MR. HILL:  Objection.

6          THE COURT:  I want you to redact everything that they

7     objected to other than that portion at the top of 84.

8          MR. YALOWITZ:  I apologize, Your Honor, I'm just not

9     following the ruling.

10          MR. HORTON:  The sentence "She is considered" remains

11    in?

12          THE COURT:  That remains in.

13          MR. YALOWITZ:  "She is considered" remains in?

14          THE COURT:  Yes.

15          MR. YALOWITZ:  How about the portions on 83?

16          THE COURT:  Out.

17          MR. YALOWITZ:  May I be heard on that, Your Honor?

18          THE COURT:  Well, why do you say that that's

19    admissible?  And I don't need to go into details of what it

20    says here, just tell me what's the purpose.

21          MR. YALOWITZ:  Okay.  There are a number of purposes.

22    First of all, these are admissions as to the actual facts of

23    what happened when she blew herself up, number one.

24          THE COURT:  Well --

25          MR. YALOWITZ:  And I don't think it's in genuine

1    dispute that she blew herself up.

2            THE COURT:  No, no, no, no.  I know why, because the

3    statements that you want to attribute to them are statements

4    that in their -- and I checked it -- they accurately quote.  It

5    says, "Accorded to the enemy media."  That's what it says.  It

6    doesn't say they're admitting this.  They say this is what the

7    enemy media says.  No, that's not admissible for the purpose

8    that you are trying to admit.

9            MR. YALOWITZ:  Here's why I think it is.  First of

10   all --

11           THE COURT:  That's not their admission that those

12   facts are true.

13           MR. YALOWITZ:  All right.  Well, their job --

14           THE COURT:  I understood that.

15           MR. YALOWITZ:  Their job is to gather information and

16   decide whether or not to pay the family.

17           THE COURT:  Okay.

18           MR. YALOWITZ:  So they gather up a bunch of

19   information, and then they evaluate it, and they decide, is it

20   true or is it not true.

21           THE COURT:  Right.

22           MR. YALOWITZ:  And if it's true that she blew herself

23   up among a crowd of Zionists or whatever it says there, then

24   they pay her.

25           THE COURT:  No, but that's not their words, that's the

1    whole point.  They're not calling --

2              MR. YALOWITZ:  They're adopting it.  Those are their

3    words, and I think the jury is entitled to see those words.

4              THE COURT:  No, the jury -- what you just said that

5    you wanted as facts is what I gave you that I said stays in at

6    the top of 84.  Those are the facts on which they determine to

7    decide to make those martyr payments.

8              MR. YALOWITZ:  Maybe I'm not following you, Your

9    Honor.

10             THE COURT:  The top box on 84.

11             MR. YALOWITZ:  "Department's Recommendation"?

12             THE COURT:  That top box.  I'm giving you the top box

13   on 84.

14             MR. YALOWITZ:  But what I really want is the --

15             THE COURT:  I know what you want.  You want the

16   statement that says, "According to the enemy media," and you

17   want the statement that says, you know, she was against the

18   Zionist occupied Israel.  I find two things:  One, that the

19   first part of that statement are not statements by them, it's

20   statements quoting someone else and quoting obviously someone

21   who's not speaking for their interests; two, the second part, I

22   just think the potential prejudice outweighs any probative

23   value, particularly in light of the fact that the only

24   relevance of this document would be that they had information

25   that you've laid out at the top of 84, and based on that

1    information, they decide to make these martyr payments.

2    That's --

3              MR. YALOWITZ:  It also goes --

4              THE COURT:  There's no factual allegation about what

5    she did that is somehow in this other part of the statement the

6    way you want it.  That's not the relevant information here.

7    That's why I'm giving you that portion.

8              MR. YALOWITZ:  May I just give you two other things on

9    83?  The first is, the language that they use, "Crowd of

10   Zionists" --

11             THE COURT:  I find it's more prejudicial than

12   probative.  That does not make them responsible for any

13   terrorist act.  Anyone can make that statement.  Anyone who has

14   a point of view that is an opposite of the point of view that

15   Israel has could have made that statement.  It's not probative

16   of any knowledge of a particular terrorist act, it's not

17   probative of the fact that they participated in this probative

18   act, and, in fact, if the jury were to use it for that purpose,

19   it would be unduly prejudicial to use it for that purpose.

20             You cannot say that using the term Zionist means that

21   it is more likely than not that they committed any one of the

22   incidents or violent acts that are at issue in this case.  And

23   to do so is improper, and that's exactly the reason why I

24   thought you wanted it, and that's exactly the reason why I'm

25   keeping it out.

1        MR. YALOWITZ:  Let me just say this -- and I don't

2   want to -- I understand what Your Honor said, but this is a

3   case in which state of mind is an element of my --

4        THE COURT:  No, knowledge is an element.  State of

5   mind is not an element.

6        MR. YALOWITZ:  Knowledge or intent.

7        THE COURT:  Intent to commit the terrorist act.

8        MR. YALOWITZ:  Right.

9        THE COURT:  Not intent to have animosity against

10  Israel or the Israeli people.

11       MR. YALOWITZ:  Well, okay, but when they say --

12       THE COURT:  That's a given that these folks disagree,

13  and they have strong feelings against each other.  This does

14  not make it more likely than not that they committed the act

15  that you want -- that you've accused them of.  It has no

16  probative value to that issue.

17       MR. YALOWITZ:  Okay.  I agree on the actus element,

18  but we understand people's state of mind by looking at their

19  words before --

20       THE COURT:  Right, the relevant state of mind.

21       MR. YALOWITZ:  Right.  Before and after the --

22       THE COURT:  What state of mind do you say the word

23  "Zionist" represents?

24       MR. YALOWITZ:  It's a heroic martyrdom operation.

25       THE COURT:  What state of mind do you say that that

1    represents?

2            MR. YALOWITZ:  Knowledge and intent.

3            THE COURT:  Of what?

4            MR. YALOWITZ:  Of terrorism.  Knowledge and intent of

5    committing acts of violence for a political purpose, for an

6    apparent political purpose of influencing the government or

7    coercing a civilian population.

8            THE COURT:  But that's not what's at issue here.

9    What's at issue is whether they participated in these acts.

10           MR. YALOWITZ:  It's my burden to show on international

11   terrorism, number one, that it's a crime of violence, that's

12   pretty easy; number two, that it had the apparent intent of

13   coercing a civilian population, or influencing a government by

14   coercion, or affecting the conduct of a government --

15           THE COURT:  That's fine, and I don't disagree to some

16   extent that that's true.  But that's another reason why this is

17   not admissible, because it's just cumulative.  You have plenty

18   of evidence about people being martyred, and you even have

19   evidence in this file about this person being martyred.  The

20   other evidence that you want in the context that you want it,

21   that they're quoting statements that they attribute to the

22   enemy media, and that they're referencing Zionists, no, that's

23   not more probative than the other evidence that you have that

24   you're offering in the martyr files with regard to other

25   individuals and specifically with regard to whether or not this

1  person received martyr payments and went into their decision to

2  decide to give this person martyr payments.  I understand that

3  argument, and that's in, but it is not the proper way to put it

4  in by simply wanting the prejudicial effect of quoting from

5  the, quote, enemy media and calling people Zionists.  That's my

6  position.

7         MR. YALOWITZ:  I accept that.

8         There are two statements that I want to -- that I

9  really feel strongly about.  The first one is, "The operation

10  was claimed by the Al-Aqsa Martyrs Brigades (the military wing

11  of Fatah)."  Fatah is Arafat's dominant faction of the PLO, and

12  there's a dispute in this case whether the Al-Aqsa Martyr

13  Brigades is the military wing of Fatah.  That's a disputed

14  issue.  And here we have a document in which the defendants

15  themselves, in a report -- this is not quoting enemy media,

16  this is their statement, their admission -- that Al-Aqsa Martyr

17  Brigades is the military wing of Fatah.

18         THE COURT:  Well, unless you have some more

19  information about the context of this statement, I don't know

20  why I can conclude that.  This is in quotations.  Who do you

21  say that they're quoting?

22         MR. YALOWITZ:  No, it's in quotations from the

23  defendants.  The defendants are quoting.  It's not in

24  quotations in the original document.

25         THE COURT:  Oh, okay.

1    MR. YALOWITZ:  No, this is an admission in an official

2  document by the defendant --

3    THE COURT:  But I thought you had other evidence that

4  you intended to offer that was --

5    MR. YALOWITZ:  That's not my only piece of evidence,

6  obviously.

7    THE COURT:  Wasn't this cumulative of other evidence,

8  more direct evidence that you say that you have that

9  demonstrates this?

10    MR. YALOWITZ:  Look, I think -- we have a lot of

11  evidence.  I'm not going to lie to you that we don't have a lot

12  of evidence that Al-Aqsa Martyr Brigades is the military wing

13  of Fatah, but this is a direct admission in a key document in

14  the case.  I just ask you to reserve decision on that.

15    THE COURT:  I'll think about it, but I'm not going to

16  reserve decision.  This is my ruling unless I'm convinced

17  otherwise to change it.

18    MR. YALOWITZ:  Fine.  As long as I have the

19  opportunity to come back to you.

20    The second one is, it says -- and this is their

21  conclusion -- and, again, it goes to their ratification and

22  state of mind -- they say, "She was martyred during a heroic

23  martyrdom operation against the Zionists" -- you want to take

24  out the word Zionists, I don't care -- "in the occupied City of

25  Jerusalem."  That's their conclusion in their report.

1    THE COURT:  So you want to offer evidence, because

2  they described it as heroic, that means they must have been

3  complacent in nit?

4    MR. YALOWITZ:  That they approved it, they --

5    THE COURT:  How does that say they approved it?  It

6  may mean that they approved of it, but it doesn't mean they

7  preapproved it.

8    MR. YALOWITZ:  I think a reasonable jury could

9  conclude that based on this statement, they ratified the acts

10  of this --

11    THE COURT:  You can't prove your case that way.  That

12  doesn't prove your case.  Even if they said, after every

13  incident, we're glad it took place, that doesn't prove your

14  case.  You can't sue them for millions of dollars for taking

15  that position.  That may be an objectionable position from your

16  point of view, but it doesn't prove liability on their part,

17  because they decided that they agreed with it.

18    MR. YALOWITZ:  I think that I need to show a link

19  between her and the defendants in advance.

20    THE COURT:  Right.  This doesn't do that.

21    MR. YALOWITZ:  I agree.  I can show that through other

22  evidence.

23    THE COURT:  Right.

24    MR. YALOWITZ:  And then it's just like the analogy of

25  the law clerk, if your law clerk comes in and says, I just

1    murdered someone --

2              THE COURT:  And I said, you know, that's good, I never

3    liked that person, what does that mean, you would sue me for

4    murdering the person?  No, that doesn't follow.

5              MR. YALOWITZ:  If your court officer comes in and

6    says, I just murdered somebody in front of the courthouse --

7              THE COURT:  And I still say I'm glad you did, I never

8    liked that person anyway, you still couldn't sue me.

9              MR. YALOWITZ:  I think -- well, you're an employee --

10             THE COURT:  It doesn't matter, take that out of the

11   equation.  Under no scenario can you advance liability by

12   saying they were glad that it happened.  That's not the way you

13   conclude this case.

14             MR. YALOWITZ:  Right, happiness -- the emotion of

15   happiness doesn't prove liability.

16             THE COURT:  If you want to demonstrate that after she

17   did that, they martyred her and made payments to her, and you

18   want to argue that that's further evidence that they could

19   infer from that that they asked her to do it, or helped her to

20   do it, or told her if she was going to do it, they would pay

21   her or gave her some expectation if she did, that's for you to

22   argue, but not on the inflammatory words that these are

23   Zionists, or she's heroic, or -- that's not the way --

24             MR. YALOWITZ:  Your Honor, I think if you go

25   glorifying somebody who's a murderer, even a suicide murderer,

1    that indicates --

2            THE COURT:  Indicates what?

3            MR. YALOWITZ:  -- your state of mind about --

4            THE COURT:  After the murder?

5            MR. YALOWITZ:  After the murder.

6            THE COURT:  How does that indicate -- your state of

7    mind after the murder doesn't make you liable.

8            MR. YALOWITZ:  We understand people's state of mind

9    based on what they say and what they do before and after the

10   events.

11           THE COURT:  I know, but you can't just say state of

12   mind.  And as you look at these things, you should focus on

13   what you have to prove and argue it to me.  It's got to be

14   knowledge or present or prior intent, okay?  It can't be

15   afterthought or what I felt about it after it happened.  It's

16   got to be that it's reflective that I had knowledge that it was

17   taking place or that I intended, before it took place, that it

18   was to take place.

19           If you don't prove those, you don't have any relevant

20   knowledge.

21           MR. YALOWITZ:  Are you going to give me a charge like

22   the one that Judge Kogan gave in the Chowdhury case about

23   ratification?  This is -- I understand --

24           THE COURT:  I haven't resolved that yet.

25           MR. YALOWITZ:  I understand the debate --

1      THE COURT:  I don't know what your theory is with

2  regard to ratification.  It's not -- I just can't decide this.

3  I don't know what the proof is going to be.  I don't know what

4  theory you're going to say that this case is simply proved by

5  the fact that they committed the act; after they committed the

6  act, they said good job, you know, here's some money.

7      MR. YALOWITZ:  Well, let me give you an example of

8  what I'm thinking about.

9      THE COURT:  Well, let's do this.  Let's take our

10  break.  I need to give my court reporter a break.  Let's come

11  back this afternoon, we'll continue this, and if you want to be

12  more specific.  With regard to a lot of these other things, I

13  can tell you right now that a lot of the other documents

14  contain the indictments and the verdicts.

15      MR. YALOWITZ:  I don't care about that.

16      THE COURT:  Well, I'm just saying that my ruling,

17  consistent with the indictments and verdicts, is that they're

18  going to come in -- that they're coming in with regard to the

19  other exhibits, they're coming in in this form, and they're

20  coming in redacted the way we say they're going to be redacted.

21      MR. YALOWITZ:  That's fine.

22      THE COURT:  If I say they're inadmissible, they're

23  inadmissible, so that's it.  That's an easier one to address,

24  unless you have an independent argument to make about that.

25      MR. YALOWITZ:  No, that's fine.

1          THE COURT:  And the same thing about the sentencing

2     opinions that are out.  But I have some other -- quite frankly,

3     I have about -- there are about a dozen exhibits that I think

4     either are inadmissible or need to be redacted, and I will go

5     through those this afternoon.  But to the extent otherwise

6     there are arguments about hearsay, and I'm not sure I know of

7     any other -- we went past the foundation, but I don't know of

8     any other ground that they've articulated at this point other

9     than hearsay and being offered for the truth of what's in the

10    document.  On hearsay grounds, whether -- what reports were

11    written by GIS, whether there are martyr files to represent the

12    payments that were made or not made, whether or not the

13    employment records indicate whether they were employed or not

14    employed, I don't think that those are hearsay -- legitimate

15    hearsay objections to that, nor do I hear any legitimate

16    objection challenging even the truth of what the documents

17    represent.

18          MR. YALOWITZ:  Where are you, Your Honor, on -- so

19    such-and-such an employee is serving 15 life sentences for

20    murder, he's currently in such-and-such a prison, he's good in

21    terms of security and morals?

22          THE COURT:  I don't have a strong reaction one way or

23    the other about that, because I'm not sure what you're going to

24    contend that that means.

25          MR. YALOWITZ:  That goes to scope of employment.

1          THE COURT:  It goes to employment, but just because

2     they say he's a nice guy, I don't know what that -- I'm not

3     sure -- depending on what you guys are going to try to argue

4     that it means, I'm not even sure the nature of the objection,

5     but I'm not even sure the purpose on which -- I assume you're

6     trying to imply that because they say he's a nice guy, they're

7     really referring to the fact that he's a nice guy because he

8     kills people.  If that's what you want to argue, I don't know

9     if that makes the document admissible or inadmissible, but it

10    seems to me that that's for the parties to argue about, whether

11    or not that reflects some intent on their part to -- or that

12    coupled with some evidence that they participated in the act.

13         Your problem with proof is not one of intent.  Your

14    problem with proof is trying to tie it in directly to how they

15    participated in the act and what evidence that you have.

16    That's what's going to determine this case, if you have some

17    evidence that they either assisted, planned, or helped

18    coordinate one of these acts, and that evidence is admissible.

19    That's going to take you a long way.  But if your evidence is

20    just that they're on their side, that's not going to go very

21    far, you know that.

22         MR. YALOWITZ:  No, no, it's more than that.  If you're

23    running the NYPD, and you have a cop who's serving 15 life

24    sentences, and you keep him on the payroll, and you say he's

25    good in terms of security and morals, that suggests that what

1  he's doing is okay by you within the scope of his employment.

2          THE COURT:  Well, as I say, that's an argument -- I

3  think if you have admissible evidence, and I think it sounds

4  like some of this will be admissible for you to make that, I

5  think that's an argument that the jury can consider, but I

6  think there's just a legitimate or strong argument on the other

7  side to argue that it doesn't necessarily mean that.  That's

8  for the parties to argue, that's not an issue of admissibility.

9          MR. YALOWITZ:  Agreed.

10          THE COURT:  The question is if we know -- the

11  importance of these files, as far as I'm concerned, is that we

12  know that if they were in their files, that they at least had

13  some awareness -- I'm going to use the word knowledge -- they

14  had some awareness of the information that was in the files.

15  Now, what that awareness means is an issue for the jury to

16  resolve and for the parties to argue.  It may mean that they

17  knew about it beforehand, they participated in it, or it may

18  mean that they didn't know about it beforehand and just

19  approved of it.  It may mean that they didn't approve it

20  because they decided they were going to arrest people.  That's

21  for the jury to determine.  As far as I'm concerned, that's not

22  an admissibility issue.

23          And unless -- as I say, I've gone through these

24  documents.  The employment records -- quite frankly, the

25  employment records are not much in dispute.  Whether these

1    people were employed is not much in dispute, and it's not the

2    argument that you guys are going to be arguing.  If you're

3    going to say they were employed, they are going to have to say,

4    yeah, they were employed, but it doesn't mean they were

5    employed to do terrorist acts or it doesn't mean we had any

6    idea that they were personally involved in these terrorist

7    acts.  That's the argument to be made for the jury, it's not an

8    argument about admissibility of the employment records.  I

9    think the employment records were totally legitimate employment

10   records, and there's no genuine argument to be made that they

11   reflect some untrue state of affairs, okay, or that they're

12   somehow inaccurate, or they're somehow giving false impression

13   to the jury of the relationship between the PA, the PLO, and

14   these individuals.  The strongest evidence of what the

15   relationship is is their employment records, if they were

16   employed.

17           Now, what they were employed to do, and what they were

18   aware that they were doing, and whether or not you can even

19   establish to get to the jury that this was in the scope of

20   their employment is a different issue.  That's a different

21   issue.  But I think most of these issues that I'm addressing,

22   it more has to do with the form of the information rather than

23   the information itself.  If you want to argue that, obviously

24   we're happy when these terrorist acts took place, and there's

25   some evidence of that, sure, there's some probative value to

1    that.  I guess they will argue on the other side that, look, we

2    arrested some of these people, and we're trying to do the

3    lawful thing in terms of preventing people from doing that.

4    It's legitimate to offer that.  It doesn't mean that they were

5    or were not, as you argue.  It doesn't mean they were or were

6    not, it means the question is are their statements and actions

7    genuine, or are their statements and actions such that they're

8    simply trying to cover up their participation because there's

9    other evidence that indicates they participated in these

10   crimes.

11          So I will continue -- let's do this --

12          MR. YALOWITZ:  I think your court reporter probably

13   needs a break.

14          THE COURT:  Yes, we're going to take a lunch break.

15   We're going to come back at -- let's say 3 o'clock, and then

16   we'll go probably another hour, and I'll tell you what else I

17   need to resolve, but I'll reorganize myself.

18          MR. YALOWITZ:  Thank you, Your Honor.  See you at

19   3:00.

20          THE COURT:  You're welcome.

21          (Luncheon recess)

22

23

24

25

ECGKSOL2

                    AFTERNOON SESSION

                       3:00 PM

1            THE COURT:  I've spoken to jury.  I think we can

2    adjust and give you a little more time for the jury.

3            MS. FERGUSON:  Thank you, Your Honor.

4            THE COURT:  We'll still have them fill it out, the

5    questionnaire, on the 7th.  What I'll need is, you should make

6    copies and get me back the original the morning of the 8th,

7    just the original.  And you can have until the close of

8    business on the 9th to get me your forms.

9            MS. FERGUSON:  Thank you, Your Honor.

10           THE COURT:  So that will give you two days with the

11   form.

12           What I will do is, I will go through the forms and be

13   able to tell the -- we'll meet on the 12th, I'll tell you and

14   the jury room, who we'll bring back, and we'll bring them back

15   on the 13th, and we can address any other issues that are still

16   outstanding that we haven't really resolved on the 12th before

17   we start on the 13th.  So we will start the trial on the 13th.

18           MR. YALOWITZ:  Your Honor, what time on the 9th would

19   you like those forms?

20           THE COURT:  Since I'm the one that's going to be

21   working over the weekend, not you, I would like them -- if you

22   can get it to us -- well, the reality is, if you can even just

23   electronically send it to us, I would appreciate having it by

1   5 o'clock, but --

2           MR. YALOWITZ:  That will be great.  That way, I can

3   take the weekend off.

4           THE COURT:  You guys can take the weekend off and

5   prepare more substantively for trial.

6           I'll have the questionnaires themselves the next

7   morning, so I'm going to go through the questionnaires myself,

8   so I'll have a feel -- clearly people who checked off saying, I

9   can't do this, I'll know who they are and something about the

10  kinds of answers that we get.  And then all I need is your

11  form, and you can do it electronically, send that to me, and

12  then I'll have both forms, and we can go through them, my law

13  clerk and I, and hopefully come up with a section of jurors to

14  voir dire.

15          MR. YALOWITZ:  Did Your Honor contemplate they would

16  be blind to the other side?

17          THE COURT:  Yes.

18          MR. YALOWITZ:  It's a strategic issue with preemptory.

19          THE COURT:  I'm not trying to put anybody at an unfair

20  advantage or disadvantage, but the reality is, all I'm

21  interested in is if you invoke -- identify some people that you

22  both find are acceptable.  I don't know whether or not -- how

23  sincerely you are going to be in terms of clearly identifying a

24  large number or a small number of acceptable people, but I'm

25  thinking if you both identify a hundred of the same people that

1    are acceptable, it makes my job easier.  If you only check off

2    three people who are acceptable for voir dire, then, as I say,

3    I'm going to go to my fallback position to just go back and

4    forth with regard to who checked off somebody acceptable and

5    who the other person didn't, and then if I've exhausted that,

6    then I'm just going to go to people who neither one of you

7    checked off for any reason at all and put them in.

8        MR. YALOWITZ:  And ultimately, just because there's an

9    objection for cause doesn't mean it's a good objection.

10       THE COURT:  No, but, look, I'm not going to -- I'm

11   going to look at the form.  It doesn't matter what the

12   objections are as long as I have enough people who you both

13   want to voir dire, and they're going to fill the box.  So why

14   waste my time arguing about whether or not there's

15   objectionable cause if I have 30 people you both say are

16   acceptable.

17       MR. YALOWITZ:  I agree with that.

18       THE COURT:  My hope is that you are able to do that,

19   but as I say, this is either a process or a strategy, so you

20   can either be -- you can approach it the way you will.  I hope

21   you generally approach it that you reasonably look at the

22   questionnaires, as we all are going to look at them, and we

23   should be all pretty much in agreement that certain people

24   clearly are not people that you would want in this case, one

25   side, or the other, or both sides, or any of us, and other

ECGKSOL2

people, there's nothing that looks wrong on the form.

You see that I took out a lot of the direct questions about people's religions and that sort of thing. I think there are enough nuanced questions in terms of whether they visited the area, they have had relatives who have been there, whether or not -- I put in the context of -- because we have translations, whether or not they understand Hebrew or understand Arabic, so you'll at least have some of that kind of information.

I had some more general questions about -- I combined some of your questions about whether they had any religious, political, or other views that would make it difficult for them to be a fair and impartial juror. I don't think it's appropriate to strike somebody just because they're Jewish or Israeli, and I don't think it's appropriate to strike somebody just because they're of Arab descent or Palestinian. Look, it depends on what the answers are, and I'm not going to consider challenge for cause just because you say, I don't want this guy, he visited Israel.

MR. YALOWITZ: Look, I haven't gone through the questions, but that basically was my approach.

THE COURT: That was my thrust, and then I went through the objections that you had, each side, and I understood most of the nature of the objections, and I either took those questions out or I refashioned them in a way that I

usually ask them, in a more innocuous way, so that jurors

understand, look, we're just trying to understand who they are

and what their backgrounds are.

Quite frankly, you have much more information than I

would usually get from jurors in voir dire.  I couldn't care

less what TV shows they watch or what newspapers they read.  I

don't ask those kinds of questions.  It makes absolutely no

difference to me.  In most cases, it makes absolutely no

difference, but if you want to know if they watch reruns of the

Muppets, let them tell you that.

MR. YALOWITZ:  That might be material, Your Honor.

THE COURT:  As I say, I don't think it usually affects

the verdicts that we get in these cases, so I don't usually

spend a lot of time asking those questions.

So I'll accommodate you that way, I'll give you more

time with it, but that means that I need it back right away.

If it's a simple process for us to just simply grab 50 people

that we see that both say they're acceptable, then that would

be the easy process, and then I'll let you know first thing.

So you'll know about the same time, if not before, the jury

room starts to call jurors on Monday, but the problem is, they

literally need to call every juror and tell them whether they

have to come here or not.  Even the first day, I'm trying to

coordinate with -- we still have to talk further about how I'm

going to handle jurors during the trial.  I don't know who's

1  going to show up at this trial, I don't know if a lot of people

2  are going to have an interest, I don't know if a few people are

3  going to have an interest, I don't know if people are going to

4  protest, I don't know what they're going to do, so I want to be

5  able to get the jurors into the building without any

6  interruptions or being accosted by people who have a point of

7  view that they want to express.

8       And I don't want them mingling in the hall and running

9  into people who might try to have a conversation and want to

10  express their point of view to their friend who happens to be

11  here, and they happen to be talking while the juror is here.  I

12  have had enough experience, as I probably indicated, in the

13  last year where a juror had gotten into the wrong cab, and the

14  defendant happened to jump in front of her and jump into the

15  cab, and she gave him the finger, so now the lawyer wants to

16  excuse the juror because she's biased against her client, and

17  it turns out to be a complicated issue in a very high profile

18  case.  So the confrontation that might seem insignificant could

19  end up being significant if one of your clients or

20  representatives happen to say something in an elevator, and

21  there happens to be a juror in the elevator, or I give the

22  jurors a break, and somebody walks out of the courtroom, and

23  the jury is in the hall and says something about the case, or

24  about one of the witnesses, or one of the parties.  I'm going

25  to think of some ways that I have used in the past and some new

ways to try to insulate the jury from that kind of contact.

Let me just go back to quickly -- and then I had some questions with regard to some of the motions in limine, even though I didn't indicate I would resolve them all today, but I can give you some guidance. I'm going to go back to the 177 exhibits.

I'm fashioning an order, I'll give you an order, but basically other than 17 that we have talked about, I think there's at least 65, 66, 67, 69, and 70 that have either -- do we have the -- they're either indictments or a sentencing verdict.

Obviously, with regard to those, I'm applying the same rule that I am applying with regard to the admissible ones. However, it was awkward for me to try to figure out exactly what was there and what wasn't there. It either was because it was difficult for me to figure it out or it's genuinely that information wasn't there. It seems to me that you're raising issues now that I approached it, and I think I approached it inaccurately. I approached it as if all of the defendants on the list that I had in criminal cases were individuals who were found guilty or pled guilty to offenses that are at issue in this case, and that that's what was reflected in the 177 exhibits. Now I'm understanding that the defense's position is that some of the people who pled guilty also pled guilty at the same time to things that are not related to this case --

1          MS. FERGUSON:  Right.

2          THE COURT:  -- and that there may be indictments and

3     pleas or convictions of individuals on that list or in the 177

4     exhibits that are convictions that have nothing to do with this

5     case.

6          MS. FERGUSON:  That's right, Your Honor.

7          MR. YALOWITZ:  I don't agree with that.  At least I

8     can't think of an example offhand, and I don't know why I would

9     want to put in evidence of somebody who was convicted of

10    something having nothing to do with the case.  We've got enough

11    evidence just to deal with seven attacks.

12         THE COURT:  That's why I say -- I just raised that, so

13    you're going to have to identify for me, one side or the other,

14    if that's the case because I didn't notice that, and then as I

15    started discussing it today, it seems like that's what at least

16    one side is under that impression.  But obviously, to the

17    extent -- I'm assuming that the convictions -- whether they be

18    by plea or verdict, that the convictions that you're offering

19    are convictions of individuals who were convicted of

20    participating in one of the acts at issue here.

21         MR. YALOWITZ:  Right, except for the material support

22    convictions.  So Shubaki, who provided weapons to Al-Aqsa

23    Martyr Brigades or Abdullah Barghouti who provided --

24         THE COURT:  But that's -- is that on the list of --

25         MR. YALOWITZ:  That's in the military court

ECGKSOL2

1    convictions.  I don't think it's in the 177.  I don't think

2    those two guys are in the 177.

3         THE COURT:  All right.  Well, I'm going to assume --

4    and those are convictions of what?  You're trying --

5         MR. YALOWITZ:  Okay.  So like Fuad Shubaki, a top

6    Arafat advisor, he's convicted of gathering and supplying --

7    gathering, controlling, and supplying all weapons to the

8    Al-Aqsa Martyr Brigades.  Al-Aqsa Martyr Brigades perpetrated,

9    I don't know, four of the seven attacks or something like that.

10        THE COURT:  So you want to establish that --

11        MR. YALOWITZ:  Material support.

12        THE COURT:  -- a person who is either employed or an

13   agent of the defendants was directly providing support to a

14   designated terrorist organization?

15        MR. YALOWITZ:  Correct.

16        THE COURT:  Okay.

17        MR. HILL:  The problem is that the conduct for which

18   he was convicted was before Al-Aqsa Martyr Brigades was

19   designated.  Al-Aqsa Martyr Brigades was designated, as Your

20   Honor noted in the summary judgment order, on March 27th, 2002.

21   Mr. Shubaki was arrested by the PA in January of 2002, so all

22   the conduct of which he was convicted necessarily predates the

23   designation.

24        THE COURT:  You don't contend that that would

25   establish a violation of the ATA if he committed those acts

ECGKSOL2

```
 1    prior to the designation?

 2              MR. YALOWITZ:  Those are -- I think it's evidence of

 3    the pattern of his conduct.

 4              THE COURT:  But as I say -- let me address those

 5    issues separately.  You're not contending that you can

 6    literally meet the elements of the claim by showing that he

 7    supplied -- he provided material support prior to the

 8    designation?

 9              MR. YALOWITZ:  Correct.

10              THE COURT:  So that's not what you are directly trying

11    to prove by that evidence.  You want to offer that evidence to

12    prove what?

13              MR. YALOWITZ:  Pattern.

14              THE COURT:  A pattern of what?

15              MR. YALOWITZ:  A pattern of support for Al-Aqsa Martyr

16    Brigades by the defendants.

17              THE COURT:  Do you have any evidence that had

18    continued after --

19              MR. YALOWITZ:  Yes, after the designation.

20              THE COURT:  After the designation?

21              MR. YALOWITZ:  Yes.

22              THE COURT:  So what is your proof that it occurred

23    after the designation?

24              MR. YALOWITZ:  We have expert testimony, we have

25    convictions of other people, like Marwin Barghouti, Nasser
```

1    Aweis.  So we have a number of pieces of the puzzle that show

2    support for this terror organization before, during and --

3    before and after the actual designation.

4              THE COURT:  Well, we can discuss further, as we get

5    closer, and I look more in the context of the other evidence,

6    whether or not it makes sense to exclude or include some of the

7    prior evidence that you want to offer, if there is evidence

8    that --

9              MR. YALOWITZ:  That it continued?  Right.

10             THE COURT:  After the designation.

11             MR. YALOWITZ:  Right.

12             THE COURT:  Again, a lot of these issues depend on the

13   nature of the claim and the nature of the defense.  If the

14   defense is other than they can't prove their case, it depends

15   what you're arguing to the jury.

16             MR. YALOWITZ:  I agree.  2339(b), an element of the

17   claim is that they are a designated terror organization.  So

18   2339(a) --

19             THE COURT:  Unless you can show they provided material

20   support after they were designated.

21             MR. YALOWITZ:  After they were designated, right.

22   2339(a) doesn't require designation, but it requires a more

23   direct connection between --

24             THE COURT:  To the act.

25             MR. YALOWITZ:  To the act.

1          THE COURT:  The terrorist act itself.

2          MR. YALOWITZ:  Yes.

3          THE COURT:  But that's not what this evidence goes to.

4          MR. YALOWITZ:  Not Shubaki, right.

5          THE COURT:  I have it.  But as I say, my general rule,

6     and I think it applies to most, if not all, the circumstances,

7     is that other than issues about providing material support, to

8     the extent that you're trying to prove either that the

9     respondent superior relationship, employment relationship in

10    furtherance of that employment, and/or that they had a direct

11    involvement in perpetrating a particular act, the convictions

12    of those individuals who acknowledged or were found guilty by a

13    tribunal of committing those acts are admissible and admissible

14    in the form in which I have indicated, their pleas, their

15    hearing minutes, they're indictment that they acknowledge that

16    they were pleading guilty to, and to the extent that there was

17    a trial, a bench trial or a trial verdict, the actual verdict

18    that the court rendered and not the sentences.

19          So I think that I have identified -- we talked about

20    17, which I know you want to further argue in the future, but

21    with regard to -- and I have 65, 66, 67, 69, and 70, I had

22    issues with.  In 65, I have a sentence at the bottom of page

23    57, if you're looking at the joint chart, that sentence under

24    that rule should be out.

25          MR. YALOWITZ:  Okay, we understand the ruling.

1      THE COURT:  Okay.

2      And then --

3      MR. YALOWITZ:  Is Your Honor going to issue an order

4   on this?

5      THE COURT:  I am.  I have an order drafted, but I

6   didn't issue it because I wanted to have this discussion first

7   because this is helpful because I'm tightening it up in light

8   of this discussion.

9      MR. YALOWITZ:  Right.  But I don't have any concern

10  about Your Honor's ruling on 65.

11     THE COURT:  66, also the same thing.  There's an

12  indictment.  Obviously to the extent that this is an indictment

13  that somebody pled guilty to that you are independently

14  admitting, that's fine, but to the extent -- my understanding

15  is this indictment is not an indictment of a person who pled

16  guilty to this indictment and is not otherwise on that other

17  list.

18     MR. YALOWITZ:  I have to check, Your Honor.  It may be

19  that he pled guilty to the indictment, it may be that he

20  didn't.  If he didn't, we'll take it out.  If he did, we'll

21  leave it in.

22     THE COURT:  Right, just apply the same rule.

23     And 67, I think, is the same thing.  67 is an

24  indictment on page 69, and I could not find this indictment on

25  that other list to be an indictment that is pled guilty to by

1    one of the defendants on that list.  To the extent that it

2    is --

3          MR. YALOWITZ:  Right, same thing, we'll check it

4    and -- okay, we'll check it, and if it is, we'll keep it in,

5    and if it's not, we'll take it out.

6          THE COURT:  69, the same thing, it's an indictment.

7          70 is a sentence.  Same thing, same rule applies.  So

8    those would be out.

9          Now, I had some issues with regard to several other

10   exhibits.  As I said, to the extent that the defendant objected

11   to a portion that wasn't the portion that the plaintiff said

12   that that's the relevant portion they wanted admitted, I'm

13   going -- my default position is going to be, it's out.  To the

14   extent that you have disagreements, and I am not identifying it

15   as one of the items here, that means I resolved it as being in,

16   it can come in.

17         130 --

18         MR. YALOWITZ:  Help me on it, Your Honor.  It's not

19   page ordered.  I found it.

20         THE COURT:  130, all of the objected-to statements

21   should be redacted out except the portion where it indicates

22   that he worked for the police force in Bethlehem, the military

23   activities on behalf of the Fatah movement, and the

24   aforementioned was active in the Fatah movement.  All of these

25   other have double hearsay problems.  The portions that you said

1  you wanted --

2          MR. HILL:  Your Honor, may I be heard on that?

3          THE COURT:  Yes.  Let me just finish the statement.

4          MR. HILL:  I'm sorry.

5          THE COURT:  The portions that you wanted on page --

6  I'm sorry, let me just make sure I have this right.

7          The portions that you wanted on the -- the first three

8  portions all are statements by this person made someplace else.

9  Unless you have some argument that those statements are

10  somehow -- there's an exception to the hearsay rule, all of

11  those -- most of those are statements by that person that's in

12  this report.

13          MR. YALOWITZ:  I'm sorry, are you looking at my side

14  of the chart --

15          THE COURT:  Yes.

16          MR. YALOWITZ:  -- or the defendants' side of the

17  chart?

18          THE COURT:  Yes, your side of the chart.  The GIS

19  report re -- you're saying that the report says this?

20          MR. YALOWITZ:  Right.

21          THE COURT:  Okay, not --

22          MR. YALOWITZ:  I'm quoting the report.  Like the

23  financial status of his family is good, that's a conclusion by

24  the defendants.

25          THE COURT:  Wait a minute.  Let me make sure I have

1  this right.

2          MR. HILL:  Your Honor, I hesitate to interrupt, but if

3  the issue is whether the statement of financial status of his

4  family is good can come in, that's not one I lodged an

5  objection to.

6          THE COURT:  Okay.

7          MR. YALOWITZ:  Yes, this one is a little tricky

8  because there's not a good match between the two sides of the

9  chart.

10          THE COURT:  Let me just remind myself where I was on

11  this.

12          MR. YALOWITZ:  Like they've got an objection to this

13  text, "During his confession, Ahmed Sala implicated him," "him"

14  being the subject of the report.  I don't have a problem with

15  that coming out.  That's they're reporting that some other guy

16  implicated --

17          THE COURT:  Where are you looking?

18          MR. YALOWITZ:  If you look on the --

19          THE COURT:  Oh, yes, I have those last three items.

20          MR. YALOWITZ:  Those can come out.

21          THE COURT:  The Sala statement and the other two that

22  they objected to that you didn't indicate that that was the

23  portion that you wanted, I have that that portion is out.

24          MR. YALOWITZ:  Right, I'm fine with that.

25          THE COURT:  Okay.  Now, with regard to the one before

1    that, my notation has that I thought that it can come in.

2              MR. YALOWITZ:  Right.  Okay, we're together on that.

3              THE COURT:  And I think I misread the first three,

4    because I have circles that he states, but you're saying that

5    it's not -- well, yes, it says he states that.

6              MR. YALOWITZ:  Where are we looking?

7              THE COURT:  GIS report re -- okay, you're saying the

8    report states or he states?  That was my confusion.

9              MR. YALOWITZ:  Yes, the report states.

10             THE COURT:  Okay.

11             MR. YALOWITZ:  We can look at it and come back to you

12   because I understand the ruling, and I'm fine with it.

13             THE COURT:  My concern is, if it was just his

14   statement to them, then I thought it should come out, but if

15   you're saying that the report just alleges these facts about

16   him, then I agree with you, that it's not inadmissible on that

17   basis.  I think that it's relevant to -- unlike the employment

18   reports, which I think more directly come in with regard to

19   being offered for the truth of the fact that they were provided

20   by them and during this period of time, these GIS files are

21   more -- I think they have a different relevance, they come in

22   because it indicates the kind of information that was available

23   to the PA and the PLO at the time about these individuals, and

24   what they believed about these individuals at the time is just

25   as relevant to what was true or not true about these

1    individuals.

2           So if they had this information -- and I think I used

3    this example -- a bad example, but I used the example as I was

4    discussing this with my law clerk -- if I said that we need a

5    babysitter, and I'm getting ready to deliver the person to the

6    babysitter, and somebody comes to me and gives me information

7    that the babysitter is a child molester, it is relevant to my

8    decision as to whether or not I'm going to hand the kid over to

9    this person, whether it is true or not.  The fact that I have

10   that information, and I take an action that is either

11   consistent with my being concerned about that or consistent

12   with my accepting that as it doesn't really matter whether it's

13   true or not, is relevant determination.  So this is the

14   information, obviously, that the GIS gathered about this

15   person.  This was the information that's in their files.

16   Obviously, one logically can say, and a jury logically can say,

17   if somebody asked the PA or the PLO about this individual, it

18   would be legitimate for them to go to the GIS and say, what do

19   you have on this guy, and they would say, we have this kind of

20   information.

21          Now, whether it is true or not is secondary as to

22   whether or not they had knowledge or belief about this

23   information.  So to the extent the information alleges, says --

24   and I made that distinction -- that X says something about him

25   in a context where it's obviously just restating the fact that

1    X says something, it still may or may not be admissible, but

2    the fact is, it just simply states that fact in the report.  It

3    doesn't matter to me where they got that fact from, it's

4    obviously put in the report in the context in which they have

5    this information.  And there's nothing about the way they've

6    stated it that's saying that they're challenging the

7    information, or they think this is suspect, or they're not

8    using this information, because they're filling it in.  A lot

9    of these are forms, they fill in something on the form.  If

10   they fill it in on the form, one can't argue that you can't say

11   that obviously they had that information at the time about this

12   person, and they recorded that information for themselves and

13   their records.  That's my view and approach on those kinds.

14          MR. HILL:  May I be heard very briefly?

15          THE COURT:  Yes.

16          MR. HILL:  Because I think Your Honor's analogy is apt

17   if we're talking about an individual, but here, we're talking

18   about an organization.

19          The knowledge that's reflected in the GIS files is,

20   under Palestinian law, a state secret and cannot be shared

21   outside of the GIS.  So to vary the hypothetical slightly,

22   assume Your Honor is hiring a babysitter, you're an employee of

23   the federal government, assume that the FBI has information

24   that your prospective babysitter is a child molester, the FBI

25   doesn't share the information with you, indeed they would be

1  prohibited by law from doing so.  Now, it's not relevant to the

2  question of your negligent hiring of the babysitter because

3  it's information that you as an employee of the federal

4  government cannot access.

5          THE COURT:  But that's an issue that you can raise,

6  but I don't have any evidence to that effect.  I don't have any

7  evidence that somehow the GIS files are not available to the

8  president of the PA.

9          MR. HILL:  Well, they're available to the president of

10 the PA, but the president's conduct is not at issue here.  The

11 conduct that's at issue are payments, as I understand it.  And

12 the timing is also important.  The timing of this document is

13 August 17th, 2007, so this is more than -- let me see the name

14 of the person on the file -- this is more than three years

15 after this person allegedly committed the crime, and this is in

16 a secret intelligence file.

17         You do have this in the record because it's in the

18 declaration of Majid Faraj, which is an exhibit to our

19 opposition to the motion to overrule the objections.

20         THE COURT:  Okay.

21         MR. HILL:  So this is a situation where the

22 information Your Honor is thinking is relevant, because it's

23 relevant to PA decision-making, is, in fact, isolated by law

24 within a component of the PA and cannot be accessed by the

25 other portions of the PA, the basis of which the plaintiffs are

1    claiming there's some indication of liability for payments or

2    promotions and so forth?

3           THE COURT:  I know, but that doesn't preclude -- as

4    you already said, it doesn't preclude a number of people who

5    are officials of the PA having access to this information, and

6    the GIS is part of the PA.

7           MR. HILL:  It is, Your Honor.

8           THE COURT:  So to simply say that it's part of the --

9    the GIS is part of the PA, but it's secret to just the GIS

10   doesn't take away the responsibility of the PA if the

11   information is within a PA agency.  Even if the PA agency is

12   not sharing it with another part of the PA, it's still part of

13   the PA, the PA has this information.

14          MR. HILL:  But it has it post hoc.  This is

15   information it has three years after the event, which is not

16   going to be probative of whether this particular person was

17   engaging in this as part of his employment.  The fact that this

18   information is in the secret intelligence file of the

19   intelligence branch for whom he did not work three years after

20   the fact is not probative.  The only issue that the jury is

21   going to have to consider, which is, was it his job, was he

22   ordered to engage in this particular attack.

23          THE COURT:  But you'd have to give me an example of

24   that, because as I look at the facts themselves, it doesn't

25   matter, the timing doesn't particularly matter.  What fact do

1    you say would be not a relevant piece of information that is

2    somehow untimely now because they're putting it in a later

3    report?  If you want to argue that they didn't know this until

4    they wrote the report, that's an argument to make, but I'm not

5    sure that --

6        MR. HILL:  This is all about reports of detentions and

7    convictions by Israelis which necessarily happened after the

8    fact.

9        THE COURT:  I know, but --

10        MR. HILL:  Frankly, this is just an echo of the

11    Israeli process.  This is recording hearsay of the Israeli

12    military corps process.  It's knowledge after the fact, which

13    is secondary, and it's not going to be probative of the issue

14    of was it this individual's job to commit the crime that

15    allegedly injured these plaintiffs.

16        THE COURT:  See, I don't have the information to

17    cross-reference.  I don't know -- when was he supposedly --

18    what was the period of employment?

19        MR. HILL:  This individual was allegedly involved in

20    the bombing that took place in January of 2004, and he was

21    allegedly arrested by the Israelis shortly thereafter.

22        THE COURT:  And what was supposed to be his period of

23    employment?

24        MR. HILL:  Well, it would have terminated no later

25    than when he was arrested.

1          THE COURT:  I know, but how long was he employed?

2          MR. HILL:  For how many years prior to' 04?  That

3     information is in the record.  I don't have it here.

4          THE COURT:  What is his relationship to one of these

5     acts?

6          MR. HILL:  He is allegedly one of the conspirators in

7     the January 2004 bombing.

8          MR. YALOWITZ:  But wait a minute.  He's still on the

9     force today, Your Honor.  He's still on the force.  He's

10    getting promotions, he's getting his monthly pay.  And if you

11    read a document in your files that says one of our employees is

12    a homicidal maniac, and then you say he's good in terms of

13    security and morals, that seems like evidence that goes to the

14    jury about whether he was acting within the scope of his

15    employment.

16         MR. HILL:  My point is that this is a secret file that

17    the so-called employers, people making decisions about

18    promotions and payments, can't access.

19         THE COURT:  It's not a question of who is making

20    decisions about --

21         MR. HILL:  You're trying to discern the state of mind,

22    if you will, of a corporate entity, of a nonreal person.

23         THE COURT:  Right.

24         MR. HILL:  And so we're all familiar with the notion

25    that the right hand doesn't know what the left hand is doing.

1    THE COURT:  But there's also a notion that that's not

2    a defense.  To say that they knew this over in corporate, but

3    they didn't know this in personnel is not a defense to --

4    MR. HILL:  For the organization to be liable, the

5    organization has to make a decision, and the people that are

6    making the decisions about the events that Mr. Yalowitz is

7    pointing to, promotions and payments, are not the individuals

8    that have the information that's in the secret intelligence

9    file, and that's why it's not probative of whether the fact of

10   continued payment or continued promotion is somehow reflective

11   of --

12   THE COURT:  I can't accept that, because obviously, it

13   would -- the jury can consider that, if you have such evidence,

14   but the jury -- it's not a particularly compelling argument to

15   say that, well, the GIS is the intelligence arm of the PA.

16   MR. HILL:  And learned after the fact that this

17   person's alleged involvement in the crimes.

18   THE COURT:  Okay.  But after the fact, I understand

19   your argument, I can give that further consideration, but they

20   have information that this person is involved in a violent act,

21   a terrorist act.  Despite that, the GIS having that

22   information, no one, in making decisions, at best that you can

23   argue, no one, in terms of making decisions about whether or

24   not this person can continue to be employed, factored in the

25   fact that he was convicted or accused of this terrorist act.

1    MR. HILL:  Well, the latter can be proved without the

2  GIS file.  The only thing we're arguing about here is whether

3  the GIS file should come in and what probity, if any, it has.

4  I'm saying it doesn't have any because the people that are

5  making decisions about promotions and payments are not the

6  people with access to this information.

7    THE COURT:  But isn't it a jury question as to whether

8  or not that, in itself, is reasonable, that that's reasonable

9  and plausible, that the GIS -- that you want to put on someone

10  who says the GIS would never let the people know who ultimately

11  had responsibility for continuing to hire this person, that

12  this person -- that they had information that this person was

13  committing terrorist acts?

14    MR. HILL:  Your Honor, I think it's very problematic

15  for the jury to decide that the PA's intelligence law is a

16  basis for liability.  We would never have a trial --

17    THE COURT:  I don't know, you have to give me where

18  the intelligence law is.

19    MR. HILL:  The intelligence law is appended to the

20  declaration of Majid Faraj, which is attached to our

21  opposition --

22    THE COURT:  What do you say it says?

23    MR. HILL:  It says that the files of the intelligence

24  are state secrets and may not be shared with anyone without

25  order of the president.

ECGKSOL2

1          THE COURT:  Right.  So it can be shared with the

2     president, and it can be shared with others by order of the

3     president.

4          MR. HILL:  Just like our intelligence files, no one

5     would ever go to trial on the theory that the EPA is liable for

6     doing something with an employee because the CIA had

7     information on --

8          THE COURT:  That's right, but that's not what we have

9     here.  You're not the EPA and the CIA, you're the EPA and the

10    U.S. Government.  That's the difference.  Yes, you would find

11    the U.S. Government responsible if the EPA knew regardless of

12    whether they could share with another agency in the U.S.

13    Government.

14         MR. HILL:  Your Honor, I don't believe the corporate

15    knowledge doctrine can function in that fashion.

16         THE COURT:  Well, but that's the example you just gave

17    me.  You said EPA and CIA.  This isn't the EPA and CIA.  This

18    is the CIA and the government, as you say, for which the CIA

19    works.  That analogy doesn't work.

20         MR. HILL:  It's not the president of the PA that's

21    making payment decisions --

22         THE COURT:  It doesn't matter.  It's not the President

23    of The United States that's making payment decisions to people,

24    but if the CIA has the information, and the President can be

25    privy or is privy to that information, and he's not directing

1    the EPA not to hire this person because this person is already

2    convicted of environmental violations, it would still be on the

3    responsibility of the United States Government to do something

4    about it.  They can't insulate themselves by saying the

5    President put on blinders.  I don't think that that's the

6    argument you can make.

7         So if your argument is simply that it should be

8    excluded because the GIS, which works for the PA, doesn't share

9    the information with anybody other than whoever the president

10   tells them to share it with, I can't accept that as an

11   argument, as excluding it as not knowledge of the PA.  It is

12   knowledge of the PA.

13        Now, whether you want to reasonably argue that it

14   doesn't mean that the PA or people making decisions in the PA

15   about employment had that information and factored in that

16   information when they continued his employment, so you can't

17   infer that they knew this when they continued to employ them,

18   but I think you even concede that pretty much, it was more than

19   just secret knowledge that these people were convicted of --

20        MR. HILL:  That's precisely my point, is that if it

21   has any relevance at all, it's marginal probative value of

22   knowing what somebody in the GIS knew three years after the

23   fact about whether someone had been involved in a crime.  That

24   marginal probative value --

25        THE COURT:  No, I understand that.

1          MR. HILL:  -- is outweighed by the unfairly

2     prejudicial effect not only in this court, but of revealing the

3     client's intelligence files.  These are things that are state

4     secrets under the PA's law.  This is an organization that's in

5     security coordination with the United States, with the

6     government of Israel.  There's a real problem with the Court

7     saying we're going to let the jury see the secret files of the

8     defendant, particularly where we're talking about an issue here

9     where they don't really shed any light on whether the

10    defendants are going to be liable.  The PA is not going to be

11    liable because somebody at the GIS wrote this down three years

12    after the fact.  That's not going to create liability.

13         The only thing it could do is could conceivably allow,

14    as the plaintiffs are apparently going to argue, an inference

15    that this was in the scope of employment.  But the fact that

16    somebody wrote it down afterwards that someone committed a

17    crime or that they allegedly did it in association with some

18    particular organization, that's going to have very little

19    probity to the real issue, which is were they ordered to do

20    this as part of their job.

21         THE COURT:  Well, part of their argument is that it is

22    also consistent with the fact that even if that were the case,

23    having known this information, even subsequent information,

24    that they continued this person's employment, and they

25    continued this person's employment, they would argue, because

1  this is exactly what they expect this person to do, hired this

2  person to do within the scope of this person's employment, and

3  they had no concern about this person being convicted of --

4          MR. HILL:  If that's the theory, there will be

5  evidence of that apart from the intelligence files.  I'm trying

6  to focus on the intelligence files.  These are, at best,

7  cumulative, at best, very marginally probative, but they are

8  highly prejudicial, and they are state secrets under the PA's

9  laws.

10         THE COURT:  The problem is that your state secrets

11  argument would be a stronger argument about withholding their

12  production, not a stronger argument that it's disclosed in

13  discovery, but now the jury can't see it.  That's not a real

14  strong argument.

15         MR. HILL:  Your Honor, just so we're clear, we did

16  object to producing it.

17         THE COURT:  I know, and you lost.

18         MR. HILL:  And they were produced over our objection

19  because the PA is participating in the lawsuit, and --

20         MR. YALOWITZ:  May I be heard on this?

21         MR. HILL:  But that doesn't waive the objection --

22         THE COURT:  Wait a minute, slow down.

23         MR. HILL:  -- that publicly disclosing them will

24  injure the PA by revealing material that is a state secret

25  under its own laws.

ECGKSOL2

1          THE COURT:  It doesn't protect them from revealing the

2     information because the information would indicate that they're

3     in violation of the ATA.  There's no compelling reason to say,

4     well, we should protect them from a violation of the ATA or a

5     violation of the ATA can be established because they consider

6     this to be secret.

7          MR. HILL:  This information will not establish --

8          MR. YALOWITZ:  Your Honor, may I be heard?

9          THE COURT:  You can be heard fully, but let me finish.

10         MR. HILL:  This does not establish an ATA violation.

11    This is something that's written years after the fact.  It

12    cannot be proximate cause, it cannot be material support.

13    There's only this attenuated theory that somehow someone could

14    infer an order, or a direction, or scope of employment from

15    this evidence, and that is a weak inference at best, and the

16    prejudicial effect outweighs it.  And so even --

17         THE COURT:  I'm not sure -- articulate one more time

18    what the prejudicial effect is.

19         MR. HILL:  First of all, the jury is going to hear,

20    and the jury is going to have a hard time sorting out because

21    it's three years after the fact.

22         THE COURT:  Why not?  You explained it very clearly to

23    me.  I don't know why -- I'm not more intelligent than the jury

24    to understand that part of it.  That's pretty simple.

25         MR. HILL:  We're still prejudiced by the plaintiffs

1  throwing up on the screen and telling them their own files show

2  that they know they're terrorists.

3          THE COURT:  What's unduly prejudiced about that if

4  that's the truth?

5          MR. HILL:  Right.  It's also going to unduly

6  prejudice --

7          THE COURT:  Why does that unduly prejudicial if it is,

8  in fact, persuasive and true?

9          MR. HILL:  You've got to weigh them against each

10  other.  So the probative value is almost nothing, so a very

11  minor amount of prejudice will outweigh that.

12          THE COURT:  Well, the problem you have is that you can

13  argue that the intelligence files are confidential, but the

14  intelligence files have a purpose, they have a legitimate

15  purpose, and that legitimate purpose is to protect the

16  interests of the PA.  And so it's kind of -- it's more

17  difficult for you to argue just because they say they want

18  to -- that these are secret, that these aren't what they

19  purport to be.  They are files, they're investigations of an

20  intelligence --

21          MR. HILL:  They're not investigations, Your Honor.

22          THE COURT:  Well, then what's the secret nature of the

23  information if they're not investigations?

24          MR. HILL:  They're information gathered from public

25  and secret sources.

ECGKSOL2

1          THE COURT:  Well, that's an investigation.

2          MR. HILL:  It's not an investigation, this is

3   intelligence.  This is not a law enforcement investigation

4   where the PA went out and decided to figure out who did this

5   crime.

6          THE COURT:  Well, I don't know your definition of

7   investigation.  I'm not quibbling with some technical -- what

8   did you say it was?

9          MR. HILL:  It's an intelligence file.  They gather

10  information on people, and they write it down.

11         THE COURT:  The intelligence that they are gathering

12  is gathered for the purpose to protect the interests of the PA.

13         MR. HILL:  Yes, it is.

14         (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

ECGKSOL2

1          THE COURT:  So you cannot argue that somehow the PA

2     does not have an interest in gathering this information and

3     utilizing this information and making important decisions that

4     the PA has to make.  And one of those important decisions is

5     whether or not they're going to employ people who are convicted

6     of or continue to compensate people who are convicted of

7     committing terrorist acts in Israel.

8          MR. HILL:  There is no evidence that GIS information

9     is used for the purpose your Honor described.

10         THE COURT:  Well, that's fine and dandy, but that in

11    itself raises a question, if you had that information, why you

12    wouldn't use it to make those kinds of decisions, and they

13    would argue they would use it because they don't care.  You

14    would argue that they don't use it because they keep it secret

15    and they don't want to discuss it, but that's not a compelling

16    reason.

17         It is intelligence gathering for the PA, for the

18    benefit of the PA, for the PA to use it as the PA feels fit in

19    its best interests.  They have made a determination, and you

20    argue that they did not feel fit to use it to not hire people

21    who were convicted or who have been accused of these terrorist

22    acts.  They didn't use it for that purpose.  Now, whether there

23    is a good reason they didn't use it for that purpose or a bad

24    reason they didn't use it for that purpose, that is for the

25    parties to argue.  I don't --

1      MR. HILL:  Your Honor, there is no evidence that

2   someone was hired in the face of information --

3      THE COURT:  No, not hired but that they were not

4   terminated.  They continued to be employed.  That's their

5   argument.  They continued to employ them even though they knew

6   that these people had either committed -- in fact, committed --

7   or had admitted to committing, or had been accused of

8   committing the terrorist acts that are at issue here.

9      MR. HILL:  If somebody wrote that in a secret file,

10  hearsay that these people have been involved in attacks, that's

11  what we've got --

12     THE COURT:  No, not somebody; somebody on behalf of

13  the PA --

14     MR. HILL:  Wrote down hearsay, yes, your Honor --

15     THE COURT:  The PA wrote that down.

16     MR. HILL:  Yes, the PA's employees, whose job it is to

17  record --

18     THE COURT:  Right.  Well, that is true of any

19  corporate responsibility --

20     MR. HILL:  Yeah, but that doesn't mean that hearsay

21  comes in.  That's where we are.

22     MR. YALOWITZ:  Actually, it does.

23     THE COURT:  It is not hearsay.  It is the information

24  that you record.

25     MR. HILL:  It is not being offered to prove that he,

1    in fact, was involved in Fatah?

2              THE COURT:  It is being offered to prove that you

3    thought he was involved in Fatah because that's what you put

4    down.  You believe he was involved in Fatah.

5              MR. HILL:  Why is the fact that we believe he was

6    involved in Fatah relevant?  It is not.

7              THE COURT:  Because if you believe that he was Fatah

8    and --

9              MR. HILL:  Your Honor, many people --

10             THE COURT:  -- it goes to your knowledge of how you

11   acted in the face of believing that he was a member of Fatah.

12             MR. HILL:  Your Honor, Fatah is a political

13   organization.  It is like the Republicans.  Many people who --

14             THE COURT:  Then, what are you complaining about if it

15   is like the Republicans?  What, you don't like Republicans?

16             That's a double argument.  Either you say that that is

17   some evidence that he is involved in terrorist activities and

18   you want to argue to the jury, which you're perfectly able to

19   do, that just because he is a member of Fatah doesn't make him

20   a terrorist, and just because we know he is a member of Fatah

21   doesn't mean that we're approving of his activities and --

22             MR. HILL:  It is not relevant.  It ought to be

23   excluded.  It is prejudicial to the client to have their

24   intelligence files shown to the jury.

25             THE COURT:  Let me hear from you --

1          MR. YALOWITZ:  Okay.  Thank you, your Honor.

2          Let me just recite the facts about what happened with

3     the GIS files.  Magistrate Judge Ellis made a ruling in July of

4     2013 that the defendants had not justified their claims of

5     state secret privilege or whatever their claim is.  The

6     defendants did not object to that ruling.  They re-argued it to

7     Magistrate Judge Ellis.  They said, well, we would like you to

8     reconsider.  Magistrate Judge Ellis reconsidered and adhered to

9     his ruling in, I think, November of 2013.  The defendants

10    didn't object to that ruling, either.  He said, they're not

11    privileged, they are relevant, you got to produce them.  So as

12    I read Rule 72 and as I read Second Circuit law, their

13    objection to these documents being turned over, made public,

14    all like that, that's been waived.

15         Now, they may have a different issue about

16    confidentiality, like it would compromise law enforcement

17    techniques or something, okay.  If they had an argument like

18    that, we could talk about it, but this idea that like they have

19    a blanket state secret and the documents are protected by that,

20    Magistrate Judge Ellis rejected that, and these defendants

21    didn't bring it to you, so they are done on that issue.  They

22    can't get further review on that issue.

23         They have gone running to the Court of Appeals saying

24    this is a big emergency because of our state secret privilege,

25    and they didn't even bring it to you back when it mattered when

1   they could have brought it to you in a timely fashion.

2          So, one of the things that I need to do tomorrow --

3   and I kind of need your help on this if you can help me out --

4   one of the things I'm going to do tomorrow is I'm going to give

5   the Court of Appeals an example of what we're talking about,

6   not only because Judge Ellis made a ruling that the defendants

7   acquiesced in it, but also because if you look at the

8   documents -- and I know you have spent a lot of time looking at

9   these documents, there is no law enforcement.  It is not like

10  they have informants that if the name comes out somebody could

11  get hurt.  It is not like they've got special wiretapping

12  technology that's being disclosed.  I'm looking at 142, which I

13  gave to defendants over the lunch break.  142 is about Ahmed

14  Barghouti.  He was convicted on more than 50 counts of criminal

15  activity, and they say in this report, based on the report of

16  the political security, which stated the following, here is our

17  information about it:  "He was born in Jenin and lived in

18  al-Bireh, but he currently is in prison."  Okay, that is not a

19  state secret.

20         "He used to work as Brother Marwan al-Barghouti's

21  bodyguard, but he was arrested by the Israeli occupation forces

22  and was sentenced to 15 life terms plus 50 years.  He is

23  currently serving his prison sentence in the Al-Naqab Prison."

24  Well, that is not a state secret.

25         Then, they say, "The aforementioned is good in terms

1    of security and moral."  That is not a state secret.

2           That is the text of the report that they're saying

3    requires mandamus to protect.

4           I want to give this to the Court of Appeals, and the

5    issue is:  Can I do that consistent with your Honor's

6    confidentiality order, or do I need to go and file a motion to

7    file under seal in the circuit?

8           Then, the other thing I want to tell them is that this

9    guy, Ahmed Barghouti, since his arrest has been kept on the

10   payroll as a member of the police force, and he has been

11   promoted twice since the attack in this case.  That's just in

12   my little summary chart.

13          THE COURT:  I'm not even sure what relevance that has

14   on the issues before the circuit.

15          MR. YALOWITZ:  Because the total issue on mandamus is

16   irreparable harm.  They have got to show the circuit that

17   absent an intervention before trial, there is going to be some

18   serious irreparable harm.  Otherwise, they have to get in line,

19   wait until their final judgment, and then they can go appeal,

20   just like everybody else.  So their argument to the circuit for

21   irreparable harm is, oh, we got these important state secrets,

22   we're an important almost-state, and because we're an important

23   almost-state, we have important almost-state secrets, and if

24   you let Judge Daniels try this case, he is going to let the cat

25   out of the bag and destroy our state secret secrecy.

1      If you look at the documents that we're talking

2  about -- I know you have -- it goes beyond malarkey.  I want to

3  show this to the circuit.  I'm going to show it to the circuit

4  tomorrow.  The only question is:  Do I have to go through the

5  shuffle and pony show of saying these things are protected by

6  confidentiality.  We're in the district court, which the Court

7  has already ruled they're admissible.  I thought we were going

8  to be beyond it, and maybe we are.  But the question is:  Can I

9  file these publicly, or do I need to go make a motion to file

10  it under seal?

11      THE COURT:  Did you want to say something?

12      MR. YALOWITZ:  It's just logistical.

13      MS. FERGUSON:  Your Honor, first, there were multiple

14  grounds on the irreparable injury part.  The focus is on the

15  confidentiality.  Currently, they are under protective order.

16  So that's the issue, and I do very much object to

17  cherry-picking a particular exhibit and passing it off to the

18  Second Circuit as representative of the entire collection of

19  documents.

20      THE COURT:  That is a different issue.  That's not an

21  issue of whether or not it is disclosable.

22      MR. YALOWITZ:  I will offer to the defendants, any GIS

23  document they want me to put before the circuit, I will put it

24  before the circuit tomorrow if they get it to me by the close

25  of business today.

1          MS. FERGUSON:  The risk of harm comes from any

2     particular GIS file that might contain identification of

3     sources.

4          THE COURT:  I'm not going to make any ruling today for

5     the submission tomorrow that is going to change the status quo

6     of how documents are being treated.  We still have issues to

7     address, and the press is still knocking on the door saying

8     that they want to see documents.  I have to be sensitive to the

9     fact that some documents may not end up being admissible at

10    trial and may not be appropriate to further disclose.  I'm

11    still evaluating that to see where we are when we get close to

12    trial.  If you want to characterize the nature of the evidence,

13    you can do that.  If you want to ask the Court to look at it in

14    confidence under seal, if they want to do that, they can do

15    that, too.  They have the full authority to do that.  It

16    doesn't violate the confidentiality, but I'm not going to make

17    a ruling now that says that you can file it in a form that will

18    be public and disclosable by anyone who wants to search the

19    filings in that case.

20         MR. YALOWITZ:  Does your Honor have a problem with my

21    including just the text that I recited in open court today?

22         THE COURT:  I do because I don't know the

23    consequences --

24         MR. YALOWITZ:  Fine.  Then, I will move on.  That's

25    fine.

1        THE COURT:  -- you could argue about whether or not

2    you really need that.  Quite frankly, I don't think that's the

3    thrust of their argument, the main argument that they're making

4    here, nor do I think that that is going to be a determining --

5        MR. YALOWITZ:  I don't think it is going to be --

6        THE COURT:  -- factor as to whether they want to take

7    this before or after the trial --

8        MR. YALOWITZ:  I agree.  That is their argument.  I

9    will deal with it with the circuit.

10        Okay.  Thanks.

11        THE COURT:  There were a couple of things that I was

12   going to rule on; 130, 131, and 134.  Let me look at that more

13   carefully.  In light of this discussion and in light of my

14   rereading of the statements, I may have a different view.  As I

15   say, my position in general is the belief of the PA or the PLO,

16   as reflected, and the knowledge and belief as reflected by any

17   information that is in the possession of the PA or PLO has some

18   relevance in this case and has some relevance on their mental

19   state, their state of mind, how they act consistent or

20   inconsistent with having that knowledge.  In the abstract, I

21   think that that kind of information is relevant and admissible

22   at the trial.  Just because the information is subsequent

23   information received does not make it not relevant.  I will

24   still have to weigh its probative value as to any potential

25   prejudice, and it may be so remote in time that it is clear

1   that they received it at a point in time where a reasonable

2   inference couldn't be drawn from that.  For the most part, most

3   of this information, it is information that the PA had in its

4   possession, and the PA utilized that information and took acts

5   that the parties can argue about whether it is consistent with

6   participation or some intent or approval of the acts of its

7   employees or agents or that it is somehow simply isolated,

8   which it would be unusual for the jury to conclude that this

9   information was within the universe of knowledge that the PA

10  had in making its decisions about how they would deal with

11  issues associated with those accused, admitted, or convicted of

12  these terrorist acts. I will look at it closely, but at this

13  point, I'm not compelled that GIS files, simply because they

14  considered them to be confidential intelligence files, that

15  that in and of itself gives it some greater protection so that

16  the jury should not be able to hear this information,

17  particularly in light of Judge Ellis' rejection of that

18  argument when that information was produced.  Obviously, if

19  there was such protection, it would have protection from

20  disclosure to the plaintiff, as well as protection from

21  disclosure to the jury.  I'm not sure that we understand how it

22  would be available and unprotected from the plaintiffs' eyes

23  but somehow protected to be withheld from the jury's eyes.  I

24  will review that.

25          I'm going to skip to 135.  135 needs to be redacted

ECGKSOL2

1    because 135 has a statement -- all of the statements except one

2    are in.  The statement, the third box on that second page of

3    135, talks about Salah.  The phrase starts, "during his

4    confession," and it says he implicated someone else.

5    Consistent with what I have already ruled, that is not

6    admissible; that he, during his confession, implicated a third

7    party.  I think that has to be redacted.

8            Then, I'm going to skip to 164.  Most of the

9    information that is recorded I believe is appropriate except I

10   don't believe that -- with regard to the second box on the

11   second page of Exhibit 164, apparently this information being

12   quoted out of a newspaper, the information in that newspaper is

13   not admissible for the truth, so that is to be redacted.  I

14   don't see any other legitimate purpose for offering that

15   newspaper, particularly given the nature of the comments.

16           Then, 317(a), not a big deal --

17           MR. YALOWITZ:  Where are we?

18           THE COURT:  317(a). You have to go back to page 97.

19           The last statement -- I don't think this is a big deal

20   either way -- but the last statement on that page with regard

21   to dividing the allowance between the two wives, I don't think

22   that that has much probative value.  As slight as the prejudice

23   might be with regard to that, I think the probative value is

24   even slighter.

25           MR. YALOWITZ:  That is fine.  You will see a picture

1    of them, and you'll be surprised at the two wives, your Honor.

2            THE COURT:  Nothing surprises me.

3            I think there are other indications in there that

4    payments were made and that sort of thing.  The relevant

5    portions are there.

6            I will go back and review 131 and 134 and 135 again,

7    but other than those items, I think that everything else that I

8    have reviewed that's in dispute, direct conflict between the

9    parties, I believe that it is admissible, and there is a

10   legitimate reason for the jury to hear it, and for the parties

11   to argue what they will as to what reasonable inference should

12   be drawn from the fact that this information is found in the

13   files of the PA's GIS, except for those portions, as I said,

14   that defendants objected to, which were not the designated

15   portions that the plaintiffs indicate were the relevant

16   portions that they wanted to admit for a particular purpose.

17   Those documents are to be redacted in that manner.

18           If there is something else that I have missed or

19   something else that should be compelling for me to change that

20   determination, you can let me know by letter quickly, and then

21   I can evaluate it or reevaluate it, but that's my ruling with

22   regard to the documents.

23           Now, let me just quickly give you some idea of where I

24   am with regard to the motions in limine, although we weren't

25   really going to resolve all of those today, but I want to give

ECGKSOL2

1    you some guidance.  I could tell already that some of these are

2    no longer at issue.  I think a lot of the plaintiffs' motions

3    are no longer at issue because I think the defendants have

4    agreed that's not going to be part of the case.  I'm just going

5    to categorize it this way:  The plaintiffs basically object to

6    any evidence of alleged mistreatment of Palestinians by the

7    state of Israel.  My understanding is that the defendants do

8    not intend to offer such evidence.  Is that correct?

9              MR. SATIN:  I think our position is that that is

10   correct provided that they're not permitted to introduce the

11   same kind of reciprocal; that we were going to do it if they

12   don't do it themselves first.

13             THE COURT:  Does the plaintiff intend to do that?

14             MR. HORTON:  Unless the door is open, I don't

15   anticipate a need for that.  It's not quite clear what the

16   "that" is.

17             THE COURT:  Do you intend to offer evidence alleging

18   mistreatment of Israelis by Palestinians --

19             MR. YALOWITZ:  Yes.  Our clients were blown up by

20   suicide terrorists.

21             THE COURT:  I didn't finish.

22             Other than the acts at issue in this case?

23             MR. YALOWITZ:  No.

24             THE COURT:  That will be out for both sides.  That is

25   easy to resolve.

1    This is what I'm going to do:  Since I have allowed

2  the Israeli military court conviction, I'm going to allow the

3  defendants to present evidence, if they have such evidence and

4  they want to present that.  The jury shouldn't rely on those

5  convictions if they don't have such evidence to present.

6  Plaintiffs can present evidence, I think they have a recent

7  expert who wants to testify, that this is a process that is

8  consistent with due process and it's a legitimate process that

9  the jurors should rely upon.  If you debate about that issue,

10  then that's an issue for the jury to resolve.

11    MR. YALOWITZ:  So I have no problem, your Honor, with

12  the defendants saying I don't think that Abdullah Barghouti got

13  due process because he didn't get an adjournment on

14  such-and-such a day or he didn't get crunchy peanut butter or

15  whatever their arguments about the lack of due process.  I have

16  a serious problem with the defendants coming in and saying the

17  Israelis engage in torture all the time, and so you can't rely

18  on the military courts, or the military court system as a whole

19  is a kangaroo court because the officers are in uniform.

20    THE COURT:  What do you want Mr. Kaufman for?  He is

21  saying just the opposite.

22    MR. YALOWITZ:  I want Kaufman to present the

23  convictions, summarize some of the salient facts.

24    THE COURT:  I thought you wanted him to testify about

25  the quality of justice in Israeli military --

1        MR. YALOWITZ:  I don't need it.  I'm perfectly happy

2   to say these people were convicted, here is what they were

3   convicted of, Mr. X received due process.

4        THE COURT:  Mr. X received due process.  Who is

5   supposed to testify to that?

6        MR. YALOWITZ:  Kaufman can testify.

7        THE COURT:  If he says that, you're saying I shouldn't

8   allow them an expert that testifies that he didn't receive due

9   process?

10       MR. YALOWITZ:  I have no problem with them bringing an

11  expert to say that someone convicted didn't receive due

12  process.  I have a big problem with them saying the military

13  courts are fundamentally unjust because they reflect an

14  apartheid state.

15       THE COURT:  My reaction is this:  As I say, a lot of

16  the issues you want as early as possible and even want them at

17  summary judgment, but quite frankly most of these issues are

18  issues that usually don't get resolved until you have a context

19  in which to resolve them --

20       MR. YALOWITZ:  I agree.

21       THE COURT:  -- and see what the witnesses have to say

22  and what issues and what arguments are being made to the jury.

23       MR. YALOWITZ:  Right.

24       THE COURT:  If you are going to offer any evidence

25  about due process in Israeli courts, you will open the door to

1    their putting on whatever evidence they want to put on about

2    the lack of due process in the Israeli courts.  I'm not sure I

3    have to turn to them to find out, if knowing that, if you

4    decide to avoid that, whether or not they still want to put

5    forth their experts to argue that there is not due process in

6    Israeli courts.

7            MR. YALOWITZ:  I will not open the door.

8            THE COURT:  What does the defense want to do?

9            MR. SATIN:  It is our position that we're permitted to

10   do so whether they open the door or not.

11           THE COURT:  What do you want to do, is the question.

12   Because the convictions have nothing to do -- for example, he

13   used an example about torturing in confessions -- that has

14   nothing to do with the due process of whether or not somebody

15   is legitimately convicted in this case or whether or not their

16   plea of guilty was a legitimate plea of guilty.  I don't know

17   how you tie it to any particular case other than wanting to

18   throw mud in general at the Israeli justice system, and so that

19   means that somebody who stood up in open court and said, I

20   committed this act, that you're trying to say somehow the jury

21   should believe that he didn't commit this act.

22           MR. SATIN:  Well, there are a couple of different

23   things here, your Honor.  First of all, there are allegations

24   of torture within the cases themselves.

25           THE COURT:  What does that have to do with this case?

ECGKSOL2

1    How does that make it --

2            MR. SATIN:  If there are allegations of physical abuse

3    that was conducted on the individuals who were convicted --

4            THE COURT:  To what result that you say the jury

5    should factor into their assessment in this case?

6            MR. SATIN:  In assessing the reliability of those

7    convictions.  The rule by which the government --

8            THE COURT:  Tell me who it is you believe was

9    convicted that you believe was innocent.

10           MR. SATIN:  Who was innocent?

11           THE COURT:  Yes.  It attacks the reliability of their

12   conviction.  Obviously, most of the people stood up in open

13   court and said they did it.  You're saying the jury should be

14   suspect of that.  Are you saying that they didn't do it?

15           MR. SATIN:  Well, I think there are a couple of

16   different issues here in terms of innocent versus not.  I'm

17   surely not in a position to say whether or not a person was, in

18   fact, innocent.

19           THE COURT:  I'm trying to understand what relevant

20   context you want to throw this into the soup.

21           MR. SATIN:  In trying to show that the convictions

22   themselves may not be reliable such that the jury may not trust

23   them as being true and it may be --

24           THE COURT:  Which ones are you asking them not to

25   trust as being true?

ECGKSOL2

1          MR. SATIN:  I don't know if I have a list in front of

2     me.

3          THE COURT:  Do you have an idea of whose convictions

4     are suspect and whose convictions aren't suspect?  And do you

5     intend to offer some evidence relevant to that particular case?

6          MR. SATIN:  To a particular case to show that that

7     person wasn't?  I mean, I could go back and look at my notes

8     and figure out which ones they are.  But I think the issue is

9     the rule by which they are seeking to admit these convictions,

10    Rule 803-22, it says that the evidence comes in.  It is not

11    conclusive that it's true.  The parties can litigate whether or

12    not it is reliable or not.

13         THE COURT:  Right.

14         MR. SATIN:  In fact, the cases that they themselves

15    have cited for the proposition that these come in say, when

16    there are problems with the military courts -- I forget if it

17    was the Strauss case -- problems, that goes to the weight of

18    the evidence --

19         THE COURT:  I'm still not sure what it is you want to

20    demonstrate about the Israeli court.  You shouldn't trust the

21    convictions because they likely tortured a false confession out

22    of one of these defendants?  Is that the inference that you

23    want?

24         MR. SATIN:  Well, they're using torture because it is

25    the most extreme case.

1    THE COURT:  Give me a different case, less extreme.  I

2  don't know what it is that you want to say to cast doubt on the

3  conviction in these cases.

4    MR. SATIN:  The Court want to know specific --

5    THE COURT:  Give me an example.  You said not to use

6  torture.

7    MR. SATIN:  Another example would be conflict of

8  interest.  You have two defendants represented by the same

9  attorney.  When I say two defendants, two individuals charged

10  in connection with the same incident.

11    THE COURT:  How would that imply that their confession

12  or admission or plea of guilty is false?

13    MR. SATIN:  I think the one that I'm getting to -- and

14  I was not talking about in the context of torture -- but you

15  had two individuals charged in connection with the same offense

16  represented by the same attorney.

17    THE COURT:  Okay.

18    MR. SATIN:  And one --

19    THE COURT:  Happens here all the time.

20    MR. SATIN:  -- one --

21    THE COURT:  That's not unusual.

22    MR. SATIN:  That was just the lead-up.  One client was

23  convicted based upon evidence from his same attorney's other

24  client.

25    THE COURT:  Okay.

1    MR. SATIN:  You don't have that in this court.  I have

2    never seen that.

3         THE COURT:  That may be unfair, but what about that

4    makes the confession unreliable or the conviction unreliable?

5         MR. SATIN:  That shows that he did not have an

6    attorney representing him that was free of a conflict of

7    interest such that he received effective representation.

8         THE COURT:  Are you attacking someone's trial, or are

9    you attacking someone's plea?

10        MR. SATIN:  This is a trial.  Someone went to trial.

11   They're convicted.  And it turns out that the very lawyer that

12   was representing him was also representing another individual

13   charged in connection with the same offense for whom that

14   evidence for that individual was used to convict him, the

15   person who was convicted.

16        THE COURT:   Your position is that that person didn't

17   do it?

18        MR. SATIN:  Well, that is a separate question.

19        THE COURT:  That's the important question, isn't it?

20   That's all they want to establish, that this was the

21   perpetrator of the crime.

22        MR. SATIN:  That they cannot rely on that conviction

23   for the purposes of showing that they did.  Whether or not I

24   have a true halo over my head and have sufficient information

25   to say whether this person was factually innocent or not, I

1    don't know --

2            THE COURT:  I will look back at your submission, but

3    what is the nature of the testimony that you want to offer?

4            MR. SATIN:  So I think there's a couple of different

5    things.  Even through their own witness talking about what

6    happened in those cases -- in other words, this person was

7    convicted of this event and that event -- we should be

8    permitted, since they're offering that evidence, to

9    cross-examine that witness both on the things that happened in

10   that case that cast doubt on the reliability of that conviction

11   but also systemic problems.  You cannot divorce the two.

12           THE COURT:  What evidence of systemic problems do you

13   have?

14           MR. SATIN:  You have lawyers whom are ineffective for

15   some of the --

16           THE COURT:  You have a direct circumstance that you

17   are pointing to, or are you going to have some expert stating

18   his opinion --

19           MR. SATIN:  We also have --

20           THE COURT:  -- generally about what he thinks that the

21   case --

22           MR. SATIN:  Well, I think there's circumstantial

23   evidence.  We can lay out, for example, that the lawyers

24   practicing there, they don't have to pass a bar exam, they're

25   not even required to take a language exam to represent them.

ECGKSOL2

1    So we're going to have a number of problems.

2           There have been studies done on this very system

3    during the relevant period of time that have found, to quote,

4    "severe shortcomings and failures in the delivery of due

5    process" --

6           THE COURT:  Okay.

7           MR. SATIN:  -- to those individuals.  So the jury

8    should be entitled to hear either through our cross-examination

9    of their expert or through our own expert --

10          THE COURT:  They're only entitled to hear the parts

11   that you say go to whether or not the conviction or confession

12   was reliable or not.

13          MR. SATIN:  You cannot --

14          THE COURT:  The fact that there isn't all of the same

15   due process there as in the United States doesn't in and of

16   itself -- every country has its own process -- it doesn't in

17   and of itself make the conviction unreliable.  That's that.  We

18   have a Fifth Amendment privilege, but many countries don't,

19   they don't have a Fifth Amendment privilege.  That doesn't make

20   the convictions unreliable.

21          MR. SATIN:  Right, and it would look really silly if

22   we got up there and we started eliciting about the differences,

23   minor differences, between our country's system of justice and

24   theirs.

25          THE COURT:  Tell me, to the extent that you want a

```
1    side show with regard to the justice system.  Are you just
2    talking about the military justice system?  Are you talking
3    about something other than the military justice system?
4            MR. SATIN:  The military justice system, that is what
5    is at issue here.
6            THE COURT:  So you don't intend to offer evidence
7    about the weaknesses in the civil system?  You're talking about
8    the military system.
9            MR. SATIN:  That's right.
10           THE COURT:  You want to offer a person that is going
11   to say what?  What issues are they going to attack?
12           MR. SATIN:  For one thing --
13           THE COURT:  Well, just tell me what issues they're
14   going to attack.  They're going to say people don't get their
15   own lawyer.
16           MR. SATIN:  Right.
17           THE COURT:  What else are you going to say?
18           MR. SATIN:  There's going to be discrimination between
19   who is in which court system, whether they're in the military
20   court system versus the civilian court system, how that
21   decision is made.
22           THE COURT:  Well, I think that touches on another
23   issue we already said wasn't coming in this case.  You're going
24   to say that issue was made because they're Palestinians and not
25   Israelis.  That's irrelevant.
```

1          MR. SATIN:  It's relevant because the reason for it --

2     the reason for it -- and this is coming from a judge in the

3     Court of Appeals in that very military court system -- one of

4     the reasons for it is because those defendants receive less due

5     process than day do in Israel --

6          THE COURT:  So?  What do I care what the reason for it

7     is?  That's not at issue.  I will look to see to what extent

8     that you have direct evidence to present with regard to either

9     these convictions or with regard to a systemic problem in the

10    military system that you can document.  To the extent that I

11    see that you have such, I will consider whether or not that is

12    appropriate for you to put into this case and to have the jury

13    reflect on whether or not they should not accept these

14    convictions.  I'm not particularly compelled that you're going

15    to be able to legitimately undermine the pleas of guilty or the

16    convictions of these individuals who you don't necessarily take

17    the position that really weren't personally involved.  If you

18    want to identify some convicted defendant that you claim was

19    innocent, then I'm willing to hear it, but I don't think that

20    is your argument.  Your argument is not that you're identifying

21    that X shouldn't have been convicted because he really never

22    committed the offense, and that's why they shouldn't rule

23    against the defendants, because this person who was convicted

24    never did it in the first place.

25         MR. SATIN:  I will say on that very point of whether

1  or not they did in light of the statements they made to the

2  effect of I did do it, one of the things that is true about the

3  military court system -- and we have evidence to substantiate

4  this -- is that people say all kinds of things, exaggerating

5  their guilt or even making claims of guilt when that's not the

6  case.

7           THE COURT:  That is not the military justice system's

8  problem.

9           MR. SATIN:  No, but --

10          THE COURT:  People have their own incentives.  That

11  happens in the United States.  People have their own incentives

12  to confess to crimes they didn't commit.  That's not a systemic

13  issue with regard to the Israeli military court.

14          MR. SATIN:  No doubt.  I only say that because the

15  Court was asking me, well, how can you bring out this evidence

16  of the unreliability of the convictions in light of the fact

17  that people have said they did it.  So what I'm saying is there

18  can be evidence based on the unreliability of the system and

19  the convictions themselves that they didn't do it despite the

20  fact that they may have said that they did.  That's the

21  significance of that.

22          THE COURT:  I will look at it more carefully and see

23  what it is, because I could not identify in my quick review

24  what, as I say, documented evidence that you intended to offer

25  other than somebody's opinion that they think that, in general,

1  most people don't get justice and some people maybe have

2  coerced confessions and some people may plead guilty to things

3  that they really didn't do.  You should take all that

4  amalgamation of stuff and decide, therefore, the people who

5  were convicted in this case were wrongfully convicted.  I'm not

6  going to let you do that.

7        MR. SATIN:  Let me back up for a second because I

8  think that there has been a bit of a straw man that has been

9  built here.  I know Mr. Yalowitz started by stating they want

10  to bring out all this evidence of torture, suggesting that we

11  are doing something more than what we are doing.  And I may

12  have taken the bait a little bit when I shouldn't have.  But

13  one of the things that we are going to want to do -- and I

14  suspect that they're going to do it on their direct first -- is

15  to educate the people about the very system in which these

16  convictions have happened, not even necessarily with the goal

17  of showing that it is reliable or not, though I'm sure the

18  parties will be doing that in some respects.  One thing they're

19  certainly going to want to do is at least give information

20  because I suspect that these jurors, to the extent that they

21  know anything about our own judicial system, probably know very

22  little about the Israeli military court system.  I certainly

23  knew very little about --

24        THE COURT:  I don't have any problems with that.

25        MR. SATIN:  So one of the things that both sides, I

suspect, are going to be doing is going to be bringing out

information about how it works, what actually happens there.

And when that's done, I'm sure they're going to do it with an

eyes towards:  And this shows that there is a fairness to it.

And we'll do it with an eye towards this shows that there is an

unfairness to it.  That's just the nature of the game.  There

is no reason that shouldn't happen if they're going to be

allowed to present this evidence.

THE COURT:  I think we addressed that part of it.  I

don't have any problems with, if they open the door to that, if

they want to offer any further evidence other than this is how

the process works and they want someone to comment or opine or

provide evidence about the extent that due process is offered

in these courts, then they will open the door, and I will allow

you to put on whatever evidence you want to put on to counter

that.  But if that's not the way it comes out, I'm going to be

very hesitant to simply your response to the fact that these

people were convicted, to simply try to indict the entire

system in order to convince the jury that these people really

didn't do what they confessed to, that's why your guys

shouldn't be held liable.  I am not persuaded that you should

have that kind of leeway if they don't open the door to some

evaluation by the jury of whether or not this was a fair system

or isn't a fair system that provides due process or doesn't

provide due process.  So I don't think the jury is going to be

particularly compelled one way or the other as to whether or

not your clients were involved in terrorist acts by your

clients now trying to prove something which you can't prove, is

that the people who were convicted of perpetrating these acts

really didn't do it and that's your defense.  I'm sure that's

not your defense.  I'm sure you're not in the position to even

attempt to say to the jury that you're in a position to know

who perpetrated these acts and who didn't and to say that you

know somebody else did it other than the people who pled guilty

to it or were convicted of it.

MR. SATIN:  Judge, it is not our burden to show who

did it or didn't do it.

THE COURT:  It is your burden if you're going to get

up there and try to convince the jury that they shouldn't rely

upon these convictions because the Israeli military system is

so flawed that it is your position that you're trying to

convince the jury that they shouldn't accept the convictions

that these individuals, who are not even your individuals,

didn't commit the crime.  You're the one taking on the burden

of trying to convince them that these are unreliable

convictions --

MR. SATIN:  Well, if I can --

THE COURT:  The convictions are convictions.  They are

what they are --

MR. SATIN:  If I can --

ECGKSOL2

1    THE COURT:  -- if you want to challenge them, then

2  you've taken that burden on, not them.

3    MR. SATIN:  Right.  And if I said that I was mistaken,

4  what I'm saying is that if they're going to present evidence

5  that these people did it and the evidence for that proposition

6  is these convictions in the military court, we can show, in

7  challenging that evidence, that the jury cannot rely on those

8  convictions.

9    THE COURT:  To the effect that you're going to argue

10  that the jury should believe they didn't do it?

11    MR. SATIN:  The jury should not trust their claim that

12  they did.  That's the nature of the burden of evidence here.

13    THE COURT:  As I said, be careful what you ask for.

14  You may get it.  Because I guarantee you, whether or not it is

15  their burden or not, if you open that door, you're going to

16  take on that burden before this jury.  If they have not raised

17  this issue, the jury is going to wonder why you're standing up

18  there trying to convince them that people who you say you had

19  nothing do to do with and you had no idea about their

20  activities and are not here to argue today, mostly these people

21  really weren't involved, that your attack on the judicial

22  system isn't simply a red hearing and a distraction on what the

23  genuine issue is, and the genuine issue is whether or not you

24  participated with these or any other individuals to commit the

25  crimes.

1          MR. SATIN:  That is a strategic question, not an

2     evidentiary question.

3          THE COURT:  That is a strategic question.

4          MR. SATIN:  We can choose or not choose to do that,

5     and I realize that the judge is telling us -- and I'm not

6     saying I agree or disagree at this point that it's a silly

7     position for us to do that.  I take the point that it may be

8     silly for us to do that, but that is a separate question of

9     whether we're entitled to do it under the law.

10          THE COURT:  Go ahead.

11          MR. YALOWITZ:  Okay.  They are not entitled to stand

12     around this courtroom and throw around -- I'm not -- there is

13     not even a polite word for it -- some of the stuff that this

14     guy is talking about, like it's an apartheid system or the

15     judges view these defendants as an enemy -- I mean the

16     depositions in this case were offensive to me and offensive to

17     people, and I understand that the systemic issue goes to

18     admissibility.  And the Court has ruled on that.  And you can't

19     come before the jury and say there's a systemic problem with

20     the Israeli military court system.  That's the exact thing that

21     we're talking about in our motion in limine, that the Israeli

22     government mistreats Palestinian individuals.  The Israeli

23     government is not on trial here.

24          I hear Mr. Satin say, out of one side of his mouth,

25     saying we're not going to attack the Israeli government, and

1    out of the other side of his mouth, he says stuff like there's

2    a reason why they choose for the Palestinians go to the

3    military system.  There is a reason, which is there is a

4    statute that says, if you commit a security crime against the

5    state of Israel, that's where you're tried, and there is an

6    agreement between the PLO and the government of Israel saying

7    the military system that was in place before the agreement will

8    continue.  So yeah, there are reasons why they do it that way,

9    but the reasons are not this sort of nefarious racial prejudice

10   that is trying to be injected here.  It really offends me.  I

11   really feel strongly about it.

12        THE COURT:  My position so far is this, and depending

13   on how the case unfolds, it may it may change:  If you're not

14   opening the door to that --

15        MR. SATIN:  I'm not going to open the door.

16        THE COURT:  -- then it's not likely that they're going

17   to be able to just try to systemically challenge the system in

18   order to somehow cast doubt on the conviction.  If you open the

19   door, what I'm more likely to allow is any relevant testimony

20   that indicates that there is something problematic with the

21   process and that that problem existed, there is evidence that

22   problem existed in the particular case at issue.  If that's

23   something that you want to attack, if you want to say, look,

24   they don't give people their separate lawyers and this guy who

25   pled guilty didn't have a separate lawyer and the evidence was

 1    used against him, maybe I will allow that.  But to simply say,

 2    well, there's evidence that sometimes in Israeli investigations

 3    that confessions are coerced or beaten out of people, well, you

 4    can say that about any system.  And to simply say that in

 5    general but to have no evidence that that played a part in any

 6    particular case that's before the jury to determine whether or

 7    not they should accept the conviction as an admission that the

 8    person did it or as a reliable conviction based on sufficient

 9    evidence under that system to convince the court that the

10    person is guilty, no, I don't intend to allow a systematic

11    attack on the military system.  Even if they open the door, I

12    intend to minimally allow it; and depending on how wide they

13    open the door, I will reconsider it, but to allow any evidence

14    that you might have that a particular case had a particular

15    infirmity that you say the system has and cast doubt on that

16    individual conviction, but no, you can't just say that the

17    system is bad in general, so, therefore, most of these

18    convictions aren't reliable in general, I'm not going to allow

19    it.

20              MR. SATIN:  I think it is more nuanced than that.  It

21    is really this is how the system works --

22              THE COURT:  No --

23              MR. SATIN:  -- this is how the system works --

24              THE COURT:  -- that's how the system doesn't work.

25    You can tell them how the system works.

1          MR. SATIN:  We can tell them how it works, that's

2     fine.

3          THE COURT:  To the extent that the parties had an

4     objective factual piece of evidence to offer about how the

5     system works, not a biased argumentative factor about its

6     fairness, you can offer that if you want to present evidence

7     that everybody is entitled to a lawyer but not necessarily a

8     separate lawyer, the jury can understand that.  That's fine.

9          I assume you're not going to present evidence that

10     under Israeli military court that a confession that is beaten

11     out of a prisoner is legally admissible in a court of law.  I

12     assume that is not the evidence that you're going to present.

13     So it has nothing to do with how the system is supposed to

14     work.  So if you say the system didn't work the way it was

15     supposed to work in this particular incident, then you better

16     have some evidence that in the particular case that you're

17     trying to attack, it's reliability of the conviction, there is

18     some evidence that it is semi-related to that case.  That's my

19     view of that.  As I say, they open the door, I'm going to give

20     you more leeway; if they don't open the door, it seems to me

21     that unless you have some specific argument to make that a

22     particular defendant's conviction should not be accepted

23     because a particular thing happened in that case, I will

24     consider that further if they don't open the door to this

25     altogether.

ECGKSOL2

 1          The plaintiff also objected to any arguments that a

 2     verdict in plaintiffs' favor would interfere with United States

 3     foreign policy.  You intend to argue that in this case?

 4          MR. HILL:  No, your Honor.

 5          THE COURT:  I think you also said you did not intend

 6     to argue any personal attacks on plaintiffs' co-counsel or

 7     their motives.

 8          MR. HILL:  Only to the extent that it would reveal the

 9     bias of the witnesses.  Some of the witnesses are connected

10     with the latest co-counsel.  That's legitimate.

11          MR. YALOWITZ:  No, it is totally illegitimate, and

12     this is exactly what they do.

13          THE COURT:  I'm not sure I understood what you just

14     said.  You intend to do what?

15          MR. HILL:  One of the plaintiffs' witnesses is the

16     accountant for the plaintiffs' lawyer in Israel.

17          THE COURT:  You intend to attack that witness --

18          MR. HILL:  With evidence of the bias.

19          THE COURT:  Of whose bias?

20          MR. HILL:  The witness' bias.

21          THE COURT:  Okay.  So what does that have to do with

22     co-counsel?

23          MR. HILL:  Co-counsel is the person who is his client

24     in Israel.

25          THE COURT:  You're not attacking his bias?

1          MR. HILL:  The witness' bias because he is in a

2     business relationship with the plaintiffs' lawyer.

3          THE COURT:  You're not attacking the bias of the

4     plaintiffs' lawyer?

5          MR. HILL:  I don't believe so.

6          THE COURT:  You're going to say to the accountant,

7     isn't it true that you are in a business relationship with one

8     of the lawyers in this case?

9          MR. HILL:  Correct.

10          THE COURT:  Okay.  What bad are you going to say about

11     the lawyer?  Anything bad to say about the lawyer?

12          MR. HILL:  I'm not sure I would in that particular

13     instance, no.

14          MR. YALOWITZ:  In any instance, your Honor.

15          THE COURT:  I don't understand what you're objecting

16     to that he just said.

17          MR. YALOWITZ:  Here is what happens in the

18     depositions:  They go and they say, okay, Nitsana

19     Darshan-Leitner, she's politically motivated, she does this and

20     that.

21          THE COURT:  Is that the lawyer?

22          MR. YALOWITZ:  That's the lawyer.

23          THE COURT:  That's not going to happen in this case.

24          MR. YALOWITZ:  Right.

25          THE COURT:  So that's the end of that part of it.

ECGKSOL2

1    Anything else?

2              MR. YALOWITZ:  No.  I just --

3              THE COURT:  It's not going to happen.

4              MR. YALOWITZ:  Since they're doing it in the

5    depositions, I want to make sure they are on fair warning,

6    they're not going to do it in the courtroom.

7              THE COURT:  It is very clear to me.  If they want to

8    attack the credibility of the witness who is testifying by

9    indicating that that witness has some bias or affinity with one

10   side or the other, they have a perfect opportunity to do that,

11   but they are not, nor have they indicated to me that they would

12   attempt to cast aspersions on any lawyer who participated in

13   this case because that wouldn't have any relevance to the

14   jury's determination of the issues in this case.  I want to

15   make that clear.

16             You've got to give me a better idea of who you think

17   that you're calling as a witness and what they are going to

18   testify to if they're objecting because they said they had

19   knowledge.

20             MR. HILL:  You want me to give it to you in writing?

21             THE COURT:  It would be helpful to just give me the

22   list of those witnesses that you intend to call --

23             MR. HILL:  Description of what their testimony might

24   be?

25             THE COURT:  Yes, what the subject of their testimony

might be.  I'm not quite sure I understand the nature of the

disagreement as to whether or not they were properly noticed

that these witnesses might testify --

MR. HILL:  I would be glad to do that.

MR. YALOWITZ:  Your Honor, the nature --

THE COURT:  -- or if you have some other argument to

make that they have nothing to complain about, they should have

properly known and are always on notice that these were

potential witnesses, then I will consider it further, and I

will consider what particular objection I have, but I don't

have enough information about these witnesses.

MR. YALOWITZ:  Just to be crystal clear, your Honor,

the nature of my problem is that we are 27 days before trial,

and I have never heard from the defendants, despite my asking

them, who are these people and why are you going to call them.

As soon as I saw them on the witness list, I was like --

THE COURT:  You don't know who these people are?

MR. YALOWITZ:  -- I never got a disclosure about them.

Some of them I can figure who they are, Salam Fayyad, he was

the prime minister, I know who he is.  So if he comes, fine,

you know, I have no problem with him coming, I'll cross-examine

him, whatever.  Some of these people are obscure.  I have no

idea who they are, what they are, why they think they're going

to bring them as witnesses.

THE COURT:  We're going to get that.

ECGKSOL2

1    MR. YALOWITZ:  I need to know that.  If they're

2    important and the Court is going to indulge them in bringing

3    with witnesses that were never disclosed to me who they are or

4    why they're bringing them, I need a crack at them.  Not seven

5    hours, but I need some crack at them.

6    THE COURT:  Well, I thought we had already earlier

7    agreed that you two were also going to exchange exhibit lists

8    and witness lists, and do it simultaneously, and pick a time to

9    do that.  My suggestion is that you do that before January 5th.

10   Okay?  Simultaneously.  But I want this other letter, I want it

11   within the next ten days, telling me who these witnesses are

12   that you guys are fighting about and what you anticipate

13   they're going to say.  You may get that list and decide there's

14   only a handful of those people that you really have some

15   objection to, and then you can articulate the specific

16   objection, but I can't rule on the objection as a group because

17   I don't have any idea who these witnesses are.  They say that

18   you know; you say you don't know.  Let's see who they are, what

19   they're going to testify to.

20   MR. YALOWITZ:  Would it be possible to ask the

21   defendants to provide the list by Friday, your Honor, since

22   they are their people and their employees, they control them?

23   THE COURT:  What's reasonable for you?

24   MR. HILL:  I was going to say Tuesday.

25   MR. YALOWITZ:  We'll settle on Sunday then?

1          I mean, really, we're so close to trial, and they're

2     screwing around.  They know exactly who these people are.

3     They're playing games with me.

4          MR. HILL:  Frankly, your Honor, I'm in the same boat

5     with some of their witnesses.  There are a number of people on

6     their list that I don't know who they are.

7          THE COURT:  Make sure he has it no later than Tuesday.

8          MR. HILL:  Yes, your Honor.

9          THE COURT:  I don't see any relevant admissible

10    evidence by experts on damages in other cases.  This case is

11    not other cases.  I'm not sure what you would be comparing this

12    case to if you wanted to offer some expert.  Obviously, it

13    would not be an appropriate analysis to show what people get in

14    a car accident and try to tell the jury that has some relevance

15    as to how they're supposed to assess damages in this case.

16    Unless you can convince me that somehow --

17         MR. HILL:  Some of the damages measures that we

18    proposed are other jury verdicts for similar injuries.

19         THE COURT:  What's similar to a terrorist attack in

20    Jerusalem?

21         MR. HILL:  Similar types of injuries.  So if it is

22    someone who died --

23         THE COURT:  Well, that's what I said.  If I get run

24    over by a car in New Jersey and I get a judgment, that's not an

25    appropriate way --

ECGKSOL2

1          MR. HILL:  These are not auto accidents.  These are

2     our cases involving intentional use of force by police

3     officers.  So they are what our experts determined would be

4     most analogous jury verdicts.

5          THE COURT:  I don't see that that is admissible in

6     this case.

7          MR. HILL:  Beyond the jury verdict analysis, another

8     analysis is what people were compensated for, for the injuries

9     they sustained from the terror attacks on 9/11.  So these are

10    direct, reasonable measurements of compensation.

11         THE COURT:  I don't know why that is admissible for

12    this case.  Jurors make their own determinations of what things

13    are worth, and you make your own arguments about what things

14    are worth.  It is not a legitimate basis for a jury to give a

15    verdict simply because another verdict was given in another

16    case.  That has a different set of facts, has a different

17    scenario.  It is not likely that I'm going to allow that unless

18    you want to submit something further to show me why that would

19    be admissible and that would be a legitimate basis for the jury

20    to determine the amount of damages in this case.

21         MR. HILL:  We can submit a letter.  We think it is a

22    reasonable measure of reasonable damages.

23         THE COURT:  I'm not aware that that has ever been

24    admitted in a case.

25         MR. YALOWITZ:  They already briefed this.  They don't

1   need other letters.

2           THE COURT:  If you have something else different to

3   say, fine; otherwise, I will just go back to your papers.

4           I thought, in my 25 years as a judge, I had heard

5   everything, but this is the first time I've heard that there

6   was an expert whose expertise is to testify about other experts

7   not being experts.  I have never heard of that.  Where do you

8   get such a guy?

9           MR. HILL:  From the University of Bath.

10          MR. HORTON:  They couldn't find one in America, is the

11  answer, your Honor.

12          THE COURT:  There is no such animal.  He doesn't even

13  have the same expertise as any of the experts that you want him

14  to opine on that they're quack experts. I looked at that.  If

15  you have something else to say, that's fine, but it is not

16  likely that you're going to get a guy that will simply get up

17  and say, I don't know this guy's area of the law but I don't

18  think he is a qualified expert because I know about experts and

19  I'm an expert on experts.

20          MR. HILL:  The nature of the testimony would be that

21  they're not engaging in a reliable methodology, which he does

22  have expertise on.

23          THE COURT:  Unless he is engaged in the same area of

24  expertise, that testimony is not admissible.

25          MR. HILL:  He is engaged in the study of terrorism and

1    terrorism experts.

2            THE COURT:  If you want dueling experts, that's fine.

3    But if you want an expert just simply to say that I'm opining

4    about the other experts because I say that they're not

5    qualified as experts in whatever field they're in, that's not

6    fine.  If you have designated a counter expert and that counter

7    expert is giving expert opinion on the same subject matter as

8    the expert that he's attacking, then that's your dueling

9    expert, and that's your counter expert.  You don't get an

10   expert on being an expert.  The way you've described this

11   person and his qualifications, no, his testimony is not going

12   to be admissible.

13           This was the Plaintiffs' argument, but I'm not sure

14   that the defense would argue that they have such a person.  I'm

15   not even sure, given my rulings, that this would even be an

16   issue for anybody, but an expert on the law, is there any

17   reason to have an expert on any area of the law?

18           MR. HILL:  No, nobody would be testifying about the

19   law, but expert opinions that we have disclosed are relevant

20   and respond to the plaintiffs' experts in the case.

21           THE COURT:  Right.  They said that you have some kind

22   of law expert --

23           MR. HILL:  No.  The only person that would have

24   testified about the law would have been on foreign law claims,

25   and those have been --

1          THE COURT:  That's what I thought.

2          MR. YALOWITZ:  Actually, I thought they had a couple

3    of lawyers.  They had this lady Sharon Weil.  She is a very

4    nice lady.  She testifies about international law and whether

5    the military court system in Israel satisfies international

6    law.  I don't know if they're planning to bring her.  There was

7    one guy, Raja Shehadeh, for example, testifies that the

8    occupation violates international law.  He shouldn't be a

9    witness.

10          THE COURT:  We have already dealt with that in other

11   areas.  This is not the issue in this case.

12          MR. YALOWITZ:  Muhammad Dahleh has opinions about

13   Israeli law, and that's out of the case.

14          THE COURT:  We're not going to have that.

15          Quickly, I have to go back to defendants' motions

16   because I have to look at it in more detail.  Do you intend to

17   call Mr. Marcus?

18          MR. YALOWITZ:  Yes.

19          THE COURT:  What is Marcus going to testify?

20          MR. YALOWITZ:  What Marcus is going to do is he's

21   going to bring videotape and newspaper articles from the

22   defendants' own media that they own.  He's going to say, hey,

23   look, these are their words, and their media says, kill Jews

24   and do bad stuff.  It is evidence.

25          THE COURT:  Evidence of what?

1    MR. YALOWITZ:  It is evidence both that what their

2    messaging is to their own people --

3    THE COURT:  How does that advance, make it more likely

4    that they were involved in these terrorist --

5    MR. YALOWITZ:  Because it shows that they in advance

6    and after the fact are telling people that it's okay to commit

7    terror.

8    THE COURT:  You think that meets your responsibility

9    under the ATA to make them liable if somebody goes out and

10   commits a terrorist act?

11   MR. YALOWITZ:  Their defense is, we are against

12   terror, we condemn terror, and we did everything we could to

13   block terror.  That's their defense.  And so their own words

14   put the lie to that defense because their own

15   government-controlled media outlets didn't say stop the terror.

16   They said, you people have a right to jihad or that a million

17   martyrs should march to Jerusalem, or this terrorist did a

18   great thing and more people should do things like that.

19   So he's a very important witness to meet their --

20   THE COURT:  He may be an important witness, but it is

21   not likely I'm going to let him testify.  I will look at it

22   more carefully; but one, I have a problem with your using the

23   newspaper articles and simply, by saying they controlled the

24   newspapers --

25   MR. YALOWITZ:  No, no, it is not controlled.

1          THE COURT:  To use statements by a reporter in a

2     newspaper and simply by trying to say that they controlled the

3     media --

4          MR. YALOWITZ:  That's not my -- no, I'm not

5     bringing that up.

6          THE COURT:  -- that's not sufficient to attribute

7     those individual statements to the PA or the PLO.

8          Second of all, even if that were the case, there is

9     very minimal, if at all, any probative value as to the

10    rhetoric.  As I say, the jury is not going to be surprised of

11    the heightened rhetoric going back and forth between the

12    parties, and that heightened rhetoric does not make it more or

13    less likely that the defendants were involved in any of the

14    particular acts that were committed here.  If you have some

15    individual statements about those particular acts that you

16    think that you can tie those statements to appropriate

17    representatives, responsible representatives of the PA or the

18    PLO, if the president of the PA was quoted saying something

19    about that act before or after it took place and you want to

20    consider offering something like that, I will consider that.

21    But just in general to say, we got a bunch of newspaper

22    articles where they say, we hate Israel, wipe them off the map,

23    and then you say that that's relevant evidence to prove that

24    they committed these terrorist acts, no.

25          MR. YALOWITZ:  Let me try to be a little clearer about

1  this because it is not control like censorship.

2          THE COURT:  I understand your point.  They own it,

3  they don't let anybody say anything they don't want them to

4  say.

5          MR. YALOWITZ:  They own it.  Everybody who works there

6  is on their payroll.  They appoint the top dog, so it is their

7  mouthpiece.

8          THE COURT:  Okay.

9          MR. YALOWITZ:  And when their mouthpiece wants to tamp

10  down violence, the mouthpiece says stop; and when their

11  mouthpiece wants people to be violent, they say, go do jihad.

12          THE COURT:  That doesn't prove this case.

13          MR. YALOWITZ:  Well, it does go, in my opinion, your

14  Honor -- and I know you'll think about it -- it goes very, very

15  much to state of mind.

16          THE COURT:  I know what the state of mind is on that

17  issue.  Your position is that they want the destruction of

18  Israel.  I know what you say their state of mind is, but that

19  has --

20          MR. YALOWITZ:  I think --

21          THE COURT:  -- nothing to do with the jury

22  determining, even if they accepted that proposition, that

23  doesn't move them any closer as to whether they are responsible

24  for the terrorist acts that are at issue here.

25          MR. YALOWITZ:  It also goes to scope of employment

ECGKSOL2

|  |  |
|---|---|
| 1 | because, look, they're going to stand here in four weeks at |
| 2 | opening statement and they're going to say these individuals |
| 3 | went rogue. That's going to be their case. They went rogue. |
| 4 | And if I'm going to meet that, key evidence for me is their own |
| 5 | words in which they say to their population -- and we also have |
| 6 | evidence of like their Stars and Stripes Magazine, you know, |
| 7 | for the military, saying go kill Jews. But even what Marcus |
| 8 | brings, which is more general stuff, is not the message of |
| 9 | somebody who says don't do violence, and if you do, you're |
| 10 | going rogue. The message that they're giving is it's good to |
| 11 | go be violent. That's the message that the government, which |
| 12 | is on trial, is giving. And then people go, and they do it. |
| 13 | THE COURT: I know, but I'm not going to accept that |
| 14 | connection, that kind of proof. You can't simply say that they |
| 15 | are responsible for every terrorist act that takes place |
| 16 | because they, in their newspaper, said, people, if you want to, |
| 17 | go out and do terrorist acts. |
| 18 | MR. YALOWITZ: Maybe we have got to save him as a |
| 19 | rebuttal witness. Maybe we ought to save them as a rebuttal |
| 20 | evidence, but if they open the door -- |
| 21 | THE COURT: It is not direct proof of their |
| 22 | involvement in any of these acts. |
| 23 | MR. YALOWITZ: I agree with that. |
| 24 | THE COURT: If you have -- |
| 25 | MR. YALOWITZ: It doesn't go to causation. What I'm |

saying is, if they stand around and say, oh, we were trying to

tamp down the violence, we were trying to stop it, and we

just --

THE COURT:  As soon as they open that door, you may

have some admissible evidence if you can demonstrate that this

is an official statement by the PA.

MR. YALOWITZ:  Right.

THE COURT:  Then you may be able to rebut it with such

statements, if they say that.  They may say that.  They have

evidence that people were arrested for doing terrorist acts,

people were detained, they cooperated with some Israeli

authorities in investigating some of these crimes.  So where

you guys go with that is a different question.  But just in

general, to be able to, in your case in chief, offer evidence

that they have heightened rhetoric against Israel --

MR. YALOWITZ:  No, no, that's not --

THE COURT:  -- and you want to put that in because

that advances your argument that they must be complicit in

these acts, I'm probably --

MR. YALOWITZ:  No, no, that's not where I want to go

with that.  Maybe we ought to revisit the question of Marcus

after we see the opening statements.

THE COURT:  That's fine.  That's my reaction at this

point.  I can give you a ruling at the appropriate time.

Let me quickly run through this so we can let the

1    court reporter go.

2              MR. HORTON:  I just want to add one brief point on

3    this.  Obviously, your Honor will make your own decisions.  But

4    there is an analogue to Mr. Marcus involving cases against

5    Al-Qaeda.  The same sort of claims that they have brought

6    against Mr. Marcus here have been tried against Mr. Coleman, is

7    his name.  In case after case, the courts have consistently

8    said, he is an expert, his methodology is appropriate, this is

9    appropriate testimony, that's other courts in this district,

10   other courts around the country.  We're not writing on a blank

11   slate here.  Those cases are all discussed in our brief.  I

12   would ask your Honor to --

13             THE COURT:  I will look at that.  I think you have

14   several hurdles, as I said.  One, you have to convince me that

15   they are responsible for every single statement that is made in

16   the newspaper that they control; and two, that the

17   interpretation of that statement, that the jury can conclude

18   that this is a signal to go out and commit the act that you're

19   accusing them of committing.  Those are big leaps, and I

20   understand the inference you want, but I think that those --

21             MR. YALOWITZ:  I think we need to see what their

22   position is, because if they're not going to contest this,

23   okay, then we can evaluate it.  Like I said, you know, I don't

24   mind waiting and bringing him as a rebuttal witness.  It is not

25   a methodology issue.

ECGKSOL2

1      What I understand your Honor's concern to me is:  What

2  element of the claim does it go to?

3      THE COURT:  Okay.

4      MR. YALOWITZ:  Let's see what they do on opening.

5      THE COURT:  Addicott, I'm not quite sure I understand

6  his testimony or the nature of the objection.  He wants to

7  testify that Fatah and the PA are basically indistinguishable?

8      MR. YALOWITZ:  We don't need Addicott.

9      THE COURT:  What about Karsh?

10      MR. YALOWITZ:  We're fine without Karsh.

11      See, I tell you when I need somebody.

12      THE COURT:  As they say, the most effective advocacy

13  is to be consistently reasonable, and you can convince me of

14  something.

15      MR. YALOWITZ:  Always appear reasonable.

16      THE COURT:  Eviatar.

17      MR. YALOWITZ:  Eviatar is a key witness.

18      THE COURT:  You want him to testify in general that

19  the PA and the PLO engages in terrorism?

20      MR. YALOWITZ:  No.

21      THE COURT:  I'm not sure I understand the nature of

22  his expert --

23      MR. YALOWITZ:  Eviatar is a former field intelligence

24  officer.  He spent his entire career in the West Bank and Gaza

25  Strip.  He knows these people very well.  He's a fluent Arabic

1    speaker.  He has personal relationships with a lot of these

2    people.  The first thing he has got to do is he's got to

3    educate the jury, who is the PA, who is the PLO.

4              THE COURT:  What is he going to say about them that is

5    going to advance this case?

6              MR. YALOWITZ:  He is going to say the PLO is this

7    entity and what they are and what their charter says and like

8    that.

9              THE COURT:  I don't think anybody has any problem with

10   that.

11             MR. YALOWITZ:  Then, he is going to say --

12             THE COURT:  What's the bad stuff he's going to say?

13             MR. YALOWITZ:  Well, then, he's going to say, okay,

14   here's what the PA is.  They were created by the PLO, and they

15   report to the PLO, and they're an agent of the PLO.  He is

16   going to talk about the relationship between the two of them,

17   agency, alter ego, like that.

18             THE COURT:  All right.

19             MR. YALOWITZ:  He's going to talk about Fatah, which

20   we heard about Fatah, the Republican party, and he is going to

21   talk about Al-Aqsa Martyrs Brigades.

22             THE COURT:  He is going to define, from your

23   perspective, what Fatah is and what the Brigade is?

24             MR. YALOWITZ:  Yes.

25             THE COURT:  What is it that they're concerned about in

1    terms of your painting them as terrorists?

2              MR. YALOWITZ:  Then, he is going to talk about the

3    engagement of Arafat and his senior staff in material support

4    of terrorists.  So he's going to bring evidence of --

5              THE COURT:  What evidence is that going to be other

6    than his opinion?

7              MR. YALOWITZ:  Convictions.

8              THE COURT:  Not convictions of Arafat?

9              MR. YALOWITZ:  No, no, but convictions, admissions,

10   videotape --

11             THE COURT:  Tell me what the purpose of this testimony

12   is.  To show that they are independently terrorists unrelated

13   to these acts?

14             MR. YALOWITZ:  To show that they provided material

15   support to terror organizations, Al-Aqsa Martyrs Brigades and

16   Hamas.

17             THE COURT:  Do you have direct evidence of that, or is

18   that just his conclusion based on his review of other sources?

19             MR. YALOWITZ:  It is his opinion based on his review

20   of admissible evidence.

21             THE COURT:  I'm not going to let him give me that

22   opinion.  He's going to have to give me that fact.

23             MR. YALOWITZ:  Yeah, right.

24             THE COURT:  If you having a specific instance of a

25   fact that ties them to a terrorist act and you can convince me

ECGKSOL2

1   that that is relevant, then I will consider that.

2          MR. YALOWITZ:  Right.

3          THE COURT:  No, we don't need an expert to come in and

4   opine that he believes that the PA and PLO are terrorists --

5          MR. YALOWITZ:  That's not --

6          THE COURT:  -- based on his analysis of the totality

7   of the circumstances --

8          MR. YALOWITZ:  You have to give me some credit here.

9   I have been doing this for 25 years.  That is not what Eviatar

10  is going to come in and do.

11         THE COURT:  You have got to give me a better idea of

12  specifically what is you want him to say that they cannot

13  object to.

14         MR. YALOWITZ:  Okay.  For example, he's going to talk

15  about material support of Hamas.  He is going to talk about the

16  connection between the PA, PLO.

17         THE COURT:  What is he going to say?

18         MR. YALOWITZ:  He is going to say --

19         THE COURT:  That they give money to Hamas?

20         MR. YALOWITZ:  They didn't give money to Hamas.

21         THE COURT:  Okay.  Give me more specifics.

22         MR. YALOWITZ:  They gave weapons, they gave bombs,

23  they gave bomb-making equipment, and they --

24         THE COURT:  How does he know this?

25         MR. YALOWITZ:  He knows it from the guy's confessions,

1   he knows it from the convictions, he knows it from the guy's

2   admissions on videotape.

3         THE COURT:  Why isn't that all hearsay?

4         MR. YALOWITZ:  Why are convictions and confessions

5   hearsay?  We just went through that.

6         THE COURT:  Not convictions.  You said he was going to

7   give his opinion that based upon information that he knows that

8   they supplied bombs and stuff.  You are going to have

9   convictions of PA officials that you're going to offer in

10  evidence?

11        MR. YALOWITZ:  One, yeah.  Yeah.  There is one PA

12  official who was convicted of material support --

13        THE COURT:  Okay.

14        MR. YALOWITZ:  -- of Hamas for the Hebrew University

15  bombing.

16        THE COURT:  Okay.

17        MR. YALOWITZ:  Then, he has a lot of granular

18  information.

19        THE COURT:  We have that fact.

20        MR. YALOWITZ:  Because the jury -- it is so alien.

21        THE COURT:  It's not that sophisticated when you come

22  right down to it.  Everybody knows what a bomb is.

23        MR. YALOWITZ:  I know, but the whole milieu is so

24  alien.  If you don't give the jury some background of somebody

25  who reads the language, who speaks the language, who

1    understands.

2         THE COURT:  This is my problem.  You can understand my

3    problem.  I'm hesitant to have someone walk in here, say I'm an

4    expert, and testimony they want to present to the jury is, in

5    my expert opinion, the defendants are terrorists.  Okay?

6         MR. YALOWITZ:  I understand.

7         THE COURT:  You can understand my concern about that.

8    That is what this sounds like.

9         MR. YALOWITZ:  It is not.

10        THE COURT:  I will look at it more thoroughly, and I

11   will look at the nature of their objection, but I'm not

12   convinced by this dialogue that he has direct evidence to give,

13   relevant evidence that you want him to give, other than his

14   opinion they're a bunch of terrorists.

15        MR. YALOWITZ:  No, no, no.  He is not going to give

16   his opinion, oh, I know them, they're a bunch of terrorists.

17   He may believe that, but that's not expert testimony.  He is

18   going to give very granular, very backed-up -- these are

19   intelligence guys.  That's their job, is to look at what is the

20   data that I have, what are the documents that I have, analyze

21   the documents, understand them in the language in which they

22   were written.

23        So I'll give you an example.  I will give you a great

24   example.  There are documents that were seized from the

25   Palestinian Authority's headquarters, in which Arafat is

1    signing, give this amount of money to this guy and that guy and

2    that guy.  It is Arafat's signature.  He knows Arafat's

3    signature.  We have other people who admit it is Arafat's

4    signature.  It is not going to be an issue.  Then, we have

5    other documents also from the PA that are like intelligence

6    reports from this General Intelligence Service that say, here's

7    a picture of what Al-Aqsa Martyrs Brigades is doing in this

8    particular region.  They give very detailed information.  What

9    do you know?  It's the same guys.  So he's able to look at the

10   documents --

11            THE COURT:  So is the jury.

12            MR. YALOWITZ:  Yeah, yeah, but --

13            THE COURT:  That's what I'm trying to figure out.  Are

14   you going to offer that in evidence, or are you going to just

15   offer his opinion?

16            MR. YALOWITZ:  I'm going to use him to present the

17   evidence and help the jury understand what it means in the

18   context of a milieu that is very unfamiliar.

19            THE COURT:  Well, let me look at that more carefully.

20            Does the defense want to say anything further at this

21   point?

22            MR. HILL:  I don't think the documents Mr. Yalowitz

23   just referred to have anything to do with the seven incidents

24   that we're going to try in this case.  The people involved in

25   those documents, as I recall them, they're not the perpetrators

ECGKSOL2

of this case.  I don't think this man has anything relevant to

say.  We deposed him at length about his personal knowledge.

He disclaimed any personal knowledge.  He disclaimed any

reliance on his experience while he was working for the IDF.  I

think he is best viewed as someone who is going to summarize

hearsay.  If he has any use at all, your Honor is going to have

to rule on whether or not he is going to do something other

than just summarize hearsay or give his general opinion about

the PA.

THE COURT:  I assume that if he's qualified to give

opinions about the structure of the PA and the PLO --

MR. HILL:  I'm not even sure he is qualified to do

that.  Frankly, I'm not sure that it's in his report.  We have

to go back and look at it.  That was not the focus of his

report.

MR. YALOWITZ:  It's in his report.

THE COURT:  Do I have this report?  Is that

attached --

MR. YALOWITZ:  I know you have a lot of paper.

MR. HILL:  It is attached to the motion in limine.

THE COURT:  We talked about Kaufman.

MR. YALOWITZ:  So Shrenzel.

THE COURT:  Shrenzel.

MR. YALOWITZ:  Shrenzel is a very important witness,

too.  He is a retired intelligence officer from the Shin Bet.

1   What he does is he looks at the convictions, he looks at the

2   payroll records, he looks at the messaging from the PA to the

3   police department.  He gathers all kinds of information about

4   the particular attacks, which is what Eviatar is doing for the

5   Hebrew University attack, but he does the other six, and he

6   says, here is a picture of the direct involvement of the

7   defendants in this attack, and here is a picture of their

8   material support for the people --

9            THE COURT:  Tell me what form that testimony is in.

10  Is that some kind of a chart?

11           MR. YALOWITZ:  It is a metaphor.

12           THE COURT:  I know, but what is he going to say about

13  them?  You want him to analyze each incident and say that it is

14  his opinion that this evidence evaluated leads to the

15  reasonable conclusion that they were involved.

16           MR. YALOWITZ:  Right.

17           THE COURT:  Why is that the jury's province?

18           MR. YALOWITZ:  It is the jury's province to make the

19  ultimate conclusion.

20           THE COURT:  That's what you want him to make.

21           MR. YALOWITZ:  No, I want him to bring the evidence to

22  the jury from which they can make the ultimate decision.

23           THE COURT:  I'm not as concerned about what evidence

24  you want him to talk about that's presented to the jury.  I'm

25  more concerned about what expert opinion that you want him to

1    render.  You want him to render that, in his expert opinion,

2    they were involved in these attacks?  That's basically his

3    expertise?  If the jury needs him for --

4              MR. YALOWITZ:  No, his expertise is understanding the

5    documents.

6              THE COURT:  But his expert opinion, what is his expert

7    opinion?

8              MR. YALOWITZ:  His opinion is that the documents

9    support the conclusion --

10             THE COURT:  That they committed --

11             MR. YALOWITZ:  That the PA itself, through its

12   employees, was directly involved.  And so he can bring evidence

13   dealing with the various factors that the courts have looked at

14   or that the jury is going to have to look at with regard to the

15   scope of employment.

16             THE COURT:  What is the nature of his expertise that

17   the jury needs his opinion to render on what they have to

18   decide?

19             MR. YALOWITZ:  He reads, speaks, and writes Arabic,

20   and he spent a career studying the Palestinian arena.

21             THE COURT:  He is a really smart guy, but that doesn't

22   tell me about why his opinion is any more valid than anybody

23   else's opinion given an informed jury that's supposed to make

24   this decision solely on the evidence presented at this trial.

25             MR. YALOWITZ:  Look, I'm being very candid with you.

ECGKSOL2

1          THE COURT:  No, I understand that.

2          MR. YALOWITZ:  I don't see how the jury understands

3     this evidence, which is --

4          THE COURT:  Why?

5          MR. YALOWITZ:  Look, I have been through it.  I have

6     been studying it --

7          THE COURT:  I know, but, look, the evidence is not as

8     complex as you guys want to make it out to be.  It is not that

9     complicated a case.  Either you're going to be able to tie them

10    to these incidents or you're not; and if the jury finds that

11    there is evidence that a reasonable jury can conclude that they

12    were participants in these terrorist acts or that the people

13    who they employed knew that they had the permission and

14    encouragement of the employer during the course of their employ

15    to do these acts, or they had some direct participation,

16    they're going to find them liable.  As you say, each one of the

17    acts is very straightforward, not complicated.

18         MR. YALOWITZ:  Right.

19         THE COURT:  You have somebody coming in and shooting

20    somebody or blowing somebody up.

21         MR. YALOWITZ:  Right.

22         THE COURT:  It is a who-done-it, not what happened.

23         MR. YALOWITZ:  So he will give a summary of, for

24    example, each of the perpetrators --

25         THE COURT:  Right.

1          MR. YALOWITZ:  -- and what is their relationship to

2     the PA.

3          THE COURT:  That's fine.  I don't have any problems

4     with that.  He can summarize the evidence if he wants to make

5     such a chart.

6          MR. YALOWITZ:  He will give examples of their police

7     magazine saying to the police -- like they have these -- we

8     don't have anything like it.  It is like a political guidance

9     directive.  He will give examples of the police magazines that

10    are distributed to the police force saying, kill Jews.

11         THE COURT:  If that turns out to be admissible, he can

12    organize that for the jury, too, and say this is what you

13    have --

14         MR. YALOWITZ:  Right.

15         THE COURT:  -- make your decision.

16         MR. YALOWITZ:  Right.

17         THE COURT:  But where does it come in that he gets to

18    be an expert to say, well, my opinion is that the PA and the

19    PLO were involved in this based on my review of the evidence,

20    that you review it, and you should take my word for it?

21         MR. YALOWITZ:  So you just don't want him to opine on

22    the ultimate conclusion?

23         THE COURT:  That's the first thing I don't want.  I

24    mean, I don't see what basis he has expertise to of offer when

25    he says, this is the evidence that you had.  I'm laying it out

ECGKSOL2

1    in an organized fashion.  The lawyers will argue what they want

2    to argue as to what you should do with that, but I'm going to

3    tell you this is what you have, you have these people doing

4    this, you have this relationship, you have them saying these

5    things, and this is the evidence that the plaintiffs have put

6    together in support of their case that these people are

7    responsible.

8            MR. YALOWITZ:  Are responsible, right.

9            THE COURT:  It is your argument to make that based on

10   that evidence that the jury should conclude that.  No expert

11   has any greater ability to conclude that than the jury.

12           MR. YALOWITZ:  Look, I didn't think it was forbidden.

13   Let me go back and think about it a little bit, and I know you

14   will, too.  But I didn't think it was forbidden for an expert

15   to offer opinions on the ultimate issue.  I think that dueling

16   experts do that all the time.  If they want to bring in an

17   intelligence agent that says, look, I have looked at this

18   picture and here are all the reasons why the PA is not

19   responsible or the PA is not connected with these particular --

20           THE COURT:  It is a more basic problem than that.  You

21   have to convince me that he has some area of expertise that

22   makes his conclusion evaluating this evidence somehow more

23   valid or necessary or helpful for the jury to make that

24   conclusion on their own.  They don't need him for that.  Why do

25   they need him for that?

1          MR. YALOWITZ:  Because he has a career of studying and

2    understanding their system.

3          THE COURT:  This is not a system issue.

4          MR. YALOWITZ:  It kind of is.

5          THE COURT:  It's a they-did-it-or-they-didn't-do-it

6    issue.

7          MR. YALOWITZ:  Yeah, but part of it is --

8          THE COURT:  I don't want the jury to have to conclude

9    based on, well, this is what I know in my experience that goes

10   on over there, so therefore, it is my conclusion that these

11   people were probably involved in this.  That's not an area of

12   expertise that's appropriate for the jury to be able to use

13   that to base their judgment on that somehow they think he's

14   smarter than them and he has some greater experience to be able

15   to conclude that they must have done this.

16         MR. YALOWITZ:  Look, the only thing that -- the only

17   sticking point that I'm seeing with Shrenzel -- I want to come

18   back to Eviatar for a minute because there is another thing I

19   want to talk about -- but with Shrenzel, the only sticking

20   point that I'm seeing between what you're saying and what I'm

21   thinking is I think he's entitled, after he gives all of the

22   evidence of, for example, the perpetrators of this particular

23   incident, what they were convicted of, what their relationship

24   is with the PA, I think he is then entitled to say, in my

25   opinion, this is evidence of their involvement in terror

1  because that's been his job or that was his job for years and

2  years, was to prevent terror.

3       THE COURT:  But that opinion isn't the relevant

4  opinion, even if it was admissible, and I think the relevant

5  opinion, which even though it is relevant is not admissible is

6  that he would have to say:  This is the evidence that you

7  heard.  It is my opinion that you should find against them

8  based on this evidence.  No, they don't need him for that.

9  That's not appropriate for him to opine that.  He can give his

10 opinion --

11      MR. YALOWITZ:  No, I don't think that's what he is

12 saying --

13      THE COURT:  -- about the weight of the evidence.

14 That's what you're saying.  If he is basing this on something

15 that is not before the jury, it is improper for him to be here

16 in the first place.  I'm assuming that all he is saying to the

17 jury is this is the evidence that you heard, it is my opinion

18 that you should find against them based on this evidence.  The

19 jury does not need him for that purpose no matter how smart he

20 is.

21      MR. YALOWITZ:  He is very smart.

22      I think there are things that an expert is entitled to

23 do that a summary witness can't do that he should be allowed to

24 do.  So, for example, an expert can say, look, the defendants

25 had a number of policies that supported terror and that makes

1    it more likely that they supported terror in this instance.

2    For example, they put convicted terrorists on their payroll

3    even if they weren't already their employees.  For example,

4    they have a law that says, if you're convicted of terrorism and

5    you're already on the payroll, you stay on the payroll.

6              THE COURT:  How is that more compelling coming from

7    him than coming from you in closing argument?  Because he is a

8    smart guy?

9              MR. YALOWITZ:  No, because he lived through it.

10             THE COURT:  I know.  You think that makes him more

11   qualified to evaluate that evidence than you?

12             MR. YALOWITZ:  Than me, yeah, of course.

13             THE COURT:  Than the jury?

14             MR. YALOWITZ:  Of course.

15             THE COURT:  What part of that that you just said makes

16   it so sophisticated that I need an expert to tell me that?

17             MR. YALOWITZ:  Because we hear the defendants back

18   here saying, oh, we have laws that say GIS can't do this, that,

19   and the other.  Well, you have to understand what are the laws

20   and what was the real relationship that Arafat had to his

21   senior staff.

22             THE COURT:  If he has some knowledge about that and he

23   wants to testify as to the relationships or some factual

24   information that he has or he knows the nature of the

25   relationships, that's fine.

1      MR. YALOWITZ:  Right.

2      THE COURT:  The problem is I don't see this guy is

3 much use to you unless you can get him to say, it is my opinion

4 you should find against these people based on this evidence,

5 and I'm not sure I'm going to allow him to say that.  I'm not

6 sure that that his province to say that.

7      MR. YALOWITZ:  I think an expert is allowed to opine

8 on the ultimate issue in the case.

9      THE COURT:  He is not opining on the ultimate issue in

10 the case.  He is telling the evidence that they hear is

11 sufficient evidence for them to find liability.  That is not

12 within his province.

13      MR. YALOWITZ:  I think intelligence agents have an

14 important role in a case where the defendant here is a police

15 operation and the police department runs in a certain way and

16 they know how that department runs --

17      THE COURT:  They can explain that.

18      MR. YALOWITZ:  They can explain that.

19      THE COURT:  They can explain that, but the rest is

20 common sense.

21      MR. YALOWITZ:  Okay.

22      THE COURT:  You think it takes an expert for you to

23 make the inference that if somebody is committing terrorist

24 acts that you want to argue to the jury that they should infer

25 from that that they approved of those terrorist acts because

ECGKSOL2

1    they didn't fire him?  You think you need an expert to make

2    that argument?  I don't think the expert has any greater

3    opinion on that issue than you or I.

4                MR. YALOWITZ:  I think the jury will get that.  The

5    jury doesn't know who Muhammad Dahleh is and what's his role.

6    And when the defendants come and say --

7                THE COURT:  If there's factual testimony that someone

8    can give us for who he is or what his role is, that's

9    appropriate.

10                MR. YALOWITZ:  Right.

11                THE COURT:  But to say, and also, by the way, I think

12    that based on that his role is terrorist --

13                MR. YALOWITZ:  I think we're going to have to take

14    this question by question.  I'm not saying that I'm never going

15    to ask a question that, you know, you don't sustain an

16    objection to.  I will try not to.

17                THE COURT:  Try to avoid as many objectionable

18    questions beforehand --

19                MR. YALOWITZ:  Me, too.  It is not good for me.

20                But the idea that these guys are not experts or

21    something, you'll meet them.  You'll see that --

22                THE COURT:  I have very little concern about his

23    expertise or about the testimony that he might want to give

24    about how he explains his experience, what the relationships

25    are between the entities if that's what he is going to testify

1    to.  If they want to dispute that, they can say, no, he is

2    wrong about that.  He thinks they have a relationship and they

3    don't have that relationship, or he thinks that they control

4    the GIS but they really don't, GIS does whatever they want to

5    do.  Whatever guys you want to debate about, that's a different

6    issue.  When it comes down to whether or not he is qualified to

7    tell us who is a terrorist in this room, I'm not so convinced.

8              MR. YALOWITZ:  All right.  Did you want to add --

9              MR. SATIN:  Yeah, I will be very direct.

10             I will direct the Court to page 3 of the expert report

11   of Israel Shrenzel, under the section of expert opinion.  This

12   is the very first sentence in the substantive portion of his

13   report.  "I have been requested by counsel for the plaintiffs

14   to provide my expert opinion with respect to the degree of

15   involvement of the Palestinian Authority in six terrorist

16   attacks that are at the center of this action."

17             Then, what he does in his report, he reviews the

18   discovery in this case, which may or may not be admissible, and

19   he renders his opinion they did.  In other words, it's like a

20   detective looking at the evidence in this case and saying, the

21   guy is guilty.  That's what his report says.  That's what

22   Mr. Yalowitz wants to use him to do.

23             Now, when the Court told Mr. Yalowitz a moment ago

24   that that's not permissible, he then stated, no, he's going to

25   talk about how police operations work, Muhammad Dahleh, police

1    magazines.  None of that is in his report.

2               MR. YALOWITZ:  That's not true.

3               THE COURT:  I don't need to debate that issue, but I

4    will review that in that context.

5               Any last thing?

6               MR. YALOWITZ:  No.  No.  I think we've done a lot

7    today.

8               THE COURT:  All right.  So what I'm going to do --

9               MR. HILL:  Your Honor, you haven't mentioned anything

10   about their other expert, Matthew Levitt.

11              THE COURT:  Yes, I did have some.  I'm sorry.

12              Levitt was going to testify about the relationship

13   between the AAMB and Fatah?

14              MR. HORTON:  Your Honor, I think that's exactly the

15   sort of thing you just said Mr. Shrenzel could testify about,

16   who these people were and how they worked.

17              THE COURT:  What is he going to base his knowledge

18   upon.

19              MR. HILL:  He appears to base it on newspaper articles

20   and internet research.

21              MR. HORTON:  He testified, quite clearly, it was based

22   on extensive field research in the area at the time.

23              THE COURT:  What is in dispute?  Whether or not --

24              MR. HILL:  When I deposed him, he said he couldn't

25   recall talking to anybody about the subject matter.

ECGKSOL2

1          THE COURT:  Are there going to be instances of

2   evidence of the PA funding the AAMB?

3          MR. HORTON:  Yes.

4          THE COURT:  What is the nature of that direct evidence

5   in this case?

6          MR. HORTON:  He is going to testify based on his

7   experience.  I said there was field work.  Mr. Hill said he

8   couldn't remember specific names ten years after the fact.

9          THE COURT:  What is the evidence that the PA funded

10  the AAMB?

11         MR. HORTON:  He has an extensively documented report

12  with a lot of documents to back up all of this.

13         THE COURT:  What does it say?

14         MR. HORTON:  I don't have them with me right now, your

15  Honor.  I can't be more specific.

16         THE COURT:  What about the relationship between the

17  AAMB and Fatah?  Is there some disputes about that?

18         MR. HILL:  Yes, your Honor.

19         MR. HORTON:  This is a hotly disputed issue.  This is

20  the question of whether they are the military wing of Fatah.

21  He has studied them carefully.  He cited to a lot of materials.

22  Some of them may be admissible.  Some are the sorts of things

23  on which experts reasonably rely --

24         THE COURT:  If you can show me some admissible

25  evidence that demonstrates the PA funded the AAMB, I will allow

ECGKSOL2

1      it, and I will allow him to testify about that.

2              MR. HORTON:  It is not just that, your Honor.  As an

3      expert, he is allowed to testify based on inadmissible evidence

4      on which experts --

5              THE COURT:  No, he can't testify to a fact.  Whether

6      the PA funded the AAMB is a fact.  If he --

7              MR. HORTON:  I understand --

8              THE COURT:  If he has evidence of that fact and can

9      tell the jury what it is and the jury can conclude based on

10     that fact that that evidence of that fact is true or he

11     doesn't.  He can't simply say it is my opinion that they funded

12     that.

13             MR. HORTON:  I understand the distinction you're

14     drawing.

15             THE COURT:  If you can direct my attention to the

16     evidence that you can put before the jury that indicates the PA

17     funded the AAMB or evidence that you can put before the jury

18     that there is a relationship between the AAMB and Fatah, then I

19     will allow that evidence in, and I will allow some expert

20     testimony from him based on that evidence.  I'm not going to

21     allow him to walk in and say I'm a smart guy and it is my

22     opinion based on the newspaper articles that I read that the PA

23     funds the AAMB or that AAMB and Fatah have a close

24     relationship.  If there is no evidence to on which you, I, or

25     the jury can make that conclusion, then I'm not going to let

1    him simply testify to that conclusion based on newspaper

2    articles that he has read.  He has to say he looked at some

3    facts, tell us what those facts are, give us some specific

4    incidents where he says it was established that this money was

5    traced from the PA to the AAMB.  An opinion that it happened is

6    not admissible in this case.

7              MR. YALOWITZ:  Can I just leave you with one thought?

8              THE COURT:  Yes.

9              MR. YALOWITZ:  Which is, in the Arab Bank case that

10   Judge Cogan just tried, I think Levitt testified, if I'm

11   remembering correctly.  I think that the guy who had Eviatar's

12   job in the military intelligence before Eviatar did testified

13   in front of Judge Cogan, and a former Shin Bet intelligence

14   agent like Shrenzel testified.  My memory is we briefed all

15   this stuff before Judge Cogan issued rulings allowing those

16   witnesses to testify.

17             One of the things I want to do is go back and look at

18   what he said.  Those guys all testified, and they came in --

19   I'm not saying that every single word that they might have

20   wanted to say they said.  I'm sure that there are constraints

21   and your Honor is going to try a different case than Judge

22   Cogan.  I'm not saying that just because he did it that you're

23   going to do it.  I just want to look at what he did because I

24   think that, focusing on the really impactful witnesses here,

25   these guys, to get a New York jury up to speed on what these

1    documents mean and how they work and how the defendant works

2    and what the defendant's policies ands procedures are and who

3    the defendant's players are, you need people who know that

4    arena.

5         THE COURT:  I don't disagree with that in the

6    abstract, but it can't simply be that you should find against

7    the defendants because it is my opinion based on everything

8    that I know about them that you don't know about them that they

9    must have done this.

10        MR. YALOWITZ:  No, that is not useful expert

11   testimony.

12        THE COURT:  If you want to, it might be helpful if you

13   think these witnesses testified in front of Judge Cogan on

14   similar issues, let me see the transcript, highlight the

15   portions that they testified about, and I can look at it

16   directly if you think they gave similar relevant testimony.

17        MR. HILL:  None of that testimony is relevant because

18   it wasn't about AAMB.  In fact, Dr. Levitt has never been

19   qualified as an expert in the AAMB.  He hasn't done any

20   academic work in this area.  He is independently not qualified

21   to opine about that issue separate and apart from whether he is

22   just reciting hearsay.

23        MR. HORTON:  I disagree with what Mr. Hill just said.

24   We understand what you say.  We will govern ourselves

25   accordingly.

ECGKSOL2

1          THE COURT:  Let me go back to your briefs, and let me

2     look at the arguments.

3          MR. HILL:  If you look at Dr. Levitt's report, for

4     example, he has an eight-page section of his qualifications,

5     and the words "Al Aqsa Martyrs Brigades" and "Fatah" never

6     appear.

7          THE COURT:  I have not had a chance to look at any of

8     the expert reports, so that's going to be helpful for me to do

9     that.

10         Okay.  I think we have exhausted more than one court

11    reporter.  Let's adjourn.

12         We're scheduled now for January 6th.  I will see you

13    on January 6th.

14         MR. HILL:  I don't think we have a start time, your

15    Honor.

16         THE COURT:  Let's do 11:00 on the 6th unless I hear

17    from you or the circuit before then.

18         Have a happy holiday, and I will see you then.  I will

19    wait to hear whatever further submissions by letter you want to

20    send to me.

21         (Adjourned)

22

23

24

25