RELEASED IN FULL



PLAINTIFF'S EXHIBIT 635

# REPORT PURSUANT TO THE PLO COMMITMENTS COMPLIANCE ACT, AND RELATED PROVISIONS IN THE FOREIGN RELATIONS AUTHORIZATION ACT, FISCAL YEARS 2002 AND 2003

This report and related Presidential Determinations are transmitted in accordance with section 804 of the Foreign Relations Authorization Act, Fiscal Years 1990 and 1991 (the PLO Commitments Compliance Act of 1989 - PLOCCA), as amended, and related provisions of the Foreign Relations Authorization Act, FY 2003 (the "Act"). It covers the period from May 29, 2002 until November 20, 2002. Events occurring after November 20 will be covered in a subsequent report that will cover the period November 20, 2002 until July 15, 2003.

This report describes compliance by the Palestine Liberation Organization (PLO) and the Palestinian Authority (PA), as appropriate, with respect to commitments set forth in section 602 of the Act, and any additional commitments in Chairman Arafat's September 9, 1993 letters to Israeli Prime Minister Rabin and Norwegian Foreign Minister Holst and to those contained in, and resulting from, the good faith implementation of the Declaration of Principles (DOP).

The commitments made by the PLO and cited in the Act are:

(A)   Recognition of the right of the State of Israel to exist in peace and security.

(B)   Acceptance of United Nations Security Council Resolutions 242 and 338.

(C)   Resolution of all outstanding issues in the conflict between the sides through negotiations and exclusively peaceful means.

(D)   Renunciation of the use of terrorism and all other acts of violence and responsibility over all PLO elements and personnel in order to assure their compliance, prevent violations and discipline violators.

In addition, the PLO has committed itself to submit to the Palestine National Council (PNC) changes to the PLO Covenant necessary to eliminate articles that deny Israel's right to exist, and strengthen cooperation with Israel on a wide range of security issues. The Wye River Memorandum of October 23, 1998,

REVIEW AUTHORITY: Charles Daris, Senior Reviewer

2

signed by Prime Minister Netanyahu and Chairman Arafat, further detailed both parties' commitments related to the 1995 Interim Agreement, including Palestinian obligations regarding security cooperation and revision of the PLO Charter. In the Sharm el-Sheikh Memorandum of September 4, 1999, signed by Prime Minister Barak and Chairman Arafat, both sides reiterated their commitment to implement the obligations emanating from the Wye River Memorandum, and further undertook to ensure the effective handling of any incident involving a threat or act of terrorism. This specifically included cooperating in the exchange of information, coordinating policies, and taking measures to prevent an act of terrorism, violence or incitement.

I. Overview of the Reporting Period

The sustained violence between Israelis and Palestinians, which broke out on September 28, 2000, continued at a very high level during this reporting period. According to statistics maintained by the U.S. government, between May 29, 2002 and November 20, 2002, 105 Israelis, including 88 civilians and 17 IDF members, were killed and 600 Israelis, including 52 IDF members and 548 civilians, were wounded in violent incidents. During the same period, 353 Palestinians were killed and approximately 1200 were wounded.

Terrorist groups including Hamas, Palestinian Islamic Jihad (PIJ), the Popular Front for the Liberation of Palestine (PFLP) and the Al Aqsa Martyrs Brigades (AAMB) continued to be very active during the reporting period. These groups utilized a variety of terrorist tactics, including suicide bombs, pipe bombs, mortar attacks, roadside bombings and ambushes, drive-by shootings, and shooting at Israeli homes and military and civilian vehicles.

There were numerous major suicide bombings during the reporting period. Most, if not all of these attacks were clearly aimed at causing civilian casualties. At the same time, Israel increased the scope and duration of its incursions into Palestinian-controlled territory, staying in most Palestinian cities for months at a time, demolished the homes of families of suicide bombers and wanted men, and conducted mass arrests. The Israeli military controlled all major West Bank cities except Jericho and Bethlehem at the end of the reporting period. Palestinian civilians suffered many casualties during these incursions.

Case 1:04-cv-00397-GBD-RLE   Document 693-4   Filed 12/30/14   Page 3 of 12
UNCLASSIFIED U.S. Department of State Case No. F-2013-19349 Doc No. C05697438 Date: 12/16/2014

3

II. Determinations as to Palestinian Compliance with Their Commitments Required by Section 603 of the Act

A. "Recognition of the right of the State of Israel to exist in peace and security": The PLO and PA have not complied with this commitment. Neither the PLO nor the PA has retracted its recognition of Israel and acceptance of a two-state solution. While some low level PA officials have said publicly that Israeli settlement activity might have already made a two-state solution impossible, that is not the official position of either the PLO or PA senior leaderships. Even those PLO or PA figures implicated in the violence have said that their objective was to force an Israeli withdrawal from the West Bank, Gaza, and East Jerusalem, not the destruction of Israel. That said, as detailed below, PA and PLO failure to take action against terrorist groups or others engaged in violence has called into question their commitment to recognizing Israel's right to exist in peace and security.

B. "Acceptance of United Nations Security Council Resolutions 242 and 338": The PLO and PA have complied with this commitment. Neither the PLO nor the PA have retracted their acceptance of Security Council Resolutions 242 and 338.

C. "Resolution of all outstanding issues in the conflict between the sides through negotiations and exclusively peaceful means": The PLO and PA have not complied with this commitment. A commitment to a peaceful resolution of the conflict remains the official position of the PLO and PA. However, the failure to take action against, and in some cases the provision of support for terrorist groups or others engaged in violence, and statements by senior officials during the reporting period, contradicted that official policy.

D. "Renunciation of the use of terrorism and all other acts of violence and responsibility over all PLO elements and personnel in order to assure their compliance, prevent violations and discipline violators": The PLO has not complied with its commitments to assume responsibility over all PLO elements and personnel to assure their compliance with the renunciation of the use of terrorism, prevent violations, and discipline violators. Similarly, the PA has not taken sufficient steps to prevent violence by PA personnel. Some PLO and PA officials supported the Intifada as a proper path towards an acceptable end to the conflict, even as they called for renewed negotiations. Available evidence is that elements with varying degrees of affiliation with the PLO and PA, specifically the Al

4

Aqsa Martyrs Brigade, Tanzim, and members of PA security forces, were frequently involved in acts of violence against Israelis. While there is no conclusive evidence that these groups carried out specific attacks with the prior approval and encouragement of the PLO and PA leaderships, it is clear that these armed elements were not disciplined. In fact, there is strong evidence that some members of the PA security forces were allowed to continue serving even though their participation in terrorist incidents was well known. The PA and PLO senior leadership made only sporadic and ineffective efforts to issue clear instructions to refrain from violence or to assume responsibility over violent elements.

Moreover, some senior PLO and PA leaders did little to prevent – and in some cases encouraged – acts of violence and an atmosphere of incitement to violence in the Palestinian media and through the public statements of Palestinian officials. While the PLO and PA officials often condemned terror attacks against civilians within Israel, they failed consistently to condemn attacks on Israeli settlers and soldiers in the occupied territories. This omission amounted to tacit support for such attacks. For example, one high-ranking PA official referred to suicide bombing as "the highest form of national struggle" in an interview with the al-Jazeera television station. The PA subsequently took no action to discipline the individual or to repudiate his statement. According to the Israeli press, the PA Interior Minister publicly said that while the PA opposed killing civilians it "is not against military operations." The Minister went on to say that settlers should not be considered civilians.

That said, some PA officials have publicly spoken against suicide bombing and other forms of violence. The PLO and PA senior leaderships also routinely condemned suicide bombings, especially those aimed at civilians within the Green Line. Sari Nusseibeh, the PLO representative for Jerusalem, signed an "Urgent Appeal to Stop Suicide Bombing" that was published in a full-page advertisement in a Palestinian newspaper on June 19, 2002. The next day, Arafat welcomed the petition and condemned attacks on civilians. On August 30, 2002, then PA Interior Minister Yahya, in an interview with an Israeli newspaper, called on Palestinians to stop suicide bombings as they were "contrary to the Palestinian tradition, against international law and harm the Palestinian people." However, condemnations of terror were not followed up with concrete sustained actions to prevent further acts of violence.

5

The last PLOCCA report discussed direct payments from the PA to Fatah party activists, some of whom were deeply involved in the ongoing violence. We believe such payments continued during this reporting period.

The PA did not use its capabilities, and the PA and PLO senior leaderships did not consistently make clear that violence was undermining Palestinian interests or that they should be stopped. Even in Gaza, where PA capabilities remained largely intact, security resources were not deployed consistently and effectively against terrorism during the reporting period. Nonetheless, Palestinians from the West Bank, not Gaza, perpetrated the vast majority of suicide and other attacks committed inside Israel. An atmosphere of impunity allowed terrorist groups to act without fearing either legal or political consequences.

III. Imposition of Sanction

Section 604 subsection (a) of the Act requires that if in the report transmitted pursuant to section 603 the President determines that the PLO or PA, as appropriate, has not complied with any of the commitments specified in the Act, or if the President fails to make a determination with respect to such compliance, the President shall impose one of a specified list of sanctions.

In accordance with that requirement, and with reference to my determinations of non-compliance by the PLO and PA with certain commitments, the sanction specified in section 604 (a)(2) of the Act, calling for a downgrade in status of the PLO office in the United States is imposed.

IV. Waiver of Sanction

The United States has a national security interest in helping Israel and the Palestinians end the ongoing violence and resume negotiations. A just, lasting, and comprehensive peace between Israel and its neighbors has been a long-standing and bipartisan goal of U.S. foreign policy in the Middle East. To be able to advance these interests, we must maintain our ties and contacts with all sides. Encouraging a new Palestinian leadership and reform of Palestinian institutions is a key part of our strategy towards the region. Downgrading or closing the PLO office would make it more difficult for us to continue to stay in contact with and support Palestinian reformers who share those goals. Furthermore, downgrading or closing the PLO office

Case 1:04-cv-00397-GBD-RLE   Document 693-4   Filed 12/30/14   Page 6 of 12
UNCLASSIFIED U.S. Department of State Case No. F-2013-19349 Doc No. C05697438 Date: 12/16/2014

6

at this critical time would also complicate our relations throughout the region. For these reasons, and consistent with the justification provided to the Congress in waiving the provisions of section 1003 of the Anti-Terrorism Act of 1987, Public Law 100-204, pursuant to the authority vested in me under section 534 (d) of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, Fiscal year 2002, the President is invoking the waiver authority granted by section 604 (c) of the Act, based on the determination that such a waiver is in the national security interest of the United States.

V. Other PLOCCA Requirements

Security Cooperation

In addition to the commitments detailed above, PLOCCA requires the President to report on Palestinian compliance with its commitment to strengthen cooperation with Israel on a wide range of security issues. Our assessment is that the PLO and PA did not comply with that commitment. In addition, the ongoing violence and Israel's retaliation against PA security elements continued to have a profoundly negative effect on the ability of the PLO and remaining PA security forces to carry out their security responsibilities and the PLO's commitment to strengthen security cooperation with Israel. Citing the involvement of some members of the PA security forces in violence and terror, Israel targeted Palestinian security facilities during some military incursions into the West Bank and Gaza. Israel also targeted individuals, including Palestinian security officers, whom it asserts were involved in planning or carrying out terrorist attacks.

PLO Charter

As mentioned in previous reports, the PLO convened its Executive Committee and the Palestinian Central Council to reaffirm the letter of January 22, 1998, from Chairman Arafat to former President Clinton concerning the nullification of the PLO Charter provisions that are inconsistent with the letters exchanged between the PLO and the Government of Israel on September 9-10, 1993. The Israeli government stated that the Palestinians had met their obligations concerning the revision of the PLO Charter. Our assessment is therefore that the PLO complied with the commitment to amend its charter.

7

### Arab League Boycott of Israel

As previously reported the PLO reiterated its stand against the Arab boycott of Israel when it signed the September 28, 1995 Joint Declaration of the Washington Summit which called, inter alia, for an end to the boycott as soon as possible. Additionally, senior Palestinian Authority economic and trade official Ahmed Quray (now Speaker of the Palestinian Council) made the following commitment in an October 17, 1996, letter to then U.S. Trade Representative Mickey Kantor: "The PLO and the Palestinian Authority and its successors will support all efforts to end the boycott of Israel and will not enforce any elements of the boycott within the West Bank and Gaza Strip." That remains the Palestinian position on the Arab boycott, although in practice the PA has occasionally tried to prevent the entry of Israeli goods into the Gaza Strip in response to Israeli blocking of Palestinian exports.

### Status of the PLO Office

The State Department's Office of Foreign Missions designated the PLO office in Washington a "foreign mission" under the Foreign Missions Act on June 21, 1994. The designation was published in the Federal Register on July 20, 1994. The PLO office and personnel are not accorded diplomatic status, privileges or immunities. The office may not portray itself as a diplomatic mission or embassy, but may portray itself as representing the PLO. Mr. Hassan Abdel Rahman currently heads the office. On October 15, 2002, President Bush exercised his authority to permit the PLO Office to remain open for an additional six months.

### Assistance to Palestinians

The United States has continued to work with the international donor community to meet the humanitarian and developmental needs of the Palestinian people. The United States provides no programmatic foreign assistance funds to the Palestinian Authority, Palestinian Legislative Council, PLO, or to any international funds established to contribute money directly to these entities. U.S. foreign assistance to the West Bank and Gaza funds contractors and non-governmental organizations hired to carry out specific projects, and these organizations are audited by USAID. In some cases, U.S. assistance is in the form of contracts to provide technical assistance to agencies of the Palestinian Authority in areas of high priority to the U.S. and other international donors,

Case 1:04-cv-00397-GBD-RLE   Document 693-4   Filed 12/30/14   Page 8 of 12
UNCLASSIFIED U.S. Department of State Case No. F-2013-19349 Doc No. C05697438 Date: 12/16/2014

8

including health, water, and financial transparency. Furthermore, USAID and Embassy Tel Aviv's country team jointly monitor all Palestinian NGOs that are the recipients of funds to ensure that there are no links to terrorist organizations or to organizations that advocate or practice violence. In some cases -- primarily related to water projects -- equipment, materials, and infrastructure developed by contractors and NGOs have been turned over to PA agencies or instrumentalities.

The U.S. Agency for International Development continues to implement its procedures for the monitoring and supervision of activities performed by USG-funded non-governmental organizations and contractors to ensure that funds are only used for their intended purposes. The Secretary of State has certified, in accordance with section 571 of the FY 2002 Foreign Operations, Export Financing and Related Programs Appropriations Act, that procedures have been established to ensure that the Comptroller General will have access to appropriate U.S. financial information in order to review the uses of United States assistance for the ESF Program for the West Bank and Gaza.

The United States had been actively engaged, together with other donors, in supporting ongoing efforts to reform Palestinian public institutions and increase the accountability of the Palestinian Authority and its financial operations.

Unilateral Declaration of Palestinian Statehood

In the Interim Agreement, both Israel and the PLO agreed that, "Neither side shall initiate or take any step that will change the status of the West Bank and the Gaza Strip pending the outcome of the permanent status negotiations." The sides reiterated that commitment in the Wye and Sharm el-Sheikh Memoranda. In the trilateral statement issued after the Camp David summit, former Prime Minister Barak and Chairman Arafat agreed to a set of principles to guide their negotiations. Point four of that statement says, "the two sides understand the importance of avoiding unilateral actions that prejudge the outcome of negotiations and that their differences will be resolved only by good faith negotiations." On September 11, 2000, the Palestinian National Council (PNC) decided to defer declaring statehood and agreed to meet again on November 15. On November 15 the PNC, citing Israeli restrictions on travel within the West Bank and Gaza and the ongoing violence, announced that its meeting had been postponed. There was no

Case 1:04-cv-00397-GBD-RLE    Document 693-4    Filed 12/30/14    Page 9 of 12
UNCLASSIFIED U.S. Department of State Case No. F-2013-19349 Doc No. C05697438 Date: 12/16/2014

FROM WHITE HOUSE SITUATION ROOM (BR)

9

further official action by the PLO or PA toward a unilateral declaration during the reporting period.

Agreements Signed by the PLO

We have no evidence the PLO has signed any agreements for the benefit of the PA not within the areas allowed in its agreements with Israel (economic agreements, agreements with donor countries for the purpose of implementing arrangements for the provision of assistance to the Council, agreements for the purpose of implementing the regional development plans, and cultural, scientific, and educational agreements). We also have not seen any evidence that Palestinian offices abroad issue Palestinian passports or other Palestinian travel documents.

PA Offices Outside Its Jurisdiction

Under Israeli-Palestinian agreements, the Palestinian Authority may only maintain offices in the areas under its territorial jurisdiction, which do not include Jerusalem. In response to Israeli complaints in previous years, the Palestinians moved several institutions -- including the Vocational Training Center, the Mapping and Geography Department, the Central Bureau of Statistics, the Palestinian Broadcasting Corporation, Institute for Professional Training, the Society for Development and Welfare of Jerusalem and the Youth and Sports Department -- out of Jerusalem, mostly to Ramallah. The PA produced written declarations that offices that remained in Jerusalem did not carry out functions for the PA. Israeli officials welcomed these moves and allowed the offices to remain open. On April 5, 1999, Israeli police distributed orders to close three offices in the Orient House building in East Jerusalem. A court order suspended implementation of the closure acts, and the two sides conducted some discussions to try to reach a solution out of court. The Israeli government had until August 9, 2001 effectively suspended those efforts. However, on August 9, following a suicide bomb attack in Jerusalem that killed 14 Israelis and wounded 140 more, the Israeli government seized and shut down Palestinian offices at Orient House and several other locations in East Jerusalem. Israel later claimed documents found at Orient House and elsewhere showed unauthorized PA activity was carried out at these locations, a charge the Palestinians denied.

10

Role of the Council

The Palestinian Legislative Council (PLC) continued to make strides toward greater relevance in the PA political process during the reporting period. The PLC called for far-reaching reforms and greater democracy and rule of law, but remained weak compared to the commanding power of the executive. USAID's Democracy and Governance program has in the past provided assistance to the PLC to enhance its ability to act as a legislative body. The U.S. will be looking for ways to increase the effectiveness of the PLC in support of Palestinian efforts to reform PA institutions.

Miscellaneous PLOCCA Requirements

- On June 3, 1998, FBI agents arrested Muhammad Rashid. He is currently being prosecuted in the U.S. District Court for the District of Columbia for the August 11, 1982 bombing of a Pan Am flight from Tokyo to Honolulu. The parties currently are waiting for a trial date to be set by the court.

- As reported in previous reports there are no U.S. criminal charges against Abu Abbas and the Israeli government has announced that it has no plans to seek his arrest. There were no further developments during the reporting period.

- Regarding the issue of PLO compensation to American citizen victims of PLO terrorism, the PLO, among others, was sued in Federal District Court in Rhode Island in connection with a 1996 drive-by shooting in Israel in which American citizen Yaron Ungar was killed and two other Americans injured. One of the suspects in that shooting is in Palestinian custody and four are in Israeli custody. The State Department is not a participant in these legal proceedings and is not in a position to address the positions of any of the parties to the suit. The State Department was also not a participant in the Klinghoffer family's litigation and has no information on the terms of the 1997 settlement. At this time, the State Department does not have information available on any other recent compensation claims against the PLO by or on behalf of American victims of terrorism.

- Issues relating to the Hawari group were reported in the January 1994 report. We have no further information.

- Prior to the second Intifada, the PLO agreed to cooperate with our requests for information available to them that could shed

Case 1:04-cv-00397-GBD-RLE   Document 693-4   Filed 12/30/14   Page 11 of 12
UNCLASSIFIED U.S. Department of State Case No. F-2013-19349 Doc No. C05697438 Date: 12/16/2014

11

light on the status of U.S. nationals known to have been held by the PLO or factions thereof in the past. Currently, we do not have an ongoing relationship with the PLO on these matters.

## VI. Report on Transfer of Proscribed Weapons to Persons or Entities in the West Bank and Gaza

Section 699 of the Act requires the President to determine whether there have been any knowing transfers of proscribed weapons to Palestinian entities in the West Bank and Gaza; cut off any assistance and sales of defense articles or services to any foreign person or entity making such a transfer; and report to Congress on transfers reviewed under those provisions.

Although during this reporting period there were no attempts on the scale of the Karine A incident to smuggle proscribed weapons, Palestinian terrorist groups and their sympathizers continued their efforts to illegally introduce proscribed weapons into the West Bank and Gaza Strip. Most weapons were probably smuggled through underground tunnels located along the Egypt-Gaza border. Less used smuggling routes likely included by sea and overland by car. Some Palestinian Authority (PA) security elements in Gaza likely participated in weapons-related activity by assisting smugglers and locally manufacturing some weapons. Israeli interrogations of two mid-level PA officers revealed that other PA officials, including senior leaders, may also have been involved in smuggling, but such allegations cannot be confirmed. There is no indication that the Egyptian or Jordanian governments were complicit in the smuggling of weapons into the West Bank or Gaza.

Some smuggling attempts were thwarted, but many others probably were not. On October 23, a Jordanian security court sentenced four Jordanians to prison terms after convicting them of trying to smuggle machine guns and missiles into the West Bank. In August, Israeli authorities charged two IDF soldiers and two settlers with selling ammunition to West Bank Palestinians. The southern Gaza border town of Rafah continues to be the focal point of smuggling activity, placing civilians there at great risk. As of late October, the IDF had found and destroyed some 37 weapons smuggling tunnels in Rafah, and Reuters reported that tunnels examined had exit points in residences. During an operation on October 13 in which the IDF destroyed two tunnels, armed Palestinians clashed with IDF soldiers, leaving three Palestinians dead and more than 20 hurt. Palestinian civilians often have been caught in the crossfire as

Case 1:04-cv-00397-GBD-RLE   Document 693-4   Filed 12/30/14   Page 12 of 12
UNCLASSIFIED U.S. Department of State Case No. F-2013-19349 Doc No. C05697438 Date: 12/16/2014

FROM WHITE HOUSE SITUATION ROOM 8A

12

armed Palestinian militants sought to repel IDF forces destroying discovered tunnels or conducting other military operations along the densely populated Rafah border. On October 17, a four-year old Palestinian boy was killed when a wall collapsed on him after the IDF leveled an adjoining home used as cover for smuggling.

Cooperation against smuggling remains strong between Israel and Jordan, generally good between Israel and Egypt and non-existent between Israel and the PA. In July, Israeli leaders expressed gratitude for Egyptian assistance in uncovering tunnels and the IDF has characterized cooperation as "generally good." However, in October, IDF Chief of Staff Yaalon said that individual Egyptian soldiers are often bribed to let smugglers through. Lax border inspections probably resulted in some successful smuggling, including overland, from Egypt into Gaza, and additional security measures may need to be implemented on the side of the Rafah border. Lebanese Hizballah and some Iraqis were also suspected of smuggling weapons into the West Bank via Jordan, though the Jordanians have been very successful in thwarting many such attempts.

No basis exists to determine that smugglers have official support from any foreign person or entity to which the U.S. assistance might be given or defense articles or services sold by the United States.