F17GSOKC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x

MARK I. SOKOLOW, et al.,

             Plaintiffs,

          v.                   04 CV 397(GBD)

PALESTINE LIBERATION
ORGANIZATION, et al.,

             Defendants.

-------------------------------x

                          New York, N.Y.
                          January 7, 2015
                          9:40 a.m.

Before:

                HON. GEORGE B. DANIELS,

                          District Judge

                  APPEARANCES


ARNOLD & PORTER, LLP
     Attorneys for Plaintiffs
KENT YALOWITZ
PHILIP HORTON
CARMELA ROMEO

MILLER & CHEVALIER, CHARTERED
     Attorneys for Defendants
LAURA FERGUSON
BRIAN HILL
MARK ROCHON
MICHAEL SATIN

F17GSOKC

1          (In open court)

2          THE COURT:  The jurors are getting their orientation

3    now.  My guess is that it's probably going to be about an hour

4    or so before we are prepared to go down.

5          Why don't we use that time productively.  Let me

6    address some issues that you wanted to raise first and then

7    we'll get back to some of the evidentiary issues.

8          Logistically, I know you raised some questions about

9    who can come down in the space.  Just tell me how many seats

10   you think you'll need.  I can probably accommodate a reasonable

11   number of seats down there, but I can't accommodate 25 people.

12         MR. YALOWITZ:  On the plaintiffs' side, your Honor,

13   it's the three of us, Mr. Horton, Ms. Romeo, myself and we have

14   a professional consultant who is going to do Vulcan mind melds

15   with the jury or something, so that's four.  That leaves 21 for

16   the defense side.

17         THE COURT:  I'm always curious about whether the money

18   is well spent.  The last case was a criminal case.  We had a

19   consultant.  They lost.

20         MR. YALOWITZ:  Well --

21         MR. HORTON:  They didn't have our consultant, your

22   Honor.

23         MR. YALOWITZ:  Sometimes even with the very finest

24   representation, you still have to dance with who brung you.

25         THE COURT:  We're setting up tables.  That's the other

F17GSOKC

1    thing.  It's going to take a couple of minutes to set up the

2    tables downstairs for the lawyers to sit and I'm trying to get

3    them to set aside some seats on the side for others.  We can

4    probably accommodate a half dozen at each table.

5        MR. YALOWITZ:  We'll follow your lead.  Certainly, the

6    three of us can sit at the table, and if our professional.

7        THE COURT:  You have can have either table.

8        MR. YALOWITZ:  Wherever you want him to sit, that's

9    fine with us.

10        THE COURT:  Today I'm not going through the process of

11    introducing the lawyers and the parties.  It's on the

12    questionnaire.  I'm going to wait until we bring in the jurors

13    next week before we start the individual discussions with the

14    potential jurors, that's when I will introduce the parties.

15        If you want any plaintiffs or representatives to be

16    introduced, have them here next week on Tuesday when we bring

17    in the jurors and that's when I'll make all of the

18    introductions.  And whoever you want introduced, have them here

19    Tuesday morning.  Give me a list so I can introduce everyone.

20        MR. YALOWITZ:  Okay.  We'll do that.

21        THE COURT:  Mr. Rochon.

22        MR. ROCHON:  I thought it was going to be as many as

23    nine for us:  The four counsel, two client representatives and

24    there are three members of the consulting team here.  However,

25    if you're not going to be introducing parties or people today,

F17GSOKC

1  I may excuse the client reps just to not have so many people

2  there frankly.

3          THE COURT:  All right.

4          MR. ROCHON:  And that would then have us at a total of

5  seven.

6          MR. HILL:  Seven.

7          THE COURT:  Would you want all seven at the table?

8          MR. ROCHON:  I doubt that.  I don't know the layout of

9  the room.  I've never been on jury duty here.

10          THE COURT:  The layout of the room is it doesn't even

11  accommodate this.  We're putting tables there.  As a matter of

12  fact, the tables had to be moved to bring in the jurors to give

13  them the orientation.  So they're going to set up the tables as

14  soon as they finish their orientation.  So it's probably going

15  to be two sets of similar tables, probably not that large, but

16  my guess is four or five people could fit at the table, maybe

17  six, depending on which table they're using.  Then I've asked

18  them to try to find some seats on the side.

19          I'll have someone call downstairs and find out the

20  logistics of the numbers.  Those numbers I think are

21  manageable.

22          MR. ROCHON:  I think our consultants will sit at the

23  side.  And I appreciate your point about the cost of

24  consultants.  It's a very, very good point.

25          THE COURT:  You both have consultants.  One of you are

F17GSOKC

1   going to get your moppy's worth.

2          MR. ROCHON:  By definition, someone is always happy.

3          I know we have the jurors assigned numbers.  Will they

4   be in order down there today?

5          THE COURT:  No.  The way it's going to work is, before

6   we get down there, I have instructed them to give the numbers

7   out to the jurors and to give them -- as a matter of fact,

8   they're going to have a slip of paper in their hand that tells

9   them what their number is.

10         MR. ROCHON:  Okay.

11         THE COURT:  As soon as I finish giving them the

12  introductory remarks, the jury personnel are going to start

13  calling the numbers and they're going to say juror number one.

14         MR. ROCHON:  Right.

15         THE COURT:  And that juror is going to get up,

16  wherever that juror is sitting, they're going to come right up

17  and then we're going to hand them the questionnaire and then go

18  back and take a seat.

19         MR. ROCHON:  They'll be coming from different spots.

20         THE COURT:  Right.  But they'll be coming right up to

21  the front to get their questionnaire.  So that's the process I

22  decided on so you can see who they are and you can make notes,

23  whatever notes you think or your consultants think are relevant

24  to further assessing their eligibility.  It's going to take a

25  little bit of a sit-and-wait process.

F17GSOKC

1           MR. ROCHON:  Sure.

2           THE COURT:  If you figure it takes 30 seconds or 60

3      seconds for each juror to come up and get their question

4      anywhere, we have 200-plus jurors.  So 200 times one minute is

5      200 minutes.

6           MR. ROCHON:  Right.

7           THE COURT:  I think it's worth doing that process so

8      we can see who the people are.  So we'll get a call.  Give me a

9      second with my law clerk.  We'll verify that.

10          I'm being told that what we have worked out with them

11     is that we are trying to set up six seats at each table and

12     trying to set up as many as ten seats to the side.  It should

13     be plenty given the limited number of people we have here.

14          I don't know if there is going to be significant press

15     interest in this process, but I'm not going to exclude them

16     given the issues that we have already addressed with them, so

17     I'll put them off to the side or any other interested people,

18     as long as it's reasonable and we know who is in there.

19          The only thing is that I need to ensure that you need

20     to get your folks out right away.  And I need to ensure that

21     everybody who is not a juror leaves after we finish because

22     then the jurors are going to be sitting there filling out the

23     questionnaires for the next hour.  Hopefully, we can get

24     through that process at least by lunchtime or sometime after

25     lunch, we'll hopefully have the questionnaires.

F17GSOKC

1          I think another issue was raised, and I didn't

2     addressed yesterday, it was about the affirmance of the

3     witnesses.  I don't have any problem -- I'll do it any way you

4     want to do it.  There are three ways to do it.  Jurors either

5     swear, they either affirm or they swear or affirm.  So I'll do

6     it either way you want me to do it.  I just want to be

7     consistent.

8          MS. ROMEO:  We spoke about this with defense counsel

9     and they don't have any objection to giving the witnesses an

10    option to affirm or swear.  It's a matter of religious

11    preference for a lot of the plaintiffs and witnesses, so as

12    long as they're given that opportunity, we're fine with that.

13         THE COURT:  The language is, "Do you solemnly swear or

14    affirm," and we'll leave it at that.

15         MS. ROMEO:  Right.

16         THE COURT:  Then we take out "So help you God."

17         MS. ROMEO:  That would be fine.

18         THE COURT:  That would be the standard process for

19    each juror.  And they can just say I do and that will be it.

20         MS. ROMEO:  Thank you.

21         I wanted to address first -- I want to try to put

22    aside the -- both sides raised some objections based on the

23    timeliness of the disclosure.  I want to put that aside very

24    quickly.  It's unclear to me given the different

25    representations by each side with regard to the timeliness of

F17GSOKC

 1    the disclosure exactly what the determinative issue is.

 2              Let me start with the plaintiffs.  Mr. Yalowitz, I

 3    think your objection based on timeliness went to some expert

 4    opinions.  I don't know.  There may be some other areas, too.

 5              MR. YALOWITZ:  I'm sorry I wasn't clear about that,

 6    your Honor.  My problem is not with the expert witnesses.  We

 7    had an agreed-on schedule with the experts and we received

 8    their reports timely.  We interviewed them on deposition.  That

 9    all went smoothly.

10              THE COURT:  I'm sorry.  I have it backwards.

11              MR. YALOWITZ:  My issue was we got the defendants'

12    witness list in January in accordance with the schedule that

13    Judge Ellis set and we said, well, who the heck are these

14    people?  A lot of them we've never heard of.

15              THE COURT:  Because let me make sure we're on the same

16    page.  You're talking about people like Issa Asrawi, Safia Baya

17    (ph), those people?

18              MR. YALOWITZ:  Right.

19              THE COURT:  Tell me who it is that is a surprise to

20    you and why I should exclude them.

21              MR. YALOWITZ:  Sure.  Frankly, they were all a

22    surprise to me.

23              THE COURT:  And "all" meaning how many of the

24    witnesses?

25              MR. YALOWITZ:  There are 12 left.  There were 21.

F17GSOKC

1            THE COURT:  Right, because they withdrew nine of those

2    witnesses.

3            MR. YALOWITZ:  Right.

4            THE COURT:  So you say now there are still 12 left.

5            MR. YALOWITZ:  There are 12 left.  Of the 12 be two of

6    them --

7            THE COURT:  -- are being replaced.

8            MR. YALOWITZ:  Two of them were, you know, New Year's

9    Eve replacements.  So those people I never heard of.  And

10   frankly, those two people seem like propagandists.  I don't

11   really get how they have anything relevant to say to the case.

12   They weren't in the case at the time and they weren't in the PA

13   at the time and maybe the defense can explain what they

14   actually think they're going to talk about, that they have from

15   personal knowledge.

16           THE COURT:  I assume they're going to talk about the

17   same thing that they're substituting for this other witness.  I

18   didn't think there was a substantive issue.

19           MR. YALOWITZ:  I don't know how you have somebody who

20   comes and talks about the origins of the Palestinian Authority

21   when they weren't there.

22           THE COURT:  Well, that's possible.  It's not

23   impossible.  I'm not even sure the people they're replacing are

24   there at the beginning.

25           MR. YALOWITZ:  That was a problem that we raised as

F17GSOKC

1    well.

2                THE COURT:  That's not the new issue.

3                MR. YALOWITZ:  Right.

4                THE COURT:  The new issue is -- and you're right, they

5    fall into a different category than the other witnesses.  They

6    told you they were going to call two witnesses and they gave

7    you the subject matter of their testimony.  Now they found out

8    that those two witnesses are not available, so they want to

9    substitute two more witnesses.

10                My initial view in the abstract is always, well, look,

11    if that was a timely substitution, meaning that fairly soon

12    after they realized that they had to replace those witnesses,

13    they told you who they were going to replace them with, and

14    these new witnesses are not testifying to new information that

15    you didn't anticipate from the old witnesses, I'm not

16    particularly compelled to say that they should be excluded

17    because now they are being substituted at the last moment.

18    That's a different analysis than just people who just come out

19    of the blue and have different testimony.

20                MR. YALOWITZ:  I understand that thought.

21                THE COURT:  I assume you were aware of the other two

22    witnesses that they're substituting for and you were aware of

23    the nature of their testimony.

24                MR. YALOWITZ:  No.  That's the problem.

25                THE COURT:  That's not problem, because the issue you

F17GSOKC

```
 1   raised is not having notice of the witnesses.  You clearly had

 2   notice of those other two witnesses.

 3            MR. YALOWITZ:  I didn't, your Honor, respectfully.

 4   Let me take you through the chronology.

 5            THE COURT:  You didn't know Fayyad and Safia (ph) were

 6   on the witness list?

 7            MR. YALOWITZ:  I knew they were on the witness list in

 8   January of 2014.

 9            THE COURT:  Right.  So you were aware they were going

10   to be called as witnesses?

11            MR. YALOWITZ:  I was aware January 2014.  When I found

12   out -- and I know who Salam Fayyad is.  I'm not naïve.  Well,

13   maybe I am in some ways.  But a lot of these witnesses we never

14   heard of.

15            THE COURT:  I know, but I'm trying to take this point

16   by point.  Those two witnesses you have heard of, right?  You

17   heard of those witnesses in January of 2014.  And this is going

18   to be -- unless both of you can convince me in regard to this

19   kind of objection otherwise, my basic attitude about this is,

20   look, if these people were disclosed to you as being witnesses

21   at this trial in a timely manner during discovery, it is not a

22   valid objection now to say to me you have no idea what they're

23   going to talk about.

24            MR. YALOWITZ:  Okay.

25            THE COURT:  I'm not going to accept that.  My attitude
```

F17GSOKC

1    for both sides is, if you found out that this person was on the

2    witness list a year ago, then it was your responsibility at

3    that time to figure out what this person was going to testify

4    to.  And if you did nothing, sat on your hands, I'm not going

5    to hear an objection now that even though you knew they were on

6    the witness list, they never told you what they were going to

7    testify about.

8              MR. YALOWITZ:  Okay.

9              THE COURT:  I'm not going to accept that argument from

10   either side.

11             MR. YALOWITZ:  Let me give you the facts so that we're

12   both talking from the common set of facts, and then you can

13   figure out what to do, all right?

14             In January of 2014, I get a list of -- call it

15   whatever it was -- 21, 12 of whom are still in play.

16             THE COURT:  Okay.

17             MR. YALOWITZ:  It's a list of people, some of whom I

18   have heard of, like Salam Fayyad.  I know who he is.  You can

19   look him up on Wikipedia.  And there were others of whom I have

20   absolutely no idea who they are.

21             THE COURT:  You got this list in January of 2014?

22             MR. YALOWITZ:  Correct.  So the first thing I did is,

23   I went back through all of the discovery and remember, I came

24   in the case after discovery was closed.  So I worked with my

25   colleagues and we went back and we figured out, okay, we have

F17GSOKC

1    some information about some of these individuals, for example,

2    Fayyad, we have a deposition from.  Other individuals, we have

3    no clue who they are.  We can't find them anywhere in

4    discovery.  There's no Rule 26(a) disclosure.  There's no

5    document I could find about them.

6            THE COURT:  So what did you do about them in January

7    of 2014?

8            MR. YALOWITZ:  I immediately wrote to Mr. Hill and I

9    said, we can't figure out who these people are.  We don't have

10   a 26(a) disclosure.  We didn't ever have the fair notice that

11   you were going to put them on your witness list, and so we need

12   to know who they are and we need a deposition of these people.

13           THE COURT:  Okay.

14           MR. YALOWITZ:  And Mr. Hill said pound sand.  So, we

15   then came to you and we said we need these witnesses either

16   precluded or we need a deposition and we did that in the *in*

17   *limine* motion, which we filed in May.

18           THE COURT:  When?

19           MR. YALOWITZ:  In May.  So as far as me being

20   prejudiced, my prejudice is, I never had them, I never had

21   notice of them while we were in the discovery phase.  When we

22   get out of the discovery phase, I get notice of them, I jump on

23   it and I say I need to know who these people are, you are

24   prejudicing me and I need their depositions.  If we had done it

25   in May, you know, I could have taken their depositions easily.

F17GSOKC

1          THE COURT:  Did you get a response in writing?

2          MR. YALOWITZ:  Yes, I did.

3          THE COURT:  What did the response in writing say?

4          MR. YALOWITZ:  I'll look it up and we'll give it to

5    the Court, because I don't have it memorized, but the response

6    in writing said, in words or substance, we have given you

7    everything we think you're entitled to.  In words or substance,

8    that was the response.

9          THE COURT:  You believe you received a letter which

10   indicated that they were refusing to give you any information

11   with regard to these witnesses who were disclosed after the

12   close of discovery?

13         MR. YALOWITZ:  I have a clear and specific memory of

14   the letter and I have a state-of-mind recollection about it.

15         THE COURT:  If you can tell me what that language

16   is --

17         MR. YALOWITZ:  We will get it to the Court this

18   afternoon.

19         THE COURT:  Mr. Rochon, is there some reason why

20   they're in a position -- if they requested information about

21   these witnesses in January of 2014 and indicated that they

22   might want to take their deposition, is there some reason why

23   it did not happen?

24         MR. ROCHON:  I'm not sure if they indicated a desire

25   to take the deposition.  Mr. Hill will address this issue.  I

F17GSOKC

 1   appreciate the Court reaching out to me, but I'll defer to him.

 2              THE COURT:  Mr. Hill, did you refuse to give them any

 3   further information with regard to these witnesses?

 4              MR. HILL:  What we said was that we didn't think we

 5   violated Rule 37.  We don't think we did.

 6              THE COURT:  Had you disclosed these witnesses during

 7   discovery?

 8              MR. HILL:  With the exception of one at the time, yes.

 9              THE COURT:  You disclosed them in what manner?

10              MR. HILL:  We produced their depositions.  We

11   identified them in response to interrogatories.  And we

12   produced documents that had their names on them indicating that

13   they were involved.

14              THE COURT:  Did you indicate at any point in time

15   during discovery that you anticipated that these people were

16   potential witnesses?

17              MR. HILL:  By producing them under Rule 26(e) and the

18   information about them, I believe we complied with that

19   obligation; yes, your Honor.  We did not send a 26(a)

20   disclosure saying that they are now witnesses.  We otherwise

21   disclosed them in discovery pursuant to 26(e).

22              THE COURT:  Is there a reason why they weren't

23   disclosed in that manner until January of 2014 after the close

24   of discovery?

25              MR. HILL:  Well, they were disclosed during discovery

F17GSOKC

1    and then when we prepared the joint pretrial order and listed

2    the witnesses, we then listed their names.

3                THE COURT:  What information did you disclose other

4    than their names?

5                MR. HILL:  For some of them, we produced depositions

6    that had been taken in other cases.  For some of them, we

7    responded to specific interrogatories about their knowledge.

8    And for some of them, we produced documents that have their

9    names on them indicating they were involved in preparing the

10   documents.

11               THE COURT:  Is there anyone on that list that we're

12   talking about now that was disclosed in January of 2014 that

13   you did not produce any information about or any relevant

14   documents or testimony?

15               MR. HILL:  Prior to the close of discovery?

16               THE COURT:  Prior to -- putting their name on the list

17   in 2014?

18               MR. HILL:  There's one individual, General Al-Yaman.

19   He was disclosed only because the documents that he pertains to

20   were produced after the close of discovery.  Those were the

21   so-called GIS files.  As you remember, we initially withheld

22   those on a claim of privilege and we have subsequently produced

23   them, but that production occurred after the close of

24   discovery.  The plaintiffs were aware of him because they

25   mentioned him in a letter in October of 2013.

F17GSOKC

1          THE COURT:  What is the subject matter of his

2    testimony?

3          MR. HILL:  He'll testify about those files, including

4    facts in the files about the escape of Hashaika and Shawish.

5          THE COURT:  Is there any way the other side knows what

6    the substance of his testimony will be?

7          MR. HILL:  We put in the letter that we sent to your

8    Honor on the 23rd.

9          THE COURT:  On the 23rd of?

10         MR. HILL:  December.

11         THE COURT:  If you can group the other witnesses at

12   issue, what is the nature of their testimony?

13         MR. HILL:  Sure.  I can go through them.  This is

14   Mr. Rochon's letter dated on the 23rd.  Salam Fayyad has now

15   been substituted by the information.  There, it's about the

16   background of the PA and the PA security forces at the time.

17         THE COURT:  The substituted witnesses are Fayyad and

18   the other one who has been substituted, is that essentially the

19   same testimony that you were going to present with regard to

20   those witnesses?

21         MR. HILL:  Yes, and I think in addition, Mr. Issa, who

22   is the substitute for Dr. Fayyad, would also testify generally

23   about social payment policies.  He's the current minister of

24   social affairs.  But that's the subject matter that was covered

25   by other witnesses, including Jawad Amawi and Radwan El Hilo

F17GSOKC

1    and the three witnesses from the Martyrs' Institute.

2                THE COURT:  Are the plaintiffs in a position to know

3    the substance of the testimony of all of these witnesses at

4    this point?

5                MR. HILL:  I believe so.  We disclosed numerous

6    depositions taken in other cases about these general policy

7    issues.  We disclosed a declaration from one of the people

8    associated with the Martyrs' Institute who has general

9    information about the Martyrs' Institute, the way it functions,

10   the way they go about preparing the documents that the

11   plaintiffs want to offer into evidence in this case.  We

12   disclosed the GIS files that contain the information about the

13   escape of Shawish and Hashaika.  We have disclosed the

14   substance of Governor Al-Bakri's testimony about the escape of

15   Abdullah Barghouti.

16               MR. YALOWITZ:  I'm sorry.  That one is not true, your

17   Honor.  That's really not true.

18               THE COURT:  Mr. Yalowitz, you can't do it that way for

19   two reasons:  One, I can't follow it; and two, my court

20   reporter -- the record gets confused.

21               MR. YALOWITZ:  Sorry.  I apologize.

22               THE COURT:  I've never refused to hear from you.

23               MR. YALOWITZ:  I know.  I know.  It's just so many

24   misrepresentations that it's really hard.

25               THE COURT:  Relax, and you can tell me that after he

F17GSOKC

1    has fully given me.

2              MR. YALOWITZ:  I wish we would have counsel that would

3    stick to the actual record --

4              THE COURT:  Mr. Yalowitz, I wish that too, and I wish

5    you would stop saying that because it wastes my time.

6              MR. YALOWITZ:  I understand.

7              THE COURT:  Let me try to resolve it.

8              MR. HILL:  Yes.

9              THE COURT:  So is it your position that all of these

10   witnesses were named and only the one general is the only

11   person that you did not provide some sort of documentation to

12   accompany the disclosure of that person with relevant

13   information?

14             MR. HILL:  Just to be precise:  Everyone except

15   General Al-Yaman was disclosed in Rule 26(e) disclosures during

16   fact discovery with the exception of the two that we're trying

17   to substitute as you know obviously.  So General Al-Yaman was

18   disclosed when we made the productions of the GIS files

19   pursuant to the Court's order of 2013 and the plaintiffs were

20   aware of him no later than October 2013.

21             THE COURT:  Mr. Yalowitz, did you want to add

22   something?

23             MR. YALOWITZ:  Yes, I do.  I think what Mr. Hill has

24   done is incredibly deceptive, your Honor.  I'm shaking with

25   rage.  I'll give you an example.  I'll give you two examples

F17GSOKC

1    that spring to mind:  The first one is these three martyrs

2    foundation ladies, I guess it's two ladies and a man from their

3    martyrs foundation.  And they said in response to my *in limine*

4    motion, oh, these people were disclosed, just like Mr. Hill

5    stood here and said that to you.  And we went back to try to

6    find how they were disclosed.  It turns out, their handwritten

7    signatures were on documents in Arabic in, like, fact

8    documents.  That's their disclosure.  And now they want to

9    bring these people to say this is how our martyrs foundation

10   works and why we make payments and stuff like that.

11        That's not a disclosure that puts me on notice that

12   there's going to be a witness at trial who I might want to take

13   the deposition of to find out what they're actually going to

14   say so I can reasonably prepare for trial.  That's number one.

15        Number two, and this one is really, really outrageous

16   to me is Mr. Hill says -- and I really do apologize for

17   interrupting and I take the admonishment seriously -- but to

18   say that the defendants' disclosed that Abdullah Barghouti

19   escaped, that that's their story, is an outrageous

20   misrepresentation.  I have never seen -- and I know this record

21   pretty well, maybe I'll stand corrected -- but I have never

22   seen a document or a transcript or a letter or anything in

23   which anybody from the defense side said our defense, our

24   theory of the case is that Abdullah Barghouti escaped so we're

25   not responsible for his activities.

F17GSOKC

1              In fact, there was an exchange of correspondence and a

2     meeting with Judge Ellis about Abdullah Barghouti in which the

3     plaintiffs' side represented that our theory of the facts based

4     on the documents is that Abdullah Barghouti was released from

5     prison, and those documents include Abdullah Barghouti's own

6     statements as well as statements of Ahmed Barghouti who

7     released him and so the idea that this guy who is the governor

8     of -- I don't know where he's even the governor of -- I don't

9     have it here, but he's not a prison warden.  He's a governor.

10    He's a politician.  How does he know that Abdullah Barghouti

11    was escaped.  Was he guarding him?

12             THE COURT:  How are you going to prove that he was

13    released?

14             MR. YALOWITZ:  From his statements.

15             THE COURT:  Whose statements?

16             MR. YALOWITZ:  Abdullah Barghouti saying I was

17    released, and from the statements of Ahmed Barghouti who was

18    convicted of providing material support for Abdullah Barghouti

19    because he said I took Abdullah from the prison to the safe

20    house, that's in his own inculpatory statements and in the

21    conviction to which he pled guilty.

22             THE COURT:  I'm not sure how the second goes to the

23    issue of whether he escaped.

24             MR. YALOWITZ:  Well, maybe he didn't -- fair enough.

25    The statement I think goes further than that and says, you

F17GSOKC

1    know, we got him from Jibril Rajoub and Rajoub turned him over

2    to us.  Things like that.  It's pretty well documented that

3    Rajoub released -- and then the other thing is, there's that

4    deposition testimony about his arrest where there was a witness

5    to the arrest who said there was a side deal between Marwan

6    Barghouti and Jibril Rajoub to arrest him and then be released.

7              THE COURT:  Yousef.

8              MR. YALOWITZ:  Mosab Yousef, right.  So we have a

9    series of pieces of evidence saying that he was released or

10   making it more likely that he was released than that he

11   escaped, but I never heard of a theory of the case that he was

12   escaped from the defendants until they wrote this letter to

13   your Honor at your Honor's request saying tell me what these

14   people are going to testify to.

15             THE COURT:  Who is the witness?

16             MR. YALOWITZ:  Al-Bakri, Jibreen Al-Bakri.

17             THE COURT:  Mr. Hill, did you ever disclose that this

18   witness had information with regard to an escape?

19             MR. HILL:  Yes, your Honor.  I was given an

20   interrogatory that asked me to identify individuals who had

21   information about the arrest or interrogation of Abdullah

22   Barghouti and identified Governor Al-Bakri.  That was in March.

23             THE COURT:  Did you say anything about the escape?

24             MR. HILL:  No.  It wasn't called for by the

25   interrogatory answer.  This was a question about witnesses with

F17GSOKC

1    knowledge of the arrest and interrogation.  I disclosed him.

2            THE COURT:  Did you ever disclose that you had a

3    witness who was going to come in and testify that he had

4    escaped?

5            MR. HILL:  No.  I disclosed the witness and the

6    plaintiffs' chose not to depose him and they chose not to

7    discover that information.

8            THE COURT:  Is there reason why you didn't disclose

9    that information?

10           MR. HILL:  I wasn't asked that question.  I was never

11   asked in an interrogatory do you have a witness who knows about

12   an escape.  They didn't ask that.

13           THE COURT:  Were you asked about witnesses and the

14   subject matter of their testimony?

15           MR. HILL:  No.  I never got an interrogatory like

16   that.

17           THE COURT:  Did you represent anything about

18   Mr. Al-Bakri's -- the subject matter of his testimony?

19           MR. HILL:  I represented that he was responsive to the

20   interrogatory that asked about the arrest and interrogation of

21   Abdullah Barghouti, and they chose not to take his deposition.

22           THE COURT:  They say that you did not make a clear

23   disclosure of any of these witnesses.  They say that the

24   disclosure you made was producing a document that had some

25   signature of a person in Arabic.

F17GSOKC

1          Did you ever affirmatively disclose this person as a

2   potential witness or as someone who would have relevant

3   information?  Did you ever make that representation?

4          MR. HILL:  We certainly did it in January of 2014 as

5   part of the witness list; and then in addition, we filed a

6   declaration in this case and in another case from Mr. al-Deek

7   that explains in some detail his knowledge of the general

8   operation of a Martyrs' Institute.  And these witnesses are, to

9   a certain degree, in the nature of rebuttal.

10         As you know, we have objected to the admissibility of

11  these documents.  If the plaintiffs are going to be allowed to

12  offer them, it would severely prejudice our clients if the

13  people involved in their preparation are not allowed to testify

14  and explain what the documents mean and the basis of their

15  knowledge, the general operation of the fund.

16         As you know, the plaintiffs' theory is this is a

17  reward for terrorism.  We would need to be able to call a

18  witness that explains that it's not.

19         THE COURT:  Was Al-Bakri on the list in January?

20         MR. HILL:  Yes.

21         THE COURT:  Of 2014?

22         MR. HILL:  He was.  And with respect to government

23  Al-Bakri, I suggest we set him aside until after you have ruled

24  on the renewed motion for summary judgment because he will only

25  testify about the Hebrew University incident.  We believe

F17GSOKC

1    you're going to grant summary judgment on that because I know

2    Mr. Yalowitz has talked about evidence of a release today.

3    That is all hearsay, and your Honor has already excluded most

4    of that.  We have before you a letter about this double-hearsay

5    statement of Mr. Yousef at his deposition.  And we think when

6    you look at the evidence that they actually have, you're going

7    to end up granting summary judgment on that matter anyway, in

8    which case, Governor Al-Bakri will not need to testify.

9            THE COURT:  I want to deal with both sides' motion

10   together.  What's the nature of your compliant that you did not

11   get full disclosure?

12           MR. HILL:  The majority of the thousands of exhibits

13   on the exhibit list were not produced during fact discovery.

14           THE COURT:  They were produced when?

15           MR. HILL:  After the close of fact discovery?

16           THE COURT:  When?

17           MR. HILL:  On a rolling bases some as recently as last

18   week.

19           THE COURT:  Beginning when?

20           MR. HILL:  Beginning shortly after fact discovery

21   closed and the basic of that principal was the magistrate

22   judge's direction.  The magistrate told us not to do that.

23           THE COURT:  I'm not sure what's at issue because

24   that's not the nature of your motion.  I thought your motion

25   was directed at expert testimony.

F17GSOKC

1          MR. HILL:  Which motion are you referring to?

2          THE COURT:  Your motion to exclude expert testimony as

3     not being timely disclosed.

4          MR. HILL:  Yes.  That's with respect to the so-called

5     reports.

6          THE COURT:  I didn't know that there was another

7     outstanding motion to exclude all of these documents as

8     untimely disclosed.

9          MR. HILL:  We objected to them individually.

10          THE COURT:  Right.  But I don't have a letter

11     application asking me to exclude those documents because they

12     were untimely disclosed.  The untimeliness issues that I'm

13     dealing with have to do with what they raised and what you

14     raised with regard to experts.

15          MR. HILL:  If your Honor wouldn't mind, I'd like to

16     show you one of them and talk about it in particular.

17          THE COURT:  I have the January 2 letter.

18          MR. HILL:  Yes.  May I approach?

19          THE COURT:  Yes.

20          MR. HILL:  I have handed the Court a copy of

21     Plaintiffs' Trial Exhibit 325.  It's very short.  You may want

22     to read the English and then I can talk about it.  It's only a

23     couple of paragraphs.

24          THE COURT:  Okay.  Israeli police memo.

25          MR. HILL:  Yes.  It's actually two memos, but they're

F17GSOKC

1      put together.

2                   THE COURT:  Go ahead.

3                   MR. HILL:  The objection here is that this document

4      was first produced to us after the close of fact discovery in

5      March of 2013.  It's actually two different memos by apparently

6      two different Israeli police officers, setting aside whether or

7      not it could be authenticated since none these witnesses are on

8      the exhibit list.

9                   What it says is that it examined the crime scene where

10     the Guettas were shot on January 8, 2001.  As you can see on

11     the first page carrying over to the second, it talks about how

12     this officer apparently recovered 15 AK-47, 7.65 caliber bullet

13     casings and that he marked them and sent them to investigation.

14     And then on the third page, a different officer talks about

15     recovering 15 more 7.65 bullet casings from a vehicle in an

16     Arab village called Biddu.

17                  So, obviously, the identification of the casings as

18     having that particular caliber or coming from that particular

19     weapon is an expert opinion, and this is a person who I did not

20     have an opportunity to depose.  I probably couldn't depose him

21     anyway.  He's in Israel.  And the plaintiffs want to offer this

22     for the truth of the matter asserted that the bullet casings

23     were, in fact, from that type of gun.  This is obviously going

24     to be very prejudicial to me if the jury gets this.

25                  THE COURT:  I don't understand that at all.  I don't

F17GSOKC

1    understand.  You say it's obviously very prejudicial to you.

2    I'm not sure I understand at all what difference it could

3    possibly make in this case.

4             MR. HILL:  I don't want to make Mr. Yalowitz'

5    argument.  He can correct me if I'm wrong.

6             THE COURT:  I want you to make your argument about

7    prejudice.  I don't see the prejudice.  Who cares?  Why would

8    the jury care?

9             MR. HILL:  They're going to argue their expert

10   Mr. Shrenzel has said that because they were AK-47 casings,

11   that's an indication that PA employees were involved because an

12   AK-47 is a weapon carried by PA security forces.

13            THE COURT:  An AK-47 is a weapon carried by a lot of

14   people.

15            MR. HILL:  Indeed it is, your Honor.

16            THE COURT:  I understand the testimony about whether

17   or not -- because it's an AK-47, that the logical conclusion is

18   that it must have come from the PA.

19            MR. HILL:  Right.

20            THE COURT:  You are saying that there's some reason to

21   believe that an AK-47 wasn't used?

22            MR. HILL:  What I'm saying is I didn't have a chance

23   to test this in discovery.

24            THE COURT:  I understand, and I'm trying to figure out

25   whether or not giving you an opportunity to contest that is

F17GSOKC

1     going to put us in any different situation than we're in right

2     now.  And you have some reason to believe that this is at

3     issue?

4               MR. HILL:  Yes.

5               THE COURT:  You think it wasn't an AK-47.

6               MR. HILL:  He can correct me if I'm wrong.  I

7     understand his argument to be that one of the bases for finding

8     liability against my clients is that the weapon that was used

9     was in fact an AK-47.

10              THE COURT:  Have you done any independent

11    investigation to determine whether or not AK-47s were or were

12    not used?

13              MR. HILL:  I don't know how I could have done so, your

14    Honor.  I don't have --

15              THE COURT:  Then if you had this information, how

16    could you have done that?

17              MR. HILL:  How could I have investigated in Israel the

18    police files of the Israel police?

19              THE COURT:  No.  You say you are prejudiced because

20    you didn't have this.  You have this now.

21              MR. HILL:  Yes.

22              THE COURT:  You had this for two years.  Is there some

23    way, simply because you have this, that you could have done

24    something to either determine whether this is true or not true?

25              MR. HILL:  I don't know how I could have.

F17GSOKC

1              THE COURT:  Then how are you prejudiced?  If you

2     couldn't have done anything if you had gotten it five years

3     ago, how are you prejudiced, because you got it three years

4     ago?

5              MR. HILL:  During discovery, I could have.

6              THE COURT:  Done what?

7              MR. HILL:  I could have asked the Court to take a

8     deposition of the author of the report.

9              THE COURT:  You just said it's unlikely you would have

10    gotten a deposition.  You wouldn't have even found the author

11    of the report to get a deposition.

12             MR. HILL:  I know his name and I could have asked for

13    a Hague request to depose him.

14             THE COURT:  I'm just saying what you said to me five

15    minutes ago.  You said it was unlikely that you would possibly

16    be able to take his deposition.  That's what you said to me.

17             MR. HILL:  If I did, I misspoke.  I couldn't take his

18    deposition after fact discovery disclosed.

19             THE COURT:  That's not what you said.

20             MR. HILL:  But I misspoke.  That's the point I'm

21    making, is that having not gotten it during fact discovery, I

22    could not have used this Court's discovery tools to depose the

23    author of the document to request the Israeli government to

24    provide me access to the casings so my own independent expert

25    could make a determination.

F17GSOKC

1    THE COURT:  Why couldn't you have done that in 2013

2 when you received the report?

3    MR. HILL:  Discovery was closed.

4    THE COURT:  Discovery was closed, but your

5 investigation wasn't closed.  Why couldn't you have

6 investigated whether or not this information was true?

7    MR. HILL:  I don't know how I would have gone about

8 doing so.

9    THE COURT:  I guess you could have made an inquiry.

10    MR. HILL:  To the government of Israel?

11    THE COURT:  I don't know.  I don't know how you say

12 that you would have made --

13    MR. HILL:  I think that would have been an exercise in

14 futility.

15    THE COURT:  So would deposing this witness if this

16 witness has already given a sworn statement that it was an

17 AK-47, it would be an exercise in futility unless you can tell

18 me there's a reasonable basis to believe that the witness was

19 going to break down and say I was lying when I wrote the report

20 that it really wasn't an AK-47.

21    MR. HILL:  No, but what I would test is the

22 qualifications, I would test the testing.  The witness just

23 says I collected them and they are AK-47s.

24    THE COURT:  Is there any basis on which you can tell

25 me that you think there is a genuine dispute about the type of

F17GSOKC

1  weapon that was used in this case?

2            MR. HILL:  Yes, I do dispute that.

3            THE COURT:  What is the basis of your believing that

4  there's a genuine dispute about the type of weapon that was

5  used in this case?

6            MR. HILL:  No weapon was ever recovered, no one was

7  ever prosecuted, no one ever confused to doing the crime.

8            THE COURT:  How does that raise a dispute as to what

9  kind of weapon was used during the incident?

10            MR. HILL:  There's no admissible evidence as to what

11  kind of weapon was used.  Undisputed.

12            THE COURT:  I didn't ask you that.  I asked you was

13  there a genuine factual dispute about the type of weapon.  One

14  of the two problems that I have, one, I don't hear you saying

15  there's any genuine factual dispute; and two, I don't see where

16  you say that you're prejudiced by the fact that you found out

17  in 2013 that an AK-47 was claimed to be the weapon that was

18  used in this case.

19            MR. HILL:  I assume you don't want me to repeat the

20  arguments I've made.

21            THE COURT:  I don't.

22            MR. HILL:  I told you how I'm prejudiced.  I've told

23  you that there's no other evidence of the type of the weapon

24  and that we demand the plaintiffs meet their burden of proof.

25  If they want to prove the kind of weapon, they have to do it

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F17GSOKC

1    with admissible evidence.

2            THE COURT:  What is the other untimely disclosures

3    that you are asking preclusion?

4            MR. HILL:  Let me get the letter in front of me, your

5    Honor.  Again, on the January 1 letter, which is docket entry

6    703, there's an appendix that indicates which of these Israeli

7    government reports or even state department reports were first

8    produced after the close of discovery, and it would be the same

9    sort of argument.

10           THE COURT:  Does it all have to do with the AK-47

11   designation or is there some other substantive information that

12   you think will mislead the jury?

13           MR. HILL:  There are other reports as well.

14           THE COURT:  No.  What's the substance of the

15   information that you say should not come before the jury?  I

16   understand about the AK-47 report.  You don't want the jury to

17   conclude from this report that an AK-47 was used.  I understand

18   that position.

19           What is the nature of the information that you don't

20   think should now be put before the jury because you were not

21   aware that that information might be put before this jury?

22           MR. HILL:  For example, your Honor, Plaintiffs' Trial

23   Exhibit 354, which we were discussing yesterday, I don't know

24   if the Court has -- I apologize, I didn't bring a hard copy of

25   this one.  We have a binder.  This is the one, the statement

F17GSOKC

```
 1    from the Israeli Ministry of Foreign Affairs about the
 2    so-called Zinni list, and it's obviously hearsay.  It says in
 3    December 2001, Israel presented US peace envoy Anthony Zinni
 4    with the list of 33 most-wanted terrorists requesting their
 5    arrest by the Palestinian Authority.  The list was subsequently
 6    given by Zinni to the Palestinians.
 7              THE COURT:  Right.  We talked about that yesterday.
 8              MR. HILL:  Yes.
 9              THE COURT:  What's your timeliness argument?  I
10    understand your other argument you made about that, but what is
11    your timeliness argument?
12              MR. HILL:  Again, because it wasn't produced in fact
13    discovery.
14              THE COURT:  When?  When was it produced?
15              MR. HILL:  This particular one was produced May 19,
16    2013, again, after the close of fact discovery.
17              THE COURT:  May 19.
18              MR. HILL:  2013.
19              THE COURT:  When you got it on May 19, what did you do
20    about it?
21              MR. HILL:  Well, there's nothing I could do about it.
22              THE COURT:  You could have raised it with the Court.
23    Did you do that?
24              MR. HILL:  No, your Honor.  I did not seek to reopen
25    discovery.
```

F17GSOKC

1          THE COURT:  I didn't ask you whether you sought to

2     reopen discovery.  You could have made the same motion you're

3     making now then.  There's a lot of things you could have done.

4     I'm not trying to say you should have done anything.  I'm just

5     asking, is there anything you did?

6          MR. HILL:  Let me be clear:  I didn't think I needed

7     to make a motion.

8          THE COURT:  I didn't ask you that.  I didn't ask you

9     that.  I asked you a very simple question.  You want to make an

10    argument that's not even relevant to my determination.

11         MR. HILL:  Okay.

12         THE COURT:  I asked you, when you got it and you said,

13    ah, discovery is closed, they're producing this untimely, did

14    you do anything at that time?

15         MR. HILL:  I didn't because I didn't need to.

16         THE COURT:  That's fine.  You don't have to tell me

17    why.  I'm not asking you why.  Okay.  So, you raised this

18    issue.  Now, you're raising this issue.  Did you raise this

19    issue with the Court any time prior to January 2 of 2015?

20         MR. HILL:  Yes, I did.

21         THE COURT:  When?

22         MR. HILL:  During fact discovery on about four

23    different occasions --

24         THE COURT:  No.  That can't be right.  You don't

25    understand my question.

F17GSOKC

1              MR. HILL:  Okay.

2              THE COURT:  Did you raise the issue of receiving the

3    late disclosure with the Court, either me or Magistrate Judge

4    Ellis, at any time before January 5 of 2015?

5              MR. HILL:  Yes, your Honor.

6              THE COURT:  When, and with whom?

7              MR. HILL:  I did it repeatedly with Judge Ellis during

8    fact discovery.

9              THE COURT:  No.  You couldn't have done it during fact

10   discovery because you didn't receive this document until after

11   fact discovery.

12             MR. HILL:  Exactly.  And Judge Ellis repeatedly said

13   if you don't produce it during fact discovery, you can't use it

14   at trial.

15             THE COURT:  That's not what I asked you.  You are

16   either misunderstanding my question or avoiding my question.

17             I can only assume what the answer is now by the way

18   you're answering the question.

19             When you received this document in 2013 --

20             MR. HILL:  Did I go back to the Court?

21             THE COURT:  No.  Listen.  You did nothing to raise

22   this with the Court about objecting to that --

23             MR. HILL:  -- particular document.

24             THE COURT:  -- that particular receipt of that

25   document until January 2 of 2015; that would be a correct

F17GSOKC

 1    statement?

 2                MR. HILL:  No.

 3                THE COURT:  So what did you do after you received the

 4    document to raise this with the Court prior to January 2?

 5                MR. HILL:  When I filed my objections, I objected on

 6    the grounds that it was not produced during fact discovery.

 7                THE COURT:  When you filed your objections when?

 8    When?

 9                MR. HILL:  I believe it was in February of this year.

10                THE COURT:  Okay.

11                MR. HILL:  Last year.  February of this year hasn't

12    happened yet.

13                THE COURT:  So February of 2014.

14                MR. HILL:  Yes.

15                THE COURT:  You filed an objection.

16                MR. HILL:  Yes.

17                THE COURT:  So this document.

18                MR. HILL:  Correct.

19                THE COURT:  On the grounds that it was not produced

20    timely.

21                MR. HILL:  Correct.

22                THE COURT:  That's what I'm asking.  I'm asking for

23    facts here.

24                MR. HILL:  We had conversations about it here.  I have

25    written you a letter about it which is in the record and which

F17GSOKC

1    we reference.  I don't have the number handy.

2              THE COURT:  You wrote a different letter than the

3    January 2 letter?

4              MR. HILL:  Yes, your Honor.

5              THE COURT:  Okay.  Specifically addressing these

6    documents?

7              MR. HILL:  Yes.

8              THE COURT:  And when was that letter?

9              MR. HILL:  Let me see if I can find the docket entry.

10   It was in June of this year.

11             THE COURT:  June.

12             MR. HILL:  June of last year.

13             THE COURT:  What was your request in that letter?

14             MR. HILL:  That all documents produced after the close

15   of fact discovery be excluded based on the Judge Ellis' prior

16   order.

17             THE COURT:  And you referenced this document in that

18   letter?

19             MR. HILL:  Yes.  I cross-referenced the exhibit

20   objections which specify which of the documents were not

21   produced prior to the close of expert discovery.

22             THE COURT:  Did Judge Ellis address any of these

23   untimely issues?

24             MR. HILL:  He didn't address them specifically as to

25   these documents because they weren't produced prior to close of

F17GSOKC

1    fact discovery.  But during fact discovery, he repeatedly ruled

2    that documents not produced during fact discovery would not be

3    allowed at trial.

4            THE COURT:  I understand that, but I'm just trying to

5    understand whether or not Judge Ellis subsequently took some

6    action with regard to any untimely-produced documents to

7    identify these documents as being in violation of his order.

8            MR. HILL:  He ruled prospectively.  I did not go back

9    to him and say I now want you to rule.  I thought that was with

10   your Honor.

11           THE COURT:  Again, you're taking me there and I'm just

12   right here.

13           MR. HILL:  Okay.

14           THE COURT:  So Judge Ellis did not.

15           MR. HILL:  He has not ruled on the specific documents.

16   He has ruled prospectively generally.

17           THE COURT:  Right.  That's all I'm asking.  He ruled

18   prospectively.  I understand that.  You don't have to say that

19   five times.  You're trying to answer a different question.

20           MR. HILL:  I have not asked him specifically.  I asked

21   you specifically.

22           THE COURT:  Judge Ellis has never been in a position

23   to rule that, oh, yes, I told you not to do this.  You have

24   done this.  This is in violation of my order.  You should

25   expect that you're not going to get that.  He never made any of

F17GSOKC

1  those kinds of determinations with regards to his order about

2  timeliness.

3            MR. HILL:  He made those determinations before the

4  late productions, but not afterwards; yes.

5            THE COURT:  If you keep doing that, you're going to be

6  less persuasive, not more persuasive.

7            MR. HILL:  -- since discovery closed --

8            THE COURT:  That's all I want to know.  This isn't a

9  trick question.  I'm trying to get some facts here so I can

10 make an informed judgment.  Decisions aren't made by smart

11 people; they're made by informed people.   There are just a

12 couple of facts that I'm trying to get from you, and you want

13 to make argument, and I'm asking you facts.

14            MR. HILL:  I have not gone back to Judge Ellis.

15            THE COURT:  So Judge Ellis never addressed it?

16            MR. HILL:  Correct.

17            THE COURT:  Just generally, the nature of the

18 documents, they fall into what category?

19            MR. HILL:  Soup to nuts:  IMC materials, websites,

20 publications, newspapers, photographs, videotapes.  The

21 majority of the plaintiffs' exhibit list falls into this

22 category.

23            THE COURT:  Let me turn to Mr. Yalowitz.

24            Mr. Yalowitz, is there any legitimate argument to make

25 that that disclosure was not timely or was excusable if it was

F17GSOKC

1    untimely?

2            MR. YALOWITZ:  Sure.  So, a couple of things on that.

3    First of all, what we're talking about, with the exception of

4    some family photographs, family photographs that I collected

5    from my clients because I want the jury to see photographs of

6    the deceased, I want the jury to be able to see photographs at

7    opening so that they can know who the plaintiffs are, other

8    than photographs, what we are talking about is material public

9    domain material collected mostly by experts in connection with

10   their expert reports.

11           THE COURT:  That doesn't advance a timeliness

12   argument.  Tell me about the time.

13           MR. YALOWITZ:  Bear with me.

14           THE COURT:  Why is it timely?  Why is it not timely?

15           MR. YALOWITZ:  It's timely because it's not material

16   that the plaintiffs had.  I didn't have position, custody or

17   control of it.

18           THE COURT:  So when do you say you obtained this

19   information and in relationship to when you obtained this

20   information, when did you disclose it?

21           MR. YALOWITZ:  Our practice has been with material

22   that we collected from the public domain, we make prompt

23   supplementations.  I can't say every one has been three days,

24   but within a week, within ten days, we get it, we provide it.

25   That's been our practice since the day I came into the case and

F17GSOKC

1  I believe a high degree of confidence that that was the

2  practice before I came into the case.

3       THE COURT:  Is there any of this information that you

4  had during discovery?

5       MR. YALOWITZ:  It's a lot of information.  I want to

6  go back and check before I make a blanket representation like

7  that, but I can tell you if there was, it would be inconsistent

8  with our practice.

9       THE COURT:  And it would be inconsistent with Judge

10  Ellis' order.

11       MR. YALOWITZ:  That I don't -- well --

12       THE COURT:  If you had it during discovery and you

13  didn't produce it during discovery and you didn't produce it

14  until after discovery closed, that would not be a timely

15  production.

16       MR. YALOWITZ:  I believe that is true.  I agree with

17  that, and I would need a good excuse.

18       THE COURT:  Right.

19       MR. YALOWITZ:  I agree with that.  And I will tell you

20  that in candor, the family photos obviously fall into that

21  category if they -- I have to say, you know, family photos --

22  it's not uncommon for family photos to get exchanged as we

23  approach trial.  And I don't know.  I haven't gone back and

24  looked was there a request for family photos and all like that.

25       I think the family photos are really important so that

F17GSOKC

1    the jury can understand, number one, they can see who the

2    plaintiffs are, who are the survivors, and number two, so they

3    can get a name to the face of the decedents.

4          I haven't gone back and parsed Judge Ellis' rulings.

5    There's not a written order.  It's a bunch of conversations in

6    which Judge Ellis says some stuff, and people say stuff on the

7    transcript all the time.  And what the defendants have done, as

8    is their custom, is they have seized from a snippet here and

9    there and turned it into some, you know, grand plan for the

10   conduct of the case, which --

11         THE COURT:  What I'd like you to do is, these

12   documents that are in issue, I want you to indicate to me which

13   one of these documents that you had during the discovery.

14         MR. YALOWITZ:  We'll go back and look at that.

15         THE COURT:  I don't need a full list, but I want to

16   know candidly what you had in discovery.

17         MR. YALOWITZ:  I think you're entitled to that.  And

18   I'm representing to you that the family photos -- I'll say some

19   of the family photos are recent.  I went to people and said,

20   look, I want to show a picture of you to the jury and we took a

21   photo, so those we didn't have during discovery, but photos of

22   the decedents obviously we had.  If the Court wants, I can go

23   back and try to parse through it.

24         THE COURT:  I just want you to know I'm not going to

25   make you do it as to every exhibit but I want you to identify

F17GSOKC

 1   for me which exhibits you had during discovery.

 2          MR. YALOWITZ:  Obviously, I make a blanket

 3   representation on family photos because it's impossible to have

 4   them other than from the clients who had them from before the

 5   victims were killed.

 6          THE COURT:  Quite frankly, I give you a little bit

 7   more leeway than that.  Even if the family members had them, if

 8   you had not requested them of the family members and did not

 9   receive them yourself after having made the decision that this

10   is something that you might want to produce, I might be

11   somewhat more flexible with whether or not there's a family

12   photo that you asked for after the close of discovery and you

13   gave them in a timely manner.  And obviously they may have a

14   technical violation, but there's no prejudice to them that they

15   got a family photo three months after the close of discovery

16   that the lawyer didn't have in his possession during discovery

17   as opposed to getting it before the day it closed on discovery.

18          MR. YALOWITZ:  I'll tell you, your Honor, with the

19   family photos, we weren't sitting on anything.  It's the

20   opposite.  There are still a couple of families I would like a

21   photo of and I'm working to try to get that.

22          THE COURT:  You don't have to tell me about what the

23   client had.  I'm interested to know what the lawyers had in

24   their possession during discovery.

25          MR. YALOWITZ:  I get it.

F17GSOKC

```
 1              THE COURT:  And if you tell me you had X exhibit in
 2    your office and you didn't produce it during discovery, I want
 3    to know why and I want to know a good reason for it or
 4    otherwise, as they say, that's a foul.
 5              MR. YALOWITZ:  I agree with that.  I understand that.
 6    I think we should be held to that standard.  I'm going to go
 7    back and check.  Obviously, I think what the Court is asking
 8    is, did the counsel for plaintiffs have it.
 9              THE COURT:  Right.
10              MR. YALOWITZ:  I understand the Court to be asking
11    about all the counsel for the plaintiffs, not just me, because
12    I didn't come into the case until after that.  So that's the
13    inquiry I'm going to make.  We'll do it on a rolling basis
14    because it's a lot of questions to be asking.
15              THE COURT:  As I say, you can do it on a rolling
16    basis, but we have a week, less than a week, so you better roll
17    it pretty quickly.  That's why I said I just want to know what
18    it is that you had during discovery, because that's what I'm
19    going to ask you.  If you don't put something on that list, the
20    only thing I can do is take your representation as an officer
21    of the Court that you didn't get this and the lawyers didn't
22    get this or you don't have any evidence that you got this
23    during discovery and that's the reason not to have produced it
24    during discovery.  It's not necessarily a good reason to have
25    it admitted during the trial, but it's a reason why it wasn't
```

F17GSOKC

1    produced during discovery.

2            I will look at that.  Just tell me if you want to make

3    some representation in the letter that I'm still expecting to

4    get from you, you can do that.

5            MR. YALOWITZ:  Yes.

6            THE COURT:  I can tell you that for both sides'

7    planning, I am not inclined to grant either one of these

8    motions based on timing, but I'm going to think about it.  I'm

9    not inclined to grant your motion and I'm not inclined to grant

10   their motion.

11           MR. YALOWITZ:  The inclination is to let the witnesses

12   testify.

13           THE COURT:  That's my inclination.

14           MR. YALOWITZ:  Okay.

15           THE COURT:  I think it's an issue that you intend to

16   raise.  I think that the nature of the response, it would be

17   appropriate if you raised it.  Quite frankly, I think they do

18   have a point that even if they hadn't disclosed this, if you

19   presented that evidence that he escaped, it would be

20   appropriate rebuttal to say no, we have evidence that he

21   didn't, that you presented evidence that he was released, it

22   would be sufficient and appropriate rebuttal to say we have

23   evidence that he escaped, and if you put in evidence that he

24   was released, we're going to put in evidence that he escaped.

25           Quite frankly, if you don't put in evidence that he

F17GSOKC

1    was released, then they wouldn't have an independent basis to

2    put in evidence that he escaped and I would grant your motion,

3    because if they had intended for that to be their defense,

4    regardless of what you presented, then they would have a

5    heavier burden in this case.

6            I think you're in a position to put this before the

7    jury and let them decide whether or not this is appropriate.

8    And you have it enough times -- I don't -- quite frankly,

9    neither one of you have convinced me that had you had this ten

10   weeks ago whether or not we would be in any different situation

11   and sit here and talk about, well, he says this and he says

12   that.

13           MR. YALOWITZ:  I really respect your Honor is working

14   hard to be fair and balanced to both sides, and I do respect

15   that.  I know you have thought about it and will continue to

16   think about it.  The one thing that is really a problem for me

17   is to have a new, substantive assertion on the eve of trial and

18   a witness who has never been identified as making it really

19   turns it into trial by ambush.

20           If your Honor is inclined to let these witnesses

21   testify, I have to say I was very diligent in raising a

22   problem.  We went back and emailed with our office and that

23   letter that I mentioned was February 14, so it was about two

24   weeks after we got their witness list.  I'll be happy to email

25   it to the Court's staff later today.  And we'll also send

F17GSOKC

 1    Mr. Hill's response, which was two weeks later.

 2              And if the Court is really inclined to let these

 3    witnesses come and testify, I think a curative remedy that I

 4    really would commend to the Court is to let us take an

 5    eve-of-trial deposition of these people so that we know what

 6    they're going to say, so that we can be efficient in front of

 7    the jury, so that we're not subject to serious, unfair

 8    surprise.

 9              I think that's within the Court's discretion.  I think

10    it would make the trial more efficient.  It wouldn't entirely

11    cure the prejudice, but it would at least put me on a footing

12    where I'm not crossing coal.

13              THE COURT:  My position is the same as my position

14    with Mr. Hill.  Tell me what it is that you think this person

15    is going to say that is going to be -- and you may have some

16    greater comfort letter because you deposed him -- but what do

17    you think that you're going to get out of a deposition other

18    than to see whether somehow you can poke holes into his

19    representation that he escaped?

20              You have the information.  You know what he's going to

21    say.  You have information from a different source that you

22    want me to allow over their objection that he was released.

23              MR. YALOWITZ:  This guy was a public official.  His

24    movements may have been documented.  There's a lot we could do

25    with a guy --

F17GSOKC

```
1                THE COURT:  Between now and Tuesday?
2                MR. YALOWITZ:  No.  There's a lot we could have done.
3       There's a lot we could have done between February and today,
4       and now I can't do it.
5                THE COURT:  I know, but you're telling me -- I'm only
6       addressing the issue of you want a deposition between now and
7       Tuesday.  I'm trying to say to you that that doesn't seem to
8       help you.
9                MR. YALOWITZ:  I want a deposition.
10               THE COURT:  If you want me to help you with this
11      issue, either I'm going to commit error, reversible or not
12      reversible, by allowing them to do this, or you're going to go
13      forward and you're going to deal with this.  I can't see how
14      I'm going to undue the prejudice if you think there's prejudice
15      by giving you a deposition on Monday.
16               MR. YALOWITZ:  I think that, like a lot of things, as
17      a district judge, you have very significant discretion on
18      evidentiary calls obviously.  I'm not standing here arguing
19      you're committing reversible error.  I'll tell you if I think
20      you are because I don't think you are.
21               THE COURT:  Look, the bottom line is, I think you're
22      in a little more awkward position with this issue because if
23      they had made no disclosure, once you put a witness on the
24      stand who said this guy was released, it would be difficult for
25      you to argue to me that they cannot now bring in a witness to
```

F17GSOKC

1    rebut that, even if that witness had never been disclosed,

2    okay, because you put that issue in the case.  They didn't put

3    that issue in.  Quite frankly, that issue is not even in the

4    case at this point until you put a witness on the stand to say

5    so.

6         So you're absolutely right:  Part of the control you

7    already have is that if you don't want to make this an issue

8    and you want to keep them from doing this, then don't put the

9    contrary evidence on.  If you don't put evidence on that he was

10   released, there's no basis for them to put on evidence that he

11   escaped.

12        Now, if you want to put that evidence on, it's very

13   difficult for you to argue that they cannot say to you that

14   now, Judge, we want to call a witness who is going to say he

15   was not released, he escaped.  And if you had said, well, he

16   never disclosed that and they say, well, Judge, we don't have

17   to disclose that, that was not what we intended to put in on

18   our case to defend our case.  That's what they put in to this

19   case, that he escaped.  And we have the right, if we have a

20   rebuttal witness, to call that rebuttal witness, even if this

21   rebuttal witness wasn't identified during discovery.  And I

22   think they're probably right that you can't interject that into

23   this case and then say that they can't rebut it.

24        I think you're in a better position than that because

25   you know prior to trial that this is what he's going to say.

F17GSOKC

1  Now, whether or not it would have been better if you would have

2  gotten a deposition of him at the time, I mean, that's true.

3  Both of you were making those arguments.

4          MR. YALOWITZ:  Let me be very clear about this.  First

5  of all, I want to be very clear that this is a matter of how

6  you exercise the disclosure invested in you.

7          THE COURT:  I understand.

8          MR. YALOWITZ:  Here is where I disagree with you and

9  it's really about Al-Bakri because the escape of Abdullah

10 Barghouti or the release of Abdullah Barghouti is really a

11 pretty core issue in this case.  It's not a side issue.  It's

12 not a surprise issue.  It's a central issue that here is a guy

13 who is a known terrorist.  The president of the United States

14 of America demanded his arrest.  They arrested him.  And three

15 weeks later, they released him and he went on a killing spree.

16 That's the core narrative of my case.

17         THE COURT:  I'm not sure the jury is going to agree

18 with you.  The core narrative of your case is what their

19 relationship was with him after he escaped.  That's the core

20 analysis.  That's what's important.

21         If he escaped and the inference is or the

22 circumstantial evidence is that they were complicit with him in

23 committing the terrorist act, I couldn't care less whether he

24 climbed out the window or they opened the door if I'm on the

25 jury.  I'm concerned about what did he do once he got out

F17GSOKC

1    there.

2            Now, you want to draw the inference.  Sure, you want

3    them to say sure, yeah, it was more likely they were involved

4    if he was released than he escaped.  Maybe, maybe not.  I don't

5    know how many people they released.  They released a lot of

6    people and not everybody went out and did terrorist acts, so

7    I'm not sure that that follows, but you can argue what you

8    want.

9            MR. YALOWITZ:  Sure.  My point is, whether the jury is

10   more moved by the fact that they took a known bomb-maker and

11   let him out on the street or they helped him after -- suppose

12   the jury believes this guy and say, yeah, he escaped, but they

13   helped him anyway, those are both interesting narratives that

14   the jury might conclude.  But my issue is as a lawyer on the

15   defense, certainly they anticipated this was going to be in the

16   case, so what they did was sandbag me.  They had a witness.

17   They prepared him.  They know what he's going to say.  They

18   have an obligation under Rule 26(a)(3) to tell me this is what

19   the guy is going to say, and they didn't do that.  And there

20   ought to be some consequence for that.  I'm not saying between

21   now and next Tuesday, but I'm saying between now and when he

22   comes to testify, bring him to New York a few days early,

23   somebody from my team can take his deposition.  It's done

24   commonly enough.  It's not that difficult.  I know you're going

25   to think about it.

F17GSOKC

```
 1              THE COURT:  I'll think about it further, but let me
 2      also just move because probably we're going to be leaving in
 3      another ten minutes, let me move to a different issue because
 4      you should know that I have it in context and I'll move to the
 5      Yousef issue.
 6              MR. YALOWITZ:  Before we do, I just want to mention
 7      one other thing, if I may, which is, with these two substitute
 8      witnesses, the defendants agree it's appropriate to have a
 9      deposition in advance of their testimony.  They have already
10      agreed to that as a condition to the substitution.  What I'm
11      saying is "Add this guy."
12              THE COURT:  I understand.
13              MR. YALOWITZ:  I think he's the one I'm most alarmed
14      about because I've never seen a transcript.  I've never seen
15      anything about him.
16              THE COURT:  Have there been any documents produced
17      with regard to his testimony at this point?
18              MR. YALOWITZ:  No, sir.
19              THE COURT:  Are there going to be any exhibits that
20      he's going to utilize?
21              MR. HILL:  I don't anticipate using any exhibits.  It
22      would be his personal knowledge.
23              MR. YALOWITZ:  We did ask are there any documents
24      relating to any alleged escape by this guy, and the answer that
25      came back was no.
```

F17GSOKC

1          THE COURT:  Okay.

2          MR. YALOWITZ:  That's an admission that we'll use, but

3     if they are now going to suddenly discover documents that are

4     being used to refresh or prep the guy, obviously, we need to

5     see those.

6          THE COURT:  I'll think about it further, but I want to

7     give you some guidance, unless I change my mind, as to where

8     I'm going to go so you should prepare for these witnesses.

9          With regard to Yousef, first of all, I'll put aside

10    the easy part.  There was some testimony that you wanted to

11    offer or someone wanted to offer.  Plaintiffs wanted to

12    designate some testimony about torture in prison.

13         MR. YALOWITZ:  We withdrew that.  No torture on either

14    side.  Nobody tortures anybody in the Middle East.  It never

15    happens.

16         THE COURT:  So that's not in the case.

17         I guess I should turn to the defense because I'm not

18    particularly compelled by the circumstances now under which you

19    want to preclude any testimony for two reasons:  One, because

20    there was, in fact, a deposition of this individual where you

21    had a full opportunity to examine this witness; and, two, I

22    think that, given your motion to preclude, that the record --

23    and I have to look further at the excerpts and I still need to

24    do that -- but the record that I have before me or that appears

25    to be before me and I haven't read word-for-word all the

F17GSOKC

```
 1    transcript, it does not clearly demonstrate what you say is the

 2    basis for precluding the testimony, which is primarily the

 3    hearsay objections that you're raising with regard to the

 4    testimony.

 5           Quite frankly, based on this record, it's difficult,

 6    if not impossible, for me to rule that most of the statements

 7    that you're objecting to are hearsay statements.  For example,

 8    the phone conversation, it's unclear to me by the nature of the

 9    examination or the cross-examination whether or not he's saying

10    something that he has personal knowledge of and he overheard

11    the conversation or whether he's saying something that is

12    third-hand hearsay information that was provided to him.  And

13    most of the statements fall into that category.

14           Now your basis for your objection is that it should be

15    excluded because they can't overcome your hearsay objection.

16    Well, you were there.  You did the deposition.  And I'm not

17    saying you had an obligation to do anything at the deposition,

18    but if the basis for your objection is that I have a clear

19    record to rule that this is hearsay, you did not give me a

20    clear record to rule that this was hearsay.  You had a full

21    opportunity to do that.

22           There's not a single question -- and I go back, I

23    shouldn't say because I haven't read it word-for-word -- but

24    there's not a single question where you asked him or anyone

25    asked him "Was that what you heard or is that what somebody
```

F17GSOKC

1    told you?"  Nobody asked him that.

2         I find very few positions or parts of this deposition

3    where I can clearly say, ah, this is clearly something that he

4    could not have observed, this is clearly something that someone

5    must have told him.  I don't have that record.

6         I think the burden is on you in order to preclude that

7    testimony and object to that testimony on the hearsay ground is

8    to tell me and show me where I have a basis to definitively

9    determine that this is hearsay, particularly, and I might have

10   taken a different view if there hadn't been a deposition in

11   which you participated.  If it was someone else and we can't

12   tell, then that's one thing, but to simply say that you deposed

13   this guy, and since I can't tell what portions of this might be

14   hearsay that that's the basis of your objection, I don't find

15   that compelling.  I don't find that compelling.

16        You could have clearly given me the record to clearly

17   knock this out or knock out any portion of this testimony by

18   putting it to the witness and saying "This isn't something you

19   heard; this is something somebody told you;" and you obviously

20   made a tactical or strategic or unthinking decision not to do

21   that.  You didn't do that.

22        So I'm not particularly compelled that there's any

23   particular statement that I can simply say, well, this

24   statement of a witness who was deposed by both sides who says

25   that this is what happened when I was there, that certain parts

F17GSOKC

1      of this I should conclude that that must be hearsay and exclude

2      that and other parts of it; that there are no parts of it that

3      I can say that should be read to the jury with regard to these

4      designations.  I'll let you respond to that, but that's my

5      initial reaction, and I'll look at the transcript, of course.

6                  MR. SATIN:  Thank you, your Honor.

7                  Let me start, then, by going from where the Court is

8      right now, which is believing that it's not our burden to prove

9      the exception and to assume that because we were at the

10     deposition, we had the opportunity to clear it up; those are

11     two arguments.  I'm not going to address it now.

12                 Let me start by saying this:  What is undisputed is

13     that the testimony that's given by Yousef is based on hearsay

14     in the sense that there's an out-of-court statement.  Even if

15     he had firsthand knowledge of that statement, he's relaying

16     that statement.

17                 THE COURT:  No.  There's not undisputed --

18                 MR. SATIN:  For example, this idea that there was a

19     deal between Jibril Rajoub and Marwan Barghouti to release him,

20     that deal, his ability to say there was a deal is based on him

21     overhearing that, that conversation, whether he learned about

22     it from somebody else third-hand or he was actually present

23     when they said that.

24                 THE COURT:  I know, but that doesn't make it hearsay,

25     because he is testifying at a deposition as to exactly what he

F17GSOKC

1      what he heard, okay?  The fact is, a deal is like a contract.

2      It is the operative language that is important, not the facts

3      of what the details are.

4              So he says that I was there and I heard them talking

5      and they struck a deal while I was there.  Now, if I was on

6      this witness stand, and I have to assume that the deposition is

7      comparable to being on this witness stand, if I was on this

8      witness stand and someone said, okay, tell me what occurred

9      when you were in the lawyer's office and I said, well, when I

10     was in the lawyer's office, Mr. Hill and Mr. Yalowitz agreed

11     that they were going to be much nicer to each other, that's

12     what I'd testify.  That's what I heard in substance in

13     appropriate language.  That's not hearsay.  There's no hearsay

14     rule that that violates.

15             The statements that I made under oath about what I

16     heard, what I heard is the operative language that is the

17     agreement; it is not that, well, Mr. Hill said that yesterday

18     Mr. Yalowitz threw a shoe at him.  That would be hearsay.  You

19     see?  As I say, I've had some evidence lessons, too.  That's

20     the way it works.  So, no, that is not a good example to give

21     me to say that I was there when they struck a deal, okay, to

22     say that under oath.

23             MR. SATIN:  What distinguishes the Court's example

24     from what happened here is that the person who gave that

25     testimony specifically said I didn't know what they said.

F17GSOKC

1          THE COURT:  Right.

2          MR. SATIN:  If I could pass this up to the Court.

3   Does the Court have that?

4          THE COURT:  I have it right in front of me.  So he

5   doesn't know the substance of all of the details of the deal,

6   but he is saying -- the way I read it, he's saying that, look,

7   when they got back together, the kinds of things that they were

8   talking about, it's clear that they had agreed that they would

9   act in this manner.

10          Whether he is saying that I know that because when

11   they both got out they said, okay, you know the details of the

12   deal we struck?  We're going to follow that and the first thing

13   we're going to do is we're going to make sure that this guy is

14   arrested and we'll worry about whether we're going to release

15   him later.  Now, if they said that in front of him and he said

16   that under oath, that's not hearsay.  I don't know.  You don't

17   give me a clean record to determine definitively what you want

18   me to conclude from the way he's testified here because no one

19   explored this.  And that is the burden that I do put on you.

20   You didn't explore this.

21          You took the chance on this record that it would be

22   sufficient for you to argue that this must be hearsay.  Well, I

23   can't make a definitive determination this must be hearsay.

24          I have a scenario in my mind, which I think is a

25   similar scenario that the jury is going to have, that these two

F17GSOKC

 1    guys may have walked over into the corner and had some secret

 2    meeting, but then when they came back in front of him, they

 3    said, okay, we're going to do it the way we said we're going to

 4    do it and this is what we're all going to do, and then they

 5    went and they did it consistent with that.  Obviously something

 6    happened before him.  It doesn't say they told me they had a

 7    deal.  It says they did a deal.

 8            Now, if you wanted to kill that testimony, you could

 9    have said, well, you know they had a deal because they came

10    back and told you they had a deal, right?  You didn't hear the

11    deal.

12            You could have done that.  You could have done that.

13    You didn't have to do that.  But now you're in a position where

14    you're saying to me I should exclude this because I have to

15    determine that this was hearsay and, quite frankly, I don't

16    have a clear record to do that.

17            MR. SATIN:  First of all, the plaintiffs were at that

18    deposition, too.  They had called that deposition.

19            THE COURT:  Right.

20            MR. SATIN:  They asked those questions.  They had

21    every opportunity to lay that foundation for that evidence.

22            THE COURT:  That's true.

23            MR. SATIN:  And they didn't do that.  But leaving that

24    aside, the example the Court just gave, let's assume that that

25    took place, that those two people went to the corner, they made

F17GSOKC

 1    a deal, they came back and said, hey, we made a deal, and let's

 2    assume it's Marwan Barghouti saying to Yousef --

 3          THE COURT:  No, that's not what I'm assuming.  Let's

 4    assume they came back and said, okay, now we're going to do it

 5    exactly the way we said we were going to do it five minutes ago

 6    when we were making this deal.  We're going to go in this room

 7    and we're going to let them be arrested and then we'll worry

 8    about releasing them later.  Now, if they said that in front of

 9    this witness, you could not argue that that is inadmissible

10    hearsay when he testifies to what they said in front of him

11    about what they were going to do when he testified under oath

12    about what he heard them say.

13          MR. SATIN:  If that testimony, Yousef saying I heard

14    those two people say we made a deal to go and arrest him and

15    then release him, if Yousef is now going to say or has said and

16    will be presented to the jury for the truth that, in fact, they

17    said it to make this deal, that's an out-of-court statement.

18          THE COURT:  No, it's not.  Not.  Because what's at

19    issue is not the truth of what he is saying.

20          MR. SATIN:  Who is the "he"?

21          THE COURT:  Yousef.  That's not what's at issue.  He's

22    testifying under oath.

23          MR. SATIN:  Right.

24          THE COURT:  What's at issue is whether or not the

25    facts that are in the other statements that he's saying that he

F17GSOKC

1    heard are being offered for the truth of what those two

2    individuals said.  And based on this transcript, neither one of

3    those -- those are operative statements.  They're not factual

4    statements.  They're not reciting to him things that happened

5    in the past that they're making representations about.  They're

6    talking about what they are getting ready to do and how they're

7    going to handle this situation.  That is not hearsay.

8            If I said under oath we were in front of the bank and

9    you told me you were waiting in the getaway car and I'll go

10   into the bank, that's not hearsay.  Under no theory is that

11   hearsay because that's not a representation of fact.

12           Now, if I said to you, yeah, and I robbed the bank

13   next door yesterday and that was the nature of the testimony

14   that I was relating by what you said to me, that would be

15   hearsay.

16           I don't see it.  I don't see it.  I'll look at the

17   transcript, but I'm not persuaded by this argument.  As I said,

18   you're in an awkward position given the fact that there was an

19   army of lawyers there and a decision was made not to pursue

20   this, and now you want me to say that this record clearly

21   demonstrates that this is hearsay which should be excluded.

22   And on this record, I can't give you the benefit of that

23   strategic decision not to make a clean record for me if you

24   were going to make a motion to exclude this based on hearsay.

25   That's my reaction to it at this point.

F17GSOKC

1          MR. SATIN:  Our argument is in the papers.  I'd ask

2     the Court to consider both the burden being on the proponent of

3     the evidence regardless of whether opposing counsel was there.

4     There's no "you didn't cross-examine" hearsay exception.  So to

5     the extent it's murky, and I'll concede to the Court it's a bit

6     murky, that should not be on us.  It should be on them.

7          THE COURT:  Well, it's on you because it's your

8     motion.

9          MR. SATIN:  But it's on them because they're the ones

10    trying to introduce the evidence.  The proponent has the

11    burden.

12         THE COURT:  Right.  And they don't claim it's hearsay;

13    you claim it's hearsay.

14         MR. SATIN:  Well, no.  They claim it's admissible.

15    And they claim it fits within the hearsay exception.  And it's

16    the proponent who has the burden to show it falls within that

17    exception.  They haven't done that.

18         THE COURT:  No, this is no hearsay exception.  This is

19    either hearsay or not hearsay.  This is a witness who testified

20    under oath.  This is a totally different situation than the

21    other issues that we have dealt with.

22         This person is testifying under oath with both lawyers

23    from both sides being there to examine him.  You can't compare

24    that to some report that's written or some statement by

25    somebody in interrogation.  The lawyers are there.  That's your

F17GSOKC

1    job, to give me a clean record.  Nobody did so.  Nobody did so.

2    And now you want me to say that this is hearsay.  Well, I can't

3    say that this is hearsay because the record doesn't demonstrate

4    clearly that this is hearsay.  And it could have demonstrated

5    clearly this was hearsay.  It's very easy for you to get rid of

6    this.  All you had to say was "You heard this, right, somebody

7    told you this, you didn't experience this."  End of story.  We

8    wouldn't be debating this.  You didn't do that.

9            MR. SATIN:  But he's testifying or he testified,

10   Yousef, about what he heard.

11           THE COURT:  That's right.

12           MR. SATIN:  What he heard or what he claims he heard

13   was that there was a deal.

14           THE COURT:  Right.

15           MR. SATIN:  Then he talks about the details.  That

16   fact is hearsay.  It's an out-of-court statement by other

17   people offered for the truth.

18           THE COURT:  Again, you can go back and check your case

19   law.  The fact that I heard two people agree to a contract is

20   not hearsay.  It is not.

21           What is hearsay is a recitation of facts by that third

22   party that I'm offering for the truth that the only reason that

23   you should believe that those facts took place is because that

24   third party said at a different time that those facts took

25   place.

F17GSOKC

1          MR. SATIN:  Even if that were true, and I'm not going

2     to agree with the Court, but even if it were true that hearing

3     two people agree to a contract was not hearsay, that's not what

4     we have here.  We have two people making a contract supposedly

5     in private and then coming out and said we made a contract.

6          THE COURT:  No.

7          MR. SATIN:  That testimony of "We made a contract,"

8     that's hearsay.

9          THE COURT:  Unfortunately, that's not the way it

10    happens.  It's not that we made a contract; it's that we have a

11    contract.  That's the difference.  That's the difference.

12          If they came out and said we got a deal -- you know,

13    if you said to me, if you said to me the two of you walked out

14    of this courtroom and then, you walked back in this courtroom

15    and said, Judge, we got a settlement, you could not say to me

16    that I couldn't testify under oath that the two of you came in

17    and said you had a settlement.  That's not hearsay.

18          MR. SATIN:  Even assuming that were to be the case,

19    the only thing you could say is they said we had a settlement,

20    not what the details of that settlement are.

21          THE COURT:  Only if the details, as I'm relating it,

22    were given to me by a third party, and you don't have a clean

23    record that says that.  That's your problem.  If you had a

24    clean record that says that, I wouldn't even have to think

25    twice about this.  You don't have a clean record that said

F17GSOKC

1    that, and you could have very easily had a clean record that

2    said that, all right?

3         This is the way you decided to proceed.  That's fine

4    and dandy.  But under the circumstances here, you don't get the

5    benefit of, well, we were there and even though you can't make

6    a determination as to what was said, which part of this was

7    said in their presence, which part of this was said outside of

8    their presence, well, the reason I can't make that

9    determination is because neither side cleared that up.

10        I'm not saying it's anybody's burden, I'm just saying

11   I don't have it.  And if you wanted me to have it, you should

12   have given it to me, and you had a full opportunity.  That's

13   what cross-examination is for.  That's why the hearsay rule

14   exists, because at least this person was supposed to testify

15   under oath and be challenged with regard to whether or not

16   those statements are information that they really observed

17   rather than information that's inaccurate or third-hand

18   information.  That's what the cross-examination is for.

19        I'll look at the transcript and I'll see if there's

20   something that clearly I believe is a factual statement made by

21   a third party that the record clearly indicates to me that this

22   person did not have any firsthand knowledge of that, that the

23   only way this person had that fact and is relaying that fact to

24   the jury in his deposition is because a third party told him,

25   and so we have to believe the third party in order to have that

F17GSOKC

 1    testimony or evidence to have any probative value, and I can't

 2    create that for you.  So that's my basic view.

 3            MR. YALOWITZ:  If you're ready to move away from that,

 4    and I have enjoyed listening to it because it brings me back to

 5    my days at 116th and Amsterdam.

 6            Before we break, and I know the Court is anxious to

 7    talk to the jury, I just wanted to tell you two things, one of

 8    which I think will take some work off your plate and one of

 9    which I think could put work on your plate.  I don't need to

10    discuss either one of them.  I just want to make sure I

11    communicate it to you.

12            The first one is, having reflected on your

13    conversation yesterday, what I would like to do with Itamar

14    Marcus, who is our expert witness that brings the PA's

15    television station statements and their newspaper statements,

16    what I'd like to do with him, I don't want to call him in my

17    case-in-chief.  I'm going to wait to see what they put in in

18    their case, and I may call him as a rebuttal witness if I think

19    it's appropriate.

20            I know you reflected on it already, but rather than

21    write something up, I think I understand where the Court is

22    going with the kind of evidence he brings.  I'm not waiving

23    that as a rebuttal, but especially in light of our conversation

24    about the escape, I'm going to just reserve on him and not

25    bring him as part of my case-in-chief.

F17GSOKC

```
 1              THE COURT:  What the situation will be is that that
 2      witness will not testify on your case-in-chief.
 3              MR. YALOWITZ:  Correct.
 4              THE COURT:  And then before that witness is allowed to
 5      testify as a rebuttal witness, you'll raise it with the Court
 6      and we'll discuss it, and if we think it's appropriate, we'll
 7      allow it in.
 8              MR. YALOWITZ:  Exactly.  I know you already thought
 9      about it and had it in mind.
10              THE COURT:  I want the record to be clear so everybody
11      knows what we can anticipate.
12              MR. YALOWITZ:  Great.
13              MR. ROCHON:  Before Mr. Yalowitz reaches his second
14      point, at some point, I'd like to discuss with the Court and
15      Mr. Yalowitz what would open the door to that kind of testimony
16      to get some clarity.  I'm not asking for it now.
17              THE COURT:  I can't help you at this point.  I really
18      can't.  You guys are still sort of formulating how you're going
19      to present this case.
20              MR. ROCHON:  There's going to come a time -- there are
21      certain things that I know might or might not and I'm going to
22      run them by you because I don't want to open the door, but I
23      don't want to do it now.
24              THE COURT:  Okay.Mr. Yalowitz, you had another issue.
25              MR. YALOWITZ:  The same thing:  We received a thing on
```

F17GSOKC

1    the docket called a notice of intent to redact the transcript

2    of the proceedings in open court from December 16.  The Court

3    has extremely narrow rules about what's appropriate to redact.

4    Once something is said in open court, it's a public document,

5    it's a public record, it's a public statement.  All I can say

6    about this notice and the proposed redaction is there they go

7    again.

8              THE COURT:  When was this filed because I haven't seen

9    it.

10             MR. YALOWITZ:  This morning, your Honor.

11             THE COURT:  I guess that's why I haven't seen it.

12   I've seen most everything.

13             MR. YALOWITZ:  All I'll say about it is, There they go

14   again.  We're going to have to look at it.  You know my

15   position about public proceedings.

16             THE COURT:  I can articulate what their position is,

17   too, so we can all, going forward, be more sensitive to it.  I

18   think they have a concern that in the arguments and exchange of

19   the parties, that in the detail of your arguments, you may be

20   intentionally or unintentionally disclosing information that

21   the parties agree was subject to the confidentiality order.

22             I just say that for you to be sensitive to that, look,

23   when you say something and give me a fact or you want to give

24   me a recitation of what you say the relevant facts are,

25   consider whether or not this is something that is subject to

F17GSOKC

1    the confidentiality order and whether or not the details of the

2    facts that underlie your argument are appropriate at this point

3    in time to put on the record.  That's the only thing that I

4    said.  That's the only thing that I can guess is the nature of

5    their application, because I'm sure they're not asking to

6    redact some things that they said.  I'm sure they're asking to

7    redact some of the things that you said.

8            MR. YALOWITZ:  I'm sure they're not.

9            Look, first off, I really don't want to get wrapped

10   around the axle on this now, but I categorically reject the

11   idea that these intelligence files were ever subject to an

12   agreement.  They were not.  They were subject to unilateral

13   designation.  They are not confidential in any reasonable way,

14   number one.

15           Number two, I thought we had a ground rule in this

16   case that when we are presenting evidence to the jury, it is a

17   public forum.

18           THE COURT:  But we're not there yet.

19           MR. YALOWITZ:  We'll be there next week.

20           THE COURT:  We're not there yet.

21           MR. YALOWITZ:  So I guess, in truth, I don't really

22   care about the December 16 transcript, other than my basic

23   fundamental American belief in the First Amendment and the

24   right of public access.

25           THE COURT:  Sure.

F17GSOKC

```
1          MR. YALOWITZ:  But I do not want this to be a pattern

2     starting on Tuesday that we have some confidentiality

3     restrictions on us based on the evidence in the case.

4          THE COURT:  Let me put it to you this way:  My

5     recollection -- and I may have it wrong -- my recollection is

6     that there was not just a protective order, there was a

7     confidentiality agreement.

8          Am I correct?

9          MR. YALOWITZ:  That is true.

10         THE COURT:  So my attitude is that I am only enforcing

11    the agreement of the parties, and you are bound by that

12    agreement.  So whatever that agreement says is what you are

13    bound by; otherwise, you shouldn't have agreed to it, okay?

14    Those are the first ground rules.

15         You look at your confidentiality agreement and figure

16    out whether or not what you are saying in open court is

17    consistent or inconsistent with that.  That's your guidance.

18    You wrote the agreement.  I didn't.

19         MR. YALOWITZ:  I didn't write the agreement.  I'm

20    bound by it.

21         THE COURT:  The parties did.

22         MR. YALOWITZ:  I'm bound by it.  I'm not running away

23    from it, but I did not write that agreement.  I would never

24    have signed that agreement.

25         THE COURT:  That's fine.
```

F17GSOKC

1          MR. YALOWITZ:  It's an agreement that is fundamentally
2     inconsistent with law.
3          THE COURT:  Well unfortunately for you, you step in
4     the shoes of the prior attorney.
5          MR. YALOWITZ:  I don't deny that.
6          THE COURT:  So this is yours.  You bought this
7     agreement when you stepped in as the lawyer.
8          MR. YALOWITZ:  I agree with you.
9          THE COURT:  So you are bound by it, so you can't think
10     of ways to try to get around it.  Just be conscious of that,
11     because I don't want to spend a lot of time on running around
12     trying to go back now for six months trying to figure out what
13     portions of things you guys want me to redact.
14          MR. YALOWITZ:  I don't care what happened in the past,
15     I really don't, but I do not want to have a situation where I'm
16     trying to try the case and I put in a document that says "X" PA
17     employee is serving 15 life sentences and he's good in terms of
18     security and morals, and we have to close the courtroom for
19     that.
20          THE COURT:  No.  I don't anticipate that that is going
21     to happen with any exhibit or any testimony, and there has to
22     be a real strong argument, and an argument that goes beyond
23     just the fact that there was a confidentiality agreement and
24     protective order with regard to discovery.
25          MR. YALOWITZ:  Right; that's where I am.

F17GSOKC

```
 1            THE COURT:  And that is going to compel me to say that
 2    an exhibit, unless there's some other grounds to redact an
 3    exhibit, the exhibit is somehow precluded or it's redacted
 4    because the information is, quote, secret.
 5            MR. YALOWITZ:  Right.  Then we're on the same page.
 6    I'm not trying to relitigate what happened in the past.  I
 7    really don't care.  It's not useful.  Whatever.  It's not
 8    important.
 9            MR. ROCHON:  This has been clear for a while.  Once
10    the trial starts, if it comes in evidence, we all know -- but
11    we're not at trial yet.
12            THE COURT:  I understand.  Let's do this quickly.
13            MR. YALOWITZ:  Thank you.
14            THE COURT:  Are we ready?
15            MR. YALOWITZ:  Thank you, Mr. Rochon, for being clear
16    about that.
17            THE COURT:  Let me ask you this.  Give me now, before
18    we go down there, what's your best estimate of approximately
19    how many witnesses you have and how long it will take to
20    present your evidence?
21            MR. YALOWITZ:  I have about 40 witnesses, my best
22    estimate.  And I believe that if we can move efficiently, I can
23    be done with my case in mid-February.
24            THE COURT:  You have to give me --
25            MR. YALOWITZ:  That's five weeks if we move
```

F17GSOKC

1   efficiently.  If we have objections every seven seconds, it's

2   going to take a long time.

3          THE COURT:  Well, if you keep making those statements,

4   it's going to take even longer.

5          MR. YALOWITZ:  I know.

6          THE COURT:  Let's do this.  I want you to focus

7   on -- be a little more specific than that.  Focus on how many.

8   What's the rate of production of witnesses?  How many do you

9   think?  My guess is that the number of witnesses are sure.  My

10  guess is you may average at least three to five witnesses a

11  day.

12         MR. YALOWITZ:  Depends on the witness.

13         THE COURT:  Right, depending on the witness.

14         MR. YALOWITZ:  Depends on the witness.  I have

15  witnesses who I think are going to take me three days and then

16  they're going to be crossed.

17         THE COURT:  That's fine.  There are always

18  unusual -- I'm not sure who is going to last three days, but

19  there are always longer witnesses than others.

20         MR. YALOWITZ:  And I have other witnesses that I

21  expect are going to be 15 minutes.

22         THE COURT:  So you can add up the number of people

23  that you think are going to be 15 minutes and we can do four of

24  those an hour.

25         MR. YALOWITZ:  I have thought about it carefully.  I

F17GSOKC

1    have sharpened my pencil and I think that I can be done in five

2    weeks.  I thought about it carefully.

3                THE COURT:  Mr. Rochon.

4                MR. ROCHON:  We listed 22 and everyone here knows

5    we're not going to call anywhere near that many.  You know

6    that.  We know that.  I think that's always the case.  I think

7    our case can wind up being a week.  It could go a few days

8    over.

9                THE COURT:  So you're talking about a week or two?

10               MR. ROCHON:  Yes.  And then it, of course, depends on

11   which of the experts end up needing to testify.  I guess two

12   weeks and I'll beat that, and if they asked for five, that's

13   seven.  I'd ask the Court maybe to say something like six to

14   eight.

15               THE COURT:  That's what I'm saying.

16               MR. YALOWITZ:  I was thinking seven to nine.

17               MR. ROCHON:  Even I won't argue -- I leave it up to

18   you.

19               MR. YALOWITZ:  Yes, it's up to him.

20               MR. ROCHON:  More jurors might try to wiggle out.

21   That's the concern.

22               THE COURT:  I will say six to eight if you think

23   there's a possibility that we might do it quicker than that.

24               MR. ROCHON:  I think we can.

25               THE COURT:  Do you think there is a possibility that

F17GSOKC

1  it might go quicker than that?

2           MR. YALOWITZ:  Quicker than six weeks?  No, not if

3  you're going to let them bring in all of those undisclosed

4  witnesses, your Honor.

5           THE COURT:  Suppose I don't?

6           MR. YALOWITZ:  Then there's a possibility.

7           THE COURT:  You know what I can do?  I can cut out a

8  bunch of your witnesses.  That will save us a couple of weeks.

9           MR. ROCHON:  Yes, I have my own views of what might

10  shorten the case and we'll talk about it on Monday.  But I

11  think as the case currently stands, six to eight weeks is fair,

12  and we hope it's much shorter.

13           THE COURT:  I'm going to give them six to eight weeks.

14  That means I'm going to keep the pressure on you to be

15  efficient about this.  You guys are all experienced lawyers.  I

16  find in criminal cases, usually it takes a lot less than the

17  parties tell me.  In the civil cases, the only reason it might

18  take a lot more than the parties tell me is because we're not

19  doing it efficiently, but you guys know how to do this.  Be

20  prepared.  The basic rule is, have a witness waiting in the

21  witness room when we have a witness on the stand so there are

22  no gaps.  I'm going to move this case along.

23           If the witnesses are here and you have deposition

24  testimony to read or something else to present, let's use that

25  time efficiently so the jury gets -- I want them to get very

F17GSOKC

1    early on some confidence that I'm in control of this case,

2    we're moving along, the lawyers are being efficient, not

3    wasting their time.  So let's try to keep it moving

4    efficiently.

5            I'm going to give them that time frame.  I think it's

6    probably reasonable.  I would hope we might be done before the

7    end of February, but we still also have some holidays.

8            MR. YALOWITZ:  I have just two logistical issues:  The

9    first is, the Court has made rulings about the conviction

10   binder that we submitted, the binder of convictions and about

11   the 177 defendants' records.  Are those documents deemed

12   admitted in evidence or do I need to move them in?  And if I

13   need to move them in, can we do it on Monday before we start?

14           THE COURT:  I'll hear from the defense.  The documents

15   that were produced from the files of the defendants directly to

16   the plaintiffs, it seems to me that that demonstration of that

17   fact or that fact will probably be a sufficient foundation for

18   admitting those documents.

19           My inclination is, to save time, that the documents

20   that were produced, you can just simply offer them and we

21   already have the record for the objections and you can make

22   them again if you want, but the record will stand with regard

23   to the objections, and I'll go ahead and allow them in.

24           Unless the defense believes that for some reason that

25   you want to put them to the burden in front of the jury to lay

F17GSOKC

 1    that kind of foundation, but what I'm talking about is having

 2    to have the plaintiff literally lay out a litany demonstrating

 3    that, look, you gave us those documents, you have no basis for

 4    objecting to those documents and we're going to show that we

 5    requested those documents, they came out of your files.  You

 6    can jump up every five minutes if you want and try to keep this

 7    from the jury hearing it and seeing it, but I will consider

 8    that if you want to go through that process.

 9         MR. HILL:  No.  We don't intend to do that.  The issue

10    I wanted to raise, though, is, as you remember, we had this

11    exchange where we told you what we wanted out and they told you

12    what they wanted in and you ruled on that.

13         There's a third category of stuff that neither party

14    put on that chart.

15         THE COURT:  Which is?

16         MR. HILL:  It's stuff that we didn't think was

17    relevant and they didn't think was relevant.  And I think that

18    should be redacted under the guidance the Court gave us

19    previously.  Particularly with respect to the intelligence

20    files, if it doesn't go to issues the plaintiffs thought was

21    relevant, it ought not to be publicly disclosed.

22         MR. YALOWITZ:  Wait a minute.  There's a real problem

23    here with that, which is, we spent enormous time redacting in

24    accordance with the chart.  I don't know whether we did what

25    Mr. Hill is suggesting.  He never suggested it to me.  And I'm

F17GSOKC

1    not going to have people go back and re-redact these documents

2    again.

3         THE COURT:  My position is still the same, and I think

4    I was particularly generous with regard to the redactions.  I

5    redacted every portion that the defendants said that they did

6    not want in this case that the plaintiffs did not put as part

7    of their -- the part that they said was relevant.  And I even

8    redacted some portions where the plaintiffs said they wanted it

9    and I redacted it for the defendants.

10        So on this issue, no, I think in fairness, the jury

11   shouldn't get a piece of paper with three words on it.  They

12   should get the report.  I asked you to identify the parts that

13   you said that you had objections to.  Even some of those parts

14   that I didn't think where necessarily there was a particularly

15   valid objection, if there was a part that the plaintiffs said

16   that they would say was the relevant part, I told them to

17   redact it.  I think that was very generous.

18        MR. HILL:  My only point is, we only did that with

19   respect to stuff that was relevant to this case.

20        THE COURT:  Right.

21        MR. HILL:  There's stuff in there that's not relevant

22   and both sides agree it's not relevant.

23        THE COURT:  Right.

24        MR. HILL:  My position is, since your Honor is going

25   to turn this over to the press, that material should be

F17GSOKC

1    redacted as well.  There's no reason for material that both

2    sides agree is not relevant to be included in the record in the

3    case.

4             THE COURT:  I can only assume that you identified for

5    me the portions that you did not believe should have gone

6    before the jury.

7             MR. HILL:  No.  What we did was identify the portions

8    that were relevant to case that should not go.  So, there's

9    this whole category of stuff where the parties have agreed

10   through this process --

11            MR. YALOWITZ:  Not true.

12            MR. HILL:  -- that it's not relevant --

13            MR. YALOWITZ:  Not correct.

14            MR. HILL:  -- because the plaintiffs didn't want to

15   offer it and we didn't list it as something that was relevant

16   that we wanted to exclude.  So my point is that there's no

17   point in putting that into the record or into the public

18   domain.

19            THE COURT:  Mr. Yalowitz, unless you want to talk me

20   out of it, because I'm getting ready to rule in your favor --

21            MR. YALOWITZ:  No.  I'll be silent.

22            THE COURT:  You want to talk?

23            I'm not going to do that.  With regard to the jury, as

24   I say, with regard to this kind of issue, if it's irrelevant,

25   they can ignore it.  And if there is some compelling reason

F17GSOKC

1    that that particular information, other than a general, well,

2    we think these are secret files and we don't want any words out

3    of the secret file, the minimal words out of the secret file

4    disclosed, if you did not identify it as something that you did

5    not want to put before this jury in a public manner, then I'm

6    not going to force them to redact it at this point in time

7    simply on relevance.

8              MR. HILL:  The other issue is there were a few

9    exhibits that your Honor did require a foundation for out of

10   the 177, and we will insist on them laying a foundation for

11   those.

12             THE COURT:  Is that anything beyond the documents that

13   they did not receive?

14             MR. HILL:  I think that's the group.

15             MR. YALOWITZ:  Wait a minute.  This is three

16   documents.

17             THE COURT:  Right.

18             MR. YALOWITZ:  This is three documents.

19             THE COURT:  And two one you said you weren't going to

20   use.

21             MR. YALOWITZ:  I think, frankly, we're down to one

22   document, which is Exhibit 233.

23             THE COURT:  If they insist on you laying a proper

24   foundation for the admissibility of a document that they did

25   not produce to you, then you're going to have to do it.  I

F17GSOKC

1    think we went through that.  I think you said it.

2              MR. YALOWITZ:  I know we went through that and you

3    said is there a genuine dispute that it's your document; and if

4    there is, I want to hear from you and they have been silent.

5    That's my recollection of the Court's ruling on this.

6              THE COURT:  I'm not sure which document you're talking

7    about because I have to say there's only one document at issue.

8              MR. YALOWITZ:  Right.

9              THE COURT:  My suggestion is that you tell them the

10   one document that you want to use.

11             MR. YALOWITZ:  They know it.

12             THE COURT:  Find out from them whether or not you want

13   to offer that document the same way you offer every other

14   document or you want to independently lay a foundation,

15   because, if necessary, you know, you can attempt to lay the

16   foundation.  If it's in, then when they put their witness on

17   the stand, you shove it in front of them.  If it's not in, make

18   them admit it or deny it and you can do whatever you want with

19   it, but I don't want to waste a lot of time on this if it's not

20   genuinely at issue.

21             Discuss it with them.  Show it to them.  If they say

22   they insist on laying some foundation, then you can tell me

23   whether or not you want to or are incapable of doing so or

24   whether you think we should dispense with it depending on which

25   document you're talking about.

F17GSOKC

```
 1              MR. YALOWITZ:  Let me tell you why I think we should
 2   dispense with it quickly.  This is a document that was seized
 3   by the Israeli defense force.  We have it.  We gave it to them.
 4              THE COURT:  Right.
 5              MR. YALOWITZ:  We said who are the people whose
 6   signatures appear on this document.
 7              THE COURT:  I remember that.
 8              MR. YALOWITZ:  They answered the interrogatory.  That
 9   signature is a guy who works for us and that's it.  They didn't
10   say, oh, the document is a forgery.  Okay.  I can do all of
11   that in front of the jury.  It just seems like a waste of time.
12              THE COURT:  It may be a waste of time, unless they
13   have a genuine strategy that they're better off if you have to
14   do that than if you don't have to do that.
15              MR. YALOWITZ:  Fine.
16              THE COURT:  But the bottom line is, if they insist, I
17   may let you do all of that.  I may let you even put in evidence
18   that their interrogatory answers.
19              MR. YALOWITZ:  Fine.
20              THE COURT:  If they say they object to the foundation
21   for the admissibility of the document, if they looked at the
22   document and said these are the signatures of their employees,
23   then that's the evidence that you're going to put in there to
24   lay the foundation.  And if you have other evidence or you have
25   some other employee that they put on the witness stand, if you
```

F17GSOKC

```
 1   want to shove that document in front of their face and say this
 2   is your document, isn't it?  We have been sitting here five
 3   weeks arguing this document.  You know this is yours, right?
 4   And they say, oh, yeah, that's mine.  And that's the way it
 5   happens.
 6           Talk to each other and see whether it's worth your
 7   while to fight about this.  If it is, then do so.  Otherwise,
 8   as they say, you know what happens in a case when you say
 9   certain things aren't relevant?  In a case, 85 percent of the
10   evidence you give to the jury isn't relevant.  There's only
11   about 15 percent that's really in dispute in most cases, and
12   that's the thing that's going to make the difference.
13           Let's figure out what's really in dispute and figure
14   out how you can really win your case, because fighting over
15   most of this stuff, that will be context for them, but that's
16   not going to be a determinative factor here.  You know what the
17   determinative factors are in terms of being able to tie a
18   connection between the perpetrators of these acts and the PA
19   and PLO, and you know that's where the jurors are going to be
20   concentrating.
21           MR. ROCHON:  The question about the jury, it's
22   unrelated to this issue, if this is going to be our first
23   meeting for the jury and they're down there waiting for us --
24           THE COURT:  They're not.  Now they're ready.
25           MR. ROCHON:  I was going to say, once they're ready, I
```

F17GSOKC

1     did not want to make them wait.

2               THE COURT:  No, we're not.  I was waiting for a signal

3     and I just got it.

4               MR. ROCHON:  Okay.  Perfect timing.  Should we go to

5     the jury assembly room and assemble?

6               THE COURT:  Yes.  There's a CSO at the door.

7               MR. ROCHON:  There's two doors to that jury assembly

8     room.

9               THE LAW CLERK:  Go to the door with the CSO and please

10    wait until they instruct you to go in.

11              MR. YALOWITZ:  Before the court reporter leaves, we're

12    going to hand up to the court a proposed order on cost-sharing

13    which the defendants have seen.

14              THE COURT:  If you agree it to, I'll sign it.

15              (Adjourned)

16

17

18

19

20

21

22

23

24

25