
PLAINTIFF'S
EXHIBIT
468

Appeal (Judea and Samaria) 2793/04        Military Prosecutor v. Munzar Mahmoud Khalil Noor

Judea and Samaria Appeal 2793/04+1009/05

| **The Military Appellate Court** | **Judea and Samaria Appeal 2793/04** |
|---|---|
| **In Judea and Samaria and in the Gaza Strip** | **Judea and Samaria Appeal 1009/05** |

**Before a panel:**   Colonel Shaul Gordon        - **Presiding Judge**
Colonel Moshe Matalon      - **Judge**
Colonel Moshe Tirosh       - **Judge**

**The Military Prosecutor**
(the Appellant in Case 2793/04 and the Respondent in Case 1009/05 (Represented by Counsel,
Captain Yosef Malaku)

- v. -

**Munzar Mahmoud Khalil Noor, Identity No. 902442607**
(the Appellant in Case 1009/05 and the Respondent in Case 2793/04)
(Represented by Counsel, Adv. Eli Gozlan)

Appeal against the verdict of the Judea Military Court (panel headed by Honorable President
Lieutenant Colonel Shlomi Kochav and Honorable Judges Captain Shlomo Katz and Captain
Menachem Lieberman) in Case No. 3465/02 dated August 26, 2004
(The appeal in Case 2793/04 is accepted,
the appeal in Case 1009/05 is denied)

Date of the session: September 28, 2005, 24 Elul 5765

# Verdict

**President Colonel Sh. Gordon:**

**Highlights of the facts**

1

[Stamp] P 8: 113

Appeal (Judea and Samaria) 2793/04          Military Prosecutor v. Munzar Mahmoud Khalil Noor

On January 27, 2002, a loud explosion rocked Jaffa Street in Jerusalem. Once the dust settled and the smoke dispersed, it was found that Pinhas Tokatli, of blessed memory, a resident of the city, aged about 80, had been killed and more than 150 people who were standing nearby had been injured in this explosion, and extensive damage had been caused to stores, buildings and many vehicles nearby.

In the event, pieces of the body of the terrorist who carried the explosive device on her person were found after being scattered in all directions, and the investigation revealed it to be the body of **Wafa Idris**, a resident of the al-Amari Refugee Camp in the Ramallah District.

On April 17, 2002, **Munzar Noor**, a resident of the village of Anbata (hereinafter: the "**Appellant**") was arrested on the suspicion of involvement in the said attack, as well as other security offenses. In the end, an indictment was filed against the Appellant, indicting him on six counts as follows:

A.  **Aggravated abduction** – Insofar as in 1993, when the Respondent was a member of the youth movement of the Fatah organization, he participated in the abduction of a person who was suspected of collaborating with Israel.

B.  **Causing intentional death** – Insofar as in early 2002, he took part in the bombing attack mentioned above; we will discuss his part in this case at length below.

C.  **Attempting to cause intentional death** – Insofar as he caused the injury of 150 people in the said attack.

D.  **Malicious damage to property** – Insofar as he caused heavy damage to stores, buildings and vehicles in the said attack.

E.  **Attempted solicitation of trading in war materiel** – Insofar as he suggested to a senior member of the military intelligence of the Palestinian Authority to transfer explosive devices using Red Crescent ambulances, an organization in which the Appellant worked.

F.  **Providing information of military value** – Insofar as he transferred to that senior member of the Military Intelligence – information concerning IDF checkpoints, movements of forces nearby and war materiel with which they were equipped.

[Stamp] **P 8: 114**

On August 26, 2004, the Lower Court decided to convict the Appellant of the offenses that were attributed to him, except for the offense of abduction in the first count, of which he was acquitted. On that same day, the pleas for sentencing were heard, following which the Court sentenced the Appellant to life imprisonment for causing the death of Pinhas Tokatli, of blessed memory, and another 30 years' imprisonment for the other offenses of which he was convicted, to be served concurrently.

**The appeal**

As events would have it, both the Prosecution and the Defense were of the opinion that the Lower Court had erred in its actions. The Defense argued that the Appellant's conviction for involvement in the suicide attack in Jerusalem could not stand, and in any case, there was still room for intervention in the sentencing. In contrast to that, the Prosecution argued that the Lower Court had erred by not handing down an additional life sentence to the Appellant for injuring 150 people in the said attack, as it had petitioned in its pleas for sentencing.

2

Nevo Publishing Ltd.    nevo.co.il    The Israeli Legal Database
C:\DOCS\American Suits\Sokolow - Gould\ Sokolow Attack\Nur Appellate Decision.doc

[Stamp] **P 8: 114** [continued]

Hence, before attending to the arguments of the parties, it would seem that the facts of the main count of this case warrant re-examination, and that the Appellant's part in this case be studied during this process.

### The attack on Jaffa Street

As set forth, the Appellant was arrested on April 17, 2005, and during his questioning, his interrogators took three statements, as follows:

A.     Statement dated April 23, 2002 (P/1).

B.     Statement dated April 25, 2002 (P/2).

C.     Statement dated May 13, 2002 (P/3).

These statements were filed with the Court consensually, meaning that it is agreed that they reflect the course of events. Despite certain differences between the various accounts that the Appellant gave, they portray the following picture:

The Appellant worked as a medical orderly for the Red Crescent in Ramallah, and in June 2001 he met **Wafa Idris**, a divorced woman who was volunteering at the site.

In August 2001, following **Wafa**'s suggestion, the Appellant met with one **Mohamed Muhtaseb** in the Mukataa in Ramallah; he was also known by the name of **Mohamed Kahal** and as **Abu-Talal** (hereinafter: "**Mohamed**"), who served in the Military Intelligence of the Palestinian Authority. These meetings were held at a frequency of once to twice per week; and in effect the Appellant served as the source for that **Mohamed**. This happened until January 24, 2002, when the Appellant, with **Mohamed**, talked together about suicide attacks. At some stage, **Mohamed** said that he was interested in dispatching a woman on a suicide attack, and mentioned the name of **Wafa**.

All that occurred until that stage can be learned from the Appellant's statement P/2 (page 2 line 3 onward):

> *"And then Mohamed told me that in his opinion Wafa was suitable for carrying out a suicide attack... Mohamed also asked me to convince Wafa to carry out an attack because we were good friends and I told him that it would be difficult for me because she was a good friend of mine. Mohamed said on the contrary, because I was her friend, I would be able to convince her better than others."*

[Stamp] **P 8: 115**

And so, the Appellant talked with **Wafa** on this matter, whether alone, as he said in one of his accounts, or in the home and presence of **Mohamed**, as he stated in another account. In the end, **Wafa** agreed to carry out a suicide attack, but at some point backed out of her intent of to carry out a suicide attack, and instead asked to carry out an attack that would not end in her death.

The Appellant's statement in P/2 (page 2 line 19 onward) describes matters as follows:

[Stamp] **P 8: 115** [continued]

> *"... I called Mohamed and told him that Wafa was prepared to carry out an attack and Mohamed asked for us to come to his office in the Mukataa on Friday, January 25, 2002, and we came to the office, Wafa and I, and there she told Mohamed that she did not want to carry out the attack and we were surprised. Mohamed started to talk to her to convince her and she did not want to hear him, and also when I wanted to talk she interrupted me and asked me to leave the room. Mohamed and Wafa stayed alone in the room for about a quarter of an hour and talked, and then Mohamed asked me to take Wafa, and asked me, while we were leaving the room, to convince Wafa. And we went out, Wafa and I, and we sat in a café in Ramallah and I asked her why she did not want to carry out an attack, and she said that she did not want to die but she agreed to place an explosive device. And then I took her back to her home and told Mohamed later that Wafa was prepared to place an explosive device..."*

Later, the Appellant was asked by **Mohamed** to explain to **Wafa** how to reach Jaffa Street in Jerusalem, when she went out to conduct a preliminary visit of the attack scene. The Appellant also helped her return to Ramallah after she got lost in Jerusalem and needed directions from him by telephone.

After **Wafa** returned to Jerusalem, the Appellant picked her up in his vehicle and the two traveled to **Mohamed**'s office. All that occurred until that stage can be learned from the Appellant's statement P/2 (page 3 line 13 onward):

> *"... And we traveled to Mohamed's office in the Mukataa and we sat with him. Wafa said that she could reach Jerusalem through Beit Hanina and Shuafat, but on Jaffa Street she saw many soldiers and that there was no good possibility of placing an explosive device and leaving the site, but she would try to do it. Mohamed asked me to fetch a bag from behind the door of his office and bring it to him... Mohamed told me to be careful when bringing the bag and not to open it, but to put it next to Wafa on the floor. Mohamed told Wafa to pick up the bag and see what it weighed, and she said* (should be 'said' (fem.) – S.G.) *that it was not very heavy. Wafa asked how to activate the explosive device and Mohamed said that on the following day he would explain it to her, and we left, Wafa and I, the Mukataa, and I went home."*

On the morning of Sunday, January 27, 2002, **Wafa** went out to Jerusalem carrying the explosive device. According to one of the statements, she had to transfer this explosive device to another person, but in the end she chose to bring the explosive device by herself, and this plan was approved by **Mohamed**. Because a clock was connected to the explosive device, and it was supposed to cause the detonation of the explosive device, **Mohamed** called **Wafa** and warned her seven minutes prior to the time of the detonation. He did so again three minutes prior to the explosion occurring. The explosive device that **Wafa** was carrying exploded at the intended time, regardless of whether she intended to commit suicide or it exploded before she had time to place it, and the carnage that the explosive device left in its wake has already been described above and also documented in a list of graphic pictures that were filed with the Court.

### The part of the Appellant

One of the main arguments by Counsel for the Appellant is that his client, even if he knew that **Wafa** intended to carry out an attack in Jerusalem, did not encourage her to do so and also was not an accomplice in its planning. To prove this, Defense Counsel referred to the statements by

[Stamp] **P 8: 116** [continued]

the Appellant, which show that the Appellant himself objected to suicide attacks, and in his talks with **Wafa** stated, "*If she is satisfied with the matter* (commission of a suicide attack – S.G.) *I am also satisfied with the matter and if not, then no, and she can do whatever she wants.*"

In other words, at the most, the Appellant can be accused of failure to prevent an offense and nothing more.

This argument, with all due respect, must be denied *in limine*. The picture that results from the aggregate of evidence cannot leave any doubt that the Appellant opted to involve himself in the execution of the attack. The Appellant not only knew that **Mohamed** intended to recruit **Wafa** for carrying out the suicide attack, but also assisted in her recruitment for that task, under orders by **Mohamed**.

The Appellant talked with **Wafa** on several occasions about the said attack, and made sure to update **Mohamed** of the developments. Thus, at a certain stage, the Appellant stated, "*I called Mohamed and told him that Wafa was ready to carry out the attack*" (P/2, page 2 lines 19-20), and later, once **Wafa** changed her mind and preferred to carry out an attack using an explosive device without committing suicide, he hastened to forward her request to **Mohamed**.

The Appellant took part in all of the meetings that were held concerning the said attack, and in effect it can be said that in this case three people were involved: **Mohamed**, who was undoubtedly the originator; Wafa, who agreed to carry out the attack; and the **Appellant**, who as the friend of **Wafa** on the one hand and the proxy of **Mohamed** on the other, talked to **Wafa**'s heart and mediated between the two.

It is true that **Wafa** agreed not to involve the Appellant and share her plans with him out of fear that this would prove detrimental for him, but despite this, the Appellant continued to involve himself in bringing the attack to fruition. Thus, the Appellant briefed **Wafa** on how to reach Jaffa Street in Jerusalem when she went out on the preliminary excursion, and helped her return to Ramallah after she had gotten lost in Jerusalem. Also, when she returned to Ramallah, the Appellant hastened to pick her up in his vehicle and took her for a meeting with **Mohamed** (whether it was in his office, as indicated in one of the accounts, or in his home in Bitunia).

[Stamp] **P 8: 117**

During this meeting, the Appellant gave **Wafa** the explosive device that **Mohamed** had brought, and the Appellant was also able to tell that a clock had been attached to the explosive device.

The sequence of meetings, the persuasion attempts, the directions for reaching Jaffa Street in Jerusalem, driving the terrorist to meetings at the office or home of **Mohamed**, delivering the explosive device to **Wafa** – can only indicate the work of a full accomplice in bringing the attack to fruition.

Even if Mohamed's part exceeds the part of the Appellant, which nobody disputes, this does not diminish in any way from the part of the latter. With all due respect, this is not petty knowledge of the intentions of **Wafa** but **active** activity, which indicates a full wish for the attack to be carried out.

---

5

Nevo Publishing Ltd.    nevo.co.il    The Israeli Legal Database

C:\DOCS\American Suits\Sokolow - Gould\ Sokolow Attack\Nur Appellate Decision.doc

[Stamp] **P 8: 117** [continued]

Therefore, I see fit to determine without hesitation that the Appellant was a **full accomplice** in the execution of the said bloody attack, and in any case assumes full responsibility for its horrific results.

### Change in the manner of execution

Another key argument that Counsel for the Appellant raised is that even if the Appellant involved himself and assisted **Mohamed and Wafa**, at the most, he intended to assist in an attack of placing an explosive device. Once **Wafa** changed her mind and opted to carry out a suicide attack instead of placing the explosive device, in effect a **different attack** from that which he intended to be carried out, and in any case he did not assume responsibility for its results.

This argument, with all due respect, must also be denied.

First of all, the plan from the outset was for **Wafa** to carry out a suicide attack, and we did not find that the Appellant objected to that plan at that stage. Moreover, when **Wafa** announced that she was withdrawing her intent to carry out a suicide attack and preferred to carry out an attack of placing an explosive device instead, the Appellant was surprised and also tried to talk to her heart. Therefore, this is not an act to which the Appellant objected, and how can the Appellant complain that the attack was eventually carried out as initially planned?

Secondly, and more importantly, the manner in which the attack was carried out is of no significance. The Appellant assisted in committing an offense of causing intentional death, and this was committed. Moreover, the Appellant knew that **Wafa** intended to cause the deaths of innocent civilians on Jaffa Street in Jerusalem by detonating explosives. The fact that the Appellant believed that the attack would be carried out by placing an explosive device in a crowded street and not by way of a suicide attack does not add to or diminish from anything.

It was ruled previously on more than one occasion that even when an offender used a weapon that is **completely different** from one whose use was planned from the outset, this does not exempt his accomplices from responsibility for the result, which itself was wished for by the accomplices. The following was ruled in the **Lugasi** case (Criminal Appeal 35/98, **Lugasi** *et al.* v. **State of Israel**, PD 44 (1) 102, pp. 112-113):

[Stamp] **P 8: 118**

> *"We have already clarified that it does not matter for our purposes whether the pistol that had been prepared in advance or the knife that was taken from the murder scene was used, because the question of which destructive device the offender used to advance the common goal in which violence was expected is of no importance."*

See also: Criminal Appeal 147/77, **Saadia** *et al.* v. **State of Israel**, PD 31 (3) 421, at 425.

That being said, whether the Appellant believed that **Wafa** intended merely to place an explosive device or took into account that she might actualize her intention through a suicide attack, one way or the other, he knew that he was assisting in the murder and injury of innocent civilians. As a result, it was not **another attack** that was carried out here, but rather the same attack that was planned from the outset, which was completely identical to the planned attack with regard to the identity of the perpetrator, the identity of the scene of the attack and the identity of the means that were used to cause the deadly result.

---

6

C:\DOCS\American Suits\Sokolow - Gould\ Sokolow Attack\Nur Appellate Decision.doc

[Stamp] **P 8: 118** [continued]

Beyond what is necessary, I shall add that just as the Appellant cannot be excused because of a change in the scene of the attack, if, for example, **Wafa** had chosen to blow herself up on another street, the change in the manner of carrying out the attack, if there was one, cannot save him either.

Therefore, I find no substance in the Defense's appeal to the extent that it is aimed at the matter of conviction, and the Lower Court was right when it convicted him for his responsibility in carrying out the said bloody attack.

## Concerning the sentence

Having found that the Appellant was a full accomplice in the performance of the said attack, lenience in his sentencing is certainly unjustified. Even if the Appellant were not the originator of the attack, once he took part in its fulfillment, he assumes full responsibility for its results.

Therefore, it is difficult to imagine an argument that justifies handing down a sentence of less than life imprisonment.

On the other hand, I found genuine substance in the Prosecution's appeal, whereby there was room for handing down a sentence of life imprisonment to the Appellant for the attempt to cause the deaths of 150 innocent civilians. The Military Prosecutor was right by stating that not only did the Prosecution **explicitly** demand such a sentence, but that this was also the right thing to do according to the rules of this Court.

There is no doubt that had this terrible attack ended only with the injury of civilians, it would have been right to sentence the Appellant to life imprisonment, and as he was able to cause a person's death, there is no reason to be lenient with him owing to this alone.

The Appellant expected the said explosive device to cause the deaths and injury of many people, and once this plot actually materialized, he must be held responsible for the results. I have not found even a trace of an argument in the arguments of the Lower Court that justifies deviation from the rule practiced in these cases. We have ruled on more than one occasion that when a person attempted to cause death in circumstances in which a person sustains grievous bodily harm, or when the act was intended to cause loss of human life, and certainly in circumstances in which both of these conditions have been fulfilled, as in our case, the offender is to be sent behind bars for the rest of his life (and see, for example: Judea and Samaria Appeal 190/03, 183, **The Military Prosecutor v. Jarar**, in which this Court handed down a sentence of life imprisonment for being an accomplice in an attempted suicide attack, that was not achieved).

[Stamp] **P 8: 119**

In order to give meaning not only to the value of human life, but also to the right of freedom from physical injury, the Court must clarify that a sentence of life imprisonment inflicted for causing death will not exempt [a defendant] from a sentence for injuring others. Only **separate, strict** sentencing will clarify that just as a penal expression is to be given to every life that is lost as a result of the offense, the same applies to those who were miraculously only injured. Thus it is routine, and in mass bombing attacks in which the casualties bear the scars of the bombing for many years to come on their bodies and in their minds, this applies all the more so.

### Conclusion

---
7
---

Nevo Publishing Ltd.    nevo.co.il    The Israeli Legal Database

C:\DOCS\American Suits\Sokolow - Gould\ Sokolow Attack\Nur Appellate Decision.doc

[Stamp] **P 8: 119** [continued]

Appeal (Judea and Samaria) 2793/04        Military Prosecutor v. Munzar Mahmoud Khalil Noor

A person inspecting the evidentiary material in the court case, reading the statements of the many casualties and examining the grisly pictures of the destruction and carnage cannot fail to be horrified. The Appellant, who worked as a medical orderly and was entrusted with the saving of life, assisted in the commission of a lowly attack that was aimed at harming innocent civilians, including women, the elderly and infants.

The Appellant, who was aware of the distress to which his friend was subjected, not only failed to attempt to dissuade her from realizing her plot, but also supported and assisted her in fulfilling her plan. This Appellant, who had no mercy for the lives of others, is not fit to come into contact with people anymore and we must punish him to the full extent of the law.

Therefore, and if my opinion will prevail, I would reject the appeal of the Defense, sustain the appeal of the Prosecution and sentence the Appellant to two terms of life imprisonment, one for causing the intentional death of Pinhas Tokatli, of blessed memory, and the other for attempting to cause the intentional deaths of other civilians, many of whom were injured in the said attack.

There is also room for sentencing the Appellant to ten years' imprisonment for the remaining offenses of which he was convicted, including that in which he suggested to make use of Red Crescent ambulances for transporting explosive devices.

These sentences, it should be ordered, must all be served cumulatively to one another.


**Judge Colonel M. Matalon:**

I concur.


**Judge Colonel M. Tirosh:**

I concur.


Decided as set forth, in the verdict of President Colonel M. Gordon.

[Stamp] **P 8: 120**

Handed down and announced this day, January 30, 2060, 1 Shevat 5766, in the presence of the Appellant, his Counsel and the Military Prosecutor.

(-)                          (-)                          (-)

7

[Stamp] **P 8: 120** [continued]

Appeal (Judea and Samaria) 2793/04        Military Prosecutor v. Munzar Mahmoud Khalil Noor

_____        _____        _____

Shaul Gordon 54678313-2793/004

      Judge                        Presiding Judge                        Judge

The wording of this document is subject to wording and editing modifications

7
_____
Nevo Publishing Ltd.    nevo.co.il    The Israeli Legal Database
C:\DOCS\American Suits\Sokolow - Gould\ Sokolow Attack\Nur Appellate Decision.doc

[Stamp] **P 8: 121**

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

MARK I. SOKOLOW, *et al.*,

                Plaintiffs,

    vs.

THE PALESTINE LIBERATION
ORGANIZATION, *et al.*,

                Defendants.

No. 04 Civ. 00397 (GBD) (RLE)

## DECLARATION OF RINA NE'EMAN

Rina Ne'eman hereby certifies as follows:

1.    The attached translation from Hebrew to English is an accurate representation of the document received by Rina Ne'eman Hebrew Language Services, to the best of my knowledge and belief. The document is designated as P 8: 113-21.

2.    I am a professional translator with a B.A. in International Relations from the Hebrew University of Jerusalem (Israel) and 30 years of translation experience. I am fluent in Hebrew and English, and I am qualified to translate accurately from Hebrew to English.

3.    To the best of my knowledge and belief, the accompanying text is a true, full and accurate translation of the Hebrew-language document bearing the bates number, P 8: 113-21.

Dated: February 28 2014

                                     Rina Ne'eman

ss.: New Jersey

On the 28 day of February, 2014 before me, the undersigned, personally appeared Rina Ne'eman, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is signed to this Declaration and acknowledged to me that he executed the same in his capacity, and that by his signature on this Declaration, the individual executed the Declaration.

Sworn to me this
28 day of February, 2014

Notary Public

MIRIT J MEHRETE
NOTARY PUBLIC
STATE OF NEW JERSEY
MY COMMISSION EXPIRES SEPT. 7, 2015
I.D.# 2332704

ע' איו"ש 2793/04+1009/05

| | |
|---|---|
| ע/ איו"ש 2793/04 | בית המשפט הצבאי לערעורים |
| ע/ איו"ש 1009/05 | באיו"ש        ובאזח"ע |

|  |  |  |
|---|---|---|
| בפני **הרכב**: | אל"ם שאול גורדון | - **אב"ד** |
| | אל"ם משה מטלון | - **שופט** |
| | אל"ם משה תירוש | - **שופט** |

**התובע הצבאי** (המערער בתיק 2793/04 והמשיב בתיק 1009/05)(באמצעות ב"כ סרן יוסף מלקו)

נגד

**מונזר מחמוד חליל נור, ת"ז 902442607** (המערער בתיק 1009/05 והמשיב בתיק 2793/04)

(באמצעות ב"כ עו"ד עלי גוזלן)

ערעור על פסק דינו של ביהמ"ש הצבאי יהודה (הרכב בראשות כב' הנשיא סא"ל שלומי כוכב וכב' השופטים סרן שלמה כץ וסרן מנחם ליברמן)בתיק מס' 3465/02 מיום 26.8.04

(הערעור בתיק 2793/04 התקבל,

הערעור בתיק 1009/05 נדחה)

תאריך הישיבה: 28 בספטמבר 2005, כ"ד באלול התשס"ה.

## פסק דין

<u>הנשיא אל"ם ש' גורדון</u>:

<u>עיקרי העובדות</u>

---

1

ביום 27.1.02 החריד פיצוץ עז את רחוב יפו בירושלים. משמגוג האבק והתפזר העשן, התברר כי בפיצוץ זה נהרג פנחס טוקטלי ז״ל, תושב העיר כבן 80, למעלה מ-150 בני אדם אשר עמדו בקרבת מקום נפצעו, ונזק רב נגרם לחנויות, בניינים סמוכים וכלי רכב רבים.

בזירת האירוע נמצאו חלקי גופתה של המחבלת אשר נשאה על גופה את מטען התופת ואשר התפזרו לכל עבר, ובחקירה הוברר כי מדובר בגופתה של אחת **וופא אדריס**, תושבת מחנה הפליטים אל-אמערי שבנפת רמאללה.

ביום 17.4.02 נעצר **מונזר נור**, תושב הכפר ענבתא (להלן : **המערער**), בחשד למעורבות בפיגוע האמור, כמו גם בעבירות ביטחוניות נוספות. סופם של דברים, הוגש נגד המערער כתב אישום אשר ייחס לו 6 פרטי אישום כדלהלן :

א.  **חטיפה בנסיבות מחמירות** – בכך שבשנת 1993, עת היה המשיב חבר בתנועת הנוער של ארגון הפת״ח, השתתף בחטיפתו של אדם אשר נחשד בשיתוף פעולה עם ישראל.

ב.  **גרימת מוות בכוונה** – בכך שבראשית שנת 2002 נטל חלק בפיגוע התופת הנזכר מעלה, ואשר על חלקו בפרשה זו עוד נעמוד בהרחבה בהמשך.

ג.  **ניסיון לגרימת מוות בכוונה** – בכך שגרם לפציעתם של 150 בני אדם בפיגוע האמור.

ד.  **היזק בזדון לרכוש** – בכך שגרם נזק כבד לחנויות, בניינים וכלי רכב בפיגוע האמור.

ה.  **ניסיון לשידול לסחר בציוד מלחמתי** – בכך שהציע לבכיר במודיעין הצבאי של הרשות הפלסטינית, להעביר מטעני חבלה באמצעות אמבולנסים של ״הסהר האדום״, ארגון בו עבד המערער.

ו.  **מסירת ידיעות בעלות ערך צבאי** – בכך שהעביר לאותו בכיר במודיעין הצבאי מידע הנוגע למחסומי צה״ל, תנועת הכוחות במקום ואמצעי הלחימה בהם מצוידים הם.

ביום 26.8.04 החליט ביהמ״ש קמא להרשיע את המערער בעבירות שיוחסו לו, זולת בעבירת החטיפה שבפרט האישום הראשון, ממנה זוכה. בו ביום נשמע הטיעונים לעונש, ולאחריהם גזר ביהמ״ש למערער עונש של מאסר עולם בגין גרימת מותו של פנחס טוקטלי ז״ל, ועוד 30 שנות מאסר במצטבר בגין שאר העבירות בהן הורשע.

**הערעור**

מסתבר, כי הן התביעה והן ההגנה היו בדעה כי שגגה יצאה תחת ידו של ביהמ״ש קמא. ההגנה סברה, כי הרשעת המערער במעורבות בפיגוע ההתאבדות בירושלים אינה יכולה לעמוד, וממילא יש מקום להתערב אף בעונש. לעומתה, טענה התביעה, שגה ביהמ״ש קמא בכך שלא גזר למערער עונש מאסר עולם נוסף, בגין פציעתם של 150 בני אדם בפיגוע האמור, כפי שעתרה בטיעוניה לעונש.

נבו הוצאה לאור בע״מ   nevo.co.il   המאגר המשפטי הישראלי

C:\DOCS\American Suits\Sokolow - Gould\Sokolow Attack\Nur Appellate Decision.doc

מכאן, וקודם שאדרש לטענות הצדדים, דומה כי יש לשוב ולבחון עובדותיו של פרט האישום המרכזי בתיק זה, ולעמוד, אגב כך, על חלקו של המערער בפרשה זו.

<u>הפיגוע ברחוב יפו</u>

כאמור, המערער נעצר ביום 17.4.05, ובמהלך חקירתו גבו ממנו חוקריו שלוש הודעות כדלהלן :

א.   אמרה מיום 23.4.02 (ת/1).

ב.   אמרה מיום 25.4.02 (ת/2).

ג.   אמרה מיום 13.5.02 (ת/3).

אמרות אלו הוגשו לביהמ"ש בהסכמה, ומכאן שמוסכם כי משקפות הן את מהלך הדברים. חרף הבדלים מסוימים בין הגרסאות השונות אשר מסר המערער, עולה מהן התמונה הבאה :

המערער עבד כחובש ב"סהר האדום" ברמאללה, ובחודש יוני 2001 הכיר את **וופא אידריס**, גרושה אשר התגדבה במקום.

בחודש אוגוסט 2001, בעקבות הצעתה של **וופא**, נפגש המערער במוקטעה ברמאללה עם אחד **מחמד מוחתסב**, המוכר אף בשם **מחמד כחאל** ובכינוי "אבו-טלאל" (להלן : "**מחמד**"), אשר שימש במודיעין הצבאי ברשות הפלסטינית. מפגשים אלה התקיימו בתדירות של פעם עד פעמיים בשבוע, ולמעשה שימש המערער כמקור של אותו **מחמד**. כך, עד שביום 24.1.02, עת נפגש המערער עם **מחמד**, דיברו השניים אודות פיגועי התאבדות. בשלב כלשהו, אמר **מחמד** כי מעוניין להוציא אישה לפיגוע התאבדות, והעלה את שמה של **וופא**.

על אשר אירע בשלב זה ניתן ללמוד מהודעתו של המערער ת/2 (עמ' 2 ש' 3 ואילך) :

*"ואז מחמד אמר לי כי לדעתו וופא מתאימה לעשות פיגוע התאבדות... מחמד*
*גם ביקש ממני לשכנע את וופא לבצע פיגוע כי היינו חברים טובים ואמרתי לו*
*כי קשה לי כי היא חברה טובה שלי. מחמד אמר להיפך בגלל שאני חברה אני*
*יכול לשכנע אותה טוב יותר מאחרים."*

ואכן, המערער שוחח בעניין זה עם **וופא**, בין אם ביחידות, כפי שמסר באחת מגרסאותיו, ובין אם בביתו של **מחמד** ובנוכחותו, כפי שמסר בגרסה אחרת. סופם של דברים, הסכימה **וופא** לבצע פיגוע התאבדות, הגם שבשלב כלשהו חזרה בה מכוונתה לבצע פיגוע התאבדות, ותחת זאת ביקשה לבצע פיגוע אשר לא יסתיים במותה.

וכך מתוארים הדברים באמרתו של המערער ת/2 (עמ' 2 ש' 19 ואילך) :

נבו הוצאה לאור בע"מ    nevo.co.il    המאגר המשפטי הישראלי

C:\DOCS\American Suits\Sokolow - Gould\Sokolow Attack\Nur Appellate Decision.doc

"...התקשרתי למחמד ואמרתי לו כי וופא מוכנה לבצע הפיגוע ומחמד ביקש כי
ביום שישי 25.1.02 נגיע למשרדו במוקטעה והגענו למשרד אני וופא ושם היא
אמר (צריך להיות "אמרה" – ש"ג) למחמד כי אינה רוצה לעשות הפיגוע ואנחנו
התפלאנו. מחמד החל לדבר איתה לשכנעה והיא לא רצתה לשמוע אותו וגם
כאשר רציתי לדבר היא קטעה אותי וביקשה כי אצא מהחדר. מחמד וופא
נשארו לבד בחדר כרבע שעה ודיברו ואז מחמד ביקש כי אקח את וופא וביקש
ממני בעוד אנו יוצאים מהחדר כי אשכנע את וופא. ויצאנו אני וופא וישבנו
בבית קפה ברמאללה ושאלתי אותה למה היא לא רוצה לעשות פיגוע, והיא
אמרה כי לא רוצה למות אבל היא מסכימה להניח מטען. ואז החזרתי אותה
לביתה ואמרתי למחמד לאחר מכן כי וופא מוכנה להניח מטען..."

בהמשך, התבקש המערער ע"י מחמד להסביר לוופא כיצד להגיע לרחוב יפו בירושלים, שעה שזו
יצאה לערוך סיור מקדים בזירת הפיגוע. כן סייע המערער בידה לחזור לחזור לרמאללה, לאחר שזו
איבדה דרכה בירושלים ונזקקה להדרכתו הטלפונית.

לאחר שוופא חזרה לרמאללה, אסף אותה המערער ברכבו והשניים נסעו למשרדו של מחמד. על
אשר אירע בשלב זה מסר המערער באמרתו ת/2 (עמ' 3 ש' 13 ואילך) :

"...ונסענו למשרדו של מחמד במוקטעה וישבנו איתו. וופא אמרה כי היא
יכולה להגיע לירושלים דרך בית חנינא ושועפט אבל ברחוב יפו ראתה הרבה
חיילים וכי אין אפשרות טובה להניח מטען ולעזוב המקום אבל היא תנסה
לעשות זאת. מחמד ביקש ממני להביא תיק מאחורי הדלת של משרדו ולהביא
אותו...מחמד אמר לי להיזהר שאני מביא את התיק ולא לפתחו ולהניחו ליד
וופא על הרצפה. מחמד אמר לוופא להרים את התיק ולראות מה משקלו והיא
אמר (צריך להיות "אמרה" – ש"ג) שהוא לא כבד הרבה. וופא שאלה איך
להפעיל את המטען ומחמד אמר כי למחרת יסביר לה, ויצאנו אני וופא
מהמוקטעה והלכתי הביתה."

ביום ראשון בבוקר, 27.1.02, יצאה וופא לירושלים כשמטען הנפץ עמה. לפי אחת הגרסאות היה
עליה להעביר מטען נפץ זה לאחר, אך סופם של דברים בחרה היא להוביל את המטען בעצמה
ותוכניתה זו אושרה על-ידי מחמד. הואיל ולמטען חובר שעון, אשר אמור היה לגרום לפיצוץ
המטען, התכוון מחמד לוופא והתריע בפניה שבע דקות קודם הגיע מועד הפיצוץ. כך חזר ועשה
אף שלוש דקות קודם שעת הפיצוץ. בשעה היעודה התפוצץ המטען אשר נשאה וופא, בין אם
התכוונה להתאבד ובין אם התפוצץ קודם שהיה סיפק בידה להניחו, והוזנחה אשר הותיר המטען
הלוא כבר תוארה מעלה היה אף תמונות של תמונות קשות לצפייה, אשר הוגשו לביהמ"ש.

<u>חלקו של המערער</u>

אחת מטענותיו המרכזיות של ב"כ המערער היא, כי מרשו, אף אם ידע כי בכוונת וופא לבצע פיגוע
בירושלים, לא עודדה לעשות כן ואף לא היה שותף בתוכניתה. לראיה, הפנה הסנגור לאמרותיו של

4

המערער, מהן עולה כי המערער עצמו התנגד לפיגועי התאבדות, ובשיחותיו עם **וופא** ציין כי**״אם היא מרוצה מהעניין** (ביצוע פיגוע התאבדות – ש״ג) **גם אני מרוצה מהעניין ואם לא אז לא ומה שתרצה שתעשה״**.

לשון אחרת; לכל היותר ניתן להאשים את המערער באי מניעת עבירה, הא ותו לא.

טענה זו, בכל הכבוד, דינה להידחות על הסף. התמונה המתקבלת ממכלול הראיות, אינה יכולה להותיר ספק כי המערער בחר לשתף עצמו בהוצאת הפיגוע אל הפועל. המערער לא רק שידע כי בכוונת **מחמד** לגייס את **וופא** לביצוע פיגוע התאבדות, אלא אף נתן יד לגיוסה למשימה זו, במצוותו של **מחמד**.

המערער שוחח עם **וופא** לא אחת ולא שתיים אודות הפיגוע האמור, והקפיד לעדכן את **מחמד** בהתפתחויות. כך, בשלב מסוים מסר המערער כי **״התקשרתי למחמד ואמרתי לו כי וופא מוכנה לבצע הפיגוע״** (ת/2 עמ׳ 2 ש׳ 20-19), ובהמשך, משנתינתה **וופא** טעמה והעדיפה לבצע פיגוע באמצעות מטען, מבלי להתאבד, מיהר להעביר בקשתה ל**מחמד**.

המערער נטל חלק בכל המפגשים שהתקיימו ביחס לפיגוע האמור, ולמעשה ניתן לומר כי בפרשה זו היו מעורבים שלושה: **מחמד**, אשר ללא ספק היה היוזם, **וופא**, אשר נאותה לבצע את הפיגוע ו**המערער**, אשר בהיותו חברה של **וופא**, מחד גיסא, ושלוחו של **מחמד**, מאידך גיסא, דיבר על ליבה של **וופא** ותיווך בין השניים.

נכון הוא, כי **וופא** העדיפה שלא לערב את המערער ולשתפה בתוכניותיה, מחשש כי יבולע לו, אך חרף זאת המשיך המערער לערב עצמו בהוצאת הפיגוע אל הפועל. כך, תידרך המערער את **וופא** כיצד להגיע לרחוב יפו בירושלים, עת יצאה לסיור המקדים, וכך סייע בידה לחזור לרמאללה לאחר שאיבדה את דרכה בירושלים. גם משישבה לרמאללה מיהר המערער ואספה ברכבו, והובילה לפגישה עם **מחמד** (בין אם במשרדו של זה, כמצוין באחת הגרסאות, ואם בביתו שבביתוניא).

במהלך פגישה זו, מסר המערער ל**וופא** את המטען שהובא למקום על-ידי **מחמד**, והמערער אף ידע לספר כי למטען הוצמד שעון.

רצף המפגשים, ניסיונות השכנוע, ההדרכה כיצד להגיע לרחוב יפו בירושלים, הסעת המחבלת לפגישות במשרדו של **מחמד** או בביתו, מסירת המטען לידיה של **וופא**, כל אלה אינם יכולים אלא להצביע על שותפות מלאה בהוצאת הפיגוע אל הפועל.

אף אם חלקו של **מחמד** עולה על חלקו של המערער, ועל כך לא יחלוק איש, הרי שאין בכך כדי להפחית במאומה מחלקו של האחרון. בכל הכבוד, לא ידיעה סתמית אודות כוונותיו של **וופא** יש כאן, אלא פעילות **אקטיבית**, כזו המלמדת על חפץ מלא בהוצאת הפיגוע מן הכוח אל הפועל.

5

אשר על כן, מוצא אני לקבוע ללא כל היסוס, כי המערער היה **שותף מלא** בביצוע פיגוע הדמים האמור, וממילא נושא הוא באחריות מלאה לתוצאותיו המזוויעות.

<u>שינוי אופן הביצוע</u>

טענה מרכזית נוספת אשר העלה ב"כ המערער היא, כי אף אם עירב עצמו המערער וסייע בידי **מחמוד וופא**, הרי שהתכוונו, לכל היותר, לתת יד לפיגוע הנחת מטען. משניתנה **וופא** טעמה, ובחרה לבצע פיגוע התאבדות חלף הנחת המטען, הרי שבפועל בוצע **פיגוע אחר** מזה שהתכוונו לו, וממילא אין הוא נושא באחריות לתוצאותיו.

אף טענה זו, בכל הכבוד, דינה להידחות.

ראשית, מלכתחילה דובר כי **וופא** תבצע פיגוע התאבדות, ולא מצאנו כי באותו שלב התנגד המערער לתוכנית זו. יתרה מכך, משהודיעה **וופא** כי חזרה היא בה מכוונתה לבצע פיגוע התאבדות וכי מעדיפה היא לבצע פיגוע מטען תחתיו, התפלא המערער ואף ניסה לדבר על ליבה. הנה כי כן; אין מדובר במשעות לו התנגד המערער, ומה לו למערער כי ילין על שלבסוף בוצע הפיגוע כפי שתוכנן מלכתחילה.

שנית, וכאן העיקר, אין כל משמעות לאופן בו בוצע הפיגוע. המערער נתן ידו לביצוע עבירה של גרימת מוות בכוונה, וזו בוצעה. יתרה מכך, המערער ידע כי בכוונתה של **וופא** לגרום למותם של אזרחים חפים מפשע ברחוב יפו בירושלים, באמצעות פיצוץ חומר נפץ. העובדה כי המערער סבר שהפיגוע יבוצע על דרך הנחת המטען ברחוב הומה אדם, ולא על דרך של פיגוע התאבדות, אינה מעלה ואינה מורידה.

לא אחת כבר נפסק כי אף מקום בו השתמש עברין בכלי נשק **שונה לחלוטין** מזה שתוכנן לשימוש מלכתחילה, אין בכך כדי לפטור את שותפיו מאחריות לתוצאה, אשר היא כשלעצמה הייתה לרצון השותפים. כך נפסק בעניין **"לוגסי"** (ע"פ 35/89 **לוגסי ואח'** נ' **מדינת ישראל**, פ"ד מד(1) 102, בעמ' 112-113), כי –

> *"כבר הבהרנו לעיל כי אין חשיבות לכך לצורך ענייננו אם נעשה שימוש באקדח שהכן מראש או בסכין שניטלה ממקום הרצח, שהרי אין חשיבות לשאלה באיזה כלי משחית השתמש העבריין בקידום המטרה המשותפת בה הייתה האלימות בגדר הציפיות."*

כן ראה: ע"פ 147/77 **סעדיה ואח'** נ' **מדינת ישראל**, פ"ד לא(3) 421, 425.

אמור מעתה; בין אם סבר המערער כי בכוונתה של **וופא** אך להניח מטען, ובין אם הביא בחשבון כי עשויה היא להוציא את כוונתה אל הפועל בדרך של פיגוע התאבדות, הרי שבין כך ובין כך ידע כי נותן הוא יד לרציחתם ולפציעתם של אזרחים חפים מפשע. משכך, לא **פיגוע אחר** בוצע כאן, אלא אותו פיגוע אשר תוכנן מלכתחילה, הזהה לחלוטין לפיגוע המתוכנן, הן בזהות המבצע, הן בזהות מקום הפיגוע והן בזהות האמצעי אשר שימש בגרימת התוצאה הקטלנית.

6

למעלה מן הצורך אוסיף כי כשם שלא יכול היה המערער להיוושע משינוי מקום הפיגוע, לו למשל הייתה **ופא** בוחרת לפוצץ עצמה ברחוב אחר, כך אין בשינוי אופן ביצוע הפיגוע, אם יש בו כלל משום שינוי, כדי להושיעו.

אשר על כן, לא מצאתי ממש בערעור הסנגוריה ככל שמכוון הוא לעניין ההרשעה, ובדין ראה ביהמ״ש קמא להרשיעו באחריות לביצוע פיגוע הדמים האמור.

<u>אשר לעונש</u>

משנמצא כי המערער היה שותף מלא להוצאת הפיגוע האמור אל הפועל, הרי שבוודאי אין כל הצדקה להקל בעונשו. אף אם המערער לא היה יוזם הפיגוע, הרי משנתן יד להגשמתו, נושא הוא באחריות מלאה לתוצאותיו.

על כן, קשה להעלות על הדעת נימוק המצדיק גזירת עונש הנופל ממאסר עולם.

מנגד, מצאתי ממש בערעור התביעה, לפיו היה מקום לגזור למערער עונש של מאסר עולם אף בגין הניסיון לגרימת מותם של 150 אזרחים חפים מפשע. בצדק ציין התובע הצבאי, כי לא רק שהתביעה עתרה **במפורש** לעונש כאמור, אלא שכך נכון היה לנהוג בהתאם להלכות ביהמ״ש זה.

אין ספק כי אילו הסתיים פיגוע נורא זה, אף בפציעתם של אזרחים, נכון היה לגזור למערער עונש של מאסר עולם, ומשעלה בידו לגרום למותו של אדם, אין מקום להקל עימו בשל כך בלבד.

המערער צפה כי המטען האמור יגרום למותם ולפציעתם של רבים, ומשבפועל התממשה מזימה זו, דין הוא כי ישא בתוצאות. לא מצאתי בנימוקיו של ביהמ״ש קמא, בדל-נימוק המצדיק סטייה מן ההלכה הנוהגת במקרים אלה. לא אחת פסקנו כי מקום בו ניסה אדם לגרום מוות, בנסיבות בהן נגרמו לאדם חבלה חמורה, או מקום בו כוון המעשה לפגוע בחיי רבים, ובוודאי בנסיבות בהן התמלאו שני תנאים אלה כאחד, כמו בענייננו, יישלח העבריין אל מאחורי סורג ובריח לכל ימי חייו (וראה לדוגמה: ע׳ איו״ש 190/03, 183, **התובע הצבאי נ׳ ג׳ראר**, שם גזר בימ״ש זה עונש מאסר עולם בגין ניסיון פיגוע התאבדות, אשר לא יצא כלל אל הפועל).

כדי ליתן ביטוי לא רק לערך חיי האדם, אלא אף לזכות לשלמות הגוף, על ביהמ״ש להבהיר כי עונש מאסר עולם המוטל בשל גרימת מוות, לא יפטור מעונש בשל פציעתם של אחרים. רק ענישה **נפרדת ומחמירה** תבהיר כי כשם שיינתן ביטוי לכל נפש אשר נגרם מותה בעבירה, כך ייעשה אף ביחס לאלה אשר דרך נס נפצעו בלבד. כך ברגיל, ובפיגועי תופת המוניים – בהם נושאים הפצועים על גופם ובנפשם את צלקות התופת שנים ארוכות - על אחת כמה וכמה.

<u>סוף דבר</u>

נבו הוצאה לאור בע״מ nevo.co.il המאגר המשפטי הישראלי

C:\DOCS\American Suits\Sokolow - Gould\Sokolow Attack\Nur Appellate Decision.doc

המעיין בחומר הראיות שבתיק ביהמ"ש, הקורא את עדויותיהם של הפצועים הרבים והבוחן את תמונות הזוועה של ההרס והחורבן, אינו יכול שלא להתחלחל. המערער, אשר עבד כחובש ואמון על הצלת חיים, נתן ידו לפיגוע שפל, אשר כוון לפגוע באזרחים חפים מפשע, נשים, זקנים וטף.

המערער, אשר היה מודע למצוקה בה הייתה נתונה חברתו, לא רק שלא ניסה להניאה מלממש זממה, אלא אף תמך בה וסייע בידה בהגשמת תכניתה. מערער זה, אשר לא חס על חיי אחרים, אינו ראוי לבוא עוד בקרב הבריות, ודין הוא כי נמצה עמו את מלוא חומרת הדין.

אשר על כן, ואם תישמע דעתי, הייתי דוחה את ערעור ההגנה, מקבל את ערעור התביעה וגוזר למערער עונש של שני מאסרי עולם, אחד בגין גרימת מותו בכוונה של פנחס טוקטלי ז"ל והשני בגין הניסיון לגרום למותם של אזרחים נוספים, אשר רבים מהם נפצעו בפיגוע האמור.

כן יש מקום לגזור למערער עונש של 10 שנות מאסר, בגין שאר העבירות בהן הורשע, לרבות זו שבה הציע לעשות שימוש באמבולנסים של "הסהר האדום" להעברת מטעני חבלה.

עונשים אלה, כך יש להורות, ירוצו כולם במצטבר זה לזה.


<u>השופט אל"ם מ' מטלון:</u>

אני מסכים.


<u>השופט אל"ם מ' תירוש:</u>

אני מסכים.


הוחלט כאמור, בפסק דינו של הנשיא אל"ם ש' גורדון.


ניתן והודע היום, 30 בינואר 2006, א' בשבט התשס"ו, בנוכחות המערער, ב"כ והתובי"ץ.

(-)                              (-)                              (-)

נבו הוצאה לאור בע"מ nevo.co.il  המאגר המשפטי הישראלי

C:\DOCS\American Suits\Sokolow - Gould\Sokolow Attack\Nur Appellate Decision.doc

ע (איו״ש) 2793/04                התובע הצבאי נ׳ מונזר מחמוד חליל נור

_____    _____    _____

                                                    שאול גורדון 54678313-2793/04

שופט                              אב״ד                    שופט

                                    נוסח מסמך זה כפוף לשינויי ניסוח ועריכה

נבו הוצאה לאור בע"מ   nevo.co.il   המאגר המשפטי הישראלי

C:\DOCS\American Suits\Sokolow - Gould\Sokolow Attack\Nur Appellate Decision.doc