# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK


| | |
|---|---|
| MARK I. SOKOLOW, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. |
| | ) 04cv397(GBD)(RLE) |
| THE PALESTINE LIBERATION | ) |
| ORGANIZATION, et al., | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |



DEPOSITION OF DOV WEINSTEIN

JERUSALEM, ISRAEL

OCTOBER 16, 2013


REPORTED BY: BRENDA MATZOV, CA CSR NO. 9243

1  that's responsive to our discovery request, I would ask

2  that it be produced.

3           MR. HORTON:  I'll take it under consideration.

4           MR. HILL:  Okay.

5      Q.   BY MR. HILL:  The testimony that you gave in

6  Tel Aviv, when you were deposed the first time, was that

7  about someone who had been injured or killed?

8      A.   Killed.

9      Q.   Okay.

10     A.   Two people that killed.

11     Q.   Okay.  And did you provide a written report

12  or reports in that case in Washington?

13     A.   Before.  I make the same situation as now.

14     Q.   Okay.  And those written reports that you

15  provided pertained to economic damages for someone who

16  was killed?

17     A.   Yes.

18          MR. HILL:  Mr. Horton, to the extent that

19  those documents are accessible to the witness or the

20  plaintiffs, I'd ask that they be produced, as they

21  appear to be responsive to our discovery requests.

22          MR. HORTON:  And I'll take it under

23  consideration.

24     Q.   BY MR. HILL:  Are you familiar with the

25  concept of "reasonable certainty"?

1    leminhal."  It's an organization that arrange you,

2    today and then, to be a CPA.

3         Q.    And how long did you attend that institution?

4         A.    Four years.

5         Q.    And did you graduate with a degree?

6         A.    Yes.

7         Q.    What degree did you obtain?

8         A.    CPA.

9         Q.    And did you have to take a separate exam to

10   become a CPA?

11        A.    Yes.

12        Q.    And did you pass that exam?

13        A.    Yes.

14        Q.    Is the degree you obtained the equivalent of

15   an American Bachelor's degree?

16        A.    I don't understand what you say.  I'm sorry.

17        Q.    Okay.  In America, when you go to a four-year

18   college, you typically graduate with what's called a

19   Bachelor's degree.

20             Is the degree you obtained in the school that

21   you went to for the CPA a similar sort of program?  Do

22   you know?

23        A.    No, I don't know the difference.  I -- I don't

24   know what -- what is it in the States.

25        Q.    Okay.

1    A.    So I don't know.

2    Q.    Apart from the education you've described,

3    have you had any other further education?

4    A.    Not formal.  But all the time, I'm -- I'm

5    study.  Even now, I'm in Stanford in one of the units.

6    Q.    You say you're at Stanford now?  What do you

7    mean?

8    A.    Yes.  But it's from far, not from -- by the

9    Internet.

10    Q.    Okay.  Are you currently enrolled in a degree

11    program in Stanford?

12    A.    Not to get some formal.  Just courses.

13    Q.    Okay.  So you're taking sort of continuing

14    education courses today?  Is that what you're saying?

15    A.    It's not continuing.  It's just to -- anything

16    that interest me.  Like, at this time, retirement,

17    pension, and estate, just to know the difference.  One

18    of the courses is some kind of mathematics and things

19    that I like.

20    Q.    Have you ever taken any courses about how to

21    calculate economic loss for someone who has been killed?

22    A.    I don't think that this exist anywhere, not

23    in Israel.

24    Q.    So is it fair to say, sir, that you have never

25    taken a course about how to calculate economic loss for

1   someone who has been killed?

2       A.   No.

3       Q.   Do you agree with me?

4       A.   Yes.

5       Q.   Okay.  Have you ever taken any courses of any

6   kind about how to -- how to calculate economic loss for

7   someone who has been injured?

8       A.   For someone who has been?

9       Q.   Injured.

10      A.   Also no.

11      Q.   Okay.  Can you think of any courses you have

12  ever taken that trained you to do the sort of work you

13  did in this case?

14      A.   No, except within the law cases here and the

15  course that I'm making now, retirement and pension, so

16  to see part of the information that I'm making.

17      Q.   Okay.  Now, when you say in the course of the

18  law cases, are you referring to the work you did for the

19  lawsuits in Washington that we discussed earlier?

20      A.   Yes.

21      Q.   Okay.  And how did you figure out how to do

22  the work you did in those cases in Washington?

23      A.    In that time, it was a Professor Ovadia

24  Manzur, one of the -- he's an American professor that

25  work in my office as part of my team -- and Dr. Daniel

1    Ben Oliel, also that study in university.  He's working

2    as an employee in my -- in my firm, and we work on that

3    together.

4        Q.    What was the name of the professor that helped

5    you --

6        A.    Ovadia -- Ovadia Manzur.

7        Q.    And do you know where Mr. Manzur obtained his

8    education?

9        A.    Part of it in Pennsylvania.  I don't know

10   before that.

11       Q.    Okay.  Is Mr. Manzur an American?

12       A.    Both Israeli and American.

13       Q.    Okay.  Do you know if he had ever previously

14   done work on economic damages for someone who's been

15   killed?

16       A.    We make it together at the first time.

17       Q.    Okay.  So it was also his first time trying

18   to do this?

19       A.    Yes.

20       Q.    What resources did you and Mr. Manzur look

21   at to try and figure out the methodology for calculating

22   economic loss for someone who had been killed?

23       A.    The basic was very simple.  It looks about

24   the profit, the salary, that someone who killed [sic]

25   or someone who have a damage, the expectation of earning

1  sir, that most of your professional work has been in

2  areas other than --

3       A.   Yes.  Yes.

4            MR. HORTON:  You got to let him finish his

5  questions, Mr. Weinstein.  We're going to have a messy

6  transcript.

7       Q.   BY MR. HILL:  Let me -- let me start it

8  again.

9            You would agree with me, sir, that most of

10  your professional work has been in areas other than

11  calculating economic loss for people who have been

12  injured or killed; correct?

13       A.   Correct.

14       Q.   Have you read the reports that Mr. Gaskins

15  prepared in this case that critiqued your reports in

16  the case?

17       A.   Yes.

18       Q.   Do you regard Mr. Gaskins as a specialist

19  in the area of calculating economic loss for people

20  that have been injured or killed?

21       A.   I don't know.

22       Q.   You don't know Mr. --

23       A.   I've --

24       Q.   -- Gaskins?

25       A.   Not -- not enough.  And I really not did --

1     Q.    Okay.  Do you believe you've ever received

2  any information from STEP about how to calculate

3  economic loss for people that are injured or killed?

4     A.    I'm not sure.  But I think that I read a few

5  things that depend on insurance cases, not in terror

6  attack, about it.  Because I'm reading -- it's -- it's

7  a lot of knowledge that they spend between the -- the

8  friends of the organization.

9     Q.    Okay.

10     A.    And I'm read it all the time.  [sic]  So --

11     Q.    Have you ever done any work in connection with

12  an insurance case where someone was killed prematurely?

13     A.    No.  I'm not working usually for insurance

14  cases, not -- not as a calculation.

15     Q.    Are you familiar with a treatise called

16  "Determining Economic Damages"?

17     A.    No.

18     Q.    Are you familiar with the author of that --

19     A.    I'm familiar, yes.  But not -- I'm not using

20  that.  I'm not --

21     Q.    Okay.  You're only familiar with that because

22  it was given to you by the lawyers in this case; right?

23     A.    Yes.  Or others that -- that I -- I make.

24     Q.    Prior to receiving a portion of "Determining

25  Economic Damages" from the lawyers in this case within

1    the Jerusalem chapter?

2        A.    The president of the Jerusalem chapter of

3    the organization.  And we had organization all over

4    the world.

5        Q.    Is that mentioned on your CV?

6        A.    I think that, yes, in the past, in the last --

7    not -- not that I was the -- the head of the -- STEP

8    appear in the second -- in the -- in the last page,

9    the second line --

10       Q.    I see.

11       A.    -- or the third line.

12       Q.    Okay.  On the third page of your CV, you

13   indicate some publications, on page 3.

14            Do any of those Hebrew publications have

15   to do with calculating economic damages for people

16   who have been injured or killed?

17       A.    No.  No.  I'm sorry if you don't -- if you

18   don't hear me.

19       Q.    Your CV indicates that you are the director

20   of the office for Weinstein & Company.

21            Are you the "Weinstein" in Weinstein &

22   Company?

23       A.    I am the "Weinstein" and my son also --

24       Q.    Okay.

25       A.    -- the older one is -- is CPA and manage

1      Q.    His first name is Daniel?

2      A.    Daniel.  Yes.  I forgot it in the beginning.

3  I told you that I have a problem with names.

4      Q.    That's quite all right.

5            So Daniel Ben Oliel is a lawyer in Tel Aviv?

6      A.    He's a lawyer that work in my office in that

7  time.

8      Q.    Okay.  At the time you were working on the

9  cases in Washington, Daniel Ben Oliel was working for

10 you?

11     A.    Yes.

12     Q.    Okay.  He no longer works for you?

13     A.    No.  He's -- he's teaching in Haifa

14 University.

15     Q.    Okay.  Had Daniel Ben Oliel ever done any

16 work on calculating economic loss for people injured

17 or killed prior to the work --

18     A.    Before --

19     Q.    -- on the case in Washington?

20     A.    Before that, I think not.

21     Q.    You think not?

22     A.    Yes.

23     Q.    Okay.  So as far as you know, the first time

24 you, Mr. Ben Oliel, or Ms. Segal ever tried to calculate

25 loss for someone injured or killed, it was for those

1    cases in Washington?

2        A.    And Professor Ovadia Manzur.

3        Q.    Okay.

4        A.    Yes, it's the first one.  Yes.

5        Q.    Okay.  So Professor Manzur, had he had any

6    prior experience in calculating economic loss for people

7    that had been injured or killed prior to the cases in

8    Washington?

9        A.    I think that he's also not.  I think -- I'm

10   not sure.  But I think that not.

11       Q.    As far as you know, Professor Manzur also

12   had never done this sort of work prior to those cases

13   in Washington; right?

14       A.    Yes.

15             (Defendants' Exhibit 320 marked.)

16       Q.    BY MR. HILL:  Mr. Weinstein, I'm handing

17   you what we've marked as Exhibit No. 320.

18             Have you ever seen this document before?

19       A.    (Examining.)  No.

20       Q.    Okay.  At the beginning, it says:

21             "I, the undersigned, CPA Dov Weinstein."

22             That's you; right?

23       A.    Yes.

24       Q.    Okay.  Take a moment and read it and tell

25   me --

1    Someone paid because I didn't care about -- I didn't

2    take care about it.  And it's not a lot.

3        Q.   And so -- just so the record is clear, I

4    understand you don't have a contingency interest in

5    the case.  But your testimony is that, in your view,

6    you have no conflict of interest in --

7        A.   No, I don't.

8             MR. HORTON:  You got to let him finish his

9    question.

10       Q.   BY MR. HILL:  You have no conflict of

11   interest in the case, even though the lawyers that

12   have asked you to provide this work are clients of

13   your firm?

14       A.   Yes.

15            MR. HILL:  Why don't we take a short break?

16            MR. HORTON:  Sure.

17            (Recess from 10:21 a.m. to 10:33 a.m., after

18       which Mr. Wise was not present in the proceedings.)

19       Q.   BY MR. HILL:  Mr. Weinstein, as you

20   mentioned before we broke, two of the reports you

21   did involve people who were killed; correct?

22       A.   One of them -- correct.  One of them is

23   Waxman.  The name is Waxman.

24       Q.   The case that you worked on in Washington,

25   one of them is called Waxman?

1      A.    Waxman, yes.  It's someone that killed in

2  a terror attack in Bir Nabala here when Yitzhak Rabin --

3  when it was -- the Prime Minister was in -- and the

4  other case was in Argentina.  And I asked them to send

5  me the name because I forgot it.  It's Benkin or Belkin.

6  Let me be sure.  It's Lawrence Belkin.  And the first

7  one was Nachshon Waxman.

8      Q.    Could you spell that for me?

9      A.    N-a-c-h-o-n [sic].  And the family one,

10  Waxman, it's "V" or "W" -- I don't -- I think "V,"

11  it sounds like more.  Vaksman, V-a-k-s-m-a-n [sic].

12      Q.    Okay.

13      A.    And the other one was Belkin.  This case was

14  in Argentina.  Belkin is B-e-l-k-i-n.  And the lawyer

15  that represent them, his name Roland Roth, the one that

16  here in Israel was the -- the -- the man that make the

17  connection with me.  And he's not my client.

18      Q.    Okay.  So the name of the lawyer, could you

19  spell that for me?

20      A.    Roland, R-a-o-l -- Roland, R-o-l -- sorry --

21  a-n-d.  And Roland Roth.  The family name, I forgot.

22  Just a moment.  Rot, R-o-t [sic].

23      Q.    Okay.

24      A.    He's a French and Israeli lawyer.

25      Q.    So Mr. Roth was the lawyer in both the Waxman

1   case and the Belkin case?

2       A.   Yes.  That -- that located in Israel.  And he

3   asked me to -- to make this.

4       Q.   Okay.  Do you know the name -- and the Waxman

5   case is the one that's in Washington, DC?

6       A.   In both of them, Belkin and Waxman.

7       Q.   They were both --

8       A.   Waxman was very -- sorry.

9       Q.   That's okay.

10          So just -- so the -- the Waxman case and the

11  Belkin case were both brought in the United States in

12  Washington --

13      A.   Yeah.

14      Q.   -- right?

15          And the Waxman incident was in Israel?

16      A.   Yes.

17      Q.   And the Belkin incident was in Argentina?

18      A.   Yes.  Correct.

19      Q.   All right.  Do you know the name of any of

20  the American lawyers involved in those cases?

21      A.   No.

22      Q.   Do you know if Shurat HaDin was involved

23  in either --

24      A.   No.

25      Q.   -- of those cases?

```
 1   taxation -- income taxation in the United States?

 2        A.   It's 30 -- or no.  No, not about personal.

 3   I know about companies.

 4        Q.   You -- you don't know what the individual tax

 5   rates are for income tax in the United States at the --

 6        A.   No.

 7        Q.   -- Federal level?

 8        A.   I'm not a specialist in the tax --

 9        Q.   Do you know --

10        A.   -- in the U.S.A.

11        Q.   -- in what state Mr. Gritz would have worked

12   in the United States?

13        A.   I knew.  I forgot.  I will tell you that

14   later.  I just forgot.

15        Q.   Okay.  I take it that --

16        A.   Because I know the difference between the

17   Federal and the -- the -- the location.  And I know

18   the different rate between them or part of them.

19        Q.   You understand that, in America, people are

20   taxed on their income not only at the Federal level,

21   but --

22        A.   Yes.  And -- and the country level.

23             MR. HORTON:  No, let him finish his question.

24             THE WITNESS:  Oh, sorry.

25        Q.   BY MR. HILL:  You understand that they're
```

1    occasionally taxed at the state level; right?

2         A.   Yes.  Right.

3         Q.   Do you also understand that sometimes people

4    are taxed on their income at the city level?

5         A.   Yes.

6         Q.   Okay.  And it's fair to say that your analysis

7    does not include any deduction for Mr. Gritz's income

8    taxes during the period of time when you assumed he

9    would work in the United States?

10        A.   Correct.

11        Q.   It's also fair to say that you cannot today

12   tell me how the level of taxation that his mother might

13   have to pay on a judgment in this case compares to what

14   taxes he would have paid had he worked in the United

15   States?

16        A.   Correct.

17        Q.   Okay.  You would agree with me that, one way

18   or the other, Mr. Gritz's income has to be taxed; right?

19        A.   I agree.

20        Q.   Would you agree with me that your report does

21   not contain any deduction for taxes for Mr. Gritz?

22        A.   I agree.

23        Q.   Okay.  Now, you said that -- let's talk about

24   Mr. Goldberg.

25             You're -- you assume Mr. Goldberg would work

1       Q.   Well, let's talk about the American side of

2   Mr. Gritz's income, then.

3            You would agree with me that, if Mr. Gritz

4   paid more than 38 and a half percent of his income in

5   taxes in the United States and he consumed 61 and a half

6   percent of his income from living expenses, there would

7   be nothing left; right?

8       A.   There would be nothing left in that issue.

9   Yes.

10      Q.   Okay.  And sitting here today, you don't know,

11  if Mr. Gritz had got a job in the United States, whether

12  his combined rate of taxation from Federal tax, State

13  tax, and possibly city tax would have exceeded 38 and

14  a half percent; correct?

15      A.   Yes, I don't know if it's not included in

16  the -- in the rate of the living.

17      Q.   Okay.  Do you need a break, or are you okay

18  to continue?

19      A.   No.  I'm quite fine.

20           (Defendants' Exhibit 321 marked.)

21      Q.   BY MR. HILL:  Mr. Weinstein, I'm handing

22  you what we've marked as Defendants' Exhibit

23  No. 321.

24           Is this the report you tendered in this case

25  pertaining to Mr. Gritz?

1      A.   (Examining.)  Yes.  Yes.

2      Q.   And is that your signature on page 9?

3      A.   Yes.

4      Q.   Did you sign this on or about March 25th of

5   this year?

6      A.   Again?  Sorry.

7      Q.   Did you sign this on or about March 25th of

8   this year?

9      A.   I think it's supposed to be.

10      Q.   Okay.  Look, if you will, on Schedule 2, which

11   is maybe about halfway through the document.

12      A.   Yes, I'm there.

13      Q.   And on Schedule 2, for the year 2003, when

14   Mr. Gritz would have been 25 years old, you estimate

15   that his income in U.S. dollars would have been $47,901;

16   right?

17      A.   Yes.  Correct.

18      Q.   And sitting here today, you do not know what

19   percentage of American income tax he would pay on that

20   amount of money; right?

21      A.   Right.

22      Q.   You also don't know what percentage of taxes

23   he would be required to pay for Social Security in the

24   United States; correct?

25      A.   I think that we take care about the -- the

1   he wants to refer back to them.

2       Q.    BY MR. HILL:  Let me hand you what we've

3   marked as Defendants' Exhibit No. 325.

4           Do you recognize this as the report you

5   tendered in this case relating to Mr. Goldberg?

6       A.    (Examining.)  Yes.

7       Q.    All right.  And was the manner in which

8   this report was prepared similar to the one you've

9   previously testified about?

10      A.    Somehow.

11      Q.    It was prepared by your staff --

12      A.    Aah, by -- yes.  Yes.

13      Q.    -- and reviewed by you and then signed --

14      A.    Yes.

15      Q.    -- by you?

16      A.    Of course.  Yes.

17      Q.    Look, if you will, at page No. 3.  In the

18  first paragraph, it indicates that you've:

19          "Been requested by Mrs. Karen Goldberg,

20  the representative of the estate of Mr. Stuart Scott

21  Goldberg, to estimate the economic loss caused to her

22  as a result of the murder of her husband in a terrorist

23  attack."

24          Do you see that, sir?

25      A.    Yes.

1      Q.   BY MR. HILL:  Sir, we're handing you what

2   we've marked as Defendants' Exhibit No. 328.

3           Is this your initial report regarding

4   Mr. Mandelkorn?

5      A.   (Examining.)  Yes.  The answer is "yes."

6           (Defendants' Exhibit 329 marked.)

7      Q.   BY MR. HILL:  Let me hand you what we've

8   marked as Defendants' Exhibit No. 329.

9           Is this your amended report regarding

10  Mr. Mandelkorn?

11     A.   (Examining.)  Yes.

12     Q.   Okay.  Why did you amend your report for

13  Mr. Mandelkorn?

14     A.   We made a mistake in the -- the -- the

15  main issue, we made a mistake with the severance pay

16  current price.  It was the -- the severance pay -- it

17  was based on the same rules that we talked about before,

18  one salary amount per year.  But we make a mistake, and

19  we make it twice time.  Like we take a yearly salary

20  instead of monthly salary.

21     Q.   Okay.  Turn, if you will, to Schedule 1 of

22  the reports and lay them side by side.

23     A.   The new or the other one?

24          MR. HORTON:  Both.

25     Q.   BY MR. HILL:  Both, please.

1     A.   Except other -- other than -- not the earning

2   one.

3     Q.   Right.

4          (Court reporter clarification.)

5          THE WITNESS:  Not the -- not the salary.

6          MR. HILL:  "Not the earning one" is what

7   he said.

8          THE WITNESS:  Not the earning one.

9     Q.   BY MR. HILL:  Okay.  And you're not opining

10  about damages Mr. Mandelkorn may have suffered other

11  than economic damages; right?

12    A.   No.

13    Q.   You're agreeing with me; right?

14    A.   I agree with you.

15    Q.   Okay.  So if and when Mr. Mandelkorn goes

16  back to work, his damages will end; right?

17    A.   Correct.

18         (Recess from 5:03 p.m. to 5:11 p.m.)

19         (Defendants' Exhibit 330 marked.)

20    Q.   BY MR. HILL:  Okay.  Mr. Weinstein, while

21  we were on the break, did you learn anything about

22  your testimony?

23    A.   No, I did not.

24    Q.   Okay.  Let me hand you what we've marked

25  as Exhibit No. 330.

1          Is this your original March report about

2    Varda Guetta?

3          A.    (Examining.)  Yes.

4          Q.    Okay.

5                (Defendants' Exhibit 331 marked.)

6          Q.    BY MR. HILL:  Let me hand you what we've

7    marked as 331.

8                Is this your amended September report about

9    Varda Guetta?

10         A.    (Examining.)  Yes.

11         Q.    Turn, if you will, to Schedule 1 of both

12   reports.  It should be about three pages from the back.

13               MR. HORTON:  There you go.

14               THE WITNESS:  This one?  (Indicating.)

15         Q.    BY MR. HILL:  Yes.

16         A.    It's two pages.  Okay.

17         Q.    All right.  You would agree with me that, on

18   both of the Schedule 1s, the "Total Salary Loss Current

19   Prices" is the same; correct?

20         A.    The "Severance Pay" is a mistake.

21         Q.    I'll get there in a second.

22               But for the record, the first line is the

23   same on both; right?

24         A.    Yes.

25         Q.    Okay.  And then second line, "Total Severance

Page 306

1      Q.    Okay.  You would also agree with me, sir,

2  that on Schedule 2 of your reports about Mrs. Guetta,

3  you do not deduct for any future wages she may be able

4  to earn?

5      A.    I agree with you, except what -- something

6  that I think that she tell us or we get it from her.

7      Q.    But just for the record, on Schedule 2, for

8  the years 2013 and following, there are no deductions

9  for future wages that Mrs. Guetta may earn; correct?

10     A.    Yes, when she is not working at what we

11  understand.

12     Q.    Okay.  So your report, essentially, assumes

13  that Mrs. Guetta will not work in the future; correct?

14     A.    Correct.

15          MR. HILL:  Let's go off the record for a

16  second.

17          (Recess from 5:46 p.m. to 5:47 p.m.)

18          (Defendants' Exhibit 335 marked.)

19     Q.    BY MR. HILL:  Mr. Weinstein, let me hand

20  you what we've marked as Exhibit 335.

21          Do you recognize that as your report regarding

22  Karen Goldberg in this matter?

23     A.    (Examining.)  Yes.  This is my signature.

24     Q.    Turn, if you would, to Schedule 1.

25          This indicates that you're projecting a