# EXHIBIT A

F11Qsok6

1    the others, what language in 937 that you thought was relevant

2    to be admitted.  Was that deliberate?

3          MR. YALOWITZ:  Unlikely, but let me do this:  Let's

4    hear what the Court's balls and strikes are on the other ones.

5    If there is something in -- which one was it, your Honor?

6          THE COURT:  937.

7          MR. YALOWITZ:  If there is something in 937 that I

8    think I need, then I will give you a call.

9          THE COURT:  You will let me know.

10          MR. YALOWITZ:  If I think I need it and it's

11    consistent with your other rulings, I'll let you know.  If I

12    think I need it and it's outside the lines of what your rulings

13    are, I'll be guided by that ruling and it will be understood I

14    offered it, but that based on the other rulings, I'm not going

15    to re-offer it.

16          THE COURT:  We can discuss in detail later, but let me

17    give you my list as I have it as it existed in plaintiff's

18    letter.

19          Exhibit 201 is out.  Exhibit 202 is out.  Exhibit 204

20    is out.  175 is in.  964 is out.  198 is in.  178 is in.  199

21    is out.  177 is out.  179 is out.  200 is in.  936 is in.  203

22    is out.  935 is in.  949 is in.  176 is out.  965 is in.  966

23    is out.  185 is in.  176 is out.  And my default position,

24    because I've looked at it and I can't find, nor it hasn't been

25    identified at this point what the relevant portion would be,

996

F11Qsok6

1    I'm going to rule at this point that 937 is out; but if you

2    tell me there is something there -- but, quite frankly, in my

3    review of 937, again, I think it is a two-edged sword because I

4    think some of the statements in there are not particularly

5    complimentary of plaintiffs with regard to the issues that are

6    raised there and are not particularly -- I'll just put it that

7    way.

8        You can look at it.  That's an assessment the

9    plaintiff has to make whether or not you feel its probative

10   value is greater than the danger the jury might use other

11   portions against you.

12       MR. YALOWITZ:  I'll assume it's out unless there's

13   something we really think we need in it, we'll make that

14   assessment; but if you don't hear from us, you should assume

15   it's been withdrawn.

16       THE COURT:  I can give you some reasons specifically I

17   will just give you an example of 201 is the first one on here,

18   talking about liquidating the Jews, describing them as a

19   chronic parasite disease, cutting out some or all of their

20   organs and destroying its function.  I think that that is a bit

21   over the top to simply be evidence that it is some signal or

22   indication that they intend to do terrorist acts or that they

23   intend to do the terrorist acts involved in this case.  I think

24   it is highly inflammatory and prejudicial and the undue

25   prejudice outweighs whatever probative value that one

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1N8SOK1

```
 1              Let me just state, my ruling stands.  I evaluated it
 2    thoughtfully, in a discriminate manner, and the ones that I
 3    allowed are the ones that I thought were appropriate to allow.
 4    Quite frankly, I don't think I need to make any further record
 5    than the record that's made by the quotations that the
 6    plaintiff himself adds to this letter arguing, again, that it
 7    should be admitted.
 8              Clearly, the statements in this have little, if any,
 9    probative value with regard to whether someone is committing an
10    act of terror or whether they are involved in these terrorist
11    acts, and it's clearly unduly prejudicial and duly prejudicial
12    based on stated positions about religion.
13              I evaluated these and evaluated them in context with
14    the ones that I allowed.  The ones that I allowed I made a
15    determination that there are some, although I find to be slight
16    probative value, but that probative value is not outweighed by
17    its undue prejudice.  That's the ruling on that and I am not
18    going to revisit that ruling.
19              I have looked at the other videos that have been
20    handed to me and a lot of these other issues are issues that
21    were in yesterday's letter.  Let me just put it into a
22    category.  All of the following items are out and I will put
23    them in categories.
24              Symbolic funerals that were held eight years later,
25    after the Israeli government returned remains of people who had
```

F1nQsok2                        Shrenzel - Direct

1    guidance for the border region forces.

2    Q.  Is that part of the PA?

3    A.  It is.

4    Q.  Is this a publication of the PA itself?

5    A.  It is.

6             MR. YALOWITZ:  Plaintiffs offer 200 in evidence.

7             THE COURT:  Any objection?

8             MR. ROCHON:  Yes, sir.

9             THE COURT:  It will be admitted into evidence.

10            (Plaintiff's Exhibit 200 received in evidence)

11   Q.  Please turn to Exhibit 201.  Do you have 201 before you?

12   A.  I do.

13   Q.  What is it?

14   A.  Again, al-Shuhada the martyrs.

15            MR. ROCHON:  Your Honor, we would object on this one.

16   I think we need to at least consult with counsel, if I may.

17            MR. YALOWITZ:  Does the Court have this exhibit in

18   mind?

19            THE COURT:  I don't have it in front of me, so I don't

20   have it in mind.  Speak to Mr. Rochon first and see if you can

21   resolve whatever difficulties you have.

22            MR. YALOWITZ:  Let me make my record and application

23   and then Mr. Rochon can object if he cares to.

24            THE COURT:  OK.  Are you objecting to this exhibit?

25            MR. ROCHON:  Yes, your Honor.

F1nQsok2                     Shrenzel - Direct

1           THE COURT:  Let me see the exhibit.

2           Come up come up, Mr. Rochon.

3           MR. ROCHON:  Thank you.

4           (At the side bar)

5           THE COURT:  Yes, sir.

6           MR. ROCHON:  This is one that you excluded.

7           MR. YALOWITZ:  I agree with that.

8           THE COURT:  So why are we up here?

9           MR. YALOWITZ:  Because I want to offer it and have him

10   object to it and --

11          THE COURT:  But I already ruled on this.  All right?

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1477

FlqQsok3

1           THE COURT:  Mr. Hill, cross-examination?

2           MR. HILL:  Yes, sir.

3    CROSS-EXAMINATION

4    BY MR. HILL:

5    Q.  Good afternoon, ladies and gentlemen.  Good afternoon

6    Colonel Shrenzel.

7    A.  Hello.

8    Q.  My name is Brian Hill.  You testified here over the course

9    of the last few days about five separate terrorist attacks?

10   A.  I did.

11   Q.  At the time of each of those attacks between 2002 and 2004,

12   you worked for the Israel Security Agency?

13   A.  Yes.

14   Q.  As part of your work at the ISA, you did not investigate

15   any of the five attacks that you testified about, correct?

16   A.  Not from the effort of the ISA -- I was not part of the

17   direct effort to find out who was the perpetrator and how we

18   can put our hands on, but of course as head of an analysis

19   unit, I had got information about the attacks, I got

20   information -- when we had it, about the perpetrators in order

21   for me to fulfill my task that of portraying the picture and

22   understanding the policies and the strategies of the

23   defendants.

24   Q.  And you did not actually interrogate any of the

25   perpetrators of any of these attacks?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

FlqQsok3                    SHRENZEL - Cross

1    A.  No, I was not involved in direct interrogations.

2    Q.  In fact, you have not even met any of the perpetrators of

3    these attacks, right?

4    A.  No, I have not -- I haven't met any of them.

5    Q.  You were hired by a group of lawyers to testify in this

6    case?

7    A.  Yes.

8    Q.  And you were not hired by Mr. Yalowitz and his team,

9    correct?

10            MR. YALOWITZ:  Objection.

11            THE COURT:  I'm going to sustain as to relevance.

12   Q.  You were in fact hired by an Israeli law firm?

13            MR. YALOWITZ:  Objection.

14            THE COURT:  Is there some relevance to this, Mr. Hill?

15            MR. ROCHON:  Trying to get there, your Honor.

16            THE COURT:  Well, you're not there, so I'm going to

17   sustain the objection.  It doesn't make a difference which

18   lawyers he's hired by.

19   Q.  When you were hired by the lawyers, regardless of who they

20   were, you were given a draft report, right?

21   A.  Yes, I was.

22   Q.  That draft report had been written by two people, Arieh

23   Spitzen and Noa Meridor, correct?

24   A.  Yes.

25   Q.  Arieh Spitzen is a former Israeli Defense Forces officer,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

FlqQsok3                      SHRENZEL - Cross

1    correct?

2    A.  I think he was -- he worked as a civilian for the army,

3    yes, but he -- he worked as a civilian for the army within

4    direction of the army.

5    Q.  He was a colonel right?

6    A.  Or equivalent to a colonel.

7    Q.  Just like you?

8    A.  Yes.

9    Q.  Noa Meridor, he is also a former IDF officer?

10   A.  I also think he worked as a civilian in COGART.  I

11   mentioned this term, the coordination of government activities

12   in the territories.

13   Q.  That's a unit of the Israeli army, right?

14   A.  Yes, but it has also many civilian aspects of.

15   Q.  What was Meridor's rank?

16   A.  I don't know.

17   Q.  Now, Arieh Spitzen, he used to work for the intelligence

18   branch of the Israel defense forces, right?

19   A.  No, I think he worked for that body COGAT.  I am really

20   not -- I know him, of course, but I'm not that familiar with

21   every detail of his career.

22   Q.  COGAT is also where Lieutenant Colonel Eviatar worked?

23   A.  Yes, basically.  Yes.

24   Q.  And you know Lieutenant Colonel Eviatar, you saw him

25   testify here?

FlqQsok3                         SHRENZEL - Cross

1    A.  I saw not all of his testimony.  I saw parts of it.

2    Q.  Now, you've mentioned a couple of times this thing called

3    COGAT.  That's an acronym right?

4    A.  Yes, COGAT.

5    Q.  In English it's C-O-G-A-T?

6    A.  Right.

7    Q.  And that stands for coordinator of government activities in

8    the territories, right?

9    A.  Yes.

10   Q.  And the T is for territories, right?

11   A.  Yes.

12   Q.  And those are the occupied Palestinian territories, right?

13          MR. YALOWITZ:  Objection, your Honor.

14          THE COURT:  Overruled.  You can answer.

15   A.  You know that we are now getting into this maze of

16   terminology.  Of course, the Palistinians see it as occupied.

17   Some Israelis see it as liberated.  These are the polar --

18   polarized positions.  So the definition of the Israeli army and

19   of my service was territories.  Not occupied.  Not liberated.

20   But the territories.

21   Q.  The Israeli Supreme Court has said they're occupied

22   territories, right?

23          MR. YALOWITZ:  Objection.

24          THE COURT:  Sustained.

25   Q.  COGAT is responsible for implementing the Israeli

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   government's policy in the Palestinian territories, correct?

2                MR. YALOWITZ:  Objection.

3                THE COURT:  Overruled.  You can answer.

4   A.  I was never an employee of COGAT, so I'm not familiar with

5   the detailed definition, but as you said.  It's a part of the

6   army in Israel and the army is obedient to the government so--

7   Q.  They are responsible for administration of Israeli policy

8   in Gaza and the West Bank, right?

9   A.  Generally speaking, yes.

10  Q.  You also know a man named Roni Shaked, right?

11  A.  Not personally.

12  Q.  You know hoe is?

13  A.  I know who he is, but I never met him personally.

14  Q.  Roni Shaked also used to work for the ISA, right?

15  A.  That's what I heard, but he is -- I do believe that he

16  retired even before I was enlisted to the service.

17  Q.  You were here when Lieutenant Colonel Eviatar testified

18  that the first draft of his report was written by Roni Shaked,

19  right?

20  A.  I was here, yes.

21  Q.  To sum up Lieutenant Colonel Eviatar, Colonel Spitzen,

22  Meridor, Roni Shaked and yourself have all worked for the

23  Israeli government, correct?

24  A.  In some point or another in our career, yes.

25  Q.  Now, you testified about payments that were made to

FlqQsok3                    SHRENZEL - Cross

1    families of martyrs, correct?

2    A.  Yes.

3    Q.  We should be clear about who is considered a martyr.  Any

4    Palestinian who is killed in connection with the conflict with

5    Israel is considered a martyr by the Palistinians, correct?

6    A.  Yes.

7    Q.  It doesn't matter how that person dies, right?

8    A.  Yes, but it should be in the scope of confrontation with

9    Israel, yes.

10   Q.  So a Palestinian who is shot by a soldier in the West Bank

11   is considered a martyr, right?

12   A.  By the Palistinians, yes.

13   Q.  And a Palestinian that is killed by an Israeli settler in

14   the West Bank is also considered a martyr, right?

15             MR. YALOWITZ:  Objection.

16             THE COURT:  Overruled.

17             You can answer.

18   A.  Yes.  Well, no one dictates to them how to define their

19   people so they consider them as martyrs.

20   Q.  Any Palestinian who was accidentally killed during the

21   Israeli invasion called operation defensive shield, they would

22   also be considered a martyr, right?

23             MR. YALOWITZ:  Your Honor, could I have a side bar

24   please?

25             THE COURT:  No.  Do you have an objection?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

F1qQsok3                    SHRENZEL - Cross

1              MR. YALOWITZ:  Yes, I do.

2              THE COURT:  The objection is sustained.

3    Q.  Any Palistinian killed as collateral damage in an

4    assassination --

5              MR. YALOWITZ:  Objection.  Objection.

6    Q.  -- by the IDF is also considered a martyr?

7              MR. YALOWITZ:  Objection.

8              THE COURT:  Mr. Yalowitz, I heard you the first time.

9              MR. YALOWITZ:  Mr. Hill didn't.  I'm sorry about that.

10             THE COURT:  Mr. Hill, I'm sustaining the objection,

11   and also to any questions in that regard the way you just

12   phrased it.  Move on.

13             MR. ROCHON:  I understand.

14   Q.  Let me show you what is in evidence as plaintiff's trial

15   Exhibit 496.  We will put it on the screen.

16             This is a U.S. government report that Mr. Yalowitz

17   asked you some questions about, right, sir?

18   A.  Yes, sir.

19   Q.  Let me show you page 2.  In the first paragraph of the

20   overview, if we could call that out, this U.S. Government

21   report indicates in the second sentence: "According to

22   statistics maintained by the U.S. Government, between

23   December 16, 2001 and June 15, 2002, and then if we skip to the

24   last sentence, it says, "679 Palistinians were killed" --

25             MR. YALOWITZ:  Objection.  Objection.

F1qQsok3                    SHRENZEL - Cross

1      THE COURT:  Overruled.  It's in evidence, sir.  If you

2  want to use it again, you can bring it up on your redirect.

3  A.  I didn't hear you.  Sorry for that.

4  Q.  Mr. Shrenzel according to the document that is in evidence,

5  according to statistics between December 16, 2001 and June 15,

6  2002679 Palistinians were killed, correct?

7  A.  That's what it says, I accept it as credible.

8  Q.  Each of those 679 Palistinians is considered a martyr by

9  the Palistinians, right?

10  A.  Yes.

11  Q.  And each of those 679 families are eligible under the

12  Palestinian law to apply for martyrs benefits, right?

13  A.  Yes.

14  Q.  And the institute that we've called the martyrs institute,

15  it makes payments not only to the families of martyrs but also

16  to Palistinians that are injured as a result of the conflict,

17  right?

18  A.  Yes.

19  Q.  This document that we are looking at here, the American

20  report indicate that during the period between December 16,

21  2001 and June 15, 2002, 1,514 Palistinians were wounded,

22  correct?

23      MR. YALOWITZ:  Objection.

24      THE COURT:  Overruled.

25  A.  Yes, as I said, I take it as written.  I have no reason to

1   doubt the data provided by the American authorities.

2   Q.  Each of those 1,514 Palistinians who were wounded during

3   this six-month period were eligible to apply for benefits to

4   the institute for the familiar leaves martyrs and the injured,

5   correct?

6   A.  Yes.

7         MR. ROCHON:  Judge, in caution, I know it's 12:30, and

8   I know you may have lunch for the jurors and our policy is not

9   to stand between jurors and lunch.

10        THE COURT:  I have just been handed a note that lunch

11  is on the way upstairs.  This is what I am going to do though,

12  ladies and gentlemen.  I'm going to keep you a little bit

13  longer.  It stopped snowing at the moment, and I want to give

14  Mr. Hill maybe about 45 minutes or so to continue his

15  examination, so we won't lose as much time as we might

16  otherwise.

17        I am going to ask you to do this:  We are going to

18  adjourn for about 45, 50 minutes you don't have to stay in the

19  jury room, but after you've completed your lunch, I'm going to

20  bring you out about 1:15 or so and probably go until about 2:00

21  and then send you home.  That is the way I think it is best to

22  proceed.

23        Don't discuss the case.  Keep an open mind.  You can

24  go into the jury room hoping your lunch is on its way up the

25  elevator and you can eat.  I will see you at 1:15.

1486

F1qQsok3                         SHRENZEL - Cross

1                    (Jury recessed)

2              (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1qQsok3                    SHRENZEL - Cross

1     (Jury not present)

2         THE COURT:  Grab a quick lunch and Mr. Hill, I will

3     give you 40, 45 minutes.  I'll check the weather.  It started

4     snowing already again, but I want to at least use some of that

5     time.

6         MR. HILL:  I may be able to finish, your Honor.

7         MR. YALOWITZ:  Your Honor, I just want to say one

8     thing about Mr. Hill's line of examination.

9         THE COURT:  Yes.

10        MR. YALOWITZ:  I am very, very concerned.  I think

11    that he has gone way, way far afield of the actual testimony of

12    Mr. Shrenzel.  This business about people injured being

13    eligible for martyr payments -- there is no evidence that any

14    of the suicide terrorists in this case were injured.  They all

15    died.

16        So for Mr. Hill to start talking about a thousand

17    people injured -- the only purpose of it is to try to inject

18    politics into the case, and I think that -- I understand the

19    Court wants to give him some leeway, but he has already gone

20    way outside where the Court said he is permitted to go.  I

21    think he needs to be admonished.  Quite frankly, if he does it

22    again, I think he needs to be admonished in front of the jury.

23        THE COURT:  I think in regard I'll limit it to that

24    specific examination.  With regard to that portion of his

25    examination, he utilized the exhibit that you put in evidence,

FlqQsok3                    SHRENZEL - Cross

1    it's statistics that you relied upon and he asked what were

2    relevant questions, and I think are relevant considerations for

3    the jury as to whether or not martyr payments means terrorists

4    or means something broader than that.

5            I think he has a right to make that point and both

6    sides have a right to argue what they will from that evidence

7    and from the fact that your witness acknowledged that martyr

8    does not mean terrorist and martyr in and of itself and people

9    who receive death benefits or injury benefits are people who

10   are terrorists and people who are not terrorists, as you have

11   defined.

12           So those are appropriate issues before the jury.  You

13   put before it the jury.  You put through this document and used

14   this document.  The document is in evidence.  As I say, as I

15   will always let you do, you can read from it, do whatever you

16   want from it once it's in evidence.  I don't think the nature

17   of these questions in that regard with regard to those issues

18   were out of bounds or inappropriate.

19           (Continued on next page)

20

21

22

23

24

25

1489

F1Q8SOK4

1          MR. YALOWITZ:  Well, I think there were a number of

2     questions where he started in with assassinations, where he

3     started in with settlers, and it is clear that what he is

4     trying to do is suggest to the jury that they should bring

5     politics into this case instead of focus on the evidence.  I

6     think your Honor was correct to sustain some of the objections.

7     I appreciate it.  I think he should be forewarned that if he

8     tries to pull that kind of stunt again, there is going to be a

9     consequence in front of the jury.

10          THE COURT:  I don't disagree with your general

11     premise.  I did sustain your objection.  I did warn Mr. Hill.

12     I don't expect that line of questioning to be placed in this

13     case before this jury.  I don't think I have to say it, but I

14     will say, in general, that if my orders are not followed, there

15     will be consequences.  I made it clear.  I don't want any of

16     those kinds of questions.  The way the questions were phrased,

17     they were loaded questions, the best I can describe it, and I

18     thought that the first couple of questions that he asked with

19     regard to the area were sufficient, but as he tried to

20     characterize it and put it in the context, which I agree with

21     you was a political context, I believe that those questions

22     were inappropriate.  I sustained the objections.  I warned him.

23     I admonished him.  If it continues, I will take stronger

24     action.  Get some lunch and we will be back.

25          (Luncheon recess)

F1Q8SOK4                        Shrenzel - cross

1      AFTERNOON SESSION

2                          1:15 p.m.

3              THE COURT:  Let's bring in the jury.

4              (Jury present)

5      ISRAEL SHRENZEL, resumed.

6              THE COURT:  Mr. Hill, you can continue.

7              MR. HILL:  Thank you, your Honor.

8      BY MR. HILL:

9      Q.  Good afternoon, Mr. Shrenzel.

10             Before we broke we were talking about payments to

11     families of martyrs, and, in fact, those payments that were

12     made are actually quite small, aren't they?

13     A.  You should show me some more accurate figures.  It depends

14     on the period, the time, maybe the financial situation of the

15     PA at the time.  You should always measure it according to the

16     necessities or the cost of living in the territories.

17     Q.  Let's take a look at what is in evidence as Plaintiffs'

18     Trial Exhibit No. 62.  If we could look at page number 9133.

19             This is the document that pertains to Said Ramadan,

20     correct?

21     A.  Yes, it is.

22     Q.  You can see that when the switch was made to the martyrs

23     and the injured, that the amount of money he began receiving in

24     June of 2002 was 686.48 shekels, right?

25     A.  Yes.

F1Q8SOK4                    Shrenzel - cross

1   Q.  In U.S. dollars that would be about $175 a month, right?

2   A.  Yes.

3   Q.  Now, before he died in January of 2002, he was being paid

4   964.69 shekels per month, right?

5   A.  Yes.

6   Q.  That's only about $250 per month, right?

7   A.  Yes.

8   Q.  So Said Ramadan's family actually got less money after he

9   died than what he earned prior to his death, right?

10  A.  That's what this chart reflects, yes.

11  Q.  Let's look at Plaintiffs' Trial Exhibit No. 23, which is

12  also in evidence.

13          This is the martyr's file for Mohamed Hashaika,

14  correct?

15  A.  Yes.

16  Q.  Mohamed Hashaika was the bomber in the March 21, 2002

17  attack, right?

18  A.  Yes.

19  Q.  Let's look at page 7307.

20          Do you see under approval of the general director

21  where it says his family receives a monthly allowance of 600

22  shekels?

23  A.  I see it, yes.

24  Q.  Again, that's $150 a month?

25  A.  Yes.

1492

F1Q8SOK4                        Shrenzel - cross

1   Q.  On the top of this form it says his parents are alive and

2   he has four siblings who are students.  Do you see that, sir?

3   A.  I see.

4   Q.  So that's $150 for a family of six?

5   A.  Yes, that's what it says.

6   Q.  Let's look at what is evidence as Plaintiffs' Trial Exhibit

7   No. 22.  This is the martyr's file for Ali Ja'ara, right?

8   A.  Yes.

9   Q.  Ali Ja'ara was the bomber who did the January 29, 2004

10  bombing, right?

11  A.  Yes.  The attack that we have discussed today, yes.

12  Q.  Let's look at page number 7292.

13          Do you see under approval of the general director

14  where it says his family also receives an allowance of 600

15  shekels per month?

16  A.  Yes, I see it.  But let me just say that, if you want to be

17  very accurate, we must maybe check what happened after 2004.

18  Q.  These are the documents that Mr. Yalowitz examined you

19  about, right, sir?

20  A.  OK.  If you want to have an accurate picture of what a

21  family is getting, so maybe there is a possibility of an

22  increase.

23  Q.  Let's look at the prior page.

24          Do you see that Mr. Ja'ara had a father, a mother, and

25  four siblings?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1493

F1Q8SOK4                        Shrenzel - cross

1   A.  Yes.

2   Q.  For that entire family, they were paid 600 shekels a month,

3   right?

4   A.  OK.  But without getting into specific details, I assume

5   they had other sources of income, from the PA or maybe from

6   other sources, yes.

7   Q.  Let's go back to page 7293.

8           Do you see at the top, next to the part that's been

9   blacked out, where it says the house of the martyr's father was

10  blown up?

11  A.  Yes.

12  Q.  It was the Israeli army that did that, right?

13          MR. YALOWITZ:  Objection.

14          THE COURT:  Overruled.

15  A.  I am not aware of all the details.  There are cases when

16  houses of terrorists are demolished.  I don't know about this

17  specific case.

18  Q.  But there were cases during the Second Intifada where the

19  houses of terrorists were demolished by the Israeli Army,

20  right?

21          MR. YALOWITZ:  Objection.

22          THE COURT:  Overruled.

23          You can answer.

24  A.  I didn't look in-depth to the issue of house demolishing

25  during the Second Intifada.

F1Q8SOK4                    Shrenzel - cross

1    Q.  But you're aware, sir, that as a general matter, there were

2    a number of occasions --

3          MR. YALOWITZ:  Objection.

4    Q.  -- where the Israeli Army demolished the homes of people

5    who committed acts of terrorism or were suspected of doing so,

6    right?

7          THE COURT:  Overruled.

8    A.  Yes.  But it should be looked at in a more detailed manner.

9    Sometimes the house was blown up because other terrorists maybe

10   found harbor there.  Sometimes it's kind of a punitive action.

11   I really don't know.  I am not familiar with the specifics of

12   the house of the father.

13   Q.  Let's go back to the prior page.

14         Sir, you're not saying that anyone else in

15   Mr. Ja'ara's family was suspected of terrorism, are you?

16   A.  Again, please.

17   Q.  You're not saying that any of these other people in

18   Mr. Ja'ara's family are suspected of terrorism, are you?

19   A.  I am not saying the opposite as well.  I didn't look at any

20   information about his -- maybe one of his brothers was also

21   involved.  How can I tell without checking it?

22   Q.  Sitting here today you can't tell the jury that Mr.

23   Ja'ara's house was destroyed because somebody else was a

24   terrorist, right?

25   A.  There are 2.5 million citizens in the West Bank.  I didn't

F1Q8SOK4                    Shrenzel - cross

1   check each of them in preparation for this testimony.  So I

2   cannot say if Moussa Ja'ara was also involved in what Israel

3   perceived as terrorist activity.

4   Q.  Let's look at Plaintiffs' Trial Exhibit 159.

5            This is a GIS file, right?

6   A.  Yes.

7   Q.  This one is for Mohamed Mousleh, correct?

8   A.  Yes.

9   Q.  Let's look at page 10001.

10  A.  Could you please enlarge it for me a little bit?  Thank

11  you.

12  Q.  Do you see in the third sentence where it says the army

13  demolished his house about two months ago?

14  A.  Yes.  But this is another -- OK.

15  Q.  Again, that was the Israeli Army that was doing that whole

16  demolition?

17  A.  The word army means the Israeli Army.

18  Q.  Let's look at what is in evidence as Plaintiffs' Trial

19  Exhibit 130.

20           This is another GIS file?

21  A.  Yes.

22  Q.  This one is for Hilmi Hamash?

23  A.  Yes.

24  Q.  Let's look at page 9873.

25           MR. HILL:  If we could enlarge the bottom portion

F1Q8SOK4                      Shrenzel - cross

1   where it says "text of report."

2   Q.  Do you see, sir, in the fourth sentence, "The

3   aforementioned was arrested in his home two years ago.  His

4   house, in the al-Dheisheh refugee camp was demolished."  Do you

5   see that?

6   A.  Yes.  It was demolished.  Yes, I see it.

7   Q.  His home was demolished by the Israeli Army, right?

8   A.  Yes, it was.  It was one of the means that Israel had to

9   resort to in order to confront this really terrible and

10  horrifying wave of terrorist attacks.  So in order to take some

11  detriment measures, this was one of them.

12  Q.  You also testified about some of the things that were

13  written in some of the martyr files, right?

14  A.  Yes, sir.

15  Q.  Now, these martyr files are actually a form, right?

16  A.  Yes.  OK.

17  Q.  You mentioned a couple of sometimes that the PA is a

18  bureaucracy like other governments, right?

19  A.  Yes.

20  Q.  It has government forms, right?

21  A.  Yes.

22  Q.  Let's take a look at one of these which is in evidence,

23  Plaintiffs' Trial Exhibit 60.

24          MR. HILL:  Justin if we can show this page and then

25  show the Arabic version side by side.

F1Q8SOK4                    Shrenzel - cross

1  Q.  You can see the Arabic version of this document has

2  portions that are preprinted and portions that are handwritten,

3  right?

4  A.  Yes.

5          MR. HILL:  Justin, if we can turn to the next page on

6  both of them.

7  Q.  Because it's Arabic, the portions that are on the left in

8  the English are on the right in the Arabic, right?

9  A.  Correct.

10  Q.  Again, what we can see here, we have got a form with

11  typewritten information and handwritten information, correct?

12  A.  Yes.

13  Q.  And the way this works is that when someone is killed,

14  their family comes into the Martyrs Institute and they fill out

15  an application for benefits, right?

16  A.  Yes, or the secretary does it, yes.

17  Q.  So what we have actually got here is an application for

18  martyrs' benefits, right?

19  A.  Yes.  OK.  This is an application, but I'm not sure that it

20  is written only according to what the family states.  Maybe

21  it's verified and then moves along to be ratified by the

22  institute itself.

23  Q.  Well, you have never actually worked for the Institute for

24  the Families of Martyrs and the Injured, right?

25  A.  Again, please.

F1Q8SOK4                     Shrenzel - cross

1   Q.  You work for Israel, right?

2   A.  I think that's evident, yes.

3   Q.  You have never worked for the PA?

4   A.  Well, if peace survives, I will be happy to do it, but so

5   far unfortunately not.

6   Q.  You have never actually been to an office of the Martyrs

7   Institute, have you?

8   A.  No, I haven't been inside.

9   Q.  You have never spoken to anyone who works at the Martyrs

10  Institute?

11  A.  No.

12  Q.  You have no idea if they verify the information that is

13  submitted on the application, do you?

14  A.  No.  I think they verify it because you have the decision.

15  We also read decision of the department.  He is acknowledged as

16  a martyr.  So if it's not verified so everyone can come in and

17  say, my son died of a certain disease and I want him to be

18  considered as a martyr.  This is not the case.  They must look

19  and find out that really this person was the shooter in the

20  case, in the event.

21  Q.  No one has ever told you that, correct?

22  A.  What?

23  Q.  No one has ever told you they have verified the identity of

24  the shooter, right?

25  A.  No, but you can deduct it very clearly if you see the

F1Q8SOK4                    Shrenzel - cross

1    information.  Then there is the commendations of the

2    supervisor.

3    Q.  So that's a deduction you have made, right?

4    A.  Yes.

5    Q.  It's based on reading the document?

6    A.  It's based on logic, yes.

7    Q.  It's not based on anything else?

8    A.  Sometimes logic is enough.

9    Q.  The information under the heading "short biography," that's

10   information that's provided by the family, right?

11   A.  I'm not sure.  I cannot say for sure.

12   Q.  You don't know?

13   A.  I don't know to what extent other people in the office are

14   involved.

15   Q.  You have no idea how that information got there?

16   A.  No.  For example, he was a corporal.  I believe if the

17   family said he was a major, it wouldn't have been written down

18   that way.  What I say is I think, or I assume, or I believe

19   that the Palestinian Authority give credit to the family's

20   version, but up to a certain extent.  And information regarding

21   his military career, etc. is being checked either in this way

22   or another.

23   Q.  But that's just what you think based on reading the

24   document, right?

25   A.  Yes.

1500

F1Q8SOK4                        Shrenzel - cross

1   Q.  I want to talk about a different agency.

2   A.  Also about the logic of bureaucracy all over the world.

3   Q.  Let's talk about a different bureaucracy.  This one is

4   called the Ministry of Detainees Affairs and Ex-Detainees

5   Affairs.  You talked about that one, right?

6   A.  Yes.

7   Q.  This is another agency of the PA?

8   A.  Yes.

9   Q.  You have also never been to a Ministry of Detainees Affairs

10  office, right?

11  A.  No, I haven't.

12  Q.  You have never talked to anyone from the Ministry of

13  Detainees Affairs?

14  A.  As far as I recall, no.

15  Q.  The Ministry of Detainees Affairs, like the Martyrs

16  Institute, also has preprinted forms, right?

17  A.  You can show me and I will confirm it.

18  Q.  Let's look at what is in evidence as Plaintiffs' Trial

19  Exhibit No. 76, at page 9304.

20          MR. HILL:  Justin, if we can see the English

21  translation side by side with the Arabic version.

22  Q.  Do you see that, sir?

23  A.  Yes.

24  Q.  This is another form that has some typewritten information

25  and some handwritten information, right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1Q8SOK4                          Shrenzel - cross

1    A.  Yes.

2    Q.  This particular form pertains to someone called Nasser

3    Aweis, right?

4    A.  Yes.

5    Q.  As you can see on the Arabic -- again, remembering that

6    right is right and left is left -- the blanks that are filled

7    in are the name of the detainee, their number, and their

8    province, right?

9    A.  Yes.

10   Q.  So in the example we have before us, the only information

11   filled in by the person filling out the form was the name of

12   Nasser Aweis, his identity number, and the fact that he was

13   from the Nablus Balata refugee camp, right?

14   A.  Yes.

15   Q.  The rest of it is just something that is on the form?

16   A.  Yes.

17   Q.  So when Mr. Yalowitz asked you about whether or not Nasser

18   Aweis was detained in the prisons of the Israeli occupation as

19   a result of the fight for his country, he was just reading you

20   language on a form, right?

21   A.  Yes.  But it relates to -- there is a connection.  You have

22   to connect the dots between what is on the form and what was

23   filled in the blanks.  The whole idea of the form is this

24   person convicted in an Israeli jail, for multiple cases of

25   murder I remind you, he is considered to be serving his prison

F1Q8SOK4                    Shrenzel - cross

 1   because of his, as it says here in the translation, his fight

 2   for his country.

 3   Q.  But this is the form used for all security detainees,

 4   right?

 5   A.  Maybe.  I don't know.  Maybe there are some diversions, but

 6   basically yes.

 7   Q.  So if someone is imprisoned by the Israelis for throwing

 8   stones at soldiers, the form would be exactly the same, right?

 9   A.  I don't know.  You have to show me.

10   Q.  You don't know?

11   A.  I cannot say for sure.

12   Q.  That's because all you're doing is reading the document,

13   right?

14   A.  No.  I read this document so I related to this document.

15   If you can show me a document of the stone thrower, I will

16   relate to it happily.

17   Q.  And the other documents we looked at, where people were

18   imprisoned as a result of the fight for their country, it's the

19   same form, isn't it?

20   A.  OK.

21   Q.  No one at the Ministry of Detainees Affairs is making a

22   determination about whether or not Nasser Aweis was fighting

23   for his country, right?

24   A.  Yes.  But the very fact that they chose this definition is

25   of importance as well.  And they know -- they didn't change the

F1Q8SOK4                        Shrenzel - cross

1   form because they didn't -- when the family came, they didn't

2   say, hey, wait a minute, you are a murderer, we cannot say that

3   you love your country, how can you love your country and then

4   kill innocent people in the center of Jerusalem?  They didn't

5   do it.  They attached his information to this form.  So the end

6   result is very clear.  The PA is stating that he is serving

7   multiple cases in prison, multiple imprisonment verdicts in

8   prison because of his love of his country.  That's their

9   definition.  If you want to show me about stone throwing, let's

10  see it.

11  Q.  There is a similar form for released prisoners, right?

12  A.  Again, please.

13  Q.  There is a similar form for released prisoners, right?

14  A.  Just remind me.

15  Q.  Let's look at what is in evidence as Plaintiffs' Exhibit

16  No. 26.  If we can look at page 7740.

17  A.  I'm with you, sir.

18  Q.  Again, this is another form that has handwriting and typing

19  on it?

20  A.  Yes.

21  Q.  This one pertains to ex-detainees?

22  A.  Yes.

23          Can you enlarge it a little bit.

24  Q.  Yes.

25          The language about completing his sentence in the

F1Q8SOK4                    Shrenzel - cross

1   prisons of the Israeli occupation as a result of his fight for

2   his country, that's language that's on the form, right?

3   A.  Yes.

4   Q.  Sir, you mentioned that a number of the General

5   Intelligence Services files would reference a person's security

6   status or moral status, right?

7   A.  Yes.

8   Q.  And you also mentioned that that is usually a reference to

9   their conduct in prison, right?

10  A.  Yes.

11  Q.  Now, these GIS files that you have reviewed and have been

12  admitted in evidence, these are not publicly available in

13  Palestine, right?

14  A.  They probably are not.

15  Q.  These are the General Intelligence Services' private

16  records on individuals, right?

17  A.  Yes.

18  Q.  You would agree with me that one issue that all

19  intelligence agencies are concerned about is traitors, right?

20  A.  Yes.

21  Q.  Even Israeli intelligence worries about traitors, right?

22  A.  It's not the only subject, thank God, but I agree with you.

23  Q.  Intelligence agencies worry about certain characteristics

24  or qualities that might allow a foreign government to co-opt or

25  blackmail a citizen, right?

F1Q8SOK4                        Shrenzel - cross

1    A.  Yes, that's possible, yes.

2    Q.  For example, during the 1950s, the U.S. State Department

3    believed that any U.S. citizen who was a homosexual could be

4    blackmailed by the USSR and forced to spy for the Soviets,

5    right?

6              MR. YALOWITZ:  Objection.

7              THE COURT:  Sustained.  Let's get out of the 50s.

8    Q.  During this period of time, Israel was able to convince

9    some Palestinians to spy for Israel, right?

10   A.  Of course, yes.

11   Q.  One of the ways Israel was able to convince Palestinians to

12   spy for Israel was threatening to expose their moral problems,

13   right?

14   A.  No.  There is no evidence in the documents of the GIS.  Now

15   you're referring me to the issue of how Israel recruited

16   allegedly informants and this is not -- my testimony didn't

17   deal with it at all.

18   Q.  For example, the Israelis would try and recruit informants

19   who were gay by threatening to expose the fact that they were

20   homosexuals?

21   A.  I'm not aware of that.

22             MR. YALOWITZ:  Objection.

23             THE COURT:  Sustained.

24             MR. YALOWITZ:  I object to the line.

25   Q.  Let's look at what is in evidence as Plaintiffs' Trial

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

1506

F1Q8SOK4                    Shrenzel - cross

1   Exhibit 148.

2          This is the GIS file for Mohamed Hashaika, right?

3   A.  Yes.

4   Q.  And Mohamed Hashaika was the bomber on the March 21, 2002

5   attack?

6   A.  Yes.

7   Q.  Let's look at page 9953.

8          MR. HILL:  Can you cull up the sentence that says "the

9   mother of the aforementioned."

10  A.  The mother is morally corrupt, that line?

11  Q.  That one right there.  "His mother is morally corrupt,"

12  that line.

13         It says, "His mother is morally corrupt and there are

14  security suspicions against her.  She used to use her house as

15  a brothel because the father is not sane."

16         That's what it says, right?

17  A.  Yes.

18  Q.  You also testified about promotions that prisoners

19  received, right?

20  A.  Yes, of course.

21  Q.  And you testified about a promotion that Ahmed Barghouti

22  received while he was in jail?

23  A.  Yes.

24  Q.  Let's take a look at what is in evidence as Plaintiffs'

25  Trial Exhibit No. 36C.  Look at page 8964.

1507

F1Q8SOK4                        Shrenzel - cross

1    MR. HILL:  Justin, if you can cull up the part under

2    promotions there.

3    Q.  On the last line it indicates he received a promotion from

4    first sergeant to warrant officer by order 15999/3.  Do you see

5    that?

6    A.  Yes.

7    Q.  It also indicates it was pursuant to presidential orders,

8    right?

9    A.  Yes.

10   Q.  Let me show you what is in evidence as Exhibit 105.

11          Do you see on the sign there, sir, where this

12   administrative order indicates that it is number 15999/3?

13   A.  Yes.

14   Q.  You would agree with me that the order that is Exhibit 105

15   is the same order that's being referred to in Exhibit 36C,

16   right?

17   A.  Yes.

18          MR. HILL:  Now if we could see the text from Exhibit

19   105.

20   Q.  It says, "The following first sergeants named in the

21   attached addendum from the roster of units that appears next to

22   their names followed by northern governorates are promoted to

23   the rank of warrant officer effective the date listed next to

24   their name with regard to rank, and November 1, 2008."

25          Do you see that, sir?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1508

F1Q8SOK4                    Shrenzel - cross

1    A.  I do.

2            MR. YALOWITZ:  Objection.  Would it be possible to

3    allow the witness to see the entire document on this one?

4            THE COURT:  If you want to show him the entire

5    document, you can when you examine him.

6    Q.  The next sentence says says, "The total number of promoted

7    first sergeants is 1,484," right?

8    A.  Yes.

9    Q.  "The list begins with First Sergeant Mohamed Awad and ends

10   with First Sergeant Yusuf Al-Halahleh."

11           Let's go to page 9508 of Exhibit 105.

12           This is a page of this order promoting 1484 people,

13   right?

14   A.  Yes.

15   Q.  Ahmed Barghouti is number 1,052 on the list.  He is

16   actually on the next page.

17           Do you see that?

18   A.  I see it.

19   Q.  Let's go back to the first page.

20           You mentioned that this promotion was pursuant to

21   presidential orders, right?

22   A.  That's what was written on the document.

23   Q.  But this document, the actual order, it doesn't have

24   President Abbas's name on it, does it?

25   A.  It's some discrepancies in your client's bureaucracy.

F1Q8SOK4                    Shrenzel - cross

1   Q.  It's just a bureaucracy.  President Abbas didn't promote

2   Ahmed Barghouti, did he?

3   A.  No, he did.

4   Q.  Because he promoted 1400 other people on the same day?

5   A.  Of course he didn't interview each of them, but the basic

6   idea in my testimony was that while most of the others, I'm not

7   sure -- I didn't check the list, but most of them were in

8   service allegedly.  This Ahmed Barghouti was in an Israeli

9   jail, and he was promoted while serving multiple imprisonment

10  life sentences in Israeli jail.  That's the point.

11  Q.  And he was promoted along with 1484 people who were

12  promoted on the same day?

13  A.  The question is why, why was he promoted while being in an

14  Israeli jail, while not being able to serve on the ground?

15  Q.  Let's look at another one.  Let's look at Plaintiffs' Trial

16  Exhibit 48.

17          MR. HILL:  If we can cull out the section under

18  promotions.

19  Q.  This pertains to Ahmed Salah, right?

20  A.  Yes, sir.

21  Q.  This one indicates that he was promoted from first warrant

22  officer to honorary lieutenant by order number 4610/3, right?

23  A.  Yes.

24  Q.  Let me show you Exhibit 104, which is also in evidence.

25          This is another one of these administrative orders,

1510

F1Q8SOK4                    Shrenzel - cross

1   right?

2   A.  Yes, it is.

3   Q.  Similar to the one we just looked at?

4   A.  Yes.

5   Q.  This one is numbered 4610/3, right?

6   A.  Yes.

7   Q.  So that's the same order that was referenced in the

8   document about Ahmed Salah that we just looked at?

9   A.  It is.

10  Q.  This one indicates that the following first warrant

11  officers named in the attached addendum from the roster of

12  units that appears next to their names, followed by northern

13  governorates, are hereby promoted to the rank of honorary

14  lieutenant effective the date next to their names with regard

15  to rank and July 1, 2009 with regard to salary.  Do you see

16  that, sir?

17  A.  Yes.

18  Q.  Now, as you mentioned, a warrant officer is an enlisted

19  person, right?

20  A.  Yes.

21  Q.  And armies around the world differentiate between enlisted

22  men and officers, right?

23  A.  Yes, sir.

24  Q.  And the highest rank for an enlisted man in the Palestinian

25  Army is a first warrant officer, right?

F1Q8SOK4                    Shrenzel - cross

1   A.  Yes.

2   Q.  So then you can't be promoted above that unless you become

3   an officer, right?

4   A.  Yes.

5   Q.  In this instance, all of the first warrant officers on this

6   list are being promoted to something called honorary

7   lieutenant, right?

8   A.  Yes.

9   Q.  That's a title that's given to someone who has served so

10  long that they have exceeded the rank of first warrant officer,

11  right?

12  A.  Or maybe they excelled in their service.  I don't know.

13  Q.  You don't know?

14  A.  The exact reason why -- probably there were other

15  candidates.  Why were those 540 something chosen to be

16  promoted?

17  Q.  Do you know why Palestinians are promoted?

18  A.  Seniority, maybe excellence in service, I don't know.

19  Q.  Do you know if Palestinian promotions are based on merit?

20          You don't know, right?

21  A.  What do you mean I don't know?

22  Q.  You have never worked for this agency, you don't know how

23  they decide to promote people, do you?

24  A.  I have a general idea.  It's seniority, sometimes

25  excellence, and sometimes carrying out acts of terror.  This is

F1Q8SOK4                      Shrenzel - cross

1    the main point of my argument.

2    Q.  But that's your view.  You you have never actually worked

3    for this office that makes the promotions, have you?

4    A.  Well, may I ask you not to ask me a question if I was

5    employed by the PA.  This is ridiculous.

6    Q.  This is cross-examination, sir.  You have never worked for

7    this office, right?

8    A.  Right.

9    Q.  You have never been to this office, right?

10             MR. YALOWITZ:  Objection.

11             THE COURT:  Mr. Hill, you're cutting off the answer.

12   A.  What is the point of asking me about being --

13             THE COURT:  Sir, you can't talk when I am talking.

14   One person at a time.

15   Q.  You have never worked for the office that issued this

16   order, right?

17   A.  No, I didn't.

18   Q.  You have never been to that office, right?

19   A.  No, I haven't been there.

20   Q.  You have never spoken to anyone who works in that office,

21   right?

22   A.  This I cannot relate to.

23   Q.  You don't know if you have spoken to somebody who works in

24   this office?

25   A.  I cannot relate to.  I cannot tell you everything I did

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

F1Q8SOK4                     Shrenzel - cross

1   during my 20 years of service under the Israeli Intelligence

2   and Israeli Army.  I am not allowed to tell you everything I

3   did or did not.

4   Q.  The document says the number of promoted first warrant

5   officers totals 547, right?

6   A.  Yes.

7   Q.  It again tells us who is first and who is last, right?

8   A.  Yes.

9   Q.  Let's look at page 9506.

10           Ahmed Salah, who we are talking about, he is number

11  366 out of 547 on this list?

12  A.  Again, please.

13  Q.  Ahmed Salah, who we have been talking about, he is number

14  366 out of 547 on this order, right?

15  A.  Yes.

16  Q.  I am going to ask you a couple of questions about the March

17  21 attack.

18           You remember that Mr. Yalowitz had something up on the

19  screen that had the pictures of alleged perpetrators on it?

20  A.  I do.

21  Q.  One of those pictures was a picture of someone named Tawfiq

22  Tirawi, right?

23  A.  Yes.

24  Q.  Now, Mr. Tirawi was not convicted in connection with the

25  March 21, 2002 attack, was he?

F1Q8SOK4                        Shrenzel - cross

1   A.  Unfortunately, Israel was not able to capture him.

2   Q.  He was not convicted in connection with the March 21, 2002

3   attack, was he?

4   A.  And as a result of being uncaptured, he was not indicted

5   and neither convicted, yes.

6   Q.  So Tawfiq Tirawi was not convicted in connection with the

7   March 21, 2002 attack, right?

8   A.  As I said, he was not convicted.

9   Q.  Now, in the binder relating to the January 27, 2002 attack

10  there was a tab about Tawfiq Tirawi, correct?

11  A.  Yes, there was.

12  Q.  He was not convicted in connection with the January 27,

13  2002 attack either, right?

14  A.  Just because he was not brought to justice, he was not

15  indicted about it.

16  Q.  He was never charged and he was never convicted in

17  connection with the January 27, 2002 attack, correct?

18  A.  Yes.  But let's be accurate.  Because he was not in the

19  hands of the Israeli authority.  That's the only reason.  Were

20  he captured by the Israelis, as we really like to do, he would

21  have been indicted.  And, OK, I don't want to predict the

22  possible hypothetical results of the trial, but we have strong

23  evidence to his terrorist activity.

24  Q.  Mr. Shrenzel, Tawfiq Tirawi was not convicted of the

25  January 27, 2002 attack, was he?

F1Q8SOK4                    Shrenzel - cross

1    A.  The way you phrase the question might imply that he was

2    charged or was at trial and was not convicted.  There was no

3    trial.  He was not in our hands.  So he was not convicted.

4    That's it.

5    Q.  Mohamed Hashaika was the bomber for the March 21, 2002

6    attack?

7    A.  Yes.

8    Q.  At one point in time, Hashaika was a corporal in the

9    Palestinian police in Bethlehem, right?

10   A.  Yes.

11   Q.  But at the time of the attack on March 21, 2002, he was not

12   a PA police officer, correct?

13   A.  Again, please.  I'm not sure that he was from the Bethlehem

14   area that you mentioned.

15   Q.  Setting aside Bethlehem for the moment.  As of March 21,

16   2002, Mohamed Hashaika was not employed by the PA police,

17   correct?

18   A.  Yes.  But he was reinstated at least, as is reflected by

19   his salary, his family continuing to receive allocations.

20   There was no mention that the allocations did stop or something

21   like that.

22   Q.  Let's look at Plaintiffs' Trial Exhibit 9, which is in

23   evidence.

24   A.  It will be fruitful to refresh my memory on that, yes.

25   Q.  Can we look at page number 4499?

F1Q8SOK4                    Shrenzel - cross

1        You see, sir, that this document indicates payments

2    stopping after January of 2002, right?

3    A.  Yes.  To him personally, yes.

4    Q.  The bombing that Mr. Hashaika was involved in was in March

5    of 2002, correct?

6    A.  Yes.

7    Q.  So the documents that have been shown to the jury show that

8    as of March 2002, he was not getting paid by the PA, correct?

9    A.  Which to my opinion doesn't diminish their responsibility

10   for his activity.

11   Q.  The documents that have been shown to the jury indicate

12   that as of March 21, 2002, Mohamed Hashaika was not being paid

13   by the PA, correct?

14   A.  As to this very narrow aspect of payments, yes, that's

15   correct.  But as to the more general responsibility, and if you

16   remember, Mr. Tirawi that you mentioned before, in a letter to

17   Arafat he told him the matter is at your discretion.  He

18   announced that Hashaika was detained and interrogated and the

19   matter is at your discretion, he told the president of the PA,

20   and the result of this discretion or the results of the deeds

21   and misdeeds of the PA president, this person detonated himself

22   five weeks later.

23   Q.  Let's look at Plaintiffs' Trial Exhibit 148, which is in

24   evidence.

25        This is the GIS file for Mohamed Hashaika, right?

F1Q8SOK4                    Shrenzel - cross

1   A.  Yes.

2   Q.  Let's look at page 9953.

3         MR. HILL:  Justin, can you cull out the bullet that

4   starts with "originally"?

5   A.  You bring us back to his devious mother.  This is not so

6   fair for him.

7   Q.  Sir, the file says, "Originally the aforementioned intended

8   to perform his operation in the Netanya area, and he was

9   arrested in Tulkarm by the Palestinian Authority."

10        That's what it says, right?

11  A.  Yes.

12  Q.  It says, "He was transferred to Ramallah and was imprisoned

13  there."

14        That's what it says, right?

15  A.  Yes.

16  Q.  It says, "During the invasion into Ramallah, he escaped

17  from prison and intended to perform his operation through the

18  people of the Islamic Jihad, but then the Al Aqsa Martyrs

19  Brigades have taken him from them."  Do you see that, sir?

20  A.  I do.

21  Q.  Mr. Yalowitz did not read that portion of the GIS file to

22  you during direct, did he?

23  A.  I have to look at the transcript again.

24  Q.  Are you saying Mr. Yalowitz read the portion where it says

25  he escaped?

F1Q8SOK4                    Shrenzel - cross

1   A.  No.  I am not saying what Mr. Yalowitz read or did not

2   read.  I just don't remember.  I was here almost three days.

3   You want me to remember every sentence that Mr. Yalowitz read

4   from the documents?

5   Q.  You would agree this is the first time the members of the

6   jury have had their attention called to the fact that the file

7   says escaped?

8   A.  As an appreciation to your credibility, I will accept it,

9   but I really don't recall it.

10  Q.  I want to talk to you about the attack that took place --

11  A.  May I explain?  Do you have any questions regarding that?

12          THE COURT:  It is 2:00.  Unless you are going to wind

13  up a short area, I want to let the jury go.  I think a storm is

14  coming.

15          MR. HILL:  I have a little more to go.

16          THE COURT:  Is it all right to break right here?

17          MR. HILL:  Certainly.

18          THE COURT:  Ladies and gentlemen, we are going to

19  adjourn.  Don't discuss the case.  Keep an open mind.  I am

20  going to ask you to be here on Wednesday at 9:45.  I heard that

21  the schools just closed 15 minutes ago and I think this court

22  might be closed also.  So I will see you on Wednesday, we will

23  pick up there, and hopefully we will get back on schedule.

24          (Jury exits courtroom)

25          (Continued on next page)

F1Q8SOK4

```
1            THE COURT:  I am going to let you go.  The weather is
2    getting bad.
3            Let's get together at 9:15 on Wednesday.  We will have
4    about a half hour or so.
5            MR. YALOWITZ:  Did your Honor want to call the balls
6    and strikes on those remaining cross-designations?
7            THE COURT:  I still want to look at them some more.
8    It's a little difficult because you don't go line by line for
9    me with the cross-designations.  You have sort of objected to
10   every cross-designation.
11           MR. YALOWITZ:  Maybe I am misremembering.  I thought I
12   put in a letter Saturday, your Honor, that gave -- there were
13   about seven or eight that I objected to and the rest I had no
14   objection.
15           THE COURT:  It depends on which chart you're referring
16   to.  The chart that I thought you were referring to is what is
17   designated as Exhibit 6.
18           MR. YALOWITZ:  I don't think we need to deal with that
19   until the defendants' case, if ever.  I am only talking about
20   in the body of my letter, I thought we were in the middle of
21   that.
22           THE COURT:  We were.  I am just going to add one more
23   right now, but I will look at that again.  At this point let me
24   tell you the ones that I thought --
25           MR. YALOWITZ:  I'm sorry for the confusion.  That's
```

1520

F1Q8SOK4

 1    what I was getting at.

 2            THE COURT:  Just quickly, I think we addressed page 27

 3    of Jadallah.  And then Al-Sheikh, 140.  I don't remember what

 4    page 140 was.

 5            MR. YALOWITZ:  140 looks like the witness just asks a

 6    question.  He doesn't understand the question so he asks a

 7    question.

 8            THE COURT:  I didn't see why 140 was an appropriate

 9    designation, 21 through 25, and the next page, 5 through 14.  I

10    tend to agree with you on that, but we can discuss that

11    further.  You can look at it.  I will look at it more

12    carefully.

13            There was also another one that I had a problem with,

14    but it was unclear to me.  It was the part about the

15    interpreter section.  I think it was 204.  It's unclear to me

16    who is talking.  Is this just an exchange between the lawyers

17    and the interpreter or is this something being interpreted?

18            MR. HILL:  I wasn't there.  I believe it was an

19    exchange between the lawyers and the interpreter.  It's the

20    same document that there has been testimony here about.

21            THE COURT:  I know, but I have Mr. Sa'de and I have a

22    Mr. Shihada and Mr. Tolchin.  Mr. Tolchin is the lawyer.

23            MR. HILL:  Sa'de is an Israeli lawyer that represents

24    the witness and Shihada I believe was the interpreter.

25            MR. YALOWITZ:  This is a lawyer and an interpreter

F1Q8SOK4

1    bickering on the record.

2              THE COURT:  I have some concern.  We can talk about it

3    on Wednesday.  I have some concern with 204, line 4 through 12.

4    That seems to be just a confused conversation among lawyer and

5    interpreters.  It seems to me that the answer that was given is

6    1 through 3 and 13 through the end of the page is the answer

7    given.

8              MR. HILL:  The issue is the witness is speaking

9    Arabic.  What is happening the witness says something in

10   Arabic, and then the interpreter interprets it, and then the

11   lawyer disagrees with the interpretation.  So if we just get

12   the plaintiff's interpreter's view of what it means, you don't

13   get what actually happens at the deposition.

14             THE COURT:  I don't think the interpreter's

15   interpretation of what it means is the interpreter's job.  It

16   is to interpret the words that the witness said.  The question

17   was asked.  I assume that the interpreter interpreted the

18   question to the witness, and then the answer was given when the

19   witness said, I would like to explain.  That seems to be the

20   substantive evidence.

21             MR. HILL:  Your Honor is proposing to take out lines 4

22   through 12 and allow 13 and thereafter?

23             THE COURT:  That's my inclination.

24             MR. HILL:  That will be fine.

25             THE COURT:  Because I was even confused in trying to

1522

F1Q8SOK4

1    figure out this exchange going back and forth between the

2    lawyer and interpreter.  I think Q and A is what goes before

3    the jury, but let me look at the rest.

4         Mr. Yalowitz, I think that was really the only

5    portions that I really had concern with that jumped out at me

6    as being beyond the scope or, in fairness, not being subject

7    matters related to issues and subjects that you want to put

8    before the jury.  I want to look at it a little more carefully

9    and also look at it in the context of their independent

10   designations.

11        I have been looking at the rule again.  I am going to

12   double-check the law.  I could be wrong.  But my understanding

13   of the rule is, if you offer the deposition testimony, they can

14   force you to read those portions that they say in fairness

15   should be read at the same time, and then they have the right

16   to read other portions from the deposition on their case that

17   they want read.

18        MR. YALOWITZ:  This is what I want to write to you

19   about because I think it's different where I am -- it's where a

20   party is represented at the deposition.

21        THE COURT:  I know but, quite frankly, that would

22   preclude both of your designations.

23        MR. YALOWITZ:  The defendants were parties represented

24   at deposition.

25        THE COURT:  That's not what the rule says.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

1523

F1Q8SOK4

1    MR. YALOWITZ:  Let me look at it again.

2    THE COURT:  The rule says that the parties were

3    represented there.  It doesn't say just one party.  I

4    understand if you were offering this as some sort of admission

5    or something like that by a party opponent.  I don't think

6    that's the way the rule works.

7    MR. YALOWITZ:  As I said, I got this last night and I

8    haven't drilled down into the words of the rule.

9    THE COURT:  Neither have I.  I have done some quick

10   research.  I can't find anything in the circuit.  But my

11   recollection of the rule, the general rule, is you can't do

12   what you want to do, sort of I want to use the deposition and

13   say it's fair for me to use the deposition for any portion I

14   want to use it for, but the other side can't use it for any

15   purpose, even though I am the one putting the witness's

16   testimony in.

17   MR. YALOWITZ:  As I said, rather than speak in the

18   abstract, I want to look at that, give you something in

19   writing.  That's not something that we need to deal with for

20   Wednesday because Wednesday we just have to deal with their

21   little cross-designations.  When it comes to their case in

22   chief, they may have a narrower set of things that they want to

23   use, and I may not actually care about it.  So I will look at

24   the law and research it and give you something in writing so we

25   have it nailed down, but I don't think we need to deal with

1524

F1Q8SOK4

1    that bigger issue for Wednesday.  But I will try to get you

2    something.  I don't know if I can get it to you tomorrow.

3            THE COURT:  Quite frankly, they are a little bit in

4    the same situation.  If they say you can put your stuff in,

5    then I guess they can say they can put their stuff in.  But

6    they can't say you can't put your stuff in, but we can put our

7    stuff in.  It doesn't work that way.  Either it's all in or

8    it's all out.  You can't just pick and choose and decide you

9    object to the other side's and you just want yours.

10           MR. YALOWITZ:  Let's both look at it, and we will both

11   be more educated when we have done that.

12           MR. ROCHON:  I am just rising on a scheduling issue.

13   If this was the District of Columbia, the court would be closed

14   about a month.  On the off-chance that Wednesday is an issue,

15   how do we learn that?  Does the court contact us?

16           THE COURT:  We will try to contact you as soon as we

17   know.  Quite frankly, the last time we had a snow day, we were

18   told 5:00 in the morning the court wasn't going to open.

19           Also, there is a phone number we can give you to call

20   that will say whether the court is open or closed.

21           MR. ROCHON:  That will be great.

22           THE COURT:  Otherwise we will reach out to you to let

23   you know as soon as we know.

24           MR. ROCHON:  Thank you. .

25           (Adjourned to January 28, 2015, at 9:15 a.m.)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1525

```
 1                    INDEX OF EXAMINATION

 2      Examination of:                        Page

 3      ISRAEL SHRENZEL

 4      Direct By Mr. Yalowitz . . . . 1420

 5      Cross By Mr. Hill  . . . . . . 1477

 6                    PLAINTIFF EXHIBITS

 7      Exhibit No.                          Received

 8        116, 1196 and 1197  . . . . . . . . . . . .1421

 9        185   . . . . . . . . . . . . . . . . . .1473

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1526

F1S8SOK1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   MARK I. SOKOLOW, et al.,

 4                   Plaintiffs,

 5            v.                          04 CV 397 (GBD)

 6   PALESTINE LIBERATION
     ORGANIZATION, et al.,
 7
                     Defendants.
 8   ------------------------------x
 9                                       January 28, 2015
                                         9:15 a.m.
10
     Before:
11
                     HON. GEORGE B. DANIELS,
12
                                         District Judge
13
                          APPEARANCES
14
     ARNOLD & PORTER LLP
15        Attorneys for Plaintiffs
     BY:  KENT A. YALOWITZ
16        PHILIP W. HORTON
          TAL MACHNES
17        SARA PILDIS
          CARMELA T. ROMEO
18        RACHEL WEISER

19   MILLER & CHEVALIER, CHARTERED
          Attorneys for Defendants
20   BY:  MARK J. ROCHON
          LAURA G. FERGUSON
21        BRIAN A. HILL
          MICHAEL SATIN
22        DAWN E. MURPHY-JOHNSON

23   Also present:  RACHELLE AVITAL, Hebrew interpreter
                    RINA NE'EMAN, Hebrew interpreter
24

25
```

1527

F1S8SOK1

1          (Trial resumed; jury not present)

2          THE COURT:  Good morning.

3          Let me put aside the issue of the deposition

4    designations.  I guess they go into three categories.  One,

5    whether they should be allowed at all; two, whether or not in

6    fairness the plaintiffs should read a portion at the same time

7    when they read their portion; and, three, whether or not it's

8    admissible on the defendants' case.

9          The first objection by the plaintiff to the

10   designation by the defendant is Jadallah, and I partially agree

11   with the plaintiff.

12         MR. YALOWITZ:  I apologize.  I am having a little

13   trouble hearing you over this machine.

14         THE COURT:  All right.  I will keep my voice up.

15         On the designation on page 27, I think the portion on

16   27 and the top of 28 in fairness should be read at the same

17   time.  It's the same inquiry about the financing.

18         The portion that is at the bottom, line 17 through the

19   next page, line 10, I don't think given the way the answer was

20   given he has any basis one way or the other to make these

21   statements.  Clearly not firsthand knowledge.

22         The question was whether or not moneys in any currency

23   transferred from the Palestinian National Authority directly or

24   indirectly to the Al Aqsa Martyrs Brigades for the time period

25   1999 to 2005.

F1S8SOK1

1      Unless you can tell me on what basis he has some

2   personal knowledge of every single transfer, whether direct or

3   indirect, that went to the Al Aqsa Brigade, I don't think he

4   has any firsthand knowledge of that.

5      MR. HILL:  If I could address that.  He does explain

6   the answer on 129.  He is saying that because by law they are

7   only allowed to transfers moneys for things that are in the

8   budget and that thing was not in the budget, therefore, there

9   were no transfers that day as a matter of law.  That is what he

10   is saying.  He does have personal knowledge of that because he

11   works in the finance ministry and manages the budget.

12      THE COURT:  I take that not in support of your

13   position but in opposition of your position.  If that's the

14   basis on which he is giving that testimony, that's further

15   evidence that it's not direct evidence of his knowledge of

16   whether or not there was money transferred, directly or

17   indirectly, to the Al Aqsa Martyrs Brigades.  Then there would

18   be some logical conclusion for him to draw, but that is clearly

19   not the fact.  He makes clear he doesn't know.  He says just

20   because it's not in the budget line, it never happened.  He is

21   not in the position to say that.

22      That's the basis on which he is saying he is basing

23   that answer and that's not a direct, nonhearsay knowledge that

24   gives him a basis to say, therefore, because it's not a line in

25   the budget he concludes that no money was ever transferred,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1S8SOK1

1    directly or indirectly, to the Al Aqsa Martyr Brigades.

2              MR. HILL:  I think it's a lay opinion that the jury is

3    entitled to hear based on his knowledge, and I would ask the

4    court, if not requiring the plaintiffs to read it now, allow us

5    to read it in our case when we read the other portions.

6              THE COURT:  No.  I have considered it.  I don't think

7    there is a basis for a lay opinion on this fact.  It's either

8    fact or not a fact.  He has no layperson's opinion as to

9    whether or not the Al Aqsa Martyrs Brigade got the money.  If

10   someone slipped him money, then the best he can say is he did

11   it to the best of my knowledge.

12             MR. HILL:  What is he saying is if it was done, it was

13   done contrary to the law and the budget.

14             THE COURT:  No.  He said it wasn't done.  That's part

15   of the problem.  He said there is no money transferred to

16   anything other than what is in the budget.  He doesn't know

17   that.  He has no basis.  It's not even a legitimate opinion.

18             MR. HILL:  He does, your Honor, because he

19   administered the budget during the relevant time frame.

20             THE COURT:  He doesn't know what happened to the money

21   after it's transferred to the budget line or if someone else

22   decides to give the money to the Al Aqsa Martyrs Brigades.  He

23   is saying all he knows is it's not a budget line so they must

24   not have gotten the money.

25             MR. HILL:  We think it is relevant and probative and

F1S8SOK1

1  based on his personal knowledge.  I understand the court's

2  ruling.

3          THE COURT:  That part is out.

4          MR. YALOWITZ:  Do we end with the answer on 15?

5          THE COURT:  You end it at 11 on 28.

6          I think the continued Q and A about the budget matter

7  on 188, I think that that is an appropriate part of that

8  discussion that the plaintiff wants to read.  That portion

9  should be read.

10         I am not going to require the plaintiff read the 192,

11 line 21.  It's likely I will let the defendant read the rest of

12 it, if they want to read it, but the exchange about the

13 intifada, I don't think the plaintiff should be required to

14 read that.  If the defendants want that read --

15         MR. YALOWITZ:  Where are we?

16         THE COURT:  I'm on page 192.

17         MR. YALOWITZ:  Are we on Al-Sheikh?

18         THE COURT:  No, Jadallah.

19         MR. YALOWITZ:  Your Honor, I'm sorry.  I thought we

20 were on 188 through 190 for Jadallah.  Maybe I am just

21 looking -- maybe we are looking at different sheets.

22         THE COURT:  We are because I am at 192.  Are you on

23 192 to 193?

24         MR. YALOWITZ:  Not on Jadallah.  Let me look at

25 Al-Sheikh.

1531

F1S8SOK1

1          THE COURT:  Am I correct from defendant you were

2   seeking to offer Jadallah, I have 188 through 193.

3          MR. YALOWITZ:  190, line 2.

4          THE COURT:  192, line 22.  You don't have that.

5          MR. YALOWITZ:  No, sir.

6          THE COURT:  Is that a portion that the defendant

7   designated?

8          MR. HILL:  Bear with me, your Honor.

9          THE COURT:  You just have 188 through 190.  Does that

10  mean you don't have any objection to 190 through 193?  I have

11  190 through 193.

12         MR. YALOWITZ:  What it is intended to mean is that

13  when they sent me an e-mail Friday night saying, these are in

14  fairness designations, this chart was the limit of their in

15  fairness designations.

16         THE COURT:  That's not the limit of what I have been

17  given.

18         Do you have a copy of this?

19         MR. YALOWITZ:  I have that in the back, your Honor.

20         THE COURT:  We will skip over that.

21         MR. YALOWITZ:  They put that aside and said that's not

22  part of our in fairness designations.

23         They can pop up and say no, it is, but I think the

24  record in the correspondence between us is that their in

25  fairness designation ends at 190, line 2, and I think their

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1532

F1S8SOK1

1    silence on that is an admission here.  If they have some other

2    documentation that they did send me that, I am pleased to be

3    corrected.

4          THE COURT:  What did you intend, Mr. Hill?

5          MR. HILL:  We did intend to stop for the in fairness

6    portions at 190, line 1.  We intend to offer this portion in

7    our case.

8          THE COURT:  OK.

9          Then Al-Sheikh, I looked at that a little more

10   carefully.  On Al-Sheikh, I think the plaintiffs, if you're

11   going to read page 5, I think you should read page 14.  And I

12   think you should read page 15.  I don't think the plaintiffs

13   should have to read pages 16, 17.

14         MR. YALOWITZ:  I think the problem here, your Honor,

15   is somehow what the defendants have given you is broader than

16   what their in fairness designations are.

17         THE COURT:  That might be my mistake by not reading

18   the correspondence.

19         MR. YALOWITZ:  There has been so much paper flying at

20   you.

21         THE COURT:  Do I have a copy of that letter?  Was that

22   letter sent to me?

23         MR. YALOWITZ:  Yes.

24         THE COURT:  No.  The defendants' letter that you say

25   you got narrowing the request, did I get a copy of that?

1533

F1S8SOK1

1          MR. YALOWITZ:  It's an e-mail that somebody on Mr.

2     Rochon's team sent to me on Friday night.  Then I reproduced it

3     in my chart.

4          THE COURT:  I am still going off of the yellow and the

5     green.

6          MR. YALOWITZ:  It's overbroad.  What you have got in

7     front of you is their whole everything designations, not their

8     in fairness.

9          So I am happy to either hand you up a copy of my

10     letter, which I think with one exception we talked about

11     faithfully reproduces their request, or I can just read it out

12     to you and we can go line by line.

13          THE COURT:  If there is something at issue still, you

14     have to tell me.  Because you gave me a letter that said that

15     you objected to all the pages 72 through 74.

16          MR. YALOWITZ:  I was going to take you there, your

17     Honor.

18          With regard to Al-Sheikh, we have got one, two, three,

19     four, five.  We have got passages where we are in dispute.  We

20     have got a bunch of passages where they have made an in

21     fairness counterdesignation and I have said fine, I don't care.

22     It's not like I am fighting them on every single one.

23          THE COURT:  You had no objection to most of it.

24          MR. YALOWITZ:  Right.

25          So 72, 14, through 74, 6, we talked about.  My big

1534

F1S8SOK1

1    problem with part of that is that Al-Sheikh doesn't have any

2    personal knowledge of some of the things he says.  And they

3    never foundationalize him.  He says all of the PA's buildings

4    were destroyed.  How could he know that?  They didn't ask him

5    did you take a census or anything like that.  If he wants to

6    say the political situation is unstable, he knows about that,

7    but all their buildings were destroyed?

8            THE COURT:  I don't know if he doesn't know about

9    that.  I don't know how many buildings we are talking about and

10   I don't know whether he got up and went to work one day and all

11   the buildings were destroyed.  I don't have any basis to say

12   that's hearsay.  The question was asked and there was no

13   objection.

14           MR. YALOWITZ:  I am sorry?

15           THE COURT:  The question was asked and there was no

16   objection on that basis.

17           MR. YALOWITZ:  This is as if the witness is sitting in

18   the courtroom.  So all objections are preserved except to form.

19           THE COURT:  But sometimes you made objections and

20   sometimes you didn't.

21           MR. YALOWITZ:  I wasn't at these depositions.

22           THE COURT:  I understand, but the lawyers sometimes

23   make objections and preserve those objections for later on.

24   That was not an objection made at the time to the answer.

25   Nobody said objection, hearsay, but go ahead and answer the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1S8SOK1

1    question anyway.  I don't have any basis to read this to

2    conclude that this is hearsay.

3         MR. YALOWITZ:  I am not saying it's hearsay; I am

4    saying he has no personal knowledge.

5         THE COURT:  That's hearsay.

6         MR. YALOWITZ:  He could be making it up.

7         THE COURT:  But I don't know.  Why would I conclude

8    that?  I would only exclude it if I had a basis to conclude

9    that either he is making it up or somebody told him this rather

10   than this is something that he saw.  I can't take this as

11   opposed to anything else he said and assume that this is

12   supposed to be hearsay.  He says the buildings were destroyed.

13   I assume that he knows that the buildings were destroyed.

14        MR. YALOWITZ:  Let me explain my thought process and

15   we will be guided by you on this obviously, but let me take you

16   to what my thinking is as to why I think it is an inappropriate

17   counterdesignation.

18        Number one, it's not responsive to the question.  So

19   this is just something that the witness blurts out, number one.

20        Number two, because the defendants are offering it

21   affirmatively, they are offering it affirmatively, it's their

22   burden to make some establishment that he knows what he is

23   talking about.  All they have to do is say, in cross at the end

24   of the deposition, now you said some stuff, how do you know

25   that?  They chose not to do that because he is their witness,

F1S8SOK1

1    he is their employee.  They figure they can bring him to trial.

2              THE COURT:  This was the plaintiffs' examination.

3              MR. YALOWITZ:  It was not a plaintiff in this case.

4              THE COURT:  You can't use that for any purpose at this

5    point because you want this transcript in evidence.  And you

6    can't argue I should allow it in evidence but at the same time

7    I am supposed to somehow say that you didn't have an interest

8    in making an appropriate record here because you weren't the

9    party.  You are the one that wants this deposition in.  You

10   can't have it both ways.  It's either in fairness a deposition

11   that the parties can use against or for both sides or it's not.

12             MR. YALOWITZ:  Look, I don't want to get ahead of

13   myself because I do want to put something in.  We have been

14   looking at that question and we have found some cases.  I

15   believe I will be able to put something in in the next day or

16   two on that very topic.

17             My problem with this particular thing is it's not

18   responsive to the question.  I am just talking about this line.

19   It's not responsive to the question.  His testimony is he got

20   paid for six years.  Then there was this period of time when he

21   was in transition, and they asked him a question about -- the

22   question I have a problem is, they say, How long was the period

23   of time?  And he never answers that question.

24             THE COURT:  He says he didn't know.

25             MR. YALOWITZ:  Right.

F1S8SOK1

```
 1              THE COURT:  Then the question was --
 2              MR. YALOWITZ:  Then they say, well, do you mean nobody
 3    knew?  He says, no, I mean all the buildings were destroyed.
 4              THE COURT:  That plaintiffs' attorney asked him the
 5    question, Do you mean that nobody knew how long the period was
 6    that you could continue receiving a salary?  He asked him what
 7    he meant and his response was, this is what I mean.  That was
 8    directly responsive to the question.  He said there was so much
 9    confusion and violence going on, all the buildings got
10    destroyed.  That's why I can't tell you exactly when it did
11    because there was chaos when all the buildings were destroyed.
12    That's directly responsive to the question.
13              MR. YALOWITZ:  I understand the ruling.  Let's keep
14    going.
15              THE COURT:  You might convince me if they want it
16    read, maybe they can read it themselves, but that's awkward
17    given the line of questioning.
18              MR. YALOWITZ:  We will deal with the logistics.  We
19    will figure out the logistics.  Let's keep going.
20              THE COURT:  Then you said 140.
21              MR. YALOWITZ:  Hold on one second.  122, I don't have
22    a problem with their counterdesignations, but there is some
23    additional things I want to read just to put them in context.
24    I don't think there is a problem with that.
25              THE COURT:  Make sure they know what you're completely
```

1538

F1S8SOK1

 1    going to read and if there is objection, let me know.  If they

 2    say, because you want to read more, they have some other

 3    counterdesignations, you can let me know.  But why don't you

 4    discuss that with them before you discuss that with me.  If

 5    there is no problem, then you don't even have to discuss it

 6    with me.

 7            MR. YALOWITZ:  They will let me know if they have a

 8    problem with it; otherwise, I will assume that what is in my

 9    letter is OK.

10            MR. HILL:  If it's page 122, lines 12 to 23, I do not

11    object to that being read at the same time.

12            THE COURT:  Is that it?

13            MR. YALOWITZ:  The other one we have is 123, lines 7

14    through 16.  I am not hearing any objection from the defense on

15    that.

16            THE COURT:  He is still reading.

17            MR. HILL:  You should read through 19 so you can get

18    the whole answer.  Otherwise, it's fine.

19            MR. YALOWITZ:  This is the first I heard that they

20    have a problem with this.

21            THE COURT:  If you two would talk to each other a

22    little more, it wouldn't be the first that you have heard.

23            MR. YALOWITZ:  That's fine.

24            I think your Honor has already ruled on 140 and 141.

25            THE COURT:  140 and 141, their designations you do not

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1539

F1S8SOK1

 1    have to read.

 2              MR. YALOWITZ:  Then we are on 154, line 23, through

 3    156, line 2.

 4              THE COURT:  I don't have a real problem with the

 5    admissibility of this testimony.  I am just not sure in

 6    fairness it should be your burden to read it.  If they want it

 7    in, they should read it.

 8              I don't have a strong opinion about it.  Some of it

 9    does relate to budget, but I think a different kind of point is

10    being made.  I think the point that is being made is making the

11    points about spending money for humanitarian aid and all that

12    kind of stuff.  Obviously, it doesn't advance your argument one

13    way or the other whether or not money is going to Al Aqsa.

14              MR. HILL:  It would affect the issue whether the money

15    was given with the knowledge that it would be used for

16    terrorism as opposed to some other purpose.

17              THE COURT:  That's what I said.  It may be something

18    that you believe is relevant to put in, but in fairness it's

19    not necessarily what he should be required to read.

20              MR. HILL:  The reason we contend it is in fairness is

21    because as the examination continues, Mr. Al-Sheikh is

22    confronted with two documents that are already in evidence here

23    and asked about who the payments are made to.  So the jury is

24    entitled we believe to hear Mr. Al-Sheikh's explanation that

25    those were humanitarian in nature as opposed to what Mr.

F1S8SOK1

1    Yalowitz intends to argue, that they were in support for

2    terrorism.

3         THE COURT:  I don't know what part you're talking

4    about because the designations I have, literally from page

5    147 -- the designations I have from pages 153 through 175 are

6    all your designations.

7         MR. HILL:  Yes, sir.

8         THE COURT:  I don't know which question you're talking

9    about.

10        MR. HILL:  Particularly, we are talking about 154,

11   line 23, through 156, line 2.

12        THE COURT:  What are you saying is being inquired

13   about there?

14        MR. HILL:  Mr. Al-Sheikh is being asked about requests

15   he would make to Yasser Arafat for payments to certain people.

16   This is on 155, line 8.  For instance, I used to present to Abu

17   Ammar humanitarian aid.  In this instance I presented to him

18   people.  Let's say, he would wire to each person $600,000.

19        THE COURT:  I didn't follow your point.  You said he

20   was being asked by the plaintiff and then you quoted me this

21   portion that you wanted read.  What is the part --

22        MR. HILL:  That it relates to?

23        THE COURT:  Yes.

24        MR. HILL:  If you look at page 202.

25        THE COURT:  It's a little awkward to say it relates to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1541

F1S8SOK1

1    something that is 20 pages later.

2         MR. HILL:  He says, What is this document?  I

3    presented this to Yasser Arafat, financial aid for certain

4    people.  So this is the type of document on 202 that he is

5    being examined about, that he is earlier more generally being

6    examined about on pages --

7         THE COURT:  Where does it say that?  What line is a

8    line that one would say is the type of document or the type of

9    payment that he was shown?

10        MR. HILL:  Following on then, on page 203, he

11   identifies the handwriting.  Then we get to line 16.  He says,

12   What did you write in this letter?  The answer on line 18 is, I

13   requested from Abu Ammar to allocate money for three people.

14        So this is a specific example of the general practice

15   of requesting humanitarian aid.

16        THE COURT:  What difference does it make whether it's

17   humanitarian aid or not humanitarian aid for the jury to

18   understand the process that is being required here?

19        MR. HILL:  It makes a difference because the

20   plaintiffs are arguing, as I understand it, that these payments

21   to persons who are not perpetrators in this case are somehow

22   relevant to whether or not the PA or PLO was supporting

23   terrorism.  So the jury in fairness should hear the testimony

24   from Mr. Al-Sheikh that these requests for payments are in fact

25   humanitarian in nature, in contrast to what the plaintiffs want

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1542

F1S8SOK1

1     to argue is that they support terrorism.

2            THE COURT:  I understand your point.  The distinction

3     that I am not following is that why is the jury entitled to

4     hear it from the plaintiff?

5            MR. HILL:  Because in fairness they should be told

6     that the documents that they are hearing testimony about

7     starting on page 202 are characterized by the witness as

8     humanitarian requests on the earlier pages of the transcript.

9            THE COURT:  He never references that document before

10    he is shown that document.  He never says that's a humanitarian

11    payment.  Where does he say that this document corresponds to a

12    humanitarian payment?

13           MR. HILL:  He is talking about a general practice of

14    requesting humanitarian payments and later in the examination

15    he is confronted with the specific details.

16           THE COURT:  No, he is confronted with a document.  It

17    doesn't say I am showing you a document that represents

18    humanitarian payments.

19           MR. HILL:  Page 202, line 16:  I presented this Yasser

20    Arafat, financial aid for certain people.

21           THE COURT:  The question is what is this document?  He

22    doesn't say it is humanitarian aid.  He says I presented this

23    to Yasser Arafat, financial aid for certain people.

24           MR. HILL:  Yes, sir.

25           THE COURT:  The jury understands that.  I'm not quite

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1543

F1S8SOK1

1    sure what that whole line of questioning somehow clears up for

2    the jury that they don't understand given what they know about

3    this case.

4         As I say, they haven't convinced me that you're wrong,

5    that it's relevant, if you want to argue about that point and

6    you want to say that this makes that point.  But I think that's

7    for you to put forward as an explanation and for you to read

8    and it's not their responsibility to do it.  It's not their

9    position, that's for sure.

10        MR. HILL:  It's definitely not their position.  That's

11   why we thought in fairness it should be included, but I

12   understand the court's ruling.

13        MR. YALOWITZ:  So this whole thing is out, your Honor,

14   154 through 158?

15        THE COURT:  You will not be required to read it, but I

16   don't want to mislead you that it's out when it's likely to

17   come in.

18        MR. YALOWITZ:  We will get you something on that.  We

19   have looked at it a little bit, and I feel pretty good about

20   our position, but I want to give it to you in writing.

21        THE COURT:  Then I think the last objection you had, I

22   think we addressed it.

23        MR. YALOWITZ:  I think you ruled on that, that

24   translators and lawyers bickering is not evidence.

25        THE COURT:  Only those portions that I specifically

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1544

F1S8SOK1

1    indicated, like the translated portion, I think is out for all

2    purposes.  There is no reason for either side to read that.

3              I don't remember if I identified any specific others,

4    but you can let me know if I missed something.  But that pretty

5    much is going to be my general position.

6              If you want to give me something further to try to

7    preclude them from offering any deposition testimony, my view,

8    unless I see something more specific, my view is under the

9    rule, particularly the subdivision (6), using part of a

10   deposition, it says:  If a party offers in evidence only part

11   of a deposition, the adverse party may require to offer or to

12   introduce other parts that in fairness should be considered

13   with the part introduced, and any party may itself introduce

14   any other parts.

15             MR. YALOWITZ:  My focus, just so we are clear, and we

16   will get you cases because the cases address this, my focus is

17   part (a)(1).

18             THE COURT:  My focus is part (6).

19             You put in the deposition testimony.  (a)(1) deals

20   with whether or not it's going to be admissible and on what

21   basis it's going to be admissible.

22             MR. YALOWITZ:  It's three legs of the stool.  You have

23   to have all three.  Leg number one, the party was present.  I

24   don't meet that.

25             THE COURT:  Then you shouldn't use it.  You want me to

F1S8SOK1

1    exclude it?  I can't let you have it in and you argue that you

2    don't meet the requirement for it coming in.

3           MR. YALOWITZ:  They don't meet the requirement.  I do.

4    Because it may be used against a party.

5           I am going to giving something in writing.  I

6    understand that there is an open question about this and if we

7    use the depositions, I understand there is an open question.

8           THE COURT:  I can't quite tell from what you have

9    given me and reading the transcript, I don't even know -- I

10   assume you are contending that this is somehow 30(b)(6)

11   witnesses, all of them, and this is somehow admissions by the

12   defendant.

13          MR. YALOWITZ:  Right.

14          THE COURT:  But I don't know who is a 30(b)(6)

15   witness.  You may tell me everybody who you designate is a

16   30(b)(6) witness in some case.  You can understand my position,

17   even if you disagree with it, that, look, no, can't do that.

18   You can't just say I have got an admissible portion of a

19   deposition, but they should be precluded, the rule precludes

20   them from offering in fairness any other portion of that

21   deposition.  That's not what the rule says.  The rule says just

22   the opposite.  It says, if you designate a portion of the

23   deposition, they can ask you to in fairness introduce other

24   portions, and they can introduce any other parts of the

25   deposition.  That's what the rule says.

1546

F1S8SOK1

1        If you have a case that says they are precluded from

2   doing that, I would like to see it because I have not found

3   such case in the Second Circuit.

4        Do you have a such a case in the Second Circuit?

5        MR. YALOWITZ:  I don't know about a Second Circuit

6   case.  I have cases from other judges of this court.

7        THE COURT:  If you have something that specifically

8   says that, then let me see which one of my colleagues said that

9   and the reason they said it and see if I agree with it.

10       MR. YALOWITZ:  We have got to look at it.  I don't

11  think it's a clear-cut.  There is no answer from the Second

12  Circuit on this.  So we will just have to look at it.  I am

13  going to get you something in writing.

14       I understand the defendants' position.  I think I have

15  support for my position.  I understand if we offer these

16  depositions, that question hasn't been answered.

17       THE COURT:  Unless there is a rule, and I don't see

18  anything in the rule precluding it, my position is this.  It

19  doesn't matter on what basis you get to use part of a

20  deposition.  Once you get to use part of a deposition,

21  regardless of what basis it comes in, then (6) applies, that

22  you can use the part of the deposition for whatever reason you

23  say it's admissible.  And if you do that, they have the right

24  to demand in fairness that you not give partial answers, that

25  you give the complete answers.  And the rule says once you put

1547

F1S8SOK1

 1    the deposition in evidence, a portion that you want, they have

 2    the right to offer any other admissible portion.

 3         MR. YALOWITZ:  OK.  First of all, what I understand

 4    the rule to do is, if you meet (1)(a), which we have to give

 5    you some cases on whether they can meet (1)(a), but if you meet

 6    (1)(a), then it's as if the witness is sitting there on the

 7    stand.  So they still have to have personal knowledge.

 8         THE COURT:  I don't say that they meet (1)(a).  You

 9    meet (1)(a).  You are the one offering this deposition.  They

10    didn't raise this issue.  You have to meet (1)(a).  You have to

11    tell me you have a basis on which to say this deposition is

12    admissible.  You say you have a basis.  I understand your

13    basis.  Once you give me a basis for admitting the deposition,

14    then the rules apply as to how that deposition is going to be

15    used.  And they don't apply by saying, well, you get to pick

16    the stuff out of the deposition that you want to read, but they

17    can't counterdesignate anything they say in fairness should be

18    read and they can't offer any other portions of that deposition

19    that you have indicated to this jury that they should rely on

20    as admissible evidence.

21         MR. YALOWITZ:  I want to give you something in writing

22    on this because I think the case law says, or some of the case

23    law says -- I think they cited an Eighth Circuit case from 1982

24    or something that says what you're saying, but I think the more

25    recent case law from this district says the opposite.  I

1548

F1S8SOK1

1    haven't looked at it.  I have got somebody looking at it.

2             THE COURT:  Just give me a cite and I will read that

3    case as soon as I have a free moment.

4             MR. ROCHON:  I have nothing on that.  I have one other

5    short thing.

6             THE COURT:  We are still short jurors.  We still have

7    three or four that we are still waiting for.

8             MR. ROCHON:  With the first three witnesses, when they

9    finished all their testimony, Mr. Yalowitz thanked them in

10   various degrees of heartfeltness, but unfortunately in the

11   presence of the jury right here.  I would like to avoid that

12   going forward.  I think the thanks to the witness departing

13   really shouldn't happen in front of the jury.  And it becomes

14   more important as we come to the plaintiffs which is going to

15   be far more emotional testimony, more intense.  I don't think

16   that should happen in the presence of the jury.

17            THE COURT:  Mr. Yalowitz, can you take this issue out

18   of this case.

19            MR. YALOWITZ:  I think you're allowed to show

20   affection to your client in front of the jury.  I understand

21   why --

22            THE COURT:  You have got a case for that?

23            MR. YALOWITZ:  I have never looked at it because I

24   have never had anybody say I don't want them to do that.

25            THE COURT:  As I say, you both can't have it both

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1549

F1S8SOK1

1     ways.  I am doing my best to try to make sure this jury decides
2     this case on the substance and on the merits and without any
3     emotionally or politically charged issues that others may bring
4     into this case.  I think if you want me to do that and protect
5     you from them doing that, then I have to apply the rules
6     straight across-the-board.
7            There is no utility for you to thank the witness in
8     front of the jury for anything.  I don't care who it is.  Let's
9     just leave that out.  Everybody leave that out.  Let the
10    witnesses come in, give their testimony, let them leave.
11    Whatever you want to say to them, comfort them or do whatever
12    else you want to do outside the presence of the jury.
13    Otherwise we run a risk.
14           MR. YALOWITZ:  Frankly, every time I do a normal thing
15    I get something an application to the court to have me not do
16    it.  When we said terror cell, we had a problem with that.  We
17    don't say the word terrorism.  We had a problem with that.
18    Don't comfort your client?  We are going to have people weeping
19    on the witness stand and I am supposed to stand there like a
20    automaton.
21           THE COURT:  You're supposed to be professional.  I
22    have had plenty of experience with emotional witnesses and if
23    it's necessary, we can take a break.  We can offer them water.
24    We can offer them a tissue.  We can do whatever you want to do.
25    But it's not your time to do anything of greater significance

1550

F1S8SOK1

1  in front of the jury.  If you want a break to comfort your

2  witness, then you ask for a break and we will take a break and

3  then you can say or do whatever you think is appropriate to

4  compose your witness.

5        You may not like them picking at you, but you don't

6  need this in this case and it's not an appropriate place for it

7  in this case.  OK?

8        MR. YALOWITZ:  I will abide by the court's instruction

9  on this.  I have to tell you, I am very disappointed in the

10  professionalism of the defense.

11        THE COURT:  You have told me that 20 times already.  I

12  don't know what you want me to do with it.  If you want to

13  vent, I will give you another couple seconds to vent.  But it

14  doesn't affect my judgment to make sure this case is fairly

15  presented.

16        MR. YALOWITZ:  I don't want to vent.  I want there to

17  be a consequence the next time we get a politically loaded

18  question, the next time we have questions that are designed to

19  elicit sympathy for the Palestinian people.  It's not relevant

20  to this case how many people were injured.

21        THE COURT:  Mr. Yalowitz, if you think that somehow I

22  have been unfair in my rulings, I have handled the lawyers one

23  way differently than I handled their lawyers, you can point

24  that out to me and I will attempt to do a better job.  I have

25  tried to across-the-board, in fairness, treat those issues the

1551

F1S8SOK1

1  same.  I just can't hear from you that you want to see me pick

2  on them.

3          MR. YALOWITZ:  I think you have fairly warned them.  I

4  think you have appropriately sustained objections.  I am not

5  complaining about that.  I am looking to the future, not the

6  past.

7          In the future, I don't want to hear those kinds of

8  politically loaded questions, politically loaded behavior, and

9  I think that they need to be -- they are saying, oh, we don't

10  want Yalowitz to say thank you to the witness.  Well, I don't

11  want the defendants asking inappropriate questions that you

12  have repeatedly ruled are inappropriate and that from the very

13  beginning they have said they weren't going to do.  They stood

14  up here and said it's not appropriate to bring politics into

15  this case.  And then you heard his questions.

16          THE COURT:  What else do you want me to do about it,

17  Mr. Yalowitz?

18          MR. YALOWITZ:  I think if they do it again, they

19  should be admonished in front of the jury.

20          THE COURT:  If you do it, should I do the same thing?

21          MR. YALOWITZ:  I welcome the same level of scrutiny.

22          THE COURT:  I will take the action that I deem is

23  appropriate at the time and the action that I think is

24  warranted by the extent of the egregiousness of the conduct and

25  to the extent that I don't unduly prejudice either side by

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1552

F1S8SOK1

1    inappropriately admonishing you or Mr. Rochon or Mr. Hill or
2    anybody from either side with regard to an issue.
3            MR. YALOWITZ:  Nobody could ask for anything better
4    than that.
5            THE COURT:  I intend to do that.
6            Did you have something, Mr. Rochon?
7            MR. ROCHON:  Only if the court needed me to respond to
8    anything.
9            THE COURT:  No.  If you could just quickly respond, do
10   you have any position with regard to the letter that I received
11   about Dr. Perry or Dr. Strous?
12           MR. HILL:  Dr. Perry is a treating physician who
13   treated Shaul Mandelkorn.  As your Honor knows, Shaul
14   Mandelkorn is not U.S. national and his claims have been
15   dismissed.  So our position is that we should not be hearing
16   testimony from the treating physician of Shaul Mandelkorn about
17   injuries to Shaul Mandelkorn.
18           THE COURT:  It depends.  If the injury is supposed to
19   be as a result of PTSD that Leonard Mandelkorn saw his son
20   experience, who is supposed to give me testimony that Shaul has
21   PTSD?
22           MR. HILL:  My position is whether or not Shaul as a
23   technical matter has PTSD is irrelevant to Leonard Mandelkorn's
24   damages.  Leonard Mandelkorn's damages will be based on his
25   knowledge of his son, his interactions with his son.  And

F1S8SOK1

1   Leonard Mandelkorn will be able to testify about his injuries.

2           Now, Dr. Strous has also evaluated Leonard Mandelkorn.

3   I have no objection to Dr. Strous testifying about Leonard

4   Mandelkorn's injuries.  However, I do have an objection to Dr.

5   Strous testifying about Shaul Mandelkorn's injuries, and for

6   that matter, Leonard Mandelkorn's wife Nurit's injuries.

7           So to the extent people are no longer plaintiffs, our

8   position is that doctors are not to be testifying about

9   injuries, be they mental or physical or economic, to

10  nonplaintiffs.

11          THE COURT:  In the abstract, and I don't have as much

12  detail as you, but in the abstract I don't have a problem if

13  the plaintiff believed that they have a sustainable theory that

14  the injuries suffered by Leonard Mandelkorn was as a result of

15  observing and having knowledge of the condition that his son

16  suffered as a result of the incident.  I think that is a

17  legitimate issue on which they should have the right to present

18  evidence.

19          So I don't know to what extent that they intend to go

20  into the, as you say, injury of Shaul, but I think that it

21  doesn't preclude someone explaining, an expert or treating

22  physician explaining what condition that Shaul Mandelkorn was

23  experiencing that caused the injury to Leonard.

24          Now, I don't know to what extent they want to go

25  through these.  I don't know there is much relevance beyond

1554

F1S8SOK1

 1    explaining what his condition was and what symptoms manifest

 2    itself, to the extent that those are symptoms that, a condition

 3    about which Leonard had knowledge and adversely affected

 4    Leonard to the extent that he suffered injury that should be

 5    compensated in damages.

 6          So unless you can articulate something specifically

 7    that he is going to say, where I can either rule that's in or

 8    that's out, I think they have some leeway with regard to

 9    presenting some basic information about what physical or

10    emotional condition that manifested itself, or of which Leonard

11    was aware, that they claim caused Leonard injury that they are

12    seeking to have compensated.

13          MR. HILL:  Part of this is I don't know exactly what

14    Dr. Perry is going to say, but as I understand it, Dr. Perry

15    did not treat Leonard Mandelkorn, and the plaintiffs can tell

16    me if I am wrong about that.  So I don't see how Dr. Perry, as

17    the treating physician for Shaul, will have personal knowledge

18    of the effect of Shaul's injuries on Leonard.  That's my

19    objection to Dr. Perry.

20          THE COURT:  It seems to me that it's admissible within

21    the area of being in the abstract admissible, that the doctor

22    says, look, I don't know about Leonard, and I don't know what

23    Leonard is going to say, but I can tell you that Shaul had X

24    condition and X symptoms.  Now, to the extent he says that, and

25    to the extent that Leonard testifies that I was emotionally

F1S8SOK1

1    damaged knowing that my son had this condition and seeing the

2    symptoms of how they manifest, I think the jury has some right

3    to understand what that is, particularly if they are going to

4    make some assessment beyond what Leonard just happens to say

5    that my son was depressed every day and that made me depressed.

6              Well, that doesn't tell me the extent of this

7    depression.  It doesn't tell me what caused this depression.

8    They even have a causation issue to address to show that the

9    cause of the PTSD is the terrorist act for which the defendants

10   are responsible, the knowledge of which or experience of which

11   caused Leonard's compensable injury.

12             MR. HILL:  I understand your Honor's ruling.

13             Let me raise one other issue, which is Dr. Perry also

14   apparently intends to testify about the reputation of Stuart

15   Scott Goldberg.

16             THE COURT:  I didn't follow that at all.

17             MR. HILL:  I don't think that should be admitted.

18             THE COURT:  I just don't know the relevance of that

19   issue.

20             MR. HILL:  Mr. Goldberg is also not an American

21   national and his claims and the claims of his estate were

22   dismissed by your Honor.  So, therefore, we don't think his

23   professional reputation is relevant to any issues.

24             THE COURT:  Even if he was here, what is his

25   professional reputation, you want to put that in issue?

1556

F1S8SOK1

1        MR. YALOWITZ:  Let me pass over the reputation.  I

2  will just tell you what we learned from Perry.  Perry actually

3  shared office space with Goldberg and so he saw the family in

4  the aftermath of the murder of Goldberg.

5        THE COURT:  Goldberg is not in this case.

6        MR. YALOWITZ:  The whole family is.  So he can give a

7  before and after.  It goes to what they lost.

8        (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1sQsok2

1      (Jury not present)

2           THE COURT:  The way you characterized it is that there

3      were long-term injuries suffered by Leonard and that Peri is

4      going to talk about the professional reputation of Scott

5      Goldberg.  I am sure you are not saying that they damaged his

6      reputation, and that's what caused injury to his family.

7           MR. YALOWITZ:  No.  What I was thinking last night --

8      and I may stand corrected on this:  There are two things, one

9      of which I think may be out, and one of which I think is

10     definitely in.

11          So what I was thinking was in but may be out now that

12     your Honor has asked me about it is the lost earnings of

13     Goldberg himself, his lost earnings.

14          THE COURT:  Right.

15          MR. YALOWITZ:  Which his reputation would go to.

16          THE COURT:  But who damaged his reputation?

17          MR. YALOWITZ:  No.  No.  He had a fine reputation.  He

18     had a nice practice.  He had a lot of patients coming to him,

19     and, therefore, he had good earning potential; not that anyone

20     hurt his reputation but that he had good earning potential.

21          THE COURT:  I understand it a little better now, but I

22     am not sure why that plays a part in terms of damages of the

23     family.

24          MR. YALOWITZ:  I think you may be right about that.

25          THE COURT:  They could not sue for his lost earnings.

F1sQsok2

1          MR. YALOWITZ:  I think you're right.  I think that

2     part is wrong.

3          The other thing though is that he knew the family; he

4     saw the circumstances of the family.  It is a classical sort of

5     wrongful death.  They were a nice family.  They were close.

6     They came to the office afterward, and he could give a little

7     perspective on who he was.

8          THE COURT:  We can discuss further whether any of that

9     would be admissible, but that's not what you addressed in the

10    letter.

11         MR. YALOWITZ:  I apologize for that.

12         THE COURT:  I wasn't clear.

13         All our jurors are here.  Let's go back to cross and

14    then we will proceed.

15         (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1559

F1sQsok2

1      (Jury present)

2          THE COURT:  Good morning.  Luckily, the weather wasn't

3      as bad as it was predicted, but I think it was prudent for us

4      to adjourn until today.  We are ready to proceed.  I appreciate

5      your coming in even now because I know the weather is still

6      bad.  It's treacherous out there.  Be careful as you're

7      traveling.

8          At this point we are going to continue with the

9      cross-examination by Mr. Hill and hopefully we can make up some

10     of the time.

11      ISRAEL SHRENZEL, resumed.

12     CROSS-EXAMINATION

13     BY MR. HILL:

14     Q.  Good morning, Mr. Shrenzel.

15     A.  Good morning to you.

16     Q.  I'd like to talk to you about the attack on June 19, 2002.

17     The binder for that attack mentions just one individual who was

18     involved in that attack.  Sa'id Awada, correct?

19     A.  Yes.

20     Q.  Sa'id Awada was not a PA employee as of June 19, 2002,

21     correct?

22     A.  Yes.  He was 17 years old.  Yes.

23     Q.  He did not work for the PA, correct?

24     A.  As far as I know, he didn't.

25     Q.  Let's look at what's in evidence as Plaintiff's Trial

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1sQsok2                    Shrenzel - Cross

1    Exhibit 19.  This is the martyr file for Mr. Awada, correct?

2    A.  Yes.

3    Q.  If we could look at wage 6828, at the top under personal

4    information, under the heading previous employment, it

5    indicates that Mr. Awada was a construction worker, correct?

6    A.  Yes.

7    Q.  You have testified about payments that were made to

8    prisoners and their families after the attacks, correct?

9    A.  Yes, I did.

10   Q.  You would agree that those payments to prisoners and their

11   families were not the direct cause of the perpetration of these

12   attacks, correct?

13             MR. YALOWITZ:  Objection.

14             THE COURT:  Sustained as to the form.

15   Q.  The people who committed these crimes didn't do so in order

16   to get payments for their family while they were in prison,

17   right?

18   A.  Yes they --

19             MR. YALOWITZ:  Objection.

20             THE COURT:  Overruled.  You can answer that.

21   A.  The money issue was a factor.  It was a contributing factor

22   to their motivation, but I would like to stress that their main

23   motivation was brought about by the deeds and misdeeds of the

24   defendants, and the defendants did much worse things than

25   providing salaries to the families.

1561

F1sQsok2                    Shrenzel - Cross

1   Q.  Sir, you would agree that the payments to prisoners and

2   their families were not the primary objective for committing

3   the crime, right?

4           MR. YALOWITZ:  Objection.

5           THE COURT:  Overruled.  You can answer.

6   A.  No.  Although it's, of course, nice to know that once you

7   are in jail, you get your salary or either your family is

8   compensated and that your name is going to be attached, as you

9   mentioned on Monday, to forms that praise you, etc., etc., but

10  it was not the central factor.

11          The central motivation was the way the perpetrators of

12  the attack and the planners, all the people involved that we

13  have discussed here, what did they understand Arafat's policy

14  from the PA leadership, what did they understand, and they

15  understand that we are now launching a wide-scale terrorist

16  campaign against Israel.  We are supporting terrorism.  We are,

17  in fact, becoming a terrorist entity.  That's what they

18  understood.  And this is far worse than post factum supplying

19  material assistance which in itself, as I said, is a

20  contributing factor.

21  Q.  You would agree that payments of money to families of

22  martyrs did not motivate the suicide attackers to do the

23  attacks, right?

24          MR. YALOWITZ:  Objection.

25          THE COURT:  Overruled.  You can answer.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

F1sQsok2                    Shrenzel - Cross

1   A.  Of course that was not a motivation.  The motivation what

2   Arafat preached, what Arafat decided, what Arafat condoned,

3   what orders and what atmosphere was created by the PA, an

4   atmosphere of an all-out attack against the Israel contrary to

5   the commitment, the written commitment of the PA during the

6   Oslo Accords' years.

7          So this shift of policy which was basically very

8   tragic for both people, both the Palestinians and the

9   Israelis -- this shift of policy is the main theme of the PA

10  leadership, and, as I say, the introduction of terrorism and

11  the fact that it -- that some of the security apparatuses

12  become tools for terrorism, and the main organization of the PA

13  that is identified with Fatah also became part of the terrorism

14  machine of the PA.  These are the main motivations.

15         So Palestinian operatives ask themselves, what is

16  expected from me?  Yes, in the year 2000, when it was the

17  eruption of Fatah and forward.  What is expected for me?  What

18  Arafat wants for me?  What Fatah wants for me?  What should I

19  perform as a member of the security apparatuses?  And the

20  answer was:  You should participate -- his understanding was:

21  I should take active role in the attacks against Israel.

22  That's what the main motivation.

23         OK, it's nice if I have to sacrifice my life, my

24  family will be compensated.  That's very nice, but that was not

25  the main factor.

F1sQsok2                    Shrenzel - Cross

1   Q.  This is not the first time you have testified in this case,

2   is it, sir?

3   A.  Yes, I have a deposition with Mr. Satin.  Yes.

4   Q.  You have previously testified that suicide attackers

5   certainly didn't do so in order for their families to receive

6   martyr payments, correct?

7   A.  Yes, I did, and I stick to it.  Yes.

8   Q.  In fact, you testified that that would not even be logical,

9   correct?

10  A.  Yes.

11  Q.  You also testified that you didn't have any evidence that

12  the perpetrators in these cases did their crimes in order to

13  receive prison payments, correct?

14  A.  Yes -- I think I explained my position at length, and I can

15  reiterate it.  The responsibility lies with the defendants,

16  yes, with the defendant's policy, this is the main issue:  The

17  sudden shift of death, the sudden shift of policy that resulted

18  in Israel finding itself confronted with such a widespread

19  terrorist attack.  I don't think anyone is going to detonate

20  himself just on the idea that his family is going to get money,

21  yes.  It's far more deep and profound.

22  Q.  You testified about some language that was found in certain

23  magazines, right?

24  A.  Yes, I did.

25  Q.  You don't actually know who read those magazines, right?

F1sQsok2                    Shrenzel - Cross

1   A.  On a one-to-one basis, of course I don't know who reads The

2   New York Times --

3   Q.  You don't have any evidence that any of the perpetrators of

4   the attacks in issue in this case actually read any of these

5   magazines right?

6   A.  No, I don't have a definite knowledge of that.

7   Q.  Mr. Yalowitz read some portions of those magazines to the

8   jury, correct?

9   A.  Yes, he did.

10  Q.  He did not read the entire magazine, correct?

11  A.  It was up to him to choose, and I -- as I rely on you, I

12  rely that he made it wisely, yes.

13  Q.  He didn't read even the entire articles, did he?

14  A.  OK.  Yes.

15  Q.  In some instances, he didn't even read the entire

16  sentences, did he?

17  A.  This I don't know.  I really can't tell.

18  Q.  Let's take a look at one.  Let's take a look at Plaintiff's

19  Exhibit 175, which is in evidence.  This is one of the

20  magazines that Mr. Yalowitz read from, right?

21  A.  As I said, so much was read to my ears during these days,

22  but I rely on you.  If you said it was read, I accept it.

23  Q.  Let's look at page which is page 00171 T in the middle.  If

24  you could call out that paragraph that starts with "The

25  European nations" and highlight the portion through the word

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1565

F1sQsok2                        Shrenzel - Cross

1  communities.

2          So this is the portion of this magazine that

3  Mr. Yalowitz read, right?

4  A.  Yes.

5  Q.  It reads: "The European nations and the U.S., who have

6  strategic interests in the region, are called upon to see the

7  necessity of urgent and immediate action to stop Israeli

8  practices against the Palestinian people.  Without this, their

9  vital interests shall be directly jeopardized, and this shall

10  redound adversely on their people's and communities."

11          Do you see that?

12  A.  Yes.

13  Q.  That's where Mr. Yalowitz stopped reading, right?

14  A.  If you say so, OK.

15  Q.  Just continue let's show the rest of the sentence.

16          The rest of the sentence says: "Since the Arab and

17  Islamist communities in these countries play a prominent role

18  pressuring these governments by turning out for impressive,

19  peaceful marches aimed at getting foreign nations to exert

20  positive and effective pressure on Israel.  These communities

21  speak the word of truth and justice in relation to our

22  Palestinian people, who continue to suffer under the most

23  extreme example of occupation in the world."

24          Mr. Yalowitz did not read that portion, did he, sir?

25  A.  OK, yes.

F1sQsok2                    Shrenzel - Cross

1   Q.  He also didn't read the next paragraph.  Let's show that

2   one, Justin.

3           This paragraph says:  "A Real War.  The Israelis

4   consider the Palestinian Intifada to be a real war and to wage

5   it, they utilize airplanes, tanks, rockets and all the lethal

6   and internationally prohibited weapons.  The Palestinian side

7   considers the Intifada to be peaceful for it uses only sacred

8   stones to wage it.  It is therefore incumbent on peace-loving

9   nations to point a finger of accusation at Barak and his

10  military establishment, because he is an aggressor who is

11  waging a real war against the Palestinian people."

12          Barak was the prime minister of Israel at the time,

13  wasn't he?

14  A.  Yes, he was.

15  Q.  The next sentence says:  "To this we say that the bloodshed

16  of martyrs shall not being in vein, for through the

17  accumulation of Palestinian bloodshed, we succeeded in forging

18  the 1988 declaration of independence and succeeded in getting a

19  real and true Palestine recorded on political and geographic

20  maps.  And through the accumulation of Palestinian bloodshed,

21  we shall announce the establishment of our independent

22  Palestinian state on all the lands that were occupied in 1967.

23          "The Palestinian people are among the people's of the

24  world most deserving of independence and their martyrs,

25  wounded, prisoners and disabled have led the way, as these

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1567

F1sQsok2                      Shrenzel - Cross

1   martyrs are the sons of the Palestinian state.  Without them,

2   we shall not succeed in achieving our nationalistic goals,

3   foremost among these the establishment of an independent

4   Palestinian state with its capital in Jerusalem.  And despite

5   all this, the Palestinian people are still striving for a just

6   and comprehensive peace, and still seeking to reclaim usurped

7   rights that are so inconsistent with the spilling of blood and

8   killing of innocent children."

9              Mr. Yalowitz didn't read that section either, did he?

10  A.  Yes, but let me remind you, I find it a little bit awkward

11  that I have to relate to what Mr. Yalowitz did or didn't do.  I

12  better refer to what I did and what I said.

13             MR. HILL:  I have no further questions, your Honor.

14             THE COURT:  Mr. Yalowitz, any further questions?

15             MR. YALOWITZ:  Briefly.

16  REDIRECT EXAMINATION

17  BY MR. YALOWITZ:

18  Q.  Let me begin with Exhibit 175 that Mr. Hill was just asking

19  about.  Do you recall the date of that or should we pull it up

20  and find it?

21  A.  Yes.

22  Q.  Let's pull it up and find it.  Can you see it on the

23  screen?  Does it show the date?

24  A.  Yes, this is of November 2000.

25  Q.  Following November of 2000, as we went into 2001, 2002,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1sQsok2                      Shrenzel - Redirect

1    2003, did you have the opportunity to examine these four

2    security apparatus magazines we were talking about?

3    A.  Yes, I did, as I said in my direct examination.

4    Q.  Could you just give your recollection of the degree to

5    which the pro-violence rhetoric -- do you recall whether the

6    rhetoric concerning violence by the Palestinian police

7    intensified, decreased?  What did it do?

8    A.  Yes, I believe we see a gradual degree of intensification

9    of the level of incitement of calling upon the apparatuses to

10   take part in activities against Israel; and more than that, in

11   creating an atmosphere.  This is the crucial issue.  There was

12   an atmosphere, either those were employees of the PA, either

13   they read it, either they were exposed to announcement by the

14   commanders that are in compliance with the messages that are

15   listed here.  So the overall atmosphere grew more and more

16   violent.

17            If you check, for example, how many times the notion

18   of blood, the notion of martyrdom is repeatedly mentioned.

19   Again, we should look at it from the point of view of the

20   potential reader or the potential employee of the PA, what he

21   understands.  He understands that he as a PA officer --

22            MR. ROCHON:  Objection, your Honor.

23            THE COURT:  Overruled.

24   A.  He understands that he as an employee of the PA or as a

25   Fatah member or both, both a Fatah member and PA employee, he

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1569

F1sQsok2                    Shrenzel - Redirect

1    shouldn't contribute to calm down the situation he shouldn't

2    condemn terrorist activity.  He shouldn't look upon other

3    employees who carry out suicide attacks as murderers, as

4    criminals.  He should probably himself contribute to that

5    wide-scale attack that I have referred to previously.

6    Q.  Do you recall seeing issues of these magazines calling on

7    people to engage in liquidation or extermination or things like

8    that?

9            MR. ROCHON:  Objection.  Leading.

10           THE COURT:  Overruled.  You can answer.

11   A.  They were.  They even reached that part, our part that

12   speaks about the Jews and descendents of monkeys and pigs; that

13   there are anti-Semitic expression.  Usually they refrain from.

14           MR. ROCHON:  Objection.

15           THE COURT:  No, overruled.  He was asked about this.

16   Q.  They refrain from directly saying please go out and kill

17   all Jews or all the Israeli citizens.  But, again, it is the

18   explicit, but no less than that, the implicit messages of these

19   magazines.  And, as I said, it is really a very -- it was, I

20   believe, a contributing factor.

21           This accompanied the instructions.  This accompanied

22   the decision of Arafat.  You see there was a political decision

23   to launch a wide-scale attack and to support it; then there was

24   the actual support; and then was the whole issue of propaganda,

25   of creating the proper atmosphere in which people, for example,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1sQsok2                    Shrenzel - Redirect

1   a 17-year-old former constructor would go out and detonate

2   himself.  Yes?  Or a policeman as we saw, reading the Shurta,

3   either reading -- yes, as I said, I don't have specific

4   evidence that Said Ramadan read the specific portion, but he

5   was exposed to the atmosphere that is reflected here; and for

6   him it was clear, this is what my superiors expect from me.

7               MR. ROCHON:  Objection, your Honor.

8   A.  They want me to go out and --

9               THE COURT:  No.  Overruled.

10  A.  -- shoot indiscriminately in the streets of Jerusalem.  He

11  also could have understood it from the spirit of the magazine.

12  Q.  Now, Mr. Hill was asking you about a lot of the documents.

13  What I would like to do, I also would like to go back to some

14  of those documents.  The way I would like to do it is to look

15  in one of our binders.  I am going to hand out to the jury our

16  binder from the attack of March 21, 2002.  I think you may have

17  your binder handy behind you on that?

18  A.  Yes.

19              MR. YALOWITZ:  I need just one moment.

20  Q.  Mr. Hill was asking you about whether the PA accepted or

21  relied on the facts set forth in the martyr files.  Do you

22  remember that line of questioning?

23  A.  Could you please repeat it?

24  Q.  Sure.  Do you remember Mr. Hill asked you some questions

25  about the martyr files?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1571

F1sQsok2                        Shrenzel - Redirect

1   A.  Yes.

2   Q.  The files of the martyrs?

3   A.  He mainly asked about the issue that it was a prepared form

4   and filled in, yes.

5   Q.  So I just want to look with you on tab A of the Mohammed

6   Hashaika file, the Mohammed Hashaika packet.  Do I have it

7   right, this is Hashaika's' martyr file?

8   A.  You mean Exhibit 23?

9   Q.  Exhibit 23, yes.

10  A.  Yes, this is the martyr file.  Yes.

11  Q.  I think Mr. Hill was showing you page 2 to show you it was

12  a form that was filled out by hand some of the information.

13  Turn to the second page.

14  A.  Yes, the second page is all printed.  It's in English, so

15  maybe to look at the Arabic, no?

16  Q.  Sure.  Definitely.  Let us know when you have a chance to

17  look at it.  I want to orient us on that?

18  A.  I have the same page in English and Arabic 7305.

19  Q.  Do I recall correctly that Mr. Hill wanted to point out,

20  and you agreed with him, that some of the information is filled

21  out by hand on that form?

22  A.  Yes, it is.

23  Q.  Then I think you were saying, if I remember it right, that

24  the information was then relied on and approved by some

25  employees of the PA and the PLO?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1572

F1sQsok2                    Shrenzel - Redirect

1   A.  Yes, I said it's necessary to assume that, of course, the
2   PA cannot pay just based on a statement of a member of the
3   family.
4   Q.  Is there a place in this document where the general
5   director of this organization actually does approve?
6   A.  Yes, I also pointed to it when I was asked by Mr. Hill,
7   that after everything is reviewed, then there is -- and it's on
8   another two pages on 7307, an approval of the general director.
9   After weighing the evidence, the evidence provided to him, that
10  was his decision.
11  Q.  Then let's confirm on 7307 in the Arabic.  Does he actually
12  have that signature?
13  A.  Yes, I have it.
14  Q.  It looks like there is something, at least on the English,
15  it says audit notes?
16  A.  Audit notes.
17  Q.  Do you see where I'm looking right below "approval of the
18  general director"?
19  A.  In Arabic, it's more "comments of the inquiry" or something
20  like that.
21  Q.  So what is that?  Is that somebody checking up after the
22  director approves it?
23  A.  Maybe.  I'm not that knowledgeable about the minute details
24  of the Palestinian bureaucracy regarding this document, but
25  it's clear.  There are approval of the general director but

1    under the audit notes, there is only a signature.  Yes, so

2    maybe it's logical it seems that there is a further check of

3    this approval.

4    Q.  So based on this document, does the PLO today pay this

5    family every single month as a matter of policy?

6    A.  Yes.

7    Q.  As a policy matter, would it discourage terrorism if the PA

8    and the PLO adopted a policy of refusing to pay the families of

9    suicide terrorists?

10   A.  Yes, this would be an indication that the PA is against

11   terrorist attack.  Yes.  But this, unfortunately, was far from

12   happening.  We had all the signs of the opposite, as I tried to

13   explain.

14   Q.  Are you aware of another government anywhere in the world

15   that pays the families of suicide terrorists every single month

16   because they committed a suicide terror attack?

17            MR. ROCHON:  Objection.

18            THE COURT:  Sustained.

19   Q.  Let's look at one of the prisoner files from that case.  I

20   think we can find one, if I'm remembering right, under the

21   Nasser Shawish packet.  Shawish is the second guy in.  There is

22   a picture of him with his arms crossed, and then his prisoner

23   file looks like it's Exhibit 83 which is under tab C.  Let's

24   make sure everybody gets there.

25   A.  83.  Yes, I have that.

F1sQsok2                    Shrenzel - Redirect

1   Q.  Let's see if we can find that preprinted form which I think

2   is on 9327.  It's about 15 pages in.

3   A.  93 which?

4   Q.  9327.

5   A.  You direct me to the English or the Arabic or both?

6   Q.  Let's use both, I guess.

7   A.  So I found the English.

8   Q.  Let's start with the Arabic.  They have a couple of good

9   things on it.

10  A.  Yes, I see the Arabic as well.

11  Q.  The Arabic, kind of in the middle toward the bottom third

12  of the page has a big seal stamp on it.  Do you see that?

13  A.  Yes, this is the emblem of the PA, yes.

14  Q.  That's like the stamp of approval?

15          MR. ROCHON:  Objection, your Honor.

16          THE COURT:  Sustained.

17  Q.  Then I think Mr. Hill was pointing out that the portion of

18  the document that says that Shawish is in prison as a result of

19  his fight for his country.  That is part of the official form?

20  A.  Yes.

21  Q.  Whose words are those "as a result of his fight for his

22  country"?

23          MR. ROCHON:  Objection, your Honor.

24          THE COURT:  Overruled.

25  A.  These are the words of the ministry of prisoners, of the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1575

F1sQsok2                          Shrenzel - Redirect

1   Palestinian ministry of prisoners.  They are those who prepared

2   the form, and, as I said, they, unfortunately, attached it or

3   linked it with names of convicted murderers.  This is the main

4   problem, as I explained.

5   Q.  I just want to ask you about an answer that you gave on

6   Monday.  I will read from the transcript.  I am on 1501 to

7   1502.

8           You said:  "The whole idea of the form is this person

9   convicted in an Israeli jail for multiple cases of murder, I

10  remind you, he is considered to be serving his prison sentence

11  because of his, as it says here in the translation, his fight

12  for his country."

13          My question is:  He is considered by whom to be

14  serving his prison sentence because of his fight for his

15  country?

16  A.  In an official form of the ministry of prisoners of the

17  Palestinian Authority, it, of course, is considered a stature

18  outside the formalities or the phrasing of this document.  That

19  is the way it's portrayed in the media.  One can say that there

20  are heaps of praise usually on most salient terrorist but

21  basically on everyone who is serving his time in an Israeli

22  prison.

23  Q.  You said heaps of praise?

24  A.  Yes.

25  Q.  I also want to go to one of those promotion records that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1sQsok2                    Shrenzel - Redirect

 1   Mr. Hill was asking you about.  I think we can see one in the

 2   packet of Abdel Karim Aweis.  He is the next big tab over in

 3   our binder.  You can see his picture here.  He is in 1159?

 4   A.  Yes.

 5   Q.  I want to look at Exhibit 103.

 6   A.  Which one?

 7   Q.  I think we didn't put 103 in.  I think we have to put it up

 8   on the screen.  I didn't have my binders last night.  Let's go

 9   ahead and put 103 up on the screen.  Do you see 103 up on the

10   screen?

11   A.  Yes.

12   Q.  Do you remember Mr. Hill was asking you questions about

13   these kinds of administrative orders?

14   A.  Yes, I do.

15   Q.  In particular, he was asking you about where it might say

16   on the document that it was pursuant to the presidential order?

17   A.  Yes.

18   Q.  Just looking at it, can you direct the jury to where it

19   indicates that this is a presidential order?

20   A.  As you can see, you can see on the left side the name of

21   the PLO is written, the Palestinian Liberation Organization,

22   then the PA, which we call here the PA, and so it's official.

23   And, again -- and that's in the beginning.  Then you have the

24   emblem.  And then after the beginning of the administrative

25   order, it's written clearly pursuant to the instructions of his

1577

F1sQsok2                        Shrenzel - Redirect

1    excellency the president, commander in chief of the security

2    forces.

3    Q.  Who is the president and commander in chief of the security

4    forces?

5    A.  At that date 2008 it was president Mahmoud Abbas.

6    Q.  So when the documents that we have in our binder like

7    tab -- let's look at tab D under Aweis.  That is Exhibit 58.

8    If we look on the bottom, it talks about presidential orders,

9    promotions by presidential orders on the right-hand side.

10   A.  Yes, this is in exact compliance of what we have in front

11   of us here.

12   Q.  So the document matches up to the order?

13   A.  Yes, it did.

14   Q.  Great.  What does it tell us about PA policy with regard to

15   terrorists that they give promotions to people sitting in jail

16   while convicted of terrorist murders?

17          MR. ROCHON:  Objection, your Honor.

18          THE COURT:  Sustained as to the form of the question.

19   Q.  Can you tell us what policy it reflects to give promotions

20   to individuals such as Abdel Karim Aweis who have been

21   convicted of murder?

22          MR. ROCHON:  Objection, your Honor.

23          THE COURT:  No, I'm going to allow that.

24          You can answer the question.

25   A.  I think I have discussed it several times, but let me

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1sQsok2                    Shrenzel - Redirect

1    reiterate it.  It reflects a policy of praise, of appreciation,

2    of endorsing what he did.  And this is really unthinkable, yes?

3    It's like if -- let's say a convicted murderer that belongs to

4    the security forces of a certain country, it's unheard of, and

5    it's totally illogical that he gets promoted, and it's a

6    reflection, as I tried to explain on Monday and today, this is

7    a reflection of the policy of the PA.  They wanted him to do

8    it.  He did it.  They praised him for that and they continue

9    their support for him.

10   Q.  By the way, Abdel Karim Aweis, did he have a criminal

11   record before he got hired by the PA?

12           MR. ROCHON:  Objection.

13   A.  Yes, we discussed it.

14           THE COURT:  Overruled.

15   A.  He killed a person with an ax, with a knife, he was

16   convicted and sentenced to life in prison.  He was released

17   under some gestures by a consequence of the Israeli courts.

18   Q.  Now, I want to come back to Mohammed Hashaika, one of the

19   bombers in the attack.  He is the first one in our binder.

20   Let's be sure we are oriented to him.  He is 1171 in our

21   binder.  Then I want to look at his GIS file, which is tab E in

22   the binder.

23           In particular, I want to ask you about the report on

24   the second page?  Do you have that report in front of you

25   A.  Yes.  9953?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

F1sQsok2                    Shrenzel - Redirect

1    Q.  9953.

2    A.  Yes, I have it.

3    Q.  Mr. Hill asked you some questions about this document or,

4    actually, I think Mr. Hill pointed out this document and -- am

5    I remembering this right?  He pointed this out, and the only

6    question he asked was whether I had asked you anything about

7    it?

8    A.  I don't exactly remember.  It was one minute or something

9    before we adjourned on Monday, but if you have the transcript,

10   I can read --

11   Q.  It's all right.  You don't remember it.  It's no problem.

12   Looking toward the bottom of this report --

13   A.  Yes.

14   Q.  -- there is a bullet item that says: "Originally, the

15   aforementioned intended to perform his operation in the

16   Netanyanya, and he was arrested in Tulkarem by the Palestinian

17   Authority.  He was transferred to Ramallah and was imprisoned

18   there."

19   A.  Yes, now I remember.  Mr. Hill asked me to confirm the fact

20   that you have skipped some of the -- some portion of this

21   bullet.

22   Q.  So let's focus on this portion.

23   A.  OK.

24   Q.  I think what Mr. Hill is interested in is he says --

25              MR. ROCHON:  Objection, your Honor.

1580

F1sQsok2                    Shrenzel - Redirect

```
 1          THE COURT:  Sustained?  What's your question.

 2   Q.  During the --

 3          THE COURT:  What's your question?

 4   Q.  I want to ask --

 5          THE COURT:  What is your question?

 6          MR. YALOWITZ:  I withdraw it.  Let me ask another

 7   question.

 8   Q.  Let me direct your attention to the sentence -- I will read

 9   you a sentence and ask you a question about it.  The sentence

10   is: "During the invasion into Ramallah, he escaped from prison

11   and intended to perform his operation through people of the

12   Islamic jihad, but then the Al-Aqsa Martyrs Brigades have taken

13   him from them."

14          My question is, are there other documents in our

15   binder that are inconsistent with this statement?

16          MR. ROCHON:  Objection, your Honor.

17          THE COURT:  No, I will let him answer that.

18   A.  Yes, and I believe that the assertion that he escaped

19   because of these very so-called invasion or incursion, he is

20   not correct, because we have significant pieces of information

21   to the contrary.  For example, we have the verdict of Abdel

22   Karim Aweis.  He was convicted according to his own confession

23   that he is the one that released Hashaika, the suicide bomber.

24   Because Mr. Nasser Shawish is a partner in planning this

25   attack, told him that Mr. Hashaika is ready to carry out a
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1sQsok2                        Shrenzel - Redirect

1   terrorist attack, and therefore released him.

2   Q.  Let's just look at that together.

3   A.  OK.

4   Q.  This is under Abdel Karim Aweis.  He is the third one in

5   our binder.  We see his picture.

6           Then if we turn to tab A, let's make sure we are

7   really solid on this.  Turn to tab A.  Are you there Exhibit

8   375?

9   A.  Yes, I'm there.

10  Q.  This document, is this a transcript of a hearing in the

11  case of Abdel Karim appeals?

12  A.  Yes.

13  Q.  If we look at the very bottom of the first page, it says:

14  "Prosecutor:  We have reached an arrangement in the case

15  whereby the defendant will plead guilty to the amended

16  indictment and the prosecution undertakes not to make use of

17  the statement by the defendant today before the Court in other

18  cases.

19          Then the defendant says on the next page, his counsel

20  says, "I confirm the statements of my colleague.  I have

21  explained the amended indictment to my client.  He understands

22  it and pleads guilty to it."

23          Then the defendant says:  "My counsel has explained

24  the amended indictment to me.  I understand and plead guilty to

25  it.  I request with regard to count 19, if explicitly or

                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

F1sQsok2                    Shrenzel - Redirect

1   implicitly, I incriminate my brother blank, I do not admit

2   this.  I admit I sent with my brother blank and blank, but my

3   brother did not know that they were being sent to carry out the

4   attack.  I asked my brother to take them, as he is a taxi

5   driver, without him knowing of the intentions to carry out an

6   attack.

7          Based on that, if we look at the next page, we see

8   verdict, based on the guilty plea we convict the defendant of

9   the offenses that are attributed to him.  Are you with me

10  A.  Yes, sir.

11  Q.  Now let's go to that amended indictment that you were

12  speaking about.  That's on the next tab 356?

13  A.  Yes.

14  Q.  I want to go with you to page 35.  Let's open that up?

15  A.  Yes.

16  Q.  I guess we should even start on 34.  Let's just make sure

17  everybody is there before we start with it.  First of all, this

18  is the 39th count, do we see that on page 34?

19  A.  The 9, I see it, yes.

20  Q.  That's not 19th count that we were look at a moment ago

21  where we were talking about his blot?

22  A.  I'm on page 3478.

23  Q.  Great.  Then --

24  A.  Yes, 39th count.  Yes, I looked at the number.

25  Q.  If we look at item 3 on page 35?

F1sQsok2                    Shrenzel - Redirect

1   A.  Yes.

2   Q.  I will read it.  "In early March 2002, Muhammad Hashaika

3   was remanded in the Mucataa complex of the Palestinian

4   Authority in Ramallah."

5        Can you remind us was is that Mucataa complex?

6   A.  The Mucataa complex, as I explained, is a compound a main

7   compound of the Palestinian Authority where also some of the

8   security apparatus resided, especially the central intelligence

9   and its head, Tawfiq Tirawi.  And please remember that the

10  convicted person here Abdullah Karim Aweis was an officer in

11  that force.  And also the jail was probably in the Mucataa.

12  Q.  So in early March 2002, Mohammed Hashaika was remanded in

13  the Mucataa complex of the Palestinian Authority in Ramallah

14  following the request for the defendant, who is -- I think it's

15  a typo.

16  A.  In.

17  Q.  -- who is in the general intelligence of the Palestinian

18  Authority, Mohammed Hashaika was released from the said remand.

19       Could you tell me how you reconciled those two

20  documents?

21       MR. ROCHON:  Objection, your Honor.

22       THE COURT:  No, he can answer overruled.

23  A.  Yes, as I said, I do not accept the assertion of the GIS

24  file that it had anything to do with the potential or

25  hypothetic Israeli invasion.  I assume it was in the interest

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1sQsok2                         Shrenzel - Redirect

1    of the GIS to present it like this because they were so deeply

2    involved in the case.  As you remember --

3               MR. ROCHON:  Objection, your Honor.

4               THE COURT:  I'm going to sustain the objection.

5               Let what the's your follow up question?

6    Q.  Let's go back to a 138 exhibit -- I'm sorry 148 which is

7    tab E.

8    A.  In whose file?

9    Q.  Hashaika?

10   A.  Tab E of Hashaika?

11   Q.  Yes.

12   A.  148.

13   Q.  Let's look at 148, page 2.  Are you there?

14   A.  Yes.

15   Q.  What is the date of the report that Mr. Hill was asking you

16   about.

17   A.  The date entered is November of 2011.

18   Q.  November 2011?

19   A.  Yes.

20   Q.  Do you know what year this case was filed, the case we are

21   here about?

22   A.  2003.

23   Q.  So by 2011?

24   A.  '02 or '03, yes.

25   Q.  By 2011, the lawsuit that we are here about had already

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

                                                                1585
    F1sQsok2                    Shrenzel - Redirect

1   been filed?

2   A.  Yeah.  The case was over.  Aweis was convicted according to

3   his plea, and this is later.  This was produced later.

4   Q.  In fact, this lawsuit Sokolow against PLO, do you know when

5   this lawsuit was filed?

6              MR. ROCHON:  Objection, your Honor.

7              THE COURT:  You can answer.

8   A.  No, I honestly don't remember.

9   Q.  May I refresh?

10             MR. ROCHON:  Your Honor, we will stipulate.

11             THE COURT:  No.

12             MR. ROCHON:  It's relevant.  If the Court deems it

13  relevant, we don't need this witness --

14             THE COURT:  I don't know if it's relevant.

15             MR. ROCHON:  Right.

16             THE COURT:  He says he doesn't know.

17             MR. YALOWITZ:  Sure.  So I would like to either

18  refresh him or counsel will stipulate.

19             MR. ROCHON:  If the Court deems it relevant, we'd be

20  willing to stipulate.

21             THE COURT:  I don't know if it's relevant.  I don't

22  know if you have an objection to its relevance.

23             MR. ROCHON:  I do.

24             THE COURT:  Are you trying to make some point with

25  this witness in --

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

F1sQsok2                        Shrenzel - Redirect

1     MR. YALOWITZ:  Yes.

2     THE COURT:  Why don't you ask him the next question?

3     MR. YALOWITZ:  I'm sorry, your Honor?

4     THE COURT:  Why don't you ask him the next question.

5  Q.  Sure.  Was this 2011 report after the Palestinian Authority

6  had already been sued in this case?

7  A.  Yes, I assume it is.

8  Q.  Thank you.  Who was in charge of the general intelligence

9  service?

10 A.  Tawfiq Tirawi.

11 Q.  By the way, have you seen any documents from the defendants

12 in which they made any evidence to capture Hashaika after his

13 departure from prison in the Mucataa?

14     MR. ROCHON:  Objection, your Honor.

15     THE COURT:  I'll overrule.  You can answer.

16     MR. ROCHON:  Including as to scope.

17     THE COURT:  You can answer that yes or no.

18 A.  No, not at all.  I wasn't warned.  He wasn't looking --

19     THE COURT:  Sir.  You answered yes or no.  That's all

20 I want.

21 A.  OK.

22 Q.  Have you seen any documents reflecting any indication that

23 they should try to capture him or get him back in some way?

24     MR. ROCHON:  Objection, your Honor.  Sustained.  Asked

25 and answered.

F1sQsok2                      Shrenzel - Redirect

1    Q.  Do you see any documents reflecting a large manhunt to try

2    and catch this --

3            THE COURT:  Mr. Yalowitz is this the same question

4    three times.  How is this a different question?  He answered.he

5    said he's never seen such a document.

6            MR. YALOWITZ:  All right.  Thank you, your Honor.

7    Q.  Have you seen any documents indicating the level of

8    security that was placed over this individual?

9            MR. ROCHON:  Objection, your Honor.

10           THE COURT:  Sustained.

11   Q.  Was this individual allowed to come and go during his

12   prison stay?

13           MR. ROCHON:  Objection.

14           THE COURT:  Sustained.

15   Q.  Let's take a look at Exhibit 1060 which is tab F in our

16   binder.

17   A.  Yes.

18   Q.  Who is the author of this document?

19   A.  Tawfiq Tirawi, the head of the general intelligence.

20   Q.  As I recall, Mr. Hill asked you about whether Tawfiq Tirawi

21   had been convicted of the March 21 attack.  Do you remember

22   that line of questions?

23   A.  Yes, I remember being questioned and I answered that --

24           MR. ROCHON:  Objection, your Honor.

25           THE COURT:  Overruled.

1588
F1sQsok2                        Shrenzel - Redirect

1   A.  I answered that I reiterated that he was not convicted

2   because, unfortunately, in spite of being one of the most

3   wanted terror operatives by Israel, he wasn't captured by

4   Israel and was not put to justice.

5   Q.  Mr. Hill also asked you if he was convicted of the

6   January 27 of 02 attack.  Am I remembering that right?

7   A.  Yes, the same answer.

8   Q.  Based on Exhibit 1060 what was Tirawi's role in that

9   March 21 attack?

10          MR. ROCHON:  Objection, your Honor.

11          THE COURT:  I'm going to sustain as to the form of the

12   question.  If there is something in the document you want to

13   refer to, you can.

14   Q.  Sure.  Do you see where Tirawi informs Arafat of the arrest

15   and interrogation of Hashaika?

16   A.  Yes.

17   Q.  And then he says, "The matter is at Arafat's discretion?

18   A.  Yes, the matter is at your excellency's discretion, I see.

19   Q.  Based on this, what can you say Tirawi's role was in the

20   attack?

21          MR. ROCHON:  Objection, your Honor.

22          THE COURT:  Sustained as to the form of the question.

23   Q.  Sure.  Based on this document, do you have an opinion as to

24   Tirawi's involvement?

25          MR. ROCHON:  Objection, your Honor.

1589

F1sQsok2                        Shrenzel - Redirect

1    THE COURT:  Sustained.  Haven't we been over this?

2    MR. YALOWITZ:  Sure.

3    THE COURT:  Asked and answered.

4  Q.  Let me just also go to Exhibit 233, which is the January 27

5  attack.  This one we will have to put up on the screen.

6    MR. ROCHON:  Objection.  Scope.

7    THE COURT:  No, I'll overrule it.  You can answer.

8  Q.  Is this another document from the PA?

9  A.  Yes, this brings us back to the Wafa Idris case.  This is

10 the document of the preventive security that relates to the

11 involvement of the general intelligence in the issue of Wafa

12 Idris, as it says in the headline or in the comment that was

13 written there.

14 Q.  Do you recall that the defendants stipulated that the

15 handwriting at the very top was written by a PA employee?

16 A.  Yes, I even remember that his name was Nabani.  Yes, he was

17 one of the officials to whom the letter was addressed.

18 Q.  It says:  "This information proves that the general

19 intelligence are involved in the issue of Wafa Idris."

20    Did I read that right?

21 A.  Your English is beyond doubt.

22 Q.  Do you recall looking at the custodial statements of Noor,

23 the individual who was convicted in that attack?

24 A.  I remember it in general.  If you want, we can --

25 Q.  I think I have one or two questions on that.  If we need

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1sQsok2                        Shrenzel - Redirect

1    the document, I'll put it up.

2    A.  OK.

3    Q.  Do you recall where Noor got the bomb that Wafa Idris used?

4    Which building he got it in?

5                MR. ROCHON:  Objection, your Honor.

6                THE COURT:  Sustained as to the form of the question.

7                MR. YALOWITZ:  Bear with me then, your Honor.  I am

8    just going to get the document and I will need just a moment.

9                MR. ROCHON:  Your Honor, may we request a side bar?

10               MR. YALOWITZ:  I'm really almost done, and I think

11   we're here really within the scope of what your Honor's ruling

12   was.

13               THE COURT:  Talk to each other and see if you can

14   resolve it.

15               MR. ROCHON:  I don't think this is one we can resolve.

16   I'll be happy to talk to him.

17               THE COURT:  Well, come up.

18               (Continued on next page)

19

20

21

22

23

24

25

F1sQsok2                        Shrenzel - Redirect

1          (At the sidebar)

2          MR. ROCHON:  Thank you, your Honor.  This goes to the

3    core issue of whether they can use the Noor statements to

4    implicate my client in this attack.  He is about to -- the

5    question was where did Noor get the bomb.

6          THE COURT:  That's why I sustained the objection, and

7    I told him already that if you have something, and you want to

8    go to that report and you want to quote something from it, then

9    you can.

10         MR. ROCHON:  Of course what it's going to say is that

11   it's going to suggest he got it from someone at the Mucataa.

12   That is to implicate my client in this because the witness --

13   it's the same issue we raised with the Court previously.  It's

14   juxtaposing to try to suggest my client provided the bomb,

15   that's exactly what the Noor statement cannot be used to do.

16         MR. YALOWITZ:  I thought we got a ruling from your

17   Honor on this that it was OK to argue from the inference that

18   he committed his crime in the Mucataa.

19         THE COURT:  I don't have any problems with you arguing

20   that the inference is whatever it is, but I want to know what

21   it is you want to ask this witness.

22         MR. YALOWITZ:  Let me just find the exact passage.

23         MR. ROCHON:  This is an area that we did not inquire

24   in at all on cross as to the letter.

25         MR. YALOWITZ:  They did.  They asked he wasn't

1592
F1sQsok2                    Shrenzel - Redirect

1   convicted.  They completely opened the door on this.

2          MR. ROCHON:  Your Honor, if the purpose is to respond

3   to whether Mr. Tirawi could be convicted, then what he is

4   trying to do is suggest that by this statement by Noor against

5   Tirawi, and that is act exactly what you told him he couldn't

6   do.  He is using the statement of this gentleman who is

7   shifting blame to others to say the people he was shifting

8   blame to is my client.  This is exactly what he cannot do.

9          THE COURT:  I still don't know what the question is.

10  What are you going to ask this witness?

11         MR. YALOWITZ:  I'm going to show him a passage in

12  which he says, "I got the bomb in the Mucataa."

13         THE COURT:  OK.  Then what?

14         MR. YALOWITZ:  Then what's the Mucataa?

15         THE COURT:  We have been through that like five times

16  already.  You don't have to ask him that.  It's been asked and

17  answered.

18         MR. YALOWITZ:  Then I just want to show him that

19  passage.

20         THE COURT:  And ask him what?

21         MR. YALOWITZ:  And ask him is that consistent with

22  your understanding.

23         MR. ROCHON:  Of what?

24         THE COURT:  That's not even a substantive question.

25  That's argument.  So I'm not going to allow that kind of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1593

F1sQsok2                    Shrenzel - Redirect

1  question.  If you want to make whatever reasonable arguments

2  you want to make, but that is not a substantive response from

3  this witness with regard to that issue.  It will remain to be

4  seen of whether you have what appropriate instances you can to

5  argue --

6           MR. YALOWITZ:  Let me move away from this document.

7  We can argue from the document.  I will have some follow-up on

8  233, which I will focus on the text of 233.

9           THE COURT:  I don't remember which one it is.

10          MR. ROCHON:  It's the letter we didn't ask a single

11 question about on cross-examination deliberately.  That was the

12 whole point of our scope of cross.

13          MR. YALOWITZ:  It's Tirawi was convicted and talks

14 about Tirawi.  It's fair.

15          THE COURT:  Let's see what the questions are.

16          MR. YALOWITZ:  Your Honor, while we're here, I don't

17 understand why if Mr. Hill is doing the cross-examination,

18 Mr. Rochon is doing the objecting.  It seems like if we have

19 one lawyer per witness, that would be more orderly.

20          THE COURT:  You don't want them to tag-team you?

21          MR. YALOWITZ:  I don't like being tag-teamed.

22          THE COURT:  I think you're real good at this.

23          You can handle both.

24          (Continued on next page)

25

F1S8SOK3                    Shrenzel - redirect

1           (In open court)

2   BY MR. YALOWITZ:

3   Q.  So, Mr. Shrenzel, have you had a chance to consider the

4   role of Tawfiq Tirawi in connection with the Wafa Idris suicide

5   bombing based on Exhibit 233?

6           MR. ROCHON:  Objection, your Honor.

7           THE COURT:  Overruled.

8           You can answer.

9   A.  Yes.  I would say the following.  This very document cannot

10  provide us with a conclusive final proof of his prior knowledge

11  of the attack.  But given our overall knowledge about --

12          MR. ROCHON:  Objection.

13          THE COURT:  He can finish.

14  A.  -- the profound involvement of Tirawi during the whole

15  period, in the series of attacks, of covering up, of providing

16  weapons, for example, the explosives used in the Hashaika

17  attack, if we take all of the Tirawi file in consideration, I

18  think it's more likely than not that he had prior knowledge and

19  involvement in that attack.  That's my professional assessment.

20          MR. ROCHON:  Objection.

21          THE COURT:  Overruled.

22          MR. YALOWITZ:  I have nothing further on redirect.

23          THE COURT:  Any further questions, Mr. Hill?

24          MR. HILL:  No, your Honor.

25          THE COURT:  Thank you, sir.

F1S8SOK3                    Shrenzel - redirect

1        You can step down.

2        THE WITNESS:  Thank you, your Honor.

3        MR. YALOWITZ:  Would it be convenient to take a recess

4    while we prepare for the next witness?

5        THE COURT:  Sure.

6        Let's take a ten-minute break.

7        Don't discuss the case, keep an open mind, and I will

8    see you in ten minutes.

9        (Jury exits courtroom)

10        MR. ROCHON:  When the court comes back, I have some

11    issues that relate to redirect, but I can raise them when you

12    come back.

13        THE COURT:  Sure.

14        (Witness excused)

15        (Recess)

16        (Continued on next page)

17

18

19

20

21

22

23

24

25

1596

F1S8SOK3

1     (Jury not present)

2          MR. ROCHON:  As to the redirect, there are at least

3     four different areas where the witness went into either

4     inadmissible or improper testimony, each of which we objected

5     to.  I will reference first the areas where he discussed

6     evidence that this court had excluded.

7          When Mr. Yalowitz went to the magazines, and we were

8     objecting, the witness nonetheless included some of the

9     material from the magazines about, that contains language about

10    Jewish people and exactly the kind of inflammatory religious

11    language this court ruled cannot come in and this witness

12    specifically referenced that language in his answer.

13         THE COURT:  My recollection is he referenced that kind

14    of language on cross.

15         MR. ROCHON:  No, sir.  He referenced it during the

16    redirect.

17         THE COURT:  Go ahead.  You can finish.

18         MR. ROCHON:  If he referenced it on cross and I am

19    mistaken, it would be improper as well.

20         THE COURT:  But you asked the questions and you didn't

21    stop him.  And I know what you're going to lay out in a second.

22    You're going to lay out how it is beyond the scope of cross.

23    Quite frankly, he was asked questions and he was allowed to go

24    on in a very long narrative and give his opinions about all of

25    these areas.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1597

F1S8SOK3

1          I think the defense opened the door to all of this.

2    If you didn't want the answer, you should have said it was

3    nonresponsive and gone on to another question.  One question he

4    answered for about five minutes and he went into all of his

5    opinions into all of these areas, and not only without

6    objection but in response to the defense's question.  That's

7    basically my position.  So if you want to quickly put the rest

8    of it on the record, then we can get the jury in.

9          MR. ROCHON:  As to the specific references, I was just

10   citing the language in the magazines.  I don't think he

11   included that even in his long answers during cross.

12         THE COURT:  I will look at the transcript.

13         MR. ROCHON:  Certainly we didn't get into it during

14   the close of his redirect examination, but the witness

15   referenced that Tawfiq Tirawi allegedly supplied the explosives

16   to Mr. Hashaika in his attack.  You excluded a custodial

17   statement in which that was referenced, and that is because a

18   custodial statement was putting the blame on another.

19         THE COURT:  I have to look at the transcript because

20   my recollection is there was not an objection.

21         MR. ROCHON:  There was an objection before the answer

22   and after the answer.  And it was towards the end of the

23   redirect.

24         In addition, again over objection, he discussed as to

25   the motivations of individuals, specifically as to Abdul Karim

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1598

F1S8SOK3

1    Aweis, that "they wanted him to do it and he did it," and the

2    "they" in that instance was our clients.  The experts are not

3    allowed to testify about the state of the mind of an entity or

4    organization.

5         THE COURT:  Given the answers given on cross, that was

6    well within the scope.  He gave similar answers on cross.  He

7    gave more complete answers.

8         MR. ROCHON:  The fact that the witness was able to

9    sneak in improper answers --

10        THE COURT:  He can't sneak it in on cross.  You asked

11   him the questions.  That argument doesn't fly.  You didn't

12   object.  You let him go on and on.

13        MR. ROCHON:  I understand the court's position on

14   that.  I respectfully disagree.

15        THE COURT:  That is fine.  You don't preserve any

16   objection to a question that you asked and an answer that was

17   given and you didn't object to the answer, or you didn't stop

18   the witness from going on.

19        Anything else?

20        MR. ROCHON:  Yes.

21        THE COURT:  I don't want the jury to wait.

22        MR. ROCHON:  It's only one other specific reference.

23   He specifically discussed at some length what Said Ramadan

24   supposedly thought and said this is what he thought.  Said

25   Ramadan, you will recall, is one of the suicide attackers in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1599

F1S8SOK3

1     this case.  There is no evidence as to what Said Ramadan was

2     thinking, as to his motivation in this case, and we have a

3     contemporaneous objection, and I know the court overruled it,

4     but I wanted to point out this testimony was also improper by

5     the witness.

6               THE COURT:  If there is no basis in the record for

7     that, then that's an argument you will make to this jury.  They

8     can assess his expertise and the basis for his conclusions

9     based on the evidence that's before them.  If it is consistent

10    with that, they can accept it.  If it's inconsistent, you will

11    argue that they should reject it.

12              MR. ROCHON:  Lest some day someone say I didn't ask

13    for a remedy for my objections, your Honor, I think given the

14    testimony the court can either strike the redirect or declare a

15    mistrial.  If you are not inclined to declare a mistrial, I

16    wouldn't want to fail to ask for a remedy given our objection.

17              THE COURT:  What remedy are you asking for?

18              MR. ROCHON:  To strike the redirect.

19              THE COURT:  I am not going to strike the redirect.  I

20    think it was within the scope of cross.  I think I gave you

21    significant leeway on cross.  I think you gave him significant

22    leeway in his answers.  I think the questions posed that relate

23    to that are within the scope of that cross and nothing is

24    appropriate to strike.

25              I will look at the transcript when I get the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1600

F1S8SOK3

1    transcript.  If I believe some other remedy is appropriate, I

2    will consider it.

3              Let's get the jury.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25