UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

MARK I. SOKOLOW, *et al.*,

                              Plaintiffs,

        vs.

THE PALESTINE LIBERATION
ORGANIZATION, *et al.*,

                              Defendants.

No. 04 Civ. 00397 (GBD) (RLE)

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
SUPPLEMENTAL REQUESTS TO CHARGE**

ARNOLD & PORTER LLP
399 Park Avenue
New York, New York 10022
(212) 715-1000

*Attorneys for Plaintiffs*

February 5, 2015

Plaintiffs respectfully request that, following the close of evidence, the Court

include the jury instructions discussed below, in addition to those already requested.

## I.  RATIFICATION

Plaintiffs propose two alternate jury instructions on ratification.  The first is based

on the ratification instruction in *Bowoto v. Chevron Corp.*, No. 99-CV-02506, 2008 WL

5110368 (N.D. Cal. Nov. 25, 2008).  The ratification instruction in *Bowoto* includes

several examples that are directly applicable here.  Should the Court determine that the

*Bowoto* charge is too broad, however, plaintiffs alternatively propose a second instruction

based on Judge Cogan's charge in *Chowdhury v. Wordtel Bangladesh Holding, Ltd.*, No.

08-CV-1659 (BMC) (E.D.N.Y. 2008) (DE 58 at 120-21), which was recently approved

by the Second Circuit.  *Chowdhury*, 746 F.3d 42, 53 & n.11 (2d Cir. 2014).  Notably, in

proposing a ratification charge, the plaintiffs in *Chowdhury* relied in part on the

ratification charge in *Bowoto*.

### A.    Proposed Ratification Instruction #1 (the "*Bowoto* Charge")

Plaintiffs' first proposed ratification instruction is modified from the language the

court read in *Bowoto* as follows:

> "Plaintiffs contend that each defendant is liable for the acts
> of ~~CNL~~ its employees or other agents because each
> defendant ratified or approved that conduct after it
> occurred.  Defendants deny that they ratified ~~CNL's~~ their
> employees' or other agents' conduct.  To show ratification,
> plaintiffs must prove:
>
> 1.  That one or more defendants knew or should have
> known of all material facts related to ~~CNL's~~ their
> employees' or other agents' conduct, and
>
> 2.  That the defendant or defendants ratified, adopted, or
> approved of this conduct.

Ratification means to treat the act as if originally authorized.  Defendants are liable for ~~CNL's~~ the conduct of their employees or other agents if, after the fact, they ratified, adopted, or approved that conduct, even if it was originally unauthorized.  Approval or ratification can be shown through defendants' statements or it can be inferred from the defendants' conduct that implies an intent to consent to or adopt the act.  A variety of different types of conduct permit you to infer approval.  Ratification of an unauthorized act may be demonstrated through knowing acceptance after the fact of ~~CNL's~~ the actions of their employees or other agents.  Defending ~~CNL's~~ their employees' or other agents' actions or covering up ~~its~~ their misdeeds may also constitute ratification.  Failure to disavow ~~CNL's~~ their employees' or other agents' acts may constitute ratification, even if the acts were not within the scope of the employment or agency relationship.  Ratification also exists if the defendants, after knowledge of or opportunity to learn of the misconduct, continued to use ~~CNL's~~ their employees' or other agents' services.  Failure to take adequate steps to investigate or remedy ~~CNL's~~ their employees' or other agents' misconduct also constitutes ratification.  In considering whether defendants ratified the acts of ~~CNL~~ their employees or other agents, you may consider, among other things, whether defendants have made statements ~~to the media~~ that evidence ratification, including ~~false or conflicting~~ statements about ~~CNL's~~ their employees' or other agents' involvement in the ~~Parabe incident~~ terror attacks ~~and false or conflicting statements about CNL's ownership of the boats and helicopters used to transport the Nigerian security forces~~.  A defendant's 'knowing' ratification can be shown by circumstantial evidence including through evidence of the nature of the acts done, the relation of the parties, the interests of the alleged agent and ratifier, and other circumstances.

If you find that one defendant did not ratify ~~CNL's~~ its employees' or other agents' conduct, you must still consider whether ~~each of~~ the other defendants ratified ~~CNL's~~ its employees' or other agents' conduct.

Each theory of liability is independent, such that if you reject ratification for any defendant, you must also consider whether any other theory of liability applies to that defendant."

3

**B.**    **Proposed Ratification Instruction #2** **(the "*Chowdhury* Charge")**

Plaintiffs' second proposed ratification instruction is modified

from the language Judge Cogan read in *Chowdhury* as follows:

"The plaintiffs also claim that the defendants are liable for the acts of ~~the Rapid Action Battalion~~ their employees or other agents because the defendants ratified, adopted or approved the wrongful conduct after it occurred. If you find that ~~members of the Rapid Action Battalion~~ the defendants' employees or other agents are responsible for plaintiff's injuries, you must decide whether the defendants ratified, adopted or approved the ~~Rapid Action Battalion's~~ conduct of their employees or other agents. To show that ~~this~~ these defendants ratified, adopted or approved the ~~Rapid Action Battalion's~~ conduct of their employees or other agents, plaintiff must prove, one, that the defendants' employees or other agents ~~Rapid Action Battalion~~ professedly acted on that defendant's behalf. Two, that the defendants knew or should have known of all material facts related to ~~Rapid Action Battalion's~~ the conduct which led to plaintiff's injuries, and three, that the defendant ratified, adopted or approved of the conduct.

Ratification, adoption or approval means to treat the act as if it was originally authorized. A defendant is liable for the conduct of ~~the Rapid Action Battalion~~ its employees or other agents if after the fact, the defendant ratified, adopted or approved of that conduct even if it was originally unauthorized.

Therefore, even if you conclude that the defendants' employees or other agents ~~members of the Rapid Action Battalion~~ were not acting as agents of the defendants at the time of the relevant acts, the defendants are nevertheless responsible for the ~~Rapid Action Battalion's~~ action of their employees or other agents if you find that the defendants ratified or adopted or approved those actions after the fact.

Approval, adoption or ratification can be shown through a defendant's statements. Or it can be inferred from the defendant's conduct that implies intent to consent to adopt the act. A variety of different types of conduct permits you to infer approval. Ratification of an unauthorized act may be demonstrated through knowing acceptance after the fact

of the <u>employees' or agents'</u> actions.  Failure to disavow the ~~Rapid Action Battalion's~~ acts <u>of its employees or other agents</u> may constitute ratification, even if the acts were not within the scope of an agency relationship.

A defendant's knowing ratification can be shown by circumstantial evidence<u>, i</u>.~~I~~ncluding through evidence of the nature of the acts done, through relationship of the parties, through the interest of the alleged agent and ratifier and other circumstances."

A ratification instruction—in either form—is appropriate here.  The ATA extends tort law remedies to Americans who are injured by an act of international terrorism.  18 U.S.C. § 2333(a).  Such tort law remedies include the concept of ratification.[1]  In *Chowdhury*, the Second Circuit affirmed the judgment (which went to the jury on an agency and ratification theory).  The Second Circuit expressly relied on the Restatement (Third) of Agency as "outlining the bases for liability on a ratification theory of agency." 746 F.3d at 53 n.11.  According to Section 4.01 of the Restatement (Third) of Agency, ratification occurs if a person's "conduct…justifies a reasonable assumption that the person so consents."  For example:

P, who deals in used cars, employs A as a retail salesperson.  A is not authorized to make public statements on behalf of P.  A is interviewed on a local television program and, without P's consent, falsely accuses a competitor of P's of engaging in illegal sales practices.  A knows these statements to be false.  P watches the television program and, the next day, congratulates A on A's television appearance.  P has ratified A's tortious conduct.

Restatement (Third) Of Agency § 4.01, cmt. d (2006).  Both of plaintiffs' proposed instructions track the Restatement's black-letter rule of ratification.

---

[1] Defendants object to a ratification instruction on the basis that the ATA requires deliberate wrongdoing and must be construed narrowly because it applies extra-territorially.  DE 592 at 26.  However, *Chowdhury* and *Bowoto* both involved extra-territorial acts of intentional wrongdoing.

Ratification is not merely evidence of scope of employment.  It can form an independent basis for liability.  Judge Cogan made this clear in *Chowdhury,* denying the defendants' motion for a new trial:

> Finally, I reject defendants' challenge to the jury instruction.  The premise of the challenge is that plaintiff's agency theory and ratification theory are mutually exclusive.  Defendant[s] effectively argue that if they had an agreement with the [agent] to torture plaintiff, then they could not ratify what the [agent] did since that was already part of their agreement.  However, with defendants denying both any agreement with the [agent] and after-the-fact ratification of the torture, it would have been fundamentally unfair to require plaintiff to elect either theory.

*Chowdhury v. Worldtel Bangladesh Holding, Ltd.*, No. 08 Civ. 1659 (BMC), 2009 WL 9053203, at *3 (E.D.N.Y. Sept. 16, 2009), *aff'd in relevant part and rev'd on other grounds*, 746 F.3d 42 (2d Cir. 2014); *see Prunty v. Arkansas Freightways, Inc.*, 16 F.3d 649, 652-55 (5th Cir. 1994) (employer liable for employee's acts of sexual harassment on a ratification theory).  Because "ratification may create a relationship of agency when none existed between the actor and the ratifier at the time of the act," Restatement (Third) of Agency § 4.01, it is distinct from *respondeat superior* liability.

The evidence in the record is sufficient to support either ratification instruction.  First, it is indisputable that the defendants have knowledge of "material facts related to their employees' or other agents' conduct."  The employees or other agents relevant here have been sitting in jail for terrorist crimes following their convictions in Israeli courts for years.  The public court documents evidencing those convictions are in the record.  It would defy common sense for defendants to argue that they were unaware of the status of these employees—who have not shown up for work for years because they are serving multiple life sentences.  If that were not enough, the record also contains evidence—from

the PA's own General Intelligence and Ministry of Prisoners' files—directly admitting knowledge of the perpetrators' criminal convictions and imprisonment.

Second, each defendant's "conduct…justifies a reasonable assumption that [it] so consents." Restatement (Third) of Agency § 4.01. This is evident not only from defendants' "failure to disavow the acts" of their employees or other agents, but also by documents showing that the PA and the PLO continue to pay *and* promote those individuals. Employment records showing this continued pay and these promotions are in evidence. In addition, for at least one of the terror attacks at issue in this case, the record contains evidence of the head of the PA's General Intelligence Service, Tawfiq Tirawi, "covering up the[] misdeeds" of the PA's employees or other agents. Pls.' Ex. 233. This, too, may constitute ratification, according to the *Bowoto* charge.

Defendants' own words also constitute ratification of the relevant conduct. The official PA forms that are provided to applicants of prisoner benefits indicate that the recipients of those benefits—including those convicted of murder—were imprisoned "as a result of his fight for his country." The PA's own intelligence files describe the perpetrators as being "good in terms of security and morals." This language alone, which demonstrates that the PA approved of, and benefitted from, the acts of terrorism committed by its employees and other agents, is sufficient to permit the jury to find ratification. Moreover, PA and PLO forms that are provided to applicants of martyr payments indicate that the recipients of those benefits—including families of suicide terrorists—receive payments on account of their family member's participation in acts of terror.

## II. <u>ALTER EGO</u>

Based on the Eleventh Circuit Civil Pattern Jury Instructions 2013—Civil 4.27 (as modified), plaintiffs request the following instruction on alter-ego liability:[2]

"In this case, ~~[name of plaintiff]~~ <u>plaintiffs</u> ~~claims~~ <u>claim</u> that ~~[name of subsidiary] was the mere instrument or tool of its parent corporation~~ <u>the PLO, the PA, and Fatah were indistinguishable, and that each acted as the instrument or tool of the other</u>—what the law calls an alter ego. <u>Plaintiffs also claim that the Al-Aqsa Martyrs Brigades is the military wing of Fatah.</u> Should you find that plaintiffs have proven ~~this claim~~ <u>these claims</u> by a preponderance of the evidence, the law requires you to disregard the separate status of ~~[name of subsidiary]~~ <u>those entities</u> and hold ~~[name of corporation]~~ <u>each</u> legally responsible for the ~~subsidiary's~~ acts <u>of the other</u>.

~~Under our free-enterprise economic system, the law permits—even encourages—people, and even other corporations, to form corporations as a way to attract stockholder investments. Parent corporations can invest their money in subsidiary enterprises without risking liability for the subsidiary's acts and transactions. In return, society gets the benefit of jobs and other commercial activity that the subsidiary's business creates. So, in~~ <u>In</u> most cases, ~~the status of a subsidiary corporation as a separate legal entity apart from its parent corporation~~ <u>an entity's status as having a distinct legal existence, separate and apart from other entities,</u> must be respected and preserved.

But this rule is not absolute, and you can disregard the separate status of ~~a subsidiary corporation~~ <u>an entity</u> when ~~the parent corporation~~ <u>it</u> uses ~~the subsidiary~~ <u>another entity</u> as a mere tool for the purpose of evading or violating a statutory or other legal duty, or for accomplishing some fraud or other illegal purpose.

To decide whether to treat ~~[name of subsidiary]~~ <u>the Palestinian Authority, the Palestinian Liberation Organization, Fatah, Al-Aqsa Martyrs' Brigade or any of</u>

---

[2] Based on the evidence presented at trial, plaintiffs have modified slightly their proposed instruction from the version that was submitted in August 2014 (DE 582, Proposed Instruction No. 12).

them as alter egos ~~as the alter ego of [name of corporation]~~, you should consider:

> (a) whether ~~the parent~~ any caused the formation of another ~~subsidiary's incorporation~~;

> (b) whether ~~the parent and subsidiary have common stock ownership, or~~ they have directors or officers in common;

> (c) whether the ~~business~~ purpose or function of ~~the subsidiary~~ one organization is separate and distinct from the ~~parent~~ other;

> (d) whether the ~~two~~ entities kept separate ~~corporate~~ books and records ~~(even though they may have filed joint tax returns as required by law)~~;

> (e) whether ~~the parent~~ one organization finances ~~the subsidiary~~ another or pays ~~the subsidiary's~~ its salaries and other expenses;

> (f) whether the ~~subsidiary's~~ organizations' funds were comingled ~~or not mingled~~ with the ~~parent's funds~~; and

> (g) any other factor the evidence disclosed tending to show that the ~~subsidiary~~ organizations ~~was or was not~~ were or were not operated as ~~an entity~~ separate entities ~~from its parent~~.

You should consider all these factors. No single factor is determinative."

The evidence in the record is ample to support plaintiffs' proposed alter-ego instruction. Plaintiffs' expert Alon Eviatar testified at length to the overlapping relationship among the PA, the PLO, Fatah, and the Al-Aqsa Martyrs' Brigades as it existed during the Al-Aqsa Intifada. Additionally, plaintiffs read deposition testimony of defendants' own employees in other cases testifying to the overlapping nature of the relationship among the PA, the PLO, and Fatah during the same time period. A few examples suffice.

Mr. Alon Eviatar testified that the PA was established by the PLO through the Oslo Accords prior to the Al-Aqsa Intifada—with Yasser Arafat as the leader of both entities. *E.g.*, Tr. (1/15/15) at 415:18-417:12; 460:9-21 (discussing Pls.' Ex. 171). Defendants' own Salam Fayyad (Finance Minister of the PA from mid-2002 through late 2005) testified to the same. Fayyad Dep. 46:19-47:21, 90:5-16. Fayyad added that after the creation of the PA, the PLO was funded directly by the PA. *Id.* at 75:17-76:7, 77:14-78:3; *see also* Yasser Shaqbu'a Dep. 37:24-38:4 (PA's Finance Ministry paid for all PLO activities, all PLO expenses, inside the West Bank prior to 2009). Similarly, Hussein Al-Sheikh, Secretary General of Fatah during the Al-Aqsa Intifada, described Arafat as "the head of the PA and PLO" with control over the PA budget. Al-Sheikh Dep. 141:15-25, 142:13-19. He added that both the PA and the PLO had its main office in the Mukata, since Arafat was the head of both entities. *Id.* at 152:6-17. Hasan Abu-Libdeh, Minister of National Economy for the PA, also testified that the PA and the PLO have overlapping leadership. Abu-Libdeh Dep. 134:7-15, 135:13-19 (any Palestinian elected to the PA's Palestinian Legislative Council is "automatically admitted" to become a member of the PLO's Palestine National Council).

As for Fatah, Mr. Eviatar testified that the Fatah movement was established by Yasser Arafat, that it comprises the largest faction of the PLO, that it constituted "the central framework of the Palestinian Authority" during the relevant time period, and that the Al-Aqsa Martyrs Brigades was its "military wing." *E.g.*, Tr. (1/15/15) at 443:5-446:13. Importantly, during the Al-Aqsa Intifada, "[t]he heads of the Palistinian [sic] security apparatuses in the West Bank were under the authority of the Palestinian Authority and also served as members of Fatah, including among the leadership of the

movement, and some also served later or at the same time in leadership positions subordinate to the president." *Id.* at 462:1-8. Plaintiffs also introduced documents into evidence showing—and Mr. Eviatar testified at length about—funding of Fatah by the PA during the relevant time period. *Id.* at 474-82 (discussing Pls.' Exs. 20, 173, 958). Further still, Al-Sheikh testified that "Fatah is part of the PLO" and that "[o]nce you are a member of Fatah, you immediately become a member of the PLO." Al-Sheikh Dep. 38:8-17. He added: "We [*i.e.*, Fatah] had a general commander Yasser Arafat," *id.* at 120:24-121:11, that he "used to receive daily instructions" from Arafat, *id.* at 137:18-138:11, and that Fatah's main office was in the Mukata because "[t]he headquarters was where Yasser Arafat was[.]" *Id.* at 151:5-14. Finally, Al-Sheikh explained that he made frequent requests to Arafat for funding to Fatah, and, that: "Fatah and PLO are the same because the Fatah and the PLO budget are with Arafat." *Id.* at 140:9-20.

As for the Al-Aqsa Martyrs' Brigades, in addition to Mr. Eviatar's testimony, there are a number of documents in the record demonstrating that the AAMB is the military wing of Fatah. For example, Plaintiffs' Exhibit 1052, which was published by the Palestinian Mission to the United Kingdom and bears the PA emblem, provides a history of the "Palestinian National Liberation Movement—Fatah," and states: "Al-Aqsa Martyrs Brigades: This is the military wing of the Fatah movement. It started its activities at the beginning of the second Palestinian Intifada. It carried out a number of quality military operations and offered many martyrs." *Id.* at P 1: 4482; *see also* Tr. (1/19/15) at 672-78 (Eviatar testimony discussing Pls.' Ex. 1052). The PA's own GIS file on Sa'id Ramadan, the suicide shooter involved in the January 22, 2002 attack that severely injured the Gould and Waldman families, uses the terms "Fatah operation" and

"AAMB operation" interchangeably.  Pls.' Ex. 153 at 02:009965-66.  A number of the PA's own employees who are perpetrators of attacks at issue in this case were also convicted of membership in AAMB, including Majed al-Masri, Ahmed Salah, Nasser Aweis, and Abdel Karim Aweis.  *E.g.*, Pls.' Exs. 260-61 (Salah, Count 2); 362 (Nasser Aweis, unspecified count); 356, 376 (Abdel Karim Aweis, Counts 2-3); 384 (al-Masri, Counts 1-2).  Finally, plaintiffs have put in the record (through government reports based on captured PA documents) extensive evidence of funding of AAMB by the PA.  *E.g.*, Pls.' Exs. 626, 631, 826, 829-31, 962, 963.

In addition to the foregoing, of the employment-related records produced by defendants in this case, there are at least 15 documents in evidence that bear letterhead or signatories consisting of:  (1) the names of the "Palestinian Authority" and the "Palestinian Liberation Organization," and a corresponding joint seal; (2) the phrase "State of Palestine" and the name "Palestinian Liberation Organization," and the same joint seal; or (3) simply, the joint seal.  *E.g.*, Pls. Exs. 14, 25, 36B, 48, 60, 88-89, 104-06, 108, 113-14, 116, and 123.  Two documents, captured by Israel during Operation Defensive Shield, were also introduced into evidence, bear the same types of letterheads discussed above, and are requests for funding of the Al-Aqsa Martyrs Brigades addressed to Yasser Arafat himself.  Pls. Exs. 962-63.  Plaintiffs even introduced into evidence the business card of "Jabreel M. Rajoub," a "National Security Advisor" of both the "Palestinian Authority" and the "Palestinian Liberation Organization."  Pls. Ex. 1127.  Accordingly, there is sufficient evidence from which the jury could conclude that the PA, the PLO, and Fatah are alter egos of one another, and that AAMB is the military wing of Fatah.

Defendants argue that plaintiffs' reliance on a model instruction from the Eleventh Circuit is erroneous because New York choice-of-law rules provide that the law of the place of the entity's formation determines this issue, and, as such, Palestinian law on alter ego applies. *See* DE 582 (Pls.' Proposed Instruction No. 12), DE 592 (Defs.' Objection). However, federal common law applies to this federal cause of action. Even if it does not, defendants have not identified a Palestinian law that applies here, nor have they shown that such a law would conflict with the instruction as proposed by plaintiffs, and, moreover still, they have not identified any additional factors that they contend should be considered.

For similar reasons, defendants' objection that plaintiffs' proposed instruction applies only to corporations and not to "governmental organizations" or "political parties" because they "are not set up in corporate form" elevates form over substance. Even in the context of a Foreign Sovereign Immunities Act case—which affords foreign sovereign states with immunity from suit unless certain exceptions apply, and of which defendants derive no benefit since neither is a State—alter ego principles apply. *Kensington Int'l Ltd. v. Republic of Congo*, No. 03 Civ. 4578 (LAP), 2007 WL 1032269, at *7-*16 (S.D.N.Y. Mar. 30, 2007) (collecting cases and stating "foreign sovereign instrumentalities and agencies are accorded a presumption of independent juridical status," but that such status "may be rebutted by evidence establishing an alter ego relationship between the instrumentality and the sovereign state that created it"). At least one case has applied alter-ego law to the PLO and the PA. *Palestine Monetary Auth. v. Strachman*, 62 A.D.3d 213, 222-23 (1st Dept. 2009).

### III. <u>MATERIAL SUPPORT OF PERSONNEL UNDER 18 U.S.C. § 2339B</u>

Plaintiffs request that the Court instruct the jury that providing personnel is a type of material support prohibited under 18 U.S.C. § 2339B. Plaintiffs propose inserting this instruction onto page 21 of the Court's draft substantive charge as follows:

> "Consequently, if you find by a preponderance of the evidence that the defendants provided any of the types of 'material support or resources' I described before to the AAMB or Hamas, or furnished to any person acting on behalf of the AAMB or Hamas, after Hamas or the AAMB were designated foreign terrorist organizations, plaintiffs' burden with respect to this element has been met.

> <u>For example, plaintiffs claim that the PA provided material support to Hamas in the form of personnel, by harboring Abdullah Barghouti, and by giving him freedom to operate as a Hamas bomb-maker. A person provides 'personnel' if he knowingly provides, attempts to provide, or conspires to provide a foreign designated terrorist organization with one or more individuals to work under that terrorist organization's direction or control or to organize, manage, supervise, or otherwise direct the operation of that organization. Individuals who work entirely independently of the foreign terrorist organization to advance its goals or objectives are not considered to be working under the foreign terrorist organization's direction or control. If you find that the PA provided or conspired to provide Abdullah Barghouti to Hamas so that he could work under Hamas' direction or control, plaintiffs' burden with respect to this element has been met.</u>

> You should find that defendants provided material support or resources to the AAMB or Hamas if you find that the person or entity to which the defendants provided the support or resources was operating under the AAMB's or Hamas's direction or control or if that person or entity was organizing, managing, supervising, or otherwise directing the operation of the AAMB's or Hamas's personnel or resources."

A specific instruction regarding the provision of material support in the form of personnel to Hamas is warranted. The proposed language is taken directly from the

statute.  18 U.S.C. § 2339B(h).  Moreover, the Second Circuit has upheld jury instructions that include the provision of personnel to a designated foreign terrorist organization as one type of material support.  *See United States v. Farhane*, 634 F.3d 127, 136, 140-41, 148 n.17 (2d. Cir. 2011) (rejecting challenge to the term "personnel").

Specifically, the evidence in the record supports an instruction concerning whether the PA provided or conspired to provide Abdullah Barghouti to Hamas.  This includes the deposition testimony of Mosab Yousef, who was present at the arrest of Abdullah Barghouti and testified that senior PA officials, including Jibril Rajoub (head of the Preventative Security Services of the PA) and Marwan Barghouti, made a deal with Hamas that the PA would arrest Abdullah Barghouti but release him shortly thereafter.  Tr. (1/21/2015) at 807-09.  Indeed, Ahmed Barghouti—a senior PA employee and the right-hand man of said Marwan Barghouti—was convicted of "transfer[ing]…Abdullah Barghouti from the prison of the Preventative Security of the Palestinian Authority in Bitunia to an apartment, which [Ahmed Barghouti] had rented downtown."  Ex. 357, Count 51.  Although the Court excluded Abdullah Barghouti's and Ahmed Barhgouti's own statements that the Preventative Security Service released Abdullah Barghouti, the jury has extensive testimony from Mr. Eviatar about the PA's "revolving door" policy.  *E.g.*, Tr. (1/20/15) at 762-66.

The record also contains ample evidence that, following his "departure" from the prison of the Preventative Security, Abdullah Barghouti began to "work under [Hamas]'s direction or control" as a bomb-maker.  For example, the PA's own intelligence files set forth that "Abdullah received approximately $117,000, which he was supposed to use for financing the military wing of the Hamas movement."  Ex. 164 at 02:010034; Ex. 452,

Count 2.  Abdullah Barghouti's conviction and interrogation records also indicate that, following his release, he manufactured a string of bombs at the behest of, and for use by, Hamas.  Exs. 452, 427 at P7: 130.  The PA's own intelligence files also reflect the same, stating that Abdullah Barghouti "is responsible for manufacturing explosives for the Izz al-Din [al-Qassam] Brigades."  Ex. 164 at 01:010038.  Ultimately, Abdullah Barghouti's success as a Hamas bomb-maker earned him the nickname, the "Engineer."  Ex. 452 at P7: 30.

## IV. *POLICY, PRACTICE, AND CUSTOM*

Plaintiffs have reviewed the Court's draft jury instruction on "Employees (*Respondeat Superior*)" and request that the Court insert the following language—based on the *Monell* standard for vicarious liability—after the discussion of the factors that the jury may consider in deciding whether a PA employee was acting in furtherance of the PA's business and within the scope of his or her authority.  Specifically:

> "Among the factors you may consider in deciding whether a PA employee was acting in furtherance of the PA's business and within the scope of his or her authority are:  the connection between the time, place and occasion for the act; the history of the relationship between the PA and the employee as spelled out in actual practice; whether the act is one commonly done by such an employee; the extent of departure from normal methods of performance; and whether the specific act was one that the PA could reasonably have anticipated.

> In addition, you may consider whether a PA employee's conduct was the result either of an official policy of the PA or a PA custom that was in place even though such a custom had not necessarily received formal approval through the PA's official decision-making channels.  A practice of custom is a persistent, widespread course of conduct by PA officials or employees that has become the usual and accepted way of carrying out PA policy, and has acquired the force of law, even though the PA may not have necessarily formally adopted or announced the custom.  An official to whom the PA has delegated final policy-making authority is a policy-making official whose actions can be said to represent a decision of the government itself.  The policy-making official may cause injury by giving direct orders, by ratifying a subordinate's decision and the basis for it, or by establishing a policy for PA employees that, when followed by those employees, results in the injury.

> If you find an employee of the PA intentionally caused injury to a plaintiff while acting within the scope of his or her authority or within the scope of his or her authority or in furtherance of the PA's business, or as a result of an official policy or custom, then the PA is legally responsible for the employee's conduct.

Even if you find the PA specifically instructed its employees not to perform the shootings and bombings that are at issue in this case, if you find that those acts were done in furtherance of the PA's business and were reasonably foreseeable by the PA, you may find those acts were within the scope of the employees' authority."

This language is modified from three instructions on *Monell* liability as set forth in

Sand's Modern Federal Jury Instructions:

"~~The fact that an employee of a municipality deprived the plaintiff of a federal right is not alone a sufficient basis for holding the municipality liable to the plaintiff. Before you can hold the municipality liable, the plaintiff must establish by a preponderance of the evidence that the action of the employee that deprived him of his federal right~~ was the result either of an official policy of the ~~municipality~~ PA's or a ~~municipal~~ PA's custom that was in place even though such a custom had not necessarily received formal approval through the ~~body's~~ PA's official decision-making channels." **L. Sand, *et al.*, Modern Federal Jury Instructions—Civil** ¶ 87.03, **Instructions 87-81 (modified).**

"~~Whether an official practice or custom exists is a question of fact for you to determine.~~ A practice or custom is a persistent, widespread course of conduct by ~~municipal~~ PA officials (~~*or*~~ or ~~employees~~) that has become the usual and accepted way of carrying out PA policy, and has acquired the force of law, even though the ~~municipality~~ PA has not necessarily formally adopted or announced the custom." **L. Sand, *et al.*, Modern Federal Jury Instructions—Civil** ¶ 87.03, **Instructions 87-83 (modified).**

"~~The [governing body] of the municipality or an official or body~~ An official to whom the ~~[governing body]~~ PA has delegated final policy-making authority ~~[or who are given such powers by the municipal charter] are the~~ is a policy-making ~~entities or officials~~ official whose actions can be said to represent a decision of the government itself. The ~~[governing body] or the~~ [policy-making official] may cause injury by direct orders, by ratifying a subordinate's decision and the basis for it, or by establishing a policy for ~~municipal~~ PA employees that, when followed by those employees, results in the injury. ~~I instruct you that [name particular officials or governmental bodies] are policy-making officials whose actions may be attributed to the municipality.~~"**L. Sand, *et al.*, Modern Federal Jury Instructions—Civil** ¶ 87.03, **Instructions 87-84 (modified).**

18

The proposed language is appropriate because there has been sufficient evidence presented at trial from which the jury could conclude that the conduct of the PA employees was pursuant to either official policy of the PA or a PA custom.[3]

As to official PA policy, plaintiffs presented evidence of the PA's law that provides payments and other benefits to "[a]nyone who is kept in prisons of the occupation for offenses of participating in the struggle against the occupation." Pls.' Ex. 512. Two of plaintiffs' expert witnesses—Mr. Alon Eviatar and Mr. Israel Shrenzel—testified that pursuant to this law, the PA has an official policy of paying incarcerated and released prisoners convicted of participating in terrorist acts, including several of the attacks at issue in this case. *E.g.*, Tr. (1/15/15) at 494-505; Tr. (1/16/15) at 568-92, 602-03. In fact, Mr. Eviatar testified that: "[T]he pragmatic significance in terms of the prisoners and the members of their families is not only to ensure their economic security for a period of many years, for every prisoner and his family, but this law or these payments also constitute, they constitute an economic motivation for the perpetration of acts of terror." Tr. (1/16/15) at 569. Mr. Shrenzel tied these policies to actual payments made by the PA to employees and others convicted of perpetrating, or providing material support for, the six terrorist attacks at issue in this case. *E.g.*, Tr. (1/22/15); Tr. (1/23/15); Tr. (1/26/15); Tr. (1/28/15).

Plaintiffs also presented evidence of the PLO's official policy, through the Martyrs' Foundation, to pay the families of suicide terrorists after those terrorists have engaged in such acts. *E.g.*, Tr. (1/15/15) at 441-43; Tr. (1/16/15) 593-94, 603-04. Mr. Shrenzel also tied these general policies to actual payments made by the Martyrs' Foundation to suicide terrorists involved in five of the six attacks at issue in this case. *E.g.*, Tr. (1/22/15) at 1097-

---

[3] Defendants have always advocated for a *Monell* standard in this case (DE 497 (Defs.' Mot. for Summary Judgment) at 11-15) because it is a higher burden than traditional *respondeat superior* principles.

1114 (Ramadan), 1179-81 (Hashaika); Tr. (1/23/15) at 1306-07 (Idris), 1365-66 (Awada); Tr.

(1/26/15) at 1422 (Ja'ara).

Finally, as to PA custom, plaintiffs presented evidence through Mr. Shrenzel that

the PA kept their employee-terrorists on the payroll after they were tried and convicted of

murder (or even killed in their suicide operations), as well as continued to promote these

employees and other agents while they were imprisoned (some even posthumously).

*E.g.*, Tr. (1/22/15); Tr. (1/23/15); Tr. (1/26/15); Tr. (1/28/15).  Mr. Eviatar testified that

"hundreds from among the Palestinian security apparatuses were involved in terrorist

activities during the Intifada" and subsequently convicted and imprisoned, and that

"[t]here is an almost complete identification…[of] the members of the Palestinian

security apparatuses and their membership in the Fatah, and their membership in the Al-

Aqsa Martyrs Brigade."  Tr. (1/20/15) at 746.

The evidence also includes numerous publications issued by the PA during the

Al-Aqsa Intifada to its security employees, bearing photos of Yasser Arafat and Ghazi

Gibali (the Chief of Commander of the Palestinian Police at that time), which evidence a

policy of favoring terror.  *E.g.*, Pls.' Exs. 175, 178, 198, 200, 935-36, 949, 965, 1194-95.

In Yasser Arafat's own words:  "Our Palestinian people are persevering in the glorious

Intifada, the blessed al-aqsa Intifada, for a third consecutive month, offering up legions of

martyrs, and making the costliest and most precious sacrifice in the cause of realizing

their legitimate aspirations of ending the occupation of our land and holy places...I

celebrate and bless, in you, the spirit of allegiance and enduring national commitment,

and I value highly your wholehearted determination.... "  Ex. 175.  Shrenzel added that in

the police magazines, throughout the relevant time period:  "[W]e see a gradual degree of

intensification of the level of incitement of calling upon the apparatuses to take part in

activities against Israel; and more than that, in creating an atmosphere….Again, we should look at it from the point of view of the potential reader or the potential employee of the PA, what he understands…. He understands that he as an employee of the PA or as a Fatah member or both, both a Fatah member and PA employee, he shouldn't contribute to calm down the situation he shouldn't condemn terrorist activity.  He shouldn't look upon other employees who carry out suicide attacks as murderers, as criminals.  He should probably himself contribute to that wide-scale attack [on Israel] that I have referred to previously."  Tr. (1/28/15) at 1568-69.

## V. **MISSING WITNESS**

Based on the evidence presented at trial, plaintiffs renew their request that the Court instruct the jury that Tawfiq Tirawi has not been called to testify by defendants despite evidence of his involvement in the January 27, 2002 bombing (Pls.' Ex. 233) and the March 21, 2002 bombing (Pls.' Ex. 1060). Specifically, this is Proposed Instruction No. 8 from DE 582, as modified to remove Kamal Al-Abed.

This instruction is particularly appropriate because defendants offered an affidavit of Tirawi himself in this case, and yet, have never listed him as a witness. Defs.' Letter (3/27/14), Ex. 1 (undocketed); *but see* DE 547-776 (docketed). Had Tirawi been listed as a witness, he could have answered, via live testimony in front of the jury, and from his personal knowledge, as to the evidence of his wrongdoing in connection with the January 27 and March 21 attacks.

## VI. **DAMAGES**

In August 2014, plaintiffs proposed a number of damages instructions.

DE 582 (Pls.' Instructions Nos. 32-44).  Based on the evidence presented at trial,

plaintiffs renew their request for the following instructions to be included:  Nos. 32, 33,

34, 35, 36, 37, 38 (modified to remove claims of lost earnings or profit for the estates of

Benjamin Blutstein and Scott Goldberg), 39, 40, 41 (modified to remove claim

shortening of life damages for the estate of Scott Goldberg), 42, 43, and 44.

In addition, plaintiffs request that the Court give the New York Pattern Jury

Instruction on "Increased Susceptibility to Injury"—often referred to as the "thin skull"

instruction.  That instruction provides as follows:

> "The fact that the plaintiff may have a physical or mental condition that
> makes (him, her) more susceptible to injury than a normal healthy person
> does not relieve the defendant of liability for all injuries sustained as a
> result of (his, her, its) negligence.  The defendant is liable even though
> those injuries are greater than those that would have been sustained by a
> normal healthy person under the same circumstance."

N.Y. Pattern Jury Instr.—Civil 2:283 (2014).

This instruction is appropriate because the evidence shows that some of the

plaintiffs suffered from certain physical and/or emotional difficulties prior to the attacks

at issue that may have impacted in some manner the emotional damages that they

suffered as a result of those attacks.

Finally, consistent with CPLR 4016(b), plaintiffs intend to make reference, during

closing statement, to a specific dollar amount that counsel believes to be appropriate

compensation for any element of damage that is sought to be recovered in the case.

Plaintiffs therefore request that in accordance with CPLR 4016(b), the Court give the jury

the following instruction from the New York Pattern Jury Instructions:

"During [his/her] his closing remarks, counsel for [plaintiff/defendant] plaintiffs suggested a specific dollar amount [he/she] he believes to be appropriate compensation for specific elements of plaintiff's plaintiffs' damages.  An attorney is permitted to make suggestions as to the amount that should be awarded, but those suggestions are argument only and not evidence and should not be considered by you as evidence of plaintiff's damages.  The determination of damages is solely for you, the jury, to decide."

N.Y. Pattern Jury Instr.—Civil-2:277A (modified).  Although there is no federal analog to CPLR 4016(b) in the New York federal courts, it is within this Court's discretion to give such an instruction where counsel references a specific dollar amount.  *E.g.*, *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 912 (2d Cir. 1997) ("It is best left to the discretion of the trial judge, who may either prohibit counsel from mentioning specific figures or impose reasonable limitations, including cautionary jury instructions.").

In this regard, plaintiffs have carefully reviewed existing jury and bench damages awards in terror attack cases and plan to recommend amounts that are consistent with those cases.

## CONCLUSION

Plaintiffs respectfully request that, following the close of evidence, the Court include the foregoing instructions to the jury.

Dated: New York, New York
          February 5, 2015

                          **ARNOLD & PORTER LLP**


                          By: /s/ Kent A. Yalowitz
                               Kent A. Yalowitz
                               Philip W. Horton
                               Sara K. Pildis
                               Ken L. Hashimoto
                               Lucy S. McMillan
                               Carmela T. Romeo
                               Tal R. Machnes

                          399 Park Avenue
                          New York, New York  10022
                          Telephone:    (212) 715-1000
                          Facsimile:    (212) 715-1399
                          *kent.yalowitz@aporter.com*