

# Israel and the occupied territories

**Country Reports on Human Rights Practices**
Bureau of Democracy, Human Rights, and Labor
2003
February 25, 2004

(The Report on the occupied territories is appended at the end of this Report.)

Israel is a parliamentary democracy with a multiparty system and free elections. There is no constitution; a series of "basic laws" provide for fundamental rights. The legislature, or Knesset, has the power to dissolve the Government and limit the authority of the executive branch. On January 28, elections for the Knesset were held. Likud Party leader Ariel Sharon was re-elected Prime Minister. The judiciary is independent.

Since the Intifada began in September 2000, and during the year, Palestinians from the West Bank and Gaza continued to perpetrate terrorist attacks against Israeli targets. Terrorist organizations such as the Islamic Resistance Movement (Hamas), Hizballah, Islamic Jihad in Palestine, and the Popular Front for the Liberation of Palestine (PLFP), among others, committed numerous acts of terrorism in Israel and the occupied territories. Between January and November, approximately 130 terrorist attacks occurred within Israel and Jerusalem, killing more than 145 Israelis and injuring more than 720. Israeli security forces prevented numerous terrorist attacks against citizens on a daily basis.

Israel occupied the West Bank, the Gaza Strip, East Jerusalem, and the Golan Heights after the 1967 War. (The human rights situation in the occupied territories is discussed in the annex appended to this report.) The international community does not recognize Israel's sovereignty over any part of the occupied territories. Since 1991, the Israelis and the Palestinians made repeated attempts at negotiating peace. Despite meetings between high-level Israeli and Palestinian officials, efforts to resolve the conflict yielded few results.

Internal security is the responsibility of the Israel Security Agency (ISA), formerly the General Security Service (GSS) and also known as Shin Bet or Shabak, which is under the authority of the Prime Minister's office. The police are under the authority of the Minister of Internal Security. The Israel Defense Forces (IDF) is under the authority of a civilian Minister of Defense. The IDF included a significant portion of the adult population on active duty or reserve status and played a role in maintaining security. The Foreign Affairs and Defense Committee in the Knesset reviewed the activities of the IDF and the ISA. Security forces were under effective government control. Members of the security forces committed serious human rights abuses in the occupied territories and against Palestinian detainees.

The country's population is approximately 6.7 million (including Israeli settlers in the occupied territories). The country has an advanced industrial economy with a relatively high standard of living. During the year, unemployment was approximately 11 percent, but was substantially higher in the country's peripheral regions, among lower-skilled workers and the country's Arab citizens. The country's economic growth was accompanied by an increase in income inequality. The longstanding gap in levels of income within the Jewish population and between Jewish and Arab citizens increased. Arab citizens populated most of the 17 towns in Israel with the highest unemployment rates. During the year, the country relied heavily on foreign workers, principally from Asia, Africa and Eastern Europe, who were employed in agriculture and construction and constituted approximately 10 percent of the labor force.

The Government generally respected the human rights of its citizens; however, there continued to be problems with respect to its treatment of its Arab citizens. Israeli and international human rights organizations continued to report allegations that security forces tortured detainees during interrogation and that police officers beat detainees. The conditions in military detention camps and Israeli interrogation centers for Palestinian security detainees held in Israel remained poor, and did not meet international standards. Human rights groups issued complaints regarding torture, insufficient living space, and inadequate medical care for those detained in interrogation centers. During the year, the Government detained without charge thousands of persons in Israel, the West Bank, and Gaza. According to human rights nongovernmental organizations (NGOs) in the country, some security prisoners were sentenced on the basis of coerced confessions.

The Government did little to reduce institutional, legal, and societal discrimination against the country's Arab citizens, who constituted approximately 20 percent of the population but did not share fully the rights and benefits provided to, and obligations imposed on, the country's Jewish citizens. The Government interfered with individual privacy in some instances. The Government interfered with an individual's ability to marry within the country by not recognizing Jewish marriages other than those performed by the Orthodox Jewish establishment and by prohibiting civil marriages. Discrimination and societal violence against women persisted, although the Government continued to take steps to address these problems. Discrimination against persons with disabilities persisted. Trafficking in women into the country for the purpose of forced prostitution was a continuing problem. There was evidence of labor trafficking among the country's estimated 236,000 foreign workers. Abuse of foreign workers, including prostitutes, some of whom were trafficked to and employed illegally in the country, continued.

RESPECT FOR HUMAN RIGHTS

Section 1 Respect for the Integrity of the Person, Including Freedom From:

a. Arbitrary or Unlawful Deprivation of Life



DEFENDANT'S EXHIBIT NO. 70

There were no political killings in Israel during the year.

On September 1, the Orr Legal Commission of Inquiry (COI), established in 2000 to investigate the demonstrations of October 2000, during which police killed 12 Arab citizens and 1 Palestinian, released a report of its findings. The report criticized then Prime Minister Ehud Barak and then Minister of Internal Security Shlomo Ben-Ami for their handling of the situation and recommended personnel action and, in some cases, criminal investigations, against several government and police officials. The report also criticized police practices with regard to the Israeli-Arab population and noted the historical, societal, and governmental discrimination against Arab citizens.

On September 14, the Government established a ministerial committee to advise the Government on implementation of the COI recommendations within 60 days. By year's end, the committee's tenure had been extended.

Several Israeli-Arab advocacy groups alleged that police and security forces wrongfully killed other Arab citizens since the killings of the 12 Arab citizens in the October 2000 demonstrations. On July 22, Israeli Border Police shot and killed unarmed 28-year-old Morassi Jibali, a passenger in a car that the police claimed had failed to stop upon order. The police claimed the victim had been mistaken for a terrorist. It was later discovered that the driver had tried to avoid the roadblock as he was driving without a license. On July 24, the police shot and killed an unarmed Bedouin man, Nasser Abu al Qia'an, who was behind the wheel of a car near a junction. Several witnesses reportedly stated that the victim's car had stopped in traffic, and that a police officer shot Qia'an at point blank range. Police claimed that the victim had tried to run them over. Commenting on a pattern within the Israeli police forces, the COI wrote in its report that the "police must learn to realize that the Arab sector in Israel is not the enemy and must not be treated as such."

On September 11, police and residents of an Arab community, Kfar Qassem, clashed when police reportedly searched for Palestinians who allegedly entered Israel illegally. The police shot and wounded one Israeli Arab when, according to police reports, village residents began to throw stones at them. At year's end, the police were still investigating the incident.

According to the Government, there was a 50 percent decrease in the number of terrorist attacks in the country by Palestinian groups or individuals as compared to 2002. The Government reported that these attacks resulted in the deaths of about 213 Israelis, including about 50 members of the IDF (see Sections 1.a. and 1.c. of the annex). Terrorists injured approximately 900 Israelis during the year. The Government and Israeli society continued to function on a heightened state of alert due to continuous and numerous threats of attacks from these groups.

On January 5, a double suicide bombing killed 23 persons, including 15 Israeli citizens and 8 foreign nationals, and injured approximately 120 persons near the Tel Aviv Central Bus Station. On June 11, 17 people were killed and over 100 wounded in a suicide bombing on a bus on Jaffa Road in Jerusalem. On August 19, 23 persons were killed and over 130 wounded when a suicide bomber detonated a bomb on a bus in Jerusalem. On October 4, 20 people were killed and more than 60 wounded in a suicide bombing at Maxim's restaurant in Haifa.

b. Disappearance

There were no reports of politically motivated disappearances during the year.

c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

Laws, judicial decisions, and administrative regulations prohibit the physical abuse of detainees. During the year, there continued to be allegations that security forces tortured Palestinian detainees from the occupied territories during interrogation. The Attorney General has the authority to accept a "necessity defense" in deciding whether to prosecute those accused of alleged abuses. There also were numerous allegations that security officers beat Palestinian detainees from the occupied territories during arrest and on the way to interrogation or detention facilities.

The Public Committee Against Torture in Israel (PCATI) submitted approximately 80 complaints of alleged torture by the ISA to the State Prosecutor during the year. According to the PCATI, the Government did not respond to 27 complaints, and approximately 30 cases were still under investigation. The Government, according to PCATI, claimed that 3 detainees had since been released from detention, and 12 others either withdrew their complaints or refused to meet with the investigator. Human rights groups maintained that no ISA agent has been criminally charged with torture or other ill treatment for the past several years. NGOs and international organizations reported government use of sleep deprivation, prolonged shackling and tightening of shackles, enforced positioning, forcing the detainee to run blindfolded and then tripping him, threats of violence, humiliation, threats against detainees' family members, and threats of house demolition against detainees held for interrogation. Human rights groups further complained that the investigators who did field work for the State Prosecutor's office on such claims were ISA agents and, therefore, biased in favor of their colleagues.

The law provides for the right to live in conditions that do not harm the health or dignity of the detainee, access to adequate health care, a bed for each detainee, and exercise and fresh air daily. Conditions varied in incarceration facilities in the country and the occupied territories that were administered by the Israeli Prison Service (IPS), the IDF, or the national police. IPS prisons, which generally housed citizens accused or convicted of common crimes, generally met international standards. There were some enlargements of IPS facilities to address overcrowding during the year, including the addition of 400 prison cells since June. Expansions and initiatives to renovate and repair existing facilities were underway at year's end.

In July 2002, Physicians for Human Rights (PHR) filed a petition with the Supreme Court calling for improved prison conditions. In June, the Supreme Court issued a permanent injunction prohibiting prisoners from being forced to sleep on the floor and demanded every prisoner be provided a bed. The Minister of Internal Security stated publicly that all persons held in the IPS would receive a bed, daily outdoor exercise, telephone and visitation rights, and less crowded facilities. During the year, the Government has begun to ease overcrowding in some facilities thereby freeing up more bed space.

Conditions in interrogation facilities for Palestinians were generally poorer than those of detention facilities and prisons.

In Israel, security detainees were held in IDF detention camps such as the Megiddo and Ketsiot facilities, and in special sections of police detention facilities. In August, hundreds of Palestinian prisoners at Megiddo Prison rioted against the Government's decision to transfer some of them to the Ketsiot detention camp in the south. Ketsiot is further away from most prisoners' homes in the West Bank, making it difficult for families to visit. However, the Government transferred the prisoners.

Conditions in IDF facilities for security detainees were more basic than those of IPS facilities. Detention camps were mainly open-air, makeshift facilities, composed of tents on concrete floors with no heating. Beds were composed of mattresses on wooden palettes on the floor. A new wing opened at the Ketsiot facility alleviated overcrowding to some degree. According to the Government, security detainees may receive financial assistance from the Palestinian Authority (PA), including food required for observing religious holidays from their families and other persons or organizations and medical supplies from the International Committee for the Red Cross (ICRC) and other aid organizations. The IDF detention facilities held mainly male Palestinian detainees. The total number of Palestinian prisoners held by Israel on security grounds reached approximately 6,000 by year's end.

Approximately 650 Palestinians from Gaza and the West Bank were held in administrative detention (that is, not charged or tried and considered security threats) at year's end.

Conditions at the Russian Compound interrogation center in Jerusalem remained extremely poor. According to a PHR report released in November, prisoners in the Russian Compound holding cells were routinely handcuffed with their hands behind their backs to their feet, sometimes for hours. A major Israeli newspaper further reported that the Jerusalem police confirmed the use of this practice but noted it was used only in "extreme cases." According to the PHR, the Israeli Supreme Court has prohibited the use of painful handcuffing. In response to a petition by the PHR, the Attorney General notified the PHR that the Police Commissioner had been instructed to stop the use of this handcuffing position. The PHR report also stated that medical examinations given to arriving prisoners were used to determine if the prisoner could withstand "the application of violent approaches to those jailed." In addition, the report claimed that the Russian Compound was overcrowded.

Since the Intifada began, only Israeli lawyers or Palestinian lawyers with Jerusalem identification cards were permitted to visit Palestinian prisoners in jails as advocates or monitors, which reduced significantly the availability and timeliness of legal aid for such prisoners.

Conditions at some national police detention facilities remained poor. Such facilities were intended to hold criminal detainees prior to trial but often became de facto prisons. Those individuals held included some security detainees and some persons who were convicted and sentenced. Inmates in the national police detention facilities often were not accorded the same rights as prisoners in the IPS system.

Women were held separately from men, and children were held separately from adults. Israeli citizens 18 years and over were treated as adults within the criminal justice system. Military orders, however, provide that Palestinian youth age 16 and above are treated as adults. According to one international organization, as of November, about 180 Palestinian minors were held by Israeli authorities for security violations. In September, according to media reports, the IDF detained a 12-year-old Palestinian boy for security reasons. He was released in December. Overcrowding, poor physical conditions, lack of social workers, and denial of visits by parents remained problems for Palestinian youth. According to the National Council for the Child, detention centers for Israeli juveniles had problems with poor infrastructure and overcrowding.

Various institutions, including government ministries, the Knesset, the ICRC, or human rights groups regularly monitored incarceration facilities (see Section 1.d. of the annex). However, in August, in response to a Supreme Court petition, the Government admitted the existence of a secret IDF detention facility. The Government prohibited the media from publishing the exact location of the prison, the names of persons held, and prison conditions. The Government has not allowed the ICRC, Knesset members, or the media access to the facility. Prisoners, their lawyers, and their families did not know the prison's exact location. On December 1, Supreme Court ordered the Government to release information on this prison by February 20, 2004.

d. Arbitrary Arrest, Detention, or Exile

The law prohibits arbitrary arrest; however, the Government did not always observe this prohibition. Defendants are considered innocent until proven guilty and have the right to writs of habeas corpus and other procedural safeguards. The law permits, subject to judicial review, administrative or preventive detention (i.e., detention without charge or trial), which was used in a small percentage of security cases. In such cases, the Minister of Defense may issue a detention order for a maximum of 1 year, which can be extended every 3 months. Within 24 hours of issuance of a detention order, detainees must be brought before a district judge who can confirm, shorten, or overturn the order. If the order is confirmed, an automatic review takes place after 3 months. Detainees have the right to be represented by counsel and to appeal detention orders to the High Court of Justice; however, according to the Association for Civil Rights in Israel (ACRI) and Adalah, the Legal Center for Arab Minority Rights in Israel, the police can delay a suspect's meeting with counsel for up to 48 hours in certain extreme cases. If the detainee is suspected of committing a "security offense," the police can delay notification of counsel for up to 10 days with the consent of a judge, which was usually granted. The court can delay the suspect's meeting with counsel for an additional 21 days. The Government may withhold evidence from defense lawyers on security grounds.

The 1997 Arrest and Detention Law limited the grounds for pretrial detention in criminal and security cases and reduced to 24 hours the length of time a person may be held without charge; however, this law does not extend to administrative detention cases. Human rights groups noted abuse of detention orders in cases in which the accused did not pose a clear danger to society.

Some protections afforded to citizens were not extended to Palestinian detainees, who fell under the jurisdiction of military law even if they were detained in Israel.

At year's end, the Government held approximately 8,400 Palestinians in custody. Those held were a combination of common criminals (approximately 1,250), administrative detainees (approximately 650), and ordinary security detainees (approximately 5,650). In 2000, a High Court ruling declared illegal the holding of Lebanese detainees in Israeli prisons as "bargaining chips" to extract concessions or the release of Israeli prisoners held in Lebanon. Since 1989 and 1994, the Government has held, without explicit charges, both Sheikh Obeid, a Lebanese Hizballah leader, and Mustafa Dirani, a head of security for the Amal militia. The Government claimed both were security threats and that Dirani personally oversaw the detentions of Israeli MIA Ron Arad, to whose release the Government linked Dirani's detention. In 2002, in response to the High Court's 2000 decision that detaining Lebanese captives indefinitely as "bargaining chips" violated the administrative detention law, the Knesset passed the Illegal Combatant Law. This law allows the IDF to detain anyone if there is a basis to assume that he or she "takes part in hostile activity against Israel, directly or indirectly" or "belongs to a force engaged in hostile activity against the State of Israel." Detainees can be held indefinitely and without charge or trial. This law allowed for Dirani's continued incarceration. In June 2002, the ICRC began regularly visiting both Obeid and Durani. At year's end, Obeid, Dirani, and some 25 other Lebanese prisoners (3 on administrative custody as illegal combatants, 19 on security grounds, and 5 on

criminal grounds) remained in custody. In October, the Tel Aviv District Court disclosed that a Lebanese citizen imprisoned in the country for 5 years but eligible for release, had been detained under administrative detention for the past year because the IDF decreed him an illegal combatant.

The law prohibits forced exile of citizens, and the Government generally respected this prohibition in practice.

e. Denial of Fair Public Trial

The law provides for an independent judiciary, and the Government generally respected this provision in practice. The judiciary generally provided citizens with a fair and efficient judicial process. However, in practice, Arab citizens often received harsher punishments than Jewish citizens did. Palestinians from the occupied territories are prosecuted under a separate system of military law and courts.

The judicial system is composed of civil, military, religious, labor relations, and administrative courts, with the High Court of Justice as the ultimate judicial authority. The High Court of Justice is both a court of first instance (in cases involving government action) and an appellate court (when it sits as the Supreme Court). All courts in the judicial system, including the High Court of Justice, have appellate courts of jurisdiction.

The law provides for the right to a hearing with representation by counsel, and authorities generally observed this right in practice. A regional and national system of public defenders operated by the Ministry of Justice employed approximately 700 attorneys through 5 regional offices. The Public Defenders Office represents all eligible persons, including Palestinians from the occupied territories. Under the system, all persons who were accused of crimes punishable by sentences of 10 years or longer received mandatory legal representation. Defendants who lack means and who are facing possible prison sentences of 5 to 9 years are provided with a public defender on a discretionary basis. Judges also have discretionary power to appoint an attorney in all cases. Counsel represented approximately 70 percent of defendants. All nonsecurity trials were public except those in which the interests of the parties were determined to be best served by privacy.

Cases involving national security may be tried in either military or civil courts, and may be partly or wholly closed to the public. The prosecution must justify closing the proceedings to the public in such cases, and the Attorney General determines the venue. Adult defendants have the right to be represented by counsel even in closed proceedings but may be denied access to some evidence on security grounds. Under the law, convictions may not be based on any evidence denied to the defense, although that evidence may be used to influence a judge's decision.

The 1970 regulations governing military trials are the same as evidentiary rules in criminal cases. Convictions may not be based solely on confessions; however, according to PCATI, in practice, some security prisoners have been sentenced on the basis of the coerced confessions made by both themselves and others. Counsel may assist the accused, and a judge may assign counsel to those defendants when the judge deems it necessary. Charges are made available to the defendant and the public in Hebrew, and the court can order that they be translated into Arabic if necessary. Sentencing in military courts was consistent with that in criminal courts. Defendants in military trials have the right to appeal through the Military High Court. Defendants in military trials also can petition the civilian High Court of Justice (sitting as a court of first instance) in cases in which they believed there were procedural or evidentiary irregularities.

According to human rights organizations, the legal system in practice often imposed harsher punishments on Israeli-Arab citizens than on Israeli-Jewish citizens. A study released in December by Haifa University indicated that there is serious discrimination against Israeli-Arabs in the criminal justice system, including a tendency to render heavier prison terms to Israeli-Arabs. For example, human rights advocates claimed that Arab citizens were more likely to be convicted of murder (which carries a mandatory life sentence for adults) than Jewish citizens. The courts reportedly also were more likely to detain without bail Arab citizens until the conclusion of proceedings. According to the Government, as of December 1, of the 3,572 citizens held in detention, 1,177 were Arab. In May, the former mayor of the Israeli-Arab city of Umm al-Fahm and leader of the Islamic Movement-Northern Branch in Israel, Sheikh Raed Salah, was arrested for allegedly funneling funding to charity organizations associated with a terrorist organization. The current mayor of Umm al-Fahm and other leaders of the Islamic Movement were also arrested. Despite Salah's and the serving mayor's status and ties to the community, they were detained without bail. At year's end, they remained imprisoned pending conclusion of their trial. Human rights groups have criticized their remand during trial as discriminatory.

There were no reports of political prisoners.

f. Arbitrary Interference with Privacy, Family, Home, or Correspondence

The law generally protected privacy of the individual and the home; however, there also were laws that provide that authorities may interfere with mail and monitor telephone conversations in certain circumstances. In criminal cases, the law permits wiretapping under court order; in security cases, the Ministry of Defense must issue the order. Under emergency regulations, authorities may open and destroy mail based on security considerations. The Government indirectly interferes with an individual's ability to marry by recognizing only religious marriages in Israel. Muslims may marry through the Shari'a court system, and Christians under church jurisdiction. Israeli Jews can only marry in Orthodox Jewish services. Those who wish to have a civil marriage, Jews who wish to marry according to Reform or Conservative Judaism, those not recognized as being Jewish, and those marrying someone from another faith must marry in civil marriages abroad. While civil marriages are available in nearby Cyprus and are recognized by the Government, this requirement presents a hardship to those seeking such an alternative or having no other choice but to marry in a civil ceremony.

Section 2 Respect for Civil Liberties, Including:

a. Freedom of Speech and Press

The cumulative rulings of the Supreme Court provide for freedom of speech. The Prevention of Terrorism Ordinance of 1948 prohibits persons from expressing support for illegal organizations. On occasion, the Government prosecuted persons for allegedly speaking or writing on behalf of terrorist groups.

All newspapers were privately owned and managed. Newspaper licenses were valid only for Israel; separate licenses were required to distribute publications in areas in the occupied territories still under the Government's authority. There were 12 daily newspapers, 90 weekly newspapers, more than 250 periodical publications, and 8 Internet news sites.

Directed by a government appointee, the quasi-independent Israel Broadcast Authority controlled television Channel 1 and Kol Israel (Voice of Israel) radio, both

major sources of news and information. There were two privately owned commercial television channels. The Second Television and Radio Authority, a public body that also supervised 14 private radio stations, supervises both channels. There were five cable television companies that carried both domestic and international networks and produced shows specifically for the Israeli audience.

In 2001, the Attorney General announced that he would file an indictment against Knesset Member Azmi Bishara for making statements perceived by some as supportive of Hizballah during Bishara's June visit to Syria (a country still in a state of war with Israel) and during a 2000 visit to the Israeli-Arab city of Umm al-Fahm. In November 2001, the Knesset voted to lift Bishara's immunity so that he could face prosecution. In November, the Nazareth Magistrate Court decided in a preliminary hearing to uphold the charges against Bishara. At year's end, the case was still pending.

The law prohibits hate speech and incitement to violence and individuals, groups, and the press freely addressed public issues and criticized government policies and officials without reprisal. In the past, the Government has investigated a significantly higher number of Arab Members of the Knesset (MKs) than Jewish MKs for the use of hate speech and incitement to violence; however, during the year, there were no reports that the Government investigated any Arab or Jewish MK.

In November, a three-member Supreme Court panel unanimously ruled that the Film Censorship Board's decision to prohibit the screening of the film "Jenin, Jenin" violated freedom of speech. The film depicts fighting in the West Bank refugee camp of Jenin during April 2002. In response to an appeal by the Attorney General, the State Prosecutor, soldiers who fought in Jenin, and families of soldiers who died there, the Supreme Court issued a temporary injunction in December barring the screening of the controversial film until the court decided whether to rehear the case before an expanded panel. Critics claimed that the film contains lies about the events and incites violence against Israel.

The law provides for freedom of the press, and the Government generally respected this right in practice. The law authorizes the Government to censor any material reported from Israel or the occupied territories that it regards as sensitive on national security grounds. Foreign correspondents and news agencies complained of harassment by the Government Press Office (GPO), which falls under the Prime Minister's office. Specifically, foreign agencies complained that their Palestinian employees, whom the agencies claimed were necessary for adequate coverage of events in the territories, were denied press cards (and thereby unable to travel unhindered in the occupied territories) for no valid reason. Since January 2002, the Government has denied press credentials to all Palestinians, based on security grounds. Press credentials were not required in Israel or the occupied territories; however, they were important to facilitate access to official events. As a general rule, Israeli journalists/technicians cover the occupied territories only under IDF protection.

Foreign and domestic media harshly criticized the GPO's proposed eligibility rules for Israeli and foreign journalists as a Government attempt to control the press. The new eligibility rules published in November would have required Israeli and foreign journalists to fill out a 25-page application as well as to a pay a fee. The GPO would provide copies of the applications to the ISA for security checks while the GPO examined them. The GPO indicated that it could revoke passes already granted if the ISA found unspecified derogatory information. In the past, only Palestinian journalists were subject to a vetting process by the ISA. After meeting with press representatives, the GPO rescinded the controversial rules.

The security forces detained without charge several foreign media employees. On April 24, security forces arrested without charge Agence France-Presse photographer Hossam Abu Alan, and on April 30, Reuters cameraman Yusri Al Jamal. Both were released 6 months later without charge. Abu Alan's equipment was confiscated and never returned. Security forces also detained without charge other Palestinians working for foreign agencies. Most were released shortly thereafter. None were charged and they were told only that their detention was based on their alleged assistance to terrorist organizations.

In 2002, the Ministry of Interior closed an Israeli-Arab newspaper, Sawt al-Haqq Wal-Hurriya. The newspaper was affiliated with the northern branch of the Islamic movement in the country and had previously published articles the Government believed supported terrorism. The newspaper has since been allowed to open and continued to publish regularly during the year. A censorship agreement between the Government and media representatives, and applicable to all media organizations in the country, provided that military censorship was to be applied only in cases involving national security issues that had a near certainty of harming the country's defense interests. All media organizations may appeal the censor's decision to the High Court of Justice. Moreover, a clause prohibits the military censor from closing a newspaper for censorship violations and from appealing a court judgment against it. News previously printed or broadcast abroad may be reported in Israel without the censor's review, which permits the media to run previously censored stories that have appeared in foreign sources.

During the year, journalists and professional journalist groups claimed that the Government placed limitations on their freedom of movement within the occupied territories, between the West Bank and Gaza, and between the occupied territories and Israel during violent unrest. The Government and security forces have stated that they did not target journalists due to their profession; however, three journalists were killed, and at least five were injured while covering events in the occupied territories during the year (see Section 2.a. of the annex).

The GPO, on security grounds, required foreign journalists to sign an agreement stating that they would submit to the military censor certain news stories and photographs; however, they rarely were challenged for not doing so. In practice, foreign and Israeli journalists sometimes submitted articles and photographs for military censorship; however, the requirement was not systematically followed or enforced, live broadcasts precluded such submission. The military censor decides whether a violation has occurred after the fact. In December, two major Israeli papers were fined for failing to submit material to the censor.

The Government generally respected academic freedom; however, the Government continued to interfere with the education of Israeli-Arab students because a member of the ISA monitored and approved the appointment of teachers and administrators in Arab schools.

b. Freedom of Peaceful Assembly and Association

The law provides for freedom of assembly and association, and the Government generally respected these rights in practice. During the year, there were a number of peaceful demonstrations for and against peace negotiations with the Palestinians. According to an Israeli-Arab advocacy NGO, Mossawa Center, on December 27, security forces dispersed a small demonstration in Tel Aviv by surrounding the group and arresting many of the participants. The security forces then declared the demonstration, which had been approved, illegal.

The law provides for the right of association, and the Government generally respected this provision in practice.

c. Freedom of Religion

The law provides for freedom of religion, and the Government generally respected this right; however, it imposed some restrictions. Approximately 80 percent of citizens consider themselves Jewish, although some persons in that group are not considered Jewish under Orthodox Jewish law or are related by marriage to a Jewish citizen. Muslims, Christians, and Druze make up the remaining 20 percent of the population. The law recognizes certain "religious communities" as carried over from those recognized under the British Mandate. These communities include the Eastern Orthodox Church, several Catholic orders, Maronites, and Jews. Three additional communities have subsequently been recognized by the Government--the Druze, the Evangelical Episcopal Church, and the Baha'i. Several other religious communities are not officially recognized. According to the Government, this lack of official recognition does not affect the ability of these communities to practice their religion freely or to maintain communal institutions.

Each recognized religious community has legal authority over its members in matters of marriage and divorce. For so-called "unrecognized religions," there were no local religious tribunals that had jurisdiction over their members in matters of personal status. The principle consequence of non-recognition is that they do not receive government funding for their religious services, as do many of the recognized communities. The fact that there was no recognized Muslim community is a vestige of the Ottoman period, during which time Islam was the dominant religion, and does not affect the rights of Muslims to practice their faith. Legislation enacted in 1961 afforded the Muslim courts exclusive jurisdiction to rule in matters of personal status concerning Muslims. Secular courts have primacy over questions of inheritance, but parties, by mutual agreement, may bring cases to religious courts. Jewish and Druze families may ask for some family status matters, such as alimony and child custody in divorces, to be adjudicated in civil courts as an alternative to religious courts. Christians may ask only that child custody and child support be adjudicated in civil courts as an alternative to religious courts. Despite not having legal recognition, Muslims, since 2001, also have the right to bring matters such as alimony and property division associated with divorce cases to civil courts in family-status matters. However, paternity cases remain under the exclusive jurisdiction of the Muslim or Shari'a Court.

Under the Law of Return, the Government grants automatic citizenship and residence rights to Jewish immigrants and their families; the Law of Return does not apply to those not officially recognized by the Orthodox establishment as Jews or to persons of Jewish descent who have converted to another faith (see Section 2.d.). Persons qualifying under the Law of Return as Jews may, nonetheless, fail to meet stricter criteria defining who is a Jew by some government organizations. Members of unrecognized religious groups (particularly evangelical Christians, but also Russian immigrants and others who considered themselves Jewish but were not recognized as such by all Israeli institutions) at times faced problems obtaining marriage certificates or burial services. However, informal arrangements provided relief in some cases.

Many Jewish citizens objected to exclusive Orthodox control over Jewish marriages, and it has been at times a source of serious controversy in society, particularly in recent years, as thousands of immigrants from the former Soviet Union have not been recognized as Jewish by Orthodox authorities (see Section 1 f.).

The 1996 Alternative Burial Law established the individual right to be buried in an alternative civil cemetery and that these cemeteries were to be located throughout the country. The Orthodox Rabbinate must certify the Jewish heritage of Russian immigrants in order for them to receive full Jewish burial rights; however, many Russian immigrants could not obtain approval to be buried in a Jewish cemetery. Several non-Orthodox Jewish and secular groups have complained, however, that the Ministry of Religious Affairs has been slow to implement this law and that there have been an inadequate number of civil cemeteries designated. According to one organization advocating the timely implementation of the 1996 law, many persons who would like a civil interment were forced to finance civil burials privately through a kibbutz, which was costly.

At year's end, the Israeli Religious Action Center, a civil rights NGO in the country, petitioned the Supreme Court to overturn the government practice whereby the Adoption Service of the Ministry of Social Affairs places non-Jewish children only with Orthodox Jewish homes. Pursuant to law, the adopted child must be of the same religion as the parents who adopt him or her. Since conversions to non-Orthodox forms of Judaism are not recognized in the country, the Government argued that by placing these children with Orthodox parents, they would not face any limbo periods during which their conversions could be questioned.

Under the Jewish religious courts' interpretation of personal status law, a Jewish woman may not receive a final writ of divorce without her husband's consent. Consequently, there were thousands of so-called "agunot" in the country who were unable to remarry or have legitimate children because their husbands either disappeared or refused to grant a divorce.

In April, the Women of the Wall, a group of more than 100 Orthodox, Conservative, and Reform women, lost their 14-year legal battle to hold formal women's prayer services at the Western Wall. The High Court ruled that the group instead would be permitted to hold such services at nearby Robinson's Arch.

Some Islamic law courts have held that Muslim women may not request divorces but that a woman may be forced to consent if a divorce is granted to the husband.

The Government provided proportionally greater financial support to Orthodox Jewish institutions than to non-Orthodox or non-Jewish groups, such as Muslim, Christian, and Druze groups. For example, the budget for the Ministry of Religious Affairs for 2000 (the most recent available) allocated only 2.9 percent of its resources to the non-Jewish sector, although Muslims, Christians, and Druze constituted approximately 20 percent of the population. In 2000, the High Court of Justice ordered the Government to allocate resources equitably to cemeteries of the Jewish and Arab communities. During the year, some non-Jewish cemeteries reported enhanced financing and some money to complete long-standing infrastructure and improvement projects. However, Muslim groups complained that the Government still did not equitably fund the construction and upkeep of Muslim holy sites in comparison to Jewish Orthodox sites, and, that it has been reluctant to refurbish mosques in areas where there was no longer a Muslim population.

In previous years, for security reasons the Government imposed restrictions on citizens who performed the Hajj, including requiring that they obtain permission from the Ministry of Interior and that they be over the age of 30. The Government justified these restrictions on the grounds that Saudi Arabia remained officially at war with Israel and that travel to Saudi Arabia therefore was considered subject to security considerations. However, Israeli Muslims were no longer required to obtain permission from the Ministry of the Interior to travel to Saudi Arabia on the Hajj. Because Israel and Saudi Arabia have no diplomatic relations, Israeli Muslims must travel through another country, usually Jordan, to obtain travel documents for Saudi Arabia. The average number of pilgrims from Israel is 4,500 per year.