Missionaries were allowed to proselytize, although the Church of Jesus Christ of Latter-day Saints voluntarily refrained from doing so under an agreement with the Government. The law prohibits anyone from offering or receiving material benefits as an inducement to conversion; however, there have been no reports of the enforcement of this law.

The 1967 Protection of Holy Sites Law protects holy sites of all religions, and the penal code makes it a criminal offense to damage any holy site. In May, the Government demolished a mosque in the Bedouin village of Tal el-Malah in southern Israel that was constructed without a building permit. This action forced approximately 1,500 residents to travel over 12 kilometers to the nearest mosque. Difficulties in reaching more distant mosques prevented some residents from engaging in public prayer, as required by their religious beliefs.

During the year, the Government continued to refuse recognition to the duly elected Greek Orthodox Patriarch, Eirinaios I. Many local Greek Orthodox Christians perceived the Government's actions as interference with the internal workings of their church. During the year, the Government appointed a ministerial committee chaired by Foreign Minister Silvan Shalom to determine the status of the Patriarch.

For a more detailed discussion, see the 2003 International Religious Freedom Report.

d. Freedom of Movement Within the Country, Foreign Travel, Emigration, and Repatriation

The law provides for these rights and the Government generally respected them in practice for citizens, except with regard to military or security zones or in instances in which citizens may be confined by administrative order to their neighborhoods or villages. Since the Intifada began in September 2000, the Government has imposed restrictions on the movement of persons between Israel and the West Bank and Gaza, and between cities inside the West Bank and Gaza (see Section 2.d. of the annex).

Citizens generally were free to travel abroad and to emigrate, provided they had no outstanding military obligations and were not restricted by administrative order. Citing confidential security reasons, in 2002, the Government restricted the right of Sheik Raed Salah, leader of the Northern Branch of Israel's Islamic Movement, from foreign travel. The Minister of Interior repeatedly renewed the 6-month travel ban and it remained in effect at year's end. Since imposition of this travel ban, Sheikh Salah has been arrested, detained, and put on trial for allegedly funneling funding to terrorist groups in the occupied territories. His case remained pending at year's end.

The law provides that a male spouse of a non-Jewish citizen may acquire citizenship and enter the country after the spouse passes a 4 1/2-year, multi-stage period of adaptation in Israel, except if the man has a criminal record or is suspected of posing a threat to security. Non-Jewish female citizens who marry non-citizen men, including men from the occupied territories, generally were allowed to retain their citizenship.

In May 2002, the Government stopped processing all residency and citizenship applications for Palestinian spouses, as well as family unification applications in general, on security grounds. The Government stated that 23 Palestinians who received some sort of status prior to May 2002 were suspected of being involved in terrorist incidents. Spouses and children who have resided in the country legally since that time have done so via a series of temporary residency permits. On July 31, the Knesset enacted the "Citizenship and Entry Into Israel Law," which bars Palestinians from the occupied territories from acquiring residence or citizenship rights through marriage to Israelis. The law requires annual Knesset renewal in maximum 1-year increments. According to one human rights organization, the El-Sana family is representative of the group of newly married couples who would be affected by this new law. In March, Morad El-Sana, an Israeli Arab, married Abeer El-Sana, a resident of Bethlehem in the West Bank. Pursuant to the new law, the Ministry of Interior denied El-Sana's request for his wife to receive status in Israel. Several advocacy groups have submitted petitions to the Supreme Court to challenge this law. The law would have an adverse impact on the country's Arab citizens, since they are more likely than Jews to have married Palestinians from the occupied territories. Advocacy groups claimed that approximately 16,000 cases--either approved or pending applications--could be adversely affected by this new law. The Government may issue permits to children under the age of 12 to reside in the country to prevent them from being separated from their parents who were lawfully staying in the country. The law provides for the extension of residency and other permits to remain in country that were obtained by the resident prior to the commencement of the law, and allows for the granting of a permit for temporary stay to a resident who submitted an application for citizenship prior to enactment of the law but had not yet received a determination. In November, the Supreme Court ordered the Government to further justify this citizenship law and issued injunctions preventing the deportation of three Palestinian spouses married to Israeli Arabs, until the Court delivered a final judgment on the petitions. At year's end, the Supreme Court had not issued a decision on the legality of this law.

During the year, the Government placed limits on journalists' freedom of movement within the occupied territories, between the West Bank and Gaza, and between Israel and the occupied territories (see Section 2.a.).

Citizens are required to enter and leave the country on their Israeli passports only. In addition, no citizen or passport-holder is permitted to travel to countries officially at war with Israel without special permission from the Government. In 2002, there were credible reports that the Government confiscated both the Israeli and Vatican passports of Archimandrite Theodosios Hanna, an Israeli citizen and official of the Greek Orthodox Church in Jerusalem. Credible reports from the media and an NGO indicated that while in several Gulf countries, Hanna gave clear endorsements of terrorist activities, including suicide bombings. The police held and interrogated Hanna at the Russian Compound on his travel, relations with PA President Yasser Arafat, and his position on the Intifada. When summoned to collect his passports, Hanna was informed that he would have to sign a statement promising not to incite violence against the state, make statements in support of terrorist activity, or to visit states hostile to the country without Ministry of Interior permission. Hanna refused to sign and was denied his passports. The Government continued to deny Hanna his passports at year's end.

The Law of Return provides automatic citizenship and residency rights to Jewish immigrants and their Jewish or non-Jewish family members. Children of female converts to Judaism are eligible to immigrate only if the children were born after the woman's conversion. The Law of Return does not apply to non-Jews or to persons of Jewish descent who have converted to another faith. In 2002, several non-Jewish Israeli citizens from the former Soviet Union told diplomats that the Ministry of Interior was attempting to strip their citizenship and return them to their home countries because they had divorced their Jewish spouses. At least one of those potential deportees had served a full term in the IDF. The Israel Religious Action Center (IRAC) reported that it had successfully petitioned the court to block the removal of several of these individuals and that it did not have information about all the cases. The IRAC reported that it had represented cases during the year of non-Jews or those whose Jewish identity was in question who immigrated to the country with their Jewish spouse but then divorced shortly thereafter.

These persons were then threatened by the Ministry of the Interior with having their citizenship revoked. The IRAC reported that it during the year had successfully petitioned the High Court to rescind the Ministry's decisions in some specific cases.

The law does not provide for the granting of asylum or refugee status in accordance with the 1951 U.N. Convention Relating to the Status of Refugees and its 1967 Protocol. In practice, the Government provided protection against refoulement and granted refugee status or asylum to Jews. The law does allow non-citizen Jews to live in the country as permanent residents. The Government cooperated with the office of the U.N. High Commissioner for Refugees (UNHCR) and other humanitarian organizations in assisting Jewish refugees. The Government does not return refugees against their will to their home countries; solutions are determined on an individual basis in observance of 1951 treaty obligations and in cooperation with the UNHCR. Individuals present in the country on tourist or work visas, or those in the country illegally, sometimes filed petitions with the local UNHCR representative as the first step in seeking refugee status, and there was individual adjudication of those with genuine claims to refugee status. Before 2002, refugee status was adjudicated in Geneva; beginning in 2002, a Government interministerial committee reviewed pending cases to determine if the facts merited designation of refugee status. The Minister of the Interior has the final authority to determine status, but within the past year has generally accepted the recommendation of the committee. If a person is granted refugee status, it is government policy to grant renewable temporary visas. However, the Government attempts to find a third country for persons from a state with which the country is at war. In those cases, the Government attempts to find a third country in which the individuals can live. The Government provides refugees all the protections under refugee conventions.

Section 3 Respect for Political Rights: The Right of Citizens to Change Their Government

The law provides citizens with the right to change their government peacefully, and citizens exercised this right in practice through periodic, free, and fair elections held on the basis of universal suffrage for adult citizens. National elections were held on January 28, when the Likud Party led by Ariel Sharon again won a plurality of Knesset seats, and Sharon was asked to form a government of which he became Prime Minister. The country is a parliamentary democracy with an active multi-party system in which political views were wide-ranging. Relatively small parties, including those whose primary support is among Israeli Arabs, regularly won seats in the Knesset. Elections were by secret ballot.

There were 18 women in the 120-member Knesset, and women chaired 5 of the Knesset's 21 committees (including the Committee on the Status of Women). There were 3 women in the Cabinet and 4 women on the 14-member High Court of Justice. There were 8 Arabs and 2 Druze in the 120-member Knesset; most of these 10 represented parties that derived their support largely or entirely from the Arab community. One Arab Christian served on the 14-member High Court of Justice. No Muslim or Druze citizens served on the court.

In August, the ministerial committee on Arab Affairs, headed by Prime Minister Sharon, approved a plan to appoint "at least one Arab board member to every government company within one year."

The Basic Law prohibits the candidacy of any party or individual who denies the Jewish and democratic existence of the State of Israel, incites racism, or supports (in action or speech) the armed struggle of enemy states or terror organizations. The Central Election Committee decided under provisions of this law to disqualify Dr. Ahmed Tibi, Azmi Bishara, and the Arab Bal'ad Party list from running in the January elections; however, the Supreme Court overturned this decision.

The Knesset Elections Committee for the 16th Knesset denied MK Azmi Bishara's right to run in the January 29 elections for expressions and other statements he made in public appearances and in the newspapers, for his opposition to the status of Israel as a Jewish state, and for supporting armed struggle of an enemy country or terror organization against the State of Israel. The Supreme Court overruled the Committee's decision and allowed him to participate in the election campaign, and he was elected as a member of the Knesset.

Section 4 Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Violations of Human Rights

A wide variety of local and international human rights groups operated without government restriction, investigating and publishing their findings on human rights cases. In 2002, Human Rights Watch (HRW) reported harassment by IDF soldiers and difficulty in gaining permission for expatriate staff to enter the country.

In March 2002, the Ministry of Interior issued an order to border officials to bar entry to all foreign nationals who were affiliated with some Palestinian human rights NGOs and solidarity organizations. During the year, there have been numerous cases where persons affiliated with Palestinian NGOs and humanitarian organizations providing assistance in the occupied territories were denied entry into Israel and, in some cases, deported. The Government's stated policy is to deny entry to those persons it considers security risks. In May, Israeli border police denied entry at the Allenby Bridge from Jordan to nine European youth who were working on a project associated with the European Union. The group was returning to Israel following the expiration of their initial 3-month visas. After the youth waited for several hours at the border to enter the country, the border police told them that the Ministry of Interior had denied them entry. After being denied on a subsequent request, the group was turned back into Jordan. In May, an advocacy organization filed a petition with a district court challenging the Ministry's decision, and the Minister of Interior rescinded prohibition on their entry.

In May, the Government prohibited entry of foreign nationals and members of international NGOs into the Gaza Strip unless they signed a form accepting limitations on their freedom of movement to certain areas and absolving the IDF of any responsibility for their safety. Failure to honor the conditions set forth in the form could result in arrest and/or deportation.

In May, Adalah reported that the Government requested information and documents relating to activities Adalah had allegedly taken beyond the scope of its mandate, including association with a political party and financial mismanagement. Adalah challenged this request and charged that many of the questions went beyond the inquiry's scope and outside the Registrar's authority.

NGOs must register with the Government by submitting an application and paying approximately $20 (85 shekels) to the Office of the Registrar. The office investigates the organization to confirm its stated purpose and ensure conformity with the law. If approved, the organization then receives a license to operate as an NGO. It must subsequently register with the tax office to receive tax-exempt status. Registered Israeli NGOs receive state funding; however, some Israeli-Arab NGOs complained of difficulties in both registering and receiving state funding. In 2002, the Government denied registration to a new Palestinian NGO, Tawasul. The Government said that it merely wanted the organization to change its name, due to its similarity to those of other registered NGOs (see Section 2.b.). In April,

however, the Government registered Tawasul as an NGO.

Section 5 Discrimination Based on Race, Sex, Disability, Language, or Social Status

The law prohibits discrimination on the basis of sex or marital status. The law also prohibits discrimination by both government and nongovernmental entities on the basis of race, political beliefs, or age. Local human rights groups were concerned that these laws often were not enforced, either as a result of institutionalized discrimination, or because resources for implementing those laws, or mechanisms for their enforcement, were lacking. During the year, NGOS complained of discrimination and police harassment against homosexuals in Tel Aviv. According to a February 200 report submitted to the U.N. by the Government, allocation of resources to different population groups was inconsistent with the law's prohibition on discrimination.

Approximately 93 percent of the country's land area is public domain under the management of the Israel Lands Administration (ILA), which, as a matter of policy, does not sell but only leases land. Of that 93 percent, some 14 percent is owned by the Jewish National Fund (JNF), an organization established in 1897 for the purchase and management of land for the Jewish people. The JNF's statute prohibits the sale or lease of land to non-Jews, although reports indicate it has done so. Foreigners and citizens of all religions were allowed freely to purchase or lease the 7 percent of land not controlled by the Government or the JNF.

At year's end, the Government had still not implemented the 2000 High Court of Justice ruling that the Government cannot discriminate against Israeli Arabs in the distribution of State resources, including land. The Court held that the ILA must provide an Israeli-Arab family, the Ka'adans, with title to a plot of land they wanted to buy in the Jewish community of Katzir. The court ruled specifically that the ILA cannot discriminate on the basis of nationality or religion when dispensing land to its citizens. The High Court determined that its ruling would not affect previous land allocations and that differentiating between Jews and non-Jews in land allocation might be acceptable under unspecified "special circumstances." The community council was instructed to develop and publish criteria for its decisions and a plan for implementation; however, the ILA through the local council did not implement the court's 2000 decision. In October, the Arab family petitioned the court to compel the ILA's allocation of the plot of land in Katzir. To avoid returning to court, the ILA agreed to offer the Arab family a similar plot of land in an adjacent newly constructed community. On December 17, the Supreme Court issued an interim injunction ordering the ILA to set aside a plot of land in Katzir for the Ka'adans; however, at year's end, the ILA still had not done so.

The Association of Gay Men, Lesbians, Bisexuals and Transgender in Israel complained that there had been several incidents where police in Tel Aviv had allegedly engaged in verbal and physical harassment of homosexuals in a Tel Aviv public park. Representatives of that organization subsequently met with representatives of the police to discuss ways to improve relations between the police and the homosexual community. According to reports, the police appointed contact persons in all police districts who would serve as liaisons to the homosexual community.

Women

The Equality of Women Law provides for equal rights for women in the workplace, the military, education, health, housing, and social welfare, and entitles women to protection from violence, sexual harassment, sexual exploitation, and trafficking. The law prohibits domestic violence; however, violence against women was a problem, despite the steps taken by the Government to prosecute these crimes and by other organizations to raise public awareness about this problem.

In 2001, the Government enacted the Prevention of Stalking and amended the Prevention of Family Violence Law to include a duty to inform service requiring a number of public and private sector professional personnel to inform suspected victims of their right to turn to the police, welfare service, or Centers for the Prevention of Domestic Violence for assistance.

According to the Ministry of Public Security, 13 women were killed by their husbands between January and November. Between January and October, according to the Government, women lodged 10,000 complaints of domestic violence. At the end of September, 522 women with 809 children stayed in battered women's shelters. The Government estimated that 5,500 women were treated in centers for prevention and treatment of domestic violence. Annually, approximately 4,000 women and 3,350 girls were victims of violence and were treated by the various social services departments in the local municipalities. Social workers have taken statements from approximately 1,200 girls who were victims of domestic violence. The Government also reported that between January and October, women and girls filed 2,024 complaints of sexual assault with the police. By the end of September, aid centers received 5,063 calls from victims of sexual assault, 852 of whom were victims of incest. During the year, sexual assault victims treatment centers treated approximately 100 women, and the Agency for Women and Girls treated approximately 1,100 women and girls, 480 of whom were victims of incest. Social workers for children who were victims of sexual offenses, took statements during the year from 240 girls who claimed they were victims of sexual assault committed by family members.

Rape is illegal; however, NGOs consider the incidence of rape a matter of concern in the country.

One women's organization claimed that during the year, it had information about three cases of Arab women killed by male relatives in family honor cases. That organization also stated that a Bedouin women's organization suspected 10 cases of honor killings of women in the Negev. Several of the women had reportedly disappeared. There was no accurate estimate of the number of family honor cases as families often attempted to cover up the cause of such deaths.

Prostitution is not illegal; however, the operation of brothels and organized sex enterprises is outlawed. NGOs reported that there may be prostitutes under the age of 18 but there is currently no accurate estimate. NGOs speculate that there are approximately 100-200 prostitutes under 18 years of age.

Trafficking in women remained a significant problem. Criminal networks reportedly trafficked hundreds of women, primarily from the former Soviet Union, into the country by criminal networks to work as prostitutes (see Section 6.f.).

The law prohibits sexual harassment. There were no accurate statistics regarding the extent of sexual harassment in the workplace; however, there was a dramatic increase in the number of complaints of sexual harassment following enactment in 1998 of the law prohibiting sexual harassment. According to the Government, from January to October, victims filed 167 complaints of sexual harassment to the police.

The law provides for class action suits and requires employers to provide equal pay for equal work, including side benefits and allowances; however, women's rights advocates claimed that deep wage gaps remained. Women's advocacy groups reported that women routinely received lower wages for comparable work, were promoted less often, and had fewer career opportunities than their male counterparts. According to the Central Bureau of Statistics, women averaged only 79 percent of men's wages in 2002. According to press reports, women filled only 2 percent of senior management positions in large companies.

Religious courts adjudicate personal status law in the areas of marriage and divorce. Jewish and Muslim women are subject to restrictive interpretations of their rights in both systems. Under personal status law, Jewish women are not allowed to initiate divorce proceedings without their husbands' consent; consequently there were estimated to be thousands of "agunot" who may not remarry or have legitimate children because their husbands either disappeared or refused to grant a divorce.

In accordance with Orthodox Jewish law, the 1995 Rabbinical Courts Law allows rabbinical tribunals to impose sanctions on husbands who refuse to divorce wives who have ample grounds for divorce, such as abuse. One foreign citizen has been in prison since 1999 for refusing to grant his wife a divorce. However, in some cases, rabbinical courts failed to invoke these sanctions. In addition, there were cases in which a wife failed to agree to a divorce, but rabbinical authorities allowed the man to "take a second wife;" a remedy not available to wives. Such restrictive practices have been used by husbands to extort concessions from their wives in return for agreeing to a divorce. Rabbinical courts also may exercise jurisdiction over, and issue sanctions against, non-citizen Jews present in the country.

Some Islamic law courts in the country have held that Muslim women may not request a divorce, but that women may be forced to consent if a divorce is granted to a man.

Children

The Government has stated its commitment to the rights and welfare of children; however, in practice, resources at times were insufficient, particularly with respect to low-income families. Government spending was proportionally lower in predominantly Arab areas than in Jewish areas, which adversely affected children in Arab villages and cities. In November, the Central Bureau of Statistics reported that in 2002, 16 percent of children in Israel lived in households with no working parent (13.1 percent of Jewish children and 26 percent of Arab children). In December, the Child Welfare Council of Israel published a report stating that Israeli children were growing poorer and increasingly falling victim to violence, sexual exploitation, and drug and alcohol addiction. The report states that nearly 656,000 children, or one-third of all Israeli children, lived below the poverty line in 2002 and that the situation in the non-Jewish sector was worse, with 54.4 percent of children living in poverty.

Education is compulsory up to the age of 15 or until the child reaches the 10th grade, whichever comes first. Education is free until age 18. Arab children comprised approximately one-quarter of the public school population, but historically, government resources allocated for them were proportionately less than that for Jewish children. Many schools in Arab communities were dilapidated and overcrowded, lacked special education services and counselors, had poor libraries, and had no sports facilities.

During the year, the Mossawa Center reported that only about one third of the 1,500 classrooms that were scheduled to be built in Arab communities had been made available by year's end. According to the Government's February 2002 report to the U.N., government investment per Arab pupil was approximately 60 percent of investment per Jewish pupil.

High school graduation rates for Arabs were significantly lower than for Jews. Preschool attendance for Bedouin children was the lowest in the country, and the dropout rate for Bedouin high school students was the highest. In August, the Supreme Court ordered the Ministry of Education to provide two appropriate classrooms for eight hearing impaired Arab children in response to a petition filed by an advocacy group. According to Adalah, the Government provided classroom space in existing school facilities; however, the condition of the classrooms remained unsuitable.

In 2000, the Commission to Examine the Implementation of the Special Education Law (the Margalit Commission) published its detailed recommendations on how to improve special education in the Arab sector. Over the past 3 years, the Government increased the number of classroom hours for special education in the Arab sector by 12,000 weekly hours.

The Government operated a number of school systems: one for secular Jews, at least two for religious Jews, and one for Israeli Arabs. Most Jewish children attended schools where the language of instruction was Hebrew and the curriculum included Jewish history. Most Israeli-Arab children chose schools where the language of instruction was Arabic and the curriculum had less of a "Jewish" focus. Israeli-Arab children overall received an education inferior to that of Jewish children in the secular system. The Education Ministry allocated money per class, and acknowledged that due to the larger classes of Arab students, it allocated less money per student in the Arab system than in the Jewish system. In addition, Jewish schools received additional state and state-sponsored funding for school construction and special programs through other government agencies.

In 2001, Adalah requested that the Government discontinue ISA monitoring and approval of teachers and administrators in Arab schools and claimed that in its role at the Ministry of Education, the ISA discriminated against persons on the basis of their political affiliation. In August, members of the Knesset also criticized ISA involvement in the appointment of teachers and principals in Arab schools during a Knesset committee's session on the status of Israel's Arab education system. Arab members of the Knesset also criticized the lower academic achievements of Arab students and stated that this was an indication of discrimination in the system.

On a practical level, several factors prevented foreign workers from marrying or maintaining a normal family life while in the country. Work visas apply only to the worker; a family cannot be brought with the worker into Israel. According to NGOs, if two foreign workers marry while in the country, one of their work permits will not be renewed, forcing that spouse to leave the country. These same NGOs stated that if a foreign worker attempted to reunify his or her family by having his or her spouse apply for a separate work permit, and this arrangement became known to authorities, at least one of the spouses would not have their work permits renewed, and that spouse will either have to leave the country or remain in an illegal status. Foreign workers who wished to marry a citizen must apply for a permit from the Ministry of the Interior to allow them to stay in Israel. NGOs noted that the process was burdensome and that workers encountered serious delays while their status was adjudicated.

If a legal foreign worker becomes pregnant while in the country, the child born to that worker is entitled to remain with their parent as long as the parent maintains a legal work permit and until age 18. The child is entitled to receive limited health and education benefits until the age of 18; however, it is not clear whether children received these benefits as a matter of practice. After the age of 18, these individuals must leave the country and if found in the country, are subject to deportation. Other minor children of foreign workers (who usually enter the country though tourist visas) are subject to deportation as a matter of law; however, at

year's end, the Immigration Authority deported these children.

The Government has legislated against sexual, physical, and psychological abuse of children and has mandated comprehensive reporting requirements regarding these problems. Although there was a sharp increase in reported cases of child abuse in recent years, activists believed that this largely was due to increased awareness of the issue rather than a growing pattern of abuse. There were five shelters for children at risk of abuse.

Persons with Disabilities

The Government provided a range of benefits, including income maintenance, housing subsidies, and transportation support for persons with disabilities, who constituted approximately 2.4 percent of the population. Existing anti-discrimination laws do not prohibit discrimination based on disability, and persons with disabilities continued to encounter difficulties in areas such as employment and housing. A law requiring access for persons with disabilities to public buildings was not widely enforced. There was no law providing for access to public transportation for persons with disabilities. At a Knesset meeting in December, the Commissioner for Equality for the Disabled stated that a survey of buildings in 2002 indicated that most contractors have ignored laws calling for access for the disabled. The Commissioner also accused the Government of not doing enough to provide employment for the disabled despite requirements in the law. According to the Commissioner, 595 out of 50,000 public-service workers were disabled. The Attorney General told the Knesset committee that laws protecting and assisting the disabled were not being implemented due mainly to a lack of funding.

National/Racial/Ethnic Minorities

The Government did not allocate sufficient resources or take adequate measures to provide Israeli Arabs, who constitute approximately 20 percent of the population, with the same quality of government services, as well as the same opportunities for government employment, as Jews. In addition, government spending was proportionally far lower in predominantly Arab areas than in Jewish areas; on a per capita basis, the Government spent two-thirds as much for Arabs as for Jews. The Government noted in a 2002 report to the U.N. that "the Arab population is typified by larger families, lower levels of education, and lower income than the total Israeli population."

The COI report (see Section 1.a.) stated that the "Government handling of the Arab sector has been primarily neglectful and discriminatory," that the Government "did not show sufficient sensitivity to the needs of the Arab population, and did not take enough action to allocate state resources in an equal manner." As a result, "serious distress prevailed in the Arab sector in various areas. Evidence of distress included poverty, unemployment, a shortage of land, serious problems in the education system, and substantially defective infrastructure." On September 14, the Cabinet appointed a special ministerial committee to advise the Government on how to implement those recommendations within 60 days. The committee's tenure was extended at year's end.

Minister of Finance Benjamin Netanyahu's statement in December at a major public policy conference that Israeli Arabs presented a "demographic problem" in the country elicited strong criticism, especially from civil rights groups and Israeli-Arab leaders.

Municipalities, including Arab municipalities, were responsible for issuing building permits within the municipal boundaries. Some Israeli-Arab and civil rights NGOs claimed that outside of Arab-governed municipalities, the Government was more restrictive in issuing building permits to Arabs than to Jews. In addition, Israeli law does not recognize many long-established Israeli-Arab and Bedouin communities. All buildings constructed in these unrecognized villages are considered illegal and it is impossible to obtain building permits for construction to accommodate the natural growth of communities. The COI report stated that the Government "must allocate land to this sector according to the same egalitarian principles it uses with other sectors." The COI also found that "suitable planning should be carried out as soon as possible to prevent illegal construction caused by lack of existing town planning that make it difficult to obtain building permits." Israeli-Arab advocacy organizations have challenged the Government's plan to demolish more illegal buildings in the Arab sector, calling for the initiation of a comprehensive planning process, with the participation of the affected communities. These groups alleged that state-approved plans for development were lacking in many of the areas of unrecognized villages, such as the Negev. Pursuant to Israeli law, such a plan must exist to obtain building permits. Several ministers were reportedly considering establishing a separate department to expedite demolitions of illegal buildings in Arab areas. The department would reportedly focus on three geographic areas: the Bedouin villages in the Negev, Arab villages in the Galilee, and the Arab village "triangle" in the central area of Israel.

The Bedouin sector was the weakest of all the population groups in the country. Bedouin living in unrecognized villages had no way to obtain building permits. The COI report stated that the living conditions and the hardships of the Bedouin community should be afforded "special attention." According to a well-known Bedouin advocacy organization, during the year, the Government destroyed over 35 Bedouin houses, a mosque, 13 shops and a water container. For example, in May, security forces demolished two houses in the unrecognized Bedouin villages of Kherbat Al Ras and Al Fara'h in the Negev. According to this same organization, hundreds of security forces and aircraft arrived in Kherbat Al Ras and Al Fara'h, closed all the main entryways and demolished the two houses, leaving the inhabitants homeless. In 2002, the Government destroyed 52 Bedouin homes in the unrecognized village of al-'Araqib. The Government continued to prohibit building in that village.

Israeli-Arab organizations have challenged publicly the 1996 "Master Plan for the Northern Areas of Israel," which listed as priority goals increasing the Galilee's Jewish population and blocking the territorial contiguity of Arab villages and towns, on the grounds that it discriminated against Arab citizens; the Government continued to use this document for planning in the Galilee. A hearing on objections to this plan was held in March but at year's end, there had not been a response from the National Council for Building and Planning, and the plan had not been implemented.

Israeli Arabs were underrepresented in the student bodies and faculties of most universities and in higher level professional and business ranks. During the 1999-2000 school year, Arab students comprised 9 percent of all students studying for bachelor's degrees and 4 percent of all students studying for advanced degrees. The Bureau of Statistics notes that the median number of school years of the Jewish population is 3 years more than that of the Arab population. In the 1999-2000 school year, according to the Bureau, 12 percent of students in the Arab education system and 6 percent in the Hebrew school system dropped out of school in the 9th to 11th grades. Well-educated Arabs often were unable to find jobs commensurate with their level of education. In 2002, Arab citizens held fewer than 60 of the country's 5,000 university faculty positions. The Government stated that it was committed to granting equal and fair conditions to Israeli Arabs, particularly in the areas of education, housing, and employment. A small number of Israeli Arabs have risen to responsible positions in the civil service, generally in the Arab departments of government ministries. According to the advocacy NGO Sikkuy's 2002-2003 Report, Israel's Civil Service Commission

provided data showing that Israeli Arabs comprised 6.1 percent of all civil service workers in Israel. In September, the Government approved an affirmative action plan to promote the hiring of Israeli Arabs in the civil service.

In 2000, the Knesset passed a bill requiring that minorities and underrepresented populations be granted "appropriate representation" in the civil service and on the boards of government corporations. The Government took some steps toward implementing the law in 2002, including setting aside civil service positions for Arab candidates and appointing more Israeli Arabs to corporate boards. For example, in 2002, an Arab citizen was appointed to the board of Ben Gurion Airport. But, according to one advocacy organization, as of December 2002, Arab citizens held only 37 out of 671 positions (approximately 5.5 percent) on the boards of directors of governmental companies. The Government's affirmative action plan for Israeli Arabs would also include the appointment of more Arabs to the boards of government companies; however, there had been no implementation by year's end.

Israeli Arabs continued to complain of discriminatory treatment at the airport. In September, the Airport Authority hired 12 Arab security officers to serve as airport security personnel following the mistreatment of an Israeli-Arab senior commander in the border police. The senior commander complained of being humiliated at Ben-Gurion Airport by security personnel.

Israeli Arabs were not required to perform mandatory military service and in practice, few Israeli Arabs served in the military or worked in companies with defense contracts or in security-related fields. The Israeli Druze and Circassian communities were subject to the military draft, and the overwhelming majority accepted service willingly. Some Bedouin and other Arab citizens who were not subject to the draft served voluntarily. Those who did not serve in the army had less access than other citizens to those social and economic benefits for which military service was a prerequisite or an advantage, such as housing, new-household subsidies, and government or security-related industrial employment.

In 2002, NGOs challenged in court a government plan to pay less social security child allowance benefits to families in which at least one parent did not serve in the IDF than to families in which at least one parent did. Advocacy and civil rights organizations argued that the law would discriminate against most Israeli Arabs who were exempt from and did not serve in the military. In July, the Supreme Court dismissed the petition as the relevant provision of the law was cancelled by the Knesset's passage of the new economic plan.

Israeli-Arab groups alleged that many employers used the prerequisite of military service to avoid hiring non-Jews. In 2001, the municipality of Tel Aviv advertised for parking lot attendants; "military service" was a prerequisite.

There were approximately 130,000 Bedouin in the Negev; of this number, approximately half lived in 7 state-planned communities and the other half lived in 45 settlements that were not recognized by the Government. The recognized Bedouin villages receive basic services from the Government; however, they remain among the poorest communities in the country. The Government reported that Bedouins who move to these state-planned communities were compensated for abandoned property, provided grants, as well as new land free of charge.

The unrecognized villages were declared illegal by the National Planning and Building Law of 1965, which rezoned the lands on which they sat as nonresidential, and the Government claimed ownership of the land. New building in the unrecognized villages was considered illegal and subject to demolition. According to the Government, recognizing these villages would conflict with its attempts to establish new villages in "an orderly manner and would leave disputes over the land unresolved." Residents of the unrecognized villages paid taxes to the Government; however, their villages were not eligible for government services. Consequently, such villages were denied basic health, education, water, electricity, employment opportunities, and other services. Only 13 of the unrecognized villages had elementary schools. There are no high schools in any of the unrecognized villages. Private efforts have supplied some unrecognized villages with water, and the courts have ordered the provision of limited health and education services.

The Government has yet to fulfill its commitment to resolve the legal status of unrecognized Arab villages. Since 1994, 8 villages have been recognized officially, but nearly 100 more, of varying size and with a total population of nearly 70,000 persons, remained illegal. At year's end, the Government still had not implemented a 1999 High Court decision requiring a study into the infrastructure needed in each village.

In March, without prior warning, two ILA airplanes, accompanied by a large number of police forces and other security forces, sprayed a chemical herbicide on houses and more than 2,000 dunams (500 acres) of crops belonging to residents of Abda, an unrecognized Bedouin village in the Negev. According to a reputable advocacy organization, elderly persons and children were in the fields at the time of the spraying. In addition, in April, the ILA sprayed chemical herbicide on about 2,000 dunams (500 acres) of land belonging to several unrecognized villages to compel the residents to move into one of the seven townships.

In February 2002, the ILA sprayed from the air chemical herbicide over 12,000 dunams (12 sq. km) of Bedouin wheat fields in the Negev that had been planted on unrecognized land. Bedouin communities depend on agriculture for sustenance.

There continued to be claims by Arab groups that land expropriation for public use affected the Arab community disproportionately; that Arabs have been allowed too little input in planning decisions that affect their schools and municipalities; that mosques and cemeteries belonging to the Islamic Waqf (religious endowment) have been neglected or expropriated unjustly for public use; and that successive governments have blocked the return to their homes of citizens displaced in the early years of the country's history. The Government has yet to agree with the pre-1948 residents of the northern villages of Bir Am and Ikrit, and their descendants, regarding their long-term demand to be allowed to rebuild their houses. In 1997, a special interministerial panel recommended that the Government allow the villagers to return to Bir Am and Ikrit. The High Court granted the Government several extensions for implementing the recommendation.

In October 2001, after the expiration of the most recent extension, the State Prosecutor's Office submitted an affidavit to the High Court asking it to reject the villagers' appeal, stating that the Government had legally appropriated the land, and that the precedent of returning displaced persons to their villages would be used for propaganda and political purposes by the Palestinian Authority. In June, the Supreme Court rejected a petition by former residents of Ikrit to return to their homes. The three justices accepted the Government's claim that despite promises given by previous governments to former Ikrit residents that they would be allowed to return, the State's interest justified rejecting the petition. The former residents would have to accept alternatives offered by the State. At year's end, no information was available regarding these alternatives.

Section 6 Worker Rights