a. The Right of Association

Citizen workers may join and establish labor organizations freely. Most unions belong to Histadrut (the General Federation of Labor in Israel) or to a much smaller rival federation, the Histadrut Haovdim Haleumit (National Federation of Labor). These organizations are independent of the Government. Histadrut members elect national and local officers and officials of its affiliated women's organization, Na'amat, from political party lists of those already in the union. Plant or enterprise committee members are elected individually. Approximately 650,000 workers were members of Histadrut during the year, and much of the non-Histadrut work force was covered by Histadrut's collective bargaining agreements.

Palestinians from the West Bank and Gaza Strip who worked in Israel were not able to join Israeli trade unions or organize their own unions in Israel. Palestinian trade unions in the occupied territories were not permitted to conduct activities in Israel (see Section 6.a. of the annex). However, nonresident workers in the organized sector were entitled to the protection of Histadrut work contracts and grievance procedures. They may join, vote for, and be elected to shop-level workers' committees if their numbers in individual establishments exceed a minimum threshold. Palestinian participation in such committees was minimal.

Labor laws apply to Palestinians holding East Jerusalem identity cards and to the Syrian Druze living on the Golan Heights.

Unions were free to affiliate with international organizations.

b. The Right to Organize and Bargain Collectively

Citizen workers exercised their legal rights to organize and bargain collectively. The law specifically prohibits anti-union discrimination. No anti-union discrimination was reported.

Nonresident workers could not organize their own unions or engage in collective bargaining, but they were entitled to be represented by the bargaining agent and protected by collective bargaining agreements. The country's immigration officials estimate there are 236,000 foreign workers in the country. They did not pay union dues, but were required to pay an agency fee in lieu of dues, which entitled them to union protection by Histadrut's collective bargaining agreements. The Ministry of Labor could extend collective bargaining agreements to nonunionized workplaces in the same industrial sector. The Ministry of Labor also oversaw personal contracts in the unorganized sectors of the economy.

The right to strike was exercised regularly. Unions must provide 15 days' notice prior to a strike. Strike leaders--even those organizing illegal strikes--were protected by law. If essential public services are affected, the Government may appeal to labor courts for back-to-work orders while the parties continue negotiations. There were a number of strikes in both the public and private sectors during the year by employees protesting the effects of privatization. Worker dismissals and the terms of severance arrangements often were the central issues of dispute. During the year, there were several major strikes of municipal workers. Histadrut called strikes both in the spring and fall of the year protesting wage, pension, and benefit issues. At year's end, port workers were in court-mediated negotiations over privatization issues.

There are no export processing zones.

c. Prohibition of Forced or Bonded Labor

The law prohibits forced or bonded labor, including by children, and there were no reports that such practices occurred for citizens and or nonresident Palestinians working in Israel; however, civil rights groups charged that unscrupulous employers often took advantage of illegal workers' lack of status to hold them in conditions that amount to involuntary servitude (see Section 6.e.). The problem was notable concerning non-Palestinian illegal workers.

Women were trafficked for the purpose of prostitution (see Section 6.f.).

d. Status of Child Labor Practices and Minimum Age for Employment

Children who have attained the age of 15 years, and who fall under the compulsory education law (which applies to all children except those who have completed grade 10), may be employed only as apprentices under the Apprenticeship Law. Children who are 14-years old may be employed during official school holidays in light work that will not harm their health. Working hours of those 16 to 18 years of age are restricted to ensure time for rest and education. The Government enforced all of these restrictions in practice.

There were no reliable data regarding illegal child workers. The estimated small number of child workers reportedly was concentrated among the country's illegal Arab population. Illegal child employment was found primarily in urban, light industry.

e. Acceptable Conditions of Work

The minimum wage is calculated periodically and adjusted for cost of living increases. In 2001, the minimum wage was raised to 47.5 percent of the average wage. At year's end, the minimum wage was less than $900 (approximately 3,555 NIS) per month. During the year, the minimum wage often was supplemented by special allowances and was considered by the government to be sufficient to provide a worker and family with a decent standard of living. Some union officials and social commentators disputed that the minimum wage was adequate to provide a decent standard of living. Union officials expressed concern over enforcement of minimum wage regulations, particularly with respect to employers of illegal nonresident workers, who were sometimes paid less than the minimum wage.

By law, the maximum hours of work at regular pay are 45 hours a week, 8 hours a day, and 7 hours in night work on the day before the weekly rest. That rest period must be at least 36 consecutive hours and include the Sabbath for Jews and a choice of Friday, Saturday, or Sunday for non-Jews.

Employers must receive a government permit to hire Palestinian workers from the occupied territories, certifying that no citizen is available for the job. All Palestinians from the occupied territories working in Israel were employed on a daily basis and, unless they were employed on shift work, were not authorized to spend the night in Israel. Palestinians without valid work permits were subject to arrest.

The employment service of the Ministry of Labor, which disbursed wages and benefits collected from employers, paid Palestinian nonresident workers. The

Ministry deducted a 1 percent union fee and the workers' required contributions to the National Insurance Institute (NII), the agency that administered the Israeli social security system, unemployment benefits, and other benefits. Despite these deductions, Palestinian workers were not eligible for all NII benefits. They continued to be insured for injuries suffered while working in the country, maternity leave, as well as the bankruptcy of a worker's employer. However, they did not have access to unemployment insurance, general disability payments, or low-income supplements.

Since 1993, the Government has agreed to transfer the NII fees collected from Palestinian workers to the Palestinian Authority, which is to assume responsibility for all the pensions and social benefits of Palestinians working in Israel. Mechanisms for transferring the funds and mechanisms for providing these services in the PA controlled territories, have not been established. At year's end, the funds had not been transferred and were held in a trust.

Following the outbreak of violence in 2000, the Government implemented a closure policy, which prevented nearly all Palestinians from getting to their places of employment in Israel (see Section 2.d.).

Along with union representatives, the Labor Inspection Service enforced labor, health, and safety standards in the workplace, although resource constraints, such as adequate staffing, affected overall enforcement. Legislation protects the employment rights of safety delegates elected or appointed by the workers. In cooperation with management, these delegates were responsible for safety and health in the workplace.

Workers did not have the legal right to remove themselves from dangerous work situations without jeopardy to continued employment. However, collective bargaining agreements provided some workers with recourse through the work site labor committee. Any worker may challenge unsafe work practices through government oversight and legal agencies.

Public debate continued regarding the role in the workplace and society of non-Palestinian foreign workers, whom the Government estimated to be 236,000, about half of whose legal status had lapsed and who were thus undocumented and both living and working illegally. The majority of such workers came from Eastern Europe and Southeast Asia, and worked in the construction and agricultural sectors. The law does not allow foreign workers the ability to obtain citizenship or permanent residence status, unless they are Jewish, in which case they would qualify under the laws that allow for Jewish persons to immigrate. According to NGOs, foreign workers and their families, especially those who entered the country illegally, experienced uncertainty in addressing legal and social problems, including exploitation or abuse in the workplace, because they fear immediate discharge and subsequent deportation if they raise these issues with government ministries.

NGOs alleged that foreign workers were being lured to the country with the promise of jobs that in fact did not exist. Work visas were tied to specific jobs, and quotas to bring in foreign workers were assigned by the Government to employers. Technically, it is illegal for Israeli manpower companies who provide the workers to the employers, to receive payments from the worker, but NGOs and news articles alleged that the companies made thousands of dollars from each worker brought into the country, usually as a payment from the foreign partner. Some foreign workers paid up to $10,000 (45,000 NIS) to employment agencies to obtain permits to work in the country.

According to NGOs, there were a significant number of cases where workers have been dismissed shortly after arriving in Israel. These NGOs alleged that the manpower companies worked with deportation authorities to deport the newly arrived workers, who were then replaced with newly arriving workers, earning the manpower companies more fees. NGOs argued that most workers expected to work for some time in Israel to recoup their initial payments; those faced with the absence of jobs for which they had made arrangements often sought illegal employment for fear of returning home with large debts. According to NGOs, there have been cases where workers have killed themselves rather than face this prospect.

Illegal foreign workers facing deportation were brought before a special court established to deal with issues related to deportation, and workers may contest the deportations. Many workers lacked fluency in Hebrew, which hindered the process. NGOs exist to aid workers facing deportations, and there have been cases in which the worker's status was reinstated. The court also provided a forum where deportable workers can claim that they were not paid or given benefits according to the law. In some cases, the court delayed deportation until employers paid all claims, including severance. However, some NGOs suggested that illegal workers often lived in situations amounting to involuntary servitude, due primarily to their tenuous legal status and lack of recourse. NGOs noted cases in which the police injured foreign workers during arrest. In some cases, these NGOs claimed, the workers were so seriously injured that they were not ultimately detained, due to the potential cost of care for their injuries and police fears of possible investigation of police misconduct. At least one foreign worker killed himself while in detention.

In 2002, the editor of the foreign worker newspaper Manila-Tel Aviv Times was deported shortly after giving interviews to other publications on the subject of foreign worker rights under the law; foreign worker advocates claimed the deportation was politically motivated. During the year, another reporter from the publication was deported after advising foreign workers in an article on strategies for avoiding detention and deportation. Human rights groups claimed that since foreign worker residency permits were tied to specific employment, even legal foreign workers had little leverage to influence their work conditions.

f. Trafficking in Persons

The law prohibits trafficking women for the purpose of prostitution; however, it remained a serious problem. The penal code also stipulates that it is a criminal offense, punishable by between 5 and 7 years imprisonment, to force or coerce a person to engage in prostitution and makes it a criminal offense to induce a woman to leave the country with the intent to "practice prostitution abroad." The Equality of Women Law (see Section 5) stipulates that every woman is entitled to protection from violence, sexual harassment, sexual exploitation, and trafficking. The operation of brothels and "organized sex enterprises" is outlawed, as are many of the abuses committed by traffickers and pimps, such as assault, rape, abduction, and false imprisonment; however, brothels operated openly in at least several major city.

Women were trafficked primarily from the former Soviet Union, including Moldova, Russia, Uzbekistan, and Ukraine. According to some local NGOs, several hundred women are trafficked into the country annually. NGOs reported that the number of trafficked women entering the country fell from previous years because of increased security at Ben Gurion airport, but women were still being trafficked across the Egyptian border.

NGOS reported that traffickers often lured women into traveling to the country by offering them jobs in the service industry. In many cases, traffickers met women at the border and confiscated all their official documents. Many trafficked women were forced to live and work under extremely harsh conditions and to give most

of the money they earned to their traffickers. The women reportedly often were raped and beaten, then auctioned to pimps who repeated the procedure. If the women escaped from their traffickers, they were often afraid to report their situations to the police because the traffickers threatened to hunt them down and hurt them. According to press reports, it was common for trafficked women to be told that they must repay the costs of their travel to the country through servicing up to 25 clients a day. They were paid little or no money for this work and once the debt had been repaid, they were auctioned again.

In previous years, some victims accused individual police officers of complicity with brothel owners and traffickers. The Government claimed that it reviewed cases involving allegations of police involvement; however, NGOs reported that the review process was slow and questioned whether all complaints were taken seriously. An NGO reported that sex trafficking victims reported seeing police officers at the brothels; the report was based on interviews with trafficking victims in 2001-2002.

According to the Government, from January to December, police opened 51 trafficking in persons investigations and approximately 400 investigations involving related offenses such as pandering, causing a person to engage in prostitution, soliciting prostitution and kidnapping.

During the year, the police arrested 92 persons for trafficking in persons, with 65 detained until the conclusion of their trials. Another 93 persons were arrested for related offenses. Government sources provided a partial list of judgments rendered during the year. Of the 13 cases presented, 7 were appealed to the Supreme Court. Three cases involved plea bargains, and the range of sentences rant form 16 months to 15 years imprisonment.

Police often detained trafficked women following raids on brothels; the number of such raids increased during the year. The Ministry of Interior has broad powers to deport illegal aliens and to hold them in detention pending deportation. The Government estimated that more than 500 women deported from the country during the year had been trafficking into the country. Trafficked women could not apply for legal status to remain as refugees or protected persons unless they were Jewish and filed under the Law of Return.

Authorities generally placed trafficked women who were arrested in a special detention facility prior to deportation. Trafficked women often did not challenge a deportation order because they did not speak the language or were unaware of the appeals procedure. The Government transferred women willing to testify against their traffickers to a hotel or hostel and provided them funds on which to live. Many women were reluctant or afraid to testify in trials due to threats and intimidation by their traffickers. The country has no witness protection program for non-citizens. NGO reports and witness testimony indicated that only in limited circumstances did the Government attempt to determine whether or not a trafficked woman or girl would be at risk of abuse if she were deported to her country of origin, even in cases in which the woman or girl had testified in criminal proceedings. During the year, the Government did undertake its first repatriation with NGO assistance in an attempt to protect a Moldovan victim at risk after returning to Israel to testify against her trafficker.

The law criminalizes trafficking in persons for the purposes of sex. The maximum penalty for aggravated trafficking of trafficking of minors is 20 years in prison and the penalties proscribed by law are commensurate with those for rape and assault; however, the majority of cases were resolved through plea bargains. According to media reports on specific cases reviewed over the year, it appears that sentences have increased since 2002.

The Government provided limited funding to NGOs for assistance to victims. In November, the Government finalized a plan, begun more than a year earlier, to establish a shelter available for trafficked women; however, at year's end, no shelter had been made available. The Government provided funding to an NGO, which has distributed Russian-language leaflets with information to assist trafficking victims.

**The occupied territories** (Including Areas Subject to the Jurisdiction of the Palestinian Authority)

Israel occupied the West Bank, Gaza Strip, Golan Heights, and East Jerusalem during the 1967 War. Pursuant to the May 1994 Gaza-Jericho Agreement and the September 1995 Interim Agreement, Israel transferred most responsibilities for civil government in the Gaza Strip and parts of the West Bank to the newly created Palestinian Authority (PA). The 1995 Interim Agreement divided the territories into Areas A, B, and C, denoting different levels of Palestinian and Israeli control. The PA controls security and civil affairs in Area A, civil affairs and shared responsibilities with Israel in Area B, and Israel controls certain civil functions and all security in Area C. In parts of the West Bank and Gaza, Israel exercised civil authority through the Israeli Ministry of Defense's Office of Coordination and Liaison (MATAK). The approximately 193,170 Israeli settlers (a decrease of approximately 15,000 since 2002) living in Area C of the West Bank and in the Gaza Strip were subject to Israeli law and, as citizens, received preferential treatment from Israeli authorities compared to Palestinians in the protection of their personal and property rights.

These distinctions were not in force during the year following Israel's reassertion of security control over most PA-controlled areas in 2002, which Israel carried out citing the PA's failure to abide by its security responsibilities. The international community considered Israel's authority in the occupied territories to be subject to the Hague Regulations of 1907 and the 1949 Geneva Convention relating to the Protection of Civilians in Time of War. The Israeli Government considered the Hague Regulations applicable and maintained that it largely observed the Geneva Convention's humanitarian provisions. Palestinians and international human rights groups maintained that Israel consistently violated these provisions. (This annex on the occupied territories should be read in conjunction with the report on Israel.)

The "Intifada," or Palestinian uprising, began in September 2000. Since 2000, the security situation has deteriorated both within Israel and within the occupied territories. Israeli and Palestinian violence associated with the Intifada has claimed 2,369 Palestinian lives, 856 Israeli lives, and the lives of 48 foreign nationals, including 41 American citizens. Israeli military operations and armed attacks and terrorism by Palestinians against Israeli targets—including civilians within Israel, settlers, and soldiers in the occupied territories and Israel marked the conflict. On October 15, three American security personnel were killed and one wounded when a bomb detonated under their car as they drove in Gaza as part of a diplomatic motorcade. At year's end, the PA continued to investigate the incident. The attacks by Palestinians also included suicide bombings, roadside bombings, shooting at Israeli vehicles and military installations, firing of antitank missiles and mortars, and use of hand grenades. Israel Defense Forces (IDF) military actions against Palestinians included violence and abuse at checkpoints, incursions into Palestinian-controlled towns and villages, targeted killings, demolitions of homes, property, and public buildings, firing toward civilian areas with tanks and fighter aircraft, and intense gun battles with Palestinian gunmen. By year's end, Israel asserted military control over all major West Bank cities except Jericho and Bethlehem, demolished homes, including those of suicide bombers and wanted men, conducted mass arrests, and forcibly relocated some suspects. In response to the ongoing terrorist threat originating in the West Bank, Israel began construction of a security barrier to be built along parts of the Green Line and in the West Bank.

In 1996, Palestinians chose their first popularly elected government in democratic elections that generally were free and fair; an 88-member Palestinian Legislative Council (PLC) and the Chairman of the Executive Authority were then elected. The PA has a cabinet of 24 ministers serving under Prime Minister Ahmad Quray. President Arafat asserts executive authority over the government and Prime Minister. Most senior government positions in the PA are held by individuals who are members of, or loyal to, President Yasir Arafat's Fatah faction of the Palestinian Liberation Organization (PLO).

The Independence of the Judiciary Law and the PA Basic Law define the authorities of the three governmental branches and prescribed direct election of a president accountable to a cabinet and the elected PLC. At year's end, neither law was implemented fully and the respective roles of the Ministry of Justice and the High Judicial Council remained unclear. The PA courts were perceived as inefficient, and the PA executive and security services frequently ignored or failed to carry out court decisions.

Israeli security forces in the West Bank and Gaza Strip consisted of the IDF, the Israel Security Agency (the ISA-formerly the General Security Service, or GSS), the Israeli National Police (INP), and the paramilitary border police. Israeli military courts tried Palestinians accused of committing acts of violence and terror in Israeli-controlled areas. Members of the Israeli security forces committed numerous, serious human rights abuses.

The Palestinian Police Force (PPF) included the Palestinian Public Security Force, the Palestinian Civil Police, the Preventive Security Force (PSF), the General Intelligence Service, or Mukhabarat, the Palestinian Presidential Security Force, and the Palestinian Coastal Police. Other quasi-military security organizations, such as the Military Intelligence organization, also exercised de facto law enforcement powers. Palestinian police were responsible for security and law enforcement for Palestinians and other non-Israelis in PA-controlled areas of the West Bank and Gaza Strip. Israeli settlers in the occupied territories were not subject to PA security force jurisdiction. Members of the PA security forces committed numerous, serious human rights abuses.

The occupied territories comprise the Gaza Strip, the West Bank, and East Jerusalem. The population of the Gaza Strip was approximately 1,397,011, not including some 7,781 Israeli settlers. In the Gaza Strip, 62 percent of the land consists of Area A; 6 percent of Area B; and 32 percent of Area C. In the West Bank, 18.1 percent of the land consists of Area A; 21.6 of Area B; and 60.3 percent of Area C. The population of the West Bank (excluding East Jerusalem) was approximately 2,237,194 not including some 187,854 Israeli settlers. In the West Bank, Area A includes 55 percent of the Palestinian population; 41 percent of the Palestinian population is in Area B; and 4 percent is in Area C (which also contains Israeli settlements). The population of East Jerusalem, within the municipal boundaries established by Israel in 1967 was approximately 385,600, including 177,333 Israeli settlers.

The economy of the West Bank and Gaza Strip is small, underdeveloped, and highly dependent on Israel and international assistance. Israeli curfews and closures, as well as the continuing conflict, severely impacted the economy. The economy relied primarily on agriculture, services, and small manufacturing. Before the beginning of the Intifada, up to 146,000 workers from the West Bank and Gaza (approximately 25 percent of the Palestinian work force) were employed in Israel. During heightened terrorist activity in Israel or periods of unrest in the West Bank or Gaza, Israeli-imposed closures on Palestinian cities, curfews, and strict limitations on movement within the West Bank and Gaza impeded Palestinians from reaching jobs or markets and disrupted internal and external trade. In addition, the IDF and settlers destroyed sections of Palestinian-owned agricultural land and economic infrastructure. The Government of Israel stated that some of these actions, such as the destruction of groves alongside roadways and security fences by the IDF, were necessary for security reasons. Unemployment in the West Bank and Gaza was estimated at 30 percent, and approximately 63 percent of Palestinian households were living below the poverty line (54 percent of families in the West Bank and 84 percent of families in Gaza). These circumstances effectively prevented any amelioration of worker rights in the occupied territories. During the year, the US Agency for International Development (USAID) and Johns Hopkins University reported that 7.8 percent of Palestinian children under 5 suffered from acute malnutrition, 11.7 percent suffered chronic malnutrition, and 44 percent were anemic.

Israel required Palestinians to obtain Israeli permits for themselves and their vehicles to cross from the West Bank or Gaza into Israel and Jerusalem. Citing security concerns, Israel applied partial "external closure," or enhanced restrictions, on the movement of persons and products, often for lengthy periods. During times of violent protest in the West Bank or Gaza, or when it believed that there was an increased likelihood of such unrest or of terrorist attacks in Israel, Israel imposed a tightened, comprehensive version of external closure, generally referred to as "total external closure." Total external closures also were instituted regularly during all major Israeli holidays and during some Muslim holidays. During such closures, Israel prevented Palestinians from leaving the occupied territories.

Israel also placed Palestinians in the West Bank under strict "internal closure" for the entire year, allowing only Palestinians with special permits for work or health services to leave cities and pass through checkpoints on main roads. Most Palestinians were unable to leave their towns or were forced to travel without authorization on secondary roads. Israeli forces further restricted freedom of movement of Palestinians by imposing extended curfews on Palestinian towns or neighborhoods. These curfews did not apply to Israeli settlers in the same areas.

Israel's overall human rights record in the occupied territories remained poor and worsened in the treatment of foreign human rights activists as it continued to commit numerous, serious human rights abuses. Security forces killed at least 573 Palestinians and 1 foreign national and injured 2,992 Palestinians and other persons during the year, some of whom were innocent bystanders. Israeli security forces targeted and killed at least 44 Palestinians, many of whom were terrorists or suspected terrorists. Israeli forces undertook many of these targeted killings in areas where civilian casualties were likely, killing 47 bystanders in the process, including children. The Israeli Government said that it made every effort to reduce civilian casualties during these operations.

Israeli security units often used excessive force when confronting Palestinian demonstrations, while on patrol, pursuing suspects, and enforcing checkpoints and curfews, which resulted in numerous deaths. In response to Palestinian attacks on Israeli targets, Palestinian civilian areas suffered extensive damage as a result of IDF retaliation, which included shelling, bombing, and raiding. Israeli soldiers placed Palestinian civilians in danger by ordering them to facilitate military operations, which exposed them to live fire between armed Palestinians and Israeli soldiers. The Government of Israel said that is has reiterated to its forces that this practice is prohibited unless the civilian gives his voluntary consent; however, in practice, most Palestinians who agreed to assist such operations often did so out of fear of the soldiers even if they were not directly coerced. Palestinians who took part in such operations without being harmed still faced the risk of being branded as collaborators and risked being attacked by other Palestinians.

Israeli forces sometimes arbitrarily destroyed, damaged, or looted Palestinian property during these operations. Israeli security forces often impeded the provision of medical assistance to Palestinian civilians by strict enforcement of internal closures that prevented passage of ambulances, asserting in some cases that emergency vehicles have been used to facilitate terrorist transit and operations. Israeli security forces harassed and abused Palestinian pedestrians and

drivers who attempted to pass through the approximately 430 Israeli-controlled checkpoints in the occupied territories. Israel conducted mass, arbitrary arrests in the West Bank during military operations, summoning and detaining males between the ages of 15 and 45. Israel provided poor conditions for Palestinians in its prisons. Facilities were overcrowded, sanitation was poor, and food and clothing at times were insufficient. Israeli security forces and police officers beat and tortured detainees. Prolonged detention, limits on due process, and infringements on privacy rights remained problems.

Israel carried out policies of demolitions, strict curfews, and closures that directly punished innocent civilians. Israel demolished the homes of families and relatives of suspected terrorists as well as buildings suspected terrorists used as hideouts. Israel's demolitions left hundreds of Palestinians not involved in terror attacks homeless. Israel often demolished homes after suspects had already been killed or arrested. Israel maintained that such punishment of innocents would serve as a deterrent against future terrorist attacks.

The IDF destroyed numerous orchards, olive and date groves, and irrigation systems on Palestinian-controlled agricultural land. Israel constructed parts of a large security barrier on land inside the West Bank isolating residents and limiting access to hospitals, schools, social services, and agricultural property. At year's end, Israel was engaged in a process of reconsideration and reassessment of the routing and operation of the security barrier. A number of petitions in connection with the routing and operation of the barrier were pending before Israel's Supreme Court. In several instances, Israel killed, injured, and obstructed human rights monitors and NGO workers through the use of excessive deadly force and the imposition of strict closures. Israel censored Palestinian publications in East Jerusalem, raided and closed media outlets in the territories, blocked publications and broadcasts, and periodically detained or harassed members of the media and clergy. IDF fire allegedly killed two journalists covering clashes between Palestinians and Israeli security forces, both of whom had clearly identified themselves as noncombatants, and injured at least three others. The Israeli authorities placed strict limits on freedom of assembly and severely restricted freedom of movement for Palestinians. Israeli security forces failed to prevent Israelis from entering Palestinian-controlled areas in the West Bank who injured or killed several Palestinians. In some cases, Israeli soldiers escorted Israeli civilians who beat Palestinians and damaged Palestinian property.

The PA's overall human rights record remained poor, and it continued to commit numerous, serious abuses. Many members of Palestinian security services and the Fatah faction of the PLO participated with civilians and terrorist groups in violent attacks against Israeli civilians inside Israel, Israeli settlers, foreign nationals, and soldiers.

Palestinian security forces used excessive force against Palestinians during demonstrations. PA security officials abused prisoners and arbitrarily arrested and detained persons. Prolonged detention without respect for due process remained a problem. The PA provided poor conditions for prisoners. PA courts were inefficient and failed to ensure fair and expeditious trials. Internal closure in the occupied territories obstructed courts from holding sessions or issuing rulings during most of the year. The PA executive and security services frequently ignored or failed to enforce court decisions. PA security forces infringed on the right to privacy and restricted the freedom of speech and press. Palestinian groups harassed and abused journalists. Such restrictions and harassment contributed to the practice of self-censorship by many Palestinian commentators, reporters, and critics. During the year, informal reports of domestic abuse of women and "honor crimes" persisted. Societal discrimination against women and persons with disabilities and child labor remained problems.

Israeli civilians, most often settlers, harassed, attacked, and occasionally killed Palestinians in the occupied territories. During the year, settlers attacked and killed at least one Palestinian. Settlers also caused significant economic damage to Palestinians by attacking and damaging greenhouses and agricultural equipment, uprooting olive trees, and damaging other valuable crops. The settlers did not act under government directive in the attacks, and Israeli soldiers sometimes restrained them, but in several cases Israeli soldiers accompanied them or stood by without acting.

Palestinian terrorists and gunmen were responsible for the deaths of 376 Israelis killed in the occupied territories. Palestinian extremists targeted Israelis in drive-by shootings and ambushes, suicide and other bombings, mortar attacks, and armed attacks on settlements and military bases. Palestinian terrorist and militant groups used minors to prepare attacks or carry them out, exploitation that amounted to forced conscription. During the year, Palestinians acting individually or in groups, including off-duty members of the PA security services, killed 25 Israeli civilians and 39 Israeli security personnel. Most of the attacks were organized by a number of Palestinian terrorist groups, including the militant Islamic Resistance Movement (HAMAS), the Palestine Islamic Jihad (PIJ), the Popular Front for the Liberation of Palestine (PFLP), and the Fatah-affiliated al-Aqsa Martyrs Brigades. The Democratic Front for the Liberation of Palestine (DFLP) and Fatah-affiliated groups also participated in the attacks. Palestinian civilians also killed at least five Palestinians in the occupied territories who allegedly had collaborated with Israel. Most of the deaths were shootings perpetrated by small groups of unidentified Palestinian gunmen. The PA conducted no investigations and made no arrests in any of these killings.

RESPECT FOR HUMAN RIGHTS

Section 1 Respect for the Integrity of the Person, Including Freedom From:

a. Arbitrary or Unlawful Deprivation of Life

Israeli security forces killed at least 573 Palestinians in the West Bank and Gaza. Israeli civilians, mostly settlers, as well as extremist groups believed to be associated with settlers, killed at least one Palestinian. Palestinian militants and civilians killed an estimated 64 Israelis and security personnel in the occupied territories. Palestinian civilians killed at least five Palestinians suspected of spying for the Israeli Government (see Sections 1.c. and 1.g.).

Israeli security forces killed most Palestinians during armed clashes, targeted killings, incursions into Palestinian-controlled areas, at checkpoints, or as a result of sometimes excessive or indiscriminate fire toward Palestinian civilian areas. During these incidents, Palestinian protesters frequently threw stones and Molotov cocktails, and in some cases, also fired weapons at IDF soldiers (see Sections 1.c. and 1.d.). Israeli security forces used a variety of means to disperse protesters, including tear gas, rubber-coated metal bullets, and live ammunition. The IDF did not regularly investigate the actions of security force members who killed and injured Palestinians under suspicious circumstances. Since the start of the Intifada, the IDF has opened only 11 investigations into the improper use of deadly force despite the fact that human rights organizations have raised numerous allegations.

Israeli security forces used excessive force against protesters, in response to threats while on patrols, in pursuing fleeing suspects, and in responding to trespassers in restricted areas, at times resulting in death. Israel also used excessive lethal force against rock-throwers in some instances. For example, on September 15, IDF soldiers shot and killed 10-year-old Ahmad Abu Latifa near the Qalandia checkpoint north of Jerusalem. The boy was among a group of

youths who were throwing rocks at Israeli soldiers.

IDF soldiers shot and killed suspects who were avoiding arrest, but in a number of cases who posed no apparent mortal threat to the soldiers at the time of the incidents. For example, on February 10, IDF soldiers in Nablus shot and killed PFLP member Imad Mabrouk when he attempted to escape arrest. On July 3, IDF soldiers in Qalqilya shot and killed al-Aqsa Martyrs Brigades militant Ahmad Shawar when he attempted to run away after being ordered to halt.

IDF soldiers fired without warning on unarmed Palestinian trespassers in or near restricted areas, on several occasions killing Palestinians. For example, on March 5, an IDF soldier shot and killed 75-year-old Abdallah Shehadeh al-Ash'hab as he rode a donkey collecting firewood on his property, which was located near the Netzarim settlement in the Gaza Strip.

On November 29, IDF soldiers in Gaza shot and killed Palestinian police officer Sayed Abu Safra when he attempted to prevent a mentally disabled Palestinian from nearing the perimeter fence surrounding the Israeli settlement of Nissanit. The IDF expressed "sorrow and regret" over the incident.

During the year, the IDF targeted for killing at least 44 Palestinians suspected of involvement in terrorism. In the process, IDF forces killed more bystanders than targeted individuals, including children. IDF forces killed at least 47 bystanders of those targeted and injured a number of others, including bystanders, relatives, or associates. Israel stated that it only targeted individuals believed to be "ticking bombs" on the verge of carrying out terrorist attacks. In practice, however, the IDF targeted some leaders of terrorist organizations generally considered not to be directly engaged in carrying out attacks.

Israeli security forces put large numbers of Palestinian civilian lives in jeopardy by undertaking targeted killings in crowded areas where civilian casualties were likely. For example, on April 9, Israeli forces fired four missiles at a car in a densely populated area of Gaza city in order to kill two suspected terrorists, Sa'ad ad-Din al-Arabeit, 35, and Ashraf al-Halabi, 25. Israeli forces killed five other Palestinians in the effort, including two children, 13-year-old Ahmad Hamsa al-Ashraf, and 16-year-old Samid Hasan Qasem.

Beginning on June 11, Israeli forces conducted 5 targeted killings in Gaza City within 48 hours, killing 23 Palestinians, including 18 bystanders. Israel conducted the fifth such attack on June 12, firing five rockets at a car traveling in central Gaza City. The rockets killed wanted Hamas terrorist Yasser Muhammad Ali Taha, 31, and six bystanders, including an 18-month-old child and a pregnant woman.

Israeli security personnel used excessive force while operating checkpoints, killing a number of Palestinians (see Section 1.g.). On July 25, an IDF soldier at a checkpoint outside Bartaqa ash-Sharqiya near Jenin fired on a car waiting for permission to pass. The shots killed 3-year-old Palestinian Mahmoud Jawadat Sharif Kabaha, who was sitting in the car. An investigation into the incident was ongoing at year's end.

Israeli forces put civilian lives in jeopardy by using imprecise, heavy weaponry in operations against terrorist infrastructure conducted in civilian areas. Frequently, and often following Palestinian shooting attacks, IDF retaliation excessively damaged Palestinian towns and cities in the West Bank and Gaza. Israeli forces fired tank shells, heavy machine-gun rounds, and rockets from aircraft at targets in residential and business neighborhoods where Palestinian gunfire was believed by the IDF to have originated.

On April 27, the Israeli Supreme Court of Justice ruled in an October 2002 case brought by the Palestinian Center for Human Rights (PHCR) and Physicians for Human Rights-Israel against the IDF's use of flechette tank shells in Gaza. The imprecise anti-personnel munitions launch thousands of small metal darts over an area of several thousand square feet; use of such munitions in densely populated civilian areas makes the likelihood of civilian casualties very high. The Gaza Strip has a population density of approximately 3,300 persons per square kilometer and is one of the most densely populated areas in the world. The High Court of Justice denied the petition and stated that it would not intervene in the IDF's choice of weapons. Unlike in previous years, there were no reports that the IDF used flechette shells during the year.

On September 9, Israeli soldiers targeting gunmen hiding in a building in a residential area of Hebron opened fire on the building with tank shells. The shelling continued for more than 4 hours, and shrapnel killed 11-year-old Palestinian Muhammad Mansour Sayouri, who was hit in the head while standing in the kitchen of another residential building approximately 150 feet south of the structure being targeted.

Israeli security forces killed numerous civilians during military incursions into Palestinian-controlled cities and towns. Such incursions usually were conducted in response to Palestinian suicide bombings, shooting attacks that had killed Israeli civilians, settlers, or soldiers, or to make arrests. Israeli security forces also conducted military incursions on the basis of intelligence information about possible future attacks. Palestinians often responded with gunfire and by booby-trapping civilian homes and apartment buildings with deadly, indiscriminate devices. As part of such actions, the IDF usually raided and often leveled buildings, including homes.

On May 1, the IDF launched an incursion into Gaza City, home to approximately 365,000 Palestinians. The raid in a densely populated neighborhood led to a shootout with Palestinian militants. During the fighting, the IDF killed five innocent Palestinian bystanders, including a 1-year-old boy, a 13-year-old boy, a 14-year-old boy, a 57-year-old man, and a 38-year-old man who attempted to treat the wounded. IDF fire killed Amir Ahmad Muhammad 'Ayad, the 1-year-old baby boy who was inside his home during the incursion. The IDF also killed seven Palestinian gunmen during the clash. The IDF demolished two homes before withdrawing from the city.

Israeli forces used excessive force to enforce curfews in reoccupied Palestinian areas, resulting in deaths. For example, on April 17, IDF soldiers enforcing a curfew in Tulkarm opened fire on and killed a Palestinian civilian found out of his home.

Israeli security forces at checkpoints often impeded the provision of medical assistance to sick and injured Palestinians. The Government's implementation of control measures resulted in delayed access to medical treatment for at least one Palestinian who subsequently died (see Section 1.g.).

Israel forces allegedly beat and killed a Palestinian prisoner in December 2002. On December 30, 2002, Israeli Border Police in Hebron arrested 'Imran Abu Hamdiyeh, a 17-year-old Palestinian. Palestinians found Hamdiyeh dead in Hebron's industrial area later that day. An autopsy sponsored by Palestinian and Israeli human rights groups concluded that Hamdiyeh died due to "blunt force injury." On April 18, Israel arrested four Israeli Border Police officers on charges that they had beaten Hamdiyeh to death. The trial was ongoing at year's end.