Palestinian security officers and members of Arafat's Fatah faction attacked and killed Israeli citizens, Israeli settlers, foreign nationals, and soldiers. They often fired at Israelis from within or close to the homes of Palestinian civilians or in other locations with knowledge that civilians were present, drawing Israeli return fire and increasing the potential for the noncombatants to be injured. Arafat issued several "ceasefire" orders and publicly denounced attacks on civilians without lasting effect, but took no action to arrest or try violators or against terrorist groups including those affiliated with the PLO. The PA did not prevent terrorist attacks, enforce a ban on militant groups, or prevent such groups from seeking shelter in civilian areas. Some PA officials made public statements justifying Palestinian attacks on Israelis. Additionally, some Fatah leaders made public statements urging Palestinians to continue all aspects of the Intifada, including violent attacks on Israelis.

Palestinian civilians harassed, attacked, and killed Israelis, especially settlers and soldiers. During the year, Palestinians, acting as individuals or in unorganized or small groups, including some members of PA security services, killed 25 Israeli civilians, 39 Israeli soldiers, and injured hundreds of others in acts of violence and terrorism in the occupied territories (see Section 1.c.). The Palestinian attacks consisted of suicide bombings, shootings, bombings involving improvised, indiscriminate explosive devices, and stone-throwing at Israeli drivers.

On May 17, a Hamas-affiliated suicide bomber strapped with explosives blew himself up outside the Cave of Machpela/Ibrahimi Mosque in Hebron, killing himself and two Israeli settlers.

On January 23, Hamas-affiliated Palestinian gunmen fired on an IDF jeep driving in southern Hebron and killed three IDF soldiers.

Israeli settlers, acting individually, or in small groups, harassed, attacked, and occasionally killed Palestinians in the West Bank and Gaza Strip (see Section 1.c.). During the year, settlers killed at least one Palestinian. On April 30, a settler security guard at the Moshav Petza'el settlement in the Jordan Valley shot and killed Palestinian laborer Ra'ik Mas'id Daraghmeh, 35, who had stopped to relieve himself in a field near the settlement.

On January 25, a settler near the West Bank village of Budrus allegedly shot and killed Palestinian shepherd Ahmad Subuh, 24. A companion of Subuh's claims to have seen a settler drive away from the scene, but no suspect had been arrested by year's end.

Palestinian civilians also killed at least eight Palestinians in the occupied territories who allegedly collaborated with Israel. Most of the deaths were shootings perpetrated by small groups of unidentified Palestinian gunmen, sometimes affiliated with terrorist groups. The PA made no arrests in any of these killings.

b. Disappearance

There were no reports of politically motivated disappearances during the year.

c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

Israel employs physical pressure and degrading treatment as interrogation methods against arrested Palestinians in the occupied territories. The law, based on a 1999 High Court decision, prohibits the use of a variety of abusive practices, including violent shaking, painful shackling in contorted positions, sleep deprivation for extended periods of time, and prolonged exposure to extreme temperatures. However, the High Court decision allowed for the security forces to request "special permission" to use "moderate physical pressure" against detainees considered to possess information about an imminent attack. In 2002, the Israeli GSS acknowledged use of physical pressure against 90 Palestinians who had been defined as "ticking bombs."

Interviews and studies by human rights groups during the year claim that torture is employed. The Public Committee Against Torture in Israel assessed that in the beginning of this year hundreds of Palestinians were subjected to torture or other cruel, inhuman, or degrading treatment by Israel security agencies, an increase from the dozens reported in 2002.

Israeli and Palestinian human rights groups noted that jailers made it difficult to visit prisoners during the interrogation period and that some detainees were reluctant to report abuse out of fear of retribution.

The case of Daoud Dirawi was representative of numerous allegations of physical abuse which human rights groups received. For example, on February 21, Israeli authorities arrested Dirawi, a Palestinian lawyer, for being in Jerusalem without proper identification. Police initially detained Dirawi at the al-Qeshle police station in Jerusalem before transferring him to the Asyun military prison in the Negev. Dirawi told his attorney that soldiers beat him severely en route to the Asyun prison. Dirawi sustained serious bruises and a broken lower jaw. Dirawi states that he was tied up upon arrival with his hands locked above him and that he was kept in this position outdoors in the rain through the night. On March 4, Israel sentenced Dirawi to 6 months of administrative detention without pressing formal charges against him and rejected his appeal. Israel renewed his administrative detention for another 6 months. At year's end, Dirawi remained under administrative detention.

The law prohibits the admission of forced confessions as evidence. However, most convictions in security cases before Israeli courts were based on confessions made well before legal representation was made available to defendants. A detainee may not have contact with a lawyer until after interrogation, a process that may last days or weeks. The Israeli Government did not allow representatives of the International Committee of the Red Cross (ICRC) access to detainees until the end of their legal period of isolated detention. Detainees sometimes stated in court that their confessions were coerced, but judges rarely excluded such confessions.

The IDF injured approximately 2,992 Palestinians, including innocent bystanders and journalists, during armed clashes, retaliatory strikes, targeted killings, and other military actions. During the year, Israeli gunfire allegedly killed two journalists and injured at least three others during Israeli military actions (see Sections 1.a., 1.g., and 2.a.).

Israeli authorities abused Palestinians at checkpoints, subjecting them to verbal and physical harassment. Each day, tens of thousands of Palestinians traveling between Palestinian towns and villages faced as many as 730 different barriers to movement. At year's end, Israel had established 60 checkpoints, 9 occasionally manned checkpoints, 479 earthen mounds blocking roads, 102 cement roadblocks, 39 road gates, and 41 gates in a separation barrier. As many as several thousand Palestinians encountered some form of abuse from soldiers at checkpoints. Palestinians were subjected to excessive delays in passing through checkpoints. For example, on May 12, an IDF soldier at the Hawarah checkpoint outside Nablus decided to only let Palestinians pass through who were

able to identify the Israeli political figure on the 100 Shekel note. On April 30, an IDF soldier abused Qassem Awisat, 19, a resident of Qalqilya, when he attempted to pass through the Seida checkpoint in the Tulkarm district. The soldier pulled Awisat aside and etched a Star of David on his arm using shards of broken glass. The Israeli human rights organization B'tselem documented Awisat's testimony of the incident and photographed the injury to his arm. Israeli soldiers forced Palestinian civilians to wait in the rain or inclement weather for excessive periods of time.

The IDF subjected Palestinians in the West Bank and Gaza to beatings, tire slashings, and gunfire directed against them or their vehicles because they were traveling on, or trying to circumvent, roads on which the IDF blocked passage to Palestinians as it attempted to enforce internal closures between Palestinian cities and towns in the West Bank and Gaza (see Section 2.d.).

Israeli security personnel on patrol abused and in some cases tortured Palestinian civilians. For example, Israeli soldiers on patrol in June attacked 20 Palestinian youths who were trying to cross a dirt road near a military checkpoint north of Jerusalem. The soldiers beat the youths with their rifles and threw several of them in a sewage ditch before leaving the scene. In June, Israeli Border Police in Tulkarm took the identity card of shepherd Nazih Salah 'Awad Damiri, 24, and forced him to mime sexual intercourse with his donkey.

Israeli fire injured seven Palestinian medical personnel. Israeli fire also damaged 12 Palestinian Red Crescent Society (PRCS) ambulances (see Sections 1.a and 1.g.).

Article 13 of the PA Basic Law prohibits the use of torture or force against detainees; however, PA security forces tortured and abused Palestinian detainees. The abuse generally took place after arrest and during interrogation, and reportedly was widespread. Palestinian security officers were not issued formal guidelines regarding the proper conduct of interrogations; most convictions were based largely on confessions.

PA security officials tortured and abused prisoners by threatening, hooding, beating, and tying detainees in painful positions, forcing them to stand for long periods of time, depriving them of sleep and food, and burning detainees with cigarettes and hot instruments. Palestinians also alleged that PA authorities have shaken them violently while in PA custody. International human rights groups have documented widespread arbitrary and abusive conduct by the PA. The organizations stated that the use of torture was widespread and not restricted to those persons detained on security charges. Human rights groups stated that Palestinians who were suspected of belonging to radical Islamic groups were more likely to be treated poorly, as were alleged collaborators with Israel. Observers noted that documentation of abuses was very limited, due partly to the hesitancy of alleged victims to file or make public claims of torture and abuse against the PA authorities.

Palestinian security officers and Fatah Tanzim members with firearms attacked and injured Israelis. In some cases, they fired at Israeli civilians or soldiers from within or close to the homes of Palestinian civilians, drawing Israeli return fire (see Section 1.a.). Palestinian security forces consistently failed to prevent armed Palestinians in areas under PA control from opening fire on Israeli settlers or other civilians, soldiers, or military targets.

Israeli settlers harassed, attacked, and occasionally killed Palestinians in the West Bank and Gaza Strip (see Section 1.a.).

Some settlers attacked Palestinian homes and damaged crops, olive trees, greenhouses, and agricultural equipment, usually in areas located near settlements, causing extensive economic damage to Palestinian-owned agricultural land and depriving innocent farmers of their livelihood. In October, settlers disrupted the Palestinian olive harvest by firing on Palestinians picking olives, beating harvesters returning home and stealing the harvest, and invading Palestinian property and picking the olives themselves. For example, October 23, settlers from the Yitzhar settlement near Nablus threw stones and fired warning shots at Palestinian farmers harvesting olives in the village of Burin. The harvesters were forced to disperse. On October 22, Yitzhar settlers also stole 6 120-pound bags of olives from a farmer in Burin.

Although human rights monitors reported that the IDF provided greater protection to Palestinian farmers than they did in the past, settlers carried out such actions in areas in which the IDF was responsible for security. Israel often enforced security by applying curfews and closures only to Palestinians, which on occasion prevented Palestinians from defending themselves and their property from attacks by settlers. Palestinians also complained that when the IDF provided protection it gave insufficient time for Palestinians to complete the harvest. Burin farmers, for example, complained that they only received 2 days of IDF protection to complete a harvest of some 1,000 olive trees.

The Government of Israel generally did not prosecute settlers for their acts of violence against Palestinians, and settlers rarely served prison sentences if convicted of a crime against a Palestinian. However, in August Israel arrested nine settlers for plotting and carrying out attacks on Palestinian civilians. On August 8, two of those settlers were charged with possessing army explosives and preparing for a terrorist attack on Palestinian civilians. Those two were released after a plea bargain. Three other settlers were convicted during the year. In September, two were sentenced to 15 year terms and one was sentenced to 12 years. The remaining detained settlers were still under trial at year's end.

On January 19, a group of settlers in Hebron stabbed Iyad Salhab, 25, three times in the waist, thigh, and face. IDF soldiers stood by while the stabbing attack took place, but intervened when a larger group of twenty or more settlers ran toward the scene. Salhab was treated with stitches and was briefly hospitalized.

Palestinians harassed, attacked, and occasionally killed Israelis, especially settlers (see Section 1.a.).

Israel provided poor conditions for Palestinians in Israeli prisons. Facilities were overcrowded, sanitation was poor, and at times food and clothing were insufficient. Israel crowded Palestinian prisoners, exceeding capacity of the facilities. Israel was unprepared to accommodate properly the hundreds of Palestinians that were arrested in sweeps that accompanied Israeli operations during the year. In January, Palestinian prisoners in the Ofer prison camp near Ramallah, which held close to 1,000 Palestinian detainees, conducted a protest against poor treatment.

Israel significantly expanded its use of solitary confinement, holding increasing numbers of prisoners in isolation. At year's end, Israel held 120 Palestinian prisoners in some form of solitary confinement compared to 15 at the end of 2002.

Israel neglected the medical needs of some Palestinian prisoners. The Mandela Institute, a Palestinian prisoners advocacy group, alleged that such neglect contributed to at least one death in custody. Bashir Oweiss, a Palestinian from Nablus, died of a stroke on December 8 after allegedly receiving negligent medical care as his condition deteriorated. Oweiss was arrested on November 1 and sentenced on November 27 to 6-months of administrative detention. Oweiss

suffered a stroke on December 4. According to the Mandela Institute, poor treatment at the Megiddo hospital caused Oweiss' condition to deteriorate that night. The hospital then transferred him to Afula hospital where he died 3 days later.

Israel permitted independent monitoring of prison conditions by the ICRC and other groups, although human rights groups reported they sometimes encountered difficulties gaining access to specific detainees.

The PA provided poor conditions for its prisoners. In many cases, facilities were old, dilapidated, and neglected. There were separate facilities to hold juvenile prisoners. Most Palestinian prison facilities and detention centers were destroyed during the current conflict, and prisoners were kept informally in houses or other buildings.

The PA permitted independent monitoring of its prisons, although human rights groups, humanitarian organizations, and lawyers reported difficulties arranging visits or gaining access to specific detainees. Human rights organizations stated that their ability to visit PA prisons and detention centers varied depending on which security organization controlled the facility. Human rights organizations stated that the police, the Preventive Security Force, and Mukhabarat generally allowed them to inspect facilities and visit prisoners and detainees. However, they stated that the Military Intelligence Organization usually did not grant them access to facilities that they controlled. Human rights monitors stated that prison authorities did not consistently permit them to have access to PA detention facilities, and that they rarely were permitted to see inmates while they were under interrogation.

The PA generally permitted the ICRC access to all detainees held by the PA, and allowed regular inspections of prison conditions; however, the PA denied access to some detainees for 14 days immediately following his or her arrest. When abuses occurred, they frequently happened during that 2-week period.

d. Arbitrary Arrest, Detention, or Exile

Israeli security personnel may arrest without warrant or hold for questioning a person suspected of having committed a criminal or security offense. During the year, Israel conducted mass, arbitrary detentions in the West Bank. Most of those detained were released several days or weeks thereafter. Israeli Military Order 1507 permits the Israeli army to detain people for 10 days during which detainees were barred from seeing a lawyer or appearing before court. Israel conducted mass detentions under this order's authority. On May 12 and 13, Israeli forces arrested 83 Palestinians in Hebron.

Israel used administrative detention to hold hundreds of Palestinians without trial or charge. At year's end, Israel held 649 Palestinians in administrative detention.

Individual administrative detention orders could be issued for up to 6-month periods and could be renewed indefinitely. A number of Palestinians under administrative detention during the previous several years have had their detention orders renewed repeatedly.

Israel conducted de facto detentions at checkpoints by confiscating Palestinian identification cards and car keys. Palestinians were unable to leave the scene until IDF soldiers returned the items. For example, on the morning of June 3, IDF soldiers confiscated the car keys and identification cards of three Palestinian residents of East Jerusalem driving to Hebron. The soldiers did not return the keys until the afternoon and never returned the identification cards at all.

On November 23, IDF soldiers at the Hawwara checkpoint outside Nablus demanded that two Palestinians stop and clean the checkpoint. When the men refused, the soldiers handcuffed, blindfolded and detained them for several hours. When B'tselem investigated the incident the soldiers admitted to the action and claimed their superiors had ordered them to do it.

Israeli authorities intermittently issued special summonses for those suspected of involvement in or knowledge of security offenses. Israeli military order 1369 provides for a 7-year prison term for anyone who does not respond to a special summons delivered to a family member or posted in the MATAK office nearest the suspect's home address. Bail rarely was available to those arrested for security offenses.

Israel's age standard in prosecuting youth as adults differs based on national origin. Israeli youth under the age of 18 cannot be tried as adults; however, Palestinian youth who are 16 years of age can be tried as adults.

Israeli authorities must inform detainees of their right to an attorney and whether there are any orders prohibiting such contact. Higher-ranking officials or judges may extend the period during which a detainee is denied access to counsel. For example, access to counsel was denied routinely while a suspect was being interrogated, which may last up to several weeks.

Israel hampered or prevented contacts between Palestinians, their lawyers, families, and human rights organizations in Israeli prisons and detention facilities. The law provides that in the occupied territories, Israeli authorities must inform the family of a person's arrest and place of detention "without delay." Such notification rarely was given, and Palestinian suspects often were kept incommunicado for much longer than 48 hours. Israeli authorities stated that they attempted to post notification of arrests within 48 hours, but that senior officers may delay notification for up to 12 days. Additionally, a military commander may appeal to a judge to extend this period in security cases for an unlimited period of time. Even if family members or others became aware of a person's arrest, it often was difficult for them to obtain information regarding where a detainee was being held or whether the detainee had access to an attorney. Palestinians often located detained family members through alternative means. Palestinians may check with a local ICRC office or the Israeli human rights organization HaMoked to determine whether it has information regarding the whereabouts of a family member.

The Israeli Government routinely transferred Palestinians arrested in the occupied territories to facilities in Israel, especially the prison in Ashkelon and the military detention centers in Megiddo and the Negev Desert. Israeli authorities in some instances scheduled appointments between attorneys and their detained clients, but subsequently moved the clients to another prison without notice prior to the meetings. Authorities reportedly used such tactics to delay lawyer-client meetings for as long as 90 days. Palestinian prisoners had difficulty obtaining legal representation because of restrictions in place on Palestinian lawyers. Since the Intifada began, only Israeli citizens or Palestinian lawyers with Jerusalem identification cards were permitted to visit Palestinian prisoners in Israeli prisons as advocates or monitors. This significantly reduced the availability and timeliness of legal aid for such prisoners due to a reduction from 1,300 to approximately 100 lawyers available to handle such cases. Lawyers with Jerusalem identification cards reported frequent, repeated, and lengthy delays in meeting with prisoners.

Human rights groups stated that Palestinian lawyers from the Gaza Strip had a more difficult time obtaining permission to meet their clients than their West Bank

counterparts, and that they were denied entry into Israel more frequently than West Bank lawyers.

Male family members between 16 and 40 years of age, and any family members with security records, usually were barred from visiting relatives in Israeli facilities. Relatives of Palestinian prisoners also stated that in some instances they learned that visitation rights were canceled only when they arrived at the prison after having traveled for many hours from the occupied territories. Following the outbreak of violence in 2000, the Israeli Government banned all family visits for Palestinian prisoners in Israeli prisons, although some visitation rights were restored intermittently after ICRC intervention (see Section 1.c.).

Evidence used at hearings for administrative detentions in security cases was secret and unavailable to the detainee or his attorney during the hearings; the detainee and defense lawyer were required to leave the courtroom when secret evidence was presented. Israeli authorities maintained that they were unable to present evidence in open court because doing so would compromise the method of acquiring the evidence. Judges, not military officials, may renew administrative detention orders beyond a 6-month period. Detainees may appeal detention orders, or the renewal of a detention order, before a military judge, but their chances for success were very limited. No information was available regarding whether any detainees were successful in such appeals.

During the year, the total number of Palestinian prisoners and administrative detainees in Israeli prisons rose. According to the IDF, there were 5,944 Palestinian security prisoners held in IDF and Israeli Prisons Service jails, compared to 4,511 at the end of 2002. The IDF also held an unspecified number of Palestinian detainees in waiting facilities in the occupied territories.

Israel forcibly transferred 20 Palestinians suspected of terror activity but not convicted in court from the West Bank to Gaza. Israel forcibly transferred three Palestinians in 2002 and none in 2001.

On May 18, Israel transferred Mahmoud Suleiman Sa'id as-Sa'di as-Saffouri, 31, from his home in Jenin in the West Bank to the Gaza Strip. Israel conducted the transfer on the basis of a military order issued on April 10. Israel first detained as-Saffouri on June 19 and held him without charge in the West Bank before expelling him to Gaza for 2 years. From November to December, Israel relocated 18 Palestinians from the West Bank to Gaza. Israel in mid-October issued military orders calling for the transfers. All of the appeals to the Israeli High Court by the detainees were struck down.

The 2001 PA Criminal Procedures Law allows police to hold detainees without charges for 24 hours. Judges can authorize detention for another 15 days. Court approval is necessary for detention without charges for a maximum total of 45 days. A trial must start within 6 months of arrest, or the detainee must be released. In practice, however, many Palestinians were held in detention without charge for months.

The Independence of the Judiciary Law and the PA Basic Law define the authorities of the three governmental branches and prescribes direct election of a president accountable to his cabinet and to the elected PLC; however, neither law has yet been fully implemented. Without such laws to constrain them, PA security officers refuse to carry out some High Court of Justice orders to release detainees.

PA security forces arbitrarily arrested and detained persons, and security officials often ignored laws that protect the rights of detainees. The PA ignored court decisions calling for the release of alleged security criminals. Lawyers and PA judicial officials acknowledged that, in contravention of the law, PA security services sometimes arrested and detained persons without informing judicial officials. On May 17, the PA High Court of Justice ordered Taysir Abu Meghasib and Mehdi Abu Seif released from detention for lack of evidence. The PA Military Intelligence Service in Gaza had arrested both men in 2001 and 2002 respectively on charges of collaborating with Israel. Despite this ruling, Meghasib and Seif remained imprisoned at year's end.

At year's end, an unknown number of suspected collaborators and at least 20 political prisoners were in custody in PA prisons. Alleged collaborators often were held without sufficient evidence, and denied access to lawyers, their families, or doctors. On May 1, the PA Military Intelligence Service released political prisoner Farouk Abu Hassan after 9 1/2 years of illegal detention.

PA authorities generally permitted prisoners--except those held for security offenses--to receive visits from family members and human rights monitors. PA security officials did not always permit lawyers to see their clients. In principle detainees may notify their families of their arrest, but this was not always permitted.

PA security services had overlapping or unclear mandates that often hampered the protection of human rights. Under existing law in the West Bank, only the PA's civil police force is authorized to make arrests. In practice all security forces detained persons at various times. The operating procedures and regulations for the conduct of PA security personnel in the various services still were not well developed and have not been made fully available to the public.

Families, lawyers, and even the Ministry of Justice were often unable to track detainees' whereabouts and to determine their numbers. In general the PA did not inform families of a relative's arrest, or did so only sporadically. Most PA security officers remained unaware of proper arrest, detention, and interrogation procedures, as well as basic human rights standards. Israeli operations during the Intifada destroyed most PA prisons, and the use of informal detention centers in homes and apartment buildings spread.

PA security forces continued to harass journalists, political activists, and human rights advocates who criticized the PA and its policies (see Section 2.a.).

Neither the Israeli Government nor the PA used forced exile, or forcibly deported anyone from the occupied territories, during the year.

e. Denial of Fair Public Trial

Israeli law provides for an independent judiciary, and the Government generally respected this in practice. Palestinians accused by Israel of security offenses in the occupied territories usually were tried in Israeli military courts. Security offenses are defined broadly and may include charges as varied as rock throwing or membership in outlawed terrorist organizations, such as HAMAS or the PFLP. Military prosecutors brought charges. Serious charges were tried before three-judge panels; lesser offenses were tried before one judge. The Israeli military courts rarely acquitted Palestinians of security offenses, but sentences in some cases were reduced on appeal.

Israeli military trials followed evidentiary rules that were the same as those in regular criminal cases. Convictions may not be based solely on confessions, although in practice some security prisoners were convicted on the basis of alleged coerced confessions of both themselves and others. The prosecution must justify closing the proceedings to the public in security cases, and the Attorney General determines the venue. Counsel may assist the accused during trial, and a

judge may assign counsel to those defendants when it is deemed necessary. Charges are made available to the defendant and the public in Hebrew, and the court may order that the charges be translated into Arabic if necessary. Sentencing in military courts was consistent with that in civilian criminal courts. Defendants in military trials had the right to appeal through the Military High Court. Defendants in military trials also may petition to the civilian High Court of Justice (as a court of first instance) in cases in which they believe there are procedural or evidentiary irregularities. The court may hear secret evidence in security cases that is not available to the defendant or his attorney. While a conviction may not be based solely on such evidence, it reportedly may influence the judge's decision.

Trials sometimes were delayed, sometimes excessively, because witnesses, including Israeli military or police officers, did not appear, the defendant was not brought to court, files were lost, or attorneys failed to appear, sometimes because they were not informed of the trial date or travel restrictions prevented Palestinian lawyers from reaching the court (see Section 2.d.). Palestinian legal advocates argued that these delays were designed to pressure defendants to settle their cases without trial or to pressure some defendants to plead guilty to minor offenses so that an expedited trial could be held.

In expedited trials a charge sheet was drawn up within 48 hours and a court hearing was scheduled within days. There frequently was no testimony provided by Palestinian witnesses either for or against Palestinians on trial. Israeli authorities stated that this was due to the refusal of Palestinians to cooperate with the authorities. Palestinian authorities stated that the absence of Palestinian witnesses was due to strict travel restrictions. Tension resulting from the security situation, and the closures imposed on the West Bank and Gaza, posed additional barriers to cooperation. Confessions usually were given in Arabic but translated into Hebrew for the record because, authorities maintained, many Israeli court personnel could speak Arabic but few could read it. As a result, many Palestinian prisoners signed confessions written in Hebrew, which many could not read or understand.

Crowded facilities and poor arrangements for attorney-client consultations in prisons hindered legal defense efforts. Appointments to see clients were difficult to arrange, and prison authorities often failed to produce clients for scheduled appointments with their attorneys.

Israeli settlers in the West Bank and Gaza Strip accused of security and ordinary criminal offenses were tried under Israeli law in the nearest Israeli district court. Civilian judges presided, and the standards of due process and admissibility of evidence were governed by the laws of Israel, not military orders. Settlers rarely were prosecuted in Israeli courts of crimes against Palestinians, and, in the rare instances in which they were convicted, regularly received lighter punishment than Palestinians convicted in Israeli courts (see Section 1.a.). The Government of Israel maintains a special department within the police force to investigate violence by settlers; however, the establishment of such a unit has not noticeably diminished settler violence. During the year, 9 settlers were indicted for violence in the occupied territories and three were convicted for related crimes

The Israeli Government maintained that it held no political prisoners, but Palestinians claimed that many of the 553 Palestinian administrative detainees being held without charge were political prisoners.

The Government of Israel held thousands of persons for security related offenses (see Section 1.d.).

The PA courts were inefficient, lacked staff and resources, and often did not ensure fair and expeditious trials. The PA executive and security services frequently failed to carry out court decisions and otherwise inhibited judicial independence. There has been significant reduction in major previous problems including torture, extrajudicial killings, and arbitrary detention (see Sections 1.a., 1.c., and 1.d.).

The PA court system is based on legal codes that predate the 1967 Israeli occupation and Israeli military orders. The Gaza legal code is based on Ottoman, Egyptian, British Mandate, and PA directives and laws. The West Bank legal code is derived from pre-1967 Jordanian law (informed substantially by Ottoman and British Mandate law), and PA directives and laws. Israeli military decrees issued during the occupation remained valid in both the West Bank and Gaza.

A High Judicial Council (HJC) maintained authority over most court operations. In each governorate there must be at least one conciliation court and a court of first instance that hears appeals from the conciliation court, and which has original jurisdiction for more serious cases. Legislation dictates that three courts of appeals sit in Gaza, Ramallah, and Jerusalem to review decisions of the first instance courts. In practice, there was no Jerusalem appeals court, and the Ramallah court handled its responsibilities. A High Court does exist, officially designated as sitting in Jerusalem, but it meets in Ramallah and Gaza City. The High Court also serves as the Constitutional Court until additional legislation establishes a separate one. The High Court also serves as the Court of Cassation and as an administrative court until administrative courts are established by legislation. Most of the changes required by the legislation started to take effect during the year, and very limited resources and restriction of movement have hampered the transition.

The delivery of justice often was slow and uneven. The ability of the courts to obtain enforcement of their decisions was extremely weak. In addition, closures, curfews, and the inability of lawyers, members of the judiciary, and public to travel seriously impeded administrative functions and implementation of reform. The court system in general was struggling to recover from years of neglect and conflict; most of the problems predated PA jurisdiction and were aggravated by lack of resources and attention since the PA assumed control of the courts. Judges and staff lacked sufficient resources and suffered from a lack of skills and training. Court procedures and record keeping were in some instances obsolete, although donor-funded activities started to improve some of the systems. A heavy caseload even before the Intifada exacerbated these systemic problems. During the past 3 years, the revolving court caseload reportedly increased by over 50 percent (see Section 2.d.).

The Intifada and related Israeli military actions have adversely affected the administration of justice in the West Bank and Gaza. For example, fighting and aerial attacks in Operation Defensive Shield in 2002 caused damage to the Court of First Instance and Conciliation in Ramallah and the PA's main forensic lab. Many, if not most, of the PA's police stations in West Bank and Gaza were similarly damaged or destroyed.

Apart from damage to the physical infrastructure of the legal system, travel restrictions, curfews, and closures significantly impeded the administration of justice. For example, judges and prosecutors were frequently unable to reach their courthouses and offices during periods of closure. If allowed access, they often had to travel for long periods of time to reach their workplaces, substantially reducing the amount of time devoted to their legal duties. Citizens who attempted to use the courts to address complaints were at times denied physical access to the courts due to closures, or were affected by communications problems that resulted from the curtailment of travel and passage from community to community. Notices of trial schedules, court dates, etc., reached intended recipients late, if at all.

The High Judicial Council slowly gained authority over judicial matters that formerly were administered by the Ministry of Justice. Institutional and interpersonal

tension continued to exist between the two bodies. Both the Ministry of Justice and High Judicial Council claimed to be working towards the same aim: the independence of the judiciary. During the year, both institutions opted for a pragmatic approach to that goal. For example, the Deputy Minister of Justice and the Attorney General worked together as members of the HJC. Ministry of Justice and HJC officials jointly undertook the development of by-laws for the establishment of the Judicial Training Institute.

During the year, the PA abolished State Security Courts, which were responsible for numerous human rights abuses over the past several years. Cases previously assigned to the courts before their abolition were still adjudicated, however, and it remained unclear at year's end whether the institution would continue to exist in some form. On July 27, PA Minister of Justice Abdel-Karim abu Salah issued a ministerial decree that put an end to the powers and the jurisdiction of the State Security Courts and the State Security prosecution. Two sessions of a State Security Court regarding commercial fraud subsequently took place in Gaza in September. The PA Attorney General claimed that these sessions were conducted in error and assured that measures have been taken to prevent future mistakes. He said that the PA prosecutor trying the cases had misinterpreted the governing statute. The PA High Judicial Council during the year cast further doubt on the depth of this reform measure by raising the possibility of "special courts" that could be established to handle State Security cases. In July, the PA began formal work to establish a Court Police Unit.

f. Arbitrary Interference with Privacy, Family, Home, or Correspondence

Israeli military authorities on many occasions entered private Palestinian homes and institutions without a warrant, citing security concerns. An officer of the rank of lieutenant colonel or above could authorize such action. In conducting searches, both in areas under Israeli control and during incursions into areas ostensibly under PA control, IDF personnel forcibly entered and in some cases, beat occupants and destroyed property.

Israeli forces arbitrarily destroyed or looted Palestinian property and solicited bribes during military operations. A B'tselem investigation revealed that IDF soldiers stationed at the Qalandiya checkpoint outside Jerusalem in October and November solicited bribes from Palestinian truck drivers to facilitate the passage of their vehicles. Authorities stated that beatings and arbitrary destruction of property during searches were punishable violations of military regulations and that compensation was due to victims in such cases. However, the Israeli Government stated that it did not keep consolidated information regarding the claims against the Ministry of Defense for damages resulting from IDF actions.

Israeli security forces demolished and sealed the homes (owned or rented) of Palestinians suspected of terrorism or the relatives of such suspects, without any judicial review (see Section 1.g.). During the year, according to Israeli human rights organization B'tselem, Israeli forces demolished 219 homes (compared to 250 in 2002) and sealed three others as punishment for terror activity and deterrence against future attacks. Israel also demolished many homes in the Gaza Strip between the Rafah refugee camp and the border with Egypt claiming that the houses concealed tunnels used for weapons and other smuggling from Egypt or provided cover for attacks against Israeli soldiers.

The IDF destroyed numerous citrus orchards, olive and date groves, and irrigation systems on Palestinian-owned agricultural land in both the West Bank and Gaza. The IDF destroyed these groves or orchards for security reasons, stating that Palestinians had been shooting from those areas. The IDF also cleared and took control of West Bank land, including land held by private Palestinians, in order to facilitate construction of the separation barrier. B'Tselem estimated that at least 10,000 dunams of land has been taken over for construction of the separation barrier. Israel asserts that it has sought to build the barrier on public lands where possible, and where private land was used, provided opportunities for compensation to the owners.

The PA required the Attorney General to issue warrants for entry and searches of private property; however, Palestinian security services frequently ignored these requirements. Police searched homes without the consent of their owners. In some cases, police forcibly entered premises.

g. Use of Excessive Force and Violations of Humanitarian Law in Internal Conflicts

Israeli security forces often used excessive force against Palestinians and others. The IDF killed or injured Palestinians or others in non life-threatening situations. IDF fire killed or injured innocent bystanders, including journalists and Palestinian civilians, when they fired into crowds at demonstrations (see Sections 1.a. and 2.a.). Palestinian medical groups have estimated that approximately 10 percent of the injuries will result in permanent disabilities, and another 10 percent will require medical rehabilitation (see Section 5).

Israel obstructed the movement of and occasionally fired upon and assaulted medical personnel and ambulances. In the past, Israel alleged that terrorists have used ambulances to transport weapons or to commit terrorist acts. During the year, the PRCS reported that ambulances came under fire 57 times and emergency teams came under fire 79 times. The PRCS also reported that IDF soldiers and Israeli settlers injured 7 PRCS medical staff members and damaged 12 ambulances in these incidents. PRCS reported that its ambulances were delayed or denied access to areas on 584 separate occasions.

On March 11, a PRCS ambulance entered an ongoing firefight in Tel al-Sultan in Gaza to retrieve a Palestinian injured in tank shelling and gunfire. When the crew located an injured Palestinian and moved to take him into the ambulance an IDF tank opened fire in the ambulance's direction. The ambulance driver was hit in the left hand by shrapnel from a tank shell before managing to flee the scene.

On February 2, Israeli soldiers raided the medical center of the Union of Palestinian Medical Relief Committees (UPMRC) in the Old City of Nablus. The soldiers destroyed three hospital beds, furniture, a defibrillator, and various containers of medicine.

On May 20, an IDF soldier at the Surda checkpoint in Ramallah assaulted ambulance driver Talal 'abd al-Malek Muhammad 'Ida, 45. A soldier in a jeep summoned 'Ida as he attempted to coordinate his passage through the checkpoint and punched him in the face. 'Ida was treated with stitches at a Ramallah hospital.

On June 14, the UPMRC reported that IDF soldiers outside the village of Deir Ghassaneh halted an ambulance at gunpoint and then boarded it. The ambulance was driving to the town to pick up injured Palestinians. The soldiers hid in the rear of the ambulance and told the ambulance team to drive to the town with them inside. The soldiers told the UPMRC staff not to reveal the soldiers' presence in the ambulance. The soldiers used the cover of the ambulance to arrest people seized the identification cards of the ambulance crew members when they refused to continue driving and did not return until 3 days later.

During the Intifada, the IDF also used excessive force in responding to a number of incidents at checkpoints (see Section 1.a.).