Israeli soldiers placed Palestinian civilians in danger by ordering them to facilitate military operations, which exposed them to live fire between armed Palestinians and Israeli soldiers. Since the beginning of the Intifada, IDF soldiers have ordered Palestinian civilians to enter buildings to check whether they were booby-trapped; to expel their occupants; to remove suspicious objects from the road; and to walk in front of soldiers to protect them from gunfire. For example, on May 14 Israeli Border Police officers forced a Palestinian driving a car in Jenin to park the vehicle in front of a private home and then proceeded to use the car, which held three passengers, as a shield during a gun battle with armed Palestinians. One Border Police officer forced Muhammad Aradeh, 19, out of the car and made him to kneel while firing over his head. On March 6, IDF soldiers conducting an incursion into Awarta village near Nablus ordered 'Ula 'Awad to lead them through an apartment building and a neighboring house and knock on doors as they conducted searches. The officers threatened to shoot 'Awad as he conducted the search.

In 2002, the Israeli High Court of Justice granted an injunction against the use of Palestinians as "shields" for Israeli forces. Israel admitted the use of such practices, in violation of existing procedures, and reiterated that IDF forces "are absolutely forbidden to use civilians of any kind as a means of 'living shield' against gunfire or attack by the Palestinian side, or as 'hostages.'" However, this ruling did not prevent IDF soldiers from carrying out the same practices under another name. IDF soldiers are openly permitted to employ the "neighbor procedure," which allows them to seek the assistance of Palestinian civilians in operations so long as that assistance is consensual. Human rights groups asserted that Palestinians who agreed to assist such operations often did so out of fear of the soldiers even if they were not directly coerced. Palestinians who took part in such operations without being harmed still faced the risk of being branded as collaborators and risked being attacked by other Palestinians.

Israel also placed civilians in danger by occupying Palestinian homes, quartering soldiers there, and conducting military operations from them. For example, in December, IDF soldiers conducted raids in the Old City of Nablus and detained residents of buildings in a single apartment while using the upper floors for military activities.

The IDF fired tank rounds, as well as rockets from helicopters and military aircraft, on targets in cities and towns in the West Bank and Gaza during operations undertaken in response to attacks on Israeli soldiers, settlers, and other civilians (see Section 1.a.).

Israeli forces demolished the homes of the families and relatives of those convicted of or suspected of committing terror attacks, effectively punishing innocent Palestinians not implicated in the attacks. Israel's demolitions left hundreds of Palestinians not directly implicated in the attacks homeless. During the year, Israeli forces demolished 219 homes and sealed three others for punitive reasons, compared to 250 in 2002, and 10 in 2001. The numbers of such demolitions increased as Israel re-occupied areas previously under exclusive PA control and gained access to such homes. For example, on March 3, Israeli forces in the Bureij refugee camp in the Gaza Strip carried out the punitive destruction of the home of arrested Hamas leader Muhammad Saleh Hassan Abu Taha. The destruction of the home left seven residents of the building homeless and severely damaged an adjacent home, causing a wall to collapse that killed a 40-year-old pregnant woman next door.

Israel demolished entire apartment buildings that had been used as past shooting points by Palestinian gunmen, effectively punishing innocent civilians unconnected with the attacks. For example, on September 5, Israel demolished a seven-story residential building in Nablus after exchanging fire with and killing Muhammad al-Hanbali, 26, a Hamas militant who was hiding inside the building. IDF soldiers removed Hanbali's body from the building and then planted explosives on the first floor of the building and leveled the structure. The demolition left 15 Palestinian families homeless with all of their belongings destroyed.

Israel's extensive curfews on Palestinian towns punished entire innocent populations. The curfews affected every aspect of life for Palestinians, damaging livelihood and causing food shortages. The Israeli Government's sustained imposition of internal and external closures and curfews in the West Bank and Gaza during the year severely impacted Palestinian society and economy, contributing to shortages of basic food, water, and the provision of medical care and supplies.

The external and internal closures contributed to increased unemployment and poverty in the occupied territories. Approximately 146,000 West Bank and Gaza workers, representing roughly 25 percent of the Palestinian work force, depended on day jobs in Israel, Israeli settlements, and Jerusalem and were prevented from leaving the occupied territories. The closures on Palestinian cities and towns also impeded Palestinians from reaching jobs or markets in the occupied territories and disrupted internal and external trade. Closures, and the destruction of large swathes of Palestinian-owned agricultural land and economic infrastructure by the IDF and settlers, contributed to an unemployment rate that was estimated at 30 percent at the end of the year. Closures particularly isolated and hurt the roughly 200,000 Palestinians who lived in rural villages. Rural villages rarely were self-sustaining communities and did not have the full range of services--such as medical care, education, or municipal provision of water--that larger urban areas had, increasing their isolation when community members were not able to travel outside the area to obtain access to services and provisions. Other rural villages under full Israeli control were further isolated from major Palestinian population centers.

Israeli security forces' implementation of control measures at checkpoints often impeded the provision of medical assistance to sick and injured Palestinians. Since the beginning of Intifada, The Government's implementation of control measures resulted in delayed access to medical treatment for at least 39 Palestinian who subsequently died (see Section 1.g.).

The ICRC stated that the prolonged closure of Palestinian cities significantly obstructed the delivery of medical care. The closures made it extremely difficult for patients living outside large cities who need repeated medical treatment, such as dialysis or physical therapy, to reach medical centers on a regular basis. The PRCS has estimated that more than one-third of Palestinians who have been injured in the Intifada required some type of physical rehabilitation and at least 10 percent have permanent disabilities. Medical professionals reported that many Palestinians delayed all but emergency medical care because of the restrictions and economic conditions. Preventive treatment, such as vaccinations, antenatal and postnatal care, and family planning often was postponed; and the number of births at home, in ambulances, and at checkpoints remained high. Medical observers reported that as the Intifada continued, the impact on public health would be negative.

On June 14, Israeli soldiers detained for 1 hour the ambulance of Muhammad Hassan Abu Qibeta, a 65-year-old diabetic Palestinian from Yatta on his way to a hospital in Hebron. Qibeta had reportedly suffered a heart attack before reaching the checkpoint, and died there after waiting at the checkpoint for an hour. Closures and curfews also have affected the provision of emergency medical care, including by impeding the ability of medical staff to reach work. Israeli security services stopped and searched all ambulances at each checkpoint, which frequently added life-threatening delays in reaching hospitals, due to the fact that

some had to use substandard local roads when denied access through any of the checkpoints. Israeli security forces often impeded the provision of medical assistance to Palestinian civilians by strict enforcement of internal closures. The PCRS reported that its average response time to emergency calls in "outer city" areas was 40 to 50 minutes, compared to a past average of 10-15 minutes.

Israeli soldiers frequently harassed and abused Palestinian emergency services staff at the checkpoints (see Section 1.c.).

Palestinian militants placed Palestinian civilians in danger by firing on Israeli forces from civilian areas.

Section 2 Respect for Civil Liberties, Including:

a. Freedom of Speech and Press

The Israeli Government generally respected freedom of speech in the occupied territories; however, IDF soldiers routinely harassed and occasionally detained Palestinian and other journalists covering stories in the West Bank and Gaza. Israel frequently denied journalists travel permits and revoked or delayed issuing press credentials, all of which amounted to de facto censorship. Israel censored and prohibited public expressions of anti-Israeli sentiment and of support for Islamic extremist groups. The IDF allegedly killed two journalists covering clashes between Palestinians and Israeli security forces, both of whom were identified as noncombatants, and injured at least four others. During the year, Israel raided the premises of several television and radio stations.

During the year, the Israeli Government continued to enforce selectively its standing prohibition on the display in East Jerusalem of Palestinian political symbols, such as flags, national colors, and graffiti. Such displays were punishable by fines or imprisonment. Israeli enforcement of existing censorship regulations remained stringent regarding press coverage of the Intifada. Israeli authorities monitored Arabic newspapers based in East Jerusalem for security-related issues, and newspapers sometimes were ordered to halt publication of stories about the security situation until the information first appeared in the Israeli media. Military censors reviewed Arabic publications for material related to the public order and security of Israel. Reports by foreign journalists were subject to review by Israeli military censors for security issues, and the satellite feed used by many foreign journalists was monitored. In periods of heightened security, the Israeli Government often closed areas to journalists when it imposed a curfew or closure. Israeli authorities denied entry permits to West Bank Palestinian journalists traveling to their place of employment in Jerusalem during closures of the territories, and the journalists had difficulty renewing their Israeli issued press credentials (see Section 2.d.).

The IDF required a permit for Palestinian publications sold in areas of the occupied territories under its control. Publications may be censored or banned for content considered anti-Semitic or anti-Israeli. Possession of banned materials was punishable by a fine and imprisonment. The Israeli Government prohibited the delivery and distribution of publications, including newspapers, in the Gaza Strip on the Jewish holiday of Yom Kippur (when import of any item is prohibited) and on numerous other occasions when the closure of the Gaza Strip was particularly tight. On several occasions during the year, usually following terrorist incidents, the Israelis banned Palestinian daily newspapers from entering Gaza. However, during such periods, Israeli newspapers were allowed into Gaza. During internal closures, the Israeli Government also occasionally blocked the delivery of Palestinian daily newspapers to Palestinian cities in the West Bank.

Israel also harassed Palestinian media organizations. On January 31, Israeli forces conducted an incursion on the city of Hebron and shut down all local radio and television stations in the course of imposing curfew. During the incursion, IDF soldiers raided the offices of the al-Nawras and al-Majd television stations and the Marah radio station.

During the year, Israeli soldiers killed two journalists. On May 3, the IDF killed James Miller, 34, a cameraman for a British television network. Miller was filming a documentary in the Shaja'iya neighborhood of Gaza City and was wearing a vest marking him as a journalist. IDF sources claimed that they were returning Palestinian fire; however, Palestinians at the scene claimed that there was no such fire. Human rights groups rejected Israel's account of the incident after independent investigations of the circumstances of the shooting.

On April 19, an IDF soldier shot and killed Nazeeh Darwaza, 45, a cameraman for the Associated Press Television Network and Palestinian Television. Dawazah was filming a wounded child during an IDF incursion in Nablus and was wearing a jacket labeling him as press. On July 30, Reporters Sans Frontieres released a statement criticizing Israel for an incomplete and botched investigation into Darwaza's death. The IDF did not charge any soldiers in this case.

On March 6, Israeli tank fire in the Jabalya refugee camp in the Gaza Strip injured two Reuters journalists, Ahmad Jadallah and Shams Odeh. Jadallah suffered severe shrapnel injuries and Odeh suffered a fractured foot. On January 28, Israeli gunfire during an incursion into Jenin injured Reuters reporter Seif ad-Din Ad-Daheleh, 20.

Israeli soldiers confiscated journalists' press cards, detained, and beat them on several occasions. For example, on May 19, IDF soldiers in Beit Sahour detained licensed photographers Sha'aban Qandil and Joseph Hadal and beat them. Qandil and Hadal were driving in a car marked "press" and labeled with "TV" stickers. Both men suffered broken bones from the beating.

The PA restricted freedom of speech and freedom of the press. During the year, the PA limited free expression, particularly regarding human rights and alleged security issues. Press freedom is subject to a 1995 press law that does not protect the press adequately. PA security services closed media outlets, banned publications or broadcasts, and periodically harassed or detained members of the media (see Section 1.d.). Palestinian commentators and human rights groups stated that, as a result, journalists practiced self-censorship.

On January 6, PA General Intelligence Organization (Mukhabarat) officers arrested the Gaza-based correspondent for al-Jazeera Seif ad-Din Shahin, 34. The arrest came after Shahin conducted an interview with an anonymous alleged member of the Fatah-affiliated al-Aqsa Martyrs Brigades who criticized the Fatah movement. The PA detained him for 18 hours in an effort to make him reveal his source and reconsider broadcasting critical commentary.

On March 17, PA police in Gaza City shut down the Palestinian weekly newspaper ar-Risalah, a weekly publication affiliated with the Islamic National Salvation Party (Khalas). The PA first shut down the paper in March 2001. The PA Supreme Court ordered it reopened in April 2002, but PA police did not comply with the court order. The staff of the paper began issuing it again in October 2002 and continued until the closure in March.

On September 13, masked, armed Palestinians broke into the offices of the al-Arabiya satellite channel in Ramallah. They destroyed equipment and briefly

detained three staff members. The PA created a board of inquiry to investigate the attack and later arrested and charged a PA security officer with leading the effort and relieved him of duty.

On September 14, armed Palestinians in Gaza City identifying themselves as members of the PA customs service intercepted a vehicle distributing copies of the Palestinian daily newspaper al-Ayyam. The attackers confiscated approximately 1,400 copies of the newspaper. The PA customs department later denied any connection to the incident, and the attackers have not been identified.

There were three Palestinian dailies and several Palestinian weekly newspapers. There also were several monthly magazines and three tabloids.

The Israeli Government required one Palestinian-owned newspaper, Al-Quds, to submit its entire contents, including advertising, to the military censor by 4 p.m. each day. The editor claimed that this process caused his journalists to practice self-censorship.

In addition to the official Palestinian Broadcast Corporation television and radio, also known as Voice of Palestine, there were approximately 20 independently owned televisions stations and 9 radio stations in the West Bank.

The Internet was available widely.

Israeli severely restricted academic freedom by disrupting the operations of West Bank and Gaza schools, colleges, and universities during the year. Israel disrupted Palestinian education through closures, curfews, and military actions that shut universities down entirely. Students and staff at all educational levels had difficulty traveling to and from educational facilities because most areas were under some form of internal closure for the entire year. In addition, Israeli forces imposed curfews on many Palestinian areas, some for 24 hours a day, for extended periods (see Sections 2.d. and 5). Students from Gaza were unable to reach West Bank universities since early October 2000, when Israel closed the safe passage route between Gaza and the West Bank. Israeli shelling and gunfire during military operations damaged a number of schools in the West Bank and Gaza.

In January, Israel shut down the two principal higher education facilities in Hebron by military order. The military order, which was valid for 6 months and was extended in June, closed down Hebron University and the Hebron Polytechnic School. The closure blocked the education of over 5,000 Palestinian students.

The PA Ministry of Education reported that since 2001 the IDF had confiscated 3 schools in Hebron and subsequently quartered soldiers there after converting them to military barracks. Those three schools were the Jawhar Girls Elementary School, the Osama Girls Elementary School, and the Ma'arif Boys Elementary School. The Ministry of Education also reported that IDF forces raided schools 26 times during the year. Since the start of the Intifada, the IDF reportedly raided or fired on schools 295 times, shut down 9 schools completely, and forced the suspension of classes at 1,125 schools and nearly all higher education institutions.

The PA generally had authority over all levels of education in the West Bank and Gaza Strip, and it controlled the budgets of all public colleges. During the year, the PA did not interfere with education in the West Bank and Gaza Strip.

b. Freedom of Peaceful Assembly and Association

The Israeli Government placed severe limits on freedom of assembly for Palestinians in the occupied territories, largely through the imposition of internal closures and curfews (see Section 2.d.). Israeli military orders banned public gatherings of 10 or more persons without a permit. Extensive curfews during the year made assembly of any kind impossible in most major Palestinian cities. Those Palestinians who chose to take part in even peaceful demonstrations often did so only by breaking curfew restrictions and IDF prohibitions against demonstrations.

Israeli security forces killed many Palestinians and injured several thousand during demonstrations and other often violent clashes (see Sections 1.a. and 1.c.). The Israeli and Palestinian authorities regularly disputed whether Palestinians fired at security forces during such demonstrations. Israeli security forces resorted to live fire, even in instances when Palestinians did not direct gunfire at them at them first. In 2001, the IDF changed its definition of "life-threatening" situations to include rock-throwing in some cases.

The PA imposed some formal limits on freedom of assembly; however, while it required permits for rallies, demonstrations, and large cultural events, these permits rarely were denied. In Gaza police approval was required for political meetings at several specific large meeting halls. Written permission also was required for buses to transport passengers to attend political meetings. In West Bank cities, the PA required permits for outdoor rallies and demonstrations and prohibited calls for violence, displays of arms, and racist slogans, although this rarely was enforced.

The Israeli Government continued to place severe restrictions on freedom of association in East Jerusalem. In 2001, Israeli forces closed Orient House, the preeminent Palestinian political institution in Jerusalem, and other East Jerusalem institutions located in Orient House, including: The Chamber of Commerce, the Land Research Center, the Higher Council for Tourism, a women's center, a prisoner's rights society, and a historical preservation group. Orient House remained closed at year's end; however, during the year, several institutions opened up alternative offices outside Jerusalem in the neighborhoods of al-Ram and Dahiat al-Barid.

During the year, Israeli police closed the Arab Graduates Club, a social club frequented by Fatah activists and run by PA Deputy Waqf Minister and Jerusalem Fatah Secretary General Salah Zuheikeh. In 2002, the Israeli police closed the Multi-Sectoral Review Project, the Land Research Center, the East Jerusalem offices of the Federation of Palestinian Chambers of Commerce, and the Jerusalem Cultural Association and the Union of Sports Clubs. At year's end, all of these organizations remained closed.

The PA placed some limits on freedom of association; however, the PA permitted Palestinian charitable, community, professional, and self-help organizations to operate.

c. Freedom of Religion

Israeli law provides for freedom of worship, and the Government generally respected this right in practice in the occupied territories. Israel did not ban any group on religious grounds, and permitted all faiths to operate schools and institutions.

Israel's imposed internal and external closure of the West Bank and Gaza, significantly impeded freedom of worship for Muslims and Christians. Israeli closure policies prevented tens of thousands of Palestinians from reaching their places of worship in Jerusalem and the West Bank, including during religious holidays such as Ramadan, Christmas, and Easter. On numerous occasions, the Israeli Government prevented worshippers under the age of 45 from attending Friday prayers inside the Haram al-Sharif/Temple Mount, the third holiest site in Islam and the holiest site in Judaism. The Israeli Government stated that such actions were necessary for security reasons. However, in June, armed Israeli police officers began escorting groups of Christian and Jewish tourists into the Haram al-Sharif/Temple Mount against the wishes of the Waqf authorities. Israeli police spokesmen indicated that the visits were an effort by the Government of Israel to re-assert the right of non-Muslims to visit the shrine.

During the year, the Government of Israel's continued closure policy prevented a number of Palestinian religious leaders (both Muslim and Christian) from reaching their congregations.

The PA has no law that specifically protects religious freedom; however, the PA generally respected religious freedom in practice.

Islam is the official religion of the PA, and its Islamic institutions and places of worship received preferential treatment. The PA required individuals to be at least nominally affiliated with some religion. Religion must be declared on identification papers, and all personal status legal matters must be handled in either Shari'a or Christian ecclesiastical courts. The PA had a Ministry of Waqf and Religious Affairs that paid for the construction and maintenance of mosques and the salaries of many Palestinian imams. The Ministry also provided some Christian clergymen and Christian charitable organizations with limited financial support. The PA did not provide financial support to any Jewish institutions or holy sites in the occupied territories.

The PA required that religion be taught in PA schools. The PA ran separate religious instruction classes for Muslim and Christian students.

For a more detailed discussion, see the 2003 International Religious Freedom Report.

d. Freedom of Movement Within the Occupied Territories, Foreign Travel, Emigration, and Repatriation

The Israeli Government severely restricted freedom of movement for Palestinians. During the year, Israel prohibited most Palestinians from the West Bank and Gaza from entering Israel, and the IDF continued to enforce a massive network of checkpoints and roadblocks across the occupied territories, which impeded the movement of people and goods between Palestinian cities, villages, and towns. Numerous cities were placed under strict curfews that ran for weeks and even months. Israel lifted some checkpoints and eased some movement following the release of the roadmap in May, but in most cases the restrictions were later reinstituted. During the year, the restrictions on movement were the most severe that Israel had imposed since it occupied East Jerusalem, the West Bank, and Gaza in 1967.

Israel constructed parts of a large security barrier in the West Bank. The result was division of approximately 5,000 Palestinian residents from the rest of the West Bank and severe disruption of their access to hospitals, schools, social services, and agricultural property. At the end of the year, the total land area secluded by the separation barrier from the remainder of the West Bank was approximately 96,000 dunams.

Since 1993, Israel has required that all West Bank and Gaza residents obtain permits to enter Israel and Jerusalem. However, Israel often denied applicants permits with no explanation and did not allow effective means of appeal. Palestinian officials and members of the clergy with VIP passes, including PA cabinet officials, members of the Palestinian Council were regularly subjected to long delays and searches at Israeli checkpoints in the West Bank, despite the fact that they were traveling on special passes issued by the Israeli Government. These practices continued at an increased level from previous years, severely restricting PA officials from conducting administrative functions and implementing reform.

On October 2, Israel issued military orders that required Palestinians residing between the separation barrier and the Green Line to obtain residency permits in order to remain in these areas. At year's end, the permit requirement applied to approximately 5,000 Palestinians who were located in such areas, dubbed "seam zones."

Even in periods before the Intifada, Palestinians in the West Bank and Gaza Strip found it difficult to obtain permits to work, visit, study, or obtain medical care in Israel. Israeli authorities permitted only a small number of Gazans to bring vehicles into Israel and sometimes did not permit West Bank vehicles to enter Jerusalem or Israel. Except for senior PA officials, Palestinians of all ages crossing between the Gaza Strip and Israel were not permitted to travel by automobile across the main checkpoint. Instead they were forced to travel along a narrow walkway almost a mile long. Israelis moving into and out of the Gaza Strip were permitted to use their automobiles. Israeli regulations prohibited Palestinian residents of Jerusalem from entering the West Bank, although this ban only intermittently was enforced. Israeli authorities also required that these Palestinian residents provide written notice to the Israeli Government if they intended to travel to the Gaza Strip; however, provision of such notice did not ensure that the Government would permit the travel.

Since 1993 Israel applied varying levels of "closure," or enhanced restrictions, on the movement of Palestinians and their goods, often for lengthy periods, in response to Palestinian terrorist attacks and other changing security conditions. The Government of Israel imposed a tightened version of closure, called "comprehensive, external closure" during periods of violent protest in the West Bank or Gaza, or when it believed that there was an increased likelihood of such unrest. Comprehensive closures also were instituted regularly during major Israeli holidays and during some Muslim holidays. During such closures, the Israel Government cancelled travel permits and prevented Palestinians--even those with valid work permits--from leaving the occupied territories. During comprehensive closures, the authorities severely restricted the movement of goods between Israel and the occupied territories and between the West Bank and Gaza. Due to the ongoing unrest, Israel imposed strict and consistent external closure throughout the year for the second straight year, compared with 210 days in 2001 and 88 days in 2000.

During periods of unrest in the West Bank and Gaza, in the aftermath of terrorist attacks, or during military exercises, the Israeli Government prohibited travel between towns and villages within the West Bank. These "internal" closures resulted in the cutoff of goods, including food and fuel, and restricted the movement of persons. During the year, Israel expanded internal closures further, sometimes in response to specific acts of violence and sometimes as a preventive measure imposed on entire cities and towns. The internal closures were even more severe when Palestinians were prohibited from using primary roads and physical barricades close off many secondary roads.

The Israeli Government further constrained the movement of Palestinians and goods in the West Bank and Gaza by imposing total closures on specific areas or villages, sometimes for weeks at a time, and by intermittently closing the Allenby and Rafah crossing points to Jordan and Egypt. Israel also consistently imposed curfews in some areas, often for extended periods. During the curfews, Palestinians generally were confined to their homes for all but a few hours per week during which they were allowed to buy food and other provisions.

The prolonged closures and curfews imposed by the Government of Israel on Palestinian cities and towns during the year had a severely negative impact on every sector of the Palestinian economy. They impeded Palestinians from reaching jobs or markets and disrupted internal and external trade (see Section 1.g.).

The prolonged closure also seriously impacted students' ability to attend school and university (see Sections 2.a. and 5.). The Government of Israel stated that they were necessary security measures (see Section 1.g.).

The Israeli Government required all Palestinian residents to obtain permits for foreign travel and restricted the travel of some political activists. Bridge-crossing permits to Jordan may be obtained at post offices without a screening process.

Israel offered East Jerusalem residents Israeli citizenship following Israel's occupation of Jerusalem in 1967. Most have chosen not to accept Israeli citizenship, choosing instead to seek a residence permit or Jerusalem identification card. which Israel occupied during the 1967 War, Israel applied the 1952 Law of Permanent Residency and its 1974 amendments to Jerusalem identification card holders. The law states that a Jerusalem resident loses the right of residence if he or she leaves Israeli territory for more than 7 years, acquires the nationality of another country, or acquires permanent residence in another country. Such persons are permitted to return only as tourists and sometimes are denied entry. The Government of Israel does not apply these same restrictions to Israeli citizens.

In 2000, the Israeli Ministry of Interior published new instructions regarding residency rights in Jerusalem. According to these instructions, permanent residents whose identity cards had been revoked after 1995 but who returned to live in Jerusalem from 1998 on were entitled to restoration of their identity cards, provided that they could demonstrate that Jerusalem was the "center of their lives." In addition to the provision on restoration of identity cards, the new guidelines allowed for the revocation of residency in cases in which East Jerusalem Palestinians obtained new citizenship or residency rights while living abroad. Human rights groups reported that such revocations have taken place infrequently.

In December, three Palestinians deported from abroad to the West Bank and Gaza were denied entry at Allenby border crossing. The three were returned to the deporting country, where they currently reside as stateless persons.

Israeli restrictions also affected family reunification. Most Palestinians who were abroad before or during the 1967 War, or who lost their residence permits for other reasons since then, were not permitted to reside permanently with their families in Jerusalem or the occupied territories. Foreign-born spouses and children of Palestinian residents also experienced difficulty in obtaining permission to reside with their family members; children of Israeli residents did not suffer such hardships. For example, a Palestinian with a West Bank identification card must apply to the Government of Israel for permission to live with his or her Jerusalem-resident spouse in Jerusalem. In May 2000, the Israeli Knesset declared a freeze on providing residency permits. At year's end, the freeze remained in effect. Palestinians reported delays of several years or more before spouses were granted residency permits. The Government of Israel occasionally issued limited-duration permits, which must be renewed. Renewing the permits may take up to 8 months, a common delay that resulted in many Palestinians falling out of status. Palestinians also reported extensive delays in registering newborn children with Israeli authorities.

The PA issued passports and identification cards for Palestinians who resided in the West Bank and Gaza, and the Israeli Government required residents of the West Bank and Gaza to use their Palestinian passports to exit and enter Israel. Bearers of Palestinian passports did not need special exit permits from the PA; however, when leaving the area via Ben Gurion Airport, the Israeli Government required Palestinians to obtain permits to transit Israel to reach the airport and the Government of Israel rarely granted such permits. Since 2001, Israeli authorities rarely granted these requests except in humanitarian or special interest cases. Without this permit, travelers must depart via land crossings and may experience delays lasting days or weeks. Palestinian residents of the West Bank and Gaza were prohibited from using the Sheikh Hussein or Arava crossings. As a result, most Palestinians could exit and enter the West Bank and Gaza only via the Allenby Bridge or Rafah crossing points, respectively, which were closed completely several times during the year. Internal closures made it difficult for Palestinians to reach even these crossing points and begin the wait at the border.

Palestinians who held Jerusalem identification cards, issued by the Israeli Government, must obtain special travel documents from the Israeli Government to travel abroad. Upon request the Jordanian Government also issued travel documents to Palestinians in the West Bank and East Jerusalem. Palestinians who wish to travel to Jordan must leave their Israeli identification documents with Israeli authorities at the Allenby Bridge. The Israeli authorities also required that Palestinians from East Jerusalem obtain a special permit to cross the Allenby Bridge, which they must purchase from the Ministry of Interior. Restrictions on residency, reentry, and family reunification only applied to Palestinian residents of the occupied territories.

The PA generally did not restrict freedom of movement.

Section 3 Respect for Political Rights: The Right of Citizens To Change Their Government

In 1996, Palestinian residents of the West Bank, Gaza Strip, and East Jerusalem chose their first popularly elected government in elections that generally were free and fair; the 88-member Palestinian Legislative Council and Chairman of the Executive Authority were elected. PLO Chairman Yasir Arafat won almost 89 percent of the vote in a two-person race for Chairman. Approximately 700 candidates competed for Council seats. Voters elected Council members to multimember electoral districts. As many as 35 of the elected members were independent candidates. International observers concluded that the election could reasonably be regarded as generally free and fair, despite some irregularities. During the year, the Council debated numerous draft laws and resolutions. Some members of the Council stated that it lacked power in relation to the executive branch.

The last municipal elections in the West Bank and Gaza took place in 1996. PA officials announced plans to hold new elections in June 2004. Incumbent municipal officials serve until the following elections. In the case of the death or resignation of an incumbent, the Ministry of Local Government appoints a replacement, with the approval of the PA Chairman.

Most Palestinians in East Jerusalem do not recognize the jurisdiction of the Israeli municipality of Jerusalem. While all Palestinians with residency permits are eligible to vote in municipal elections, only a very small percentage of Jerusalem's Palestinian population actually voted. There were no Palestinian residents of Jerusalem on the city council. There were 5 women on the 88-member Council, and 1 woman served in a ministerial-level position.

Section 4 Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Violations of Human Rights

During the year, Israel obstructed human rights monitors and NGO workers through the excessive use of deadly force and the imposition of strict closures, at times resulting in death and serious injuries. Beginning on May 9, Israel required foreigners entering the Gaza Strip to sign a waiver that purports to absolve Israel of responsibility for death or injuries caused by Israeli soldiers. The waiver stated that those entering the Gaza Strip "accept that the Government of the State of Israel and its organs cannot be held responsible for death, injury and/or damage/loss of property which may be incurred as a result of military activity."

Israel demonstrated disregard for the work of human rights monitors in official statements, and soldiers attempted to disrupt their work. On May 21, Israeli Minister of Foreign Affairs Silvan Shalom said, "Most human rights offices in the West Bank and Gaza Strip provide shelter for Palestinian terrorists."

On March 16, an Israeli bulldozer clearing land in Rafah in the Gaza Strip crushed and killed Rachel Corrie, 23, a US Citizen peace activist. Corrie was standing in front of the bulldozer and was wearing a reflective vest. Eyewitness demonstrators stated that they believe the driver knew Rachel was in front of the bulldozer as he proceeded forward. The IDF conducted two investigations into the case, including a polygraph of the operator, and found no negligence on the part of the operator. The operator knew that there were demonstrators in the area, but claimed he did not see Corrie at the time she was struck. However, the report of the IDF Judge Advocate General recommended several remedial measures including remedying blindspots from the cabs of armored bulldozers, for improved safety during future operations.

On March 20, Israeli soldiers in Nablus shot US citizen Eric Hawanith during a demonstration, wounding him in the chest and leg with three rubber-coated steel bullets.

On April 7, Israeli gunfire very likely appears to have struck 24-year-old peace activist and US citizen Brian Avery in Jenin, although the IDF denied responsibility for the incident. Avery and another activist, both with the International Solidarity Movement, were walking outside during curfew in the city when an IDF armored personnel carrier approached them. Avery was shot in the face and remained hospitalized in stable condition at year's end.

On April 12, IDF soldiers shot Thomas Hundall, 22, a British activist with the International Solidarity Movement. Hundall was attempting to move Palestinian children to safety during a clash. Hundall was declared brain dead on arrival at a hospital in Rafah.

On July 28, Israeli soldiers fired tear gas and rubber coated bullets on a nonviolent demonstration conducted at a section of the security barrier in 'Anin village, near Jenin. The rubber bullets wounded six demonstrators. The demonstrators were from the International Solidarity Movement, the Popular Committees Against the Wall, Ta'ayush, and the Palestinian National Initiative.

On May 31, IDF soldiers harassed residents of at-Tuwani village south of Hebron and threatened them with abuse if they accepted further solidarity visits from the Israeli peace group Ta'ayush. One soldier tore down a tent that Ta'ayush activists had set up in the town for meetings with local residents.

On December 26, Israeli soldiers aimed live fire at demonstrators attempting to penetrate the separation barrier built near the town of Qalqilya. The gunfire wounded a 25-year-old US citizen and seriously wounded Israeli citizen Gil Na'amati, 21. Na'amati was shot in both legs. The IDF launched an internal inquiry into the incident, but no soldiers were charged with wrongdoing at year's end.

In many cases, such groups refused to apply for special travel permits in order to protest Israel's regulation of their activities. Israeli, Palestinian, and international humanitarian and human rights NGOs monitored the Israeli Government's human rights practices in the occupied territories. Some of these organizations were critical of the Israeli Government's practices and cooperation. The Israeli Government permitted human rights groups to publish and hold press conferences.

The U.N. Relief and Works Agency (UNRWA) reported continued delays but some overall improvement in treatment of its personnel and vehicles at checkpoints. Other humanitarian groups, such as PRCS, continued to complain of unacceptable delays.

During the year, Israeli settlers in Hebron continued their longstanding harassment of members of the Temporary International Presence in Hebron (TIPH), an NGO comprised of civilians, which monitored relations between Israeli and Palestinian security forces, Palestinian civilians, and settlers in the city. The settlers damaged a number of TIPH vehicles.

At year's end, the Government of Israel continued to withhold information regarding the documents and property taken during the 2001 seizure of Orient House (see Section 2.b.).

Local human rights groups, most of which were Palestinian, and several international organizations monitored the PA's human rights practices. PA officials usually met with their representatives. Public criticism from these groups has been somewhat less forthcoming since the outbreak of the Intifada, with several NGOs voluntarily deciding to focus their efforts on the Palestinian struggle for basic rights and defer comprehensive critiques of the PA's human rights performance. During the year, human rights organizations reported that they sometimes were denied access to detainees in Palestinian prisons (see Section 1.c.). Observers noted that documentation of abuses was very limited because victims were hesitant to file or make public claims of abuse against PA authorities.

Some PA security organizations, including the General Intelligence Organization in the West Bank and the police, appointed officials to act as liaisons with human rights groups. These officers met with human rights organizations and members of the diplomatic community to discuss human rights cases.

The ICRC and other human rights groups, including the Palestinian Independent Commission for Citizens' Rights and the Mandela Institute, regularly visited PA prisons and detention centers. During the year, some human rights and international humanitarian organizations reported that they occasionally encountered delays in obtaining access to detainees in Palestinian prisons. PA officials reportedly were less responsive to queries regarding the PA's policies toward and treatment of collaborators and members of Islamist opposition groups than to queries on other detainees (see Sections 1.c. and 1.d.).

The PA issued registration certificates for 150 of the approximately 350 new and existing NGOs that submitted applications under the 2000 NGO law. The