remaining applications still were under review at year's end (see Section 2.d.).

Section 5 Discrimination Based on Race, Sex, Disability, Language, or Social Status

Palestinians were disadvantaged under Israeli law and practices compared with the treatment received by Israeli settlers. This included discrimination in residency and land use.

In the Palestinian territories several Palestinians alleged that PA security officers tortured them because of their sexual orientation. Homosexuals were persecuted by both the public and by PA security officers. Homosexuals were subject to harassment and physical abuse, and some were arrested.

Women

The law does not explicitly prohibit domestic violence, but assault and battery are crimes. There were reports indicating that domestic violence increased during the Intifada.

In the occupied territories, so-called honor crimes resulted infrequently when family members beat or killed women in response to such alleged violations of their family's honor. The PA kept no statistics on the frequency of such crimes, but human rights groups reported that they occurred infrequently. Victims of violence often were encouraged by relatives to remain quiet and were punished themselves or blamed for the "shame" that had been brought upon them and their families. Public discussion of the problems of rape, domestic violence, and violence related to "family honor" generally remained muted, but gained greater attention in the Palestinian community as a result of a significant effort by Palestinian women's groups. The crimes almost exclusively were tied to alleged sexual interactions of female family members with men who were not their husbands. This could include rape, a sexual encounter with any man except a woman's husband, or merely being seen alone with a male who was not her family member. Women's groups sought to educate women on these problems, but women's rights advocates stated that few resources were available to shelter the victims of violence because women's shelters are not accepted culturally in Palestinian society. Activists also maintained that society was not receptive to providing counseling or outreach services to victims of violence, which these advocates saw as more widespread than was acknowledged. According to women's groups, there was no reliable data on the incidence of violence against women.

There were increasing anecdotal reports from women's and humanitarian groups that the incidence of domestic abuse rose significantly during the year. Spousal abuse, sexual abuse, and "honor killings" occurred, but societal pressures prevented most incidents from being reported.

Rape is illegal but spousal rape is not. During the year, there were no figures available regarding the extent of the problem.

Palestinian women endured various forms of social prejudice and repression within their own society. Some girls, especially in rural areas, did not finish the mandatory level of schooling because husbands did not approve of their intentions to continue their education. Cultural restrictions occasionally prevented women from attending colleges and universities. Muslim women who married outside of their faith were considered apostates by Shari'a law, an offense that could result in death. Christian women who married Muslim men often were disowned by their families and sometimes were harassed and threatened with death by members of their community. Local officials sometimes attempted to convince such women to leave their communities in order to protect themselves.

Before the Intifada began in 2000, a growing number of Palestinian women worked outside the home, where they often encountered discrimination and occasionally experienced sexual harassment. There were no special laws that provide for women's rights in the workplace. Women were underrepresented in most aspects of professional life. Despite the fact that there is a small group of women who were prominent in politics, medicine, law, teaching, and NGOs, women for the most part were seriously underrepresented in the decision-making positions in these fields.

Personal status law for Palestinians is based on religious law. For Muslim Palestinians, personal status law is derived from Shari'a (Islamic law). The varied ecclesiastical courts ruled on personal status issues for Christians. In the West Bank and Gaza, Shari'a pertaining to women is part of the Jordanian Status Law of 1976, which includes inheritance and marriage laws. Under the law, women in most cases are not entitled to inheritance, while their male siblings are. The marriage law allows men to take more than one wife, although few did so. Women were permitted to make "stipulations" in the marriage contract to protect them in the event of divorce and questions of child custody; however, only an estimated 1 percent of women took advantage of this provision, leaving most women at a disadvantage in the areas of divorce or child custody. Ecclesiastical courts also often favored men over women in divorce and child custody cases.

Children

The PA provided substantial but incomplete protection for children's rights and welfare in areas under its control. The PA provided compulsory education to children and banned child labor, but did not legislate against child abuse or contain the practice of early marriage. Palestinian militants manipulated children to assist in violent attacks.

The PA provides for compulsory education through the ninth grade, when children usually reach 15 years of age. However, women who chose to marry were prevented by their families in certain sectors of society at times from completing the mandatory level of schooling. Especially in rural areas and refugee camps, boys often left school before they reached the mandatory age in order to help support their families.

The internal closure across the occupied territories and extended periods of curfew in most major cities significantly impeded the ability of both students and teachers to reach educational facilities (see Sections 2.a. and 2.d.). In areas under curfew, all classes were cancelled.

The separation barrier's construction has resulted in missed days of schooling and hardships for Palestinian children. The separation barrier, located east of the village of Khirbat Jabara, separates the village from rest of the West Bank. The village has no primary school and 183 children from the town have had their schooling disrupted by being forced to pass through a gate in the separation barrier in order to reach the nearest primary school in the village of ar-Ras.

Numerous education and health care professionals acknowledged that students were badly affected by the violent security situation, which interfered with learning and manifested itself in lack of focus, nightmares, daytime and nighttime incontinence, and other behavioral problems. Closures and curfews impeded school attendance, and UNRWA reported that more than 35,000 teacher workdays were lost in the 2002-03 academic year. UNRWA reported that test scores in its West Bank and Gaza schools dropped dramatically.

The PA Ministry of Health provided for children's immunizations. The PA insurance program provided basic medical care for children, for a small monthly fee.

Economic problems and checkpoint obstacles affected the availability of food to Palestinian children. During the year, USAID and Johns Hopkins University reported that 7.8 percent of Palestinian children under 5 suffered from acute malnutrition, 11.7 percent suffered chronic malnutrition, and 44 percent were anemic.

The law does not explicitly prohibit child abuse. Abuse existed but was not a widespread problem. The law penalizes parents or families that failed to protect children from abuse. PA courts may provide protection for children in "difficult situations," including cases of neglect or abuse. The Ministry of Social Affairs may intervene by bringing a case before a court, which would decide how to best protect the child. The judge may decide to place a child in an official protective institution, or with an alternate family. There was one protective institution for children in Gaza and one in the West Bank.

The law provides that no children 14 or under can work, and children aged 15-18 can be employed only for certain types of work and under certain conditions (see Section 6.d.). While there was no juvenile court system, judges specializing in children's cases generally adjudicated on juvenile cases. In cases in which the child was the victim, judges had the discretion to remove the child from a situation considered harmful. However, the system was not sophisticated in the protection it afforded children.

Palestinians living in East Jerusalem continued to be discriminated against in terms of their access to municipal services, compared to other residents of Jerusalem. According to the Association for Civil Rights in Israel, the Government of Israel and the municipality have not kept their pledge to the High Court to build three new infant-care clinics in East Jerusalem. In addition, East Jerusalem schools remained underfunded and overcrowded, and many students were denied an education in public schools due to lack of space. In 2001, the Israeli Government agreed to build 245 new classrooms within the next 4 years to alleviate this problem. However, by year's end, only 30 classrooms had been built and only 36 were under construction.

International and domestic NGOs, including UNICEF, Save the Children, and Defense for Children International, promoted the rights and welfare of children in the occupied territories. There also were numerous Palestinian social welfare organizations that focused on developing and providing educational, medical, and cultural services to children. A number of other groups specialized in addressing the needs of children with disabilities.

Palestinian terrorist groups used minors to prepare attacks or carry them out and as human shields. These youths were recruited to throw pipe bombs and plant explosives. On January 11, two Palestinian youth attempted to infiltrate the Israeli Netzarim settlement in Gaza. The IDF captured both youths after shooting and wounding one of them. Neither was armed. The IDF released a video in November showing Palestinian gunmen firing on IDF forces while taking cover around a donkey-drawn cart with children near them.

Persons with Disabilities

There was no mandated accessibility to public facilities in the occupied territories under either Israeli law or Palestinian authority. Many Palestinians with disabilities were segregated and isolated from Palestinian society; they were discriminated against in most spheres, including education, employment, transportation, and access to public buildings and facilities. There were approximately 130,000 Palestinians with disabilities in the West Bank and Gaza prior to the outbreak of the current Intifada. The Health, Development, Information, and Policy Institute estimated that one-tenth of the approximately 23,000 Palestinians injured in the Intifada will have permanent disabilities.

Some Palestinian institutions cared for and trained persons with disabilities; however, their efforts consistently were under-funded.

Section 6 Worker Rights

a. The Right of Association

Labor affairs in the West Bank were governed by Jordanian Law 21 of 1965, as amended by Israeli military orders, and in Gaza by PA decisions. The law permits workers to establish and join unions without government authorization. Following a process to consolidate trade unions in the West Bank, there were 12 trade unions. Four trade unions were in Gaza.

Israeli labor law governs Palestinian workers in Jerusalem, and they were free to establish their own unions. The Israeli Government restricted unions in Jerusalem from joining West Bank trade union federations; however, this restriction was not enforced. Individual Palestinian workers in Jerusalem may belong simultaneously to unions affiliated with West Bank federations and the Israeli Histadrut Labor Federation.

West Bank unions were not affiliated with the Israeli Histadrut Federation. Palestinians from the West Bank and Gaza who worked in Israel or Jerusalem were not full members of Histadrut, but they were required to contribute 1 percent of their wages to Histadrut. Their partial membership entitled them to limited benefits, including compensation in the case of on-the-job injuries, maternity leave, and compensation in the case the employer declares bankruptcy. (Full members of Histadrut also received health insurance, social security benefits, pensions, and unemployment benefits.) Negotiations between Histadrut and West Bank union officials to return half of this fee to the Palestinian Union Federation were completed in 1996, but funds have yet to be transferred. Palestinian labor officials claim that they are owed $6.5 million (NIS 30 million). Palestinians from the occupied territories who worked in Israel were not permitted to join Israeli trade unions or to organize their own in Israel.

The majority of West Bank and Gaza unions belonged to the Palestinian General Federation of Trade Unions (PGFTU). The union estimated that it had 290,000 members in the West Bank and Gaza Strip, drawing from 12 trade syndicates in the West Bank and 8 in Gaza. The PGFTU estimated that actual organized membership of dues-paying members, included approximately 75 percent of all Palestinian workers. The PGFTU was involved in the completion of the negotiations with Histadrut regarding workers' fees. The reorganization of unions under the PGFTU was intended to enable the West Bank and Gaza unions to better represent the union members' interests.

There are no laws in the occupied territories that specifically protect the rights of striking workers. In practice, such workers had little or no protection from an employer's retribution. Palestinian unions that seek to strike must submit to arbitration by the PA Ministry of Labor. If the union disagrees with the final arbitration and strikes, a tribunal of senior judges appointed by the PA decides what, if any, disciplinary action is to be taken, such as a fine. During the year, there were several local labor strikes in West Bank cities.

The PGFTU participated in some programs of the International Confederation of Free Trade Unions, but was not a member. The PGFTU became an ICFTU

affiliate in November 2002.

b. The Right to Organize and Bargain Collectively

A majority of workers in the occupied territories were self-employed or unpaid family helpers in agriculture or commerce. Only 35 percent of employment in the occupied territories historically has consisted of wage jobs. Most of this employment has been through UNRWA, the PA, or municipalities. Collective bargaining was protected. Committees of 3 to 5 members adjudicated labor disputes in businesses employing more than 20 workers. The PGFTU reported several local labor strikes in West Bank cities during the year. Existing laws and regulations do not offer real protection against antiunion discrimination.

There are no export processing zones (EPZs) in the occupied territories, although the Gaza Industrial Estate did enjoy free trade access to foreign markets. Israeli closures and curfews impeded the right to organize and bargain collectively.

c. Prohibition of Forced or Bonded Labor

PA law does not prohibit specifically forced or bonded labor, including forced and bonded labor by children, and during the year there were no reports of such practices.

d. Status of Child Labor Practices and Minimum Age for Employment

The minimum legal working age in the West Bank and Gaza is 15 years, and there are special limits governing the conditions of employment for juveniles between 15 and 18 years, including prohibitions against working at night, under conditions of hard labor, or in jobs that require them to travel outside their area of domicile. However, in practice many Palestinian children under the age of 15 were engaged in some form of work. Most such employment was believed to involve work on family farms and in family shops, or as urban street vendors. Some employment of children also reportedly occurred in small manufacturing enterprises, such as shoe and textile factories. The PA's capacity to enforce existing labor laws was limited. It had only 40 labor inspectors to inspect an estimated 65,000 enterprises. The ILO and UNICEF were working with the PA to study the nature and extent of the problem and to develop the capacity to enforce and update child labor laws. During the year, the ILO began work in the occupied territories to implement its International Program for the Elimination of Child Labor.

e. Acceptable Conditions of Work

There was no minimum wage in the West Bank or Gaza Strip. Prior to the outbreak of the Intifada in 2000, which severely disrupted employment patters for the majority of working Palestinians, the average wage for full-time workers appeared to provide a worker and family with a decent standard of living. The majority of Palestinians currently were unemployed or underemployed and the standard of living has dropped dramatically over the last 2 years. The dependency ratio increased more than 50 percent since the start of the Intifada. In 2000 one Palestinian supported 4.3 persons in the West Bank and 5.9 persons in Gaza. During the year, those figures reached 6.9 persons and 9.4 persons, respectively. As wage earners were forced to support 50 percent more persons, the standard of living seriously deteriorated.

In the West Bank, the normal workweek was 48 hours in most areas; in Gaza, the workweek was 45 hours for day laborers and 40 hours for salaried employees. There was no effective enforcement of maximum workweek laws.

The PA Ministry of Labor was responsible for inspecting workplaces and enforcing safety standards in the West Bank and Gaza. The Ministry's ability to enforce the standard was limited due to lack of resources for inspections and other constraints; however, it carried out inspections. The Ministry reported that closures, curfews, and ongoing Israeli military operations further limited its ability to carry out inspections. The Ministry of Labor stated that new factories and workplaces met international health and safety standards, but that older ones failed to meet such standards. There was no specific legal protection afforded workers that allows them to remove themselves from an unhealthy or unsafe work setting without risking loss of employment.

Like all Israeli workers, Palestinians who worked in Israel were required to contribute to the National Insurance Institute (NII), which provided unemployment insurance and other benefits. Palestinians from the West Bank and Gaza were eligible for some, but not all, NII benefits. According to the Interim Agreement, Palestinians who worked in Israel and Jerusalem benefit from NII in cases of injuries that occurred in Israel, the bankruptcy of a worker's employer, and allowances for maternity leave.

There were outstanding cases of Palestinian workers who attempted to sue their Israeli employers for nonpayment of wages but were unable to travel to the relevant courts because they were unable to receive the proper permits.

f. Trafficking in Persons

Palestinian law does not prohibit trafficking in persons; however, there were no reports that persons were trafficked to, from, or within the occupied territories.