## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

_____
                                  )
MARK I. SOKOLOW, *et al.*,         )
                                  )
                Plaintiffs,        )
                                  )
        v.                         )        Civil Action No. 04cv397 (GBD) (RLE)
                                  )
THE PALESTINE LIBERATION           )
ORGANIZATION, *et al.*,            )
                                  )
                Defendants.        )
_____)

### DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
### MOTION FOR JUDGMENT AS A MATTER OF LAW

At the close of Plaintiffs' case, pursuant to Federal Rule of Civil Procedure 50(a), Defendants the Palestinian Authority ("PA") and Palestine Liberation Organization ("PLO") moved for judgment as a matter of law on all claims related to the July 31, 2002 (Hebrew University), January 27, 2002 (Sokolow) and June 19, 2002 (Mandelkorn) attacks, as well as on the direct liability (material support) claims relating to the January 22, 2002 (Gould-Waldman), March 21, 2002 (Bauer), and January 29, 2004 (Goldberg) attacks. *See* DE 795. Defendants also moved for judgment as a matter of law on their personal jurisdiction defense. *Id.* at 22-23. Now, at the close of evidence, Defendants renew their motion and incorporate by reference the arguments made in their initial Rule 50(a) motion (DE 795) and supplement their Rule 50(a) motion, as set forth below.

### Brief Procedural History

The relevant procedural history was provided in the Rule 50(a) motion Defendants filed at the close of Plaintiffs' case. *See* DE 795 at 1-3.

**ARGUMENT**

In their initial Rule 50(a) motion, Defendants set forth the elements of Plaintiffs' Anti-Terrorism Act claim, including the scienter, predicate criminal act, and causation requirements. *Id.* at 3-6.  Defendants hereby incorporate that section by reference.

**I.     THE PA IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFFS' RESPONDEAT SUPERIOR CLAIMS.**

For the reasons stated in its motion for summary judgment, the PA maintains it may not be held liable under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333(a), under a respondeat superior theory for the unauthorized acts of low-level employees.  DE 497, Mem. at 9-11. Because the ATA has an extraterritorial reach, it should be construed narrowly.  *Id.* at 9-10.  No court has imposed ATA liability on a foreign defendant for the acts of low-level employees.  *Id.* at 10-11.  In addition, because the PA is a foreign government and any damages will come out of the public fisc, Plaintiffs "must demonstrate that, through its deliberate conduct, the [PA] was the 'moving force' behind the alleged injury."  *Roe v. City of Roxbury*, 542 F.3d 31, 37 (2d Cir. 2008) (applying principal as to municipal government); DE 497, Mem. at 11-12.  Finally, because the statute imposes treble damages, Plaintiffs must show that the Defendant itself engaged in deliberate wrongdoing.  *Id.* at 7-8.

Even assuming, *arguendo*, that Plaintiffs may assert respondeat superior liability under the ATA, Plaintiffs lack a sufficient evidentiary basis for imposing liability on the PA as a matter of law.  "For an employer to be liable for the conduct of its employees, a plaintiff must demonstrate that the alleged wrongful conduct was performed in the course of employment." *Capitol Records, Inc. v. MP3tunes, LLC*, 821 F. Supp. 2d 627, 649 (S.D.N.Y. 2011); *see also* Restatement (Third) of Agency § 2.04 ("An employer is subject to liability for torts committed by employees while acting within the scope of their employment.").   "The fact that the act done

is a serious crime is a factor indicating that it is not in the scope of employment." *Id.* § 229(2)(j), Comment f.

An important factor in determining whether the conduct was within the scope of employment is whether it was within the "work-related limits of time and place." *Rau v. Roberts*, 640 F.3d 324, 328 (affirming district court's grant of municipality's motion for summary judgment where the plaintiff produced no evidence showing that the police officer assaulted him within the officer's "work-related limits of time and space"). In *Rau*, the Court of Appeals specifically noted that the employee was "outside his jurisdiction as an officer for the Minneapolis Police Department" when the assault occurred. *Id.* Here, the five attacks as to which Plaintiffs allege employee involvement occurred in Jerusalem, outside the jurisdiction of PA security forces. Tr. 2856 (Faraj).

*Hamm v. United States*, 483 F.3d 135 (2d Cir. 2007), is particularly instructive. There, the Second Circuit held that a U.S. army reservist was not acting within the scope of his employment, or in the "line of duty," when involved in a car accident on his way to a training exercise. The Court of Appeals rejected the plaintiff's argument that the reservist acted within the scope of employment because he was subject to military discipline for wrongful conduct outside of work hours. "[T]his approach would hold the military potentially liable under respondeat superior for any wrongful conduct by a military employee outside of work hours that may subject the employee to military discipline, at least where the conduct is, in some way, 'in furtherance of the duties he owes to his employer.'" *Id.* at 138-39. Rejecting this approach as a "drastic expansion of federal liability," the Second Circuit required "case-specific evidence of control." *Id.* at 139. The Second Circuit also cited *Bissell v. McElligott*, 369 F.2d 115, 119 (8th Cir. 1966), for the principle that the "unique control which the Government maintains over a

3

soldier has little if any bearing upon determining whether his activity is within the scope of his employment." *See Hamm*, 483 F.3d at 139.

In addition, as part of the scope of employment inquiry, Plaintiffs must establish that the tortious conduct was for the benefit of the employer. *FMC Corp. v. Boesky (In re Boesky Sec. Litig.)*, 36 F.3d 255, 265 (2d Cir. 1994) (employee's "acts must in some way further the interests of the employer, and not solely benefit the employee."); *Faulkner v. Nat'l Geographic Soc'y*, 211 F. Supp. 2d 450, 472 (S.D.N.Y. 2002) ("Benefit and control are the signposts of vicarious liability.''); *Doe v. Abdulaziz Bin Fahd Alsaud*, 12 F. Supp. 3d 674, 677 (S.D.N.Y. 2014) (employee must act "in furtherance of the employer's interests").   Here, the PA is not liable for the alleged tortious behavior of its employees because there is no evidence their conduct was in furtherance of the PA's activities, or for the PA's benefit, as opposed to for the employee's personal motives.  An employer "cannot be held liable for 'torts committed by the employee for personal motives unrelated to the furtherance of the employer's business.'"  *Woods v. CVS*, No. 13 Civ. 611, 2013 U.S. Dist. LEXIS 58764, at *6 (S.D.N.Y. Apr. 19, 2013) (dismissing sexual assault claim against employer even though employee acted while on duty as a security guard for employer); *Ross v. Mitsui Fudosan*, Inc., 2 F. Supp. 2d 522, 531 (S.D.N.Y. 1998) ("New York courts consistently have held that sexual misconduct and related tortious behavior arise from personal motives and do not further an employer's business, even when committed within the employment context").

### A.      There Is Insufficient Evidence That Any PA Employee Carried out the Attack Within the Scope of His or Her Employment.

There is no evidence that any of the shooting or bombing attacks were carried out by PA employees acting within the scope of their employment.   The Court's February 17, 2015 draft jury charge on respondeat superior identifies a number of factors relevant to determining whether

an employee is acting within the scope of his employment, including: "the connection between the time, place and occasion for the act; the history of the relationship between the PA and the employee as spelled out in actual practice; whether the act is one commonly done by such an employee; the extent of the departure from normal methods of performance and whether the specific act was one that the PA could reasonably have anticipated." Here, the shootings and bombings were performed in Jerusalem, where PA police and security forces are not allowed to operate. Tr. 2856 (Faraj). Certainly, shooting and suicide bombing attacks on Israeli civilians was not commonly done by PA employees and was an extreme departure from the normal methods of performance for PA police and security force employees. In addition, attacks on Israeli civilians were not in furtherance of the Defendants' activities or interests. Tr. 3126 (Ashrawi).

Moreover, the evidence establishes that the PA did not have the ability to control the conduct at issue given the chaos and destruction created by the conflict in the 2002-2004 period. Tr. 2837, 2854-55, 2861-62 (Faraj).

        1.     The January 22, 2002 Shooting

Plaintiffs introduced evidence at trial that Said Ramadan was the shooter who carried out the January 22, 2002 attack. Tr. 1097-98 (Shrenzel). At the time of the attack, Ramadan was employed by the PA's Maritime Police. At trial, Plaintiffs provided no evidence that Ramadan was acting within the scope of his employment and in furtherance of the PA's business when he carried out the attack. In fact, Plaintiffs sponsored evidence that Ramadan carried out the attack "on behalf of the Al-Aqsa Martyrs' Brigades in retaliation for the istishhad [death of a martyr] of Raed al-Karmi." PTE 153 at 2; Tr. 1104 (Shrenzel). *See also* Tr. 1098 (Shrenzel testimony about PTE 1181, photo of Ramadan wearing headband with words Al Aqsa Martyrs' Brigades).

Thus, the evidence is that Ramadan acted in furtherance of his personal motives, not in furtherance of the PA's business.

At trial, Plaintiffs' expert Israel Shrenzel noted that, in a file prepared by the PA's Ministry of Social Affairs, Martyrs' Families & Injured Care Establishment ("Martyrs' Institute"), Ramadan is referred to as having been "faithful to his country" and "martyred while performing his national duty."  Tr. 1101 (Shrenzel testimony about PTE 60 at 02:009051). According to Shrenzel, the reference to "national duty" "reflects the fact that those who wrote this document; namely, an official of the PA considers such an attack against civilians in the center of Jerusalem as a performance of a national duty, and also as written one line before, as proof of his faithfulness to his country."  *Id.*  The fact that an employee in the Martyrs' Institute wrote that Ramadan was "performing his national duty" is not evidence that the Ramadan carried out the shooting attack as part of his job for his employer the Maritime Police.  Moreover, evocations of "national duty" and "faithful[ness] to country" in the context of a broad-based national liberation movement cannot create liability for the Palestinian Authority.  The PA is not liable for the acts of everyone who purports to act in resistance to the Occupation and in support of the establishment of a Palestinian state.  Even Plaintiffs' experts did not contend that such statements constitute evidence of scope of employment.

Plaintiffs also introduced evidence that in April 2002, Ramadan was posthumously promoted from the rank of Corporal to Sergeant, effective January 22, 2002, the date of the attack.  Tr. 1108-1110 (Shrenzel testifying about PTE 89).  According to Shrenzel, this promotion was a "token of appreciation."  Tr. 1109.  Later, Shrenzel acknowledged that the change in rank is "in order to enable his family to get a little bit more money."  Tr. 1110.

Plaintiffs introduced evidence that, after his death, Ramadan's family received monthly payments of 687 shekels, or approximately $172 per month from the PA's Martyrs' Institute. *See* PTE 62 at 02:009133.   The Martyrs' Institute makes payment to anyone who was killed or injured in the "struggle against the Occupation," or conflict with Israel.  Tr.  993 (Eviatar); Tr. 1482 (Shrenzel).   This includes Palestinian civilians killed or injured by the Israel Defense Forces or by settlers.  Tr. 1482 (Shrenzel).   A reasonable jury could not conclude that the payments establish by a preponderance of the evidence that Ramadan carried out the shooting within the scope of his employment as a member of the Maritime Police rather than on behalf of the Al Aqsa Martyrs' Brigades.

### 2.   January 27, 2002 Bombing

There is no dispute that Wafa Idris carried out the January 27, 2002 suicide bombing attack that injured the Sokolows.  There also is no dispute that Wafa Idris was not a PA employee.  Tr. 1305-06 (Shrenzel).  She worked as a medic for the Palestinian Red Crescent (the local equivalent of the Red Cross).  Tr. 1305 (Shrenzel).  As a matter of law, the PA is not liable for the bombing under a respondeat superior theory.

### 3.   March 21, 2002 Bombing

Mohamed Hashaika, the suicide bomber, was not a PA employee on March 21, 2002, the date of the attack.  Although Hashaika had been employed as a PA police officer, an administrative order shows that Hashaika "was discharged from the salary roster of the Police Department/Northern Province as of February 1, 2002, for being unfit to be a police officer." PTE 14.  Hashaika's employment records confirm that Hashaika was not receiving a salary from the PA on March 21, 2002, the date of the attack.  PTE 9; *see also* Tr. at 1516 (Shrenzel testifying that PTE 9 shows that Hashaika was not being paid by the PA on the date of the attack).  Although Shrenzel interpreted a different administrative order (PTE 95 at 02:009478) as

backdating Hashaika's termination from February 11, 2002, to February 1, 2002 (Tr. at 1178-79), Plaintiffs have no evidence that Hashaika was employed by the PA on March 21, 2002, the date of the attack.  As a matter of law, the PA is not liable for the March 21, 2002 bombing under a respondeat superior theory.

4.     June 19, 2002 Bombing

The Court previously granted Defendants' motion for summary judgment on the Mandelkorn Plaintiffs' respondeat superior claim.  DE 646 at 13 ("Therefore, the Mandelkorn Plaintiffs cannot proceed under a theory of respondeat superior.").

5.     July 31, 2002 Bombing

There is no dispute that a Hamas cell (known as the Silwan cell) planned and perpetrated the July 31, 2002 bombing at Hebrew University.  Plaintiffs' expert Alon Eviatar testified about the involvement of members of that cell in the attack – specifically, Ibrahim Hamed, Mohamad Arwan, Wael Al-Qassim, Walid Anjas, and Mohamad Adwan.  Tr. 839-49.  There is no evidence, however, that any of the individuals convicted for planning and perpetrating the attack – or with providing the explosive device – was a PA employee.  Accordingly, as a matter of law the PA is not liable for the July 31, 2002 bombing under a respondeat superior theory.

6.     January 29, 2004 Bombing

Ali Ja'ara, the suicide bomber, was not a PA employee on January 29, 2004, the date of the attack.  Although Ja'ara had been employed as a police officer in the Bethlehem police department, his employment records show that he lost his job due to "lack of commitment towards work" on January 5, 2004.  PTE 88 at 02:009412.  To be sure, Ja'ara's martyr file says that Ja'ara "worked as a First Sergeant in the police until he was martyred."  PTE 22 at 02:007291.  But his martyr file cannot be considered a more accurate record of his employment

status on the date of the attack than his actual employment records, which confirm his "termination of services" on "January 5, 2004." PTE 88 at 02:009412.

In any event, there is no evidence that Ali Ja'ara carried out the bombing within the scope of his employment for the PA or in furtherance of the PA's interests. Plaintiffs' expert Alon Eviatar testified that the bombing was carried out on behalf of the Al Aqsa Martyrs' Brigades. Tr. 1428. *See also* PTE 132 at 02:009888 ("A group belonging to the al-Aqsa Martyrs' Brigades claimed responsibility for the operation."). Evidence that the PA's Martyrs' Institute made post-attack payments to Ja'ara's family (PTE 22) is not evidence that Ja'ara acted within the scope of his employment, because, as noted, the Martyrs' Institute makes payments to the families of anyone killed in connection with the Israeli-Palestinian conflict, without regard to their employment status. As a matter of law, the PA is not liable under a respondeat superior theory for the July 29, 2004 bombing.

   **B.      There Is Insufficient Evidence that a PA Employee, Acting within the Scope of His or Her Employment, Provided Material Support Used in Preparation for or in Carrying out the Attack at Issue.**

In opposing summary judgment, the Plaintiffs acknowledged that they had to establish direct liability, rather than vicariously liability, as to their material support claims. DE 545 at 22-26. Plaintiffs cited evidence – inadmissible and irrelevant – in an effort to establish that PA institutions or senior PA or PLO officials provided material support. *Id.* When denying Defendants' motion for summary judgment on the material support claims, the Court characterized them as "ATA claims of direct liability." DE 646 at 1-2. Plaintiffs have now switched course and are attempting to argue that PA low-level employees provided material support in violation of 18 U.S.C. § 2339A or § 2339B, and that the PA should be liable under a respondeat superior theory. Not only have Plaintiffs waived such claims, but in addition, layering a vicarious liability theory on top of a secondary liability theory leads to an

unwarranted, unprecedented expansion of the ATA.  Plaintiffs should be required to show that material support was provided at the senior-officer level.  *See* DE 583 (Defs.' Proposed Jury Instructions No. 47) at 60.  In any event, there is an insufficient evidentiary basis for a reasonable jury to find that a PA employee, acting within the scope of his or her employment, provided material support used in preparation for or in carrying out one of the attacks at issue.

During the time period relevant to this lawsuit, "material support or resources" was defined to mean:

> currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, transportation, and other physical assets, except medicine or religious materials.

18 U.S.C. § 2339A(b) (2000 ed. Supp. III) (Jan. 2, 2001 to Jan. 19, 2004).  "According to Plaintiffs, Defendants provided support to terrorist groups by providing personnel, weapons, funds, and a safehouse."  DE 646 at 16.

In addition to establishing that the employee, acting within the scope of employment and in furtherance of the PA's interests, provided the personnel, weapons, funds or safehouse used in preparation for or in carrying out the attack, the Plaintiffs also must establish that the employee did so with the requisite scienter and that the material support was both the "but for" and proximate cause of the attack.  *See* DE 795 at 5-6.  As to each attack, Plaintiffs' claims should be dismissed as a matter of law.

1.      January 22, 2002 Shooting – Plaintiffs' § 2339A Claim

a.      *Personnel.*  The Court previously has held that the "Plaintiffs may not proceed under Section 2339A on the grounds that Defendants provided the AAMB with personnel."  DE 646 at 17-18.  Plaintiffs introduced evidence that PA employees Ahmed Barghouti and Ibrahim Abdel Hai played a role in recruiting PA employee Said Ramadan for a shooting on behalf of AAMB.  *See* Tr. 164-66 (Kaufman); PTE 357 at 34-40; Tr. 1128 (Shrenzel); PTE 360 at 9-13; Tr. 1470-71 (Shrenzel).  Consistent with the Court's ruling, such evidence may not be used to establish a violation of § 2339A.

b.      *Weapons.*  Plaintiffs introduced evidence that PA employee Nasser Aweis supplied the weapon used in the Gould-Waldman shooting.  The evidence is a supposed custodial statement of Aweis, which was quoted in the Aweis verdict.  PTE 362 at 56.  Even assuming, *arguendo*, that this is sufficient evidence for a reasonable jury to conclude that Aweis provided the weapon, there is insufficient evidence that Aweis did so within the scope of his employment with the PA National Security Forces.   The evidence on which Plaintiffs rely falls well short of meeting the test for establishing respondeat superior liability.  The lengthy Israeli court verdict for Aweis does not indicate that Aweis acted as a PA employee in connection with the January 22, 2002 shooting.  To the contrary, Plaintiffs sponsored evidence that Aweis acted on behalf of the AAMB.  *See* PTE 362 at 33; PTE 140 at 02:009919.

Plaintiffs rely on a 2011 memo from the Director of the Directorate of Nablus, of the PA Ministry of Detainees, which states that Nasser Aweis is "detained in the prisons of the Israeli occupation as a result of his fight for his country."  PTE 76 at 02:009304.  The same would be said of any security detainee.  In addition, this statement, made 9 years after the attack at issue, has no evidentiary bearing on whether Aweis acted within the scope of his employment in 2002.  Similarly, Plaintiffs cite a statement in a 2012 General Intelligence Services ("GIS") file that

11

"Aweis is good in terms of security and morals."  PTE 140 at 02:009919T.  As with the 2011 Detainees file, a statement a decade after the attack about Aweis's status in prison is irrelevant to whether Aweis supplied a weapon to Ramadan in 2002 within the scope of employment with the National Security Forces.   Plaintiffs also introduced evidence that, in December 2001, Israel presented U.S. envoy Anthony Zinni with a list of 33 "most wanted terrorists," and that Nasser Aweis's name was on that list.  According to an Israel Ministry of Foreign Affairs April 22, 2002 press release, Zinni gave the list to the Palestinians. PTE 354.  *See also* PTE 239, clip 2 (Arafat interview regarding Zinni list).   Eviatar testified to the PA's failure to arrest Nasser Aweis between December 2001-April 2002, when Aweis was captured by the Israelis.  Tr. 765.   But a mere failure to arrest does not provide evidence that Aweis acted within the scope of his PA employment in connection with the January 22, 2002 shooting.

             c.    *Funds.*  Plaintiffs relied at trial on the following statement in Ahmed Barghouti's indictment:  "After the Defendant learned about the execution of the above mentioned attack, the Defendant approached [redacted] and received from the latter the amount of 1,000 U.S. dollars for executing the said attack.  The Defendant gave [redacted], [redacted] and [redacted] 100 U.S. dollars each for their participation in the execution of the attack."  PTE 357 at 40.  This funding came from an unidentified person, not a PA employee, and Ahmed Barghouti was merely a conduit.  Plaintiffs also introduced evidence that Ahmed Barghouti bought food, new clothes, and shoes for Ramadan, and that Ahmed Barghouti paid with his own money for these purchases in the amount of NIS 1,200.  As to both types of funding, there is no evidence that Ahmed Barghouti was acting within the scope of his employment for the PA or that the $100 payments or purchase of food, clothes or shoes was the proximate cause of the shooting attack.  Plaintiffs introduced evidence that "[m]ost of the time [Ahmed Barghouti]

worked posts as Marwan Barghouti's bodyguard."  Tr. 1116 (Shrenzel); *see also* PTE 142 at 1

(listing Ahmed Barghouti's occupation as "Marwan al-Barghouti's bodyguard").   There is no

evidence that Marwan Barghouti was a PA or PLO official.  He was not employed by the PLO,

and his only function with respect to the PA was his election to the Palestinian Legislative

Council by the public (Tr. 881-83 (Eviatar); PTE 1), which does not make him an officer of the

PA.

> 2.      January 27, 2002 Bombing – Plaintiffs' § 2339A Claim

There is no evidence that any PA employee provided funding, personnel or a safehouse

knowing or intending it would be used in preparing for or carrying out the January 27, 2002

bombing.   Plaintiffs introduced into evidence two custodial statements of non-employee Munzer

Noor, which provide conflicting information on where suicide bomber Wafa Idris collected the

explosive device used in the attack.  In the April 25, 2002 custodial statement, Noor states that

she received an explosive device in an office of an unidentified person in the Mukata'a.  PTE

467 at Sheet 3.  In a later May 3, 2002 statement, Noor states that Idris collected the explosive

device at an unidentified person's home.  PTE 465 at Sheet 3.  The Israeli Court verdict

characterized the more recent statement (referencing a home) as more accurate and complete.

*See* PTE 322 at 3.  In any event, as there is no evidence of who supposedly provided the

explosive device at the Mukata'a so there is no evidence that would allow a reasonable jury to

conclude that the device was provided within the scope of the unidentified person's employment

with the PA, even if the jury could infer that the unidentified person worked for the PA.

(Defendants continue to maintain that the portion of the Noor statement inculpating a PA

employee is not admissible under Federal Rule of Evidence 804(b)(3).)

     3.       <u>March 21, 2002 Bombing – Plaintiffs' § 2339A Claim</u>

There is no evidence that a PA employee provided funding, personnel or a safehouse knowing or intending it would be used in planning for or carrying out the March 21, 2002 bombing.  Plaintiffs introduced evidence that PA employee Abdel Karim Aweis made "an explosive device for carrying out the planned suicide attack."  PTE 356 at 37.  But Plaintiffs have no evidence that this provision of a weapon was done within the scope of Aweis's employment or in furtherance of the activities of the PA.  Plaintiffs introduced evidence that Aweis pled guilty to holding an office in the Al Aqsa Martyrs' Brigades.  Tr. 1191 (Shrenzel).  Plaintiffs' expert also testified that in December 2001, Abdel Karim Aweis joined the leadership of the AAMB in the Ramallah area.  Tr. 1192 (Shrenzel).  The fact that Aweis received payments as a prisoner, PTE 2, does not provide sufficient evidence that his involvement in the bombing was within the scope of his employment and in furtherance of the PA's business.  All security prisoners receive monthly payments regardless of employment status.

     4.       <u>June 19, 2002 Bombing – Plaintiffs' § 2339A or § 2339B Claims</u>

The Mandelkorn Plaintiffs have no respondeat superior claim.  DE 646 at 13 ("Therefore, the Mandelkorn Plaintiffs cannot proceed under a theory of respondeat superior.").

     5.       <u>July 31, 2002 Bombing – Plaintiffs' § 2339A or § 2339B Claim</u>

There is no evidence that a PA employee provided any funding or weapons used in planning for or carrying out the July 31, 2002 bombing.  There is no dispute that the individual who made the bomb used in the attack was a Hamas operative named Abdullah Barghouti, who was not a PA employee.  Eviatar testified that Abdullah Barghouti was a Hamas operative.  Tr. 771.  Abdullah Barghouti's custodial statement admitting to manufacturing the explosive device used in the Hebrew University bombing is in evidence, PTE 428, as is Abdullah Barghouti's

conviction for his role in the bombing.  PTE 452; *see also* Tr. 286-300 (Kaufman testimony regarding the conviction).

Plaintiffs allege that PA employee Ahmed Barghouti provided material support in the form of a safehouse and a weapon to Abdullah Barghouti.  The only evidence that arguably supports this is Ahmed Barghouti's conviction for sheltering Abdullah Barghouti.  PTE 357.  According to the Israeli Military Court indictment, to which Ahmed Barghouti pled guilty, in "late 2001 or thereabouts," Ahmed Barghouti "transferred . . . Abdullah Barghouti from the prison of the Preventive Security of the Palestinian Authority in Bitunia to an apartment, which [Ahmed Barghouti] had rented in downtown Ramallah."  PTE 357 at 73-74 (51st Count).  According to the indictment, Ahmed Barghouti and another individual provided lodging to Abdullah in the apartment for "several days."  *Id.* at 74.  Before Abdullah left the apartment, according to the indictment, Ahmed Barghouti provided Abdullah Barghouti a pistol.  *Id.*  There is insufficient evidence for a reasonable jury to conclude that Ahmed Barghouti did so within the scope of his employment for the PA.

Even assuming arguendo the PA could be found vicariously responsible for Ahmed Barghouti's actions, no reasonable jury could find that providing Abdullah Barghouti a place to stay for "several days" and a pistol in late 2001 was the "but for" and proximate cause of the Hebrew University bombing attack in July 2002.  Not only is the material support temporally removed from the attack, but also the nature of the alleged support is not logically connected to the attack.  Even as to the weapon, there is no evidence that would allow a reasonable jury to conclude that providing a handgun was a proximate cause of a bombing.

6.    July 29, 2004 Bombing – Plaintiffs' § 2339A or § 2339B Claim

Plaintiffs introduced evidence at trial that PA employees Ahmed Salah, Abdel Rahman Maqdad, and Hilmi Hamash provided material support used in preparation for or carrying out the

attack by recruiting Ali Ja'ara, providing him with the explosive device, and instructing Ja'ara on how to use the device.  PTE 261; PTE 275; PTE 313; *see also* Tr. at 307-18 (Kaufman).  There is no evidence that any of these individuals were acting within the scope of his employment for the PA and in furtherance of the PA's interests.   Plaintiffs' only evidence consisted of automatic lockstep promotions (PTE 48, PTE 116, PTE 114), monthly payments while detained (PTE 7, PTE 10), and references in their recent GIS files to their security and moral status (PTE 131, PTE 129, PTE 130).  None of this evidence establishes that these individuals acted within the scope of their employment for the PA or with the purpose of furthering the PA's interests.

## II.    DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFFS' DIRECT LIABILITY (MATERIAL SUPPORT) CLAIMS.

### A.    The PLO Is Entitled to Judgment as a Matter of Law on Plaintiffs' Direct Liability Material Support Claims.

There is insufficient evidence for a reasonable jury to find that the PLO provided material support used in the preparation for or in carrying out the attacks at issue.  Plaintiffs offered evidence that Yasser Arafat was the Chairman of the PLO, but offered no evidence that he provided any weapons, funding, personnel, or safehouses used in the preparation for or in carrying out the attacks at issue, or that any support he supposedly provided was provided with the requisite scienter and constituted the "but for" and proximate cause of Plaintiffs' injuries.

### B.    The PA Is Entitled to Judgment as a Matter of Law on Plaintiffs' Direct Liability Material Support Claims.

#### 1.    The July 31, 2002 Bombing

There is insufficient evidence for a reasonable jury to find that the PA provided material support used in the preparation for or carrying out of the attacks at issue.  Plaintiffs offered the deposition testimony of Mosab Hussan Yousef that PA Preventive Security Services Chief Jibril Rajoub and Marwan Barghouti "had kind of [a] deal . . . . on the side" regarding Abdullah

Barghouti's arrest, but he "didn't know what they said." DE 678-1 at 107:17-19. Yousef also

testified that Marwan Barghouti had Yousef's father, a Hamas leader, talk to Abdullah Barghouti

to "convince him to go with the forces, and they would release him afterwards." *Id.* at 21-23.

According to Yousef, Abdullah Barghouti was violently resisting arrest; there was "gunfire" and

PA security forces were "afraid that if they [got] into the place [where Abdullah was hiding],

they get shot." DE 678-1 at 106:16; 107:9-10. There is no evidence that Jibril Rajoub in fact

agreed to release Abdullah Barghouti or in fact did release Abdullah Barghouti. Yousef did not

overhear the statements of Jibril Rajoub, which, in any event, would be hearsay. Moreover,

police will say many things to suspects to bring them into custody. Further, there is no evidence

that a PA official authorized the release of Abdullah Barghouti. In any event, the mere failure of

a government, exercising its police power, to indefinitely detain a third party in custody does not

create liability for subsequent crimes committed by the third party.

2.      The January 27, 2002 Bombing

Plaintiffs also claim that the head of General Intelligence, Tawfiq Tirawi, was implicated

in the Sokolow bombing. Plaintiffs' only evidence is PTE 233 — the PA Preventative Security

Service memo, the body of which states:

> At the night at which it was revealed that the person, who carried out the
> attack was *shahida* [female martyr] Wafa Idris – and before anyone
> claimed responsibility for the attack – Tawfik al-Tirawi, head of the
> General Intelligence, called Khalil Idris, the elder brother of the *shahida*
> [female martyr], several times and requested that the family would not
> announce that Wafa was the one who carried out the attack, but that she
> got married and moved to Jordan or to any other place. In return, al-
> Tirawi was willing to facilitate Khalil's visit to Jordan despite the fact
> that he is on the Israeli wanted list. Khalil answered that he could not sell the
> blood of his sister in this way. The family indicated that during her last
> day, Wafa did not show any signs that she was not coming back. She said
> that she was traveling to Nablus and might be late.

17

PTE 233.  According to Plaintiffs' translation, handwritten notes that appear at the top of the document state: "This information proves that the General Intelligence are involved in the issue of Wafa Idris.  You can discreetly check this with her brother."  *Id*.

This lone document does not constitute a legally sufficient evidentiary basis to find it more likely than not that Tirawi committed the January 27, 2002 attack, or that he did so within the scope of his employment.  Even Plaintiffs' expert Israel Shrenzel admitted that PTE 233 does not show that Tirawi had "prior knowledge of the attack."  Tr. 1594:10-11.  The author of the document Amnah Reehan testified that she was just relaying "gossip" or "casual conversation" from "[p]eople in the street."  Tr. 3547-49.  In order to meet the statute's predicate criminal act requirement, Plaintiffs must adduce sufficient evidence for a jury to conclude that Tirawi violated a criminal statute that meets the definition for an act of international terrorism.  *See* 18 U.S.C. §  2331(1)(A).  At trial, Plaintiffs offered rumor and character attack from Plaintiffs' expert, Tr. 1564 (Shrenzel), but no evidence of what criminal law Tirawi supposedly violated.

### 3.    The Remaining Attacks

As to the remaining attacks, there is no evidence of any involvement by a senior official of the PA.  Plaintiffs' evidence of material support had no relevance to the attacks at issue.  For example, Plaintiffs' experts relied on PTE 889, the verdict of Fouad Shoubaki, who was convicted by the Israelis of transferring "a monthly salary in the amount of NIS 500 to members of the military squads of the al-Aqsa Martyrs Brigades in the Bethlehem area."  PTE 889 at 2.  There is no evidence that any of the payments, even if made, were made to individuals associated with the attacks at issue.  Nor is there any evidence that Shoubaki made the payments knowing or intending they would be used to support attacks on Israeli civilians.  *See id.* at 35.  Plaintiffs also relied on several Israel Defense Forces ("IDF") reports (PTE 626, 631, 826, 829, and 830), none of which provides evidence of any funding to AAMB or AAMB activists after AAMB was

designated by the U.S. State Department as a foreign terrorist organization (*see* PTE 537).

Therefore, these reports and the documents referenced therein, do not provide any evidence of a

violation of 18 U.S.C. § 2339B.  In addition, none of the IDF reports or referenced documents

provide any evidence of funds, weapons, personnel or safehouses being provided knowing or

intending that they would be used in preparation for or carrying out the attacks at issue.  They

therefore provide no evidence of a violation of 18 U.S.C. § 2339A.

The mere payment of salaries to employees or post-attack social support payments to

prisoners and their families does not, as a matter of law, constitute material support.

## III.   DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFFS' AGENCY THEORY.

Defendants continue to maintain that the Plaintiffs may not seek liability under an agency

theory, for the same reasons respondeat superior liability and other indirect, vicarious forms of

liability should not be available.  The Court has already dismissed vicarious liability claims as to

the PLO, which would include agency.  DE 646 at 1.  As to the PA, in opposing summary

judgment on the PA's ATA claim, Plaintiffs did not identify any triable issue of fact that non-

employee agents carried out the attacks acting within the scope of their agency.  The Court

allowed the case to proceed to trial on two theories:  respondeat superior as to the PA, and direct

liability for material support.  DE 646 at 9-15.  In any event, there is no evidence that a non-

employee agent of the PA or PLO, acting within the scope of his or her agency, carried out the

shooting or bombing attacks at issue.

Plaintiffs have failed to establish that any agency relationship existed.  Agency is defined

as "the fiduciary relationship which results from manifestation of consent by one person to

another that the other shall act on his behalf and subject to his control, and consent by the other

so to act." *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 277 (2d Cir. 2013) (internal quotation

marks omitted); *Bigio v. The Coca-Cola Co.*, 675 F.3d 163, 175 (2d Cir. 2012) (similar).  "The three elements *necessary* to an agency relationship are (1) a manifestation by the principal that the agent will act for him; (2) acceptance by the agent of the undertaking; and (3) an understanding between the parties that the principal will be in control of the undertaking." *Johnson*, 711 F.3d at 277 (emphasis added) (internal quotation marks omitted); *see also Commercial Union Ins. Co. v. Alitalia Airlines, S.p.A.*, 347 F.3d 448, 462 (2d Cir. 2003) (holding that the establishment of an agency relationship "requires facts sufficient to show (1) the principal's manifestation of intent to grant authority to the agent, and (2) agreement by the agent.  In addition, the principal must maintain control over key aspects of the undertaking.") (citations omitted).  It is only after all three of these elements are satisfied, that an agent is then "a fiduciary with respect to matters within the scope of his agency."  *Johnson*, 711 F.3d at 277. "The principal's power to control the agent is an essential element of an agency relationship." *Mouawad Nat'l Co. v. Lazare Kaplan Int'l Inc.*, 476 F. Supp. 2d 414, 422 (S.D.N.Y. 2007).  In addition, "the entire purpose of an agency relationship is to empower the agent to take actions 'on behalf of and for the benefit of the principal – not the agent.'"  *Id.* at 423.

Plaintiffs also have failed to establish that any agent was acting within the scope of his or her authority.  Specifically, an agent's "authority . . . exists only where the agent may reasonably infer from the words or conduct of the principal that the principal has consented to the agent's performance *of a particular act*."  *Dinaco, Inc. v. Time Warner, Inc.*, 346 F.3d 64, 68 (2d Cir. 2003) (emphasis added).  Thus, in this case, senior officials of the PA or PLO must have authorized the alleged agent to take the specific actions at issue in this case.  There is a complete absence of such evidence.

**A.      The PLO Is Entitled to Judgment as a Matter of Law on Plaintiffs' Agency Theory.**

The Court granted Defendants' motion for summary judgment on Plaintiffs' "ATA claims of vicarious liability against the PLO," DE 646 at 1, which includes agency liability.  In any event, there is no evidence before the jury that any non-employee who carried out the shooting or bombing at issue – or who provided material support used in the planning for or carrying out of the shooting or bombing at issue – did so as an agent of the PLO and acting within the scope of the agency, and on behalf of the PLO.

Plaintiffs also have suggested that the PLO is liable for acts of the PA or Fatah.  Here, Plaintiffs' agency theory relies entirely on unsurprising administrative and political connections between the PA, the PLO and Fatah.  For example, that the PA funded the PLO; that Yasser Arafat served as the head of the PLO, the PA and Fatah (a political party) during the relevant time period; that Arafat controlled the budgets of the PLO and Fatah; that Arafat gave daily instructions to the Secretary of Fatah; and, that the Secretary of Fatah made a request for funding to Arafat in 2001.  *See* Tr. at 2070:17-19; 2073:7-14 and 2077:3-10; 2076:24-2077:2; 2075:18-22; and, 2079:18-2082:13.

Arafat's leadership of the PLO, the PA and Fatah is insufficient to demonstrate the existence of an agency relationship, however.  This is because, even assuming a close association between the PLO, PA and Fatah, mere interconnectedness among entities cannot create an agency relationship—even when these entities share leadership:

> The fact that a corporation or other entity owns a majority of the voting equity in another entity does not create a relationship of agency between them or between each entity and the other's agents. Likewise, common ownership of multiple entities does not create relationships of agency among them. *See* § 1.01, Comment f(2). An entity becomes the agent of another entity, and an individual becomes an entity's agent, only when they are linked by the elements of an agency relationship as stated in § 1.01.

> Within a related group of corporations or other entities the same individuals may serve as officers or directors of more than one entity. An overlapping cast in multiple organizational roles does not in itself create relationships of agency that are not otherwise present.

Rest. 3d of Agency, § 7.03, Cmt. d(3); *see also* DE 646 at 15 n.12 (holding that actions of a purported Fatah operative cannot be imputed to the PLO: "If Plaintiffs' argument here is premised on the interconnectedness between Fatah and the PLO, that is not sufficient evidence for a reasonable jury to conclude that as a function of [Marwan Barghouti's] association with Fatah, the PLO is liable for his actions.").

Plaintiffs similarly have offered no evidence that the PLO operated as a principal or otherwise controlled the PA or Fatah or those entities' funding decisions, or that the PLO manifested a desire for the PA or Fatah to act on the PLO's behalf in that regard.  Plaintiffs offered little evidence pertaining to funding decisions made by Arafat, and no evidence at all about the capacity in which Arafat was acting when he made purported funding decisions—as President of the PA, chairman of the PLO Executive Committee, or as the head of Fatah.  For instance, while Plaintiffs offered some limited evidence that Arafat gave instructions to the Secretary of Fatah, there is no evidence about the subject matter or nature of those instructions. *See* Tr. at 2075:18-24.  Plaintiffs likewise failed to offer any evidence from which the jury can draw the inference that Arafat gave these instructions in his capacity as head of the PLO, rather than as head of Fatah.

Moreover, Plaintiffs have offered no evidence of any actual authority imparted by the PLO to the PA or Fatah, and no evidence of the alleged scope of any such authority; no evidence of whether the PA or Fatah consented to act on behalf of the PLO; or, whether or how the scope of any such PA or Fatah authority related to the attacks at issue here.

With these evidentiary gaps, the jury is left to speculate as to whether an agency relationship existed between the PLO, the PA or Fatah and, further, whether any such agency relationship covered the conduct related to the terror attacks in this case.  This is an inadequate basis on which to permit a liability determination.

> **B.    The PA Is Entitled to Judgment as a Matter of Law on Plaintiffs' Agency Theory.**

There is no evidence before the jury that any non-employee who carried out the shooting or bombing at issue – or provided material support used in the planning for or carrying out of the shooting or bombing at issue – did so as an agent of the PA and acting within the scope of the agency, and on behalf of the PA.

## IV.    THE PA AND PLO ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON THEIR PERSONAL JURISDICTION DEFENSE.

Defendants have consistently maintained that the Court lacks personal jurisdiction over them.  *See* DE 45 (Rule 12(b)(2) motion); DE 82 (renewed Rule 12(b)(2) motion); DE 421 (motion for reconsideration in light of *Daimler*); DE 472 (motion to certify *Daimler* issue for interlocutory appeal); DE 457 (*Daimler* reply) DE 497 (motion for summary judgment); No. 14-4449, Dkt. 1 (Mandamus Petition) (2d Cir.).  It is the Plaintiffs' burden of proof to establish personal jurisdiction over the PA and PLO.  *Kernan v. Kurz-Hastings, Inc.*, 175 F.3d 236, 240 (2d Cir. 1999); *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996). "The burden of proof plaintiffs must meet varies with the procedural posture of the case. Prior to discovery, plaintiffs need only make a prima facie showing through the pleadings and affidavits that jurisdiction exists. . . .Ultimately, however, the plaintiffs must establish personal jurisdiction by a preponderance of the evidence, either at an evidentiary hearing or at trial." *Louros v. Cyr*, 175 F. Supp. 2d 497, 518 (S.D.N.Y. 2001); *see also A. I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79 (2d Cir. 1993) ("Eventually personal jurisdiction must be established by a preponderance

of the evidence, either at an evidentiary hearing or at trial."); *Travelers Indem. Co. v. Calvert Fire Ins. Co.*, 798 F.2d 826, 831 (5th Cir. 1986) ("at any time when the plaintiff avoids a preliminary motion to dismiss by making a prima facie showing of jurisdictional facts, he must still prove the jurisdictional facts at trial by a preponderance of the evidence") (internal citation and quotation omitted).

Plaintiffs have not introduced any evidence at trial of <u>any</u> PA or PLO jurisdictional presence in the United States, and certainly have not met the due process standard for the exercise of general personal jurisdiction, *see Daimler AG v. Bauman*, 134 S. Ct. 746, 754, 760 (2014), or for the exercise of specific personal jurisdiction, *see Walden v. Fiore*, 134 S. Ct. 1115 (2014). Evidence adduced at trial establishes that neither the PA nor the PLO is at home in the United States. The PA had approximately 100,000 employees in 2003. Tr. 2832 (Faraj). Plaintiffs did not present evidence that the PA had any employees in the United States. The PA had no offices in the United States during the 2002-2004 period. Tr. 3113 (Ashrawi). The PLO had its headquarters in Amman, Jordan, and in Ramallah and Gaza. Tr. 3112 (Ashrawi). The PLO had only two offices in the United States, the PLO United Nations mission office in New York and the office of the PLO Mission to the United States in Washington, D.C. Tr. 3113 (Ashrawi). The Court previously held that the PLO's New York United Nations office may not be treated as a jurisdictional contact. *Sokolow v. PLO*, 2011 U.S. Dist. LEXIS 36022, at * 25 (S.D.N.Y. Mar. 30, 2011) ("With respect to the activities involving the New York office, Defendants are entitled to the *Klinghoffer* jurisdictional exception.") (citing *Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44 (2d Cir. 1991).

Defendants have argued that the activities of the Washington, D.C. office of the PLO are exempt under the government contacts exception. DE 82, Mem. at 11-18; DE 421 at 3-4. No

evidence was introduced at trial of non-exempt activities of the PLO's Washington, D.C. office. In addition, no evidence was introduced at trial that would support imputing the jurisdictional contacts of the PLO to the PA under either an alter ego or agency theory.  In any event, the jurisdictional contacts of the PLO in the United States are insufficient to make either the PLO or PA essentially at home in the United States for purposes of *Daimler*.

During its hearing on Defendants' *Daimler* motion, the Court expressed reluctance to be "the first court" to dismiss either the PA or the PLO for lack of personal jurisdiction.  Tr. 4/11/14 at 30:9-12.  At the same time, however, the Court expressed that it was open to revisiting the issue in response to new "compelling" authority.  *Id.* at 69:2-16.  On February 11, 2015, Judge Kollar-Kotelly of the United States District Court of the District of Columbia dismissed two cases that had been brought against the PA.  *See Livnat v. Palestinian Auth.*, No. 14-cv-668, 2015 U.S. Dist. LEXIS 16522 (D.D.C. Feb. 11, 2015); *Safra v. Palestinian Auth.*, No. 14-cv-669, 2015 U.S. Dist. LEXIS 16492 (D.D.C. Feb. 11, 2015).  *Livnat* and *Safra*, like this case, were brought under the civil liability provision of the ATA.  Judge Kollar-Kotelly held that neither general nor specific personal jurisdiction could be exercised over the PA, and rejected the very arguments that Plaintiffs have advanced in this case as to both the PA and PLO.  Judge Kollar-Kotelly also "respectfully disagree[d]" with Your Honor's "application of *Daimler*" to the PA in this case.  For the reasons set forth in Judge Kollar-Kotelly's well-reasoned opinion, Defendants again urge the Court to dismiss this case for lack of personal jurisdiction.

## CONCLUSION

For the foregoing reasons, Defendants are entitled to judgment as a matter of law on their personal jurisdiction defense and, in the alternative, on all of Plaintiffs' ATA claims.

February 18, 2015                    Respectfully Submitted,

                                     /s/ Laura G. Ferguson
                                     Laura G. Ferguson
                                     Mark J. Rochon
                                     Brian A. Hill
                                     Dawn E. Murphy-Johnson
                                     Michael J. Satin
                                     MILLER & CHEVALIER CHARTERED
                                     655 15th Street, NW, Suite 900
                                     Washington D.C. 20005-6701
                                     (202) 626-5800 [tel]
                                     (202) 626-5801 [fax]
                                     mrochon@milchev.com [email]

                                     *Counsel for Defendants the Palestinian Authority and the Palestine Liberation Organization*