F1CZSOK1                          Conference

 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   MARK I. SOKOLOW, et al.,

 4                Plaintiffs,

 5          v.                          04 CV 397 (GBD)
     PALESTINE LIBERATION
 6   ORGANIZATION, et al.,

 7                Defendants.

 8   ------------------------------x
                                        New York, N.Y.
 9                                      January 12, 2015
                                        9:40 a.m.
10
     Before:
11
                    HON. GEORGE B. DANIELS,
12
                                        District Judge
13
                          APPEARANCES
14
     ARNOLD & PORTER LLP
15        Attorneys for Plaintiffs
     BY:  KENT A. YALOWITZ
16        PHILIP W. HORTON
          TAL MACHNES
17        SARA PILDIS
          CARMELA T. ROMEO
18
     MILLER & CHEVALIER, CHARTERED
19        Attorneys for Defendants
     BY:  MARK J. ROCHON
20        LAURA G. FERGUSON
          BRIAN A. HILL
21        MICHAEL SATIN

22

23

24

25

F1CZSOK1                    Conference

 1

 2                 THE COURT:  You could be seated.

 3                 (Case called)

 4                 THE COURT:  Good morning.

 5                 MR. YALOWITZ:  Good morning, your Honor.

 6                 THE COURT:  Let me first address the potential jurors

 7     because we need to notify -- I told the jury room that we'll

 8     try to notify them early this morning as to which jurors to

 9     come back.

10                 I have the letter from the defense with regard to the

11     process.  Let me first explain to you, which I think is fairly

12     obvious, explain to you how I came up with this list of 50

13     jurors to bring back, and then we can address the defendant's

14     issue and come up with a solution for that.

15                 Obviously, the first thing as I said I will do is I

16     look to see whether or not there were people that both sides

17     said were specifically indicated were acceptable for voir dire.

18     Unfortunately, there were none.  So that put that process

19     aside.  Then I look for individuals who were designated by as

20     acceptable for voir dire by one side and not objected to by the

21     other side.

22                 My recollection is that there were four for the

23     defense and 32 for the plaintiff.  That's not an exact number,

24     it's about where it was.

25                 I think overall the defendants indicated 17 were

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

F1CZSOK1                      Conference

1    acceptable for voir dire and plaintiff indicated 52 were

2    acceptable for voir dire.  And so there is a discrepancy.  I'm

3    not going to say that the discrepancy is necessarily because of

4    the objections.  Because when I looked at it, I think the

5    defendant objected to 26 and the plaintiff objected to 27.  So

6    it's not like there was an inordinate amount of objections by

7    one side or the other.  But the bottom line is I came up

8    with -- this is the process that I came up with so you could

9    have a fair cross-section of jurors to pick from.  I found four

10   for the defense that they said they were acceptable that the

11   other side did not indicate they thought were unacceptable, and

12   I identified the 32 that fell into that category for the

13   plaintiff.  I decided that to select a pool of 50, the first 50

14   of those people, that no side said they thought was

15   unacceptable.  What I was going to propose is this -- well, let

16   me tell you how I selected those 50.  I took the four from the

17   defendants that they say were acceptable for voir dire and the

18   plaintiff didn't object to, and then I took another matching

19   four, the first four from the other side.  So I have four

20   people from both sides that one side said was acceptable for

21   voir dire and the other side did not say it was unacceptable

22   for voir dire.  So that's it.

23       Then I picked fairly at random, which would give us at

24   least enough people, more than people we need.  I went through

25   the first 50 to get the first 50 jurors who were eligible for

F1CZSOK1                     Conference

1    voir dire based on that analysis.  What I did is I looked -- I

2    took the other 28 that the plaintiff said were acceptable for

3    voir dire and defendant did not object, and I matched that with

4    an equal number of people that neither side checked off a box.

5    So all of that 50 are people that neither side said was

6    objectionable.

7         Now what I propose, and then we can discuss how the

8    plaintiff wants to proceed -- what I propose is that I bring in

9    those 50, all those 50 who are eligible for voir dire; that

10   today that I seat in the box, the 18 seats among which you're

11   going to choose, that I seat first the four that each of you

12   pick, that eight, and then I randomly pull from the box out of

13   those 50, ten more names.  Those 18 will be the jurors that

14   we'll voir dire, unless someone indicates tomorrow that there's

15   a challenge for cause, and then we have to replace that with

16   one of the people out in the audience.

17        Then I propose again to keep it randomized.  I propose

18   that tomorrow morning you'll know what the numbers are, but

19   tomorrow morning when the jurors arrive into the courtroom,

20   that we put the 18 names in the box, in the wheel, and we spin

21   the wheel.  And the order in which those 18 names come out is

22   the order in which those people are going to be seated, okay.

23   So that is my proposal and that's what I propose doing.

24        Now, the defense has raised an issue they want to

25   dispute some of the designation that, the objections that the

F1CZSOK1                    Conference

1    defendant, the plaintiff had which would amount to challenges

2    for cause.  Quite frankly, if you want to do that, that opens

3    up the process for both sides if you want to do that.  And so

4    I'm not sure you're going to end up being better than what you

5    would have had.  But it's clear to me that the 50 that I intend

6    to call are people that no one had a reaction that those people

7    couldn't serve as jurors.  But if you want to discuss some of

8    these jurors, I'm not going to spend a lot of time going

9    through every single juror.  But I'm inclined to -- I may be

10   inclined to bring in a smaller number than 50, maybe bring in

11   40, and listen to any objections that the defendant has.  And

12   if the plaintiff wants to say objections too, they could say

13   it -- but any objections that the defendant has to any of the

14   people that they chose, which is what the letters complain

15   about, that they think is acceptable for voir dire that would

16   constitute a challenge for cause by the plaintiff, and I'll

17   hear plaintiff on what basis there is a challenge for cause and

18   then I'll rule, if you want to do that.  But I'm not going to

19   go through everyone  of them because I don't think -- we

20   probably don't even need more than 25 jurors here.  And in

21   excess of caution and to keep randomizing the process, I went

22   to 50.  But if we're going to have to spend the time going

23   through each juror, I'm probably going to cut it down to 40.

24   I'm not going to go beyond the 40 to hear objections because

25   they would not have been brought back in, okay.  So that's my

F1CZSOK1                        Conference

1    position.  And, quite frankly, if I look at that, I think --

2    what was the number -- the last number we had?  Well, you can

3    do that process yourself.  If you cut out the last ten jurors,

4    potential jurors, then I think the number is -- I had marked it

5    off.  I lost it.  I think we go -- I think the 40th number is

6    what?

7              MR. HASHIMITO:  Judge, I think it's 107. voice.)

8              THE COURT:  That makes --all right.  So if I knocked

9    off the last ten, we would be at 107.  I see that the defense

10   said that they designated four people between 120, up to 120

11   that the -- as a matter of fact, designated four people 12, 25,

12   49 and 60 within that number that the plaintiff said -- marked

13   off as they thought were objectionable.  So if you want to

14   discuss those four and see whether you want me to throw those

15   in the mix, you know, I'll consider that, you know.  But

16   otherwise -- quite frankly, I don't think it's going to make a

17   big difference.  And I've looked at those four and started to

18   look at the others even beyond that, and I'm not sure that --

19   well, you can tell me what, if you want to dispute that, you

20   can dispute that.  But the process as I laid it out is what I

21   intended.  I bring back the 50, we spin the wheel today, we get

22   ten names, we'll have 18 names.  You'll know today, those are

23   the people who you're going to voir dire in the box initially.

24   Tomorrow morning when they walk in just randomly pull these 18

25   names out of the box and seat them in that order, and then I'll

F1CZSOK1                    Conference

1    have some basic questions and you can propose some other basic

2    questions.  We don't have to go through obviously all of the

3    basic information you already have, but I just want to have

4    some dialogue with each juror and I want to have them reassure

5    us that they can be fair and impartial jurors in this case.

6            So let me first start with the defense.  What did you

7    want to do?

8            MR. HILL:  Your Honor, we do want you to invite the

9    jurors that were challenged for cause.  Now to be candid there

10   were 13 of them that we designated as acceptable.

11           THE COURT:  Right.

12           MR. HILL:  And the plaintiffs challenged for cause.  I

13   think with respect to six of them, the jurors did check there

14   was a concern about their impartiality.  But for seven of them

15   they did not.

16           THE COURT:  I know.  But now I'm only dealing with the

17   first four that you dealt with, because I would have never

18   gotten to the others.

19           MR. HILL:  I understand.  So numerically those, in my

20   view, are two different categories.  See juror number 12 did --

21           THE COURT:  Let me -- hold on just a second.  Let me

22   have the?  You would oppose an objection for cause to juror

23   number 12.

24           MR. HILL:  They're two different categories.  Juror

25   number 12 is a harder case for me to make, I acknowledge.

F1CZSOK1                    Conference

1          THE COURT:  You got to tell me.  They said they could

2     challenge this person for cause.  You have to tell me whether

3     or not you think that there is a legitimate basis to challenge

4     for cause given the answers to these questions.

5          MR. HILL:  Well, we can talk about each of them if

6     your Honor wants to.

7          THE COURT:  Well, I am because that's the only way I

8     can rule on challenge for cause.

9          MR. HILL:  So the very last question on number 12, the

10    juror did indicate that they could be fair and impartial.  And

11    the concerns that the juror articulates are about general

12    issues about knowledge of the conflict.  And I think that if

13    the juror was here and was questioned, the juror would affirm

14    what he said in 61, which is that he can be fair and impartial.

15    And I think the juror just needs to be focused on following the

16    Court's instructions, which they indicated they could do in

17    question number 52, and applying the facts to the law in the

18    case.

19          THE COURT:  Well --

20          MR. HILL:  But I acknowledge this juror did indicate

21    they had some concerns about their impartiality.

22          THE COURT:  And I can tell you what I did, because I

23    made my own designations when I first got them back before I

24    heard from you.  And the main questions I went to were

25    questions 43, 45, 49, 52, 53, 54, 56, 57, 59, 60 and 61.  The

F1CZSOK1                      Conference

1     first question I'm went to is 61.  If they answered no to 61,

2     they can assure all sides they can be fair and impartial juror

3     I put a no next to that and on my list that already exists.

4     So, for example, I think number two and number three already

5     have a no and number of them before 12.  I didn't look as

6     carefully at the other questions.  Once I looked at that

7     question, because that sort of gave me the guide that I think

8     is going to be a big, a lot of dispute about, but I mean, quite

9     frankly -- I mean, I will consider seating this person and I'll

10    hear what the objections for cause is.  But, quite frankly, I'm

11    not sure why you would want this person, given the answer, the

12    answer given to question number 44 and 45.

13            MR. HILL:  Well, that's the, in part, why I wanted to

14    invite him back was to explore and hear what his views were,

15    whether or not he can set them aside and be a fair and

16    impartial juror.  So that's why --

17            THE COURT:  Why would I invite somebody back who says

18    they have feelings or opinions about these individuals that

19    would make it difficult for them to be a fair and impartial

20    juror to all sides, what would be the purpose of that?

21            MR. HILL:  If we're looking on question 45 on juror

22    number 12, the person's answer refers to certain organizations

23    as non-state militant/terrorist organizations that use violence

24    as their primary activity.  Now if that's a reference to Hamas,

25    that's not a problem from our perspective.

F1CZSOK1                         Conference

1          THE COURT:  Well, but --

2          MR. HILL:  That --

3          THE COURT:  I am looking also at question 43 and, 42

4   and 43.  Why would you want this person?

5          MR. HILL:  I don't necessarily have a problem with

6   that answer.

7          THE COURT:  You don't have a problem with the answer

8   do you have any feelings or opinions about the PLO or the PA

9   that would make it difficult for you to be a fair and impartial

10  juror to all parties in this case?

11         MR. HILL:  Yeah, that's why I wanted to invite him

12  back and explore.

13         THE COURT:  I know, but you must have a problem with

14  that answer.

15         MR. HILL:  No, actually I don't.  That's why we

16  designate it as acceptable.

17         THE COURT:  So you don't have a problem with people

18  who say that they have feelings or opinions about the PLO or

19  the PA that would make it difficult for them to be a fair and

20  impartial juror?

21         MR. HILL:  It depends on what the feelings are.  This

22  particular juror's answer did not cause me to think there was

23  cause.

24         MR. YALOWITZ:  See, your Honor, that's the problem

25  that I have.

 1          THE COURT:  You want this guy out?

 2          MR. YALOWITZ:  Yeah, I do.  You know, the way we

 3   approached it was we looked at people who said I have strong

 4   feelings.  Some of them said I have strong pro Israel feelings.

 5   I said well, you know, Judge Daniels isn't going to want that

 6   person, it's not fair to the process, we're going to check that

 7   person as cause.  Some said I have pro Palestinian feelings

 8   that make it difficult.  I said I don't want that person.  So

 9   that is guy who is personal friends with King Abdullah of

10   Jordan.  He says I don't -- it's going to be a problem for me

11   to be a juror because I'll get fired and I don't want to get

12   fired.  This seems like a guy who we shouldn't be bringing

13   back.

14          And let me just stay if we're going to start reopening

15   cause, I got a lot of problems with the defendant's challenges.

16          THE COURT:  I understand that.

17          MR. YALOWITZ:  We can go start doing that.

18          THE COURT:  Well, as I say, I'm not going to spend a

19   lot of time doing that.  I'm going to cut down the number and

20   I'm going to just hear whatever numbers would have been cause

21   within that number and I'm already willing to cut it down to 40

22   instead of 50, because if we're going to add more people or

23   substitute people.  But, quite frankly, I don't, I mean --

24          MR. HILL:  Your Honor --

25          THE COURT:  Mr. Hill, let me tell you also what my

F1CZSOK1                        Conference

1    thinking is.

2            Part of the problem that I have is that if you bring

3    this juror back, I am going to question this juror in the box.

4    If this juror gets in the box, I'm going to question this juror

5    in the box about these questions in front of other jurors,

6    okay.  Now, you see what this person said in answer 44.  Now,

7    if you want this juror to explain in front of the other jurors

8    why they think -- and I'm not going to even repeat it for the

9    record -- but why they believed this, then that's -- I'm going

10   to have -- that's a danger that, quite frankly, it's not worth

11   bringing this juror back for you to take a chance that he's

12   going to say something that might affect the other jurors.  So

13   particularly on an individual who clearly answered that they

14   could not -- they had difficulty being a fair and impartial

15   juror.  And, quite frankly, the difficulty they seem to have

16   seems to be, if anything, a difficulty with information they

17   have about your client, rather than the difficulty with

18   information they have about the plaintiffs or Israel on the

19   side of the Palestinian Israeli conflict.  So --

20           MR. HILL:  Can we set number 12 aside?  Because I

21   agree there are issues with this juror.  Maybe we can focus on

22   the ones where I think there really is an issue according to

23   the question.

24           THE COURT:  Let met say this, let me just say this.  I

25   think given the answer to these questions, that I think that

F1CZSOK1                       Conference

1    there is a valid challenge for cause.

2              MR. HILL:  We can --

3              THE COURT:  And I would sustain the challenge for

4    cause if this juror, this juror was challenged based on these

5    questions.  And, quite frankly, there is not a whole lot this

6    juror could say to me that would change my mind given the

7    direct nature of these questions, so.

8              MR. HILL:  I understand your Honor's ruling.  We can

9    go to the next one.

10             THE COURT:  I want the record to be clear that you

11   object to this juror not sitting in as a juror.  If it's a

12   challenge for cause, if it were a challenge for cause by the

13   plaintiff, I am going to sustain that challenge for cause

14   unless you can make some argument that somehow the answers to

15   these questions qualifies this juror as a fair and impartial

16   juror.

17             MR. HILL:  I've already said all could be said based

18   on the records we have, your Honor.

19             THE COURT:  Then I'm putting that aside.

20             MR. YALOWITZ:  Your Honor, may I just be heard on one

21   thing that I think needs to come into the mix before Mr. Hill

22   continues?

23             Over the weekend we noticed, and I'm embarrassed that

24   we didn't notice this before, but over the weekend we noticed

25   that two of the jurors gave personally identifying information

F1CZSOK1                    Conference

1   in their questionnaires.  And because of the anonymity of the

2   juror, I'm concerned that those two jurors could be either

3   identified based on -- they gave the names of who they live

4   with.  So either they could be identified or they might have a

5   concern.

6           THE COURT:  Are they among the 50?

7           MR. YALOWITZ:  They are.  That's why I'm raising it.

8           THE COURT:  Okay.  Do you --

9           MR. YALOWITZ:  It's number --

10          THE COURT:  You don't have to tell me the number.

11          MR. YALOWITZ:  Okay, I can --

12          THE COURT:  Mr. Hill, do you know who he's talking

13  about?

14          MR. HILL:  I don't specifically.  I did notice a

15  couple of people gave names, but right new none of this is in

16  the public record and I don't intend to put any of that in the

17  record so.

18          THE COURT:  Let's put that aside for now and let's

19  see.

20          MR. YALOWITZ:  But do I think those two should not be

21  called back for that reason.

22          THE COURT:  All right, we'll come back to that.

23          MR. YALOWITZ:  Okay, thank you.

24          THE COURT:  Mr.

25          MR. HILL:  I don't know what the numbers are, so maybe

F1CZSOK1                    Conference

1    Mr. Yalowitz can write them on a note and we can --

2              THE COURT:  Why don't you just share the number with

3    him and then see if you can agree whether or not I should bring

4    them back or not.

5              MR. HILL:  The next juror that we designated as

6    acceptable to the plaintiffs and challenge for cause is juror

7    number 25.

8              MR. YALOWITZ:  Can I do one, your Honor?  Because I

9    have one that I'd like to do.

10             THE COURT:  Wait a minute.

11             MR. YALOWITZ:  I mean he gets to do all mine and I

12   don't get to do his?  Is that how we're going to do it?

13             THE COURT:  No, that's not how we're going to do it.

14   We're going to let him do his first, then we can give you a

15   full opportunity to do yours if you want to do yours.

16             MR. YALOWITZ:  Okay.  Thank you, your Honor.

17             THE COURT:  All right.

18             MR. HILL:  So for juror number 25, the juror did not

19   check yes to any of the questions your Honor had indicated

20   would potentially be for cause.

21             61, they indicated they could be impartial.  And then

22   the ones in the 40s, they also indicated that they could be

23   fair and impartial.

24             THE COURT:  Well, this person said that they're

25   scheduled to start volunteering at a new Hospice program that

F1CZSOK1                    Conference

1   could lead to a job, and I don't want to miss the opportunity.

2            And with regard to answer 60 said, I'm supposed to

3   start Hospice training to volunteer.  This could lead to a job

4   opportunity that I don't want to miss.

5            Now, if you want me to bring this juror here in and

6   your position is that even though this juror stated that

7   problem -- and we have plenty of jurors who haven't stated such

8   a problem -- that you want me to force that juror to sit on

9   this case despite this concern, then I will consider bringing

10  this juror back.  But you're going live with the fact that this

11  juror's indicated that they have a conflict and that may

12  interfere with their assessment and concentration on this case.

13  If you wish to take that chance, even though you have other

14  people who don't state -- you have plenty of people who don't

15  say that, then I'm willing to do that.  But I'm not going to

16  bring this juror in and with the ultimate decision that you

17  really don't want to force the juror to stay here if the juror

18  has a genuine conflict with serving, so.

19            MR. HILL:  At this point we do want her to be invited

20  back, your Honor.

21            THE COURT:  All right.  Well let me put that aside for

22  a second and we'll come back to that.

23            What about the other people?

24            MR. HILL:  Do you want me to go in numerical order or

25  what, I --

F1CZSOK1                    Conference

1          THE COURT:  I want you to go to 49.

2          MR. HILL:  49, yes, your Honor.

3          THE COURT:  Because I don't know if there's anybody

4     else between 25 and 49.

5          MR. HILL:  Yeah.  49 did check yes to questions 43 and

6     44, and then referred to those answers in subsequent questions.

7     Again, the nature of the concern from the juror is general

8     knowledge about the conflict.  And I believe that the juror

9     indicated they could follow the Court's directions and apply

10    the law to the facts that are in evidence, and we think the

11    juror should be seated for that purpose.  We don't think the

12    person is unfair or lacks partiality based on the content of

13    the questionnaire.

14         THE COURT:  Well, the juror said in answer 45, I would

15    want to be impartial and truthfully can find this difficult.

16         MR. HILL:  I suspect many of the jurors are going to

17    find the case difficult, but this person --

18         THE COURT:  No.  There are plenty of jurors who say

19    they any didn't find it difficult to be impartial.  That's not

20    a question of whether they find the case difficult.  And

21    she's -- and then he or she said on line 60, question 60, is

22    there any reason at all why you think you can not serve on this

23    jury.  It says, only what I've already stated.  And it says,

24    see below.  And question number 61 where I ask can you assure

25    the Court and all parties that you can serve as a fair and

F1CZSOK1                        Conference

1   impartial juror on this case, the juror checked neither the yes

2   box nor the no box, but wrote in, I would try, but please see

3   above.

4           As far as I'm concerned, that disqualifies the juror.

5           MR. HILL:  I understand your Honor's ruling.

6           THE COURT:  So I would -- would you have a challenge

7   for cause with regard to this juror based on those answers?

8           MR. YALOWITZ:  Yes sir.

9           THE COURT:  All right.  Then I would grant that

10  challenge for cause.

11          MR. HILL:  All right.  The next one numerically, your

12  Honor, is number 60.

13          THE COURT:  I looked at number 60.  My recollection is

14  that is more of a time job -- maybe --I could let the other

15  side articulate the objections.  But let me just tell you that

16  the answer given to 48, 49, 53, 54, 56 and the additional

17  answer added on 19 give me serious concern about seating this

18  person as a juror.

19          MR. HILL:  I don't have any ability beyond what's in

20  the questionnaire.  If your Honor's inclined to sustain the

21  cause challenge, I don't have anything to add to what the

22  witness has already said.

23          MR. YALOWITZ:  We would --

24          MR. HILL:  Juror said.

25          MR. YALOWITZ:  We would make such challenge, your

F1CZSOK1                    Conference

1    Honor.

2            THE COURT:  All right, then I would grant such a

3    challenge.

4            MR. HILL:  The next juror in this category numerically

5    is number 120.

6            THE COURT:  Right, which we will never get to.

7            MR. HILL:  Well, at this point we've only put back

8    into the pool one of the --

9            THE COURT:  Right.

10            MR. HILL:  -- persons that we indicated.

11            THE COURT:  To save time, I am going to cut the number

12    down to 40.  We're going to bring in 40.  And within the first

13    40 people who are eligible you don't have any other objection,

14    any other concerns.  These are the only people in that 120 that

15    you said were you wanted -- you said were acceptable and that

16    they challenged.

17            MR. YALOWITZ:  Your Honor, if we're going to go to the

18    randomized system I wouldn't mind the 50.  If he wants to talk

19    about juror number 120, that doesn't bother me.

20            MR. HILL:  It's actually the ones after 120 that I

21    would like to talk about, yeah.

22            THE COURT:  Hold on just a second.

23            I think the last -- what is the last number?  Last

24    number we had was 192.  All right.  You say 120?

25            MR. HILL:  120 we can discuss if the Court would like

F1CZSOK1                          Conference

1    to.  This individual is pregnant so I think she may well be

2    excused for hardship.

3              THE COURT:  Okay.  So I can take her off the list you

4    say you --

5              MR. HILL:  I assume you would sustain --

6              THE COURT:  I'm asking you.  Not necessarily.  You

7    want me to force her to sit?  That's my decision.  If you say

8    there is no challenge for cause, not a valid challenge for

9    cause and you want to make her stay, then I'm going to tell her

10   like everybody else that you're going to have to stay.

11             MR. HILL:  It would only be if the case is going to

12   get shorter and I honestly don't know the answer to that.

13             THE COURT:  So you want -- you oppose this excusing

14   this juror or not?

15             MR. HILL:  No.  She may be excused.

16             THE COURT:  Okay, then that's set.  Anything else?

17             MR. HILL:  Number 141.

18             THE COURT:  141.

19             MR. HILL:  This juror indicated in the final question

20   that they could be fair and impartial, and their answers to the

21   other ones go to general knowledge of the conflict.  They

22   indicated in 45, they answered that question yes, but they did

23   not explain why.  So I think at a minimum this juror should be

24   invited back.

25             THE COURT:  Let me just look at it.

F1CZSOK1                    Conference

1          Mr. Yalowitz, is there reason that you would challenge

2    this juror for cause?

3          MR. YALOWITZ:  My concern was this is a young person

4    who's been recently laid off and is looking for work.  And it

5    seemed to me that given the large number of people we have who

6    are not suffering economic hardship, that juror should be

7    excused for that reason, your Honor.  That was question 56.

8          THE COURT:  Juror on 56 said that she had an unusual

9    financial hardship, a serious problem would prevent her from

10   serving as a juror for the duration of this case, because she

11   was recently laid off, currently interviewing for new position.

12         MR. HILL:  If your Honor thinks that's a such

13   hardship, your Honor.

14         THE COURT:  Well, I don't have to think about it at

15   all, unless you object to it, unless you want her here.  You

16   want me to make her come back?

17         MR. HILL:  It's not clear to me that that would

18   qualify as a hardship.

19         THE COURT:  But that's not my question.  My question,

20   the way I --

21         MR. HILL:  I want them back, yes, your Honor, if

22   that's the question.

23         THE COURT:  The way I proceed is if there is a

24   challenge for cause usually, I don't even want to hear the

25   explanation unless the other side opposes.  If both sides say

F1CZSOK1                    Conference

 1  let's not bother to make this juror serve, then that's good

 2  enough for me.

 3          MR. HILL:  I think this one should be brought back.

 4          THE COURT:  You think this juror should serve?

 5          MR. HILL:  Yes, your Honor.

 6          THE COURT:  All right.  Let me put that aside with

 7  number, what was the one I put aside, 25?

 8          MR. HILL:  25.

 9          THE COURT:  All right.

10          MR. HILL:  148 is the next one, your Honor.

11          THE COURT:  All right, 148.

12          MR. HILL:  Here the concern of this juror was that

13  this was a case that was a dispute between an employee and

14  employer.  This is --

15          THE COURT:  I have no idea what this juror, what room

16  this juror was in.

17          MR. HILL:  Yeah, the juror was apparently checked

18  out --

19          THE COURT:  Thinks this is an employment

20  discrimination case.

21          MR. HILL:  Right.  But it's obviously not.

22          THE COURT:  You think this juror is qualified to sit

23  if she sat there in that room and as a lawyer and thought this

24  was an employment discrimination case?

25          MR. HILL:  Yes, your Honor.  I would like the juror to

F1CZSOK1                        Conference

1    be returned.  I don't believe this answer disqualifies them.

2              THE COURT:  All right.

3              MR. HILL:  It is a respondeat superior case, they just

4    mistook it as a dispute between an employer and employee.

5              THE COURT:  Mr. Yalowitz, you want this juror brought

6    back and voir dired?

7              MR. YALOWITZ:  No.  I really don't want people who

8    don't listen to the Court's instructions to sit as jurors.  You

9    know, you didn't tell the jury that is respondeat superior

10   case.  It was a very clear and simple instruction.  And I agree

11   with you, I don't know what room the juror was in.  Maybe

12   the -- but whatever, I just think if we have somebody who

13   doesn't have the mental capacity to fill out the form, you

14   know, in a way that relates to the instructions that the Court

15   gave, that's a serious concern for me.

16             THE COURT:  Let me just -- I remember reading this.

17   What --

18             MR. HILL:  Your Honor's remarks did mention whether it

19   was within the scope of the employment and whether it was for

20   the benefit of the employer, which is what I think this person

21   heard.

22             THE COURT:  Well on top of that, the answer to

23   choices, the requests from 53 were yes or no.  She made a third

24   box and checked a maybe.

25             MR. HILL:  Right, because I think she misunderstood

F1CZSOK1                    Conference

1    what the case was about.

2              THE COURT:  I mean, I just want the record to be

3    clear, that kind of person you want on this jury?

4              MR. HILL:  We do want this person to be returned, your

5    Honor.

6              MR. YALOWITZ:  Your Honor, may I be heard for just one

7    other --

8              THE COURT:  Just a second.  Let me just --

9              MR. YALOWITZ:  Sure.

10             THE COURT:  And number 60, the answer to the question

11   is there any reason at all why you think you can not serve on

12   the jury, she checked no and put in parentheses, aside from 53.

13   So that would mean 53 must be a yes.

14             MR. HILL:  Well, they said it was maybe, but that's

15   what the form says, your Honor.  I think this could be very

16   quickly cleared up with the juror when they return.

17             THE COURT:  Can you assure this Court and all parties

18   you can serve as a fair and impartial juror?  Check yes in

19   parentheses, but see 53, all right.

20             Mr. Yalowitz.

21             MR. YALOWITZ:  That concerned me as well, your Honor,

22   that the -- I want jurors who say, look, I understand, I'm

23   going to bring my life experience, but I can be fair, I can set

24   aside my concerns.  This is a juror who doesn't even understand

25   what the case is about, and is already expressed concerns about

F1CZSOK1                    Conference

 1    his or her ability to be impartial.  So that struck me as

 2    something that was of serious concern.

 3            THE COURT:  All right.  You would challenge the juror

 4    for cause based on those answers?

 5            MR. YALOWITZ:  Yes, sir.

 6            THE COURT:  All right I would grant such a challenge.

 7            MR. HILL:  All right.  Numerically, your Honor, the

 8    next one is 154.

 9            THE COURT:  Okay.

10            MR. HILL:  And this person I don't think checked any

11    of disqualifying questions.

12            THE COURT:  Yeah, 54.

13            MR. HILL:  They indicate some general familiarity with

14    the parties and the people involved and the conflict, but they

15    indicate they can otherwise be fair.

16            THE COURT:  Mr. Yalowitz, what's the basis for your

17    objection?

18            MR. YALOWITZ:  My concern with 154, your Honor, is

19    that this is a person who studied international development,

20    has observed elections in the Middle East, is a consultant for

21    the National Democratic Institute of International Affairs and,

22    despite all that extensive experience with the Middle East,

23    says in response to question 42, I have heard of the PLO.  And

24    in response to question 44 says, about the organizations and

25    interviews, they may have held leadership positions.

F1CZSOK1                    Conference

1          THE COURT:  I'm sorry, what question are you --

2          MR. YALOWITZ:  I'm sorry.  44, your Honor.  They may

3     have held leadership positions and Hamas and the PLO may have

4     united to work together.  And then says with regard to the --

5     Israeli Palestinian conflict that they think it's something

6     about priority and land.  So I was concerned that this was a

7     juror who was very well educated, and yet was masking

8     knowledge, and that was of concern to me.

9          THE COURT:  Okay.  But you don't have any basis,

10    evidence for me to look at that indicates they're masking that.

11         MR. YALOWITZ:  The basis is that they are very well

12    educated and are involved with the democracy in the Middle East

13    and claim not to know anything about the Israeli Palestinian

14    situation.

15         THE COURT:  Well, what makes you think the Middle East

16    they're referring to Israel or Palestine?

17         MR. YALOWITZ:  They say Egypt.

18         THE COURT:  Right.

19         MR. YALOWITZ:  And Pakistan.

20         THE COURT:  That's not Israel or Pakistan.

21         MR. YALOWITZ:  Right, Egypt Pakistan, Greece

22    Mozambique, Angola, South Africa, lot of --

23         THE COURT:  Lot of countries other than Israel and

24    Palestine.

25         MR. YALOWITZ:  That's my -- I'm telling you my concern

F1CZSOK1                    Conference

1    candidly.

2              THE COURT:  No, I understand.

3              MR. YALOWITZ:  A well educated person who, you know,

4    reads newspapers and is interested enough in the Middle East to

5    go there to observe elections and then says, well, I don't

6    really know very much.

7              THE COURT:  Okay.

8              MR. YALOWITZ:  That's of concern to --

9              THE COURT:  If this is all the information that this

10   juror gave us during voir dire, would you consider that to be a

11   challenge for cause?

12             MR. YALOWITZ:  I would have.  I believe I would, your

13   Honor.

14             THE COURT:  Just based on this information?

15             MR. YALOWITZ:  I believe it's not credible.  I --

16             THE COURT:  I mean, which part of -- I'm not sure I

17   understand which part you say is not credible.

18             MR. YALOWITZ:  I don't think it's credible to say I

19   only know a little, and when they spend all that time abroad.

20   So that's my problem with that juror.

21             THE COURT:  Okay.  But abroad is pretty broad.

22             MR. YALOWITZ:  Well, Egypt, Pakistan.

23             THE COURT:  You think that somebody who spent time in

24   Egypt and Pakistan should be intimately familiar with the

25   Israeli Palestinian conflict?

F1CZSOK1                    Conference

1          MR. YALOWITZ:  I think that somebody who has got a

2     Master's Degree in international development and who supervises

3     people for the National Democratic Institute for International

4     Affairs and is a consultant for International Development is

5     somebody and who reads the New York Times and the Washington

6     Post and says I don't know much about the POL or Israel strikes

7     me as somebody who is not being candid with the Court.

8          THE COURT:  All right.  Well, I would not have a basis

9     to make that determination now.  So I would not grant a

10    challenge for cause to that juror just based on this without

11    any further information.  So I think that I probably would not

12    sustain a challenge for cause.

13         MR. YALOWITZ:  All right.  I understand, your Honor.

14         THE COURT:  Anything further?

15         MR. HILL:  The next one numerically is 163, which I'll

16    make it easy and withdraw.  The next one after that is 190.

17    This individual also did not answer any of the disqualifying

18    questions.

19         THE COURT:  190.

20         MR. HILL:  190.

21         THE COURT:  Mr. Yalowitz.

22         MR. YALOWITZ:  You have to bear with me, your Honor.

23    I didn't think we're going past 160.

24         THE COURT:  I'm sorry, I haven't looked at this

25    intimately.

F1CZSOK1                        Conference

 1              MR. ROCHON:  We can share a copy with Mr. Yalowitz if

 2    it helps.

 3              MR. YALOWITZ:  If your Honor just bears with us, I

 4    can -- I think I know.  We brought it.

 5              THE COURT:  Sure.

 6              MR. YALOWITZ:  We may have it in back.  I think we've

 7    got it in back.

 8              While we're waiting, should we do some of ours?

 9              THE COURT:  No.

10              MR. YALOWITZ:  Okay.  Because I've got a lot, I've got

11    more than they do.

12              THE COURT:  Well, I'm not sure, unless you want to

13    replace the ones that you chose, I'm not sure that it's to your

14    advantage to go all through that.  But as I say I'm more

15    inclined to bring in smaller number than a larger number if the

16    two of you are still fighting and a smaller number of people

17    who clearly are people who are qualified.

18              MR. YALOWITZ:  I get it.  I need to cut --

19              THE COURT:  I'm not going to spend a whole lot -- I

20    told the jury be able to contact these people I'd give them the

21    names before 11 o'clock.  That's what I intend to do.

22              MR. YALOWITZ:  I think we.

23              THE COURT:  Quite frankly, even there is no guarantee

24    any of any of these people are going to sit in the box anyway.

25              MR. YALOWITZ:  Bear with me on 190, and then maybe --

F1CZSOK1                      Conference

 1              THE COURT:  All right.

 2              MR. YALOWITZ:  Maybe I can -- let me consult with my

 3      team.

 4              THE COURT:  Mr. Hill, did you have something beyond

 5      190?

 6              MR. HILL:  I think 213.  I would withdraw 191 and 208

 7      in light of the way the rulings have been going so far.

 8              THE COURT:  Okay, all right.  So you have one more you

 9      said.

10              MR. HILL:  213.

11              MR. YALOWITZ:  Wait a minute.  I'm sorry, your Honor.

12      I can't do both things at once.

13              THE COURT:  Well, you got an army of lawyers there.

14      Why don't you do one thing, let them do something else.  I

15      mean --

16              MR. YALOWITZ:  I don't want to waste time either.

17              THE COURT:  Let me have 213.  I'll give you plenty of

18      opportunity to look at that.  I just want to know so I can be

19      ahead of you.  Let me look.

20              MR. YALOWITZ:  All right, good.

21              THE COURT:  You know that's the next one.

22              MR. YALOWITZ:  Your Honor, may I consult with my team

23      for a moment?

24              THE COURT:  Sure.  On one in any I would have thought,

25      quite frankly, that the two of you would have had the opposite

F1CZSOK1                          Conference

1    positions that you have.

2              MR. YALOWITZ:  You know what, your Honor, I've looked

3    at 190.  I don't have a problem with him.  I'm just looking at

4    213.  I apologize for the delay.

5              THE COURT:  No, that's okay.

6              MR. YALOWITZ:  I just didn't think we're going this

7    deep.

8              THE COURT:  This is as deep as we're going.

9              213, I can tell you on question 56 this person says, I

10   have a business conference scheduled in Zurich for

11   February 10th.  My family would join me after for the kids

12   winter break.  Missing the conference will be bad, and the loss

13   of all airline tickets and hotel will be substantial.  Give

14   that significant weight.  Question 60 says, as I described in

15   the financial section, the length of the case means that an

16   important conference will be missed and financial loss on

17   planned vacation.

18             MR. HILL:  I can't argue with that if that, your

19   Honor, believes that's sufficient hardship obviously your

20   Honor --

21             THE COURT:  You know, as I say, the worst thing I

22   could think you could have is jurors who don't want to be here.

23             MR. HILL:  Very well.  All right.  Then, your Honor,

24   where I think we are after that is of the ones that we

25   designated as acceptable and they challenged for cause, four of

F1CZSOK1                    Conference

1    them can be returned.  Those are numbers 25, 141, 154 and 190.

2    And so I would request that those four be returned in addition

3    to the four that we designated as acceptable and the plaintiffs

4    did not challenge for cause, which are 78, 93, 186, and 192.

5              THE COURT:  Well, let me hear --

6              MR. YALOWITZ:  I thought 25 was a problem because

7    their schedule start volunteering at new Hospice program.

8              THE COURT:  I have a problem with it.  I don't know

9    how serious this is going to be.  The defense says they want me

10   have to force this person to serve, even if --

11             MR. YALOWITZ:  The other --

12             THE COURT:  Possibly force this person to serve even

13   if they're of that problem.

14             MR. YALOWITZ:  The other serious concern I have, I had

15   is that the juror's spouse was in the Iranian Army.

16             THE COURT:  What question?

17             MR. YALOWITZ:  This is 18.

18             THE COURT:  18?

19             MR. YALOWITZ:  Yeah.

20             THE COURT:  I see.

21             MR. YALOWITZ:  And then there is just one other thing

22   that bothered me about this juror, your Honor, which was that

23   question 48 she says she had common knowledge, and referenced

24   the word occupation, which struck me as somebody who had

25   political views that would leak in the case.

F1CZSOK1                    Conference

1          THE COURT:  I'm sorry, which question are you at?

2          MR. YALOWITZ:  I flipped away from it.  48.  But I

3     think, frankly, the bigger issue is the person expressed

4     reservations about not wanting to lose the volunteer

5     opportunity, and she said in question 60 that that would, that

6     that would be a reason why she couldn't serve on the jury.

7          THE COURT:  Well, as I say, my view, standard view is

8     that if the parties didn't want to make her stay because of

9     that, I would let her go.  But if one side thinks there is a

10    possibility that she might give answers to those or other

11    questions that would make her a fair and impartial juror, you

12    want to make her stay, I'll make her stay.

13         MR. HILL:  We do want her to return, your Honor.

14         THE COURT:  Let's put those four aside for now and

15    let's see.  Mr. Yalowitz, did you want to go through this

16    process also?

17         MR. YALOWITZ:  Not really.

18         THE COURT:  I posed it that way.  If you want me to --

19         MR. YALOWITZ:  Before we just do kind of tit for tat,

20    let me understand what -- I mean because I got a lot.  I got a

21    lot more than they do.

22         THE COURT:  Well it depends if it turns out to be to

23    your advantage because --

24         MR. YALOWITZ:  That's what I'm trying to figure out.

25         THE COURT:  You know, I'm not going to just add

F1CZSOK1                    Conference

1    another 20 people.  I'm going to knock out some of the people

2    that got us to 50.  We're not going beyond 50.  All right.  So,

3    you know, maybe I'd be willing to throw these four in on top of

4    the 50 and then pull them out of the wheel today, and you could

5    seem who is going to be in the box.  But, you know, I'm not

6    going to add another 20 people.  I'm more inclined, as I say to

7    cut it down to 40.

8            MR. YALOWITZ:  Here's what I'm thinking.

9            THE COURT:  Because we have more than enough jurors

10    who could serve as fair and impartial jurors in this case.

11            MR. YALOWITZ:  Here's what I'm thinking is, here's my

12    recommendation to the Court.

13            THE COURT:  I may take it.

14            MR. YALOWITZ:  All right.  I would think the Court

15    should remove the two jurors who gave personally identifying

16    information, so now we're down to 48.

17            MR. ROCHON:  And we agree.  We know the numbers.  We

18    can get them to your Clerk.

19            THE COURT:  Just write them on a piece of paper.

20            MR. YALOWITZ:  Okay, so now we're at 48.

21            THE COURT:  All right.

22            MR. YALOWITZ:  The defendants have four that were

23    acceptable to them that the Court is willing to throw back into

24    the mix.  If the Court randomly selects four of the blank

25    jurors to swap those out, so that we wind up with equal

F1CZSOK1                       Conference

1    treatment -- in other words, I'm not being disadvantaged, if

2    you take -- if you take four that both sides said, well, we

3    don't have an objection to, but we don't want them and you

4    knock those out randomly -- I mean you'll decide that -- then

5    given the Court's process that we've been through, we don't

6    then to have to go through my side of the process, because I

7    had so many more acceptable jurors in the pool than they did,

8    and --

9              THE COURT:  Well, quite frankly, that's why I think

10   this is pretty much an exercise in futility.  Because the only

11   real fair way to do it is to knock out the last four jurors and

12   make these the 50, to the extent they're ahead of the last four

13   jurors.  Now, the last juror --

14             MR. ROCHON:  Judge --

15             THE COURT:  But the reality is is that we only went to

16   186, okay.  So I'm not sure why 190 needs to be in the mix at

17   all, unless you want to substitute 190 for 186.  But 186 is

18   somebody that the defense wants, and so was 172 -- 172, I mean

19   no 172 was somebody that the plaintiff wanted I think, and 186

20   was somebody the defense wanted.  162 is -- 67 is somebody the

21   plaintiff wanted, and 162 was somebody the plaintiff wanted.  I

22   would knock out those four to substitute these four to get 50.

23             MR. YALOWITZ:  So then you're -- what you've done is

24   you rewarded them.

25             THE COURT:  How have I rewarded them?  They want me to

F1CZSOK1                    Conference

1    substitute these.  I just knocked out one of the people they

2    said they wanted.

3            MR. YALOWITZ:  Yeah, you've also knocked out two of

4    the people that I wanted.

5            MR. ROCHON:  Your Honor, at one point this morning you

6    had said that perhaps your approach would be to take the four

7    that we said were acceptable that they did not object to, have

8    four of theirs that --

9            THE COURT:  The first four.

10           MR. ROCHON:  Did not object.  That would be the first

11   eight.

12           THE COURT:  Right.

13           MR. ROCHON:  And then the question is what do we do

14   for the next ten.

15           THE COURT:  The next ten are going to be picked out of

16   the wheel of the 50 that I had given you.

17           MR. ROCHON:  That's acceptable to us.  It also would

18   be acceptable, if Mr. Yalowitz prefers, that the jurors that we

19   have, for lack of a better phrase, rehabilitated or put back in

20   be deemed now acceptable and not objected to.  But he would of

21   course get an equal number of acceptable that we don't object

22   to, and you would then have 16 or I think if my numbers are

23   right, that would be eight, eight and eight, and we'd have to

24   fill out of the wheel for the last two.

25           THE COURT:  I see what you're saying.  So these people

F1CZSOK1                    Conference

1    would qualify as someone that -- these three people would

2    qualify as someone that you believe, you checked off were

3    acceptable for voir dire.

4                   MR. ROCHON:  Yes.

5                   THE COURT:  And then I should add, so I do seven and

6    seven.

7                   MR. ROCHON:  That's, I think we may have had four, but

8    eight and eight was how it might be.

9                   THE COURT:  Well, four plus, four plus three is 7.

10                  MR. ROCHON:  I think you might have four in your hand

11   25, 141, 154 and 190.

12                  THE COURT:  We would never get to 190.

13                  MR. ROCHON:  I see.

14                  THE COURT:  And in any scenario to get 50 is much more

15   than we need, we'll never get to 190.

16                  MR. ROCHON:  I understand.

17                  THE COURT:  We probably wouldn't even get to 154, but

18   or -- well, we will because we want --

19                  MR. ROCHON:  This does.

20                  THE COURT:  186.

21                  MR. YALOWITZ:  Look, the problem here is he's gaming

22   the --

23                  THE COURT:  I'll tell you what, why not just throw the

24   three in the wheel.

25                  MR. YALOWITZ:  That's fine?

F1CZSOK1                    Conference

1              THE COURT:  Wait a minute.

2              MR. YALOWITZ:  That's fine if -- look, if you --

3              THE COURT:  I gave you 48 names, this would make 51

4    okay.

5              MR. ROCHON:  Right.

6              THE COURT:  Why don't you just throw these three in

7    there and we're going to spin the wheel, we're going to pull

8    out.

9              MR. YALOWITZ:  Can you give me three more put in the

10   wheel too?

11             THE COURT:  Everybody you asked for is in this wheel.

12   Every single person you asked for is in this.

13             MR. YALOWITZ:  But there are people that -- there are

14   people that they improperly -- I mean, if we go through the

15   Hill exercise on my side, I'm going to have a lot more than

16   three.

17             THE COURT:  You just said to me you didn't want to go

18   through that.

19             MR. YALOWITZ:  I didn't, but if I'm going to get gamed

20   by --

21             THE COURT:  I'm not gaming you.  Tell me what you

22   think you suggest.  Are you suggesting throw people in the

23   wheel?

24             MR. YALOWITZ:  All I'm saying is give me three more

25   and we'll be done, give me there are more to put in the wheel

F1CZSOK1                    Conference

```
1    and we'll be done.
2            MR. ROCHON:  I think what he's saying is he'd like to
3    do his three best challenges to our four causes.
4            THE COURT:  I understand that.  I'm not sure why --
5            MR. YALOWITZ:  My first three.  We can go through in
6    numerical order, do the first three.
7            THE COURT:  If you'd like, I don't care, the bottom
8    line --
9            MR. ROCHON:  Your Honor?
10           THE COURT:  Do you want to do that?
11           MR. ROCHON:  I don't want to do it, but respect Mr.
12   Yalowitz think he's being treated unfairly.  I'll defer to the
13   Court.  Under any system, the four that we said were acceptable
14   would go in, their first four that they said were acceptable
15   would go in.  We're talking about then are the next ten.  Am I
16   correct?
17           THE COURT:  Yes.
18           MR. ROCHON:  We said that right, thank you.
19           THE COURT:  I mean I'm just talking about pulling ten
20   out of the wheel of 50, approximately 50 people.
21           MR. ROCHON:  And that wheel, just for the record will
22   still have vastly more that he finds acceptable than we haven't
23   objected to than us.
24           THE COURT:  Right.
25           MR. ROCHON:  But I mean he's still -- that wheel is
```

F1CZSOK1                      Conference

 1    going to be full of jurors that he found acceptable that we did

 2    not.

 3              THE COURT:  Right.

 4              MR. YALOWITZ:  I'd just like it a little more full.

 5              THE COURT:  I'm sure you would.  But I mean, you know,

 6    look the bottom line is all you're entitled to is a fair and

 7    impartial juror, everybody --

 8              MR. YALOWITZ:  I agree with that.

 9              THE COURT:  Everybody on this list is qualified as

10    that.  So I'm trying to give you some more flexibility in terms

11    of what peremptory challenges you might have, want to exercise.

12    But the reality is I'm giving you more than you are really

13    entitled to.  You're not entitled to pick the jurors.  You're

14    entitled to challenge jurors.  So you only get three of those.

15    So, you know, I will -- if you want me to throw these back into

16    the mix, I will throw these back into the mix.  But at this

17    point I'm still going to stick with the four and four, unless

18    you want me to make it seven and seven.

19              MR. YALOWITZ:  No, no.  I want you to make it four and

20    four.

21              THE COURT:  Stick with the four and four.

22              MR. ROCHON:  Right.  We would prefer the seven and

23    seven because now we I think overcome the challenges for cause,

24    so we have jurors that we find acceptable that no longer have a

25    valid change for cause.

F1CZSOK1                    Conference

1          THE COURT:  I mean, that's fine and dandy, but that

2     just gives them a -- when you think about it, gives you some,

3     but just gives them three more people.

4          MR. ROCHON:  He could challenge three of ours and then

5     we'd have seven and seven that -- if I have bad challenges for

6     cause, he should make that argument, get three and we have 14

7     and seven and seven, I'd be fine with that.

8          THE COURT:  All right.

9          MR. ROCHON:  Because that would be -- I think these

10    are no longer valid challenges for cause, and Mr. Yalowitz

11    should have the ability to challenge up to three of ours if he

12    thinks that's they're bad challenges.

13         THE COURT:  What do you want, Mr. Yalowitz?

14         MR. YALOWITZ:  Look --

15         THE COURT:  Otherwise, I'll just withdraw my four and

16    four and just throw everybody in the wheel and what you're

17    going to get.

18         MR. YALOWITZ:  Let's do what you said, four and four,

19    throw their additional three into the mix and we'll deal with

20    the hardship issues and the cause issues if there are any.

21         THE COURT:  I mean, I do have some concern about

22    throwing their three in the wheel because at least they've

23    taken the position that they object to those.  Now whether I

24    sustain the objection as a valid objection, if they come out of

25    a different question, but it is unfair for me to put somebody

F1CZSOK1                    Conference

1    in there on the same par as somebody who was objected to on the

2    same par as somebody who wasn't objected to.  I tried not to do

3    that.  I tried to be fair.

4           MR. YALOWITZ:  Right.  So the Court's proposal is take

5    the three quasi rehabilitated jurors --

6           THE COURT:  Throw them --

7           MR. YALOWITZ:  -- into the mix and move on.

8           THE COURT:  Right.

9           MR. YALOWITZ:  Okay.  I'm fine with that.

10          THE COURT:  Mr. Rochon.

11          MR. ROCHON:  We keep saying three.  We had 25, 141,

12   154 and 190.

13          THE COURT:  190 we never get to.

14          MR. ROCHON:  I see.

15          MR. HILL:  He withdrew his objection to that one, your

16   Honor.

17          THE COURT:  All right, so I'm willing to put the 51 in

18   the wheel, spin the wheel, pull out ten names.  Four, four, and

19   ten are the people who we're going to voir dire initially.  If

20   it turns out they have a problem and there is a valid challenge

21   for cause or the parties agree that they shouldn't sit, then

22   we'll take one of the others who are in the audience and put

23   them in that seat, until we have 18 people who are qualified to

24   serve as jurors, and you will exercise your three peremptory

25   challenges as to those 18.

1          MR. ROCHON:  Yes, sir.  And the ones who will be

2     brought back tomorrow will include everyone who is in the

3     wheel?

4          THE COURT:  All 51.

5          MR. ROCHON:  Thank you.

6          THE COURT:  Even though we're going to pull the 18

7     now, I'm not going to say we already pulled the 18.  I'm just

8     going to spin the wheel with the 18 in it, and we're going to

9     pull out the names at random and seat them in that order, and

10    those are the first people who we're going to voir dire.

11         MR. ROCHON:  Understood.

12         THE COURT:  Okay.  So that's what I'm going go do.

13         MR. YALOWITZ:  Bear with me, your Honor.  I just want

14    to hand a note to Ms. Quirk about those two jurors I'm going to

15    show Mr. Rochon.

16         MR. ROCHON:  I think I already --

17         MR. YALOWITZ:  Oh, did you give it?

18         THE COURT:  Make sure.

19         MR. ROCHON:  I gave her your last one.

20         MR. YALOWITZ:  Okay, that's fine.

21         THE COURT:  All right, so.

22         MR. YALOWITZ:  So your Honor, your Honor?

23         THE COURT:  Yes.

24         MR. YALOWITZ:  I have a request and a question with

25    regard to this process.  The request is that if you could,

F1CZSOK1                    Conference

1    after the ten random, if you could give us the next ten just so

2    we understand today where the jury lies, it just will help us

3    evaluate, it will help both sides.  I'm sure Mr. Rochon would

4    like that too.

5            MR. ROCHON:  Yeah, you want to know who is in the box.

6            THE COURT:  Right.  I have no problem about.

7            MR. YALOWITZ:  That's the first thing.

8            The second thing we would just like to know how the

9    Court intends to deal with the foreperson.

10           THE COURT:  They going to elect their own.

11           MR. YALOWITZ:  That's all we want to know.

12           THE COURT:  All right, okay.  So what I'm going to do

13   is I'm going to put these 43 names in the wheel.  We're going

14   to pull out 20.  The first ten will be the ones who will be --

15   well, the first ten we're going to put back into the wheel

16   tomorrow with the other eight.  I'm not going to put the

17   additional ten in.  We will spin the wheel.  The order that

18   they come out of the wheel tomorrow morning when they're here

19   in our presence is the order they're we're going to seat them,

20   and then we'll voir dire them.  If they're all qualified, then

21   we're going to have you challenge, exercise your peremptory

22   challenges.  If there are no challenges for cause -- if there

23   are challenges for cause that I grant, then we'll refill that

24   seat and until we have 18 people who are, there are no

25   challenges for cause.  So let's --

F1CZSOK1                    Conference

1          MR. YALOWITZ:  Your Honor, I apologize.  It's which

2    numbers are the eight that are --

3          THE COURT:  Sure.  The numbers are --

4          THE DEPUTY CLERK:  4, 11, 20, 24, 78, 93, 186, 192.

5          THE COURT:  And that should be the --

6          MR. HILL:  I'm sorry, could I have it one more time?

7    I apologize.

8          THE COURT:  Yes.

9          THE DEPUTY CLERK:  It's not going to be the same

10   order, but 78, 24, 20, 11, four, 186, 93, 192.

11         MR. ROCHON:  Thank you.

12         THE COURT:  All right.  We're now in the electronics

13   age.

14         MR. ROCHON:  I like this.

15         MR. YALOWITZ:  They use those wheels in the Clerk's

16   Office too?

17         THE COURT:  No.  They have computerized.

18         THE DEPUTY CLERK:  All right, 88, 28.

19         MR. ROCHON:  28.

20         THE DEPUTY CLERK:  28.  76.  85, 89, 48.

21         THE COURT:  48?

22         THE DEPUTY CLERK:  48 -- I'll read them all again at

23   the end.  62, 44, 162, 37.  So that is 88, 28, 76, 85, 89, 48,

24   62, 44, 162, 37.

25         THE COURT:  Then you wanted an additional ten.  That's

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1CZSOK1                    Conference

1    going to be the 18.

2            MR. ROCHON:  Can I ask a stupid question?  It's my

3    specialty.

4            THE COURT:  I have stupid answers too.

5            MR. ROCHON:  I take it Ms. Quirk had put in the

6    salvaged jurors before we spun the wheel.

7            THE COURT:  Yes, yes.  That added up to 43.

8            MR. ROCHON:  Okay, thank you.

9            THE COURT:  Because the number was 51.

10           All right.  So those are the 18 jurors that we're

11   going to put in the box.  We'll randomly select them in that

12   same manner in the wheel tomorrow when they're here, call the

13   names and tell them to take a seat.

14           Now, what I'll do is we'll call ten more names, and

15   then if we have to replace a juror, we'll replace them in that

16   order, okay.

17           All right go ahead.

18           THE DEPUTY CLERK:  159, 1, 43, 96, 7, 95, 41, 14, 57,

19   68.  So that's 159, 1, 43, 96, 7, 95, 41, 14, 68, 57.

20           MR. ROCHON:  Search I'm sorry.

21           MR. YALOWITZ:  68, 57 or.

22           THE COURT:  57, then 68.

23           MR. ROCHON:  That's what I have 57 and --

24           THE DEPUTY CLERK:  57, then 68, excuse me.

25           MR. YALOWITZ:  Probably an academic question.

F1CZSOK1                    Conference

1          THE COURT:  And as a matter of fact, I don't think any

2     of ones we just argued about came out of the wheel.

3          MR. HILL:  Yeah, your Honor, we, just so the record is

4     clear you have not sustained those challenges for cause.

5          THE COURT:  I have not.

6          MR. HILL:  So in our view those should go in the front

7     of the box.  Because there was a challenge for cause made, your

8     Honor has ruled that at this point it is no a valid challenge.

9     So we think those three people that you added back in should be

10    the next, part of the next group of six.  Because otherwise

11    what's happened is the plaintiffs have made a challenge for

12    cause, you've overruled it and they've dropped out of the pool.

13         THE COURT:  Well, they didn't drop out of the pool.

14    They weren't randomly pulled out of the pool.  And I never said

15    that I would seat in the box people that were rejected.  You

16    had the opportunity to have them randomly selected, unless you

17    want me to throw the four -- you can't have it both ways.  You

18    can't ask me to give you the four and then --

19         MR. HILL:  I just want the record to be clear, your

20    Honor.

21         THE COURT:  The record isn't clear because I don't

22    know what you're objecting to because you asked me to put the

23    four in the box.

24         MR. HILL:  Yes, your Honor.

25         THE COURT:  You didn't ask me to put the -- well, you

F1CZSOK1                    Conference

 1    did ask me to put the seven in the box.

 2            MR. HILL:  We did.

 3            THE COURT:  But you never agreed that the seven that

 4    the people who were objected to were going to automatically go

 5    into the box.  That was never agreed upon.

 6            MR. HILL:  I understand.

 7            MR. YALOWITZ:  I agree with that, your Honor.

 8            THE COURT:  All right.  So if you had wanted that and

 9    you insisted upon that, then I would have randomized everyone.

10    But I gave you the advantage to have in the box those people

11    who you said you wanted, you wanted to voir dire.  So I think

12    at this point it's unfair for you to say that now you're

13    disadvantaged by its process.

14            So, all right, so that's the way we're going to do it.

15    We're going to notify the jury ten to 11:00.  They're going to

16    start calling those individuals, those 50 -- those 51

17    individuals will be here tomorrow.  When they come in I'll

18    speak to them initially, and then we'll randomly put them in

19    the box.  Then I'll have some basic questions for them.  If you

20    have some questions that you would like me to ask of particular

21    jurors, again don't give me anything extensive.  I just want to

22    have a little bit of dialogue with them.  If there's something

23    that's been raised by the questionnaire that you think ought to

24    be explored, just give me have a quick letter before the end of

25    the night and I'll look at that and see if it's appropriate.

F1CZSOK1                    Conference

1    All right?

2            MR. ROCHON:  Thank you, your Honor.

3            THE COURT:  So we can move forward efficiently

4    tomorrow.  All right?

5            Yes, sir.  Mr. Yalowitz.

6            MR. YALOWITZ:  Your Honor, if the Court is ready to

7    move to another topic?

8            THE COURT:  Yes.

9            MR. YALOWITZ:  Ms. Romeo has a logistical issue I'm

10   hoping we can raise and dispose of promptly.

11           THE COURT:  Okay.

12           MR. YALOWITZ:  Thank you.

13           MS. ROMEO:  So, your Honor, we have our lead

14   translator here Rena Naman(phonetic), and I just wanted to make

15   sure the Court is okay and approved with the set up that we're

16   going to use tomorrow for trial.  So I have a question which I

17   think might make it very easy.  Is the Court Reporter going to

18   be sitting where the Court Reporter is today during the trial

19   or is the Court Reporter going to be at the podium?

20           THE COURT:  The Court Reporter is going to be where

21   the Court Reporter is.

22           MS. ROMEO:  Okay.

23           THE COURT:  They're going to be -- you're talking

24   about the podium on the side?

25           MS. ROMEO:  Yes.

F1CZSOK1                    Conference

1              THE COURT:  They also utilizing that.  You've asked

2      them for not just daily copy, I understand you've asked them

3      for real time.  Is that not correct?  Just daily copy?

4              MR. ROCHON:  We did not ask for real time.

5              MS. ROMEO:  No.

6              MR. YALOWITZ:  I don't need real time either, but my

7      translator needs it.  So when we have translation, she -- they

8      need -- told us they need real time and we've committed to

9      that.

10             MS. ROMEO:  We're going to have one computer with live

11     note.

12             THE COURT:  So what do you want?

13             MS. ROMEO:  So -- well, the concern of the translator

14     is that they need to see the witness in order to be

15     interpreting.  And the way it was set up on Friday was that

16     there was a -- the interpreters would be in the back of the

17     witness box.  So we were hoping that potentially -- I'm not

18     sure maybe we can just move the podium a little bit closer.

19             THE COURT:  What are you going to do about a monitor?

20             MS. ROMEO:  Well, what I was hoping is that we can

21     maybe put a small folding table kind of on the side of the

22     witness box and maybe just put the laptop right on top of

23     there.  This way we don't have to move any, if your Honor --

24             THE COURT:  My suggestion would be this.

25             MS. ROMEO:  Sure.

F1CZSOK1                    Conference

```
 1              THE COURT:  My suggestion is that your interpreter
 2    stand --
 3              MS. ROMEO:  Okay.
 4              THE COURT:  -- between that podium and the witness
 5    box; that you put the monitor on top of the podium.
 6              MS. ROMEO:  Okay.
 7              THE COURT:  Because the juror has -- jurors have to
 8    see.
 9              MS. ROMEO:  Right.
10              THE COURT:  Not so much the witness, but the
11    interpreter because the interpreter's the one that's giving
12    them the English, so.
13              MS. ROMEO:  Sure.
14              THE COURT:  It would be easier for the jurors to
15    follow if they can see the interpreter.  So the interpreter
16    should stand right next to the witness.  And if she has to look
17    at the monitor, she can look at the monitor.  I don't think the
18    monitor will be in the way of the Court Reporter, since most of
19    what the Court Reporter will be doing will be pretty much from
20    that seat other than, you know, just going back and quickly
21    within seconds doing something at the desk.
22              MS. ROMEO:  Right.  I understand, your Honor.  And are
23    we also able to just put where that chair is right there, a
24    small table for the second laptop that the second interpreter
25    will have and the --
```

1          THE COURT:  I'm not sure why you need a second laptop.

2     Why do you need a second interpreter?  You're going to use two

3     interpreters at the same time?

4          MS. ROMEO:  They're going to be switching off, your

5     Honor.

6          THE COURT:  Well, they can use the same monitor, I

7     assume.

8          MS. ROMEO:  Do you mind if I just have the interpreter

9     address that?

10          THE COURT:  I assume they're going to be listening to

11     the witness, translating what the witness says.  If they have a

12     problem about what the witness says, they're going to see the

13     monitor to verify it.

14          MS. ROMEO:  Okay, so.

15          THE COURT:  The one who is going to be doing that is

16     the one who is translating for the jury.

17          MS. ROMEO:  Right.  So my understanding, your Honor,

18     is there is going to be the one laptop with the live note, and

19     then the second laptop is going to have -- they use it like a

20     glossary so that they're able to -- it's what they use when

21     they interpret.  Second laptop is not going to be the live

22     note.

23          THE COURT:  Well, I don't -- I'm not quite sure what

24     the two interpreters have to do -- I mean, you're only using

25     one interpreter at a time, right?

F1CZSOK1                    Conference

1           MS. ROMEO:  Correct, correct.

2           THE COURT:  Okay.

3           MS. ROMEO:  Right, but they're going to switch off

4    during the testimony because it's going to be a long day and

5    this way --

6           THE COURT:  No, I understand.

7           MS. ROMEO:  So just -- right.

8           THE COURT:  I'm just not quite sure why you need two

9    lap tops, but.

10          MS. ROMEO:  If you want to give me a moment I can

11   inquire to see if there is a way we can put it on one laptop

12   and see if that's possible.

13          THE COURT:  Well, I would assume -- I'm not quite sure

14   what kind of glossary you say is on the second laptop.

15          MS. ROMEO:  It's a glossary that they use in the

16   course the interpreting with the witness.

17          THE COURT:  Of names or glossary of.

18          MS. ROMEO:  I believe it's of words.

19          THE COURT:  Words.

20          MS. ROMEO:  I believe it's both.  I believe it's both.

21   But I can clarify that for the Court, because if we can

22   condense it to one, I'm happy to make that work and do that.

23          THE COURT:  Well, I would prefer one.  We already have

24   significant amount of laptops.

25          MS. ROMEO:  I understand.  So I propose that I'll

F1CZSOK1                      Conference

1   clarify that with the interpreter team and see what we can do.

2   We'll put the live note laptop on the podium and we'll have one

3   interpreter just sitting and the other one standing and they'll

4   just have to switch off, if that sounds like it will work for

5   the Court.

6              THE COURT:  That's fine.  I'm used to that.

7              MS. ROMEO:  Okay.  And then there is a second issue,

8   your Honor.  The second issue has to do with splitting the

9   costs of the interpreter.

10             THE COURT:  Yeah, I didn't know what you agreed to.

11  You submitted an order to me, but neither side signed that

12  order, so I don't know what you want me to do.  You agree or

13  not agree?

14             MS. ROMEO:  So here's the issue.  The issue is we

15  wrote to defendants back at the end of October.

16             THE COURT:  Stop.

17             MR. HILL:  We're fine.

18             MR. ROCHON:  We'll sign.

19             MR. HILL:  We'll sign for it.

20             MS. ROMEO:  Then we don't have a problem.

21             THE COURT:  Solved.

22             MR. YALOWITZ:  Solved.

23             MS. ROMEO:  Wonderful.  Thank you, your Honor.

24             THE COURT:  All right.  Okay.  Then let me -- we'll

25  take a break in a little bit, ten minutes.  Let me just move to

1    some of the other substantive issues so we can get them out of

2    the way.  Just keep myself organized.

3         I've looked at the deposition designations.  I don't

4    have any problems with those designations to the extent they're

5    consistent with my rulings.  I don't see any legitimate

6    objections to the designations so I'm going to allow the

7    designations.  If there's something that's really that I missed

8    or something that is particularly prejudicial or in there

9    that's inconsistent with the rulings that I made -- I looked at

10   all these designations.  They don't seem to be particularly any

11   really particular objection or somehow inadmissible, so.

12        MR. HILL:  We'll submit counter designations to the

13   plaintiff's and we'll see if there is any disagreements.

14        MR. YALOWITZ:  Thank you, your Honor.

15        THE COURT:  Let me go to --

16        MR. ROCHON:  Your Honor?  I'm sorry.

17        THE COURT:  Yes.

18        MR. ROCHON:  Because there were two sets of -- there

19   were two letters of designations, one that we sent on

20   Palestinian officials and one on Mossab Yousef.

21        THE COURT:  Yousef, Fayyad, Abu-Libdeh, Shqbu'a, Al

22   Seek Cheek(Phonetic), Jadallah.

23        MR. ROCHON:  Jadallah.

24        THE COURT:  Those are the ones.

25        MR. ROCHON:  I just want to make sure because there

F1CZSOK1                        Conference

1    was two letters -- the only one that we were going speak to

2    additionally today was one set of things as to Mossab Hassan

3    Yousef, Mr. Satin was going to address that was not addressed

4    last week, not to reargue last week, but there was one portion

5    of the conversation he was going to address today, and --

6              THE COURT:  And Yousef we already discussed in more

7    detail, the testimony about torture and all --

8              MR. ROCHON:  That was coming out.

9              THE COURT:  That was out.

10             MR. YALOWITZ:  That's out, your Honor.

11             Your Honor, as memory serves, the defendants have

12   provided us with their counter designations sometime ago and if

13   I could, just with the Court's permission, ask the defendants

14   to take another look at those and let me know by Friday if

15   there are any that they're withdrawing, then we can consult

16   with them and if there is a problem we can let you know

17   promptly.

18             THE COURT:  All right.

19             MR. ROCHON:  As long as it's not going to be this

20   week's stuff, better to address it later in the week instead of

21   today.

22             MR. YALOWITZ:  So with the Court's permission I don't

23   want to turn my back on the Court.

24             THE COURT:  That's all right.  You know when you might

25   call --

F1CZSOK1                      Conference

1          MR. YALOWITZ:  Yeah, if we can -- it would be

2    extremely helpful if we can hear from the defendants by the end

3    of this week.

4          THE COURT:  Okay.  They said fine.

5          MR. ROCHON:  Yeah.

6          MR. YALOWITZ:  Okay, thank you.

7          THE COURT:  All right.  Let me go to -- all right.

8          I think we already addressed the plaintiff's motions

9    particularly with regard to certain kinds of evidence and

10   expert testimony.  If we haven't, it's not clear, we can

11   discuss it further.  So really what I want to deal with the

12   defendant's objections to six, basically six witnesses.  Mr.

13   Yalowitz, just remind me.  I think there were one or two of

14   these experts you say that you on probably would not call in

15   your case in chief.

16         MR. YALOWITZ:  So today as we speak there are three.

17         THE COURT:  Okay.

18         MR. YALOWITZ:  That would be Karsh and Addicott.

19         THE COURT:  Karsh and Addicott would not be presented

20   in your case in chief.

21         MR. YALOWITZ:  Correct.  And then as we discussed last

22   week Marcus, we're cognizant of the Court's earlier comments

23   and rulings.  Based on that we've withdrawn him from our case

24   in chief with the understanding that we reserve them for

25   rebuttal.

F1CZSOK1                    Conference

1           THE COURT:  All right, okay.

2           MR. YALOWITZ:  If needed, if needed, and if the Court

3    thinks it's appropriate, I mean obviously.

4           THE COURT:  We may have to come back to Marcus because

5    you want to admit some statements that you say were printed in

6    PA or PLO controlled media.  And if I were to consider allowing

7    that, you would have to establish of some witness who is going

8    to testify that in fact this is what it purports to be.  So I

9    don't know if that's Marcus or if that's somebody else.

10          MR. YALOWITZ:  Yeah, Marcus -- right, Marcus can -- I

11   mean, I would have thought that the defendants would know what

12   was printed in the newspaper they owned and what was shown on

13   the television station that they owned, if we --

14          THE COURT:  Two things.  One or two things; that

15   either it was in fact printed and, two, whether it was printed

16   by them, so.

17          MR. YALOWITZ:  So if we need to bring a witness who

18   otherwise wouldn't testify in order to, in order to persuade

19   the Court that these documents are authentic, which is I think

20   what we're talking about here, then -- and we do it, then I

21   think that some cost shifting would be in order here.  Because

22   to bring a guy in, fly him from Israel, have him get on the

23   stand -- doesn't even need not be in the presence of the jury

24   because these are questions for the Court -- have him say yes,

25   my organization recorded this from PA TV, and therefore it's a

F1CZSOK1                    Conference

1    real, you know, it's a document that is authentic, we watched

2    it and this is our process and it's our business.

3            THE COURT:  I assume that you already had witnesses

4    you at least put on the list that you intend to have at this

5    trial who were in a position to testify to that.

6            MR. YALOWITZ:  That would be Marcus.

7            THE COURT:  Including Marcus.

8            MR. YALOWITZ:  That would be Marcus.

9            THE COURT:  Okay.

10           MR. YALOWITZ:  Right.

11           THE COURT:  Then they shouldn't have to pay for Marcus

12   if Marcus --

13           MR. YALOWITZ:  If we're withdrawing him as a -- well,

14   okay.  Look --

15           THE COURT:  It depends you're right, I will leave that

16   up to you.  Clearly to the extent that you want to either

17   stipulate or that the defense represents to you that they have

18   no objection to the admissibility of the document and can come

19   in without objection and without any further foundation, then

20   you can just put it in.  Unless you have agreed that it can

21   come in without any foundation, you're going to have at least

22   lay a foundation for all your exhibits.  And minimal foundation

23   is as the law requires it is what it purports to be.  So

24   whatever you purport it to be you need someone to say where

25   they got it from, and what it is.

F1CZSOK1                    Conference

1                MR. YALOWITZ:  Yeah.

2                THE COURT:  And how they know what it is.

3                MR. YALOWITZ:  Yeah, I think we can do that.

4                THE COURT:  And that's the guidance that I can give as

5       to what the foundation is if I'm going to admit it over

6       objection.

7                MR. YALOWITZ:  Right.

8                THE COURT:  Okay.

9                MR. YALOWITZ:  Okay.

10               THE COURT:  If you meet that foundational requirement

11      for the other issues that I would allow in, I don't think that

12      there is other legitimate objections unless there may be some

13      hearsay objections with regard to some other issues.  But my

14      attitude generally will be this, and then we can go back to all

15      of these exhibits.

16               To the extent that you have something that you contend

17      is a statement made by the PA or POL, its officials, or its

18      agents on their behalf, and there is not any dispute about that

19      statement or you've laid the proper foundation, it is probably

20      going to come in.  That's the guidance.

21               MR. YALOWITZ:  I think we'll be able to address it

22      with our existing witnesses.  And then if there's a problem we

23      can reserve the right to call Marcus as a foundational witness.

24               THE COURT:  Well, as I say, I want you to be a

25      prepared so we'll move forward efficiently and smoothly.

F1CZSOK1                    Conference

1          MR. YALOWITZ:  Very good.

2          THE COURT:  Figure out what you are really going to be

3     fighting about.  To the extent that you, you know, there is an

4     extensive fight about it that we haven't already addressed,

5     let's raise it early so we don't waste the jurors' time with

6     regard to that.

7          So then the question is -- I didn't know -- I didn't

8     know where we ended up with Kaufman.

9          MR. YALOWITZ:  Kaufman, we spoke about Kaufman.  He

10    is -- I thought -- my recollection, and I could stand

11    corrected, my recollection is he's -- I described what he's

12    going to do, which is summarize the convictions and summarize

13    the facts found in the convictions, and provide the jury with

14    some assistance in understanding where they can find the

15    various attacks and the various convictions while I hand out

16    binders of those convictions to the jury and have them walk

17    them through it and --

18         THE COURT:  Okay.

19         MR. YALOWITZ:  -- my recollection is that the Court

20    didn't have a problem with that.

21         THE COURT:  Well, I think that the dispute at one

22    point, I just don't remember how we resolved the dispute, at

23    one point was whether or not there was going to be testimony

24    about the fairness or quality of the Israeli military courts,

25    and it was unclear, I forget -- we discussed, if they raised

F1CZSOK1                    Conference

1    it, if they didn't raise it.  I didn't know where we ended up.

2         MR. YALOWITZ:  Again my recollection is, and this one

3    I'm pretty sure -- I mean I can go back and check, but I'm

4    pretty sure, is the Court said if I open that door, then the

5    Court would give them a fair opportunity to respond.  But that,

6    in general, that kind of testimony and examination is out of

7    bounds.  Because the Court has ruled that these documents are

8    admissible based on a reasonable evaluation of the system as a

9    whole.  And so unless the door is open, there is not going to

10   be inquiry about torture or apartheid justice or any of that

11   kind of any of that kinds of attacks on the military system.

12   And at one point I think the Court said to Mr. Satin, which one

13   of these guys was tortured that you think is actually innocent,

14   and he didn't have any anybody like that.

15        THE COURT:  You intend to raise this issue on

16   cross-examination, in your opening or on your case in chief?

17        MR. ROCHON:  No.

18        THE COURT:  Okay.

19        MR. ROCHON:  And just to be -- I give that answer, but

20   now the explanation after just briefly.  We, our position is

21   that you ruled they can come in over our objections and our

22   objections were on multiple bases, I don't need to repeat them

23   here.  Now the decision has been made to allow them in, the

24   defense is not going to raise a separate challenge to their due

25   process challenge, to the quality of the justice, challenge --

F1CZSOK1                    Conference

1           THE COURT:  Wait a minute.  I ruled that what was
2      going to come in?  The only issue --
3           MR. ROCHON:  The convictions.
4           THE COURT:  Oh, yeah.  But the only issue I'm
5      addressing now right now is there was a question of whether or
6      not I should allow this witness to testify about the quality of
7      the Israeli military courts and other courts.
8           MR. YALOWITZ:  We're not offering that testimony.
9           MR. ROCHON:  And we're not going to open the door to
10     it.
11          THE COURT:  Okay.
12          MR. ROCHON:  And, therefore, what I would expect
13     pretty clean.  I will say on Kaufman, though, the biggest issue
14     is that we received the proposed redactions that -- of the
15     convictions that he would seek to use on Saturday afternoon.
16     It is I think close to a thousand pages.  I didn't count them,
17     but it's massive.  We are going through those.  We do have
18     concerns about some of those redactions and we want to find --
19     now is not the time -- I want to find the time to sit down with
20     counsel to say where our concerns are, and then with the Court,
21     and do it when the jury is not waiting.  You know, this is a
22     case that has a lot of paper as opposed to live testimony.  So
23     I apologize.  I know it can be inconvenient to the Court, but
24     it's the nature of this case of massive paper.  We complained
25     about it, the plaintiffs I'm sure feel it's necessary for the

F1CZSOK1                    Conference

1    case.  I'm not trying to get into who struck John.  We now need

2    to go through the redactions, and it's a lot, and we're not

3    going to agree on it -- what a surprise -- and we'll try to see

4    if we can work it out with them, but if not we're going to need

5    the Court's attention on some of these.  And so that is

6    something we probably need to do before Kaufman testifies.

7               MR. YALOWITZ:  Kaufman is going on tomorrow, your

8    Honor.

9               MR. ROCHON:  Well --

10              MR. YALOWITZ:  They've had these, look --

11              MR. ROCHON:  Wait, wait.  We had these since Saturday,

12   these proposed redactions.  Let's just be clear, we've had

13   these since Saturday.  We're a little busy this weekend because

14   we got their opposition on motion for summary judgment just

15   before or after 10:00 p.m. Friday night, got a thousand pages

16   of proposed redactions.  It's not a surprise I haven't been

17   through them by Monday morning.  We have people working on it,

18   we're going to get through it, but we need time with to go

19   through it.  I mean, if they want -- they said last

20   Wednesday --

21              THE COURT:  What do you want to do?

22              MR. ROCHON:  I want to, after we go through them, see

23   what the problems are, talk to you about them.

24              THE COURT:  Okay.  How do you want to do that?

25              MR. ROCHON:  Well, I think one way to do it would be

F1CZSOK1                    Conference

1    see how far we get today, pick a jury tomorrow.  We can open

2    tomorrow and then see if time, either after opening or before

3    we begin Wednesday to go through --

4            THE COURT:  Who is your first witness.

5            MR. YALOWITZ:  First witness is my Meshulam Pearlman.

6    He's an eye witness to one of the explosions.

7            THE COURT:  All right.  So --

8            MR. YALOWITZ:  He's a sure --

9            THE COURT:  -- it's not like we're going to get to

10   Kaufman or these exhibits tomorrow.

11           MR. YALOWITZ:  I expect Pearlman to be done in half an

12   hour.  We'll have Kaufman ready to go tomorrow.

13           THE COURT:  Kaufman is your second witness?

14           MR. YALOWITZ:  Second witness.  So it's up to the

15   Court if you, you know, want to --

16           MR. ROCHON:  We're not going to be jammed this way.

17   We're getting jammed here.  This is --

18           THE COURT:  Let me know what you want to address.

19   Look, I'm not going to debate this, guys.  I'm going to rule.

20   You let me know what you want to address and when you want to

21   address it.

22           MR. ROCHON:  I'd like to address it before he

23   testifies.

24           THE COURT:  Well, then you better get it to me before

25   he testifies.

1          MR. ROCHON:  Right.  I'll do that.  And we're working

2     on it, but I just, you know, we may need some leeway from the

3     Court.

4          THE COURT:  You get some leeway, so just what's

5     reasonable.

6          MR. ROCHON:  Thank you.

7          MR. YALOWITZ:  May I be heard on this before I move to

8     the next topic?

9          THE COURT:  If you want, but I think it is resolved.

10    So I don't know why we need to debate this further.

11         MR. ROCHON:  I had one more point on it.  Mr. Kaufman

12    I think is going to be testifying as a summary witness for the

13    convictions, not as an expert I think.

14         THE COURT:  They didn't qualify him as an expert.

15         MR. ROCHON:  I don't know if they are either, but I'd

16    like to know.

17         THE COURT:  If you got an expert report, you can

18    probably anticpate he's going to be an expert.

19         MR. ROCHON:  I know, but previously they indicated

20    he's coming as a summary witness because there was talk about a

21    Daubert challenge.  We don't object to him coming -- he's going

22    to talk about the convictions and he's going to read them, but

23    that's not expert testimony.  He is just --

24         THE COURT:  It depends.  I don't know if the jury

25    needs some expert testimony about how convictions are laid out

F1CZSOK1                    Conference

1    and, you know, what the difference is between what a conviction

2    would like look in Israel and what a conviction looks like

3    in -- I don't know.  They could use some somebody that's

4    familiar with that process.

5            MR. ROCHON:  If he's going to describe the process, we

6    want to make sure he's not opining on the quality of the

7    process, that's what --

8            THE COURT:  I thought we went past that.

9            MR. ROCHON:  I did too.  That's why I was wondering

10   whether he's really an expert or just someone who just says

11   here's the convictions of these individuals.

12           THE COURT:  Well, to the extent that he's going to

13   explain to the jury, which would be beyond their lay person's

14   knowledge, what these documents are and what form they're in

15   and how they get generated, I would assume he has to be some

16   kind of an expert to do that.  I assume that when you accept

17   somebody familiar with the process, you can do that.  So to the

18   extent -- I assume he's going to be qualified as an expert.

19           MR. ROCHON:  Right.  He was one of the experts we had

20   a challenge to on Daubert and the Court never actually, because

21   of the exchange about how they were going to use them, I don't

22   know that you actually formally even ruled on that challenge.

23           THE COURT:  Well, I don't see -- I don't think I've

24   seen any basis -- if you say they're going to talk about the

25   process of prosecution and conviction in a civilian and

F1CZSOK1                    Conference

1    military court, I'm not sure I saw anything on that issue that

2    made me believe that he is somehow unqualified to do so.

3            MR. ROCHON:  It does depend what the plaintiffs are

4    going to do with him.  We don't have a good sense of that.

5            THE COURT:  Assume that's all they're going to do with

6    him.

7            MR. ROCHON:  He's talking about the process and

8    getting these convictions were obtained, it's one thing.

9            THE COURT:  You say this is an indictment and this is

10   a --

11           MR. ROCHON:  Right.

12           THE COURT:  -- judgment and the way you get the

13   judgment is usually they either plead guilty or sometimes don't

14   admit they're guilty but they admit facts and sometimes the

15   Court decides on its own, you know, whether or not the person

16   is guilty and they're not jurors here.

17           MR. ROCHON:  Right.  That sounds all fine, your Honor.

18           MR. YALOWITZ:  Have you been in the prep sessions,

19   your Honor?

20           THE COURT:  I mean, this isn't rocket science, guys.

21   You guys will have a jurors that say break this down for me and

22   that's --

23           MR. ROCHON:  If it's that, where the rub is going to

24   hit the road and the issues are if they get into interrogation

25   because that's where we have to be very careful that we're not

F1CZSOK1                    Conference

1    opening the door back up to that which the plaintiff said they

2    don't want to do and we said we would not open the door.

3           THE COURT:  I'm not even sure that -- I don't remember

4    anything that was coming in that was an interrogation -- well,

5    I guess there were interrogations that said I, you know, I did

6    this.

7           MR. ROCHON:  Right.  And the documents we have from

8    the plaintiffs -- that's why we're going through them, so we'll

9    see.  Probably this is something we're going to want to need

10   sometime from the court and we've got a process put in place we

11   can talk bit hopefully tomorrow.

12          THE COURT:  Well, I assume what has been redacted is a

13   statement by non -- PA employee or a non official or agent of

14   the PLO in which the person is the accusing a third person of

15   committing a crime.

16          MR. ROCHON:  Not all of those were redacted in our

17   preliminary scan of them.

18          THE COURT:  Okay.

19          MR. ROCHON:  That's what we've talked about.

20          THE COURT:  That's what I would -- if you want to move

21   forward efficiently, I would prepare a second set of documents

22   that redacts all of that.

23          MR. ROCHON:  We can share our concerns with

24   plaintiffs.  They may not agree with us, but we can tell them

25   what our first skim -- we looked at some of them this weekend.

F1CZSOK1                     Conference

1    We've not looked at all of them.  I have people doing that

2    while we're here, so its not like it's waiting on me to get

3    back to.

4              THE COURT:  I mean, to the extent the person is a PA

5    employee and the person is in some or official or stabbed that

6    they are agent on behalf of the PLO or the PA, that person's

7    statement can be admitted.

8              MR. ROCHON:  Most of the plaintiffs have offered this

9    on a declaration against penal interest theory as to the

10   interrogations.  As to -- I don't think any finding yet by the

11   Court, and I don't think there could be that any of these

12   people were speaking as agents of the PLO and they're being

13   interrogated or questioned, because by the time you get

14   arrested and charged with a crime, the agency relationship,

15   whatever it was, is no longer primary.  The primary

16   relationship is you're facing criminal charges.

17             THE COURT:  Not primary doesn't mean it's

18   distinguished.

19             MR. ROCHON:  I'm just saying I think the theory that

20   these are coming in as agent's statement hasn't been made out

21   nor was it a basis for your allowing it.

22             THE COURT:  No, so but that wasn't the nature -- I

23   mean we -- the nature of my indicating that they needed

24   redaction was redactions of those individuals who profess that

25   they were committing the crime and they want to say that an

F1CZSOK1                      Conference

1    agent of the, or an employee of the PA or PLO also committed

2    that crime.

3             MR. ROCHON:  Those should be redacted.

4             THE COURT:  Those should be redacted.

5             MR. ROCHON:  We don't think all of them were.  That's

6    what we're going to talk to plaintiffs about.  There is some

7    other portion that we'll disagree about.

8             MR. YALOWITZ:  So when Mr -- when the Court is done

9    with Mr. Rochon, I want to address some of the things that the

10   Court and he discussed.

11            THE COURT:  Okay, go ahead.

12            MR. YALOWITZ:  Okay, thank you.  First of all, this

13   redaction project took us quite a substantial effort.  You'll

14   see the redactions.  They're very heavy.  Enormous amounts are

15   blacked out.  I had assumed that the defendants understood when

16   we were beginning trial and when the Court's ruling was and

17   that they were actually looking at documents themselves to

18   anticipate what should be redacted.

19            THE COURT:  Well, I don't need to debate that further.

20   Let's just move on.

21            MR. YALOWITZ:  Thank you.

22            The second thing is I'm very concerned about Mr.

23   Rochon trying to back door torture into this case by saying to

24   the extent the convictions were --

25            THE COURT:  It's not coming in.

F1CZSOK1                    Conference

1              MR. YALOWITZ:  Good, okay.  And the third thing is we

2        do think that these individuals were employees after their

3        arrest.  They stayed on the payroll.  We didn't make the

4        redactions on that basis, but, but we certainly agree with the

5        Court's views on that, that relationship is not extinguished.

6        So we'll reserve on that, but we did not make the redactions on

7        that basis.

8              THE COURT:  I'm not concerned about individuals who

9        are individuals who were at the time that they committed the

10       acts, that you establish were either employees or agents of the

11       PLO during the relevant period of time.  It doesn't matter to

12       me that whether or not there is an agency relationship that

13       continues beyond that.  Because if the person said, if that

14       person said while I was, and the evidence established that

15       while I was a PA employee or an agent acting on behalf of the

16       PA, I committed a crime and I committed the crime with the

17       person who detonated the bomb or fired the gun, I don't have a

18       problem with that.  I don't have a problem with that.

19              I have a problem with a person who was involved

20       directly in the crime who wants to point the finger at the PA

21       or the PLO or at PA employee or a PLO agent official or anyone

22       associated with them.

23              MR. YALOWITZ:  Okay.

24              THE COURT:  All right.  That's the basic of this.  The

25       redactions should be consistent with that.

F1CZSOK1                    Conference

1              MR. YALOWITZ:  I believe that's how we approached it

2      and if the defendants have a problem, then they better get

3      ahold of us pretty fast.

4              THE COURT:  All right, so.

5              MR. YALOWITZ:  Thank you, your Honor.

6              THE COURT:  Let's just finish up and then we'll take a

7      break.  Let's finish up on these experts.

8              I think generally I have no problems with Levitt

9      testifying, if he is qualified to do so, with regard to the

10     what he says the relationship is between the AAMB and Fatah and

11     the funding mechanisms.  If he is learned in this area he can

12     state, you know, what he believes it to be and the basis for

13     which he believes that to be.  And if the defense wants to

14     counter that with their own expert to say he's wrong, they can

15     do so.  Atacott --

16             MR. YALOWITZ:  We've withdrawn Atacott.

17             THE COURT:  Okay, good.  Because I had a problem with

18     Atacott.  Marcus, Atacott, all right.  So --

19             MR. ROCHON:  Karsh.

20             THE COURT:  Karsh is also off.

21             Eviatar, I'm not -- it's unclear to me what he's going

22     to say.  He's going to say in relationship to the PA and PLO

23     involvement in terrorism, I'm not sure.

24             MR. YALOWITZ:  So in large part Eviatar covers the

25     same ground as Levitt, and that's why we have Levitt as a may

F1CZSOK1                        Conference

1    call.  Eviatar is extremely knowledgable about structure of the

2    PA's policies and procedures with regard to how they deal with

3    terror.  He is a 20 year field agent.

4            THE COURT:  Well, tell me, give me an example what

5    he's going to say.

6            MR. YALOWITZ:  He's going to say the PA has a law that

7    provides for the payment of money to anybody who is arrested

8    for a crime of terrorism.

9            THE COURT:  Okay.

10           MR. YALOWITZ:  So that's a policy that they have and

11   that he's going to explain, going to show how the law, and

12   explain who it works.  As a example of what he's going to do,

13   he's going to say I've studied the PA and the PLO and Fatah for

14   many years and they treat themselves interchangeably.

15           THE COURT:  And he's basing that on what?

16           MR. YALOWITZ:  He's basing that on evidence in the

17   case, documents that have been --

18           THE COURT:  Give me an example.

19           MR. YALOWITZ:  There is a deposition testimony that

20   Fatah doesn't have its own money, they rely completely --

21           THE COURT:  Talking about the money trail of how to

22   fund.

23           MR. YALOWITZ:  Right, right.  So he's going to say

24   here's some documents that are from the PA's intelligence files

25   that show that they knew that these particular individuals were

F1CZSOK1                    Conference

1   terrorists, and then here's another document that shows the PA

2   approving payments to those individuals; follow the money

3   trail.

4           THE COURT:  All right spoke.

5           MR. YALOWITZ:  So those are the kinds of things he's

6   going to do.  He's going to also going to talk about the PA's

7   material support for the Al Aqsa Martyrs Brigades, which is in

8   the form of money and weapons.

9           THE COURT:  He's going to base that on what?

10          MR. YALOWITZ:  Again on the documents that we've just

11  been discussing, government reports, convictions, the PA's own

12  intelligence files like that.  He's also going to talk about

13  the PA support for Hamas, and in particular the support

14  material support for the Hebrew University bombing, which was a

15  Hamas attack, again using convictions, policies, procedures.

16          THE COURT:  What's going to be the nature of the

17  evidence of the material financial support for the two Hamas

18  for the Hebrew University bombing?

19          MR. YALOWITZ:  I don't think they provided financial

20  support to Hamas.

21          THE COURT:  Okay.  That's what I thought you said.

22          MR. YALOWITZ:  No.  They provided some financial

23  support to the bomber.  They gave the bomber some money, but

24  they didn't give the --

25          THE COURT:  Okay, okay.  I just misunderstood what you

F1CZSOK1                    Conference

1   just said.

2           MR. YALOWITZ:  They didn't cut a check, you know,

3   Hamas, pay to the order of Hamas.

4           THE COURT:  Well, I have a question mark next to that

5   not so much because I think that the testimony in general is

6   inadmissible, but I'm not quite sure whether everything you

7   said he's going to testify to is admissible or all of the

8   documents that you say he's going to rely upon are going to be

9   before this jury.  But I don't -- I'm not going to preclude him

10  as a witness, but I will hear specific objection with regard to

11  where he goes with this.  I mean, obviously, you know, there is

12  enough out there so he can, if he's qualified, he could talk

13  about, you know, payments and the policy of payments.  And, you

14  know, both sides can debate why payments were made and that

15  sort of thing.  So I don't have any problems in general, but

16  we'll see more specifically.  So I'm not going to preclude him

17  as a witness.

18          MR. YALOWITZ:  Thank you, your Honor.

19          THE COURT:  All right.  Shrenzel, I don't -- give me

20  the primary testimony that you expect.

21          MR. YALOWITZ:  Sure.  So Shrenzel's got two things.

22  He does -- first of all he takes those policies that we were

23  talking about and looks at how they were applied in the, in six

24  of the seven attacks, so payments to people convicted of

25  terrorism.

F1CZSOK1                    Conference

1              THE COURT:  Is this going to be, is his analysis going

2     to be based on evidence that's already going to be before this

3     jury?

4              MR. YALOWITZ:  Correct, correct.

5              THE COURT:  All right.  In the form of?

6              MR. YALOWITZ:  Payroll records, intelligence files.

7     It's very granular, take the jury through who participated in

8     the attack, which is established by the convictions, and how

9     did the PA treat them before and after they were arrested and

10    convicted.

11             THE COURT:  All right.  And is there something you

12    anticipate that he's going to rely upon that is not going to be

13    evidence in this case before this jury?

14             MR. YALOWITZ:  I mean, obviously, an expert has some

15    things that they rely on, but I'm not --

16             THE COURT:  Depends on what he has to say.

17             MR. YALOWITZ:  Yeah.  I mean, I'm not -- I don't think

18    that we're going to have a problem with, okay, we didn't get

19    something in because it was hearsay and now he's going to, you

20    know, transmit it to the jury.  We don't need to do that.

21             THE COURT:  And is he primarily going to analyze the

22    evidence before the jury with regard to the incidents and their

23    connection to the PA or PLO?

24             MR. YALOWITZ:  Correct, correct.

25             THE COURT:  All right.

F1CZSOK1                    Conference

1          MR. YALOWITZ:  There is a second thing that he brings,

2     your Honor, which is these police magazines.  Again, it goes to

3     the scope of employment.

4          THE COURT:  You want him to go through the police

5     magazines, tell them what they are, that sort of thing, he has

6     familiarity, that kind of thing.

7          MR. YALOWITZ:  Right.

8          THE COURT:  And is he going to opine that there is

9     these police magazines and/or other public printed material is

10    put out by the PA or the PLO?

11         MR. YALOWITZ:  Correct, which I, until this weekend, I

12    didn't think there would be a factual dispute about that, but

13    now --

14         THE COURT:  There may be.  But my attitude would be, I

15    don't see in the abstract any reason to exclude him as a

16    witness.  If there's something that appears that he's getting

17    ready to testify to he's not qualified to testify to, or no

18    basis for or legitimate professional analysis, then I'm willing

19    to hear the objection, but in general, I'm not going to exclude

20    him as a witness.

21         MR. YALOWITZ:  Understood.  Thank you, your Honor.

22         THE COURT:  All right, yes sir.

23         MR. SATIN:  Can I be heard, your Honor, with respect

24    to Mr. Shrenzel that Mr. Yalowitz and the Court just discussed?

25         THE COURT:  YES.

F1CZSOK1                    Conference

1              MR. SATIN:  I'll start with Mr. Shrenzel.  And what

2        Mr. Yalowitz said in response to the question, what's his

3        primary testimony, I think Mr. Yalowitz said to show how those

4        so-called policies are applied.

5              But really what he's doing is he's taking the evidence

6        in the case, to the extent it gets admitted, and he is just

7        opining, based on that the defendants are liable for these

8        particular attacks.  In other words, he is just summarizing

9        documents that are going to be in front of the jury, if they

10       are, which as the Court has said many times, which we agree,

11       this is not rocket science.

12             THE COURT:  But have a witness come and summarizing

13       evidence from the jury, he could make a chart, he can, you

14       know, plenty of time witnesses are summary witness.

15             MR. SATIN:  That's fine.  And what I'm talking about

16       now is whether or not this witness is going to be cloaked as an

17       expert witness.  If they want him as a summary witness, then

18       that's a separate conversation for us to have.  Certainly the

19       evidence has to be admissible -- which some of these things

20       that I think he's going to be talking about are not admissible,

21       and he still has to have the basis for knowledge about those

22       particular exhibits to give that summary testimony, which I

23       don't know that he has.  These aren't documents that he has

24       personally reviewed.  They were just given to him and he says

25       this is what they said.  But at least -- but here's the danger

F1CZSOK1                    Conference

1    with Mr. Shrenzel.  His report is not -- it's a summary of

2    documents, but on top of that it's his conclusion that the

3    defendants are liable.  And that's why we're concerned about

4    his testimony that they are, the plaintiffs are seeking to

5    invade the province of the jury by having this person who is

6    going to be, according to them, cloaked as an expert based on

7    his intelligence and experience say I've looked at the

8    documents in this case and I conclude that the defendants are

9    liable, and that should not happen in this case.

10            THE COURT:  Well --

11            MR. SATIN:  Especially when the evidence at issue is

12    not so complicated that they can't make their mind up on their

13    own.

14            THE COURT:  I am less concerned about that, and I'll

15    look at his report more thoroughly.  I'm less concerned about

16    that because the reality is is that, you know, if his analysis

17    and conclusions are based primarily and not exclusively on the

18    evidence that's before this jury, that you have a full

19    opportunity to argue he's a quack, doesn't know what he's

20    talking about, and you have an expert to say just the opposite,

21    and you have dueling experts.  Or even -- and I clearly intend

22    to give the jury an instruction that it is not -- they need not

23    accept the expert's opinion; that they have to make the final

24    decisions and ultimate determinations in this case, and

25    consider the opinions of experts and give it whatever weight

1   they deem is appropriate.

2           So I have less of a fear that somehow, one, that

3   simply because he's going to opine upon the ultimate issue that

4   that necessarily makes it automatically inadmissible and, two,

5   whether or not that it will invade the jurors' province, which

6   I'm sure you want to emphasize to the jury that it is their

7   province.  And I instruct them as to it's their province.  And

8   the bottom line is that regardless of what he says or your

9   expert say they have to make that determination and decide

10  whether or not it is a logical reasonable conclusion to draw

11  consistent with the experts, or whether or not the evidence

12  supports a different conclusion.  So I'm not particularly

13  persuaded that that, in and of itself, should preclude his

14  opinions in this case.

15          MR. SATIN:  Well, a couple things.  First of all, I do

16  want to say that there has been some discussion of the police

17  magazines witness second opinion he's going to talk about.  I'm

18  not going to address that now, but I do want the Court to be

19  aware that for two independent reasons that we discussed later

20  number one the language in those magazines does not fit within

21  the parameters of what is proper to be for a jury and, second,

22  that those magazines are not in fact statements of a PA or PLO.

23  So certainly he should not be allowed to testify about those

24  things, if and when it is shown, and we believe we're already

25  shown in our letter, but we can argue to the Court about it,

F1CZSOK1                    Conference

1    that they don't come in independently.

2                THE COURT:  Who do you contend generates these

3    documents other than the PA or PLO?

4                MR. SATIN:  I'll defer to my colleague to address the

5    issue if the Court would like to hear about it now.

6                THE COURT:  I just want to know the answer to that

7    question, who outside the PA and PLO generates these?

8                MR. HILL:  There are a number of people in Palestine,

9    as your Honor, would suspect, that have opinions, and only one

10   of the magazines in issue is actually produced by the PA or

11   PLO.  The others were not.

12               THE COURT:  All right.  Well, I don't know, to the

13   extent that they say they have evidence that it is produced by

14   the PLO.  Obviously if they have such evidence, they're allowed

15   to offer it and you're allowed to offer evidence that

16   contradicts that.  But if there is no legitimate evidence by a

17   witness that could lead a reasonable jury to conclude that the

18   PLO the PA or an arm or agent of the PLO or PA generates this

19   information, then it cannot come in.

20               MR. YALOWITZ:  Your Honor, I don't think Mr. Hill

21   answered the Court's question, which was who does produce

22   these.

23               THE COURT:  You contend that there is someone else

24   other than the PA?

25               MR. HILL:  Yes.  The plaintiff's burden, as you said,

F1CZSOK1                    Conference

1   to lay the foundation for them to come in as our statements.

2   They're not going to able to do that.

3           THE COURT:  Do you contend there is someone else other

4   than the PA who --

5           MR. HILL:  Publishes magazines in Palestine?  Yes,

6   your Honor.

7           THE COURT:  Who do you contend that to be?

8           MR. HILL:  Well, the people that reported, produced

9   the magazines, got their own name and their own banner, some

10  group in Gaza that published one of them, and another one

11  purports to be some other independent organization.

12          THE COURT:  Okay.  Well, you know, as they I say to

13  the extent, I don't know what the evidence is that they wish to

14  offer that it is a PLO or PA generated document.  If they offer

15  legitimate evidence that it is a PA or PLO generated document,

16  then it is an issue for the jury to resolve.  So we'll see

17  where we go with that.

18          Let me take a short break, let me give the Court

19  Reporter a break.  We'll take a ten minute break.

20          MR. YALOWITZ:  Thank you, your Honor.

21          (Recess)

22          (Continued on next page)

23

24

25

F1cdsok2

1          THE COURT:  Once again, it is up to the defense

2    whether they want you to go through that process.

3          MR. YALOWITZ:  I understand.

4          THE COURT:  If it is not necessary, if that is the

5    case, if you could establish that --

6          MR. YALOWITZ:  We will.

7          THE COURT:  -- find out whether they have an

8    objection.

9          I didn't have a real problem with 337, but I wasn't

10   exactly sure what it was and where it came from.

11         Mr. Yalowitz, can you sort of identify that?  It seems

12   to be some sort of recitation.

13         MR. YALOWITZ:  Bear with me, your Honor.  I just want

14   to consult on this.

15         (Pause)

16         You know, we are not going to use 337 based on the

17   summary judgment.  Sorry about that, your Honor.

18         THE COURT:  That is all right.  So we could pass that.

19         Now, which takes me to 339 and similar documents.

20   Although this purports to be something from the Israel Ministry

21   of Foreign Affairs, and there are similar documents, I'm not

22   quite sure what it is you contend these are and I'm not sure

23   that I could make a finding that these are somehow some

24   government reports that are based on some government

25   investigation.  It just seems to be a summary recitation of

F1cdsok2

1    someone's position, opinion or known fact, which I can't tell

2    which, that the information that is stated here is somehow

3    true.  I'm not quite sure what this is supposed to read.

4             MR. YALOWITZ:  I just need one second, your Honor.

5             THE COURT:  Sure.

6             MR. YALOWITZ:  I am going to be able to find this.

7             THE COURT:  I have problems with all of those

8    documents that you retrieved from both the Israel Ministry of

9    Foreign Affairs and the Prime Minister's department.  It is

10   just making statements about events and there is no basis for

11   why these statements are being made.

12            MR. YALOWITZ:  Sure.  So with regard to the -- let me

13   start with the one about Zinni list, which is 354, your Honor.

14            THE COURT:  354?

15            MR. YALOWITZ:  Yes.

16            So this is a statement by the government of Israel

17   about the activities of the government of Israel.  So it is a

18   public report.

19            THE COURT:  OK.

20            MR. YALOWITZ:  I have somebody who can look at it and

21   say, you know, I've checked and it is what it purports to be.

22   And so this document says, "In December 2001, Israel presented

23   U.S. peace envoy Anthony Zinni with a list of 33 most wanted

24   terrorists, requesting their arrest by the Palestinian

25   authority."  That's a statement by the government of Israel

F1cdsok2

1    about the government of Israel's activities.

2                THE COURT:  All right.  So they gave this report to

3    Zinni?

4                MR. YALOWITZ:  Yes.

5                THE COURT:  You have to give me more detail about

6    Zinni.  You want to show that they were put on this list, and

7    then there is going to be some testimony that was given to

8    Yasser Arafat?

9                MR. YALOWITZ:  Yes.  So there is video of Yasser

10   Arafat being asked about the Zinni list.  And then he says,

11   yeah, I got it and I arrested some of the guys and other guys I

12   didn't arrest and maybe I will, or whatever he says.  He

13   extemporizes about it, but he admits he got it on video.  There

14   is not going to be -- I don't know what they are going to do.

15   It looks like Yasser Arafat.  Maybe he says Yasser Arafat is

16   like those Elvis lookalikes.  Maybe it was an actor pretending

17   to be Yasser.  I don't know.

18               Then this next sentence, "The list was given by Zinni

19   to the Palestinians."  That doesn't come in, I guess, if we are

20   going to be rigid about it because that's about what Zinni did.

21               THE COURT:  But if you say you have an independent

22   statement on videotape by Yasser Arafat saying that he received

23   the list --

24               MR. YALOWITZ:  He did.  I do.

25               THE COURT:  I'm so sure why we are arguing about

F1cdsok2

1    whether or not that is a legitimate video or whether or not he

2    in fact -- or they can even debate about whether or not he

3    really did have the list or didn't have the list.  But I don't

4    see that that goes to admissibility if that is the only purpose

5    of this one document.

6        MR. YALOWITZ:  Then the final sentence, the final

7    statement that I am interested in is:  "Five of these most

8    wanted terrorists have been arrested by Israel during operation

9    Defensive Shield."  Then it lists the names.

10        THE COURT:  OK.

11        MR. YALOWITZ:  And what do you know?  Two of the names

12    are guys who between the time that they gave the list and

13    between the time that Israel finally arrested them perpetrated

14    attacks in our cases.

15        THE COURT:  OK.

16        MR. YALOWITZ:  So that's why I want that document, and

17    it is a statement by Israel about Israel's activities.

18        THE COURT:  Yes.

19        MS. FERGUSON:  Your Honor, first, this document is

20    being offered apparently for the truth of the matter that the

21    PA somehow had notice that these particular people were on the

22    Zinni list, and there is no evidence of what names were on the

23    Zinni list.

24        THE COURT:  Well, he says he has a video of Yasser

25    Arafat saying he got the Zinni list.  Are you disputing that

F1cdsok2

1    there is evidence that Yasser Arafat admitted he had the Zinni

2    list?

3         MS. FERGUSON:  There is no further discussion of whose

4    names are on the list.

5         THE COURT:  That is a different question.  The

6    question is whether is there any genuine dispute that there is

7    evidence that Yasser Arafat admitted that he received something

8    referred to as the Zinni list?  I just wanted to know --

9         MR. HILL:  My recollection is they said he received a

10   list from General Zinni.  The issue is who is on the list.  And

11   there is no evidence of the content of the list apart from this

12   hearsay document, and it's being offered to prove the content

13   of the list.  That's the basis for the hearsay objection.

14        THE COURT:  But I don't understand what you contend he

15   got, if this providing you with the Zinni list, what you

16   contend he got other than this list.

17        MR. HILL:  He said he got a list from General Zinni.

18   There is no evidence of who was on the list that was given --

19        THE COURT:  Isn't there a reasonable inference for a

20   reasonable jury to conclude that he got -- if they say this is

21   what the Zinni list is, that one can infer that he got this

22   list?

23        MR. HILL:  Well, setting aside the relevance issue, I

24   understand the relevance of it.  This is hearsay.  This is

25   being offered to prove the content of the list, which will not

F1cdsok2

1    come into evidence.  This is being offered to prove that in

2    fact the list contained these names.  It is offered for the

3    truth of the matter asserted as to the content of the list.

4    That is why it is hearsay.

5            THE COURT:  And you --

6            MR. HILL:  It is not based on an Israeli government

7    investigation or anything.

8            THE COURT:  No.  I'm going to overrule that objection.

9    I think that if they have evidence that Yasser Arafat said he

10   got the Zinni list, I think it is appropriate for the jury to

11   know who the Israel Ministry of Foreign Affairs says was on

12   that list and whether or not there is some reasonable logical

13   conclusion to reach that Yasser Arafat got something different

14   than this.  It is up to the jury.

15           The question isn't whether or not -- I'm not even sure

16   it qualifies as hearsay.  The question is not whether or not

17   what's on this report -- activities on this report in fact

18   happened.  The question is simply whether or not these were the

19   names that were listed on the list that he got.

20           Now, do you have some reasonable argument to argue to

21   the jury that he got some other list with a different set of

22   names, then I think the jury is entitled to hear that.

23           MS. FERGUSON:  Your Honor, in addition, it is multiple

24   levels of hearsay.  It is the Ministry of Foreign Affairs

25   communicating what they heard from Israeli security forces

F1cdsok2

1  about this list that no one ever --

2          THE COURT:  I know.  But it takes it out of the realm

3  of hearsay, at least those layers of hearsay by Yasser Arafat

4  admitting that he got a Zinni list.  I mean, that is like

5  saying that --

6          MS. FERGUSON:  It is still an out-of-court statement

7  being offered for the truth.  It doesn't matter that --

8          THE COURT:  The truth of what.

9          MS. FERGUSON:  Well, apparently, it is being offered

10  for the truth that there was a Zinni list that had 33 names

11  that included --

12          THE COURT:  Well, we know there was a Zinni list

13  because you admit there was a Zinni list.

14          MS. FERGUSON:  But I don't know anything about the

15  content of the Zinni list.

16          THE COURT:  No, I disagree with that.  I think it is

17  your burden.  If you contend that there was something different

18  on the Zinni list, then you should be able to say so.  They say

19  that this reflects, consistent with what -- if Yasser Arafat

20  had to say that he got the Zinni list, I might have excluded

21  it.  But if they have evidence of Yasser Arafat saying he got

22  the Zinni list, I think you have the burden of convincing the

23  jury there is some other Zinni list other than this one, if

24  that is your legitimate position, and I don't know that is your

25  legitimate position.

F1cdsok2

1          So, no, I don't think that this is hearsay simply

2    because they list a list of names.  The only question is were

3    these names on the Zinni list or weren't they on the Zinni

4    list.  They say this is the Zinni list.  And Yasser Arafat said

5    I got the Zinni list.  So it is logical, common sense.  If you

6    have some other evidence that disputes that, I would -- I think

7    it should go to the jury.

8          But I agree with them.  Initially, I didn't know

9    exactly how it was connected.  But if they are going to connect

10   this through an admission by Yasser Arafat that there is such a

11   thing as the Zinni list -- and I doubt it -- I think it is

12   admissible to say, OK, the Minister of Foreign Affairs said

13   that they gave a Zinni list to the PA and this is the list that

14   they gave them.  It doesn't give a recitation of a whole bunch

15   of events.  It just says that these people are wanted.  I don't

16   think that that is --

17          MS. FERGUSON:  Your Honor, can we go back to 339?

18          THE COURT:  Yes.

19          MR. YALOWITZ:  Actually --

20          THE COURT:  339, 350, 354, I still have some problems

21   with those documents, or issues.

22          MR. YALOWITZ:  All right.  So 339 and 954, which -- is

23   it 954?

24          THE COURT:  954?

25          MR. YALOWITZ:  Yes.  So 339 and 954, 954 is sort of a

F1cdsok2

1    PowerPoint presentation that goes with 339.

2          THE COURT:  OK.  Because it says "DVD."  I just don't

3    know what the content of the DVD is.

4          MR. YALOWITZ:  I will explain it.

5          So those two documents are announcements of the

6    seizure of funds from various individuals implicated in

7    terrorism.

8          THE COURT:  OK.

9          MR. YALOWITZ:  So one of those individuals is Naef Abu

10    Sharkh.

11          THE COURT:  Unfortunately, I don't see that name on

12    339.  Is that on 339?

13          MR. YALOWITZ:  He is on the second-to-last page, your

14    Honor.

15          THE COURT:  The second-to-last page?

16          MR. YALOWITZ:  Yes.  Personal bank accounts from which

17    fund were confiscated during --

18          THE COURT:  Tell me where.  I don't see the name.

19          MR. YALOWITZ:  So I am on page 4 of 5 of the --

20          THE COURT:  Page 4.

21          MR. YALOWITZ:  -- of the ECF.

22          THE COURT:  Yes.

23          MR. YALOWITZ:  Then it says, "Personal bank accounts

24    from which funds were confiscated during the operation" in bold

25    type, kind of a third of the way down the page.

F1cdsok2

1              THE COURT:  "Types of bank accounts from which funds

2      were confiscated."

3              MR. YALOWITZ:  Maybe we are looking at different

4      things.

5              THE COURT:  I have 339 it is from.

6              MR. YALOWITZ:  Yes, 339.  Should we test out the Elmo?

7      I can put it up on the Elmo here.

8              THE COURT:  You can try.  My document is titled,

9      "Operation for the Confiscation of Terror Funds background."

10             MR. YALOWITZ:  Correct.

11             THE COURT:  The first name that is bolded is Ahmed

12     Sa'ari Hussein.

13             MR. YALOWITZ:  Right.  So now we flip -- I am just

14     going to flip one, two, three more pages.

15             THE COURT:  OK.

16             MR. YALOWITZ:  And we've got a bold item that says

17     "Personal bank accounts from which funds were confiscated

18     during the operation."

19             THE COURT:  Yes.  I see that.  OK.

20             MR. YALOWITZ:  And then one of the guys is this Naef

21     Abu Sharkh.

22             THE COURT:  OK.

23             MR. YALOWITZ:  And he is implicated by this document

24     in the June 19, 2002 suicide bombing.

25             THE COURT:  Which is?

F1cdsok2

1          MR. YALOWITZ:  Which is one of the attacks in our

2     case.

3          THE COURT:  June 19th -- which attack?

4          MR. YALOWITZ:  Mandelkorn.

5          THE COURT:  Mandelkorn, right.

6          So you want this document to prove what?

7          MR. YALOWITZ:  To prove that this individual, who

8     other evidence indicates was a terror-financing individual

9     associated with Al-Aqsa Martyrs Brigades was implicated in this

10    attack.

11         THE COURT:  You don't have any other evidence that

12    this person was involved in this attack?

13         MR. YALOWITZ:  He was liquidated.  So this is the --

14    he was liquidated after this but this is what we have --

15         THE COURT:  He's not a PA or PLO employee?

16         MR. YALOWITZ:  He was a PA or PLO employee, and they

17    shifted him from the security forces to some other mysterious

18    detail.  But --

19         THE COURT:  So what is the evidence that this is based

20    on that he was involved in this attack?

21         MR. YALOWITZ:  We don't have the underlying evidence.

22         THE COURT:  All right.  That's what I am assuming.

23         MR. YALOWITZ:  I understand that.

24         THE COURT:  Who says this and why is the question that

25    I have to ask?

F1cdsok2

1          MR. YALOWITZ:  Look, the only thing I have on this

2     document and I would like this document in --

3          THE COURT:  I understand.

4          MR. YALOWITZ:  Of course.  What I have is it's like an

5     OFAC press release.  So OFAC says, you know, we seized a bank

6     account of a guy who was financing terror, and if he disagrees

7     he can show up and appeal.  And it says that in the press

8     release in the PowerPoint.  They only have a right of appeal.

9     This was conducted by the Attorney General and the IDF and the

10    security --

11         THE COURT:  You don't have any of that?

12         MR. YALOWITZ:  I'm sorry.

13         THE COURT:  You don't have any of that?

14         MR. YALOWITZ:  No.  No.  We do.  It is in 954, it says

15    that.

16         THE COURT:  954 is what?  You have to give me the

17    context of 954.

18         MR. YALOWITZ:  OK.  So 954 is a more detailed

19    presentation that was given together with 339 --

20         THE COURT:  So, again, do you have a witness who can

21    tell me where it comes from and what it is supposed to be?

22         MR. YALOWITZ:  Yes.

23         THE COURT:  Where does it come from and what is it

24    supposed to be?

25         MR. YALOWITZ:  It is a presentation given to the press

F1cdsok2

1      about the results of this investigation and seizure.

2              THE COURT:  And given by whom?

3              MR. YALOWITZ:  Given by the Ministry of Foreign

4      Affairs.

5              THE COURT:  It is like a press conference?

6              MR. YALOWITZ:  Like a press release.

7              THE COURT:  A press release?

8              MR. YALOWITZ:  Right.  Like if, you know, Eric Holder

9      made an announcement, we seized the bank account of this guy

10     who is a terrorist.

11             THE COURT:  Let me say, this is a DVD.  I'm not sure,

12     is it a video --

13             MR. YALOWITZ:  No.

14             THE COURT:  -- or is just a document?

15             MR. YALOWITZ:  It's a PowerPoint presentation.  And it

16     is just -- the formating is kind of weird, and I'm sure we can

17     get it printed out and we can look at it.

18             THE COURT:  And you want it to show that they

19     basically seized his funds as being involved in this attack?

20             MR. YALOWITZ:  Correct.

21             THE COURT:  OK.

22             MR. YALOWITZ:  It links -- this guy, who is a known

23     Al-Aqsa Martyrs Brigades financier to our attack.

24             THE COURT:  So what is the evidence that links him to

25     this attack?

F1cdsok2

1           MR. YALOWITZ:  This is my evidence.

2           THE COURT:  What is the evidence that they rely upon

3      that links him to the attack?

4           MR. YALOWITZ:  It is not disclosed.  They did not

5      disclose this.

6           THE COURT:  So you don't know why they say he is

7      involved?

8           MR. YALOWITZ:  Correct.  Just as sometimes we don't

9      know why OFAC seized -- they may have had their own reasons for

10     not disclosing the evidence.  This is the evidence I have.  I

11     don't have --

12          THE COURT:  You don't have evidence that he is

13     involved in this attack?

14          MR. YALOWITZ:  That I --

15          THE COURT:  And he is your key link to the PA and the

16     PLO at this point?

17          MS. FERGUSON:  Your Honor, if I could just --

18          MR. YALOWITZ:  He is -- he was the only link to the PA

19     and the PLO.  Your Honor ruled on summary judgment that that's

20     not enough to do vicarious liability.

21          THE COURT:  Right.

22          MR. YALOWITZ:  I still want the document in because he

23     is a known Al-Aqsa guy and it is Al-Aqsa attack, and it will

24     help the jury understand the connection between Al-Aqsa and

25     financing of terror and this case.

F1cdsok2

```
1          THE COURT:  How are they going to understand that if
2     they have no idea why he is being accused?
3          MR. YALOWITZ:  Because our expert will explain what
4     the operation was, what operations like this are, what the
5     results were, the fact that he has an opportunity to come in
6     and show up on appeal and say no, no, you've got the wrong
7     guy --
8          THE COURT:  But that doesn't tell me what he did and
9     who says he did it.
10         MR. YALOWITZ:  I can't dispute that, your Honor.
11         THE COURT:  All right.  And you say this and 9 --
12         MR. YALOWITZ:  954.
13         THE COURT:  -- 954 go together?
14         MR. YALOWITZ:  Correct.
15         THE COURT:  Did you want to respond to that?
16         MS. FERGUSON:  Your Honor, this is nothing like an
17    OFAC document.  It comes from the Israeli Ministry of Foreign
18    Affairs, and it is just making an accusation.  So going to Eric
19    Holder's example, you wouldn't allow Eric Holder to announce in
20    a press release about someone being arrested coming in for the
21    truth of the matter that the person actually carried out the
22    crime.  And as Mr. Yalowitz noted, this is the very document
23    that you considered in deciding that the plaintiffs had no
24    admissible evidence that Naef Abu Sharkh was involved in the
25    Mandelkorn bombing incident.  It is just the Israeli Ministry
```

F1cdsok2

1    of Foreign Affairs relaying information communicated by the

2    government press office about some operation that they made an

3    accusation about something.  We don't know the basis.  This

4    isn't some official finding of some investigation.

5            And the related PowerPoint, I can't tell who it is

6    from, and it has no attribution that it was prepared by any

7    particular government official.

8            THE COURT:  Does give any details of what this

9    person's role was supposed to be?

10            MS. FERGUSON:  It gives no detail about who

11    prepared --

12            THE COURT:  No.  I mean, any detail about what

13    Sharkh's role was in the bombing?

14            MS. FERGUSON:  No.  It just says that -- it calls him

15    a senior fugitive of the Tanzim infrastructure in Nablus who

16    was behind a large number of suicide bombings, and then it

17    lists this one.  But, again, there is no independent evidence

18    Mr. Yalowitz has of involvement with Naef Abu Sharkh in the

19    Mandelkorn incident.  That is why the respondeat superior claim

20    has been dismissed from the Mandelkorn case.  So he is now

21    trying to reargue that whole ruling.

22            THE COURT:  Mr. Yalowitz, do you know what he is

23    alleged to have done?

24            MR. YALOWITZ:  I will say that I have custodial

25    statements from co-conspirators saying I got money from Naef

F1cdsok2

1  Abu Sharkh to perpetrate terror activities, to recruit

2  terrorists.  So we have a pretty good idea that he was a funder

3  of terror.  But, you know, you have to kind of put some pieces

4  together.  It is not -- I don't have a conviction.  I don't

5  have a -- I mean, he is not a recruiter.  He doesn't film video

6  wills of terrorists.  He is a money guy.  And they seized his

7  bank accounts.

8         THE COURT:  And he was supposed to have given money to

9  a terrorist who admitted the Mandelkorn incident?

10        MR. YALOWITZ:  That is a gap in my proof.

11        THE COURT:  OK.

12        MS. FERGUSON:  And the custodian statement

13 Mr. Yalowitz is referring to would have to be redacted to

14 remove Naef Abu Sharkh's name because it is only --

15        THE COURT:  I understand.

16        MS. FERGUSON:  There is no other evidence.

17        THE COURT:  All right.  I'm not convinced that this

18 can go in for that purpose.

19        MR. YALOWITZ:  All right.  We will respect the Court's

20 ruling on that and move on.

21        THE COURT:  Is there anything you want to say more

22 about -- because I have similar problems with these just

23 releases from the office.  You have the Prime Minister's office

24 releasing statements about the PA.

25        MR. YALOWITZ:  If I can just walk through a few with

F1cdsok2

1    your Honor?

2             THE COURT:  353 is the next one I have.  I had a

3    problem with 353.  As I said, I'll give you -- I'm sorry.  Yes,

4    I'll give you 354, but I have a problem with the two before

5    that, 339 and 353, for those reasons.

6             MR. YALOWITZ:  You've got to bear with me, your Honor,

7    because I kind of put them out of order.

8             THE COURT:  Basically, it's all of the other documents

9    that give factual recitations that I don't know if there is any

10   underlying proof of or whether or not there is any other

11   independent proof of --

12            MR. YALOWITZ:  OK.  353 I don't care about.

13            THE COURT:  All right.  Let's go past that.

14            MR. YALOWITZ:  Yes.

15            THE COURT:  Then I gave you 354.

16            MR. YALOWITZ:  OK.

17            THE COURT:  What about 365?  I mean, I'm not quite

18   sure --

19            MR. YALOWITZ:  So 365 is a -- it's a recitation by the

20   Israel Ministry of Foreign Affairs of what Israel did when it

21   entered the City of Ramallah and what it seized, which was arms

22   and weapons and individuals, including some of the

23   individuals -- at least one of the individuals who perpetrated

24   an attack in our case.  So like --

25            THE COURT:  Where is the fact that you want?

F1cdsok2

1          MR. YALOWITZ:  So the first fact that I want is

2     starting on the morning of March 29, IDF Central Command forces

3     entered the City of Ramallah, and then here's what they found.

4     Large stores of weapons and arms were discovered during the

5     sweep of the Mukataa compound and other locations in Ramallah

6     as follows.  And they list all these weapons.

7          THE COURT:  OK.  And who are you trying to tie these

8     weapons to?

9          MR. YALOWITZ:  To the PA.

10          THE COURT:  OK.  How do you tie it to anybody who

11     committed any one of these --

12          MR. YALOWITZ:  This goes to PA policy of having

13     illegal weapons and then we tie that, for example, to the

14     conviction of Fuad Shubaki, who was the senior PA finance --

15     Arafat's senior finance associate who admitted and who was

16     convicted of buying weapons for use in terror operations.

17          THE COURT:  OK.  So what terrorist attack are you

18     tying this to?

19          MR. YALOWITZ:  I don't have a particular attack that

20     any of these weapons were used in because they were seized.

21          THE COURT:  OK.

22          MR. YALOWITZ:  This goes more to policy of what are

23     they doing collecting all of these weapons.

24          THE COURT:  Frankly, I don't think it is going to be a

25     surprise to anybody on this jury that the PA accumulates

F1cdsok2

1   weapons.

2          MR. YALOWITZ:  Well, that's --

3          THE COURT:  Or the PLO accumulates weapons.

4          MR. YALOWITZ:  I think that's right but I've got to

5   show them something.

6          THE COURT:  No.  You've got to show them a connection

7   with the plaintiff's causation.

8          MR. YALOWITZ:  This is for policy.  This is not

9   connected to any --

10          THE COURT:  A policy of accumulating weapons?

11          MR. YALOWITZ:  Correct.  Accumulating weapons that are

12   inconsistent with the -- the defendants' thesis is that they're

13   trying to tamp down violence.  OK?  The IDF goes in and seizes

14   a whole bunch of weapons that are used for violence against

15   civilians.  That's a tipoff that maybe they are not really

16   trying to tamp down --

17          THE COURT:  The only thing you just said that I don't

18   see any proof of is that any of these weapons that were seized

19   why used against civilians.

20          MR. YALOWITZ:  I'm sorry, that they were used?  No,

21   they weren't.  They were seized.

22          THE COURT:  So they weren't used against civilians.

23          MR. YALOWITZ:  I agree with that.

24          THE COURT:  So there is not any evidence that -- it is

25   just as consistent with the next time they decided that they

F1cdsok2

1  are going to have a war, or as opposed to the next time that,

2  you know, they are going to have a terrorist attack, I don't

3  see it specifically advancing your argument that they were

4  connected to these terrorist attacks, or that because they have

5  weapons it makes it more likely than not that they were

6  involved in either participating in these terrorist attacks or

7  encouraging these particular terrorist attacks, or terrorist

8  attacks at all.

9        MR. YALOWITZ:  So I don't want to argue that.  I don't

10 want to debate that issue with you.  I do think that having a

11 bunch of weapons laying around in places they shouldn't be is

12 inconsistent with the policy of discouraging violence.  So, for

13 example, we have --

14       THE COURT:  There are a lot of people who would

15 discourage violence but feel that they have a right to arm

16 themselves and protect themselves if necessary.

17       MR. YALOWITZ:  I think it definitely depends on the

18 particularized facts and circumstances.  And, your Honor, I

19 don't want to fight all that hard on this document.

20       THE COURT:  I just want to understand it.  You know,

21 again, I still -- you know, I have the same problems with just

22 general releases about what the Ministry of Finance for Foreign

23 Affairs wants to tell the rest of the world about what they did

24 and why they did it in cryptic, unspecific language, and we are

25 supposed to infer from that, you know, that this must mean

F1cdsok2

1    that, you know, they are seizing weapons that were used in

2    terrorist attacks or weapons that were used in these particular

3    terrorist attacks, because that is not the reasonable

4    inference.  So I have a problem with that.  I think I am going

5    to stick with my ruling.

6            MR. YALOWITZ:  I am fine with that.  I just want to be

7    very clear that this document is a very generalized document

8    about weapons that actually weren't used in any terrorism.

9            THE COURT:  I understand.

10           MR. YALOWITZ:  So I have no problem with the Court's

11   ruling based on that understanding.

12           THE COURT:  As I say, if some of the other documents

13   that you say were seized I find that they have relevance and

14   they are admissible if you can establish, you know, as I say,

15   where it came from, what it purports to be, and the jury can

16   determine whether or not in fact this is a statement by the

17   defendant.

18           MR. YALOWITZ:  So the Court is sustaining the

19   objection on 365?

20           THE COURT:  Yes.

21           MR. YALOWITZ:  OK.

22           THE COURT:  I have also -- I mean, my position would

23   be the same, unless you have a different argument to make, on

24   539.

25           MR. YALOWITZ:  So 539 is an important one.  It

F1cdsok2

1   actually does have seized documents that we rely on.  And you

2   can see them, your Honor.  Like, if you go to, just to give you

3   an example -- a lot of these -- like, if you go to page 5 --

4   no, that is not a good example.  But if you go to page 9,

5   here's a good example.  You can see that -- are you with me,

6   your Honor?

7          THE COURT:  Yes.  Document number 2.

8          MR. YALOWITZ:  Right.  So document number 2 is a list

9   of guys that we can show were engaged in terror and in which we

10  can show that the defendants knew were engaged in terror.

11         THE COURT:  Are these documents in the other document

12  that you had translated and seized?  You have a bunch of

13  documents specifically you say which have you seized.

14         MR. YALOWITZ:  This is one of seized documents.

15         THE COURT:  Is it in one of the other exhibits?

16         MR. YALOWITZ:  I don't think so, your Honor.  I think

17  this is my source for document number 2.

18         THE COURT:  And what do you say that it purports to

19  say?

20         MR. YALOWITZ:  It shows -- it is a request from Marwan

21  Barghouti to Yasser Arafat asking that these individuals be

22  paid.

23         THE COURT:  OK.

24         MR. YALOWITZ:  And then our expert will confirm that

25  this sort of text that is kind of angled off to the side in the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1cdsok2

1    Arabic, that's Yasser Arafat's approval and Yasser Arafat's

2    signature.

3            THE COURT:  Do you claim that any of these individuals

4    were related to any of these, or you just in general want to

5    show their support of terrorism?

6            MR. YALOWITZ:  Pattern of paying Al-Aqsa Martyrs

7    Brigades members before they were designated to show that it

8    continued after the designation.

9            THE COURT:  OK.  I mean, in the abstract, I thought --

10   the evidence itself I don't have a big problem with because I

11   thought that there was going to be other evidence, if not

12   plenty of evidence, that you intend to offer that financial

13   support was given to the --

14           MR. YALOWITZ:  This is a really impactful example and

15   there is other evidence, but, you know, we don't have, like,

16   wire transfer instructions or checks saying pay to the order of

17   the Al-Aqsa Martyrs Brigades.  You have to piece it together.

18           THE COURT:  Where do you say this document comes from?

19           MR. YALOWITZ:  This document was seized by the

20   government of Israel in that operation Defensive Shield.

21           THE COURT:  Where do you say this exhibit comes from?

22           MR. YALOWITZ:  This exhibit is from the Ministry of

23   Foreign Affairs.

24           THE COURT:  Well, I mean, how do you -- and how did

25   you retrieve it?

F1cdsok2

1          MR. YALOWITZ:  The Israel Ministry --

2          THE COURT:  No.  How did you get it is what I want to

3     ask you?

4          MR. YALOWITZ:  We got it from the Israel Ministry of

5     Foreign Affairs' website.

6          THE COURT:  The website?

7          MR. YALOWITZ:  Yes.

8          THE COURT:  So this came off the Foreign Affairs'

9     website.  And is there anything else other than a general

10    discussion of the PLO and Arafat being involved in terrorism,

11    is there anything else specifically in this report that you say

12    is relevant other than this one document that is referenced on

13    page --

14         MR. YALOWITZ:  That was an example.  It is just an

15    example I happened to flip through --

16         THE COURT:  Do you have something else?

17         MR. YALOWITZ:  No.  For example, I will give you

18    another example of a statement that I find very useful.  Based

19    on the granular analysis of these documents, they've reached

20    some summary conclusions.  For example, item number 2 on the

21    very front page:  "The closest aides to Arafat responsible for

22    terrorist activity are Head of General Intelligence Tawfiz

23    Tirawi and financier Fuad Shubaki."  And Fuad Shubaki later was

24    convicted of financing terror.

25         THE COURT:  OK.

F1cdsok2

1          MR. YALOWITZ:  And Tawfiq Tirawi is implicated as

2     having had a role in the Wafa Idris attack.  He is the one that

3     that letter is about.  He is implicated as having had --

4          THE COURT:  Which letter?

5          MR. YALOWITZ:  The letter -- 233, the letter saying

6     Tirawi knew about it --

7          THE COURT:  Why do you need this report?

8          MR. YALOWITZ:  I like having it in the English

9     language so the jury can see that I'm not the only one saying

10    it.

11         THE COURT:  OK.  And so you say this is what?  What

12    does this purport to be?

13         MR. YALOWITZ:  It is a report describing the results

14    of a legally authorized factual investigation conducted by the

15    government of Israel.

16         THE COURT:  OK.

17         MR. YALOWITZ:  And it states facts found in those and

18    conclusions drawn from those facts.  You know, what some people

19    call like meta facts or bigger facts.

20         MS. FERGUSON:  Your Honor, if I can just address

21    Mr. Yalowitz's contention?

22         THE COURT:  Yes.

23         MS. FERGUSON:  The report is a Ministry of Foreign

24    Affairs' website relaying a report prepared by somebody named

25    Danny Neva (phonetic), who is a minister of parliamentary

F1cdsok2

1    affairs.  I don't know what his expertise is, whether he was

2    legally authorized to conduct an investigation, how he

3    conducted his investigation, how he came to these conclusions,

4    and yet Mr. Yalowitz wants to put before the jury Danny Neva's

5    conclusions.

6         THE COURT:  Well, I certainly read that these

7    conclusions made the reference adopted.

8         MS. FERGUSON:  Can I ask you to turn to page 2, where

9    right before Danny Neva's name it says, "All allegations made

10   in this report" -- and then it says "allegations" -- not

11   binding, "all allegations" -- this is the full material right

12   under paragraph 35.  "All allegations" -- not binding -- "made

13   in this report are true Israeli intelligence as a result of the

14   Israel campaign to eradicate the sources of terror in the areas

15   under the control of the Palestinian Authority."

16        So this is a political speech coming from the Ministry

17   of Foreign Affairs, some report by somebody we have no idea

18   what he basis it on, what his expertise was, and Mr. Yalowitz

19   wants to offer it for these findings on the front page.  This

20   is patent hearsay.  In addition, he wants to rely on this

21   particular document -- in fact, I think he did pick the one

22   that he thinks is his best one, and it doesn't say very much.

23   It says at best that $350 was given to some individuals who had

24   no connection with this attack.  That is his best document.

25   This is Mr. Yalowitz's material support case.  He doesn't have

F1cdsok2

 1    the documents.  He has Danny Neva's photocopies and summaries.

 2    And he wants to have the PA found liable for terrorism based on

 3    this?  This is his material support case he is looking at right

 4    here.

 5              THE COURT:  You know, Mr. Yalowitz, my position is

 6    this, that if you -- I have confidence with regard to the

 7    reliability and admissibility, at least for admissibility

 8    purposes, of these other documents that the Israeli government

 9    represented as being seized and they show the document and they

10    translate the document.  That gives me some degree of comfort

11    about its trustworthiness and its reliability to overcome the

12    objections that have been made by the defendant.  But this is a

13    different kind of a document.  And my position would be,

14    consistent with at least that theory -- and we can come back

15    and revisit it -- consistent with that approach, I don't think

16    that this document has a sufficient basis on which the

17    conclusions are being drawn that will give either me or the

18    jury reason to believe that somehow this is, you know, based on

19    some direct evidence, as you've referenced in these others.

20              Is there some reason why you have these other

21    documents and not this document?

22              MR. YALOWITZ:  I'm sorry.  I just didn't understand

23    The court's question.  I want to answer the Court's question.

24              THE COURT:  Yes.  I mean, for example, you give -- as

25    an example, you say that the document that was seized has

F1cdsok2

 1   Arafat's signature on it approving payment to certain

 2   individuals.  You have a lot of those documents, and you have a

 3   lot of translations of those documents at the end.

 4              MR. YALOWITZ:  Right.

 5              THE COURT:  Is there some reason why that document is

 6   not available to you?

 7              MR. YALOWITZ:  This is my source for that document.

 8              THE COURT:  Yes.

 9              MR. YALOWITZ:  So --

10              THE COURT:  You have more direct sources for some of

11   these other documents.  You have given me the document and the

12   English translation of the document.

13              MR. YALOWITZ:  In some cases I have the document.  In

14   other cases I have a reproduction of a document in a government

15   report.  As long as I can use -- as I understand the Court's

16   ruling, you don't want me to put in front of the jury the kind

17   of ultimate analysis that the report is making, and I think I

18   can -- I don't have a problem with that.  If I can use the raw

19   material that's embedded in the report, I think that's enough

20   for me.

21              MS. FERGUSON:  Your Honor, I don't know how this raw

22   material got embedded in Danny Neva's, the Ministry of Finance,

23   report.  I think this is very different from something that

24   more directly purports to reproduce the document.

25              MR. YALOWITZ:  I have no problem, your Honor, giving

F1cdsok2

 1    adequate foundation for that and making the link.  That is not

 2    going to be an issue.  I just want to use the documents.

 3              MS. FERGUSON:  Mr. Yalowitz doesn't disclose a witness

 4    who will lay a foundation for these documents.

 5              THE COURT:  How do you intend to demonstrate that

 6    these documents were documents seized -- I don't know even

 7    where these documents were gotten from.  Where do you contend

 8    these documents came from.

 9              MR. YALOWITZ:  They came from the Palestinian

10    Authority.  They are the Palestinian Authority's documents.

11              THE COURT:  How do you contend that they came into the

12    hands of the person who wrote this report.

13              MR. YALOWITZ:  The IDF, the Israel Defense Forces,

14    went into the PA headquarters in Oregon House (phonetic) and

15    they went into the PA headquarters in the Mukataa, which is in

16    Ramallah, and they seized the documents.

17              THE COURT:  Is that when they seized all these other

18    documents, at the same time?

19              MR. YALOWITZ:  Correct.  Correct.

20              THE COURT:  All right.

21              MR. YALOWITZ:  And they inventoried -- and I've got a

22    witness who can explain.  They inventoried them --

23              THE COURT:  You don't have any better view of this

24    document?

25              MR. YALOWITZ:  I wish I did, your Honor, but, you

F1cdsok2

```
1    know, this is what I've got.  You know, the truth is, when we

2    blow it up on the screen, the jury is going to be able to see

3    it and an expert is going to be able to break it down for you.

4         THE COURT:  Look, you might convince me to be able to

5    utilize the documents that purport to be seized and purport to

6    be, those portions -- well, the documents themselves and the

7    translation of the documents if you say that that is relevant,

8    if the foundation can be laid that they were seized at the same

9    time that these other things were seized and that is what the

10   documents say.  The report itself I have a concern with.  Even

11   the example that you reference, this statement, as the report

12   is written, says in a letter addressed to Fuad Shubaki and then

13   it says, quote, Arafat's crony and confidante.  That is not an

14   objective, fair, you know, factual characterization of the

15   relationship between the two.  He is asking somebody who has a

16   perspective.  His perspective is irrelevant.  OK?

17        MR. YALOWITZ:  I get it.  Your Honor, I think I get

18   the Court's ruling on this, and I think we can work with that.

19   That is not -- I don't need the commentary and analysis.

20        THE COURT:  If you can lay a foundation that these

21   documents are documents that were seized from PLO offices and

22   that these documents are identified as documents belonging to

23   the PLO and the PA and/or identify, you know, that this is

24   Arafat's signature on this document, I don't have a real

25   problem -- I don't have the same problem that I had with the
```

F1cdsok2

1    rest of the report, the documents themselves.  I don't know if

2    you can sufficiently lay the foundation as to why you say it is

3    what it purports to be.  But if you can overcome that, as far

4    as I am concerned, at that point it is simply a statement by a

5    party opponent.

6              MR. YALOWITZ:  Correct.

7              MS. FERGUSON:  Your Honor --

8              MR. YALOWITZ:  I think we will be fine with that.

9              MS. FERGUSON:  I'm sorry.  There is a relevance

10   objection because these documents have nothing to do with the

11   attacks at issue.  These individuals have nothing to do with

12   the attacks at issue.  And even as to this document, one, that

13   Mr. Yalowitz wants to show the jury, it has got a parenthetical

14   note.  The document number two, which Mr. Yalowitz highlighted,

15   that lists individuals who allegedly received $350, it says:

16   "Note, these activists are known FATA operational activists in

17   Kulkar (phonetic) who were involved in lethal attacks."  Now,

18   that is not something that was in the PA document, that was

19   something that Mr. Neva has inserted.  I have a problem with

20   these documents going to a jury.  They are irrelevant and it is

21   part of a -- they are a politicized report that was prepared --

22             THE COURT:  If you can lay a little foundation that

23   these documents are documents that were seized and that they

24   appear to be or in fact are documents in the possession or were

25   created by the PLO, the PA, depending on how you can do that --

F1cdsok2

1    with Arafat's signature, it probably is a little easier than

2    somebody who is not known generally without it, but if you can

3    lay that, I am going to allow you to offer the document -- the

4    underlying document and its translation.  That is it.  Not any

5    commentary by this person who wrote the report, not any

6    assessment about whether or not he thinks these are Arafat's

7    cronies, all of that.

8         MR. YALOWITZ:  That is how I understood the Court's

9    ruling.  I am good with that.

10        THE COURT:  You look at that.  You put it in a form so

11   that they can see it.  You give it with however you want to

12   attach the translation, and I think I would be willing to give

13   you that but not the exhibit as you have it.

14        MR. YALOWITZ:  Understood.

15        THE COURT:  All right.

16        MR. YALOWITZ:  All right.

17        THE COURT:  Also, my position is that I think 547

18   doesn't appear to be admissible for any purpose.

19        MR. YALOWITZ:  The reason -- there is only one reason

20   I care about 547, your Honor, which is I want the jury to know

21   the total number of fatalities during the years 2000 to 2004 in

22   the series of terror attacks and that is these two graphs.

23        MS. FERGUSON:  Your Honor, that is just --

24        MR. YALOWITZ:  May I?

25        THE COURT:  Go ahead and finish.

F1cdsok2

1            MR. YALOWITZ:  I am perfectly happy to just put the

2       graphs in front of the jury, but I think that there is nobody

3       who understands better the number of terror fatalities and

4       casualties than the Israeli Security Agency, which is the

5       agency charged with preventing attacks.  Every single one of

6       these numbers is a failure by that agency to prevent terror.

7            THE COURT:  Well, I can't accept that.  I can't --

8       one, I think that is more prejudicial than probative to simply

9       try to say there is a high level of violence, let's make the PA

10      personally responsible for each one, when that is not the case

11      we're proving here, nor can that case be proven at all, that

12      the PA or the PLO is legally responsible for every act of

13      terrorism that you claim happened in Jerusalem over a ten-year

14      period.  So I think that that is not appropriate.  I think

15      that, no, the jury cannot come to the conclusion that simply

16      because there are a lot of terrorist attacks, it makes it more

17      likely that the PA was involved in the terrorist attacks here

18      at issue.  I can't accept that.

19            MR. YALOWITZ:  I think it's useful -- look, I don't

20      want to wallow on this.  It's not a critical point for the

21      case.

22            THE COURT:  All right.

23            MR. YALOWITZ:  I think it is useful background for the

24      jury to understand because part of my burden is to show that

25      these attacks were to coerce and intimidate the civilian

F1cdsok2

1    population, and a sustained campaign of terror is an element of

2    that --

3            THE COURT:  Yeah, but we can't go into a side trial on

4    every other act of terror to try to prove whether or not the PA

5    should be responsible for that.

6            MR. YALOWITZ:  All right.  I understand your ruling.

7    Let's go to the next one.

8            THE COURT:  554 -- so we can move on, 554, I don't see

9    why this is in this.

10           MR. YALOWITZ:  I am fine with 554 being out, your

11   Honor.

12           THE COURT:  Again, I have the same issues as we

13   discussed with regard to 559.

14           MR. YALOWITZ:  Look, your Honor, 559 and 1109 are very

15   important documents for the Guetta case, and so I want your

16   Honor to understand what they show.  I think I gave your Honor

17   the demonstrative we created from these reports --

18           THE COURT:  OK.

19           MR. YALOWITZ:  -- which show the sort of spread of

20   attacks in and around the area of Ramallah during the first --

21           THE COURT:  Yes, I did look at that.

22           MR. YALOWITZ:  -- 18 months.

23           THE COURT:  This is the MO that you say you want to

24   rely upon now that you say you had withdrawn --

25           MR. YALOWITZ:  That is exactly right.

F1cdsok2

```
1            THE COURT:  -- the testimony identifying certain

2     individuals?

3            MR. YALOWITZ:  Correct.  So these are the kinds of

4     reports that experts rely on to show a pattern.  They are

5     not -- none of the reports in this case are -- none of the

6     attacks --

7            THE COURT:  I don't understand.  Tell me specifically,

8     what is it in this report that would lead one to that

9     conclusion?

10           MR. YALOWITZ:  This is a report saying here is the

11    location of attacks by this cell, and these are the individuals

12    in the cell who we've now captured and so we have solved

13    this --

14           THE COURT:  Where does it say that in 559?

15           MR. YALOWITZ:  "The Israel Security Agency and IDF

16    forces arrested a number of terrorists who are suspected of

17    perpetrating many shootings that have killed and wounded

18    Israelis."

19           THE COURT:  OK.

20           MR. YALOWITZ:  Then they say -- bear with me.  I am

21    just having a little trouble reading my exhibit.

22           (Pause)

23           They say, "Six members of the terror cell are

24    currently being interrogated.  The cell belongs to 417."

25           THE COURT:  OK.
```

F1cdsok2

1           MR. YALOWITZ:  "And its members are suspected of

2     perpetrating shooting attacks in the Ramallah area and the

3     Samaria area.

4           THE COURT:  All right.  And you say that is in

5     conjunction with what exhibit?

6           MR. YALOWITZ:  1109.

7           THE COURT:  And 1109 supposedly represents what?

8           MR. YALOWITZ:  1109 is another statement communicated

9     by an IDF spokesman saying that the IDF targeted a 417

10    terrorist and that that terrorist and one of his

11    co-conspirators committed the following attacks.

12          THE COURT:  Right.

13          MR. YALOWITZ:  And so the question is whether it is

14    reasonable for an intelligence analyst to rely on reports like

15    this.

16          THE COURT:  Well, that is not exactly -- the answer to

17    that is yes, they can rely on that.  But the biggest problem

18    that I have with this and what you have left with the Guetta

19    case is that they analyzed a bunch of terrorist attacks.  The

20    one that is conspicuously absent is this one.  They never

21    attributed this one or made any conclusion that this one had

22    anything to do with, had any pattern that was consistent with,

23    that they were suspected of -- because they did these others,

24    they were suspected of doing this one.  That is a conclusion

25    you want them to draw from their documents that don't draw that

F1cdsok2

1   conclusion.

2           MR. YALOWITZ:  That sounds like if -- I hope

3   Mr. Rochon was taking notes because that sounds like something

4   that he ought to say to the jury in summation.  The fact that

5   they didn't --

6           THE COURT:  You've got to convince me, in conjunction

7   with that, that you have enough evidence that I shouldn't grant

8   them summary judgment at this point in time because the main

9   evidence that you were relying upon previously was an

10  identification that they significantly and severely attacked a

11  later identification by a witness who was going to tie a PLO

12  associate or PA employee with this attack.  You have withdrawn

13  that evidence.

14          MR. YALOWITZ:  I have.

15          THE COURT:  So now you want to say that this attack is

16  consistent with an MO that should lead the jury to conclude

17  that the people who committed those other terrorist acts must

18  have also committed this terrorist act.  And you rely on an MO

19  that, one, there is a shooting on a motorcycle, which,

20  unfortunately -- I don't know if it was a motorcycle.

21          MR. YALOWITZ:  Auto.

22          THE COURT:  An auto shooting, which I don't want to be

23  crass about it or insensitive about it, but it is not a

24  particularly unusual set of circumstances in this area, and,

25  two, that it covers an area of Jerusalem, in the environs of

F1cdsok2

1    Jerusalem, which, again, is not particularly unique with regard

2    to any of the terrorist attacks that you are pointing out here,

3    you know, what else you refer to as something being unique

4    about this.  But, also, the problem is is that it would be one

5    thing if we were sitting here saying that the Israeli

6    government did a report and they went through it and they

7    analyzed it and they put these five, six, seven, I forget what

8    number of terrorist attacks, on this list and said that these

9    people are suspected of those and they put this terrorist

10   attack on that list, but this terrorist attack is not on that

11   list.  There is nothing that they said that would lead to the

12   conclusion that you want the jury to lead to.

13          I mean, I would think that if anyone had an interest

14   and would swap such evidence that this is related to other

15   attacks and a pattern of other attacks, it is exactly what the

16   Israeli government went through, and they excluded this one

17   after this one had occurred.  So I'm not sure what is the --

18   other than you saying that this is a firing into cars, which,

19   as you say, your chart before we talked about, I don't even

20   know how many firings into cars there must be but I know there

21   are numerous others.  And because it happened in this area, I'm

22   sure most of the attacks happened in this greater area.  I'm

23   not that sure --

24          MR. YALOWITZ:  Actually, here's my issue.  I mean,

25   obviously, the question you raise is of great interest to me.

F1cdsok2

```
 1    Are there a lot of shooting attacks of this MO in this area
 2    during this period of time?  That was an interesting question
 3    you made.  And we went and looked and we didn't see any.  Now,
 4    maybe the defendants have done a better job than me and they'll
 5    come and say, well, here was one, here was one, here was one.
 6               THE COURT:  Well, there are a lot of shootings.  You
 7    are aware of a lot of shootings.
 8               MR. YALOWITZ:  Yes.
 9               THE COURT:  Committed by different individuals.
10               MR. YALOWITZ:  Look, what I'm telling you --
11               THE COURT:  Shooting is not the unique part of this
12    that makes it an MO.
13               MR. YALOWITZ:  Correct.  Shooting car to car, into
14    cars in this area in this timeframe --
15               THE COURT:  Is there some evidence that this is the
16    only group that shoots into cars?
17               MR. YALOWITZ:  I'm saying that in evaluating this
18    evidence, my expert looked at are there other attacks with this
19    MO that are attributable to other groups.  That's a relevant
20    question.
21               THE COURT:  Well, and the MO that he analyzed was an
22    MO, it's got to be a shooting of a car in this area --
23               MR. YALOWITZ:  During this timeframe.
24               THE COURT:  -- during this -- what timeframe are you
25    talking about?
```

F1cdsok2

1          MR. YALOWITZ:  The first, you know, September of 2000

2     to spring of '02.

3          THE COURT:  And he concluded that there are no others?

4          MR. YALOWITZ:  He couldn't find any.

5          THE COURT:  No other what?

6          MR. YALOWITZ:  No other shooting attacks that have the

7     MO that your Honor is describing.

8          THE COURT:  No.  There is no other MO.  He had to say

9     that there is no other shooting attack in this area.  That is

10    the only MO that you give me.  Into cars.  There are no other

11    shooting attacks into cars in this area during this period of

12    time, is that what he is going to say?

13         MR. YALOWITZ:  Attributable to other groups.

14         THE COURT:  What do you mean, "attributable to other

15    groups?"

16         MR. YALOWITZ:  That is the question I ask.  So you are

17    asking me a question that I don't know the answer to so I don't

18    want to misrepresent.

19         THE COURT:  No, I understand that.

20         MR. YALOWITZ:  So I don't know the answer to that

21    question.

22         THE COURT:  All right.

23         MR. YALOWITZ:  Was there ever a shooting?  You know, I

24    don't know.

25         THE COURT:  So the proof on which you want to go to

F1cdsok2

1    the jury and have the jury conclude that the PA was involved in

2    this shooting, is that 417 --

3              MR. YALOWITZ:  More likely than not --

4              THE COURT:  -- had been accused of several other

5    shootings by the Israeli government.  A lot of those shootings

6    you want to argue happened in a similar manner as this

7    shooting.  So, therefore, the jury should conclude that 417

8    members were involved in this shooting and that the PA and the

9    PLO had what to do with it?

10             MR. YALOWITZ:  Well, that is a second question.

11             THE COURT:  Right.

12             MR. YALOWITZ:  The question on which we have lost a

13   significant portion of our case is the one you just said.  Is

14   it more likely than not that this was a 417 shooting?  When we

15   get past that, I don't think I have a big problem convincing

16   the jury that members of 417 who committed shooting attacks

17   were acting within the scope of their employment, for all the

18   reasons that we have -- their policies, the statements in the

19   police magazines, the discipline of 417.  I don't think that is

20   a real concern.  I'm candidly telling you that without these

21   two exhibits, at least -- either the exhibits or allowing my

22   expert to rely on the exhibits, I don't see that I have a case

23   left for her.

24             THE COURT:  And so you want these two exhibits to

25   demonstrate what?

F1cdsok2

1            MR. YALOWITZ:  To demonstrate the location, timing and

2    modus operandi of the attacks attributed by my expert to 417.

3            THE COURT:  What would you say -- I think I tried to

4    figure it out.  But what would you say is the general

5    geographic area, the size of the geographic area that you are

6    using here?

7            MR. YALOWITZ:  I think that it's --

8            THE COURT:  Several miles?

9            MR. YALOWITZ:  Yeah.  The distance from Ramallah to

10   Jerusalem is seven miles.  If you look at the spread on a map,

11   most of these are within three to five miles of --

12           THE COURT:  Would it be accurate to say that most of

13   the terrorist attacks, or at least most of the terrorist

14   attacks at issue here and probably most of the terrorist

15   attacks took place in that geographical area?

16           MR. YALOWITZ:  No.  No.  That is actually not

17   accurate.

18           THE COURT:  OK.

19           MR. YALOWITZ:  The thousand people dead and the 5,000

20   people wounded were from all over Israel and from all over the

21   West Bank.

22           THE COURT:  I know.  But the ones that -- I mean, of

23   the ones that happened in and around Jerusalem, I mean, there

24   are a significant number that happened in and around Jerusalem.

25           MR. YALOWITZ:  Yes, that's true.

F1cdsok2

1          THE COURT:  There is nothing unique about that.

2          MR. YALOWITZ:  Right.

3          THE COURT:  Because they happened in or around

4  Jerusalem doesn't distinguish it as someone's, you know, MO.

5          MR. YALOWITZ:  Right.

6          THE COURT:  That it happened in and around Jerusalem.

7  So that is not particularly compelling.

8          And the fact that it is a shooting doesn't distinguish

9  it from probably most of the terrorist attacks in and around

10 Jerusalem because probably most of them were shootings, not

11 bombings, right?

12         MR. YALOWITZ:  I'm with you.

13         THE COURT:  And the fact that there was a shooting in

14 a car, towards a car, or towards people in a car, are you

15 saying that that is somehow unique to 417?

16         MR. YALOWITZ:  I believe that the MO of driving up to

17 a car, cutting it off, and having four guys pop out with AK-47s

18 and rake the car with bullets was the MO of 417.

19         THE COURT:  OK.  But it didn't -- nobody else does it

20 that way?

21         MR. YALOWITZ:  I think that if the defendants have

22 evidence that other people do it that way, my expert is not

23 going to be very persuasive.  I couldn't find evidence like

24 that.

25         MS. FERGUSON:  Your Honor, if I could just address

F1cdsok2

1    this MO point?

2            THE COURT:  Sure.

3            MS. FERGUSON:  Mr. Yalowitz's own exhibit, which

4    should not come in as a public records exception, belies the

5    notion that there is some sort of 417 MO.  If you look at 1109,

6    which the Israeli Ministry of Foreign Affairs captions, "417

7    terrorist, known as Said Naderia (phonetic)," it describes

8    attacks that they accused him of.  One is a shooting at the

9    National Insurance Building, so not a car.  Another was a

10   shooting attack on a bus.  If you move on, there is a reference

11   to a roadside bomb.  I mean, there is no distinctive MO for

12   417, even according to the Israeli Ministry of Foreign Affairs.

13           And I would just emphasize again that there was no

14   finding by the Israeli Ministry of Foreign Affairs that 417

15   even did any of these shootings that are identified; it is just

16   they suspected people of it.  And a reasonable jury cannot find

17   based on the fact that the Israeli Ministry of Foreign Affairs

18   is reporting that some people were suspected of some shootings,

19   so, therefore, a PA employee carried out an entirely different

20   shooting.  I mean, this is -- it is almost incomprehensible

21   that we are even debating whether this gets to a jury.

22           (Continued on next page)

23

24

25

F1czsok3                          Conference.

1          THE COURT:  I'm not sure what you say the pattern is

2     with regard to Karsh.  I don't see such a pattern.

3          MR. YALOWITZ:  I think that your Honor's right here,

4     it's shootings.

5          THE COURT:  So you have shootings in and around a

6     several mile radius of Jerusalem.

7          MR. YALOWITZ:  Several mile radius of the 417

8     headquarters.

9          THE COURT:  Well, several mile radius of Jerusalem

10    too.

11         MR. YALOWITZ:  Although it's the pattern is really

12    more toward their headquarters, but.

13         THE COURT:  Which is --

14         MR. YALOWITZ:  They're so close that -- I mean we're

15    debating semantics.

16         THE COURT:  But I mean like they're in the north and

17    all these happened in the north or something?  I'm not sure

18    what you're --

19         MR. YALOWITZ:  This one in a series happened within a

20    few miles, within 3 miles of the Mukataa.

21         THE COURT:  Let me just look at, what we're going I'm

22    trying to do is to go another 25 minutes unless --

23         MS. FERGUSON:  Your Honor, Mr. Yalowitz's experts

24    testified it was a 15-mile radius, so we should get our facts

25    straight.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1czsok3                         Conference.

1              THE COURT:  I thought it was much.

2              MR. YALOWITZ:  Yeah, I mean I'm looking at -- I'm

3    looking at the map.  It's not -- I mean, there are a couple of

4    outliers, but if you look at the map they're very tightly

5    clustered.

6              MS. FERGUSON:  We don't have a scale for the map, I

7    mean the map's just frankly a little silly.

8              MR. YALOWITZ:  Your Honor --

9              THE COURT:  Well, the --

10             MR. YALOWITZ:  Ms. Ferguson I think knows that the

11   Mukataa is 7 miles from Jerusalem.  She's been there, I'm sure.

12             THE COURT:  You know what, I have two real problems

13   with this.  One is that, as I say, the conclusion you want them

14   to draw from the Israeli reports are not the conclusions their

15   Israeli reports draw.  And two, you know, most of these Israeli

16   reports are -- they don't hesitate to, as they say, point the

17   finger at the PA and the PLO when they say they have such

18   evidence.

19             These reports don't do that.  These reports don't even

20   say that the PA or PLO had anything to do with these.  So I

21   mean -- which is, quite frankly, unusual rather than usual;

22   that if they suspected the PA or PLO to be directly involved in

23   that, I would have expected, given the nature of the reports

24   that you produced, that it would have said that.  It doesn't

25   say that the PA or PLO had any involvement in this.  It says

F1czsok3                         Conference.

1    that they think 417 did, but it doesn't say that 417, having

2    known that this, the attack in this case had already taken

3    place when this final report was written.  It doesn't say that

4    oh, and by the way, let's add this other terrorist act and that

5    is the same -- that we have a reason to believe is the same

6    committed by the same individuals.

7         So they've not concluded in this report that this

8    attack was committed by the same individuals, based on any

9    evidence that they have, nor do they reach that conclusion

10   based on the way you want the jury to reach that conclusion.

11   They don't say -- and I, quite frankly, one would suspect that

12   they would not be hesitant to say so, if there was a pattern

13   that was clearly discernible that both a lay person and a

14   professional would recognize.  And you're not asking the

15   professional to recognize this, to accept this.  You're asking

16   lay people to recognize this and accept this, when there is no

17   conclusion whatsoever by this report that they have anything to

18   do with any other attacks, other than the -- I mean, you have

19   12 attacks.  I mean, you have to admit that to say they have 12

20   attacks that were committed by these, by 417 as of March 2002

21   to have this attack not on that list is conspicuously absent.

22        MR. YALOWITZ:  So let me just try to make four points

23   with you, your Honor, and I know you're thinking hard about it.

24        THE COURT:  I'm also thinking of it in the context of

25   your summary judgment.

F1czsok3                          Conference.

1           MR. YALOWITZ:  I understand that.

2           THE COURT:  This is critical.

3           MR. YALOWITZ:  I understand that, that's –– and I mean

4    in candor that's why, as soon as I understood what I was doing

5    with that ID, I brought it to you, because I didn't want to ––

6           THE COURT:  Right.

7           MR. YALOWITZ:  There was ––

8           THE COURT:  Because this was not the main evidence

9    that overcame their motion.

10          MR. YALOWITZ:  I agree with that.

11          THE COURT:  For summary judgment.

12          MR. YALOWITZ:  I agree with that.

13          THE COURT:  Initially.

14          MR. YALOWITZ:  That's why I brought it to your

15   attention.  I agree with that and that's why we're having this

16   discussion, because I brought it to your attention.

17          THE COURT:  Yes.

18          MR. YALOWITZ:  Okay.  Four items.  Item number one,

19   the link between 417 and PA.  I'm being very candid, I'm not

20   going to have a problem with that, okay.

21          THE COURT:  Right.  But I'll, for the purpose of this

22   argument ––

23          MR. YALOWITZ:  Grant me that for the purpose of this

24   argument, okay.

25          Item number two, the absence of this attack on that

F1czsok3                          Conference.

1      list of 12.  I think is a cross question, it's a jury question.

2      If everything else about this list was great and it was the

3      exact same MO of the exact same place, you know, I don't think

4      we'd be having the conversation because this wasn't on the

5      list.  That's what people do with attribution.  So I think

6      that's a thing they can argue to the jury.  I don't think it's

7      a thing that says no reasonable juror could say that that

8      because it's not on the list it can't be that it's part of the

9      same group.  Okay.

10          Number three is a professional, does a professional

11      think that this is the same MO by the same group, and would a

12      professional attribute it to this group.  You know --

13          THE COURT:  Not the professionals who wrote the

14      report.

15          MR. YALOWITZ:  Not those professionals.  But my

16      professional came from the same agency and who I said, look,

17      you know, I need to -- I mean, I'm not going to -- he believes

18      that, he believes, based on his professional experience, that

19      this attack is attributable to 417 based on -- and he comes

20      from that agency, so.

21          THE COURT:  And we're talking about who, Levitt?

22          MR. YALOWITZ:  Shrenzel.

23          THE COURT:  Oh, Shrenzel.

24          MR. YALOWITZ:  Shrenzel.  So I mean, I'm representing

25      to you that he will say, without the ID, it is my professional

F1czsok3                        Conference.

1    opinion, based on this evidence, I'm telling you what the

2    evidence is, that this was a 417 attack.

3            Now, that may not be an adequate -- ultimately, it's

4    your conclusion and I understand that, but I want you to

5    understand the facts that this is his professional judgment

6    without the ID and -- I mean I have no doubt that that's going

7    to be his testimony.

8            THE COURT:  Well --

9            MR. YALOWITZ:  And so --

10           THE COURT:  Go ahead.

11           MR. YALOWITZ:  So really the question for the Court

12   is, given those three facts or given those three things, are

13   you going to keep him out, because his opinion is going to be,

14   subject to questions and -- I mean, I understand the questions,

15   I understand the weakness of this case without the ID.  I

16   really do.  The question is is it for the -- could a reasonable

17   jury conclude that it is more likely than not.  It's not must

18   have, it's not had, not beyond a reasonable doubt.  Could a

19   reasonable jury listen to this professional, evaluate his

20   views, and conclude that it is more likely than not that this

21   was a 417 attack.  That's the question for the Court.

22           THE COURT:  Well, the problem, part of the problem I

23   have is that I'm not sure that's a professional opinion.  I

24   mean, all he's saying to us is what you said to us.  I accept

25   your word as strongly as I would his.  You say because they're

F1czsok3                        Conference.

1    all in the same area and were shootings, drive-by shootings as

2    we call them, that's what we'll say because they were in the

3    same general area of where 417 is and within miles of each

4    other, and were driveby shootings, that it must mean that the

5    reasonable conclusion is the 417 did this.

6             MR. YALOWITZ:  And that we can't find others of a

7    similar pattern.  In other words, if there were five gangs

8    operating in the area, I mean this is -- I think this is the

9    basis for his views.  If there are five gangs operating in a

10   neighborhood in New York City, how do you know who did the

11   crime?  But if there's one gang and they control the turf and

12   it's their turf and the crime fits their profile, that -- I

13   mean those kinds of attribution experts testify all the time

14   even in criminal cases.

15            THE COURT:  But I don't assume that he's going to be

16   able to say that there no driveby shootings other than these in

17   this area.

18            MR. YALOWITZ:  Well --

19            THE COURT:  I mean, if you tell me that they're going

20   to -- that he's going to say these are the only driveby

21   shootings within this radius, that might be somewhat more

22   compelling, but --

23            MR. YALOWITZ:  Well, let me find out what he would say

24   to that question, because I don't know the answer, your Honor,

25   but I can find out and send the Court a letter this afternoon.

F1czsok3                        Conference.

1          THE COURT:  It's sort of like saying to me, well, over

2     the last two years in downtown Manhattan there were 12

3     robberies of banks, Chase banks in which the robbers used a gun

4     and gave them a note saying put the money in the bag.  We find

5     that there is a robbery of the Capital One Bank downtown, so

6     the reasonable conclusion is the person who robbed the Capital

7     One bank with a gun handing them a note saying put the money in

8     the bag, it's got to be the same person people who did the

9     other 12 that are scattered around the area.

10          MR. YALOWITZ:  Let me come -- I don't think it's the

11     same.  I think it's more like -- I mean, I think that it's --

12     there is rivalries here between the PA and other groups like

13     Hamas.  I don't think you get four guys popping out of the

14     window shooting people with machine guns every, you know,

15     just -- it's not street crime.

16          THE COURT:  See I don't think there is much detail in

17     his report about that.  I have to go look at his report.  But I

18     don't think his report really concentrates on that because that

19     really wasn't the crux of your case, before --

20          MR. YALOWITZ:  It does.  His report does go through

21     this issue.  He relies on these exhibits.

22          MS. FERGUSON:  Exactly.  He relies on these exhibits.

23          MR. YALOWITZ:  He does rely.

24          MS. FERGUSON:  And the identification.

25          MR. YALOWITZ:  If I may be heard, your Honor?

F1czsok3                         Conference.

1            THE COURT:  Let him finish, then I'll hear from you.

2    Go ahead.

3            MR. YALOWITZ:  Thank you.  Look, I will ask my expert

4    any question that the Court would like me to.  It is not in my

5    interest to promise something --

6            THE COURT:  All right.

7            MR. YALOWITZ:  -- and then not deliver it tomorrow.

8            On the other hand, I do think that -- I do think that

9    it is for the jury to decide how reliable his conclusion is

10   based on the facts and circumstances which are I think

11   different from bank robberies in Manhattan.

12           THE COURT:  I'm just not sure what it is in his

13   expertise he knows that we don't know, and why it makes it an

14   expert be able to say, oh, sounds the same to me as opposed to

15   anybody else.

16           MR. YALOWITZ:  It's I know the territory, I know the

17   groups that operate in the territory, and I'm telling you this

18   was the group that operated in the territory, not them.  You

19   know, the bloods didn't go up to that area at that time.  It's

20   that kind.

21           THE COURT:  Did you want to add something?  Because I

22   want to speed this up?

23           MS. FERGUSON:  Well, your Honor, I just want to

24   emphasize that the core documents that Mr. Yalowitz wants to

25   put in front of the jury are documents that come under the

F1czsok3                        Conference.

1    public records exception.

2              THE COURT:  Which documents?  These two documents.

3              MR. HILL:  The Ministry of Foreign Affairs Press

4    Releases about accusations that the IDF has made that they've

5    heard about them from an IDF spokesperson.  That's not a public

6    record.  So the only thing Mr. Yalowitz has is Shrenzel who is

7    relying on these very documents and Ms. Guetta's identification

8    to say now we've drawn.  That other stuff was not disclosed to

9    us in his expert report, and there simply isn't enough that a

10   reasonable jury could find, based on these, evidence that

11   shouldn't even get to them, these Ministry of Foreign Affairs

12   website materials that a PA employee carried out this attack.

13   I mean, if this makes it to a jury, I mean then anything can.

14   There's nothing here.

15             THE COURT:  Well, is there a particular person that

16   you say that there's evidence of that participated, who was

17   associated with 417 that participated in this attack?

18             MR. YALOWITZ:  I don't have an ID.  So I know who the

19   terror cell members were, but I can't link any of them.  I

20   can't -- you know, I'm not going to present evidence to this

21   Court and this jury that this guy was one of the four shooters.

22             THE COURT:  But is it your position --

23             MR. YALOWITZ:  I couldn't do that.

24             THE COURT:  I couldn't understand whether it was your

25   position that every single person in 417 is a terrorist who

F1czsok3                        Conference.

1  committed terrorist acts.

2              MR. YALOWITZ:  No.  That is not my position.

3              THE COURT:  Okay.  So how do -- so that's even more

4  difficult.  How do I pick which ones are you saying are

5  supposed to be the ones that are responsible that are supposed

6  to be connected to the PLO?

7              MR. YALOWITZ:  There was a pretty well defined group

8  who were.  They were well known within the intelligence

9  community.  It was understood who they were, and in fact the

10  head of 417 actually went to jail for being involved in

11  terrorist activity, so.

12              THE COURT:  Okay.  Finally, let me just ask, then

13  we'll move on and then come back to you.

14              MR. YALOWITZ:  Okay.

15              THE COURT:  What is your reasonable or your expert's

16  reasonable explanation for why no one associated, no one in

17  Israeli government associated any of 417 to this attack?

18              MR. YALOWITZ:  I don't know the answer to that

19  question, your Honor.  If I knew it, I would tell it to you.

20              THE COURT:  Okay.  No, that's candid.

21              I want to address -- I may have to address it in the

22  context of the objection.

23              MR. YALOWITZ:  All right.

24              THE COURT:  So I don't see this summary of four years

25  of conflict, I don't see that to be admissible for the time

F1czsok3                          Conference.

1  being.

2          MR. YALOWITZ:  Summary, I'm sorry, this is six?

3          THE COURT:  No 554.

4          MR. YALOWITZ:  554.  We're fine not using 554, your

5  Honor.

6          THE COURT:  Okay.  So let me get to some things that I

7  do find admissible.  559 is the same.  That's what we just --

8          MR. YALOWITZ:  We just spent quite a bit of time on

9  559.

10          THE COURT:  626.

11          MR. ROCHON:  Judge, is 559 in or out?

12          THE COURT:  559 is -- I hadn't made up my mind yet

13  because I want to figure out whether the case is still around

14  whether it's in or out, so I'm going -- I want to just address

15  that in the same context we'll come back to that.

16          626 I'm prepared to give that if you could demonstrate

17  that, you know, it was retrieved from a certain location, or I

18  don't know where you got that this from.

19          MR. YALOWITZ:  We can authenticate it.

20          THE COURT:  Right.  You can show where it came from,

21  and what it purports to be.  It is represented to be documents

22  which the jury could look at to determine whether or not it

23  appears to be documents that of the PA or PLO.

24          MS. FERGUSON:  Your Honor, if I could just be heard on

25  626?  It's mostly not reproducing documents captured.  It's

F1czsok3                              Conference.

1    called Arafat and PA's involvement in terrorism according to

2    captured documents, and then it contains, you know, just a lot

3    of discussion and summary and characterization.  So I just want

4    to be clear the document in its current form would not be

5    admissible.

6              THE COURT:  No, I disagree with that.  Since it's only

7    analyzing the documents themselves, and it's not making an

8    independent analysis beyond the documents, I think it's an

9    appropriate report and analysis and report.  We know exactly

10   what they're relying upon.  If any of their conclusions are not

11   consistent with these documents, I'm sure that you can point

12   them out.  So I don't see there's anything that I saw in the

13   recitation and their evaluation of the document that would be

14   an unfair characterization of what the documents are.  And what

15   conclusions might be drawn from it, you can argue that those

16   conclusion should be drawn.

17             MS. FERGUSON:  Your Honor, if I could just draw your

18   attention to page seven.

19             THE COURT:  Yes.

20             MS. FERGUSON:  So it says on the top that several

21   expressions of the direct support of terrorism provided by the

22   GIA and other PA intelligent listed below as reflected in the

23   document.  Participation in terrorist attacks.  From several

24   documents that could be learned that intelligence personnel

25   were directly involved in planning, preparing and carrying out

F1czsok3                         Conference.

1     terrorist attacks.

2              So I mean this is highly prejudicial and there's been

3     no foundation laid for how this comes in under the public

4     records exception.

5              THE COURT:  The foundation is they're saying that this

6     is this one reason --either one worn can or can't.

7              MS. FERGUSON:  But who is saying --

8              THE COURT:  It doesn't matter who is saying it.  It's

9     either a reasonable conclusion to draw from the documents or

10    it's not a reasonable conclusion to draw from the documents.

11    The jury's going to say --

12             MS. FERGUSON:  But under the --

13             THE COURT:  Not this person.  I mean she -- obviously

14    they jury's not going to be surprised that the Israeli

15    government believes this is evidence of support of terrorism.

16    The fact is whether the documents do in fact support that

17    position, that's not a fact.  It's an analysis, an analysis in

18    an official report.

19             MS. FERGUSON:  But we don't know who prepared the

20    report, how --

21             THE COURT:  Doesn't matter who prepared it.

22             MS. FERGUSON:  It doesn't manner the public records

23    exception who prepared --

24             THE COURT:  No, because they're analyzing the

25    documents.  They're not making reference to things that are not

F1czsok3                          Conference.

1    in --

2              MR. HILL:  But you're going to allow Mr. Yalowitz

3    to --

4              THE COURT:  I mean if --

5              MS. FERGUSON:  -- present it to the jury as fact, the

6    conclusion?

7              THE COURT:  That's not a fact, no.  It's not a fact.

8    That's their evaluation based on the document.  That's a

9    conclusion.  You can say that that conclusion is not consistent

10   with these documents so it should be rejected.  They could say

11   that the conclusion is supported by the documents, it shouldn't

12   be rejected.

13             MS. FERGUSON:  The other problem is that only a very

14   small percentage of the supposedly captured documents are

15   summarized here, so there could have been any number of other

16   documents that were, you know, exculpatory that were not

17   discussed, so it's are very selective misleading summary.

18             THE COURT:  Well, that's quite a hypothetical, but

19   there is no evidence that there's some exculpatory documents

20   that weren't considered.  I can't assume that that's the case.

21   You may want that to be the case, but there is no evidence that

22   they say they seized these documents.  If the documents say I'm

23   involved in terrorism, you know you can't argue that they

24   didn't put in the documents that say I'm not involved in

25   terrorism.

F1czsok3                        Conference.

            MS. FERGUSON:  Just, there's a problem not, without

knowing the process by which these few documents were picked

and who prepared the analysis and --

            THE COURT:  It doesn't matter because there is -- it's

not analyzing these documents with some other evidence.  It's

analyzing these documents and they're saying that's what those

documents represent, and either these documents do support

those conclusions or they don't support those conclusions.  It

doesn't say along with something else it supports these

conclusions.  So I can't accept those arguments.  I think that

they lay the proper foundation, indicate that these documents

were whatever they're taken from, were represented to be

documents that were seized from the PA, or the PLO, the jury

could look at the documents make their own assessment whether

or not it's reasonable to conclude these are PA documents or

not PA documents, and whether or not what's in the documents

either is consistent with, inconsistent with or supports the

plaintiff's theory that these support their position that they

were involved in terrorist acts.

            MS. FERGUSON:  But, your Honor, I mean findings and

conclusions are being offered by an out-of-court declarant and

we have no opportunity to cross-examine them who --

            THE COURT:  Yeah, because they're totally irrelevant

to the jury's determination.  They may agree with those

conclusions.

F1czsok3                        Conference.

1          MS. FERGUSON:  Then they should be redacted, right?

2          THE COURT:  No, no.  I, as I say, I think this is an

3    official report.  You don't redact conclusions in an official

4    report if it qualifies as a official report simply because you

5    disagree with the conclusion.

6          MS. FERGUSON:  I guess I'm questioning whether it

7    qualifies as a official report.  I think the foundation's been

8    laid to that, for that.

9          THE COURT:  And I think if they tell us where the

10   document came from, and the documents entitled Arafat's and

11   PLA's involvement in terrorism according to captured documents

12   they purport that's what it is, and the jury can decide what

13   weight they want to give it.  So I'm going to allow them to put

14   that in.  And consistent with that I am also going to allow

15   them to put in 631, same thing.

16         MR. ROCHON:  Could we have a proffer of which Israeli

17   governmental entity or maybe it wasn't an Israeli Governmental

18   entity, who prepared this document?

19         THE COURT:  Where you going to say this document came

20   from?

21         MR. YALOWITZ:  It says right on the cover, IDF.  That

22   stands for Israel Defense Forces.

23         THE COURT:  Okay.

24         MR. ROCHON:  So, yeah.  Upper right hand states IDF,

25   so some IDF person prepared the document.  But --

F1czsok3                          Conference.

1          THE COURT:  Okay.

2          MR. ROCHON:  -- we don't know who, of course, and we

3     don't know under what auspices.

4          THE COURT:  They didn't prepare the document that some

5      PLO person prepared the document.

6          MR. ROCHON:  I wish.

7          THE COURT:  Prepared the underlying document.

8          MR. ROCHON:  There is only a few underlying documents.

9     The rest are all these conclusions.  You read this report,

10    there is all sorts of stuff in here that has nothing to do with

11    the documents, Judge.  This is one you need to -- I know Mr.

12    Yalowitz says this is a really important one when he thinks

13    it's a really important one.  This one, Judge, I honestly think

14    is -- this is somebody in the IDF spinning their theory about

15    the role of Arafat supposedly in terror, not based solely on

16    documents, and for that to go to --

17         THE COURT:  Well, I'm not sure what you're referring

18    to.

19         MR. ROCHON:  Well, if you look at the language, that's

20    why it's so -- this requires I think some of the Court's time.

21    So if you look, for instance, they talk about Arafat utilizes

22    the civilian apparatus, his personal associate Fuad Shubaki and

23    middle man and senior fatah activist in the west bank.  It's on

24    page five.  There is no documents cited for that.  There is

25    places in here where they talk about --

F1czsok3                          Conference.

1              THE COURT:  I'm sorry, where are you on page five?

2              MR. ROCHON:  On page five of the actual document in

3    subsection b.

4              THE COURT:  All right.

5              MR. ROCHON:  Where it says at the end, to this end,

6    Arafat utilizes the PA civilian apparatus --

7              THE COURT:  I'm sorry, I'm looking at different page

8    five.

9              MR. ROCHON:  I'm sorry?

10             THE COURT:  I'm looking --

11             MR. ROCHON:  It's says.

12             THE COURT:  Talking about 631 or about another

13   document?  You're not talking about 631, you're talking about

14   because --

15             MR. ROCHON:  626 is what we've just been talking

16   about.

17             THE COURT:  Oh, because I went onto 631.

18             MR. ROCHON:  Oh, I was trying to belabor a point.

19             MR. YALOWITZ:  He was rearguing 626, your Honor.

20             THE COURT:  Okay.  On page five?

21             MR. ROCHON:  We all do that.

22             THE COURT:  What you did.

23             MR. ROCHON:  Just as an example at the end of

24   paragraph it says, to this end Arafat utilizes the PA civilian

25   apparatuses, his personal associate Fuad Shubaki and, quote,

F1czsok3                        Conference.

1  middle man, close quote, and senior fatah activist from the

2  West Bank.

3          THE COURT:  I know, but now I can't accept that.

4  Because it says -- the sentence before that says, according to

5  the captured documents, Arafat is involved personally and this

6  is why the report draws this conclusion.

7          MR. ROCHON:  So.

8          THE COURT:  That's the legitimate thing that could be

9  in any report.

10         MR. ROCHON:  What they say is involved personally.  If

11 they go with the actual documents, your Honor.

12         THE COURT:  No it says -- he personally, he signs

13 allocation of both the small and large amounts to Fatah

14 according to the documents.  That's what they say, it's

15 according to the captured document.  They're referring to the

16 analysis of the captured document.  If this -- I understand

17 your disagreement that this is an official report, but I do

18 cannot accept your position that if it is an official report

19 and is being admitted under that basis, that somehow this part

20 of the official report is inadmissible.  It's not.

21         MR. ROCHON:  Your Honor, if the court pours through

22 this thing you'll see this report consists of all sorts of --

23 it's a mixture of the documents and what they have to say about

24 them, and some spin by someone in the IDF written at a time of

25 great hostility between the two.

F1czsok3                          Conference.

1          THE COURT:  I'm sure the jury can understand that if

2     you want to explain that to them.

3          MR. ROCHON:  Well, your Honor, but for it to come in

4     it needs to meet standards for a public record and then all of

5     the portions in it meet that be, and clearly --

6          THE COURT:  Official records are not necessarily

7     unbiased official records.

8          MR. ROCHON:  Well but, they have to be of a

9     constituted, a structure of an investigation.

10          THE COURT:  Right, structure of an investigation of

11     this report is an analysis of the captured documents.  That's

12     the --

13          MR. ROCHON:  It has to have indicia of

14     trustworthiness, Judge.

15          THE COURT:  It has some indicia of trustworthiness

16     because it has a bunch of documents that purport to look like

17     PLO and PA documents and signatures that purport to look like

18     signatures of PA and PLO officials.

19          MR. ROCHON:  Even if you assume those documents are

20     what they appear to be, despite the fact that we have just

21     photo copies of this report, even if you assume that --

22          THE COURT:  Unless you're denying it.

23          MR. ROCHON:  What?

24          THE COURT:  I'm assuming it for purposes of

25     admissible, unless you're denying it.

F1czsok3                          Conference.

1          MR. ROCHON:  So you assume that for, if your Honor

2     pleases of admissibility.

3          MS. FERGUSON:  The conclusions in the report clearly

4     go beyond those documents, they -- you look at the report and

5     compare it to --

6          THE COURT:  No, that's exactly the conclusion that the

7     plaintiffs are going to ask the jury to draw.  So it's up to

8     the jury to determine the whether or not to draw those

9     conclusions.  I don't understand that.

10          MR. ROCHON:  The reason the standard is so high for

11     public records is because we don't get to cross examine the

12     maker.  So it has to have indicia of trustworthiness.

13     Trustworthiness for the PA and the PLO to come to the United

14     States, brought before a court, have people make claims against

15     them for involvement in terror and to have the proof of that be

16     some report from the IDF prepared at a time of great hostility

17     with the client, but we don't even have the maker of the report

18     available to cross-examine, is hearsay on top of hearsay.

19     Eventually this trial becomes a trial of hearsay.

20          THE COURT:  Well, the final word on this is the reason

21     I draw the distinction because I drew the distinction where it

22     is, they were relying on documents that were claimed to have

23     been seized from the PLO and the PA that purport and on a lay

24     person's review one could reasonably conclude are documents

25     from PA files or documents, more likely documents created by

F1czsok3                          Conference.

1    the PA.  That's what these documents are about.  I drew the

2    line at all these summary reports, and I accept your argument

3    with regard to we have no basis to know what the reports are

4    based on, what those summary conclusions are based on, what

5    their factual allegations -- where the factual allegations are

6    coming from.

7            That's not true with regard to the, what is purported

8    to be PA documents seized from the PA and it's not -- I draw

9    the line at PA documents that are claimed to be PA documents

10   either sized from the PA or the PLO, or PA or PLO documents

11   that were turned over by the PA and the PLO.  I think that it

12   has some indicia of reliability, unless you want to demonstrate

13   to the jury that they should not accept it as what it purports

14   to be because it is a forgery, it is not in fact what it

15   purports to be, it was never taken from us, it was never

16   produced by us, and that's not Arafat's handwriting.  If you

17   want to dispute all of that, that's fine.  But in terms of my

18   assessment of its reliability, without such evidence disputing

19   those facts, it meets the minimum threshold of being admissible

20   to put before the jury what is claimed to be PA documents

21   either seized or obtained from the PA and PLO.

22           632 I think should be out because of the same

23   consistent analysis.  You know what, let me just run through it

24   and you could --

25           MR. YALOWITZ:  Bear with me, your Honor.  I'm sorry,

F1czsok3                          Conference.

1      622.  Okay.  I understand the Court's ruling.

2                THE COURT:  Same analysis.

3                MR. YALOWITZ:  I the Court's ruling.

4                THE COURT:  826 is in, based on the same analysis.

5      829 is in based on the same analysis.  830 is in based on the

6      same analysis.

7                MS. FERGUSON:  Your Honor, can I just say something

8      about 830?  It doesn't purport to be a government document.

9                MR. YALOWITZ:  I can establish that through testimony

10     your Honor.

11               THE COURT:  All right.  Well, if they lay the proper

12     foundation, my attitude will be that obviously the crux of this

13     is that these are supposedly PA -- these are PA documents

14     created or possessed by the PA or PLO.  He still has the burden

15     of laying, as I say, proper foundation, where did this come

16     from, what is it, why should one consider reasonably that it is

17     what it purports to be, all right.  And I think, as I say, I'll

18     skip 1109, come back.

19               My attitude is the same about 1118.  It should be out,

20     not in.  325, I believe 325 can be admitted if the proper

21     foundation is laid for what it's supposed to be, where it came

22     from.  Same thing with 338.  I looked at 338 photos.  I don't

23     see 338 photos to be a problem, so they can stay in.

24               The 473 the report.  Seems to me if you can lay the

25     proper foundation, that's admissible; basically crime scene

F1czsok3                         Conference.

 1   report.  474 is out based on the same rulings I made with

 2   regard to photographs.  476 is out.

 3             MR. ROCHON:  Same with 475, your Honor?

 4             THE COURT:  I'm sorry, I skipped 475.  Yes, 475 is

 5   out.

 6             477.  477 can be admitted with -- let me just make

 7   sure -- yes, I didn't have a real problem with the photo.  I

 8   think most of these photos are photos that were in the other

 9   document.

10             And then 1125.  1125 should be out and I don't think

11   you need that.  So then that should be that.  All right?

12             MR. YALOWITZ:  That's because of the photos.

13             THE COURT:  Yeah.

14             MR. YALOWITZ:  Yeah.

15             THE COURT:  It's --

16             MR. YALOWITZ:  I understand.  Okay.

17             THE COURT:  All right.  So, and also, you know, some

18   of this is cumulative too since you have --

19             MR. YALOWITZ:  I'm sorry.  I apologize, your Honor.

20   May I have permission to consult for one second?

21             THE COURT:  Yeah, sure.  Then I think we might be able

22   to wind up.

23             MR. YALOWITZ:  Your Honor, what I'd like to do with

24   1125 is, and we don't have to do this today, but I'd like to

25   come back to the Court with a kind of a version of 1125 that

F1czsok3                          Conference.

1    doesn't have some of the photos that I think concern the Court,

2    because there's some other useful information.

3                THE COURT:  What is it that you want out of this we

4    don't already have in this case?

5                MR. YALOWITZ:  Some of the, what I do want --

6                THE COURT:  You want the text or the photos?

7                MR. YALOWITZ:  I want some of the other photos.

8                THE COURT:  I think most of these photos I've already

9    ruled on.  Almost all, if not everyone of these photos was in

10   the other binder of photos that we went through one by one.  I

11   think most of these photos already came in in that other

12   binder.

13               MR. YALOWITZ:  Let me go back.

14               THE COURT:  The only I remember specifically that

15   didn't come in was the first three pages.

16               MR. YALOWITZ:  Right.

17               THE COURT:  Pretty much the other photos --

18               MR. ROCHON:  You went through them one at a time.

19               MR. YALOWITZ:  Right.  So 1125 comes in, but we

20   just -- without those photos that the Court has excluded.

21               THE COURT:  You said 1125 comes in.

22               MR. YALOWITZ:  I'm asking.

23               THE COURT:  1125 is two things.  It's a report and

24   photographs.  What are you asking for?  I already gave you the

25   photographs, so.  And you didn't give it me to in this context.

F1czsok3                          Conference.

1    There is something in this written report that you want?

2              MR. YALOWITZ:  I don't think so.  I think all I want

3    is the photos.

4              THE COURT:  All right.

5              MR. YALOWITZ:  I got to look at the text.

6              THE COURT:  Check the other photos I went through one

7    by one, I told you which ones are in.  I know that the first --

8    I do have a recollection of the first three pages seeing those

9    photos before in that binder and saying that those photos

10   shouldn't come in.

11             MR. YALOWITZ:  Yeah.  No, no, your Honor, I don't mean

12   to need the text.  The text just foundationalizes the photos,

13   so.

14             THE COURT:  I understand.

15             MR. YALOWITZ:  So the photos that the Court has said

16   are in are in, the photos that the Court has said are out are

17   out, and I don't need the document other than for admissible

18   purpose.

19             THE COURT:  So that's the way I think you should

20   prepare for that.

21             MR. YALOWITZ:  Great.

22             MR. ROCHON:  Did your Honor rule on 631?

23             THE COURT:  Which one is --

24             MR. ROCHON:  You've similar sorts of rulings, but I

25   don't know you if said the number.  We objected on the same, it

F1czsok3                         Conference.

1    says --

2             THE COURT:  Yeah, that's where I was, I was going to

3    allow that, 631.

4             MR. ROCHON:  Right.

5             THE COURT:  Then I find it's pretty much an analysis

6    of the, what they contain to be original documents that were

7    seized from the --

8             MR. ROCHON:  We won't repeat our arguments on that

9    one, your Honor, but they would be similar to the previously

10   made arguments on the similar types of reports.

11            THE COURT:  Sure.  I understand.

12            Then let me wind up.

13            Did you resolve the videos?  I don't want no more

14   information.

15            MR. ROCHON:  On the videos there's one portion, it's

16   videos of the two women and in general --

17            THE COURT:  Have you resolved it is really all I want.

18            MR. ROCHON:  We haven't resolved it.  We might be able

19   to.

20            THE COURT:  Okay.  Take your time.

21            MR. ROCHON:  I'll tell them what my objection is at

22   the break.  Maybe who knows we might agree.

23            THE COURT:  Okay.  Have you come to some agreement

24   about the demonstratives you want to use in opening?  I should

25   rule on that so you can prepare for that.

F1czsok3                          Conference.

1              MR. ROCHON:  We don't seem to have come to an

2      agreement because I've come to a disagreement.

3              THE COURT:  All right.  I have a list somewhere.  All

4      right.  So you objected to -- you objected to using the GIS is

5      materials about Ahmed Garghouti?  I'm not sure, I mean I think

6      you acknowledged that.  I already said that can come in.

7              MR. ROCHON:  I know you ruled on authenticity and

8      we're not objecting on the basis of authenticity or whether

9      it's in fact the document that it purports to be.  The

10     objection that hadn't been at least dealt with was relevance as

11     to this?

12             THE COURT:  It seems to me Ahmed Barghouti is a

13     critical piece of that case, so I can't say that doesn't have

14     relevance.

15             MR. ROCHON:  I understand your ruling.

16             THE COURT:  Okay.  So they can use that if they want

17     to, unless there is a real chance they're not going to be able

18     to get that in evidence.

19             MR. ROCHON:  201.

20             THE COURT:  201, I'm not quite sure what your

21     objection was.

22             MR. ROCHON:  Well, this is among the documents that we

23     have indicated we object to that are not our publication.  And

24     Mr. Yalowitz sent a letter saying, in essence, yes it is, and

25     we should withdraw the remark.  And Mr. Yalowitz attached to

F1czsok3                         Conference.

1    his letter something about this institute on whatever it's

2    called National Political Moral Guidance, whatever it's called

3    and --

4              THE COURT:  You really need this in opening, Mr.

5    Yalowitz, something we can --

6              MR. YALOWITZ:  Do I really need it?

7              THE COURT:  Yes?

8              THE COURT:  Something we can resolve later?

9              MR. YALOWITZ:  We can resolve it later.

10             THE COURT:  Just hold back on it.

11             MR. YALOWITZ:  Got it.

12             THE COURT:  Assume you're -- look, to the extent that

13   you can establish through expert testimony or otherwise that

14   certain publications or publications generated, controlled or

15   otherwise owned by the PA and the PLO, I'm going to allow those

16   statements in those publications.

17             MR. ROCHON:  But your Honor had said what kind of

18   statements would come in.  This is partly has to do with that

19   rhetoric of incitement versus something related to a specific

20   act, and so --

21             THE COURT:  Well, I was more concerned -- look, there

22   is some -- I got to give them, concede to them there is some

23   relevance about heightened rhetoric that they claim that is by

24   the PLO or the PA that they claim is urging people to commit

25   violence.  I got to concede there is some relevance to that.

F1czsok3                              Conference.

1    What we, the context in which we discussed it before was about

2    statements by other people.  I think, you know, there was a --

3    I think it was even some little girl saying that you ought to

4    kill all the people or something.  I mean those kinds of

5    statements.  But, you know, I'm not -- look, the fact that

6    they -- the fact that they want to argue there's certain

7    statements or inciting others to violence, I can't say that

8    they can't present some of that evidence.

9              MR. ROCHON:  Right.  And the rubber hits the road when

10   we talk about which particular --

11             THE COURT:  Right.

12             MR. ROCHON:  -- ones.

13             THE COURT:  Right.

14             MR. ROCHON:  And the Court had indicated that hateful

15   rhetoric was not going to come in; that it needed to be tied to

16   encouragement of specific acts of violence.  That was the

17   standard last week when we're before you.  And the plaintiffs

18   offered in a separate letter what they thought met that

19   standard.  But for purposes of opening that Mr. Yalowitz isn't

20   using 201, we don't need to address it.

21             THE COURT:  All right, so we'll come back to all

22   those.  But as I say I'm going to give them some leeway, but

23   it's got to be something that one logically would be able to

24   conclude that it is in fact -- one, as I say, I don't know

25   again, I don't know what you're going to -- your position is

F1czsok3                          Conference.

1    going to be about what the PA and the PA's position generally,

2    you know, I don't know we're going to get into this debate of

3    your saying, look, the PA and the PLO is seeking peace and is

4    trying to --

5         MR. ROCHON:  I'll tell you what I'm going to say.  I'm

6    going to say -- try this as a tort case, as whether or not

7    there is evidence to tie to the specific incidents.  I'm not

8    going to try this as a second taffadal, the peace, lack of

9    peace.  I'm going to try a tort case.  I'm not going to say my

10   clients sought peace.  I'm not going to be introducing specific

11   denunciations even.  And that's why I don't want them to inject

12   that into this case.  I'm trying to try a tort case.

13        THE COURT:  Well, that's fine.  And if that's the

14   intent, your intent, then I'm going to give them less leeway in

15   that regard.

16        But the original discussion we had was that there was

17   a -- they would say, oh, they released people and you would

18   say, no, they arrest people, you know.  And they would say, no,

19   they encourage violence and you would say, no, look they say

20   don't do any violence.  So if you guys are going to go back and

21   forth with that, it's a moving target for me.

22        MR. ROCHON:  I've been pretty clear I think.  What I'm

23   trying is the case is a respondeat superior for material

24   support for the seven incidents, hopefully less than seven,

25   when we're done down to it, that are going to be on trial.

F1czsok3                              Conference.

1                THE COURT:  All right.

2                MR. ROCHON:  And not --

3                THE COURT:  We'll.

4                MR. ROCHON:  And I won't be reserving opening so Mr.

5     Yalowitz won't feel like he's sand bagged and he'll know after

6     my opening where we are.

7                THE COURT:  They'll have a better feel for both sides

8     here, all right.  So let's put that on the shelf and until

9     not -- let's go beyond opening on that.

10               I'm not sure why you object to 512 being referenced in

11    opening, used in opening if it's going to be admitted.

12               MR. ROCHON:  Actually, your Honor, what I said was

13    that the first part of 512 we recognize, we didn't object to

14    about the 2004 law.

15               THE COURT:  So.

16               MR. ROCHON:  So the document itself includes

17    subsequent laws as well, which is from 2006 and therefore is

18    not proximate.  Actually didn't object to the 2004.  We

19    previously noted our concerns about the -- you pretty much

20    ruled that that's coming in.  But the payment information

21    that's relevant should be the one that was contemporaneous, the

22    two.

23               THE COURT:  I'm not sure what's the difference between

24    2006 and 2004.

25               MR. YALOWITZ:  Your Honor, I can't even tell what he's

F1czsok3                        Conference.

1    talking about.  I'm flipping through the exhibit.  Maybe he can

2    clarify for the Court and for me.

3             MR. ROCHON:  Sure.  The articles through 13 start the

4    2004 law, and then the next one starts with article one, you'll

5    see at the end they say proposed 2006 law.  They don't even

6    indicate whether --

7             THE COURT:  What's the difference?

8             MR. ROCHON:  More money.

9             THE COURT:  And I'm sorry?

10            MR. ROCHON:  I mean, boil it down there is more money

11   paid according to the draft 2006 law than the 2004.

12            THE COURT:  I see.  So they accounted for inflation

13   and now a larger sum of money.

14            MR. ROCHON:  That's it.  And the real measure of how

15   much people got paid, of course we've provided in discovery the

16   payment records that show how much.  So I don't know that we

17   need possibly not an act of law when the real thing is how much

18   did you pay these guys.

19            THE COURT:  Well, the real thing is not even how much.

20   Couldn't careless how much.  The question is was there payment,

21   what was the reason for it.  Whether they got paid $100 or

22   $1,000 is not particular relevant to the jury's assessment,

23   whether it was a legitimate payment or --

24            MR. ROCHON:  So that's our position, it's simply that

25   the second part.

F1czsok3                        Conference.

1              THE COURT:  Are you going to reference any of the 2006

2     stuff in your opening?

3              MR. YALOWITZ:  No, your Honor.

4              THE COURT:  All right.  Are you going to show the jury

5     any part of that 2006 photo?

6              MR. YALOWITZ:  No, your Honor.

7              THE COURT:  All right.

8              MR. ROCHON:  Good.

9              THE COURT:  We'll see.

10             MR. YALOWITZ:  Okay.

11             THE COURT:  Then we can see whether or not all of the

12    documents are --

13             MR. YALOWITZ:  We're just dealing with opening.

14             THE COURT:  Whether legitimate basis for excluding

15    that.

16             Okay, then we're dealing with 1060.

17             MR. ROCHON:  We didn't object.

18             THE COURT:  And then we're dealing with the

19    photographs and other demonstrative.  You said there was -- you

20    want to show them a picture of a funeral in opening?

21             MR. YALOWITZ:  I'll withdraw it, your Honor.

22             THE COURT:  All right.  And --

23             MR. ROCHON:  The photographs of the victims, your

24    Honor, I do want to correct one thing.  I believe some of the

25    photographs that we objected to were of people who actually

F1czsok3                          Conference.

1   were hurt in the incidents, but they're not plaintiffs.  We'll

2   withdraw that objection.  I mean if they're actually hurt in

3   the incident, it's --

4            THE COURT:  Some of the --

5            MR. ROCHON:  Some of the victims in this -- people

6   were hurt in these incidents are not plaintiffs.

7            THE COURT:  Right.

8            MR. ROCHON:  And there are photographs in there.

9   Initially we objected and frankly --

10            THE COURT:  You're not talking about gory bloody

11   photographs.  You're just talking about identifying certain

12   individuals who might be witnesses or --

13            MR. ROCHON:  They're family photos and --

14            THE COURT:  Okay.

15            MR. ROCHON:  -- we don't object to those where the

16   people -- I mean they were hurt in the incidents, I can see

17   where counsel wanted to use them.

18            THE COURT:  All right.  And then there were photos of

19   convicted perpetrators.  Is there some reason why you objected

20   to that?

21            MR. ROCHON:  Well, you'd have to I think look at them,

22   your Honor.  So I think this begins -- the papers aren't

23   numbered, but it starts on -- it would be page 26, but these

24   are the so-called terror cell.

25            THE COURT:  Well, you object to the photographs

F1czsok3                          Conference.

1   themselves or just -- I know you objected to them being

2   referred to as terror cell.  You object.

3        MR. ROCHON:  We don't object to the photos.  We do

4   object to the fact that the plaintiffs have put some client

5   insignia next to them, presumably thinking they're employees.

6   One of them, as far as we know, wasn't even an employee, but

7   still has one of those insignia.

8        But the core prejudice on this is the reference to

9   terror cells.  The reason being of course it's not just word

10  terror, know we're in a terror trial, but the idea of a cell,

11  that these were some kind of organized cells starts to assume

12  facts that -- actually for some of these these are pretty

13  loosely, plaintiffs don't proper --

14        THE COURT:  Is there some proof in this case of terror

15  cells or is that just your --

16        MR. YALOWITZ:  I think that's just a fair -- I thought

17  that was kind of a description of a bunch of people who ban

18  together to commit terrorism.  It's a cell.  I mean, you know,

19  unit sounds more organized to me, terror unit sounds like

20  they're regimented.

21        THE COURT:  Well, what are you trying to describe them

22  as, what is the demonstrative?

23        MR. YALOWITZ:  They're a group of --

24        THE COURT:  You are going to put up a demonstrative

25  and going to show what, it's going to say these guys --

F1czsok3                        Conference.

1          MR. YALOWITZ:  Right.  So the demonstrative is very

2     helpful to the jury to put a face to the name, to organize the

3     evidence and to think about, okay, what was -- what were the

4     different roles of these people in the attack.

5          THE COURT:  Can you tell them terrorist group?

6          MR. YALOWITZ:  Sure.

7          THE COURT:  Can we live with that?  If that's what he

8     says, the proof's going to show, they were grouped together?

9          MR. ROCHON:  I would -- I actually would object.  They

10    weren't a group.  Some of these people didn't even know each

11    other.

12         THE COURT:  Well, but that's a question whether

13    they're going to meet their promise.  They say that they're

14    going to prove that they worked together as a group.

15         MR. YALOWITZ:  But I don't want to be restricted, if

16    I'm talking and I say, well, this cell.

17         THE COURT:  Why do you call it a cell?  There's no

18    witness is going to call it a name cell.

19         MR. YALOWITZ:  Okay, just because --

20         THE COURT:  If you say that some expert is going to

21    say they're, quote, cell, then you can do that.

22         MR. YALOWITZ:  I think what's happening here is the

23    defendants are trying to micro manage my opening.

24         THE COURT:  Well, that's -- I assume this does not

25    significantly restrict your opening.

F1czsok3                        Conference.

1          MR. YALOWITZ:  There is nothing wrong --

2          THE COURT:  Another word other than cell.

3          MR. YALOWITZ:  All right, I'll do that.

4          THE COURT:  My suggestion would be is pick a word

5   that's consistent with what the witnesses are going to

6   characterize it as, all right.

7          MR. YALOWITZ:  That's for sure.

8          THE COURT:  So then if your witnesses are going to

9   say, you know, this terrorist group organization whatever they

10  are going to call it, then that's what the evidence is going to

11  be and you have a right to comment on that evidence.

12         MR. YALOWITZ:  Right.

13         THE COURT:  If that's what the evidence is going to

14  be.  But if you have nobody in this case who is going to call

15  it a cell, then you're not a witness and you don't get to call

16  it a cell.

17         MR. YALOWITZ:  Okay.  I'm good with that.  I don't

18  want them popping up saying, oh, I object to the word cell.

19  I'm going to talk to my witnesses, if that's their view and I

20  feel like that's the right word based on their views, I might

21  use that word.

22         THE COURT:  No, you're only going to use that word if

23  an expert is going to come in and describe these as cells and

24  say why in his expert opinion these constitute cells.

25         MR. YALOWITZ:  I agree with --

F1czsok3                           Conference.

1          THE COURT:  I don't know what a cell is supposed to

2   be.  Do you?

3          MR. YALOWITZ:  Yeah, I mean that's --

4          THE COURT:  Do you have -- is there some legal

5   definition of a cell?

6          MR. YALOWITZ:  It was the natural common sense

7   definition of a group of guys that get together, hatch a terror

8   attack.  But you know, I'm going to talk to my witnesses, and

9   if it's something that's consistent with --

10          THE COURT:  I think it's a loaded word.  You have the

11  word terrorist, you don't need the loaded word cell.  It sounds

12  like we're dealing with Al Qaeda and Osama Bid Laden.  We're

13  not.  That's not what this case is about.  So I understand

14  their objection.

15          MR. YALOWITZ:  I'm going to call it a terror attack,

16  because that's what it was.

17          THE COURT:  Okay.

18          MR. ROCHON:  I have no problem with that.

19          MR. YALOWITZ:  Terror attack.

20          THE COURT:  I don't know why attack and cell -- I

21  think you're talking about the group, but terror attack is

22  fine.

23          MR. YALOWITZ:  Right, okay.

24          MR. ROCHON:  There is only two other things, your

25  Honor.  One is one of these is a photo, all of them are photos

F1czsok3                      Conference.

1   of the convicted or the perpetrator, except for one, there is a

2   photo, a guy named Tawfiq Tirawi who is neither.

3          THE COURT:  So what is Tirawi's role, what are you

4   going to say, why are you showing his photo, who is he?

5          MR. ROCHON:  Tawfiq Tirawi was a senior PA official,

6   your Honor, head of the intelligence service.

7          THE COURT:  You're going to say he's the one that

8   directed some of these attacks.

9          MR. YALOWITZ:  Correct, provided materials --

10         THE COURT:  Some reason why they cant' show his

11  picture?

12         MR. ROCHON:  He wasn't convicted of that.

13         THE COURT:  Well, it doesn't matter.  Is there some

14  reason why they can't show his picture?

15         MR. ROCHON:  The picture is not the problem.  It's

16  what they say about him.

17         THE COURT:  What?

18         MR. ROCHON:  They say provided weapons, freedom to

19  operate.  They characterize, you know, him.

20         THE COURT:  That's either going to be a fair

21  characterization or what the evidence is going to show or

22  that's going to be a promise that he made that he couldn't

23  keep.

24         MR. ROCHON:  I understand your ruling.  But the last,

25  your Honor --

F1czsok3                          Conference.

1           THE COURT:  The eagle graphics, is there some reason

2    why it's appropriate to put graphics on the pictures as if

3    you've already established that they somehow officially are

4    part of the --

5           MR. YALOWITZ:  It's my promise, I will prove that all

6    these people were employees.  I'm promising to prof that.

7           THE COURT:  But you make the pictures appear as if

8    that's somehow an official picture of them being associated

9    with the PA or PLO and that's not.  You created that.

10          MR. YALOWITZ:  Look, okay, that's -- I created it,

11   that's true.  I'll be very candid about that.  I created.  It's

12   my demonstrative, it's my representation.  But I want boards in

13   here with these pictures so the jury can see them and

14   understand who they are when all the witnesses are testifying.

15   And one of the things I'm going to prove is that the guys with

16   little eagle emblems were employees.  So it's my demonstrative.

17   I'm going to represent it's not an official picture.  But to

18   tell me I can't put a symbol on my demonstrative to help the

19   jury remember which ones were employees, I mean I think they're

20   really reaching there, your Honor.

21          THE COURT:  Well, I don't know what the picture looks

22   like with this demonstrate so I don't know what --

23          MR. YALOWITZ:  May I hand, I could hand up an example

24   if it would be helpful to the Court.

25          MR. ROCHON:  I've got --

F1czsok3                          Conference.

1            THE COURT:  I don't have a strong feeling one way or

2       the other.  I understand their concern that I am --

3            MR. ROCHON:  I have a colored one if that helps.

4            THE COURT:  I think our jury's probably going to be a

5       little more intelligent than have to be misled by this.  Let me

6       see.  Are you going to explain to them what these symbols mean?

7            MR. YALOWITZ:  Of course.

8            THE COURT:  What does the first symbol mean?

9            MR. YALOWITZ:  The little eagle?

10           THE COURT:  No, the other one.  There is another one

11      on the, is that some kind of symbol?

12           MR. YALOWITZ:  You know, you have again my only copy.

13           THE COURT:  Oh.

14           MR. YALOWITZ:  I'm sorry.

15           THE COURT:  It has a different symbol other than the,

16      what's in that picture.

17           MR. YALOWITZ:  Oh, that's just part of the picture.  I

18      don't know that's not --

19           THE COURT:  That's not a symbol of any kind?

20           MR. YALOWITZ:  Right.  That's just part of the

21      picture.

22           THE COURT:  All right, okay.

23           You know what, now I'm not going to restrict you, as

24      long as you make clear that you put those to indicate to them

25      which ones you contend are -- you're going to tie to the PLO.

F1czsok3                        Conference.

1          MR. YALOWITZ:  Okay.  Thank you, your Honor.

2          MR. ROCHON:  Then the last one, your Honor, if I could

3   tender, this is the last one.  In our view this is sort of

4   the --

5          MR. YALOWITZ:  Is that 201?

6          MR. ROCHON:  It is 201.

7          MR. YALOWITZ:  Yeah, I already told him I'm not going

8   to use it.

9          MR. ROCHON:  That takes care of that one.

10         THE COURT:  Okay, good.

11         MR. ROCHON:  I'm on a roll.

12         THE COURT:  So that's opening.

13         Again, with regard to -- it's not likely I'm just

14   going to allow you to put in newspaper articles.

15         MR. YALOWITZ:  I understand that.

16         THE COURT:  I think we went through that.

17         MR. YALOWITZ:  I think I get it.

18         THE COURT:  To the extent, as I say, you say that

19   these are communications of the PA and PLO made by the PA and

20   PLO, that's one thing.  But in terms of New York Times and Time

21   Magazine.

22         MR. YALOWITZ:  Look, the only thing I'll tell you,

23   your Honor, the only thing that's coming up, and I haven't

24   decided for sure I'm going use it, but there is -- one of the

25   perpetrators in our attacks whose name is Nasser Aweis, was

F1czsok3                         Conference.

quoted in Reuters as saying he was proud that he was a member

of Al Aqsa Martyrs Brigades and he was proud that the United

States had designated Al Aqsa Martyrs Brigades as a terrorist

organization.  Reuters carried that story.  He's a member, he's

an employee of the intelligence service, and so I don't

really --

         THE COURT:  Is he a member of that Al Aqsa Brigade?

         MR. YALOWITZ:  He is.  There is independent evidence

of that.  There is independent evidence that he's a member of

the intelligence service.  I just think it's interesting that a

guy gets quoted in the newspaper and the intelligence service

which, you know, you think a normal intelligence service would

know when their employees are getting quoted in the newspaper,

doesn't fire him, doesn't say anything about it, doesn't

discipline him, so.

         THE COURT:  May be interesting, but I'm not sure it

advances your cause of action.

         MR. YALOWITZ:  Okay.  Well, that's -- I mean I think

it does.  If you're going to keep it out as hearsay, that's

useful information for me to know.  I'm not offering it --

         THE COURT:  I'm more concerned about its relevance

than it's hearsay.  You want them to conclude from that that

they must be approving of that statement because he's making

that personal statement?

         MR. YALOWITZ:  No.  They don't care; that the fact

F1czsok3                         Conference.

1   that the guy goes in the press and admits he's a terrorist,

2   doesn't bother him.

3           THE COURT:  You know, I'm not going to do it on the

4   basis -- and this is going to be my ruling as a general

5   principle -- I'm not going to do it on the basis of just your

6   saying this was out there, they probably knew about it so they

7   didn't do anything about it.  If you have some direct evidence

8   that he made this statement, that they were aware of it, that

9   somehow in the deposition you asked somebody, well, when you

10  heard him make statement, what was your reaction, if you have

11  some evidence of that, then fine I probably would let you do

12  it.  But just the fact that now it was in yesterday's Wall

13  Street Journal -- well, I didn't read yesterday's Wall Street

14  Journal so I don't know what was in yesterday's Wall Street

15  Journal.

16          MR. YALOWITZ:  Okay, fine.  We can move on.  That's

17  your ruling.  I'll move on.

18          THE COURT:  All right.

19          MR. YALOWITZ:  Not agreeing with it, but --

20          THE COURT:  No.

21          MR. YALOWITZ:  But I don't think it's, you know.

22          THE COURT:  I just want you to understand my position.

23  You don't have to agree with it.

24          MR. YALOWITZ:  Right.  I get it.

25          THE COURT:  All right, so this is about as I can do.

F1czsok3                        Conference.

1    I'm going to try to give you, before the end of the day, what I

2    am working on as a rough draft of the jury instruction.  Quite

3    frankly, it's kind of early in a case that's ten weeks, you

4    know, away from jury selection for me to have a final draft of

5    the jury instruction.  Quite frankly, I'm not even sure what

6    this case is going to look like.

7              MR. YALOWITZ:  Feels very early, your Honor.  I

8    mean --

9              THE COURT:  I agree.

10             MR. YALOWITZ:  I appreciate it, but --

11             THE COURT:  What I've done is -- maybe I can give you

12   my general instructions, which are taken mostly out of Sand, on

13   you know, about credibility and those kind of things and burden

14   of proof.  Those are really important.

15             I fashioned some instructions with regard to the

16   substantive claims, with regard to harboring, with regard to

17   providing material support, with regard to respondeat superior.

18   I have some standard instructions which shouldn't be a surprise

19   to you.  So I'll give that to you as quickly as I can.  But

20   just understand it's rough and it doesn't have any of your

21   objections that you might have to the language, and we'll work

22   on it over the weeks as we get closer, but at least you'll have

23   an idea where I'm thinking at this point in terms of how I

24   started to approach that.

25             Now with regard to -- I guess I need to deal with

F1czsok3                        Conference.

1    summary judgment.  You know, with regard to --

2              All right.  I guess the four that are now at issue are

3    Guetta, Hebrew University, Sokolow and Mandelkorn; are those

4    the ones that they've renewed their objection?

5              MS. FERGUSON:  Yes, your Honor.

6              MR. YALOWITZ:  That is correct, your Honor.

7              MS. FERGUSON:  And as to the PLO for all.

8              THE COURT:  Yes.

9              MR. YALOWITZ:  I mean, they didn't technically renew

10    their objection to Guetta, but I came to you because of the

11    change in --

12              THE COURT:  They did in the subsequent letter.

13              MR. YALOWITZ:  Anyway, but whatever it's.  I

14    understand it's an open issue.

15              THE COURT:  Yeah, well --

16              MR. YALOWITZ:  But I want credit for it.

17              THE COURT:  You may not want -- as they way, you may

18    not want credit for it, because that's the one that I think is

19    just as much as I struggled with it to see that, you know,

20    whether or not it's appropriate to at least let the jury first

21    evaluate that before I make any determination, without the

22    identification, and solely on the basis of what you want to

23    describe as an MO, that nobody has described prior to your

24    coming up with it, I just don't -- I just can't see that that's

25    enough for a reasonable jury to conclude that the PLO is

F1czsok3                           Conference.

involved in that.  I mean, it was significantly determinative
when I ruled that the identification could come in, because I
said you have an identification and that person is a PA or PLO
employee or associate, then that would be enough to withstand a
summary judgment and go to the jury and let them make the
determination of whether or not that's a reliable
identification, and I did so over the defendant's objection.

        That identification now being represented for whatever
reason that it's not going to be evidence before this jury,
there's really no evidence, there is clearly no direct evidence
that would point to a 417, the PLO or the PA, and the
circumstantial evidence is so weak that I could not sustain a
verdict if the jury were to say that we're holding the PA or
the PLO liable for this terrorist attack simply because there
were a bunch of other terrorist attacks that were done that
sounded a lot like this one.  And so since the Israeli
government thought, quite frankly without any proof that I know
that's going to come before the jury, thought that they were
involved in these other terrorist attacks, that that's enough
for me to convince me that because it was a shooting in the
general area close to each other, close to the headquarters,
that they must have been involved in this one too.  And as I
indicated, you know the problems I have with it in terms of the
what is really purported to be the pattern here.  And the fact
that there is not even an -- even more liberally allowing you

F1czsok3                         Conference.

1    to rely on the Government's, Israeli Government's determination

2    that they believed that they're involved in terrorist attack,

3    the Israeli government made no determination that they thought

4    this was one of the attacks they were involved in.  And that

5    also weighs heavily in my evaluation of this and whether it's

6    reasonable for the jury to conclude this when there is

7    absolutely no evidence that the Israeli government indicated

8    that they had that would point to this attack or lead them to

9    put this attack on the list of a dozen acts that they obviously

10   analyzed and had an opportunity to analyze.

11              So I think that given the paucity of evidence with

12   regard to that, the MO evidence is not sufficient for a

13   reasonable jury.  Accordingly --

14              (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

F1cdsok4

1          MR. YALOWITZ:  Your Honor, let me just say, I

2     understand the Court's ruling.  I suspect that it was not a

3     happy moment to write that --

4          THE COURT:  I understand.

5          MR. YALOWITZ:  -- letter.  I do want to find out the

6     answers to some of the questions the Court asked me.  I don't

7     know that it would make a difference.  I'm not saying it would

8     or wouldn't.  But I want to reflect on it.  And if I think it

9     does, I will come back to the Court and at least say what those

10    answers are and say why I think it makes a difference.

11         THE COURT:  Sure.

12         MR. YALOWITZ:  I understand the Court's ruling.  I'm

13    not -- I just want to make sure that I have really an accurate

14    record --

15         THE COURT:  Sure.

16         MR. YALOWITZ:  -- as best I can --

17         THE COURT:  You can write me a letter later today or

18    if you want to --

19         MR. YALOWITZ:  It may not be today.  It may be in the

20    next day or two.

21         THE COURT:  Yes.

22         MR. YALOWITZ:  But it's -- you know, this is a family

23    that I've lived with.

24         THE COURT:  I understand.

25         MR. YALOWITZ:  And that I care about, and I want to do

F1cdsok4

1    everything I can to save their case.  And I understand the

2    Court's ruling.  I just want to make sure that I have all the

3    facts.

4             THE COURT:  Yes.

5             MR. YALOWITZ:  And if there is something I can bring

6    to the Court, I know you will entertain it.

7             THE COURT:  I'm sure that they must understand.  You

8    have explained to them that their case has gotten significantly

9    weaker rather than stronger since the last time I had

10    considered the summary judgment motion because we had a

11    identification --

12             MR. YALOWITZ:  Even a simple country lawyer like me

13    understands that.

14             THE COURT:  I just want to make sure they understand

15    it.

16             Now, with regard to the other claim, you know, I think

17    it is close.  I think that I don't have necessarily confidence

18    that the plaintiff will meet its burden with regard to those

19    cases, but at this point I am not compelled to grant summary

20    judgment as to any of those others.  I think that there are

21    certain facts and factors that we'll to weigh in depending on

22    how the evidence comes in.  I think that with regard to the --

23    I will just give you some examples rather than try to go

24    through them in detail.

25             I think with regard to the Hebrew University

F1cdsok4

1    circumstance, I think the evidence with regard to Ahmed is

2    critical to them being able to overcome the hurdles that are

3    required in order to, as I say, connect the dots on this one.

4    I weighed the fact and have gone back and forth with regard to

5    the different -- if the plaintiff wants to argue MO, the

6    different MOs with regard to the Hebrew University bombing and

7    some of the other incidents.  The fact that even the plaintiffs

8    attribute that pretty much to Hamas rather than to the AMB.  So

9    it is a different set of facts.

10        But I think that I am not significantly persuaded

11   about the material support, that it has to be further evaluated

12   because pretty much -- there are two things that I give you my

13   concerns, but, as I say, it depends on what Ahmed's evidence,

14   how that comes out.  But, obviously, one, you are relying

15   heavily on the providing of weapons but not any weapons that

16   were associated with the bombing.  You say Ahmed gave him a gun

17   and you claim that he committed a bombing.  Well, there is a

18   little disconnect there.  You can't say that they are providing

19   him with a gun unless something else is disclosed during this

20   trial necessarily to follow that they are supporting a bombing.

21        You've indicated and you say there was some evidence,

22   but it was only from him that I had excluded, indicating that

23   he was -- that -- well, two things:  One, that they left some

24   bombing materials at his apartment.

25        MR. YALOWITZ:  I didn't think you excluded that, your

F1cdsok4

1     Honor.

2          THE COURT:  Well, the reason I excluded it, because he

3     was the only one that says so, and the reality is he was in

4     jail.  He has no way to know that.  That is clearly hearsay.

5     He doesn't know whether or not they found and deliberately

6     threw out his bombing material.  I don't know what that

7     statement is based on.  I am not sure that statement is

8     admissible.

9          Now, if you can convince me that you can get that in,

10     I may give that some weight.  But at this point I am assuming

11     that, wait a minute.  No.  The guy who is sitting in jail can't

12     tell me what happened in his house when the search was done.

13          MR. YALOWITZ:  All right.  We will have to look at it

14     during the trial.  I understand that.  I understand what your

15     Honor is saying.  We will have to look at it during the trial.

16     I think he is a percipient witness, but I understand your

17     summary judgment is based on you are assuming he is not.

18          THE COURT:  Now, if you say that there is some other

19     independent evidence or some evidence that would indicate there

20     is such nonhearsay evidence, you also contend that -- I assume

21     you contend that they didn't know, they didn't find any.  You

22     contend that they stopped bomb making materials and they didn't

23     seize it.  I assume they are going to want to dispute that.  I

24     don't know how they are going to dispute that and what

25     evidence, if at all, that they are going to dispute that.

F1cdsok4

1          MR. YALOWITZ:  We'll see what the evidence brings on

2     that.  I think we are better on that than you might think.

3          THE COURT:  That is the phrase.  It is harder for me

4     on summary judgment to say in my mind I know what this trial is

5     going to look like eight weeks from now.  OK?

6          MR. YALOWITZ:  All right.

7          THE COURT:  As I say, I think that, you know, it is a

8     closer question and there is a possibility that, obviously, I

9     am going to have to assess when you rest whether or not this

10    case is going to the jury or when they rest whether or not that

11    case is going to go to the jury.

12         MR. YALOWITZ:  I understand that.

13         THE COURT:  And even I have to assess, if there is a

14    verdict in your favor, whether or not the evidence does support

15    such a verdict.  So I have plenty opportunity to do that.  I

16    have also made an assessment that I don't think presenting that

17    evidence is so unduly prejudicial to the defendant that I

18    should be more concerned about making sure the jury doesn't

19    hear this.

20         The fact is that I have taken significant steps to

21    minimize the prejudice with regard to the evidence in that

22    case.  I have excluded, you know, gory photographs, etc.,

23    certain types of things that would take this -- you know, make

24    this somehow significantly more prejudicial than the other

25    six -- five or six terrorist attacks that the jury is going to

F1cdsok4

1    consider.

2           So I believe, as I said, Ahmed's involvement and

3    whether or not you can establish and what you establish Ahmed's

4    involvement to be and the pivotal connection between -- he

5    seems to be the bridge between the individuals who perpetrated

6    terrorist attacks and your proof that the PA or the PLO was

7    involved, and I have determined that you should have an

8    opportunity to at least attempt to --

9           MR. YALOWITZ:  One thing I think we should be thinking

10   about as this evidence comes in and as your Honor thinks about

11   the evidence, I know in the summary judgment motion your Honor

12   expressed concern about supplying the personnel under the

13   material support.  And, remember, we are talking about 2339(b),

14   which is -- Hamas is a designated organization.  So my state of

15   mind --

16          THE COURT:  Right.  But your issue is greater than

17   that.  Your issue is causation.

18          MR. YALOWITZ:  Causation.

19          THE COURT:  You are doing this in the context of these

20   particular --

21          MR. YALOWITZ:  Correct.  Correct.

22          THE COURT:  -- attacks.  So you are going to have to

23   show me the relationship between that.  You can't -- everybody

24   can't recover simply because you showed that they gave support

25   to Hamas.  They can only recover if they are in fact a victim

F1cdsok4

1    of that support.

2            MR. YALOWITZ:  You are right.  If there is a

3    specific -- if the material support was a substantial

4    contributing factor, I agree with that.

5            But what I was going to say is in the context of the

6    Al-Aqsa Martyrs Brigades, I think the Court was concerned about

7    saying the fact that a guy is in the PA police force, PA is a

8    member of the Al-Aqsa Martyr Brigades, I don't want to say that

9    that person -- that that is providing personnel.  I read that

10   ruling and I understand it, and I think there are other reasons

11   why personnel could be an issue.

12           THE COURT:  You have to tell me what they did.  It is

13   not a membership.  It is determinative of the activity.

14           MR. YALOWITZ:  So as we think about the evidence with

15   Abdullah Barghouti, I just want you to be cognizant of the

16   special -- first of all, there is a special definition of

17   personnel under 2339(b) which I think cured some of the

18   problems that Judge Koeltl was concerned about with the

19   definition of personnel under 2339(a).  But, also, when we're

20   talking about letting a bomb maker out of jail and giving him a

21   safe house, that kind of sounds like supplying personnel in a

22   way that's different from my employee went off and did a crime

23   and I'm trying to link the employer to the crime.  That is a

24   more classical respondeat superior issue.  So I'm not saying --

25   I'm just saying this is an issue --

F1cdsok4

1          THE COURT:  I will give you an opportunity to attempt

2     to make whatever appropriate argument you want to make in that

3     regard.  The fact is that, look, you cannot simply say that

4     because they release somebody from jail a year and a half

5     before the person committed a terrorist act, that somehow that

6     there is some -- you don't even have temporal proximity when

7     you do that.  So you can't say, oh, everything that the

8     person -- but for the person being released from jail, he would

9     have never been out there to commit a terrorist act.  That is

10    not the way you can prove this case.

11         You have to demonstrate that in anticipation of him

12    committing a future terrorist act, and may have to establish

13    that anticipation of him committing this particular terrorist

14    act, they let him go so he could in fact commit that act.  You

15    know, I can't -- you know, it is like saying, well, Judge, why

16    did you release someone accused of a crime from jail on bail

17    and that person went out, you know, six months later and they

18    robbed a bank.  So it is your fault that they robbed the bank.

19    Wait a minute.  That is not the way it works.  That is not the

20    cause of his committing the crime, because I released him, you

21    know, on bail six months later, unless you could establish the

22    reason I released him is so he could go out and rob the bank.

23         MR. YALOWITZ:  I think we are good on that.  I think

24    it is a Thelma and Louise kind of story, you know.  He starts

25    and goes on a crime spree.

F1cdsok4

1              OK.  I think the jury is going to be able to get there

2          MS. FERGUSON:  Your Honor, if I could just have a

3      clarification on the Yeshiva University?

4              THE COURT:  Go ahead.

5          MS. FERGUSON:  With some of the incidents like the

6      Mandelkorn, you distinguish between the respondeat superior

7      theory and the material support.  So with Hebrew --

8              THE COURT:  I am not making a distinction at this

9      point because I don't think it is necessary, I think, because

10     the evidence is going to come in, and it is going to come in,

11     you know, whether it is one theory or another.  So I am not

12     here to define the theory.  I am here to say whether or not I

13     am going to dismiss the claims, but I am not going to

14     dismiss --

15         MS. FERGUSON:  It is our contention that there is no

16     evidence of any employee who was involved of Yeshiva

17     University.  Ahmed Barghouti was convicted of a number of

18     things but not for any involvement in the Hebrew University

19     bombing, and he is the only employee in the mix here.  So there

20     is no evidence of an employee's involvement in the bombing.

21     They say they have evidence of an employee helping someone who

22     was involved in the bombing later but not of any involvement in

23     the bombing itself.

24             THE COURT:  All right.  Well, since I'm not dismissing

25     any of the claims as they are alleged in the complaint, I don't

F1cdsok4

1   think I have to reach that issue and I am not going to reach

2   that issue.  But you may be right that it may be very simple

3   for me when the evidence is in or when the plaintiffs rest to

4   go ahead and put one or both aside at that time.  But quite

5   frankly, even the complaint as written is not clearly

6   distinguishable of those claims.  So I am still in the process

7   of evaluating how these individual claims can go to the jury

8   and identifying which ones.  And that is a process that I am

9   still working on that you won't have yet, which is my process

10  of thinking about the verdict form.  So as soon as I get some

11  handle on how I am going to pose these questions with regard to

12  each one of the events and each one of the theories that apply

13  to that, I will have a better feel hopefully within the next

14  couple of days or weeks to address that.

15          With regard to Sokolow, I think that there it is a

16  close one.  What has tipped me in the direction of giving you

17  an opportunity to present that case is the evidence --

18  primarily the evidence that you want to offer that the GSS was

19  aware of the female bomber before it was announced.  I think

20  you have to give that some weight in conjunction with the other

21  circumstantial evidence that you want to offer.  Whether or not

22  that is going to come out in a form that is going to be

23  sufficient to meet your burden or for a reasonable jury to

24  conclude liability, it is impossible for me to say at this

25  point.  But I will let you rely on that and other evidence that

F1cdsok4

1    you have argued that does seem to effectively maybe not -- one

2    of the reasons why I didn't grant summary judgment.

3           Now, with regard to the Mandelkorn, I think that the

4    significant issue still remains with regard to the funding of

5    the AAMB.  I think that -- I can imagine a scenario that you

6    could present that might make a reasonable jury conclude that

7    they were responsible for funding the AAMB who went on to

8    committing that terrorist attack and providing financial

9    assistance to them, and I do so given the nature of the

10   documents that we have been talking about and some of the

11   testimony.  Again, whether or not it is going to come in in a

12   way that is going to be sufficient for a reasonable jury to

13   conclude any liability against the defendants I think remains

14   to be seen.  But with regard to those issues and those cases,

15   that is going to be in my ruling with regard to the summary

16   judgment, and the parties should be prepared to move forward on

17   that basis with those cases and the relevant evidence with

18   regard to those cases.

19          I think pretty much that's as much guidance as I can

20   give you now.  I don't know what else is still outstanding.

21          MS. FERGUSON:  There is the question of the PLO.  Your

22   Honor already held that their respondeat superior claims

23   against the PLO are dismissed if there is no evidence of any

24   PLO involvement, and the plaintiffs have not identified any PLO

25   material support for these particular attacks.

F1cdsok4

1              THE COURT:  I'm sorry.

2              MS. FERGUSON:  The plaintiffs have not identified any

3      admissible evidence of PLO support for these attacks.

4              THE COURT:  Well, I think that you've routinely argued

5      to me that I should make a distinction between the PA and the

6      PLO, a distinction that may or may not be an appropriate

7      distinction to draw.  I am not in a position to make that

8      distinction at this point because the plaintiffs contend that

9      they are going to demonstrate that there is a direct link

10     hand-in-hand with the activities and decision making of the PLO

11     and the PA and that they are going to demonstrate the same

12     people made the same decisions, and they are the same officials

13     that consistently made those decisions on behalf of the PA, the

14     PLO.  Now, whether they are going to be able to establish that,

15     I don't know, but I am not in a position now to say that the

16     decision making and the activity that they may end up

17     attributing to certain individuals, particularly Yasser Arafat

18     and other individuals, that when Yasser Arafat signs off on

19     something, that technically it is only a sign off for the PLO

20     with regard to an issue that he signed off for the PA and PLO.

21     I think it depends on the nature of the decision making process

22     and it depends on the nature of whether or not there are others

23     who are making individual decisions that could be independent

24     or inconsistent with those decisions.

25              So at this point I am not in a position to make a

F1cdsok4

1    factual determination with regard to distinguishing the

2    decision making process, the activities, or the involvement of

3    the PA, particularly direct involvement in PA and PLO.  I think

4    it is a factual determination to be addressed by the jury, and

5    I think depending on whether or not they can establish a

6    unitary decision making process and a unitary involvement in

7    these alleged -- these terrorist attacks, I think that is an

8    issue for the jury to evaluate and not a legal question that

9    the Court can as a matter of law determine at this point

10           MS. FERGUSON:  There is a legal standard as to whether

11   one entity can be deemed an alter ego of another, and the

12   plaintiff have not proffered facts so it doesn't share

13   leadership at the Yasser Arafat level, which is insufficient

14   for alter ego status.

15           THE COURT:  I am not even addressing specifically the

16   legal relationship of alter ego.  And it is a factual

17   determination with Yasser Arafat, or others, who make

18   decisions, sign off on issues, provide funding, if they say

19   they can establish that, whether it is a decision being made on

20   behalf of the PA or it is a decision made on behalf of the PLO.

21           MS. FERGUSON:  But there is no evidence of any Yasser

22   Arafat sign-off related to any of these attacks at issue.

23           THE COURT:  There is clearly at least evidence of

24   Yasser Arafat's sign-off on some payment of monies to people

25   that they contend are people or entities involved in the

F1cdsok4

```
 1    terrorist attacks.  So there is -- you know, if they say that
 2    Yasser Arafat approved providing money to the AAMB for the AAMB
 3    to commit a terrorist act, there is a factual determination,
 4    not a legal one, whether or not he was doing that on behalf of
 5    the PA or he was doing that on behalf of the PLO if he serves
 6    as dual roles in both organizations.  I don't know what the
 7    evidence is.
 8         MS. FERGUSON:  Even the plaintiffs acknowledge there
 9    is no evidence of PA or PLO payments to an organization called
10    the Al-Aqsa Martyrs Brigade.  The only thing they are relying
11    on is -- the classic example is that letter we looked at
12    earlier where $350 to this group of people unrelated, and we
13    have no evidence that it is for terrorism or that there is any
14    effort to reward terrorism.
15         THE COURT:  That is a different issue than the issue
16    you are raising now.  The issue you are raising now is that
17    somehow I should make a legal determination that the PA and the
18    PLO are different entities so that any activity that the PA was
19    involved in the PLO can't be responsible for that, or any
20    activity that the PLO is involved in the PA can't be
21    responsible for that.  I do not have a record to make that kind
22    of a determination.
23         MS. FERGUSON:  So the absence of evidence against the
24    PLO, the PLO is going to file based on evidence against the PA?
25         THE COURT:  Well, you know the answer to that is no.
```

F1cdsok4

1    As I am saying, the answer to that is no.

2              MS. FERGUSON:  I mean, the PA is an elected

3    government.  So the whole alter egoness doesn't apply.  At one

4    point Hamas was running the PA government and they are not even

5    part of the PLO.

6              THE COURT:  I'm not sure what -- I'm sorry, go ahead.

7              MS. FERGUSON:  They definitely do not meet the alter

8    ego test.

9              THE COURT:  OK.  So I am not sure what decision you

10   are asking me for at this point.

11             MS. FERGUSON:  But in the absence --

12             THE COURT:  You want me to rule what?

13             MS. FERGUSON:  I want you to dismiss the PLO because

14   there is an absence of evidence as to the PLO, and the PLO

15   should not be tried based on attributing PA evidence to it

16   based on an alter ego theory.

17             THE COURT:  But there is separate evidence that they

18   say that they are going to rely upon that they say would

19   independently make the PLO responsible on not only a respondeat

20   superior theory but on the theory that they are PLO agents and

21   individuals who were acting at the direction of the PLO to

22   commit these terrorist acts.  I mean, that doesn't get them out

23   of the case.  I mean, it may end up being that they can't

24   attribute both theories to both sides, and clearly I have

25   already indicated that they can't attribute both theories to

F1cdsok4

1    both sides because the PLO was not the employer and the PA is

2    the employer so that respondeat superior theory only applies to

3    the PA.

4          But any evidence that they want to offer that the PLO

5    was directly involved in, supportive, provided material

6    support, harbored terrorists who committed these acts, or any

7    of their agents that they say were involved in participating in

8    the accomplishment of these acts is direct evidence against the

9    PLO, and the PLO would have to -- the jury would have to assess

10   whether that evidence is strong enough to make the PLO

11   independently liable or not.  And they still have the burden

12   and they will have the burden of demonstrating the independent

13   liability of the PA and the independent liability of the PLO.

14         Now, if they want to establish that with the same

15   evidence, that is another question.  But if they -- you know, I

16   don't think that there is anything that I have ruled that is

17   inconsistent with that.  And I don't think that there is any

18   basis for me to conclude that there isn't sufficient evidence

19   that they intend to try to present to indicate that PLO

20   employees and PLO officials, the jury has evidence to consider

21   as to whether or not they were either directly involved in any

22   of these terrorist acts or involved in the decision that

23   supported these terrorist acts.  All right?

24         Anything else that we need to address before we go and

25   prepare for tomorrow?

F1cdsok4

1          MR. YALOWITZ:  I have two items, your Honor.  I have

2     three items.  One of them we don't need to address right this

3     minute, but it is an open issue that I just want to make sure

4     we can get back from you.  The defendants have offered two

5     depositions for these late-substituted witnesses.  We would

6     like --

7          THE COURT:  If you want to do the depositions and you

8     have agreed to it, go ahead and do the depositions.

9          MR. YALOWITZ:  And I would like one of al-Bakri also,

10    who we talked about before.  He was one of the claims that

11    Abdullah Barghouti escaped.  I would like to do him in New York

12    so that we don't have to have somebody running out to Israel to

13    take these depositions.

14         THE COURT:  The two depositions that you agreed to,

15    you can do the al-Bakri deposition.  I am not going to do that

16    deposition at the same time unless you want to agree to that.

17    If you want to agree to that, I don't see it at this point.

18         MR. YALOWITZ:  All right.  Can we have the Court order

19    them to be done in New York so we don't have to send somebody

20    out --

21         THE COURT:  Are these people coming here as witnesses?

22         MR. ROCHON:  Exactly.  They would have to be here as

23    witnesses, yes, your Honor.  I should tell you that we may come

24    to a point in this trial where some of our people are denied

25    visas and we are having problems with that and have to do some

F1cdsok4

1    testimony by videotape from there.  They have applied for visas

2    but --

3                THE COURT:  How do you want to do depositions of these

4    two people?  You agree to do the depositions?

5                MR. ROCHON:  I agreed to do them.

6                THE COURT:  How?

7                MR. ROCHON:  I don't know when they are going to get

8    here right now.  You will have to give me time to figure out

9    the travel plans, your Honor.

10               THE COURT:  All right.

11               MR. ROCHON:  I will obviously try to get them here a

12   couple of days before they testify so he can do their

13   depositions.

14               THE COURT:  Let me see if I can solve your problem.

15               MR. YALOWITZ:  Thank you.

16               THE COURT:  You have two choices.  You can get them

17   here the week before they are going to testify, in that week,

18   to do the deposition.  So they should be here sometime before

19   the Friday before the Saturday or Sunday.  If they are going to

20   do the deposition, do the deposition so they can have it, they

21   can review it over the weekend, and they can further prepare

22   for the witness the next day.  If that is not possible, then

23   you should both consider whether or not you are going to do --

24   you can make arrangements for some kind of video deposition of

25   these witnesses immediately -- immediately within the next two

F1cdsok4

1    to three weeks so that they still have an opportunity to do

2    that if they want to convince me, after they have done that,

3    that somehow that is inadequate and I can hear that.

4          But it seems to me that you either should give them a

5    very early video deposition within the first two or three weeks

6    of this trial or give them a live deposition a week before they

7    are supposed to testify -- the week -- the week before --

8    during the week before they are supposed to testify so they can

9    have a full opportunity to be fully prepared for the witness.

10   And you should let them know within a week which one of that

11   could happen.  So see if you two could work it out.

12         MR. ROCHON:  Understood.  So within a week I will let

13   them know which it is going to be.  If it is going to be by

14   video, we will set it up several weeks beforehand.  If it is

15   going to be live, it will be the week before they testify.

16         THE COURT:  If it is going to be by video, you should

17   set it up with within three weeks.

18         MR. ROCHON:  OK.

19         THE COURT:  So if you have a week to tell them, then

20   within the next two weeks just go ahead and do it by video and

21   get it over with so you can concentrate on this job.

22         MR. ROCHON:  That is fine.  Thank you.  We might be

23   able to arrange to have those taken for defendants by someone

24   other than Mr. Yalowitz and myself so that we can do them even

25   while we are in court, if that is OK with --

F1cdsok4

          1              THE COURT:  Sure.

          2              MR. YALOWITZ:  Your Honor, I'm not --

          3              THE COURT:  Do you want to agree to do it on the

          4     weekend, that is fine.

          5              MR. ROCHON:  I'm sure that we are going to want to

          6     have someone else take it that is going to be other than I.

          7              THE COURT:  I'm not sure that this is going to be

          8     critical to either case.

          9              MR. YALOWITZ:  I agree.  OK.  Two other really quick

         10     logistical things.

         11              THE COURT:  Yes.

         12              MR. YALOWITZ:  Number one.  For the convictions, we

         13     have prepared five little binders that are organized by the

         14     five attacks for which there are convictions.  We will give the

         15     Court a courtesy copy today.  We will give the defendants a

         16     courtesy copy today.  And we would like the Court's permission

         17     during the course of Mr. Kaufman's testimony to hand those out

         18     to the jury so they can page through them and see them.

         19              THE COURT:  As long as you have laid the foundation

         20     and they are all admitted into evidence, you can do that.

         21              MR. YALOWITZ:  Thank you, your Honor.

         22              MR. ROCHON:  So I take it five binders, one of the

         23     five -- one for each of the five is where there are

         24     convictions?

         25              MR. YALOWITZ:  That is correct.

                         SOUTHERN DISTRICT REPORTERS, P.C.
                                 (212) 805-0300

F1cdsok4

1          MR. ROCHON:  OK.  Again, we have this issue with

2     redactions, your Honor.  I mentioned it earlier.  This comes up

3     until we get through it.  I am going to mention that to remind

4     you.

5          THE COURT:  You can remind me but I can't do anything

6     with it until you tell me what your problem is.

7          MR. ROCHON:  I understand but I got them Saturday --

8          THE COURT:  I understand.

9          MR. ROCHON:  I'll tell you, tomorrow morning I am sure

10    I will be able to inform you on that issue.

11         MR. YALOWITZ:  It sure would be helpful, your Honor,

12    if defendants would talk to me and let me know what their

13    problems are.  It might save the Court some time.

14         THE COURT:  It is always helpful for the lawyers to

15    talk.

16         MR. YALOWITZ:  That is my philosophy, but, you know,

17    you learn something new with every case, I guess.

18         The final thing is, your Honor, we have a request to

19    the Court for permission to play certain videos.  We haven't

20    given the Court that request yet.  We will file the letter --

21         THE COURT:  Is this the videotape we are talking

22    about?

23         MR. YALOWITZ:  This is different videos.

24         THE COURT:  A different video?

25         MR. YALOWITZ:  So these are videos primarily of PA

F1cdsok4

| | |
|---|---|
| 1 | senior officials speaking on tape, and we are going to file a |
| 2 | letter and -- but I wanted to give the Court courtesy copies of |
| 3 | the videotapes.  And one of the videotapes -- |
| 4 | THE COURT:  Do you have the transcripts? |
| 5 | MR. YALOWITZ:  I don't know if we have transcripts. |
| 6 | But they are translated -- none of them are very long and they |
| 7 | are like -- |
| 8 | THE COURT:  I think we discussed this several weeks |
| 9 | back. |
| 10 | MR. YALOWITZ:  Yes. |
| 11 | THE COURT:  That is fine. |
| 12 | MR. YALOWITZ:  Then one of them is something that we |
| 13 | would like to play with Mr. Pearlman.  It is a news footage -- |
| 14 | MR. ROCHON:  He sent it to us.  We didn't object to |
| 15 | it. |
| 16 | MR. YALOWITZ:  OK.  So we are fine with that. |
| 17 | THE COURT:  If you are both happy, I am happy. |
| 18 | MR. ROCHON:  Exhibit 49. |
| 19 | MR. YALOWITZ:  49, as edited to take out the sound. |
| 20 | THE COURT:  That is fine.  If you are both happy, I am |
| 21 | happy. |
| 22 | MR. YALOWITZ:  The two live witnesses are translated. |
| 23 | MR. ROCHON:  We are not going to object as they are |
| 24 | having a claim of present sense impression or spontaneous |
| 25 | utterance, given that these people are being interviewed live |

F1cdsok4

1    on the scene.

2              I just want the Court to know and we are aware of

3    this.  There are some graphic scenes there in the sense of

4    bodies but they are in bags and there is some blood but it is

5    at a distance.  Just so you are aware, we are calibrating our

6    objection to that kind of evidence.  So we recognize that this

7    is --

8              THE COURT:  You know --

9              MR. ROCHON:  They can laugh but I didn't object.

10             MR. YALOWITZ:  They are quick learners.

11             THE COURT:  I will do whatever is necessary to

12   minimize the undue influence of that kind of thing.  But, look,

13   I note, you know, the jury is not going to be surprised that

14   there is some blood.  OK?  It just depends on the nature of we

15   know what the most extreme photos are and we know what the

16   least extreme photos are.  So that is usually the rule of

17   reason guides that.

18             MR. YALOWITZ:  If your Honor will permit, I will hand

19   two copies of the CD to this Court.

20             MR. ROCHON:  I guess he has a got separate one.

21             MR. YALOWITZ:  Yes. (handing)

22             THE COURT:  All right.  I will let you adjourn.  And

23   if I can get you something before the end of the day, if you

24   would like the jury instructions, I will.

25             MR. ROCHON:  So, Mr. Yalowitz, these are the

F1cdsok4

1    additional videos and -- I don't know which videos we are

2    getting at this point.  I want to make sure that we are not

3    going to use them tomorrow.

4              MR. YALOWITZ:  No, we are not going to use them

5    tomorrow.

6              MR. ROCHON:  Except Mr. Pearlman's.

7              MR. YALOWITZ:  Pearlman, yes, but it is not in there.

8              Is one sufficient for the Court?

9              THE COURT:  That is fine.  All right.

10             Anything else?

11             MR. ROCHON:  No.  Thank you.

12             THE COURT:  Go prepare.  I will see you tomorrow

13   morning at 9:30.  I am going to send the jury to a different

14   courtroom.  When they've all gathered, I'm going to have them

15   brought here and then we will begin that process.

16             MR. ROCHON:  9:30 for us?

17             THE COURT:  Yes, please.

18             MR. ROCHON:  Thank you, Judge.

19             MR. YALOWITZ:  Thank you, your Honor.

20

21                                    -   -   -

22

23

24

25