F1D8SOK1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   MARK I. SOKOLOW, et al.,

4                   Plaintiffs,

5           v.                              04 CV 397 (GBD)

6   PALESTINE LIBERATION
    ORGANIZATION, et al.,
7
                    Defendants.
8
    ------------------------------x
9                                           New York, N.Y.
                                            January 13, 2015
10                                          9:30 a.m.

11  Before:
                    HON. GEORGE B. DANIELS,
12
                                            District Judge
13
                            APPEARANCES
14
    ARNOLD & PORTER LLP
15       Attorneys for Plaintiffs
    BY:  KENT A. YALOWITZ
16       PHILIP W. HORTON
         TAL MACHNES
17       SARA PILDIS
         CARMELA T. ROMEO
18       RACHEL WEISER

19  MILLER & CHEVALIER, CHARTERED
         Attorneys for Defendants
20  BY:  MARK J. ROCHON
         LAURA G. FERGUSON
21       BRIAN A. HILL
         MICHAEL SATIN

22

23  Also present:  RACHELLE AVITAL, Hebrew interpreter
                   RINA NE'EMAN, Hebrew interpreter
24

25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

F1D8SOK1

1           (case called)

2           THE COURT:  We are gathering the prospective jurors

3    together.  We may have one issue with regard to a juror that's

4    not among the first 28.  We may have an issue with regard to a

5    juror that's in the first eight.  But I think that the

6    information I have been given so far is that one of the jurors

7    had a serious heart condition and was rushed to the hospital

8    for some procedure or operation.  That juror is obviously not

9    going to be available for this trial.  It is not a juror, as I

10   said, that's in the first 28 that was pulled out of the wheel

11   so that shouldn't be an issue.  I have sketchy information

12   right now, but I think that juror is number 17.

13           Also, I am getting some information now about another

14   juror.  I will discuss it in a second.  If this juror is here,

15   then it's not a problem.  As I get some information about

16   whether or not they are all here, I should get that in the next

17   five to ten minutes.

18           I have received some letters this morning.  Let me

19   first go to the letter that I received from the defense about

20   an objection to some attached exhibits.  I received the letter

21   from Mr. Hill.

22           MR. HILL:  Yes, your Honor.

23           THE COURT:  You haven't seen any of these exhibits

24   that are proposed to be used with Mr. Kaufman.

25           MR. HILL:  With respect to the ones we attached, which

F1D8SOK1

1    are photographed as the car and the stone building, the one

2    that looks like a map with some writing on it, and the one that

3    has a stone building on it, we have never received those prior

4    to last night.

5            THE COURT:  Is that what you're objecting to?

6            MR. HILL:  Yes, your Honor.

7            THE COURT:  The stone building photograph?

8            MR. HILL:  The first three attached to my letter, your

9    Honor.

10            THE COURT:  Mr. Yalowitz, what is the situation with

11    these?

12            MR. YALOWITZ:  This is one of those things, your

13    Honor, where if the parties talked to each other, we wouldn't

14    have to waste the Court's time.  These are demonstratives that

15    I prepared to help the jury put a location to Mr. Pearlman's

16    testimony.  Mr. Pearlman is an eyewitness.  I took a map off

17    Google maps.  Mr. Pearlman drew a box of where his flower shop

18    is and where the bus blew up and that's what that map is.

19            Then the two photographs are from Google street view.

20    I pulled them off the Internet so that Pearlman can show a

21    scene of what his flower shop is and where the bus was just so

22    the jury can understand it.  They are demonstratives.  I am not

23    offering them in evidence.  We can offer them in evidence.

24            THE COURT:  My ruling is this.  If you're not offering

25    them in evidence, they are not shown to the jury.  They are not

F1D8SOK1

1    a demonstrative; they are substantive evidence.

2              MR. YALOWITZ:  Then consistent with your rule,

3    Mr. Pearlman will foundationalize them.

4              THE COURT:  Is there any reason why these pictures

5    weren't produced in a more timely manner?

6              MR. YALOWITZ:  The reason is because I thought we

7    would use them as demonstratives.  We met with Pearlman about

8    three weeks ago in Israel and pulled them off the Internet and

9    I just didn't think they needed to be produced.  So it's my

10   fault, my personal fault.

11             THE COURT:  Mr. Hill, you tell me, is there some

12   reason we should be fighting about these photographs?

13             MR. HILL:  Timing, your Honor.  It's the day before

14   trial.  If you don't stop this now, I assume every night before

15   trial I am going to get new stuff.

16             THE COURT:  You don't have to assume that.

17             The bottom line is that my position is this.  I am

18   going to start strictly enforcing the rule.  I don't

19   particularly see any undue prejudice with regard to these

20   photographs, and I don't know what you or he might want to do

21   with these photographs, but at this point in time, as I say,

22   it's time for me to start strictly enforcing the rule.

23             As you say, Mr. Yalowitz, it would be more helpful if

24   the parties would talk, but that burden is on you, not on them,

25   when you have an exhibit that you say you want to offer and you

F1D8SOK1

1    have never shown them that exhibit prior to the first day of

2    trial.  I can't fault them for that.  I fault you for that.

3           MR. YALOWITZ:  I accept responsibility, your Honor.  I

4    misunderstood the Court's views.

5           THE COURT:  I didn't make these rules up.  These are

6    the rules of the court.

7           MR. YALOWITZ:  I accept responsibility.  I don't see

8    any prejudice to them.  I will not let that happen again.  We

9    are talking about a three-week delay.  What we are talking

10   about is photographs that the witness can say, this is my

11   flower shop, this is what it looks like.

12          THE COURT:  The witness could have said that during

13   deposition, during discovery.  As I say, I agree with you, I

14   see minimal prejudice to the defense with regard to these

15   photographs, but I am going to start strictly enforcing the

16   rule.

17          Mr. Hill, if you want these photographs out, they are

18   going to be out.

19          MR. HILL:  I want them out.  I also want the

20   PowerPoint that I received last night out as well.

21          THE COURT:  That's what I asked you.  I asked you if

22   you had an objection and you said you had objection to the

23   first three.

24          MR. HILL:  You asked about the photographs.

25          THE COURT:  I asked you what you had objection to.

F1D8SOK1

```
 1    You said you just had an objection to the first three.

 2              MR. HILL:  I also object to the PowerPoint, which I

 3    also received for the first time last night.

 4              THE COURT:  Is there anything else you object to?

 5              MR. HILL:  We object to the materials that are

 6    referenced in the PowerPoint that were not produced during

 7    discovery as well as the other exhibits that were not produced

 8    during discovery that they intend to use with Mr. Kaufman and

 9    Mr. Pearlman.

10              THE COURT:  Mr. Yalowitz, is there some reason why you

11    didn't produce this PowerPoint that you apparently had

12    generated by your expert?

13              MR. YALOWITZ:  First of all, the PowerPoint wasn't

14    done until after court yesterday.  We had to adjust it based on

15    some of the Court's rulings.

16         I have been practicing law for 25 years, trying cases

17    for almost that long.  I have never had an adversary say, I

18    object to your PowerPoint with an expert.  You're not going to

19    let me use these photographs.  I think you're giving them

20    something they don't deserve.  But if we are going to start

21    having every day objections to expert PowerPoints, that's

22    ridiculous.

23              THE COURT:  We are going to have what the rule was as

24    I set down, Judge Ellis set down, and it was clear for both

25    sides.  If you were going to produce something that you want
```

F1D8SOK1

1    before the jury at trial as an exhibit, it should be produced

2    during discovery.  If it wasn't produced during discovery, then

3    it's not going to be before this jury.  This was not produced

4    during discovery.

5        My position is this.  With regard to the photographs,

6    if the defendants are objecting to these photographs, since

7    these photographs could have been obtained and a decision could

8    have been made and they could have been provided to the defense

9    during discovery, or at least even if it wasn't during

10    discovery at a significantly earlier time than the day of

11    trial, I am going to exclude those photographs.

12        My position is different with regard to the map.  The

13    map is something that the witness could create in the middle of

14    the trial.  It would not have to have been an existing map

15    prior to.  If you want to show him a map and have him mark on a

16    map where his flower shop was, then I think that's appropriate

17    and the witness can create such an exhibit during trial.  I see

18    very a little prejudice with regard to the defense, and I think

19    the intent of the rule that's set down, that's not in violation

20    of the intent, giving both sides notice of what they can

21    anticipate as evidence to be put before the jury.

22        With regard to the PowerPoint, I am not going to allow

23    the PowerPoint during the witness's testimony to be used by the

24    witness.  If you want to create a PowerPoint that is truly

25    demonstrative, then a demonstrative exhibit is an exhibit that

F1D8SOK1

1    the lawyer wants to utilize during summation which summarizes

2    the evidence or the testimony during the trial.

3              Now, if you want to create a PowerPoint that you want

4    to use during your summation, that's based on the testimony

5    that's put before the jury and/or exhibits that are put before

6    the jury, I have no problem with you using such a PowerPoint as

7    a demonstrative aid during your arguments if it reflects the

8    evidence that is already before the jury.

9              With regard to the witness now creating a PowerPoint

10   to reflect what he did before he got here and his analysis of

11   the situation, if you want to utilize such a PowerPoint, then

12   they should have had some notice of it.  My rule would have

13   been the same if their expert pops up with a PowerPoint that

14   they want to put before the jury during their testimony.

15             So my suggestion to both sides is, if you have

16   something that you think that's going to go before this jury

17   that the other side hasn't seen, then you better very promptly

18   show it to them because I am going to start strictly enforcing

19   the rule, that if they have not seen it prior to today, it's

20   not coming in.

21             MR. YALOWITZ:  Let me just understand the Court's

22   ruling on this because I have to say it really comes as a

23   surprise to me.

24             THE COURT:  It should not.

25             MR. YALOWITZ:  OK.  I accept that you're saying that,

F1D8SOK1

1    but I am telling you I think we have been candid with each

2    other, your Honor.

3         THE COURT:  I agree, but I think you violated this

4    rule.

5         MR. YALOWITZ:  I am telling you this comes as a

6    serious surprise to me, and I wouldn't say that if I didn't

7    believe it.

8         THE COURT:  What do you think the rule means that you

9    can't put an exhibit before the jury unless the other side has

10   previously seen it prior to the beginning of the trial?

11        MR. YALOWITZ:  My understanding was demonstrative aids

12   can be used during witness testimony.  That is a pretty common

13   practice.

14        THE COURT:  A photograph is not a demonstrative aid.

15   There is no difference between your photograph where you want

16   to put before them today and the photographs that we discussed

17   over the last several weeks that are exhibits.  These are not

18   demonstrative aids.

19        MR. YALOWITZ:  I am not talking about the photographs.

20   I accept the Court's ruling on that and moving on.  I am

21   talking about the PowerPoints because it's not just this

22   expert, it's experts coming down the road.

23        THE COURT:  This expert is supposed to testify today

24   or tomorrow.  You think it's fair for you to give it to them

25   less than 24 hours before the witness is going to utilize it

F1D8SOK1

1    for them to review it and decide how they are going to react to

2    it?

3            MR. YALOWITZ:  I had a discussion with the defendants

4    about demonstratives.  We offered to give demonstratives

5    significantly in advance of the day before.  They didn't want

6    to do that.  So the idea that now we go to no demonstratives,

7    as long as it's equal.

8            THE COURT:  Oh, it's equal.  If there is something you

9    want to show this jury during the presentation of evidence, if

10   the other side has not seen it, I am not allowing it to be

11   admitted as an exhibit to show the jury.  It can't be shown to

12   the jury during the trial unless it is admitted in evidence.

13   All right?  To be admitted in evidence means it is not a

14   demonstrative.  It means it is substantive evidence that the

15   jury should consider in making its determination.

16           If you are going to offer something other than what

17   you claim summarizes the testimony and the evidence that they

18   have seen, and you want to use it to demonstrate your argument

19   during your summation, then that's a demonstrative aid and that

20   can be utilized.  But if it doesn't reflect the testimony or

21   the evidence that's already before the jury, you cannot put it

22   in for the jury's review to use as substantive evidence.

23           That is what you're doing with this PowerPoint.  If

24   this expert was going to try to convince the jury of his point

25   of view with this demonstrative, then the other side had the

F1D8SOK1

1    right to know that that was going to take place, if you want

2    the jury to be able to review that and utilize it, and if they

3    wanted to ask to see it during their deliberations.  The rule

4    is very simple that I did not make up, and I will instruct the

5    jury this way, and you have seen it at the end of the draft of

6    the instructions that I gave you.  No exhibit that was not

7    admitted in evidence will go into the jury room for their

8    review.  You can call it demonstrative, you can call it

9    whatever you want to call it, but if it's not admitted into

10    evidence, it does not go into the jury room for their

11    consideration during deliberations.

12            Those are the rules.  Those are the rules that have

13    been around for 100 years or more.  They are not my rules.  So

14    that's the rule I am going to enforce.  I am no longer going to

15    listen to the lawyers talk about they should have discussed it.

16    The lawyer who is disadvantaged for not discussing it is the

17    lawyer who wants to now put the evidence in, and they did not

18    make sure that they shoved it in front of the face of the other

19    lawyer to make sure that they had no objection or to make sure

20    they could not raise a legitimate objection at the last minute.

21    Whatever you think that you have that they haven't seen, you

22    better show it to them or it's not coming in.

23            MR. YALOWITZ:  I hear you on that.  I need guidance

24    from you, your Honor.

25            THE COURT:  My guidance is I mean what I say.

F1D8SOK1

1          MR. YALOWITZ:  I need you to separate out the timing

2     and the substance, if you can for me.  Because I have other

3     experts who it will be very helpful to the jury when the expert

4     is talking about a perpetrator to see a photograph of the

5     perpetrator.

6          THE COURT:  Well, if those photographs were shown to

7     the defense --

8          MR. YALOWITZ:  They were.

9          THE COURT:  -- previously, then they don't have a

10    legitimate objection.  If the expert pulls it out of his hat

11    while he is sitting on the stand, and they say I have never

12    seen this photograph, my rule is fairly simple.  It's not

13    coming before the jury.

14         MR. YALOWITZ:  Agreed.  It will be very helpful for

15    the jury, when the expert is testifying, to see the name of the

16    person next to his photograph.

17         THE COURT:  That's different.  Those are things that

18    are technically being created while the witness is testifying.

19    As long as whatever demonstrative you use reflects the evidence

20    that's already before the jury, that's the way the rule works.

21         MR. YALOWITZ:  Right.

22         THE COURT:  There is no magic about this.  If it

23    reflects the testimony or the other evidence before the jury in

24    an exhibit, then you can represent it or create something that

25    represents it any way you want and use it as a demonstrative by

F1D8SOK1

1    yourself or try to create an exhibit that shows a bunch of

2    people's names and faces and show that to the jury, if those

3    items of evidence are items of evidence that the party has seen

4    and has been admitted into evidence.

5         MR. YALOWITZ:  Well, that's what this PowerPoint is.

6         THE COURT:  That's not what this PowerPoint is.  The

7    PowerPoint seems to represent what you say he is going to say.

8    You want him to say it and show it at the same time.  I am not

9    going to allow that.  We will listen to his testimony.  As far

10   as I am concerned, this doesn't fall outside of the category of

11   any report that an expert does.  This expert has created this

12   in writing, and has created this in writing prior to the

13   beginning of this trial.  You have an obligation to give them

14   everything that this expert has created prior to trial that

15   relates to his testimony, particularly if it's going to be

16   utilized during his testimony and shown to the jury.

17        You didn't do that.  That's the guidance that I can

18   give you.  We are not going to start doing this.  If you think

19   that some things you want to use, in an excess of caution, you

20   should make sure that they have seen it, and they have seen it

21   in plenty of time so I don't have to hear an argument that you

22   didn't show this to them, and you had an opportunity to do so,

23   and now you want to do so.  No, it's not fair for you to give

24   them something 12 hours before we are supposed to get it before

25   the jury and say, here, now you look at it and figure out what

F1D8SOK1

1    you want to do with it.  I am not going to do it.

2         MR. YALOWITZ:  We have got another expert coming

3    tomorrow.  We will get them his PowerPoint as soon as we can.

4    It doesn't refer to any evidence that they haven't seen, number

5    one.  Number two, he is going to build it on the fly.  So we

6    will get it to them this morning as soon as we can, but you're

7    going to really hamstring me if you don't let the

8    expert -- it's just like a flip chart.  If the expert was going

9    to write on a flip chart --

10        THE COURT:  You can let him write on a flip chart,

11   because you did not produce the exhibit that you created prior

12   to this witness getting on the stand that you decided prior to

13   the witness's testimony that you wanted to put physically

14   before the jury for the jury's review.  I am not going to allow

15   you to do that.  If you have some other things that you think

16   they have not seen, I don't care how you describe it, if they

17   haven't seen it prior to trial, I am not going to admit it at

18   this trial.  If they haven't shown you something prior to

19   trial, if you have an objection to that, I am not going to

20   admit it.  That's the rule we set down months ago, if not years

21   ago.  It's time to strictly enforce that rule.  No one has any

22   excuse for having something that they say they are going to put

23   before the jury at this point and the other side has not seen

24   it.  No excuse.

25        MR. YALOWITZ:  They are bamboozling the Court.  They

F1D8SOK1

1    haven't seen it in the order, but this is a summary of

2    documents that they have had for years.

3        THE COURT:  My attitude is very simple and this is the

4    last word on it.  If you say that not having the PowerPoint is

5    sufficient for them to have prepared for this trial and to

6    understand this case, then that's sufficient for the jury, and

7    you're not going to give the jury something different or more

8    than the other side has at this point.

9        That's the rule for everybody.  I am not talking to

10   you.  I am talking to everyone.  All right?  I am not going to

11   spend a lot more time on these kinds of issues.  If you say you

12   haven't seen it and the other side cannot tell me that they

13   have produced this either during discovery or in a timely

14   manner after discovery, which gave the other side plenty of

15   time to prepare for this and utilize it in whatever manner they

16   wanted to utilize it, it is not coming in.

17        MR. YALOWITZ:  I think, your Honor, I understand the

18   Court's ruling.  I understand it applies to both sides.  Before

19   we reach a final conclusion on this, I think Mr. Rochon and I

20   should consult at a break because we may be able to come to

21   agreement on it.  If we can't, both sides will follow the

22   Court's ruling.

23        THE COURT:  If you can come to agreement that's fine,

24   but otherwise this is the final ruling.

25        I am going to put that aside.  Let me see where we are

F1D8SOK1

1    with the jurors.

2            MR. ROCHON:  I have one quick issue with the jurors.

3            Obviously there is a lot of interested people in this

4    case.  Many of them are in the audience today, lawyers or

5    plaintiffs.  Obviously, contact with jurors is a very serious

6    issue.  This morning the lead lawyer for the plaintiffs in

7    Israel came out of the jury assembly room.  Fortunately, as I

8    understand it, our jurors were not instructed to go there.  But

9    it is obviously a grave risk for counsel, especially

10   experienced counsel, to be going into the jury assembly room.

11   I am not asking for any relief because our jurors could not

12   have been tainted because as I understand it they were not sent

13   there, but the risk is extraordinary.  I do think that the

14   defendants would at least benefit from the Court instructing

15   people about the importance of having no contact with the

16   jurors.  That could have been a significant problem.

17           THE COURT:  I intend to do that, and I have taken

18   steps to assure that we can minimize that.  I can tell you at

19   this point you're right.  I did not have the jurors return to

20   the central jury room; I had them return to a different

21   courtroom.  They have been amassing in that different

22   courtroom.  I have made arrangements with the court officers to

23   make sure that the court officers are able to escort the jurors

24   off of this floor during our breaks so that no one gets in the

25   elevator with the juror.  I want no one hanging out in the hall

F1D8SOK1

1    when the jurors are arriving, and there will be a court officer

2    who is going to be assigned to make sure there is no contact

3    between jurors, parties, or any other interested spectators.

4         I have taken serious precautions for that.  I intend

5    to emphasize that.  I will tell the jurors what I am going to

6    say right now, that I expect that no one will speak to these

7    jurors, no one will speak around these jurors, no one will talk

8    about this case while they are in this building.  That rule

9    goes for everyone who steps into this courtroom and everyone

10   who has any interest whatsoever in this case.  If I find out

11   that that's the case, I will take some action against that

12   party, whether it be a lawyer, their client or a spectator.

13        You can minimally anticipate that if someone violates

14   that rule, they will not be attending this trial on any further

15   days during this trial.  So let me emphasize that.  That's the

16   first step that I will take.  They will forfeit their right to

17   attend this trial if I find out that anyone is speaking about

18   this case while they are in this courthouse or they have spoken

19   or attempted to have contact with the jury.

20        Let's move forward so we can finish jury selection and

21   be prepared hopefully this afternoon to begin with opening

22   statements.

23        MR. ROCHON:  If we have a down moment, if it's OK to

24   address something.

25        THE COURT:  Yes.

F1D8SOK1

1          MR. ROCHON:  I know you're going to be bringing the

2    jurors in.  Obviously, there are a lot of people here already.

3          THE COURT:  I am moving everyone out of this side of

4    the courtroom and the jurors are going to utilize that side of

5    the courtroom.  Everyone will have to find seats on the other

6    side or they will have to stand.

7          MR. YALOWITZ:  Your Honor, I have a couple of things.

8          First of all, do you mind if counsel wanders away from

9    the podium?

10         THE COURT:  Down the street?

11         MR. YALOWITZ:  Some people walk around a little bit.

12   Some judges don't like that.

13         THE COURT:  I will give you as much leeway in that

14   regard as you would like.

15         MR. YALOWITZ:  Second of all, as your Honor has

16   observed, both sides have advisors about jury selection.  I

17   would like mine as close to me as possible because I am not

18   very good at it.  But I don't want him here if the Court is

19   going to introduce him as a jury consultant.

20         THE COURT:  I am not going to introduce any of the

21   parties at this point.  I am going to let you introduce

22   yourselves and introduce the parties when you do your openings.

23         MR. YALOWITZ:  That is perfect.

24         The third thing is, the Court wanted the names of

25   plaintiffs who are here for opening.  You want to deal with

F1D8SOK1

1    that after?

2              THE COURT:  Let's deal with that after.

3              MR. HILL:  Before we bring the jurors in there were

4    letters last night from us and one this morning from the

5    plaintiffs about prospective questions.  I think we have some

6    objections to the plaintiffs' proposed questions so maybe you

7    could rule on those before the jurors come in.

8              THE COURT:  Sure.

9              MR. HILL:  Your Honor, I believe one of the witnesses

10   may also be in the courtroom.  I think at this point any

11   witnesses should be excused, other than parties.

12             THE COURT:  The basic rule is anyone who is not a

13   party, a plaintiff or a defendant's representative or anyone

14   who is not an expert should be excluded.

15             MR. YALOWITZ:  I don't know if he is here yet.  Our

16   first witness is here.  He saw the bus blow up.

17             THE COURT:  I don't care what kind of witness he is.

18   If they want him excluded then that's going to be the general

19   rule.  All witnesses will be excluded until it's time for them

20   to testify.

21             MR. YALOWITZ:  Unless they are a party or an expert?

22             THE COURT:  Yes.  If there is such a witness, fact

23   witness, then that witness can wait in the witness room.

24             MR. YALOWITZ:  OK.  Fine.  Thanks.

25             THE COURT:  I don't have any problems with the

F1D8SOK1

1    substance of the defense questions that they want.

2         I don't have significant problems with most of the

3    substance of the questions that the plaintiff wants me to ask

4    except I am still not going to ask jurors specifically about

5    their assessment of damages.  I rarely have to do that.  The

6    jurors said they can follow my instructions on the law.  They

7    have already been instructed that that is what this case is

8    about.  I don't need to emphasize that point one way or the

9    other.

10        Also, that was probably, in essence, the only thing

11   that I didn't think that there was some question with regard to

12   the subject matter that I could ask, but I didn't know if you

13   had any other objection.

14        MR. HILL:  Three issues.  One, we had requested in our

15   letter with respect to the two jurors that had lost loved ones,

16   that they would be allowed to answer those questions at the

17   bench.

18        THE COURT:  I am not quite sure what you want me to

19   ask, the ones who lost loved ones in 9/11 or lost loved

20   ones --

21        MR. HILL:  No, I don't believe these were 9/11.

22        THE COURT:  Then I am not sure which ones we are

23   talking about.

24        MR. HILL:  Number 20 and Number 162, one has indicated

25   they are widow and one has indicated that they had a -- I can't

F1D8SOK1

1    remember the exact relation -- who was killed in a crime.

2              THE COURT:  What do you want me to ask people about

3    that?

4              MR. HILL:  Would you please tell us when you lost your

5    loved one and what happened?

6              THE COURT:  Why?

7              MR. HILL:  Because it may affect their ability to be

8    impartial in the case and it may affect our desirability to

9    choose them.

10             THE COURT:  I am not quite sure why it's relevant to

11   their qualifications as a juror.

12             MR. HILL:  It's not only qualifications, it would be

13   peremptories.  The reason they lost people, that may affect

14   whether or not we want them on the jury and want to exercise

15   one of our peremptories.

16             THE COURT:  Mr. Yalowitz, do you have a position one

17   way or the other about the nature of that inquiry?

18             MR. YALOWITZ:  It seems far afield to me and

19   intrusive.  I don't think it's necessary.  I defer to the

20   Court's judgment.  I am not going to fight it, but I don't

21   think it's appropriate.

22             THE COURT:  What do you want to know?

23             MR. HILL:  Just the circumstances of the deaths, if

24   they were killed in an act of violence, for example, that is

25   something that we would like to know about.  One of these

F1D8SOK1

1    people indicated they were killed as a result of a crime.  We

2    would like to know what happened so we can make a judgment

3    about whether or not that rises to the level of a cause

4    challenge or whether or not we want to use a peremptory.

5        THE COURT:  I will make some initial inquiry in that

6    regard but I am not going to do it at sidebar.  I will ask the

7    juror if they feel comfortable saying something and if they

8    want to tell us there, they can just tell us in general what

9    happened; if they want to do so privately, then I will bring

10   them up to sidebar.

11       MR. HILL:  Thank you, your Honor.

12       The only other two issues I had was with respect to

13   the questions the plaintiffs wanted to pose to Juror Number 57

14   where they wanted to ask about a particular organization that

15   they are a member of.  It is my understanding it is a religious

16   organization.  Given the Court's decision to not allow any

17   inquiry about religious views, I would ask that this particular

18   juror not be asked about their religious views.

19       THE COURT:  Quite frankly, I don't have a real problem

20   with asking about this from my perspective.  And my perspective

21   is, I don't know anything about this organization or what it

22   does and I don't think it's inappropriate for me to ask, if

23   they say they belong to this organization, if they can explain

24   to me what kind of organization this is and what kind of

25   involvement they have in the organization.

F1D8SOK1

1         MR. HILL:  The only other issue I had is with respect

2    to the question that the plaintiffs wish to pose to Juror

3    Number 186 which is the very last one.  It's about the burden

4    of proof.  I don't think it's appropriate to --

5         THE COURT:  I am not going to ask that question.

6         MR. HILL:  Thank you, your Honor.

7         THE COURT:  I will give the jury appropriate

8    instructions.  I think there may even be some language in the

9    final instructions that I am working on.

10        Let me tell you where we are.  We have several jurors

11   absent.  I think it's appropriate to move forward.

12        As I indicated, Number 17 has a serious medical

13   problem so that juror is going to be excused.

14        There is a juror, though, in the first eight who we

15   are missing.  That's Juror Number 93.  I will just give you

16   some basic information as I have it.  We attempted to reach out

17   to that juror yesterday to notify the juror to come in.  I was

18   told that the telephone has been disconnected and that juror

19   could not be reached.  We did some research and it appears that

20   the juror may be homeless at this point.  The juror may be

21   staying at the YMCA.  We are not quite sure what the situation

22   is but we sent out some information to try to reach that juror.

23   There has been no contact with that juror.  As I say, the

24   contact information we have, the phone is disconnected and

25   there is no way to contact the juror.  I think we did send some

F1D8SOK1

1    information to the local YMCA to try to have them reach out to

2    this juror but we have not heard from this juror and this juror

3    is not here today.  That's Juror Number 93.

4            So my suggestion is that we move forward, replace

5    Juror Number 93 with the first person that you said that you

6    wanted me to pull out of the wheel as the second ten.

7            MR. HILL:  That would be Juror Number 25 numerically.

8            THE COURT:  No.  That's not what I have.  That would

9    be the first juror whose name was pulled out of the wheel after

10   we did the 18 which was Juror Number 159.  You said you wanted

11   me to pull an extra ten because you wanted to know who the next

12   juror would be if we replaced a juror.  The next juror would be

13   the juror whose name was pulled out of the wheel and that would

14   be 159.

15           MR. HILL:  The reason why I am asking for 25 is that

16   25 is the next juror that we had designated acceptable.  93 who

17   has not appeared for whatever reason is one of the jurors we

18   had designated acceptable.

19           THE COURT:  That's not of the first 28 that we picked.

20   It's not a juror in the first 28.

21           MR. HILL:  Number 159 is a juror that plaintiffs have

22   designated as acceptable.

23           THE COURT:  No.  You told me you wanted me to pick a

24   second ten so that if we lost one of the 18, we would replace

25   one of those jurors with one of those ten.  That's what I

F1D8SOK1

1   intend to do.  This is what you agreed upon.

2           MR. HILL:  I don't believe we agreed to it.

3           THE COURT:  Why did I pick ten extra?

4           MR. HILL:  So we would know who was in the batting

5   order.

6           THE COURT:  He is in the batting order.  That is the

7   whole point.  Now it is time that he is at bat.  Let's go,

8   guys.

9           MR. HILL:  Your Honor, I just want the record to

10  reflect that what has happened is, the juror that we designated

11  as acceptable has not appeared and that person is being

12  replaced with a juror the plaintiffs designated as acceptable.

13          THE COURT:  So do you want me to chuck the second ten

14  that you say were on deck that you asked me to put on deck

15  because you asked me to do this -- I didn't do this.

16          MR. HILL:  No, your Honor.  I would like it to be

17  replaced with the juror that we designated as acceptable; that

18  is what I am asking because we are losing one that we

19  designated as acceptable.

20          THE COURT:  The fact is, you wouldn't have gotten that

21  in any case.  You would have gotten a random selection of

22  jurors.  That's what we did, a random selection of jurors.  I

23  put all of the people that you designated in the wheel.  They

24  did not come out of the wheel.  That's not my fault or your

25  fault.  That's the luck of the draw.  The luck of the draw is,

F1D8SOK1

1    this is the way you asked that the jurors be drawn to be seated

2    and questioned.  Now to try to change that process, unless the

3    two of you want to agree with that, I am going to do what you

4    agreed to and what you asked me to do which was to figure out

5    18 who we are going to put in the box, that if we lost one of

6    those 18, you would know who is on deck and who would fill that

7    slot.  We have lost 93 so 159 is on deck.

8              MR. HILL:  I understand, your Honor.

9              THE COURT:  We are missing four jurors.  One other

10   juror who is not in the 20, I think we are missing three other

11   jurors and I don't believe any of those jurors are within that

12   first group.  One is in the second ten that you pulled but that

13   is the ninth person.  I doubt we are going to get to that

14   person.  So at this point I think that without any further

15   delay we should bring the jurors down.  We should put the 18 in

16   the wheel.  We should spin the wheel and seat those jurors in

17   the order as we discussed previously.

18             MR. HILL:  Your Honor, just so I have got it clear,

19   are you saying number 57 is also absent?

20             THE COURT:  Number 57 is absent.

21             MR. HILL:  Thank you, your Honor.

22             THE COURT:  I would like that side of the courtroom

23   cleared.  Find seats over there or find places to stand if you

24   want to stay during the jury selection.  Then we will bring in

25   the jurors and we will seat those jurors.

F1D8SOK1

1              As I say, I don't want anybody lingering in the

2     hallway.  Anyone who comes to this floor, they either come into

3     this courtroom or they leave the floor.  I don't want people

4     hanging around in the hallway.

5              (Pause)

6              THE COURT:  Those people in front of the door, could

7     you move over to the side, please.

8              We have a slight change.  Number 57 has arrived.

9              Do the parties have an extra copy of the letters about

10    voir dire so that I can give a copy to my law clerk?

11             The jurors are entering.

12             (Prospective jurors enter courtroom)

13             THE COURT:  Please be seated, ladies and gentlemen.

14             Good morning, ladies and gentlemen.

15             First, let me thank you both for your patience and for

16    your cooperation in this jury selection process.

17             We brought your number back.  From your number we are

18    going to choose the 12 jurors who will be sitting on this case.

19    I appreciate your efforts in filling out the questionnaires.

20    We already have a significant amount of information about you

21    so I just have a few follow-up questions.  And I want to ask

22    each of you finally, before I move on to the next juror, if you

23    still feel that you could be a fair and impartial juror to both

24    sides, all sides, and that you can assure us all that you can

25    be fair and impartial jurors.

F1D8SOK1

1              Let me just make a couple of comments first.

2              First of all, a lot of people think that this process

3    is technically a process for us to decide whether you can be a

4    fair and impartial juror in this case.  Quite frankly, it's for

5    you to decide because we can only go by what you say.  We can

6    only go by your honest assessment of your ability to put aside

7    any preconceived notions, anything that you think you might

8    have heard outside of this courtroom and to decide this case

9    solely on the evidence presented in this courtroom.

10              I am being told that everyone is not in the room.

11              (Prospective jurors enter courtroom)

12              THE COURT:  For now, ladies and gentlemen, just come

13    in and stand on the side.  We will get you seats in a second.

14    We will be filling the jury box in a minute.

15              Come up to the front.  Just give me five minutes and I

16    will find seats for everyone.  Please stay on this side so we

17    can keep count of you.

18              (Continued on next page)

19

20

21

22

23

24

25

F1D3SOK2

1          THE COURT:  Is there anything we should address before

2     we adjourn for lunch?

3          MR. ROCHON:  We did have an issue with redactions.  We

4     are going to talk about it only if they are going to use the

5     things in opening.  Just the redaction goes to the convictions

6     and the statements at sentencing.  And I should ask if

7     Mr. Kaufman is here, this does relate to his actual testimony.

8     He is an expert and I defer to the Court on your rules.  If

9     this is a discussion that relates to his testimony, whether he

10    can remain or not.

11         THE COURT:  Is he here?

12         MR. ROCHON:  He was here before the break.

13         THE COURT:  He is an expert.  He comments upon

14    whatever he comments upon in his expert opinion.  So I think he

15    can stay.

16         MR. ROCHON:  We appreciated the opportunity to look at

17    the redactions.  This is an example of why we really do need to

18    get these things sooner.  As it turns out, there was one thing

19    in here that I'm sure the plaintiffs inadvertently left in

20    which was a direct reference to the Abu Talal name, about which

21    we fought so much.  And I've confirmed it is an oversight, but

22    it is why we need a lot of time.

23         In addition, there are other references in there that

24    we think should not be in there.  They're not properly redacted

25    in light of your rulings.

F1D3SOK2

1          THE COURT:  What is the nature of them?  I don't need

2     the substance.

3          MR. ROCHON:  If we get in the weeds, Mr. Satin will

4     address it.  I'll give you the big picture which is all I'm

5     capable of.

6          There are direct references that implicate Yassir

7     Arafat in that people are saying he did this, he did that.  Not

8     general references to him as leader, but pointing the finger at

9     him.  So there are those kinds of references we discussed.

10    There are statements in one file of what specifically another

11    individual said.  Muhammad Hashaika.  We recognize that the

12    names of suicide bombers aren't being redacted, but if it is

13    Muhammad Hashaika said X, Y, or Z, then we have the hearsay

14    problems.

15         THE COURT:  This is part of the indictment or part of

16    the judgment?

17         MR. ROCHON:  I believe, in that instance, part of the

18    indictment.  And I've now -- those are the major problems.  I

19    didn't spend my time looking at these redaction.  There are

20    some other things.

21         THE COURT:  Before we get into the details of that, do

22    you understand the nature of their objections?

23         MR. YALOWITZ:  This is the first time I'm hearing

24    about it, your Honor.

25         MR. ROCHON:  We had a call last night with your team,

F1D3SOK2

1    at your request.

2            THE COURT:  Do you know about the Yassir Arafat

3    objection?

4            MR. YALOWITZ:  First time I'm hearing about it.  But

5    yes, look, if they have proposed redactions, they should send

6    them to us and we'll look at them.  I can't comment.

7            THE COURT:  I don't know why I have to be the one to

8    say that.  I assumed that's common sense at this point, even

9    appropriate lawyering.  Look, talk to each other.  Tell them

10   what you want out, and have him agree that it's coming out or

11   have him say I refuse to take that out.  And then we will

12   discuss it as soon as we get back.  But I am not going to spend

13   a lot of time on it.

14           MR. ROCHON:  Judge, just so you know, we've had that

15   conversation not with Mr. Yalowitz.  With part of the army of

16   lawyers.  We had it last night.

17           THE COURT:  Mr. Yalowitz, have your lawyers had that

18   conversation?

19           MR. YALOWITZ:  I haven't seen any particular

20   redactions that they proposed.  I had a generalized

21   conversation, your Honor, in which they said we hate everything

22   you've done and you've got to redo everything.

23           MR. ROCHON:  No.

24           MR. YALOWITZ:  That is not a useful conversation.

25           THE COURT:  Gentlemen, this is not a useful

F1D3SOK2

1    conversation.

2                MR. YALOWITZ:  I agree.

3                THE COURT:  As we say, what we have is a failure to

4    communicate.

5                MR. YALOWITZ:  I agree.

6                MR. ROCHON:  One of my favorite movies.

7                THE COURT:  My suggestion is some representatives from

8    one side offer themself up as the person who will resolve this

9    issue.  Get it resolved.  Otherwise, I am going to resolve this

10   in 30 seconds when we get back here.  So resolve what you can.

11   Key it up for me what the disagreement is.  And let's move

12   forward.  It is a little late in the day for us to be arguing

13   about this and for you to be telling me that the two of you

14   haven't even discussed this.

15               MR. ROCHON:  I just want to say we did -- we sent an

16   e-mail.  We had the discussion last night.

17               THE COURT:  I assume they didn't give you a response

18   that was satisfactory.

19               MR. SATIN:  May I?

20               MR. YALOWITZ:  Why don't we have a conversation not in

21   front of the Court, and see if we can come to an agreement.

22   And if we can, that would be great.  And if we can't, then

23   maybe we'll have some specific things and we can stick a

24   document in front of you and you can say take that out, keep

25   that in.

F1D3SOK2

| | |
|---|---|
| 1 | THE COURT:  That seems like a very proper discussion. |
| 2 | MR. YALOWITZ:  Thanks. |
| 3 | MR. ROCHON:  It sounds great.  We did all that. |
| 4 | Except he wasn't involved.  It was -- who was it? |
| 5 | THE COURT:  I don't care.  It doesn't matter to me. |
| 6 | Make sure you have an understanding of what it is you want out, |
| 7 | and I want an understanding of what it is that you're refusing |
| 8 | to take out. |
| 9 | MR. ROCHON:  We're happy to have that conversation |
| 10 | with them again. |
| 11 | THE COURT:  You have to represent to me that you asked |
| 12 | them to take out X and they have refused.  Okay? |
| 13 | MR. ROCHON:  Yes. |
| 14 | THE COURT:  You put yourself in a position to |
| 15 | represent that, and you should put yourself in a position, if |
| 16 | somebody from your team has reviewed that and they've taken the |
| 17 | position that they will take it out, or they won't take it out. |
| 18 | That's the position that you both should be in, and neither one |
| 19 | of you are in.  So until you advance that for me, there is not |
| 20 | much for me to do with it. |
| 21 | Take your lunch hour.  I suggest you start |
| 22 | concentrating on the presentation of your opening statements |
| 23 | and the witnesses to the jury, rather than this. |
| 24 | Look, we've spent days, week, months, trying to |
| 25 | resolve issues so you can move forward efficiently.  I'm not |

F1D3SOK2

1  going to spin my wheels resolving issues that should have been

2  resolved long before this, and now you're telling me on the

3  first day of trial you that you don't know what direction you

4  are going to go.  Talk to each other.  Resolve it.  I'll see

5  everyone in this courtroom at 2 o'clock.

6          MR. YALOWITZ:  Thank you.

7          MR. ROCHON:  Thank you.

8          (Recess)

9          (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1D3SOK2

                        AFTERNOON SESSION

                           2:00 p.m.

1          (In open court; jury not present)

2          THE COURT:  As we're waiting for all the jurors to

3   arrive, let me ask you if you've agreed on where you disagree.

4          MR. ROCHON:  We've agreed on where we disagree, I

5   think, but we don't agree.  We at least have found --

6          THE COURT:  I'm not surprised.  What is it that you

7   want out that's not out?

8          MR. ROCHON:  Because I was focusing on the opening,

9   Mr. Satin will address that.

10          THE COURT:  Mr. Satin, what should be out?

11          MR. SATIN:  Last night we received from plaintiffs

12   three separate exhibits of court records that contained the

13   name in unredacted form of Abu Talal.  This is the one we

14   discussed over a significant period of time before.  So they've

15   given us an unredacted version containing the name Abu Talal

16   which is the name implicated by Munzar Noor when he was

17   convicted.  We want those --

18          THE COURT:  In what kind of document?

19          MR. SATIN:  There is an indictment, a sentencing, it

20   looks like a sentencing hearing or explanation, and an

21   appellate opinion, which are separate, just so the Court knows,

22   from the binder of documents that have been sent by the

23   plaintiffs previously of those records of convictions they were

F1D3SOK2

1    seeking to introduce.  This is what we received last night.

2    That's one issue.

3            THE COURT:  Let me address that issue.  Mr. Yalowitz,

4    why isn't their name redacted?

5            MR. YALOWITZ:  Your Honor, these are three documents,

6    I'll tell you they're Exhibit 325, 468, and 478.  And I would

7    like to offer those not for the truth, but for notice of Abu

8    Talal's name.

9            THE COURT:  Notice of name about what?

10           MR. YALOWITZ:  That this was an individual who was

11   publicly implicated as having been the organizer of --

12           THE COURT:  What evidence do you have that they were

13   put on notice by the document that you want to offer?

14           MR. YALOWITZ:  My only notice that I'm relying on

15   would be those documents.

16           THE COURT:  How does that put them on notice?

17           MR. YALOWITZ:  Because it is a public document and

18   they are the intelligence service.

19           THE COURT:  We've been through this on other

20   documents.  I'm not going to accept your notice argument simply

21   based on the fact it is a public document.

22           MR. YALOWITZ:  I understand.

23           THE COURT:  If you have some evidence that they were

24   provided with a particular document or a particular

25   information, that's notice.

F1D3SOK2

1           MR. YALOWITZ:  I do not have that evidence.

2           THE COURT:  As I say, I don't know what was in The

3   Wall Street Journal yesterday.  So that you can't say that I'm

4   put on notice of what they claim about any fact that happened

5   yesterday.

6           MR. YALOWITZ:  The only thing I'm going to do is -- I

7   understand the Court's ruling.  We'll move on.  If those three

8   documents are not in the record, I'll just file them as a

9   proffer.

10          THE COURT:  So you're going beyond the redactions.  It

11  is of no use to you with the redaction is the bottom line.

12          MR. YALOWITZ:  The only purpose of those documents

13  would be for notice.  Based on the Court's ruling, we won't put

14  them in front of the jury.  I want to make sure they're in the

15  record.

16          THE COURT:  If you have some document that someone

17  showed this document to somebody at the PA or the PLO so that

18  they have notice of it.  But if it was in The New York Times in

19  2002 on Sunday, February 1st, doesn't necessarily put them on

20  notice.

21          MR. YALOWITZ:  Okay.  I understand the Court's ruling.

22  I think the Court understands my position on that.

23          THE COURT:  I understand.  What else?

24          MR. SATIN:  The second one, now we're still talking

25  about a record related to Munzar Noor involving Abu Talal.

F1D3SOK2

1    This one is Exhibit 322.

2              THE COURT:  What kind of a document?

3              MR. SATIN:  It is a verdict.  And this is the one that

4    they had sent in redacted form, Abu Talal's name appears three

5    times.

6              THE COURT:  I don't need that much detail.  Is it in

7    an indictment in which the defendant who is pleading guilty is

8    trying to implicate a third party?

9              MR. SATIN:  Yes.  So let me be clear about what we're

10   seeking here.  We want not just Abu Talal's name redacted,

11   which they have agreed to, although they did miss one of them

12   but they've corrected it.

13             In addition, when Abu Talal was implicated by the

14   declarant Munzar Noor, he used the name Abu Talal, and his

15   position, which was a senior --

16             MR. YALOWITZ:  What page are we on, Mr. Satin?

17             MR. SATIN:  -- a senior operative of the PA's military

18   intelligence.  This is on page two of Exhibit 322.

19             THE COURT:  You want his name and his title redacted.

20             MR. SATIN:  Correct.

21             THE COURT:  Can we do that, Mr. Yalowitz?

22             MR. YALOWITZ:  We understood the Court's ruling, and

23   this is something that is expressed throughout, that the

24   defendants asked for this.  They said we want the

25   circumstances, the name, their position, all kinds of

F1D3SOK2

1     identifying information.  And as I recall the Court's ruling,

2     it was the name comes out, and that's what we've done.  But the

3     fact that the individual worked in a certain place.

4             THE COURT:  The fact that he's accusing a PA or PLO

5     employee or agent is the issue.  As I say, this is not rocket

6     science here.  If you say "I accuse Mr. Obama," there is not

7     much difference than saying "I accuse the president of the

8     United States."  All right?

9             So, let's use common sense here.  You can understand

10    why they would have a legitimate objection in that regard.  So

11    the identifying information is the position of the person at

12    the PA or the PLO.  That's an accusation against that

13    individual.  That's an identification of that individual.

14    That's an accusation against the PA, the PLO.  There is an

15    out-of-court statement of someone you do not intend to bring in

16    here as a witness to be cross-examined under oath.  That

17    identifying information should also be redacted.

18            MR. YALOWITZ:  All right.  I'm perfectly willing, your

19    Honor, to take out the thing they've identified that your Honor

20    has said is coming out.  I think we need to take it document by

21    document.

22            THE COURT:  Well, it should be taken out in every

23    document.  If you want document by document, if it is the name

24    of the person or the title of the person, it is clearly

25    identifying an individual, a third person that one would

F1D3SOK2

1    readily identify that they're accusing then, you should take it

2    out.  As I say, you can't say "I accused the president of the

3    United States" and nobody knows who you're talking about.

4              MR. YALOWITZ:  Well --

5              THE COURT:  Just because you didn't say the name

6    "Obama."

7              MR. YALOWITZ:  Look, I don't want to relitigate.  I

8    thought we had a different ruling.  We faithfully applied it,

9    and it was a lot of work.  If your Honor is going to do that,

10    then we'll follow your Honor's ruling.

11             THE COURT:  Obviously the rationale for the ruling is

12    I'm sure very obvious to you and everybody in this courtroom.

13    So you can understand that, no, it can't just be that I didn't

14    mention him by name, but I accused this guy who is standing in

15    front of me at the plaintiffs' table who is arguing the case

16    for the plaintiff.  That's you.  Everybody knows it is you.  So

17    you can't do it that way.

18             All right.  Anything else before I bring this jury

19    back in here?

20             MR. SATIN:  There are a number of other ones.  Do you

21    want me to go through it now or wait?

22             THE COURT:  You can wait.  I won't make the jury wait.

23             Mr. Yalowitz, approximately how long do you think

24    you'll be on opening?

25             MR. YALOWITZ:  Slightly less than an hour.

F1D3SOK2

1           THE COURT:  Mr. Rochon?

2           MR. ROCHON:  The same.

3           MR. YALOWITZ:  One other thing.  During opening, I

4    would like the Court's permission to give the jury copies of a

5    little cheat sheet card so they can keep track of the attacks.

6    I think it would be helpful.  If I could hand it up.

7    Mr. Rochon has it.  He objects.  If I can hand --

8           MR. ROCHON:  I might not object.

9           THE COURT:  Mr. Yalowitz, let's not fight about it.

10   Are you going to say yes or no?

11          MR. ROCHON:  I thought he was going to give it for the

12   entire trial.  If he wants to use it in opening.  The idea that

13   jurors are walking around with it.

14          THE COURT:  You want to utilize this in opening?

15          MR. YALOWITZ:  Yes, sir.

16          THE COURT:  You'll utilize it in opening.  When you

17   finish with the opening, we can collect it back.  If you want

18   to give it to the jury under some other circumstances, then it

19   will be done so as an exhibit.

20          MR. ROCHON:  I don't mind them keeping them for mine,

21   as long as they'll have them for his.

22          THE COURT:  Then leave them on the seat.  That's what

23   I do with any exhibits they examine when they get up.

24          MR. YALOWITZ:  Thank you, your Honor.

25          THE COURT:  All our jurors are here.  I am going to

F1D3SOK2

1    bring them in, swear them in, and give them preliminary

2    instructions and then we'll have opening statements.

3            MR. YALOWITZ:  Your Honor, would the Court like a

4    copy?

5            THE COURT:  Sure.

6            I think that podium could be moved a little bit more.

7            MR. ROCHON:  It is pretty beholden to an electrical

8    cord, your Honor.

9            (Jury present)

10            THE COURT:  Can we swear in the jurors.

11            (A jury of 12 is sworn)

12            THE COURT:  Members of the jury, at this point I'm

13    required by law to instruct you generally concerning your basic

14    functions, duties, and certain rules which apply to every jury,

15    so that you will better be able to assess and weigh the

16    evidence as it's presented and reach a proper verdict.

17            Now, the trial has commenced with the selection of the

18    jury.  The next step in the trial will be an opening statement

19    by the parties, if they wish to make an opening statement, to

20    outline for you what they intend to prove by way of evidence to

21    be presented in the case.

22            Now, after the plaintiffs' attorney makes his opening

23    statement, the defendants' attorney, if he desires, may also,

24    but is not required to, make an opening statement.

25            What counsel for either side says in an opening

F1D3SOK2

statement is not evidence.  You may consider it, consider the

opening statements a preview of what each side intends to prove

by way of evidence in the case.

        After the opening statement or statements, the

plaintiffs' attorneys will present one or more witnesses who

will be questioned by them.  This is called direct examination.

After the plaintiffs' attorney completes their questioning of

the particular witness, defendants' attorneys will be given an

opportunity to question the witness.  This is called

cross-examination.

        After the plaintiffs have concluded the calling of

their witnesses and the introduction of any exhibits which are

admissible into evidence, the defendants may, but are not

required to, offer evidence in their own defense.

        After both sides rest, the defendants' attorney may

make a closing argument followed by the closing argument of the

plaintiffs' attorney.  Then I will charge you on the law, and

you will retire to deliberate for the purpose reaching a

verdict.  This is a general outline of the trial procedure.

        You may not take notes during the trial, I ask you to

listen carefully.  The court reporter will be taking everything

down.  If you want any testimony read back during your

deliberations, we'll have a court reporter read it back to you

verbatim and whatever you may require.

        The evidence consists of testimony of witnesses under

F1D3SOK2

1    oath and exhibits which are admitted into evidence plus any

2    stipulations agreed upon by the attorneys.

3            Questions in and of themselves are not evidence.

4    Therefore, you cannot infer any fact from the mere asking of a

5    question.  It is the answer coupled with the question that

6    constitutes evidence.  For example, if a witness was asked a

7    question "Don't you own an automobile?"  And the witness

8    answers, "No," you may not infer from the mere asking of the

9    question that the witness does own an automobile.

10           During the course of the trial, the plaintiffs'

11   attorneys or the defendants' attorneys may object to a question

12   or an answer on the ground that it is somehow legally improper

13   or inadmissible.  If I sustained the objection, this means I

14   believe that the question or the answer was in some way

15   improper.  If an answer has already been given, I will instruct

16   you to disregard it, and therefore the answer is no longer

17   evidence in the case.  If I overrule the objection, then it

18   means that the question is proper, and I will permit it to be

19   answered.  Or if already answered, I will permit the answer to

20   remain as evidence in the case.

21           Please do not resent the fact that either attorney

22   makes objections.  This is their duty.  And do not hold it

23   against either side if I rule against them.

24           As I'll explain to you in detail in my instructions at

25   the end of the case, as jurors in this case, you are the sole

F1D3SOK2

judges of the facts, and I am the sole judge of the law.  You

must accept the law as I give it to you without hesitation or

reservation, even if you privately disagree with it.

You must keep an open mind throughout the trial.  You

must not converse among yourselves or with anyone else upon any

subject connected with the trial.  You must neither offer nor

express an opinion or reach any conclusion about what the

verdict should be until I finally give the case to you.

You must not read or listen to any accounts or

discussions of the case in the event that it is reported by

newspapers or other news media.

You must not visit or view any premise or place

described during the trial or any other place or premise

involved in the case.

You must not do any research or investigation about

the case on your own.  You must decide this case solely on the

evidence presented at this trial.

You must not speak to anyone about the case until the

trial is completely ended.  You must promptly report to the

Court any incident within your knowledge involving an attempt

by any person to speak with any member of the jury about the

case.

During the trial, again, you should not speak with any

of the parties in this case nor any individuals associated with

it.  They're instructed not to speak with you.  So don't

F1D3SOK2

1  consider it rude if they see you outside this courtroom and

2  they don't acknowledge your presence.  Obviously, if someone

3  would see you speaking to one of the parties involved in the

4  case, they might draw an improper inference, even though it

5  might be a perfectly innocent conversation unrelated to the

6  case.

7         As I indicated to you, it is my best estimate at this

8  point that this case should take approximately six to eight

9  weeks to present the evidence.  I will do my best to keep us on

10  schedule and even get ahead of schedule and shoot for a goal of

11  making this six weeks or less, rather than of the goal of

12  making this eight weeks or more.  By the end of this week,

13  depending upon how much progress we can make this week, I'll

14  start to get a feeling for where I think we are and what else I

15  think is anticipated in this case to be presented to you and

16  how long it might take.  As I say, I will keep you continuously

17  informed about what the schedule will be, and whether I think

18  we are ahead of schedule, behind schedule, or on schedule.

19         As I indicated, we will have some holidays in between

20  that I will honor, so I'll give you an opportunity to make your

21  own personal and professional plans around those holidays.

22         With those preliminary instructions, at this point

23  we'll now proceed with the next step in the trial which will be

24  an opening statement by the plaintiff.  Mr. Yalowitz.

25         MR. YALOWITZ:  Thank you so much, your Honor.

F1D3SOK2                    Opening - Mr. Yalowitz

1            March 21, 2002, was cold and rainy in Jerusalem.  Alan

2     Bauer took his oldest child, seven-year-old Yoni, to the doctor

3     and then stopped by the office.  A little after four, Alan took

4     Yoni by the hand and headed for home.  Their walk took them

5     through a busy downtown neighborhood.  They walked down Jaffa

6     Road, one of the busiest streets in Jerusalem, and they turned

7     left on to King George Street.

8            In the meantime, a Palestinian ex-cop by the name of

9     Muhammad Hashaika had snuck into Jerusalem.  Hashaika had a

10    bomb hidden under his clothing.  The bomb had powerful

11    explosives in it and homemade shrapnel, a bag of Phillips head

12    screws.

13           A woman led Hashaika to King George Street.  She told

14    him, "Allah will show you favor.  Allah willing, you will

15    reside in paradise."

16           Hashaika went up behind Alan and Yoni and set off the

17    bomb, killing himself instantly.  The blast hit Alan from

18    behind, threw him to the ground.  He had just been holding his

19    seven year old by the hand.  Now Yoni was missing.

20           The scene was chaotic, filled with smoke and fog.

21    Three people were dead.  81 wounded.

22           Alan ran back and found Yoni.  He was on the ground

23    gurgling.  Minutes passed.  They got Yoni into an ambulance.

24    The paramedics checked his arms, his legs, his torso.  They

25    couldn't see what was wrong.  Then they took a towel out from

F1D3SOK2                    Opening – Mr. Yalowitz

1    behind the back of his head, and the towel was soaked in blood.

2    Suddenly, Alan realized what had happened.  Something had

3    penetrated his little boy's brain.

4         Now, Yoni survived, but his life is not the life you

5    would wish for your child.  He can walk, but he can't walk the

6    way you and I can walk.  He can talk, but he can't talk the way

7    you and I talk.  He can use his arms, but not the way we can.

8         Ladies and gentlemen, my name is Kent Yalowitz.  I

9    have the privilege of representing the Bauer family and nine

10   other American families who survived terror attacks in

11   Jerusalem, Israel.  My colleagues will help me try this case,

12   Tal Machnes, Phil Horton, Carmela Romeo, Sara Pildis, Rachel

13   Weiser.  We'll be together over the coming weeks, and we will

14   prove to you that the defendants, the Palestine Liberation

15   Organization and the Palestinian Authority, bear the

16   responsibility for six brutal attacks.

17        With the Court's permission, I am going to hand you a

18   summary which we also see up on the screen, of these attacks.

19        May I, your Honor?

20        THE COURT:  Yes.

21        MR. YALOWITZ:  Thank you so much.  If you can just

22   pass them around, that would be great.  Thank you.

23        The evidence will show that killing civilians was

24   standard operating procedure for the Palestine Liberation

25   Organization and the Palestinian Authority.  We will ask you at

F1D3SOK2                    Opening - Mr. Yalowitz

1    the end of the trial to award money damages for economic

2    losses, physical injuries, emotional losses, pain, suffering,

3    and the loss of a loved one.  We will ask you to award these

4    damages under the Anti-terrorism Act which allows Americans,

5    United States citizens, who have been injured by terrorism

6    anywhere in the world, to recover money damages in a United

7    States court of law.

8              I want to begin by telling you about the families who

9    have come to court today seeking justice.  I already told you

10    about the Bauer family.  That's Alan, circled in red.  He is

11    the one who had his little boy by the hand.  Yoni, also circled

12    in red, was seven at the time of the attack 12 years ago.  Mom,

13    Revital Bauer, and three younger children who will not be

14    testifying, but who are plaintiffs in this case.

15              Next I want to tell you about Shayna Gould.  Shayna's

16    circled in red there down at the bottom of the picture of her

17    family.  Shayna was 19, studying abroad for a year in Israel.

18    She was waiting at a bus stop when a Palestinian Authority

19    police officer with an M-16 assault rifle shot her in the

20    chest.  She bled out.

21              By the time she got to the hospital, she was listed as

22    dead on arrival, but a doctor saved her life by breaking open

23    her rib cage and giving her cardiac massage.

24              Her family back in Chicago received a call to come

25    urgently.  Get on a plane and come urgently, because she might

F1D3SOK2                    Opening – Mr. Yalowitz

1   not survive the night.  They raced to Israel, and when they got

2   there, the doctors told them "She's alive, she's in a coma, and

3   when she comes out of it, we don't know if you're going to get

4   the same girl back."

5        She lost a lung, she had severe damage to three ribs,

6   she has severe scarring, she has severe physical pain to this

7   day, and she has even worse emotional pain.

8        Let me tell you about the Waldman family.  Shmuel

9   Waldman was on that same street that same day.  Shmuel and his

10  wife Henna are here in the courtroom.

11       Stand up, Shmuel and Henna.  Thank you so much.

12       Shmuel and Henna were young newlyweds.  Shmuel was 20

13  that terrible day.  He was on his way home from work, waiting

14  on a bus to meet his beautiful wife.  He heard the scream

15  "Allahu akbar" and then he got shot in the leg.  He prepared

16  himself for death and he thought he was going to die, but he

17  didn't die.  Instead began a 13-year nightmare for this man.

18  Terrible leg injuries, multiple leg surgeries, terrible

19  emotional, disabling emotional injuries.  He lost his business.

20       Let me tell you about the Sokolow family.  The Sokolow

21  family are here, too.  Mark, Rena, stand up, Mark and Rena.

22  Elana, Jamie, Lauren.  I think Jamie and Lauren are here.

23  Stand up if you're here.  Jamie, Lauren, Elana.

24       The Sokolow family was visiting Elana.  She was

25  studying abroad in Israel.  The family decided to take a trip

F1D3SOK2                    Opening - Mr. Yalowitz

to see her.  They were in Jerusalem on that same busy downtown

shopping street, Jaffa Road, when a terrorist set off a bomb

and blew herself up behind them.  Rena, Jamie, Lauren, Mark,

they were all wounded.  They all had shrapnel.  They were

separated by blast.  They went to three different hospitals,

each one not knowing whether the other ones were alive or dead.

Not knowing if any one in the family was okay.  Jamie was 12

years old.  Rena actually saw the head of the suicide

terrorist.  She had horrible damage to her leg.

        Let me tell you about the Mandelkorn family.  Shaul,

Leonard, Nurit.  Shaul was 18, he had been away on a school

trip for a weekend.  He was taking a bus home, and he got off

the bus, and he walked into the path of a suicide bomber.  He

had shrapnel over a lot of his body.  He had horrific pain.  He

was in the hospital for more than a month, and his parents bore

a heavy, heavy burden of caring for this young boy.  And they

still bear that burden, because he was destroyed by emotional

injuries.

        This is the Goldberg family.  They were a beautiful,

close-knit family.  They did everything together, they sang

together, they went everywhere together.  Even family chores

were a fun game for these kids when their dad was around.

Scotty Goldberg was the glue that held this family together.

        On the morning of January 29, 2004, Scotty didn't take

his usual bus to work.  No one knows why.  He wound up on a

F1D3SOK2                    Opening – Mr. Yalowitz

1   different bus, and he never made it to work that day.  The bus

2   he was on was blown up by a PA police officer.  He left a widow

3   and seven children.  The oldest child, Chana, was only 16.  The

4   youngest was a baby.  This family's lives were torn apart.

5   You're going to meet them, other than the younger kids.  And

6   you're going to see they're still trying to pick up the pieces.

7           Ben Blutstein was in his early 20s.  He was studying

8   abroad.  He was in Israel to study to become an educator.  On

9   the Sunday before he died, he called his parents.  He told his

10  mother, "I am the happiest I have ever been.  I finally know

11  what my place is in life."  He was supposed to take a test

12  Wednesday for his school and then come home that evening.

13          He stopped off for lunch at the Frank Sinatra

14  cafeteria at Hebrew University, sat down at a table for lunch,

15  and that was his last meal.  He never even made it to the test.

16  A hidden bomb ripped through that cafeteria and killed Ben and

17  eight others.

18          This is Diane and Larry Carter.  Larry is a

19  veterinarian from North Carolina.  His daughter Diane had left

20  home and she had cut off contact with the family.  Her dad

21  hoped and prayed for a reunion.  He loved that daughter.  And

22  the day he found out that she had been killed by a terrorist

23  bomb, that day his hope died too.

24          Here is the Coulter family.  Janis Coulter lived in

25  Brooklyn.  She worked in Manhattan for a study abroad program.

F1D3SOK2                    Opening - Mr. Yalowitz

1    She was the apple of her dad's eye.  She was her sister's best

2    friend.  Her boss got sick, and she had to substitute in for a

3    three-day business trip.  She was one of the Americans killed

4    at the Frank Sinatra cafeteria that day.  Her dad turned on the

5    news that morning and he saw her beautiful hair spilling out of

6    a body bag on television.  The family had to travel down from

7    Massachusetts to J.F.K. Airport to pick up Janis's body in a

8    cardboard box.

9            Here's David Gritz.  David's parents also learned

10   about it from the morning news.  They were in New York, too,

11   staying with friends.  They tried desperately to call David, he

12   didn't answer his phone.  He was a beautiful soul.  He was

13   musical, he was philosophical, he became interested in religion

14   although he hadn't had much when he was young, either from his

15   mom or from his dad.  His mom was Catholic, his dad was Jewish.

16   Israel was interesting to him because he was trying to learn

17   about religion.  He went to Jerusalem to study for a year.

18           The day he died, his parents spent the whole day in

19   New York waiting, calling the authorities, trying to get

20   information.

21           His dad passed a couple years later.  Now his mom

22   Nevenka is alone in the world.  Before David died, she had

23   never been to Jerusalem.  Now she goes there as often as she

24   can because she wants to walk where her son walked.

25           Now I want talk to you about who perpetrated these

F1D3SOK2                    Opening - Mr. Yalowitz

1    violent crimes.  I want to start with the group that attacked

2    Alan and seven-year-old Yoni that cold day in March 2002.  The

3    evidence will show that the suicide bomber who attacked Alan

4    and Yoni did not act alone.  It turns out that he was a -- bear

5    with me.  I think -- well, I'll show you the cell anyway.

6           It turns out he was assisted by a whole group of

7    people.  You can see a picture of Muhammad Hashaika, the

8    suicide bomber down there at the bottom.  I am going to prove

9    to you that all of these individuals had a role in his suicide

10   attack.

11          It turns out that Hashaika was a known and

12   specifically identified threat.  Five weeks before he attacked

13   Alan and Yoni, the Palestinian Authority itself arrested him

14   because he was planning a suicide attack.

15          Some of you may have heard of the Palestinian

16   Authority.  Sometimes we're going to call it the PA for short.

17   It is the local government in the Gaza Strip and West Bank.

18   Let me show you a map.  The West Bank and the Gaza Strip are

19   these brown areas.  At the time of the events, they were the

20   local government in these two areas.  It was created, the

21   Palestinian Authority was created by the Palestine Liberation

22   Organization, sometimes called the PLO.  The PLO is a political

23   entity that represents the Palestinian people.  The evidence

24   will show that the PLO is in charge of the PA.

25          So, the PA, the Palestinian Authority, provided local

F1D3SOK2                    Opening – Mr. Yalowitz

government services, including police and security services.
The Palestinian Authority had a local police force, it had a
presidential guard, it had an intelligence service, it even had
a preventive security service.  They were armed.

          Now let me show you some more about the terror group
that planned and executed the bombing of Alan and Yoni.  Up at
the top, you see a Palestinian Authority officer named Abdel
Karim Aweis.  He's at the top right.  Next to Aweis you see a
little eagle emblem.  I put that there, because I'm going to
prove to you that he was an employee of the Palestinian
Authority.  That little eagle is a symbol that the Palestinian
Authority uses on their documents.  It is like their little
shield.  I put it there because that will help you remember
that I'm going to show you that he was a Palestinian Authority
employee.

          I already mentioned down at the bottom you see
Muhammad Hashaika.  He was the suicide bomber.  Now, Aweis, the
evidence will show, up at the top, got Hashaika released from
jail, and teamed up with the fellow at the top on the left
named Nasser Shawish to plan the attack.  The terror group also
included two women who snuck Hashaika into Jerusalem past all
those security points.  You see them there in the middle of the
chart.

          The evidence will show that these people got help from
a man named Toufik Tirawi.  You'll hear a lot about Tirawi.  He

F1D3SOK2                    Opening - Mr. Yalowitz

1     was the head of the intelligence service where Aweis worked.

2     In other words, the evidence will show that he was one of the

3     top officials for the defendant Palestinian Authority.  We're

4     going to show you that he provided support for this terror

5     group.

6           Tirawi's direct boss was Yassir Arafat.  Some of you

7     may have heard of Arafat.  He was chairman of the PLO for

8     decades.  He was president of the Palestinian Authority from

9     the day it was created to the day he died.

10          The evidence will show that Arafat was the epitome of

11    one-man rule.  You'll hear testimony and see documents showing

12    that he controlled the money.  Indeed, all of the PLO's money

13    came from the Palestinian Authority.  For all intents and

14    purposes, the evidence will show, the PLO and the PA were one.

15          Now, I want to give you an example of Arafat's

16    personal control.  It is Exhibit 1060.  It is in the original

17    Arabic and came from the files of the Palestinian Authority.

18    It is from Tirawi, the fellow I just mentioned, the head of the

19    PA's general intelligence service.  You'll see his signature

20    down there at the bottom.  It is addressed to Yassir Arafat.

21          We've translated it to show how they addressed Arafat.

22    "His excellency, brother, president and general commander, may

23    Allah protect him."  That's Yassir Arafat, the evidence will

24    show.

25          Now, we've translated the document to show that

F1D3SOK2                    Opening - Mr. Yalowitz

1    Hashaika is specifically discussed as a suicide terrorist.

2    Here we see that Arafat was personally informed of the arrest,

3    and we see at the bottom Tirawi writes to Arafat, "the matter

4    is at your excellency's discretion."  Five weeks later,

5    Hashaika was out of jail with a bomb strapped around his body.

6              Now, the PA and the PLO never provided us with a

7    direct order from Arafat saying release Hashaika.  Arafat

8    didn't work that way.  Such was his control that a simple,

9    quiet nod of the head was enough.  You won't see anything else.

10             Let me tell you about the other six attacks -- excuse

11   me, the other five attacks.  You see them on your chart.

12   January 22, 2002, was the attack against Shmuel Waldman and

13   Shayna Gould.  The evidence will show that they were shot by

14   the man at the bottom, Said Ramadan.  There you see him with

15   his M-16 rifle.  He was a PA police officer.  This group had

16   six Palestinian Authority security officials.  I put the little

17   eagle emblems to show you which ones were PA employees.

18             You see the same pattern as in the attack on the Bauer

19   family.  Commanders, someone who recruited the suicide

20   terrorists, people who prepared him, videotaped him reading his

21   suicide will, people who transported him to the scene.  These

22   people were convicted of murder.  And after they were

23   convicted, the Palestinian Authority either kept them on the

24   payroll while they're in jail, or they went on the payroll

25   after they were arrested.

F1D3SOK2                    Opening - Mr. Yalowitz

1          I want to make sure you understand that.  These are

2    people convicted of murder, and they are still on the payroll

3    today.

4          As for Ramadan, the shooter, he died committing his

5    crimes, and the Palestinian Authority and the PLO declared him

6    an Al Aqsa martyr.  Al Aqsa is the name of a mosque in

7    Jerusalem which the Palestinian Authority co-opted as a symbol

8    of the terror campaign.  Ramadan's family gets money every

9    single month from the PLO because he died as a suicide

10   terrorist.

11         Five days after Ramadan committed his crime, a bomber

12   named Wafa Idris blew herself up behind Mark Sokolow and his

13   family.  The evidence will show that an official of the PA's

14   intelligence apparatus recruited Idris as a confidential

15   informant.  In fact, you will personally see a document from

16   the Palestinian Authority's own files showing that intelligence

17   head Tirawi, the same fellow we just talked about, had advance

18   knowledge of the attack before it became public.

19         As for the suicide bomber, she was declared an Al Aqsa

20   martyr.  Her family gets money every month from the PLO because

21   she died as a suicide terrorist.

22         Let's go to January 29, 2004.  Scott Goldberg was

23   riding a bus to work.  That bus he wasn't supposed to be on.

24   And a PA police officer named Ali Ja'ara blew himself up

25   murdering Scott and 10 others.  This group had four PA security

F1D3SOK2                    Opening - Mr. Yalowitz

1    officials.  You see the same pattern again.  A commander of the

2    cell, someone who recruited the suicide terrorist, people who

3    prepared him, people who transported him past the checkpoints

4    in Israel.  These people were convicted of murder, and they

5    either stayed on the payroll as police and security officers

6    even while they sit in jail, or they went on the payroll after

7    they were arrested.

8           As for Ja'ara himself, he had been fired a couple of

9    weeks before he blew himself up.  After he died, the police

10   department reinstated him as a member of the force in good

11   standing.  He was declared an Al Aqsa martyr officially.  His

12   family gets money every month because he died as a suicide

13   terrorist.  And eventually, he was even given a full dress

14   state funeral by the Palestinian Authority.

15          So we see in these attacks a pattern in which groups

16   of PA employees band together to organize terror attacks.  The

17   organizers get caught, they get arrested, they get tried,

18   convicted, sentenced, put in jail, and then they're rewarded by

19   the Palestinian Authority with pay and with promotions and with

20   glorification.  The families of the suicide terrorists get

21   money from the PLO.

22          Now, I want to talk a little bit about what is

23   terrorism.  Judge Daniels will direct you on the law, but your

24   common sense tells you that terrorism is different from random

25   street crime.  The evidence will show that these terror attacks

F1D3SOK2                    Opening – Mr. Yalowitz

1    were violent and dangerous crimes with the apparent purpose of

2    intimidating and coercing the population of Israel, and

3    influencing the government of Israel and even influencing the

4    government of the United States of America.

5           If you want to intimidate a civilian population,

6    killing randomly selected civilians can be pretty effective.

7    The evidence will show that this killing was indeed random.

8    Christians and Jews, Israelis, Americans, people from all over

9    the world.

10          Now, I want to start to tell you a little bit more

11   about how we're going to prove the things that I've told you.

12   You're going to see documents.  You're going to see personally

13   the convictions for murder and attempted murder.  These are

14   people who are convicted of their crimes in the Israeli

15   criminal justice system, they went to jail, and some of them

16   are still in jail.  While they sit in jail, performing no

17   services whatsoever, they draw a generous salary from the

18   Palestinian Authority.  You are personally going to be able to

19   look at those payroll records.  You'll see promotion records

20   for employee convicts people who are promoted in rank while

21   they're in jail.

22          These records will prove that even after these people

23   are convicted of murder, the Palestinian Authority keeps them

24   on as security employees.  It celebrates their crimes as having

25   been as a result of their fight for their country.  The

F1D3SOK2                    Opening – Mr. Yalowitz

Palestinian Authority did this over and over and over again.
Keeping convicted murderers on the payroll, promoting convicted
murderers while they sit in jail, glorifying the murders in
Palestinian press.

          Not only that, when people who are not employees were
convicted of terror crimes, the Palestinian Authority actually
went ahead and put them on the payroll.  You'll see those
records too.  Showing the terrorists got put on the payroll
when they were arrested, and stayed on the payroll after they
were convicted.

          Now, these employees were not rogue employees.  As I
said, this was standard operating procedure.  And I'm going to
bring you three forms of evidence that will show you how deeply
the Palestinian Authority embraced these crimes.

          Official policies, widespread practices, number one.
Number two, evidence of material support.  And number three,
the defendants' own words from their own official intelligence
documents, from their own official prisoner ministry records,
from their own official publications, from their own top
leadership.

          Let's first start with reason number one, official
policies and widespread practices.  You'll see evidence that
the PLO has something called the Martyrs Institute.  The
Martyrs Institute pays families of suicide terrorists.  They
pay every month to the family of every suicide bomber.  They do

F1D3SOK2                    Opening – Mr. Yalowitz

1    this as a matter of official policy.

2              You'll also see and hear about a Palestinian Authority

3    law that provides for money for anyone who is convicted of a

4    terror crime against an Israeli.  In other words, as a matter

5    of law and policy, anyone who is convicted of murder for

6    political purposes gets paid.

7              You'll see evidence and hear evidence that the

8    Palestinian Authority has a whole ministry of prisoners to

9    serve the needs of these convicts, providing them legal

10   assistance, making solidarity visits to their families, even

11   negotiating for their release.

12             Now, I want to show you one thing about the law, the

13   Palestinian Authority law that is especially important.  And

14   that's their definition of a prisoner.  A prisoner is somebody

15   who is qualified to get that money.  And here's how they define

16   prisoner.  "Anyone who is kept in the prisons of the occupation

17   for offenses of participating in the struggle against the

18   occupation."

19             Now, this definition has an important phrase that I

20   want to speak about candidly.  "The struggle against the

21   occupation."  What is the occupation?  There is a political

22   conflict in Israel.  As I said before, during the relevant

23   years, Israel and the Palestinian Authority divided

24   responsibility for governing in the West Bank and the Gaza

25   Strip.  Some people were against the Palestinian Authority

F1D3SOK2                    Opening – Mr. Yalowitz

gaining additional power, and others believed that the

Palestinian people should have their own country immediately.

One word that people with that perspective used for the shared

power arrangement was "occupation."  And you will see and hear

the PLO and the PA documents and maybe witnesses, if they bring

any, talking about the struggle against the occupation or

resistance of the occupation.

     Now, think about what that means in the context of

this prisoners law.  They refer to someone who is in jail for

murdering civilians as a person who was participating in the

struggle against the occupation and therefore worthy of getting

paid money every month while they sit in jail.

     I want to be very clear.  Great minds might disagree

about the political issues between these peoples.  That's not

what this case is about.  It is not about who is right and who

is wrong in that debate.

     The plaintiffs in this case are 10 innocent American

families.  Not the government of Israel.  What was

seven-year-old Yoni Bauer's crime.  What did he do wrong?  He

was walking with his dad home from work.  Did Scotty Goldberg

do something wrong by getting on that bus?  Shayna and Shmuel

and Shaul.  All they were doing was getting on and off buses,

just like you and I do.  The Sokolow family was buying shoes

for their 12-year-old daughter.  Four Americans in the Frank

Sinatra cafeteria were sitting down to lunch.

F1D3SOK2                    Opening – Mr. Yalowitz

1           This case is not about whose land it is.  This case is

2     about the consequences of murdering and maiming innocent

3     civilians to achieve a political objective.

4           No matter what your political beliefs, killing

5     innocent civilians is morally unacceptable.  No matter what

6     your political beliefs, shooting young people with an M-16

7     assault rifle on a busy downtown shopping street is morally

8     unacceptable.  No matter what your political beliefs, making a

9     homemade bomb out of homemade explosives and a bag of Phillips

10    head screws and sending people on suicide missions is morally

11    unacceptable.

12          You're also going to see evidence of widespread

13    practices supporting terror.  You will see evidence that Yassir

14    Arafat and top PA and PLO officials used PA money to finance

15    terrorism.  Time and time again, the evidence will show, Arafat

16    and other PA and PLO officials approved and directed payments

17    to people engaged in terrorism, knowing that this was what

18    these terrorists were up to.

19          You will see convictions of top and midlevel officials

20    for this conduct.  You will see documents from the Palestinian

21    Authority showing the funding of terrorists, and the knowledge

22    of the Palestinian Authority intelligence apparatus about these

23    terror operations.  You will see government reports from the

24    United States government and from the government of Israel

25    detailing the terror financing operations, and you will hear

F1D3SOK2                    Opening – Mr. Yalowitz

personally from experts in the Palestinian arena who have spent

their careers fighting terror.  They will help you understand

these documents.

        You will also see evidence that the Palestinian

Authority and the PLO did their best to control the supply of

weapons in the West Bank and the Gaza Strip, and then they used

those weapons to support terror operations.

        The evidence here again will include convictions and

confessions and expert analysis.  You'll also see evidence

about a revolving door of the Palestinian Authority's own

prison system.  In fact, the release of Hashaika, the ex-cop

who blew himself up behind Alan and Yoni, was not an isolated

event.  You'll see evidence that the PA released other

terrorists from prison, and that they failed to arrest known

terrorists, even when those known terrorists were on their own

payroll and worked as their own employees.

        You'll also see and hear evidence that engaging in

terror attacks was common for security employees of the

Palestinian Authority security apparatus.  The defendants' own

websites reveal hundreds of their security employees are in

jail for those "struggle against the occupation" crimes.

        Let me turn to the evidence on reason number two, the

evidence of material support.  The evidence here will show that

there were several terror groups operating in Israel at that

time, including one called the Al Aqsa Martyr Brigades named

F1D3SOK2                          Opening – Mr. Yalowitz

1    after that mosque Al Aqsa, and another called Hamas.  These

2    were terror groups that were designated by the United States

3    government as designated foreign terrorist organizations.

4    Hamas got that designation in the 1990s, and the Al Aqsa Martyr

5    Brigades was officially designated on March 25, 2002, three

6    days after the attack on Alan and Yoni for which that

7    organization took credit.

8            We're going to bring you evidence that the PA closely

9    supported the Al Aqsa Martyr Brigades, both before and after

10   its designation, with weapons and money and freedom to operate

11   within territory patrolled by the Palestinian Authority's own

12   security forces.

13           We'll show that you Al Aqsa Martyr Brigade was just

14   another name for a thing called Fatah, which was controlled and

15   dominated by Yasser Arafat.

16           (Continued on next page)

17

18

19

20

21

22

23

24

25

F1D8SOK3                    Opening – Mr. Yalowitz

1              MR. YALOWITZ:  And financed by the Palestinian
2      Authority.
3              We will show you that two of the attacks in this case
4      were carried out by the Al Aqsa Martyr Brigades after the
5      designation.  One of them took place on June 19, 2002 at French
6      Hill, killing seven, wounding 39, including Mandelkorn.  The
7      other one, the bus attack that took the life of Scotty
8      Goldberg, January 29, 2004.
9              We will also bring you evidence that the PA and PLO
10     officials provided support to Hamas in the form of freedom to
11     operate, bomb-making equipment, communications equipment.
12             The evidence will show that the PA arrested a
13     notorious bomb maker named Abdullah Barghouti, but released him
14     only three weeks later.  PA employees let him keep his
15     bomb-making equipment and took him to a safe house.
16             Then Abdullah Barghouti went on a killing spree.  He
17     was not caught by the Israeli authorities until his bombs had
18     murdered 66 innocent civilians.
19             After he was caught, he openly confessed his crimes.
20     He pled guilty.  At his sentencing he told the court:  I do not
21     regret any of the acts that I have carried out.
22             One of his bombings was the Frank Sinatra cafeteria,
23     Hebrew University, July 31, 2002.  That bomb killed nine and
24     wounded 81.  Four of my client families lost a child or a
25     sibling that day.

F1D8SOK3                    Opening – Mr. Yalowitz

1          Now, let me take you to reason number 3.  The

2     defendants' own words.

3          You are going to see the defendants' intelligence

4     files, their prisoner ministry files, their martyr files.

5     Those files are filled with words of praise for the murderers.

6     I want to just give you one example.  That's Ahmed Barghouti.

7          Ahmed Barghouti organized the January 22 attack on

8     Jaffa Road in downtown Jerusalem.  You see him up there on the

9     right at the top.  That's the one in which Said Ramadan used an

10    M-16 assault rifle to shoot Shayna Gould in the chest and

11    Shmuel Waldman in the leg.

12         Ahmed Barghouti is also the one who took that Hamas

13    bomb maker, the one who bombed the Frank Sinatra cafeteria, to

14    a safe house.

15         In a criminal proceeding in Israel Barghouti was

16    convicted following a guilty plea of murder and attempted

17    murder for his role in those attacks.  Immediately before he

18    was sentenced for his crimes, Barghouti said:  I have no

19    regrets.

20         Now, the PA has intelligence files on Barghouti and

21    the other convicted murderers I have shown you.

22         One report on Barghouti says this.  It says he was

23    arrested by the Israeli Occupation Forces and was sentenced to

24    15 life terms plus 50 years.  He is currently serving his

25    prison sentence in the Al-Naqab prison.  He is good in terms of

F1D8SOK3                    Opening – Mr. Yalowitz

1    security and morals.

2         Good in terms of security and morals.  Consistent with

3    those words, the PA has kept Barghouti on their payroll and

4    they have promoted him through the ranks of their officers

5    three times since his arrest and conviction.

6         You will also see police magazines.  The PA has

7    something called the Institute for Political Guidance.  We

8    don't have anything like it here in the United States.  The

9    evidence will show that this institute puts out monthly

10   magazines that it uses to educate the police forces.  The

11   magazines are called things like The Police or The Martyrs.

12        The education that these magazines provide to the

13   police is incitement.  You will see evidence of these magazines

14   telling PA police officers to engage in violence, either

15   directly or indirectly.

16        This is the PA's and the PLO's official political

17   guidance to their armed security officers.

18        Now, I have told you about some of the documents you

19   are going to see in this case -- convictions, confessions,

20   payroll records, promotion records, ministry of prisoner

21   records, martyr files, intelligence files, police magazines,

22   statements of senior PLO and PA officials, government reports.

23        You are also going to hear from witnesses.  One thing

24   I want you to watch out for is which witnesses the defendant

25   brings.  Watch and see who they bring and who does not show up

F1D8SOK3                        Opening – Mr. Yalowitz

1   for the PA and the PLO.

2              Here is who we will bring.  We are going to bring you

3   eyewitnesses who will tell you what they saw and heard.

4              We are going to bring you experts, people who have

5   spent a career working in their fields.

6              You are going to meet intelligence agents who spent a

7   career fighting terror.  You are going to meet practicing

8   lawyers, psychiatrists, rehab doctors, accountants who will

9   help you with damages, experts who will help you understand the

10  evidence.

11             And you will meet the families.  These families can be

12  very emotional.  Some of them have trouble expressing their

13  emotions, and I want you to understand that.  When you lose a

14  piece of your own body to terrorists or, God forbid, a child,

15  something terrible happens to you and you can't always express

16  it.  Terrorism tore these families apart, not just physically

17  but in many cases emotionally.

18             Of course, you will see the physical scars that some

19  of the survivors carry.  You will hear about the physical pain

20  that some of the survivors bear.  But you and I have lived long

21  enough to understand that sometimes the worst scars we carry

22  are the scars that no one can see.

23             You will hear about emotional losses that so many of

24  these families have suffered.  You will hear how these acts of

25  terror ripped apart these families' lives.  You will hear from

F1D8SOK3                    Opening – Mr. Yalowitz

1    the survivors.  But I also want to take a moment with you to

2    think about those who did not survive and what they meant to

3    the loved ones who they left behind.

4              (Photographs shown)

5              Ladies and gentlemen, your Honor, thank you.

6              THE COURT:  Ladies and gentlemen I am going to give

7    you a ten-minute break.

8              Don't discuss the case.  Keep an open mind.  We will

9    proceed in ten minutes.

10             (Jury exits courtroom)

11             THE COURT:  We will continue in ten.

12             MR. ROCHON:  I have some matters to address about the

13   opening.  I did not want to object during Mr. Yalowitz's

14   opening.  I could do it now or after the break.

15             THE COURT:  What do you prefer?

16             MR. ROCHON:  I know you prefer me to do neither, but

17   whatever you prefer.  I can tell you what they are.

18             THE COURT:  Sure.

19             MR. ROCHON:  Number one, I am concerned that after all

20   the promises about trying to keep the occupation, all the

21   political rhetoric out of the case, that it's being injected in

22   the opening and some of the evidentiary rulings.  I have been

23   clear, I have been saying we are not going to do that, and I

24   think it was directly implicated by the opening.

25             I can list them all and then have the Court's comment.

F1D8SOK3

1          Number two, there was reference to evidence that you

2     have ruled inadmissible, the bomb-making materials that were

3     supposedly left in Abdullah Barghouti's apartment that have

4     always not been allowed in and your recent enunciation on that

5     was yesterday.

6          The testimony about the nature of the release of

7     Abdullah, the hearsay on that, was also restricted because it

8     was in the nature of implicating others.

9          So, your Honor, I think that the arguments -- finally,

10     he said that Ahmed Barghouti was convicted in the Hebrew

11     University bombing.  He was not.  That's a PA employee.  There

12     is no other PA employee.  There is no PA employee convicted in

13     that.  And in his opening statement he just told the jury Ahmed

14     Barghouti was convicted of those attacks.  That's not so.

15          I want to use a pejorative.  I am obviously extremely

16     upset about it, but there is no excuse for that.  They know he

17     wasn't convicted.  He just said he was convicted.  That is a PA

18     employee in the four person, dead person, saddest case, worst

19     case in this case, as you pointed out.  He just said that my

20     client was convicted of it.  That was inaccurate at best.

21          I would ask for a mistrial.  I'm sorry.  This

22     obviously is a very moving opening, a very well-presented

23     opening, a very emotional case.  That is one of the most

24     emotional incidents, and he just falsely told the jury that an

25     employee of my client was convicted.

F1D8SOK3

1              THE COURT:  I am not going to grant your application

2    for a mistrial at this point in time.  We had simply the first

3    party's opening statement.  I will let you give an opening

4    statement and then I will consider the presentation of the

5    evidence, and to the extent that the evidence is inconsistent

6    with the opening statement, I am sure you will have an

7    opportunity to point out that he made promises that he could

8    not keep.  To the extent that some other sanction, either

9    evidentiary sanction, becomes appropriate or a basis for a

10   mistrial becomes appropriate, I will consider that at that

11   point in time.

12             The first thing I have already done and I have already

13   emphasized to the jury is that what the lawyers say is not

14   evidence, and I will emphasize that again.  There is a basic

15   principle of trying a case.  Promises made, promises kept.

16   Promises made, promises not kept.  So I will be very careful

17   and watchful as to whether or not there is some other evidence.

18             I have to characterize it slightly different than how

19   you characterized it.  I did not rule that the evidence was

20   inadmissible.  I ruled that the evidence he was going to offer

21   to prove that point was not admissible.

22             Now, whether or not he has some other evidence that he

23   intends to present during this trial to support that statement,

24   that is to be seen.  But if an appropriate sanction needs to be

25   imposed during the trial or an ultimate sanction of mistrial, I

F1D8SOK3

```
1    will consider it at the appropriate time.  But at this point in

2    time I think it is appropriate for you to make your opening

3    statement and for us to see what in fact is the evidence or

4    lack of evidence that's presented to the jury and see whether

5    or not that in and of itself is a basis for the jury to render

6    a fair and just verdict.

7              MR. ROCHON:  Yes, sir.

8              THE COURT:  We will take a short break.

9              (Recess)

10              THE COURT:  Mr. Rochon, are you ready to go?

11              MR. ROCHON:  Yes, I am.

12              THE COURT:  Then let's bring in the jury.

13              (Jury present)

14              THE COURT:  Mr. Rochon, would you like to make an

15    opening statement?

16              MR. ROCHON:  Yes, sir.

17              May it please the court.

18              Ladies and gentlemen, my name is Mark Rochon.  I am a

19    lawyer.  I am a lawyer from Washington, D.C., and I stand

20    before you today on behalf of the Palestine Liberation

21    Organization and the Palestinian National Authority, which is

22    sometimes called the PA.  I am grateful for the opportunity to

23    represent them.

24              I hope that I do them justice during this case.

25              I know you will do justice in this case even if I fall
```

F1D8SOK3                    Opening - Mr. Rochon

1    short.

2            I hope I bring to you in this opening statement the

3    additional evidence you haven't heard yet that will give you

4    the full context of what happened here.  But let me first tell

5    you first of all what we can all agree on.

6            These acts happened.  There is no dispute of that.

7    These acts were horrific.  We are not defending those acts.

8    Those acts are condemnable, they were wrong, intolerable.  We

9    are not defending these acts as a proper part of resistance

10   against an occupation or a struggle or any of that political

11   stuff that you were just hearing about.

12           Ladies and gentlemen, this case is also not about that

13   occupation that you just heard about from Mr. Yalowitz.  Yes,

14   there are extremely strong feelings on both sides.  Yes, a lot

15   of things could be said about that from both sides.  Yes,

16   there's people who have wildly different views as to what is

17   right and wrong.  But I have got good news for you.  We are not

18   asking you to figure that out.

19           So what I want you to do, if you would, after having

20   heard such an emotional opening statement and knowing what

21   these facts are going to be like is take a deep breath because

22   we are not going to ask you to like what happened.  We are

23   going to ask you to decide whether or not the government that I

24   represent is responsible for that, should be held liable for

25   that, for things that it did not do.  That's what we are going

F1D8SOK3                    Opening – Mr. Rochon

1    to do.  And with your help, with the court's help on the law,

2    we are going to get through that.

3           At the end of that process, if you take a deep breath

4    and you don't just think about the pain but you think about

5    bringing a government to the United States of America for a

6    trial for things that happened over there and to hold the

7    government responsible for what in some instance its employees

8    did but in many instances no employees did, you are going to

9    find that the evidence doesn't support that.

10          So if you will join with me, ladies and gentlemen, the

11   first thing I would ask you to do is take a deep breath.  We

12   are going to be here for a while.  It's not going to be easy.

13   OK?  I am not telling you it's going to be easy.  People are

14   going to come into court and get on that witness stand and

15   there is going to be painful testimony, and no one defends what

16   happened.  But the people who did it aren't here.

17          I am here today with the representatives of the

18   Palestine Liberation Organization for the trial, and I would

19   like to introduce them to you.

20          First of all, on behalf of the Palestinian Authority,

21   Hind Khouri.  Ms. Khouri is the adviser to the minister of

22   finance and is here on behalf of the Palestinian Authority.

23          On behalf of the PLO, Mr. Husam Zomlot, who is a

24   roving ambassador for the PLO.

25          The government and the political party are here,

F1D8SOK3                    Opening — Mr. Rochon

1    brought to the United States for a trial for what others did.

2    The men and women who did this aren't here.  The Al Aqsa

3    Brigades is not sued here.  Hamas, which was by all accounts

4    responsible for that Hebrew University bombing, is not sued

5    here.  Fatah is not sued here.

6         This case is about whether one can hold on these facts

7    a government of over 100,000 employees responsible for what a

8    few of them did during a period of the most intense, passionate

9    conflict.  And the evidence is going to show that they fall way

10   short on that.

11        So we take a deep breath.  We get ready to talk about

12   the case.  One thing I want to do is tell you a little bit more

13   about who we are because you talk about the Palestinian

14   Authority, you talk about the PLO and some people have some

15   associations with that.  Some people say PLO and they think

16   Yasser Arafat or they think bad things.  I hope you don't.

17        But if you ever did, I am not worried about it.  You

18   know why?  Because you have already told me you're going to be

19   fair.  And we believed you.  The court believed you.  And we

20   trust you to be fair.  To treat the Palestine Liberation

21   Organization and the Palestinian Authority like any other

22   defendant, any other government that would be brought before

23   you, where people are seeking to hold them liable for what

24   their employees did, or in many instances where no employee was

25   involved.

F1D8SOK3                    Opening - Mr. Rochon

1              It's important as we talk about this to realize that

2      you have two defendants in this case.  And we will talk a

3      little bit about each of them.  Plaintiffs' counsel already did

4      that a little bit.  I am going to do it a little bit more.

5              The first thing I want you to know, not all

6      Palestinians are alike.  It's an important thing to think

7      about.  They are not just some lump of things called

8      Palestinian people.  Not all Palestinians are alike.

9              There are a lot of names they throw around.  Fatah, Al

10     Aqsa Martyrs Brigades, Hamas.  And they want to say they are

11     all the same.  That Fatah is Al Aqsa, that the PA is the PLO,

12     is Hamas.  And why do they want to do that?  Because the

13     evidence will show that there is not evidence connected to the

14     defendants who are here.

15             In our system of justice we don't do something called

16     guilt by association.  If your friend does something wrong, you

17     didn't do something wrong, even if it's your friend.  If your

18     enemy does something wrong, it is definitely not you who did

19     it.  And not every time that an employee of a company or a

20     government does something is the company liable.

21             When you think about it with a common sense attitude,

22     you will know when the evidence comes in and your common sense

23     applies, how would you hold an employer responsible for what

24     its employees did?

25             So we talk about who we are.  I want you to start my

F1D8SOK3                    Opening – Mr. Rochon

1    clients off with a clean slate.  It may be hard to do.  It's a

2    foreign country.  With the word Palestinian some people have

3    connotations.  That's what you said you were going to do and

4    that's what we know you're going to do.

5              So there's two sides to this story, right?  You don't

6    need to worry about it.  We are not asking you to decide to

7    make peace to result in a two-state solution.  You don't need

8    to pick a side.  Your only job is to listen to the evidence and

9    decide whether or not the PA or PLO are responsible for the

10   shootings and bombings at issue.

11             So the PLO, they were created first.  The PLO has been

12   around for a long time.  It was created in 1964, 51 years ago,

13   to represent the cause of the Palestinian people around the

14   world.  The Palestine Liberation Organization represents all

15   Palestinians around the world.  It is international.

16             Ten years after it was created the United Nations

17   represented the PLO as the legitimate representative of the

18   Palestinian people, including here in the United States where

19   the PLO represents the Palestinian people at the United Nations

20   and in Washington, D.C.

21             Mr. Yalowitz said the PLO created the PA.  The

22   evidence is going to show that the Palestinian Authority was

23   created in an agreement between the PLO and Israel, brokered by

24   the United States that said that the Palestinian people needed

25   a government in the West Bank, and that government in the West

F1D8SOK3                        Opening – Mr. Rochon

1    Bank and Gaza is called the Palestinian Authority.  So it was

2    created out of some agreements that were negotiated in the

3    '90s.  They called them the Oslo Accords.  Their name doesn't

4    matter.  The fact is they were created by agreement.  A lawful

5    government pursuant to an agreement.

6              Under this agreement that was created, it was very

7    important.  You remember the map.  The Palestinian Authority

8    does not have full authority even over the West Bank.  Under

9    the agreements, the Palestinian Authority, they created three

10   areas.  A, B and C.  In area A, which is only about 20 percent

11   of the West Bank, Palestinians have civil and security control.

12   They both run the government and have security control.  That

13   is not where any of these things happened.

14             Area B is also about 20 percent.  The Palestinians had

15   civil but no security control.  It's not where any of this

16   happened.

17             In area C, where essentially it is mostly controlled

18   by Israel even though they call it the West Bank, it's about 60

19   percent of it and Israel has civil and security control.

20             But that's not even where these things happened.

21   These things happened in Jerusalem, outside of the security

22   control or political authority of the PA.  So it's a case in

23   which these people went to a place outside of the governing

24   region of the government and did these horrible things.

25             In Jerusalem, the PA has no jurisdiction.  So these

F1D8SOK3                    Opening – Mr. Rochon

1    cases come out of a very troubling period between this conflict

2    called the Second Intifada, where also horrible things

3    happened, condemnable things.  But the question is, did we

4    cause them to happen?

5         I want to turn shortly to the evidence that they say

6    shows what happened.

7         First, so you have got two defendants.  You have got

8    two trials.  You are going to have to do double duty.  When you

9    hear evidence, you will have to decide is it coming in against

10   the PLO or Palestinian Authority.  At the end of the case when

11   you come back with your verdict, you are going to be asked how

12   do you find on the PLO and then how do you find on the

13   Palestinian authority.  Two verdicts.  A breakdown on the

14   incidents, and you will learn in a little bit even as to the

15   PLO the theories are somewhat different.  But the idea is you

16   have got two trials going on.  You don't get double pay, double

17   duty.  You don't get double anything.  It's double service, two

18   defendants.

19        With these different theories, however, they will have

20   the same result.

21        So let's move to the evidence.  Let's talk about what

22   the plaintiffs have talked about a little bit here.

23        Now, you had those little cards that Mr. Yalowitz gave

24   you.  If you want to pull them out, you can pull them out.

25        We will talk about these incidents because I want to

F1D8SOK3                    Opening – Mr. Rochon

 1    be clear.  So the January 27, 2002 Jaffa Road bombing.  The

 2    Sokolow incident.  The evidence will show that not any

 3    Palestinian Authority person was involved in that incident.  A

 4    woman blew herself up.  She worked for the Red Crescent, which

 5    is like the Red Cross.  She didn't work for the PA.

 6         A man was convicted for helping her.  He didn't work

 7    for the PA.  He worked for the Red Crescent.

 8         No Palestinian Authority employee was convicted in

 9    these military tribunal trials that he was talking about before

10    that incident.

11         And in this case, the plaintiffs have a theory called

12    respondeat superior.  It's Latin, I think.  I don't really

13    know.  I am a lawyer, but I don't know much Latin.  What it

14    means is you're responsible for what your employees do.

15    Respondeat superior.

16         In this case that theory about you're responsible for

17    what your employees did doesn't apply to the PLO at all.  They

18    don't even allege a single PLO person employee was here

19    involved.  The allegation is that PA employees were involved.

20         So as to this incident, no PLO person employee

21    convicted.  No PA employee convicted.  And therefore, ladies

22    and gentlemen, the evidence is going to be, I suggest to you,

23    it's going to be hard because you're going to have to listen to

24    the horrible facts of the injuries, but nobody from my client

25    was convicted for doing it.

1          So let's go to another one.  Mandelkorn.  That's June

2     19th, French Hill.  If you heard the opening, you would have

3     thought all these employees were convicted in all of these

4     things.  Those employees were involved in all of those.  No.

5     You will hear, ladies and gentlemen, that in the Mandelkorn

6     incident, of course no PLO employee is alleged to be involved

7     in any of them.  It's not their theory.

8          As to the Palestinian Authority, the same thing.  No

9     PA employee convicted.

10          Let's go to Hebrew University, that horrible incident

11     in what is called the Frank Sinatra cafeteria, the one where

12     four separate families were injured.  A man named Abdullah

13     Barghouti was convicted for that.  PA employee?  No.  The

14     evidence will show he wasn't.

15          The evidence will show he was from Hamas, as to which

16     it's safe to say my clients have a difficult relationship.

17     Hamas isn't even in the PLO.

18          So, ladies and gentlemen, even on the theory about our

19     employees, you have to break it down and look at these incident

20     by incident or you will reach an unfair result, and you don't

21     want to do that.  The stakes are too high.

22          When you look at the other incidents where there are

23     PA employees who were convicted, you are going to see no

24     evidence that they were in their uniforms, used PA equipment,

25     were on the job at the time, were operating in the area where

F1D8SOK3                    Opening - Mr. Rochon

1    they actually had authority.  There is no evidence that they

2    used any PA materials to commit those offenses.

3           They were acting on their own for their own reasons.

4    Crazy, wrong, contemptible, but not my clients.

5           I want to talk about this employees/nonemployees.

6           So you already heard they are suing under this thing

7    called the Antiterrorism Act.  And under that the burden of

8    proof falls on the plaintiffs.  So they have the burden of

9    proof to prove what they say against my clients.  We don't have

10   the burden of proof.  They do.

11          They are trying to do that in two ways.  They are

12   trying to say the PA is liable for what the employees did and

13   liable for something called direct support or material support.

14   They somehow helped even if the employees weren't involved.

15   Those are the two theories as to the PA.  As to the PLO they

16   only have the second theory.

17          Now as to the first theory, the PA employees did it

18   and therefore you're responsible.  You will hear even in the

19   three incidents where there were PA employees convicted, no

20   evidence of them in uniform, participating, in using any

21   equipment from their employer in these attacks, no evidence

22   that they were directed in regard to doing it by their

23   employers.

24          I think what I would like to do is discuss with you

25   what is the law that Judge Daniels will tell you about that

F1D8SOK3                    Opening - Mr. Rochon

respondeat superior, when are you liable for that?  And roughly

speaking.  We will work out the final law later.  An act of a

person can only be held against his employer if it's within the

scope of employment.  So employers aren't automatically liable

for everything their employees do.  If you're a business owner,

you would be happy to hear that because how could you run a

business otherwise.

          Basically what it says is an act is within the scope

of employment if it is in furtherance of the employer's

business and it is within the scope of the employee's

authority.

          An employer's business in this context is its

regularly conducted activities, whether commercial or

non-commercial.  An act is within the scope of an employee's

authority if it is performed while he is engaged generally in

the performance of his or her assigned duties or if the act is

reasonably necessary or incidental to the employment.

          Now the employer doesn't need to specifically

authorize the act to get liability, but it's got to be within

the scope of their employment, and there will be no evidence

even as to those incidents where employees were convicted that

it was within the scope of their employment.

          Now, this material support theory.  Really this gets

down to the money that he was talking about.  Remember all this

stuff about there's three kinds of payments.  There's payments

F1D8SOK3                    Opening – Mr. Rochon

1    made to prisoners.  There's payments called martyr payments,

2    and then there are payments made to employees where their

3    employment salary continues while they are incarcerated.

4         The first thing you need to understand is that these

5    payments did not cause these events to occur.  These payments

6    were not made because of these events.  These payments are

7    routine in my client's society.  My client is essentially a

8    social welfare state.

9         I will give you an example.  In the course of this

10   martyr society that he talked about, the thing that pays for

11   so-called martyrs, the first thing you might say is, well,

12   martyrs, is that everybody who kill themselves.  That is anyone

13   injured whatsoever in the course of this conduct.  You don't

14   even have to be killed.  Any injury.

15        40,000 different people received those payments.

16   These payments aren't being made specially to the three or four

17   people who are involved in this case.  This is something if any

18   Palestinian is hurt, injured, whatsoever in connection with

19   this conflict, the Palestinian Authority or the PLO -- in this

20   instance the money comes from the PLO -- provides payment.

21        Now, how much was that payment?  I will give you an

22   example.  One of the people that they talked about in this case

23   was a guy named Ali Ja'ara, one of the suicide bombers in this

24   case.  He was the Palestinian police officer and you will

25   actually see the evidence that he in fact had been removed from

F1D8SOK3                     Opening – Mr. Rochon

the force about two weeks before this happened.  How much did

his family get?  About $100 a month.

        Ladies and gentlemen, the man did not blow himself up

so his family could get $100 a month.  The martyr's payments

didn't cause that event to occur.  When someone is lost in that

society, they provide a variety of ways to make up for it.  And

in that case, the evidence will show he left behind numerous

siblings, five or six, a mentally ill father, and the house of

the family was destroyed because of his act.  So they are put

out of their home as a punishment for the act and the family

received after he blew himself up $100.

        The martyr's payments are not evidence of anything

that caused someone to do this.  They are for the people left

behind.  That 24-year-old man, awful what he did, he didn't do

it so his family could get martyr's payments.

        The prisoner payments that he talked about.  Every

single Palestinian who is incarcerated as a result of this

conflict receives from the Palestinian Authority a payment.

Whether you're arrested and incarcerated for throwing stones at

a tank or anything else, you get those payments.

        Now, how does this system work?  You first need to be

certified as a security prisoner.  The International Committee

of the Red Cross certifies them as a security prisoner.  Not

the PA.  Because it's a conflict, these people don't get along,

and a lot, thousands and thousands and thousands of

F1D8SOK3                         Opening — Mr. Rochon

 1    Palestinians have been locked up in the course of this

 2    conflict.

 3                MR. YALOWITZ:  Objection.

 4                THE COURT:  Overruled.

 5                MR. ROCHON:  Each of them received these payments if

 6    the International Committee of the Red Cross certifies them as

 7    a security prisoner.

 8                The evidence will show that those payments didn't

 9    cause these acts to occur.  They didn't reward these acts.  You

10    get them no matter what.  And the evidence will also show that

11    it's not that much money.

12                So the payments to prisoners didn't cause anybody to

13    decide to go as a Palestinian to an Israeli prison for the rest

14    of their life so they can get some money.  When you think about

15    it, your common sense tells you who would want to sit in

16    prison.  The reason people did these things is not because of

17    the money.

18                The last one of these is that if an Palestinian has

19    got a job in the security services and he is locked up by the

20    other side, they don't take his job away and they continue to

21    pay him.

22                Now, you may not agree with this system.  You may say

23    these people are crazy the way they are doing things over

24    there.  But that's not causing these acts to occur.  If you're

25    a Palestinian security person and you're arrested by the

F1D8SOK3                    Opening – Mr. Rochon

1    Israelis and put in one of their prisons, you don't lose your

2    job, and you continue to get promotions.

3             Now, I am not equating this conflict to any conflict

4    we have ever been in, but any time there is a conflict between

5    two countries, that's the rule.  John McCain didn't lose his

6    rank or his money when he was locked up by the Vietnamese.  He

7    continued to get his salary.  He continued to collect it.

8             The evidence, ladies and gentlemen, is that the PA

9    treats its security personnel who are locked up by Israelis the

10   same no matter what.

11            So these payments that they want to talk about did not

12   cause these acts to occur.  These prisoner payments did not

13   cause these acts to occur.

14            And, ladies and gentlemen, when you get down to what

15   the evidence will show here in this case, the evidence will

16   show that no witness will come to court and fill the gaps in

17   their evidence sufficiently.

18            Now, they are going to have payment records.  They got

19   them from us.  All these martyrs' payments, those are our

20   records.  We gave them to them.

21            They have got these horrific incidents and they have

22   got these convictions from the Israeli military tribunal

23   prosecutions.  You will hear about them.  I think a guy will

24   testify tomorrow about them and how they work and what they are

25   convicted of.  Those convictions don't establish any guilt or

F1D8SOK3                    Opening - Mr. Rochon

1    responsibility to the PA or the PLO.  The payment records don't

2    establish any such.

3          They actually don't have witnesses who come to court

4    who know about these incidents from firsthand knowledge and

5    implicate the PA or the PLO.  So they try to fill it up with

6    people who will give you some opinion testimony.  Opinion

7    testimony comes from people who are considered experts.

8          So they will call some witnesses, two, three, maybe

9    four, to give their opinions on the evidence.  Well, you won't

10   need someone's opinion on the evidence to reach your own

11   opinion on the evidence.  These kinds of witnesses, they are

12   called expert witnesses, and they basically get hired to

13   provide an opinion that supports one side or the other.

14         In this case, listen to those witnesses carefully.

15   Listen to these so-called expert or opinion witnesses carefully

16   to see if they are giving you anything you can't figure out on

17   your own.  Listen to see if their opinions are theirs or they

18   were fed to them.

19         You may say, Mr. Rochon, what do you mean their

20   opinions were fed to them?  Just wait.  Wait and see if their

21   opinions were theirs or they were fed to them.

22         And listen, ladies and gentlemen, to see if they know

23   anything about this case as opposed to general information that

24   serves the other side, and listen to see if they just might

25   have some bias against my clients.

F1D8SOK3                    Opening - Mr. Rochon

1           And at the end, you know what you will be instructed

2   on, that you should not substitute those opinion witnesses for

3   your own reason, judgment or common sense.

4           So this case will move your emotions, but it's still

5   not about those emotions.  These were tragic and sad and

6   senseless events, and I am not going to ask you to turn your

7   hearts away and ignore that sadness.  But I am going to tell

8   you that even when the emotions run high, even when people are

9   sharing these sad and heartbreaking events, remember, take that

10  deep breath and remember we are not here to decide whether

11  these are bad or sad things.  You're here to decide whether the

12  PA or the PLO should be liable for what the evidence will show

13  they did not do.

14          The perpetrators aren't on trial.  Hamas is not sued

15  here, though the evidence would show that they are the ones

16  that are responsible for that Hebrew University bombing.  So

17  don't let emotion get the best of you.  You get the best of it.

18          And, ladies and gentlemen, passion.  Passion will

19  claim this trial too.  Both sides will confuse passion, which

20  means intensely believing something with proof, both sides will

21  confuse passion with proof.  Passion ain't proof.  Passion is

22  an intense belief in something, but it's not proof.  Passion

23  clouds the judgment, it doesn't help it, and it infects your

24  reason.  Don't let hatred or passion affect you from hearing

25  the evidence.  I know you won't.  And be careful to watch out

F1D8SOK3                    Opening - Mr. Rochon

1    for when passion on either side, mine or his, gets in the way

2    of a fair decision.

3          It's reason that we ask of you, your reasoned and fair

4    judgment, not infected by emotion or passion.  As you listen to

5    the evidence, your reason will help you.  There will be a

6    natural tendency in this case for you to want to do what you

7    can to address the plaintiffs' pain.  It's very human to want

8    to help.  But that's not what we are here to do, to let our

9    good desires to take over our reason.  It may be a basic

10   instinct to want to right this wrong, but you can't do it by

11   holding liable the wrong party.  We are here to see if the PA

12   or the PLO should be made to pay for what these others, all

13   dead or punished already, did.

14         So, ladies and gentlemen, our justice system.  These

15   incidents happened way over there, but they are being tried

16   here in the United States District Court for the Southern

17   District of New York.  The evidence, a lot of it is going to

18   come from way over there, but it's not going to be judged by

19   those standards.  My client is not on trial in Israel.  My

20   client is on trial in the United States.  We benefit from the

21   United States justice system.  We benefit from the jury system.

22   We benefit from you because you have agreed to take on this

23   task.

24         There may be some bias with some of that evidence, but

25   you will see through it and discount it.  We don't judge

F1D8SOK3                    Opening – Mr. Rochon

1    defendants in our system by their name.  If my client was the

2    Fredricksburg National Authority and the Fredricksburg

3    Liberation Organization, they should get the same quality of

4    justice as they do with their name having the word Palestine in

5    it.

6             So this case is not being tried in front of just

7    anyone.  It's being tried in front of you, jurors who will get

8    the evidence only the way it deserves, jurors who will not be

9    swayed by opinions from biased witnesses, jurors that will not

10   let the PA or the PLO have their fate determined by anonymous

11   reports from those with whom they are in conflict, jurors who

12   like their evidence of liability to be something they can test.

13   So these defendants have been brought to you and to our justice

14   system.  That's why we picked you.

15            Now, I want to tell you a little bit more about how

16   this trial is going to go.  There is going to be a lot of

17   witnesses.  I am going to make a little bit of a deal with you.

18   I am not going to ask and my colleagues aren't going to ask a

19   lot of these people questions.  When these victims testify, I

20   will often say or one of my colleagues will say no questions

21   after the examination.  I don't do that to belittle their pain.

22   It doesn't help to ask about those things.  It doesn't help to

23   remove the pain.  And ultimately those people, those people who

24   suffered this can't help you with the liability issues, because

25   we all agree terrible things happened.  So if you don't hold it

1    against the defense, we will frequently say after a witness

2    testifies, no questions.  Because we want to focus on the

3    evidence that might have something to do with the actual

4    liability part of the case, not whether something bad happened.

5            So as the trial unfolds, I think maybe we will hear

6    from a witness today, maybe tomorrow for the first time, and

7    then the plaintiffs will start getting into some of these

8    so-called opinion or expert witnesses, not witnesses who

9    directly have knowledge.  And after them a lot of the

10   plaintiffs will testify.

11           Ladies and gentlemen, when you get to the end of the

12   trial and you look at what the evidence is, it will not

13   establish the liability we are talking about.

14           So the way this works is I have had the pleasure to

15   speak to you today, and I appreciate your attention and the

16   attention you give this case.  I appreciate that you will

17   provide the justice that's appropriate, a verdict that is

18   appropriate.

19           I won't get to talk to you again directly until the

20   very end of the trial, it could be in five or six weeks, and I

21   will get to speak to you again.  And when I speak to you again

22   in closing argument to discuss what the evidence has been and

23   how it compares to the law, that will be the last time.  The

24   way this works is I don't get the last word.  Plaintiffs'

25   counsel doesn't get the last word.  Even Judge Daniels doesn't

F1D8SOK3                         Opening - Mr. Rochon

1    get the last word.  You, ladies and gentlemen, have the last

2    word.  It is with your collective voice that you will present

3    the last word, and based on the law and the facts, based on the

4    evidence that neither the PA nor the PLO are liable under our

5    law for what happened over there, they are not liable for what

6    these other people did.  So we look forward to hearing your

7    voice at the end of this trial and a verdict that the

8    defendants are not liable.

9            Thank you.

10           THE COURT:  Mr. Yalowitz, would you call the

11   plaintiffs' first witness.

12           MR. YALOWITZ:  Yes, your Honor.

13           Your Honor, the plaintiffs call Meshulam Perlman.

14           We may have to get him from outside the courtroom so

15   we may be just a moment.

16    MESHULAM PERLMAN,

17        called as a witness by the plaintiffs,

18        having been duly sworn, testified as follows:

19   DIRECT EXAMINATION

20   BY MR. YALOWITZ:

21   Q.  Good afternoon, Mr. Perlman.  Thank you for coming in

22   today.

23           Could you tell the jury where you are from?

24   A.  I am from Jerusalem.

25   Q.  Where did you grow up?

F1D8SOK3                       Perlman - direct

1    A.   In Jerusalem.

2    Q.   Of what country are you a citizen?

3    A.   The State of Israel.

4    Q.   What kind of work do you do there in Jerusalem?

5    A.   I have a flower shop.

6    Q.   I want to take you to the morning of January 29, 2004, but

7    before I do I would just like you to show us on a map where

8    your flower shop is in relation to the terror attack at issue

9    in this case.

10   A.   Shall I point to it?

11   Q.   I think we need you to use words to describe where the

12   flower shop is and where the bombing took place.

13   A.   The flower shop is on the corner of Ben Maimon and

14   Arlozorov.

15   Q.   Is that where we have drawn a little square and written

16   flower shop in English?

17   A.   Correct.

18   Q.   Can you describe for the jury --

19           MR. YALOWITZ:  I apologize, your Honor.  I am actually

20   color blind.  Maybe one of my colleagues can use it.

21           THE COURT:  There is a red button on the top and you

22   push it and point it.

23           MR. YALOWITZ:  I won't be able to see it, but I know

24   one of my colleagues will be able to.

25   Q.   Are we looking at the intersection where the bombing took

F1D8SOK3                          Perlman - direct

1   place?

2   A.   Yes.

3   Q.   Now, what time of day did the attack take place?

4   A.   Approximately 8:30, maybe a little later, in the morning.

5   Q.   About how far is it from your shop to the intersection?

6   A.   Approximately 15 meters.

7   Q.   Where were you when the bombing took place?

8   A.   I stood behind a wall that hid the garbage receptacle made

9   out of stone.

10  Q.   Were you inside the shop or outside the shop?

11  A.   I was outside the shop.

12  Q.   In what direction were you looking as you were standing

13  behind that garbage receptacle?

14  A.   I was looking in the direction of Aza Street.

15  Q.   Please tell the jury what you saw as you were looking in

16  the direction of Aza Street.

17  A.   I have an iron column there about two meters high on which

18  I hang hooks.  And on the hooks I hang plants and similar

19  objects.  And at the time that I was at eye level, I was

20  holding the iron hook in order to hang it on the column, and

21  all of a sudden I heard an explosion, and I saw that the roof

22  of a bus completely opened up and there were white and red

23  pyrotechnic displays above on top of the bus.  On the basis of

24  my experience from the military, I knew that it was a terrorist

25  attack, and I immediately told myself, this is a terrorist

F1D8SOK3                          Perlman - direct

1     attack.  And I said a few words and I went outside and the

2     street was empty, with a very few people who were outside on

3     the street, to try and help the passengers on that bus.

4                    (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1D3SOK4                    Perlman - direct

1   BY MR. YALOWITZ:

2   Q.  Could you describe the scene as you saw it inside the bus.

3   A.  The bus was destroyed.  The seats were almost entirely

4   gone.  People were lying dead underneath the seats of the bus,

5   and injured people as well.  A very few people were thrown out

6   of the bus.  And passersby who had been walking in proximity to

7   the bus, they had also been injured.

8           What we, as civilians, as citizens could do, we could

9   only help those who were not on the bus.  Because there is a

10  danger that there might be an additional bomb, and who knows

11  what could be there.

12  Q.  Could you describe the scene outside the bus as you

13  perceived it that day.

14  A.  The scene outside the bus was one of utter destruction.

15  Bodies, corpses were flying.  They were flying onto balconies

16  and rooftops.  Parts of body, body parts.  People were severed

17  into two, severed into pieces.  The first day, the ambulances

18  arrived within two to three minutes and they took body parts on

19  stretchers with them.  And it was a worse scene than a scene of

20  war.

21          People who were visibly injured and you could see

22  blood and flesh on their -- the outside of their bodies, it was

23  internal organs of people who had been killed.

24          I saw the driver during the time of the terrorist

25  attack.  I saw him slumped, fall over the wheel.  Since the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1D3SOK4                      Perlman - direct

1   terrorist attack had taken place and the entire bus had

2   changed, it was possible for the driver to turn entirely around

3   in his chair facing the passengers who were sitting.  And when

4   he saw the magnitude of the tragedy, he -- he fell prostrate.

5           And I want to say that I know the fellow.  And on the

6   day of remembrance, on the 29th of January every year, I

7   participate in their day of remembrance.  And that driver never

8   came back to work.

9   Q.  Could you describe the bus mirror for the jury.

10  A.  As I stated, I was standing behind the wall of the garbage

11  receptacle.  The height of the wall was almost up to my head.

12  The external frame of the mirror of the bus smashed into that

13  wall.  And had that wall not been there to protect me, I would

14  have not -- I would not have emerged alive from the attack.

15  And on that Sabbath, on that Shabbat, I gave a prayer of

16  deliverance in the synagogue.

17  Q.  I'd like to show you a couple of photographs.  We'll begin

18  with 1123.

19          Can you identify that photograph for the court.

20  A.  That's the bus at the scene of the terrorist attack, and

21  you can see that its roof is blown open.

22  Q.  Does that photograph accurately depict the scene as you

23  recall it?

24  A.  Definitely.  We can see corpses of people there.  We can

25  see corpses of people that are being placed into body bags.

F1D3SOK4                         Perlman - direct

1              MR. YALOWITZ:  Plaintiffs offer 1123 in evidence.

2              MR. ROCHON:  No objection to 1123.

3              THE COURT:  It will be admitted into evidence.

4              (Plaintiff's Exhibit 1123 received in evidence)

5              MR. YALOWITZ:  Why don't we go to 1124 for

6    identification.  Ms. Machnes, can we enlarge that on the screen

7    or is that as large as we can get?  Thank you.

8    Q.  Mr. Perlman, do you recognize those photos?

9    A.  Definitely.

10   Q.  Can you describe them for the jury, please.

11   A.  In the left-hand picture, we see the evacuation of either

12   person who was injured or the corpse of a person.

13              And that is not the roughest, most grave picture.  I

14   remember a picture of the stump of a young woman who was

15   severed from the hip down.  And she remained with her tights

16   on, on the stretcher, when she was being evacuated, and it was

17   a scene of horror.

18              MR. YALOWITZ:  Your Honor, plaintiffs offer 1124 in

19   evidence.

20              MR. ROCHON:  No objection to 1124.

21              THE COURT:  It will be admitted into evidence.

22              (Plaintiff's Exhibit 1124 received in evidence)

23   Q.  Mr. Perlman, I would like also to play a video.  I just ask

24   have you had the opportunity to review a video with me in

25   advance of your testimony?

F1D3SOK4                    Perlman - direct

1    A.  Yes.

2    Q.  Does that video accurately depict the scene as you recall

3    it?

4    A.  Yes.

5              MR. YALOWITZ:  Your Honor, plaintiffs offer Exhibit

6    489 in evidence.

7              MR. ROCHON:  No objection to 489, your Honor.  We've

8    seen it previously.

9              THE COURT:  489 will be admitted in evidence.

10             (Plaintiff's Exhibit 489 received in evidence)

11             MR. YALOWITZ:  Thank you, your Honor.  Let's play the

12   video when you're ready.

13             (Video playing)

14             MR. YALOWITZ:  Thank you, your Honor.  I have nothing

15   further for Mr. Perlman.

16             THE COURT:  Any questions?

17             MR. ROCHON:  No questions, your Honor.

18             THE COURT:  Thank you, sir.  You can step down.

19             (Witness excused)

20             THE COURT:  Can we move forward with your next

21   witness?

22             MR. YALOWITZ:  Your Honor, I need to consult with the

23   Court about that for a moment.

24             (Continued on next page)

25

F1D3SOK4

1          (At the sidebar)

2          MR. YALOWITZ:  Okay, your Honor, we can begin the next

3     witness, get him qualified and so forth, but the binders with

4     the redactions, because I recall your Honor's ruling

5     differently than what you gave me this morning.  I respect the

6     Court's ruling, we've got to adjust to it.

7          THE COURT:  We must have all been in a different room

8     than you.

9          MR. YALOWITZ:  I'm not arguing with you.  I respect

10    the Court's ruling.  I'm telling you I didn't understand it the

11    way you articulated it this morning, so I'm going to need

12    tonight to get those binders adjusted.

13         THE COURT:  How much testimony can you give us before

14    you go to the binders?

15         MR. YALOWITZ:  We can probably get 10 minutes out of

16    him to get him qualified.

17         MR. ROCHON:  I'm open to whatever Mr. Yalowitz

18    prefers.  We've had a pretty good day.

19         THE COURT:  I'd like to use that 10 minutes because I

20    want to get the jury to understand that we're using the time

21    efficiently.  So why don't you take the 10 minutes, and when

22    you're ready go to the binders, then we can adjourn for the

23    day.

24         MR. YALOWITZ:  Your Honor, what is your rule once a

25    witness goes on the stand?  Are we able to consult with him?

F1D3SOK4

1          MR. ROCHON:  Actually, your Honor, this question is a

2     good one.  In light of the ruling and making sure the witness

3     understands the ruling, I would greatly prefer us not start

4     with him.  So we don't have a witness on the stand issue,

5     Mr. Yalowitz can make sure to communicate the ruling, and we

6     don't have any inadvertent mistakes.  Give him the night.

7          THE COURT:  You haven't been able to do that, right?

8          MR. YALOWITZ:  I've been a little occupied.

9          THE COURT:  Really?  Where you been?

10          MR. ROCHON:  In light of that, I know you're moving us

11     along, but safety would suggest to give him a full opportunity.

12          MR. YALOWITZ:  Or we can qualify him.

13          THE COURT:  Whatever you're comfortable with.

14          MR. YALOWITZ:  As long as I can communicate with him

15     tonight, we get the 10 minutes done, and as long as the cloak

16     of privilege remains on my communications with him tonight, I'm

17     fine with that.

18          MR. ROCHON:  To accommodate things, we won't invoke

19     the rule.  So he can get his 10 minutes.

20          MR. YALOWITZ:  Thank you.

21          (Continued on next page)

22

23

24

25

F1D3SOK4

1           (In open court)

2           MR. YALOWITZ:  Your Honor, the map that we put up, we

3     didn't sticker it and identify it in evidence.

4           THE COURT:  Do you have a number?

5           MR. YALOWITZ:  Consistent with the Court's ruling, I

6     think we should number it as --

7           MR. ROCHON:  Is that the flower shop document?  No

8     objection to whatever number they give it.

9           MR. YALOWITZ:  We'll mark it as 1149 and offer it in

10    evidence, your Honor.

11          MR. ROCHON:  No objection.

12          THE COURT:  Plaintiff's 1149 will be admitted into

13    evidence.

14          MR. YALOWITZ:  Plaintiffs call Nick Kaufman.

15          (Plaintiff's Exhibit 1149 received in evidence)

16          (Witness sworn)

17     NICHOLAS KAUFMAN,

18        called as a witness by the Plaintiffs,

19        having been duly sworn, testified as follows:

20    DIRECT EXAMINATION

21    BY MR. YALOWITZ:

22    Q.  Mr. Kaufman, thank you for coming in this afternoon.

23          Could you describe for the jury what you plan to cover

24    in your testimony.

25    A.  What I plan to cover in my testimony is to submit and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1D3SOK4                    Kaufman - direct

1    present to the honorable members of the jury a number of court

2    documents, originating from the Israel military courts on the

3    West Bank, and other places.  And I will explain those court

4    documents, I will explain the convictions which one finds

5    therein.  And that's about it.

6    Q.  Would you please tell the jury where you were educated.

7    A.  Well, if we exclude my secondary education, I was educated

8    at Cambridge University in the United Kingdom.  That was from

9    1986 until 1989.  And after that, I went to study to become a

10   lawyer at the Inns of Court School of Law in London.  That was

11   in 1989 until 1990.  And I was there qualified to become a

12   barrister.

13   Q.  What does a barrister do in the English court system?

14   A.  Well, it is basically like you, Mr. Yalowitz, except we

15   wear wigs in England.

16   Q.  So, were you admitted -- I think you may have said this,

17   but I want to make sure.  Were you actually admitted to the bar

18   of England and Wales?

19   A.  That's correct.  In February 1991 if I remember correctly.

20   Q.  Did there come a time when you left England and moved

21   somewhere else?

22   A.  Indeed I did.  In 1993 I left England and I moved to

23   Israel.

24   Q.  What did you do when you moved to Israel?

25   A.  Well, being a lawyer, I immediately enlisted in the Israel

F1D3SOK4                          Kaufman - direct

1    Defense Force.  There I did my articles or internship, and I

2    served my compulsory military service, because I was by then an

3    Israeli citizen, in the Israel Defense Force in the Military

4    Advocate General's Office.

5    Q.  What does the Military Advocate General do?

6    A.  Well, I think it is similar to the Judge Advocate General

7    here in the United States.  Basically, the Military Advocate

8    General is responsible for all the legal work of the army.

9    Q.  Is that what you did as part of the Office of the Military

10   Advocate General?

11   A.  That's correct.  I performed my compulsory military service

12   in the Military Advocate General's Office.  I was in the

13   international law department.

14   Q.  Did you gain admission to the bar of Israel?

15   A.  Yes, I did.  After my release from my compulsory military

16   service in 1995, I studied for a year, I did internship, and I

17   took the bar exams, and I was admitted to the bar of Israel as

18   well.

19   Q.  Now, following your admission to the bar, what kind of work

20   did you do in Israel?

21   A.  Well, after a period of a year or so in a commercial law

22   firm, which didn't really interest me that much, in 1996 I

23   joined the Office of the District Attorney of Jerusalem.

24   Q.  As a lawyer in the Office of the District Attorney, did you

25   prosecute crime?

F1D3SOK4                          Kaufman - direct

1   A.  Yes, I did.

2   Q.  What kinds of crimes did you prosecute during your period

3   of service in the District Attorney's Office?

4   A.  Well, there I was there for a long time.  I started off in

5   1996 prosecuting the most minor of offense, small-time drug

6   offenses, car theft, minor assaults.  And by the time I left in

7   2010, I was prosecuting the most serious types of offenses,

8   whether it be serious sexual crime, murder, or offenses against

9   the security of the state.

10  Q.  What kinds of crimes did you prosecute that were security

11  crimes?

12  A.  Well, crimes like the crimes we've been discussing today.

13  I also dealt with at least one espionage case.  Those are the

14  types of offenses which are considered offenses against the

15  security of the state.

16  Q.  When you were practicing in the District Attorney's Office,

17  did you work in the English language or the Hebrew language?

18  A.  Only in the Hebrew language.

19          May I just qualify that?

20  Q.  Please.

21  A.  Sometimes, of course, if there was a tourist or somebody

22  who spoke English or French, which I speak pretty well, I would

23  handle the case in English or French with the victim.

24  Q.  During your course of service in the District Attorney's

25  Office, were you given leave to take some special assignments?

F1D3SOK4                    Kaufman - direct

1    A.  Yes, I was, on two occasions.  In 2004, I left the Office
2    of the District Attorney in Jerusalem, and I became a
3    prosecutor at the International War Crimes Tribunal in the
4    Hague, that's in the Netherlands.  There I was involved in the
5    prosecution of a Serbian general, who had committed war crimes
6    in Dubrovnik.  That's a seaside resort in Croatia.  That was
7    for a period of a year or so.  Then I went back to the Office
8    of the District Attorney in Jerusalem.
9    Q.  Was there a second special assignment that you did as well?
10   A.  Yes.  Once again, it is not as if it is an assignment on
11   behalf of the State of Israel.  This is a personal decision.
12   And I left for another period of a year between 2008 until
13   2009, I joined the International Criminal Court.  That's also a
14   war crimes tribunal in the Hague, in the Netherlands.  And
15   there I was involved in prosecuting African warlords for war
16   crimes and crimes against humanity.
17   Q.  When did you leave the District Attorney's Office?
18   A.  In 2010.
19   Q.  What kind of work have you been doing since then?
20   A.  Well, I entered into private practice.  And because of my
21   experience at the international war crimes tribunals, I have,
22   when I can get the work and when the clients want me, involved
23   myself heavily in defending war criminals, and other types of
24   crime in the national jurisdiction.
25   Q.  Now, did you have occasion to serve as a judge in Israel?

F1D3SOK4                        Kaufman - direct

1    A.  Yes, I did.  But I qualify, in the courts in the West Bank.

2    Q.  Would you just explain what you did in that capacity, and

3    would you explain how it came about that you had that

4    opportunity and what did you in that capacity?

5    A.  Well, this was in about 2002.  A call went out for people

6    who were serving in the Office of the Military Advocate General

7    doing their reserve duty, because every male citizen in Israel

8    has to do compulsory reserve duty as well after he's released

9    from his obligatory army service.  A call went out to lawyers

10   asking whether they would like to become judges.  I thought,

11   well, I've been a prosecutor, I've been a defense counsel,

12   because I had been defending soldiers.  So I said, why not have

13   a go at being a judge as well.  So I did.  I answered the call.

14   And in 2002 or thereabouts, I was appointed a judge at the rank

15   of captain in the reserve corps of the Israeli Defense Force.

16   Q.  In preparation for your testimony here today, can you just

17   tell the jury in general what you did.

18   A.  Well, I reviewed a number of case files which were given to

19   me by the plaintiffs, through lawyers.  These case files

20   originated from the Israel military courts in the West Bank.  I

21   reviewed them, and I reviewed the convictions.  I read the

22   judgments.  I read the case files.  And afterwards, I went back

23   to the military courts on my own, to make sure that what I had

24   received from the lawyers for the plaintiffs exactly reflected

25   what was actually in those court files.

F1D3SOK4                          Kaufman – direct

1           MR. YALOWITZ:  Your Honor, may I have a moment to

2    consult with my colleagues?

3           THE COURT:  Sure.

4           MR. YALOWITZ:  Thank you so much.

5           (Pause)

6           MR. YALOWITZ:  Your Honor, we're at a good breaking

7    point, if it suits the Court.

8           THE COURT:  Surely.  Ladies and gentlemen, we're going

9    to take a break for the day.  Don't discuss the case.  Keep an

10   open mind.  If you have the cards that were given to you by

11   Mr. Yalowitz during his opening, just leave them on the seat.

12   Or if they are in the jury room, just leave them in the jury

13   room.

14          I am going to ask you to be in the jury room by 9:30

15   tomorrow morning.  I think we've gotten a good start.  I want

16   to keep us on pace.

17          Don't discuss the case, keep an open mind.  I'll see

18   you at 9:30 tomorrow morning.

19          (Jury excused)

20          (Continued on next page)

21

22

23

24

25

F1D3SOK4

1          THE COURT:  Anything we need to address before we

2    adjourn?

3          MR. ROCHON:  We had not finished with exhibits that

4    were related to this witness.  Mr. Satin will address any

5    remaining issues.

6          THE COURT:  Mr. Satin, is there a category of

7    documents?

8          MR. SATIN:  Yes, your Honor.  One issue, and this

9    happens repeatedly, in at least three of them, is that the name

10   Yassir Arafat is within those records.  We certainly believe

11   that same principle that has guided the Court's ruling to other

12   individuals applies to Yassir Arafat.

13         THE COURT:  Is a reference to a person making some

14   accusation against Yassir Arafat?

15         MR. SATIN:  It is.  In the various cases it is

16   individuals implicating him in criminal activity.  In fact,

17   that was the defense of one of the defendants in one of the

18   cases.

19         MR. YALOWITZ:  If Mr. Satin would give me a particular

20   example, I'll look at it.  I think I understand the Court's

21   ruling, which is, let me just articulate it to make sure I've

22   got it right.  That if it says Yassir Arafat signed a check for

23   me to commit an act of terror, the Court's ruling is that's not

24   coming in in this conviction.  We'll have to prove that some

25   other way.

F1D3SOK4

1          Do I have that right?

2          THE COURT:  Well --

3          MR. YALOWITZ:  I think that's what Mr. Satin is

4     talking about.

5          THE COURT:  Well, I think you're being too specific

6     about the rule.  The rule is much more general and to be

7     applied across the board.  To the extent that you have people

8     who have made self-incriminatory statements, those statements

9     come in as statements against interest.

10         To the extent those same people say "I did it and

11    Mr. Yalowitz did it too," those statements accusing

12    Mr. Yalowitz don't come in through that witness, because that

13    is not an exception to the hearsay rule.

14         If you want someone to come in and accuse Mr. Yalowitz

15    of committing the crime, then you should put that person in the

16    courtroom under oath and have that person give that testimony.

17         That's the basic rule.  This isn't a fancy rule.  So,

18    I thought it was clear that if you had some statement that you

19    were offering, and a basis for offering that statement was it

20    was a statement against interest, that you could offer the

21    statement that the person admitted their own participation.

22    You cannot offer a statement by some person who was being

23    interrogated or was pleading guilty or was accused of doing it

24    with somebody else, and they stand there accusing the somebody

25    else.  I don't care whether it is Yassir Arafat or anybody

F1D3SOK4

1    else.

2              So, if that is the nature of the statement, no, you

3    can't use that person's out-of-court statement as evidence that

4    the other person that he's talking about in that out-of-court

5    statement committed the offense that you're trying to tag him

6    with.

7              I don't know why we didn't have a clear understanding

8    about that.

9              MR. YALOWITZ:  All right.  I think I need to consult

10   with one of my colleagues who wants to talk to me.

11             THE COURT:  All right.

12             MR. YALOWITZ:  Thank you, your Honor.  Bear with me.

13             THE COURT:  Okay.

14             (Pause)

15             MR. YALOWITZ:  Your Honor, Ms. Romeo has an issue that

16   she's better at explaining than I am.

17             MS. ROMEO:  So I just want to be clear so we're

18   redacting the documents correctly and we can keep moving

19   tomorrow.

20             THE COURT:  I'm obviously not explaining myself well.

21             MS. ROMEO:  We have the two sets of documents.  We

22   have the IMC conviction binder, which has documents that have

23   come in as records of conviction under the hearsay exception.

24   We took the Court's rulings after looking at the transcripts to

25   be that we needed to redact all names and corresponding

F1D3SOK4

1    identifying information for that name.

2              THE COURT:  Accusing a third party of committing a

3    crime.

4              MS. ROMEO:  Of witnesses and -- oh, actually witnesses

5    and accomplices was used, the term was used in a couple of

6    conferences.  So we went through all the documents, and any

7    time a name popped up, we redacted that.  We also redacted,

8    with the exception that we've discussed with the Court where

9    there is the independent corroborating evidence.

10             THE COURT:  I am not sure what you mean by

11   "witnesses," because I don't think we had a specific discussion

12   about witnesses.  The discussion was whether or not you wanted

13   to use someone's out-of-court statement admitting their own

14   guilt and accusing a third party at the same time that you

15   wanted to use the accusation against the third party as

16   evidence in this case, even though it does not meet a hearsay

17   exception, particularly if it is not a statement against

18   interest.

19             I don't know how many times I can say this.  And I

20   don't understand why you don't understand what I'm saying.  If

21   it is accusing a third party by someone's statement out of

22   court, then it is not coming in.  And I don't care what form it

23   is.  All right?

24             MS. ROMEO:  Okay.

25             THE COURT:  You make sure that whatever document you

F1D3SOK4

1   want to offer does not have in it, that you want to use for

2   that purpose, an accusation against a third party which no one

3   has the ability to test because that person is not a witness in

4   this courtroom.

5           MS. ROMEO:  Okay.  Can I just ask for one

6   clarification?

7           THE COURT:  Sure.

8           MS. ROMEO:  That rule, is that qualified by the

9   exception if we have the independent corroborating evidence

10  that that person was in fact involved in that crime in the

11  manner described?  Because we discussed a few exceptions to

12  that in one of the conferences.  I believe it was last week.

13  Because this issue of Yassir Arafat has been raised before as

14  well as I believe --

15          THE COURT:  Well, let me put it this way.  I might

16  extend some leeway in that regard, if the evidence is already

17  independently before the jury.  If the argument is that, oh,

18  you can't believe that evidence, it may or may not be relevant

19  that someone else said it too.  Not for its truth.  But if

20  someone else said it too.

21          But we don't have that at this point.  All right?  So

22  if you want to put somebody on the stand to say "I was there

23  and I saw Yassir Arafat do it," then you're right, I'm not

24  particularly concerned about a third party also saying Yassir

25  Arafat did it, if it is offered for some other purpose than to

F1D3SOK4

1     independently prove that fact.

2           But right now what you're doing is you have a bunch of

3     convictions, and the issue was you cannot prove the criminal

4     activity of third parties by just taking people who have their

5     own interest in accusing third parties out of court or during

6     interrogations or in another court not subject to

7     cross-examination here, by saying that person must be guilty of

8     this because this other person when he pled guilty accused that

9     person.

10          That's the rule.  Okay?  So you can figure out where

11    that rule applies.

12          MS. ROMEO:  We understand, your Honor.

13          THE COURT:  I didn't ask you to do a ministerial task.

14    I asked you to look through your documents, figure out where

15    that person is accusing a third party, and take out the

16    references that would be in any way accusatory of the third

17    party.

18          MS. ROMEO:  We understand.

19          THE COURT:  Whether it is an accusation directly by

20    name or whether that is an implication and an accusation by

21    circumstantial evidence that you want the jury to rely solely

22    on that statement to conclude that that person did it.

23          MS. ROMEO:  We understand.  Okay.

24          THE COURT:  I don't know how else to explain this 10

25    more times.

F1D3SOK4

1          MS. ROMEO:  We understand the Court's ruling.  I just

2     have one question.  So the question is obviously these are

3     translations of Hebrew language documents.  Should we also

4     go -- it is going to be extraordinarily difficult to do the

5     Hebrew overlay.  So what would be possible is to do the

6     redactions on the translations for tomorrow.

7          MR. ROCHON:  That's going to serve for tomorrow

8     because this witness speaks English.  And if we are going to

9     show him the English versions, we don't have to worry about it.

10          THE COURT:  You can discuss that first and see if

11     there is a problem.  But, I have to go back over the jury

12     questionnaires, but my recollection is I don't think anybody on

13     this jury speaks Hebrew or Arabic.

14          MR. ROCHON:  We were pretty careful on that one, your

15     Honor.

16          THE COURT:  I'm not particularly concerned about that

17     issue.  I'm more concerned they are going to rely on you for

18     the accuracy of the English translation, what that English

19     translation says, means, and for what purpose you're offering

20     it to them.  That's what I'm concerned about.

21          Okay.  So I think that you both have to do a little

22     bit more analysis to make sure that the purpose of why I said

23     you should redact it appropriately is being addressed.  All

24     right?

25          MS. ROMEO:  We understand, your Honor.

F1D3SOK4

1          THE COURT:  Anything else other than that?

2          MR. ROCHON:  No, sir.

3          THE COURT:  All right.  Then I think we got a good

4     start.  Let's try to keep moving along.  If there are any

5     issues we need to address before the jury comes out, let me

6     know right away at 9:30 so we don't keep them waiting.

7          MR. YALOWITZ:  I do have one issue, your Honor.  It is

8     a little warm in the room.

9          THE COURT:  You want me to --

10          MR. ROCHON:  I'm with you.  I agree with him.

11          MR. YALOWITZ:  It wouldn't be bad if we cooled it down

12     a little bit.

13          THE COURT:  I'll have them lower the temperature for

14     you tomorrow.  I guarantee you after we do that, you'll be

15     telling me it's too cold.  That's what happens.  I'll make sure

16     we have a lower temperature.

17          (Adjourned until January 14, 2015, at 9:30 a.m.)

18

19

20

21

22

23

24

25

```
1                    INDEX OF EXAMINATION

2   Examination of:                              Page

3   MESHULAM PERLMAN

4   Direct By Mr. Yalowitz . . . . . . . . . . . .95

5   NICHOLAS KAUFMAN

6   Direct By Mr. Yalowitz . . . . . . . . . . . 105

7                    PLAINTIFF EXHIBITS

8   Exhibit No.                              Received

9    1123    . . . . . . . . . . . . . . . . . 101

10   1124    . . . . . . . . . . . . . . . . . 101

11   489    . . . . . . . . . . . . . . . . . 102

12   1149    . . . . . . . . . . . . . . . . . 105

13

14

15

16

17

18

19

20

21

22

23

24

25
```