F1E3SOK1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

MARK I. SOKOLOW, et al.,

                    Plaintiffs,

          v.                          04 CV 397 (GBD)

PALESTINE LIBERATION
ORGANIZATION, et al.,

                    Defendants.

------------------------------x
                                      New York, N.Y.
                                      January 14, 2015
                                      9:30 a.m.

Before:

                    HON. GEORGE B. DANIELS,

                                      District Judge

                         APPEARANCES

ARNOLD & PORTER LLP
     Attorneys for Plaintiffs
BY:  KENT A. YALOWITZ
     PHILIP W. HORTON
     TAL MACHNES
     SARA PILDIS
     CARMELA T. ROMEO
     RACHEL WEISER

MILLER & CHEVALIER, CHARTERED
     Attorneys for Defendants
BY:  MARK J. ROCHON
     LAURA G. FERGUSON
     BRIAN A. HILL
     MICHAEL SATIN

Also present:  RACHELLE AVITAL, Hebrew interpreter
               RINA NE'EMAN, Hebrew interpreter

F1E3SOK1

1             (In open court; jury not present)

2             THE COURT:  I received some letter objections.  First

3    of all, let me just go right to it, Mr. Yalowitz.  When for the

4    first time did you provide to the defendants Exhibit 1150?

5             MR. YALOWITZ:  Exhibit 1150 is a photograph we

6    received yesterday?

7             THE COURT:  Yes.

8             MR. YALOWITZ:  Your Honor, we received it yesterday

9    for the first time.  And we provided it to them yesterday for

10   the first time.

11            THE COURT:  It's out.

12            MR. YALOWITZ:  All right.  I understand the Court's

13   ruling.

14            THE COURT:  I'm not wasting any time.  When is the

15   first time you provided Exhibits 362, 451, 889?

16            MR. YALOWITZ:  Bear with me, your Honor.

17            THE COURT:  Yes.

18            MR. YALOWITZ:  Okay.  Your Honor, let me begin with

19   362.  362 is the verdict of Nasser Aweis.  That document was

20   translated between -- that document was originally provided, as

21   I understand it, it was before I came in the case, was provided

22   by the defendants to my predecessor counsel in about 2007.  It

23   was filed on the docket in the Knox case before Judge Marrero

24   like six or seven years ago.

25            When we filed our initial disclosures in 2011, it was

F1E3SOK1

1    filed on the docket by the defendants.  When we filed our

2    initial disclosures in 2011, again before I came in the case,

3    we said we're going to rely on convictions that you already

4    have.  We then --

5            THE COURT:  Which exhibit are you talking about?

6            MR. YALOWITZ:  362.

7            THE COURT:  You gave me a binder of convictions, more

8    than one binder of convictions as I remember.  Was this in it?

9            MR. YALOWITZ:  I believe, yes, sir, yes.  Yes.  I got

10    a lot of exhibit numbers.  I'm doing my best here.

11            THE COURT:  Well, I'm doing my best too.

12            MR. YALOWITZ:  You're doing great.

13            THE COURT:  I need to know when they were aware that

14    this was a conviction that you had and possibly you might use.

15            MR. YALOWITZ:  I think they were aware that it was a

16    conviction when they filed it in front of Judge Marrero in

17    another case.  They were aware of what it was because they had

18    it translated.

19            THE COURT:  When did you indicate you would utilize

20    that conviction at this trial?

21            MR. YALOWITZ:  Certainly no later than January 2013.

22            THE COURT:  In what form did you give that?

23            MR. YALOWITZ:  '14.  We put it on our exhibit list.

24            THE COURT:  It was on the exhibit list?  I want to

25    make sure what your representations are.  It was on the exhibit

F1E3SOK1

1  list, they produced it to you, it is in the binder of

2  convictions when I went through the binder of convictions to

3  determine which convictions would be admissible and which were

4  not.

5          Is that an accurate statement or what part is not

6  accurate?

7          MR. YALOWITZ:  The only part I don't know is the part

8  about your binder.  I'm not sure what the timing of your going

9  through the binder is.

10          THE COURT:  I'm trying to figure out whether it was in

11  the binder.  You gave me a binder of all the convictions.

12          MR. YALOWITZ:  Today?

13          THE COURT:  No, you gave it to me when we were

14  arguing.

15          MR. YALOWITZ:  Yes, it was in that binder.

16          THE COURT:  That was weeks ago.

17          MR. YALOWITZ:  Yes.  Yes, it was in that binder.  Yes.

18  Of course.

19          THE COURT:  It was in that binder?

20          MR. YALOWITZ:  Yes, sir.

21          THE COURT:  All right.  Because I can guarantee if you

22  it was in that binder, I reviewed it.  It was in the binder of

23  convictions that you said you wanted to use before we resolved

24  the issue of whether or not convictions would be admitted as

25  statements against interest.

F1E3SOK1

1          MR. YALOWITZ:  Correct.

2          THE COURT:  It was part of the convictions that were

3    in that, that we went through in that binder.

4          MR. YALOWITZ:  Yes, sir.

5          THE COURT:  What is 451?

6          MR. YALOWITZ:  451 is the verdict of Marwan Barghouti.

7          THE COURT:  Was that in the binder?

8          MR. YALOWITZ:  Yes, sir.

9          THE COURT:  When did you produce that and when was it

10   produced to you?

11         MR. YALOWITZ:  I don't have that one at the top of my

12   head.  But, that was certainly on our list from January of

13   2014.

14         THE COURT:  That was on your exhibit list and it was

15   in the binder?

16         MR. YALOWITZ:  Yes, sir.

17         THE COURT:  What about 889?

18         MR. YALOWITZ:  889, same thing.  It was on our exhibit

19   list, it was in the binder that we provided to the Court.

20         THE COURT:  Let me have one more last look.

21         MR. YALOWITZ:  Your Honor, excuse me.  I just want to

22   correct one thing.  Your Honor, I just want to correct one

23   statement.  362 was one of the three that we substituted.

24         THE COURT:  Right.  That was the one we talked about

25   that you added.

F1E3SOK1

1          MR. YALOWITZ:  Correct.  We substituted.  But they had

2      it.  This is the one they had that they filed with Judge

3      Marrero.

4          THE COURT:  I'm not so interested in what happened in

5      Judge Marrero's courtroom.  I'm interested in what happened in

6      this courtroom.

7          MR. YALOWITZ:  Fair enough.  Okay.  That's why I

8      corrected it, because I made a mistake.

9          THE COURT:  They have this conviction in their

10     possession and you added this and said you wanted to add this.

11         MR. YALOWITZ:  They had the conviction in their

12     possession from before the case.  They were put on notice we

13     were going to use all convictions in their possession during

14     discovery.

15         THE COURT:  You added this one.

16         MR. YALOWITZ:  We put it on our witness list.  We put

17     it on our exhibit list.  We gave them a copy of it.

18         THE COURT:  When?

19         MR. YALOWITZ:  In March of 2014 we gave them a copy of

20     it.  And then we didn't put it in the binder, but I told you

21     that I needed to substitute it in.  Within a day or two we

22     filed it on the docket.

23         THE COURT:  You can remind me and they can remind me,

24     I have no recollection that when you said you were going to

25     substitute it they said they had any objection.

F1E3SOK1

| | |
|---|---|
| 1 | MR. YALOWITZ:  I don't remember it either.  My memory |
| 2 | is not as good as it used to be, but I think I would have |
| 3 | remembered that. |
| 4 | THE COURT:  What is the story with the photographs |
| 5 | that they're referencing in the letter that they are discussing |
| 6 | Mr. Eviater? |
| 7 | MR. YALOWITZ:  Those photographs are photographs that |
| 8 | I think the Court went through, they objected to the |
| 9 | photographs.  Some of them were bloody and then there were some |
| 10 | photographs of people and we discussed it on the 16th. |
| 11 | THE COURT:  Is there any photograph that was not known |
| 12 | to them? |
| 13 | MR. YALOWITZ:  There is no photograph that we're going |
| 14 | to use with Eviater that was not either in an exhibit, provided |
| 15 | to them as part of our exhibit list, and a copy given to them |
| 16 | as part of our exhibit exchange, or provided to them in the run |
| 17 | up to the December 16 conference at which they objected to the |
| 18 | ones that they didn't already have. |
| 19 | THE COURT:  All right.  Who wants to be heard from the |
| 20 | defense?  Mr. Hill. |
| 21 | MR. HILL:  I'm on deck, your Honor. |
| 22 | THE COURT:  1150 you want out. |
| 23 | MR. HILL:  Yes, your Honor. |
| 24 | THE COURT:  When is the first time you saw 1150? |
| 25 | MR. HILL:  Last night. |

F1E3SOK1

1           THE COURT:  When is the first time you were aware that

2    1150 existed?

3           MR. HILL:  Last night.

4           THE COURT:  It's out.

5           Two of these three convictions were convictions that

6    we discussed in the binder, right?

7           MR. HILL:  They were in the binders that your Honor

8    looked at in December.

9           THE COURT:  And the third conviction was one that in

10    court I do have the vague recollection that they said they

11    wanted to add, and I don't have a recollection that you stated

12    any objection to adding that to the convictions.

13           MR. HILL:  So, we did object in the objections to be

14    filed to all of the evidence that it was not timely produced.

15    But the objection I'm pressing here today is it wasn't

16    disclosed to be used with Mr. Kaufman.

17           THE COURT:  That was my next question.  Your objection

18    is not that you were unaware of this exhibit, didn't know it

19    existed, unlike 1152, you never saw this exhibit until today or

20    yesterday.  That's not the nature of your objection.

21           MR. HILL:  They are on their exhibit list.

22           THE COURT:  The nature of your objection is not even

23    to the admissibility of these convictions.  It is the

24    utilization of these convictions with the expert.

25           MR. HILL:  That's one of them.

F1E3SOK1

1          THE COURT:  What is the other?

2          MR. HILL:  I also objected to Mr. Barghouti and

3     Mr. Shubaki's convictions coming in because they weren't

4     convicted for any of the six attacks.

5          THE COURT:  You never stated such an objection.

6          MR. HILL:  It's in my letter.  They weren't convicted

7     of any of these six crimes.

8          THE COURT:  How long have you had these convictions?

9          MR. HILL:  I've had the Nasser Aweis one, as counsel

10    pointed out, we did file it in another case.  So if you want to

11    exclude that, I got it from them in this case in July of 2013

12    is the first time I got it in this case.

13          THE COURT:  That's when you got all two of the three?

14          MR. HILL:  I got the Nasser Aweis one in July of 2013.

15    The Marwan Barghouti and Fuad Shubaki convictions I did receive

16    prior to the close of that discovery.

17          THE COURT:  Let me go to the third letter.  Are all of

18    these photographs, these exhibits that you objected to?

19          MR. HILL:  They're not all photographs, your Honor.

20          THE COURT:  Which ones aren't photographs?  If they're

21    not photographs, what are they?

22          MR. HILL:  They're documents that were either produced

23    in discovery and some of them were not produced in discovery.

24          THE COURT:  That doesn't tell me what they are.

25          MR. HILL:  Some of them are records we produced

F1E3SOK1

1    related to payments, some of them are printouts from the

2    Internet, one of them is a video.

3          THE COURT:  I'm trying to understand, again, the

4    objection we're dealing with now is simply your objection that

5    it shouldn't be utilized with this witness.  Not your objection

6    that they are for all purposes inadmissible.

7          MR. HILL:  I understand.

8          THE COURT:  I'm trying to understand.  I know you

9    understand.  I'm trying to understand you.  That's the nature

10   of your objection.

11         MR. HILL:  I can specify which ones they are, but I

12   handed my copy to the clerk.  If I can retrieve it.

13         THE COURT:  We'll give you back the copy.  So your

14   objection is that they didn't tell you that Eviater was going

15   to comment on these.

16         MR. HILL:  Correct, your Honor.

17         THE COURT:  And you say other than the photographs,

18   what else is there that you're objecting to?

19         MR. HILL:  Bear with me just a moment, your Honor.

20   Plaintiff's Exhibit 171.

21         THE COURT:  Okay.  What is that?

22         MR. HILL:  It purports to be some sort of phone

23   directory.

24         THE COURT:  When did you get that?

25         MR. HILL:  I've had it, I produced it, but my point is

F1E3SOK1

1    it is not in Mr. Eviater's report.  So until yesterday, I was

2    not on notice it was going to be used for him.  It is a listing

3    of names and people in Palestine.

4             THE COURT:  That's a phone directory.  What else?

5             MR. HILL:  173 is a document which we produced in

6    another matter that deals with payments made to Fatah.  Again,

7    my objection is it was not referenced in Mr. Eviater's report,

8    so until last night I had no notice they would use it with him.

9             THE COURT:  But that's a document that you produced to

10   them when?

11            MR. HILL:  I produced it, yes.

12            THE COURT:  When?

13            MR. HILL:  We produced it in another case.  It would

14   have been before the close of discovery in this case.

15            THE COURT:  How many years ago?

16            MR. HILL:  My guess is two or three years ago.

17            THE COURT:  I'm sorry, you referenced that as a what?

18            MR. HILL:  A list of payments made to Fatah.

19            THE COURT:  Okay.  What else that's not a photograph?

20            MR. HILL:  Exhibit 212, which is a printout of several

21   dozen pages from a website.

22            THE COURT:  Were you on notice that this was going to

23   be used at trial as opposed to on notice that this was going to

24   be used with this witness?

25            MR. HILL:  Let me check when I received it, your

F1E3SOK1

1    Honor.

2              THE COURT:  All right.

3              MR. HILL:  I was definitely not on notice that it

4    would be used with this witness.

5              THE COURT:  I understand that.

6              MR. HILL:  This document was first produced to us in

7    August of 2013.  So nearly nine months after close of fact

8    discovery.

9              THE COURT:  You were on notice that it was possibly

10   going to be an exhibit at this trial.

11             MR. HILL:  I was.  It is on their exhibit list.

12             THE COURT:  What other kind of exhibit?

13             MR. HILL:  Exhibit Number 215 is also a website.  That

14   was not referenced in Mr. Eviater's report, so I was not on

15   notice it would be used with him.  And it was produced to me,

16   according to my records, also in August of 2013.

17             THE COURT:  The content of both of those websites, did

18   the content of that website relate to the subject matter that

19   you knew he was going to testify about?

20             MR. HILL:  They are about the prisoners.

21             THE COURT:  Okay.  I don't have the details,

22   obviously, of his report.  So I assume he laid out some

23   assessment with regard to prisoners that related to his expert

24   opinion.

25             MR. HILL:  So in that sense, he does talk about

F1E3SOK1

1   prisoners, and these documents are about prisoners.  My

2   complaint is I'm supposed to know from the report what the

3   basis of his opinions are and what exhibits will be used.

4           THE COURT:  But the factual basis for his opinion that

5   is represented in the website, you were aware of that.

6           MR. HILL:  Not at the time I deposed him.  Not at the

7   time I received his report.

8           THE COURT:  You were unaware that he was relying on

9   prisoner information when he gave his report?

10          MR. HILL:  I was aware of the general subject matter

11  of prisoners.  I was not aware that the witness had anything to

12  do with these particular documents.

13          THE COURT:  I'm not talking about the documents.  I'm

14  talking about the subject matter.

15          MR. HILL:  I was aware of the general subject matter.

16          THE COURT:  What else?

17          MR. HILL:  241 is another website.

18          THE COURT:  And the subject matter of that website?

19          MR. HILL:  Also about prisoners.

20          THE COURT:  Okay.

21          MR. HILL:  It was not referenced --

22          THE COURT:  I didn't ask you about that first website.

23  Also about prisoners?  What is the subject matter of that?

24          MR. HILL:  Does your Honor have the number there?

25          THE COURT:  That was maybe --

F1E3SOK1

1              MR. HILL:  171?

2              THE COURT:  212.

3              MR. HILL:  Also purports to be about prisoners.

4              THE COURT:  All that was the same subject matter.

5     Anything else that's an exhibit that wasn't a photograph?

6              MR. HILL:  What was the last one I gave your Honor?

7              THE COURT:  241.

8              MR. HILL:  628.

9              THE COURT:  What's that?

10             MR. HILL:  It purports to be a report from the World

11    Bank.

12             THE COURT:  Okay.  And the subject matter of that

13    report?

14             MR. HILL:  Has to do with public expenditures reviews

15    for the PA.

16             THE COURT:  Did he opine on that subject matter in his

17    report?

18             MR. HILL:  I don't believe so.

19             THE COURT:  He did he testify to that during

20    deposition?

21             MR. HILL:  No, your Honor.

22             THE COURT:  What did you say that document is?

23             MR. HILL:  It purports to be volume two of a West Bank

24    and Gaza public expenditure review published purportedly by the

25    World Bank.

F1E3SOK1

1          THE COURT:  How long have you had that?

2          MR. HILL:  Bear with me.  Your Honor, I don't have a

3   precise date.  It was referenced in the report of a different

4   expert, which meant I would have been aware of it in March or

5   April of 2013.

6          THE COURT:  What do you think they believe is the

7   relevance of that information?

8          MR. HILL:  I actually don't know, your Honor.

9          THE COURT:  Does it reflect expenditures of the PA or

10  the PLO, for example, with regard to martyr payments or

11  something like that?

12         MR. HILL:  It may be about martyr payments.  It is at

13  least 174 pages long.

14         THE COURT:  You saw nothing relevant in that document?

15         MR. HILL:  It's generally about the PA's finances in

16  the period of 2006, which is after all these attacks.

17         THE COURT:  Mr. Yalowitz, what has that got to do with

18  this case?

19         MR. YALOWITZ:  The document does talk about the dollar

20  volume of payments to prisoners and martyrs.

21         THE COURT:  Well, that was my guess.

22         MR. YALOWITZ:  I didn't think, I didn't think it was a

23  big mystery, but okay now.

24         THE COURT:  That's why I asked.

25         MR. YALOWITZ:  Now he's been tipped off.

F1E3SOK1

1          MR. HILL:  I still have the objection it wasn't

2     disclosed.

3          THE COURT:  You guys aren't going to outsmart each

4     other.  You'll win this case on its merits.

5          MR. HILL:  I have three more.  958 which are

6     interrogatory answers from another case.

7          THE COURT:  Okay.

8          MR. HILL:  They're not referenced in Mr. Eviater's

9     report.

10          THE COURT:  Is the subject of the interrogatories

11     something that he opined upon?

12          MR. HILL:  It has to do with payments to Fatah.  I

13     don't recollect him having an opinion about payments to Fatah.

14          THE COURT:  What else?

15          MR. HILL:  I have Plaintiff's Exhibit 1127 which

16     purports to be a business card.

17          THE COURT:  Okay.  Of who?

18          MR. HILL:  Of Jabril Rajoub.

19          THE COURT:  Do you know the relevance of the business

20     card?

21          MR. HILL:  I know Mr. Rajoub was the head of PSS

22     during the relevant time frame, but this card does not have the

23     PSS, so I don't know the relevance.

24          THE COURT:  Mr. Yalowitz, what does the card have to

25     do with this case?

F1E3SOK1

1          MR. YALOWITZ:  The card is to help expertize the

2     expert.  He's an expert --

3          THE COURT:  That's lawyer talk.  Don't give me that

4     "expertize the expert."  What is the relevance?  Why should we

5     care about this card?  What is this card supposed to show?

6          MR. YALOWITZ:  The card is supposed to show that the

7     witness who received the card knows people in the PA, is

8     knowledgeable about the PA from first-hand knowledge.

9          THE COURT:  So the testimony is going to be this

10    witness received this card directly from this individual?

11         MR. YALOWITZ:  Correct.

12         THE COURT:  And he has personal relationships with

13    some of these individuals?

14         MR. YALOWITZ:  Exactly.

15         THE COURT:  In support of your argument that he is

16    intimately familiar with their activities and their personnel?

17         MR. YALOWITZ:  You got it.

18         THE COURT:  All right.  That's all I'm asking.

19         MR. HILL:  I do object.  That was not disclosed in the

20    report, and I asked him at his deposition about conversations

21    with Palestinians and he did not tell me about conversations

22    with Mr. Rajoub.  He told me about conversations with several

23    different people, but Mr. Rajoub is not one of them.

24         MR. YALOWITZ:  May I be heard on that, your Honor?

25         THE COURT:  No.

F1E3SOK1

1          MR. HILL:  1143 is the last one.  This is another

2    printout which does have to do with prisoners, but it was not

3    referenced in Mr. Eviater's report.

4          THE COURT:  Is it accurate that all the photographs

5    which you're objecting to be utilized with this witness were

6    photographs in the binder we went through?

7          MR. HILL:  They were photographs, with the exception

8    of one, that were given to us in December of last year.

9          THE COURT:  I'm trying to figure out whether those

10   were the ones I looked at.

11         MR. HILL:  Yes, except one.  I don't believe I have a

12   photograph of Mr. Karaqi.  I'll stand corrected if that's

13   incorrect.

14         THE COURT:  Mr. Yalowitz, was Mr. Karaqi's photograph

15   in that binder?

16         MR. YALOWITZ:  I don't believe it was.  It was in

17   Exhibit 700, so that defendants have had it for whatever it is,

18   nine months.

19         THE COURT:  You put that on your list of exhibits?

20         MR. YALOWITZ:  Yes, sir.

21         MR. HILL:  That wasn't on the list last night, so I

22   haven't had a chance to look at 700.

23         THE COURT:  Let me look quickly, because our jurors

24   are here waiting, and I don't want either side to be prejudiced

25   because of the fact that they're cooling their heels waiting

F1E3SOK1

1    for us.

2            I flipped through the first few redactions.  It seems

3    to be consistent with what we discussed.  Is there some basis

4    that you have to believe that the redactions, particularly with

5    regard, and I assume what you focused on, was the objections

6    that you found to be inadequate yesterday or the day before.

7    Have you looked at any of those and did you still find any of

8    those to be inadequate?

9            MR. HILL:  We had only checked through the binder

10   pertaining to the Sokolows.  We've got people working on the

11   other ones now, and Mr. Satin can point to things that we do

12   think is inadequate.

13           THE COURT:  Tell where it is.

14           MR. SATIN:  Sure.  It relates to the case of Nasser

15   Shawish.

16           THE COURT:  Just a second.

17           MR. SATIN:  Exhibit numbers are 382G and 366.

18           THE COURT:  Tell me what page.

19           MR. SATIN:  I have on the bottom 74.

20           THE COURT:  Page 74.

21           MR. SATIN:  My understanding that's just the first

22   page.

23           THE COURT:  Slow down.  Page 74.  What line do you

24   claim is an inappropriate redaction?

25           MR. SATIN:  So it says 74.  This is the first page of

F1E3SOK1

1  the exhibit.

2          THE COURT:  Mine says 74.

3          MR. SATIN:  What happens for the next few pages --

4          THE COURT:  Show me the line that you say is an

5  inadequate redaction.

6          MR. SATIN:  All of the trial testimony that --

7          THE COURT:  Show me the line that you say is an

8  inadequate redaction.

9          MR. SATIN:  So can I just back up just to give the

10 Court a little bit of background.

11         THE COURT:  Answer my question.  Give me the first one

12 that you say is an inadequate redaction.

13         MR. SATIN:  The --

14         THE COURT:  What line?

15         MR. SATIN:  "Question:  I ask that you relate to the

16 crime attributed to me."

17         THE COURT:  That's the nature of your objection?

18         MR. SATIN:  I'm trying to tell the Court what it is.

19         THE COURT:  I'm trying to ask you where was the

20 redaction that you say is inadequate.  I said that they were

21 supposed to redact any identifying information of which one

22 party is accusing or incriminating another identified party.

23 As long as that the identity of that person is not stated or

24 obvious or disclosed by the relevant description of that

25 person, it is an appropriate redaction.

F1E3SOK1

1          Do you have any one that you can show me that falls

2   outside of that category?

3          MR. SATIN:  Not on this particular --

4          THE COURT:  Any document.  Give me one.

5          MR. SATIN:  Then we can go -- I want to come back.

6   This a separate and unique issue I do want to address at some

7   point.

8          THE COURT:  Well, "at some point" is the next

9   30 seconds because I'm bringing this jury in.

10         MR. SATIN:  Then if we can go, your Honor, to the

11  trial exhibit 357, which is the indictment of Ahmed Barghouti.

12         THE COURT:  Okay.  Ahmed.

13         MR. SATIN:  If the Court would turn to page 73.  If

14  the Court looks to the bottom the last line has the name

15  Abdullah Barghouti in that last line.  And it has the name

16  Abdullah Barghouti three times unredacted on the next page.

17         THE COURT:  What are you saying it says about Abdullah

18  Barghouti that we don't already know?

19         MR. SATIN:  What are we saying?

20         THE COURT:  Yes.  You're objecting to it.  You say

21  it's prejudicial to you.  What is he saying about Abdullah

22  Barghouti that we don't already know by Abdullah Barghouti's

23  conviction?

24         MR. SATIN:  The jury does not know that Ahmed

25  Barghouti transferred Abdullah Barghouti from the prison of the

F1E3SOK1

1    preventive security of the Palestinian Authority.

2            THE COURT:  With regard to Ahmed Barghouti, I'm not

3    going to sustain any objection with regard to that.  Because

4    Ahmed Barghouti himself was an employee of the PA.

5            MR. SATIN:  But, your Honor, whether he is an employee

6    or not, his statements are not -- the same rule applies for

7    him, if he is implicating some other person.

8            THE COURT:  Next.

9            MR. SATIN:  So --

10           THE COURT:  Ahmed Barghouti is not accusing Yassir

11   Arafat.  He's making reference to Abdullah Barghouti, who has

12   already pled guilty to the crime.

13           MR. SATIN:  That's the difference, your Honor.  That's

14   why each time that Abdullah Barghouti is mentioned by Ahmed

15   Barghouti, he is accusing him for things of which Abdullah

16   Barghouti was not convicted.  He was not convicted of escaping

17   from jail.  There is no independent admissible evidence of that

18   fact.

19           THE COURT:  The rest of your objections are overruled.

20   All the other objections are overruled, other than the one that

21   I indicated we're moving forward.  All right?  If we get to a

22   point where they're getting ready to offer an exhibit before

23   the jury, and you have some objection that a non-PA related

24   person is accusing the PA or the PLO and they didn't redact

25   that, then I will hear objection to that document.  But I think

F1E3SOK1

1    we have exhausted this, beat the dead horse on this one.  We're

2    moving forward.  All right.

3                MR. ROCHON:  Your Honor, just one thing to preserve an

4    issue.  We're moving forward, accepting your ruling.  It is

5    significantly likely that we will discover some additional

6    problems with the redactions, because we only got them after

7    midnight.  I know the plaintiffs were working hard on it.

8    We're working hard.  I'm asking you if there's any other

9    objections that we might have, they should not be deemed

10   waived.  And we can do curative instructions and redactions

11   later to deal with the issue.

12               THE COURT:  Fine.  You have that.

13               MR. YALOWITZ:  Wait a minute.

14               THE COURT:  You have that.  But you're going to have

15   to convince me that there is some reasonable basis why you

16   didn't go right back to what you said was the objectionable

17   part and verify immediately that those changes were made.  And

18   that's not going to take days or hours.  That's going to take

19   minutes.  Go back to the ones that you say were inadequate and

20   see if they have fixed them.  Okay.  And we are not going to

21   sit around with the jury cooling their heels in the jury room

22   so you can go back through this process for the 10th time.

23               MR. ROCHON:  Judge, I'm accepting your ruling, and we

24   are going to bring the jury in.  I don't want it to be deemed a

25   waiver if we missed something between one in the morning and

F1E3SOK1

1    this morning.

2              THE COURT:  If you identify something that they did

3    not fix and that you can argue that there is a good reason why

4    you didn't find it before this time, and that it is prejudicial

5    to the defendant, I will take the appropriate action.

6              MR. ROCHON:  Thank you.  That will probably just be

7    redaction.  The jury won't remember every word.  We'll be able

8    to cure it.

9              THE COURT:  Look, my guess is, if there is something

10   there where some non-related PA person accused a PA or the PLO,

11   that you would be bringing that to my attention this minute.

12   Okay.  So I assume now all this nuance about whether or not it

13   is this person, I don't consider that to be something that we

14   should go through line by line.

15             But if you think there is something where a non-PA or

16   PLO official is identifying a PA or PLO individual, and

17   accusing that person of committing the crime, then I suggest

18   you better find that pretty quickly and let me know.

19             MR. ROCHON:  We have people back working on it while

20   we're here, of course.  Thank you, your Honor, and we're ready.

21             May I have the Court's indulgence for 30 seconds so I

22   can communicate to the people working on that?

23             THE COURT:  Sure.

24             MR. ROCHON:  Thank you.  If you want to receive it,

25   Mr. Yalowitz can handle that.

F1E3SOK1

1          THE COURT:  Mr. Yalowitz, can we move forward?

2          MR. YALOWITZ:  No, let's go.  I'm ready to go.

3          THE COURT:  Get your witness back.

4          MR. SATIN:  Can I raise one quick point on the

5    redaction issue that's a new thing based on binders they gave

6    us?

7          THE COURT:  No.

8          MR. YALOWITZ:  Thank you, your Honor.

9          THE COURT:  If it is not in the letters and we didn't

10   discuss it, no.  I'm not going to deal with it.

11         MR. YALOWITZ:  Plaintiffs call --

12         THE COURT:  If it doesn't call into the category we

13   have, we're not going to address it now.

14         MR. SATIN:  Just about the binder cover.  How they are

15   being presented to the jury.

16         MR. YALOWITZ:  They've had those covers for a long

17   time.

18         THE COURT:  That is a waste of my time and the jury's

19   time.  All right.

20         MR. YALOWITZ:  Plaintiffs recall Nick Kaufman.

21         THE COURT:  Bring the witness in and let's get the

22   jury.

23         MR. ROCHON:  Before the jury comes in --

24         THE COURT:  Yes, sir.

25         MR. ROCHON:  I see the witness has brought something.

F1E3SOK1

1    I don't know the Court's practice on this.

2            THE COURT:  The Court's practice is he can bring his

3    teddy bear if he wants.  If you want to examine him about why

4    he's got it in front of him, you can.

5            MR. ROCHON:  I would like the record to reflect the

6    witness has his teddy bear.

7            MR. YALOWITZ:  Your Honor, I want to move the

8    admission of the five binders.  Rather than go through every

9    number, rather than go through every number, we'll provide a

10   copy of the -- well, provide a list to the Court, but we have

11   copies of the binders for the jury and for the Court.

12           THE COURT:  All right.  What I will do is, they will

13   be deemed admitted, unless when you get ready to put it before

14   the jury and utilize it with this witness, there really is a

15   serious objection beyond what we've just discussed that we have

16   to deal with.

17           MR. ROCHON:  Can I ask a record question?

18           MR. YALOWITZ:  We'll need to hand out binders one at a

19   time to the jury.

20           MR. ROCHON:  So we've obviously --

21           THE COURT:  Mr. Yalowitz.

22           MR. YALOWITZ:  I'm sorry.

23           MR. ROCHON:  We've obviously objected on a number of

24   grounds that's come in previously.  In order to preserve our

25   record, does the Court want me to stand up and say "no

F1E3SOK1

1    objection" --

2              THE COURT:  Not on previous objections that you have

3    made.  I'm admitting those binders over the defense objections.

4    Defense objections have been noted.

5              If, like I said, if for some reason you're getting

6    ready to go over a conviction and then somebody notices that it

7    says "Yassir Arafat drove me to the incident," then if you want

8    to stop it at that point and it is worth discussing, that's one

9    thing.  But, it better be something pretty stark and pretty

10   serious at this point.  All right.

11             MR. ROCHON:  Understood.  Thank you.

12             MR. YALOWITZ:  Okay.  But they are admitted in

13   evidence.  I don't need to move them into evidence in front of

14   jury?

15             THE COURT:  No, you don't need to.

16             MR. YALOWITZ:  Thank you, sir.  Okay, we're ready.

17             THE COURT:  Let's get the jury.

18             (Continued on next page)

19

20

21

22

23

24

25

F1E3SOK1

1            (Jury present)

2            THE COURT:  Good morning, ladies and gentlemen.  First

3    of all, let me apologize for the delay.  I can tell you that in

4    most instances I'm dealing with issues with the parties that in

5    the long run save us time, rather than delay the trial.  So you

6    can be assured we were working, and that I'm confident that we

7    were resolving certain issues before we start.  It will

8    hopefully shorten the length of the trial, rather than lengthen

9    the trial.

10            So we're prepared to move forward at this point.

11   Mr. Yalowitz, you can continue.

12            MR. YALOWITZ:  Thank you so much, your Honor.

13    NICHOLAS KAUFMAN,

14        called as a witness by the Plaintiffs,

15        having been previously sworn, testified as follows:

16   DIRECT EXAMINATION (Continued)

17   BY MR. YALOWITZ:

18   Q.  Good morning, Mr. Kaufman.  Welcome back.

19   A.  Good morning, Mr. Yalowitz.

20            Good morning, members of the jury.

21            MR. YALOWITZ:  Good morning, members of the jury.

22   Q.  All right.  Mr. Kaufman, I would ask you to summarize for

23   the jury the attack of January 22, 2002, based on the

24   convictions that you have reviewed.

25   A.  Yes, Mr. Yalowitz.  I believe there is a little

F1E3SOK1                          Kaufman - direct

1    organizational chart which we can perhaps display for the

2    benefit of the jury.

3    Q.   Sure.  Bear with us and Ms. Machnes will display it.  I

4    think that's a good idea.

5    A.   Yes.  Now, members of the jury, this is what we will refer

6    to as a cell.  You can see a number of operatives.  For all

7    intents and purposes, the two people at the top are the most

8    senior operatives in this cell.  Ahmed Barghouti, I will call

9    him the operational commander.  Nasser Aweis on the left-hand

10   side, right at the top, I'll call him the hierarchy commander.

11   I use that quite loosely.  From my reading of the documents, he

12   certainly has a position of seniority in the Palestinian

13   Authority.

14          Anyway, so, around about January 2002, the chap on the

15   top right-hand corner, Ahmed Barghouti, decided that he wanted

16   to carry out a terrorist attack.  So, he decided to recruit

17   someone to do that.  And the person who actually did the

18   recruiting, you can see on the second line down on the far

19   left, that's Ibrahim Abdel Hai.

20          He found someone who was prepared to carry out this

21   attack.  And the person who was prepared to carry out the

22   attack, he's right at the bottom.  Said Ramadan.  And he is

23   written "shooter" there.  This in fact was going to be a

24   suicide attack carried out by way of machine gunfire.

25          Now, as things happen in things like this, Ahmed

F1E3SOK1                          Kaufman – direct

1    Barghouti sought approval for the attack.  He sought it from

2    his hierarchical superior, Nasser Aweis.  Nasser Aweis gave his

3    approval for this attack.

4            So, the attack itself took place, as you heard

5    yesterday from the opening statement, on the 22nd of January.

6    And Ahmed Barghouti, the operational commander, and another

7    individual called Muhammad Mousleh, you'll see him in the

8    second line down, he is the second one in there.  They met with

9    the suicide recruit, Said Ramadan, in order to prepare him for

10   the attack.

11           Now the preparations for these attacks, members of the

12   jury, are sometimes quite complex and intricate.  In order to

13   get the suicide shooter to Jerusalem, you need to find means of

14   transport.  He's obviously not going to walk on foot.

15           So, two individuals were hired, Fares Ghanem and

16   Muhammad Abdullah, they are the two individuals on the middle

17   line right at the end.  They agreed to transport Said Ramadan

18   to Jerusalem to carry out his attack.  And they planned a route

19   to do that.

20           Ahmed Barghouti, the operational commander, and

21   Muhammad Mousleh, part of the preparation team, got Ramadan

22   ready for the attack.  They did that by taking him to pray.

23   Why, may you ask, did they take him to pray?  Well, he knew he

24   was going to die, so he was preparing himself for death.  They

25   bought him food maybe for his last supper, clothes and shoes.

F1E3SOK1                    Kaufman - direct

1    All for the purpose of the attack.

2              Muhammad Mousleh, he bought the weapon.  The weapon

3    was an M-16 semi-automatic rifle.

4              Now, I don't know whether we can perhaps enlarge this

5    picture so we can have a look at Said Ramadan himself.  Is that

6    possible, Mr. Yalowitz?

7    Q.  I think it's going to be difficult but if you bear with us

8    one moment, Mr. Kaufman, we might be able to do it.

9    A.  Just to magnify Said Ramadan.

10   Q.  I'm not sure we can.  Let me just consult.

11   A.  It's not important, members of the jury.  If there is a

12   dispute about this.

13             If you look at Said Ramadan and you look at the weapon

14   he's clutching, that in my own personal knowledge, and I know

15   this because before I started my compulsory military service I

16   had to do basic training, I was actually trained with this

17   weapon.  It is an American weapon.  It is an M-16

18   semi-automatic rifle.  It was used in Vietnam.  It is used by

19   the Israeli Army.  And he's clutching that M-16 semi-automatic

20   weapon.  This was the type of weapon that he used to carry out

21   the attack.

22             Said Ramadan also has around his head a band.  And

23   behind him there is a kind of I would say canvas.  It's got a

24   logo on it.  I know those logos.  Once again, being an Israeli

25   citizen, I've seen the news like anyone else, I know that logo

F1E3SOK1                         Kaufman – direct

1    is the logo of the Al Aqsa Martyrs Brigade.  And I had a good

2    look at the brand which is wrapped around --

3              MR. ROCHON:  Your Honor, we would object.  Can we have

4    a brief sidebar?

5              THE COURT:  Yes.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1E3SOK1                    Kaufman – direct

1              (At the sidebar)

2              MR. ROCHON:  None of this is in his expert report or

3     in his deposition about his knowledge of weapons, his knowledge

4     of Al Aqsa Martyrs Brigade, the knowledge about why he's

5     getting his money for the last meal.  What he's testifying to

6     is the content of these convictions.

7              THE COURT:  So what part are you objecting to?

8              MR. ROCHON:  This entire narrative of what happens

9     needs to be based on the language of the convictions.

10             THE COURT:  I don't disagree.  But, okay.  This is a

11    little late objection.

12             MR. ROCHON:  I didn't know what he was going to do

13    with this witness.  This wasn't in the report or the

14    deposition.

15             THE COURT:  The bottom line is, I don't think that

16    this witness or any of your expert witnesses are qualified to

17    testify as to how this event happened.  That's a factual

18    recitation.  He is giving testimony about who was involved,

19    when it was involved, who gave what.  That's not an expert

20    opinion.  That's something he read.

21             MR. YALOWITZ:  May I be heard on that?

22             THE COURT:  Yes.

23             MR. YALOWITZ:  Okay.  At his deposition, he said I'm

24    also going to be a summary witness.

25             THE COURT:  How is he a summary witness?  He's the

F1E3SOK1                         Kaufman - direct

1    first witness we're hearing from.  He's not summarizing

2    anything.

3              MR. YALOWITZ:  He's summarizing the convictions.

4              THE COURT:  What he just said has nothing to do with

5    convictions.

6              MR. YALOWITZ:  I understand that.

7              THE COURT:  You asked him tell me how this whole thing

8    happened.  How is he qualified to tell us factually how this

9    happened?  He's not qualified.

10             MR. ROCHON:  That's what I should be hearing from --

11             MR. YALOWITZ:  Bear with me.  Let me clarify with him

12   to try to slow him down a little bit.  Ask him some questions.

13             But, his summary, what he said -- leave aside the

14   headband which he just noticed and is talking about the

15   headband.  But his summary is based directly on document after

16   document.  And that PowerPoint that your Honor said we don't

17   want to put in front of jury, I respect that ruling, but I am

18   telling you I gave that PowerPoint to the defendants, and every

19   single statement in there is sourced to a conviction.

20             MR. ROCHON:  Keep your voice down.

21             MR. YALOWITZ:  And he is faithfully adhering to that

22   summary.  In fact, he's got it in front of him.

23             THE COURT:  He is not a fact witness.

24             MR. YALOWITZ:  No, he is a summary witness.

25             THE COURT:  No, he is not a summary witness.  He is an

1    expert witness.  He can give some expert opinion about this

2    case that is beyond the understanding or knowledge of the jury.

3    He wasn't there.  He was not a fact witness.  You can't use him

4    to say, okay, let me tell you how this happened.  That's

5    exactly what you asked him.  He is not qualified to tell --

6            MR. YALOWITZ:  I asked him to summarize.

7            THE COURT:  -- who did what, who spoke to who.  And

8    most of that is based on evidence that is otherwise

9    inadmissible.

10           MR. YALOWITZ:  Your Honor.

11           THE COURT:  So you can't use him as a fact witness to

12   put in facts that you don't otherwise have in this case.  If he

13   wants to summarize the evidence before the jury, but I'm not

14   going to let this jury say we are going to find them liable

15   because this guy told us the whole story.

16           MR. YALOWITZ:  All right.

17           THE COURT:  He's not here to tell us the story.  He is

18   here to give an expert opinion about his review of the

19   documents on whatever particular issues are relevant.  It is

20   not appropriate to say, well, I got an expert who is going to

21   come in on a bank robbery case, and give chapter and verse

22   minute by minute how the robbery took place.  That's not an

23   expert witness.  That's not what he's qualified to do.

24           MR. YALOWITZ:  He is a summary witness, your Honor.

25           THE COURT:  Summarizing what?  What is he summarizing?

1              MR. YALOWITZ:  He's summarizing the convictions.

2              THE COURT:  He's not summarizing the convictions.

3    He's summarizing, first of all, he's summarizing much of the

4    information that we said was inadmissible.

5              MR. YALOWITZ:  No, no, your Honor, we really carefully

6    vetted this.

7              THE COURT:  That's fine.  I'm giving you guidance at

8    this point because they didn't object.  They didn't object on

9    that basis.  They objected on a different basis.  When you

10   asked him tell me how this happened, nobody objected.

11             MR. ROCHON:  Judge, I didn't know what he was going to

12   do with this guy.

13             THE COURT:  You knew over the last 10 minutes.

14             MR. YALOWITZ:  Also they have the PowerPoint, so they

15   knew exactly what he was going to testify to.

16             MR. ROCHON:  I wanted to give Mr. Yalowitz the chance

17   to -- I assume he knows the rules.  This witness is supposed to

18   move the convictions.  If he wants to point out certain parts

19   of the convictions, to say what was said there -- I don't like

20   it, but I lost -- if he wants to describe the process to tell

21   the jury how that works, that's what they said he is going to

22   use them for.

23             MR. YALOWITZ:  I said he is going to summarize the

24   convictions.  I said that five times.

25             THE COURT:  You said that five times, but he has not

1    said a single word about a conviction.

2              MR. YALOWITZ:  Let me do it a different way.  I get

3    it.

4              THE COURT:  Let me lay the ground rules for all your

5    experts.  You can't use your experts to simply come in here and

6    say "I know how this happened.  Let me tell you how it happened

7    beginning at 8 a.m. on such-and-such a date and who was where

8    and who did what."  He doesn't know that.

9              MR. YALOWITZ:  Okay.  I get it.  Let me do it a

10   different way.

11             MR. ROCHON:  My point is, Mr. Yalowitz in his closing

12   would put all this together and say maybe those kinds of things

13   if they are based on the evidence that's in the record, then I

14   wouldn't object.  But for this witness to do this.

15             MR. YALOWITZ:  We can do it a different way.  It will

16   take longer, but I can do it a different way.

17             THE COURT:  Not necessarily.  It may take shorter.  If

18   he's here to tell us that he reviewed the convictions and he

19   wants to comment on the admissible part of those convictions.

20             MR. YALOWITZ:  That's what we are going to do.

21             THE COURT:  That is going to be before this jury, he

22   can do that.  For him to simply say in his opinion he knows X

23   did it because -- I don't know why he says, because he didn't

24   even say how he knows this.  You just asked him, well, what

25   happened.

1          MR. YALOWITZ:  Because last night I said what did you

2     do to prepare.  He said I reviewed the convictions, I reviewed

3     court files.

4          THE COURT:  If he wants to comment specifically.

5          MR. YALOWITZ:  Let's do it that way.

6          THE COURT:  On the portions of the convictions that

7     are admissible at this trial, then he can comment on that

8     information and comment on those portions of the convictions.

9          MR. YALOWITZ:  Let's do it that way.

10         THE COURT:  If you want to put the convictions in and

11    put him through those convictions.

12         MR. ROCHON:  What I thought we were going to do.

13         THE COURT:  He should understand that he can't just

14    start throwing out names, throwing out accusations, his

15    recitation of what he's concluded happened minute by minute

16    during this event.

17         Now with regard to your outstanding objection, I am

18    going to overrule that objection.  I'll leave the record the

19    way it is based on the limited objection you made.  But I'm

20    giving you that guidance.  If you think we are going into an

21    area that is objectionable, then you make the objection and

22    then I'll address it.

23         MR. YALOWITZ:  Thank you.

24         MR. ROCHON:  I didn't want to get up too soon.  We

25    just got the jury in.  I'll have to start jumping up.

F1E3SOK1                        Kaufman – direct

1            THE COURT:  It is never too soon.  It can be too late,

2    but never too soon.

3            (Continued on next page)

F1E3SOK1                    Kaufman - direct

 1              (In open court)

 2              MR. YALOWITZ:  So, your Honor, what I'd like to do is

 3    hand out to the jury a binder of the convictions of the

 4    individuals from the January 22 attack, and then they can see

 5    those convictions for themselves, with the Court's permission.

 6              THE COURT:  Why don't you just tell me what exhibit

 7    you wish to offer and then the record will reflect what you're

 8    putting in front of the jury.

 9              MR. YALOWITZ:  Sure.  Bear with me one second.

10              THE COURT:  Just go ahead and do that.  We'll do that

11    for the record later.  I don't want to waste the jury's time.

12    BY MR. YALOWITZ:

13    Q.  Mr. Kaufman, what I'd like to begin with, with you after

14    our discussion with Judge Daniels, is the conviction of Ahmed

15    Barghouti.

16              If you can direct the jury to that portion of their

17    binders and help them understand, just break down what the

18    documents show, that would be a great start.

19    A.  Perhaps, Mr. Yalowitz, it will be possible to explain what

20    has been given to the members of the jury so they know.

21              This is a binder, members of the jury, of a record of

22    convictions.  Each and every one of the people that you see on

23    the screen there have a separate binder, have a separate

24    divider.  And you'll see the index on the very first page, and

25    that will assist you how to find all the various operatives

F1E3SOK1                    Kaufman - direct

1    that were involved in this particular attack.

2           So, Mr. Yalowitz has asked me to deal with Ahmed

3    Barghouti, and he's to be found at the very first binder.  If

4    you look at this, and open it, you will see there is a tab and

5    that tab is marked A.  And now please, if you would, turn to

6    tab A and you will see a document.  In the top-right-hand

7    corner there is a number 358.  That's just an exhibit number,

8    it is something legal.

9           But this document itself is a transcript, it is a

10   record of a hearing that went on in the military court.  It is

11   basically what that lady is doing here, it is a stenographer's

12   report.  Except in the military courts, there isn't a

13   stenographer.  There is a young woman soldier who types.

14          And here, if you look right at the bottom of the page,

15   you can see the word "verdict."  Here, it says "Based on his

16   confession to the charge, we convict the defendant of defenses

17   attributed to him."  So here, the three judges who are

18   mentioned at the top-right-hand part of the page, are

19   convicting Ahmed Barghouti of criminal offenses.

20          And you might ask yourselves, well, what are those

21   criminal offenses?  Well, if you turn to tab B, you will see

22   that amended indictment.

23          Now, an indictment is a charging sheet.  That's the

24   original document which is submitted before a court in the

25   Israeli military court, and it sets out all the charges leveled

F1E3SOK1                    Kaufman - direct

against a suspect.  And normally, you find an amended

indictment, a corrected indictment, when there has been what we

call a plea bargain.  When the prosecution and defense reach an

agreement as to how the case should be disposed.

That's in fact what happened here.  The verdict was

given as a result of the plea bargain.  Ahmed Barghouti decided

to plead guilty, and he pled guilty to a number of offenses.

One of which was relevant to this particular incident on

January 22, 2002.

And indeed, if you turn to page 34 of this amended

indictment, to be found at tab B, right at the very bottom,

very last line, you will see the words 26th Count.  Detailed

incident 502/2 Zion.  Let me explain to you what that is.  It

is just basically the police case file.  Zion is a police

station in Jerusalem.  That was the police station which

investigated this particular attack on January 22, 2002.

And if you look at page 35, 36, 37, 38, 39, and 40,

you will see the facts of the January 22, 2002, attack.  Those

are the facts that I was telling you earlier, before the

lawyers started to talk.

Q.  Now Mr. Kaufman, with the Court's permission, I'd like to

direct you to certain portions of this conviction, and direct

the jury to certain portions of this conviction so that the

jury can focus on the role of this particular defendant in the

attack.

F1E3SOK1                         Kaufman - direct

1            MR. YALOWITZ:  Your Honor, may I proceed in that

2    fashion?

3            THE COURT:  Yes.

4            MR. YALOWITZ:  Thank you.

5            (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1E8SOK2                         Kaufman - direct

1    BY MR. YALOWITZ:

2    Q.  I am looking particularly at paragraph 1 on page 35.

3              Let's just make sure everybody is with me.

4              Paragraph 1.

5    A.  Paragraph 1, you will see that when the word defendant is

6    mentioned that means Ahmed Barghouti because he is actually the

7    person on trial here and he was the one who decided to execute

8    the seaside attack.

9    Q.  If you would, Mr. Kaufman, if you could just read out

10   paragraph 1 to the jury.

11   A.  "The above-mentioned defendant, in January 2002, the

12   defendant decided that he wanted to execute a suicide attack

13   inside the territory of the State of Israel in order to cause

14   the death of as many Israeli civilians as possible."

15             MR. YALOWITZ:  Now, with regard to some of the

16   following paragraphs I would ask the court's permission for me

17   to read them out so that I can be sure to comply with some

18   things that we did outside the presence of the jury.

19             May I proceed in that fashion, your Honor?

20             THE COURT:  Yes.

21             MR. YALOWITZ:  Thank you so much.

22   Q.  So I am going to read out paragraph 2 for you, Mr. Kaufman.

23             "The above-mentioned defendant telephoned an illegal

24   organization in Nablus.  The defendant asked an unnamed person

25   to send him a person who would be prepared to carry out a

F1E8SOK2                    Kaufman - direct

suicide attack.  The defendant told someone that he himself

would see to bringing the suicide terrorist into Jerusalem in

order to carry out a suicide attack there."

"A few days later, on January 22, 2002, in Ramallah,

the defendant met Said Ramadan, a resident of Kfar Tal in the

Nablus district.  Another person met the defendant -- I am on

paragraph 5, ladies and gentlemen -- and the above-mentioned

Said Ramadan that day in Ramallah.  The defendant introduced

the two to each other.  The defendant and that person took Said

Ramadan to a barber shop to have his hair cut before carrying

out the planned suicide attack."

I would like to turn to paragraph 8.

"According to the instruction of the defendant, two

unnamed persons travelled in the above-mentioned Isuzu vehicle

from Ramallah to Jerusalem in order to find a way that had no

police or IDF checkpoints, with the aim of driving the suicide

terrorist who would carry out the planned attack in Jerusalem

later using the same route."

I am going to skip to paragraph 10 on page 37.

"In Ramallah, the defendant and another person took

the above-mentioned Said Ramadan to pray, and also bought for

the above-mentioned Said Ramadan food, new clothes and shoes.

The defendant paid with his own money for these purchases in

the amount of 1200 Israeli shekels."

"Another person, at the instruction of the defendant,

F1E8SOK2                    Kaufman - direct

1    brought an M-16 assault rifle and three magazines for the said

2    assault rifle, filled with cartridges, two of which were

3    connected with a magazine coupler (jungle clip)."

4            "According to the plan of the defendant and his

5    above-mentioned colleagues, Said Ramadan should have arrived in

6    Jerusalem and shoot there at Israeli civilians with the intent

7    of causing their death until he himself would be killed by the

8    Israeli security forces."

9            Let me skip to paragraph 14.

10           "The defendant explained to two individuals that the

11   above-mentioned Said Ramadan was the suicide terrorist that

12   they had to drive to Jerusalem in order for him to carry out a

13   suicide attack by shooting at Israeli civilians with the aim of

14   causing the death of as many Israeli civilians as possible."

15           "Two unnamed individuals hid the above-mentioned M-16

16   assault rifle and magazines in the above-mentioned Isuzu

17   vehicle."

18           Let's turn to page 38, paragraph 16.

19           "The defendant and an unnamed colleague wished Said

20   Ramadan luck and the three travelled to Jerusalem.  The

21   defendant told two individuals that they would have to take

22   Said Ramadan to carry out the suicide attack in any place in

23   Jerusalem of their choosing."

24           "An unnamed individual drove the Isuzu vehicle.  Said

25   Ramadan sat in the seat next to the driver's seat and another

F1E8SOK2                         Kaufman - direct

1    individual sat in the rear seat."

2         "Two individuals transported Said Ramadan to Jerusalem

3    on a route that they had inspected earlier that day as

4    described above."

5         "In Jerusalem, two individuals travelled to Sheikh

6    Jarah Street.  There they took out the M-16 assault rifle and

7    magazines that were hidden inside the vehicle and handed them

8    over to Said Ramadan.  One individual moved to the seat next to

9    the driver's seat while Ramadan moved to the back seat, holding

10   the M-16 assault rifle and the magazines in his hands."

11        Let's skip to paragraph 22.

12        "Upon reaching the junction of Strauss and Hanevi'im

13   Street, two individuals stopped the Isuzu vehicle."

14        Paragraph 24.

15        "After Said Ramadan got out of the vehicle with the

16   M-16 assault rifle and the ammunition, two individuals drove

17   away from the site in the Isuzu vehicle, departed through the

18   Musrara neighborhood to Highway 1 and then drove by way of the

19   main road to Ramallah."

20        "Said Ramadan, a few minutes after having got out of

21   the vehicle of those two individuals, arrived at Jaffa Street."

22        Mr. Kaufman, if you would read paragraph 26 to the

23   jury, that would be great.

24   A.  "At about 4:20 p.m., while standing opposite Building No.

25   47 on Jaffa Street or thereabouts, Said Ramadan loaded the M-16

F1E8SOK2                        Kaufman - direct

1   assault rifle that he was carrying, shouted 'Allahu Akbar' and

2   discharged automatic gunfire indiscriminately at the people who

3   were on Jaffa Street, at the bus stop at the site, aboard the

4   Egged bus No. 27 that was at this stop at the time and at the

5   people who were within the stores nearby with the aim of

6   causing the death of as many people as possible.  Said Ramadan,

7   while continuing to fire, fled from the site towards the

8   parking lot in Harav Kook Street.  There, Said Ramadan changed

9   magazines and continued to shoot at civilians with the aim of

10  causing their death.  Said Ramadan fired through the M-16

11  assault rifle that he carried more than 38 cartridges.  Said

12  Ramadan continued to shoot at civilians until he was killed by

13  civilian and policemen who arrived at the site."

14  Q.  Thank you, Mr. Kaufman.

15          Mr. Kaufman, what was the charge in the 26th count

16  that Ahmed Barghouti pled guilty to, and where can the jury

17  find that?

18  A.  Members of the jury, look at page 35, right at the top, and

19  it's always going to be like this in all of the indictments

20  that you will see from the Israeli military court.  You have

21  the count and then you have the nature of the offense.  You

22  will find the charge in the part titled Nature of the Offense.

23  That's the very first line, top of page 35.  Causing

24  intentional death.  That's murder.  It's just that it is not

25  called murder in the legislation in the Israeli military court.

F1E8SOK2                      Kaufman - direct

1    It's called causing intentional death.

2              MR. YALOWITZ:  Your Honor, with the court's

3    permission, I would also like to direct the jury to page 40 of

4    the Ahmed Barghouti conviction, and I would like the court's

5    permission to read out to the jury paragraph 28.

6              THE COURT:  Yes.

7              MR. YALOWITZ:  "After the defendant learned about the

8    execution of the above-mentioned attack, the defendant

9    approached a co-conspirator and received from the latter the

10   amount of 1,000 U.S. dollars for executing the said attack.

11   The defendant gave other co-conspirators 100 U.S. dollars each

12   for their participation in the execution of this attack."

13   Q.  Mr. Kaufman, could you direct the jury, by the way, to the

14   name of the individual who was murdered as reflected in Count

15   26.

16   A.  Have a look at paragraph 27, members of the jury, of this

17   particular count.  It is to be found on page 40, right at the

18   top.

19             I can read it out if you wish, Mr. Yalowitz.

20   Q.  Yes, please do.

21   A.  "By his acts described above, the above-mentioned defendant

22   caused the intentional death of the late Ora (Svetlana)

23   Sandlar, who died as a result of gunshot wounds caused by the

24   bullets that were fired by Said Ramadan."

25             Svetlana is a Russian name, members of the jury.  It's

F1E8SOK2                    Kaufman - direct

1    likely that lady had Russian origins and came to Israel to live

2    there.

3    Q.  Mr. Kaufman, could you direct the jury to the 27th count

4    and explain to them what that count is.

5    A.  Well, the 27th count, members of the jury, it's the same

6    factual setup.  It's just that it's repeating the facts and

7    charging Ahmed Barghouti once again for causing the intentional

8    death, murder, of another person, the late Sarah Hamburger.  If

9    you look at the paragraph there, details of the offense, you

10   will see there is a name highlighted in bold print, Sarah

11   Hamburger.  Two people were murdered in that attack.  Sarah

12   Hamburger and Ora Sandlar.

13   Q.  I would also ask you, Mr. Kaufman, to explain to the jury

14   the 28th count.

15   A.  Yes.  Well, two people were murdered.

16           MR. ROCHON:  Objection, your Honor, as previously

17   noted.

18           THE COURT:  I'm sorry.  What is your question

19   specifically?

20           MR. YALOWITZ:  Could he explain to the jury the nature

21   of the 28th count.

22           THE COURT:  I am going to sustain the objection as to

23   form.

24   Q.  Mr. Kaufman, would you please read out the charging

25   information at the top of page 41 for the jury.  I am talking

F1E8SOK2                    Kaufman - direct

1    about just that paragraph right at the top of page 41.

2    A.  "The above-mentioned defendant, at the time set forth, at

3    the place set forth in the 26th count of the indictment, by his

4    actions described in the 26th count of the indictment,

5    attempted to cause the intentional death of as many civilians

6    as possible who at the time were on or near Jaffa Street.  As a

7    result of the gunfire at the site that was fired by Said

8    Ramadan, who was dispatched to carry out the above shooting

9    attack by the defendant, more than 45 civilians were injured."

10   Q.  Thank you so much, Mr. Kaufman.

11          We have just gone over the conviction of Ahmed

12   Barghouti and I would like you now to turn to the conviction of

13   this man, Nasser Aweis, and show the jury where they can find

14   that conviction.

15   A.  It's the next binder, members of the jury.

16          This is slightly different.

17          If you remember, the last document we had two tabs, A

18   and B.  Here there are no tabs.

19          Let me explain what went on here.

20          MR. ROCHON:  Objection, your Honor.

21          THE COURT:  Why don't you direct the question.

22          MR. YALOWITZ:  Sure.

23   Q.  Can you explain to the jury why there is a -- without

24   getting into substance, just explain to the jury as a matter of

25   procedure why there is a single document before them instead of

F1E8SOK2                    Kaufman - direct

1    two documents that they just saw a moment ago.

2    A.   Members of the jury, this document is a reasoned judgment.

3    We don't have juries in Israel.  We have three judges in

4    serious cases who sit.  They decide the law and the facts.

5         After hearing the evidence in the case against Nasser

6    Aweis, the three judges in the -- if you look at this document,

7    right at the top, you will see it's the Tel Aviv district

8    court.  They convicted Nasser Aweis and they did so by writing

9    a very long document and that's the verdict, the judgment of

10   the court.

11   Q.   Could you please direct the jury to the portion of this

12   exhibit that deals with the January 22 attack.

13   A.   Yes.  Members of the jury, please, if you would, open up

14   the document to page 56.

15        In the first two paragraphs you will see similar facts

16   that you are familiar with from the previous individual, Ahmed

17   Barghouti.  But if you look at the third paragraph down, where

18   it starts, "The admission by the defendant is as follows,"

19   there you will see the factual basis for the conviction.

20   Q.   Bear with us just one second.  I just want to make sure

21   that all the members of the jury have the page that you have

22   Mr. Kaufman.

23        Are we good?  OK.  Great.

24        MR. YALOWITZ:  So if you could -- I think just to be

25   safe, your Honor, may I have the court's permission to read out

F1E8SOK2                    Kaufman - direct

1    the -- actually, I can could do it this way, your Honor.  I

2    apologize.  We are working on the fly a little bit.

3    Q.  Mr. Kaufman, if you could read out the admission going down

4    to the September 2001 portion for the jury, that would be

5    great.

6    A.  OK.  So the admission -- I will read it out first, members

7    of the jury.  Maybe I can clarify afterward.

8    Q.  I will ask you a couple of questions.

9    A.  The admission by the defendant is as follows:  "P/511.  I

10   supplied Said Ramadan with weapons for carrying out the suicide

11   attack in Jerusalem.  P/6.

12   "Q.  Which terrorist attack in Jerusalem?

13   "A.  The terrorist attack carried out by Said Ramadan in

14   September 2001."

15   Q.  Now, I just want to ask you a couple of questions about

16   this exchange, if I may.

17          First of all, I notice it says weapons rather than a

18   weapon.  I just wanted to ask you whether you had an

19   opportunity to compare this to the original Hebrew and whether

20   you have a view on whether he got one weapon or more than one

21   weapon?

22   A.  Yes, I do have a view on this because it struck me as being

23   slightly odd and I checked the Hebrew version.  And the word

24   used in Hebrew is *neshek*.  Now *neshek* means a weapon.  It could

25   also mean weapons.  In Arabic, *slah*.  Maybe I think something

F1E8SOK2                         Kaufman – direct

1    was a bit lost in translation here.  I think the more

2    appropriate translation in the circumstances would be *neshek*,

3    meaning a weapon singular.

4    Q.  Also I noticed that in his confession Aweis used the date

5    September 2001.  Do you have a view on how that fits into the

6    conviction?

7                MR. ROCHON:  Objection, your Honor.

8                THE COURT:  Overruled.

9                You can answer.

10   A.  Well, when you have got someone like this who is convicted

11   of, or being interrogated, because this comes out of a police

12   interrogation, this interchange, these comments made by Nasser

13   Aweis, when you have got somebody who has been interviewed for

14   a large number of criminal offenses and is admitting a large

15   number of criminal offenses, then mistakes can happen.  I just

16   think he was mistaken.  And there is corroboration for it as

17   well.

18   Q.  Thank you.

19               MR. YALOWITZ:  Now, with the court's permission, I

20   would like to read out the paragraph that appears at the bottom

21   of page 56 and it goes on to the top of page 57 for the jury,

22   your Honor.

23               THE COURT:  Yes.

24               MR. YALOWITZ:  Thank you so much.

25   Q.  "And the terrorist attack in Jerusalem was carried out in

F1E8SOK2                        Kaufman - direct

such a way that Said Ramadan contacted a co-conspirator and

said that he had been a friend of another individual, and that

he wanted to avenge his killing and another individual told me.

I then met with Said and I understood that he wanted to carry

out the terrorist attack, and I called another individual in

Ramallah and I asked him to take him to Jerusalem, and that

individual agreed.  Said went to Ramallah by public

transportation, where he met with another individual.  The next

day, Said went to Jerusalem and shot at a group of policemen

and civilians and in that terrorist attack two people were

killed and so was Said."

          Now, I want to come back for just a moment with you,

Mr. Kaufman, to Ahmed Barghouti and, in particular, I want to

ask you about Ahmed Barghouti's sentencing.

          Ahmed Barghouti was the first fellow we talked about,

and Ahmed is up here in this corner on the screen.

          Could you just describe as a procedural matter for the

jury whether a defendant, even one who pleads guilty, has the

opportunity to address the court before he or she is sentenced?

A.  Yes, he does.  It's stipulated in law that the defendant

has the right, the absolute right to the last word.  He can say

whatever he likes.  Sometimes defendants say I'm sorry,

sometimes they say I'm not sorry.

          MR. YALOWITZ:  Your Honor, plaintiffs move Exhibit

359, as redacted per our earlier discussion, in evidence.

F1E8SOK2                         Kaufman - direct

 1                THE COURT:  That's not in the binder.

 2                MR. YALOWITZ:  No, sir, it's not in the binder.  We

 3   are going to have to put it up on the screen as redacted.

 4                We have a copy for the court.

 5                THE COURT:  Let me just have a copy to remind myself.

 6                It will be admitted into evidence.

 7                (Plaintiff's Exhibit 359 received in evidence)

 8                MR. YALOWITZ:  Thank you.

 9                We will put it up on the screen so the jury can see it

10   and we will start with the first page.

11   BY MR. YALOWITZ:

12   Q.  We have Exhibit 359 on the screen and if you could just

13   describe as a procedural matter what it is.

14   A.  There is a lot of black here, Mr. Yalowitz, but I'm

15   assuming this is the actual sentencing hearing.  First of all,

16   there is normally in a hearing like this arguments for

17   sentencing.  The prosecution would make its arguments for a

18   strong sentence.  The defense would make a plea of mitigation

19   for a lenient sentence.  And then the defendant would of course

20   have his last word.  And then the judges would pass sentence,

21   once again, by way of reasoned decision.

22   Q.  Now I would like to direct you to the third page of this

23   document.

24   A.  Yes.  There is a number 5 at the bottom.

25   Q.  Which has got the number 5 on it and let's just see what

F1E8SOK2                    Kaufman - direct

1   the defendant had to say about his crimes.

2   A.  Well, it says, "The defendant in his last address, I have

3   no regrets."

4           Now, that's rather --

5           THE COURT:  Sustained.

6           Why don't you ask him a question.

7           MR. YALOWITZ:  I was going to go there, your Honor.

8   Thank you.

9           I don't have any questions about this document.  I

10  just wanted to make sure the jury saw it.  "I have no regrets."

11  Q.  OK.  Thank you.

12          Next, Mr. Kaufman, I would like you to tell the jury

13  where they can find the conviction of Ibrahim Abdel Hai.

14  A.  Next binder.  We are back to the tab A, tab B format.

15  Q.  So take us to Exhibit 361.

16          Let's make sure everybody has got it before them.

17  A.  That's tab A.

18  Q.  Tab A, it's got a 361 at the top.

19          Bear with us just one second, Mr. Kaufman.

20          THE COURT:  That would be the third named individual

21  in the binder for the jury.

22          MR. YALOWITZ:  Thank you, your Honor.  That's what I

23  have as well.

24  Q.  Mr. Kaufman, why don't you break down 361 for us.

25  A.  Well, you will be experts on this, members of the jury, by

F1E8SOK2                        Kaufman - direct

1   the end of the day, but this is once again a transcript.  It's

2   a record of the proceedings.  This time in front of the

3   military court in Samaria.  The West Bank is divided into two

4   parts, Judea and Samaria.  You will see some documents which

5   are in the military court of Judea and some documents which are

6   in the military court of Samaria.  This is in the Samaria

7   court, the northern part of the West Bank.

8            Here we have defense counsel announcing to the

9   court -- once again, three judges -- that his client, the

10  defendant, Ibrahim Abdel Hai in this instance, is pleading

11  guilty to an amended indictment.  Once again amended indictment

12  because obviously there has been some form of plea bargain.

13  And of note is the fact that the defendant himself participates

14  in the hearing.  This is often the case.

15           May I be entitled to explain why?

16           MR. YALOWITZ:  Perhaps the court would like me to

17  direct the jury to the relevant portion of the page that they

18  are looking at and read it out for them.

19           THE COURT:  Yes.

20           MR. YALOWITZ:  Thank you.

21           "Defendant:  I plead guilty to the indictment,

22  including the fact that I and someone else were accomplices in

23  the murder of Zahir Turabi, that I and someone else dispatched

24  Said Ramadan to carry out an attack in the heart of Jerusalem,"

25  and other crimes which are not the January 22 attack.

F1E8SOK2                         Kaufman - direct

1    Q.  Is that the portion of the document that you wanted to

2    direct the jury to, Mr. Kaufman?

3    A.  Yes.

4    Q.  OK.  Great.

5         Now, where do they go from here on Ibrahim Abdel Hai?

6    A.  Well, really, members of the jury, you have the actual

7    facts, factual basis of the conviction set out there for you in

8    the very words that Mr. Yalowitz has said now.  But if you want

9    to know what exactly the amended indictment was, if you would

10   turn to tab B, there you will see the amended charge sheet.

11   This is the thing that Ibrahim Abdel Hai pleaded guilty to.

12   And if you look at page 9, you will see --

13   Q.  Let's wait and make sure that everybody gets to page 9.

14   A.  Sixth count.  That's the third line down.

15   Q.  What is that count charging?

16   A.  Well, if you look, it's Detailed Incident 502/02 Zion.

17   Remember, that's the police case file.  So we are talking about

18   the same case.

19        There you will see that Ibrahim Abdel Hai is pleading

20   guilty to causing intentional death.  Murder.  And details of

21   the offense there are all the factual basis for that conviction

22   for murder.  The same facts that we have been talking about,

23   the January 22, 2002 shooting.

24   Q.  Now, I would like to direct you to paragraph 1, and, in

25   particular, I would like to read out paragraph 1 with the

F1E8SOK2                    Kaufman - direct

1   court's permission.

2            THE COURT:  Yes.

3            MR. YALOWITZ:  Thank you, sir.

4   Q.  "During the course of his work in the Palestinian Naval

5   Police, the defendant met Said Ibrahim Ramadan ('hereinafter

6   Said').  During one of their meetings, Said told the defendant

7   something and the defendant asked Said to give him an

8   opportunity to check out one matter."

9            THE COURT:  The matter.

10  Q.  "The matter."

11           MR. YALOWITZ:  Thank you, your Honor.  My copy is a

12  little cut off.  Thank you.

13  Q.  Paragraph 2:  "The defendant contacted a co-conspirator and

14  informed him of the intentions of Said, and the former referred

15  him to another individual.  The defendant met another

16  individual and informed him of Said's intentions."

17           Paragraph 3.  Why don't you read out this one, Mr.

18  Kaufman, so the jury can understand what this defendant did.

19  A.  "The defendant, with the aim of testing Said, put a dummy

20  explosive belt on him and gave him an imaginary telephone

21  number, sent him from the Zawata area to the Tulkarm area.

22  Said put on the explosive belt and started toward Tulkarm.  The

23  defendant, who found that Said was steadfast, asked him to

24  return, on the pretext that the attack time had changed due to

25  military checkpoints on the way.  Said was angry with the

1   defendant, who asked him to be prepared to carry out the attack

2   at any time."

3   Q.  Let me take you to paragraph 4.

4           MR. YALOWITZ:  Your Honor, I ask, with the court's

5   permission, for me to read that one out.

6           THE COURT:  Yes.

7   Q.  "Accordingly, the defendant contacted a co-conspirator and

8   told him that Said was prepared to carry out the attack."

9           I would like to turn to the next page and read out

10  paragraph 6, with the court's permission.

11          "The defendant brought Said to the home of a

12  co-conspirator, and in a co-conspirator's home was a person

13  whose name is being withheld and another person called

14  something else.  Two individuals filmed Said and one wrote

15  Said's will.  Said was filmed while holding an M-16 type rifle,

16  a Koran and reading out his will."

17          Mr. Kaufman, if you would direct the jury to

18  paragraphs 7 and 8, please.

19  A.  You would like me to read them out?

20  Q.  Yes, sir.

21  A.  "Thereafter, the defendant took Said to his family, where

22  he parted from them without informing them of his intentions of

23  committing suicide."

24          "Thereafter, the defendant asked Said to depart to

25  Ramallah on the following day.  And in the morning of the

1  following day, the defendant noticed that Said was departing

2  for Ramallah."

3           MR. YALOWITZ:  Your Honor, I would now like to move

4  the admission of Exhibit 361 as redacted.  This is a document

5  concerning Abdel Hai.

6           THE COURT:  Do you have a copy of 361?

7           MR. YALOWITZ:  Bear with me, your Honor.

8           THE COURT:  Does the other side?

9           MR. YALOWITZ:  I apologize.  We have already done 361.

10  361 we have just looked at.

11           THE COURT:  I thought we looked at 359.

12           MR. YALOWITZ:  Your Honor, just to clear it up, and

13  this is my mistake, 361 is tab A.  So we have already gone over

14  that with the jury.  I'm sorry.  I was rushing a little bit.  I

15  will try to slow down.

16  Q.  We have just done Ibrahim Abdel Hai.

17           Who is the next one in your binder, Mr. Kaufman?

18  A.  Fares Ghanem.

19  Q.  Why don't we turn to his conviction.

20           I see his name is spelled with a G-H?

21           THE COURT:  That's not the next one.

22           MR. YALOWITZ:  I have Majed al-Masri.

23  Q.  We will go to Majed al-Masri.

24           We have just done Abdel Hai.  Now we will go to Majed

25  al-Masri.

1   A.  Yes.

2   Q.  Let's make sure everybody is there, including me.

3           Is that 384?

4   A.  That's correct.  And this is a one document --

5   Q.  Bear with us one second.

6   A.  -- format.

7           MR. YALOWITZ:  Everybody is good?  384?

8           OK.  Great.  Thank you.

9   Q.  Tell us as a procedural matter what 384 is, please, Mr.

10  Kaufman.

11  A.  Well, as in the case of Nasser Aweis, this is a reasoned

12  judgment, a reasoned finding of the court.  The court this time

13  is the Samaria court in the north part of the West Bank, three

14  judges.  And here they are reading out the judgment of the

15  court.

16  Q.  Where can we find the conviction of al-Masri and his role

17  in this terror attack?

18  A.  This document is numbered at the bottom, members of the

19  jury.  Look at the bottom of the page and turn to page 28.  The

20  last paragraph, members of the jury.

21  Q.  Are we on 28, everybody?  OK.  Great.

22          MR. ROCHON:  If I could, on 384 we have an objection.

23  We ask to approach the bench.

24          THE COURT:  I am going to give the jury a ten-minute

25  break so we can combine time.

F1E8SOK2                        Kaufman – direct

1            Ladies and gentlemen, don't discuss the case and keep

2      an open mind.

3            We will give you a ten-minute break in the jury room.

4      Just leave the binders on your seat.

5            (Jury exits courtroom)

6            (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1E8SOK2                        Kaufman - direct

1           (Jury not present)

2           MR. ROCHON:  This one hasn't been redacted.  It is a

3    sentencing proceeding.  At the sentencing proceeding, your

4    Honor, that is supposed to be admitted.  This has the whole

5    proceeding.  I am not saying it was done intentionally at all.

6    We just didn't get this one.

7           THE COURT:  Mr. Yalowitz.

8           MS. ROMEO:  We will pull it.  It's in the middle of

9    the document.

10          THE COURT:  Let's do that over the break.

11          MR. YALOWITZ:  I will not direct the jury to those

12   pages, your Honor.

13          THE COURT:  I want those pages taken out.

14          MR. YALOWITZ:  We can take them out perhaps at the

15   lunch break.

16          THE COURT:  We will take them out now because I will

17   not let the jury read them.

18          Are you going to do any portion of this?

19          MR. YALOWITZ:  No.

20          MR. ROCHON:  He wants the first two pages.  The

21   verdict, I assume.  It's the pages after that.

22          We recognize mistakes happen.

23          THE COURT:  We are going to leave the first two pages

24   and take the other pages out of the binder.

25          MR. ROCHON:  Thank you, your Honor.

F1E8SOK2                    Kaufman – direct

1           MR. YALOWITZ:  We will work as quickly as we can to do

2   that.

3           THE COURT:  We will take ten minutes.

4           (Recess)

5           THE COURT:  Are we ready to continue, Mr. Yalowitz?

6           MR. YALOWITZ:  Yes.

7           THE COURT:  Let's bring in the jury.

8           (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1              (Jury present)

 2              THE COURT:  You can continue, Mr. Yalowitz.

 3              MR. YALOWITZ:  Thank you, your Honor.

 4    BY MR. YALOWITZ:

 5    Q.  Mr. Kaufman, before we go on to al-Masri, I just wanted to

 6    follow up with one thing about Ibrahim Abdel Hai, and I ask

 7    that we go back to page 9 of his indictment to which he pled

 8    guilty.

 9    A.  That's tab B.

10    Q.  Tab B.

11              I do apologize for going backwards, but there is just

12    one thing I wanted to ask you about.

13              THE COURT:  I'm sorry.  Where are we?

14              MR. YALOWITZ:  We are on 360, your Honor.  It's tab B

15    of Hai.  So it's just the one that we were looking at a minute

16    ago.

17              THE COURT:  All right.

18              MR. YALOWITZ:  I do apologize for skipping back, but I

19    wanted to focus the jury on one particular item on page 9.

20    Q.  Let me make sure everybody is there.

21              I am focused on paragraph 1, Mr. Kaufman.  Are you

22    there?

23    A.  Yes, I am.

24    Q.  It says:  "During the course of his work in the Palestinian

25    Naval Police."

F1E8SOK2                         Kaufman - direct

1              Who is the "his" in that sentence that they are

2      referring to?

3      A.   I believe that I did check the Hebrew version of this and I

4      came to the same conclusion.   I think the "his" here is in fact

5      the defendant himself, Ibrahim Abdel Hai.

6      Q.   So during the course of Ibrahim Abdel Hai's work in the

7      Palestinian Naval Police, that's how you understood the

8      original Hebrew?

9      A.   Correct.

10     Q.   OK.   Thank you.

11             I just wanted to focus on that particular sentence

12     with regard to Ibrahim Abdel Hai.   Now I am ready to go on to

13     Majed al-Masri.

14             If you could tell the jury procedurally what they have

15     with Majed al-Masri's conviction, that would be helpful.

16     A.   Well, we have a document which is basically a reasoned

17     judgment, as I mentioned earlier.   Majed al-Masri did not plead

18     guilty.   He was found guilty after a trial.

19     Q.   Where in the document do we see that the court actually

20     found him guilty?

21     A.   Well, if you turn to page 28.

22     Q.   Perhaps, Mr. Kaufman, we want to direct the jury at the

23     beginning to page 1 where they say that the defendant is

24     convicted.

25     A.   Yes.   They summarize the conviction on the first two pages,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1E8SOK2                        Kaufman - direct

1    the judges here.  He is convicted of a number of offenses, of

2    which at least one refers to the terror attack in 2002 on

3    January, the 22nd.

4    Q.  OK.  Thanks.  I didn't mean to interrupt you.

5         You want to take the jury to 28?

6    A.  Yes.

7         So on page 28 --

8    Q.  Bear with us.  I just want to make sure that we are all

9    caught up.

10        It looks like everybody is there.  OK.

11   A.  Last paragraph, entitled Counts 6 to 8 of the Indictment.

12   The attack on Jaffa Street.

13   Q.  Now, would you read out for the jury the first two

14   sentences of that paragraph under Counts 6 through 8 and then I

15   want to ask you a question about those two sentences.

16   A.  Certainly.

17        "These counts of the indictment attribute to the

18   defendant responsibility for the murder of the late Ora Sandlar

19   and Sarah Hamburger and an attempt to cause the death of 45

20   civilians who were injured in the event.  The event was

21   executed on behalf and in the name of the Al Aqsa Brigades

22   organization."

23        Those are the first two sentences, Mr. Yalowitz.

24   Q.  Now, first of all, let me ask you about Ora Sandlar and

25   Sarah Hamburger.

F1E8SOK2                          Kaufman - direct

1          Have we seen those names elsewhere in the convictions

2    we have been reviewing?

3    A.  I think we have, yes.  Indeed we have.

4          MR. YALOWITZ:  If I could just ask the court to direct

5    the jury to the other convictions in which -- particularly

6    Exhibit 357 -- in which Ahmed Barghouti was convicted of the

7    murders of Ora Sandlar and Sarah Hamburger.

8          THE COURT:  What did you want me to do?

9          MR. YALOWITZ:  Just direct the jury to the portion, or

10   perhaps give me permission to direct the jury to the portions

11   of Exhibit 357 in which Ahmed Barghouti was convicted of the

12   murders of Ora Sandlar and Sarah Hamburger.

13         Mr. Kaufman can remind me what page that is on.

14   A.  Yes, Mr. Yalowitz.  It is to be found on page 34, the 26th

15   count of Ahmed Barghouti.  Those are the facts.  And if you

16   turn to page 40 of this document.

17   Q.  Where do we find Ora Sandlar?

18   A.  You will find her right at the top of the page, page 40, in

19   paragraph 27.  The lady with the Russian name.

20   Q.  Where do we find Sarah Hamburger?

21   A.  She is in the 27th count.  Right in the middle of the page

22   there are some names.  It's in bold print, Sarah Hamburger.

23   You can also see the 28th count, the issue with the 45

24   civilians.

25   Q.  OK.  Great.

1          Now, if I could ask the jury to turn back to the

2    al-Masri verdict which we were just looking at and I will give

3    you a minute to get there because I know we are flipping around

4    in this binder a little bit.

5          We are on page 28 of 384.

6          So we have gone over the responsibility of this

7    defendant for the murder of these two ladies.

8          Now I want to ask you about Al Aqsa Brigades

9    organization.  In particular, I want to ask you about the first

10   count of the indictment, which is on page 22, with regard to Al

11   Aqsa Brigades.

12         So let me know when you're on page 22, at the very

13   bottom, first count.

14         Mr. Kaufman, would you read out for the jury the first

15   sentence on Count One.

16   A.  To be found at the top of page 23, Mr. Yalowitz.

17   Q.  Yes, sir.

18   A.  "This count of indictment attributes to the defendant

19   membership in the well-known terrorist organization, the Al

20   Aqsa Brigades."  I think that's probably a typo there.  It

21   should be al with one L, not all.

22         MR. ROCHON:  Objection, your Honor.  The witness was

23   not reading what was in the document accurately.

24         THE COURT:  What page were we on?

25         MR. YALOWITZ:  We are on page 23.

F1E8SOK2                    Kaufman – direct

1              THE COURT:  Of?

2              MR. YALOWITZ:  Of 384.

3              THE COURT:  Of al-Masri?

4              MR. ROCHON:  I thought he was reading under the second

5     count.  Perhaps the witness was reading at the top of the page.

6              THE COURT:  Wait a minute.  Let's start again.

7              We are on al-Masri?

8              MR. YALOWITZ:  Yes, sir.

9              THE COURT:  On page 23.  And you wanted him to read?

10             MR. YALOWITZ:  The very first sentence.

11             THE COURT:  The very first paragraph sentence.

12             MR. ROCHON:  I am withdrawing the objection.  I am

13    sorry for my mistake.  I thought he was reading the second

14    count.

15    A.  Similar but not the same.

16             MR. YALOWITZ:  Be patient, Mr. Rochon.  I am sure I

17    will get to the second count.

18    Q.  I am sorry, Mr. Kaufman.  You believe that the word Al Aqsa

19    Brigades is a typo in the English translation?

20    A.  Yes.

21    Q.  Why do you believe that?

22    A.  Because I have very basic Arabic.  Very, very basic Arabic.

23    But I think most people know that the word "the" in Arabic is

24    *al*.  So it should be one L, not two Ls.  All is all, the

25    English word.

F1E8SOK2                        Kaufman - direct

1    Q.  Is Al Aqsa Brigades an illegal organization under Israeli

2    law?

3    A.  It is.  It is a proscribed organization.

4    Q.  Let's just look at the second count.

5         MR. YALOWITZ:  I think I better read this one, your

6    Honor, with the court's permission.

7         THE COURT:  Sure.

8    Q.  "This count of the indictment attributes to the defendant

9    holding an office in the prohibited organization insofar as he

10   headed the Al Aqsa Brigades in the Nablus area in 2002,

11   commanded the military operations that the organization

12   performed during that bloody year, coordinated the activity of

13   the military operations, provided them with arms, and

14   financing, which he received from unnamed co-conspirators and

15   used to take responsibility for the acts of the organization in

16   the media."

17        Now, if we could go back to Counts 6 through 8, Mr.

18   Kaufman.  I just want to make sure the jury has in mind what

19   al-Masri was convicted of with regard to the January 22 attack,

20   and let me make sure I have got everybody on page 28.

21        Perhaps I can have you do this.  If you could read out

22   the next two sentences, but there is a name that may be in your

23   version that must be withheld from the jury.

24   A.  I can do it without mentioning names if you want.

25   Q.  Yes, please.

F1E8SOK2                            Kaufman – direct

1   A.   Essentially, Majed al—Masri was charged with having

2   received —

3            THE COURT:   I'm sorry.   Could you tell us where you're

4   reading from.

5            THE WITNESS:   I do apologize.   I am reading from page

6   28.

7            THE COURT:   Where?

8            THE WITNESS:   Third sentence.

9   Q.   Read from "the defendant."

10  A.   OK.

11           "The defendant is charged with having received the

12  suicide terrorist in an apartment in the Balata Camp and having

13  filmed him holding a rifle and the book of the Koran, along

14  with —"

15  Q.   "Another individual."

16  A.   "Thereafter, the defendant dispatched the suicide

17  terrorists, Said, on his last way."

18           That should be terrorist.   It's a mistake.

19  Q.   Why don't I do the last one that we need on al—Masri, with

20  the court's permission.

21           THE COURT:   Yes.

22  Q.   "After these things, Said departed for Ramallah, where he

23  was sent by a co-conspirator to Jerusalem, where he opened fire

24  at others indiscriminately until he was vanquished, but not

25  before he had caused the murder of two women and injured dozens

1     of others."

2              Now, Mr. Kaufman, we have covered Majed al-Masri and I

3     would like to turn to Fares Ghanem.

4              I noticed you said his name a little different.  Can

5     you explain how you pronounce his name and how we Americans can

6     get a handle on it.

7     A.  Well, I have used Ghanem because I believe the letter is

8     "arrain," which is the Arabic way of pronouncing it.  But in

9     English we can say Ghanem.  For example, Gaza.  Once again, I

10    have self taught extremely basic Arabic.

11    Q.  If I call him Fares Ghanem, you know who I am talking

12    about?

13    A.  Yes, I do.

14    Q.  I apologize to the Arabic speakers listening.  I don't mean

15    to mangle your native tongue.

16              Would you tell the jury procedurally what we have with

17    Fares Ghanem.

18    A.  Yes, members of the jury.  This is a single document.  If

19    you look at the top of 390B.

20    Q.  Let me make sure everybody is there, Mr. Kaufman.

21              Are we all on 390B?  Great.  Thank you.

22              OK.  Go ahead.

23    A.  I think we are becoming accustomed to the fact that when we

24    see one document it is in fact a court decision, a verdict, a

25    conclusion of the trial after evidence has been submitted.

F1E8SOK2                    Kaufman - direct

1   Q.  So where do we find the facts of the court concerning Fares

2   Ghanem's role in this January 22 attack?

3   A.  Well, on the very last page, on page 11 -- sorry, 21.  This

4   is one of the documents which aren't numbered, if I am not

5   mistaken.

6   Q.  Let's make sure we get there.  We are at 21 at the bottom.

7   It looks like it's got a stamp off to the lower right that says

8   P6:330.  21 at the bottom.

9           It's got like a signature of a judge, president of the

10  court and judge at the bottom too.

11  A.  Yes.

12  Q.  I think we are all there.  Let's just make sure.

13          I think everybody is with us.

14  A.  I apologize in advance.  We are going to flip about in this

15  document a bit.

16          First of all, I would ask you to bear in mind the last

17  paragraph and it's entitled "Endnote."  If I could read that

18  out.

19  Q.  Please do.

20  A.  "In view of the conclusions above and after all of the

21  counts of the indictment that have been attributed to the

22  defendant have been found to be properly substantiated in the

23  evidence of the prosecution, we convict the defendant of them."

24          Now, here we don't have the indictment in this

25  particular bundle, but we can go back and find out what the

F1E8SOK2                    Kaufman - direct

1    defendant in this case Fares Ghanem was charged with.  If you

2    look at the very first page of this document, paragraph 2, you

3    will see that he was charged with eight offenses of causing

4    death intentionally.  I won't give you the number of the

5    provision in the statute.

6    Q.  Could you just read out for the jury the second sentence of

7    paragraph 2 so they understand what we are talking about here.

8    A.  Yes.

9            "These offenses encompass a series of terrorist

10   attacks in which the defendant took part, as a result of which

11   eight Israelis lost their lives and an attempt was made to

12   cause the death of many others."

13           Now, we know --

14   Q.  Bear with me because I want to make sure every member of

15   the jury has the opportunity to see this document.

16           MR. YALOWITZ:  Maybe, Ms. Machnes, you can put it up

17   on the screen so that we can help everybody find it when we are

18   talking about 390B.  Just on the very first page, and maybe go

19   up to the top so we can orient ourselves.

20           Then let's just scroll down to show the jury where Mr.

21   Kaufman was reading from and we can even highlight for the jury

22   what he just read.

23           A series of terrorist attacks.

24           Thank you so much for that.

25   Q.  Now, Mr. Kaufman, where are you taking us next?

F1E8SOK2                          Kaufman - direct

1   A.   Yes.   So he was convicted of a series of terrorist attacks,

2   but only one of those terrorist attacks is of relevance to us

3   at the present moment in time, and that of course is the

4   January 22, 2002 attack.   You will find the facts pertinent to

5   that.

6            Here there is no number, members of the jury, so you

7   will have to count.   One, two, three, four.   On the fourth

8   page, in the middle paragraph --

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1E3SOK3                         Kaufman – direct

1    BY MR. YALOWITZ:

2    Q.  Is there like a stamp number at the bottom?

3    A.  Yes, there is, Mr. Yalowitz.  It's stamp P6:321.

4    Q.  Let's see if we can find 321.  We may need to help each

5    other find it, but it looks like everybody's got it.  We're all

6    there.

7    A.  This is one of the ones where you might want to ask --

8          MR. YALOWITZ:  I think I'd best, your Honor.

9          "In the middle of January 2002, the defendant

10   contacted a co-conspirator, and informed him that another

11   co-conspirator wanted to bring a suicide terrorist into the

12   city of Jerusalem, and suggested that he transport the

13   terrorist together with him.  That co-conspirator agreed to the

14   proposal.

15         "On January 22, 2002, the defendant once again

16   contacted a co-conspirator and informed him that everything was

17   ready for carrying out the terrorist attack.  The defendant and

18   his co-conspirator took a preliminary drive to find a route on

19   which there were no roadblocks.  Afterward, they returned to

20   Ramallah where they were introduced to the suicide terrorist

21   who was armed with an M-16 rifle.  The defendant and his

22   co-conspirator concealed the weapon in the vehicle, and drove

23   the terrorist to Straus Street where the terrorist alighted

24   from the car.  And they explained to him that he must go to

25   Jaffa Street, and there he must open fire.

F1E3SOK3                         Kaufman - direct

1            "The two fled from the scene.  The terrorist opened

2       fire in all directions and murdered the late Ora Svetlana

3       Sandler and the late Sarah Hamburger, and wounded 45 other

4       civilians."

5       Q.  Let's go, Mr. Kaufman, to the next one in your binder?

6       A.  That would be?

7       Q.  Muhammad Abdullah.  Why don't you start the jury off with

8       what they've got procedurally.

9       A.  Yeah.  Well, once again we're back to tab A, tab B format.

10      So, tab A is a transcript of a hearing before the military

11      court in Beit El.  That's in -- it is nearby Ramallah.  And

12      here, the prosecutor first of all announces that he's reached a

13      plea bargain with the defendant and his counsel.

14      Q.  Are we looking at the very first page?

15      A.  Yes, we are.

16      Q.  All right.  And what does the defense attorney say in

17      response?  Maybe you can read that out.

18      A.  Well, the defense attorney says "I confirm the prosecutor's

19      statement, namely that we've reached a plea bargain and move to

20      permit my client to withdraw his denial of the charges."

21      Because he originally pleaded not guilty.  Now he's changing

22      his plea.

23      Q.  Okay.

24      A.  And then we see on page two, right at the bottom, that the

25      defense counsel is telling the Court that he's explained what's

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    contained in an amended indictment to his client, Mr. Muhammad

2    Abdullah.

3            MR. ROCHON:  Your Honor, just for the record, the

4    witness was asked to read the document.  Not interpret it.

5            MR. YALOWITZ:  I think this witness is very able to

6    interpret the document, your Honor.

7            THE COURT:  It depends on what your question was.

8    What is your question?

9    Q.  My question is can you explain procedurally what is

10   happening in this document.

11           MR. ROCHON:  Your Honor --

12           THE COURT:  Overruled.  He can answer.

13           MR. ROCHON:  I believe the question was to ask him to

14   read it.

15           THE COURT:  We have a new question now.

16           MR. ROCHON:  All right.

17   A.  So in the very last sentence on that page, page number two,

18   the defendant himself, Muhammad Abdullah, says that his lawyer

19   has explained what's in the amended indictment and he agrees to

20   plead to it.  And --

21   Q.  Thank you.  And now, let's show the jury the substantive

22   portion as you're ready.  Perhaps there is more you wanted to

23   show on this document?

24   A.  Yes.  Maybe if we have a look at page three, members of the

25   jury.  Right at the top, after the defendant says that he's

1    pleading guilty to that amended indictment, the court states as

2    follows:  "On the basis of his admission of guilt, we convict

3    the defendant of the offenses attributed to him in the amended

4    indictment."  And --

5    Q.  So is that the conviction?

6    A.  That's the conviction, Mr. Yalowitz, yes.

7    Q.  All right.  And now where do you want to take the jury

8    next?

9    A.  I think we want to see the amended indictment, and you will

10   find that at tab B.  This is the substance of what Mr. Muhammad

11   Abdullah was pleading guilty to.

12   Q.  This is Exhibit 422?

13   A.  That's correct.

14   Q.  Where should we go?

15   A.  Well, I think we can go straightaway here to page 14.  This

16   document is correctly numbered.  And right at the top you'll

17   see eighth count, brackets, detailed incident filed 502/02

18   Zion.

19   Q.  Would you just remind us what that 502/02 Zion means?

20   A.  That's the police investigating file, and Zion is the

21   police station which investigated this offense.  This offense

22   of carrying out murder on Jaffa Street.

23   Q.  Thank you.

24            MR. YALOWITZ:  I think, your Honor, I best take the

25   jury through the substantive portion, with the Court's

F1E3SOK3                    Kaufman - direct

1    permission.

2              THE COURT:  That's fine.

3              MR. YALOWITZ:  Thank you.

4              Paragraph one.  "In the middle of January 2002, a

5    co-conspirator called the defendant, informed the defendant

6    that another co-conspirator bodyguard of the head of the Fatah

7    Organization's Tanzim, which is an unlawful organization,

8    wanted to get a terrorist into Jerusalem to carry out a suicide

9    terrorist attack in Jerusalem with the aim of causing the

10   deaths of as many civilians as possible.

11             "The defendant consented to participate by

12   transporting the above-mentioned suicide terrorist to

13   Jerusalem.

14             "On January 22, 2002, a co-conspirator called the

15   defendant and informed him that a co-conspirator had spoken

16   with him and informed him that the suicide terrorist who was to

17   carry out the planned terrorist attack was ready and had to be

18   gotten into Jerusalem.  The defendant again agreed to

19   participate in executing the planned terrorist attack.

20             "Later on that day, the defendant and a co-conspirator

21   met in Ramallah.  A co-conspirator came to the meeting in his

22   Isuzu van with Israeli license plates.  The defendant and a

23   co-conspirator traveled in the said Isuzu from Ramallah to

24   Jerusalem so as to find a road without police or Israel Defense

25   Forces checkpoints, so as to later transport the suicide

F1E3SOK3                    Kaufman – direct

1    terrorist who was to carry out the planned terrorist attack in

2    Jerusalem by the same route.

3            "The defendant and a co-conspirator drove from

4    Ramallah via Rafat and arrived at the Atarot Industrial Zone,

5    where the two rushed to the main Jerusalem Ramallah road and

6    turned left toward the junction leading to the Rama camp, and

7    there they turned right and traveled to Adam Junction.  At Adam

8    Junction, the defendant and his accomplice turned right and

9    traveled to Hizme Junction, where they turned right and entered

10   Anata.  Through Anata, the defendant and his accomplice reached

11   the French Hill Junction, where the two turned right and

12   returned to Ramallah.

13           "The defendant and his co-conspirator saw that it was

14   possible to transport the suicide terrorist to Jerusalem on the

15   route they had taken without being stopped at police or Israel

16   Defense Force checkpoints."

17           Now I want to go to paragraph 10 on page 15.

18           "The defendant and his co-conspirator drove Said

19   Ramadan to Jerusalem via the route they had check out earlier

20   that day as described above.

21           "The defendant and the co-conspirator drove to Sheikh

22   Jarrah Street.  There they took out the assault rifle and the

23   magazines that had been concealed in the vehicle and gave them

24   to Said Ramadan.  The defendant shifted into the seat next to

25   the driver seat while Said Ramadan moved to the back seat

F1E3SOK3                    Kaufman - direct

1    holding in his hands the M-16 assault rifle and the magazines.

2    The defendant and his co-conspirator drove Said Ramadan to

3    Haneviim Street.

4    Q.  What is that street in English, Mr. Kaufman?

5    A.  It is Prophet Street.  *Hanevi* is a prophet.

6            MR. YALOWITZ:  "During the trip, Said Ramadan

7    complained to the defendant and his co-conspirator that they

8    had bought him new shoes for the terrorist attack, but that

9    they were too small and tight on him.  The defendant took off

10   his Reebok shoes and gave them to Said Ramadan saying, 'Go up

11   to paradise with Reebok shoes.'

12           "Upon reaching the intersection of Straus and Prophet

13   Streets, the defendant and his co-conspirator stopped the

14   Isuzu.  The defendant and his co-conspirators said to Said

15   Ramadan to go down to Jaffa Street on foot and to begin

16   shooting where he saw a large number of people.

17           "After Said Ramadan got out of the vehicle with the

18   M-16 assault rifle and the ammunition, the defendant and his

19   co-conspirator drove from there in the Isuzu, went out onto

20   Road No. 1, through the Musrara neighborhood, and from there,

21   drove along the main road to Ramallah.

22           "Said Ramadan, some minutes after getting out of the

23   defendant's and his co-conspirator's vehicle, reached Jaffa

24   Road."

25           And your Honor, I don't think we need to read out

F1E3SOK3                    Kaufman - direct

1    paragraph 18 again.  We read it out earlier this morning.  I

2    think if we just give the jury a moment to review it, that will

3    be sufficient.

4         (Pause).

5    Q.  Muhammad Mousleh.  Let's go to his conviction, Mr. Kaufman.

6    And why don't you begin with telling the jury what we have

7    procedurally for this.  This one is a little different.

8    A.  Yes.  On here I do apologize, we'll have to do a bit of

9    flipping about as well.

10        The first item I want to you look at is in fact not

11   tab A, but tab B.  And if you will see in the top-right-hand

12   corner, there is a number 420.

13   Q.  Bear with us one moment.  Okay.  Everybody's here.

14   A.  So, chronologically speaking, it starts with this document

15   which is a transcript of a hearing once again.  We're familiar

16   with the format already.  The parties are announcing a plea

17   bargain.  The court allows the prosecutor to file an amended

18   indictment to reflect that plea bargain.  Defense counsel on

19   the second line from the bottom of the page states that he's

20   explained the content of the amended indictment to his client,

21   Mr. Muhammad Mousleh.  And the defendant himself, Muhammad

22   Mousleh, says that he has had the amended indictment read to

23   him, explained to him, sorry, and he pleads guilty to it.

24        And then, members of the jury, if you would turn to

25   tab A, you will see the next page of what should have been the

1   unified transcript.  But at the top of the page, you'll see

2   number 419 and then verdict.  Based on his admission of the

3   charges, we convict the defendant of the offenses that are

4   attributed to him in the amended indictment.

5           And you'll find that amended indictment, members of

6   the jury, at tab C.

7   Q.  Let's pause for a moment and get everybody to tab C.

8   Mr. Kaufman, what do we have under tab C?

9   A.  This is the amended indictment.  As you can see, it's a

10  weighty document, so it has a lot of offenses in it.  But the

11  only one that is of relevance to us is to be found on page 27.

12  If you can open that up, please, members of the jury.  At the

13  bottom there is a stamp number as well, P6:  54.

14  Q.  All right.  Bear with us one moment.  I think everybody's

15  here, Mr. Kaufman.

16  A.  So if you go up six lines or something like that, you'll

17  see 16th count, details incident 502/02 Zion.  Then the nature

18  of the offense causing intentional death, murder.  And then the

19  details of the offense.

20          You can see on that page, the first sentence and the

21  following pages, the details with which you are already very

22  familiar.  Those are the facts substantiating the conviction of

23  Muhammad Mousleh for the January 22, 2002, shooting attack.

24          MR. YALOWITZ:  All right.  Let's go to page 28,

25  paragraph one.  And I'm going to just change the wording here a

F1E3SOK3                    Kaufman - direct

1    little bit to make it understandable.

2              "A co-conspirator in January 2002."

3              THE COURT:  I'm sorry.  Where are you?

4              MR. YALOWITZ:  Paragraph one, it says the blank, but

5    I'm just interpreting that for the jury as a co-conspirator.

6              THE COURT:  I just wanted to know where you were.

7              MR. YALOWITZ:  Thank you, your Honor.

8              "In January 2002, decided that he wanted to carry out

9    a suicide attack inside the territory of the State of Israel in

10   order to cause the deaths of as many Israeli civilians as

11   possible."

12             Now I'll skip to paragraph three.  "A few days later,

13   on January 22, 2002, in Ramallah, a co-conspirator met Said

14   Ramadan."

15             Now I'll skip to paragraph five.  "The defendant met a

16   co-conspirator and the above-mentioned Said Ramadan that day in

17   Ramallah.  A co-conspirator introduced the two to each other.

18   The defendant and a co-conspirator took Said Ramadan to a

19   barber shop to have his hair cut before carrying out the

20   planned suicide attack.  Thereafter, the defendant and a

21   co-conspirator called another co-conspirator and asked the

22   latter to transport a suicide terrorist from Ramallah to

23   Jerusalem in order for the suicide terrorist to carry out a

24   suicide attack in Jerusalem and to cause the deaths of as many

25   Israeli civilians as possible."

F1E3SOK3                         Kaufman - direct

1          Now I want to skip ahead to paragraph 11 on page 29.

2     "The defendant brought an M-16 assault rifle and three

3     magazines for the said assault rifle filled with cartridges.

4     Two of which were connected with a magazine coupler."

5          Now I'm going to skip to paragraph 13.  "Thereafter,

6     on the same day, the defendant and Said Ramadan met

7     co-conspirators in the area of the City In Hotel in Albira."

8          Now I'm going to go to paragraph 15.  "Two

9     co-conspirators hid the above-mentioned M-16 assault rifle and

10    magazines which the defendant had brought for carrying out the

11    planned suicide attack in the above-mentioned Isuzu."

12         I'm going to turn the page and go to paragraph 16.

13    The defendant and co-conspirators did something that's been

14    removed from the binders.  "And the three traveled to

15    Jerusalem.  The defendant told two co-conspirators that they

16    would have to take Said Ramadan to carry out the suicide attack

17    in any place of their choosing in Jerusalem."

18         And then, your Honor, I think we've covered the other

19    areas, but I do want to give the jury a moment to look at

20    paragraph 26 and just confirm that they've seen that.

21         (Pause)

22    Q.  We have one more in this binder, Mr. Kaufman, who is not on

23    our chart.  And why don't you take us procedurally to his

24    verdict.

25    A.  Yes.  The very last divider is entitled Barghouti, Bashar.

F1E3SOK3                    Kaufman – direct

1    Bashar Barghouti.  Bashar is his first name.  Tab A.  Here we

2    have a hearing in front of a single judge.  There is a reason

3    for that.  I don't want to bore you with it.  But anyway,

4    before a single judge.  Once again, we have a plea bargain

5    being announced.  The single judge allows the prosecutor to

6    amend his indictment pursuant to the plea bargain which he

7    reached with the defense counsel.

8         And if you turn over the page and look at the third

9    line down, the defendant himself, Bashar Barghouti, the

10   defendant, states as follows:  "My defense counsel has

11   explained to me the amended indictment.  I understand and plead

12   guilty to it."  And then the judges convict him and they say as

13   follows -- sorry, it is the judge.  "Based on admission of

14   guilt, I convict the defendant of the offense attributed to him

15   in the amended indictment."

16        And you will find that amended indictment, members of

17   the jury, at tab B.  Here, Bashar Barghouti is in effect

18   pleading guilty to an indictment with only one count, only one

19   offense.  And that offense is failing to prevent an offense.

20        MR. YALOWITZ:  Your Honor, I think I better take the

21   jury through this one.

22        THE COURT:  Sure.

23        MR. YALOWITZ:  "The defendant habitually hosted in his

24   home" --

25        THE COURT:  I'm sorry.  Where are you reading from?

1          MR. YALOWITZ:  Sorry.  We're on 390A.

2          THE COURT:  Page?

3          MR. YALOWITZ:  Page one.

4          "Details of the offense."  And then there is a

5     paragraph that's got some area whited out.

6          "The defendant habitually hosted in his home a

7     co-conspirator which is responsible for carrying out hundreds

8     of lethal attacks.  The above-mentioned co-conspirator

9     participated himself in the execution of shooting attacks

10    against IDF soldiers and reported this to the defendant."

11         Now I'd like to skip to page three.  "The defendant

12    did not act reasonably" I'm in the middle.  "The defendant did

13    not act reasonably in order to prevent the planned attack.

14         "On January 22, 2002, a shooting attack was carried

15    out on the junction of Jaffa and King George Streets in

16    Jerusalem by a co-conspirator.

17         "In this attack, the terrorist opened fire at

18    passersby in the street with the intent of causing their

19    deaths.

20         "In this attack, two women were killed.  The late Ora

21    Sandler and the late Sarah Hamburger, and dozens of others were

22    injured.

23         "After this attack, while defendant was at work at

24    Makassed Hospital, a co-conspirator called him.  The defendant

25    responded positively and knew that this was the attack that his

F1E3SOK3                    Kaufman - direct

1   co-conspirator had planned as set forth above."

2               MR. YALOWITZ:  Your Honor, would the Court like me to

3   move to the next topic at this time or would the Court

4   prefer --

5               THE COURT:  Yes, I'd like to go until about 12:45 and

6   break for lunch.

7               MR. YALOWITZ:  If the Court could bear with me.  We've

8   completed our review of the convictions in the January 22

9   terror attack.

10              THE COURT:  You'd like to collect the binders back or

11   do you want to handout different binders?

12              MR. YALOWITZ:  I think we'll collect these and the

13   jury will be able to have them in the jury room, but there will

14   be too much for them to balance all the binders.

15              THE COURT:  Why don't we take those back for now, and

16   I'll admit those binders.

17              MR. ROCHON:  Judge, in case we use the same binders,

18   if they can remain available.

19              THE COURT:  Yes, let's make sure they're available for

20   cross-examination.

21              MR. ROCHON:  Thank you.

22   Q.  Mr. Kaufman, can you explain to the jury where they should

23   go for the conviction of Munzar Noor.

24   A.  Do we have something to show the jury on the screen here?

25              THE COURT:  Do you have an extra binder?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1            MR. YALOWITZ:  Let's get an extra binder.

2   Q.  I think we don't want to put it up since it is really only

3   one conviction.  I think we want to take them through it.

4            MR. YALOWITZ:  And I think we need a binder for Judge

5   Daniels.

6            LAW CLERK:  No, we have one.

7            MR. YALOWITZ:  Oh, great.

8            THE COURT:  Which exhibit is this?

9            MR. YALOWITZ:  We're on 322, your Honor.

10            THE COURT:  Plaintiff's Exhibit 322?

11            MR. YALOWITZ:  Yes, sir.

12            THE COURT:  Go ahead.

13            THE WITNESS:  Okay.

14   Q.  All right.  So, just tell us procedurally what we've got

15   with regard to the conviction of this defendant.

16   A.  Well, we only have one document here.  It is a verdict.  It

17   is a reasoned judgment, the finding of guilt by the three

18   judges at the military court in Judea.

19   Q.  Where do we find details of this defendant's role in the

20   January 27, 2002, terrorist attack?

21   A.  Members of the jury, you might want to remember this attack

22   by virtue of the fact that there was a female terrorist

23   involved blowing herself up.  Her name was Wafa Idris.  And if

24   you turn to page four of this document, you will see the facts

25   as the defendant admitted them in this interview, yeah.

F1E3SOK3                          Kaufman - direct

1    Q.  Could we look at in particular paragraph two.

2    A.  On page one, yes, Mr. Yalowitz, I meant to do that.  I was

3    rushing ahead of myself.

4    Q.  That's all right.  And maybe you might just read out

5    paragraph two for the jury.

6    A.  Yes.  Here the judges are explaining the charges with which

7    the defendant himself was charged, and I will read out

8    paragraph two.

9          "Intentionally causing death, an offense pursuant to

10   Section 51 of the Security Provisions Order, and Section

11   14(a)(4) of the Rules of Liability for an Offense Order, in

12   respect of his involvement in a suicide terrorist attack that

13   took place on January 27, 2002, in Jerusalem, as a result of

14   which the late Pinhas Emanuel Tokatli was killed.  It was

15   attributed to the defendant that he took an active part in the

16   terrorist attack in that he convinced the female terrorist

17   Wafa" just turn the page "Idris to carry out the terrorist

18   attack.  The defendant went further, and when he became aware

19   that the suicide bomber had changed her mind about committing

20   suicide, he sat with her again and persuaded her that she

21   should carry out her intentions and execute a terrorist attack,

22   even if it was not to be through a suicide terrorist attack,

23   but by planting a bomb.

24         "Ultimately, as stated, the terrorist attack was

25   carried out, and Pinhas Emanuel Tokatli was murdered" and I

F1E3SOK3                    Kaufman - direct

1    believe members of the Sokolow family were injured.

2    Q.  And Mr. Kaufman, if you could just read out paragraph three

3    for the jury so they see the complete charges on that.

4    A.  Yeah.  Also --

5    Q.  In that paragraph as well.

6    A.  With respect to the same incident, he was charged with, and

7    I read "Attempting to intentionally cause death, an offense

8    pursuant to Section 51 of the Security Provisions Order, and

9    Sections 14(a)(4) and 19 of the Rules of Liability for an

10   Offense Order, in that in the terrorist attack in which the

11   late Pinhas Emanuel Tokatli was killed, other people (over 150)

12   were wounded, it having been intended to kill them."

13   Q.  Now, I would like to direct your attention to the court's

14   discussion of the evidence.  And in particular, in particular,

15   I'd like to look at page three and four with you in some

16   detail.

17           If you could, I'd like you to read out to the jury the

18   first three paragraphs under evidentiary materials in the

19   court's files.

20   A.  Okay.  "During the course of hearings in the court, a great

21   deal of evidentiary material was submitted by consent.  On

22   April 2, 2003, two statements given by the defendant in his

23   police interrogations, one that he gave on April 23, 2002, and

24   marked P/1, and one dated April 25, 2002, marked P/2.  At the

25   next hearing on May 5, 2003, his police statement dated May 13,

F1E3SOK3                    Kaufman - direct

2002, and marked P/3 was submitted.  These three statements

constitute the principal evidence relating to the defendant in

the file, and so will merit the bulk of discussion in this

verdict, with a further 100 or more exhibits having been

submitted over the course of the hearings, all relating to

terrorist attack on January 27, 2002, but which do not

independently or directly involve the defendant in the crimes

attributed to him.

        "When we survey the defendant's statements which were,

as mentioned, submitted by consent, and hence the court may

accept their content as the truth, we will find the accusations

attributed to the defendant in the indictment to be well

founded.  At the same time, before we detail the supporting

elements found in the defendant's statements, and weave them

together with the extrinsic evidence supporting the facts of

the indictment, it is worth noting that the defendant's

admissions in this case gradually came to confirm the

accusations.  That is, as his interrogation continued, his

statements became more complete and detailed.  This may be seen

to be a natural development of the interrogation with the

subject initially not being willing to admit to all of the

suspicions, but as the interrogation develops, he reveals many

more elements of the truth.

        "Hence, we found it appropriate to reject the defense

counsel's request in his submission to specifically adopt the

F1E3SOK3                    Kaufman – direct

1    first statement and not the latter ones."

2    Q.  If we could just turn the page and complete that

3    discussion.

4    A.  Yes.  "In his first statement, the defendant still

5    distanced himself from the actions of Wafa Idris.  But when we

6    read his second and third statements, it can clearly be seen

7    that his relationship with the terrorist attack described in

8    counts two to four of the indictment is much closer than he

9    initially admitted to."

10           MR. YALOWITZ:  Thank you.  Now, with the Court's

11   permission, I'd like to cover the bottom of page four.

12           THE COURT:  Yes.

13           MR. YALOWITZ:  "In these statements, the defendant

14   admits that he sat together with the individual known as" and

15   then that individual's name has been withheld "and the

16   terrorist Wafa Idris."

17           So he sat together with the individual known as blank,

18   and terrorist Wafa Idris "when they planned to execute a

19   terrorist attack in Jerusalem.  The defendant also admits that

20   he was given the task of persuading the terrorist to carry out

21   the terrorist attack, and when she expressed a certain

22   hesitation, and changed her mind about carrying out the attack,

23   he sat with her with the intention of persuading her

24   nonetheless to carry out a terrorist attack.  Ultimately she

25   consented, and indeed, on January 27, 2002, the terrorist

F1E3SOK3                    Kaufman - direct

 1    attack was carried out."

 2            Now, I also want to go to page six with you,

 3    Mr. Kaufman.  Your Honor, I need the Court's permission for me

 4    to read this one out.

 5            THE COURT:  Sure.

 6            MR. YALOWITZ:  I'm going to begin from the top.

 7            "This being a test, then as stated above, the very

 8    proof of the terrorist attack having occurred and the terrible

 9    outcomes that were caused by it constitute the something more

10    for the counts connected with the terrorist attack.  In

11    addition, the very proof of the terrorist attack having

12    confirmed, all that stated in the defendant's statements in

13    relation to his relationship with the said co-conspirator"

14    whose name has been withheld from the jury.  "The individual

15    who set that terrorist attack in motion, if as it has been

16    said, we are verifying that relationship.  Then the something

17    more has the power to verify that stated in the fifth and sixth

18    counts of the indictment in which the defendant also connected

19    himself with that co-conspirator in carrying out additional

20    crimes."

21    Q.  And Mr. Kaufman, I just want you to take the jury --

22            MR. ROCHON:  I'm sorry, your Honor.  I have an

23    objection.  May we approach the bench briefly?

24            THE COURT:  Do we need to address it now?  You want me

25    to do something at this point?

F1E3SOK3                        Kaufman - direct

1              MR. ROCHON:  I think we do need to address it now.

2              (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1E3SOK3                        Kaufman - direct

1              (At the sidebar)

2              MR. ROCHON:  So up until now, counsel has said "blank"

3       for some of the names that have been withheld.  Counsel has

4       said "co-conspirator" for some of the names that have been

5       withheld.  Suddenly on this, which as you know, is the weakest

6       count with the biggest problems, he decided to go with "a name

7       that has been withheld from the jury" when there was a

8       reference to the official.

9              Now, counsel to suggest that this name has been

10      withheld from the jury, clearly Mr. Yalowitz is implying -- it

11      is no accident he did it for the first time on this one -- as

12      if the defendants are withholding it.  That wasn't an accident.

13      There is nobody picking their words more carefully than Kent.

14             THE COURT:  Do you want me to say anything to the

15      jury?

16             MR. ROCHON:  I want you to tell him to cut that out.

17             THE COURT:  Don't refer to anything as "withheld from

18      the jury."

19             MR. YALOWITZ:  All right, your Honor.

20             THE COURT:  It is redacted.  It's missing.  It is not

21      there.  Any way you want to say it.  It has nothing to do with

22      anything being withheld from the jury.

23             MR. YALOWITZ:  By the way -- I accept the Court's

24      ruling.  But Mr. Rochon is not an honest reporter of the facts

25      in this regard.  I have used that phrase earlier.  The record

F1E3SOK3                         Kaufman - direct

1    will reflect that he is not -- he came up here to make a point

2    on this one, and he's not telling you the truth.  I've caught

3    him in that before, your Honor.  But I accept the Court's

4    ruling.

5              THE COURT:  Quite frankly, Mr. Yalowitz, I don't agree

6    with you.  I think if you had said that previously, I would

7    have noticed it.

8              MR. YALOWITZ:  All right.

9              THE COURT:  I noticed it when you said it that time.

10   If you said it previously and we didn't notice it, I think it

11   is an inappropriate reference.

12             MR. YALOWITZ:  I'll abide by the Court's ruling.

13             THE COURT:  Nobody is withholding anything from this

14   jury.

15             MR. YALOWITZ:  I disagree with that, but I accept the

16   Court's ruling.

17             THE COURT:  It's not for you to comment to the jury.

18             MR. YALOWITZ:  I understand that.

19             THE COURT:  I don't want to give any greater

20   sanctions.  Don't do that.  Don't imply anything is being

21   withheld from this jury.

22             MR. YALOWITZ:  I got it.

23             MR. ROCHON:  Your Honor, going forward, the blanks,

24   can we just come up with a convention of just --

25             MR. YALOWITZ:  You got to let me read it in context,

F1E3SOK3                         Kaufman – direct

1   but I will not say that word.

2            THE COURT:  You will say "another individual."  That's

3   the phrase that we will all use when there is a blank.  All

4   right?

5            MR. YALOWITZ:  All right.

6            (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1E3SOK3                    Kaufman – direct

1              (In open court)

2              MR. YALOWITZ:  Rebecca, if could you just give me the

3     last question and answer so we can orient ourselves to where we

4     are.

5              THE COURT:  Why don't you just move forward.

6              MR. YALOWITZ:  I just don't remember where I was.

7              THE COURT:  Well, in the nature of the objection, I'm

8     not going to let you go back.

9              MR. YALOWITZ:  I understand.  That's fine.  I'll do my

10    best.

11             Your Honor, may I read from page six just so we can

12    orient ourselves?

13             THE COURT:  Yes.  I thought that's where we were.

14             MR. YALOWITZ:  Great.  "In addition, the very proof of

15    the terrorist attack having occurred confirms all that's stated

16    in the defendant's statements in his relationship with the said

17    other person, the individual who set the terror attack in

18    motion.  If, as has been said, we are verifying that

19    relationship.  Then the something more has the power to verify

20    that stated in the fifth and sixth counts of the indictment in

21    which the defendant also connected himself with another

22    individual in carrying out additional crimes."

23    Q.  Mr. Kaufman, if I could just direct you back to counts five

24    and six, and I especially want to focus on count six.

25             MR. YALOWITZ:  And I think, your Honor, I best read

F1E3SOK3                    Kaufman - direct

1      this one.

2              THE COURT:  Where are you?

3              MR. YALOWITZ:  On page three, paragraph five.

4              THE WITNESS:  Page two.

5              MR. YALOWITZ:  Page three, paragraph five.

6      Q.  By the way, Mr. Kaufman, are these the six counts that --

7      is this count six the count that we were just reading about?

8      A.  It is in my copy, Mr. Yalowitz, it's page two.

9              MR. YALOWITZ:  I'm sorry.  I misspoke.

10     Q.  I'm on page three, paragraph six.

11     A.  Okay.

12             THE COURT:  In count six?

13             MR. YALOWITZ:  My mistake.

14     Q.  Mr. Kaufman, is this count six I was just reading out with

15     reference to a moment ago?

16     A.  Obviously, for the sake of clarity, I would have preferred

17     to see the amended indictment itself.  But if you understand

18     that the reasoned judgment you can see on the very first page

19     that the judges are attributing to the defendant Munzar Noor

20     six offenses.  So it would be reasonable to assume that indeed

21     these are the six offenses, and the sixth offense is that to be

22     found at the top of page three.

23             MR. YALOWITZ:  And now I'd just like the Court's

24     permission to read out paragraph six, in light of the Court's

25     earlier rulings.

F1E3SOK3                    Kaufman – direct

1        THE COURT:  When you say paragraph six, I see six

2    counts, and then I see a paragraph entitled "evidentiary

3    materials in the court file."

4        MR. YALOWITZ:  Right.

5        THE COURT:  Is that what you want to read from?

6        MR. YALOWITZ:  I want to read the one that says

7    numbered six.  And the reason I want to read that, your

8    Honor --

9        THE COURT:  You don't have to tell me.  You want to

10   read what's in number six.

11       MR. YALOWITZ:  Right.

12       THE COURT:  Go ahead.

13       MR. YALOWITZ:  This is number six.  "Communicating

14   information of military value, an offense pursuant to Section

15   63 of the Security Provisions Order, in that he gave that other

16   individual information on Israel Defense Forces checkpoints,

17   and the movements of Israel Defense Forces units in the area."

18   Q.  Mr. Kaufman, could you just explain what the area with the

19   capital A means in this verdict?

20   A.  That would be the West Bank.

21   Q.  Thank you.  Is there anything else that you'd like to point

22   out to the jury about this conviction of Munzar Noor?

23       MR. ROCHON:  Your Honor, objection.

24       THE COURT:  Are you trying to direct his attention to

25   something?

F1E3SOK3                      Kaufman - direct

1              MR. YALOWITZ:  No, no, I just wanted to make sure

2       that --

3              THE COURT:  You can answer that "yes" or "no."

4              THE WITNESS:  I'll make Mr. Rochon's life easy.  No.

5              MR. ROCHON:  Perfect.

6              MR. YALOWITZ:  I just didn't want to leave anything

7       out that Mr. Kaufman wanted to cover.

8              THE COURT:  I understand.

9              MR. YALOWITZ:  I think we're then done with the

10      conviction on the January 27 attack.  I'll collect those.

11             Is your Honor ready to proceed to the next one?

12             THE COURT:  Let's go another 10 minutes and stay on

13      schedule.

14             MR. YALOWITZ:  We're going to hand out to the jury a

15      binder related to the March 21 conviction, and that's the one

16      that injured Alan and Yoni Bauer.

17      Q.  Let's go to March 21, 2002.  That cold and rainy day in

18      Jerusalem.  Let me make sure I get our chart up on the board.

19      Why don't we begin with this man, Nasser Shawish.

20      A.  Yes, he's the first individual to be found in your binder.

21      Q.  Just give us procedurally what we have with Nasser Shawish.

22      A.  Well, in fact back to tab A, tab B format.  But here's a

23      bit different.  Please open up tab A.  The document entitled in

24      the top-right-hand corner 382.  We have a hearing, and here we

25      have something which is similar to what Mr. Yalowitz himself is

1    doing to me at the moment.  It is a direct examination that

2    goes on for a few pages.

3    Q.  It's Q and A?

4    A.  Sorry?

5    Q.  It is questions and answer?

6    A.  Yes, question and answer, yes, indeed.

7    Q.  Then what happens that is of relevance to the conviction?

8    A.  Yes, well, if you look at page 77.

9    Q.  Maybe you might want to tell the jury why this was an

10   unusual trial.

11   A.  Well, this was unusual because, as is his right, of course,

12   and it does happen all over the world, the defendant decided to

13   represent himself and he was asking questions.

14        And if you look at page 77, at the bottom, the last

15   paragraph, the defendant says something.  Would you like me to

16   read it out?

17   Q.  Yes, please do.

18   A.  "In connection with the Muhammad Hashaika operation, the

19   details of the incident in my statement, there are things that

20   are not true and there are things that are true.  I want to

21   make clear to the court those things that are true.  Muhammad

22   Hashaika, I sent him and filmed him and explained to him the

23   place for the terrorist attack.  In connection with the time

24   and date of the terrorist attack, and preparation for the

25   terrorist attack, I received the belt, and prepared him, and

1    dressed the suicide terrorist.  Subsequently, I checked the

2    place for the terrorist attack.  And I brought the car and

3    drove Muhammad Hashaika up to the Qalandiya checkpoint.  From

4    the checkpoint I put him into a taxi, I don't remember which

5    taxi, and I explained to the taxi driver to drive him to King

6    George Street."

7            Maybe I better stop there and let you take over.

8    Q.  Sure.  That would be great.  Just explain what the

9    prosecutor said after the defendant made that statement in open

10   court, and show the jury where they might find that.

11   A.  Well, the prosecutor, having heard this from the

12   defendant's mouth, he said that he was satisfied with the

13   statements as given on October 6, 2002, and December 10, 2002,

14   and now he obviously repeated this confession, as it were, in

15   other portions of the transcript, and he wants to make it clear

16   to the court that the defendant's admission is not the result

17   of a bargain or a promise that we made to him.  Namely, that

18   the defendant confessed of his own free will.  And then the

19   defendant added something.

20   Q.  Please say what he added.

21   A.  Well, I think you better say that, Mr. Yalowitz, perhaps.

22   It is at the bottom of page 78.

23   Q.  You're right.

24           MR. YALOWITZ:  With the Court's permission, I'd read

25   it out.

F1E3SOK3                          Kaufman - direct

1              THE COURT:  Yes.

2              MR. YALOWITZ:  "I wish to add, in connection with

3      another individual."

4              Your Honor, I'm sorry.  I don't understand the

5      redactions on this one.

6              But "in connection with blank terrorist attack, in

7      connection with dressing blank, and in connection with the

8      terrorist attack during preparations, this is because I want to

9      demonstrate that there are many errors in the statements and

10     blank admission when she says blank it is not true.  When she

11     says blank it is not true.  It was I who produced the belt and

12     I dressed her in it.  I filmed her and it is I who filmed the

13     terrorist attack.  And I dressed her in the belt in the

14     presence of blank.  Another individual had no connection but

15     she was with me present in the vehicle."  All right.

16     A.  If you could give me one minute.

17     Q.  Sure.

18     A.  I would like to check the Hebrew version of that.

19             MR. ROCHON:  Your Honor, if the witness is checking

20     the Hebrew version and we are close to the time we would be

21     breaking, may I suggest this may be an apt time to avoid any

22     confusion?

23             THE COURT:  Is this a convenient time or do you want

24     to finish up?

25             MR. YALOWITZ:  Why don't we finish up this conviction.

1    That way we're not hanging out there.

2              THE COURT:  Sure.

3              (Pause)

4              THE WITNESS:  Yes, I've just checked and it does

5    reflect correctly the Hebrew.

6    Q.  All right.  Could we turn to page 79.

7    A.  Yes.

8    Q.  If you can just read out what the prosecutor said after the

9    defendant made this somewhat -- well, after the defendant made

10   this statement.

11   A.  He said that "I repeat my motion," the motion is a request,

12   "to convict the defendant on the basis of his own confession.

13   I move, since the court will convict the defendant, to adjourn

14   the case to March 17 for arguments as to penalty."

15   Q.  And then, where do we find the court's response to that

16   motion?

17   A.  You'll find the response on the next page.  Indeed, on page

18   80.

19   Q.  In order to find the relevant portion it looks like

20   there -- if could you just direct the jury to where they're

21   convicting the defendant of the crimes attributed to him.

22   A.  It is in the second paragraph, members of the jury.  The

23   specific one is most likely 25, count 25.  But you don't have

24   the indictment in your binder.

25   Q.  Is the indictment tab B, 366?  Or has that been removed?

F1E3SOK3                         Kaufman – direct

1    A.  I apologize.  Sorry about that.

2            MR. ROCHON:  Your Honor, I do have something I'd like

3    to address at the bench.  I'm sorry.  I know we're trying to

4    get --

5            THE COURT:  On this issue?

6            MR. ROCHON:  Yes.

7            THE COURT:  Mr. Yalowitz, let me interrupt you at this

8    point and take the lunch break so we can save time.

9            Don't discuss the case, ladies and gentlemen, keep an

10   open mind.  Keep the binders on your seat.  Have lunch.  I'll

11   see you at 2 p.m.

12           (Jury excused)

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

F1E3SOK3

1             MR. YALOWITZ:  Your Honor, can we approach and just

2     discuss this because I think Mr. Rochon may have an application

3     about it and --

4             THE COURT:  Do we need to approach on it?

5             MR. YALOWITZ:  Well, we don't need to approach.  We

6     can just talk about it.

7             THE COURT:  Mr. Rochon, what did you want to say?

8             You can step down, sir.

9             MR. ROCHON:  It was helpful we got the first part of

10    it.  This guy is in the middle of his trial, and all of a

11    sudden he says, okay, I did it, but you got some things right

12    and you got some things wrong.  When they convict him, they

13    convict him subject to his statements about that.  So he speaks

14    about the Hashaika incident and the conviction is subject

15    essentially to what he said.  Obviously, he admits the main

16    core of what he did.

17            But you get to count 25, it includes stuff that he did

18    not admit to when he made his colloquy there in court,

19    including the release of Hashaika, which is a critical part of

20    this case.

21            THE COURT:  Show me where you are.

22            MR. ROCHON:  So the first thing you need to know is

23    what he just read about the defendant and he explains how the

24    whole attack went down live in court.  He doesn't include

25    anything about Hashaika getting out of custody or any of that

F1E3SOK3

1  stuff.  Then when you get to page 80, when you get --

2          THE COURT:  Which page?

3          MR. ROCHON:  80, which is just right after his

4  rambling narrative in open court, just four or five pages in,

5  the 382G, that's what he was just reading from.  382, tab A.

6          THE COURT:  Okay.  Page 80, yes.

7          MR. ROCHON:  At 80 when they talk about what he's

8  being convicted to, it says 25, that's the count we care about

9  here, that's the Hashaika count is count 25.  It says in

10  parenthesis "subject to the description of the matter as given

11  by the defendant."

12          THE COURT:  Okay.

13          MR. ROCHON:  Then when we get to the conviction

14  itself, excuse me, to the count itself, to count 25, it

15  includes things that weren't in his narrative.

16          THE COURT:  I'm sorry.  Where are you under?

17          MR. ROCHON:  That would be tab B is where they have

18  the indictment.  21 at the bottom.

19          THE COURT:  Page 21.

20          MR. ROCHON:  At the bottom.  21 at the bottom, it says

21  in the middle of the page "25th count."

22          THE COURT:  Okay.

23          (Continued on next page)

24

25

F1E8SOK4

1          THE COURT:  OK.

2          MR. ROCHON:  25th count is this instance.

3          When you read through the document, the bottom of page

4   21 is no problem.  But then the part about the defendant and

5   Hashaika being transferred by the Palestinian Authority to

6   Ramallah and there released, which is at the top of page 22.

7          THE COURT:  Which number?

8          MR. ROCHON:  It's paragraph numbered 3 at the top of

9   page 22.

10          MR. YALOWITZ:  Can I see the unredacted?

11          MR. ROCHON:  Is the Court with me?

12          THE COURT:  Yes.

13          MR. YALOWITZ:  It's really impossible to follow this

14   without the redactions taken out.

15          THE COURT:  There is no redaction in that sentence.

16          Let me get a feel for what we are arguing about.

17          MR. ROCHON:  That paragraph numbered 3, and the next

18   one numbered 4, concern an issue central to this case.

19          THE COURT:  You say 3 and 4?

20          MR. ROCHON:  3 and 4.

21          THE COURT:  OK.

22          MR. ROCHON:  One of the core issues in this trial is

23   why is Hashaika out?

24          THE COURT:  Right.

25          MR. ROCHON:  When the defendant spoke in court, he

F1E8SOK4

1    said some things they had were right and some were wrong.  And

2    this defendant was convicted based on what he said in court.

3    In fact, the conviction itself says so in parentheses.

4                THE COURT:  He was convicted also on the statements he

5    said out of court, his confession.

6                MR. ROCHON:  Your Honor, I think that that could be

7    how you interpret it, although you will note that --

8                THE COURT:  That's what the court said.  The court

9    said they reviewed his confession, the first one, the second

10    one, and the third one, and they made an assessments about his

11    confession and the contents of his confession.

12                MR. ROCHON:  I think for his conviction, however, in

13    terms of what he admitted to, when they went through it, they

14    put that amendment behind Count 25, and not all of the others,

15    just the ones where he clarified things.

16                THE COURT:  So is there anyplace where he denied any

17    of the allegations in paragraph 3 and 4?

18                MR. ROCHON:  I am not aware of anywhere where he

19    denied them.

20                THE COURT:  So they are subject to his restrictions

21    and he did not restrict that part of the facts.

22                MR. ROCHON:  I would say that he admitted to along

23    with a plea of guilt on Count 25, which is more than enough in

24    our system to say there is a Rule 11 basis for it.  He said he

25    belted a guy up.  He was intimately involved.  He filmed him.

F1E8SOK4

1    A complete set of admissions to what is essential to the

2    conviction, and did not include this.  And his conviction is

3    based, according to the conviction, on the admissions made by

4    the defendant, which I would suggest to the Court, therefore,

5    should not include this conduct that he did not admit to in his

6    colloquy with the court.

7            Just as if a defendant were to come here, and you

8    would say, OK, the indictment says all this stuff, what did you

9    do, and the defendant makes admissions that are sufficient for

10    guilt of the count, and doesn't make other admissions that are

11    sufficient for guilt of the count, that would affect what his

12    admissions are.

13            The release of Hashaika is not essential to the count

14    of the intentional killing that he was admitting that he did.

15    He admitted to putting a suicide belt on the person and causing

16    this terrible incident.  He did not admit in his colloquy with

17    the court to anything having to do with getting Hashaika out,

18    and that is a critical issue in this trial.  We all agree to

19    that.

20            I would suggest to the Court that when a defendant

21    does that, and when the conviction specifically restricts the

22    basis for the conviction, that the Court should not let in the

23    extraneous information in that count which implicates the

24    Palestinian Authority --

25            MR. YALOWITZ:  May I be heard?

F1E8SOK4

1          THE COURT:  When he finishes you can be heard, Mr.

2     Yalowitz.  You know that's the way we work.  You are always

3     heard.

4          Mr. Rochon.

5          MR. ROCHON:  That implicates the Palestinian

6     Authority.  So it's not just a random reference.

7          If you look at paragraph 3 that I first focused the

8     Court to, it says they were transferred by the Palestinian

9     Authority to Ramallah and there released.  You understand that

10    the plaintiffs in this case are arguing that that release is

11    the basis for liability here.

12         THE COURT:  I understand that.

13         MR. ROCHON:  Therefore, we suggest the Court should be

14    careful in allowing it in when the defendant did not admit to

15    it as part of his plea.  And if nothing else, when you said if

16    there is a redaction coming up that you want to raise, this one

17    should be taken out.  This reference to the Palestinian

18    Authority should be redacted in any event.

19         THE COURT:  Do I have a copy of this unredacted?

20         MR. YALOWITZ:  We can put it up, your Honor.  We can

21    print one.

22         THE COURT:  You can print one for me.

23         Do I have available to me the statements that he made

24    in his confession?

25         MR. YALOWITZ:  Yes.  But probably not over lunch.

F1E8SOK4

1    They ought to get them for you.  I don't know if I have them.

2                    THE COURT:  Your response is you can't get them.

3                    MR. YALOWITZ:  I might be able to.

4                    THE COURT:  That would be helpful.

5                    MR. ROCHON:  We will get them to you as well.

6                    THE COURT:  If somebody can get it to me, it might be

7    helpful.

8                    Are you finished, Mr. Rochon?

9                    MR. ROCHON:  We have received parts of the

10   interrogations of Mr. Hashaika and we will get them to you,

11   whatever we have.

12                   THE COURT:  If you can get them to me as quickly as

13   possible in an unredacted document.

14                   MR. YALOWITZ:  What you really need is the unredacted

15   hearing, because what that hearing was about was one of these

16   two ladies, and Shawish was exculpating one of these two

17   ladies.  Remember, these two ladies confessed and admitted and

18   pled guilty to driving the suicide terrorist into Jerusalem.

19   And Shawish for some reason wanted to exculpate one of these

20   two ladies.  So he said, I put him in a taxi.  And that is what

21   he is saying is incorrect in the indictment.

22                   So you just need to see that.  First of all, Aweis is

23   the PA guy who organized the release.  Shawish is not a PA guy.

24   I think Mr. Rochon -- I understand why he wants it out, but

25   it's not the core evidence about the release of Hashaika.

F1E8SOK4

1              THE COURT:  What is the core evidence?

2              MR. YALOWITZ:  The conviction of Aweis, as well as the

3     inference -- let me check on that because I want to make sure I

4     have got that.  But in candor Shawish is not a PA guy.  I am

5     telling you that.

6              THE COURT:  I understand.

7              MR. YALOWITZ:  So you have got to look at the hearing

8     in which what he is doing is exculpating Kahira, and he doesn't

9     deny that Hashaika was released and that he was involved.  So

10    we will get you that unredacted hearing because I think that's

11    really the core of it.

12             THE COURT:  If you can give me this unredacted and

13    that unredacted and give me the confession, I will try to look

14    at it as quickly as possible over your lunch hour.

15             MR. ROCHON:  When did you tell the jury to be back?

16             THE COURT:  I told them 2:00.

17             MR. ROCHON:  Thank you.

18             (Luncheon recess)

19

20

21

22

23

24

25

F1E8SOK4

1          (Jury not present)

2          THE COURT:  Mr. Rochon, let me specifically let you

3     again articulate the basis for your objection.

4          MR. ROCHON:  Yes.  The basis for our objection is

5     this.  The defendant was charged in a long indictment.  The one

6     that matters is 25.  The defendant spoke up in court on various

7     occasions and made statements.  Eventually he was convicted and

8     you will see the convictions that reflect -- he was charged

9     with so much stuff.  They list a bunch of stuff at the top of

10    the conviction.  And then say, as to Count 25, and I want to

11    quote it, which is tab B, "subject to the description of the

12    matter as given by the defendant."

13         That is not subject to all the interrogations.

14    Moreover --

15         THE COURT:  Why not?

16         MR. ROCHON:  Here is why.  Because when the

17    prosecutor -- at the top of that page -- we will stay there --

18    it says, "on the basis of the defendant's confessions in the

19    court hearings above," and then it lists a number of court

20    hearings.

21         THE COURT:  OK.

22         MR. ROCHON:  "We convict the defendant."

23         First of all, the basis for the convictions is listed

24    by the court that convicted him.  And the prosecutor, when he

25    said he was satisfied as to Count 25, referenced two previous

F1E8SOK4

1    court proceedings as satisfying, in addition to the one they

2    were currently at.  That is in tab A of 382G.

3            After the defendant's discussion of what I will refer

4    to is the Hashaika incident, the military prosecutor says, and

5    I am quoting him, "I am satisfied with the defendant's

6    statements as given on October 6, 2002, December 10, 2002, and

7    now."

8            So the prosecutor is basing it on those two

9    statements.

10           The court later subjects the conviction, as it says,

11   to the description of the matter as given by the defendant.

12   And if you look at the statements given on October 6, 2002 and

13   December 10, 2002, and the one given in open court, it does not

14   include -- I just need to check to make 100 percent sure on

15   December 10, 2002.  It was just brought over to me.

16           I know that on October 6, 2002 he gave a denial.

17           THE COURT:  A denial of what?

18           MR. ROCHON:  This incident.  I had nothing to do with

19   it.

20           Then the statements on December 10, 2002 are longer.

21   I am looking through them as we speak.

22           THE COURT:  What sentences are you saying should be

23   not put before the jury in these documents?

24           MR. ROCHON:  There is a relevant small part.  It's at

25   the top.

F1E8SOK4

1          THE COURT:  Page 22.  Number 3?

2          MR. ROCHON:  Number 3.

3          That's really it when you come down to it because

4     that's the only part that implicates my client.

5          THE COURT:  First of all, is there some factual

6     dispute with regard to whether he was released as opposed to

7     the reason he was released?

8          MR. ROCHON:  I want to tell you, they have better

9     evidence of it, I'll admit, than what Nasser Shawish did.

10    Abdel Karim Aweis made admissions that I can't likely keep out

11    given your ruling so far.  I have made arguments.

12         THE COURT:  That makes this --

13         MR. ROCHON:  About getting Hashaika out.

14         THE COURT:  It's coming in someplace else.

15         MR. ROCHON:  I have to admit, it is coming in

16    someplace else.

17         THE COURT:  At best, your argument should be it's

18    cumulative, not that it's prejudicial, because it states a fact

19    that is already coming in and that you're not in a position to

20    deny.

21         MR. ROCHON:  Two things that I would like the court to

22    consider.  First of all, Abdel Karim Aweis we consider to be an

23    employee who was acting outside of his authority when he did

24    those things.

25         THE COURT:  That's an issue for the jury.

F1E8SOK4

1      MR. ROCHON:  This is a statement that refers to

2   transferred by the Palestinian Authority.  This is direct

3   reference to my client.  Not just a single person, but the

4   client.  I am trying to get Palestinian Authority out of it.

5      THE COURT:  I understand that.  Part of the problem I

6   have is, one, I have no basis to think that you're arguing that

7   this is somehow inaccurate.  That's not what you're arguing.

8   You're arguing they shouldn't be allowed to put it in in this

9   form.  You're saying it's coming in anyway in another form.

10      Also, quite frankly, this statement is not a criminal

11   accusation in and of itself.  As a matter of fact, the fact

12   that the next two paragraphs are so heavily redacted take it

13   out of the context of a criminal accusation.  They have to put

14   it back in the context of a criminal accusation.

15      Then as I looked back at the confession itself, I know

16   what the court had in front of him.  The court said, I am

17   convicting him based on the statements he made in court.  But I

18   know the court also had before it his confession.  The

19   confession is consistent with this, not inconsistent with this.

20      So that was the evidence that they had, and you

21   clearly can't argue that when he said I'm admitting some

22   things -- and I think that is the way you argued it before

23   lunch -- are true but other things are false, that he wasn't

24   supposed to conclude he is referencing this because he said

25   this in his confession and he did not say what I said in my

F1E8SOK4

1    confession was false.

2            MR. ROCHON:  I am not disagreeing with any of the

3    facts.

4            THE COURT:  I just want to make sure we understand

5    each other.  I understand your argument.  A lot of these are

6    important issues, but it seems to me in my analysis over lunch,

7    as I was getting indigestion, one, that this statement itself,

8    given the heavy redactions -- if we didn't have the redactions

9    in the next two paragraphs, you might have a little stronger

10   argument.  But this statement in 3 is not an incriminatory

11   statement.  Two, it is not genuinely in dispute.  Three, it is

12   evidence that is coming in in another form before the jury.

13   Four, it is a statement that the defendant made in his

14   confession.  Five, it was a statement that he did not put in

15   the category of being false, or being not true, when he said

16   there are some things that are true and some things that are

17   false.  And logic would dictate that if he is standing before

18   the court saying some things were true and some things were

19   false, there would be some incentive for him to say what it is

20   was in his confession that he is now denying if he did not want

21   them to attribute it to him.  He did not do that.

22           So it seems to me that they still have -- I don't know

23   why he was released.  We know he got out.  They want to say --

24   and I think he was released weeks before the attack at issue.

25   In fact, my reading of the circumstances under which he was

released, even in the indictment, it basically says that the Israeli defense forces told the Palestinian Authority to arrest him. They said that he is getting ready to do a terrorist attack.

They go and arrest both of them. When they arrest them, they have got no bounds. That seems to be what the facts are. It says right here that the defendant removed the above-mentioned explosive belt from Mohammed Hashaika person before the two were arrested. So I have got a scenario here where the Israeli forces are saying these guys are getting ready to do a terrorist attack. They tell the Palestinian Authority to arrest him. They in fact arrest him. When they arrest him, the guy has got nothing on him, and at some point they release him.

Do I know whether or not that means they released him to give him another bomb so he can do another terrorist attack? I don't know. You guys have more of the facts before you than before me and the jury so far, and you know what is a reasonable inference to draw and not a reasonable inference to draw. On top of that, I can't conclude that this document is coming in otherwise redacted with this mere statement 3 saying that following the arrest they were released.

This is not like the other statement. There is another situation where I know you genuinely dispute whether he was released or whether he escaped. I understand that. That's

F1E8SOK4

1    to be fought out before the jury if you think it's important

2    and you need to fight it out.  That's not this.  I don't hear

3    you saying the jury is getting some false impression about what

4    occurred.

5              Apparently they get arrested.  Apparently they

6    released him.  They may have released him because they didn't

7    have any evidence against him or they may have released him

8    because they were setting off to do a terrorist attack.  I

9    don't know why they released him.  And anything that indicates

10   that they released him for some criminal reason has been

11   redacted from this document.

12             That's my analysis.

13             MR. ROCHON:  I understand the court's ruling.  I don't

14   think it's essential to your ruling but the defendants contend

15   he was released for bad reasons.  It will come in another

16   conviction.  I just want you to know we have -- there may be a

17   dispute whether he escaped or not, but I don't think that's

18   what is essential to your ruling.  I understand your ruling.

19             THE COURT:  Is there a dispute as to whether he

20   escaped or not?

21             MR. ROCHON:  Yes.

22             THE COURT:  You have evidence that he escaped?

23             MR. ROCHON:  Yes.

24             THE COURT:  You never said that.

25             MR. ROCHON:  I think in our disclosures of witness

F1E8SOK4

1    testimony --

2            THE COURT:  You never said that to me.  You said it to

3    me about the other guy.

4            MR. ROCHON:  It didn't come up with this one.  I have

5    heard your ruling and I don't think that point is what is

6    critical to it.

7            THE COURT:  That's important to my ruling too.  If you

8    say there is a genuine factual dispute with regard to whether

9    or not they were released because you have contrary evidence

10   that they escaped, then I would like to know what that is.  I

11   may give that some weight.  Unless you don't want to give me

12   that.

13           MR. ROCHON:  One thing I want to be clear with you

14   about is they have another conviction of Abdel Karim Aweis

15   where he says he got him out.  I can't keep that out because he

16   is talking about what he did.

17           THE COURT:  The reality is, even if they have a

18   statement in an indictment or even a statement by this

19   individual that he was released, it still begs the question of

20   who released him.  I don't know if he was released by Arafat or

21   whether he was released by some rogue guard who decided that he

22   didn't think this person should go to jail for the things they

23   accused him of and he opened the gate and let him go.  You guys

24   know better what you're going to fight about or whether or not

25   that's going to be a determinative issue in this case.

F1E8SOK4

1          In my analysis, with regard to the nature of the

2     objection you're making now, just to exclude that one sentence,

3     and the grounds for that, in going through all these documents

4     over lunch I don't think there is a basis to do that.

5          MR. ROCHON:  I want to thank the court for letting me

6     raise it and taking the time to address it.

7          THE COURT:  Mr. Yalowitz, anything you want to add to

8     try to talk me out of the ruling?

9          MR. YALOWITZ:  If your Honor is ready, we would like

10     to resume the testimony as soon as possible.

11          THE COURT:  That's right now.

12          MR. YALOWITZ:  I think you have been more than

13     indulgent with these defendants.

14          THE COURT:  Let's get your witness back.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

F1E8SOK4

 1              (Jury present)

 2    NICHOLAS KAUFMAN, resumed.

 3              THE COURT:  Mr. Yalowitz, you may continue.

 4              MR. YALOWITZ:  Thank you, your Honor.

 5    BY MR. YALOWITZ:

 6    Q.  Mr. Kaufman, we were on -- bear with me one second.  I just

 7    want to put up that picture.

 8              We were on Shawish.  As I recall, you had taken the

 9    jury to the verdict and you were just about to show them what

10    happened in the indictment.  So maybe you can take them to

11    where they need to be in the indictment.

12    A.  Maybe we can have a brief recap.

13              This was the case where the defendant himself was

14    conducting the questioning and decided in the middle of the

15    examination of one of the witnesses to confess to the March 21,

16    2002 attack.  He said he wanted to tell the truth, tell the

17    court what things are true and what things are not true.

18              That's to be found on page 77, at tab A, of Nasser

19    Shawish, right at the bottom.

20    Q.  And then?  I didn't mean to interrupt you.

21    A.  Then on the basis of his version of events with respect to

22    this particular attack, the military prosecutor asked the court

23    to convict him.  And that can be found on page 78, the middle

24    paragraph there.

25    Q.  OK.  Great.

F1E8SOK4

1    A.  Then if you turn to page 80, you will see that the court

2    convicts him.  The count which is relevant to the attack of

3    March 21, 2002, is Count 25.  The judges state that his

4    confession and their finding of guilt is subject to the

5    description given by the defendant himself, that description

6    which you saw earlier on page 78.

7              And if you want to see the actual content of that

8    count, 25th count, you can now open up to tab B.

9    Q.  So let's turn to tab B and see what that document says.

10             Where do we find that 25th count?

11   A.  It's a weighty document.  There are many criminal offenses

12   that he pled guilty to.  But the one of relevance here is to be

13   found on page 21.  If you look right at the numbers at the

14   bottom.

15   Q.  Bear with us.  Page 21.

16   A.  In the middle of the page you will see 25th count.

17   Detailed incident file 2069/02, Special Duties Department,

18   Jerusalem.

19   Q.  What are those numbers?

20   A.  The first one is the case file.  The special duties

21   department is, I suppose you could say it's a bit like the FBI.

22   They are specialists, serious crime investigators.

23   Q.  Now, I will ask you to read out paragraph 2 on page 21

24   under the 25th count.

25             Actually, you could read paragraphs 2 and then on the

F1E8SOK4

1    next page paragraph 3 to the jury.

2    A.    "The defendant travelled together with Mohammed Hashaika

3    from Nablus to Tulqarm.  During the trip, the defendant

4    understood that Mohammed Hashaika was carrying on his person a

5    belt with an explosive device, with the aim of carrying out a

6    suicide terrorist attack.  The defendant and Mohammed Hashaika

7    were unable to enter Tulqarm, which was surrounded by Israeli

8    Defense Forces troops, and were also arrested by the Preventive

9    Security Service of the Palestinian Authority, after they were

10   informed by Israeli sources that the defendant and Mohammed

11   Hashaika intended to carry out a suicide terrorist attack.

12   Before the two were arrested, the defendant removed the

13   above-mentioned explosive belt from Mohammed Hashaika's person.

14        "Following their arrest, the defendant and Mohammed

15   Hashaika were transferred by the Palestinian Authority to

16   Ramallah and there released."

17        MR. YALOWITZ:  With your Honor's permission, I think I

18   will take over on paragraph 4.

19        THE COURT:  Sure.

20   Q.   "Following their release, Mohammed Hashaika contacted the

21   defendant and another person and informed them of his

22   willingness to carry out a suicide attack.  The defendant and

23   the other person agreed to prepare Mohammed Hashaika and to

24   equip him with everything necessary for the purpose of carrying

25   out a suicide attack within the State of Israel."

F1E8SOK4

1              "Mohammed Hashaika told the defendant and another

2    person that he had been approached by another person who

3    proposed to send Mohammed Hashaika to carry out a suicide

4    attack."

5              Let me take you to paragraph 6, Mr. Kaufman, and ask

6    you to read that one to the jury.

7    A.   "The defendant found a rented apartment in Ramallah, in

8    which he and his accomplices were to prepare the planned

9    suicide terrorist attack."

10             MR. YALOWITZ:  May I go forward, your Honor?

11             THE COURT:  Yes.

12   Q.   Paragraph 7:  "The defendant took another person and

13   Mohammed Hashaika to the said apartment.

14             "At the request of another person, the defendant

15   recruited another individual, a resident of Asira

16   Ash-Shamaliya, to carry out the above-mentioned suicide

17   terrorist attack, after the defendant and another person

18   decided that there would be two suicide terrorists, a man and a

19   woman, who would carry out a double suicide terror attack, with

20   the aim of causing the deaths of as many Israeli civilians as

21   possible.  Another person also arrived at said apartment."

22             "In the said apartment, at the defendant's request,

23   photographer, blank, filmed with a video camera Mohammed

24   Hashaika and another individual prior to their carrying out the

25   planned suicide terrorist attack."

F1E8SOK4

 1          "At this stage, the defendant decided that he did not

 2     want another individual to take part in carrying out the

 3     suicide terrorist attack and he informed her family as to their

 4     daughter's intentions.  As a result, that person returned to

 5     the Nablus area, from which she fled, to Jordan."

 6          Paragraph 11:  "Another person contacted the office of

 7     blank and brought explosives from there.  From the said

 8     explosives, blank produced an explosive device for the purpose

 9     of carrying out the planned suicide terrorist attack."

10          "Subsequently, the defendant and another person

11     prepared the explosive belt.

12          "For the purpose of transporting Mohammed Hashaika

13     into the State of Israel to carry out the planned suicide

14     terrorist attack, the defendant enlisted another person, who he

15     had previously met through his fiance."

16          "On March 20, 2002, the defendant met in Ramallah with

17     someone else.  The defendant informed another person that

18     someone was about to send a suicide terrorist to carry out a

19     suicide terrorist attack within the State of Israel."

20          Bear with me, your Honor.

21          Let's go to paragraph 16.

22          I am sorry.  Let's go to paragraph 15.

23          "On March 21, 2002, the defendant met in Ramallah with

24     another person.

25          "On that same day the defendant, another individual

F1E8SOK4

1    and Mohammed Hashaika visited the offices of someone else.

2    There another person received from that someone money and two

3    hand grenades for the purpose of executing the planned

4    terrorist attack.

5         "With the said money, the defendant and his

6    above-named accomplices purchased clothes for Mohammed Hashaika

7    in which the later carried out the suicide terrorist attack

8    which will be described below."

9         "Subsequently, the defendant and his above-named

10   accomplices came to the apartment in Ramallah at which were the

11   above-named Mohammed Hashaika and other persons.  Those other

12   persons prepared Mohammed Hashaika to carry out the planned

13   suicide terrorist attack and, together with the defendant, they

14   dressed him in the above-mentioned explosive belt."

15        Let's go to page 25, paragraph 21.

16        "During the afternoon, on March 21, 2002, the

17   defendant drove from Ramallah to Qalandiya checkpoint in a

18   rented vehicle, taking with him Mohammed Hashaika, who wore the

19   above-mentioned explosive belt, and two other individuals who

20   accompanied the above-named suicide terrorist."

21        "Subsequently, after parting from Mohammed Hashaika

22   with a kiss, the defendant returned to Ramallah.

23        "Two individuals took Mohammed Hashaika, carrying on

24   his person the above-mentioned explosive belt, to King George

25   Street in Jerusalem.  The two chose the place since it is full

F1E8SOK4

1    of people during the afternoon."

2         "After two persons left Mohammed Hashaika on King

3    George Street, Muhammad Hashaika came to the crosswalk adjacent

4    to the Aroma cafe, near the corner of King George and

5    Hahistadrut Streets."

6         Mr. Kaufman, perhaps you can do paragraph 25.

7    A.  25.  "At the said location, at approximately 4:20 p.m. on

8    said day, Mohammed Hashaika set off the explosive device,

9    carried on his person, while in the crowd of people, with the

10   aim of causing the deaths of as many civilians as possible."

11   Q.  I would also like to take you to 26.

12        MR. YALOWITZ:  With the court's permission, I will

13   read that one.

14        THE COURT:  Yes.

15   Q.  "After the defendant and his accomplices were informed of

16   the execution of the planned suicide terrorist attack, the

17   defendant passed a videotape with the recorded testament by

18   Mohammed Hashaika to a journalist."

19        I will take you also to paragraph 28, with the court's

20   permission.

21        "For his participation in carrying out the

22   above-mentioned suicide terrorist attack, the defendant

23   received the sum of 1,200 shekels."

24        Mr. Kaufman, are there other counts of this indictment

25   concerning the March 21, 2002 attack?

F1E8SOK4

A.   Yes.   Members of the jury, there are indeed.   Let me
explain what happens.

         This is Count 25.   Right at the end at paragraph 29,
you will see that this count relates to the March 21 attack but
also to the murder of Sergeant Major Gadi Shemesh.   You can see
his name highlighted in bold there on 29.

         And the 26th count, on the next page, page 26,
essentially adopts the same facts which are set out in Count
No. 25, but this time imputes to the defendant Nasser Aweis the
murder of Tzipora Shemesh, and notes at the very last line she
was in the fourth month of her pregnancy.

         Then Count 27, once again, adopts the same facts but
this time imputes to Nasser Shawish the murder of Yitzhak
Cohen, another individual.

         Then Count 28 adopts the same facts set out in Count
25, but this time imputes Nasser Shawish the offense of
attempting to murder 81 civilians.   You can see that in the
last two lines of the 28th count at the top of page 27.
Q.   Thank you.

         I'm sorry.   Did you want to do 29 as well?
A.   I suppose you can credit the prosecutor here in being
complete because in the 29th count he has charged Nasser
Shawish with malicious damage to property.   Once again for the
same facts set out in the 25th count, for all the damage which
was caused to the business premises in the district.

F1E8SOK4

1    Q.  Thank you, Mr. Kaufman.

2         MR. YALOWITZ:  Your Honor, I would like to move into

3    evidence Exhibit 246 as redacted in compliance with the court's

4    earlier rulings, which is a sentencing statement.

5         THE COURT:  Is it in the binder?

6         MR. YALOWITZ:  No, sir.  It's a sentencing statement

7    that this individual made immediately before he was sentenced

8    by the court for these crimes.

9         Exhibit 246.

10        THE COURT:  Any objection?

11        MR. ROCHON:  No, your Honor.

12        THE COURT:  I will admit it.

13        (Plaintiff's Exhibit 246 received in evidence)

14        MR. YALOWITZ:  May I approach?

15        THE COURT:  Yes.

16        MR. YALOWITZ:  We will put it up on the screen for the

17   jury.

18   Q.  Mr. Kaufman, are you familiar with Exhibit 246?

19   A.  I remember seeing this, yes.

20   Q.  Could you just remind the jury procedurally what is

21   happening at this moment in the case of Nasser Shawish?

22   A.  Well, I have to be honest, I know where we are now from the

23   context of the proceedings, but on the basis of this alone I

24   wouldn't be able to tell you that this was a sentencing

25   hearing.  But it is in fact a sentencing hearing.

F1E8SOK4

1    Q.  I will so represent to you, Mr. Kaufman.

2    A.  So much has been blacked out.  Nevertheless, here we have a

3    hearing in front of a single judge, deputy president, Major

4    Netanel Benichou, and the defendant is making a confession and

5    we can see it there.  Nasser Shawish.

6          MR. YALOWITZ:  Let's see if we can enlarge it for the

7    jury so we can all see it.

8    Q.  "I was the organizer of five suicide terrorist attacks.  I

9    do not regret my actions."

10         Why don't we go to the next one, Mr. Kaufman.  Bear

11   with us.  We will put the chart back.

12         Who is the next one in your binder?

13   A.  It's Abdel Karim Aweis, the chap on the right-hand side.

14   Q.  Abdel Karim Aweis.

15         Why don't you break it down for the jury procedurally.

16   A.  If you turn to that divider, members of the jury, we have

17   tab A, tab B format.

18         Tab A, Exhibit 375, this is a transcript of a hearing

19   before three judges in the Beit El military court.

20   Q.  Where do we find the moment in time what he says and where

21   he is convicted?

22   A.  Well, if you see at the bottom of page 1, members of the

23   jury, after a break -- they have breaks as well in the military

24   courts -- the prosecutor comes back and announces we have

25   reached an arrangement in the case whereby the defendant will

F1E8SOK4

1    plead guilty to an amended indictment.

2                He also states, "And the prosecution undertakes not to

3    make use of the statements of the defendant today before the

4    court in other cases."

5                Then if you turn to page 3, you will see that the

6    court convicts the defendant of the offenses that are

7    attributed to him in the amended indictment.  That's just under

8    the little title Court Verdict in the middle of the page.

9                And of course we want to see what the amended

10   indictment is, so we turn to tab B.

11   Q.  All right.  Exhibit 356.

12   A.  That's correct.

13   Q.  The amended indictment of Abdel Karim Aweis.

14   A.  Yes.

15               And if you would, members of the jury, turn to page 34

16   of that document.  And in the middle of the page you will see

17   the 39th count and the case file number.  Once again, the

18   Jerusalem Special Duties Department, that's the file relating

19   to the March 21, 2002 terror attack.

20   Q.  Why don't we begin with paragraph 3 on page 35, Mr.

21   Kaufman.  If you could read that out while the jury follows

22   along.

23   A.  Yes.  It states as follows:  "In early March 2002, Mohammed

24   Hashaika was remanded in the Mukta'ah complex of the

25   Palestinian Authority in Ramallah."

F1E8SOK4

1    Q.  May I just stop you there.

2            What is that Mukta'ah complex?

3    A.  Well, I believe it's the headquarters of the Palestinian

4    Authority.  It's where Yasser Arafat used to live and work

5    from.

6    Q.  All right.  So Mohammed Hashaika was remanded in the

7    Mukta'ah complex of the Palestinian Authority in Ramallah.

8            If you could continue.  Thank you.

9    A.  "Following the request of the defendant, who is the general

10   intelligence of the Palestinian Authority (sic)", because I

11   believe there is a mistake there, "Mohammed Hashaika was

12   released from the said remand."

13   Q.  Why do you believe that's an error?

14   A.  It doesn't make sense in English.  If you would let me

15   check the Hebrew, I can probably tell you the exact way it

16   should have been translated, unless the mistake is in Hebrew as

17   well.  But it strikes me as it ought to be the general

18   intelligence officer, but let's have a look.

19           Please give me one moment, Mr. Yalowitz.

20   Q.  Sure.

21   A.  In fact, the mistake is also in Hebrew.

22   Q.  All right.  So that's something that I will be able to

23   clear up as the trial goes along.

24   A.  Would you like me to read it in Hebrew?  I can if you want.

25   Q.  I don't think it will be helpful to the jury.

F1E8SOK4

```
 1              Let's just have it in mind, "following the request of
 2    the defendant."  My suspicion, based on other things, is that
 3    we will be able to clear it up --
 4              MR. ROCHON:  Objection.
 5              MR. YALOWITZ:  We will be able to clear it up.
 6              THE COURT:  Let's just move on.
 7    Q.  "Mohammed Hashaika was released from the said remand."
 8              All right.  After his release --
 9              MR. YALOWITZ:  May I continue, your Honor?
10              THE COURT:  Yes.
11    Q.  "After his release, Mohammed Hashaika contacted the
12    defendant and another person and announced his wish to carry
13    out a suicide attack.  The defendant and another person agreed
14    to prepare Mohammed Hashaika and equip him with all measures
15    required to carry out the suicide attack inside the State of
16    Israel."
17              Let's turn to paragraph 5.  "The defendant promised to
18    another person that he would act to have the latter released
19    from custody in the Palestinian Authority if he would be
20    arrested following the execution of the planned attack."
21              Paragraph 6:  "The defendant and another person
22    convinced Mohammed Hashaika not to believe the Palestinian
23    Authority intelligence officer out of fear that he would hand
24    him over to Israel.  The defendant and another person convinced
25    Mohammed Hashaika that they would take care of everything to
```

F1E8SOK4

1  send him to carry out a suicide attack."

2          Paragraph 8:  "Another person led the defendant and

3  Mohammed Hashaika to the said apartment."

4          "At the request of the defendant, another person

5  recruited a third person to carry out the above-mentioned

6  suicide attack after the defendant and another person decided

7  that there would be two suicide terrorists, a man and a woman,

8  who would carry out a double suicide attack with the intent of

9  causing the death of as many Israeli civilians as possible."

10          Paragraph 10.

11          MR. YALOWITZ:  Let me skip 10 because it doesn't

12  concern the defendant in this one, your Honor.

13  Q.  Paragraph 11:  "The defendant guided Mohammed Hashaika to

14  detonate his charge and cause the deaths of as many Israeli

15  civilians as possible.  The defendant clarified to Mohammed

16  Hashaika that if he would be arrested he would have to detonate

17  his charge on the spot and that the main thing, that he would

18  kill a Jew, at least one, but he would nonetheless kill."

19          Paragraph 13, on page 37:  "The defendant contacted

20  another person and brought explosives from there.  The

21  defendant used those explosives to make an explosive device for

22  carrying out the planned attack.

23          "Thereafter, the defendant and another person made the

24  explosive belt."

25          "The defendant recruited another person for conveying

F1E8SOK4

1    Mohammed Hashaika into the State of Israel for carrying out the

2    planned suicide attack."

3              Let me go to paragraph 18.

4              "On March 21, 2002, the defendant met two other

5    persons.  The defendant explained to one of them that she would

6    have to transport the suicide terrorist into Jerusalem for him

7    to carry out the planned suicide bombing because she was

8    closely familiar with Jerusalem and the roads leading to it.

9              "That day, the defendant, another person and Mohammed

10   Hashaika visited the offices of a third person.  Defendant

11   received from that third person money and two hand grenades for

12   executing the planned attack.

13             "The defendant and his above-mentioned colleagues

14   purchased, using this money, clothes for Mohammed Hashaika,

15   with which the latter carried out the suicide attack, which is

16   described below."

17             Let me take you to paragraph 24.

18             "At noontime, on March 21, 2002, another person drove

19   Mohammed Hashaika, who was carrying the above-mentioned

20   explosive belt on his person, and two other individuals who

21   accompanied the above-mentioned suicide terrorist from Ramallah

22   to the Kalandia checkpoint.

23             "Thereafter, after he parted from Mohammed Hashaika

24   with a kiss, that other individual returned to Ramallah."

25             Let me ask you, Mr. Kaufman -- actually, we can do it

F1E8SOK4

1    this way.

2            Ladies and gentlemen of the jury, with the court's

3    permission, I will direct you to paragraph 28, which we have

4    seen before, and you can read to yourselves what happened at

5    4:20 p.m. on that rainy afternoon.

6            MR. ROCHON:  Your Honor, Mr. Yalowitz is not a witness

7    in this case.

8            THE COURT:  Mr. Yalowitz.

9            MR. YALOWITZ:  I withdraw it.  I direct the jury to

10   paragraph 28.

11   Q.  Mr. Kaufman, have you had the opportunity to review this

12   indictment before your testimony here today?

13   A.  Yes, I have.

14   Q.  Could you summarize for the jury the number of counts of

15   murder?

16   A.  Well, it's the same --

17   Q.  I'm sorry.  The number of counts of murder with respect to

18   the March 21 attack.

19   A.  Well, you can see, once again, it's the same format as in

20   Nasser Shawish's indictment.

21           You will see at the foot of Count 39, paragraph 31,

22   that Abdel Karim Aweis was convicted of murdering first

23   sergeant Gadi Shemesh.

24           In the 40th count he was convicted of murdering

25   Tzipora Shemesh, who you remember was four months' pregnant.

F1E8SOK4

1              In the 41st count he was convicted of murdering

2     Yitzhak Cohen.

3              In the 42nd count, Abdel Karim Aweis was convicted of

4     attempting to murder 81 people.

5              In the 43rd count, just as in the previous count, he

6     was convicted of causing malicious damage to all the property

7     on King George Street.

8              MR. YALOWITZ:  Your Honor, at this time I would like

9     to move the admission of Exhibit 376 as redacted in accordance

10    with the court's earlier rulings, which is a sentencing

11    statement by Abdel Karim Aweis.

12             THE COURT:  It will be admitted.

13             (Plaintiff's Exhibit 376 received in evidence)

14             MR. YALOWITZ:  Thank you.

15             May I approach?

16             THE COURT:  Yes.

17             MR. YALOWITZ:  Thank you.

18             Your Honor, may I direct the jury's attention to the

19    statement of Abdel Karim Aweis on the third page of Exhibit

20    376.

21             THE COURT:  Yes.

22             MR. YALOWITZ:  Thank you.

23    Q.  The defendant in his last comment:  "I am proud of the acts

24    that I have committed."

25    A.  That's correct.

F1E8SOK4

```
1    Q.  Let's go to Sana'a Shehadeh in your binder.

2    A.  I think Kahira Sa'adi is next.

3    Q.  We are on Kahira Sa'adi.  Why don't you break down the

4    procedure of her verdict.

5    A.  Once again, tab A and B.

6    Q.  So if we go to tab A, we are on 349?

7    A.  That's correct.

8    Q.  Let's make sure everyone is there.

9    A.  Second paragraph down in the body of the page.

10   "Prosecutor, we have reached a plea bargain under which I

11   request amendments be made in the body of the indictment."

12            Then the judges allow that amendment to take place.

13            Please turn over the page.

14            On page 2, members of the jury, very last line.

15   Kahira Sa'adi confirms the word of the lawyer and she admits to

16   the counts in the amended indictment.

17            On the basis of that admission, if you look at the

18   next page, very first two lines:  Based on her admitting to the

19   charges, we convict the defendant of the offenses attributed to

20   her in the amended indictment.

21            And you will find that amended indictment, members of

22   the jury, at tab B.  It consists of one charge, one count,

23   accessory to causing intentional death.

24            Let me just check the Hebrew.  Yes.  Accessory.  We

25   would call it aiding and abetting.  It's the same thing.
```

F1E8SOK4

1    Q.  Can we take the jury to the first count.  Is that where you

2    were going to take them?

3    A.  Yes.

4              MR. YALOWITZ:  I best read this out, your Honor.

5              THE COURT:  Yes.

6    Q.  We are on page 1, ladies and gentlemen, under Details of

7    the Offense.

8              "The defendant, who resided at the Jenin refugee camp,

9    moved to A-Ram with her family at the beginning of 2002."

10             "When she was in Ramallah, the defendant and her

11   husband, whose name is blank, met with another individual, a

12   Palestinian police officer, who was responsible for carrying

13   out dozens of attacks in the area and in Israel and who had

14   also moved his activities and residence from the Samaria area

15   to the Ramallah area."

16             "After the meeting the defendant and her husband blank

17   visited the home of this individual several times.  During

18   these meetings, another individual suggested to the defendant

19   that she accompany suicide bombers to Jerusalem, to the place

20   where the attacks would be carried out, and thereby cause the

21   deaths of many Israeli civilians.  The defendant agreed to help

22   this individual if she were to be asked."

23             "Later, following the death of another individual, the

24   brother of another person called the defendant and asked her if

25   she had heard about his death.  The defendant cried over the

F1E8SOK4

1    phone and apologized because she was unable to go to Ramallah.

2    Another individual planned to carry out the suicide bombing

3    through the suicide terrorist named Mohammed Hashaika, who was

4    wearing an explosive belt, in order to take a suicide terrorist

5    the place in Jerusalem where the attack would be carried out,

6    the military operative whose name is unknown here had recruited

7    another person."

8            "However, the military operative was concerned that

9    that person was afraid to carry out the attack, and another

10   person was also wearing traditional Arab clothing.  Therefore,

11   another person called the defendant and asked her to come to

12   Ramallah.  They met next to the Abu Rayah Hospital in Ramallah,

13   and another person was accompanied by another military

14   operative.

15           "In a small blue car parked next to them sat the

16   suicide terrorist Mohammed Hashaika, who was wearing the

17   explosive belt.  The driver of the car, another individual and

18   another individual sitting next to him, on the way to carrying

19   out the foregoing attack, told the defendant that in the car

20   were a terrorist on his way to carry out suicide attack and

21   another woman."

22           "Another individual asked the defendant to travel

23   together with the suicide terrorist and the young woman to

24   carry out the attack because the defendant was wearing pants

25   and her head was uncovered."

F1E8SOK4

1          "The defendant got into the car and sat in the back

2     seat next to the suicide terrorist.  Another person sat in the

3     front seat next to the driver of the car.  Another person gave

4     a copy of the Koran to the suicide terrorist.  About 200 meters

5     from the Kalandia checkpoint, the driver stopped the car and

6     kissed the suicide terrorist, and the defendant, together with

7     the suicide terrorist and the other individual, got out of the

8     car.

9          "The other individual hailed a taxi and asked the

10    driver to take them by the A-Ram checkpoint.  She paid the taxi

11    driver 50 shekels.  She even bought flowers, which she gave to

12    the suicide terrorist.  The defendant, the suicide terrorist

13    and the other individual crossed the A-Ram checkpoint on foot

14    while passing the IDF soldier check."

15         "Afterwards the three of them took another taxi and

16    the other individual asked the driver to take them to Jaffa

17    Street in Jerusalem because they wanted to celebrate Mother's

18    Day and because they don't have Israeli identity cards he

19    should drive them along roads where there were no IDF check

20    points."

21         "The defendant, the other individual and the suicide

22    terrorist walked along Jaffa Street looking for a crowded place

23    where the suicide terrorist could blow up the bomb and cause

24    the deaths of many civilians."

25         "While walking, the defendant told the other

F1E8SOK4

1    individual to walk behind them and not next to them because she

2    was wearing traditional Arab clothing so they would not look

3    suspicious."

4         "The defendant noticed that there were many people on

5    the street and told another individual that this was a good

6    spot for carrying out the suicide attack in order to cause the

7    deaths of many civilians.  The other individual agreed with the

8    defendant and sent the suicide terrorist to carry out the

9    planned attack."

10        "The suicide terrorist told the defendant to fall back

11   and he went to blow up the explosive belt he was wearing in

12   order to cause the deaths of many civilians."

13        "The defendant and the other individual hurried away

14   from the place and a few minutes around 4:20 p.m. the suicide

15   bomber triggered the explosive belt he was wearing in King

16   George Street in Jerusalem."

17        "As a result of the blast, three civilians were killed

18   and another 81 injured.  Massive damage was also caused to

19   property."

20        Let's go, Mr. Kaufman, to the last one in this March

21   21 binder.

22   A.  Yes.  Sana'a Shehadeh.

23   Q.  We are on Sana'a Shehadeh.

24   A.  Yes.

25        MR. ROCHON:  If we are turning to a new one, I would

F1E8SOK4

1    ask if I can briefly approach the bench on an issue.

2              I think it will be short.

3              (Continued on next page)

F1E8SOK4

1          (At the sidebar)

2          MR. ROCHON:  That last one, we missed one of the

3    redactions that should have been in.  There is a reference to a

4    Palestinian police officer.  This is an example of something we

5    got early this morning.  The Palestinian police officer should

6    have been redacted.  I waited for him to move to a different

7    exhibit, but I need to raise it as promptly as possible

8    afterwards.

9          MR. YALOWITZ:  I would like to be heard on this.

10          MR. ROCHON:  We think it should have been redacted,

11    and if the court is agreeing with us, our remedy is to ask that

12    it be redacted, not to instruct the jury now because it would

13    just highlight it.  Therefore, when they get their binders at

14    the end it won't be there.

15          The other thing I would say, we have not asked or

16    pressed about the words military operative to be redacted.  The

17    plaintiffs are going to contend that's a reference to the

18    Palestinian Authority police.  It appears in a lot of these,

19    your Honor.  So either they don't get to argue about the PA or

20    else we are going to have to take it out.  I don't think it's

21    fair to be in there.

22          THE COURT:  With regard to the police officer, I don't

23    know whether or not the evidence demonstrates that there was

24    such a police officer and the issue is whether or not that

25    police officer did this in the scope of their employ, or is

F1E8SOK4

1    there some dispute that he was a police officer?

2              MR. ROCHON:  I want to be careful not to get it wrong.

3              THE COURT:  Do you know?

4              MR. YALOWITZ:  I don't know either.

5              MR. ROCHON:  I am not asking for anything right now.

6    I need to raise it as soon as possible afterwards.  Then the

7    other thing, this military operative we are going to have to

8    talk about too.

9              MR. YALOWITZ:  I want to be heard on both things.

10             THE COURT:  Before we resolve it you will be able to.

11   You want to do it now?

12             MR. YALOWITZ:  We have the jury now.  I don't want to

13   do anything now.

14             THE COURT:  Then stop talking.

15             MR. ROCHON:  The third thing --

16             THE COURT:  You guys are just slowing us up.

17             MR. ROCHON:  Mr. Yalowitz is reading these in a very

18   dramatic manner, especially when he gets to really bad parts.

19   The documents aren't dramatic.

20             THE COURT:  You can read it in a non-dramatic manner.

21             (Continued on next page)

22

23

24

25

1           (In open court)

2           MR. YALOWITZ:  May I continue, your Honor?

3           THE COURT:  Yes, you can continue.

4           MR. YALOWITZ:   Thank you.

5    Q.  We're on the last one of this binder, Sana'a Shehadeh.

6    Will you break down this lady's verdict for the jury,

7    Mr. Kaufman.

8    A.  Yes.  In the last divider in this binder, tab A, Exhibit

9    342B, here we have a hearing in the military court.  And the

10   prosecutor once again, as previously, announces we've reached a

11   plea bargain.  Defense counsel confirms the fact that the plea

12   bargain's been reached.  The court allows the prosecutor to

13   amend the indictment.

14           Turn over the page please, members of the jury.  Page

15   nine at the bottom.  Defendant's lawyer says "I've explained

16   the amended indictment."  And then the defendant, and I quote,

17   "My defense attorney has explained the amended indictment to me

18   and I concur with her statement."

19   Q.  So where do we go to find the amended indictment,

20   Mr. Kaufman?

21   A.  The next document, Mr. Yalowitz, is to be found at B, and

22   that's where the court actually convicts the defendant of the

23   offenses attributed to her in the amended indictment.

24   Q.  Let's just make sure we're there.

25   A.  Tab B.

1    Q.   Okay.  We got it.

2    A.   Then tab C is the amended indictment, which is almost

3    virtually the same as that of Qahira Sa'adi, the previous lady.

4    And you can see it there, members of the jury, tab C, Exhibit

5    342, have a look at the first count.

6             MR. YALOWITZ:  Your Honor, with the Court's

7    permission, I think I will direct the jury to page three of

8    this amended indictment.

9             THE COURT:  Yes.

10             MR. YALOWITZ:  And once we're there, I'm going to take

11    the jury through the bottom paragraph on page three.

12             "The defendant gave the suicide terrorist a Koran.

13    About 200 meters before the Qalandiya checkpoint, the driver --

14    an unnamed individual -- stopped the car.  And the defendant

15    together with the suicide terrorist and another individual got

16    out of the vehicle.  The defendant caught a taxi and asked the

17    driver to drive them so as to bypass the A-Ram checkpoint, and

18    she paid the driver 350 shekels.  The defendant also purchased

19    flowers which she gave to the suicide terrorist.

20             "The defendant, the suicide terrorist, and another

21    individual passed the A-Ram checkpoint on foot, avoiding

22    examination by the Israeli Defense Forces troops.

23             "Subsequently the three got into another taxi, and the

24    defendant asked the driver to take them to Jaffa Road in

25    Jerusalem since they wanted to celebrate Mother's Day.  Since

F1E3SOKS                    Kaufman - direct

1    they didn't have an Israeli identity card, he should drive them

2    by roads where there were no Israeli Defense Forces

3    checkpoints."

4         I'm going to skip ahead to the area after the omitted

5    material.  "The defendants saw that there were many people in

6    the street, and consulted with another individual whether this

7    was a suitable place for carrying out a suicide terrorist

8    attack which would cause the deaths of numerous civilians.  The

9    other individual responded in the affirmative.  The defendant

10   agreed with this individual, and sent the suicide terrorist to

11   carry out the planned terrorist attack, and went to detonate

12   the explosive belt on his person so as to cause the deaths of

13   many civilians.

14        "The defendant and this other individual left the

15   scene, and a few minutes later, at around 4:20 p.m., the

16   suicide terrorist detonated the explosive belt on his person,

17   on King George Street, in Jerusalem.  As a result of the

18   detonation, three civilians were killed, and 81 others

19   wounded."

20        Your Honor, I would like to offer in evidence Exhibit

21   344, which is the statement that Sana'a Shehadeh made at her

22   sentencing.

23        THE COURT:  It will be admitted into evidence.

24        (Plaintiff's Exhibit 344 received in evidence)

25        MR. YALOWITZ:  May I approach?

1          THE COURT:  Yes.

2          MR. YALOWITZ:  Thank you.  We're on page six of 344.

3    Q.  Let's see what she had to say for herself at her

4    sentencing.  Why don't you go ahead and read it, Mr. Kaufman.

5    A.  "I made no mistake."

6          MR. YALOWITZ:  Now, your Honor, with the Court's

7    permission, we'll collect the binders for March 21, and we'll

8    go to the next tab.

9          THE COURT:  Let me give the jurors a break.  That will

10   be easier.  Ladies and gentlemen, just leave it on your seat.

11   We'll take a 10-minute break.  We'll continue in 10 minutes.

12   Don't discuss the case, keep an open mind.  I'll see you in 10

13   minutes.

14         (Jury excused)

15         THE COURT:  You may step down.

16         Mr. Yalowitz, did you want to be heard with regard to

17   issues at sidebar?

18         MR. YALOWITZ:  If the court is ever going to grant

19   relief on that, I do.  But if it was just making an idle

20   comment, then I don't need to be heard.

21         THE COURT:  He was saying that he first raised the

22   issue of redaction.

23         MR. YALOWITZ:  Right.  So, look, I mean, I thought we

24   were done with the redactions.

25         THE COURT:  I thought so too, but they did they raise

F1E3SOKS                      Kaufman - direct

1     this objection to you.

2                MR. YALOWITZ:  They did not.  They may have -- well,

3     let me consult, your Honor, before I say no.

4                MS. PILDIS:  That specific page and line?  No.

5                MR. YALOWITZ:  No, sir.  That was not raised with me.

6     With my team.

7                THE COURT:  Is this something that both sides

8     overlooked?

9                MR. ROCHON:  I actually think so, because they have

10    been diligent in removing other references to police by name.

11    Again, I just want to be clear, I'm not saying --

12                THE COURT:  Can we close that door.

13                MR. YALOWITZ:  I just feel like --

14                THE COURT:  Let him finish.  I can resolve this

15    quickly.

16                MR. ROCHON:  I think they got it for almost all of

17    them.  I think this one was missed.  Where there is a direct

18    reference to PA police, they've been redacting.  We missed

19    this -- they missed this one, we raised it as an issue.  We

20    clearly raised it as an issue.  It has been redacted, many of

21    them.

22                THE COURT:  You both overlooked this.

23                MR. ROCHON:  We got this version after the changes

24    early this morning.

25                THE COURT:  No.  I assume this was like this all the

F1E3SOKS                        Kaufman - direct

1    time.  So you overlooked it today, yesterday, last week, last

2    month, whatever you got.

3             MR. ROCHON:  Conceptually we've raised this issue.

4             THE COURT:  Not conceptually.  You never objected

5    specifically to this one.  You overlooked it, they overlooked

6    it, you overlooked it.

7             MR. ROCHON:  I think that's fair.  I can say I

8    certainly did not or my team did not raise this page, that

9    reference.  We raised the concept.

10            THE COURT:  What do you want me to do about it?

11            MR. ROCHON:  My only --

12            THE COURT:  I don't know where this is going to be an

13   issue.  I don't know if it is referencing somebody that both

14   sides know who is being referenced.  I don't know what the

15   import of that is.  I don't know whether the issue for the jury

16   would be whether or not this is a police officer -- please,

17   have a seat everyone, ladies and gentlemen, until we're

18   finished with court.  Have a seat, please.

19            So you want to make it conspicuously absent the next

20   time they see it?  You tell me what you think.  I don't know

21   what difference it will make at this point.  I don't know what

22   the evidence is.

23            MR. ROCHON:  So, your Honor, we would ask, first of

24   all, what I want.  I'll tell you that.

25            I'd like it redacted from the binders before they

F1E3SOKS                           Kaufman - direct

1    would go to the jury for deliberations.  I'm not asking for an

2    instruction now.  That's really all I can do now.  And then the

3    plaintiffs should not be allowed to argue that this person was

4    a Palestinian officer.  I'm not asking for anything else right

5    now.  I'm not asking to instruct the jury or strike testimony.

6    I'm asking that it not be referenced in closing, and when they

7    get the binders, it is not there.

8              Frankly, let's all be clear.  They've got a lot of

9    information today.  So odds are, my calculus is, odds are by

10   closing, we're all going to be trying to refresh them as to

11   what was in evidence, and we can take care of it.

12             THE COURT:  Mr. Yalowitz, did you intend to redact

13   this sort of statement and just inadvertently did not?

14             MR. YALOWITZ:  Why doesn't Ms. Pildis cover this, your

15   Honor.  Ms. Pildis.

16             MS. PILDIS:  Sure.

17             MR. YALOWITZ:  My issue is a process issue, your

18   Honor.  But let's get an answer to your question.

19             THE COURT:  Trying to be fair about this, guys.

20             MR. YALOWITZ:  The fair thing is to stop with the

21   redactions.  We have gone --

22             THE COURT:  If you made an error and I think it is

23   prejudicial to them, that's why I asked you, is this the kind

24   of thing you've been redacting and did you just make an error

25   in not redacting this portion.

F1E3SOKS                         Kaufman - direct

1          MS. PILDIS:  As a general rule, we did redact the

2     words the "Palestinian police officer" in this type of

3     situation.

4          THE COURT:  I would assume.  So I assume this was

5     inadvertent rather than deliberate.

6          MS. PILDIS:  This is the first time -- right now is

7     the first time I'm specifically considering this page.  But,

8     yes, based on my quick read of it right now, I believe this was

9     an error.

10         THE COURT:  All right.  If this was a mutual mistake,

11    then I'll consider that we do something about it, if it is

12    worth doing something about it before this gets in the jury.

13    If you want to redact it, go ahead and redact it.  Then go

14    ahead and redact it and do the page.  If you want to fight

15    about it later, we can fight about it later in the context and

16    what's really relevant and determinative in this case.

17         But, it seems to me the fair thing to do is if it was

18    intended to have been redacted, and it wasn't, it was a mutual

19    mistake, and it should be redacted.

20         MR. YALOWITZ:  Here's my problem, your Honor.  We

21    had -- I am going to be very candid.  We had a conversation

22    with the Court on December 16 in which the Court admonished the

23    defendants if you have redactions that you want, you,

24    defendants, it is the responsibility of you to come and explain

25    to the plaintiffs what redactions you want.  Don't wait until

F1E3SOKS                        Kaufman - direct

1    they give you theirs.

2            THE COURT:  I understand, Mr. Yalowitz.  That's

3    neither here nor there.  I'm not trying to put fault on either

4    side.  You're both at fault.  If this is what you intended to

5    do that you thought was consistent with my ruling and you

6    inadvertently did that, I can't fault them for that part of it.

7    I can't fault them for not finding it.  But neither one of you

8    did.  Both of you would have agreed, had we discussed this

9    earlier, that it should have been redacted.

10           So I wish the both of you would stop throwing mud at

11   each other and start dealing with the substance of the issue.

12   I couldn't care less what their motive is.  I'm not here to

13   blame you or them.  I'm here to resolve the issue.

14           MR. YALOWITZ:  We are going to redact this as

15   Ms. Pildis described.  We are going to redact it.

16           THE COURT:  End of issue.

17           MR. YALOWITZ:  I want to be very clear about

18   something.  We've got other documents that the Court has

19   ordered redacted.  We are going to give those to the

20   defendants.  And we are going to wait for them to propose

21   redactions.  We are not going to reredact and rereredact.

22           THE COURT:  Mr. Yalowitz, that's fine and dandy for

23   you to say that.  It goes in one of my ears and out the other.

24   That's not my issue.  My issue is I told you how I wanted it

25   redacted.  I expect it to be redacted that way.  I told them if

F1E3SOKS                          Kaufman - direct

1     they got a problem, they better let me know.  All right.  And I

2     deal with all the issues in that context.  This is not that

3     issue.

4             MR. YALOWITZ:  All right.  Let's move on.

5             THE COURT:  This is mutual mistake.  Let's not waste

6     time on this.

7             MR. YALOWITZ:  I agree with you.  Let's move on.

8             THE COURT:  You had that other issue.

9             MR. ROCHON:  I am not sure we need to take jury time

10    on it right now.

11            THE COURT:  We're taking your time, not theirs.

12            MR. ROCHON:  Okay.  There is a lot of references to

13    people by the words "military operative" in these documents.

14    It comes up six --

15            THE COURT:  As a matter of fact, the context that I

16    remember it coming up I think, let's see, I think I noticed

17    the --

18            MR. ROCHON:  It is in a lot of them, Judge.

19            THE COURT:  But the most of the references I saw or a

20    number of references I saw were with regard to the Al Aqsa

21    Brigade.

22            MR. ROCHON:  Sometimes it is there.  A lot of times it

23    is so-and-so military operative or something.  If it is

24    reference to Al Aqsa Brigades, then frankly --

25            THE COURT:  Where do you say it's referenced?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1E3SOKS                    Kaufman - direct

1          MR. ROCHON:  I want to make sure they don't argue that

2     when it says "military operative," that that's a reference to

3     someone in the PA military.

4          THE COURT:  Is there something in this record that

5     would support that conclusion?  Did a witness have an

6     opportunity to say that?

7          MR. ROCHON:  Because I didn't want to take it out of

8     all of them.

9          MR. YALOWITZ:  I think they did want to take out all

10    of them and we said no.

11         THE COURT:  Is this some generic phrase or is this an

12    actual phrase that refers to a unit of the PA?

13         MS. PILDIS:  I don't think that anyone can identify an

14    individual based on that language.  And therefore, we thought

15    it was consistent with your Honor's ruling not to redact it.

16         THE COURT:  Is this a generic term or is this a

17    reference specifically to some official unit of the PA?

18         MS. PILDIS:  It is a generic term.  I can't relate it

19    to anything specific.

20         MR. ROCHON:  That takes care of it.

21         THE COURT:  As long as it is a generic term, then we

22    can leave it at that.  Okay.  All right.  And why don't you

23    take a break and then I'll give you five minutes.

24         MR. ROCHON:  Thank you, your Honor.

25         (Recess)

F1E3SOKS                    Kaufman - direct

1           THE COURT:  Everybody ready?

2           MR. ROCHON:  Yes, sir.

3           THE COURT:  Let's bring in the jury.

4           (Jury present)

5           THE COURT:  You can continue, Mr. Yalowitz.

6           MR. YALOWITZ:  Thank you, your Honor.

7           Does the jury have July 31, 2002, Hebrew University?

8     Great.  Great.  Thank you.

9     BY MR. YALOWITZ:

10    Q.  All right, Mr. Kaufman, why don't you take us to the

11    conviction of Abdullah Barghouti of Hebrew University, and

12    let's see if we can break it down for the jury.

13    A.  Okay.  So if you would, members of the jury, please open up

14    the divider which says Barghouti Abdullah.  Tab A.  Here we

15    have once again a transcript of a hearing before the Beit El

16    military court.

17          Here we're in a remand hearing, which is a custody

18    hearing, and they ask for the charges to be put.  The

19    prosecutor asks for the charges to be put to the defendant.

20    And that was done.

21          Defense counsel stood up, and please look at the

22    bottom of the page.  Defense counsel says as follows: "I've

23    explained the indictment to my client.  He understands it and

24    requests to plead guilty to it."

25          Turn over the page please, members of the jury.  Right

F1E3SOKS                     Kaufman - direct

1   at the top, the defendant himself then says "I confirm the

2   words of my defense counsel and plead guilty to that which has

3   been attributed to me in the indictment."

4          And then verdict.  The judges state as follows:

5   "Based on the guilty plea to the charge, we convict the

6   defendant of the offenses that are attributed to him in the

7   indictment."

8          There was no plea bargain here, members of the jury.

9          Yes.  Then, if we want to see what that indictment

10  looks like, that unadulterated and unamended indictment, please

11  turn to tab B.

12  Q.  That's Exhibit 452?

13  A.  Yes, Mr. Yalowitz.

14  Q.  Thank you.

15         Now I'd like you to take the jury through Exhibit 452

16  in some detail.  So, if I could ask you to begin with the

17  second count and just describe for the jury what that count is.

18  A.  This is a count of membership in an unlawful association.

19  Q.  Let me read -- let me ask you to read the nature of the

20  offense and the first three paragraphs of the details of the

21  offense and then I am going to ask you something about it.

22  A.  Okay.  "The above-mentioned defendant in the area from

23  May 2001 until the day of his arrest, was a member or acted as

24  a member of an unlawful association as follows:

25         "The above-mentioned defendant during the period set

F1E3SOKS                    Kaufman - direct

1   forth was a member of the Az-Adin Alqazzam Brigades, the

2   military arm of the Hamas Organization, which is an unlawful

3   association.

4           "The defendant, within the framework of his activity

5   in the military arm of Hamas, was responsible for manufacturing

6   explosive devices and training other individuals in the

7   manufacture of explosive devices.

8           In view of his success in the said function, the

9   defendant acquired the alias 'the Engineer.'"

10  Q.  Thank you very much, Mr. Kaufman.  Now, in your work as a

11  prosecutor dealing with security crimes, have you had occasion

12  to encounter the Hamas Organization?

13  A.  I have indeed.

14  Q.  Can you comment for the jury on the nature of that

15  organization as it relates to this particular offense?

16          MR. ROCHON:  Your Honor, excuse me, Mr. Kaufman.

17          Your Honor, I may not object.  I need a proffer from

18  counsel.  Can we either have a side bar between us or come

19  forward and see the Court?

20          THE COURT:  Why don't you talk to each other.

21          (Pause)

22          MR. ROCHON:  By counsel's representation, no problem.

23          THE COURT:  Good.

24  A.  Could you ask the question again, Mr. Yalowitz?

25  Q.  Sure.  What is Hamas?  What is the Hamas Organization in

F1E3SOKS                         Kaufman - direct

1    relation to this count of the indictment?

2    A.  It is a prohibited proscribed organization.  It is illegal

3    to be a member of such an organization.  It is not just in

4    Israel, by the way.  It is in the U.S. and in the European

5    Union.

6    Q.  Thank you.  I would like to direct you and the jury to the

7    35th count of this indictment which has got a stamp that says

8    P7:  40.  And there is a page 12 on the page right before it.

9    It is a little hard to find, so let's make sure everybody gets

10   to the 35th count at the bottom of -- the page doesn't have a

11   number.  But it says P7:  40 right at the edge.  It is right

12   after page 12.

13   A.  Yes.

14   Q.  I just want to make sure that all of our jurors are there

15   because this one is a little confusing, I'm afraid.

16           Could you tell us what the 35th count was.

17   A.  It states "Military training without possession of a

18   permit, an offense pursuant to Regulation 62 of the Defense

19   Regulations (Time of Emergency), 1945."

20           That was before the creation of the State of Israel.

21   This is in fact still a criminal offense, of course, in the

22   courts of West Bank, but it is a British provision when the

23   British ruled the territory there.

24           MR. YALOWITZ:  I just want to focus on the next page,

25   which is page 13.  And with the Court's permission, once the

1    jury is there, I'll read it out.

2             THE COURT:  Sure.

3             MR. YALOWITZ:  We're on page 13, count 34.  "The

4    above-mentioned defendant, at the time set forth, in an

5    apartment in Ramallah that served as a bomb laboratory,

6    administered military training to Operative A.

7             "During the said training, the defendant taught

8    Operative A to manufacture an explosive called Um Al Abed TATP,

9    electrical circuits for activating explosive devices, and

10    activation mechanisms for explosive devices consisting of a

11    clock, a remote control, and a cellular telephone handset.

12            "At the end of the training, the defendant transferred

13    to Operative A a bag with various materials that are used for

14    manufacturing explosives, and explosive devices, and a sheet

15    with the instructions for manufacturing them.  The defendant

16    introduced himself by the alias 'Engineer.'

17            "During the above-mentioned military training, the

18    defendant and Operative A were masked."

19    Q.  I also would like to direct your attention, Mr. Kaufman,

20    and ask you to take the jury to count 11, which is on pages

21    five and the unnumbered page that immediately follows it.  I'm

22    sorry.  Count 12.  Page five and the unnumbered page right

23    after page five.

24    A.  Yes, count 12.

25    Q.  All right.  What is count 12, if you could just give the

1    jury a little overview of the nature of the offense based on

2    the indictment there before them.

3    A.  Well, this was a very notorious incident.  Once again, it

4    is causing intentional death, that's murder.  The defendant's

5    role in this particular instance was manufacturing a large

6    explosive device that consisted of his hallmark, the hallmark

7    of this particular individual, Abdullah Barghouti, the use of

8    shampoo bottles filled with explosives.  You can see that in

9    paragraph two.  And then he put the improvised explosive device

10   into a guitar.

11           MR. YALOWITZ:  Let me, with the Court's permission,

12   read from paragraph three.

13           "Paragraph three.  The defendant inserted the

14   above-mentioned explosive device into a guitar that another

15   individual brought.  In addition to the above-mentioned

16   explosive device, the defendant put two plastic bags filled

17   with explosives inside the above-mentioned guitar.  In

18   addition, the defendant affixed screws inside the guitar using

19   glue.  The defendant sealed the opening of the guitar using

20   glass so its contents could not be seen.  The defendant

21   connected an activation mechanism to the above-mentioned

22   explosive device."

23           Your Honor, with the Court's permission, I'd like to

24   take the jury to paragraph 10 on next page.

25           THE COURT:  Yes.

1          MR. YALOWITZ: "On August 9, 2011, another individual

2     introduced an individual to the suicide terrorist who was

3     carrying the booby trapped guitar.  The suicide terrorist had

4     gotten a haircut before carrying out the planned attack and

5     wore clothes that were supposed to make him look like a Jew.

6          "Thereafter, another individual and the suicide

7     terrorist departed to carry out the planned attack."

8     Q.  And Mr. Kaufman, without mentioning the name of the suicide

9     terrorist, would you read paragraph 14 to the jury, please.

10     This is on the next page.

11     A.  Yes.  "At about 1:55 p.m., the suicide terrorist and

12     somebody entered the Sbarro Restaurant at the corner of Jaffa

13     and King George Streets which was then crowded.  There, the

14     suicide terrorist detonated the explosive device that the

15     defendant had prepared as described above, with the intent of

16     causing the deaths of as many people as possible."

17     Q.  And maybe just take them to the next one, too, Mr. Kaufman.

18     A.  "As a result of the explosion of the suicide terrorist with

19     the said explosive device, 15 people were killed, as will be

20     described in the next counts of the indictment."

21     Q.  Thank you.  Now I want to go back to November of 2001, and

22     take the jury to count 38, page 14.  If you could bear with us

23     one moment, Mr. Kaufman, until we get to page 14.  And if you

24     could read for the jury paragraph one.

25     A.  Yes.  Once again, "An incident of murder, causing

F1E3SOKS                         Kaufman – direct

1    intentional death.  The above-mentioned defendant during

2    November 2001 or thereabouts in Ramallah or thereabouts

3    manufactured explosives of Um Al Abed TATP type."

4              Would you like me to continue?

5    Q.   Yes.  I'm trying to see if we can, yeah, why don't you read

6    the next -- why don't you read two, and I'll continue from

7    there with the Court's permission.

8    A.   "Using these explosives, the defendant manufactured three

9    explosive devices.  The defendant inserted the first explosive

10   device into a computer case.  The defendant inserted the second

11   explosive device into a black cloth bag.  The defendant

12   prepared the third explosive device in the form of an explosive

13   belt.

14             "In addition to the explosive, the defendant put

15   fragments consisting of nails and nuts into the explosive

16   devices.  The defendant attached activation mechanisms to the

17   three above-mentioned explosive devices.  When explosive

18   devices were assembled in the explosive belt and in the

19   computer case, they were activated by pressing the activation

20   button, while the explosive device that was concealed inside

21   the black cloth bag was activated by a stopwatch.  Defendant

22   added nuts and nails to these three explosive devices to

23   increase the destructive effect of the explosive device.  In

24   addition, the defendant put toxic material, which was also for

25   purpose of increasing the lethality of the explosive devices

F1E3SOKS                          Kaufman - direct

1   into the three explosive devices."

2           MR. YALOWITZ:  If the Court would permit it, I'd like

3   to take the jury quickly through paragraphs six through nine by

4   reading portions of it.

5           THE COURT:  Yes.

6           MR. YALOWITZ:  "On December 1, 2001, at about

7   11:36 p.m., at the entrance from Zion square to Ben Yehuda

8   Street in Jerusalem or thereabouts, suicide terrorist, name

9   unknown, activated the explosive device that had been

10  manufactured by the defendant.

11          "Paragraph seven.  That same day about that same time,

12  at the junction of Ben Yehuda and Luntz Streets in Jerusalem or

13  thereabouts, a few meters away from the site of the explosion

14  of the first device, suicide terrorist whose name is unknown

15  activated the explosive device that had been manufactured by

16  the defendant.

17          "Paragraph eight.  On that same day, a few minutes

18  after the two above-mentioned suicide terrorists activated the

19  above-mentioned explosive devices, the explosive device that

20  had been manufactured by the defendant and hidden inside the

21  black cloth bag as set forth above was detonated.

22          "Paragraph nine.  As a result of the detonation of the

23  three explosive devices, which were detonated as described

24  above, 10 people were killed and approximately 191 were

25  injured."

F1E3SOKS                         Kaufman – direct

1   Q.  Now I'd like to take you next, Mr. Kaufman, to March 2002.

2   We're on page 19, 54th count.

3   A.  Yes.

4        MR. YALOWITZ:  All right.  With the Court's

5   permission, I'll try to take the jury through this one.

6        THE COURT:  Yes.

7        MR. YALOWITZ:  Thank you.  "In early March 2002, in

8   Ramallah, or thereabouts, the defendant met his handler.

9        "Paragraph two.  The defendant agreed with the request

10  of another individual.  The defendant manufactured in Ramallah

11  or thereabouts an explosive belt.  The above-mentioned

12  explosive belt was made of an imitation leather fabric on which

13  screws and shampoo bottles filled with explosives were adhered.

14  The defendant also attached a detonation mechanism for the

15  above-mentioned explosive belt.

16       "Paragraph nine.  At about 10:30 p.m., on March 9,

17  2002, or thereabouts, an individual who was carrying the

18  explosive belt that the defendant had manufactured for this

19  purpose on his person entered the Moment Cafe, which was

20  crowded at the time, and activated the above-mentioned

21  explosive belt with an aim of causing the deaths of as many

22  people as possible."

23       I'd like to take you, Mr. Kaufman, and the jury, to

24  the 67th count.  Page 23.  With the Court's permission, I'll do

25  this one.

F1E3SOKS                        Kaufman - direct

1              THE COURT:  Yes.

2              MR. YALOWITZ:  "Details of the offense.  The

3    above-mentioned defendant, both in the area and elsewhere, on

4    May 7, 2002, or thereabouts, caused the intentional death of

5    another person."

6              Paragraph 12 on page 24.  "At about 10:50 p.m., on

7    May 7, 2002 or thereabouts, the suicide terrorist entered the

8    above-mentioned club and activated the explosive belt and the

9    additional explosive device that the defendant had manufactured

10   for this purpose with the aim of causing the deaths of as many

11   people as possible."

12   A.  That's the nightclub.  The Sheffield Club.

13   Q.  What was the Sheffield Club?

14   A.  It is a nightclub, Mr. Yalowitz.  It is to be found in

15   paragraph 11.

16   Q.  Let me take you to July 21, 2002, count 86.  What is the

17   nature of the charge on this one, Mr. Kaufman?

18   A.  This is an attempt to cause intentional death.  Attempted

19   murder.

20             MR. YALOWITZ:  Let's go to paragraph 11.  I think I

21   best do it, your Honor.

22             THE COURT:  Yes.

23             MR. YALOWITZ:  "On the following day, July 21, 2002,

24   in the early morning hours, two individuals traveled to the

25   site at which the above-mentioned explosive device had been

F1E3SOKS                        Kaufman - direct

 1  placed.  At about 7:30 a.m., another individual activated the

 2  above-mentioned explosive device with the aim of causing the

 3  deaths of as many people as possible.

 4          "Paragraph 12.  The above-mentioned explosive device

 5  exploded.  As a result of the explosion, one person was

 6  injured."

 7  Q.  Now I'd like to take you to count 87.  Would you describe

 8  for the jury, Mr. Kaufman, the nature of the charges in count

 9  87.

10  A.  Yes, it is causing intentional death.  Murder.  Homicide.

11  Q.  What is count 87?  Where did that take place?

12  A.  This is the Hebrew University attack.

13  Q.  Thank you.

14          MR. YALOWITZ:  Your Honor, I best begin with paragraph

15  two.

16          THE COURT:  Yes.

17          MR. YALOWITZ:  "The defendant agreed to manufacture

18  the explosive device in order for it to be used for the purpose

19  of carrying out a bombing attack with the intent of causing the

20  deaths of as many people as possible.

21          "Paragraph three.  Following the said request, the

22  defendant manufactured an explosive device which was made using

23  a large shampoo bottle filled with explosives which had been

24  concealed inside a rigid black cloth bag similar to a

25  briefcase.  In addition, the defendant filled the

1    above-mentioned bag with hardware nuts for the purpose of

2    increasing the destructive power of the device.  The defendant

3    attached a wireless activation mechanism to the above-mentioned

4    explosive device so that the explosive device would be

5    activated using a cellular handset.

6         "The defendant delivered the above-mentioned explosive

7    device and three additional shampoo containers filled with

8    explosives.

9         "Paragraph eight.  For the purpose of carrying out the

10   planned bombing attack, an individual delivered to another

11   individual the explosive device that the defendant had

12   manufactured as set forth above.  Another individual added

13   three bottles of shampoo filled with explosives to the

14   explosive device which that individual had received from the

15   defendant.

16        "Paragraph 11.  On July 28, 2002, an individual along

17   with another individual transferred the above-mentioned

18   explosive device to Jerusalem.  Two individuals brought the

19   above-mentioned explosive device into the Mount Scopus campus

20   of the Hebrew University in Jerusalem.  One of these

21   individuals was very familiar with the site because he had

22   worked there previously, and also made use of an employee card

23   which he had retained to enter the above-mentioned campus.

24        "One of the individuals placed the above-mentioned

25   explosive device inside the cafeteria located in the Frank

1     Sinatra building of the above-mentioned campus.  Thereafter,

2     two individuals tried to activate the above-mentioned explosive

3     device using a cellular telephone, but the explosive device did

4     not explode due to a fault in it.

5          "Thereafter, one of the individuals returned to the

6     place at which he had put the above-mentioned explosive device,

7     collected the explosive device, and together with another

8     individual, traveled to Beit Iksa.

9          "Thereafter, on July 29, 2002, two individuals met

10    with a third again.

11         "Paragraph 13.  Another individual repaired the

12    above-mentioned explosive device after inspecting it and

13    discovered there was a problem with the electrical wires.  On

14    the following day, July 30, 2002, another individual met

15    another individual again with the latter transferred the

16    above-mentioned explosive device to Beit Iksa.  In Beit Iksa,

17    two individuals met with a third individual, and delivered the

18    above-mentioned explosive device.

19         "That night, two individuals took the above-mentioned

20    explosive device to Jerusalem, concealed it among the trees in

21    the botanic garden in the Mount Scopus campus of Hebrew

22    University.

23         "On the following day, July 31, 2002, two individuals

24    traveled again to the Mount Scopus campus of the Hebrew

25    University.  While an individual was waiting outside, another

F1E3SOKS                    Kaufman - direct

1    individual entered the campus, collected the above-mentioned

2    explosive device, and placed it in the cafeteria located in the

3    Frank Sinatra building in the Mount Scopus campus of the Hebrew

4    University in Jerusalem.

5                "At about 1:30 p.m., after one of the individuals left

6    the area of the campus and joined the other, one of the

7    individuals activated the above-mentioned explosive device that

8    had been manufactured by the defendant via a cellular telephone

9    handset, with the intent of causing the deaths of as many

10   people as possible.

11               "These individuals chose to carry out the attack at

12   around 1 p.m. because, according to the information that one of

13   them had gathered, the above-mentioned cafeteria was crowded

14   with people at that time."

15   Q.  Mr. Kaufman, could you please direct the jury to the count

16   at which the late Dina Carter is mentioned.

17   A.  Yes.  That's in the 89th count.

18   Q.  Could you please take us to the count for the murder of Ben

19   Blutstein.

20   A.  That would be the 90th count.  If you look at the bottom of

21   the page.  You'll see the name Benjamin Thomas Blutstein

22   highlighted in bold print.

23   Q.  That's on page 34?

24   A.  That's correct, Mr. Yalowitz.

25   Q.  Ben Blutstein.

F1E3SOKS                        Kaufman - direct

1              Let's go to let's see if we can find Janis Coulter.

2     A.   She's to be found in the 94th count.  It is on page 35.

3     Q.   And David Gritz?

4     A.   Underneath.  The 95th count.

5     Q.   Also page 35.

6     A.   Correct.

7     Q.   Okay.

8     A.   The Hebrew University is a place where students from all

9     around the world study.

10    Q.   Let's go to Abdullah Barghouti.  I'm sorry.  Let's go to

11    Ahmed Barghouti.

12    A.   Yes, it is the next divider, members of the jury.

13              MR. YALOWITZ:  Oh.  My colleague reminds me, your

14    Honor, we wanted Abdullah Barghouti's sentencing statement

15    before the jury.  So let me move the admission of Exhibit 435.

16              THE COURT:  It will be admitted into evidence.

17              (Plaintiff's Exhibit 435 received in evidence)

18              MR. YALOWITZ:  Thank you, sir.  May I approach?

19              THE COURT:  Yes, sir.

20              MR. YALOWITZ:  Thank you.

21    Q.   By the way, Mr. Kaufman, do you recall how many counts of

22    murder Abdullah Barghouti pled guilty to?

23    A.   Not offhand.  If you give me one minute, I can check that.

24    Q.   Sure.

25    A.   I made a note of it beforehand.  This guy was a

F1E3SOKS                        Kaufman - direct

1   professional murderer.

2             Yes.  He admitted 66 counts of murder.  That would be

3   66 people.

4   Q.  Let's take a look at what he said immediately before the

5   court passed sentence on him for his crimes.

6   A.  I don't think anyone needs me to read that out,

7   Mr. Yalowitz.

8   Q.  I'll do the honors for the record.  "I do not regret any of

9   the acts that I have carried out."

10            MR. YALOWITZ:  All right.  Let's go to Ahmed

11   Barghouti.

12   Q.  Am I recalling correctly, Mr. Kaufman, that we've actually

13   spoken about Ahmed Barghouti earlier in the day?

14   A.  That's correct, Mr. Yalowitz.  We talked about him with

15   respect to the shooting incident on Jaffa Street.  22nd

16   January 2002.

17   Q.  So, if I could, I'd like to go directly to the count that

18   relates to Abdullah Barghouti.  And if you could help the jury

19   find that, it would be great.

20   A.  Sorry.  We're talking about in this particular binder?

21   Yeah.

22   Q.  Right.  Maybe just remind the jury what Ahmed Barghouti did

23   in connection with his criminal proceeding.

24   A.  Well, you have two documents in -- I'm sorry.  Ahmed

25   Barghouti's divider.  Tab A, tab B format.  So tab A -- that's

F1E3SOKS                        Kaufman - direct

 1 | not Ahmed Barghouti.
 2 | Q.  Right.  That's Abdullah.  We're going to put Ahmed up in a
 3 | second.  There we go.  Thank you.
 4 |         I'm sorry, Mr. Kaufman, I didn't mean to interrupt
 5 | you.
 6 | A.  So this, was a hearing in front of the Beit El military
 7 | court.  It was a plea bargain.
 8 | Q.  What was the disposition of his plea?
 9 | A.  He confessed to an amended indictment, and you'll see at
10 | the bottom of the page, when you have the number 358 as the
11 | exhibit number in the top-right-hand corner, the decision of
12 | the court.  "Based on his confession to the charge, we convict
13 | the defendant of the offenses attributed to him in the amended
14 | indictment."
15 |         You will find that amended indictment at tab B.  And
16 | the relevant part of the amended indictment is count 51.
17 | Q.  Why don't we direct the jury to page 73.
18 | A.  That's correct.  That's where it is to be found.
19 | Q.  And perhaps you can describe the nature of the offense of
20 | count 51.
21 | A.  It's giving shelter.  Giving shelter normally to somebody
22 | who is wanted by the authorities.  Would you like me to read
23 | out the details?
24 | Q.  Yes, if you would please read the details of the offense in
25 | the first paragraph.

1    A.  This is standard legal format.  It is not the particulars

2    as far as they relate to Ahmed Barghouti, but it is the

3    description of the offense in the statute.

4              "The above-mentioned defendant in the area in late

5    2001 or thereabouts, assisted or gave shelter to an unspecific

6    person who had committed an offense against the security

7    legislation or had been or was involved in any activity which

8    was intended to harm the public welfare, the welfare of the

9    Israel Defense Forces troops and soldiers, and the maintenance

10   of public order or concerning whom there are reasonable grounds

11   to suspect that he did so whether by giving information,

12   shelter, food, beverage, money, clothing, weapons, ammunition,

13   supplies, animal fodder, means of transport, petroleum, or fuel

14   of any type and kind whatsoever or in any other way as

15   follows."

16   Q.  All right.  I think I asked you this before, but there is

17   this mention again of area with a capital A.  In the area.

18   Could you just remind the jury what that means, the area in the

19   context?  It seems like just a generic term, but in the context

20   of this 51st count, what do they mean by the area?

21   A.  It is the West Bank controlled by the Israelis.

22   Q.  The West Bank.  Anywhere in the West Bank?

23   A.  Well, it would be the area in the West Bank controlled --

24   where it is subject to Israeli security control.

25   Q.  All right.  Now, is that specific to part A, B or C or is

F1E3SOKS                    Kaufman - direct

1   it in any part of the West Bank?

2   A.  It would be to parts B and C.

3         MR. YALOWITZ:  Let me read out, with the Court's

4   permission, the substantive portions of count 51.

5         "The above-mentioned defendant," if I may, that's

6   Ahmed Barghouti, "at the time set forth with another individual

7   transferred a third individual and Abdullah Barghouti from the

8   prison of the Preventive Security of the Palestinian Authority

9   in Bitunia to an apartment which the defendant had rented in

10  downtown Ramallah.

11        "The above-mentioned individual and Abdullah Barghouti

12  are senior operatives of the Hamas Organization, which is an

13  illegal organization, and are responsible for carrying out a

14  number of attacks against Israeli civilians, including the

15  bombing attack at the Sbarro Restaurant in Jerusalem on

16  August 9, 2001.

17        "The defendant and this other individual provided

18  lodging to a third individual and Abdullah Barghouti in the

19  above-mentioned apartment for several days.  Before this third

20  individual and Abdullah left the above-mentioned apartment of

21  the defendant, the defendant provided each of them a number 14

22  pistol."

23        MR. YALOWITZ:  Your Honor, I'm not sure if I moved it

24  in evidence before.  I may have.  But I would like to move into

25  evidence, in case it hasn't been moved, Exhibit 359, the

F1E3SOKS                         Kaufman - direct

1   statement that Ahmed Barghouti made before he was sentenced.

2               THE COURT:  It will be admitted into evidence.

3               (Plaintiff's Exhibit 359 received in evidence)

4               MR. YALOWITZ:  Bear with me one second, if I may

5   consult.

6               THE COURT:  Yes.

7               MR. YALOWITZ:  Thank you.

8               MR. ROCHON:  Your Honor, this is already in evidence

9   and it was moved this morning.  If he wants to do it again.

10              MR. YALOWITZ:  No, once is enough.

11              MR. ROCHON:  It was in and it was read aloud I think

12   this morning although -- right.

13              MR. YALOWITZ:  This is Ahmed Barghouti's statement

14   before he was sentenced.  "I have no regrets."

15              Your Honor, with the Court's permission, I'd like to

16   collect the July 31 binders and move to the fifth attack for

17   which we have convictions, and the final one of the testimony,

18   which is January 29, 2004.

19              THE COURT:  Sure.

20              MR. YALOWITZ:  Bear with us, your Honor.  We're just

21   going to put up the demonstrative.

22              THE COURT:  Yes.

23   Q.  Mr. Kaufman, let's begin with Ahmed Salah.

24   A.  Yes.  You'll find his court documents at the first divider.

25   His name is right at the bottom.  Salah Ahmed.  Tab A, B

1  format.  Tab A, top-right-hand corner, Exhibit 260.  This is

2  the transcript of a hearing before the Judea military court.

3  The southern part of the West Bank.

4  Q.  And where do we find the relevant information?

5  A.  Turn over to page please, members of the jury.  And at page

6  three you'll see there is a verdict.  The third paragraph down.

7  And the judges state that "Based on the defendant's admission

8  of the facts of the indictment, we've examined the counts of

9  the indictment, and we are convinced that the admission of the

10  facts is enough to substantiate the guilt of the defendant for

11  all counts of the indictment."

12          (Continued on next page)

F1E8SOK6                         Kaufman - direct

1    A.   There you see from A, B, C, D, E onwards the offenses to

2    which the defendant pleaded guilty.

3    Q.   Where would we find the details that tie him to the January

4    29, 2004 attack?

5    A.   Well, you will find -- if you turn to tab B, you will find

6    the indictment which contains the facts admitted by Ahmed

7    Salah.  And if you look at the page which has the stamp at the

8    bottom P2:151, that's, one, two, three, four, five, six, it's

9    the sixth page of print in.

10   Q.   The fifth count?

11   A.   That's correct.

12   Q.   Let's just make sure everybody has got it.

13           THE COURT:  Is that the fourth count?

14           THE WITNESS:  The fifth one, your Honor.

15   A.   It says fifth count.

16           THE COURT:  There are two 151s.

17           THE WITNESS:  You're is absolutely right.  The

18   numbering is not very good here.

19   A.   It's the fifth count.  In brackets, "Detailed incident

20   09891/04 Jerusalem Special Duties Department."  Once again,

21   that's the special serious crime squad in Jerusalem.  And this

22   count refers to the January 29, 2004 bombing of the number 19

23   bus.

24           MR. YALOWITZ:  All right.  Perhaps I ought to take the

25   jury through page 4, paragraph 2, with the Court's permission.

F1E8SOK6                          Kaufman – direct

1          THE COURT:  Yes.

2          MR. YALOWITZ:  We are on paragraph 2.  Just for

3     reference, paragraph 1 says, "In early January 2004 or

4     thereabouts."  There is then a large omission.

5          Paragraph 2.  "Shortly thereafter, the military

6     operative contacted Ali Ja'ara and offered him a meeting with

7     the military operative to send him to carry out a suicide

8     attack.  Ali Ja'ara (hereinafter:  "the suicide terrorist").

9          "Accordingly, another individual introduced the

10    above-mentioned defendant to the suicide terrorist.  During the

11    meeting, the defendant checked the degree of willingness of the

12    suicide terrorist to carry out an attack.

13         "Accordingly, the defendant asked the suicide

14    terrorist to prepare to carry out an attack."

15         Let me turn over the page and we will look at

16    paragraph 5 together.

17         "A few days later, the defendant came to the home of

18    another individual and told him that he had found a person who

19    was prepared to carry out a suicide attack.

20         "On January 28, 2004, or thereabouts, the defendant

21    again approached another individual and asked him urgently to

22    prepare an explosive bag using the explosives in his possession

23    because he intended to send the suicide terrorist to carry out

24    the suicide attack."

25         Paragraph 6.  "Shortly thereafter, the defendant

F1E8SOK6                        Kaufman – direct

approached the military operative and asked him to transport a

suicide terrorist armed with an explosive belt to carry out a

suicide attack within the territory of the State of Israel."

Paragraph 7.  "At the time of the foregoing, another

individual made an additional quantity of Um Al Abed explosive

weighing 12 kilograms, and made an explosive bag using it for

carrying out a suicide attack."

"A few minutes later, the defendant arrived with the

suicide terrorist and another individual at the home of a third

individual.  Another individual waited outside while the

suicide terrorist and the defendant entered another

individual's home."

Paragraph 9.  "Shortly thereafter, the defendant and

the suicide terrorist departed towards the university in

Bethlehem.  There, the defendant deactivated the safety

mechanism of the explosive device in order to prepare it for

use.  After that, the defendant left another individual with

the suicide terrorist.

"Thereafter, at about 6:30 a.m., another individual

transported the suicide terrorist in the direction of Jerusalem

through the village of Walaja until they arrived near the Malha

Mall in Jerusalem.  There, that other individual parted from

the suicide terrorist and returned to the area.

"Shortly thereafter, the suicide terrorist boarded

Egged Bus No. 19, which was driving toward Paris Square.  When

F1E8SOK6                    Kaufman - direct

 1   the bus reached the corner of Arlozorov and Aza Streets, at

 2   about 8:45 a.m., the suicide terrorist activated the explosive

 3   bag that was in his possession, with the aim of causing the

 4   deaths of a large number of individuals.  As a result of this,

 5   the explosive bag detonated aboard the bus."

 6   Q.  Could you take us, Mr. Kaufman, to the count of murder

 7   dealing with Scotty Yehezkel Goldberg.

 8   A.  That's the eighth count, Mr. Yalowitz.  It starts at the

 9   very bottom of the page which is stamped P2:154.  Eighth count.

10          If you turn over the page, you will see in the details

11   of the offense the death of the late Mr. Yehezkel Goldberg in

12   bold print.

13   Q.  Thank you.

14          Let's go to Ali Mohamed Abu Haliel.

15   A.  The next divider, here we have one document.  It's a

16   verdict, a written decision after the hearing of evidence.  As

17   you can see, there are three judges, but only one judge writes

18   the decision.  You will note on the last page the other two

19   judges agreed with his decision.

20          The relevant part for our intents and purposes, the

21   part that relates to the number 19 bus bombing, is to be found

22   on page -- well, it's on the third page.  It has a stamp at the

23   bottom P2:335, the third paragraph down.  That's the factual

24   basis.  And you will see the actual conviction.

25   Q.  Where would we find that actual conviction?

F1E8SOK6                        Kaufman - direct

A.   On the last page stamped 338.  "We have decided unanimously

to convict the defendant of 19 counts of being an accessory to

causing intentional death and two counts of being an accessory

in attempting to cause intentional death."  At the very last

page, and you will see the signatures of the judges.

          MR. YALOWITZ:  With the Court's permission, I would

like to take the jury back just to make sure we have that

factual basis nailed down.

          We are back to page 335.  I think I best read it once

we get there.

          THE COURT:  335 or 335 continued?

          THE WITNESS:  The first one.

          MR. YALOWITZ:  The original 335.  Maybe the best thing

to do is put this one -- can we put this one on the screen?

          303.  I just want to make sure we nail down that this

is the same attack.  So why don't we go to the third page of

the exhibit and we can enlarge the third full paragraph.

          Ms. Machnes, if you can blow that up.

          With the Court's permission, I will read it out.

          THE COURT:  Yes.

          MR. YALOWITZ:  "Notwithstanding that which was set

forth in the first count of the indictment, to which the

defendant admitted, in early January 2004, the defendant and

others planned to carry out attacks that included suicide

attacks against Israeli targets.  Later, the defendant

F1E8SOK6                    Kaufman - direct

1    forwarded materials for preparing an explosive device to one of

2    his accomplices.  After another person prepared an explosive

3    device with these materials, on January 29, 2004, a suicide

4    terrorist boarded bus line 19 in Jerusalem and blew himself up.

5    As a result of this attack, 11 people were killed."

6            Let's go to Abdul Rahman Maqdad.  He is the next one

7    in our binder.

8    BY MR. YALOWITZ:

9    Q.  Can you break down that verdict for the jury, Mr. Kaufman?

10   A.  Maqdad, tab A, tab B format.

11           Tab A, Exhibit 295, here we have a transcript of the

12   hearing.  The defendant is represented by counsel.  The

13   defendant himself confirms, if you look -- it's the second

14   paragraph up from the bottom of the very first page of Exhibit

15   295, let me read out what the defendant said.

16           "I confirm that the facts of the indictment are

17   correct, as my defense counsel has said.  I do not plead

18   guilty; the court can decide whether I am guilty or not."

19           Well, the court did find that he was guilty, you will

20   find that on the following page, because he essentially pleaded

21   to all of the facts.

22           And the court states as follows:  "Based on the

23   defendant's admission of the facts in the indictment, we have

24   examined the counts of the indictment and are satisfied that

25   the admission of the facts is sufficient in order to

F1E8SOK6                        Kaufman - direct

1   substantiate the guilt of the defendant on all of the counts of

2   the indictment."

3          You will see the offenses of which he was convicted,

4   A, B, C, D, E.

5          The actual indictment itself, that is to be found at

6   tab B.

7   Q.  Which count should we turn to?

8   A.  You should turn to the fourth count, which is to be found

9   on the fifth printed page.  It has a stamp at the bottom

10  P2:209.  Detailed incident 098 -- the fourth count.  Detailed

11  incident 09891/04 Jerusalem Special Duties Department.  Causing

12  intentional death, murder.

13         Then on the following pages you will have the facts

14  which are similar to the facts that were set out in the case of

15  Abu Haliel.

16         MR. YALOWITZ:  Bear with me one second.  I just need

17  to make a note.  I apologize, your Honor.

18         THE COURT:  Sure.

19         MR. YALOWITZ:  I know we are trying to get through it.

20         Why don't I begin with paragraph 1?

21         THE COURT:  Yes.

22         MR. YALOWITZ:  This is under, "Details of the

23  offense."

24         "In early January 2004 or thereabouts, the defendant

25  contacted the military operative, blank, and asked him to

1    introduce military operatives to him who would help him produce

2    explosives and explosive devices in order to carry out attacks

3    against Israeli targets, and to find suicide terrorists for

4    carrying out suicide attacks."

5         Just skipping down, "During the meeting, the defendant

6    asked him to help him in the making of explosives."

7         Going to the top of page 4 on the next page, you see

8    there is quite a bit that's been removed, but here again we

9    have the reference to "Ali Ja'ara, the suicide terrorist,

10   expressed willingness to do so."

11        Paragraph 4.  "On the following day, the defendant met

12   another individual and obtained 36 liters of chemical acetone

13   and 10 liters of hydrogen Peroxide from him."

14   BY MR. YALOWITZ:

15   Q.  Mr. Kaufman, one of the things I bet you know as an

16   individual who grew up in England and lives in a country that

17   uses the metric system is how much that is, 36 liters and 10

18   liters, in terms of gallons or quarts?

19   A.  Growing up in England I am used to drinking pints, not

20   liters, but it's a lot of liquid, put it that way.

21   Q.  About how much is a liter?

22   A.  It's a big jar of beer.

23   Q.  Thanks.

24        Paragraph 5.  "A few days later, another individual

25   came to the home of the defendant.  At that time, the defendant

F1E8SOK6                        Kaufman – direct

asked another individual to buy him materials for making an

explosive bag, which included *inter alia*, a bag, batteries and

a switch.  That other individual agreed, and with a third

individual purchased everything requested for the defendant so

that he could make the explosive bag as soon as possible."

Paragraph 8, on page 5.  "A few minutes later, another

individual arrived with the suicide terrorist and a third

individual at the home of the defendant.  Another individual

waited outside while the suicide terrorist and another

individual entered the defendant's home.  The defendant

explained to this individual and to the suicide terrorist how

to activate the explosive bag and gave the explosive bag for

use in a suicide attack."

Paragraph 10.  "Thereafter, at about 6:30 a.m., an

individual transported the suicide terrorist in the direction

of Jerusalem through the village of Walaja until they arrived

near the Malha Mall in Jerusalem."

Paragraph 11.  Why don't you do this one, Mr. Kaufman?

A.  "Shortly thereafter, the suicide terrorist boarded Egged

Bus No. 19, which was driving towards Paris Square.  When the

bus reached the corner of Arlozorov and Aza Streets, at about

8:45 a.m., the suicide terrorist activated the explosive bag

that was in his possession with the aim of causing the deaths

of a large number of individuals.  As a result of this

explosive bag denoted aboard the bus (hereinafter: the "suicide

F1E8SOK6                         Kaufman - direct

1    attack").

2              "As a result of the suicide attack, the death of the

3    late Mr. Avraham Balhasan was caused."

4              And if you look at the seventh count, which is on the

5    following page, at the very bottom, you will see also the death

6    of Mr. Yehezkel Goldberg was caused.

7    Q.   Thank you, Mr. Kaufman.

8              Next in our binder is Hilmi Hamash.

9    A.   Yes.   It's Exhibit 313.   Here, once again, it's a single

10   document.   That means it's a reasoned judgment, delivered after

11   the consideration of evidence by the judges.

12             The part relevant to the bus attack can be found on

13   the sixth printed page.   It has a number 6 at the bottom.

14   Q.   If you could just direct us, are we talking about Counts 4

15   through 15?

16   A.   That's correct.   It's the last paragraph on the page.   This

17   is the factual basis for the conviction.

18             Let me read it out.   I don't think there is anything

19   redacted here.

20             "Counts of indictment 4-15:   Causing intentional

21   death -- participation in the execution of a suicide attack on

22   line 19 in Jerusalem."

23   Q.   It sounds like the -- well, let me ask you a question.

24             In this case, the case of Hamash, was there any

25   disagreement as to the facts?

F1E8SOK6                    Kaufman - direct

A.  Well, the dispute between the parties was very limited for

all intents and purposes.

Q.  Why don't I --

A.  We can read out the arguments of the defense, if you want

to, Mr. Yalowitz.  It's on the following page.

Q.  Actually, what I would like to take you to, with respect,

Mr. Kaufman, is where the parties agree just at the very top of

page 7.

A.  I can read it, just the first sentence.

Q.  That would be great.

A.  "In addition, the parties agreed concerning the acts of the

defendant to advance the conspiracy himself, which were as

follows:"

          MR. YALOWITZ:  May I proceed with that, your Honor?

          THE COURT:  Yes.

          MR. YALOWITZ:  "The defendant heard that another

individual was looking for a person who was prepared to commit

suicide in an attack and introduced him to Ali Ja'ara, from

whom he heard that he was having a bad life and was interested

in carrying out a suicide attack.

          "The defendant was also present during the

conversation between a third individual and Ali Ja'ara.

          "The defendant purchased from another individual seven

kilograms of lemon salts and four batteries.

          "Another individual asked the defendant for a video

F1E8SOK6                        Kaufman – direct

1    camera and the defendant tried to get such a camera.

2              "The defendant made contact with another individual

3    after the attack and that individual informed him that it was

4    an attack that Ali Ja'ara had carried out."

5    BY MR. YALOWITZ:

6    Q.  Do we have anything else on this conviction that we need to

7    cover, Mr. Kaufman?  Have we taken the jury to where he was

8    actually convicted?

9    A.  Well, the conclusions of the judge are to be found on page

10   13.

11   Q.  Let's get the jury there and then we will take a look at

12   it.

13   A.  Yes.

14   Q.  Where do you wish to direct the jury on this one?

15   A.  The first line.  This is the final sentence which is

16   relevant to the attack perpetrated by Ali Ja'ara.

17   Q.  This is, "I suggest to my colleagues to convict the

18   defendant as an accomplice in the offenses that are attributed

19   to him"?

20   A.  That's correct, Mr. Yalowitz.

21   Q.  All right.

22   A.  And you will see at the very end the other two judges

23   agree.

24   Q.  Excellent.

25   A.  Last line of page 14.

F1E8SOK6                    Kaufman - direct

1    Q.  So then why don't you take us, Mr. Kaufman, to this man,

2    Mohamed Ma'ali.

3    A.  The next divider, members of the jury, tab A, tab B format.

4    Q.  I think we are all there.  Bear with us.

5    A.  This is a plea bargain.  Turn over the page -- sorry.  It

6    is a plea bargain, yes, the prosecutor says so.

7           Turn over the page, please, and the defense lawyer

8    says, "I have explained the indictment to my client.  He

9    understands it and admits to it."

10          And the defendant himself says, "My defense attorney

11   has explained the indictment to me.  I understand it and admit

12   to it."

13          And then you will see verdict.  This is the actual

14   conviction of the judges.  I shall read it.

15          "On the basis of his admission of guilt, we convict

16   the defendant of the offenses attributed to him in the

17   indictment, that is, throwing a burning object, two offenses of

18   placing a bomb, 19 offenses of intentionally causing death, and

19   two offenses of attempting to cause death, pursuant to

20   Regulation 58 of the Defense Emergency Regulations and Section

21   51 of the Security Provisions Order."

22   Q.  Where do we see the factual information tying --

23   A.  You would have to look at the indictment because defendant

24   pleaded guilty to the indictment, as we saw.

25   Q.  Where is Ma'ali's indictment?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1E8SOK6                          Kaufman – direct

 1   A.  It is to be found at tab B, exhibit 289.

 2            MR. ROCHON:  I am so sorry, Mr. Kaufman.

 3            Your Honor, we have one thing that we need to approach

 4   the bench on.

 5            MR. YALOWITZ:  Why don't I just consult with Mr.

 6   Rochon.

 7            THE COURT:  Sure.  Why don't you see if you can work

 8   it out.

 9            MR. YALOWITZ:  We need to approach.

10            (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1E8SOK6                        Kaufman - direct

1              (At the sidebar)

2              MR. ROCHON:  They have left in the sentencing portion,

3    the entire sentence portion, not just what the defendant said.

4    I am sure it's a mistake, like we had this morning, but the

5    jurors have it in front of them now.

6              What I would ask us to do is, we are not going to

7    finish --

8              MR. YALOWITZ:  We are going to finish.  I am five

9    minutes from finishing.

10             MR. ROCHON:  Right now we have inadmissible stuff

11   inadvertently left in front of the jury.

12             MR. YALOWITZ:  He is just trying to delay.

13             THE COURT:  Mr. Yalowitz, you're delaying now.

14             MR. YALOWITZ:  I am keeping quiet.

15             THE COURT:  Let's see if we can quickly resolve this.

16             What do you suggest?

17             MR. YALOWITZ:  I suggest we direct the jury to turn

18   over the tab and keep moving.

19             THE COURT:  Are you ready to go to the next person?

20             MR. YALOWITZ:  To tab B.

21             THE COURT:  You're ready to go Sa'ad?

22             MR. YALOWITZ:  No.  I am ready to go to tab B of

23   Ma'ali, which is not a problem.

24             THE COURT:  Go to tab B.

25             (Continued on next page)

1              (In open court)

2     BY MR. YALOWITZ:

3     Q.  We are on tab B, which is 289.  Let's make sure everybody

4     is there.

5     A.  Yes, the third page.

6     Q.  Where are we?  Which count are we looking at to find the

7     January 29, 2004 attack?

8     A.  It's the fourth count.  Page 3, middle of the page.

9              MR. YALOWITZ:  All right.  With your Honor's

10    permission, I would like to direct the jury to page 5,

11    paragraph 9.

12             THE COURT:  Yes.

13             MR. YALOWITZ:  "After another individual left them, at

14    around 6:30 a.m., the defendant took the suicide terrorist to

15    Jerusalem via Walaja village, until they approached the Malha

16    Mall in Jerusalem, where the defendant took his leave from the

17    suicide terrorist."

18             That's Muhammad Ma'ali.

19    Q.  Let's go to the final tab in our binder, Mr. Kaufman, Ahmed

20    Sa'ad.

21    A.  This is a one document instance.  It's a reasoned verdict

22    once again.

23    Q.  Where in this verdict do we find the factual allegations

24    tying Ahmed Sa'ad to the January 29 terror attack?

25    A.  Well, the judges set out the arguments on page 4.  The

1  judges balanced the arguments of the prosecution against the

2  arguments of the defense.  Then you will see that they

3  discussed them.  They considered the defendant's admissions and

4  statements.  And on page 9 you will find a disposition of the

5  court.

6  Q.  Are we looking just above where it says Counts 15 to 23?

7  A.  That's correct.  There the judges state, and I will quote

8  it, with respect to the number 19 bus incident:  "Therefore, I

9  suggest to my colleagues" -- that is to the other judges

10 sitting on the panel -- "to convict the defendant of aiding in

11 causing intentional death, (counts 3-13 of the indictment) and

12 aiding in an attempt to cause intentional death, count 14."

13 Q.  Where do the other judges agree, or do they agree I should

14 ask?

15 A.  They do.  If you have a look at pages 10 and 11, you will

16 see a summary of the findings on page 10.

17         And then on page 11, you will see two judges, Yair

18 Tirosh and Dalia Kaufman, saying, "I agree, I agree."

19         There is no relation between me and Dalia.

20         MR. YALOWITZ:  Your Honor, plaintiffs move Exhibit

21 259, as redacted in compliance with the Court's earlier orders.

22 It's the sentencing statement of this individual Ahmed Sa'ad.

23         THE COURT:  It will be admitted.

24         (Plaintiff's Exhibit 259 received in evidence)

25         MR. YALOWITZ:  Perhaps we can put the relevant portion

F1E8SOK6                    Kaufman – direct

1    of this document on the screen and we can show the jury what

2    this individual said.

3    Q.  If you would do the honors, Mr. Kaufman.  I will give you

4    the last word.

5    A.  In contrast to the others he actually said, "I made a

6    mistake and I regret that I did it, but the part I did I admit

7    it.  My actions were violent and bad actions against humanity."

8            MR. YALOWITZ:  Your Honor, I have nothing further of

9    this witness.

10           THE COURT:  Ladies and gentlemen, before we go to

11   cross-examination, we are going to adjourn for the day.  I know

12   we have had a long time, and I thank you for the attention you

13   have given to the case.

14           Don't discuss the case.  Keep an open mind.  I will

15   ask you to be back here again by 9:30 so we can get a good

16   start.  I think we are moving efficiently.  I will see you

17   tomorrow.  Just leave the binders on the seat and we will take

18   them.

19           (Jury exits courtroom)

20           (Continued on next page)

21

22

23

24

25

F1E8SOK6

1          THE COURT:  You can step down.

2          Is there anything we need to address?

3          MR. YALOWITZ:  Very briefly.  I noticed going through

4     these documents that there were a couple of mistakes that

5     disadvantaged the plaintiffs.  There was an item where the name

6     of Ali Ja'ara was inappropriately redacted.  There was also an

7     item where we had labeled operative A, somebody who had been

8     trained by Abdullah Barghouti, and later operative A prepared

9     the bomb of Hebrew University and that got inadvertently

10    redacted.  So since we are correcting mistakes at the request

11    of Mr. Rochon, I would like those mistakes corrected before

12    these binders go back to the jury.

13         THE COURT:  Why don't you discuss it with Mr. Rochon

14    and see if you can agree what we are going to do with all of

15    these issues, and to the extent that you can agree, we will do

16    that.  To the extent you can't agree, I will resolve it.

17         MR. YALOWITZ:  Thank you.  That's all I have.

18         MR. ROCHON:  I don't have anything now.  I think

19    tomorrow Mr. Yalowitz will be using the Marwan Barghouti and

20    Shubaki, and we will have issues with those redactions, your

21    Honor.  Those were the ones that we only got the redactions

22    late.  Mr. Hill addressed them this morning.  So those

23    redactions we got very late, and we will be prepared to address

24    them in the morning.  So there could be a brief matter on that

25    in the morning.  Most of the references are to Yasser Arafat.

F1E8SOK6

1   We already talked about them and we may have disagreements, and

2   maybe not.

3           THE COURT:  Is there something that you can point to,

4   Mr. Yalowitz, before you leave so he can see if he agrees with

5   you and you can cure that overnight?

6           MR. ROCHON:  With his team, yes.  I think we will have

7   a counter-proposed redaction on it as well, which shows exactly

8   what we think should be highlighted, and I will be prepared to

9   send an e-mail on it.

10          THE COURT:  If we are going to get to this issue with

11  an exhibit to go before the jury tomorrow, see if you can

12  resolve it right away.  I don't know when you expect them to

13  make the redactions if we are going to do this tomorrow.

14          There is one other thing.  I want to emphasize the

15  agreement that you had about notifying about the witnesses and

16  notifying about the exhibits, I want you to also indicate which

17  exhibits are being offered with which witness.

18          MR. ROCHON:  Understood.

19          MR. YALOWITZ:  That's how we understood the agreement

20  and that's how we have been proceeding, and that's how we

21  expect the defendants to proceed.

22          THE COURT:  There was something that I read that

23  implied that that did not happen in some instances.

24          MR. ROCHON:  There was one time where I think it

25  wasn't clear to us, but generally we have gotten it.  They have

F1E8SOK6

1    been following that practice generally.

2              THE COURT:  I just want to make sure that's the

3    understanding.

4              Anything else that you have to bring to my attention,

5    if you can get it to me overnight I can look at it before we

6    start and resolve it.

7              MR. ROCHON:  Tomorrow we are going to have a witness

8    who is fluent in Hebrew and Arabic, and the translations we

9    have got have been provided by the plaintiffs.  We really don't

10   think it's appropriate to have their witness on the stand

11   correcting translations live on the stand.  Today with Mr.

12   Kaufman it wasn't an issue, but we are now going to get into

13   some Arabic stuff, and we really don't think the witness should

14   be correcting the translations here in the courtroom live

15   without letting us know in advance.  If there is a problem with

16   the translations the plaintiffs have provided us, hopefully we

17   will find out about it from them beforehand, and certainly not

18   with these witnesses just starting to go through and saying,

19   this is right and this is wrong.

20             THE COURT:  I don't anticipate that to be a problem.

21   Obviously, if Mr. Yalowitz anticipates there is a translation

22   that he thinks his witness is going to now say is not an

23   accurate translation, you should let them know before that

24   time.  There are always some times when both sides realize the

25   witness is sitting in the box and says, I have read this and I

F1E8SOK6

1    think there is a mistake.  If that is a surprise, then see

2    whether it's appropriate to let that witness comment on it or

3    get your own expert back in to make sure they get it right.

4            MR. YALOWITZ:  I will say on that, your Honor, the

5    Court directed the defendants, if they had a problem with any

6    of our translations, to give us proposed alternate

7    translations, and we haven't received a single one.  I don't

8    expect there to be problems with the translations, but as you

9    said, you never know.

10           THE COURT:  You never know.  At this point, I am

11   assuming that they have no problems with the translations and

12   you have no problems with the translations, and you're not

13   aware of any witness that you're going to present who has a

14   problem with the translations.

15           MR. YALOWITZ:  I will say there is one that I know

16   of --

17           THE COURT:  Then you better let them know.

18           MR. YALOWITZ:  -- which I have identified both to the

19   Court and I will remind the defendants.  It's just a singular

20   plural.  It's kind of a trivial thing.

21           THE COURT:  We did that already on the stand.

22           MR. YALOWITZ:  It's similar like that.  I will be glad

23   to let Mr. Rochon know.

24           THE COURT:  As I say, just pull the rug out from under

25   them and make sure they don't have an argument to make.

F1E8SOK6

1              MR. YALOWITZ:  Mr. Rochon is too able for me to cut

2     him off on all his arguments.

3              MR. ROCHON:  Have a good evening.

4              THE COURT:  Have a good evening.

5              (Adjourned to January 15, 2015, at 9:30 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
 1                      INDEX OF EXAMINATION

 2    Examination of:                        Page

 3    NICHOLAS KAUFMAN

 4    Direct By Mr. Yalowitz . . . . . . . . . . . 148

 5                     PLAINTIFF EXHIBITS

 6    Exhibit No.                          Received

 7     359   . . . . . . . . . . . . . . . . . . 176

 8     246   . . . . . . . . . . . . . . . . . . 257

 9     376   . . . . . . . . . . . . . . . . . . 265

10     344   . . . . . . . . . . . . . . . . . . 276

11     435   . . . . . . . . . . . . . . . . . . 300

12     359   . . . . . . . . . . . . . . . . . . 305

13     259   . . . . . . . . . . . . . . . . . . 323

14

15

16

17

18

19

20

21

22

23

24

25
```