F1F3SOK1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    MARK I. SOKOLOW, et al.,

4                    Plaintiffs,

5          v.                              04 CV 397 (GBD)

6    PALESTINE LIBERATION
     ORGANIZATION, et al.,
7
                    Defendants.
8
     ------------------------------x
9                                         New York, N.Y.
                                          January 15, 2015
10                                        9:30 a.m.

11   Before:

12                      HON. GEORGE B. DANIELS,

13                                        District Judge

14                            APPEARANCES

15   ARNOLD & PORTER LLP
          Attorneys for Plaintiffs
16   BY:  KENT A. YALOWITZ
          PHILIP W. HORTON
17        TAL MACHNES
          SARA PILDIS
18        CARMELA T. ROMEO
          RACHEL WEISER
19
     MILLER & CHEVALIER, CHARTERED
20        Attorneys for Defendants
     BY:  MARK J. ROCHON
21        LAURA G. FERGUSON
          BRIAN A. HILL
22        MICHAEL SATIN

23   Also present:  RACHELLE AVITAL, Hebrew interpreter
                    RINA NE'EMAN, Hebrew interpreter
24

25

F1F3SOK1

```
 1                (In open court; jury not present)
 2                THE COURT:  Let me first address, I received a letter
 3      from the defense with regard to Tirawi.
 4                Mr. Hill, I know what your position is.  I have a
 5      couple of questions for Mr. Yalowitz.
 6                Mr. Yalowitz, you have a video, and my understanding
 7      is the video is of Mr. Tirawi making during a lecture.
 8                MR. YALOWITZ:  Correct.
 9                THE COURT:  It was made on July 23 of 2009.
10                MR. YALOWITZ:  Certainly 2009, your Honor.
11                THE COURT:  July of 2009, possibly?  2009.
12                MR. YALOWITZ:  Certainly, I'm not denying July 2009.
13      I just don't know it.  But definitely 2009.
14                THE COURT:  At the time he was not a PA employee.
15                MR. YALOWITZ:  I disagree with that.
16                THE COURT:  Okay.
17                MR. YALOWITZ:  And I have a witness who can talk about
18      that in the courtroom, your Honor.
19                THE COURT:  He was giving a lecture to whom?
20                MR. YALOWITZ:  He was giving a lecture to military
21      academy students.
22                THE COURT:  When you say military academy students,
23      these are?
24                MR. YALOWITZ:  Like their version of West Point.  So
25      he is in charge of West Point, and he's giving a lecture to the
```

F1F3SOK1

1    cadets.

2              THE COURT:  Of the PA's unit.

3              MR. YALOWITZ:  Correct.

4              THE COURT:  You say his job with the PA at that time

5    was what?

6              MR. YALOWITZ:  Chairman of that military academy.

7              THE COURT:  And you're offering this to demonstrate

8    what?

9              MR. YALOWITZ:  To demonstrate number one, Tirawi's --

10   to demonstrate that it is more likely, based on Tirawi's own

11   statements, that he was involved with two of the terror

12   incidents in this case to which he has been linked by

13   documentary evidence.  Number one.  And number two, to

14   demonstrate that it is more likely than not that the PA, by

15   employing an individual like Tirawi, who makes speeches like

16   that, had a policy in favor of supporting terror incidents.

17             THE COURT:  What statement in this video makes it more

18   likely he was involved in these incidents?

19             MR. YALOWITZ:  The whole video is encouraging people

20   to commit violence.

21             THE COURT:  Do you think that the conclusion is that

22   most or all people who encourage people to engage in violence,

23   that it is more likely than not that they were involved in

24   these incidents?

25             MR. YALOWITZ:  Well, you say all people.  I wouldn't

F1F3SOK1

1    agree with "all people."

2             THE COURT:  Most people?

3             MR. YALOWITZ:  But I think that, that in combination

4    with other evidence, this is a relevant and probative piece of

5    the puzzle for the jury.  And a significant part of my evidence

6    linking Tirawi to these incidents, not all of it, but a

7    significant part, is in the form of statements of his

8    co-conspirators.  Which, at least so far, the Court has said

9    you're inclined to keep out.

10            THE COURT:  So how do you intend to make that link?

11            MR. YALOWITZ:  We can make it through experts.  We

12   have some documentary evidence which the Court has ruled will

13   come in.

14            THE COURT:  So give me an example, and I just had it

15   from the letter, I don't know if this is the complete video

16   statement.  Give me the example from that statement or part of

17   the statement that you say is significantly probative of his

18   involvement in these acts.

19            MR. YALOWITZ:  What he's saying is --

20            THE COURT:  Just quote it to me.

21            MR. YALOWITZ:  It is the whole statement.

22            THE COURT:  You can't do that to me.  That doesn't

23   work for me.  Give me some word that the jury is supposed to

24   use to say that it makes it more likely than not that he was

25   involved in these particular terrorist attacks.  Give me an

F1F3SOK1

1    example.

2            MR. YALOWITZ:  All right.  An example.  "Jerusalem,"

3    which is where these terrorist attacks took place, "Jerusalem

4    needs thousands of martyrs."

5            THE COURT:  Okay.

6            MR. YALOWITZ:  And then, then at the bottom, he's

7    talking about two symbols.  One of the symbols is Jerusalem.

8    So these are the two symbols, one being Jerusalem, that you

9    have chosen as the title of this course.  These two symbols,

10   one being Jerusalem, "require blood, action, efforts,

11   resistance, and Palestinian unity."

12           Those are two examples, your Honor.

13           THE COURT:  Let me turn to Mr. Hill.  Mr. Hill, first

14   of all, there is a factual dispute here.  They claim he was a

15   PA employee at the time the statements were made, and you say

16   he was not.

17           MR. HILL:  He was not, your Honor.  If Mr. Eviatar is

18   the witness, Mr. Eviatar as an Israeli government employee,

19   will not have a factual basis to say who the PA did or did not

20   employ at the time.

21           THE COURT:  Up to what time, when did his employment

22   terminate?

23           MR. HILL:  My colleague tells me 2008, your Honor.

24           THE COURT:  What is the relationship between the

25   Palestinian Academy for Security Sciences and the PA?

F1F3SOK1

1          MR. HILL:  That is a school affiliated with the PA.

2          THE COURT:  His former position?

3          MR. HILL:  He was the head of the General Intelligence

4     Service during the relevant period.

5          THE COURT:  GIS?

6          MR. HILL:  Yes, sir.

7          THE COURT:  Is there a direct connection between the

8     academy and GIS?

9          MR. HILL:  No.

10         THE COURT:  They're not people who are trained to be

11    in the GIS?

12         MR. HILL:  No, sir.

13         THE COURT:  This is the first day I am aware of this

14    video.  When did you become aware of this video?

15         MR. HILL:  It's on my list, your Honor.  This document

16    was first produced to me on December 22, 2013, so just over a

17    year after the close of fact discovery.  Even though it existed

18    prior to the close of fact discovery, obviously.

19         THE COURT:  You say in your letter that the plaintiffs

20    described this exhibit as a video clip in which the PA's former

21    General Intelligence Service and Fatah leader gave a lecture.

22    What was his role with regard to Fatah?

23         MR. HILL:  I believe he is a member of the Fatah -- I

24    forget what the name is -- central committee.  I may have the

25    name wrong.

F1F3SOK1

```
 1              Central committee is the name.
 2              THE COURT:  Previously and currently, as far as you
 3     know?
 4              MR. HILL:  I believe he is currently a member.  That's
 5     an elected position within Fatah.
 6              THE COURT:  Let me just turn back one more time.
 7     Mr. Yalowitz, is there some reason that you described him as a
 8     former General Intelligence Service leader and you describe him
 9     now as a current employee?
10              MR. YALOWITZ:  Because his job was, until 2008, his
11     job was he was in charge of the General Intelligence Service.
12     Call it for analogy CIA.  Then he became, from 2008 to 2009, he
13     became special advisor to the -- special security advisor to
14     the president of the PA.  Then after that, he became, according
15     to our information, chairman of this military academy.
16              THE COURT:  Show me that proof.
17              MR. YALOWITZ:  Would you stand up, Mr. Eviatar.  Can
18     we put him on?
19              THE COURT:  No.  I want to know where that information
20     comes from.  I want to know what documentation is being relied
21     upon to say he has that position.
22              MR. YALOWITZ:  His basis is Tirawi's own Facebook
23     page.
24              THE COURT:  His Facebook page says --
25              MR. YALOWITZ:  That he's chairman of this military
```

F1F3SOK1

1    academy.

2              THE COURT:  That information was put on his Facebook

3    page when?  Do you have that Facebook page?

4              MR. YALOWITZ:  I need to consult, your Honor.

5              THE COURT:  All right.  So the basis on which you say

6    he was an employee of the PA in 2009 is his Facebook page from

7    when?

8              MR. YALOWITZ:  I need to consult, your Honor.  I don't

9    know.  May I?

10             THE COURT:  You can consult.

11             MR. YALOWITZ:  Thank you.

12             (Pause)

13             MR. YALOWITZ:  Your Honor, Mr. Eviatar reports to me

14   that if you go on his Facebook page today, Tirawi's Facebook

15   page, he has his CV.  And on his CV he says "from 2009, I have

16   been chairman of this military academy."

17             THE COURT:  Okay.  And that's Mr. Eviatar's only basis

18   to believe that he's currently a PA employee?

19             MR. YALOWITZ:  I think the defendants have just

20   acknowledged that he is associated with this military academy.

21             THE COURT:  They acknowledge he gave a lecture.

22             MR. YALOWITZ:  I think they acknowledge -- their

23   position is he's not chairman, he is a special advisor.

24             THE COURT:  Well, is it your position that he is an

25   employee?

F1F3SOK1

1          MR. YALOWITZ:  He's chairman.  I don't know whether

2    they pay him or somebody else pays him.  But my position is I

3    believe him when he says he's chairman.

4          THE COURT:  Okay.  This videotape --

5          MR. YALOWITZ:  Your Honor, my position also, well, I

6    know you have a view and I don't want to belabor it.

7          THE COURT:  Look, as I always say, best decisions

8    aren't made by smart people, they're made by informed people.

9    Give me as much information as you want to give me, and I'll

10   give you my best judgment.

11         MR. YALOWITZ:  My core issue is I'm not offering this

12   for the truth.  I'm offering it to show his state of mind and

13   to show the policy of the PA.

14         THE COURT:  Why would his state of mind in 2009

15   reflect the policy of the PA, if he's no longer a PA employee,

16   even if he is associated with them?

17         MR. YALOWITZ:  I think it is a reasonable inference

18   that his state of mind in 2009 is -- where he says "we need

19   blood and action" is reflective of his state of mind in 2002

20   when he was sending suicide terrorists into the territory of

21   Israel.  I think that's a fair inference the jury could draw.

22              I'm not offering it to prove that they need blood and

23   action.  I'm offering it to prove that this is a guy who

24   believes they need blood and action.  So that's my position.

25   The fact that he's -- the truth is, we got wrapped around the

F1F3SOK1

1    axle of what was his position at that time.  But I'm not

2    offering it to prove that it's true and therefore they admitted

3    it.  I'm offering it to prove this is who that guy is.

4                THE COURT:  All right.

5                MR. YALOWITZ:  So I just want to be clear on that.

6                THE COURT:  Sure.  This videotape is inadmissible for

7    that purpose.

8                MR. YALOWITZ:  All right.

9                THE COURT:  It is made at a time -- I can be very

10   specific -- at least seven years after the incidents at issue.

11   What his opinion was at that time has minimal, if any,

12   probative value.  It is clearly outweighed by the prejudicial

13   effect of the nature of the statements.  If the statements in

14   2009 were that "I am proud that I was a leader of the attacks

15   that happened back in 2002," then I would say that that would

16   be an admissible state of mind, not necessarily admitted for

17   its truth.  But that's not what it says.  It makes no reference

18   to any attacks.  It is the kind of heightened rhetoric outside

19   the relevant time period that we discussed otherwise.  And

20   under these circumstances, it would be inappropriate, even if

21   there was some slight probative value with regard to these

22   statements and his state of mind in 2009.  It would be

23   inappropriate to attribute his statements and his state of mind

24   in 2009 to the PA and the PLO in 2001 and 2002.

25               So, for those reasons and other reasons, primarily

F1F3SOK1

 1    though, I find that this is not admissible and does not make it

 2    more likely than not that these statements reflect evidence of

 3    his participation in the acts at issue.

 4              MR. YALOWITZ:  Thank you, your Honor.  I have an issue

 5    with regard to the videos, your Honor.

 6              THE COURT:  Let me hear from Mr. Hill.

 7              MR. YALOWITZ:  He wants to go on to a new topic I

 8    think.

 9              THE COURT:  You want to go into a new topic too.

10              MR. YALOWITZ:  I do.

11              THE COURT:  So you want to go first?

12              MR. YALOWITZ:  It's all right.  As your Honor wishes.

13              THE COURT:  I don't wish.

14              MR. YALOWITZ:  You get to decide.

15              MR. HILL:  I just wanted to note we do have a issue

16    with one of the exhibits that may be used with Mr. Eviatar.  It

17    is Exhibit 212.

18              THE COURT:  In terms of timing, do you have an

19    approximate time that you will use with this witness who is on

20    the stand?

21              MR. ROCHON:  I think it will be less than 45 minutes.

22              THE COURT:  Are you finished with your direct

23    examination?  Did you have further questions?

24              MR. YALOWITZ:  No, I'm finished with my direct, your

25    Honor.  If I could just flag one other issue for the Court.  I

F1F3SOK1

1    sent a letter January 12 with regard to, I don't know, about

2    eight or 10, maybe 15 videos, something like that.  We gave the

3    Court a disc of it.  224 was one of those videos.  And at some

4    point in the next day or two, I think I'd like the Court to

5    carve out time to go over them, because there are a number of

6    them we are going to want to use.

7            THE COURT:  You have to remind me the nature of the

8    current dispute about the videos.

9            MR. YALOWITZ:  I'm not sure that the defendants have

10   responded.

11           THE COURT:  Right.

12           MR. YALOWITZ:  But I just --

13           THE COURT:  Is it a dispute?  I wasn't aware there was

14   a dispute.

15           MR. ROCHON:  Yes.

16           MR. YALOWITZ:  There always seems to be, your Honor.

17           MR. ROCHON:  All right.

18           THE COURT:  That's why we're here.

19           MR. ROCHON:  Yes.  We're focusing on the exhibits they

20   said they would do first today so we don't unduly delay the

21   jury.  And so the one we just addressed is the first day, and

22   we appreciate the plaintiffs telling us which ones are first

23   day and second day with this witness.

24           THE COURT:  Have you identified for them which videos

25   you have an objection to?

F1F3SOK1

1           MR. ROCHON:  Yes.

2           MR. YALOWITZ:  May I consult with Mr. Rochon for a

3   moment, your Honor?

4           THE COURT:  Yes.

5           MR. YALOWITZ:  They object to them all.

6           MR. ROCHON:  We're not in agreement on the videos,

7   your Honor.

8           THE COURT:  When are we going to get to the next

9   video?

10          MR. YALOWITZ:  Let's see how the day goes.

11          THE COURT:  Do you think it is today?

12          MR. YALOWITZ:  No, it is not today.

13          THE COURT:  All right.  Possibly tomorrow?  Or not

14  until next week?

15          MR. YALOWITZ:  Anything that I think we are going to

16  get to today or tomorrow I have identified for the defendants.

17  And as far as I can tell, they've flagged what they're

18  concerned about to the Court.

19          THE COURT:  I'm not sure they flagged what they're

20  concerned about to the Court.

21          MR. ROCHON:  There is a couple of things.

22          THE COURT:  You haven't told me what you objected to.

23          MR. ROCHON:  No.  We've exchanged something on the

24  redactions overnight.  Because there is one conviction they

25  want to use today, and we sent them proposed redactions to it

F1F3SOK1

1    yesterday evening.  We haven't talked to them about how those

2    will go.  We should do that before they seek to use that with

3    the witness.

4                MR. YALOWITZ:  I agree with that.

5                MR. ROCHON:  There is an Exhibit 212 that Mr. Hill was

6    about to raise that we want to talk to them about.  But I think

7    we'll need to talk to the Court.

8                THE COURT:  Can you just hand me a copy of 212 so I

9    can look at it during examination so I can be prepared to

10   intelligently talk about it.

11               MR. YALOWITZ:  And just, your Honor, I'm curious to

12   hear from Mr. Rochon and his team, his army, what parts of 212

13   they're concerned about, because we might be able to work that

14   out.

15               THE COURT:  All right.  When I get it, I assume the

16   two of you have already discussed it.  So discuss it if you

17   haven't discussed it.

18               MR. YALOWITZ:  We have not.

19               THE COURT:  Don't raise it with me.

20               MR. ROCHON:  If it turns out they're not going to use

21   it in the morning portion, we'll talk about it at lunch.

22               MR. YALOWITZ:  I'll give the Court and Mr. Rochon my

23   assurance that even if I had been planning to use it in the

24   morning, I'll just do something else.

25               THE COURT:  All right.

F1F3SOK1

1              MR. ROCHON:  Thanks.

2              THE COURT:  Let's get the jury.  They're here, they're

3     waiting for us.  Let's bring them in and continue.  Can we put

4     the witness back in the box.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1F3SOK1

1           (Jury present)

2           THE COURT:  Good morning, ladies and gentlemen.  We're

3     prepared to continue at this time.

4           Mr. Yalowitz, do you have any further examination of

5     Mr. Kaufman?

6           MR. YALOWITZ:  No, sir.  I tender the witness.  Thank

7     you, your Honor.

8           THE COURT:  Cross-examination.

9      NICHOLAS KAUFMAN,

10    CROSS-EXAMINATION

11    BY MR. SATIN:

12    Q.  Mr. Kaufman, good morning.

13    A.  Good morning, Mr. Satin.

14          Good morning, members of the jury.

15    Q.  The cases you testified about yesterday were all criminal

16    cases, correct?

17    A.  Correct.

18    Q.  In each case there was an individual who was on trial?

19    A.  Correct.

20    Q.  You and Mr. Yalowitz took turns reading from their court

21    records?

22    A.  That's in fact what happened yesterday, yes.

23    Q.  And the individual whose case you were reading about was

24    often referred to as "the defendant"?

25    A.  Correct.

F1F3SOK1                          Kaufman - cross

1    Q.  Because in a criminal case, the person who is on trial is

2    called the defendant?

3    A.  Correct.

4    Q.  So, for example, in the case of Abdullah Barghouti, the

5    case record would call him "the defendant," correct?

6    A.  Correct.

7    Q.  For a different defendant, let's say Ibrahim Abdel Hai,

8    that person was also referred to as "the defendant"?

9    A.  If it is his own case, yes.

10   Q.  Just to be clear, none of those case records that you

11   reviewed and testified about yesterday was the Palestinian

12   Authority the defendant?

13   A.  No.

14   Q.  I'm sorry?

15   A.  No.

16   Q.  No?

17   A.  No, no, no.  Of course not.  No.

18   Q.  The same is true for the PLO?

19   A.  That's correct.

20   Q.  Neither the PLO nor the PA was the defendant in the cases

21   you reviewed and testified about yesterday?

22   A.  Correct.

23   Q.  Yesterday you also mentioned the name of some of the

24   victims of these crimes?

25   A.  Correct.

F1F3SOK1                      Kaufman – cross

1    Q.  And some of the names you mentioned are not plaintiffs in

2    this case, correct?

3    A.  That's correct.

4    Q.  Let's talk about your background for a minute.  You were a

5    prosecutor for a number of years?

6    A.  Correct.

7    Q.  Between 1996 and 2010?

8    A.  Correct.

9    Q.  And that was in an Israeli civilian court?

10   A.  Correct.

11   Q.  In Jerusalem?

12   A.  Correct.

13   Q.  And the case files you reviewed, with one exception, were

14   not from the Israeli civilian court, correct?

15   A.  Correct, there was one, Nasser Aweis, and that was from the

16   civilian court.

17   Q.  All the other ones were from the Israeli military court?

18   A.  What I'm familiar with, one Barghouti case as well, but

19   that's also a civilian court.

20           But you are absolutely right.  Only Nasser Aweis.

21   Q.  We are talking about the cases you reviewed and testified

22   about in this case.

23   A.  The cases about which I testified yesterday, only one, to

24   the best of my recollection, was in an Israeli civilian court.

25   Q.  To be clear, there are two separate court systems, the

1    Israeli civilian court system and the Israeli military court

2    system?

3    A.  You're right.

4    Q.  You were a prosecutor in the Israeli civilian court system?

5    A.  Correct.

6    Q.  At the same time you were, if I understand correctly, still

7    are a judge in the Israeli military court system?

8    A.  From 2002, yes, there was a period of overlap when I was a

9    prosecutor and a judge.

10   Q.  Your work as a judge in the Israeli military court system,

11   that was not a full-time job, correct?

12   A.  It was my compulsory reserve military duty.

13   Q.  So you say compulsory reserve military duty, that means you

14   had to do it as part of your service for the Israeli military?

15   A.  Correct.

16   Q.  Something you volunteered to do -- well, the service is

17   required, but it was your choice to do it in the Israeli

18   military court system?

19   A.  You're right, and I've given you the reasons why.  Do you

20   wish me to explain why again?

21   Q.  I'm just asking you the questions.

22   A.  Yes, it was my choice to serve as a judge.

23   Q.  In the Israeli military court system?

24   A.  Correct.

25   Q.  And the judges in the Israeli military court system are

F1F3SOK1                        Kaufman - cross

1    members of the Israeli military?

2    A.   Correct.

3            MR. YALOWITZ:  Your Honor, can I have a side bar

4    please.  I have an objection.

5            THE COURT:  Come up.

6            (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1F3SOK1                    Kaufman - cross

1            (At the sidebar)

2            MR. YALOWITZ:  Okay, your Honor has ruled that putting

3    the Israeli military court system on trial is inappropriate.

4    That's not going to happen in this case.  Mr. Satin just asked

5    a question, of which the only possible relevance can be to

6    challenge the validity of the military court proceedings.  And

7    we're just not going down that road.  I thought we were clear

8    about that.

9            MR. SATIN:  The Court said we can elicit information

10   about how the system works.  I'm not going to talk about its

11   fairness.

12           MR. YALOWITZ:  I didn't open that door.

13           MR. SATIN:  He brought out evidence about the

14   military --

15           THE COURT:  Don't debate each other.  Tell me what

16   you're going to do and where you're going.

17           MR. SATIN:  I'm eliciting basic facts, and I'm

18   confident he will say "yes" about the military court system.

19   Who the judges are, who the prosecutors are, what the cases are

20   in front of them.  That's it.

21           MR. YALOWITZ:  The purpose of that, your Honor, is to

22   make it appear that the military courts treat defendants

23   unfairly.  That's his purpose for bringing it out.

24           THE COURT:  No, he can elicit information about how

25   the court system works.  And nothing so far --

1            MR. YALOWITZ:  Why is it relevant?

2            THE COURT:  The jury wants to understand how these

3   people got convicted.  I think that's legitimate.

4            MR. YALOWITZ:  I think he's really treading up against

5   your ruling, and I think they're trying to slip in the exact

6   thing that we raised in limine and the Court said they can't

7   do.

8            THE COURT:  Well, I don't think he's crossed that line

9   yet.  I think he's asked basic questions about how the court

10  system works and what his role was in the court system.  And

11  whether or not his experience is in one court or the other

12  court.  I don't think anything that he's asked so far implies

13  that one system is somehow unfair and the other system is

14  somehow not unfair.

15           And so, the nature of the questions he's asked so far

16  have not crossed that line.  If you have a specific objection

17  to a specific question that you think is eliciting that kind of

18  information, I'll hear it.  But so far, I think these are

19  perfectly legitimate questions, and not much different than the

20  questions that you asked for this witness to explain to them

21  the way they got convicted and how the court works.

22           MR. YALOWITZ:  Let me be very clear.  I didn't have a

23  problem with any of his questions until the one I objected to.

24           THE COURT:  And you objected to?

25           MR. YALOWITZ:  The one I objected to was all the

F1F3SOK1                        Kaufman – cross

1    judges was -- can I have the question back?  I want to be very

2    specific.

3                 (The record was read)

4                 THE COURT:  Is that untrue or is that prejudicial?

5                 MR. YALOWITZ:  It is prejudicial.

6                 THE COURT:  Is that criticism of the court system?

7                 MR. YALOWITZ:  Yes.  What he's going to do --

8                 THE COURT:  Not "what he's going to do."

9                 MR. YALOWITZ:  It is never too early.  We'll take it

10   question by question.

11                THE COURT:  That's what I just said.  I said the

12   questions so far are not objectionable.  So if we get to an

13   objectionable question, then you can make that objection.  But

14   your objection to that question is overruled.

15                MR. YALOWITZ:  I understand.

16                (Continued on next page)

17

18

19

20

21

22

23

24

25

1                    (In open court)

2    BY MR. SATIN:

3    Q.  The prosecutors in the Israeli military court system are

4    also members of the Israeli military?

5                    MR. YALOWITZ:  Objection.

6                    THE COURT:  Overruled.

7    A.  Yes.

8    Q.  You testified first on Tuesday and you said that as a

9    prosecutor you prosecuted state security offenses, correct?

10   A.  Correct.

11   Q.  And state security offenses are not just violent crimes

12   committed against Israeli civilians, correct?

13   A.  They can be -- could you clarify your question?

14   Q.  Sure.

15   A.  Give me an example.

16   Q.  A state security offense is if there is a crime against

17   Israeli soldiers?

18   A.  That would be correct.

19   Q.  It is a state security crime if it is a -- destruction of

20   military property would be a state security offense as well,

21   correct?

22   A.  I would say correct, yes.

23   Q.  Even membership in a prohibited or an illegal organization

24   is a state security offense, correct?

25   A.  Correct.

F1F3SOK1                        Kaufman – cross

1    Q.  Failure to prevent an offense is considered a state

2    security offense?

3    A.  Not necessarily, no.

4    Q.  But it can be?

5    A.  Let me explain to you my thought process and why I took my

6    time to think about the last question.  Because we do have a

7    certain category of offenses under Israeli criminal code which

8    are called offenses against the security of the state.  The

9    first set of offenses that you put to me could potentially fall

10   within that category.  The last offense which you put to me,

11   failure to prevent an offense, does not fall in that category,

12   no.

13   Q.  One of the cases you reviewed was the case of the military

14   prosecutor versus Bashar Barghouti, correct?

15   A.  Correct.

16   Q.  That was related to the January 22, 2002, attack, correct?

17   A.  Correct.

18   Q.  In that case, Bashar Barghouti was charged and convicted

19   of, quote, failure to prevent an offense, correct?

20   A.  Correct.

21        MR. SATIN:  Justin, if would please put on the monitor

22   plaintiff's trial exhibit 390A.

23   Q.  This is from the case of the military prosecutor versus

24   Bashar Barghouti, correct?

25   A.  That's indeed correct.

F1F3SOK1                       Kaufman - cross

1          MR. SATIN:  Justin, if you could highlight where it

2     says details of the offense.

3     Q.  And what's been highlighted here, Mr. Kaufman, is what

4     makes up the crime of failure to prevent an offense, correct?

5     A.  This is under a military legislation.  Okay.

6     Q.  So I'm going to read it here, and you tell me if I've read

7     it correctly.

8          "The above-named defendant in the area on January 20,

9     2002, or thereabouts, while knowing or having reasonable

10    grounds to suspect that another person was committing or

11    planning to commit a violation of law or security legislation

12    whose sentence exceeds three years imprisonment, did not

13    provide notice of this immediately to a military commander or

14    the nearest police station or any IDF officer or did not act in

15    another reasonable manner to prevent the commission,

16    continuation, or completion thereof as follows."

17         That's what it says, correct?

18    A.  Correct.

19    Q.  Just so we're clear, where it says "IDF," that refers to

20    Israeli Defense Forces?

21    A.  Correct.

22    Q.  That's the name of the Israeli military?

23    A.  Correct.

24    Q.  Do you consider that a state security offense?

25    A.  Generically speaking, yes.  But let me clarify.  All

1    offenses in an Israeli military court by their very nature are

2    against the IDF or its security interests of the State of

3    Israel.  However, when you asked me about the specific offense

4    of failing to prevent a criminal offense, that's also based in

5    Israeli civilian legislation, and it is not necessarily an

6    offense against the security of the state.

7    Q.  Between 2000 and 2004, there were thousands of Palestinians

8    charged with state security offenses, correct?

9          MR. YALOWITZ:  Objection.

10   A.  I don't know.

11         THE COURT:  Overruled.  Do you know?

12         THE WITNESS:  I don't.

13   Q.  Let's talk for a minute about your role in this case.  You

14   weren't the judge in any of the cases that you testified about,

15   correct?

16   A.  Correct.

17   Q.  You weren't the prosecutor?

18   A.  Correct, I was not the prosecutor in any of these cases.

19   Q.  Your only role with respect to these cases is you reviewed

20   them and gave testimony about them, correct?

21   A.  Correct.

22   Q.  None of the files that you reviewed relate to an attack on

23   June 19, 2002, correct?

24   A.  Correct.

25   Q.  Of the case files you received, only one case related to

F1F3SOK1                         Kaufman – cross

1   the attack on January 27, 2002, correct?

2   A.   Munzar Noor.

3   Q.   That was the only one?

4   A.   Correct.

5   Q.   Yesterday there was an image from the March 21, 2002,

6   attack.

7           Justin, if you can please put that on the screen.

8           Do you remember this image from yesterday?

9   A.   Yes.

10  Q.   You see the individual on the left whose name is Toufik

11  Tirawi, correct?

12  A.   Correct.

13  Q.   I'm not going to wack the screen with a stick, but you know

14  who I'm talking about?

15  A.   Yes.

16  Q.   That individual was never charged in connection with the

17  March 21, 2002, attack, correct?

18  A.   I don't know.

19  Q.   You certainly didn't receive a file for Toufik Tirawi,

20  correct?

21  A.   I did not receive a file for Toufik Tirawi.

22  Q.   Thank you.  I just want to ask you some questions about the

23  July 31, 2002, attack.  This is the one at Hebrew University,

24  correct?

25  A.   Correct.

F1F3SOK1                         Kaufman - cross

1   Q.  Abdullah Barghouti was convicted in connection with that

2   crime, correct?

3   A.  Correct.

4   Q.  That date was July 31, 2002?

5   A.  21.

6   Q.  I'm sorry?

7   A.  Let me check.

8   Q.  Sure.  Please do.

9   A.  July 31, yes.

10  Q.  In fact, in the indictment it says the date of that

11  offense?

12  A.  Correct.

13  Q.  I'm sorry?

14  A.  Correct.

15  Q.  It lists the details of the offense; in other words, what

16  happened?

17  A.  Correct.

18  Q.  Abdullah Barghouti was also convicted of being a member of

19  Hamas, correct?

20  A.  Let me refresh my memory.

21  Q.  I'll direct your attention to Count Two if that's helpful

22  to you.

23  A.  You're right, Mr. Satin.  He was convicted of membership in

24  the proscribed organization.  Az-Adin Alqassam, that's the

25  Hamas.

F1F3SOK1                        Kaufman - cross

1    Q.  In that same binder that was given, it discusses an

2    individual named Ahmed Barghouti, correct?

3    A.  Correct.

4    Q.  Ahmed Barghouti was convicted of a number of crimes, right?

5    A.  Correct.

6    Q.  His indictment has 53 counts in it all together, correct?

7    A.  Let me refresh my memory.

8    Q.  Please.

9    A.  Correct, Mr. Satin.

10   Q.  Not one of those 53 convictions was for the July 31, 2002,

11   Hebrew University attack, correct?

12   A.  Not specifically, no.

13   Q.  Well, nowhere in the 53-count indictment is the Hebrew

14   University attack on July 31, 2002, even mentioned, correct?

15   A.  To the best of my knowledge, no.

16   Q.  In fact, at the time of the attack, you said the date was

17   July 31, 2002.  We're in agreement about that.

18   A.  Correct.

19   Q.  At that time on July 31, 2002, Ahmed Barghouti was already

20   in jail, correct?

21   A.  I can't tell you offhand.

22   Q.  If you would look at plaintiff's trial exhibit 357.

23            Justin, if you would please put that on the screen.

24            This is from the amended indictment of the military

25   prosecutor versus Ahmed Barghouti, correct?

F1F3SOK1                    Kaufman - cross

1    A.  Correct.

2    Q.  It says on the bottom -- I'm no longer on the bottom.  It

3    says there that he's been detained since April 15, 2002.

4    A.  Correct.  That would be before July the 31st.

5    Q.  Detained means he's in jail, right?

6    A.  It means he is on remand until the end of his criminal

7    proceedings.

8    Q.  When you say he's on remand, he's locked up.  He's not free

9    to go?

10   A.  He's not free to go, no.

11   Q.  Ahmed Barghouti was convicted of giving shelter to Abdullah

12   Barghouti, correct?

13   A.  Correct.

14   Q.  I'll direct your attention to count 51 on page 73, if

15   that's helpful.  Also on the screen, if that's more helpful.

16   A.  Yes.

17   Q.  Again, like in the other indictments, it gives the date of

18   this offense, correct?

19   A.  Correct.

20   Q.  That date is in late 2001 or thereabouts, correct?

21   A.  Correct.

22   Q.  If you would turn the page, Justin, if you would go to the

23   second page as well, the shelter, the lodging that Ahmed

24   Barghouti gave to Abdullah lasted for, quote, several days,

25   correct?

F1F3SOK1                         Kaufman - cross

1   A.  Several days, yes.  It says that on the end of the second

2   paragraph.

3   Q.  So you'd agree that in late 2001 or thereabouts, Ahmed

4   Barghouti gave shelter to Abdullah Barghouti for several days?

5   A.  I agree that that's what the indictment says, yes, and

6   that's what he pleaded guilty to.

7   Q.  And in late 2001 or thereabouts was at least seven months

8   before the Hebrew University attack on July 31, 2002, correct?

9   A.  Can you repeat the question, please.

10  Q.  Well, let me break it down.  So this may be the easiest

11  question ever asked.

12          December 31 is the last day in 2001, correct?

13  A.  Correct.

14  Q.  So December 31 is seven months before July 312002?

15  A.  Correct.

16          MR. SATIN:  Nothing further.

17          THE COURT:  Any further questions, Mr. Yalowitz?

18          MR. YALOWITZ:  No, your Honor.

19          THE COURT:  Thank you, sir.  You can step down.

20          (Witness excused)

21          THE COURT:  Mr. Yalowitz, call the next witness.

22          MR. YALOWITZ:  Plaintiffs call Alon Eviatar.

23          (Witness sworn)

24          THE COURT:  Could you state and spell your name for

25  the court reporter.

F1F3SOK1                        Kaufman - cross

1         THE WITNESS:  My name is Alon Eviatar.  The spelling

2    in English is A-L-O-N E-V-I-A-T-A-R.

3         THE COURT:  You can inquire.

4         MR. YALOWITZ:  Thank you, your Honor.

5    ALON EVIATAR,

6         called as a witness by the Plaintiffs,

7         having been duly sworn, testified as follows:

8    DIRECT EXAMINATION

9    BY MR. YALOWITZ:

10   Q.  Mr. Eviatar, thank you for coming in.  Would you tell the

11   jury where you grew up.

12   A.  I grew up in the State of Israel.

13   Q.  Would you tell the jury just a little bit about what it was

14   like growing up in the State of Israel.

15        MR. ROCHON:  Objection, your Honor.

16        THE COURT:  Sustained to the form of the question.

17   Q.  Could you describe a little bit of your background before

18   you went to university, please.

19   A.  I was drafted into the Israel Defense Forces at age 18.  I

20   served consecutively for 27 years.  And during the course of

21   that period of time, I studied for two academic degrees at

22   university.

23   Q.  Before you went in the army, what did you do?

24   A.  I grew up as a boy in one of Israel's cities.  I was active

25   for many years in a youth movement, I served as a counselor in

F1F3SOK1                    Eviatar - direct

1    the youth movement.

2              Should I speak about my hobbies as well?

3    Q.  With the Court's indulgence.

4              THE COURT:  A little indulgence.

5    A.  I really love to travel and hike, and I love to read.  And

6    I guess that will be enough for now.

7    Q.  Mr. Eviatar, do you speak the Arabic language?

8    A.  Yes, I speak the Arabic language.  I studied it during all

9    of my studies at school, including for my matriculation exams,

10   and I was tested in Arabic as well.

11   Q.  How would you describe your level of fluency with reading

12   and speaking the Arabic language?

13   A.  I would define it as a very good level of Arabic.

14   Q.  Mr. Eviatar, could you just try to adjust your microphone

15   so that the jury can hear your voice a little bit.

16             THE COURT:  Just pull it down towards you.

17   Q.  Now, what about the English language?

18   A.  I read English, I understand English at a level that I

19   would describe as medium to good.  And I speak a reasonable

20   level of English.

21             I should just note that I've been in New York now for

22   10 days, and my English has gotten better over the past 10

23   days.

24   Q.  Okay.  Mr. Eviatar, could you take us back to your army

25   career.  You said you were drafted in at the age of 18.  Where

F1F3SOK1                        Eviatar - direct

1    were you assigned at the beginning of your military career?

2    A.  I was drafted on a volunteer basis to the largest

3    intelligence unit in the Israel Defense Forces.  It belongs to

4    the intelligence branch.  And I served there as an intelligence

5    officer, I would say in several different intelligence arenas.

6    And that was for a period of 12 years.

7    Q.  During that time, did you pursue academic studies as well?

8    A.  Yes.  I studied on behalf of the IDF.  I was sent by the

9    military to university, and I did my bachelor's degree there in

10   middle eastern studies and political science.

11   Q.  Did you pursue studies after your bachelor's degree?

12   A.  Yes.  I continued to study for my master's degree in 2009,

13   and I completed my master's degree at the university in

14   accordance with the academic requirements.

15   Q.  What did you focus on for your master's degree?

16   A.  I studied political science and public policy.

17   Q.  Now, you mentioned you were in that intelligence unit for

18   12 years.  What areas or what arenas did you focus on?

19   A.  The two primary arenas that I dealt with were the Egyptian

20   area, the Syrian area, and during the course of that period of

21   time, I also served in a guidance capacity for other

22   military -- for other intelligence officers.

23   Q.  About what year does that take us to, the years between

24   ages 18 and 30?

25   A.  I didn't really understand the question.

F1F3SOK1                          Eviatar – direct

1    Q.   Oh.   What year did you finish your work in that

2    intelligence unit and move on to another area?

3    A.   Approximately age 30.

4    Q.   What year was that in chronological time?

5    A.   It was in 1998.   Then, I moved to a different unit.   I'd

6    only like to note I remember this very well, because that's

7    also the year when I got married.

8    Q.   What was the new unit that you moved to in 1998?

9    A.   The unit is called the COGAT unit.   Coordination of

10   Government Activities in the Territories.

11   Q.   What does the COGAT unit do?

12   A.   This unit is charged on behalf of the government of Israel

13   and the Israel Defense Forces with the entire system of

14   coordination and liaising with the Palestinian Authority, with

15   international organizations, and all of the other official

16   organizations that operate in the areas of the Palestinian

17   Authority.

18   Q.   How long were you in the COGAT unit?

19   A.   I served in the COGAT unit for approximately 15 years

20   straight.

21   Q.   Let me just make sure that we understand.   Coordination of

22   Government Activities in the Territories.   For somebody who is

23   unfamiliar with the territories, is that Gaza and the West

24   Bank?

25   A.   Precisely.

F1F3SOK1                    Eviatar - direct

Q.  So, did your work actually bring you to travel throughout
Gaza and the West Bank during your period of service?

A.  During the course of 10 years straight, I served in those
territories.  I traveled throughout the West Bank on a daily
basis.  And when I served in the Gaza Strip, I traveled there
as well.

Q.  By the end of your tenure within the Coordination Unit,
what was your military rank?

A.  I completed my service in the military with the rank of
lieutenant colonel.

Q.  At the end of your period of service, what was your
particular job?

A.  For a period of several years, I served as the head of the
consultation unit for Palestinian affairs in the headquarters
of COGAT, Office for the Coordination of Government Activities
in the Territories.  And I served as a personal advisor for the
head of the -- head of COGAT for Palestinian affairs.

Q.  In focusing on Palestinian affairs, what kinds of things
did you watch and evaluate?

A.  In fact, all the affairs that could be included in
intelligence affairs in the Palestinian arena were available to
me.  I regularly investigated and exposed all the relevant
materials from the Palestinian media, from the Palestinian
media, from all the various types of media.  I held -- I
maintained very close ties with hundreds of Palestinians

F1F3SOK1                    Eviatar - direct

1    throughout all those years.  I met personally, I would say,

2    with thousands of Palestinians from all the various sectors,

3    from all the various parts of society, official and unofficial,

4    in all possible roles and functions, from the various

5    movements.  I also maintained professional ties with research

6    institutes, academic institutes which have ties and interests

7    in the Palestinian arena.

8    Q.  Did you study the power structure of the Palestinian

9    Authority, the PLO, and Fatah?

10   A.  Of course.  That is the basis, the first and foremost of my

11   professional activities.

12   Q.  And did you study what might be called the Palestinian

13   street?

14   A.  Not only did I investigate it, that is the particular

15   specialty of my unit.

16   Q.  What kinds of things did you do to investigate that area?

17   A.  Daily, for many years, I and my people, we followed very

18   closely and read, we watched, we observed, the Arab, Arabic and

19   Palestinian media, both on the level of the ongoing current

20   events, and also observed ongoing longer term trends.

21          We, and I as the head of the department, held regular,

22   personal meetings with Palestinian officials and individuals,

23   and held discussions and meetings with those Palestinian

24   officials and people and also, held daily phone calls.

25          I also personally focused on actually traveling the

F1F3SOK1                          Eviatar - direct

1    field.  I maintain that there is nothing better than seeing

2    things for yourself.  I would enter Palestinian villages in a

3    military jeep, and I was also privileged to receive invitations

4    from my Palestinian colleagues in the Palestinian cities.

5    Q.  You mentioned that you were running a department.  How many

6    individuals did you supervise?

7    A.  About 50 officers and investigators.

8    Q.  Did you have occasion, as head of the department, to give

9    the reports, briefings, or advice to others?

10   A.  That was my daily work.  All the knowledge that I

11   accumulated, the understandings, the conclusions, and

12   recommendations, I presented in writing in the context of

13   reports of every different kind.  A report can be one page, and

14   it can be a 300-page book.  And all these were disseminated to

15   all the various intelligence units and levels in Israel.

16   Q.  Let me just ask you a little bit about those written

17   reports.  Before you signed off on a written report, did you

18   review it?

19   A.  First of all, some of those reports I myself wrote.  And

20   every other report that crossed my desk was not disseminated

21   without my authorization.

22   Q.  When you signed off on a report that somebody else had

23   drafted, did you take personal responsibility to ensure its

24   accuracy?

25   A.  Definitely.  One of my professional roles was to monitor

F1F3SOK1                          Eviatar – direct

1    and control the professional work of those working under me.

2              (Continued on next page)

F1fQsok2                    Eviatar - Direct

1   Q.  Now, I think you may have mentioned, but let me just make

2   sure I've got it.  Did you give oral briefings to military and

3   civilian officials?

4   A.  Of course.  That's part of my regular job.  I debriefed

5   officers serving under me and my superiors, including oral

6   reports and surveys that I delivered to the chief of staff

7   himself.

8   Q.  And civilian officials as well?

9   A.  Civilians who held official positions in government

10  ministries, such as the prime minister's office.  I can recall

11  a meeting that I participated in in the presence of the prime

12  minister, the ministry of foreign affairs, the ministry of

13  defense, the ministry of strategic affairs, the ministry of the

14  treasury, and others.

15  Q.  Now, did there come a time when you created a special

16  department dealing with intelligence --

17          MR. ROCHON:  Objection, leading.

18          THE COURT:  I will allow it.

19          MR. YALOWITZ:  Thank you.  It's customary to allow the

20  question to be finished before the objection is lodged.

21          THE COURT:  If you want to ask the question, you'd

22  better stop arguing.

23          MR. YALOWITZ:  Thank you, your Honor.

24          THE COURT:  Ask the question.

25  Q.  Did there come a time when you were involved in the

F1fQsok2                          Eviatar - Direct

1    creation of an intelligence department about a particular

2    organization?

3    A.  Yes, definitely.

4    Q.  Would you tell us about that?

5    A.  After the abduction of the soldier Gilad Shalit, I remember

6    clearly this incident in 2007.  It could have been late 2006.

7    I established a special department, this was for the first

8    time, which dealt with the collection of information from the

9    civilian apparatus of Hamas in the West Bank.  We're talking

10   about hundreds of institutions that belonged to Hamas.  From

11   there we collected on an ongoing basis.

12           MR. ROCHON:  Excuse me.  Objection.  Your Honor, may

13   we approach the bench?

14           THE COURT:  Come up.

15       (Continued on next page)

16

17

18

19

20

21

22

23

24

25

F1fQsok2                        Eviatar - Direct

1          (At the sidebar)

2          MR. ROCHON:  This is improper testimony.  The reason

3    it's improper is because it's 2006 and 2007 about the Hamas.

4    As the Court knows, about 2006 and 2007, Hamas not only split

5    from my client's government, it had actually overthrown it and

6    pushed them out of the Gaza Strip and were killing members of

7    the non-Hamas part of the government in Gaza and where they

8    could in the West Bank.  So this testimony about all this work

9    related to Gilad Shalit; that he was a soldier who was

10   kidnapped by Hamas and of course when they dialed up their work

11   on Hamas because Hamas had done this terrible thing, my client

12   here is not alleged to be involved in that.  This is at a time

13   when there was open oppositional relationship between my client

14   and Hamas, and we're extremely prejudiced by any effort to

15   connect the client to Hamas especially at a phase after the

16   events at issue.

17          THE COURT:  Where are you going with this,

18   Mr. Yalowitz?

19          MR. YALOWITZ:  This is background just telling the

20   jury that he started a unit that studied Hamas.  He knew enough

21   about Hamas that they put him in charge of a unit to study

22   Hamas.

23          THE COURT:  What is the relevance of the details that

24   he is going into now?

25          MR. YALOWITZ:  I don't care about the details.  I just

F1fQsok2                          Eviatar - Direct

1    wanted them to know that he was in charge of a unit that

2    studied Hamas.

3              THE COURT:  What else do you intend to ask?

4              MR. YALOWITZ:  What is Hamas?

5              THE COURT:  OK.

6              MR. ROCHON:  Your Honor, as long as we're here, the

7    comments on the rulings -- I make an objection and whether or

8    gets sustained or not, I don't need to have it embellished by

9    counsel.

10             THE COURT:  That rule needs to apply to both sides.

11   Both sides have violated that rule.  When I rule, it is over.

12   If you want to make a record outside the presence of the jury,

13   I don't want any other comments or arguments or comments on

14   other people's examinations or comments with regard to the

15   ruling.

16             MR. YALOWITZ:  Understood.

17             THE COURT:  I will make my rulings, and you will move

18   along.

19             MR. YALOWITZ:  May we have an instruction that the

20   question may be completed before the Court rules -- before the

21   objection is made because to make an objection in the middle of

22   a question is disruptive and improper because they don't even

23   know what the question is.

24             MR. ROCHON:  If it was a leading question, you've got

25   to try to stop it.

F1fQsok2                          Eviatar - Direct

1           THE COURT:  No, I'm not going to do that.  The rule

2      technically is it's an objection to the question; not an

3      objection to the answer.  So the objection comes after the

4      question; it doesn't come after the answer.

5           MR. YALOWITZ:  That's what I'm asking.  My question

6      wasn't finished, your Honor.

7           THE COURT:  He was talking when we came up here; not

8      you.

9           MR. YALOWITZ:  It's the last one.  It's where I

10     started to ask a question, Mr. Rochon interrupted me, and then

11     the Court overruled the objection, but by then I had already

12     asked another question, so, in essence, by interrupting, he

13     gets sort of a free sustained.

14          THE COURT:  I think you are smart enough and

15     experienced enough that you can handle that.

16          MR. YALOWITZ:  I don't think you were reading me right

17     on that one, your Honor.

18          (Continued on next page)

19

20

21

22

23

24

25

 1              (In open court)

 2  Q.  Just to pick up where we were Mr. Eviatar, what was the

 3  subject or target of the unit that you were put in charge of?

 4  A.  The target or aim was clear by means of these materials we

 5  identified broadly, solidly and on an ongoing basis a very

 6  close connection between the civilian apparatuses of Hamas and

 7  the terror apparatus of Hamas.  May I give an example?

 8  Q.  No.  We will get there.  Just bear with us.  I just want to

 9  get some background first.  Thank you.

10              Did you pursue studies within the army by doing

11  special course work inside of the IDF?

12  A.  Could you repeat the question?

13  Q.  Sure.

14  A.  I'm not sure I understood.

15  Q.  Did you pursue any studies within the IDF?

16  A.  Yes, of course.  The mandate that was given to me as head

17  of this unit was to be, as I would put it, the head

18  investigator of this unit.

19  Q.  Could you tell the jury about the command and staff course

20  that you took?

21  A.  For about one year I was the first candidate of my unit.  I

22  participated in a course, and the course belongs to an entity

23  that is called Staff and Command College of the IDF.  This is a

24  course which involves the participation of a couple dozen

25  officers from all the IDF units who are continuing on a

F1fQsok2                    Eviatar - Direct

1    long-term army career.  This course has a parallel course in

2    the American military.

3              The second course that I participated in, I was also

4    the first of my unit to participate in it.  It is called the

5    interbranch Course.  It's a course involves the participation

6    of about 20 people from all the military and other intelligence

7    agencies in Israel.

8    Q.  How long did you attend the Command and Staff course?

9    A.  One entire year.

10   Q.  How long did you attend the interagency intelligence

11   course?

12   A.  Between three and four months.

13   Q.  Now, during your period of service, were you a member of

14   any professional forums?

15   A.  Yes, definitely.  Would you like me to go into it?

16   Q.  Please.

17   A.  I was a member of a number of professional teams as a

18   representative of COGAT, the Coordinator of Government Affairs

19   in the interrogations.  The coordinator, the head of COGAT is a

20   brigadier general.

21             The first team that I was a member of was an

22   interministerial team, the aim of which is to prevent funds,

23   terror funds from flowing.  The idea is to create an

24   interagency understanding how to stop funds that come from

25   various different sources that reach the terror organizations.

1          The second team of which I was a member was also an

2     interagency team.  It was part of the ministry of strategic

3     affairs in Israel and its role was to collect and consolidate

4     all the materials related to incitement in the Palistinian

5     Authority.

6     Q.  What do you mean by incitement?

7          MR. ROCHON:  Your Honor, I'm going to object.  He is

8     starting to get into the opinion part.  So I would ask if --

9          MR. YALOWITZ:  I think we should be approaching, your

10    Honor, if we are going to have substantive discussions about

11    the objection.

12         THE COURT:  Are you going to move to qualify him as an

13    expert?

14         MR. YALOWITZ:  Not right this minute.

15         THE COURT:  Give me your question again.  You want to

16    know from him what?

17         MR. YALOWITZ:  He described one of his background

18    items as incitement, and I wanted the jury to understand what

19    he meant when he said incitement.

20         THE COURT:  I'll overrule the objection.

21         MR. YALOWITZ:  Thank you.

22    Q.  Please, Mr. Eviatar, what did you mean by incitement?

23    A.  The various media, the educational system from the level of

24    nursery school up until the university level to what was said

25    at the mosques, what's said at press conferences, at political

1    conferences, etc., etc., different media stages, all of this

2    has a great deal of importance with respect to everything that

3    pertains to what the leadership, the Palistinian leadership,

4    all of the different sectors of the Palistinian leadership,

5    what they want to convey to the public by messages, by

6    statements, by hinting, by explicit calls, all of these fall

7    under the category of incitement, the meaning of which is clear

8    anti-Israeli statements from an explicit call for armed

9    struggle, and to the other end of it completely ignoring the

10   existence of the state of Israel, for example.

11   Q.  Let me ask you this:  Were there other interministerial

12   teams that you participated in?

13   A.  Yes, there were three additional teams.

14   Q.  Please describe them.

15   A.  An additional team was an interagency team in which I

16   participated as a consultant for the head of the Israeli prison

17   services.  That's the person who is charged with all of the

18   Palistinian prisoners who are incarcerated in Israel, and, of

19   course, other prisoners as well.

20         The second team in which I participated, I served as a

21   personal adviser to the general in charge of the central

22   military command.  He is an officer with the rank of major

23   general who is the commander of all of the territories that we

24   mentioned previously.

25         The third team in which I was a member, I was a

F1fQsok2                    Eviatar – Direct

1    personal adviser to the head of the Judea and Samaria Division

2    unit which is, in effect, the West Bank with respect to all of

3    the different Palistinian affairs.

4    Q.  Thank you so much.  When did you retire from active duty?

5    A.  In April 2013.

6    Q.  Do you still serve as a reserve officer?

7    A.  Yes, I serve in the reserves.

8    Q.  What have you been doing now that you've entered civilian

9    life?

10    A.  First of all, I discovered that a person can have a second

11    career.  Since I was discharged from the idea, I work as an

12    expert on Palistinian affairs.  I serve as an adviser and as an

13    expert witness, and I work with several different law firms.

14          An additional kind of work that I do, I lecture at

15    various forums about the Arab-Israeli conflict.  Some of those

16    lectures, I do on a volunteer basis.

17          And the third kind of work that I do that I don't

18    receive any compensation for, I serve as a commentator on

19    Palistinian affairs for a variety of different media channels

20    in Israel.

21    Q.  Do you consult with any non-governmental organizations at

22    the present time?

23    A.  Yes.  Thank you for reminding me about that.  I also serve

24    as an adviser without pay for an entity that is a

25    non-governmental organization.  It's called the council for

F1fQsok2                         Eviatar - Direct

1    peace and security.  It's an entity that includes more than 500

2    former officers.  I would call them former senior members of

3    the Israeli defense establishment, and I'm their adviser for

4    Palistinian affairs.

5              MR. YALOWITZ:  Your Honor, would it be a good

6    convenient time to break?  If not, I would just like to consult

7    with the Court.

8              THE COURT:  All right.  Why don't we take a break.

9    Take a ten minute break.  Don't discuss the case.  Keep an open

10   mind, ladies and gentlemen.

11             (Jury excused)

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

F1fQsok2                    Eviatar - Direct

                            (Jury not present)

            THE COURT:  Mr. Yalowitz.

            MR. YALOWITZ:  Your Honor, yesterday we proceeded with

Mr. Kaufman without a motion to qualify him as an expert.

            Apparently, Mr. Rochon is objecting to the

qualifications of Mr. Eviatar as an expert on the Palistinian

arena, and we have laid out in letters to the Court, and I

think by now you've seen his expert report on the topics he's

going to cover.  And so I defer to the Court.  Some judges want

a formal oral motion or application.  Sometimes we just go

through with it.  We defer to you on it, your Honor.

            THE COURT:  Again, I have no preference.  It's usually

the parties' preference.  The last witness you didn't

necessarily have to, as long as the record obviously indicates

he's qualified to testify about what he testified to and there

is no insistence or challenge to those qualifications.

            If they are challenging specifically his

qualifications as an expert in the areas in which you want him

to testify, then as soon as you feel comfortable that you've

laid enough of a basis for me to make such a finding and you

want me to make such a finding before this jury, I will.

            MR. YALOWITZ:  All right.  Let's see what defendants

want.  I'm happy to lay a little more foundation on his

methodologies and the areas he's going to cover, and then we

can make that motion in front of the jury if the Court wishes.

F1fQsok2                          Eviatar - Direct

 1              MR. HILL:  My only concern is this:  This witness'

 2     report has 11 different topics, one of which has been

 3     withdrawn.  If the plaintiffs are offering him as an expert in

 4     each of those different topics at this point, I don't think

 5     there is a foundation for that.

 6              THE COURT:  Well, I assume not.  If he is not going to

 7     testify as to each of the topics, he's going --

 8              MR. HILL:  I understand there's ten left.  If

 9     Mr. Yalowitz will proffer which of the topics he will testify

10     about, it may help us focus on the issues of qualification.

11              THE COURT:  We can save ourself some time.

12     Mr. Yalowitz, what is going to be the nature of the subject

13     matter of his testimony?

14              MR. YALOWITZ:  We have gone over this before.  I don't

15     think this will come as any surprise to the defense.  He is

16     going to provide basic information about the PLO, the PA,

17     Fatah, and the relationships among them.

18              THE COURT:  I have that checked off on the top of my

19     list.

20              MR. YALOWITZ:  Right.  He's going to describe two

21     important terror organizations that operated during the '02 to

22     '04 period, the Al Aqsa Martyrs' Brigades in Hamas.  He's going

23     to talk about the relationship between the PA, PLO, Fatah and

24     the Al Aqsa Martyrs' Brigades.

25              THE COURT:  I'm sorry, the relationship between --

                        SOUTHERN DISTRICT REPORTERS, P.C.
                                  (212) 805-0300

F1fQsok2                    Eviatar - Direct

1    first you said relationship between PA, PLO and Fatah.

2              MR. YALOWITZ:  And how does the Al Aqsa Martyrs'

3    Brigades fit into that?  He is going to talk about the

4    relationship between the defendants and Hamas.

5              THE COURT:  Right.

6              MR. YALOWITZ:  He's going to talk about the role of

7    the defendants in providing material support for the Hebrew

8    University bombing.

9              THE COURT:  And what is the nature of that testimony

10   is going to be?  Based on what?

11             MR. YALOWITZ:  Based on the convictions that he's

12   reviewed, based on the documents that the defendants themselves

13   have produced, based on the public statements --

14             THE COURT:  Are you talking about financial support?

15   More than financial support?

16             MR. YALOWITZ:  Financial support, personnel we've

17   talked about before, weapons, money -- well, money, no.

18   Freedom to operate.  There is a little bit of money, but I

19   don't know if I can get it in based on your Honor's rulings.  I

20   might try, we'll see how you rule, but --

21             THE COURT:  It depends what you're trying to get him

22   to say.  If you're trying to get him to make an opinion based

23   on evidence that it's inadmissible at this trial, and that's

24   the primary or sole basis for his opinion, I'm not going to

25   allow it.

F1fQsok2                        Eviatar - Direct

1              MR. YALOWITZ:  I don't think we have anything on money

2       other than the -- other than the admission by Abdullah

3       Barghouti, "I got $500 from Marwan Barghouti."  So if the

4       Court's ruling, as I understand that this is the Court's ruling

5       that that statement is inadmissible, I'm not going to offer him

6       to just be a conduit for that statement.

7              THE COURT:  I notice as I've been going through now

8       the context of the report, a number of his statements, factual

9       statements and opinions are based on the Abdullah Barghouti

10      confession.

11             MR. YALOWITZ:  Correct.

12             THE COURT:  To the extent that they're based on the

13      Barghouti confession, and to the extent that I've ruled that

14      the parts of those confessions that accuse or inculpate the PA

15      or the PLO solely by those statements, that's not going to be

16      an appropriate basis for him to opine.  So I don't anticipate,

17      unless you can explain to me, that he has any specific opinion

18      to give with regard to Abdullah Barghouti and his role,

19      participation, and relationship with the PA or the PLO --

20             MR. YALOWITZ:  He does.

21             THE COURT:  -- solely based on what I have already

22      ruled is the inadmissible out-of-court statements about the PA

23      and PLO and Abdullah Barghouti.

24             MR. YALOWITZ:  As I said, your Honor, with regard to

25      the payment of money, his only basis and my only basis is what

F1fQsok2                        Eviatar - Direct

 1    you've ruled inadmissible.  I disagree with the ruling, but I

 2    accept it.  We're going to move on.

 3             THE COURT:  So I assume he is not going to testify

 4    specifically about payments of money to Abdullah Barghouti.

 5             MR. YALOWITZ:  That's correct.  That's the Court's

 6    ruling, and we're going to follow it.

 7             THE COURT:  Right.

 8             MR. YALOWITZ:  Now, with regard to other things, for

 9    example, whether he was released from prison, that's in a

10    different category.

11             THE COURT:  Why is that in a different category?

12             MR. YALOWITZ:  Well, first of all, we have testimony

13    from Mosaab Yousef that there was a plan to release him.

14             THE COURT:  Where do we have such testimony?

15             MR. YALOWITZ:  It's a video deposition of Mosaab

16    Yousef who saw the conversation when Abdullah Barghouti was

17    released.  So Abdullah Barghouti is arrested.  Marwan Barghouti

18    and Jabril Rajoub come back out, and they say "we have a deal,"

19    and the Court has ruled that testimony to be admissible.

20             THE COURT:  From my review of his report, that is not

21    what he is either relying upon or even aware of.

22             MR. YALOWITZ:  He relied on and cited that testimony

23    in his report, your Honor.

24             THE COURT:  Well, you'd have to point me to that

25    because the footnote that I saw said that he was relying on

F1fQsok2                        Eviatar - Direct

1   Abdullah Barghouti's confession.

2           MR. YALOWITZ:  Well, I'll have to get you the cite,

3   but I have a specific memory, your Honor.  I will get you the

4   cite, but I have a specific memory that we have that deposition

5   testimony cited in Mr. Eviatar's report at least twice.  But

6   may I continue?

7           THE COURT:  Just tell me quickly, because I don't want

8   to have to fight about this later, about the Abdullah Barghouti

9   statement.  So what evidence are you going to present to this

10  jury to indicate that Abdullah Barghouti was released?

11          MR. YALOWITZ:  We have a number of pieces of

12  circumstantial evidence.  Number one, we have that plan.

13          THE COURT:  OK.

14          MR. YALOWITZ:  Number two, we have --

15          THE COURT:  And the plan is?

16          MR. YALOWITZ:  The plan is we are going to arrest him,

17  keep him for a few weeks, and release him.

18          THE COURT:  And that's coming in through whom?  Who is

19  going to say that?

20          MR. YALOWITZ:  Yousef.

21          THE COURT:  That's in the deposition of Yousef?

22          MR. YALOWITZ:  Correct.

23          THE COURT:  I'm just trying to recollect.

24          MR. YALOWITZ:  Correct.

25          THE COURT:  The deposition of Yousef, which I think we

F1fQsok2                         Eviatar - Direct

1    did discuss and which at this point is admissible.

2              MR. YALOWITZ:  Correct.

3              THE COURT:  OK.

4              MR. YALOWITZ:  Number two, we have the cross-checking

5    of custodial statements both by Ahmed Barghouti and Abdullah

6    Barghouti, both of whom Ahmed Barghouti said, "He was released

7    and I took him to the safe house."  And Ahmed Barghouti is a PA

8    employee at the time he gives that statement.

9              THE COURT:  Is that in this case at this point?

10             MR. YALOWITZ:  We haven't offered it yet.

11             THE COURT:  In what form are you going to offer it?

12             MR. YALOWITZ:  It's a confession, a custodial

13   statement.

14             THE COURT:  Of?

15             MR. YALOWITZ:  Of Ahmed Barghouti at the time when he

16   was an employee of the defendant, and he's saying, "They

17   released him and I took him to the safe house."  That's his

18   east statement.

19             THE COURT:  OK.

20             MR. YALOWITZ:  "Marwan and I took him to the safe

21   house."

22             THE COURT:  OK.

23             MR. YALOWITZ:  Then we have his own statement --

24             THE COURT:  Whose own statement?

25             MR. YALOWITZ:  I'm sorry, Abdullah Barghouti's

F1fQsok2                    Eviatar - Direct

1    statement saying, "They released me and then Marwan and Ahmed

2    took me to the safe house."

3            THE COURT:  But we have discussed that as being

4    inadmissible.

5            MR. YALOWITZ:  I understand it's inadmissible, but an

6    expert who is relying on some admissible evidence and then

7    cross-checks with things that are professionally appropriate

8    for him to rely on --

9            THE COURT:  But it doesn't give him the right to put

10   that inadmissible evidence before the jury.

11           MR. YALOWITZ:  I agree with that.  Although some

12   judges allow it to be read out by counsel.

13           THE COURT:  What do you mean read out?

14           MR. YALOWITZ:  Like under 705, you can say, you know,

15   "you're relying on this piece of evidence, I'm going to read

16   it."

17           THE COURT:  That's still putting it before the jury.

18           MR. YALOWITZ:  As I said, there's a judicial

19   preference.  I don't think there is any rule that requires --

20           THE COURT:  I think there is a rule.  The rule is if

21   the evidence is inadmissible, it's inadmissible.  It doesn't

22   come in.  That's the rule.  It doesn't come in through the

23   lawyer, it doesn't come in through a witness, it doesn't come

24   in through a piece of paper.

25           MR. YALOWITZ:  I understand that's the Court's rule.

F1fQsok2                    Eviatar - Direct

1    I'm not arguing with it.

2           THE COURT:  So I do not expect that this witness will

3    make any statement about any fact that he got from Abdullah

4    Barghouti's interrogation.  He is not going to comment on

5    either the interrogation or the substance of what was said in

6    that interrogation.

7           MR. YALOWITZ:  Let me just make sure.  You know I

8    can't talk to the witness now.

9           THE COURT:  Yes, you can.  You can tell him that's my

10   ruling, and I'm not going to let him do it.

11          MR. YALOWITZ:  I will talk to him and make sure we get

12   clear on this.

13          MR. HILL:  The witness is sitting in the courtroom,

14   your Honor.

15          THE COURT:  You can translate it for him also.

16          MR. YALOWITZ:  So then there is circumstantial

17   evidence, which is that the day he was released was the day

18   that a terrorist leader was killed by IDF forces.

19          THE COURT:  Who is going to put that evidence in?

20          MR. YALOWITZ:  Alon Eviatar.

21          THE COURT:  How does he know?

22          MR. YALOWITZ:  Because that's his job is to know what

23   happens in the Palistinian arena.

24          THE COURT:  His job may be to know that, but his job

25   is not necessarily to have firsthand knowledge.

F1fQsok2                          Eviatar - Direct

1              MR. YALOWITZ:  No.  He's relying on documents; for

2       example, statements that can be tied to the defendant.

3              THE COURT:  You would agree that that is not a basis

4       on which to offer that evidence for the truth because he

5       researched it regardless of how experienced and competent an

6       expert he is.

7              MR. YALOWITZ:  I'm sorry.  Which statement are you

8       talking about?

9              THE COURT:  The statement that you say is a factual

10      statement about how he was really released.  He can't say it.

11      He can't give the jury that fact.

12             MR. YALOWITZ:  The fact of how he was --

13             THE COURT:  Right.

14             MR. YALOWITZ:  Or whether he was -- look, it's a

15      disputed issue.

16             THE COURT:  He doesn't have any firsthand knowledge of

17      that.  He is not any more competent to do that than you or I if

18      we picked up the same piece of paper that he looked at that

19      made him think that and makes us think that.  That doesn't make

20      it evidence.

21             MR. YALOWITZ:  So we put in a piece of paper that is

22      tied to the defendant.

23             THE COURT:  OK.  If that piece of paper is admissible

24      and is admitted in this record, that is the evidence of that

25      fact.

1           MR. YALOWITZ:  Right.  And the evidence says Mustafa's

2      death is terrible and we're going to avenge it.

3           THE COURT:  OK.

4           MR. YALOWITZ:  And the same day Abdullah Barghouti, a

5      well-known bomb-maker is out of jail.

6           THE COURT:  Is that also before the jury in evidence?

7           MR. YALOWITZ:  Yes, because Abdullah Barghouti says --

8           THE COURT:  Where is that before this jury in

9      evidence?

10          MR. YALOWITZ:  In Abdullah Barghouti's confession.

11          THE COURT:  Is it in evidence?

12          MR. YALOWITZ:  It will be.  We haven't offered it yet,

13     but it will be.  He says, "I was released on the day that Ali

14     Abu Mustafa was liquidated."  So he says that's the day.  Now,

15     your Honor said we can't say who released him, but I think he

16     can say "I was released."

17          THE COURT:  Is that Abdullah Barghouti's confession

18     you're talking about?

19          MR. YALOWITZ:  Yes, he should know if he was released.

20          THE COURT:  That's right.  He should know, and if he

21     wants to come into this courtroom and tell the jury under oath,

22     that's perfectly legitimate; but that doesn't address the

23     issues that we have been dealing with.  The issues we have been

24     dealing with is that, no, you can't use his statement for the

25     truth of what he was interrogated about at this point to say

1    that he was released.  I thought we went through that.  I don't

2    know why there is a question about whether or not that's the

3    evidence that you are going to get in before this jury.

4           MR. YALOWITZ:  That the date of his release -- I mean,

5    I didn't think it was a disputed issue of fact.  I don't think

6    it's controversial.  He is confessing, "I did a string of

7    bombings" and the fact that he got out of jail on a certain

8    day, I mean, that's a fair part of the narrative of his

9    self-incriminatory statements.

10          THE COURT:  Not if you want to say they let him out of

11   jail to do the Hebrew bombing.

12          MR. YALOWITZ:  No, my theory is not -- no.  No.  Let

13   me be very clear.  My theory is not they let him out of jail to

14   do a bombing.

15          THE COURT:  OK.

16          MR. YALOWITZ:  My theory is, they gave an armed weapon

17   to a terrorist group.  They gave a guy who knows how to make

18   bombs to a terrorist group, and then he went and did that.

19   That's my theory.

20          THE COURT:  They didn't give him a bomb.

21          MR. YALOWITZ:  They gave him something better than a

22   bomb.  They gave him a bomb-maker.

23          THE COURT:  I'm sorry, you confused me.  What is the

24   evidence that you want to offer?  That who gave him what?

25          MR. YALOWITZ:  OK.  The defendant --

F1fQsok2                          Eviatar - Direct

1           THE COURT:  Who?

2           MR. YALOWITZ:  PA.

3           THE COURT:  Who?

4           MR. YALOWITZ:  Jibril Rajoub and Ahmed Barghouti.

5           THE COURT:  Gave him.

6           MR. YALOWITZ:  Gave Hamas Abdullah Barghouti.

7    Abdullah Barghouti is a bomb-maker.

8           THE COURT:  The evidence they gave him Abdullah

9    Barghouti is what?

10          MR. YALOWITZ:  That he was in jail and he got out of

11   jail.

12          THE COURT:  See, I don't have any problems with that.

13   That is not going to be a big mystery to this jury that he was

14   in jail and then he got out of jail.  He must have got out of

15   jail because he committed a terrorist act; not in jail, out of

16   jail.  So that is not the issue.

17          MR. YALOWITZ:  And Ahmed Barghouti put him in a safe

18   house immediately after he was out of jail, which is Count 51

19   of Ahmed Barghouti's indictment which is in evidence.

20          THE COURT:  That's already in the case.

21          MR. YALOWITZ:  Right.  So I would also like to say

22   that Ahmed Barghouti -- there are so many Barghoutis here.  I

23   would also like to say that Abdullah Barghouti, the engineer,

24   got out of jail on a particular day; and on the day that he got

25   out of jail, the defendant made a statement saying they were

F1fQsok2                          Eviatar - Direct

1    going to increase the violence.  In essence, that's what they

2    said.  We're going to make it -- we're going to make there be

3    more violence.  And the guy who is in charge of that committee

4    that made that statement is Marwan Barghouti, the same guy who

5    both Ahmed Barghouti and Abdullah Barghouti say took him to the

6    safe house.

7                THE COURT:  What's the form of the statement that you

8    want to offer?

9                MR. YALOWITZ:  It's a publication by a joint committee

10   between Fatah and Hamas and other terrorist organizations.

11               THE COURT:  And it shows the date of when that

12   statement was made?

13               MR. YALOWITZ:  Correct.

14               THE COURT:  OK.

15               MR. YALOWITZ:  It shows the date on which this guy was

16   killed, Mustafa.

17               THE COURT:  What shows the date on which Abdullah was

18   released?

19               MR. YALOWITZ:  Abdullah's own statements, his personal

20   history -- why doesn't it come in as like a statement of

21   personal history?

22               THE COURT:  Because we're not interested in his

23   personal history.

24               MR. YALOWITZ:  We're interested in this item of

25   personal history.

F1fQsok2                          Eviatar - Direct

1          THE COURT:  It's not relevant to the jury.  We don't

2     care where he grew up and went to school.

3          MR. YALOWITZ:  We care about the day he got out of

4     jail.

5          THE COURT:  Right.  So you're going to tell me how

6     you're going to prove what day it is he got out of jail.

7     That's all you're going to tell me.

8          MR. YALOWITZ:  I have to get my rule book, your Honor.

9          THE COURT:  Tell me the physical piece of evidence

10    that you intend to use.

11         MR. YALOWITZ:  His confession.

12         THE COURT:  And his confession that says what?

13         MR. YALOWITZ:  "I got out of jail" -- what he says is

14    "Jibril handed me over to Marwan and Ahmed on the day that Ali

15    Abu Mustafa was killed."

16         THE COURT:  You show me that reference because I have

17    to look at that, and I will give that evaluation.  The bottom

18    line is, as far as I'm concerned, this witness -- and I thought

19    we went through this and I'm going back to his report.  This

20    witness has a basis to talk about in his expert experience the

21    relationship between the PA, PLO and Fatah, what he thinks the

22    relationship -- he can talk about financial payments.  He can

23    be cross-examined about those issues, whether he knows what

24    he's talking about or doesn't know what he's talking about and

25    what he is basing that on factually.  He can talk about general

1    prisoner release.  I have no problems with that.

2              MR. YALOWITZ:  Right.

3              THE COURT:  If he has a factual basis either on direct

4    examination or on cross-examination to be able to explain to

5    this jury what evidence he is using to say that they released

6    prisoners.  At least give us an example of how he accumulated

7    that opinion.  If he wants to say that there's a relationship

8    with Fatah, if he can tell us on what information he concludes

9    that, that's fine.  And the relationship between Al Aqsa

10   Brigade and Hamas, if he has a factual basis to do that and a

11   basis as an expert to do that, that's fine again.

12             But his personal opinions, the closer we get to this

13   in the context, his personal opinions about what happened with

14   Abdullah Barghouti don't seem to be within his expertise.

15             MR. YALOWITZ:  I understand the Court's ruling on

16   this.

17             THE COURT:  His comment, his personal comments about

18   who released him, why they released him, what they did, he

19   doesn't have -- and the little bit that he does have comes

20   from, only from Abdullah Barghouti's statements.  For example,

21   I am looking at page 10 of this report.  The specific sentence

22   at the end of the first paragraph about what he says is

23   relevant information about Abdullah Barghouti.

24             At the end of that statement is a footnote, and that

25   footnote cites Abdullah Barghouti's statement.  That's what it

1    cites, OK?  So that is the basis for his knowledge.  OK?  So I

2    am not going to let him put that in through the back door what

3    could not come in through the front door.

4            MR. YALOWITZ:  I get it.

5            THE COURT:  Either stay away from any specific

6    comments about his opinion about what happened with Barghouti

7    if he is only basing that on what Barghouti said in a statement

8    he read or give me some other basis in this record for him to

9    comment, and I don't think there is any other basis, so I am

10   giving you the leeway to comment generally about these issues,

11   but I don't think he is qualified to make comments specifically

12   about, quite frankly, which individuals were participants in

13   the Hebrew University bombing.  All right?  So I'm just looking

14   through his report.

15           MR. YALOWITZ:  It will be evident, and then I want to

16   raise two other things about this.

17           THE COURT:  Part Four, starting on page 19 of his

18   report.

19           MR. YALOWITZ:  What does that cover, your Honor?  I

20   don't have the report.

21           THE COURT:  I'm sorry, Part Three.  Not Part Four, the

22   connection and relationship between the PA, PLO and Fatah.

23   That seems to be within his training and experience and

24   expertise.

25           Part five I think -- let me see what notes I've made.

1    What he calls payments to terrorists and their families, he's

2    researched that and wants to comment about how payments are

3    done.  We're going to have numerous other people who are going

4    to testify.  We had statements in the opening statements about

5    why payments were made.  That is an issue of debate for the

6    jury and you can put in whatever you think is relevant on that.

7           MR. YALOWITZ:  Great.

8           THE COURT:  The Palistinian ministry of prisoners and

9    released prisoner affairs, and what he say is the general

10   policy based on whatever he says that he has reviewed about

11   who's released, how many people are released, how payments are

12   made.  That in general I have no problem with, and I think

13   those related opinions -- now, if he has a basis and can point

14   to the evidence that he's reviewed on that that leads to a

15   conclusion about the release of terrorist prisoners by the PA,

16   it's what he calls the revolving door, then he can testify to

17   that.

18          Now whether or not you can all tie that to Abdullah

19   Barghouti, it is not his role, it is your role and the role of

20   the other evidence and what's a reasonable inference for the

21   jury to conclude?

22          Finally, Fatah's terrorist operations that he says

23   that he has evidence that he's reviewed a Fatah terrorist

24   operation.  It seems to me that he has experience in that area

25   and can cite to the sources that he went to and statistics that

F1fQsok2                        Eviatar - Direct

1    he reviewed; and if I accept the cross-examination about that

2    opinion, that's his opinion and it can stand.

3              MR. HILL:  Again, your Honor, just so we're clear,

4    just like the opinion --

5              THE COURT:  Wait a minute.  Mr. Yalowitz, quiet.

6    Don't do that.  You have a bad habit.  Every time they open

7    their mouth, you want to interrupt.  Quiet.  Let him say what

8    he's going to say.

9              MR. HILL:  Just as with the opinions about Hebrew

10   University, I assume the witness is not going to be a conduit

11   for hearsay.  We are not going to get hearsay statements

12   transmitted through this witness.  If he has an opinions based

13   on hearsay, I understand you are saying you think those may be

14   permissible, but the witness should not be telling the jury

15   "so-and-so said this" or "this is what the newspaper said."

16             MR. YALOWITZ:  Your Honor, may I be heard on this?

17             THE COURT:  Wait a minute.  Just so I can focus on the

18   issue.  That is only partially correct.  With regard to the

19   Hebrew University bombing, the players, what they did,

20   particularly with regard to Abdullah Barghouti, he doesn't have

21   any particular expertise that tells us anything about that in

22   particular, OK.

23             MR. HILL:  Understood.

24             THE COURT:  Now if he has expertise about a

25   relationship between organization, about what he calls a

F1fQsok2                         Eviatar - Direct

1   revolving door policy, about payments to people who were

2   prisoners, he can comment on that and he can give examples of

3   that and he can say that he's looked at it and there's such a

4   pattern.  I have no problems with that.

5          But he can't come in here and tell this jury it's his

6   opinion that the PA released Abdullah Barghouti.  OK?  This is

7   not that complicated.  He should stay away from that area, and

8   you should instruct him now while you still have him on direct

9   examination that he should stay away from that area and stay

10  away from relaying to the jury things that he says he got from

11  looking at his out-of-court statement, his confession.

12         (Continued on next page)

F1f3sok3

1          MR. YALOWITZ:  Okay.  I understand that, I will comply

2     with it.  I think it is extremely important, your Honor, that

3     we be very, very clear that this rule applies to both sides.

4     Because as you know, on Christmas Eve for the first time the

5     defendants said to the Court, we're going to come in here to

6     prove that Abdullah Barghouti escaped.  First time I heard

7     that.  We don't have any documents of any kind that said that.

8     I don't know what that witness is going to say.

9          THE COURT:  We can deal with it as early or as late as

10    you want to deal with it.  If he's just the governor of

11    whatever it is, that doesn't give me any basis to believe that

12    he has any first-hand knowledge about whether or not somebody

13    left the door unlocked that day and everybody ran out the door,

14    or that somebody complicit with the guys who wanted to escape

15    let them escape, or they just told people, look, don't worry

16    about it, go on home, and opened the door for them.

17         The witness they have proffered so far they gave me no

18    basis to believe he had any knowledge about whether anybody

19    escaped, was released, escaped with the assistance of the PA or

20    the PLO or their personnel or employees or not.  I don't know

21    where they are going to go with that.  They want that resolved

22    real early so this guy doesn't fly from the West Bank.  I'll

23    resolve that as quickly as possible.  But, partially it will

24    depend on what you attempt to do.

25         MR. YALOWITZ:  Sure.

F1f3sok3

1        THE COURT:  I'm not going to let you through this

2    witness get in Barghouti's statements.

3        MR. YALOWITZ:  You mentioned that.

4        THE COURT:  A couple of times.  You keep saying you

5    don't understand it.  That's why I keep mentioning it.

6        MR. YALOWITZ:  All right.  I think I get it.  You

7    know, we'll take it question by question.  I'm sure everybody

8    will help me understand.

9        THE COURT:  Mr. Hill.

10       MR. HILL:  Mr. Rochon thinks I may have interrupted

11   your Honor as you were describing the topics in Mr. Eviatar's

12   reports.

13       THE COURT:  I think that's pretty much it.  I can go

14   back and look.  I understand your objection to his

15   qualifications, and we'll see if I can qualify him and you can

16   cross-examine him about whether or not his opinions are valid

17   or not valid.  I think that's all that needs to be said.

18       MR. HILL:  Thank you, your Honor.

19       MR. YALOWITZ:  I just want to be clear, I hadn't

20   finished saying the topics he is going to cover.  I think we've

21   very well laid it out in his report and in my letters to the

22   Court, policy, practices, procedures, I don't want some kind

23   of, oh, you didn't mention it to the judge at this second.  But

24   okay, that's fine.

25       THE COURT:  You're getting to be repetitive like me.

F1f3sok3

1          MR. YALOWITZ:  Well, imitation --

2          THE COURT:  What else did you want to say again?

3          MR. YALOWITZ:  I was going to say imitation is the

4     sincerest form of flattery, Judge.

5          I would like to give the Court Exhibit 427.

6          THE COURT:  Let me look at that.

7          MR. YALOWITZ:  At the lunch break.  We'll flag the two

8     questions that we care about.  One of them is the names.  I'm

9     going to give it to you unredacted.  One of them is the names

10    and titles of the people, okay, I get that.  I'm giving it to

11    you unredacted, but I get your ruling on that.  I'm not

12    rearguing it.

13         THE COURT:  This is the confession statement rather

14    than the in-court statement?

15         MR. YALOWITZ:  Right.  But the other one is the

16    question is something like, what did they do with you after the

17    interrogation.  And the answer is they kept us in the prison

18    until the death of this guy, then they released us.  So you'll

19    look at it and you'll figure out what your ruling is.

20         THE COURT:  All right.  Take a short --

21         MR. YALOWITZ:  I think we have all the information I

22    have.

23         THE COURT:  Take a very short break so we can bring

24    the jurors back.

25         (Recess)

F1f3sok3

1          (In open court; jury present)

2          THE COURT:  I apologize for the delay I wanted to

3    resolve some issues so we can move forward efficiently.

4    Mr. Yalowitz.

5          MR. YALOWITZ:  Sure.  Thank you so much, your Honor.

6    BY MR. YALOWITZ:

7    Q.  Mr. Eviatar, can you describe for the jury what methods you

8    used in order to prepare for your testimony that you're going

9    to give them.

10   A.  First of all, I thoroughly read all of the material that I

11   received from the attorneys.  I read through the material a

12   number of times, in English and in Arabic.  I checked the

13   translation very carefully, I checked the sources very

14   carefully, I cross referenced them in order to make sure that

15   they were credible and reliable, that they were based upon

16   solid and sound sources.

17          On the other side, I collected materials myself.  All

18   of them were open source materials.  I checked their

19   credibility in the Arabic language.  I listened to broadcasts

20   myself.  I read articles myself.  I formulated all of that

21   information together with my years of –– my great many years of

22   experience as an expert.  I formulated that into one solid

23   picture of evidence.

24   Q.  Did you have occasion to review files obtained from the

25   Palestinian Authority itself?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1f3sok3                    Eviatar - direct

1    A.  Yes, of course I did.

2    Q.  What kinds of files did you have the opportunity to review

3    in the original Arabic?

4    A.  For example, I received, I received original reports of the

5    Palestinian General Intelligence Service.  I received, for

6    example, entire files of what's called shahids or martyrs.

7    These are original documents that we received from the

8    Palestinian Authority, and they constitute a kind of personal

9    file of each shahid or martyr.  And there are other materials

10   and examples with respect to the type of material that I

11   received from the Palestinian Authority in Arabic, and I

12   examined those sources as well.

13   Q.  Did that include payroll records?

14   A.  Definitely.  I think that there were dozens of documents,

15   perhaps even hundreds of documents, that show that, that

16   present transfers of funds from the Palestinian Authority to

17   Palestinian prisoners in the prisons who had been charged with

18   terrorist attacks.

19          I saw, for example, I received in those materials,

20   original reports of payments that were made by the Palestinian

21   Authority to the Fatah movement in the West Bank.  There are

22   dozens of examples of that type.

23   Q.  Did you have the opportunity to review personnel files of

24   various individuals who are employees of the Palestinian

25   Authority?

F1f3sok3                        Eviatar - direct

1   A.  Yes, I reviewed dozens of files of that type, as we have

2   described here.

3   Q.  Did you have the opportunity to look, like we did, did you

4   have the opportunity to look at convictions of individuals who

5   were convicted of terror crimes?

6   A.  Yes, certainly.  I read all of the legal documents,

7   including the convictions themselves, of the senior members of

8   the Palestinian Authority, the senior members of the various

9   branches of the Fatah.  I read the files of other people who

10  had been charged with terrorist activity, and are currently

11  incarcerated as a result of their offenses.

12  Q.  Did you have the opportunity to read official government

13  reports by the United States government and by the government

14  of Israel?

15  A.  Yes, certainly, I read several reports of that type.

16  Q.  Did you have the opportunity to review original Arabic

17  documents published by the Palestinian Authority itself on

18  their own websites?

19  A.  I have read hundreds of those reports.

20  Q.  Did you have the opportunity to evaluate public source

21  material tied to terror organizations in particular?

22  A.  Yes, I have read original reports in Arabic of the

23  terrorist organizations that belong to the Fatah, that belong

24  to Hamas, the Al Aqsa Martyrs Brigade, which belong to the

25  Fatah.  They themselves publish their theory, their philosophy,

F1f3sok3                         Eviatar - direct

1    their rules, and their objectives.

2    Q.  Now, in evaluating all this material, what methods did you

3    use to break it down and sort it out?

4    A.  First of all, I always make sure that the material is cross

5    referenced.  I never base myself on a single source.  I make

6    sure that the material appears on the official websites of

7    those entities, of those movements, of those organizations.  I

8    check additional material to make sure that it corresponds with

9    other material.  I examine the identity of the people whose

10   names appear in the documents, and I also coordinate that with

11   all of the knowhow that I have accumulated over the course of

12   the years.

13   Q.  How does that work that you just described, how does that

14   compare to the work that you and your team did when you were a

15   field officer studying the Palestinian arena in the government?

16   A.  The work method that I followed during the course of my

17   preparation, the preparation for my expert opinion here, is

18   identical to all of the professional tools and instruments that

19   I made use of and that I worked with during the course of my

20   years in the military.

21         There are a number of stages in an investigation of

22   this kind of collecting information, cross referencing it,

23   verifying it, researching it, processing it, and drawing the

24   correct conclusions from that data.

25   Q.  Thank you, Mr. Eviatar.

F1f3sok3                        Eviatar – direct

1              MR. YALOWITZ:  Your Honor, I ask that the Court

2    qualify Mr. Eviatar as an expert witness to provide information

3    about the PLO and the PA and Fatah, to provide information

4    about the policies and practices of the Palestinian Authority

5    and the PLO, as they relate to support of terrorism, to

6    describe the relationship between the defendants and the Al

7    Aqsa Martyr Brigades, to describe the relationship between the

8    defendants and the Hamas terror organization, and to describe

9    those two terror organizations, Al Aqsa Martyr Brigades and

10   Hamas.

11             MR. ROCHON:  No voir dire.

12             THE COURT:  You can inquire on that basis.  He's so

13   qualified.

14             MR. YALOWITZ:  Thank you so much, your Honor.

15   BY MR. YALOWITZ:

16   Q.  I'd like to begin with a little bit of regional background

17   and just to give the jury an overview of --

18             MR. HILL:  Your Honor may we approach?

19             (Continued on next page)

20

21

22

23

24

25

F1f3sok3                          Eviatar - direct

1              (At the sidebar)

2              THE COURT:  Now you have another issue?

3              MR. HILL:  Something just appeared on the screen

4      that's never been given to me.

5              THE COURT:  What are you getting ready to do?

6              MR. YALOWITZ:  I'm going to show him a map of Israel

7      which I showed in opening statement.

8              THE COURT:  That wasn't what was on the screen.  Is

9      there something else you are going to put up on the screen,

10     other than a map of Israel?

11             MR. YALOWITZ:  No.

12             THE COURT:  Okay.  So take down the one you just put

13     up, and put up the map of Israel.

14             MR. YALOWITZ:  My mistake.  Is that it?

15             MR. ROCHON:  If we haven't seen it --

16             MR. YALOWITZ:  Wait a minute.

17             THE COURT:  Stop.  Are we going to fight about the map

18     of Israel?

19             MR. ROCHON:  No.

20             THE COURT:  Put up the map of Israel.

21             MR. YALOWITZ:  But --

22             THE COURT:  There is no issue.

23             MR. YALOWITZ:  Fine.  The words "regional background"

24     is not going to be put up again.

25             THE COURT:  Put that up.  If you are going to put

F1f3sok3                           Eviatar – direct

1     something else up and they haven't seen it, don't put it up.

2              MR. YALOWITZ:  Understood.

3              (Continued on next page)

1           (In open court)

2           THE COURT:  Mr. Yalowitz, do you have something of

3    greater detail?

4           MR. YALOWITZ:  We do.  Why don't we --

5           THE COURT:  Let's move forward.

6           MR. YALOWITZ:  Why don't we show the jury the map

7    that -- there we go.  Thank you.

8    Q.  So, can you describe just for those who haven't been there,

9    what we're looking at, Mr. Eviatar.

10   A.  We see an enlarged picture here of the tiny red spot on the

11   right-hand map.  The map on the left depicts the territory of

12   the State of Israel which is in the western part of the Middle

13   East.  Around the State of Israel in the north and in the

14   south, are Arab countries in which we know al Qaeda and jihad

15   organizations are active.

16          Within the territory of the State of Israel, I'm

17   referring to the brown areas here, we see the West Bank on the

18   right, and the Gaza Strip on the left.  These are territories

19   which for the most part are under the control of the

20   Palestinian Authority.

21          We can see on the right side the black dot.  That

22   depicts Jerusalem, the capital and largest city in Israel.

23   North of it is the city of Ramallah, which is the Palestinian

24   center of government.

25          Just by way of illustration, the distance between

1    Ramallah and Jerusalem is about 7 miles in my estimation.  The

2    distance between Israel's western border on the Mediterranean,

3    to the western part of the West Bank where we see the green

4    line, this narrow strip is also only about 8 or 9 miles wide.

5    This is the territory of the State of Israel, in fact, from

6    1967 up to the present day.

7    Q.  Could you describe the green dotted line that the jury sees

8    on the map.  At least those who can perceive the color green,

9    which I'm not one of them.

10   A.  The green line is the unofficial name given to a kind of

11   border, which is also unofficial, which was determined in 1949,

12   which in fact divides between the territory of the State of

13   Israel, up until 1967, and continues to this day, and separates

14   it from the Palestinian territories which are named here as the

15   West Bank.  The green line which is in fact what it is called,

16   it was simply drawn on a map with a green marker, that's why

17   it's given that name.

18   Q.  What is the significance of Ramallah in terms of the

19   Palestinian Authority itself?

20   A.  Ramallah represents the place where all the Palestinian

21   governmental ministries and entities and agencies reside.  We

22   heard in recent days the term the mukataa.  The mukataa is the

23   Palestinian administration or government.  It is located in

24   Ramallah, that is where the Palestinian president resides, as

25   well as the government, the Parliament, the security services,

F1f3sok3                        Eviatar - direct

1    and all the official agencies that are in charge of the

2    Palestinian territories.

3    Q.  Thank you so much.

4        MR. YALOWITZ:  Your Honor, we move in evidence the map

5    that Mr. Eviatar described.  We would offer it as Plaintiff's

6    Exhibit 1151.

7        THE COURT:  Any objection?

8        MR. HILL:  No objection.

9        THE COURT:  It will be admitted into evidence as 1151.

10       (Plaintiff's Exhibit 1151 received in evidence)

11   A.  Can I point out a fact in this regard about Ramallah?

12   Q.  Will you point out a fact in this regard of relevance to

13   the jury, please.

14   A.  My office in the West Bank, in a place called Beit El, when

15   the window is open, I could see Ramallah facing me.

16   Q.  Thank you.  Now, I want to focus on the period 2002 to 2004

17   in Israel and ask you what was happening at that time in terms

18   of terrorism and security.

19       MR. ROCHON:  Objection.  It is overly broad.

20       THE COURT:  I'll overrule it.  You can answer.

21   A.  The year 2002 was the pinnacle of a terrorist onslaught

22   which was characterized by terror attacks that occurred every

23   few days of every type.  Shooting by terrorists on the roads,

24   roadside charges on the roads, suicide bombings in cafes,

25   buses, other public places, in places in which Israeli

F1f3sok3                          Eviatar - direct

1    civilians gathered.

2              This period, or rather the characteristics of this

3    period as I am depicting them, the height came in March 2002.

4    The features that I've just described in regard to the

5    intensity of the violence and terrorism continued on in 2003,

6    as well as in 2004.  But, at varying levels of intensity.

7              One might say that the Second Intifada, which is the

8    name that was given to this wave of violence, waned towards the

9    end of 2004.

10   Q.  Could you explain for the jury what the term Al Aqsa

11   Intifada means?

12   A.  Of course.  This is the name given by the Palestinian

13   Authority to this wave of violence.  "Intifada" in Arabic means

14   a popular uprising in a violent context.  Al Aqsa is the name

15   of a holy mosque which is located on the Temple Mount in

16   Jerusalem.  And the PA decided to call these violence events

17   after that place, which is holy to them in Jerusalem.

18   Q.  Thank you.  I would like to turn now to an overview of the

19   PLO and the Palestinian Authority and Fatah.  Would you

20   describe the main components of the Palestinian government as

21   they existed during the years 2002 to 2004.

22   A.  The Palestinian Authority, which is the government, the

23   chairman of the Palestinian Authority, that was Yasser Arafat

24   during that period.  Under him is a Palestinian government.

25   From the year 2003 it had a prime minister appointed to it.

F1f3sok3                          Eviatar - direct

1    Until that time, Yasser Arafat was the prime minister as well.

2            The Palestinian government includes all the

3    governmental ministries as we know them.  It includes military

4    security services.  During that time there were 17 Palestinian

5    security services.  Parallel to the government, there is an

6    entity known as the Palestinian Legislative Council, which is

7    its parliament.

8            Parallel to the systems that I have just described,

9    there is also a law enforcement system as well.  It includes

10   courts, prisons, places of detainment, a prosecution system.

11   The entire system that we're familiar with that is part of a

12   legal system.

13   Q.  Let's go to the PLO.  What was that organization as it

14   existed during the years 2002 to 2004?

15   A.  That organization, the initials of which stand for the

16   Palestine Liberation Organization, this name has remained

17   unchanged since its establishment in 1964.  Yasser Arafat was

18   the head of the organization.  The organization in fact

19   established the Palestinian Authority, and served as an

20   umbrella organization above the Palestinian Authority during

21   the period that is relevant to this discussion.

22   Q.  Could you describe at a very general level the role that

23   the PLO had in negotiations with Israel that led to the

24   Palestinian Authority structure you described.

25   A.  The PLO, the Palestine Liberation Organization, was the

F1f3sok3                    Eviatar - direct

1  official entity on behalf of the Palestinians that held

2  negotiations with Israel which created the Oslo Agreement, in

3  the year 1993, and which was updated, as it were, in '94 and

4  '95.  PLO is signed to that agreements.

5  Q.  Who is the other signatory besides the PLO?

6  A.  Israel is signed to those agreements, and the United

7  States.

8  Q.  Now, when was the Palestinian Authority itself established

9  generally?

10 A.  The Palestinian Authority was established in late 1994.

11 Q.  Who established it?

12 A.  The Palestine Liberation Organization.

13 Q.  Who -- okay.

14      I want to ask you about the agreement that's

15 operative.  Is there an agreement today -- let me start again.

16      Was there an agreement during the years 2002 to 2004

17 that set out powers and commitments made by the PA and the PLO?

18      MR. HILL:  Objection.

19      THE COURT:  Overruled.  He can answer.

20 A.  Since the signing of the agreement between the parties,

21 which is known as the Oslo Agreement, up to the present day,

22 including in the years 2002 to 2004, that agreement is binding

23 upon the parties signed to it, including the Palestinian

24 Authority.

25 Q.  Did you have an opportunity to review that agreement in

F1f3sok3                          Eviatar - direct

1    connection with your work during the years that you were in

2    government service?

3    A.   Of course.  That agreement served for me, as the person who

4    was the commander of an area in the West Bank, as a binding

5    document.  It bound me and my superiors.  I can say that I knew

6    it by heart.

7    Q.   Have you had an opportunity to review that document in

8    preparation for your testimony here today?

9    A.   Yes, for sure.  I read it in all three languages:  English,

10   Hebrew, and Arabic.

11           MR. YALOWITZ:  We've marked it for identification as

12   Exhibit 532.

13           Your Honor, the plaintiffs move the admission into

14   evidence of Exhibit 532, which is the Oslo Accord that the

15   witness is testifying about.

16           THE COURT:  It will be admitted into evidence.

17           (Plaintiff's Exhibit 532 received in evidence)

18           MR. YALOWITZ:  Thank you.  Why don't we put it up.

19   And we can talk about it a little bit.

20   Q.   I'd like to begin by focusing with you on some of the

21   particular provisions, and I want to focus to begin on Article

22   15, pages eight and nine of the exhibit.

23           MR. YALOWITZ:  With the Court's permission, I'd like

24   to just read a portion of Article 15 and then ask the witness

25   some questions about it.

1           THE COURT:  Yes, sir.

2           MR. YALOWITZ:  Thank you.  "Article 15.  Prevention of

3   Hostile Acts.

4           "Both sides shall take all measures necessary in order

5   to prevent acts of terrorism, crime and hostilities directed

6   against each other, against individuals falling under the

7   other's authority, and against their property, and shall take

8   legal measures against offenders."

9   Q.  My question is, when it says "both sides," who are the two

10  sides that they're talking about in that agreement?

11  A.  One side is the Palestinian Authority.  The other side is

12  Israel.

13  Q.  Thank you.  Now, was there a protocol attached to the

14  agreement concerning security arrangements?

15  A.  Yes.  There was a special chapter that dealt with the

16  security issues.  It fully specified the obligations of the

17  parties, and it's included in this entire agreement.

18  Q.  Is that annex one of the agreement?  Do you recall?

19  A.  May I see the title of appendix one so I may make sure?

20          MR. YALOWITZ:  Bear with us.  See if we can line it

21  up.

22  Q.  Do I have the right one?

23  A.  Yes, I have it here in front of me.  This is the agreement,

24  this is annex one.

25  Q.  Okay.  Great.  Now, I'd like to direct you and the jury to

F1f3sok3                          Eviatar - direct

1   article two of annex one, which is the security policy for the

2   prevention of terrorism and violence.  And let me just ask you

3   as a preliminary, was this policy in annex one directed

4   particularly at the Palestinian side?

5   A.   Unequivocally yes.

6   Q.   So, I just want to highlight a couple of pieces for the

7   jury.  Let's look at paragraph B together.  "The Palestinian

8   police will act systematically against all expressions of

9   violence and terror."

10          Was that an obligation of the Palestinian Authority

11   during the years 2002 to 2004?

12   A.   Certainly.  That was one of its obligations.

13   Q.   Let me point you to paragraph D.  "The Palestinian police

14   will arrest and prosecute individuals who are suspected of

15   perpetrating acts of violence and terror."

16          Was that an obligation imposed on the Palestinian

17   Authority during the years 2002 to 2004?

18   A.   Yes.

19   Q.   Let's look at paragraph two together.  "Each side shall

20   immediately and effectively respond to the occurrence or

21   anticipated occurrence of an act of terrorism, violence, or

22   incitement, and shall take all necessary measures to prevent

23   such an occurrence."

24          Was that an obligation that the Palestinian Authority

25   undertook to be bound by during the years 2002 to 2004?

F1f3sok3                        Eviatar – direct

1    A.   Absolutely.  They are a signatory to that.

2    Q.   Let me give you one more, if Ms. Machnes is ready.  "With a

3    view to implementing the above, each side shall, in accordance

4    with the provisions of this agreement, carry out the following

5    functions in the areas under its security responsibility.

6              "C.  Apprehend, investigate, and prosecute

7    perpetrators and all other persons directly or indirectly

8    involved in acts of terrorism, violence, and incitement."

9              Was that also an obligation of the Palestinian

10   Authority?

11   A.   The answer is an unequivocal yes.

12   Q.   I want to ask you about this phrase "security

13   responsibility" up under item three.  I think I have to ask you

14   about one of the basic functions in the agreement which is

15   Areas A, B and C within the West Bank.

16             Are you familiar with that terminology, Areas A, B and

17   C?

18   A.   I am very well familiar with it.

19   Q.   So, let's begin with Area A.  What was that?

20   A.   The A territories were determined by the accord between the

21   parties to be areas that would be under the exclusive control

22   of the Palestinian Authority from a defense perspective, as

23   well as from a civilian perspective.

24   Q.   Generally speaking, what kinds of areas, what kinds of

25   areas were in Area A?

F1f3sok3                    Eviatar - direct

1    A.  I just wanted to continue that.  All of the Palestinian

2    cities, some of whose names we heard earlier today, such as

3    Ramallah, Nablus, there are other cities as well, all of them

4    fall within the realm of area A.

5    Q.  Was the city of Tulkarm in area A?

6    A.  Certainly.

7    Q.  How about the city of Jenin, was that in area A?

8    A.  Jenin was as well.  I can specify all the cities if you

9    wish.

10   Q.  Sure.  Why don't you just do it from memory.

11   A.  I'll start from north to south.  Jenin, Tulkarm, Qalqilya,

12   Nablus, Ramallah, Jericho, Bethlehem, Hebron.

13   Q.  About how many people live in the West Bank territory or

14   how many people lived in that time period in the West Bank?

15   A.  During that period of time in the West Bank, approximately

16   2.3, 2.4 million Palestinians resided there.

17   Q.  Of that, call it 2.4 million, how many lived in area A?

18   A.  Area A included, included more than 50 percent.  Even

19   60 percent.

20   Q.  Let's go to Area B.  What was that area in terms of sort of

21   geography or urbanity or something like that.  That's not a

22   good word.  Let me withdraw it and try a different question.

23        What was in Area B?

24   A.  Area B included all of the areas that were under Israeli

25   security control and Palestinian civilian control.  In effect,

1    Area B included all of the rural areas of the West Bank,

2    including in effect hundreds of Palestinian villages.  Just to

3    explain further, a Palestinian village can include 30 or 40,000

4    people.

5    Q.  And did the Palestinian police patrol in Area B?

6    A.  According to the agreement and the coordination between the

7    parties, in several central B areas, for example, large

8    villages, there were Palestinian police stations.  And in areas

9    in which there was no Palestinian police presence, generally

10   what would happen in the field was that the Palestinian

11   Authority would request permission from Israel to send

12   Palestinian police to those villages.  Generally speaking,

13   Israel would approve requests of this type.

14   Q.  What percentage of the Palestinian population lived in A

15   and B combined?

16   A.  More than 90 percent.

17   Q.  So then what was Area C?

18   A.  Area C was a further definition of that division.  They

19   were Palestinian villages that were under full Israeli control.

20   I myself, in the area in which I served as a commander, I was

21   responsible for several villages in Area C.  All in all, in the

22   entire West Bank, there were between 100,000 and 150,000

23   Palestinians in that area.

24   Q.  150,000 in Area C?

25   A.  In the entire West Bank in the C areas.

F1f3sok3                    Eviatar - direct

1   Q.  Now, I want to go back to the text of the Oslo Accord.

2           MR. ROCHON:  Your Honor, if I may, and I would object,

3   either ask to approach the bench or take a break for lunch or

4   sit down if you tell me to sit down.

5           THE COURT:  I am going to overrule your objection and

6   tell you to sit down.

7           MR. ROCHON:  Thank you.

8   Q.  Why don't we go to article four of annex one, the

9   Palestinian police.  Does article four of annex one describe

10  the duties and functions of the Palestinian police as you

11  understood it?

12  A.  The answer is yes.

13  Q.  Can we look together at paragraph F of -- I guess paragraph

14  1F of article four.  Palestinian police.

15          May I, your Honor?

16          THE COURT:  Yes, sir.

17          MR. YALOWITZ:  "Palestinian police duties and

18  functions.

19          "As detailed in the Palestinian law, the Palestinian

20  police shall carry out its duties and functions in accordance

21  with this agreement as follows:

22          "Subparagraph F, combating terrorism and violence, and

23  preventing incitement to violence."

24  Q.  Is that text consistent with your understanding of the

25  obligations undertaken by the Palestinian Authority during the

F1f3sok3                          Eviatar – direct

1    years 2002 to 2004?

2    A.   Unequivocally yes.  If I may just add and emphasize to the

3    members of the jury and to the Court, every Palestinian city

4    which I mentioned previously was under the control of the

5    Palestinian Authority and the security forces operate there.

6    In other words, the Palestinian security forces that operate in

7    Ramallah, corresponding forces exist in the other cities as

8    well in Hebron in Tulkarm, etc.

9            MR. YALOWITZ:  Your Honor, would it be convenient for

10   the Court to take a lunch recess?

11           THE COURT:  Sure.  Ladies and gentlemen, let's take a

12   lunch break then.  Don't discuss the case, keep an open mind.

13   I'll see you at 2 o'clock.  We'll start promptly.

14           (Jury excused)

15           (Continued on next page)

16

17

18

19

20

21

22

23

24

25

F1f3sok3

1          THE COURT:  You can step down, sir.  Is there anything

2     we need to address, Mr. Rochon?

3          MR. ROCHON:  Yes, your Honor, I think we do.  I think

4     it is fairly serious and requires a mistrial.

5          THE COURT:  Okay.

6          MR. ROCHON:  The issue, your Honor, is this.  It is

7     the use of the Oslo Accords that I'm speaking to.  In this

8     case, when the defendants at the beginning of this litigation

9     sought to have this case not in the United States courts and

10    represented that it involved political questions, involved

11    areas where it would require a court or a jury to address

12    issues of international relations and diplomatic agreements

13    entered into by the United States and Israel and the

14    Palestinian Authority, the plaintiffs argued that this was a

15    simple tort case in which we would try this case, and we did

16    not need to implicate all of those issues.  That's a

17    significant part of both the basis of their arguments to keep

18    the case here, and part of the reason why we're still here.

19    Because the defendants had argued of course this case does not

20    belong in the United States court, because it inevitably would

21    involve these kinds of issues.  But we got assurances this case

22    would not be politicized.  We got assurances they would not try

23    to try the Second Intifada.  Now the plaintiffs have put into

24    evidence --

25         THE COURT:  Without objection.

F1f3sok3

1          MR. ROCHON:  Your Honor, we've objected to these

2     exhibits.  We've objected.

3          THE COURT:  Did you object to this exhibit?  You

4     didn't object today.

5          MR. ROCHON:  I just did object.  You told me to sit

6     down.

7          THE COURT:  No.  You didn't object when he offered

8     this exhibit.

9          MR. ROCHON:  Your Honor --

10          THE COURT:  He offered the exhibit and it came in

11     without objection.

12          MR. ROCHON:  I move to strike the exhibit.

13          THE COURT:  It is a little late now, that's what I'm

14     emphasizing.  You didn't object to its admissibility.  Now to

15     say that you have some objection to him reading from it or from

16     utilizing it, that was the nature of your objection, that's why

17     I told you to sit down.  It is already in evidence.  He can do

18     whatever he wants with it now.

19          MR. ROCHON:  If he's now moved this in, the

20     defendants -- and they're claiming, they are going to claim

21     that the defendants violated the Oslo Accords as part of their

22     case.  That's what they have just put in.

23          THE COURT:  That doesn't advance their case.

24          MR. ROCHON:  Why did they put in what our obligations

25     are under it?

F1f3sok3

1          THE COURT:  They want to argue and they've

2     consistently argued, and you've argued against it, that they

3     had responsibilities with regard to terrorist acts and that

4     they knew what those responsibilities were, and although they

5     took a public position that they were meeting their

6     responsibilities, in fact what they were doing was just the

7     opposite.  That's the relevance.

8          MR. ROCHON:  If they claim those responsibilities came

9     from an international accord as opposed to the standards that

10    are appropriate for a tort case, that's a different thing.

11         THE COURT:  I agree.

12         MR. ROCHON:  We've argued to the Court that we're

13    entitled to a Monell standard as a governmental entity in

14    regards to the evaluation of our employees.  Now they're

15    putting in some stuff about whether we as an entity have

16    complied with this international accord.  And they are going to

17    claim that I can't go into whether Israel complied with this

18    international accord, whether it is even a valid accord if both

19    sides violated it.

20         Because this accord had all sorts of obligations of

21    Israel that, as you know, the Palestinians think Israel didn't

22    live up to.  They've opened the door to everything they said

23    they wouldn't do.  They've politicized this case.  They have

24    been saying all along we are going to politicize this case.

25    And now we've talked about the Oslo Accords and the Palestinian

F1f3sok3

1    Authority's obligations under the Oslo Accords and whether

2    we've complied with them.  And who is really politicizing this

3    case in front of the jury.

4            THE COURT:  Well, first of all, whether they've

5    complied with the Oslo Accords has not been the argument.

6    Second of all, as I indicated, this was an exhibit that came

7    into evidence without objection.  Without objection.  This may

8    be your objection now.  But you did not have such an objection

9    when he offered this document in evidence, and you did not make

10   such an argument to keep this document out of evidence.

11           So this document was admitted into evidence.  And then

12   once it is admitted into evidence, pursuant to our rules, he is

13   entitled to read from this document any portion, particularly

14   any portion that has to do with terrorism and people's

15   agreement -- not responsibility -- but their agreement with

16   regard to how they were going to deal with terrorism.  Their

17   position is with the evidence is just the opposite.  The

18   evidence is that they agreed that they would handle terrorism

19   in a certain manner, and the evidence is that they did not,

20   even though they agreed to suppress terrorism, they were

21   involved in fact in actions that are inconsistent with that,

22   which would lead the jury to believe that not only did not

23   attempt to suppress terrorism, but they were in fact involved

24   in terrorism.

25           This has no political implications.  It is either they

F1f3sok3

1    did or they didn't.  As I say, first of all, the objection to

2    this document is a late objection.  And was not an objection

3    made when the document was offered.  The document is already in

4    evidence.  And you're going to have to live with it.

5            Second of all, the nature of the questions that have

6    been asked with regard to the document, and the nature of the

7    parts that have been read.

8            And also, I must say, also that it is still consistent

9    with this witness's testimony about the structure of the

10   situation, the relationships between the PA, the PLO, how it

11   was created, who has authority, all of those issues.  This is

12   reflective of that and related to that.

13           With regard to someone making some political

14   statements about this case, the only one sort of put this in a

15   political context at this point is your statement just now.

16           MR. ROCHON:  Not in front of the jury.  I've not done

17   anything in front of the jury.  With you what I've suggested is

18   the plaintiffs have put us in that position.  And when they

19   proffered what this witness was going to say, they didn't say

20   he was going to comment whether or not the Oslo Accords were

21   complied with or not.  The Oslo Accords created my client,

22   which was a relevant and proffered portion of his testimony.

23           As far as what the Oslo Accords have to say about as

24   to whether anyone complied with the Oslo Accords, it wasn't

25   proffered, it wasn't anything you said they can get into.  I

F1f3sok3

1    dare say if they had said they wanted to get into whether my

2    client complied Oslo Accords, you never would have let them,

3    because it is not relevant to the tort standard.

4                THE COURT:  What is it you're asking me to do?

5                MR. ROCHON:  Strike this.  Strike the testimony about

6    it.

7                THE COURT:  Mr. Yalowitz?

8                MR. YALOWITZ:  Your Honor, the motion should be

9    denied.

10               THE COURT:  I'm going to deny the motion.  I think

11   this is appropriate.  If you wish to make some arguments with

12   regard to this, you can.  If you want further inquiry, you can.

13   But I think, one, the document was admissible.  Two, I admitted

14   it as evidence without objection.  Three, the questions related

15   to the document and the portions read from the document were

16   appropriate, given that the document is fully in evidence.  And

17   four, I don't think that this raised issues of some

18   international political issue.  The issues are still the same

19   for the jury.  They are to evaluate the way they should

20   evaluate, and I'm sure you're perfectly capable of arguing to

21   them that the Oslo Accords have absolutely nothing to do with

22   what the plaintiffs claim that the defendants did and what they

23   are liable for.

24               MR. ROCHON:  I'd ask the court to so instruct the jury

25   that the Oslo Accords have nothing to do with what the

F1f3sok3

1    plaintiffs allege that the defendants did.  Therefore, if

2    that's the Court's view, that's our view as well.

3          THE COURT:  That's your view.  You can argue that

4    view.  My view is I cannot make that statement because I

5    admitted the Oslo Accords.  It is for the jury to determine

6    what weight to give to the Oslo Accords and what relevance it

7    does have.  They made a basic showing without objection of its

8    admissibility.  So it will be inappropriate for me to give them

9    such an instruction, if I admitted it into evidence for the

10   consideration to give whatever weight they deem is appropriate,

11   given the arguments and the use the parties want to make.

12         MR. ROCHON:  I moved for a mistrial as well, your

13   Honor.  I understand, given your other rulings.

14         THE COURT:  That motion is also denied.

15         MR. ROCHON:  Thank you, sir.

16         MR. YALOWITZ:  Your Honor, just one thing.  Please

17   don't assume from my general silence that I agree with anything

18   Mr. Rochon said.  He made some statements that I disagree with.

19         THE COURT:  I would shock myself if I ever made that

20   assumption.

21         MR. YALOWITZ:  When there is a misstatement and I

22   don't correct it, I don't want to hear back later, well, that I

23   was silent.  But we don't need to go into it.  I don't agree

24   with everything he said.

25         MR. ROCHON:  Your Honor, we have some issues.  I don't

F1f3sok3

 1   know if we are going to get to the Shawbaki conviction this

 2   afternoon.  And 212 was another one.  If we're not going to get

 3   to it this afternoon, we can deal with it some other time.

 4          MR. YALOWITZ:  I don't know.Shawbaki I won't get to

 5   this afternoon.  212 I might.

 6          THE COURT:  I thought you were going to give me a copy

 7   of 212.

 8          MR. ROCHON:  I think Mr. Hill proffered one.  He

 9   handed you one this morning.

10          THE COURT:  I have 212.  I read 212.

11          I'll give you three more minutes, but I have a

12   sentencing to do.  With 212, what is your objection?  Quite

13   frankly, I thought this was your argument, not your objection.

14          MR. HILL:  It postdates all of the attacks at issue.

15   It is not relevant.  It's got prejudicial statements that are

16   going to prejudice our client.

17          THE COURT:  You've got to give me something more

18   specific than that.  I understand that it postdates, but I

19   assume it reflects the consistent policy of the PA throughout

20   this period of time.

21          MR. HILL:  There is no such evidence.

22          THE COURT:  With regard to the attempt to release

23   prisoners, with regard to treating prisoners, providing

24   financial support on an indiscriminate basis for prisoners, and

25   for attempting to negotiate better treatment and release of

F1f3sok3

1    prisoners.

2              MR. HILL:  If that's what it's going to be offered

3    for, that's not what it says.

4              THE COURT:  That's what it said to me.  What is it

5    that you say is prejudicial?

6              MR. HILL:  I'm concerned about this statement:  "The

7    purpose of this visit, said Qaraqe, is to draw attention to the

8    700 military detainees who are held in the prisons of the

9    occupation and open this file so that we can work on their

10   release, especially since most of them were detained while they

11   were on duty and wearing their military uniforms."

12             So I suspect the plaintiffs will argue that that's

13   evidence of our liability.  I don't want them to be able to

14   make that argument.

15             THE COURT:  I don't know, I don't know what the

16   evidence is supposed to show as to what technically is a

17   military detainee, and I didn't read this to say that they were

18   arrested for committing terrorist acts while they were in

19   uniform.

20             MR. HILL:  Well, if the plaintiffs --

21             THE COURT:  You know better than I what this is

22   referencing.

23             MR. HILL:  None of the people in this case were, so

24   that's why it is not relevant.

25             THE COURT:  I'm not thinking about the relevance, I'm

F1f3sok3

1    trying to figure out the prejudice.  I'm trying to figure out

2    what it is you say that this is going to mean to the jury after

3    you and the other side have an opportunity to explain what this

4    means.

5              I don't know what they were arrested for.  It says

6    that 800 people were in prison by the Israeli government.  I

7    don't think this document says anything about terrorism.

8              MR. HILL:  Then it's not relevant at all and shouldn't

9    come in.

10             THE COURT:  Why?  I am trying to understand, other

11   than this paragraph.

12             MR. HILL:  There are others.  I can read them if the

13   Court wants me to.

14             THE COURT:  Other than this paragraph, what is the

15   part you don't want before the jury.

16             MR. HILL:  On the next page it says at the top, Qaraqe

17   said --

18             MR. YALOWITZ:  May I indulge the Court to ask Mr. Hill

19   to provide me a copy as well as the Court?

20             THE COURT:  You don't have a copy of this document?

21             MR. YALOWITZ:  Not right in front of me.

22             THE COURT:  We are not going to waste time.  He'll

23   provide it over lunch.  You are saying top paragraph.  We can

24   discuss it after lunch.

25             MR. HILL:  "Qaraqe said the military prisoners are

F1f3sok3

1   soldiers who were working for different security and police

2   apparatuses."

3        THE COURT:  You believe it is prejudicial to refer to

4   the military prisoners as soldiers?

5        MR. HILL:  The next sentence:  "They were arrested

6   while they were carrying out their duties just to be used as

7   hostages."

8        THE COURT:  Okay.  And you say that implies what

9   that's prejudicial to the defendant?

10        MR. HILL:  The plaintiffs have not told me what they

11   intend to use it for.

12        THE COURT:  What is it you say that implies it is

13   prejudicial to you?

14        MR. HILL:  I assume they will use it to argue that the

15   people who committed the crimes in this case were carrying out

16   their duties.  If they are not going to use it for that, it

17   shouldn't come in.

18        THE COURT:  It is your objection.  So saying you don't

19   know why they are going to use it isn't a valid objection.  You

20   have to tell me why you object to it.  If it is only on

21   relevance, that's one standard to use.  If it is on some

22   prejudice, I obviously am more concerned about the prejudice

23   than I am about whether or not it has significance or little

24   relevance.

25        MR. HILL:  These are political statements by a

F1f3sok3

1    politician.

2              THE COURT:  Is that the nature of your objection to

3    this document?  That it refers to military detainees and people

4    being arrested in uniform?  Is that the substance of your

5    objection?

6              MR. HILL:  There are other political statements on

7    page 3817 at the bottom and the second paragraph from the

8    bottom.  It says:  Minister Ajrami demonstrated to the British

9    parliamentary delegation that the Palestinian prisoners are

10   political and security prisoners and not criminals as the media

11   and political machines portray them.  They are freedom fighters

12   and patriots in accordance with the laws of the United

13   Nations."

14             THE COURT:  Describing them as freedom fighters?  Is

15   what you have concerns about?

16             MR. HILL:  And patriots.

17             THE COURT:  Not patriots.

18             MR. HILL:  The plaintiffs are going to argue --

19             THE COURT:  Whether they're patriots or not?

20             MR. HILL:  This is a statement from 2008.  The

21   plaintiffs are going to argue that statement indicates my

22   client views the people who injured the plaintiffs as freedom

23   fighters and patriots.  That's going to prejudice me.

24             THE COURT:  I understand.  That's the kind of thing

25   you are objecting to.

F1f3sok3

1          MR. HILL:  Those are the sorts of statements I'm

2     objecting to in this document.

3          THE COURT:  Mr. Yalowitz, why don't you get a copy

4     from them, we'll talk about it briefly after lunch, and you can

5     tell me exactly what you say this is evidence of and how you

6     expect the jury to utilize this document.

7          MR. YALOWITZ:  I've looked at it and I've listened and

8     I can tell you right now.

9          THE COURT:  Let me take that.

10          MR. YALOWITZ:  I do want to give you for the lunch

11     break, your Honor, 427, which we've tabbed and highlighted.

12     The two paragraphs I described earlier about Abdullah

13     Barghouti.

14          THE COURT:  This is the Abdullah Barghouti

15     interrogation.

16          MR. YALOWITZ:  You got it.

17          THE COURT:  Thank you.

18          MR. ROCHON:  Whatever he's highlighted, whatever he's

19     tabbed, we don't have.

20          MR. YALOWITZ:  I am going to show it to Mr. Rochon and

21     then I'll hand it up.

22               (Luncheon recess)

23               (Continued on next page)

24

25


SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1fQsok4

                          AFTERNOON SESSION

                            2:00 P.M.

1                   (In open court; jury not present)

2             THE COURT:  Is everybody ready?

3             MR. YALOWITZ:  Plaintiffs are ready, your Honor.

4             THE COURT:  The jurors are here.  So let's go ahead

5   and continue unless there is an issue we need to address.

6             MR. YALOWITZ:  Not from the plaintiff's side, your

7   Honor.

8             THE COURT:  Then let's not use the jurors' time.

9   Let's get the jurors in.

10                  (Jury present)

11            MR. YALOWITZ:  Your Honor, before the lunch break, the

12  Court admitted Exhibit 532.  I just wanted to hand up a copy

13  for the Court's benefit.  May I approach?

14            THE COURT:  Yes.

15  DIRECT EXAMINATION CONTINUED

16  BY MR. YALOWITZ:

17  Q.  Mr. Eviatar, we were talking about the Palestinian

18  Authority.  If you could just describe for the jury some of the

19  security bodies that are within the PA to implement those

20  security responsibilities, that would be helpful.

21  A.  Yes, of course.  I will note the main security agencies of

22  the Palestinian Authority, those who were and still are in

23  charge of implementing the agreement.  One is the preventative

F1fQsok4                    Eviatar – Direct

1    security apparatus.  The second is the general intelligence

2    service.  The third is the national security apparatus, the

3    civilian police, Force 17 presidential guard, and there are

4    additional entities and agencies.

5    Q.  Does the PA have within it something called a ministry of

6    prisoners and ex-prisoners?

7    A.  Yes, of course.  The precise definition of this

8    governmental ministry is the ministry of prisoners and released

9    prisoners.

10   Q.  Is that within the PA or the PLO?

11   A.  That depends on which period we're talking about because

12   until recently, I'm talking about late 2014, the ministry of

13   prisoners and released prisoners was under the full

14   responsibility of the Palestinian Authority, but since the

15   beginning of 2015, just a few days ago, we could say on the

16   background of harsh international criticism of the Palestinian

17   Authority.

18            MR. HILL:  Your Honor, may we approach?

19            THE COURT:  Do you have an objection to that?

20            MR. HILL:  I do.

21            THE COURT:  Ladies and gentlemen, you should disregard

22   the last answer.

23            MR. HILL:  Thank you.

24            THE COURT:  What is specifically your question?

25   Q.  Just specifically, Mr. Eviatar, where is that entity today?

1              MR. HILL:  Objection.

2              THE COURT:  No, he can answer that.

3   A.  As of today, that entity is subordinate to the Palestine

4   Liberation Organization.

5   Q.  Now I want to ask you about something called the martyrs'

6   foundation.  Are you familiar with that unit?

7   A.  Yes, I'm very familiar with this entity.

8   Q.  Why don't we start with where that unit is located within

9   the PA or the PLO?

10  A.  This entity was established in 1965 by the PLO, and later

11  upon the establishment of the Palestinian Authority, and the

12  establishment of the Palistinian government, including during

13  the years of the Aqsa Intifada, this group was made subordinate

14  to the Palestinian Authority.

15              After 2005, this entity together with what is in

16  charge of it or who is in charge of it, went back to being

17  subordinate to the PLO.  If I may, I can state who heads this

18  entity.

19  Q.  Who heads the entity?

20  A.  A woman heads this entity.  Her name is Intezar al-Wazir.

21  She is known as -- her nom de guerre, as it were, is Omm Jihad.

22  She was a minister in the Palistinian government and in current

23  years she is the head of that entity.

24  Q.  Let me ask you a couple of things about -- you used the

25  word omm.  Is that an Arabic word, omm?

F1fQsok4                              Eviatar - Direct

1    A.  Yes, of course.  The meaning of that word is mother.  It

2    means she is the mother of Jihad.  Jihad is the name of her

3    eldest son, and that is how she is known, Omm Jihad.

4    Q.  Now, I also want to ask you about the word martyr,

5    foundation for martyrs.  What's the Arabic word that they used

6    in that, the title of that entity?

7    A.  In the singular the word is shahid.  In the plural the word

8    is shuhada.  That is the literal translation of the concept of

9    martyr.

10   Q.  In the context of the al-aqsa intifada, how was the word

11   martyr being used?  How was the word shahid being used?

12             MR. HILL:  Objection, your Honor.

13             THE COURT:  I'm going to sustain it the form of the

14   question.  Be more specific.

15   Q.  Could you tell us are there multiple meanings of the word

16   shahid in the Arabic language?

17   A.  This is a meaning that is very broad and deep, and it is

18   clear to the Palistinians with whom I was in contact and with

19   whom I spoke.  Shahid refers to in the context of the al-aqsa

20   intifada.

21             MR. HILL:  Objection.

22             THE COURT:  Overruled.

23   Q.  You can continue.

24   A.  It refers to someone who was killed in the context of the

25   struggle against Israel.

F1fQsok4                          Eviatar - Direct

1   Q.  Thank you.  Does that include somebody who was killed as a

2   suicide terrorist?

3   A.  It certainly includes that category.  In fact, one might

4   say that it refers specifically to that category.

5   Q.  We've talked about the PLO, and we've talked about the

6   Palestinian Authority.  I want to now turn to an organization

7   called Fatah.  Can you tell the jury, first of all, what does

8   Fatah stand for?  What is Fatah?

9   A.  Fatah is an acronym in Arabic for three words.  Harakat

10  Tahrir Filastini.  And that means the movement for the

11  liberation of Palestine.  It is a movement that was established

12  in 1959 by Yasser Arafat.  Later in 1969, ten years after its

13  establishment, it took over the PLO, which as will be recalled,

14  was established in 1964.  This movement espoused since its

15  establishment in its --

16          MR. HILL:  Objection, your Honor.

17          THE COURT:  Overruled.  You can cross-examine on it.

18  A.  -- in its written documents that the path or the way to

19  liberate Palestine -- and I would like to note to the members

20  of the jury that when they talk about Palestine, they are

21  referring to the entire territory of Israel -- that the way to

22  free Palestine is by means of an armed struggle.

23          Over the years with the establishment of the

24  Palestinian Authority up to the present date, this movement,

25  which includes tens of thousands of Palistinians as registered

F1fQsok4                          Eviatar - Direct

1    members of the movement, some of them carry membership cards.

2    I've seen them with my own eyes.  These tens of thousands of

3    members of Fatah represented and continue to represent the main

4    infrastructure of the Palestinian Authority; in other words,

5    the military apparatuses as I mentioned earlier, the

6    governmental ministries, other governmental entities and

7    agencies, are based on those tens of thousands of Fatah

8    members.

9              This movement, in essence, represents, as I would put

10   it, the central framework of the Palestinian Authority.

11   Q.  Let's talk about what Fatah is on paper.  Is it a

12   corporation?

13   A.  No, not at all.

14   Q.  Is it like an LLC or a charity or something like that?

15   A.  Not at all.

16   Q.  Is it a political committee that raises money and files

17   reports on elections?

18   A.  Not at all.

19   Q.  Do they have a budget that they publish so that people

20   could know how much money they spend?

21   A.  They do not.  I throughout my years looked for such a

22   document, but was unable to find it.

23   Q.  Do they have subparts, you know, different functions that

24   they engage in?

25   A.  Within the Fatah movement?

F1fQsok4                          Eviatar - Direct

1    Q.   Yes, sir.

2    A.   The Fatah movement is divided up, and this is something

3    that it has made public into various departments and committees

4    that deal with different areas.  The main areas that these

5    committees deal with are related to the struggle against

6    Israel.

7    Q.   Are these departments and committees and subcommittees, are

8    they corporations?

9    A.   No.

10   Q.   Are they registered anywhere as separate entities with a

11   separate corporate existence?

12   A.   No, they are all part of the same framework.

13   Q.   Is that structure of different subunits, is that published

14   anywhere?  Can you go to like a Fatah website and see what

15   their organizational chart looks like?

16   A.   Yes.  These structures as I have mentioned, the committees

17   and so on, can be seen on various websites as to what the Fatah

18   looks like.

19   Q.   Are they all put together in one place so that one person

20   could see it if they were curious?

21   A.   You can find a list of the various committees.  When Fatah

22   is interested in making things public, it does.  Then you can

23   find on a single list the breakdown of the various committees

24   that I mentioned.

25   Q.   Does Fatah have a military unit?

F1fQsok4                          Eviatar – Direct

1          MR. HILL:  Objection.

2          THE COURT:  Overruled.

3   A.  The Fatah has a military branch.

4   Q.  What's the called?

5   A.  The military branch of the Fatah is called the Al-Aqsa

6   Martyrs' Brigade.

7   Q.  Who was the commander of Fatah during the years 2002 to

8   2004?

9          MR. HILL:  Objection.

10          THE COURT:  Overruled.

11  A.  Up until November 11, 2004, the person who headed the Fatah

12  movement, he's also called the commander of the Fatah movement,

13  was Yasser Arafat.

14  Q.  Now, are you familiar with the Fatah constitution?  I think

15  I may have asked that.

16  A.  I'm familiar with the Fatah constitution.  It was published

17  by the movement itself.

18  Q.  Would you tell the jury what Article 19 talks about?

19          MR. HILL:  May we approach?

20          THE COURT:  Come on up.

21      (Continued on next page)

22

23

24

25

1            (At the sidebar)

2            THE COURT:  Yes, sir.

3            MR. HILL:  My objection is that the pending question

4   calls for the witness to relate the content of a document that

5   is not in evidence, and that he should not be allowed to do so.

6            MR. YALOWITZ:  I'm not offering the document.  I'm

7   just asking for his knowledge.

8            THE COURT:  You're not going to offer the document?

9            MR. YALOWITZ:  I'm not going to offer the document.

10           THE COURT:  What is he going to say?

11           MR. YALOWITZ:  He's going to say it's committed to the

12  armed struggle against Israel.

13           MR. HILL:  In that case, it is also unduly prejudicial

14  against my clients.  Fatah is not on trial here, and there's no

15  reason for the jury to hear about the content of a document

16  that is not going to be in admitted.

17           THE COURT:  What is the wording exactly of the

18  "article"?

19           MR. YALOWITZ:  You will remember.  I don't, but --

20           THE COURT:  Can I see it?

21           MR. YALOWITZ:  We can get it for your Honor.

22           THE COURT:  You want to ask him this to prove what?

23           MR. YALOWITZ:  Part of our theory of the case is that

24  Fatah Al-Aqsa Martyr Brigades were one entity, and that the

25  PLO, PA and Fatah were all controlled by Yasser Arafat, and he

1    used Fatah when he wanted to commit acts of terror.  This tends

2    to make it more likely that it's true when the written

3    constitution that all the Fatah members know about it calls for

4    armed struggle against Israel.

5             THE COURT:  Well, that doesn't necessarily translate

6    into terrorism.

7             MR. YALOWITZ:  That is certainly true.  They can argue

8    that --

9             THE COURT:  So you want to refer to it because they

10   say -- and I don't know what the language is, but the Article

11   19 says that they're dedicated to armed struggle against whom?

12            MR. YALOWITZ:  Israel for the liberation of Palestine.

13            THE COURT:  And you say that that's supposed to be

14   evidence that they're committed to killing innocent civilians?

15            MR. YALOWITZ:  I'm saying that's a reasonable

16   inference the jury can draw.

17            THE COURT:  I'm not going to let the jury draw that.

18   If you want to show me the document, I'll look at the document.

19            MR. YALOWITZ:  No, your Honor has made a ruling.  I

20   don't think their language is going to matter.

21            MR. HILL:  I just want to be clear.  I've preserved my

22   objections to the witness' testimony.  So I don't need to

23   object to him identifying people as factual matters at this

24   point, do I?

25            THE COURT:  My attitude to most of your objections

1    were you're going to be cross-examining him and you think he's

2    wrong, or you can bring in your own expert to say something

3    different.  It seems to me most of the areas so far that you've

4    objected to are perfectly within his expertise to explain:

5    What Fatah is, where they are, what the website is.  If you

6    disagree with that, then bring in somebody who says he didn't

7    know what he's talking about.

8            MR. HILL:  I understand.  I just want to be sure the

9    record is preserved.

10           Thank you, your Honor.

11        (Continued on next page)

F1fQsok4                         Eviatar - Direct

1            (In open court)

2            THE COURT:  The objection is sustained.

3            Why don't you move on to something else?

4            MR. YALOWITZ:  What I would like to do now is to offer

5    into evidence, your Honor, a chart that the witness prepared

6    which was in his expert report?

7            THE COURT:  Give me the exhibit number.

8            MR. YALOWITZ:  I think we're going to have to mark it

9    for identification as 1152.

10           THE COURT:  Have him identify it and tell us what it

11   is, and if the Court admits it, I will consider it.

12           MR. HILL:  I don't have a copy of it at all.

13           MR. YALOWITZ:  Why don't we block the screen and we

14   could put it up?

15           THE COURT:  Do you have a copy for them?

16           MR. YALOWITZ:  It's on page 20 of his expert report,

17   your Honor.

18           THE COURT:  They just want to know where it is so they

19   could follow it from there.  Just show them and have it ready.

20           Did you find it, Mr. Hill?

21           MR. YALOWITZ:  They have it.

22           Just one clarification, your Honor.  There are some

23   Hebrew language which we've removed from the exhibit that we're

24   going to show the jury.  I don't think anybody reads Hebrew,

25   but, anyway, we took it out.

F1fQsok4                        Eviatar – Direct

1         THE COURT:  Yes.

2         Mr. Hill?

3         MR. HILL:  May we approach?

4         THE COURT:  Do you have an objection to this document?

5         MR. HILL:  I do, your Honor.

6         THE COURT:  Come up.

7     (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1fQsok4                          Eviatar - Direct

1              (At the sidebar)

2              THE COURT:  What's the nature of the objection?

3              MR. HILL:  As I understand it, this is the document.

4              MR. YALOWITZ:  Right.

5              MR. HILL:  So I object that it's misleading and unduly

6      prejudicial to my clients.

7              THE COURT:  You mean just this little portion here?

8      Just this little portion here with the picture of Yasser Arafat

9      at the top?  And I assume that one is the PLO, one is the PA

10     and one is Fatah?

11             MR. YALOWITZ:  You got it.

12             THE COURT:  I'm not as dumb as I look.

13             MR. YALOWITZ:  That's my line.  I say that all the

14     time.

15             THE COURT:  And your objection is?

16             MR. HILL:  It's unduly prejudicial to my client.

17     Fatah is not on trial here.

18             THE COURT:  Well, neither is Yasser Arafat, but that

19     doesn't make it prejudicial to your client.  What's so

20     prejudicial about it?  Saying he's the head of these three

21     organizations, there's something prejudicial about that?

22     That's not true?

23             MR. HILL:  That he wasn't the head?

24             THE COURT:  Yes.

25             MR. HILL:  He was the head, yes. But to put it up on a

F1fQsok4                          Eviatar – Direct

1   graphic is prejudicial.  That's my motion.

2           THE COURT:  It's overruled.  Before you put it up,

3   have the witness explain to us what we're getting ready to see

4   and then you can offer it into evidence and have it admitted

5   into evidence.

6           (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1fQsok4                    Eviatar - Direct

 1                           (In open court)

 2              MR. YALOWITZ:  We have a high technology system here,

 3      your Honor.  What we've done is put a big binder in front of

 4      the projector.

 5              THE COURT:  I see.  Let's move on.  Does he have a

 6      copy in front of him?

 7              MR. YALOWITZ:  He should have it on the screen.

 8      Q.  Mr. Eviatar, do you have a little chart showing Yasser

 9      Arafat and some other symbols?

10      A.  That's before me, yes.

11      Q.  Could you just explain what's at the top of the chart?

12              THE COURT:  Just give us in general what it's supposed

13      to be.

14      BY MR. YALOWITZ:

15      Q.  In general, what is the chart supposed to show?

16      A.  This diagram clearly shows the hierarchal control of Arafat

17      over three Palistinian entities.  The first one is the

18      Palestine Liberation Organization.  The second one is the

19      Palestinian Authority.  And the authorized one is the Palestine

20      Liberation Movement, the Fatah.  This diagram also continuously

21      shows the relationship between the three entities.  All of them

22      are under Yasser Arafat.  And I would like to add that each

23      entity is represented here by its symbol.

24              THE COURT:  You offer this exhibit in evidence?

25              MR. YALOWITZ:  Yes, sir.

1          THE COURT:  It will be admitted into evidence.  You

2     may now display it.

3          MR. YALOWITZ:  Thank you.

4          (Plaintiff's Exhibit 1152 received in evidence)

5     Q.  I would like you, Mr. Eviatar, to explain some of the

6     symbols that we see here.  If we could actually begin with some

7     of the symbols that we see in chairman Arafat's photograph,

8     that would be great.

9          THE WITNESS:  Thank you to the Honorable Court for

10    assisting me with the technology.

11         THE COURT:  Batteries would help.

12         THE WITNESS:  In the meantime, I'll make due.

13    A.  The first symbol that we see is the official symbol of the

14    PLO name.  Here I'm finally successful.  This flag is the

15    Palistinian flag, and what we see here that I'm marking in red

16    is the map of Palestine which includes the entire territory of

17    the state of Israel as we saw previously.

18    Q.  And this is the official symbol of the PLO?

19    A.  Of course.

20    Q.  Anything else on that shield that you want to draw the

21    jury's attention to?

22    A.  Just a moment, please.  It says, of course, I don't know

23    whether the members of the jury can see it, but it says here

24    the PLO name.

25    Q.  Now, looking at the second symbol, the middle one, whose

F1fQsok4                         Eviatar - Direct

1     symbol is that?

2     A.  This symbol belongs to the Fatah.

3     Q.  Just describe what you are pointing at right there and

4     explain that to the jury.

5     A.  In Arabic, it says the word Fatah here.  And we see here

6     hands that are diagonally grasping two rifles.

7     Q.  Two rifles?

8     A.  Two rifles, and facing them on the diagonal.  I think that

9     we can also identify here a hand grenade underneath them.

10    Q.  A hand grenade?

11    A.  Yes, a hand grenade.  I will further add that in Arabic

12    what it says here behind the rifles is the word in Arabic

13    al-asefa.  The translation into Hebrew would be the storm.  And

14    the meaning of that term, that's one of the military forces

15    that was under the control of the Fatah in previous years.

16    Q.  Take us to the third symbol, that eagle.  That looks

17    familiar to me.

18    A.  This eagle is the official symbol of the Palestinian

19    Authority.  It appears in the official documents of the

20    Palestinian Authority, in other official exhibits of the

21    Palestinian Authority.  Underneath it says here in Arabic,

22    Palestine.

23    Q.  Thank you.  Now, could you also tell us, are there some

24    symbols in the way Yasser Arafat appears in that photograph?

25    A.  Yasser Arafat always wore an Arab national headdress, I

F1fQsok4                        Eviatar - Direct

1    would call it.  In Arabic it's called a kafia.  Now, I would

2    say that Arafat had a special way of wearing that headdress on

3    his head, as I'm marking here above.  The kafia took on the

4    form of a kind of triangle on his head but you have to pay

5    special attention to make sure that it appears like such a

6    triangle.  And Palistinians told me when I asked them about it,

7    they explained the triangle to me, and they told me that that's

8    the way that Arafat symbolizes the map of the entire country of

9    Palestine in their language, in their parlance.

10   Q.  How is a kafia normally worn on the head?

11   A.  It's usually placed on the head kind of like a scarf, and

12   it's just tied with that black cord in front.  It's placed on

13   the head.  It doesn't stand that way --

14            MR. ROCHON:  Objection, your Honor.

15            THE COURT:  Sustained.

16   Q.  Let's go to the uniform that Yasser Arafat is wearing.  Can

17   you describe the significance of appearing in uniform.

18            MR. ROCHON:  Objection.  Calls for speculation.

19            THE COURT:  Overruled.  He can answer the question.

20   A.  In all of his appearances, Arafat -- and I've seen many

21   hundreds of appearances by Arafat in the media -- Arafat always

22   appeared in a military outfit with medals and emblems on the

23   uniform, and that was the regular appearance of Yasser Arafat

24   up until, we could say, the day of his death.

25            MR. YALOWITZ:  Your Honor, may I have the Court's

1   permission to hand a copy of Exhibit 1152 so members of the

2   jury can pass it around amongst themselves?

3          THE COURT:  Sure.

4          MR. YALOWITZ:  Thank you so much.

5   Q.  Now, while the members of the jury are looking at that, I

6   will ask the witness whether you are familiar with a directory

7   published by a group called POSCI (ph)?

8   A.  I'm quite familiar with it.  This is a Palistinian research

9   institute that publishes professional publications in the

10  fields of political science, history, politics.  The name of

11  that institute is POSCI.

12  Q.  During the years 2002 to 2004, did POSCI publish a

13  directory of PA and PLO official and their offices, telephone

14  numbers, addresses?

15  A.  The answer to that is yes.  It's a thick directory which I

16  kept in my office as a work tool.

17  Q.  Did you find it to be a reliable reference tool during your

18  years in the government service?

19  A.  Absolutely.  I made use of it.

20         MR. YALOWITZ:  Your Honor, plaintiff's offer in

21  evidence Exhibit 171, which is a directory of POSCI published

22  in 2004.  We actually received it from the defendants.

23         MR. HILL:  May we approach?

24         THE COURT:  Yes.

25         (Continued on next page)

 1              (At the sidebar)

 2              MR. ROCHON:  Judge, I will tell you what:  If

 3    Mr. Yalowitz says again both in the presence of the jury or

 4    break out a document without getting it from a witness --

 5              THE COURT:  I will admonish him in front of the jury.

 6              MR. ROCHON:  Thank you.

 7              MR. YALOWITZ:  I understand.

 8              THE COURT:  Mr. Yalowitz cut out the comments, period.

 9    You are here to ask questions.  All I want to hear from the

10    lawyers are questions to the witness.

11              MR. YALOWITZ:  Yes, sir.

12              THE COURT:  Do you have an objection?

13              MR. ROCHON:  That's the main objection.  We're afraid

14    they're going to use this to say someone is a member of an

15    organization based on --

16              THE COURT:  No, they're going to say there's a

17    directory and there's names in it.

18              MR. HILL:  As long as it's not being offered for its

19    truth.

20              THE COURT:  I don't know.  The truth of what?

21              MR. YALOWITZ:  It is being offered for the truth, yes.

22              THE COURT:  The truth that they're in the directory?

23    If you want to dispute that, you can.

24              (Continued on next page)

25

1              (In open court)

2              THE COURT:  It will be admitted.

3              MR. YALOWITZ:  Thank you, your Honor.

4              (Plaintiff's Exhibit 171 received in evidence)

5              MR. ROCHON:  Your Honor, on the other point?

6              THE COURT:  I said next time.

7              MR. ROCHON:  I'm sorry, I misunderstood.

8    BY MR. YALOWITZ:

9    Q.  Now, can we look at the first page of the POSCI directory:

10   I'm sorry, the first page with entries in it, which I think is

11   page 3 of our PDF.  I just want you to identify who is listed

12   as the chairman of the PLO in this directory.

13   A.  On the top left underneath the designation PLO, Palestine

14   Liberation Organization, it says chairman:  Yasser Arafat.

15   Q.  Then it lists his telephone numbers, fax number and so

16   forth?

17   A.  Yes, these are his telephone numbers.

18   Q.  Let's just look on the part of the directory that deals

19   with the Palestinian Authority.  Let's see if we can spot the

20   president.  Is that Yasser Arafat as well?

21   A.  Yes, this too is Yasser Arafat.

22   Q.  Thank you.

23              Now, I would like to ask you about the relationship

24   between Fatah and the PLO.  Is it possible to be a member of

25   the PLO without -- let me ask it a different way.

1            If you're a member of Fatah, are you automatically a

2   member of the PLO?

3   A.   The answer is yes.

4   Q.   Now, we talked about Yasser Arafat.  Were there other

5   individuals who had offices not only in the PA but in the

6   Fatah?

7   A.   Yes, there are many such people who have functions in the

8   Palestinian Authority and are official members of Fatah

9   including among the leadership.

10  Q.   Can you give the jury some examples of who those

11  individuals were during the '02 to '04 time period?

12  A.   I will give you a few examples.  For example, Marwan

13  Barghouti.  Marwan Barghouti served as a member of the

14  Palestinian Legislative Council which is the parliament, and at

15  the same time, he served as a leader of Fatah in the West Bank.

16  Q.   Who paid Marwan Barghouti's salary?

17  A.   His salary was paid by the Palestinian Authority.

18  Q.   Now, in addition to Marwan Barghouti, are there others you

19  have in mind that had that overlap?

20  A.   Yes, I can give you additional examples.

21  Q.   Please go ahead.

22  A.   For example, Dr. Saeb Erekat.  He is both a senior member

23  of the Fatah leadership.  He is both a senior member of the

24  leadership of Fatah and he was also the governor of the Jericho

25  region under the Palestinian Authority.

F1fQsok4                          Eviatar - Direct

1    Q.  Were there individuals involved in the security apparatus

2    who were both Fatah and PA leaders?

3    A.  Yes, definitely.  The heads of the Palistinian security

4    apparatuses in the West Bank were under the authority of the

5    Palestinian Authority and also served as members of Fatah,

6    including among the leadership of the movement, and some also

7    served later or at the same time in leadership positions

8    subordinate to the president.

9    Q.  Could you give us some examples of particular individuals?

10   A.  Yes, I will give you some examples.  For example, the head

11   of the preventative security apparatus in the West Bank.  His

12   name is Jabril Rajoub.  Beyond being the head of that

13   apparatus, he is also a member of Fatah.  And he also served as

14   a security adviser to the president.

15          I will give you another example:  Muhammad Dahlan.  A

16   member of the Fatah leadership.  And he served until the year

17   2001 or perhaps 2002, I have to check it, as the head of the

18   preventative security apparatus in the Gaza Strip, and he too

19   served as a presidential security adviser, and also a

20   high-ranking minister in the Palestinian Authority.

21   Q.  Have you had occasion to meet any of these individuals?

22   A.  The truth is that I have met most of them personally.  Just

23   from among the names that I mentioned earlier, I can note that

24   I met Jabril Rajoub, I met Marwan Barghouti, and I met Muhammad

25   Dahlan a number of times.  I met a number of other individuals.

F1fQsok4                      Eviatar - Direct

1    Someone whose name I didn't mention earlier whose name is

2    Al-Sheikh.  He too is a senior member of the entities that I

3    mentioned earlier.

4           I met someone whose name came up and the jury has

5    already heard of the head of the ministry of prisoners and

6    released prisoners.  His name is Issa Karaka.  I also met him

7    personally.  And there are many others.

8    Q.  Let me just ask you a couple of questions about some of

9    those individuals.  Where did you meet Marwan Barghouti?

10   A.  I met Marwan Barghouti when he was, and he still is, a

11   prisoner in an Israeli jail.  We held what could be called a

12   personal conversation.

13   Q.  And on what occasion or occasions did you meet Jibril

14   Rajoub?

15   A.  I melt Jabril Rajoub when I was serving in the Gaza Strip

16   at a place that is a control point where Palestinians moved

17   from the Gaza Strip into Israel and also on the Allenby Bridge,

18   which is a bridge that connects the West Bank with Jordan.

19   Jabril Rajoub passed over the bridge.  It's a kind of a

20   terminal when I was responsible for that district.

21   Q.  Did he give you anything when you met him?

22   A.  Yes.  I received from Jabril Rajoub his personal visiting

23   card, and I gave him mine, as I usually do with every senior

24   Palistinian with whom I meet.

25          MR. YALOWITZ:  Your Honor, plaintiffs offer in

F1fQsok4                         Eviatar - Direct

1    evidence Exhibit 1127.  It's a copy of Jabril Rajoub's card.

2              THE COURT:  Let's do it a different way.  Why don't

3    you take the exhibit, show it to the witness, let the witness

4    identify what it is.

5              MR. YALOWITZ:  Yes, sir.  We will do that.  My

6    apologies to the jury and counsel, your Honor.  Thank you, your

7    Honor.

8              Let's show, as Judge Daniels instructed, the witness

9    1127 for identification.

10             Do you have 1127 before you?

11   A.  Yes, it is.

12   Q.  What is it?

13   A.  I see the side which is written in Arabic of the card.  The

14   heading at the top says -- in other words, the organization for

15   the liberation of Palestine.

16             THE COURT:  Why don't you tell us what this is?  What

17   is a picture of this that is drawn?

18             THE WITNESS:  This card shows the personal details of

19   Jabril Rajoub, the organizations to which he is subordinate,

20   which is the PLO and the Palestine Authority, one under the

21   other.

22   BY MR. YALOWITZ:

23   Q.  Let me just interrupt you there, Mr. Eviatar.  Just very

24   generally, what is this document?

25   A.  This is Jabril Rajoub's official business card.

F1fQsok4                    Eviatar - Direct

1           MR. YALOWITZ:  Your Honor, plaintiffs offer 1127 into

2     evidence.

3           THE COURT:  It's admitted in evidence.

4           (Plaintiff's Exhibit 1127 received in evidence)

5           MR. YALOWITZ:  All right.  Now, if you could finally

6     put the English on.

7           Ms. Machnes, can we put the English up for the jury?

8     Q.  Is the business card one of those cards where the one side

9     is in one language and the other side is in another language?

10    A.  Yes.

11    Q.  So if you look at one side, you see Arabic.  And what do

12    you see as you look at the other side?

13    A.  The other side is English.

14    Q.  Is that what we're looking at here?

15    A.  Exactly, this is the exact translation.

16    Q.  Mr. Rajoub is listed as -- just describe those two entities

17    at the top that we're looking at.

18    A.  At the top, it says the Palestine Liberation Organization,

19    PLO, which is the upper or superior organization.  Underneath

20    it in hierarchy, it says the Palistinian National Authority,

21    which is the Palestinian Authority, and it is the entity that

22    is subordinate to the PLO in the hierarchy.  And at the end, we

23    see Jabril Rajoub's function, national security adviser.

24    Q.  What does that little mark there in entail?

25    A.  On the right side, the digit 9 has been written in Jabril

F1fQsok4                    Eviatar – Direct

 1   Rajoub's handwriting.  And this is the full area code of the

 2   Palestinian cell lab network.

 3   Q.  Who wrote that in?

 4   A.  Jabril Rahjoub.

 5   Q.  Have you had occasion to look at payment records flowing

 6   from the Palestinian Authority to Fatah?

 7   A.  Yes, I've seen many examples of that.

 8           MR. YALOWITZ:  Your Honor, plaintiff's offer Exhibit

 9   935 into evidence.

10           MR. ROCHON:  Objection, Judge.

11           THE COURT:  Not before you show it to the witness and

12   ask the witness tell us what this is supposed to be?

13           MR. YALOWITZ:  May I approach?

14           THE COURT:  We are going to take a break, ladies and

15   gentlemen.  We are going to figure out a more efficient system.

16           Don't discuss the case, and keep an open mind.

17                         (Jury excused)

18       (Continued on next page)

19

20

21

22

23

24

25

F1f3sok5

 1          THE COURT:  Mr. Yalowitz, you say you don't like to be

 2    interrupted.  You're less likely to be interrupted if you take

 3    the exhibit, walk up to the witness, ask the witness to

 4    identify the exhibit, tell us what it is, and then lay the

 5    proper foundation for me to simply say it is what it is.

 6          You're sort of doing it backwards.  You're throwing

 7    out an exhibit number, which I have no idea what the exhibit

 8    is, and you're telling me to admit it into evidence, and

 9    they're popping up like a jack in the box to object.

10          MR. YALOWITZ:  I'm not going to control the popping up

11    like the jack in the box.

12          Let me just say, I heard yesterday a really smart

13    thing, which is good decisions are made by informed people, not

14    smart people.  And I processed the fact that the witness has

15    the documents in a binder before him.  So I'm going to do it

16    that way now.

17          THE COURT:  Go through the binder.  Put in the next

18    exhibit.  Say I'm showing you exhibit X.  Tell us what that is

19    in general.  Let him identify it.  If he wants to say a little

20    bit how he knows what it is.  And you can offer it in evidence.

21    If they have some objection, they can let me know.

22          MR. YALOWITZ:  958 is not -- this particular document

23    is responses to a document request by the defendants.

24          THE COURT:  All right.

25          MR. YALOWITZ:  And then the documents are attached.

F1f3sok5

1          THE COURT:  Do we need that?

2          MR. YALOWITZ:  Well, I only need it if they're going

3    to fight me on the foundation of the documents which --

4          THE COURT:  You are going to object to the

5    admissibility of the evidence?

6          MR. ROCHON:  Relevance and other objections have been

7    overruled.

8          THE COURT:  Are you going to object?

9          MR. ROCHON:  No, I think it is already preserved.  The

10   reason to object, your Honor, is two fold.  Number one, because

11   it has got the cover of the document from us on it.  Language

12   with all the general preliminary objections and all that.

13         THE COURT:  You can eliminate that by simply not

14   objecting to the document and tearing that off and let's go

15   forward.

16         MR. ROCHON:  Right, that's fine.  The other reason to

17   stand up is how this works is they show it to defense counsel,

18   may I approach the witness, show it to the witness, ask the

19   witness what it is.  The witness does enough to move it,

20   describe it, then he moves it.  And that's how it's been done

21   for -- he's been a lawyer for 25 years.  I've been a lawyer for

22   33 years.  It's been that way since we both started.  Those

23   rules make the trial not only move more smoothly, it has the

24   witness testifying instead of counsel.

25         THE COURT:  That's what I thought I just said.

F1f3sok5

1          MR. ROCHON:  I agree with you so much here.  I'll sit

2     down.

3          THE COURT:  You are going to lose your jurors'

4     attention if you keep stumbling back and forth.  Let's go

5     smoothly through the exhibits, put them out there, make sure we

6     know the objection.  We'll have fewer and fewer sidebars.

7     We're wasting a lot of time.  If you have a legitimate

8     objection to articulate, then you better let me know now so we

9     don't have to go up every single exhibit.  I am going to stop

10    hearing you.

11         I am going to hear what he says about the document,

12    I'll know what the document is, and I am going to rule.  You

13    can make your arguments at the end of the day.  Write down a

14    list of all the objections you have, and you can make your

15    record as to why it shouldn't go in.

16         I am not going to use their time waiting for us at the

17    sidebar and have them cooling their heels sitting in the box.

18    Make sure it's important if you want to come up.

19         MR. ROCHON:  We'll work out how to deal with this

20    exhibit.

21         THE COURT:  I want you to work out how to deal with

22    the next 10 exhibits.  Let's take a break.

23         (Recess)

24         MR. YALOWITZ:  Your Honor, we're not going to get to

25    them today.  But, on 451 and 889, those are the convictions of

F1f3sok5

1    Marwan Barghouti and Fuad Shawbaki where there is a dispute

2    about the redactions.

3         I have two issues.  One is I'd like to give the Court

4    a completely unredacted copy of both of those documents because

5    I think we will get to them tomorrow.  That's the first thing.

6    The second thing is, it is my view that because of two facts,

7    we don't think there should be any redactions on those

8    documents.  So we have a dispute that we need the Court to

9    resolve.

10         The two facts in my view that matter are, number one,

11    these were findings by a court after a full trial.  And number

12    two, that these are both individuals who were indisputably

13    direct reports to Yasser Arafat.  There is no dispute about

14    that.

15         THE COURT:  I'm not sure what rule of law that's

16    supposed to be.

17         MR. YALOWITZ:  So, when a court makes a finding that

18    Fuad Shawbaki received orders from Yasser Arafat to gather all

19    the weapons in Gaza and the West Bank, there is nobody trying

20    to inculpate Yasser Arafat.  That's a finding that goes to

21    whether Fuad Shawbaki's guilty of illegal trading in weapons.

22         So, the fact that we could say an individual told him

23    to do that and then an expert can make the link who was his

24    boss.  But it just seems to me that the Court's prior ruling

25    with regard to inculpatory statements doesn't apply to those

F1f3sok5

1    two documents.

2            So, we have another dispute.  The defendants want even

3    more redacted than what we proposed based on that Yasser Arafat

4    ruling.  We, having looked at it, it really is my view that

5    those two documents are of a different character.

6            THE COURT:  When will we have an opportunity to review

7    it?

8            MR. YALOWITZ:  I believe we have copies unredacted we

9    can give to the Court.

10            THE COURT:  Is there any way I'm supposed to know what

11    I'm looking for?

12            MR. YALOWITZ:  The defendants have highlighted, I

13    think the defendants have a highlighted copy of what they're

14    looking to have redacted, and so they can provide that to the

15    Court.

16            THE COURT:  That's the part that's at issue?

17            MR. YALOWITZ:  No, it is beyond that, because in our

18    haste to deal with the redaction issue the night before trial,

19    we did have somebody on our team go through and redact Yasser

20    Arafat's name everywhere we could find it.

21            THE COURT:  So now you want to unredact it.

22            MR. YALOWITZ:  I certainly do, before I offer it in

23    evidence.

24            THE COURT:  Am I just looking for references of Yasser

25    Arafat?

F1f3sok5

1          MR. YALOWITZ:  There are other things the defendants

2     want.

3          THE COURT:  Is there something I can look at while

4     we're doing this witness?

5          MR. ROCHON:  I think we have a set here.

6          THE COURT:  If you can give me the unredacted and what

7     you want redacted, I can look at that.

8          MR. ROCHON:  I have to make sure we have another copy

9     of it.

10          THE COURT:  I'll give it back to you.

11          MR. ROCHON:  If it is okay with the Court, I'll

12     approach.  Just make 100 percent sure we didn't mark anything

13     on these.

14          Actually, this is redacted.  I'm very sorry, your

15     Honor.

16          THE COURT:  I just want to know what your additional

17     redactions are.  I assume you want the redactions and

18     additional redactions.

19          MR. ROCHON:  Right.  We provided that to the

20     plaintiffs for Shawbaki.

21          MR. HILL:  We have the additional redactions for

22     Shawbaki.  We did not get through the 173 pages of Marwan

23     Barghouti yet.

24          THE COURT:  Let me look at those two.

25          MR. ROCHON:  We've tendered Shawbaki.  And the

F1f3sok5

 1    plaintiffs are tendering?

 2              MR. YALOWITZ:  Shawbaki.

 3              MR. ROCHON:  These are very different, your Honor.

 4    These two guys are very different.  Not the redactions.

 5              THE COURT:  I am going to look at it.

 6              MR. ROCHON:  So Mr. Yalowitz is saying they think they

 7    redacted too much.  We think they didn't redact enough.  As we

 8    read through these, there also becomes a question what is this

 9    coming in to prove.  That goes to the redactions tomorrow when

10    we talk about it or tonight when we talk about it.  We'll get

11    to that as well.

12              THE COURT:  Let me see if I can get through it so we

13    can talk about it today.  Let's get the jury in and let's get

14    to it.

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25

F1f3sok5                      Eviatar - direct

1             (Jury present)

2    BY MR. YALOWITZ:

3    Q.  Mr. Eviatar, do you have a binder of documents on the

4    witness stand there with you?

5    A.  Yes.

6    Q.  Could you turn to Exhibit 958 in your binder.

7    A.  I have the exhibit before me.

8    Q.  Could you turn past the first few pages to the attachment.

9    A.  Yes, I see it.

10   Q.  Can you identify this document generally, explain what it

11   is in a very general way.

12   A.  There is a document here which indicates the transfer of

13   funds from the Palestinian Ministry of Finance, in other words

14   the Palestinian Authority, to the Fatah movement in Bethlehem.

15   The total of the transfer of funds --

16   Q.  Mr. Eviatar, just very general description of it.

17   A.  That's all.  Thank you.

18           MR. YALOWITZ:  Your Honor, pursuant to an agreement

19   with Mr. Rochon, we'd like to offer in evidence Exhibit 958

20   without the lead-in pages that we've discussed.

21           MR. ROCHON:  That's right.

22           THE COURT:  It is admitted into evidence.

23           (Plaintiff's Exhibit 958 received in evidence)

24           MR. YALOWITZ:  Let's place it before the jury.

25   Q.  Describe a little bit further what it is we're looking at.

F1f3sok5                         Eviatar - direct

1    Please, go ahead.

2    A.   On the upper-left-hand corner we see, we see the words

3    "Ministry of Finance of Palestine."  And we see here a transfer

4    of funds under the heading in the middle to the Fatah movement

5    in the government of Ramallah.  The transfer of funds is in the

6    amount of 35,000 shekels on the dates December 31, 2000, to

7    January 1st, 2000.

8           Excuse me.  The other way around.

9    Q.   As you page through the document, do you see other

10   transfers to Fatah?

11   A.   Yes, I see additional transfers.

12   Q.   Could you just tell the jury what page of the -- there is a

13   stamp down at the bottom.  What page are we looking at here?

14   A.   654.

15   Q.   Are you looking at the English or the Arabic?

16   A.   (In English)  The English one.

17   Q.   All right.  How much is being transferred there?

18   A.   Just a moment, please.  I don't see the amount on this

19   page.  But two pages later, on the document ending with the

20   number 656, I see an amount.

21   Q.   Let's see if we can put that one up so we can look at it

22   with you.  How much of the transfer is that to Fatah?

23   A.   The amount of the transfer to the Fatah was 252,000

24   shekels, and on the right-hand column we see 273,000 shekels.

25   Q.   Can we look at together at page 673.

F1f3sok5                        Eviatar - direct

1    A.  I see it.

2    Q.  Let's get that one up on the screen so we can look at it

3    together.  I have a couple of questions about it.

4              How much is being transferred there?

5    A.  The transfer to the Fatah in Ramallah is 35,000 shekels.

6    Q.  What does it say it's for?

7    A.  The translation into English there is election costs.

8    Q.  Was there an election in the Palestinian Authority in the

9    year 2000?

10   A.  No.

11   Q.  Let's go to page 676.  What have we got here?

12   A.  We see a transfer of funds, Fatah movement in the West Bank

13   during the course of the year 2000.  Total of 21,000 shekels.

14   And it says here that this is a monthly transfer.

15   Q.  Let's go to page 678.  What have we got here?

16   A.  A transfer of funds from the Palestinian Ministry of

17   Finance to the Fatah movement in the governorate of Nablus.

18   The transfer here is in the amount of 35,000 shekels.

19   Q.  Let's go to 679.

20   A.  We see here a transfer of funds from the same Palestinian

21   Ministry of Finance to the Fatah movement in the governorate of

22   Hebron in the amount of 63,500 shekels.

23   Q.  Let's go to 680.

24   A.  What we see here is a transfer from the Palestinian

25   Ministry of Finance to the Fatah movement, it says here in Beit

F1f3sok5                        Eviatar – direct

1    Fajar, that's a village near Bethlehem, in the amount of 10,500

2    shekels.

3    Q.  Let's go to 681.

4    A.  We see here a transfer of funds from the Palestinian

5    Ministry of Finance to the Fatah movement in the area of

6    Karabsha in the amount of 14,000 shekels.

7    Q.  Let's go to 682.

8    A.  We see here a transfer of funds from the Palestinian

9    Ministry of Finance to the Fatah movement in an area that's

10   called Sawahra, which is not far from Jerusalem, in the amount

11   of 17,820 shekels.

12   Q.  Let's go to 683.

13   A.  It is a transfer of funds from the same Palestinian

14   Ministry of Finance, to the Palestine -- to the Fatah movement

15   in Birzeit in the amount of 13,500 shekel.

16   Q.  I'm sorry, what was that number?  I want to make sure we

17   have it right.

18   A.  3,500 shekel.

19   Q.  Thank you.  And let's go to 684.

20   A.  684 is a transfer of funds from the Palestinian Ministry of

21   Finance to the Fatah movement, the translation of what's

22   written here in English is The Old City, in the amount of

23   10,500 shekel.

24   Q.  Thank you.

25           Mr. Eviatar, I'd like you to turn in your binder to

F1f3sok5                              Eviatar - direct

1    Exhibit 173.

2    A.  I see it.

3    Q.  Have you had an opportunity to look at that document

4    before?

5    A.  Yes, I have seen it.

6    Q.  Generally, what does it reflect?

7    A.  The document reflects transfers of funds to the Fatah

8    movement in various districts in the West Bank, for various

9    amounts of money, for the period of time in January 2000 up

10   until February 2002.

11           MR. YALOWITZ:  Your Honor, I move Exhibit 173 in

12   evidence pursuant to an agreement with Mr. Rochon.

13           THE COURT:  It will be admitted.

14           MR. ROCHON:  Pursuant to that agreement, we agree this

15   document was produced by the Palestinian Authority.

16           THE COURT:  It will be admitted into evidence.

17           (Plaintiff's Exhibit 173 received in evidence)

18           MR. YALOWITZ:  Thank you, Mr. Rochon, and thank you,

19   your Honor.

20   Q.  Why don't we take a look at 173.  Can you describe for the

21   jury what we have in Exhibit 173.

22   A.  We see here in the heading of the document the name of the

23   Fatah movement, and under that, the date on which each of the

24   transfers of funds was carried out.  And there is itemization,

25   each line here itemizes the amount of money that was

F1f3sok5                        Eviatar – direct

1    transferred to each one of the Fatah movements, whether on the

2    West Bank or within the West Bank.

3    Q.  Do we have a total of the sum of the various amounts that

4    we're talking about?

5    A.  For example, the Fatah movement in the West Bank in its

6    entirety, I'm talking here about the entire West Bank, received

7    the amount of 294,000 shekel during the course of the period,

8    we could say throughout 2001, most of that period of time.  We

9    see here additional transfers of funds as well.  For example,

10   the governorate of Bethlehem, the Fatah movement in that

11   governorate received the amount of 70,631 shekels.

12          We see here also translation to U.S. dollars.  And the

13   document ends with a transfer of funds that was carried out to

14   the Fatah movement in Tulkarm where the movement received the

15   amount of 42,000 shekels.

16   Q.  If we turn the page over, in our binders, do we see a total

17   amount in shekels and dollars?

18   A.  I see such figures.

19   Q.  What are we talking about in terms of shekels and dollars

20   here?

21   A.  The total amount of the monetary transfers in shekels are

22   in the sum of 520,381 shekels.  And in dollars it is $130,095.

23   Q.  Thank you.  Could you turn in your binder to Exhibit 20.

24   A.  I have it before me.

25   Q.  Can you describe generally what this document is.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1f3sok5                         Eviatar - direct

1   A.   A transfer of funds from the Finance Ministry of Palestine

2   to the Fatah movement in the West Bank.

3          MR. YALOWITZ:  Your Honor, plaintiffs offer Exhibit 20

4   in evidence.

5          THE COURT:  It will be admitted into evidence.

6          (Plaintiff's Exhibit 20 received in evidence)

7   Q.   Why don't you tell us what we've got on the front page.

8   We'll put it up on the screen for the jury.

9   A.   We see here a breakdown of a transfer of funds, or to be

10  more precise, transfers of funds, from the Finance Ministry to

11  the Fatah movement in the West Bank on six separate dates in

12  the course of the year 2003.  The total sum that was

13  transferred is 100,000 shekels.

14  Q.   Let's go to the next page, and why don't you tell us what

15  we've got there.

16  A.   A transfer of funds from the Palestinian Finance Ministry

17  to the Fatah movement in North Hebron.  The sum that appears

18  here is 17,500 shekels.

19  Q.   Let's go to the next page and tell us what we've got.

20  A.   Another transfer of funds from the Palestinian Finance

21  Ministry to the Fatah movement in the Al-Shurfa region, that's

22  near Ramallah, in the sum of 7,500 shekels.

23  Q.   I want to direct your attention to the heading at the top

24  of the page.  It says Ministry of Finance Palestine.  Do you

25  have an understanding of -- are they referring there to the

1    Palestinian Authority or the PLO or what?

2    A.   They're referring to Palestine.  That's in fact the

3    Palestinian Authority.  But the Palestinians refer to the

4    Palestinian Authority as Palestine in some of the documents.

5    Q.   Thank you.  Now, let's go to the final substantive page.

6    Skip one page, and there is a page that's numbered 6839.  Let's

7    see if we can look at that together.

8             Could you tell us what we have here.

9    A.   May I have a moment?

10   Q.   Yes.

11   A.   We see here transfers of funds to the Fatah movement in

12   different areas.  And the bank that received these moneys,

13   that's where the account is being held, that is the branch of

14   the Arab Bank located in Ramallah.  That's where the Fatah

15   movement holds an account.

16   Q.   Thank you.  Now, I'd like to turn from the funding --

17            MR. ROCHON:  Your Honor, before we leave that

18   document, may I have a brief sidebar with counsel, and if the

19   document can go back on the screen.

20            THE COURT:  Yes.

21            (Pause)

22            MR. ROCHON:  Pursuant to agreement with counsel, we

23   agree that that stamp at the bottom that says "confidential"

24   was not part of the original document.  That's just part of how

25   documents were produced in the case.

1          MR. YALOWITZ:  The lawyers have agreed that the

2     lawyers put that on.  It is not the Palestinians.

3          THE COURT:  I understand and I think the jury

4     understands.

5          MR. ROCHON:  Thank you.

6     Q.  All right.  Now, I'd like to turn to the administration of

7     the security forces, and I want to ask you, first of all, have

8     you had any opportunity to review documents relating to

9     administrative orders with regard to certain public security

10    forces of the PLO and the Palestinian National Authority?

11    A.  Could you direct me to the relevant documents?

12    Q.  Sure.  If you could turn in your binder to Exhibits 104,

13    105, 106, and 108.  If you could just identify those generally.

14    A.  I see them and I have indeed reviewed them.

15    Q.  What are they generally?

16    A.  These are documents that show transfers of funds to members

17    of the security forces.

18    Q.  All right.

19    A.  And further instructions coming from Yasser Arafat.

20          MR. YALOWITZ:  Your Honor, plaintiffs offer 104, 105,

21    106 and 108 in evidence.

22          MR. ROCHON:  Your Honor, we're not going to object,

23    but I don't think they've been described yet, so we are not

24    going to object but --

25          MR. YALOWITZ:  So why don't we offer them in evidence

1    and then the witness can explain them in a more detailed way.

2              THE COURT:  I'll admit into evidence subject to

3    further inquiry.

4              MR. YALOWITZ:  All right.

5              (Plaintiff's Exhibit 104, 105, 106, 108 received in

6    evidence)

7    Q.  Let's take a look at 104.  What is this document?

8    A.  There is a breakdown here of various position holders,

9    officers in the security forces, together with their ranks.

10   With their rank, a date, and the name of the force in which

11   they are serving.

12   Q.  What is the purpose of this document?

13   A.  May I have a moment?

14   Q.  Sure.  You might prefer the Arabic which is behind the

15   English.

16   A.  This is a document that was disseminated by the PLO, the

17   Palestinian Authority, and the security forces, in which

18   promotions of rank are being authorized by the Palestinian

19   president and commander in chief of the security forces, and

20   there is a list of those Palestinian officers that were

21   promoted.

22   Q.  Now, I want to focus with you first with the description at

23   the top of the page of the entities on whose behalf this

24   document was created.

25             Could you describe those entities, please.

F1f3sok5                         Eviatar – direct

1    A.  At the top of the document we have the PLO, underneath

2    which we have the Palestinian National Authority, which is the

3    Palestinian Authority, under that we have the name of the

4    security force which is known as Public Security.  After that

5    we have the Organization and Administration Institution of the

6    government, and after that we have officer affairs.

7            May I add that in the emblem that we see here, at the

8    top it says also the Palestine Liberation Organization and

9    underneath that the Palestinian National Authority.

10   Q.  So that's a stamp that has both PLO and PA on it?

11   A.  Yes indeed.

12   Q.  Thank you.  Could you turn to -- by the way, I just want to

13   note and this will be true of --

14           MR. YALOWITZ:  Your Honor, may I consult with

15   Mr. Rochon for a moment?

16           THE COURT:  Yes.

17           (Pause)

18           MR. YALOWITZ:  Your Honor, with the Court's

19   permission, Mr. Rochon and I have reached an agreement to

20   inform the jury that when they see a stamp that says

21   "confidential" like the one we saw before, on this document and

22   similar documents, just to inform them that those confidential

23   stamps were applied by the lawyers and not in the original

24   documents.

25           THE COURT:  I assume also the Bates number.

1              MR. ROCHON:  The numbers on the bottom right as well.

2     It is all lawyers stuff.

3              THE COURT:  Ladies and gentlemen, that's the discovery

4     process where both sides exchange documents and make sure they

5     mark them and where they can keep track of them and which

6     documents is confidential at the time.

7              MR. YALOWITZ:  Thank you, Mr. Rochon, and thank you,

8     your Honor.

9     Q.  Let's go to 105.  Is this another one of those

10    administrative orders?

11    A.  This is another administrative order that comes from the

12    security forces, the same department in the security forces of

13    the Palestinian Authority.  The PLO.  And here we are talking

14    about ranks of enlisted soldiers -- or rather soldiers, and not

15    officers.

16    Q.  Can we just blow up that heading again.  I just wanted to

17    ask you, do you still have the laser pointer that the judge

18    shared with you?  Could you just highlight for the jury where

19    on that stamp it says PLO.

20    A.  In Arabic.  Here in Arabic it says the Organization for the

21    Liberation of Palestine.

22    Q.  Where on that logo stamp does it say PA?

23    A.  Here it says in Arabic the Palestine National Authority.

24              THE INTERPRETER:  Excuse me.  Palestinian National

25    Authority.

F1f3sok5                          Eviatar - direct

1    Q.  Let's look at 106 and see what that one looks like.  Why

2    don't we focus in again on -- first of all, what is this

3    document?

4    A.  We see here an order, an administrative order it could be

5    called, disseminated by the same entity in the Palestinian

6    Authority and the PLO.  And here it says "Pursuant to the

7    instructions of his excellency, the president, commander in

8    chief of the security forces."  And this order promotes by two

9    ranks Major Majed Al-Masri who serves in the Palestinian police

10   department in the West Bank to the rank of colonel, "aqeed" in

11   Arabic.  That's one rank above mine.

12   Q.  What is the date of this document?

13   A.  This document is dated January 25, 2010.  I just wanted to

14   check that the text in Arabic and in English were identical.

15   Q.  Have you had an opportunity to do so?

16   A.  Yes, I did.

17   Q.  This is a promotion record from 2010?

18   A.  Yes indeed.

19   Q.  Majed Al-Masri, is that a name familiar to you?

20   A.  The name Majed Al-Masri is indeed familiar to me.

21   Q.  Who is he?

22   A.  Majed Al-Masri served as an officer in the Palestinian

23   Security Forces, and today Majed Al-Masri is a prisoner in an

24   Israeli jail and has been for a number of years.

25            MR. YALOWITZ:  Can we just direct the jury, with the

F1f3sok5                          Eviatar - direct

1    Court's permission, to Exhibit 384 in evidence, your Honor.

2              THE COURT:  Do you want to put it up on the screen?

3              MR. YALOWITZ:  Yes, sir.

4              THE COURT:  Yes.

5              MR. YALOWITZ:  Your Honor, with the Court's

6    permission, I'd like to direct the jury to the verdict in which

7    Majed Al-Masri was convicted.

8              MR. ROCHON:  Objection.  Now counsel is testifying.

9              MR. YALOWITZ:  Your Honor, I'm sorry.  Your Honor, I

10   apologize.  Your Honor, may I direct the jury's attention to

11   the name of the defendant in Exhibit 384.

12             THE COURT:  All right.  Go ahead.  Do you want it

13   highlighted?

14             MR. YALOWITZ:  Majed Ismael Muhammad Al-Masri.

15             And if your Honor will bear with me, I just want to

16   direct the jury to --

17             MR. ROCHON:  Your Honor, I have an objection.  May we

18   approach the bench briefly?

19             THE COURT:  With regard to what he's getting ready to

20   do?

21             MR. ROCHON:  An objection to form.  Not otherwise.

22             THE COURT:  No.  I don't want to waste the time.

23             MR. YALOWITZ:  Thank you, your Honor.

24             THE COURT:  You just want to show them a document?

25             MR. YALOWITZ:  Yes, sir.  I would like to show them

F1f3sok5                          Eviatar - direct

1    page 28 of this conviction.

2                THE COURT:  All right.

3                MR. YALOWITZ:  Count six through eight.  We can just

4    go wide and highlight the title, Ms. Machnes.  May I read to

5    the jury, your Honor?

6                THE COURT:  Yes.

7                MR. YALOWITZ:  "Count six through eight of the

8    indictment, the attack on Jaffa Street.

9                "These counts of the indictment attribute to the

10   defendant responsibility for the murder of the late Ora Sandler

11   and Sarah Hamburger, and an attempt to cause the death of 45

12   civilians who were injured in the event.  The event was

13   executed on behalf of and in the name of the Al Aqsa Brigades

14   organization.  The defendant is charged with having received

15   the suicide terrorist in an apartment in the Balata camp, and

16   having filmed him holding a rifle and a book of the Koran along

17   with another individual.  Thereafter, the defendant dispatched

18   the suicide terrorist Said on his last way."

19               I think we have enough, your Honor.  Let's go back to

20   106.

21   Q.  I'd like to focus you on the entities at the top of 106 and

22   if you could just describe for the jury the top two entities.

23   A.  The top line says the Palestine Liberation Organization and

24   underneath it, it says the Palestinian National Authority.  And

25   that's the Palestinian Authority.

F1f3sok5                              Eviatar - direct

```
 1   Q.  Thank you.  Let's go to 108.  What is Exhibit 108?
 2   A.  Just a moment, please.
 3           There is confirmation here that was given by the
 4   organization and administrative branch of the Palestinian
 5   Authority that confirms that aqeed, "aqeed" is a colonel,
 6   Nasser Mahmoud Ahmed Aweis is one of its members, that he's an
 7   officer that serves in that entity of the Palestinian
 8   Authority, and he's detained in prison in Israel since April 9,
 9   2003.
10   Q.  So first of all, what is the date of this document?
11   A.  The 27th of September, 2011.
12   Q.  The document is 2011 and it is saying --
13           On whose behalf is this document prepared, according
14   to the listing at the top of the document?
15   A.  The document was issued by the PLO, the Palestinian
16   National Authority, the National Security, and the organization
17   and administration branch, one could say.  The officer -- the
18   Office of Officers Affairs.
19   Q.  What is the name of the individual being discussed in this
20   document?
21   A.  The name of the officer is Nasser Aweis.
22           MR. YALOWITZ:  Your Honor, may I just read from part
23   of the document?
24           THE COURT:  Yes.
25           MR. YALOWITZ:  "The Palestinian National Authority's
```

F1f3sok5                         Eviatar - direct

1    Organization and Administration Institution affirms that

2    Colonel Nasser Muhammad Ahmed Aweis is one of its members, and

3    that he was detained by the Israeli Army on April 9, 2003."

4    Q.  Now, Mr. Eviatar, have you had occasion to meet Nasser

5    Aweis?

6    A.  Yes, I have personally met Nasser Aweis.

7              MR. ROCHON:  Your Honor, we would be objecting to

8    hearsay here if we can approach.

9              THE COURT:  Well, not yet.  What is your next

10   question?

11             MR. YALOWITZ:  Do you recognize his picture.

12             MR. ROCHON:  That's not -- I don't object to that one.

13             THE COURT:  "Do you recognize his picture?"

14             MR. ROCHON:  I don't object to that one.

15             THE COURT:  Okay.  You can answer that.

16             THE WITNESS:  I recognize his picture.  I cannot

17   forget him.

18             MR. YALOWITZ:  Your Honor, may we show the jury the

19   picture of Nasser Aweis?  We move it in evidence.  We will

20   identify this as Plaintiff's 1153.

21             THE COURT:  Any objection to the photo?

22             It will be admitted into evidence.  You can display

23   it.

24             (Plaintiff's Exhibit 1153 received in evidence)

25   Q.  Is that him?

F1f3sok5                              Eviatar - direct

1   A.  That's Nasser Aweis.

2   Q.  Where did you meet him?

3   A.  I met him during the course of a professional visit that I

4   paid to prison.

5   Q.  Why is it that you can't forget him?

6           MR. ROCHON:  Objection, your Honor.

7           THE COURT:  Sustained.  Don't answer the question.

8   Sustained as to the form of that question.

9   Q.  What about him do you remember?

10          MR. ROCHON:  Objection, your Honor.

11          THE COURT:  Just a second.

12          MR. ROCHON:  I know the Court is trying to avoid bench

13  conferences but -- thanks.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

F1f3sok5                              Eviatar – direct

1              (At the sidebar)

2              THE COURT:  What terrible prejudicial thing is that

3    you want to ask this witness to testify to that Mr. Rochon is

4    concerned that he's going to say?

5              MR. YALOWITZ:  My recollection is he is going to say

6    he met Nasser Aweis and Nasser Aweis said "I regret nothing."

7              MR. ROCHON:  Number one is it is already in evidence.

8    Number two, that's essentially what the guy said when he was

9    sentenced.  Number two, the concern I have is this witness is

10   willing to go a little more dramatic than your average expert.

11   And when he says "I'll never forget him," you know it going to

12   get dressed up too much.

13             THE COURT:  I'm not sure it is within the scope of his

14   expert opinion or the scope of any factual testimony that would

15   be independently relevant at this point.

16             MR. YALOWITZ:  Why don't we keep moving.

17             (Continued on next page)

18

19

20

21

22

23

24

25

F1f3sok5                          Eviatar – direct

1              (In open court)

2              MR. YALOWITZ:  Your Honor, I think we need a ruling.

3              THE COURT:  Objection sustained.

4              MR. YALOWITZ:  Thank you.

5   Q.  Mr. Eviatar, could you turn in your binder to Exhibit 512.

6   A.  I see it here before me.

7   Q.  What is it?

8   A.  This exhibit presents the prisoners log, the log of

9   prisoners and released prisoners as the law was enacted by the

10  Palestinian government.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. YALOWITZ:  Your Honor, plaintiffs move Exhibit 512

2    in evidence.

3          MR. ROCHON:  Subject to the prior, no objections, your

4    Honor.

5          THE COURT:  It will be admitted.

6          (Plaintiff's Exhibit 512 received in evidence)

7    Q.  Now, let's take a look at Article 1 of page 2, the

8    definition of prisoner.

9          MR. YALOWITZ:  Your Honor, may I read that definition

10   to the jury?

11         THE COURT:  Yes.

12   Q.  "Prisoner:  Anyone who is kept in prisons of the occupation

13   for offenses of participating in the struggle against the

14   occupation."

15         Can you explain to the jury what kinds of prisoners

16   are subject to this law based on this definition?

17   A.  This law pertains solely and exclusively to prisoners who

18   are incarcerated as a result of their participation in the

19   struggle against Israel.

20   Q.  What kinds of crimes are we talking about here?

21   A.  There can be prisoners here who were tried for shooting

22   offenses, for placing bombs, for terrorist attacks of various

23   types, including suicide bombers -- including suicide attacks.

24   Q.  Are there also lesser crimes that are included within this

25   definition?

1    A.   Every prisoner who is incarcerated as a result of his

2    participation in the struggle is included in the definition

3    under this law.

4             MR. ROCHON:  Objection.  Not responsive, your Honor.

5             THE COURT:  No, overruled.  You can cross-examine.

6             MR. ROCHON:  All right.

7    Q.   Now, there is also a definition of released prisoner.

8    A.   Of course.

9    Q.   Let's just see if we can get that definition in front of

10   the jury as well.  I'm not sure how easy that is.

11            MR. YALOWITZ:  Released prisoner.  With the Court's

12   permission, I'll read it.

13            THE COURT:  Yes.

14   Q.   "Released prisoner:  Any prisoner who has been released

15   from prisons of the occupation."

16            Does that released prisoner definition include

17   people -- let me ask you this:  Does the prisoner definition

18   include people who commit what we might call street crime?

19   A.   Absolutely not.

20   Q.   What about released prisoner, does that include people who

21   committed street crimes?

22   A.   Also absolutely not.

23   Q.   Now, I'd like to direct you to some regulations on pages 4

24   to 5.  I want to focus on Article 1.

25            MR. YALOWITZ:  Your Honor, may I read this?

1          THE COURT:  Yes.

2          MR. YALOWITZ:  Thank you.

3   Q.  "Article 1.  The following regulations of the law of

4   prisoners and released prisoners are issued:

5          "1.  System to secure employment for released

6   prisoners.

7          "2.  System of monthly salary payment to the prisoners

8   and their families.

9          "3.  System to secure a living allowance and yearly

10  clothing allowance for prisoners inside Israeli prisons and

11  detention centers.

12         "4.  System of exemption from school and college

13  tuition fees, health insurance fees and training courses fees."

14         Do these four items relate to people who commit those

15  struggle against the occupation crimes?

16  A.  Unequivocally, yes.

17  Q.  Is there any exception to those benefits if you commit

18  murder?

19  A.  Only those who fall under the category of what I described

20  previously -- of what I defined previously, excuse me.

21  Q.  So if you commit a murder just of a person in like a

22  business dispute, do you get these benefits?

23  A.  No, the law doesn't pertain to that at all.

24  Q.  But if you commit a murder of people riding on a bus inside

25  Jerusalem, do you get those benefits?

F1fQsok6                        Eviatar - Direct

A.  If you killed Israeli civilians or other civilians who were

riding on the bus, and that falls within the framework of the

struggle against Israel, you are entitled to the benefits that

are enumerated here.

Q.  So I would like to focus with you on Article 9.  Bear with

me.  Article 20.  I'm sorry.  I do want Article 9.  Forgive me.

Perhaps I'm getting ahead of myself.

          Let's look at Article 9.

          MR. YALOWITZ:  May I read Article 9, your Honor?

          THE COURT:  Yes.

Q.  "Every Palistinian or Arab prisoner in Israeli prisons or

detention centers has the right to receive a salary that is

paid to him or his family if the following conditions are met:

          "A.  If he was detained as a result of his resistance

to the occupation.

          "B.  If he is not receiving a monthly salary from any

other governmental or non-governmental institution."

          So I want to ask you a few questions about that

Article 9.  First of all, it says, "Every Palistinian or Arab

prisoner."  What is meant by that?

A.  The meaning of that is that the prisoner may be a

Palistinian citizen under the Palestinian Authority or an

Israeli citizen of Arab extraction, or a Jordanian citizen of

Arab extraction.  What is important is the reason for his

incarceration.

F1fQsok6                          Eviatar - Direct

1   Q.  So somebody is a citizen of like Kuwait, and he goes to

2   Jerusalem and kills a civilian --

3            MR. ROCHON:  Objection, your Honor.

4            THE COURT:  Sustained as to the form of the question.

5   Q.  So does the term Arab prisoner include people from places

6   other than Israel, Palestine and Jordan?

7   A.  Yes.  There are other people who are citizens of other Arab

8   countries.

9   Q.  If you are a person of Arab heritage from the country of

10  Moracco, do you qualify under this law if you meet the

11  conditions?

12  A.  Yes, you qualify for these criteria.

13  Q.  If you are a person of Arab descent from the United States,

14  do you meet these conditions if you are qualified under this

15  law?

16  A.  Yes, you do.

17  Q.  Now, if you are a person of non-Arab descent and you are

18  not a Palistinian citizen, can you qualify under this law?

19  A.  I would think not.

20  Q.  Now, I also want to ask you about condition A.  If he was

21  detained as a result of his resistance to the occupation as

22  used in this context, is that different from the definition of

23  prisoner where they talk about struggle against the occupation?

24  A.  It's the same definition.

25  Q.  I also want to ask you about condition B.  If the prisoner

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1fQsok6                      Eviatar - Direct

1    is not receiving a monthly salary from any governmental or

2    non-governmental institution, why do they have that in your

3    understanding?

4    A.   If that Palistinian prisoner -- I'll explain the difference

5    briefly for the jury.  If that Palistinian prisoner is

6    registered as someone who is employed by the Palestinian

7    Authority, whether he held a position in the military apparatus

8    or in one of the civilian apparatuses of the Palestinian

9    Authority and at that time he carried out his offenses, he will

10   continue to receive during the time that he is in prison the

11   same salary that he received previously from the Palestinian

12   Authority with the raises as would be pursuant further on.

13            If he was, however, a Palistinian who was, when he was

14   arrested, not an employee of the Palestinian Authority, for

15   example, a member of Hamas or a member of the Islamic jihad, or

16   a member of the popular front for the liberation of Palestine,

17   he would receive a salary from the Palistinian Authority during

18   the time that he is in prison.

19   Q.   All right.  I think I get it.  I want to go to page 12,

20   Article 20.  I just want to ask you once we get it on the

21   screen what we are looking at here.  What is this article

22   dealing with?

23   A.   There's a table here that defines the salary that each

24   prisoner will receive from the Palestinian Authority, and the

25   salary rises directly relative to the number of years that he

F1fQsok6                          Eviatar - Direct

1   is a prisoner.  If, for example, you've been convicted for 15

2   years, up to the first five years you receive a thousand

3   shekels a month.  And when you reach the category of 5 to 10

4   years, you get 1,300 shekels and so on and so forth.  If you

5   are married, there is another addition of 300 shekels.  And if

6   you have children, you get a further additional amount.

7   Q.  So what is the jump -- what's the raise you get after

8   you've sat in jail for five years according to this law?

9   A.  Could you be more precise in wording the question?

10  Q.  Sure.  According to this law, once you've been in jail for

11  five years for committing a crime in accordance with the

12  struggle against the occupation, what does your salary go from

13  and what does it become after you've passed the five-year mark?

14  A.  If you are unmarried, you get 1,000 shekels for up to five

15  years, and if you continue to be unmarried, you get 1300

16  shekels a month.

17  Q.  For a prisoner who sits in jail for ten years, how much

18  does he get for the anniversary of his tenth year

19  incarceration?

20  A.  At least 2,000 shekels a month.

21  Q.  And when the prisoner passes the 15th year of his

22  incarceration, how much does he start getting a month?

23  A.  Up to the 17th year, he will get 2,500 shekels, and up to

24  20 years he'll receive 2,000 shekels per month.

25  Q.  Let's just show the jury the next piece of the chart.  When

F1fQsok6                         Eviatar - Direct

1    a prisoner reaches 17 years, how much does he get?

2    A.  3,000 shekels.

3    Q.  And when the prisoner has sat in jail for 20 years, how

4    much does he get?

5    A.  3,500 shekels.

6    Q.  And when the prisoner has sat in jail for 25 years, what

7    salary do they pay him as a base?

8    A.  The base salary would be 4,000 shekels.  I would just like

9    to note that these amounts are separate from what are known as

10   canteen fees that each prisoner receives in addition.

11   Q.  Now, in order to receive this salary that runs from a

12   thousand shekels a month to 4,000, does the prisoner have to

13   perform any services for the Palestinian Authority or the PLO?

14   A.  He doesn't have to do anything.

15   Q.  What is the result of a system like this in your

16   experience?

17             MR. ROCHON:  Objection, your Honor.

18             THE COURT:  Sustained as to form.

19   Q.  Is this system well-known?

20             MR. ROCHON:  Objection, your Honor.

21             THE COURT:  Sustained again.  It's also leading.  I'm

22   not sure where you're going.

23   Q.  During your years in the West Bank, did you have occasion

24   to learn about this system from individuals you met from time

25   to time?

F1fQsok6                    Eviatar - Direct

1          MR. ROCHON:  Objection, your Honor.  I'm sorry, but it
2   was a yes-or-no question.  Therefore, I'm --
3          THE COURT:  No, I'm going to let him continue the
4   answer.  You can continue.
5   A.  Yes.  I met with former prisoners, for example, from the
6   Fatah movement who told me about how this system was
7   implemented.
8   Q.  Based on your experience and knowledge, how would you say
9   the system was implemented?  Just explain what you mean by
10  that.
11         MR. ROCHON:  Objection to form.
12         THE COURT:  Overruled.  You can answer.
13  A.  Could you repeat the question, please?
14         MR. YALOWITZ:  Maybe we can have it read back.
15         THE INTERPRETER:  I can read it back.
16         (Read back)
17  A.  This law and its translation based on my experience is one
18  of the most significant elements that Palistinian government
19  views as an accomplishment that it can present to the
20  Palistinian public towards the prisoners and their families.
21  Q.  Is the program administered in a systematic way?
22  A.  Yes, and it is updated every couple years.
23  Q.  I would like to direct your attention to Article 10.
24         MR. ROCHON:  There are two article 10s in the
25  document, your Honor.

 1              THE COURT:  I think we want this one.

 2              MR. ROCHON:  I guess that's what he wanted.

 3              THE COURT:  Is that the one we wanted?

 4              MR. YALOWITZ:  Shockingly, it is.

 5              THE COURT:  As long as everybody knows what we're

 6    going to do.

 7              MR. YALOWITZ:  Ms. Machnes knows what I'm going to do

 8    before I know what I'm going to do.

 9    Q.  Can you take a look at Article 10, Mr. Eviatar?

10    A.  Yes, Attorney Yalowitz.  I have the form in English and in

11    Arabic.

12    Q.  I just want to know, are these the kinds of documents

13    that -- why don't I slow it down?

14              MR. YALOWITZ:  Your Honor, may I just read portions of

15    this Article 10?

16              THE COURT:  Yes.

17              MR. YALOWITZ:  Thank you, sir.

18    Q.  "The prisoners' relatives must produce the following

19    evidentiary documents:

20              "1.  Original certificate from the Red Cross

21    documenting his detention.  This document shall be renewed

22    every three months for the prisoners who are still in detention

23    and once a year for the prisoners who have been sentenced.

24              "2.  The charge sheet issued by the Israeli military

25    prosecutor.

1          "3.  A copy of the prisoner's personal identity card.

2          "4.  A copy of the personal identity card of the

3     prisoner's agent.

4          "5.  A copy of the prisoner's marriage certificate, if

5     he is married.

6          "6.  A copy of the birth certificates of the

7     prisoner's children.

8          "7.  The account number [which is] in the name of the

9     agent, in a bank inside the territories of the national

10    authority.

11         "8.  The sentence, if the Israeli courts have

12    sentenced him."

13         Are these items required for every prisoner who

14    receives these payments?

15    A.  Yes.

16    Q.  As a matter of course, are they received -- well, let me

17    ask you this:  Have you had the opportunity to review files of

18    the prisoners' authority?

19    A.  I've gone over many such files.

20    Q.  In your experience, do those files actually contain the

21    required documents?

22    A.  Yes, systematically so.

23    Q.  Now, I want to direct your attention to Article 13.

24         MR. YALOWITZ:  With the Court's permission, I'll read

25    it.

F1fQsok6                        Eviatar - Direct

1              THE COURT:  Yes.

2    Q.  "The general directorate for detainees' affairs shall

3    prepare a special file containing all the evidentiary documents

4    for the prisoner, its observations on the file and the

5    specified the salary that he shall receive based on his status.

6    The complete file shall be submitted to the Department of

7    Oversight and Examination to confirm the accuracy of the

8    documents and that the salary corresponds with the information

9    in the file."

10             To your knowledge and based on your experience, can a

11   prisoner receive payments without submitting all of the

12   required documents and making sure the file is complete?

13   A.  No.

14   Q.  Thank you.

15             Do you have an opinion as to whether these payments

16   are social welfare payments?

17   A.  These payments are not social welfare payments.

18   Q.  Do you have any statements of PA officials that support

19   your opinion?

20   A.  Yes, we have an example of a statement that was made by the

21   minister of prisoners affairs himself.  His name is Issa

22   Karaka.

23             MR. ROCHON:  Your Honor, there is an issue I want to

24   discuss with the Court.

25             THE COURT:  Can we take a break for the day?

1            MR. YALOWITZ:  I can continue or I can continue for

2     awhile, as the Court wishes.

3            THE COURT:  Let me give the jurors a break.  Ladies

4     and gentlemen, why don't we adjourn for the day.  Don't discuss

5     the case.  Keep an open mind.  See you at 9:30 tomorrow.

6     Tomorrow is Friday.  I will try to give you an idea where I

7     think we are.

8            Remember Monday is a holiday, so we won't sit till

9     Tuesday.  So you have a long weekend.

10                            (Jury excused)

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1fQsok6                         Eviatar - Direct

1                          (Jury not present)

2              MR. ROCHON:  The Court will recall that there were a

3    series of exhibits that we were going to address, and counsel

4    thought we weren't going to get to today, one of them is the

5    video or the statement that he was just referring to, I

6    believe.  I know the witness was told to step down.

7              THE COURT:  Yes, you could tell him to step down.

8              (Witness excused)

9              MR. YALOWITZ:  May I consult with Mr. Rochon?

10             THE COURT:  Yes.

11             MR. YALOWITZ:  The jury is gone.

12             (Off the record)

13             MR. ROCHON:  I have to say I think we are in dispute,

14   but I have to admit Mr. Yalowitz is right.  I was not thinking

15   it was that one, so I recognize that may have been wrong.

16   Either way, I think we do have an objection to this one as

17   well.

18             THE COURT:  What is it?  I don't know what you're

19   talking about.

20             MR. ROCHON:  I just took a quick glance at it and

21   realized it wasn't what I was thinking of, and I don't have it

22   in front of me right now but I can probably get it.

23             THE COURT:  I just want to know what it is and why

24   you're objecting.

25             MR. HILL:  Mr. Yalowitz can tell us which one he's

                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

F1fQsok6                          Eviatar - Direct

1   going to offer.

2              MR. YALOWITZ:  It's 241, your Honor.  It's a statement

3   published by WAFA, which is the Palistinian authorities

4   official news agency.  And he says:  This is WAFA.  It says:

5   "The minister of detainees and ex-detainees affairs, Issa

6   Karaka, denied on Thursday the news reports and rumors about

7   converting the prisoners' wages to welfare payments."

8              That is the statement I was thinking of.

9              THE COURT:  Is there anything earth-shattering about

10  that statement?

11             MR. HILL:  It's not a quote from him.  It's a

12  secondary report.  Something he allegedly said.  It's more

13  prejudicial than it is probative.  The law is what the law is.

14  The witness has testified about it.  When we get to cross,

15  we'll point out to everybody in the room that it wasn't the law

16  in effect at the time that the people that were convicted were

17  these torts they were involved with.

18             THE COURT:  Again, that's your favorite phrase; it's

19  more prejudicial than probative, but I'm not sure I understand

20  how you are prejudiced.

21             MR. HILL:  Mr. Yalowitz, and presumably the witness,

22  are going to argue they are not social welfare, they're wages

23  or salaries, as the translation that they were working with

24  today pointed out, and that somehow that makes us liable for

25  the crimes that these non-employees committed.

F1fQsok6                          Eviatar - Direct

1            It has no relevance to the jury's inquiry, which is,

2    are the PA or PLO liable for the torts these non-employees

3    commit.  It doesn't make it any more likely that we're liable.

4    All it does is prejudice the jury against us because they won't

5    like that Mr. Karaka said they were wages and not welfare in

6    2012, ten years after the events.  The fact a politician says

7    something that gets picked up in a press ten years later is not

8    relevant.

9            THE COURT:  Mr. Yalowitz, is there something

10   compelling about this statement that is quoted in 2012?

11           MR. YALOWITZ:  Yes.  First of all, your Honor, this is

12   not the press.  This is the official news agency of the

13   defendant.  It's called WAFA.  When WAFA writes Issa Karaka

14   says blah, blah, blah, that's not hearsay; that's an admission,

15   because it's a defendant.  And I heard Mr. Rochon stand in

16   front of the jury two days ago and say these were welfare

17   payments.  It was a welfare state.  And I've got his own client

18   two years ago, whatever, three years ago, saying "It's not

19   welfare."  And so it doesn't really matter when it was.  It

20   matters what it is because they're still getting those payments

21   today.

22           THE COURT:  I don't remember Mr. Rochon's comment.  Is

23   there a specific comment that I'm supposed to remember, Mr.

24   Rochon, something you said in opening about welfare payments?

25           MR. ROCHON:  Let me say, I don't have the transcript

F1fQsok6                        Eviatar - Direct

1    in front of me.  I'm sure I used a reference to either social

2    welfare to the general society but I don't know if I -- there

3    are three different types of payments here.  I bet I said

4    social welfare in there somewhere or welfare or something like

5    that.

6              THE COURT:  Do you have a page of the transcript that

7    you are referring to so I can point out Mr. Rochon to it?

8              MR. YALOWITZ:  This one is from personal memory.

9              THE COURT:  I will look for it.

10             MR. YALOWITZ:  I thought he did a nice opening.  I was

11   paying close attention.

12             MR. ROCHON:  Your Honor, I don't think it's time to

13   impeach my opening yet.

14             MR. YALOWITZ:  I had the ammunition to do it.

15             THE COURT:  Welfare payments or not welfare payments,

16   you may have made relevant if you asserted that the facts are

17   going to indicate that the facts are that they are welfare

18   payments.

19             MR. ROCHON:  Let me be clear to the Court.  I don't

20   know my exact words.  I'm sure I said something like social

21   welfare.  I have to look at the transcript.  I was referring to

22   the general society.  I don't know I said "these prisoner

23   payments."  I have to say, I don't have the transcript in front

24   of me.  If I'm wrong, of course the transcript will show it.

25             THE COURT:  If you reference any prisoner payments --

1            MR. ROCHON:  I doubt it.

2            THE COURT:  -- to being welfare payments or not

3    welfare payments, I think that they have the right to rebut

4    that statement by showing that they can take this out of the

5    realm of that dispute.  The PA's own official paper is quoting

6    its minister of detainees and ex-detainees as saying it is not

7    what you said it was.

8            MR. ROCHON:  Since we did take a break, I'll check the

9    opening and see if I have additional arguments in the morning.

10           THE COURT:  I will look at it.  If that is the case,

11   then I'm going to let him go ahead.  If it is not the case,

12   I'll consider it further, but I may let him go ahead anyway.

13           MR. ROCHON:  Judge, may I ask two short questions?

14           Number one, the practice of counsel reading exhibits

15   to the jury is not one that I'm normally familiar with,

16   especially if they have already been read once, like yesterday,

17   and Mr. Yalowitz just liked it so today we read Majid Al-Masri

18   again to the jury.

19           THE COURT:  There is no rule that prohibits a lawyer

20   from reading from an exhibit that is in evidence in order to

21   quote the relevant language that the lawyer would like to

22   direct the jury's attention to.  Obviously, one way to do it,

23   and the standard way to do it, is to ask the witness to read

24   it.  But I don't think that it violates any rule or practice by

25   having a lawyer read it if that is all and is read without

1    commentary or testimony from the lawyer.

2              MR. ROCHON:  I understand the Court's ruling on that.

3              The second one is even shorter.  The Court works

4    awfully hard.  Does the Court take off any earlier on a Friday?

5    I want to get my team back to D.C.  We all have been up here

6    for awhile.

7              THE COURT:  I did last week Friday because you had to

8    be here Saturday and Sunday working on this.

9              MR. ROCHON:  The Court knows it's going to be that we

10   all have to get train tickets back, and I want to figure out

11   which train to get on.

12             THE COURT:  What's your favorite train?

13             MR. ROCHON:  I'm about to calibrate so perfectly

14   between what I can get and what I can ask for, I'd really like

15   the 5:00 train.

16             MR. YALOWITZ:  I have a suggestion, your Honor.

17             THE COURT:  You like the 5:00 train?

18             MR. YALOWITZ:  I have a suggestion, your Honor.  One

19   member of our team observes the Sabbath.  She is going to head

20   out about --

21             MS. WEISER:  2:30, quarter to 3:00.

22             MR. YALOWITZ:  Quarter to 3:00 tomorrow.  Maybe even

23   2:30.  She is not going to be here the whole trial, but she is

24   here tomorrow.

25             THE COURT:  We will talk a little tomorrow about where

F1fQsok6                          Eviatar - Direct

```
1    we think where we are.  I want to be able to tell the jury --
2    but you would have to give me some confidence that I can do
3    that -- that I am going to at this point predict that we will
4    be finished either sometime before the end of February or
5    sometime just after the beginning of March, I think somewhere
6    in that range.  I'm hopeful.  I don't know if that is too
7    optimistic, but you have to think about that.
8            MR. ROCHON:  I was hoping that was pessimistic, but
9    I'll turn to Mr. Yalowitz.
10            MR. YALOWITZ:  Yes, so we have gone a little slower
11    than I thought we would, but not a lot slower than I thought we
12    would.  I think that -- I've got to look.  We've cut down our
13    case a little bit.  I can look and I will try to assess it
14    tomorrow.
15            THE COURT:  I just don't want to tell them the wrong
16    thing.  I don't want to be too optimistic so let's be realistic
17    about it, but let's not make it too depressing.  They don't
18    want to be here forever.
19            MR. YALOWITZ:  I will do my best to honor it your
20    Honor.
21            THE COURT:  Just don't tell me June or something.
22            MR. YALOWITZ:  I am not going to spend too much time
23    at the office tonight because I have to pay a condolence call.
24    We are behind where I thought we would be right now but not a
25    lot behind.
```

F1fQsok6                        Eviatar - Direct

1          THE COURT:  Tomorrow I would like to end depending how

2     much we get done, I would like to end sometime maybe as early

3     as 4:00, as late as 4:30, depending on how much progress we are

4     making.  If we are slowing down, I may be more concerned about

5     using the hours.  If we are making good pace after that, then I

6     would like to sort of shoot for sort of a 4:00 or earlier

7     ending on Fridays and maybe even earlier than that or even

8     taking another Friday and doing a half day or taking a Friday

9     off altogether, but I will try to accommodate all of that.

10          MR. ROCHON:  Thank you, your Honor.

11          MR. HORTON:  I will note, your Honor, I'm on the 7:00

12     train back to D.C., and I recommend it to Mr. Rochon.

13          THE COURT:  You guys can sit together.

14          Two things:  I am going to give you back what my edits

15     are on 889.  Neither one is going to be happy.  It's not as

16     much as the defense wants and it's more than the plaintiffs are

17     asking for.  I give you this to look at it.  I think you'll

18     pretty much see the pattern.  I will give you an opportunity to

19     convince -- are we dealing with this tomorrow?

20          MR. YALOWITZ:  I am hoping we will get to that.  I am

21     fairly confident that we will be able to work with whatever we

22     got from the Court.

23          THE COURT:  Unless you can come to some other

24     agreement, this is pretty much my attitude.  You might be able

25     to convince me first thing in the morning to give it a little

F1fQsok6                        Eviatar - Direct

1    less or a little more, but the bottom line is I've pretty much

2    taken out the names of individuals, and that's it.  Let the

3    defense look at it and then you can give it to the plaintiff.

4              MR. ROCHON:  The Court is in yellow?

5              THE COURT:  Mine is the yellow one on the plaintiff's

6    copy.

7              MR. ROCHON:  Thank you.

8              THE COURT:  Two other quick things, then we will

9    adjourn.

10             You haven't convinced me yet, and I'm not sure you

11   will, Mr. Yalowitz, that the Abdullah Barghouti statement is

12   admissible.  I know you're concentrating on that this statement

13   is not necessarily incriminating of others, but it has a more

14   basic problem.  This statement is not even incriminating of the

15   defendant, so it doesn't even qualify as an exception to the

16   rule, and it doesn't even qualify as a statement against

17   interest, the fact that he was released and he went on his way.

18   That's not the crime he was charged with; it's not the crme he

19   pled guilty to; it's not even relevant to or in furtherance of

20   the crime.  If you're argument is that he was released by them,

21   that's not a crime that he committed.  Quite frankly, to be a

22   crime he committed would be their escape.  In terms of what you

23   want it to be, I'm not convinced.

24             I'm not so sure -- I'm still looking.  I'm not so sure

25   you can't build a legitimate argument consistent with what you

F1fQsok6                        Eviatar - Direct

 1    want to argue to the extent that it's relevant in this case

 2    with regard to his release.  Obviously, he was arrested on a

 3    certain day, and by a certain day and time he was back on the

 4    street.  That is basically the argument.  I don't know what

 5    else anybody cares about how he got out.  He was out.  I don't

 6    know if you want to argue about its inference.  Quite frankly,

 7    you should all go back to what my recollection was of some of

 8    the stuff I highlighted in terms of the conviction, I think

 9    some of the indictment and other information in the conviction

10    alluded to the fact he was taken out of prison and went and

11    stayed several weeks with someone, I forget who else, if you

12    know what I'm referring to.

13            MR. YALOWITZ:  Yes.

14            THE COURT:  And I think even in Ahmed Barghouti's

15    statement, he said that he transferred Abdullah from prison to

16    the Palestinian Authority in Baituniya to an apartment which

17    the defendant had rented in downtown Ramallah.  I don't know

18    what you want to argue from that.  Obviously, they took him out

19    of prison.  They took him to Ramallah.  It's obviously already

20    in the case.  So the statement itself independently, I don't

21    see the admissibility or the exception to the rule with regard

22    to it.  We can discuss it further, but that is my position.

23            MR. YALOWITZ:  Let me just give you one more thing to

24    think about on that line.  The answer I am thinking about has

25    two sentences.  The first sentence is "I stayed in the prison

F1fQsok6                    Eviatar - Direct

1    from the time of my arrest till the death of a certain

2    individual."  The second sentence says, "Then they released us"

3    or something like that.  So the sentence, "Then they released

4    us," I understand consistent with your Honor's earlier rulings,

5    which I disagree with, but will, of course, obey is that

6    statment is not coming in.  "They released us" is not coming

7    in, although we might think about redacting the word "they".

8    That's something you might think about consistent with your

9    other rulings.

10             THE COURT:  They didn't keep him.

11             MR. YALOWITZ:  Right.

12             THE COURT:  You can argue whatever you want.  We know

13   he was on the street.  How he got on the street, we're not

14   going to have a side trial about.  We know they didn't keep

15   him, and he's out on the street.  He got out pretty quickly and

16   did whatever he did.  Beyond that, if you want a stronger

17   inference -- you see, the problem is that you have a more

18   difficult inference.  You want to draw -- well, you don't

19   really want to draw that inference but that's an implication.

20   You cannot have the inference that they released him to commit

21   this terrorist act because that's not even a proximity in time.

22             MR. YALOWITZ:  That's not the inference I'm heading

23   toward.

24             THE COURT:  It's harder for me to debate why it's so

25   relevant for you to try to establish by his own words that

1    somehow -- it really goes more to their state of mind rather

2    than anything else.

3             MR. YALOWITZ:  You got it.

4             THE COURT:  You're trying to imply that he got out

5    because they decided to let him out, and the fact that they let

6    him out means they're in cahoots with terrorists.  That's what

7    you basically want.  That's inference upon inference.

8             MR. YALOWITZ:  You went exactly where I was going to

9    go.  Let me explain it.  Your Honor, while you were talking, I

10   was thinking about Judge Posner's comment in the Boim case

11   where he says giving a loaded gun to a child is criminally

12   reckless and the same thing as giving a bomb-maker to Hamas;

13   it's the same idea.  It's criminally reckless.  It goes exactly

14   to their state of mind.

15            THE COURT:  Releasing someone from prison isn't giving

16   him to Hamas.

17            MR. YALOWITZ:  I can draw there a link from the Yousef

18   testimony.

19            THE COURT:  But I'm saying to you, that's like saying

20   if I release somebody from jail today that the inference is

21   when they rob the bank six months from now that somehow is a

22   reflection on me.  That in and of itself is not a reasonable

23   inference.  You have to have something else.

24            MR. YALOWITZ:  I have to have something else, and my

25   plus is the Yousef testimony.  But let me say what I also want,

1    I want another something else.

2                THE COURT:  Right.

3                MR. YALOWITZ:  The other something else that I want is

4    the date of his --

5                THE COURT:  I understand.

6                MR. YALOWITZ:  I don't care -- I do care but, I lost

7    this issue.

8                THE COURT:  You have no other way that you determined

9    or established in discovery of when it was that he hit the

10   street or when it was that he was arrested or when in

11   relationship to this other guy that he was out there?  I would

12   think that there would be some other creative ways to establish

13   that, rather than saying "I want to establish that true fact by

14   his out-of-court statement."  Aren't there prison records?  I

15   don't know what --

16               MR. YALOWITZ:  We don't have prison records.

17               THE COURT:  Did he get a parking ticket on Thursday

18   after he was gone?  There is usually something out there that

19   shows he's either in jail or he's on the street.  You don't

20   have any independent evidence of whether he was in jail or on

21   the street at a particular relevant time?

22               MR. YALOWITZ:  We asked for all documents from the

23   defendants, and they didn't give us a single piece of paper.

24               THE COURT:  Do you know the day he was arrested?

25               MR. YALOWITZ:  He was arrested August 9.

F1fQsok6                         Eviatar – Direct

1          THE COURT:  So he know he was arrested August 9.

2          MR. YALOWITZ:  Well, we know that from -- I don't know

3    how we know that.  We know that because he says "I was arrested

4    on the day of the Sbarro bombing.

5          THE COURT:  You don't know that any other way other

6    than his statement?

7          MR. YALOWITZ:  His statement.

8          THE COURT:  You don't know when he was out on the

9    street or when he got out, the day he got out other than his

10   statement that he got out this day?

11         MR. YALOWITZ:  That's where we know it from.

12         THE COURT:  You see, that is the thing too:  You want

13   an inference that he got out on the day of a terrorist attack.

14         MR. YALOWITZ:  No, no.  He went in on the day of his

15   terrorist attack.

16         THE COURT:  Right.

17         MR. YALOWITZ:  And he got out three weeks later on the

18   day when the Israel defense forces killed an alleged terrorist.

19         THE COURT:  OK.  So who cares?  I mean -- I don't say

20   it like that, who cares, but why is that relevant because they

21   released him on the day they killed a terrorist?

22         MR. YALOWITZ:  Because they issued a statement saying

23   the death of this guy will lead to more violence.

24         THE COURT:  I know, but it only gets you there if you

25   get the inference that you say you're not trying to draw.

F1fQsok6                        Eviatar - Direct

1    You're not trying to draw the inference that they let him go to

2    commit that violence, the terrorist act at issue here.  That is

3    not why you say they let him go.  Quite frankly, in between

4    this terrorist act and when he was released and even after this

5    terrorist account there's no evidence he committed another

6    terrorist act, so I'm not sure what --

7            MR. YALOWITZ:  Wait a minute.  20 second time-out.

8    First of all, the inference that I want from the statement in

9    the Intifada diary saying Mustafa has been killed, they're

10   going to pay, again, goes to state of mind because I'm not

11   saying, "Therefore, we're going to bomb Hebrew University."

12   It's just "they're going to pay."  So really it goes to state

13   of mind.  That is the first thing.

14           The second thing -- OK, so you get it, you get my

15   thesis and you get how I --

16           THE COURT:  Even if you've got that inference, you can

17   only have that inference if he was released after they made

18   that statement.  After he was arrested.  You say he was

19   released on the day that they arrested someone.

20           MR. YALOWITZ:  No, no, I'm trying to get it clear.

21           THE COURT:  He doesn't say, "I was released after they

22   heard that he was arrested" or "I was released because he was

23   arrested."

24           MR. YALOWITZ:  You mean assassinated.

25           THE COURT:  I mean assassinated.  He doesn't say that.

1          MR. YALOWITZ:  That's a question for the jury.

2          THE COURT:  If he was assassinated in the afternoon

3    and he was released in the morning, you don't have that

4    inference, but you can't even tell me when he was released that

5    day.

6          MR. YALOWITZ:  That would certainly be Mr. Rochon's

7    argument to the jury.

8          THE COURT:  Think about it.  Those are your hurdles.

9    That's all I'm saying.  Think about if you have some way to

10   overcome that, then tell me.  At this point, again, it's just

11   sort of rank hearsay when he got released and who released him.

12   It really is.  It's not even a statement against interest.  I

13   don't know even know what the exception to the hearsay rule is.

14         MR. YALOWITZ:  Let me give it to you because this goes

15   to the other thing, which is it's not correct that he was

16   sitting selling vegetables from August 27, 2001 till the Hebrew

17   University bombing.  He was not selling vegetables; he was

18   making bombs.

19         THE COURT:  Right.

20         MR. YALOWITZ:  And he got admitted to and was

21   convicted of making bombs in November, December, March, May,

22   June, July, so he has a string of -- his story which he tells

23   the police is "I got out of jail and I started making bombs."

24         THE COURT:  Right, but he didn't commit a terrorist

25   act until the bombing at issue here after he was released.

F1fQsok6                        Eviatar - Direct

1          MR. YALOWITZ:  Not correct.  Not correct.

2          THE COURT:  What incident was he involved in?

3          MR. YALOWITZ:  December 1.  So he gets out at the end

4     of August.  He's in the safe house.  He's in the protection of

5     Marwan Barghouti according to his statements.  Then he makes

6     bombs for Marwan Barghouti.  Then he makes bombs for Hamas and

7     they blow up three suicide terrorists in December.

8          THE COURT:  OK.

9          MR. YALOWITZ:  Then he makes bombs, and they blow

10    up -- so he's on a killing spree.

11         THE COURT:  I understand.  I don't want to go into too

12    much more detail.  If you want to say something briefly now,

13    but if you want to convince me --

14         MR. ROCHON:  I think you've given Mr. Yalowitz a lot

15    of opportunities to argue this point, your Honor, and I don't

16    have anything to add right now.  We still don't think it is

17    admissible.

18         THE COURT:  Let me move quickly so we can resolve

19    tomorrow and save ourselves some time.

20         Exhibit 212, do you want this for any other purpose

21    other than the ones they object to?

22         MR. YALOWITZ:  I'd be happy with the ones they object

23    to.  I could live with myself to those.

24         THE COURT:  Whether we could live with you is the

25    question.  Is that the purpose you want these or does it have

F1fQsok6                          Eviatar - Direct

1     some other relevant purpose?

2                MR. YALOWITZ:  I take it back, there is even more

3     stuff, but the ones they object to are the best ones.

4                THE COURT:  That's what you really want this for.

5                MR. YALOWITZ:  Let me be clear.  I am not saying that

6     somebody committed a terrorist act wearing a military uniform.

7     I will stipulate I have no evidence that any of them was

8     wearing a military uniform.

9                THE COURT:  Right.  But you want the implication that

10    because he is characterizing these as military detainees, that

11    somehow that is supposed to imply that they were in the course

12    of their employ on behalf of their employer when they were

13    arrested or for whatever they were arrested for.

14                (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

F1f3sok7

 1              MR. YALOWITZ:  I actually have a less ambition

 2     purpose.  My purpose is the number of people in the military

 3     who 10 years after the intifada are still in prison.

 4              THE COURT:  On salary?

 5              MR. YALOWITZ:  Still in prison on salary.

 6              THE COURT:  That's relevant.  I guess I don't have any

 7     problems with that.

 8              MR. ROCHON:  Judge, we have problems with the word

 9     "still."  How many of those were arrested since the intifada?

10     This statement is made in 2012.

11              THE COURT:  I can tell you that --

12              MR. ROCHON:  When he says they're still in prison.

13              THE COURT:  I can tell you that the statement is that

14     800,000 citizens were arrested and incarcerated.  That's the

15     number.  800,000.  And their number of military detainees is

16     700.

17              So, be careful what you both ask for.  You may get it.

18     The jury may find this useful for some purpose that you didn't

19     anticipate.  That's what this thing says.  It says 800,000

20     people have been detained by the military -- or by, well, to be

21     more specific, it says there have been 800,000 prisoners and

22     that --

23              MR. ROCHON:  It says since 1967.

24              THE COURT:  Right.  Since 1967 they estimated around

25     800,000 citizens have been arrested and detained.  This first

F1f3sok7

 1    page talks about 700 people who are currently detained, but

 2    they are characterized as military detainees.

 3          Quite frankly, I don't know who is going to define

 4    term "military detainees." I don't know what that means. I

 5    don't know what that means. That they were in the military

 6    force of the PA, that they were taking a military stance, that

 7    they were engaged in some physical conflict. I don't know what

 8    that means. I don't know what you think they're trying to say

 9    here.

10          So, my position at this point is, unless you can give

11    me two things, a real strong argument that there is some

12    probative evidence in this, and/or you can come to some

13    agreement with the other side that you're willing to redact

14    those portions that they're primarily concerned about so you

15    can have other portions that you think are not inconsistent

16    with the facts but give you a stronger basis to argue your

17    point.

18          I don't think this is appropriate for the jury to just

19    to infer that somehow this is an acknowledgment that the people

20    who are in prison are in prison, one -- I have to say it this

21    way -- in prison because they were people who are in the

22    military, uniformed military who were detained because they

23    were involved in terrorist acts. This doesn't say that at all.

24    I don't know why those 700 people were detained. And you can't

25    imply they were detained because they committed terrorist acts.

F1f3sok7

1    That's not even a reasonable inference.  There is no basis to

2    infer that.  They could have been detained, they could have

3    been questioned, they could have been material witnesses, they

4    could have been people who got into a conflict with somebody.

5    As you say, threw a stone.  I don't know who these people are

6    and why they're incarcerated for a long time or short time.

7            So you'll have to point to me what is the real

8    important evidence that you want.  And I got a document here

9    that's I don't know how many pages, but I think there is grave

10   dangers for both sides, and I'm not going to take the risk that

11   the jury is going to take this for an improper purpose and

12   maybe an improper purpose that may be to the disadvantage of

13   the party that wants the document to go before the jury for

14   another purpose.

15           MR. YALOWITZ:  All right.  I think I understand the

16   Court's ruling.  I am going to take a look at the document and,

17   certainly, the subject matter how many Palestinian Authority

18   police officers committed terror crimes and are still in jail

19   today on the payroll of the PA, that's an interesting and

20   useful fact.

21           THE COURT:  It ain't in this document.

22           MR. YALOWITZ:  It may be --

23           THE COURT:  It is not in this document.  There is

24   nothing that says anything about military people committing

25   terrorist acts.  It doesn't say that.  They could have gotten

F1f3sok7

1    in a fight on the street with a police officer.  I don't know

2    what they're in jail for.

3         And I assume you would acknowledge that all 700 of

4    these people can't possibly be in jail because they were

5    convicted of committing terrorist acts in the uniformed

6    military.

7         MR. YALOWITZ:  Actually, your Honor, I think the

8    evidence will show -- well, I think that what I'd like to do is

9    work on this fact issue.  Or, it is not really exactly a fact

10   issue.  It is not a core fact issue.  But the issue for me is

11   how common was it to commit these crimes.

12        THE COURT:  Which crimes?

13        MR. YALOWITZ:  Terror crimes.

14        THE COURT:  That's the problem.  This document doesn't

15   refer to any crime.

16        MR. ROCHON:  May I interrupt for a second?

17        MR. YALOWITZ:  No.

18        THE COURT:  This is his burden, okay.  So I want to

19   let him know what my concerns are.  If you can satisfy those,

20   you will get it.  But this document doesn't even reference a

21   single crime.  It doesn't tell us anything about why these

22   people are legitimately or illegitimately detained.  I don't

23   know.  To simply say they are a person who is detained in

24   uniform is not the inference that they committed terrorist acts

25   as employees of the PA or on behalf of the PLO.  You can't get

F1f3sok7

1    that inference from that document.

2         MR. YALOWITZ:  Let me tell you where I agree with what

3    you're saying, and what additional information I think we need

4    to deal with.

5         I agree that reading this document alone, cold, with

6    no context and no understanding of what it means to be in

7    prison as of the date of this statement, is not, standing

8    alone, it is not useful information.  I agree with that.

9         The only way to understand that statistic, which is

10   not the only place it exists, but that 700 statistic, the only

11   way to understand it is to understand the context of the

12   military apparatus, to understand who is saying it, and to

13   understand why they're saying it.  To understand what it means

14   to be incarcerated in an Israeli prison at the date of this

15   statement and other statements like that.

16        Frankly, I can do all that with an expert without the

17   document.

18        THE COURT:  The problem you have is that when you say

19   "as the date of this document."  You talk about 700, quote,

20   military detainees as of January 21, 2012.  I'm not sure any

21   one of these people were in jail in 2002.  That's 10 years

22   later.  I can't even make a reasonable assessment of whether

23   these people were incarcerated during the relevant period of

24   time.  So what does that got to do with making it more likely

25   than not that in 2002 they were involved in terrorist acts,

F1f3sok7

1    which this doesn't say.

2            MR. YALOWITZ:  That's another reason why the document

3    standing alone isn't all that interesting.

4            THE COURT:  Unfortunately, you give it to me standing

5    alone, because I didn't have any other evidence at this point

6    to relate it to.  And reading the document in itself it is not

7    a proper inference to draw that somehow these people are

8    involved in terrorist acts, somehow this reflects the PA or the

9    PLO's approval of terrorist acts.  Somehow it reflects that

10    they were committing terrorist acts because they are in the

11    military, or that's their job in the military.  All of those

12    inferences are not proper inferences from this document.  So

13    alone --

14            MR. YALOWITZ:  Standing alone.  Okay.

15            THE COURT:  Mr. Rochon, you can have the last word and

16    then we'll adjourn.

17            MR. YALOWITZ:  I understand the Court's concerns, and

18    rather than address it in the abstract, I think what we need to

19    do is deal with the concepts with the witness, and then we can

20    evaluate whether we even need the document.

21            MR. ROCHON:  Your Honor, as to these documents and as

22    to the notion they are going to explore the concepts with the

23    witness, the danger of the documents and the concern about the

24    exploring the concepts with the witness is that a state of mind

25    of an entity being proved through this kind of evidence is

F1f3sok7

1    especially problematic.  It is not an appropriate province for

2    an expert witness, as the Court knows from the cases we put

3    before you in connection with Daubert and on the Second

4    Circuit.

5         Much of what Mr. Yalowitz is trying to do is put in

6    documents that say one thing, and then to try to argue the

7    state of mind of my clients, which is not reflected directly in

8    the documents, and it enters the realm of both speculation, and

9    you've identified the dangers of these documents, your Honor,

10   and it extends not only to these two sets we've talked about

11   for the last 20 or 30 minutes, but even as to some of the

12   testimony that he's going to apparently seek.  And I think the

13   Court should be cautious about how the plaintiffs are going

14   about trying to prove the state of mind, which is a critical

15   element in this case.

16        THE COURT:  I would hope that you will continuously

17   try to put these issues before me as early as possible.

18   Because, as I say, if I have 30 seconds to make a decision, you

19   are going to get 30 seconds worth of thought.  Give me as much

20   advance in writing on these issues so we can resolve these

21   issues and I can think about them and look at the documents.

22   I've looked at a lot of documents, so you see I read the stuff

23   you give me.  It is not like it's osmosis.  I put it up against

24   my head and it soaks in.

25        MR. YALOWITZ:  Just to be clear --

F1f3sok7

1          MR. ROCHON:  I thought I was going to get the last

2     word.  I was so close.

3          Go ahead.

4          MR. YALOWITZ:  I promise I'll give him the last word,

5     but I want to be clear on one thing.  It is actually to

6     Mr. Rochon's benefit that I tell him this.  I'm not --

7          THE COURT:  You like his tie?

8          MR. YALOWITZ:  Not really.

9          MR. ROCHON:  Johnston & Murphy.  It is not a nice tie.

10         THE COURT:  Let's wind up.

11         MR. YALOWITZ:  It is actually a really simple and

12    highly relevant fact, which is it goes to are they rogue

13    employees or is it within the scope of employment.  If hundreds

14    of people or dozens of people are doing this, and they don't

15    get fired, that seems like a relevant fact.  That seems to make

16    it more likely they were acting within the scope of employment.

17         THE COURT:  You can argue that, but as they say, I

18    don't have any evidence.

19         MR. YALOWITZ:  I don't think --

20         THE COURT:  In this document.

21         MR. YALOWITZ:  I don't think your concern was

22    relevance.  I think your concern was other things.

23         MR. ROCHON:  Judge, that's what he said he wasn't

24    going to do a little while ago.  This is exactly that.

25         I did get the last word.  Good night, your Honor.

F1f3sok7

1    Thank you.

2              THE COURT:  Have a good evening.

3              (Adjourned until January 16, 2015, at 9:30 a.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                              Page

NICHOLAS KAUFMAN

Cross By Mr. Satin . . . . . . . . . . . . . . 346

ALON EVIATAR

Direct By Mr. Yalowitz . . . . . . . . . . . 363

PLAINTIFF EXHIBITS

Exhibit No.                              Received

1151   . . . . . . . . . . . . . . . . . . . 414

532   . . . . . . . . . . . . . . . . . . . 418

1152   . . . . . . . . . . . . . . . . . . . 455

171   . . . . . . . . . . . . . . . . . . . 460

1127   . . . . . . . . . . . . . . . . . . . 465

958   . . . . . . . . . . . . . . . . . . . 474

173   . . . . . . . . . . . . . . . . . . . 478

20   . . . . . . . . . . . . . . . . . . . 480

104, 105, 106, 108   . . . . . . . . . . . 483

1153   . . . . . . . . . . . . . . . . . . . 490

512   . . . . . . . . . . . . . . . . . . . 494