```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   MARK I. SOKOLOW, et al.,

 4                  Plaintiffs,

 5          v.                            04 CV 397 (GBD)

 6   PALESTINE LIBERATION
     ORGANIZATION, et al.,
 7
                    Defendants.
 8
     ------------------------------x
 9                                        New York, N.Y.
                                          January 16, 2015
10                                        9:30 a.m.

11   Before:

12                    HON. GEORGE B. DANIELS,

13                                        District Judge

14                          APPEARANCES

15   ARNOLD & PORTER LLP
          Attorneys for Plaintiffs
16   BY:  KENT A. YALOWITZ
          PHILIP W. HORTON
17        TAL MACHNES
          SARA PILDIS
18        CARMELA T. ROMEO
          RACHEL WEISER
19
     MILLER & CHEVALIER, CHARTERED
20        Attorneys for Defendants
     BY:  MARK J. ROCHON
21        LAURA G. FERGUSON
          BRIAN A. HILL
22        MICHAEL SATIN

23   Also present:  RACHELLE AVITAL, Hebrew interpreter
                    RINA NE'EMAN, Hebrew interpreter
24

25
```

```
 1                (In open court; jury not present)

 2           THE COURT:  Good morning.  I have a letter from

 3    Ms. Ferguson with regard to a number of exhibits.  I really

 4    have no idea what they are and what they indicate or what the

 5    substance of them are.

 6           But let's start with the documents, rather than the

 7    video clips.  What are the documents that are at issue and let

 8    me see it and so we can address them.

 9           How many documents are at issue?

10           MS. FERGUSON:  Twelve documents, your Honor.

11           THE COURT:  Okay.

12           MS. FERGUSON:  The first one --

13           THE COURT:  If you can give them all to me.  Have I

14    seen any of these documents before?

15           MS. FERGUSON:  No, your Honor.  Well, a few of them

16    you have.

17           So I'll start with the first one and then we'll bring

18    up the others in a group.  So the first one, your Honor, is

19    plaintiff's trial exhibit 276.  And it is from a palpolice.ps

20    website, and it provides the list of the names of Palestinian

21    police members being held in Israeli occupation forces prisons

22    and detention centers.

23           THE COURT:  All right.  Let me stop right there.

24    Mr. Yalowitz, what is the relevance of the document?

25           MR. YALOWITZ:  Okay, so this is the defendant's own
```

1    website.  The defendant's police force website.  It has got a

2    list of more than 100 employees as of November 21, 2012, who

3    are in jail and who have committed security crimes.

4            THE COURT:  Where does say that?

5            MR. YALOWITZ:  I think that is what -- the expert will

6    contextualize it.

7            THE COURT:  How does he know it?  How does he know

8    that Mr. Al-Masri committed a security crime and what security

9    crime he committed?

10            MR. YALOWITZ:  Well, we know that Majed Al-Masri

11    committed a security crime because we have his conviction in

12    evidence, your Honor.

13            THE COURT:  All right.

14            MR. YALOWITZ:  He's one of our perpetrators.

15            THE COURT:  All right.

16            MR. YALOWITZ:  Same with Ahmed Barghouti.

17            THE COURT:  You're not offering it for that purpose,

18    because you already have that as to Mr. Al-Masri.

19            Let me go right to the heart of the problem that I

20    have.

21            MR. YALOWITZ:  All right.

22            THE COURT:  First of all, a security crime means a lot

23    of things.

24            MR. YALOWITZ:  Right.

25            THE COURT:  A security crime does not mean that these

538

1    people, one, unless you can give me some further demonstration,

2    one, that all of these people were convicted of anything.

3    Right?  It doesn't say they were convicted of anything.  Two,

4    that they were all convicted of security crimes.  Three, that

5    they were all convicted of participating in crimes related to

6    terrorist activity.

7            So, what is the inference the jury is supposed to draw

8    from this document?

9            MR. YALOWITZ:  Okay.  So first of all, those three

10   things that your Honor said, I am very, very sure that my

11   expert has an opinion on that.

12           THE COURT:  I don't need an opinion on that.  I need a

13   fact.  I need to know where that fact would come from.  There

14   is no opinion about what somebody was convicted of.

15           MR. YALOWITZ:  Look, your Honor, I feel very strongly

16   about this document and I just would like to have a chance

17   to -- I know I talk slow.  But just give me a chance on this

18   one, okay.

19           THE COURT:  Excuse me.  Have I ever not given you a

20   chance to speak?

21           MR. YALOWITZ:  You've been great.  But I feel strongly

22   about this one.

23           THE COURT:  That's fine.  You feel strongly about all

24   of them.  I'm trying to tell you what my concern is so you can

25   address that.  You can say whatever you want to say, but if

1    you're going to convince me, you're more likely to be able to

2    address the concerns I'm raising here at the midnight hour, as

3    they say.

4            MR. YALOWITZ:  I understand.

5            THE COURT:  At the 9 o'clock hour.

6            MR. YALOWITZ:  I understand.  In terms of the last

7    minute hour, I will say, your Honor, I gave this list that I

8    was going to use these documents to the defendants four days

9    ago.  So the people who are doing the last minute game here are

10   the defendants.  Not me.  They give a letter at 8:30 in the

11   morning when I don't have time to respond to it.  That's the

12   game they're playing.  Not me.  So don't punish me for it.

13           THE COURT:  I'm not punishing anybody.  I don't want

14   to punish you at all.  I am saying if you want me to resolve

15   it, I got a jury sitting out there waiting for us already 10

16   minutes now I've got this.  I don't have a written response

17   from you.  And quite frankly --

18           MR. YALOWITZ:  I got it 10 minutes ago.

19           THE COURT:  Mr. Yalowitz, I'm not saying it is your

20   fault.  But I can tell you I haven't gotten anything from you

21   guys that hasn't been faxed to me or e-mailed to me after

22   midnight.  That's just the fact.  That's the circumstance that

23   I find myself in.

24           So, I'm giving you an opportunity right now to tell me

25   why it is that the jury should imply from this, infer from

540

 1   this, that these people were convicted of being involved in

 2   terrorist acts while they were in the scope of their employ

 3   from this document.

 4          MR. YALOWITZ:  So there are two things.  Thing number

 5   one, we have three of our perpetrators on this list.  At the

 6   top of the list --

 7          THE COURT:  Three of how many?

 8          MR. YALOWITZ:  Three out of 100.  Something like that.

 9   100 and something.  But basically 100.  Okay.  Top of the list,

10   three of our perpetrators.  Majed Al-Masri.  Ahmed Barghouti,

11   he's on the second page.

12          THE COURT:  That evidence is already before this jury.

13   This is --

14          MR. YALOWITZ:  What is not before the jury is that 10

15   years after they perpetrated the crimes, the defendant lists

16   them on the website as "our employees," and the jury is

17   entitled to infer that they are proud of those employees.

18   That's why they're putting them on the website.

19          THE COURT:  Who?

20          MR. YALOWITZ:  The defendant.

21          THE COURT:  No.  Which employees?

22          MR. YALOWITZ:  Majed Al-Masri, convicted of a crime in

23   this case.

24          THE COURT:  Okay.

25          MR. YALOWITZ:  Ahmed Barghouti, convicted of two

541

1    crimes in this case.  Hilmi Hamash, convicted of a crime in

2    this case.

3          THE COURT:  If you want to put in evidence that 10

4    years later they still list them as police prisoners --

5          MR. YALOWITZ:  That's what I want to do.

6          THE COURT:  That's fine.  That's three of the 100.

7          MR. YALOWITZ:  Right.  The second thing I would like

8    to use this document to prove, because it goes directly to

9    scope of employment, is that these were not rogue employees

10    because they got 100 of them that they list on their website.

11    If the defendants want to argue --

12          THE COURT:  No, I don't understand that.  I don't

13    understand your point.  Give me that factual point and what is

14    the conclusion to be drawn from this document.

15          MR. YALOWITZ:  Here is the factual point.  If you are

16    in jail in 2012 for a security crime, and you were a member of

17    the police, that means you committed your crime in the '02 to

18    '04 period.  Because after Arafat died, the PA stopped using

19    terror as a weapon with their own police.

20          THE COURT:  Wait a minute.  How do I know that

21    Mr. Jarme is convicted of a terrorist act?

22          MR. YALOWITZ:  What we know is he's still in jail, 10

23    years after or eight years after the intifada is over.

24          THE COURT:  How does this document say that he was

25    arrested during the intifada?

1          MR. YALOWITZ:  It is a reasonable inference from the

2     fact that after Arafat died, they stopped.  The police stopped

3     committing terror crimes.

4          THE COURT:  But this document doesn't say anybody on

5     this list was convicted of a terror crime.  It doesn't say

6     anything about what these people were convicted of.

7          MR. YALOWITZ:  That's a fact outside the document that

8     people can use to interpret the document.

9          THE COURT:  So you want the jury to infer that all of

10    these people were arrested during the intifada, arrested for

11    committing terrorist -- participating in terrorist acts, and

12    were convicted of committing terrorist acts.  That's what you

13    want them to infer from this list?

14         MR. YALOWITZ:  Yes.  Let me say one other thing, your

15    Honor.  Okay, these 105 people or whatever it is, these are the

16    defendants' own employees.  They've got Ministry of Detainee

17    files on them.  They've got GIS files on them.

18         THE COURT:  I accept that.

19         MR. YALOWITZ:  If I'm wrong about this, if I'm wrong,

20    who is in a better position to cross-examine my expert and

21    shove documents in front of him saying this guy wasn't

22    convicted of a terror crime, he was convicted of looking at

23    somebody the wrong way or he was arrested after.

24         THE COURT:  They don't need to do that.

25         MR. YALOWITZ:  They are in the best position to

 1   cross-examine him.

 2          THE COURT:  You are in the best position to tell me

 3   what evidence you have that they in fact were, if that's what

 4   you want the jury to infer.  This witness' opinion about what

 5   he thinks that they most likely are in jail for, what is the

 6   basis of that opinion?

 7          MR. YALOWITZ:  That was, number one, that was his job

 8   during the time.

 9          THE COURT:  His job was to do what with regard to

10   these inmates?

11          MR. YALOWITZ:  His job was to understand the PA

12   infrastructure and to understand what they were doing and to

13   prevent terrorist crimes.

14          THE COURT:  If I go through this whole list with your

15   witness, is there any reason for me not to assume that when I

16   ask him about the vast majority of these individuals, that he

17   will respond that he has, one, no personal knowledge about

18   these individuals, and no personal knowledge about the reasons

19   that they are detained?

20          MR. YALOWITZ:  I think, your Honor, he will not have

21   personal knowledge.  But I think he will have professional

22   knowledge.

23          THE COURT:  There is no such thing.

24          MR. YALOWITZ:  Well, he is an expert.

25          THE COURT:  There is no such thing.  Either you know a

1    fact or you don't know a fact.  You are saying his opinion is

2    going to be that the 67th person on this list is in jail

3    because he is a terrorist who committed an act during the scope

4    of his employ?

5            MR. YALOWITZ:  I think he has that opinion about all

6    of them.

7            THE COURT:  Based on what?  What is the research?

8            MR. YALOWITZ:  Based on the timing, based on the

9    nature of the PA security apparatus, based on the nature of the

10   kinds of -- based on the Shalit deal in which 1,000 security

11   prisoners were released before this document was created.  I

12   think he has a lot of bases to tell you right now on the stand

13   under oath before the jury comes in, why this document is a

14   reliable indicator of widespread practice of terrorism by PA

15   police officers during the 2002 to 2004 period.

16           THE COURT:  Give me an example of a fact which would

17   be a basis on which to make that conclusion.

18           MR. YALOWITZ:  Number one, I'll give you three right

19   off the top of my head and I'm not him.  So I'm sure he knows

20   more than me.  That's one thing I've learned about him.

21           THE COURT:  If he hasn't told you this by now, it

22   ain't coming in in this case.

23           MR. YALOWITZ:  Number one, the PA security forces

24   stopped committing terror crimes after Arafat died.  Number

25   one.  Number two, in the Shalit deal, the only people who --

1    the people who were not let go were the hardest core criminals,

2    the ones who had done the worst crimes.  Number three, this

3    document is from so long after the 2002 to 2004 period, that

4    the only people who could be on there are people who are

5    serious, hard core criminals who committed serious, hard core

6    acts, and who the government of Israel perceived as enough of a

7    threat they wouldn't let them go in a deal in which they let

8    1,000 people go back.

9        THE COURT:  That was when?

10       MR. YALOWITZ:  He'll remind me with the Court's

11   permission.

12       THE COURT:  Sure.

13       MR. YALOWITZ:  When was the Shalit deal?

14       THE WITNESS:  October 2011.

15       MR. YALOWITZ:  October of '11.

16       THE COURT:  October 2011.  How do I know that somebody

17   on this list was not detained October of 2012?

18       MR. YALOWITZ:  Because the fact is that the PA

19   security forces are not committing those kinds of crimes right

20   now.  Number one.

21       THE COURT:  That doesn't say why these people are

22   detained.

23       MR. YALOWITZ:  I know it doesn't.  It is outside the

24   document.

25       THE COURT:  Where outside the document?

346

```
 1              MR. YALOWITZ:  My witness will say it.  I'm sure that

 2    Mr. Rochon will stipulate it.  PA security forces are not

 3    committing terror crimes today.  They weren't committing terror

 4    crimes in 2011 and 2012.

 5              THE COURT:  This doesn't say these people are detained

 6    for terror crimes.  It doesn't say these people were convicted

 7    of terror crimes.  It doesn't say these people were convicted

 8    of anything.  How do I know this person wasn't arrested three

 9    weeks before this report was issued and is a pre-convicted

10    detainee?  What makes you say that these people must have been

11    in jail at least 10 years?

12              MR. YALOWITZ:  Because both sides, I would have

13    thought, would agree, and in fact I remember General Al-Faraj

14    in his deposition said our cooperation with the Israelis is

15    very good.  I'm satisfied.

16              THE COURT:  I assume you don't accept that.

17              MR. YALOWITZ:  No, I thought -- I didn't watch him

18    testify, but when I read it, it rang true.  I'll tell you

19    that --

20              THE COURT:  You're arguing just the opposite.

21              MR. YALOWITZ:  No, I'm not.  I want you to understand

22    my views on this, because I am not sure you do.  These --

23              THE COURT:  I'm pretty sure I do.

24              MR. YALOWITZ:  These people are disciplined, loyal

25    police officers.  And so if they're told don't go, they don't
```

 1   go.

 2           THE COURT:  Okay.

 3           MR. YALOWITZ:  If they're told go, they go.

 4           THE COURT:  Okay.

 5           MR. YALOWITZ:  So, in 2002 and 2003 and 2004, they

 6   were told go, and they went.  Now, they're told don't go.

 7           THE COURT:  So what did they do?

 8           MR. YALOWITZ:  They did terror crimes.

 9           THE COURT:  How do you know that?

10           MR. YALOWITZ:  Because it says security -- because

11   they wouldn't be in jail if they hadn't committed those crimes.

12   They wouldn't be in jail today.

13           THE COURT:  Not every security crime, as we've already

14   had testimony from your expert, not every security crime is a

15   terrorist crime.

16           MR. YALOWITZ:  Correct.

17           THE COURT:  All right.  So what is the evidence that

18   these people were involved in terrorist crimes?

19           MR. YALOWITZ:  Number one, there is a no-go policy

20   over the last -- from '04 to the present.  So, it is more

21   likely than not that there is nobody on that list who committed

22   a crime after 2004.  Number one.

23           Number two, in the Shalit deal, people who were not

24   considered a security risk were released.

25           So, the combination of those two facts, number three,

 1    they have a disciplined police force.  Professional.  The

 2    combination of those three facts, which are not in the

 3    document, but which are reasonable to apply to the document,

 4    allows the reasonable inference that these individuals are

 5    still in jail because they committed terror crimes.

 6              Now, I understand it is fair cross-examination to ask

 7    all the questions your Honor asked.  It is also fair

 8    cross-examination to shove a document in front of this witness

 9    to prove he's wrong.  And nobody has a better opportunity to do

10    that than the defendant does.  So I'm taking that risk with

11    this document, and I'm fully prepared to take it because I

12    believe without any doubt --

13              THE COURT:  Where in your expert's report did your

14    expert opine that this document represents what you claim it

15    represents?

16              MR. YALOWITZ:  You have to bear with me.  You have to

17    bear with me on that.

18              THE COURT:  Does it exist in his report?

19              MR. YALOWITZ:  I just don't know.  We have to check.

20              THE COURT:  All right.

21              MR. YALOWITZ:  He certainly -- well, I don't know.  We

22    have to check.

23              THE COURT:  All right.  Let me go past that.  We'll

24    come back.

25              What is this Washington Post article 497?

349

 1            MR. YALOWITZ:  497 is the Marwan Barghouti Washington

 2    Post Op-Ed piece in which he says Want security?  End the

 3    occupation.  And he does that five days before the January 22

 4    attack, and he does that 10 days --

 5            THE COURT:  What is the line that you say implicates

 6    him in terrorism?

 7            MR. YALOWITZ:  It shows --

 8            THE COURT:  Tell me the line that implicates him in

 9    terrorism.

10            MR. YALOWITZ:  It is the title.

11            THE COURT:  Show me the line.

12            MR. YALOWITZ:  Bear with me, your Honor.  What page

13    are we on?  What exhibit is it?

14            THE COURT:  497.

15            MR. YALOWITZ:  497.

16            THE COURT:  You say the headline?

17            MR. YALOWITZ:  Right.  Number one, the headline.

18    Number two, bottom of the page, "The only way for Israelis to

19    have security is quite simply to end the 35-year-old Israeli

20    occupation of Palestinian territory."  Number three.  Top of

21    page two, "The lack of Israeli security is born of the lack of

22    Palestinian freedom.  Israel will have security only after the

23    end of the occupation, not before."

24            Apparent intent to influence a government.  It is no

25    mistake that this was in the Washington Post.  And apparent

1    intent to influence or coerce a civilian population.

2             THE COURT:  By the use of terrorism?

3             MR. YALOWITZ:  By the combination of committing crimes

4    and then announcing the crimes will not stop unless you do what

5    I want.

6             THE COURT:  It doesn't say "unless you do what I

7    want."

8             MR. YALOWITZ:  That's exactly what it says.

9             THE COURT:  Where?

10            MR. YALOWITZ:  It says "Israel will have security only

11   after the end of the occupation."

12            THE COURT:  Okay.  It doesn't say --

13            MR. YALOWITZ:  That's what he wants.

14            THE COURT:  That doesn't say "after you do what I

15   want."  It says if the occupation ends, they will have

16   security.  That's what it says, right?  It doesn't say any more

17   or any less than that.

18            MR. YALOWITZ:  I agree with that.  I think it is a

19   fair inference.

20            THE COURT:  I understand with regard to that document.

21   Let me move on to the other document.

22            Grilling of top Palestinian militant exposes Arafat's

23   link to terror attacks on Israel paper shows.  Okay.

24            MR. YALOWITZ:  I'm not going to offer that in

25   evidence.  He's relying on it, but I'm not going to offer it in

351

 1   evidence.

 2           THE COURT:  All right.  He's not going to comment upon

 3   this?

 4           MR. YALOWITZ:  He may comment on it.

 5           THE COURT:  No, he won't comment upon it.  If it is

 6   not in evidence, he can't comment on it.

 7           MR. YALOWITZ:  I don't think I need it then.  Fine,

 8   okay.

 9           THE COURT:  497 is out.

10           MR. YALOWITZ:  He can rely on it.

11           THE COURT:  I don't know what you mean by that.

12           MR. YALOWITZ:  Okay.  I think it will be fine.  He's

13   not going to say Marwan Barghouti said blah, blah, blah.  He's

14   not going to transmit a thing like that.

15           THE COURT:  He's not going to say my opinion here is

16   based on the fact that I read an article in which he said there

17   will be peace in the Middle East when the occupation ends.

18           MR. YALOWITZ:  Let's do it the slow way.

19           THE COURT:  I thought that was the slow way.

20           MR. YALOWITZ:  It wasn't.  Okay.  What this is --

21           THE COURT:  You told me you weren't going to use it.

22           MR. YALOWITZ:  Right.  So I thought we can move on.  I

23   want to be very clear, this article repeats Marwan Barghouti's

24   interrogation statements.

25           THE COURT:  Are they admissible?

 1              MR. YALOWITZ:  They are admissions against interest.

 2              THE COURT:  Are they admissible.

 3              MR. YALOWITZ:  Yes.

 4              THE COURT:  Did I rule that they were admissible?

 5              MR. YALOWITZ:  You ruled that self-inculpatory

 6    statements are admissible.  So, you didn't -- I didn't shove

 7    these in front of you, but the statements themselves are

 8    admissible.  I'm not going to offer the document.

 9              THE COURT:  He's not going to comment on this document

10    or tell the jury what the content of this document is.

11              MR. YALOWITZ:  Correct.

12              THE COURT:  All right.  Then we put the document

13    aside.

14              MR. YALOWITZ:  Okay.

15              THE COURT:  I told the jury we would begin about

16    10 o'clock, so we'll do as much as we can right now.  What is

17    539?

18              MR. YALOWITZ:  539 you've already ruled on.  I don't

19    know why they're rearguing it.

20              THE COURT:  Okay.  And is this in or out?

21              MR. YALOWITZ:  Both.

22              THE COURT:  You see why I get a little confused

23    sometimes?  That's not the answer to my question.

24              MR. YALOWITZ:  Yes, it is.

25              THE COURT:  No, it's not.

353

1           MR. YALOWITZ:  You said if there is raw material, raw

2  documents, then we can use those.

3           THE COURT:  Okay.

4           MR. YALOWITZ:  But the commentary we can't use.  I

5  understand that ruling.  I think there may be two photographs,

6  but we're not using that commentary.  You already ruled on

7  that.  So I don't know why they're rearguing it.

8           THE COURT:  You are going to use a blow up or that

9  size?  You are going to use the documents that are here in

10  Arabic and the translation?

11           MR. YALOWITZ:  Yes.  I think we're using the two

12  photographs on the front also.

13           MS. FERGUSON:  We haven't received a copy of what

14  plaintiffs intend to use with Mr. Eviatar.  So as far as I

15  know, they're using the whole thing.

16           MR. YALOWITZ:  Why would she think I'm using the whole

17  thing?

18           THE COURT:  Mr. Yalowitz, you guys can go out in the

19  hall and argue if you like.

20           MR. YALOWITZ:  No, I'm sorry, your Honor.

21           THE COURT:  Do you have an exhibit that you intend to

22  offer in the form in which you intend to offer it?

23           MR. YALOWITZ:  I need to consult.

24           THE COURT:  Okay.

25           MR. YALOWITZ:  We can either offer it or we can put it

 1    up on the screen in a redacted form.  Bear with me.

 2            We can get them the slides, but I'll tell you what it

 3    is.  It these two photographs on the front of the page.

 4            THE COURT:  The two photographs of Yasser Arafat?

 5            MR. YALOWITZ:  Or at least one of them.  I can't

 6    remember.

 7            THE COURT:  And what else?

 8            MR. YALOWITZ:  And one of those Arabic documents.

 9            THE COURT:  Which one?

10            MR. YALOWITZ:  The one we talked about.

11            THE COURT:  Which one did we talk about?  They don't

12    seem to have a clue as to what you're going to use.

13            MR. YALOWITZ:  Yes.  I don't believe that, but okay.

14    Page nine of 37.  Document two.

15            THE COURT:  Page nine.

16            MR. YALOWITZ:  Of 37.  Document two.

17            THE COURT:  In what form are you going to present

18    that?  Are you going to have some blow up?

19            MR. YALOWITZ:  Yes, we're going to put it up on the

20    screen and blow it up.

21            THE COURT:  Just as it is here?

22            MR. YALOWITZ:  It may be from a different government

23    report, but that Arabic and a translation of the names.

24            THE COURT:  Is that also the second document on the

25    next page or just the document on that page?

1          MR. YALOWITZ:  I don't think we're using this one.  At

2    least not from this -- not from 539.

3          THE COURT:  So just --

4          MR. YALOWITZ:  We may be using it from a different

5    source.

6          THE COURT:  You just want to offer the document that's

7    reflected on page nine and the two photos on the front.

8          MR. YALOWITZ:  Yes.

9          THE COURT:  The form in which you intend to put it

10   before the jury, you should make sure as quickly as possible

11   that they see it exactly in that form.

12         MR. YALOWITZ:  Okay.  Actually, what we're going to

13   do, we're not going to use the one from 539, your Honor.  We

14   are going to use the one from 626, which the Court admitted in

15   evidence in its entirety.

16         THE COURT:  So we already have the document in

17   evidence.

18         MR. YALOWITZ:  The only thing I need from 539 is a

19   photograph of Arafat.

20         THE COURT:  Okay.  You want both of these photographs

21   of Arafat?

22         MR. YALOWITZ:  I think only the one with the gun.

23         THE COURT:  Okay.  We'll come back to that.  This

24   Reuters article, 623.

25         MR. YALOWITZ:  You already ruled on that, your Honor

```
1      it's out.  You ruled it is not in evidence.

2              See, this is what happens when you sandbag instead

3      of --

4              MR. ROCHON:  All right.  Listen, we got this --

5              THE COURT:  Mr. Rochon, have a seat.  Have a seat.

6              Mr. Yalowitz, I thought that we also dealt with 626.

7              MR. YALOWITZ:  Yes, sir.  It is in.

8              THE COURT:  What is 628?

9              MR. YALOWITZ:  628 I'm not going to offer in evidence.

10             THE COURT:  631?

11             MR. YALOWITZ:  631, your Honor already ruled on.

12             THE COURT:  826 I already ruled on.

13             MR. YALOWITZ:  Yes, sir, you did.  It's in.

14             THE COURT:  829 I believe already ruled on.

15             MR. YALOWITZ:  Yes, sir, you did.  It's in.

16             THE COURT:  830 I already ruled on.

17             MR. YALOWITZ:  Yes, sir, you did.  It's in.

18             THE COURT:  What's 831?

19             MR. YALOWITZ:  831 is a captured document from the

20     defendant's general intelligence service.  I actually got it

21     from a deposition that Mr. Hill used -- Mr. Hill offered it as

22     an exhibit at a deposition he took of Mr. Levin.

23             THE COURT:  Put that aside for a second.  And what

24     about --

25             MR. YALOWITZ:  1052?  That is a PLO website in which
```

357

```
 1   they admit that Fatah and -- in which they admit that Al Aqsa
 2   Martyr Brigades is the armed wing of Fatah.
 3            THE COURT:  When you say "they," who admits?
 4            MR. YALOWITZ:  The PLO.  It is a PLO website.
 5            THE COURT:  Who admits that?
 6            MR. YALOWITZ:  The PLO on their website.
 7            THE COURT:  Is there a person that statement is
 8   attributed to.
 9            MR. YALOWITZ:  No.  It's like frequently asked
10   questions or something.
11            THE COURT:  Because I see a picture of an ambassador
12   on the front page.  That's not a quote from that ambassador.
13            MR. YALOWITZ:  No, sir.
14            THE COURT:  Where is the statement that you say?
15            MR. YALOWITZ:  Bear with me.  It's got a Bates number
16   4482.  If you look at the second page, it is just like a
17   description, Palestinian National Liberation Movement-Fatah.
18            THE COURT:  On that page?
19            MR. YALOWITZ:  No, sir.  I'm trying to rush again and
20   I'm sorry.  Second page, you see a heading Palestine National
21   Liberation Movement-Fatah.  Then if we turn two more pages, it
22   says military wings.  And then --
23            THE COURT:  I see it.
24            MR. YALOWITZ:  Item number one -- I'm sorry, number
25   three, Al Aqsa Martyr Brigades.  "This is the military wing of
```

1    the Fatah movement.  It started its activities at the beginning

2    of the Second Palestinian Intifada.  It carried out a number of

3    quality military operations and offered many martyrs."

4              THE COURT:  And you want to establish that this comes

5    from where?

6              MR. YALOWITZ:  This comes from a website of the PLO

7    U.K.  The Palestinian Mission to the U.K.

8              THE COURT:  You want to use it with this witness, this

9    witness can identify it as such?

10             MR. YALOWITZ:  Yes.

11             THE COURT:  Let me put that aside for a second.  And

12   then you have another picture of Yasser Arafat that you want to

13   use 1129.

14             MR. YALOWITZ:  Right.  It is with a rocket propelled

15   grenade launcher.

16             THE COURT:  All right.  Ms. Ferguson, with regard to

17   any of these exhibits, do you have anything else that you want

18   to add?

19             MS. FERGUSON:  Well, your Honor.  With respect to the

20   Marwan Barghouti Washington Post editorial.  I just want to

21   make clear that -- I am not sure if you ruled on that.

22             THE COURT:  I have not.

23             MS. FERGUSON:  So I want to make sure he was not

24   speaking on behalf of the PLO or the PA.  He was speaking as a

25   Fatah official.  So his only relationship to the PA is that he

```
 1   is one of many legislators.  He's just a politician speaking.

 2              THE COURT:  He doesn't have any other formal role in

 3   the PA or the PLO?

 4              MS. FERGUSON:  That's correct.  He is one of many,

 5   sort of like a member of the House of Representatives here.

 6              MR. YALOWITZ:  That would be a disputed fact, your

 7   Honor.

 8              MS. FERGUSON:  There is no evidence.

 9              THE COURT:  I understand your point.  Anything else?

10              MS. FERGUSON:  Well, with respect to this Palestinian

11   Mission to the U.K.com website, I don't know who made that

12   statement.  I don't know if they had any personal knowledge of

13   the relationship between Fatah and Al Aqsa.  It is dated

14   February 14, 2014, 10 years after the relevant time period.  So

15   I don't know who put that up there or whether they had any

16   personal knowledge at all.

17              THE COURT:  All right.  As I said, there were a stack

18   of documents that I already ruled were admissible.  I don't

19   know if you're just attempting to reargue that or you just had

20   a different argument to make.

21              MS. FERGUSON:  I just think there is a distinction

22   between reproductions of captured documents versus this highly,

23   you know, partisan, highly political rhetoric that surrounds

24   them, which is very prejudicial.  I don't see that it comes

25   under the public record exception.
```

1      THE COURT:  I thought we went through that and

2    addressed those issues already.  Is this a new argument or is

3    this the same argument?

4      MS. FERGUSON:  It is not clear to me if they are

5    actually going to offer reproductions of captured documents in

6    some cases that are not fully reproduced, in some cases there

7    is interlineated comments, so we don't know specifically what

8    parts of these documents they're using.  So maybe I'll address

9    it as they offer them.

10      THE COURT:  All right.  But I thought we went through

11    that in detail in terms of which documents they were going to

12    use and what part of documents they were going to use.

13      MS. FERGUSON:  They're highly prejudicial, and these

14    are documents we feel very strongly about.

15      THE COURT:  I know.  I heard this argument.  I was

16    trying to figure out what else you're adding to it.  Are you

17    adding something we didn't discuss earlier?

18      MS. FERGUSON:  No.

19      THE COURT:  There is no reason for me to change my

20    ruling.  I heard those arguments.

21      And then he already indicated that certain exhibits

22    are not being offered.

23      I'm sorry, Mr. Yalowitz, you said 831 was what?

24      MR. YALOWITZ:  831 is a captured document, it is a PA

25    intelligence report.  The witness is prepared to explain

1    exactly what it is.

2              THE COURT:  Is this the one you said was used at the

3    deposition?

4              MR. YALOWITZ:  It was used at the deposition by

5    Mr. Hill.

6              MR. HILL:  I used it at a deposition because I printed

7    it off the web.  There is no way this witness can lay a chain

8    of custody it came from my client.  In the absence of that

9    evidence, it shouldn't be allowed.

10             THE COURT:  I don't know, can he identify this

11   document?

12             MR. YALOWITZ:  He can explain what it is and how he

13   got it and why it is a reliable document.  And you know, this

14   is a document that was addressed to Toufik Tirawi, and the

15   defendants have put in affidavits from Toufik Tirawi.  If

16   Toufik Tirawi didn't get this document, they could have

17   certainly shown it to your Honor and said this is a forgery,

18   Tirawi didn't get it.  They haven't said that.

19             THE COURT:  This is my position.  That document can be

20   admitted.  276 is inadmissible.  497 is inadmissible.  If you

21   want --

22             MR. YALOWITZ:  Your Honor, you know, it is really

23   unfair.

24             THE COURT:  May be unfair, but that's my ruling.

25             MR. YALOWITZ:  Your Honor, it is a verbal act.  It is

 1   not hearsay.  It is a verbal act.

 2              THE COURT:  I'm sorry, you're talking about 497?

 3              MR. YALOWITZ:  Yes.

 4              THE COURT:  497 is no evidence of terrorism.  Period.

 5   It is not.  Any person could have made this statement.  Whether

 6   they were involved in violence or not involved in violence.

 7   This statement is not a statement about terrorism.  This

 8   statement is a statement about what conditions in the Middle

 9   East would lead to the security of Israel.

10              MR. YALOWITZ:  All right.

11              THE COURT:  All right.

12              MR. YALOWITZ:  Here's what I would like to do, your

13   Honor.  Here's what I would like to do with that.  I understand

14   the Court's ruling.  I want you to keep an open mind as the

15   evidence comes in.

16              THE COURT:  I don't have an open mind on this.

17              MR. YALOWITZ:  Well --

18              THE COURT:  I'm just telling you right away.  I'm not

19   going to be unfair to you.  I don't have an open mind on this

20   document.  This document purely says if Israel wants security,

21   that they should end the occupation.

22              MR. YALOWITZ:  All right.

23              THE COURT:  That's an opinion that could be an opinion

24   from an ambassador, it could be the opinion from a president,

25   it could be the opinion from the secretary general of the U.N.

1   It doesn't have anything to do with terrorism.  It doesn't

2   reflect terrorism.

3         MR. YALOWITZ:  I think you know on almost everything,

4   I'm moving on.  On this one, I may come back to you on it.  I'm

5   just telling you.

6         THE COURT:  All right.

7         MR. YALOWITZ:  You've got to see the evidence and then

8   we'll -- okay.

9         THE COURT:  With regard to the U.K. document, again,

10   if the foundation is laid in terms of what it is and where this

11   comes from, 1052 will be admissible.

12         You want some pictures of Yasser Arafat.  How many

13   pictures of Yasser Arafat do we have in this case?

14         MR. YALOWITZ:  Less than a half a dozen.

15         THE COURT:  We've already put in at least one, two,

16   maybe one.

17         MR. YALOWITZ:  One.

18         THE COURT:  You want to put in Yasser Arafat's picture

19   with a rocket launcher, and his picture with an Uzi, for some

20   implication that he's committed to violence against Israel.

21         MR. YALOWITZ:  I never saw President Obama carrying an

22   Uzi or a rocket propelled launcher.

23         THE COURT:  I saw Governor Dukakis sitting on top of

24   the tank.

25         MR. YALOWITZ:  And that came off real well, didn't it?

```
 1                    THE COURT:  So, at this point --

 2                    MR. YALOWITZ:  It is a symbolic message when Dukakis

 3     did it --

 4                    THE COURT:  When are we going to get to the photos?

 5     Today?

 6                    MR. YALOWITZ:  I don't think so.  Maybe today.

 7                    THE COURT:  If they want to make a further argument

 8     about its potential prejudice, but quite frankly, I'm not sure

 9     that the jury is going to be surprised if they haven't already

10     seen those kinds of pictures.  I don't think the prejudice

11     outweighs the probative value, if that's what you want to show.

12     He's obviously not holding flowers.

13                    Are we going to get to a video before lunch?  I don't

14     have any clue about the videos.

15                    MR. YALOWITZ:  I don't remember, your Honor.  I don't

16     remember.

17                    THE COURT:  Are we going to get to it before the next

18     two hours?

19                    MR. YALOWITZ:  If you tell me not to, I will move past

20     it.

21                    THE COURT:  My attitude is always to let you try the

22     case.

23                    MR. YALOWITZ:  My head only can hold so much stuff in

24     it.

25                    THE COURT:  Your head is bigger than mine.
```

```
 1              MR. YALOWITZ:  Well, my ego, I don't know.

 2              THE COURT:  Then I am going to put aside the videos.

 3   We'll have to address the videos before you offer them in

 4   evidence.  So if we get to the video portion, and as I say,

 5   I'll let the lawyers try the cases.  I won't tell you when to

 6   do it.

 7              MR. YALOWITZ:  Let me talk about the videos, your

 8   Honor.  The first video I think on their list is 219.  I've

 9   taken a second look, I'm not going to offer it.

10              THE COURT:  All right.  That solves that problem.  219

11   is out.

12              MR. YALOWITZ:  The reason I'm not going to offer it is

13   based on your prior ruling.

14              THE COURT:  Thank you.

15              MR. YALOWITZ:  But I sent you a letter on January 12

16   to which the defendants have not responded about a whole bunch

17   of videos.

18              THE COURT:  Is that the videos here?  Should I be

19   looking at that letter to see what your response is?

20              MR. YALOWITZ:  I would really appreciate it if you

21   would look today at my January 12 letter.  And the defendants

22   have had four days to respond to it, and what they've done is

23   they've trickled out their response.

24              May I hand up a copy to your clerk?

25              THE COURT:  Yes.
```

1          MR. YALOWITZ:  You have the CD also.

2          THE COURT:  Yes.

3          MR. YALOWITZ:  What's going on is that the defendants,

4    instead of responding to the letter and giving the Court an

5    opportunity to do it in a deliberative way, at 8:30 in the

6    morning before I'm planning to use something, they fire off a

7    last minute salvo when nobody has time to think about it.

8          THE COURT:  I have my copy.

9          MR. YALOWITZ:  I'll make you a deal, your Honor.  I

10   will not offer any videos before lunch, but I would really

11   appreciate it if the Court would turn to that as early as

12   possible.

13         THE COURT:  I'll go back to your letter.  I have my

14   copy of your letter right here.

15         MR. YALOWITZ:  I did it early because I wanted the

16   Court to be able to deliberate.  The defendants have not

17   responded.  They have not responded to that letter.

18         THE COURT:  All right.

19         MR. YALOWITZ:  I think they ought to be sent a message

20   about not responding.

21         THE COURT:  Mr. Rochon, do you have something, last

22   word that you like to say?

23         MR. ROCHON:  I have something to say, but I can wait

24   to the break.  It goes to all these allegations of sandbagging

25   and all this other stuff.

```
 1              THE COURT:  I don't think the jury needs to sit around
 2   while you guys do that.
 3              MR. ROCHON:  I would like to address it because the
 4   record is inaccurate, and I think I know you're not that
 5   concerned about the allegations and the back and forth.  I hope
 6   you're not.
 7              THE COURT:  I'm not concerned about it at all.  I'm
 8   trying to make sure the curtain goes up and the lights stay on.
 9   I'm trying to direct this play so people with get some evidence
10   before them.
11              MR. ROCHON:  I'm concerned if there is ever a
12   follow-on review of this, that the record be accurate.
13              THE COURT:  I told them we would start at 10 and it is
14   almost 10:20.  Let's continue with the jury.  Let's bring in
15   the jury.
16              MR. YALOWITZ:  Your Honor, Mr. Rochon has correctly
17   pointed out that they received this list of exhibits at
18   10:25 a.m. on Wednesday.  So the record should be accurate.
19   They've had it since 10:20 a.m. Wednesday.
20              THE COURT:  Let's bring in the jury.
21              (Continued on next page)
22
23
24
25
```

```
 1              (Jury present)
 2              THE COURT:  Good morning, ladies and gentlemen.  Thank
 3    you for your patience.  We'll proceed uninterrupted and
 4    efficiently today.  And depending on how far we get, I may try
 5    to send you a little early for the long weekend.
 6              Let's continue with this witness, Mr. Yalowitz.
 7              MR. YALOWITZ:  Thank you so much, your Honor.
 8     ALON EVIATAR,
 9        called as a witness by the Plaintiffs,
10        having been previously sworn, testified as follows:
11    DIRECT EXAMINATION (Continued)
12    BY MR. YALOWITZ:
13    Q.  Thank you, Mr. Eviatar, yesterday for taking us through
14    that law about the payments to prisoners.  And I want to ask
15    you, Mr. Eviatar, to turn to that law in your binder.  It is
16    Exhibit 512.
17              Do you have it before you?
18    A.  It is before me.
19    Q.  Would you be able to identify when that law was first
20    adopted?
21    A.  In order to be precise, it says here in this law that it
22    was officially enacted in 2004.
23              But it is important to emphasize, it is important to
24    emphasize before the jury and before the Court, that these
25    regulations, the significance of which is payments to prisoners
```

1    in the jails, were absolutely realized and carried out many

2    years prior to that.

3          This law does not define that only from 2004 onward

4    the prisoners would receive a salary.  It also includes all of

5    the prisoners who were already incarcerated in the prisons,

6    even prior to the al Aqsa Intifada.

7          I'll end with this.  The Palestinian Ministry of

8    Prisoners back in 1998 published the expenditures that it pays

9    and the amount of the salaries to the prisoners.  Therefore,

10   what this law does is to ensure that this matter of payments to

11   the prisoners is anchored in the form of a law.  But the

12   significance of this law was realized many years prior to the

13   law.

14         And with the permission of the members of the jury and

15   the Court, I'll add that the pragmatic significance in terms of

16   the prisoners and the members of their families is not only to

17   ensure their economic security for a period of many years, for

18   every prisoner and his family, but this law or these payments

19   also constitute, they constitute an economic motivation for the

20   perpetration of acts of terror.  I can prove what I'm saying

21   here, if I will be allowed to do so.

22   Q.  Well, I want to follow up on that.  First I want to make

23   sure that I ask you about something that you said a moment ago,

24   which was, the significance of the law was realized many years

25   prior.

1  A.  That's absolutely correct.

2  Q.  I want to understand what you mean by that.  If you could

3  just explain to the jury what happened many years prior to

4  2004, and how long prior.

5  A.  A Palestinian terrorist who perpetrated an act of terror,

6  whether or not he was a member -- whether or not he was an

7  employee of the Palestinian Authority, if he perpetrated the

8  act of terror in 1993, '96, 2000, during the course of the

9  Second Intifada, all of these fall within the realm of the

10  criteria.  And they received payments just as this law sets

11  forth.  I'll give an example, if I may.

12           MR. ROCHON:  Objection, your Honor.  Not responsive.

13           THE COURT:  Overruled.  He can answer.

14  Q.  Go ahead.

15  A.  When I was an intelligence officer in the Bethlehem

16  district, between 1998 and 2000, I regularly met with dozens of

17  members of the Fatah, I would even say hundreds of members of

18  the Fatah, some of whom were former prisoners who had been

19  released within the framework of the relationship between

20  Israel and the Palestinian Authority.  And some of them, those

21  who confessed to it before me, received salaries from the

22  Palestinian Authority while they were in prison.

23  Q.  Are you saying that they received these salaries, even

24  before the 2004 law was passed?

25  A.  Absolutely.

1  Q.   Okay.  Thank you.  I think I asked you yesterday whether

2  you had an opinion as to whether these payments were social

3  welfare payments.  But in case I didn't, would you just tell

4  the jury what your opinion is on that.

5  A.   My opinion is the same as that of the Palestinian

6  Authority:  These are not social welfare benefits.  Even if the

7  prisoner is a millionaire, he'll get these payments from the

8  Palestinian Authority.

9  Q.   I would like to know if you're familiar with an entity or a

10 unit of the Palestinian Authority called Wafa?

11 A.   I could not fail to be familiar with it, because that's the

12 first Internet site that I would open up at the start of every

13 workday.  That is the official news agency of the Palestinian

14 National Presidential Institution.

15 Q.   So, during the years that you were in office, was there

16 ever a time when Wafa did not reflect the official position of

17 the Palestinian Authority?

18 A.   The role of Wafa is to be a mouthpiece for the Palestinian

19 presidency.  It is not the kind of Internet site where anyone

20 could post anything they want.  The only thing that would be

21 published there is what the office of the Palestinian president

22 or the Palestine -- the institution of the Palestinian

23 president would want.

24        MR. ROCHON:  I'm sorry, Mr. Yalowitz.  Your Honor,

25 objection.  This goes to an issue we didn't address this

1    morning.  So if we could have a brief sidebar.

2                THE COURT:  Come up.

3                (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                (At the sidebar)

 2           MR. ROCHON:  Judge, this goes to what I said in

 3  opening, whether this is social welfare or not, and you didn't

 4  rule on that yesterday at the end of the day.  You need to let

 5  it in or not.  I've got to object.

 6           THE COURT:  That's fine.  I think that this is

 7  admissible.  Of minimal relevance, but I don't see any reason

 8  it is more prejudicial than probative at this point.  Everybody

 9  gets paid Social Security.

10           MR. YALOWITZ:  Thank you.

11                (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              (In open court)

 2   BY MR. YALOWITZ:

 3   Q.  Could you please -- did I ask you where to turn?  Did I ask

 4   you to turn to 241 yet?

 5   A.  No.

 6   Q.  Please turn to 241 in your binder.

 7   A.  I have it before me.

 8   Q.  What is it?

 9   A.  With your permission, Mr. Yalowitz, I'm reviewing the

10   document in Arabic.

11              This is an official statement of the minister of

12   prisoners Issa Qaraqe via the presidential news agency by the

13   name of Wafa.  The publication is from March 17, 2013.  Excuse

14   me.  It's from December 27, 2012.

15   Q.  All right.  Thank you.

16              MR. YALOWITZ:  Your Honor, plaintiffs offer Exhibit

17   241 in evidence.

18              MR. ROCHON:  Subject to prior.

19              THE COURT:  It will be admitted.

20              (Plaintiff's Exhibit 241 received in evidence)

21   Q.  Why don't we take a look at it.  Let's focus the jury on

22   the first two paragraphs and the title.  It says, I just want

23   to read the headline and then ask you about it.  "Qaraqe denies

24   rumors of converting prisoners' wages to welfare payments."

25              If I could just ask Rina to translate reading as we do
```

1      it, that would be great.  Thank you so much.

2              Tell me again who Qaraqe is.

3      A.  Issa Qaraqe is the Minister of Prisoners and Released

4      Prisoners in the Palestinian government.  And he's a senior

5      member of the Fatah leadership.

6      Q.  Could you give us a little bit about his background and how

7      he became -- how he came to come in the position that he's in,

8      please.

9              MR. ROCHON:  Objection, your Honor.

10              THE COURT:  Overruled.  He can answer.

11     A.  I know Issa Qaraqe personally.  I met with him in my office

12     in the area of Bethlehem.  He grew up in the Deheishe Refugee

13     Camp near Bethlehem.

14              He's considered one of the most -- I would define him

15     as extreme members of the Fatah in the area.  He has a militant

16     background, he's considered one of the most harsh detractors

17     who frequently lies to the media, spreads lies to the media,

18     with respect to Palestinian prisoners.  For example, everything

19     related to Israel's attitude and treatment of the Palestinian

20     prisoners.

21              By virtue of his background, he was elected to be a

22     minister in the Palestinian Authority.

23              (Continued on next page)

24

25

376

1    Q.  Do you believe that he was telling the truth in this

2    comment?

3              MR. ROCHON:  Your Honor, it calls for speculation.

4              THE COURT:  He can answer.

5    A.  I more than believe.  I am 100 percent certain of that.

6    Q.  Why is that?

7    A.  Qaraqe, as a representative of the Palestinian Authority,

8    it's important to him to convey a clear message for the

9    prisoners, for their families, for the Palestinian public, the

10   meaning of which is the value and the appreciation that the

11   Palestinian Authority attributes to the prisoners who are

12   incarcerated in prison in Israel within the framework of their

13   struggle against the occupation.

14   Q.  In the second paragraph, Qaraqe indicates that the

15   prisoners received their financial allowances in accordance

16   with the rules and the law.  Do you see that?

17   A.  Yes.

18   Q.  Is that the rules and the law as you understand it, the

19   rules and the law that we went over yesterday with you?

20   A.  Exactly right.

21   Q.  To your knowledge, since this statement was published by

22   Wafa in December 2012, have those prisoner payments, prisoner

23   wages, been converted to welfare payments?

24   A.  The wages have not been converted to social welfare

25   payments, and his definition of payments to military people

 1  remains the same to this very day.

 2  Q.  Thank you.  I think you began to tell us about the economic

 3  case that you were going to describe involving prisoner wages,

 4  and I kind of cut you off.  I apologize for that.  Could you

 5  explain to the jury the thing you wanted to tell them before.

 6  A.  Yes, of course.  The Palestinian Authority does not check

 7  to see what your economic status is before you are imprisoned.

 8  Whether you are poor or rich, you will receive these payments

 9  continuously in accordance with the years that you are in

10  prison.  And even if during the years of your imprisonment you

11  win the lottery, you will continue to receive payments from the

12  Palestinian Authority as the law stipulates.

13  Q.  Has this law been amended in recent years?

14  A.  Yes.

15  Q.  Have you had an opportunity to review the amendment to the

16  law?

17  A.  Yes, I have seen the amendment.  This law was amended in

18  2013, quite recently, and was authorized by the Palestinian

19  prime minister.

20  Q.  Would you please turn in your binder to Exhibit 1143.

21  A.  I see it before me.

22  Q.  Is this the amendment you were just describing?

23  A.  Yes, that is the heading.

24          MR. YALOWITZ:  Your Honor, plaintiffs offer 1143 in

25  evidence.

 1                  MR. ROCHON:  Subject to the prior, your Honor.

 2                  THE COURT:  It will be admitted of.

 3                  (Plaintiff's Exhibit 1143 received in evidence)

 4    Q.  First of all, have you had the opportunity to review it in

 5    advance of your testimony?

 6    A.  Yes.

 7    Q.  Is there anything in this law that converts the wages to

 8    social welfare?

 9    A.  Absolutely not.

10    Q.  I want to focus with you on article (8).  Let's take a look

11    at article (8).  Maybe I can read it, with the Court's

12    permission.

13                  THE COURT:  Yes.

14    Q.  "The text of article (8) of the original law is amended,

15    with the addition to it of two paragraphs following paragraph

16    (2) as follows:  3.  The State shall continue to pay the salary

17    of an imprisoned employee.  4.  The ministry must pay a portion

18    of the salary of an imprisoned employee if his salary as a

19    prisoner is higher than his salary as an employee."

20                  The first thing I want to ask you is, did the

21    amendment change the definition of "prisoner" or are we still

22    talking about people who committed those struggle-against-the-

23    occupation crimes?

24                  MR. ROCHON:  Objection, your Honor.

25                  THE COURT:  Overruled.  You can cross it.

 1              MR. ROCHON:  The objection was that it misstated the

 2    law.

 3              THE COURT:  I understand.

 4              MR. ROCHON:  Thank you.

 5    A.   The exact same prisoners are involved.

 6    Q.   Let's go to article (2).  I would like to focus the jury on

 7    the fifth line from the top and following, the definition of

 8    "the prisoner."

 9              MR. YALOWITZ:  May I read it, your Honor?

10              THE COURT:  Yes.

11    Q.   "The prisoner:  Anyone who sits in the prisons of the

12    occupation on the grounds of his participation in the struggle

13    against the occupation."  Is that the definition of "prisoner"

14    that you were thinking of when I asked that question?

15    A.   Absolutely.

16    Q.   Let's go back to article (8) now that we have gotten that

17    straightened out.  I want to ask you to explain how this new

18    portion of the law works with regard to employee prisoners who

19    are in jail for struggle-against-the-occupation crimes.  Could

20    you explain that, how it works.

21    A.   If you are an officer in one of the Palestinian security

22    apparatuses an you are involved in a terror attack, for

23    example, during the Al Aqsa intifada and you are tried by

24    Israel and sent to prison, you continue to remain registered as

25    an officer in the Palestinian Authority.  And according to the

1   law, you are supposed to continue to receive the wages that you

2   would receive had you continued to be in the Palestinian

3   Authority.

4           However, if during the time that you were in prison

5   and the salary, as we saw yesterday in the table, jumps up an

6   increment every five years much more than it would have grown

7   or risen had you remained in the Palestinian Authority, in

8   order for you not to lose any money, the Palestinian Authority

9   will supplement the missing part.  That's the meaning of this

10  article.

11  Q.  The prisoner who is in prison for, say, 20 years, that

12  prisoner stays on the payroll?

13  A.  He remains on the payroll.

14  Q.  Then, if his matrix wage under the prisoners law is higher

15  than his police pay, does he get the higher one or does he

16  stick with the lower police pay?

17  A.  He will receive the higher wages.

18  Q.  In order to get that higher wage instead of his regular

19  pay, does he have to perform any service at all other than

20  sitting in jail for his crimes?

21  A.  He doesn't have to do anything at all.

22  Q.  Do you have a figure of how much money the Palestinian

23  Authority is spending on these prisoner payments?

24  A.  I have data, data that was published by the Palestinian

25  Authority, by the way.  One figure that I can present here

1    talks about a scale of 17 million shekels annually, which is

2    paid only to the prisoners.

3    Q.   17 million shekels per month or 17 million shekels per

4    year?

5    A.   I'd have to check the figure.

6    Q.   Is it in your report?

7    A.   Yes, it is in my report.

8    Q.   Let me see if we can get a copy of the report for you at a

9    break, and we will come back to that.  Now I want to turn to

10   the policies for the released prisoners.  Have you had an

11   opportunity to study the Palestinian Authority's policies for

12   prisoners who have been released from jail?

13   A.   Yes.  These things are public.

14   Q.   Can you describe for the jury what circumstances lead to

15   the release of a prisoner from jail in your experience.  By

16   prisoner, I don't mean a person who committed street crime, I

17   mean a person who committed one of those struggle-against-the-

18   occupation crimes.

19   A.   Could you repeat the question, the first part, please.

20   Q.   Sure.  How does somebody like that typically get out of

21   jail?

22   A.   The release of a prisoner from prison, there are two

23   possibilities for that.  One, and this is in the majority of

24   cases, when his sentence is up according to what the court

25   ruled.  A minority of cases involving release of prisoners

1    relates to prisoners who were released in the context of

2    agreements between Israel and the Palestinian Authority.

3    Q.  The second category, could you explain a little bit more

4    about that.

5    A.  Yes, of course.  I am familiar with the subject because I

6    participated in staff work regarding this matter.  There are

7    situations over the years when the two sides agree, for

8    example, in order to advance or promote negotiations between

9    them, that Israel will perform a gesture and will release, with

10   the agreement and authorization of Israel's ISA, that is, the

11   Israel Security Agency, the prisoners will be released before

12   the date when their sentence would have been up.  They would be

13   released.

14   Q.  Let me ask you about a couple of the individuals that we

15   have spoken about already.  The first is Nasser Aweis.  Has

16   Nasser Aweis been released from prison in any of these

17   exchanges?

18   A.  Nasser Aweis was not released.  Can I give you my

19   assessment of what will happen in the future, to add my

20   assessment?

21           MR. ROCHON:  Not responsive, your Honor.

22           THE COURT:  Do you object?

23           MR. ROCHON:  Yes, I object.

24           THE COURT:  Objection sustained.  Why don't you pose a

25   question.

1  Q.  Why don't you give us your assessment of what is likely to

2  happen with Nasser Aweis based on your experience and knowledge

3  of him and his crimes.

4         MR. ROCHON:  Objection, your Honor.

5         THE COURT:  Sustained.  Don't answer that question.

6  Q.  What is your understanding of Nasser Aweis's sentence in

7  terms of how long, not how many but how long, he is expected to

8  be in jail?

9  A.  According to Nasser Aweis's sentencing, he is supposed to

10 remain in jail until the day he dies.

11 Q.  I want to ask you about another individual we have spoken

12 about in connection with this case, Abdel Kareem Aweis.  Has

13 Abdel Kareem Aweis been released in one of these exchanges?

14 A.  Abdel Kareem Aweis has not been released.

15 Q.  How long has he been sentenced to remain in jail?

16 A.  He also received a number of life sentences.  He is

17 supposed to remain in jail until his dying day.

18 Q.  Let me ask you about another individual that we have heard

19 about in the last few days.  His name is Ahmed Barghouti.  Has

20 Ahmed Barghouti been released in one of these exchanges?

21 A.  The answer is no.

22 Q.  How many years is he expected to remain in jail?

23 A.  Until his dying day.

24 Q.  Let me ask you about one more, Majed al-Masri.  How long is

25 he expected to remain in jail?

 1  A.  I believe that he, too, is until his dying day.

 2  Q.  Has Majed al-Masri been released from jail?

 3  A.  No.  I'd like to add --

 4          MR. ROCHON:  Objection.  I'm sorry, your Honor.  When

 5  the witness just starts adding to the answer to the question,

 6  we would object.

 7          THE COURT:  Objection sustained.  Why don't you pose a

 8  question.

 9  Q.  Could you please elaborate on that.

10  A.  Anyone who is released from prison, his name is published

11  by the Israel prison authority.  I, for example, in order to

12  prepare myself for this trial, reviewed the entire list of

13  1,027 prisoners, Palestinian prisoners, who had been released

14  within the framework of the Shalit deal, and as a result it's

15  always possible to know who was released and who was not.

16  Q.  Can you explain to the jury what assessment is made with

17  regard to a struggle-against-the-occupation prisoner before the

18  Israeli authorities to turn him over in one of these exchanges.

19          MR. ROCHON:  Objection.  I wanted the interpreter to

20  finish first so I didn't interrupt her.  It goes outside the

21  scope of --

22          THE COURT:  Overruled.

23          MR. YALOWITZ:  Your Honor, could we have --

24          THE COURT:  Overruled.  Go forward.

25  Q.  Do you need the question again, Mr. Eviatar?

1    A.  No.  There are a number of considerations that the Israeli

2    defense establishment takes into account prior to the release

3    of every prisoner of this type.  I can tell you with certainty

4    and emphasize to the members of the jury that the names of

5    those prisoners who are slated for release, their names are

6    examined very strictly by the highest echelons of government in

7    Israel.  The personal case file of each prisoner is carefully

8    examined:  The level of danger that he poses, his motivation to

9    continue in the perpetration of acts of terror.  And I have to

10    say that that, too, is no insurance.

11    Q.  Once an individual has been released in one of these

12    exchanges, what does the Palestinian Authority do for them?

13    A.  I'd like to go into detail, with your permission, Mr.

14    Yalowitz.

15    Q.  Sure.  Would it be helpful for you to have the law in front

16    of you?

17    A.  Yes, I will make use of that.

18    Q.  It is Exhibit 512.

19    A.  Before I open up the exhibit, I'd like to speak about my

20    personal knowledge, which of course was made public in the

21    Palestinian media, and it does not appear in the statute.

22    Those 1,027 Palestinian prisoners that I spoke of before who

23    were released within the framework of the Shalit deal received

24    from the Palestinian president, each and every one of them,

25    subsequent to his release received a grant of $5,000.  That

 1   appears in my report, you will get or receive as a prisoner

 2   that $5,000 regardless of whether you were released to your

 3   home in the West Bank or whether you are traveling to Turkey.

 4   It doesn't matter what your destination is, you will receive

 5   that grant from the Palestinian president.

 6           Now, Mr. Yalowitz, I have the exhibit here before me

 7   and we can talk about that.

 8   Q.  Before you go to the terms of the law, I want to ask you

 9   one thing.  To get that grant from the president of the

10   Palestinian Authority, do these prisoners have to perform any

11   service at all other than sitting in jail for one of those

12   struggle-against-the-occupation crimes?

13   A.  They do not have to do a single thing.

14   Q.  Thank you.  You were going to take us to the law.

15   A.  I have the law here before me.  I'm just looking here for

16   the relevant part that pertains to released prisoners.

17   Q.  May I direct you to article 6, about six pages in.

18   A.  I have article 6 before me.

19   Q.  What kinds of things does the law give to these released

20   prisoners?

21   A.  Just a moment, please.

22   Q.  Actually, why don't we take you first to article 3.  That

23   might be the easiest way into this.  I'll highlight the

24   beginning of paragraph A for you.

25           MR. YALOWITZ:  May I read it, your Honor?

1          THE COURT:  Yes.

2   Q.  "Every released prisoner has the right to guaranteed

3   employment in one of the authority's ministries or agencies if

4   he meets the following conditions:

5          "1.  Having spent a period of five years or more in

6   prison because of his resistance to the occupation, without

7   exception, whether in one period or over several periods."

8          Let's start there.

9   A.  I have the article before me.

10  Q.  If somebody is put in jail because they were involved in,

11  say, drug dealing, do they get guaranteed employment?

12  A.  No.

13  Q.  How about somebody who is arrested and questioned and held

14  and then released because it turns out they didn't do anything

15  wrong, do they get guarantee employment upon their release?

16  A.  No.

17  Q.  How about somebody who does some kind of a protest and

18  winds up with a sentence of one year, do they get guaranteed

19  employment because they served one year in prison on their

20  release?

21  A.  He would not receive it.

22  Q.  Is there a means test for this guaranteed employment?

23  A.  I understood the question.  There is no test of means or

24  economic ability.  Even if your family has a successful

25  economic enterprise, a gorgeous house, and extensive

1  opportunities for employment, you can rely on this and receive

2  what the Palestinian Authority promises you.

3  Q.  Does this law have a scale for deciding how much the

4  released struggle-against-the-occupation prisoner gets paid

5  during those five years?

6       MR. YALOWITZ:  I'm sorry, your Honor.  I think I may

7  have asked the question wrong.  Let me withdraw the question

8  and ask it again.

9  Q.  Does the law have a scale for how much immediate financial

10 assistance the newly released prisoners receive?

11 A.  Yes, there is a specification of payments that the released

12 prisoner receives.  I see it here in the text in Arabic and I

13 see it here in the English language version in section G.

14 Q.  This looks like it's probably on page 8.  Let's see if we

15 can get it on the screen.  Indeed, we have it.  What are we

16 looking at with this scale?

17 A.  We see here itemization of the amounts of money that each

18 released prisoner will receive pursuant and directly related to

19 the number of years that he sat in prison.  The more years you

20 sat, the higher the amount of money that you will receive upon

21 your release.

22       I would like to note, please, in order to illustrate

23 to the members of the jury the monetary value of those amounts,

24 the average salary in the areas of the Palestinian Authority is

25 approximately 2,000 or 2500 shekels per month.  If we divide it

1  by 4, that is the amount in U.S. dollars.  In other words, an
2  amount of $10,000 that a released prisoner receives is a very,
3  very significant amount of money.
4  Q.  In addition to what you have just described, is there
5  anything in the law about giving prisoners or released
6  prisoners civilian titles or military rank based on the number
7  of years in prison?
8  A.  Yes.  While you are a prisoner, you don't lose any of your
9  tenure or seniority as an employee of the Palestinian
10 Authority.  For example, you can go into jail with the rank of
11 captain and to be released from prison with the rank of
12 brigadier general.  If you are a clerk or an official in the
13 civilian apparatus, you come in at a certain rank or a certain
14 pay grade, and when you are released however many years later,
15 your pay grade, your civilian pay grade, is much, much higher.
16 Q.  In order to earn these promotions in grade, does the
17 prisoner have to do anything other than commit a struggle-
18 against-the-occupation crime and then sit in jail?
19 A.  That is precisely what he needs to do.
20 Q.  If an employee, say a police officer, commits a non-
21 struggle-against-the-occupation crime, like drug dealing, do
22 they get these automatic promotions in grade while they sit in
23 jail?
24 A.  No, because he does not meet the basic and binding
25 definition of this law, which is the struggle against Israel.

1   Q.   Thank you for taking us through that portion of the law.  I

2   would now like to turn to whether the ministry of prisoners

3   provides additional services to these struggle-against-the-

4   occupation convicts.  Have you had an opportunity to consider

5   that question in preparation for your testimony here today?

6            MR. ROCHON:  Objection.

7            THE COURT:  Overruled.

8   A.   Yes, for sure.

9   Q.   We have gone over monthly salaries.  What are some of the

10  other benefits provided by this ministry of prisoners to the

11  struggle-against-the-occupation convicts?

12  A.   The ministry of prisoners provides free tuition.  The

13  ministry of prisoners provides free health insurance.  The

14  ministry of prisoners provides assistance to the families in

15  various areas of life.  This can be seen in the law.  And the

16  full implication of this is that the prisoner can sit in jail

17  calm.  He doesn't need to worry about his family's livelihood

18  or his own livelihood.  These needs are all paid for by the

19  Palestinian Authority and with a very broad hand.

20  Q.   Is one of the benefits provided by this ministry of

21  prisoners under this program free legal representation?

22  A.   Yes.  I didn't mention this earlier.  The attorneys that

23  represent the prisoners, the prisoners don't need to pay their

24  fees.  They receive ongoing, continuous legal representation at

25  the expense of the Palestinian Authority.

1    Q.   The benefits that this ministry of prisoners provides to

2    these struggle-against-the-occupation convicts, does that

3    include money to buy items in a canteen in the prison?

4    A.   Yes.  Each prisoner also receives money to buy in the

5    canteen.  I can explain how that works.

6    Q.   Please do.

7    A.   Just for the sake of example, if there are, say, 1,000

8    prisoners who meet this definition and they are in jail, and if

9    we assume that the amount given to each prisoner is 300 shekels

10   for canteen expenses -- "canteen" refers to candy, cigarettes,

11   things of that nature -- the Palestinian Authority calculates

12   the overall sum.  It is transferred to the prisons, usually to

13   the dominant prisoner, the leader.  This amount is registered

14   in the canteen.  Then the prisoners can, on the authority of

15   that high-ranking prisoner, that dominant prisoner, buy what

16   they want from the canteen.  That's how it works.

17   Q.   Thank you.  Let me ask you about one more item.  Suppose

18   that the prisoner is given a fine.  Does the ministry of

19   prisoners and ex-prisoners do anything about that?

20   A.   Yes, the ministry pays the fine.

21   Q.   The ministry pays the fine?

22   A.   I mean, of course, the Palestinian Authority.

23   Q.   During the course of your years dealing with the

24   Palestinian arena, did you form an opinion on the incentives

25   that these policies created?

1    A.   Undoubtedly, this entire --

2              MR. ROCHON:  I'm sorry.  Objection, your Honor.

3              THE COURT:  No, I'll allow him to answer.  You can

4    cross-examine him.

5    A.   This entire substantial economic package, which is

6    significant for every Palestinian citizen, represents a

7    positive incentive that multiplies his motivation.  He doesn't

8    have to worry about any economic affairs.  Not only that, these

9    economic incentives prod and assist the prisoner to go ahead

10   and carry out those things that he wants to do.  I am referring

11   to terror attacks and terror incidents of this type.

12              (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.  During the course of your work and in preparation for your

2    testimony, have you come to reach an understanding of the

3    Martyrs' Foundation?

4    A.  Yes, I have, for sure.

5    Q.  Could you just describe for the jury the bases of

6    information that you have about the Martyrs' Foundation.

7    A.  The full name of this foundation is the Foundation for the

8    Welfare of the Families of the Shahid, the martyrs and the

9    wounded.  This foundation was established by the PLO and moved

10   over to the responsibility of the Palestinian Authority, went

11   back to the PLO, that is its organizational development.  The

12   foundation determines, based on documents that it has, payments

13   to the families of martyrs, of shahids who have been killed.

14   Q.  Let me back up a little bit and ask you how you know about

15   this foundation.  How do you know about it?

16   A.  First of all, the foundation publishes on websites, public

17   websites, a thick document in which it reviews the activities

18   of the foundation, and further details about the background and

19   the activities that it carries out.  I can give you additional

20   examples.

21   Q.  Sure.  I think that would be helpful just to understand the

22   basis for your understanding of the Martyrs' Foundation.

23   A.  This is not a secret foundation.  Its activities appear on

24   public websites, on news websites.  The director of the

25   foundation, who was a minister in the Palestinian Authority, is

1   interviewed on television programs, television programs of the

2   Palestinian Authority as well.  She talks about the activities

3   of the foundation.

4   Q.  Is she the one named Um Jihad?

5   A.  This is the same Um Jihad.

6   Q.  That's because she named her first child Jihad?

7   A.  Exactly.

8   Q.  Okay.

9   A.  Her husband was known as Abu Jihad.

10  Q.  What does that mean, Abu Jihad?

11  A.  The father of Jihad.

12          By the way, he was one of the leaders of the PLO, he

13  established together with Arafat the PLO and Fatah, and was

14  responsible for some of the most horrific terror attacks in the

15  1970s and 1980s.

16  Q.  All right.  Let me come back to the Martyrs' Foundation.

17          MR. ROCHON:  I'm sorry.  Judge, will you be taking a

18  morning recess at all?

19          THE COURT:  Yes, we can do it now.  I was going to do

20  it in a couple minutes.  Is this a convenient place?

21          MR. YALOWITZ:  Whatever the Court wishes.

22          THE COURT:  Let me give the jury a break until 11:45.

23  Take a 10-minute break.

24          MR. ROCHON:  I appreciate it.

25          (Jury excused)

395

1                    THE COURT:  We'll take 10 minutes.

2                    MR. ROCHON:  Thank you, your Honor.

3                    (Recess)

4                    (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              MR. YALOWITZ:  Your Honor, one of the interpreters

 2   needs to leave about 2:30.

 3              THE INTERPRETER:  Two.

 4              MR. YALOWITZ:  So I'm really happy to keep going as

 5   long as the Court wants.  You just may want to calibrate doing

 6   a little later lunch break, but it is up to you.  I won't

 7   suggest.

 8              THE COURT:  It is not up to me.  It depends how long

 9   you --

10              MR. YALOWITZ:  This witness will be here for the

11   balance of the day and at least through Tuesday.

12              THE COURT:  Okay.  So I need someone to interpret his

13   testimony for the balance of the day.

14              MR. YALOWITZ:  We've got two.  It is Ms. Ne'eman will

15   have to work alone after 2:30.  So the issue is I think, for

16   them, they'd like -- I don't know what they want.

17              THE COURT:  If you want to go with this witness to

18   like 1 o'clock, a little bit after 1 o'clock and come back at

19   2:15, 2:20 something like that, I'll consider doing that, and

20   maybe we can end early somewhere around 4 o'clock so Mr. Rochon

21   can jump on the train.  But I want to be more efficient about

22   this.

23              Quite frankly, I think you're getting a little

24   repetitive about the payments.  A lot of this we went over

25   yesterday.
```

1              MR. YALOWITZ:  I'm done with the payments.

2              THE COURT:  I think the jury gets it.

3              MR. YALOWITZ:  I'm done with the payments.  If you

4      think the jury gets it, that gives me some comfort.

5              MR. ROCHON:  I have a couple things, Judge.

6              THE COURT:  Please be seated.

7              MR. ROCHON:  Thank you, your Honor.  I'll stay

8      standing because I'm speaking.

9              Mr. Yalowitz seems to really like the fact that this

10     woman's name is Um Jihad.  He's now gotten into evidence about

11     her twice, and we had to find out her husband is Abu Jihad.

12     That is not a surprise, because he is married to the mother.

13     That's just to get the name "jihad" in front of the jury as

14     many times as we can.  There is no place for that.  That's why

15     that happened.

16             And, Judge, I can't object every time these things

17     happen.  Because -- I've got to ask the Court for some

18     assistance.

19             THE COURT:  What would you like me to do?

20             MR. ROCHON:  Well, I had objected yesterday.

21             THE COURT:  Tell me what you want me to do

22     prospectively.  I can't do anything about yesterday.

23             MR. ROCHON:  When there is pejorative stuff coming

24     in -- I'll give you another example.

25             THE COURT:  You've got to tell me what you want me to

1  do.

2          MR. ROCHON:  This is what I want you to do.  Direct

3  the witness to answer the question.

4          Two examples.  The first question of the day today is

5  when was the prisoners law passed.  Five minutes later, the

6  witness finished his answer and described his entire theory

7  about the prisoner law, including it incited terrorism.  The

8  question was when was it passed.  I can't formulate objections

9  if the answers aren't responsive.

10          THE COURT:  You can.  You can say "I object.  Answer

11  not responsive."

12          MR. ROCHON:  I did.  You overruled me.

13          THE COURT:  Then I overruled it.  That's not an issue

14  I can help you with.  I think he was in the middle of an answer

15  and I don't think his answer was not responsive.

16          MR. ROCHON:  If the question is "when was it passed,"

17  it is very hard to see anything other than a month or a day or

18  decade is responsive.

19          THE COURT:  It may be difficult for you, but the

20  problem from my perspective is they have the right to ask him

21  those questions anyway.

22          MR. ROCHON:  It is a good question.

23          THE COURT:  Every time you say it is non-responsive,

24  I'm not going to stop, turn to Mr. Yalowitz, and tell him to

25  ask it again and have the witness give the same answer.

1           MR. ROCHON:  I'm telling you to tell the witness to be

2    responsive.  The question "when was the law passed" is a great

3    question.

4           THE COURT:  If you want to demonstrate to the jury

5    that he's giving non-responsive answers or you want to

6    cross-examine his evasive answers, then you should do that and

7    you should demonstrate that.  And I'm sure it will be just as

8    obvious to them as it is to you or I.

9           I don't tell witnesses how to answer questions.  I

10   think it is the jury's evaluation about how they answer

11   questions.  So the jury will make their own determination of

12   whether or not they thought that that was relevant, useful

13   information with regard to the question, or that this witness

14   is just on board with the team and is just trying to say

15   whatever he wants to say in order to get paid or in order for

16   that side to win.  You know how to make those arguments.

17          MR. ROCHON:  I do.

18          THE COURT:  I give the parties a little bit more

19   leeway when it is simply an argument as to form, when I know

20   the substance of the information is going to come in any way,

21   and simply delaying the case, and this information is not going

22   to be kept out.

23          MR. ROCHON:  That takes me to my second point.

24          MR. YALOWITZ:  Your Honor --

25          THE COURT:  No, Mr. Yalowitz.  Wait.  Wait.

```
1              MR. ROCHON:  The second point is sometimes information
2   isn't going to come out.  When he's talking about the Martyrs'
3   Society, and by the way her husband is one of the worst
4   terrorists in the '70s.  That is just gratuitous and wouldn't
5   have come in because it is a non-responsive answer.  If you
6   don't instruct the witness, I can't -- I don't know what he's
7   going to say next.  And I don't understand Hebrew, so I don't
8   know even after he says it in Hebrew what he is going to say
9   next.
10             THE COURT:  I understand that.  I was ready to address
11  that, but you didn't object to it.
12             MR. ROCHON:  The only way to address it is to tell him
13  to cut it out.
14             THE COURT:  I don't know what he's going to say next.
15             MR. ROCHON:  If you tell him to be responsive and not
16  embellish answers, it won't happen.  Once the thing is in the
17  jury box and I object, you say, what, jurors, disregard the
18  fact that her husband is one of the worst terrorists?  You and
19  I both know that doesn't do anything.
20             THE COURT:  Sir, will you be responsive to the
21  questions?
22             THE WITNESS:  Yes, your Honor.
23             THE COURT:  I don't know what else you want me to do.
24  I doubt that will solve your problem.  If you have an
25  objection, you make it.  If you have an objection to the
```

1    question, you make it.  If you believe that you have an

2    objection to the answer, it is just like he was speaking in

3    English.  Once he answers and then you decide that's not

4    something you wanted to hear, I can't undo it.  Okay.

5            MR. ROCHON:  I agree.  I agree you can't undo it.

6    Thank you, your Honor.

7            THE COURT:  Mr. Yalowitz, is there something you

8    wanted to say?

9            MR. YALOWITZ:  I wanted to say the jury is waiting,

10   and I think these are the kinds of matters we can take up when

11   the jury is not waiting.

12           THE COURT:  Most of these matters are.  Let's bring

13   the jury in and let's continue.

14               (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

```
 1                    (Jury present)

 2                    THE COURT:  Mr. Yalowitz, let's continue.

 3                    MR. YALOWITZ:  Thank you, your Honor.

 4      BY MR. YALOWITZ:

 5      Q.  Mr. Eviatar, before the break, I asked you a question that

 6      you said you wanted to check up on by looking at your report.

 7      Have you had an opportunity to review your report during the

 8      break?

 9      A.  Yes.

10      Q.  I think the question I was asking was something like how

11      much money per month does the PA spend on prisoner salaries for

12      struggle against the occupation crimes?

13      A.  Yes, I said that I would check that and I did so.  The

14      amount per month that the Palestinian Authority paid, at least

15      as of May 2011, was more than 17 million shekels per month to

16      the prisoners.

17                    I can estimate that today, in January 2015, the amount

18      is higher.

19                    MR. YALOWITZ:  Your Honor, may I have the Court's

20      permission to write that figure on my white board?

21                    THE COURT:  Yes.

22      Q.  Mr. Eviatar, earlier you said that you had a rough exchange

23      rate calculation that would convert the shekels to dollars.

24      Would you remind us what that is?

25      A.  The rate is approximately four shekels per U.S. dollar.
```

1   Q.   So just doing the math, that would be $4.25 million every

2   single month?

3   A.   That was approximately four years ago.

4   Q.   Thank you.  Let's go back to the Martyrs' Foundation.   In

5   addition to the public information you described, have you had

6   the opportunity to review actual martyr files?

7   A.   Yes.

8   Q.   Based on the information you've seen, do you have an

9   opinion as to whether the Martyr Foundation is administered in

10  a professional and bureaucratic manner?

11  A.   Absolutely.  It is very organized, very orderly.

12  Q.   Is there any need-based element in its decisions?

13  A.   Not at all.

14  Q.   Do you have an opinion as to whether martyr payments are

15  social welfare payments?

16  A.   They do not constitute social welfare payments.

17  Q.   What is the basis for your professional opinion on that?

18  A.   The foundation determined in the official document that it

19  published, as well as in the personal files of the martyrs that

20  I've seen, that a person who receives funds on its behalf is

21  every family of a shahid, of a martyr.  I remind you that

22  "shahid" is a person who was killed within the framework of the

23  struggle against Israel.  And as a result of that, his family

24  receives the money from the foundation.

25  Q.   Do the rules of the foundation exclude somebody who dies as

 1    a suicide terrorist, killing innocent civilians?

 2    A.  No.  He's also included in those criteria.

 3    Q.  Thank you.  Now, I'd like to turn from the Martyrs'

 4    Foundation to some of the Palestinian Authority's own security

 5    structure.

 6          So, first I'd like to show you a photograph and ask if

 7    you know who it is.

 8          Bear with me one moment, because I don't want to put

 9    it in front of the jury until you've had a chance to look at

10    it.  I think I've got my technology in place now.

11          Let's see if we can take a look at this individual and

12    see if you know who he is.

13    A.  This man's name is Fuad Shubaki.

14    Q.  How do you know him?

15    A.  First of all --

16    Q.  Bear with me.

17          MR. YALOWITZ:  Your Honor, plaintiffs offer the

18    photograph in evidence.

19          THE COURT:  It will be admitted into evidence.

20          MR. YALOWITZ:  We've marked it for identification

21    as --

22          MR. ROCHON:  I just wanted a number.

23          MR. YALOWITZ:  Sure.  We're working on it.

24          MR. ROCHON:  Around 1153?

25          MR. YALOWITZ:  He's the last one in our stack, your

1    Honor.  1187.

2                THE COURT:  It will be admitted as Plaintiffs' Exhibit

3    1187.

4                (Plaintiff's Exhibit 1187 received in evidence)

5    Q.  All right.  You said he's Fuad Shubaki.

6    A.  Yes.

7    Q.  How do you know who he is?

8    A.  That's his picture when he was a younger man.  But in any

9    event, I know Fuad Shubaki.  First of all, because my office in

10   the governorate of Jericho was three or four kilometers away

11   from the stretcher that belonged to the Palestinian Authority.

12   It's a detention prison where Fuad Shubaki was detained after

13   an agreement between the Palestinian Authority and Israel, the

14   Americans and the British.  He was detained there because he's

15   responsible for several terror incidents.  Personally involved

16   in those acts of terror.

17               MR. ROCHON:  Objection, your Honor.  May we approach

18   on this?

19               THE COURT:  Come on up.

20               (Continued on next page)

21

22

23

24

25

 1              (At the sidebar)

 2              MR. ROCHON:  You've got his conviction, and he wasn't

 3      convicted of any acts of terror.

 4              THE COURT:  You can cross-examine him on that and

 5      prove him wrong.

 6              MR. ROCHON:  This is a PA person.  This is not a

 7      non-PA person.  This a senior PA person that they've now put in

 8      evidence.

 9              THE COURT:  What is the nature of your objection?

10              MR. ROCHON:  It is inadmissible.

11              THE COURT:  I thought you said they had his

12      convictions that were coming in.

13              MR. ROCHON:  And they are not for acts of terror.

14              THE COURT:  Okay.

15              MR. ROCHON:  And this witness just said he was locked

16      up for many acts of terror.

17              THE COURT:  So he's wrong.

18              MR. ROCHON:  He is wrong.

19              MR. YALOWITZ:  That's good for you.

20              THE COURT:  Stop.

21              MR. ROCHON:  But counsel has elicited he wishes to put

22      into evidence that it is the case, even though he wasn't

23      convicted of them.

24              THE COURT:  He asked him if he was convicted.  He said

25      he was.

```
 1              MR. ROCHON:  He did not say he was convicted.  He said
 2    he was involved in.
 3              THE COURT:  Okay.
 4              MR. ROCHON:  He was not in fact convicted.  Counsel's
 5    putting in what amounts to I guess a form of other crimes
 6    evidence or something that was never disclosed.
 7              THE COURT:  Where are we going with this?
 8              MR. YALOWITZ:  I actually just wanted to know who he
 9    was.  The witness --
10              THE COURT:  Don't give me that argument.  That is a
11    disingenuous argument.  You know exactly who he is.
12              MR. YALOWITZ:  I know who he is.
13              THE COURT:  Tell me what you're trying to do.  What do
14    you want the jury to imply from this?
15              MR. YALOWITZ:  I actually don't know why he's talking
16    about this particular --
17              THE COURT:  Because you put it up, and you asked him
18    about it.  What do you want him to say?
19              MR. YALOWITZ:  I want him to say this is Fuad Shubaki
20    and this was his relationship with Yasser Arafat.
21              THE COURT:  What was the relationship that you are
22    trying to get?
23              MR. YALOWITZ:  He was the chief financial officer for
24    military affairs for Yasser Arafat.
25              MR. ROCHON:  Counsel --
```

1              THE COURT:  I'll instruct the jury to disregard the

2    last question and answer.

3              MR. YALOWITZ:  I have no objection.

4              THE COURT:  You ask him that.

5              MR. YALOWITZ:  I have no objection.

6              THE COURT:  Focus his attention.  Do something for me

7    so we don't have to come up here.

8              MR. YALOWITZ:  All right.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    (In open court)
 2              THE COURT:  The objection is sustained.  Ladies and
 3    gentlemen, you are instructed to disregard the last question
 4    and answer.
 5              Mr. Yalowitz.
 6              MR. YALOWITZ:  Thanks.
 7    Q.  What was Fuad Shubaki's position in the Palestinian
 8    Authority?
 9    A.  He was in charge of the money administration, financial
10    administration of the Palestinian security apparatuses.
11    Q.  Who was his direct boss?
12    A.  Fuad Shubaki was Yasser Arafat's personal money man.
13    Q.  How long did Fuad Shubaki and Yasser Arafat have a personal
14    and professional relationship?
15    A.  Dozens of years.
16    Q.  Was Fuad Shubaki also a Fatah member?
17    A.  Yes.
18    Q.  Was Fuad Shubaki convicted of crimes by the State of
19    Israel?
20    A.  Yes.
21    Q.  Have you had the opportunity to review that conviction?
22    A.  Yes.
23    Q.  Would you please turn to Exhibit 889 in your binder.
24    A.  I have the exhibit before me.
25    Q.  What is it?
```

```
 1              MR. ROCHON:  May I have the Court's indulgence,
 2    sidebar with counsel.
 3              THE COURT:  Yes.
 4              (Pause)
 5              MR. YALOWITZ:  You know, your Honor, Mr. Rochon
 6    reminds me that we may need to discuss something later, so I'm
 7    going to move to a different topic.
 8              THE COURT:  Okay.
 9              MR. YALOWITZ:  Let me press ahead.
10              THE COURT:  Sure.
11    Q.  Let's go to Exhibit 15 in your binder.  Let me know when
12    you've had a chance to glance at it.
13    A.  Mr. Yalowitz, I'm just checking the Arabic and the English.
14    Q.  Thank you.  Have you had a chance to look at Exhibit 15?
15    A.  Yes, yes.
16    Q.  Can you identify it briefly for the Court.
17    A.  Just a moment, please.
18              These documents include a specification of the
19    transfers, salaries, on behalf of the Palestinian Authority
20    paid to Fuad Shubaki in the year 2000, and 2001, and 2002, and
21    so forth.
22              MR. YALOWITZ:  Your Honor, plaintiffs offer Exhibit 15
23    in evidence.
24              MR. ROCHON:  Subject to previous.
25              THE COURT:  It will be admitted into evidence.
```

1              (Plaintiff's Exhibit 15 received in evidence)

2   Q.  Let's take a look at the first page.  First of all, can you

3   just remind us what that eagle emblem is there at the top.

4   A.  This is the national emblem of the Palestinian Authority.

5   Q.  Let's just highlight Fuad Shubaki's name there.  So, is

6   this Mr. Shubaki's actual personnel records?

7   A.  Exactly.

8   Q.  Can you tell the jury what rank Fuad Shubaki had as of 2000

9   from this document?

10  A.  I am just checking.  I just wanted to check the translation

11  from Arabic.  He was a -- he was a brigadier general.

12  Q.  I want you to take a minute and just page through these

13  payroll records and tell me was there ever a month during 2000,

14  or 2001, or 2002, or 2003, or 2004, in which Fuad Shubaki was

15  not paid his salary?

16  A.  Between the months of January 2000 to December 2004, his

17  salary is recorded here for every single month.

18  Q.  Now, could you just remind us when the Palestinian National

19  Authority was created?

20  A.  Late 1994.

21  Q.  I just want to take a look at the final page of this

22  personnel file.  And look at the very top where it says his

23  date of recruitment.  We might even enlarge that for the jury.

24              What does it say for his date of recruitment?

25  A.  His date of recruitment as it appears here is January 1st,

1    1967.

2    Q.  How could it be that he was recruited to the PA in 1967?

3    A.  It really doesn't quite make sense.

4    Q.  What are they referring to when they say State of Palestine

5    General Security?

6    A.  State of Palestine, that is the Palestinian Authority.

7    Although it is not a state, the general security, that is the

8    entity that is responsible for all the security apparatuses.

9    Q.  I'm sorry.  Could I just ask you, when they're saying State

10   of Palestine General Security, is that the PLO or the PA or

11   something else?

12   A.  The reference here is to the Palestinian Authority.

13   Q.  So the Palestinian Authority is giving him like service

14   credit for his years in the PLO?

15           MR. ROCHON:  Objection.  Leading.

16           THE COURT:  Sustained.

17   Q.  Can you explain whether you can make heads or tails of this

18   1967 date.

19   A.  My conclusion from these data, is that the Palestinian

20   Authority in essence recruited Fuad Shubaki into its ranks.

21   But there was no Palestinian Authority in 1967, so the only

22   entity that Fuad Shubaki could have been recruited into at that

23   particular time is apparently the Palestine Liberation

24   Organization.

25           (Continued on next page)

1  Q.  Was Fuad Shubaki convicted of a crime?

2  A.  Yes.

3  Q.  Have you had the opportunity to review the verdict that

4  represents his conviction?

5  A.  Yes, I have reviewed it.

6  Q.  Would you please turn to Exhibit 889.

7  A.  I have it before me.

8  Q.  What is that?

9  A.  This document is the verdict of Fuad Shubaki from the year

10  2009.

11          MR. YALOWITZ:  Your Honor, plaintiffs move Exhibit 889

12  into evidence.

13          MR. ROCHON:  That was the one that we needed to

14  discuss.

15          THE COURT:  Have you resolved whatever you needed to

16  discuss?

17          MR. ROCHON:  No.  I'm afraid we are tied.  We need

18  someone to resolve the tie.

19          THE COURT:  That is usually me.

20          MR. ROCHON:  Yes, sir.  You are the tie-breaker, your

21  Honor.

22          MR. YALOWITZ:  Shall we speak, your Honor?

23          THE COURT:  Can we go into some other areas?

24          MR. ROCHON:  Your Honor, I'm not objecting if he wants

25  to name the convictions and go through them.  It is just how

1   much of the document itself comes in, that's all.

2           THE COURT:  Why don't we do this at this point.  You

3   have asked him about what he was convicted of.  I assume that

4   you have no objection to his indicating from his review of the

5   document those offenses that he was convicted of.

6           MR. ROCHON:  Exactly.  No objection to that.

7           THE COURT:  Let's start with that.  If we need to put

8   in the document itself or get more information on the document,

9   then we can see.

10  BY MR. YALOWITZ:

11  Q.  Do you have Exhibit 889 before you?

12  A.  Yes, I do.

13  Q.  Was Fuad Shubaki convicted of trading in war material?

14  A.  Yes, he was.

15  Q.  Was Fuad Shubaki convicted of performing a service for a

16  prohibited organization?

17  A.  Yes.

18  Q.  What was that organization?

19  A.  The Al Aqsa Martyrs Brigade.

20  Q.  Was Fuad Shubaki convicted for trading in war material?

21  A.  Yes.

22  Q.  Was Fuad Shubaki convicted for contact with a hostile

23  organization?

24  A.  Yes.

25          MR. YALOWITZ:  May I consult with counsel for a

815

```
 1    moment, your Honor?

 2              THE COURT:  Yes.

 3    Q.  He was convicted on all of those counts?

 4    A.  Yes.

 5    Q.  Sitting here today, is Fuad Shubaki still an employee of

 6    the Palestinian Authority?

 7    A.  Fuad Shubaki is sitting in an Israeli prison.

 8    Q.  Is he still on the payroll?

 9    A.  Yes.

10    Q.  Thank you.  I may come back to his conviction, but we will

11    move forward for now.  I next want to show you another

12    photograph.  We will have to go back to our high-tech system.

13    This will be Plaintiffs' 1188 for identification.  Who is that

14    man?

15    A.  This man's name is Tawfiq Tirawi.

16              MR. YALOWITZ:  Your Honor, plaintiffs offer 1188 into

17    evidence.

18              MR. ROCHON:  No objection.

19              THE COURT:  It will be admitted.

20              (Plaintiff's Exhibit 1188 received in evidence)

21    Q.  During the years 2000 to 2002, what was Tawfiq Tirawi doing

22    for a living?  What was his job?

23    A.  He was the head of the general security services apparatus

24    on the West Bank.

25    Q.  General intelligence service?
```

```
 1   A.  I'm sorry, yes.

 2           THE INTERPRETER:  That's my mistake.

 3   A.  General intelligence services in the West Bank.

 4   Q.  Would you please turn to Exhibit 6.

 5   A.  OK.

 6   Q.  Have you had an opportunity to review Plaintiffs' Exhibit 6

 7   for identification?

 8   A.  Yes.

 9   Q.  What is it, very briefly?

10   A.  This is Tawfiq Tirawi's personnel file in the Palestinian

11   Authority.

12           MR. YALOWITZ:  Plaintiffs offer Plaintiff's Exhibit 6

13   in evidence.

14           MR. ROCHON:  No objection subject to connection.

15           THE COURT:  It will be admitted as Plaintiffs' Exhibit

16   6.

17           (Plaintiff's Exhibit 6 received in evidence)

18   Q.  Have you had an opportunity to page through the information

19   on 2000, 2001, and 2002?

20   A.  Yes.

21   Q.  Was there ever a month during those three years in which

22   the Palestinian Authority missed a payment for Tawfiq Tirawi's

23   salary?

24   A.  There was no such month.

25   Q.  According to the Palestinian Authority's own personnel
```

1    records, what was Tawfiq Tirawi's rank?

2    A.   He was a brigadier general.

3    Q.   Is there a higher rank than that in the Palestinian

4    Authority infrastructure?

5    A.   There's one higher rank.

6    Q.   What's that?

7    A.   Major general.  In Arabic, it's Liwa.

8    Q.   Who did Tawfiq Tirawi report directly to?

9    A.   Yasser Arafat.

10   Q.   Was there anybody between Arafat and Tirawi?

11   A.   No, there wasn't.

12   Q.   Did I ask you that about Shubaki?  Was there anybody

13   between Shubaki and Arafat?

14   A.   No.

15   Q.   If Shubaki needed an order, where did it come from?

16   A.   Yasser Arafat.

17   Q.   Was there anybody else, to your knowledge, who ever gave

18   Shubaki orders during the years 2000 and 2002?

19            THE INTERPRETER:  Did you ask about Shubaki?

20            MR. YALOWITZ:  Shubaki.

21   A.   I don't know of any such thing.

22   Q.   With regard to Tirawi, can you describe his official

23   position in the PA in terms of what that general intelligence

24   service was supposed to do.

25   A.   The main roles of this service were, under Tawfiq Tirawi,

1   the prevention of terror and the prevention of any subversive

2   activity that would undermine the government.

3   Q.  Did Tawfiq Tirawi have an unofficial role?

4           MR. ROCHON:  Objection.

5           THE COURT:  I am going to sustain the objection.  I am

6   not going to allow the question.

7   Q.  What did Tawfiq Tirawi actually do as head of the general

8   intelligence service?

9           MR. ROCHON:  Objection.

10          THE COURT:  Sustained as to the form of the question.

11  Q.  Do you have information about Tawfiq Tirawi's activities

12  during the years 2000 to 2002?

13          THE COURT:  He can answer that question.

14  A.  Yes, I do.

15  Q.  What is the basis for your information?  What kinds of

16  sources do you have for information about the activities of

17  Tawfiq Tirawi?

18  A.  I have original documents in Arabic which were found as

19  material that was captured.  Tirawi's signature and/or name

20  appear on them.

21  Q.  Have you had the opportunity to review government reports

22  which discuss the activities of Tawfiq Tirawi?

23  A.  Yes, of course, a number of such documents.

24  Q.  Without getting into the specifics of any particular

25  incident, can you give the jury a general overview of the

```
 1   activities of Tawfiq Tirawi?

 2            MR. ROCHON:  Objection, your Honor.

 3            THE COURT:  Objection sustained.

 4            MR. YALOWITZ:  My don't we pause for a moment, Honor.

 5   I'm going to give the witness another binder.

 6            THE COURT:  Sure.

 7            MR. ROCHON:  Does counsel have a binder for us?

 8            THE COURT:  I assume you provided a copy to the

 9   defense.

10            MR. ROCHON:  I'm sure I have what's in it.

11            MR. YALOWITZ:  I might have an extra.  If I do, Mr.

12   Rochon is certainly welcome to it.

13            THE COURT:  Thanks.

14            MR. YALOWITZ:  Let me check with my supervisors.

15            MR. ROCHON:  Thanks so much.

16            MR. YALOWITZ:  Of course.

17            MR. ROCHON:  I'm not going to share it now that I have

18   it.

19            MR. YALOWITZ:  I wouldn't expect you would.

20   BY MR. YALOWITZ:

21   Q.  Let's take a look at 831.  Let me know when you have got

22   it.

23   A.  I have the document.

24   Q.  Is this a document that you have had the opportunity to

25   review in the past?
```

1    A.   Yes, of course.

2    Q.   What is it, generally?

3    A.   The document describes the armed Palestinian forces in the

4    area of Tulkarm.

5    Q.   Do you have an understanding of how this document was

6    obtained?

7    A.   I know it well.

8    Q.   First of all, where does this document come from?  How does

9    it appear in your possession?

10   A.   I received this document from the attorneys as well, and I

11   also saw it in the unit of the Israel defense forces that

12   disseminated this document.

13   Q.   How did the Israel defense forces come into possession of

14   this document based on your experience and knowledge?

15   A.   The IDF carried out searches in the headquarters of the

16   Palestinian security apparatuses in different cities of the

17   West Bank in the year 2002.  This document, like others, were

18   collected by the IDF.

19   Q.   Have you had an opportunity during your career to work with

20   the unit that did that kind of collection?

21   A.   I worked with this unit from the day it was established.

22   Q.   Can you describe your opinion of the professionalism and

23   integrity of that unit.

24   A.   This is a unit that belonged to the intelligence branch of

25   the IDF.  It includes professionals of the highest caliber who

1  are experts in Islam, in the Middle East, and in Arabic,

2  including Ph.Ds, and I worked in cooperation with them over the

3  years.

4  Q.  Have you had occasion to look at government reports in

5  which portions of this Exhibit 831 were published by the

6  government of Israel?

7  A.  Yes.

8  Q.  Do you have an opinion about whether the government reports

9  are accurate in their factual representations?

10           MR. ROCHON:  Objection, your Honor.

11           THE COURT:  Sustained as to the form of the question.

12           MR. YALOWITZ:  Sure.

13  Q.  What is your view about the inclusion of Exhibit 831 in one

14  of those government reports is this?

15           MR. ROCHON:  Objection, your Honor.

16           THE COURT:  Again, just as to the form, sustained.

17  Q.  Do you believe that Exhibit 831 as published is a fair and

18  accurate representation of the document as captured?

19  A.  Completely accurate and credible.

20           MR. YALOWITZ:  Your Honor, plaintiffs offer 831 in

21  evidence?

22           MR. ROCHON:  Objection:  Foundation and also subject

23  to prior.

24           THE COURT:  I am going to admit the document.

25           (Plaintiff's Exhibit 831 received in evidence)

 1   Q.   Why don't we take a look at it.  I would like to begin by

 2   focusing on the header.

 3           MR. YALOWITZ:  May I read the heading information,

 4   your Honor?

 5           THE COURT:  Yes.

 6   Q.   "Palestinian National Authority," and then off to the left,

 7   "Palestine general security, general intelligence, West Bank

 8   governates administration."

 9           Are you familiar with that unit of the Palestinian

10   Authority?

11   A.   Yes.

12   Q.   Who is in charge of that unit?

13   A.   Tawfiq Tirawi.

14   Q.   Now let's take a look at the salutation.

15           MR. YALOWITZ:  May I, your Honor, read?

16           THE COURT:  Yes.

17   Q.   "His excellency, the brother head of the general

18   intelligence/northern governates, may Allah protect him."  Is

19   that the addressee of this document?

20   A.   Yes.

21   Q.   Who is that?

22   A.   This person is Tawfiq Tirawi.

23   Q.   Now I would like to ask you if you could explain generally

24   what this document is.  Then I would like to go over it in some

25   detail with you.

1    A.  This is a document that was disseminated by the head of the

2    general intelligence service in the Tulkarm governate to his

3    commander Tawfiq Tirawi.  In the document he specifies and

4    describes the deployment of Fatah forces, the armed forces, in

5    this region.

6    Q.  Does he give a report on how many armed men of the Fatah

7    movement are in Tulkarm?

8    A.  Yes.

9    Q.  Where do we find that in the document?

10   A.  We see in the details of the document a division into

11   groups.

12   Q.  If I may direct your attention at the very beginning of the

13   document.

14            MR. YALOWITZ:  If I can read, your Honor?

15            THE COURT:  Yes.

16   Q.  "The number of armed men of the Fatwah movement in Tulkarm

17   and its refugee camp is between 15 and 20 individuals.  Most of

18   them carry M16 rifles."

19            Later in the document they talk about several groups,

20   is that what you were saying

21   A.  Yes.

22   Q.  Does the document talk about the group headed by Zaid Daas?

23   A.  The answer is yes.

24   Q.  Now I would like to direct your attention to the paragraph

25   discussing the Zaid Daas group.  I am going to read a portion

1    of a sentence and then ask you to explain it to the jury.  I'm

2    looking at the second sentence in paragraph 1.  "This group

3    carried out quality, successful activities and operations, the

4    last of which was the coordination and planning of the Hadera

5    operation."  Then the sentence continues.  Do you see that?

6    A.  Yes, I see it.

7         MR. YALOWITZ:  Ms. Machnes, maybe we could blow that

8    up or highlight it for the jury.  Actually, this will do it.

9    Q.  When they say "quality, successful activities and

10   operations," what are they talking about there?

11        MR. ROCHON:  Objection.  Speculation.

12        THE COURT:  Sustained.

13   Q.  Do you have a professional understanding of what they mean

14   by quality and successful operations?

15        MR. ROCHON:  Same objection.

16        THE COURT:  Sustained.

17   Q.  The sentence reads, "This group carried out quality,

18   successful activities and operations, the last of which was the

19   coordination and planning of the Hadera operation."  Do you

20   know what the Hadera operation was?

21   A.  Yes, I do.

22   Q.  Would you please tell the jury what the Hadera operation

23   was.

24   A.  Armed terrorists that belong to Fatah entered a wedding

25   hall in a city in Israel known as Hadera.  There was a bar

1    mitzvah or bat mitzvah celebration going on in the hall.  They

2    opened fire inside the hall.  If my recollection serves me, six

3    Israeli civilians who were in the hall were killed.

4    Q.  Based on your knowledge of the Hadera operation, do you

5    have an understanding of what the Palestinian Authority's

6    intelligence agency meant when they wrote that "This group

7    carried out quality, successful activities and operations"?

8            MR. ROCHON:  Same objection.

9            THE COURT:  Sustained.

10            MR. YALOWITZ:  Would it be convenient for the Court to

11    take a break?

12            THE COURT:  Sure.  Let's take the lunch break, ladies

13    and gentlemen.  Don't discuss the case, keep an open mind.  I

14    am going to ask you to be back in the jury room at 2:10.  Then

15    I will see how far we can go this afternoon.  I still may let

16    you go home early.

17            (Continued on next page)

18

19

20

21

22

23

24

25

1           (Jury not present)

2           MR. ROCHON:  Judge, the one thing we skipped over was

3    the redaction issue.  We brought you some additional proposed

4    redactions earlier today.  That is what Mr. Yalowitz and I were

5    having our side bar about.  I am happy to address that now or

6    after lunch.

7           THE COURT:  Let's take a couple of minutes now.  Let

8    me take a quick look at it.  Then we'll see if we need to

9    discuss it further.

10          MR. ROCHON:  I think we may have tendered it this

11   morning to the Court.

12          THE COURT:  I think I do have it.  I don't have it in

13   front of me.  I did look at it quickly.  Some of the references

14   that I said should be redacted I'm sure I must have missed

15   other places.  To the extent that I have done that and you have

16   found them, they should be properly redacted if it is the same

17   redaction in other places.

18          MR. YALOWITZ:  We did that.  There were a couple of

19   "Arafat"s that the Court may have missed because of the

20   shortness of time.  I think what Mr. Rochon is doing is he is

21   saying he is unhappy with some of the substantive rulings of

22   the Court and he wants you to reconsider those.  I don't want

23   you to reconsider them.  I'm not happy with Court's rulings,

24   but I'm not asking you to reconsider them.

25          THE COURT:  I didn't think that ruling would make

1     either side happy.

2              MR. YALOWITZ:  If we are going to start rearguing it,

3     then maybe I will reargue my side, too.

4              MR. ROCHON:  If we could have a nobody-ever-reargues,

5     we might do that as sort of a handshake deal.

6              THE COURT:  Is there anything else you want me to do?

7              MR. ROCHON:  A couple of specific ones Mr. Hill would

8     address.

9              MR. HILL:  This is a group, your Honor.  What we have

10    proposed are in pink on the copy I gave.

11             THE COURT:  I read that.

12             MR. HILL:  We are proposing you redact the reference

13    to the PA and the PLO.  Neither of them are on trial in that

14    case.  Accusations about them should not come in in this case,

15    particularly given the nature of the accusations that are made

16    here, that they were coordinating with the Iranians, which has

17    nothing to do with liability in this case but is extremely

18    prejudicial; that they were involved in buying a shipful of

19    weapons that were seized by the Israelis and we know were never

20    used for any of these courts.

21             If you are going to admit this, it could only come in

22    on the theory that it implicated Mr. Shubaki, and he was

23    convicted as an individual.  The PA and the PLO were not

24    charged with any crime, they did not appear to defend

25    themselves in that action, and their names ought to be removed

828

1    from any document that is submitted to the jury.

2         THE COURT:  I have considered that issue and I have

3    rejected that argument.  I think that this is sufficient

4    evidence, at least admissible evidence for the parties to argue

5    from, argue about whether or not certain activities that were

6    engaged in by PA employees, whether or not there is direct or

7    circumstantial evidence that certain kinds of activity was

8    engaged in during the course of their employ.

9         That is their purpose, and that is why I redacted all

10   the other names.  I think it is only relevant in order to put

11   that issue in admissible form before the jury.  The jury can

12   review that and they can decide for themselves whether or not

13   it makes it more likely or less likely that these activities,

14   these types of activities, were engaged in in the course of

15   their employment and/or, more importantly, whether other types

16   of activity, including terrorist acts themselves, were also

17   engaged in under that similar pattern and circumstances.

18        I have reviewed that, I have considered that.  I think

19   the jury can assess this without a limited purpose.  I think

20   the redactions, particularly the redactions I have done about

21   the individuals, specifically the individuals that they spoke

22   with or talked about, I think those are appropriate redactions

23   given the fact that the person is giving a recitation of their

24   ongoing activity at that time, and part of that recitation is

25   their ongoing activity about where they did things, where they

 1   were, whether or not they negotiated on behalf of the PA or the

 2   PLO.

 3        I think all those contemporaneous activities are

 4   admissible and not separate recitations of accusations or

 5   activities that were beyond or after the activities that they

 6   were engaged in.  It clearly is relevant to the matter in which

 7   that person engaged in the activities to which they pled

 8   guilty.

 9        As I said, my recollection of the document is that

10   this document is not even a document that talks about

11   committing a violent terrorist act.  There are other kinds of

12   activities.  So it does not prove that purpose.  But it is

13   relevant for the purpose of demonstrating the relationship

14   between this individual and the relationship between his

15   activities in regard to the criminal conduct that he was

16   engaged in and admitted to and his recitation about how he

17   engaged on his own behalf in that criminal conduct.

18        MR. ROCHON:  Understood, your Honor.  I am standing

19   because I was starting to sit down but also the individual

20   clips.  We have them loaded, if you would like to see them

21   either now or at 2 o'clock.

22        THE COURT:  How much time would it take me to watch

23   all of the videos?

24        MR. ROCHON:  I think the total is no more than ten

25   minutes.  They are clips.  The Arafat one is a little longer.

1    We could also talk to the other side to make sure they are

2    still offering them all and then present them to you at 2:00.

3         THE COURT:  Do you have them on the disk?  I'm not

4    sure that is the same disk.

5         MR. YALOWITZ:  I gave you a disk.  You have already

6    ruled on at least one of them, keeping it out.  That is 224.

7    219, based on some information I received this morning about

8    the timing of Dov Lon's employment, I'm withdrawing, 219.  He

9    said it like two months before he went back on the official

10   payroll.  I can't offer it as an admission.  But the remainder

11   are on the disk and they are discussed in my letter.

12        THE COURT:  In exactly the form that you want to offer

13   them?

14        MR. YALOWITZ:  Yes.

15        THE COURT:  I have the disk.  I'll look at it.  If I

16   can do it in chambers rather than the courtroom, I'll prefer to

17   do it that way.

18        MR. ROCHON:  We may want to play one or two of them

19   during the argument.  But we have them loaded up ready to go.

20        THE COURT:  I don't think playing them is necessary if

21   I can watch them and look at them further.  The only thing I

22   don't have, in your letter, Mr. Yalowitz, if you don't indicate

23   a date that this was created, then that means you are unaware

24   of the date?

25        MR. YALOWITZ:  No, that is not true.

```
 1                 THE COURT:  Some of them have a date and others do

 2      not.

 3                 MR. YALOWITZ:  For example, that BBC video with Arafat

 4      investigated, we know that that happen before Arafat died.

 5                 THE COURT:  That gives me about 75, 80 years, I guess.

 6                 MR. YALOWITZ:  That is an end date.  And we know that

 7      it happened around 2003, because they were talking about the

 8      appointment of Abu Masin as prime minister, I think, somebody.

 9      We certainly could get it for you.  There is a record of when

10      that is.

11                 THE COURT:  You think it is somewhere around 2005?

12                 MR. YALOWITZ:  '03.

13                 THE COURT:  OK.  Other than the BBC documentary, the

14      others that don't have a date, you are unaware of the date, is

15      that basically it?  Look at it.  If you have dates, when I come

16      back and we discuss it further, tell me that you either have a

17      date, what it is, or that you don't have a date.

18                 MR. YALOWITZ:  OK.

19                 THE COURT:  I'll use your letter as a guide.  Why

20      don't we come back at 2:10.

21                 (Luncheon recess)

22

23

24

25
```

```
 1                        AFTERNOON SESSION

 2                          2:10 p.m.

 3            (Jury not present)

 4            THE COURT:  This is my position on these videotapes

 5   that I just reviewed.

 6            197 clip 1 is out.

 7            197 clip 3 is out.

 8            197 clip 6 is out.

 9            197 clip 7 is out.

10            218 is out.

11            219 is out.

12            224 is out.

13            228 clip 1 is out.

14            228 clip 3 is out.

15            228 clip 5 is out.

16            235 is out.

17            239 clip 2 is in.

18            239 clip 3 is in.

19            242 is in.

20            700 is out.

21            727 is out.

22            846 is out.

23            928 is out.

24            929 is out.

25            If there is anything more you want to discuss about
```

 1  them or any record you want to make later on, I'll let you do

 2  that.

 3          MR. YALOWITZ:  Let's keep going with the jury, your

 4  Honor.

 5          THE COURT:  Let's get the jury.

 6          MR. YALOWITZ:  You're killing me.

 7          THE COURT:  It's not me.  It's your lack of evidence.

 8  That's not admissible evidence.  I would suggest you not make

 9  those kinds of comments.  All right?

10          MR. YALOWITZ:  All right.

11          THE COURT:  I have no interest in this case.  I rule

12  on the law.

13          MR. YALOWITZ:  I'm sorry?

14          THE COURT:  I have no interest in this case.  I rule

15  on the law.  Don't imply that there is any other basis.

16          MR. YALOWITZ:  Your Honor, let me apologize to the

17  Court.

18          THE COURT:  You should.

19          MR. YALOWITZ:  That's what I'm doing.  It was a

20  lighthearted comment.

21          THE COURT:  I take my job very seriously.

22          MR. YALOWITZ:  It was inappropriate and I apologize.

23          THE COURT:  This is a very serious case.

24          MR. YALOWITZ:  I know that.  Nobody knows that better

25  than me.  Nobody feels it more heavily than I do, your Honor.

```
1              THE COURT:  You are not the only one.

2              MR. YALOWITZ:  I understand that.

3              THE COURT:  Let's continue.

4              MR. YALOWITZ:  Thank you.

5              THE COURT:  Let's get the jury.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    (Jury present)

 2   ALON EVIATAR resumed.

 3             THE COURT:  Mr. Yalowitz, you may continue.

 4             MR. YALOWITZ:  Thank you so much, your Honor.

 5   DIRECT EXAMINATION (continued)

 6   BY MR. YALOWITZ:

 7   Q.  Before we broke, Mr. Eviatar, we were looking at group 1 in

 8   this intelligence report.  I just want to follow up on a

 9   statement on the second page of Exhibit 831.

10             MR. YALOWITZ:  May I read from the document, your

11   Honor?

12             THE COURT:  Yes.

13             MR. YALOWITZ:  Thank you, sir.

14   Q.  "One may say that this group is the most disciplined and

15   knowledgeable of the overall situation.  They are very close to

16   us and we are in continuous coordination and contact with

17   them."

18             My question is, when a member of the general

19   intelligence service is writing to Tawfiq Tirawi and he says

20   they are very close to us, who is the "us"?

21             MR. ROCHON:  Objection.

22             THE COURT:  Overruled.  You can answer.

23   Q.  Who is the "us" that they are close to?

24   A.  "Us" means the general intelligence service in the Tulkarm

25   area.
```

1   Q.  Now I want to look with you at group 2, which is on the

2   second page.

3         MR. YALOWITZ:  I would like the Court's permission to

4   read from part of the paragraph about group 2.

5         THE COURT:  Yes.

6   Q.  "This group is trying to obtain an approval from Marwan

7   al-Barghouti to appoint brother Mansur Sharim as the commander

8   of the Al Aqsa Martyrs Brigades in the Tulkarm governate.

9   Their way of pursuing this approval is by repeatedly calling

10  Barghouti as well as with help from Nasser Aweis, from the

11  Balata camp, who has strong ties with the group."

12        I have a couple of questions about that.  First of

13  all, when they talk about Nasser Aweis helping this group, is

14  that the same guy you showed the picture of earlier?

15  A.  The very same guy.

16  Q.  Remind the jury where he worked.

17  A.  Nasser Aweis was an officer in the Palestinian security

18  apparatus.

19  Q.  Was he in the general intelligence service?

20  A.  Yes.

21  Q.  Do I have it right that he worked for Tawfiq Tirawi?

22  A.  He was subordinate to him.

23  Q.  They also mentioned an individual named Marwan Barghouti.

24  Who is that?

25  A.  Marwan Barghouti is a member of the Palestinian legislative

1    council, and he is the leader of the Fatah in the West Bank.

2    Q.   How about Mansur Sharim, who was he?

3    A.   Mansur Sharim, according to the reports and according to

4    other reports as well, he's the head of a group of armed Fatah

5    operatives in the Tulkarm area.

6    Q.   I also want to look with you at group 3.  This is a group

7    identified with brother Ahmed al-Wahab "Hafs."

8           MR. YALOWITZ:  I want the Court's permission to read

9    from the bullet at the very bottom of page 2.

10           THE COURT:  Yes.

11    Q.   "The failure of brother Hafs to fully control the armed

12    brothers and unite them under one entity is a result of his

13    inability to restrain their practices.  Some of them opened a

14    communication channel with Marwan Barghouti, others with Nasser

15    Aweis, and others with Ahmed Al-Faransi, Barghouti's escort."

16           Now I want to ask you about these three individuals.

17    Marwan Barghouti we just discussed, is that right?

18    A.   Yes.

19    Q.   Nasser Aweis we just discussed?

20    A.   Yes.

21    Q.   Now I want to ask you about this fellow Ahmed Al-Faransi,

22    Barghouti's escort.  Have we talked about him yet, you and I?

23    A.   During the course of the trial?

24    Q.   Right.

25           MR. ROCHON:  Objection, your Honor.  If he could just

 1    ask him --

 2              MR. YALOWITZ:  Let me rephrase the question.

 3              THE COURT:  You don't have to have argument.  The

 4    objection is overruled.  Go ahead and rephrase the question.

 5              MR. YALOWITZ:  Thank you, your Honor.

 6    Q.  Could you tell the jury who Ahmed Al-Faransi is.

 7    A.  Ahmed Al-Faransi Barghouti, Al-Faransi is his nickname.

 8    Q.  What does that mean, Al-Faransi?

 9    A.  They called him Al-Faransi because during that period of

10    time he had a French style beard, kind of like French men do.

11    In Arabic, "Fransa" is France.

12    Q.  Ahmed Barghouti, let me show you what we have marked for

13    identification as a photograph.  Do you have it on your screen?

14    Do you recognize that individual?

15    A.  Yes.

16    Q.  Who is it?

17    A.  Ahmed Al-Faransi Barghouti.

18              MR. YALOWITZ:  Your Honor, plaintiffs offer 1162 in

19    evidence.

20              MR. ROCHON:  No objection to 1162.

21              THE COURT:  No objection, 1162 it will be admitted in

22    evidence as a plaintiff's exhibit.

23              (Plaintiff's Exhibit 1162 received in evidence)

24    Q.  Is that him?

25    A.  Yes.

1    Q.   When it says that he is Barghouti's escort, Marwan

2    Barghouti's escort, what does that mean?

3    A.   Ahmed Barghouti personally escorts Marwan Barghouti since

4    1996.   That was the year when Marwan Barghouti was elected to

5    the legislative council.   Ahmed was his right-hand man, his

6    personal assistant, and driver of Marwan Barghouti.

7                (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    Q.   Where is Ahmed Barghouti today?

 2    A.   He's in an Israeli prison.

 3    Q.   In whose employ is Ahmed Barghouti while he sits in prison?

 4    A.   The Security Services of the Palestinian Authority.

 5    Q.   I also would like to direct you to page three of Exhibit

 6    831.

 7              MR. YALOWITZ:  May I read, your Honor?

 8              THE COURT:  Yes.

 9              MR. YALOWITZ:  "Recently, the Preventative Security

10    Service started to deal with the subject of the armed men

11    through Ikrima Thabet, who works in the headquarters of the

12    Preventative Security in Ramallah."

13    Q.   Could you just remind us, Mr. Eviatar, what the

14    Preventative Security in Ramallah is?

15    A.   The Preventive Security System in Ramallah belongs to the

16    Palestinian Authority.  One of its main responsibilities is to

17    thwart and prevent acts of terror.

18    Q.   The Preventive Security Service was headed by whom during

19    that period?

20    A.   Jabril Rajoub.

21    Q.   Is that the guy whose business card you showed us

22    yesterday?

23    A.   The very same guy.

24              MR. YALOWITZ:  May I continue reading from the

25    document, your Honor?
```

1    THE COURT:  Yes.

2    MR. YALOWITZ:  "Thabet made several arrangements and

3    coordinations between Hafs and Colonel Jabril Al Rajoub who

4    recently facilitated a sponsorship by a wealthy person to Raed

5    al-Karmi's family (his pregnant wife and daughter)."

6    Q.  Do you see that?

7    A.  Yes.

8    Q.  Who was Raed al-Karmi?

9    A.  Raed al-Karmi was the head of the Tanzim of the Fatah in

10   the Tulkarm region.

11   Q.  Could you just take a look at the date of 831 by flipping

12   to the first page of your binder.  First page of 831 in your

13   binder.

14   A.  I see the date.

15   Q.  What is it?

16   A.  February 6, 2002.

17   Q.  As of February 6, 2002, what was Raed al-Karmi's situation?

18   A.  He was killed.

19   Q.  Why was he killed?

20   MR. ROCHON:  Objection to form.

21   THE COURT:  Sustained as to form.

22   Q.  What were the circumstances of the death of Raed al-Karmi?

23   A.  He was liquidated by the Israel Defense Forces due to his

24   direct responsibility, liability, for acts of terror in which

25   Israeli civilians were killed.

```
 1   Q.  Can you think of a reason why Jabril Rajoub would
 2   facilitate a sponsorship by a wealthy person for Raed
 3   al-Karmi's family?
 4          MR. ROCHON:  Objection.
 5          THE COURT:  Sustained.
 6   Q.  Let me move ahead to Exhibit 829 in your binder.  Would you
 7   take a look at Exhibit 829.
 8   A.  I see it.
 9   Q.  Can you explain what this document is.
10   A.  This is a report that was distributed by the intelligence
11   branch of the Israel Defense Forces that sets forth, that
12   establishes that the Al Aqsa Martyrs Brigade and the Fatah
13   Organization are one and the same, and Yasser Arafat is their
14   leader and their commander.
15   Q.  How do you know what the document is?  Let me ask you that.
16   A.  I personally checked it with the commander of the unit.
17   Q.  Have you had the opportunity to review this document?
18   A.  Yes, and of course, I've also read the document thoroughly
19   and carefully.
20   Q.  Is it the kind of document that you used during your period
21   in service?
22   A.  Definitely.
23          MR. YALOWITZ:  Your Honor, plaintiffs offer 829 in
24   evidence.
25          MR. ROCHON:  Subject to previous.
```

```
 1              THE COURT:  It will be admitted into evidence.
 2              (Plaintiff's Exhibit 829 received in evidence)
 3              MR. YALOWITZ:  Let's just, actually, you know, given
 4     the hour, your Honor, I think I am going to hold this one with
 5     the Court's permission.
 6              THE COURT:  Sure.
 7     Q.  Let me ask you to turn to 626.  Do you have 626 in your
 8     binder?
 9     A.  Yes.
10     Q.  What is 626 very briefly?
11     A.  It is a report that was distributed by the intelligence
12     branch of the Israel Defense Forces that determines that Arafat
13     and the Palestinian Authority are involved in terrorism.
14     Q.  Have you had a chance to review it carefully?
15     A.  Yes, definitely.
16     Q.  Have you reviewed the source documents on which it is
17     based?
18     A.  I have reviewed all of them.
19     Q.  Are you familiar with the unit that did the analysis and
20     put it together?
21     A.  I know it inside and out.
22     Q.  In your opinion, is this document a professional document
23     on which a professional such as yourself would rely?
24              MR. ROCHON:  Objection, your Honor.
25              THE COURT:  Overruled.  He can answer.
```

```
 1   A.  Definitely so.

 2           MR. YALOWITZ:  Your Honor, plaintiffs offer 626 in

 3   evidence.

 4           MR. ROCHON:  Subject to prior, your Honor.

 5           THE COURT:  It will be admitted into evidence.

 6           (Plaintiff's Exhibit 626 received in evidence)

 7   Q.  Is this the document, "Arafat's and the PA's involvement in

 8   terrorism (according to captured documents)"?

 9   A.  Unequivocally yes.

10           If I may add a small comment.  The green emblem that

11   we see at the top of the page, that's the emblem of the

12   intelligence branch of the Israel Defense Forces.

13   Q.  Excellent.

14           MR. YALOWITZ:  Your Honor, may I have the Court's

15   permission to hand out a copy of this document to the members

16   of the jury?

17           THE COURT:  Yes.

18           MR. YALOWITZ:  Thank you so much.  Has everybody got

19   one?  Great.

20   Q.  I'd like to direct everybody's attention to page 10,

21   please.  Mr. Eviatar, just tell us what we're looking at.

22   A.  We see here a report that was distributed by the same Raed

23   al-Karmi who we spoke of earlier.  The report was sent to

24   Marwan Barghouti, the leader of the Fatah in the West Bank.  In

25   which economic assistance is being sought for 12 Fatah
```

1   operatives in the Tulkarm region.

2   Q.  Is Tulkarm the same place that was being talked about in

3   831, which we were just looking at a minute ago?

4   A.  The very same place.

5   Q.  Could you just point out to the members of the jury, do you

6   have on the stand that laser pointer that the Court is so fond

7   of?

8           Thank you so much, your Honor.

9   A.  Once again, I thank the Honorable Court for its assistance.

10  Q.  Can you just point out where we see in the Arabic the names

11  of those individuals.

12  A.  Yes, this is the list here in Arabic from top to bottom.

13  Q.  Do you see in the Arabic any place in which there has been

14  an approval of payment to these individuals?

15  A.  The place that I'm demarcating here, that's where the

16  approval of the request appears.

17  Q.  Let's just highlight that for the jury if we can.

18  Excellent.  So, can you tell the jury just looking at this

19  diagonal writing here, whose signature that is?

20  A.  The signature that I'm indicating right now is the

21  signature of Yasser Arafat.

22  Q.  Thank you.  Now, I also want to take a look at the names of

23  the individuals receiving this money.

24          So, have you had a chance to compare the names on this

25  list of document number two that we're looking at here to the

 1   names in the intelligence report to Toufik Tirawi that we were

 2   looking at a few moments ago?

 3        THE INTERPRETER:  Can you rephrase question?  Or read

 4   the question again?

 5        MR. YALOWITZ:  Do you want me to say it again?

 6   Q.  Have you had a chance to compare the names on this list to

 7   the names in Exhibit 831 which we were just looking at?

 8   A.  Yes, I have done so.

 9   Q.  Let's take a look at the two documents side by side.  Maybe

10   we should -- I don't know if we can enlarge portions of group

11   two.  It might be possible.

12   A.  Could you, Mr. Yalowitz, give me the number of the document

13   on the left-hand side?

14   Q.  831.  There we go.  We've also, Ms. Machnes has put it up

15   on the screen for us so we can see parts of it a little more

16   clearly.

17        So, on document number two, which the jury has in

18   their hand, we see an individual named Jamil Adwan.  Is he

19   identified in exhibit 831?

20        THE INTERPRETER:  The name again, please?

21   Q.  Jamil Adwan.

22   A.  Yes, I see it.

23   Q.  Jamil Adwan is identified as a member of the Mansur Sharim

24   group?

25   A.  Just a moment, please.

```
 1              MR. YALOWITZ:  Maybe I can read, your Honor?

 2              THE COURT:  Yes.

 3              MR. YALOWITZ:  "We would like to emphasize that Mansur

 4    Sharim carried out several successful operations with Shahid

 5    Jamil Adwan, Shahid Raed al-Karmi, and Brother Muhammad Abu

 6    Rabia."

 7    Q.  Is that the same Jamil Adwan that is getting money from

 8    Yasser Arafat?

 9    A.  The very same one.

10    Q.  Let me ask you also about Majed Jarad.  Is he the same

11    Majed Jarad up at the very top of paragraph two?

12    A.  Yes.  He appears here as number two.

13    Q.  How about Mansur Sharim himself, he's number four?

14    A.  That is the very same Mansur Sharim.

15    Q.  How about number six, Iyad Abed Al Rahim Jarad?

16    A.  He appears there as well.

17    Q.  How about number nine, Sami Mahmud Dib Sabeh?

18    A.  I'm looking for him.  He appears here as well.

19    Q.  How about number 10, Iyad Nasser?

20    A.  He appears here as well.

21    Q.  Thank you.  Now, I'd like to look with you at the

22    photograph on page three, and I'd ask you to just identify for

23    the jury the logo of Fatah.

24    A.  The logo that appears in the upper center of the page,

25    that's the Fatah logo.
```

1    Q.  Where do we see the Al Aqsa Martyr Brigades logo?

2    A.  In the upper-right-hand and left-hand corners.

3    Q.  Thank you.

4        MR. YALOWITZ:  Your Honor, I'd ask the Court's

5    permission to read the abstract on page two to the jury.

6        THE COURT:  Yes.

7        MR. YALOWITZ:  "During the IDF "Defensive Wall"

8    operation in the PA areas, numerous documents were captured

9    that point at the direct and indirect involvement of Arafat,

10   the PA, and the Palestinian intelligence apparatus in terrorism

11   against Israel.  This involvement, as evidenced in the

12   documents, has three dimensions.  The ideological dimension,

13   which means essentially the sanctioning of lethal terror

14   attacks (viewed as "quality attacks" that serve the PA's goals)

15   and the use of terrorism as an important instrument in

16   promoting the Palestinians' goals vis-a-vis Israel.  The

17   financial dimension, continuous financing of the terrorist

18   infrastructure, personally approved by Arafat, and carried out

19   by the PA civilian entities, the heads of the PA security

20   apparatuses and Arafat's associate (Fuad Shubaki) and the" --

21   let me stop there.

22   Q.  Is that the same Fuad Shubaki we showed a picture of

23   earlier?

24   A.  The very same one.

25       MR. YALOWITZ:  "And the practical dimension,

1    involvement of the intelligence apparatuses led by the general

2    intelligence in direct and indirect assistance to the terrorist

3    infrastructures and activities, including for lethal terrorist

4    attacks inside Israel."

5    Q.  Can you tell the jury a little bit -- well, let me actually

6    do it this way.  Let me direct you to -- let me direct you to

7    page five.

8    A.  I have the page here in front of me.

9    Q.  I'd like especially to look at paragraph C at the bottom of

10   page five.

11   A.  I see it.

12   Q.  Is this where they detail the practical dimension discussed

13   in the abstract?

14              MR. ROCHON:  Objection.

15              THE COURT:  Overruled.

16              MR. ROCHON:  I'll withdraw it.

17   A.  That's absolutely correct.

18   Q.  Is there an individual implicated in paragraph C?

19   A.  I'm examining it.  The person who appears here in this

20   segment is Toufik Tirawi.

21   Q.  Is that the same Toufik Tirawi who was the addressee of

22   Exhibit 831 we were just examining?

23   A.  The very same one, he's the head of the General

24   Intelligence Services in the West Bank.

25              MR. YALOWITZ:  With the Court's permission, may I

```
 1   read?
 2              THE COURT:  Yes.
 3              MR. YALOWITZ:  I'm looking at page six.  "Of
 4   particular note in the documents, is the role of the general
 5   intelligence apparatus in the West Bank."
 6   Q.  Is the that same thing we've been calling the general
 7   intelligence service?
 8   A.  The very same service.
 9   Q.  What is that general intelligence apparatus, what is it
10   part of?
11   A.  It's part of the Palestinian Authority.
12              MR. YALOWITZ:  May I read, your Honor?
13              THE COURT:  Yes.
14              MR. YALOWITZ:  "Of particular note in the documents is
15   the role of the general intelligence apparatus in the West
16   Bank, headed by Toufik Tirawi, a clear associate of Arafat.
17   GIA personnel hold close ties with the Fatah/al Aqsa Martyrs
18   Brigades/Tanzim terrorist infrastructures.  And occasionally,
19   in Jenin, for instance, with those of the PIJ and Hamas, and at
20   times lend them practical support (while in parallel, the GIA
21   and other intelligence apparatuses closely watch and keep tabs
22   on those involved in terrorism, but do not use their abundant
23   information to foil terrorist attacks.)"
24   Q.  In the course of your work and in the preparation for your
25   testimony today, have you had occasion to review documents
```

1    reflecting the activities of the general intelligence

2    apparatus?

3    A.  Yes, definitely.

4    Q.  Without getting into any specifics, can you give me a sense

5    of how many such documents you've had the occasion to review?

6    A.  Are you referring to documents that were distributed by the

7    Israel Defense Forces?  Or documents of the General

8    Intelligence Service of the Palestinian Authority?

9    Q.  Actually, I was thinking of both.

10   A.  Dozens of such documents.

11   Q.  Again, without getting into any specifics, do you have an

12   opinion as to whether those documents support the conclusion in

13   Exhibit 626, which we've just been going over, about the

14   activities of the general intelligence apparatus headed by

15   Toufik Tirawi?

16            MR. ROCHON:  Objection, your Honor.

17            THE COURT:  Overruled.

18   A.  Definitely.  And I corroborate every word that appears here

19   as a professional in the field.

20   Q.  Thank you.  You mean you share the opinion expressed -- let

21   me ask it a little different way.  I see Mr. Rochon is standing

22   up because I started off with a bad formulation.

23            Do you share the opinion expressed on pages five to

24   six in paragraph C?

25   A.  I fully share that opinion.

1    Q.  I'd like to turn from the practical dimension to the

2    financial dimension.  And I direct your attention to paragraph

3    B on page five.

4         MR. YALOWITZ:  May I read, your Honor?

5         THE COURT:  Yes.

6         MR. YALOWITZ:  "The financial dimension.  Financing

7    the terrorist infrastructure.  The ongoing financial support is

8    crucial for the regular and systematic operation of the

9    terrorist infrastructures.  The PIJ, as noted in the captured

10   documents, receives large sums of money from external sources.

11   The Fatah/al Aqsa Martyr Brigades/Tanzim, however, receive

12   funding from the Palestinian Authority budgets approved by

13   Arafat and carried out by the PA's treasury ministry.

14   According to the captured documents, Arafat is involved

15   personally.  He personally signs allocations of both small and

16   large sums to Fatah/al Aqsa Martyr Brigades/Tanzim

17   infrastructure and activities in the various sectors.  To this

18   end, Arafat uses the PA's civilian apparatus, his personal

19   associate (Fuad Shubaki)."

20   Q.  Is that the same Fuad Shubaki we were talking about a

21   minute ago?

22   A.  The very same guy.

23        MR. YALOWITZ:  "And middlemen and senior Fatah/Tanzim

24   activists in the West Bank."

25        With the Court's permission, I would like to publish

```
 1    to the jury Exhibit 889, the conviction of said Fuad Shubaki.

 2              THE COURT:  Yes, sir.

 3              MR. ROCHON:  Subject to prior.

 4              THE COURT:  Are you offering it to into evidence?

 5              MR. YALOWITZ:  Yes, sir.  I have offered it into

 6    evidence.  I don't recall whether we have a ruling.

 7              THE COURT:  You're offering it now or had you offered

 8    it previously?

 9              MR. YALOWITZ:  I'll offer it now, your Honor.

10              MR. ROCHON:  Subject to prior, your Honor.

11              THE COURT:  It will be admitted into evidence.

12              (Plaintiff's Exhibit 889 received in evidence)

13              MR. YALOWITZ:  Your Honor, I'd like to direct the

14    jury's attention to the first count, trading in war material.

15    Q.  First let me ask the witness.  Mr. Eviatar, have you had an

16    opportunity to look at Exhibit 889?

17    A.  I believe that it is in the second binder.

18    Q.  Yes, sir.

19              MR. YALOWITZ:  May I approach the stand and relieve

20    the witness of that bulky binder?

21              THE COURT:  Yes.

22              MR. YALOWITZ:  Thank you.

23    Q.  Have you had a chance to look at Exhibit 889 in preparation

24    for your testimony?

25    A.  Yes.
```

```
 1   Q.  Let me just reiterate my question to you.  Fuad Shubaki, is
 2   that the individual who was convicted as reflected in Exhibit
 3   889?
 4   A.  The very same person.
 5   Q.  Was there anyone that Fuad Shubaki reported to, other than
 6   Yasser Arafat?
 7   A.  Not that I am aware of.
 8   Q.  Is there anyone that Fuad Shubaki took instructions from,
 9   other than Yasser Arafat?
10   A.  Not that I am aware of.
11   Q.  All right.
12          MR. YALOWITZ:  Your Honor, may I read from Exhibit
13   889?
14          THE COURT:  Yes.
15          MR. YALOWITZ:  "First count.  Trading in war material.
16   The defendant is" --
17   Q.  Who is the defendant here?
18   A.  Fuad Shubaki.
19          MR. YALOWITZ:  "The defendant is accused of having
20   traded in war material, starting in the year 2000 and up to the
21   end of January 2002.  It is argued that the defendant took part
22   in a meeting at which another person instructed him and the
23   heads of the security organizations to purchase any amount of
24   weapons from any possible place.  The defendant, starting on
25   the date of that meeting, acted together with others toward the
```

 1   purchase of large quantities of material.  The defendant, who

 2   headed the Palestinian finance office, coordinated the

 3   requisitions of members of the various organizations which were

 4   transferred to him in the form of paperwork.  In order to

 5   ascertain that the material for which he was paying actually

 6   existed, the defendant required the people who applied to him

 7   to bring the weapons to his office, and for that purpose, he

 8   maintained a storeroom of material in Ramallah and an

 9   additional storeroom in the Gaza Strip.  After the material was

10   transferred to his possession, the defendant would submit the

11   paperwork to another person for approval, and after he approved

12   it, the defendant would also sign the requisition and would

13   instruct his staff to transfer the money to the applicant by

14   means of a bank transfer.  During the period in question,

15   approximately 1,000 tons of material were purchased for 7 to 10

16   million dollars.  The defendant arranged for the transfer of

17   the material to the Palestinian security organizations knowing

18   that a considerable part of the staff of those organizations

19   consisted of members of the military arm of the Fatah

20   Organization, which was conducting many terrorist attacks at

21   the time."

22   Q.  Was Fuad Shubaki convicted on this count?

23   A.  Yes.

24   Q.  I'd like to ask you about the second count.

25        MR. YALOWITZ:  May I read, your Honor?

```
 1                   THE COURT:  Yes.

 2                   MR. YALOWITZ:  "Second count.  Performance of a

 3       service for a prohibited organization.  It is argued that

 4       during the period set forth in the first charge of the

 5       indictment, the defendant transferred a monthly salary in the

 6       amount of 500 shekels to the members of the military squads of

 7       the Al Aqsa Martyrs Brigades in the Bethlehem area.  At that

 8       time, members of the squads in question were conducting many

 9       terrorist attacks.  In the month of October 2001, the defendant

10       received a request for the payment of 25,000 dinars from

11       another person for the purpose of purchasing material and

12       materials for the production of explosive charges, and for the

13       purpose of paying salaries to 268 members of the Al Aqsa

14       Martyrs Brigades.  The defendant forwarded this request to

15       another person who instructed him to pay the money through the

16       Ministry of Finance."

17       Q.  Mr. Eviatar, was Fuad Shubaki convicted on this count?

18       A.  Yes.

19                   MR. YALOWITZ:  I'd like to read with the Court's

20       permission from the third count.

21                   THE COURT:  Yes.

22                   MR. YALOWITZ:  "Trading in war material.  This count

23       sets forth the defendant's ostensible role in the funding and

24       organization of the arms ship Karina A, which was seized on

25       January 3, 2002, carrying large quantities of material of
```

 1   various types, including rockets, mortars, and machine guns.

 2   It is argued that in September 2001, the defendant met with

 3   another person who updated him with regard to his contacts with

 4   the Iranians with regard to the financing of the arms ship."

 5   Q.  Mr. Eviatar, was Fuad Shubaki convicted on this count?

 6   A.  Yes.

 7   Q.  Mr. Eviatar, I would like to direct you to page 43 of

 8   Exhibit 889.

 9           MR. YALOWITZ:  May I read, your Honor?

10           THE COURT:  Yes.

11           MR. YALOWITZ:  Thank you.  "The collection of weapons

12   has nothing to do with a desire to prevent those irresponsible

13   entities from using them for terrorist purposes.  The objective

14   of the collection of the weapons was to transfer them to

15   entities within the Palestinian Authority, which obeyed another

16   person, and which made it possible to engage in warfare against

17   Israel, its forces, and its civilians.  As the defendant

18   himself stated in the memorandum dated March 15, 2006,

19   6:15 p.m., in section 30:  Another person gave an instruction

20   that all of the weapons would be purchased by the Palestinian

21   Authority, and not by Hamas or other organizations, so that he

22   himself would be able to control everything that happened.  In

23   this way, that person would be able to control the strength of

24   the intifada.

25           "As we have seen, this is no innocent and responsible

1    objective.  Rather, it is a clear objective which was intended

2    to enable entities of the Palestinian Authority headed by that

3    other person to use offensive fire power to control the

4    strength of the intifada.  That is:  The strength of

5    Palestinian terrorism.

6            "It should be further stated that the argument to the

7    effect that the defendant did not know that the weapons had

8    been transferred to the Al Aqsa Martyr Brigades organization

9    which used it for the purposes of terrorism is an argument

10   which is not in line with the evidentiary material.  Thus, for

11   example, in the memorandum dated March 15, 2006, 6:15 p.m., in

12   section 36, the following appears:  The subject" --

13   Q.  By the way, who is the subject in this sentence?

14   A.  I'm just trying to locate the section here in my material.

15   Just a moment.

16   Q.  Sorry.  Why don't I continue while you take a look.

17           MR. YALOWITZ:  "The subject explained that each of the

18   security organizations purchased material in large quantities

19   and the subject approved the payment.  All of the Al Aqsa

20   Martyrs organizations used the weapons which were supplied by

21   the security forces, which carried out the massive

22   procurement."

23   Q.  Who is the subject in that statement?

24   A.  Fuad Shubaki.

25   Q.  Thank you.

```
 1              MR. YALOWITZ:  "As we have seen, the defendant knew

 2   very well that the material which was purchased was transferred

 3   to the Al Aqsa Martyr Brigades which used those weapons.

 4   Obviously, the defendant knew what the Al Aqsa Martyrs Brigades

 5   organization was and what its activities were."

 6   Q.  I want to focus a little bit more on count two, and so I

 7   direct you to page 45.  Let me know when you're there.

 8   A.  I'm there.

 9              MR. YALOWITZ:  Count Two of the indictment.  This

10   count concerns -- may I, your Honor?

11              THE COURT:  Yes.

12              MR. YALOWITZ:  Thank you.  "This count concerns the

13   transfers of salaries to operatives in the Al Aqsa Martyr

14   Brigades as well as the transfer of a requisition by another

15   person for the payment of money for material.  The basis for

16   this count lies in the statements by the defendants, but also

17   in the statements which were made by another person to the

18   police.  The defendant, in fact, confessed in his interrogation

19   that he had transferred salaries to that person's men, and the

20   latter confirms this matter in his statement.  Accordingly, the

21   opening passage of this count of the indictment is based on

22   statements by the defendant and has been given a significant

23   evidentiary supplement in the statement by that other person."

24   Q.  Again, here, Mr. Eviatar, who is the defendant?

25   A.  Fuad Shubaki.
```

```
 1   Q.  All right.  Now, I'd like you to turn in your binder to

 2   Exhibit 631.

 3   A.  I'm sorry, I don't have it here.

 4   Q.  I can share my coppy.

 5            MR. YALOWITZ:  Bear with me, your Honor, we have a

 6   little bit of logistical problem.

 7            THE COURT:  Yes.

 8            MR. YALOWITZ:  I apologize for the delay.

 9   Q.  Tell me when you're at Exhibit 631.

10   A.  I'm there.

11   Q.  You have it?

12   A.  Yes.

13   Q.  Great.  What is it, very briefly?

14   A.  This is a document that was distributed by the intelligence

15   branch of the Israel Defense Forces.  It's based on captured

16   material, that was captured from the Palestinian Authority.

17   Q.  Have you had an opportunity to review this document as well

18   as the documents on which it is based?

19   A.  I have reviewed all of them.

20   Q.  Have you had an opportunity to investigate the authenticity

21   of the document and where it comes from?

22   A.  Definitely, yes.

23   Q.  Are you familiar with the unit that produced it?

24   A.  I know it very well.

25   Q.  How do you know that unit?
```

1  A.  That's the same unit that we spoke of earlier.  I'm

2  familiar with the material that that unit receives, I know the

3  head of the unit very well, I know the staff writers, I

4  cooperated with them on an ongoing basis.

5  Q.  Could you express your view as to the professionalism and

6  quality of the work in this document?

7  A.  I define their work as 100 percent accurate.

8        MR. YALOWITZ:  Your Honor, plaintiffs offer Exhibit

9  631 in evidence.

10        MR. ROCHON:  Subject to prior, your Honor.

11        THE COURT:  Sure.  It will be admitted into evidence.

12        (Plaintiff's Exhibit 631 received in evidence)

13        MR. YALOWITZ:  May I have the Court's permission to

14  hand out a copy to the jury.

15        THE COURT:  Yes.

16  Q.  What is the title of this document?

17  A.  Palestinian Authority captured documents main implications.

18  Q.  Would you summarize for the jury what the main implications

19  are as reflected in this document?

20  A.  The first conclusion is personal involvement of Arafat in

21  acts of terror.  The second conclusion, Arafat, through the

22  Palestinian Security Services and other apparatuses,

23  transferred funds for the organization and perpetration of acts

24  of terror.  Money was transferred by the various intermediaries

25  such as Fuad Shubaki to terrorist operatives, according to

     1   their level.  A junior operative received a little bit of

     2   money; senior operative would receive a lot of money.  This

     3   terrorist infrastructure also included senior people such as

     4   Marwan Barghouti, Fuad Shubaki, and other people.

     5          That is my summary.

     6          MR. YALOWITZ:  Your Honor, may I have the Court's

     7   permission to read from the document?

     8          THE COURT:  Yes.

     9          MR. YALOWITZ:  Let's look at page one together.

    10          "Abstract.  Documents captured by the IDF during

    11   operation "Defensive Wall" provide evidence of the role of

    12   Arafat and Palestinian Authority apparatuses in the systematic,

    13   institutionalized and ongoing financing of the Fatah, Tanzim,

    14   and Al Aqsa Brigades terrorist infrastructure and activities."

    15   Q.  Let me ask you this, Mr. Eviatar.  When was operation

    16   Defensive Wall?

    17   A.  During the course of the period between the end of

    18   March 2002 to the beginning of May 2002.

    19          MR. YALOWITZ:  May I continue, your Honor?

    20          THE COURT:  Yes.

    21          MR. YALOWITZ:  "The picture which emerges from the

    22   captured documents is that large sums of money are transferred

    23   on a monthly basis in order to finance terrorist

    24   infrastructures.  Whereas the civilian infrastructures of the

    25   PA, which depend on financial grants of the Arab world and

1    European Union are collapsing, and the Palestinian people is

2    suffering from poverty and distress."

3              I direct the jury, your Honor, to paragraph two.

4              THE COURT:  Yes.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.  (continuing) "The main characteristics of the funding

2   method based on the captured documents are (a) Arafat's

3   personal involvement.  Arafat personally and with his signature

4   controls the allocation of funds even in small sums of money to

5   junior field echelons."

6          Let me ask you, Mr. Eviatar, did we see an example of

7   that?  Did you bring us an example of that control of very

8   small sums of money?

9   A.  Yes.  We presented that here earlier.

10  Q.  Is that in the document 626?

11          THE INTERPRETER:  626?

12          MR. YALOWITZ:  Right.

13  Q.  Do you have 626 before you or should I give you a copy?

14  A.  I don't have it.

15          MR. YALOWITZ:  May I approach, your Honor?

16          THE COURT:  Yes.

17  Q.  I'm looking on page 10.

18  A.  Yes, I see the page here.

19  Q.  Is this the one we went over where we went over the names

20  of the various people who had been identified in that report to

21  Tirawi?

22  A.  Yes.  Yes, it's the very same document.

23  Q.  I want to focus on the request for money and the response

24  which we see in the lower right-hand corner of this page.

25  Let's take a look and make sure everybody's there.  I'm looking

1  at the very lower right-hand corner.  May I read it, your

2  Honor?

3         THE COURT:  Yes, sir.

4  Q.  "To brother president Abu Amar, may the Lord protect him."

5  Who is Abu Amar?

6  A.  Abu Amar is the nickname of Yasser Arafat.

7  Q.  "To brother president Abu Amar, may the Lord protect him.

8  Greetings.  I request of you to order the allocation of a

9  thousand dollars for each of the fighter brothers.  Sincerely,

10 Marwan al-Barghouti."

11        Then below that we have a note about what Yasser

12 Arafat's handwriting says.

13        MR. YALOWITZ:  May I read that, your Honor?

14        THE COURT:  Yes.

15 Q.  "The treasury Ramallah.  Please allocate $350 to each."

16 Yasser Arafat's signature, 7th of January 2002.

17        Maybe you can tell.  Is it January 7 or is it July 1?

18 It must be January 7.

19 A.  It's January 7.

20 Q.  Now let's go back to 631.  We were talking about Arafat's

21 personal involvement.  Right after the paragraph that we just

22 read, talking about allocation of a few hundred dollars to a

23 single terrorist, I would like to focus on paragraph B on page

24 2.  Let me know when you've got that.

25 A.  I'm there.

1    Q.   Paragraph B.

2              MR. YALOWITZ:  May I, your Honor?

3              THE COURT:  Yes.

4    Q.   "Arafat is assisted by the PA apparatuses and his personal

5    associates in the transfer of the money.  After he approves the

6    sums of money, Arafat is assisted by the PA's finance ministry.

7    In other words, the PA's civilian apparatuses are involved in

8    the transfer of funds to terrorist activists from the senior

9    level down to the junior level.  In addition, Arafat is helped

10   by his confidante Fuad Shubaki, who was also involved in the

11   purchase of the Karina A arms ship."

12             First of all, this is the same Fuad Shubaki?

13   A.   The very same one.

14   Q.   Can you explain generally what the purchase of the Karina A

15   arms ship involved.  Let me ask you to focus especially on that

16   incident as detailed in the conviction.

17   A.   The Palestinian Authority headed by in this context Fuad

18   Shubaki organized the smuggling of an arms ship on the basis of

19   its contacts with the Iranians, with the objective of smuggling

20   those weapons into the territories.  This was in contravention

21   of all of the agreements.  The person who headed this

22   activity --

23             MR. ROCHON:  Objection.

24             THE COURT:  I am going to sustain the objection.  Why

25   don't you focus your question a little more so we don't just

 1    get a narrative.  As a matter of fact, let's take a short

 2    break.  Let me give them a short break now.  I'm going to still

 3    see if I can send them home early.

 4         Ladies and gentlemen, take a short break.  Don't

 5    discuss the case, keep an open mind.  I'll bring you back in in

 6    less than ten minutes, and we will go probably another half

 7    hour.

 8         (Recess)

 9         THE COURT:  You may continue, Mr. Yalowitz.

10         MR. YALOWITZ:  Thank you so much, your Honor.  With

11    the Court's permission, I would like to direct the witness and

12    the jury back to Exhibit 631, page 3.

13         THE COURT:  Yes.

14         MR. YALOWITZ:  Paragraph G.  "In addition to the

15    allocation of money by Arafat, the terrorist infrastructure

16    activists received regular payments for their activities from

17    Fatah Tanzim local and regional commanders.

18         "For example, according to one of the captured

19    documents, Fatah Tanzim terrorists infrastructure act

20    activities in the Tulkarm district received regular funding for

21    their activities from the Tanzim director in the district.  For

22    example, Marwan Barghouti distributes, according to the same

23    document, sums of money to terror activities in Tulkarm in

24    order to strengthen his control and encourage them to escalate

25    the attacks."

1     Paragraph 3.  "This financial system is the fuel which

2  energizes the terror infrastructure engines of the Fatah Tanzim

3  and Al Aqsa Brigades without which they would find difficulty

4  in operating effectively and continuously."

5     I want to ask you a couple of questions about some of

6  the players.and entities there.  First of all, this document

7  and others we have looked at mention Al Aqsa Brigades.  What

8  was the Al Aqsa Brigades in the 2000 to 2004 time period?

9  A.  They are defined as the military branch of the Fatah.  They

10 are, in essence, terrorism units that operated on behalf of the

11 Fatah.

12 Q.  What did the United States government conclude about the Al

13 Aqsa Brigades?

14     MR. ROCHON:  Objection, your Honor.

15     THE COURT:  Sustained.

16 Q.  Would you please turn to Exhibit 537 in your binder.

17     MR. ROCHON:  Your Honor, may I have a side bar with

18 counsel?  It will save some time.

19     MR. YALOWITZ:  It is objection to form.

20     MR. ROCHON:  I just corrected it, your Honor.  With

21 that correction, I won't have an objection.

22     THE COURT:  Go ahead.

23 Q.  What did the United States government think of the Al Aqsa

24 Martyrs Brigades?

25 A.  The United States declared that organization -- designated

```
 1   that organization.

 2            THE INTERPRETER:  Thank you.

 3   Q.  As what?

 4   A.  As an unlawful organization.

 5   Q.  Would you please turn to Exhibit 537 in your binder.  Do

 6   you have it before you?

 7   A.  Yes.

 8   Q.  Have you had the opportunity to look at this document

 9   before?

10   A.  Yes.

11   Q.  Very generally, what is it?

12   A.  It's the American designation of the Al Aqsa Martyrs

13   Brigade as a terrorist organization.

14            MR. YALOWITZ:  Your Honor, plaintiffs offer

15   Exhibit 537 in evidence.

16            MR. ROCHON:  Subject to prior, no objection.

17            THE COURT:  It will be admitted.

18            (Plaintiff's Exhibit 537 received in evidence)

19            MR. YALOWITZ:  Why don't we publish it to the jury.

20   May I read, your Honor?

21            THE COURT:  Yes.

22   Q.  "Pursuant under the authority of section 1(b) of executive

23   order 13224 of September 23, 2001, the deputy secretary of

24   state, acting under the authority delegated to him by the

25   secretary of state, in consultation with the secretary of the
```

1    treasury and the attorney general, has determined that the Al

2    Aqsa Martyrs Brigades, also known as the Al Aqsa Martyrs

3    Battalion, has committed or poses a serious risk of committing

4    acts of terrorism that threaten the security of U.S. nationals

5    or the national security, foreign policy, or economy of the

6    United States."

7            "Pursuant to section 1(a)(ii)(A) of the executive

8    order 12947 of January 23, 1995, the deputy secretary of

9    state" -- I'm going to skip over some of the formalities --

10   "has determined that the Al Aqsa Martyrs Brigades has committed

11   or poses a serious risk of committing acts of violence that

12   have the purpose or effect of disrupting the Middle East peace

13   process."

14           Is that conclusion of the secretary of state

15   consistent with your own conclusion

16   A.   Yes.  Yes, that the Al Aqsa Martyrs Brigade is a terrorist

17   organization.

18           MR. YALOWITZ:  Can we highlight the date of that

19   designation.  It may come into play.

20   Q.   What is the date at the bottom of the page reflecting the

21   date of the designation?

22   A.   March 25, 2002.

23   Q.   Thank you so much.

24           MR. YALOWITZ:  Your Honor, may I consult with one of

25   my colleagues just for a moment?

1         THE COURT:  Yes, sir.

2         MR. YALOWITZ:  Thank you.

3    Q.  During the course of your professional career and in

4    preparation for your testimony here today, did you have

5    occasion to study the Al Aqsa Brigades and its relationship to

6    the Fatah organization?

7         MR. ROCHON:  Objection, your Honor.

8         THE COURT:  No, overruled, he can answer that.

9         MR. YALOWITZ:  Your Honor, let me rephrase the

10   question.  I think that is what Mr. Rochon is concerned about.

11   Q.  When I said "Al Aqsa Brigades," Mr. Eviatar, did you

12   understand me to mean Al Aqsa Martyrs Brigades?

13   A.  Of course.

14   Q.  Is there a thing called the Al Aqsa Brigades?

15   A.  No.  The full name is the Al Aqsa Martyrs Brigade.

16   Q.  In studying the relationship between that designated

17   terrorist organization and Fatah, what kinds of things have you

18   studied and reviewed?

19   A.  I've studied and read dozens of documents, both in Arabic,

20   that indicate the relationship between the Fatah movement and

21   the Al Aqsa Martyrs Brigade, the physical and the infra-

22   structure-based relationship between them, the establishment of

23   the brigades, their commitment to the organization and to the

24   leader of the organization, and other subjects.

25   Q.  By the way, during your years in service, did you have

1  occasion to evaluate the relationship between Fatah and Al Aqsa

2  Martyrs Brigade?

3  A.  Yes, of course I did.  All of the material was available to

4  me.

5  Q.  Based on the materials that you have reviewed in

6  anticipation of your testimony here today, can you give the

7  jury your opinion about the relationship between Al Aqsa

8  Martyrs Brigades and Fatah?

9  A.  Absolutely.

10  Q.  Please go ahead.

11  A.  The Al Aqsa Martyrs Brigade were established by the Fatah

12  movement at the beginning of the Al Aqsa intifada as a code

13  name that the Fatah movement and Arafat could hide behind.  But

14  the very same Al Aqsa Martyrs Brigade, in effect, carried out

15  the official policy of the Palestinian Authority and the Fatah

16  movement itself in order to perpetrate acts of terror and armed

17  struggle against Israel.

18        The relationship between Arafat, Marwan Barghouti, the

19  other heads or leaders of the Fatah movement, and the Al Aqsa

20  Martyrs Brigade on the West Bank was a strong relationship, it

21  was an ongoing relationship, and it was a mutual relationship.

22  Q.  Now I would like to ask you about a document that we have

23  marked for identification as 1052 in your binder.

24        MR. ROCHON:  Objection, your Honor.  This is one where

25  I think we needed to chat with the Court, if I'm not mistaken.

```
 1    May I consult?

 2              THE COURT:  Yes.

 3              MR. ROCHON:  May we come up briefly?

 4              THE COURT:  Sure.

 5              MR. ROCHON:  Sorry.  On Friday afternoon, no one wants

 6    a side bar.

 7              (Continued on next page)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1              (At the side bar)
2              MR. ROCHON:  Judge, you haven't ruled on this one yet.
3              THE COURT:  I thought I had.
4              MR. YALOWITZ:  I thought he had, too.
5              MR. ROCHON:  I'm very sorry if you had.
6              MR. YALOWITZ:  Subject to foundation.
7              THE COURT:  This was the Palestinian UK exhibit.
8              MR. ROCHON:  You are exactly right.  The highlighting
9     is ours.
10             THE COURT:  I forget what the subject matter of it
11    was.
12             MR. YALOWITZ:  Al Aqsa is the armed Fatah.
13             MR. HILL:  This witness is not going to be able to lay
14    a foundation that that information on this website was
15    authorized by our client.  In order to lay a foundation for a
16    web page to come into evidence, you have to have a person with
17    personal knowledge who put the information on the Web page that
18    was authorized to be put there.  This witness, who is not part
19    of the PLO, is not going to be able to lay the foundation.
20             THE COURT:  That is not the only way you can lay a
21    foundation.  This is a website called Palestinian -- let me see
22    if I can read it.
23             MR. YALOWITZ:  Palestinian Mission UK.
24             THE COURT:  Palestinian Mission UK.  It has on the
25    face of it a picture of a person who, I assume there is no
```

1    dispute, is the president of the Palestinian mission to the

2    United Kingdom, the Palestinian National Liberation Movement

3    Fatah, and there is a history.  There is information here, none

4    of which I understand is even in dispute.  So I'm not sure what

5    you are fighting about.

6          MR. HILL:  It is in dispute.

7          THE COURT:  What is in dispute?  Mr. Hill?

8          MR. HILL:  The part we have highlighted.  The point

9    I'm making is anyone can set up a web page.

10         THE COURT:  Is it your contention that there was a

11   false page set up and that this is not a Palestinian document?

12         MR. HILL:  My contention is that foundation has not

13   been laid and cannot be laid --

14         THE COURT:  Answer my question.  Is it your contention

15   that this is a false document that has been created and that

16   your client has no responsibility for?

17         MR. ROCHON:  We don't contend that it is a false

18   document.

19         THE COURT:  We have been through this.  I have already

20   admitted it.  I am not going to hear any further arguments,

21   particularly if you are not disputing the reliability of it.

22         MR. ROCHON:  Judge, I didn't think you had ruled on

23   it.

24         (Continued on next page)

25

876

```
 1          (In open court)
 2   Q.  1052.  Do you have it before you?
 3   A.  No.
 4   Q.  Bear with us.
 5   A.  Yes.
 6   Q.  All right, 1052.  First of all, can you identify the
 7   gentleman whose photograph appears on 1052 at the front?
 8   A.  Yes, I'm familiar with the gentleman.
 9   Q.  Is he someone you know personally?
10   A.  Yes.
11   Q.  Is he associated with the Palestinian mission to the United
12   Kingdom?
13   A.  Yes, he's the ambassador.
14   Q.  Have you had the opportunity to review 1058 to satisfy
15   yourself as to what it is?
16   A.  1052?
17   Q.  I'm sorry.  1052.
18   A.  Yes, I have read the document.
19   Q.  What is it, very generally?
20   A.  This is a document that explains the Fatah movement, the
21   background of the Fatah, and the structure of the Fatah.
22          MR. YALOWITZ:  Your Honor, plaintiffs offer 1052 in
23   evidence.
24          MR. ROCHON:  Subject to prior, your Honor.
25          THE COURT:  Could you give me a little bit more
```

1    background as to where this document supposedly comes from.

2    Q.   Where does the document come from, Mr. Eviatar, this

3    Palestinian Mission UK down at the bottom?

4    A.   The document comes from the website of the Palestinian

5    embassy in Great Britain.

6              THE COURT:   It will be accepted.

7              (Plaintiff's Exhibit 1052 received in evidence)

8    Q.   Let's first show the picture.  How do you know him?

9    A.   I've met with him on several different occasions in my

10   office in Bethlehem.

11   Q.   I would ask you to turn to the second page of the document.

12   Explain to the jury what these one, two, three, four, five

13   pages of 1052 constitute.

14   A.   These pages include detailed explanations about the

15   establishment of the Fatah movement and the people who formed

16   it, the background for its establishment, its ideology, and

17   first and foremost the activity of armed struggle against the

18   State of Israel.  Later on, we can see further milestones in

19   the life span of the organization, and we can also see a list

20   of the armed forces that belong to the movement.  Of course,

21   there is also a list of the activity of the Fatah movement

22   during the course of the Al Aqsa intifada.

23   Q.   Do you find the PLO UK mission to be an accurate source of

24   information about Fatah, based on your review of this document?

25   A.   Definitely.

1  Q.  What do they say about the Al Aqsa Martyrs Brigade, "they"

2  being the PLO in this website?  Let's show the jury page 4.

3          THE COURT:  Keep your voice up.

4          MR. YALOWITZ:  I'm sorry.  I will ask Ms. Machnes to

5  publish page 4.

6  Q.  What do they say, the PLO, about the Al Aqsa Martyrs

7  Brigade?

8  A.  The definition here is a clear one.  The Al Aqsa Martyrs

9  Brigade are the military branch of the Fatah movement.

10  Q.  Mr. Eviatar, thank you for giving us some background

11  information and introduction to the Al Aqsa Martyrs Brigade.

12          MR. YALOWITZ:  Your Honor, I'm finished with this

13  topic.  Would you like me to press ahead?

14          THE COURT:  No.  Why don't we give the jury a rest and

15  a long weekend.

16          Ladies and gentlemen, I'm going to adjourn at this

17  point in time.  Don't discuss the case, keep an open mind.

18  Have a good weekend.  See you on Tuesday morning at 9:30.  We

19  will start promptly at that time.

20          Before you step out, I will keep talking with the

21  lawyers about how we are moving along.  At this point in time,

22  I think if we get ahead of schedule, we may finish the

23  testimony before the end of February.  If we get behind

24  schedule, it may be into the first or second week of March.

25          I think we are on schedule.  I can't say we are ahead

1   of schedule.  I want to try to get us ahead of schedule.  That

2   is my best read right now.  I will keep you posted after I see

3   how much we can get accomplished next week.  Have a nice

4   weekend, and I'll see you on Tuesday.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

880

1                    (Jury not present)

2          THE COURT:  Is there anything we have to address now?

3          MR. YALOWITZ:  There are two things I want to

4    highlight for the Court, both of which are things that we would

5    like you to think about over the weekend.

6          The first is we still have the Marwan Barghouti

7    verdict to deal with.  I feel that we can apply the Court's

8    ruling on Shubaki to the Marwan Barghouti verdict, but I want

9    to give it to the Court and ask the Court to consider one item

10   that applies to Marwan Barghouti that doesn't apply to Shubaki.

11   I'll explain what it is.

12         Marwan Barghouti was convicted of conspiring with a

13   number of individuals we have heard about, including Nasser

14   Aweis, Abdel Kareem Aweis, and Ahmed Barghouti.  Their

15   statements are in his conviction.  I would like the Court to

16   consider --

17         THE COURT:  What document are we talking about?

18         MR. YALOWITZ:  451.  We will hand up a copy.

19         I know the Court is very familiar with the rules on

20   the admission of the statements of co-conspirators.  The Court

21   does not need to go through all of 451, which is a lengthy

22   document.  But if the Court, your Honor, could look at the

23   portions of the document dealing with Nasser Aweis, Abdel

24   Kareem Aweis, and Ahmed Barghouti, all of whom are identified

25   in the verdict as co-conspirators, all of whom were convicted

1    of crimes in the same conspiracy, and consider whether the

2    Court's ruling of redacting the names will apply to those three

3    individuals.

4         The sooner you can give us an up or down on that, the

5    sooner we can apply the Court's ruling, get the redactions done

6    in a systematic way, deal with Mr. Rochon and his team, and try

7    to come to agreement based on that ruling.

8         THE COURT:  The first thing I should tell you is you

9    should redact the document.  You should have a redacted copy

10   and the way you want it unredacted.  You should have a redacted

11   copy ready to go.

12        MR. YALOWITZ:  We will do that.

13        THE COURT:  I will address that.  I will look at it.

14   If you want me to look at it in comparison to some of the

15   others, tell me.  I think I have most of it, if not all of it.

16   Just tell me which documents you want me to look at and you

17   think are relevant for me to examine in terms of making that

18   determination, and I'll do that right away.

19        MR. YALOWITZ:  I don't think we can get a letter to

20   the Court tonight.

21        THE COURT:  That's fine.

22        MR. YALOWITZ:  But we will get you something very

23   briefly.

24        THE COURT:  If you can identify which documents you

25   are referring to, give me the exhibit numbers, I will start

1      pulling them.

2             MR. YALOWITZ:  The Marwan Barghouti verdict is 451.

3      Why don't you look it up in the next few minutes and give it to

4      my law clerk.  I think we already have them.  If we don't, give

5      me a copy so I can compare them.

6             Do you have a second issue?

7             MR. YALOWITZ:  The second thing is that on the police

8      magazines, Mr. Hill made a representation to the Court that

9      only one of the magazines was published by the PA and that

10     three of the magazines were not published by the PA.  We have

11     done a considerable amount of work since he made that

12     representation.

13            I'm going to supply the Court as soon as I can get it

14     together -- it could be tomorrow, it might be Sunday -- with

15     the factual basis for my position that all of those magazines

16     were published by the PA.  I will give the Court some documents

17     that have been translated.

18            THE COURT:  Do you have a witness who can lay a

19     foundation?

20            MR. YALOWITZ:  I do have a witness who can lay a

21     foundation.  There are a lot of those statements.  I can give

22     those to the Court if it would be helpful to the Court.  Or the

23     Court can assume that they are going to come in, that they are

24     linkable to the PA.

25            The question that we really have of your Honor is

 1    which ones you are going to allow that go to the scope of

 2    employment and which ones the Court feels under 403 are really

 3    not going to come in.  We gave them to you, and I understand

 4    the Court's prior indication about 403.

 5              THE COURT:  You gave me what?

 6              MR. YALOWITZ:  We gave you a letter on January 12th or

 7    13th with the statements.  I can resend them.

 8              THE COURT:  Did I rule on that?

 9              MR. YALOWITZ:  No.

10              THE COURT:  You will have to tell me which document.

11    Tell my law clerk which one you are referring to, and I'll pull

12    it out and look at it and give you a ruling.

13              My position is this.  To the extent that there is no

14    dispute that it is a PA or PLO publication, it can go in.  To

15    the extent that there is a dispute that it is one of their

16    publications, then you are going to have to put some evidence

17    before the jury that convinces me and them that it is such a

18    publication of theirs.  If they want to dispute that, they can

19    fight that out in front of the jury.  If you lay the minimum

20    foundation indicating that this is generated by the PA to be a

21    statement attributed to the PA or PLO, then that is the

22    foundation.

23              MR. YALOWITZ:  We will give the Court the docket

24    number.  If the Court needs courtesy copies of anything --

25              THE COURT:  You mean exhibit numbers?

 1            MR. YALOWITZ:  No, docket number of the letter

 2  requesting a ruling.

 3            THE COURT:  I have the stack of letters here.  It is

 4  probably right here.  If you tell me what day it was written, I

 5  can pull it out.

 6            MR. ROCHON:  Your Honor, I think I have the docket

 7  number here, if it is of any help.  We sent the Court a letter

 8  on January 5th that goes to this.

 9            THE COURT:  January 5th?

10            MR. ROCHON:  Yes.

11            MR. YALOWITZ:  That's not it, your Honor.  It was

12  after that.

13            THE COURT:  You are going to have to identify it.

14            MR. YALOWITZ:  I will do that.  With the Court's

15  permission, could we send an email.

16            THE LAW CLERK:  Just tell me the docket number.

17            MR. YALOWITZ:  I don't know it off the top of my head.

18            THE COURT:  If you get it to me this afternoon, I will

19  read it tonight.  If you can't get it to me this afternoon, I

20  will read it whenever I can receive it.  Tell me what it is

21  that I need to look at to make a judgment about this, and I'll

22  look at it all and I'll be prepared to make a determination.

23            MR. YALOWITZ:  I don't have it right at the table.

24            THE COURT:  That's fine.  My decision is very simple.

25  If they dispute it, then as long as you have something you are

1   confident that is going to demonstrate that they are

2   responsible for this publication, that would convince a

3   reasonable person, then it is going to convince me.

4           MR. YALOWITZ:  It will convince you.

5           MR. ROCHON:  Let's not talk about what we will do, but

6   just do it.  We will read the letter when we get it.

7           THE COURT:  What else?

8           MR. YALOWITZ:  Marwan Barghouti, 451.  We will hand up

9   a copy before we walk out of the courtroom.

10          THE COURT:  You say the information is already in?

11          MR. YALOWITZ:  Right.  That is the three individuals,

12  when the Court is ready.  Abdel Kareem Aweis.

13          THE COURT:  You don't have to do it now.  Give it to

14  my law clerk, and she will write it all down after we adjourn.

15  Anything else that we need to do on the record?

16          MR. YALOWITZ:  No.

17          THE COURT:  Anything else?

18          MR. HILL:  I just want to say one thing about the

19  Marwan Barghouti conviction.  He was not convicted, as you

20  know, for any of the attacks at issue in this case.  However,

21  he was acquitted for one of them.  He was charged in the

22  January 22, 2002, shooting attack, and he was acquitted of that

23  conduct.  I would urge the Court to not unredact anything in

24  there, particularly given the fact that that particular

25  defendant was charged in one of these courts and he was

1    acquitted.

2              THE COURT:  You don't want that in?

3              MR. HILL:  The fact that he was acquitted?

4              THE COURT:  Yes.

5              MR. ROCHON:  We would rather not have it in that he

6    was charged.

7              THE COURT:  That's what I'm trying to figure out.

8              MR. ROCHON:  We want to keep it out.

9              MR. HILL:  We don't want it in.

10             THE COURT:  I have to look at it again.  I don't have

11   a present memory of it and the issue.  I will look at it and

12   have a view for you first thing Tuesday morning.

13             MR. ROCHON:  What time on Tuesday?

14             THE COURT:  9:30.  Have a good weekend.

15             (Adjourned to 9:30 a.m., January 20, 2015)

16

17

18

19

20

21

22

23

24

25

1                         INDEX OF EXAMINATION

2   Examination of:                    Page

3   ALON EVIATAR

4        Direct By Mr. Yalowitz  . . . . . . . . . 568

5

6

7                      PLAINTIFF EXHIBITS

8   Exhibit No.                              Received

9   6   . . . . . . . . . . . . . . . . . . . 616

10  15  . . . . . . . . . . . . . . . . . . . 611

11  241 . . . . . . . . . . . . . . . . . . . 574

12  537 . . . . . . . . . . . . . . . . . . . 669

13  626 . . . . . . . . . . . . . . . . . . . 644

14  631 . . . . . . . . . . . . . . . . . . . 661

15  829 . . . . . . . . . . . . . . . . . . . 643

16  831 . . . . . . . . . . . . . . . . . . . 621

17  889 . . . . . . . . . . . . . . . . . . . 653

18  1052 . . . . . . . . . . . . . . . . . . . 677

19  1143 . . . . . . . . . . . . . . . . . . . 578

20  1162 . . . . . . . . . . . . . . . . . . . 638

21  1187 . . . . . . . . . . . . . . . . . . . 605

22  1188 . . . . . . . . . . . . . . . . . . . 615

23

24

25