688

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   MARK I. SOKOLOW, et al.,

 4                   Plaintiffs,

 5            v.                          04 CV 397 (GBD)

 6   PALESTINE LIBERATION
     ORGANIZATION, et al.,
 7
                     Defendants.
 8
     ------------------------------x
 9                                       New York, N.Y.
                                         January 20, 2015
10                                       9:30 a.m.

11   Before:

12                   HON. GEORGE B. DANIELS,

13                                       District Judge

14                        APPEARANCES

15   ARNOLD & PORTER LLP
          Attorneys for Plaintiffs
16   BY:  KENT A. YALOWITZ
          PHILIP W. HORTON
17        TAL MACHNES
          SARA PILDIS
18        CARMELA T. ROMEO
          RACHEL WEISER
19
     MILLER & CHEVALIER, CHARTERED
20        Attorneys for Defendants
     BY:  MARK J. ROCHON
21        LAURA G. FERGUSON
          BRIAN A. HILL
22        MICHAEL SATIN

23   Also present:  RACHELLE AVITAL, Hebrew interpreter
                    RINA NE'EMAN, Hebrew interpreter
24

25
```

```
 1              (Trial resumed; jury not present)

 2         THE COURT:  Good morning.  Let me go first to the

 3    characterizing of the police magazines that are at issue.  I

 4    understand your argument.  I don't know specifically what the

 5    defense's position is as to why or not PA publications.

 6    Articulate your position to me.

 7         MR. HILL:  We are planning to submit one letter today.

 8    As I understand it, those are not going to be offered with

 9    today's witness.  Perhaps we could take that up later on.

10         THE COURT:  Just give to it me quickly so I can focus.

11    Is it your position that these are not published by PA

12    employees?

13         MR. HILL:  They are not official PA publications.

14         THE COURT:  You can't trick me now.  Listen to my

15    question so we can be focused.  I can understand your argument

16    to focus in if I eliminate some others.  But that is not your

17    argument.  Your argument is not that these aren't PA employees

18    who are working on the publication of these documents.

19         MR. HILL:  I don't know if that is the case for all of

20    them.  I know that for some of them people who were employed by

21    the PA were involved in preparing these materials.  They are

22    not the PA's materials.

23         THE COURT:  You don't contend that there are some who

24    are working on these materials but that are otherwise employed

25    other than as PA employees?
```

 1              MR. HILL:  I don't know the answer to that, your

 2      Honor.  I'm sorry.

 3              THE COURT:  I assume your position is not that they

 4      are not being paid by the PA; they are being paid by some other

 5      entity or they are being paid independently by the publication,

 6      that that is their job rather than their job being PA

 7      employees?

 8              MR. HILL:  I don't the answer.  That is why we are

 9      working on the letter.

10              THE COURT:  I'll put that aside.  Let me go to Marwan

11      Barghouti's op-ed piece.  First of all, I sometimes think that

12      lawyers are supposed to oppose whatever the other side wants

13      simply because they want it.  Quite frankly -- I read this

14      op-ed piece -- I don't understand why the two of you aren't

15      taking the opposite position that you are taking with this

16      op-ed piece.  Let me quickly refer you to some phrases that are

17      in this op-ed piece.

18              "I can assure the Israeli people that neither my

19      assassination nor any of the other 82 assassinations during the

20      past 15 months will bring them any closer to the security they

21      seek and deserve."

22              Standard language:  "Israel will have security only

23      after the end of occupation, not before."

24              "That the independent and equal neighbors of Israel

25      and Palestine negotiate a peaceful future with close economic

 1    and cultural ties."

 2            "Over the past 15 months Israel has killed more than

 3    900 Palestinian citizens, 25 percent of them under the age of

 4    18."

 5            "If Israel reserves the riot to bomb us with F16s and

 6    helicopter gunships, it should not be surprising when

 7    Palestinian's seek defensive weapons to bring those aircraft

 8    down and while I and the Fatah movement to which I belong

 9    strongly oppose attacks and the targeting of civilians inside

10    Israel."

11            "Our future neighbor.  I reserve the right to protect

12    myself to resist the Israeli occupation of my country and to

13    fight for my freedom."

14            "I am not a terrorist."

15            "For six years I languished as a political prisoner in

16    an Israeli jail, where I was tortured, where I hung blindfold

17    as an Israeli beat my genitals with a stick.  I have been a

18    tireless advocate of a peace based on fairness and equality.  I

19    do not seek to destroy Israel but only to end its occupation of

20    my country."  The writer is general secretary of Fatah on the

21    West bank and was elected to the Palestinian legislative

22    council.

23            Mr. Yalowitz, do you want this op-ed to demonstrate

24    that these are statements of a terrorist?

25            MR. YALOWITZ:  I thought your Honor already ruled on

1    that document.  What I was trying to do is make sure that the

2    Court understood my theory, my legal theory, and how it fit in.

3    I'm not rearguing the Court's ruling on that evidential matter.

4    I just wanted to make sure that the Court is informed about --

5              THE COURT:  You want this in?

6              MR. YALOWITZ:  Your Honor already ruled that it is

7    out.

8              THE COURT:  I may reconsider it.  They may change

9    their mind.  I just read to you the parts that jumped out at

10   me.  I wasn't, I am a terrorist.

11             MR. YALOWITZ:  Even Homer nods sometimes.  I'm

12   satisfied with the Court's ruling on that document.

13             THE COURT:  Don't tell me you're satisfied with the

14   Court's ruling.  You are always going to be bound by the

15   Court's ruling.  I'm giving you an opportunity to convince me

16   to change that ruling and let me put this before this jury.

17   You want to put this before this jury?

18             MR. YALOWITZ:  We don't need to put this document

19   before the jury.

20             THE COURT:  Are you moving for its admission or are

21   you withdrawing your application to admit this in evidence?

22             MR. YALOWITZ:  I am withdrawing my application to

23   admit that document.

24             THE COURT:  Does the defense have any other position?

25   Do you want this the document in?

```
 1              MR. ROCHON:  No.

 2              THE COURT:  Then that is not an issue.

 3              MR. YALOWITZ:  That letter is not an issue.  I just

 4    want to make sure the Court was understanding my legal theory.

 5              THE COURT:  You don't have a legal theory.  You just

 6    withdrew the offer of this document.

 7              MR. YALOWITZ:  My legal theory on coercion and

 8    intimidation of the United States government not based on that

 9    document, based on other evidence.

10              THE COURT:  I don't understand why I'm concentrating

11    on this if you're saying you're not going to offer it in

12    evidence.  I read it, in detail.

13              MR. YALOWITZ:  I can tell.

14              THE COURT:  You have some other issues that I don't

15    think are necessarily, one, consistent with your position about

16    this person; two, may be prejudicial to your clients.

17              MR. YALOWITZ:  Having had the colloquy with the Court,

18    I am unequivocally clear we are withdrawing our application for

19    that document.

20              THE COURT:  All right.

21              MR. YALOWITZ:  I do want to make sure the Court

22    understands my theory about apparent intent to coerce and

23    intimidate the United States government.

24              THE COURT:  I can't understand the theory unless you

25    put it in a context.  I know what you are saying in the
```

 1   abstract, but there is nothing for me to do with it at this

 2   point.

 3            MR. YALOWITZ:  I agree.

 4            THE COURT:  Because we are not fighting over a

 5   document that you want that reflects that.  I thought this was

 6   the document that you wanted that reflects it.

 7            MR. YALOWITZ:  I tried to be clear, but I was being

 8   hasty.

 9            THE COURT:  That definitely wasn't clear.

10            MR. YALOWITZ:  I understand.

11            THE COURT:  You said up until this second you wanted

12   this document admitted into evidence and you said you

13   understood my ruling.  You never said until this very moment

14   that you were withdrawing the application.

15            MR. YALOWITZ:  Right.  We withdrew that application.

16            THE COURT:  Let's move on.  I'm not sure I understand

17   the relevance and your purpose for wanting to offer Exhibits

18   192A, 655, 913, and 914.  You say they purport to be what and

19   demonstrate what?

20            MR. YALOWITZ:  These are the intifada diaries.  They

21   demonstrate apparent intent to coerce and intimidate the United

22   States government.

23            THE COURT:  I didn't see that in the document.  Give

24   me an example of that in the document.  Quote to me what is

25   evidence there.

 1              MR. YALOWITZ:  Bear with me, your Honor.

 2              THE COURT:  You say this document was provided to

 3   whom?

 4              MR. YALOWITZ:  This document was authored by a joint

 5   committee that included representatives of Fatah and Hamas and

 6   others and published in the West Bank and Gaza during the years

 7   in question.

 8              THE COURT:  When are these publications?

 9              MR. YALOWITZ:  '01, '02 time frame.

10              THE COURT:  Not in the police publications?  What kind

11   of publications are you saying?

12              MR. YALOWITZ:  It's like a circular, like a leaflet

13   that they send out.  I'm looking for a quote.  For example,

14   913, page 2.  I apologize.  Page 3, at the very beginning.

15   "There needs to be action and greater pressure letting the

16   United States of America know that the continuation of their

17   flagrant bias toward the interests of the Zionist entity and

18   against the rights of our people will be an incentive for our

19   nation's masses to move in earnest to threaten U.S. interests

20   in the region in all their economic, political, and security

21   forms.  The battle is open, bloody, and fierce, and nobody can

22   escape its fire except by engaging in it side by side with our

23   inalienable national rights, at the forefront of which is the

24   right to Jerusalem, the first of the two quatib and the third

25   holy place.

1          THE COURT:  You say this is evidence of what?

2          MR. YALOWITZ:  Apparent intent to coerce and

3     intimidate the United States government and influence the

4     policy of the United States government.

5          THE COURT:  I understand your general theme, but that

6     is not the complete statement of what is relevant.  What is

7     relevant is terrorist activity that is done to coerce the U.S.

8     government.  Their words of threats, begging, cajoling,

9     negotiating, that doesn't reflect the use of terror as a weapon

10    to influence the government.  We all know -- there is no secret

11    in this courtroom, I think even the jury knows from day one

12    when they came in here -- that all of the activity that is

13    being done by the PA, the PLO, the public statements and the

14    negotiations are in an effort to influence the position of both

15    the U.S. and Israel.  There is no secret about that.

16          You want some implication from this that this is

17    somehow the purpose of the terrorist attack.  Everybody who is

18    on that side of this debate wants to influence the position of

19    Israel and the U.S.  How does that make it more likely that

20    people will engage in acts of terror?

21          MR. YALOWITZ:  My position is this.  First of all, I

22    agree with you, what you said.  I think it is obvious from the

23    context of the actions and the number of Americans who are

24    touched by terror in this period, a number of U.S. envoys, and

25    so forth --

 1                 THE COURT:  I didn't say all of that.  That's not what
 2      I said.
 3                 MR. YALOWITZ:  People understand, and I am just
 4      articulating why.
 5                 THE COURT:  OK.
 6                 MR. YALOWITZ:  My position is this.  When you are
 7      trying to figure out what someone's intent is, you have to look
 8      at their actions and their words.
 9                 THE COURT:  Right.
10                 MR. YALOWITZ:  We understand the actions.  Words can
11      have different meanings depending upon what actions they
12      accompany.
13                 THE COURT:  You hit the nail on the head.  I don't see
14      anyplace in this document where these words accompany a
15      terrorist act.
16                 MR. YALOWITZ:  This document was dated August 12,
17      2001.  That is three days after the Sbarro Pizza bombing at
18      which the PA arrested Abdullah Barghouti.
19                 THE COURT:  What difference would it make whether it
20      was three days after, three days before, or on that date if it
21      doesn't even reference that date?
22                 MR. YALOWITZ:  It does not reference that event.
23      Maybe this is something that we need to see what their case is.
24                 THE COURT:  Maybe you do.
25                 MR. YALOWITZ:  This goes very much to the issue of

1   condemnations.  Remember the chronology.  This pizza restaurant

2   blew up August 9th.  President Bush said, I call on chairman

3   Arafat to condemn this in the strongest terms.  Arafat issued a

4   condemnation and then within days this document came out

5   criticizing America's policy toward the conflict and speaking

6   about blood and action and like that.

7           THE COURT:  Every comment speaks about blood and

8   action.  The problem I have, even when we went through the

9   individuals, is that, first of all, I'm not sure whose blood

10  they are talking about in every statement in isolation.  Two,

11  that is an accurate comment.  There is significant blood being

12  let here.  Whether that is in a context of I'm going to go out

13  and shoot or blow up innocent civilians, I can't keep letting

14  you make that leap because someone makes a comment that they

15  are dedicated to armed struggle for their political interests.

16          As I say, that is one reason who I it is named the

17  Palestine Liberation Organization.  We know they are dedicated

18  to a position, and we know that most of its leaders and many of

19  its people feel that they are justified and have the right to

20  armed struggle.

21          I'm trying to balance that.  Every time you want to

22  show somebody with a gun or every time someone says, I'm

23  dedicated to defending myself or I'm dedicated to liberating my

24  people or my land by armed struggle, I can't let you translate

25  that into, oh, he's talking about blowing up innocent civilians

1    in Jerusalem.  I cannot give you that unless you give me

2    something that ties this to that.

3           And it has to be a little bit more than temporal

4    proximity.  Quite frankly, if I use that, there is so much

5    violence, there was so much violence going on during this time

6    period, I don't know that I could find a time period without

7    some violent acts going on, terrorist acts happening at this

8    point.  You have to tell me that it reflects someone's state of

9    mind about the terrorist or terrorist activity.

10          MR. YALOWITZ:  In this case.

11          THE COURT:  In this context you can't simply say

12   because someone said we are going to liberate our country, we

13   need an army to do so, that that means that they are talking

14   about terrorism.  You can't do that.

15          MR. YALOWITZ:  I'm really focused with the intifada

16   diaries on three documents.  Let me lay out for you what I want

17   to do with them.

18          THE COURT:  OK.

19          MR. YALOWITZ:  Then we will be guided by your ruling.

20   That is all I can do, is give you the information.  I

21   understand the baseline from which you are beginning.  I don't

22   disagree with that baseline.

23          One of the intifada diaries I want to offer just to

24   show who is in it, what organizations are in it.

25          THE COURT:  Which document are you talking about?

700

         1              MR. YALOWITZ:  I think it is 192A.  Just who signed it

         2    and how did they get organized and what are they.  That is an

         3    intifada diary from the beginning of the intifada.  It just

         4    says these are who the members are.

         5              THE COURT:  Members of what?

         6              MR. YALOWITZ:  The members of the committee that

         7    published this intifada diary.  You can see at the end,

         8    Palestine National Liberation Movement, Popular Front for the

         9    Liberation of Palestine, Populist --

        10              THE COURT:  I didn't read it as carefully as I would

        11    have if I had had more time.  What is the substance of this

        12    document that you say has any relevance to this case, the

        13    substance?  What is it that you want to attribute, what comment

        14    do you want to attribute to the defendants?  Or are you just

        15    doing this document simply for the list of organizations that

        16    happen to put out a joint statement?

        17              MR. YALOWITZ:  As the baseline, this is who the

        18    intifada diary authors are in general.  I don't really care

        19    about the substance of that article.  I care about the date and

        20    the names.  That is 192A.  The reason I care about the name is

        21    twofold.  Number one, two establish the joint action.

        22              THE COURT:  Between whom?

        23              MR. YALOWITZ:  Between Hamas and Fatah.  Number two,

        24    to give a baseline for who is responsible for later intifada

        25    diaries if the Court wants to redact the substance of the

701

1    statement --

2         THE COURT:  I'm not sure what the testimony would be

3    if I just redacted the statement and gave them a list of

4    organizations.

5         MR. YALOWITZ:  The testimony would be this is what

6    the -- the intifada diaries came out of a committee joined by

7    Hamas, Fatah, other groups, and they met regularly and they

8    established this committee and it worked for a period of years

9    and they put out a number of statements, some of which you are

10   going to hear about.

11        THE COURT:  You have to give me more detail.  What do

12   you characterize as the intifada diary?

13        MR. YALOWITZ:  It is like a 14-volume set of books

14   that collects all these circulars that were put out by this

15   committee.

16        THE COURT:  It reflects what?

17        MR. YALOWITZ:  It reflects statements by Fatah, Hamas,

18   Palestinian Islamic Jihad, all these organizations in a joint

19   committee talking about their goals and communicating with the

20   people what their policies are.

21        THE COURT:  The policy that they are talking about

22   isn't terrorism.

23        MR. YALOWITZ:  I think in some cases -- if I can take

24   you to the two that I care about.  The first one we just talked

25   about is this August 12th.

702

1        THE COURT:  You say there is nothing of substance

2   there that you even want.  You're not going to argue that this

3   discusses terrorism.

4        MR. YALOWITZ:  No, I'm sorry.  192A is the baseline,

5   this is who it is.  913 is the August 12th, saying -- remember,

6   this is a week in which there has been a horrific terrorist

7   attack that caused the President of the United States to react,

8   and the immediate response of this committee, of which Marwan

9   Barghouti is the Fatah representative, the immediate response

10  is to say America will feel its interests threatened if they

11  don't stand with us.

12       THE COURT:  Where does it say that?

13       MR. YALOWITZ:  Third page.  "There needs to be action

14  and greater pressure letting the United States know that the

15  continuation of their flagrant bias towards the interests of

16  the Zionist entity," I think it is a reasonable inference

17  reflected in the statement of President Bush, "and against the

18  rights of our people will be an incentive for our nation's

19  masses to move in earnest to threaten U.S. interests in the

20  region in all their economic, political, and security forms."

21       Given the temporal proximity --

22       THE COURT:  What do you say they are threatening to

23  do?

24       MR. YALOWITZ:  Let's read the next sentence.  "The

25  battle is open, bloody, and fierce, and nobody can escape it,

703

```
1   its fire, except by engaging in it side by side with our

2   inalienable national rights."

3        THE COURT:  Is there anything inaccurate about that

4   this is bloody and fierce?

5        MR. YALOWITZ:  I'm saying that it will be.  It is a

6   forecast of further -- it is a forecast.

7        THE COURT:  That's the thing.  You want to say it is a

8   forecast that the PA and the PLO are going to engage in

9   terrorist acts?

10        MR. YALOWITZ:  Right.

11        THE COURT:  Let me go back logically.  So you know

12   where I'm coming from, there is a basic approach that I'm

13   looking into.  When I look at these public documents and I look

14   at your videos, logic would dictate that if one is going to

15   engage in terrorist acts, one is not going to advertise that

16   while they are engaging in those acts.  As a matter of fact, if

17   you look at the stuff that I have given you, it is the opposite

18   of that.  To give your example that you are trying to argue,

19   Yasser Arafat is saying just the opposite.  His statements are

20   just the opposite:  Not me.  Right?  You would agree with that?

21        MR. YALOWITZ:  Some of his statements.  Some of his

22   statements are he goes in English to the Americans, sometimes

23   in Arabic, and says violence is bad.  Other times he whips up

24   the crowd and leads a chant, give us weapons, Abu Ammar.

25        THE COURT:  "Give us weapons" is not a statement that
```

704

 1    the only conclusion is that is consistent with terrorism.  That

 2    is consistent with, I agree with you, violence.  It is

 3    consistent with armed struggle.  It is even consistent with

 4    what I read to you out of the op-ed piece that you originally

 5    wanted in.  It says, look, we condemn killing innocent

 6    civilians, but we have the right to get weapons that when

 7    helicopters are coming down and shooting our civilians, we have

 8    the right to shoot back at the helicopter.

 9         One could debate any part of that issue or any part of

10    that political position, but it is not a statement about

11    terrorism.  I want to be clear.  Obviously, I want to be fair

12    about this.  But I can't let you say every statement about

13    violence every time somebody is shown with a gun in their hand,

14    every time someone says they need to defend themselves, every

15    time someone says blood has been spilled, every time someone

16    says further blood will be spilled, that that is a reasonable

17    inference for the jury to draw that that means they are a

18    terrorist.  You know that is not a reasonable logical position

19    that you could urge upon the jury.

20         MR. YALOWITZ:  I hear what you are saying.  I think it

21    is not the only inference.  The defendants could argue to the

22    jury the opposite.  We could argue that it is a reasonable

23    inference.  But I hear what you are saying.

24         My concern is twofold.  First, there is some evidence

25    which is very tightly linked to the issues in the case.  The

1   August 12th one is think is pretty tightly linked.  I think the

2   August 27th intifada document is very tightly linked because

3   that is the day they let Abdullah Barghouti out of jail and

4   they say, we are going to avenge the death of this guy who was

5   killed, Mustafa, Ali Abdul Mustafa .

6        THE COURT:  When did the next terrorist act occur?

7   Months later, right?

8        MR. YALOWITZ:  Yes, that's right.

9        THE COURT:  Your temporal proximity now is not

10   temporal proximity with regard to a terrorist act taking place.

11   It is temporal proximity with regard to Marwan Barghouti being

12   released from jail and, putting on that, that somehow reflects

13   that he was released from jail so he could do some terrorist

14   act in the future, the first of which happened months later.

15   That is quite a leap, isn't it?

16        MR. YALOWITZ:  I don't think it is a leap at all.  You

17   give a loaded gun to a child and the child keeps the gun around

18   for a while and then starts using it.

19        THE COURT:  If you have evidence of giving a loaded

20   gun to a child, I'll let it in.

21        MR. YALOWITZ:  We are saying that is evidence of

22   recklessness.  It is the same thing here.

23        THE COURT:  You're right, it may be evidence of

24   recklessness, but it doesn't transform public statements that

25   are the standard public statements that are made every other

 1    day when there are terrorist acts and when there are not

 2    terrorist attacks, that it is more likely than not that he

 3    means a terrorist attack.

 4              You can't just argue that they can argue the other

 5    side.  If both inferences are equally plausible, it is not

 6    relevant.  You cannot offer it for the jury to decide more

 7    likely than not this has to do with terrorism.

 8              As you said, they make these statements.  They might

 9    have made this kind of statement yesterday.  I don't know a

10    period of time that you could tell me that they didn't make

11    this kind of statement.  So I don't know that the temporal

12    proximity has anything to do with what they intended.  They

13    made this kind of statement from day one and they made this

14    kind of statement each day.  That would be your position,

15    right?

16              MR. YALOWITZ:  I actually don't think that is true.  I

17    don't think they make that kind of statement --

18              THE COURT:  The most recent one you wanted to offer on

19    the videotape was 2012.

20              MR. YALOWITZ:  They do make statements glorifying

21    terrorists.  They do make statements saying Abdullah Barghouti

22    is a national hero, Nasser Aweis is a national hero.  That

23    strikes me as relevant, when they go on television and say this

24    guy is a national hero.  That suggests some element of

25    agreement about the actions that you perpetrated because the

 1    reason they think he is a national hero is because he killed

 2    civilians.

 3           With regard to these documents that we are talking

 4    about, I hear the Court's views.  I'm not withdrawing them.  I

 5    understand the Court's views.  I think that we may have a

 6    different conversation if the defense case is we were

 7    condemning violence, we are trying to prevent violence.  If

 8    that is the defense case, then I think we have a very different

 9    conversation about this kind of rhetoric, because now we have

10    to meet their case.

11           If your ruling is these aren't coming in in my case in

12    chief, I can move on.

13           THE COURT:  Frankly, from my perspective and I think

14    from the jurors' perspective, the way you characterize it as to

15    what they might put in in this case is not going to advance

16    this case either in their favor or your favor.  It is not

17    whether or not they are against violence.  I think the evidence

18    is pretty clear that they are willing to resort to violence,

19    armed struggle.  That is the way they characterize it.  So that

20    is not the issue.

21           The issue is whether or not they are committed to

22    terrorism, that they are committed to doing violence, injuring

23    and killing innocent civilians.

24           I kind of think that they are not going to get up

25    there and say that.  That would be my guess.  I don't think it

1  will ever be in that context in this case.  I would find it

2  very difficult to believe that they would get up and say, no,

3  we are not committed to the use of violence and armed struggle

4  to get our way.  I doubt seriously that that is going to

5  happen.

6        You have got to draw a fine line.  Quite frankly, the

7  fine line that I have to confront is that the ruling on either

8  side of that line is significantly prejudicial, is

9  significantly prejudicial.  I'm not going to let them get up

10  here and say, oh, violence, no, we follow Mahatma Ghandi and

11  Martin Luther King, we don't do violence.  They are not going

12  to say that.

13        And I can't let you say every time they say, we are

14  dedicated to armed struggle to free our people, that that means

15  that they are saying, watch out, I'm going to blow you up in a

16  café tomorrow.  I can't let you do that.  That is not

17  reasonable unless you have some evidence that that is what

18  somebody is talking about.

19        As yet, I have seen not a single statement that is in

20  the context of discussing a terrorist act, in particular a

21  terrorist act in this case.  That is where you need to start

22  convincing.  I can't let you just keep throwing in these are

23  violent people.  That is not the logic that this jury is

24  supposed to decide this case on, that they are willing to

25  dedicate themselves to violence to get their way or even to

1  influence the position of Israel or influence the position of

2  the United States.  That is not what this case is about.

3          I want to bring the jury in.  That is where you are

4  going to have to convince me.  I don't know what we are going

5  to get to today, what I need to resolve for this morning.

6          MR. YALOWITZ:  I don't know that we are going to get

7  through all of Eviatar's testimony today, but that was my goal

8  coming into today.  I want to get his direct done, if not

9  today, then tomorrow morning.

10          THE COURT:  Most of these issues that I looked at this

11  weekend, they are resolved.

12          MR. YALOWITZ:  Yes.

13          THE COURT:  They are already resolved.  I don't know

14  why we are going over the same ground.  I thought the GIS

15  document files and the personnel record, I thought it was

16  pretty clear what my ruling was on that.  Redact them.  Redact

17  them in the way that I said redact them; otherwise, don't offer

18  them.  That is your choice.  We are not going to go over this a

19  sixth time.

20          MR. YALOWITZ:  I think we have done that.  What the

21  defendants have done is I think they have misread the Court's

22  ruling.  They are saying every time there is a name of anybody

23  in a GIS document, it's got to be redacted.  That is not the

24  way I remember the Court's ruling.

25          My recollection is if there is an indictment in their

710

1    files, then it has to be redacted in the way the Court said.

2    But if it is their reports, if it is their documents, then we

3    are not offering it as self-inculpatory statements, we are

4    offering it as their business records, their publications.

5        THE COURT:  Again, it depends on what documents you

6    are talking about.  I think the way you just characterized it,

7    it is probably more consistent with my ruling than inconsistent

8    with my ruling.  If it is their document that they created,

9    clearly, if they created the document, if there is some

10   evidence to indicate that they created the document -- but even

11   if they didn't create the document, it may be relevant to what

12   they knew, what they had before them.  That is a different

13   question.  That has nothing to do with indictments or the

14   judgments or anything else or confession.

15       MR. YALOWITZ:  Right.  That was my recollection.

16       THE COURT:  If there is a specific statement in a

17   particular document that they believe should be excluded based

18   on my ruling and is somehow prejudicial to them because you are

19   using it for an improper purpose, then I want to hear it.  But

20   both sides at this point are saying, I want none of this and I

21   want all of this.  It is not advancing my position any

22   differently from when we talked about this on day one.

23       MR. YALOWITZ:  I agree with that.  With regard to the

24   Marwan Barghouti verdict, your Honor, we had talked on Friday

25   about the issue of co-conspirators and allowing --

1          THE COURT:  I'm not sure what rule you are referring

2    to.  A co-conspirator's statement made during the course of a

3    conspiracy that is attributed to all of those who are currently

4    involved in that conspiracy.  This is not a co-conspirator

5    statement during the course of the conspiracy.

6          MR. YALOWITZ:  It is not essential to the case.

7    Marwan Barghouti was the hub with Nasser Shawish, Nasser Aweis,

8    Abdel Aweis, these were the direct reports, and it says that in

9    his report.  Frankly, I don't think it is contested because

10   they either they admitted to or they were found guilty of being

11   his direct reports.  It would be helpful to the jury to see

12   that link.

13         THE COURT:  I thought we had testimony last week that

14   these people directly reported to him.

15         MR. YALOWITZ:  I think it would be helpful for them to

16   see that link in his verdict.

17         THE COURT:  I know.  But it is the form of the

18   evidence you want to offer at this point.  What I thought you

19   were going to argue to me, until I started going back to the

20   documents, is that Marwan admitted it and Ahmed admitted it, so

21   what is the big deal.

22         MR. YALOWITZ:  That was my argument.

23         THE COURT:  But that is not the argument, because they

24   have it.  As a matter of fact, we should go back to locate the

25   document.  There is only one plea of guilty among all of these

1    documents that you want to offer for that purpose.

2         MR. YALOWITZ:  Ahmed.

3         THE COURT:  Right.  There is one admission.  No one

4    else says what you say, none of the other defendants.  So it is

5    not that.  It is that you want me to say that because the Court

6    found it in one case and they found it in another case, that it

7    must be so.  Well, it is the same court.  I don't know if they

8    are relying on their finding in the other court when they found

9    it in this court.  It doesn't make it any more or less likely

10   that it is true.

11        MR. YALOWITZ:  I think I understand the Court's ruling

12   on that.  Let's move on.  I don't think it changes the ruling.

13   It was different courts.  But let's move on.

14        THE COURT:  You say different courts.  I thought it

15   was the military court.

16        MR. YALOWITZ:  Marwan was tried in a civilian court.

17        THE COURT:  I stand corrected.  I don't think it

18   changes my position.

19        MR. YALOWITZ:  I'm ready to move on.

20        THE COURT:  The last thing is that I'm not quite sure

21   what we are fighting about again on prisoner files, particular

22   prisoner files of prisoners who weren't convicted in this

23   attack.

24        MR. YALOWITZ:  They were convicted.  As I understand

25   the defendant's argument -- I spoke with them last night about

 1   this and tried to resolve it.  They can speak for themselves.

 2   As I understand their argument, the evidence in the defendant's

 3   own files saying this guy was convicted of the Hebrew

 4   University attack is irrelevant because we haven't already

 5   proven with a conviction that the guy was convicted.

 6          THE COURT:  Have you proven that the guy was

 7   convicted?

 8          MR. YALOWITZ:  I want to offer that evidence to prove

 9   that he was convicted.  It is not subject to dispute.

10          THE COURT:  What evidence are you offering to prove he

11   was convicted and why do we not have the conviction if he was

12   convicted?

13          MR. YALOWITZ:  Your Honor, I came into the case at a

14   time when a lot had been done, so I have some things --

15          THE COURT:  You step into the shoes of the former

16   lawyer.

17          MR. YALOWITZ:  You asked me why.  I have never been

18   untransparent with you.

19          THE COURT:  I understand.

20          MR. YALOWITZ:  I don't need a conviction to prove that

21   the defendants, consistent with their regular policy,

22   understood that these individuals participated in the Hebrew

23   University attack and put them on the payroll.

24          THE COURT:  What is the evidence that they knew that

25   they participated in the Hebrew University attack?

```
 1              MR. YALOWITZ:  Intelligence files.

 2              THE COURT:  That says what?

 3              MR. YALOWITZ:  That says he participated in the Hebrew

 4    University attack.

 5              THE COURT:  Whose intelligence file?

 6              MR. YALOWITZ:  The defendant's.

 7              THE COURT:  You want to offer files of individuals

 8    for?  Is it your position these people were convicted?

 9              MR. YALOWITZ:  Yes.

10              THE COURT:  In an Israeli civilian or military?

11              MR. YALOWITZ:  Military.

12              THE COURT:  Obviously, that is the best evidence of

13    that fact.

14              MR. YALOWITZ:  I know.  It is not the only evidence,

15    though.

16              THE COURT:  No.  I guess it doesn't matter one way or

17    the other as to why we found ourselves with some people you

18    want to say were convicted and you don't have any convictions.

19              MR. YALOWITZ:  I might be able to get some convictions

20    in as impeachment evidence if it is denied.  I don't think it

21    is going to be denied.

22              THE COURT:  Is this something you want to utilize with

23    this witness?

24              MR. YALOWITZ:  Yes.

25              THE COURT:  I don't believe we are arguing about this.
```

1   This witness has been on the stand three days, and we are still

2   arguing about what goes in with this witness.

3            MR. YALOWITZ:  I'm doing my best with these guys, your

4   Honor.  I can't seem to agree on even the -- honestly, I'm

5   really trying hard with these guys.

6            THE COURT:  The last thing, and then I will bring out

7   the jury.  Your photos of Arafat, I think it has minimal

8   probative value, but I don't think it is more prejudicial than

9   probative.  If you want a picture of Arafat kissing Marwan

10  Barghouti --

11           MR. YALOWITZ:  Kissing the Hamas leader, but yes.

12           THE COURT:  If you want to argue that he knows Hamas

13  leaders, I'm fine with that.  We can go through it if you want

14  to go through it later in detail, but there is another reason

15  why one of the videos that I'm particularly concerned about,

16  that I didn't allow, saying that they protected Hamas.

17           My understanding is that they are responsible for the

18  security of all of the people in the Palestinian area that the

19  Hamas leaders were targeted for assassination.  You can tell me

20  if I've got this wrong.  And that in the context in which he

21  was commenting is that they protected the Hamas leaders from

22  assassination by Israeli forces and they felt that was their

23  responsibility.

24           That is why that kind of statement out of context I

25  ruled inadmissible.  It does not demonstrate that they are in

1    cahoots with Hamas to commit terrorist acts.  I think it is an

2    unfair and inaccurate inference to take from that statement.

3    That is, again, one of the reasons why I'm not allowing that

4    statement.  That statement is not evidence that they are in

5    cahoots with Hamas.

6        The fact that you got Arafat kissing a Hamas leader on

7    the cheek, quite frankly, that is not particularly evidence

8    that he is in cahoots with the Hamas leader to commit terrorist

9    acts.  I don't know even know what terrorist act you are

10   accusing that Hamas leader of committing or being involved in

11   personally.  The only one I can guess would be the Hebrew

12   University bombing, but I'm not sure there is any evidence that

13   that Hamas leader had any involvement in that.  But if that is

14   the way you want to argue it, it seems to me --

15       MR. YALOWITZ:  First of all, I'm not rearguing any of

16   the Court's rulings on the videos.  You looked at them.  You

17   made a judgment.  I'm moving on.

18       With regard to that picture, I think that the jury

19   needs some background to understand what is Hamas, what is

20   their relationship with Arafat.  Arafat was a highly

21   sophisticated utilizer of symbolic gestures.  I'm not arguing

22   this proves that he is a terrorist.  I'm arguing this is useful

23   background information to understand what is the relationship

24   with Hamas.  Anyway, OK.

25       THE COURT:  The other picture that you want to offer,

1  you said that you have photos of the Hebrew University bombing

2  aftermath.

3          MR. YALOWITZ:  Right.

4          THE COURT:  I don't know if you were arguing about

5  photos I haven't seen before.

6          MR. YALOWITZ:  No, you have seen them.

7          THE COURT:  I don't know why we are back to the

8  photos.

9          MR. YALOWITZ:  Maybe I'll just put it out there.  The

10  defendants are saying we can't lay a foundation for these

11  photos.  Our witness will be able to look at them and

12  foundationalize them.

13          One thing.  There is a video of the Hebrew University

14  aftermath which I know the Court saw and ruled is not a

15  problem.

16          THE COURT:  Right.  I said that they can come in.

17          MR. YALOWITZ:  Right.  We have a witness who was there

18  who gave me a declaration saying this is an accurate portrayal

19  of the aftermath of that event.  I really don't want to bring

20  the witness down to the courthouse --

21          MR. ROCHON:  We are not objecting on that basis.

22          THE COURT:  Are you objecting on any other basis?

23          MR. ROCHON:  No.  You have already ruled on that.  He

24  doesn't need to --

25          THE COURT:  Why am I bothering reading your letter?

 1          MR. ROCHON:  That is not in the letter.  The video is

 2   not something that is raised in the letter.  We didn't raise

 3   the video.  Mr. Yalowitz didn't raise the video.

 4          THE COURT:  I don't know why I'm arguing about Hebrew

 5   University photos of the aftermath if you have already agreed

 6   that the whole video can come in.  Is there something wrong

 7   with these photos?  Do they represent something different from

 8   what was used in the video?

 9          MR. ROCHON:  The question came up with regard to this

10   witness, your Honor.  But we will withdraw our request as to

11   the photos.

12          THE COURT:  All right.

13          MR. ROCHON:  I have another request once Mr. Yalowitz

14   is done.

15          MR. YALOWITZ:  I'm just answering your questions,

16   Judge.

17          MR. ROCHON:  I'm not complaining about the length of

18   time.  Obviously, he has been going for a little while.  I want

19   to focus the Court's attention on two aspects of the GIS file

20   issue.  Number one, Plaintiff's Exhibit number 61 includes the

21   indictment in the file.

22          THE COURT:  Right.  We dealt with that already, too, I

23   thought.

24          MR. ROCHON:  I thought so, too, that it would have to

25   be redacted; otherwise, it is not admissible.  That person

 1    didn't plead guilty.  I just want to make sure we are clear.

 2              THE COURT:  I thought we specifically addressed this

 3    particular issue.

 4              MR. ROCHON:  We think you did, he thinks you did, but

 5    we think you may reach a different result.  We think it is not

 6    in, Mr. Yalowitz thinks it is not in.  Even though it is not

 7    our document, it is someone else's document that is not

 8    otherwise admissible that ended up in the files.  Ending up

 9    there doesn't change the evidentiary rule.  Maybe I

10    misunderstood this.

11              THE COURT:  Was that indictment an indictment of

12    someone whose conviction we have in evidence?

13              MR. ROCHON:  It is not in evidence.

14              THE COURT:  Is it an indictment of the person whose

15    conviction is in evidence?

16              MR. ROCHON:  No.

17              THE COURT:  I have to go back.  You said 61?

18              MR. ROCHON:  Yes.

19              THE COURT:  I'll go back and look at it.  I don't

20    remember specifically the ruling with regard to that

21    discussion, but I have a vague recollection that this was

22    resolved and that the GIS, consistent with my other ruling that

23    simply was they had an indictment -- you can't understand the

24    GIS document without the indictment.  But the indictment is not

25    evidence.

720

1           MR. YALOWITZ:  The indictment is offered for notice.

2           THE COURT:  Of what?

3           MR. YALOWITZ:  Of what he was accused of and then

4  convicted of.

5           THE COURT:  Does it say in there he was convicted?

6           MR. YALOWITZ:  No.  It says in the GIS.

7           THE COURT:  Right, the GIS document says he was

8  convicted?

9           MR. YALOWITZ:  Correct.

10          THE COURT:  Does it say what he was convicted of?

11          MR. YALOWITZ:  It says he was convicted of the Hebrew

12  University bombing.

13          THE COURT:  What else do you need?

14          MR. YALOWITZ:  I like the indictment because --

15          THE COURT:  I know you like it.  Liking it is not the

16  way I rule.  I know you want it because you like it.  I want to

17  know what it is probative of.  You wanted to show that he was

18  convicted of committing the Hebrew University bombing.

19          MR. YALOWITZ:  Correct.

20          THE COURT:  I understand that.  You said the GIS

21  document says he was convicted of committing the Hebrew

22  University bombing.  They are clearly on notice.  Their own

23  words put them on notice.  They admit in their document that

24  they know that.

25               What you really want is you want the details of how

721

1    the prosecutors characterize how the offense took place, what

2    this person's involvement was, and what other people's

3    involvement was that are not the subject of this indictment.

4         MR. YALOWITZ:  No, no.  We have redacted the names of

5    all those other people in the indictment, consistent with the

6    Court's ruling.  The thing that I want to publish to the jury

7    in this indictment is the fact that this individual was

8    convicted -- was accused of killing four of my client families'

9    relatives and then they've got a document in their files

10   showing that he was convicted and they put him on the payroll

11   and kept him on the payroll.

12        THE COURT:  The first part of what you said has

13   nothing to do with the second part of what you said.  They had

14   notice in their files.  They wrote he was convicted of the

15   Hebrew University bombing, and they kept him on their payroll.

16        MR. YALOWITZ:  Yes.

17        THE COURT:  What difference does it make, the

18   indictment?  The indictment doesn't make that more or less

19   likely.  You already have that they know and you have it

20   independently.  The indictment doesn't say they kept him on the

21   payroll.

22        MR. YALOWITZ:  No.  The indictment says they

23   understood exactly what he was accused of and convicted.

24        THE COURT:  How many indictments do we have in this

25   case that lay out exactly how the Hebrew University bombing

722

1     took place?  Is there something revealing in this indictment

2     that is not in the other indictment?

3            MR. YALOWITZ:  This one is a different guy.  That's

4     what I care about, that this guy was convicted of the Hebrew

5     University bombing.

6            THE COURT:  It says in the GIS file he was convicted

7     of the Hebrew University bombing.  You know exactly what

8     happened and you know who was killed, right?  You have to give

9     me some other basis why the jury is going to be smarter

10    tomorrow than they are today because they have seen this

11    indictment.

12           MR. YALOWITZ:  Because they are going to see the names

13    of the families.

14           THE COURT:  They have seen the names of the families

15    in their own indictment.

16           MR. YALOWITZ:  They are going to see the names of the

17    families with this guy.

18           THE COURT:  Didn't we go through that the other day?

19           MR. YALOWITZ:  Not with this guy.

20           THE COURT:  No, the names of the families named in the

21    indictment of the person who was convicted in the Hebrew

22    University.

23           MR. YALOWITZ:  About Abdullah Barghouti, right.

24           THE COURT:  How does this make them smarter when they

25    heard it that way?

1              MR. YALOWITZ:  People sometimes need repetition.

2              THE COURT:  You can put that indictment in front of

3    them again and read them back the testimony.  This witness, my

4    recollection, read directly from the indictment saying who the

5    victims were.  You went over that in greet detail.

6              MR. YALOWITZ:  With Kaufman, yes.  The other thing is,

7    frankly, I have a logistical problem.  I have 12 copies of

8    these binders.  I fairly followed the Court's ruling.  What I

9    get on my way to court Monday morning when I'm standing in line

10   at security, I get a letter saying, we don't like this

11   indictment and we want to reargue the Court's ruling.

12             You are the ultimate arbiter of this.

13             THE COURT:  The thing that is frustrating for me is we

14   laid out what you agreed to, both of you, as the process of how

15   you would be notified of what was going to come in evidence and

16   how you were going to indicate that you have some objection.

17   Neither side did anything consistent with that agreement.

18             I shouldn't be sitting here on Tuesday morning after a

19   week of trial with this witness already being on the stand

20   three days and I get letters that are showing up an hour before

21   we start court, arguing about whether or not things that are

22   supposed to come in evidence today are going to be admitted.

23             I'm going to start enforcing this rule without regard

24   to the merits of your argument.  You need to tell them as early

25   as possible what it is you intend to use, and they need to tell

724

1    you as early as possible that they have some objection to it.

2        I'm not listening to any more excuses why you didn't

3    figure it out earlier, and I'm not going to listen to any more

4    excuses from them of why they didn't object to it earlier.  I'm

5    going to make the ruling based on who I think has violated that

6    rule.  I fault you for giving them notice late, and I fault

7    them for waiting until minutes before we get in the courtroom

8    to try to raise this issue.

9        MR. YALOWITZ:  I gave them these documents last week,

10   your Honor.  I didn't give it to them last minute.

11       THE COURT:  Let's move on.

12       MR. YALOWITZ:  I don't want to play who struck John

13   here, but I am working real hard to give them as much notice as

14   I can.  I was very clear with them as early as I could that we

15   were going to use this document.  I gave them the redactions

16   that I thought followed the Court's ruling.  The first I heard

17   about it was last night.

18       THE COURT:  Mr. Rochon, last word.

19       MR. ROCHON:  I disagree with some of that, but we

20   don't need to get into it here.  We will both try to abide by

21   the Court's instructions.

22       THE COURT:  I'm not going to have 20 side bars every

23   day during this trial because all of a sudden for the first

24   time I hear about an objection.

25       Let's get the jury.

725

```
 1              (Jury present)

 2    ALON   EVIATAR, resumed.

 3              THE COURT:  Good morning, ladies and gentlemen.  I

 4    hope you had a nice weekend.  I thank you for your patience.  I

 5    assure you that we were out here working over the last hour.

 6    I'm hopeful that we can pick up the pace this week and maybe

 7    try to get a little head of schedule.  I will let you know

 8    before the end of the week where we are.

 9              Mr. Yalowitz, you may continue.

10              MR. YALOWITZ:  Thank you, your Honor.  And thank you,

11    ladies and gentlemen of the jury.

12    DIRECT EXAMINATION

13    Q.  Mr. Eviatar, I would like to begin the morning by asking

14    you, if we can, to describe an individual named Marwan

15    Barghouti.

16    A.  Marwan Barghouti is a member of the Palestinian Legislative

17    Council, the leader of Fatah in the West Bank, a man who was

18    very close to Arafat.  He has been sitting in an Israeli jail

19    for five life sentences for his personal and direct involvement

20    in terror during the Al Aqsa intifada.

21    Q.  You mentioned that he was very close to Yasser Arafat.

22    Could you explain to the jury the nature of the relationship

23    between those two men.

24    A.  Between Marwan Barghouti and Arafat, meetings were held on

25    a continual basis.  During these meetings, and this is how
```

1   Marwan Barghouti himself describes it --

2              MR. ROCHON:  Objection.

3              THE COURT:  Sustained.

4   Q.  Without saying Marwan Barghouti himself, what he said, just

5   if you could explain how often they spoke and what your

6   understanding was, based on your experience and years of

7   observing them, of the way they communicated and the way they

8   interacted?

9              MR. ROCHON:  Same objection.

10             THE COURT:  Sustained as to the form of the question.

11  Break that down.  It is too complicated.

12             MR. YALOWITZ:  Sure.

13  Q.  Can you explain to the jury how often they spoke.

14  A.  They would meet every few weeks.

15  Q.  Let me put some more pieces in place with regard to Marwan

16  Barghouti.  Who paid his salary during the years in question?

17  A.  The Palestinian Authority.

18  Q.  Do you have before you a large binder with some exhibits in

19  it?

20  A.  Yes, I do.

21  Q.  Would you take a look at Plaintiff's Exhibit number 1.

22  What is that document?

23  A.  This document details the transmissions, or transfers,

24  rather, of salaries to the members of the Palestinian

25  Legislative Council during the year 2002, and among them is

1  Marwan Barghouti.

2         MR. YALOWITZ:  Your Honor, plaintiffs offer Exhibit 1

3  in evidence.

4         MR. ROCHON:  No objection.

5         THE COURT:  It will be admitted into evidence.

6         (Plaintiff's Exhibit 1 received in evidence)

7  Q.  Let's take a look at the exhibit for the jury.  I

8  particularly want to focus on the date of this exhibit.

9         MR. YALOWITZ:  I direct the jury's attention, your

10  Honor, to the date of the exhibit under the notes section

11  toward the middle of the page.  With the Court's permission

12  I'll read.

13         THE COURT:  Yes.

14  Q.  It says, "Notes:  Representatives' awards for the month of

15  June 2002."  Is that date consistent with your reading of the

16  document, Mr. Eviatar?

17  A.  Yes, definitely.

18  Q.  Do you recall where Marwan Barghouti was in June of 2002?

19  A.  He was under arrest by Israel.

20  Q.  He was in jail?

21  A.  He was arrested in April of 2002.  In June he was under

22  arrest or detained.  I can't tell you if it was a jail or not,

23  or prison or not.

24  Q.  Thank you.  Now I would like to ask you, Mr. Eviatar, to

25  turn to tab 451 in your binder.

1  A.  I have the document before me.

2  Q.  I want to ask you one logistical question.  Could you turn

3  over the page and tell me, are there blacked-out names or are

4  the names legible to you?

5  A.  Yes.

6  Q.  Yes, they are blacked out?

7  A.  Yes, they are.

8  Q.  OK, great.  Can you describe what Exhibit 451 is.

9  A.  Exhibit 451 is the verdict given in the court in Tel Aviv

10  against Marwan Barghouti.

11         MR. YALOWITZ:  Your Honor, plaintiffs offer

12  Exhibit 451 as redacted consistent with our prior discussions.

13         MR. ROCHON:  Subject to prior, your Honor.

14         THE COURT:  It will be admitted into evidence.

15         MR. YALOWITZ:  Thank you, your Honor.

16         (Plaintiff's Exhibit 451 received in evidence)

17  Q.  I would like to direct you, Mr. Eviatar, to page 113 of

18  that document, paragraph 140.

19  A.  I have paragraph 140 in front of me.

20         MR. YALOWITZ:  With the Court's permission, I would

21  like to read it and then ask the witness some questions about

22  it.

23         THE COURT:  Yes.

24         MR. YALOWITZ:  Thank you.  Bear with me, ladies and

25  gentlemen.

1    Q.  "The fact that Fatah, Tanzim, and the Al Aqsa Martyrs

2    Brigades are terrorist organizations, in accordance with that

3    which has been set forth in a document, is clearly proven by

4    the seized documents that were taken during Operation

5    Protective Shield, which were presented as evidence in this

6    court, and also from the testimony of the terrorism operatives

7    and the defendant himself (see above sections 7-10 testimony of

8    another person; testimony of an additional person in section

9    25; testimony of an additional person in section 29; testimony

10   of a fourth person in section 35; testimony of a fifth person

11   in section 40; testimony of a sixth person in section 55;

12   testimony of a seventh person in section 57; and the

13   defendant's statements from his interrogation as described in

14   sections 60-64).

15          "The terrorist attacks that are the subject of this

16   indictment and many others were executed by the field

17   operatives of Fatah -- members of the Tanzim -- and by cells

18   that were organized within the framework that is called the 'Al

19   Aqsa Martyrs Brigades.'  The defendant was the leader of Fatah

20   in the West Bank and commander of the Tanzim and Al Aqsa

21   Martyrs Brigades, as he admitted during the course of his

22   interrogation and as proven by much additional evidence.

23          "The defendant's roles in leadership of the terrorist

24   organizations were also described at length.  The defendant was

25   the commander of terrorist organizations and terrorist cells,

 1   even if sometimes they did not follow his orders, and he made

 2   an effort to supply them with weapons, explosives, and money

 3   for the purpose of their activities."

 4        Do you have a view based on your professional

 5   experience of the accuracy and reliability of the conclusions

 6   of this court?

 7        MR. ROCHON:  Objection, your Honor.

 8        THE COURT:  Sustained as to the form of the question.

 9   Q.  Could you describe your view of the activities of Marwan

10   Barghouti.

11        MR. ROCHON:  Objection, your Honor.

12        THE COURT:  I'm going to sustain as to the form.  Are

13   you asking him to comment on this document or are you asking

14   him to comment on something else that is not before him?

15   Q.  Could you comment on this document?

16        MR. ROCHON:  Your Honor, objection.

17        THE COURT:  Focus your question.  What do you want him

18   to focus on?

19        MR. YALOWITZ:  I would like to know his views --

20        THE COURT:  Pose the question.

21   Q.  Mr. Eviatar, could you tell the jury your views on the role

22   of Marwan Barghouti in connection with Fatah, Tanzim, and the

23   Al Aqsa Martyrs Brigades.

24        MR. ROCHON:  Objection.

25        THE COURT:  Again, I need you to focus that question a

731

 1  little more.

 2          MR. YALOWITZ:  Sure.

 3          THE COURT:  What are you asking him to describe?

 4  Q.  Could you describe Marwan Barghouti's role as leader of

 5  Fatah and Al Aqsa Martyrs Brigades as you understand it in

 6  connection with the terrorist activities of those entities.

 7          MR. ROCHON:  Objection, your Honor.

 8          THE COURT:  I'm going to let him answer.  Go ahead.

 9  A.  Marwan Barghouti had a very significant role in causing the

10  activities of terror during the Al Aqsa intifada.  He served as

11  a central axis in operating terrorist cells that belonged to

12  Fatah and to the Al Aqsa Martyrs Brigades, the military wing of

13  Fatah.  He would supply arms, money, and other resources,

14  including in his role as someone who was an authority for them,

15  so that they would carry out terrorist attacks.  Central

16  terrorist operatives in Fatah and its military wing viewed

17  Marwan Barghouti as more than an authority; they viewed him as

18  the link between them and Yasser Arafat.

19          MR. ROCHON:  Objection.  Motion to strike.

20          THE COURT:  Overruled.  You can cross-examine.

21          (Continued on next page)

22

23

24

25

```
 1   Q.  Now, have you had the opportunity to evaluate the records

 2   of the Palestinian authorities' general intelligence apparatus

 3   concerning their views about Marwan Barghouti?

 4   A.  Yes, for sure.

 5   Q.  I would like to direct you in your binder to Exhibit 143.

 6   Do you have it before you?

 7   A.  I have the document.

 8   Q.  Can you identify it for the Court?

 9   A.  The document is a personnel record of Marwan Barghouti,

10   which was in the possession of the general intelligence

11   services of the Palestinian Authority.

12               MR. YALOWITZ:  Plaintiffs offer 143 in evidence.

13               MR. ROCHON:  Subject to prior.

14               THE COURT:  It will be admitted.

15               MR. YALOWITZ:  Thank you.

16               (Plaintiff's Exhibit 143 received in evidence)

17   Q.  I would like to direct you Mr. Eviatar, first of all, is

18   this the document -- do we have on the screen the document that

19   you were looking at?

20   A.  It's the same document.

21   Q.  I would like to direct you and the jury to the report on

22   page 4.  In particular, I am looking at the last two stars in

23   that report.

24   A.  I see them.

25               MR. YALOWITZ:  May I publish them to the jury, your
```

```
 1    Honor?

 2              THE COURT:  Yes.

 3    BY MR. YALOWITZ:

 4    Q.  "In the beginning of the current Intifada, he became one of

 5    its symbols when he was arrested and sentenced to five life

 6    sentences and is still imprisoned to this day.

 7              "He is an ambitious man, and he occupied himself in

 8    prison in studies, becoming proficient in Hebrew, English and

 9    French."

10              Have you had the opportunity to look at other general

11    intelligence apparatus reports on Marwan Barghouti?

12    A.  Yes.

13    Q.  By the way, do you agree with the Palestinian authorities'

14    assessment that Marwan Barghouti became one of the symbols of

15    the Intifada?

16    A.  I more than agree.

17    Q.  Let's take a look at 162.

18    A.  I have the document before me.

19    Q.  What is this document?

20    A.  Just a moment, please.  This is an additional security

21    report about Marwan Barghouti.  It includes personal

22    information, information that expands upon the information with

23    respect to Marwan Barghouti.

24              MR. YALOWITZ:  Your Honor, plaintiff's offer Exhibit

25    162 in evidence.
```

734

```
 1                MR. ROCHON:  Subject to prior.

 2                THE COURT:  It will be admitted into evidence.

 3                MR. YALOWITZ:  Thank you.

 4                (Plaintiff's Exhibit 162 received in evidence)

 5   Q.  Mr. Eviatar, I would like to direct you to page 5 of this

 6   particular report.

 7   A.  I see the page.

 8   Q.  I would like to direct you and the jury to certain comments

 9   in this report, and then I will ask you some questions about

10   it.

11                So let's just highlight, first of all, the name of the

12   person, and at the very top personal information – candidate

13   for the legislative council.

14                Could you remind the jury what date this document is.

15   It's just right there above where we're looking.

16   A.  The date of the document is November 12, 2005.

17   Q.  So as of November 12, 2005, what was Marwan Barghouti's

18   status with regard to his conviction?

19   A.  He was a prisoner in Israeli prison.

20   Q.  If you just flip to Exhibit 451 to refresh yourself, let's

21   take a look and see if we have a date on his conviction.  I'm

22   looking right after paragraph 179.  What is the date on which

23   Marwan Barghouti was convicted?

24   A.  May 20, 2004.

25   Q.  Would you just tell the jury what crimes he is convicted of
```

1  based on your review of that page.

2  A.  Personal responsibility for several acts of terror in which

3  Israeli civilians were killed.

4  Q.  Thank you.

5       Now, let's fast forward from May 20, 2004 back to

6  November 12, 2005, the date of the report we're looking at.

7  This is 162.

8       What was Marwan Barghouti -- from where was Marwan

9  Barghouti running as a candidate for the legislative council?

10 A.  The Fatah movement.

11      MR. YALOWITZ:  Your Honor, may I direct the jury to

12 the line right above the first table in which the Palestinian

13 authorities intelligence apparatus?

14      THE COURT:  Why don't you not characterize it.  Why

15 don't you point to where you want the jury to look.

16      MR. YALOWITZ:  Sure.  It's the line that says:  "His

17 involvement in the situation, he is currently imprisoned."

18      THE COURT:  Is that on the document?  I'll allow it.

19      MR. YALOWITZ:  Thank you, your Honor.

20      I would also like the Court's permission to direct the

21 jury to the report's statements concerning Marwan Barghouti's

22 financial status, security status and moral status, if I may.

23      THE COURT:  All right.  Go ahead.

24      MR. YALOWITZ:  Thank you.

25 Q.  Financial status - good.  Security status - very good.

1   Moral status – very good.

2          MR. YALOWITZ:  Your Honor, I would also like the

3   Court's permission to direct the jury to the statements

4   concerning the personal traits of Marwan Barghouti.

5          THE COURT:  Go ahead.

6   Q.  "He has a strong personality and is an eloquent speaker."

7          THE COURT:  Let them see that.

8          MR. YALOWITZ:  Thank you.

9          THE COURT:  Go ahead.

10          MR. YALOWITZ:  Thank you.

11          I would also like to direct the jury to his weakness

12   points and strength points according to this report.

13          THE COURT:  Go ahead.

14   BY MR. YALOWITZ:

15   Q.  Weakness points – none.  Strength points – very good,

16   through the organizational base and his competence.

17          MR. YALOWITZ:  One other one on this table, your

18   Honor, I would like to direct the jury to his influence on

19   society.

20          THE COURT:  Go ahead.

21   Q.  His influence on society – strong.

22          MR. YALOWITZ:  Finally, I would like to direct the

23   jury's attention to the statement at the very bottom of the

24   report.  Maybe we can enlarge that one, Ms. Machnes.

25   Q.  "The chances of keeping him for the benefit of Fatah in

737

 1   case he wins:  Very strong.

 2          The way to do it:  Assigning him the position of the

 3   secretary general of the Fatah movement in the West Bank."

 4          Mr. Eviatar, would you comment on the policies that

 5   this document reflects concerning Marwan Barghouti.

 6          MR. ROCHON:  Objection, your Honor.

 7          THE COURT:  Sustained as to the form of the question.

 8   Focus your question.

 9          MR. YALOWITZ:  Sure.

10   Q.  Mr. Eviatar, could you explain to the jury what your

11   understanding is when the PA says that the way to keep him for

12   the benefit of Fatah is to assign him the position of the

13   secretary general of the Fatah movement in the West Bank?

14          MR. ROCHON:  Objection, your Honor.

15          THE COURT:  Overruled.  You may answer.

16   A.  I consider that statement to constitute strong political

17   support and common interests between the party that's

18   responsible for this document and Marwan Barghouti himself.

19   Q.  Who is the party responsible for this document?

20   A.  The general intelligence services of the Palestinian

21   Authority.

22   Q.  Who was in charge of that particular security apparatus?

23          MR. ROCHON:  Objection, your Honor.

24          THE COURT:  Overruled.

25          MR. ROCHON:  No, just to get a time frame.  The

738

 1   question didn't have a date.

 2           THE COURT:  You're asking about now or then?

 3           MR. YALOWITZ:  Let me clarify the question.

 4   Q.  As of 2005, who was in charge of the Palestinian Authority

 5   security apparatus known as the general intelligence service?

 6   A.  Tawfig Tirawi.

 7   Q.  Who was Tirawi's boss?

 8   A.  Yasser Arafat.

 9   Q.  Thank you.

10           Now, I want to ask you about Marwan Barghouti's use of

11   television.

12           During the years of the Al-Aqsa Intifada, did Marwan

13   Barghouti appear on television?

14   A.  He frequently would appear on television.

15   Q.  What was his apparent purpose for appearing on television?

16           MR. ROCHON:  Objection, your Honor.

17           THE COURT:  Sustained.

18   Q.  Let me direct you to paragraph 72 of Marwan Barghouti's

19   conviction.

20           MR. YALOWITZ:  May I read, your Honor?

21           THE COURT:  Yes.

22   Q.  The section is entitled:  "The defendant's public calls to

23   carry out terrorist attacks against Israel."

24           Could you just remind the jury, Mr. Eviatar, who is

25   the defendant in this indictment -- I'm sorry -- this

 1  conviction.

 2  A.   Marwan Barghouti.

 3            MR. YALOWITZ:  May I continue, your Honor?

 4            THE COURT:  Yes.

 5  Q.  "As already explained above, the defendant did not deny,

 6  during the course of his interrogation his support for

 7  terrorist attacks against military and civilian targets in the

 8  West Bank, meaning soldiers and settlers.  The defendant also

 9  explained that he would sometimes instruct the cells that

10  accepted his authority to stop the terrorist attacks, and would

11  then inform them to resume them anew, using public television

12  broadcasts.  The defendant was aware of the influence his words

13  had on people carrying out terrorist attacks and said," I have

14  influence because I speak through the media.  That is to say,

15  that I state the position using media outlets ... my word is

16  heard as if I were speaking in the name of the Fatah movement."

17            Skipping down one sentence:  "He admitted that during

18  his public appearances, he would encourage the operatives to

19  carry out terrorist attacks within the territories against the

20  army.

21            "The defendant's public calls for the perpetration of

22  terrorist attacks against Israel were documented by the

23  intelligence branch and were submitted in binder prosecution 3

24  including the original cassettes."

25            Have you had occasion to review the television

 1   appearances referenced in this conviction?

 2          MR. ROCHON:  Objection, your Honor.

 3          THE COURT:  Overruled.

 4   A.  I have seen dozens of such appearances by Marwan Barghouti,

 5   and I would add, Mr. Yalowitz, with your permission, one

 6   sentence, if I may with respect to my impression as a result of

 7   my meeting with Marwan Barghouti.

 8   Q.  Please go ahead.

 9          MR. ROCHON:  Objection.

10          THE COURT:  Sustained.

11   Q.  Could you please describe your impression of those

12   television appearances based on your experience?

13          MR. ROCHON:  Objection, your Honor.

14          THE COURT:  Overruled.  You can answer.

15   A.  My impression, which is based upon dozens of interviews and

16   appearances of Marwan Barghouti in various media stations, is

17   that Marwan Barghouti made use of this important instrument in

18   order to convey messages to everyone who was watching him.

19   Q.  I would like to direct your attention to one such

20   television appearance which is described in paragraph 74 of the

21   verdict toward the bottom of that photograph.  If we could just

22   bring the jury to the next page, Ms. Machnes.  Thank you so

23   much.

24          MR. YALOWITZ:  May I read, your Honor?

25          THE COURT:  Yes.

BY MR. YALOWITZ:

Q.  "After the death of another person on January 14, 2002" --
let me just ask you -- I'm sorry -- let me continue."

        "After the death of another person on January 14,
2002, the defendant spoke on Abu Dhabi television and called on
the al-aqsa martyr brigades to carry out terrorist attacks
against Israelis in revenge.  The defendant admitted this
during the course of his interrogation."

        Is that statement consistent with evidence you have
seen about the conduct of Marwan Barghouti during the month of
January 2002, Mr. Eviatar?

A.  Absolutely yes.

        MR. YALOWITZ:  Your Honor, I just need to consult with
my colleagues because I want to make sure I comply with our
discussion that we had.

        THE COURT:  Go ahead.

Q.  Earlier I asked you about the defendant's -- I'm sorry --
earlier I asked you about Marwan Barghouti's relationship with
Arafat.  Could you just remind the jury as to whether there was
anybody in between Marwan Barghouti and Yasser Arafat in terms
of reporting within Fatah?

A.  There was nobody between them.

Q.  Is there anybody in Fatah, the PLO or the Palestinian
Authority, other than Yasser Arafat who could give Marwan
Barghouti an order?

```
 1    A.  I am not aware of any such person.

 2    Q.  I would like to direct you to paragraph 16 of Marwan

 3    Barghouti's verdict.

 4              MR. YALOWITZ:  Your Honor, may I read from paragraph

 5    16?

 6              THE COURT:  Yes.

 7    BY MR. YALOWITZ:

 8    Q.  "With respect to Fatah's policy on terrorist attacks, the

 9    defendant explained during the course of his interrogation" --

10    and let me just ask you, the defendant in this document is who?

11    Who is the defendant in this document?

12    A.  Marwan Barghouti.

13    Q.  "With respect to Fatah's policy on terrorist attacks, the

14    defendant explained during the course of his interrogation that

15    when another person was interested in a cease fire, he would

16    take pains to convey the guideline to many different people,

17    including the defendant; but that when he was interested in the

18    continuation of the activity, he would make sure that the

19    operatives, including the defendant, would understand this from

20    his responses and especially from his non-responses.

21              "The defendant said:  'If he, for example, did not

22    want a cease fire, he would take care of matters differently.

23    He would not say anything at all.'  The defendant said that

24    this other person had never explicitly ordered him to carry out

25    terrorist attacks.  Notwithstanding, he did add that from the
```

 1    fact this other person only opposed the perpetration of

 2    terrorist attacks within Israel, it was possible to understand

 3    that he supported a terrorist attack in the territories and,

 4    therefore, he did not order that they be stopped; on several

 5    occasions, this person stated in the media 'a million shahids

 6    heeds (martyrs) are on their way to Jerusalem' and the

 7    defendant asked rhetorically whether the statement wasn't a

 8    state of support for terrorist attacks.

 9          "The defendant" -- I'm just reading a little bit lower

10    than what is on the screen.

11          "The defendant explained that there was no need for

12    direct orders from this other person in order to carry out

13    terrorist attacks since this was self-evident between the

14    lines.  The defendant added that even if the Intifada had not

15    commenced at the order of this person, it would not have

16    continued if he did not support even though it was not

17    necessary for him to give explicit orders with respect to the

18    perpetration of terrorist attacks."

19          Just turning to the next page:  "It should also be

20    noted that the defendant understood that this person supported

21    the terrorist attacks from the fact that this person would

22    approve the financial requests that he submitted for the Fatah

23    field operatives who were perpetrating the terrorist attacks.

24          "The defendant described his relationship with this

25    person as personal and direct."

 1        MR. YALOWITZ:  Your Honor, may I just read from the

 2   block quote of Marwan Barghouti's statement in the middle of

 3   the page?

 4        THE COURT:  Yes.

 5   Q.  "When he was asked how he would announce his desire to

 6   renew attacks, the defendant answered:  'I do not want fire.  I

 7   talk on television if I want peace,' meaning I do not call up

 8   some random person and say, 'Hey go commit a terrorist attack

 9   for us.  Hey, do this or that for us "that is not the way we

10   work.  I speak in the name of the movement and I am actually

11   calling for an Intifada when I call for an armed struggle.'"

12        In spite of these statements on the part of the

13   defendant, it emerges from the testimony of the terrorist

14   operative, another person, that the defendant did instruct him

15   to cease the perpetration of terrorist attacks during the visit

16   of the United States emissary Anthony Zinni.

17        Now, Mr. Eviatar, are the relationships described in

18   the statements that I just read?  Could you just comment on

19   that direct and personal relationship, please.

20        MR. ROCHON:  Objection, your Honor.

21        THE COURT:  Sustained as to form.

22   Q.  The relationships and -- the relationship that I just

23   described, can you think -- well, let me withdraw it.  I think

24   we have done enough with this document, your Honor.

25        Let me move from the topic of Marwan Barghouti on to a

1    question of some of the patterns and policies with regard to

2    terror that we have not yet covered.

3            So, I would like to begin by asking you whether during

4    the course of your work and in preparation for your testimony,

5    you have had occasion to understand the number of individuals

6    who have been convicted and imprisoned for terrorist activities

7    in general during the years 2000 to 2004.

8    A.  Yes, of course.

9    Q.  Have you also had occasion to consider during the course of

10   your work and in preparation for your testimony how many of

11   those individuals were security employees of the Palestinian

12   Authority?

13   A.  Yes, for sure.

14   Q.  Would you please give the jury your estimates of those two

15   figures.

16   A.  My well-founded assessment is that many hundreds from among

17   the Palestinian security apparatuses were involved in terrorist

18   activities during the Intifada.

19           MR. ROCHON:  Objection.  Your Honor, not responsive.

20           THE COURT:  Overruled.  You can cross-examine.

21   BY MR. YALOWITZ:

22   Q.  Do you have an estimate of what proportion of these many

23   hundreds of individuals were members of the Fatah, Tanzim or

24   Al-Aqsa Martyr Brigades while they served as Palestinian

25   security officers?

```
 1              MR. ROCHON:  Objection.  Basis.

 2              THE COURT:  Overruled.

 3   A.  A large proportion of the number that I mentioned earlier

 4   were also members of Fatah and also members of the Al-Aqsa

 5   Martyr Brigades, and I can say one thing that can in fact

 6   explain this entire matter.  There is an almost complete

 7   identification or, rather, they're almost identical or almost

 8   completely identical the members of the Palestinian security

 9   apparatuses and their membership in the Fatah, and their

10   membership in the Al-Aqsa Martyrs Brigade.

11   Q.  Have you seen comments by Yasser Arafat himself describing

12   the level of control he felt he had over the perpetration of

13   terrorist activities?

14              MR. ROCHON:  Objection.  Substance --

15              THE COURT:  Sustained.

16   Q.  Have you had occasion to see video clips of Yasser Arafat

17   commenting on his degree of control over terrorist activities

18   from the period 2000 to 2004?

19              MR. ROCHON:  Objection.  Leading.

20              THE COURT:  Sustained.

21   Q.  In preparation for your testimony here today, have you had

22   occasion to review the videotape of Yasser Arafat commenting on

23   his degree of control over violence?

24              MR. ROCHON:  Objection.

25              THE COURT:  Sustained.  Come up.
```

1            (Continued on next page)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    (At the sidebar)

2             THE COURT:  Mr. Yalowitz, I'm not aware of any

3   videotape or any public comment in which Yasser Arafat said

4   that he controlled the terrorist acts that were being

5   committed.  Is there such a videotape or are you talking about

6   that one snippet, which is about five seconds, when he says

7   he's in control?

8             MR. YALOWITZ:  That's what I'm trying to get at.

9             THE COURT:  He didn't say anything about terrorist

10  acts.  He didn't say anything about terrorist attacks.  It is

11  not only unfair but it is inaccurate for you to characterize

12  that videotape as being a comment on terrorist attack.  That is

13  not what that videotape says; not the one I saw.  Is there

14  something in that videotape where he's commenting about

15  terrorist attacks?

16            MR. YALOWITZ:  No, I'm just trying to foundationalize

17  the tape.

18            THE COURT:  Well, you are improperly foundationalizing

19  the tape because that is not the foundation for the tape.  He

20  says absolutely nothing about terrorist attacks.  That is why

21  it was even borderline whether I was going to let you have this

22  because I did not want you to argue this.  That is not what

23  that thing said.

24            MR. ROCHON:  I would ask for a curative instruction to

25  the jury that suggestions coming from counsel have to do with
```

1  other videos as well.  He said in references to appearances,

2  and he has one clip that doesn't say anything that supports the

3  question.

4       THE COURT:  I don't give the instructions to the jury

5  about questions.  It's the answers.  He didn't answer that

6  question.  I sustained your objection.

7       MR. YALOWITZ:  I want to foundationalize the clip--

8       THE COURT:  I don't want you to comment on terrorism

9  because there is nothing in this clip that this jury is going

10  to see.  The question was:  Are you in charge of terrorists?

11  Yes, I'm in charge.  That was not the question in the answer on

12  that tape.

13       MR. YALOWITZ:  I understand.  Why don't we -- why

14  don't we have a stipulation that the tape is admissible subject

15  to prior objection.  I'll just play it.

16       THE COURT:  I already said that the tape was

17  admissible.  I already said that you could play that tape.

18  That's one of the things you gave me on the video.  It is

19  simply a question to Yasser Arafat whether he is in charge.

20  That's like asking Barak Obama:  Are you in charge, and he

21  says, yes, I'm in charge.  What is that supposed to mean?  That

22  doesn't mean every terrorist act that he was commenting -- is

23  an admission he was commenting on terrorist acts.  It's unfair

24  for you to say that unless you know something that you didn't

25  show me that you want to play to this jury that says that.

1    That's not what that said.

2         MR. ROCHON:  Judge, I know you don't normally give

3    curative instructions for questions, but when leading questions

4    are used that refer to facts that the jury will never hear, I

5    suggest that is an unusual situation that requires the Court to

6    at least remind the jury that, ladies and gentlemen, questions

7    aren't evidence.

8         THE COURT:  I gave them instructions at the beginning

9    of this case and I give them that specific instruction at the

10   end of this case.

11        MR. ROCHON:  I understand the Court's ruling.  In

12   light of the fact of not giving a curative instruction, I ask

13   the Court to declare a mistrial.

14        THE COURT:  That application is denied.

15        (Continued on next page)

16

17

18

19

20

21

22

23

24

25

7151

```
 1                    (In open court)

 2                    MR. YALOWITZ:  Let's go to the videotape.

 3                    Plaintiffs offer 239, clip 2.

 4                    THE COURT:  Do you have questions of this witness?

 5                    MR. YALOWITZ:  I want to show a videotape and then ask

 6      the witness questions about it.

 7                    THE COURT:  At least identify the videotape to this

 8      witness.  Lay a foundation.  Ask whether he's seen it and then

 9      have him comment on it.

10      Q.  Have you seen a clip of Yasser Arafat speaking on

11      December 7, 2001.

12      A.  Yes.

13                    MR. YALOWITZ:  Plaintiffs offer Exhibit 239 clip 2.

14                    MR. ROCHON:  Subject to prior, your Honor.

15                    THE COURT:  It will be admitted into evidence.

16                    MR. YALOWITZ:  Thank you.

17                    (Plaintiff's Exhibit 239 clip 2 received in evidence)

18                    (Videotape played)

19      Q.  Can you give the jury some context of what was going on in

20      December 2001 when Yasser Arafat made this comment?

21                    THE COURT:  Objection sustained.

22                    MR. ROCHON:  Your Honor --

23                    THE COURT:  No, when I sustain the objection, that

24      means you don't answer it.

25      Q.  Let me try one more.  Do you have an understanding based on
```

 1   your experience, do you have a view on what Yasser Arafat was

 2   speaking about in this clip?

 3            MR. ROCHON:  Objection, your Honor.

 4            THE COURT:  Sustained.

 5   BY MR. YALOWITZ:

 6            MR. YALOWITZ:  Let me move object then, your Honor.

 7            Now, I want to ask you about some evidence concerning

 8   financing of --

 9            MR. ROCHON:  Objection, your Honor.  Counsel is --

10            THE COURT:  I understand the question, Mr. Yalowitz.

11            MR. YALOWITZ:  I want to move to another topic.

12            THE COURT:  Let's cut out a lot of the intro.  Go

13   right to the question.

14            MR. YALOWITZ:  All right.

15   Q.  Would you turn to Exhibit 962 in your binder, Mr. Eviatar.

16   Can you tell the jury what this is?

17   A.  Yes, of course.  This document was sent by Hussein

18   Al-Sheikh, the general secretary of Fatah in the West Bank.

19   The letter was sent to the fighting president, Yasser Arafat,

20   with a request to allocate $2,500.

21   Q.  We just need it identified so that the Court understands

22   what it is.

23            MR. YALOWITZ:  Your Honor, plaintiffs move Exhibit 962

24   into evidence.

25            MR. ROCHON:  Subject to prior.

```
 1            THE COURT:  It will be admitted into evidence.

 2            MR. YALOWITZ:  Thank you.

 3            (Plaintiff's Exhibit 962 received in evidence)

 4  Q.  I didn't mean to cut you off, Mr. Eviatar.  I just wanted

 5  to make sure I followed the procedures.

 6            Now, why don't we begin, if we could, begin with the

 7  English, Ms. Machnes.  We will show it to the jury.

 8            What is Hussein Al-Sheikh asking for here,

 9  Mr. Eviatar?

10  A.  Hussein Al-Sheikh is asking from Yasser Arafat to allocate

11  the sum of $2,500 to three terrorist operatives of the Fatah.

12  Q.  And how do you know these three of terrorist is operatives?

13  A.  These are known terrorists who are responsible for a number

14  of terrorist attacks.

15            MR. ROCHON:  Objection.

16            THE COURT:  Overruled.  You can cross-examine.

17            MR. ROCHON:  Thank you.

18  A.  We have seen their names in previous documents.

19  Q.  Now, I would like to direct you to the Arabic version.  And

20  in particular highlight for you the diagonal writing across the

21  left-hand side.  Could you explain to the jury who wrote that

22  and what it says?

23  A.  I identify here the personal signature of Yasser Arafat.

24  That's the long line from top to bottom, and it says here in

25  Yasser Arafat's hand that he authorize the funding or the
```

1    allocation of $600 to each of them and the order was sent to

2    the finance ministry in Ramallah.

3    Q.   What is the finance ministry in Ramallah?

4    A.   This is a government ministry of the Palestinian Authority.

5    Q.   I also want to direct your attention to the salutation just

6    before Hussein Al-Sheikh's signature.  My English translation

7    says "the issue is at your discretion."  is that consistent

8    with the Arabic?

9    A.   I'm looking at it.  Yes, it is consistent.

10   Q.   What does it mean when a subordinate to Arafat writes "the

11   issue is at your discretion"?

12           MR. ROCHON:  Objection, your Honor.

13           THE COURT:  Overruled.

14   A.   In other words, the decision is in Arafat's hands.

15           MR. YALOWITZ:  Thank you.

16           I'd like you to turn to Exhibit 963 in your binder.

17   When you have a moment, just identify that document very

18   generally for the Court, please.

19   A.   This is a document sent from the Fatah movement to Yasser

20   Arafat, with the request to allocate funds.

21           MR. YALOWITZ:  Your Honor, plaintiffs move Exhibit 963

22   in evidence.

23           MR. ROCHON:  Subject to prior, your Honor.

24           THE COURT:  It will be admitted into evidence.

25           MR. YALOWITZ:  Thank you.

```
 1                (Plaintiff's Exhibit 963 received in evidence)

 2   BY MR. YALOWITZ:

 3   Q.  Let's start with the English version.  First of all, can

 4   you just explain what the symbol at the very top of the

 5   document is?

 6   A.  This is the symbol or the emblem of the Fatah movement.

 7   Q.  And then -- but right above the symbol, what does it say?

 8   A.  The state of Palestine.

 9   Q.  Why was the Fatah describing itself as the state of

10   Palestine if you know?

11             MR. ROCHON:  Objection, your Honor.

12             THE COURT:  Overruled.

13   A.  Fatah viewed itself as a movement that belonged to the

14   Palestinian Authority, which as it viewed it, was the state of

15   Palestine.

16   Q.  Now, in this document -- let me ask you first, who is this

17   document addressed to?

18   A.  Yasser Arafat, addressed by his nom de guerre, Abu Ammar.

19   Q.  And that is father of Ammar in Arabic?

20   A.  That is the meaning.

21   Q.  Did Arafat have any children?

22   A.  He had one daughter.

23   Q.  What was the daughter's name?

24   A.  Zahwa.

25   Q.  Did he adopt that name before he had children?
```

```
 1   A.  Yes, definitely.  This has been his nom de guerre for
 2   decades or rather this was his nom de guerre for decades.
 3   Q.  What is the request being made of Abu Ammar in this
 4   document?
 5   A.  The request specifies the names of 15 individuals and the
 6   head of the Fatah movement in the Tulkarm region district is
 7   asking Yasser Arafat to allocate $2,000 for each of them.
 8             MR. YALOWITZ:  May I read, your Honor?
 9             THE COURT:  Yes.
10   Q.  "Kindly allocate a sum of $2,000 for each of the following
11   warrior brothers.  The decision is at your discretion."
12             What is a warrior brother?
13             MR. ROCHON:  Objection.  Calls for speculation.
14             THE COURT:  No.  Overruled.  He can answer if he
15   knows.
16   A.  A warrior brother is a name for a terrorist operative who
17   is a member of the Fatah.
18   Q.  Thank you.
19             Let's take a look at the Arabic.  I want to direct you
20   to two signatures on the document.  First of all, can you just
21   identify for the jury the signature at the very bottom sort of
22   at the very right lower bottom of our screen.
23   A.  The signature that we see in the lower right-hand corner is
24   the signature of Marwan Barghouti.
25   Q.  Do you have an understanding as to why Marwan Barghouti was
```

757

 1   signing this document?

 2   A.  Of course.  Marwan Barghouti was a primary axis -- a

 3   primary entity that received the requisitions from the members

 4   of the Fatah, and he would transfer them directly to Yasser

 5   Arafat.

 6   Q.  Now, does this document reflect that pattern?

 7   A.  Precisely.

 8   Q.  Do we see an example of Arafat reaching a decision on this

 9   document?

10   A.  Yes.  We see the signature and the approval of Yasser

11   Arafat on this document.

12   Q.  Could you just point that out for the jury and explain

13   where it is in the portion of the screen.

14   A.  Arafat's signature, as we saw it in the previous document,

15   appears here as well in the middle of the page from top to

16   bottom.

17   Q.  Is that the area?

18   A.  Precisely.

19   Q.  And of the $2,000 requested, what does this document

20   indicate Arafat approved?

21   A.  Arafat approved an allocation of $800 for each person.

22   Q.  That's on a per warrior brother basis?

23   A.  Absolutely, each one of them.

24   Q.  Now, the raw documents that we have been looking at,

25   including this one, predate March of 2002.  Can you explain how

```
 1    these documents were collected?

 2              MR. ROCHON:  Objection.  Foundation.

 3              THE COURT:  Just a minute.

 4              MR. ROCHON:  Objection, your Honor.

 5              THE COURT:  I'm going to sustain the objection.  Are

 6    you asking how he collected them or how somebody else collected

 7    them?

 8              MR. YALOWITZ:  Sure.

 9    Q.  How the documents came to be part of the --

10              MR. ROCHON:  Renew the objection, your Honor.

11              THE COURT:  Ladies and gentlemen, I am going to give

12    you a break.  Let me just give it to you so we save time.

13    Don't discuss the case.  Keep an open mind.  We will bring you

14    back in a few moments.

15              (Jury excused)

16          (Continued on next page)

17

18

19

20

21

22

23

24

25
```

```
 1                        (Jury not present)
 2              THE COURT:  First of all, Mr. Yalowitz, I'm having
 3    some difficulty following some of your questions when you just
 4    ask the witness to comment on something.  If you could focus
 5    your questions more so I can know where you're going and what
 6    is it you're really asking.  What do you want him to say?
 7              MR. YALOWITZ:  He is going to say that these documents
 8    were collected during an operation at a certain period of time.
 9              THE COURT:  Wait.  Sorry.  Say it again. they're
10    collected by whom?
11              MR. YALOWITZ:  By the Israel defense forces.
12              THE COURT:  That's the first thing I didn't
13    understand.  I didn't know if you were talking about how he got
14    them, how the PA or the PLO got them.  You're asking him
15    specifically how the Israeli government came into their
16    possession?
17              MR. YALOWITZ:  Right.
18              THE COURT:  You want him to say they got this during a
19    raid?
20              MR. YALOWITZ:  Yes.
21              THE COURT:  A raid on what?
22              MR. YALOWITZ:  On the Palestinian Authority
23    headquarters.
24              THE COURT:  Any more than that?
25              MR. YALOWITZ:  I want the time.  I just want the
```

1      timing.

2                    THE COURT:  When was it?

3                    MR. YALOWITZ:  March of 2002.

4                    THE COURT:  So he's going to say that this was

5      retrieved in a raid by the Israeli military on an office of the

6      Palestinian Authority or the PLO.

7                    MR. YALOWITZ:  During the period March and April 2002.

8                    MR. ROCHON:  A lot of my objections are the Court's

9      concerns.  What happens too often is that I get a real general

10     question, I'll object and then the answer, I think -- maybe my

11     objection might have prevailed if you actually knew what he was

12     going to say, but you can't tell from the question.

13                   THE COURT:  Most of those objections I ruled in your

14     favor.

15                   MR. ROCHON:  Every now and then.

16                   Let me finish, Mr. Yalowitz.  So do you know when this

17     was collected?  Do you know who collected it?  Do you know

18     where it was collected?  Then I don't have to jump up.

19                   THE COURT:  That's why I asked him now.  That's why I

20     said what I said.  We're on the same page.  Knowing that that

21     is what he is asking about, you don't have any objection to

22     that in particular?

23                   MR. ROCHON:  The Court has already ruled on similar

24     objections as to the earlier document, I'm not going to re-put

25     those.

```
 1              THE COURT:  Do you have some objection to this
 2    question and answer?
 3              MR. ROCHON:  We think this witness doesn't have
 4    personal knowledge.  We think he gets it from other folks, but
 5    we object to other documents.
 6              THE COURT:  Mr. Yalowitz, I'll let you go into this
 7    area if that's what he's going to say.  But the way you phrased
 8    it I didn't know what you were asking.  If you want to find out
 9    how these documents were obtained and collected, he can give
10    you that testimony.
11              MR. YALOWITZ:  All right.
12              THE COURT:  Let's take a short recess.
13              (Recess)
14         (Continued on next page)
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                   (Jury present)

 2                   THE COURT:  You may continue, Mr. Yalowitz.

 3    BY MR. YALOWITZ:

 4    Q.  Are you familiar with a policy sometimes known as the

 5    revolving door?

 6    A.  Absolutely.

 7    Q.  Was that a policy of the Palestinian Authority?

 8                   MR. ROCHON:  Objection, your Honor.

 9                   THE COURT:  Overruled.

10    A.  Unequivocally, yes.

11    Q.  What was the Palestinian Authority's revolving door policy?

12    A.  This policy was in effect.  It was the method by which the

13    Palestinian Authority related to the wanted men.  I'll give you

14    some examples.  If the Palestinian Authority would receive

15    requests from Israel to arrest people who were involved in acts

16    of terror, it would send them in through one door, and after a

17    very short period of time it would send them out the other

18    door.  In effect, the revolving door enabled those wanted men

19    to continue to perpetrate the very same acts of terror.

20    Q.  Now I want to ask you, are you familiar with specific

21    requests by the State of Israel or the United States government

22    to the Palestinian Authority to arrest particular terrorists?

23    A.  Yes, I am familiar with such requests.

24    Q.  Let me direct you in your binder to Exhibit 354.

25    A.  I have the exhibit here before me.
```

 1   Q.  What is it, very generally?

 2   A.  This is the status of wanted men that was sent out by the

 3   Israeli ministry of foreign affairs.

 4           MR. YALOWITZ:  Your Honor, plaintiffs move Exhibit 354

 5   in evidence.

 6           MR. ROCHON:  Subject to prior, your Honor.

 7           THE COURT:  It will be admitted into evidence.

 8           (Plaintiff's Exhibit 354 received in evidence)

 9           MR. YALOWITZ:  Let's take look at it.  May I read,

10   your Honor?

11           THE COURT:  Yes.

12   Q.  "Most-wanted terrorists status report.  In December 2001

13   Israel presented U.S. peace envoy Anthony Zinni with a list 33

14   most wanted terrorists requesting their arrest by the

15   Palestinian Authority."

16           Are you familiar with that Zinni list?

17   A.  I'm quite familiar with it.

18   Q.  Did Yasser Arafat himself receive it?

19   A.  Yes, definitely.

20   Q.  Do you have a clip of Yasser Arafat discussing that list?

21   A.  Yes, I do.

22           MR. YALOWITZ:  Before we look at the clip, I would

23   just like to, with the Court's permission, direct the jury to

24   two of the names on Exhibit 354.

25           THE COURT:  Yes.

1  Q.  Number 2, Nasser Aweis; number 3, Abdel Kareem Aweis.  Let

2  me ask you, Mr. Eviatar, are those names we have seen in this

3  case?

4  A.  These are absolutely the very same names.

5  Q.  When was the Zinni list presented by General Zinni to

6  Yasser Arafat?

7  A.  In early December 2001.

8          MR. YALOWITZ:  Your Honor, plaintiffs offer

9  Exhibit 239, clip 3, in evidence.

10          MR. ROCHON:  Subject to prior, no objection.

11          THE COURT:  It will be admitted into evidence.

12          (Plaintiff's Exhibit 239, clip 3, received in

13  evidence)

14          MR. YALOWITZ:  Why don't we play the video.

15          (Video shown)

16  Q.  Coming back to Exhibit 354 --

17          MR. ROCHON:  For the record, the whole clip wasn't

18  played.

19          THE COURT:  Finish the clip.

20          (Video shown)

21  Q.  Going back to Exhibit 354, do you have any evidence that

22  Nasser Aweis was arrested by the Palestinian Authority as a

23  result of having been on the Zinni list?

24  A.  Nasser Aweis was on the Zinni list, and he was never

25  arrested, certainly not for any length of time.

1   Q.  Do you recall what his job was during the period December

2   2001 to April 2002?  Where did he go to work every day?

3   A.  He was an officer in the Palestinian security services.

4   Q.  What about Abdel Kareem Aweis?  What was his job during the

5   period December 2001 to April 2002?

6   A.  He was also an officer in the Palestinian security

7   services.

8   Q.  Was he arrested as a result of being on the Zinni list?

9   A.  He was not arrested, either.

10  Q.  According to Exhibit 354, when were these individuals

11  arrested, Nasser Aweis and Abdel Kareem Aweis?

12  A.  By whom?

13  Q.  By the Israeli authorities.

14  A.  I think that it was during the course of Operation

15  Defensive Shield.

16          MR. YALOWITZ:  Your Honor, may I read from 354?

17  Q.  "Five of these most wanted terrorists have been arrested by

18  Israel during Operation Defensive Shield."  Without getting

19  into specific examples of specific individuals, could you

20  comment on, could you tell the jury how the revolving door

21  policy operated in practice.

22          MR. ROCHON:  Objection, your Honor.

23          THE COURT:  It has been asked and answered already.

24          MR. YALOWITZ:  I apologize to the Court if I have

25  covered it.

```
 1            THE COURT:  I thought we had.  He described going in
 2   one door, coming out the other.
 3            MR. YALOWITZ:  OK, got it.
 4            THE COURT:  Let's move on.
 5            MR. YALOWITZ:  Thank you.
 6   Q.  I want to come back to this Operation Defensive Shield.
 7   Can you give the jury the timing of Operation Defensive Shield.
 8   A.  The operation took place starting in late March 2002 into
 9   early May 2002.
10   Q.  During the course of your testimony, we have seen a number
11   of documents in Arabic like the ones we went over this morning.
12   I want to ask you --
13            MR. ROCHON:  Objection, your Honor.
14   Q.  -- a question about those.
15            MR. ROCHON:  I apologize, Mr. Yalowitz.  Objection to
16   the preface.
17            THE COURT:  Less preface and more question.
18            MR. YALOWITZ:  This is something we went over earlier,
19   your Honor.
20            THE COURT:  Just pose the question.  You are slowing
21   us down.
22            MR. YALOWITZ:  I'm trying.
23   Q.  Those documents, from where were they originally collected?
24   A.  From the headquarters of the Palestinian security services
25   in the West Bank.
```

 1   Q.   Who collected them?

 2   A.   The Israel defense forces.

 3   Q.   Following that period March and April of 2002, did the

 4   financing of Al Aqsa Martyrs Brigades by the Palestinian

 5   Authority continue?

 6            MR. ROCHON:   Objection, your Honor.

 7            THE COURT:   Overruled.

 8   A.   The financing continued after the operation as well.

 9   Q.   Thank you.   Are you familiar with an organization called

10   Hamas?

11   A.   Yes, I am thoroughly familiar with it.

12   Q.   Are you also familiar with the relationship between the

13   Palestinian Authority, PLO, and Fatah on one hand and Hamas on

14   the other?

15   A.   Yes, I am familiar with it.

16   Q.   Can you describe it.   Can you describe the nature of that

17   relationship as it existed during the years 2000 to 2004,

18   please.

19   A.   Yes, absolutely.   I would define this relationship at a

20   number of different levels:   Cooperation between the

21   leaderships of the two parties, cooperation and coordination at

22   the level of the West Bank between the movements, and

23   cooperation and coordination in the perpetration of joint acts

24   of terror by the Hamas and the Fatah.

25   Q.   Who was the leader of Hamas during this period of time?

```
 1   A.  His name was Sheikh Ahmad Yassin.

 2   Q.  By the way, what was Hamas's status according to the United

 3   States government during the years 2000 to 2004.

 4   A.  Hamas is an organization that was designated as a terrorist

 5   organization.

 6   Q.  Let me ask you a little bit of background about Arafat's

 7   use of symbolism.  Are you familiar with the use by Arafat of

 8   symbolism?

 9   A.  I'm very familiar with it.

10           MR. ROCHON:  Objection.

11           THE COURT:  Sustained.  What is your next question?

12   Q.  Do you have any examples of Arafat's use of symbolism that

13   we can go over?

14           MR. ROCHON:  Objection.

15           THE COURT:  Sustained.

16   Q.  Let's take a look at Exhibit 1128 in your binder.

17           MR. YALOWITZ:  May I approach, your Honor?

18           THE COURT:  Yes.

19           MR. ROCHON:  Your Honor, I think this is a new binder.

20   Could we have a copy, please?  Thank you.

21   Q.  What is Exhibit 1128, very generally?

22   A.  I see the exhibit.  This is a photograph of Yasser Arafat

23   and Sheik Ahmad Yassin.

24           MR. YALOWITZ:  Plaintiffs offer Plaintiff's

25   Exhibit 1128 in evidence.
```

```
 1                    MR. ROCHON:  Subject to prior, no objection.

 2                    THE COURT:  It will be admitted.

 3                    (Plaintiff's Exhibit 1128 received in evidence)

 4   Q.  Who is the man in the gray beard toward the right of the

 5   photograph?

 6   A.  On the right, the man with the beard and the kafia is

 7   Yasser Arafat.

 8   Q.  And on the left?

 9   A.  On the left is Sheik Ahmed Yassin.

10   Q.  What is the little plaque that is being shown for this

11   photograph?

12   A.  This is a plaque from the Palestinian Authority given in

13   esteem.  We can see in the picture that Yasser Arafat is giving

14   this plaque to Sheikh Yassin.

15   Q.  What is your understanding of the symbolism that Arafat is

16   attempting to convey in this photograph?

17                    MR. ROCHON:  Objection, your Honor.

18                    THE COURT:  Sustained.

19   Q.  Was it common for Arafat to kiss people in photographs?

20                    MR. ROCHON:  Objection, your Honor.

21                    THE COURT:  Overruled.  You can answer.

22   A.  It was customary, or done.  It was the practice.

23   Q.  What did it show?  What did that practice show?

24                    MR. ROCHON:  Objection, your Honor.

25                    THE COURT:  Sustained.
```

1   Q.  Do you still have your big binder from yesterday with you,

2   Mr. Eviatar?

3   A.  Yes, I do.

4   Q.  Could you take a look at 1129.  What is 1129?

5   A.  It's a photograph of Yasser Arafat holding an RPG bazooka.

6            MR. YALOWITZ:  Plaintiffs offer 1129.

7            MR. ROCHON:  Subject to prior.

8            THE COURT:  It will be admitted into evidence.

9            (Plaintiff's Exhibit 1129 received in evidence)

10  Q.  Let me move on.  Would you turn to tab 539 in your binder,

11  please.

12  A.  I have the document before me.

13  Q.  Can you identify the photograph in the center of the first

14  page?

15  A.  Yes, of course.

16  Q.  What is it?

17  A.  It is Yasser Arafat photographed with a pistol on his desk.

18           MR. YALOWITZ:  Your Honor, plaintiffs offer the

19  photograph excerpted from Exhibit 539 in evidence.

20           MR. ROCHON:  Subject to prior, no objection.

21           THE COURT:  It will be admitted into evidence.

22           (Plaintiff's Exhibit 539 photo received in evidence)

23           MR. YALOWITZ:  May we show it to the jury, please.

24  Q.  Was it common for Arafat to be photographed with weapons?

25  A.  It was very common.  Arafat usually wore a handgun on his

```
 1    uniform.
 2    Q.  Did he wear that in personal appearances?
 3    A.  At every opportunity.
 4            MR. YALOWITZ:  Your Honor, shall we press ahead to a
 5    new topic?
 6            THE COURT:  Yes.
 7    Q.  I would like to ask you about an individual by the name of
 8    Abdullah Barghouti.  Can you tell the jury who that individual
 9    is.
10    A.  Abdullah Barghouti was a member of the military wing of
11    Hamas.  He was known as "The Engineer."  He was personally
12    responsible for numerous terror attacks.  His nickname was "The
13    Engineer."  He is sitting in an Israeli prison for 67 life
14    sentences.  If I may add, his special expertise was the
15    production and manufacture of bombs of all types.
16    Q.  Do you have Exhibit 1160 in the blue binder on your desk?
17    A.  I have the exhibit before me.
18    Q.  What is it?
19    A.  It is a picture of Abdullah Barghouti.
20            MR. YALOWITZ:  Your Honor, plaintiffs move 1160 in
21    evidence.
22            MR. ROCHON:  No objection.
23            THE COURT:  It will be admitted into evidence.
24            (Plaintiff's Exhibit 1160 received in evidence)
25    Q.  Now I would like to direct your attention in your binder,
```

 1   Mr. Eviatar, to Exhibit 452, which is tab A behind Abdullah

 2   Barghouti.  Do you have it before you?

 3   A.  Just a moment, please.  I don't have that exhibit.

 4   Q.  I'm looking at tab B in your blue binder.

 5   A.  Just a moment, please.  I have it.

 6   Q.  First of all, what is it?

 7   A.  This is the indictment of Marwan -- Abdullah Barghouti.

 8   Q.  I would like to direct you to the third count, and in

 9   particular the third paragraph of the third count.

10           MR. YALOWITZ:  With the Court's permission, I will

11   read.

12           THE COURT:  Yes.

13           MR. ROCHON:  This is already in evidence, your Honor.

14           THE COURT:  Yes.  I believe so.  You tell me.

15           MR. ROCHON:  It is in evidence.

16           THE COURT:  Yes.  He can read from it.

17   Q.  "During the above-mentioned meetings, another person taught

18   the defendant how to make um al abed, TATP explosive, explosive

19   devices, the activation mechanisms for the explosive devices,

20   including wireless mechanisms, hand grenades, and explosive

21   belts."

22           Could you explain to the jury what um al abed is.

23   A.  Um al abed is an explosive.  It's a chemical substance.

24   It's used to make bombs.

25   Q.  First of all, what does it mean?  What is the translation

1   for "um al abed"?

2   A.  It's a nickname for the substance, and the meaning is the

3   mother of satan.

4   Q.  Why is it called that?

5   A.  Because the results of the use of this substance are

6   especially lethal.  This substance explodes very quickly and

7   causes especially lethal outcomes all around it and without any

8   early warning.

9   Q.  By August of 2001, was Abdullah Barghouti's activity as a

10  bomb maker known to the authorities?

11  A.  The answer is yes.

12          MR. YALOWITZ:  Your Honor, with the Court's

13  permission, I would like to read an admission from the

14  defendant concerning this matter.

15          THE COURT:  Why don't you characterize the document

16  you wish to read from rather than trying to characterize what

17  you are going to read.

18          MR. YALOWITZ:  Sure.

19          THE COURT:  Is this a stipulation of some kind?

20          MR. ROCHON:  Yes.  It is a response to an RFA, your

21  Honor.

22          THE COURT:  OK.

23          MR. ROCHON:  If the Court could maybe explain or

24  someone could explain what that is.

25          THE COURT:  Why don't you see what part you are going

1    to read first, and then I can explain.

2          MR. YALOWITZ:  Sure.  This is in response to a request

3    for admission and was admitted.

4          THE COURT:  I see.  I'll explain it to them now.

5          Ladies and gentlemen, during the litigation process,

6    not only are the parties entitled to take depositions of

7    individuals and get documents, they are entitled to pose

8    questions to the other side and have them answer those

9    questions or admit or deny certain questions.  This is part of

10   the process.

11         I assume you have a request to admit and their

12   response during the litigation.

13         MR. YALOWITZ:  I have the request to admit, and then

14   the response was "admitted."

15         THE COURT:  OK.

16   Q.  The request to admit is, "The PA was notified by Israel

17   and/or the United States between September 1, 2000, and July

18   31, 2002, to detain or arrest Abdullah Barghouti."

19         MR. YALOWITZ:  Thank you, your Honor.

20   Q.  Did there come a time when the PA arrested Abdullah

21   Barghouti?

22   A.  Yes.

23   Q.  What was the date of that arrest?

24         MR. ROCHON:  Objection, your Honor.

25         THE COURT:  I will let him answer that.  Go ahead, you

1   can answer that.

2   A.   August 9, 2001.

3   Q.   Was there a terror attack on August 9, 2001?

4   A.   Yes.

5   Q.   According to Abdullah Barghouti's conviction, what was his

6   role in that terrorist attack?

7   A.   He manufactured the bomb that was used in that terror

8   attack.

9   Q.   Was Abdullah Barghouti arrested before or after the terror

10  attack?

11  A.   He was arrested before the terror attack.

12  Q.   Have you seen any evidence of any effort by the PA to stop

13  that terror attack between the time of Barghouti's arrest and

14  the time of the explosion?

15          MR. ROCHON:  Objection, your Honor.

16          THE COURT:  Sustained.

17  Q.   I want to show you a photograph that's been marked in

18  evidence -- I'm sorry -- that's been marked for identification

19  as 1180.  I believe it is in your small binder.  Do you have a

20  copy of it?

21  A.   I do.

22  Q.   Who is that a photograph of?

23          MR. ROCHON:  With the Court's indulgence for a second?

24          (Counsel conferred.)

25          MR. ROCHON:  No objection.  Thank you.

```
 1   A.  This is Jabril Rajoub.

 2            MR. YALOWITZ:  Your Honor, plaintiffs offer 1180 into

 3   evidence.

 4            THE COURT:  It will be admitted into evidence.

 5            (Plaintiff's Exhibit 1180 received in evidence)

 6   Q.  Take a look at Jabril Rajoub.  Was Jabril Rajoub involved

 7   in the arrest of Marwan Barghouti?

 8            MR. ROCHON:  Objection, your Honor.

 9            THE COURT:  Overruled.

10   A.  Yes, he was involved.  He was the head of the preventative

11   security apparatus at that time.  That apparatus under Rajoub's

12   command arrested Abdullah Barghouti.

13   Q.  During the course of the arrest, do you have information of

14   who else was present?

15            MR. ROCHON:  Objection:  Foundation, your Honor.

16            THE COURT:  I'll allow it.

17   A.  Yes, there were some other people who were present during

18   the arrest.

19            MR. YALOWITZ:  Your Honor, I apologize.  I wanted to

20   correct one error I made a moment ago.  I asked a question

21   about the arrest of Marwan Barghouti, and I meant Abdullah

22   Barghouti.

23   Q.  Is that how you understood it, Mr. Eviatar?

24   A.  Yes.  I was referring to Abdullah Barghouti.

25   Q.  Thank you.  Do you have information that Marwan Barghouti
```

```
 1    was present at the arrest of Abdullah Barghouti?

 2              MR. ROCHON:  Objection:  Leading and foundation.

 3              THE COURT:  Overruled.

 4              THE INTERPRETER:  Can he answer?

 5              THE COURT:  Yes.

 6    A.  Yes, Marwan Barghouti was present.

 7              MR. YALOWITZ:  Your Honor, I think it would be a

 8    useful time to get some guidance from the Court, if it is

 9    convenient for the lunch break.

10              THE COURT:  Sure, we will do that.  Ladies and

11    gentlemen, don't discuss the case, keep an open mind.  I'll see

12    you at 2 p.m.

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25
```

 1          (Jury not present)

 2          THE COURT:  Yes, Mr. Yalowitz?

 3          MR. YALOWITZ:  I have two items.  The first is now

 4   would be an opportune time to play the videotaped deposition of

 5   Mosaab Yousef.  We received last night some counterdesignations

 6   and we made some cross-designations.  I would like to consult

 7   with Mr. Rochon and see if we can come into agreement about

 8   what should be played before the jury all at once.  If we

 9   can't, then we are going to need the Court to give us guidance

10   on that.  There is not a lot of counter or cross, so we might

11   be able to reach agreement.

12          THE COURT:  How long is the video?

13          MR. ROCHON:  The clips altogether probably won't be

14   more than three or four minutes when it is played.

15          THE COURT:  Is there some reason we can't play the

16   entire clip of what everyone wants the jury to see?

17          MR. ROCHON:  We are not in agreement right now.

18          THE COURT:  I know.  But to the extent you are in

19   agreement and to the extent that I rule on what is admissible,

20   is there some reason we can't play the whole clip --

21          MR. ROCHON:  You mean once we come to agreement?

22          THE COURT:  Right.

23          MR. YALOWITZ:  We have the technology.

24          THE COURT:  Is there any objection to playing the

25   whole?

1            MR. ROCHON:  No.  I think the thing that would make

2    sense is to play designation, counterdesignation, redesignation

3    all at once because that is more like an examination, and we

4    would like to work that out.  We can talk at lunch about it.

5    Perhaps we can reach agreement.

6            THE COURT:  That would be my intent.  To the extent

7    you can't agree which clips are being played, then I will rule

8    on that.  Go ahead.

9            MR. YALOWITZ:  During the lunch break, they are all

10   really quite short and we can give the Court the pages and

11   lines and a copy of the deposition.  So if we can't reach

12   agreement, we can get a ruling.

13            The second thing is I would like to during the lunch

14   break try to reach an agreement with Mr. Rochon on the

15   documents in this Hebrew University binder.  We talked about it

16   over the weekend a little bit.  We talked about it with the

17   Court this morning.  I'm hoping, based on those conversations

18   and the conversation we had with your Honor, we can stop.  We

19   don't have to go document by document with the witness on the

20   stand, what is it, move its admission.  If we have to do that,

21   I will do that immediately after the lunch break, and we can

22   just go through it and get rulings.

23            THE COURT:  The nature of the documents at issue that

24   you are still in dispute about that haven't been resolved by

25   the Court?

1          MR. YALOWITZ:  These are the GIS documents and the

2   administrative prisoners documents.

3          THE COURT:  Again, I thought I already ruled.

4          MR. YALOWITZ:  I thought you had ruled as well.  I

5   just haven't heard from the defendants if they are standing on

6   every single objection that they gave us last night.

7          MR. ROCHON:  Even if we are standing on them, if you

8   have already ruled, it doesn't matter.  There are a couple of

9   specific problems with a couple of the documents.  Again, I

10  think the lunch break might serve us well.  I don't recall when

11  you told the jury to come back.

12         THE COURT:  2 o'clock.

13         MR. ROCHON:  If we stop now, we may be able to

14  eliminate at least some disagreements.  Then, if we come back

15  at 2:00, there will be less time taken from the jury.

16         THE COURT:  To the extent that I have already ruled,

17  you should be talking about what way I ruled rather than what

18  you want in and what you want out.

19         MR. ROCHON:  Understood.

20         THE COURT:  Whatever I said goes in, that's what's in.

21  Whatever I said was out, that's what's out.  Come to some

22  understanding about it.  Let me know right away what the nature

23  of the dispute is so we can resolve it right away and we don't

24  have to hold up the jury.  OK?

25         MR. ROCHON:  Yes.  We have a highlighted set of the

 1   designations.  I think I might want to talk with Mr. Yalowitz

 2   before we give them to the Court because there may be some in

 3   there by mistake.

 4          THE COURT:  All right, why don't you do that.

 5          MR. YALOWITZ:  What I would like to do is, with the

 6   Court's permission.  If we come into agreement, we can just let

 7   your Honor know that when we come back.  If we have something

 8   that we need the Court to resolve, as you wish, we could either

 9   wait until we come back or we could communicate with chambers

10   during the lunch break.

11          THE COURT:  As I say, the earlier the better.  If you

12   contact chambers and want me to look at something, view the

13   videotape or view a transcript or something that is at issue,

14   let me look at that right away, and I will be ready to go ahead

15   and rule.

16          MR. ROCHON:  Maybe I could give the Court at least the

17   designations the parties have made with the plaintiff's initial

18   ones in yellow and then ours -- let me just check -- ours in

19   purple, and then their counterdesignations in blue.

20          THE COURT:  I would be able to tell from the document

21   you have given me which ones are in dispute?

22          MR. ROCHON:  That's right.  There is so little.

23          MR. YALOWITZ:  Why don't we talk about those.

24   Whatever the Court wants is fine.  Let's see if we can.  It

25   will be a challenge.

1                THE COURT:  Give me the copy.  I'll take a glance at

2    it.   Then I will be prepared to rule if there is some

3    disagreement.

4                (Luncheon recess)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          AFTERNOON SESSION

 2                             2:00 P.M.

 3              (In open court; jury not present)

 4              MR. YALOWITZ:  Your Honor, I have three housekeeping

 5    matters.

 6              THE COURT:  Have you resolved the dispute with regard

 7    to this deposition?

 8              MR. ROCHON:  Yes.

 9              MR. YALOWITZ:  I believe we have, although there is a

10    technological challenge.

11              MR. ROCHON:  On the redaction.  Just to cover it,

12    there was one little stip we think should have been in there.

13              If they take that out of their direct, we are not

14    going to proffer any counters.  There won't be any re-counters.

15    It's just what they offered.  Mr. Yalowitz's colleague is going

16    to see if they can play it with that snippet out.

17              MR. YALOWITZ:  We'll see what we can achieve.

18              THE COURT:  If you can't achieve it, how do you intend

19    to do it?

20              MR. ROCHON:  We'll find a way.

21              THE COURT:  I'll leave the solution to you.

22              MR. YALOWITZ:  I don't know because we're getting

23    ready to play it.

24              THE COURT:  That's why I'm asking.  We are not going

25    to take a break and do it all over.
```

784

 1          MR. HORTON:  If worse comes to worse, we can play it

 2    up to that point, stop, bring the jury out for one minute, play

 3    it through.

 4          MR. YALOWITZ:  The Judge doesn't want to do that, I

 5    don't think.

 6          MR. HORTON:  That will work.

 7          THE COURT:  As opposed to taking a half hour break.

 8          MR. YALOWITZ:  That's resolved.  It's subject to

 9    technology.

10          The second thing, there are two government reports

11    that the Court has overruled the objections and I haven't moved

12    in evidence.  What I would like to do is move them in evidence

13    now.  I don't need to go over them with the witness.  I think

14    the jury has the message, but I just want to move them into

15    evidence so that I have them in the record.

16          THE COURT:  When I say things are admissible, that

17    doesn't necessarily mean they're admitted.

18          MR. YALOWITZ:  I understand that.  I want to move them

19    in evidence.

20          THE COURT:  No, but you're not going to lay any

21    foundation whatsoever to demonstrate it is what it is?  What

22    witness are you going to use it with?  Any witness?

23          MR. YALOWITZ:  I might use it with the next witness.

24          THE COURT:  OK.

25          MR. YALOWITZ:  But I might not.

1          THE COURT:  OK.

2          MR. YALOWITZ:  I can wait, but I think the defendants

3    will, subject to their prior objections --

4          THE COURT:  When I say it's admissible, I mean you can

5    walk in, you can show it to the witness, have the witness

6    identify it, lay a foundation and offer it to be admitted.

7          The only way I am going to let you admit a document

8    without any foundation is if they don't object to it.

9          MR. YALOWITZ:  Let's see what the defendants say.  I'm

10   happy to go through it with the witness.  I thought we might

11   save a little time with the jury.

12         THE COURT:  I don't ask for anything sophisticated.

13   have the witness who is going to testify about it identify it

14   say what it purports to be and move on.

15         MR. YALOWITZ:  This is a 826 and 830.

16         THE COURT:  What are they?

17         MR. YALOWITZ:  826 is entitled Jenin, the capital of

18   Palestinian suicide terrorists.

19         830 is entitled the Palestinian Authority employs

20   Fatah activists involved in terrorism and suicide attacks.

21         THE COURT:  We've already addressed those.

22         MR. ROCHON:  Those are two documents of which you

23   overruled our objections on a variety of grounds, including

24   whether or not they were public records.

25         MR. YALOWITZ:  I move them in evidence right now.  We

786

1   don't need to waste the jury's time.  I can foundationalize

2   them if the defendants are objecting on that basis.

3        THE COURT:  If they are objecting on that basis, then

4   you may be required to do so.

5        MR. YALOWITZ:  I understand that.  Let's see what the

6   defendant's view is.

7        MR. ROCHON:  I think they will be required to do so,

8   your Honor.

9        MR. YALOWITZ:  OK, fine.

10        THE COURT:  Because when you say it's a report --

11        MR. YALOWITZ:  That's fine.

12        THE COURT:  I know, but for future reference, when you

13   say it's a report, I take your word for that, but I don't know

14   that.

15        MR. YALOWITZ:  That's fine.

16        THE COURT:  I'm not even sure you know that.  Somebody

17   has to say it.

18        MR. YALOWITZ:  I appreciate the plug there -- you take

19   my word.

20        On this Hebrew University binder, we have a binder I

21   would like to hand out to the jury like we did with Kaufman.

22        The defendants have some problems with some of the

23   documents in the binder.

24        THE COURT:  Have we already gone through the

25   admissibility of those documents?

787

```
 1              MR. YALOWITZ:  In my opinion, we have gone over them.
 2   I just want to give you the timing of how we got to where we
 3   are.
 4              THE COURT:  I don't need all of that.  Did I rule they
 5   are admissible or not?
 6              MR. YALOWITZ:  Yes, sir, they are admissible.  The
 7   defendants want certain lines and words redacted.
 8              THE COURT:  OK.
 9              MR. YALOWITZ:  So we gave the defendants those
10   redactions --
11              THE COURT:  Don't give me the history.  Let's get to
12   the heart of it.  What is it you want me to decide whether it's
13   in, redacted, or out?
14              MR. YALOWITZ:  I think that what I'd like to do is try
15   to address it now.
16              THE COURT:  Right.  Address it now.
17              MR. YALOWITZ:  So we can hand it out to the jury.
18              THE COURT:  Tell me what line is in dispute.  I don't
19   want the history of it.  I want you to get to the substance it.
20              MR. YALOWITZ:  I think the defendants need to go over
21   that.
22              THE COURT:  Well, you're offering it; not them.
23              MR. YALOWITZ:  I'm trying to be efficient here.
24              THE COURT:  What I am supposed to be deciding?
25              MR. YALOWITZ:  Let's give your Honor a copy.
```

1          MR. ROCHON:  Maybe if the Court heard our objections,

2     they might speak for themselves.  Mr. Satin can address them,

3     and we can decide whether there is a dispute.  It's not on all

4     of them.

5          MR. SATIN:  I'll talk as quickly as I can.

6          MR. YALOWITZ:  Your Honor, may I hand you a copy of

7     what we are talking about?

8          MR. ROCHON:  That's fine.

9          THE COURT:  That would be helpful probably, because I

10    don't have a clue what you are talking about.

11         What are you objecting to?  What do you want them to

12    do?

13         MR. SATIN:  We believe in the case of the individual

14    who's called Ibrahim Hamed, this is the individual from a the

15    main side, the ministry of prisoner files is the indictment

16    from his case.

17         THE COURT:  OK.

18         MR. SATIN:  This individual did not plead guilty.  He

19    was convicted, but that conviction was not admitted the other

20    day.  It's not in evidence.  The only thing that relates to

21    this particular case, the Hebrew University bombing, is this

22    indictment in the file.

23         THE COURT:  That's 61, right?

24         MR. SATIN:  Correct, 61.

25         THE COURT:  We just looked at that.  Doesn't 61, the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

 1    substance of 61's indictment almost word for word say the same

 2    thing as you say with the co-conspirators?

 3              MR. YALOWITZ:  Yes.

 4              THE COURT:  Why don't we need it again?

 5              MR. YALOWITZ:  Your Honor, over the lunch break, we

 6    removed it from the binders in the hope that we can resolve

 7    these matters, so if 61 --

 8              THE COURT:  So you removed it from the binders.

 9              MR. YALOWITZ:  So 61, the indictment has been removed.

10              THE COURT:  So what's the dispute?

11              MR. SATIN:  They still want to admit it.

12              THE COURT:  Well, why do we need to admit it?

13              MR. YALOWITZ:  I only need to admit it --

14              THE COURT:  For what purpose?

15              MR. YALOWITZ:  I'm just trying to work through it

16    here.  I'm willing to give them that one and see if we can get

17    it resolved.

18              THE COURT:  What do you mean "give them that one"?  Do

19    you want it in evidence or it's going to be out of evidence.

20              MR. YALOWITZ:  If we can get everything else resolved,

21    I am willing to withdraw my request.

22              THE COURT:  So we're negotiating.  What do you want to

23    give in exchange?

24              MR. SATIN:  I don't want to give anything in exchange.

25    We believe the rules of evidence don't permit that document.

```
 1                THE COURT:  That document is out.  He's got all that
 2    evidence somewhere else.
 3                MR. SATIN:  Just so you know, all of the other
 4    documents related to that individual Inbrahim Hamed do not
 5    mention the university attack at all.  Nothing related to
 6    Ibrahim Hamed, none of his file should be admitted at all.
 7                THE COURT:  What else are you talking about other than
 8    indictment and the fact that they have records in his
 9    application for martyr payments.
10                MR. SATIN:  There's two GIS files that are in there
11    that's 147 and 1041.  There's a different ministry of prisoner
12    files.  A number of records related to Ibrahim Hamed.  No
13    admissible evidence of his involvement in the University
14    attack.  So absent that connection there should be no evidence,
15    no file or records.
16                THE COURT:  Depends what the other files say.  The
17    other files of --
18                MR. SATIN:  They don't say anything about Hebrew
19    University.
20                THE COURT:  So what are you saying is inadmissible?
21    Anything about him at all?
22                MR. SATIN:  Any of the --
23                THE COURT:  I assume they classified him as a
24    "terrorist" and they believe that there's evidence that they're
25    supporting him, and they believe that there is some evidence in
```

1    this case from which a reasonable jury can conclude that he is

2    involved in the Hebrew University bombing.

3            MR. SATIN:  There just isn't, your Honor.  There isn't

4    evidence of Ibrahim Hamed's involvement in admissible form.

5            THE COURT:  Are you tying him to the university

6    bombing and how are you doing that?

7            MR. YALOWITZ:  Exhibit 151, which is the GIS document.

8    It's the last one in your binder.

9            THE COURT:  I'm sorry, 151.

10           MR. YALOWITZ:  Yes, it's literally the last one.

11           THE COURT:  This is the GIS document.

12           MR. YALOWITZ:  Correct.  Page 3, text of report.

13           THE COURT:  What page am I looking at?  The second

14   page?

15           MR. YALOWITZ:  Wait.  This is the wrong one, your

16   Honor.

17           I'm looking at 1035.  It's behind the Muhammad Arman.

18           THE COURT:  I got it.

19           MR. YALOWITZ:  Then it's tab C.

20           THE COURT:  I have 165.  Then I have 1037.

21           MR. YALOWITZ:  So you got to look at Muhammad Arman.

22           THE COURT:  Arman?

23           MR. YALOWITZ:  Yes.

24           THE COURT:  OK.

25           MR. YALOWITZ:  Then go to C behind Arman.

1            THE COURT:  C?

2            MR. YALOWITZ:  You got it.

3            THE COURT:  1035.

4            MR. YALOWITZ:  Right.  Fifth page in.  "He was a

5   member of the Silwan military cell that carried out the Hebrew

6   University attack and other attacks.  He is sentenced to 36

7   life terms.  Other members of the cell are" --

8            THE COURT:  I'm sorry, I don't follow that.  I don't

9   have that page.  What page is it that you are reading from?

10  What does it say at the top of the page?

11           MR. YALOWITZ:  Personal information and general

12  comments about him.

13           THE COURT:  I do have that page.

14           MR. YALOWITZ:  Then there is a text box, and the last

15  sentence of the paragraph says:  "Other members of the cell are

16  (ineligible) Walid Anjas, Ibrahim Hamed."

17           THE COURT:  Yes.

18           MR. YALOWITZ:  That's Ibrahim Hamed.  Also, it's

19  confirmed by the indictment.  There's not really a dispute

20  that's Ibrahim Hamed was convicted of the Hebrew University

21  bombing.  No witness is ever going to come in and say he was

22  acquitted of that.

23           THE COURT:  OK.

24           MR. YALOWITZ:  What we have is an indictment, which

25  I'm willing to pull because I'm willing to just go forward on

1    the basis of this.

2            THE COURT:  So you want to say to a jury this is

3    evidence that he was convicted in that case?

4            MR. YALOWITZ:  Right.

5            THE COURT:  Well, it doesn't say that.

6            MR. YALOWITZ:  Well, then I need the indictment.

7            THE COURT:  You could argue it to them, but they may

8    not take your word for it because it doesn't say he was

9    convicted.  The indictment doesn't say he was convicted of

10   anything either.

11           MR. YALOWITZ:  I agree with that.  But the indictment

12   says what he was accused of.

13           THE COURT:  OK.

14           MR. YALOWITZ:  And then he was convicted of everything

15   he was accused of.

16           THE COURT:  Who is going to say that?  How do we know

17   that?

18           MR. YALOWITZ:  His GIS documents say that.

19           THE COURT:  Where?  That's what I was trying to figure

20   out.  If it says that, then I think it does, but I don't see

21   where it says that.

22           MR. YALOWITZ:  It says he was sentenced to 26 life

23   terms.

24           THE COURT:  No, that's not here.  The other guy was

25   sentenced to 26 life terms -- 36 life terms if I'm reading this

1    correctly.  It just says, "other members of the cell" and it

2    names him as being one of the other members -- do I have the

3    right guy?  That's not even the name I see here.  I see that

4    reference he is sentenced to 36 life terms is a reference to --

5             MR. YALOWITZ:  That's Arman.

6             THE COURT:  That's a reference to Arman.

7             MR. YALOWITZ:  Right.

8             THE COURT:  What document is this?  Just describe this

9    document.

10            MR. YALOWITZ:  It's Arman's GIS file.

11            THE COURT:  I know, but what is this form?  Do we know

12   what this form is?  Is this some kind of application for

13   something?

14            MR. YALOWITZ:  No, that's just their report on --

15   that's the GIS report on this individual.

16            THE COURT:  So you want this document reflects that

17   he's sentenced to 36 life terms?

18            MR. YALOWITZ:  Right.

19            THE COURT:  Where does it say what he was sentenced

20   for?

21            MR. YALOWITZ:  Arman?

22            THE COURT:  Yes.

23            MR. SATIN:  To be clear, your Honor we are not arguing

24   about the admissibility of Arman's documents right now.  We're

25   only talking about Hamed's documents.

795

1          THE COURT:  That's what I thought.

2          MR. SATIN:  If you look at the Arman binder --

3          THE COURT:  This says that hamed was sentenced to

4   anything.  It doesn't say he was convicted of anything.  Are

5   you sure Hamed was convicted?

6          MR. YALOWITZ:  You know, Hamed's GIS document --

7          THE COURT:  That's what we should be looking at.

8          MR. YALOWITZ:  We need to look at Hamed's GIS

9   document.

10         MR. SATIN:  I'm representing to the Court, I'm happy

11  for them to verify it, but I represent to the Court, from my

12  own review of the Hamed GIS file, they don't mention the Hebrew

13  University attack at all.

14         MR. YALOWITZ:  Right, they don't mention Hebrew

15  University, but they say he was sentenced to multiple life

16  terms.

17         THE COURT:  OK.

18         MR. YALOWITZ:  I'm flipping through the document, your

19  Honor.

20         THE COURT:  Is it your position that Hamed was

21  sentenced to 36 life terms out of his conviction in the Hebrew

22  University bombing?

23         MR. YALOWITZ:  Right.  He was convicted.  I've seen

24  the conviction.  He was convicted of every single count.

25         THE COURT:  When you say you've seen the conviction,

1    why can't the jury see it?

2             MR. YALOWITZ:  I think I could get it and bring it and

3    put it in.  I have to get it and bring it and I could put it

4    in.

5             THE COURT:  I am not trying to put obstacles in your

6    way.  I'm trying to figure out a way to do this.  Tell me what

7    you want to do.  I don't have a problem with you putting these

8    documents in.  The only thing I'm telling you is I don't see

9    whatever you're saying about him to be in any of these

10   documents.

11            MR. YALOWITZ:  Let me do this:  I don't think I have

12   his conviction here in the courtroom.  But subject to getting

13   it and offering it in evidence, which I think I can get it

14   tonight, get it offered in evidence tomorrow morning, I think

15   that would be the most useful link for Hamed.

16            THE COURT:  And subject to that, you want to do what?

17            MR. YALOWITZ:  I want to offer what I've got in the

18   binder.

19            THE COURT:  Quite frankly, I don't have any problems

20   admitting what you have in the binder whether you get that or

21   not.

22            MR. YALOWITZ:  All right.

23            THE COURT:  It says what it says.  We have testimony

24   that these are -- I assume and correct me -- the GIS documents

25   that weren't part of the seized documents.  These are the GIS

1      documents that were produced during discovery.

2             MR. YALOWITZ:  Correct.

3             THE COURT:  I don't have any problems with their

4      admissibility.  I never did.

5             MR. YALOWITZ:  All right.  That's great.

6             THE COURT:  I thought we were talking about the

7      indictment and using the indictment to imply that that is what

8      he was convicted of.

9             MR. YALOWITZ:  I'd rather use the conviction.  I just

10     don't have it, but I can get it.

11            THE COURT:  Well, I have overruled the objection to

12     the GIS documents that they produced about this guy.

13            MR. YALOWITZ:  Thank you.

14            THE COURT:  And whether or not you want to bring in

15     the conviction or whether you need that, that's a whole

16     different story.

17            Anything else before the jury?

18            MR. SATIN:  Yes, your Honor.

19            Moving along, in the Exhibit Number 164.  This is the

20     GIS document file of Abdullah Barghouti.  There are statements

21     to which they did not indicate when they submitted, back in, I

22     think, August or September that they wanted to present this

23     information to the jury.  We objected to that portion.  So we

24     believe under the Court's December 19th order about what

25     happens when they don't want it, we object to it, that should

         1    be redacted.

         2              THE COURT:  I saw that.  That was the subject of your

         3    letter over the weekend.

         4              MR. SATIN:  Right.

         5              THE COURT:  Mr. Yalowitz, that's what my recollection

         6    of what the rule was.

         7              MR. YALOWITZ:  Right.  As I explained to the

         8    defendants when we wrote that chart, we said if there are

         9    errors or if there are other things that might come up, we

        10    reserve the right to use them.  This was an error.  We said

        11    moral and security status good for all these people.  This was

        12    an oversight in the preparation of the chart.  It's not

        13    hearsay.  It's their conclusion about his moral status and

        14    security status.

        15              THE COURT:  Show me where it is.  I am looking at on

        16    the document.

        17              MR. YALOWITZ:  We are on tab D in the binder.

        18              THE COURT:  D like Delta behind Abdullah Barghouti?

        19    164?

        20              MR. YALOWITZ:  Yes.  What page, Mr. Satin.

        21              MR. SATIN:  Number 10038, your Honor.  The last page

        22    before the declaration from the translator.

        23              THE COURT:  Where it says status – good.  Which one

        24    are you talking about?

        25              MR. SATIN:  That's right.  It says security status:

 1    good.  Moral status:  Good.  It's in the middle of 245 page.

 2              THE COURT:  Remind me, but part of the problem I have

 3    with your application is I don't remember you objecting to

 4    that.  Did you object to that?

 5              MR. SATIN:  We did.  We specifically did, your Honor.

 6              THE COURT:  You objected to which part?

 7              MR. SATIN:  The security status good and the moral

 8    status:  Good.

 9              THE COURT:  What's the basis of your objection because

10    we just had that example already with another report.  Why is

11    that one admissible and this one not?

12              MR. SATIN:  Well, we believe other one is admissible

13    but we specifically identify --

14              THE COURT:  You didn't object to that one.

15              MR. SATIN:  We did.  I understand the Court overruled

16    that particular one, but in this particular case I think it's

17    different type of document.  It is on a power of attorney

18    order.

19              THE COURT:  Why is the argument different?  Is it the

20    same argument or a different argument?

21              MR. SATIN:  I think the nature of the document it's on

22    is somewhat unique.

23              THE COURT:  But it's some PA official who has

24    classified this person as good.

25              MR. SATIN:  I don't know that that is actually clear.

1    A document is in the file, but it's not clear who the document

2    is from.

3              THE COURT:  Are you contending that this document was

4    created by someone other than an employee of the PA?

5              MR. SATIN:  I'm not sure.  I just do know in the GIS

6    files there's often third-party documents.

7              THE COURT:  Not this kind of document.  I'm sure they

8    didn't ask somebody else whether he was good.  This is their

9    assessment, isn't it?  It would be the assessment of the person

10   who filled out this report, wouldn't it?

11             MR. SATIN:  What I don't know and what may be the case

12   here, your Honor, is someone seeking on behalf of that person

13   some kind of benefits so they were using that language in an

14   attempt to get that.  It would not be from the PA or the PLO.

15   I'm not making a representation that is the case.  I'm just

16   saying that's suggested by the face of the document.

17             THE COURT:  The only inference the jury is going to

18   take from this is the same inference they're going to take from

19   the other document; that this is the way he was assessed in

20   making an evaluation; that it was a relevant assessment, and

21   they made that assessment.  I'm sure they didn't ask him

22   personally whether his moral and security status was good.

23   They made an assessment of his security status and his moral

24   status.

25             MR. SATIN:  I'm saying that information may have been

7901

 1    filled out by an individual who is not a PA or PLO official.

 2            THE COURT:  But used by the PA to make a determination

 3    as to whether or not he is going to get paid.

 4            MR. SATIN:  We don't know what basis they're using

 5    that.  That's a paper in the file.

 6            THE COURT:  I'm looking at it from a jury's eyes.

 7    That's what he just said.  He's going to say, look, you knew,

 8    everything relevant about this guy in making your assessment of

 9    whether you are going to support the guy.  And in your

10    assessment, everybody else is calling him a terrorist.  You say

11    he's a good guy.  Let's give him some money.  It's as basic as

12    that.

13            MR. SATIN:  What I'm disputing is whether or not it

14    was a PA person who said that his moral status what good.

15            THE COURT:  How are you disputing it?  I can't keep

16    hearing arguments from you, well, I don't know who filled this

17    out.  Those arguments aren't persuasive.  This is your document

18    produced by your client.  This is a document in their file.  If

19    you are going to dispute that they created the document, tell

20    me, and I'll keep it out if there is a genuine dispute as to

21    whether or not they created the document and this should be

22    attributed to them.

23            MR. SATIN:  What I'm saying it appears to be a letter

24    to the head of intelligence which suggests it's coming from

25    somewhere else.

```
 1            THE COURT:  Again, I don't see how this is any

 2   different than the one we looked at an hour ago.

 3            MR. SATIN:  Some of the documents are clearly --

 4   they're on a template, GIS template where they're filling in,

 5   and clearly the person who wrote that document was a PA

 6   official filling it in.  This is not one of those documents.

 7            THE COURT:  Do you have anything for me to look at

 8   that for me to determine that that was not the assessment of

 9   the people who made the decision about whether or not he is

10   going to continue to be paid.  If you have such evidence, give

11   it to me.  Otherwise, this is a dead issue.  We're moving on.

12            MR. HILL:  This is a GIS issue.  Abdullah Barghouti is

13   not getting paid by GIS.

14            THE COURT:  But GIS is making an assessment.

15            MR. HILL:  No, your Honor.  The assessment of GIS has

16   nothing to do whether he's paid by --

17            THE COURT:  Who do you see say is making an inquiry as

18   to his moral status and his other status.

19            MR. HILL:  That's in the GIS file.

20            THE COURT:  Right.  The GIS is making that assessment.

21            MR. HILL:  It's a totally different assessment.

22            THE COURT:  But the GIS is making that assessment.

23            MR. HILL:  It's in the GIS file, correct.

24            THE COURT:  The GIS is making that assessment.

25            MR. HILL:  No.  Some individual wrote this.
```

```
 1              THE COURT:  So it's not a GIS assessment.

 2              MR. HILL:  No, it's not.

 3              THE COURT:  If you want to dispute that, put on some

 4    witness who is going to say that.

 5              MR. HILL:  It doesn't have anything to do with getting

 6    paid.

 7              THE COURT:  I don't know it has anything to do with

 8    being paid, but the GIS documents classify this guy as of good

 9    moral character.  Now, if you want to distance yourself from

10    that, then give me some evidence to distance yourself from

11    that.  But if it's in your files you've got to do something

12    better than say, "Well, we don't know who wrote this."

13              MR. HILL:  All we're saying is that your Honor already

14    ruled if they didn't put it on the list of things they wanted

15    and we wanted it out, it was out.  I understand your Honor is

16    changing that rule.

17              THE COURT:  No, I'm not changing the rule.  You

18    already have this in another form and in these other documents.

19              MR. HILL:  Not for this individual.  This is Abdullah

20    Barghouti.  This is the guy that made the bomb for the

21    university.  That's why it's prejudicial to us.

22              THE COURT:  The fact is it's only prejudicial if it's

23    not true.  That's what makes it prejudicial.  If you want to

24    tell me it's inaccurate, then tell me it's inaccurate, and I

25    will give you the benefit of the doubt.  You can't just keep
```

1    saying, "It's prejudicial because it hurts us if they get it

2    before this jury."  That's not the definition of prejudicial.

3    You want to dispute this, then tell me how you dispute this.

4    That's all I'm asking.

5         MR. HILL:  This is someone's opinion, your Honor.

6    It's not a matter of truth.

7         THE COURT:  It's the GIS' opinion if it's in their

8    file.  He has a legitimate basis to argue that, and if you want

9    to say you have evidence that is not the opinion, they have a

10   different opinion, then bring somebody from the GIS and say no

11   that's not our opinion.

12        MR. HILL:  I understand the Court's ruling.

13        THE COURT:  That's all.  Let's move on.

14        Would you get the jury, please?

15        MR. YALOWITZ:  So, your Honor, with regard to this

16   video, here is what I want to try to do:  Do we have the time

17   stamps?

18        THE COURT:  Don't tell me what you are trying to do.

19   Do it.  I am bringing in the jury.  I am not spending any more

20   time on this.  Just do it.

21        MR. YALOWITZ:  You got it.

22        (Continued on next page)

23

24

25

```
 1                    (Jury present)

 2                    THE COURT:  Mr. Yalowitz, let's continue.  Pick up the

 3       pace.

 4       DIRECT EXAMINATION CONTINUED

 5       BY MR. YALOWITZ:

 6       Q.  Mr. Eviatar, have you had an opportunity to look at Exhibit

 7       826 in your large binder?

 8                    MR. YALOWITZ:  May I approach, your Honor?

 9                    THE COURT:  Yes.

10       A.  The answer is yes.

11       Q.  What is it?

12       A.  This is an intelligence document of the Israel defense

13       forces of the intelligence division that reviews and that

14       substantiated in a professional manner everything that took

15       place in the district of Jenin in the West Bank.  This city was

16       called the terrorist city.

17       Q.  In your professional experience, have you had the occasion

18       to review documents like this in the past?

19       A.  Yes, of course, I have reviewed many such documents.

20       Q.  Do you have a view on whether Exhibit 826 reflects a

21       reliable degree of professional reporting and analysis?

22       A.  I do have an opinion.  This document reflects extremely

23       reliable evidence with respect to what took place in Jenin

24       during the period of the Intifada.

25                    MR. YALOWITZ:  Your Honor, plaintiffs offer Exhibit
```

```
 1   826 in evidence.

 2             MR. ROCHON:  Subject to prior, your Honor.

 3             THE COURT:  It will be admitted into evidence.

 4             MR. YALOWITZ:  Thank you.

 5             (Plaintiff's Exhibit 826 received in evidence)

 6   BY MR. YALOWITZ:

 7   Q.  Mr. Eviatar, could you turn to Exhibit 830 in your binder.

 8   A.  I'm there.

 9   Q.  Could you just tell the jury what the title of that

10   document is and what it reflects.

11   A.  The title of the document is "The Palestinian Authority

12   Employs Fatah Activists Who Were Involved in Terrorism and

13   Suicide Attacks."

14   Q.  Have you had the opportunity to review that document in

15   advance of your testimony here today?

16   A.  Yes, I've read it thoroughly.

17   Q.  Who is the publisher of that document?

18   A.  The Intelligence Division of the Israel Defense Forces.

19   Q.  Now, in your experience and judgment, does the document

20   reflect a reliable degree of professionalism and integrity in

21   the facts and analysis?

22   A.  Absolutely yes.  The party that distributed the document is

23   the same intelligence unit that distributed all of the

24   documents that we've seen up until this point that are based on

25   captured documents that were discovered at the Palestinian
```

 1   Authority.

 2          MR. YALOWITZ:  Your Honor, plaintiffs offer 830 in

 3   evidence.

 4          MR. ROCHON:  Subject to prior, your Honor.

 5          THE COURT:  It will be admitted into evidence.

 6          (Plaintiff's Exhibit 830 received in evidence)

 7          MR. YALOWITZ:  Your Honor, I think we are ready to go

 8   with the videotape deposition.  Did the Court want to give the

 9   jury some information in that regard?

10          THE COURT:  I will just say I will give you further

11   instructions at the end, ladies and gentlemen.  A deposition is

12   an examination done before trial during the discovery process

13   and under certain circumstances that apply here, the deposition

14   of a witness can be played for you because both sides had an

15   opportunity to be there and examine that witness at that time

16   under oath.  So we will allow the parties to play that

17   videotape deposition.

18          MR. YALOWITZ:  As soon as we are ready, we will begin

19   the deposition.  At a certain point we are going to have to

20   pause it or turn the sound off.

21          THE COURT:  This is the deposition of?

22          MR. YALOWITZ:  Mosab Yousef.

23          (Videotape played)

24          MR. YALOWITZ:  Thank you, your Honor.

25   Q.  I would like to ask you some questions about that clip.

1    First of all, can you identify who is the Abdullah Barghouti

2    that they are talking about?

3    A.  It's the same Abdullah Barghouti that we spoke of earlier,

4    the terrorist, the engineer of the Hamas, the same fellow who

5    was sentenced to 67 life sentences for preparing bombs for the

6    perpetration of terrorist attacks, for terrorist attacks and

7    suicide bombings.

8    Q.  There was an individual named Jibril Rajoub mentioned in

9    the testimony.  Who was the Jibril Rajoub that they were

10   talking about of the?

11   A.  It's the same Jibril Rajoub whose picture we saw earlier.

12   He is the head of general intelligence services in the West

13   Bank.

14   Q.  I'm sorry, I don't know if you perhaps misspoke.  What was

15   his job during the 2000 to 2004 time frame?

16   A.  Sometimes I'm wrong.  The head of the preventative security

17   services in the West Bank.

18   Q.  We heard about an individual by the name of Marwan

19   Barghouti in that piece of testimony.  Who was Marwan Barghouti

20   that was being referred to there?

21   A.  He is the head of the Fatah movement in the West Bank and a

22   member of the Palestinian Legislative Council.

23   Q.  Now, I want to ask you about one other individual relevant

24   to this testimony who wasn't mentioned.  Let me start again.  I

25   apologize to the Court.

 1          Let me ask you about Ahmed Barghouti.  Who is that?

 2   A.  Ahmed Barghouti is an officer in the Palestinian security

 3   Services.  He is Marwan Barghouti's right-hand man.  He is his

 4   assistant and his personal driver since 1996.

 5          MR. YALOWITZ:  Your Honor, I ask the Court's

 6   permission to direct the jury to count 51 of Exhibit 357.

 7          THE COURT:  Yes.

 8   BY MR. YALOWITZ:

 9   Q.  Count 51 of Exhibit 357.

10          MR. YALOWITZ:  May I read from it?

11          THE COURT:  Go ahead.

12          MR. YALOWITZ:  Ms. Machnes, if you could put the first

13   page up so we could just identify who we are talking about

14   here?

15   Q.  Do you recognize this document Mr. Eviatar.

16   A.  Yes, of course I do.

17   Q.  What is it?

18   A.  I don't have the document written in the binder, so it's

19   reading it from the computer.

20   Q.  To whom does it relate?

21   A.  It's an indictment against Ahmed Barghouti.

22          MR. YALOWITZ:  With the Court's permission, I'll read

23   from Count 51.

24          THE COURT:  Yes.

25          MR. YALOWITZ:  "The above-mentioned defendant at the

 1   time set forth with another person transferred a second person

 2   and Abdullah Barghouti from the prison of the preventive

 3   security of the Palestinian Authority in Bitunia to an

 4   apartment, which the defendant had rented in downtown Ramallah.

 5           "The above-mentioned second person and Abdullah

 6   Barghouti are senior operatives of the Hamas organization,

 7   which is an illegal organization, and are responsible for

 8   carrying out a number of attacks against Israeli citizens,

 9   including the bombing attack at the Sbarro Restaurant in

10   Jerusalem on August 9, 2001."

11           Could you please look in your binder at Exhibit 427?

12           MR. ROCHON:  Your Honor, I apologize, I'm sorry we do

13   need to approach on this one?

14           MR. YALOWITZ:  Maybe your Honor with the Court's

15   indulgence, I can consult with counsel and see if we can

16   resolve it.

17           THE COURT:  That would be helpful.

18           MR. ROCHON:  Your Honor, I'm sorry, I don't think we

19   are going to be able to work this out.  I think we need a short

20   sidebar.

21           THE COURT:  Come on up.

22        (Continued on next page)

23

24

25

```
 1                (At the sidebar)
 2           MR. ROCHON:  This is a custodial statement.  This is
 3   the custodial statement of Abdullah Barghouti in which he is
 4   describing in this portion what happened at his apartment while
 5   he was in prison.  The Court had previously suggested that he
 6   doesn't know what happened when he wasn't there.  Therefore, we
 7   don't think it is properly in.
 8           THE COURT:  Which part are you talking about?
 9           MR. YALOWITZ:  Let me show your Honor.  It starts on
10   line 20 and continues on the next page as marked.
11           MR. ROCHON:  And counsel wants to use it through what
12   line?
13           MR. YALOWITZ:  I want to take it down to the -- I
14   don't want to reach over.  Until the release.
15           MR. ROCHON:  I think it's the first three lines.
16           MR. YALOWITZ:  I think it's two questions.
17           THE COURT:  So what is the part you have concern with?
18           MR. ROCHON:  What he describes what happened in his
19   apartment when he was not there.
20           THE COURT:  Which part of that?
21           MR. ROCHON:  Well, to be consistent, I don't think any
22   part -- thank you, your Honor.  He said he sent them to his
23   apartment and to a storeroom and after that it says what they
24   did, and he doesn't know what they did.  He wasn't there.
25           THE COURT:  Well, they said they took two drums of
```

```
 1    olive oil.  You're concerned about that?

 2              MR. ROCHON:  No.

 3              THE COURT:  Tell me the part you are concerned about.

 4              MR. ROCHON:  Two drops of olives containing Um Al Abed

 5    explosives.  So it was fake olive canisters, apparently.  Then

 6    he's talking about who somebody transferred to his home the

 7    drums when they planned the attack.

 8              THE COURT:  That part is not what happened.

 9              MR. ROCHON:  "In addition, they took from my home" all

10    this other stuff at the bottom of the page.  He doesn't know

11    what happened at his home, who took it or who didn't take it.

12    The part Mr. Yalowitz wants is the gallon of 20-liter of H2O2

13    they left in the storeroom.

14              THE COURT:  Is there any evidence at all there was

15    such a thing in his home by any other person?

16              MR. YALOWITZ:  No, I'm relying on his personal

17    knowledge of what bomb-making equipment he had when he was

18    arrested and what bomb-making equipment he had when he got

19    back.

20              THE COURT:  Am I incorrect that it was both the

21    Palestinian Authority security people and Israeli government

22    people who went in there?

23              MR. YALOWITZ:  No, was just PA people.

24              THE COURT:  Just PA people?

25              MR. YALOWITZ:  Right.
```

```
 1                  THE COURT:  And they were the only ones on the scene
 2   at the time?
 3                  MR. YALOWITZ:  Correct.
 4                  THE COURT:  Do you have any other information as to
 5   what was retrieved or not retrieved from that apartment?
 6                  MR. YALOWITZ:  Just what he said.
 7                  THE COURT:  Do you even know anything about this
 8   storeroom?
 9                  MR. YALOWITZ:  Elsewhere in his statements and in his
10   indictment to which he pled, he describes that he had various
11   bomb-making laboratories.
12                  THE COURT:  Do we even know they went into the
13   storeroom or were aware of the storeroom?  I know what you want
14   to imply.  You want to imply that they allowed him to keep the
15   bomb-making material.
16                  MR. YALOWITZ:  Right.
17                  THE COURT:  But is there any evidence that they were
18   even aware that he had this bomb-making material in a
19   storeroom?
20                  MR. YALOWITZ:  The only evidence I have is his
21   personal knowledge and the fact that he's arrested, and then he
22   comes back and some is missing and others are not.
23                  THE COURT:  You contend that he used this in the
24   bombing?
25                  MR. YALOWITZ:  No, I don't contend that.
```

```
 1            THE COURT:  I am going to let you have everything but
 2    that line because I don't --
 3            MR. YALOWITZ:  I need a pen.  I want to make sure I
 4    get it right.  Does your Honor wish to do the --
 5            THE COURT:  Just the gallon line.  Quite frankly, the
 6    other stuff --
 7            MR. ROCHON:  This is the part that matters.
 8            THE COURT:  That's why I asked you what's important to
 9    you.  Quite frankly, I can't tell whether the other stuff is
10    hearsay.  He didn't know what happened when he was there, but
11    he knows what was missing when he got back.
12            MR. ROCHON:  He never gets back.  This guy never gets
13    back.  He hasn't been back.  He doesn't really know.
14            MR. YALOWITZ:  I just want to make sure I am taking
15    from here down to here.
16            THE COURT:  I don't think they have any specific issue
17    with it.
18            MR. ROCHON:  I don't read upside down as good as I
19    used to.  Can I just look at it very quickly, your Honor?
20            THE COURT:  I don't have a problem with the rest of
21    the stuff, but I can see why that one statement is problematic
22    with them.  I'm not even sure there is a reasonable inference
23    that he even, one, is telling the truth.  Two, that if he is
24    telling the truth, whether they really saw it.  Three, you
25    don't even imply that he used that for any -- as far as you
```

```
 1    know, given your theory, it's still sitting there.  That's too
 2    much of a reach.
 3             MR. YALOWITZ:  I understand the Court's ruling on
 4    that.  We'll proceed.  Thank you.
 5        (Continued on next page)
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1               (In open court)
 2   BY MR. YALOWITZ:
 3   Q.  Mr. Eviatar, do you have 427 before you?
 4   A.  Yes.
 5   Q.  What is it?
 6   A.  It's a report from a police interrogation that was carried
 7   out with respect to Abdullah Barghouti.
 8               MR. YALOWITZ:  Your Honor, plaintiffs offer Exhibit
 9   427 in evidence as modified by the Court's earlier rulings.
10               MR. ROCHON:  Subject to prior, your Honor, no
11   objection.
12               THE COURT:  Yes, it will be admitted into evidence.
13               MR. YALOWITZ:  Thank you.
14               (Plaintiff's Exhibit 427 received in evidence)
15   Q.  Now, in the course of your work, have you had occasion to
16   review custodial statements such as 427?
17   A.  Definitely.
18   Q.  Are they the kinds of documents that people in your line of
19   work rely on?
20   A.  Absolutely, yes.
21   Q.  I would like to direct you to sheet number 11.  Did we
22   establish, first of all, who was giving this statement?
23   A.  Abdullah Barghouti.
24   Q.  So let's take a look at sheet number 11?
25   A.  Yes (In English).
```

```
 1   Q.  I would like to focus you on the question and answer

 2   beginning on line 20.

 3           MR. YALOWITZ:  First of all, with the Court's

 4   permission, may I read the question and answer beginning on

 5   line 20?

 6           THE COURT:  Yes.

 7           MR. YALOWITZ:

 8   Q.  "Q.  What did they question you about at the preventive

 9   security?

10   "A. It was not an ordinary interview, but only questions."

11           Can you explain what that means, "it wasn't an

12   ordinary interview"?

13           MR. ROCHON:  Objection, your Honor.  The statement

14   speaks for itself.

15           THE COURT:  I'm going to sustain the objection as to

16   form.  I'm not sure what you're asking him or how he would

17   know.

18           MR. YALOWITZ:  Sure.

19   Q.  In the course of -- well, let me move on.

20           "They asked me whether I knew whether there were

21   explosive devices and explosives, and I sent them to my

22   apartment in Ein Um Sharit  And to my storeroom in Beit Rima,

23   and they took from my home in Ein Um Sharit the two drums of

24   olives containing the Um Al Abed explosives in them.  Another

25   person transferred to my home those drums when we planned the
```

 1    attack with the guitar."

 2              What was the attack with the guitar?

 3    A.   It was a suicide attack in Sbarro Pizzeria in Jerusalem.

 4    Q.   "In addition, they took from my home electricity wires,

 5    super glue, a soldering iron from my storeroom in Beit Rima."

 6              MR. YALOWITZ:  And now when we're ready I just want to

 7    consult and make sure we are getting the next page correct and

 8    I see that we are.  I would like to, with the Court's

 9    permission, continue on the next page.

10              THE COURT:  Yes.

11              MR. ROCHON:  Your Honor, could we take this off the

12    screen for a second and approach the bench?

13              THE COURT:  If you want to.  Quickly.

14              (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1              (At the side bar)

2         MR. ROCHON:  Your Honor, this is getting into the part

3    that we discussed at great length, which is the release.  We

4    covered the stuff that they took the apartment.  I understand

5    the Court's ruling here.  But then it gets to this.  "We were

6    detained in the preventive security prison in Ramallah from

7    that day, from the day on which Abdul Ali Mustafa was

8    eliminated."  You have ruled on this more than once.

9         THE COURT:  We could have dealt with this when you

10   were up here before.

11        MR. ROCHON:  I know, but it is what you said couldn't

12   come in.  It is shown on the screen right now.  I would suggest

13   that Mr. Yalowitz read the portion that you said could come in

14   and then we can prepare a redaction that doesn't include all

15   this other stuff.

16        MR. YALOWITZ:  I thought it was part of the overall

17   narrative and we have corroborating evidence.

18        THE COURT:  Of what?

19        MR. YALOWITZ:  We have an agreement that the jury just

20   saw that he be released.

21        MR. ROCHON:  Wait.  That is this guy.  The deposition

22   is not in agreement with me, just so we are clear.

23        MR. YALOWITZ:  Yes.

24        THE COURT:  Wait.  So I can put it together, the

25   deposition testimony was that he would be arrested and released

1    later.

2         MR. YALOWITZ:  Right.  Now he is confirming he got

3    released.

4         MR. ROCHON:  The Court has said more than once that

5    getting released is not self-incriminatory.

6         THE COURT:  I'm sorry?

7         MR. ROCHON:  The Court has said more than once that

8    Mr. Yalowitz getting released is not self-incriminatory and has

9    said this couldn't come in.  That has been the ruling in this

10   case.  And it is not incriminatory.  The only part that is

11   supposed to come in is the self-incriminatory part.  This isn't

12   a conviction.  This is a statement.

13        THE COURT:  I did rule that way, and I think that is

14   still my ruling.  You have this guy saying that the agreement

15   was that he was supposed to be released.  You have, I assume,

16   some testimony from somebody who can put him on the street at

17   some point after this.

18        MR. YALOWITZ:  Yes.

19        THE COURT:  I don't know why you need anything more

20   than that.

21        MR. YALOWITZ:  OK.  Let's move on then.

22        THE COURT:  Yes.

23        MR. ROCHON:  We have to take it off the screen.

24        MR. YALOWITZ:  It is not on the screen.

25        MR. ROCHON:  I know that.  Further testimony.

1                    (Continued on next page)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    (In open court)
 2               MR. YALOWITZ:  Your Honor, may I continue?
 3               THE COURT:  Yes, sir.
 4               MR. YALOWITZ:  Thank you.
 5               "Those individuals took only um al abed explosives.  I
 6    do not know what happened to that other person with his
 7    questioning, but they took from his home the stone explosive
 8    device and the 7 millimeter pistol that I had given to that
 9    person on the night before we were arrested."
10               Thank you, your Honor.
11    Q.  Do you have a date of that arrest, Mr. Eviatar?
12    A.  Yes, I do.
13    Q.  What is it?
14    A.  The 9th of August 2001.
15    Q.  Could you turn to Exhibit 956 in your binder.  What is 956?
16    A.  A statement given by the President of the United States.
17    Q.  What is the date of that statement?
18    A.  The 9th of August 2001.
19               MR. YALOWITZ:  Your Honor, plaintiffs offer
20    Exhibit 956.
21               MR. ROCHON:  No objection.
22               THE COURT:  It is admitted into evidence.
23               (Plaintiff's Exhibit 956 received in evidence)
24    Q.  I would like to direct your attention to the second
25    paragraph.  I just want to highlight the request of the
```

1    president concerning this matter.  It begins, "Palestinian

2    Authority chairman Arafat must condemn this horrific terrorist

3    attack, act now to arrest and bring to justice those

4    responsible, and take immediate, sustained action to prevent

5    further terrorist attacks."

6              Did Abdullah Barghouti stay in Palestinian prison?

7    A.  It depends on what period you're talking about.

8    Q.  Did there come a time when he was no longer in prison?

9    A.  It came quite quickly.

10   Q.  Let me see if we can take you through some of the events in

11   the conviction of Barghouti.  Do you have a sense as to what

12   terror attacks he was convicted of following his exit from

13   prison?

14   A.  Of course.

15   Q.  Will you take us through those.

16   A.  Abdullah Barghouti, I would call him a terror industry.  He

17   is directly responsible --

18              MR. ROCHON:  Your Honor, objection.  Not responsive.

19              THE COURT:  Overruled.  He can answer.

20   A.  He was directly responsible for the preparation of bomb

21   belts and bombs for at least seven serious terror attacks which

22   occurred after his release.  In these terror attacks, dozens of

23   people were killed, innocent people.

24   Q.  Can you give us the dates?

25   A.  On December 1, 2001, there was the triple bombing in the

1    center of Jerusalem.  I am referring to three bombings that

2    occurred, one immediately after the other.  The next bombing

3    attack took place on March 9, 2009, at a café in Jerusalem.

4    The next terror attack took place on May 7, 2002, in a club in

5    a city not far from Tel Aviv.

6          The next bombing took place on June 30, 2002.  An

7    explosive charge was laid on a railroad track.  The next terror

8    attack took place on July 21, 2002.  It, too, involved laying

9    explosive charge on railroad tracks.  The next terror attack

10   took place on July 31, 2002.  It involved the laying of an

11   explosive charge in the Hebrew University of Jerusalem.  The

12   next terror attack took place on September 19, 2002.  A bus was

13   placed on a bomb.

14          THE INTERPRETER:  Excuse me.

15   A.  A bomb was placed on a bus.

16   Q.  Coming back to July 31, 2002, Hebrew University, do you

17   have -- let me withdraw that and ask a different question.  Mr.

18   Eviatar, could you look at Exhibit 428 in your binder.

19   A.  I have it.

20   Q.  What is it?

21   A.  It is a report from a police investigation, the

22   investigation Abdullah -- or rather interrogation of Abdullah

23   Barghouti.

24          MR. YALOWITZ:  Your Honor, plaintiffs offer

25   Exhibit 428 in evidence as modified by the Court's prior

1    rulings.

2         MR. ROCHON:  Objection, your Honor.  I don't know how

3    soon counsel is going to get into this, but this may be another

4    one we need to have --

5         THE COURT:  Haven't we already discussed this?

6         MR. ROCHON:  Not completely.

7         MR. YALOWITZ:  I don't think there is a problem with

8    this one, your Honor.  May I consult?

9         MR. ROCHON:  Happy to consult.

10        THE COURT:  Yes.

11        (Counsel conferred)

12        MR. ROCHON:  Based on the proffer, your Honor, we

13   don't object to to it being admitted into evidence.

14        THE COURT:  I will admit it.

15        (Plaintiff's Exhibit 428 received in evidence)

16   Q.  Take a look at page number 12.

17        MR. YALOWITZ:  Your Honor, I would like to direct the

18   jury's attention to the questions at the bottom of sheet number

19   12 that begin, "What is your connection to the attack that

20   occurred at the Hebrew University in Jerusalem?"

21        THE COURT:  Yes.

22        MR. YALOWITZ:  May I proceed?

23        THE COURT:  Yes.

24        MR. YALOWITZ:  "A.  I manufactured the explosive

25   device that exploded at the Hebrew University in Jerusalem.

1    "Q. Who asked for that explosive device?

2    "A. Salah 2 told me that they needed a bag containing an

3    explosive device in order to carry out an attack.  He did not

4    tell me in what way he wanted the device to be activated.

5    Salah 2 brought me a black plastic bag, like a briefcase, but

6    made of strong cloth rather than plastic.  Inside the bag I put

7    a lot of nuts and on them I poured Super Glue.  After that I

8    put in a large container of shampoo filled with um al abed

9    explosives.

10          "Salah 2 took this bag and after about a week he

11   returned and told me that he wanted the explosive device to

12   explode using a mobile phone that was connected to it.  Salah 2

13   brought me two Motorola mobile phones of the Orange Company,

14   i.e. the line and service.  The suspect said the word 'service'

15   in English.  I connected one of the mobile phones to the

16   shampoo container containing the explosives.

17          "On the following day, Salah 2 took the bag and

18   another three shampoo bottles filled with um al abed

19   explosives.  I was not in the laboratory in the Alatimad

20   building when Salah 2 took the bag and the shampoo containers.

21   On the following day Salah told me that he had put in three

22   more shampoo containers into the bag.  Of course, the

23   containers were filled with um al abed explosives."

24          Thank you.

25          Your Honor, subject to an agreement with the

                                                                          7627

 1   defendants, plaintiffs offer Exhibits 1130, 1131, 1135, and

 2   242.

 3             THE COURT:  They will be admitted into evidence.

 4             MR. ROCHON:  One second, to make sure we are talking

 5   about the same thing, Judge.

 6             (Counsel conferred)

 7             MR. ROCHON:  Your Honor, counsel is correct.

 8             (Plaintiff's Exhibits 1130, 1131, 1135, and 242

 9   received in evidence)

10             MR. YALOWITZ:  We will show the jury 1130, 1131, 1135,

11   and then 242.

12             (Photographs shown)

13             MR. ROCHON:  May I consult with counsel briefly, your

14   Honor?

15             THE COURT:  Yes.

16             (Counsel conferred)

17             (Video shown)

18             MR. YALOWITZ:  Your Honor, would it be a convenient

19   time to pause while we get some materials ready to hand out to

20   the jury?

21             THE COURT:  Sure.  Ladies and gentlemen, we will take

22   a ten-minute break.  Keep an open mind, don't discuss the case.

23   I'll see you in ten minutes.

24             @(Jury not present)

25             MR. ROCHON:  Your Honor, I have one issue before we

1    take our break.  The issue in this case that's been percolating

2    for a long time and on which we have had many legal rulings is

3    whether or not the plaintiffs can put in evidence the motion

4    that Mr. Barghouti was released.  The Court hasn't allowed

5    that.  There wasn't evidence to support it.  The witness

6    presumably has been instructed consistent with the Court's

7    repeated rulings.  The witness just said that he was, quote,

8    released, in his testimony.

9         We have fought hard, we have worked hard, you have

10   made rulings.  This is a key issue.  In the testimony about

11   what happened as to Mr. Barghouti, this witness just referenced

12   his release in an answer to one of Mr. Yalowitz's questions.

13   We would ask the Court to declare a mistrial in light of that.

14        It is one of the issues in this case, it is one on

15   which we spent an inordinate amount of time, and the Court's

16   rulings have been absolutely consistent regarding what could

17   come in and what could not come in.  The Court's rulings have

18   not been followed, to the prejudice of the defendants.

19   Therefore, we would ask you to declare a mistrial.

20        THE COURT:  Do you want to be heard, Mr. Yalowitz?

21        MR. YALOWITZ:  Frankly, I didn't catch if the witness

22   said the PA released him or something like that.  I didn't

23   catch that.  But we certainly have cautioned the witness not to

24   say that.

25        THE COURT:  I am going to deny that request.  It is

1    clear that the jury can reach their own conclusions about

2    whether or not they think he escaped, whether he was released,

3    he was otherwise exchanged, whatever is reasonable and logical

4    for this jury to conclude.

5            What I ruled is that it was not a statement from the

6    witness that could be admitted in that form.  I did not

7    preclude the plaintiffs from arguing, which they have already

8    argued, that there was a revolving door, and it is obvious that

9    they are going to argue to this jury that that was part of that

10   revolving door.

11           They have the evidence and the testimony to the extent

12   that it has come into this case and to the extent either side

13   wants to make that an issue and argue about whether or not he

14   was released, escaped, otherwise got out of prison with someone

15   else's assistance, and whether it really makes any difference

16   in this case for the jury's determination of the defendant's

17   liability.

18           They have a basic premise that people are arrested and

19   are not otherwise held.  It is obvious from the circumstantial

20   evidence here that this person was arrested and was not kept in

21   jail for any significant period of time, and that is not in

22   dispute.  The circumstances of his leaving prison are still

23   unverifiable and not established by any direct evidence, nor

24   has this witness testified to anything that would be a factual

25   basis for him to rely upon as to how it is that he got out of

1    jail.

2           MR. ROCHON:  I understand the Court's ruling.  One of

3    the reasons we had concern was that in addition to concern

4    about the answer, it was actually in the question as well about

5    the release.  So we lost the benefit of the ruling by virtue of

6    counsel's introducing this.

7           THE COURT:  I will look at the transcript.  That is

8    not my recollection, but it could be incorrect.  My

9    recollection is I heard the witness when the witness said it.

10    I did not hear it in the question.  But that can be reviewed.

11           MR. ROCHON:  In the interest of candor -- we will see

12    what the record says -- I have younger ears next to me that are

13    better than mine.

14           THE COURT:  The Court stenographer's hearing is better

15    than all of ours, so he can tell us exactly what the record is.

16           MR. YALOWITZ:  Your Honor, there is one other issue

17    before we break, which is we do have a piece of evidence that I

18    would like to offer.  I want to give it to the Court and get a

19    ruling in advance because I don't want another side bar on it.

20           THE COURT:  In advance would have been before trial.

21    This can hardly be described, what you guys are doing now, as

22    being in advance.

23           MR. ROCHON:  I just need to know what it is.

24           MR. YALOWITZ:  I am going to describe it exactly.  It

25    is 1147, which is the custodial statement of Ahmed Barghouti.

1    It is not in that binder, your Honor.

2        THE COURT:  What is it?

3        MR. YALOWITZ:  It is a question and answer about the

4    release of Abdullah Barghouti.  This is Ahmed Barghouti who

5    talked about taking him to a safe house.  My position is that

6    Ahmed Barghouti is an employee of the PA.  A reasonable person

7    could conclude that he took Abdullah Barghouti to the safe

8    house under the instructions of Marwan Barghouti in the course

9    of his employment.

10       This is not only a statement against interest, it is

11   also a statement of an employee about his employment at a time

12   when the employment relationship has not been extinguished.  I

13   can either hand it up to the Court or just read the statement

14   that I want to focus on.

15       THE COURT:  Hand it up.

16       MR. ROCHON:  Counsel, is this statement number 2,

17   sheet number 2?

18       MR. YALOWITZ:  Yes, sir.  I have marked what I would

19   cross out.

20       THE COURT:  I thought this was also in some other

21   document.  I thought I read this before.  Maybe I read it here.

22       MR. YALOWITZ:  It is consistent with the conviction,

23   with the indictment to which he pled.

24       THE COURT:  What is it that you want?  Do you want

25   something more than what is in the conviction, or do you just

```
 1   want to add this to it?

 2            MR. YALOWITZ:  I want to add this to it.  But I think

 3   that given the corroborative statements, given the

 4   corroborative testimony we have seen, I think the unredacted

 5   statement should come in.  As I said, this is not Abdullah

 6   Barghouti talking.

 7            THE COURT:  What indictment and judgment am I thinking

 8   about?

 9            MR. YALOWITZ:  Count Fifty-One of Ahmed Barghouti.

10            THE COURT:  Is it in evidence?

11            MR. ROCHON:  357, your Honor.

12            MR. YALOWITZ:  Abdullah Barghouti's custodial

13   statement is very similar.  We originally redacted that, and

14   then the Court ruled that it was all out.

15            THE COURT:  You said Ahmed Barghouti?

16            MR. ROCHON:  Yes.  357 is his indictment, and it is

17   Count Fifty-One that discusses it.

18            THE COURT:  Count Fifty-One?

19            MR. ROCHON:  Yes, sir.

20            MR. YALOWITZ:  What I think the Court is thinking of

21   is 428 -- I'm sorry -- 427, which we just went over at side

22   bar.

23            THE COURT:  No, that is not what I was thinking.

24            MR. YALOWITZ:  All right.

25            THE COURT:  I don't see it on that page.  You say page
```

 1    51?

 2              MR. ROCHON:  No.  Count Fifty-One.

 3              THE COURT:  I'm sorry.  That was my mistake.

 4              MR. ROCHON:  It's pretty far in the back of the

 5    English portion.

 6              THE COURT:  Do you know what page that is?

 7              MS. FERGUSON:  73 I think.

 8              MR. YALOWITZ:  That count doesn't have the name of

 9    Jabril Ragoub.  The only other place the name Jabril Ragoub

10    name appears is in 427, which is the Abdullah Barghouti

11    custodial statement.

12              THE COURT:  You just want to get in the name that was

13    redacted in the indictment by getting it in through his

14    custodial statement?

15              MR. YALOWITZ:  The indictment doesn't have Jabril

16    Ragoub.  The indictment has Marwan Barghouti, if I'm

17    remembering correctly.  I may be mistaken about that.  The

18    indictment does not mention Jabril Ragoub.

19              THE COURT:  I don't see why this is admissible.  Why

20    is this any exception to the hearsay rule?

21              MR. YALOWITZ:  Because it is a statement about Ahmed

22    Barghouti's employment during the course of that employment.

23              THE COURT:  It still doesn't tell me that you know

24    that Ragoub called Marwan Barghouti.  How would he know that?

25              MR. YALOWITZ:  I gave you my only copy.

```
 1                THE COURT:  Still, why is that not hearsay?

 2                MR. YALOWITZ:  I can't see it.  If I may, your Honor?

 3     I'm sorry.

 4                THE COURT:  For the only purpose that you are offering

 5     it, that he was the one that in fact made that call.  The

 6     substance of what you want, and that's why I think we are

 7     beating a dead horse about whether he was released or not, the

 8     substance of what you want is here in various forms.  Here it

 9     says they went together off to a hotel room.  I don't know what

10     else you need at this point.

11                MR. YALOWITZ:  All right.  I just wanted to make sure

12     we touched the base, your Honor.

13                THE COURT:  The fact that he says he was the one that

14     made the phonecall, I don't know of any reason why we should

15     think that is reliable direct evidence that he has not, other

16     than that is what somebody told him.

17                MR. YALOWITZ:  I understand the Court's ruling on

18     that.  Let's move forward.

19                THE COURT:  Let's take five minutes.

20                MR. YALOWITZ:  What we are going to do, your Honor, we

21     will hand out those binders.

22                THE COURT:  Go ahead and set that up.

23                (Recess)@

24                THE COURT:  Let's get the jury.

25                (Jury present)
```

1          THE COURT:  Mr. Yalowitz.

2          MR. YALOWITZ:  Thank you, your Honor.  I would like to

3    ask the members of the jury to look at Exhibit 164, which is

4    behind the Abdullah Barghouti tab in their binders.  I guess as

5    a housekeeping matter, your Honor, I would ask Mr. Eviatar if

6    he has had an opportunity to review the binder before him,

7    which is entitled "July 31, 2002, 1:30 p.m., Frank Sinatra

8    Cafeteria, Hebrew University, Jerusalem."

9    BY MR. YALOWITZ:

10   Q.  Mr. Eviatar, have you had an opportunity to review that?

11   A.  Definitely.

12   Q.  Have you had the opportunity to review the index in front

13   of the binder?

14   A.  Yes, I have reviewed it.

15   Q.  Does the index accurately reflect the contents of the

16   binder?

17   A.  Absolutely.

18          MR. YALOWITZ:  Your Honor, in order to save time, if I

19   may read the numbers of the exhibits that we wish to have

20   admitted.

21          THE COURT:  You don't have to do that now.  We will

22   save even more time.

23          MR. YALOWITZ:  Thank you.  Plaintiffs move the

24   admission of the documents contained in the binder to the

25   extent they have not already been admitted and subject to the

 1    Court's prior ruling.

 2              THE COURT:  They will be admitted.

 3              MR. YALOWITZ:  Thank you.

 4              (Plaintiff's Exhibits 164, et al., received in

 5    evidence)

 6    Q.  Now if we could look together at tab D.  What are we

 7    looking at here?

 8              MR. ROCHON:  If we could reference it by exhibit

 9    number so the record is clear, your Honor.

10              MR. YALOWITZ:  Your Honor, I think that is a good

11    suggestion.

12    Q.  Tab D, Exhibit 164.

13              THE COURT:  Abdullah Barghouti.

14    A.  Yes, sir.

15    Q.  What kind of a file is this?

16    A.  Exhibit 164 is a report containing personal information and

17    other information with respect to Abdullah Barghouti.

18    Q.  Whose document is this?

19    A.  The general intelligence services of the Palestinian

20    Authority.

21    Q.  Now could you turn with me to the third page.  I want to

22    look at the report at the very bottom of page 3.  Does

23    everybody have the bottom of page 3 before them?  It looks like

24    we do.  All right.

25              MR. YALOWITZ:  Your Honor, I ask to direct the jury to

737

1    the very last sentence of that report in the box, if I may

2    read.

3            THE COURT:  Yes.

4            MR. YALOWITZ:  "Later, he joined Hamas and continued

5    working with them until he was arrested."

6            If we could turn over the page and look at page 4, I

7    want to ask that the jury look at the middle panel, and I will

8    direct them to the statement, "He is very dangerous and his

9    situation is being checked," with the Court's permission.  With

10   the Court's permission, we will put that on the screen just so

11   everybody has it in mind.

12   Q.  Mr. Eviatar, did the General Intelligence Service reach a

13   conclusion about the security status and the moral status of

14   Abdullah Barghouti?

15   A.  Yes, definitely.

16   Q.  Where do we find that conclusion?

17   A.  In the portion of the table that you just referred me to.

18   Q.  May I also direct you to turn one, two, three pages

19   further, to the very last English page before the translation

20   certificate.  Do we have here a conclusion by the Palestinian

21   Authority about the security status and moral status of

22   Abdullah Barghouti?

23   A.  Yes, definitely.

24   Q.  What is their conclusion?

25   A.  They write that the security situation and his moral

 1  situation are good.

 2  Q.  Now I would like to direct you and the members of the jury

 3  to tab C behind Abdullah Barghouti, Exhibit 73.  Could you

 4  explain what this document is to the members of the jury.

 5  A.  Exhibit 73 is an existing file that pertains to Abdullah

 6  Barghouti in the Palestinian ministry of prisoners.  Later on,

 7  the file itemizes the transfer of salaries from the Palestinian

 8  Authority to Abdullah Barghouti from the time of his arrest and

 9  up until 2012.

10  Q.  Could we look at the second page and the third page, the

11  fourth, fifth, sixth, and seventh, this chart.  Could you

12  explain what this table is.

13  A.  We see in this very detailed chart that presents the

14  amounts of the monetary transfers that were made to the family

15  of Abdullah Barghouti.  To be more precise, they were made to

16  his wife beginning in May 2003 every single month to a bank

17  account in Ramallah up until December 2012.  I would like to

18  note here that the amounts of money became higher during the

19  course of this period of time.

20  Q.  Did the moneys stop in December 2012?

21  A.  No.  Just the document concluded then, not the transfer of

22  funds.

23  Q.  Let's take a look at not the next tab, which is Ahmed

24  Barghouti, but the one after that, which is Ibrahim Hamed.  I

25  want to ask you, first of all --

```
 1              MR. ROCHON:  Could we have an exhibit number again,
 2    just for the record, your Honor?
 3              MR. YALOWITZ:  Sure.
 4    Q.  First of all, can you tell the jury who that individual is
 5    in Exhibit 1170.
 6    A.  Absolutely.  This is Ibrahim Hamed.  He is head of the
 7    military wing of the Hamas in the West Bank.  With your
 8    permission, I would like to add a short personal story about
 9    him.
10              MR. ROCHON:  Not responsive, your Honor.
11              THE COURT:  Why don't you pose a question.
12    Q.  Have you had occasion to encounter Ibrahim Hamed?
13              MR. ROCHON:  Your Honor --
14              THE COURT:  Overruled.  You can answer.
15    A.  No, I have never met him.
16    Q.  Do you have something in particular that is relevant -- let
17    me ask it again.  Could you share with the jury a revealing
18    story about Ibrahim Ahmed.
19              MR. ROCHON:  Objection, your Honor.
20              THE COURT:  I am going to sustain.  Let's figure out
21    where we are going.
22    Q.  What was Ibrahim Ahmed's role in the Hebrew University
23    attack?
24              MR. ROCHON:  Objection, your Honor.
25              THE COURT:  Overruled.
```

1   A.   Ibrahim Hamed gave the order to perpetrate this terrorist

2   attack.  He led it, he planned it, he helped by providing the

3   resources.  By saying that, I mean the explosives, for example.

4   He gave instructions to members of the cell, and he in essence

5   was the conductor, in quotation marks, of that terrorist

6   attack.

7   Q.   I would like to look with you at tab C behind Ibrahim

8   Hamed, Exhibit 147.  In particular, I want to focus your

9   attention on the fourth page of that exhibit.

10

11        MR. YALOWITZ:  I wonder if we could put it up, Ms.

12   Machnes.  Bear with me, your Honor.  I would like to direct the

13   jury's attention to the report in the center of the page, which

14   is the fourth page in to the document.  In particular, the

15   fourth bullet down.  If I may, your Honor?

16        THE COURT:  Yes.

17        MR. YALOWITZ:  "The aforementioned is a commander in

18   the Al-Qassam Brigades and is currently being pursued and is a

19   most wanted person by Israel.  The aforementioned has a firm

20   character and is beloved.  He is most wanted by Israel the

21   opinion of the officer in charge of the organization file:  The

22   aforementioned is dangerous and is pursued by the Israelis.

23   Opinion of the officer in charge of the political file:  The

24   aforementioned is considered as Israel's most wanted man in

25   Hamas.  He is dangerous."

1    Q.  Now I would like to turn with you to tab B, the Ibrahim

2    Hamed materials, and look at Exhibit 61.  Can you explain to

3    the jury what we are looking at here.

4    A.  There is a personal file here about Ibrahim Hamed as it

5    exists in the Palestinian ministry of prisoners, which belongs

6    to the Palestinian Authority.  Some information appears here

7    about Ibrahim Hamed.  In addition, there is a detailed table

8    here which itemizes the transfer of funds to the family of

9    Ibrahim Hamed starting September 2007 and up until December

10   2012.  The transfer of funds was made to a bank account.  And I

11   will note that here as well the amounts of money went up over

12   the course of the years.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   Q.  Do you have an understanding of what triggered the

 2   defense's commencement of transfer of funds as reflected in

 3   this exhibit?  Let me ask that a little different.  Why did

 4   they start paying him?

 5   A.  It's totally clear.  Just like they transferred money to

 6   all of the prisoners who were involved in acts of terrorism and

 7   meet the definition of having participated in the arms

 8   struggle, and as a result of that, they are serving time in

 9   Israeli prisons, from that moment on war, according to the

10   Prisoners Act, the Palestinian Authority pays money, a monthly

11   amount of money to the families of the prisoners or to him

12   himself.

13   Q.  Let's take look at the next person in our binder Mohamed

14   Arman.  Are we ready?

15   A.  I have his picture in front of me.

16   Q.  Is that 1189?

17   A.  There is no number on the picture.

18          MR. YALOWITZ:  I'm informed that Mr. Eviatar's binder

19   doesn't have the number, but I will represent to the Court that

20   it's 1189?

21          THE COURT:  Yes, I see it.

22   Q.  What was Mohamed Arman's role in the Hebrew University

23   bombing?

24          MR. ROCHON:  Objection, your Honor.

25          THE COURT:  Overruled.
```

1    A.  Mohamed Arman was a senior member in the cell that was

2    responsible for this terror attack.  It was called the Silwan

3    cell.  Mohamed Arman participated in preparing the bomb.  He

4    repaired it after it misfired the first time, and he is the one

5    who gave it to the person who got it inside the university.

6    Q.  Let's take a look at tab C in our binders.  On document

7    Exhibit 1035, what kind of document is this?

8    A.  1035 is a document that in fact is Mohamed Arman's personal

9    file.

10   Q.  By the way, what branch of the -- who prepared this

11   document?

12   A.  This document was prepared by the general intelligence

13   services of the Palestinian Authority.

14   Q.  Thank you.

15        Let's take a look at the fifth page.  I want to focus

16   on the top box.  We will highlight it for the jury.

17        MR. YALOWITZ:  If I may, your Honor, I will read from

18   the jury from the top box.

19        THE COURT:  Yes.

20   Q.  "The aforementioned is a resident of Kharbata Bani Hareth.

21   He is good in terms of security and morals.  He studied, up to

22   middle school, in a school in Kharbata.  He studied at the Open

23   University.  He worked for PALTEL.  He was a member of the

24   Silwan military cell that carried out the Hebrew University

25   attack and other attacks.  He is sentenced to 36 life terms

1    [illegible] Silwan cell.  Other members of the cell are

2    [Illegible] Walid Anjas, Ibrahim Hamed.

3           "While in prison, the aforementioned wrote a book

4    called "Engineers of Death" about the formation of the cell."

5           Let's go to tab B in our binders.  Tell the jury what

6    we've got here.

7    A.  Exhibit 71 is the personal file in the ministry of

8    Palestinian prisoners of the Palestinian Authority on Wael

9    Al-Qassim, and the file includes personal details about this

10   individual.

11   Q.  I'm sorry, I meant to direct you to Exhibit 72 which is

12   behind the Mohamed Arman tab.  It's B.  It should have a 72 at

13   the front at the top.

14   A.  I'm sorry.

15   Q.  So whose file is 72?

16   A.  Thinks the file of Mohamed Arman.

17   Q.  If we flip pages 2, 3, 4, 5 and so forth, what are we

18   seeing?

19   A.  In this case as well we have a detailed table that includes

20   money transfers monthly, to the family of Mohamed Arman from

21   September 1998 with a break until late 1999.  And then one

22   again from October 2002 to December 2012.  The table notes the

23   sum each month which was transferred to the bank account, and

24   in this case too the sums rose over the years.

25   Q.  Let's go to Wael Al-Qassim, who is the next one in our tab.

1   Do you have Al-Qassim's file open?

2   A.  Yes, and this is indeed Exhibit 71.

3   Q.  First of all, what was Al-Qassim's role in the Hebrew

4   University bombing?

5              MR. ROCHON:  Objection, your Honor.

6              THE COURT:  Overruled.

7   A.  Wael Al-Qassim was a member of the Silwan cell.  This is

8   the same cell that was responsible for the terror attack, and

9   he too had a role in carrying it out.

10  Q.  Let's take a look at Exhibit 41, which is tab A.  Just tell

11  the jury what we are looking at here.

12  A.  What we see here in Exhibit 41 are personal details about

13  Wael Al-Qassim in a file for him in his name in the ministry of

14  Palestinian prisoners of the Palestinian Authority.

15  Q.  Again, just flipping pages, do we see -- well, what are we

16  looking at here in this chart?

17  A.  This table specifies, exactly like the previous ones, the

18  transfer of funds to the family of the -- to the bank accounts

19  of the Al-Qassim family starting in March 2003 every month

20  until February 2012.  The page end but the transfers continue.

21  And in this case too the sums of the transfers rose during this

22  period.

23  Q.  Let's take a look at Walid Anjas, the next one in our

24  binder.  Do you have his photograph?

25  A.  Yes, I see the photograph.

1      MR. YALOWITZ:  I'm not sure whether it is before the

2  witness, but I will represent to the Court it is Exhibit 1191.

3  Q.  What was his role in the Hebrew University bombing?

4      MR. ROCHON:  Objection, your Honor.

5      THE COURT:  Overruled.

6  A.  Walid Anjas was a member of the cell that was responsible

7  for the terror attack, the same Silwan cell.  That's the name.

8  Q.  Let's go to tab D in our binders.  Do you have tab D before

9  you?

10  A.  Exhibit 1037?

11  Q.  That's it.  Let's go to the fifth page?

12  A.  I have it in front of me.

13      MR. YALOWITZ:  Your Honor, may I read it?

14      THE COURT:  Yes.

15  Q.  "Walid's role in the cell according to the charges against

16  him was lookout and helping in transferring the explosives

17  [rest of sentence cut off]."

18      Let's also turn back one tab to Exhibit C.  First of

19  all, Mr. Eviatar, can you just help the jury, it's my

20  understanding what Exhibit 165 is and whose document it is?

21  A.  This is a document of the Palestinian Authority of the

22  General Intelligence Services.  The document deals with Walid

23  Anjas and contains personal and other details about this

24  individual.

25  Q.  I just would like to highlight for the jury certain of the

 1    information on page 1.  Do you want to put it up on the screen?

 2    It's in the center of page 1.

 3              MR. YALOWITZ:  May I read, your Honor, and we'll

 4    highlight as I'm reading?

 5              THE COURT:  Yes.

 6    BY MR. YALOWITZ:

 7    Q.  "Affiliation:  Hamas.

 8              "The aforementioned has been imprisoned for a

 9    year-and-a-half, and six months ago he was sentenced to life in

10    prison.

11              "The security and moral status of the aforementioned

12    is good.

13              "The aforementioned is a member of the military wing

14    of the Hamas Movement and of the cell that was arrested

15    following the Hebrew University bombing."

16              Whose document is this?

17    A.  The General Intelligence Services of the Palestinian

18    Authority.

19    Q.  Let's take a look at tab A Walid Anjas' section of the

20    binder.  What are we looking at in Exhibit 42 behind tab A?

21    A.  This is a table of the ministry of Palestinian prisoners

22    which details the transfers of funds every month to the family

23    of Walid Anjas starting in December 2002 every month to the

24    bank account until February 2012.

25    Q.  According to this document, who is paying this man?

 1   A.  The Palestinian Authority, the ministry of prisoners.

 2   Q.  Why are they paying him?

 3          MR. ROCHON:  Objection.

 4          THE COURT:  Sustained.

 5   Q.  Do you have an understanding of why the Palestinian

 6   authorities started paying this man?

 7          MR. ROCHON:  Objection.

 8          THE COURT:  Sustained.

 9   BY MR. YALOWITZ:

10   Q.  All right.  Let's go to the last one in our binder, Mohamed

11   Awda.  Do you have 1192 his photograph?

12   A.  I have the photograph but without a number.

13          MR. YALOWITZ:  I will represent to the Court it's

14   1192.

15   Q.  Let's begin with this man on tab B, Exhibit 151.

16   A.  I see Exhibit 151.

17   Q.  Let's look at the text of the report on page 3.

18          MR. YALOWITZ:  May I read it to the jury while they

19   follow along, your Honor?

20          THE COURT:  Yes.

21   Q.  We'll highlight it on the screen as well.

22          "The aforementioned used to work in the Hebrew

23   University and is a member of the Al-Qassam Brigades, the

24   military wing of Hamas Movement.  The aforementioned has

25   performed many operations, among them the Hebrew University

1    bombing, Sbarro Restaurant bombing and others, along with the

2    rest of his group:  Wael Qassem Alaa al-Abasi and WIsam

3    al-Abasi, the aforementioned is currently sentenced to life

4    imprisonment."

5          Who created this document?

6    A.  The General Intelligence Services of the Palistinian

7    authority.

8    Q.  Let's turn to tab A behind Mohamed Awda, and just tell the

9    jury what we're looking at here.

10   A.  This is Exhibit 86.  This is a personal file on Mohamed

11   Awda of the ministry of Palestinian prisoners of the

12   Palestinian Authority.

13   Q.  Whose file is it?

14   A.  The file belongs to the ministry of Palestinian prisoners.

15   Q.  Now, looking at the top of the document, Exhibit 86, it

16   looks like the name Mohamed Odeh is spelled a little

17   differently than I have it spelled in my tab.  Could you just

18   check the Arabic and let us know whether we have the right

19   person?

20   A.  I checked the Arabic.  It is the same Mohamed Awda.

21   Q.  Thank you.

22         MR. YALOWITZ:  Now, with the Court's permission, I

23   will collect the binders so they don't sit on the jury's lap.

24   May I, your Honor?

25         THE COURT:  Yes.

7750

```
 1              MR. YALOWITZ:  Thank you.
 2   Q.  Mr. Eviatar, I would like to direct your attention now to
 3   four documents that are in your small binder.  Those are
 4   Exhibits 496, 634, 635, and 1142.  If you could let us know
 5   when you've had the opportunity to let us take a look at those.
 6   I take it back.  1142 is not before you.  Wait, it may be.  It
 7   may be.  Do you have 1142?
 8   A.  I have all four of them.
 9   Q.  Great.  Can you briefly identify those for the Court?
10   A.  These are official documents of the American Administration
11   which detail the information about the involvement of the
12   Palestinian Authority in terrorist activities.
13              MR. YALOWITZ:  Your Honor, plaintiffs offer 496, 634,
14   635 and 1142.
15              MR. ROCHON:  Subject to prior, no objection, your
16   Honor.
17              THE COURT:  They will be admitted into evidence.
18              (Plaintiff's Exhibits 496, 634, 635 and 1142 received
19   in evidence)
20   Q.  I'd like to focus with you on Exhibit 496.
21              MR. YALOWITZ:  First of all, your Honor, may I direct
22   the jury's attention to the second sentence of the report?
23              THE COURT:  Yes.
24   Q.  It covers the period from September 14, 2001 to June 15,
25   2002 and it has some other material that I don't think is of
```

1    that concern.

2         MR. YALOWITZ:  So, thank you, your Honor.

3         May I direct the jury in addition to the second one

4    your Honor?  This report describes actions and statements of

5    the Palestine Liberation Organization (PLO), and as relevant

6    the Palestinian Authority (PA) with respect to commitments set

7    forth in Chairman Arafat's September 9, 1993 letters to Israeli

8    Prime Minister Rabin and Norwegian Foreign Minister Holst and

9    from those contained in and resulting from the good faith

10   implementation of the declaration of principles."

11        MR. YALOWITZ:  Now I would like to turn to the first

12   page of this document item 5 for the jury, your Honor.  May I?

13        THE COURT:  Yes.

14   Q.  "To renounce the use of terrorism and other acts of

15   violence, call on Palistinians in the West Bank and Gaza to

16   refrain from violence and assume responsibility overall PLO

17   elements and personnel to assure their compliance, prevent

18   violations and discipline violators."

19        MR. YALOWITZ:  May I read the first paragraph

20   following the list of commitments, your Honor?

21        THE COURT:  Yes.

22   Q.  "The Palistinians' record regarding these commitments

23   during the reporting period is mixed at best with specific

24   serious concerns about their commitment to renounce the use of

25   terrorism and violence, assume responsibility for all PLO

1    elements and discipline violators."

2         MR. YALOWITZ:  May I read from the next paragraph,

3    your Honor?

4         THE COURT:  Yes.

5    Q.  "At the same time, available evidence indicates that

6    elements with varying degrees of affiliation with the PLO,

7    specifically the Al-Aqsa Martyrs Brigades, Tanzim and members

8    of other security forces, were frequently involved in acts of

9    violence against Israelis.  The Al-Aqsa Martyrs Brigades use of

10   terror intensified during the reporting period.

11        "While there is no conclusive evidence that these

12   groups carried out specific attacks with the prior approval and

13   encouragement of the PLO and PA leadership, it is clear that

14   those armed elements were not disciplined."

15        MR. YALOWITZ:  Now I will read from the third

16   paragraph on -- I'm sorry -- may I direct the jury's attention

17   to page 7, your Honor?

18        THE COURT:  Yes.

19   BY MR. YALOWITZ:

20   Q.  Paragraph two:  "It was clear that some members of the PA

21   Security Forces and Chairman Arafat, Fatah faction within the

22   PLO were deeply involved in the violence.  The Al-Aqsa Martyr

23   Brigades, self-designated cells of largely young militants from

24   refugee camps, emerged as the leading cause of increasing

25   terror attacks in the West Bank and Israel.  Members of AAMB

 1    are drawn largely from grass roots Fatah Tanzim."

 2            MR. YALOWITZ:  If I could just the direct the jury to

 3    the third paragraph on that page with the Court's permission.

 4            THE COURT:  Yes.

 5    Q.  "While there is no conclusive evidence that Chairman Arafat

 6    or the senior PA or PLO leadership approved or had advance

 7    knowledge of planned attacks, they clearly knew that Al-Aqsa

 8    Martyr Brigades and elements of Tanzim and the Palestinian

 9    Security Forces were involved in the violence and they did not

10    take effective or sustained action to rein them in."

11            Now, Mr. Eviatar, what is the date on which this

12    report was issued?

13    A.  This report pertains to the period between December 27,

14    2001 to the 15th of June 2002, and the date that it was issued

15    as I see here, was the 16th of December 2014.

16    Q.  Following 2002, did evidence emerge that senior PA and PLO

17    leaderships --

18            MR. ROCHON:  Objection.  Leading.

19            THE COURT:  I am going to sustain the objection.

20    Q.  When was the conviction of Marwan Barghouti?  Was it before

21    or after June of 2002?

22    A.  It was after June 2002.

23    Q.  Was when was the conviction of Fuad Shubaki?  Was it before

24    June of 2002 or after June of 2002?

25    A.  It was after June 2002.

```
 1              MR. YALOWITZ:  Your Honor, think I may either be

 2    finish or almost finished, but I need to consult with

 3    Mr. Rochon for just a moment.

 4              THE COURT:  Certainly.

 5              MR. ROCHON:  Your Honor, I discussed with counsel.

 6    There was one reference to the date that this report was

 7    published, and Mr. Yalowitz is stipulating to agree that the

 8    date of December 16, 2014 is not the date it was published.  It

 9    was simply the date it was made public.  Agreed?

10              MR. YALOWITZ:  That's right.

11              Your Honor, I have no further questions on direct for

12    Mr. Eviatar.

13              THE COURT:  Did you want to begin a few minutes now or

14    did you want to start tomorrow?

15              MR. ROCHON:  Your Honor, what I will do is a few

16    minutes now and I don't want to take the jury too late.

17              THE COURT:  Take five or ten minutes.

18    CROSS-EXAMINATION

19    BY MR. ROCHON:

20    Q.  What I will do, sir, is start by asking you these

21    questions.  You were just looking at the report from the

22    Exhibit 634 from the department of state, correct?

23    A.  I reviewed it, yes.

24    Q.  That report --

25              MR. YALOWITZ:  Objection.  Objection, your Honor.  I
```

1    thought I was looking at 496 with him.

2         THE COURT:  Do you want to speak?

3         MR. ROCHON:  I meant to say 634 if I said 496.  I

4    apologize.  I think I said 634, what he was just looking at.

5         THE COURT:  I think he's following it.

6    Q.  Sir, that report includes information about the Palestinian

7    Authority arresting police officers that had been involved in

8    improper activity, doesn't it?

9         MR. YALOWITZ:  Objection, your Honor.  I'm sorry, we

10   have the wrong document.  I was going over 496 with the

11   witness.  Counsel is entitled to ask him anything he wants.  I

12   just want to make sure we're clear.

13        MR. ROCHON:  They're both in evidence.

14        THE COURT:  Are you referring him to specifically

15   which document?

16        MR. ROCHON:  Your Honor, I will tell you what I will

17   do to satisfy the objection.  The Exhibit No. 496 includes

18   references to the arrest of Palestinian police officers by the

19   Palestinian Authority during this time, correct?

20   A.  I don't know.  I have to review it.

21   Q.  I'm not going to have you review it right now.  We are

22   going to get to do this some more tomorrow.  I'm going to turn

23   you to page 5 which says the paragraph beginning:  "The PA

24   leadership" and I quote, doesn't it say on page 5: "The PA

25   leadership and PLO chairman Arafat on numerous occasions during

1   the reporting period condemned acts of violence and terror"?

2   A.  What is the question, please, sir?

3   Q.  Sir, when Mr. Yalowitz was reading you from the reports

4   previously, you understood his questions, right?

5   A.  If there's a question that I don't remember what it is,

6   then I ask you again.  Could you explain it, please.

7   Q.  On page 5 of the report, it states:  As I just read, "The

8   PA leadership and PLO Chairman Arafat on numerous occasions

9   during the reporting period condemned acts of violence and

10  terror."

11          That's what it says, right?

12  A.  Yes, sir.

13  Q.  You are currently still a military reservist, aren't you?

14  A.  That is correct.

15  Q.  Your right in the Israeli Defense Force is colonel or

16  lieutenant colonel?  I apologize for not remembering.

17  A.  Lieutenant colonel.

18  Q.  So Lieutenant Colonel Eviatar, for how long have you been

19  in the Israeli Defense Forces?

20  A.  I served on a continuous basis for 27 years.

21  Q.  And you retired from active service in the Israeli Defense

22  Forces in April of what year?

23  A.  I was discharged in April 2014.

24  Q.  Then you were contacted to be an expert or opinion witness

25  in this case the next month.  Is that right?

1    A.   I completed my military service in April 2013, and I was

2    officially discharged in 2014.

3    Q.   You were contacted to be a witness in this case the month

4    after you were discharged.  True or not true?

5    A.   That's correct.

6    Q.   You testified last week when Mr. Yalowitz was asking you

7    questions about the payments to Palestinian prisoners -- do you

8    remember Mr. Yalowitz talked about that with you for awhile,

9    right?

10   A.   Yes, sir.

11   Q.   And the exchange between you and Mr. Yalowitz indicated

12   that prisoners are paid who are in prisons as a result of their

13   struggle against the occupation, correct?

14   A.   They sit there as a result of their participation in the

15   armed struggle against Israel.  That is what I said.

16   Q.   What you and Mr. Yalowitz last week talked about was that

17   Palestinian prisoners are paid while they're at prison as a

18   result of their struggle against the occupation.  Isn't that

19   right?

20   A.   I wish again to say what I said in my previous response.

21   Q.   Last week when we were talking about the statute at great

22   lengths involving payments to prisoners, it did not say they

23   were paid as a result of their being in prison as a result of

24   their armed struggle against the occupation, did it?

25   A.   Sir, I explicitly defined the definition of the Palestinian

1    statute.

2    Q.  The statute does not include the word that prisoners are

3    paid for involvement in armed struggle.  It says they're paid

4    if they're in prison as a result of struggle against the

5    occupation, right?

6    A.  I must see the precise definition, if I may.

7    Q.  Right.  But that was one of the things you reviewed before

8    coming here as a witness, that's one of the documents you

9    reviewed, right?

10   A.  I reviewed the documents.

11   Q.  And it's your recollection as you sit here right now that

12   the statute that provides for payment to Palestinian prisoners

13   as a result of their imprisonment in Israeli jails pays them

14   only if there is armed struggle or does it simply refer to

15   struggle against the occupation?  What's your memory?

16   A.  Sir, I do not recall precisely.

17   Q.  OK.  We can look more at that tomorrow.

18           The documents that you looked at that were recovered

19   allegedly in the occupied Palestinian territory in the West

20   Bank were recovered by IDF soldiers, right?

21           MR. YALOWITZ:  Objection.

22           THE COURT:  Overruled.

23   A.  Yes.

24   Q.  You're an IDF soldier?

25   A.  In the reserves.

759

1    Q.  The occupation that Palestinian prisoners struggle against

2    is an occupation that is maintained by the Israeli Defense

3    Forces.  Isn't that right?

4            MR. YALOWITZ:  Objection, your Honor.  May we have a

5    side bar?

6            THE COURT:  No.

7    Q.  Isn't that right?

8    A.  Sir, I cannot agree with the determination that's contained

9    in your question.

10   Q.  Thank you.

11           MR. ROCHON:  Your Honor, if we are going to break,

12   I've taken us pretty late.

13           THE COURT:  Let's do that now.

14           Ladies and gentlemen, don't discuss the case.  Keep an

15   open mind.  We'll continue 9:30 tomorrow.  We will try to keep

16   this on time.  I think we are on schedule.  We are not ahead of

17   schedule.  I want to move us along, particularly after we

18   finish this witness.

19           MR. YALOWITZ:  Your Honor?

20           THE COURT:  Just a second.

21           (Jury excused)

22        (Continued on next page)

23

24

25

```
1          THE COURT:  You wanted to address something at the

2   sidebar?

3          MR. YALOWITZ:  No.  No.  Well, I did, but we can move

4   on.

5          THE COURT:  Well, you can put it on the record now if

6   you think it's something you didn't think I understood.

7          MR. YALOWITZ:  I have a feeling your Honor understood

8   very well.  I am very concerned about Mr. Rochon getting into

9   political issues by calling things the occupied Palestinian

10  territories and saying that the IDF is conducting an occupation

11  and things like that.  That is really verging into the

12  territory that I thought the Court was pretty clear we were not

13  going to get into, and it's never too early to start objecting

14  on something like that.  I don't know that he crossed the line,

15  but I'm very concerned about where he's going.

16         THE COURT:  I don't think he crossed the line with

17  regard to the nature of his questions.

18         MR. YALOWITZ:  I understood your ruling to have

19  reached that conclusion.

20         MR. ROCHON:  Your Honor, I thought Mr. Yalowitz was

21  done.  I'm sorry.

22         MR. YALOWITZ:  I've been advised that I misspoke a few

23  moments ago moving two documents in evidence.  I had said 364

24  and 365.  And what I should have said was 634 and 635.

25         THE COURT:  OK.  But those were the documents the
```

1    witness was reviewing?

2            MR. ROCHON:  I think he said did say 634 and 635.

3    That's what I looked at.

4            MR. YALOWITZ:  Maybe both of us are dyslexic.

5            THE COURT:  Yes, sir.

6            MR. ROCHON:  I only have two quick things.  One, I

7    assume now the witness is on cross he can no longer consult

8    with counsel.

9            THE COURT:  OK.

10           MR. YALOWITZ:  That's my understanding as well.

11           MR. ROCHON:  Second, your Honor, as of yet --

12           MR. YALOWITZ:  My understanding is that would be the

13   rule for all witnesses.

14           THE COURT:  Yes.

15           MR. ROCHON:  -- we don't yet have an exhibit list for

16   the next witness, so I hope we can get that as early as

17   possible tonight.  It's foreshadowing; it's not happy

18   foreshadowing for Mr. Shrenzel, who we've been told is the next

19   witness.  We don't have documents that they are going to use

20   with him.  As soon as we get that, it would allow us to deal

21   with any issues that might arise promptly.

22           THE COURT:  How long before we get through cross.

23           MR. ROCHON:  Way shorter than direct.  I'll be done

24   tomorrow, and tomorrow before the end of the day, so their next

25   witness should be available certainly by mid afternoon

 1    tomorrow.

 2              MR. YALOWITZ:  That's fine.  As soon as we can, we

 3    will get the documents exhibit numbers to Mr. Rochon.  I

 4    believe based on the Court's earlier rulings, we are not going

 5    to have the kind of roller-coaster ride we've had the last few

 6    days.  But one never knows.

 7              I understood from Mr. Rochon over the weekend he was

 8    going to take longer than tomorrow, or he might take longer

 9    than tomorrow, but we'll get them to him tonight and work with

10    him.

11              THE COURT:  As I said, when you finish one witness, as

12    have one witness in the witness room ready to go when the

13    previous witnesses gets off the stand.  See you tomorrow at 9:

14    30.

15              (Witness excused)

16              (Trial adjourned to January 20, 2015 at 9:30 a.m.)

17

18

19

20

21

22

23

24

25

```
 1                    INDEX OF EXAMINATION

 2   Examination of:                           Page

 3   ALON  EVIATAR

 4   Direct Q.  . . . . . . . . . . . . . . . . 725

 5   Cross By Mr. Rochon  . . . . . . . . . . . 854

 6                   PLAINTIFF EXHIBITS

 7   Exhibit No.                            Received

 8   1   . . . . . . . . . . . . . . . . . . . 727

 9   451  . . . . . . . . . . . . . . . . . . 728

10   143  . . . . . . . . . . . . . . . . . . 732

11   162  . . . . . . . . . . . . . . . . . . 734

12   239 clip 2  . . . . . . . . . . . . . . . 751

13   962  . . . . . . . . . . . . . . . . . . 753

14   963  . . . . . . . . . . . . . . . . . . 755

15   239, clip 3,  . . . . . . . . . . . . . . 764

16   1128  . . . . . . . . . . . . . . . . . . 769

17   1129  . . . . . . . . . . . . . . . . . . 770

18   539 photo  . . . . . . . . . . . . . . . 770

19   1160  . . . . . . . . . . . . . . . . . . 771

20   1180  . . . . . . . . . . . . . . . . . . 776

21   826  . . . . . . . . . . . . . . . . . . 806

22   830  . . . . . . . . . . . . . . . . . . 807

23   427  . . . . . . . . . . . . . . . . . . 816

24   956  . . . . . . . . . . . . . . . . . . 822

25   428  . . . . . . . . . . . . . . . . . . 825
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    1130, 1131, 1135, and 242   . . . . . . . . . 827

2    164, et al.,   . . . . . . . . . . . . . . 836

3    496, 634, 635 and 1142  . . . . . . . . . . 850

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25