F1L8SOK1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

MARK I. SOKOLOW, et al.,

              Plaintiffs,

          v.                     04 CV 397 (GBD)

PALESTINE LIBERATION
ORGANIZATION, et al.,

              Defendants.

------------------------------x

                           New York, N.Y.
                           January 21, 2015
                           9:40 a.m.

Before:

                 HON. GEORGE B. DANIELS,

                             District Judge

                      APPEARANCES

ARNOLD & PORTER LLP
     Attorneys for Plaintiffs
BY:  KENT A. YALOWITZ
     PHILIP W. HORTON
     TAL MACHNES
     SARA PILDIS
     CARMELA T. ROMEO
     RACHEL WEISER

MILLER & CHEVALIER, CHARTERED
     Attorneys for Defendants
BY:  MARK J. ROCHON
     LAURA G. FERGUSON
     BRIAN A. HILL
     MICHAEL SATIN

Also present:  RACHELLE AVITAL, Hebrew interpreter
                RINA NE'EMAN, Hebrew interpreter

F1L8SOK1

1          (Trial resumed; jury not present)

2          THE COURT:  I still have some things to review given

3    that I received most of this information this morning, some

4    within the hour.  The only thing I am going to address now is

5    the issues with regard to this witness.

6          I received a letter from the plaintiffs objecting to

7    certain exhibits to be used on cross-examination, but quite

8    frankly I have no clue as to what these exhibits are since the

9    exhibits weren't attached.

10         MR. YALOWITZ:  Your Honor, I received them this

11   morning by hand when I arrived in the courtroom.  Perhaps Mr.

12   Rochon has a copy that he can share with the Court.

13         MR. ROCHON:  I do, your Honor.

14         So I will hand up what are Defendants' 71 -- I can

15   give a copy of these to Mr. Yalowitz -- 72, 73 and 74, which

16   are photographs of Yasser Arafat, and two maps.

17         THE COURT:  Give me everything that you still intend

18   to use.

19         MR. ROCHON:  Also, they object to the use of Exhibit

20   70, which is a report from the United States Department of

21   State, dated February 25, 2004.

22         MR. YALOWITZ:  Also, Mr. Rochon, if you could give the

23   judge a copy of Exhibit 29.

24         MR. ROCHON:  Exhibit 29, your Honor, I don't have a

25   clean copy.  It's being brought here now.  Unfortunately, my

F1L8SOK1

 1   copy is highlighted.

 2              THE COURT:  What is it?

 3              MR. ROCHON:  It's previously been marked in evidence.

 4   It's a United Nations report.

 5              MR. YALOWITZ:  It has not been marked in evidence.

 6              THE COURT:  Is it in evidence?

 7              MR. ROCHON:  I said marked.

 8              THE COURT:  There is no such thing as marked in

 9   evidence.

10              MR. ROCHON:  It's been marked for identification

11   purposes.  It's 29.  The plaintiffs have had that one for a

12   while, although I did not indicate I would use it on cross, as

13   Mr. Yalowitz indicates, until this morning.

14              THE COURT:  What is that?

15              MR. ROCHON:  A united Nations report.  My copy is

16   marked up.  I have only marked-up copies here.

17              MR. YALOWITZ:  I will be glad to give my only copy to

18   the Court.

19              MR. ROCHON:  Thank you, Mr. Yalowitz.

20              MR. YALOWITZ:  I have also highlighted it in yellow,

21   but given where we are I think the judge can see it.  I have

22   not had a chance to get all the way through it.

23              MR. ROCHON:  I can tell the Court, in terms of these

24   exhibits, I don't anticipate using them until after lunch.  So

25   if we end up with a delay with the jury we can begin with

F1L8SOK1

1    things that are not among these exhibits for a couple of hours

2    at least.

3              THE COURT:  Let me do it this way so then you can give

4    me a more substantive objection.

5              With regard to your letter that I simply exclude these

6    exhibits because the defendants have not produced them in a

7    timely manner in violation of what I ordered, I guess I can

8    characterize it in one or two ways.

9              I am not going to impose a sanction with regard to

10   that alone, a sanction of exclusion.  But, frankly, if there is

11   any sanction that I am going to impose in this case, I am going

12   to impose a sanction on both parties for violating the rules

13   that we have set out, and that sanction is going be that I am

14   not going to hear any argument by either side that these things

15   have not been timely produced up to this point.

16             Everybody has violated the rules.  There is absolutely

17   no reason why I should be getting these notices in the morning

18   of the testimony fighting about exhibits and having the parties

19   say that they have only seen this exhibit within the last 24

20   hours.  Both sides have violated the rule so don't even waste

21   my time anymore about saying I should impose a sanction on the

22   other side because of excluding exhibits at this point based on

23   their violation of the rule.

24             I can assure you that going forward I am going to be

25   particularly strict about this rule.  I expect that, one, that

F1L8SOK1

1    we meet the 72-hour rule, which has been violated.  I don't

2    even know if it's ever been complied with.  And 72 hours means

3    72 hours, not including the weekend or the holiday.  That's

4    what it means.

5            So if I can spell it out for all of you, if there is

6    something you intend to offer -- today is Wednesday -- if there

7    is something you intend to offer on Monday, you better be

8    producing it today.  That's the 72-hour rule.  It means produce

9    it three days, business days, before you're going to offer it.

10   That's the rule.  I thought we understood that that was the

11   rule.  It doesn't mean the night before and it doesn't mean on

12   a Saturday night.  Forget about 72 hours.  I want to know that

13   at least three days, no less than three days before you intend

14   to offer this exhibit before the jury, that the other side

15   knows that is what your intent is.  That's the rule.  I am not

16   going to say it again.  And I want within 24 hours of receiving

17   that notice any objection to those exhibits.  For some reason I

18   thought that is what we had agreed upon, but it hasn't

19   happened.  So let's put that aside.

20           I will say to you that you should tell me whether you

21   have a substantive objection and what the evidentiary basis is

22   for your objection with regard to these exhibits because that's

23   the only thing that I am going to spend any time on.  So if we

24   don't need to address these now, I would like to bring the jury

25   in promptly this morning and not have them sit around.

F1L8SOK1

1              MR. YALOWITZ:  I do need to address the substance of

2      something that happened yesterday and is happening based on

3      these exhibits, your Honor.

4              THE COURT:  Is there any reason why we need to address

5      that before cross-examination?

6              MR. YALOWITZ:  I think we do.

7              THE COURT:  Why?

8              MR. YALOWITZ:  Because Mr. Rochon is about to start

9      cross, and he has already injected irrelevant politicization

10     into this case, and he is trying to do it right now with these

11     exhibits.

12             THE COURT:  We are not discussing these exhibits.

13             MR. YALOWITZ:  We are very clear that generalized

14     mistreatment of Palestinians by Israelis is not coming in, and

15     he should be instructed and admonished not to ask about it.

16             THE COURT:  I don't remember a question that he asked

17     about that.  Did he ask such a question?

18             MR. YALOWITZ:  I believe he did.  I believe asking

19     about the IDF occupying Palestinian territory is not relevant

20     to this case.

21             THE COURT:  It's not what you just described it as.

22     It's not some testimony about abuse of prisoners or anything

23     like that.

24             MR. YALOWITZ:  I think he is trying to get past that

25     line, your Honor.  I really do.  I see what he is doing this

F1L8SOK1

1    morning, and I saw what he was doing last night, and I think we

2    need to keep him on a very short leash because he will cross

3    the line.  If you let him, he will.

4         MR. ROCHON:  I don't like the concept of a leash, but

5    I understand it's just a form of phraseology.

6         THE COURT:  Do I need to be concerned about this

7    issue, Mr. Rochon?

8         MR. ROCHON:  Not this morning.  When we take our break

9    before the afternoon we should address some of those.

10        THE COURT:  Do you intend to put evidence in this case

11   of abuses by Israeli security forces?

12        MR. ROCHON:  Some of those reports, the two reports

13   you have discuss those issues.

14        THE COURT:  You can understand my position has been

15   that that has minimal, if no relevance in this case.

16        MR. ROCHON:  I do understand we talked about this

17   previously.

18        THE COURT:  I ruled previously.  I said that kind of

19   thing is out, right?

20        MR. ROCHON:  Yes.  I think the reports in question,

21   there may be portions that we talked about whether they need to

22   be redacted.  I think the direct examination has opened up some

23   issues that we did not anticipate and each of the parties in

24   this case I think are each saying the other is politicizing the

25   events.  I think we should have a discussion about that, but I

F1L8SOK1

1    don't need to do it now, and I am not going to get into those

2    issues in the first part of the cross-examination.

3              THE COURT:  You're not going to ask any questions

4    about abuses by any security forces.

5              MR. ROCHON:  I don't anticipate that being part of my

6    examination this morning or this afternoon.

7              THE COURT:  I don't anticipate that being part of your

8    examination at all.  You lawyers like to talk and find

9    distinctions.  Not this morning, not this afternoon, not next

10   week, not next year.  I want to be clear.

11             Mr. Yalowitz, please have a seat.

12             MR. ROCHON:  That's not going to be part of my

13   examination at all.

14             THE COURT:  That's all I want to hear.

15             Mr. Yalowitz, have a seat.

16             MR. ROCHON:  I did want to discuss one thing on the

17   72-hour rule.  I think cross-examination could be a little bit

18   different.

19             THE COURT:  I agree with it.  It's all trumped by what

20   you agree to.  You always ask me what I want.  I want a world

21   without hunger, probably 8-track tapes to come back, and reruns

22   of The Munsters.  That's what I want.  Otherwise you guys have

23   to decide how to try the case.  I am trying to give you the

24   ability to try the case in the manner that you think is

25   appropriate to demonstrate appropriate evidence before the

F1L8SOK1

jury.  So you make up your mind what you want to agree to and what agreement you want me to enforce.  If that was your agreement, and if that continues to be your agreement, then I will attempt to enforce it for you.

But you're right.  There is a difference with cross-examination.  They don't have the right to have your witness prepped or anticipate or know exactly what you're going to use to impeach him or cross-examine him if you have something.  That's not the technical rule.  But it is the rule if you agree to it.  So you better figure out what it is that you agree to, and if it's different than the rule, tell me what it is if you want me to enforce some other rule other than the standard rule.  Things you intend to offer on direct-examination the parties have the right to know, things you intend to use on cross-examination they have a right to see it before you put it before the witness, but they don't necessarily have the right to see it in advance of cross-examination.

So if you want to agree to something else, I am going to apply the rules across-the-board going forward, but I am not going to hear any arguments from the parties at this point about how the other side has violated the rule.  So let's just move forward.  I don't think there is anything we need to address now, unless you tell me that you're going to put this before the jury before the break.  Otherwise, if you want me to

F1L8SOK1

1    make an informed judgment, let me look at the other issues and

2    look at all of the exhibits.  I have read the letters, but I

3    have to go through each one of the exhibits to figure out what

4    they are and what the relevance is.

5              MR. ROCHON:  If the Court does so, on one of the maps

6    that you have, on the right-hand column, there is some written

7    language that's opinionated.

8              THE COURT:  You don't intend to use that and you said

9    that's in your letter.  Let's save the time.

10             MR. YALOWITZ:  I am ready to go, your Honor.  I just

11   want to be clear, anything with a 70 and above, the first day I

12   ever saw from the defendants is today.  I just want to be very

13   clear about that.

14             THE COURT:  Why don't you be very clear about it

15   later.  I don't want to take any more time with the jury.

16   Because sooner or later the jury is going to start holding it

17   against the parties that they have to sit and cool their heels.

18             Let's get the jury and let's proceed.  Let's make them

19   think that we are proceeding in an efficient manner sensitive

20   of their time.

21             (Continued on next page)

22

23

24

25

F1L8SOK1

1              (Jury present)

2       ALON EVIATAR, resumed.

3              THE COURT:  Good morning, ladies and gentlemen.

4              Mr. Rochon, you may proceed.

5              MR. ROCHON:  Yes, sir.

6  CROSS-EXAMINATION (Cont'd)

7  BY MR. ROCHON:

8  Q.  Lieutenant Colonel Eviatar, you did not have any role in

9  investigating the incidents that are on trial here, did you?

10             MR. YALOWITZ:  Object to form.

11             THE COURT:  Could you state that again?

12             MR. YALOWITZ:  Object to form.

13 Q.  Lieutenant Colonel Eviatar, you did not have any role in

14 investigating the incidents that are on trial here, did you?

15             MR. YALOWITZ:  Same objection.

16             THE COURT:  Overruled.  He can answer that.

17 A.  That's not correct.

18 Q.  In terms of when these incidents occurred and the

19 prosecution of them, you did not have any role in the

20 investigation and prosecution of any of those incidents, did

21 you?

22 A.  We can break down the question into two.  There is

23 investigation and there is prosecution.

24 Q.  At the time from 2000 to 2004, what was your position?

25 A.  I served as the commander of the Jericho district in the

F1L8SOK1                          Eviatar – cross

1   context of my unit.

2   Q.  On direct examination you discussed a period of time when

3   you took over a position that had to do with Palestinian

4   affairs, correct?

5   A.  That's correct.

6   Q.  What year did you take over that position?

7   A.  In the year 2001.

8   Q.  At what point did you then get promoted to a supervisory

9   position you told this jury about that you had responsibility

10  for Palestinian affairs?

11  A.  I dealt with the Palestinian subject on an ongoing basis

12  from 1998.

13  Q.  Let me ask you now about specific incidents and specific

14  people.

15          You testified at some length about someone named

16  Marwan Barghouti, correct?

17  A.  That's correct.

18  Q.  Marwan Barghouti was not convicted of any of the incidents

19  that are on trial here, correct?

20  A.  I don't agree with that statement.

21  Q.  Sir, Mr. Yalowitz went through with you what Marwan

22  Barghouti was convicted of in your direct examination.  Do you

23  recall that?

24  A.  We went over Barghouti's conviction in general terms; we

25  didn't go through the various counts.

F1L8SOK1                          Eviatar - cross

1    Q.  In none of the counts that he was convicted in was Marwan

2    Barghouti convicted of anything to do with the six incidents

3    that are on trial here, isn't that right?

4    A.  I'm very familiar with the details of the terror attack

5    about which I testified.  I am not completely familiar with all

6    the details of the other terror attacks.

7    Q.  Are you saying to the ladies and gentlemen of the jury that

8    Marwan Barghouti was convicted of any of the incidents that are

9    on trial here?

10   A.  I say once again the full details of the conviction of

11   Marwan Barghouti, which pertain to the terror attacks that I am

12   not testifying about, need to be thoroughly examined.

13   Q.  Lieutenant Colonel Eviatar, do you understand my question

14   is whether or not Marwan Barghouti was convicted of any of the

15   incidents that are on trial here?  Do you understand that

16   question?

17   A.  Sir, I understand the question, and I am responding to it.

18   The counts of the conviction that Marwan Barghouti was

19   convicted of, the level of the contact between them and the

20   various incidents that are being discussed here are not part of

21   my testimony.

22   Q.  Let me see if I understand your answer.

23        You testified about Marwan Barghouti for quite a

24   while, right?

25   A.  Correct.

F1L8SOK1                          Eviatar - cross

1    Q.  Mr. Yalowitz showed you Plaintiffs' Exhibit No. 451, which

2    is the verdict in his case, right?

3    A.  Correct.

4    Q.  And you looked at that and testified about it, correct?

5    A.  Correct.

6    Q.  It's one of the documents that you told the jury that you

7    had examined so carefully in preparation for your testimony,

8    right?

9    A.  Correct.

10   Q.  And the truth is that there is not a conviction of Marwan

11   Barghouti for any of the incidents that are on trial in, this

12   case in Plaintiffs' Exhibit No. 451, his conviction, isn't that

13   right?

14   A.  I will repeat again, sir.  In order to give a yes or no

15   answer to your question, I would have to reexamine the

16   conviction in detail.

17   Q.  So as you sit here today, you're telling the ladies and

18   gentlemen of the jury you don't know whether or not Marwan

19   Barghouti was convicted of any of the incidents that are on

20   trial here?

21   A.  Sir, all the other terror attacks that will be discussed

22   here in this trial are not under my responsibility here.

23   Q.  All right.  Sir, you read the conviction of Marwan

24   Barghouti before testifying before these people, didn't you?

25   A.  Correct.

F1L8SOK1                         Eviatar - cross

1    Q.  You know the incidents that are on trial in this case,

2    don't you?

3    A.  The incidents that will be discussed in the trial, I know

4    in general terms only.

5    Q.  Sir, you sat through Kaufman's testimony last week, you

6    were in the courtroom for the whole testimony, weren't you?

7    A.  Yes.

8    Q.  You heard him testify about the incidents that are on trial

9    here, didn't you?

10   A.  I heard his testimony.

11   Q.  None of the incidents that Kaufman testified about last

12   week are incidents of which Mr. Marwan Barghouti was convicted,

13   isn't that right?

14   A.  I don't have a very good recollection of Mr. Kaufman's

15   testimony.

16   Q.  Were you sitting in the courtroom for some reason other

17   than listening to him testify last week?

18   A.  Sir, I heard Mr. Kaufman's testimony, and I don't recall

19   its details.

20   Q.  In fact, you were asked to come here and listen to his

21   testimony by the plaintiffs, weren't you?

22           MR. YALOWITZ:  Objection.

23           THE COURT:  Overruled.

24   A.  I came here as an observer.

25   Q.  So last week you were just here as an observer?

F1L8SOK1                      Eviatar - cross

1    A.  Yes.

2    Q.  Let's talk then about Fuad Shubaki.  You would agree with

3    me that Fuad Shubaki was not convicted of any of the incidents

4    that are on trial here, right?

5    A.  I know what Fuad Shubaki was convicted of, but I am not

6    familiar with all the details of the terror attacks that will

7    be discussed after my testimony.

8    Q.  Sir, are you telling us that you also don't know whether

9    Fuad Shubaki was convicted of any of the incidents that are on

10   trial here?

11   A.  I will repeat, sir.  I know what Fuad Shubaki was convicted

12   of.  Whether or not the details of his conviction pertain to

13   the terror attacks that will be discussed here is something

14   about which I cannot say yes or no.

15   Q.  I want to get back to Marwan Barghouti for just one second.

16          On your direct examination, the plaintiffs showed you

17   Plaintiffs' Exhibit No. 1, and that was the payment records for

18   Marwan Barghouti.  Do you remember looking at that exhibit when

19   Mr. Yalowitz showed it to you?

20          MR. YALOWITZ:  Object to form.

21          THE COURT:  Overruled.

22   Q.  You see in front of you Plaintiffs' Exhibit No. 1?

23   A.  I see it.

24   Q.  These are the payment records for Marwan Barghouti?

25   A.  Could I have a moment to see the entire document, please?

F1L8SOK1                              Eviatar - cross

1     Q.  Sure.

2                MR. ROCHON:  May I approach, your Honor?

3                THE COURT:  Yes.

4                MR. YALOWITZ:  May I have a copy?

5                MR. ROCHON:  You do have a copy.

6     Q.  Sir, if you would take a look at Plaintiffs' Exhibit No.

7     1 --

8                MR. YALOWITZ:  Excuse me, your Honor.

9                THE COURT:  Have a seat.

10    Q.  That is the document, sir?

11    A.  Yes, I believe this is the same document.

12    Q.  And you recognize it because Mr. Yalowitz showed it to you

13    on your direct examination, right?

14    A.  I think it's the same, yes.

15    Q.  All right.  If you go to the notes, please, the notes on

16    the first page indicates at the top that this is

17    representatives' awards for the month of June 2002, correct?

18    A.  I see the notes.

19               MR. ROCHON:  OK.  Now I would like to go to page 2, if

20    I could.

21               If you could just highlight the names a bit so the

22    witness can see them.

23    Q.  Those are the names of representatives that were elected to

24    the Palestinian Legislative Council, isn't that right?

25    A.  I would have to see the heading on the document to see that

F1L8SOK1                          Eviatar - cross

1    this is indeed what is involved.

2    Q.  Well, you know that this reflects payments being made to

3    Marwan Barghouti, you told us about that yesterday, right?

4    A.  As for Marwan Barghouti, that is correct.

5    Q.  And you know that it was payments for his salary as a

6    member of the Palestinian Legislative Council, don't you?

7    A.  That's correct.

8    Q.  If we go back to the first page, in the note section that

9    we just looked at, it says "representatives' awards for the

10   month of June 2002," doesn't it?

11   A.  That's correct.

12   Q.  And that reflects that it was a payment to the

13   representatives in the Palestinian Legislative Council, right?

14   A.  That makes sense.

15   Q.  All right.  In fact, you indicated great familiarity with

16   the Palestinian street, Palestinian society, in your direct

17   testimony, that's what you said you had, right?

18   A.  Correct.

19   Q.  And you know that the people on page 2 of exhibit number 1

20   in fact were representatives of the Palestinian Legislative

21   Council in June of 2002, don't you?

22   A.  I didn't testify about these other individuals; I don't

23   know each and every one of them.

24   Q.  Do you know whether any of them were representatives of the

25   Palestinian Legislative Council in June of 2002 based on your

F1L8SOK1                          Eviatar - cross

1    great familiarity with the Palestinian street?

2    A.  I know Marwan Barghouti.  As for the rest, I would have to

3    check each one individually.

4    Q.  You're telling us you have no idea, as you sit here right

5    now, whether any of them were in the Palestinian Legislative

6    Council?

7    A.  I didn't say I have no idea.  I said I'd have to check each

8    name individually in order to give you an authoritative answer.

9    Q.  OK.

10            MR. ROCHON:  We are done with Exhibit 1.

11   Q.  I would like to turn to prisoner payments.

12            You testified at some length with Mr. Yalowitz about

13   payments that are made to Palestinians who are locked up as a

14   result of security offenses, right?

15   A.  That is correct.

16   Q.  And yesterday we were talking for a little while about the

17   statute or the legislation or the act that authorizes those

18   payments.  Do you remember that?

19   A.  That is correct, sir.

20   Q.  I would like to discuss with you for a few minutes the

21   process by which a person qualifies for those payments.  OK?

22   A.  Please do.

23   Q.  The first step under the legislation is that the prisoner

24   must be certified as a security prisoner by the International

25   Committee of the Red Cross, isn't that right?

F1L8SOK1                          Eviatar - cross

1    A.  In order to answer your question, sir, I must see the

2    document in front of me.

3    Q.  You don't remember that part?

4    A.  I don't recall whether it was the first section as you

5    stated.

6    Q.  OK.  You recall that it's one of the steps, right?

7    A.  I believe so.

8    Q.  You would agree with me, wouldn't you, that payments to

9    prisoners were relatively low through 2010?

10   A.  I do not agree with that statement.

11   Q.  You would agree with me that -- actually, I had the date

12   wrong -- that until 2011 the amounts paid were relatively low?

13   A.  I meant that I do not agree with your determination that

14   the sums of money were low.

15   Q.  OK.

16          MR. ROCHON:  I just need the Court's brief indulgence.

17   I would like to provide to the witness what we have marked as

18   Defendants' 79, but don't bring that up yet.  That is the

19   report of the witness.

20   Q.  You prepared a report in this case, correct?

21   A.  Yes.

22   Q.  Would you please bring up the first page of 79?

23          Do you see the first page of Defendants' Exhibit 79

24   there, sir?

25   A.  Yes.

F1L8SOK1                          Eviatar - cross

1    Q.  That's the first page of your report, isn't it?

2    A.  Yes.

3    Q.  You're familiar with your report, right?

4    A.  Yes.

5           MR. ROCHON:  Would you please move to page 28, at the

6    bottom of the page.

7           For the witness, would you highlight the language at

8    the bottom of the page that begins with the word "until."

9    Q.  You see the part that is highlighted there?

10   A.  Yes, sir.

11   Q.  That is from your report, correct?

12   A.  That is written in my report, yes.

13   Q.  Did you write your report?

14   A.  Part of it.

15   Q.  You didn't write all of your report?  Was some of it fed to

16   you?

17   A.  I did not write the report in its entirety.  The part that

18   I did not write I examined carefully.  I corrected everything

19   that required correction, and I stand behind every word that

20   appears in the report.

21   Q.  Do you stand behind the words that say until 2011 the

22   salaries were relatively low about the prisoner payments?

23   A.  The intent is that they were relatively low with respect to

24   the salaries that followed.

25          MR. ROCHON:  I would move the part that is excerpted

F1L8SOK1                      Eviatar – cross

1   on page 28 of the report.

2              MR. YALOWITZ:  Your Honor, we need to have the --

3              THE COURT:  Come up.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1L8SOK1                          Eviatar - cross

1          (At the sidebar)

2          THE COURT:  I need some guidance from you about how we

3     are going to handle these reports in general.  I am not going

4     to take it piecemeal and then fight about each sentence.  Are

5     these reports coming in or not coming in?

6          MR. YALOWITZ:  It's got to be the whole report in my

7     opinion if he wants to offer it.

8          MR. ROCHON:  The plaintiffs were referencing the

9     report on direct examination.

10          THE COURT:  That doesn't make it admissible just

11     because you reference it.

12          MR. ROCHON:  If he admits he said it in his report, I

13     will just go by his oral testimony.

14          THE COURT:  You don't intend to offer any portion of

15     his report in evidence?

16          MR. YALOWITZ:  I was operating under the assumption

17     from my side that it's hearsay.  So I can't offer it.  If the

18     Court has a different rule --

19          THE COURT:  I don't have a different rule.  I want to

20     make sure we are all on the same page.  You don't intend to

21     offer any of his report.  You don't intend to offer any

22     expert's report in evidence.

23          MR. ROCHON:  Expert report, no.  I can impeach him

24     with a sentence.

25          THE COURT:  Sure.  You just had.  The record will

F1L8SOK1                    Eviatar - cross

1    reflect the impeachment that he acknowledges what is in the

2    report.  Technically, you shouldn't put it on the screen if

3    it's not in evidence.  The portions you want to inquire about,

4    that's fine if you don't have an objection.

5           The bottom line is I am not admitting these reports in

6    evidence.  So let's not start coming up here every five minutes

7    trying to figure out whether certain parts get in and other

8    parts get in.  If you want to impeach the witness impeach him.

9    If you want to rehabilitate the witness with the report and ask

10   the witness whether he put such a thing in the report, if he

11   denies it and it's in front of him, we will deal with it.

12          MR. ROCHON:  I have not yet published it to the jury.

13   It's just on the private screen.  Normally, written impeachment

14   you can move that portion in that impeaches.

15          THE COURT:  Not necessarily.  That's not the rule.

16   The rule is you can ask the witness did he make a prior

17   statement on a prior occasion.  If he says yes, the prior

18   statement doesn't come in.  It's only to impeach, not

19   substantive evidence.

20          MR. ROCHON:  It's not in for the truth.  I understand.

21          THE COURT:  You can quote from the report and say, did

22   you make this statement?  Once the witness acknowledges he

23   makes the statement, that is the evidence and that is the

24   impeachment.

25          (Continued on next page)

 1                    (In open court)

 2      BY MR. ROCHON:

 3      Q.  Sir, you agree with me in your report it does state, "Until

 4      2011, the salaries were relatively low," right?

 5      A.  I again reiterate, with your permission, sir, what I stated

 6      previously.  The intention here and the context are both

 7      important, and I wish to emphasize that before the jury as

 8      well.  When it states relatively low, the intent is relative to

 9      the high salaries that subsequently followed.

10      Q.  Let me just get the first part clear.  I understand the

11      explanation.

12              You agree with me, though, that the report does state

13      what I said it states, which is "until 2011 the salaries were

14      relatively low"?  You agree that's what it states?  I

15      understand your explanation, but I want to make the record

16      clear that is what it says?

17                  MR. YALOWITZ:  Object to form.

18                  THE COURT:  Overruled.

19      A.  That is what is written there, and with respect to the

20      context we must recall what I just stated.

21      Q.  Now, sir, the incidents that are on trial here occurred in

22      2002 through 2004.  Are you aware of that?

23      A.  I'm not familiar with the dates of all of the terrorist

24      attacks that will subsequently be discussed.

25      Q.  The one that you discussed related to Hebrew University,

F1L8SOK1                          Eviatar – cross

 1   what occurred in that period, right?

 2   A.   That is the terrorist attack that I am testifying about.

 3   Q.   My question to you was when it occurred.  It occurred in

 4   that time period, correct?

 5   A.   Yes.

 6   Q.   All right.  So you would agree with me then what is

 7   relevant as to prisoner payments would be the amount of

 8   prisoner payments that were roughly contemporaneous with that

 9   incident, right?

10           MR. YALOWITZ:  Object to form.

11           THE COURT:  Why don't you break that down for us

12   simple folks.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

F11Qsok2                          Eviatar - Cross

1   Q.  I'm going to make it even simpler.  Would you pull up

2   Exhibit 86, please.  That's Plaintiff's Exhibit 86.  It is

3   already in evidence.  This is one of the records you looked at

4   yesterday regarding payments of prisoner benefits, isn't it?

5   A.  Correct.

6   Q.  If you would go, please, to page 4.  So what this reflects

7   as to this individual the record in Plaintiff's Exhibit 86 is

8   the one named Muhammad Odeh, it reflects as of the bottom entry

9   that says 2003 on the left and then to the right the number 3.

10  That is March 2003, right?

11          I'll rephrase it.

12          The bottom left-hand portion of the exhibit, it says

13  2003 in the left column and then right next to it the number 3,

14  right?

15  A.  Correct.

16  Q.  And that reflects an entry for a payment made in the month

17  of March 2003, right?

18  A.  Correct.

19  Q.  That reflected the amount of the payment as of March 2003

20  to this individual was 1180 shekels, right?

21  A.  Correct.

22  Q.  You told us in your earlier examination that, roughly

23  speaking, the exchange rate is 4 to 1 shekels per dollar,

24  right?

25  A.  Correct.

F1lQsok2                    Eviatar - Cross

1    Q.   What this reflects is a payment of about $250, right?

2    A.   I'm no mathematics wiz, but it's almost $300.

3    Q.   Maybe my math is bad.  I apologize.  250 would go into a

4    thousand, that's 250.  Then 184 and 180.  So it's almost $300,

5    right?  You're better at math than I am.  So, that's about $300

6    that this individual's wife received in March of 2003, right?

7    A.   $300?  I'm not sure it's to his wife; it's to his family.

8    Q.   The name that is there Houda Shahda Odeh, do you see the

9    payee name highlighted?

10   A.   I see that's what it says.  I don't know if that's his

11   wife.  I'd have to check.

12   Q.   What I am going to establish is, you recognize that's a

13   woman's name, right?

14   A.   Yes.

15   Q.   If we could scroll up, you will see that the payments

16   remained at 1180 shekels through June of 2003, correct?

17   A.   That's correct.

18   Q.   Then they went up to 1480 through the end of that year,

19   correct?

20   A.   Correct.

21   Q.   And you don't know if that reflects the birth of a child or

22   a raise in the amount of payment or why it went up, right?

23   A.   Correct.

24   Q.   Then if we continue to the prior page if you would which

25   would be page 3, Justin.  Thank you.  You will see on page 39,

F11Qsok2                        Eviatar – Cross

1    the payments remained at 1700 shekels through the end of 2004,

2    right?

3    A.   That's correct.

4    Q.   This time let's see if I get it right.  That's about $425,

5    right?

6    A.   More or less.

7    Q.   If you would go to the next page, please, I guess that's

8    page 2.  You will see that the payments remained at 1700

9    through January 2008?

10   A.   Correct.

11   Q.   And then they went up to 2000 shekels, correct?

12   A.   Correct.

13   Q.   Then if we could go to the first page.  This shows the

14   increase of payments starting in 2011, correct?

15   A.   Correct.

16   Q.   That pattern of relatively low payments is the same in all

17   of the payment files you looked at with Mr. Yalowitz that the

18   increases come in 2011, right?

19             MR. YALOWITZ:  Object to form.

20             THE COURT:  Overruled.

21   A.   I don't remember the details of every single file that I

22   examined for 2011.

23   Q.   But the pattern of increases you actually discussed with

24   Mr. Yalowitz, right?

25   A.   I spoke about the pattern of increase.  I didn't check in

F1lQsok2                          Eviatar - Cross

1    every single one of the reports if the rise was only in 2011,

2    and for each and every one of them.

3    Q.  OK.  But the reason your report said that until 2011 the

4    salaries were relatively low is because you know that's when

5    the increases happened, right?

6    A.  This was one of the occasions that there was to raise the

7    salary.  I think, sir, that in the tables that we saw, there

8    were raises in salaries before 2011 as well.

9    Q.  Sir, do you agree with me that the major raise in salaries

10   was in 2011 or not?

11   A.  There was a raise.  I think for different prisoners we saw

12   different rates of raises in other years.  In order to give you

13   a certain mathematical answer, I would really need to check

14   each and every one of the tables individually.

15   Q.  Well, they were moved in yesterday with Mr. Yalowitz, and

16   the jury can see them at an appropriate time.

17            THE INTERPRETER:  I'm sorry, can you repeat?  I didn't

18   understand it.

19            MR. ROCHON:  I'll withdraw it.

20   Q.  If you could bring up 512 for me.  Do you remember talking

21   to Mr. Yalowitz about Plaintiff's Exhibit 512?

22   A.  If I could see the full exhibit, I think I could give a

23   more complete answer.

24   Q.  If you want to scroll through it a bit, Justin, through the

25   second page and the third page, fourth page, fifth page, sixth

F1lQsok2                       Eviatar – Cross

1    page, seventh page, eighth page, ninth page, tenth page,

2    eleventh page, one more, one more, one more and yet another

3    page.  You recognize this document as the exhibit you looked at

4    with Mr. Yalowitz, right, Plaintiff's Exhibit 512?

5    A.  I think it is the one I saw.  I always find it more helpful

6    to see the document in Arabic, if I may.

7    Q.  Sure.  If you could scroll a little bit further, we will

8    show it to the witness in Arabic.  If you continue to scroll so

9    the witness can eventually confirm that this is what he looked

10   at.

11         Sir, you had a chance to look at it.  That's the

12   exhibit you looked at on direct examination, isn't it?

13   A.  Yes, this is the same document.  Thank you.

14   Q.  I want to ask you a couple of questions.  First, Justin if

15   you go to Article 10.  I think that article is nine or ten

16   pages in.  That's it.  Thank you.

17         We talked before about the process by which someone is

18   eligible for these payments and Article 10 is the article that

19   describes the criteria, correct?

20   A.  Could I have a moment to look at it, please?

21   Q.  Sure.  Would it help if you had a paper copy so you could

22   flip to the Arabic?

23   A.  Both.

24   Q.  I will bring you mine.

25   A.  I'd like to see both, the English and the Arabic.

F1lQsok2                        Eviatar - Cross

1   Q.  I'm going to give you both.

2   A.  Thank you.

3   Q.  Have you had a chance to look at the Arabic?

4   A.  Yes, sir, I see it.

5   Q.  Article 10 that is on the screen before the jury describes

6   the evidentiary documents that are necessary for such payments,

7   right?

8   A.  That's correct.

9   Q.  You described at some length that these payments are only

10  for those who have been convicted of what the document refers

11  to as incarceration resulting from struggle against the

12  occupation, right?

13  A.  The term occupation is the term used by the Palistinians.

14  It's not my term.

15  Q.  We're talking about this document, and what it refers to is

16  those who were kept in prisons of the occupation for offenses

17  of participating in the struggle against the occupation.

18  That's what it says in Article 1.

19          Justin, go to the first page and show him Article 1.

20  Go to the next page, please, where Article 1 continues, if you

21  don't mind, and then highlight the definition of prisoner which

22  is the second entry on that page.

23  A.  Yes, sir, that's what I said earlier.  According to the

24  document, they use the term occupation.

25  Q.  Yesterday you referenced they paid prisoners for armed

F1lQsok2                     Eviatar - Cross

1    struggle against the occupation.  Does that say that here?

2    A.  I may have said that.  I'd have to check the record to see

3    the full quote.

4    Q.  You mean what you said yesterday afternoon when I was

5    asking you questions for like ten minutes?

6    A.  Yes, sir.  You are citing words that I said, and in order

7    for me to be precise in what I say and to give you an accurate

8    answer to your question, I would have to see if that is indeed

9    what I said.

10   Q.  OK.  So you don't remember yesterday whether you referenced

11   armed struggle as the basis or not?

12          MR. YALOWITZ:  Object to form.

13          THE COURT:  Overruled.

14   A.  I remember using the term armed struggle.  I just don't

15   remember whether I associated that with the statute or not.

16   Q.  Now, if we could, Justin, go back to Article 10, the one we

17   were on previously with the ICRC.  If we could enlarge the

18   first part of it.  Thank you.

19          Back to Article 10, the first evidentiary document

20   that a relative must produce is an original certificate from

21   the Red Cross, correct?

22   A.  Correct.

23   Q.  That's because the international committee of the Red Cross

24   certifies which Palistinians are security prisoners and which

25   are not, correct?

F11Qsok2                        Eviatar – Cross

A.  I don't have the knowledge to confirm what you just asked.

Q.  You said to this jury that this provision, these provisions

for payment of prisoner payments was one of the contributors

potentially to terrorist instance, didn't you?

A.  Correct.

Q.  The fact that the international committee of the Red Cross

is the one that certifies them is not of significance to that

analysis to you?

A.  Sir, the responsibility of that committee and its role and

its considerations are not part of the purview of my testimony

here.

Q.  Do you think that the international committee of the Red

Cross contributes to terrorism when it certifies who is

eligible for prisoner payments?

        MR. YALOWITZ:  Object to form.

        THE COURT:  Overruled.  You can answer.

A.  Sir, I am only referring here to what appears in the

statutes.

Q.  What appears in the statute are the Red Cross documents of

detention, right?

A.  Sir, the section here is just as it is written.  I cannot

make any commentary on that.

Q.  Well, after the original certification comes from the Red

Cross when someone is first locked up, they actually have to,

according to what's written there, renew the certification

F1lQsok2                        Eviatar - Cross

1    every three months for the prisoners who are still in

2    detention, and then once a year for the ones who've been

3    sentenced.  Isn't that right?

4    A.  In order to answer your question, I would like the

5    interpreter to translate that section for me.

6    Q.  Would you like to go to the Arabic portion of Article 10?

7    A.  I could definitely do so.

8    Q.  Why don't you do that, and let us know when your there.

9    A.  Of course.  That is correct, sir.

10   Q.  What is correct?  I'll withdraw that, and say what is

11   correct is that the Red Cross needs to renew the certification

12   every three months for prisoners in detention and once a year

13   for the ones who have been sentenced.  That's what it says in

14   Arabic and English, right?

15   A.  Correct.

16   Q.  You told the ladies and gentlemen of the jury in your

17   direct examination last week that the recordkeeping at the

18   Palestinian Authority was reliable, and that they followed

19   these processes accurately, right?

20   A.  What I stated in my testimony is that the files that the

21   Palestinian Authority maintains, the ones that I examined,

22   included the documents that appear here.

23   Q.  Can I ask you why is it you are able to remember what it is

24   you told Mr. Yalowitz last week and you can't remember what you

25   told me yesterday?

F11Qsok2                    Eviatar - Cross

1    A.  I can state with certainty that the things that I told

2    Mr. Yalowitz last week, even those I don't remember all of

3    them.

4    Q.  So pursuant to this statute, what this means is that every

5    year for every one of the individuals receiving prisoner

6    payments, the international committee of the Red Cross needs to

7    certify them, right?

8    A.  What it states here, sir --

9    Q.  All right.  If we could go to article 3, actually don't go

10   there yesterday?

11          THE COURT:  I'm sorry, I don't know if she translated

12   his full answer.

13          MR. ROCHON:  I apologize, ma'am.

14          THE COURT:  Why don't you finish the answer that you

15   gave.

16          THE WITNESS:  Of course.

17          THE COURT:  Stop.  I'm asking the interpreter.  Have

18   you translated everything that he said?

19          THE INTERPRETER:  No, your Honor.

20          THE COURT:  Translate what he said, first.

21          THE INTERPRETER:  Excuse me, your Honor.  What --

22          THE COURT:  What the witness, said continue that

23   translation.

24          THE INTERPRETER:  Yes, your Honor.

25          THE COURT:  If he wanted to continue his answer, he

F1lQsok2                          Eviatar - Cross

 1   can finish his answer.

 2   Q.  You finished your answer, right?

 3             MR. YALOWITZ:  No.

 4   A.  I started my answer.

 5   Q.  OK.  Finish your answer.

 6   A.  I stated that what's written here according to the statute

 7   is that every three months the Red Cross must provide a

 8   document for the new prisoners and for those prisoners who have

 9   already been tried on a yearly basis.

10   Q.  The certifications that are required are in the files.  In

11   fact, you saw them, correct?

12   A.  I saw what I was provided with.

13   Q.  Do you remember Mr. Yalowitz asked you last week in the

14   January 15 transcript Page 504/line 20 through 22:

15   "Q.  In your experience do these files actually contain the

16   required documents?"

17             And you answered:

18   "A.  Yes, systematically so."

19             Is that right?

20   A.  That is correct.

21   Q.  I would like to turn to another aspect of the statute.

22   Last week Mr. Yalowitz asked you about released prisoners.  Do

23   you remember that?

24   A.  That is correct.

25   Q.  You told Mr. Yalowitz that the provisions that provided for

F1lQsok2                          Eviatar – Cross

1    employment for released prisoners did not include consideration

2    of their income; that they would get that employment no matter

3    how much money they had, whatever job they had, whatever they

4    owned or whatever business they ran.  Do you remember telling

5    him that?

6              MR. YALOWITZ:  Object to form.

7              THE COURT:  I'm not going to sustain the objection.

8    Mr. Rochon, we are going through an interpreter, so it would be

9    easier if you shorten your questions.

10             MR. ROCHON:  I appreciate that.  I will withdraw the

11   question.

12   Q.  You remember testifying about released prisoners last week,

13   right?

14   A.  Correct.

15   Q.  Do you remember Mr. Yalowitz asked you questions about what

16   the criteria were for people getting released prisoner

17   benefits, right?

18   A.  That's right.

19   Q.  You told him that there was no means testing for such

20   benefits, correct?

21   A.  That's right.

22   Q.  If we could go to Article 3 and blow that up.  There is

23   another Article 3.  For some reason that exhibit has two

24   Article 3's:  The one in question is about eight pages in --

25   four pages in.  There we go.  Thank you.

F1lQsok2                          Eviatar - Cross

1          You have that paper document in front of you still,

2     don't you, sir?

3     A.  Yes, sir.

4     Q.  So you are welcome to look at the Arabic version or the

5     English version that's on the screen, whatever you prefer.

6     A.  I see both versions.

7     Q.  Highlight paragraph 4.  One of the conditions that must be

8     met is that the released prisoner must not work in any official

9     or local organization from which he receives a regular salary,

10    right?

11    A.  Correct.

12    Q.  Number 5, he must not have any other source of income,

13    whether from business or running a workshop, factory or service

14    office from which he derives an adequate income, correct?

15    A.  Just a moment, please.  Correct.

16    Q.  Number 6, he must not own lands or movable or non-movable

17    properties from which he derives a permanent income that allows

18    him to live honorable, dignified life, correct?

19    A.  Correct.

20    Q.  So you agree with me, don't you, that in fact last week --

21    I'll withdraw that.  You will agree with me that in fact the

22    regulation also of the statute does include means testing for

23    receiving released prisoner benefits?

24          MR. YALOWITZ:  Object to form.

25          THE COURT:  Overruled.  You can answer.

F1lQsok2                         Eviatar - Cross

1   A.  What I stated is that there is no discrimination among

2   prisoners.

3   Q.  I beg your pardon?

4   A.  What I stated is that all of the prisoners who meet the

5   criteria receive the benefits, and there is no difference

6   between them, and what doesn't appear here is not examined.

7   Q.  When you say "what does not appear here does not get

8   examined, are you suggesting that there is any part of Exhibit

9   512 that you don't have up there?

10  A.  What I intend to say is what's written here, this is what I

11  can refer to.

12  Q.  Right.  You would agree with me that released prisoners are

13  subject to showing that they don't have other income before

14  they can get these benefits, right?

15          MR. YALOWITZ:  Object to form.

16          THE COURT:  Overruled.  You can answer if you

17  understand.

18  A.  That's what is written in the statutes.

19  Q.  Justin do you have the transcript from January 16 available

20  to you over there?  Would you be so kind as to go to page

21  587/line 22?

22          So last week Mr. Yalowitz asked you:

23  "Q.  Is there a means test for this guaranteed employment?"

24          And didn't you testify:

25  "A.  There is no test of means or economic ability.  Even if

1   your family has a successful economic enterprise, a gorgeous

2   house and extensive opportunities for employment, you can rely

3   on this and receive what the Palestinian Authority promises

4   you."

5          Is that what you said last week?

6   A.  Yes, that's correct, sir.  That is what I stated, and there

7   is no contradiction between the two.

8   Q.  Are you able, Justin, to keep that 512 section available to

9   me where we had Article 10.

10          Mr. Eviatar, what I want you to do is look at what's

11   highlighted on the screen where it says:  "There is no test of

12   means or economic ability even if your family has a successful

13   enterprise, a gorgeous house and extensive opportunities for

14   employment, you can rely on this and receive what the

15   Palestinian Authority promises you."

16          Now, would you go to that Article 10 again for me,

17   clauses 4, 5 and 6.  And that is 512.  It's the second Article

18   3 is that what it is.  I got my numbers wrong.  Justin realizes

19   it.

20          So where it says the released prisoner must not work

21   in any official or local organization from which he receives a

22   regular salary, and he must not have any other source of

23   income, whether from business or running a workshop, factory or

24   service office from which he derives an adequate income.  Would

25   you explain to me how your answer is consistent with the

F11Qsok2                         Eviatar – Cross

1    statute?

2    A.   The answer, as far as I'm concerned –– excuse me –– the

3    explanation as far as I'm concerned, as I said earlier, there

4    is no contradiction.  The family can own assets, but they are

5    not in your name.  And if the prisoner himself does not own

6    property, he can receive the salary.

7    Q.   Finish the quote that is up there for the transcript on the

8    next page.  When you said even if he has extensive

9    opportunities for employment, that that too would not

10   disqualify you, is that also consistent with what you say your

11   answer was last week?

12   A.   Yes, opportunities for employment doesn't necessarily mean

13   that he's working there.

14   Q.   When it says, Lieutenant Colonel Eviatar, "He must not have

15   any other source of income" in the statute, you're saying they

16   would ignore family income?

17   A.   I don't know what they write about the family, but I know

18   what the law says.

19   Q.   OK.  Thank you for your answers on that, Lieutenant Colonel

20   Eviatar.

21   A.   You're welcome.

22   Q.   So, Lieutenant Colonel Eviatar, I'd like to discuss with

23   you what kind of offense qualifies one as a security prisoner

24   according to the international committee of the Red Cross.  You

25   agree with me, don't you, that to be classified as a security

F11Qsok2                    Eviatar - Cross

1    prisoner by the international committee of the Red Cross, that

2    it would include things that are not terrorism?

3            MR. YALOWITZ:  Objection, your Honor.

4            THE COURT:  Overruled.  He can answer.

5            MR. YALOWITZ:  Your Honor, may I be heard?

6            THE COURT:  No.  Let's move forward.

7    Q.  You would agree -- did you understand the question?

8            THE INTERPRETER:  I'll repeat it.

9    A.  I'm not familiar with the considerations or criteria of the

10   Red Cross.

11   Q.  So you don't know who actually gets classified as a

12   security prisoner so they can actually get these payments?

13   A.  I'm not familiar with the considerations of the Red Cross.

14   Q.  And, therefore, you can't tell the ladies and gentlemen of

15   the jury what constitutes eligibility for these payments, can

16   you?

17   A.  I can relate to it and state that everything that is

18   written in the law as it is specified by the Palestinian

19   Authority, those are the criteria.

20   Q.  One of the criteria in the law is the international

21   committee of the Red Cross, right?

22   A.  One of the criteria as is stated here is a document or a

23   certificate from the Red Cross.

24   Q.  You don't know what offenses make one eligible for that

25   certificate.  That's what you're telling us, right?

F1lQsok2                    Eviatar - Cross

1  A.  I know what the Palestinian Authority determined as it

2  appears here.

3  Q.  Sir, you would agree with me that people get these payments

4  for every offense that is deemed to be a security offense.  You

5  know that, don't you?

6  A.  Everyone that the Palestinian Authority determines to meet

7  the criteria of the law, he will receive the payments.

8  Q.  And that would include if someone was arrested for throwing

9  stones at a tank, right?

10          MR. YALOWITZ:  Objection.

11          THE COURT:  Overruled.

12  A.  I don't know what the considerations of the Palestinian

13  Authority are with the exception of what is stated in the law.

14  Q.  It would include even if you were convicted only belonging

15  in a prohibited organization, wouldn't it?

16  A.  If the Palestinian Authority has determined if, I've

17  understood your question correctly, that that person should

18  receive payments, then he will receive it.

19  Q.  Last week you testified that there was a total amount of

20  monthly payments of 17 million shekels as of -- what month was

21  that in 2011 -- what year was that, 2011?

22  A.  It was in May 2011.

23  Q.  All right.  So in May of 2011, you testified that the

24  average monthly payment was 17 million shekels, right?

25  A.  The payment for prisoners' salaries.

F11Qsok2                         Eviatar - Cross

 1   Q.  All right.  Do you know what the average prisoner's salary

 2   was?

 3   A.  It would have to be checked.

 4   Q.  Let's use, if we could, bring up Plaintiff's Exhibit 73,

 5   please.  Do you recognize 73, the front page of it, to be

 6   payment records that you looked at yesterday with Mr. Yalowitz?

 7   That's Plaintiff's Exhibit 73 for Abdullah Barghouti.

 8   A.  I think this is indeed that page.

 9   Q.  If you would go to page 1, please, Justin.  That shows

10   payments in 2011 to him of 4,450 shekels a month, right?

11   A.  Yes, 4,450 shekels.

12   Q.  The amount being paid to him would have been one of the

13   higher amounts given the extraordinarily long sentence he got,

14   right?

15   A.  During the following years that he would be in jail, yes.

16   Q.  So if we were to take 17 million shekels and divide it by

17   4450.  Now we will see who is really good at math.  It won't be

18   me.  Do you know how many even if that was the average payment

19   how many Palestinian prisoners would that reflect as of

20   May 2011?

21   A.  I can't do the math right now.  I would just like to

22   emphasize before the jury and in response to your question that

23   the sum of approximately 17 million shekels which was paid for

24   prisoners' salaries was published by the Palestinian Authority.

25   Q.  I'm not questioning it.  I'm just asking you how many

1    prisoners that must reflect.  So if we take 4,450 into

2    17 million, experts have informed me that that would be about

3    3,820 Palestinian prisoners.  Does that sound about right to

4    you?

5    A.  It makes sense.

6    Q.  That is at the highest level of payments because of who

7    we're talking about here, Abdullah Barghouti, right?

8    A.  That's not correct.  I explained earlier that the payment

9    of salaries is incremental forwards.  In 2012, it's less than

10   ten years since he was first imprisoned.

11   Q.  I understand.  I'll accept your answer then.  You agree

12   with me that this reflects at least 3,820 Palistinians that

13   were incarcerated in Israeli prisons for offenses that were

14   labeled as struggle against the occupation in May 2011,

15   correct?

16   A.  You were asking a number of questions together.  Could you

17   ask a concrete specific question, please?

18   Q.  I am just trying to get you to see if you agree with me

19   that this would reflect at least 3,820 Palestinian prisoners as

20   of that date, right?

21   A.  No, it doesn't reflect the number of 3,800.  You asked me

22   if it makes sense.  It could make sense, but I don't know if

23   that is indeed the number of people that were incarcerated in

24   prison.

25   Q.  Well, you testified to the 17 million shekel number, right?

F11Qsok2                       Eviatar - Cross

1    A.  That's correct.

2    Q.  You would at least agree with me that it must reflect a

3    very large number of Palestinian prisoners incarcerated related

4    to the struggle against the occupation, right?

5    A.  I'm sorry I don't quite understand the question.  I

6    apologize.

7    Q.  That's OK.  How much was being spent on prisoner salaries,

8    prisoner payments, however you want to characterize it, in

9    2000?

10   A.  In all?

11   Q.  Yes, total.

12   A.  I don't have that figure.

13   Q.  How about 2001?

14   A.  I don't have that figure.

15   Q.  Same for 2002, 3 and 4?

16   A.  Yes, I don't have the figure.

17   Q.  Would you agree with me that you can't be motivated to do

18   something today based on something that hasn't happened yet?

19             MR. YALOWITZ:  Objection.

20             THE COURT:  I'm going to sustain the objection.

21             MR. ROCHON:  Thank you, your Honor.  I would like to

22   show you -- your Honor, I don't know when we are going to take

23   a break.  I don't need a break.

24             THE COURT:  We are going to take a break at 11:30.

25             MR. ROCHON:  Then I will do a couple of quick things.

F1lQsok2                        Eviatar - Cross

1    Q.  I would like to show you, and we will bring them up

2    Exhibits 962 first.  Do you remember about being asked about

3    962 yesterday?  And if we could go to the next page, which I

4    think would have the Arabic version for the witness.  Do you

5    remember being asked questions about that document I was

6    showing you in English and Arabic?

7    A.  Yes, sir, I do.

8    Q.  Now go to the English version.  The three names that are on

9    there who -- as to whom financial aid is being requested, sir,

10   you know that none of those three people were convicted in any

11   of the incidents that we're here on trial on, don't you?

12   A.  I know what happened with the first one at least.

13   Q.  You know what my question was, don't you?  My question was

14   whether any of these three men were convicted for any of the

15   incidents we are here on trial about.

16   A.  I repeat, the people who appear in this document -- the

17   person who appears number two, at number 2 here and number 3, I

18   don't know what happened to them.

19   Q.  Did you just correct the interpreter's interpretation for

20   us?

21            THE INTERPRETER:  No.  No.  I didn't understand what

22   he said.  He mixed up a plural and singular, and so I wasn't

23   sure what he was saying.  He didn't correct me.

24   Q.  Sir, you do know that none of these three were convicted in

25   any of the incidents that we're on trial here.  Don't you know

F1lQsok2                    Eviatar - Cross

1    that?

2    A.  I will reiterate my previous response.

3    Q.  OK.  If we could go to 963.  Before we highlight any

4    portion of it, let's make sure we give the Arabic version to

5    the witness, please.  I've got the Arabic version in front of

6    the witness.

7          What the document says is -- I'll read it in English.

8    "Kindly allocate a sum of $2,000 will for each of the

9    following" -- actually leave up the Arabic, please.

10          MR. YALOWITZ:  Objection.

11          THE COURT:  To having him highlight the Arabic?

12          MR. YALOWITZ:  No, to the question.

13          THE COURT:  I'm not sure what the question is.  What's

14    the question?

15          MR. ROCHON:  I haven't asked one yet.

16          THE COURT:  Let's hear your question.

17    Q.  What this says is, "Kindly allocate the sum of $2,000 for

18    each of the following struggling brothers."  Isn't that what it

19    says?

20    A.  It says warriors.

21    Q.  Isn't the word munadilin.  I'll spell it.

22    M-U-N-A-D-I-L-I-N.

23          Isn't that the word -- isn't that the Arabic word

24    there that you are referring to as saying warriors?

25    A.  Yes.

F11Qsok2                          Eviatar – Cross

1   Q.  Doesn't that word mean strugglers, plural for struggle?

2   A.  Yes, but the practical meaning of the word is the struggle

3   against Israel.

4   Q.  So it does not say warrior; it says strugglers, right?

5   A.  It says strugglers, but the context is very, very

6   important.

7   Q.  There is actually an Arabic word for warriors, isn't there?

8   A.  Correct.

9   Q.  Would you please pronounce it for the ladies and gentlemen

10  of the jury, and then we'll spell it phonetically for our court

11  reporter.

12  A.  In Arabic?

13  Q.  Yes.  Just pronounce the word in Arabic for warrior.

14  A.  Mujahid.

15  Q.  And that word is not in that document, is it?

16  A.  That's correct.

17  Q.  Now, could you go to the English version of the document

18  please?  Justin, would you highlight the line that begins

19  "kindly."

20          So, if I were to read this with a literal translation,

21  it would not say, "Kindly allocate a number sum of $2,000 for

22  each of the following warrior brothers," it would say, "kindly

23  allocate a sum of $2,000 for each of the following struggling

24  brothers," right?

25  A.  The term struggling, as I stated earlier, is in the context

F11Qsok2                         Eviatar - Cross

1  of the struggle against Israel.

2  Q.   Thank you.

3           THE COURT:  Take a break?

4           MR. ROCHON:  That would be great, your Honor.

5           THE COURT:  Ladies and gentlemen, take a ten minute

6  break.  Don't discuss the case.  Keep an open mind.  I'll see

7  you in ten minutes.

8           (Jury excused)

9           THE COURT:  Let's take a short recess.

10          (Recess)

11        (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1L8SOK3

1           (Jury not present)

2           THE COURT:  I want to see if we can quickly resolve

3      the exhibits that are going to be used on cross-examination.

4           Mr. Yalowitz, do you have a substantive objection to

5      these exhibits?

6           MR. YALOWITZ:  I do, your Honor.

7           THE COURT:  I have eight exhibits.  The first one is

8      71.  Do you have an objection to that?

9           MR. YALOWITZ:  I do not object to 71 on substance.  If

10     we are going to be letting in exhibits that I have never seen

11     until during trial, I have a couple that I would like to

12     review.

13          THE COURT:  I know you do because you have already

14     done it.

15          MR. YALOWITZ:  You have kept them out.

16          THE COURT:  I haven't kept them all out.

17          We are past that point, Mr. Yalowitz, right now.

18          I told you I am not going to exclude any of the

19     exhibits on a timeliness basis.  So give me the substance of

20     what you say you have an objection to.

21          MR. YALOWITZ:  I will do that, your Honor.  There is

22     one that I want to talk about at another time.

23          THE COURT:  I assume we are going to use these with

24     this witness.

25          So 71 you don't have a substantive objection to.

F1L8SOK3

1          MR. YALOWITZ:  I do not.

2          THE COURT:  72 do you have substantive objection to?

3          MR. YALOWITZ:  I do not.

4          THE COURT:  What about 73?

5          MR. YALOWITZ:  I do not.

6          THE COURT:  What about 74?

7          MR. YALOWITZ:  I do not.

8          THE COURT:  What about 75?

9          MR. YALOWITZ:  I do.

10         THE COURT:  What about 76?

11         MR. YALOWITZ:  I do.

12         THE COURT:  What about 29?

13         MR. YALOWITZ:  I do.

14         THE COURT:  What about 70?

15         MR. YALOWITZ:  I do.

16         THE COURT:  So the photos you don't have any problem

17    with.  You have problems with the maps.

18         MR. YALOWITZ:  Yes.

19         THE COURT:  What is your substantive objection to each

20    one of them?

21         MR. YALOWITZ:  My substantive objection to the maps is

22    that -- well, I don't know.  I haven't had a chance to look at

23    them.

24         THE COURT:  I assume you recognize these as Israel and

25    the Palestinian territory because they are very similar to the

F1L8SOK3

1    maps that you put in evidence.

2              MR. YALOWITZ:  One says Occupied West Bank.  I thought

3    we weren't politicizing the case.

4              THE COURT:  Is that your objection, because it says

5    Occupied West Bank?

6              MR. YALOWITZ:  That's right.  It's got this

7    inflammatory red.

8              THE COURT:  Why is that red inflammatory?

9              MR. YALOWITZ:  It looks to me like it's designed to

10   show something bad.

11             THE COURT:  As opposed to inflammatory yellow?  What

12   is the difference between yellow and red?  You don't like red

13   as a color?

14             MR. YALOWITZ:  I don't think it's a neutral color when

15   it's a map of Israel.

16             THE COURT:  What color do you think should be used,

17   blue?

18             MR. YALOWITZ:  Blue would be fine.

19             THE COURT:  You have got to give me a more substantive

20   argument than that, that you don't like the color.

21             MR. YALOWITZ:  I don't like the colors and commentary.

22   I have no idea whether the shapes are accurate.  I have never

23   seen it until today.

24             THE COURT:  Well, that's not a substantive objection.

25             MR. YALOWITZ:  How can I make a substantive objection?

F1L8SOK3

1    I have been in court all day.

2                THE COURT:  You made an objection.  I want to know

3    whether you have a substantive objection.  You see it now.  If

4    you don't have a substantive objection, I want to know it.  If

5    you do, tell me.

6                MR. YALOWITZ:  I don't have a basis to know whether

7    the shapes on the map are fair and accurate representations.  I

8    don't know whether they are fair and accurate.  I haven't had

9    an opportunity to consult anybody.

10                THE COURT:  It's the same shape as your map.

11                MR. YALOWITZ:  These pictures of area A, are we

12    looking at 75 or 76?

13                THE COURT:  76.

14                MR. YALOWITZ:  So it's got pictures of area A which

15    are in a different color.

16                THE COURT:  You don't believe that's an accurate

17    description of those areas?

18                MR. YALOWITZ:  It might be.  It might not be.

19                THE COURT:  You have been with this case for ten

20    years.  You shouldn't have to guess as to whether you think

21    this is accurate assessment of this area.

22                MR. YALOWITZ:  May I consult?

23                THE COURT:  I am not going to waste a lot of time on

24    this.  Tell me if you have got a real objection.  I am tired of

25    playing games with these exhibits.  Tell me what it is you

F1L8SOK3

 1    object to and give me something that makes sense to everybody

 2    in this room why it shouldn't be in.  And the color red is not

 3    a particularly compelling objection to anybody in this room.

 4    Give me a better argument than that.

 5            MR. YALOWITZ:  This was handed to me --

 6            THE COURT:  I don't want to hear that.  I know when it

 7    has been handed to you.  Do you presently at this time have a

 8    substantive objection?

 9            MR. YALOWITZ:  I need to consult.

10            THE COURT:  You don't presently at this time have a

11    substantive objection you can articulate, is that correct?

12            MR. YALOWITZ:  My problem is --

13            THE COURT:  Is that correct?

14            MR. YALOWITZ:  No, sir.

15            THE COURT:  No, sir, it's not correct, or it is

16    correct?

17            MR. YALOWITZ:  I don't have complete information.

18            THE COURT:  So you don't at this point have a

19    substantive objection, other than the color, and you're not

20    sure whether or not the areas represented on the map are

21    accurate, different colored areas, as they are described.  Your

22    lack of knowledge is what you're using as your objection, not

23    any knowledge that there is something untrue or unduly

24    prejudicial to your client.

25            MR. YALOWITZ:  Correct.

F1L8SOK3

1       THE COURT:  How much time do you want to look at that?

2       MR. YALOWITZ:  30 seconds.

3       THE COURT:  You can have more than that.

4       Are we going to get to this before lunch?

5       MR. ROCHON:  I can hold off if that's helpful to Mr.

6    Yalowitz.

7       THE COURT:  At this point do you have a substantive

8    objection to the first map?  It says Oslo 2 1995.  I assume

9    that is supposed to mean that's what the parties agreed to were

10   going to be the areas when they entered into the Oslo Accords.

11   I don't know that.  I am guessing.

12      MR. YALOWITZ:  I need about 30 seconds to check this

13   one too.

14      THE COURT:  You can have more than 30 seconds, but I

15   need a substantive objection.

16      MR. YALOWITZ:  I just want to know if it's accurate.

17   Standing here I am not equipped to say that.

18      THE COURT:  You can take the next few hours to

19   determine that, even if you have to consult somebody.  I want

20   to hear substantive objections.

21      MR. YALOWITZ:  I understand.

22      THE COURT:  Now, you said you object to 29 and 70.

23      MR. YALOWITZ:  You have my only copy of 29.  I had it

24   for about five minutes before we walked in.

25      THE COURT:  I have highlighting on this copy.  Is that

F1L8SOK3

1    your highlighting?

2              MR. YALOWITZ:  That's my highlighting.

3              THE COURT:  Just summarize for me what your objection

4    is.

5              MR. YALOWITZ:  My objection is that this document is

6    replete with critiques about how Israel supposedly treated

7    Palestinians badly of a very generalized nature.  I don't think

8    it's relevant.  I think it's highly prejudicial.  I think it's

9    directly contrary to the ruling that the Court has made

10   repeatedly.

11             THE COURT:  And this is a report by a certain UN

12   committee?

13             MR. YALOWITZ:  It's a report of a UN committee that

14   has been shown in other places to be unreliable.

15             THE COURT:  Which committee?

16             MR. YALOWITZ:  It's called Committee on the Exercise

17   of the Inalienable Rights of the Palestinian People.  It's a

18   committee set up to criticize the State of Israel.

19             THE COURT:  I understand the nature of that objection.

20             What about the State Department?

21             MR. YALOWITZ:  The State Department is also of dubious

22   relevance and is also replete with information, allegations of

23   generalized mistreatment that is inappropriate in light of the

24   Court's earlier ruling.  For example --

25             THE COURT:  You don't have to give me an example.  I

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1L8SOK3

1    just want to see if Mr. Rochon -- it's going to be his burden

2    to convince me otherwise.

3            Does this have any other purpose other than, as I say,

4    throwing mud at Israel?  What is the purpose of a report that

5    is on human rights practices of Israel?

6            MR. ROCHON:  Your Honor, I think it is relevant, the

7    portions of the report, and the reason it's relevant is because

8    the plaintiffs have put into evidence U.S. government reports,

9    four of them, over my objection, saying that they were going to

10   create a problem criticizing this case that heavily critiqued

11   my client in a host of areas.

12           THE COURT:  So you just want to do that back at them.

13   What is the relevance for the jury's determination of the facts

14   in this case?  It's kind of difficult for you to argue this is

15   relevant because you made a very strong argument that it wasn't

16   relevant.

17           MR. ROCHON:  But I lost.

18           THE COURT:  That doesn't make this relevant either.

19           MR. ROCHON:  Once I lose on evidence that I think is

20   irrelevant in the case, then I have to counter.

21           THE COURT:  Then you have to put in more irrelevant

22   information?  That's not the way it works.

23           MR. ROCHON:  If this is more irrelevant

24   information --

25           THE COURT:  Do you want it for anything other than to

F1L8SOK3

1    demonstrate the human rights violations of the Israeli

2    government?

3             MR. ROCHON:  Yes.

4             THE COURT:  What else does this demonstrate?

5             MR. ROCHON:  These reports characterize what the

6    occupation actually was.  There has been testimony about it

7    introduced over my objection.  There is information in here

8    about the Palestinian prisoners.

9             THE COURT:  What relevant information to the jury in

10    this case?

11             MR. ROCHON:  I think the information about the

12    occupation itself is relevant.

13             THE COURT:  What relevant information in this report

14    that they don't already have that you are trying to contradict

15    in terms of some other evidence?

16             MR. ROCHON:  The plaintiffs through their witness are

17    putting in question even whether there was an occupation.

18             THE COURT:  You think we are going to debate that

19    here?

20             MR. ROCHON:  I didn't want to debate it.

21             THE COURT:  We are not going to debate it.

22             MR. ROCHON:  Now I am getting a one-sided debate.

23             THE COURT:  I don't understand the one-sided debate

24    you say that is out there.

25             MR. ROCHON:  The one-sided debate is that I have

F1L8SOK3

1    reports from one branch of the United States government heavily

2    criticizing my client for its behavior during the Second

3    Intifada and saying that that client engaged in unreasonable

4    behavior.

5           THE COURT:  I understand your argument.

6           MR. ROCHON:  I have a report here from the State

7    Department that indicates that in fact it was an occupation.

8    That fact alone is something the plaintiffs --

9           THE COURT:  That's not the issue and that's not why it

10    was admitted in evidence.  The issue was whether or not the PLO

11    or Palestinian Authority was either complicit or people were

12    committing terrorist acts on their behalf and whether they were

13    acting in that regard, taking actions consistent with the

14    actions that they promised to take in relationship to

15    terrorism.  That's the relevance of this.  Trying to show on

16    the other side that you want to throw mud at the Israeli

17    government does not counter that position.

18           I am going to exclude 29, and I am going to exclude

19    30.  They have absolutely no relevance and no place in this

20    trial.

21           MR. ROCHON:  The Court said 30.

22           THE COURT:  I misspoke.  29 and 70.

23           MR. ROCHON:  These are important to the defense.  The

24    government reports came in late in this man's examination.

25    They are extremely damaging to my client.

F1L8SOK3

| | |
|---|---|
| 1 | THE COURT:  These don't address any of those issues. |
| 2 | MR. ROCHON:  They do. |
| 3 | THE COURT:  Which issue? |
| 4 | MR. ROCHON:  For instance, there is going to be |
| 5 | testimony about martyr payments.  There already has been some. |
| 6 | In this report they talk about the policies of demolitions. |
| 7 | THE COURT:  What does that have to do with martyr |
| 8 | payments? |
| 9 | MR. ROCHON:  Because the martyr payments help families |
| 10 | recover from the practices of demolishing homes. |
| 11 | THE COURT:  You want to ask the witness that? |
| 12 | MR. ROCHON:  I don't need a witness because I have got |
| 13 | a report that says it. |
| 14 | THE COURT:  You do need a witness because you don't |
| 15 | have this report.  It is more prejudicial than probative.  It |
| 16 | is unduly prejudicial.  You are doing exactly what I said you |
| 17 | cannot do.  You cannot simply say, oh, the Israelis are bad |
| 18 | guys because they bulldozed my house, and therefore that has |
| 19 | some relevance to the jury's determination of whether the PA or |
| 20 | the PLO was complicit in terrorism.  Even you would hope the |
| 21 | jury didn't make that analysis.  That would be an unreasonable |
| 22 | analysis for them to undergo. |
| 23 | MR. ROCHON:  I feel that the jury, as a result of the |
| 24 | arguments of counsel, the use of U.S. government reports |
| 25 | already, and the IDF reports which are -- |

F1L8SOK3

1          THE COURT:  If you have some other government reports

2     that have to do with the Palestinian Authority or the PLO being

3     found to being complicit in terrorism or found not to be

4     involved in terrorism, then I will hear you.  Israel is not on

5     trial.  OK?  I am going to say that one time.  Israel is not a

6     party to this litigation.  So I don't care how good or bad, how

7     appropriate or inappropriate the Israeli actions were because

8     it's not relevant to the jury's determination.  And even you

9     would say to the jury that don't use that to try to determine

10    whether or not my clients were complicit in terrorism.  It is

11    not a basis for them to do that.  It is an illegitimate basis

12    for them to do that.  And, no, you don't get to put in

13    something that you think is bad about Israel because you think

14    they put in something that's bad about the Palestinian

15    Authority.  It has nothing to do with the substantive issue.

16         MR. ROCHON:  The United Nations report goes

17    particularly to activities of the IDF.  The IDF reports are a

18    critical part of the plaintiffs' case here.

19         THE COURT:  So it criticizes the IDF.  How does that

20    make it more or less likely that your clients were involved in

21    terrorism?  Quite frankly, it gives them more incentive to

22    being involved in terrorism.

23         MR. ROCHON:  It goes to the bias of the evidence

24    introduced by virtue of public record and through testimony.

25         THE COURT:  I think you can effectively establish that

F1L8SOK3

1    bias, if you think one exists, and that bias does not exist in

2    the UN and it does not exist in the State Department.  For

3    purposes of this trial it is irrelevant.  So those two

4    documents are not going to be admitted for any purpose in this

5    trial.

6            With regard to the photos, he does have an objection,

7    but he doesn't have a substantive objection to the photo so I

8    will let you put in the photos.  If they don't want to object

9    fine, but I am not quite sure of the relevance of a picture of

10   Yasser Arafat with Nelson Mandela.  If you want it in, that's

11   fine.  I am not going to go beyond that.  But I will hear Mr.

12   Yalowitz before we get to the maps, and he will tell me

13   specifically what he says is inaccurate about the map and

14   prejudicial about the map.  If he can articulate something, I

15   will hear the objection.  If he cannot articulate something

16   after lunch, then that will be admitted into evidence.  So at

17   this point you can anticipate that at this point I am excluding

18   Exhibit 29 and Exhibit 70.

19           Let's get the jury.

20           MR. YALOWITZ:  Thank you, your Honor.

21           (Continued on next page)

22

23

24

25

1              (Jury present)

2    ALON EVIATAR, resumed.

3              THE COURT:  Mr. Rochon, you may continue.

4              MR. ROCHON:  Thank you, your Honor.

5              If we could please bring up Plaintiffs' Exhibit 1052.

6    BY MR. ROCHON:

7    Q.  Do you remember Mr. Yalowitz asking you questions about

8    Plaintiffs' Exhibit 1052 last week?

9    A.  Yes.

10   Q.  This gentleman who wrote the report that you testified

11   about that is 1052, his name is Dr. Manuel Sarkis Hassassian,

12   right?

13             You can read his name on the page.

14   A.  I see his name, yes.

15   Q.  This report that is Plaintiffs' Exhibit 1052 concerns

16   Fatah, that's what the report concerns, right?

17   A.  This page that I see here before me deals with the Fatah,

18   that's right.

19   Q.  This person, doctor, whose last name I can't pronounce, he

20   is not even in Fatah, is he?

21   A.  I don't know if he is a member or not.

22   Q.  Last week you testified that you knew him and you had met

23   him, right?

24   A.  That's right.

25   Q.  But you don't know if he is even in Fatah, the organization

1  that this thing is about?

2  A.  I'm not sure whether he is a member of the Fatah.  I really

3  don't know what to answer you, but that can be checked.

4  Q.  If you don't know, just say you don't know.

5  A.  That's what I said.  I don't know whether he is a member or

6  not.

7          MR. ROCHON:  Plaintiffs' 171, please.

8  Q.  You're aware, aren't you, sir, that there are numerous

9  different political parties within the PLO, right?

10  A.  Correct.

11  Q.  Last week you testified about Plaintiffs' Exhibit 171,

12  right?

13  A.  That's right.

14  Q.  That's a PASSIA directory, correct?

15  A.  That's right.

16  Q.  And you said that it was a reliable source of information,

17  PASSIA, correct?

18  A.  That's correct.

19  Q.  This directory lists those leaders of both the PLO

20  executive committee and the various ministers, correct?

21  A.  That's right.

22          MR. ROCHON:  If we could, please, go to the media

23  department, which is toward the left hand towards the bottom.

24  Q.  This person Yasser Abed Rabbo, who is the PLO head of the

25  media department, that person is not in Fatah, correct?  He is

F1L8SOK3                         Eviatar - cross

1   in the democratic front for the liberation of Palestinian,

2   right?

3   A.  He is not a member of the Fatah.  With respect to the

4   popular front, which you just noted, I have to check before I

5   can state that.

6   Q.  Fair enough.

7          For our purposes, it's sufficient that he is not in

8   Fatah?

9   A.  That's right.

10  Q.  The point is Fatah is the largest party in the PLO, right?

11  A.  That's right.

12  Q.  But there are multiple other parties, and representatives

13  of them are leaders in the PLO as well, correct?

14          MR. YALOWITZ:  Object to form.

15          THE COURT:  Overruled.

16  A.  That's right.

17          MR. ROCHON:  If we can go to the full exhibit, the

18  first full page.

19  Q.  I realize the font is small.  I will go through it

20  relatively quickly, but if you want to see anything highlighted

21  you tell me.

22          MR. ROCHON:  Can I come up to the witness with a paper

23  copy?

24          THE COURT:  Yes.

25  Q.  I will provide you with a paper copy of Plaintiffs' 171.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1L8SOK3                          Eviatar - cross

1          The head of the economic department there, that

2     individual is also not in the Fatah or a party, correct?

3     A.   I think that he is not; however, I am not certain.

4     Q.   Then, as far as the head of the social affairs department,

5     Hanna Amirah, also not in Fatah, correct?

6     A.   I think that he is not either.

7     Q.   Then as to the other PLO executive committee members, I am

8     going to read off their names.

9          First, Dr. Samir Ghosheh, not in Fatah, correct?

10    A.   I believe that he is not.

11    Q.   Ali Ishaq, not in Fatah, correct?

12    A.   I'm not familiar with his name.

13    Q.   Dr. Emil Jarjoul, not in Fatah, correct?

14    A.   That's right.

15    Q.   Taysir Khalid, not in Fatah?

16    A.   That's right.

17    Q.   Riad Khodari, not in Fatah, right?

18    A.   I'm not familiar with him.

19         MR. ROCHON:  If you could go to the next column.

20    Q.   Moving up to the right side, Abdel Rahim Malouh, not in

21    Fatah, correct?

22    A.   That's right.

23    Q.   And Ghassan Shaka'a, also not in Fatah, correct?

24    A.   To the best of my recollection, with respect to Shaka'a, I

25    think that he was a member of the Fatah for a certain period of

F1L8SOK3                    Eviatar - cross

1    time and then left, something like that.

2    Q.  Thank you, sir.

3            That means of the members of the PLO executive

4    committee, of which there were one, two, three, four, five,

5    six, seven, eight, nine listed in the PASSIA directory, at

6    least six, and maybe seven, are not in Fatah, right?

7    A.  Out of the nine that appear there.  But the executive

8    committee of the PLO includes, I think, twice as many as nine.

9    Q.  Well, let's go to the PASSIA directory that you said was

10   reliable and who is listed as being the PLO executive

11   committee.

12           If you look at page 9 in the bottom right-hand corner,

13   it lists a total of one, two, three, four, five, six, seven,

14   eight, nine members, correct?

15   A.  What is written here, nine appear.

16   Q.  Bottom line, you would agree with me the PLO and Fatah are

17   two different things, right?

18   A.  I do not agree.

19   Q.  You say the PLO and Fatah are the same thing?

20   A.  I'm saying what I have stated up until this point.  The

21   head of the PLO is the head of Fatah.  There are areas in which

22   there is a common denominator or overlap.  And I also said that

23   in 1969, the Fatah took control over the PLO, and it is still a

24   movement that is larger than the other movements in the PLO,

25   etc., etc.

F1L8SOK3                    Eviatar - cross

1    Q.  So you would agree with me that the Palestinian Authority

2    and the PLO are different from each other, they are two

3    different things, right?

4    A.  With respect to that as well, I do not agree.

5    Q.  The Palestinian Authority is a government, the PLO is a

6    political party or movement, correct?

7    A.  Not correct.

8    Q.  The Palestinian Authority is the government that governs,

9    in the West Bank and Gaza, since the accords with Israel,

10   right?

11   A.  That's correct, the Palestinian Authority is the government

12   in the West Bank.

13   Q.  Of its ministers, as of the PASSIA directory in 2004, of

14   the roughly 20 or 24 ministers, whatever the number was, many

15   of them were not in Fatah, right?

16   A.  I don't know if many would be the right word here.  I must

17   review all of them and give you an exact answer how many of

18   them precisely.

19   Q.  Let me come to you, if you would like then, with the PASSIA

20   directory that you used on direct examination and ask you.

21        Let's start with one of the most important.  If we go

22   to page 15 in the lower right-hand corner, please, where it

23   says ministry of finance in the lower part of the page.  The

24   head of the ministry of finance was Salam Fayyad, who was an

25   independent, not in Fatah, correct?

1          MR. YALOWITZ:  Object to form.

2          THE COURT:  Overruled.  You can answer.

3   A.  That's correct.

4   Q.  In addition, and if you need to look at the exhibit tell

5   me, but Jamil Tarifi, the head of civil affairs, not in Fatah,

6   correct?

7          If you would like me to direct you to the particular

8   entry I will.

9   A.  Yes, please.

10  Q.  This is page 14, upper left-hand side.

11         The ministry of civil affairs was headed by Jamil

12  Tarifi, also not in Fatah, independent?

13  A.  That's right.  I think that's right.

14  Q.  Ministry of labor, and I think this will be on page 17,

15  left side, sort of toward the top, was Ghassan Al-Khatib, also

16  not Fatah?

17  A.  Correct.

18  Q.  The ministry of planning -- next page, left side -- Nabil

19  Kassis, also not Fatah, independent, correct?

20  A.  I think that's correct.

21  Q.  And ministry of public works -- same page, bottom left --

22  Abdul Rahman Hamad, also not Fatah, independent, correct?

23  A.  I think that's correct.

24  Q.  And the ministry of tourism and antiquities, named Miri Abu

25  Alta, also not Fatah, also independent, correct?

F1L8SOK3                          Eviatar - cross

1    A.  That's correct.

2    Q.  Finally, the ministry of women's affairs -- upper

3    right-hand corner, same page -- also not Fatah, correct?

4    A.  About her, I don't know.

5    Q.  You would agree with me that a substantial number of the

6    ministers, including of important ministries, are not Fatah,

7    correct?

8    A.  Yes.  It's true that a substantial number of the ministers

9    are not members of Fatah.

10   Q.  If we can go to Exhibit 537.  This is already in evidence.

11          Do you recall Exhibit 537, that's the designation of

12   the Al Aqsa Martyrs Brigade as an FTO by the United States of

13   America, correct?

14   A.  Yes.

15   Q.  The United States of America has not designated the

16   Palestinian Authority as such, has it?

17   A.  That's correct.

18   Q.  The United States of America has not designated the PLO as

19   such, has it?

20   A.  That's correct.

21   Q.  The United States of America has not even designated Fatah

22   as such, has it?

23   A.  That's correct.

24   Q.  Therefore, that would suggest that the United States of

25   America can tell the difference between the Al Aqsa Martyrs

F1L8SOK3                    Eviatar - cross

1  Brigade and these three other organizations, right?

2  A.  I don't agree with that statement.

3  Q.  You testified on direct examination about Yasser Arafat a

4  bit.  Do you remember that?

5  A.  Yes.

6  Q.  You suggested to the jury that the way he tied his head

7  garb had some special significance about his view of Israel.

8  Do you remember telling them that?

9  A.  Correct.

10 Q.  In fact, Yasser Arafat has worn that same head garb, in

11 that same style, for long before the period that's called the

12 Second Intifada, correct?

13 A.  That's correct.

14 Q.  If we could go to 71 in the selection, and we will go

15 through these relatively quickly.

16        You know what Exhibit 71 is, correct?

17 A.  Of course.

18 Q.  That's Yasser Arafat with President Bill Clinton.  And who

19 is the man on the left?

20 A.  Yitzhak Rabin.

21 Q.  He was a leader of Israel?

22 A.  He was the prime minister.

23 Q.  Go to 72.

24        Again, we have President Clinton, Yasser Arafat, and

25 the man on the left?

F1L8SOK3                          Eviatar - cross

1    A.   Ehud Barak, the prime minister.

2    Q.   If we can go to 73.

3            Yasser Arafat and Nelson Mandela, right?

4    A.   Yes.

5    Q.   Wearing his headgear in exactly the way you say suggests

6    some kind of view of Israel?

7    A.   That's correct.

8    Q.   74.  You know what this is, right?

9    A.   Yes.

10   Q.   Tell the ladies and gentlemen of the jury who is the man in

11   the middle?

12   A.   Shimon Peres.

13   Q.   Leader of Israel?

14   A.   Correct.

15   Q.   What was his position?

16   A.   At the time, I believe he was the foreign minister.

17   Q.   And on the left Yasser Arafat?

18   A.   Correct.

19   Q.   Wearing his headgear in the same way he always wore it?

20   A.   Correct.

21   Q.   That's the photo of those three individuals receiving the

22   Nobel Peace Prize, correct?

23   A.   Correct.

24   Q.   You are actually not suggesting that this jury should reach

25   any conclusions about my client because of the way the man wore

F1L8SOK3                    Eviatar - cross

1    his headgear, are you?

2    A.  I described Arafat as a man of symbols.  Since the time he

3    became a Palestinian leader and the way he tied his headgear,

4    as Palestinians have told me, indeed reflects his approach

5    towards Israel as it has always been.

6    Q.  And that approach that he had towards Israel, you're saying

7    he had that approach when he was standing there with -- was

8    that the prime minister at the time or president in 74?

9              MR. YALOWITZ:  Object to the form.

10             THE COURT:  Overruled.  He can answer.

11   A.  His approach, as I represented it, did not change; it

12   wasn't different from 2000, 1990, or before that.

13             MR. ROCHON:  I am done with the photographs.  Thank

14   you.

15   Q.  Sir, yesterday, when we began your examination, we talked

16   about how you first became a witness in this case?

17   A.  Correct.

18   Q.  And we discussed that you had retired in April of 2000 --

19   what year?

20   A.  I will reiterate it.  In April 2013, I ended my service,

21   and I was officially discharged one year later.

22   Q.  You were contacted within a month of that retirement,

23   correct, to be a witness in this case?

24   A.  That's correct.

25   Q.  Actually, when you first became a witness, you did not

F1L8SOK3                         Eviatar - cross

1   write from start to finish the report you eventually submitted,

2   did you?

3   A.  That's correct.

4   Q.  You were actually handed a report that someone else had

5   written named Roni Shaked?

6   A.  I received a draft, that's correct.

7   Q.  Well, that draft report that you received and your final

8   report are essentially identical, aren't they?

9   A.  They are similar.

10  Q.  Well, he had 90 pages, you had 88, right?

11  A.  88 in English.

12  Q.  He had 176 footnotes, you had 178 footnotes, right?

13  A.  I don't remember exactly how many footnotes he had, but

14  that sounds about right.

15  Q.  In fact, when you signed your report, when you first signed

16  your report, you actually included language in the report that

17  you signed that stated, "While I have not personally been

18  involved in the interrogation of terrorists, I am familiar with

19  such interrogations from, *inter alia*, my work at the Israeli

20  security agency."

21  A.  I remember that wording.  I remember also that there was a

22  technical error, that we took care to amend, in which it stated

23  that I did not work with the Israeli security agency.

24          (Continued on next page)

25

F11Qsok4                        Eviatar - Cross

1    Q.   Understood.  The first version of your report included

2    something that had been copied from his that said:  "My work at

3    the Israeli security agency," when, in fact, you never worked

4    there, right?

5    A.   That's correct.  As I said earlier, that was a technical

6    mistake in the writing.

7    Q.   Justin, would you pull up the corrected report for me,

8    please?  For the witness, would you please highlight at the

9    bottom of Page 1 the sentence that begins "in that position."

10   Then, if you are able to, go to the next page, please, page 2,

11   and also highlight the paragraph that begins "in the course of

12   my services."  Thank you very much.

13            Now, sir, do you see in front of me the two paragraphs

14   that my colleague has highlighted?

15   A.   Yes, I do.

16   Q.   Did you write those?

17   A.   Yes, I did.

18   Q.   You signed your report in May of 2013, correct?

19   A.   I think it was June.

20   Q.   June 14, 2013, thank you.  Does that sound right?

21   A.   Yes.

22   Q.   Correct.

23            MR. ROCHON:  Your Honor, I would like to move those

24   two paragraphs in, if I could, or at least preserve them for

25   use with a subsequent witness.

1          MR. YALOWITZ:  Objection.

2          THE COURT:  I'm sorry, do you want to --

3          MR. ROCHON:  Here is what I'd like to do --

4          THE COURT:  Are you doing something with this witness

5    now?

6          MR. ROCHON:  What I'd like to do is have those two

7    excerpts marked as an exhibit.

8          THE COURT:  Let's not address that now unless you're

9    dealing with it with this witness.  If you want to ask this

10   witness questions about that, exhaust that, and then we'll deal

11   with the evidence.

12         MR. ROCHON:  I ask the excerpt be marked 79A.

13         THE COURT:  I'm not going to do that now.  Do your

14   examination now.  We'll discuss it after the jurors leave.

15         MR. ROCHON:  Thank you.  Fair enough.  I'm done with

16   that portion.

17   Q.  Sir, you talked about some of your interactions with

18   Palestinian people in your direct examination as well, correct?

19   A.  Correct.

20   Q.  When you moved through the West Bank, you moved through it

21   in a military jeep, right?

22   A.  Not always.

23   Q.  But in an identified military vehicle of whatever sort:

24   jeep, tank, whatever it was.

25   A.  In most cases.

F1lQsok4                        Eviatar - Cross

1   Q.  You traveled in the uniform of the IDF in which you are now

2   a lieutenant colonel and you were then an officer, right?

3   A.  Correct.

4   Q.  When you met with people, you did so in your capacity as a

5   member of the Israeli Army, right?

6   A.  That's correct.

7   Q.  For instance, you said you met with Jabril Rajoub one day

8   when he was coming across from Raman Jordan, right?

9   A.  Correct.

10  Q.  The reason you met with him is that he couldn't get into

11  the West Bank without going through you first, right?

12          MR. YALOWITZ:  Objection.

13          THE COURT:  Overruled.  You can answer.

14  A.  That's not why I met him, and he didn't have to meet me.

15  Q.  You would agree with me that the Israeli Defense Forces is

16  the vehicle by which the Palestinian territories or occupation

17  is maintained, correct?

18          MR. YALOWITZ:  Objection.

19          THE COURT:  Sustained as to the form.

20  Q.  Sir, you also testified about some Israeli Defense Forces

21  reports that were prepared that Mr. Yalowitz showed you.  Do

22  you remember those?

23  A.  Yes.

24  Q.  During the period in question, 2002, 3 and 4, without

25  getting into the substance of any criticisms, Israel's

F11Qsok4                          Eviatar - Cross

1   occupation was being criticized in the public media?

2              MR. YALOWITZ:  Objection.

3              THE COURT:  Sustained.

4              MR. ROCHON:  Your Honor, could we approach?

5              THE COURT:  No, sir.

6   Q.  Sir, you would agree with me that the reporting of the

7   IDF -- do you know who Ephraim Levy is?

8   A.  You mean Ephraim Levine.

9   Q.  Dr. Ephraim Levy from the Palestinian section of the

10  military intelligence directors's office of the Israeli Army.

11  You know what that is, right?

12  A.  I know him.

13  Q.  And you know Dr. Matty Steinberg?

14  A.  I know him.

15  Q.  He was an adviser to the Shin Bet?

16  A.  Correct.

17  Q.  You're aware that those individuals were in a position to

18  be familiar with the work done by the IDF and the incursions in

19  2002 that generated those reports that you testified about in

20  direct examination weren't you?

21  A.  I'm sorry, I don't understand the question.

22  Q.  Those two individuals are familiar with the work that was

23  done by the IDF in connection with the incursions in 2002 that

24  resulted in those reports, right?

25  A.  I think they are familiar.

F11Qsok4                          Eviatar – Cross

1   Q.  Isn't it a fact that the IDF's role in connection with the

2   reporting they did was to use propaganda in order to affect

3   policy?

4            MR. YALOWITZ:  Objection.

5            THE COURT:  Sustained.

6            MR. ROCHON:  Your Honor, may I approach on -- I had

7   another question, but I don't want to run it by --

8            THE COURT:  Let's take the lunch break.  Ladies and

9   gentlemen, I'm trying to be a little tough on the lawyers about

10  using our time efficiently I'm trying to coordinate.  Don't

11  hold it against them I'm trying to keep us on schedule and move

12  forward.  We will take a break now and deal with any issues we

13  have to address.  Don't discuss the case.  Keep an open mind.

14  We will see you back here at 2:00.

15            (Jury excused)

16            (Continued on next page)

17

18

19

20

21

22

23

24

25

F1lQsok4                        Eviatar - Cross

1                        (Jury not present)

2              MR. ROCHON:  Your Honor, may we discuss the issue?

3              THE COURT:  Just a second.

4              MR. YALOWITZ:  May I be heard, your Honor?

5              THE COURT:  Let me hear Mr. Rochon.

6              MR. ROCHON:  May the witness be excused while we

7    discuss the issue?

8              MR. YALOWITZ:  I don't think that's necessary, your

9    Honor.

10             MR. ROCHON:  I defer to the Court.

11             THE COURT:  He can stay if you want to cross-examine

12   him about whether he was in the room.  The bottom line I don't

13   need a whole lot of discussion on this issue if I know where

14   we're going unless you can tell me that you have something that

15   was relevant to the issues that were raised.  If you're simply

16   attempting to elicit some mistreatment by the IDF, then

17   obviously you are violating both the letter and the spirit of

18   the ruling that I just gave you.  We are not going there.

19             MR. ROCHON:  I'm not.

20             THE COURT:  Your last question was particularly

21   inadmissible as a question and as an answer, all right?  If he

22   had answered that question.  He's not here to -- propaganda is

23   not within his expertise, nor is it within yours.  So I suggest

24   that you stay far afield of those kinds of questions.  That is

25   not relevant to this jury's determination.  Where do you want

1    to go?  What leeway do you want me to give you?

2              MR. ROCHON:  Here is where I'd like to go and here's

3    the leeway I'd like.  The witness has not only been a vehicle

4    to introduce the idea of report study, he has vouched for the

5    people that created them for the integrity.

6              THE COURT:  No.  He said they're accurate reports.

7              MR. ROCHON:  He says far more --

8              THE COURT:  If you want to dispute that you, can ask

9    him questions about whether or not there is something that

10   makes them inaccurate reports, not their motivation to do them.

11             MR. ROCHON:  If I could, the witness vouched for them.

12   He's here as an expert allowed to give opinions not as a fact

13   witness.  It's proper cross-examination of an expert to present

14   contrary views of other people in his field?

15             THE COURT:  About relevant issues.

16             MR. ROCHON:  And the relevant --

17             THE COURT:  What is the relevant issue that you want

18   to contradict?

19             MR. ROCHON:  The people who he just admitted had

20   reason to be familiar with the incursions that produced these

21   reports have written -- and I was just going to ask him the

22   views -- "We also see that Israeli intelligence had not a scrap

23   of evidence indicating Arafat had abandoned the negotiating

24   tract and" --

25             THE COURT:  Is that in some document you want to

F1lQsok4                          Eviatar - Cross

1   question him about or admit into evidence?

2          MR. ROCHON:  I was going to question him about the

3   views of those people.  I have a good faith basis for it from

4   the document.

5          THE COURT:  What is the view that you think is

6   relevant that somehow casts doubt on some evidence that is

7   presented?

8          MR. ROCHON:  Well, the plaintiffs have presented these

9   reports with the suggestion that Arafat was behind the

10  terrorists.

11         THE COURT:  And you're saying that those reports don't

12  support that?

13         MR. ROCHON:  I'm saying that his peers have written

14  that the Israeli intelligence had not a scrap of evidence

15  indicating that Arafat and abandoned the negotiating" --

16         THE COURT:  Who wrote it and who wrote it where?

17         MR. ROCHON:  Ephraim Levy and Maddie Steinberg the two

18  people I just referenced.

19         THE COURT:  What do they have to do with this case?

20         MR. ROCHON:  He just testified, Dr. Levy he actually

21  had the position of --

22         THE COURT:  I know what he testified what their

23  position is.  What do they have to do with this case?

24         As you say to me, you've effectively cross-examined

25  him.  What does that have to do with the six attacks at issue

F1lQsok4                          Eviatar - Cross

1    in this case?

2                MR. ROCHON:  If the Court hadn't included them?

3                THE COURT:  No, tell me what they have to do --

4                MR. ROCHON:  It undermines those IDF reports that

5    plaintiffs relied on so heavily and the people who created

6    them.

7                THE COURT:  Which IDF reports?  All IDF reports, is

8    that what you are you saying?  Or do you have something that

9    they commented on in a particular report.

10               MR. ROCHON:  It undermines 831, 829, 631, 626 and 826.

11               THE COURT:  Why is it appropriate for you to put their

12   opinions before this jury in the form of a question for this

13   witness.

14               MR. ROCHON:  Because it's proper cross-examination of

15   an expert to provide him contrary views of others with a basis

16   to know.  It's proper cross.

17               THE COURT:  What was the contract contrary view that

18   he had that you say conflicts with his view.

19               MR. ROCHON:  He vouched for those reports.

20               THE COURT:  He didn't vouch for the report.  He didn't

21   use that word, "I vouch for the report."  He says that these

22   are reports done.  I know how reports are done, and they're

23   usually done appropriately and following the right procedures

24   and that's the best I can give you about these reports."

25               MR. ROCHON:  So these reports that have come in, the

F11Qsok4                    Eviatar - Cross

1   ones I just listed, none of them discuss any of those six

2   instances.  What they do is describe generally is supposed

3   support for terrorism.

4           The reports were according to people who are in a

5   position to know, part of a propaganda effort.

6           THE COURT:  How would they know it's part of a

7   propaganda effort?

8           MR. ROCHON:  Because they work in the very unit that

9   created them.

10          THE COURT:  Well, you're in your firm.  It doesn't

11  mean if somebody steals something out of somebody's desk

12  drawer, that you know about it.  I don't understand how you

13  connect these people with any of these incidents or even any of

14  the report.  Is any one of those people commenting on any one

15  of these reports that went into evidence?

16          MR. ROCHON:  They comment on the overall behavior of

17  the IDF for that period in connection with those incursions.

18          THE COURT:  Go ahead.

19          MR. ROCHON:  When I talk about him vouching, so I

20  realized -- I apologize for reading the transcript to the

21  Court.

22          THE COURT:  I have a clear recollection of what he

23  said.

24          MR. ROCHON:  He said they asked that the document

25  reflect a reliable degree of professionalism and integrity in

1    the facts and analysis.

2            "Absolutely yes.  The parties that distributed the

3    document is the same intelligence" and he goes on.  They

4    brought in integrity.  Propaganda doesn't have integrity.

5            THE COURT:  You're saying it's propaganda because

6    somebody else who is not in this court said it was propoganda

7    and you want to put that before the jury.

8            MR. ROCHON:  As cross-examination of an expert, I

9    think that's entirely proper.

10           THE COURT:  I understand your argument.  I'm not going

11   to allow it.

12           MR. ROCHON:  I understand the Court's ruling.  May I

13   mark as Defendant's Exhibit identification only not the what

14   the jury viewed for the record, the document on which I was

15   relying for questions.  We'll have to give it a number and we

16   will figure it out as we go along.

17           THE COURT:  Let's go ahead.

18           Do you have something you would like to address,

19   Mr. Yalowitz?

20           MR. YALOWITZ:  My problem is, I thought the Court's

21   ruling was very clear.  I didn't think we were going to have

22   questions about propoganda, occupation.

23           THE COURT:  I don't need speeches, Mr. Yalowitz.  We

24   resolved this issue.  Let's move forward.  I'm trying to keep

25   us on schedule.

F11Qsok4                        Eviatar - Cross

1              MR. YALOWITZ:  I ask the Court admonish Mr. Rochon.

2              THE COURT:  I just did.

3              MR. YALOWITZ:  In front of the jury.

4              THE COURT:  In the most forceful way I thought was

5      appropriate, and I don't think it's appropriate to admonish him

6      any further.  I don't have any basis to believe he did not in

7      good faith ask that question believing it was admissible and

8      proper even though I determined that it is not.

9              MR. YALOWITZ:  Thank you, your Honor.

10             THE COURT:  Let's take the lunch break.  I have a

11     couple of matters to handle.

12             MR. ROCHON:  Thank you, your Honor.

13             (Luncheon recess)

14                        AFTERNOON SESSION

15                           2:00 P.M.

16             (In open court)

17             THE COURT:  Are we ready to proceed or is there

18     anything we need to address before we bring out the jury.

19             MR. YALOWITZ:  Your Honor, I've had a chance to look

20     at Exhibit 75 and 76.  I have no problem with 75, other than

21     the fact that it was given to me while the trial was going on.

22     If we are going to start having exhibits while the trial is

23     going on, I have one or two I might want.

24             76 I have no problem with the shape of the map, the

25     images on the map.  I will withdraw my objection to the color

F1lQsok4                    Eviatar - Cross

1    of the map.  The only thing is there is some commentary in the

2    map in the written language that needs to be redacted

3              THE COURT:  What is that?

4              MR. YALOWITZ:  Number one, there's a legend, and at

5    the bottom of the legend, it says Green Line Preoccupation

6    Border.  I think that should be redacted.

7              THE COURT:  Where is that?  I see Green Line.

8              MR. YALOWITZ:  Green Line is fine.  We've heard what

9    the Green Line is.

10             1967 preoccupation border should be redacted.

11             THE COURT:  If that is redacted, are you otherwise

12   satisfied?

13             MR. YALOWITZ:  I have three other redactions, and I'll

14   be satisfied.

15             Number two, the facts on Palestinian security

16   controlled areas, area A, all those fact should be redacted

17             MR. ROCHON:  I already said I wasn't using those.

18             MR. YALOWITZ:  Number three, there are two places on

19   the map where it says occupied.  Occupied West Bank.  Occupied

20   Gaza Strip.  Those should be redacted.

21             THE COURT:  Is that somehow inconsistent with this as

22   described by anyone?

23             MR. YALOWITZ:  Yes, there is a whole -- there is

24   endless debate about whose land it is, whether it's occupied,

25   whether it is not occupied.  That debate is not relevant to the

F1lQsok4                    Eviatar - Cross

1    case.  To start injecting it's occupied or no, it's not

2    occupied.

3              THE COURT:  Didn't we hear testimony from witnesses

4    who described it as the occupied territory.

5              MR. YALOWITZ:  We've had questions from Mr. Rochon and

6    an opening from Mr. Rochon and that's what he calls it.  But

7    this witness -- I know this witness doesn't agree with that.

8              THE COURT:  Let me hear from Mr. Rochon.  What do you

9    want me to do with it?

10             MR. ROCHON:  So 75 is fine, as I understand it.  As to

11   76, the upper right key where it says Green Line, there's

12   already been testimony about the Green Line what it is and

13   where it is.  I don't see that as being prejudicial and there

14   is no need to redact it.  I think the only thing that should be

15   redacted is Palistinian controlled areas and underneath that

16   including, of course, through the footnote which begins "Since

17   2000," none of that will be shown to the jury --

18             THE COURT:  Whose map is this?

19             MR. ROCHON:  This map is produced by the Negotiation

20   Support Unit of the Palestinian Authority or the PLO.

21             THE COURT:  So this is --

22             MR. ROCHON:  This is prepared, I think it would be

23   fair to say, by somebody affiliated with the defense.

24             THE COURT:  Well, that may be important to put before

25   the jury if I am going to give them this map.  I understand

F1lQsok4                          Eviatar - Cross

1    their position with regard to the occupied territory.  If you

2    want to make a representation -- go ahead.

3              MR. ROCHON:  I don't need 76.

4              THE COURT:  Then let's not debate as we say the

5    politics of it.

6              MR. ROCHON:  That's fine.

7              THE COURT:  Let's move forward.  When do you think we

8    are going to get to the next witness?

9              MR. ROCHON:  I think I'm only an hour now.

10             MR. YALOWITZ:  I don't think I have more than a half

11   hour.

12             THE COURT:  I know there will probably be some

13   redirect, but we have some issues that I think need to be

14   addressed before we get to this next witness.  We can address

15   them during the next break as soon as this witness is finished

16   or before we start with the next witness, as a matter of fact,

17   because you may have to make some redactions.

18             I hate to do this to the jury, but let me see if I can

19   resolve some of these issues.  We have exhibits with the next

20   witness.  Let me tell you what my position is based on this and

21   then I have a couple quick questions.

22             Defense objected to a number of exhibits.  I will

23   start with the summary.  My position is this:  If there is -- I

24   don't think I have a copy of that summary chart.  I do have a

25   copy of that summary chart.  I have it attached.

F1lQsok4                          Eviatar - Cross

 1              MR. YALOWITZ:  Right, and we went over the summary

 2    chart back in maybe December.

 3              THE COURT:  Let me just tell you what my position is

 4    and then if we need to debate about it, we can do it further.

 5              I don't have any problems with the caption page

 6    promotions to defendants' employees.  If defense feels that's

 7    inaccurate, then you can question the witness who prepared the

 8    document or other witnesses utilizing the document, and you can

 9    point out in what way that is not accurate; but if that is the

10    witness' conclusions based on witness' review of the evidence

11    before this jury, then I think you can appropriately point out

12    that to the extent it is accurate, it is an accurate reflection

13    of what are the true facts in evidence before the jury.

14              The same thing with the Marwan Barghouti listed as one

15    of defendant's employees.  I think if that is an issue whether

16    these are improperly listed and it's inconsistent with the

17    evidence the jury has before them, it is at risk for

18    cross-examination.  An inaccurate chart doesn't make a chart

19    inadmissible.  That is basically my position, as long as it is

20    supposedly based on that witness' review of the evidence that

21    is before the jury.  If he's got it wrong, I'm sure you'll

22    point it out.

23              The same thing with Ali Ja'ara being listed as a PA

24    employee.  As a matter of fact, I don't think the defense is

25    saying he wasn't a PA employee.  They're saying he was

F1lQsok4                        Eviatar – Cross

terminated at a certain point in time.  I don't think they

characterize him as a PA employee because he was terminated on

January 5, 2004.

        Six of the individuals are listed as being currently

employed by the PA or with the PA.  The defense takes issue

with that.  If that's not accurate, then the defense can point

that out to the jury, and further call into question the

accuracy of the witness' summary chart and the accuracy of the

witness' testimony.

        Quite frankly, I think the objection there is that

they are listed as being currently employed with the PA and the

only objection is that they are currently incarcerated by the

state of Israel.  That's a debate between the parties as to

whether that makes him still an employee of the PA or not.

That's not a basis for an objection.

        I do agree with the defendants about the note at the

bottom of the summary.  I think that is an inappropriate note.

I think that is an inappropriate comment for this witness to

make or for any witness or any person who has prepared this

chart about the defendants.  So that should be redacted.  If

you want to agree with the defendants and you want to state it

a different way as to whether or not this chart accurately has

all the complete information, timely information, up to a

certain date, if you want to give some more neutral assessment

of that, then you can.  But the comment that you have at the

1    bottom, I agree with the defendant that that is an

2    inappropriate comment for the witness to make either as a

3    statement or as testimony before the jury or in the form of the

4    witness' chart.  I am not even sure the evidence is going to be

5    this witness is the one who prepared the chart.

6            The caption defendants payment to the convicted

7    non-employees is inaccurate.  If it is inaccurate, the defense

8    can point out where there are errors or inaccuracies.

9            I thought with regard to the photographs, the crime

10    scene photographs, I thought these two photographs were already

11    in.  In fact, I know I've seen them before.

12            MR. HILL:  You previously ruled on our objections that

13    they were irrelevant and more prejudicial than probative.

14            THE COURT:  These two photos?

15            MR. HILL:  Yes, sir.  The objection here is that there

16    is not a witness with personal knowledge --

17            THE COURT:  I thought I did not rule inadmissible

18    these two photographs if they are the photographs that I see

19    attached here.  One is a photograph of the scene without any

20    individuals in it.  It's supposed to show the aftermath of a

21    bombing.  If you tell me that I ruled they were out, then --

22            MR. HILL:  No, you had not excluded them on relevance

23    grounds.

24            THE COURT:  I don't think I excluded them at all.

25            MR. HILL:  My objection is foundation grounds.

F1lQsok4                     Eviatar - Cross

1          THE COURT:  But you say I excluded them already.  I

2    don't think that is true.  I think my ruling was just the

3    opposite.  Maybe this is just similar to another photo I saw.

4    I don't remember the exhibit.

5          MR. ROCHON:  Judge, we're not saying you ruled them

6    out.  You may have misunderstood Mr. Hill.  We are saying you

7    had allowed them but hadn't addressed this objection.

8          THE COURT:  I know.  Well, I ruled.  I thought I said

9    that you gave me a bunch of photos.  This was among them.  I

10   identified certain photographs that would be excluded.  This

11   was not one of them.

12         MR. HILL:  Correct.

13         THE COURT:  By default this was one of the ones that

14   we anticipated it was going to come in.  Now you're renewing

15   your objection?

16         MR. HILL:  I'm making a different objection.  I'm

17   objecting on foundation that the witness does not have personal

18   knowledge to identify the photograph, say that it accurately

19   depicts what he claims it is.  That's the objection.

20         THE COURT:  What did we do with the other photographs?

21   Did we put in all the other photos at this point?

22         MR. YALOWITZ:  Yesterday the defendant stipulated

23   their admission.

24         THE COURT:  So you're not doing that with this photo.

25         MR. ROCHON:  That's because they had a witness who

1  could foundationalize those photographs.  They don't for these

2  photos.

3              THE COURT:  I don't understand what the difference

4  between this photo is and all the photos that --

5              MR. HILL:  They're different events.

6              THE COURT:  Different events?

7              MR. HILL:  Yes, sir.  They had a witness who could

8  foundationalize the photographs of the Hebrew University

9  bombing.  They do not have a witness who could foundationalize

10  these photo.

11              THE COURT:  This is not the Hebrew University bombing.

12  This is not among those group of photos?

13              MR. ROCHON:  Correct.  The plaintiffs have represented

14  to me it's the January 22, 2002 shooting.  I don't have any

15  personal knowledge of that, and I don't think any witness who

16  is going to come in and testify will.

17              THE COURT:  Which one is 407?

18              MR. YALOWITZ:  407 is the bus stop.

19              THE COURT:  I saw thought I saw these two photographs.

20              MR. YALOWITZ:  407 is the bus stop, the bus stop which

21  was January 22.  1134 is the bombing that the Sokolow family

22  was in.  Frankly, I don't get it.  Both of these families, they

23  got blown up or they got shot.  They passed out.  I can't put

24  the survivor on the stand and say:  Did you take this

25  photograph?

F1lQsok4                         Eviatar - Cross

1              THE COURT:  No, it doesn't matter.  I couldn't care

2       less who took the photograph.  That's not the foundation.  I

3       need somebody to tell me it is what it purports to be.  That's

4       all I need.  Somebody who has knowledge and basis for

5       knowledge--

6              MR. HILL:  Personal knowledge.

7              THE COURT:  Doesn't necessarily have to be personal

8       knowledge, but they have to have some basis to be able to say

9       that this is what it purports to be.  Are these part of the

10      photographs that the expert was given to examine?

11             MR. HILL:  No, sir, they're not.

12             THE COURT:  That's what I'm trying to say.

13             MR. HILL:  They're not in the man's report.  I didn't

14      get a chance to depose him about his personal knowledge of this

15      information.

16             THE COURT:  Does he have a basis to lay a foundation

17      for these photographs?

18             MR. YALOWITZ:  Of course he does.

19             THE COURT:  Now you say of course he does.  What is

20      the basis?

21             MR. YALOWITZ:  He's looked at the photographs.  He's

22      been to the place.  He's looked at where we got them.  He will

23      be able too say, yes, this is a fair representation of the

24      scene on that day.

25             THE COURT:  How would he know that?

F11Qsok4                          Eviatar - Cross

1              MR. YALOWITZ:  Because he's been in the place, so he

2       recognized Jaffa Road, and he has either looked at or -- I want

3       to check, but these were pulled off of websites dedicated to

4       events like this to say here is a picture of this place, here

5       is a picture of this place.

6              THE COURT:  That doesn't make it real.

7              MR. YALOWITZ:  I understand that, but that's fair

8       cross-examination.

9              THE COURT:  I'm not going to rule on it at this point.

10      We will see what kind of objection, what kind of foundation you

11      lay.  If you lay a proper foundation for it, I'll let it in.

12      That was my only issue.  I thought we already addressed this.

13      Apparently not.

14             Also, the alleged perpetrator photographs.  I thought

15      some of these the jury already saw.  Is that true or not?

16             MR. HILL:  The particular ones that are objected to

17      here have not yet been introduced into evidence.

18             THE COURT:  I thought I saw 1172.  Where did I see

19      that?  I thought I saw it up there.  I didn't see it up there?

20             MR. HILL:  He may have put it up in opening.  It's not

21      in evidence.

22             THE COURT:  I know I saw it somewhere, and I know the

23      jury's seen them.

24             MR. HILL:  He put something up in opening that he

25      anticipates will come into evidence.  Now is the time to have

F1lQsok4                          Eviatar - Cross

1    him lay a foundation for it.

2              THE COURT:  As I say, I had two questions.  You

3    answered the first, your ground for objection.

4              MR. HILL:  Is foundation.

5              THE COURT:  My second one is, what is your reason for

6    objection?

7              MR. HILL:  Because it's more prejudicial to my client

8    if it comes in.

9              THE COURT:  Why is it more prejudicial to your client?

10             MR. HILL:  Because they're going to claim that that

11   person is responsible for injuring the Sokolow family.

12             THE COURT:  And you're going to claim this person is

13   not?

14             MR. HILL:  No.  I'm objecting to the photo because he

15   can't foundationalize it.

16             THE COURT:  Do you have somebody who can identify the

17   photograph and who the people are --

18             MR. YALOWITZ:  Yes, sir.

19             THE COURT:  -- and a legitimate basis to do so, then

20   it will come in.  If you don't lay a proper foundation, I'm

21   putting it aside, and you can bring in the next witness who can

22   do it.

23             MR. YALOWITZ:  Understood.

24             THE COURT:  The last one is the Palestinian Authority

25   financed Fatah branch activities.  This document was not in the

F1lQsok4                          Eviatar - Cross

1    binder that I was given.  I know because I know 554 is in

2    there.

3              MR. YALOWITZ:  Right.

4              THE COURT:  What is this and where does it come from?

5              MR. YALOWITZ:  It's similar to the other five.  I

6    think we just omitted it from the binder inadvertently.

7              THE COURT:  Where does it come from?  Who generated

8    it?

9              MR. YALOWITZ:  I believe it's IDF.  I don't have it in

10   front of me.

11             THE COURT:  You'd better tell me because what you

12   believe doesn't get it in evidence.

13             MR. YALOWITZ:  I'm pretty sure it's IDF, but I'll

14   double check.  I don't want to tell you something that's not

15   correct.

16             THE COURT:  Is there some reason we're discussing it

17   now on the day this witness is supposed to testify?  As you

18   have scolded them for, I'm sure we're not in a position that

19   you only showed this to them and told them just last night that

20   you were going to utilize this with this witness.  That would

21   be in violation of the rule that you want me to enforce.

22             MR. YALOWITZ:  Right.  Yes.

23             Your Honor, until this morning the rule was 72 hours

24   for witnesses which everybody has abided by; mainly me, and day

25   before on exhibits.  Day before.

1          THE COURT:  When did you tell them that you were going

2     to utilize this with this witness?

3          MR. YALOWITZ:  Day before.  Yesterday.

4          THE COURT:  When?

5          MR. YALOWITZ:  After court last night.

6          THE COURT:  When?

7          MR. YALOWITZ:  I have --

8          THE COURT:  Midnight?

9          MR. YALOWITZ:  No.  No.  No.

10         THE COURT:  You would agree with me that would be a

11    little bit unreasonable, wouldn't it?

12         MR. YALOWITZ:  Midnight would be too late.  8:02 p.m.

13    We are not going to use it today.

14         THE COURT:  Are you going to use it at all?

15         MR. YALOWITZ:  I would like to use it.

16         THE COURT:  With whom?

17         MR. YALOWITZ:  With Shrenzel.

18         THE COURT:  What is it and who is going to identify

19    it?

20         MR. YALOWITZ:  Shrenzel is going to identify it.

21         THE COURT:  As what?

22         MR. YALOWITZ:  As an IDF-produced report.  Like the

23    ones we talked about, it's got --

24         THE COURT:  Where did it come from?

25         MR. YALOWITZ:  It came from the IDF.

F1lQsok4                          Eviatar – Cross

1           THE COURT:  Meaning what?  How did you get it from the

2      IDF?  The others I understood were seized in a raid.  That's

3      the evidence that I have as part of this foundation.  This is

4      not seized in that same raid?

5           MR. YALOWITZ:  These documents are also seized

6      documents and analysis of the seized documents.

7           THE COURT:  You say "these documents," I'm talking

8      about one document, 553.  Where did 553 come from?

9           MR. YALOWITZ:  553 is an analysis.

10          THE COURT:  Where did it come from?

11          MR. YALOWITZ:  It came from the IDF.

12          THE COURT:  How did the IDF get it?

13          MR. YALOWITZ:  They created it.  They wrote it.  So

14     it's a government report.

15          THE COURT:  So this is an IDF report?

16          MR. YALOWITZ:  Right.

17          THE COURT:  Where did you get it from?

18          MR. YALOWITZ:  We got it from the IDF.

19          THE COURT:  Did Shrenzel get this from the IDF?

20          MR. YALOWITZ:  I don't think Shrenzel went and got it

21     from the IDF, but he's going to testify --

22          THE COURT:  We will come back to that one because I

23     might not allow this.  I will look at it more carefully.

24          MR. YALOWITZ:  We will be guided by your Honor on

25     that.

F1lQsok4                         Eviatar – Cross

1          THE COURT:  We have all these other documents.  I

2     still don't understand why –– it should have been in the other

3     binder.  We could have resolved this.

4          MR. YALOWITZ:  Yes, and it was an oversight on my

5     part, and your Honor will be guided accordingly.

6          THE COURT:  Let's continue.

7          MR. YALOWITZ:  All right.  But just to be clear ––

8     whatever, OK.

9          THE COURT:  When you keep saying "just to be clear,"

10    it's usually you muddied the water.  Usually it was already

11    clear before you say "just to be clear."  I understand what you

12    say.  I follow you pretty good.

13         MR. YALOWITZ:  I know you do.  I follow you pretty

14    good too, sir.

15         THE COURT:  All right.  So let's get the jury in here

16    and let's get this moving.

17             (Continued on next page)

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1lQsok4                          Eviatar - Cross

1          (Jury present)

2          THE COURT:  Be seated.  Mr. Rochon, you can proceed.

3          MR. ROCHON:  Thank you, your Honor.

4          First a housekeeping matter.  I believe this morning's

5     session I used.  But did not move in Defendant's Exhibit 71,

6     72, 73 and 74.  I would move those.  Those were the

7     photographs, your Honor.

8          THE COURT:  They will be admitted into evidence.

9          MR. ROCHON:  Thank you.

10          (Defendant's Exhibits 71, 72, 73 and 74 received in

11     evidence)

12  Q.  This morning I asked you, Lieutenant Colonel Eviatar, about

13  being first contacted to be a witness in this case.  Now I

14  would like to ask you the name of the person who first

15  contacted you to be a witness in this case was a gentleman

16  named Arieh Spitzen, correct?

17  A.  Arieh Spitzen contacted me, and he generally asked me, he

18  said to me in a very general way, he spoke to me about the

19  matter.

20  Q.  And Arieh Spitzen used to be one of your commanding

21  officers in the Israeli Defense Forces, correct?

22  A.  That's right.

23  Q.  At the time that he contacted you to be a potential witness

24  in this case, he was working for a law firm that assists the

25  plaintiffs in this case, correct?

F1lQsok4                          Eviatar – Cross

```
 1   A.  I don't know how exactly to define the nature of his work.
 2   Q.  He had an affiliation of some sort with a law firm that is
 3   assisting the plaintiffs in this case, correct?
 4   A.  He had an affiliation with it.  I don't know to say exactly
 5   what the nature of that affiliation was.
 6   Q.  Understood.  And only for the sake of clarity, I'm not
 7   referring to the law firm here at the counsel table.  It's a
 8   law firm in Israel, correct?
 9   A.  That's right.
10          If I may add, please, I see the report here before me
11   that you asked me about previously, and there is an updated
12   version here -- an updated copy here as I noted to you that the
13   sentence that says "I worked for the Israel security agency," I
14   noted that it had been fixed and it was simply written as a
15   technical error.  And, in fact, the sentence that I referred to
16   as having been erased or removed is in fact removed in this
17   report.
18   Q.  Lieutenant Colonel Eviatar, I didn't ask you any question
19   about that report just now, did I?
20   A.  That's right.
21   Q.  That's just something you came back from lunch and you
22   thought you wanted to tell me and the ladies and gentlemen of
23   the jury?
24   A.  No.  I simply came back here to the witness stand, and I
25   saw here the updated and the amended report.
```

F1lQsok4                    Eviatar – Cross

1    Q.  Do you mean during lunch someone put a document up there,

2    an updated and amended report in front of you?

3    A.  I came back to my chair, and I see that here before me now.

4    Q.  And it happened to be turned to that very page?

5    A.  No.  The entire report in its entirety was here.

6    Q.  But it happened to be turned to that very page that was

7    just turned right now before you picked it up?

8    A.  No, I opened it up myself.

9    Q.  So that report wasn't there when I went to lunch, was it?

10   A.  That's right.

11   Q.  So I didn't give it to you, and none of these people gave

12   it to you, right?

13   A.  I didn't receive it from anyone, sir.

14   Q.  Do you know how it got there?

15   A.  No.

16          MR. ROCHON:  May we approach, your Honor?

17          THE COURT:  No, sir.

18   Q.  Did you talk about your testimony this morning with anyone

19   from the team of lawyers representing the plaintiffs in this

20   case?  I'll withdraw the question.  It was asked so poorly.

21   During the lunch break, did you talk to any of the individuals

22   representing the plaintiffs about your testimony?

23   A.  I did not speak with any of them.

24          MR. ROCHON:  OK.  I will come get that document, if I

25   may.

1              MR. YALOWITZ:  Objection, your Honor.

2              THE COURT:  Overruled.

3              MR. ROCHON:  I don't know where to put it.  I don't

4      know whose it is.

5              THE COURT:  Why don't you ask a question and put it

6      aside.

7      Q.  Sir, I am going to approach you with what has been marked

8      as Defendant's 75.  If you would please look at Defendant's

9      Exhibit number 75 for identification purposes.

10     A.  I see the exhibit.

11     Q.  It's a map, right?

12     A.  That's right.

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

F1L8SOK5                        Eviatar - cross

1   Q.  It's a map that includes portions of Israel as well as the

2   West Bank, correct?

3   A.  It demarcates primarily the border of the West Bank.  There

4   are no towns or places marked here in Israel.

5   Q.  OK.  What this is -- I am looking at it on the screen -- it

6   includes at the legend some colors for the three areas that are

7   in the West Bank, area A, B and C.  Do you see that code at the

8   bottom of the map?

9   A.  I see it.

10  Q.  And you testified last week about what these various areas

11  mean, correct?

12  A.  That's right.

13  Q.  Area A is the area where the Palestinian government has

14  both security control and administrative control, right?

15  A.  That's correct, sir.  I would simply like to say that the

16  map that I am holding here in my hand is a map according to the

17  Palestinians, and in order to ascertain that it is correct, as

18  an investigator I would examine it together with other maps.

19  Q.  You see that this map was produced by the Palestinian

20  Academic Society for the Study of International Affairs at the

21  bottom?

22  A.  That's right.

23  Q.  That's PASSIA, the same organization you said was a

24  reliable source of information about the Palestinian

25  government, right?

F1L8SOK5                        Eviatar - cross

1  A.  That's right.  And still, this is a document that must be

2  examined just as I examined other documents as well.

3  Q.  Sure.  So examine it for a second, and you will see that

4  the areas that are dark colored, area A, are the same cities

5  that you identified as being area A last week in your

6  testimony, right?

7  A.  Yes.

8  Q.  And area B, in the lexicon for these areas, these are the

9  areas where Israelis have security control, but the

10  Palestinians have some administrative control, right?

11  A.  That's right.

12  Q.  Area C is the area where Israel has both security and

13  administrative control, right?

14  A.  That's right.

15  Q.  Last week when you testified on January 15 you said that

16  the PA controls, for the most part, the West Bank and Gaza

17  Strip.  Do you recall so stating?

18  A.  I remember.  And what I said was that the Palestinian

19  Authority, and I reiterate that, controls more than 50 percent

20  of the Palestinian population in area A.

21      I will be more precise with your permission.  The

22  Palestinians that reside in area A are more than 50 percent of

23  the population of the entire West Bank, and the Palestinians

24  that reside in area A are all under the control of the

25  Palestinian Authority.

F1L8SOK5                              Eviatar - cross

1    Q.  In fact, sir, isn't it the case that you told the jury last

2    week that 90 percent of the Palestinians live in A and B?

3    A.  A and B together, yes.

4    Q.  So who lives in C?

5    A.  Between 100 and 150,000 Palestinians reside in area C.

6    Q.  That's not what my question was, was it?  I asked you who

7    lived there.

8              MR. YALOWITZ:  Objection.

9              THE COURT:  Sustained.

10             What is your question?  I thought he understood your

11   question, but he obviously did not.  What is your question?

12             MR. ROCHON:  Who lives in area C.

13             THE COURT:  He said 100 to 150,000 Palestinians.

14   That's not the answer to your question?

15             MR. ROCHON:  No.

16             THE COURT:  You will have to rephrase your question.

17   Q.  Some people who are not Palestinians live in area C,

18   correct?

19             MR. YALOWITZ:  Objection.

20             THE COURT:  Overruled.  You can answer.

21   A.  Those who live in area C are Palestinians.

22   Q.  Don't Israelis live now in area C in settlements?

23             MR. YALOWITZ:  Objection.

24             THE COURT:  Sustained.  Let's move on to something

25   relevant.  Mr. Rochon, let's pick this up.

F1L8SOK5                        Eviatar - cross

1    Q.   As an Israeli defense force soldier, you are responsible

2    for providing security in areas B and C, correct?

3    A.   Security responsibility was not directly in my hands.

4    Q.   The Israeli security services had responsibility for

5    security in areas B and C, correct?

6    A.   Yes.

7    Q.   Now, we have talked a little bit in the direct examination

8    about crimes that are alleged to be a struggle against the

9    occupation?

10   A.   Yes.

11   Q.   Such crimes can occur in area A, B, C, or outside the West

12   Bank, correct?

13   A.   Yes, that's true.

14   Q.   Now, the period of time -- I am going to turn to a new set

15   of exhibits.

16           MR. ROCHON:  Could you put that back up, Justin?  I'm

17   so sorry.

18   Q.   Understanding that you have not actually seen this map to

19   compare it to others, you would agree with me that it roughly

20   shows the layout of the West Bank, correct?

21   A.   The layout of the West Bank?

22   Q.   Yes.

23   A.   In principle, yes.

24           MR. ROCHON:  Move in Defendants' Exhibit 75.

25           THE COURT:  It will be admitted in evidence.

F1L8SOK5                          Eviatar – cross

 1            (Defendants' Exhibit 75 received in evidence)

 2    Q.  So when we look at the map and the portions that are dark

 3    in color, those are the ones -- I don't have a pointer.

 4            The parts that are this color, where it says area A

 5    Palestinian cities, that includes, for instance, part of

 6    Hebron, and further up Jericho, and down here Bethlehem, and

 7    further up north other cities, correct?

 8    A.  In consideration of the fact, as you said, that I have not

 9    seen this map in relation to other maps, the brownish color

10    that you pointed to is indeed area A.

11    Q.  Then this lighter color, that is area B.  I am just asking,

12    generally, does that conform to where you understand that areas

13    in area B were in the West Bank?

14    A.  I can say so, yes.

15    Q.  The other color, all the rest of the West Bank, that's C,

16    area C, right?

17    A.  Yes.

18    Q.  When there is movement by Palestinians from area A to area

19    C, that's controlled movement, correct?

20            MR. YALOWITZ:  Objection.

21            THE COURT:  Sustained.

22    Q.  Now I will go to another exhibit.  If we could go to 634,

23    please, Plaintiffs' Exhibit 634.

24            Do you recognize Plaintiffs' Exhibit 634?

25            MR. YALOWITZ:  Your Honor, may I consult with counsel

F1L8SOK5                        Eviatar - cross

```
 1   for just a moment?
 2              THE COURT:  Yes.
 3              MR. ROCHON:  Your Honor, for the record, there's two
 4   different versions of the same document.  They have the same
 5   language.  So this 634, the content is the same.
 6              THE COURT:  Don't explain it to me.  Why don't you
 7   talk to the witness and let the jury observe.
 8   Q.  Do you remember talking to Mr. Yalowitz about Plaintiffs'
 9   Exhibit 634, which was one of the reports from the United
10   States government pursuant to Title VIII of this public law
11   that is listed up there, right?
12   A.  Sir, I recall that we discussed one of the reports of the
13   United States administration.  I think, though, it may have
14   been a report that was relating to different dates.
15   Q.  OK.  Didn't you in fact identify reports numbered 634, 635
16   and 496?  And I will put all three up and you can see.
17              MR. ROCHON:  Can we do 635, please?
18   Q.  Do you see 635?
19   A.  Yes, I do.
20              MR. ROCHON:  If we can have 496.
21   Q.  You see 496?
22   A.  Yes, I do.  We spoke about 496 in my testimony.
23   Q.  OK.  You spoke about 496, but you may not recall, but all
24   three were moved during your testimony so all three are in
25   evidence.
```

1    A.  Yes.

2              MR. ROCHON:  Your Honor, may I approach?  That way I

3    will be showing him the version that was actually marked and

4    moved.

5              THE COURT:  Yes.

6    Q.  So if you would please take a look first at 634.

7              That's the report that you looked at on direct

8    examination, correct?

9              MR. YALOWITZ:  Objection.

10             THE COURT:  Overruled.  He can answer yes or no.  He

11   is the one who knows.

12   A.  We spoke in the direct examination, as I said earlier,

13   about 496.

14   Q.  That's your recollection?

15   A.  Yes.  I think we spoke about 496.

16   Q.  So just to refresh your recollection on this, if we could

17   go to page 850 of the January 20 transcript, please?

18             If we can go up to lines 2 through 8.

19             If you see there, Mr. Yalowitz showed you 496, 634,

20   635 and 1142.  And you indicated that you had all four of them?

21   A.  Yes, indeed.  The four were before me during the

22   examination, but we discussed or rather I was asked about

23   Exhibit 496.

24   Q.  Understand.  I may ask you about the others because they

25   are now in evidence.  I just wanted to make sure that you knew

F1L8SOK5                      Eviatar - cross

1     that you had actually seen them before.

2              So the period of time that was covered in these

3     reports was a very difficult time in the West Bank, correct?

4              MR. YALOWITZ:  Objection.

5              THE COURT:  Overruled.  You can answer that.

6     A.  Yes.

7     Q.  The reports that were moved in during your direct

8     examination discussed that, right?

9     A.  The reports here review or present the involvement of the

10    Palestinian Authority and the entities that belong to it.

11    Q.  Now, if we go to 634, which is the one that's up there, and

12    the overview of the reporting period, it discusses the violence

13    that was occurring there, correct?

14             Do you see that portion that says overview of the

15    reporting period, which is also highlighted on the screen?

16    A.  Yes.

17    Q.  It discusses the violence that was going on at that time,

18    correct?

19    A.  It discusses the violence in general terms without getting

20    into all the details.

21    Q.  It discusses that 114 Israelis had been killed and 394

22    Palestinians had been killed in that period, correct?

23    A.  That's what it says here, yes.

24    Q.  Then if we go to Plaintiffs' Exhibit No. 496, I am handing

25    you 496.

1          MR. ROCHON:  If you go to the same overview section

2    please, Justin.

3    Q.  It discusses the level of violence during that period,

4    correct?

5    A.  Here, too, it discusses in general terms the numbers of the

6    casualties.

7    Q.  And it indicates that during that period 179 Israelis had

8    been killed and 879 Palestinians had been killed, correct?

9          MR. YALOWITZ:  Objection.

10          THE COURT:  Overruled.  The document is in evidence.

11          MR. YALOWITZ:  It misstates the document.

12          THE COURT:  You can point that out.

13   Q.  179 Israelis were killed, and during the same period 879

14   Palestinians were killed.  That's what it says, right?

15          MR. YALOWITZ:  Your Honor, may I consult because I

16   think counsel is reading from something that is actually not in

17   evidence.

18          THE COURT:  You want to show him the exhibit that

19   you're using?

20          MR. ROCHON:  I am reading it incorrectly.  It's 679,

21   not 879.

22          THE COURT:  Let's back up.  State the question again.

23          MR. ROCHON:  I apologize.

24   Q.  So I will back up.  During that period, 179 Israelis were

25   killed and 679 Palestinians were killed, correct?

F1L8SOK5                          Eviatar – cross

1    A.  It says here 179 Israelis, including 151 civilians, were

2    killed and 679 Palestinians were killed.

3    Q.  Thank you.

4            It was during this period that the IDF had the

5    operation that yielded the documents that you testified about

6    on direct examination that were allegedly recovered from

7    government offices, correct?

8    A.  Can you repeat the question, please?

9    Q.  It was during this period, the period of the violence that

10   we have been talking about, that the incursion occurred where

11   the IDF recovered the documents that you testified about on

12   direct examination, right?

13           MR. YALOWITZ:  Object to the form, your Honor.

14           THE COURT:  Overruled.  He can answer it.

15   A.  Just a moment, please.  I would like to read that section

16   again.

17   Q.  Which section?

18   A.  The section that I see here on the screen.

19   Q.  The section that says between December 16 and June 15,

20   2002?

21   A.  Yes.  Yes.

22   Q.  Please read it.

23   A.  OK.

24   Q.  My question was, it was during this time frame that IDF

25   went in and allegedly recovered those documents that you

F1L8SOK5                         Eviatar - cross

1   testified about with Mr. Yalowitz, right?

2   A.  That's right.

3   Q.  If we could go to 634, please.

4        Let me highlight for you a portion of that same U.S.

5   government report, number 634.

6        You see in that report from the U.S. government it

7   indicates -- it doesn't indicate, it states, and I quote:

8        "The PA on a number of occasions took action against

9   Islamic militant groups that rejected his calls for a

10  ceasefire.  Violent clashes between PA security forces and

11  Hamas supporters in September resulted in -- may have resulted

12  in several deaths.  There was evidence that at times during the

13  reporting period PA security forces in Jericho and Hebron acted

14  effectively to quell violence.  Following the assassination of

15  Tourism Minister Rehavam Zeevi on October 17, the PA announced

16  the closure of the military wings of a number of rejectionist

17  groups.  The PFLP, Hamas and the Palestinian Islamic Jihad

18  sharply criticized these moves and related arrests.  On

19  December 12, the PA condemned an attack near the Immanuel

20  settlement on a bus that killed seven Israelis.  The Al Aqsa

21  Martyrs Brigade carried out the attack."

22        Did I read that correctly?

23  A.  You read it correctly, but it's important to state, sir,

24  that we have to look at the picture in its entirety.  And it's

25  true that there are cases in which the Palestinian Authority

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1L8SOK5                         Eviatar - cross

arrested or handled members of Hamas, or as it states here, but
we have to look at everything that the Palestinian Authority
did not do, and that is much more than what it did do.

            And I would further state that I do not examine only
the declarations of the Palestinian Authority as it appears
here with respect to the closure of military wings.  I examine
what it actually did.  And, in actuality, not only did it
facilitate and allow the continued activity of the military
wings during the period of time that followed this report, but
it also assisted and supported the continuation of its
terrorist operations.  And I, as an expert, as an investigator
of Palestinian affairs, that is the perspective with which I
examine these matters.

Q.  I understand your views.  You understand these are the
views of the United States, as evidenced in this report, right?

A.  Sir, I spoke about the facts, and I only speak about the
facts.

Q.  My question was, you understand that what you're reading up
there is a report from the United States, right?

A.  That's right.

Q.  Can we go to 496, please?

            This report covers the period from December 16, 2001,
to June 15, 2002, and is again a report of the United States
Department of State in evidence as 496.

            MR. ROCHON:  I was directed to the wrong part.

F1L8SOK5                          Eviatar - cross

1    Q.  So what the report indicates here is, and I quote,

2    "Following the March and April IDF operations in the West Bank,

3    the PA security forces' ability to resume regular security

4    cooperation is significantly diminished.  Many PA security

5    facilities and much of their equipment and weaponry have been

6    destroyed or confiscated.  Hundreds of PA forces were arrested

7    during the operations, and many remained in IDF custody during

8    the reporting period."  Do you see that?

9            You agree that that's what it says, right?

10   A.  It's true that that's what it says.

11   Q.  All right.  It is true that, in fact, after the IDF

12   operations in the West Bank that the PA security forces'

13   ability to resume regular security cooperation was diminished,

14   significantly diminished, correct?

15   A.  Sir, I do not agree with the conclusions that appear in

16   this section.

17   Q.  All right.  It is the case that the IDF had a different

18   view of what was going on there than the United States

19   government?

20            MR. YALOWITZ:  Objection.

21            THE COURT:  Sustained as to form.

22   Q.  If we could go also in 496, and that's what we have on the

23   screen, in the report it goes on to say, "During these

24   incursions, the PA security forces in the West Bank were

25   severely damaged, both in manpower and equipment.  The

1   headquarters of the PA's principal security service in the West

2   Bank was destroyed by the IDF."

3           That's what it says, right?

4   A.  Sir, that's what it says here, but with respect to this

5   section as well, just as with the other sections that you

6   presented, I do not accept the conclusions that appear here.

7   We saw many situations, during which in the mentioned period of

8   time, when the Palestinian Authority wanted to make arrests and

9   handle things and handle those terrorist cells, it was capable

10  of doing so and nobody got in its way.  What we saw, for

11  example, what I stated here, which contradict the conclusions

12  that appear here, for example, the method of the revolving

13  door.  The revolving door proves, as an example, that when the

14  Palestinian Authority wanted to do so, or was forced to do so,

15  to arrest wanted persons, its security forces arrested those

16  same wanted persons, or some of them we should say, but

17  afterwards the Palestinian Authority released them.  And,

18  therefore, I do not accept the conclusions that appear in this

19  report.

20  Q.  Sir, do you agree that your views and the opinions

21  expressed to this jury are biased as a result of your work in

22  the IDF and in connection with the work that the IDF does in

23  the West Bank?

24  A.  Sir, I absolutely do not agree with your statement.

25  Everything that I have presented here was a matter of fact

1  representations, meaning exhibits, the same documents that

2  appeared here, original exhibits.  I have not expressed here,

3  not an opinion or a point of view, but rather conclusions that

4  are based upon fact as an investigator.

5  Q.  So I think we will move to some of the exhibits that the

6  IDF created.  Let's start with number 826 on page 9.

7          Do you remember 826 that was moved in during your

8  testimony?

9  A.  Yes, sir.

10          MR. ROCHON:  If we can go to page 9, subparagraph C,

11  Justin, and if you wouldn't mind highlighting that paragraph.

12  Q.  Just so we are clear, this is a report from the IDF, right?

13  A.  That's right.

14  Q.  Even though the national language of Israel is Hebrew,

15  these reports were produced in English, correct?

16  A.  These reports were written in Hebrew, and when they were

17  made public they were translated into English.

18  Q.  Wasn't one of the reasons for the creation of these reports

19  to influence public opinion?

20          MR. YALOWITZ:  Objection.

21          THE COURT:  Overruled.  He can answer.

22  A.  I think that these reports simply present what was

23  confiscated at the headquarters of the Palestinian Authority,

24  as was presented here during the course of my testimony.

25  Q.  All right.  Let's see what the IDF says here in paragraph

1  C.  What it says is that "the existence of a strong terror

2  infrastructure which was built by the PIJ and Hamas."

3       Let me stop there.  PIJ is Palestinian Islamic Jihad,

4  right?

5  A.  That's correct.

6  Q.  "Which depends, amongst other things, on intensive use of

7  its financial resources.  According to the documents, the large

8  amounts of money flowing to Jenin from Damascus (see below)

9  enable PIJ and Hamas to recruit to their ranks youths with

10  motivation, provide them with a monthly salary, and solve their

11  financial problems (while posing a challenge to Fatah, which

12  does not have such large financial resources, and whose

13  members, as reported in one document, receive financial aid

14  from PIJ).  The strength of their financial sources enabled

15  these organizations, *inter alia*, to penetrate the ranks of the

16  Palestinian intelligence apparatuses, bribe senior commanders

17  of the apparatuses in the Jenin area, and receive assistance

18  from them in the operational activity and in protection against

19  expected PA moves."

20       Did I read it right?

21  A.  You read it right.

22  Q.  That last sentence says that they are getting assistance in

23  protection against expected PA moves, right?

24  A.  Sir, what is presented here is one excerpt, which you read

25  perfectly as it's stated here, which is excerpted from an

1    entire report, which presents the assistance and involvement of

2    the Palestinian Authority, including officers in its security

3    apparatuses in Jenin, in assistance to free terrorist

4    activities of those same Islamic organizations, both in

5    collaboration with officers in the Palestinian Authority.  And

6    a further statement about the finances that is mentioned here,

7    every organization, as I understand it, everywhere in the

8    world, including within the Palestinian Authority, always wants

9    more money, and we must bear in mind that money motivates

10   terror.

11   Q.  In this instance, what it's talking about is money coming

12   from Damascus, which is in the country of Syria, correct?

13   A.  From Damascus to the Islamic Jihad.

14   Q.  Now, sir, you will agree with me at least to this, that

15   governing in the West Bank during this period and trying to

16   control the various forces was extremely difficult, wasn't it?

17   A.  To what side are you referring?

18   Q.  Well, I am not talking about the IDF.  I am saying that if

19   you have got Hamas and the PIJ and Damascus and Hamas

20   shootouts, that it would have been difficult to govern in the

21   West Bank by the PA, right?

22   A.  I don't know what that means "difficult."  I know that the

23   Palestinian government was given the appropriate resources in

24   order to have control as a single governing force and not to

25   enable terror from any party, even one that may be considered

1    opposition to it.

2    Q.   Do you think at all, would you admit at all, that the fact

3    of the dispute between Israel and Palestine might have caused

4    individuals to act on their own to commit terrorist acts?

5    Would you agree that's possible?

6    A.   This theoretical possibility exists.  I didn't investigate

7    individuals.  I look and investigate how organizations

8    operated, how movements operated, certainly those that were

9    connected with the government.  And those organizations and

10   movements that carried out terrorist activities, as I reviewed

11   here in my testimony, did not act as individuals on their own

12   account.

13   Q.   The IDF reports that you and Mr. Yalowitz talked about and

14   were moved in during your direct examination -- 826, 626, 829,

15   631 -- out of all those reports, the actual supposed documents

16   that were recovered, he only showed you two or three, right?

17   A.   Sir, I would like to emphasize here before the jury that

18   the documents that were presented here, as you yourself noted,

19   were just individual examples which were disseminated by that

20   IDF unit openly, to the public, in English and in Hebrew, but

21   these were just samples from many, many documents and

22   intelligence materials, which were not presented here.

23        And we must bear in mind one more thing that I will

24   say.  These are only the examples that the IDF confiscated, and

25   dealt with them and disseminated them, out of dozens or

F1L8SOK5                    Eviatar - cross

1  hundreds of boxes of materials, original materials that were

2  captured in the Palestinian command posts and which have not

3  been dealt with to this day.

4  Q.  And none of the examples that were offered in your direct

5  examination go to any of the individuals that were convicted in

6  these cases that are on trial here, correct?

7  A.  I would like to reiterate, sir, that the precise details of

8  the terror attacks that will be discussed here I am not

9  familiar with.  I can testify to all the things that I

10  testified up till now, and I am willing to answer any question

11  on that that you may have.

12  Q.  None of the documents that you were shown by Mr. Yalowitz

13  involved any of the individuals who were convicted in the

14  Hebrew University case, correct?

15          MR. YALOWITZ:  Object to form.

16          THE COURT:  Overruled.  He can answer it if he

17  understands.

18  A.  Could you repeat the question, please?

19  Q.  Yesterday you were asked questions about people convicted

20  in the Hebrew University incident, yes?

21  A.  Yes.

22  Q.  Yesterday and in earlier days Mr. Yalowitz showed you some

23  of the supposed documents the Israelis actually recovered, not

24  the reports but the documents they actually recovered, yes?

25  A.  Correct.

1    Q.   None of those documents that he showed you related to the

2    people who were convicted in the Hebrew University case,

3    correct?

4    A.   I don't agree.  Let me give you an example.  The documents

5    presented the involvement of Marwan Barghouti, the leader of

6    Fatah in the West Bank, with the authorization and the

7    allocation of terror funds for example.

8    Q.   Hebrew University was a Hamas case, right?  Is that right?

9    A.   The terror bombing in the Hebrew University was carried out

10   physically by a Hamas cell, but as we saw here in evidence that

11   was presented, that cell, or at least part of it, received

12   assistance from senior members of the Palestinian Authority.

13   Q.   Who in that unit received assistance from senior members of

14   the Palestinian Authority according to the evidence and the IDF

15   documents, which one?

16   A.   Mosaab Yousef said in his testimony that Marwan Barghouti

17   received in his hands from Abdullah Barghouti.

18   Q.   You know, sir, as you sit here today, that Marwan Barghouti

19   was not convicted of the Hebrew University bombing, don't you?

20   A.   Correct.

21   Q.   You know I was asking you questions about the documents

22   recovered by the IDF, right?

23   A.   Correct.

24   Q.   And none of those documents relate to the Hebrew University

25   case or its commission, do they?

F1L8SOK5                     Eviatar - cross

1   A.  The documents do not discuss the bombing at the university.

2   But you asked me earlier, sir, about people that appear in

3   these documents and who are connected to terror, and that's

4   what I answered you.

5   Q.  No, sir.  I asked you about people connected to the Hebrew

6   University incident, didn't I?

7            MR. YALOWITZ:  Object to the form.

8            THE COURT:  Overruled.  He can answer.

9   A.  Yes.  And I answered about Marwan Barghouti, who was also

10  mentioned in Mosaab Yousef's testimony and is also mentioned in

11  the indictment of Ahmed Barghouti.

12  Q.  So you remember the indictment of Ahmed Barghouti?

13  A.  Yes.  It was presented here.

14  Q.  And he too was not convicted in the Hebrew University

15  bombing, correct?

16  A.  Correct.

17           MR. ROCHON:  I think I am done with Lieutenant Colonel

18  Eviatar.  May I check with my colleagues, your Honor?

19           THE COURT:  Yes.

20           MR. ROCHON:  I actually did forget one or two things.

21  Q.  The martyrs society, you mentioned that briefly the other

22  day?

23  A.  Yes, I recall.

24  Q.  The actual name of it is the Institute for the Care of

25  Martyrs Families and the Injured?

F1L8SOK5                              Eviatar – cross

A.   The actual name is the Foundation for the Welfare of the

Families of the Martyrs and the Injured.

Q.   Eligibility for such payments comes to anyone injured as a

result of the occupation, right?

A.   Who is injured in the context of his struggle against the

occupation.

          MR. ROCHON:  I think that's all I have.

A.   That's the Palestinian definition.

          MR. ROCHON:  Thank you.

          THE COURT:  Do you want to take a break?

          MR. YALOWITZ:  As you wish.  I am happy to proceed

right now or take a few moments.

          THE COURT:  Do you think it will be longer than five

or ten minutes?

          MR. YALOWITZ:  Redirect may be half an hour.

          THE COURT:  Then let's take a break.

          Ladies and gentlemen, let's take a break.  Don't

discuss the case, keep an open mind, and I will see you in ten

minutes.

          (Jury exits courtroom)

          (Recess)

F11Qsok6

1              (Jury not present)

2              THE COURT:  Before we bring out the jury, I want to

3      take some of the other issues quickly.  I want to make a list.

4      I am going to overrule the general objection to what we will

5      characterize as police magazines, although I am not going to

6      allow all of it.  I think if there is some genuine factual

7      dispute as to whether or not these are police magazines and

8      these are statements of the defendant or published by

9      defendant, then I think that is for the jury to determine.  I

10     find a minimum foundation is laid, given the nature of the

11     magazine and how they're published.  I find a lot of them were

12     not relevant and more prejudicial than probative.  A lot of

13     what I've cut out has been certain religious stuff from either

14     side quoting from the Koran or Bible or wherever it's quoted

15     from and comments that were made that have to do with religion.

16     I think there is -- I won't call it a leap, but I think there

17     is a link that is part of the plaintiff's burden to connect

18     what they claim are language inciting violence, what violence

19     they say it incites, and how does it incite the violence that

20     are at issue in this case.  I am not going to address that now.

21     These are the ones I am going to rule on.

22              The only thing is I saw references in citations of

23     relevant portions on all of the exhibits except Exhibit 937.

24     It was listed, but there was nothing in your letter,

25     Mr. Yalowitz, that told me what language, as you cited for all

F11Qsok6

1    the others, what language in 937 that you thought was relevant

2    to be admitted.  Was that deliberate?

3            MR. YALOWITZ:  Unlikely, but let me do this:  Let's

4    hear what the Court's balls and strikes are on the other ones.

5    If there is something in -- which one was it, your Honor?

6            THE COURT:  937.

7            MR. YALOWITZ:  If there is something in 937 that I

8    think I need, then I will give you a call.

9            THE COURT:  You will let me know.

10           MR. YALOWITZ:  If I think I need it and it's

11   consistent with your other rulings, I'll let you know.  If I

12   think I need it and it's outside the lines of what your rulings

13   are, I'll be guided by that ruling and it will be understood I

14   offered it, but that based on the other rulings, I'm not going

15   to re-offer it.

16           THE COURT:  We can discuss in detail later, but let me

17   give you my list as I have it as it existed in plaintiff's

18   letter.

19           Exhibit 201 is out.  Exhibit 202 is out.  Exhibit 204

20   is out.  175 is in.  964 is out.  198 is in.  178 is in.  199

21   is out.  177 is out.  179 is out.  200 is in.  936 is in.  203

22   is out.  935 is in.  949 is in.  176 is out.  965 is in.  966

23   is out.  185 is in.  176 is out.  And my default position,

24   because I've looked at it and I can't find, nor it hasn't been

25   identified at this point what the relevant portion would be,

F1lQsok6

1    I'm going to rule at this point that 937 is out; but if you

2    tell me there is something there -- but, quite frankly, in my

3    review of 937, again, I think it is a two-edged sword because I

4    think some of the statements in there are not particularly

5    complimentary of plaintiffs with regard to the issues that are

6    raised there and are not particularly -- I'll just put it that

7    way.

8         You can look at it.  That's an assessment the

9    plaintiff has to make whether or not you feel its probative

10   value is greater than the danger the jury might use other

11   portions against you.

12        MR. YALOWITZ:  I'll assume it's out unless there's

13   something we really think we need in it, we'll make that

14   assessment; but if you don't hear from us, you should assume

15   it's been withdrawn.

16        THE COURT:  I can give you some reasons specifically I

17   will just give you an example of 201 is the first one on here,

18   talking about liquidating the Jews, describing them as a

19   chronic parasite disease, cutting out some or all of their

20   organs and destroying its function.  I think that that is a bit

21   over the top to simply be evidence that it is some signal or

22   indication that they intend to do terrorist acts or that they

23   intend to do the terrorist acts involved in this case.  I think

24   it is highly inflammatory and prejudicial and the undue

25   prejudice outweighs whatever probative value that one

F1lQsok6

1    particular statement by --

2           MR. YALOWITZ:  So with regard to 201, which I happen

3    to know that one, because I was thinking about showing it in

4    opening, as your Honor may recall, but which we pulled back on.

5    The argument the defendant is making here --

6           THE COURT:  Let's not go into details of it now.  I

7    want to give you a chance to finish this witness.

8           MR. YALOWITZ:  I really would like to talk about that.

9    If we could do it after we dismiss the jury, I appreciate it.

10          THE COURT:  We could do it after or if you want

11   further time to look back at the ones I gave you and make a

12   decision of which ones you think are compelling.  You can raise

13   that before we get to the witness.

14          One other thing that I want to address now, so you can

15   go forward efficiently, 553, that exhibit --

16          MR. YALOWITZ:  Right.

17          THE COURT:  -- as I say, I don't know why we're

18   dealing with it now.  I have read that exhibit.  I am going to

19   rule this exhibit is inadmissible, and I will give you the

20   quick reason.  I want the record to be clear.

21          MR. YALOWITZ:  I was going to say I'll withdraw it and

22   we can get the jury in --

23          THE COURT:  If you withdraw, I don't have rule.  I

24   wish you would withdraw it before I ruled, but I want the

25   record to be clear because, remember, look, I know lawyers --

F1lQsok6

1    as I say, all the nice things the lawyers say about me during

2    about how good a trial they get all go out the window when one

3    side loses and they want to tell the Circuit what a stupid

4    judge I was and all the mistakes I made.

5         I want the record to be clear as to why I am doing

6    things.  In this case, the conclusion this report draws is not

7    supported by the documents.  That is the main reason.  It is

8    not the only reason, but it's the main reason.  The documents

9    simply say there is budgeted money going from the PA to Fatah.

10   The conclusion that in this manner, the PA created an

11   infrastructure of terror activists in dozens of local branches,

12   and then to further support that by what they call a reasonable

13   assumption, it is reasonable to assume that during the course

14   of the confrontation with Israel, the scope of the financing

15   has increased due to the growing expenditures of Fatah and

16   Tanzim whose activists perpetrated a considerable number of

17   terrorists attacks.  That is not supported by any of the

18   documents that are attached to this.  The documents are just

19   financial documents.

20        MR. YALOWITZ:  I understand the distinction the Court

21   is drawing.  I don't have a problem with it.  I am not trying

22   to be sycophantic.  There are other rulings I do have a problem

23   with, and we have discussed them, but I don't have a problem

24   with that.

25        THE COURT:  That is my position.  So going forward to

F1lQsok6

1    the next witness, we can address it further if we need to by

2    either side, but otherwise that's my ruling, and you should be

3    prepared to examine the witness on that basis.

4            Let's get the jury in and finish up with this witness.

5        (Continued on next page)

F1lQsok6

```
 1              (Jury present)
 2              THE COURT:  I apologize for the weather indoors.  I
 3    know it's either too hot or too cold.  We have been trying to
 4    adjust it all week.  I guarantee you we are paying attention to
 5    it.
 6              Mr. Yalowitz, any redirect?
 7              MR. YALOWITZ:  Just a little bit, your Honor.  Thank
 8    you.
 9    REDIRECT EXAMINATION
10    BY MR. YALOWITZ:
11    Q.  Mr. Eviatar, during your cross-examination you were asked
12    some questions about Roni Shaked.  Do you recall that line of
13    questioning?
14    A.  Yes.
15    Q.  In particular, do you recall being asked about the fact
16    that Roni Shaked did a draft of what ultimately became your
17    report?
18    A.  I remember that.
19    Q.  Do you recall the circumstances that caused Mr. Shaked to
20    withdraw as an expert in this case?
21              MR. ROCHON:  Objection, your Honor.
22              THE COURT:  Is this really a controversial issue?
23              MR. ROCHON:  Yes.  Well, not controversial.
24    Moderately controversial.  Not the end of the world.  I'd like
25    it sustained more than overruled, but I'll defer to the Court.
```

F1lQsok6                        Eviatar - Redirect

1              THE COURT:  I don't know what he's going to say.  Come

2      on just quickly.

3              (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1              (At the sidebar)

 2              THE COURT:  I just don't know.

 3              MR. ROCHON:  I think he had some kind of health

 4      problem, or his spouse did.

 5              MR. YALOWITZ:  Shaked's wife had cancer, so he

 6      withdrew.  We got permission from Judge Ellis to substitute him

 7      in.  On cross Mr. Rochon said --

 8              THE COURT:  I just want to know how much you want out

 9      of him.

10              MR. YALOWITZ:  I want three or four questions just to

11      establish --

12              THE COURT:  How much of -- not questions.  You don't

13      want questions.  You want answers.  Tell me what you want him

14      to say.

15              MR. YALOWITZ:  That Shaked's son and wife both had

16      grave health illnesses.  He withdrew.  We received permission

17      from the Court to make the late substitution.  I think it's

18      fair.  He's opened the door.

19              MR. ROCHON:  My point of the cross was when they got a

20      report and then whether it was his, I didn't suggest anything

21      untoward about Mr. Shaked.

22              THE COURT:  He's got the right to explain why he came

23      in at the last minute.  Obviously, you raised issues about him

24      adopting this other report.  He didn't do it because they

25      kicked the other guy out and didn't like what he said.

F1lQsok6                    Eviatar - Redirect

1           Obviously, he did it because the guy had a health

2      problem, but I don't think we need much more detail than that.

3      I don't think we need four questions.  I only think you need

4      one question.  If he answers this question, I don't know why

5      you need more.

6           MR. YALOWITZ:  I just want to establish we got

7      permission from the court to substitute.

8           THE COURT:  I don't know why that's relevant.

9           MR. YALOWITZ:  Because it's been suggested there was

10     something improper about substituting him in.

11          MR. ROCHON:  I think he wants to lead him and say did

12     Mr. Shaked have a family health emergency that required him to

13     no longer be an expert in the case.  I have no problem with

14     that.  That gets him where he needs to be.

15          MR. YALOWITZ:  I don't mind the Court instructing the

16     jury that we had permission to make the substitution.

17          THE COURT:  How does he know that?

18          MR. YALOWITZ:  I'm saying, you could --

19          THE COURT:  How does he know?  You're asking him; not

20     me.  This is your examination.

21          MR. ROCHON:  I am willing to give him the leading

22     question so he could get it all out.  He had a family health

23     issue.  I don't discredit whether he had a family health issue

24     that required he no longer be a witness.

25          THE COURT:  I will let you go into it a little bit.

F1lQsok6                         Eviatar – Redirect

1              MR. YALOWITZ:  Let me just do a couple questions on

2     it.

3              THE COURT:  I would stay away from the court stuff.

4     He doesn't know anything about what goes on in court, what you

5     were allowed or weren't allowed.  All he can say is I got hired

6     because the other guy had an illness and he had to be

7     substituted.  That's it.

8              MR. YALOWITZ:  Understood.  We'll do it that way.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1lQsok6                              Eviatar - Redirect

1             (In open court)

2             THE COURT:  You can continue.

3    BY MR. YALOWITZ:

4    Q.  Mr. Eviatar, are you aware of the circumstances that caused

5    Mr. Shaked to withdraw as an expert in this case?

6    A.  I am definitely aware of them.

7    Q.  Would you very briefly, just very briefly, explain them to

8    the jury.

9    A.  This refers to very tragic family circumstances.

10   Q.  Did the family have some health problems that required him

11   to attend to that business instead of continuing on with us?

12   A.  Definitely.

13   Q.  In coming in at the last minute like that, did you have the

14   opportunity to carefully review the report --

15             MR. ROCHON:  Objection.  Leading.

16             THE COURT:  No, I'll let him ask this question.

17   A.  Of course I did.  I reviewed the entire thing very

18   meticulously.

19   Q.  And did you make changes?

20   A.  Yes, I made changes, throughout the entire expert's

21   opinion.

22   Q.  And the ultimate work product, do you stand behind it?

23   A.  I stand behind the entire expert report from the first word

24   until the very last word.

25   Q.  Thank you.

F1lQsok6                        Eviatar - Redirect

1            Do you remember being asked about the number of

2    security prisoners in jail?

3    A.  Yes, I remember that.

4    Q.  Did you have an estimate based on your experience and

5    research of the number of prisoners who are in jail as a result

6    of those struggle-against-the-occupation crimes?

7    A.  Yes, I do have such an estimate.

8    Q.  What is it?

9    A.  It's based upon information that's public record.  In the

10   most recent period of time, or lately, one could say that the

11   figures, the numbers of Palestinian prisoners who meet that

12   definition ranges between 4,000 and 4,000 and a bit.

13   Q.  Of the 4,000 or so, how many are employees of the PA

14   security apparatus in your estimation?

15           MR. ROCHON:  Objection.  Scope.

16           THE COURT:  No, overruled.  He can answer.

17   A.  According to declarations of senior members of the

18   Palestinian Authority, this refers to approximately 700 members

19   of the security apparatuses.

20   Q.  Do you have an opinion on whether those individuals, that

21   700 figure, are individuals who were accused of light crimes

22   like throwing rocks?

23           MR. ROCHON:  Objection, your Honor.

24           THE COURT:  Sustained as to form.

25   Q.  Of the 700, is it your view that -- let me strike that and

F1lQsok6                        Eviatar – Redirect

1    try it again.

2              Do you have a view on the nature of the crimes the 700

3    committed?

4              MR. ROCHON:  Objection, your Honor.

5              THE COURT:  Overruled.  You asked him about it.

6    A.  Yes, I do.

7    Q.  What is it?

8    A.  Most of them, perhaps even the overwhelming majority of

9    them, of this group of people, are incarcerated as the result

10   of these people being involved in acts of terror.

11             MR. ROCHON:  Objection, your Honor.

12             THE COURT:  Overruled.  You opened the door up.  You

13   can cover it on recross.

14   Q.  Do you recall Mr. Rochon asking you some questions about

15   increases in salary for security prisoners from the PA around

16   the 2011 time period?

17   A.  Yes.

18   Q.  What, if anything, did those prisoners do to earn that

19   raise?

20   A.  They did nothing.  They simply sat in prison.

21   Q.  Do you recall Mr. Rochon asking you a line of questions

22   about the Red Cross?

23   A.  Yes.

24   Q.  What I would like to do is show you a Red Cross

25   certificate.  Have you seen those in the documents in your

F1lQsok6                      Eviatar - Redirect

1  binders?

2  A.  Yes.

3          MR. ROCHON:  Which exhibit is this?

4          MR. YALOWITZ:  Let me see if I can bring it up.  Let

5  me turn to Exhibit 86 which is a prisoner file of Muhammad

6  Odeh.  I apologize, your Honor.

7  Q.  I put on the screen a Red Cross certificate from Exhibit 86

8  which is the individual that Mr. Rochon was asking you about.

9  Have you seen documents like this before?

10  A.  Of course I have.  I've seen many such documents.

11  Q.  Is there anything in this Red Cross certificate that says

12  what the reason is why the individual is being held in prison?

13  A.  Just a moment, please.

14  Q.  Would you prefer the Arabic?

15  A.  No, English is OK.  No reason whatsoever appears there for

16  the detention or the imprisonment.

17  Q.  Thank you.

18          Let's see if with Mr. Kelly's help we can switch from

19  the Elmo to our computer system and take a look at Exhibit 512.

20  In particular, I would like to take you to the check list which

21  I think is in Article 10.  Could we highlight for the jury item

22  number 2, the charge sheet issued by the Israeli military

23  prosecutor.  Is that charging sheet a document that is required

24  for the evaluation by the ministry of prisoners whether they've

25  committed a struggle-against-the-occupation crime?

F11Qsok6                           Eviatar - Redirect

1    A.   Yes.

2    Q.   As between the Red Cross document and the indictment that

3    they get from the prosecutor, which one tells them what kind of

4    crime they're in jail for?

5    A.   The document from the military prosecution itemizes the

6    charges.

7    Q.   Let's take a look at Article 6 of that law.  I want to

8    focus your attention on an item there, which I may have written

9    it down incorrectly.  I'm not sure.  Could you take a moment to

10   look at this grid from Article 6 of the prisoner's law.

11   A.   Yes.

12   Q.   What is going on with this grid?

13   A.   Here the amounts of money are itemized, amounts of money in

14   U.S. dollars, which the released prisoners will receive

15   immediately upon their release from prison.  The table provides

16   the figures on the basis of how many years you were

17   incarcerated.  The longer the period of time that you sat in

18   prison, the amount of money that you will receive upon your

19   release will be higher.

20   Q.   You get that money even if you are wealthy?

21   A.   According to this section, there are no limitations.

22   Q.   Thank you.

23        Do you recall Mr. Rochon asking you some questions

24   about the translation of Exhibit 963?

25   A.   I don't see the exhibit.

F1lQsok6                    Eviatar – Redirect

1    Q.  Now do you see it?

2    A.  Yes.

3    Q.  He was asking about that translation of the word warrior

4    brothers.

5    A.  That's right.

6    Q.  Did you do this translation?

7    A.  No, I did not.

8    Q.  Do you know who did?

9    A.  This document was translated by a professional, as it says

10   here, named Yaniv Berman.

11   Q.  Do you think that the translation in the context of this

12   document is a fair translation?

13   A.  Yes.

14   Q.  Thank you.  Now, do you recall Mr. Rochon asking you a line

15   of questions about the ministers in the PLO and the PA who are

16   not members of Fatah?

17   A.  Yes.

18   Q.  Am I remembering correctly that he identified the ministry

19   of tourism and person in charge of women's affairs and public

20   works as non-Fatah members?

21            MR. ROCHON:  Objection.  Leading.

22            THE COURT:  Overruled.  You can answer the question.

23   A.  Yes.  That's how I remember it.

24   Q.  He identified some ministers without portfolio as non-Fatah

25   members?

F11Qsok6                         Eviatar - Redirect

 1              MR. ROCHON:  Objection.

 2              THE COURT:  Overruled.  You can answer.

 3   A.  I don't think so.

 4   Q.  Well, let me take an example.  The ministry of tourism, do

 5   they issue guns to the employees of the ministry of tourism?

 6   A.  Not at all.

 7   Q.  Now, are you aware of any -- when Mr. Rochon was going

 8   through that exercise with you, did he identify any ministers

 9   or people in charge of the security forces who were not members

10   of Fatah?

11   A.  No.

12   Q.  Are you aware of any leaders of the security forces who

13   were disloyal to Arafat?

14              MR. ROCHON:  Objection.

15              THE COURT:  Sustained.

16   Q.  Are you aware of any members of the security forces who

17   were not members of Fatah?

18   A.  I don't know of any.

19   Q.  Now, Mr. Rochon showed you some photographs during your

20   cross.  Do you recall that?

21   A.  Yes.

22   Q.  I would like to show you one myself that we marked for

23   identification as 1148.  I just need a box top.  Are you

24   familiar with that photograph?

25   A.  Definitely.

F1lQsok6                          Eviatar - Redirect

1   Q.  Who is it?

2   A.  It is Yasser Arafat holding a picture of Marwan Barghouti.

3              MR. YALOWITZ:  Plaintiffs move 1148 in evidence.

4              THE COURT:  It will be admitted.

5              MR. ROCHON:  Subject prior, your Honor.

6              THE COURT:  Yes, it will be admitted.

7              (Plaintiff's Exhibit 1148 received in evidence)

8   Q.  Is that the same Marwan Barghouti we have been discussing

9   the last few days?

10  A.  Exactly the same one.

11             MR. YALOWITZ:  I don't have anything further on

12  redirect, your Honor.

13             THE COURT:  Anything further on recross?

14             MR. ROCHON:  I have one area.

15  RECROSS EXAMINATION

16  BY MR. ROCHON:

17  Q.  Sir, you said just now to Mr. Yalowitz that there were 700

18  security officers that were incarcerated in Israeli jails as of

19  now, right?

20  A.  I mean security people.

21  Q.  From the security services of some sort?

22  A.  Yes.

23  Q.  Then you said that most of them, perhaps overwhelmingly,

24  that most them were involved in terror?

25  A.  Yes.

F11Qsok6                    Eviatar - Recross

1    Q.  What is your source for that claim?

2    A.  My authorized source, first of all, is a professional

3    summary which was written by the Israel Security Agency which

4    is the entity in Israel that is authorized in this area.

5    Q.  Go ahead.

6    A.  The second source that I used for my answer is the

7    cooperation -- professional cooperation and affinity that I

8    have with the Israeli prison service which is the body that is

9    holding those prisoners.

10   Q.  So if I understand your answer correctly, it is from the

11   Israeli prison and then the Israeli government?

12   A.  That is regarding my estimate or the estimate that most of

13   them were involved in terror.

14   Q.  Your source is not from the United States?

15   A.  No.

16   Q.  Your source is not from the Palestinian Authority?

17   A.  No.

18   Q.  Your source is not from the international committee of the

19   Red Cross that certifies the incarceration?

20          MR. YALOWITZ:  Objection.

21          THE COURT:  Overruled.

22   A.  No.

23   Q.  And your source is not from review of the convictions of

24   those 700 people?

25   A.  That's correct.

1                 MR. ROCHON:  Nothing else.

2                 THE COURT:  Any further questions, Mr. Yalowitz?

3                 MR. YALOWITZ:  No, your Honor.

4                 THE COURT:  Thank you, sir.  You can step down.

5                 (Witness excused)

6                 THE COURT:  Would it be convenient to at least

7       introduce your next witness and go for ten or 15 minutes?

8                 MR. YALOWITZ:  We are ready to go.  The witness is

9       here.  Why don't we get him called.

10                Plaintiffs call Israel Shrenzel.

11                Your Honor, may I consult with the interpreters for a

12      moment?

13                THE COURT:  Sure.

14                MR. ROCHON:  I don't know what we're doing.

15                THE COURT:  You can come up too if you want.

16                MR. YALOWITZ:  Come up too.

17                THE COURT:  I don't think there is any mystery.

18                (Off the record)

19                THE COURT:  Mr. Yalowitz, let's do this:  My

20      understanding from overhearing your conversation is this

21      witness will probably testify primarily, if not completely, in

22      English.  Is that right, Mr. Yalowitz?

23                MR. YALOWITZ:  I'm sorry, your Honor.

24                THE COURT:  The witness will testify primarily, if not

25      completely, in English.

F11Qsok6                    Eviatar - Recross

 1              MR. YALOWITZ:  Correct.

 2              THE COURT:  But you would like the interpreters to

 3    stand by because you may want something interpreted if he

 4    doesn't understand English.

 5              MR. YALOWITZ:  Right.  English is not his first

 6    language.

 7              THE COURT:  That's fine.  We will swear him in in

 8    English and have him testify in English.  Anytime he wants to

 9    consult with the interpreter to interpret for him or wants to

10    speak in another language, he can.

11              MR. YALOWITZ:  Thank you, your Honor.  That's perfect.

12     ISRAEL SHRENZEL,

13         called as a witness by the Plaintiffs,

14         having been duly sworn, testified as follows:

15    DIRECT EXAMINATION

16    BY MR. YALOWITZ:

17    Q.  Mr. Shrenzel, where are you from?

18    A.  I'm from Tel Aviv, Israel.

19    Q.  Is that where you grew up?

20    A.  Yes, sir.

21    Q.  Could you tell the jury about your education?

22    A.  I graduated from the Tel Aviv University many years ago and

23    in the field of middle eastern studies and Arabic/Islamic

24    studies, and I completed a B.A. degree in these fields; and

25    then after my military service, I completed my M.A. degree in

F1lQsok6                          Shrenzel - Direct

1    middle eastern studies.  Further along the road, I graduated

2    from a program of linguistic editing in Hebrew.

3    Q.  Could you tell the jury about your early professional

4    experience?

5    A.  Yes.  So after graduating from Tel Aviv University, I

6    joined the intelligence branch of the IDF where I served in the

7    analysis unit dealing with Palestinian issues for three and a

8    half years, and then I moved on to Syrian affairs for another

9    year and a half.

10   Q.  When you were in the IDF intelligence branch, what were

11   your job responsibilities?

12   A.  The IDF I was then a junior officer, and I was assigned

13   with analyzing Palestinian issues, especially the PLO.  It was

14   before, of course, the foundation of the PA.

15   Q.  What kind of work did you do?  How did you do that work?

16   A.  In the IDF, you mean?

17   Q.  Yes.

18   A.  Well, the accepted method of analysis in intelligence

19   service, we gathered materials -- materials from various

20   sources were supplied to us by other units of the intelligence,

21   and we were charged with analyzing, assessing it and writing

22   reports based on that information.

23   Q.  What did you do after you left the IDF?

24   A.  After I left the IDF, basically my main issue was

25   completing my M.A. thesis, as I previously stated; and a few

F1lQsok6                          Shrenzel - Direct

1    years after I was released from the army I joined the Israeli

2    Security Agency.

3    Q.   What is the Israeli Security Agency?

4    A.   The Israeli Security Agency is a government body charged

5    with frustration or prevention of terrorism and espionage.  We

6    can equate it in some way to the FBI in the United States.

7    Remember in mind or keep in mind in Israel this body is not

8    charged with dealing with criminal activity, only, as I said,

9    terror and espionage.

10   Q.   Now, how long did you work there at the Israel Security

11   Agency?

12   A.   I worked there for 17 years.

13   Q.   What kind of job did you have by the end of your time

14   there?

15   A.   In the last ten years of my service, I was head of the

16   department that dealt with the analysis of Palestinian affairs,

17   especially the policies of the PLO, the PA and the various

18   other Palestinian organizations.

19   Q.   Did you say you headed up a team that looked at those

20   questions?

21   A.   Of course, yes.  I was the head of the department.  My rank

22   was equivalent to that of a colonel, and I had under me around,

23   let's say, 15 to 20 analysts.

24   Q.   What kind of topics did you focus on with regard to policy

25   at the PA and PLO?

F11Qsok6                         Shrenzel - Direct

1  A.  Yes.  We basically tried to understand the ideas, the

2  ideologies, the motivation and the declaration and of course

3  the deeds of the PA as a whole and of the various organizations

4  within the PA and even those that were not part of the PA, such

5  as Hamas and PIJ and analyzing the positions of various

6  important individuals in the PA area.

7  Q.  When you were at the Israel Security Agency, were you like

8  an in-the-field guy going around to various towns or were you

9  more like an in-the-office guy looking at documents?

10  A.  Much more an office guy, sir.  Of course from time to time

11  we also visited Palestinian towns or -- but this is where we

12  were.

13  Q.  During your years at the ISA, did you have occasion to

14  interact with counterparts in the U.S. Government?

15  A.  Yes, that was part of my job to handle some exchange of

16  information and analysis, assessments, so I did that.

17  Q.  Did you have an opportunity to come here to the United

18  States from time to time?

19  A.  Yes, let's say half a dozen times during my service.

20  Q.  Did you also work with security people around the world,

21  not just the U.S.?

22  A.  Well, I prefer not to go into details, but in general terms

23  the answer is yes.

24  Q.  Now, did you provide a written report in this case earlier

25  during the course of the case?

F1lQsok6                         Shrenzel - Direct

1    A.  Yes, I did.

2    Q.  What was your sort of work style in getting ready to sign

3    off on that report?

4    A.  Yes.  The methodology of preparing the report was very much

5    similar to any work of intelligence analysis; namely, I tried

6    to base the report on facts, on documents, and so we gathered

7    information regarding each of the five attacks I am going to

8    discuss, and based on that I tried to reach conclusions, first

9    of all, of exactly what happened, who was involved in these

10   attacks, and what is the level of involvement of the defendants

11   in those acts of terror.

12   Q.  Did you have individuals who supported you in your work

13   preparing a report to reach your conclusions?

14   A.  Yes, there was a team that gathered the material and

15   prepared an initial draft of my report.

16   Q.  Who were the members of that team?

17   A.  The members of that team were two people, two persons,

18   Arieh Spitzen and Noa Meridor.

19            THE COURT:  Spell the last name.

20            THE WITNESS:  M-E-R-I-D-O-R.

21   Q.  Thank you.  Are those individuals that you had encountered

22   from time to time in the past?

23   A.  Yes, I had some working relationship with them as they both

24   are in the government bodY name COGAT, the Coordination of

25   Government Activities in the Territories.

1    Q.  Just tell the jury what you did to review the initial work

2    that they did.

3              MR. ROCHON:  Objection, your Honor.  Can we approach

4    on this?

5              THE COURT:  Can we send the jury home at this point?

6              MR. YALOWITZ:  As your Honor wishes.

7              THE COURT:  Let's send the jury home.

8              Don't discuss the case, keep an open mind, and I will

9    see you at 9:30.

10             (Jury exits courtroom)

11             MR. ROCHON:  We have already discussed early today

12    these reports don't come into evidence barring something

13    unusual.  I let Mr. Yalowitz go for a while on this, but it

14    seems that we are getting into the report itself.  I am not

15    really sure where we are going here.

16             THE COURT:  I don't remember the question, but I don't

17    remember it as being an objectionable question.  What are you

18    objecting to?

19             MR. ROCHON:  I think we are getting pretty far into --

20             THE COURT:  Did you object to something he asked?

21             MR. ROCHON:  That he asked.

22             THE COURT:  What did he ask?

23             MR. ROCHON:  The last question was about the people

24    who helped him prepare the report and had a working

25    relationship with him and what essentially they did in

F1L8SOK7

1    assisting him in preparing the report.

2              THE COURT:  That's not the substance of the report.

3              MR. ROCHON:  We are getting there.  I don't know where

4    we are going with a document that's not going to come into

5    evidence barring something unusual.

6              THE COURT:  I don't know where we are going either,

7    but we haven't gotten to any portion that's objectionable yet.

8    I think it's perfectly appropriate, just as you asked on

9    cross-examination with the last witness who helped him prepare

10   the reports, how they were done, the methodology, whether he

11   did it all on his hand, whether it was all in his head or had

12   assistance.  All of that seems appropriate.  So at this point,

13   unless he is going into the details of the report or starts

14   quoting stuff out the report to the witness, I don't think we

15   have gotten to any objectionable area.

16             Mr. Yalowitz, do you intend to cross that line?

17             MR. YALOWITZ:  No.  I just sat there and listened to

18   him try to make hay out of the fact that the last guy didn't do

19   the first draft of his report.  So this guy didn't do the first

20   draft either.  I just wanted to bring it out to the jury so

21   they know there is nothing wrong with it.  It is not some

22   sneaky thing.  It's just the normal way that a lot of people

23   work.

24             THE COURT:  I don't think there was anything you asked

25   that was inappropriate.  Obviously, we had this discussion at

F1L8SOK7

1    the sidebar.  If for some reason the substance of the report

2    itself becomes relevant, and you think you want to read that to

3    the witness before the jury, then we should address that.  But

4    at this point I assume the witness is going to testify to the

5    relevant portions that we talked about that are consistent with

6    his report, and to the extent that it's not consistent with his

7    report, the defense will have an opportunity to say you said

8    something different in your report and quote it to him and let

9    him be questioned about it.

10            MR. ROCHON:  A related issue.

11            THE COURT:  You can step down, sir.

12            MR. ROCHON:  I appreciate that counsel and the witness

13    referred to the five incidents instead of more that he looked

14    at.  We appreciate the care that counsel took.

15            THE COURT:  Always glad to hear when you appreciate

16    each other.  That's always a big change.  You guys are playing

17    well together.

18            MR. YALOWITZ:  It's all you.

19            THE COURT:  Why don't you get some rest and let's pick

20    up tomorrow morning.  Let me know if I have to be here by 7:00

21    in the morning to read some letters, but let's hope we are

22    getting to a point where I can get some more sleep.

23            MR. HILL:  Just to let you know, we will be filing a

24    letter tonight on the other exhibits we got yesterday that we

25    were not told would be up today in accordance with your Honor's

F1L8SOK7

1    direction to object within 24 hours.

2                    THE COURT:  I am shocked.

3                    I will see you tomorrow morning.

4                    MR. YALOWITZ:  Judge, I think Mr. Hill is talking

5    about exhibits that we disclosed today, and I don't think we

6    are going to get to those tomorrow.

7                    THE COURT:  I want to resolve them as early as

8    possible.  If you have got an issue, put it on the table so I

9    can start looking at it.  I only have limited time outside of

10   the court, as you have, to review these documents.  I only have

11   a few law clerks and I have to read a lot of stuff.

12                   MR. YALOWITZ:  It's quality that counts.

13                   THE COURT:  Have a nice evening.

14                   (Adjourned to January 22, 2015, at 9:30 a.m.)

15

16

17

18

19

20

21

22

23

24

25

```
 1                        INDEX OF EXAMINATION

 2   Examination of:                              Page

 3   ALON EVIATAR

 4   Cross By Mr. Rochon . . . . . . . . . . . . 875

 5   Redirect By Mr. Yalowitz . . . . . . . . . .1000

 6   Recross By Mr. Rochon . . . . . . . . . . .1012

 7   ISRAEL SHRENZEL

 8   Direct By Mr. Yalowitz . . . . . . . . . . .1015

 9                       DEFENDANT EXHIBITS

10   Exhibit No.                              Received

11    71, 72, 73 and 74 . . . . . . . . . . . . 968

12    75  . . . . . . . . . . . . . . . . . . . 976

13                       PLAINTIFF EXHIBITS

14   Exhibit No.                              Received

15    1148  . . . . . . . . . . . . . . . . . .1012

16

17

18

19

20

21

22

23

24

25
```