F1mQsok1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   MARK I. SOKOLOW, et al.,

4                   Plaintiffs,

5           v.                              04 CV 397 (GBD)
                                            Trial
6   PALESTINE LIBERATION
    ORGANIZATION, et al.,
7
                    Defendants.
8
    ------------------------------x
9                                           New York, N.Y.
                                            January 22, 2015
10                                          9:30 a.m.

11  Before:

12                      HON. GEORGE B. DANIELS,

13                                          District Judge
                                            and a Jury
14                          APPEARANCES

15  ARNOLD & PORTER LLP
         Attorneys for Plaintiffs
16  BY:  KENT A. YALOWITZ
         PHILIP W. HORTON
17       TAL MACHNES
         SARA PILDIS
18       CARMELA T. ROMEO
         RACHEL WEISER
19
    MILLER & CHEVALIER, CHARTERED
20       Attorneys for Defendants
    BY:  MARK J. ROCHON
21       LAURA G. FERGUSON
         BRIAN A. HILL
22       MICHAEL SATIN

23  Also present:  RACHELLE AVITAL, Hebrew interpreter
                   RINA NE'EMAN, Hebrew interpreter
24

25

F1mQsok1

<table>
<tr><td>1</td><td>(In open court; jury not present)</td></tr>
</table>

1     (In open court; jury not present)

2     THE COURT:  I want to see what we have to address at

3    least before the break this morning.  I have looked at

4    everything that I got other than plaintiff's letter and

5    attachments that I received 20 seconds ago.  I haven't looked

6    at that.  So if that is of some urgency, we should address

7    that, but let me address those issues that I'm informed about.

8     There seems to be some disagreement about redaction of

9    Exhibit 17.

10     MR. YALOWITZ:  I thought we went over 17 and that the

11    Court's -- I thought there was some confusion based on the

12    chart where there was some quotation marks put in by the

13    defendants that led the Court to believe that there was a quote

14    of some article in Exhibit 17.  I think the Court then went

15    back and looked at the actual exhibit.  My recollection is that

16    in the written order that you issued, you were very specific

17    about what could stay in and what was based on -- or at least

18    the ruling was based on, you know, enemy media or something

19    like that.  So I thought we were faithful to the order.  We

20    provided those redactions --

21     THE COURT:  You're leaving that in or are you taking

22    that out?

23     MR. YALOWITZ:  We took out the thing about "according

24    to enemy media."

25     THE COURT:  But the way it's described in defendant's

F1mQsok1

1    letter, that's not the way it is here.

2              MR. SATIN:  I have a copy of the redaction if the

3    Court would like to see it, the redacted exhibit.

4              THE COURT:  I just want to make sure the two of you

5    are talking about the same thing.

6              MR. YALOWITZ:  Right.  I guess I haven't seen this

7    letter until just this moment, but I believe that where they

8    have description of event they are correctly reproducing my

9    redaction, which is "description of event" and then it's

10   redacted.

11             THE COURT:  So it's just the opposite of what you

12   said.  You said "according to the enemy media" is redacted.

13   It's not redacted in the letter that I have with the redaction.

14             MR. YALOWITZ:  Then I wasn't clear.  What I was trying

15   to convey is that the substance of what appears to be a media

16   report has been redacted.  We have left in the name of the

17   suicide terrorist, and we've left in that that they are

18   reporting on from so-called enemy media.  Then we left in the

19   thing that they don't want, which is their conclusion from

20   their report, "the operation was claimed by the al-aqsa martyr

21   brigades, the military wing of Fatah."  That is why we are

22   having this conversation.  Because their employees in their

23   report concluded that this suicide bombing was claimed by the

24   al-aqsa military brigade, the military wing of Fatah.

25             THE COURT:  Is there some evidence in this case that

F1mQsok1

1    that is the case?

2            MR. YALOWITZ:  I think this is what I have on that

3    attack.

4            No, that's not true.  There is some other evidence for

5    example Marwan Barghouti marched at the funeral of Wafa Idris

6    and the video and of the funeral show Al-Aqsa Martyr Brigade

7    insignias.

8            THE COURT:  Is this supposed to be represent -- have

9    you filed evidence of a public statement that was issued by the

10   Al-Aqsa Martyr Brigade taking responsibility for this attack?

11   Do you intend to put that in evidence?

12           MR. YALOWITZ:  I am not offering independent evidence

13   other than this is a claim by the Al-Aqsa Martyr Brigade that

14   they took credit for.

15           THE COURT:  So what do you claim is the source of this

16   information?  You want to imply that they had some secret

17   information or you believe that this is a reference to some

18   public statement that was made taking responsibility for it.

19           MR. YALOWITZ:  I have no idea how they got this

20   information.  They've got witnesses who are going to come who

21   prepared these documents, so they can explain them.

22           THE COURT:  You have no idea whether Al-Aqsa Martyr

23   Brigade ever took responsibility for it?

24           MR. YALOWITZ:  We have significant evidence linking

25   al-aqsa brigade to this attack, for example, photographs and

F1mQsok1

1    video of the symbolic funeral of Wafa Idris.

2              THE COURT:  That's not the answer to my question.

3              MR. YALOWITZ:  Then I'm not understanding the

4    question.  Ask me again.

5              THE COURT:  The question is fairly direct.

6              In many instances when there is an attack, someone

7    announces publicly that a certain organization is taking

8    responsibility for that.

9              MR. YALOWITZ:  I don't have an announcement like that.

10             THE COURT:  That's all I'm asking.  Then you don't

11   know whether or not anyone ever publicly made a statement for

12   which this is being cited saying that "We are the ones that

13   executed this terrorist."

14             MR. YALOWITZ:  I don't have a statement like that.  I

15   have video of a funeral in which people associated with

16   al-aqsa, like Marwan Barghouti, say "This is a good operation

17   we're going to continue this," but I don't have like a fax to

18   the news media, you know, "this was our attack, yours truly

19   Al-Aqsa Martyr Brigade."

20             THE COURT:  What's the date of this exhibit?

21             MR. YALOWITZ:  I think it's February 14, 2002, about

22   two weeks after the attack.

23             THE COURT:  The attack was on which date?

24             MR. YALOWITZ:  January 27, 2002.

25             THE COURT:  Would you just tell me in your comparison

F1mQsok1

1    chart -- because I want to go back and look at my individual

2    notes -- what page this exhibit is on?

3              MR. YALOWITZ:  82.

4              THE COURT:  82?

5              MR. YALOWITZ:  82.

6              THE COURT:  My 82 is blank.

7              MR. YALOWITZ:  It will probably be a little earlier

8    than 82.  There is a section on martyr files.

9              MR. SATIN:  Page 83, your Honor.

10             MR. YALOWITZ:  83, a little after 82.

11             THE COURT:  OK.

12             MR. YALOWITZ:  I think the problem arose because the

13   defendants put quotations -- if I am remembering right, the

14   defendants put quotations which indicate that they are quoting

15   from the document.  I think that may have led you to think that

16   the document itself contained quotations from a third source.

17             THE COURT:  Let me see the document.

18             MR. HILL:  May I approach, your Honor?

19             THE COURT:  Yes, whoever has it.

20             MR. HILL:  This is the proposed redacted version.

21   Would you like the unredacted version as well, your Honor?

22             THE COURT:  Yes.

23             MR. SATIN:  It's on page 2 of the document, your

24   Honor.

25             THE COURT:  It's difficult for me to revisit this

F1mQsok1

1    because I don't remember exactly the nature of the conversation

2    and what the transcript reflects in terms of our discussion,

3    but I know my concern was that I wasn't sure what was according

4    to the enemy media.

5            MR. YALOWITZ:  Right.

6            THE COURT:  What is it that you claim is according to

7    the enemy media?

8            MR. YALOWITZ:  My version is blacked out, but it says

9    something like:  She executed a heroic suicide operation in

10    occupied West Jerusalem against the Zionists or -- I don't

11    remember exactly.

12            THE COURT:  I know, but is it your position that the

13    entire first sentence is according to the enemy media?  Because

14    I know that was my question and concern in the beginning.

15            MR. YALOWITZ:  I think that, frankly, the way I read

16    that sentence is that Israeli newspapers and television

17    reported that someone committed a suicide attack on Jaffa

18    Street, and this is the defendant's characterization of it.

19    There is nobody in Israeli media that would report an event

20    like that in this way, but, I mean, I don't think it is that

21    important, and we redacted it.

22            THE COURT:  Well, it is important.  If it wasn't

23    important, you wouldn't be asking for it.

24            MR. YALOWITZ:  We redacted it.

25            THE COURT:  It says, "according to the enemy media."

F1mQsok1

1           MR. YALOWITZ:  Right and that covers the first

2    sentence.

3           THE COURT:  But the first sentence says: "During the

4    execution of a martyrdom operation in occupied Jerusalem, Wafa

5    Idris blew herself up in a crowd of Zionists that resulted in

6    killing one and injuring more than 100 in addition to her

7    immediate death."

8           You say that entire statement is according to the

9    enemy media?

10          MR. YALOWITZ:  I don't think it is, but that was the

11   defendant's position and your Honor accepted it, and I'm

12   prepared to move on.  It is redacted --

13          THE COURT:  Well, it's not redacted.  That's the

14   problem.

15          MR. YALOWITZ:  It is redacted.

16          THE COURT:  Well, the first sentence --

17          MR. YALOWITZ:  The first sentence is redacted.  I

18   don't know what Brian Hill handed you, Judge, but look at mine.

19          THE COURT:  Why don't you show me because you said the

20   letters as they said it accurately depicts the redaction.

21          MR. YALOWITZ:  I don't know what he handed you.

22          THE COURT:  Well, you didn't redact "according to the

23   enemy media."

24          MR. YALOWITZ:  I can take that out.

25          THE COURT:  That is the first thing.  The reality is,

F1mQsok1

1    I don't have -- there are two things I don't have.  This was my

2    ruling and I think the rationale from my ruling and to the

3    extent that I am more informed about where we are in this case

4    and what the evidence is, this is my position:  Quite frankly,

5    at this point I don't have any problem if you want that

6    sentence.  You either redact the whole sentence or you can have

7    the part that says, "Wafa Idris blew herself up in a crowd that

8    resulted in killing one and injuring more than 100 in addition

9    to her immediate death."  I don't have any problems with that.

10   That is consistent with the evidence in this case.

11          But the part that they have a legitimate issue about

12   is who characterized this as a martyrdom operation, and I

13   didn't like the inflammatory phrase "enemy media," which seems

14   to be important to you now, but I am not going to change my

15   position on this.  The last sentence is not the part that you

16   said you wanted.

17          MR. YALOWITZ:  No.  No --

18          THE COURT:  No, it was not.  I have your --

19          MR. YALOWITZ:  It's in the next box, your Honor.

20          THE COURT:  All right.  Fine.  Then you're absolutely

21   right.  But I ruled that it was out.  That is my note.  Now if

22   you tell me I ruled that it was in, then you appropriately

23   redacted it.  But if I ruled it is out, it is out.  I already

24   ruled it is out.

25          MR. YALOWITZ:  Here is what happened with that because

F1mQsok1

1    I remember it -- look, I remember it, and I'll tell you what

2    happened and then I'll --

3              THE COURT:  Did I rule it was out?

4              MR. YALOWITZ:  No.  Let me tell you what happened and

5    then I will go with whatever you want to do.  I don't feel

6    strongly about it, but I want to explain what happened.

7              THE COURT:  If you want to show me the transcript

8    that's what happened --

9              MR. YALOWITZ:  I don't have the transcript, but I

10   remember it live in my mind.

11             MR. HILL:  We have the transcript, your Honor.

12             MR. YALOWITZ:  God, I wish I wouldn't get interrupted

13   by these guys.

14             Here is what happened:  There are quotes in the

15   defendant's piece of the box, and based on those quotes and

16   your Honor's notes, you said, "I think this is out because it's

17   hearsay, and I'm going to keep it out."  I remember that.

18             And then afterwards, you said, "I want to go back and

19   look at the document.  I want to look at the actual document

20   and then make a judgment."

21             My memory is you then issued a written order, and our

22   understanding of the order -- we may have misunderstood it and

23   if we did, I just want to go with what you say right now

24   because I don't care that much.  But our understanding of the

25   order was to take out the part about, you know, the substance

F1mQsok1

1    of what the enemy media was saying because that was hearsay, as

2    your Honor said -- I don't agree that was hearsay, but I don't

3    care that much -- and that we didn't have to take out the part

4    about Al-Aqsa Martyr Brigades and the armed wing of Fatah

5    because that's a conclusion the defendants have drawn, and that

6    the operation was claimed by al-aqsa -- apparently I'm better

7    informed than I was a minute ago.  There is other evidence in

8    the case that that operation, which is a very notorious

9    operation, was claimed by Al-Aqsa Martyr Brigade, but I don't

10   have a direct like fax or something.  I have other sources that

11   say al-aqsa claimed it.

12             THE COURT:  Is there going to be evidence in this case

13   that al-aqsa claimed it?

14             MR. YALOWITZ:  Yes.

15             THE COURT:  What is that evidence going to be?

16             MR. YALOWITZ:  The witness is going to testify about

17   it.

18             THE COURT:  What kind of a witness?

19             MR. YALOWITZ:  The witness on the stand, the expert

20   witness.

21             THE COURT:  How does he know?

22             MR. YALOWITZ:  Because he's done research.  He's

23   reviewed the files.

24             THE COURT:  What file did he review?

25             MR. YALOWITZ:  He reviewed this file.

F1mQsok1

1          THE COURT:  I know, but, see that's the thing, I'm not

2     going to go through that.  You can't do this in a circular

3     matter.  You can't say if it's inadmissible in this document

4     that I'm going to let him testify and the only source of his

5     information is this document.  That's not the way it works.

6          MR. YALOWITZ:  No, Human Rights Watch issued --

7          THE COURT:  That's what I'm saying, what is the source

8     of the information?

9          MR. YALOWITZ:  Human Rights Watch issued a report

10    saying al-aqsa claimed this and Amnesty International issued a

11    report saying al-aqsa claimed this.

12         THE COURT:  Do you intend to offer that evidence here?

13         MR. YALOWITZ:  No, because those are NGO reports,

14    those are not government reports.  So we have a series of

15    reports that an expert can rely on -- experts can rely on

16    hearsay.

17         THE COURT:  This is not an expert opinion.  This is a

18    fact.  OK?  I want to know who is trying to prove the fact.

19    The expert witness can't prove the fact by simply saying "I

20    heard it," OK?  I am trying to understand where the facts come

21    in.  Who is going to put this in in this case?

22         MR. YALOWITZ:  The best evidence I have that this

23    operation was claimed by the Al-Aqsa Martyr Brigade is in your

24    hand.  That is an admission by the defendant.

25         THE COURT:  Say it again.

F1mQsok1

1            MR. YALOWITZ:  This is the defendant's document.

2            THE COURT:  What statement?

3            MR. YALOWITZ:  The statement that says --

4            THE COURT:  This statement?

5            MR. YALOWITZ:  The operation was claimed by the

6    Al-Aqsa Martyr Brigade.  That's an admission by the defendant.

7    That's an admission.

8            THE COURT:  An admission of what?

9            MR. YALOWITZ:  An admission that the operation was

10   claimed by the Al-Aqsa Martyr Brigade.

11           THE COURT:  That's not an admission.

12           MR. YALOWITZ:  Sure it is.

13           THE COURT:  They're not admitting anything.  That is a

14   comment upon somebody -- that's why I say, I don't know -- the

15   problem I have always had with this, I don't know what the

16   source of that information is supposed to be.  Are you saying

17   they got it the same place your expert got it?

18           MR. YALOWITZ:  No.

19           THE COURT:  They had some secret knowledge?

20           MR. YALOWITZ:  They might --

21           THE COURT:  Do you have some other indication that

22   publicly they made such an announcement?  What is supposed to

23   be referenced?

24           MR. YALOWITZ:  So I don't know --

25           THE COURT:  Well, that's the problem.

F1mQsok1

```
 1              MR. YALOWITZ:  OK, look, I don't know and I don't
 2      think I need to know because in order to decide whether to give
 3      this woman's family money, they did an analysis -- the
 4      defendant in their usual course of business did an analysis,
 5      they gathered information, they wrote down the information that
 6      they gathered, they put it in a document that they keep in the
 7      usual course of business, and based on the information that
 8      they gathered and they wrote down, they made a decision.  So
 9      that is my position on that.
10              There are other things I want to raise and deal with,
11      so we will be guided by you on this.  I think we are right
12      about it, and I think it is meaningful.  I know there was some
13      confusion.  I think the confusion was caused by the way the
14      defendants put their chart together.
15              THE COURT:  My recollection and my more informed
16      judgment at this point is I am willing to give -- as I say, you
17      don't have to redact all of the first sentence.  If you want to
18      redact the first sentence, you can.  You should.  But I don't
19      have any problems with the portion of the first sentence that
20      says:  "Wafa Ali Khalil Idris blew herself up in a crowd that
21      resulted in killing one and injuring more than 100 in addition
22      to her immediate death."  That evidence is in this case.  That
23      is not in dispute, and I don't see any prejudice to the
24      defendant by leaving that portion in if you want that portion
25      in.  That is more than what I gave you initially.
```

F1mQsok1

1          MR. YALOWITZ:  I agree with that.

2          THE COURT:  Now, I still have some problems about the

3    second sentence because it's only significant -- it's

4    significant in two ways or it can only be significant in one of

5    two ways:  One, that you want to imply that they had some

6    special knowledge about Al-Aqsa Martyr Brigade being

7    responsible for this.

8          MR. YALOWITZ:  I don't think that is a fair inference

9    from this document.

10          THE COURT:  I don't either.  So I am concerned about

11    that.

12          MR. YALOWITZ:  I am not going to suggest that.

13          THE COURT:  So that is my first concern.

14          My second concern is that the only other basis that

15    you are offering it is to show that in fact the Al-Aqsa Martyr

16    Brigade took responsibility for this.  Now that is not an

17    admission by the defendant.  That is an admission by Al-Aqsa

18    Martyr Brigade.  OK?

19          If you want to tie them into the defendants, that's

20    another link, but that's not the defendant's admission.  So

21    that means what you are saying is the same way everybody else

22    knew, that's how they knew, but you have no evidence.

23          MR. YALOWITZ:  Right --

24          THE COURT:  That's why I said, if they took

25    responsibility, there should be some evidence out there that

F1mQsok1

1    they publicly took responsibility so they made that claim so

2    that not only the PA knew about it, but everybody else knew

3    about it.  You say in every report it says that they took

4    responsibility for this.  That's the evidence of that.

5            MR. YALOWITZ:  Look, I don't want to belabor this, I

6    really don't.

7            THE COURT:  OK.

8            MR. YALOWITZ:  But I thought that's what we see in

9    terror cases all the time.  I mean, you can't get records from

10   the Al-Aqsa Martyr Brigade.

11           THE COURT:  No, but you can.  Almost every single

12   terrorist attack where some organization takes public

13   responsibility for it, it is real easy to find someplace where

14   they've taken public responsibility.  They usually show up on

15   Al Jazeera or some place, and there's a guy on the tape saying,

16   "We did it and we're proud of it."  That's taking

17   responsibility.

18           MR. YALOWITZ:  We have that with the January 22

19   attack.

20           THE COURT:  Exactly.  So I am trying to figure out the

21   source of your information.  Everybody is assuming because

22   you're saying they took public responsibility for this, and I

23   don't have any problem if that is the case, but I think there

24   is too much of a danger that the jury is going to imply what

25   you just said you're not offering it for; that somehow they're

F1mQsok1

1    saying that they know that it's the Al-Aqsa Brigade.

2              MR. YALOWITZ:  Let's take that out then because there

3    are other things -- that's your ruling.  Let's accept it and

4    move on.

5              THE COURT:  Sure.  I may not have ultimately resolved

6    it at the time because there were a lot of issues still pending

7    out of context, but clearly in my note I have an "out" written

8    next to it.

9              MR. YALOWITZ:  I remember because we talked about it.

10   OK.  Let's move on.

11             THE COURT:  What else do we need to deal with for this

12   witness to address?

13             MR. YALOWITZ:  The video that we just talked about of

14   the January 22 shooter.  So the January 22 shooter, Said

15   Ramadan.

16             THE COURT:  Which exhibit is that?

17             MR. YALOWITZ:  196, clip 6.

18             THE COURT:  That's 196.  I haven't had an opportunity.

19   I don't think I have the clip yet.

20             MR. HILL:  Your Honor, it's 18 seconds long.  We can

21   play it right now if you'd like.

22             THE COURT:  Give me in essence what you want.

23             MR. YALOWITZ:  It's the shooter.  He's got a bandanna

24   on that says Al-Aqsa Martyr Brigade.

25             THE COURT:  Who?

F1mQsok1

1              MR. YALOWITZ:  The shooter in the January 22 attack.

2     He is holding his M-16 or an M-16.  He's in front of a banner

3     that says Al-Aqsa Martyr Brigade.  Guys in this case, employees

4     of the defendant were convicted for shooting the video, and the

5     video was released at or around the time of the shooting.

6              THE COURT:  Let me try to be more specific.  I assume

7     you mean several days after the shooting.  Is that what you

8     mean or do you mean some other time?

9              MR. YALOWITZ:  Within days of the shooting.

10              THE COURT:  Well, after the shooting or before the

11     shooting?  I assume after the shooting.

12              MR. YALOWITZ:  Yes, after.  I assume after.

13              THE COURT:  So a few days after the shooting.  And you

14     want it to demonstrate what?

15              MR. YALOWITZ:  That Al-Aqsa Martyr Brigade is taking

16     credit.

17              THE COURT:  Who is going to be able to establish that?

18     Do you have a witness who knows this?

19              MR. YALOWITZ:  Our expert, Israel Shrenzel, studied

20     the terrorist structure for many years.

21              THE COURT:  I know, but that doesn't tell me he knows

22     what this is.  How does he know what this is?

23              MR. YALOWITZ:  Because he checked it and looked at it

24     and confirmed that it is what it purports to be.

25              THE COURT:  He knows who the people are in the video?

F1mQsok1

1    He has some testimony to give about when the video was released

2    or is there some other --

3            MR. YALOWITZ:  The video even has on it the date.  I

4    just don't remember.

5            THE COURT:  Play that video for me.

6            (Video played)

7            MR. YALOWITZ:  I don't know why -- is that ours?  Are

8    we going to black that out?

9            THE COURT:  Are you going to play the sound or any

10   subtitles?

11           MR. YALOWITZ:  We're going to play it silently.

12           THE COURT:  So the words don't matter to you.

13           MR. YALOWITZ:  The words don't matter to us.  The

14   words matter to the witness.  They are in Arabic.

15           THE COURT:  That's what I'm saying.

16           MR. YALOWITZ:  The words don't matter to the jury.

17   The words are from a newscast saying -- I don't know what they

18   say, but, in essence, here is the video of the guy claiming

19   credit or something like that.

20           THE COURT:  As I say, these were the kind of questions

21   I was asking before:  This is something that was publicly

22   released days after the event in which this person was taking

23   credit for --

24           MR. YALOWITZ:  I think days may be an overstatement.

25   I think it's like immediately after.

F1mQsok1

| | |
|---|---|
| 1 | THE COURT:  You mean within hours. |
| 2 | MR. YALOWITZ:  Yeah, within hours.  I don't think they |
| 3 | wait days because they want to get it on the news. |
| 4 | THE COURT:  Who was this person? |
| 5 | MR. YALOWITZ:  That's the shooter.  That's the suicide |
| 6 | shooter. |
| 7 | THE COURT:  Who? |
| 8 | MR. YALOWITZ:  Said Ramadan. |
| 9 | THE COURT:  Do we have his conviction already in |
| 10 | evidence? |
| 11 | MR. YALOWITZ:  He died committing his crime. |
| 12 | THE COURT:  All right. |
| 13 | MR. YALOWITZ:  We have some photographs of him after |
| 14 | the event which your Honor has seen and has excluded under 403. |
| 15 | I think you probably remember him.  It was a police report. |
| 16 | THE COURT:  Yes, it was body part. |
| 17 | MR. HILL:  So the record is clear, our objection is |
| 18 | that this witness, who I assume has never met Said Ramadan, |
| 19 | does not have personal knowledge to testify that the person |
| 20 | depicted in the video is in fact Said Ramadan, and that |
| 21 | knowledge could only come from the hearsay itself -- from the |
| 22 | video itself identifying that person as Said Ramadan. |
| 23 | THE COURT:  I am going to give you an opportunity to |
| 24 | lay the proper foundation. |
| 25 | MR. YALOWITZ:  Good. |

F1mQsok1

1             THE COURT:  If you lay what I consider to be the

2    proper foundation, I will admit that video into evidence.

3             MR. YALOWITZ:  That's great.

4             The second video we need to talk about is the funeral

5    of Wafa Idris.  This is the lady we were talking about in

6    Exhibit 17.  We have some video.  They have a symbolic funeral.

7             Ms. Machnes, who knows the facts so well, said to me

8    the date of that broadcast of Ramadan is the 23rd of January,

9    so it's the day after.

10            But coming back to Wafa Idris.  They had a symbolic

11   funeral for her, and Marwan Barghouti is marching at the

12   funeral, and he makes a statement which the defendants have

13   quoted in their letter saying, our tactics are going to

14   continue and stuff like that.

15            THE COURT:  How long is this video?

16            MR. YALOWITZ:  It's also real short.

17            THE COURT:  Let me see it.

18            MR. HILL:  32 seconds, your Honor.

19            THE COURT:  How many?

20            MR. HILL:  32 seconds.

21            THE COURT:  Which one is this Exhibit?

22            MR. HILL:  196, clip 3.

23            THE COURT:  Both of these are 196?

24            MR. YALOWITZ:  Yes, but we broke them out.

25            THE COURT:  All right.  Let me see it.

F1mQsok1

 1           (Video played)

 2           THE COURT:  The nature of the objection is the same or

 3    different?

 4           MR. ROCHON:  Your Honor, the objection is what is the

 5    relevance?  He doesn't say he endorses this act.  He's marching

 6    and talking about the political situation.  So the relevance of

 7    his discussion of the political situation and the fact it

 8    happens to be at this woman's funeral -- we'll take the

 9    representation that this is the funeral of Wafa Idris and not

10    contest it.  The question is, so he's marching there, and if

11    you look at the words he says, it doesn't say a word about Wafa

12    Idris.  It doesn't say a word about terrorist.

13           THE COURT:  Where is the language?  The first

14    statement he makes, he says that this is --

15           MR. ROCHON:  If we play it, he discusses --

16           THE COURT:  You quoted the language in your letter.

17           MR. ROCHON:  I think it's on page 2.

18           THE COURT:  Page 2.

19           MR. ROCHON:  Yes, sir, at the top it says, "In my

20    opinion" --

21           THE COURT:  Right.

22           MR. ROCHON:  -- "the Fatah movement has not changed

23    its strategy."

24           THE COURT:  Right.

25           MR. ROCHON:  "This is a clear strategy based primarily

F1mQsok1

1   on continuation of the struggle against the Israeli

2   occupation."

3           I won't read the whole thing.

4           THE COURT:  But he is saying that her blowing herself

5   up in a terrorist attack is a clear strategy against the

6   occupation.

7           MR. ROCHON:  I don't think it does say that, your

8   Honor.

9           THE COURT:  You don't think that's a reasonable

10  interpretation?  What do you think he's talking about if he's

11  walking in the funeral saying, "In my opinion, the Fatah

12  movement has not changed its strategy.  This is a clear

13  strategy based primarily on continuation of the struggle

14  against the Israeli occupation."

15          What "this" do you think he's referring to?

16          MR. ROCHON:  The strategy of Fatah.

17          THE COURT:  No.  He's talking about something that

18  happened is reflective of the strategy.

19          MR. ROCHON:  No --

20          THE COURT:  There is no other reasonable reading of

21  "this" other than to say "this" act, "this" terrorist act.

22          MR. ROCHON:  No.  I think he is saying, "This strategy

23  is a clear strategy based primarily on continuation of the

24  struggle against Israeli occupation."

25          THE COURT:  What is a clear strategy?

F1mQsok1

1              MR. ROCHON:  The Fatah strategy.

2              THE COURT:  What is the strategy?  He's saying that

3     the bombing is the strategy.

4              MR. ROCHON:  No, sir.

5              THE COURT:  What are you saying he's saying is the

6     strategy?

7              MR. ROCHON:  Let me back up.  He is a political

8     leader.  He is not a PA person.  He not a PLO person.  He's an

9     elected official.  He is in the legislative council, and he is

10    in Fatah.  So, he is, first of all, not our guy.

11             THE COURT:  You can argue that.

12             MR. ROCHON:  Having lost that, however, now he's a

13    politician at a funeral being approached by a cameraman.  We

14    don't have the question.

15             THE COURT:  Right.

16             MR. ROCHON:  We don't know what he was asked.

17             THE COURT:  OK.

18             MR. ROCHON:  And for you to conclude that he is

19    endorsing the suicide bombing as opposed to comments in

20    general--

21             THE COURT:  Do you know what the question is that he

22    was asked?

23             MR. ROCHON:  Beg pardon?

24             THE COURT:  Do you know what the question is that was

25    asked?

F1mQsok1

1         MR. ROCHON:  I'm not fluent in Arabic.  I don't know
2    what he says.

3         THE COURT:  You have the rest of the clip.  Has it
4    been translated?

5         MR. ROCHON:  No.

6         THE COURT:  You don't have the rest of it?  That is
7    what I'm asking.

8         MR. ROCHON:  This is some clip that the guy Marcus was
9    going to use.

10        MR. YALOWITZ:  That is not correct, your Honor.

11        MR. ROCHON:  I'm sorry if I'm wrong.

12        THE COURT:  What is it?

13        MR. YALOWITZ:  Exhibit 196 was admitted in evidence in
14   the Marwan Barghouti criminal trial in Israel.

15        THE COURT:  OK.

16        MR. YALOWITZ:  It was obtained for use in this country
17   in another case against these defendants by hand request.

18        THE COURT:  Do you have a full clip?

19        MR. YALOWITZ:  I have what's there.  I have what we
20   got from the military --

21        THE COURT:  Did you get any more than this?

22        MR. YALOWITZ:  That's what we got.

23        THE COURT:  Do you know what the question was?

24        MR. YALOWITZ:  I do not.  I do not.  But if that was
25   something the defendants wanted to develop, they had a lot of

F1mQsok1

1  time to develop it, because --

2                THE COURT:  Develop it with whom?

3                MR. YALOWITZ:  With the source of the clip.

4                THE COURT:  Who was what?

5                MR. YALOWITZ:  It says what television station it is,

6  and they've had this clip for years.

7                THE COURT:  Was this the subject of some deposition?

8                MR. YALOWITZ:  This was submitted in evidence in the

9  Israeli court.

10                THE COURT:  No, was it the subject of some

11  examination, a deposition of some witness in this case?

12                MR. YALOWITZ:  No.

13                THE COURT:  Not Marcus or anybody else?

14                MR. YALOWITZ:  No, not that I can recall.

15                THE COURT:  You originally intended to offer it with

16  Marcus.

17                MR. YALOWITZ:  No, I don't think that's true.  It's

18  not collected by Marcus.

19                THE COURT:  Did you intend to offer it through this

20  witness?

21                MR. YALOWITZ:  With Shrenzel, right.

22                THE COURT:  And he is going to lay a foundation

23  describing it as what?

24                MR. YALOWITZ:  As a video interview of Marwan

25  Barghouti at the symbolic funeral of Wafa Idris -- it's a

F1mQsok1

1    statement by Marwan Barghouti.

2              MR. ROCHON:  Your Honor, this was not part of any

3    deposition of this witness because it's not in his report.

4              In our view an interview includes two things:  A

5    question and an answer.  So this is not an interview.  But it

6    obviously appears to be in response to something and,

7    therefore, is easily taken out of context, as I believe it is,

8    in the effort to get it into evidence.

9              THE COURT:  There was some other of Barghouti's

10   statements that you were trying to offer.  What were they?  I'm

11   going to give you some and not give you others is the bottom

12   line.

13             MR. YALOWITZ:  The other Barghouti statements weren't

14   linked tightly to these attacks.

15             THE COURT:  Which other statements do you want?

16             MR. YALOWITZ:  I don't remember the exact ones.  I

17   remember there was a one where he was making a speech at the

18   beginning of the Intifada saying -- whipping up the crowd and

19   people were firing guns in the air.  I'm sure you remember

20   that.

21             THE COURT:  But we've been past that.

22             MR. YALOWITZ:  Right.  And you said it was out.

23             THE COURT:  I thought there was something else about

24   this witness that they didn't want in.

25             MR. YALOWITZ:  There is a video that ran repeatedly on

F1mQsok1

1    PA TV glorifying Wafa Idris.  It's like a song saying Wafa --

2                THE COURT:  What does he have to do with this?

3                MR. YALOWITZ:  Nothing.  This is the only Marwan

4    Barghouti statement left that we're offering as far as I can

5    tell.

6                THE COURT:  All right.

7                MR. YALOWITZ:  I think so far we have not had any

8    Marwan Barghouti video coming into evidence.

9                MR. ROCHON:  Your Honor, may I correct a misstatement

10   that I made?

11               THE COURT:  Yes.

12               MR. ROCHON:  The witness did reference it in his

13   report.  I apologize for getting that wrong.  I guess the page

14   doesn't matter to the Court.  He referenced it.  It still

15   doesn't make it admissible for the reasons we stated, but I

16   didn't want to misstate that.

17               THE COURT:  Correct me if I'm wrong, I thought the

18   main dispute with regard to Marwan Barghouti was not what his

19   views were but whether or not he was either an employee or

20   acting on behalf of the PA or the PLO.

21               MR. ROCHON:  I think there's two aspects of

22   Mr. Barghouti.  So he's convicted of terror crimes, but none of

23   ours.

24               THE COURT:  Right.

25               MR. ROCHON:  And so tying him to these is, of course,

F1mQsok1

1    great concern to us because otherwise he's not this case.

2              I could tell the Court, I didn't develop -- he was

3    actually acquitted of one of the incidents in this case.  I

4    didn't use that on cross for tactical reasons.  So he's never

5    convicted of any of these.  Charged with one and acquitted of

6    it.

7              The statements he made as a political person are -- he

8    is a political person and according to the convictions, also

9    convicted of terror activity by the Israelis.

10             THE COURT:  Right.

11             MR. ROCHON:  So he's both.  And some of these

12   statements are clearly political statements.

13             THE COURT:  I don't know how you can separate the two.

14             MR. ROCHON:  I think we have to.

15             THE COURT:  Anybody would say all of the statements

16   even by other terrorists are political statements.

17             MR. ROCHON:  Yes, but the Court has been careful to

18   make sure that when third-party statements are put into

19   evidence that they tie to the actual incidents on trial or to

20   something specific.  That's not this, given the context of some

21   public -- this guy is a politician.

22             THE COURT:  I know, but, unfortunately, I think it is

23   a close one for me, but I am going to give them this one, and

24   you can argue those issues.  It does tie him to this because

25   he's at her funeral.  If it was a different funeral -- I don't

F1mQsok1

  1      think that's a lot, but I can't he is not tied to her and her

  2      terrorist attack because he could have decided to say it at a

  3      different funeral or he could have decided to stay away from

  4      this funeral, so whatever they want to argue this is supposed

  5      to represent in terms of his affinity, support --

  6            MR. ROCHON:  If they wanted to put in "Marwan

  7      Barghouti was at her funeral," that would be one thing, run it

  8      without the subtitles.  What they want are the statements to

  9      create an impression that is not supported by the tape that he

 10      is speaking directly to the tactic of suicide bombings.  That

 11      is not justifiable by the excerpt.  If they want to put it into

 12      evidence without the words that he was at the funeral, that's

 13      different.

 14            THE COURT:  I understand.  Let's move on.  I think

 15      that that is an assessment for the jury to make.  Whether or

 16      not it is reasonable in light of all the other evidence to draw

 17      that conclusion, both sides can argue what they will; that

 18      given the other evidence, this represents consistent with that

 19      his position or doesn't do anything other than represent a

 20      politician who decides to show up at a funeral.  So I'm going

 21      to allow it in.

 22            All of these other clips from -- I don't know if I'm

 23      going to address those now, but the clips about the song and

 24      that sort of thing, I don't think I'm going to allow that.  I

 25      have to look at the clips.  I don't know if you're going to

F1mQsok1

1    address that.

2                MR. YALOWITZ:  I don't know if we're going to get to

3    that before the next break.

4                THE COURT:  Let me look at it.

5                MR. YALOWITZ:  I can make sure we don't, your Honor,

6    because I don't want to rush you on this.

7                THE COURT:  One more just quickly, and then I will

8    bring the jury in if you have something else.

9                MR. YALOWITZ:  I have one thing, and then I want to

10   put a marker down on another thing that we don't need to

11   address now, but I do need you to focus on.

12               THE COURT:  Sure.

13               MR. YALOWITZ:  The thing I want to put a marker down

14   on is I went back after we broke, I looked at your rulings on

15   the police magazines, I want to send you a letter about five of

16   them.

17               THE COURT:  OK.  We can discuss it further.

18               MR. YALOWITZ:  The other thing --

19               THE COURT:  You want to tell me which ones?

20               MR. YALOWITZ:  201 is the main one, and ones like it.

21               THE COURT:  Well, address that.

22               MR. YALOWITZ:  If you look at 201, it has to do with

23   direct incitement to killing.

24               THE COURT:  OK.

25               MR. YALOWITZ:  Direct incitement to killing.

F1mQsok1

 1          THE COURT:  Is it something you quoted in your letter

 2    or some additional --

 3          MR. YALOWITZ:  No.  No.  In the letter.

 4          THE COURT:  You quoted in the letter for most of them

 5    a certain portion that you say were the relevant portion.

 6          MR. YALOWITZ:  Correct.

 7          THE COURT:  I primarily relied on those in making my

 8    judgment.

 9          MR. YALOWITZ:  That's good.

10          THE COURT:  It's already cited in the letter.

11          MR. YALOWITZ:  It is.  It is.

12          THE COURT:  Go ahead.

13          MR. YALOWITZ:  But I want to send you a letter on it

14    tonight.

15          THE COURT:  You don't need to address it today?

16          MR. YALOWITZ:  I don't think we need to, but I want

17    you to know I care about it.

18          THE COURT:  OK.

19          MR. YALOWITZ:  Now, the other thing is, I think the

20    defendants have a problem with my redactions of 467.

21          THE COURT:  Yes, 465 through 467.  That's where I was

22    going to go next.  Quickly tell me, what is the redaction

23    that's missing?  I wasn't quite sure, and I will tell you very

24    quickly whether or not I need to read that.

25          MR. SATIN:  Thank you, your Honor.

F1mQsok1

1          THE COURT:  What exhibit are restarting on.

2          MR. SATIN:  We start with 467.

3          THE COURT:  What about 465?

4          MR. SATIN:  That one too.  I thought you asked me to

5   start with one.  I thought that was the question asked of me.

6          THE COURT:  That was the question you asked me.  I

7   thought you would start at the beginning rather than the end.

8   So 467.

9          MR. SATIN:  For what it's worth, 467 happened

10  chronologically before 465.

11         THE COURT:  So 467, what page and what words did you

12  say should have been redacted?

13         MR. SATIN:  Let me just --

14         THE COURT:  I don't need an intro.

15         MR. SATIN:  First of all, midway through the page.

16         THE COURT:  Where?  Which page?

17         MR. SATIN:  The first page.  The first redaction says

18  "person A."  Then right after, it says, "working for the

19  military intelligence."

20         THE COURT:  OK.

21         MR. SATIN:  That should come out.  That is the same

22  issue we argued about with President Obama, the President of

23  the United States.

24         THE COURT:  Anything else on that page?

25         MR. SATIN:  Well, I think nothing on that page from

F1mQsok1

1       what I gather is actually self-incriminatory to actually

2       declare --

3                   THE COURT:  You have to be more specific because

4       you're not going to win that argument.  Give me something

5       specific that you object to.  Is there any other redaction?

6                   MR. SATIN:  Yes.  It talks about the declarant being

7       registered with the Palestinian Authority -- worked without

8       being registered at the Palestinian Authority.  There are

9       numerous to Palestinian Authority on that first page and his

10      association with or without -- to or not to the Palestinian

11      Authority, none of that is self-incriminatory.

12                  THE COURT:  Anything else on this exhibit?

13                  MR. SATIN:  On the exhibit itself?

14                  THE COURT:  Yes, on the next couple of pages.  There

15      are four pages to this exhibit.

16                  MR. SATIN:  Part of the difficulty for me, your Honor,

17      is that 95 percent of it is not self-incriminatory with respect

18      to the declarant.

19                  THE COURT:  That is not the discussion we are going to

20      have today.  You have to give me a word you say I should take

21      out.  If you don't have a word that goes beyond your general

22      objection to the document, then I am going to address this

23      redaction and then we're moving on.  So if you don't tell me

24      specifically some other thing that falls into that specific

25      category, then let's just move on.

F1mQsok1

1          MR. SATIN:  OK.  The Court's indulgence one moment

2     then.

3          THE COURT:  While you are looking at that,

4     Mr. Yalowitz, my position --

5          MR. YALOWITZ:  What's your view on military

6     intelligence?

7          THE COURT:  My view is you should take out the words

8     "military intelligence."

9          MR. YALOWITZ:  If that's all we take out of this

10    document, we don't need further discussion.

11         THE COURT:  The only thing neither one raised, I was

12    concerned about the mobile phone number.  We have no concern

13    about that at this point putting that mobile phone number,

14    listing it in this document publicly?

15         MR. YALOWITZ:  I can assure the Court, I'm not going

16    to do a reverse lookup and try to argue that's the number of

17    some guy.

18         THE COURT:  I don't know whose number that is.  I

19    don't know who uses that number now.

20         MR. YALOWITZ:  Should we try it and see?

21         MR. ROCHON:  In the interest of caution, we should

22    take it out.

23         THE COURT:  That's why I raised it.  If that doesn't

24    have any utility for you --

25         MR. YALOWITZ:  It doesn't.

F1mQsok1

```
 1            THE COURT:  -- then let's be cautious and take it out.
 2    I don't want somebody calling someone who is a little old lady
 3    who now has the number in Tel Aviv someplace being called
 4    because they say she's a terrorist.
 5            MR. YALOWITZ:  If we take out "military intelligence"
 6    and the phone numbers, you don't need to hear from me on this
 7    document.
 8            MR. SATIN:  Your Honor, just to be clear, on the first
 9    page there's a lot of references to the Palestinian Authority.
10            THE COURT:  I think those are appropriate references.
11    They're not accusing the Palestinian Authority of committing
12    any criminal act.
13            MR. SATIN:  Let me show why I think that is not true.
14    For one thing, there is a reference on line 27:  "Cared for
15    people over the Palestinian Authority who had shot at IDF
16    soldiers in @Atira."
17            There's a reference to Palestinian Authority doing
18    criminal activity.  "My hand was blood-stained because I cared
19    for people of the Palestinian Authority."
20            THE COURT:  I understand.
21            MR. SATIN:  It's not clear who they're referencing,
22    but I think the suggestion is it was Palestinian Authority
23    people who were shooting at the IDF.
24            THE COURT:  I understand your argument.  I considered
25    that and I'm not going to take it out.
```

F1mQsok1

1        MR. SATIN:  Here is the other problem.  If we go above

2   the "military intelligence" line where it says, "I would meet

3   her supervisor at Palestinian Authority.  I agreed I would say

4   I would work only with her and would not be registered at the

5   Palestinian Authority."  Then there is a reference to "person

6   A."  People are going to assume that person A works for

7   Palestinian Authority because that's the person that the

8   introduction is to.

9        THE COURT:  Right.

10        MR. SATIN:  In the same vein that they should know

11   that person worked for military intelligence, they should not

12   know that person worked for Palestinian Authority.

13        THE COURT:  Mr. Yalowitz?

14        MR. YALOWITZ:  I think he is just getting -- I think

15   he is reaching and speculating here.  I think that the fact he

16   says, "My hand was blood-stained because I cared for people in

17   the Palestinian Authority," that could be anybody.

18        And the same with "I wouldn't be registered at the

19   Palestinian Authority."  Who knows what that means?

20        To me the issue is, this is a guy who is under

21   suspicion and ultimately pleads guilty to passing intelligence

22   information inappropriately.  He is convicted of that crime

23   Count Six, and this is his self-inculpatory statement that was

24   the basis for his conviction.  I think that comes in.

25        THE COURT:  The redactions as I indicated, those

F1mQsok1

1    redactions should be made.  That's it on this document.

2             Give me another document.

3             MR. SATIN:  We are on document number 465.

4             THE COURT:  All right.

5             MR. SATIN:  If we go to the second page, there's a

6    reference again "a source for military intelligence and

7    introduced me to person A."  Again, now it's likening person A

8    to a member of military intelligence.

9             MR. YALOWITZ:  I'm sorry, I just lost it, Mr. Satin.

10            MR. SATIN:  Page 2 of document 465, line 6.

11            MR. YALOWITZ:  Thank you.  I apologize.

12            THE COURT:  Take out the words "military

13   intelligence."

14            MR. YALOWITZ:  Yes, sir.

15            THE COURT:  Anything else?

16            MR. YALOWITZ:  I'm sorry.  What was the Court's ruling

17   on this one?

18            THE COURT:  Take out the words "military

19   intelligence."

20            MR. YALOWITZ:  Got it.

21            MR. SATIN:  If we go to page 4, another reference to

22   military intelligence in line 18.

23            THE COURT:  Line 18.

24            MR. SATIN:  Halfway between 18 and 19, it's not clear

25   which line it is --

F1mQsok1

1          THE COURT:  Is this the same reference to the arrest?

2     I keep getting them confused.

3          MR. YALOWITZ:  This is a different.  That was the

4     Abdullah Barghouti.

5          THE COURT:  Right.

6          MR. YALOWITZ:  This is a different revolving door

7     arrest.

8          THE COURT:  Where are you?  I see it.  The "preventive

9     intelligence"?

10          MR. SATIN:  Right.

11          THE COURT:  I do have that highlighted.  Why don't you

12     take that out?

13          MR. YALOWITZ:  Just tell me which words, Judge.

14          THE COURT:  Where it says "answer."

15          MR. YALOWITZ:  Yes.

16          THE COURT:  "Preventive intelligence" in that first

17     line.

18          MR. YALOWITZ:  Just the words "preventive

19     intelligence"?

20          THE COURT:  Yes.

21          MR. SATIN:  In the second line, "preventive

22     intelligence."  In the third line, "military intelligence."

23          THE COURT:  I don't feel strongly about this one.

24     It's basically they showed up to arrest him.  Quite frankly,

25     I'm not sure why you want to take that out consistent with your

F1mQsok1

1  argument that they arrested a terrorist.  So, you want me to

2  take it out, they're going to assume somebody else arrested

3  him, the Israeli authorities rather than the preventive

4  intelligence, but I don't know why -- as I say, you may have a

5  ground, but I don't know your reason for it.  If you want it

6  out, I'll take it out, and we'll assume it wasn't preventive

7  intelligence who came to arrest him.

8         MR. SATIN:  Very well.

9         THE COURT:  You want it out?

10         MR. SATIN:  Yes.

11         THE COURT:  All right.  Those two references to

12  preventive intelligence are taken out.

13         Up top in line 7 is also a phone number.  I don't know

14  whose phone number that is.  My suggestion in excess of

15  caution, take it out.

16         MR. SATIN:  Come back to where we were on line 16, 17,

17  18.  I know the Court referenced "preventive intelligence."

18  Also below that, line 18, "military intelligence."

19         THE COURT:  Do you have a position one way or another

20  on this?

21         MR. YALOWITZ:  I don't really.

22         THE COURT:  Tell me what your position is because you

23  are probably going to sway me one way or the other.

24         MR. YALOWITZ:  I think it should stay in.

25         THE COURT:  I'll keep it in.  It just says, "The

F1mQsok1

1    military intelligence had to arrest me."  That's all it says.

2    I'm not even sure there is anything called the military

3    intelligence.  The preventive intelligence I know they're

4    talking about a particular PA entity.

5                MR. SATIN:  Here is the concern with that one, your

6    Honor.  It's person A who is arguing about not arresting the

7    person.  The concern is that they will infer from that that

8    person A must be a member of military intelligence to be making

9    that argument.

10                THE COURT:  Whose military intelligence?

11                MR. SATIN:  The Palestinian Authority's.

12                THE COURT:  Is there such a thing called the military

13    intelligence?  I thought it was the preventive intelligence.

14                MR. SATIN:  They're different agencies.

15                THE COURT:  There is an agency called military

16    intelligence, a separate agency?

17                MR. SATIN:  Yes.

18                THE COURT:  I don't understand what the prejudice is.

19                MR. SATIN:  We spent a lot of time discussing whether

20    or not the jury would know the person who was redacted or

21    referred to as person A was a member of military intelligence.

22                THE COURT:  I know, but was accused of being complicit

23    in a terrorist act.  That's the primary goal here to protect.

24                MR. SATIN:  This suggests person A is trying to work

25    some internal magic to keep this person --

F1mQsok1

1           THE COURT:  You already had such evidence with the

2     Barghoutis.  That is not going to be a big surprise to the

3     jury.

4           MR. SATIN:  This is a separate entity.

5           THE COURT:  It know, but it is consistent with the

6     other evidence.  I understand your position.  I'm going to

7     leave military intelligence.  I will give you the two

8     "preventive intelligence" out.  Anything else?

9           MR. YALOWITZ:  Not from me.

10          THE COURT:  I want to just finish.

11          MR. HILL:  Your Honor, there are other documents in

12    our letter.

13          THE COURT:  I know, but anything else on these

14    redactions?

15          MR. HILL:  Not on the redaction.

16          THE COURT:  So we've dealt with the redaction.  Is

17    there anything else we think we are going to get to with this

18    witness this morning that I should address?

19          MR. ROCHON:  I have one very short thing on the Said

20    Ramadan video that we heard about.  I don't know if the

21    coverage was in Hebrew or Arabic.  I want to make sure as to

22    the witness we are not going to be describing what those words

23    are on the screen without us knowing in advance.

24          THE COURT:  Are you going to have him interpret this?

25          MR. YALOWITZ:  I think we've given him a translation.

F1mQsok1

1          THE COURT:  Are you going to have this witness

2    interpret this?

3          MR. ROCHON:  They're otherwise blacked out.

4          THE COURT:  I assume not.  I assume if you wanted

5    those words to come before the jury, you would have had those

6    words up on the screen.

7          MR. YALOWITZ:  We are planning to play it silently.

8          THE COURT:  So it is not going to tell us what he

9    heard.

10          MR. YALOWITZ:  No.

11          THE COURT:  He's not going to tell us what the guy is

12    saying.

13          MR. YALOWITZ:  No.

14          THE COURT:  No, he's not.  If he's going to tell us

15    what the guy is saying, you should have had an interpreter do

16    it and put the words up like everybody else.

17          MR. YALOWITZ:  OK.  The answer is no, he's not.

18          THE COURT:  Then that issue is resolved.  Let's get

19    the jury.

20          (Continued on next page)

21

22

23

24

25

F1mQsok1

1          (Jury present)

2          THE COURT:  Good morning, ladies and gentlemen.  I'm

3   not going to start making excuses for delaying you, but I am

4   going to say to you we used an hour of your time, and I'm

5   hopeful it will save us an entire day.  Having used that time,

6   I assure you it will save you time rather than just delaying

7   the trial.

8          We will continue at this point.

9          Mr. Yalowitz?

10         MR. YALOWITZ:  Thank you so much, your Honor.

11  ISRAEL SHRENZEL, resumed.

12  DIRECT EXAMINATION CONTINUED

13  BY MR. YALOWITZ:

14  Q.  Mr. Shrenzel, I think when we broke off, you were talking

15  about the team that you supervised in the preparation of your

16  report.  Am I remembering that right?

17  A.  Yes, sir.

18  Q.  Just remind me what you did in order to evaluate their work

19  before you signed off on that written report?

20  A.  Yes, I first went through the whole version of the initial

21  draft.  I revised parts of it.  I added to it.  And we had at

22  least two meetings together, me and the people of our team to

23  be sure that everything is OK.  And, of course, I reiterate

24  that the responsibility is mine and only mine.

25          (Continued on next page)

F1M8SOK2                          Shrenzel - direct

1    BY MR. YALOWITZ:

2    Q.  So just in terms of the actual preparation of the document,

3    did you sit like at a keyboard or --

4    A.  A what?

5    Q.  -- like a typewriter or something and do it yourself or did

6    you get a draft and then you checked it over?  Which one did

7    you do?

8    A.  OK.  I was e-mailed a Hebrew draft and I worked on that

9    draft.  I typed it and I worked at my desk revising it and, as

10   I said, also we had two meetings to discuss issues.  I edit and

11   revised and I -- the final version to which I approved was sent

12   to English translation.

13   Q.  OK.  Great.

14         Now, could you just compare the work style you had

15   that you just described for this report and your work style

16   that you had back when you were at the Israel Security Agency

17   supervising that team there?

18   A.  There were clear similarities between the two.  Of course,

19   during my work in ISA --

20   Q.  What is ISA?

21   A.  Israel Security Agency.

22         -- we dealt with classified materials that do not

23   exist in my report.  And basically what were the similarities I

24   can explain.

25         Also during my service, I assigned a group of people

F1M8SOK2                          Shrenzel - direct

1    to prepare a certain subject.  They gather the material.  They

2    prepare the version, let's say, for an intelligence report.

3    And I supervised it and went through its content, editing,

4    revising, sometimes throwing it all together away, etc.

5    Q.  That's great.

6          Now, these days, since you retired -- how long ago did

7    you retire from the ISA or that Israel Security Agency?

8    A.  Already ten years.

9    Q.  In recent years what have you been doing with yourself in

10   terms of academics?

11   A.  I teach for the last nine years in Tel Aviv University in

12   the department of Arabic and Islamic studies as an adjunct

13   professor.

14   Q.  As an adjunct professor?

15   A.  Yes, sir.

16   Q.  In addition to your teaching in the department of Islamic

17   studies, have you done any work as a professional in

18   translating?

19   A.  Yes, sir.

20   Q.  What kinds of things have you been involved with in that

21   capacity?

22   A.  Yes.  In the field of translation, I was part of a team

23   that issued a new Hebrew translation of the Koran.

24   Q.  Of the Koran?

25   A.  Koran, yes.  The holy book for the Muslim faith.

F1M8SOK2                        Shrenzel - direct

1   Q.  Tell us about that project a little.

2   A.  Well, it was headed by a professor in Tel Aviv University.

3   He was the chief translator.  And my work was of editing the

4   Hebrew version, suggesting some changes, reductions.

5   Q.  How did you feel about that work of translating the Islamic

6   holy book into the Hebrew language?

7   A.  I am very proud of it because I think it is a contribution

8   of the coming together between two cultures, the Muslim and the

9   Jewish, and I believe that the Jewish people in Israel should

10  know more about their neighbors, about the faith, the Muslim

11  faith in general.  So I think it was really a very positive

12  project.

13  Q.  Have you also done some other work involving translating

14  from the Arabic language into the Hebrew language?

15  A.  Not so much, just on a private basis.  I helped MA and

16  doctorate students in translating excerpts of their thesis.

17  Q.  Have you done some publishing of other written work besides

18  that Koran project?

19  A.  I was an editor or mainly a linguistic editor of two other

20  books relating to the Palestinian issue.  One is named -- it's

21  in Hebrew.  The book appeared in Hebrew and English.  The

22  translation of its name is the ticking bomb.

23  Q.  You said the ticking bomb?

24  A.  Yes.

25  Q.  What is the ticking bomb about?

F1M8SOK2                      Shrenzel - direct

1          MR. ROCHON:  Objection.

2          THE COURT:  Overruled.

3          He can answer.

4    A.  The ticking bomb is the name of the book and this book is a

5    collection of articles regarding the phenomenon of suicide

6    attacks, analyzing it and comparing it to other places in the

7    world, etc.

8    Q.  I think you mentioned there was a second book you worked on

9    as well.

10   A.  Yes.  The second book was -- again, I didn't write it.  I

11   was the editor, of Hamas lexicon.  It appeared in the first

12   edition in 2009 and later this year second edition.  This is

13   basically a lexicon of Hamas activists, activities, operatives,

14   and also refers to Hamas relations with other entities, etc.

15   Q.  Hamas, is that the Hamas organization we have heard some

16   testimony about earlier?

17   A.  Yes, of course.

18   Q.  Have you done other things, other written work that you

19   have published from time to time?

20   A.  Yes.  I published some book reviews that were pertaining to

21   Islamic issues.  Because, may I mention again that I teach

22   mainly about Islamic subjects, Muslim, Islamic movements, such

23   as the movement brothers.  I wrote some book reviews and

24   articles regarding modern Muslim thought, activities,

25   movements, etc.

F1M8SOK2                        Shrenzel - direct

1    Q.  Have you been a consultant to any commissions since your

2    retirement?

3    A.  Yes.  Once during the year 2007, in Israel was established

4    the Vinograd committee.  Vinograd is the name of the judge that

5    headed that committee.  It was a committee appointed by the

6    Israeli government to look into the facts and the failures or

7    the potential failures that happened during the second Lebanese

8    war in 2006.

9    Q.  What was your role, without getting into specifics, what

10   generally was your role?

11   A.  I was kind of an adviser to that committee, especially on

12   intelligence issues.

13   Q.  So what do you do in your spare time?

14   A.  Coming to freezing New York.  My main hobby is chess.  I am

15   an international chess master.  I didn't play much during the

16   last 30 years, but I do write a regular weekly column in the

17   Haaretz newspaper.  It is one of the leading newspapers.

18   Q.  Have you enjoyed your time here in New York?

19   A.  So far so good.

20   Q.  Did you do anything good yet?

21   A.  Yesterday and today I am contributing to the service of

22   justice here, yes.

23   Q.  I hope you had some time off.

24   A.  Yes.  No complaints.

25   Q.  By the way, what languages do you speak?

1    A.  Well, the audience can evaluate my English.  Besides that,

2    I am quite good in Arabic, especially in written Arabic, what

3    is called Fusha.  This is the literary version of Arabic.  In

4    dialects I am not that good.  Besides that, I have good

5    knowledge of French, of Russian and maybe less of Spanish and

6    Persian.

7    Q.  In preparation for your testimony today, did you have the

8    opportunity to review documents?

9    A.  Of course.  Of various sources, yes.

10   Q.  What kind of documents did you look at in order to prepare

11   yourself for talking to our jury?

12   A.  I looked, as they say, let's begin from the legal point of

13   view.  I went through the verdict, the indictment, verdict and

14   sentencing of the persons that are in the center of our cases.

15   I looked at the IDF reports of various kinds, of Israeli

16   government reports, of American administration reports.  Some

17   of them were mentioned here yesterday.  And open source, like

18   newspapers, YouTube videos or clips, and also another report or

19   category of documents that were supplied to us by the

20   defendants.

21   Q.  What was your methodology in evaluating those kinds of

22   documents?

23   A.  As I said yesterday, I believe we tried to focus on facts

24   that are clear from those documents and tried to analyze each

25   attack to confirm, to understand what actually happened, who

1  was involved, and what was the links of the perpetrators to the

2  PA, to the defendants, and what was, let's say, the attitude of

3  the defendants toward that attack and towards its perpetrators.

4  Q.  In evaluating that last part about the attitudes, did you

5  consider policies and practices of the Palestinian Authority

6  and the PLO?

7  A.  Yes.  We considered what was said in the documents, what

8  was said in funerals, what was said in various occasions.

9  Q.  So how did the methodologies that you used in this case

10  compare to the methodologies that you used back when you were

11  supervising the team at the ISA, Israel Security Agency?

12  A.  As I said, there are similarities.  The basic thing is that

13  we tried to base our assessment and assertions on facts that

14  can be proven and shown if necessary.

15          MR. YALOWITZ:  Your Honor, plaintiffs offer Mr.

16  Shrenzel as an expert on the policies of the Palestinian

17  Authority and the PLO as they are linked to these attacks in

18  his opinions, such as the payment of salaries to convicted

19  terrorists --

20          MR. ROCHON:  Objection, your Honor.

21          THE COURT:  Slow down.

22          MR. YALOWITZ:  It's an offer, a proffer.

23          THE COURT:  I am sure that's not his area of

24  expertise.  He has a broader area of expertise.  So give me in

25  general.  If he was a brain surgeon, you would offer him as an

F1M8SOK2                      Shrenzel - direct

1   expert as a brain surgeon.  I assume his expertise is a lot

2   more expanded than the limited.  What kind of expert is he?

3           MR. YALOWITZ:  He is an expert on terrorism as it

4   relates to the policies and practices of the PA and the PLO.

5           MR. ROCHON:  I have no objection to that.

6           THE COURT:  You can inquire on that basis.

7           MR. YALOWITZ:  Thank you so much, your Honor.

8   BY MR. YALOWITZ:

9   Q.  Now, Mr. Shrenzel, I would like to begin by directing your

10  attention to what I believe to be a chart or a stack of

11  photographs on the podium before you.

12          Do you have that?

13  A.  Do you refer to the photographs of the relevant persons?

14  Q.  Yes.

15  A.  OK.  I have it with me.

16  Q.  I just want to go down the list and ask you about each one.

17          Let's begin with Plaintiffs' Exhibit 154 for

18  identification.  Have you had a chance to look at that

19  photograph?

20  A.  Yes.  I basically reviewed all the sources that are

21  mentioned here relating to each photo.

22  Q.  Who is 1154 in your opinion?

23  A.  This is Mohamed Sami Abdullah.  Would you like me to tell

24  in which case he is involved?

25  Q.  No.  If you could just explain what your basis is for

F1M8SOK2                    Shrenzel - direct

 1   concluding that this is Mohamed Sami Abdullah, that would be
 2   great.
 3   A.  As it says in this chart, it's a YouTube clip or YouTube
 4   film.
 5   Q.  Did you or somebody under your supervision check that link
 6   and determine that -- check it and make some determination
 7   about it?
 8   A.  Yes.  I personally did it in the last few days again.
 9   Q.  What is your conclusion about the reliability of that
10   particular source?
11   A.  I think that it gives us an accurate photo of this person.
12            MR. YALOWITZ:  Plaintiffs offer 1154 in evidence.
13            MR. ROCHON:  Objection.  Lack of foundation.  We would
14   like to either approach or --
15            THE COURT:  No.
16            Is there any dispute as to who this person is?
17            MR. ROCHON:  I have never met this person.
18            THE COURT:  I just don't have the exhibit in front of
19   me.  Do I have the stack of exhibits that you're going through?
20   Is that in a binder somewhere?
21            MR. YALOWITZ:  It is.  I think we can get it in a
22   binder.
23            THE COURT:  Do I have it?
24            MR. ROCHON:  It's right here.
25            THE COURT:  I am going to -- why don't you just lay a

F1M8SOK2                    Shrenzel - direct

1    little more foundation as to how he knows who this person is.

2              MR. YALOWITZ:  Sure.

3    BY MR. YALOWITZ:

4    Q.  Can you just give us a little bit more detail on how you

5    know who this person is.

6    A.  Well, when you look at this clip, it is clear from the

7    saying, from the words that are written there that we deal with

8    this person.

9    Q.  In your professional career, have you had occasion to rely

10   on those kinds of sources to reach conclusions?

11   A.  Yes.  Maybe not that often, but it happened, yes.

12   Q.  OK.

13             MR. YALOWITZ:  With that additional foundation,

14   plaintiffs offer 1154.

15             THE COURT:  As a photo of?

16             MR. YALOWITZ:  As a photo of Mohamed Sami Abdullah.

17             THE COURT:  Then I will admit it.

18             (Plaintiff's Exhibit 1154 received in evidence)

19   BY MR. YALOWITZ:

20   Q.  Could you tell us who is in the photo that's been marked as

21   1155.

22   A.  This is Majed al-Masri.

23   Q.  What is the source for that photo?

24   A.  Again, a YouTube clip which pays tribute to him or praises

25   him.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1M8SOK2                          Shrenzel - direct

1    Q.  Have you had the opportunity to evaluate that clip and

2    reach a determination as to whether it's a reliable source for

3    the image of this individual?

4    A.  Yes, it is.

5              MR. YALOWITZ:  Plaintiffs offer 1155 in evidence.

6    It's a photo of Majed al-Masri.

7              MR. ROCHON:  Foundation.

8              THE COURT:  It will be admitted.

9              (Plaintiff's Exhibit 1155 received in evidence)

10   BY MR. YALOWITZ:

11   Q.  Have you had a chance to look at Exhibit 1158?

12   A.  Yes, sir.  This is the photo of Said Awada.  This is taken

13   from his martyr file supplied to us by the defendants.

14             MR. YALOWITZ:  Plaintiffs offer 1158 in evidence.

15             THE COURT:  It will be admitted.

16             MR. ROCHON:  We don't object, but I don't think we

17   have a copy of that.

18             THE COURT:  I don't have that either.

19             I have 1155 and then 1162.

20             MR. ROCHON:  Based on the representation we are

21   comfortable getting it later so we can move on.  Given where he

22   said he got it from, we are not going to contest foundation.

23             MR. YALOWITZ:  I think Mr. Rochon --

24             THE COURT:  We will admit it into evidence.

25             (Plaintiff's Exhibit 1158 received in evidence)

F1M8SOK2                      Shrenzel - direct

1          MR. YALOWITZ:  There may be one or two that I can

2   skip, your Honor.

3          I think we have done the next two, but we are just

4   going to double check.

5          THE COURT:  You believe the next three are already in

6   evidence.

7          MR. YALOWITZ:  I believe 1159 and 1153 and 1162 are

8   already in evidence, but we are going to double check on that.

9   If we have to come back to them, we will.

10          THE COURT:  Sure.

11  BY MR. YALOWITZ:

12  Q.  Now, have you had a chance to look at Exhibit 1166?

13  A.  Yes.

14  Q.  Who is in 1166?

15  A.  This is Fares Ghanem, and the sources are various sites.

16  Q.  Have you found those kinds of sources to be reliable in

17  your professional evaluation?

18  A.  Yes, I do.

19          MR. YALOWITZ:  Plaintiffs offer 1166.  It's a

20  photograph of Fares Ghanem.

21          THE COURT:  Again, I don't have it in the photographs

22  you gave me.  I assume both sides have it.  So I'll admit it.

23          (Plaintiff's Exhibit 1166 received in evidence)

24  A.  In Arabic it's Fares.

25  Q.  I will never get it right.

F1M8SOK2                          Shrenzel - direct

1          Let's go to 1167, Ibrahim Abdel Hai.

2   A.  Yes.  Again, in an Internet site that I rely on, this is a

3   photo.

4   Q.  Is the site and the source that the site has reliable based

5   on your professional experience with this kind of thing?

6   A.  Yes.

7          MR. YALOWITZ:  Plaintiffs offer 1167 in evidence.

8          THE COURT:  It will be admitted.

9          (Plaintiff's Exhibit 1167 received in evidence)

10  BY MR. YALOWITZ:

11  Q.  Let's go to 1169, Hilmi Hamash.

12  A.  Yes.  Again, this is a video clip already taken from a

13  television show or television program.  I believe this is a

14  clear representation of this photo.

15         MR. YALOWITZ:  Plaintiffs offer 1169 in evidence.

16         MR. ROCHON:  That's another one we don't have.  May we

17  approach briefly on this?  We would like to have the exhibits.

18         THE COURT:  Why don't you get it from him.  Don't come

19  up here.

20         Mr. Yalowitz, give him a copy of the photos.  I

21  believe you produced them previously, but give them to him so

22  he can follow.

23         MR. YALOWITZ:  We certainly did, and I expected they

24  would have them handy.

25         MR. ROCHON:  Let's not have this kind of -- they are

F1M8SOK2                    Shrenzel - direct

1    not in the binder.

2              THE COURT:  Just get the photos together and let's go.

3              MR. ROCHON:  We have got them.

4    BY MR. YALOWITZ:

5    Q.  Let's go to 1171.  Who is this fellow?

6    A.  This is Muhammad Hashaika.  Again, it's based on Internet

7    sites and I believe them to be credible and this photo is

8    reliable.

9              MR. YALOWITZ:  Plaintiffs offer 1171 in evidence.

10             THE COURT:  It will be admitted.

11             (Plaintiff's Exhibit 1171 received in evidence)

12   BY MR. YALOWITZ:

13   Q.  Let's go to 1172.  Who is that?

14   A.  This is Wafa Idris.  Based on several sites, also a picture

15   was widely published in the press.  There is no doubt about

16   that.

17             MR. YALOWITZ:  Plaintiffs offer 1172 in evidence.

18             THE COURT:  It will be admitted.

19             (Plaintiff's Exhibit 1172 received in evidence)

20   BY MR. YALOWITZ:

21   Q.  Let's go to 1173.  Who is that fellow?

22   A.  Ali Ja'ara.

23   Q.  How do you spell that in English?

24   A.  J-A-A-R-A.

25   Q.  What is the basis -- what is the source that you are

1   relying on for 1173?

2   A.  This is a site of Palestinian news agency.

3   Q.  In your professional opinion, is that a reliable site for

4   an image like this?

5   A.  Yes, for this purpose at least.

6           MR. YALOWITZ:  Plaintiffs offer 1173 in evidence.

7           THE COURT:  It will be admitted.

8           (Plaintiffs' Exhibit 1173 received in evidence)

9   BY MR. YALOWITZ:

10  Q.  Now, 1175, who is this an image of?

11  A.  This is Mohamed Ma'ali.  The source here is from a site

12  that deals with Palestinian prisoners.

13  Q.  Is it a reliable source for this kind of information?

14  A.  Yes, it is.  And I believe the photo is accurate.

15          MR. YALOWITZ:  Plaintiffs offer 1175 in evidence.

16          MR. ROCHON:  No objection.

17          THE COURT:  It will be admitted.

18          (Plaintiff's Exhibit 1175 received in evidence)

19

20  Q.  Let's go to 1176.  Who is this a photo of?

21  A.  This is Abdel Rahman Maqdad.

22          MR. YALOWITZ:  Plaintiffs offer 1176 in evidence.

23          MR. ROCHON:  No objection.

24          THE COURT:  It will be admitted.

25          (Plaintiffs' Exhibit 1176 received in evidence)

F1M8SOK2                         Shrenzel - direct

1    BY MR. YALOWITZ:

2    Q.  1177, who is that fellow?

3    A.  This is Mohamed Mousleh.

4                MR. YALOWITZ:  Plaintiffs offer 1177 in evidence.

5                MR. ROCHON:  No objection.

6                THE COURT:  It will be admitted.

7                (Plaintiffs' Exhibit 1177 received in evidence)

8    BY MR. YALOWITZ:

9    Q.  1178.

10   A.  Munzar Noor.

11   Q.  What is your source for that information?

12   A.  Video clip that I believe is reliable.

13               MR. YALOWITZ:  Plaintiffs offer 1178 in evidence.

14               THE COURT:  It will be admitted.

15               (Plaintiffs' Exhibit 1178 received in evidence)

16   BY MR. YALOWITZ:

17   Q.  Who is 1181?

18   A.  Said Ramadan.

19   Q.  What is your source for the photograph of Said Ramadan?

20   A.  This specific picture is taken from Abu Dhabi television on

21   which his picture was screened while he is taking

22   responsibility for the terror activity which he committed.

23               MR. YALOWITZ:  Plaintiffs offer 1181 in evidence.

24               THE COURT:  It will be admitted into evidence.

25               (Plaintiffs' Exhibit 1181 received in evidence)

F1M8SOK2                         Shrenzel - direct

1   BY MR. YALOWITZ:

2   Q.  1182, who is that?

3   A.  This is Kahira Sa'adi.

4   Q.  What is your source for that photograph?

5   A.  The source is an Israeli film that dealt with the

6   phenomenon of Palestinian female terrorists and she was

7   interviewed for that film.

8   Q.  This is like a screen shot?

9   A.  A documentary.

10  Q.  It's a still from the documentary?

11  A.  Yes, it is.

12          MR. YALOWITZ:  Plaintiffs offer 1182 in evidence.

13          THE COURT:  It will be admitted.

14          (Plaintiffs' Exhibit 1182 received in evidence)

15  BY MR. YALOWITZ:

16  Q.  How about 1183, who is that?

17  A.  This is Ahmed Salah, and the source is from a site of the

18  Palestinian Prisoners Club.

19  Q.  Is that a reliable site for images like this?

20  A.  Yes, it is.

21          MR. YALOWITZ:  Plaintiffs offer 1183 in evidence.

22          THE COURT:  It will be admitted.

23          (Plaintiff's Exhibit 1183 received in evidence)

24  BY MR. YALOWITZ:

25  Q.  1185, who is that?

F1M8SOK2                          Shrenzel – direct

1   A.   This is Nasser Shawish.

2   Q.   What is your source for that image?

3   A.   This is a Palestinian television program that was dedicated

4   to him and his family.

5   Q.   Is that a reliable source for images like this?

6   A.   Yes, it is.

7              MR. YALOWITZ:  Plaintiffs offer 1185 in evidence.

8              THE COURT:  It will be admitted into evidence.

9              (Plaintiffs' Exhibit 1185 received in evidence)

10  BY MR. YALOWITZ:

11  Q.   How about 1186, who is that?

12  A.   Sana'a Shehadeh.  Again, it is taken, I believe, from the

13  Israeli film about the female Palestinian terrorists.

14             MR. YALOWITZ:  Plaintiffs offer 1186 in evidence.

15             THE COURT:  It will be admitted into evidence.

16             (Plaintiffs' Exhibit 1186 received in evidence)

17             MR. YALOWITZ:  I think I just need to do one more.

18  BY MR. YALOWITZ:

19  Q.   You have 1159 before you?  It's on the first page of your

20  summary.

21  A.   I thought we are already done.

22             1159, Abdel Karim Aweis.

23  Q.   What is your source for that image?

24  A.   It's written here it was taken from a previous witness

25  expert report.  It is taken from the Israeli press.

F1M8SOK2                         Shrenzel – direct

1    Q.  Is that source reliable for this kind of an image in your

2    opinion?

3    A.  Yes, it is.  Also, he is a very well-known figure,

4    Palestinian.

5    Q.  Do you recognize him?

6    A.  I don't have a clear recollection of me recognizing him

7    immediately, but I know that I have seen his picture even

8    before dealing with this case.

9               MR. YALOWITZ:  Plaintiffs offer 1159 in evidence.

10              THE COURT:  It will be admitted into evidence.

11              (Plaintiff's Exhibit 1159 received in evidence)

12              MR. YALOWITZ:  I think we have done the photos.

13   BY MR. YALOWITZ:

14   Q.  Now, I want to go to a document that we have marked for

15   identification as 1193.  I am not sure if the witness has that

16   one.  Oh, he does.

17              Can you describe what 1193 is?

18   A.  Yes.  1193 I have.  This is a summary of the six terror

19   attacks that are in the center of this trial.

20   Q.  Did you look it over and make sure it was accurate based on

21   all of the work you have done in preparation for your testimony

22   here today?

23   A.  Yes, I did.

24              MR. YALOWITZ:  Plaintiffs offer 1193 in evidence, your

25   Honor.

F1M8SOK2                        Shrenzel - direct

```
 1              MR. ROCHON:  No objection to 1193.

 2              THE COURT:  1193 will be admitted.

 3              (Plaintiff's Exhibit 1193 received in evidence)

 4    BY MR. YALOWITZ:

 5    Q.  I also want to direct your attention to Exhibits 1120 and

 6    1121, which you should have before you.

 7    A.  Yes, I do.

 8    Q.  Just describe in general what those documents are.

 9    A.  Let's begin with 1120.  1120 is the summary of the

10    defendants' payment to convicted nonemployees of the PA of

11    course.  It specifies the name, the year of arrest, the year of

12    conviction and the years paid.

13    Q.  Did you have the opportunity to check the sources of all of

14    this information on this chart and confirm to your

15    satisfaction?

16    A.  Yes.  It constitutes part of my original report.

17    Q.  Are there some individuals that were not in your report

18    that you also had the opportunity to check up on?

19    A.  I believe I did, yes.

20              MR. YALOWITZ:  Plaintiffs offer 1120 in evidence as a

21    summary exhibit, your Honor.

22              MR. ROCHON:  We do have an objection and we do need to

23    approach.  I am very sorry.

24              THE COURT:  I thought we already discussed this

25    document.
```

F1M8SOK2                        Shrenzel - direct

1          MR. ROCHON:  We did.

2          MR. YALOWITZ:  May I consult with counsel?

3          THE COURT:  Is there some reason we didn't discuss

4    what you want to discuss now?

5          MR. ROCHON:  We did.

6          THE COURT:  We already discussed it and I have already

7    ruled?

8          MR. ROCHON:  Yes, and the version that I have doesn't

9    reflect that.

10          THE COURT:  Speak to Mr. Yalowitz and see if some

11   error has been made.

12          MR. YALOWITZ:  Let's see if there is something we can

13   organize.

14          (Pause)

15          MR. ROCHON:  We have worked it out.  No objection.

16   BY MR. YALOWITZ:

17   Q.  Let's go to 1121.

18   A.  1121 is the pay and promotion to the defendants' employees,

19   mainly people involved in the attacks of various PA agencies.

20   Again we have the name, we have the branch of service, the

21   years paid, the year of arrest order, the year of the

22   conviction, and the number of post-attack promotions.

23   Q.  Have you had an opportunity to check over the information

24   on this chart and satisfy yourself as to its accuracy based on

25   the sources available to you?

F1M8SOK2                    Shrenzel - direct

1   A.  Yes.  All of them are mentioned in my report.

2   Q.  To the extent they are individuals -- I think they are all

3   mentioned in the report.

4           MR. YALOWITZ:  Plaintiffs offer 1121 in evidence.

5           THE COURT:  1121 will be admitted.

6           (Plaintiffs' Exhibit 1121 received in evidence)

7           MR. YALOWITZ:  At this point, your Honor, what I would

8   like to do is hand out some materials to the jury, with the

9   court's permission.  It's a binder of exhibits that we have

10  already provided to the defendants.

11          THE COURT:  Is it a binder of exhibits that are

12  already in evidence?

13          MR. YALOWITZ:  Perhaps we ought to give the court a

14  copy and just move them in evidence en masse.

15          THE COURT:  You need to lay a foundation for some of

16  the documents.  Let's do it before we hand them all out.

17          MR. ROCHON:  Does your Honor anticipate taking a

18  mid-morning recess at any point?

19          THE COURT:  Yes.  Probably in about 20 minutes.  Did

20  you need it before that?

21          MR. ROCHON:  Yes.

22          THE COURT:  Let's try to set this up first.  Let's do

23  about ten minutes.  Is that all right?

24          MR. ROCHON:  Of course, your Honor.

25  BY MR. YALOWITZ:

F1M8SOK2                    Shrenzel - direct

1    Q.  Mr. Shrenzel, I have placed before you a binder and it has

2    on the cover January 22, 2002, 4:20 p.m., Jaffa Road,

3    Jerusalem.

4            Do you have that binder before you?

5    A.  Yes, I do.

6    Q.  Can you just turn to the index.

7    A.  Yes, sir.

8    Q.  Also, could you look at -- could you just describe to the

9    court what this index is.

10   A.  I believe this is an index of exhibits relating to the

11   attack that took place on that date.

12   Q.  So just describe, without going into any particulars, just

13   describe the kind of documents that are in this binder.

14   A.  Again, we can see a variety of sources.  If we just look at

15   exhibits pertaining to the first perpetrators, we see martyr

16   file, we see employment records, we see GIS, which means

17   general intelligence service, the Palestinian Intelligence

18   Service files.  In the next one we see indictment, hearing

19   record.  We have again, files, employment records and so forth.

20   Q.  Have you had the opportunity to evaluate all these

21   documents and read them and so forth?

22   A.  I did.

23           MR. YALOWITZ:  Your Honor, in order to save time what

24   I think I would like to do is move the documents that are

25   listed in the index before you.  Some of them have been

F1M8SOK2                          Shrenzel – direct

1    redacted in accordance with the court's prior rulings.  We can

2    then file on the docket the index so that the court will have a

3    record of what has been offered in evidence.

4              MR. ROCHON:  Subject to prior, we don't object.

5              THE COURT:  Sure.

6              MR. YALOWITZ:  Great.  So then I am ready to hand out

7    the binder.

8              THE COURT:  Let's do this.  Let me give the jury a

9    ten-minute break, and it will be ten minutes this time, ladies

10   and gentlemen.  We will put out the binders on the seat.  You

11   will come back and the binders will be there and we will

12   continue.

13             (Jury exits courtroom)

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

F1M8SOK2                        Shrenzel – direct

1              (Jury not present)

2              MR. YALOWITZ:  Just before we break, one logistical

3     thing.

4              MR. ROCHON:  Can Mr. Shrenzel wait one second?

5              THE WITNESS:  It's OK.

6              MR. ROCHON:  The witness has a summary up there with

7     him.  We don't have a copy of what the witness has.  They said

8     he can take a teddy bear if he wanted.  We should have a copy

9     of the teddy bear if they bring something up.

10             THE COURT:  If he is going to utilize that with his

11    testimony, and you want to look at it, you can look at it.  You

12    have the right to do so.  You even have the right, depending on

13    how they want to handle it.  If you want to save us all time,

14    you can see what they have.  If they don't want to do that, you

15    can get up on cross-examination and demand to see it.

16             MR. ROCHON:  I am sure Mr. Yalowitz would prefer the

17    latter.

18             MR. YALOWITZ:  Let me take that one under advisement.

19    I enjoy watching Mr. Rochon perform.

20             THE COURT:  Take it under advisement for two minutes

21    and then make a decision.

22             Yes, you have the right to see it.  I can either order

23    you to show it to him now or he can ask him what he has in

24    front of him in front of the jury.

25             Mr. Yalowitz, you had something.

F1M8SOK2                      Shrenzel - direct

 1           MR. YALOWITZ:  Just one logistical thing.  In addition

 2    to the binders, I would like to give the jury copies of 1120

 3    and 1121, which are the summary charts we just moved in

 4    evidence, and also copies of this little card.

 5           THE COURT:  Is that the one you used before?

 6           MR. YALOWITZ:  Yes.  We have now moved it in evidence.

 7    I just wanted to get the court's permission.

 8           MR. ROCHON:  The same one they used in opening.

 9           THE COURT:  Sure.

10           MR. ROCHON:  It's in evidence.  I don't think I have a

11    grounds to it other than some of this might be duplicative.

12           THE COURT:  You may proceed in that manner if that's

13    the way you want to proceed.

14           We will take a short break.

15           (Recess)

16           THE COURT:  Are we all set with the binders?

17           MR. ROCHON:  I haven't heard on Mr. Yalowitz's

18    consultation with himself.

19           MR. YALOWITZ:  I am sorry, Mr. Rochon.  Finish your

20    statement and then I need to consult and then --

21           MR. ROCHON:  You didn't interrupt.  I just said I

22    haven't yet got an answer on the summary.

23           MR. YALOWITZ:  I understand.

24           THE COURT:  Is that a question?

25           MR. YALOWITZ:  We don't have a problem if Mr. Rochon

F1M8SOK2                    Shrenzel – direct

1    wants to see the notes that Mr. Shrenzel was referring to.

2              You want to come up and look at them right now?

3              MR. ROCHON:  If Mr. Shrenzel just shows me when we

4    break for lunch, if that's convenient.

5              THE COURT:  All right.  As long as he sees it before

6    he gets to cross.

7              Let's get the jury.  We are doing well.  Let's move

8    along.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1              (Jury present)

 2              THE COURT:  Mr. Yalowitz, you can continue.

 3              MR. YALOWITZ:  Thank you, your Honor.

 4              As you can see, we have handed out a thoroughly large

 5    binder, members of the jury.  We will try to get that binder

 6    off your lap as soon as we can.  I know it is a bit of a hefty

 7    one.

 8              With the Court's permission, there are three other

 9    things I would like to hand out to the jury and they can just

10    tuck them into the binder and have them handy.

11              THE COURT:  All right.

12              MR. YALOWITZ:  We are handing 1120, 1121 and 1193.

13              While we are handing those out, your Honor, I just

14    want to reflect to the court and to counsel that in addition to

15    the documents listed in the index of this binder, the binder

16    also has the photographs we were just going over that are

17    relevant to the particular perpetrators at issue here.

18              THE COURT:  All right.

19              MR. YALOWITZ:  We are almost ready to go.

20    BY MR. YALOWITZ:

21    Q.  Now, Mr. Shrenzel, have you had the opportunity to

22    familiarize yourself with the shooting attack that occurred on

23    January 22, 2002?

24    A.  I did.

25    Q.  Just tell the members of the jury generally what happened.

F1M8SOK2                     Shrenzel - direct

1    A.  Yes.

2              MR. ROCHON:  Objection, your Honor.

3              THE COURT:  Overruled.

4              He can answer.

5    A.  So in the very center of Jerusalem, on Jaffa Road, a

6    Palestinian policeman opened indiscriminate fire against the

7    crowd that was there at the time.  He killed two women and he

8    wounded dozens of others.

9              Later he was captured and killed by the Israeli

10   security forces that rushed to the scene.

11   Q.  Have you had the opportunity to examine a photograph of the

12   scene of this crime?

13   A.  Yes, I have.  Yes.

14             MR. YALOWITZ:  With the court's permission, I will

15   show that to the witness.

16             THE COURT:  Yes.

17             MR. YALOWITZ:  Ladies and gentlemen, I apologize.  We

18   seem to be having a little technological challenge.

19             Why don't we move on from that.  We will try to

20   address that at a break.

21   Q.  So let's go right to the binders.

22             If you could just open your binders, ladies and

23   gentlemen, and Mr. Shrenzel, and just turn to that first photo.

24             Who are we looking at here?

25   A.  This is Said Ramadan, the policeman that committed this act

F1M8SOK2                      Shrenzel - direct

1    of terror.

2    Q.  I think you mentioned earlier that this is a photo from a

3    video, is that right?

4    A.  From the Abu Dhabi television, if I am not mistaken.  But

5    it may be another channel.  And this is his photo.  While

6    declaring his readiness -- he was filmed before the attack of

7    course and in order to be presented afterwards while he

8    declares his readiness and willingness to carry it out.

9    Q.  What does the headband say?

10   A.  This says *Kata'ib Shuhada*, which means Al Aqsa Martyr

11   Brigades.

12   Q.  What language is that?

13   A.  This is in Arabic.

14   Q.  What is the weapon he is holding?

15   A.  According to my common knowledge of weapons, this is M-16.

16   Q.  I want you to give the jury some information about the

17   first document in their binder which is behind tab A.  It's

18   Exhibit 60.

19   A.  This document summarizes the basic facts about this person.

20   It is issued by the martyrs' families, families in the Injured

21   Care Establishment, and it's basically what we call his martyr

22   file.

23   Q.  So let's turn the page and just look at page 2 of this

24   martyr file.

25            By the way, who prepared this document?

F1M8SOK2                    Shrenzel – direct

1    A.   This was prepared by this institute.

2    Q.   I just want to go back to the front page.  At the very top

3    it says –– I want to direct you to where it says, Palestinian

4    National Authority, Ministry of Social Affairs.

5            Do you see that?

6    A.   Yes, sir.

7    Q.   Where it says Palestinian National Authority, what is that

8    institute?

9    A.   This is the PNA.  This is one of the defendants in this

10   case.  We usually refer to it as the PA, but the full name is

11   PNA, Palestinian National Authority.

12   Q.   And that eagle, what is that eagle?

13   A.   This is an emblem or the emblem of the PNA.

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1mQsok3                      Shrenzel – Direct

1    Q.  Great.  I want to now go back to the second page.  I just

2    want to focus you on personal data, and can we tell from this

3    personal data who the martyr is in this case?

4    A.  Yes, it's written.  His name is written here.  Said

5    Ramadan.  Also where he served in the maritime police.  He was

6    a maritime police officer and some other details regarding him.

7              MR. YALOWITZ:  With the Court's permission, I just

8    want to read the description of the event according to the PA's

9    documents?

10             THE COURT:  Yes.

11   BY MR. YALOWITZ:

12   Q.  "He was martyred by executing a martyrdom operation in West

13   Jerusalem.  The operation led to the death and injury of a

14   number of Israelis."

15             Do you see, Mr. Shrenzel, there is an area that's been

16   blacked out on that page?

17   A.  Yes, I see it.  I can't see what is beyond it.

18             MR. YALOWITZ:  May I just read to the jury this

19   section, your Honor?

20             THE COURT:  Beginning where?

21             MR. YALOWITZ:  Right after the part that has been

22   blacked out.

23             THE COURT:  "He began"?

24             MR. YALOWITZ:  Yes, sir.

25             THE COURT:  Yes.

F1mQsok3                           Shrenzel - Direct

1    Q.  "He began his professional life as a mechanic after which

2    he joined the maritime police of the Palestinian National

3    Authority.  He was a corporal.  He was known to be a calm

4    person and faithful to his country.  Among his expressions was

5    'Oh, martyr you have tested my soul.'  He was martyred while

6    performing his national duty."

7            Does this statement in this document reflect any

8    policies that you're aware of?

9            MR. ROCHON:  Objection, your Honor.

10           THE COURT:  Sustained as to the form of the question.

11   Q.  Could you explain what they mean when they say he was

12   martyred while performing his national duty?

13           MR. ROCHON:  Objection, your Honor.

14           THE COURT:  Overruled.  You can answer and you can

15   cross-examine.

16   A.  Yes.  I think it speaks for itself, but let me add that it

17   reflects the fact that those who wrote this document; namely,

18   an official of the PA considers such an attack against

19   civilians in the center of Jerusalem as a performance of a

20   national duty, and also as written one line before, as proof of

21   his faithfulness to his country.  This is really very

22   disappointing.

23   Q.  Now, I just want to turn over one more page and ask you a

24   couple of questions.  The first one is looking at that page,

25   it's got a number at the very top on the top right that ends

1    with 9052.  Do you see that?

2    A.  Yes, I see this page.  Yes.

3    Q.  Great.  Then it's got a line that says department's

4    recommendation.  Do you have that?

5    A.  Yes.

6    Q.  Can you tell from this whether Said Ramadan had a wife or

7    children?

8    A.  I believe I saw before that he was single.

9            MR. YALOWITZ:  May I direct, your Honor?

10           THE COURT:  Yes.

11   Q.  Just reading the very first part.  Go ahead, Mr. Shrenzel.

12   A.  Yes, I see now that under the heading "decision of the

13   director," it states that "martyr was single."

14   Q.  I want to take you now to tab E in this first set of

15   documents.  That is Exhibit 153.  Let me know when you are

16   there, and I will make sure the members of the jury are with us

17   as well.

18   A.  I am.

19   Q.  Great.  Looks like everybody is there.

20           What kind of document are we looking at here?

21   A.  This is a general intelligence document.  I reiterate

22   again, a Palestinian document of the Palestinian general

23   intelligence.  And, again, it is a review of the data regarding

24   this individual.

25   Q.  When you said Palestinian document, could you just direct

F1mQsok3                      Shrenzel - Direct

1    us to the part of the document on the first page that you are

2    relying on for that?

3    A.  The heading on the left side, "general intelligence

4    northern governorates."

5    Q.  In the middle there right where it says:  "In the name of

6    Allah, the compassionate and merciful"?

7    A.  Palestinian National Authority.

8    Q.  Where do we see this is Said Ramadan's file?

9    A.  His name is clearly up in this page.

10   Q.  That's just right on the first page there?

11   A.  Yes.  Name and then -- the name is there.

12   Q.  So let's flip to the second page.  I want to ask you a

13   couple of questions about it.  Do you see there is a box toward

14   the bottom that says "text of report"?

15   A.  I do.

16   Q.  That is just right on the page that has a 9966 T in the

17   very bottom?

18   A.  9966, yes.

19          MR. YALOWITZ:  Your Honor, I just want to read from

20   that report, if I may.

21          THE COURT:  Go ahead.

22   BY MR. YALOWITZ:

23   Q.  "The aforementioned is a member of the Fatah movement.  He

24   was employed by the maritime police" --

25          THE COURT:  Marine.

F1mQsok3                    Shrenzel - Direct

1   BY MR. YALOWITZ:

2   Q.  I'm sorry, "Marine police in Nabus.  He carried an amaliya

3   istishhadyia."

4   A.  It's istishhadyia.

5   Q.  As I said, "an act of martydom in occupied Jerusalem in

6   2003 on behalf of the Al-Aqsa Martyr Brigade in retaliation for

7   the istishhad death as a martyr of Raed al-Karmi."

8           Could you just explain what amaliya istishhadyia is?

9   A.  Yes.  But let me first make a correction.  I think the

10  mistake is in the original.  It was in 2002 and not 2003.  OK?

11  Q.  Right.  OK.  That's helpful.

12  A.  Yes.

13  Q.  What about this employment by the marine police in Nablus?

14  Do you have other information about whether that's correct?

15  A.  Well, that's what it says, and there is no reason to have

16  doubts about it.  There were units of the marine police though

17  there is no sea in Nablus, but still the major bases of the

18  Palistinian naval forces were in Gaza, but they also had units

19  in other places.

20  Q.  Let's look at tab B.

21  A.  You wanted me to explain about the amaliya istishhadyia.

22  Q.  Yes, I'm sorry.

23  A.  Amaliya istishhadyia is the common name for an act of

24  terror where either it's a suicide attack or, as in this case,

25  it is clear to the perpetrators that he is not going out alive

1   of it; that his chances to survive the attack are very slim.

2   He didn't detonate a bomb, but, for example, he opened fire but

3   he knew in central Jerusalem probably he will be shot at by

4   Israelis policemen.

5   Q.  Thank you.  That's helpful.

6          Could we look at tab B together right in the very

7   front of the binder so we are still under Said Ramadan.  Just

8   go back two files to Exhibit 62.

9   A.  Under tab B?

10  Q.  B like bravo.  Have you got Exhibit 62 in front of you

11  there?

12  A.  No, it's probably mistaken in the tab.

13          MR. YALOWITZ:  May I approach, your Honor?

14          THE COURT:  Yes, please.

15          MR. YALOWITZ:  Thank you.

16  Q.  We are all looking at 62.

17  A.  Yes.

18  Q.  First of all, let's orient ourselves.  Whose document is

19  this?

20  A.  This is a document of the central financial administration.

21  It belongs to the ministry of interior and national security.

22  Q.  Of which --

23  A.  Again of the PNA.

24  Q.  What is that eagle we see at the top?

25  A.  The same emblem of the PNA that we mentioned before.

1    Q.  If we flip pages, first, second, third page.  What

2    information is there in this table.

3    A.  We have information about the salaries that he got and that

4    his family continued to get after his death in the years 2000

5    to 2002.

6    Q.  So this is his salary as a police officer?

7    A.  Yes, as a policeman.  Yes.

8    Q.  How much was he making in terms of net shekels as a police

9    officer, according to this document?

10   A.  For example, in 2000, it is written 943 shekels.

11   Q.  Can you convert on the fly what's the shekel-to-dollar

12   ratio roughly?

13   A.  Roughly one-to-four today.  But -- OK, I have no

14   recollection of the exact exchange rate at that period.

15   Q.  So if we took that one-to-four, am I kind of doing the math

16   in my head right, this is about a $250 a month job as a police

17   officer?

18   A.  Yes, it seems accurate.

19   Q.  That is as a corporal?

20   A.  Yes.

21   Q.  Could we flip past 2000 and 2001 and just look at 2002 for

22   a second?

23   A.  Yes.

24   Q.  First of all, do you recall from the documents when Said

25   Ramadan died?

F1mQsok3                        Shrenzel - Direct

1    A.  Yeah, he died on that very day, on the 22nd of January,

2    2002.

3    Q.  What are we looking at here in 2002 in terms of pay for

4    this man?

5    A.  That he continued to get -- or probably his family

6    continued to get his salary with some deductions.

7    Q.  So even after he died, they're still paying his salary?

8    A.  Yes.

9    Q.  How much is the salary as of January of 2002?  How much is

10   his sort of corporal maritime police salary?

11   A.  This is quite similar to what he earned as we discussed

12   previously, 964 shekels.

13   Q.  Then I see it looks like there's a change in the fifth

14   month of 2002?

15   A.  Yes.

16   Q.  What's happening there?

17   A.  I'm not aware of the reasons why it was a little bit

18   lowered.

19   Q.  What does it say in terms of the written description?  I'm

20   wondering it goes from "maritime Nablus," and then it says

21   "martyrs and the injured - the west."

22   A.  This is technical, more technical from where he is going to

23   get the salary he is going from the department of the maritime

24   police or from the department of the that institute.

25   Q.  Tab C, what kind of document are we looking at here?

F1mQsok3                        Shrenzel - Direct

1    A.  This is a document that relates to his promotion.

2    Q.  I want to focus on the first panel, that top third of the

3    document and just ask you about the very last entry in that

4    first panel of the top third.  Maybe we can put this on the

5    Elmo so everybody can see what we are talking about because

6    this is confusing.  Here we are looking at that comprehensive

7    overview statement.  I just want to direct your attention and

8    the attention of the members of the jury to the thing that I

9    have circled here promotion from corporal to sergeant

10   January 22, 2002?

11   A.  Yes.

12   Q.  So what is happening with that promotion?

13   A.  Yes.  Let me explain.  You see the date of the -- the date

14   when this promotion was issued is April 28, but it is really

15   since January 22; namely, the day of his death, of Said

16   Ramadan's death following the attack, and you are not showing

17   me the rank, but I remember it.  He was promoted d from

18   corporal to sergeant.

19   Q.  Do you see that in your binder?

20   A.  Yes.

21   Q.  If you open up 89, you see it right there in your own

22   binder?

23   A.  I do.

24   Q.  Great.

25              MR. ROCHON:  May I have a side bar with counsel for a

F1mQsok3                          Shrenzel - Direct

```
 1   second, your Honor?
 2            THE COURT:  Why don't you discuss it with him?
 3            MR. ROCHON:  That's what I said, sidebar with counsel.
 4            THE COURT:  This is the sidebar.
 5            MR. ROCHON:  Can I talk to him for a second?
 6            THE COURT:  Yes, talk to him.  That's a podium.
 7            (Pause)
 8            MR. ROCHON:  Thank you, your Honor.
 9   Q.  I think we've done enough on that.
10            Can you comment on the fact that this document shows
11   that he was given a promotion effective the day he committed a
12   terror act?
13            MR. ROCHON:  Objection, your Honor.
14            THE COURT:  Sustained.  Let me just give you some
15   guidance.  I prefer you not ask questions: "Can you comment
16   on."  Be more specific about what you are asking.  It's just
17   too general a question.
18            MR. YALOWITZ:  Thank you, your Honor.  We will be
19   guided by that.
20   Q.  Could you explain why he is getting promoted as of
21   January 22?
22            MR. ROCHON:  Objection, your Honor.
23            THE COURT:  Overruled.  You can cross-examine.
24   A.  Well, this was very common.  This is a token of
25   appreciation to what he did.  We already saw that in previous
```

F1mQsok3                         Shrenzel – Direct

 1    documents he performed his national duty, etc., and as a person

 2    that fulfilled his national duty and is no more among us, then

 3    he is promoted in order to enable his family to get a little

 4    bit more money.

 5    Q.  I just want to look at one more with you, one more document

 6    about him which is behind tab E, Exhibit 153.

 7    A.  I have it.

 8    Q.  I think we've gone over that.  I just want to direct you to

 9    the very bottom of the first page which it says in the very

10    bottom box "text of report."

11    A.  Yes.

12    Q.  Do you have that?

13    A.  Yes.

14    Q.  If you could just read that sentence, and then I have a

15    question for you about it.

16    A.  The aforementioned was martyred during a Fatah operation in

17    Israel.

18    Q.  Now, by the way, whose document is this?

19    A.  This is again a document of the Palestinian GIS, General

20    Intelligence Service.

21    Q.  Now, did a particular group take credit for this operation?

22              MR. ROCHON:  Objection, your Honor.

23              THE COURT:  Are you asking about something in the

24    document?

25              MR. YALOWITZ:  No.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1mQsok3                      Shrenzel - Direct

1          THE COURT:  About something in his personal knowledge?

2          MR. YALOWITZ:  About something based on his review of

3    the evidence.

4          THE COURT:  What evidence?  Evidence that's before

5    this jury?

6          MR. YALOWITZ:  It's before the jury, your Honor.

7          THE COURT:  Why don't you direct his attention to

8    something that is before the jury.

9          MR. YALOWITZ:  Sure.  Let's do it that way.  That will

10   be simpler.

11   Q.  Let's just turn over the page and look at the report on the

12   bottom of that next page.

13         THE COURT:  Where are you?

14         MR. YALOWITZ:  We are on 9966 T.

15         THE COURT:  Which tab?

16         MR. YALOWITZ:  Same tab, tab E like echo.

17   Q.  May I just direct the jury's attention to the statement:

18   "He carried out an amaliya istishhadyia in occupied Jerusalem

19   in 2003 on behalf of the Al-Aqsa Martyrs' Brigade."  Do you see

20   that statement.

21   A.  I do.

22   Q.  Now, have you had the opportunity to look at a videotape

23   that we talked about earlier?

24   A.  I did.

25   Q.  Have you reached an opinion about its authenticity based on

1   your evaluation of the tape and the place where you got it?

2   A.  I did.  As I said, it's very credible.

3   Q.  Let me ask you this:  Have you had the opportunity also to

4   look at a photograph which we've marked as Exhibit 407?  I will

5   just put it before you with the box top so you can see it.  Do

6   you see Exhibit 407 for identification on the screen before

7   you, Mr. Shrenzel?

8   A.  I do.

9   Q.  Have you had an opportunity to look at that photograph?

10  A.  I have.

11  Q.  What is it?

12  A.  It is part of the scene of this attack -- after the attack,

13  the wreckage brought about as a result of that attack.

14  Q.  Have you had an opportunity to evaluate the source of that

15  information?

16  A.  I did.

17  Q.  Do you believe it to be a reliable source for this kind of

18  photograph?

19  A.  I do.

20          MR. YALOWITZ:  Your Honor, plaintiffs offer 407.

21          MR. ROCHON:  No objection to 407.

22          THE COURT:  It will be admitted in evidence.

23          (Plaintiff's Exhibit 407 received in evidence)

24  Q.  What do we see here?

25  A.  We see here the remains of the bus stop after the attack

F1mQsok3                        Shrenzel - Direct

1    took place.

2    Q.  Are we able to enlarge it a little bit?

3            MR. YALOWITZ:  Plaintiffs would also move to admit the

4    Exhibit 196, clip 6 without sound.

5            MR. ROCHON:  Subject to prior, your Honor.

6            THE COURT:  Sure.  It will be admitted into evidence.

7            (Plaintiff's Exhibit 196 received in evidence)

8    Q.  Let's go to the videotape.  Tell us what we are going to

9    see before we queue it up there.

10           Mr. Shrenzel, what are we going to see?  Oh, you don't

11   know

12   A.  Foresight is not one of my qualifications mentioned.

13   Q.  Have you had a chance to look at a videotape of Said

14   Ramadan in the days or hours before his suicide operation?

15   A.  I believe it was incorporated in a broadcast that was on

16   the air after the attack.  And then in that broadcast was

17   included his picture, his photo and the fact that he belonged

18   to the Al-Aqsa Martyr Brigade taking responsibility.

19   Q.  Let's go to the videotape.  Can we pause it a second?  I

20   think I asked you about the headband and the gun.  Could you

21   just describe what that logo is on the canvas behind the gun?

22   A.  Yes, this is the logo of the Al-Aqsa Martyr Brigade.  You

23   see the rifles and you see the al-aqsa mosque.

24   Q.  In your experience when a person who is about to commit a

25   terror attack appears in a video like this, what is that an

F1mQsok3                         Shrenzel – Direct

1    indication of?

2    A.   This is an indication of his willingness and readiness to

3    carry out the attack, and one might say that this is very

4    important for those who organized it; that they have such a

5    video in order to glorify him later to show that he serves as a

6    war martyr.

7    Q.   I just want you to turn back before we finish the videotape

8    to tab E in your binder, that very first page of Exhibit 153.

9    A.   Yes.

10           MR. YALOWITZ:   Your Honor, may I just read to the jury

11   from the bottom of that document?

12           THE COURT:   Yes.

13   Q.   "The aforementioned was martyred during a Fatah operation

14   in Israel."  Whose document is this?

15   A.   This is the GIS document.

16   Q.   And the GIS is part of what entity?

17   A.   PNA.

18   Q.   Thank you.

19           Let's watch the remainder of the videotape.

20           (Videotape played)

21   Q.   Let's pause it for a second.  Can you tell what he is doing

22   there?

23   A.   He is reading what is supposed to be his will.

24   Q.   Thank you.  Let's continue.

25           (Videotape played)

1    Q.  Let's turn to the next tab in our binder PNA.  Who do we

2    have here in this photograph?

3    A.  I don't have a photograph. -- now I have it.

4    Q.  If you turn to the next, Mr. Shrenzel.

5              MR. YALOWITZ:  May I approach to make sure everyone

6    has the binder in mind?

7              THE COURT:  Yes.

8    Q.  Mr. Shrenzel, I am just going to direct you here to the

9    binder.  Who do we have here in your binder?

10   A.  Where?

11             THE COURT:  In the binder.  You're confusing.  That's

12   not the same picture in the binder.

13             THE WITNESS:  I have this picture.

14             THE COURT:  He has something different.  You put up

15   several pictures.

16   Q.  Whose tab on we on here?

17             THE COURT:  Do it by exhibit number.  What exhibit is

18   he looking at?

19   Q.  What exhibit are you looking at?

20   A.  1162.

21   Q.  Who is that?

22   A.  This is Ahmed Barghouti.

23   Q.  We can just flip through tab A and B.  We have seen those

24   before.  I want to direct you to tab C.  So what are we looking

25   at in Exhibit 36C?

1    A.  We have a list of his salaries as a policeman from the year

2    2000 to the year 2002.

3    Q.  Was this Ahmed Barghouti, was he an employee of the

4    Palestinian Authority?

5    A.  He was.  He was officially a Palestinian policeman.  Most

6    of the time he worked posts as Marwan Barghouti's bodyguard and

7    driver, and he was engaged in terrorist activity; but

8    officially he was a member of the Palestinian Police.

9    Q.  What was his salary as a Ramallah police corporal during

10   the year 2000?

11   A.  2000 if we take the first month, 1041 shekels.

12   Q.  Just doing our four-to-one math, do you get about $260 a

13   month?

14   A.  That's fair enough.

15   Q.  Now, I want to go past the schedule of his payments in the

16   years through '02 and go to the fourth page which says

17   "comprehensive overview statement" at the top?

18   A.  The same tab?

19   Q.  Yes, same tab.

20   A.  Yes, I found the comprehensive overview statement.

21   Q.  Can you just from that statement determine how many times

22   Ahmed Barghouti has been promoted after his arrest and

23   conviction?

24   A.  Yes, he was promoted twice.

25   Q.  Do you still have that Exhibit 1120, that summary sheet

1   before you?

2   A.  Yes, I do.

3   Q.  Can you just tell us where he is on the summary sheet?

4   A.  The third from the top.

5   Q.  Take us through what the summary shows about him.

6   A.  The summary shows that he was promoted from sergeant to

7   first sergeant and then to warrant officer and it even says

8   "pursuant to presidential orders."

9   Q.  Do you have 1121 before you?

10  A.  I do.

11  Q.  Take us through what we can learn about him just from 1121

12  alone.

13  A.  Well, I think that we already covered this basic

14  information; that he belonged to the police.  He's paid from

15  2000 until present and he was an arrested in 2002 and convicted

16  in 2003.  He was given three promotions, but I'm not sure about

17  the three.

18          THE COURT:  You have to keep your voice up.

19  A.  I counted twice, but --

20  Q.  Let's flip over to 1113.

21  A.  Under which tab?

22  Q.  1113, it's under tab D.

23          THE COURT:  113 or 1113?

24          MR. YALOWITZ:  113.  I apologize.

25  A.  OK.  This document there is another promotion, yes.

1    Q.   So we have that tied up.  Do you feel comfortable that it's

2    three promotions?

3    A.   Yes, it's three promotions as I have now a more updated

4    document and we can see that while the attack took place he was

5    a sergeant, and on 2010 he is already a captain.

6    Q.   I think you mentioned this earlier, but let's see if we

7    have it in a document.  Let's look at tab E Exhibit 142, Ahmed

8    Barghouti.

9    A.   Yes, sir.

10   Q.   Just tell us who created Exhibit 142?

11   A.   The general intelligence.

12   Q.   Of?

13   A.   Of the PNA.

14   Q.   Can you direct the jury to where it says what his

15   occupation is.  Toward the middle of the page on the left,

16   there is a box that says "occupation."  Do you see that?

17   A.   I do.

18   Q.   What are they listing as his occupation?

19   A.   He was brother Marwan al-Barghouti's bodyguard.

20   Q.   Remind us who is Marwan al-Barghouti?

21   A.   Marwan al-Barghouti is the head of Fatah in the West Bank,

22   head of legislative council and the mentor of the Al-Aqsa

23   Martyr Brigade.

24   Q.   Mentor?

25   A.   Mentor, father, one can even say commander to some extent,

F1mQsok3                              Shrenzel - Direct

1    OK.

2    Q.  Now, I want to turn the page on Ahmed Barghouti's

3    intelligence report and look at the second page with you, which

4    has 9925 T?

5    A.  I have it, sir.

6    Q.  Great.  I want to focus you on the text of the report down

7    at the bottom.  Do you have that?

8    A.  I do.

9    Q.  You see there are some places where there are three little

10   stars, three sets of three little stars.

11   A.  I do.

12   Q.  I want to read the first one, and then I want to ask you

13   about the second one with the Court's permission.

14          THE COURT:  Yes.

15          MR. YALOWITZ:  Thank you, your Honor.

16   Q.  "The aforementioned used to work as brother Marwan

17   al-Barghouti's bodyguard, but he was arrested by the Israeli

18   occupation forces and was sentenced to 15 life terms plus 50

19   years.  He is currently serving his prison sentence in the

20   al-Naqab prison."

21          MR. YALOWITZ:  May I continue, your Honor?

22          THE COURT:  Yes.

23   Q.  "It says the aforementioned is good in terms of security

24   and moral."

25          Mr. Shrenzel, have you had the opportunity to look at

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1mQsok3                          Shrenzel - Direct

1   this document in advance of your testimony?

2   A.  I did.

3   Q.  And the word moral, is that singular or plural in the

4   original?

5   A.  In the original it said says "achla" (ph) which means it is

6   better translated as moral in the plural.

7   Q.  Morals?

8   A.  Yes.

9   Q.  OK.  "The aforementioned is good in terms of security" --

10  and morals is the way you would write it.

11  A.  I would do it that way.

12  Q.  I want to go to the next individual in our binder.  His

13  name is Nasser Aweis.  I want to begin by looking at his

14  photograph with you?

15  A.  Yes, sir.

16  Q.  This is 1153.  Is that right?

17  A.  Yes.

18  Q.  Let's go past tab A which is his conviction.  I think we

19  can go right to tab B.  What is this document in tab 76?

20  A.  This is his prisoner file.

21  Q.  What are we looking at on the first page?

22  A.  On the first page what is the most interesting part is the

23  fact that the period of his detention between '86 and '91 he is

24  cultivated as part of his service in the Palestinian police

25  or -- sorry, as part of his period of service in the

F1mQsok3                              Shrenzel - Direct

1    Palestinian police, although it didn't exist on that date.

2    Q.  So are you looking at the January 19 of '86 through

3    January 17 of '91?

4    A.  Yes.

5    Q.  When was the Palestinian Authority created?

6    A.  In '94.

7    Q.  In '94?

8    A.  Yes, sir.

9    Q.  Are you saying they are giving him credit for service

10   before they were created?

11   A.  Literally in this document they give him credit for being a

12   prisoner of Israeli cell of that period as well.

13   Q.  I just want to flip through with you five pages to a page

14   that says subject detainee detention status approval?

15   A.  Could you please direct me to the number of the page?

16   Q.  It is 9304.

17   A.  Yes.

18   Q.  What are we looking at here in 9304?

19   A.  This is an official approval of his being a prisoner in an

20   Israeli cell, and it also tells us something about the

21   circumstances in which he -- or the reason for his being in the

22   Israeli cell.

23   Q.  What entity created this document?

24   A.  This was created by the ministry of prisoners and

25   ex-prisoners, and this belongs to the PA as well, of course.

F1mQsok3                          Shrenzel - Direct

1   Q.  It belonged to the PA in 2011?

2   A.  That's the way I understand it.

3   Q.  Now, what does it say is the reason for his being a

4   prisoner?

5   A.  He is a prisoner as a result of his fight for his country.

6   You can also translate it, I looked at the original, because of

7   his national struggle or fight, depends -- I was here yesterday

8   and I noted some dispute about translated term, but I think it

9   is basically the same, struggle, fight.

10  Q.  In the context of this document, what is your understanding

11  the phrase as a result of his fight for his country?

12          MR. HILL:  Objection.

13          THE COURT:  Overruled.

14  A.  That his actions that resulted in 15 life imprisonments;

15  namely, 15 or around 15 cases of murder, not only the one that

16  we deal with here now.  And he is sitting in jail because of

17  those crimes.  And an official document of the PA describes it

18  as a fight for his country.  Those crimes are considered a

19  fight for his country.

20  Q.  Let's turn to tab C, which is Exhibit 3 in your binder?

21  A.  Yes.

22  Q.  What are we looking at here?

23  A.  These are again -- this is again information about his

24  salaries.

25  Q.  Does it also say what department he was in?

F1mQsok3                         Shrenzel - Direct

1    A.   Yes.  It says that he was in the Nablus intelligence.

2    Q.   Then in the '01 and '02 period, what was his job then, or

3    what was his department then?

4    A.   National security.  He was probably transferred from the

5    national -- Nablus intelligence to the national security forces

6    in Nablus.

7    Q.   So his department was national security?

8    A.   Yes, that's in the name of the overall agency of the PA,

9    national security forces.

10   Q.   And his rank was what?

11   A.   Depends on what point of time.  In the beginning of 2000,

12   he was a first lieutenant, yes.  And then he was promoted.  I

13   believe we have a different chart for his promotion.

14   Q.   Looking at this rank here, what is his rank as of, say,

15   April of 2002?

16   A.   Captain.  Captain plus one.

17   Q.   Captain, is that a higher rank than corporal as we saw with

18   Ramadan?

19   A.   Much higher.

20   Q.   Then it looks like his salary here is about 1934 shekels.

21   Am I reading that right?

22   A.   That is on the first month, yes.  On January, yes.

23   Q.   So, do you recall when Nasser Aweis was arrested off the

24   top of your head, or would you like a document?

25   A.   Better to see a document.  I believe it was during April or

1   the month of –– in the months of 2002 following the attack.

2   Q.  April 2002?

3   A.  I'm not so sure, but you can direct me to this piece of

4   information.

5   Q.  Sure.  Can you put up 354 up for us a minute?  Bear with

6   us.  We are going to put Exhibit 354 up on the screen so we can

7   check it.

8           MR. YALOWITZ:  May I read, your Honor?

9           THE COURT:  Yes.

10  Q.  "In December 2001, Israel presented U.S. peace envoy

11  Anthony Zinni with a list of 33 most wanted terrorists."

12          May I continue the next paragraph, your Honor?

13          THE COURT:  Yes.

14  Q.  "Five of these most wanted terrorists have been arrested by

15  Israel during operation defensive shield."

16          Number two on that list Nasser Aweis of Nablus.  Does

17  that refresh your recollection?

18  A.  Yes, I said April –– I was right, yes.

19  Q.  Just looking at tab C Exhibit 3, between December of 2001

20  and April of 2002, did the PA have any trouble paying Nasser

21  Aweis?

22          MR. HILL:  Objection.

23          THE COURT:  Sustained as to the form of the question.

24  Q.  Do these records reflect payment to Nasser Aweis during

25  that period?

1  A.  Payment --

2           MR. HILL:  Objection.

3           THE COURT:  Overruled.

4  A.  Payment and promotions.

5  Q.  And then after his arrest in April of 2002, looking at May,

6  June, July, August, September, all the way through the end of

7  2002 --

8  A.  Yes, sir.

9  Q.   -- are they keeping him on the payroll?

10  A.  Of course.

11  Q.  Why do you say of course?

12  A.  Because he fought for his country, so why should he lose

13  his position as a result of a fight for his country.

14           MR. HILL:  Objection, your Honor.  Move to strike.

15           THE COURT:  Overruled.  You can cross-examine.

16  Q.  Do you agree with that as a matter of --

17  A.  With what?

18  Q.  Do you think that's a good policy?

19           MR. HILL:  Objection.

20           THE COURT:  Sustained.

21  Q.  Let me ask you this:  I want to look at Exhibit 112 with

22  you.

23  A.  Which tab, please?

24  Q.  I'm sorry, I want to turn to tab E, Exhibit 140.  What are

25  we looking at here?

F1mQsok3                          Shrenzel - Direct

1    A.  We have again his file in the general intelligence of the

2    PA.

3    Q.  Let's turn to the third page in this document which is

4    9919T at the bottom.

5    A.  Yes sir.

6    Q.  I want to direct you to the part of the report that begins

7    right after the item that has been blacked out?

8    A.  Yes.

9    Q.  Do you see that?

10   A.  Yes.

11           MR. YALOWITZ:  May I read, your Honor?

12           THE COURT:  Yes.

13   Q.  "His financial status is good.  Most of his relatives are

14   members of the Fatah movement.  He was accused by the other

15   side in the Israeli court of founding the Al-Aqsa Martyr

16   Brigade and of planning and carrying out several operations.

17   He was sentenced to several life terms and is still imprisoned

18   by the occupation.  He is a prisoner of the occupation and is

19   one of the commanders of the Fatah movement.  He is good in

20   terms of security and morals."

21           Whose document is this?

22   A.  The GIS document.

23           MR. YALOWITZ:  May I consult with my colleague for

24   just one moment?  I want to make sure I stay on course here,

25   your Honor.

F1mQsok3                          Shrenzel - Direct

```
 1            THE COURT:  Yes, sir.

 2            (Pause)

 3            MR. YALOWITZ:  Your Honor, I have one other thing I

 4   want to do with regard to this individual, but I need to

 5   discuss it with the Court.  We can move ahead and come back or

 6   we can break for lunch, whatever your Honor's preference is.

 7            THE COURT:  Why don't you move ahead and come back.

 8            MR. YALOWITZ:  Perfect.  Thank you.

 9   Q.  Let's go to the next individual in our binder.

10   A.  One minute, sir.  I am not sure the jury is familiar with

11   Zinni list and what it entails.  If you like, I can take it

12   through.

13   Q.  I think they got it, and I don't think we need to do it

14   with you as well, but thank you.  I think that the jury will

15   appreciate us moving forward.

16            Let's go to the next individual in your binder which

17   is Ibrahim Abdel Hai

18   A.  Yes, sir.

19   Q.  I want to cover him very briefly by asking you to look at

20   tab B in your binder.  In particular, page 9 of tab B.

21   A.  I have it in front of me.

22   Q.  Looking at page 9, tab B, could you just read out the first

23   sentence of paragraph one under details of the offense for the

24   jury?

25   A.  Yes.  "During the course of his work in the Palestinian
```

F1mQsok3                          Shrenzel - Direct

1   Naval Police, the defendant met Said Ibrahim Ramadan.  During

2   one of the meetings, he told the defendant" --

3   Q.  Actually, just stop there.  I want to make sure we don't

4   cover something that the jury might not have before them.

5          What was Said -- I'm sorry -- what was Ibrahim Abdel

6   Hai's job according to this document?

7   A.  He was also a policeman in the naval police in Nablus.

8   Q.  According to his conviction, what did he do in connection

9   with this attack?

10  A.  He recruited Said Ramadan and influenced him and presented

11  him, if I'm not mistaken, to Nasser Aweis, and then they -- and

12  as we say, the rest is history, sad history.

13  Q.  Let's go and -- by the way, what was the role of Nasser

14  Aweis in this attack?

15  A.  He was the one that dealt with Said Ramadan.  He made the

16  connection with Ahmed Barghouti.  He also saw that he was

17  transfered from the area of Nablus to Jerusalem.  He had a very

18  prominent role in attack.

19  Q.  Thank you.

20         Let's go to the next individual in our binders.

21  That's Majed al-Masri.  So let me take you past Exhibit A and

22  let's look at Exhibit B.  In particular, I want to -- before I

23  focus you on the document, if you could remind the jury what

24  his role was in the January 22 attack.

25  A.  He was part of the team that was actually in Nablus.  If I

1    remember correctly, he was charged with filming Said Ramadan,

2    the video that we saw before.

3    Q.  Now, let's go to our seventh page.

4           MR. ROCHON:  Your Honor, counsel is referring to the

5    tab numbers.  We need to do both to help the jury with the tabs

6    and exhibit numbers.

7           THE COURT:  Let's keep the tabs and exhibit numbers

8    different.  They're different tab numbers.

9           MR. ROCHON:  This is 96.

10           THE COURT:  This is Exhibit 96 in tab B.

11    A.  What page, sir?

12           (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

F1M8SOK4                        Shrenzel - direct

1    Q.  So I am looking at 9495.  It's got that little eagle logo

2    at the top.

3    A.  Yes, sir.

4    Q.  And then at the very top of the page it says Palestinian

5    National Authority?

6    A.  Yes, indeed.

7    Q.  That's the PA, the defendant in this case?

8    A.  Yes.

9    Q.  All right.  What are they saying in this document about

10   Majed al-Masri?

11   A.  That he is in the Israeli occupation -- sorry.  He is in

12   the Israeli prison because he was fighting for his country.  As

13   we have seen, it is a common formula.

14   Q.  So let's look at tab C in our binder, which is Exhibit 36B.

15   A.  I have it.

16   Q.  What are we looking at in Exhibit 36B?

17   A.  We see the payments for the years 2000 to 2002, his salary

18   as a policeman.

19   Q.  What was his rank at the time of the January 1, 2002

20   terrorist attack for which he was convicted?

21   A.  He was a captain.

22   Q.  What was his salary as a captain?

23   A.  2,050 shekels.

24   Q.  Where is he today, this guy Majed al-Masri?

25   A.  I assume he is still in the Israeli prison.

F1M8SOK4                          Shrenzel - direct

1    Q.  Let's just turn over the page and take a look at his

2    comprehensive overview statement.

3    A.  Yes.  That lists his promotions.  As you can see, he was

4    especially lucky, like his counterpart Nasser Aweis.  He

5    received in 2010 a quite high degree, the rank of a colonel.

6    Q.  Again, I am going to put this one on the elmo so we can see

7    exactly what we are talking about.

8            MR. ROCHON:  Your Honor, I object to the use of

9    highlight, previously highlighted documents.

10            THE COURT:  He can use the document, as long as the

11   record reflects it is highlighted.

12            MR. YALOWITZ:  I will be glad to make sure that

13   everybody knows.  I am just showing the jury a part of the

14   document on the screen, and I have circled and highlighted to

15   direct everybody's attention to the thing I wanted to ask

16   about.

17   Q.  Now, I want to ask you, first of all, about July 17, 2004.

18   Is that before or after Majed al-Masri is convicted of murder?

19   A.  It's after.

20   Q.  What is the PA doing in this comprehensive overview

21   statement with Majed al-Masri?

22   A.  As I said, in 2004 he is promoted to major, and in 2011 he

23   is promoted to colonel.

24   Q.  Is that a jump in rank or is that a normal promotion?

25   A.  This is a jump.  He skipped at least one rank, one rank,

F1M8SOK4                         Shrenzel - direct

1   lieutenant colonel.

2   Q.  They are skipping him ahead?

3   A.  That's the way it is.

4   Q.  What was he doing in jail?  Was he performing services for

5   the PA in jail?

6   A.  The truth is that they do, unfortunately, even in jail, but

7   not, of course, on behalf of the agency in which they

8   participated.  He doesn't do any policing in the prison.  He

9   tries to continue his terrorist activity from prison.

10            MR. ROCHON:  Objection, your Honor.

11            THE COURT:  Overruled.  Let's move on.

12  Q.  I just want to direct you to the January 1, 2010 promotion.

13  A.  Yes, sir.

14  Q.  It says there "presidential orders"?

15  A.  Yes.

16  Q.  What does that mean?

17  A.  Well, I'm not sure about it, but it might reflect --

18            MR. HILL:  Objection, your Honor.

19            THE COURT:  Sustained.  If he doesn't know, he doesn't

20  know.

21  Q.  Now, do you know what it means?

22  A.  I know what it means.

23  Q.  All right.  What does it mean?

24  A.  It means that the president of the PA, in that time it's

25  Abu Mazen, the current president, issued an order to promote

F1M8SOK4                     Shrenzel - direct

1    him.

2    Q.  Let me ask you this.  I want to show you Exhibit 159.

3    A.  Under which tab, sir?

4    Q.  I am looking for it.  I may have left that one out of the

5    binder accidentally.

6            Let's forge ahead then and look at 127, which is tab

7    D.

8    A.  I am there, sir.

9    Q.  What are we looking at in this document?

10   A.  This is the document of the Palestinian police.  It is from

11   2001, namely before the attack that we dealt with, and it lists

12   a series of offenses, discipline offenses and others, committed

13   by Majed al-Masri.

14   Q.  There is paragraph 1 there in the middle of the page and it

15   says:

16           "Captain Majed al-Masri from the General

17   Investigations Administrations Bureau, Nablus, is penalized

18   with the following:

19           "Item 1.  A final warning followed by dismissal should

20   he violate instructions."

21           Do you see that?

22   A.  I do.

23   Q.  What is the date of that final warning?

24   A.  I see only 2001.  Let me have a look on the other side.

25           On the original -- maybe that's the date it was faxed.

1    It's unclear.  Here I see only in the Arabic, I see September

2    5, 2001.

3    Q.  Then there is a stamp.  Is there a date on the stamp?

4           Let me see if I can put that on the elmo.

5    A.  There is also a date on the stamp, OK.  It says April 11.

6    So this was really the date of the faxing only.  It was before.

7    His warning, penalized with a warning, happened on April 11,

8    2001.

9    Q.  I just put something on the screen, Mr. Shrenzel.  Is that

10   the stamp that you're looking at?

11   A.  No, I looked at the English.

12          Now I look at the Arabic and it's clear that it is 11

13   of April 2001, the date.

14   Q.  I have just highlighted the English part.  Let's just all

15   look at the very front page of this Exhibit 127.  I have

16   highlighted and circled paragraph 1.

17          MR. YALOWITZ:  May I read, your Honor?

18          THE COURT:  Yes.

19   Q.  "A final warning followed by dismissal should he violate

20   instructions."

21          This warning came before he participated in the terror

22   attack that we are talking about?

23   A.  Yes, sir.

24   Q.  Was he dismissed following his conviction of that terror

25   attack?

F1M8SOK4                    Shrenzel – direct

1   A.  No.

2   Q.  No?

3   A.  Not at all.  These are promotions and payments.

4   Q.  What was his infraction that caused the PA to warn him that

5   he is going to be fired if he violates instructions?

6   A.  At least in the legible part it says that he is accused of

7   firing a Kalashnikov, AK-47, on a public street in Nablus

8   without justification.

9   Q.  Let's go next in our binder to Fares Ghanem, which I think

10  your Arabic pronunciation was like Fares Radnem?

11  A.  My correction related to his first name Fares.

12  Q.  Fares Ghanem.

13          I want to turn to tab -- well, tab A.  Let's turn past

14  tab A, which is in the binder.  We have been over that.

15          Let's go to tab B, which is Exhibit 85.

16          Do you have Exhibit 85 behind tab B before you?

17  A.  I do.

18  Q.  What are we looking at here?

19  A.  This is his prisoner file.

20  Q.  If we just turn the pages, what do we see in this table?

21  A.  For this person, we have information for a much longer

22  period.  The papers begin with 2012 and go down until 2002.

23  Q.  Although the record ends with 2012, do you have an opinion

24  on whether he is continuing to be paid even to this day?

25  A.  There is no reason to assume otherwise.

F1M8SOK4                        Shrenzel – direct

1   Q.  All right.  Now, looking at the very bottom of this table,

2   I want to just look with you at the 2002 time period.  Can you

3   turn to page 9368 in that exhibit?

4   A.  Yes.

5   Q.  So can you tell what his prisoner salary was in 2002?

6   A.  1,260 shekels.

7   Q.  So he was getting more as a prisoner than like Said Ramadan

8   was getting as a police officer?

9   A.  That's what the numbers reflect.

10  Q.  Now, I just want to look with you also at Exhibit 146,

11  which is tab C.

12  A.  Tab C, I am with you.

13          MR. YALOWITZ:  I just want to make sure everybody is

14  on 146.

15  Q.  Is this a document created by the Palestinian National

16  Authority?

17  A.  Yes, it is.

18  Q.  Who is it information about?

19  A.  It's about Fares Ghanem.

20  Q.  Same guy?

21  A.  Fares Ghanem.

22  Q.  Is that the same guy we have been dealing with in these

23  other documents?

24  A.  Yes, it is.

25  Q.  So I want to turn over the page and look at the report on

1    him.  We have got a report in sort of the middle of the page.

2                MR. YALOWITZ:  May I read from it, your Honor?

3                THE COURT:  Yes.

4    Q.  The very first bullet:  "The aforementioned is affiliated

5    with the Fatah movement.

6                The third bullet:  "The aforementioned is a member of

7    the Al Aqsa Martyr Brigades."

8                Then the fifth bullet:  "The aforementioned is from a

9    good family with an excellent financial situation.  They own

10   excavators, bulldozers, and trucks."

11               Could I just turn back with you to his salary payments

12   behind tab B in Exhibit 85.  Let's just flip back to the second

13   page of that tab, and let's just look at what he is making as

14   of 2012, what he is being paid as of 2012 for sitting in jail?

15   A.  6,450 shekels.

16   Q.  6,450?

17   A.  Yes, sir.

18   Q.  That's in 2012?

19   A.  Yes.

20   Q.  December of 2012?

21   A.  Yes.

22   Q.  I will do it one more time.  Let's just flip back to 146,

23   tab C, second page.

24               Just tell us, what is the date of the report that says

25   he is from a good family with an excellent financial situation?

F1M8SOK4                    Shrenzel – direct

1    Do we see the report date there in the upper right-hand corner?

2    A.  December 6, 2012.

3    Q.  2012?

4    A.  Yes, indeed.

5    Q.  December of 2012, same date?

6    A.  Same date.

7            MR. YALOWITZ:  Your Honor, would it be convenient at

8    this time to take a break?

9            THE COURT:  Yes, sir.

10           MR. YALOWITZ:  OK.  Great.

11           THE COURT:  Ladies and gentlemen, we will take the

12   luncheon break.  Don't discuss the case, keep an open mind, and

13   we will see you at 2:05.  We will start promptly.  Just leave

14   your books on your chair.

15           (Jury exits courtroom)

16           (Continued on next page)

17

18

19

20

21

22

23

24

25

F1M8SOK4                         Shrenzel - direct

1              THE COURT:  You can step down, sir.

2              Mr. Yalowitz, did you have something you wanted to

3    address?

4              MR. YALOWITZ:  I think we do.

5              There is a video, which is Exhibit 716, and it's a

6    clip from PA TV, and it has a song and some photos of Nasser

7    Aweis glorifying him.

8              THE COURT:  That's which one, 716?

9              MR. YALOWITZ:  Yes.

10             THE COURT:  You would like to use it with this

11   witness?

12             MR. YALOWITZ:  I would like to use it with this

13   witness.

14             THE COURT:  How long is it?

15             MR. HILL:  1 minute and 19 seconds.

16             THE COURT:  Let me see it.

17             Does this have sound or without sound?

18             MR. YALOWITZ:  Sound.

19             Wait a minute.  This is not the version.  Let us play

20   it, please.

21             (Videotape played)

22             MR. YALOWITZ:  Your Honor, this is PA TV, which is

23   owned by the defendants.

24             THE COURT:  What is the date of this?

25             MR. HILL:  2012.

F1M8SOK4                    Shrenzel – direct

1              THE COURT:  I am not going to allow it.

2              MR. YALOWITZ:  OK.  Glad we skipped over it.

3              MR. ROCHON:  For the record, I checked with

4     Mr. Shrenzel's notes and have taken care of that issue.  I have

5     nothing to raise with the Court at this time.

6              (Luncheon recess)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1M8SOK4                         Shrenzel - direct

1                            AFTERNOON SESSION

2                                2:00 p.m.

3              (Jury not present)

4              THE COURT:  Are we ready to continue?

5              MR. YALOWITZ:  Yes, sir.

6              MR. HILL:  Your Honor, I think there are a couple

7     issues likely to come up this afternoon.  The other ones

8     mentioned in my letter from last night.

9              THE COURT:  Which ones?  Remind my which ones we

10    haven't dealt with.

11             MR. HILL:  We haven't dealt with category number 2.

12             THE COURT:  Which is?

13             MR. HILL:  It is this alleged PSS document about Wafa

14    Idris.  You will recall that your order required we lay a

15    foundation for the document to come in.  This witness was

16    examined about the document at his deposition.

17             THE COURT:  I'm sorry.  I just don't know which

18    document it is.

19             MR. HILL:  Yes, your Honor.  It is Exhibit number 233.

20             THE COURT:  233?

21             MR. HILL:  Yes.

22             THE COURT:  What is it supposed to be?

23             MR. HILL:  It's supposed to be a preventive security

24    service memo, but it was not produced by my clients.  The

25    plaintiffs contend that it was seized from my clients.

F1M8SOK4                        Shrenzel – direct

1              THE COURT:  Do you know which exhibit you attached to

2    your letter?

3              MR. HILL:  I believe it was attached to last night's

4    letter, your Honor.

5              THE COURT:  Last night's letter.

6              MR. HILL:  Yes, sir.

7              THE COURT:  Is it attached as an exhibit here?  I have

8    here place holder for Exhibit 472.  Is it before or after that

9    or is it not even near it.

10             MR. HILL:  It's immediately before that page, your

11   Honor.

12             THE COURT:  Immediately before that page?

13             MR. HILL:  Exhibit 233.

14             THE COURT:  The one that is signed or the notation is

15   Amna Aidiya, political security.

16             MR. HILL:  Yes, sir.

17             THE COURT:  What do you wan to do with this and how

18   are you going to do it?

19             MR. YALOWITZ:  This is the letter that says –– you

20   know the letter right it's 233.

21             THE COURT:  Yes.

22             MR. YALOWITZ:  So the witness has examined it as part

23   of his report.

24             THE COURT:  OK.

25             MR. YALOWITZ:  He is going to explain what it is.

F1M8SOK4                         Shrenzel – direct

 1              THE COURT:  How is he going to do that?

 2              MR. YALOWITZ:  Based on two things:  Number one, the

 3     seized document procedures.

 4              THE COURT:  He knows the seized document procedures?

 5              MR. YALOWITZ:  He knows how they seize documents.

 6              THE COURT:  How does he know that?

 7              MR. YALOWITZ:  From his experience.

 8              THE COURT:  As what?

 9              MR. YALOWITZ:  Working in the Israeli security agency.

10              THE COURT:  OK.

11              MR. YALOWITZ:  The second thing is, I think you

12     probably remember, Judge, this is the one where we gave it to

13     him in an interrogatory and said who are the people who signed

14     this, and they answered all -- they explained all the people

15     who signed it.

16              THE COURT:  I only see one signature.

17              MR. YALOWITZ:  Yes.  I don't have it in front of me.

18     If you look at the Arabic there are all of these scribbles on

19     it.

20              THE COURT:  That's not the English.  The English says

21     it was signed by Amna Aidiya for political security.  Have they

22     identified to you who that person was?

23              MR. YALOWITZ:  They identified all the people who

24     received and signed that document as their people.  That's in

25     an interrogatory so we will just have to introduce it.

1           THE COURT:  What did they say about this person?

2           MR. YALOWITZ:  I am looking for the document.  Can we

3    get it up on the screen?  Bear with me, Judge.

4           THE COURT:  When I looked at this document, I was

5    trying to figure out the date.  The date of the attack is what?

6           MR. YALOWITZ:  January 29 of '02.

7           THE COURT:  No.  I don't have a January 29.

8           MR. YALOWITZ:  January 27.

9           THE COURT:  January 27 of '02.

10          MR. YALOWITZ:  You're using the card.

11          THE COURT:  Yes, it's a fancy card.  I think I know

12   why you're trying to offer it, but I'm not sure why you want to

13   argue what it says.  It says "At the night in which it was

14   revealed that the person who carried out the attack was Idris

15   and before anyone claimed the responsibility for the attack

16   that the brother called."

17          MR. YALOWITZ:  Right.

18          THE COURT:  Are you arguing that this reveals that

19   before anybody else knew she was the attacker, they knew she

20   was the attacker?

21          MR. YALOWITZ:  Right, that this guy Tirawi had inside

22   information.

23          THE COURT:  That's not what it says.  It says "At the

24   night in which it was revealed that the person."  I read that

25   as they said that this was the person who did the attack.  But

1     no one had yet taken responsibility for it.  That is not the

2     sequence of events as you know them?

3              MR. YALOWITZ:  Right.  The way I read this document is

4     that it was not revealed before the claim of responsibility who

5     the attacker was, and that Tirawi was trying to keep it quiet,

6     and in return for the family keeping it under wraps, he was

7     willing to facilitate the brother's visit to Jordan.  So this

8     is consciousness -- this is signs of a coverup which -- from

9     which the jury could infer culpability.

10             THE COURT:  I'm not sure that is as clear as you say

11    it is, but this is going to be described as what?  By, I assume

12    this witness?

13             MR. YALOWITZ:  Yes.

14             THE COURT:  He is going to describe it as what?

15             MR. YALOWITZ:  As a document from the PA recording the

16    information in the letter.

17             THE COURT:  A document from the PA meaning what?

18             MR. YALOWITZ:  Meaning that it was prepared by the PA.

19    It was prepared by Palestine National Authority preventive

20    headquarters.

21             THE COURT:  And he knows that?

22             MR. YALOWITZ:  From reading the document.

23             THE COURT:  Is he going to testify as to how it was

24    obtained?

25             MR. YALOWITZ:  I wasn't planning to do it that way.

He might know how they seize documents, but the real basis for

authenticity in this case is we gave it to them in an

interrogatory and said, "Who are these people?"  And they

didn't come back and say, "Oh, this document is a fake."

THE COURT:  I need to see what you asked them and what

they responded.  Do you have that?  Just direct my attention to

a paragraph.

MR. YALOWITZ:  Sure.

THE COURT:  If you can tell me what the question was

and what the answer was.

MR. YALOWITZ:  Sure.  If you look on page 5, these are

our specific definitions, PA, PLO, defendants, and then if you

flip over, letter means and refers to the letter attached as

Exhibit A.

THE COURT:  Where am I looking?  OK.  Which

interrogatory?

MR. YALOWITZ:  It's just one interrogatory.

THE COURT:  Which interrogatory?

MR. YALOWITZ:  And then the letter attaches Exhibit A

is 233.  We just have it in a different document.  I don't

think there is going to be any dispute about that.

THE COURT:  Wait.  I'm sorry.  You are talking about

on page 8?

MR. YALOWITZ:  Right, 6 -- right.  And then page 8

they give the names of all these people who based on an

1   investigation conducted to date, defendants provide the

2   responsive names.  WAFA --

3            THE COURT:  This is responsive to what request?

4            MR. YALOWITZ:  To the question:  Provide the full

5   names and identification numbers of the relevant persons.

6            THE COURT:  But I don't see this person's name here.

7   Is this person who is on this document on this list?

8            MR. YALOWITZ:  Yes.  Bear with me.  He is the fourth

9   bullet down.  They spell it a little differently in the

10  English.  They've got him Amna Mohammad Abdullah Rehan.

11           THE COURT:  What makes you think that is Amna

12  Al-Riyadh (ph.)?

13           MR. YALOWITZ:  It's got a different name.

14           THE COURT:  My assumption would be if it's a different

15  name, it's a different person.

16           MR. YALOWITZ:  Yes.

17           THE COURT:  That could tip me over the top here if you

18  could tell me that they identify this person and you know who

19  this person is through this document.  I'm not sure that that

20  would be the determinative factor, but it sure would make it a

21  lot easier if you tell me they said that that's who this person

22  is.

23           MR. YALOWITZ:  It would and --

24           THE COURT:  I remember we had this discussion before,

25  and that is what you represented to me, but I don't see it.  Do

F1M8SOK4                          Shrenzel - direct

1    you want to look at this further?

2              MR. YALOWITZ:  Yes, I need to look at it further.

3    Frankly, I need somebody who is an Arabic reader to look at the

4    Arabic and just make sure I've got it right, because if you

5    just flip over to the last page, your Honor, you see there is a

6    whole bunch of handwriting on the side with people's names in

7    Arabic.  Then what the defendants have done is they have

8    identified those people in this interrogatory.  And because I'm

9    not an Arabic reader, I can't link it up for you --

10             THE COURT:  That was done awkwardly since the person

11   you say have been identified is not the person who is in the

12   English translation that you want to put before the jury.

13   There may be a hundred other people on the Arabic, but that is

14   not what's on the English translation.

15             MR. YALOWITZ:  I need to consult on this one, Judge.

16   I want to really make sure we have the right record on this

17   document.  I want to make sure that I have the right

18   information for your Honor.

19             THE COURT:  You are representing to me that the other

20   handwritten names on this document --

21             MR. YALOWITZ:  I believe that's correct, but I really

22   want to --

23             THE COURT:  It's not on the translation.

24             MR. YALOWITZ:  I know.  I'm trusting my memory here,

25   and I want to get somebody who can look at the document.

F1M8SOK4                         Shrenzel - direct

1            THE COURT:  You have to give me more information

2     before you can attempt to use this document.  If you can give

3     me some greater detail on that, I am willing to be persuaded.

4            MR. YALOWITZ:  All right.  Thank you, your Honor.

5            THE COURT:  Mr. Hill?

6            MR. HILL:  Category three additional videos and

7     newspaper articles.

8            THE COURT:  Give me by exhibit number.

9            MR. HILL:  It's 472, 684, 686, 687, 688, 692.  You've

10    already excluded 768.

11           MR. YALOWITZ:  I'm sorry, your Honor.  I don't have a

12    copy of Mr. Hill's letter because I thought we were done with

13    his letter.

14           MR. HILL:  I have a copy, counsel.

15           MR. YALOWITZ:  If I could just indulge because I want

16    to make sure we are right on this.  Judge, did you rule on this

17    video clip of the music video of Wafa's.

18           THE COURT:  Yes, it wasn't particularly persuaded.

19    Did I see that?  I don't think I saw it.

20           MR. YALOWITZ:  I don't think you saw it either.  It's

21    a video made in 2002 and they aired it on PA TV and it's got a

22    song saying Wafa you're great.

23           THE COURT:  Who made the video.

24           MR. YALOWITZ:  I don't know who made it, but I know

25    who aired it, which is PA TV.

F1M8SOK4                      Shrenzel – direct

 1              THE COURT:  It's supposed to be what?

 2              MR. YALOWITZ:  It's a video saying Wafa Idris who blew

 3     herself up is a national heroine.

 4              THE COURT:  How long is that?

 5              MR. HILL:  That was one minute 21 seconds long, your

 6     Honor.

 7              THE COURT:  Can I see part or all of that?

 8              MR. HILL:  Can you play Exhibit 472?

 9              MR. YALOWITZ:  I just don't remember whether you ruled

10     on that one.

11              (Videotape played)

12              THE COURT:  I don't want to be facetious about it.  Is

13     it supposed to be MTV?  Is this entertainment or news or what

14     do you claim it is?

15              MR. YALOWITZ:  So PA TV is an official television

16     station of the defendants.  So people watch it to see what

17     their policies reflect.

18              THE COURT:  They watch it for other reasons too, I

19     assume.

20              MR. YALOWITZ:  They might.  OK, yes, but it's not --

21              THE COURT:  I assume they watch it, it has some

22     entertainment value too.

23              MR. YALOWITZ:  Not much, apparently.

24              THE COURT:  I don't know.  I don't know what this is.

25     What do you contend that this program is?  You don't contend

1    this is a news program.

2              MR. YALOWITZ:  No.  This is a program that that TV

3    station played, and it glorifies Wafa.  It says Wafa is great.

4              THE COURT:  I understand that.  They are airing a

5    performance of a song at some event.  What do you contend that

6    they are airing?

7              MR. YALOWITZ:  It is like a national concert or

8    something.

9              THE COURT:  Well, that's what I'm saying.  I wasn't

10   really being facetious.  When I say MTV, I mean is this like

11   some entertainment, music entertainment program?

12             MR. YALOWITZ:  Right.  But they didn't play it once.

13   They played it over and over again.

14             THE COURT:  And they played it for something other

15   than entertainment value?

16             MR. YALOWITZ:  Right.  They're playing it, we contend,

17   because they approve of her actions, and it is an example of

18   glorifying somebody who committed a terrorist act.  So it goes

19   to state of mind, and it goes to ratification.

20             THE COURT:  I understand your argument, but it would

21   be like, I think if I remember correctly, many years ago, there

22   was a song by an entertainer maybe Ice-T or somebody who is now

23   on Law and Order, criticizing the police.  And he sang this

24   song, it was some rap song and the police department was

25   particularly upset about it.  I don't want to mischaracterize

1    it.  Kill the police, or something like that.  So you would say

2    that if that was aired on New York City TV station, that that

3    would represent the policy of New York City?  Is that what you

4    are trying to argue?

5            MR. YALOWITZ:  I guess I would change the analogy a

6    little bit.  So if somebody who worked for like -- I live in

7    Westchester County.  We have like a county-owned TV station or

8    something.

9            THE COURT:  Right.

10           MR. YALOWITZ:  It's owned by the county.  The county

11   gets to decide what's on it.

12           THE COURT:  Right.

13           MR. YALOWITZ:  So if there was like a county employee

14   who killed civilians and then on the county-owned TV station

15   which people don't really watch for, you know, fun, they watch

16   it because they're interested -- it may be fun for them, but

17   people watch it, and on the county-owned station, every day or

18   repeated -- I don't know how often.  I don't want to say every

19   day, but repeatedly there was a music video saying what this

20   person did was terrific and we're really proud of him, that

21   would be some evidence that they approve of what he did.

22   That's my theory of why I want to offer that.

23           THE COURT:  You don't know if this is a broadcast of

24   some concert or some event that took place?  I don't even know

25   what context you say this was played.

1          MR. YALOWITZ:  Somebody knows, not me, what it was.

2     It's knowable what it was.

3          THE COURT:  Is it knowable in this courtroom that I

4     can know it or the jury can know it?

5          MR. YALOWITZ:  I think it may be knowable right this

6     minute.

7          THE COURT:  I am not persuaded that you can simply say

8     that somebody at some event where somebody is performing, and I

9     assume performing their own song, not the national anthem, that

10    I can attribute that to the PA or the PLO because they aired

11    it.

12         MR. YALOWITZ:  Frankly, what I think we should do with

13    this, because this video is originally Marcus video, so what I

14    would like to do is we won't play it with Shrenzel.  Let's deal

15    with it, if ever, if we need to put on the rebuttal case.

16         THE COURT:  If we have to revisit it, we will.

17         MR. YALOWITZ:  I understand the Court's position based

18    on this.

19         THE COURT:  This is from PA watch or whatever it is.

20         MR. YALOWITZ:  Yes, Palestinian media watch.

21         THE COURT:  I am not even sure who collected this and

22    where they collected it from.  You say they aired it a lot.  I

23    don't know what basis you're saying it was aired once, ten

24    times, a hundred times, who aired it, who made the decision to

25    air it this time.

F1M8SOK4                          Shrenzel - direct

1          MR. YALOWITZ:  And really the person in the best

2     position to address all of that is Marcus.

3          THE COURT:  Well, my position is that it's out and out

4     for all purposes unless you can get Marcus to convince me and

5     at that point in the trial it seems it is relevant to an issue.

6     I think it is just blemishing them with every bad act that

7     happened or everything that you say is complimentary of a

8     terrorist act on a TV station.

9          MR. YALOWITZ:  So let's reserve it for Marcus.

10          THE COURT:  I'm doing more than reserve it.  I'm

11     saying no unless you convince me otherwise through Marcus.

12          MR. YALOWITZ:  I understand that to be the same thing

13     at this point.

14          THE COURT:  I don't.

15          MR. YALOWITZ:  Let me tell you why --

16          THE COURT:  As you said to me before, keep an open

17     mind?  No.  My mind has been closed.  If you want to reopen it,

18     you can.  But my mind, this is it.  I'm not going to revisit it

19     ten times unless you give me some new information.

20          MR. YALOWITZ:  Let's move on.

21          MR. HILL:  There are other five newspaper articles.

22          THE COURT:  Are we getting to any of these any time

23     soon?

24          MR. YALOWITZ:  We're not going to offer them.

25          THE COURT:  Then let's move on.  Let's get the jury.

F1M8SOK4                        Shrenzel - direct

1            MR. YALOWITZ:  I did want to consult with the witness

2       about 233.

3            THE COURT:  Whatever you want.  Talk to him.

4            MR. HILL:  It should be removed from the binder.

5            MR. YALOWITZ:  We are not going to give anything to

6       the jury unless it's in evidence so --

7            (Pause)

8            MR. ROCHON:  Your Honor, I may have misunderstood.

9       I'm not sure counsel is in compliance with the Court's order.

10      What are we doing now?

11           THE COURT:  He's in the middle of his examination.

12      He's not finished.  He can say whatever he wants to.

13           MR. ROCHON:  I recognize he's in consultation with his

14      witness, and he is still in examination.  That's why I didn't

15      join him.

16           THE COURT:  The jurors are waiting.

17           MR. YALOWITZ:  I think we are going to have to pass

18      over this now and come back to it at the next break because the

19      jury is waiting.

20           THE COURT:  Let's bring the jurors in.

21           (Continued on next page)

22

23

24

25

F1M8SOK4                        Shrenzel - direct

 1              (Jury present)

 2              THE COURT:  Mr. Yalowitz.

 3              MR. YALOWITZ:  Thank you, your Honor.

 4    BY MR. YALOWITZ:  CONTINUED

 5    Q.  I think we are ready to go back to the binders.  If I could

 6    ask everybody to turn to the second to last tab in the binder

 7    which is Muhammad Abdullah.

 8              Are you there, Mr. Shrenzel?

 9    A.  Yes, I am.

10    Q.  Muhammad Abdullah -- let's go past his photograph and past

11    the conviction in A and B and let's take a look at tab C.  Just

12    tell the jury what we're looking at in tab C.

13              MR. ROCHON:  To make sure the record is correct,

14    Exhibit 66.

15    A.  This is Exhibit 66 and this is a prisoner file of this

16    person.

17    Q.  Is this Muhammad Abdullah?

18    A.  Yes, Mohamed Sami Ibrahim Ahmed Abdullah.

19    Q.  If we just look at the first few pages, what are we looking

20    at here?

21    A.  We are looking at his prisoners locations, according to the

22    order of the pages from 2012 from 2002.

23    Q.  So he is -- if we go to 2002, October of 2002, how much was

24    his prisoner salary?

25    A.  It is written here 1140 shekels.

F1M8SOK4                    Shrenzel - direct

1   Q.  If we flip back to the last month on which we've got a

2   record on December of 2012?

3   A.  Of the location has risen sharply and now it's 6350

4   shekels.  Not a bad salary even in Israeli terms.

5           THE COURT:  You have to keep your voice up.

6   A.  Not a bad salary even in Israeli terms.

7   Q.  Let's go to tab D and look at Exhibit 136.  What are we

8   looking at here?

9   A.  This is the general intelligence file information about

10  this person again Palestinian general intelligence that belongs

11  to the PNA.

12  Q.  If we just turn the page, we see will text of a report on

13  him.  Do you see that?

14  A.  I see.

15  Q.  I just want to focus you on the first and the third bullet.

16  What are we seeing in the first bullet?

17  A.  It says that he is a member of the Fatah movement, and it

18  says his date of arrest or at least the year of his arrest.

19  Q.  And then what are we seeing in the third bullet?

20  A.  A description of his crimes, murders and that he committed

21  also with others and alone.  There are a few illegible names

22  but it's known that his sentence, as I explained, it's related

23  to his case and to other cases.

24  Q.  And these individuals, according to the PA that he

25  participated in murders with what organization were they

F1M8SOK4                            Shrenzel - direct

1    members of, according to the PA?

2    A.  Al-Aqsa Martyr Brigade.

3    Q.  Thank you.  Let's go to the fellow in our binder Muhammad

4    Mousleh.  What was his role in this particular terrorist attack

5    January 22?

6    A.  As it says on the chart, he was one of the members of the

7    preparatory team.  He spoke with him.  He gave him food.  He

8    maybe also dealt with the weapons maybe.  I don't remember

9    exactly what he was, but he was one of those who prepared him

10   in Nablus for the act of terror in Jerusalem.  But I really

11   need to look at this a little bit in more detail.

12   Q.  Why don't we begin on him with tab F in our binder?

13   A.  F.

14   Q.  F like Frank.

15   A.  Yes.  I would like to correct something.  He was in the

16   preparatory team that dealt with the shooter in Ramallah in the

17   headquarters of the PA in Ramallah.

18   Q.  I see.

19   A.  Not in Nablus because he worked for the legislative

20   council.

21   Q.  I see.  Thank you for that.  That is great.

22          Now, have you had a chance to look at tab F in your

23   binder which is Exhibit 159?

24   A.  Yes.  This is again GIS document.  This is a security check

25   for the political file.  This is done probably quite regularly

1  for prisoners who continue to be faithful to the organization

2  that they belong to, etc.

3  Q.  So just looking at the front of 159, I want to direct your

4  attention to the fourth line of that chart.

5  A.  Which page, please?

6  Q.  It's the first page of 159.

7  A.  Yes, sir.

8  Q.  I'm looking at it says the fourth line after identity card,

9  mother's name, date of birth, it says political affiliation?

10  A.  Al-aqsa martyrs.

11  Q.  Al-aqsa martyrs?

12  A.  Yes, sir.

13  Q.  Then it says wing.  What does that mean?

14  A.  I believe this is just a formality because all those who

15  belong to the Al-Aqsa Martyrs' Brigades are engaging in the

16  Palestinian military activity, and of course this is seen by me

17  as a witness as a terrorist activity.

18  Q.  Then below that we have some information about him.  What

19  is the information about him that --

20  A.  There is information about education, about where was his

21  school, and of course now that he is in prison and was

22  sentenced to nine life terms.  And, again it stresses that he

23  belongs to al-aqsa martyrs.

24  Q.  If we could turn five pages on to the page that end in like

25  10001?

F1M8SOK4                          Shrenzel - direct

1    A.  I have it, sir.

2    Q.  That says confidential Palestinian National Authority at

3    the top?

4    A.  Yes.

5    Q.  I think just for the jury that word confidential was put on

6    there by the lawyers?

7           MR. ROCHON:  Agreed.

8           MR. YALOWITZ:  Mr. Rochon can check me on that.

9           MR. ROCHON:  We agree.

10   Q.  Now, in the middle, it says, "Subject:  Security check."

11   If Mr. Kelly could help me turn on the Elmo, I just want to

12   show the jury one thing about this.  First of all, I want to

13   look at the very bottom of the page.  I highlighted it here.

14   It says, "He was one of the Fatah military activists in the

15   region."

16           Do you see that?

17   A.  Yes.

18   Q.  Why does it say the Fatah military activists here and then

19   earlier in the report it says al-aqsa was his affiliation?

20   A.  My sense is it's basically the same.  Nobody disputes that

21   al-aqsa is a wing of Fatah, so I don't have -- it's just a

22   matter of phrasing or -- again, I agree to everything it says

23   other than the word military.  That I would substitute for

24   terrorist.

25   Q.  And then what is the PA's conclusion of this man's security

F1M8SOK4                    Shrenzel - direct

1    status?

2    A.   Good.

3    Q.   And what is the PA's conclusion of this man's moral status?

4    A.   Good as well.

5    Q.   And what is the date of this report?

6    A.   The date of this report is from June 2004.

7    Q.   By June of 2004, had this man already been convicted of

8    murdering civilians?

9    A.   Yes, sir.

10   Q.   What did the PA do with regard to this man convicted of

11   murdering civilians after he was arrested?  Let's go to tab E

12   Exhibit 109.  What do we have here?

13   A.   We have here a summary of salaries or allowances that he

14   got from the legislative council where he was employed.

15   Q.   Does this go past the date of his conviction?

16   A.   Of course.  The chart that we have ends in we have also for

17   2006, 2007, just in a different order, 2010 and 2012.  The last

18   one is from 2012.

19   Q.   How much are they paying him in monthly salary as of 2012?

20   A.   4276 -- 77 shekels.

21   Q.   Is he performing any services for the legislative council?

22   A.   Not at all.

23   Q.   Is his salary continuing even to this day?

24   A.   There is no reason to assume otherwise.

25   Q.   Let me just make sure I covered what I want to in this

F1M8SOK4                          Shrenzel – direct

1    binder.  I think we've done enough with this individual

2    Muhammad Mousleh.

3                What I would like to do now is collect those binders

4    from the jurors -- before I collect them, we can just close

5    them?

6                THE COURT:  You can just set it under your seat.

7                MR. YALOWITZ:  Actually, that's the best thing.  If

8    you all just put them on the floor right behind you or in front

9    of you so you won't trip over them.  We'll collect them at the

10   next break so we don't have to bother you.

11   Q.  So having looked at these documents about the January 22

12   attack, can you relate them to the policies that you studied

13   that the PA has with regard to terrorism?

14               MR. ROCHON:  Objection, your Honor.  The documents

15   speak for themselves.

16               THE COURT:  I'm sorry.  Would you give me the question

17   again?

18   Q.  Sure.  Can you relate the documents that we've just been

19   through to the policies of the PA with regard to terror as you

20   understand it?

21               MR. ROCHON:  Objection.

22               THE COURT:  I'm going to sustain the objection as to

23   form.

24               MR. YALOWITZ:  Thank you, your Honor.

25   Q.  Now, do you have some views -- just generally yes or no --

1    do you have some views on the relationship between these

2    individuals and the PA with regard to terror?

3            MR. ROCHON:  Objection, your Honor.

4            THE COURT:  Overruled.

5    A.  Yes, sir, I do have some opinions about this issue.

6    Q.  Could you share those with the jury, please.

7    A.  Yes.  This is a clear example of the close links between

8    the PA and Al-Aqsa Martyr Brigade; namely, Fatah in the region

9    of those activities.  We have here I think six, six members of

10   the squad are PA employees.  If I am mistaken, if it's five, it

11   still doesn't matter so much.  And all of them get paid by the

12   PA.  Some of them get promotions and the promotions are very

13   impressive.  Two of them are colonels.  In addition to that,

14   it's worth noting that especially in this case, we see very

15   senior activities of Al-Aqsa Martyr Brigade/Fatah involved in

16   that attack.  There were at least regional commanders,

17   especially Nasser Aweis, in the Nabus area, Barghouti in

18   another area, and we saw that even in one of the Palistinian

19   documents, it says about one of them that he was a founder of

20   the Al-Aqsa Martyr Brigade.

21           Then we have, of course, the words of praise written

22   by the Palestinian Authority and various agencies.  We saw that

23   they consider them fighting for their country.  They consider

24   him having very good morals, and much more than that.

25           And I believe that in previous testimony also there

F1M8SOK4                         Shrenzel – direct

1    was examples of the link between PA and Fatah, so I don't want

2    to go any depths into the money transfers, but those are some

3    basic identity between the PA and Fatah.  OK.

4    Q.  Thank you very much.  You reminded me, there was one thing

5    I had meant to come back to right before we took a break, which

6    has to do with Nasser Aweis.  I don't think we need to ask the

7    jury to pull those binders back out but do you recall

8    Mr. Shrenzel the promotion history of Nasser Aweis after he got

9    put in jail for murder?

10   A.  Yes, we said that he Nasser Aweis was promoted twice, to

11   the rank of colonel, a person that serves 14 life imprisonment.

12   Q.  Did he skip some ranks and get promoted faster than normal?

13              MR. ROCHON:  Asked and answered.

14              THE COURT:  Overruled.

15   A.  I have to look, but in any of those colonels, I didn't see

16   the rank of lieutenant colonel.

17   Q.  For those of us who aren't really familiar with military

18   terminology, what kind of a rank is colonel in terms of

19   seniority?

20   A.  It's quite senior.  Actually, with all due difference, I

21   also was appointed myself as a colonel.  So, yes, of course

22   it's not number one, but it's not simple soldier.  It's not a

23   junior officer.  It is a very high officer.

24   Q.  Now, what I would like to do is give you a binder relating

25   to another one of our attacks and just ask you some questions

F1M8SOK4                      Shrenzel - direct

1    about it.  Could you open the binder that I placed before you.

2    Your Honor, this one has the title March 21, 2002 --

3    A.  No, this is a mistake.

4    Q.  4:20 p.m.

5    A.  No.  We are on the 21 --

6          THE COURT:  Speak up.  I'm sorry.

7    A.  I think that we should deal with the 27th.

8    Q.  I promise you, and the ladies and gentlemen of the jury, I

9    promise, we are going to get to the 27th.  There is just one

10   thing I need to talk to the judge about with regard to that one

11   and I don't want to waste the jury's time now.  I want to move

12   them right along?

13   A.  I'm sorry for that.

14   Q.  That's OK.  I know we were going to go in chronological

15   order, but we will cover that one?

16   A.  Just that we cover all the dates.

17   Q.  So could you just open the index of the March 21 binder?

18   A.  Yes, sir.

19   Q.  Do you have it?

20   A.  I have it in front of me.

21   Q.  Could you describe generally for the Court the types of

22   records that are in the binder?

23   A.  Yes.  Basically, the facts in this case are based on the

24   same criteria that was represented in the previous case;

25   namely, martyr file, employment records, GIS files, also a

F1M8SOK4                         Shrenzel – direct

1    letter.  This is a unique piece of information that we have a

2    letter from -- between -- going from Tafiq Tirawi, head of the

3    general intelligence service to Arafat.

4    Q.  That's to Yasser Arafat?

5    A.  Yasser Arafat, of course.  Yes.

6    Q.  OK.

7    A.  And the usual things, the indictments, the verdicts and the

8    sentencing.

9              MR. YALOWITZ:  Your Honor, plaintiffs move the

10   documents contained in the March 21, 2002 binder in evidence.

11             MR. ROCHON:  Subject to prior, no objection.

12             THE COURT:  Sure.  It will be admitted into evidence.

13             MR. YALOWITZ:  Your Honor, I should also reflect that

14   the binders also contains some photographs that were admitted

15   in evidence earlier.

16             Let's begin by describing the attack generally and

17   then we'll hand out the binders to the members of the jury

18   A.  So on that date March 21, 2002, a terrorist equipped with

19   an explosive belt detonated himself in the King George Street

20   in Jerusalem.  Again it's a very central street in Jerusalem.

21   It's really, I don't know, 100, 200 meters from where the

22   previous attack occurred.  And the result was that three people

23   were killed and more than a hundred were wounded.

24             (Continued on next page)

25

F1M8SOK6                        Shrenzel - direct

1          MR. YALOWITZ:  OK.  I am going to hand out those

2     binders with the Court's permission.

3          THE COURT:  Yes.

4          MR. YALOWITZ:  That's great.  Let's hand them out.

5          May I approach the witness, your Honor?  I just want

6     to make sure he has one of these cards.

7     BY MR. YALOWITZ:

8     Q.  I know we have gone out of order.  Which attack on your

9     summary are we on now?

10    A.  The March 21 on King George Street bombing, and the

11    plaintiffs are members of the Bauer family.

12    Q.  So that's the third one down on your list?

13    A.  Yes, it is.

14    Q.  I promise we will come back to the January 27 one.  I am

15    sorry for that little miscue there.

16    A.  Fine.

17    Q.  Let's start with Mohamed Hashaika.  We can look at his

18    picture.  He is right behind the very first tab.  Just tell us

19    who he was.

20    A.  He was a member of the Palestinian police, and he is the

21    one that detonated himself in this attack.

22    Q.  Now, what was going on with Hashaika during February and

23    March 2002?

24         MR. ROCHON:  Objection, your Honor.

25         THE COURT:  Sustained as to the form.

1    Q.  Do you have any information about Hashaika's arrest --

2                MR. ROCHON:  Objection, your Honor.

3    Q.  -- by the Palestinian Authority?

4                MR. ROCHON:  Objection, your Honor.

5                THE COURT:  You can answer.

6    A.  It's a bit complicated story but a very interesting one,

7    and I think it contributes to our case so I will go on and

8    describe it.

9                This fellow Hashaika, he was, as I said, a member of

10   the police, and he looked for opportunities to carry out a

11   suicide attack.  He first contacted the Islamic Jihad, and he

12   went out on a mission to carry out an explosive attack, a

13   suicide attack on, as we understand it, the 10th of February

14   2002.  Probably it was some kind of a joint venture between the

15   PIJ and Fatah.

16               Now, this attack was not carried out.  He was sitting

17   in a vehicle with Nasser Shawish and, as we understand from

18   various sources, they decided not to carry it out, probably

19   because of Israeli checkpoints and other obstacles to carrying

20   out of this attack.

21   Q.  So did he wind up getting arrested by the Palestinian

22   Authority police?

23   A.  Yes.  So the Palestinian police or Palestinian preventive

24   security arrested him and Nasser Shawish.

25   Q.  Can we just go to a document on that which and then --

1    A.  Promise me to complete the story.

2              THE COURT:  Listen to the question first.  Let's go

3    question by question.

4    Q.  Let's go to tab F.

5    A.  Yes.

6    Q.  We are looking at Exhibit 1060.  Just tell the jury what

7    this document is and how it relates to the arrest of Mohamed

8    Hashaika and Nasser Shawish.

9    A.  Yes.  We already mentioned this before.  This is a letter

10   from Tawfiq Tirawi, the head of the Palestinian General

11   Intelligence in the West Bank.

12   Q.  Is that the same Tawfiq Tirawi we heard about from Mr.

13   Eviatar?

14   A.  Yes, it is.

15   Q.  OK.

16   A.  He is informing, no less than Yasser Arafat himself, about

17   the arrest of what he calls persons that belong to the Islamic

18   Jihad.  The subject of the letter is Islamic Jihad.  If you

19   like, I could read it.

20   Q.  Why don't you go ahead.

21             Before we go there, let's just make sure we are

22   oriented on the document.  Where do we see Tawfiq Tirawi's

23   signature?

24   A.  His signature is on the bottom, under the heading Head of

25   General Intelligence Northern Governorates.  This means the

F1M8SOK6                         Shrenzel - direct

1    West Bank.  Then Tawfiq Tirawi and the signature.

2    Q.  If we just flip to the very last page of that exhibit, will

3    you just direct the jury to where that Tawfiq Tirawi signature

4    is on the Arabic version.

5    A.  Yes.  It's quite a complicated signature, but in the left

6    side, on the left side of the Arabic, on page 010270.

7    Q.  Is it at the very bottom corner?

8    A.  The bottom left corner.

9    Q.  Now, just to make sure we are oriented, at the very top it

10   says, "His excellency brother, president and general commander,

11   may Allah protect him."

12           Who is that that is being addressed in that statement?

13   A.  The president and general commander, Yasser Arafat,

14   president of the PA, chairman of the PLO, and head of the Fatah

15   organization.

16   Q.  What was the relationship between Tawfiq Tirawi and Yasser

17   Arafat in terms of reporting structure?

18   A.  I cannot point to a certain clear pattern, but one may

19   assume that he was very close to Arafat and he reported to him

20   on a regular basis.  As we got the documents, if I remember

21   correctly, we have this very clear document in this case.

22   Q.  I don't want you to assume things that you don't know.

23   Just based on this document, what is happening?

24   A.  So let me read the letter.

25   Q.  Please go right ahead.

1   A.   The subject is Islamic Jihad.

2            "The person, who wanted to perpetrate a suicide

3   operation, of whom I told your Honor yesterday, was arrested

4   today in Tulkarm.  The arrest took place in the afternoon in

5   cooperation with the brothers from the preventive security.

6            "The person was:

7            "1.  Mohamed Mashhur Mohamed Hashaika, who was born in

8   Taluza in 1981.

9            "Two other men were arrested along with him.  The two

10  recruited him, equipped him, and were about to transfer him

11  across the Green Line:

12           "2.  Nasser Jamal al-Shawish, who was born in

13  al-Fari'ah in 1971.

14           "3.  Saleh al-Bukhari, who was born in Nablus in 1976.

15           "They are all being interrogated.

16           "The matter is at your excellency's discretion.

17           "Please accept my utmost request."

18           And then the signature, the title and the signature.

19  Q.   So I interrupted you when you were describing the facts

20  related to Hashaika based on this document.  Did we cover the

21  material that you had wanted to cover?

22           MR. ROCHON:  Objection, your Honor.

23           THE COURT:  Overruled.

24           You can answer.

25  A.   Not yet.  I wanted to take the story from here, if it's

F1M8SOK6                    Shrenzel - direct

1     possible.

2     Q.  Let's do it question by question.

3     A.  It's up to you.

4     Q.  OK.  Great.  That's better.

5          What I want to ask you about is, what information do

6     you have, based on the documents before us, about what happened

7     next with Hashaika?

8     A.  Yes.  He was put in a Palestinian jail together with

9     Shawish, but we have information from those involved, from the

10    interrogations of those involved --

11         MR. YALOWITZ:  Your Honor, may I just ask that

12    the -- I want to make sure the witness doesn't get into

13    territory that --

14         THE COURT:  Why don't you go question by question and

15    ask direct specific questions.

16         MR. YALOWITZ:  Thank you, your Honor.

17    Q.  Now, actually, what I would like to do is bring you to a

18    document that I think will help us move the story forward.

19         What I would like to do in that regard is I am going

20    to take a page from Exhibit 356, which is in the jury's binder.

21         Just for the record, Exhibit 356 is the indictment of

22    Abdel Karim Ratab Yunis Aweis.

23         I am going to put this on the elmo and we can look at

24    it together.  It's page 35 of that indictment, which is tab B

25    behind the Abdel Karim Aweis attack.

F1M8SOK6                          Shrenzel - direct

1    A.  Which tab, sir?

2    Q.  It's tab B, behind Aweis, page 35.  I bet I can make it

3    clearer.

4              MR. YALOWITZ:  May I read, your Honor?

5              THE COURT:  Yes.

6    Q.  This is paragraph 3.

7              "In early March 2002, Mohamed Hashaika was remanded in

8    the Mukata'ah complex of the Palestinian Authority in

9    Ramallah."

10             Now, I just want to ask you, what is the Mukata'ah

11   complex?

12   A.  Mukata'ah is the basic compound of the center of the

13   headquarters of the Palestinian Authority, where the offices of

14   Arafat are, where are also many offices of various agencies of

15   the PA.

16   Q.  Then it says, "Following the request of the defendant.

17             Who is the defendant here?

18   A.  Abdel Karim Aweis.

19   Q.  "Following the request of the defendant, who is --" I think

20   this should say in -- "who is in the general intelligence of

21   the Palestinian Authority, Mohamed Hashaika was released from

22   the said remand."

23             So just explain to the jury what is happening to

24   Mohamed Hashaika based on the request of Abdel Karim Aweis.

25             MR. ROCHON:  Objection, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1M8SOK6                    Shrenzel - direct

1              THE COURT:  Overruled.

2              You can answer.

3   A.  He was basically released from prison, upon the request of

4   Abdel Karim Aweis that was an officer in the general

5   intelligence, the very body that informed Arafat of the arrest.

6   Q.  Who runs the general intelligence?

7   A.  Tawfiq Tirawi.

8   Q.  So was Tawfiq Tirawi the boss of this guy Abdel Karim

9   Aweis?

10  A.  Yes, sir.

11  Q.  So do we have any information about -- let me not ask it

12  that way.

13             How long was it between the date of his arrest,

14  Hashaika's arrest February 10 and the bombing that injured the

15  Bauer family?

16  A.  Yes.  That happened on the 21st of March.  So given that

17  February is usually a short month, we speak about 40 days,

18  about 40 days.

19             But I would like to add, if I may, that we have

20  evidence that even in that period of so-called being arrested,

21  this was also kind of a sham arrest.

22             MR. ROCHON:  Objection, your Honor.

23  A.  It was not --

24             THE COURT:  Just a minute.  Sustained.  I am going to

25  cut you off.

F1M8SOK6                    Shrenzel - direct

1              Your question.

2    Q.  What I would like to do is turn you to tab B of the

3    Hashaika documents.

4    A.  Yes, sir.  Which tab?  B.

5    Q.  I just want to look with you at Plaintiffs' Exhibit 9.

6    A.  One minute.  What page, please?

7    Q.  So it's just the first page of Plaintiffs' Exhibit 9, the

8    first page of tab B.

9    A.  Yes.  I am with you, counselor.

10   Q.  What are we looking at here with regard to Hashaika?

11   A.  We have again a record of his salaries from the year 2000

12   till the first month of 2002.

13   Q.  What was his rank in the police?

14   A.  In the last salary he got here, he was a corporal.

15   Q.  How much did they pay him per month as a corporal?

16   A.  1,019.96 shekels.

17   Q.  I want to make sure I have it right.  Corporal is lower

18   than a colonel, but it's not the junior most rank.  Do I have

19   that right?

20   A.  It's not the first rank on the ladder, but it's the second.

21   It's not very high.  It's very low, actually.

22   Q.  They are paying him a thousand shekels a month?

23   A.  Yes, sir.  A bit more.

24   Q.  Now, I want to ask you about some things that we see in tab

25   D.  So why don't we start by looking at tab D and just tell us,

F1M8SOK6                    Shrenzel - direct

1   what is tab D?

2   A.  Tab D is an administrative order by the public security,

3   namely, the general security, and its institutional

4   organization and administration.

5   Q.  I think I may have misdirected you.  I meant to say tab C,

6   Exhibit 14.  Is that what you're looking at?

7   A.  I am looking at 14.  I tried to decipher or to explain what

8   is written on the left side in the English version.

9   Q.  Bear with me, Mr. Shrenzel.  We are on tab C?

10  A.  Yes.

11  Q.  With regard to tab C, Exhibit 14, whose document is this?

12  A.  This is a document -- this is some kind, let's say a form

13  or formal document from the bureaucracy that deals with the

14  status of the Palestinian -- the rank and file of the

15  Palestinian security apparatuses.

16  Q.  I notice it says Palestine Liberation Organization and then

17  Palestinian National Authority.

18  A.  OK.

19  Q.  Is that both of the defendants that are here in this case?

20  A.  Yes.  That's the case.

21  Q.  Just looking at that logo, are you able to read that or do

22  you want to look at the Arabic version?

23  A.  It says (speaking Arabic).

24          COURT REPORTER:  I can't record that.

25  A.  I can skip it, but I just want to make sure so better stick

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1M8SOK6                    Shrenzel - direct

1   with the original sometimes.

2           OK.  It says the PLO, the Palestine Liberation

3   Organization.  And then the PNA that we have seen so many

4   times.

5   Q.  That's the logo of both of them on that document?

6   A.  That's the way it seems, yes.

7   Q.  What are they saying in this administrative order about

8   Corporal Hashaika?

9   A.  That he was discharged from the salary roster of the police

10  department, northern provinces, as of February 1, 2002, for

11  being unfit to be a police officer?

12  Q.  Now, that date February 1, 2002, let's just keep

13  that -- can you just keep that date in mind for me as we go to

14  the next document?

15  A.  I will do my best effort.

16  Q.  Let's flip over to tab D.  This is Exhibit 95.

17          What is this document under Exhibit 95, what is this?

18  A.  It's another report from -- of course, another PA

19  institution, but maybe it's even the same institution that we

20  referred to before.  But, of course, it's a formal form or

21  document of the PA.

22  Q.  It's a formal document of the PA?

23  A.  No doubt about it.  You have his picture even here.

24  Q.  So now let's just turn pages.  I want to turn one, two,

25  three, four, five, six, seven, eight, nine, ten, eleven,

F1M8SOK6                        Shrenzel - direct

1    twelve.  I want to turn twelve pages, and we are going to look

2    together at the one that has a 478 at the end, 029478.

3    A.  94?  Please repeat, sir.

4    Q.  9478.  I will just put it up on the screen so we can all

5    look at it.

6              So what are we looking at here?

7    A.  We are looking at another administrative order.  This is

8    clear that it was issued by the Palestinian police.  Would you

9    like me to read it?

10   Q.  Sure.  Why don't you read the part that I have highlighted

11   or read the part that you're interested in?

12   A.  "Pursuant to the administrative order issued from the

13   organization and administration institution/number this and

14   this, dated February 11, 2002."

15   Q.  So that's February 11.  That's ten days after that February

16   1 date we were referring to?

17   A.  Yes.  I believe that refers to the previous document in the

18   binder.

19   Q.  What are they saying underneath after they are explaining

20   what the order dated February 11 is?

21   A.  They actually say they backdate his being fired from the

22   police, dismissed from the police, to February 1, 2002, as we

23   also saw in another document.

24   Q.  Are you saying they backdated the date of his dismissal?

25   A.  Yes.  They wanted it to look like that he was dismissed on

1  February 1, and not on February 11.

2  Q.  February 11, was that before or after the date of his

3  arrest?

4  A.  This was one day after his arrest by the Palestinian forces

5  because, or as we explained, because he wanted to carry out a

6  terrorist attack inside the Green Line.

7  Q.  Then it says, "Corporal Mohamed Hashaika, from the police

8  of the government of Nablus, is hereby dismissed as of February

9  1 due to his inability to perform the duties required as a

10  police officer."

11          I guess I have asked you enough about that backdating.

12  Let me go to another document.

13  A.  OK.

14  Q.  I guess we should go to tab A.  What do we have in tab A?

15  A.  Of which person?

16  Q.  Of Hashaika.

17  A.  In tab A, we have a document prepared by the Institute for

18  the Martyrs Families and the Injured.  Again, it's an organ of

19  the Ministry of Social Affairs that belongs to the PNA.

20          To cut a long story short, this is his martyr's file.

21  Q.  Can we just look at the second page of his martyr file?

22  A.  Yes, sir, I am there.

23  Q.  Under administrative data, what organization are they

24  saying he belonged to?

25  A.  Al Aqsa Martyr Brigades.

F1M8SOK6                    Shrenzel – direct

1   Q.  Under description of the event, right before the

2   blacked-out part of the document?

3   A.  Yes.  It says that he was martyred while executing a

4   martyrdom operation in Jerusalem.  The operation led to the

5   killing and injuring of a large number of Israelis.

6   Q.  What does it say right below the blacked-out part?

7   A.  It says, this person, he was raised to love the nation.

8   Q.  He was raised to love the nation?

9   A.  Yes.

10  Q.  What does it say he did during the Al Aqsa Intifada?

11  A.  He participated in a number of operations and armed clashes

12  against Israeli targets and equipment until he was martyred

13  while defending Al Aqsa.

14  Q.  If we just look on the fourth page, if we just turn over

15  and look at the fourth page of this document?

16  A.  What number, sir?

17  Q.  It's 7307.

18  A.  Yes.

19  Q.  Does this document indicate -- just where it says approval

20  of the general director.

21  A.  Yes, sir, I see it.

22  Q.  He is being approved as a registered martyr?

23  A.  Yes.  It speaks for itself, yes.

24  Q.  What happens because he becomes a registered martyr?

25  A.  His family deserves an allowance, at least, and of course

F1M8SOK6                    Shrenzel - direct

1   he will be praised on various occasions, etc.

2   Q.  Why does his family get that money?  What did he do for

3   them to get that money?

4   A.  Well, he reflected or his love of his nation was reflected

5   by killing civilians in central Jerusalem.  That is considered

6   an act that merits his family with an allowance, very

7   unfortunate.

8   Q.  Who considers that to be such an act?

9            MR. ROCHON:  Objection, your Honor.

10           THE COURT:  Sustained.

11  Q.  When you say that's considered to be an act that warrants

12  approval, who were you referring to?

13           MR. ROCHON:  Objection.

14           THE COURT:  Overruled.

15  A.  To those who wrote this document, those who prepared this

16  martyr file.  As I said, this is an official organ of the PA

17  and this is the regular pattern.  Every person that was killed

18  during the confrontation was considered -- usually, after some

19  verification, as we see here, he was considered a martyr.

20  Q.  Now, I think I would like to go to the next individual in

21  our binder, which is Nasser Shawish.

22  A.  I am there.

23  Q.  OK.  Great.

24           Let's turn past tab A and let's -- actually, let's

25  stop at tab A just for a second and make sure we are oriented.

F1M8SOK6                          Shrenzel - direct

1      Who is the defendant in tab A?

2   A.   Tab A.  One minute.  This is Nasser Shawish.

3   Q.   Then 366 we can skip over.  That's in tab B.

4        So let's go to -- let's pause for a minute at tab C.

5   Before we get there, if you could just describe Nasser Shawish

6   as you understand his activities based on the documents?

7        MR. ROCHON:  Objection, your Honor.

8        THE COURT:  Sustained as to form of the question.  Be

9   more specific.

10  Q.   Based on his conviction, could you summarize for the jury

11  the nature of Nasser Shawish's terrorist activities?

12  A.   Yes, sir.  Nasser Shawish, he was a key operative of

13  Fatah/Al Aqsa Martyr Brigades in the area of Nablus.

14  Unfortunately, he was moved from the Nablus area.

15       MR. ROCHON:  Objection.  This is in the document, your

16  Honor.

17       THE COURT:  I don't want a wandering narrative.  Stay

18  focused.

19  Q.   Without giving a long narrative, if you could just

20  summarize what were his activities of which he was convicted?

21  A.   OK.  I am really sorry for that.  It's my first time on the

22  stand.

23  Q.   That's OK.

24       THE COURT:  It's fine.

25  A.   Nasser Shawish, as I said, he was a key operative in the

1  Nablus area.  He participated in quite a large number of terror

2  attacks and he was convicted for multiple life imprisonment.

3  Q.  Is that on multiple counts of murder?

4  A.  Yes, sir.

5  Q.  Who did he report to in the Al Aqsa structure?

6          MR. ROCHON:  Objection.

7          THE COURT:  Overruled.

8          You can answer.

9  Q.  If you remember.

10  A.  I think, basically, he had relations with a few activists.

11  OK.  You don't want me to mention that he was transferred to

12  Ramallah, but it's relevant to this case.  So with many senior

13  activists of the Al Aqsa Martyr Brigades in the Ramallah area,

14  and of course before his transfer with activists in his area.

15  Q.  Let's take a look at tab C, and we will just flip through

16  and take a look at his pay records.  Do you have those in front

17  of you?

18  A.  I'm not sure.  I don't see C.

19          I have D, and I have before that C, yes.

20          THE COURT:  Do you have it?

21          THE WITNESS:  Yes.

22  Q.  83, we have got -- if you would just page through and tell

23  us what we are looking at in 83.

24  A.  We are looking at allocations to his family from the year

25  2002 going ten years forward, all the way ten years forward to

F1M8SOK6                          Shrenzel - direct

1   2012.

2   Q.  What was his salary when he first got arrested on charges

3   of murder in 2002?

4   A.  We have information about October and further.  It's an

5   allowance to his family.  He was not an employee of the PA.  So

6   it's 1,180.

7   Q.  Was he getting paid by the PA before October of 2002?

8   A.  I don't think that we have any specific record about that.

9   Q.  Then after October of 2002, he started getting payments?

10  A.  Yes.

11  Q.  Let's just see if we can --

12  A.  I hesitate.  May I add that during his terrorist activity

13  he was not given a regular salary, but we have information that

14  he, as a member of the Al Aqsa Brigade, got financial

15  assistance from higher echelon of Fatah.

16          MR. ROCHON:  Objection.

17          THE COURT:  I am going to sustain the objection.

18          Ladies and gentlemen, disregard the last answer.

19          It's just easier if you just answer his questions and

20  then we won't have to get these objections.

21          MR. ROCHON:  I don't know if the Court is going to

22  take an afternoon recess.

23          THE COURT:  Let's take a break, ladies and gentlemen.

24          Take ten minutes.  Don't discuss the case.  Keep an

25  open mind.

1          (Jury exits courtroom)

2          MR. YALOWITZ:  May I just say something?

3          THE COURT:  Yes, you can say whatever you want.

4          MR. YALOWITZ:  May I address the witness?

5          THE COURT:  Not if I have to sit here and listen to

6     it.  If you have something to say to me, say it to me.

7          MR. YALOWITZ:  I just want to say to your Honor I am

8     working real hard with the witness to get him to focus on the

9     question and answer the question and not go off on things that

10    I haven't asked him about.

11         THE COURT:  I am not scolding you or the witness.  As

12    a matter of fact, it's just the opposite.  I am attempting to

13    give you a significant amount of leeway to question this

14    witness.  But I can only do so if I know you're asking focused

15    questions that the answers to those questions can be

16    anticipated and will be obvious.

17         MR. YALOWITZ:  I will work on that.

18         THE COURT:  That's all.  I can't control the other

19    side getting up, if he wants to volunteer something, to object

20    because I don't know what he is getting ready to say.

21         MR. YALOWITZ:  I am not criticizing Mr. Rochon for

22    interrupting the witness if he feels it's necessary.

23         THE COURT:  I am prepared to give you more control

24    over this.  As long as you focus the question, you can ask him

25    anything you want to ask him.

1          MR. YALOWITZ:  I take responsibility for it.

2          MR. ROCHON:  I asked for the break because I am very

3     concerned about this, and I think it's extremely prejudicial

4     and I think it is caused partly by counsel's question and

5     partly by the witness.  That last answer is something that you

6     had specifically excluded in the redactions.

7          THE COURT:  Which answer?

8          MR. ROCHON:  The answer that was volunteered by the

9     witness about the payments that this guy was getting.

10         MR. HILL:  That's a statement from an alleged

11    custodial interrogation of Nasser Shawish, which you have

12    expressly excluded.

13         THE COURT:  Which payment?  Are you talking about

14    martyr payments?

15         MR. ROCHON:  We talked about the salary, which is in

16    the records.  Then without a question, the witness says, but I

17    do have information that he was being paid by the Al Aqsa

18    Martyr Brigades during such and such a period.  You ordered

19    that to be redacted.  It is redacted.

20         MR. YALOWITZ:  I don't think that's correct.

21         THE COURT:  Let's finish this.

22         MR. ROCHON:  The witness needs to be directed.  And

23    since it's all based on documents anyway, in theory he is only

24    supposed to be testifying about facts that are otherwise in

25    evidence, show him the document that's in evidence and then we

F1M8SOK6                    Shrenzel - direct

1   don't have to worry about him adding stuff.

2           The other thing I would say, your Honor, at this

3   juncture, after almost every answer that counsel likes, he

4   compliments it in one way or another either by saying, that's

5   helpful, thank you, or he repeats the answer he likes, or thank

6   you for that, that's great, or thank you very much.  At some

7   point counsel is not allowed to praise the answers.

8           THE COURT:  Stop.

9           Mr. Yalowitz, let's try to stick with question and

10  answer.  I want both sides to minimize their comments, whatever

11  they are, but I can tell you what I say to my class on trial

12  advocacy.  When a lawyer does that, the jury doesn't remember

13  the times he thanked the witness; they remember the times he

14  did not.  So my suggestion is, let's focus the question, let's

15  cut out the commentaries, let's cut out the comments in between

16  from both sides, and let's get through this in an efficient

17  manner.  So let's all attempt to do this more efficiently and

18  more focused and more direct.

19          The witness should understand that the witness is here

20  to answer questions, not to volunteer information, to give a

21  responsive answer to the lawyer's question.  And the lawyers

22  ask what they want to know.  If they don't ask it, then they

23  don't want to know it.  So that's the way it works.  That's not

24  scolding anybody.  That's the way the rules work.

25          Let's take a break and we will proceed.

F1M8SOK6                        Shrenzel - direct

1           (Recess)

2           THE COURT:  Let's get the jury in.

3           (Jury present)

4    ISRAEL SHRENZEL, resumed.

5           MR. YALOWITZ:  Ladies and gentlemen, we were on tab C

6    of Nasser Shawish.

7           If we could look together -- I am going to turn pages,

8    turn one, two, three, four, five, six and seven.  When we get

9    to the seventh page, I am looking on the left-hand side of our

10   binder at 9327.

11   A.  Again, please.

12   Q.  9327.

13   A.  Yes, sir.

14   Q.  So 9327, just remind the jury what kind of document this

15   is.

16   A.  This is a document that the intention is to revalidate his

17   status as a prisoner in an Israeli jail.

18   Q.  If you could just pull the microphone a little closer to

19   you.

20          THE COURT:  Would you pull the microphone down?

21   Q.  Who is the creator of this document?  Whose document is

22   this?

23   A.  The PNA.  Within it, the ministry of prisoners and

24   ex-prisoners, and the program for ex-detainee rehabilitation.

25   Q.  What do they say is the reason he is in jail?  What does

F1M8SOK6                          Shrenzel - direct

1  the PA say is the reason he is in jail?

2  A.  His fight for his country.

3  Q.  Let's go to Abdel Karim Aweis.

4           Here I would like to go past tab A to tab B.

5           MR. YALOWITZ:  And with your Honor's permission, I

6  just want to direct the jury's attention to page 35 of tab B to

7  remind us.

8           May I read paragraph 3?

9           THE COURT:  Yes.

10          MR. YALOWITZ:  "In early March 2002, Mohamed Hashaika

11 was remanded in the Mukata'ah complex of the Palestinian

12 Authority in Ramallah.  Following the request of the defendant,

13 who is" -- I think it should say -- "in the general

14 intelligence of the Palestinian Authority, Mohamed Hashaika was

15 released from the said remand."

16 Q.  Now I want to go to tab C and ask you, what was Abdel Karim

17 Aweis's job in February 2002 during the events we just read

18 about?

19 A.  In February of 2002, he was employed by the Ramallah

20 intelligence as a first lieutenant.

21 Q.  Did he remain on the payroll after April of 2002?

22 A.  Yes.  We have information about the year 2002 till

23 December, for example, yes.

24 Q.  Do you recall whether Abdel Karim Aweis appeared on the

25 Zinni list?

1    A.  Yes.  He was on the Zinni list.

2    Q.  Do you recall when he was arrested?

3    A.  The exact date, unfortunately, I don't remember.

4    Q.  All right.  We can look at that later, but I just want to

5    try to keep us moving then.

6            I want you to look with me at tab D and just tell me

7    how many times he has been promoted since 2002?

8    A.  Yes.  He was promoted three times.

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1MZSOK7                    Shrenzel – direct

 1   BY MR. YALOWITZ:

 2   Q.  And let's just flip back to tab B. and we could figure out

 3   when he was arrested by the Israeli authorities.  Let's look at

 4   its 356 tab B, very first page.  We're going to flip backwards.

 5   A.  March 30, 2002.

 6   Q.  Now, I'd like to direct you to count two of the indictment

 7   to which he pled guilty, and just will let me know when you're

 8   there.  It's the third page in.

 9   A.  The second count?

10   Q.  Yeah, count two.

11   A.  On page three, yes?

12   Q.  Yeah.

13   A.  Okay.

14   Q.  And just could you just explain to the jury what he was

15   convicted of in this count?

16   A.  Holding an office in an illegal organization.

17   Q.  And which illegal organization was he serving in?

18   A.  The Al Aqsa Martyrs Brigades.

19        MR. YALOWITZ:  And may I read, your Honor?

20        THE COURT:  Yes.

21        MR. YALOWITZ:  The above mentioned defendant, from

22   late 2000 until he moved from Jenin to Ramallah in

23   December 2001, served as head of the Al Aqsa Martyrs Brigades,

24   the military arm of the Tanzim of the Fatah, which is an

25   illegal organization in the Jenin area.

F1MZSOK7                         Shrenzel – direct

1          In December 2001, the defendant moved to Ramallah and

2     then left the above-mentioned function and joined the

3     leadership of the Al Aqsa Martyrs Brigades in the Ramallah

4     area.

5     Q.  Is that something that you were commenting on before?

6     A.  Nothing, not in a special way.  This is, this is

7     acceptable.  I mean, this is common offense ascribed to people

8     of this nature and post.

9     Q.  Let me direct you now -- by the way, did Abdel Karim Aweis

10    have disciplinary problems before his, before his joining the

11    PA Police Department?

12          MR. ROCHON:  Objection.

13          THE COURT:  Overruled.

14    A.  Yes, he did.

15    Q.  What were they?

16    A.  He was convicted for murder for, of murdering a person with

17    a knife and an axe.  He was sentenced to imprisonment life.

18    Q.  Now, let me take you to Qahira Al-Sa'adi.  What was Qahira

19    Al-Sa'adi's role in this attack?

20    A.  She was in the vehicle in which the perpetrator of the

21    attack was transported to Jerusalem and she even escorted him

22    to the scene of the crime.

23    Q.  Was she a PA employee during the crime?

24    A.  No.

25    Q.  Did they put her on the payroll afterwards?

1          MR. ROCHON:  Objection.

2          THE COURT:  Overruled.

3    A.  Yes, they did.

4    Q.  Why don't we go to tab C in your binder under Qahira

5    Al-Sa'adi.  That's exhibit 63?

6    A.  6?

7    Q.  63?

8    A.  What tab again?

9    Q.  C.

10   A.  C, okay.  63, yes.

11   Q.  And so what do we have in tab C?

12   A.  We have in tab C, prisoner file.

13   Q.  Now, if we page through, what are we seeing in terms of pay

14   records here?

15   A.  We have information of payment.  We have here information

16   of payments from 2004 till 2012.

17   Q.  Now, I want to go to the next individual in our binder and

18   just tell us who we're looking at here, who is this photograph

19   of?

20   A.  This is Sana'a Shehadeh.

21   Q.  And what was her role in the conspiracy?

22   A.  Quite similar to that of Qahira Al-Sa'adi, they were two

23   women being in the taxi that took him, took the perpetrator to

24   the scene.

25   Q.  So let's -- and she was one of the two women?

F1MZSOK7                        Shrenzel - direct

1    A.  Yes.

2    Q.  All right, let's go to tab C -- I'm sorry, to tab D, our

3    last one in this binder.  Now, what are we looking at here?

4    A.  Again, this is her prisoner file.

5    Q.  And what are we seeing in terms of pay records here as we

6    page through?

7    A.  About her, we have information from 2003 till 2012.

8    Q.  Now, and by the way, what was the -- when she -- it's hard

9    to tell, at 2003 what were they paying her -- I'm sorry, 2002,

10   what did they start her off on in terms of prisoner salary?

11   A.  Okay, I made mistake, I'm sorry.  We have information

12   pertaining to 2002 as well, beginning from August of that year.

13   Q.  And what did they start her off at in terms of prisoner

14   salary?

15   A.  Seems to be --

16   Q.  I'm sorry, did you have a figure on what they started her

17   off on with her salary?

18   A.  According to what they say August 2002.

19   Q.  Now, and how much money was she being paid as of

20   August 2002?

21   A.  Here it says 900, 900 shekels.

22   Q.  And between August 2002 and April of 2012 -- by the way,

23   what was her salary as of April 2012 at the very top of this

24   chart?

25   A.  4,630 shekels.

F1MZSOK7                         Shrenzel – direct

1    Q.  And between 2002 and 2012, did she perform any services for

2    the PA or the PLO in order to earn this salary?

3    A.  She was just in jail.

4    Q.  All right.  Now, have you had occasion to observe videotape

5    of Sana'a or Qahira provide and describing their role in this

6    crime?

7           MR. ROCHON:  Objection, your Honor.  This is a matter

8    we need to discuss with the court.

9           THE COURT:  Didn't we discuss this exhibit?

10          MR. ROCHON:  No.

11          MR. YALOWITZ:  I thought that -- well --

12          THE COURT:  Yes or no?

13          MR. YALOWITZ:  I thought we did.

14          THE COURT:  We discussed this already?

15          MR. ROCHON:  I don't think we've covered this.

16          THE COURT:  All right, come up.

17          (Continued on next page)

18

19

20

21

22

23

24

25

F1MZSOK7                       Shrenzel - direct

 1                (At the sidebar)

 2                MR. ROCHON:  Your Honor, I believe it's in today's

 3     letter that we sent the Court, we discussed this.

 4                THE COURT:  Is this one of the ones you played for me?

 5                MR. ROCHON:  No.

 6                THE COURT:  Which one is this, which one are you going

 7     into?

 8                MR. YALOWITZ:  I thought that we -- I thought we dealt

 9     with this weeks ago.

10                THE COURT:  Which one is this?

11                MR. YALOWITZ:  This is --

12                THE COURT:  Slow down, please.  Which --

13                MR. YALOWITZ:  This is the clip where she says I

14     walked with the guy, I walked with him, I told him where to go

15     and he -- she says, describes her eyewitness of participating

16     in the perpetration of the attack.  I thought we went over this

17     before, before the trial even started.

18                MS. FERGUSON:  That was a different video, that was

19     372, and you submitted the declaration of P. Benichou.  That

20     was a different video.

21                MR. YALOWITZ:  I thought that we, I thought that you

22     saw it?

23                THE COURT:  I don't -- I've seen a lot of videos I

24     can't tell you --

25                What's your objection to this video?

1          MS. FERGUSON:  This is a video that is called,

2     according to plaintiff's, bribes of Shehadeh.  There is no one

3     to lay a foundation for it.  She wasn't a PA employee, so it's

4     not a party admission.  It's highly prejudicial.  I don't know

5     where this video came from, I don't know who made it.

6          THE COURT:  I remember the title and I remember

7     reviewing, at least reviewing the papers because I remember my

8     reaction to the title, but I don't know if I know what the

9     content of --

10         MS. FERGUSON:  It's a different video about her called

11    suicide killers, that was the subject of --

12         THE COURT:  So what's the contents that you're

13    concerned about, what is she --

14         MS. FERGUSON:  She's describing her role in the

15    bombing.

16         THE COURT:  Okay.  And is there something wrong with

17    that?

18         MS. FERGUSON:  Well, it's a very chilling video.

19    She's not our employee, and I have no idea who made this video,

20    where it came from.

21         THE COURT:  Well it doesn't matter who made it.  I can

22    take a --

23         MS. FERGUSON:  As to other videos he was prepared to

24    lay an evidentiary foundation, I mean I don't know where this

25    came from, when it was made, who made it.

1          MR. YALOWITZ:  She's in jail.  She's -- they show her

2     in the jail.

3          MS. FERGUSON:  I can't tell if she's in jail.  I can't

4     tell what's --

5          THE COURT:  The reality is I can't give you an

6     informed judgment about this, unless I see the video.  And if I

7     haven't seen the video, it's not one of the ones I've seen, I

8     need to see it before we get into it.  So you have to tell me

9     whether -- see if you can go to some other area, we can cover

10    that.

11         MR. YALOWITZ:  This is the end of -- this is the end

12    of the line on this attack, then we're going to go to the next

13    attack.

14         THE COURT:  Well, you can to that, come back.  I'm not

15    going to, you know --

16         MR. YALOWITZ:  This is so obstructive, the defendants

17    are really being obstructive, your Honor, and --

18         THE COURT:  You know --

19         MR. YALOWITZ:  They're obstructing my examination.

20         THE COURT:  Stop, stop.

21         MR. YALOWITZ:  May I just be heard on this?  Because

22    I'm very upset about it and I want to be heard.  What I'm

23    getting is, to use the Yiddish, and Mr. Rochon uses this

24    before, I'm getting hondle direct.

25         MR. ROCHON:  I never used that.

1          MR. YALOWITZ:  And we had, this afternoon we had an

2     objection to 233, we got to the bottom of that.  We're going to

3     foundationalize that document, now we're getting a foundation

4     objection, a foundation objection, to take --

5          MR. ROCHON:  Counsel has got to keep his voice down.

6          THE COURT:  Slow down.  You guys can't talk at the

7     same time.  Let him finish.

8          MR. ROCHON:  Keep his voice down.

9          MR. YALOWITZ:  We're getting a foundation objection to

10    a video tape of somebody that everybody agrees is the

11    perpetrator who confessed, who was convicted and who is in jail

12    for this attack, and I'm entitled to make my presentation to

13    the jury in an orderly way.

14         THE COURT:  Well then, you know what, Mr. Yalowitz,

15    I'm no longer sympathetic to either side on this issue.  If you

16    want to make sure your -- you've been proceeding in the

17    opposite manner you should proceed in the future.  It's not

18    about whether they have an objection.  If you got something

19    that you want to get in, you better make sure it's going to get

20    in.  You better find out early whether they have an objection

21    to it, what the objection is, and you better be ready to meet

22    it.  I'm not going to listen to those kind of arguments any

23    more.  You make sure you know what they're going -- you know

24    whether they have an objection or they don't have an objection.

25    If they have an objection, you should bring it up because it's

F1MZSOK7                    Shrenzel - direct

1    your document and you want to get it in.  I haven't seen -- I

2    can't give you an informed decision.  I need to see this.  So

3    I'm not dealing with this now, and I'm not sending the jury

4    home at 4:15 after we've spent all this time, making them cool

5    their heels.  I'm going to give them some more testimony for

6    the next half hour.  If you want to come back to this, you show

7    me the video and --

8                MR. YALOWITZ:  Let's do that.

9                (Continued on next page)

F1MZSOK7                          Shrenzel – direct

1              (In open court)

2              MR. YALOWITZ:  Your Honor we –– just one more moment

3     with the Court?

4              THE COURT:  All right, sure.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1MZSOK7                              Shrenzel - direct

 1              (At the sidebar)

 2              MR. YALOWITZ:  Now, your Honor, I have a different

 3      video that I'd like to play.

 4              THE COURT:  Okay.

 5              MR. YALOWITZ:  That's also of these suicide

 6      perpetrators.

 7              THE COURT:  Okay.

 8              MR. YALOWITZ:  This one is 372, this is 372.  We have

 9      an affidavit foundationalizing it.

10              THE COURT:  Okay.

11              MR. YALOWITZ:  And the affidavit is of the film maker

12      saying I recorded had this and this is, so on, so forth.

13              THE COURT:  It's a video of what?

14              MR. YALOWITZ:  Of the suicide -- of these two women

15      explaining their role in the attack.

16              THE COURT:  Okay.

17              MR. YALOWITZ:  And the defendants have seen that video

18      and, you know, I know that we went over these videos with the

19      Court, and I'm very sure that your Honor ruled on this.

20              THE COURT:  Show me where and then I'll stay

21      consistent with that ruling, but you can't expect me to keep

22      track of that, you know, how much stuff I read.

23              MR. ROCHON:  Can I ask the Court to make my point?  I

24      would ask the Court to ask Mr. Yalowitz to confirm he didn't

25      even tell us he was going use this for this witness.  This was

1    not on any of the exhibit lists that we got.

2            THE COURT:  Did you make an objection to --

3            MR. ROCHON:  We've objected to it previously and we --

4            THE COURT:  Do you have an objection to --

5            MR. ROCHON:  I think, Judge, I think we do.  It wasn't

6    on the list of things they were going use with this guy, none

7    of them.

8            THE COURT:  Well I hear you, but that's not going to

9    solve my problem.  Do you have an objection to this?

10           MR. ROCHON:  Judge, in all honesty, I can't tell you

11   without seeing the thing.  He didn't tell me that he was going

12   to use it.

13           THE COURT:  Now, again, I'm not sympathetic to that.

14   You knew that they intended to use it at this trial, you

15   indicated you had an objection.

16           MR. ROCHON:  We do.

17           THE COURT:  You should be prepared to argue that

18   objection.

19           MR. ROCHON:  I am.

20           THE COURT:  I'm not going to play this game, guys.

21   We're not going -- every five minutes you have an objection and

22   you state objection weeks ago, and you didn't, and you now

23   object.  If you got an objection, you better be able to

24   articulate it now or I'm not going to hear you.

25           MR. ROCHON:  We have --

F1MZSOK7                          Shrenzel – direct

1          THE COURT:  What is your objection?

2          MR. ROCHON:  We have an objection on the same grounds

3     as the last one.

4          THE COURT:  What is your objection?

5          MR. ROCHON:  Your Honor, it's prejudicial to the

6     defendants.  These are not declarations against penal interest.

7     It's after the incident.  As far as notice, it's after the

8     incident.

9          MR. YALOWITZ:  He's rearguing.

10         MR. ROCHON:  Judge, I'm not re-arguing.

11         THE COURT:  Continue with your examination.  I will

12    look at the video and I'm going to resolve it right away as

13    soon as the jury goes home.

14         MR. YALOWITZ:  Okay, thank you.

15         (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          MR. YALOWITZ:  Okay, ladies and gentlemen, we're done

3     with this second binder, so if we put that on the floor we'll

4     be able to collect those after you exit.

5     Q.  Now, I want to turn to another area with you, Mr. Shrenzel,

6     which is -- well, first of all, having looked at the documents

7     in the binder before you, do you have an opinion, just without

8     going into detail, just yes or no, do you have an opinion on

9     the relationship between PA policies and the perpetrators as

10    evidenced in these documents?

11    A.  I do.

12    Q.  Would you please state it?

13         MR. ROCHON:  Objection, your Honor.

14         THE COURT:  Overruled.  He can answer.

15    A.  Well, what we have in front of us is a very lethal act of

16    terror perpetrated by this squad of Al Aqsa Martyr Brigades;

17    and, two of these, two of the members of this squad, or it's,

18    okay, at least two of the members of this squad are PA

19    employees, namely, the perpetrator himself and other

20    colleagues.  We also saw some connection to this case, I want

21    to, I want to level with that now.  And we saw of course

22    payments, promotions.  According to the pay the, we've already

23    demonstrated in the previous attack, we know words of praise as

24    we saw as people are defined as serving there country loving

25    their nations, and this is effect by the attack, and maybe it's

F1MZSOK7                           Shrenzel - direct

1    it was mentioned, it's up to you, it's something about the date

2    I think there is an importance to the date.

3    Q.  Sure, I do think -- let me ask you, what was the date of

4    this attack?

5    A.  The 21st of March, 2002.

6    Q.  And how did that date relate to the designation of the Al

7    Aqsa Martyr Brigades as a terror organization?

8    A.  Yes, it relates in the following, in the following manner;

9    that on that date there was, it was already clear that the

10   United States is going to declare Al Aqsa Martyr Brigade as a

11   FTO, Foreign Terrorist Organization.  So we would have maybe

12   expected it in order to prevent the designation, there would be

13   much more activity on the part of the PA to frustrate this

14   attack.  And what we did see to disavow or to disassociate

15   themself from the attacker, yes, we saw in the document,

16   qualified him only as an Islamic jihad.  But the fact that he

17   was released, yes, this person was released and was free to

18   carry out this attack is, I think it's a sign that the PA was

19   not that worried or at least by the upcoming American

20   designation or at least didn't do anything substantial in order

21   to frustrate this act of terror and thus maybe gained points in

22   their image or relations with the American administration.

23   Q.  Okay great.  Now, I want to turn to something called the

24   Institute for Political and Moral Guidance of the PA.  Are you

25   familiar with that institute?

F1MZSOK7                          Shrenzel - direct

1    A.  Yes sir.

2    Q.  What is it?

3    A.  It is an institute that is charged with let's say educating

4    the Palestinian masses, indoctrinating them and especially

5    indoctrinating those that work within the scope of the various

6    ministries and security apparatuses, namely, people that are on

7    the payroll of the PA.  The idea is that this institute will,

8    will give them let's say explanations or, about the path that

9    the PA and the PLO is going in, and will instruct them, at

10   least generally, as to which positions they should stick to and

11   subsequently what actions they might take.

12   Q.  And when was it formed?

13   A.  This body was formed initially in Lebanon when the PA or

14   not -- wait -- where the PLO resided, in the 70's.

15   Q.  And when was it moved from the PLO into the PA?

16   A.  I believe with the establishment of the PA in '94.

17   Q.  And how does this institute communicate its guidance?

18           MR. ROCHON:  Objection, your Honor.

19           THE COURT:  Overruled.

20   A.  In various manners.  There are publications that are

21   directed by this organ, there are statements by the head of

22   this organization, there are public gathering in which they

23   voice their position and standing.  They might distribute

24   written material regarding other than the magazines, and I

25   think it's very basic and very important to the PA that such a

1   body exists.

2   Q.  Do they have units that are kind of embedded in the various

3   security forces?

4   A.  Yes.  We can speak about political commissioners, yes, that

5   are stationed in every important Palestinian official organ and

6   inter alia the security apparatuses, they're called in Arabic

7   Amaliya Ishtahadiya, the political commissioner.

8   Q.  And what is the job of a political commissioner?

9   A.  You can equate it a lot was used in the Soviet Union, to

10  educate people, to control their minds and thoughts and lead

11  them in a specific way that is desired by the central

12  leadership of the PLO/PA.

13          MR. ROCHON:  Objection, your Honor.

14          THE COURT:  Overruled.  You can cross-examine.

15  Q.  Now, did these political commissioners, were they involved

16  in the publication of magazines within the various security

17  force branches?

18  A.  Yes, they were.

19  Q.  So have you had the opportunity to review those magazines?

20  A.  Yes, we succeeded in obtaining some physical, some physical

21  copies of some of these magazines, and also photos of other

22  parts of some other publications.

23  Q.  Do you have an opinion on whether these magazines reflect

24  official PA policy?

25          MR. ROCHON:  Objection, your Honor.

F1MZSOK7                           Shrenzel - direct

1            THE COURT:  Sustained.

2   Q.  Do you have an opinion as to -- well, who was responsible

3   for editing these magazines?

4            MR. ROCHON:  Objection, your Honor.

5            THE COURT:  Over ruled.

6   A.  Maybe we should analyze it on magazine-per-magazine basis.

7   But generally speaking, in most of them there was the

8   represented the people that represented or were members of this

9   national guidance did that job, and there was on the editorial

10  board, there was some other senior members of others.

11  Q.  Now, which magazines in particular have you had the

12  opportunity to review?

13  A.  Yes, we looked especially in four magazines.  Would you

14  like me to enlist them now.

15  Q.  Yes, would you please?

16  A.  Yes.  Al Watan, Al Watan, without -- Watane, okay again,

17  Watan, which means my fatherland.  This is of the national

18  security forces.

19  Q.  So that's the first one, Watan?

20  A.  Yes.  The name of this publication is Watan.

21  Q.  Is that an Arabic word?

22  A.  Yes, of course.

23  Q.  And then how did you translate it?

24  A.  My fatherland, my motherland, my homeland, what is the

25  place where a person resides and lives.

F1MZSOK7                          Shrenzel - direct

1    Q.  And what's the next one that you've had the opportunity

2    to --

3    A.  Yes, we looked at Al Shuhada, means the martyrs in plural.

4    Q.  Al Shuhada?

5    A.  Al Shuhada, yes.

6    Q.  Al Shuhada.  And what does that mean?

7    A.  It means the martyrs.

8    Q.  The martyrs?

9    A.  Yes.  This was published by the forces of, security forces

10   stationed in the borders.  Yes, this is a unit or some units

11   that came back from abroad to the territories with the

12   establishment of the PA.  They were mainly stationed in Gaza,

13   let's say with the aim of supervising the border with Israel.

14   Q.  You said they were mainly established in Gaza.  Did they

15   also work in the West Bank?

16   A.  I believe their publication was also distributed in the

17   West Bank.

18   Q.  Now, what's the next one Al Shuhada?

19   A.  The next one is (phonetic)Homat Alarene.

20   Q.  Humat Alarene?

21   A.  Yes, defenders of the lions den.  This is, belongs to the

22   force 417 of the PA security apparatuses.  This is a

23   presidential guard of Arafat, a force that is very loyal to

24   Arafat, stationed all over the territories, but especially in

25   the near vicinity of Arafat in Ramallah.

F1MZSOK7                          Shrenzel – direct

1   Q.  And what's the final one?

2   A.  Just give me a moment, Ashuta, the final one is Ashuta,

3   which means deputies, yes in Arabic, and this is specifically

4   written that is issued by the command of the Palestinian

5   Police, stationed both in Gaza and in the West Bank.

6   Q.  So do you have physical copies of some examples of these

7   magazines?

8   A.  Yes.  As I said, we obtained two copies for the purpose of

9   this testimony and the report.

10  Q.  All right.

11          MR. YALOWITZ:  May I approach the witness, your Honor?

12          THE COURT:  Yes, sir.

13          MR. YALOWITZ:  Your Honor, we're going to identify

14  these as 1194 and 1195, and I'm going to hand them to the

15  witness?

16          THE COURT:  Yes.

17  A.  Thank you.

18  Q.  So why don't you take the first one out of that little

19  protective sleeve and just tell us what it is?

20  A.  Yes.  This is Ashuta, the police, it's from July 2000;

21  namely, even before the outbreak of the second defendant, we

22  saw on the cover the overall commander of the Palestinean

23  police, Razi Jabali, standing next to Yasar Arafat.

24  Q.  And this particular magazine, who are the, who are the

25  editors listed on the mast head?

1        MR. HILL:  Your Honor, may we approach?

2        THE COURT:  No.

3        MR. HILL:  We've never seen this before this.

4        THE COURT:  Then go up and show it to him.

5        MR. ROCHON:  May we --

6        MR. HILL:  May we see it?

7        MR. YALOWITZ:  Sure.  I'll represent to the Court that

8   we gave it to them quite a long time ago and --

9        THE COURT:  You don't have to represent anything.

10  Just show it to them.  If they recognize it, then we can move

11  on.

12       MR. ROCHON:  I think we can address it after we're

13  done with the jury for the day if we may.

14       THE COURT:  You can continue.

15       MR. YALOWITZ:  All right.

16  Q.  So we were on the --

17  A.  Ashuta, yes.  Could you please repeat your question?

18  Q.  Sure.  Who are the editors of this?

19  A.  Yes, it's opening to it we see the name of Razi Jabali the

20  or the general, Razi Jabali, the commander of the police, and

21  he's qualified or defined here as the general supervisor.

22  Q.  So that's --

23  A.  Supervisor of this publication.

24  Q.  Was there anybody in this Police Department above Razi

25  Jabali?

F1MZSOK7                          Shrenzel - direct

1    A.  No.

2    Q.  And then who else is listed as an editor?

3    A.  There are people that are designated as advisors, yes, some

4    of them doctors, and some of them officers, high ranking

5    officer, brigadier generals of the Palestinian police, and the

6    head of the of the editorial board is again, a colonel, Dr.

7    Abdel (phonetic) Haman L. Mosenyen.

8    Q.  And how and where were these, was this magazine Ashuta

9    circulated?

10   A.  According to what is written here, it was published again

11   by the general commander of the police in Gaza.  They have here

12   the phone numbers, the number of the bulletin, and it says

13   clearly that this is a monthly publication dedicated to the

14   sciences of policing and law enforcement and it's, and that it

15   is issued by the little, or by the leadership by the command of

16   the Palestinian Police.

17   Q.  So do you have another one on the podium there, before you?

18   A.  Yes, sir.

19   Q.  And is that one Watan?

20   A.  Yes, this is Watan from March of 2001, namely, half a year

21   after the eruption of the --

22   Q.  And whose emblem is on the cover there?

23   A.  This is the emblem of here it's written only for the, we

24   notice know this emblem to be both the emblem of the PLO and of

25   the PA or mainly of the PA.

1    Q.  And who was this, who was this magazine directed at?

2    A.  The National Security Forces of the Palestinian security

3    apparatuses.

4    Q.  And is there any information on that magazine about who the

5    editors are?

6    A.  Yes, first of all it says that this is the central organ of

7    or publication of the national security forces or the general

8    security forces here, and there is a designation of the

9    chairman of the editorial boards.  Again he is colonel, his

10   name is here.  You have other that serve as advisors as

11   managers of the editorial board, secretary, and people that are

12   engaged in the actual editing of this magazine.

13   Q.  All right.  Now, what kinds of articles appear in these

14   magazines generally?

15   A.  The, all four of them or just the two that you handed me?

16   Q.  All four of them.

17   A.  Well, it depends.  It's not the same in each and every one

18   of them.

19            MR. ROCHON:  Objection, your Honor.

20            THE COURT:  Overruled.

21   A.  Usually it states, there is a statement on figures,

22   Palestinian policy or perception of the situation in that

23   specific time, when, a specific issue is published, for example

24   here in Ashuta, there is an article by (phonetic) Yufman Abula,

25   he was the head of the national guidance, and he -- sorry it's

1    in Watan, and, the title said that there are three exits or

2    three roads, basic roads to for action.  Yes, so this is his

3    understanding of the situation of July 2000 from the official

4    Palestinian point of view.

5            There are also articles depicting clashes with Israel.

6    It depends, of course, on the date and the circumstances of

7    every issue.  A lot is dedicated to the personality of Yasar

8    Arafat quoting him, having pictures of him and of course

9    praising him, of various -- if you want, I can go over some of

10   the articles.

11   Q.  No no.  I think we've got it, enough of that background.

12   A.  Yes.

13   Q.  Let me ask you this.  Have you had occasion to read various

14   articles that appear, not just these two, but in various other

15   of the four magazines from the period 2000 to 2004?

16   A.  Yes, I did.

17   Q.  And have you had occasion to consider and investigate

18   whether these magazines are what they purport to be, are they

19   authentic copies of magazines that were published during that

20   era?

21   A.  Yes I believe it is.  It's clear from everything that is

22   written on them.

23   Q.  And have you -- do you, have you reached a view as to

24   whether they were published under the authority of the

25   Palestinian authority?

F1MZSOK7                        Shrenzel - direct

1   A.   Yeah.   This is of course -- well, I think that it's clear

2   from the picture that I portrayed so far that the Palestinian,

3   that the PA and the PLO, they have the policy of supervising

4   press.   It was not, it was rather far from being free press.

5            MR. ROCHON:   Objection.

6            THE COURT:   Overruled.

7   A.   So they of course looked at the, supervised it, it was very

8   crucial to them what message do we convey to the, to our

9   forces.   So it's not, it can -- it cannot be, let's say

10  sporadic or according to one's minds, et cetera.   It should be

11  very centralized, and very clear cut.

12  Q.   All right.

13           MR. YALOWITZ:   So, your Honor, plaintiffs offer the

14  two exemplars, which I think we've identified as 1194 and 1195,

15  in evidence?

16           MR. ROCHON:   Your Honor, I think we'd like to address

17  with the Court, but if we want to move through it now we can

18  address at the end of the day.

19           THE COURT:   You object.

20           MR. ROCHON:   I do, but I --

21           THE COURT:   All right.

22           MR. ROCHON:   Subject to that, we can proceed here.   I

23  can talk with you about it afterwards.

24           THE COURT:   All right.   You can.   We can either end

25  now, we can go onto another area for five minutes and then we

F1MZSOK7                          Shrenzel - direct

1    can address this.

2              MR. YALOWITZ:  Sure, okay.  So why don't we -- I think

3    we're at a good breaking point.  I think we've --

4              THE COURT:  All right.

5              MR. YALOWITZ:  -- covered more material than I had

6    expected today, and it's a good breaking point if it's

7    convenient for the Court.

8              THE COURT:  Ladies and gentlemen, we're going to

9    adjourn for the day.  Don't discuss the case, keep an open

10   mind.  I'm going to ask you to be here -- sometimes I feel it's

11   more appropriate for me to tell you to come in later than

12   earlier, and we can start on time.  So I'm going to tell you to

13   be here by 9:45.  We'll be here 9:30 working so we don't have

14   to make you wait, as long if we can get through it efficiently

15   what we have to do to prepare for the day.

16             All right, so don't discuss the case.  I'll see you at

17   9:45 tomorrow morning.

18                  (Continued on next page)

19

20

21

22

23

24

25

F1MZSOK7                           Shrenzel - direct

1            (In open court, jury not present)

2            THE COURT:  You can step down, sir.

3            THE WITNESS:  Thank you.

4            THE COURT:  Can I see the magazines?  I just want to

5    see the magazines.  You can step down.

6            MR. YALOWITZ:  May I approach?

7            THE COURT:  Yes.  Mr. Rochon, what's your objection.

8            MR. ROCHON:  Your Honor, I've got a couple.  First of

9    all, and I need to give you a little background.  I appreciate

10   the opportunity to do so.

11           So in the last two days, yesterday and the day before,

12   we received a total of 190 potential exhibits that would be

13   used with this witness identified by the exhibit number.  And

14   then we scrambled we go through them, we write our letters and

15   we all know what happens.  Among those 190, the numbers 1194

16   and 1195 aren't there, the had never been assigned.  The number

17   372, which was that video they came -- the second video isn't

18   on this list.  Now, I understand the Court to say, look, if you

19   know it's in evidence, you got to be ready to argue it.  But

20   when you got 190, you focus on an expert witness who is pretty

21   critical to the case, you do focus on the ones they say they

22   might use.  And I understand the Court admonished me up there

23   to be ready on anything.  But, frankly, for him to go sotto

24   voce to me here to say you have an objection to 372 and I'm

25   like -- I haven't memorized the exhibit numbers just so it's

F1MZSOK7                          Shrenzel - direct

1    clear.  I got over whatever number now we're up to, almost 1200

2    exhibits.  And he just says you got a objection talks to 372,

3    the answer is, I don't even know what 372 is, and I am prepared

4    to address it and I haven't had chance to look at it recently,

5    and it puts me in a bad position.  And frankly, your Honor, I

6    don't think it's fair to criticize the defendant for not being

7    ready to argue that objection.  I got 190 --

8              THE COURT:  When do you think I'm supposed to be ready

9    to rule?

10             MR. ROCHON:  I think you're supposed to be -- I think

11   they're supposed to tell me they want to use 372 and then

12   either object to it or we don't.

13             THE COURT:  That's not the substance of what I wanted

14   to discuss.  But, quite frankly, I don't accept that.  The

15   reality is in most cases, regardless of how many exhibits there

16   are, I don't spend my time on every exhibit when you object to

17   thousands of exhibits, going through every one of them prior to

18   there being offered, and prior to them attempting to offer them

19   in evidence.  That's a luxury that you've had today, and during

20   this trial.  You're not entitled to that, okay.  I tried to

21   work it out so the two of you can efficiently get this through

22   this trial.  It is not working, okay.  So the reality is is

23   that you're not entitled to anything, other than he tries to

24   lay a foundation.  Either he does lay the foundation or doesn't

25   lay the foundation, he offers it into evidence, you object, I

F1MZSOK7                        Shrenzel - direct

1    rule, it's either in or it's out.  If you think it's

2    prejudicial to you to have that done before the jury, then you

3    better make sure that early enough long before we get there,

4    you better identify the ones that you don't want to go through

5    that process in front of the jury, so you raise that and make

6    sure that you understand whether it's coming in or coming out.

7    That's the general rule, okay.  So I'm not particularly

8    sympathetic that you have to look at thousands of exhibits,

9    that you've already seen over the years.  Because I have to

10   look at thousands of exhibits that I've never seen, and I have

11   to give you a ruling in 30 seconds, all right.  So let's get to

12   the substance of this.  What's your objection to this?

13            MR. ROCHON:  Judge, those in that format, I've

14   never -- I didn't know they had the original.

15            THE COURT:  What is your objection?

16            MR. ROCHON:  Judge, I haven't looked at them.

17            THE COURT:  That's not an objection.  Unless you come

18   back tomorrow morning and give me a basis for legitimate

19   objection, these magazines are admitted in evidence.

20            MR. ROCHON:  Right.

21            THE COURT:  We can put that aside then because you're

22   not in a position to argue now.  If you want to argue tomorrow,

23   then you tell me that that's a wrong ruling, tell me why.

24   Otherwise it's admitted.

25            MR. ROCHON:  Can I be heard for a bit more on this,

F1MZSOK7                         Shrenzel - direct

1     your Honor.  Just so the record's clear, those are two colored

2     copies of magazines in Arabic.  I'm going to check and see if I

3     got the complete copy of them from the plaintiffs.  I don't

4     know.  They were given a brand new exhibit number.  So he's

5     just marking exhibits with a new number.  I don't know what

6     he's doing.

7               THE COURT:  I don't know what he's doing either.  I

8     don't know what you're doing.  So I can't follow you guys here,

9     you know, you've seen these before, you've had them probably

10    for years, okay.

11              MR. ROCHON:  Judge, I've only had parts of them.  I

12    don't know what else is in there.  I want to go --

13              THE COURT:  Mr. Rochon, why give me a reason why you

14    want -- you're not ready to argue?  I don't want to hear it.

15    When you're ready to argue, come back to me and give me the

16    substance of your argument.

17              MR. ROCHON:  May we have the magazines over night,

18    your Honor?

19              THE COURT:  You can do whatever you want with them.

20              MR. ROCHON:  Thank you.

21              MR. YALOWITZ:  They have them, your Honor.  They were

22    sent on -- we will give them the date --

23              THE COURT:  Look, Mr. Yalowitz, you make sure that

24    they do have a complete copy of those magazines, otherwise you

25    give it to them overnight.

1          MR. YALOWITZ:  You got it.

2          THE COURT:  All right.

3          MR. ROCHON:  If we could just get -- I don't even know

4    what exhibits they were previously.

5          THE COURT:  Well, look, Mr. Rochon I'm not going to

6    spend my time doing this, okay.  You spend your time doing

7    this.  All right?

8          Now, any other issues substantively I can deal with?

9          MR. YALOWITZ:  Your Honor, I have one other, your

10   Honor.  On 372, the Court ruled on that in advance of January

11   8th.

12         THE COURT:  Which one is 372?

13         MR. YALOWITZ:  That's the one that Mr -- we went up

14   for a second time to the sidebar.

15         THE COURT:  Show me the videos.  How long are these

16   videos?

17         MR. YALOWITZ:  I have an e-mail January 8th.  "Per the

18   Court's ruling earlier this week, you will receive a link to

19   downloads shortly, the clip of Exhibit 372 that plaintiffs may

20   use at trial."  So that we sent them this clip that we're going

21   to use on January --

22         THE COURT:  Let me see the clip.

23         MR. YALOWITZ:  Based on the Court's ruling of

24   January 7th.

25         There's also 352, but this is the one that I thought

 1    we --

 2                    (Video played)

 3                    THE COURT:  Is that one video of the -- or both

 4    videos?

 5                    MR. YALOWITZ:  That's the first one.

 6                    THE COURT:  Okay.

 7                    MR. YALOWITZ:  And, frankly, we were going to omit

 8    that and do the one I'm about to play to save time, but -- and

 9    then I went back to this one because we specifically discussed

10    this one on January 6th, and that's where Mr. Rochon or

11    Mr. Hill, or both of them were arguing it's not a statement

12    against interest.  And the Court said it is a statement against

13    penal interest.  And their argument was, she's already in jail.

14    And the Court said, no, that's not true, that's never true.

15    Anything could happen.  They could decide to partner, she could

16    decide that she is so sorry or so old they let her go, they may

17    decide they will never let her go because she never shows a

18    single ounce of remorse.

19                    So I thought we had a ruling on 372, and in accordance

20    with the Court's instructions, we sent the defendants on

21    January 8th this clip which we just played.  And so I kind of

22    thought we were done on that.  And we show up in court and it's

23    like a whole new slew of objections.

24                    THE COURT:  Let me see the other one.  How long is the

25    other one?

1          MR. YALOWITZ:  Shorter, and this is the one I'd rather

2    play because it's shorter.

3          (Video played)

4          THE COURT:  Mr. Rochon, what's your objection?

5          MR. ROCHON:  Your Honor, I have 372 and just -- that's

6    the one that wasn't on the list, but which we had disclosure

7    previously that -- the last one was only on the list, but we

8    hadn't talked to you about.

9          As to 373 we object on numerous grounds.  372 we think

10   that it's edited in a way to not be prejudicial.

11         THE COURT:  I'm sorry, say it again?

12         MR. ROCHON:  You probably didn't hear me.

13         THE COURT:  No, the last part.

14         MR. ROCHON:  We think it has been edited in a way to

15   be not prejudicial.

16         THE COURT:  And when you said 372, I'm just not sure.

17         MR. YALOWITZ:  The first one.

18         THE COURT:  First one.

19         MR. ROCHON:  Yes.  The second one has a lot of

20   extraneous --

21         THE COURT:  So your stronger objection is to the

22   second one.

23         MR. ROCHON:  Yeah, and that's -- part of the confusion

24   here is 372 we looked at, we actually had a proposed redaction

25   we're going to use, then it was off the list.

1           THE COURT:  All right.

2           MR. ROCHON:  So then I now look at 373 where I think

3     the Court's seen it, I know the record hasn't seen it, but it's

4     much longer, lots of graphic stuff, lots of things that aren't

5     self incriminatory but are unpleasant to see and hear for

6     people, where as the first one is fairly direct and is tied to

7     what the person actually did.

8           Our view previously to you has been that none of these

9     should come in, third parties and not PA people, not at a time

10    when it would incriminate themselves, and you haven't been

11    favorably disposed to those arguments.  But we made them not

12    about -- so it's got a little jumbled up because the plaintiffs

13    changed their mind.  We think 372 is far less prejudicial to us

14    and much closer to at least the actual incidents, it doesn't

15    have extraneous stuff that no one could say is self

16    incriminatory.

17          THE COURT:  Mr. Yalowitz.

18          MR. YALOWITZ:  What's the second one?  352 is a

19    narrative by the woman who is in jail for bringing the guy

20    there.

21          THE COURT:  Is that the same person who was in the

22    other one?

23          MR. YALOWITZ:  Right, saying exactly what she did and

24    how she did it.  It's --

25          THE COURT:  You're not satisfied with the first one?

1           MR. YALOWITZ:  No.  I would rather have the second

2     one.

3           THE COURT:  When did you disclose the second one?

4           MR. YALOWITZ:  They've had it for years.

5           THE COURT:  Okay.  When did you tell them you were

6     going to use it in this trial?  The first one is the one we

7     discussed.  I remember the transcript was --

8           MR. YALOWITZ:  Right, we disclosed --

9           THE COURT:  Is there some reason why we didn't discuss

10    the second one at that time?

11          MR. YALOWITZ:  They --

12          THE COURT:  You took it off the list, right?

13          MR. YALOWITZ:  No, I didn't take it off the list.

14          THE COURT:  So why didn't we discuss it?

15          MR. YALOWITZ:  Because we were dealing -- I thought we

16    did, but we're dealing with -- we were dealing with a letter

17    from the defendants.

18          THE COURT:  Okay.

19          MR. YALOWITZ:  I got to go back and look, but I

20    thought we were dealing with both videos.

21          THE COURT:  Okay all right.

22          MR. YALOWITZ:  It was my understanding from that

23    conversation that we were dealing with both videos.

24          THE COURT:  You know, gentlemen, I just can't spend

25    this much time with you, you know.  I can't.  I'm going to

1    start ruling and my rulings are going to be straight forward

2    direct and I'm not spending a lot of time hearing arguments

3    that could have been made in detail long before this.  If you

4    can --

5                MR. YALOWITZ:  I thought we did.

6                THE COURT:  If you can lay the foundation for the

7    first video, I will allow you to put in the first video.

8    That's my ruling, end of story.  All right.

9                MR. YALOWITZ:  Your Honor, you know, it's so unfair.

10   This one, look --

11               THE COURT:  Mr. Yalowitz, I'm done, all right.  I

12   don't need -- you can wine when I leave, okay.  That's my

13   ruling, okay.  And if you guys, if you want to make sure you

14   get the rulings you like, then you better make sure that I know

15   what's coming and that you prepared yourself to make sure that

16   I can rule in your favor.  That goes for both sides.

17               MR. YALOWITZ:  All right.

18               THE COURT:  So I'm putting this on you, guys.  I'm not

19   going to deal with this any more.  That's it.

20               MR. YALOWITZ:  Mr --

21               THE COURT:  Mr. Yalowitz, we're done for the day.

22               MR. YALOWITZ:  All right, good night.  I understand.

23   Good night.

24               (Adjourned to January 23, 2014 at 9:30 a.m.)

25

```
 1                    INDEX OF EXAMINATION

 2   Examination of:                      Page

 3   ISRAEL SHRENZEL

 4   Direct By Mr. Yalowitz . . . . 1068

 5                    PLAINTIFF EXHIBITS

 6   Exhibit No.                       Received

 7   1154   . . . . . . . . . . . . . . . . . .1078

 8   1155   . . . . . . . . . . . . . . . . . .1079

 9   1158   . . . . . . . . . . . . . . . . . .1079

10   1166   . . . . . . . . . . . . . . . . . .1080

11   1167   . . . . . . . . . . . . . . . . . .1081

12   1171   . . . . . . . . . . . . . . . . . .1082

13   1172   . . . . . . . . . . . . . . . . . .1082

14   1173   . . . . . . . . . . . . . . . . . .1083

15   1175   . . . . . . . . . . . . . . . . . .1083

16   1176   . . . . . . . . . . . . . . . . . .1083

17   1177   . . . . . . . . . . . . . . . . . .1084

18   1178   . . . . . . . . . . . . . . . . . .1084

19   1181   . . . . . . . . . . . . . . . . . .1084

20   1182   . . . . . . . . . . . . . . . . . .1085

21   1183   . . . . . . . . . . . . . . . . . .1085

22   1185   . . . . . . . . . . . . . . . . . .1086

23   1186   . . . . . . . . . . . . . . . . . .1086

24   1159   . . . . . . . . . . . . . . . . . .1087

25   1193   . . . . . . . . . . . . . . . . . .1088
```

1     1121      . . . . . . . . . . . . . . . . . . .1090

2     407      . . . . . . . . . . . . . . . . . . .1112

3     196     . . . . . . . . . . . . . . . . . . .1113

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25