F1N8SOK1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   MARK I. SOKOLOW, et al.,

4                   Plaintiffs,

5            v.                              04 CV 397 (GBD)
                                             Trial
6   PALESTINE LIBERATION
    ORGANIZATION, et al.,
7
                    Defendants.
8
    ------------------------------x
9                                            New York, N.Y.
                                             January 23, 2015
10                                           9:30 a.m.

11  Before:

12                    HON. GEORGE B. DANIELS,

13                                           District Judge
                                             and a Jury
14                          APPEARANCES

15  ARNOLD & PORTER LLP
         Attorneys for Plaintiffs
16  BY:  KENT A. YALOWITZ
         PHILIP W. HORTON
17       TAL MACHNES
         SARA PILDIS
18       CARMELA T. ROMEO
         RACHEL WEISER
19
    MILLER & CHEVALIER, CHARTERED
20       Attorneys for Defendants
    BY:  MARK J. ROCHON
21       LAURA G. FERGUSON
         BRIAN A. HILL
22       MICHAEL SATIN

23  Also present:  RACHELLE AVITAL, Hebrew interpreter
                   RINA NE'EMAN, Hebrew interpreter
24

25

F1N8SOK1

```
 1              (Trial resumed; jury not present)

 2              THE COURT:  Let me address the issues that were raised

 3    by letter over night so we can move forward efficiently with

 4    the jury's time.

 5              Let me make sure I have my letters.

 6              Let me work backwards.  We have already discussed

 7    this.  Let me make the record clear and we can move on.

 8              With regard to the videos we saw yesterday, my ruling

 9    stands.  The first video we saw is admissible, as we had

10    discussed and we discussed previously.  The second video was

11    not.  Since I have already admitted the first video, the second

12    video is at most cumulative, but I find it is unduly

13    prejudicial and lacks any significant probative value that's

14    not outweighed by the prejudice.

15              We discussed the first video previously.  We did not

16    discuss this video.  I allowed the previous video in evidence,

17    at least giving a indication at that point in time that I might

18    allow that video.  This late additional offer and argument

19    about the second video, as I say which is purely cumulative,

20    does not compel me to allow additionally this video as well.

21              MR. YALOWITZ:  Your Honor.

22              THE COURT:  I am not finished.

23              MR. YALOWITZ:  I'm sorry.  I will come back to that.

24              THE COURT:  Quite frankly, I am not allowing this

25    video in as some exception to the hearsay rule.  This video is
```

F1N8SOK1

1   not hearsay.  It's not offered for its truth or any other

2   hearsay purpose.  It's offered to demonstrate the role, and the

3   jury has the right to assess their attitude and their stated

4   motivation for their conduct.

5          Second of all, this is one of those objections which I

6   consider to be no legitimate reason for us to spend significant

7   time on or any need to entertain.  The role that these

8   individuals played in these incidents is not in dispute.  The

9   evidence of that role and participation is already before this

10  jury.  This video is not offered for the hearsay purpose of

11  proving that.  There is nothing inconsistent about what they

12  say their role was that the jury doesn't already have before

13  them in admissible evidence form.  So to argue this is being

14  offered for them to conclude that in fact they were involved is

15  a nonstarter.

16         As I say, the jury has the right to assess their

17  attitude and stated motivation for their conduct, and whether

18  it logically supports or doesn't support a conclusion with

19  regard to the participation of the defendants in this case,

20  that's an issue for the jury to resolve.

21         I am going to address all of these issues and then you

22  can add whatever you would like before the jury arrives at

23  9:45.

24         My ruling with regard to police magazines, I already

25  gave the plaintiff some and I excluded others.

F1N8SOK1

1          Let me just state, my ruling stands.  I evaluated it

2     thoughtfully, in a discriminate manner, and the ones that I

3     allowed are the ones that I thought were appropriate to allow.

4     Quite frankly, I don't think I need to make any further record

5     than the record that's made by the quotations that the

6     plaintiff himself adds to this letter arguing, again, that it

7     should be admitted.

8          Clearly, the statements in this have little, if any,

9     probative value with regard to whether someone is committing an

10    act of terror or whether they are involved in these terrorist

11    acts, and it's clearly unduly prejudicial and duly prejudicial

12    based on stated positions about religion.

13         I evaluated these and evaluated them in context with

14    the ones that I allowed.  The ones that I allowed I made a

15    determination that there are some, although I find to be slight

16    probative value, but that probative value is not outweighed by

17    its undue prejudice.  That's the ruling on that and I am not

18    going to revisit that ruling.

19         I have looked at the other videos that have been

20    handed to me and a lot of these other issues are issues that

21    were in yesterday's letter.  Let me just put it into a

22    category.  All of the following items are out and I will put

23    them in categories.

24         Symbolic funerals that were held eight years later,

25    after the Israeli government returned remains of people who had

F1N8SOK1

1    been killed, Palestinians who had been killed --

2              MR. YALOWITZ:  May I be heard on that one?

3              THE COURT:  I read your letter.

4              MR. YALOWITZ:  I did not have an opportunity to

5    address that particular letter.

6              THE COURT:  Let me finish.  You can be heard on it,

7    but it's not going to change my view.  I have examined this.

8    Unless you tell me something shockingly that I am not aware of,

9    this is my ruling.

10             Mr. Yalowitz, let me finish.

11             Symbolic funerals eight years later are out.

12             Visits to jails by certain individuals or to family

13   members is out.

14             The videotape that I looked at in which Yasser Arafat

15   was talking to youth is out.

16             The excerpt from a book written by some author who

17   wrote a book called Dying to Win the Strategic Logic of Suicide

18   Terrorism is out.

19             The report by the former Israeli government minister

20   with regard to his assessment of the involvement of Arafat or

21   PA officials or other PA officials or entities in terrorism

22   against Israel is out.

23             Those are my rulings.

24             Mr. Yalowitz, you want to be heard further?

25             MR. YALOWITZ:  I do.  Thank you.

F1N8SOK1

1            Number one, with regard to my letter of last night

2    concerning the 403, I have two things to say.

3            First of all, thank you for taking a hard look at

4    that.  I know you did and I appreciate it.

5            Second of all, I don't think it's going to change your

6    ruling, but I just want to be clear that the video that your

7    Honor addressed, which I think is Exhibit 352.

8            THE COURT:  Which video?

9            MR. YALOWITZ:  The video of the woman talking about

10   her role in the suicide bombing.

11           THE COURT:  The second video we saw yesterday.

12           MR. YALOWITZ:  The second video we saw yesterday, yes.

13           With regard to that, I don't think it's going to

14   change your ruling, but as you said, you have to be fully

15   informed of the facts.  And I just want to be very clear that I

16   offered that video first and if we are going to play one video,

17   that's the video I want.

18           THE COURT:  That's not true.  You offered the first

19   video weeks ago.  All right.  So technically you offered the

20   first video, not only first but alone.  We discussed the first

21   video.  You quoted the day we discussed the first video weeks

22   ago.  We have never discussed the second video prior to

23   yesterday.  So it is not an accurate record to say that you

24   first offered the second video before you offered the first

25   video.

F1N8SOK1

1              MR. YALOWITZ:  OK.  My purpose is not to debate with

2      the court.

3              THE COURT:  You don't have to debate it.  I just want

4      to know if you really think that's a true fact.

5              MR. YALOWITZ:  When it came to the day of trial, the

6      video I want is 352.

7              THE COURT:  You never argued to me to admit that video

8      prior to yesterday.

9              MR. YALOWITZ:  That is true.  I agree with that.  I am

10     not asking to revisit the ruling.  I just want to make sure

11     that with regard to the cumulativeness, the court understands

12     that's the one I want.  Your ruling on 403, you have made your

13     ruling.

14             THE COURT:  That's the one you want now, but that's

15     not the one you discussed and you urged upon me to offer, and

16     then you finally said yesterday, between the one I said I am

17     probably going to let in and this new one that popped up

18     yesterday for my consideration, now you want the second.

19     That's the reality.

20             MR. YALOWITZ:  Look, I disagree with that.

21             THE COURT:  Which part of that do you disagree with?

22             MR. YALOWITZ:  My memory of what happened several

23     weeks ago is that the defendants raised all three of these

24     videos.

25             THE COURT:  And you didn't argue for the second.

F1N8SOK1

1          MR. YALOWITZ:  And I argued for all three because I

2    wanted all three at that time.

3          THE COURT:  We did not discuss the second one.  We

4    discussed the first one.  I am not trying to trick you.  You

5    quoted me the language yesterday.  We were discussing the

6    second.

7          Isn't it true that we never discussed the first one

8    when you argued for the video on that day?

9          MR. YALOWITZ:  The debate -- yes, that's true and let

10   me tell you why.  Because the debate that we had that the

11   defendants raised was their foundation argument.  They came to

12   your Honor and said, these three videos lack foundation.  So we

13   dealt with the foundational issues.

14         Then your Honor correctly said, well, I want to know

15   about the substance of these things.  And in the context of

16   that discussion, as you say, we discussed 372.  We did not

17   discuss 353.  So I agree with you on the fact that the first

18   time we discussed the substance of 353 was --

19         THE COURT:  We didn't discuss anything about 353, not

20   the substance.

21         352, right?  You keep saying 353.

22         MR. YALOWITZ:  352, right.  I am getting the numbers

23   wrong.

24         THE COURT:  That's important.  I have never seen that

25   video.

F1N8SOK1

1          MR. YALOWITZ:  I agree with that.

2          I just wanted to make it clear, as I understand the

3     court's ruling, I just didn't want to leave -- I wanted to make

4     sure you had complete information about it.

5          THE COURT:  I think I do.

6          MR. YALOWITZ:  That's all I wanted with that.

7          Now I want to move to three other items.  OK?  That's

8     the letter that I got handed to me right before we came back

9     from lunch from Ms. Ferguson.  Handed me a letter, while I have

10    a witness on the stand, while I am getting ready on the podium.

11    I have not responded to that letter.

12         THE COURT:  Ms. Ferguson's letter?

13         MR. YALOWITZ:  Yes.  I have three things that I care

14    about in that letter.

15         THE COURT:  Wait a minute.  This is in substance,

16    quite frankly, as they say, pretty much a waste of time to read

17    this letter because this is the exact same thing that was in

18    the letter that was written yesterday, arguing the

19    inadmissibility of the exact same exhibits.

20         MR. YALOWITZ:  I don't have the letter straight, but I

21    have three exhibits that I have never been heard on that I want

22    to be heard on.

23         THE COURT:  It talks about the video Brides of

24    Shahida.  It talks about the video of Yasser Arafat, which I

25    think you even addressed.

F1N8SOK1

1          MR. YALOWITZ:  I have not addressed that.  I want to

2     address that.

3          THE COURT:  It was raised yesterday.

4          MR. YALOWITZ:  It was raised yesterday, handed to me

5     while I was coming back with a witness on the podium.

6          THE COURT:  Robert Pape's book?

7          MR. YALOWITZ:  Never been addressed.  I need to

8     address it.

9          THE COURT:  I understand that.  You say you want to

10    make a clear record.  The record is that these issues were

11    raised by letter yesterday, not today for the first time.  They

12    were in yesterday's letter.  I read them.  I read them twice

13    now.  OK?

14         MR. YALOWITZ:  I haven't had the time to respond to

15    that letter.  I want to talk to you about three of the items in

16    that letter.

17         THE COURT:  You're saying you didn't have the time

18    between when they were raised yesterday and until now to

19    respond.

20         MR. YALOWITZ:  Correct.

21         THE COURT:  That's your position.  Not that you didn't

22    have time to respond to Ms. Ferguson's letter.  Quite frankly,

23    it's very well written, but you didn't tell me anything that I

24    didn't know yesterday.

25         MR. YALOWITZ:  Let me try to address now the three

F1N8SOK1

1    pieces of evidence that I care about, which, quite frankly,

2    were very misleadingly described in Ms. Ferguson's letter.

3    Very misleadingly described.

4                THE COURT:  I have looked at all of these exhibits.

5                MR. YALOWITZ:  Let me give you the information and

6    then we can move on.

7                THE COURT:  You're assuming I don't have the

8    information.  I have the information.

9                Go ahead.  Say what you want to say.  And if something

10   strikes me as new information, I will tell you.

11               MR. YALOWITZ:  Number one, the Ali Ja'ara funeral, it

12   is not a symbolic funeral.  It is a police funeral, state

13   funeral of a suicide bomber in this case and there is a debated

14   issue of fact about this man.  The disputed issue of fact about

15   this individual is was he a police officer or was he not a

16   police officer at the time that he blew himself on a bus and

17   killed my client's husband and father.

18               That's the guy that the PA gave a state-sponsored

19   funeral to when his remains were returned.  So this goes

20   directly to ratification.  This goes directly to the

21   circumstantial evidence of whether it was in the course of his

22   employment.

23               Ms. Ferguson didn't tell you those things in her

24   letter.  She just said it was some symbolic funeral, and that's

25   not true.  That is not true.  And if the video is somehow

F1N8SOK1

1    unduly prejudicial, we have photographs --

2              THE COURT:  There is no dispute that he was once a PA

3    employee, is there?

4              MR. YALOWITZ:  They dispute --

5              THE COURT:  There is no dispute that he was once a PA

6    employee.

7              MR. YALOWITZ:  Correct.

8              THE COURT:  So the fact that they give him a state

9    funeral does not tell me whether or not they are giving a state

10   funeral because he was a PA employee on one day as opposed to

11   another day.

12             MR. YALOWITZ:  Of course it does.  I don't know how

13   you can say that.

14             THE COURT:  All right.  How does it prove that?  If I

15   resign from the bench today and 20 years from now I die and

16   they give me a judge's funeral, how does that prove that I was

17   a judge on the day that was at issue in the lawsuit?

18             MR. YALOWITZ:  I don't think you can be buried in

19   Arlington Cemetery if you were dishonorably discharged, your

20   Honor.

21             THE COURT:  We know he wasn't dishonorably discharged.

22             MR. YALOWITZ:  I think he was.  That's what the

23   defendants say.  The defendants say they fired him.

24             THE COURT:  OK.

25             MR. YALOWITZ:  Then he blew himself up and then they

F1N8SOK1

1    reinstated him.   My position.

2              THE COURT:   That evidence is in the record.

3              MR. YALOWITZ:   That evidence is in the record.

4              THE COURT:   You can argue what you will from that.

5              MR. YALOWITZ:   Right.   And the fact that they gave him

6    a state-sponsored funeral supports my position in the debated

7    issue of fact whether they reinstated him.

8              THE COURT:   OK.   I understand your argument.

9              MR. YALOWITZ:   Thank you.

10             Item number two, the Pape book.   There is a disputed

11   issue of fact about whether the June 19th bombing was claimed

12   by the Al Aqsa Martyr Brigades.   Pape has studied terrorism.

13   In the back of this book he has a chart with dates that show

14   the date of the attack and who was attributed to that attack.

15   Not only my expert who is on the stand, but one of the

16   defendants' experts, who they have listed as one of their

17   witnesses they are going to call, Lori Allen, both say that it

18   is reasonable to rely on that chart.

19             So it is a, whatever the word is, treaties, a

20   scholarly treaties that an expert can rely on.   I am not going

21   to put the thing in evidence, but I am allowed to read out that

22   portion that the expert is relying on.

23             THE COURT:   They seem to have objected -- and I can

24   look more carefully at the exhibit -- they seem to have

25   objected to the excerpt.

F1N8SOK1

1      MR. YALOWITZ:  They quoted something that they didn't

2    like.

3      THE COURT:  So I assume it's more than just a chart

4    that you are offering in evidence.

5      MR. YALOWITZ:  That is incorrect.

6      THE COURT:  You're not offering this excerpt.

7      MR. YALOWITZ:  I don't have the excerpt in mind.

8      THE COURT:  Strategic logic of suicide terrorism aimed

9    at political coercion.

10      MR. YALOWITZ:  I don't need that.

11      THE COURT:  Is that in the exhibit that you wanted?

12      MR. YALOWITZ:  No.

13      THE COURT:  The exhibit is an excerpt from a book.

14      MR. YALOWITZ:  That's Ms. Ferguson's misleading

15    characterization.

16      THE COURT:  Let me see the chart, see the exhibit in

17    the form that you want it.

18      MR. YALOWITZ:  Does your Honor have the exhibit?

19      THE COURT:  I do not.

20      MR. YALOWITZ:  Bear with me and let me move to the

21    third one.

22      THE COURT:  Go ahead.

23      MR. YALOWITZ:  Literally what I want to do is read the

24    date and the attribution.  That's all I need to do.

25      THE COURT:  The date of what?

F1N8SOK1

1          MR. YALOWITZ:  June 19, 2002, Al Aqsa Martyr Brigades.

2          THE COURT:  I am sorry.

3          MR. YALOWITZ:  I will show it to you.

4          THE COURT:  You want to offer his book and his chart

5     as evidence that on a certain date that the Al Aqsa Martyr

6     Brigades took credit for the incident.

7          MR. YALOWITZ:  Correct.

8          THE COURT:  And you have got no witness to say that.

9          MR. YALOWITZ:  I have an expert who is going to rely

10    on it.

11         THE COURT:  You have no witness who can say that

12    without relying on someone else's book?

13         MR. YALOWITZ:  The expert, like all terror experts,

14    when you're -- not all terror experts.  In terror cases when

15    you're attributing a terror attack to a particular group, the

16    expert has to piece it together from various pieces of

17    evidence.  This is one piece of evidence on which he is

18    relying.  There are others, but this is one.

19         THE COURT:  Let me see it and go to the next issue

20    because as soon as the jurors are here, we are going to start.

21    We are not going to waste their time.

22         What was your third issue?

23         MR. YALOWITZ:  My third item is the video of Arafat on

24    January 31, 2004, two days after the Goldberg bombing, leading

25    the crowd chanting, millions of martyrs marching to Jerusalem.

F1N8SOK1

1  That's two days after my event.

2          THE COURT:  Would you agree the record before this

3  jury is that a reference to martyr is a broader attribution

4  than simply a person who committed a terrorist act?

5          MR. YALOWITZ:  I think there is ambiguity and it

6  depends on the context.

7          THE COURT:  I will accept that.

8          MR. YALOWITZ:  I think we are in agreement with that.

9          THE COURT:  You want it as evidence that he is saying,

10  let's send more terrorists, bombers or terror attackers to

11  Jerusalem.  That's the inference that you want the jury to draw

12  from this?

13          MR. YALOWITZ:  Yes.

14          THE COURT:  I think that's an improper inference based

15  on what I saw.

16          MR. YALOWITZ:  Let me, in candor, about that --

17          THE COURT:  Candor would help.  I always expect that

18  from you.

19          MR. YALOWITZ:  I hope that we have built that track

20  record here, Judge.

21          Quite frankly, that statement by Arafat is already in

22  this record in writing.

23          THE COURT:  Then why do you need it?  Then it's

24  cumulative.

25          MR. YALOWITZ:  As counsel in the case I don't think

F1N8SOK1

 1    it's cumulative at all to take the cold written record and put

 2    it on the videotape so that the jury can understand the human

 3    nature of it.

 4            THE COURT:  I don't know even know what context you

 5    say it is in the record.  That doesn't necessarily persuade me

 6    that you get to put it in an inflammatory manner or put it in

 7    in the context to be able to argue that he is standing there

 8    telling children that they should become suicide bombers.

 9    That's quite a stretch.

10            MR. YALOWITZ:  That's why I am telling you it's in

11    candor because it's already in the record.

12            THE COURT:  In the record in what form?

13            MR. YALOWITZ:  In the Marwan Barghouti conviction.

14            THE COURT:  That what?

15            MR. YALOWITZ:  That he lead chants, that he said

16    millions of martyrs are on the way to Jerusalem.

17            THE COURT:  Who said?

18            MR. YALOWITZ:  Arafat or another person.

19            THE COURT:  Said that --

20            MR. YALOWITZ:  It may say Arafat.  I don't know.

21            THE COURT:  In what context?  That was supposed to be

22    evidence that Marwan Barghouti was committing a terrorist

23    attack on that command?

24            MR. YALOWITZ:  I don't remember the exact context.  I

25    want you to know it's already there.

F1N8SOK1

1            THE COURT:  That wouldn't change my ruling.

2            MR. YALOWITZ:  You have your job and I have my job.

3            THE COURT:  I am telling you how I am ruling and I

4    have considered what you have given me as additional evidence

5    and it doesn't change my ruling.

6            MR. YALOWITZ:  The Arafat video, you have got my

7    information on it.

8            The Pape chart, there's two entries that I want to

9    read out to him.

10            THE COURT:  Give me the number of the entry.  Do you

11    know?

12            MR. YALOWITZ:  It's June 18 and June 19.

13            THE COURT:  This is supposed to be a chart of what?

14            MR. YALOWITZ:  Of terror attacks in Israel during the

15    Al Aqsa Intifada.

16            THE COURT:  That's not what you said this chart is.

17    This chart is supposed to represent something more than that.

18            MR. YALOWITZ:  I thought that's what I said.

19            THE COURT:  You said something about somebody taking

20    responsibility.  We don't need a chart telling us when the

21    terrorist attack took place.

22            MR. YALOWITZ:  Based on the research of this scholar

23    attributing the attacks to various terror groups, Al Aqsa

24    Martyr Brigades, Hamas, Palestinian Islamic Jihad.

25            THE COURT:  As you say, I do expect, and you have

F1N8SOK1

1    given me a track record to rely on your candor.  But you're not

2    being candid if you say it's only a chart that is this exhibit.

3    This exhibit is 503.  It has the cover title of the book.  It

4    has the inside title of the book.  It has the table of

5    contents.  It has at least five, six, seven, eight to nine

6    pages of text.  And it has a chart which is one, two, three

7    pages.  That's the exhibit.

8           MR. YALOWITZ:  Hold on.  This doesn't go back to the

9    jury.  803 --

10          THE COURT:  How does it not go back to the jury?  If I

11   admit 503 in evidence, it goes back to the jury.

12          MR. YALOWITZ:  Does anybody have a copy?

13          THE COURT:  You gave me 503.  This is what you said

14   you wanted to admit in evidence.  So the jury can take it into

15   the jury room with them.

16          MR. YALOWITZ:  I was not clear.  Let me try to be very

17   clear about this.

18          I am offering under 803(18).  Under 803(18), it

19   doesn't go back to the jury.  It is read out by counsel.  All I

20   want to read out is that portion.

21          THE COURT:  Which portion?

22          MR. YALOWITZ:  The two dates and the entries -- if you

23   hand it to me back, I will highlight what I want to read out.

24   I am sorry I wasn't clear.

25          THE COURT:  The problem is the two dates in the entry

F1N8SOK1

1    don't say what you want it to say.  It just gives the date of

2    the incident and where it took place.  We know those facts.

3    The two entries don't say it.

4            It says what terrorist act took place and what the

5    date of the terrorist act is.  We know that.

6            MR. YALOWITZ:  Let me read it and then I will hand it

7    to your Honor.

8            Item 59.  June 18, 2002.  Hamas.  Belt bomb.  The

9    target is a bus in Jerusalem.  Number of killed, 19.

10           THE COURT:  You want that as proof that Hamas --

11           MR. YALOWITZ:  Let me finish.

12           Item 60.  June 19, 2002.  Al Aqsa.  Belt bomb.

13   Target, bus stop in Jerusalem of.  Number of killed, seven.

14           THE COURT:  You want it to prove that these are the

15   individuals that attribute the responsibility for these acts.

16           MR. YALOWITZ:  I want it to support the expert's

17   conclusions.

18           THE COURT:  The expert is only relying on Pape's

19   statement.

20           MR. YALOWITZ:  He is relying on other things as well.

21           THE COURT:  You want to say that it makes it more so

22   because Pape said it in his book.

23           MR. YALOWITZ:  May I read 803(18) to your Honor?

24           THE COURT:  It is not necessary.  I have read it like

25   20 times during this trial.  I have it memorized at this point.

F1N8SOK1

1              MR. YALOWITZ:  My understanding of 803(18) is this

2      does not go back to the jury.  So if I led your Honor to think

3      that I wanted this to go back to the jury, I'm really sorry.

4              THE COURT:  You didn't mislead me.  The problem is, if

5      it doesn't go back to the jury, if it is not admissible as

6      evidence in this case, to be an exhibit to go back in the jury

7      room, then it doesn't have any other legitimate purpose.  The

8      purpose for which you're offering it is a purpose that it must

9      go into evidence, because the jury can't rely on it for that

10     purpose unless it is admissible evidence.

11             They are not going to rely on this and not have it as

12     an exhibit for you to make them conclude that these were the

13     people responsible.  No.  That's my rationale.

14             MR. YALOWITZ:  If admitted, under 803(18) the

15     statement may be read into evidence but not received as an

16     exhibit.

17             THE COURT:  For what purpose?

18             MR. YALOWITZ:  For the purpose of informing the jury

19     of the basis for the expert's conclusion, especially because I

20     think there may be some confusion about the 18th and the 19th

21     of June.  I think there may be some confusion based on some of

22     the other evidence.

23             THE COURT:  Confusion about what?

24             MR. YALOWITZ:  About whether this incident took place

25     on the 18th or the 19th of June.

F1N8SOK1

1        THE COURT:  You can ask your expert about that.  He

2   can clear up any confusion in his book with regard to that.

3        MR. YALOWITZ:  As far as we understand each other.

4        THE COURT:  I usually do understand you.

5        MR. YALOWITZ:  I didn't have a chance to respond to

6   Ms. Ferguson's letter and as you can see, based on her letter,

7   there was some incomplete information.  I want to make sure you

8   have complete information.

9        With regard to the Ja'ara funeral, in addition to the

10  video, if the court is concerned about the video nature of it,

11  I also have photographs that were published by the defendants

12  in their official press release, again about this guy.  I think

13  that goes to ratification.

14       THE COURT:  When you say ratification, you're using it

15  in a much broader sense than technically is relevant in this

16  case.  The fact that they would say we approve of his conduct

17  in the past does not establish your case, particularly in this

18  instance because you say any ratification was at a time when he

19  no longer worked for them.

20       So ratification doesn't prove your case, and you can't

21  say, oh, they agreed with it eight years later and thought it

22  was a good idea.  That doesn't prove your case.  You have to

23  prove their involvement and that the people acted within the

24  scope of their employ and that they took acts during that

25  period of time that made it justifiable in the actor's mind

F1N8SOK1

1    that they had permission to do so.  That's not eight year later

2    dig up my bones and say I get a state funeral.  No.  I am not

3    going to allow it for that purpose.

4            MR. YALOWITZ:  Let's move on.

5            THE COURT:  Is there anything else we can address

6    until the jury gets here?

7            MR. YALOWITZ:  You and I have a different view of 403,

8    but you get to decide these things.

9            THE COURT:  I'm glad you acknowledged that.  Do I need

10   you to tell me that?  I assume you checked your frustration so

11   we don't need to have this type of conversation.  This is

12   unnecessary.

13           MR. YALOWITZ:  I agree with that.

14           THE COURT:  I have given both sides an opportunity to

15   come up with some agreed-upon procedures based on some

16   professional courtesy and on fairness.  Both sides have

17   squandered that opportunity.  That's all I can say.

18           First of all, I don't intend to get any more shotgun

19   approaches to exhibits prior to the foundation being laid and

20   prior to the exhibit being offered.  If you think something is

21   so important that you would like to seek an advanced ruling,

22   that is the exception rather than the rule from now on.

23           So I suggest you start to be a little bit more

24   discriminating with regard to the things that you think I

25   should spend my time on and you should spend your time on

F1N8SOK1

1    rather than focusing on moving forward with this case.

2              I am going to say it this way.  This is not a game.

3    This is a trial.  Now if you want to try to outsmart each

4    other, you want to be try to be obstructionist with regard to

5    each other, you want to try to slip in something that the other

6    side is asleep at the switch and doesn't know, that's the way

7    you want to do it, fine and dandy.  But I am not going to be a

8    part of it.  So from now on I expect there to be a legitimate

9    reason to object and I expect there to be a clear ground for

10   admissibility with regard to the exhibits.

11             Also, from now on there will be no subject to prior.

12   When I hear the foundation is laid for the exhibit, I will

13   assess at that point whether or not that exhibit is admissible.

14   I expect on the record an objection.  I expect to hear the word

15   objection or expect to hear the word object.  If you object at

16   that time, you preserve your objection.  But it is unfair to me

17   to make an informed decision, and unfair to the other side, to

18   somehow try to say that you don't have an objection, a

19   different objection to state now but subject to all the other

20   objections you made months and months ago.  I can only decide

21   in the context of what is before this jury at the time and what

22   foundation is laid.  If I don't hear a present objection in

23   court on the record, I do not consider there to be an objection

24   and you have not preserved your objection for trial.  That's

25   the way we are going to proceed.

F1N8SOK1

 1              If you can come up with a way to make this easier for

 2      each other and easier for the court, I welcome that.  But you

 3      have not been able to do that.  So this is the way we are going

 4      to proceed and, quite frankly, it is an inconvenience -- I

 5      don't want to say at most.  It is inconvenient for me to read

 6      all these letters first thing in the morning and try to make an

 7      immediate decision.  But I am not really concerned about that.

 8              It is unfair to the two of you to have to spend your

 9      nights going back and forth on these issues every night rather

10      than preparing for your examination the next day and

11      concentrating on what the evidence is going to be before this

12      jury.

13              As far as I am concerned, my only role is to make sure

14      this case is decided on its merits, on the substance of what

15      the jury has before it, and the jury should have what is

16      relevant and appropriate for them to make an informed,

17      reasonable decision about how the facts should be decided.

18      That's my only concern.

19              It's not about who gets an advantage over someone

20      else.  It's not about slipping in an exhibit for one purpose,

21      even though it may be ostensibly for another.  It is not about

22      objecting because you can articulate some technical objection

23      to the exhibit.  I want to know that there is a ground for an

24      objection and I want to know there is good reason to object.

25      And I want to know there is a good reason to resolve this prior

F1N8SOK1

1    to the party having an opportunity in front of me, and in front

2    of this jury, to lay the proper foundation for its

3    admissibility.

4          Now, if you want to object to every single exhibit

5    they have, fine, you get up in front of the jury and do that.

6    Otherwise, it's time to start thinking about, OK, if this

7    witness already said this fact ten times or five different

8    witnesses have already stated this fact, and this fact is not

9    in dispute, I lose confidence in the lawyers if I hear an

10   objection about that on some technical ground and it's clear to

11   me that it does not affect the jury's legitimate assessment of

12   the evidence and the facts in this case.

13         That's the last comment I am going to make on that.  I

14   am going to proceed as if your burden is to lay the proper

15   foundation, unless I have excluded it previously, and their

16   burden is to tell me after you have attempted to do so that

17   that is inadequate and they object to my admitting it and then

18   I will rule and we will move on.

19         I expect us to use the jury's time much more

20   efficiently than we have and I expect these little debates,

21   most of which are inconsequential to the jury's determination

22   of the merits of this case.

23         That's it.  That's what I am saying.  I will give you

24   another 60 seconds to tell me what else we need to address, but

25   all of our jurors have just arrived and I want to promptly let

F1N8SOK1

 1    them start hearing this case.  I am going to try to see if we

 2    can adjourn a little early today and get the jury home before

 3    the weather turns too bad.

 4            MR. YALOWITZ:  Your Honor, I am ready to go when you

 5    are.

 6            MR. ROCHON:  I just want to say I am sorry for

 7    disappointing the court.  I think we can do better and we will.

 8            If I may, I might also say that this portion of the

 9    trial with the experts I think was inevitably going to have far

10    more of these legal issues.  The next witnesses are going to be

11    damages experts and there will be a lot less that will be

12    difficult in the trial.  I think many of the difficult issues

13    were front loaded in these important witnesses.  I think that

14    will also contribute to the trial moving more smoothly and

15    having fewer of these issues.

16            I was going to suggest this morning, if it would be

17    helpful for me, Mr. Yalowitz and you to meet in chambers.  I

18    think you have already done so.  We don't want to cause

19    additional problems, and I apologize if we have done so.

20            THE COURT:  I'd rather you be mad at me and cooperate

21    with each other than the other way around.

22            With regard to the Mandelkorn expert, I thought there

23    was still one Mandelkorn in the case.  I assume that the

24    experts have some testimony to give with regard to that.  It

25    should be obvious that any testimony with regard to damages of

F1N8SOK1

1    Mandelkorn that is no longer in the case is no longer relevant.

2              MR. YALOWITZ:  I want to be very clear.  What the

3    defendants have done here is they debate --

4              THE COURT:  Mr. Yalowitz, you know what would be an

5    olive leaf.

6              MR. YALOWITZ:  An olive branch.

7              THE COURT:  What would be an olive branch is for you

8    to tone that down a little bit and then try to reach out to the

9    other side and see if you can solve the problem.

10             Now, telling me that you have already done that is not

11   going to advance this one bit.  I would simply say double your

12   efforts and continue to do so.

13             MR. YALOWITZ:  I would really like to get to the jury.

14             THE COURT:  I would too, but you wanted to start this

15   conversation.

16             MR. YALOWITZ:  I didn't.  I said that I wanted to get

17   to the jury.

18             THE COURT:  You said:  I want to make clear that.

19             MR. YALOWITZ:  We will talk about it later.

20             THE COURT:  We won't talk about it later.  There is

21   nothing for me to do, is there?  We don't need to talk about

22   it.

23             MR. YALOWITZ:  The defendants have raised an objection

24   to a witness that I want to bring and we don't have to talk

25   about him now, but I need to talk about him at some point.

F1N8SOK1

1      THE COURT:  Whenever you lay that out before me, I

2   will see if there is something that should be addressed prior

3   to the witness showing up.  If it is something of substance, I

4   will address it.

5      MR. ROCHON:  We are happy to address it today.

6      THE COURT:  Then I suggest the two of you talk to each

7   other before you talk to me.  Tell me where you agree and tell

8   me where you disagree and then I will rule.

9      Let's get the jury.

10      MR. ROCHON:  There was one issue that I wanted to

11   address before we get to the jury per your guidance.  The

12   plaintiffs want to use the interrogatories that relate to that,

13   what I will call the Tirawi letter, the letter we talked about

14   yesterday, where there is a question of the admissibility of

15   the letter and who signed it and the names and some

16   interrogatories.

17      If counsel doesn't want to do it right now, maybe we

18   can address it after the first witness.

19      THE COURT:  Do you have a solution to this problem?

20      MR. ROCHON:  We never spoke to the issue yesterday.

21      THE COURT:  You want to argue against it or give me a

22   solution to the problem?

23      MR. ROCHON:  I felt I needed to give you some

24   information so you have a better record.

25      THE COURT:  Mr. Yalowitz, have you had an opportunity

F1N8SOK1

1   to double check that interrogatory and see whether or not you

2   have made an error or whether or not --

3       MR. YALOWITZ:  I certainly have.  You may remember

4   that this exhibit was the subject of a motion.

5       THE COURT:  I do remember.  Give me answer to my

6   question.

7       MR. YALOWITZ:  The answer is, we are ready to go.  We

8   want to put the interrogatory into evidence an foundationalize

9   the document, because yesterday the defendants said --

10      THE COURT:  Where in the interrogatory does it mention

11  this person in the document?

12      MR. YALOWITZ:  The problem is it was in the question.

13      MR. ROCHON:  Judge --

14      THE COURT:  Let him finish.

15      MR. ROCHON:  I am trying to help.

16      THE COURT:  He obviously doesn't want your help.

17      MR. YALOWITZ:  I really don't need his help.  I really

18  don't.  I don't want to talk to him right now.

19      The interrogatory question says:  Identify the parties

20  to the letter.  It says, Including one of the individuals named

21  Amana Iyaidieh.  It's even got a footnote showing the Arabic

22  spelling of this woman's name.  Then the answer identifies four

23  people who are parties to the letter, one of whom is named

24  Amana, which is the author.  But it uses her married name in

25  the answer instead of her maiden name.

F1N8SOK1

```
 1              So our experts have checked and in fact the Amana

 2     Iyaidieh is the maiden name of Amana, whatever her last name is

 3     in the answer.  There is independent evidence in the world

 4     about that.  And the defendants say in the interrogatory, in

 5     the answer, the parties to the letter are these individuals.

 6     One of them is Amana.  That's the author.  Another one is

 7     Hilal.  That's the guy who did the little scribbling at the

 8     bottom.

 9              Also, this letter is publicly available on the IDF Web

10     site as a captured document.  So I want to lay all of that

11     foundation with the witness in front of the jury because

12     yesterday I was caught short.  My whole presentation was

13     disrupted, and now I want to make sure the jury understands

14     exactly why this is an authentic document and I don't want to

15     hear questions on cross, oh, these alleged captured documents.

16     I want to really lay a foundation for why this document, which

17     was captured, is authentic based on the defendants' own answer

18     sworn -- I guess it wasn't sworn.  It was just signed by Mr.

19     Rochon.

20              THE COURT:  Mr. Rochon, do you have a simpler way to

21     proceed?

22              MR. ROCHON:  What I was trying to say yesterday and

23     today, that's correct, the woman's name, who signed the name,

24     gave her correct name.  We confirmed that.  I could have saved

25     all of that.
```

F1N8SOK1

1              What I was trying to do is stand up and tell you,

2    that's what the interrogatory answer is, that gives the correct

3    name of the person who signed the letter but it is the same

4    person.

5              THE COURT:  Is there some way you want him to proceed

6    otherwise that you can help him out in this regard?

7              MR. ROCHON:  The only thing is, part of the

8    interrogatory include references to the Munzar stuff.

9              THE COURT:  Why should that be redacted?

10             MR. ROCHON:  That is not what this issue relates to.

11   It includes the name of the individual being redacted from all

12   the Munzar Noor convictions, the Abu Talal individual.  I just

13   want to make sure -- we still want to use the

14   interrogatories -- that that unrelated aspect of the inquiry

15   doesn't come into the record.

16             THE COURT:  Mr. Yalowitz, I still don't know what your

17   interrogatory question is.

18             MR. YALOWITZ:  May I hand this to the court?

19             Quite frankly --

20             THE COURT:  Which question?

21             MR. YALOWITZ:  Let me just take you through it.

22             THE COURT:  Let's do it quickly.  I don't want you to

23   take me through it.  Tell me which question.

24             MR. YALOWITZ:  Interrogatory No. 1.

25             THE COURT:  1.  Defendant shall respond to these

F1N8SOK1

1    interrogatories.  That's instructions.

2              Interrogatory No. 1.  Which portion of that

3    interrogatory No. 1?

4              MR. YALOWITZ:  Look at the definition of parties to

5    the letter, in paragraph 5.

6              "'Parties to the letter' means and refers to Amana

7    Iyaidieh, whose name appears at the bottom of the letter; the

8    two persons who are listed by title as addresses of the letter

9    (i.e., the commanders of the National Security and Political

10   Security as of the date of the letter); and the persons who

11   made the handwritten notes on the letter (including, without

12   limitation, 'Hilal')."

13             Then letter means and refers to the letter attached as

14   Exhibit A, and that's the letter.

15             THE COURT:  That's all I want to know.

16             Mr. Rochon, do you want him to have to go through

17   those?

18             MR. ROCHON:  The interrogatory, your Honor, also

19   includes questions about someone unrelated to the letter.

20             THE COURT:  I just want to know, do you want him to

21   jump through all of these hoops or is it not genuinely in

22   dispute that the person who wrote this letter does in fact have

23   the position that he or she says they have and there is no

24   genuine dispute they offered this document.

25             MR. ROCHON:  The actual dispute is as to relevancy and

F1N8SOK1

1    as to the handwriting on the letter.  In other words, there is

2    notes on the letter written in hand and the question is as to

3    the admissibility of that other stuff.

4              THE COURT:  I just don't know from the English

5    translation, which I assume is what the jury is going to be

6    looking at, I don't know what is on the Arabic that's on the

7    English translation.

8              MR. ROCHON:  It is on the back of the interrogatories,

9    the Arabic part.

10             THE COURT:  I have the Arabic.  I don't see what

11   you're referring to in the English translation that you say is

12   inadmissible.

13             MR. ROCHON:  Mr. Yalowitz, I can hand up the English

14   translation.

15             THE COURT:  I have it.  But I don't see what you're

16   referring to is inadmissible.  Which part?

17             MR. YALOWITZ:  I think we just need to do the

18   interrogatory.

19             THE COURT:  Mr. Rochon, which part do you say is

20   inadmissible?

21             MR. ROCHON:  There is a note on the right hand that

22   says:  Important.  Confirm this with your brother and inform me

23   as soon as possible.  There is a signature there.

24             THE COURT:  Say that again.

25             MR. ROCHON:  On the right-hand side.  That's

F1N8SOK1

1    handwriting that says:  Brother, ineligible.  Important.

2    Confirm this with your brother and inform me as soon as

3    possible and there is a signature.

4                THE COURT:  Whose signature is that?

5                MR. ROCHON:  It's one of the names we provided.

6                That's Tmaize, last name Tmaize.

7                THE COURT:  Is there some reason that you have taken

8    the position that's not what this person wrote?

9                MR. ROCHON:  The interrogatory we answered indicated

10   that is his signature.  We stand behind the representations we

11   made.  We have provided the names.

12               THE COURT:  You represent that is in fact his

13   handwriting.  What is your objection to it?

14               MR. ROCHON:  We don't think it should be admissible

15   because it's not relevant as to this case that they would

16   confirm with their brother.

17               THE COURT:  They think it is relevant.  If they think

18   it is relevant and you think it's not, why is that a compelling

19   reason not to put it in?

20               MR. ROCHON:  I will go to where the rubber hits the

21   robe.  The part at the top.

22               It says:  National security command be informed.  This

23   information proves that the General Intelligence are involved

24   in the issue of Wafa Idris.

25               THE COURT:  Who wrote that?

F1N8SOK1

 1          MR. ROCHON:  That we understand to be written by the

 2   person whose last name is Nobani, whose name we provided in our

 3   interrogatories.

 4          That speculation, that's what should not come in.

 5          THE COURT:  Who is that person?  What is his role?

 6          MR. ROCHON:  He is a PA official.  The specific

 7   title -- he may be in political security.

 8          THE COURT:  You have indicated that that is in fact

 9   his handwriting.

10          MR. ROCHON:  I know we are being criticized for

11   holding stuff back.

12          THE COURT:  I am not criticizing you for anything at

13   this point.

14          So you don't want the jury to see that he wrote that

15   note.

16          MR. ROCHON:  That's correct.

17          Here is the concern.  We might as well get to the real

18   issue.  The language of the letter simply says that on the

19   night that it was revealed, that this person carried out the

20   attack was Wafa Idris.

21          THE COURT:  There's no dispute about that.

22          MR. ROCHON:  Yes.  But before anyone had claimed

23   responsibility, meaning if anyone ever did, that Tawfiq Tirawi

24   called the brother of the person.  This doesn't really prove

25   any PA involvement, the text of this letter.  It simply shows

F1N8SOK1

1    after it was revealed who the person was that somebody in

2    General Intelligence called her brother and they did whatever.

3    That doesn't show any planning, preparation or involvement.

4              THE COURT:  It brings it a little closer to a

5    reasonable conclusion, if that's what the conclusion was of the

6    PA official who wrote the note at the time.

7              MR. ROCHON:  What it says -- it doesn't say involved

8    in the attack.  What we are really dealing with about this

9    letter is it could be misused and the evidentiary inferences to

10   suggest involvement in the attack when the comments on it don't

11   support it.  Particularly if it is just someone scrawling on

12   the letter with their particular interpretation.  Interpreting

13   the letter should be up to the jury, not some random PA person

14   who scrawled a note on it.

15             THE COURT:  That's a very logical argument and I think

16   that's a logical argument for the jury.  I understand your

17   position.  My position now is that if you don't genuinely

18   dispute the authenticity of this document or the signatures on

19   this document, then this document is admissible and it's

20   admissible in the form in which PA employees or officials wrote

21   notes on this document.

22             If they want to try to see if the jury is going to

23   draw a reasonable inference that it reflects some prior

24   knowledge and you believe that that inference isn't a

25   legitimate inference for them to draw, you can argue they

F1N8SOK1

1  should not draw that inference.  But the document speaks for

2  itself.  It's whatever PA employees wrote on it, and the

3  question is how you interpret what they wrote on it.  I can't

4  interpret it.  The jury can interpret it in the context of all

5  other evidence in the case.

6        MR. ROCHON:  I understand the court's ruling.  When I

7  was interrupting, I thought it would be helpful information so

8  you can rule.

9        The other thing, on the subject to prior, I don't mean

10  to sandbag the court.  It probably feels like that when I do

11  it.

12        THE COURT:  No, it doesn't.  It is just that I am not

13  going to do it anymore.  I want you to stand up before this

14  jury and you have to make a determination for whether you're

15  going to object to this document coming into evidence.  You

16  will have to say it on the record when you offer it.

17        MR. ROCHON:  We have objected to a lot of things.

18        THE COURT:  I have just made my ruling.  That's the

19  way I want you to proceed.

20        MR. ROCHON:  If I believe I have an objection that you

21  haven't already ruled on --

22        THE COURT:  No.  If you have any objection, you must

23  state it at the time they offer it so I can assess whether or

24  not at that time any objection exists to this document.  That's

25  what I am going to have you do.

F1N8SOK1

1          I don't want to hear subject to prior.  I want to hear

2     objection.  That's going to be the ruling.

3          MR. ROCHON:  I understand the court's rule.  Say on

4     the magazines where I have already objected --

5          THE COURT:  No.  I want to hear objection.  When they

6     offer it, if you have an objection, you must state it for the

7     record at the time they offer it and I will either overrule or

8     sustain that objection.  I can't be any clearer than that.

9          All right?

10          As I say, the final word is I mean what I say.  That's

11     the way we are going to proceed going forward unless the two

12     you can come to some other agreement that you two want to

13     independently enforce.

14          MR. ROCHON:  Thank you.

15          THE COURT:  Let's get the jury.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

F1N8SOK1

 1              (Jury present)

 2      ISRAEL SHRENZEL, resumed.

 3              THE COURT:  Ladies and gentlemen, we are ready to

 4      proceed and I think we are going to move forward efficiently.

 5      I hope we are going to pick up the pace next week.  We are not

 6      ahead of schedule yet.  I am going to try to see if we can pick

 7      up the pace and get a little ahead of schedule.  We are still

 8      on schedule to finish the end of February or sometime in the

 9      beginning of mid-March.

10              Mr. Yalowitz, you can continue.

11              I am going to let you go home a little early because I

12      know the weather is going to turn bad.  Maybe we will shoot for

13      3:00 or 3:30 depending on where we are.

14      DIRECT EXAMINATION (Cont'd)

15      BY MR. YALOWITZ:

16      Q.  Mr. Shrenzel, I think when we broke yesterday we were

17      discussing the exhibits 1194 and 1195, which if I remember you

18      had.  I am going to bring them over to you.

19              MR. YALOWITZ:  With the court's permission.

20              THE COURT:  Yes.

21              MR. YALOWITZ:  Thank you.

22      Q.  Now, Mr. Shrenzel, could you just take a look at 1194 and

23      just take it out of that protective sleeve.

24              THE COURT:  I don't think we have resolved this issue.

25              Are you moving this in evidence?

F1N8SOK1                         Shrenzel – direct

1              MR. YALOWITZ:  If I am remembering, I think I had an

2     open motion and Mr. Rochon had objected.

3              THE COURT:  Are you moving these into evidence at this

4     point?

5              MR. YALOWITZ:  Yes.

6              THE COURT:  Any objection?

7              MR. ROCHON:  Yes, sir.

8              THE COURT:  Objection is overruled.  They will be

9     admitted in evidence.

10              (Plaintiff's Exhibits 1194 and 1195 received in

11     evidence)

12     BY MR. YALOWITZ:

13     Q.  Mr. Shrenzel, can you just hold up Exhibit 1194 and remind

14     the jury what it is.

15     A.  1194 is the Al Shurta magazine.  Namely, the police.

16     Q.  Whose picture is on the cover?

17     A.  This is both Yasser Arafat and Ghazi Gibali, the chief

18     commander of the Palestinian police at that time.

19              MR. YALOWITZ:  May I have permission to hand 1194 to

20     the jury so they can pass it around and see what it looks like.

21     Q.  While we are on 1194, maybe you can take 1195 out of your

22     packet if you have that one handy.

23              MR. YALOWITZ:  With the court's permission, I will

24     give the jurors a chance to pass it around before I move

25     forward.

F1N8SOK1                           Shrenzel – direct

1          THE COURT:  All right.

2   Q.  What is 1195?

3   A.  1195 is Watani.  This is the organ of the Security National

4   Forces of the PA.

5   Q.  Just take a look at the cover and tell us what is on that

6   cover.

7   A.  On the cover we have the name of the magazine, we have the

8   photo of Al Aqsa mosque, we have an emblem of the PLO/PA, we

9   have the date of the publication.  Then we have some

10  quotations, both of President Arafat and of Abu Obaya.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1nQsok2                           Shrenzel - Direct

1    Q.  Who is Abu Al-Gharbia?

2    A.  He is the head of the political guidance institute speaking

3    about Intifada.  We have some pictures basically depicting --

4    at least from the Palistinian's point of view -- resistance to

5    Israel, stones throwing, demonstrations, etc.

6            MR. YALOWITZ:  May I have the Court's permission to

7    hand 1195 to the jury as well?

8            THE COURT:  Yes.

9            MR. YALOWITZ:  Thank you.

10           Your Honor, may I approach the witness with a binder

11   of the security apparatus magazines?

12           THE COURT:  Yes.

13           MR. YALOWITZ:  Thank you.

14   Q.  Mr. Shrenzel, do you have a binder of items before you?

15   A.  Yes, I do.

16   Q.  Could you just let us know what they are?  In general, flip

17   through, and without describing each one, just let us know what

18   they are.

19   A.  Yes.  These are translations of articles and statements in

20   the various PA security publications that we had listed

21   yesterday.

22   Q.  If you just take any one at random, and if you could take a

23   look in the back behind the English, what do we have behind the

24   English translation for each of these items?

25   A.  We have a copy of the original Arabic.

F1nQsok2                        Shrenzel - Direct

1  Q.  Have you had a chance in preparation for your testimony to

2  review the articles, both in the Arabic and in English, that

3  are in your binder?

4  A.  Yes, I did that.

5  Q.  What I would like to do is go through these one by one and

6  move their admission, or at least some of them, with you.  Is

7  that all right?

8  A.  Yes, sir.

9  Q.  Let's take a look at  --

10       MR. ROCHON:  I'm sorry, Mr. Yalowitz.  Your Honor, if

11  the witness is going to be -- if we're moving them, if we could

12  have one of the binders so as to be able to evaluate --

13       THE COURT:  Do you have a binder for them?

14       MR. ROCHON:  We have the documents.  I want to be

15  clear which one --

16       THE COURT:  Do you have it in binder form?  Are you

17  going to offer it in binder form?

18       MR. YALOWITZ:  I am not going to offer it in binder

19  form, your Honor.  It is just for the convenience of the

20  witness.  I do not have one at the podium that I can share with

21  Mr. Rochon.

22       THE COURT:  Do you have one anywhere else in this room

23  you can share with Mr. Rochon?

24       MR. YALOWITZ:  Ms. Machnes would have to be our guide

25  on that.

1          THE COURT:  You've got an army of people there at the

2     table.  She can do that while you question him.

3          Let's proceed.

4          MR. ROCHON:  Thank you, your Honor.

5     Q.  Could you take a look at Exhibit 935.

6     A.  Yes, I'm there.

7     Q.  What is this one?

8     A.  These are excerpts from al-Shuhada bulletin.  As we

9     explained yesterday, this is a monthly bulletin.  It also

10    clearly states here:  Published by political guidance for the

11    border region forces.

12    Q.  The political guidance for the border region forces, what

13    is that?

14    A.  This is, let's say, a branch of the overall institute of

15    political guidance that is in charge of guiding politically the

16    specific forces that are mentioned here, the border region

17    forces.

18    Q.  What entity is in charge of the political guidance

19    institute?

20    A.  As we explained yesterday, it was part of the PLO in the

21    beginning, and then it moved to the territory to the PA after

22    the establishment of the PA in '94.

23         MR. YALOWITZ:  Your Honor, plaintiffs move Exhibit 935

24    into evidence.

25         THE COURT:  Any objection?

1           MR. ROCHON:  Yes, sir.

2           THE COURT:  It will be admitted into evidence.

3           (Plaintiff's Exhibit 935 received in evidence)

4    Q.  Could you turn to Exhibit 949, please.

5    A.  Yes, sir.

6    Q.  Is this another one of those magazines we were talking

7    about?

8    A.  Yes, this is the al-Shurta magazine, the police magazine.

9    Actually, I believe is this is the magazine that was handed to

10   the jury right now.

11          MR. YALOWITZ:  Plaintiffs move Exhibit 949 in

12   evidence.

13          THE COURT:  Any objection?

14          MR. ROCHON:  Yes, sir.

15          THE COURT:  It will be admitted into evidence.

16          (Plaintiff's Exhibit 949 received in evidence)

17   Q.  Can you turn to Exhibit 965 in your binder?

18   A.  Yes.

19   Q.  What is this one?

20   A.  This is again the al-Shurta magazine from another month,

21   one month after the previous one from August 2000.

22   Q.  Is this one also published by a unit of the Palestinian

23   Authority?

24   A.  Yes, as explained yesterday, this is clearly published by

25   the general commander of the Palestinian police.

F1nQsok2                          Shrenzel – Direct

1              MR. YALOWITZ:  Plaintiffs offer 965 into evidence.

2              THE COURT:  Any objection?

3              MR. ROCHON:  No, sir.

4              THE COURT:  It will be admitted into evidence.

5              (Plaintiff's Exhibit 965 received in evidence)

6    Q.  Can you turn to Exhibit 175 in your binder.

7    A.  Yes, sir.

8    Q.  What is this one?

9    A.  This is another issue of al-Shurta from November 2000.

10             MR. YALOWITZ:  Plaintiffs move Exhibit 175 into

11   evidence.

12             THE COURT:  Any objection?

13             MR. ROCHON:  Yes, sir.

14             THE COURT:  It will be admitted into evidence.

15             (Plaintiff's Exhibit 175 received in evidence)

16   Q.  Can you please turn to Exhibit 178 in your binder.

17   A.  Yes.

18   Q.  What is this one?

19   A.  This is from Watani from the issue, I believe, that was

20   handed to the jury.  Again, this is as it says:  The central

21   magazine of the general security forces.

22   Q.  Is this another publication of the PA?

23   A.  Yes, we explained about it.  Yes.

24             MR. YALOWITZ:  Plaintiffs offer 178 in evidence.

25             THE COURT:  Any objection?

1              MR. ROCHON:  Yes, sir.

2              THE COURT:  It will be admitted into evidence.

3              (Plaintiff's Exhibit 178 received in evidence)

4    Q.  Please turn to Exhibit 936.

5    A.  Yes, sir.

6    Q.  What is 936?

7    A.  This is another issue of al-Shuhada, the martyrs, the same

8    bulletin published for the border region forces that we have

9    just mentioned.

10             MR. YALOWITZ:  Your Honor, may I approach?  I just

11   want to make sure the witness is looking at the same document I

12   am.

13             THE COURT:  Yes.

14   A.  935?

15   Q.  936.

16   A.  I'm sorry.  Sorry for that.

17   Q.  That's all right.

18   A.  This is Humat Al-Areen, the publication of Humat Al-Areen.

19   This belongs to -- this is an organ of the presidential guard;

20   namely, charged with protecting the president.

21   Q.  The charge of protecting Yasser Arafat in the years in

22   question?

23   A.  Yes, of course.

24   Q.  Is this a publication of the PA?

25   A.  Yes, it is as I explained already.

F1nQsok2                          Shrenzel – Direct

1          MR. YALOWITZ:  Plaintiffs offer Exhibit 936 in

2     evidence.

3          MR. ROCHON:  Objection.

4          THE COURT:  It will be admitted into evidence.

5          (Plaintiff's Exhibit 936 received in evidence)

6    Q.  Please turn to 198.

7    A.  Yes, sir.

8    Q.  What is this one?

9    A.  Again, al-Shuhada bulletin for the border region forces.

10   Q.  What entity publishes this one?

11   A.  The political guidance for the force.

12   Q.  Is it part of the PA?

13   A.  It is.

14   Q.  Is this a PA publication?

15   A.  Yes, it is.

16          MR. YALOWITZ:  Plaintiffs offer 198 in evidence.

17          THE COURT:  Any objection?

18          MR. ROCHON:  Yes, sir.

19          THE COURT:  It will be admitted into evidence.

20          (Plaintiff's Exhibit 198 received in evidence)

21   Q.  Please turn to Exhibit 200.  Do you have it before you?

22   A.  Yes.  I look at the English translation.  So it is again

23   from al-Shuhada, the martyrs.

24   Q.  And who is the publisher of this one?

25   A.  The same as the previous one; namely, the political

F1nQsok2                         Shrenzel - Direct

1   guidance for the border region forces.

2   Q.  Is that part of the PA?

3   A.  It is.

4   Q.  Is this a publication of the PA itself?

5   A.  It is.

6           MR. YALOWITZ:  Plaintiffs offer 200 in evidence.

7           THE COURT:  Any objection?

8           MR. ROCHON:  Yes, sir.

9           THE COURT:  It will be admitted into evidence.

10          (Plaintiff's Exhibit 200 received in evidence)

11  Q.  Please turn to Exhibit 201.  Do you have 201 before you?

12  A.  I do.

13  Q.  What is it?

14  A.  Again, al-Shuhada the martyrs.

15          MR. ROCHON:  Your Honor, we would object on this one.

16  I think we need to at least consult with counsel, if I may.

17          MR. YALOWITZ:  Does the Court have this exhibit in

18  mind?

19          THE COURT:  I don't have it in front of me, so I don't

20  have it in mind.  Speak to Mr. Rochon first and see if you can

21  resolve whatever difficulties you have.

22          MR. YALOWITZ:  Let me make my record and application

23  and then Mr. Rochon can object if he cares to.

24          THE COURT:  OK.  Are you objecting to this exhibit?

25          MR. ROCHON:  Yes, your Honor.

F1nQsok2                          Shrenzel – Direct

 1              THE COURT:  Let me see the exhibit.

 2              Come up come up, Mr. Rochon.

 3              MR. ROCHON:  Thank you.

 4              (At the side bar)

 5              THE COURT:  Yes, sir.

 6              MR. ROCHON:  This is one that you excluded.

 7              MR. YALOWITZ:  I agree with that.

 8              THE COURT:  So why are we up here?

 9              MR. YALOWITZ:  Because I want to offer it and have him

10      object to it and --

11              THE COURT:  But I already ruled on this.  All right?

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

F1nQsok2                         Shrenzel - Direct

1                  (In open court)

2      Q.  Mr. Shrenzel, did the PA publications that you are

3      referencing that we have been looking at, these four

4      publications, were they published during the period 2001, 2002

5      and 2003?

6      A.  Yes, they were, but we also noted that there are issues

7      from 2000 as well.

8      Q.  I just want to be very clear.  These issues continued

9      beyond 2001 into 2002 and 2003?

10     A.  Yes, but they already began in 2000.  Like al-Shurta that

11     we handed to the jury, it's from the year 2000.

12     Q.  In fact, were they published before the year 2000 and after

13     2003 as well?

14     A.  I believe they were.  I don't have the dates of the

15     beginning and maybe the end or termination of the publication,

16     but for the relevant period that we need here they appeared

17     regularly.

18     Q.  Have you had the opportunity to review such magazines that

19     were published by the PA during the entire period of 2000 to

20     the end of 2003?

21     A.  Yes, sir.

22     Q.  Thank you.

23          I would like to show you and the jury some of the ones

24     that have been admitted in evidence.  Let's see if we can get

25     the screen going.  You have before you Exhibit 935.  Which

F1nQsok2                          Shrenzel - Direct

1  entity is this?

2  A.  This is again al-Shuhada, the bulletin of the border

3  regions forces.

4  Q.  Who do we see on the cover there?

5  A.  This is Yasser Arafat making a V-sign, and we see the

6  al-aqsa mosque in the background.

7  Q.  That's the al-aqsa mosque?

8  A.  Yes, it is.

9  Q.  Have we seen that before in your testimony?

10 A.  My testimony concentrates on the Al-Aqsa Intifada so I

11 believe we have seen, this is a co-issue of --

12 Q.  Is that the same building we saw in the Said Ramadan video?

13 A.  In the emblem of the Al-Aqsa Martyr Brigades, yes.

14        MR. YALOWITZ:  With the Court's permission, I would

15 like to display an excerpt of that?

16        THE COURT:  Yes, sir.

17        MR. YALOWITZ:  May I read it, your Honor?

18        THE COURT:  Yes.

19 Q.  "If our lawful rights are not addressed, with all that this

20 entails ... then the battle shall be hard, and the Israeli and

21 Palestinian people's shall pay its price exorbitantly."

22        "Even around the negotiations table, we shall back our

23 delegation, support our leader, and declare our preparedness to

24 be martydom projects and forearms of building -- building of

25 the future state."

F1nQsok2                    Shrenzel - Direct

1          Let me show you the next one.  Which magazine is this?

2   A.  This is al-Shurta.  Again, the persons that are here is

3   Yasser Arafat to the left and Ghazi Jabali, the head of the

4   police, next to him.

5   Q.  And this is 949?

6   A.  949, yes.

7   Q.  Your Honor, may I read an excerpt?

8   A.  Yes.

9   Q.  "The enduring and faithful position that president Abu

10  Ammar of" -- by the way, who is Abu Ammar?

11  A.  Abu Ammar is the nickname of Yasser Arafat.

12  Q.  "The enduring and faithful position of president Abu Ammar

13  (Yasser Arafat) embodied during the Camp David negotiations

14  affirms that there is no room for doubt but that the conflict

15  shall not be ended, and shall remain wide open, by all means

16  and methods, until the minimum aspirations of our patient

17  people, who are anchored to the eternal soil of Palestine are

18  realized."

19          "The Palestinian people have refused to capitulate or

20  relent, and they have resisted -- by word, demonstration and

21  Intifada -- offering up tens of thousands of martyrs."

22          Let's go to the next one, 965.  Which magazine is

23  this?

24  A.  This is again al-Shurta for the following month; namely,

25  August 2000.  The same persons are on the cover.

F1nQsok2                          Shrenzel - Direct

1   Q.   On the left who is that?

2   A.   That is Yasser Arafat.  Next to him is Ghazi Al-Jabali.

3   Q.   What is Jabali's job?

4   A.   He is the head of the Palestinian police, commander.

5             MR. YALOWITZ:  May I read an excerpt, your Honor?

6             THE COURT:  Yes, sir.

7   Q.   "For in no time, our Palestinian people have sprung into

8   motion in all the regions of the West Bank, Gaza, and the area

9   within the so-called Green Line."

10             What is the area within the Green Line?

11  A.   This is Israel within the 6-7 borders.  By the way, I made

12  a mistake about the date.  The date is not August, but

13  October 2000, after the eruption of the Intifada.

14  Q.   Thank you.  This is after the eruption of the Intifada?

15  A.   Yes, just a few weeks.

16  Q.   "For in no time, our Palestinian people have sprung into

17  motion in all the regions of the West Bank, Gaza and the area

18  within the so-called Green Line (Israel), to defend the land

19  and the holy places.  This has fashioned a marvelous picture

20  embroidered with the blood of our martyrs and the wounds of our

21  heroes in Nablus, Tulkarem, Jerusalem" -- by the way Jerusalem,

22  is that inside the Green Line?

23  A.   Yes, part of Jerusalem is inside the Green Line, West

24  Jerusalem, and, of course, there is a big dispute about its

25  final status.

F1nQsok2                          Shrenzel - Direct

1   Q.  I will skip some of these names which I will mangle if I

2   try to say them.

3           "And the rest of the regions where our Palestinian

4   population is present, domestically and abroad."

5           I think we have another quote from 965 as well if I

6   remember correctly.  Let's see that.

7           MR. YALOWITZ:  May I read, your Honor?

8           THE COURT:  Yes.

9   Q.  "We cannot but bow reverentially and respectfully to our

10  heroic martyrs who have watered the soil of our beloved nation

11  with their pure blood ... in order to prove to the whole world

12  that our Palestinian land is our right, and that blood is a

13  small price to pay on the path to liberating and defending it."

14          "Our righteous martyrs ... our brave wounded:  To you

15  goes the glory ... to you go immortality."

16          Let's go to 175.  Do you recognize those two

17  individuals on the cover?

18  A.  Yes, of course, only switching sides.  Now Yasser Arafat is

19  on the right and Ghazi al-Jabali is on the left.

20  Q.  What is that building in the background?

21  A.  This is again the al-aqsa mosque.

22          MR. YALOWITZ:  May I read, your Honor?

23          THE COURT:  Yes.

24  Q.  "The European nations and the U.S., who have strategic

25  interests in the region, are called upon to see the necessity

1  of urgent and immediate action to stop Israeli practices

2  against the Palestinian people.  Without this, their vital

3  interests shall be directly jeopardized."

4          Who is the "their" in that sentence?  Whose interests

5  will be directly jeopardized according to this police magazine?

6  A.  The interests of the European nations and of the U.S.

7  Q.  "And this shall redound adversely on their people and

8  communities ..."

9          Let's go to the next one which also is part of 175.

10         MR. YALOWITZ:  May I continue, your Honor?

11         THE COURT:  Yes.

12 Q.  What are we looking at in this blowout?

13 A.  It's very unclear in front of me, the Arabic text.  Let me

14 look in the binder.  Maybe it's a bit better.

15 Q.  Why don't I give you the actual magazine of it.

16         MR. YALOWITZ:  May I approach, your Honor.

17         THE COURT:  Yes.

18         MR. YALOWITZ:  My mistake.

19 Q.  Do you have page 107 in your binder?

20 A.  1017?

21 Q.  Yes.  In the Arabic?

22 A.  Yes.

23 Q.  Is that a little easier for you to see?

24 A.  Yes, I see it in the binder.  Yes.

25 Q.  Whose signature is that there down at the bottom of this

F1nQsok2                    Shrenzel – Direct

1    letter?

2    A.  Yasser Arafat.

3    Q.  Yasser Arafat, the head of the PLO and the Palestinian

4    Authority?

5    A.  Yes, sir.

6    Q.  What does it say up at the top there?  Who it's from?

7    A.  I mean, of course, when Yasser often sign a letter, it's on

8    a formal form of the PLO and of the PNA.  So it reads PLO,

9    Palestinian Liberation Organization, then Palestinian National

10   Authority and then Office of the President.

11           MR. YALOWITZ:  With the Court's permission, I would

12   like to read an excerpt of the English translation of this

13   letter.

14           THE COURT:  Yes.

15   Q.  "Our Palestinian people are persevering in the glorious

16   Intifada, the blessed al-aqsa Intifada, for a third consecutive

17   month, offering up legions of martyrs, and making the costliest

18   and most precious sacrifice in the cause of realizing their

19   legitimate aspirations of ending the occupation of our land and

20   holy places ... I celebrate and bless, in you, the spirit of

21   allegiance and enduring national commitment, and I value highly

22   your wholehearted determination ..."

23           Who is this letter addressed to?

24   A.  This letter is addressed to Ghazi Al-Jabali, the commander

25   of the Palestinian police.

F1nQsok2                          Shrenzel - Direct

1    Q.  It was published in a magazine distributed to who?

2    A.  To the rank and file of the Palistinian Police.

3    Q.  Let's go to 178.  What's this one?

4    A.  This is Watani.  I believe this is the issue that I have

5    already described that was handed to the jury.  This is from

6    February-March of 2001.

7    Q.  Who is Watani distributed to?

8    A.  Watani is distributed to the national security forces of

9    the PA.

10            MR. YALOWITZ:  May I read an excerpt, your Honor?

11            THE COURT:  Yes.

12   Q.  "We are walking on the edge of the sword, meaning that we

13   are always on the verge of martyrdom, and this is the nature of

14   the events and the reality of the situation ..."

15            This is distributed to security officers.

16            MR. ROCHON:  Objection.  Asked and answered.

17            THE COURT:  Sustained.

18   Q.  Let's look at 936.  Which one is this?

19   A.  This is Humat Al-Areen, the publication of 417.

20   Q.  Who is on the cover?

21   A.  Again, Yasser Arafat.

22            MR. YALOWITZ:  May I read an excerpt, your Honor?

23            THE COURT:  Yes.

24   Q.  "I call to you ... I grasp your hand ... I kiss the ground

25   beneath your feet ... we say:  We will sacrifice for you

F1nQsok2                          Shrenzel - Direct

1    exclamation point".

2           "Since the first bullet was fired in our great

3    revolution, the sharp, leading opinions of a revolutionary

4    perspective have belonged to the iconic leader brother Abu

5    Ammar at all intervals ... at all times ..."

6           Abu Ammar.  Who is that?

7    A.  Yasser Arafat.

8    Q.  "If you dove into the world's seas, all seven ... we would

9    dive in behind you even if blood formed ... the waves against

10   the boat of sacrifice!"

11          Have you had an opportunity to review this magazine in

12   advance of your testimony?

13   A.  Yes, sir.

14   Q.  Do you have an understanding based on your review of this

15   magazine and your professional expertise of the policy

16   reflected in this magazine?

17          MR. ROCHON:  Objection, your Honor.

18          THE COURT:  Sustained.

19   Q.  Let's go to 198.  Which one is this?

20   A.  1987 this is al-Shuhada publication for border regions

21   forces.

22          MR. YALOWITZ:  May I read, your Honor?

23          THE COURT:  Yes.

24   Q.  "They are becoming martyrs as a sacrifice for the

25   Palestinian dream, and in compliance with the call of

F1nQsok2                        Shrenzel - Direct

1    al-aqsa..."

2                "For this reason, we today wage war in an advancing

3    position; we wage war with the occupation; and we wage war with

4    the Zionist state's terrorism against our people, continuing in

5    our Intifada."

6                Let's go to 200.  Which one is this?

7    A.   This is again al-Shuhada for the border regions forces.

8                MR. YALOWITZ:  May I read, your Honor?

9                THE COURT:  Yes.

10   Q.   "All efforts by Palestinian forces should be turned towards

11   inflaming the popular Intifada until the image of the infamous

12   child who challenges Israeli tanks, with stones appears, for

13   this image evokes Arab and Muslim sympathy, and of the free

14   world and moves it ... to needed additional U.S. and European

15   pressure on Israel ..."

16               "The Palestinian people reject the yellow policy of

17   the U.S. and its leader Bush, and our people shall continue the

18   popular struggle until the achievement of the sought-after and

19   historical goal ... which we have taken on through waterfalls

20   of blood that Palestinian people have offered up on a daily

21   basis ..."

22               Do you have opinions regarding the policies of the PA

23   that these magazines reflected during the period 2000 to 2004?

24               MR. ROCHON:  Objection, your Honor.

25               THE COURT:  Sustained.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1nQsok2                          Shrenzel - Direct

1           MR. YALOWITZ:  Your Honor, at this time, plaintiffs

2     offer Exhibit 372 in evidence.

3           THE COURT:  372.  Any objection?

4           MR. ROCHON:  Yes, sir.

5           THE COURT:  372 will be admitted into evidence.

6     Q.  Mr. Shrenzel, have you had the opportunity to look at 372

7     or do we need to queue it up for you so you can see what it is?

8     A.  It might be helpful.

9           MR. YALOWITZ:  Your Honor, I am just going to cover

10    the screen and show the initial image to the witness so he can

11    explain what's coming.

12          THE COURT:  As a matter of fact, I was premature in

13    admitting it into evidence.  Let him lay a foundation for its

14    admissibility, and then I will admit it if he can do so.

15          MR. YALOWITZ:  Thank you, your Honor.  I apologize for

16    getting ahead of myself there.

17          THE COURT:  That was my fault.

18    Q.  Do you see the beginning of the videotape there on your

19    screen?

20    A.  Yes, sir.

21    Q.  Do you recognize that individual?

22    A.  Yes, sir.

23    Q.  Who is it?

24    A.  This is Qahira al-Sadi.

25    Q.  How is she related to the --

1  A.  Yes, this brings us back to the attack that we have

2  discussed yesterday known as the Bauer attack in March of 2002.

3  Let me remind the Court that her war was that of facilitating

4  the transport of the suicide bomber into the scene.

5  Q.  Are we going to see another individual on this videotape,

6  Qahira al-Sadi?

7  A.  Yes, there were two women involved in the mission of

8  transporting the suicide bomber.  The other one is Sanaa

9  Shehadeh.

10  Q.  Is she on the videotape as well?

11  A.  I believe so, yes.

12        MR. YALOWITZ:  Your Honor, plaintiffs offer 372.

13        THE COURT:  Do you still have a continuing objection?

14        MR. ROCHON:  I don't object to the foundation, your

15  Honor.

16        THE COURT:  You don't object to the admissibility?

17        MR. ROCHON:  No, sir.

18        THE COURT:  Then it will be admitted into evidence

19  without objection.

20        (Plaintiff's Exhibit 372 received in evidence)

21        (Videotape played)

22        MR. YALOWITZ:  Your Honor, I'm ready to move to a new

23  topic.  Shall I proceed?

24        THE COURT:  Yes, please.

25        MR. YALOWITZ:  Thank you.

F1nQsok2                          Shrenzel - Direct

1          I am going to place before Mr. Shrenzel a binder

2    concerning the January 27, 2002 attack.

3    Q.  Mr. Shrenzel, I placed before you a binder with the date

4    January 27, 2002, time:  12:30 p.m., Jaffa Road, Jerusalem.  Do

5    you have that before you?

6    A.  I do.

7    Q.  Have you familiarized yourself with that particular terror

8    attack?

9    A.  Yes, I know the date.  Yes.

10   Q.  Could you describe it generally for the jury.

11   A.  Yes, on the date, January 27, 2002, by the way, five days

12   after the first attack that we have discussed that took place

13   on the 22nd, a female named Wafa Idris, she carried a bomb with

14   her into Jaffa Road, again, in the same vicinity of all three

15   attacks that we have discussed, and the bomb exploded killing

16   one Israeli and wounding more than a hundred.

17   Q.  Thank you.

18          Could you open the binder, please.  Do you see the

19   index before you?

20   A.  Yes, I do.

21   Q.  Are you familiar with the documents in that index?

22   A.  I am.

23   Q.  Tab A, Exhibit 17, what is that?

24   A.  This is the martyr file of Wafa Idris of the suicide

25   bomber, of the one that carried the bomb that exploded.

F1nQsok2                    Shrenzel - Direct

1   Q.  And then do you see 1172 and 1172 just before tab A?

2   A.  Before tab A.  OK, one minute.  Yes, I do.

3   Q.  Do you see 1178 right after the name Munzar Noor?

4   A.  Under the same tab?

5   Q.  Right, under the name Noor.  I will just show you so you

6   can see it.  It's in evidence.

7   A.  Can you say the number of the page, please?

8           MR. YALOWITZ:  May I approach, your Honor?

9           THE COURT:  Yes.

10          MR. YALOWITZ:  I want to make sure the witness is on

11  the same page.

12  A.  OK.

13  Q.  Do you see 1178?

14  A.  Yes, I do.

15  Q.  If we turn behind tab, A do you see Exhibit 322?

16  A.  Yes, this is the verdict of Munzar Noor.

17  Q.  If we turn behind tab B, we see Exhibit 26?

18  A.  Yes.  OK.

19  Q.  And if we turn to the next exhibit in the binder, we have

20  Exhibit 465?

21  A.  Uh-huh.

22  Q.  What is 465?

23          THE COURT:  Mr. Yalowitz, if you could just back away,

24  your back is to the jury and they can't see you.

25          MR. YALOWITZ:  I apologize.

F1nQsok2                         Shrenzel - Direct

1    A.  This is a report of the police interrogation of Munzar

2    Noor, one of those involved in this attack.

3    Q.  Exhibit 467 what is that one?

4    A.  This is another record of his interrogation in the Israeli

5    police.

6    Q.  If we turn to the next tab, we see 1188?

7    A.  Under Tirawi?

8    Q.  Yes, you see a photograph of Tirawi?

9    A.  Yes, this is a photo of Tirawi, 1188.  Yes.

10   Q.  Behind tab A, we have Exhibit 233?

11   A.  Yes, sir.

12   Q.  Let me begin with Exhibit 233?

13   A.  OK.

14   Q.  What is Exhibit 233?  Just identify it generally, please.

15   A.  Yes, this exhibit is a letter, it was seized by the IDF,

16   the Israeli army in the year 2002.  And it is a letter from an

17   employee of the preventive security to her superiors.  And this

18   is the basic structure of a letter, I mean, the -- who wrote it

19   and who were the addressees, yes.

20   Q.  Now, how do you know that this was captured by the IDF?

21   A.  It was widely published and already translated and

22   disseminated by the Israeli army.

23   Q.  Is it publicly available from the Israeli Army?

24   A.  Yes, on various websites of the Israeli army of the Israeli

25   foreign ministry.

F1nQsok2                         Shrenzel - Direct

1              MR. YALOWITZ:  Your Honor, I would like to place

2       before the witness Exhibits 879 and 883 with the Court's

3       permission.

4              THE COURT:  Is that in the binder?

5              MR. YALOWITZ:  No, it's not.  These are exhibits that

6       we discussed earlier this morning.

7              THE COURT:  All right.

8              MR. YALOWITZ:  May I approach, your Honor?

9              THE COURT:  Yes.

10             MR. YALOWITZ:  Your Honor, may I have the Court's

11      permission to identify Exhibits 879 and Exhibit 883?

12             THE COURT:  Can I give the jury a break first?

13             MR. YALOWITZ:  Yes, of course.

14             THE COURT:  Let's take a ten minute break, ladies and

15      gentlemen.  Keep an open mind.  Don't discuss the case.

16             (Jury recessed)

17           (Continued on next page)

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1           THE COURT:  I wanted to take a break.  Mr. Rochon, I

2    wanted to ask you after we've had this discussion, do you want

3    them to go through this process?  Is this something the two of

4    you can agree upon?

5           MR. YALOWITZ:  I want it for the jury, your Honor.

6           THE COURT:  Mr. Yalowitz, I was talk to Mr. Rochon.

7           MR. ROCHON:  Your Honor, I don't think we need to go

8    through this process.

9           THE COURT:  OK.

10          MR. ROCHON:  I think if we can at least get the answer

11   as to who the people are some other way --

12          THE COURT:  Then you have to propose something to

13   Mr. Yalowitz that will be satisfactory to you both.  That's

14   all.  I'm giving you two the opportunity to do so.  If you

15   still have your backs to each other, then I assume you won't be

16   able to do so.

17          MR. ROCHON:  I'd like to try.

18          THE COURT:  Take a few minutes.  If you want to

19   discuss it, you can propose something that is smoother and

20   effective for his purposes.  Then we can dispense with all of

21   this and we can go forward.

22          MR. ROCHON:  Yes, sir, we will do that on the break.

23          THE COURT:  All right.  So let's take a break.

24          (Recess)

25

 1             (Jury not present)

 2             MR. ROCHON:  I think we have a stipulation and we are

 3  working on the language.

 4             THE COURT:  Pleasantly surprised.

 5             OK.  This is progress.

 6             MR. YALOWITZ:  I think we need the Court's indulgence

 7  for a couple of minutes.

 8             THE COURT:  I am just going to say for the record stop

 9  holding hands.

10             MR. YALOWITZ:  Please make sure it shows that

11  everybody was laughing except me.

12             THE COURT:  What do you want to do?

13             MR. YALOWITZ:  What I think we are going to agree to

14  is that the document is authentic and the defendant is going to

15  identify the names of individuals who prepared different pieces

16  of it.  Then we can read that out to the jury.

17             THE COURT:  Do you have that written out word for

18  word?

19             MR. YALOWITZ:  We are working on it.

20             THE COURT:  You want some more time?

21             MR. YALOWITZ:  We need just a few minutes.

22             THE COURT:  OK.

23             MR. ROCHON:  Thank you, your Honor.

24             (Pause)

25             MR. ROCHON:  Your Honor, I think we do have the

F1N8SOK3                          Shrenzel - direct

1    language.  I can read it out loud now.

2               THE COURT:  If you agree to it, we will read it in

3    front of the jury.

4               MR. ROCHON:  OK.  We are set.

5               THE COURT:  Let's get the jury in.

6               (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1N8SOK3                         Shrenzel - direct

 1            (Jury present)

 2   ISRAEL SHRENZEL, resumed.

 3            MR. YALOWITZ:  At this time, I ask that Mr. Rochon

 4   read out a stipulation that the parties have agreed to

 5   concerning Exhibit 233.

 6            THE COURT:  Yes, sir.

 7            MR. ROCHON:  The defendants and the plaintiffs have

 8   agreed to stipulate that Exhibit 233 is an accurate copy of a

 9   letter and handwritten notes created by employees of the

10   Palestinian Authority.  The author of the text of the letter

11   was Amneh Muhammad Abdullah Rihan, an employee of the

12   Palestinian Authority.  The letter was addressed to Ghaleb

13   Abdul Rahman al-Nobani and Hilal Hussain Khaled Abdel Haq, one

14   of whom was the head of National Security and the other of whom

15   was the head of Political Security in February 2002, and both

16   of whom were PA employees at the time.

17            The handwritten note at the top of the letter is

18   written by Mr. Nobani.  The handwritten note at the right-hand

19   side of the letter was written by Sabri Muhammad Ismail Tmaize,

20   an employee of the PA.  And the handwritten note at the bottom

21   was written by Mr. Abdel Haq.

22            The parties so stipulate, your Honor.

23            THE COURT:  Mr. Yalowitz, you may continue.

24            MR. YALOWITZ:  Your Honor, plaintiffs offer Exhibit

25   233 in evidence.

F1N8SOK3                              Shrenzel – direct

1           THE COURT:  Do you have an objection to its

2    admissibility?

3           MR. ROCHON:  The stipulation takes care of it.  No

4    objection.

5           THE COURT:  It will be admitted in evidence without

6    objection.

7           (Plaintiffs' Exhibit 233 received in evidence)

8           MR. YALOWITZ:  Your Honor, at this time, plaintiffs

9    offer in evidence the binder, including its index labeled

10   January 27, 2002, 12:30 p.m., Jaffa Road, Jerusalem.

11          THE COURT:  Any objection to the binder?

12          MR. ROCHON:  Yes, sir, objection.

13          THE COURT:  Do you have an objection to a particular

14   document in the binder?

15          MR. ROCHON:  I believe 322 is already in evidence.

16   The ones that are not are 17, 26 465, 467 and 233, all of which

17   have been previously discussed with the Court.

18          THE COURT:  You still maintain objections?

19          MR. ROCHON:  Yes, sir.

20          THE COURT:  Pursuant to our previous discussion, I

21   will admit those exhibits into evidence over objection.

22          (Plaintiffs' Exhibits 17, 26 465, 467 received in

23   evidence)

24          MR. YALOWITZ:  May I hand out copies of the binders?

25          THE COURT:  Yes, sir.

F1N8SOK3                          Shrenzel - direct

1          MR. YALOWITZ:  Is the binder considered in evidence?

2          THE COURT:  Yes, sir.

3          So we can efficiently proceed, the documents that you

4     objected to, Mr. Yalowitz, did you already lay a foundation

5     with regard to those documents indicating what they were and

6     where they came from?

7          MR. YALOWITZ:  Yes, sir, we did it just before the

8     break.

9          THE COURT:  And before the jury?

10         MR. YALOWITZ:  Yes.

11         THE COURT:  So all of those documents you have already

12    identified and laid the foundation for.

13         MR. YALOWITZ:  Yes, sir.  I am comfortable that we

14    have.

15         Thank you for inquiring.

16    BY MR. YALOWITZ:

17    Q.  Now, let's begin with Munzar Noor.

18         Do you have his information in the binder before you,

19    Mr. Shrenzel?

20    A.  I do.

21    Q.  What was he convicted of?

22    A.  Of murder or at least assisting.  I don't see in front of

23    me the exact phrasing of the indictment.

24         Yes.  Of intentionally causing death, yes.  This was

25    his conviction.

F1N8SOK3                          Shrenzel - direct

1   Q.  He was convicted of murder?

2   A.  Yes, sir.

3   Q.  Could you please turn to tab B, exhibit 26.

4           Do you have it before you?

5   A.  I do.

6   Q.  I would like to skip past his pay records and just turn

7   pages until we arrive at the page numbered 7740.  This is

8   acknowledgement of detention status?

9   A.  Yes, sir.

10  Q.  Who prepared this document?

11  A.  The PA, the Ministry of Prisoners and Ex-Prisoners, and

12  within that ministry the General Department of Prisoners and

13  Ex-Prisoners.

14  Q.  What does the PA say about Munzar Noor having completed his

15  sentence as of March 17, 2011?

16  A.  It says that he was jailed as a result of his fight for his

17  country.

18  Q.  Now, could we just look and could you direct the jury to

19  the portion of the document that deals with his pay records?

20  A.  Yes.  I believe Exhibit 26, yes?

21  Q.  I think we are still on Exhibit 26.

22  A.  So we have a record of his allocations since 2002.

23  Q.  This goes all the way through?

24  A.  2012.

25  Q.  I'm sorry.  As of March 2011, had he been released?

1  A.  I don't remember the exact date of his release, but I know

2  that he was released approximately at that period.

3  Q.  I am sorry to do this to you.  I know we were just on this

4  page.  Let's go back to 7740.

5  A.  Yes.

6        MR. YALOWITZ:  May I read, your Honor?

7        THE COURT:  Yes.

8  Q.  "The directorate of the Ministry of Detainees and

9  Ex-Detainees Affairs and the Governorate of Tulkarm

10 acknowledges that detainee Munzar Mahmoud Khalil Noor, holder

11 of identity number" -- and lists the identity number -- "from

12 the Governorate of Tulkarm, has completed his sentence in the

13 prisons of the Israeli occupation as a result of his fight for

14 his country.  He was a security detainee during the period of

15 his detention."

16        So as of March 2011, according to this record, has

17 Noor been released by the Israeli authorities?

18 A.  Yes.

19 Q.  How much are they paying him as an ex-prisoner in 2011 and

20 2012?

21        I think we can just go to the second page and third

22 page of 26.

23 A.  We can see that in, for example, in April of 2011, a month

24 after his release, he is receiving 4,000 shekels a month and

25 this allocation is rising in July 2012 up to 6,000.

F1N8SOK3                        Shrenzel - direct

1    Q.  Let's just look together at the entry for March of 2011.

2    Do you have that?

3    A.  Yes.

4              MR. YALOWITZ:  Maybe I can show it on the elmo.

5    Q.  March of 2011 is the date that he has completed his

6    sentence according to the document we were just looking at?

7    A.  Yes, sir.

8    Q.  I have just circled the number 5400 shekels --

9    A.  Yes.

10   Q.  -- as of March 2011.  Is that additional pay that they gave

11   him in that month?

12   A.  Yes, I believe it is.  It's kind of a grant while he is

13   terminating his -- he is in prison in an Israeli jail.  So

14   besides the usually salary there is an additional grant.

15   Q.  Let's go to Wafa Idris.  She is at the front of our binder.

16             Is she a well-known figure in Palestinian society

17   today?

18             MR. ROCHON:  Objection, your Honor.

19             THE COURT:  Sustained as to form.

20   Q.  What did Wafa Idris do?

21   A.  She worked as a medic or a certain post in the Palestinian

22   Red Crescent in Ramallah.  Besides that she used to be an

23   informant --

24             MR. ROCHON:  Objection, your Honor.

25             THE COURT:  Sustained.  Disregard that last comment.

F1N8SOK3                         Shrenzel – direct

1              What is your question, Mr. Yalowitz?

2    Q.  What did she do on January 27, 2002?

3    A.  As I said before, she carried the bomb in the very center

4    of Jerusalem and the bomb exploded.  She, of course, died and

5    she caused the deaths of one Israeli and wounded more than 100

6    Israelis.

7    Q.  Can we turn to Exhibit 17, which is tab A behind Wafa

8    Idris?

9    A.  Which tab, please?

10   Q.  A like Alpha?

11   A.  17, yes.  OK.

12   Q.  What is this document?

13   A.  This document is her personal martyr file.

14   Q.  If we turn over the page to the page number 6762 and make

15   sure everybody gets there.  It's got some blackouts towards the

16   bottom half of that page.  Do you see that?

17   A.  Yes.

18              MR. YALOWITZ:  May I read the portion of the document

19   that is available to the jury?

20              THE COURT:  Yes.

21   Q.  "Wafa Ali Khalil Idris blew herself up in a crowd that

22   resulted in killing one and injuring more than 100 in addition

23   to her immediate death."

24              May I direct you, Mr. Shrenzel, to the next page, if

25   you just turn over the page.

1          I want to look with you together at the department's

2    recommendation?

3    A.  Yes, sir.

4    Q.  Could you just describe what we see under department's

5    recommendation?

6    A.  Yes.  She was martyred during a heroic martyrdom operation

7    against the Zionists in the occupied city of Jerusalem.

8    Therefore, we recommend that she is considered one of Al Aqsa

9    Intifada martyrs according to the regulations.

10         She is ratified as one of the Al Aqsa Intifada

11   martyrs, and you can see the way they phrase it:  "heroic

12   martyrdom operation against the Zionists."  That's the reason

13   for the official recommendation as a martyr -- her official

14   recommendation as a martyr.

15   Q.  Thank you.

16         Now, I would like to direct you to Exhibit 467, which

17   is behind a Munzar Noor tab.

18   A.  What tab?

19         MR. YALOWITZ:  This should be D, ladies and gentlemen

20   of the jury.  It should say 467 at the bottom.

21   A.  This is 467?

22   Q.  Do you have 467 before you?

23   A.  Yes, sir.

24   Q.  I would like to direct you to page 1, line 8.

25   A.  8.

1              MR. YALOWITZ:  May I read, your Honor?

2              THE COURT:  Yes.

3    Q.  "In June 2001, I got to know Wafa Idris when I was working

4    at the Red Crescent in al-Bireh.  She is about 28 years old,

5    divorced, and she also worked there with me.  When we talked,

6    she said she was fed up with her life, and had married and she

7    is small and she did not graduate from her studies and that in

8    the first intifada (uprising) she also participated by throwing

9    stones in Ramallah.  She also said that there were people who

10   behave (aggregate) badly and they had to be fought.  After

11   about two weeks, she told me that if I wanted to work with her

12   on this, then we would work by keeping an eye on the behavior

13   of the people from the Red Crescent, and she told me that I

14   would meet her supervisor at the Palestinian Authority.  I

15   agreed, but I said to her that I agreed only if I would work

16   only with her and would not be registered at the Palestinian

17   Authority.

18           "In August 2001, I went with her to the Mukataa for a

19   meeting --"

20           What is the Mukataa?

21   A.  Mukataa is the compound, the very huge compound in Ramallah

22   where Arafat resided, other heads of the security apparatuses,

23   and various other organs of the Palestinian Authority.

24   Q.  What would you compare it to in the U.S.?

25   A.  I don't want to insult the White House.  The Pentagon.  I

F1N8SOK3                        Shrenzel - direct

1    don't know.  No insult intended.  It's just a matter -- it is

2    the center of government.

3    Q.  Thank you.

4         "In August 2001, I went with her to the Mukataa for a

5    meeting, and we arrived there at the place of another person,

6    age about 40, working for the" -- it's been redacted.  His

7    mobile phone number has also been redacted.

8         "I don't remember the number exactly, and his alias

9    is -- redacted -- that is what I heard one of the workers

10   calling him, and after we got to know each other, I said there

11   to -- another person -- that I would work without being

12   registered at the Palestinian Authority."

13        Now, I would also like to direct you to Exhibit 465,

14   page 2.

15   A.  Yes, sir.

16   Q.  And we are on line 5.

17        I would like to direct you to line 5.  Are you there?

18   A.  This is page 101?

19   Q.  Page 101.

20   A.  Yes.

21   Q.  I am just counting.  I see there are lines on the side,

22   one, two, three, four, five, and I am going to begin --

23        MR. YALOWITZ:  Let me just wait until the jury is all

24   there, your Honor.

25        It's tab C, ladies and gentlemen.

F1N8SOK3                        Shrenzel - direct

1          MR. YALOWITZ:  May I read, your Honor?

2          THE COURT:  Yes.

3     Q.  "In the eighth month of 2001, Wafa Idris recruited me -- "

4          THE COURT:  Just a second.  I don't think everybody

5     has it.  What exhibit are you on?

6          MR. YALOWITZ:  I am on 465, tab C, page 2.

7          THE COURT:  Let me make sure the jury has it.

8          Page 2 of that exhibit, line 5.

9          MR. YALOWITZ:  Yes, sir.

10         THE COURT:  I think everybody has it.

11         MR. YALOWITZ:  Great.  Thank you so much.

12    Q.  "In the eighth month of 2001, Wafa Idris recruited me as a

13    source (Mansour)."

14         What is Mansour?

15    A.  I'm not sure -- I should look at the Arabic if it's

16    important.  Maybe it relates to Munzar himself.  Maybe it's a

17    nickname for source.

18    Q.  We can pass over that for right now.

19         "Recruited me as a source for Isthabarat."  What is

20    its Isthabarat?

21    A.  With this I am more familiar.  Isthabarat is intelligence.

22         MR. ROCHON:  Objection, your Honor.

23         THE COURT:  Overruled.  You can cross-examine.

24    Q.  "And introduced me to person A.  Each time I had

25    information, I would forward that information to person A.  In

F1N8SOK3                         Shrenzel - direct

1    my first statement, I said that his name was person A, and he

2    is person A, but his real name is person A, aged about 40, who

3    is known as person A, married and living in Bitunia.  And he is

4    tall, mustached, fat and fair complexioned.  In that period I

5    worked and brought information of suspicions (Shibha) --"

6            What is Shibha?

7    A.  It's the translation of the word suspicions.

8    Q.  -- "of vice."

9            Can you give us that word?

10   A.  Alhalkiya.

11   Q.  What does it mean in English?

12   A.  More offenses, more vices.

13   Q.  "And theft."

14           Based on this document, do you have an understanding

15   of the relationship between Wafa Idris and person A?

16           MR. ROCHON:  Objection, your Honor.

17           THE COURT:  Sustained as to form.

18   Q.  What was Wafa Idris doing based on this document, if you

19   can express a view?

20   A.  Yes.

21           MR. ROCHON:  Objection, your Honor.

22           THE COURT:  I am going to sustain an objection unless

23   you point to something specific.

24   Q.  I want to come back to line five and six.  I will just read

25   you that line and then ask you a question about that specific

F1N8SOK3                          Shrenzel – direct

1    statement.

2              "In the eighth month of 2001, Wafa Idris recruited me

3    as a source (Mansour) for Isthabarat and introduced me to

4    person A.  Each time I had information I would forward that

5    information to person A."

6              Based on that line, do you have a view on the

7    relationship between Wafa Idris and person A?

8              MR. ROCHON:  Objection, your Honor.

9              THE COURT:  I am going to allow it.

10   A.  It's quite clear that Wafa Idris and Munzar Noor both

11   worked for this person A and that was a member of the

12   Isthabarat.

13             May I explain in more length what is Isthabarat

14   without violating the redactions?

15   Q.  It depends on whether Mr. Rochon has an objection.

16             MR. ROCHON:  I do have an objection.

17             THE COURT:  I sustain the objection.

18             If you have a specific question, direct his attention.

19             MR. YALOWITZ:  Yes, sir.

20   A.  But, of course, it's the --

21             THE COURT:  Wait for a question.

22             MR. ROCHON:  I know you don't like side bars, but I

23   really think it would be helpful to approach.

24             THE COURT:  OK.

25             (Continued on next page)

F1N8SOK3                        Shrenzel - direct

1              (At the sidebar)

2              MR. ROCHON:  Your Honor, what Mr. Yalowitz has just

3      elicited is person A is in intelligence.  We went through all

4      of these redactions so that would not happen.

5              THE COURT:  So how did this happen if you went through

6      this one?

7              MR. ROCHON:  I objected when he got to Isthabarat.

8              THE COURT:  You didn't specifically redact that

9      portion that said who this person was.  I mean, at least you

10     redacted the name, but didn't ask to redact that other

11     language.  So I don't know how I can control that.

12             MR. ROCHON:  We had asked to redact that.

13             THE COURT:  That word?

14             MR. ROCHON:  Of course, we asked to eliminate all of

15     it.  We had not focused on the word Isthabarat.  What

16     plaintiff's counsel has done, leaving aside objection to that

17     word, is elicited from this person that person A is in the

18     intelligence.  As you know, the rest of the document says that

19     person A was involved in this attack.  This is completely

20     improper.  It overwhelms the Court's ruling as to the

21     redactions on the document and it was not done unintentionally.

22     He has elicited from this witness, over our objection, that

23     this reflects she was working with this person.  He has

24     elicited, over our objection, that this person was therefore in

25     intelligence, and now that person is referred to throughout,

F1N8SOK3                          Shrenzel - direct

1  this person A, and therefore the entirety of the Court's ruling

2  has opinion undermined.

3        THE COURT:  Well, the problem is the reason I can't

4  accept that is because you didn't ask that the word be

5  redacted.

6        Now, the reason why I overruled the objection is

7  because it's in the document.  You didn't say, Judge, we need

8  to redact this word.  If you had done so, that would have

9  solved the problem.  But the document is what it stands for,

10  and I ruled that the document is admissible.  If you wanted to

11  make an argument that that word shouldn't be there so that this

12  issue wouldn't arise, you could have done so.  You didn't do

13  so.  You overlooked it.

14        MR. ROCHON:  Judge, even taking the Court's position,

15  for counsel to then use that to demonstrate to the jury that

16  the same person who is person A is also in intelligence clearly

17  undermines your ruling.  The Court this morning said this is

18  not going to be a game and you are not going to be able to slip

19  things by people.  We spent untold hours fighting for and

20  obtaining a ruling that they would not be able to point to this

21  person as being in our client's headquarters.

22        THE COURT:  The document says that he is in

23  intelligence.  That's the point.

24        MR. ROCHON:  In Arabic it says it.  So now he has this

25  witness translate it.

1              MR. SATIN:  The English was redacted.

2              MR. ROCHON:  Mr. Satin pointed out that you redacted

3     the English word intelligence.  So you have redacted the

4     translation of the word.

5              THE COURT:  I didn't redact the translation of the

6     word.  I had no idea whether those two words had anything to do

7     with them at all.  You never said that you needed that word

8     redacted.  What do you want me to do about it now?  You're

9     right.  I would fault Mr. Yalowitz significantly if the record

10    that you had is that we redacted the information and that word,

11    but we didn't redact that word and you never pointed out to me

12    that that word was going to be something that you would have a

13    specific problem with and why you had a problem with that word.

14    I don't know what you want me to do about it now.

15             MR. ROCHON:  We did seek to have the Court redact "a

16    source (Mansour) for military intelligence."

17             THE COURT:  And I did it.

18             MR. ROCHON:  The part about a source (Mansour) has

19    just been read to the jury.

20             THE COURT:  Mansour is not the word we are debating

21    about.

22             MR. ROCHON:  If it had been redacted per our request,

23    then the word intelligence means nothing.

24             THE COURT:  The word intelligence, even from your page

25    of redactions, that's not the word that you asked to be

F1N8SOK3                          Shrenzel - direct

 1    redacted.  What do you want me to do about it now?

 2              MR. ROCHON:  I want you to instruct counsel that he

 3    cannot argue that person A is from intelligence or ask jurors

 4    to reach that inference, because that overwhelms your ruling

 5    and he should move away from this.

 6              THE COURT:  What is person A's further involvement in

 7    the terrorist act?  Where does it say that this person A is

 8    involved in the terrorist act?

 9              MR. ROCHON:  Person A approached Wafa.  Person A sat

10    down with her.  Person A is clearly a guilty person.  So they

11    are tying person A to our client improperly.

12              MR. YALOWITZ:  It's not improper at all.  It says

13    Mukataa.  Everybody knows Mukataa is the headquarters of the

14    military intelligence.  This man was convicted of passing

15    military intelligence to an inappropriate source.  This is the

16    basis of his conviction.  These are statements against interest

17    that came in as such.  It is a fair inference.  And we have

18    233, which has come in without objection, that the intelligence

19    service knew about this attack and Tirawi was linked to it.

20              THE COURT:  Go ahead and finish.

21              MR. YALOWITZ:  The handwriting has come in which the

22    defendants stipulated was made by their employee.  We have a

23    lot of evidence tying the defendant to this attack and this

24    document was the subject of intensive scrutiny by both sides.

25    We gave this to the defendant yesterday.  They had it

F1N8SOK3                           Shrenzel - direct

1    overnight.  They have Arabic speakers on their team, and I

2    think they are trying to pick at a small thing and try to turn

3    it into a ruling of generalized intent that it wasn't.

4                MR. ROCHON:  Hearing counsel, there is no question

5    that this Court, if it thought that counsel was going to argue

6    that this document implicated our client in the attack because

7    of these redactions, he should have brought it to our attention

8    and should have argued it.  This is not how you do these

9    things.  We litigated at great length about redactions, with

10   everybody understanding the intent of the Court's ruling that

11   we are not going to let the defendants be on trial with someone

12   pointing a finger at them.  For counsel to get it in that way,

13   that's not right, it's not fair.

14               THE COURT:  First of all, it's already in this case.

15   I don't know what you want me to do about it.  It's not about

16   what I anticipate; it's about what the lawyers guide me on.

17   You didn't guide me on this one.  I gave you a ruling based on

18   the information you gave me.  As I always say, I didn't make

19   the best decision, not because I wasn't smart but because I

20   wasn't informed.

21               It's not their fault that you didn't raise it.  Given

22   the mountain of information and letters that I get, the minutia

23   of the stuff that you object to, I can't blame them that you

24   left it in the document and didn't tell me that this is an

25   inference that you didn't want to draw.  Now I am not even sure

1    it is an improper inference given the other document that you

2    just allowed in, without objection, that basically says there

3    is evidence that they have.

4            MR. ROCHON:  The fact that defendants are cooperating

5    with the process --

6            THE COURT:  I don't think that's our problem.

7            MR. SATIN:  It's the Arabic word.  That's the problem.

8    The Court redacted the English.  They did not redact the

9    Arabic.

10           THE COURT:  You didn't ask me to redact the Arabic.

11           MR. SATIN:  We didn't know we were going to ask this

12   guy to translate an Arabic word.  We don't know what that word

13   means.  Apparently it means the same thing.  But it's the same

14   thing, if the Court was redacting military intelligence, it has

15   to redact the Arabic word.

16           THE COURT:  That's a very reasonable argument for you

17   to have made last week.  It's not a reasonable argument for you

18   to make now.  The document has gone before the jury.  You have

19   never said that.  And now your objection is the jury should

20   know what remains unredacted.

21           MR. ROCHON:  We are not blaming the Court.

22           THE COURT:  What am I supposed to do about it?

23           MR. ROCHON:  I am blaming plaintiffs' counsel.

24           THE COURT:  It's not their fault you didn't raise this

25   issue.  It's your responsibility to raise this issue.

F1N8SOK3                        Shrenzel - direct

1              MR. ROCHON:  Having ruled that military intelligence

2      should be redacted, for counsel to introduce the translation of

3      it in front of the jury and present it to them is improper.

4              THE COURT:  What do you want me to do about it?

5              MR. ROCHON:  Direct counsel not to make that argument,

6      to have this now redacted, and tell the witness not to refer to

7      person A as military intelligence.

8              THE COURT:  What else are you going to do with this at

9      this point?

10              MR. YALOWITZ:  I lost the train of my examination.

11              THE COURT:  Do you have further questions of this

12      witness about that?

13              MR. YALOWITZ:  I probably do.  I don't remember.  I

14      have got to go back and look.

15              THE COURT:  Tell me in substance where you want to go.

16              MR. YALOWITZ:  In substance, I want to take the

17      witness through his self-inculpatory statements about what he

18      was doing in connection with his conviction.

19              THE COURT:  What do you want to do about military

20      intelligence?

21              MR. YALOWITZ:  I am not going to use the word military

22      intelligence.

23              THE COURT:  What do you want to do about intelligence

24      or this issue?  Do you have more questions on this issue?

25              MR. YALOWITZ:  I don't have questions about

F1N8SOK3                          Shrenzel – direct

1    intelligence.

2                THE COURT:  Do you have any more questions with regard

3    to this issue?

4                MR. YALOWITZ:  Sorry.  What is the issue?

5                THE COURT:  Do you have any more questions with regard

6    to this person that has been identified?

7                MR. YALOWITZ:  Yes.

8                THE COURT:  What is the nature of those questions?

9                MR. YALOWITZ:  I am going to establish the

10   relationship between person A and the attack.

11               THE COURT:  Tell me what the answers will be.

12               MR. YALOWITZ:  The answers are that he personally

13   participated in the recruitment of Wafa Idris to do the attack.

14               MR. ROCHON:  That's exactly what the Court redacted.

15               THE COURT:  The record is what it is.  You didn't

16   object.  As a matter of fact, they would have been able to make

17   that argument anyway based on the document that you just

18   stipulated to in evidence.

19               MR. ROCHON:  They wouldn't have been able to make it

20   about person A, not at all.

21               THE COURT:  Then, obviously, if you had thought about

22   that, you would have made that clear to me when we were doing

23   these redactions.  You obviously missed it.  They didn't miss

24   if.  You missed it.

25               MR. ROCHON:  This morning you said that we are not

1   going to have a trial where people are trying to slip things by

2   other people.

3        THE COURT:  You have an army of lawyers here.  You

4   didn't pick it up.  The fact that you have now stipulated that

5   in fact there is some evidence that someone said that the GIS

6   was involved, let this be the evidence.  That's the end of it.

7        MR. ROCHON:  This is not that evidence.  All that

8   letter says is that someone at GIS called the family of this

9   woman after it was known that she had killed herself and it

10  wasn't claimed by anybody.  That is a far cry from this.

11       THE COURT:  Do you have other areas that you can go

12  into before lunch and we can address this issue over lunch so I

13  can give you some guidance here.

14       Quite frankly, I am telling you at this point I don't

15  have any basis to do anything about this.  This is the way the

16  evidence came in and this is what you said was critical to be

17  redacted.  You have gone meticulously through all of these

18  exhibits that I have had to confront over the last few weeks

19  and you let this sit there and I am supposed to say that it was

20  their fault.

21       MR. YALOWITZ:  May I raise one other thing?  It's

22  12:20.

23       THE COURT:  If you can fill up the next 20 minutes

24  with something else, let's do so.  Then we don't have to waste

25  any of the jury's time.

1          MR. YALOWITZ:  The problem is we are really right in

2     the middle of a line which has once again been disrupted by the

3     defendants, and I would really like to continue on the line.  I

4     will not say the word military intelligence.

5          THE COURT:  I am not questioning what you're saying.

6     If you want to explore this area any more, we will have to

7     discuss it further so go to something else.  I don't care if

8     you have to come back to it.  As I say, you guys can try to

9     outsmart each other if you want, and maybe you caught them

10    sleeping at the switch, but that's not my issue.  I am trying

11    to figure out what is the fair and admissible evidence before

12    this jury.  If you convince me that you can go into this, then

13    you can do whatever you want with it.  Quite frankly, I am not

14    yet convinced that I am supposed to grant them some relief

15    because they find themselves stuck in this position because

16    nobody on their army of lawyers decided that they wanted to

17    specifically make sure that this didn't get before the jury.

18         MR. YALOWITZ:  If you're asking me to move on to

19    another topic, I will do that.

20         May I just make one request of the Court on another

21    topic?

22         THE COURT:  Can we do that later?  Is it going to come

23    up before lunch?

24         MR. YALOWITZ:  No.

25         THE COURT:  Let's use the jury's time.

F1N8SOK3                          Shrenzel - direct

 1                    (In open court)

 2    BY MR. YALOWITZ:

 3    Q.  Mr. Shrenzel, could we turn to the tab in our binder

 4    labeled Tawfiq Tirawi?

 5    A.  Yes, sir.

 6    Q.  Let's turn to Exhibit 233.  Do you have that?

 7    A.  Yes.

 8    Q.  Now, I would like to begin on examination of Exhibit 233 by

 9    directing us to the logo at the top and the name of the

10    organization that created it, and perhaps we should read the

11    Arabic for that.

12    A.  In the Arabic it's not that clear the logo, but I don't

13    think there is any dispute that this is a document or a letter

14    prepared by an official of the preventive security headquarters

15    in Ramallah.

16    Q.  Ramallah, is that where that Mukataa is?

17    A.  Yes, sir.

18    Q.  Let's go to the English.

19                 MR. YALOWITZ:  First of all, your Honor, may I have

20    the Court's permission to read a portion of the stipulation the

21    parties entered into earlier today?

22                 THE COURT:  It's already been read.

23                 MR. YALOWITZ:  I just want to orient the jury to who

24    some of these individuals are.

25                 THE COURT:  All right.

1          MR. YALOWITZ:  Thank you.

2              Maybe I can do it with the witness.

3     Q.  Mr. Shrenzel, did you hear the stipulation that was being

4     discussed?

5     A.  I did.

6     Q.  Can you tell the jury who the author of this letter is?

7     A.  The author of the letter is Amna Aidiya.  She is employed

8     in the political security branch of the preventive security.

9     Q.  Do you recall who the addressees were?

10    A.  Yes.  They are two individuals within the preventive

11    security, higher in rank or status than the writer.  And she

12    addresses the letter to them, one of them is head of national

13    security and the second is head of political security, again

14    within the preventive security.

15    Q.  What is the subject of the letter according to the face of

16    the document?

17    A.  The subject of the letter is, as it says, "Private

18    information regarding the issue of Shahida Wafa Idris."

19             It speaks about an effort by Tawfiq Tirawi -- and I

20    will mention again he is head of the General Intelligence

21    Service -- to prevent at least the publication of her name as

22    the martyr.  It has to do vis-a-vis her family, especially her

23    brother.  And according to the information, her brother refuses

24    to be part of the deal or idea.

25             MR. YALOWITZ:  Your Honor, may I have the Court's

F1N8SOK3                        Shrenzel - direct

1    permission to read the text?

2              THE COURT:  Yes.

3    Q.   "At the night in which it was revealed that the person, who

4    carried out the attack was shahida (female martyr) Wafa

5    Idris -- and before anyone claimed responsibility for the

6    attack -- Tawfiq al-Tirawi, head of the General Intelligence,

7    called Khalil Idris, the elder brother of the shahida (female

8    martyr), several times and requested that the family would not

9    announce that Wafa was the one who carried out the attack, but

10   that she got married and moved to Jordan or to any other place.

11   In return, al-Tirawi was willing to facilitate Khalil's visit

12   to Jordan despite the fact that he is on the Israeli wanted

13   list.  Khalil answered that he could not sell the blood of his

14   sister in this way.  The family indicated that during her last

15   day, Wafa did not show any signs that she was not coming back.

16   She said that she was traveling to Nablus and might be late."

17             Now, I would also like to focus your attention on the

18   handwritten notes, and there are three of them.  Let me start

19   with the one down here.  I will just direct you to the English

20   translation.

21             It says, "To the brother, head of the directorate, may

22   Allah protect him.  Be informed.  May you last long."

23             Mr. Shrenzel, do you recall, based on the stipulation

24   that Mr. Rochon announced, who the handwritten note at the

25   bottom was written by?

F1N8SOK3                         Shrenzel - direct

1    A.   Yes.  In the Arabic, you can see clearly the word Hilal

2    that was omitted for some reason from the translation.  So I

3    think it is referring the letter to the head of the

4    directorate, probably the overall head of the preventive

5    security.  Because probably the importance as --

6              MR. ROCHON:  Objection, your Honor.

7              THE COURT:  You're objecting?

8              MR. ROCHON:  Just the added on.

9              THE COURT:  Go ahead.  What is your next question?

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1nQsok4                          Shrenzel - Direct

1    Q.  Let's go to the handwriting on the side which is over here.

2    Do you recall who wrote the handwritten note at the right-hand

3    side according to the stipulation that Mr. Rochon read out?

4    A.  Yes.  Again, I assume it was every one of the addressees of

5    the letter.  He refers it to another person and said to him

6    that it's important and you have to confirm this information

7    with her brother and inform me as soon as possible.

8    Q.  Do you recall according to the stipulation who wrote the

9    handwritten note at the top?

10   A.  Yes, sir, this is Mr. Nobani.  Again, he is one of the

11   addressees of the letter.  And, again, he addresses it or

12   refers it to the national security command to another body and

13   he said, "Be informed and that this information" according to

14   Mr. Nobani's assessment, "proves that the general intelligence

15   are involved in the issue of Wafa Idris.  Can you discreetly

16   check this with her brother?"

17   Q.  Have you had the opportunity to review documents in the

18   record before the Court concerning Tawfiq Tirawi?

19   A.  Yes, we have mentioned him quite many times so far.  I

20   believe not only my testimony but also of the previous witness.

21   Q.  In the course of your work, did you have occasion to

22   understand who Mr. Tirawi was based on other information as

23   well that is generally available to the public?

24   A.  Yes.

25   Q.  Just describe your views based on that information about

F1nQsok4                        Shrenzel - Direct

1    his role in terror during the Al-Aqsa Intifada.

2              MR. ROCHON:  Objection, your Honor.

3              THE COURT:  Sustained.

4    Q.  Let me just ask you a couple of questions about the text of

5    the document.  The document indicates that Tirawi called

6    Idris's brother several times and requested that the family

7    would not announce that Wafa was the one who carried out the

8    attack.  Do you have an understanding of what Tirawi was doing

9    in that?

10             MR. ROCHON:  Objection, your Honor.

11             THE COURT:  Sustained.

12   Q.  Do you have a view as to what meaning of the notations were

13   at the top of the document?

14             MR. ROCHON:  Objection, your Honor.

15             THE COURT:  Sustained.

16   Q.  Did you have a view on what the timing is indicated in the

17   document before anyone claimed responsibility for the attack?

18             MR. ROCHON:  Objection, your Honor.

19             THE COURT:  Sustained.

20   Q.  Let me move ahead to a document that we have identified

21   as--

22             MR. YALOWITZ:  Let me place it before the witness,

23   your Honor?

24             THE COURT:  Yes.

25   Q.  We will use our box top and get a foundation laid.  Do you

F1nQsok4                        Shrenzel – Direct

1   have Exhibit 477 before you, Mr. Shrenzel?

2   A.   It's in the binder?

3   Q.   On the screen.

4   A.   On the screen.  Yes, but it's not very clear.  But I have

5   it, yes.

6   Q.   Let's see if we can adjust it to go a little wider.

7   Without getting into detail, can you tell the Court what that

8   document is?

9   A.   This is an expert opinion of an Israeli police officer that

10  is an expert in the field of explosives.

11  Q.   To what does this document relate?

12  A.   It relates to the findings in the scene of the attack.

13  Q.   Which attack?

14  A.   The attack perpetrated by Wafa Idris.

15          MR. YALOWITZ:  Your Honor plaintiffs offer 477 in

16  evidence.

17          MR. ROCHON:  Objection.

18          THE COURT:  I think I know which exhibit it is.

19          MR. ROCHON:  We have reviewed it previously with the

20  Court.

21          THE COURT:  Yes.  I just want to make sure I see it.

22  I remember it.  I'll admit it.

23          MR. YALOWITZ:  The objection is overruled?

24          THE COURT:  Yes, that's what it means when I say

25  admitted.

1          MR. YALOWITZ:  I just didn't hear the Court.

2          THE COURT:  I admitted it into evidence.

3          (Plaintiff's Exhibit 477 received in evidence)

4    Q.  Now, could we go to the second page.  I just want to look

5    at the opinion here.

6          MR. YALOWITZ:  May I read, your Honor?

7          THE COURT:  Yes.

8    BY MR. YALOWITZ:

9    Q.  "On January 27, 2002 at about 12:25 p.m., I was called by

10   the Jerusalem district bomb squad to #50 Jaffa Road, Jerusalem

11   to examine the circumstances of an explosion that occurred

12   there."

13         Let's go to the next page.

14         MR. YALOWITZ:  May I read, your Honor?

15         THE COURT:  Yes.

16   Q.  At the bombing scene -- I'm sorry -- "at the bombing crime

17   scene, I identified extensive damage to stores and shop

18   windows, multiple shrapnel impact damage, and the remains of

19   human bodies strewn about in the adjacent road and sidewalk.

20         "The following exhibits were gathered at the scene of

21   the incident:

22         "1.  Various pieces of cloth.

23         "2.  Various pieces of plastic.

24         "3.  Various pieces of metal.

25         "4.  The recommend remains of an electromechanical

1    clock.

2              "5.   The remains of a cellular phone.

3              "6.   The remains of various electric conductors.

4              "7.   Batteries and various remains of batteries.

5              "8.   Nails, various bolts and nuts."

6         I would like to turn to the next page under test

7    results.

8              MR. YALOWITZ:  May I read, your Honor?

9              THE COURT:  Yes.

10   Q.   "Investigation of the bombing crime scene and of the

11   exhibits indicate that an improvised explosive device, carried

12   on the body of a female terrorist, exploded on the sidewalk

13   next to the window of a shoe store at 50 Jaffa Street in

14   Jerusalem.

15             "2.   Bombing of crime scene findings:  Paragraph A.

16   At the bombing crime scene, I identified severe damage caused

17   by the blast to the nearby stores, shop windows and the windows

18   of nearby buildings.

19             "B.   Multiple shrapnel damage marks were found on the

20   sidewalk and on the nearby walls, door frames and shop window

21   frames.

22             "C.   Based on the findings at the bomb crime scene, I

23   identified the center of the blast, some ten centimeters above

24   the sidewalk, next to the shop window of the adjacent shoe

25   store.

F1nQsok4                          Shrenzel - Direct

1          "D.  Based on the findings on the remains of the

2     terrorist's body, it appears that the blast occurred close to

3     the torso."

4          I would like to turn to page 3, paragraph four.

5          Next page, paragraph 4.

6          "The force of this type of improvised explosive device

7     is able to cause death when it explodes.

8          "5.  Photographs of the bombing crime scene and of the

9     exhibits are attached hereto."

10         Let's just take the jury through those photos with the

11    court's permission.  Are we able to enlarge that one?  Let's

12    enlarge the one that says "damage next to shoe store."  Let's

13    enlarge the one that says "damage to store fronts."  Let's

14    enlarge the one that says "nails."Let's enlarge the one that

15    says "remains of what appears to be a black bag."

16         MR. YALOWITZ:  Your Honor, I know I have gone a little

17    past the time you had indicated you wanted to break.

18         THE COURT:  We are going to break now.  Ladies and

19    gentlemen, we will take the lunch break.  Don't discuss the

20    case.  Keep an open mind.  I will see you at 2:00.  I still

21    intend to send you home a little early today.

22                            (Jury recessed)

23         (Continued on next page)

24

25

F1nQsok4                          Shrenzel - Direct

1                            (Jury not present)

2              THE COURT:  Mr. Yalowitz, with regard to this issue of

3      redaction of 465, the name that was redacted without saying

4      what the name is at this point, is that a name that we see

5      somewhere else in the exhibits in this case?

6              MR. YALOWITZ:  Person A?

7              THE COURT:  Yes.

8              MR. YALOWITZ:  No.  Person A is in that interrogatory

9      answer that I was going to offer in evidence and I might still

10     offer, but so far that person's name has been redacted from the

11     documents that have been admitted in evidence.

12             THE COURT:  I would like you to just write on a piece

13     of paper which person that is so I can review that without

14     publicly stating that person's name at this point, so I can

15     compare it to the interrogatory.

16             MR. YALOWITZ:  Maybe I need to correct that.  Person A

17     is listed in the publicly available conviction which is

18     publicly filed both in Israel and in this court.

19             THE COURT:  His own conviction?

20             MR. YALOWITZ:  No.

21             THE COURT:  Someone else's.

22             MR. YALOWITZ:  He is identified in the Noor conviction

23     by name.

24             THE COURT:  Which exhibit is that?

25             MR. YALOWITZ:  322.

1           THE COURT:  Is that in this binder?

2           MR. YALOWITZ:  Yes.  But it's redacted in your binder.

3           THE COURT:  I understand that.  322 under Noor.

4           MR. YALOWITZ:  He is also identified in 883.

5           THE COURT:  Do I have a 322?  I see 322.  You say he

6    is mentioned 322, and where else?

7           MR. YALOWITZ:  Correct.

8           THE COURT:  And where else?

9           MR. YALOWITZ:  There are several other exhibits which

10   we offered in evidence which the Court excluded that are other

11   court documents from Israel where he is mentioned and then his

12   name is in the interrogatory answer 883, which I would be happy

13   to hand up to the Court if it would be helpful.

14          THE COURT:  I have 883.  I just don't know which one

15   of the names that is.  So at this point do you have any

16   unredacted copy of 322?

17          MR. YALOWITZ:  I can get one for your Honor.  I may

18   not have one in the courtroom, but I can print one and bring it

19   in in a few moments.

20          THE COURT:  Let me see the unredacted 322 and let me

21   see again the unredacted 465.  And then we will address this

22   before the jury comes back.

23          MR. ROCHON:  Your Honor, 467 has the same issue.  It's

24   another one, so if you're asking --

25          THE COURT:  467 also.

F1nQsok4                         Shrenzel – Direct

1          MR. ROCHON:  If you're asking for these documents, you

2    may want that as well.

3          MR. YALOWITZ:  Wait a minute.  467 doesn't say

4    anything about intelligence.  Well, it talks about --

5          THE COURT:  Does it reference this same individual?

6          MR. YALOWITZ:  It does, person A.

7          THE COURT:  Let me see the unredacted of that.

8          MR. YALOWITZ:  I will also give the Court 883, and I

9    will just highlight the information about him because I think

10   it will help connect the dots.

11         THE COURT:  Why don't we take the lunch break and I

12   will see you at 2:00.

13                         (Luncheon recess)

14        (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

F1nQsok4                          Shrenzel - Direct

AFTERNOON SESSION

2:00 P.M.

3          (In open court; jury not present)

4          THE COURT:  Mr. Rochon.

5          MR. ROCHON:  Yes, sir.

6          THE COURT:  What is it that you are asking me to do

7    with regard to 465?

8          MR. ROCHON:  As to 465, your Honor, I don't think the

9    plaintiff should be able to argue that the person who is

10   referenced there as person A worked for the Palestinian

11   Authority.  I think that the jury doesn't speak Arabic, so the

12   issue of how we deal with the word, I think it could be taken

13   out given if counsel has referred to it.  I understand that

14   hadn't been the redaction ordered by the Court.  Our request

15   had been to take that whole line out, and the Court agreed to

16   take out the words "military intelligence."

17         When we made the request, we were arguing that there

18   was a danger that someone could associate person A with

19   military intelligence.  Mr. Yalowitz argued that we were

20   stretching in making that kind of argument and then actually

21   elicited the testimony from the witness, and then ran with

22   it -- or tried to run with it -- before we got to the bench

23   that overcame the effect of redactions.

24         I think that there should be no further testimony that

25   associates that person with military intelligence or any other

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1nQsok4                              Shrenzel - Direct

1    Palestinian Authority, and that Mr. Yalowitz should not be

2    allowed to argue anything along those lines.

3           THE COURT:  Mr. Yalowitz.

4           MR. YALOWITZ:  I remember the conversation very

5    differently than Mr. Rochon does.  We were arguing there should

6    be no redactions in this document, and I think that the Court

7    was giving the defendants a third or fourth bite at the apple

8    to make additional redactions, and you very patiently gave them

9    the opportunity to ask for any redactions that they wanted.

10   They did not ask for redaction of the Mucataa, which is the

11   headquarters of the Palestinian security apparatus.  They did

12   not ask for redaction of Palestinian Authority.  They did not

13   ask for redaction -- appropriately they didn't ask for

14   redaction of the self-inculpatory statements about providing

15   intelligence information to this individual in his office in

16   the Mucataa because that was self-incriminatory, and it is

17   confirmed, in fact, by paragraph sixth of the conviction, Count

18   Six of the conviction.

19          I will tell you, candidly, I did not know what that

20   word meant when we were standing here in court.  In fact, I

21   didn't know until I asked the witness because I just saw the

22   word, and I was reading, and I thought we should know what it

23   was.  So this insinuation that I was trying to slip something

24   past the defendants is incorrect.  We worked night and day to

25   deal with these redactions, and we did it in complete good

F1nQsok4                    Shrenzel - Direct

1   faith.

2          In fact, looking over the redactions today, I was very

3   upset to see that in our haste to make redactions in compliance

4   with the repeated and changing requests of the demands of the

5   defendants during the trial, we made an oversight in 467 by

6   omitting the name person A in all of these places in 467 where

7   it refers to that individual.  So what I had suggested to

8   Mr. Rochon at the break, was that if he wanted to take out that

9   word, that Arabic word, which I don't remember what it was, and

10  I could replace 467 with a correctly redacted first name, I'd

11  be perfectly willing to do that.  And I think that would cure

12  any concern that he has and would allow me to present my case

13  as the Court ruled on it yesterday.

14         MR. ROCHON:  In responding to that, a couple of

15  things, your Honor.  First of all, we asked to take out

16  Palestinian Authority throughout and we lost.  We did ask to

17  take out any reference to Palestinian Authority, and the Court

18  didn't rule our way on that.  We asked to take out the entire

19  line and we didn't win on that.

20         Mr. Yalowitz argued that our efforts to say that this

21  could refer to the Palestinian Authority could be read that way

22  he described that we were reaching and speculating here, but

23  the net effect -- and that was in I think yesterday's

24  transcript.  The net effect of it though is that there has been

25  an association briefly by the witness of our client to this

F1nQsok4                         Shrenzel - Direct

1    individual who has otherwise been redacted.  My request had

2    been that the Court not allow any argument along those lines

3    because it would be improper given the redactions we've all

4    agreed to.

5           And if there is an agreement that it can't be argued

6    that way, then that's the solution.  Now, if we come to that

7    agreement and there is a need to have or a request to have

8    person A in both or something, we can talk about it.  The

9    remedy I need is one that puts us back, I would suggest to the

10   Court, where we were -- what the Court anticipated from the

11   redactions; that this gentleman's statements about someone who

12   worked for the PA that implicated that person should not be

13   used to establish that person's involvement for reasons we've

14   discussed at great length.  That is where I want to end up.

15          THE COURT:  This is my position, and this is what I am

16   going to order.

17          First of all, I think both sides bear some

18   responsibility.

19          After looking at the document, Mr. Yalowitz, without

20   making any judgments about your intentions, I am compelled to

21   conclude that you made a conscious decision to redact in any

22   way that was inconsistent with the purpose for which I ordered

23   the redaction, and I conclude that for several reasons:

24          One -- I am going to take out one factor that I

25   considered because you said to me that you didn't even know

F1nQsok4                        Shrenzel - Direct

what the word meant.  I am going to accept your representation

on that because if you knew what the word meant, then it would

be clear that you were simply going to elicit in English the

exact things that I took out in English through the witness.

So I am going to accept that.  But I think that your redactions

were inappropriate.  I think it is partially the responsibility

of the defense because they didn't insist on something

different.

        What tips me in that regard is that you designated

this person as person A.  As far as I'm concerned, that's

testimonial because you also designated -- when I went back and

looked at the other document, you also designated that

redaction as person A in 322.  So it's obvious that you were

trying to say that the person who was in that document who was

redacted is the same person, and that the only purpose for

putting in person A in this instance as opposed to any other

instance, was so that you could link each one of these

activities to the single person.  You didn't have the right to

do that.  You had the right to make the redaction and simply

leave the redaction.

        Quite frankly, when I first saw the redaction that

way, it raised my concern, but I had no idea exactly at that

point why it was done that way, and the defense did not object

to it being done that way.  But I think it was done

inappropriately.  You cannot be the one to tell the jury that

F1nQsok4                        Shrenzel - Direct

1    the same person in one document is the same person in the other

2    document, and that's what you did.  You are not a witness to do

3    that.  So I think that that is inappropriate.  I think the

4    nature of the redaction was inappropriate.

5          Also, I think the whole purpose of this -- as a matter

6    of fact, let me go back to 322, because 322 you specifically

7    redacted the words "a senior operative of the Palestinian

8    Authority's military intelligence."  So it was clearly obvious

9    to you and all of us that we intended that information to be

10   redacted.  OK?  Then you inadvertently brought that information

11   out by asking the witness what does the word mean in another

12   language.  I think that that is not consistent with what we

13   were trying to accomplish.

14         That being said, my ruling is going to be this:  You

15   are going to have to take these documents back -- first of all,

16   you are going to have to redact them the same way you redact

17   every other document.  I don't want a person A or Mr. Blue or

18   Donald Duck.  I want it redacted by crossing it out and leaving

19   it blank.  You don't have the right to fill in something else

20   so that you can make a point, and that is what you did, and

21   particularly a point that could not otherwise be made given a

22   consistent redaction.  This is the only place where you made an

23   inconsistent redaction, and now I know the reason for it.  I

24   know exactly the reason for it.  I think that is inappropriate.

25         Also, you should redact the Arabic word.  That should

F1nQsok4                         Shrenzel - Direct

1    be out.

2              Also I'm not consistent with my ruling, I am not going

3    to let you argue from either of these documents that this is

4    evidence that the PA was involved.  You can't argue that

5    because it is hearsay.  That is the whole purpose of the

6    redaction; that this person is accusing another person, but

7    more importantly, he is accusing the PA and the PLO.

8              The whole purpose of the redaction was that if you

9    want to prove that, then you have admissible non-hearsay

10   evidence or witnesses to come into this court and prove it.

11   And even now the defense has backed away from their objection

12   to the other document from which you have at least some

13   inferences that you can argue.  But you cannot argument it from

14   this document by saying it must be true because this person

15   said it because that is exactly what you are not allowed to do,

16   and that is exactly the reason why I ordered the redaction.

17   What we've just done today is inconsistent.

18             So that is my ruling.  I expect the documents to be

19   redacted the same way every other document is redacted.  I

20   expect that word to come out, and I don't expect you to

21   reference this out-of-court hearsay statement by this

22   individual as substantive evidence that he must have been

23   dealing with a PA person in the course of his employment or as

24   an agent of the PA.

25             Do you understand?  Are we clear on that?

1          MR. YALOWITZ:  Yes, your Honor.  That's fine.  I

2    accept the Court's ruling.  Let's move on.

3          THE COURT:  All right.  Then let's move on.

4          MR. YALOWITZ:  I would just say, I appreciate that --

5    I'm glad that I volunteered what I said.

6          THE COURT:  I am too.

7          MR. YALOWITZ:  And I want you to know that we were

8    transparent with the defendants about person A, and they have

9    not been shy about sharing with me or you when they are

10   unhappy.

11         THE COURT:  I agree with that.

12         MR. YALOWITZ:  So I accept the Court's ruling, but to

13   lay this all at my feet --

14         THE COURT:  I'm not.  I'm not.  I can tell you this

15   much:  If it hadn't come up the way it did, and I would have

16   been convinced that you would have done it deliberately

17   calculated for that purpose, I would have imposed a greater

18   sanction.  But as I say, and I am going to keep saying it, I

19   think they bear significant responsibility for this.  But I am

20   still going to issue a ruling consistent with what I said from

21   day one, and that is the only way I'm dealing with it.

22         MR. YALOWITZ:  I accept that, and I am not re-arguing

23   that.  I'm not happy with it.

24         THE COURT:  I don't expect you to be happy.

25         MR. YALOWITZ:  I'm really not happy with it.

1            THE COURT:  I expect you to be very unhappy.

2            MR. YALOWITZ:  Well, I am very unhappy.

3            THE COURT:  I accept that.

4            MR. YALOWITZ:  But I think that will basically --

5            THE COURT:  But you know the situation I've been

6    placed in.

7            MR. YALOWITZ:  Well, look, this is a situation that

8    the Court has been placed in by the defendants.

9            THE COURT:  No, by both, because you can't justify the

10   person A insertion by you.  You can't justify that for the

11   purpose that you did it.  You can't.  You don't have the right

12   to do that.

13           MR. YALOWITZ:  I'm not going to argue with you.

14           THE COURT:  You don't have the right to do that.

15           MR. YALOWITZ:  I think that if the defendants thought

16   that was a problem, they had a right and responsibility to

17   raise that, and they didn't.

18           THE COURT:  You're right.  They were sleeping at the

19   switch on that one.

20           MR. YALOWITZ:  So in my view they waived it because

21   they have come to this Court with every single objection they

22   can dream up.

23           THE COURT:  I agree.

24           MR. YALOWITZ:  So I accept your ruling, but to lay it

25   at my feet instead of Mr. Rochon's feet --

1          THE COURT:  I'm not laying it at your feet.  This is

2     the only remedy that I can impose which is not a more severe

3     remedy because this should not be before this jury in this way.

4          MR. YALOWITZ:  Frankly, I think he is taking advantage

5     of the fact that I stumbled into this by asking a question, and

6     it's a good lesson --

7          THE COURT:  You both stumbled into it, apparently.

8     And I'm stuck with trying to keep it fit.

9          MR. YALOWITZ:  I didn't stumble into person A.  That

10     was obvious from the face of the document.

11          THE COURT:  I'm saying they stumbled into not figuring

12     out the item that was going to do them harm.

13          MR. YALOWITZ:  I expect more from them.  In my view,

14     they've waived it.  Let's move on.

15          THE COURT:  Are you going to reference any of these

16     two documents further today?

17          MR. YALOWITZ:  Yes, but I am going to say "another

18     person."

19          THE COURT:  No, then I want you to take it out of the

20     binder.  I am not going to let you proceed in any manner

21     referring to this document pointing the jury's attention to

22     these documents in the form that they are in.  That's what it

23     means that it is being redacted.  You can't go forward with the

24     witness.

25          MR. YALOWITZ:  I accept it.  I'm just trying to think

1   about the logistics.

2           THE COURT:  The logistics is you take it out of the

3   binder or go on to something else, and just ask the witness

4   questions about it.

5           MR. YALOWITZ:  Let me tell you what I want to do.  I

6   don't want to interrupt you.

7           THE COURT:  No, go ahead.

8           MR. YALOWITZ:  Why don't we collect the binders, and

9   we will read 465 and 467 as the Court has now ordered it to be

10  read, so the jury won't have person A any more.

11          THE COURT:  Is there any reason to go back to 465?

12          MR. YALOWITZ:  Yes.

13          THE COURT:  Why do we need to read that a second time?

14          MR. YALOWITZ:  Because Noor inculpates himself in the

15  attack.

16          THE COURT:  I know, but we have been over that

17  already.  Why do you need to repeat it?

18          MR. YALOWITZ:  I don't think I went over it, your

19  Honor.

20          THE COURT:  What do you want to --

21          MR. YALOWITZ:  I don't think I went over it, and I

22  don't think it prejudices the defense.

23          THE COURT:  What is it you want to quote that you

24  didn't already quote?

25          MR. YALOWITZ:  That we sat together --

F1nQsok4                          Shrenzel - Direct

```
 1              THE COURT:  Where?  I thought you quoted that already
 2     with the person A.
 3              MR. YALOWITZ:  No, I did not.  I didn't.  It was in my
 4     outline.  I skipped over it.
 5              THE COURT:  You want to say what?  You want to quote
 6     what?  What page?
 7              MR. YALOWITZ:  465, page 3.
 8              THE COURT:  OK.
 9              MR. YALOWITZ:  Right at top.
10              THE COURT:  "In the home," that sentence?
11              MR. YALOWITZ:  Yes.
12              THE COURT:  Fine.  You want to take the binders away
13     and you want to read that?
14              MR. YALOWITZ:  Right, that, and also -- I mean, there
15     are about three passages I want to read.
16              THE COURT:  On that page that you haven't read before?
17              MR. YALOWITZ:  I have not read any of them yet.  I am
18     not going to repeat things.  I'm trying to get this witness
19     done and off the stand and we have chewed up so much time.
20              THE COURT:  I agree.  Not by my doing.
21              MR. YALOWITZ:  Well --
22              THE COURT:  You're finished with page 2.
23              MR. YALOWITZ:  Let me tell you what I want to do.
24              THE COURT:  You want to go to page 3.  Is that what I
25     hear you saying?
```

F1nQsok4                        Shrenzel - Direct

1              MR. YALOWITZ:  Yes, 465, page 3 and two on 467.

2              467 is not the problem because it doesn't say person

3    A.  OK.  All right.  That's it on 465.

4              THE COURT:  You want to just read from page 3?

5              MR. YALOWITZ:  Right.

6              THE COURT:  Fine.  You can do that.  Take the binders

7    back.  You can read it.  When you get to something that was

8    redacted, you should use the word --

9              MR. YALOWITZ:  "Another person."

10             THE COURT:  No.  You should use the word "blank."  All

11   right?

12             MR. YALOWITZ:  Yes, sir.

13             MR. ROCHON:  Your Honor, can I have a brief sidebar

14   with Mr. Yalowitz?

15             MR. YALOWITZ:  I don't want to talk to him at the

16   moment.  I'm sorry, I really don't.

17             THE COURT:  Yes, you may.

18             But if he doesn't want to talk to you, I can't help

19   you.

20             MR. ROCHON:  I understand.  Thank you.

21             THE COURT:  Get those binders, and let's get the jury

22   in.

23             MR. ROCHON:  Your Honor, I just want to make sure we

24   were not going to use sheet 4 from 465.  That is what I was

25   trying to ask counsel.

F1nQsok4                         Shrenzel - Direct

1          THE COURT:  What is sheet 4?

2          MR. ROCHON:  Sheet 4, 465 includes the word istikhara

3    again.

4          MR. YALOWITZ:  I can't even pronounce the word.  I'm

5    not going to read it again.

6          MR. ROCHON:  That is all I wanted to raise.  Thank

7    you, your Honor.

8          THE COURT:  Let's get going.  Are you ready,

9    Mr. Yalowitz?

10         MR. YALOWITZ:  Not quite.  Just give me a just a

11   minute to get organized, please.

12         THE COURT:  Sure.

13         Mr. Yalowitz, approximately how long do you think

14   you'll be with this witness?  I am trying to figure out the

15   day.

16         MR. YALOWITZ:  I had hoped to be finished with the

17   witness today.

18         THE COURT:  Within the hour, do you think?

19         MR. YALOWITZ:  We've lost so much time.

20         THE COURT:  Within the hour, do you think?

21         MR. YALOWITZ:  I think if we go until four, I am

22   likely to be able to finish.

23         THE COURT:  We probably won't go that long.  I

24   promised them I would let them go home early.  If we can get

25   him done within the hour, I might let them go at that break.

F1nQsok4                          Shrenzel - Direct

1    But let's see where we are.

2               MR. YALOWITZ:  Your Honor, there is one other thing I

3    wanted to raise -- and I may be misremembering it.

4               THE COURT:  Go ahead.

5               MR. YALOWITZ:  So, you know, I don't want to --

6               THE COURT:  Go ahead.

7               MR. YALOWITZ:  Very soft.

8          I believe that when Mr. Rochon was asking me for a

9    binder, the Court may have inadvertently made a comment about

10   me having an army of lawyers.

11              THE COURT:  I don't think I did that in front of the

12   jury.

13              MR. YALOWITZ:  As I say, I may be misremembering it.

14              THE COURT:  I don't know.  I don't know what context

15   you raised it in.  If I said something inappropriate in front

16   of the jury, I apologize.

17              MR. YALOWITZ:  I'll go back and look.  I'm not

18   faulting your Honor, but --

19              THE COURT:  Mr. Yalowitz, I know I did react to some

20   comment that you made because I asked you would you give him a

21   binder.  I remember this.  You said, "I don't have one at the

22   podium."  That was an inappropriate response to my question,

23   particularly when -- and I asked you is there -- you're right,

24   I may have said, "There are an army of lawyers there.  Is there

25   one in the room?"  And then you turned to your associate and

1    said, "Give him a binder."  That's what you should have done

2    when I asked you the question first; not to say there's not one

3    at the podium.  That is how you got yourself in that situation.

4          MR. YALOWITZ:  All right.

5          THE COURT:  Because, obviously, there was a binder

6    available for him and all you had to do was ask one of your

7    colleagues to pick it up and hand it to him.  You wanted to be

8    slick about it and say you don't have one at the podium.

9    That's what I reacted to.  You created that situation.  I don't

10   know what I said, but whatever I said in reaction was in

11   reaction to that because I thought that was inappropriate

12   conduct.

13         MR. YALOWITZ:  I think you misperceived my intentions.

14         THE COURT:  Well, you didn't give him a binder.

15   That's all I know.  I asked you did you have one, and you said,

16   "Not at the podium."

17         MR. YALOWITZ:  Right, and I didn't know whether I had

18   an extra binder for him.

19         THE COURT:  Well, you could have quickly asked your

20   binder.  She apparently had a whole bunch of them ready to hand

21   him.

22         MR. YALOWITZ:  We didn't have a whole bunch of them,

23   your Honor.

24         THE COURT:  You had enough to give him one.

25         MR. YALOWITZ:  I don't want to get into a debate.

F1nQsok4                          Shrenzel – Direct

1           THE COURT:  Then you shouldn't have raised it.  Let's

2    go.

3           MR. YALOWITZ:  I won't raise it again.

4           THE COURT:  Go ahead.  Let's get the jury.

5       (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1nQsok4                          Shrenzel – Direct

1            (Jury present)

2      ISRAEL SHRENZEL , resumed.

3    DIRECT EXAMINATION CONTINUED

4    BY MR. YALOWITZ:

5            THE COURT:  Mr. Yalowitz, you can continue.

6            MR. YALOWITZ:  Thank you.

7            Your Honor, with the Court's permission, I would like

8    to return to Exhibit 467 and read for the jury.

9            THE COURT:  Sure, you can go ahead and do that and

10   then we'll move on.

11           MR. YALOWITZ:  Thank you.  I'm reading from page.

12           (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

F1N8SOK5                          Shrenzel - direct

1           MR. YALOWITZ:  I am sorry, your Honor.  I just need a

2     moment to see if I am oriented.  I really do apologize.  We had

3     so much going on this morning.

4           I am at the bottom of sheet 3.  I will read with the

5     Court's permission.

6           THE COURT:  Yes.

7           MR. YALOWITZ:  "I called blank and told him" --

8           I'm sorry, that's not where I am.

9           I just need to get oriented, your Honor.  I really

10    apologize.

11          We are on page 2, line 18.

12          "I called blank and told him that Wafa was prepared to

13    carry out an attack, and blank asked for us to come to his

14    office in the Mukataa on Friday, January 25, 2002.  And we came

15    to the office, Wafa and I, and there she told blank that she

16    did not want to carry out the attack, and we were surprised.

17    Blank started to talk with her to convince her, and she did not

18    want to hear him, and when I wanted to talk, she interrupted me

19    too and asked me to leave the room.  Blank and Wafa stayed

20    alone in the room for about a quarter of an hour and talked,

21    and then blank asked me to take Wafa, and asked me while we

22    were leaving the room for me to persuade Wafa.  Wafa and I, we

23    sat in the Rukab Cafe in Ramallah, and I asked her why she did

24    not want to carry out an attack, and she said she did not want

25    to die, but she agreed to lay an explosive device, and then I

F1N8SOK5                          Shrenzel - direct

1    returned her to her home, and I told blank after that that Wafa

2    was prepared to lay an explosive device."

3           Your Honor, with the Court's permission, I would like

4    to read from Exhibit 465, page 3.

5           THE COURT:  Yes.

6           MR. YALOWITZ:  "In the home of blank, we sat down,

7    blank, Idris and I, and we talked about the subject, I mean a

8    suicide attack.  And then initially Wafa agreed and afterward

9    she changed her mind.  We said that the attack would be in

10   Jerusalem; we did not say where in Jerusalem.  Wafa then

11   changed her mind because I told her that I was going down to

12   Jerusalem, meaning that I would be a partner with her in the

13   attack, and because of this Wafa withdrew her consent, and she

14   did not want to be the reason that would endanger me."

15          Your Honor, may I go back to 467.

16          THE COURT:  Yes.

17          MR. YALOWITZ:  "Blank said that he would check the

18   issue of laying an explosive device.  On Saturday, January 26,

19   2002, blank called me and asked me to come to Manara in

20   Ramallah.  I arrived there and blank asked me how to reach

21   Jerusalem from Beit Hanina.

22          "Question:  To what place in Jerusalem?

23          "Answer:  To explain to her how to reach Jaffa Street

24   in Jerusalem via Shuafat so that Wafa would find a place in

25   Jerusalem where she would lay an explosive device.  He asked

F1N8SOK5                          Shrenzel - direct

1    that after Wafa arrived from the visit to Jerusalem, for me to

2    return her to the Mukataa.  I met with Wafa in Jerusalem Street

3    in Ramallah, it is next to the Red Crescent in Ramallah, and I

4    explained to her how to get to Jerusalem, to Jaffa Street.

5    Wafa went to Beit Hanina and from there to Shuafat, and when

6    she was inside Jerusalem, said to me that she was lost and did

7    not know where she was.  I explained to her how to get out of

8    Jerusalem and she eventually left for Ramallah at 4 p.m.  Wafa

9    called me and told me that she had come to Jerusalem Street in

10   Ramallah, and asked me to come take her.  And I came and took

11   her in my vehicle and she travelled to blank's office in the

12   Mukataa.  We sat with him.  Wafa said that she could reach

13   Jerusalem via Beit Hanina and Shuafat, but in Jaffa Street she

14   saw many soldiers and that there was no good way of laying an

15   explosive device and leaving the place, but she would try to do

16   it.  Blank asked me to bring a bag behind the door of his

17   office and bring it.

18        "The school bag is black and it is slung on a

19   shoulder, and the bag is closed with a black string, and the

20   bag has a color on which it said in English, I don't know what

21   it said, there was also a handle at the top.  I took the bag in

22   my hand.  Blank told me to be careful when I bring the bag and

23   not to open it and put it next to Wafa on the floor.  Blank

24   told Wafa to pick up the bag and see what it weighed, and she

25   said that it was not very heavy.  Wafa asked how to activate

F1N8SOK5                         Shrenzel – direct

1    the explosive device, and blank said that he would explain it

2    to her on the following day.  We went out, Wafa and I, from the

3    Mukataa and I went home.

4              "On Saturday night, I was working the night shift at

5    the Red Crescent until Sunday morning, from midnight on

6    Saturday to 8 on Sunday morning.  On Sunday morning, January

7    27, when I got up, the clerk blank, aged 25, living in Silwad

8    and working as a clerk at the Red Crescent, told me that Wafa

9    had asked her for 20 shekels and that she had errands, and she

10   went out on errands early in the morning.  She asked blank to

11   send me her regards.  I called Wafa and she did not answer, her

12   telephone was off, and then I called blank and told him that

13   Wafa was not answering, and we met at 12 p.m. in Manara Square.

14   Blank met with me and travelled with me in his vehicle and

15   said" -- I'm just going to read the English, your Honor, with

16   the Court's permission -- "Only God knows Wafa has martyred

17   herself."

18   BY MR. YALOWITZ:

19   Q.  Mr. Shrenzel, I would like to show you a photograph we have

20   marked as Exhibit 1134.

21             MR. YALOWITZ:  I will have to put the cover on the

22   projector.

23   Q.  Do you see it?

24   A.  Exhibit 1134?

25   Q.  Yes.

F1N8SOK5                    Shrenzel - direct

1    A.  Yes, I do.

2    Q.  Do you recognize that photograph?

3    A.  I believe we -- maybe we showed it before.  Some of the

4    wreckage caused by the attack, by the explosion.

5    Q.  Have you had an opportunity to evaluate the source of that

6    photograph?

7    A.  I don't recall exactly the source, but I believe it was on

8    TV or in the press.

9    Q.  Do you recognize it as a photograph of the scene we have

10   been discussing?

11   A.  Yes.

12           MR. YALOWITZ:  Plaintiffs offer 1134 in evidence.

13           MR. ROCHON:  No objection to 1134.

14           THE COURT:  It will be admitted in evidence.

15           (Plaintiffs' Exhibit 1134 received in evidence)

16   Q.  Let me ask you, Mr. Shrenzel, was there a symbolic funeral

17   for Wafa?

18           MR. ROCHON:  Objection, your Honor.

19           THE COURT:  Could you say that again?

20   Q.  Was there a symbolic funeral for Wafa?

21           MR. ROCHON:  Objection, your Honor.

22           THE COURT:  I am going to sustain that objection.

23   Q.  Let me show you Exhibit 196, clip 3, maybe if I direct it

24   to a particular event.

25           MR. ROCHON:  Objection, your Honor.

F1N8SOK5                          Shrenzel – direct

1              MR. YALOWITZ:  Let's get 196, clip 3 cued up.

2              THE COURT:  Can I see the exhibit, please?

3              MR. YALOWITZ:  You have it.  We have discussed it.

4              THE COURT:  I need to look at it again.

5              MR. YALOWITZ:  It's a video, your Honor.

6              Let's just cue up the beginning of it.

7              THE COURT:  Go ahead.

8   Q.  Mr. Shrenzel, have you had the opportunity to review this

9   videotape in anticipation of your testimony?

10  A.  Yes, sir.

11  Q.  What is it?

12  A.  It is an interview with Marwan Barghouti, mentioned in this

13  court many times.  As it is written here, he is the general

14  secretary of Fatah in the West Bank.  And this interview was

15  conducted while he participated, as written here, in the

16  symbolic funeral for suicide terrorist Wafa Idris.

17  Q.  Is this video from a reliable source in your opinion?

18  A.  I believe it is.

19             MR. YALOWITZ:  Plaintiffs offer Exhibit 196, clip 3.

20             THE COURT:  Any objection?

21             MR. ROCHON:  Yes.

22             THE COURT:  It will be admitted he in evidence.

23             (Plaintiffs' Exhibit 196, clip 3, received in

24  evidence)

25             (Videotape played)

1    Q.  Who is that man?

2    A.  This is Marwan Barghouti.

3            (Videotape played)

4    Q.  Let's go to the June 19 binder.

5            MR. YALOWITZ:  May I hand it to the witness?

6            THE COURT:  Yes.

7    Q.  Mr. Shrenzel, have you had the opportunity to familiarize

8    yourself with the June 19, 2002 attack at French Hill?

9    A.  Yes, sir.

10   Q.  Could you generally describe what happened?

11   A.  Yes, sir.  The French Hill is a neighborhood of Jerusalem,

12   and close to a bus stop there a suicide bomber detonated

13   himself, killing seven people and wounding dozens.

14   Q.  Have you had an opportunity to review any reports setting

15   out findings about the events of the attack as they occurred?

16   A.  You mean a forensic report?

17   Q.  Yes, sir.

18   A.  I did.

19   Q.  Let me put it before you.

20           I am showing you, but not the members of the jury,

21   what we have marked for identification as Exhibit 338.  Have

22   you had the opportunity to see that before?

23   A.  Yes, sir.

24   Q.  What is it?

25   A.  It is an expert opinion of an Israeli police officer, and

F1N8SOK5                         Shrenzel - direct

1   he is an expert on explosives.  Basically, it's the very same

2   expert that we have read his opinion in another case.

3   Q.  Is it the same individual who prepared the report about the

4   Sokolow event?

5   A.  Yes.

6               MR. YALOWITZ:  Plaintiffs offer 338 in evidence.

7               THE COURT:  Any objection?

8               MR. ROCHON:  Yes, sir.

9               THE COURT:  It will be admitted.

10              (Plaintiffs' Exhibit 338 received in evidence)

11              MR. YALOWITZ:  Thank you, your Honor.

12  Q.  Let's see if we can go to the third page -- actually, let's

13  go right where Ms. Machnes has taken us.

14              MR. YALOWITZ:  May I read, your Honor?

15              THE COURT:  Yes.

16              "On June 19, 2002, at about 7:10 p.m., along with

17  Chief Inspector Igor Peckerman and Chief Inspector Ron Yaniv of

18  the national headquarters bomb laboratory, I was called by the

19  Jerusalem District Bomb Disposal Unit to the French Hill

20  junction in Jerusalem to examine the circumstances of an

21  explosion that had occurred at the site."

22              Let's go to page 3.

23              "At the incident scene, near the first bus stop on the

24  east side of the junction, I noticed the remains of human

25  bodies strewn at the site, damage to the stop structure,

F1N8SOK5                          Shrenzel – direct

1    fragmentation impacts and sprayed bloodstains."

2              Ms. Machnes, I don't know if you can enlarge what we

3    have just a little bit.  Otherwise I am going to have to come

4    over and read it.

5              "As a result of the explosion, seven civilians had

6    been killed and 39 injured.  Damage was caused to the bus stop

7    and its surroundings."

8              "The following exhibits were gathered from the scene

9    of the incident:

10             "1.  An electricity switch to which an electric wire

11   and sticky tape were attached.

12             "2.  Various electric wires.

13             "3.  Metal balls.

14             "4.  Nuts and remains of nuts.

15             "5.  Various pieces of cloth.

16             "6.  Various pieces of metal.

17             "7.  Remains of cellular phone handsets.

18             "8.  Remains of various electrical batteries."

19             Let's go on to page 4.

20             "Results of the examination:

21             "An examination of the incident scene and the exhibits

22   reveals that on the eastern side of the French Hill junction in

23   Jerusalem, near the curb of the pavement next to the first bus

24   stop, an improvised explosive device that had been carried on

25   the person of a suicide bomber had exploded."

1          Let's go to page 6.

2          "Item F.  Fragmentation.

3          "Metal balls of approximately 6.4 millimeters in

4    diameter and metal nuts of approximately 8 millimeters in

5    diameter were used as fragmentation in the explosive device.

6          "Balls of a total weight of approximately 15 grams and

7    nuts of a total weight of approximately 35 grams were collected

8    from the scene of the incident."

9          Let's go to the photos.

10          Why don't we take a look at the post.

11          Why don't we enlarge the fragmentation.

12   BY MR. YALOWITZ:

13   Q.  Mr. Shrenzel, could you open the binder that's before you?

14   A.  Yes.

15   Q.  You see the index?

16   A.  I do.

17   Q.  There is a name of a perpetrator Sa'id Awada.  Do you see

18   that in the index?

19   A.  Sa'id Awada.

20   Q.  Then there are two documents.  What are those documents?

21   A.  These are his martyr file and GIS, General Intelligence

22   Service, file regarding him.

23   Q.  Behind that we have collected some additional documents.

24   Do you see the list there?

25   A.  I see the list.  Could you please raise your voice?

F1N8SOK5                          Shrenzel - direct

1    Q.  I apologize.

2              MR. YALOWITZ:  Your Honor, plaintiffs move in evidence

3    Exhibits 19 and 139, which are the two files that Mr. Shrenzel

4    just mentioned.

5              THE COURT:  Which ones?

6              MR. YALOWITZ:  19 and 139.

7              THE COURT:  Any objection?

8              MR. ROCHON:  Yes, sir.

9              THE COURT:  Can you just get a little more testimony

10   from him, if you can, about where these documents come from?

11             MR. YALOWITZ:  Yes, of course.

12   Q.  Could you just turn to Exhibit 19 and explain what it is?

13   A.  Exhibit 19 is the martyr file of Sa'id Awada, the suicide

14   bomber in this attack.

15             MR. ROCHON:  We don't object on foundation grounds to

16   19 and 139.

17             THE COURT:  Then I will admit it in evidence.

18             (Plaintiffs' Exhibits 19 and 139 received in evidence)

19             MR. YALOWITZ:  Your Honor, plaintiffs have moved in

20   evidence all the documents in this binder, and so we ask in

21   addition that the binder be admitted in evidence with the

22   index, and that we be permitted to hand it to the jury.

23             THE COURT:  Are the exhibits in here already in

24   evidence?

25             MR. YALOWITZ:  Yes.

1           THE COURT:  Sure.  This binder will be admitted into

2    evidence in its entirety and you can pass it on to the jury.

3           MR. YALOWITZ:  I will pass it to the jury.

4    BY MR. YALOWITZ:

5    Q.  Let's take a look at the tab marked Sa'id Awada.  And we

6    can go past the photograph and begin with tab A.

7           Do you have tab A before you?

8    A.  I do.

9    Q.  Let's turn to page 2 of tab A.  It's got 6828 at the

10   bottom.  I want to direct your attention to the portion that

11   says how the incident occurred, and then off to the right there

12   is a little piece of text.  Do you see that?

13   A.  I do.

14   Q.  Would you just read it to the jury, please?

15   A.  Yes.

16           "He was martyred while executing a martyrdom operation

17   in Jerusalem.  The operation led to the death and injury of a

18   large number of Zionists."

19   Q.  Could you read the portion of the brief biography that has

20   not been blacked out?

21   A.  "The martyred hero was born in the brave city of Nablus on

22   February 17, 1985."

23   Q.  What was the date of this suicide attack?

24   A.  June 19, 2002.

25   Q.  How old was this boy at the time he blew himself up?

F1N8SOK5                          Shrenzel - direct

```
 1    A.  17 years old.
 2    Q.  Do you know what organization sent this boy to his death?
 3              MR. ROCHON:  Objection, your Honor.
 4              THE COURT:  Sustained to the form of the question.
 5    Q.  Do you know what organization was responsible for this
 6    suicide attack?
 7              MR. ROCHON:  Objection.
 8              THE COURT:  I am going to sustain unless you can give
 9    some foundation about what he is basing the conclusion on.
10    Q.  Let's go to Exhibit 139.
11    A.  Tab B?
12    Q.  Tab B.
13              What are we looking at in tab B?
14    A.  This is a GIS report about the perpetrator of this attack.
15    Q.  GIS is whose document?
16    A.  General Intelligence Service of the PA.
17    Q.  Let's just look at it together.
18              MR. YALOWITZ:  Actually, I don't need to put it on the
19    elmo.
20    Q.  Could we just look together where it says, "Re: Response to
21    query," and then there is a bullet that says, "Sa'id Awada,
22    Hamed Awada"?
23    A.  I see it, sir.
24    Q.  Then it says, "The aforementioned is a member of Fatah and
25    the Al Aqsa Martyr Brigades."  Do you see that?
```

1  A.  Of course, yes.

2  Q.  Then the next bullet says, "The aforementioned is

3  *istashhada* (was killed as a martyr) in Jerusalem during an

4  operation of the Al Aqsa Martyr Brigades.  The aforementioned

5  had carried out the *amaliya istishhadiya* (act of martyrdom)."

6          Have you had the opportunity to cross-check the

7  information in Exhibit 139?

8          MR. ROCHON:  Objection, your Honor.

9          THE COURT:  I didn't understand your question.

10  Cross-check it with something else or just check the document

11  itself?

12          MR. YALOWITZ:  Why don't I rephrase it.

13  Q.  Do you see where it says that Sa'id Awada was killed as a

14  martyr in Jerusalem during an operation of the Al Aqsa Martyr

15  Brigades?

16  A.  Yes.

17  Q.  Is that a statement of this document?

18  A.  Yes.

19  Q.  Who prepared this document?

20  A.  As I mentioned, the Palestinian General Intelligence

21  Service.

22  Q.  Have you had the opportunity to investigate whether this

23  document correctly states that this individual, Sa'id Awada,

24  age 17, was killed in Jerusalem during an operation of the Al

25  Aqsa Martyr Brigades?

1              MR. ROCHON:  Objection, your Honor.

2              THE COURT:  Overruled.  He can answer that.

3   A.  This is clear from the document, and I believe they also

4   took public responsibility.

5   Q.  Now, I would like to direct your attention to tab E behind

6   Al Aqsa Martyr Brigades.

7              Have you had an opportunity to look at Exhibit 537 in

8   evidence?

9   A.  E you say, yes.

10  Q.  E, like echo.

11  A.  Yes.  One minute, please.

12             Yes.  I know this document, yes.

13  Q.  What is it?

14  A.  This is the official designation by the American

15  administration of the Al Aqsa Martyr Brigades as an FTO,

16  meaning a foreign terrorist organization.

17  Q.  What is the date of that designation, according to this

18  document?

19  A.  March 25, 2002.

20  Q.  Just so we are clear, is March 25, 2002 before the date of

21  June 17, 2002?

22  A.  Yes, it is.

23  Q.  So at the time of the June 19 attack, was the Al Aqsa

24  Martyr Brigades a designated terrorist organization by the

25  United States Department of State?

1   A.  Yes, it was.

2   Q.  Now, are you familiar, based on your work and your review

3   of various documents, with the relationship between the

4   Palestinian Authority and the Al Aqsa Martyr Brigades?

5   A.  Yes.

6   Q.  Do you have a view as to whether the Palestinian Authority

7   and the PLO were providing financing to the Al Aqsa Martyr

8   Brigades in and around the time of this attack, June 19, 2002?

9           MR. ROCHON:  Objection.

10          THE COURT:  I am going to sustain the objection.  I

11  think that's a fact to be established rather than an opinion.

12  So if you want to direct him to some documents or something

13  that indicates that.

14          MR. YALOWITZ:  Sure.  We can do that.

15  Q.  Let's go to tab D in your binder, which is Exhibit 496.

16  A.  Yes.  I'm with you.

17  Q.  Great.

18          This document, Exhibit 496, let's just get oriented,

19  are you looking at the first page?

20  A.  I do.

21  Q.  You see at the top it says, "Unclassified, U.S. State

22  Department"?

23  A.  Yes, I do.

24  Q.  Then it says below that "released in full"?

25  A.  Yes.

F1N8SOK5                          Shrenzel - direct

1   Q.  Then the title of the document is "report pursuant to," and

2   then it's got the name of the law that the report is pursuant

3   to?

4   A.  Yes, I see it.

5           MR. YALOWITZ:  With the Court's permission, I would

6   just like to read the first two sentences.

7           THE COURT:  Yes.

8           MR. YALOWITZ:  Thank you.

9   Q.  "This report is submitted in accordance with Title VIII of

10  Public Law 101-246 (the PLO Commitments Compliance Act of 1989

11  - PLOCCA), as amended.  It covers the period from December 16,

12  2001 to June 15, 2002 and is consistent with Section 566 of the

13  Foreign Operations, Export Financing, and Related Programs

14  Appropriations Act 2002."

15          Do you see that?

16  A.  I do.

17  Q.  I would like to now direct you to page 5 of this report.

18  Just let me know when you're there.

19  A.  I am there.

20  Q.  I would like to direct you to the first full paragraph,

21  which is in the top third of that page after the carryover

22  paragraph.  Do you see that?

23  A.  I do.

24          MR. YALOWITZ:  May I read, your Honor?

25          THE COURT:  Yes.

1   Q.  I am looking at the second sentence.

2           "Documents seized by the Israeli Defense Forces during

3   incursions into Palestinian controlled areas in March and April

4   show direct payments from the PA to Fatah party activists, some

5   of whom were also affiliated with the Al Aqsa Martyr Brigades,

6   who had been involved in violence."

7           I would also like to direct you to tab P in your

8   binder, P like pop.  It's the very last one.  Exhibit 1142.

9   A.  I see it.

10  Q.  Now, you see this also says, "Unclassified, U.S. Department

11  of State"?

12  A.  Yes.

13  Q.  Then below that it says "released in full"?

14  A.  Yes.

15          MR. YALOWITZ:  Then may I read a portion of the first

16  sentence, your Honor?

17          THE COURT:  Yes.

18          I'm sorry.  What exhibit are you on?

19          MR. YALOWITZ:  I am on P, like poppa.

20          THE COURT:  Exhibit 1142?

21          MR. YALOWITZ:  Yes, sir.

22          THE COURT:  Let's try to keep with the exhibits so the

23  record can be clear.

24  Q.  "This report and related presidential determinations are

25  transmitted in accordance with Section 804 of the Foreign

F1N8SOK5                          Shrenzel – direct

1   Relations Authorization Act, fiscal years 1990 and 1991, (the

2   PLO Commitments Compliance Act of 1989 – PLOCCA), amended."

3            Then I will continue on the next sentence.

4            "It covers the period from December 16, 2003 until

5   June 15, 2004."

6            I would like to direct your attention, Mr. Shrenzel,

7   to page 5.

8   A.  I am there.

9   Q.  Top of page 5.

10           MR. YALOWITZ:  May I read, your Honor?

11           THE COURT:  Yes.

12  Q.  "Past PLOCCA reports have discussed direct payments from

13  the PA to Fatah party activists, some of whom were deeply

14  involved in the ongoing violence.  Such payments continued

15  during this reporting period."

16           Now, I would like to direct you to Exhibit 451, which

17  is tab C in your binder.

18           Whose verdict is this?

19  A.  One moment, sir.  This is the verdict of Marwan Barghouti.

20  As I mentioned, and we saw on the clip, is the head of Fatah

21  organization in the West Bank.

22  Q.  I would like to direct you to the third page in, table of

23  contents, "Statements of the defendant during his interrogation

24  and other evidence with respect to his role and involvement in

25  the terrorist attacks."  Do you see that?

F1N8SOK5                         Shrenzel – direct

1    A.  Yes, I do.

2    Q.  Then, unfortunately, our pages are not numbered so bear

3    with me.  I am just going to find the particular comment.  I

4    will find the page I meant to mark.

5           So we are on page 000401.  It's on the left-hand page

6    of our binders.

7    A.  Again, please, the number of the page.

8    Q.  000401.

9           THE COURT:  Stamped P7: 000401.

10          MR. YALOWITZ:  Yes, sir.

11   A.  401.  I'm there, sir.

12   Q.  First of all, do you see the heading where it says number

13   3, "provision of funds, weapons and explosives for carrying out

14   terrorist attacks"?

15   A.  I do.

16   Q.  You see we go one, two pages and then a little more, and

17   that's the discussion there about provision of funds, weapons,

18   and explosives for carrying out terrorist attacks?

19   A.  On the same page, yes?

20   Q.  Yes.  Then it continues for another page, and then a little

21   over onto the third page.

22   A.  Please try to direct me more specifically.  What words does

23   the paragraph begin with?

24   Q.  Let's just look together at paragraph 68 on the page right

25   after 401.

F1N8SOK5                          Shrenzel – direct

1              Are you with me on paragraph 68?

2    A.   I am.

3    Q.   I would like to go to the second paragraph under 68.

4              MR. YALOWITZ:  May I read, your Honor?

5              THE COURT:  Yes.

6    Q.   "The defendant emphasized that the military -- "

7              THE COURT:  Just a minute.

8              MR. ROCHON:  May we approach?

9              THE COURT:  Come on up.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1N8SOK5                          Shrenzel - direct

1              (At the sidebar)

2              MR. ROCHON:  We collectively missed an Arafat that is

3    on this page, which was just directed to me by one of my

4    colleagues, in the middle of paragraph 68, and I know it was

5    inadvertent.

6              THE COURT:  I missed it.

7              MR. YALOWITZ:  I won't direct the jury to that item.

8    We can fix it on the break.

9              THE COURT:  When you say they are not going to be

10   directed to that page, you already directed them to that page

11   so what are you going to do?

12             MR. YALOWITZ:  I just wanted to read this paragraph.

13             THE COURT:  Is that all right?

14             MR. ROCHON:  It's probably our mistake.

15             Do you know when you're going to break?

16             THE COURT:  Probably in the next 10, 15 minutes at the

17   most, or now.

18             MR. YALOWITZ:  I just want to complete this line.

19             THE COURT:  I will let you do that.  You tell me when

20   it is convenient.

21             (Continued on next page)

22

23

24

25

F1N8SOK5                         Shrenzel - direct

1              (In open court)

2              MR. YALOWITZ:  May I read, your Honor?

3              THE COURT:  Yes.

4    BY MR. YALOWITZ:

5    Q.  "The defendant" -- by the way, who is the defendant here?

6    A.  Marwan Barghouti.

7    Q.  "The defendant emphasized that the military operations

8    could not have taken place without funding from blank.  He

9    explained the issue:  There is someone who comes and says, 'I

10   want a thousand shekels.'  He might receive a thousand shekels.

11   I do not ask him, but maybe next week he will go shoot.  I do

12   not care.  During the course of his interrogation, the

13   defendant could not remember the details of the financial

14   assistance that he gave to Fatah field operatives and explained

15   that hundreds of operatives would approach him with requests

16   for financial assistance in order to fund military activities."

17              Let's go to tab G in your binder.

18              Are we on 626, Arafat's and the PA's involvement in

19   terrorism according to captured documents?

20   A.  Yes, we are.

21   Q.  Let's turn to page 2, the abstract.  Are you there?

22   A.  I am.

23   Q.  I am looking at the middle of the page, about five lines up

24   from where the three-ring binder's middle ring is.  You see

25   where it says "the financial dimension"?

F1N8SOK5                          Shrenzel – direct

1    A.  Yes.

2              MR. YALOWITZ:  May I read, your Honor?

3              THE COURT:  Yes.

4    Q.  "The financial dimension, continuous financing of the

5    terrorist infrastructure, personally approved by Arafat and

6    carried out by the PA civilian entities, the heads of the PA

7    security apparatuses and Arafat's associate, Fuad Shubaki."

8              Let's go to tab H.  Do you have 631 before you?

9    A.  Yes, I do.

10   Q.  "Palestinian Authority captured documents, main

11   implications"?

12   A.  I do.

13   Q.  Let's go to the third page in.  It says page 2 at the top.

14   Are you there?

15   A.  Page 2 or 3?

16   Q.  It's the third page of the document, but I am looking at

17   the page that says 2 at the top.

18   A.  OK.

19   Q.  There is an item B, paragraph B.

20   A.  Yes.

21             MR. YALOWITZ:  May I read, your Honor?

22             THE COURT:  Yes.

23             MR. YALOWITZ:  I just want to direct the jury and

24   witness to this paragraph.

25   Q.  "Arafat is assisted by the PA apparatuses and his personal

F1N8SOK5                    Shrenzel – direct

1   associates in the transfer of the money.  After he approves the

2   sums of money, Arafat is assisted by the PA's Finance Ministry.

3   In other words, the PA's civilian apparatuses are involved in

4   the transfer of funds to terrorist activists, from the senior

5   level down to the junior level.  In addition, Arafat is helped

6   by his confidante, Fuad Shubaki."

7           I would like to direct your attention now, Mr.

8   Shrenzel, to tab -- I don't have what I was thinking of.

9           Here it is.  Tab M, Exhibit 889.

10          Who is the defendant whose verdict this is, Mr.

11  Shrenzel?

12  A.  Sorry.  I lost track.

13          Yes.  This is the verdict of Fuad Shubaki.  It's

14  Arafat's right henchman with regard to money transfers.

15          MR. ROCHON:  Objection.

16          THE COURT:  Overruled.

17          Next question.

18  Q.  What was the relationship between Fuad Shubaki and Arafat?

19  A.  Fuad Shubaki, as I said, was Arafat's closest confidante

20  regarding money transfers, purchase of arms.  I believe part of

21  this subject was presented by the previous witness, Mr.

22  Eviatar, for example, the whole --

23          MR. ROCHON:  Objection.  Not responsive.

24          THE COURT:  He can finish his answer.

25  A.  The whole issue of purchasing the Karine A ship of lethal

F1N8SOK5                          Shrenzel – direct

 1    weapons, a purchase that was frustrated by the Israeli Navy.

 2            Also, Mr. Shubaki was convicted for supplying

 3    financial assistance to scores of Al Aqsa Martyr Brigades.

 4    Q.  Let's go to tab J, Exhibit 829.

 5            Do you have Exhibit 829 before you?

 6    A.  I do.

 7    Q.  "The Al Aqsa Martyrs Brigades (on U.S. State Department

 8    list of terror organizations) and the Fatah organization are

 9    one and the same, and Yasser Arafat is their leader and

10    commander."

11    A.  I see that.

12    Q.  I would like to direct your attention to the executive

13    summary on the second page.

14    A.  I'm there.

15            MR. YALOWITZ:  May I read, your Honor?

16            THE COURT:  Yes.

17    Q.  "Documents captured by the IDF during Operation Defensive

18    Shield prove unequivocally that the Fatah movement and the Al

19    Aqsa Martyr Brigades are one and the same.  The documents

20    clearly indicate that not only are the Al Aqsa Martyr Brigades

21    a pseudonym for taking responsibility for terrorist attacks

22    carried out by Fatah, but they are also a terrorist apparatus

23    which up until the IDF Defensive Shield operation was in the

24    process of institutionalization and intensification of its

25    suicide and murderous attacks.  The captured documents

F1N8SOK5                          Shrenzel - direct

1    demonstrate that Arafat and other senior PA officials (Marwan

2    Barghouti is of note) are the leaders of the Al Aqsa Martyr

3    Brigades and finance its terror activities."

4            Now, when was Operation Defensive Shield, Mr.

5    Shrenzel?

6    A.  It began in the end of March 2002.  This month of March was

7    one of the worst in terms of civilian casualties in Israel,

8    more than 130 persons lost their life in terrorist attacks

9    during that month.

10           MR. ROCHON:  Objection.

11           THE COURT:  Overruled.  You can finish.

12   A.  At the end of that month, Israel decided that it is

13   necessary to carry out a wide-scale military operation in order

14   to derail this process or this deteriorating situation of

15   continuous ongoing terrorist attacks on a daily basis.  So,

16   basically, the IDF entered the main Palestinian cities and some

17   refugee camps, arrested senior activists, and also seized some

18   of the documents that we viewed in our cases, and it lasted for

19   about a month and a half or two months, till the end of May,

20   and it gradually, only gradually, not immediately, produced

21   some positive results from the Israeli point of view; to some

22   extent lowering the scope of terrorism, but it took a much

23   longer time to calm the situation almost altogether.

24   Q.  As of June 2002, were the terror attacks continuing?

25   A.  Yes, as we see, of course.  As I explained, the effects of

F1N8SOK5                          Shrenzel - direct

1   the operation were very gradual.  It was not immediately.  It

2   didn't bring about an immediate halt in the Palestinian

3   terrorist activities.

4   Q.  As of June of 2002, was the financing continuing?

5               MR. ROCHON:  Objection, your Honor.

6               THE COURT:  Overruled.

7               You can answer.

8   A.  Yes.  We have strong evidence, as a matter of fact, that

9   Arafat himself provided financial aid to AAMB squads just a few

10  days after the attack that we are discussing, namely, a few

11  days after June 19.

12              MR. ROCHON:  Objection, your Honor.

13              THE COURT:  Overruled.  You can cross-examine.

14  Q.  I want to just take you back to the Sa'id Awada file, and

15  in particular, tab A, which is Exhibit 19.

16              Maybe I went too fast.  It's the very first tab in the

17  binder.  It's tab A.

18  A.  Yes.  Exhibit 19.  Yes.

19  Q.  OK.  Great.

20  A.  Some of it we already read, I believe.

21  Q.  I just want to turn to the fourth page in that binder.

22  A.  In the tab, yes?

23  Q.  Fourth page in that tab.  I'm sorry.

24  A.  What is the number, please?

25  Q.  It's 6830.

F1N8SOK5                          Shrenzel – direct

1    A.  Yes, sir.

2    Q.  Looking at the second bullet under 6830, it says, "He was

3    martyred on June 18, 2002, while executing the Jerusalem

4    martyrdom operation."  Do you see that?

5    A.  I do.

6    Q.  Have you had the opportunity to evaluate whether the attack

7    took place on June 18 or June 19?

8    A.  The attack that we are dealing with took place on the 19th

9    of June.  Unfortunately, this reflects how successive the

10   attacks were.

11              MR. ROCHON:  Objection.

12              THE COURT:  Sustained.  What is your question?

13   Q.  Have you satisfied yourself that the attack of Sa'id Awada

14   took place on June 19?

15   A.  Absolutely.

16   Q.  And are you satisfied that the attack was an Al Aqsa

17   attack?

18              MR. ROCHON:  Objection.

19              THE COURT:  Overruled.  You can cross-examine.

20   A.  Absolutely.

21              MR. YALOWITZ:  Your Honor, I am ready to move to a new

22   topic.

23              THE COURT:  Can I send the jurors home early?

24              MR. YALOWITZ:  Of course, your Honor, you should do

25   so.

F1N8SOK5

1          THE COURT:  Thank you for it.

2          Ladies and gentlemen, don't discuss the case.  Keep an

3     open mind.  We are going to start at 9:30.  We will have you

4     come in at 9:45.

5          This is what I am going to do on Monday.  I think

6     there may be some inclement weather on Monday.  I am going to

7     treat you to lunch.  When you arrive before 9:45, we are going

8     to send in lunch orders.  You fill out what you want, and then

9     we will send the lunch in and I will have it arrive by 12:30,

10    12:45, so you can eat in the jury room, if you like, or you can

11    go out if you wish.  Just do me a favor, don't spread it around

12    because all the other jurors will want lunch too.  So this will

13    be our secret.

14         Get some rest.  Have a good weekend and I will see you

15    on Monday.

16         (Jury exits courtroom)

17         MR. ROCHON:  I have a series of objections with

18    reference to AAMB and I wanted to explain.

19         This morning we had an argument about whether Exhibit

20    503, that guy's book can come in, and you said not, and asked

21    about the basis for the conclusion that it was other than what

22    is in the GIS file.  It developed that there wasn't another

23    basis and you said, if there wasn't another basis, then the

24    witness shouldn't be testifying about it.

25         MR. YALOWITZ:  That's not what it developed.

F1N8SOK5

1    THE COURT:  Mr. Yalowitz, relax.  As Mr. Rochon said

2    in opening, take a deep breath.  Relax.

3    The reality is Mr. Yalowitz read directly from the

4    binder the conclusions that it was the AAMB.

5    MR. ROCHON:  I agree.  That was from our clients'

6    file.  Then asked, have you been able to cross-check that?

7    THE COURT:  I don't remember us getting a direct

8    answer to that question.  What do you say he said in response

9    to that question?

10    MR. ROCHON:  He said, yes, that he had cross-checked

11    it.

12    THE COURT:  I don't know how he cross-checked.  That's

13    why I asked, even before he finished the question, I asked him,

14    do you mean did he check it with someone else or did he check

15    to see if it was verified?  I am not sure what answer you say

16    he gave that was problematic.

17    MR. ROCHON:  Mr. Yalowitz has admitted there is not a

18    public claim or credit to that.

19    MR. YALOWITZ:  I didn't admit that.  I wish he would

20    stop misrepresenting what I said.

21    THE COURT:  Mr. Yalowitz, why don't you just relax a

22    little bit?  We are professionals here.

23    MR. ROCHON:  If I misunderstood --

24    THE COURT:  What is your objection and what do you

25    want me to do about it?  He said that he had a conclusion that

F1N8SOK5

1    they were involved.  I said to Mr. Yalowitz, before you go

2    there, demonstrate what the basis of that conclusion was.  He

3    pulled out the binder and he quoted him the language.  Then he

4    asked him, Had you cross-checked that?  I still don't quite

5    know exactly what that is supposed to mean, but he did not make

6    specific reference to anything that is inadmissible in this

7    case.  Now, if you want to follow up on that, that's fine and

8    dandy, but I don't know what you want me to do at this point

9    with regard to that testimony.

10                   (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1nQsok6

1          MR. ROCHON:  Your Honor, I understood that cross-check

2     meant to look to other sources, and that's what I thought the

3     witness testified to.  That is the basis for my objection.  We

4     were not aware that there was any other source that A and B

5     took credit, other than what's in our client's file and you've

6     admitted it.

7          THE COURT:  You said it differently than what I

8     remember.  The testimony was not -- and I could be corrected.

9     I didn't think the testimony was whether they took credit.  I

10     thought the testimony was that they were responsible; not that

11     they admitted that they were responsible.  I think there were

12     numerous instances in this trial where one might look either at

13     the direct or circumstantial evidence where people have said

14     that they are involved.  In fact, one cross-check was that it

15     says so in some of these reports, and, quite frankly, the fact

16     that the U.S. designated them a foreign terrorist organization

17     is a way to check whether or not there is any other basis for

18     that conclusion.  So I don't see anything inappropriate about

19     the nature of those questions.

20          MR. ROCHON:  Thank you, your Honor.

21          THE COURT:  Mr. Yalowitz, what I need from you -- and

22     I would be happy to get it sometime this weekend, but either

23     way, before you have to deal with it.  You gave me earlier some

24     deposition designations.

25          MR. YALOWITZ:  Right.

F1nQsok6

1          THE COURT:  And you had some dispute about their

2     cross-designation.  I looked at your letter and the

3     designations.  However, I can't do anything with it unless I

4     know what lines you object to that they cross-designated.  I

5     don't think you've given me that.  I need to you to identify at

6     some point before we get to this which pages and lines that you

7     object to to their cross-designations, then I can be prepared

8     to address it.

9          MR. YALOWITZ:  Here is my problem with that:  I

10    designated what is really about a half hour of reading of

11    deposition testimony.

12         THE COURT:  OK.

13         MR. YALOWITZ:  It is from PA employees where the

14    defendants were there in other cases.

15         THE COURT:  OK.

16         MR. YALOWITZ:  What I got in response was probably

17    four or five hours of deposition testimony; none of which is

18    responsive to the actual testimony that I designated.

19         So what they are trying to do is dump in a whole bunch

20    of hearsay in my case that has nothing to do with the

21    depositions that I designated.

22         THE COURT:  You see, I understand your position and

23    genuineness, Mr. Yalowitz.  The problem I have had throughout

24    this whole case, you can't just throw the kitchen sink at me

25    and tell me to pick through and try to figure out what is the

F1nQsok6

 1    objectionable part.  Neither side could do that, and both sides

 2    have been doing that.  I can't sort through the good and the

 3    bad here.

 4            You have to tell me what specifically you object to

 5    and I can look at those lines, and I will either say it's out

 6    or it's in.  I can't do anything with the way you presented it

 7    to me at this point.

 8            MR. YALOWITZ:  Let me try to get you something

 9    tomorrow.

10            THE COURT:  As soon as you can, I will rule and if you

11    say, "Judge, this line is inappropriate, this page is

12    inappropriate," then I can rule.  But I can't say, OK, I agree

13    with you.  What does that mean?  Am I supposed to just dump all

14    of their designations?  Or am I supposed to figure out which

15    ones are appropriate and which ones aren't?

16            MR. YALOWITZ:  I think, that, frankly, proper course

17    here -- I think if you give the defendants some guidance that

18    you can't designate things unrelated.  You know, I understand

19    if the guy says, "I was speeding down the highway," and then

20    the next sentence says, "because my wife was in labor," and

21    they designate the one but not the other, OK, that ought to be

22    included.

23            MR. ROCHON:  Can I insert something?  To help.  To

24    help.  Remember this morning, it did help when I interrupted,

25    so just indulge me.  I think we can do a better job on our end

F1nQsok6

1    regarding our counter-designations that would put Mr. Yalowitz

2    in a better position to inform the Court.  That's why I was

3    interrupting.

4                THE COURT:  You will give him a different set of

5    counter-designations?

6                MR. ROCHON:  We will color-code it a little bit to

7    identify it better.

8                THE COURT:  You are going to change your designations?

9                MR. ROCHON:  I think we need to indicate more

10   directly -- I think Mr. Yalowitz may have some good points.

11               MR. YALOWITZ:  When are we going to get those, your

12   Honor?

13               THE COURT:  To the extent he has good points, that

14   means you're going to drop those designations.  I don't need

15   another color, OK?  I just need you to either take it out or

16   leave it in.

17               MR. ROCHON:  I think we can do better and it will help

18   the Court.

19               THE COURT:  When are you going to do that, so I can

20   hear if he has some specific objection?

21               MR. YALOWITZ:  How about tonight?

22               MR. ROCHON:  I think that might be too soon.  How

23   about tomorrow?

24               MR. YALOWITZ:  How can I get them to the Court

25   tomorrow?

F1nQsok6

```
 1          THE COURT:  When are we supposed to address this?

 2          MR. YALOWITZ:  Monday.

 3          THE COURT:  Mr. Yalowitz, you have this choice:  They

 4   with either get it to you tomorrow and you can wait until you

 5   get them and then decide whether you want to give me

 6   designations or you can sit down tonight before you get it and

 7   you can give me the designations.  Those are your two choices.

 8          I am just saying to you, I want to help you, but

 9   you've got to give me some information.  I will cut out

10   whatever is extraneous and not appropriate if you tell me which

11   ones that those are.

12          MR. YALOWITZ:  Your Honor, I'm afraid I am not going

13   to be able to wait for them because they've proven --

14          THE COURT:  Then you give me as soon as you want.

15          MR. YALOWITZ:  I'm going to have to do that.

16          THE COURT:  If they still give you something that

17   makes it easier for me to say, well, he complained about this,

18   but they took it out, then that's easier for me to rule.  If

19   you don't want to wait for it, get it to me as soon as you can

20   if you want me to resolve it by Monday morning.  I understand

21   your problems --

22          MR. YALOWITZ:  It's not fair to you, right.

23          THE COURT:  What am I supposed to do?  I can't sleep

24   here every night just waiting for your fax to come in.

25          MR. YALOWITZ:  I agree.  This is something that should
```

F1nQsok6

1    have been resolved long ago.

2              THE COURT:  That's why I'm the one raising it now, so

3    we can resolve this because we haven't discussed it.  I need to

4    know what you object to.  If you want to wait until they change

5    their designations, you can.  If you want to give it to me as

6    quickly as possible, then go ahead immediately right now and

7    tell me what lines you want me to cut out.  If I agree with

8    you, I'm going to cut those lines out, assuming that's the

9    relief you're asking for.

10             MR. YALOWITZ:  The other thing is I don't want my

11   reader to be reading their lines if -- well, let's just see

12   what there is.

13             THE COURT:  Then throw it in the garbage when you get

14   it.  Are you talking about you don't want to read the

15   designations --

16             MR. YALOWITZ:  He can stand up and add the

17   designations.

18             THE COURT:  Let's put it this way:  You two should try

19   to see if you can work out a mutual agreeable process.  If you

20   can't, I will resolve it.

21             MR. YALOWITZ:  Your Honor, I have one scheduling

22   issue, which is that -- let me see if I can resolve it with

23   Mr. Rochon.  If I can't, I may ask for a little indulgence

24   around the lunch hour.

25             THE COURT:  On Monday?

F1nQsok6

1          MR. YALOWITZ:  On Monday.

2          THE COURT:  I have a faith the two of you might be

3     able to work it out.

4          MR. YALOWITZ:  You have a lot of faith then, your

5     Honor.

6          MR. ROCHON:  Thank you, your Honor.

7          THE COURT:  I'm an eternal optimist.  Have a good

8     weekend.  Get some rest so we can start out with a framework

9     for going forward in an efficient manner.  You know how I'm

10    approaching this at this point, so don't do it the way you want

11    to do it.  Do it the way you know I'm going to enforce it.  I'm

12    going to move this case along next week.  Be efficient and

13    let's deal with it and get to me whatever issues you need to

14    get to me as early as possible.

15          (Trial adjourned to January 26, 2015 at 9:30 a.m.)

16

17

18

19

20

21

22

23

24

25

```
 1                        INDEX OF EXAMINATION

 2    Examination of:                           Page

 3    ISRAEL SHRENZEL

 4    Direct By Mr. Yalowitz . . . . . . . . . . .1269

 5                       PLAINTIFF EXHIBITS

 6    Exhibit No.                              Received

 7     1194 and 1195  . . . . . . . . . . . . . .1270

 8     935  . . . . . . . . . . . . . . . . . . .1275

 9     949  . . . . . . . . . . . . . . . . . . .1275

10     965  . . . . . . . . . . . . . . . . . . .1276

11     175  . . . . . . . . . . . . . . . . . . .1276

12     178  . . . . . . . . . . . . . . . . . . .1277

13     936  . . . . . . . . . . . . . . . . . . .1278

14     198  . . . . . . . . . . . . . . . . . . .1278

15     200  . . . . . . . . . . . . . . . . . . .1279

16     372  . . . . . . . . . . . . . . . . . . .1292

17     233  . . . . . . . . . . . . . . . . . . .1301

18     17, 26 465, 467  . . . . . . . . . . . . .1301

19     477  . . . . . . . . . . . . . . . . . . .1330

20     1134  . . . . . . . . . . . . . . . . . . .1358

21     196, clip 3,  . . . . . . . . . . . . . . .1359

22     338  . . . . . . . . . . . . . . . . . . .1361

23     19 and 139 . . . . . . . . . . . . . . . .1364

24

25
```