F1qQsok1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    MARK I. SOKOLOW, et al.,

4                  Plaintiffs,

5            v.                          04 CV 397 (GBD)

6                                        Trial

7    PALESTINE LIBERATION
     ORGANIZATION, et al.,
8
                  Defendants.
9
     ------------------------------x
10                                       New York, N.Y.
                                         January 26, 2015
11                                       9:40 a.m.

12   Before:

13                    HON. GEORGE B. DANIELS,

14                                       District Judge
                                         and a Jury
15                            APPEARANCES

16   ARNOLD & PORTER LLP
          Attorneys for Plaintiffs
17   BY:  KENT A. YALOWITZ
          PHILIP W. HORTON
18        TAL MACHNES
          SARA PILDIS
19        CARMELA T. ROMEO
          RACHEL WEISER
20
     MILLER & CHEVALIER, CHARTERED
21        Attorneys for Defendants
     BY:  MARK J. ROCHON
22        LAURA G. FERGUSON
          BRIAN A. HILL
23        MICHAEL SATIN

24   Also present:  RACHELLE AVITAL, Hebrew interpreter
                    RINA NE'EMAN, Hebrew interpreter
25

F1qQsok1

1          (In open court; jury not present)

2          THE COURT:  Good morning.

3          MR. YALOWITZ:  Good morning, your Honor.

4          MR. ROCHON:  Good morning.

5          THE COURT:  Is everyone present?  We are still getting

6   our jurors.  Let me first address the issue of schedule.  This

7   is what I hope to do, unless the weather gets too bad too soon.

8          I am going to try to go until lunchtime.  I am going

9   to order the jurors lunch at 12:30.  Depending on how things

10  go, we are either going to adjourn sometime between 1:00 and

11  3:00.  It looks like more likely it's going to be 1:00 instead

12  of 3:00.  We will not be open tomorrow.  We will not be sitting

13  tomorrow.  We haven't got the official word yet that the court

14  is closed, but my guess is they are going to make a decision

15  sometime within the next 24 hours to close the court.  I am

16  going to tell the jurors we are going to pick up on Wednesday.

17  So that will be the schedule that we will work from.

18         I think we have about half our jurors.  Let me address

19  some of the issues that were raised.

20         Let me work backwards from my perspective.  Where is

21  Exhibit 226?  Mr. Yalowitz, do you intend on offering that as a

22  document?

23         MR. YALOWITZ:  226 we probably aren't going to need,

24  your Honor.  It's a large document that contains an

25  introduction that explains what these Fatah circulars are.

F1qQsok1

| | |
|---|---|
| 1 | THE COURT:  Do you intend to offer that? |
| 2 | MR. YALOWITZ:  I don't think I need it unless the |
| 3 | defendants have some kind of foundational objection to 185, |
| 4 | which they have not complained about.  185 is a Fatah circular |
| 5 | that the witness is going to talk about and explain. |
| 6 | THE COURT:  Are the Fatah circulars separate exhibits? |
| 7 | MR. YALOWITZ:  185 is all I need. |
| 8 | THE COURT:  185 is the only Fatah exhibit that is in |
| 9 | this communiqué that you intend to offer? |
| 10 | MR. YALOWITZ:  Yes.  I don't know that 185 is in the |
| 11 | communiqué.  The communiqué contains an introduction that |
| 12 | explains what these Fatah circulars are. |
| 13 | THE COURT:  My question is:  Do you intend to offer |
| 14 | 226 or any portion of 226? |
| 15 | MR. YALOWITZ:  Highly unlikely.  The only reason I |
| 16 | would offer any portion at all of 226 is if the Court requires |
| 17 | some kind of foundation for the witness to be able to explain |
| 18 | what 185 is.  He can do it because he knows it.  He studied it. |
| 19 | THE COURT:  Is 185 in 226? |
| 20 | MR. YALOWITZ:  I don't think so.  I don't remember. |
| 21 | THE COURT:  At this point, 226 you don't intend to |
| 22 | offer.  You intend to lay a foundation for 185 through this |
| 23 | witness and offer 185? |
| 24 | MR. YALOWITZ:  That's right.  I just warn the |
| 25 | defendants in case I needed 226, I wanted them to be prepared. |

F1qQsok1

1      MR. ROCHON:  Your Honor has already ruled that 185 can

2  come in.  We've already addressed that with you previously.

3      THE COURT:  I am going to assume 226 is not unless

4  that changes.

5      MR. YALOWITZ:  The only reason it would change is if

6  there is an objection to the witness talking about 185 and we

7  need additional documentation for foundation.

8      THE COURT:  Let's address that if you think at some

9  point that you want to offer 226.

10      What is 687?  Do I have a copy of that?

11      MR. YALOWITZ:  Is 687 a photo.

12      THE COURT:  Do I have a copy of the photo?  Did we

13  discuss that?

14      MR. YALOWITZ:  We discussed in principle the idea of

15  symbolic funerals.  I will tell you again this is something I

16  will only need if there is a problem with foundationalizing

17  some of the witness' testimony.

18      So let me give you a little background if I may, your

19  Honor.

20      THE COURT:  I thought I saw this someplace.

21      MR. YALOWITZ:  I think I sent this to you last week.

22      THE COURT:  I know we discussed several articles.  I

23  thought this was one of them.

24      MR. YALOWITZ:  I think it may have been.  There was so

25  much going on last week, I'm not a hundred percent sure.  I

F1qQsok1

1    think it was.

2              Let me just tell you, this is another one of those

3    just-in-case documents, your Honor.  One of the things I want

4    to make sure we have nailed down is that Al-Aqsa Martyr Brigade

5    publicly claimed credit for the January 27, 2002 bombing which

6    the witness is fully prepared to testify about.

7              THE COURT:  I thought we even had testimony.  Maybe

8    not.

9              MR. YALOWITZ:  I haven't gone back and read the

10   transcript.  I just want to make sure I dot that "I."  If there

11   is no objection to him testifying based on his expertise and

12   all the things he's reviewed, I don't need that photo.

13             Again, if there is some objection that there isn't an

14   adequate foundation in the record, he did explain how this

15   photo links Al-Aqsa Martyr Brigade to the Idris bombing.

16             THE COURT:  On Friday we already played Marwan

17   Barghouti's statement that he was at the funeral and he said he

18   was at the funeral because I remember when he started, I

19   thought he was going to testify about the substance of the

20   funeral and there was an objection, I sustained the objection,

21   and then you showed him the video, laid a foundation and said

22   that was a statement made at the funeral.

23             MR. YALOWITZ:  Right.  Right.

24             THE COURT:  Are we going to deal with this, do you

25   think?

F1qQsok1

| | |
|---|---|
| 1 | MR. YALOWITZ:  I think we have enough for this witness |
| 2 | to testify about Al-Aqsa Martyr Brigade claiming credit for |
| 3 | that attack.  I don't think I need the photo.  Again, if there |
| 4 | is an objection -- |
| 5 | THE COURT:  Well, the photo doesn't say they're |
| 6 | claiming credit for the attack. |
| 7 | MR. YALOWITZ:  Yes, but it's the interpretation of the |
| 8 | photo and some of the images in the photo that he was |
| 9 | explaining to me. |
| 10 | THE COURT:  I know, but that is a big leap to say by |
| 11 | the photo itself, I conclude that this is them taking |
| 12 | responsibility for the attack. |
| 13 | MR. YALOWITZ:  I think it is one piece of evidence, |
| 14 | among others, that he would rely on.  I don't think it is the |
| 15 | sole piece -- as I said, I don't think I really need the photo. |
| 16 | THE COURT:  You know the history of this better than I |
| 17 | do, the public history of this.  If the Al-Aqsa Martyr Brigade |
| 18 | ever publicly took credit for this attack, then anybody who has |
| 19 | heard that can say it. |
| 20 | MR. YALOWITZ:  I think we're going to be good without |
| 21 | the photo. |
| 22 | THE COURT:  If he knows that, he can say it. |
| 23 | It makes totally moot any argument that you need some |
| 24 | inference from the article that they took credit for the |
| 25 | attack.  You know better than I whether or not it's common |

F1qQsok1

1    knowledge that they took credit for the attack

2            MR. YALOWITZ:  It's not common knowledge here in New

3    York.

4            THE COURT:  Well, no, but over there.

5            MR. YALOWITZ:  But I don't have any problem with that.

6    I don't think we are going to need the photo.  Again, this was

7    an item that I was putting defendants on notice just in case we

8    have an objection and we need to be able to put it in that way.

9            THE COURT:  Do I need to give him a bunch of documents

10   and related testimony to inferentially prove that the Al-Aqsa

11   Martyr Brigade took credit for that attack?

12           MR. ROCHON:  Your Honor, this is an incident where the

13   Al-Aqsa Martyr Brigade did not publicly take credit for the

14   attack as far as we know.  It is not one of the ones where

15   there is a communiqué from someone saying they're from Al-Aqsa

16   Martyr Brigade taking credit for it.  So the evidence that the

17   plaintiffs want the witness to say that they took credit for

18   it, there is no public taking credit for it.  So, instead that

19   testimony is based on something like this, which is not a basis

20   for it.

21           If there is a fact that Al-Aqsa Martyr Brigade took

22   credit for it that is somewhere in evidence -- the only

23   reference to it I believe is in the Wafa Idris' file.  There is

24   a reference in that file which is in evidence which was

25   discussed last week which was rejected by the Court.  So that's

F1qQsok1

1  not in evidence so, the basis to assert that the Al-Aqsa Martyr

2  Brigade took credit for it is not on record.

3        It's an expert testifying to facts that are not in the

4  record, and it is based on something I guess like this. I hear

5  Mr. Yalowitz saying he has no problem with it. He has no

6  problem with it in the sense that he wants his witness to say

7  it, but we have a problem with it in that there are no facts in

8  the record to support that.

9        THE COURT: Mr. Yalowitz, somebody is going to have to

10  show me where it comes from. If they publicly took credit for

11  it, they either did so in a publication or did so in some other

12  communiqué or news program that this witness would have seen.

13        MR. YALOWITZ: I'm pretty comfortable that the witness

14  has seen public claims of credit by Al-Aqsa Martyr Brigade.

15        THE COURT: Then how come we don't have it? I want to

16  know what he's basing it on.

17        MR. YALOWITZ: Well, with the Court's permission,

18  perhaps the witness could answer that question.

19        THE COURT: No, I want to see what he saw.

20        MR. YALOWITZ: I think it's publicly available. My

21  recollection is in addition to the Idris' file, which until

22  last week was going to be in evidence as far as we understood,

23  in addition to the Marwan Barghouti marching at the funeral,

24  Marwan Barghouti remembers the symbol of the al-aqsa martyr --

25        THE COURT: I know but that's not taking credit for

F1qQsok1

1    the attack.

2             MR. YALOWITZ:  As I understand it, there is an Al-Aqsa

3    Martyr Brigade website that is maintained.

4             THE COURT:  If you want to pull that off the website

5    and put it in front of this witness and have the witness say he

6    looked at that website and has an independent recollection

7    either close in time or contemporaneously having seen that or

8    similar claims by the Al-Aqsa Martyr Brigade to take credit,

9    that puts it to rest, but he has got to --

10            MR. YALOWITZ:  Let me consult with him and see if we

11   can get a copy of that website printed.  We weren't planning to

12   do it because it's a website, but I don't think it's a problem

13   getting that pulled off the Internet.

14            THE COURT:  Look, it depends whose website it is and

15   it depends on what statements they made.  It's not hearsay to

16   say "I did it."  If they say "I did it," then they took credit

17   for it.  Whether they did it or not, who knows?  Who cares?

18   They wanted to take credit for it.  That's the fact to be

19   proven.  If you have anything to show him that publicly

20   indicates them taking credit for it, and he says he was also

21   aware and the person who reviewed other information which they

22   credit for it, I'll let it in.

23            I don't think this is a subject of a significant

24   inference.  Either they did or they didn't.  If they did, then

25   he can say so, if there is some proof out there that they did.

F1qQsok1

1    His conclusion that because they were at the funeral and they

2    had al-aqsa symbols at the funeral, that is not a reasonable

3    basis for him to say, yeah, they took credit.

4              MR. YALOWITZ:  I don't think we are going to have a

5    problem that.  Mr. Shrenzel has just indicated he wants to

6    consult with me to make sure we are locked and loaded on that

7    issue, if I could have a minute?

8              THE COURT:  Do you want to do that now or do you want

9    to discuss some of these other issues?

10             MR. YALOWITZ:  I think the other issue that is ripe

11   are these in fairness counterdesignations which, if the Court

12   pleases, I think we're still waiting for the jurors.

13             THE COURT:  Yes, I'm ready to deal with those now.

14             MR. YALOWITZ:  Maybe Mr. Shrenzel, why don't you step

15   down and talk with Ms. Machnes about getting that website

16   printed?

17             THE COURT:  Let me go to the other letter.  I'm

18   talking about their letter about the redactions.

19             MR. YALOWITZ:  I haven't even read it, your Honor.  I

20   haven't even read it.  I really, you know -- it came in very

21   late last night.  I was up early this morning getting ready for

22   the storm.  I have no idea what it says.

23             THE COURT:  Take an opportunity to look at it.  Most

24   of it I don't think that you would disagree with or even if you

25   disagree with it, we've already resolved.  I think the main

F1qQsok1

1    issue that they want that we haven't already explicitly

2    addressed was defendant's proposed redaction of Mucataa and

3    Palestinian Authority in some places.

4             I can tell you that my view even before the other

5    stuff that we talked about at sidebar after its name was

6    inadvertently not redacted, there's an Exhibit 452 I think

7    where the redaction was you inserted Hamas at picture A.

8    Consistent with my ruling, there should be no substitution of

9    description.  That's not the definition of a redaction.  It

10   should be a blank just like the previous ones and all the

11   redaction should be consistent in that way.

12            We talked about person A, and we talked about

13   isthabarat.

14            MR. YALOWITZ:  Right.

15            THE COURT:  So I don't think that is an issue.  The

16   only thing that seems to be an issue that they raised, and I

17   think we discussed it partially already, is the Mucataa

18   reference.  Quite frankly, I will hear from them again if I

19   need to, but my position is that I don't think that needs to be

20   redacted.  I think that that is a little different than all the

21   other references.  The person is admitting committing an

22   offense, and the way he committed the offense, he says he met

23   with somebody at the Mucataa, and the person that he met with

24   helped him.  I think that's his description of his crime.

25            I think that it doesn't prove, one, whether or not --

F1qQsok1

1    it is not substantive evidence of whether or not that person

2    was a PA employee working at the behest of the PA or in the

3    scope of his employ.  It is not an accusation.  Nothing in this

4    statement says:  Yasser Arafat told us to do this or we were

5    taking direction from the PA or PLO when we did this.  I don't

6    think I can protect the defendants from the inference to be

7    drawn that if he wants to argue about it in the context of all

8    other evidence as to whether or not the meaning of Mucataa it

9    would be reasonable to infer that he was meeting with someone

10   who was acting on behalf of the PA to conclude that the PA

11   itself was complicit in his activities.  We have to discuss it

12   some more.  Why don't read the letter first, and I will let

13   them discuss it one more time if they wish, given my position,

14   and then we can be prepared to move forward.

15            The transcripts, I am going to use your chart that you

16   gave me over the weekend.

17            MR. YALOWITZ:  I just have one correction of the

18   chart, your Honor.

19            THE COURT:  Yes.

20            MR. YALOWITZ:  The Hussein Al-Sheikh deposition, I

21   left one counter-designation off of the chart to which I had no

22   objection.  So we are going to read that.

23            THE COURT:  So I don't need to address it.

24            MR. YALOWITZ:  You don't need to address it.  I just

25   didn't want them to think I was, you know --

F1qQsok1

1          THE COURT:  I think you had about four objections.

2     The portion on page 28, not 27, but the portion at the bottom

3     of 28 and the top of 29, I don't think that that is a proper

4     counter-designation.  I don't think that this witness is in any

5     position to know whether or not any money got to the Al-Aqsa

6     Martyr Brigade.  His opinion about it I don't think is

7     admissible.

8          By the nature of the deposition at best he was a

9     person who did not do so and was not aware of anybody else who

10    did so, and any evidence in this case that was done, he

11    apparently doesn't know about, so there is nothing in this

12    transcript that makes me believe he was in a position to be

13    able to say one way or another that the money is linked to the

14    Al-Aqsa Brigade.

15         MR. YALOWITZ:  So what are we reading from?

16         THE COURT:  I would say that as a counter-designation

17    that page 28/line 17 through 29/line 10 is not an appropriate

18    counter for this designation.

19         MR. YALOWITZ:  That's out.

20         THE COURT:  I can be convinced further.  I've looked

21    through the transcripts, not as carefully or thoroughly as I

22    wanted to look at the plaintiff's designations, but I did look

23    them over.

24         On Al-Sheikh, you said that you objected to --

25         MR. YALOWITZ:  I'm sorry, your Honor, did you have a

F1qQsok1

1    ruling on page 188 to --

2            THE COURT:  Oh, I'm sorry.  I'm not sure I understand

3    the nature of your objection.  He is talking about the

4    procedures and the process and how the budget transfers money

5    from the PA to the PLO and other entities.  That seems to be

6    what was being inquired by plaintiff in that area.  What did

7    you specifically was a problem with those?

8            MR. YALOWITZ:  The real thing I had a problem with,

9    your Honor, and the reason we brought it up, is the sort of

10   additional point that he kind of throws in not in response to a

11   question starting on 189/line 14 where he is saying

12   hypothetical number, scarcely funds --

13           THE COURT:  Where are you 19?

14           MR. YALOWITZ:  189 -- are you on 189?

15           THE COURT:  Yes.  15?  Line 15?

16           MR. YALOWITZ:  Right.  So starting with line 14, you

17   see the question is:

18   "Q.  Yes."

19           Which isn't really a question, and then the guy says

20   "because of a scarcity of funds, let's say that the PLO is

21   entitled to a hypothetical number, a million dollars.  We don't

22   have a million to transfer the funds.  I'm just worried that

23   could be confusing to the jury could be misconstrued.  He is

24   not giving real evidence there he is talking about

25   hypotheticals and particularly saying we have a scarcity of

F1qQsok1

1    funds could be prejudicial in a case where we are asking the

2    jury to award damages?

3         THE COURT:  He seems to be describing as was

4    questioned by the plaintiff.  He seems to be describing the

5    process for transferring money.  He is not describing a

6    particular instance for transferring money.  He is saying,

7    "Look this is the way it works.  We ask for money; they give it

8    to us.  If we're short dollars, we have them transfer it to

9    this place."  I think his the use of the words hypothetical --

10   as a matter of fact, it says hypothetical number; doesn't mean

11   to say hypothetical instance.  They pick a number.  A million

12   dollars, if we were going to transfer a million dollars.  If

13   anything, it doesn't imply that they don't have a lot of money,

14   and it doesn't imply that they do have a lot of money.  He's

15   asking for a million dollars.

16        MR. YALOWITZ:  That we'll leave in, your Honor.

17        THE COURT:  Let me go through the next one quickly.  I

18   don't think I have a problem with 72.

19        He seemed to be talking about -- the way I read it,

20   and I read it quickly -- he said, "Look, I got a new job.  They

21   transferred me to a new job.  They kept me on salary until we

22   can figure out budget-wise how I can get paid on the new job.

23   And they worked it out that I should get paid by the Fatah" --

24   let me make sure I have it right -- "I should get paid in my

25   new position, then, the old salary carried me over until I got

F1qQsok1

1    a new salary with the new position."  Are you reading that some

2    way different?

3        MR. YALOWITZ:  No, I don't have a problem with that up

4    through line 9.  Where I think the witness is being cagey and

5    inappropriate, they ask him how long was the period of time.

6    He never answers that question.  He says, "The problem was that

7    all these things were mixed up."

8        Then the follow-up is, "Do you mean that nobody knew

9    how long the period was?"

10        He says, "I mean by that, that in 2000 the Intifada

11    interrupted and the whole area was prevailed with violence and

12    all the authorities' buildings were destroyed.  There was no

13    stability in the political Palestinian organization in general.

14    The Palestinian political system was no longer stable.

15    Different organizations were not working or active as they used

16    to be before the Intifada.  Working hours were not regulated

17    any more.  This is what I mean."

18        So he never even answers the question which is how

19    long was it, and he goes off on a rant about all the bad

20    things --

21        THE COURT:  I don't feel strongly about whether or not

22    there should be a counter-designation on your case or a

23    designation on their case.  I was just trying to figure out

24    whether you objected to it in both instances.  It would seem to

25    me, I assume this is going to be at least one of the basic

F1qQsok1

1    themes that we are going to hear from one or more defense

2    witnesses that during this period of time that they were not as

3    organized as they had been before that or after because of the

4    amount of hours.

5        MR. YALOWITZ:  This is a witness who is defendant's

6    employee.  I don't think they can read his deposition

7    testimony.

8        THE COURT:  The problem is that that is not why you

9    objected to it.  You can't be selective that way.  You can't

10   say, "I don't object to three-quarters of what they want to

11   read but then I just object to this part because I don't like

12   this part."

13       MR. YALOWITZ:  My problem, I have two problems with

14   73.

15       THE COURT:  Because you don't object to 122.  You

16   don't object to 143.  You don't object to 150.

17       MR. YALOWITZ:  Because those are fairly within the

18   scope, so I don't have a problem with it.  This is not fairly

19   within the scope.  It is not responsive to the question.

20   Number one, I'm telling you why I want it out.  Number two, I

21   don't think it meets the standard under 106.  If they are going

22   to try to read it as part of their case, we can deal with that

23   at a later time whether they can deal with it as part of their

24   case.

25       The thing I am saying to you for today is it's not in

F1qQsok1

1  fairness a counter-designation because he doesn't even answer

2  the question

3          THE COURT:  I know you weren't at the deposition, but

4  was there a question that you wanted to read about his salary,

5  and who he was employed by and who he was paid by?

6          MR. YALOWITZ:  Yes.

7          THE COURT:  At least the subject matter would be

8  relevant, right?

9          MR. YALOWITZ:  Like I said, I don't have a problem up

10  through 9, but 10 and going forward, he doesn't even answer the

11  question.  And that the PA's buildings were destroyed, that is

12  not in the subject matter of how long he was paid.

13          THE COURT:  I'm going to disagree with that.  The

14  building was destroyed and they can't write a check.  That

15  might explain why he wasn't paid.

16          MR. YALOWITZ:  His testimony was he did get paid.

17          THE COURT:  But he said he didn't get paid on a

18  regular --

19          MR. YALOWITZ:  No, he said he got paid every month.

20  He got paid.

21          THE COURT:  Right, you're right.

22          MR. YALOWITZ:  So even though all their buildings were

23  supposedly destroyed, he got paid.  I can argue that that's all

24  fine and dandy that he said that --

25          THE COURT:  He says the process was disrupted in terms

F1qQsok1

1  of where the payment was coming from and what the records were

2  of the payments because the buildings were destroyed.

3          MR. YALOWITZ:  He doesn't say that either.  All he is

4  saying is, he is just dumping in the record his opinion.  He

5  doesn't know that all the buildings were destroyed.  He didn't

6  go around and make a census of all the buildings.  He is just

7  saying that to get anti-Israeli government -- bad acts by the

8  government of Israel in the record.

9          THE COURT:  I can tell you that you are not going to

10  be able to keep out if they legitimately intend to offer

11  evidence that they were not in total control because the

12  building and infrastructure was damaged or destroyed.  You're

13  not going to keep that out.

14          MR. YALOWITZ:  I agree that if somebody comes with

15  personal knowledge and says, "We tried to arrest Nasser Aweis

16  but we couldn't find him because he wasn't coming to work and I

17  know because I was the one trying to arrest him," OK.  That at

18  least meets the relevancy.

19          But some guy who is not in the military, who is not in

20  the police, who is the secretary general of Fatah -- the reason

21  I like his testimony he is secretary general of Fatah, and the

22  PA is paying him.  So it goes to the relationship between the

23  PA and Fatah.  And he got paid every month during the whole

24  period of 2000 to 2004.  What possible relevance does it have

25  for him to say all the buildings were destroyed?

F1qQsok1

1          THE COURT:  It's in response to how long did you get

2     paid and what was the exact cutoff from when you transitioned

3     from one job to the other?  And his response is, well, there

4     was no exact cutoff because things were a little bit confused,

5     so I can't tell you exactly when I was supposed to get off

6     salary on one and start the other because the building was

7     destroyed, it was chaos at the time, and there weren't those

8     fine distinctions being drawn, and that clearly there was

9     nobody in the building who was concentrating on that particular

10    aspect of what was going on at the time.

11         Let me put it to you this way:  It is likely they are

12    going to get this in.  You can make a judgment that you are

13    going to wait until they read it out of context or in a

14    different context in their case or you get it now, read it, and

15    be done with it.

16         MR. YALOWITZ:  I don't want it read now.  And we can

17    deal with whether they want it read at another time.

18         THE COURT:  Mr. Rochon?  Mr. Hill?

19         MR. HILL:  I take it from what your Honor has said

20    that any other parts of the depositions you want us to play or

21    read in our case as opposed to when we cross in the plaintiffs

22    case.

23         THE COURT:  That's what I'm addressing now.

24         MR. YALOWITZ:  But wait, your Honor.

25         THE COURT:  If you feel strongly about it, you can try

F1qQsok1

1    to convince me this should be done on their case.  Like I said,

2    I am going to be fair about it in terms of giving you advance

3    notice that it is likely I am going to let them put this in.

4              MR. YALOWITZ:  This is something I asked to be able to

5    be heard on in writing.  I understand your inclination, but the

6    issue of these depositions and the counter-designations and

7    whether they can use their own depositions of their own

8    witnesses, they sent a letter -- they raised it with the Court

9    for the first time late last night.  This has been an issue for

10   quite a long time, and I would like to be heard on it in

11   writing.

12             THE COURT:  That's fine, but I don't know what

13   objections that you have to their other common designations.

14             MR. YALOWITZ:  I gave them to you.  It's very, very

15   long list, your Honor.

16             THE COURT:  You did?

17             MR. YALOWITZ:  Yes.  It's an exhibit to my letter.  It

18   goes on and on for pages.

19             THE COURT:  On the ones that they want to use on their

20   case?

21             MR. YALOWITZ:  Right.  Because they said they wanted

22   to do them on my case.

23             THE COURT:  I thought these counter-designations were

24   just the ones that you were objecting to.

25             MR. YALOWITZ:  So it's a little confusing --

F1qQsok1

1              THE COURT:  You mean the letter from last week?

2              MR. YALOWITZ:  Yeah, I think I did give it to you in

3    the letter from last week, and then I gave it to you again on

4    Saturday.

5              THE COURT:  I'll look at it.

6              MR. YALOWITZ:  I really would like to put something in

7    on it, Judge.

8              THE COURT:  All right.  The last juror has arrived, so

9    I want to try to get us past the counter-designations.

10             MR. HILL:  I do want to be heard on the two that you

11   talked about this morning.  With respect to Mr. Jadallah

12   testimony with respect to whether the Al-Aqsa Martyrs Brigade

13   received funding, the plaintiff's argument is the PA provided

14   money to Fatah and that money got to the Al-Aqsa Martyrs

15   Brigade.

16             So we do want the jury hear Mr. Jadallah say we, in

17   fact, don't pay money to something called the Al-Aqsa Martyrs

18   Brigade.  This is obviously a debate about what the Al-Aqsa

19   Martyrs Brigade is, how closely it's related to the Fatah and

20   we think in fairness the jury should hear there is not a line

21   to fund the Al-Aqsa Martyr Brigade.

22             THE COURT:  My rulings now are not rulings as to

23   whether or not you are going to be able to use them.  I'm just

24   ruling on the counter-designations because he said he wants to

25   read this today.  I'm going to be in a much better position

F1qQsok1

1    once he reads his designations and you read your

2    counter-designations to make a decision whether independently

3    you should be able to add more or your case, whether they

4    opened the door to that, whether it's appropriate -- might have

5    been appropriate for a common designation so it still is

6    appropriate for you to do so.  I am not precluding you from

7    doing that.

8            MR. HILL:  I would like it to be read today is my

9    point.  He is reading another portion of the deposition about

10   funding to Fatah, and we think their argument is because

11   funding to Fatah is funding to Al-Aqsa Martyr Brigade, the jury

12   should in fairness hear that there was not funding directly to

13   the Al-Aqsa Martyr Brigade by the PA.  We think in fairness

14   that is part of what needs to be read to the jury whether it's

15   today or --

16           THE COURT:  That is not the way I read his testimony.

17   His testimony is that they fund Fatah, and it's in the budget.

18   There's no budget line for Al-Aqsa Martyr Brigade, so because

19   there's no budget line for it, it must not have happened.  That

20   doesn't necessarily follow just because there's no budget item

21   for it, it must not have happened.

22           MR. HILL:  Well, that's right.  I understand that.

23           THE COURT:  I don't know if he is in a position to

24   say, "Well, I personally wrote all of the checks and I

25   personally transferred the money to the widows and orphans and

F1qQsok1

1    so I know the money never went there."  He doesn't say.

2              MR. HILL:  He personally didn't transfer the money to

3    Fatah either, but the plaintiffs are not playing that part of

4    the deposition.  In fairness, we should have the part where he

5    talks about the budget relationship between the AAMB and the PA

6    because he does testify about the relationship between the

7    Fatah and the PA.

8              THE COURT:  When are we going to get to these

9    designations?  How quickly are we going to do this?  Before we

10   finish with this witness?

11             MR. YALOWITZ:  No.  No.  No.  No.  I was hoping to get

12   to them today.

13             THE COURT:  How much time do you have with this

14   witness?

15             MR. YALOWITZ:  I think I have an hour.

16             THE COURT:  How much time do you have with this

17   witness?

18             MR. ROCHON:  I think it will be two hours.  We'll

19   finish with him today.

20             THE COURT:  We are not going to get to it today.

21             MR. YALOWITZ:  I'd like to get to it today because the

22   person that I have who is going to read them is here ready to

23   do it.

24             THE COURT:  I can't imagine if you have an hour and

25   he's has three hours -- it's 10:20 now.  I mean, you can try,

F1qQsok1

1    but at this point I can give you the rest, but I want to bring

2    in the jury.

3          MR. YALOWITZ:  Let's get going.

4          MR. ROCHON:  Before we bring in the jury, I believe

5    counsel had had his colleague and the witness discuss the

6    Al-Aqsa Martyrs Brigade issue.  I don't know what the answer

7    is.

8          THE COURT:  I don't know if they've resolved it.

9          MR. YALOWITZ:  We're trying to get some other

10   materials, your Honor.

11         THE COURT:  That would make it simpler.  I don't care

12   where it comes from.  If there is something publicly out there

13   where they took credit, then put it before the jury, and lay it

14   to rest.  We don't need his opinion about it.  Everybody knows

15   it is a fact.

16         MR. YALOWITZ:  We're working on pulling that together.

17         THE COURT:  All right.  Let me get the jury in and

18   let's continue.

19         (Continued on next page)

20

21

22

23

24

25

F1qQsok1

1            (Jury present)

2            THE COURT:  Good morning, ladies and gentlemen.

3   Please be seated.  Thank you for coming in.  I know it was a

4   trek getting in here today.  This is the way we're going to

5   proceed.  I am going to keep watching the weather.  I'm going

6   to order your lunch for 12:30.  Sometime between 1:00 and 3:00

7   we are going home.  It looks more likely 1:00 instead of 3:00.

8   If it is still light snow, we may try get it in if we're trying

9   to finish up.  I want to see if we can substantially, if not

10  totally, complete this witness' testimony so we don't fall too

11  far behind.

12           Tomorrow I'm canceling court.  We are still

13  determining whether the court is going to be open at all, but I

14  am not going to try to figure out whether you should come in

15  here given the predictions for the weather.  I am going to tell

16  you now, we'll adjourn and we'll pick up on Wednesday.  It's

17  going to mean that we're going to fall a little behind.  So

18  that's why I want to do something now and see if we can make up

19  that time over the next few weeks because, as I say, I'll keep

20  you informed.  I don't want to say to you we're on schedule or

21  ahead of schedule.  Clearly, this is the one thing we can't

22  plan for, so this puts us a day and a half to two days, which

23  puts us half a week behind.  So we will try to make that up.

24  So that is what we will do.

25           You can pick up your lunch.  I will tell you whether

F1qQsok1

1  we're going to do anything after lunch, if we have a little

2  more to do but the lunch will be here, and I will give you

3  further instructions depending what the weather looks like and

4  we'll take a short break.

5           Mr. Yalowitz, please continue with this witness so we

6  can see how far we can go.

7           MR. YALOWITZ:  Thank you, your Honor.

8   ISRAEL SHRENZEL, resumed.

9  DIRECT EXAMINATION

10  BY MR. YALOWITZ:

11  Q.  I would like to begin with three photos I'd like to get in

12  evidence.  Mr. Shrenzel, do you have before you photographs

13  that have been marked for identification as 1156, 1196 and

14  1197?

15  A.  I do.

16  Q.  Who is 1156?

17  A.  Hussein Al-Sheikh.

18  Q.  Who is 1196?

19  A.  Marzen Jadallah.

20  Q.  Who is 1197?

21  A.  Hassan abu Libdeh.

22           MR. YALOWITZ:  Plaintiffs move 1156, 1196 and 1197

23  into evidence.

24           MR. ROCHON:  No objection.

25           THE COURT:  They will be admitted into evidence.

F1qQsok1                    Shrenzel - Direct

 1          (Plaintiff's Exhibits 116, 1196 and 1197 received in

 2     evidence)

 3          MR. YALOWITZ:  Your Honor, we have handed out to the

 4     jury our binder concerning the January 29, 2004, 8:45 a.m. bus

 5     bombing.  Do you have that binder as well, Mr. Shrenzel?

 6     A.  Yes.  Thank you.

 7          MR. YALOWITZ:  Before the jurors actually open the

 8     binder, I would like to move it in evidence, your Honor?

 9          THE COURT:  Any objection?

10          MR. ROCHON:  Yes, sir.

11          THE COURT:  OK.  Do you object to a document in the

12     binder?  I'm sorry, I don't think I have it.

13          MR. ROCHON:  Some of them have not been previously

14     moved, but all of them have been previously discussed with the

15     Court, and you are fully aware of the basis for our objection.

16          THE COURT:  OK.

17          MR. ROCHON:  It is not foundational, your Honor.

18          THE COURT:  Consistent with our previous discussion, I

19     am going to admit those documents in the binder and the binder

20     itself into evidence over objection.  What's the date?  I have

21     the 22nd and the 27th.

22          MR. YALOWITZ:  Here you go.  I am going to give the

23     court reporter one as well because I know it helps her.

24          Your Honor, as I was reviewing the record, and I'm not

25     sure that some of the previous binders themselves were admitted

F1qQsok1                        Shrenzel - Direct

1   in evidence.  I know we've handed them to the jury, and I think

2   we have had that understanding, but I just want to make sure we

3   are clear that all six binders with the dates of the attacks

4   their indexes as well as the documents in them have all been

5   admitted in evidence.

6           THE COURT:  Yes.

7   BY MR. YALOWITZ:

8   Q.  So Mr. Shrenzel, are you familiar with that January 29,

9   2004 bus bombing?

10  A.  Yes, I am.

11  Q.  Could you describe it generally.

12  A.  Yes.  On that date in the morning, a suicide bomber went on

13  board the bus in central Jerusalem and detonated himself thus

14  causing the death of 11 Israelis and the wounding of dozens.

15  Q.  Do you have information as to who the suicide bomber

16  himself was?

17  A.  Yes.  His name was Ali Al-Ja'ara.  He was a policeman from

18  the Bethlehem district.

19  Q.  Let's take a look at Ali Al-Ja'ara.  He is in our first

20  tab.  Is that him right behind the name Ali Al-Ja'ara?

21  A.  Yes, it is.

22  Q.  Why don't we go to his martyr file behind tab A?

23  A.  I have it, yes.

24  Q.  Let's look at the brief biography on the second page.

25  A.  Yes, I see under personal data his name, his work as a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1qQsok1                         Shrenzel - Direct

1    police officer, his education, his marital status, etc.

2    Q.  Did you notice the part that's been blacked out?

3    A.  I notice that part, yes.

4    Q.  Right after that, what does it say?

5    A.  It says, "He worked as a first sergeant in the police until

6    he was martyred."

7    Q.  What does it say in the description of the event just above

8    the blackout?

9    A.  "The brother was martyred when executing a martyrdom

10   operation in West Jerusalem.  He blew himself up on an Israeli

11   bus carrying passengers."

12   Q.  Now, this martyr file, could we just go back to the first

13   page on the front of it, Exhibit 22?

14   A.  Yes.

15   Q.  Whose seal is that on the front page?

16   A.  This is the seal of the PA.

17   Q.  Whose document is this?

18   A.  Of the PA ministry of social affairs and institute or

19   establishment for martyrs' families and injured.  So this is

20   basically the martyr's file that we are familiar with from

21   previous cases.

22   Q.  All right.  Let's look at his personnel pay records which

23   is Exhibit A that is behind tab B.  First of all, whose seal do

24   we see at the top?

25   A.  The same seal of the PA.

F1qQsok1                         Shrenzel - Direct

1   Q.  Right on the left-hand side, whose document does it say it
2   is?
3   A.  It is of the PA, the ministry of interior and national
4   security and the central and financial administration that
5   these, of course, were the salaries.
6   Q.  Let's just look at his police salary.  He is a corporal.
7   Is that what it says?
8   A.  Yes, in the beginning of his career.
9   Q.  Then he moved up to what?
10  A.  Yes, he was -- he moved up to a sergeant.
11  Q.  Just looking at the years 2000, 2001, 2002, just turning
12  pages, 2003 and let's go to 2004.  Before I talk about '04, I
13  want to ask you, according to the PA's own records, was there
14  ever a month that this man's pay was skipped?
15  A.  No.
16  Q.  I want to go to 2001.  When was the date that he blew
17  himself up on that bus?
18  A.  As we said, the 29th -- January 29, 2004.
19  Q.  I think I accidentally said '01, but I meant to say 2004.
20  A.  OK.
21  Q.  Look just January of 2004.  Was he paid that month?
22  A.  Yes, he was.
23  Q.  And then was he paid every month in 2004 even though he was
24  dead?
25  A.  That's what the record shows.

F1qQsok1                          Shrenzel – Direct

1    Q.  I also want to take you to the next document and see if we

2    can understand that one.  This is tab C Exhibit 88.

3            (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1R8SOK2                        Shrenzel - direct

1    Q.  So I think I need to put this one on the elmo.  I just want

2    to make sure we all see it.

3            So do you see sort of in the middle here it says

4    "termination of services"?

5    A.  Yes, I do see it.

6    Q.  January 5, 2004?

7    A.  Yes.

8    Q.  How long in advance of the attack was that January 5, 2004?

9    A.  This is around three weeks before the attack.

10   Q.  What is the reason he was terminated?

11   A.  As it states here, it is because of his lack of commitment

12   towards work.

13   Q.  Let's just remind the jury about 1123.

14           MR. YALOWITZ:  Just enlarge it.

15   Q.  Was Sergeant Ali Ja'ara reinstated to his position after he

16   did this?

17           MR. ROCHON:  Objection, your Honor.

18           THE COURT:  Overruled.

19   A.  Yes.  If he already was expelled, then he was clearly

20   reinstated and considered a policeman by the Palestinian

21   Authorities after his death.  And there is no mention, as you

22   said, of skipping any salary.

23   Q.  I want to go back to Exhibit 8, which is in tab B, and I

24   want to look particularly at the year 2004.

25   A.  Yes.

F1R8SOK2                         Shrenzel – direct

1    Q.  As of January of 2001, what was his rank?

2    A.  2001 or 4?

3    Q.  I'm sorry.  2004.

4    A.  His rank was sergeant plus one.

5    Q.  At sometime after his death was he promoted?

6    A.  Yes.  Sergeant plus two.

7    Q.  Let's go to Exhibit 132.

8    A.  Which tab?

9    Q.  Tab D in our binders.

10   A.  I'm with you.

11   Q.  All right.  Let's turn over the page and let's look at the

12   text of the report towards the middle of the page in the large

13   box.

14   A.  The text of the report?

15   Q.  Yes.

16   A.  I'm there.

17            MR. YALOWITZ:  May I read, your Honor?

18            THE COURT:  Yes.

19   Q.  "The aforementioned used to work in the Palestinian police

20   force in Bethlehem."

21            Who is the aforementioned in this document?

22   A.  Ali Ja'ara.

23   Q.  By the way, what entity created this document?

24   A.  This is a document prepared by the General Intelligence of

25   the PA, and we have already seen this kind of document before.

F1R8SOK2                    Shrenzel - direct

1   Q.  Just continuing back to the text of the report.

2              "The aforementioned carried out an *amaliya istishadiya*

3   (act of martyrdom) inside Israel during the Second Intifada,

4   which resulted in deaths.  A group belonging to the Al Aqsa

5   Martyrs Brigades claimed responsibility for the operation."

6              Based on this and other materials you have reviewed,

7   do you have an opinion as to whether Al Aqsa Martyrs Brigades

8   claimed credit for this operation?

9   A.  Yes.  There is no doubt about it.  They claimed

10  responsibility for the attack.

11  Q.  Was it in fact an Al Aqsa Martyrs Brigade attack?

12             MR. ROCHON:  Objection, your Honor.

13             THE COURT:  Sustained.

14  Q.  Do you have an opinion as to whether it was an Al Aqsa

15  Martyrs Brigade attack?

16             MR. ROCHON:  Objection, your Honor.

17             THE COURT:  No.  I will allow him to answer that.

18  A.  Yes.  No doubt.  I believe it was an AAMB attack.

19  Q.  Let's go to some of the individuals in the binder.  Why

20  don't we turn next to Ahmed Salah.

21             Do we have his photograph here behind Ahmed Salah?

22  A.  I have his photograph.

23  Q.  Let's turn past his conviction and let's go to his pay

24  records.

25  A.  Which tab, sir?

1    Q.  Tab C.

2              Let's pause for a moment on tab B.  I just want to

3    look at the front of tab B with you for a moment.

4              Do you have tab B in front of you?

5    A.  I do.

6    Q.  This is the indictment of Ahmed Salah?

7    A.  Yes, it is.

8    Q.  It says, "The military prosecutor v. Ahmed Salah Ahmed

9    Salah"?

10   A.  Yes.

11   Q.  Then right below that it says "detained since March 8,

12   2004"?

13   A.  Yes.

14   Q.  Is that the date of his arrest?

15   A.  Yes.

16   Q.  So now let's go to tab C and just see what we can learn

17   from tab C.  We will just turn pages.

18              We have got 2000, 2001, 2002, 2003, 2004.  Is he being

19   paid every single month in that whole period?

20   A.  He is.

21   Q.  What is his rank at the time of January 1, 2004?

22   A.  Warrant officer plus one.

23   Q.  What is a warrant officer?

24   A.  Noncommissioned officer.

25   Q.  Is that higher than a sergeant?

F1R8SOK2                          Shrenzel - direct

1    A.  Yes, it is.  Almost an officer, so to speak.

2    Q.  After his arrest in March of 2004, do they continue to pay

3    him?

4    A.  Yes.  They continued to pay him, and he gets a promotion to

5    warrant officer plus two.

6    Q.  The month after he is arrested?

7    A.  Yes.

8    Q.  The month after he is arrested he gets a promotion?

9    A.  Yes.

10   Q.  Do you have an understanding of whether he continued to be

11   paid while he sits in jail?

12   A.  We have the records for 2004, and we see that he got paid

13   till the end of that year, probably later as well.  We don't

14   have about other years but it's clear that for the year 2004 he

15   was paid.

16   Q.  Let's just take a look at his promotion record which is

17   behind tab D.

18   A.  Yes.

19   Q.  How many times was he promoted after his arrest on charges

20   of terrorism?

21   A.  Just one minute.

22          Well, we see one promotion in 2006 and the other one

23   in 2009, bringing him to the rank of an honorary lieutenant.

24   Q.  What does that mean, honorary lieutenant?

25   A.  It means that he, of course, doesn't serve in the field as

F1R8SOK2                           Shrenzel - direct

1    a lieutenant, but he gets an honorary degree.  Well, one might

2    say that the honorary --

3             MR. ROCHON:  Objection, your Honor.

4             THE COURT:  Sustained.

5             What specifically is your question?

6    Q.  Why is he being honored?

7             MR. ROCHON:  Objection.

8             THE COURT:  Sustained.

9    Q.  Do you have any explanation from the defendants' documents

10   as to why they are honoring this man?

11            MR. ROCHON:  Objection.

12            THE COURT:  Sustained as to the form of the question.

13   If you want to direct his attention to something, you can.

14   Q.  Have you had a chance to review these documents about Ahmed

15   Salah?

16   A.  The document that is in front of me now?

17   Q.  Yes.

18   A.  Yes, of course.

19   Q.  Actually, let's turn to tab E.  Have you had a chance to

20   look at tab E?

21   A.  Yes.

22   Q.  What is tab E?

23            THE COURT:  Again, would you refer to the exhibit

24   number also?

25            MR. YALOWITZ:  131.

F1R8SOK2                         Shrenzel – direct

1   A.   Yes.  This exhibit is a document prepared by the General

2   Intelligence.  This is the apparatus in which this person Ahmed

3   Salah served, and again, it summarizes his activity, his

4   behavior, his biography.

5   Q.   According to this document, what is his occupation just on

6   the first page here?

7   A.   Government employee.

8   Q.   Now, let's look at the text of the report on the third

9   page.

10  A.   Yes.

11  Q.   I want to just direct your attention to the third line in

12  the text of the report:  "The aforementioned is at the moment

13  imprisoned in Israel and was sentenced to 21 life terms."

14          Is that consistent with your understanding of the

15  conviction?

16  A.   Yes, it is.

17  Q.   What is the date of this report?  Do you see that just

18  right above the text?

19  A.   Yes.  It is written December of 2011.

20  Q.   So this is a report as of December of 2011?

21  A.   Yes.  Yes, it is from 2011.  In the document it mentions

22  the month of October, then December, but it's from that year.

23  Q.   I want to direct your attention to the fourth sentence in

24  the text of the report:  "The aforementioned is a member of the

25  General Security Service in Bethlehem."  Do you see that?

1   A.  I do.

2   Q.  Is that consistent with your understanding about his

3   employment status during his imprisonment?

4   A.  Yes.  He is considered as continued being employed while

5   sitting in jail.

6   Q.  Then look at the the blacked-out text.  Do you see where

7   there is a blackout?

8   A.  I see.

9   Q.  I just want to direct you to the statement right above the

10  blackout.  It says, "The aforementioned is loved and

11  appreciated by all"?

12  A.  I see it.

13  Q.  Then, also, just at the very bottom of that report, it says

14  "no security or moral comments"?

15  A.  Yes.

16  Q.  There is one other I want to ask you about.  This is about

17  four lines up from the blackout.  It says, "During the Second

18  Intifada, the aforementioned was engaged in a *fida'i* activity?

19  A.  Yes.

20  Q.  What is *fida'i*?

21  A.  The translation is self-sacrifice, an operation in which

22  one is ready to sacrifice his life.  It's an Islamic term,

23  well-known Islamic term.

24  Q.  What was Ahmed Salah's role in this particular attack?

25  A.  He was basically the commander, the mastermind of this

F1R8SOK2                      Shrenzel - direct

1    attack.

2    Q.  So was he self-sacrificing himself or was he

3    self-sacrificing Ali Ja'ara?

4    A.  Of course, Ali Ja'ara was the one who detonated himself.

5    He was the one who sent him, organized for the mission, etc.

6    Q.  Ahmed Salah is the one who has been given the rank of

7    honorary lieutenant?

8    A.  Yes.  It's the same person.

9    Q.  Based on this document, do you have an opinion as to why

10   the defendant is honoring Ahmed Salah?

11              MR. ROCHON:  Objection, your Honor.

12              THE COURT:  Sustained.

13              MR. ROCHON:  There is a misunderstanding.

14   Q.  Based on this document, Mr. Shrenzel, do you have an

15   understanding of why the PA has promoted this man to the rank

16   of honorary lieutenant?

17              MR. ROCHON:  Objection, your Honor.

18              THE COURT:  Sustained.

19   Q.  Let's go to Ali Abu Haliel.  He is the next one.  We don't

20   have a photograph of him.

21              Have you gotten to his tab?

22   A.  Which tab, sir?

23   Q.  It's just the very text one, Haliel.

24   A.  I have found the person.  Which tab in his index?

25   Q.  Let's start with tab D, Exhibit 133.

F1R8SOK2                        Shrenzel - direct

1    A.  Yes, I have it.

2    Q.  So what are we looking at here?

3    A.  Again, a report of the General Intelligence about this

4    person.

5    Q.  What was his role in this attack?

6    A.  He was -- his main conviction was in transporting the

7    explosives.

8    Q.  Now, let's turn to the text of the 2012 report on this

9    individual.  It's on the second page.

10   A.  I see it, yes.

11   Q.  I just want to direct your attention to a few of the items.

12        The third sentence:  "The aforementioned is affiliated

13   with the Fatah movement."

14   A.  Yes.

15   Q.  The next sentence:  "The aforementioned is now imprisoned

16   in Israel.  He was sentenced to 21 life terms."

17   A.  Yes.

18   Q.  The next sentence:  "The aforementioned was an operative

19   during the Second Intifada in a cell belonging to the Al Aqsa

20   Martyrs Brigades, which was responsible for carrying out

21   *amaliyat istishhadiya*."

22   A.  *Istishhadiya*.

23   Q.  "He transferred explosives and an explosive belt."

24        Just skipping down:  "The financial state of the

25   family of the aforementioned is good.  There are no security or

F1R8SOK2                          Shrenzel – direct

1    moral comments."

2              Do you see that?

3    A.   I do.

4    Q.   Then if we just flip back to tab B.

5    A.   B?

6    Q.   B.   What are we looking at here in tab B?

7    A.   In tab B we have his prisoner's file and the payments, the

8    allocations given to his family.

9    Q.   As of 2004, how much was this man being paid while he sat

10   in prison?

11   A.   1,000 shekels.

12   Q.   By 2012, what was his salary up to?

13   A.   4,000 shekels.

14   Q.   Do we have information on when this man was released from

15   prison?

16   A.   I don't recall the exact date, but there were, of course,

17   some rounds of release due to the political situation or

18   agreements between the parties.

19   Q.   Let's just flip through and see if I can find it.

20              Let's just take a look at tab C.  Maybe I am

21   misremembering.  I apologize.

22              Let's look at tab C, Exhibit 84 for the moment.

23   A.   I see it, yes.

24   Q.   First of all, as we turn pages again, we see pay records,

25   is that right?

F1R8SOK2                         Shrenzel - direct

1    A.  Yes.

2    Q.  Now, I want to go to the page that has a Red Cross

3    certificate.

4    A.  Yes.

5    Q.  Do you see that?

6    A.  Yes, I see it.

7    Q.  Does that Red Cross certificate say anything about the

8    nature of this man's crime?

9    A.  I don't see any mention of his crime here.

10   Q.  Thank you.

11            Let's go to Abdul Rahman Maqdad.  He is the next one

12   on our list.

13   A.  Yes, I have it.

14   Q.  Is that his picture?

15   A.  Yes, it is.

16   Q.  Let's look at tab B for a minute.  Are you there?

17   A.  Yes.  This is the indictment.

18   Q.  Can you tell from the indictment the date of his arrest?

19   A.  March 6, 2004.

20   Q.  Where do we find March 6, 2004 on this page?

21   A.  The upper part, after "The Military Prosecutor v. Ahmed

22   Rahman Maqdad."

23   Q.  Is that about a third of the way down, a little more than a

24   third of the way down?

25   A.  Yes, it is.

F1R8SOK2                         Shrenzel - direct

1    Q.   Is that typical of the indictments, do they typically show

2    the date of arrest?

3    A.   Yes.

4    Q.   Now, I would like to turn with you to tab C, Exhibit 116.

5    A.   Yes, sir.

6    Q.   What do we learn from this comprehensive overview statement

7    about Maqdad's employment status with the PA?

8    A.   Yes.  We can see his promotions in March of 2006 and

9    November of 2008.

10   Q.   By the way, what is the emblem at the top here?

11   A.   The same emblem of the PA.

12   Q.   Just help me out with the writing on the left at the very

13   top, the very first line is "State of Palestine"?

14   A.   Yes, it is.

15   Q.   What do they mean by that?

16   A.   This is the, let's say, non-official name of the PA,

17   non-official from Israel or international point of view.  This

18   is the way the PA usually defined itself.

19   Q.   Then right below that it says "Palestinian Liberation

20   Organization"?

21   A.   Yes.

22   Q.   Right below that it says "National Security"?

23   A.   Yes.  This is the unit within the PA.

24   Q.   So is this man being paid by the PA or the PLO, who is

25   paying him?

F1R8SOK2                          Shrenzel - direct

1   A.  Well, I think that basically he is paid by the PA, but, you

2   know, there is a blur, a certain blur of spheres of influence

3   and responsibility between the entities.

4   Q.  A certain blur?

5   A.  Overlap or blur.

6   Q.  How many times was Maqdad promoted after his arrest in

7   March of 2004?

8   A.  We can see that he was twice promoted.

9   Q.  What was the date of the first promotion?

10  A.  March 12.

11  Q.  What was the date of his arrest?

12  A.  No.  But it was in another year, not in the same year.

13  Q.  I see.  So promoted March 12th of '06?

14  A.  Yes.

15  Q.  Then promoted again November of '08?

16  A.  Yes.

17  Q.  It says right below 2008 "president's instructions"?

18  A.  Yes.

19  Q.  What does that mean?

20  A.  That's the then president of the PA, which is the same

21  president as it is today, Abu Mazen, and ordered or gave the

22  instructions for his promotion.

23  Q.  Let's turn to tab D, Exhibit 1129.

24          I'm sorry.  Exhibit 129.  Do you have that?

25  A.  Yes.

F1R8SOK2                          Shrenzel - direct

1    Q.   Whose intelligence file is this?

2    A.   This is the file of Abdul Rahman Maqdad.

3    Q.   Is this a PA document?

4    A.   Yes, it is.  It is prepared by the General Intelligence of

5    the PA.

6    Q.   Let me just direct you to the second, third, fourth, fifth

7    page, the one that says 9868T.

8    A.   9868?  I'm there.

9    Q.   It says "the aforementioned is originally from Gaza" under

10   the text of the report right at the bottom there?

11   A.   Yes, I'm with you.

12   Q.   "He came to Bethlehem with the arrival of the authority."

13   Do you see that?

14   A.   Yes.

15   Q.   Do you have an understanding of what that means?

16   A.   Yes.  He was born and raised in Gaza, and he moved to

17   Bethlehem, which is of course in the West Bank, when the

18   authority was established.  Did he move directly from Gaza or

19   spent a period abroad, I don't recall.

20   Q.   Then it says, "The aforementioned was among those besieged

21   in the Church of the Nativity."

22   A.   Yes.

23   Q.   What was the incident of the Church of the Nativity?

24              MR. ROCHON:  Objection.

25              THE COURT:  Overruled.

F1R8SOK2                           Shrenzel - direct

1    A.   This was quite a famous event during the Second Intifada.

2    In April of 2002, a short period after the beginning of the

3    Israeli Operation Defensive Shield, a group of about 40 armed

4    operatives, mainly of the Al Aqsa Martyr Brigades, they entered

5    the Church of Nativity.  I believe this is well-known to all

6    present, one of the most holy sites for Christianity.  They

7    captured hostages and resided there for more than a month.  So

8    this person was -- by the way, another one of the perpetrators

9    of this attack was among those who were involved in that

10   operation.  It ended, fortunately, without bloodshed.  There

11   was a negotiated settlement in which some of them were expelled

12   from the territories and the hostages were released.

13   Q.   Was this man Maqdad kept on the payroll after that

14   incident?

15   A.   Yes.  He continued his service in the General

16   Intelligence -- not in the General Intelligence, in the

17   National Security Forces.

18   Q.   Let me take you to the fourth bullet in that text of

19   report.  It says, "He was arrested on March 6, 2004."  Do you

20   see that?

21   A.   No.

22   Q.   The very last bullet in the text of the report on the

23   bottom of the page.

24   A.   He was arrested in his home, yes, OK.

25            MR. YALOWITZ:  Maybe I should just put that on the

F1R8SOK2                    Shrenzel – direct

1   elmo for a second and make sure we all are focused on it.

2   Q.  So he was arrested on March 6, 2004.  That's consistent

3   with the indictment?

4   A.  Yes.

5   Q.  So whenever this report was written, it had to be after

6   March 6th of 2004, is that right?

7   A.  Yes.

8   Q.  Now, what do they say about his morals?

9   A.  He is considered a man of good morals.

10  Q.  How do they explain that?

11          MR. ROCHON:  Objection, your Honor.

12          THE COURT:  Overruled.

13          Are you asking him about what is written there?

14  A.  It's written there that he is committed to the Fatah

15  movement and he is religious.

16  Q.  Let's look at the next one, Hilmi Hamash.

17  A.  Yes, I am with you.

18  Q.  Is that his photograph that we are looking at at the front

19  page?

20  A.  Yes, it is.

21  Q.  What was his role in the terror attack?

22  A.  He was the recruiter, namely, he worked as well in the

23  Palestinian police in Bethlehem, so he got to know the suicide

24  bomber, and he also was pivotal in the preparation process for

25  the attack.

F1R8SOK2                    Shrenzel – direct

1    Q.  Let's take a look at tab B and tell us what we see about

2    Hilmi Hamash.

3    A.  We see his payment records.

4    Q.  Let's just go to the year of the terrorist attack for which

5    we are focusing on.  Do we see 2004?

6    A.  Yes, we do see.

7    Q.  What can you tell about whether he was promoted after the

8    attack?

9    A.  Yes.  We see a promotion from the month of April 2004 being

10   promoted to sergeant plus three.

11   Q.  He goes from sergeant plus two to sergeant plus three?

12   A.  Yes.

13   Q.  Does he continue to be paid throughout the year?

14   A.  Yes, he is.

15   Q.  Based on your understanding of the policies and procedures

16   of the PA with regard to employees such as this, is he

17   continuing to be paid today?

18   A.  Yes.

19   Q.  Now, let's look together at Exhibit 49.

20   A.  Which tab?

21   Q.  Tab C.

22   A.  OK.  I'm there.  49, yes?

23   Q.  Yes.

24   A.  OK.

25   Q.  Have you had an opportunity to look at Exhibit 49 in the

F1R8SOK2                      Shrenzel - direct

1    past?

2    A.  Yes.

3    Q.  What conclusions do you draw about it?

4           MR. ROCHON:  Objection.

5           THE COURT:  Sustained as to the form of the question.

6    Q.  Could you just summarize some of the information in this?

7           First of all, what is this document?

8    A.  This is a document prepared by the Palestinian police and

9    it relates to the poor record of service of this Hilmi Hamash.

10   Q.  Let's look together at page 3.

11          I am looking at the part in section VII, "notes of the

12   government's police director or the administration director"

13   toward the middle of that page.

14   A.  Yes.

15   Q.  Do you see that?

16   A.  Yes.

17   Q.  It says, "Very cheap, liar, very angry.  We do not

18   recommend that he serve as part of the police force."  Do you

19   see that?

20   A.  Yes.

21   Q.  Then let's look at page 11, the 11th page in which, will be

22   nine.  It says 9013.  That's 9013?

23   A.  9013.  I'm with you, yes.

24          MR. YALOWITZ:  Let me just make sure everybody on the

25   jury is looking at the right page.

F1R8SOK2                         Shrenzel – direct

1    Q.   What is this offense form we are looking at here?

2    A.   The offense is firing 60 shots from his Kalashnikov without

3    justification.

4    Q.   Now, I just want to flip back to the page that we were

5    looking at before, which is 9005.

6    A.   Yes, I am with you.

7    Q.   By the way, look also with me at 9004.

8    A.   I do.

9    Q.   What is the date of this report that we are looking at on

10   9004?

11   A.   January 23, 2002.

12   Q.   Could you just direct the jury to the opinion of this

13   individual's direct supervisor at the top of 9005?  Just help

14   the jury with that by telling them what it says.

15   A.   They sum it up as follows:  "He is a troublemaker with bad

16   behavior but his behavior may improve."

17   Q.   Is this report before or after he participated in the

18   January 29, 2004 terror attack?

19   A.   This is before, two years before.

20   Q.   After he participated in this terrorist attack, did they

21   fire him or did they keep him on the payroll?

22   A.   They didn't fire him, not before the attack nor after the

23   attack.

24   Q.   Let's just turn to tab D.  We have got that comprehensive

25   overview statement here?

F1R8SOK2                        Shrenzel - direct

 1   A.  Yes.

 2   Q.  Has this individual been promoted?

 3   A.  Yes.

 4   Q.  After he was arrested for -- do we have his arrest record

 5   in here?

 6          Let me rephrase the question.  Do we have any

 7   information about whether this man has been promoted after he

 8   participated in the January 29, 2004 terror attack?

 9   A.  Yes.  He was promoted twice in July of the same year and

10   November of 2008.

11   Q.  On whose instructions was he promoted in July of 2004?

12   A.  The president's instructions.

13   Q.  Who was the president in July of 2004?

14   A.  Yasser Arafat.

15   Q.  Was he promoted again in 2008?

16   A.  Yes, he was.

17   Q.  On whose instructions?

18   A.  Of president Abu Mazen's instructions.

19   Q.  Who is Abu Mazen?

20   A.  He is the current president and the then president of the

21   PA, chairman of the PLO, and also general secretary of the

22   Fatah, or the head of it as well.

23   Q.  Let's just look at his intelligence file, tab E, Exhibit

24   130?

25   A.  Yes, I'm with you, sir.

F1R8SOK2                        Shrenzel - direct

1   Q.  Will you look with me at the second page?

2   A.  Yes, I do.

3   Q.  Do you see the text of report there?

4   A.  Yes.

5           MR. YALOWITZ:  I just want to direct everybody to the

6   middle of the page.  Let's see if we can get that on the elmo.

7   Q.  I wanted to focus on the line toward the middle of the

8   report, "During the Second Intifada, the aforementioned --

9   A.  I see.

10  Q.  -- was active in an Al Aqsa Martyrs Brigades group, which

11  was responsible for carrying out acts of martyrdom."

12  A.  I see it, yes.

13  Q.  Whose document is this that we are looking at?

14  A.  Of the General Intelligence of the Palestinian Authority.

15  Q.  Then at the very bottom of this report, what does it say

16  about the financial status of this man's family?

17  A.  It's good.

18  Q.  While we are on 130, I just want to find one other place,

19  one other item that may be at the front.

20          In Exhibit 130, can you point us to where they comment

21  on his security or moral status?

22  A.  I don't see it here, or maybe later on another page.

23  Q.  Let me point you to 9874.  If we just turn pages, it's the

24  fifth page in.

25  A.  I see it now.  "No security or moral comments regarding the

1  aforementioned to date."

2  Q.  What is the date of this particular report?  Do we see a

3  date right above the text of the report?

4  A.  I think we should look at the previous pages from December

5  2012.

6  Q.  Let me just make sure we have it.

7  A.  There is another one from November 2004.

8  Q.  Mr. Shrenzel, let me just take you look back to --

9  A.  I have found it now clearly.  It's August of 2007.

10 Q.  Is that just right above the text of the report?

11 A.  Yes.

12 Q.  On the very page that the report appears?

13 A.  Yes.

14 Q.  What does the PA General Intelligence say about this man's

15 securities and morals?

16 A.  I have just quoted it.  There are no security or moral

17 comments regarding him.

18 Q.  Let's pass to Mohamed Ma'ali.

19        Do you have a photograph of Mohamed Ma'ali before you?

20 A.  Yes.

21 Q.  Let's pass by his conviction and -- first of all, what was

22 Mohamed Ma'ali convicted of?

23 A.  He was convicted of transporting the suicide bomber to the

24 scene of the attack.

25 Q.  Then if we go to tab C, do we have his prisoner file?

F1R8SOK2                          Shrenzel - direct

1    A.  Yes, we do.

2    Q.  If we just turn pages, what is it showing about his pay?

3    A.  We see that he is regularly paid in 2012 in the sum of

4    4,000 shekels.

5    Q.  Based on your understanding of PA's procedures and

6    policies, is this man still being paid today?

7    A.  Yes.

8    Q.  Let's just turn pages past the chart of his payments, and

9    then let's go an additional two, four, six pages to the one

10   that's marked 9353.

11   A.  9353.  Yes, I'm with you.

12   Q.  Here we have acknowledgement of detention status of

13   ex-detainee, is that right?

14   A.  Yes.

15   Q.  Looking in the middle there it says "has completed his

16   sentence in the prisons of the Israeli occupation as a result

17   of his fight for his country"?

18   A.  Yes, I see it.

19   Q.  Let's just take a look at what the General Intelligence

20   Service says about this individual.  Do we have that on Exhibit

21   135, tab D?

22   A.  Yes.

23   Q.  Let's look at the report on him on the third page.

24   A.  9900, yes.

25   Q.  That's the one I'm looking at.  I just want to direct you

F1R8SOK2                          Shrenzel - direct

1    to the fourth line in the text of that report.

2    A.  Yes.

3    Q.  "During the Second Intifada, the aforementioned was active

4    in a cell of the Al Aqsa Martyrs Brigades, which was

5    responsible for carrying out *amaliya istishhadiya* (acts of

6    martyrdom) and shooting attacks inside Israel.  The

7    aforementioned is currently imprisoned.  He was sentenced to 21

8    life terms."  Do you see that?

9    A.  I do.

10   Q.  It says at the very bottom, "No security or moral

11   comments."  Do you see that?

12   A.  I do.

13   Q.  What is your understanding of what that means?

14           MR. ROCHON:  Objection.

15           THE COURT:  Sustained as to the form.

16   Q.  When the PA writes "no security or moral comments," what do

17   you believe they mean by that?

18           MR. ROCHON:  Same objection, your Honor.

19           THE COURT:  I will allow him to answer.

20   A.  Usually it refers to his behavior or conduct in prison,

21   that he didn't betray his organization, he didn't commit any

22   more offenses during his stay in prison.  But, of course,

23   unfortunately, it doesn't have any mention of his lethal

24   record, while saying that a person was convicted on more than

25   20 cases of murder has no more problems.

F1R8SOK2                       Shrenzel - direct

1   Q.  Let's go to the last one in our binder.  This is Ahmed

2   Sa'ad.  Do you see he is a security prisoner?

3   A.  Yes.  Which tab, please?

4   Q.  I'm sorry.  I thought I saw that.

5           Let's look at tab B, Exhibit 87.  Let's just flip

6   through his pay records.  Right after his pay records, we go

7   one, two, three, four, five, six, seven, eight, we go to the

8   eighth page.

9   A.  What number, please?

10  Q.  It's 9410.

11  A.  Yes.  I'm there.

12  Q.  What does it say about -- first of all, whose document is

13  this?

14  A.  This is the Ministry of Prisoners and Ex-Prisoners, and it

15  seems to be that this person was also released, so there is a

16  summary of his detention status as an ex-prisoner.

17  Q.  What does it say was the reason for his being in jail?

18  A.  His fight on behalf of the nation.

19  Q.  Now, why don't we close up our binders and I will ask you

20  about a couple of documents that we have seen before.  I just

21  want to make sure we address them.

22          First of all, we looked earlier -- I am going to show

23  you a document that we looked at, which is Exhibit 963.

24          Do you see 963 on your screen?

25  A.  Yes.  If it's possible to enlarge it to some extent.

F1R8SOK2                        Shrenzel - direct

1    Q.  Sure.  I just want to focus you on this phrase "warrior

2    brothers".

3    A.  Warrior brothers is now out of the screen.

4         Oh, OK.  "Kindly allocate the sum of $2,000 for each

5    of the following warrior brothers."  Yes.

6    Q.  Were you here in the courtroom when we had some testimony

7    about that, about whether that was a fair translation?

8    A.  Yes.  I heard the discussion about the terms *mujahid* and

9    *munadil*.  Yes, I did hear it.

10   Q.  What is your opinion about whether warrior brothers is a

11   fair translation there?

12   A.  This is translated to English from the Arabic.  The I

13   believe is *mujahid*, and I think it's a very fair translation in

14   this context.

15   Q.  I don't know if you are able to see the Arabic.

16   A.  Now it's different.  It's better.  It's good that you show

17   me the exact Arabic text.  It's in handwritten Arabic, which is

18   sometimes difficult for me, but with this one I manage quite

19   well.

20        So it says the *munadil*, which means -- I think it's a

21   very fair translation -- the warrior brothers.  *Mujahid* in this

22   context is the same and has the same notion.

23   Q.  Let me show you one other one, which is Exhibit 962.

24        Again, it's handwritten Arabic.  I know reading the

25   handwriting is not your forte.  Are you able to make out that

F1R8SOK2                       Shrenzel - direct

1    one?

2    A.  I'm not that weak.  It's OK.  I can read it.

3           *Al sayyid al-rais al-mujaheed*.  His excellency or the

4    warrior president.  This is an accurate translation, yes.

5    Q.  Who is being addressed here as the warrior president here?

6    A.  Yasser Arafat.

7    Q.  Just pronounce the word that they are using there?

8    A.  *Al-mujaheed*.

9           MR. YALOWITZ:  Your Honor, may I just have a moment to

10   consult with my colleagues about a matter we discussed earlier

11   this morning?

12          THE COURT:  Yes.

13          MR. YALOWITZ:  If it would be convenient for the Court

14   to take about a ten-minute break, I just want to confirm that I

15   have locked down that thing that we spoke about.

16          THE COURT:  Sure.

17          Ladies and gentlemen, we will take a short break.

18   Don't discuss the case.  Keep an open mind.  We will take ten

19   minutes and then continue until your lunch arrives.

20          (Jury exits courtroom)

21          MR. YALOWITZ:  We can take a short break.  We found

22   what we believe Mr. Shrenzel had been reviewing and discussing

23   with us, and I just want to confirm it with him.  We will see

24   if we can get a copy printed for the defendants and then we can

25   put it in front of him.

F1R8SOK2                        Shrenzel - direct

1             THE COURT:  Just tell me how the two of you can agree

2     on how you want to proceed.

3             MR. YALOWITZ:  I doubt we can.

4             THE COURT:  Hope springs eternal.

5             Let's take a short break.  We are going to go until

6     the jurors' lunch arrives.  It is supposed to be here at 12:30.

7     I am going to go check the weather and see whether it makes any

8     sense to go beyond that.

9             (Recess)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1qQsok3

1    (In open court; jury not present)

2    MR. ROCHON:  Your Honor, the issue that we had

3    discussed on was the issue of a claim by Al-Aqsa Martyr

4    Brigades by Wafa Idris banner, we wanted to discuss that.

5    THE COURT:  What do you want to do about it?

6    MR. ROCHON:  I don't know what counsel's position is

7    whether they found such a claim or not.

8    THE COURT:  I thought he was going to state that

9    position to you before I came back.

10    MR. ROCHON:  He gave me a piece of paper written in

11    Arabic that I am having someone read right now.

12    THE COURT:  Mr. Yalowitz, do you want to advance this

13    argument so we can bring the jury in?

14    MR. ROCHON:  Yes.  May I consult one second.

15    THE COURT:  Yes.

16    MR. YALOWITZ:  So we have a contemporaneous newspaper

17    article from a reputable newspaper reporting that Al-Aqsa

18    Martyr Brigades claimed credit for this attack.

19    THE COURT:  What is the date of that newspaper article

20    and who is it by?

21    MR. YALOWITZ:  It's January 31, 2002.

22    THE COURT:  Have you shown this to Mr. Rochon and his

23    team?

24    MR. YALOWITZ:  Yes, I gave it to them as soon as we

25    had it printed.

F1qQsok3

1           THE COURT:  Is it in English?

2           MR. YALOWITZ:  It's in Arabic.

3           THE COURT:  Have you translated it for them?  Do you

4      know what it says?

5           MR. YALOWITZ:  I would have to rely on my Arabic

6      speakers, and I'm sure Mr. Rochon can rely on his.

7           THE COURT:  What do you think it says?

8           MR. YALOWITZ:  I think it says Al-Aqsa Martyr Brigades

9      claim credit for this attack.

10          THE COURT:  And that is sourcing what, do you know?

11     Can somebody read me the text?

12          MR. YALOWITZ:  May I ask Mr. Shrenzel to do that, your

13     Honor?

14          THE COURT:  Yes.

15          MR. YALOWITZ:  Thank you.

16          THE COURT:  If you could read it into the record in

17     English if you can, that portion.

18          THE WITNESS:  It says:  That the Al-Aqsa Martyr

19     Brigades, the military wing of Fatah movement took credit for

20     the -- or adopted literally -- but took credit for the suicide

21     operation on Jaffa Street in West Jerusalem on Sunday -- this

22     Sunday, last Sunday, and it killed one Israeli and wounded 140

23     other Israelis.  And according to the announcement of the

24     Al-Aqsa Martyr Brigades, the perpetrator of the attack is Wafa

25     Idris.

F1qQsok3

```
 1              THE COURT:  What paper is that?

 2              THE WITNESS:  This is Al-Shark Al-Alawsat, if I am not

 3    mistaken.  It's a very credible newspaper that appears in

 4    London.

 5              MR. YALOWITZ:  We also have another document that the

 6    witness would be happy to explain if the Court thinks it's

 7    helpful.

 8              THE COURT:  And it is what?

 9              MR. YALOWITZ:  It's a website of the Al-Aqsa Martyr

10    Brigades.

11              THE COURT:  That seems to be a little more

12    authoritative.

13              MR. YALOWITZ:  May I hand it to him?

14              THE COURT:  Yes.

15              Mr. Rochon, unless you are going to try to genuinely

16    to dispute this, is there a way we can efficiently address this

17    issue?

18              MR. ROCHON:  The document that is said to be from the

19    Al-Aqsa Martyr Brigades was just handed to me.  It's also in

20    Arabic, and I do have an Arabic reader here, so I think we will

21    get through this fairly quickly, but if the witness can explain

22    what it says.

23              THE COURT:  Sure, if you could tell me what that

24    document is, sir?

25              THE WITNESS:  Just a minute, OK?
```

F1qQsok3

1    THE COURT:  Yes.

2    THE WITNESS:  This is from a site of the Al-Aqsa

3  Martyr Brigades that is valid, it still operates these days,

4  and every year it commemorates the acts of martyrs that took

5  place on that specific date.

6    Now, in 2013 they quote and give some information

7  about what was -- about what was published then.  So they tell

8  her personal story, what she did, etc., etc. and then they say,

9  for example -- not for example, but accurately they say that on

10  January 30, 2002 --

11    MR. ROCHON:  If the witness could tell us what pages's

12  on?

13    THE WITNESS:  Yes, I look at the -- I look on the

14  beginning is here, this isn't in English, so this is the first

15  page, sir.

16    MR. ROCHON:  Yes.  Then what page is that on?

17    THE WITNESS:  Then second, so the third page.

18    MR. ROCHON:  Thank you so much.

19    THE WITNESS:  And I will mark it for you.  In this

20  paragraph.  So this paragraph it says that the Al-Aqsa Martyr

21  Brigades --

22    MR. ROCHON:  Could you show us that paragraph again?

23    THE WITNESS:  Here.  The Al-Aqsa Martyr Brigades put

24  an end to the issue, I should add, to the issue to the name of

25  the one who perpetrated the attack and they announced on

F1qQsok3

1    Wednesday, January 30, 2002 its responsibility for the istihad

2    attack, the sacrifice attack and that its perpetrator is Wafa

3    Ali Idris.

4            It goes on saying in the next paragraph that the

5    Al-Aqsa Martyr Brigades also announced in a leaflet or an

6    announcement that this is a qualitative act, an unprecedented

7    qualitative act within the heart of the Zionist entity, that

8    one of the warriors of this revolting people had the chance of

9    perpetrating in Jaffa Street in the center of West Jerusalem.

10           THE COURT:  Mr. Rochon, do you have a simple way that

11   we can put this issue to rest?

12           MR. ROCHON:  Yes, I think this may be the way.  First

13   of all, at this court reading of the last document, we do not

14   quarrel with, the last part of it.  I don't know what the rest

15   of it says.  That last part we don't quarrel with.  The first

16   document we thought --

17           THE COURT:  Is there some kind of stipulation or do

18   you want some direct testimony from this witness that you would

19   be comfortable with?  Or, as they say, I can make him jump

20   through hoops.

21           MR. ROCHON:  I'm not anxious to have anyone jump

22   through hoops.  In a perfect world, we would have gotten this a

23   little sooner, and we are going to accommodate the Court and

24   jury to work quickly.

25           THE COURT:  If you think this is a genuine factual

F1qQsok3

1    dispute, then we should spend a lot of time on it.  But if you

2    do not, it seems to me various ways they have the basis to add

3    to what is already in the record; and, quite frankly, what is

4    already in the record is probably sufficient for their purposes

5    that the PA themselves say Al-Aqsa Brigades took credit for it,

6    or at least perpetrated it.

7            MR. ROCHON:  I think the simplest way would be for

8    Mr. Yalowitz to elicit from the witness that he's gone to an

9    Al-Aqsa Martyr Brigades website where they announce they took

10   credit for the attack.

11           THE COURT:  And you want that January 30 date of 2002?

12           MR. YALOWITZ:  Why don't I elicit some testimony, and

13   if there is an objection to the conclusion, we can produce the

14   document.

15           THE COURT:  Why don't you do something that is similar

16   to what he is asking, so I don't have to listen to ten minutes

17   of objection.

18           MR. YALOWITZ:  I will ask:  Have you reviewed the

19   Al-Aqsa Martyr Brigades website, have you reviewed

20   contemporaneous news reports, and have you reviewed documents

21   of the PA itself --

22           THE COURT:  No, that's beyond it.  We're just talking

23   about whether they took credit for it.

24           MR. YALOWITZ:  Fine.

25           THE COURT:  Ask the question.

F1qQsok3

1           MR. YALOWITZ:  Having reviewed those two sources --

2           THE COURT:  Which two sources?

3           MR. YALOWITZ:  The al-Aqsa Martyr Brigades when site

4    and contemporaneous news accounts.  Based on those two sources,

5    do you have --

6           THE COURT:  I thought that was one source.

7           MR. YALOWITZ:  No, it's two sources.  Al-Aqsa Martyr

8    Brigades website.  Source number, two contemporaneous news

9    accounts from 2002 reporting that Al-Aqsa Martyr Brigades took

10   credit.  Based on those two sources, do you have an opinion as

11   to whether Al-Aqsa Martyr Brigades took credit?

12          THE COURT:  That's fine if you want to do it like

13   that, but that is not an opinion.  All he has to do is say,

14   look, I have read contemporaneous and subsequent information on

15   their website, and in fact at the time they took credit for the

16   attack.

17          MR. YALOWITZ:  Why don't I just ask him, did they take

18   credit?

19          THE COURT:  That would do it.

20          MR. YALOWITZ:  That seems like a really simple way to

21   resolve it.  And if we get an objection and we need to

22   foundationalize it more --

23          THE COURT:  Then I'm going to give you free rein to do

24   whatever you think will lay the foundation for that conclusion.

25   I don't want to spend a whole lot of time on this because I

F1qQsok3

1    don't think this is going to be determinative of what the

2    issues are.  Let's get the jury in and let's do that directly.

3           (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1qQsok3

 1                    (Jury present)

 2                MR. YALOWITZ:  May I proceed, your Honor?

 3                THE COURT:  Yes, sir.

 4                MR. YALOWITZ:  Thank you.

 5    Q.  I just have a few final questions for this witness, your

 6    Honor.  First of all, Mr. Shrenzel, when was Hamas designated

 7    by the United States as a foreign terrorist organization?

 8    A.  In 1997.

 9    Q.  When was the Al-Aqsa Martyr Brigades designated as a

10    foreign terrorist organization?

11    A.  On March 2002.

12    Q.  As of 2001 and 2002, was it common knowledge in Israel and

13    the West Bank that Hamas was engaged in terror activity?

14    A.  Yes, it was.

15    Q.  And as of the 2001, 2002, 2003, 2004, was it common

16    knowledge in Israel and the West Bank that Al-Aqsa Martyr

17    Brigades was engaged in terror activity?

18                MR. ROCHON:  Objection.

19                THE COURT:  Sustained.  I don't think you've

20    accurately stated it.

21                MR. YALOWITZ:  I'm sorry.

22                THE COURT:  I don't think you accurately stated what

23    he said.  I thought he said it was March of 2002.  You asked

24    him about 2001.

25                MR. YALOWITZ:  Let me break that down more.  Thank

F1qQsok3

1    you, your Honor.

2    Q.  Prior to March of 2002 -- and I'm focusing only on the

3    period 2001 to 2002 pre-March, was it common knowledge in

4    Israel and the West Bank that Al-Aqsa Martyr Brigades was

5    engaged in terror activity at that time?

6    A.  It was.

7              MR. ROCHON:  Objection.

8              THE COURT:  Sustained.  Disregard that answer.

9    Q.  Following the designation of Al-Aqsa Martyr Brigades as a

10   terrorist organization in March of 2002, was it common

11   knowledge in Israel and the West Bank that Al-Aqsa Martyr

12   Brigades was engaged in terror activity?

13             MR. ROCHON:  Objection.

14             THE COURT:  Overruled.  You can answer.

15   A.  Yes, this was widely acknowledged and well-known.

16   Q.  I just want to ask you about the six terror attacks that we

17   have been discussing.  First of all, with regard to January 22

18   2002, did Al-Aqsa Martyr Brigades claim credit for that

19   operation?

20   A.  Yes, it did.

21   Q.  With regard to January 27, 2002, did Al-Aqsa Martyr

22   Brigades claim credit for that operation?

23             MR. ROCHON:  Objection.

24   A.  Yes.

25             THE COURT:  Wait.  Just a second.

F1qQsok3

1          THE WITNESS:  I'm sorry.

2          MR. ROCHON:  Your Honor, what's in the record is in

3   the record.  I'm sorry.

4          THE COURT:  Come up.

5       (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1qQsok3

1           (At the sidebar)

2           THE COURT:  I'm not sure what you guys are agreeing

3    to.  You just want testimony about one of the incidents.  You

4    don't want testimony that they claimed responsibility for more

5    than one of the incidents?

6           MR. ROCHON:  Well, counsel is going through each of

7    them pretty quickly, and we only have credit -- we know they

8    took on, I think, two of them.  I want to make sure we get this

9    right.  We got Said Ramadan and the second one is Wafa Idris

10   which we know that he just got.

11          MR. YALOWITZ:  Wait a minute.  I thought we just had a

12   whole conversation in which Mr. Rochon said rather than put the

13   document in front of him and have him read it to the jury, we

14   said we would ask him a question and he could have the answer.

15   If we want to do it the hard way, I'm happy to do it the hard

16   way, that's fine.

17          MR. ROCHON:  As to this second one, I mistakenly

18   objected there.  That's why I was interrupting you.  I was

19   mistaken there.  That was one we talked about.  I don't know if

20   counsel plans on going through all of these.

21          THE COURT:  I assume he does unless you say it's not

22   the fact.

23          MR. ROCHON:  It's not the fact as to the ones after

24   this.

25          THE COURT:  You don't think they acknowledged

F1qQsok3

1    responsibility for the others?

2            MR. ROCHON:  I don't.  Any evidence we have with Wafa

3    Idris, which is the second one; and with Said Ramadan we have

4    head bands and the court allowed that in on that basis.

5            THE COURT:  That's not basis I allowed that in.  We're

6    talking two different issues.  We're talking about whether they

7    acknowledged publicly responsibility for these individual

8    terrorist attacks.  Either they did or didn't.  It's not the

9    subject of opinion.  It's not about inference.  They either

10   said we did it and we're proud of it or they didn't say we did

11   it.  You're disputing whether they claimed responsibility as to

12   which one?

13           MR. ROCHON:  Not as to January 27.

14           THE COURT:  As to which one?

15           MR. ROCHON:  As to the others, we dispute that.

16           THE COURT:  You don't think they claimed

17   responsibility for those.

18           MR. HILL:  Well, there are no claims of responsibility

19   in the record.  There are some secondary things that have come

20   under exceptions to the hearsay rule.

21           MR. HILL:  One second.  The Court's indulgence?

22           THE COURT:  It's not the Court's job to figure that

23   out.  It's your job to figure it out.  You either figure it out

24   whether they claimed responsibility or they didn't, and whether

25   you're going to object to it.  If you're going to object to it,

F1qQsok3

1    then he is going to be able to put in whatever he wants to put

2    in that demonstrates on their website or contemporaneously that

3    they claimed for each of those incidents.

4              MR. ROCHON:  The Court's indulgence for one second.

5              THE COURT:  I've given you my indulgence for more than

6    one second.  We don't seem to have made any progress.

7              MR. ROCHON:  30 more seconds.

8              THE COURT:  All right.  Let's get past this.

9         (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1qQsok3

1        (In open court)

2        MR. YALOWITZ:  Can I have the question back?

3        THE COURT:  You were asking him about those incidents.

4        MR. YALOWITZ:  Does your Honor recall, were we on

5   January 27?

6        THE COURT:  Start all over again.

7   BY MR. YALOWITZ:

8   Q.  Let's begin with January 22 did Al-Aqsa Martyr Brigades

9   claim credit for the January 22 attack?

10  A.  Yes they did.

11  Q.  Did Al-Aqsa Martyr Brigades claim credit for the January 27

12  attack?

13  A.  Yes, they did.

14  Q.  Did Al-Aqsa Martyr Brigades claim credit for the March 21

15  attack?

16  A.  Yes, they did.

17  Q.  Did Al-Aqsa Martyr Brigades claim credit for the June 19

18  attack?

19  A.  Yes, they did.

20  Q.  I want to skip over July 31 Hebrew University and ask you:

21  did Al-Aqsa Martyr Brigades claim credit for the January 29,

22  2004 attack?

23  A.  Yes, they did.

24  Q.  Now, Hebrew University, what group claimed credit for that

25  one?

F1qQsok3

1    A.   Hamas.

2    Q.   Based on the documents and information you reviewed, do you

3    have an opinion as to whether Al-Aqsa Martyr Brigades was in

4    fact responsible for the January 22 attack?

5              MR. ROCHON:   Objection.

6              THE COURT:   Overruled.   You can answer.

7    A.   Yes.

8    Q.   What's your opinion?

9    A.   Yes, they were.

10   Q.   What is your opinion as to whether Al-Aqsa Martyr Brigades

11   was responsible for the January 27, 2002 attack?

12             MR. ROCHON:   Objection.

13             THE COURT:   Overruled.

14   A.   Yes, they were.

15   Q.   What's your opinion as to whether Al-Aqsa Martyr Brigades

16   was responsible for the March 21 attack?

17   A.   They were.

18   Q.   What is your opinion as to whether Al-Aqsa Martyr Brigades

19   was responsible for the June 19 attack?

20             MR. ROCHON:   Objection.

21   A.   They were.

22             THE COURT:   Overruled.

23   Q.   What is your opinion as to whether the Al-Aqsa Martyr

24   Brigades was responsible for the January 29, 2004 attack?

25             MR. ROCHON:   Objection.

F1qQsok3

1          THE COURT:  Overruled.

2    A.  Yes, they were.

3    Q.  Could you tell me your opinion as to whether Al-Aqsa Martyr

4    Brigades was the armed wing of the Fatah movement?

5          MR. ROCHON:  Objection.

6          THE COURT:  I'm going to sustain as to the form.

7    Q.  Was the Al-Aqsa Martyr Brigades the armed wing of the Fatah

8    movement?

9          MR. ROCHON:  Objection.

10          THE COURT:  I'm still going to sustain.

11          You have to focus that question consistent with the

12    testimony he gave about their relationships.

13    Q.  Could you just briefly remind the jury of your views on the

14    relationship between Al-Aqsa Martyr Brigades and Fatah?

15          THE COURT:  Go ahead.

16    A.  Yes.  They were basically the same with close identity

17    between the two terms, and it's clear and obvious that Al-Aqsa

18    Martyr Brigades was the terrorist wing of Fatah.  This is

19    basically the way they themselves presented.  As they say, they

20    are the military wing.  By military wing in our perception, it

21    means terrorist, their terrorist activity.  For example, even

22    Marwan Barghouti in his interrogation he said couple times

23    that --

24          MR. ROCHON:  Objection, your Honor.

25          THE COURT:  Sustained.  What's your next question?

F1qQsok3

1    BY MR. YALOWITZ:

2    Q.  Have you had the opportunity to review circulars put out by

3    the Fatah movement?

4    A.  Yes, I did.

5    Q.  I would like to show you Exhibit 185, and I will put the

6    box on so that you can have a chance to identify it for the

7    Court.

8    A.  Please enlarge it a little bit.

9         MR. YALOWITZ:  May I approach?

10        THE COURT:  Yes.

11   Q.  I will give the witness a hard document.  You have 185

12   before you.

13   A.  I do.

14   Q.  Do you recognize it?

15   A.  Yes.

16   Q.  What is it?

17   A.  It is an organizational circular issued by Fatah on

18   January 1, 2001.  January 1 is the annual anniversary of the

19   Fatah movement.  Its established or recognized date of its

20   establishment is January 1, 1965.

21        MR. YALOWITZ:  I just want to make sure the Judge has

22   in mind what it is and then I will ask you some subsequent

23   questions.

24        THE COURT:  Do I have a copy?

25   Q.  Was this document that was created on January 1, 2001?

F1qQsok3

1    A.   Yes.

2    Q.   Who created this document?

3    A.   It says here the supreme movement committee, the highest

4    body of the Fatah movement.

5    Q.   What was done with circulars like this one during the 2001

6    to 2004 period?

7    A.   They were distributed among members of the movement.

8    Probably there were broadcasts that delivered the main ideas

9    and messages of these circulars.  They basically portrayed the

10   lines of policy, the beliefs and the strategies of the movement

11   for the forthcoming year.

12   Q.   Who was the commander of the Fatah movement during '01 to

13   '04?

14   A.   The head of the Fatah movement the over all head was Yasser

15   Arafat.  The head of the Fatah in the West Bank was Marwan

16   Barghouti, till his arrest.

17          MR. YALOWITZ:  Plaintiffs offer 185 in evidence.

18          THE COURT:  Any objection?

19          MR. ROCHON:  Yes, sir.

20          THE COURT:  It will be admitted into evidence.

21          (Plaintiff's Exhibit 185 received in evidence)

22   BY MR. YALOWITZ:

23   Q.   Now, I want to remove the box so that we can all see what

24   we are talking about here.

25          So does the Fatah circular, how does that reflect At

F1qQsok3

1    All, The Views Of The Supreme Movement Committee?

2    A.  Basically it reflects it completely.  They are the ones who

3    issued it.

4    Q.  I just want to start with an image of the Arabic.  Can you

5    just explain what we are seeing here?

6    A.  This is the emblem of the Fatah movement.

7    Q.  Then I think there is an excerpt that I want to put up.  I

8    don't know if you are able to see that on your screen or if you

9    want to look at the Arabic in the document that you have in

10   front of you.

11   A.  Yes, I have the Arabic.

12   Q.  Just tell us what is going on there.

13   A.  Well, it's a long document.  The opening statement is that

14   it is an internal circular that is produced by the highest

15   committee of the movement of Fatah in the West Bank to

16   commemorate the 36 year of the beginning of the Palestinian

17   revolution.

18   Q.  What is the day of that document?

19   A.  The date of this document of our document of 185 is

20   January 1, 2001, three months after the eruption of the

21   Intifada.

22            MR. YALOWITZ:  Your Honor, I would like to read from

23   page 1 of the text of Exhibit 185.  I prefer the English if you

24   don't mind.

25            THE COURT:  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1qQsok3

1   Q.  Let's just get that in front of the jury as well.

2           "from the muzzle of your "guns --"

3           THE COURT:  Where are you reading from?

4           MR. YALOWITZ:  From page 1 that says Oh, Heric

5   Fatahlis?

6           THE COURT:  What paragraph are you reading.

7           MR. YALOWITZ:  It's the bottom of page 1 under the

8   bold.

9           THE COURT:  I got it.  "From the muzzle of your guns

10  genuine pace will swoop into the sat and suffering land ... if

11  they want to negotiate, let them negotiate with the sound of

12  your Intifada ... the sound of your memory witnessing a

13  massacre and carnage.  The screams in the city and village

14  hunger the first so.  If they ask you about that cloud soaked

15  with blood and rain pouring without interruption, the storms

16  from Arafat Fatah and the martyrs booming loudly, say ... there

17  is no turning back ... there is no return to the gravest

18  inequity of the sin and lost.  Great Palestine will not be the

19  tiny warden of Tel Aviv's beaches and the international

20  Palestine has with its blood taken off the cloth of slavery and

21  has imposed a seige of the spirit in order to clearly show its

22  trace on its body that is carrying out its rebellion from Jaffa

23  to the Neger."

24           Where is Jaffa?

25  A.  Jaffa is the sister city of Tel Aviv.

F1qQsok3

1    Q.   Is that inside the Green Line?

2    A.   Yes, it is, and the Neger as well.

3    Q.   I am going to turn to page 116 Exhibit 185.  I will read

4    from the final full paragraph and some of the carryover

5    paragraph, your Honor.

6            At the very last word of the seventh line of that

7    second to last paragraph at the end of the page: "Oh

8    combatants, our martyrs are nobler than all of us ... they have

9    made the dream a reality ... keep a firm grip on the trigger

10   and on the stones ... be patient ... those killers will retreat

11   and will depart from our country just like they departed from,

12   sovereign Lebanon.  Otherwise, they will not enjoy security,

13   peace and stability ... let your blows intensify and let the

14   Intifada continue ... do not squander this historical

15   opportunity with scattered promise."

16           Is that the policy of Fatah during the Intifada?

17           MR. ROCHON:  Objection.

18           THE COURT:  Overruled.  You can answer.

19   A.   Yes, it is.  I think it is clearly reflects the policy of

20   that period when it was written, as I mentioned swing right

21   into the second Intifada and it continued basically to the end

22   of the Intifada if there was ever a formal end to it, but it

23   went through 2004 at least.

24           MR. YALOWITZ:  I have no further questions on direct,

25   your Honor.

F1qQsok3

1           THE COURT:  Mr. Hill, cross-examination?

2           MR. HILL:  Yes, sir.

3    CROSS-EXAMINATION

4    BY MR. HILL:

5    Q.  Good afternoon, ladies and gentlemen.  Good afternoon

6    Colonel Shrenzel.

7    A.  Hello.

8    Q.  My name is Brian Hill.  You testified here over the course

9    of the last few days about five separate terrorist attacks?

10   A.  I did.

11   Q.  At the time of each of those attacks between 2002 and 2004,

12   you worked for the Israel Security Agency?

13   A.  Yes.

14   Q.  As part of your work at the ISA, you did not investigate

15   any of the five attacks that you testified about, correct?

16   A.  Not from the effort of the ISA -- I was not part of the

17   direct effort to find out who was the perpetrator and how we

18   can put our hands on, but of course as head of an analysis

19   unit, I had got information about the attacks, I got

20   information -- when we had it, about the perpetrators in order

21   for me to fulfill my task that of portraying the picture and

22   understanding the policies and the strategies of the

23   defendants.

24   Q.  And you did not actually interrogate any of the

25   perpetrators of any of these attacks?

F1qQsok3                          SHRENZEL - Cross

1    A.  No, I was not involved in direct interrogations.

2    Q.  In fact, you have not even met any of the perpetrators of

3    these attacks, right?

4    A.  No, I have not -- I haven't met any of them.

5    Q.  You were hired by a group of lawyers to testify in this

6    case?

7    A.  Yes.

8    Q.  And you were not hired by Mr. Yalowitz and his team,

9    correct?

10            MR. YALOWITZ:  Objection.

11            THE COURT:  I'm going to sustain as to relevance.

12   Q.  You were in fact hired by an Israeli law firm?

13            MR. YALOWITZ:  Objection.

14            THE COURT:  Is there some relevance to this, Mr. Hill?

15            MR. ROCHON:  Trying to get there, your Honor.

16            THE COURT:  Well, you're not there, so I'm going to

17   sustain the objection.  It doesn't make a difference which

18   lawyers he's hired by.

19   Q.  When you were hired by the lawyers, regardless of who they

20   were, you were given a draft report, right?

21   A.  Yes, I was.

22   Q.  That draft report had been written by two people, Arieh

23   Spitzen and Noa Meridor, correct?

24   A.  Yes.

25   Q.  Arieh Spitzen is a former Israeli Defense Forces officer,

F1qQsok3                        SHRENZEL – Cross

1    correct?

2    A.  I think he was –– he worked as a civilian for the army,

3    yes, but he –– he worked as a civilian for the army within

4    direction of the army.

5    Q.  He was a colonel right?

6    A.  Or equivalent to a colonel.

7    Q.  Just like you?

8    A.  Yes.

9    Q.  Noa Meridor, he is also a former IDF officer?

10   A.  I also think he worked as a civilian in COGART.  I

11   mentioned this term, the coordination of government activities

12   in the territories.

13   Q.  That's a unit of the Israeli army, right?

14   A.  Yes, but it has also many civilian aspects of.

15   Q.  What was Meridor's rank?

16   A.  I don't know.

17   Q.  Now, Arieh Spitzen, he used to work for the intelligence

18   branch of the Israel defense forces, right?

19   A.  No, I think he worked for that body COGAT.  I am really

20   not –– I know him, of course, but I'm not that familiar with

21   every detail of his career.

22   Q.  COGAT is also where Lieutenant Colonel Eviatar worked?

23   A.  Yes, basically.  Yes.

24   Q.  And you know Lieutenant Colonel Eviatar, you saw him

25   testify here?

F1qQsok3                          SHRENZEL - Cross

1    A.  I saw not all of his testimony.  I saw parts of it.

2    Q.  Now, you've mentioned a couple of times this thing called

3    COGAT.  That's an acronym right?

4    A.  Yes, COGAT.

5    Q.  In English it's C-O-G-A-T?

6    A.  Right.

7    Q.  And that stands for coordinator of government activities in

8    the territories, right?

9    A.  Yes.

10   Q.  And the T is for territories, right?

11   A.  Yes.

12   Q.  And those are the occupied Palestinian territories, right?

13            MR. YALOWITZ:  Objection, your Honor.

14            THE COURT:  Overruled.  You can answer.

15   A.  You know that we are now getting into this maze of

16   terminology.  Of course, the Palistinians see it as occupied.

17   Some Israelis see it as liberated.  These are the polar --

18   polarized positions.  So the definition of the Israeli army and

19   of my service was territories.  Not occupied.  Not liberated.

20   But the territories.

21   Q.  The Israeli Supreme Court has said they're occupied

22   territories, right?

23            MR. YALOWITZ:  Objection.

24            THE COURT:  Sustained.

25   Q.  COGAT is responsible for implementing the Israeli

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1qQsok3                        SHRENZEL - Cross

1  government's policy in the Palestinian territories, correct?

2            MR. YALOWITZ:  Objection.

3            THE COURT:  Overruled.  You can answer.

4  A.  I was never an employee of COGAT, so I'm not familiar with

5  the detailed definition, but as you said.  It's a part of the

6  army in Israel and the army is obedient to the government so--

7  Q.  They are responsible for administration of Israeli policy

8  in Gaza and the West Bank, right?

9  A.  Generally speaking, yes.

10 Q.  You also know a man named Roni Shaked, right?

11 A.  Not personally.

12 Q.  You know hoe is?

13 A.  I know who he is, but I never met him personally.

14 Q.  Roni Shaked also used to work for the ISA, right?

15 A.  That's what I heard, but he is -- I do believe that he

16 retired even before I was enlisted to the service.

17 Q.  You were here when Lieutenant Colonel Eviatar testified

18 that the first draft of his report was written by Roni Shaked,

19 right?

20 A.  I was here, yes.

21 Q.  To sum up Lieutenant Colonel Eviatar, Colonel Spitzen,

22 Meridor, Roni Shaked and yourself have all worked for the

23 Israeli government, correct?

24 A.  In some point or another in our career, yes.

25 Q.  Now, you testified about payments that were made to

F1qQsok3                         SHRENZEL - Cross

1    families of martyrs, correct?

2    A.  Yes.

3    Q.  We should be clear about who is considered a martyr.  Any

4    Palestinian who is killed in connection with the conflict with

5    Israel is considered a martyr by the Palistinians, correct?

6    A.  Yes.

7    Q.  It doesn't matter how that person dies, right?

8    A.  Yes, but it should be in the scope of confrontation with

9    Israel, yes.

10   Q.  So a Palestinian who is shot by a soldier in the West Bank

11   is considered a martyr, right?

12   A.  By the Palistinians, yes.

13   Q.  And a Palestinian that is killed by an Israeli settler in

14   the West Bank is also considered a martyr, right?

15            MR. YALOWITZ:  Objection.

16            THE COURT:  Overruled.

17            You can answer.

18   A.  Yes.  Well, no one dictates to them how to define their

19   people so they consider them as martyrs.

20   Q.  Any Palestinian who was accidentally killed during the

21   Israeli invasion called operation defensive shield, they would

22   also be considered a martyr, right?

23            MR. YALOWITZ:  Your Honor, could I have a side bar

24   please?

25            THE COURT:  No.  Do you have an objection?

F1qQsok3                          SHRENZEL - Cross

1              MR. YALOWITZ:  Yes, I do.

2              THE COURT:  The objection is sustained.

3    Q.  Any Palistinian killed as collateral damage in an

4    assassination --

5              MR. YALOWITZ:  Objection.  Objection.

6    Q.  -- by the IDF is also considered a martyr?

7              MR. YALOWITZ:  Objection.

8              THE COURT:  Mr. Yalowitz, I heard you the first time.

9              MR. YALOWITZ:  Mr. Hill didn't.  I'm sorry about that.

10             THE COURT:  Mr. Hill, I'm sustaining the objection,

11   and also to any questions in that regard the way you just

12   phrased it.  Move on.

13             MR. ROCHON:  I understand.

14   Q.  Let me show you what is in evidence as plaintiff's trial

15   Exhibit 496.  We will put it on the screen.

16             This is a U.S. government report that Mr. Yalowitz

17   asked you some questions about, right, sir?

18   A.  Yes, sir.

19   Q.  Let me show you page 2.  In the first paragraph of the

20   overview, if we could call that out, this U.S. Government

21   report indicates in the second sentence: "According to

22   statistics maintained by the U.S. Government, between

23   December 16, 2001 and June 15, 2002, and then if we skip to the

24   last sentence, it says, "679 Palistinians were killed" --

25             MR. YALOWITZ:  Objection.  Objection.

F1qQsok3                         SHRENZEL - Cross

1              THE COURT:  Overruled.  It's in evidence, sir.  If you

2    want to use it again, you can bring it up on your redirect.

3    A.   I didn't hear you.  Sorry for that.

4    Q.   Mr. Shrenzel according to the document that is in evidence,

5    according to statistics between December 16, 2001 and June 15,

6    2002679 Palistinians were killed, correct?

7    A.   That's what it says, I accept it as credible.

8    Q.   Each of those 679 Palistinians is considered a martyr by

9    the Palistinians, right?

10   A.   Yes.

11   Q.   And each of those 679 families are eligible under the

12   Palestinian law to apply for martyrs benefits, right?

13   A.   Yes.

14   Q.   And the institute that we've called the martyrs institute,

15   it makes payments not only to the families of martyrs but also

16   to Palistinians that are injured as a result of the conflict,

17   right?

18   A.   Yes.

19   Q.   This document that we are looking at here, the American

20   report indicate that during the period between December 16,

21   2001 and June 15, 2002, 1,514 Palistinians were wounded,

22   correct?

23              MR. YALOWITZ:  Objection.

24              THE COURT:  Overruled.

25   A.   Yes, as I said, I take it as written.  I have no reason to

F1qQsok3                          SHRENZEL - Cross

1    doubt the data provided by the American authorities.

2    Q.  Each of those 1,514 Palistinians who were wounded during

3    this six-month period were eligible to apply for benefits to

4    the institute for the familiar leaves martyrs and the injured,

5    correct?

6    A.  Yes.

7                MR. ROCHON:  Judge, in caution, I know it's 12:30, and

8    I know you may have lunch for the jurors and our policy is not

9    to stand between jurors and lunch.

10               THE COURT:  I have just been handed a note that lunch

11   is on the way upstairs.  This is what I am going to do though,

12   ladies and gentlemen.  I'm going to keep you a little bit

13   longer.  It stopped snowing at the moment, and I want to give

14   Mr. Hill maybe about 45 minutes or so to continue his

15   examination, so we won't lose as much time as we might

16   otherwise.

17               I am going to ask you to do this:  We are going to

18   adjourn for about 45, 50 minutes you don't have to stay in the

19   jury room, but after you've completed your lunch, I'm going to

20   bring you out about 1:15 or so and probably go until about 2:00

21   and then send you home.  That is the way I think it is best to

22   proceed.

23               Don't discuss the case.  Keep an open mind.  You can

24   go into the jury room hoping your lunch is on its way up the

25   elevator and you can eat.  I will see you at 1:15.

F1qQsok3                          SHRENZEL – Cross

1                    (Jury recessed)

2              (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1qQsok3                         SHRENZEL - Cross

1              (Jury not present)

2              THE COURT:  Grab a quick lunch and Mr. Hill, I will

3    give you 40, 45 minutes.  I'll check the weather.  It started

4    snowing already again, but I want to at least use some of that

5    time.

6              MR. HILL:  I may be able to finish, your Honor.

7              MR. YALOWITZ:  Your Honor, I just want to say one

8    thing about Mr. Hill's line of examination.

9              THE COURT:  Yes.

10             MR. YALOWITZ:  I am very, very concerned.  I think

11   that he has gone way, way far afield of the actual testimony of

12   Mr. Shrenzel.  This business about people injured being

13   eligible for martyr payments -- there is no evidence that any

14   of the suicide terrorists in this case were injured.  They all

15   died.

16             So for Mr. Hill to start talking about a thousand

17   people injured -- the only purpose of it is to try to inject

18   politics into the case, and I think that -- I understand the

19   Court wants to give him some leeway, but he has already gone

20   way outside where the Court said he is permitted to go.  I

21   think he needs to be admonished.  Quite frankly, if he does it

22   again, I think he needs to be admonished in front of the jury.

23             THE COURT:  I think in regard I'll limit it to that

24   specific examination.  With regard to that portion of his

25   examination, he utilized the exhibit that you put in evidence,

F1qQsok3                         SHRENZEL – Cross

1    it's statistics that you relied upon and he asked what were

2    relevant questions, and I think are relevant considerations for

3    the jury as to whether or not martyr payments means terrorists

4    or means something broader than that.

5          I think he has a right to make that point and both

6    sides have a right to argue what they will from that evidence

7    and from the fact that your witness acknowledged that martyr

8    does not mean terrorist and martyr in and of itself and people

9    who receive death benefits or injury benefits are people who

10   are terrorists and people who are not terrorists, as you have

11   defined.

12         So those are appropriate issues before the jury.  You

13   put before it the jury.  You put through this document and used

14   this document.  The document is in evidence.  As I say, as I

15   will always let you do, you can read from it, do whatever you

16   want from it once it's in evidence.  I don't think the nature

17   of these questions in that regard with regard to those issues

18   were out of bounds or inappropriate.

19         (Continued on next page)

20

21

22

23

24

25

F1Q8SOK4

1          MR. YALOWITZ:  Well, I think there were a number of

2     questions where he started in with assassinations, where he

3     started in with settlers, and it is clear that what he is

4     trying to do is suggest to the jury that they should bring

5     politics into this case instead of focus on the evidence.  I

6     think your Honor was correct to sustain some of the objections.

7     I appreciate it.  I think he should be forewarned that if he

8     tries to pull that kind of stunt again, there is going to be a

9     consequence in front of the jury.

10          THE COURT:  I don't disagree with your general

11     premise.  I did sustain your objection.  I did warn Mr. Hill.

12     I don't expect that line of questioning to be placed in this

13     case before this jury.  I don't think I have to say it, but I

14     will say, in general, that if my orders are not followed, there

15     will be consequences.  I made it clear.  I don't want any of

16     those kinds of questions.  The way the questions were phrased,

17     they were loaded questions, the best I can describe it, and I

18     thought that the first couple of questions that he asked with

19     regard to the area were sufficient, but as he tried to

20     characterize it and put it in the context, which I agree with

21     you was a political context, I believe that those questions

22     were inappropriate.  I sustained the objections.  I warned him.

23     I admonished him.  If it continues, I will take stronger

24     action.  Get some lunch and we will be back.

25          (Luncheon recess)

F1Q8SOK4                          Shrenzel - cross

1                          AFTERNOON SESSION

2                              1:15 p.m.

3            THE COURT:  Let's bring in the jury.

4            (Jury present)

5   ISRAEL SHRENZEL, resumed.

6            THE COURT:  Mr. Hill, you can continue.

7            MR. HILL:  Thank you, your Honor.

8   BY MR. HILL:

9   Q.  Good afternoon, Mr. Shrenzel.

10           Before we broke we were talking about payments to

11  families of martyrs, and, in fact, those payments that were

12  made are actually quite small, aren't they?

13  A.  You should show me some more accurate figures.  It depends

14  on the period, the time, maybe the financial situation of the

15  PA at the time.  You should always measure it according to the

16  necessities or the cost of living in the territories.

17  Q.  Let's take a look at what is in evidence as Plaintiffs'

18  Trial Exhibit No. 62.  If we could look at page number 9133.

19           This is the document that pertains to Said Ramadan,

20  correct?

21  A.  Yes, it is.

22  Q.  You can see that when the switch was made to the martyrs

23  and the injured, that the amount of money he began receiving in

24  June of 2002 was 686.48 shekels, right?

25  A.  Yes.

F1Q8SOK4                    Shrenzel – cross

1   Q.  In U.S. dollars that would be about $175 a month, right?

2   A.  Yes.

3   Q.  Now, before he died in January of 2002, he was being paid

4   964.69 shekels per month, right?

5   A.  Yes.

6   Q.  That's only about $250 per month, right?

7   A.  Yes.

8   Q.  So Said Ramadan's family actually got less money after he

9   died than what he earned prior to his death, right?

10  A.  That's what this chart reflects, yes.

11  Q.  Let's look at Plaintiffs' Trial Exhibit No. 23, which is

12  also in evidence.

13          This is the martyr's file for Mohamed Hashaika,

14  correct?

15  A.  Yes.

16  Q.  Mohamed Hashaika was the bomber in the March 21, 2002

17  attack, right?

18  A.  Yes.

19  Q.  Let's look at page 7307.

20          Do you see under approval of the general director

21  where it says his family receives a monthly allowance of 600

22  shekels?

23  A.  I see it, yes.

24  Q.  Again, that's $150 a month?

25  A.  Yes.

F1Q8SOK4                          Shrenzel - cross

1    Q.  On the top of this form it says his parents are alive and

2    he has four siblings who are students.  Do you see that, sir?

3    A.  I see.

4    Q.  So that's $150 for a family of six?

5    A.  Yes, that's what it says.

6    Q.  Let's look at what is evidence as Plaintiffs' Trial Exhibit

7    No. 22.  This is the martyr's file for Ali Ja'ara, right?

8    A.  Yes.

9    Q.  Ali Ja'ara was the bomber who did the January 29, 2004

10   bombing, right?

11   A.  Yes.  The attack that we have discussed today, yes.

12   Q.  Let's look at page number 7292.

13          Do you see under approval of the general director

14   where it says his family also receives an allowance of 600

15   shekels per month?

16   A.  Yes, I see it.  But let me just say that, if you want to be

17   very accurate, we must maybe check what happened after 2004.

18   Q.  These are the documents that Mr. Yalowitz examined you

19   about, right, sir?

20   A.  OK.  If you want to have an accurate picture of what a

21   family is getting, so maybe there is a possibility of an

22   increase.

23   Q.  Let's look at the prior page.

24          Do you see that Mr. Ja'ara had a father, a mother, and

25   four siblings?

F1Q8SOK4                         Shrenzel - cross

1   A.  Yes.

2   Q.  For that entire family, they were paid 600 shekels a month,

3   right?

4   A.  OK.  But without getting into specific details, I assume

5   they had other sources of income, from the PA or maybe from

6   other sources, yes.

7   Q.  Let's go back to page 7293.

8         Do you see at the top, next to the part that's been

9   blacked out, where it says the house of the martyr's father was

10  blown up?

11  A.  Yes.

12  Q.  It was the Israeli army that did that, right?

13        MR. YALOWITZ:  Objection.

14        THE COURT:  Overruled.

15  A.  I am not aware of all the details.  There are cases when

16  houses of terrorists are demolished.  I don't know about this

17  specific case.

18  Q.  But there were cases during the Second Intifada where the

19  houses of terrorists were demolished by the Israeli Army,

20  right?

21        MR. YALOWITZ:  Objection.

22        THE COURT:  Overruled.

23        You can answer.

24  A.  I didn't look in-depth to the issue of house demolishing

25  during the Second Intifada.

F1Q8SOK4                        Shrenzel - cross

1    Q.  But you're aware, sir, that as a general matter, there were

2    a number of occasions --

3              MR. YALOWITZ:  Objection.

4    Q.  -- where the Israeli Army demolished the homes of people

5    who committed acts of terrorism or were suspected of doing so,

6    right?

7              THE COURT:  Overruled.

8    A.  Yes.  But it should be looked at in a more detailed manner.

9    Sometimes the house was blown up because other terrorists maybe

10   found harbor there.  Sometimes it's kind of a punitive action.

11   I really don't know.  I am not familiar with the specifics of

12   the house of the father.

13   Q.  Let's go back to the prior page.

14             Sir, you're not saying that anyone else in

15   Mr. Ja'ara's family was suspected of terrorism, are you?

16   A.  Again, please.

17   Q.  You're not saying that any of these other people in

18   Mr. Ja'ara's family are suspected of terrorism, are you?

19   A.  I am not saying the opposite as well.  I didn't look at any

20   information about his -- maybe one of his brothers was also

21   involved.  How can I tell without checking it?

22   Q.  Sitting here today you can't tell the jury that Mr.

23   Ja'ara's house was destroyed because somebody else was a

24   terrorist, right?

25   A.  There are 2.5 million citizens in the West Bank.  I didn't

F1Q8SOK4                        Shrenzel - cross

1    check each of them in preparation for this testimony.  So I

2    cannot say if Moussa Ja'ara was also involved in what Israel

3    perceived as terrorist activity.

4    Q.  Let's look at Plaintiffs' Trial Exhibit 159.

5            This is a GIS file, right?

6    A.  Yes.

7    Q.  This one is for Mohamed Mousleh, correct?

8    A.  Yes.

9    Q.  Let's look at page 10001.

10   A.  Could you please enlarge it for me a little bit?  Thank

11   you.

12   Q.  Do you see in the third sentence where it says the army

13   demolished his house about two months ago?

14   A.  Yes.  But this is another -- OK.

15   Q.  Again, that was the Israeli Army that was doing that whole

16   demolition?

17   A.  The word army means the Israeli Army.

18   Q.  Let's look at what is in evidence as Plaintiffs' Trial

19   Exhibit 130.

20            This is another GIS file?

21   A.  Yes.

22   Q.  This one is for Hilmi Hamash?

23   A.  Yes.

24   Q.  Let's look at page 9873.

25            MR. HILL:  If we could enlarge the bottom portion

F1Q8SOK4                           Shrenzel - cross

1    where it says "text of report."

2    Q.  Do you see, sir, in the fourth sentence, "The

3    aforementioned was arrested in his home two years ago.  His

4    house, in the al-Dheisheh refugee camp was demolished."  Do you

5    see that?

6    A.  Yes.  It was demolished.  Yes, I see it.

7    Q.  His home was demolished by the Israeli Army, right?

8    A.  Yes, it was.  It was one of the means that Israel had to

9    resort to in order to confront this really terrible and

10   horrifying wave of terrorist attacks.  So in order to take some

11   detriment measures, this was one of them.

12   Q.  You also testified about some of the things that were

13   written in some of the martyr files, right?

14   A.  Yes, sir.

15   Q.  Now, these martyr files are actually a form, right?

16   A.  Yes.  OK.

17   Q.  You mentioned a couple of sometimes that the PA is a

18   bureaucracy like other governments, right?

19   A.  Yes.

20   Q.  It has government forms, right?

21   A.  Yes.

22   Q.  Let's take a look at one of these which is in evidence,

23   Plaintiffs' Trial Exhibit 60.

24            MR. HILL:  Justin if we can show this page and then

25   show the Arabic version side by side.

F1Q8SOK4                         Shrenzel - cross

 1   Q.  You can see the Arabic version of this document has

 2   portions that are preprinted and portions that are handwritten,

 3   right?

 4   A.  Yes.

 5          MR. HILL:  Justin, if we can turn to the next page on

 6   both of them.

 7   Q.  Because it's Arabic, the portions that are on the left in

 8   the English are on the right in the Arabic, right?

 9   A.  Correct.

10   Q.  Again, what we can see here, we have got a form with

11   typewritten information and handwritten information, correct?

12   A.  Yes.

13   Q.  And the way this works is that when someone is killed,

14   their family comes into the Martyrs Institute and they fill out

15   an application for benefits, right?

16   A.  Yes, or the secretary does it, yes.

17   Q.  So what we have actually got here is an application for

18   martyrs' benefits, right?

19   A.  Yes.  OK.  This is an application, but I'm not sure that it

20   is written only according to what the family states.  Maybe

21   it's verified and then moves along to be ratified by the

22   institute itself.

23   Q.  Well, you have never actually worked for the Institute for

24   the Families of Martyrs and the Injured, right?

25   A.  Again, please.

F1Q8SOK4                        Shrenzel - cross

1   Q.  You work for Israel, right?

2   A.  I think that's evident, yes.

3   Q.  You have never worked for the PA?

4   A.  Well, if peace survives, I will be happy to do it, but so

5   far unfortunately not.

6   Q.  You have never actually been to an office of the Martyrs

7   Institute, have you?

8   A.  No, I haven't been inside.

9   Q.  You have never spoken to anyone who works at the Martyrs

10  Institute?

11  A.  No.

12  Q.  You have no idea if they verify the information that is

13  submitted on the application, do you?

14  A.  No.  I think they verify it because you have the decision.

15  We also read decision of the department.  He is acknowledged as

16  a martyr.  So if it's not verified so everyone can come in and

17  say, my son died of a certain disease and I want him to be

18  considered as a martyr.  This is not the case.  They must look

19  and find out that really this person was the shooter in the

20  case, in the event.

21  Q.  No one has ever told you that, correct?

22  A.  What?

23  Q.  No one has ever told you they have verified the identity of

24  the shooter, right?

25  A.  No, but you can deduct it very clearly if you see the

F1Q8SOK4                        Shrenzel - cross

1    information.  Then there is the commendations of the

2    supervisor.

3    Q.  So that's a deduction you have made, right?

4    A.  Yes.

5    Q.  It's based on reading the document?

6    A.  It's based on logic, yes.

7    Q.  It's not based on anything else?

8    A.  Sometimes logic is enough.

9    Q.  The information under the heading "short biography," that's

10   information that's provided by the family, right?

11   A.  I'm not sure.  I cannot say for sure.

12   Q.  You don't know?

13   A.  I don't know to what extent other people in the office are

14   involved.

15   Q.  You have no idea how that information got there?

16   A.  No.  For example, he was a corporal.  I believe if the

17   family said he was a major, it wouldn't have been written down

18   that way.  What I say is I think, or I assume, or I believe

19   that the Palestinian Authority give credit to the family's

20   version, but up to a certain extent.  And information regarding

21   his military career, etc. is being checked either in this way

22   or another.

23   Q.  But that's just what you think based on reading the

24   document, right?

25   A.  Yes.

F1Q8SOK4                      Shrenzel – cross

1    Q.  I want to talk about a different agency.

2    A.  Also about the logic of bureaucracy all over the world.

3    Q.  Let's talk about a different bureaucracy.  This one is

4    called the Ministry of Detainees Affairs and Ex-Detainees

5    Affairs.  You talked about that one, right?

6    A.  Yes.

7    Q.  This is another agency of the PA?

8    A.  Yes.

9    Q.  You have also never been to a Ministry of Detainees Affairs

10   office, right?

11   A.  No, I haven't.

12   Q.  You have never talked to anyone from the Ministry of

13   Detainees Affairs?

14   A.  As far as I recall, no.

15   Q.  The Ministry of Detainees Affairs, like the Martyrs

16   Institute, also has preprinted forms, right?

17   A.  You can show me and I will confirm it.

18   Q.  Let's look at what is in evidence as Plaintiffs' Trial

19   Exhibit No. 76, at page 9304.

20            MR. HILL:  Justin, if we can see the English

21   translation side by side with the Arabic version.

22   Q.  Do you see that, sir?

23   A.  Yes.

24   Q.  This is another form that has some typewritten information

25   and some handwritten information, right?

F1Q8SOK4                         Shrenzel - cross

1    A.  Yes.

2    Q.  This particular form pertains to someone called Nasser

3    Aweis, right?

4    A.  Yes.

5    Q.  As you can see on the Arabic -- again, remembering that

6    right is right and left is left -- the blanks that are filled

7    in are the name of the detainee, their number, and their

8    province, right?

9    A.  Yes.

10   Q.  So in the example we have before us, the only information

11   filled in by the person filling out the form was the name of

12   Nasser Aweis, his identity number, and the fact that he was

13   from the Nablus Balata refugee camp, right?

14   A.  Yes.

15   Q.  The rest of it is just something that is on the form?

16   A.  Yes.

17   Q.  So when Mr. Yalowitz asked you about whether or not Nasser

18   Aweis was detained in the prisons of the Israeli occupation as

19   a result of the fight for his country, he was just reading you

20   language on a form, right?

21   A.  Yes.  But it relates to -- there is a connection.  You have

22   to connect the dots between what is on the form and what was

23   filled in the blanks.  The whole idea of the form is this

24   person convicted in an Israeli jail, for multiple cases of

25   murder I remind you, he is considered to be serving his prison

F1Q8SOK4                          Shrenzel - cross

1  because of his, as it says here in the translation, his fight

2  for his country.

3  Q.  But this is the form used for all security detainees,

4  right?

5  A.  Maybe.  I don't know.  Maybe there are some diversions, but

6  basically yes.

7  Q.  So if someone is imprisoned by the Israelis for throwing

8  stones at soldiers, the form would be exactly the same, right?

9  A.  I don't know.  You have to show me.

10  Q.  You don't know?

11  A.  I cannot say for sure.

12  Q.  That's because all you're doing is reading the document,

13  right?

14  A.  No.  I read this document so I related to this document.

15  If you can show me a document of the stone thrower, I will

16  relate to it happily.

17  Q.  And the other documents we looked at, where people were

18  imprisoned as a result of the fight for their country, it's the

19  same form, isn't it?

20  A.  OK.

21  Q.  No one at the Ministry of Detainees Affairs is making a

22  determination about whether or not Nasser Aweis was fighting

23  for his country, right?

24  A.  Yes.  But the very fact that they chose this definition is

25  of importance as well.  And they know -- they didn't change the

F1Q8SOK4                          Shrenzel - cross

1    form because they didn't -- when the family came, they didn't

2    say, hey, wait a minute, you are a murderer, we cannot say that

3    you love your country, how can you love your country and then

4    kill innocent people in the center of Jerusalem?  They didn't

5    do it.  They attached his information to this form.  So the end

6    result is very clear.  The PA is stating that he is serving

7    multiple cases in prison, multiple imprisonment verdicts in

8    prison because of his love of his country.  That's their

9    definition.  If you want to show me about stone throwing, let's

10   see it.

11   Q.  There is a similar form for released prisoners, right?

12   A.  Again, please.

13   Q.  There is a similar form for released prisoners, right?

14   A.  Just remind me.

15   Q.  Let's look at what is in evidence as Plaintiffs' Exhibit

16   No. 26.  If we can look at page 7740.

17   A.  I'm with you, sir.

18   Q.  Again, this is another form that has handwriting and typing

19   on it?

20   A.  Yes.

21   Q.  This one pertains to ex-detainees?

22   A.  Yes.

23           Can you enlarge it a little bit.

24   Q.  Yes.

25           The language about completing his sentence in the

1    prisons of the Israeli occupation as a result of his fight for

2    his country, that's language that's on the form, right?

3    A.  Yes.

4    Q.  Sir, you mentioned that a number of the General

5    Intelligence Services files would reference a person's security

6    status or moral status, right?

7    A.  Yes.

8    Q.  And you also mentioned that that is usually a reference to

9    their conduct in prison, right?

10   A.  Yes.

11   Q.  Now, these GIS files that you have reviewed and have been

12   admitted in evidence, these are not publicly available in

13   Palestine, right?

14   A.  They probably are not.

15   Q.  These are the General Intelligence Services' private

16   records on individuals, right?

17   A.  Yes.

18   Q.  You would agree with me that one issue that all

19   intelligence agencies are concerned about is traitors, right?

20   A.  Yes.

21   Q.  Even Israeli intelligence worries about traitors, right?

22   A.  It's not the only subject, thank God, but I agree with you.

23   Q.  Intelligence agencies worry about certain characteristics

24   or qualities that might allow a foreign government to co-opt or

25   blackmail a citizen, right?

F1Q8SOK4                          Shrenzel - cross

1    A.  Yes, that's possible, yes.

2    Q.  For example, during the 1950s, the U.S. State Department

3    believed that any U.S. citizen who was a homosexual could be

4    blackmailed by the USSR and forced to spy for the Soviets,

5    right?

6              MR. YALOWITZ:  Objection.

7              THE COURT:  Sustained.  Let's get out of the 50s.

8    Q.  During this period of time, Israel was able to convince

9    some Palestinians to spy for Israel, right?

10   A.  Of course, yes.

11   Q.  One of the ways Israel was able to convince Palestinians to

12   spy for Israel was threatening to expose their moral problems,

13   right?

14   A.  No.  There is no evidence in the documents of the GIS.  Now

15   you're referring me to the issue of how Israel recruited

16   allegedly informants and this is not -- my testimony didn't

17   deal with it at all.

18   Q.  For example, the Israelis would try and recruit informants

19   who were gay by threatening to expose the fact that they were

20   homosexuals?

21   A.  I'm not aware of that.

22             MR. YALOWITZ:  Objection.

23             THE COURT:  Sustained.

24             MR. YALOWITZ:  I object to the line.

25   Q.  Let's look at what is in evidence as Plaintiffs' Trial

F1Q8SOK4                        Shrenzel - cross

1    Exhibit 148.

2            This is the GIS file for Mohamed Hashaika, right?

3    A.  Yes.

4    Q.  And Mohamed Hashaika was the bomber on the March 21, 2002

5    attack?

6    A.  Yes.

7    Q.  Let's look at page 9953.

8            MR. HILL:  Can you cull up the sentence that says "the

9    mother of the aforementioned."

10   A.  The mother is morally corrupt, that line?

11   Q.  That one right there.  "His mother is morally corrupt,"

12   that line.

13           It says, "His mother is morally corrupt and there are

14   security suspicions against her.  She used to use her house as

15   a brothel because the father is not sane."

16           That's what it says, right?

17   A.  Yes.

18   Q.  You also testified about promotions that prisoners

19   received, right?

20   A.  Yes, of course.

21   Q.  And you testified about a promotion that Ahmed Barghouti

22   received while he was in jail?

23   A.  Yes.

24   Q.  Let's take a look at what is in evidence as Plaintiffs'

25   Trial Exhibit No. 36C.  Look at page 8964.

F1Q8SOK4                          Shrenzel - cross

```
 1              MR. HILL:  Justin, if you can cull up the part under
 2      promotions there.
 3      Q.  On the last line it indicates he received a promotion from
 4      first sergeant to warrant officer by order 15999/3.  Do you see
 5      that?
 6      A.  Yes.
 7      Q.  It also indicates it was pursuant to presidential orders,
 8      right?
 9      A.  Yes.
10      Q.  Let me show you what is in evidence as Exhibit 105.
11              Do you see on the sign there, sir, where this
12      administrative order indicates that it is number 15999/3?
13      A.  Yes.
14      Q.  You would agree with me that the order that is Exhibit 105
15      is the same order that's being referred to in Exhibit 36C,
16      right?
17      A.  Yes.
18              MR. HILL:  Now if we could see the text from Exhibit
19      105.
20      Q.  It says, "The following first sergeants named in the
21      attached addendum from the roster of units that appears next to
22      their names followed by northern governorates are promoted to
23      the rank of warrant officer effective the date listed next to
24      their name with regard to rank, and November 1, 2008."
25              Do you see that, sir?
```

F1Q8SOK4                    Shrenzel - cross

1    A.  I do.

2            MR. YALOWITZ:  Objection.  Would it be possible to

3    allow the witness to see the entire document on this one?

4            THE COURT:  If you want to show him the entire

5    document, you can when you examine him.

6    Q.  The next sentence says says, "The total number of promoted

7    first sergeants is 1,484," right?

8    A.  Yes.

9    Q.  "The list begins with First Sergeant Mohamed Awad and ends

10   with First Sergeant Yusuf Al-Halahleh."

11           Let's go to page 9508 of Exhibit 105.

12           This is a page of this order promoting 1484 people,

13   right?

14   A.  Yes.

15   Q.  Ahmed Barghouti is number 1,052 on the list.  He is

16   actually on the next page.

17           Do you see that?

18   A.  I see it.

19   Q.  Let's go back to the first page.

20           You mentioned that this promotion was pursuant to

21   presidential orders, right?

22   A.  That's what was written on the document.

23   Q.  But this document, the actual order, it doesn't have

24   President Abbas's name on it, does it?

25   A.  It's some discrepancies in your client's bureaucracy.

F1Q8SOK4                    Shrenzel - cross

1   Q.   It's just a bureaucracy.  President Abbas didn't promote

2   Ahmed Barghouti, did he?

3   A.   No, he did.

4   Q.   Because he promoted 1400 other people on the same day?

5   A.   Of course he didn't interview each of them, but the basic

6   idea in my testimony was that while most of the others, I'm not

7   sure -- I didn't check the list, but most of them were in

8   service allegedly.  This Ahmed Barghouti was in an Israeli

9   jail, and he was promoted while serving multiple imprisonment

10  life sentences in Israeli jail.  That's the point.

11  Q.   And he was promoted along with 1484 people who were

12  promoted on the same day?

13  A.   The question is why, why was he promoted while being in an

14  Israeli jail, while not being able to serve on the ground?

15  Q.   Let's look at another one.  Let's look at Plaintiffs' Trial

16  Exhibit 48.

17           MR. HILL:   If we can cull out the section under

18  promotions.

19  Q.   This pertains to Ahmed Salah, right?

20  A.   Yes, sir.

21  Q.   This one indicates that he was promoted from first warrant

22  officer to honorary lieutenant by order number 4610/3, right?

23  A.   Yes.

24  Q.   Let me show you Exhibit 104, which is also in evidence.

25           This is another one of these administrative orders,

1    right?

2    A.  Yes, it is.

3    Q.  Similar to the one we just looked at?

4    A.  Yes.

5    Q.  This one is numbered 4610/3, right?

6    A.  Yes.

7    Q.  So that's the same order that was referenced in the

8    document about Ahmed Salah that we just looked at?

9    A.  It is.

10   Q.  This one indicates that the following first warrant

11   officers named in the attached addendum from the roster of

12   units that appears next to their names, followed by northern

13   governorates, are hereby promoted to the rank of honorary

14   lieutenant effective the date next to their names with regard

15   to rank and July 1, 2009 with regard to salary.  Do you see

16   that, sir?

17   A.  Yes.

18   Q.  Now, as you mentioned, a warrant officer is an enlisted

19   person, right?

20   A.  Yes.

21   Q.  And armies around the world differentiate between enlisted

22   men and officers, right?

23   A.  Yes, sir.

24   Q.  And the highest rank for an enlisted man in the Palestinian

25   Army is a first warrant officer, right?

F1Q8SOK4                         Shrenzel - cross

1    A.  Yes.

2    Q.  So then you can't be promoted above that unless you become

3    an officer, right?

4    A.  Yes.

5    Q.  In this instance, all of the first warrant officers on this

6    list are being promoted to something called honorary

7    lieutenant, right?

8    A.  Yes.

9    Q.  That's a title that's given to someone who has served so

10   long that they have exceeded the rank of first warrant officer,

11   right?

12   A.  Or maybe they excelled in their service.  I don't know.

13   Q.  You don't know?

14   A.  The exact reason why -- probably there were other

15   candidates.  Why were those 540 something chosen to be

16   promoted?

17   Q.  Do you know why Palestinians are promoted?

18   A.  Seniority, maybe excellence in service, I don't know.

19   Q.  Do you know if Palestinian promotions are based on merit?

20            You don't know, right?

21   A.  What do you mean I don't know?

22   Q.  You have never worked for this agency, you don't know how

23   they decide to promote people, do you?

24   A.  I have a general idea.  It's seniority, sometimes

25   excellence, and sometimes carrying out acts of terror.  This is

F1Q8SOK4                    Shrenzel - cross

1    the main point of my argument.

2    Q.  But that's your view.  You you have never actually worked

3    for this office that makes the promotions, have you?

4    A.  Well, may I ask you not to ask me a question if I was

5    employed by the PA.  This is ridiculous.

6    Q.  This is cross-examination, sir.  You have never worked for

7    this office, right?

8    A.  Right.

9    Q.  You have never been to this office, right?

10         MR. YALOWITZ:  Objection.

11         THE COURT:  Mr. Hill, you're cutting off the answer.

12   A.  What is the point of asking me about being --

13         THE COURT:  Sir, you can't talk when I am talking.

14   One person at a time.

15   Q.  You have never worked for the office that issued this

16   order, right?

17   A.  No, I didn't.

18   Q.  You have never been to that office, right?

19   A.  No, I haven't been there.

20   Q.  You have never spoken to anyone who works in that office,

21   right?

22   A.  This I cannot relate to.

23   Q.  You don't know if you have spoken to somebody who works in

24   this office?

25   A.  I cannot relate to.  I cannot tell you everything I did

F1Q8SOK4                    Shrenzel - cross

1    during my 20 years of service under the Israeli Intelligence
2    and Israeli Army.  I am not allowed to tell you everything I
3    did or did not.
4    Q.  The document says the number of promoted first warrant
5    officers totals 547, right?
6    A.  Yes.
7    Q.  It again tells us who is first and who is last, right?
8    A.  Yes.
9    Q.  Let's look at page 9506.
10          Ahmed Salah, who we are talking about, he is number
11   366 out of 547 on this list?
12   A.  Again, please.
13   Q.  Ahmed Salah, who we have been talking about, he is number
14   366 out of 547 on this order, right?
15   A.  Yes.
16   Q.  I am going to ask you a couple of questions about the March
17   21 attack.
18          You remember that Mr. Yalowitz had something up on the
19   screen that had the pictures of alleged perpetrators on it?
20   A.  I do.
21   Q.  One of those pictures was a picture of someone named Tawfiq
22   Tirawi, right?
23   A.  Yes.
24   Q.  Now, Mr. Tirawi was not convicted in connection with the
25   March 21, 2002 attack, was he?

F1Q8SOK4                         Shrenzel - cross

1    A.   Unfortunately, Israel was not able to capture him.

2    Q.   He was not convicted in connection with the March 21, 2002

3    attack, was he?

4    A.   And as a result of being uncaptured, he was not indicted

5    and neither convicted, yes.

6    Q.   So Tawfiq Tirawi was not convicted in connection with the

7    March 21, 2002 attack, right?

8    A.   As I said, he was not convicted.

9    Q.   Now, in the binder relating to the January 27, 2002 attack

10   there was a tab about Tawfiq Tirawi, correct?

11   A.   Yes, there was.

12   Q.   He was not convicted in connection with the January 27,

13   2002 attack either, right?

14   A.   Just because he was not brought to justice, he was not

15   indicted about it.

16   Q.   He was never charged and he was never convicted in

17   connection with the January 27, 2002 attack, correct?

18   A.   Yes.  But let's be accurate.  Because he was not in the

19   hands of the Israeli authority.  That's the only reason.  Were

20   he captured by the Israelis, as we really like to do, he would

21   have been indicted.  And, OK, I don't want to predict the

22   possible hypothetical results of the trial, but we have strong

23   evidence to his terrorist activity.

24   Q.   Mr. Shrenzel, Tawfiq Tirawi was not convicted of the

25   January 27, 2002 attack, was he?

F1Q8SOK4                           Shrenzel - cross

1    A.  The way you phrase the question might imply that he was

2    charged or was at trial and was not convicted.  There was no

3    trial.  He was not in our hands.  So he was not convicted.

4    That's it.

5    Q.  Mohamed Hashaika was the bomber for the March 21, 2002

6    attack?

7    A.  Yes.

8    Q.  At one point in time, Hashaika was a corporal in the

9    Palestinian police in Bethlehem, right?

10   A.  Yes.

11   Q.  But at the time of the attack on March 21, 2002, he was not

12   a PA police officer, correct?

13   A.  Again, please.  I'm not sure that he was from the Bethlehem

14   area that you mentioned.

15   Q.  Setting aside Bethlehem for the moment.  As of March 21,

16   2002, Mohamed Hashaika was not employed by the PA police,

17   correct?

18   A.  Yes.  But he was reinstated at least, as is reflected by

19   his salary, his family continuing to receive allocations.

20   There was no mention that the allocations did stop or something

21   like that.

22   Q.  Let's look at Plaintiffs' Trial Exhibit 9, which is in

23   evidence.

24   A.  It will be fruitful to refresh my memory on that, yes.

25   Q.  Can we look at page number 4499?

F1Q8SOK4                         Shrenzel - cross

1      You see, sir, that this document indicates payments

2      stopping after January of 2002, right?

3      A.  Yes.  To him personally, yes.

4      Q.  The bombing that Mr. Hashaika was involved in was in March

5      of 2002, correct?

6      A.  Yes.

7      Q.  So the documents that have been shown to the jury show that

8      as of March 2002, he was not getting paid by the PA, correct?

9      A.  Which to my opinion doesn't diminish their responsibility

10     for his activity.

11     Q.  The documents that have been shown to the jury indicate

12     that as of March 21, 2002, Mohamed Hashaika was not being paid

13     by the PA, correct?

14     A.  As to this very narrow aspect of payments, yes, that's

15     correct.  But as to the more general responsibility, and if you

16     remember, Mr. Tirawi that you mentioned before, in a letter to

17     Arafat he told him the matter is at your discretion.  He

18     announced that Hashaika was detained and interrogated and the

19     matter is at your discretion, he told the president of the PA,

20     and the result of this discretion or the results of the deeds

21     and misdeeds of the PA president, this person detonated himself

22     five weeks later.

23     Q.  Let's look at Plaintiffs' Trial Exhibit 148, which is in

24     evidence.

25          This is the GIS file for Mohamed Hashaika, right?

F1Q8SOK4                        Shrenzel - cross

1   A.  Yes.

2   Q.  Let's look at page 9953.

3           MR. HILL:  Justin, can you cull out the bullet that

4   starts with "originally"?

5   A.  You bring us back to his devious mother.  This is not so

6   fair for him.

7   Q.  Sir, the file says, "Originally the aforementioned intended

8   to perform his operation in the Netanya area, and he was

9   arrested in Tulkarm by the Palestinian Authority."

10          That's what it says, right?

11  A.  Yes.

12  Q.  It says, "He was transferred to Ramallah and was imprisoned

13  there."

14          That's what it says, right?

15  A.  Yes.

16  Q.  It says, "During the invasion into Ramallah, he escaped

17  from prison and intended to perform his operation through the

18  people of the Islamic Jihad, but then the Al Aqsa Martyrs

19  Brigades have taken him from them."  Do you see that, sir?

20  A.  I do.

21  Q.  Mr. Yalowitz did not read that portion of the GIS file to

22  you during direct, did he?

23  A.  I have to look at the transcript again.

24  Q.  Are you saying Mr. Yalowitz read the portion where it says

25  he escaped?

F1Q8SOK4                    Shrenzel - cross

1    A.  No.  I am not saying what Mr. Yalowitz read or did not

2    read.  I just don't remember.  I was here almost three days.

3    You want me to remember every sentence that Mr. Yalowitz read

4    from the documents?

5    Q.  You would agree this is the first time the members of the

6    jury have had their attention called to the fact that the file

7    says escaped?

8    A.  As an appreciation to your credibility, I will accept it,

9    but I really don't recall it.

10   Q.  I want to talk to you about the attack that took place --

11   A.  May I explain?  Do you have any questions regarding that?

12           THE COURT:  It is 2:00.  Unless you are going to wind

13   up a short area, I want to let the jury go.  I think a storm is

14   coming.

15           MR. HILL:  I have a little more to go.

16           THE COURT:  Is it all right to break right here?

17           MR. HILL:  Certainly.

18           THE COURT:  Ladies and gentlemen, we are going to

19   adjourn.  Don't discuss the case.  Keep an open mind.  I am

20   going to ask you to be here on Wednesday at 9:45.  I heard that

21   the schools just closed 15 minutes ago and I think this court

22   might be closed also.  So I will see you on Wednesday, we will

23   pick up there, and hopefully we will get back on schedule.

24           (Jury exits courtroom)

25           (Continued on next page)

F1Q8SOK4

1    THE COURT:  I am going to let you go.  The weather is

2    getting bad.

3    Let's get together at 9:15 on Wednesday.  We will have

4    about a half hour or so.

5    MR. YALOWITZ:  Did your Honor want to call the balls

6    and strikes on those remaining cross-designations?

7    THE COURT:  I still want to look at them some more.

8    It's a little difficult because you don't go line by line for

9    me with the cross-designations.  You have sort of objected to

10   every cross-designation.

11   MR. YALOWITZ:  Maybe I am misremembering.  I thought I

12   put in a letter Saturday, your Honor, that gave -- there were

13   about seven or eight that I objected to and the rest I had no

14   objection.

15   THE COURT:  It depends on which chart you're referring

16   to.  The chart that I thought you were referring to is what is

17   designated as Exhibit 6.

18   MR. YALOWITZ:  I don't think we need to deal with that

19   until the defendants' case, if ever.  I am only talking about

20   in the body of my letter, I thought we were in the middle of

21   that.

22   THE COURT:  We were.  I am just going to add one more

23   right now, but I will look at that again.  At this point let me

24   tell you the ones that I thought --

25   MR. YALOWITZ:  I'm sorry for the confusion.  That's

F1Q8SOK4

1   what I was getting at.

2          THE COURT:  Just quickly, I think we addressed page 27

3   of Jadallah.  And then Al-Sheikh, 140.  I don't remember what

4   page 140 was.

5          MR. YALOWITZ:  140 looks like the witness just asks a

6   question.  He doesn't understand the question so he asks a

7   question.

8          THE COURT:  I didn't see why 140 was an appropriate

9   designation, 21 through 25, and the next page, 5 through 14.  I

10  tend to agree with you on that, but we can discuss that

11  further.  You can look at it.  I will look at it more

12  carefully.

13         There was also another one that I had a problem with,

14  but it was unclear to me.  It was the part about the

15  interpreter section.  I think it was 204.  It's unclear to me

16  who is talking.  Is this just an exchange between the lawyers

17  and the interpreter or is this something being interpreted?

18         MR. HILL:  I wasn't there.  I believe it was an

19  exchange between the lawyers and the interpreter.  It's the

20  same document that there has been testimony here about.

21         THE COURT:  I know, but I have Mr. Sa'de and I have a

22  Mr. Shihada and Mr. Tolchin.  Mr. Tolchin is the lawyer.

23         MR. HILL:  Sa'de is an Israeli lawyer that represents

24  the witness and Shihada I believe was the interpreter.

25         MR. YALOWITZ:  This is a lawyer and an interpreter

F1Q8SOK4

1   bickering on the record.

2           THE COURT:  I have some concern.  We can talk about it

3   on Wednesday.  I have some concern with 204, line 4 through 12.

4   That seems to be just a confused conversation among lawyer and

5   interpreters.  It seems to me that the answer that was given is

6   1 through 3 and 13 through the end of the page is the answer

7   given.

8           MR. HILL:  The issue is the witness is speaking

9   Arabic.  What is happening the witness says something in

10  Arabic, and then the interpreter interprets it, and then the

11  lawyer disagrees with the interpretation.  So if we just get

12  the plaintiff's interpreter's view of what it means, you don't

13  get what actually happens at the deposition.

14          THE COURT:  I don't think the interpreter's

15  interpretation of what it means is the interpreter's job.  It

16  is to interpret the words that the witness said.  The question

17  was asked.  I assume that the interpreter interpreted the

18  question to the witness, and then the answer was given when the

19  witness said, I would like to explain.  That seems to be the

20  substantive evidence.

21          MR. HILL:  Your Honor is proposing to take out lines 4

22  through 12 and allow 13 and thereafter?

23          THE COURT:  That's my inclination.

24          MR. HILL:  That will be fine.

25          THE COURT:  Because I was even confused in trying to

F1Q8SOK4

1   figure out this exchange going back and forth between the

2   lawyer and interpreter.  I think Q and A is what goes before

3   the jury, but let me look at the rest.

4           Mr. Yalowitz, I think that was really the only

5   portions that I really had concern with that jumped out at me

6   as being beyond the scope or, in fairness, not being subject

7   matters related to issues and subjects that you want to put

8   before the jury.  I want to look at it a little more carefully

9   and also look at it in the context of their independent

10  designations.

11          I have been looking at the rule again.  I am going to

12  double-check the law.  I could be wrong.  But my understanding

13  of the rule is, if you offer the deposition testimony, they can

14  force you to read those portions that they say in fairness

15  should be read at the same time, and then they have the right

16  to read other portions from the deposition on their case that

17  they want read.

18          MR. YALOWITZ:  This is what I want to write to you

19  about because I think it's different where I am -- it's where a

20  party is represented at the deposition.

21          THE COURT:  I know but, quite frankly, that would

22  preclude both of your designations.

23          MR. YALOWITZ:  The defendants were parties represented

24  at deposition.

25          THE COURT:  That's not what the rule says.

F1Q8SOK4

1          MR. YALOWITZ:  Let me look at it again.

2          THE COURT:  The rule says that the parties were

3    represented there.  It doesn't say just one party.  I

4    understand if you were offering this as some sort of admission

5    or something like that by a party opponent.  I don't think

6    that's the way the rule works.

7          MR. YALOWITZ:  As I said, I got this last night and I

8    haven't drilled down into the words of the rule.

9          THE COURT:  Neither have I.  I have done some quick

10   research.  I can't find anything in the circuit.  But my

11   recollection of the rule, the general rule, is you can't do

12   what you want to do, sort of I want to use the deposition and

13   say it's fair for me to use the deposition for any portion I

14   want to use it for, but the other side can't use it for any

15   purpose, even though I am the one putting the witness's

16   testimony in.

17         MR. YALOWITZ:  As I said, rather than speak in the

18   abstract, I want to look at that, give you something in

19   writing.  That's not something that we need to deal with for

20   Wednesday because Wednesday we just have to deal with their

21   little cross-designations.  When it comes to their case in

22   chief, they may have a narrower set of things that they want to

23   use, and I may not actually care about it.  So I will look at

24   the law and research it and give you something in writing so we

25   have it nailed down, but I don't think we need to deal with

F1Q8SOK4

1    that bigger issue for Wednesday.  But I will try to get you

2    something.  I don't know if I can get it to you tomorrow.

3              THE COURT:  Quite frankly, they are a little bit in

4    the same situation.  If they say you can put your stuff in,

5    then I guess they can say they can put their stuff in.  But

6    they can't say you can't put your stuff in, but we can put our

7    stuff in.  It doesn't work that way.  Either it's all in or

8    it's all out.  You can't just pick and choose and decide you

9    object to the other side's and you just want yours.

10             MR. YALOWITZ:  Let's both look at it, and we will both

11   be more educated when we have done that.

12             MR. ROCHON:  I am just rising on a scheduling issue.

13   If this was the District of Columbia, the court would be closed

14   about a month.  On the off-chance that Wednesday is an issue,

15   how do we learn that?  Does the court contact us?

16             THE COURT:  We will try to contact you as soon as we

17   know.  Quite frankly, the last time we had a snow day, we were

18   told 5:00 in the morning the court wasn't going to open.

19             Also, there is a phone number we can give you to call

20   that will say whether the court is open or closed.

21             MR. ROCHON:  That will be great.

22             THE COURT:  Otherwise we will reach out to you to let

23   you know as soon as we know.

24             MR. ROCHON:  Thank you. .

25             (Adjourned to January 28, 2015, at 9:15 a.m.)

```
1                    INDEX OF EXAMINATION

2    Examination of:                        Page

3    ISRAEL SHRENZEL

4    Direct By Mr. Yalowitz . . . . 1420

5    Cross By Mr. Hill  . . . . . . 1477

6                    PLAINTIFF EXHIBITS

7    Exhibit No.                        Received

8     116, 1196 and 1197  . . . . . . . . . . . .1421

9     185   . . . . . . . . . . . . . . . . . . .1473

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```